UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>FEDERAL INSURANCE COMPANY,<br>an Indiana corporation,<br><br>　　　　Defendant. | Court File No. 16-cv-1054 (WMW/DTS)<br><br><br>**MEMORANDUM IN OPPOSITION<br>TO PLAINTIFF'S MOTION TO<br>COMPEL DISCOVERY**<br>REDACTED |

## **INTRODUCTION**

Under the Copyright Act, a plaintiff is entitled to recover profits that are "attributable to" the alleged infringement. Before FICO is entitled to discovery of any profit or revenue numbers, however, it must demonstrate that the profits and revenues it seeks are relevant (*i.e.*, have a causal connection to the alleged infringement).

FICO contends that it is entitled to disgorge Federal's profits not based on any sales of FICO's copyrighted work but based on Federal's use of internal software, which FICO asserts helps make Federal's operations more efficient. Numerous courts have rejected similar attempts to pursue profits based on such far-reaching software-use claims. Likewise, FICO cannot recover any profits based on such tenuous assertions. Moreover, because FICO has not shown any causal connection between any of Federal's profits or revenues and any alleged infringement, it has not shown that it is entitled to discovery of any of Federal's revenues or profits.

## BACKGROUND

### I. THE PARTIES AND THE LICENSE AT ISSUE

Federal is an insurance company that provides property and casualty insurance products and services. (*See* Dkt. No. 36 ¶ 11.) FICO designs and develops predictive analytics and decision management software. (*Id.* ¶ 8.) One of the software tools offered by FICO is the FICO® Blaze Advisor® ("Blaze Advisor"), a business rules management system used to design, develop, execute, and maintain rules-based business applications. (*Id.* ¶ 9.) FICO asserts that it maintains copyright registrations for different versions of Blaze Advisor. (*Id.* ¶ 10.)

In June 2006, the parties entered into a Software License and Maintenance Agreement (the "License") for the use of Blaze Advisor. (*Id.* ¶ 12; *see also* Dkt. No. 1-2.) The final version of the License provided a perpetual, fully-paid, enterprise-wide license without a limit on the number of seats. (*See* Dkt. No. 1-2 at 12, 20.)

### II. FICO'S ASSERTED CLAIMS ARE TENUOUS AT BEST

For nearly ten years, Federal used Blaze Advisor software under the License with the support and assistance of FICO. In January 2016, Federal's corporate parent, The Chubb Corporation, merged with and into ACE INA Holdings, Inc., with ACE INA Holdings, Inc. as the surviving entity. (*See* Dkt. No. 36 ¶ 14.) Although FICO does not allege any facts that Federal's use of the software expanded or changed after the merger, it asserts that the merger of Federal's **corporate parent** was a violation of the non-assignment provision in Paragraph 10.8 of the License. (*See id.* ¶¶ 15-16.) Contrary to FICO's assertion, the non-assignment provision does not apply to upstream or

downstream corporate events—only a change of control or acquisition of the Client. (*See* Dkt. No. 1-2 at 9.) FICO's apparent reading of the License is that without any change in the use of the Blaze Advisor software, the perpetual, fully-paid License evaporated because there was an upstream change in the corporate family. On that ground, FICO now demands that Federal pay it $4,671,000 per year—more than 30 times the annual value of the existing License—to use software it already purchased. (*See* Dkt. No. 52-1 at 8-9.) This is a stretch at best.

FICO also alleges that Federal disclosed, and permitted access to, the software to third parties in the United Kingdom, Canada, and Australia. (*See id.* ¶ 22.) It asserts that this was a breach of the restrictions in Paragraph 3.1. (*Id.* ¶¶ 23, 25.) FICO fails to acknowledge, however, that such use of the software was done with FICO's knowledge and acquiescence for many years. For example, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (*See* Declaration of Nikola L. Datzov, dated February 5, 2018 ("Datzov Decl.") Ex. H at 1.) In March 2015, in response to ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ - (*Id.* Ex. I at 1.) In an April 2015 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (*Id.* Ex. J at 1.) Similarly, a June 2012 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉



███ (*Id.* Ex. K at 2.)  An October 2015 ███

███ (*Id.* Ex. L at 2.)  In a February 2015 ███

███ (*Id.* Ex. M at 1.)

All of the above is consistent with ███

███ (*Id.* Ex. N at 1.)  Only after beginning to pursue its merger-assignment theory in January 2016 did FICO begin to complain about use of Blaze Advisor outside the United States.  This is yet another unavailing attempt to pursue additional fees for use that was already covered by the fully-paid License.

FICO's final breach of contract claim is that based on its alleged termination of the License for the above alleged breaches, Federal breached the obligations of Paragraph 9.3, relating to post-termination obligations.  (*See id.* ¶¶ 29-32.)  However, without any breach to Paragraph 10.8 or Paragraph 3.1, there can be no breach of Paragraph 9.3.  FICO also asserts derivative claims that the alleged unauthorized disclosure and post-termination use of the software infringed FICO's copyrights.  (*See id.* ¶¶ 37-40, 44-47.)

**ARGUMENT**

**I.    THE COPYRIGHT ACT ALLOWS RECOVERY ONLY OF PROFITS THAT ARE ATTRIBUTABLE TO THE ALLEGED INFRINGEMENT**

Under the Copyright Act, a copyright owner may recover only those "profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). The copyright owner must first "present proof [] of the infringer's gross revenue," and then the defendant may present evidence of "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* Importantly, "the copyright holder must first establish some connection or relationship between the infringement and the profits he seeks." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 799 (8th Cir. 2003). "When an infringer's profits are only remotely and speculatively attributable to infringement, courts will deny recovery to the copyright owner." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).

Moreover, "[i]t is not enough to show an infringement and then seek all of the defendant's profits, from whatever source." *Andreas*, 336 F.3d at 799. Thus, a copyright owner must first show the causal connection between the gross revenues it intends to rely on and the alleged infringement. *See, e.g.*, *id.*; *Bell v. Taylor*, 827 F.3d 699, 710 (7th Cir. 2016) ("[A] plaintiff must show a causal nexus between the infringement and the gross revenues."); *Polar Bear*, 384 F.3d at 711 ("[T]he copyright claimant must first show a causal nexus between the infringement and the gross revenue...."); *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 2013 WL 5970065, at *3 (S.D.N.Y. Nov. 8, 2013) ("A copyright

owner bears the initial burden of demonstrating a causal nexus between the infringement and the appropriate gross revenues.").[1]

While the burden of proof in showing the causal connection for direct and indirect profits is statutorily the same, courts have recognized that it is inherently more difficult to show the required connection when seeking indirect profits. *Andreas*, 336 F.3d at 796 ("We agree that in an indirect profits case the profits 'attributable' to the infringement are more difficult to quantify."); *Sullivan v. Flora, Inc.*, 2017 WL 1487624, at *1 (W.D. Wis. Apr. 25, 2017) (citing cases and explaining that "where the sales are *not* of the infringing products themselves, like a t-shirt, book cover or poster with the copyrighted work on it, but rather of infringing advertising, plaintiff's burden to prove a casual nexus is admittedly much more challenging, because it involves proof based on indirect profits"); *Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*, 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25, 2013) (explaining that such damages are "at-best highly speculative").

## II.   REVENUES NOT ATTRIBUTABLE TO ANY INFRINGEMENT HAVE NO RELEVANCE AND ARE NOT DISCOVERABLE

As the Court knows, and as FICO acknowledges, the amendments to the Federal Rules of Civil Procedure in December 2015 narrowed the scope of discoverable information. Under the amended rule governing the scope of discovery, "[p]arties may

---

[1] FICO appears to apply the wrong standard under Sixth Circuit law, arguing it need not show "a causal connection" but only a "reasonable relationship." (*See* Dkt. No. 60 at 15.) This is not the law in the Eighth Circuit. *See Andreas*, 336 F.3d at 797 ("[I]n order to meet his **burden of a causal connection**…." (emphasis added)). As evidenced above, the Sixth Circuit approach is also contrary to other circuits to address the issue.

obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). No longer can parties pursue discovery that itself is irrelevant but may ultimately lead to the discovery of admissible evidence. Accordingly, FICO must show that any revenues or profits it seeks are relevant to its claim for damages.

A party is not permitted discovery into damages that it ultimately cannot recover. *See, e.g.*, *Young v. Appalachian Power Co.*, 2008 WL 11378834, at *1 (S.D. W. Va. May 15, 2008) ("Since royalties are not a recoverable element of damages under the facts of this case, the amount of income derived by the defendant from the transmission of electricity over the plaintiffs' land falls outside the scope of discovery prescribed by the Federal Rules."); *STC.UNM v. Intel Corp.*, 2011 WL 13115859, at *1-2 (D.N.M. May 31, 2011) (denying motion to compel lost profits information based on "accelerated market entry" theory, even though the theory was "a recognized theory of damages in patent litigation," because, "notwithstanding the broad scope of discovery," the court "cannot at this time envision a scenario where Plaintiff could recover lost royalties" under such a theory); *Virgin Islands Water & Power Auth. v. Pub. Servs. Comm'n*, 2002 WL 31309607, at *4 (Terr. V.I. Sept. 24, 2002) ("[B]ecause McKenzie cannot recover [such] damages…, its financial records…are not relevant to that lawsuit, and therefore not discoverable…."). Because only those revenues that have a causal nexus to the alleged infringement are potentially recoverable, only revenues with such a causal nexus are relevant to FICO's claim for damages. Indeed, even FICO does not appear to argue that

it is entitled to pursue discovery of revenues that have no connection to the alleged infringement.

This is precisely why courts have denied discovery of profits and revenues where a party fails to establish the required causal nexus. *See, e.g.*, *Bell*, 827 F.3d at 710 (affirming denial of motion to compel profits information because "even if the tax returns showed an increase in profits during the time the photo appeared on the defendants' websites, [the plaintiff] could not establish a nexus between the increased profits and the use of his photo," despite the assertion that "there [was] significant evidence…[that] ***would*** establish a causal nexus" (emphasis added)); *Gray v. Perry*, 2017 WL 1240740, at *10 (C.D. Cal. Apr. 3, 2017) ("[T]he complexity and conceptual difficulties involved in plausibly demonstrating any such causal link, as well as the issues of apportionment it might entail, caution against compelling disclosure of defendants' concert revenue information at this stage of the litigation."); *Lucky Break Wishbone Corp. v. Sterling Jewelers Inc.*, No. CV 10-4394 (PAM/JJG), 2011 WL 13233570, at *6 (D. Minn. Aug. 23, 2011) (denying motion to compel because plaintiff "ha[d] not shown the ***requisite causal connection*** between the use of the [copyrighted work]…and [the defendant]'s total gross sales during that period" (emphasis added)); *Classical Silk v. Dolan Grp.*, 2015 WL 12914322, at *2 (C.D. Cal. Nov. 4, 2015) (denying motion to compel "generation and production of the detailed financial records" to pursue disgorgement of profits because of lack of causal nexus).

The three cases relied on by FICO allowing discovery of profits are not binding on this Court and are entirely distinguishable. (*See* Dkt. No. 60 at 20-21.) First, all three

cases were decided prior to the December 2015 amendments and apply the former, broader scope of relevance. *See, e.g.*, *Zimnicki v. Gen. Foam Plastics Corp.*, 2011 WL 833601, at *2 (N.D. Ill. Mar. 3, 2011) ("[T]he request is reasonably calculated to lead to the discovery of evidence…."). Second, they are contrary to the more recent cases applying the current scope of discovery and this Court's earlier case law requiring a causal connection at the discovery stage. Finally, the causal connection of profits to the infringing use in those cases is nothing like the tenuous nexus asserted here based on use of software that allegedly makes a company's operations more efficient. *See Zimnicki*, 2011 WL 833601, at *1 (seeking profits for copyright infringement based on sales of decorative deer copyrighted by plaintiff and other products marketed together); *Oceans of Images Photography, Inc. v. Foster & Smith, Inc.*, 2012 WL 5878092, at *1 (M.D. Fla. Nov. 21, 2012) (seeking profits for copyright infringement based on use of plaintiff's photographs in marketing materials); *Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 589, 590 (W.D.N.Y. 1996) (seeking profits for copyright infringement based on film and screenplay that "used significant portions of Plaintiffs' original screenplays"). Accordingly, these cases are inapposite.

To the extent FICO argues that it may discover Federal's actual revenues before it has shown that any such revenues have a causal nexus to the alleged infringement, it puts the proverbial cart before the horse. FICO has no need for discovery regarding revenues it cannot recover. Therefore, before FICO is entitled to any discovery of Federal's revenues or profits, it must first identify the specific revenues and profits it seeks and

present evidence of their relevance (*i.e.*, that those specific revenues have a causal nexus to the alleged infringement).

## III. FICO HAS NOT SHOWN THAT ANY OF FEDERAL'S REVENUES ARE ATTRIBUTABLE TO ITS USE OF INTERNAL SOFTWARE

FICO argues that the Blaze Advisor software allows Federal's business to be more efficient but fails to present any evidence of a causal connection that use of Blaze Advisor contributed to sales of any products or any of Federal's profits.

As FICO acknowledges, the most common claim for profits exists when an infringer sells the copyrighted work (*i.e.*, direct profits). (Dkt. No. 60 at 16.) Federal does not sell Blaze Advisor software, and FICO acknowledges that it is not seeking direct profits. (*See id.*) Thus, cases FICO relies on allowing recovery of direct profits are entirely inapplicable. FICO also cites cases in which a copyrighted work was used, for example in advertising, to sell other products (*i.e.*, indirect profits). But FICO does not—and cannot—show that Federal used Blaze Advisor to sell any products. For example, FICO presents no evidence of Federal touting or relying on Blaze Advisor software to make a sale to a customer. Instead, FICO argues that internal use of Blaze Advisor makes Federal's business more efficient. (*See* Dkt. No. 60 at 9.) Courts have consistently found no causal connection based on allegations of such a tenuous connection of indirect profits.

For example, in *IBM*, the alleged infringer was "an inter-dealer broker, which serve[d] as an intermediary between financial institutions in transactions involving a variety of securities and financial instruments and whose revenue [was] derived from

commissions charged on such transactions." 2013 WL 1775437, at *3. "[The defendant] use[d] software, including [the copyrighted software], for its back-office functions, such as administratively processing trades after their execution and generating various reports and invoices." *Id.* The parties acknowledged that the copyrighted software was "integrally important to the operations of [the defendant] and its ability to service its customers" and that "manually inputting massive volumes of trade data" without the software would be a big detriment. *Id.* Nevertheless, the court found that there was not a sufficient "'causal link' between the infringement and the revenues." *Id.* at *4. The defendant "did not market or sell the [copyrighted] software to its customers and there [was] no evidence that its customers cared what software system it used." *Id.* The defendant's "customers [were] unaware of which software suite [was] used to process their trades and are agnostic as to [the defendant]'s internal operations." *Id.* at *3. As such, the court reasoned that "[w]hile [the defendant] ***may have profited*** from using [the copyrighted software] indirectly in that ***it enabled [the defendant] to operate more efficiently***, courts often deny recovery if the profits are only remotely or speculatively attributable to the infringement." *Id.* at *4 (emphasis added) (internal quotation marks omitted). Alleging that the software was "integral" or "important" was "insufficient, particularly where, as part of [the defendant]'s information technology infrastructure, it comprise[d] only a portion of what enabled [the defendant] to conduct its business profitably." *Id.*

Similarly, in *Complex Systems*, the plaintiff sought profits based on the defendant's continued infringing use of software "used to facilitate certain banking

transactions." 2013 WL 5970065, at *1. The software—similar to Blaze—was "a component-based solution designed to provide end-to-end *automation* of the full range of trade finance processing, and to *streamline* trade processing and other trade finance activities." *Id.* at *5 (emphasis added). The plaintiff argued that it was entitled to pursue "revenue stemming only from transactions processed through [the software]." *Id.* at *11. The district court disagreed on numerous grounds. First, although "it [was] clear that [the software] [was] related to and support[ed] [the defendant]'s work in the trade finance sector—specifically by processing letters of credit and guarantees for [the defendant]—[the plaintiff] [] failed to identify the ways in which [the defendant]'s profits [were] *attributable specifically* to [the software]." *Id.* at *11 (emphasis added). Second, even though one of defendant's documents referred to the software as "critical to increasing the company's trade revenues, [the plaintiff] [did] not provide[] evidence that [the software] was itself responsible for any revenue generated by [the defendant] years later." *Id.* at *12. Third, the defendant did "not promote its use of [the software] to its customers—[the defendant]'s customers [did] not care what specific software or technology [the defendant] use[d] to deliver a trade finance service or product to them"—and there existed a number of comparable software alternatives. *Id.* at *11-12. Moreover, there was no evidence of any instance "in which [the defendant]'s customer or prospective customer hired [the defendant] specifically because of [the defendant]'s utilization of [the software]." Although the defendant's "capacity to provide trade finance services to its customers was perhaps aided by its use of [the software], the services provided by [the defendant] are the result of a number of other factors as well."

- 12 -

*Id.* at *12. The "mere connection or usage [of software] alone [is] insufficient—…a copyright owner must meet the statutory requirement of showing attribution." *Id.* at *5. As such, the defendant's use of internal software was insufficient to establish a causal connection to any of the defendant's revenues—even for those transactions processed with the infringing software.

In yet another software case, the court found that a plaintiff failed "to acknowledge the significant disconnect between the profits of a medical supply business and the internal use of a particular accounting software." *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, 2012 WL 3306575, at *3 (E.D.N.Y. Aug. 13, 2012). The court explained that the company's "gross profits were not generated through selling the [infringing] software or somehow referring to it in advertisements or promotions, but rather were the end result of [the defendant]'s business of selling medical supplies to customers who apparently had no knowledge of or interest in the brand of internal management software used at the company." *Id.* "[M]erely showing that the software was an important tool in the internal operations of the [the defendant]'s business does not establish a sufficient causal connection under the DMCA between [the defendant]'s gross profits and either the acts of circumvention or the continued use of [the software]." *Id.* at *4. As such, the court concluded that the "plaintiffs [here have not drawn an adequate connection between [the defendant's] gross profits and the [copyrighted] software." *Id.* at *3.

Here, FICO makes the same unavailing arguments rejected by the courts above. FICO does not assert that Federal promotes the software to its clients or that clients seek

Federal's products or services because of the software.  Nor does FICO assert that Federal uses the software to determine the appropriate rules for insurance processing.  Instead, FICO merely asserts that the software is used "to automate [] insurance underwriting and renewal processes"—in other words, to improve efficiency.  (Dkt. No. 60 at 3.)

While FICO argues that Federal's documents demonstrate a nexus between Blaze and profits, (*see* Dkt. No. 60 at 9-10), the actual documents belie any such assertion.  For example, FICO relies on several slides of a PowerPoint presentation.  ***None*** of those slides suggest that Blaze Advisor "directly leads to more sales."  (*Id.* at 9.)  In fact, there is no reference to Blaze Advisor whatsoever in any of those slides.  (*See* Erbele Decl. Ex. 7 at 18 and 26.)  The quotes FICO relies on are referring to automated underwriting software, which Blaze Advisor is not.  (*See id.*)  As FICO admits, Blaze Advisor is a "business rules *management* system."  (Dkt. No. 60 at 3 (emphasis added).)  Blaze Advisor merely helps manage the rules developed by Federal to be eventually used by other applications.[2]  To the extent FICO wants to argue that some other company's automated underwriting software—as opposed to Blaze Advisor—drives revenue growth, it does not stand in those shoes.

---

[2] Because FICO cannot show the required nexus for Federal's use of the software, FICO makes assertions with regard to how ***other*** companies use Blaze Advisor.  (*See* Dkt. No. 60 at 13-14).  Other companies' use, or revenues attributable to such use, have no bearing whatsoever on how ***Federal*** used the software, much less on whether any ***Federal*** revenues have a causal nexus to the alleged infringement.  FICO's argument that "Blaze Advisor® Drives Revenue Growth in the Insurance Industry"—not at Federal—is irrelevant.  (*Id.* at 9.)

The mere fact that Blaze might allow Federal to operate its business more efficiently does not show a sufficient causal nexus under the Copyright Act to allow disgorgement of profits.  Under FICO's theory of the law, Microsoft could seek the revenues of a law firm that used an unlicensed copy of Word merely because Word helps the law firm manage its briefs and write briefs faster than relying on typewriters.  This is not the law.  *See, e.g.*, *Int'l Bus. Machines Corp.*, 2013 WL 1775437, at *4 n.7 ("Defendant could not operate without its toilets either, but that does not mean that all of its profits are attributable to commodes." (internal quotation marks omitted)).  Because FICO has not shown any evidence that Blaze Advisor contributed to sales of Federal's products, it is not entitled to discovery of Federal's revenues or profits.  *See, e.g.*, *Bell*, 827 F.3d at 711 ("There is no evidence suggesting that Cheatham attracted more clients because of Bell's photo.")

## IV.    FICO'S DISCOVERY REQUESTS FAIL TO IDENTIFY WHAT SPECIFIC REVENUES IT BELIEVES ARE ATTRIBUTABLE TO ANY ALLEGED INFRINGEMENT

Even if FICO could in theory identify some revenues that are attributable to some use of Blaze Advisor—which it cannot—its discovery requests do not identify with sufficient specificity any such revenues.  As explained above, before FICO can seek discovery of revenues, "a *causal* link between [the software] and [the sought] revenues must be established: profits must be *attributable* to [the software], not just touch the application in some way."  *Complex Sys.*, 2013 WL 5970065, at *6.  "[I]nclusion of each separate revenue stream requires an independent determination of causal nexus."  *Id.* at *7.

Here, FICO's discovery requests do not identify any specific revenues that are relevant to any alleged infringement.  Instead, FICO's discovery requests attempt to place the burden on Federal to identify which revenues relate to the alleged infringement.  For example, Interrogatory No. 6 asks to "[i]dentify all Persons known to you to have knowledge of Federal's revenues and profits…if any, *attributable to the use of the Blaze Advisor® software*."  (*See* Erbele Decl. Ex. 5 at 4 (emphasis added).)  Similarly, Requests for Production Nos. 30-32 seek "gross and net revenues, and gross and net profits, *derived from*…each line of business…to use the Blaze Advisor® software."  (*Id.* Ex. 4 at 12-13.)  Federal's position is there are *no* profits attributable or derived from the use of Blaze Advisor software.  Federal can neither identify nor produce what it contends does not exist.  It was FICO's burden to first identify the *specific* revenues it seeks and second demonstrate the causal connection of those specific revenues to any alleged infringement.  Because it cannot meet this burden, FICO asks Federal to do its bidding.  No discovery rule requires Federal to perform such analysis on FICO's behalf.

Without the required explanation of which revenues are attributable to any alleged infringement, FICO's requests would broadly seek *all* revenues and profits from *any entity* (not even just Federal) that has in any way used Blaze Advisor software.  (*See id.*)  The mere use of software is insufficient to show any causal nexus to the alleged infringement.  *See, e.g.*, *Complex Systems*, 2013 WL 5970065, at *5 ("[M]ere connection or usage [of software] alone [is] insufficient—…a copyright owner must meet the statutory requirement of showing attribution.")  There is simply no responsive information to FICO's discovery requests.

## V. FEDERAL FULLY ANSWERED INTERROGATORY NO. 4.

FICO's three-part interrogatory asks to:

(1) "Identify every software application and/or system…that utilizes in any way the Blaze Advisor software";
(2) "Identify all Persons known to you to have knowledge of each such software application and/or system"; and
(3) "Identify all documents relating to each such software application and/or system."

As to the first part of the interrogatory, FICO admits that Federal's answer "provided a list of its software applications and systems that use the Blaze Advisor® software." (*See* Dkt. No. 60 at 18.) While FICO now asks Federal "to identify which businesses employ those applications and systems," (*see id.*), FICO's discovery request does not call for that information. As to the second and third parts, Federal properly objected to the request as unduly burdensome, overbroad, and not seeking information relevant to any claim or defense. (*See* Erbele Decl. Ex. 3 at 5-6.) As explained in Federal's letter response to FICO's requests, the applications and systems identified in part one have been in place for numerous years and have been used by people across a large corporate family, not only with regard to Blaze Advisor. Asking Federal to identify virtually every person and every document that relates to its business is overbroad and improper. FICO makes no attempt to demonstrate why such broad requests for information relating to such systems seek relevant evidence. (*See* Dkt. No. 60 at 18.) In response to Interrogatory Nos. 2 and 3, Federal already identified a number of individuals with knowledge regarding use of Blaze Advisor. (*See* Erbele Decl. Ex. 3 at 3-4.) This is more than sufficient, especially

given that FICO has refused to identify which versions of Blaze Advisor it believes were used or distributed without authorization.

## CONCLUSION

FICO has not shown any causal connection between the broad discovery of revenues and profits it seeks and the tenuous infringement it alleges. Because FICO has failed to show that such revenues are relevant to the damages it seeks, the Court should deny the motion to compel.

Respectfully submitted,

Dated: February 5, 2018

s/ Nikola L. Datzov
Lora M. Friedemann (#0259615)
lfriedemann@fredlaw.com
Nikola L. Datzov (#0392144)
ndatzov@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

*Attorneys for Defendant*

63204918