# EXHIBIT A

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     Fair Isaac Corporation,        )   File No. 16-CV-1054
4                                   )            (WMW/DTS)
             Plaintiff,             )
5                                   )
     v.                             )   Minneapolis, Minnesota
6                                   )   February 14, 2018
     Federal Insurance Company,     )   3:30 p.m.
7                                   )
             Defendant.             )
8    ------------------------------------------------------------

9           BEFORE THE HONORABLE DAVID T. SCHULTZ
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
10         **(AUDIO TRANSCRIPTION OF:  MOTIONS HEARING)**

11   **APPEARANCES**
      **For the Plaintiff:**          **MERCHANT & GOULD, PC**
12                                     **ALLEN HINDERAKER, ESQ.**
                                       **HEATHER KLIEBENSTEIN, ESQ.**
13                                     80 S. 8th St., #3200
                                       Minneapolis, Minnesota 55402
14
      **For the Defendant:**          **FREDRIKSON & BYRON, PA**
15                                     **NIKOLA DATZOV, ESQ.**
                                       **LORA MITCHELL FRIEDEMANN, ESQ.**
16                                     200 S. 6th St., #4000
                                       Minneapolis, Minnesota 55402
17
      Transcribed by:             DEBRA BEAUVAIS, RPR-CRR
18                                 300 S. 4th St., #1005
                                   Minneapolis, Minnesota 55415
19

20

21

22       Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3          THE COURT:  Okay.  All right.  We are on the

4    record in the matter of Fair Isaac Corporation v. Federal

5    Insurance Company, Case No. 16-CV-1054.

6          Will counsel for the plaintiffs note your

7    appearance for the record, please.

8          MR. HINDERAKER:  Your Honor, for the plaintiff

9    from Merchant & Gould, Allen Hinderaker and Heather

10   Kliebenstein, and also for in-house at Fair Isaac, James

11   Woodward.

12          THE COURT:  Very well.  Good afternoon, everyone.

13          And for the defendant.

14          MR. DATZOV:  Good afternoon, Your Honor.

15   Fredrikson & Byron on behalf of the defendant, Federal

16   Insurance Company.  My name is Nikola Datzov, and with me is

17   Lora Friedemann.

18          MS. FRIEDEMANN:  Good afternoon.

19          THE COURT:  Good afternoon.

20          Here's what I would like to do in terms of how we

21   handle this:  Jeff Keyes used to do this, and I'm going to

22   take his process or his procedure.  What I'd like to do --

23   first, we'll start with the defendant's motion to compel.

24   It was the first filed.  And if I can have both, whoever

25   from the defendants and whoever from the plaintiffs are

 1     going to argue this, if you would both just go to the podium

 2     with me -- or with each other, rather.  I'd like to just

 3     start there.  And I'll just let you know it's my intention

 4     to get through these fairly quickly.  And I don't want to

 5     keep you from arguing or saying things that you feel need to

 6     be said, but I also have some questions.

 7              So if we start with the requests for production

 8     that the defendants seek to compel, 16 to 19, which I would

 9     lump together as a group -- actually, let me stop for a

10     second.  I see you both with some level of technology.  Do

11     you need either the document camera or anything?

12              MR. HINDERAKER:  I do not, Your Honor.

13              MR. DATZOV:  I do not, Your Honor.

14              THE COURT:  Okay.  I would lump those four

15     together as being documents relating to other licenses and

16     the revenues or license fees that relate to them, and then

17     you have the sort of omnibus request for all licensing

18     agreements, which is number 19.

19              So start with the defendant.  Why do you think

20     those are relevant, and why do you -- well, start there.

21     Why are those relevant to this case?

22              MR. DATZOV:  Sure, Your Honor.  And I think when

23     we -- when I was approaching the issue of the licensing

24     revenues, based on the objections that I saw from FICO, I

25     was really taking the licensing agreements and the licensing

1     revenues together as one discovery.  But I think the

2     objections that I've seen from FICO apply to each one.

3          So with regard to relevance, the revenues,

4     specifically just the amounts, not taking into account the

5     agreements that go with them, which would mean any licensing

6     agreement that includes amounts, but just literally the

7     gross numbers, those are relevant because they provide

8     another way of us calculating damages.  That's information

9     that we would eventually provide to our expert to say, okay,

10    well, let's look and see what the revenues for the software

11    at issue in this case was doing.  Was there a decline in the

12    value of the software?  Were they able to sell the software?

13    All of that would be complimentary to ultimately what the

14    value of the software license in any given year would be.

15    And I'm sure that that evolves.

16          THE COURT:  Is it not the case -- I think

17    Mr. Hinderaker's response to that is something on the order

18    of but this is a breach-of-contract case.  We have a

19    contractual amount you're obligated to pay.  What others may

20    or may not have paid, not really relevant to that damage.

21    So what's the response to that?

22          MR. DATZOV:  Well, Your Honor, I think that

23    argument would hold better if the estimation of damages was

24    in line with what the actual agreement for the price of the

25    license was, and it's not for two reasons.

1          First of all, it's not in line with how the

2     damages are being calculated.  I think it's undisputed --

3     and Mr. Hinderaker can correct me, but I think it's

4     undisputed that the license at issue was, in fact, an

5     enterprise-wide license, and so one would expect that if a

6     party who already has an enterprise-wide license is going to

7     be asked to pay a bit more for some additional use, that the

8     model would still continue to be an enterprise-wide license;

9     it's not, at least under the damages theory that plaintiff

10     is presenting as we now understand it.  They are using a per

11     application license, meaning they would ask our client to

12     pay for each individual application separately, not just

13     based on the license it already had.  And, as a result of

14     that, the second disparity is that there's a huge disparity

15     in the damages.  The amount of the actual license that our

16     client had, the annual value was about $150,000.  The annual

17     value of the license that they are now asking for, which is

18     the same scope of use, as I understand it, is more than 30

19     times what the actual value was.

20          So the question of what is the software being sold

21     for is relevant to understand and for us to rebut their

22     assertions for damages.

23               THE COURT:  Bear with me for a second.

24               MR. DATZOV:  Sure, Your Honor.

25               THE COURT:  Well, is there a pricing mechanism in

1  the contract, the existing agreement that is the breach of

2  contract?

3           MR. DATZOV:  For additional use, Your Honor, or --

4  there's not a pricing mechanism for any further use, because

5  it's already contemplated that they have wholesale use of

6  it.  It's an enterprise-wide license --

7           THE COURT:  Right.

8           MR. DATZOV:  -- with no limitations on any

9  application, no limitations on any seats.  It's use it as

10  you wish.

11           THE COURT:  And so -- and I understand that's your

12  -- that's your perspective; the plaintiffs is different.

13           So to the extent that the plaintiff is saying no,

14  you couldn't use it beyond this scope, they're also saying

15  and if you are going to expand the scope, that expansion --

16  our damages would be the price that we would charge you for

17  a similar scope that's expanded, right?

18           MR. DATZOV:  That's my understanding of what

19  they're seeking.  And I think as -- I think that's the

20  quintessential way that that's usually figured out, Your

21  Honor.  Certainly -- I don't think there's any dispute that

22  that's how you calculate the value of the license under

23  copyright law.  We've cited a number of cases that provide

24  that.  It's the quintessential way.  You look at benchmark

25  comparable licenses for what the value of the use was.

1          With regard to breach of contract, I'm not sure

2     that we agree on it, but we're not looking at a reasonable

3     royalty analysis.  It's still a question of expectation

4     damages.  And they didn't cite a case that says you cannot

5     look to comparable licenses to figure out what the value of

6     a license would be under contract damages.  I submit that is

7     what you look at or at least could be one of the things we

8     look at.

9          THE COURT:  Okay.  Mr. Hinderaker, on this

10     question about the licensing revenues or license fees.

11          MR. HINDERAKER:  Yes, sir.  I'd like to back up

12     just a little bit --

13          THE COURT:  Okay.

14          MR. HINDERAKER:  -- in terms of the background of

15     the claims, as well.

16          This license agreement that the defendant had has

17     been terminated, and the question is not one of expanded use

18     from what it had.  The question is, is that it has no right

19     to use at all.  We have cited cases, and this contract is

20     governed by New York law, and the cases that we cite from

21     New York say clearly that hypothetical agreements what

22     could've been negotiated is not relevant to a contract

23     damages claim.  When we are dealing with the breach of

24     contract, the entitlement for that breach is the market

25     value of what has been taken.  This is not a consensual

1    arrangement at this point.  It doesn't matter -- we do not

2    have a willing buyer and a willing seller or a willing

3    licensor and a willing licensee.  We have a party in breach.

4          So given the fact that every agreement that's

5    consensual that FICO has with another licensee is

6    negotiated, bespoke if you will, we are certainly not in

7    that situation.

8          And I also think in terms of the document

9    requests, Your Honor, that it's useful to look at what the

10   request actually is, which is a little bit different from

11   the discussion so far.  So, for example, Document Request

12   No. 16 is all documents that refer to licensing revenues

13   from 2006 to the present.  There's no connection of those

14   licensing revenues to a scope of use, to a size of use, to a

15   volume of use to the licensee's characteristics.  And we're

16   talking about a damages claim that at least with respect to

17   the client licensee, Chubb & Son, begins on the date of

18   termination of March 16, 2016 -- March 31, 2016.  The value

19   of what Federal has taken as of 2016 is part of our damages

20   analysis, but why we ask for all documents that relate to

21   revenue from 2006 to the present disconnected completely

22   from scope of use is a part of our objection.

23         It is also worthwhile noting that -- I have to get

24   my glasses on here -- it's also worthwhile noting that

25   Document No. 17 is asking for all license fees for perpetual

1    licenses from 2006 to the present.  Again, there's no

2    connection to scope of use, nature of licensee.  It's just

3    money in the air.  And as detailed in the Waid declaration,

4    the perpetual license fee for each of the applications that

5    Federal has told us they use is detailed out in William

6    Waid's declaration.  That is the market value for each of

7    those applications from the standard FICO pricing relevant

8    at the time of the breach.  Were it consensual, there would

9    be other negotiations, but this isn't consensual.

10          Document Request 18 asks for all average per-seat

11   licensing revenue, 2006 to the present; again, disconnected,

12   unrelated, doesn't care, just numbers in the air to scope of

13   use.  And the seat licensing has no relevance to this case.

14   Indeed, at the time of the breach with the enterprise

15   license there is no seat pricing at all.

16          So while Your Honor put Document Requests 16, 17,

17   18, and 19 together, I think that 16, 17 and 18 deserve

18   their individual looks because they're just asking for

19   revenue unrelated to scope of license.  And then Document

20   Request 19 is the one that asks for every license regarding

21   Blaze Advisor from 2006 to the present.  There's no

22   connection to an issue that might be relevant in this case.

23          What I just heard from counsel is now we're going

24   to match up, I guess, every license agreement to whatever we

25   would produce by way of buckets of revenue.  That's not what

1      the other requests are asking for.

2              It would be a different subject matter, Your

3      Honor, and I'll only introduce it by way of saying it is a

4      different subject matter, because in the documents on the

5      motion papers Federal tries to justify Document Request 19

6      for every license agreement for the last 12 years as being

7      relevant to the ambiguity that Judge Wright found with

8      respect to one of the provisions, 10.8.  And we can talk

9      about that separately if you like, Your Honor.

10             THE COURT:  Okay.

11             MR. HINDERAKER:  The request itself, of course,

12     isn't limited to that or anything.

13             THE COURT:  Right.  All right.  Well, let me ask

14     defendant another question here.

15             What is the reason for the date that you have

16     chosen in these, 2006 to the present?

17             MR. DATZOV:  The significance of the 2006 date,

18     Your Honor, is that's when the agreement was signed.  This

19     was more than ten years ago.  So the question of what the

20     value would have been throughout the years, again, would

21     have changed throughout the lifetime of the software.

22             Now, I realize that the value of what the license

23     use would have been now is not necessarily dependent on what

24     the use was in 2007.  But the negotiations and the formation

25     of the license took place in 2006.

1            So, you know, I think, despite the argument that I

2      heard from Mr. Hinderaker that, oh, well, here's what we

3      would want from a license, that's not the relevant question.

4      The relevant question isn't what FICO wants for damages.

5      The relevant question is what is entitled to damages.  And I

6      haven't heard any argument to the contrary that you cannot

7      look to hypothetical licenses under a copyright damages

8      theory.

9            For the contract theory, I just wanted to note I

10     haven't seen any New York cases cited that say that

11     hypothetical agreements are not relevant to a breach of

12     contract for a license.  The case that was cited in the

13     brief was a speculation of damages case.  It said, well, in

14     a non-disclosure agreement, not a license, we're not going

15     to let you go after real royalties.  And it made sense in

16     that case.  But I would note that in that very case that

17     FICO is relying on, the court actually did analyze

18     comparable licenses in considering the issue.

19            THE COURT:  Okay.  Your point -- and, again, I

20     don't mean to -- I don't want to short-circuit things, and I

21     don't mean to lump them all together inappropriately, but as

22     an umbrella to this argument you are saying what they're

23     entitled to, if anything, assuming they prove liability, is

24     the market value of the license we didn't take or pay for

25     after the termination date.  And market value, that can be

1    looked at any number of ways, based on the way they have

2    been charging or what the market has been paying for those

3    licenses.

4         MR. DATZOV:  I think that's right, Your Honor.

5    And I would point to one additional thing.  In its damages

6    response, FICO characterized its own damages as

7    "commercially reasonable fees."  I think that's a synonymous

8    meaning with market value.

9         Now, the proposition that it had -- you can

10   unilaterally set that market value, I think, is completely

11   improper.  I mean, the standard pricing model that they

12   have, that's the starting point for negotiations.  That's

13   not what the parties ultimately have agreed to, at least for

14   some of the licenses.  And that's the information we're

15   asking for, is what the parties actually agreed to, not what

16   did you come into the room with.

17        THE COURT:  Okay.  Mr. Hinderaker, anything

18   further either globally on 16, 17, and 18 or individually on

19   those?

20        MR. HINDERAKER:  Globally, Your Honor, counsel has

21   argued comparability.  And, of course, the cases that it

22   relies upon to support his position depend upon requests

23   that are directed to comparable situations.  And none of

24   these requests make any effort at all to be directed to what

25   might be a comparable situation.  They just ask for

1    everything 2006 to date.  If -- and it's not for this Court,

2    in my judgment, to blue pencil these requests and write

3    something that's better.  Federal can do that on its own if

4    that's what they want, a second set.  If there was any merit

5    to what counsel is arguing, then that's limited to what were

6    the negotiated license agreements for similar licensees and

7    similar scopes of use in 2016, the time of the breach,

8    nothing else.  Why produce documents that are more than a

9    decade old when the damages arise at that point?  So

10    counsel's argument is really a re-writing of the requests,

11    trying to make sense out of them in light of what it

12    contends to be the case.

13              And then the other global comment is that the

14    comment is made that FICO was trying to present a unilateral

15    statement about what market value is.  That's not the

16    situation here.  As Bill Waid's -- William Waid's

17    declaration details and the rest of the facts in there, FICO

18    begins every negotiation for this product based upon its

19    standard pricing, and that detail is in that declaration.

20    That's not a unilateral.  That's what the marketplace has

21    told FICO they do and can do.

22              Now, in every negotiated situation are there

23    negotiations?  And there are, of course, not only on terms

24    but on amount of fees.  But now we're into a hypothetical

25    negotiation that isn't contract damages.  I mean, I

1    understand that the Patent Act says, go through hypothetical

2    negotiation to see what the royalties would be, but this is

3    a contract action, as you mentioned at the outset.

4         So the notion that we're basing our damages on

5    something other than something that's founded in the

6    marketplace itself is wrong.

7         THE COURT:  It's both a contract and an

8    infringement action, right?

9         MR. HINDERAKER:  Now, these -- it's both contract

10   and a copyright-infringement action.  And, of course, the

11   damages that we're talking about right now have nothing to

12   do with what we're seeking by way of copyright infringement.

13        Now, the Copyright Act will tell us that we can't

14   double up, you know, we can't have both.

15        THE COURT:  Right.

16        MR. HINDERAKER:  I'm not saying we can have both.

17   But license fee damages are one thing.  That's what we're

18   talking about now.  Disgorgement on the Copyright Act is a

19   different thing and that's what we can talk about later.

20        THE COURT:  Right.  I think the nub of the issue

21   to me is even saying what you're saying about FICO starts

22   all negotiations at this point, the notion of the market

23   value of what's been taken necessarily presupposes you have

24   a willing seller and a willing buyer.  And the willing

25   buyer, presumably, knows something about the market is able

1    to say we may start there, but I'm not going to -- I'm not

2    going to pay more than market value for this.  And so to

3    their point, all of these various measures of the value of

4    your market in terms of discovery and the market value of

5    your license, don't they get those -- don't they get to give

6    those to their expert, have their expert say looking at

7    everything, the market value of this is X, not Y, and your

8    experts get to say you're wrong, you used unrelated

9    measures, you used things that weren't comparable, et

10   cetera, et cetera.  Isn't that really a battle of the

11   experts, as opposed to discovery?

12             MR. HINDERAKER:  One, I understand what you are

13   discussing, Your Honor, that can be a battle of the experts.

14   And I'd also like to go back to the discovery requests that

15   we're responding to.

16             So, for example, I'm aware of a license with

17   another licensee where the scope of the use is to use Blaze

18   Advisor for one purpose on two dedicated CPUs.  These

19   document requests ask us to search for every license

20   agreement that we have, regardless of comparability to

21   Federal's use on 15 named applications.  That isn't

22   compliant with Rule 1 or Rule 26, to go search for and

23   produce documents which are not comparable.  It is the

24   obligation of Federal to define for us what it contends to

25   be comparable, if it's going to ask for documents that go to

1    that issue.  What does Federal say is comparable?  May I

2    submit, it's not a license with one entity for two CPUs.

3    But yet everything that we have done for 12 years is what is

4    being requested here.

5            THE COURT:  Well, and I think -- but I think what

6    they're saying is in terms -- and, again, I wasn't going to

7    19 now.  We sort of carved off number 19 for a second.  But

8    that documents that evidence revenues or licensing fees,

9    they would say it's all relevant to figuring out what the

10   appropriate amount of damage would be even.  If it's not a

11   directly comparable license, the fact that a license like

12   this is only X amount and a license like this is only Y

13   amount, in our case a license like this you can derive some

14   guidance as to its market value.

15           MR. HINDERAKER:  By definition a license that has

16   no comparability has no relevance.  By definition a license

17   that has no comparability is outside the scope of discovery.

18           THE COURT:  Well, I'm not sure I agree with --

19   quite with that categorical statement.

20           MR. HINDERAKER:  That is what I -- when we are

21   asking, seeking document requests that ask for everything

22   for 12 years, every -- well, 19 is our agreement.  Every

23   agreement for 12 years, even though our damage claim starts

24   in 2016, even though there is no effort to be comparable to

25   licensee or scope of use.  That's my position on that one.

1          With respect to 16, 17, and 18, that's just asking

2     for revenue that is unrelated in any regard to scope of use.

3     That's what they say.  That's what the requests say.

4          THE COURT:  Yeah, they do say that.  I agree with

5     you.  But they're saying this is discovery, I get to see

6     that, and I'll determine -- my experts will help me

7     determine what, if any, relevance the scope of use of the

8     variation between the scope of use has in terms of its

9     impact on the value of the licensure saying that we took

10    from you.  So, I mean, I guess --

11         MR. HINDERAKER:  I think we've had the discussion,

12    Your Honor, is --

13         THE COURT:  Okay.

14         MR. HINDERAKER:  -- is the document request that

15    has no regard for comparability an appropriate document

16    request that covers 12 years for a damage claim that arises

17    in 2016.

18         THE COURT:  Okay.  Understood.

19         Anything further for the defendant on either 16

20    through 18 or 19?

21         MR. DATZOV:  We've taken a lot of the Court's time

22    on it and just a couple of very quick points on it.

23         With regard to us not allegedly narrowing the

24    discovery, we're asking only for revenues and licenses for

25    the very specific copyrighted works that are asserted in

1    this action.  We're not even going outside of that bounds.

2          With regard to comparability, I think Your Honor

3    hit it right on the head.  That's an argument they can make

4    to the factfinder and a battle of the experts will go on I'm

5    sure for a long time about it.

6          With regard to Rule 1 and proportionality, because

7    that was touched on, I recognize that 1,200 documents might

8    sound like a lot on this issue, but it's a critical issue

9    for us, and I wanted to let the Court know that thus far, by

10   my numbers at least, we've been producing -- we've produced

11   more than 9,300 documents and 39,000 pages.  By comparison,

12   FICO has produced 1,297 documents.  So I don't think asking

13   them to produce another 1,500, 2,000 documents on what is,

14   from our view, one of the most critical issues in this case

15   is overly burdensome, not just burdensome.

16         THE COURT:  All right.  One last thing on the

17   license agreements themselves.  Setting aside what, if any,

18   relationship they have to damages, tell me how they're

19   otherwise relevant.

20         MR. DATZOV:  On the licensing revenues, Your

21   Honor?

22         THE COURT:  On the licensing agreements, the one

23   -- all licensing agreements, 2006 to the present.

24         MR. DATZOV:  Sure.  Well, I think probably one of

25   the biggest reasons why they're relevant is the damages

1     piece.  We need to understand how those licensing agreements

2     were structured.  And I imagine that the licensing

3     agreements themselves will have the prices in the license

4     agreement, like ours did.  So I don't know how there's an

5     easy way to separate that information.  But beyond just the

6     amount of money that people were paying for the license,

7     whatever the license was, and we need to understand that

8     context, too, the provisions that are in some of those

9     licensing agreements are relevant to the other very critical

10    issue in this case, which is the interpretation of the

11    disputed terms provision.  As of right now, I specifically

12    know of 10.8 and 3.1.  I don't know that there might be

13    other arguments on it.  But, for example, with 10.8, the

14    argument for the -- or, I'm sorry, the assertion for the

15    claim thus far for the breach of that provision has been to

16    say you had a corporate event that happened to not the party

17    in the license, but somebody else up the corporate chain,

18    which now, from our standpoint, completely wipes out your

19    license no matter how you are using it anymore.  And Judge

20    Wright found that provision ambiguous.

21         So one of the things that we've alleged in our

22    counterclaims is that they denied their consent for our

23    continued use of the license in bad faith.  They didn't

24    provide a reason for that.  And that's not a fight the Court

25    needs to decide today.  But part of the question is, how are

1   you enforcing that provision?  What is your view of what

2   that provision means, not just with respect to us, but with

3   respect to other parties?

4           So if there are 1,250 other agreements with

5   some -- I imagine at least some large corporations, and I

6   cannot imagine that in that thousand plus corporations list

7   that not one of them underwent a similar corporate change,

8   if they haven't enforced that provision, even though they

9   have underwent a change, that is relevant to proving what

10  their intention was, not just of what the license means, but

11  how they're going to enforce it.  And that's information we

12  should be able to present to the factfinder, because -- FICO

13  can correct me if I'm wrong -- I don't believe they've

14  produced any attempts to enforce a similar provision to us

15  thus far.

16          THE COURT:  And you need the agreements to know

17  which, if any, have a similar provision?

18          MR. DATZOV:  Yes.  I mean, there's no way for us

19  to specifically ask for an agreement that has the same

20  provision.  There's going to be some judgment in there of

21  how close are the provisions.  And so I think particularly

22  in light of the fact that the money piece is already going

23  to be part of those agreements, which, from our standpoint,

24  is highly relevant, I think probably, Your Honor, it would

25  be more difficult to actually parse out agreements that are

1    not responsive to money and are not responsive to a

2    non-assignment provision than it would be just to give us

3    that information.

4           THE COURT:  Okay.  Yes, sir.

5           MR. HINDERAKER:  Yes.  Thank you.

6           It's interesting to listen to the arguments as the

7    requests try to be rewritten right here before Your Honor.

8    The document request is all licensing agreements.  Let's

9    assume a licensing agreement has a provision that's like

10    10.8 or exactly like 10.8.  That tells us absolutely nothing

11    about whether that provision has ever been enforced.

12           Federal has asked us in different discovery

13    requests for the actions that we are aware of where we have

14    enforced copyright rights with respect to Blaze Advisor, and

15    we have identified all of those lawsuits for them.

16           Now, I'm dealing with a document request, all

17    license agreements, I'm told that's relevant to enforcement

18    and we all know that having the document in front of us

19    doesn't tell us anything about enforcement, and we know that

20    FICO has given Federal every lawsuit or every enforcement

21    action that it's aware of.

22           Now, could it be, Your Honor, that the business

23    people in some other license agreement had an assignment

24    situation and they worked it out and there was no dispute

25    about it, there was nothing to enforce, the parties just

1    complied with the agreement?  Now, I don't know that that's

2    the case, and I don't know it's not the case.  I just know I

3    can't tell you that from producing more than 1,200 documents

4    that are the license agreements.

5         Then the other point -- the other argument that's

6    made is that it relates to some of the parole evidence or

7    could be parole evidence for disputed terms in the contract.

8    These agreements were -- there's a main agreement and two

9    amendments, and they were all signed between June and

10    December of 2006.  The issue on parole evidence is the

11    meeting of the minds between FICO and Federal, which will

12    come out in terms of the documents that were exchanged

13    between those parties and the testimony of the

14    representatives.

15         Rather than ask for any situation that might be

16    contemporaneous in time when these agreements were entered

17    into, we have a document request that spans 12 years, and

18    now you get 12 years' worth of documents and you have

19    provisions that are like or the same as 10.8.  That's what

20    the document request asks for.  That tells you nothing about

21    the meeting of the minds between FICO and Federal.  It tells

22    you there's another contract that has the same words in it

23    as this one does.  But it doesn't say anything about the

24    meeting of the minds and what the parties intended that

25    provision to mean in this contract.  It's just fishing in

1      the dark for something that doesn't bear on the case.

2             THE COURT:  Okay.  Last word.

3             MR. DATZOV:  As an example, Your Honor, if there

4      is a 2011 licensing agreement that has the exact same 10.8

5      with, let's say, Intel or somebody else and Intel had the

6      same corporate merger -- same structure corporate merger

7      that our client did and they did nothing and just let them

8      keep going with it, I think that evidence is probative of

9      what the intent of the parties were or at least the meaning

10     of the provision in this case is.

11            THE COURT:  Well, and the other way it might be --

12     you might have a provision -- I don't know the facts and the

13     language of your agreements, obviously, as well as you do,

14     but there may be a provision relating to change of control

15     that is differently worded, which you would argue is

16     relevant to, well, what's the meaning of this?  It uses

17     different language.  Previously they used this language to

18     indicate change of control.  I mean, I don't -- there's a

19     number of ways in which that might be -- end up being

20     relevant and probative that we don't know because we haven't

21     seen the language.

22            MR. DATZOV:  I completely agree, Your Honor.

23            THE COURT:  Okay.  Okay.  Let's go to Request No.

24     13.  I'm sorry, this is -- geez, when Jeff Keyes did this,

25     it moved much quicker.

1          All agreements relating to the works you contend

2     Federal infringed.  I, frankly, am not sure how that's

3     different from Request 19.  The only -- in my mind the only

4     potential way that's different is if you mean the agreements

5     at issue in this lawsuit, which they say they've produced.

6     But am I misreading this?

7          MR. DATZOV:  You're not, Your Honor.  Actually,

8     your reading -- initial reading of it that it's similar to

9     19 is spot on.

10          THE COURT:  How is it different from 19, other

11     than 19 is narrower if it contains a 2006 date limit?

12          MR. DATZOV:  So it's narrower in that way.  It's

13     also narrower, I think, in the sense of it's asking

14     specifically as what might be characterized as licensing

15     agreement.  Again, I think this is pretty typical.  I don't

16     want to mince words of what they might characterize as a

17     license or non-license agreement that relates to the

18     copyrighted works.  But what I think is clear from 13 is

19     that what we're asking for are agreements related to the

20     copyrights issue.  We're not asking for agreements that were

21     breached or allegedly breached by one of the parties in this

22     case.

23          So they're talking about the same subject matter.

24     They're just phrased differently.  One is a bit broader

25     because I think even agreements that relate to licensing

1    agreements could be relevant.

2             THE COURT:  But this would include, also, if there

3    were a contract with a -- you know, some sort of outside

4    software vendor to help create the Blaze Advisor software,

5    this would sweep that within its ambit if it relates to

6    that.  And that's not relevant.  Right?

7             MR. DATZOV:  I think there could be outer bounds

8    of that that probably stretch beyond what we're even looking

9    for, Your Honor.  But up until now, we haven't really had

10   the opportunity to discuss this issue because the position

11   that was in place during our meet and confers was we're not

12   giving licensing agreements and we're not giving license

13   revenues period.

14            THE COURT:  Okay.  Mr. Hinderaker, what further do

15   I need about number 13?

16            MR. HINDERAKER:  Only that I'm astounded if number

17   13 is interpreted to read every document of FICO that

18   relates to Blaze Advisor or every agreement of FICO that

19   relates to Blaze Advisor.

20            THE COURT:  That's how it -- that's how it reads

21   to me.

22            MR. HINDERAKER:  I read it as every agreement that

23   we contend Federal infringed relating to Blaze Advisor.

24            THE COURT:  Okay.  All right.

25            Let's turn to the Interrogatories 6 through 9.

1    And maybe I can short-circuit this one.  You've seen the

2    information that has been provided by the plaintiff in the

3    briefing related to the calculation of those categories of

4    damage, correct?

5              MR. DATZOV:  Yes, Your Honor.

6              THE COURT:  Does that information satisfy what you

7    were seeking to compel in this?

8              MR. DATZOV:  It does with a couple of qualifiers.

9    One, the wrong number 6 or the response to Interrogatory No.

10   6, we would like at least some explanation for the basis of

11   why they're applying a per application license model, rather

12   than an enterprise-wide license model.  If that's provided,

13   I think we're at a sufficient point that we don't need to

14   bother the Court anymore.

15             With regard to Interrogatories No. 7 and 9, we do

16   need a response to those, because at this point we don't

17   have any.  They have just said we've already answered that.

18   And I think what Mr. Hinderaker said today is, no, we're not

19   using lost licensing to determine our copyright damages,

20   which is specifically what Interrogatory No. 9 is asking:

21   How are you calculating your actual damage under the

22   copyright law?  So if they're not using the damages theory

23   they have told us about, how are they doing it?  Those

24   requests aren't cumulative.  They're asking for a response

25   under the damages for each claim.  And if the response is

1    it's category one damages for this claim and we've already

2    told you what they are, then that's fine.  They can just say

3    category one damages, copy paste whatever category one

4    damages response was.  But we still -- we're still entitled

5    to know what their position is.

6          This suggestion from the briefing that, well,

7    we've given you documents, you ought to be able to figure it

8    out, that's improper.  I mean, we don't need to take

9    educated guesses, no matter how good they are with what

10   their positions are.  It's easy enough.  Just tell us we're

11   seeking category one damages or copyright breach or whatever

12   it might be.

13         MR. HINDERAKER:  I think this is kind of reducing

14   itself to silliness if you want my honest opinion.  The

15   Interrogatory No. 6 is describe and quantify each element of

16   damage, and so we describe and quantify the damages that

17   arise from -- that arise from the period of time after the

18   contract is terminated.

19         Then we're told that the software, Blaze Advisor,

20   has been used by entities that were not the client in the

21   U.K. and Canada.  We don't know when that began, but we

22   provide them the damages on an application basis for that

23   breach and for that breach -- the breach being a 3.1, the

24   unauthorized disclosure.  We don't know when the damages

25   period began because we haven't been benefited by Federal's

1    discovery responses to tell us when they started to do that.

2    But that's that category of damages.

3           If within Federal or within -- if within Federal

4    there is any other entity or division that is not the Chubb

5    & Son being the client, and if Blaze Advisor is used with

6    respect to that, that would be an item of damage, but we

7    haven't had discovery on it.

8           So the notion that you can't read our response to

9    Interrogatory No. 6 and when -- and in response to 7 and 8

10   we refer back to 6 by reference, we should cut and paste the

11   same words into the response, I just find to be rather

12   silly.

13          Then with respect to Interrogatory No. 9, describe

14   and quantify damages based upon copyright infringement, boy,

15   Your Honor, that's why we're here on our own motion to

16   compel, so that we can get the information necessary to be

17   able to tell after expert work, tell Federal the claim that

18   we have for disgorgement of damages under the Copyright Act.

19   We just simply can't -- we're not going to make it up out of

20   thin air, and we don't have the information to answer number

21   9.

22          THE COURT:  Okay.  Anything further?

23          MR. DATZOV:  On number 9, Your Honor, I'm very

24   well aware that they're seeking profits under copyright.

25   What I don't know is are they seeking actual damages?  I

1    think they are because that's what they've alleged in their

2    complaint, but I don't know how they're calculating that or

3    on what basis they're seeking it.

4            MR. HINDERAKER:  You should read the interrogatory

5    answer to number 6, and then you would find out that the

6    license fee -- I'm sorry, you would find out that the

7    disgorgement of damages claim is directed against Federal

8    and any entity -- trying to say -- is directed against

9    Federal, the defendant.

10           Then on the -- with respect to the U.K. and

11   Canada, for example, where Federal without authorization

12   distributed our software to those entities, you should read

13   the interrogatory answer and you'll realize that we are

14   seeking lost license fees, the fees we would have had but

15   for that breach, and the disclosure, and the use by Canada

16   and the U.K.  If you read the interrogatory answer, we're

17   not asking for disgorgement of profits from U.K. and Canada

18   separately from what might be within the profit stream of

19   Federal.

20           Now, if all of those entities roll up into

21   Federal's revenue stream, that would be a different -- then

22   we would have a different conversation.  But we don't know

23   that yet because we can't get discovery from Federal on the

24   revenue streams.  But the disgorgement of damages copyright

25   claim is as I describe and as described in the interrogatory

1    answer.

2                THE COURT:  So if I'm understanding it right, what

3    you're saying is that in answer to Mr. Datzov's question,

4    FICO is seeking actual damages, as well as disgorgement with

5    respect to that use, and that the actual damages are

6    described as the value of the licenses that were being used.

7    No?

8                MR. HINDERAKER:  See, I just simply don't know --

9    because I haven't had the discovery, I don't know the facts

10   sufficiently.  In terms of the revenue streams, the reason

11   -- my only -- one thing I want to qualify, Your Honor, is

12   that with Federal being the defendant and our entitlement to

13   the -- we'll go through the act in a minute -- our

14   entitlement to at-the-end-of-the-day profits from the

15   defendant, the disgorgement claim is limited to Federal.

16               Now, how many improper uses by Federal that roll

17   up into Federal's revenue are there?  I know that there's

18   the post-termination use by Chubb & Son.  Has Federal

19   distributed the software to other divisions within Federal?

20   Has Federal distributed the software to other subsidiaries

21   of Federal whose revenue rolls up into Federal?  I don't

22   know.

23               We have unauthorized use in Canada and the U.K.

24   for sure.  Do those entities -- is their revenue -- the

25   revenue -- if their revenue does not roll up into Federal,

1    well, then I don't have a claim against a U.K. entity or a

2    Canadian entity.  And I'm not seeking disgorgement of

3    profits from an entity that's not a defendant.

4              THE COURT:  Right.

5              MR. HINDERAKER:  So with respect to the defendant,

6    Federal, I do believe and the allegations are that the

7    distribution to those other Chubb entities, Canada and the

8    U.K., was unauthorized and was FICO damaged?  It was damaged

9    by way of the license fees it could have had if it had

10   negotiated an honest license with those people.  But save

11   and except for some facts that I'm not aware of how that

12   U.K. or Canada revenue rolls up into Federal, I don't think

13   I can get at revenue that isn't in the defendant's bucket.

14   So that's the only qualification I have.  And I wish I could

15   give you a clear answer, but I haven't been able to get

16   documents.

17             THE COURT:  Okay.  All right.  I think I'm with

18   you all on that one.

19             All right.  Is there anything further on the

20   defendant's motion to compel, either side?  Mr. Datzov?

21             MR. DATZOV:  Yeah, Your Honor, I think there is

22   just one little piece left of that.

23             So the fourth request that we had made in our

24   motion was for the production of any documents that were

25   improperly redacted based on relevance or anything else

1    other than privilege or work product.  Now, they've agreed

2    to produce the two exemplar documents we provided for that

3    issue, but they remain silent on whether they're going to

4    produce, or reproduce, any documents that exist that were

5    also redacted based on relevance that are outside of just

6    those two exemplar documents.  And I can tell Your Honor

7    that from reviewing the production, there are quite a few

8    other documents that, you know, have random Excel rows

9    redacted and things like that.  I don't know the basis for

10   the redaction, but my guess is that on at least some of them

11   it was based on relevance again.  And so I would ask that to

12   the extent there are any other documents that were redacted

13   based on relevance or anything else other than privilege,

14   that those also be produced without redactions.

15            THE COURT:  Mr. Hinderaker.

16            MR. HINDERAKER:  The documents that we were aware

17   of -- made aware of by Federal not only did we agree to

18   produce them, they have been produced.  That's a fact.

19   Because we agree that the redaction -- we don't try to

20   defend that redaction.  It was an oversight.  And other

21   redactions will be on the privilege log and the statement as

22   to why, you know, for privilege.  And if something comes to

23   our attention where we say, oops, the same mistake was made

24   by, you know, that's not -- I'm responsible for everything,

25   but the same mistake was made, we'll fix it.  But we will --

1    just as I only can deal with the requests as they're

2    drafted, I only can deal with the complaint -- with the

3    objections as they're presented, and that has been remedied.

4            THE COURT:  Okay.

5            MR. DATZOV:  Your Honor, I don't think it would

6    have been fruitful for us to submit tens or hundreds of

7    documents to the Court on that point.  And I don't think it

8    should be our responsibility to go through and guess on

9    whether they have improperly redacted something.  And I

10   think waiting until the end of a privilege log to see a

11   bunch of redactions that say relevance is probably not

12   worthwhile either.

13           MR. HINDERAKER:  I think we're arguing about a

14   non-argument, Judge.  There's no dispute.

15           THE COURT:  Yeah.  I don't know if we're arguing

16   about a non-argument or not, but on this one I can easily

17   give you both guidance on this.  Can't redact for relevance.

18   If there are items that are redacted for relevance, the

19   documents have to be reproduced unredacted.  If there are

20   documents that are redacted for privilege, then a privilege

21   log has to be provided for those redactions.  And --

22           MR. HINDERAKER:  There's no disagreement, Your

23   Honor.

24           THE COURT:  Okay.  Okay.  Let's turn briefly --

25   and, again, I don't want to shortchange you, but let's turn

1    briefly to the plaintiff's motion to compel items -- the

2    RFPs 30 through 32, which essentially call for summary

3    reports of gross and net revenues and gross and net profits

4    from different defined entities.  Mr. Hinderaker.

5              MR. HINDERAKER:  Your Honor, I think it would be

6    helpful to my discussion of requests, those requests 30 to

7    32, if I could have a minute or two just to talk about Blaze

8    Advisor and the license agreement to set up the context.

9              THE COURT:  Okay.

10             MR. HINDERAKER:  So Blaze Advisor is the software

11   product that's licensed, and it is -- it's a rules

12   management.  It's a rules management software tool.  It's a

13   rules engine, if you will.  And if I can use the original

14   agreement where Chubb, the licensee, licensed for one

15   application.  So originally they licensed for one

16   application, and they called it CSI Express, and that is

17   Chubb's specialty insurance underwriting and automated

18   policy renewal business application.

19             So Blaze Advisor is the foundation for the rules

20   to be inputted so that insurance policies can be

21   automatically renewed.  And when insurance policies are

22   automatically renewed, there are more renewals, and when

23   there are more renewals, there's more revenue.

24             So then at the end of the -- at the time of

25   termination through discovery, we're told that Federal --

1     that is, Chubb -- has used Blaze Advisor to implement or on

2     15 different business applications.  So, for example, one of

3     those applications is to use rules to identify cross-selling

4     opportunities.  Blaze Advisor enables that rule-based

5     application.  The cross-selling opportunities then create

6     the opportunity for additional revenue on the cross-selling.

7     So that's what Blaze Advisor is in a nutshell.

8          The license agreement is with Chubb & Son, a

9     division of Federal.  And as you know from Exhibit 1 of the

10    declaration that we provided from Mike Erbele, Chubb & Son,

11    a division, is a manager of many -- or several, by the 10(k)

12    U.S. subsidiaries in the property and casualty group, and it

13    also is -- provides services for other insurance companies

14    within the property and casualty group.  And the property

15    and casualty group has three lines of business:  personal,

16    commercial, specialty.  So those are sort of the background

17    facts that inform us regarding the document requests.

18         So when we get to the document requests, I think

19    it's important to the argument -- maybe I'll put it this

20    way:  I think it belies the argument of Federal if we look

21    at what the document request actually asks for.  So it's

22    summary reports, revenue and profits.  And with respect to

23    number 3, revenues and profits derived from the products and

24    services, so insurance and services.  Baseline of business

25    of Chubb & Son, a division --

1          THE COURT:  Right.

2          MR. HINDERAKER:  -- that used Blaze Advisor.

3          THE COURT:  Right.

4          MR. HINDERAKER:  So that's the client under the

5    license agreement.  There will be post-termination issues.

6    And it's for products and services for which Blaze Advisor

7    has used.

8          31, again, revenue, profits, products and

9    services.  And now we're trying to get at what came from

10   products and services for any division or entity other than

11   Chubb & Son.  So get the rest of it.

12         And then on 32 it's to look at the whole picture

13   for the lines of business of Chubb & Son, plus any other

14   division of Federal or entity that Federal has distributed

15   that uses Blaze Advisor, what's the profits and revenues by

16   line of business.

17         So we get to look at the whole, and we get to look

18   at the two separate parts in 30 and 31.  And the reason for

19   saying this, Your Honor, is that by no stretch are we trying

20   to be overbroad and ask for revenue.  I don't want the

21   revenue of Federal.  That might be huge.  But the revenue

22   that is related to the use of Blaze Advisor, that's what

23   these requests are asking for.

24         Now, if I might just refresh the Court with regard

25   to the Copyright Act itself, Section 517 U.S.C. 504,

1    speaking of disgorgement.  The copyright owner is required

2    to present proof only of the infringer's gross revenue.

3    These requests are seeking a quantification.  And in the

4    briefs, as you know, we've had -- there is an argument with

5    regard to this concept of reasonably related.  And I'd like

6    to discuss that because it has two different contexts.

7          One context is the way I just described, that we

8    want the revenue that's reasonably related to the use of

9    Blaze Advisor.  I don't want to overreach.  I don't want

10   other revenue.  I just want Blaze Advisor-connected revenue.

11   I want a number.  And my burden under the statute is to give

12   the jury the gross number.  Defendant has a lot of other

13   burdens, but I want to meet my burden.

14         Now, the defendant's argument -- well, let me back

15   up.  And so in opposition, Federal has cited cases where

16   somebody asked for a tax return.  And, you know, you don't

17   get a tax return.  Why?  Because it's not related to the use

18   of the infringing.  So that case doesn't -- I don't disagree

19   with that case, but it doesn't tell us anything about this

20   situation.

21         Another case, I think it was Judge Magnuson's

22   case, the revenue related to the use of the infringing work

23   was already produced.  What wasn't produced was revenue

24   unrelated to the infringing work.  And we're not asking for

25   that.

1           And then another case that they cite is one where

2     there was partial summary judgment of no liability.  Well,

3     we're not asking for that.  That's not our situation either.

4     So we're trying to be quite precise in just getting a

5     quantity.

6           Now, the other way in which reasonably related is

7     used by Federal is to suggest that in this discovery motion

8     the sufficiency of the evidence of demonstrating that Blaze

9     Advisor has -- makes some contribution to the revenue stream

10    has any bearing at all on this.  And I submit, Your Honor,

11    that come trial we will have a burden of showing that,

12    ladies and gentlemen, here's the quantity of revenue.

13    That's this discovery today.  And then there will be another

14    set of proofs.  And, ladies and gentlemen, Blaze Advisor

15    software contributes to the ability of -- contributes to

16    that revenue stream, and then that will be that proof.

17          Now, as you know from a footnote in our brief,

18    FICO has a second set of discovery out.  The document

19    requests are for all of the business reasons that --

20    documents that relate to the business reasons that Federal

21    implemented each of the applications.  Why am I asking that?

22    I want to get the discovery that relates to the contribution

23    of the software to revenue.  We want to get CSI Express in

24    place to enhance revenue.  Now, Federal's response to those

25    is no, you don't get any of it for the same reasons they say

1    here.

2              So I'm here today defending a motion to just get

3    revenue numbers based upon a proposition that I haven't

4    proved the nexus, the contribution of software to revenue,

5    and then on second request I'm denied that as well.  This is

6    what in the old days we just call a stonewall.

7              So I submit, Your Honor, that all of the cases

8    that arise out of summary judgment context -- post-trial

9    appeals, motions in limine, every situation where the

10   sufficiency of the evidence of that nexus is at issue -- has

11   nothing to do with us today.

12             They also cite some other cases where the

13   disgorgement simply wasn't a remedy as a matter of law, and

14   that's not our situation because Section 504 says otherwise.

15             So what we did in our memorandum was to be -- try

16   to make the Court comfortable with the fact that our theory

17   that Blaze Advisor software contributes to the revenue, you

18   know, it's plausible.  There's a reality to it.  When

19   Federal's own documents say when they implement an

20   automatic, automated renewal processing at one of the auto

21   portals, Alberto Auto, revenue increased 15 fold over four

22   years, that's a fight for another day at trial or summary

23   judgment, but it is the context in which these document

24   requests simply seek the quantification of the revenue are

25   relevant.

1          I guess I have other notes here that go through

2     the various facts that have already been disclosed in

3     discovery regarding the contribution to revenue from the

4     various named applications, and there's no need to do that

5     at the moment.  I only want to point out that Federal's

6     response to our brief simply ignores all of that and says,

7     well, Blaze Advisor only enhances efficiencies, therefore,

8     there's no contribution to revenue -- less cost, but same

9     revenue.  Well, it's a convenient argument to make because

10    it fits in with some of their case law, but it's not the

11    facts of the matter that we're arguing about.  And I have no

12    doubt that Blaze Advisor also produces efficiencies, but in

13    addition to efficiencies, as I've said, and that will be our

14    proof for another day, it enhances the revenue.

15          So 30, 31, and 32, Your Honor, are clearly

16    relevant to our disgorgement plan.  We need to know the

17    quantities.  And then we included the profits as well

18    because under the statute Federal will have the burden of

19    saying, well, you're only entitled to a portion of the

20    profits so these are the profits that are derived from the

21    revenue, and we want to know their information with respect

22    to that, as well.

23          THE COURT:  Do I understand you correctly to say

24    that if they provide documents that respond to 30 and they

25    provide documents that respond to 31, that they have

1   necessarily provided the documents that respond to 32,

2   unless there is some sort of separate documents that

3   aggregate those things?

4         MR. HINDERAKER:  In theory, I can see that that's

5   true, and that's why 32 was drafted as it was in the sense

6   of, you know -- the phrasing, you know, without regard to 30

7   or 31 we want.  So when 32 says for the lines of business

8   that use Blaze Advisor total revenue and I think -- but I'm

9   asking that as a check against 30 and 31.  Maybe it's going

10  to be the same number.  But if it's not the same number, I

11  need to know why.

12        THE COURT:  Okay.

13        MR. HINDERAKER:  And I can find that out in

14  discovery, but first I have to know if it's a different

15  number.

16        THE COURT:  As it turns out, these motions are all

17  about discovery.  So, all right, Mr. Datzov.

18        MR. DATZOV:  I think I know.

19        THE COURT:  Go ahead on 30 to 32.

20        MR. DATZOV:  Sure.  Your Honor --

21        THE COURT:  Briefly, by the way.  Okay?  It is my

22  intention -- I'll let you know right now -- when we're done,

23  I'm going to take a break.  It's my intention to give you my

24  ruling today, because I think it helps parties to know and

25  not get bogged down in discovery orders that take two,

1    three, four months to get out, so just so you know.

2             MR. DATZOV:  Understood, Your Honor.

3             THE COURT:  Okay.

4             MR. DATZOV:  Let me pick up where Mr. Hinderaker

5    left off.  And when we're looking at the causal connection

6    and we're thinking about what is Blaze Advisor, the one

7    thing I want to make sure was clear is Blaze Advisor itself

8    is not an automated underwriting software program.  It is a

9    very tiny component of those applications.  And for an

10   example of that, Your Honor, I would point to Docket No. 64,

11   which is an exhibit FICO submitted.  It's Exhibit 7, at page

12   22.  And, Your Honor, I have a Computer Science degree, and

13   that's enough to recognize that this bores a lot of people,

14   so I don't want to go into too much detail, but what you're

15   looking at there is a diagram of the evolution.  That's the

16   application that Chubb was using for this particular

17   insurance line.  And it's saying current state.  And there's

18   a whole lot of boxes there about different functionalities

19   that work.

20            Now, Blaze Advisor at the bottom -- well, not at

21   the bottom, I don't know that it's noted actually in the

22   diagram -- but the rules management component of that entire

23   application is a very tiny component of how that process is

24   actually done.

25            And the other point about that is if you look at

1    about halfway down on the page, there's a line that says,

2    Build could mean our IT developers code it or it could mean

3    by AG Blaze rules.  And what that's saying is that when

4    you're thinking about these rules, you can either put them

5    right in the software, you can have a program that says if

6    so and so, then this is what we do, or you can make them

7    external and allow the software to reference those rules.

8    That's what Blaze Advisor is doing.

9         Now, with regard to what's being sought here,

10   there's a couple of points I just want to make.  First of

11   all, the requests are not looking to establish the causal

12   connection that's at issue.  They're looking to quantify

13   something that they already assume there has been

14   established a causal connection for.  They're saying what

15   are your numbers for these revenues?  And our position is

16   they're zero and there are no documents that show

17   attribution of Blaze Advisor software that we're aware of

18   because that's not something we believe exists.

19        With regard to the standard, Mr. Hinderaker kept

20   saying reasonably related.  We pointed out in a footnote

21   that Eighth Circuit law is much different.  It's causal

22   connection here.  And that is also the standard in many

23   other circuits.  The reasonably related language comes from

24   a Sixth Circuit case, which doesn't apply to the Court here.

25   So the standard is causal connection, not reasonably

1   related.  I'm not sure it matters because they can't satisfy

2   reasonably related either, but I do want to point that out.

3         Now, the two parts that we mostly disagree on this

4   motion -- I think everybody is on the same page of what the

5   copyright law and the Copyright Act requires and how those

6   burdens are going to play out at trial, if we ever got

7   there.  But the parts where we disagree are, one, do they

8   need to show such a causal connection at the discovery stage

9   and, two, if so, have they met that burden?

10        With regard to the first question, FICO is mixing

11  up the cases we're relying on.  We're not relying on the

12  *Bell v. Taylor* case, which is the tax revenue -- the tax

13  submission case for the idea that there is a causal

14  connection.  There is not a causal connection here.  The

15  *Bell v. Taylor* case and the *Lucky Break* case from this

16  court, which was a Judge Graham decision on discovery, go to

17  the question of whether you should even look at a causal

18  connection at the discovery stage when parties are seeking

19  copyrighted profits, and the answer to that is yes, you

20  should.  That's exactly what the Seventh Circuit affirmed

21  on, and that's what Judge Graham determined was lacking in

22  the *Lucky Break* case.

23        So I think the answer to that first issue is yes,

24  the Court does need to address whether the revenues that are

25  being sought have a causal connection to the alleged

1    infringement in this case, which is use of copyrighted

2    software or allegedly copyrighted software.

3            Now, for the second part of that, the question of

4    whether there is, in fact, a causal connection in this case,

5    again, I would point out we're looking at Blaze Advisor not

6    under automated underwriting software.  But the bigger point

7    here is that the cases that have looked at this very

8    specific issue have all consistently held and said no, if

9    you are using -- merely using software behind the scenes,

10   then that doesn't have a sufficient enough causal connection

11   to the alleged infringement.  Those are speculative damages,

12   which irrespective of what the copyright law or the

13   Copyright Act provides, are not recoverable.  That's the *IBM*

14   case that we cited to the Court.  That's the *Complex Systems*

15   case that we cited to the Court.  And that's the *Point 4*

16   *Data* case that we cited to the Court.  All of those are on

17   point, and they hold -- in fact, I think it was the *Complex*

18   *Systems* case where there were transactions being processed

19   by the very copyright software that was at issue, exactly

20   the argument that's being made here.  And the court said in

21   denying that there was a causal connection -- or rejecting

22   that argument the court said, the mere connection or usage

23   -- I'm bracketing here -- of the software alone is

24   insufficient.

25            So the idea that they can just come in and say,

1    well, your business was using software behind the scenes so,

2    therefore, we get to go after revenues of departments or

3    lines of business or whatever they might have, merely

4    because they use the software doesn't find support as a

5    matter of law.  That's an issue that does need to be

6    addressed because that goes to a question of a causal

7    connection.  And I don't think they can show that causal

8    connection at this point.  They're not able to show anything

9    beyond the mere use of the software behind the scenes.

10              So, you know, when we're thinking about what kind

11   of damages have been recoverable, the first category under

12   copyright law are the direct profits.  Those are where the

13   copyrighted work is part of the product that's being sold.

14   That's not at issue here.

15              The second type of damages that are often asked

16   for are damages where the copyrighted work is a part of the

17   advertising, it's used to actually solicit and make the

18   sales.  Those are the advertising cases, like the *Andreas*

19   case.  That's not what we have here either.  There's no

20   evidence that FICO -- or, I'm sorry, that Federal was using

21   Blaze to tout its business and to make sales.

22              What we have here is this third bucket of damages,

23   which is they used it behind the scenes, and that's what

24   *IBM*, *Complex Systems*, and *Point 4 Data* all address and say,

25   no, you're not entitled to those kinds of damages.

1          MR. HINDERAKER:  May I respond?

2          THE COURT:  Please.

3          MR. HINDERAKER:  Thank you.

4          I submit that there was -- well, let me respond.

5    There are a number of points, Your Honor, that deserve just

6    to be teased out.

7          I guess the one place to start is with respect to

8    the allocations of burden of proof under the Copyright Act

9    and the concept of attribution.  And for guidance I would

10   direct the Court to the Eighth Circuit's *Andreas* decision.

11   And, as you will recall, the district-court judge in *Andreas*

12   got attribution confused and overturned the jury verdict

13   because it was too speculative in his or her mind that the

14   plaintiff proved the extent of the profits from the

15   infringement.  The Eighth Circuit said you're mixing up

16   burdens of proof.  Attribution, how much profit is

17   attributable to the infringement, is not the plaintiff's

18   burden, it's the defendant's burden.  So when counsel argues

19   about attribution, it's an issue for the defendant to

20   address at trial.

21         The *Andreas* case is then used by counsel to assert

22   that the proof standard at trial is causal connection.  That

23   will not be found in the *Andreas* decision.  The words of the

24   *Andreas* decision is that the infringement contributed to the

25   revenue.  And so the advertisement for the TT Coupe, that

1    included infringing material, was found by the jury under

2    circumstantial evidence to contribute to the revenue.  And

3    then it was for Audi to present the proof of how much was

4    attributable from that, from that infringement.

5           Now, the decision then was kicked back to the

6    district court because the jury -- not only did the jury

7    award profits based upon the sales of the TT Coupe for which

8    the advertisement was directed, but it awarded profits for

9    other product -- for other cars as well.  And so the Eighth

10   Circuit said no, no, no, you have to be limited to the

11   infringing work, revenue from the TT Coupe.  Our document

12   requests are revenue from use of Blaze Advisor.

13          Now, the trial -- you know, the argument at trial

14   that Blaze Advisor is a back-office operation that never

15   sees the light of day, well, let's have that argument at

16   trial, because I do carry the burden on behalf of FICO of

17   showing that there is contribution to revenue from -- and,

18   by the way, the *Balsley* decision from the Sixth Circuit that

19   used reasonably related was interpreting *Andreas*.  The

20   defendant's objection to our discovery saying, well, you get

21   nothing using the phrase reasonably related because that

22   comes out of the *Francois* case that they rely upon.  So this

23   notion that reasonably related to and contributed to are

24   different things has its own issues.

25          But let's go back to this notion that Blaze

1    Advisor is back office.  Well, that's the efficiency

2    argument.  I have to prove more than that.  I have to prove

3    a contribution to revenue.  I'm going to be doing that at

4    trial.  But in the discovery today I get numbers.  I get

5    quantification of revenue.  But we might look at one of

6    their applications and we might look at one of Federal's

7    documents that says, with decision point the producer can

8    obtain real-time quotes and a bindable quote letter

9    enhancing producer productivity.  The same decision point

10   application is described as a market-facing web quote.

11           MR. DATZOV:  Do we have an exhibit number, Your

12   Honor, where we're reading from so I can look at it as well?

13           MR. HINDERAKER:  Federal document 252-0006.

14           And then they say the real-time bindable quote

15   letter includes helpful marketing information, completed

16   application ready for client's signature, not an indication

17   that other carriers provide Federal document 252-0006.  My

18   point being, Your Honor, that let's argue at trial the

19   contribution to revenue.  But to have the representation to

20   you that this is a hundred percent back office doesn't even

21   bear out under Federal's own documents.

22           And that *Lucky Break* case, of course, I mentioned

23   before for those revenues that were related to Blaze

24   Advisor, to use the analogy, those revenues were produced.

25   In this case, we're not asking for revenues that are not

1    related to Blaze Advisor, and so that element of *Lucky Break*

2    while right, *Lucky Break* has no relevance to us.

3              So, Your Honor, there are 15 business applications

4    that exist because of Blaze Advisor.  Counsel looked at one

5    of them, Evolution, at a certain document and stage of the

6    evolution of Evolution.  And I'm sure that when we come to

7    trial, you know, some applications are going to be not

8    contributing to revenue and some applications are.  And then

9    in terms of the attribution to the infringement, that's

10   going to be Federal's problem.

11             THE COURT:  Very briefly.

12             MR. DATZOV:  Very briefly, Your Honor.

13             I just want to make it clear we're not having a

14   fight about attribution and the issue that's in front of the

15   *Andreas* case.  What we're saying is that before you ask for

16   revenues, you have to say what the revenue is relating to,

17   and that's certainly consistent with *Andreas*.  It's

18   consistent with other cases.  You don't get to just say and

19   we get your revenues.  We're not fighting, right now at

20   least, about the issue of how much of those revenues is

21   attributable to what.  We're saying that at the very outset,

22   you need to provide some causal connection between the

23   revenues you're seeking, and ultimately we'll try to prove,

24   and the alleged infringement.

25             Now, with regard to *Andreas*, I do want to mention

1    and point to the Court on page 797, and I'm quoting, "But we

2    reject the notion that *Andreas* was required to put a TT

3    buyer on the stand to testify that she bought the car

4    because of the commercial in order to meet his burden of a

5    causal connection."  I don't know how much more clearly that

6    can come out.  The standard under Eighth Circuit law is

7    causal connection, not reasonable relationship.  Now, we can

8    fight about later what that means, but that's the standard.

9            THE COURT:  Yeah, I understand.  But in fairness

10   to the plaintiffs, I think if you read that case, there's

11   also the statement something to the effect that -- and maybe

12   I'm confusing this with a different case, I don't think I

13   am, but the plaintiff's lawyers, apparently, did an

14   admirable job of it, because the jury believed that ten

15   percent of the revenues were caused.

16           So, anyway, I feel like I've heard enough on this

17   issue.  And I feel that there's nothing you're going to say

18   that's going to -- I don't think there's anything different

19   to be said about Interrogatory No. 6, which asks for the

20   identity of the persons known to you to have knowledge of

21   Federal revenue and profits, including revenues and profits

22   attributable to the use of Blaze Advisor software by Chubb &

23   Son, a division of Federal.  It is a slightly broader

24   formulation, but I think it's asking the same thing in an

25   interrogatory for people who have knowledge; although,

1    honestly, I suspect that the answer you're going to get, if

2    you get an answer, is none.

3              MR. HINDERAKER:  Well, what we got was -- you

4    know, what happens in the motion papers is that first the

5    interrogatory is rewritten by Federal as if we're just

6    asking for persons with knowledge of attribution to revenue

7    from the infringement.  But the document request is identify

8    all persons known to you to have knowledge of Federal's

9    revenue and profits, and then it goes on to say including.

10   So we ultimately got a supplemental answer that a Ramesh

11   Pandey, who has a title of Enterprise Architect Practice, is

12   their one and only witness that they're putting up.  And

13   because there's no -- because he'll testify that none of the

14   profits are attributable to -- well, I'm looking for

15   somebody who has a foundational basis and can talk about

16   Federal's revenues and profits.  They don't have an answer

17   to that interrogatory.  No one has been disclosed that can

18   talk about Federal's revenues and profits.

19             THE COURT:  Okay.  Interrogatory No. 4, every

20   software application or system utilized by Chubb or by any

21   other division or entity other than Chubb that utilizes in

22   any way the Blaze Advisor software.  But the sticking point

23   is sub (a) and sub (b):  Identify all persons known to you

24   to have knowledge of such software application and/or

25   system, and (b) Identify all documents relating to each such

1    software application and system.  I don't need argument on

2    this.  I'll tell you what I think.

3              You're entitled to the general information about

4    what the software applications or systems are.  You're

5    entitled to that identification.  You're entitled to

6    identification of people with knowledge and documents

7    relating.  However, the way it's formed is really overbroad

8    because it could mean anybody in the business unit.  And so

9    -- well, I'll save my comments on that further until I come

10   back.  You're clearly entitled to information of this

11   nature.  It's a question of where the line is drawn, in my

12   view.

13             MR. HINDERAKER:  Could I ask the Court to consider

14   one other element on this?

15             THE COURT:  Sure.

16             MR. HINDERAKER:  Ultimately, we got a supplement

17   response that gave us 15 applications, but I have no idea

18   what entity is using them because they refuse to say, well,

19   this application is used by Chubb & Son, this application is

20   used by United Kingdom, this application is used by some

21   other division of Federal that's not Chubb & Son.  I don't

22   know where they're being used.

23             THE COURT:  Okay.  Understood.

24             Need to respond to that particular statement?

25             MR. DATZOV:  That wasn't part of the discovery

1    request.

2              THE COURT:  Okay.  All right.  We're going to take

3    a break.  I will be back here at 5:00.

4              (A brief recess was taken.)

5              THE COURT:  All right.  We're back on the record

6    in the matter of Fair Isaac Corporation v. Federal Insurance

7    Company, Case No. 16-CV-1054.

8              I indicated to the parties that I would rule from

9    the bench on these motions, if possible, and I am going to

10   do that.  I want to say at the outset a couple of things.

11             Number one, I do this because it's good for the

12   parties, it's helpful if you can just get the issues

13   resolved and move forward.  I think that's of greater

14   service than waiting for a lengthy written opinion when I

15   know what the written opinion would be.  And so I am going

16   to give you my ruling on the record.  I will follow it up

17   with a very short written order that explains various things

18   in response to the motions.  So that's number one.

19             Number two, I do want you to know that even though

20   I am going to rule from the bench, the oral argument is

21   useful.  It does help me clarify my thinking.  It actually

22   has changed my mind on a couple of issues here today.  So

23   don't assume that I just came in here with my mind made up

24   and didn't matter what you said, because that's not the

25   case.

1    So a couple of other preliminary remarks:  It's a

2    case, obviously, involving breach of contract and

3    copyright-infringement allegations.  And those allegations

4    are based on out-of-scope use of the copyrighted works and

5    post-termination use of license software.  The defendant has

6    counterclaimed for breach of contract, alleging that the

7    plaintiff wrongfully terminated the contract and for breach

8    of the covenant of good faith and fair dealing.  And at

9    issue today are hard-fought motions about compelling

10   documents that will be important to the remainder of the

11   discovery.

12    The allegations or the amount in controversy in

13   this case is, depending on one's perspective -- obviously,

14   the parties disagree -- but at least tens of millions, if

15   not more than that, that is at stake in the litigation.  And

16   that's all relevant here because ultimately there is very

17   little, if anything, as we'll go through this that I see

18   that is disproportionate considering the needs of the case

19   and considering the amount in controversy.

20    So one last sort of preliminary remark and then

21   I'll turn to the defendant's motion to compel first because

22   that was the first filed.  These are discovery motions.  As

23   everyone knows, the discovery standard is that the discovery

24   sought has to be relevant and proportional to the needs of

25   the case considering, among other things, the amount in

1    controversy, as I indicated.  That doesn't mean that

2    discovery is boundless or that if the case involves tens of

3    millions, the lawyers can spend tens of millions in

4    discovery.  But it is broad discovery.  And with that in

5    mind, let me turn to the defendant's motion to compel.

6            I am going to grant the motions relative to

7    Requests for Productions 16 through 18, and specifically --

8    let me pull up those requests so that I have the language in

9    front of me -- 16 requests documents that evidence or refer

10   or relate to licensing revenues received from the works 2006

11   to the present.  17 is documents that show the amount of the

12   licensing fee for each perpetual license to the works from

13   2006 to the present.  And 18 is the average amount per seat

14   you've received in licensing revenues.  Those are all

15   different.  They're not -- you are asking for -- the

16   defendants are asking for revenues that are either

17   calculated on a different basis than the contract licensing

18   fee at issue in this case, but the damages in this case on

19   breach of contract will involve the question ultimately of

20   the market value of what was used.  And while the plaintiff

21   wants to argue that it is defined by our pricing matrix and

22   what the parties have agreed to in their 2006 agreement, I

23   believe that the defendants have the right to say market

24   value presumes a willing buyer and a willing seller and,

25   therefore, what the licensed software would be valued more

1    generally in the marketplace is relevant and is important to

2    the experts that the defendants will eventually retain to

3    address the question of contract damages.  So those

4    documents are discoverable.  They're within the scope of

5    permissible discovery in my judgment and are not

6    disproportional to the needs of the case.

7         On Request for Production No. 19, which requests

8    essentially all licensing agreements -- well, not

9    essentially, it requests all licensing agreements for the

10   works at issue from 2006 to the present, I do understand the

11   plaintiff's objection to that request, but I am going to

12   grant that request, as well.

13        The reasoning for this is that, first of all,

14   while the defendants want to raise the issue of

15   non-enforcement and what that says about the good faith --

16   or breach of the covenant of good faith and fair dealing

17   with respect to the parties at issue in this case, they

18   can't make that argument without having discovery of what

19   licensing agreements may or may not have had similar

20   provisions that were or were not enforced.

21        In addition, I do think the language of those

22   other agreements may or may not ultimately lead to the

23   discovery of admissible evidence or the discovery of expert

24   opinions on some of the meaning of the terms at the contract

25   at issue or may shed light on the meaning of 10.8 and 9.2 at

1    issue in this particular contract.  That is not to say --

2    well, at this stage, that information is reasonably

3    calculated to lead to the discovery of admissible evidence.

4    Whether it ultimately results in admission of evidence is

5    not for me to say, obviously.

6           On the related question of redacted documents,

7    counsel for the plaintiffs has clearly indicated that they

8    will produce any documents that were inadvertently redacted

9    for relevance in an unredacted fashion and will produce a

10   privilege log for those documents for which the redaction is

11   based on privilege.  So I don't believe there's a live

12   dispute there with respect to those issues.

13          With respect to Requests for Production No. 13, I

14   am going to deny that request.  I think as worded it is

15   extremely broad, and I understand that the defendants' point

16   is we want to make sure that we're not playing a game of

17   gotcha that the plaintiffs don't say oh, we don't call this

18   a licensing agreement, we call this a software packaging

19   agreement or something of that nature, but as drafted the

20   request for production would require production of

21   potentially things like employee agreements or third-party

22   vendor contracts.  So I am not going to -- I am going to

23   order that that not be produced.

24          On Interrogatories No. 6 to 9, I think we are

25   dancing a little bit on the head of a pin perhaps.  I don't

1    think there's much of a dispute between the parties on this,

2    but for sake of clarity, here's what I will order the

3    plaintiffs to do:  For each of the interrogatories just

4    clearly state what the category of damages is, what the

5    calculation of that category is, and the arithmetic, if you

6    will, by which you calculated it.  So, for example, one of

7    the interrogatory answers that has been discussed in the

8    briefing has category one damages that are stated, and the

9    amount is calculated, and now the brief has, I think, made

10   that calculation pretty clear.  I think the interrogatories

11   need to be supplemented so that all of that is in the form

12   of the interrogatory answer.

13           This is very clearly -- I want to make it very

14   clear that that is without prejudice to the notion that

15   those damages calculations at present are not binding on the

16   plaintiff and are not in any way somehow precluding the

17   plaintiff from offering numbers based on its expert's

18   analysis or based on discovery that it receives subsequent

19   to this order.

20           Those are, I think, all of the items on the

21   defendant's motion to compel.

22           On the plaintiff's motion to compel I am going to

23   -- I'm going to give you a little bit longer discussion of

24   my rationale, so bear with me.

25           But Requests for Productions 30 through 32 I am

1    going to grant.  Those requests essentially ask for summary

2    reports of gross and net -- or gross and net revenues and

3    gross and net profits for products and services sold by the

4    business units or entities that used Blaze Advisor.  And as

5    we've discussed here today, 32 may simply be cumulative of

6    30 and 31, but it may actually have different documents that

7    are responsive that wouldn't necessarily be strictly

8    responsive to 30 and 31.  So I'm ordering that those all be

9    produced.

10           The heart of the dispute on this topic, in my

11   mind, is whether this revenue and this profit information is

12   discoverable under a disgorgement of profits theory, and it

13   is.  The disgorgement of profits remedy is clearly allowed

14   by Statute 17 U.S.C. 504.  The case law makes it clear that

15   those profits can be either direct or indirect, meaning, as

16   I understand it, direct from the sale of the infringing

17   products or indirect from the use of the infringing

18   products.  And I think the parties are in agreement with

19   that general characterization.

20           Where they disagree is that the indirect profits

21   in this case, as the defendants would say, result from the

22   use of back-office software.  I don't know that that is the

23   plaintiff's theory.  I don't believe that it is or at least

24   they would say that it is not.  Those profits are certainly

25   hard to prove.  And I would imagine that there will be

1    motion practice, both summary judgment and/or motions in

2    limine, that will address whether and when this evidence can

3    come in.  But that is to say that's after discovery.

4            And I want the parties to know I did read all of

5    the cases that were cited here and discussed, and my reading

6    of the cases is this:  *IBM, Complex Systems*, and *Point 4*

7    *Data* did talk about you have to have a causal connection or,

8    you know, these are speculative, but all of those

9    discussions took place in the context of summary judgment or

10   motion in limine, which is to say it took place after the

11   evidence had been produced in discovery.  And in the *IBM*

12   case, I'm not quoting it exactly, but the court said, The

13   number of cases where there are indirect profits resulting

14   from the use of software should only -- you know, it should

15   be the seldom case -- I can't remember if they said rare

16   case -- that gets to a jury.  But that's the point, is

17   that's a decision for another day, as Mr. Hinderaker has

18   said.

19           So the cases cited on page 8 of the defendant's

20   motion, which were argued here today as being indicative of

21   the principle that, no, it matters to discovery that there

22   be a causal element shown, those are all distinguishable.

23   And I think Mr. Hinderaker and I agree on what those

24   distinctions are.

25           The *Bell* case involved tax returns of a company

1     that used a photograph of Indianapolis, which was an

2     infringement, and the tax returns were not discoverable.

3           The *Gray* case involved a derivative work and

4     bifurcated discovery pending a decision on infringement

5     because the infringement contention was in the court's view

6     very thin, and so the court said we're not going to deal

7     with whether this revenue information is discoverable at

8     this point.

9           *Lucky Break* dealt with infringing commercials

10    shown where the commercials related to 16 products sold by

11    Kay Jewelers and the plaintiff wanted profits associated

12    with all of the products sold by Kay Jewelers, and they had

13    already gotten discovery on the profits associated with the

14    products at issue.  So I think that actually does prove

15    Mr. Hinderaker's point.

16          And *Classical Silk*, I think it is, requested

17    profits for a period and a geographical area that were not

18    connected to the alleged infringement, all of which is a

19    long-winded way of saying I agree with the defendants that

20    they have to connect in some fashion the request with the

21    allegation of infringement.  But the document requests in

22    this case were tailored to attempt to get at that.  It asked

23    for profits and revenues associated with service and

24    products sold by divisions that used the Blaze software.

25    And at this stage of the litigation, they can't further

1    tailor that, and they don't have either the expert analysis

2    or the evidence which would reasonably allow them to say

3    more about causation or reasonably related, if you want to

4    use that phrase.  So I'll order that those documents be

5    produced.

6              Interrogatory No. 6:  People with knowledge of

7    Federal's revenues and profits, including Chubb.  Here's

8    what I have to say about that.  It's not tailored in the

9    same fashion.  Okay?  So I think you have to provide

10   information of the people who have knowledge of the profits

11   and revenues associated with the divisions or entities that

12   used Blaze software.

13             You do not have to admit by way of answering that

14   interrogatory that you agree with the implicit contention

15   that there were any revenues derived from the use of Blaze

16   software.  I don't think that the plaintiffs are intending

17   that that be a game of gotcha, but let me say on the record

18   it won't be.  But the scope of what you have to provide is

19   parallel to and no greater than the documents relating to

20   revenues and profits that you're going to provide in

21   response to 30 to 32 of the document requests.

22             On Interrogatory No. 4, here 's what I want the

23   defendants -- here's what I will order the defendants to

24   produce:  In addition to the information on the applications

25   and systems, produce the information with respect to the

1     business units that are using those applications and

2     systems.  Whether or not it was exactly asked in the

3     interrogatory is fair game.  And I don't see a value at this

4     point in having the parties go back and re-serve

5     interrogatories, which everyone understands what they're

6     getting at.  And, by the way, I will say to the defendants

7     you'll notice that I also -- that's something that I have

8     done for both sides.  I haven't made you go back and redraft

9     interrogatories or document requests to the extent that I

10    have changed slightly the scope of them.

11          With respect to identifying people and documents,

12    here's what I'll order the parties to do.  I don't feel

13    capable of redrafting that.  As I indicated on the record

14    earlier, I think those are overbroad by the way they're

15    phrased because they could literally mean everybody in Chubb

16    & Son and could literally mean hundreds or thousands of

17    documents that are simply not related to this lawsuit.

18          So the parties will meet and confer on those two

19    aspects of Interrogatory No. 4.  If you can't come to an

20    agreement on that through a meet and confer process, and I

21    say this hesitantly -- I don't want the defendants to use

22    this as an opportunity, but if you can't come to a

23    reasonable agreement on this, then I think it's got to be

24    redrafted to get at what the plaintiffs want in a way that

25    is narrower.  But, hopefully, that won't be necessary.

1     Okay?

2              I'm sorry.  You guys got to talk for an hour and

3     some, and I only talk for 20, so I apologize for keeping you

4     here late and for going on at length.  I want to make it

5     clear what the ruling is and why -- at least what my

6     rationale and basis for that is in the event that either of

7     you wishes to, I guess in this case, appeal that to Judge

8     Wright.

9              So, as far as I'm concerned, the motions have been

10    ruled upon.  I will follow up with a brief written order

11    that references comments on the record and gives a brief

12    explanation.  But the order is as of today.  Okay?  Very

13    well.

14             Anything further for the plaintiffs?

15             MR. HINDERAKER:  (Inaudible).

16             THE COURT:  Okay.

17             MR. HINDERAKER:  But I think it's for both.  We

18    have a joint motion before the --

19             THE COURT:  Oh, yes.  I have that.  I have new

20    dates for you in light of what I've done.  And, again, it is

21    my intention to keep you moving along.  And I don't have

22    those dates here.  Essentially what I did was move

23    everything out, as you had suggested, four months from

24    today.  So discovery would close -- here it is.  All right.

25    Discovery would close June 29th.  And I'll re-issue an

 1   order, but let me tell you what these basically say.  Fact

 2   discovery closes June 29th.  Expert disclosures, the first

 3   set, the 30 days later, will be August 3rd.  Rebuttal

 4   witnesses and reports, September 14.  Reply reports,

 5   September 28.  That's for the plaintiff.

 6          The defendant has the same dates for the same

 7   categories.  Non-dispositive motions, June 29.  And

 8   non-dispositive motions regarding experts, October 26.

 9   Dispositive motions filed, served and scheduled by December

10   21.  And trial readiness, April 29 of 2019.  But those will

11   all be embodied in a written order as well, but wanted to

12   get those to you now.  Okay.

13          Anything further, Mr. Hinderaker?

14          MR. HINDERAKER:  No, Your Honor.

15          THE COURT:  All right.  Thank you.

16          MR. DATZOV:  Nothing from us, Your Honor.  Thank

17   you for your time.

18          THE COURT:  All right.  Thank you all.  Appreciate

19   the argument and the interesting issue.  And everybody have

20   a good evening.

21          MR. DATZOV:  Thank you, Your Honor.

22          THE COURT:  All right.

23          (Court adjourned at 5:30 p.m.)

24

25

1                          *       *       *

2              I, Debra Beauvais, certify that the foregoing is a

3       correct transcript of the audio recording of the proceedings

4       in the above-entitled matter, to the best of my abilities.

5                    Certified by:  s/Debra Beauvais
                                    Debra Beauvais, RPR-CRR
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25