# EXHIBIT 7

# FILED UNDER SEAL

DocuSign Envelope ID: D84A8AAA-789F-48E4-A71F-8137BF213C22

## AMENDMENT 1 TO SERVICE AGREEMENT

This Amendment 1 amends the Services Agreement ("Agreement") that was effective March 14, 2016 by and between Federal Insurance Company ("Federal") and ACE American Insurance Company ("ACE American")(collectively, ACE American and Federal are referred to herein as the "Original Parties").

WHEREAS, ACE American provides services not only to Federal but to other insurance companies as a subcontractor of Federal pursuant to section 8 hereof;

WHEREAS, the Original Parties desire that ACE American should be able to provide such services directly.

NOW, THEREFORE, in consideration of the mutual promises set out herein and intending to be legally bound, the parties agree as follows:

1. The following entities shall be added to the Agreement as Service Recipients of ACE American under this Agreement. ACE American shall be the Service Provider for such Service Recipients. Wherever the term "Service Recipient" is used, it shall include not only the two Original Parties, as applicable, but shall also include the following entities:

    Chubb Custom Insurance Company
    Chubb Indemnity Insurance Company
    Chubb Insurance Company of New Jersey
    Chubb Lloyds Insurance Company of Texas
    Chubb National Insurance Company
    Executive Risk Indemnity Inc.
    Great Northern Insurance Company
    Pacific Indemnity Company
    Vigilant Insurance Company

2. All other terms and conditions remain unchanged.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment 1 to be executed by their duly appointed representatives to be effective January 1, 2018.

**Original Parties:**
Federal Insurance Company
ACE American Insurance Company

*[DocuSigned by: Ilana G. Hessing]*
Ilana G. Hessing
Vice President and Assistant Secretary

Date: February 22, 2018
_____

**Additional Service Recipients:**
Chubb Custom Insurance Company
Chubb Indemnity Insurance Company
Chubb Insurance Company of New Jersey
Chubb Lloyds Insurance Company of Texas
Chubb National Insurance Company
Executive Risk Indemnity Inc.

Great Northern Insurance Company
Pacific Indemnity Company
Vigilant Insurance Company

DocuSigned by:

*Ilana N. Hessing*

5FC213ADF89444

Ilana G. Hessing
Vice President and Assistant Secretary

Date: February 22, 2018

## SERVICE AGREEMENT

This Services Agreement ("Agreement") is made effective as of 12:01 a.m. Eastern Standard Time, on the 14th day of March, 2016 ("Effective Date") by and between Federal Insurance Company and ACE American Insurance Company (together, the "Parties") signing this Agreement.

WHEREAS, the Parties may provide services to each other under this Agreement. When referred to in the context of providing services, a party is referred to as "Service Provider." When referred to in the context of receiving services, a party is referred to as "Service Recipient."

WHEREAS, the Parties hereto wish to identify the Services to be rendered, and to provide a method of fixing the basis for determining the charges to be made for such Services;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and intending to be legally bound hereby, Service Provider and the Service Recipient agree as follows:

1. PERFORMANCE STANDARDS FOR SERVICES. Subject to the terms, conditions and limitations of this Agreement, Service Provider agrees to the extent requested by the Service Recipient to perform diligently and in a professional manner such Services, as set forth in the Services Addendum A to this Agreement, as the Service Recipient determines to be reasonably necessary in the conduct of its insurance business (the "Services").

Service Provider agrees at all times to maintain trained personnel of the kind necessary to perform this Agreement.

(a) CAPACITY OF PERSONNEL. The personnel of Service Provider utilized to perform the Services hereunder are and shall remain the employees of Service Provider, and Service Provider shall alone retain full liability to all employees for their welfare, salaries, fringe benefits, legally required employer contributions and tax obligations.

(b) EXERCISE OF JUDGMENT IN RENDERING SERVICES. In performing any Services hereunder, Service Provider shall at all times act in a manner reasonably calculated to be in the best interests of the Service Recipient.

(c) CONTROL. The performance of Services by Service Provider for the Service Recipient pursuant to this Agreement shall in no way impair the absolute control of the business and operations of Service Provider or the Service Recipient by their respective Boards of Directors. Service Provider shall act hereunder so as to assure the separate operating identity of the Service Recipient.

(d) LAW. The Service Provider acknowledges the need to comply with all relevant laws and regulations applicable to it with respect to the provision of the Services.

1

2. <u>SERVICES</u>. The performance of each party hereunder shall be subject to the direction and control of such party's Board of Directors.

Subject to the foregoing and to the terms, conditions and limitations of this Agreement, Service Provider shall provide to the Service Recipient, as may be determined by the Parties from time to time, one or more of the Services listed on the Addenda hereto. The Parties may agree to add additional services to be performed by the Service Provider in accordance with this Agreement by adding additional Services addenda signed by both Parties.

3. <u>GRANT OF AUTHORITY</u>. The Service Recipient grants Service Provider authority to pay third parties on its behalf and in its name any amounts due in connection with the Services provided by Service Provider hereunder and to receive receipts, releases and discharges the Service Recipient from such third parties upon prior written approval from the Service Recipient. The Service Recipient grants Service Provider authority to receive payments from third parties, for amounts due the Service Recipient from such third parties and to issue receipts, releases and discharges, in whole or in part, to such third parties. Service Provider may pay or receive all reasonable amounts as provided for herein, and shall maintain such records as are necessary to report and account for such payments as required by this Agreement and applicable legislation and/or regulations. Service Provider will provide copies of such records to the Service Recipient upon request. The Service Provider is obliged to establish and maintain appropriate management systems, risk management systems and information technology systems enabling it to properly perform the Services.

4. <u>CHARGES</u>. For the Services rendered by Service Provider under this Agreement, Service Recipient shall pay to Service Provider no less than the full cost (including overhead) Service Provider has borne in providing those Services.

Allocations shall be based on the results of the parties' annual plan process; an annual plan is completed by the business units/segment and support organizations (e.g., Human Resources, Accounting, Information Technology). The plan is constructed by in the same format that management performance is measured by management cost center code ("MCC") and submitted to the parties' senior management for approval. The plan is then allocated to each legal entity based upon the actual cost of work completed, measured by MCC within each legal entity. Determining factors include the following:

(a) Claims Related Costs – Allocated to legal entity by using cost center as set out in a mutually agreed on table within legal entity direct paid losses on a rolling 12 month basis

(b) Underwriting Related Costs – Allocated to legal entity by using MCC within legal entity direct written premiums (DWP) by on a rolling 12 month basis

(c) Direct costs (i.e. commissions, premium taxes, boards & bureaus, loss based assessments) – charged directly to legal entity

Confidential                                                                                                   FED013551_0004

(d) Support services– allocated to MCC using a variety of methods; DWP (accounting/finance), headcount, square footage occupied (rent), transaction counts/work effort (AP, Legal); allocated to legal entity by using MCC within legal entity for the underlying expense classification (i.e. claims or underwriting related costs)

Within forty-five (45) calendar days after the end of each calendar quarter, Service Provider shall advise Service Recipient of the costs and expenses it has incurred during such calendar quarter (as well as any prior calendar quarters to the extent such costs and expenses have not been previously invoiced) in providing Services to Service Recipient pursuant to this Agreement. The Parties shall settle such account within forty-five (45) calendar days following the receipt of such invoice, any net amount due to or from either party. The Parties may, by mutual agreement, enter into pre-settlements from time to time during the quarter.

The Service Recipient and Service Provider and their respective duly authorized representatives shall, at all reasonable times, each be permitted access to all books and records of the other pertaining to Services provided and charges allocated or billed pursuant to the provisions of this Agreement.

All billing and payment will be in United States Dollars.

5. STANDARD OF CARE. The Parties shall use that degree of ordinary care and reasonable diligence in the performance of Services hereunder that an experienced and qualified Service Provider of similar services under a similar services agreement would use acting in like circumstances and familiar with such matters and in accordance with such additional standards as may be adopted by the Service Recipient from time to time and communicated to Service Provider, including industry standards and applicable laws. The Service Recipient's right to audit Service Provider, as provided in section 6 below, shall include the right to audit Service Provider's performance in accordance with such standards.

Furthermore, the Parties agree to maintain backup systems and contingency plans to assure that work stoppages, fires, riots, equipment, utility or transmission failures, shortage or damage, acts of God or other similar occurrences do not jeopardize the integrity of the data maintained on behalf of the other party. Each party warrants it will maintain such systems in conformity with corporate and prudent business standards.

6. BOOKS AND RECORDS. The term "books and records" of Service Recipient includes all of the books and developed or maintained on behalf of Service Recipient under or related to the agreement. The books and records of Service Recipient are the exclusive property of Service Recipient, are held for its benefit, and are subject to its control.

Service Provider shall make all of the books and records available for examination and inspection by duly authorized representatives of the Service Recipient, upon reasonable notice, at any time during Service Provider ordinary business hours. Service Provider shall, at Service Provider's expense, deliver to the Service Recipient within 48 hours any and all documents requested by the Service Recipient or by any

Confidential                                    FED013551_0005

governmental agency having jurisdiction over the Service Recipient. The Service Recipient shall be entitled to conduct regular performance reviews in respect of the Service Provider's compliance with all the provisions of this Agreement and the service levels as may be agreed from time to time, which reviews shall be subject to a reasonable notice to the Service Provider by the Service Recipient.

7. WARRANTY. The Service Provider warrants and guarantees that it possesses the skill, knowledge, capability and capacity to discharge all its obligations in terms of this Agreement.

Neither party will be liable to the other for any indirect, incidental, special, consequential, exemplary, punitive or reliance damages, including without limitation, lost anticipated, lost business opportunities or lost sales or profits. Nothing in this Agreement shall create, imply or operate as an admission, that a party or any member of a party's group of companies, employee or agent of a party (or any employee or agent of a party's group of companies) owes or accepts any duty or responsibility to the other party or such party's group, employee or agent (or any employee or agent of a member of a party's group) save as expressly stated in this Agreement.

The Parties agree that the foregoing limitation and exclusions are reasonable, based on each other's risk in connection with the Services to be provided pursuant to this Agreement and the remuneration to be received under this Agreement.

8. RIGHT TO CONTRACT WITH THIRD PARTIES. Nothing herein shall be deemed to grant Service Provider an exclusive right to provide Services to the Service Recipient to the extent not requested by the Service Recipient pursuant to this Agreement. Service Provider shall have the right to subcontract with any third party, affiliated or unaffiliated, for the performance of Services requested by the Service Recipient; provided that Service Provider shall remain responsible for the performance of Services by any such subcontractors; and provided further that any such Services subcontracted to an affiliate shall be provided by such affiliate in exchange for compensation, as set forth in section 4. Service Provider shall be responsible for obtaining from any such subcontractor any books and records referenced in section 6 above. Service Recipient shall also have the right to subcontract with any third party, affiliated or unaffiliated, and to assign the right to receive Services to such third party; provided that Service Recipient shall remain responsible for the performance of its duties and obligations hereunder.

9. TERMINATION. This Agreement shall remain in effect until terminated by mutual consent of the Parties or upon either Service Provider or the Service Recipient upon giving ninety (90) days or more advance written notice. Either party may also terminate the Agreement for cause upon thirty (30) days' notice if the other party materially breaches the agreement. Upon termination, Service Provider shall promptly deliver to the Service Recipient all books and records that are, or are deemed by this Agreement to be, the property of the Service Recipient. The "Initial Term" of the Agreement shall be the first twelve months from the Effective Date, and each twelve months beyond the Initial Term shall be considered an "Annual Term."

Confidential

FED013551_0006

DocuSign Envelope ID: A166E420-89E6-4AB1-95EE-8CCDBDF7A297

CASE 0:16-cv-01054-DTS   Doc. 125   Filed 08/27/18   Page 8 of 13

11. SETTLEMENT ON COMPLETE TERMINATION. No later than thirty (30) days after the effective date of termination of this Agreement, Service Provider shall deliver to the Service Recipient a detailed written statement for all charges incurred and not included in any previous statement to the effective date of termination. The amount owed or to be refunded hereunder shall be due and payable within ninety 90) days of receipt of such statement.

12. CONFIDENTIALITY;. Each party, in exercising its rights and performing its obligations under this Agreement may have access to or be exposed to, directly or indirectly, confidential and/or proprietary materials of the other party ("Confidential Information"). Confidential Information shall include all information concerning the operations, affairs, products, marketing, systems, technology, customers, end-users, and businesses, including financial affairs, of either party and their respective relations with their customers, employees, agents, patients, and service providers (including customer lists, customer data, transaction information, completed insurance forms, supplier data, know-how, third party software and/or products; all PHI (as defined below); any information regarding a party's customers or prospective customers; and any other proprietary and/or trade secret information of a party, whether in oral, graphic, written, electronic or machine-readable form. For purposes of this Agreement, "PHI" shall mean: (i) any information from which an individual may be identified; (ii) any information concerning an individual that would be considered "protected health information" within the meaning of applicable law and regulation in the United States; or (iii) any information that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.

(a) Exclusions. Except with respect to PHI, Confidential Information shall not include information which can be demonstrated: (i) to have been rightfully in the possession of the receiving party from a source other than the disclosing party prior to the time of disclosure of said information to the receiving party hereunder ("Time of Receipt"); (ii) to have been in the public domain prior to the Time of Receipt; (iii) to have become part of the public domain after the Time of Receipt by a publication or by any other means except an unauthorized act or omission by, or breach of this Agreement on the part of, the receiving party or its employees or agents; (iv) to have been supplied to the receiving party after the Time of Receipt without restriction by a third party who is under no obligation to the disclosing party to maintain such information in confidence; or (v) independently developed by the receiving party. In addition, a recipient may use or disclose Confidential Information including PHI to the extent such recipient is legally compelled to disclose such Confidential Information, provided that the recipient shall use reasonable efforts to give advance notice of such compelled disclosure to the disclosing party, and shall reasonably cooperate with the disclosing party in connection with any efforts to prevent or limit the scope of such disclosure and/or use of such Confidential Information.

(b) Restrictions on Use and Disclosure. Each party agrees to hold all Confidential Information of the other party in strict confidence and in compliance with any data protection laws in force in the Republic of South Africa, and shall not, without the express prior written permission of a

5

Confidential                                                              FED013551_0007

representative of the disclosing party authorized by the disclosing party to make such decisions,: (i) disclose such Confidential Information to third parties, except, to the extent provided by this Agreement, to the extent necessary to exercise its rights or perform its obligations hereunder, or as required by law; or (ii) use such Confidential Information for any purposes whatsoever, other than the exercise of its rights or performance of its obligations hereunder. Each party shall notify the other Party of any request it receives for access or changes to the Confidential Information, under any applicable data protection laws, and shall disclose the other party's Confidential Information only to those of its employees, representatives, affiliates and subsidiaries who have a need to know such Confidential Information in order to exercise such receiving party's rights or perform such receiving party's obligations pursuant to this Agreement. Each party shall, further, (i) only hold and process the personal data after having taken appropriate technical and organisational measures to guard against unauthorised or unlawful processing of the Confidential Information and to guard against accidental loss or destruction of or damage to, that Confidential Information, (ii) provide a level of security appropriate to the harm that might result from any unauthorised or unlawful processing or accidental loss, destruction or damage to the Confidential Information and also to the nature of the Confidential Information being protected; and (iii) use reasonable efforts to assist the other party in identifying and preventing any unauthorized use or disclosure of any Confidential Information. Without limiting the foregoing, each party shall immediately advise the other party in the event that it learns or has reason to believe that any person who has had access to the Confidential Information of such party has violated or intends to violate the terms of this Agreement, and shall cooperate in seeking injunctive relief against any such person.

(c) <u>Employees and Agents</u>. The Parties shall ensure that each of its employees, subcontractors, affiliates and subsidiaries performing under this Agreement comply with the provisions of this Article.

13. <u>INDEMNIFICATION</u>. Each Party ("Indemnifying Party") will indemnify the other party ("Indemnified Party") against any and all direct losses, costs, demands, claims, liabilities and expenses (including legal expenses) incurred or suffered by the Indemnified Party as a result of or in connection with any breach of this Agreement, or as a result of gross negligence or wilful misconduct, by the Indemnifying Party.

14. <u>ASSIGNMENT</u>. This Agreement and any rights pursuant hereto shall not be assignable by either party hereto, except upon prior written consent of the non-assigning party, which consent shall not be unreasonably withheld, delayed or conditioned. Except as and to the extent specifically provided in this Agreement, nothing in this Agreement, expressed or implied, is intended to confer on any person other than the Parties hereto, or their respective legal successors, any rights, remedies, obligations or liabilities, or to relieve any person other than the Parties hereto, or their respective legal successors, from any obligations or liabilities that would otherwise be applicable. The representations, warranties, covenants and agreements contained in this Agreement

Confidential                                            FED013551_0008

shall be binding upon, extend to and inure to the benefit of the Parties hereto, their, and each of their, successors and assigns respectively.

15. ARBITRATION. Any controversy, dispute, claim or question arising out of or relating to this Agreement, including without limitation its formation or validity, interpretation, performance or non-performance by any party, or any breach thereof (hereinafter, collectively, Controversy) shall be referred to and resolved exclusively by three arbitrators through private, confidential arbitration conducted in Philadelphia, Pennsylvania, United States as the exclusive venue for the arbitration, unless otherwise agreed to by the Parties. Such arbitrators shall be disinterested, neutral individuals who have experience and qualifications in the subject matter of the Controversy. One arbitrator shall be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of written notice from the other party requesting it to do so, the requesting party may choose a total of two arbitrators who shall choose the third. If the arbitrators fail to select the third arbitrator within ten (10) days after both have been named, the party plaintiff shall notify the American Arbitration Association (AAA) who shall appoint the third arbitrator. The AAA shall select an arbitrator who is disinterested, neutral and who has experience and qualifications in the subject matter of the Controversy. Each party shall bear the expense of its own arbitrator and shall jointly and equally bear the cost of the third arbitrator. In the event of the death, disability or incapacity of any arbitrator, a replacement shall be named pursuant to the process, which resulted in the selection of the arbitrator to be replaced. The arbitrators are released from all judicial formalities and may abstain from following the strict rules of law and evidence. The arbitrators shall make their decision with regard to the custom and usage of insurance business as at the effective date of this Agreement. The majority decision of the panel shall be final and binding upon the Parties to this Agreement. Judgment may be entered upon the award of the arbitrators in any court of competent jurisdiction. Except as otherwise specifically provided in this Article, the arbitration of any Controversy shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association, but without the administration services of the American Arbitration Association.

16. NOTICE. All notices, statements or requests provided in connection this Agreement shall be in writing, and given by facsimile, electronic mail, personal delivery, receipted delivery service, registered mail, postage prepaid, overnight courier service, telex or telecopier, addressed to the respective Contact Person listed on Appendix A. Notices shall be deemed to have been duly given when delivered by hand to an officer of the other party, or when deposited, as first class certified or registered mail, postage prepaid, overnight courier service, or when sent by electronic mail, telex or telecopier, addressed to the respective Contact Person listed on Appendix A.

17. COMPLIANCE ARTICLE

The following provisions are added in accordance with Indiana and Pennsylvania regulations:

(a) Neither party shall be permitted to advance funds to the other except to pay for services defined in the agreement.
(b) The Service Recipient shall maintain oversight for functions provided to it by the Service Provider and shall monitor services annually for quality assurance.

Confidential                                                                                          FED013551_0009

(c) If any Service Recipient is placed in receivership or seized by a state regulator under applicable law:

(A) The rights of such Service Recipient under the agreement extend to the receiver or Commissioner.

(B) The books and records shall immediately be made available to the receiver or such state regulator immediately upon the receiver or such state regulator's request.

(d) The Service Provider does not have an automatic right to terminate the agreement if the Service Recipient is placed in receivership.

(e) Service Provider will continue to maintain systems, programs or other infrastructure notwithstanding a seizure of the Service Recipient by a state regulator under applicable law, and shall make them available to the receiver for as long as the Service Provider continues to receive timely payment for services rendered.

(f) All funds and invested assets of the Service Recipient are:

(A) the exclusive property of the Service Recipient;

(B) held for the benefit of the Service Recipient; and

(C) subject to the control of the Service Recipient.

15. **ENTIRE AGREEMENT**. This Agreement, together with such amendments as may from time to time be executed in writing by the Parties, constitutes the entire agreement and understanding between the Parties in respect of the transactions contemplated hereby.

16. **SECTION HEADINGS**. Section headings contained herein are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

17. **COUNTERPARTS**. This Agreement may be executed in separate counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. **GOVERNING LAW**. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed in duplicate by their respective officers duly authorized to do so, as to the date and year first above written.

Confidential

FED013551_0010

Name: *Kathleen R. Castano* (DocuSigned by: 0C87A10E07D9477...)

Title: _Vice President & Assistant Secretary_

who warrants that she is duly authorized to sign for and on behalf of

Federal Insurance Company

Name: *Diana D. Hering* (DocuSigned by: A59176611109427...)

Title: _Vice President & Assistant Secretary_

who warrants that she is duly authorized to sign for and on behalf of

ACE American Insurance Company

9

Confidential    FED013551_0011

## Addendum A

One or more of the following services may be provided under this Agreement:

Actuarial
Administration Support
Administrative
Audit, product advisory, underwriting and claims consulting
Claims
Communications/Marketing
Compliance
Financial
Human Resources
Human Resources
Information Technology
Internal Audit
Investment
Legal
Loss Control
Operations Support
Reinsurance Related
Treasury
Underwriting
Other services appropriate or necessary in connection with the provision of and servicing of insurance policies

Confidential