```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3     Fair Isaac Corporation, a        )
       Delaware corporation,            )   File No. 16-cv-1054
 4                                      )             (WMW/DTS)
                Plaintiff,              )
 5                                      )
       v.                               )
 6                                      )
       Federal Insurance Company, an    )
 7     Indiana corporation, and ACE     )   Courtroom 9E
       American Insurance Company, a    )   Minneapolis, Minnesota
 8     Pennsylvania corporation,        )   December 17, 2018
                                        )   10:29 a.m.
 9              Defendants.             )
       ------------------------------------------------------------
10
                  BEFORE THE HONORABLE DAVID T. SCHULTZ
11          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                          (MOTIONS HEARING)
12
       APPEARANCES
13      For the Plaintiff:         MERCHANT & GOULD P.C.
                                   BY:  HEATHER KLIEBENSTEIN, ESQ.
14                                 80 South Eighth Street, #3200
                                   Minneapolis, Minnesota 55402
15

16      For the Defendants:        FREDRIKSON & BYRON P.A.
                                   BY:  CHRISTOPHER D. PHAM, ESQ.
17                                      TERRENCE J. FLEMING, ESQ.
                                   200 South Sixth Street, #4000
18                                 Minneapolis, Minnesota 55402

19
        Court Reporter:            RENEE A. ROGGE, RMR-CRR
20                                 1005 United States Courthouse
                                   300 South Fourth Street
21                                 Minneapolis, Minnesota 55415

22          Proceedings recorded by mechanical stenography;
       transcript produced by computer.
23

24

25
```

1                     **P R O C E E D I N G S**

2                          **IN OPEN COURT**

3                              *   *   *

4              THE COURT:  All right.  Let's go on the record.

5              All right.  We are on the record in the matter of

6        Fair Isaac versus Federal, Civil No. 16-1054.

7              If counsel for the plaintiff would note their

8        appearance for the record, please.

9              MS. KLIEBENSTEIN:  Your Honor, Heather

10       Kliebenstein from Merchant & Gould, and I have with me from

11       FICO Emily Perhach.

12             THE COURT:  Good morning, Ms. Kliebenstein.  And

13       Ms. Hatch, did you say?

14             MS. KLIEBENSTEIN:  Perhach.

15             THE COURT:  Perhach.  Okay.

16             And for the defendants?

17             MR. PHAM:  Good morning, Your Honor.  Chris Pham,

18       along with my colleague Terry Fleming on behalf of the

19       defendants.

20             THE COURT:  Good morning, Mr. Pham and

21       Mr. Fleming.

22             All right.  I've read everything.  I think the

23       most efficient way of doing this, if you would indulge me,

24       each -- whoever is doing the argument, I assume

25       Ms. Kliebenstein and Mr. Pham, if you would both come up to

1    the podium at the same time.  I want to walk through some of

2    this fairly quickly.

3              So I want to start with the requests for

4    production numbers 30, 31 and 32, which are the documents,

5    and I'm not going to quote your language exactly, but

6    essentially the documents showing quarterly gross and net

7    revenues and gross and net profits derived from each of the

8    lines of business that used Blaze Advisor or other entities

9    for Chubb & Son and other business entities.

10              Here's what I understand to be that situation:

11   Number one, that the defendants have said we don't have such

12   documents.  They don't exist in the ordinary course.  And by

13   the plaintiff's admission or characterization, those same

14   document requests are also covered or seek the same

15   information as is included in Interrogatories 15 to 20.

16              So first question for -- or two questions for you,

17   Mr. Pham.  One, do I have it right that those reports or

18   documents are not kept in the ordinary course of business,

19   right?

20              MR. PHAM:  That is correct, Your Honor.

21              THE COURT:  But I am assuming the underlying

22   information, and this is going to bleed over into the

23   interrogatories, but I am assuming that the information is

24   in one form or another kept in a database somehow such that

25   queries can be run in the database to provide the

1    information.  Is that also correct?

2           MR. PHAM:  Yes, that's also correct, Your Honor.

3           THE COURT:  And so in some measure in my mind

4    it's, you know, kind of a pointless debate about whether you

5    make the query and turn over the results of the query in the

6    form of a document, or you do the query and turn over the

7    information.  But -- so do you, Mr. Pham, believe at this

8    point that Federal has turned over all of the information

9    that's responsive to Interrogatories 15 to 20, or is there

10   more to do?

11          MR. PHAM:  There's just a little bit more to do,

12   Your Honor.  If I may, there are -- so with respect to

13   Interrogatory No. 4, which is not the subject of this

14   motion, but that interrogatory lays out the business units

15   and applications that are at issue.  And we will be

16   providing plaintiff with an updated supplemental answer to

17   that interrogatory that gives the lay of the land as far as

18   what those business units are and what the applications are.

19          And with respect to that thus far to date, and

20   some of this information was served to plaintiffs after this

21   motion was filed, we have provided annual figures for all of

22   the business units except for one to date.  We understand

23   that they are also seeking quarterly figures, and we have

24   started to provide that information as well.

25          THE COURT:  Is that -- and do you have the ability

1  to produce quarterly figures?

2       MR. PHAM:  Yes.  And we are in the process of

3  compiling that, correct.

4       THE COURT:  And you've done it both in terms of

5  gross revenue, net revenue, gross profit, net profit?

6       MR. PHAM:  No.  To date, we have provided the

7  gross written premiums.

8       THE COURT:  Okay.  All right.

9       So, Ms. Kliebenstein, what -- tell me in your view

10  what exactly is missing at this point on this topic of

11  either RFP 30 to 32 or the Interrogatories 15 to 20.

12       MS. KLIEBENSTEIN:  Happy to.  When it comes to

13  document requests 30 through 32, we're not seeking just an

14  identification of the gross written premium dollars that

15  touched Blaze Advisor.

16       THE COURT:  Okay.

17       MS. KLIEBENSTEIN:  We're asking for revenues and

18  profits, expense information, so we can figure out where the

19  damages analysis is going to go.

20       THE COURT:  Right.

21       MS. KLIEBENSTEIN:  And Your Honor brought up the

22  issue of -- the precise issue here; while the document

23  requests are similar to Interrogatories 16 through 20,

24  they're not the same.  They ask for backup in part.  They

25  ask for backup data for us to give a gut check to what

1   they're identifying, the premium dollars that they're

2   identifying in response to the interrogatory answers.

3           Now, why does this matter?  It matters because we

4   should be able to double-check their math.  On Friday we

5   received a third supplemental response to Interrogatory

6   No. 18.  And we got information for the same business unit

7   and the same application that uses Blaze Advisor that we got

8   back on November 18th, but the numbers were changed.  It

9   went from 4 billion to 1.6 billion.  Why?  I don't know.  I

10  don't have the backup data to be able to figure that out.

11          Your Honor also brought up the other salient

12  issue.  Does Federal have the data in its system?  Can they

13  hit query?  Can they hit query and print?  The answer is

14  yes, they can.  And after we received Federal's opposition,

15  I went and did more case law research on this issue.  There

16  are several cases that come out of this court that say if

17  you've got a document request, particularly on financial

18  data, and you have the data in your systems and all you have

19  to do is hit query, save, print, you have to do that.

20          And two of the cases that are most pertinent are

21  the *Sky* case from 2014 and Judge Graham and the *Select*

22  *Comfort versus Sleep Better* case from 2012.  In both of

23  those cases the plaintiff was seeking financial data of some

24  sort.  In the *Select Comfort* case I believe it was documents

25  relating to or evidencing the defendant's purchase of

1    plaintiff's trademarks for use as key words.  And now the

2    data that was responsive to that request was kept.  I

3    believe it was an online search engine.  But the defendant

4    had the ability to go look at their accounts, pull the data

5    and sort it for the plaintiff.

6           In the *Sky* case, that case related to websites

7    that had online subscription content.  Viewers could log in,

8    pay a subscription fee and look at content.  And in that

9    case the defendant -- the plaintiff asked for revenues and

10   profits associated with the websites at issue.  The

11   defendant in that case did the same thing that Federal is

12   doing here.  Here's our annual reports, you go figure it

13   out.  And in that case Judge Graham asked the defendant,

14   well, do you have the data?  Can you hit query, save, print?

15   If the answer is yes, then you have a duty to go do that,

16   because Federal Rule of Civil Procedure 34 is not limited to

17   discovering documents that are stored in paper copy in a

18   filing cabinet.  It also refers to electronically stored

19   data.  So if a party can go query the data, it has to do so.

20          And 30, 31, 32 are much broader than simply an

21   identification of premium dollars.  It's about revenues and

22   profits.  So there's a distinction there.  The distinction

23   matters significantly to us.  It matters significantly to my

24   damages expert who is trying to figure out what's going on

25   and what we can -- what we can connect to Blaze Advisor and

1    what are the profits from that.  We have no profit data.  We

2    have limited premium dollars.  That's not enough.

3              THE COURT:  All right.  So two observations.  One

4    is, yeah, I don't much care whether you call this a document

5    request or an interrogatory.  The information on revenues,

6    profits, gross and net, and expenses is information they're

7    entitled to, right?  In my view.  Well, and I think the case

8    law is pretty clear.

9              The difference between written premium and these

10   other figures -- I don't know the defendant's accounting.  I

11   believe the plaintiffs when they say that's not the same

12   thing.  The problem is, I guess from my view, is I have one

13   of two options here, I think.  Either -- if you have the

14   information in terms of revenues and profits, then it has to

15   be turned over.  If you -- if that information doesn't exist

16   or isn't accessible, then -- in one form or another, I think

17   the defendant is hemmed in by whatever you do produce,

18   you're going to have to live with and there may be some

19   limits on what you can do with that information imposed by

20   the court, I think.

21             So -- but let me --

22             MS. KLIEBENSTEIN:  And, Your Honor, I apologize to

23   interrupt.  I failed to address Interrogatories 16

24   through 20, if you would like me to do that now or I can

25   wait.

1          THE COURT:  Hang on a second.  I have a lot of

2     notes, and I want to -- I may want to ask you something.

3          First of all, I guess there is a question to you,

4     which is -- and I'm not hearing the defendants say they

5     can't do this.  But does it make a material difference

6     whether you get it in the form of quarterly versus annual

7     information?  If the information itself addresses what

8     you're looking for, what difference does it make?

9          MS. KLIEBENSTEIN:  If you made me pick my battles,

10    Your Honor, I would pick fully responsive and annual.  But

11    in Friday's further supplementation to Interrogatory 18 they

12    gave us quarterly information.  Federal, Chubb, ACE, huge

13    companies.  To suggest that they don't have the data on a

14    very granular basis, I would be very skeptical of that.  I

15    suspect that they do have the information quarterly.  I have

16    not heard any argument that it is unduly burdensome or it

17    adds hundreds and hundreds of hours of work to pull it in

18    quarterly data.  I think, I think I may be the one who has

19    to live with what I get on the back end with a lot of data

20    to sort through, but I suspect it's no more burdensome for

21    Federal to pull it quarterly as opposed to annually.

22          THE COURT:  Okay.  Hang on a second.

23          Mr. Pham, maybe you can tell me.  Mr. Pham, I'm

24    sorry if I mispronounce your name.  What is the difference

25    between gross written premium, sometimes called direct

1    premium, and -- certainly that sounds like at least gross

2    revenue.  But -- so, at least as I'm hearing the plaintiff,

3    there's a concern about we're asking for revenues and

4    profits and we're getting written premium and that's not

5    matching up.  So what's the difference?

6           MR. PHAM:  Okay, Your Honor.  So the gross written

7    premiums, those are the premiums that are generated.  And

8    those -- there is -- that does not include the net profits.

9    That is the revenues that are being generated by each of

10   these business lines.  And --

11          THE COURT:  So the difference is we're dealing

12   with -- you're giving them -- when you give them written

13   premium, you're giving them the revenues related to specific

14   written policies, insurance policies.  And they're saying

15   they want information about the profitability of the

16   business units.  No?  That wrote those premiums -- that

17   wrote those policies.

18          MS. KLIEBENSTEIN:  In part, Your Honor.

19          THE COURT:  All right.

20          MR. PHAM:  And just to be clear, Your Honor, so

21   what we have provided relate to those interrogatories.

22   Again, we focused on that as opposed to the 3232, because we

23   thought it would be more readily available.

24          To counsel's point about, you know, running an

25   inquiry, hitting the search button, it's not so simplified

1    as that, Your Honor.

2              THE COURT:  It never is.

3              MR. PHAM:  You know, there are certainly several

4    different business lines, and these are -- you know, a

5    company of this size, we are interfacing with individuals

6    from all over the globe, the company, 31,000 employees.  And

7    so -- and it's not even so simple as just running a specific

8    query within a business line.  There are certain

9    applications that, although they may interface with Blaze,

10   they do not contribute to the premiums or the gross written

11   premiums.  So we are working to identify, all right, this

12   specific application, is it just merely in a compliance

13   application?  Does it work with Blaze to generate gross

14   written premiums at all?  Does it merely provide quotes, but

15   then does not guarantee any premiums or any business will be

16   booked from that?

17             And so the search isn't so direct and simple.  And

18   so we -- it's a process that we have to go through in

19   working with our client, as well as our expert, to figure

20   out, okay, which one of these applications absolutely

21   interfaces with Blaze such that it also generates the gross

22   written premiums?  And so there's a certain distinction

23   between the corporation itself and then the several business

24   units that interface with Blaze.

25             THE COURT:  Okay.  So --

1          MR. PHAM:  And to your earlier point, Your Honor,

2     we're not suggesting that we're not going to turn over the

3     information.  You know, we certainly understand that what we

4     are going to be claiming as our defenses in support of

5     refuting the damages analysis provided by plaintiff, we have

6     to hold ourselves to that -- you know, the same information

7     that's available.

8          THE COURT:  Yeah, and that's true.  Of course, the

9     problem with that statement, which came from me ultimately,

10    or originally, is -- I can't think of the word I was looking

11    for.  But a disingenuous defendant would say that's the best

12    news I've heard all day because I got to live with the

13    information I give them, that's fine.  I will figure out

14    what information I want them to have.  And that's, of

15    course, the problem.  It can't -- if the defendant is

16    ultimately unable to produce the information that they have

17    requested that I know they're due, either I have to have a

18    very specific cogent explanation as to why the defendant is

19    unable to produce that information.  And if I conclude they

20    haven't been unable, they just haven't produced it, then

21    they're going to get the benefit of that, not the defendant.

22         MR. PHAM:  Sure, Your Honor.  I agree.  And it's

23    not that we are unable to.  We will be.  As Your Honor

24    knows, fact discovery doesn't close until February 14th.

25    The parties have jointly extended discovery multiple times.

1    And so it's not that the information will not be

2    forthcoming, because it is and we will be producing the

3    information.  We have been producing it on a rolling basis

4    thus far; twice in June, in August, October and November,

5    most recently in December.  And so the information is

6    moving -- is going to be produced.

7                    THE COURT:  Okay.

8                    MS. KLIEBENSTEIN:  Your Honor, if I may.

9                    THE COURT:  Yes, go ahead.

10                   MS. KLIEBENSTEIN:  You issued your order on 30

11   through 32 in February.

12                   THE COURT:  Right.

13                   MS. KLIEBENSTEIN:  We have -- I mean, you've seen

14   the correspondence in the file in the papers.  We had

15   another follow-up conversation with Your Honor in August.

16   We are three and a half months after that.  I believe that

17   the plaintiff has the right to get this information, to have

18   had this information to be able to figure out what we're

19   doing with our case, to depose Federal's witnesses about it

20   and ask follow-up discovery about it if we want to.  Our

21   opening expert reports, FICO's expert reports are due one

22   week after fact discovery closes.  To have this production

23   final and complete on February 13th is beyond prejudicial.

24                       And I do commend Mr. Pham, he has been working at

25   this, but the fact of the matter is Federal is not ponying

1   up and handing over the documents and running the queries.

2   I understand it's a big company.  So is FICO.  But to that

3   end, the answers must be somewhere.  And this lawsuit has

4   been around a long time.  It's not going anywhere.  And I

5   believe the time has passed.

6           When it comes -- I'll set aside the

7   interrogatories until you're ready for that, but those are

8   my -- those are my impassioned thoughts on 30 through 32.

9   And, you know, I don't want the first time I see this stuff

10  to be in their responsive damages report.  That's what I'm

11  very concerned about.

12          THE COURT:  Yeah, and that won't happen or, at

13  least, it won't be unrectified if it does.

14          So, Ms. Kliebenstein, as I look at -- so 30 to 32,

15  the RFPs talk about revenues and profits, gross and net.

16  The interrogatories, I don't have the interrogatories in

17  front of me on this right now.  I can look them up, but you

18  will know the answer without my looking it up.  I'm looking

19  at the answers to the interrogatories, which are stated in

20  terms of gross written premiums.  Are the interrogatories

21  phrased in terms of gross written premiums?

22          MS. KLIEBENSTEIN:  They are, Your Honor.  I'll

23  read --

24          THE COURT:  Okay.

25          MS. KLIEBENSTEIN:  -- part of 16 to you.  "For all

1   insurance policies in connection with which the Blaze

2   Advisor software was used, the gross written premium of

3   Federal," dot, dot, dot, dot, dot.

4           THE COURT:  Why -- so why are you asking for both,

5   the revenues and profits on the one hand and then the gross

6   written premiums on the other?

7           MS. KLIEBENSTEIN:  To get a full picture.  So the

8   copyright infringement -- our allegation of the copyright

9   infringement is misuse of Blaze Advisor rep license was

10  terminated.  It's this software is part of applications that

11  deal with insurance policies.

12          THE COURT:  Right.

13          MS. KLIEBENSTEIN:  And so it's insurance policies

14  that are -- that are quoted, written, the claims that are

15  handled, renewals that are handled.  So we want to know how

16  many insurance dollars touch those applications.  And then

17  taking -- what we'll do with this information at the end of

18  the day is taking those insurance dollars and then looking

19  at what's provided in response to 30, 31, 32.  What are the

20  net revenues?  How much money do they make, top-line money?

21  And then what are the profits?  What expenses are they going

22  to try to deduct from those dollar amounts in order to

23  reduce our disgorgement award.  So it goes back to the

24  statute.  What are the top-line revenues?  What are the

25  deductible expenses?  So that's why 30 through 32 and the

1    interrogatories identifying the premium dollars are related,

2    but they work together.

3                THE COURT:  Yeah.  And somewhere along the line

4    you lost me.

5                MS. KLIEBENSTEIN:  Okay.

6                THE COURT:  I get the gross revenues, net

7    revenues, gross profits, net profits, get why you want that

8    and the expenses.  How does that -- is the gross written

9    premium a way of checking those numbers or what's -- what --

10   does that tie to a different damage measure?  What's the

11   need for both?

12               MS. KLIEBENSTEIN:  Essentially the gross and net

13   revenues should match up with the premium dollars.

14               THE COURT:  Okay.

15               MS. KLIEBENSTEIN:  Now, Federal may have some

16   ancillary services --

17               THE COURT:  Sure.

18               MS. KLIEBENSTEIN:  -- that I don't know about.

19   And so that's where the difference comes.  We want the

20   premium dollars, I know that much, and the revenues should

21   line up.

22               THE COURT:  Okay.  Well, it -- I'm not hearing

23   that the defendant is saying that it's -- they have a

24   problem with what's been asked.  I mean, I frankly think

25   that if forced, you could live with one or the other

1     appropriately hemming in the defendant, but -- okay.

2             I'm looking, for example, now at supplemental

3     answer to Interrogatory No. 19.  And let me just read out

4     loud into the record what it says.  It says, "For the CAH

5     Canada business unit, the following application uses Blaze

6     Advisor software in Canada, Evolution.  The 2017 gross

7     written premiums from the issuance of the insurance policies

8     that used Evolution in connection with which the Blaze

9     Advisors software was used in Canada is approximately

10    $330 million.  The number of policies that were issued using

11    Evolution in connection with which Blaze Advisors software

12    was used in Canada is approximately 85,000."

13            What is incomplete about that answer?

14            MS. KLIEBENSTEIN:  It's right in kind, but it's

15    incomplete in -- it doesn't address the whole picture.  So

16    in Canada --

17            And could I have the document camera put up?

18            THE COURT:  Sure.  All you have to do is turn it

19    on on that -- the lower console there.  No.  Yep.  Okay.

20    You're live.

21            MS. KLIEBENSTEIN:  This is a rudimentary chart,

22    but I think it will help us.

23            So Canada, setting aside the issue that we believe

24    there are additional applications in the US and abroad that

25    are using Blaze, we know from interrogatory responses that

1    there are two applications in Canada that use Blaze Advisor.

2    So the supplemental answer that we got only addresses

3    Evolution.  It doesn't address ADAPT-ABL.  Now, the

4    supplemental answer that you read only addresses 2017.  Our

5    interrogatory asked for from the date of first use of the

6    Blaze Advisor software in Canada.  They've been using it in

7    Canada for much longer than 2017.  And as you will see in

8    the update that we got on November 16th, we were given data

9    from 2015 through 2017.  That's the period that it's been

10   used in Canada.

11        So I think that maybe right now they're half in

12   compliance with Interrogatory No. 19 and half not, but

13   that's what's consistent about all of the interrogatory

14   responses.

15        THE COURT:  Okay.

16        MS. KLIEBENSTEIN:  So this -- this spreadsheet

17   shows you the different applications that we know of that

18   are using Blaze Advisor.  There's more, but we're not going

19   to talk about that right now.

20        THE COURT:  So let me ask you, Mr. Pham, do you

21   disagree with factually what she's saying, that these are

22   the applications and here is the time period?  Or are you

23   simply saying we're working our tail feathers off, we're

24   going to get it, but we don't have it yet?

25        MR. PHAM:  Your Honor, so our position is the only

1    part that is incomplete from this interrogatory is --

2              THE COURT:  Which one?  When you say "this

3    interrogatory," which one?

4              MR. PHAM:  19.

5              THE COURT:  Okay.

6              MR. PHAM:  19, Your Honor.  -- is that we have not

7    provided the quarterly figures.  The request does ask for

8    those.  We have provided the annual figures.

9              And if I may use this device as well, Your Honor,

10   this is the chart that we will be providing as a

11   supplemental answer to Interrogatory No. 4.  And as you will

12   see, this chart provides the business units, and the

13   applications that we are submitting relate to use of Blaze.

14   And so this is a much more narrow scope than the prior

15   charts that we have provided as an answer.

16             THE COURT:  And which then begs the question, Were

17   the prior answers that were broader simply wrong?

18             MR. PHAM:  No.  So, Your Honor, with respect to

19   that, so, for example, I can --

20             THE COURT:  If you wouldn't mind, put

21   Ms. Kliebenstein's chart back up for a second, so I can ask

22   you a question, Mr. Pham.  So she's saying -- and we're

23   using 19 as an example, just as an illustration, so I

24   understand exactly what's going on here.  But what you're

25   saying is Canada accident and health ADAPT-ABL wasn't used

1    or isn't Blaze Advisor?

2         MR. PHAM:  So to that point, Your Honor, some of

3    these applications, such as that, there were considerations

4    about using Blaze with them; and ultimately if that's not

5    the case, then you adapt in that business unit or that

6    application.

7         THE COURT:  So your supplemental answers are -- or

8    your supplemental answer to Interrogatory 4 is cleaning up

9    some of what I'll call a misrepresentation?  Not that you

10   were misrepresenting things; it was just inaccurate?

11        MR. PHAM:  Correct, Your Honor.  And by way of

12   another example, for example, with the business unit CSI and

13   I think on their Decision Point, now Decision Point is one

14   of those applications that it provides quotes, so it

15   interfaces with Blaze, but it doesn't do so such that it

16   generates any premiums.  And so it's a matter of digging

17   down and looking into these applications, what their actual

18   functionalities are in determining whether or not there is

19   any gross written premiums that are generated through use of

20   that application, so if the application merely houses

21   information, but it does nothing more, or if it's just a

22   compliance application.  That's the reason why we have

23   provided the supplemental answers to clean up some of the

24   inaccuracies.

25        THE COURT:  Well, I think using that last example,

1    if you have use of an application that doesn't have any

2    connection to gross written premium, but just houses

3    information, then the better answer is to say zero dollars

4    as opposed to simply not answer.  But -- all right.

5              MS. KLIEBENSTEIN:  If I may.

6              THE COURT:  Yes.

7              MS. KLIEBENSTEIN:  Because this is the first time

8    I have seen this, many, many months after we -- years after

9    we've had a response to Interrogatory No. 4.  My initial

10   response is, well, what's next?  What curve ball are we

11   going to have thrown at us tomorrow when we dig into these

12   supplemental answers?  If you look back at the interrogatory

13   responses, again, they're being too clever by half.

14   Interrogatory No. 16 and 17, "For all insurance policies in

15   connection with which the Blaze Advisor software was used."

16   We're not asking for premium dollars that touch Blaze

17   Advisor.  If you go back to the text of the interrogatory,

18   it's broader than that.  It's when we discussed Decision

19   Point.

20             THE COURT:  Well, read the full interrogatory to

21   me, if you would, since you have it in front of you.

22             MS. KLIEBENSTEIN:  "For all insurance policies in

23   connection with which the Blaze Advisor software was used,

24   the gross written premium of Federal and the gross written

25   premium of each related company, including the specific

1    identification of each related company, for each quarter

2    from March 30th, 2016, to date."

3              It's not asking what premium dollars went through

4    Blaze Advisor software.  So the example about Decision

5    Point, that it's somehow working with the application, but

6    the premiums don't, quote, unquote, go through Blaze

7    Advisor, that's not what the interrogatory is asking about.

8              THE COURT:  That's not what I understand Mr. Pham

9    to be saying, though, but maybe I'm wrong.

10             MR. PHAM:  So, Your Honor, if there is nothing

11   that Blaze is attributing to for these revenues, then --

12   then what -- I don't understand exactly why --

13             THE COURT:  It's -- okay.  Let me rephrase what I

14   understand the plaintiff's interrogatory to be asking.  Any

15   insurance policy that was written with which the use of

16   Blaze Advisor software was used, they want to know all the

17   premiums.  So if Blaze is used with Decision Point and

18   Decision Point is connected to something else that generates

19   a premium, they're saying they get that.

20             Am I right, or am I not right?

21             MS. KLIEBENSTEIN:  You're right, Your Honor.  That

22   it forms the base for disgorgement.

23             THE COURT:  Okay.

24             MS. KLIEBENSTEIN:  Not that that's ultimately what

25   we would get.

1            THE COURT:  Right.  But that's the information you

2      want.

3            MS. KLIEBENSTEIN:  Yeah.

4            THE COURT:  Okay.

5            MS. KLIEBENSTEIN:  Because otherwise we're going

6      back to that argument we had in February.  Well, you know,

7      they haven't proven that things have contributed to revenue.

8      And then Federal gets to decide, right, what's

9      contributing --

10           THE COURT:  I remember that motion well.

11           MS. KLIEBENSTEIN:  -- and what isn't contributing.

12           THE COURT:  Right.

13           MS. KLIEBENSTEIN:  And that's our burden to prove,

14      and we'll prove it.

15           THE COURT:  Right.

16           MS. KLIEBENSTEIN:  But that's not where we are

17      right now.  And so to allow Federal to limit what's in these

18      interrogatory answers and the premium dollars and the

19      revenues and the profits, we're going down that dangerous

20      slope again.

21           THE COURT:  Okay.  Yes, my ruling in February was

22      broad as to the discovery.  There was a reason for it.  I

23      personally think it was the right decision.  I'm not certain

24      that I'm hearing Mr. Pham say there -- not that he would say

25      it this way, but the response I'm hearing doesn't suggest to

1   me that you're trying to rewrite my order or their

2   interrogatory.

3              MR. PHAM:  No, not at all, Your Honor.

4              THE COURT:  Okay.  So, for example, put that chart

5   back up, if you would.

6              If you have -- so Decision Point is an

7   application, right?  Is that -- is Decision Point the name

8   of an application that's -- is Chubb the one that calls it

9   that, or is that --

10             MR. PHAM:  Correct.

11             THE COURT:  Okay.  So you have that application.

12  Does that application associate with insurance policies?

13             MR. PHAM:  Yes, it provides quotes is my

14  understanding.

15             THE COURT:  Okay.  And their point then is it

16  provides quotes.  If Blaze Advisor is used somehow in

17  connection with the policies that are written based on the

18  quotes out of Decision Point, they get that premium

19  information.

20             MR. PHAM:  Okay.

21             THE COURT:  Right?

22             MR. PHAM:  Yes.

23             THE COURT:  So -- you know, and I think it's

24  appropriate, obviously, that if there are premium dollars

25  that are simply in no way, shape or form associated with

1    Blaze Advisor, that's not within the scope of their

2    interrogatory.  But their interrogatory, as I construed it

3    and allowed it, is pretty broad and they get -- you err on

4    the side of providing premium dollar information if there is

5    some nexus between those premium dollars and Blaze Advisor.

6    That's my recollection, not having gone back to reread the

7    transcript of that hearing.

8            Do you agree with that, Ms. Kliebenstein?

9            MS. KLIEBENSTEIN:  I do.  So we're not in front of

10   Your Honor in another two weeks about what's been deleted --

11           THE COURT:  Oh, you will be.  Go on.  I'm sorry.

12           MS. KLIEBENSTEIN:  Well, then maybe my question is

13   this.  So for what's coming off of this list, let's start

14   with Decision Point.  This is the first time I've heard this

15   argument.  Could I have Mr. Pham articulate again why

16   Decision Point -- why Federal does not believe that Blaze

17   Advisor is connected to -- or what its relationship is to

18   Decision Point one more time?

19           THE COURT:  Yeah, I wouldn't mind hearing that as

20   well.

21           MR. PHAM:  Sure, Your Honor.  And my knowledge in

22   this area is not probably as thorough as it should be

23   because we are still trying to understand.  Again, there are

24   different applications with different functions and uses.

25   My understanding of Decision Point is that while it provides

1    a quote, that quote does not guarantee that any premiums

2    will be generated from it and that it doesn't issue any

3    policies.  So while a quote may be provided by using

4    Decision Point, that does not automatically guarantee that

5    there is some kind of premium being generated therefrom.

6              THE COURT:  When it comes to -- well, let me back

7    up then.  Staying within this business line, Chubb Specialty

8    Insurance, is that a business line or is that a business

9    entity?

10             MR. PHAM:  That is a business line that is now

11   known as Financial Lines Unit.

12             THE COURT:  Okay.

13             MR. PHAM:  Post merger there was a change in the

14   name, apparently.

15             THE COURT:  So staying with that business line,

16   does that business -- let's assume -- that business line

17   uses Blaze Advisor software?

18             MR. PHAM:  Correct.

19             THE COURT:  What does it use it for?

20             MR. PHAM:  So my understanding, there's an

21   application, CSI Express, that interfaces with another

22   application, automated renewal process, so it's to help

23   renew policies.

24             THE COURT:  Okay.

25             MR. PHAM:  And there's a ratings or a rules engine

1      that helps look at that process as renewals come up.

2              THE COURT:  Here's what I'm getting at, and,

3      again, you know, if I'm not understanding the factual

4      underpinnings here, I expect you to correct me, you two.

5      But CSI, this business line, uses Blaze Advisor software at

6      a high level to do what in its business?  To actually do the

7      underwriting function?  What?  Do you know?

8              MR. PHAM:  I do not, Your Honor.

9              THE COURT:  Okay.  Here's what I understand them

10     to be saying.  That business line uses Blaze Advisor.  If it

11     uses Blaze Advisor globally as to the business line as

12     opposed to a distinct set of policies that are issued, if it

13     uses it generally for all of its business, then they get the

14     revenues for the entire business line or the written

15     premiums for the entire business line, regardless of what

16     lower level applications are used or not used, right?

17             MS. KLIEBENSTEIN:  If the defendant would agree

18     that that's the proper base, I would say that's an easy way

19     to go about it.  But if you recall in the February hearing,

20     a big important point was that we had narrowly tailored our

21     discovery requests to try to get the proper base that was

22     limited by application.  And so I have not heard that all of

23     CSI's business touches Blaze in some point.  If that were

24     the answer, and we could say that all of CSI's policies,

25     their revenues, their profits, that's where you start for

1    the base, that would be an easy way to go about the problem.

2    But on Decision Point, what I hear the argument being is,

3    yes, Blaze Advisor works with it, but it only writes quotes.

4    Some of those are issued; some of those aren't.  But to me

5    isn't it an easy answer?  Well, can't you figure out what

6    quotes turn into policies?  They've got to have record of

7    what went through Decision Point and what ultimately became

8    a premium.

9         THE COURT:  Well, that strikes me as unbelievably

10   complicated to actually do, and that's why I'm trying to

11   find an easier route to what you're entitled to.  But the

12   starting point for this whole discussion was in February

13   you, the defendants, had said they don't get what -- they

14   don't get this until they can prove there's a causal

15   connection.  And my ruling was, I had read all the cases

16   that Federal had cited and they were procedurally and

17   substantively postured differently and that they were not

18   required to find causation or show causation before they get

19   the discovery.  They get the discovery.  You can argue

20   causation.  They have to show it.  But all of that traces

21   back to if Blaze is used by this business line to generate

22   or in the stream of activity that generates premium dollars,

23   every premium dollar that is in that stream with which Blaze

24   is somehow associated, they get that information, correct?

25        MR. PHAM:  Correct.

1          THE COURT:  Okay.  So let's take a timeout for a

2     second.

3          (Recess taken from 11:12 a.m. till 11:21 a.m.)

4          THE COURT:  Here's what I hear and what I'm going

5     to -- what I'm going to do for the time being, is I'm going

6     to make some verbal orders as we're going through this so

7     that you know what I think the ground rules are.

8          You will have to appeal -- frankly, what I would

9     ask the parties to do is after you've heard the verbal

10    orders, if either side feels that they need to be appealed

11    from, then I will reduce some portion of the verbal order to

12    writing, because I really think that Judge Wright will need

13    something more concrete than what we've put on the record.

14    And that's not -- I'm not saying that so that people are

15    discouraged from appealing, but I am trying to give you

16    guidance so that you can keep the case moving, but also do

17    it in a way that we can get it in front of Judge Wright if

18    we need to.

19         So here's the way I see Request For Production 30

20    through 32 and Interrogatory Nos. 16 through 20 -- or 15

21    through 20, whichever it is:

22         On the RFPs, the information as to quarterly gross

23    and net revenues and profits derived from each line of

24    business that used Blaze Advisor for Chubb & Son and other

25    business units has to be provided.  And I haven't heard that

1   it's not available or that it can't be figured out

2   reasonably efficiently.  And so I'm going to make sure that

3   it's clear that I'm ordering that that be produced, that

4   information be produced.

5          Interrogatories 15 through 20, I don't hear a

6   dispute between the parties about what the plaintiff is

7   entitled to.  There may be a little bit of ambiguity or

8   miscommunication about what is being provided.  So to the

9   extent that it wasn't clear before, hopefully it's clear

10  now.  The way I'm going to characterize it is this:  If you

11  have premium dollars that are coming out of the business

12  line or business unit, depending on the interrogatory, for

13  which Blaze software -- Blaze Advisor software was anywhere

14  in the stream of moving that to a premium, moving that

15  potential business into a premium, then you have to provide

16  all that premium information.

17         So those are my orders on that, on the substance

18  of it.

19         Let me just hear from Ms. Kliebenstein.  Do you

20  think you understand it and, B, do you agree with it?

21         MS. KLIEBENSTEIN:  I do, Your Honor.  My follow-up

22  questions are two-fold.  When?

23         THE COURT:  Yeah.

24         MS. KLIEBENSTEIN:  And attorney's fees.

25         THE COURT:  Right.  So on the when, what is the

1       close of discovery again?  February --

2                   MR. PHAM:  14th.

3                   THE COURT:  14th.  Valentine's Day.  Lovely.

4                   All right.  I want that information completely

5       produced by January 15th.  And if you see going forward --

6       actually, let me change that date to January 18th.  I will

7       give you to the Friday of that week.  So January 18th that

8       information has to be completely produced.  If you see the

9       train coming that you're not going to be able to do it, I

10      want you to get on the phone with me.  Okay?

11                  MR. PHAM:  Yes, Your Honor.

12                  THE COURT:  Okay.  So in my mind that takes care

13      of RFPs 30 to 32 and Interrogatories 15 to 20.  Any

14      questions, concerns, comments about those two items?

15                  MR. PHAM:  No, Your Honor.

16                  THE COURT:  Ms. Kliebenstein?

17                  MS. KLIEBENSTEIN:  Not right now, Your Honor.

18                  THE COURT:  Oh, the attorney's fees.  We will come

19      back to that.

20                  All right.  RFPs 55 to 70.  Here's what I hear the

21      parties to be saying.  I hear the defendant to be saying

22      we're looking, we're not objecting to the interrogatory or

23      the request for production -- excuse me -- request for

24      production.  We'll turn them over to the extent that we can

25      find them and -- but this is difficult and time-consuming.

1    I hear the plaintiffs saying, you're looking in all the

2    wrong places.

3            I don't -- from what everything I've read, I don't

4    see it that way, to be honest with you.  I don't see that

5    they've restricted themselves to only IT people, but let me

6    ask Mr. Pham.

7            What custodians were identified, how and why?

8            MR. PHAM:  So as you may recall, Your Honor, back

9    on August 29th plaintiff identified documents that they

10   wanted Federal to look at to see if there would be

11   additional custodians and/or responsive information that

12   would stem therefrom.  We went back and looked at those

13   documents.  And based on our view of those, we did identify

14   four additional custodians, and we have since then did a

15   data collection for those custodians.  And you're absolutely

16   right; we are not objecting to the requests.  We are open to

17   any additional custodians that may be identified.  And so we

18   are working diligently with plaintiff to run those searches

19   for those individuals.

20           THE COURT:  Who signed the software agreement?

21           MR. PHAM:  The software agreements?

22           THE COURT:  Yeah, or the -- whatever the contract

23   is underlying this.

24           MS. KLIEBENSTEIN:  We're both stumped.

25           MR. PHAM:  Yeah.

1          MR. FLEMING:  Chubb & Son, a division of Federal.

2          MR. PHAM:  A specific individual?

3          THE COURT:  Yes, individual.  Here's the point:

4     Did you look in that person's documents or that person's

5     units documents?

6          MR. PHAM:  You know, that's a good question, Your

7     Honor.  I don't know the specific individual.  But if my

8     understanding is correct, the individual who was involved

9     during that negotiation, they're no longer with Federal, but

10     we did look.

11          THE COURT:  Okay.  Here's the thing.  I think

12     obviously if FICO has information that certain documents or

13     certain custodians should be looked at, they should share

14     that with you.

15          Separate and apart from that, Federal has to make

16     an effort to figure out where -- where would the logical

17     custodians be?  Who would they be or what business units or

18     what structure within the company?  And, you know, I sort of

19     need to hear from you that you've done that.  And have you

20     shared -- well, let me ask it this way:  Have you shared

21     where you decided to look with the plaintiffs?

22          MR. PHAM:  Yeah, we're looking through the entire

23     system.  We have identified via phone call that we had who

24     these additional individuals were and where their names are

25     from.  If they are listed on a document as the business

1    relationship person, then we searched through their data.

2    And we started from the individuals with the most knowledge.

3    So the folks so far that we've collected data from happen to

4    be the folks who are the most intimately involved and

5    knowledgeable about these applications and Blaze, and we

6    started there, and we kind of branched off from each of

7    those individuals.

8              THE COURT:  Okay.  What's been produced so far,

9    just a general sense?  5,000 documents?  1,000 documents?

10   What's been produced that's responsive to these requests?

11             MR. PHAM:  Specifically to Requests 55 through 70,

12   we have not seen any responsive documents specific to those

13   requests.  And, again, several of those requests may not be

14   applicable here because there are applications that simply

15   don't interface with Blaze at all.  And to the extent that

16   they don't -- if we go through each of these 15 requests,

17   Your Honor, they are application specific.  And so to the

18   extent Blaze doesn't interface with them at all, there won't

19   be any responsive documents.  To the extent Blaze does

20   interface with them, they are specifically looking for

21   documents which kind of give the business case as to why

22   this application was implemented in its interface with

23   Blaze, and that's what we are looking for.

24             THE COURT:  Right.  So set aside the issue of

25   emails for a second, okay?  Company documents.  Is there a

1     central repository such that, I don't know, all important

2     documents are kept here or anything like that?

3            MR. PHAM:  Yes, Your Honor, that's my

4     understanding.  We are looking beyond just emails alone.

5            THE COURT:  Right.

6            MR. PHAM:  There are presentations and other

7     documentation that the company holds.

8            THE COURT:  And are you looking in the places

9     where those documents would be held?

10           MR. PHAM:  Yes.

11           THE COURT:  In other words -- okay.  So let me

12    give you an example.  I used to represent Medtronic.  And if

13    there was an issue about the development of a diabetes pump,

14    first of all, I would know -- you know, I would have to go

15    look at the diabetes business unit and certain people within

16    it at a fairly high level, and then I would also look within

17    the corporate structure itself, again at a high level.  Are

18    you doing analogous things, looking for company documents

19    that are not emails?

20           MR. PHAM:  I don't know -- I mean, high level?  I

21    don't know exactly how it relates to this.

22           THE COURT:  At an appropriate level, whatever it

23    would be.  So, for example, if there is a central corporate

24    structure and you look at the vice president level or the

25    manager level or whatever it is, I think they're entitled to

1    some assurance that we're looking in the right places,

2    right?  So in my example, if I'm being sued for something

3    about a diabetes pump and I'm looking at neuromodulation,

4    I'm not looking in the right place.

5              MR. PHAM:  Right.

6              THE COURT:  So are you doing that?

7              MR. PHAM:  Yes, Your Honor.  So, for example, we

8    will look at the IT individuals and then up the ladder, the

9    supervisor above that individual and up so far as they might

10   have that -- you know, the responsive information.

11             THE COURT:  I think their concern is when you look

12   at IT, these are people who implement the software, not

13   people who make the business decision that it would be a

14   smart purchase to have the software.  And so they want to

15   make sure that -- at some point it's not an IT person alone

16   who makes the decision we ought to go with Blaze Advisor.

17   Somewhere along the line somebody is involved in that

18   decision that's not strictly IT.

19             MR. PHAM:  That's correct, Your Honor.  And so the

20   documents that we have -- that have been identified to us,

21   we have made note that, you know, it will list who the IT

22   person is and who the business person is.  And to the extent

23   there is someone there, those are the additional custodians

24   that we are searching.

25             THE COURT:  Okay.  Have you -- so where are you in

1    the process?

2              MR. PHAM:  So we -- it is our goal to have a

3    production -- there are some documents that are related to

4    the request that we plan to produce here in the next couple

5    of days.

6              THE COURT:  Okay.  And are there --

7              MR. PHAM:  And that's related to those four

8    custodians that we collected additional data from.

9              THE COURT:  Are there other custodians that you

10   have or will identify whose documents you will review, or do

11   you feel that you've gotten through all the custodians?

12             MR. PHAM:  At this time there are probably maybe a

13   handful of additional custodians, we just -- that we may

14   identify.  It's just a matter of confirming with the client,

15   you know, we see a couple of these other names, Are these

16   individuals that we believe might have responsive

17   information, and then going through that same process.

18             THE COURT:  Okay.  Ms. Kliebenstein.

19             MS. KLIEBENSTEIN:  Thank you, Your Honor.

20             You've hit the pertinent issue on the head.  Have

21   they interviewed the right custodians?  Now, to back up --

22   to back the story up, the documents that Mr. Pham is

23   referring to that we provided to them that may identify

24   additional custodians, those were from Federal documents.

25   We found some business analysis documents that had a few

1    names on them.  Amy Bell, Carla Owens and Majka Seawright.

2    Ed Tornique [phonetic], the other -- the fourth custodian,

3    is an IT fellow.  But setting that aside, those four

4    custodians can't possibly be the right people for all 16 of

5    the applications listed in Request For Productions 55

6    through 70.

7         So what I've put here before Your Honor is the

8    request for production, and I've underlined what the

9    applications are.  So we have CSI Express, CSI Upsell.

10   Decision Point, I circled that because in Exhibit 34 that

11   was the business document for the Decision Point application

12   about why it was implemented and on that was listed

13   Ms. Owens and Ms. Seawright.  So those are two of the

14   custodians from one application.

15        Automated renewal process.  You know, we can go

16   through the whole list.  And then there's another page back

17   here.

18        As Your Honor can see, there's a lot of different

19   applications.  What I haven't heard from Mr. Pham is that

20   he's identified a custodian for each of these applications

21   and searched through their business documents.  We haven't

22   received any type of communication on that point.

23        Now, what also concerned me was that Mr. Pham said

24   that, you know, some of these applications, they don't

25   really interface with Blaze, so they're not responsive,

1  there's going to be no responsive documents.  Well, the

2  request doesn't ask about interfacing with Blaze.  It asks

3  for all documents relating to the decision to implement the

4  application known as, dot, dot, dot.

5         THE COURT:  But if the application doesn't

6  interface with Blaze, why would you be entitled to the

7  document?

8         MS. KLIEBENSTEIN:  Well, we disagree with that.

9  We do believe that these applications in some way touch

10  Blaze.  We've seen that from Federal's documents.  Now,

11  obviously, there may be a disagreement about how much

12  touching between Blaze and the application is enough to make

13  it relevant.  But when you look at Federal's objections,

14  that wasn't one of their objections to any of these requests

15  for production.  So if that's their story now, that's been

16  waived.  It's the first time I've heard of that.  So we've

17  got yet another situation where Federal's got something in

18  the back of their mind and we're teasing it out bit by bit

19  through motion to compel practice, which is just not the

20  right way to go about discovery in a case of this nature.

21         So what I would be looking for is not, you know,

22  we're going to eventually produce some documents from these

23  four custodians.  Granted, they began searching these

24  custodians' files over three months ago.  The motion to

25  compel has been pending for over a month.  When are we going

1    to get those documents?  But have they found the person for

2    each one of these applications, business person that said,

3    gee, you know, I have an idea about an application that

4    could help our business and here's what I wanted to do.

5    Okay, IT people, work with me to figure out what third-party

6    software tools we're going to use to implement that

7    application and how we're going to put it together.  Those

8    are the custodians I want, those are the documents that I

9    want, and I don't think that a search of that breadth has

10   been done.

11          MR. PHAM:  Again, Your Honor, to the extent there

12   are additional custodians, we're happy to do the search for

13   them.  Again, what was identified and pointed out to us, we

14   conducted the search for those individuals.

15          Again, to the point about there are a lot of

16   applications listed there, but from our view if those

17   applications are not applications that use Blaze, then how

18   are we supposed to -- how are we going to produce documents

19   relating to the decision to implement the Blaze-containing

20   applications if they're not in use?  They identified those

21   applications; and if those applications don't use Blaze,

22   there's going to be no documents responsive to that.  And

23   so --

24          THE COURT:  Because why?  Does the --

25          Ms. Kliebenstein, if you could put the

1    interrogatories up again.

2            MS. KLIEBENSTEIN:  So let me give you an example,

3    Your Honor.  Decision Point, we just talked about that --

4            THE COURT:  Yep.

5            MS. KLIEBENSTEIN:  -- with the interrogatories.

6    We have a -- it's Exhibit 34.  It's a business document

7    about Decision Point that talks about how they're going to

8    use Blaze Advisor in it.  So I'm not really sure where

9    your -- I appreciate that you're trying to get us to some

10   sort of next steps with these, but without some -- without

11   specific information from Federal about what it thinks does

12   or doesn't use Blaze Advisor, you know, these requests stand

13   as they are.  I'm objecting to on that basis.  We've seen

14   documents in Federal's production that say all of these --

15   we didn't just make them up.  We found documents that say

16   all of these applications use in some way or another, or

17   touch in some way or another, Blaze Advisor.  That was our

18   basis for -- for asking for these types of documents.

19           MR. PHAM:  And, Your Honor, the example that's

20   provided in Exhibit 34 lists the Carla Owens and Majka

21   Seawright, and those are individuals that we most recently

22   conducted the data search for.

23           THE COURT:  Okay.  Here's what I think we need to

24   do on this.  Also by January 18th you need -- Federal needs

25   to provide a list of the custodians -- let me get at it a

1      certain -- a different way.  What you need to provide to

2      FICO is, as to each of those, an explanation of here are

3      the -- here is or are the custodian or custodians we

4      identified and why and produce documents that are

5      responsive.  If on any of these 55 through 70 the rationale

6      is we didn't search for documents because these applications

7      do not work with or do not touch Blaze Advisor and they're

8      not part of the agreement that we signed with FICO, then you

9      need to provide that rationale as well.

10              And I understand your point about the objection

11     being waived or not raised, but I also think there's -- I'm

12     not -- I'm not convinced that these are particularly

13     relevant documents, and I think they might be

14     disproportionate, frankly, if this application doesn't

15     somehow interface with Blaze.

16              I assume -- let me ask you, Ms. Kliebenstein.

17     Have you asked the interrogatory, which is, Why did you do

18     this?  Why did you implement these applications, or why did

19     you -- why did you purchase Blaze?  Why did you do this

20     thing?  I assume you've done that or something like it.

21              MS. KLIEBENSTEIN:  We've done things like it.

22              THE COURT:  To get at that.

23              MS. KLIEBENSTEIN:  Yeah, but not directly on this

24     point.

25              THE COURT:  Okay.

1          MS. KLIEBENSTEIN:  Now, Your Honor, I understand

2     your ruling on that.  I understand January 18th we're

3     talking about productions.  I do believe that if we have to

4     wait until January 18th to fully flush out the issue of what

5     they're searching for and what they aren't, that is probably

6     going to be too late in the discovery period.  So I would

7     request a bifurcated response date.  If they can let us know

8     in the next week or two which ones they're not going to

9     respond to because they don't think that Blaze is involved

10     in any way, I think that would help the process.

11          THE COURT:  Mr. Pham, that strikes me as sensible.

12     Do you have an objection to that?

13          MR. PHAM:  No objection to that bifurcated

14     process, Your Honor.

15          THE COURT:  All right.  So I would say that no

16     later than December 31st.  And, yes, I am aware that's New

17     Year's Eve.  You don't have to wait that long, but no later

18     than that do provide information as to those interrogatories

19     or those requests for production between 55 and 70 to which

20     your response is they don't touch Blaze, they're not

21     relevant, we're not searching custodians.  Okay?

22          And as to those whom you are searching custodians,

23     I think similarly provide information to the plaintiff

24     regarding who and why, what the rationale is for the

25     custodians that you searched or are searching.  And then if

1    there are documents that are responsive to any of these that

2    are going to be produced, they should be produced by the

3    18th of January.

4         And just by way of commentary, you know, it would

5    not shock me, Ms. Kliebenstein, frankly, that there's not a

6    heck of a lot of documentation frankly regarding this, but

7    at the same time I'm not so sure that it's terribly

8    important for the case.  Obviously, I guess in my view,

9    obviously, they wouldn't have done all this if they didn't

10   think it was going to be profitable for them, which is

11   ultimately I think why you want this, right?

12        MS. KLIEBENSTEIN:  You're right about that.  You

13   know, the reason for the concern, the heightened attention

14   to this issue of nexus, if you will, is that courts have

15   been -- courts have been doing interesting things with it

16   lately, and we've noticed that in our practice, and we're

17   trying to stay ahead of it and make sure we have the right

18   proof.  And I think what has concerned us about 55

19   through 70 is not necessarily the response that no documents

20   exist, although for large companies, I mean, they seem to

21   document everything, so I would think there's a memo on the

22   project on each of these projects somewhere.

23        THE COURT:  Finding that memo is --

24        MS. KLIEBENSTEIN:  Is hard.  Understood.

25        THE COURT:  Yes.

1          MS. KLIEBENSTEIN:  But we've just been concerned

2     that the search hasn't been in the right spot and that the

3     search has only been in reaction to us putting something in

4     front of them.  And so it just feels to us that there's not

5     a lot of pro-activity going on.  That's our concern.

6          THE COURT:  Understood.  I think on the issue of

7     nexus, we can revisit that later, which in my view also

8     connects up with the issue of what you have called

9     evidentiary sanctions.  I'm not so sure I want to call them

10    that.  But managing what flows from the discovery process

11    afterward, we can revisit some of that as well.  Okay?

12         MS. KLIEBENSTEIN:  Thank you.

13         THE COURT:  Okay.  The RFAs 13, 14, 15 and 16 --

14    I'm going to start with those -- at least as I understand

15    it, what you are asking is essentially this.

16         Well, let me back up.  First of all, am I correct

17    that Federal is the parent of Chubb & Son or is it Chubb --

18    a different Chubb entity, about whom these requests for

19    admission are directed?  Chubb Corporation.  Okay.

20         Federal Insurance Company, how does it relate to

21    Chubb Corporation in the corporate structure?  Does anybody

22    know?

23         MS. KLIEBENSTEIN:  I'll jump in.

24         THE COURT:  Anybody jump in.

25         MS. KLIEBENSTEIN:  Right.  So the contract is with

1    Chubb & Son, a division of Federal.

2            THE COURT:  Right.

3            MS. KLIEBENSTEIN:  But what we're asking about

4    here -- essentially what Admissions No. 13 through 18 are

5    getting at is was there a change in control of Federal on

6    January 14th, 2016, compared to January 15th, 2016.  And

7    that's when a merger happened.

8            And so Request For Admission No. 13 asks before

9    January 15th, 2016 --

10           THE COURT:  Right.

11           MS. KLIEBENSTEIN:  -- the Chubb Corporation had

12   the authority to direct or cause the directions of the

13   management and policies of Federal Insurance Company.  And

14   what we got in the response is that Federal is a

15   wholly-owned subsidiary of the Chubb Corporation before

16   January 15th, 2016.

17           Now, the objections have to do -- there's two

18   types of objections that were listed here.  One is that

19   authority to direct or cause the direction is vague and

20   ambiguous and then also that Federal is without sufficient

21   information to further admit or deny the request as written.

22           To orient us, I would like to draw the Court's

23   attention to the *C&C Jewelry* case that we cited in our

24   brief.  In that -- it is a patent case, and there was a

25   request for admission that asked the defendant to admit that

1    a particularly -- a particular design and manufacturing

2    technique was known in the art, and the defendant in that

3    case brought up the same two admissions.  They couldn't

4    understand what "known in the art" meant, and they didn't

5    have enough information to respond to it.  The ambiguity

6    objection was overruled because the phrase "known in the

7    art" came from a statute.  It was known what it was.  The

8    objection about lack of information was also overruled

9    because the defendant hadn't made a statement that it had

10   made a reasonable inquiry and was unable to ascertain the

11   facts to respond.  And that's an important thing to keep in

12   mind with Rule 37.  If you're going to object and say we

13   don't know the information, you also have to make a

14   representation that you have done a reasonable inquiry and

15   you're unable to ascertain the response.

16          So here when we look at these funny phrases in the

17   middle, "had the authority to direct or cause the direction"

18   or "had the power to direct or cause the directions of the

19   management and policies," that comes from a New York

20   business statute that defines control in the corporate

21   context.  So it doesn't come up out of thin air.  And we're

22   not asking -- we're not asking Federal to make an admission

23   about control, an ultimate disputed issue in this case.

24   We're trying to understand the facts underneath control.

25          I submit to the court that the response here, what

1    Federal did give us, should dictate whether the admission is

2    admitted or denied.  What I see in 13 and what I see in 14

3    is that Chubb Corporation -- the buck stops with Chubb

4    Corporation, right?  They're the one who ultimately owns

5    Federal.  So is it -- is it -- is it true that Chubb

6    Corporation does not have the authority to direct or cause

7    the directions?  So if you look at it in that reverse, the

8    answer to 13 and 14 has to be an admission.  The Chubb Corp.

9    is calling the shots.  These should be admitted.  The

10   objections about ambiguity should be denied.

11           THE COURT:  Is -- so who was your contract with?

12           MS. KLIEBENSTEIN:  The contract was with Federal

13   and Chubb & Son, a division of Federal.

14           THE COURT:  Say it again.  I'm sorry.

15           MS. KLIEBENSTEIN:  The contract was with Chubb &

16   Son, a division of Federal.  And so these requests for

17   admission don't say "Chubb & Son" because it's not a legal

18   entity on its own.

19           THE COURT:  Right.  But they go to the issue of

20   change in control, right?

21           MS. KLIEBENSTEIN:  Ultimately, Your Honor.

22           THE COURT:  Right.  And the, at least, theory that

23   you are propounding is that there was a change in control of

24   Chubb & Son by virtue of a change in the corporate structure

25   or the corporate relationship between Chubb Corporation and

1    Federal Insurance Company on January 16th of 2016, right?

2              MS. KLIEBENSTEIN:  Yes.

3              THE COURT:  Okay.  Mr. Pham.

4              MR. PHAM:  And I think that goes to the point

5    right there, Your Honor, that given the complexity of

6    corporate structure, you know, there cannot be an admission

7    without some minimal explanation as to are we talking about

8    the signatory Chubb & Son, the parent company, what are we

9    exactly requesting here?  And so the requests for admission

10   are supposed to be structured in a way such that it can just

11   be provided with a straightforward answer, and here that's

12   not the case.

13             THE COURT:  Okay.  Let's move on to -- so that's

14   RFAs 13 through 18.  I think I said it was just 13

15   through 16.  But that's 17 and 18 as well, correct?

16             MR. PHAM:  13 through 16.

17             THE COURT:  It is 16, okay.

18             MS. KLIEBENSTEIN:  Can I ask one question, Your

19   Honor?

20             THE COURT:  Yes.

21             MS. KLIEBENSTEIN:  Focusing on 13, we're hearing a

22   lot about complexity.  Why?  We know from the answer that

23   Federal was a wholly-owned subsidiary of Chubb Corporation.

24   Do you see where I'm going?  I'm not getting an explanation

25   as to why.

1          THE COURT:  I do see where you're going.  I have a

2     reaction to where you're trying to go, which is this:   In

3     essence, you're asking them to admit liability, ultimately.

4     You're asking them to admit an issue that is, at least to my

5     understanding, somewhat disputed in this case.  And I just

6     don't think requests to admit can carry that kind of weight.

7     I think -- if you ask the request to admit, admit that on

8     January 15, 2016, there was a change in control, you're

9     going to get an answer, you're going to get a direct answer,

10    right?  The answer is going to be "deny."

11          The authority to direct or cause the directions of

12    the management and policies -- I may be wrong -- I get your

13    point that that is straight out of the New York statute.

14    But plugging into that, that's a general -- the way I would

15    look at it -- that's a general definition of what it means

16    to be a parent corporation.  And you are trying to take that

17    and plug it in in order to say that there's a change in

18    control, and it's -- I just don't think it's a straight line

19    to where you're trying to go, and I do think it's ambiguous.

20    You know, do they have the authority?  Well, which

21    management and policies?  Does that matter for purposes of

22    the -- there's a whole bunch of questions embedded in that

23    that even if they were -- if they were to admit it straight

24    up and said, yep, you're right, if I were the Article III --

25    and I don't know what Judge Wright would do, but my reaction

1    would be, So what.  That's not -- I am not letting that in

2    as evidence that determines change in control.  I just

3    wouldn't.

4         So I just don't -- I think it's ultimately an

5    errand that is not going to get you anywhere anyway, but I

6    haven't ruled on this yet.  I'm still thinking about it,

7    okay?

8         MS. KLIEBENSTEIN:  Fair point.  And my response to

9    that would be your discussion of this is significantly more

10   articulated than anything I have gotten out of Federal,

11   right?  So what we've gotten out of Federal, the history has

12   been not really willing to peek under the hood, if you will,

13   to figure out what the answers to discovery should really

14   be; and then as things move on, you know, they supplement

15   and they add as the case moves on.  And so when I look at

16   the response to this, I think, well, they're not really

17   looking into their own corporate documents between the Chubb

18   Corp. and Federal or Chubb Limited and Federal to figure

19   out.

20        And I understand and I respect the Court's

21   guidance on you can't have an admission that goes to the

22   ultimate issue, which is why we didn't ask one on control.

23   What we're trying to do with these admissions is

24   short-circuit discovery and figure out what the heck is

25   going on internally at the Chubb Corp., at Federal, at Chubb

1    Limited.  We on the outside can't figure that out.  So these

2    admissions are important to us for those purposes.

3              THE COURT:  See, and I don't know your case,

4    obviously, nearly as well as you guys do, but just listening

5    to you what I would -- in my mind, the requests for

6    admission that I would ask would be more along the lines of

7    admit that on, whatever the date is, January 15, 2016, the

8    Chubb Corporation or Federal Insurance Company became a

9    wholly-owned subsidiary of the Chubb Corporation.  Admit

10   that the attached is a true and correct copy of the --

11   whatever the relevant corporate document is at the time.

12   Those are all -- those are all discreet facts about

13   which they aren't going to probably have a dispute.  But

14   this, to my mind, these are really an argument, and requests

15   to admit are never going to -- you're never going to be able

16   to make the argument, right, you know?  So that's sort of my

17   view of it.

18              Let's go on to 20 and 28 -- or 20 through 28.

19   Okay.

20              Well, let me back up and make one other comment

21   about 13 through 16.  I think what you're ultimately asking

22   in some ways in 13 to 16 are the ability of the company to

23   do X, in a sense, and you would make better headway with me

24   with a more specific request to admit with language that

25   said "had the ability to do this" or "do that."  I don't

1    know.  I don't know if that would get you there anyway,

2    but --

3              20 to 28.  Again, at least as I understand what

4    you're trying to get is -- all right.  Now, you're going to

5    have to help me again with the corporate entities here,

6    because you use different language here.  Federal in these

7    admissions is who?  Corporate-wise, what exact corporate

8    entity is Federal in Admissions 20 to 28?

9              MS. KLIEBENSTEIN:  The defendant.

10             THE COURT:  Okay.

11             MS. KLIEBENSTEIN:  Federal Insurance Company.

12             THE COURT:  Federal Insurance Company.

13             MS. KLIEBENSTEIN:  Mm-hmm.

14             THE COURT:  Okay.  And who is Chubb Insurance

15   Company of Europe SE?

16             MS. KLIEBENSTEIN:  So Admissions 20 through 28 are

17   all about foreign companies that are related to Federal in

18   some way and their use of Blaze Advisor.  So it's our

19   position in this case that Blaze Advisor was only supposed

20   to be used in the United States; it wasn't supposed to be

21   used by any of the foreign entities that are related to

22   Federal.

23             THE COURT:  Understood.

24             MS. KLIEBENSTEIN:  And so these admissions get to

25   Europe, Australia and Canada.  We have an admission that

1    Federal admits that Chubb Insurance Company of Europe SE

2    maybe used the Blaze Advisor, and you will see that repeated

3    throughout the admission responses.  But we want to know

4    is --

5              THE COURT:  Is how they get it.

6              MS. KLIEBENSTEIN:  -- how.

7              THE COURT:  Right.

8              MS. KLIEBENSTEIN:  And so Chubb Insurance Company

9    of Europe SE is the European entity that's making use of

10   Blaze.

11             THE COURT:  Yeah.  I'm asking a slightly dumber

12   question.  Okay?  I'm asking, these corporate entities -- so

13   if you'd put 22 through 28 up as well.  So, fine, you've got

14   Chubb Insurance Company of Canada.  You've got Chubb Europe

15   SE or whatever it's called.  Are those all divisions or

16   corporate subsidiaries of Federal Insurance Company?

17             MS. KLIEBENSTEIN:  No, Your Honor.

18             THE COURT:  What are they corporately with respect

19   to Federal Insurance Company?

20             MS. KLIEBENSTEIN:  Now you're going to test me.

21   I'll just say they're related.

22             THE COURT:  Okay.

23             MS. KLIEBENSTEIN:  Federal is not at the top with

24   these at the bottom.  They exist in different planes, if you

25   will.

1          THE COURT:  Right.  So, again, ultimately it

2     strikes me that what you're trying to do is to say the

3     following:  We had a contract with Federal.  We let Federal

4     use this software.  Federal is not Chubb Insurance Company

5     of Canada.  We didn't have a contract with Chubb Insurance

6     Company of Canada.  Chubb Insurance Company of Canada used

7     the software.  Therefore, Federal -- they got it from

8     Federal, and that's a breach of our agreement.  And these

9     all go to the question of got it from Federal somehow,

10    right?  Where did they get the damn software?  How is it

11    they're coming to use it, right?

12         MS. KLIEBENSTEIN:  Right.  So if you think about

13    it like a book, if I have a copy of a book and I want to

14    give it to you, did I drop it off in the mail?  Did I put it

15    in your front door?  Did I give it to you in your office?

16         THE COURT:  Well, I thought it was more

17    fundamentally you were trying to get at they have it, they

18    got it from them.

19         MS. KLIEBENSTEIN:  That's right.

20         THE COURT:  Right.

21         MS. KLIEBENSTEIN:  How?

22         THE COURT:  And how did they get it from them?

23    Did they get it from them through others, did they get it --

24    et cetera, right?

25         MS. KLIEBENSTEIN:  That's right, Your Honor.

1          THE COURT:  Why isn't that either a deposition or

2     an interrogatory?  Here -- I mean, part of the problem is

3     that requests for admission are really lousy tools, in my

4     opinion, because this is the kind of problem we have.  Why

5     isn't that a 30(b)(6) depo area or a set of interrogatories,

6     how did Chubb Insurance Company of Canada come to use the

7     software?

8          MS. KLIEBENSTEIN:  It has been -- let me back up.

9     Those are excellent ideas.

10         THE COURT:  I'm sorry, Mr. Pham, if these are

11     ideas that I am giving to the plaintiff.

12         MS. KLIEBENSTEIN:  Depositions have been -- it's

13     been difficult to come by specific testimony in depositions,

14     even in response to 30(b)(6) categories.  We have some

15     interrogatories that are directed at similar subject matter,

16     which is why we thought that these admissions wouldn't be

17     too difficult.  For example, in one interrogatory answer

18     they agreed that Federal disclosed the software to -- I

19     believe it was the European unit.  So when we look at the

20     discovery, frankly, these should be easy for Federal to

21     figure out.  We shouldn't be getting these ambiguity

22     objections.  A deposition, I would love to tell Your Honor

23     that we could -- we could issue that notice and we would get

24     exactly the testimony we wanted, but the route that we chose

25     to go with this was to review the documents, review the

1      interrogatory responses and try to button it up with

2      requests for admissions.  Now, if I have to go about it

3      other ways, I will, but I do believe that these admissions

4      should easily be admitted or denied.

5              THE COURT:  I don't know if the defendants are

6      willing to answer this, and it's fine if you're not, but

7      here's the question in my mind.  Obviously, they're saying

8      the use of this software by other corporate entities, other

9      than Federal Insurance Company, is a violation of the

10     agreement.  I suspect you're saying, no, it's not.  It seems

11     to me there's kind of maybe three ways that that can be

12     true.  Number one, we had a perpetual paid-up, fully paid-up

13     license and we had the right to do with it as we saw fit;

14     number two, even if that's not the case, the agreement the

15     way it's worded obviously permits us to let our

16     corporate-related entities use it; or, number three, I don't

17     know where Chubb got it, but they didn't get it from

18     Federal.

19             These are getting at "I don't know where Chubb got

20     it, but they didn't get it from Federal," which I don't

21     think is your defense on the question of whether the use by

22     those entities is a violation of the agreement.  Are you

23     able to say whether that question, that it came to these

24     corporate entities, for example, Chubb Insurance Company of

25     Canada, from Federal Insurance Company in some manner?  Is

1    that -- is that really controversial?

2            MR. PHAM:  I think it is, Your Honor, to the

3    extent that in some instances from what we've seen in the

4    record the software -- there were trials, if you will, that

5    were being utilized in -- you know, by some of these

6    companies, and we don't know whether those trials are just

7    something that they happened to come across.  It hasn't been

8    fully flushed out yet, whether we're just saying, hey, we

9    got this awesome software, you guys should use it, upload

10   it, you know, and use that, or, you know, if there's a

11   discussion as to, you know, there's this free trial, our IT

12   folks started using it, implementing it, we think this is

13   something you guys should consider.  And so it's kind of a

14   murky line there.

15           THE COURT:  All right.  Okay.  Here's what I'm

16   going to rule on RFAs 13 to 16 and 20 to 28.  I am going to

17   rule that they do not have to be further answered by the

18   defendant on the grounds that I do think they are ambiguous.

19   I also think that they are being used to attempt to get the

20   defendant to admit matters of argument that are in dispute

21   in the lawsuit, and so I'm not going to require them to

22   answer any of them any further.

23           So I think that's everything that we had before

24   us.  So let me review real quickly and send you on your way.

25           Requests for Production 30 to 32 have to be fully

1   and completely answered -- provided, the information, on or

2   before January 18th.

3        Interrogatories 15 through 20 also have to be

4   fully answered, with my clarification in mind, on or before

5   January 18th.

6        Requests for Production 55 through 70, on or

7   before December 31 the defendant will identify those

8   requests for production to which they object on the grounds

9   that they don't involve Blaze Advisor software; and as to

10  those that do involve Blaze Advisor software, they're going

11  to provide an explanation of what custodians they have

12  selected to review and why.  And then as to that subset of

13  requests for production between 55 and 70 to which the

14  defendant is going to provide documents or search for

15  documents, any and all such documents that are responsive

16  shall be produced on or before January 18th.

17       And then that leaves the requests to admit, which

18  I have just told you, as to all of them, I am going to deny

19  any motion to compel any further information in response to

20  Requests to Admit 13 to 16 or 20 to 28.

21       So those are the orders or that is my order.

22       I would ask, if you can -- today is the 17th.  By

23  the end of the week, I would ask either party, if you're

24  going to appeal -- and let me just say nobody is getting in

25  trouble if you appeal any portion of this.  Okay?  That's

1    why there are lawyers, and that's why there are Article III

2    judges.  You're fully within your rights to do that, and I

3    will take absolutely no offense if you do.  Okay?  But if

4    you do, it would be helpful to me that you notify chambers

5    that you're going to appeal, what portion of the order, so

6    that I can at least give Judge Wright a little bit more

7    detail on the ruling in written form.

8            Does that make sense to everybody in the sense of

9    do you follow it, not whether you think it's wise?

10           MR. PHAM:  Yes.

11           MS. KLIEBENSTEIN:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MS. KLIEBENSTEIN:  I have one question.

14           THE COURT:  Yes, ma'am.

15           MS. KLIEBENSTEIN:  On the Interrogatories 15

16   through 20, I am sensing we're going to have a dispute about

17   what falls in and out of that, the way that I hear defendant

18   limiting those interrogatories in a way that I don't think

19   I'm going to agree with.  I'm going to guess that they can

20   be done fully responding to them the way that they view them

21   before January 18th.

22           THE COURT:  Are those -- which interrogatories are

23   those?  10 through 20 did you say?

24           MS. KLIEBENSTEIN:  15 through 20.

25           THE COURT:  15 through 20.  Okay.

1          MS. KLIEBENSTEIN:  If you recall, Mr. Pham put up

2     a --

3          THE COURT:  Yeah.

4          MS. KLIEBENSTEIN:  -- revised sheet that shrunk

5     significantly the data set that they would be producing.  So

6     I would like to get that issue flushed out, those responses

7     fully responded to, so we can see that universe and then

8     decide what additional motion practice we need on that

9     before a month from now on January 18th.

10          THE COURT:  Mr. Pham, I think if there -- maybe

11     the way to do it is the same bifurcation; that is, as to

12     those applications to which you're going to take the -- yes,

13     that's helpful, thank you -- to which you're going to take

14     the position that they don't involve or somehow touch Blaze

15     Advisor software such that you're not providing information

16     on written premiums, provide that information to counsel on

17     or before December 31st as well.  As to those which you are

18     providing gross written premium information, that has to be

19     provided no later than January 18th.  So it's parallel to

20     what I have said about RFPs 55 to 70.  Make sense?

21          MR. PHAM:  Understood, Your Honor.

22          THE COURT:  Okay.  So I am going to deny the

23     request for attorney's fees and deny the request for

24     evidentiary sanctions.  The reason for the denial of the

25     request for attorney's fees is that I do not believe that

1    the defendant is acting in bad faith, and I certainly don't

2    believe that the lawyers representing the defendant are

3    acting in bad faith.  As to the request for evidentiary

4    sanctions, I am denying that now as premature.  When we get

5    to the close of discovery, if there's additional things we

6    need to do or discuss of that nature, we will.

7              And I just want to make it clear to the

8    defendants, you know, if we get to the end of this discovery

9    process and the plaintiff is without information that they

10   should have been given, either because it just has been too

11   hard to get or it doesn't exist, I have to review the

12   question of whether or not they're entitled to some sort of

13   evidentiary benefit going forward.  So I'm going to table

14   that issue for now, see where we are at the end of

15   discovery, and deal with it then if we have to.  Okay?

16             MR. PHAM:  Okay.

17             THE COURT:  I do think that it would be wise, not

18   because I am dying to do this, but I think it would be wise

19   if you came back.  So are people -- are counsel going to be

20   working the week -- well, the 26th, 27th or 28th, do you

21   know, or are people out of the office on personal holiday?

22             Ms. Kliebenstein?

23             MS. KLIEBENSTEIN:  I'm around.

24             MR. PHAM:  I'm in as well, Your Honor.

25             THE COURT:  Sorry, guys.  Why don't we plan on --

1    I have criminal duty that week, so my schedule is not

2    crushing.  Why don't we plan on having you come over on the

3    27th, which is that Thursday.  And why don't we say 10 a.m.

4    And we'll just see what issues, you know, what we've got to

5    deal with, how it's going, et cetera.  I think it would be

6    smart to sort of keep on track with this.  Okay?

7              MR. PHAM:  Sounds good, Your Honor.

8              MS. KLIEBENSTEIN:  I think that's a good idea.  I

9    think that, instead of calling back, I will probably make a

10   request for the transcript, so I can --

11             THE COURT:  Sure.

12             MS. KLIEBENSTEIN:  -- sort through the new stuff

13   that was -- that came up today.

14             THE COURT:  Yes.

15             MS. KLIEBENSTEIN:  That would be helpful.

16             THE COURT:  Okay.  Did you get that, Renee?  She's

17   so happy to hear it.

18             Counsel, do you need the full transcript, or do

19   you just need the portion where I said so here's the orders

20   and went through it at the end?

21             MS. KLIEBENSTEIN:  I hate to say it, but I would

22   request the full, because I want to look through what we've

23   been discussing about the different applications and how

24   they use Blaze Advisor, so we can kind of get ahead of those

25   issues where I'm going to see some trouble spots.

1          THE COURT:  Okay.  Very well.

2          MS. KLIEBENSTEIN:  I apologize.

3                    (Off the record.)

4          THE COURT:  Anything further?

5          MS. KLIEBENSTEIN:  No.  Would it be helpful for

6    the court to move us to the 28th, so then we could have

7    another day for the transcript?

8          THE COURT:  That's fine with me.  The only reason

9    I picked the 27th is I thought since the 31st was a Monday

10   you might want more time after having talked to me.

11         MS. KLIEBENSTEIN:  Okay.  I tried.

12         THE COURT:  Well, no, it's fine with me.  If you

13   want to do --

14         MR. PHAM:  I think that makes sense, the 27th, for

15   that additional day.

16         THE COURT:  All right.  We'll see you on the 27th.

17              Nothing further for the defendants?

18         MR. PHAM:  No, Your Honor.  Thank you.

19         THE COURT:  Okay.  Thank you.

20              (Court adjourned at 12:25 p.m., 12-17-2018.)

21                         *   *   *

22         I, Renee A. Rogge, certify that the foregoing is a

23   correct transcript from the record of proceedings in the

24   above-entitled matter.

25                    Certified by:  /s/Renee A. Rogge
                                     Renee A. Rogge, RMR-CRR