# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY,<br>an Indiana corporation,<br><br>Defendant. | Court File No.  16-cv-1054 (WMW/DTS)<br><br><br>**FEDERAL INSURANCE COMPANY'S<br>SUPPLEMENTAL ANSWERS TO<br>PLAINTIFF'S FIRST SET OF<br>INTERROGATORIES** |

To:   Plaintiff and its attorneys, Allen Hinderaker and Michael A. Erbele, Merchant & Gould PC, 3200 IDS Center, 80 South Eighth Street, Minneapolis, MN  55402.

Defendant Federal Insurance Company ("Federal"), for its Supplemental Answers to Plaintiff's First Set of Interrogatories, states and alleges as follows:

## GENERAL RESPONSES

1.     Federal objects to the Definitions and Instructions to the extent that they seek to impose obligations on Federal that either exceed, or are different from, what is required under the Federal Rules of Civil Procedure, District of Minnesota Local Rules, and the Stipulated E-Discovery Order.

2.     Federal's responses and objections are made to the best of Federal's present knowledge, information, and belief.  Federal's responses and objections are limited to information within its possession, custody, or control.  Federal reserves the right to amend, supplement, or change any responses and objections if and when additional, different, or more accurate information becomes available and/or facts are developed.

EXHIBIT
9

3.     Federal gives these Responses subject to all objections to admissibility that may be interposed in this proceeding.

## ANSWERS TO FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** Identify every person, division, or entity Federal contends is licensed to use the Blaze Advisor® software under the enterprise license granted by the amended Agreement, including in your answer an identification of each of the "other Chubb entities" you contend were perpetually licensed as alleged in ¶ 2 of Federal's Counterclaims, and:

> a.     Identify all Persons known to you to have factual knowledge relating to the allegations of ¶ 2 of Federal's Counterclaims; and

> b.     Identify all documents relating to the allegations of ¶ 2 of Federal's Counterclaims.

**SUPPLEMENTAL ANSWER:** Answering Interrogatory No. 1, Federal asserts that the license granted in Amendment Two to the Software License and Services Agreement covers Federal Insurance Company and its affiliates, subsidiaries and divisions. Federal further refers to the chart produced as FED000051_0013.

Answering subpart (a), Federal states that Amendment Two to the Software License and Services Agreement speaks for itself, and that the parties treated the license as including Federal Insurance Company and its affiliates, subsidiaries and divisions. People with knowledge regarding the parties' agreement and their course of dealing include Pamela Lopata, Tamra Pawloski, Henry Miralyuz, Ewen Settie, Hamish Tonkin, Alexander Pavlenko, Zorica Todorovic, Oliver Clark (FICO), Michael Sawyer (FICO) and Russell Schreiber (FICO).

Answering subpart (b), Federal identifies the Software License and Services Agreement, Amendment Two to the Software License and Services Agreement, and documents reflecting the parties' course of dealing under the Agreement, particularly documents and communications reflecting FICO's awareness and assistance installing the software in the United Kingdom and Canada.

**INTERROGATORY NO. 2:** Identify every person, division, or entity, other than employees of the division Chubb & Son, to whom Federal has disclosed the FICO Blaze Advisor® software after June 30, 2006, and:

      a.     State the date of each such disclosure;

      b.     Identify all Persons known to you to have knowledge of each such disclosure; and

      c.     Identify all documents relating to each such disclosure.

**SUPPLEMENTAL ANSWER:** Federal objects to this Interrogatory as over broad and unduly burdensome. Federal will limit its answer to available information after April 22, 2010, which is six years prior to the lawsuit being filed and reflects the outermost limit of the statute of limitations. Subject to, and without waiving these objections, Federal identifies Tamra Pawloski, Henry Miralyuz, Ewen Settie, Hamish Tonkin, Alexander Pavlenko, Zorica Todorovic, Oliver Clark (FICO), Michael Sawyer (FICO) and Russell Schreiber (FICO).

Further answering Interrogatory No. 2, Federal refers to documents regarding the use and installation of the Blaze Advisor software in the United Kingdom and Canada pursuant to Fed. R. Civ. P. 33(d).

**INTERROGATORY NO. 3:** Identify every person, division, or entity, other than employees of the division Chubb & Son, of which Federal is aware, that has used the FICO Blaze Advisor® software after June 30, 2006, and:

      a.    State the date of first use and, if applicable, the date of last use for each person, division, or entity;

      b.    Identify all Persons known to you to have knowledge of each such use; and

      c.    Identify all documents relating to each such use.

**SUPPLEMENTAL ANSWER:** Federal objects to this Interrogatory as over broad and unduly burdensome. Federal will limit its answer to available information after April 22, 2010, which is six years prior to the lawsuit being filed and reflects the outermost limit of the statute of limitations. Subject to, and without waiving these objections, Federal identifies Tamra Pawloski, Henry Miralyuz, Ewen Settie, Hamish Tonkin, Alexander Pavlenko, Zorica Todorovic, Oliver Clark (FICO), Michael Sawyer (FICO) and Russell Schreiber (FICO).

Further answering Interrogatory No. 3, Federal refers to documents regarding the use and installation of the Blaze Advisor software in the United Kingdom and Canada pursuant to Fed. R. Civ. P. 33(d), and states that it has used the Blaze Advisor software in the United Kingdom and Canada since FICO approved Federal's use of the software in those countries. FICO further states that the use has not changed following the merger between The Chubb Corporation and ACE INA Holdings on January 15, 2016.

**INTERROGATORY NO. 4:** Identify every software application and/or system utilized by Chubb & Son, a division of Federal, or by any division or entity other than Chubb & Son, that utilizes in any way the Blaze Advisor® software, and:

     a.     Identify all Persons known to you to have knowledge of each such software application and/or system; and

     b.     Identify all documents relating to each such software application and/or system.

**SUPPLEMENTAL ANSWER:** Federal objects to this Interrogatory as unduly burdensome, over broad, and because it seeks information that is not relevant to any claim or defense in this action. Federal will limit its answer to available information after April 22, 2010, which is six years prior to the lawsuit being filed and reflects the outermost limit of the statute of limitations. Subject to, and without waiving these objections, Federal identifies the below software applications.

| | |
|---|---|
| CSI | CSI Express |
| | Decision Point |
| | Automated Renewal Process |
| CCI | CUW |
| | IRMA (Individual Rate Modification Application) |
| | TAPS (Texas Accident Prevention System) |
| CBS | Premium Booking |
| Claims | CIS Claims |
| Surety | Cornerstone |
| CAH | Adapt-ABL, Evolution |
| EUZ | EZER (Comm'l PAS in EUZ) |
| Claims | ClaimsConnect |
| Commercial | Small Commercial |

**INTERROGATORY NO. 5:** Identify all Persons known to you to have knowledge of the negotiation of the parties' Software License and Maintenance Agreement and the two Amendments thereto.

**ANSWER:** Federal identifies Jim Black, a former Federal employee, as a person with knowledge regarding the negotiation of the Agreement. Federal's investigation regarding the negotiation of the Software License and Maintenance Agreement is ongoing. Federal will supplement its answer to this Interrogatory if additional individuals are identified.

**INTERROGATORY NO. 6:** Identify all Persons known to you to have knowledge of Federal's revenues and profits, including the revenues and profits, if any, attributable to the use of the Blaze Advisor® software by Chubb & Son, a division of Federal.

**SUPPLEMENTAL ANSWER:** Federal objects to this Interrogatory because it seeks information that is not relevant. Federal's profits are not reasonably related to the alleged infringement, as is necessary for FICO to obtain an award of the defendant's profits. *See, e.g., Francois v. Ruch*, 2006 WL 3735950, at *3 (C.D.Ill. Dec. 15, 2006). Subject to, and without waiving this objection, Federal states that revenues earned on the sale of insurance are not attributable to use of the Blaze Advisor software. Federal identifies Ramesh Pandey as a person with knowledge regarding this subject.

**INTERROGATORY NO. 7:** For each line of business of Chubb & Son, a division of Federal, and for each line of business of any division or entity other than Chubb & Son that uses or has used the Blaze Advisor® software, identify all persons known to you to have knowledge of the business reasons for using the Blaze Advisor® software.

**ANSWER:** Federal objects to the request for "all" persons with knowledge regarding the business reasons for using the Blaze Advisor® software as over broad and unduly burdensome. Subject to, and without waiving these objections, Federal identifies Ramesh Pandey and Henry Mirolyuz as persons with knowledge regarding the business reasons for using the Blaze Advisor® software.

**INTERROGATORY NO. 8:** If Federal contends that FICO has consented to the international use or implementation of the Blaze Advisor® software through a Scope

7

of Work Agreement or otherwise, state the complete factual basis for any such contention, and:

> a. Identify all Persons known to you to have knowledge related to any such contention, and;

> b. Identify all documents relating to any such contention.

**SUPPLEMENTAL ANSWER:** Federal objects to Interrogatory No. 8 and all interrogatories that seek an opinion or contention that relates to fact or the application of law to fact, because it seeks discovery of Federal's counsels' work product and mental impressions which are privileged. Furthermore, at this stage in the proceedings, where Federal has not yet received discovery from FICO, posing contention interrogatories is inappropriate, and premature, and therefore must be reserved, if at all, for a later stage of litigation. Even if contention interrogatories are allowed, they should not be propounded until fact discovery is at an end.

Subject to, and without waiving these objections, Federal states that FICO consented to Federal's use of the Blaze Advisor software by assisting with the implementation of the software in London. FICO and Federal negotiated a Scope of Work agreement relating to the implementation, and FICO employees were on-site in London to assist with the installation of the software. Persons with knowledge include Henry Mirolyuz, Ewen Setti, Hamish Tonkin and Oliver Clark, Senior Manager, Decision Management Solutions, FICO Europe, Middle East and Africa.

FICO also approved Federal's use of the Blaze Advisor software by Chubb Specialty Insurance in Canada. Federal sent FICO information regarding the use of the software by Chubb Specialty Insurance in Canada, and worked closely with FICO on the

implementation of the software. FICO also participated in a demonstration of the software in Latin America. Persons with knowledge include Alexander Pavlenko and Zorica Todorovic.

FICO's conduct demonstrates its consent to use of the Blaze Advisor® software within Federal domestically and internationally. Federal also refers to documents being produced pursuant to Fed. R. Civ. P. 33(d), including documents regarding the implementation of the software in London and in Canada.

**INTERROGATORY NO. 9:** State the complete factual basis for Federal's contention in ¶ 7 of Federal's Counterclaims that "Federal did not expand its use of the [Blaze Advisor®] software following the merger," and:

> a. Identify all Persons known to you to have factual knowledge relating to the allegations of ¶ 7 of Federal's Counterclaims; and

> b. Identify all documents relating to the allegations of ¶ 7 of Federal's Counterclaims.

**SUPPLEMENTAL ANSWER:** Federal objects to Interrogatory No. 9 and all interrogatories that seek an opinion or contention that relates to fact or the application of law to fact, because it seeks discovery of Federal's counsels' work product and mental impressions which are privileged. Furthermore, at this stage in the proceedings, where Federal has not yet received discovery from FICO, posing contention interrogatories is inappropriate, and premature, and therefore must be reserved, if at all, for a later stage of litigation. Even if contention interrogatories are allowed, they should not be propounded until fact discovery is at an end.

Subject to, and without waiving these objections, Federal states that it has not changed the extent or nature of use of the Blaze Advisor® software since the merger with ACE INA Holdings, Inc. on January 15, 2016. The teams and business uses of the Blaze Advisor software did not change as a result of the merger.

Answering subparagraph (a), Federal identifies Ramesh Pandey, Henry Mirolyuz and Tamra Pawolski.

Answering subparagraph (b), Federal refers to documents being produced pursuant to Fed. R. Civ. P. 33(d), including a report of premiums processed using the Blaze Advisor software before and after the merger.

**INTERROGATORY NO. 10:** State the complete factual basis for Federal's contention in ¶ 8 of Federal's Counterclaims that "Federal's use of the Blaze Advisor software post-merger is covered by the license Federal purchased from FICO in the Agreement," and:

> a. Identify all Persons known to you to have factual knowledge relating to the allegations of ¶ 8 of Federal's Counterclaims; and

> b. Identify all documents relating to the allegations of ¶ 8 of Federal's Counterclaims.

**SUPPLEMENTAL ANSWER:** Federal objects to Interrogatory No. 10 and all interrogatories that seek an opinion or contention that relates to fact or the application of law to fact, because it seeks discovery of Federal's counsels' work product and mental impressions which are privileged. Furthermore, at this stage in the proceedings, where Federal has not yet received discovery from FICO, posing contention interrogatories is inappropriate, and premature, and therefore must be reserved, if at all, for a later stage of

litigation. Even if contention interrogatories are allowed, they should not be propounded until fact discovery is at an end.

Subject to, and without waiving these objections, Federal states that FICO granted Federal a fully-paid, perpetual license to the Blaze Advisor software in 2006 in Amendment Two to the Software License and Maintenance Agreement. Federal paid over $1 million for the license. The license allows Federal to use the software enterprise-wide, with no limit on the number of users, and with no end date.

On January 15, 2016, Federal's parent corporation, The Chubb Corporation, merged with ACE INA Holdings, Inc. FICO wrongly purported to terminate the license agreement after the merger. FICO did not have the right to terminate the license. The "No Assignment" clause in the contract required that Federal seek consent from FICO to continue using the software after the merger only if Chubb & Son underwent a change in control (which it didn't), and only if Federal expanded its use of the software as a result of the merger (which it didn't).

FICO breached the contract when it attempted to terminate without having the right to do so. The contract remains in force and permits Federal to use the Blaze Advisor software enterprise-wide, without regard to the number of seats.

Answering subparagraph (a), Federal identifies Tamra Pawloski, Thomas Carretta and Andrew Hopp as persons with knowledge regarding FICO's wrongful attempt to terminate the license.

Answering subparagraph (b), Federal identifies the Software License and Maintenance Agreement with Amendments One and Two, and further references

documents being produced by Federal that demonstrate no change in the use of the software pursuant to Fed. R. Civ. P. 33(d), including a report of premiums processed using the Blaze Advisor software before and after the merger.

**INTERROGATORY NO. 11:** State the complete factual basis for Federal's contention in ¶ 10 of Federal's Counterclaims that "Federal did not need consent from FICO to continue using the Blaze Advisor software," and:

      a.     Identify all Persons known to you to have factual knowledge relating to the allegations of ¶ 10 of Federal's Counterclaims; and

      b.     Identify all documents relating to the allegations of ¶ 10 of Federal's Counterclaims.

**SUPPLEMENTAL ANSWER:** Federal objects to Interrogatory No. 11 and all interrogatories that seek an opinion or contention that relates to fact or the application of law to fact, because it seeks discovery of Federal's counsels' work product and mental impressions which are privileged. Furthermore, at this stage in the proceedings, where Federal has not yet received discovery from FICO, posing contention interrogatories is inappropriate, and premature, and therefore must be reserved, if at all, for a later stage of litigation. Even if contention interrogatories are allowed, they should not be propounded until fact discovery is at an end.

Subject to, and without waiving these objections, Federal states that FICO granted Federal a fully-paid, perpetual license to the Blaze Advisor software in 2006 in Amendment Two of the Software License and Maintenance Agreement. Federal paid over $1 million for the license. The license allows Federal to use the software enterprise-wide, with no limit on the number of users, and with no end date.

On January 15, 2016, Federal's parent corporation, The Chubb Corporation, merged with ACE INA Holdings, Inc. FICO wrongly purported to terminate the license agreement after the merger. FICO did not have the right to terminate the license. The "No Assignment" clause in the contract required that Federal seek consent from FICO to continue using the software after the merger only if Chubb & Son underwent a change in control (which it didn't), and only if Federal expanded its use of the software as a result of the merger (which it didn't).

FICO breached the contract when it attempted to terminate without having the right to do so. The contract remains in force and permits Federal to use the Blaze Advisor software enterprise-wide, without regard to the number of seats.

Answering subparagraph (a), Federal identifies Tamra Pawloski, Thomas Carretta and Andrew Hopp as persons with knowledge regarding FICO's wrongful attempt to terminate the license.

Answering subparagraph (b), Federal identifies the Software License and Maintenance Agreement with Amendments One and Two, and further references documents being produced by Federal that demonstrate no change in the use of the software pursuant to Fed. R. Civ. P. 33(d), including a report of premiums processed using the Blaze Advisor software before and after the merger.

**INTERROGATORY NO. 12:**   State the complete factual basis for Federal's contention **in** ¶ 13 of Federal's Counterclaims that ''FICO's conduct in refusing to consent to continued use of the [Blaze Advisor®] software post-merger lacked good faith, constituted unfair dealing, and was arbitrary and irrational,'' and:

>          a.       Identify all Persons known to you to have factual knowledge relating to the allegations of ¶ 13 of Federal's Counterclaims; and

>          b.       Identify all documents relating to the allegations of ¶ 13 of Federal's Counterclaims.

**ANSWER:**   Federal objects to Interrogatory No. 12 and all interrogatories that seek an opinion or contention that relates to fact or the application of law to fact, because it seeks discovery of Federal's counsels' work product and mental impressions which are privileged.  Furthermore, at this stage in the proceedings, where Federal has not yet received discovery from FICO, posing contention interrogatories is inappropriate, and premature, and therefore must be reserved, if at all, for a later stage of litigation.  Even if contention interrogatories are allowed, they should not be propounded until fact discovery is at an end.   Federal also objects to Interrogatory No. 12 on the grounds that it calls for a legal conclusion.

Subject to, and without waiving these objections, Federal states that FICO announced that it would not consent to Federal's continued use of the software in a letter from Thomas F. Carretta to Joseph F. Wayland dated January 27, 2016.  FICO decided that it would not consent to Federal's continued use of the software irrationally – FICO either did not have full knowledge of the facts when it told Federal that it would not consent, or FICO refused to consent even though it knew that Federal's use of the

software had not changed.  In either case, the decision to refuse consent was arbitrary and irrational because Federal's use of the software did not increase.

Federal employees told FICO numerous times that Federal's use of the Blaze Advisor software did not change after the merger.  Even though FICO knew that Federal's use of the software had not changed, FICO continued to demand money.  FICO employees explained that their demand for additional money was based on their pricing model, not Federal's use of the software.  FICO's pricing model is irrelevant to Federal's right to continue using the software post-merger in the same manner Federal did prior to the merger.

Answering subparagraph (a), Federal identifies Tamra Pawloski, Thomas Carretta and Andrew Hopp as persons with knowledge regarding FICO's conduct.

Answering subparagraph (b), Federal identifies the Software License and Maintenance Agreement with Amendments One and Two, the January 27, 2016 letter from Thomas F. Carretta to Joseph Wayland, and documents reflecting the post-merger communications between the parties pursuant to Fed. R. Civ. P. 33(d).


**INTERROGATORY NO. 13:**  State the complete factual basis for Federal's contention in ¶ 15 of Federal's Counterclaims that FICO's "purported termination violated the terms of the Agreement and was inoperative . . . . FICO breached the Agreement by purporting to terminate the Agreement without the right to do so," and:

    a.    Identify all Persons known to you to have factual knowledge relating to the allegations of ¶ 15 of Federal's Counterclaims; and

    b.    Identify all documents relating to the allegations of ¶ 15 of Federal's Counterclaims.

**SUPPLEMENTAL ANSWER:**  Federal objects to Interrogatory No. 13 and all interrogatories that seek an opinion or contention that relates to fact or the application of law to fact, because it seeks discovery of Federal's counsels' work product and mental impressions which are privileged.  Furthermore, at this stage in the proceedings, where Federal has not yet received discovery from FICO, posing contention interrogatories is inappropriate, and premature, and therefore must be reserved, if at all, for a later stage of litigation.  Even if contention interrogatories are allowed, they should not be propounded until fact discovery is at an end.

Subject to, and without waiving these objections, FICO granted Federal a fully-paid, perpetual license to the Blaze Advisor software in 2006 in Amendment Two to the Software License and Maintenance Agreement.  Federal paid over $1 million for the license.  The license allows Federal to use the software enterprise-wide, with no limit on the number of users.

FICO breached the contract when it attempted to terminate without having the right to do so.  The contract remains in force and permits Federal to use the Blaze Advisor software enterprise-wide, without regard to the number of seats.

Answering subparagraph (a), Federal identifies Tamra Pawloski, Thomas Carretta and Andrew Hopp as persons with knowledge regarding FICO's wrongful attempt to terminate the license.

Answering subparagraph (b), Federal identifies the Software License and Maintenance Agreement with Amendments One and Two, and further references documents being produced by Federal pursuant to Fed. R. Civ. P. 33(d), including a

report of premiums processed using the Blaze Advisor software before and after the merger.

**INTERROGATORY NO. 14:** State the complete factual basis for Federal's contention in ¶¶ 21 and 27 of Federal's Counterclaims that Federal has been damaged by FICO's alleged breach of the Agreement, and:

        a.      Identify each type of damages claimed;

        b.      Identify the amount claimed;

        c.      Identify all Persons known to you to have factual knowledge relating to Federal's claim for damages; and

        d.      Identify all documents relating to Federal's claim for damages.

**SUPPLEMENTAL ANSWER:** FICO's breach caused Federal to incur attorneys' fees and costs defending this lawsuit. The attorneys' fees and costs Federal is incurring in defense of this lawsuit are a direct and proximate result of FICO's breach. The amount of attorneys' fees and costs incurred to defend this lawsuit continues to accrue. FICO will rely on invoices and billing records to support this claim.

Dated: June 15, 2017

Lora M. Friedemann (#0259615)
lfriedemann@fredlaw.com
Nikola L. Datzov (#0392144)
ndatzov@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

*Attorneys for Defendant*

61497068_1.docx

## VERIFICATION

Tamra Pawloski states under oath that she is Vice President, Global IT Vendor

Management – Software and Compliance for Chubb Limited; that she is authorized to

respond to Fair Isaac Corporation's Interrogatories on behalf of Federal Insurance

Company; that she has relied on directors, employees, agents, and attorneys to provide

information used in formulating the answers to interrogatories; and that the answers are

true and correct to the best of her knowledge.

Subscribed and sworn to before me
this _15_ day of _June_, 20_17_.

Notary Public

Alma Hawkins
Notary Public
State of New Jersey
No. 2257861
Commission Expires:
August 11, 2020

61497068_1.docx



December 31, 2018

Via Email

Allen Hinderaker
Heather Kliebenstein
Merchant & Gould
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2215
AHinderaker@merchantgould.com
HKliebenstein@merchantgould.com

Re:     Fair Isaac Corp. v. Federal Insurance Company and Ace
        American Insurance Company
        Case No. 16-cv-1054-WMW-TNL

Dear Counsel:

Pursuant to Magistrate Schultz's Order at the December 17, 2018 hearing, this letter provides the following information: (1) an updated chart listing the business units and applications that use the Blaze Advisor software, including an explanation for the removal of any application from the previous chart; and (2) a list of proposed custodians – an IT person and a business person – and search terms for each business unit referenced in subpart (1).

**1)     Updated Business Units/Applications Chart.**

Federal's Second Supplemental Answer to Interrogatory No. 4 dated June 21, 2018 included the following chart (the "**June Chart**"):

| Business Units | Applications |
|---|---|
| CSI | CSI eXPRESS, including CIS Claims<br><br>Decision Point<br><br>Automated Renewal Process |

Attorneys & Advisors     Fredrikson & Byron, P.A.
main  612.492.7000      200 South Sixth Street, Suite 4000
fax  612.492.7077       Minneapolis, Minnesota
fredlaw.com             55402-1425

MEMBER OF THE WORLD SERVICES GROUP      OFFICES
A Worldwide Network of Professional Service Providers      Minneapolis / Bismarck / Des Moines / Fargo / St. Paul / Saltillo, Mexico / Shanghai, China

EXHIBIT
**10**

December 31, 2018
Page 2

| CCI | CUW |
| --- | --- |
| | IRMA (Individual Rate Modification Application) |
| | TAPS (Texas Accident Prevention System) |
| CBS (Corporate Business Systems) | Premium Booking |
| Surety | Cornerstone |
| CAH | Evolution |
| EUZ | Adapt-ABL |
| | EZER |

Federal will serve FICO with its Third Supplemental Answer to Interrogatory No. 4 to reflect the following updated chart (the "**New Chart**"):

| Business Units | Applications |
| --- | --- |
| Financial Lines Unit, formerly known as CSI (Chubb Specialty Insurance) | CSI eXPRESS, including Automated Renewal Process<br><br>Decision Point |
| CCI (Chubb Commercial Insurance) | CUW – name for a number of different applications, including Inventory Management, which is the only application that uses Blaze Advisor<br><br>IRMA (Individual Rate Modification Application)<br><br>TAPS (Texas Accident Prevention System) |
| CBS (Corporate Business Systems) | Premium Booking |
| Personal Risk Services (PRS), formerly known as Personal Lines Services (PLS) (Canada) | Evolution |
| EUZ (European Zone) | Adapt-ABL<br><br>EZER |

When compared to the June Chart, the New Chart no longer includes the business unit/application called Surety/Cornerstone. While the Cornerstone program initially intended to implement components of the Blaze Advisor platform, it was cancelled post-merger before any Blaze Advisor components were delivered. Also, while some of the earlier phases of the Cornerstone program were delivered, i.e., Account Management, Document Management, and Bond Newline, none of them included Blaze Advisor components. Simply put, Cornerstone never used the Blaze Advisor software.

December 31, 2018
Page 3

Another distinction between the June Chart and the New Chart relates to two business units that have new names following the merger: (1) the business unit CSI (pre-merger name), is now known as the Financial Lines Unit (post-merger name); and (2) the business unit Personal Lines Services (PLS) (pre-merger name), is now known as Personal Risk Services (PRS) (post-merger name).

With respect to the Financial Lines Unit, the applications listed on the New Chart are more accurately listed.  For example, the correct characterization is "CSI eXPRESS, including Automated Renewal Process," because CSI eXPRESS works in conjunction with Automated Renewal Process, not CIS Claims, which was inaccurate.  To be clear, the same three applications are still listed on the New Chart: CSI eXPRESS, Automated Renewal Process, and Decision Point.

With respect to Personal Risk Services (Canada), this business unit was previously identified erroneously as CAH.  Evolution is the only application that uses Blaze Advisor in that business unit.

### 2)      List of Custodians.

The following chart identifies the names of custodians – an IT person and a business person – for each business unit:

| Business Units | Applications | Custodians |
|---|---|---|
| CSI (Chubb Specialty Insurance), n/k/a Financial Lines Unit | CSI eXPRESS, including Automated Renewal Process<br><br>Decision Point | IT: Henry Mirolyuz<br><br>Business: Majka Seawright, CSI Project Management and Implementation Lead, and Carla Owens (no longer employed at the company) |
| CCI (Chubb Commercial Insurance) | CUW – name for a number of different applications, including Inventory Management, which is the only application that uses Blaze Advisor<br><br>IRMA (Individual Rate Modification Application)<br><br>TAPS (Texas Accident Prevention System) | IT: Peter Davis<br><br>Business: Brenda Starkes, Vice President, Strategic Initiatives Project Specialist |
| CBS (Corporate Business Systems) | Premium Booking | IT: Diptesh Patel and Nancy Halpin-Birkner (retired)<br><br>Business: There is no individual business person in the CBS business unit.  CBS is a shared asset that is solely owned and maintained by IT.  CBS serves the function of validating data and sending the information downstream. |
| Personal Risk Services (PRS), formerly known as Personal Lines Services | Evolution | IT: Zorica Todorovic |

December 31, 2018
Page 4

| | | |
|---|---|---|
| (PLS) (Canada) | | Business: Paul Johnstone, Senior Vice President of Personal Risk Services (PRS) |
| EUZ (European Zone – UK and Australia) | Adapt-ABL<br><br>EZER | IT: Mike Hutchinson (UK) and Stuart Fisher (Australia)<br><br>Business: |

The search terms include: implement, application, business, benefit, reason, efficiency, software, CSI, Chubb Specialty Insurance, Financial Lines Unit, Automated Renewal Process, CSI eXPRESS, Decision Point, CCI, Chubb Commercial Insurance, IRMA, Individual Rate Modification Application, TAPS, Texas Accident Prevention System, CUW, CAH, Canada Accident & Health, PRS, Personal Risk Services, PLS, Personal Lines Services, Evolution, CBS, Corporate Business System, Premium Booking, EUZ, European Zone, Australia, United Kingdom, Europe, ADAPT, and EZER.

Federal believes the above list of search terms are broad enough to capture any documents related to the business benefits to be derived from the implementation and the efficiencies to be realized from use of applications that use Blaze Advisor.

Very truly yours,

Christopher D. Pham
**Direct Dial:** 612.492.7388
**Email:** cpham@fredlaw.com

CDP/bkh
Enclosures

cc:    Terrence J. Fleming, Esq.
        Leah Janus, Esq.

2016 WL 4373694
Only the Westlaw citation is currently available.
District Court of the Virgin Islands,
Division of St. Croix,
Division of St. Croix.

Samuel LEE, Plaintiff,
v.
KMART CORPORATION, Defendant.

Civil Action No. 2014-0079
|
Signed 08/15/2016

**Attorneys and Law Firms**

Lee J. Rohn, Esq., Rhea Lawrence, Esq., St. Croix,
U.S.V.I., For Plaintiff.

Carl R. Williams, Esq., Richard F. Farrelly, Esq., St.
Thomas, U.S.V.I., For Defendant.

**MEMORANDUM OPINION**

Lewis, Chief Judge

**\*1** THIS MATTER comes before the Court on
Defendant's "Motion to Exclude Untimely Disclosed
Expert Witnesses" (Dkt. No. 55); Defendant's "Motion
to Exclude Untimely Disclosed Fact Witnesses" (Dkt.
No. 56); Defendant's "Motion to Limit the Testimony of
Dr. Jason Williams and Exclude his Untimely Updated
Report" (Dkt. No. 61); the parties' respective Oppositions
and Replies (Dkt. Nos. 57, 58, 59, 60, 62, 63); and
a supplemental brief, filed by Plaintiff (Dkt. No. 77),
pursuant to an Order of the Court (*see* Dkt. No.
75). A hearing on Defendant's Motions was held on
April 26, 2016. For the reasons that follow, the Court
will grant Defendant's "Motion to Exclude Untimely
Disclosed Expert Witnesses"; grant Defendant's "Motion
to Exclude Untimely Disclosed Fact Witnesses"; and deny
Defendant's "Motion to Limit the Testimony of Dr. Jason
Williams and Exclude his Untimely Updated Report."

**I. BACKGROUND**

Plaintiff Samuel Lee ("Plaintiff") brings this negligence
action against Kmart Corporation ("Defendant"),
alleging that on or about July 27, 2014, Plaintiff, a business
invitee of Defendant, was shopping in Defendant's store
when an employee, in the course of her employment,
negligently pushed "an over stacked cart" into Plaintiff.
(Dkt. No. 1 at 1-2). Plaintiff contends that, as a result
of the employee's actions, he suffered "physical injuries,
medical expenses, loss of income, loss of capacity to earn
income, mental anguish, pain and suffering, and loss of
enjoyment of life all of which are expected to continue
into the foreseeable future." (*Id.* at 2). Plaintiff seeks
compensatory damages, pre- and post-judgment interest
and attorney's fees and costs. (*See id.*).

On November 13, 2014, the Magistrate Judge of this
Court, George W. Cannon, Jr., entered an Order requiring
the parties to exchange initial disclosures pursuant to
Rule 26(a)(1) of the Federal Rules of Civil Procedure by
December 15, 2014. (Dkt. No. 7). Plaintiff filed a Notice
of Service of his initial disclosures on December 4, 2014
(Dkt. No. 8), and Defendant filed its Notice of Service on
December 12, 2014 (Dkt. No. 9). On January 13, 2015,
Magistrate Judge Cannon entered a Scheduling Order
setting August 31, 2015 as the factual discovery deadline;
September 30, 2015 as the deadline for the first mediation
conference; October 30, 2015 as the deadline for Plaintiff
to name experts and provide expert opinions pursuant
to Rule 26(a)(2); December 30, 2015 as the deadline for
Defendant to name experts and provide expert opinions
pursuant to Rule 26(a)(2); and February 26, 2016 as the
deadline for expert depositions. (*See* Dkt. No. 22).

On August 31, 2015, the parties filed a "Joint
Motion to Extend the Factual Discovery and Mediation
Deadlines." (Dkt. No. 29). In the Joint Motion, the parties
asserted that "good cause" existed for modifying the
Scheduling Order issued on January 13, 2015 because,
despite their best efforts, the parties were unable to
comply with the original deadlines, and depositions still
needed to be completed. (*See id.*). [1] The parties requested
until the end of September to complete factual discovery
and the end of October to complete mediation, and
stated that extending the factual discovery and mediation
deadlines would "not impact the remaining deadlines" in
the Scheduling Order. (*Id.*).

[1]     Rule 16(b) of the Federal Rules of Civil Procedure
        provides that scheduling orders "may be modified

EXHIBIT
**11**

only for good cause and with the judge's consent."
FED. R. CIV. P. 16(b)(4).

**\*2** On September 1, 2015, Magistrate Judge Cannon entered an Order amending the January 13, 2015 Scheduling Order, as the parties requested, by setting September 30, 2015 as the factual discovery deadline and October 31, 2015 as the mediation deadline. (*See* Dkt. No. 30). All of the other deadlines in the January 13, 2015 Scheduling Order remained in effect. (*See id.*). Mediation was held on October 22, 2015. (*See* Dkt. No. 41). However, the parties were unable to reach a settlement. (*See id.*).

On November 30, 2015—one month after the expiration of the deadline for Plaintiff's expert disclosures—Plaintiff filed a "Motion for Extension of Deadlines," wherein he requested to extend the deadline for filing his expert reports from October 30, 2015 [2] to December 9, 2015. (Dkt. No. 46). In support of his request, counsel for Plaintiff stated that she "refrained from incurring the expense of getting all expert reports in place [before mediation on October 22, 2015] as it would make settlement more difficult as a result of the increased costs." (*Id.* at 1). Counsel stated further that, at the October 22, 2015 mediation when it became clear that the case could not settle, she asked counsel for Defendant to agree to an additional 30 days to provide expert reports. (*See id.*). According to counsel for Plaintiff, counsel for Defendant stated that "he did not think it was a problem but would check with his client." (*Id.*).

[2]   Plaintiff's Motion states that the expert deadline was October 31, 2015. (*See* Dkt. No. 46 at 1). However, the January 13, 2015 Scheduling Order states that Plaintiff's deadline for filing expert reports was October 30, 2015. (*See* Dkt. No. 22).

Counsel for Plaintiff represents that when she did not hear back from counsel for Defendant, she "again broached the subject" with him at a status conference held on November 2, 2015, and, again, counsel for Defendant "did not oppose it but stated that he would have to check with [his client]." (*Id.* at 1-2). Plaintiff's counsel followed up by letter dated November 3, 2015, requesting an agreement to extend the deadline for filing Plaintiff's expert reports to November 30, 2015. (*See* Dkt. No. 46-1). By letter dated November 9, 2015, Defendant's counsel objected to the extension; he did not state a reason for the objection. (*See* Dkt. No. 46-2).

Plaintiff's November 30, 2015 "Motion for Extension of Deadlines" was opposed by Defendant on December 4, 2015. (Dkt. No. 49). In its Opposition, Defendant noted that Plaintiff failed to request an extension of his deadline for expert reports prior to its expiration; Plaintiff sent correspondence requesting that Defendant stipulate to an extension three days after the expiration of his expert reports deadline; and Plaintiff filed his motion for an extension thirty days after his deadline for expert reports had expired. (*See id.*). Defendant also noted that the matter had been mediated on October 22, 2015; one expert report had been received prior to mediation; Plaintiff "updated" that one report on December 2, 2015 (*see* Dkt. No. 48); and through his "Motion for Extension of Deadlines," Plaintiff sought to file additional expert reports. (Dkt. No. 49 at 3). According to Defendant, Plaintiff was "attempting to change the posture of the case to Defendant's detriment." (*Id.*).

On December 8, 2015, Magistrate Judge Cannon issued an Order denying Plaintiff's "Motion for Extension of Deadlines." (Dkt. No. 51). In the Order, Judge Cannon found that Plaintiff had "failed to establish good cause" for modifying his expert reports deadline. (*Id.* at 3). Specifically, Judge Cannon found that Plaintiff had not demonstrated "any effort or diligence" to comply with the January 13, 2015 Scheduling Order; Plaintiff "consciously decided to leave the completion of experts until after mediation"; and Plaintiff failed to explain why he waited one month after the expert reports deadline to file a motion for an extension of time. (*Id.* at 2).

**\*3** On December 9, 2015—the day *after* Plaintiff's "Motion for Extension of Deadlines" was *denied* by Magistrate Judge Cannon—Plaintiff filed a Notice of Production of an expert report prepared by Carla Seyler, MS, CRC (Dkt. No. 52), a licensed rehabilitation counselor (*see* Dkt. No. 58-5), and a Notice of Production of an expert report prepared by Richard Moore, Ph.D. (Dkt. No. 53), an economist (*see* Dkt. No. 58-4).

On December 29, 2015, Defendant filed the pending "Motion to Exclude Untimely Disclosed Expert Witnesses." (Dkt. No. 55). Defendant notes that the Notices of Production were filed one day *after* the Court denied Plaintiff's "Motion for Extension of Deadlines" and forty days *after* Plaintiff's expert witness deadline. (*Id.* at 2). Plaintiff filed an Opposition to Defendant's "Motion to Exclude Untimely Disclosed Expert Witnesses" on

January 11, 2016 (Dkt. No. 58), and Defendant filed a Reply on January 20, 2016 (Dkt. No. 59).

On December 29, 2015, Defendant also filed the pending "Motion to Exclude Untimely Disclosed Fact Witnesses." (Dkt. No. 56). In the Motion, Defendant states that on October 26, 2015—almost four weeks after the close of factual discovery on September 30, 2015—Plaintiff filed supplemental voluntary disclosures which listed fifteen additional fact witnesses. (*Id.* at 2).[3] Defendant notes that Plaintiff did not provide any explanation as to why he waited one month after the expiration of the fact witness deadline to provide notice of fifteen additional fact witnesses, especially given that the parties had previously agreed to an extension of the factual discovery deadline. (*Id.* at 3). Defendant also notes that Plaintiff "waited until after the unsuccessful mediation to supplement [his] fact witnesses." (*Id.* at 4). Plaintiff filed an Opposition to Defendant's "Motion to Exclude Untimely Disclosed Fact Witnesses" on January 11, 2016 (Dkt. No. 57), and Defendant filed a Reply on January 20, 2016 (Dkt. No. 60).

[3]   It appears that the supplemental voluntary disclosures referenced in Defendant's "Motion to Exclude Untimely Disclosed Fact Witnesses" was actually filed by Plaintiff on October 27, 2015. (*See* Dkt. Nos. 40, 57-1 at 6).

On January 20, 2016, Defendant filed the pending "Motion to Limit the Testimony of Dr. Jason Williams and Exclude his Untimely Updated Report." (Dkt. No. 61). In the Motion, Defendant states that before the Court ruled on Plaintiff's "Motion for Extension of Deadlines," Plaintiff, on December 2, 2015, filed a Notice of Production of an updated expert report from Dr. Jason Williams (Dkt. No. 48)—over a month after the expert witness deadline had expired. (*See* Dkt. No. 61 at 2). Defendant contends that the updated report of Dr. Williams "does not list any additional factual bases for his conclusions," but rather "list[s] a plethora of additional complaints from Plaintiff, increases the recommended treatment, and downgrades the prognosis from fair to poor." (*Id.*). Defendant asserts that the updated report "does not state what prompted Dr. Williams to spontaneously change his conclusions without any additional visits from Plaintiff." (*Id.*). Plaintiff filed an Opposition to Defendant's "Motion to Limit the Testimony of Dr. Jason Williams and Exclude his Untimely Updated Report" on February 3, 2016 (Dkt.

No. 62), and Defendant filed a Reply on February 10, 2016 (Dkt. No. 63).

Oral argument on Defendant's Motions was held on April 26, 2016. The Court will now address each of Defendant's Motions in turn.

## II. APPLICABLE LEGAL PRINCIPLES

**\*4** Under Rule 26(a)(1) of the Federal Rules of Civil Procedure, a party must, "without awaiting a discovery request," disclose to the other parties "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(i). "A party must make the initial disclosures at or within 14 days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court order ...." FED. R. CIV. P. 26(a)(1)(C). Each party "must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case ...." FED. R. CIV. P. 26(a)(1)(E).

A party must also supplement or correct its disclosures either "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," or "as ordered by the court." FED. R. CIV. P. 26(e)(1)(A). As a general rule, when courts order all factual discovery, including fact witness depositions, to be completed by a certain date, supplemental disclosure of witnesses after that date is untimely. *See Fitz v. Islands Mech. Contractor, Inc.*, 2013 U.S. Dist. LEXIS 47061, at \*7, 2013 WL 1319649 (D.V.I. Apr. 1, 2013); *Gautier-James v. Hovensa, L.L.C.*, Civ. No. 2006–106, 2011 U.S. Dist. LEXIS 109756, at \*12, 2011 WL 4500153 (D.V.I. Sept. 27, 2011) (collecting cases).

In addition to the disclosures required by Rule 26(a)(1), a party must "disclose to the other parties the identity of any [expert] witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." FED. R. CIV. P. 26(a)(2).[4] "Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied

by a written report—prepared and signed by the witness —if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." FED. R. CIV. P. 26(a)(2)(B). Further, "[a] party must make these disclosures at the times and in the sequence that the court orders," FED. R. CIV. P. 26(a)(2)(D), and "must supplement these disclosures when required under Rule 26(e)," FED. R. CIV. P. 26(a)(2)(E).

4    Rule 702 "governs the admissibility of expert testimony [.]" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008); *see also* FED. R. EVID. 702. "Rule 703 describes the types of materials that an expert may permissibly rely on." *Muhsin v. Pacific Cycle, Inc.*, 2012 U.S. Dist. LEXIS 80441, at *10, 2012 WL 2062396 (D.V.I. June 8, 2012); *see also* FED. R. EVID. 703. Rule 705 provides that "an expert may state an opinion—and give the reasons for it —without first testifying to the underlying facts or data," but "may be required to disclose those facts or data on cross-examination." FED. R. EVID. 705.

"If a party fails to properly provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence ... at trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). To determine whether a discovery violation warrants excluding the associated evidence, courts in the Third Circuit consider the following factors, sometimes referred to as the *Pennypack* factors:

> (1) "the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified" or the excluded evidence would have been offered; (2) "the ability of that party to cure the prejudice"; (3) the extent to which allowing such witnesses or evidence would "disrupt the orderly and efficient trial of the case or of other cases in the court"; (4) any "bad faith or willfulness in failing to comply with the court's order"; and (5) the importance of the excluded evidence.

**\*5** *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012) (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)). The party who fails to comply with Rule 26(a) or (e) bears the burden of demonstrating that the failure is substantially justified or harmless. *See Gautier-James*, 2011 U.S. Dist. LEXIS 109756, at *17, 2011 WL 4500153

(citing *Torres v. City of Los Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008)).

## III. DISCUSSION

In the three Motions pending before the Court, Defendant seeks to exclude 1) the expert report and testimony of Carla Seyler, MS, CRC, a licensed rehabilitation counselor, and Richard Moore, Ph.D., an economist, who were disclosed to Defendant as experts forty days after Plaintiff's court-ordered expert disclosure deadline, and one day after Magistrate Judge Cannon denied Plaintiff's motion to extend the deadline for filing expert reports; 2) the testimony of fifteen fact witnesses who were disclosed to Defendant twenty-seven days after the close of fact discovery; and 3) the updated report, and any corresponding testimony, of Dr. Jason Williams —Plaintiff's treating physician, who has been named as an expert in this case—which Defendant contends was disclosed thirty-three days after Plaintiff's court-ordered expert disclosure deadline and contains a changed opinion.

Defendant argues that any untimely disclosed experts and witnesses should be excluded from the trial in this matter because Plaintiff has "flagrantly disregarded" the Court's Scheduling Orders and has failed to meet his burden of showing that his untimely disclosures were substantially justified or harmless, as required by Rule 37(c)(1) of the Federal Rules of Civil Procedure. Defendant asserts that it will be severely prejudiced if the untimely disclosed experts and witnesses are permitted to testify at trial. In response, Plaintiff argues that Defendant will not be prejudiced by his untimely disclosure of experts and witnesses because Defendant has not disclosed any experts of its own; Defendant did not request an Independent Medical Examination of Plaintiff ("IME"); and Defendant would not have deposed any of the untimely disclosed damage witnesses, even if they had been disclosed within the fact discovery period. According to Plaintiff, there is sufficient time, in any event, to depose the experts and witnesses before trial.

### A. Motion to Exclude Untimely Disclosed Expert Witnesses

By Order dated January 13, 2015, the Court set October 30, 2015 as the deadline for Plaintiff to name experts and

provide expert opinions pursuant to Rule 26(a)(2). Forty days *after* the October 30, 2015 deadline, and one day *after* Magistrate Judge Cannon denied Plaintiff's motion to extend his deadline for filing expert reports, Plaintiff, on December 9, 2015, filed two Notices of Production identifying—for the first time—Carla Seyler, MS, CRC ("Ms. Seyler") and Richard Moore, Ph.D. ("Dr. Moore") as experts in this case, and providing their expert reports. The deadline for Defendant to name experts and provide expert opinions was December 30, 2015. On December 29, 2015, Defendant filed the instant "Motion to Exclude Untimely Disclosed Expert Witnesses," requesting that the Court exclude the testimony and reports of Ms. Seyler and Dr. Moore at trial.

**\*6** In his Opposition to Defendant's Motion, and at the April 26, 2016 hearing, Plaintiff conceded that his disclosure of Ms. Seyler and Dr. Moore was untimely, but argues that "Defendant has failed to demonstrate that the untimely disclosure harms Defendant." (Dkt. No. 58 at 4). Plaintiff claims that Defendant could have deposed the expert witnesses before the February 26, 2016 expert deposition deadline elapsed, and can still depose the experts before trial. (*See id.*). Further, Plaintiff states that "Defendant has not requested an IME of Plaintiff or offered any counter medical expert." (*Id.* at 5). Based on the foregoing, Plaintiff contends that there is "simply no harm or prejudice to Defendant, and therefore, the extreme sanction of exclusion of these critical expert witnesses is unwarranted." (*Id.* at 5).

Plaintiff's failure to timely comply with the disclosure requirements of Rule 26(a)(2) cannot be described as either substantially justified or harmless, and exclusion of the untimely disclosed expert witnesses is therefore warranted. The Court's conclusion in this regard is substantiated by consideration of the *Pennypack* factors.

The first *Pennypack* factor—prejudice and surprise—weighs heavily in favor of Defendant. On October 22, 2015, Plaintiff timely disclosed Dr. Jason Williams, a chiropractor, as the only expert to be proffered by Plaintiff in this case. (*See* Dkt. No. 39). Based on a "Chiropractic Report," signed by Dr. Williams, it appears that Dr. Williams is prepared to testify, that Plaintiff's "treatment included [an] ice compress [ ], [a] warm compress, electric muscle stimulation, therapeutic ultrasound, manual therapy, [c]hiropractic adjustments, and the use of kinesiotape." (Dkt. No. 58-3 at 4). Dr.

Williams is further prepared to provide the following prognosis and recommendation:

> The prognosis for Mr. Lee is fair. His back pain has subsided but he occasionally has some tension and tightness in the elbow and forearm which would lead him to come into the office for treatment. My recommendation for Mr. Lee would be to utilize a maintenance care treatment plan for the treatment of his elbow.

(*Id.*).

As will be discussed herein, Plaintiff filed an updated report from Dr. Williams on December 2, 2015 (Dkt. No. 48), based on a follow-up visit on October 23, 2015. The updated portion of Dr. Williams' report provides, in relevant part, as follows:

> The prognosis for Mr. Lee is poor. His back pain has subsided but he occasionally has exacerbations with work. He still has tension and tightness in the elbow and forearm and numbness in his left 5th finger which would lead him to come into the office for treatment. My recommendation for Mr. Lee would be to utilize a maintenance care treatment plan for the treatment of his elbow at least once per month but also whenever any flare ups occur.

(Dkt. No. 62-2 at 2).

Juxtaposed against this proposed testimony is the vastly expanded damages testimony that Plaintiff's untimely disclosed experts are expected to provide. According to her report, Carla Seyler, Plaintiff's untimely disclosed vocational rehabilitation expert, intends to testify that, based on a labor market study, "it is clear that [Plaintiff] will have considerable difficulty returning to employment

if he is unable to return to his usual and customary occupation as a groundskeeper." (Dkt. No. 58-5 at 6). Ms. Seyler also intends to testify that, based on information received from Dr. Williams, "it appears that [Plaintiff is unable to work." (*Id.*). Then, according to his report, Dr. Richard Moore, Plaintiff's untimely disclosed economic expert, intends to testify that Plaintiff's "future lost earning capacity equals $839,804." (Dkt. No. 58-4 at 8). Dr. Moore also intends to testify about the "cost of future life care for [Plaintiff]" once additional information becomes available. (*See id.* at 9). Both Ms. Seyler and Dr. Moore have reserved the right to amend or supplement their opinions and reports, if additional information becomes available. (*See* Dkt. No. 58-5 at 6; Dkt. No. 58-4 at 3).

**\*7** As Defendant expressed at the April 26, 2016 hearing, the opinions of Plaintiff's untimely disclosed experts "change the entire tenor of the case." Indeed, the expert opinions of Ms. Seyler and Dr. Moore offer an enormously enhanced assessment of the damages in this case. The proposed expert testimony has gone from a plaintiff with back pain that "has subsided" with "occasional [ ] ... exacerbations with work" and the need for a "maintenance care plan for the treatment of his elbow," (Dkt. No. 62-2 at 2), to a plaintiff who it appears is "unable to work," (Dkt. No. 58-5 at 6), with a "future lost earning capacity [of] $839,804" (Dkt. No. 58-4 at 8) and a yet to be determined cost for "future life care" (*see id.* at 9).

Based on the posture of the case before the untimely disclosures, Defendant chose not to identify expert witnesses. However, if Ms. Seyler and Dr. Moore are permitted to testify at trial, it is reasonable to assume that Defendant will have to reanalyze the case; alter its trial strategy; consider identifying rebuttal experts and/or presenting other rebuttal evidence; and consider conducting an IME of Plaintiff. Essentially, it is like preparing a defense anew. The prejudice and surprise to Defendant is thus very significant, given the nature of the untimely proffered expert testimony. The first *Pennypack* factor, therefore, weighs heavily in favor of excluding the expert testimony of Ms. Seyler and Dr. Moore from trial.

Plaintiff's argument that any prejudice or surprise to Defendant can be cured by simply allowing Defendant to depose the experts before trial is unpersuasive. Considering that the expert testimony belatedly offered

by Plaintiff effectively recasts the entire case in terms of Defendant's potential exposure to damages, curing the prejudice must necessarily involve an opportunity for Defendant to secure and designate its own expert witnesses or otherwise prepare a defense to counter Plaintiff's new experts. This significant expansion of expert discovery cannot be so casually dismissed because it will unquestionably disrupt the orderly progress of this case and delay the trial of this matter. [5] Contrary to Plaintiff's suggestion, the *Pennypack* factors cannot be read so as to mandate the kind of alterations in the Court-ordered discovery schedule and disruption to the progress of the case that Plaintiff's untimely disclosure of the two expert witnesses would entail. Therefore, the second and third *Pennypack* factors also favor excluding the testimony of Ms. Seyler and Dr. Moore from trial.

5    The undersigned Chief Judge has an established policy of not setting a trial date in the initial Scheduling Order, but waiting until after any dispositive motions are resolved. The goal of this policy is to spare the parties from the need to prepare for trials and to file motions and other documents in connection therewith that may later be rendered inapt by the Court's resolution of a pending dispositive motion. As this undersigned Chief Judge has repeatedly advised, however, the absence of a trial date does not render the deadlines in the Court's Scheduling Order meaningless, nor does it give parties license to believe or argue that changes to the Court's Scheduling Order are routine and without consequence.

Turning to the fourth *Pennypack* factor, the Court recognizes that exclusion of evidence "is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (quoting *Pennypack*, 559 F.2d at 905). However, the willful and flagrant disregard of this Court's Orders and the governing Federal Rules of Civil Procedure by counsel for Plaintiff is so egregious in this case that the extreme sanction of exclusion is warranted under the circumstances here. Indeed, when faced with flagrant violations, the Third Circuit has consistently "upheld the exclusion of expert witnesses as an appropriate sanction for a party's violation of a discovery order or some other pre-trial order." *Allen v. Parkland Sch. Dist.*, 230 Fed.Appx. 189, 194 (3d Cir. 2007) (quoting *United States v. 68.94 Acres of Land*, 918

F.2d 389, 396 (3d Cir. 1990) (internal quotation marks omitted)); *see also Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (upholding the exclusion of an expert's testimony when plaintiffs' counsel flagrantly disregarded a pretrial order).

**\*8** As noted above, the Court set October 30, 2015 as the deadline for Plaintiff to name experts and provide expert opinions. On October 22, 2015—eight days prior to the October 30, 2015 deadline—Plaintiff's counsel sought the consent of Defendant's counsel to a thirty-day extension of the expert deadline, to which counsel for Defendant did not immediately respond. Instead of filing a timely motion with the Court to extend the deadline, on November 2, 2015—three days after the October 30, 2015 deadline had passed—Plaintiff's counsel again made the same request of Defendant's counsel. Once again, Defendant's counsel did not immediately respond, and no motion for an extension was filed with the Court. Defendant's counsel formally objected to Plaintiff's request for an extension of time by letter dated November 9, 2015. Notwithstanding that it was now ten days after the October 30, 2015 deadline, Plaintiff did not file a motion with the Court to extend the deadline. Such a motion was not filed by Plaintiff until November 30, 2015—three weeks after Defendant advised of its objection and thirty days after the October 30, 2015 deadline had expired.

In support of Plaintiff's motion to extend the October 30, 2015 deadline, counsel for Plaintiff represented that she "refrained from incurring the expense of getting all expert reports in place [before mediation on October 22, 2015] as it would make settlement more difficult as a result of the increased costs." (Dkt. No. 46 at 1). On December 8, 2015, Magistrate Judge Cannon denied Plaintiff's motion to extend the October 30, 2015 deadline, finding that Plaintiff had not demonstrated "any effort or diligence" to comply with the January 13, 2015 Scheduling Order; Plaintiff "consciously decided to leave the completion of experts until after mediation"; and Plaintiff failed to explain why he waited one month after the deadline for expert reports to file a motion for an extension of time. (Dkt. No. 51 at 2). In direct violation of Magistrate Judge Cannon's December 8, 2015 Order *denying* Plaintiff's request for an extension, Plaintiff—one day later, on December 9, 2015—filed, without explanation, two expert Notices of Production. (Dkt. Nos. 52, 53).

This sequence of events reveals that the actions of Plaintiff were intentional and taken in conscious and flagrant disregard of the Court's January 13, 2015 Scheduling Order. Counsel for Plaintiff's request to Defendant's counsel that he agree to a thirty-day extension of the October 30, 2015 expert disclosure deadline—which occurred eight days *before* the deadline expired—means that Plaintiff was well aware as early as October 22, 2015 that he had no intention of complying with the Court-ordered deadline. Nonetheless, Plaintiff did not request an extension of the deadline from the Court. Counsel for Plaintiff's follow-up with Defendant's counsel three days after the October 30, 2015 deadline had expired, indicates that Plaintiff was conscious of the expired deadline but again chose not to request an extension of time from the Court. When counsel for Defendant finally objected to counsel for Plaintiff's request for an extension on November 9, 2015, Plaintiff was again reminded of the expired deadline but yet again did not file a motion to extend the deadline at that time. It was not until three weeks later—and one month after the expired deadline—that Plaintiff chose to request an extension of time from the Court. On its face, Plaintiff's conduct speaks volumes.

Not surprisingly, Plaintiff was subsequently unable to provide a credible explanation for what had transpired. During a colloquy with the Court at the April 26, 2016 hearing, counsel for Plaintiff could not explain the three-week delay in filing a motion for an extension of time with the Court, other than by stating that the delay was "inadvertent" and that her co-counsel was waiting for a stipulation from counsel for Defendant. Counsel's inadvertence excuse rings particularly hollow, especially considering that counsel was reminded of the deadline by her communications with Defendant's counsel on three occasions between October 22, 2015 and November 9, 2015. The suggestion that the deadline magically escaped from counsel's mind for a three-week period immediately thereafter simply strains credulity. Even more hollow is the excuse that counsel was waiting for a stipulation from Defendant because that excuse cannot explain the three-week lapse after Defendant registered its objection. In any event, the purpose of waiting for a stipulation—including waiting beyond the Court-ordered deadline—is not apparent because a stipulation is neither necessary nor sufficient to guarantee an extension of time from the Court.

**\*9** The intentionality and defiance with which Plaintiff acted was further reflected in his conscious and flagrant disregard of the Court's Order denying his Motion for an Extension of Time. One day after the Magistrate Judge entered an Order denying the Motion, Plaintiff—undaunted—filed his expert disclosures anyway. Plaintiff did not seek reconsideration of the Magistrate Judge's ruling. Nor did Plaintiff appeal the Magistrate Judge's ruling to the District Judge. Instead, Plaintiff—without any explanation whatsoever—simply filed his two expert disclosures. Plaintiff's total disregard of the Court's Order and the judicial process suggests a deliberate attempt to circumvent the Magistrate Judge's ruling and avoid the Rules governing discovery.

At the hearing held on April 26, 2016, counsel for Plaintiff attempted to explain the blatant violation of the Magistrate Judge's December 8, 2015 Order denying Plaintiff's request to extend the expert disclosure deadline. Counsel stated that the two expert disclosures were consciously filed after the Court denied Plaintiff's motion because a motion for an extension of the scheduling order and a motion to exclude witnesses require different legal analyses, and Magistrate Judge Cannon's December 8, 2015 Order did not embody the latter analysis. Counsel stated further that, because a motion for an extension of a scheduling order requires an analysis under Rule 16(b)(4) and a motion *in limine* requires an analysis of the *Pennypack* factors, Magistrate Judge Cannon's Order denying his Motion for an Extension of Time did not prevent Plaintiff from filing his expert disclosures after the deadline because a *Pennypack* analysis would be necessary to determine if the witnesses would actually be excluded from the trial. Counsel maintained that Plaintiff's filing was not intended to reflect an intentional violation, or ignoring of, the Magistrate Judge's December 8, 2015 Order but, rather, was the product of a careful analysis of the issue conducted prior to Plaintiff's filing of the two expert Notices of Production.

It is worthy of note that it was not until the Court probed at the April 26, 2016 hearing for an explanation of Plaintiff's filing in the face of a contrary Court Order that this justification was advanced. It was not advanced by way of explanation when Plaintiff filed the Notices of Production. Nor was it even advanced in Plaintiff's Opposition to Defendant's "Motion to Exclude Untimely Disclosed Expert Witnesses," notwithstanding that Defendant noted that the Notices of Production were

filed the day after the Court denied Plaintiff's motion for extension of the expert disclosure deadline. (Dkt. No. 55 at 2). The reason the justification was not advanced is obvious; the justification is meritless.

Plaintiff's peculiar explanation suggests that a party can violate the deadlines in a court's scheduling order with impunity, and ignore a court order denying an extension of the deadlines because, in the final analysis, a party's untimely disclosed witnesses must be accepted unless an analysis under the *Pennypack* factors dictates otherwise. Taken to its logical conclusion, a party need not even file a motion to extend the deadlines since an adverse ruling by the court can simply be ignored in anticipation of a second bite at the apple with a *Pennypack* analysis. Plaintiff cited no authority for this novel proposition, which is not surprising as it would vitiate the showing of "good cause" required to modify scheduling orders under Rule 16(b)(4); allow a party to ignore a court order denying an extension of a discovery deadline; disregard the proper procedure —as Plaintiff seeks to do here—for seeking review of a magistrate judge's Order; and allow parties to stand well-established rules and laws for litigation and the Court's authority to manage its docket on their head.

**\*10** In short, Plaintiff's post-hoc rationalization for his outright defiance of the Magistrate Judge's Order is simply not the law. His unsupported argument cannot mask Plaintiff's flagrant violation of the Magistrate Judge's December 8, 2015 Order. Accordingly, the Court finds wholly unpersuasive, and therefore rejects, Plaintiff's position that his untimely filing of expert disclosures—in the face of a Court Order denying an extension of the filing deadline—was justified.

In sum, Plaintiff's conscious decision not to disclose experts until after mediation; his consciousness of the October 30, 2015 expert disclosure deadline; his inability to provide a credible explanation for the delay of one month after the expert disclosure deadline in filing a motion to extend the Court-ordered deadline; and his conscious decision to disclose experts after the deadline, and in the face of the Court's denial of his motion for extension of time, epitomize willful conduct and a "flagrant disregard" for the judicial process. *See Exxon Corp. v. Halcon Shipping Co., Ltd.*, 156 F.R.D. 589, 592 (D.N.J. 1994) ("The repeated violations of the scheduling orders, coupled with Exxon's unsatisfactory explanation for the instant violation[,] may be characterized fairly

as a willful and bad faith breach intended to [ ] circumvent the terms of the case management orders."). The fourth *Pennypack* factor, therefore, favors excluding the testimony of Ms. Seyler and Dr. Moore from trial.

Finally, in his Opposition to Defendant's Motion, Plaintiff argues that the Court should excuse the untimely disclosure of Ms. Seyler and Dr. Moore as experts because they are "critical witnesses." (Dkt. No. 58 at 4). However, "even critical evidence may be excluded when the discovery violation is flagrant." *Jerome v. Water Sports Adventure Rentals & Equip., Inc.*, 2013 U.S. Dist. LEXIS 52931, at *6 (D.V.I. Apr. 12, 2013) (citing cases); *see also Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (holding that critical evidence may be excluded when party flagrantly or willfully disregards a scheduling order). Here, even accepting, *arguendo*, that the testimony of Ms. Seyler and Dr. Moore—which will significantly expand the scope of this case—is critical, the willful, flagrant, and inexcusable violations of the Court's Orders, as discussed above, warrant the exclusion of their testimony at trial. Accordingly, the fifth *Pennypack* factor also favors exclusion under the circumstances here.

In sum, the Court finds that each of the five *Pennypack* factors favor excluding the testimony of Ms. Seyler and Dr. Moore at the trial of this matter. Therefore, the Court will grant Defendant's "Motion to Exclude Untimely Disclosed Expert Witnesses."

### B. Motion to Exclude Untimely Disclosed Fact Witnesses

On January 13, 2015, the Court set the deadline for factual discovery—including fact witness depositions—for August 31, 2015. (*See* Dkt. No. 22 at 1). By request of the parties on August 31, 2015, the Court entered an Order on September 1, 2015 extending the factual discovery deadline to September 30, 2015. (*See* Dkt. No. 30). On October 27, 2015—twenty-seven days after the extended deadline had expired and without leave of Court—Plaintiff filed a document entitled "Supplemental Voluntary Disclosures Pursuant to Rule 26," which lists sixteen witnesses described as having knowledge of facts relevant to the case and the alleged harm suffered by Plaintiff. (*See* Dkt. No. 57-1). Of the sixteen witnesses, fifteen were not previously disclosed in Plaintiff's initial disclosures, filed on December 4, 2014. (*See* Dkt. No. 8). [6] Nor was there any other disclosure of fact witnesses

by Plaintiff except for the October 27, 2015 disclosure at issue. On December 29, 2015, Defendant filed the instant Motion requesting that the Court exclude the testimony of the untimely disclosed fact witnesses.

[6]     Steven Amedee is the one fact witness who was disclosed by Plaintiff in his initial disclosures on December 4, 2014. (*See* Dkt. No. 8). In its Reply, and at the April 26, 2016 hearing, Defendant acknowledged that Steven Amedee was initially disclosed by Plaintiff on December 4, 2014, and noted that his deposition was taken. (*See* Dkt. No. 60 at 1).

**\*11** In opposition to Defendant's Motion, Plaintiff argues that "Bernadine Hendricks, Rachel Thomas, Sarah Fenton, Ivan James, John Peter, Jaheem Lee, Jamari Lee, Wendy Thomas, Marilyn Flynn, and Clyde Lee were timely disclosed during Plaintiff's deposition," and, therefore, "cannot be excluded." (Dkt. No. 57 at 1). In support of this argument, Plaintiff quotes, *inter alia*, an Advisory Committee Note to Rule 26(e), which states: "There is ... no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition." FED. R. CIV. P. 26(e) Advisory Committee's Note to 1993 Amendments.

As for the other five witnesses—Dean Haywood, Jennifer Walcott, Levingston Smitten, Felix Dennis, and Terrence Turbe—Plaintiff argues that the untimely disclosure of these "before and after witness[es]" does not harm Defendant. (*Id.*). Specifically, Plaintiff states that Defendant "only took two depositions in this case (Plaintiff's and Steven Amedee)"; Defendant "has failed to take a single deposition of witnesses related to damages;" and Defendant "would not have taken the depositions of these additional five (5) fact damages witnesses." (*Id.* at 1-2). Accordingly, Plaintiff contends that "Defendant has not been prejudiced," and "the extreme sanction of exclusion is unwarranted." (*Id.* at 2).

At the hearing held on April 26, 2016, counsel for Plaintiff conceded that Rachel Thomas, Sarah Fenton, Ivan James, Jaheem Lee, Jamari Lee, Marilyn Flynn, and Clyde Lee were not disclosed to Defendant in Plaintiff's initial voluntary disclosures as individuals with "discoverable information," pursuant to Rule 26(a)(1). Counsel argued, however, that, pursuant to Rule 26(e), these individuals

were "otherwise made known" to Defendant during Plaintiff's deposition on September 23, 2015—prior to the close of factual discovery—and that all the information Defendant needed to depose the individuals was made available to Defendant, upon its request, at that time. [7] In support of this argument, counsel directed the Court to specific excerpts of Plaintiff's deposition testimony. (*See* Dkt. No. 57-2 at 4, 5, 7, 16; *see also* Dkt. No. 57 at 3).

[7]     As noted above, in his Opposition to Defendant's Motion, Plaintiff initially argued that Bernadine Hendricks, John Peter, and Wendy Thomas were also made known to Defendant during Plaintiff's deposition on September 23, 2015. (*See* Dkt. No. 57 at 1). However, at the April 26, 2016 hearing, counsel for Plaintiff conceded, after reviewing the deposition transcript, that Bernadine Hendricks, John Peter, and Wendy Thomas were not sufficiently disclosed pursuant to Rule 26.

The deposition testimony relied upon by Plaintiff provides, in relevant part, as follows:

**Rachel Thomas**

Q: Starting in about 2010 or so, have you had any long-term or long-running clients that used you on a regular basis?

A: 2010?

Q: Until the present.

A: Several. Several of them.

Q: And are they residences or businesses?

A: Residences.

Q: May I have the name of one of your long-term residential clients?

A: Rachel Thomas. They call her Mona.

Q: Where does Mona reside?

A: Estate La Reine.

(Dkt. No. 57-2 at 4, Plaintiff's Dep. Tr. at 13:1-13).

**Sarah Fenton**

Q: Let me ask you: May I have the name of a second long-term client that Samuel Lee Landscaping had serviced?

A: Sarah Fenton.

Q: And where does Ms. Fenton live?

A: Mon Bijou.

(Dkt. No. 57-2 at 4-5, Plaintiff's Dep. Tr. at 13:21-25; 14:1).

**Ivan James**

Q: Have there been any other long-term clients? Can you give me the name of another long-term client?

A: Ivan. I can't remember his last name.

Q: And where does Ivan reside?

 *12  A: In Frederiksted, La Grange.

Q: Do you have contact information for Ivan?

A: His number is changed. No, I think he's off island right now.

(Dkt. No. 57-2 at 5, Plaintiff's Dep. Tr. at 15:17-24).

**Jaheem Lee and Jamari Lee** [8]

Q: Let me ask you, how many children do you have?

A: Five.

Q: What are their names and ages, starting with the oldest?

A: Jahmal Lee, Jaheem Lee, and Jahmari Lee, Amani, and Ajahni Lee.

....

Q: Sorry. Your second child.

A: Jaheem.

Q: How old is Jaheem, or when was he born?

A: 1994.

Q: And what about Ja –

A: Jahmari.

Q: Jahmari.

A: 1996

....

Q: Where do these children live?

....

A: Jaheem stays with his mom. Jahmari stays with me, between me and his mom. Really with me....

Q: Did you have anyone assisting you when you worked for Ivan?

A: Yeah.

Q: And who did you have assist you?

A: My son Jaheem ....

(Dkt. No. 57-2 at 3-4, Plaintiff's Dep. Tr. at 9:25; 10:1-5; 16-23; 11:6, 11-12; 16:12-16).

**Marilyn Flynn**

Q: Has the accident at Kmart affected your outlook on life?

A: Well, it kind of slow me down in money wise, like wondering how I gonna pay some bills.

Q: Tell me about the bills that you're concerned about.

A: Light bill, light bill, support, paying for my lil kids them, doing for them, put food on the table, pay gas for the car.

Q: Do you know how — go ahead, I'm sorry.

A: Buying things for my girlfriend for her birthday.

Q: What is her name?

A: Marilyn Flynn.

(Dkt. No. 57-2 at 16, Plaintiff's Dep. Tr. at 61:5-17).

**Clyde Lee**

Q: And what family lives in Florida?

A: My brother.

Q: What is his name?

A: Clyde Lee.

Q: Do you know where he resides, what city?

A: Fort Lauderdale.

Q: What does he do there?

A: He lives there.

Q: Does Mr. Clyde Lee have an employer, or is he employed in Fort Lauderdale?

A: I can't tell you. Not too sure.

(Dkt. No. 57-2 at 7, Plaintiff's Dep. Tr. at 24:18-25; 25:1-3).

8      The transcript spells the name Jamari with an "h," whereas Plaintiff spells the name without an "h." The Court spells the name as it is written by Plaintiff.

These purported "disclosures" fail to comply with the requirements of Rule 26(a)(1). The Court is aware of the Advisory Committee Note to Rule 26(e) upon which Plaintiff relies. However, "the mere mention of an individual's identity during the course of a deposition is not sufficient" to satisfy the requirements of Rule 26(a) and (e). *Eli Lilly & Co. v. Actavis Elizabeth, LLC,* 2010 U.S. Dist. LEXIS 44913, at * 13, 2010 WL 1931233 (D.N.J. May 7, 2010) (citing *Muldrow v. Brooks,* 34 Fed.Appx. 854, 854 (3d Cir. 2002)). Indeed, the Advisory Committee Note to Rule 26(e) would appear to stand a party's disclosure obligations on its head if it were read to suggest that Rule 26(a) and (e) is satisfied by the fortuity of whomever happens to be mentioned in response to whatever questions the opposing party chooses to ask at a deposition. The opposing party is not required, and should not be expected, to go on a fishing expedition to discover information that is clearly subject to Rule 26 voluntary disclosure. Nor should the opposing party be required to assume that everyone who happens to be mentioned or asked about in a deposition is someone whom the disclosing party "may use to support its claims or defenses." FED. R. CIV. P. 26(a)(l)(A)(i). Nor should the opposing party have to speculate as to "the subjects of [the] information" that the disclosing party "may use to support its claims or defenses." *Id.* Such a haphazard,

ad hoc approach to the disclosure requirement is contrary to both the letter and spirit of Rule 26. Thus, while the objective of the disclosure Rule may be satisfied in a deposition, or through other discovery, it is the disclosing party's obligation to ensure that the particular requirements of the Rule are met.

**\*13** In this regard, Rule 26(a)(1) and (e)(1) impose affirmative obligations on a disclosing party to provide disclosures that are "complete and correct" as of the time they are made. FED. R. CIV. P. 26(g)(1)(A).[9] Specifically, Rule 26(a)(1) requires a party to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information —that the disclosing party may use to support its claims or defenses." FED. R. CIV. P. 26(a)(1)(A)(i). When those disclosures are "incomplete or incorrect," Rule 26(e) (1) requires the disclosing party to supplement its prior disclosures "in a timely manner." FED. R. CIV. P. 26(e) (1)(A). Although Rule 26(e) does not define "in a timely manner," courts have stated that "supplementation must occur 'in a fashion that will allow [the opposing party] to conduct meaningful discovery and avoid undue delay in the progress of [the] case.' " *Poitra v. Sch. Dist. No. 1*, 2015 U.S. Dist. LEXIS 170650, at \*19-20 (D. Colo. 2015) (quoting *United States v. Guidant Corp.*, 2009 U.S. Dist. LEXIS 88106, at \*4, 2009 WL 5114936 (M.D. Tenn. Sept. 24, 2009)). The responsibility for disclosure and supplementation therefore lies squarely with Plaintiff.

[9] The certification requirement under Rule 26(g) reinforces the disclosure obligations under Rule 26(a) and (e) by requiring that every disclosure under Rule 26(a)(1) is signed by an attorney of record. FED. R. CIV. P. 26(g)(1)(A) ("By signing, an attorney ... certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry" a disclosure "is complete and correct as of the time it is made.").

Counsel for Plaintiff represented at the April 26, 2016 hearing that the individuals listed in Plaintiff's supplemental voluntary disclosure filed on October 27, 2015 are "before and after" witnesses, who will provide "important" damage testimony about how Plaintiff was before the incident that is the subject of this litigation and after. Notwithstanding their alleged importance, however, at no point prior to the close of the *extended* discovery period—an approximately eight-

and-one-half-month time period—did Plaintiff disclose these individuals to Defendant. Indeed, one would expect that individuals who are being offered to testify about Plaintiff's condition before and after the incident would have been well known to Plaintiff from the outset. However, as counsel for Plaintiff acknowledged at the hearing, the individuals were never disclosed by Plaintiff prior to the conclusion of discovery, and were mentioned only in response to questions posed by Defendant at Plaintiff's deposition—seven days before discovery closed.[10]

[10] At the April 26, 2016 hearing, counsel for Plaintiff, in response to a line of questions from the Court, requested an opportunity to supplement the record with a list of any fact witnesses disclosed by Plaintiff in response to Defendant's written discovery or otherwise, prior to the September 23, 2015 deposition of Plaintiff. Counsel was granted up to and including May 2, 2016 to file any such document with the Court. (*See* Dkt. No. 75 at 2). On May 2, 2016, counsel for Plaintiff stated in a supplemental filing that "[n]o further documents exist with regard to disclosure of fact witnesses prior to Plaintiff's deposition." (Dkt. No. 77 at 1). In other words, the witnesses were not previously disclosed.

At the April 26, 2016 hearing, counsel for Plaintiff argued that "discovery is not done in a vacuum," and that "there are different avenues to get discovery." However, Rule 26 requires a party, "without awaiting a discovery request," to provide basic information that the party deems important and relevant. *See* FED. R. CIV. P. 26(a) Advisory Committee's Note to 1993 Amendments ("A major purpose of [Rule 26(a)] is to accelerate the exchange of basic information about the case and to eliminate the paper work involved in requesting such information, and the [R]ule should be applied in a manner to achieve those objectives"). Accordingly, Plaintiff had a disclosure obligation under Rule 26 that he simply cannot avoid.

**\*14** To the extent that Plaintiff learned that his initial disclosures were incomplete, he had a duty to supplement the disclosures "in a timely manner." FED. R. CIV. P. 26(e)(1)(A). Even assuming that Plaintiff could seek to rely on individuals mentioned in Defendant's deposition of him on September 23, 2015 and his October 27, 2015 filing to supplement his December 4, 2014 incomplete initial disclosures, supplementation that occurs seven days before the close of the *extended* discovery period

and twenty-seven days *after* discovery closed is not timely. *See Reed v. Washington Area Metropolitan Transit Authority*, 2014 U.S. Dist. LEXIS 89598, at *6, 2014 WL 2967920 (E.D. Va. July 1, 2014) ("Making a supplemental disclosure of a known fact witness a mere two days before the close of discovery ... is not timely by any definition."). This is especially so in view of the fact that, per the explicit directive of the Court's Scheduling Order all depositions were to be completed by the conclusion of the factual discovery period. (*See* Dkt. No. 22). Accordingly, the Court finds that, notwithstanding the "otherwise [ ] made known" language of Rule 26(e), Plaintiff failed to comply with his disclosure obligations under Rule 26(a)(l)(A)(i), as well as his duty to supplement those disclosures "in a timely manner" under Rule 26(e)(1)(A).

Having concluded that Plaintiff failed to satisfy his disclosure obligations under Rule 26 as it relates to Rachel Thomas, Sarah Fenton, Ivan James, Jaheem Lee, Jamari Lee, Marilyn Flynn, and Clyde Lee, the Court must next determine whether exclusion of these seven witnesses is warranted under the circumstances. The Court must also determine whether exclusion of the five witnesses who Plaintiff concedes were not timely disclosed—Dean Haywood, Jennifer Walcott, Levingston Smitten, Felix Dennis, and Terrence Turbe—and the three witnesses Plaintiff acknowledges were not adequately disclosed pursuant to Rule 26—Bernadine Hendricks, John Peter, and Wendy Thomas—is also warranted.

In addressing the *Pennypack* factors, at the hearing held on April 26, 2016, counsel for Plaintiff argued that prejudice is the most important factor that the Court has to consider, and that there will be no prejudice to Defendant if the Court allows Plaintiff's "before and after" witnesses to testify at trial. In support of this argument, counsel asserted that the Court should consider the past discovery practice of Defendant—i.e., whether Defendant had taken any depositions of damage witnesses. According to Plaintiff, Defendant has taken only three depositions in this case—all of which focused on liability—and, therefore, Defendant would not have deposed any of the damage witnesses, even if they were timely disclosed.

As a preliminary matter, the premise of Plaintiff's "no prejudice" argument—that Defendant had not deposed any damage witnesses—must be considered in the context of the witnesses that Plaintiff disclosed during the

eight-and-one-half-month factual discovery period. When viewed in context, the specious nature of the premise is clear. Indeed, as noted earlier, although given almost one week to do so, Plaintiff's counsel was unable to identify a single fact witness that Plaintiff affirmatively disclosed prior to the expiration of the discovery period other than himself and Stephen Amedee—both of whom were deposed by Defendant. *See* n.10, *supra*. The identities of the damage witnesses—who Defendant purportedly failed to depose—and who thus serve as the basis for Plaintiff's criticism of Defendant's past discovery practices and the premise of the "no prejudice" argument—remain undisclosed. To the extent that Plaintiff is referring to the individuals discussed above, who were mentioned when Plaintiff was questioned at his deposition one week before the expiration of the extended discovery period, such a belated "disclosure"—if it can be called a disclosure at all—is a slim reed upon which to ground the argument that Defendant failed to depose damage witnesses.

Even aside from the contextual problem, Plaintiff's argument fares no better on the merits. The Court rejects the proposition that Plaintiff can ameliorate her failures by speculating about what discovery Defendant may or may not have engaged in if Plaintiff had timely disclosed her witnesses in accordance with the applicable Rules. Plaintiff's inability to cite to any legal authority that supports such a proposition is not surprising. [11] A party's decision as to the discovery in which it will engage, including whether to depose a particular individual, is a matter that is properly left to the party's discretion. There are obviously a number of factors that can bear on such a decision. A party's determination in this regard should not be a matter for the opposing party or the Court to analyze or second-guess, let alone to use as a basis for speculating about whether the party would have deposed a witness who was not timely disclosed.

[11]     At the April 26, 2016 hearing, counsel for Plaintiff requested an opportunity to provide the Court with case authority that supports the proposition that the Court, in determining prejudice to Defendant, should consider the past discovery practice of Defendant in this case—specifically, who Defendant deposed in the past as indicative of whether Defendant would have deposed a witness who was not timely disclosed. Counsel was granted up to and including May 2, 2016 to file case authority with the Court. (*See* Dkt. No. 75 at 2). On May 2, 2016, counsel submitted a supplemental filing citing *Bedell v. Long Reef Condo.*

*Homeowners Ass'n*, 2014 U.S. Dist. LEXIS 60003, at *18-19, 2014 WL 1715441 (D.V.I. Apr. 30, 2014), *Joy Global, Inc. v. Wis. Dep't of Workforce Dev.*, 423 B.R. 445, at *—— (D. Del. 2010), *Cetlinski v. Brown*, 91 Fed.Appx. 384, 391 (6th Cir. 2004), and *Cochran v. Jackson*, 2015 U.S. Dist. LEXIS 73565, at *8-9, 2015 WL 3555291 (E.D. Pa. June 8, 2015). However, none of the courts in those cases considered the past discovery practices of the opposing party—in the manner that Plaintiff suggests that the Court should do here—in determining whether that party was prejudiced.

**\*15** Contrary to Plaintiff's contention, the Court finds that the eleventh-hour mention in Plaintiff's deposition of seven damage witnesses—which the Court has concluded were not disclosed in a timely manner—and the non-disclosure of eight other damage witnesses, prejudiced Defendant. Defendant did not have a meaningful opportunity during the Court-ordered discovery period to depose these witnesses and, therefore, did not have an opportunity to explore the knowledge that these witnesses have about this case, including the damages that Plaintiff allegedly suffered. To suggest that a party is not prejudiced by the inability to depose *fifteen* witnesses who purportedly will testify in a personal injury case about the extent of Plaintiff's damages borders on the frivolous. Accordingly, the Court finds that the first *Pennypack* factor—"the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified"—favors exclusion.

With regard to the ability to cure, at the April 26, 2016 hearing, counsel for Plaintiff represented that her co-counsel penned a letter to Defendant stating that Plaintiff would help Defendant cure any prejudice Defendant suffered as a result of Plaintiff's untimely disclosure of fact witnesses by making the witnesses available for depositions. However, the default remedy of last-minute depositions undermines the disclosure and supplementation requirements of Rule 26. *See e.g.,* *Transclean Corp. v. Bridgewood Services, Inc.*, 77 F. Supp. 2d 1045, 1064 (D. Minn. 1999) (noting that while a continuance and reopening of discovery might alleviate some of the prejudice caused by non-disclosure under Rule 26(a), "such a remedy would wreak its own distinctive prejudice" by unnecessarily prolonging the pretrial process and increasing the expense of litigation), *aff'd in part and vacated in part on other grounds*, 290 F.3d 1364 (Fed. Cir. 2002).

The parties were afforded approximately eight and one half months of factual discovery, which should have been more than sufficient to address the needs of this case. Instead, Plaintiff seeks, in effect, a wholesale reopening of factual discovery that—given the large number of witnesses involved—may well result in a renewed and enhanced presentation of his case. This, in turn, might warrant a reinvestigation by Defendant and reconsideration of witnesses that it might present. This cannot be casually dismissed—as Plaintiff would have it —as a minor cure. This would be a major infusion of factual data into the case long after the fact-gathering portion of the case was slated to be concluded. [12] In short, to reopen discovery and allow Defendant to take *fifteen* depositions at this late stage of the litigation would certainly disrupt these proceedings and delay the trial of this matter. Accordingly, the Court finds that the second and third *Pennypack* factors also favor exclusion.

[12]   This is, of course, in addition to the untimely disclosed expert witnesses which Plaintiff seeks to insert into the case as well.

Finally, even accepting the contention of counsel for Plaintiff that the individuals listed in Plaintiff's supplemental voluntary disclosure are "before and after" witnesses, who will provide "important" damage testimony about Plaintiff's condition before and after the incident at Kmart, the willful and flagrant conduct of counsel warrants excluding the testimony of these witnesses from trial. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (holding that critical evidence may be excluded when party flagrantly or willfully disregards a scheduling order). At the April 26, 2016 hearing, counsel for Plaintiff repeatedly represented that the discovery violations in this case were not willful or flagrant, but rather "inadvertent." [13] However, the Court finds it inconceivable that Plaintiff would have "inadvertently" failed to disclose not one or two, but *fifteen* fact witnesses slated to testify about something as "important" as the damages suffered by Plaintiff. Rather, Plaintiff's flagrant violations of the Court's Scheduling Orders, including the disclosure of fifteen damage witnesses twenty-seven days after discovery closed, constitutes willful, inexcusable conduct. Accordingly, the Court finds that the fourth and fifth *Pennypack* factors weigh in favor of exclusion.

13      The only justification counsel for Plaintiff was able to offer for belatedly disclosing Plaintiff's damage witnesses twenty-seven days after discovery had closed was that the witnesses were "inadvertently overlooked."

**\*16**  Upon consideration of the facts in this case, the applicable Federal Rules of Civil Procedure, and the foregoing analysis of the five *Pennypack* factors, the Court will grant Defendant's "Motion to Exclude Untimely Disclosed Fact Witnesses," and exclude the testimony at trial of Rachel Thomas, Sarah Fenton, Ivan James, Jaheem Lee, Jamari Lee, Marilyn Flynn, Clyde Lee, Dean Haywood, Jennifer Walcott, Levingston Smitten, Felix Dennis, Terrence Turbe, Bernadine Hendricks, John Peter, and Wendy Thomas.

### C. Motion to Limit the Testimony of Dr. Jason Williams and Exclude his Untimely Updated Report

In the "Motion to Limit the Testimony of Dr. Jason Williams and Exclude his Untimely Updated Report," Defendant argues that Plaintiff untimely disclosed an updated expert report of Dr. Jason Williams on December 2, 2015—thirty-three days after Plaintiff's October 30, 2015 deadline for providing expert opinions—that contains a changed opinion. (*See* Dkt. No. 61). Defendant requests that the Court exclude the "untimely disclosed" updated report of Dr. Williams and "correspondingly limit his testimony" at trial. (*Id.* at 3). In his Opposition to Defendant's Motion, and at the April 26, 2016 hearing, Plaintiff argued that the initial expert report of Dr. Williams—Plaintiff's treating physician and an expert in this case—was timely disclosed to Defendant on October 22, 2015, and that the December 2, 2015 updated report of Dr. Williams was not untimely, but rather a required supplement pursuant to Rule 26(e). (*See* Dkt. No. 62 at 3).

Rule 26(a)(2), which governs the disclosure of expert witnesses, provides that "parties must supplement [expert] disclosures when required under Rule 26(e)." FED. R. CIV. P. 26(a)(2)(E). Rule 26(e)(2) further provides, in relevant part: "For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition." FED. R. CIV. P. 26(e)(2). Here, Plaintiff

represents that he received "ongoing treatment" from Dr. Williams on October 23, 2015, and that the updated report of Dr. Williams, filed on December 2, 2015, contains Dr. Williams' "additional impressions" of the October 23, 2015 visit. (Dkt. No. 62 at 1).

Even assuming, without deciding, that the updated report of Dr. Williams, filed on December 2, 2015, was an untimely disclosure of a changed expert opinion, Defendant deposed Dr. Williams on February 26, 2016 and March 12, 2016, and conceded at the April 26, 2016 hearing that it had an opportunity to cure any prejudice that may have resulted from the updated report during Dr. Williams' deposition. Accordingly, the Court finds that exclusion of the updated report of Dr. Williams, and any corresponding testimony, is not warranted. The Court will, therefore, deny Defendant's "Motion to Limit the Testimony of Dr. Jason Williams and Exclude his Untimely Updated Report."

### IV. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has failed to demonstrate that her untimely disclosures of Richard Moore, Ph.D., Carla Seyler, MS, CRC, Rachel Thomas, Sarah Fenton, Ivan James, Jaheem Lee, Jamari Lee, Marilyn Flynn, Clyde Lee, Dean Haywood, Jennifer Walcott, Levingston Smitten, Felix Dennis, Terrence Turbe, Bernadine Hendricks, John Peter, and Wendy Thomas were substantially justified or harmless. *See* FED. R. CIV. P. 37(c)(1). Therefore, the Court will exclude at the trial of this matter the testimony and reports of the experts and the testimony of the fact witnesses. The updated report of Dr. Jason Williams, and any corresponding testimony, will not, however, be excluded because, even assuming that the report was untimely, Defendant had an opportunity to cure any prejudice that resulted therefrom.

**\*17**  An appropriate Order accompanies this Memorandum Opinion.

### All Citations

Not Reported in F.Supp.3d, 2016 WL 4373694

---

2018 WL 2047578
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

STEADY STATE IMAGING, LLC, Plaintiff,

v.

GENERAL ELECTRIC COMPANY, Defendant.

Case No. 0:17–cv–01048–JRT–KMM
|
Signed 05/02/2018

**Attorneys and Law Firms**

Devan V. Padmanabhan, Lisa B. Ellingson, and Paul J. Robbennolt, Winthrop & Weinstine, PA, counsel for plaintiff.

Marla Butler and Nicole S. Frank, Robins Kaplan LLP, counsel for defendant.

**ORDER**

Katherine Menendez, United States Magistrate Judge

**\*1** This case is before the Court on two motions seeking sanctions for alleged untimely supplementation of answers to interrogatories. Steady State Imaging, LLC ("SSI") has filed a Motion to Exclude Evidence Not Disclosed in Response to Interrogatories. [ECF No. 132.] General Electric Company ("GE") has filed a Motion to Strike Portions of Plaintiff SSI's Second and Third Supplemental Answers to Interrogatory No. 1. [ECF No. 138.] For the reasons that follow, GE's motion is **GRANTED IN PART** and **DENIED IN PART** and SSI's motion is **DENIED**.

**I. General Background**

This litigation arises from GE's purchase of the assets of SSI. SSI's primary business involved a silent MRI technology, referred to as SWIFT, which SSI licensed from the University of Minnesota. In April of 2011, GE and SSI entered an asset purchase agreement ("APA"), which transferred SSI's rights in the SWIFT technology to GE in exchange for a substantial sum of money and according to a number of carefully drafted contractual terms. In its May 19, 2017 Amended Complaint, SSI alleged that GE breached certain provisions of the APA.

Specifically, in the APA, GE promised to put the SWIFT technology through a research and development program, known as an "ATD" program, but SSI asserts that GE did not actually do so. [Am. Compl. ¶ 45 & Count 1, ECF No. 22.]

After the APA was executed, SSI alleges that GE made "repeated" promises to SSI that GE would commercialize SWIFT. SSI described one example of such a post-APA promise in its Amended Complaint. It alleged that in September of 2014, GE employees Jason Polzin and Baldev Ahluwalia promised Danny Cunagin of SSI that GE would commercialize the SWIFT Technology. [Am. Compl. ¶ 37.] SSI also claims that it made additional investments to assist GE's commercialization efforts and refrained from suing to enforce the APA or from reacquiring the rights to SWIFT in exchange for GE's post-APA promises. According to SSI, this exchange formed one or more post-APA agreements, which GE breached by ultimately failing to commercialize SWIFT. [Am. Compl., Count III.] Alternatively, SSI contends that even if no enforceable post-APA contract was formed, GE is liable under the equitable theory of promissory estoppel. [Am. Compl., Count IV.] Of particular importance here, SSI's reference to "repeated" post-APA promises in the Amended Complaint made it clear that SSI based its post-APA claims on additional promises that were not identified in the amended pleading.

GE denies that it breached the APA and asserts that it fulfilled all of its obligations under that contact. GE asserts that it conducted an ATD program to evaluate SWIFT as the APA required, but it determined that SWIFT was not appropriate for inclusion in a subsequent marketing program for clinical and other reasons. With respect to the post-APA contract claim, GE asserts that no post-APA agreement exists. It claims that any post-APA agreement would be barred by the APA's explicit integration clause and precluded by a provision requiring any modifications, amendments, or future agreements to be in writing. In addition, GE denies that it ever made any post-APA promise to commercialize SWIFT.

**\*2** On June 2, 2017, GE brought an early partial motion to dismiss the Amended Complaint that was aimed, in part, at SSI's claims that GE breached a post-APA agreement or was liable under a promissory estoppel theory. GE argued that: SSI had failed to provide sufficient detail about any alleged post-APA promises

EXHIBIT
12

to sustain a claim under either theory; SSI could not demonstrate that any GE employee had the authority to bind GE to any post-APA promise; and SSI's claims concerning post-APA agreements were barred because they were not in writing. [ECF Nos. 24, 26.]

The parties conducted a Rule 26(f) meeting on June 9, 2017. They agreed that fact discovery would be concluded on February 16, 2018, a deadline which the Court adopted in a Scheduling Order. [Rule 26(f) Report at 3, ECF No. 32; Scheduling Order (June 28, 2017) at 1 ¶ 3, ECF No. 38.] Shortly after the Scheduling Order was issued, the parties served the following discovery relevant to the current dispute: (1) GE served an interrogatory asking SSI to provide detailed factual information about each of the promises that formed the basis of SSI's post-APA contract and promissory estoppel claims; and (2) SSI served contention interrogatories asking GE to identify the factual basis for GE's assertion that it is not liable for breach of the APA or any post-APA promise, and interrogatories asking for information about GE's ATD programs.

On August 29, 2017, the Court concluded that Rule 12(a)(4) extended the time for GE to serve an Answer to the Amended Complaint such that no responsive pleading would be due until fourteen days after the District Court ruled on the motion to dismiss. [Order (Aug. 29, 2017), ECF No. 55.] On November 2, 2017, this Court recommended that GE's motion to dismiss be granted in part and denied in part. In particular, the Court concluded that despite a lack of clarity regarding SSI's post-APA contract and promissory estoppel claims, SSI had done enough to survive Rule 12(b)(6) dismissal. [ECF No. 85 at 19–24.] The District Court adopted the report and recommendation and GE served its Answer to the Amended Complaint on January 31, 2018. [Ans., ECF No. 122.]

In the motions now before the Court, each side seeks exclusion of certain evidence because the other party supplemented its answers to the interrogatories at issue at the end of the fact-discovery period. GE's motion concerns SSI's January 25, 2018 and February 16, 2018 supplemental answers to GE's interrogatory about post-APA promises. GE argues that these supplemental answers are untimely because SSI waited until the end of the discovery period to provide the information. SSI's motion challenges the timeliness of GE's disclosure of

several affirmative defenses, which GE identified in its January 31, 2018 Answer, but had not previously included in its responses to SSI's contention interrogatories asking GE to describe the factual basis for its position that it was not liable for breach of the APA or a post-APA agreement. SSI also challenges GE's allegedly untimely supplementation of answers to interrogatories seeking information about GE's ATD programs.

**II. Federal Rules of Civil Procedure 26(e) and 37(c)**
Both SSI's and GE's motions seek sanctions pursuant to Rule 37(c) for violations of obligations to timely supplement interrogatory responses. If a party learns that its previous response to an interrogatory is materially incomplete or incorrect, it must supplement or correct that answer in a timely manner. Fed. R. Civ. P. 26(e)(1). But providing such supplementation is unnecessary where the additional or corrective information has "otherwise been made known to the other parties during the discovery process or in writing...." *Id.*

 **\*3** To give teeth to Rule 26(e)'s supplementation requirement, the Federal Rules of Civil Procedure create a consequence for failure to timely supplement. If a party fails to provide information as required by Rule 26(e), that party may not use the undisclosed information "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In the face of a failure to supplement, a court can impose additional sanctions beyond exclusion or can fashion an alternative appropriate remedy. Fed. R. Civ. P. 37(c)(1)(A)–(C) (providing that the court can consider requiring payment of fees, informing the jury of the failure, or imposing other appropriate sanctions "in addition to or instead of" exclusion); *see also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006) ("Thus, the plain text of the rule provides that if an appropriate motion is made and a hearing has been held, the court does have discretion to impose other, less drastic sanctions.").

The Court has considerable discretion in fashioning an appropriate sanction for discovery violations under Rule 37(c)(1). *Wagener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). However, the more serious the sanction to be imposed, the more circumscribed that discretion becomes. *Id.* (explaining that "discretion narrows as the severity of the sanction or remedy [the district court] elects increases"). Because "the exclusion of evidence is

a harsh penalty [that] should be used sparingly," *id.*, courts should consider whether lesser sanctions can create an appropriate remedy, *see Heartland Bank v. Heartland Home Finance, Inc.*, 335 F.3d 810, 817 (8th Cir. 2003). "Generally speaking, federal courts favor resolution of cases on their merits over the imposition of drastic, tactical sanctions." *Byrd v. J Rayl Transp., Inc.*, No. 13–cv–2279 (RHK/LIB), 2014 WL 12647772, at *2 (D. Minn. Oct. 3, 2014).

Courts deciding whether to preclude a party from using late-disclosed information or to impose some other sanction pursuant to Rule 37(c)(1) consider several factors, including: (1) how important the excluded material is to the case; (2) the proffered reason for the party's failure to provide the information in a timely fashion or any evidence of bad faith or willfulness; (3) the potential that the other party will be prejudiced if the information is not excluded; and (4) whether a continuance can be provided to cure any prejudice. *Transclean Corp. v. Bridgewood Servs., Inc.*, 77 F. Supp. 2d 1045, 1063 (D. Minn. 1999), *aff'd in part, vacated in part*, 290 F.3d 1364 (Fed. Cir. 2002) (citing *Citizens Bank v. Ford Motor Co.*, 16 F.3d 965, 966 (8th Cir. 1994); *Millen v. Mayo Foundation*, 170 F.R.D. 462, 465 (1996); *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 744 (Fed. Cir. 1997) ).

### III. GE's Motion

GE's motion seeks to preclude SSI from being able to offer certain evidence in support of its post-APA contract and promissory estoppel claims. [ECF No. 138.] For the reasons that follow, the Court concludes that SSI's January 25, 2018 and February 16, 2018 supplemental responses to Interrogatory No. 1 were not timely. The Court also finds the late supplementation of these responses was not substantially justified, nor was it entirely harmless. However, the Court concludes that the remedy of exclusion is not warranted because any prejudice GE suffered as a result of the late supplementation can be remedied through a continuance to allow GE some additional limited discovery.

### A. GE's Efforts to Discover the Alleged "Promises"

A confounding aspect of this case has been SSI's entrenched unwillingness to identify precisely what its post-APA breach of contract and promissory estoppel claims are about. SSI's Amended Complaint alluded

to "repeated" post-APA promises by GE personnel to commercialize SWIFT, promises that either formed a new contract or contracts or that gave rise to promissory estoppel. But the Amended Complaint itself only provided limited information about one: the only post-APA promise identified in SSI's pleading was allegedly made by GE employees Jason Polzin and Baldev Ahluwalia to Danny Cunagin of SSI in September 2014. Unfortunately, despite repeated efforts on the part of GE to learn additional information regarding this critical aspect of SSI's case, only in the last month of discovery did SSI actually reveal several essential components of its post-APA claims.

### GE's Interrogatory No. 1

**\*4** On July 13, 2017, GE served SSI with its First Set of Interrogatories. GE's Interrogatory No. 1 asks SSI to provide information about all of the promises that form the basis of its post-APA contract and promissory estoppel claims. GE's Interrogatory No. 1 reads:

> Identify and describe every "promise" or "representation" that SSI alleges GE made, after execution of the APA, to commercialize SWIFT as alleged in Paragraphs 36, 37, 53 and 59 of the Amended Complaint, including, but not limited to providing for each "promise": the date of the alleged promise; each person who was aware of, made, or received the alleged promise; a description of each identified person's knowledge related to the alleged promise; the obligations of each party in relation to the alleged promise; the date(s) by which each party was required to satisfy its obligations in relation to the alleged promise; the details of any consideration offered and/ or provided by SSI in relation to the alleged promise, including the details of any "investments" made by SSI as alleged in Paragraphs 38 and 54 of the Amended Complaint; the date(s) by which SSI satisfied any

of its obligations in relation to the promise; and any documents that evidence the existence or substance of the alleged promise.

[ECF No. 141–1.] This is just the kind of "who, what, when and where" interrogatory that a defendant should ask and a plaintiff should answer early on in a case when a plaintiff contends that the defendant breached an oral contract.

### SSI's Initial Response and the Parties' Disagreements
SSI responded to GE's Interrogatory No. 1 on August 14, 2017. SSI had filed its Amended Complaint nearly three months earlier, so plenty of time had passed for SSI to get its ducks in a row. In its original response to the interrogatory, SSI again identified the alleged September 2014 promise to commercialize SWIFT made by Mr. Polzin and Mr. Ahluwalia to Mr. Cunagin. SSI's original answer identified an additional post-APA promise as well. SSI added that in late November or early December of 2011, Jacques Coumans of GE promised Mr. Cunagin and Troy Kopischke (another SSI representative) at GE's RSNA booth that GE would commercialize SWIFT. Finally, SSI repeated the assertion from its Amended Complaint that SSI made investments to assist with SWIFT commercialization and refrained from taking action to enforce the APA or to reacquire rights to SWIFT. No other details were provided (such as the timing of performance or the specific obligations GE allegedly incurred as a result of any promise) and no other promises were identified.

On September 7, 2017, GE sent SSI a deficiency letter raising concerns about SSI's answer to GE's Interrogatory No. 1. GE complained that SSI had simply repeated what it included in its Amended Complaint about the September 2014 promise and added one additional promise by Mr. Coumans, but had not provided the detailed information called for by the interrogatory. [ECF No. 141–3.] On September 12, 2017, SSI responded that it was continuing to investigate and intended to supplement its answer to Interrogatory No. 1 as additional information was discovered. [ECF No. 141–4.]

**\*5**  On October 4, 2017, GE again told SSI that its response to GE's Interrogatory No. 1 was deficient. GE stated: "GE is entitled to discover what facts, if any,

SSI has that support its claim for breach of contract, including the consideration SSI alleges it gave in exchange for GE's alleged promises." [ECF No. 141–5.] On October 9, 2017, SSI complained that GE's repeated demands for confirmation that SSI would supplement its discovery responses were unnecessary and unproductive. SSI again stated that it would supplement in a timely manner. [ECF No. 141–6.]

On October 24, 2017, GE demanded that SSI provide a date within the next two weeks when SSI would provide a supplemental response to GE's Interrogatory No. 1. GE articulated the reason it believed such supplementation was required:

> As GE noted in its Motion to Dismiss, SSI's Amended complaint is devoid of any factual basis upon which GE can ascertain either (a) the existence of the post-APA agreement, or (b) the terms of the alleged agreement. SSI's continued refusal to provide information concerning the existence and terms of that alleged agreement 6 months after filing its amended complaint is hindering GE's ability to defend against SSI's allegations.

[ECF No. 141–7.] In response, SSI stated that it intended to supplement its discovery responses by November 7, 2017, though it ultimately did so in December. [ECF No. 141–8; ECF No. 141–10.]

### SSI's First Supplemental Responses to Interrogatory No. 1
On December 11, 2017, almost seven months after filing its Amended Complaint, SSI provided its First Supplemental Answer to GE's Interrogatory No. 1. In this first supplemental response, SSI disclosed one additional post-APA promise. It stated that:

> on or about April 20–26, 2013, outside the main conference hall at the ISMRM meeting in Salt

Lake City, Mike Garwood of SSI expressed concern to Jacques Coumans of GE that GE would not commercialize SWIFT. Mr. Coumans put his arm around Mike Garwood and promised him that GE would commercialize SWIFT.

[ECF No. 141–12.] SSI also provided additional details about the September 2014 promise that Messrs. Polzin and Ahluwalia of GE allegedly made to Mr. Cunagin of SSI, including asking for SSI to help developing SWIFT using resources at Stanford University. SSI pointed to a Bates-labeled document, indicating that GE could discern from that document additional information sought by its interrogatory. [*Id.*] SSI further provided information about the alleged consideration exchanged for this April 2013 promise by Mr. Coumans. [*Id.*] Again, SSI identified no other promises or provided more details about previously alleged promises.

### SSI's Second Supplemental Response to Interrogatory No. 1

On January 25, 2018, just three weeks before the close of fact discovery, SSI served its Second Supplemental Answers to Interrogatory No. 1. It provided additional material details about the previously-disclosed promises and described what appear to be two entirely new promises. As with its earlier supplementation, the second supplemental answers were somewhat short on the specifics called for by GE's Interrogatory No. 1. SSI added that GE's promises to commercialize SWIFT "contemplated the development and introduction to the market of a SWIFT brain imaging, or neuro, application." [ECF No. 141–13 at 8.] That SSI considered this neuro application to be a part of the promises allegedly made by GE had not been previously disclosed.

In addition to Mr. Coumans' alleged promise to Mr. Cunagin and Mr. Kopischke in late November or early December of 2011 at the RSNA meeting (which SSI identified in its initial response to the interrogatory), SSI stated for the first time that at the same meeting, Mr. Cunagin and Mr. Kopischke met with GE's then CEO Michael Harsh. Mr. Harsh allegedly "represented that GE wanted to get to market fast with the RUFIS product, but

that it would then follow with the commercialization of SWIFT products." [ECF No. 141–13 at 8.]

**\*6** With respect to the promise made by Mr. Polzin and Mr. Ahulwalia at the ISMRM meeting between April 20–26, 2013, SSI added some additional information. SSI stated that during the meeting, "Mr. Polzin and Mr. Ahluwalia gave excuses about GE's lack of progress with SWIFT commercialization. Mr. Polzin and Mr. Ahluwalia represented that although GE was prioritizing other things like PET MR over SWIFT, SSI should not worry, because GE would commercialize SWIFT as soon as practicable." [ECF No. 141–13 at 8–9.] SSI gave a little more information about what happened when Mr. Coumans allegedly made a promise at the same meeting: "Mr. Coumans greeted Mr. Kopischke and Mr. Cunagin by shaking their hands and assuring them that they were going to make a lot of money from SWIFT commercialization." [*Id.* at 9.]

SSI also identified new information about a conversation between Messrs. Polzin, Ahluwalia, Kopischke, and Cunagin that took place on May 17, 2013. On that day, while discussing commercializing SWIFT,

> Mr. Polzin and Mr. Ahluwalia represented that GE was very interested in moving SWIFT forward but they needed SSI's assistance with that commercialization. Specifically, Mr. Polzin and Mr. Ahluwalia asked for SSI's assistance with applications that leverage the SWIFT technology and with making SWIFT run on conventional MRI hardware. They also requested that SSI provide GE a list of minimum requirements to make SWIFT work. Mr. Ahluwalia also asked to meet with Mike Garwood to discuss SWIFT during his visit to the University of Minnesota on June 10, 2013.

[ECF No. 141–13 at 9.] SSI further stated that Mr. Kopischke provided GE the requested information about

SWIFT "as well as a list of possible solutions for identified issues with SWIFT." [*Id.*]

***SSI's Third Supplemental Response to Interrogatory No. 1***

On February 16, 2018, the last day of the discovery period in this case, SSI served its Third Supplemental Answers to GE's Interrogatory No. 1. For the first time, SSI disclosed details of an August 29, 2014 meeting that it argues provides "context" [1] for the promise made on September 12, 2014, which SSI had originally disclosed in its first answer to the interrogatory. [SSI's Mem. in Opp'n to GE's Mot. at 22–23, ECF No. 146.] SSI stated that Messrs. Cunagin, Kopischke, and Garwood met with Messrs. Polzin and Ahluwalia in Wisconsin. The SSI team complained about the slow progress in commercializing SWIFT, and reminded GE's representatives that "GE had told SSI that it would commercialize SWIFT by implementing SWIFT on its clinical scanners in a 'Silent Brain' or neuro application, and that it could do so within a year." [ECF No. 141–14 at 10.] SSI's representatives stated that GE needed to reaffirm its agreement to commercialize SWIFT or SSI would take action to enforce the agreement to commercialize. [*Id.*] No previous answer or supplemental answer to the interrogatory had identified that the commercialization of SWIFT could happen "within a year."

[1] The "context" SSI provided about the days leading up to the September 12, 2014 promise discloses critical details that are relevant to disputed legal issues in this case. For example, the revelation that GE had represented in August 2014 that the commercialization of SWIFT could happen in a neuro application "within a year" directly implicates a potential defense to a post-APA contract claim under Minnesota's statute of frauds. *See SL Montevideo Tech., Inc., v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1180 (D. Minn. 2003) (concluding that plaintiff's implied contract claim failed under Minn. Stat. § 513.01(1) because the alleged agreement by its terms was not to be performed within a year). As explained below, SSI also identified that Mr. Polzin and Mr. Ahluwalia discussed commercialization of SWIFT with a CEO of part of GE's business shortly before making the alleged September 12, 2014 promise; this introduces facts relevant to GE's contention that its personnel lacked authority to bind the company. *See New Millennium Consulting, Inc. v. United HealthCare Services, Inc.*, 695 F.3d

854, (8th Cir. 2012) (discussing requirements of actual and apparent authority for an agent to bind a principal under Minnesota law). SSI downplays the significance of these additions of "context" by suggesting that it was not identifying any new promises. However, the reality is that SSI's late supplementation introduced significant facts at the end of the discovery period that altered the legally relevant landscape of its claims.

**\*7** According to SSI's February 16, 2018 supplemental answer, GE's representatives "did not deny that GE had promised SSI and Dr. Garwood that it would commercialize SWIFT, and that GE had failed to comply with its obligation to do so." [*Id.* at 11.] Instead Mr. Polzin and Mr. Ahluwalia acknowledged the slow progress in commercializing SWIFT and apologized for the failure to commercialize SWIFT and the harm caused to Dr. Garwood's reputation and career as a result. [*Id.*] Mr. Polzin and Mr. Ahluwalia said that they would bring up the issue at a September 3, 2014 meeting with Richard Hausmann, GE's CEO and President of the Global MR Business for GE Healthcare. [*Id.*] Then, when GE's representatives called Mr. Cunagin on September 12, 2014 and made one of the post-APA promises, they "informed Mr. Cunagin that Mr. Hausmann and his leadership team ... agreed to SSI's demands that GE reconfirm its commitment to SSI to commercialize SWIFT." [*Id.*] GE agreed to commercialize SWIFT as soon as practicable and said that it would implement SWIFT in a " 'Silent Brain' or neuro application." [*Id.*] Finally, GE's representatives "stated that GE had put money into SWIFT and that SWIFT solved some key technical hurdles in the current technique (RUFIS)." [*Id.* at 11–12.]

Finally, SSI disclosed for the first time that Eric Stahre, GE's new CEO and President of the Global MR Business for GE Healthcare, allegedly authorized the September 12, 2014 promise. Specifically, SSI states that Mr. Stahre "affirmed GE's agreement to commercialize SWIFT" in a telephone call in January of 2015. [*Id.* at 12.]

On February 23, 2018, GE's counsel complained that SSI's January 25, 2018 and February 16, 2018 supplemental answers to GE's Interrogatory No. 1 were untimely. [ECF No. 141–15.] GE specifically raised issues with the late disclosure of several promises that were entirely new and about the late revelation of important details regarding promises that had been mentioned earlier. [ECF No. 141–15 at 4–6.]

**B. Discussion**

In its motion, GE requests that SSI be prohibited from offering evidence on any motion, at any hearing, or at trial about portions of the information disclosed in SSI's second and third supplemental responses to GE's Interrogatory No. 1. Specifically, GE asks the Court to exclude evidence concerning: (1) promises allegedly made during the August 29, 2014 meeting in Wisconsin, and in January 2015 by Mr. Stahre; (2) Mr. Hausmann's alleged approval of GE's agreement to SSI's demands for reconfirmation of GE's commitment to commercialize SWIFT, which was allegedly conveyed as part of the September 12, 2014 promise; and (3) GE's alleged statement that GE would implement SWIFT's commercialization in clinical scanners in a "Silent Brain" or neuro application, and that it could do so within a year. [GE's Mem. in Supp. of Mot. to Strike at 20–21, ECF No. 140.]

There can be no dispute that SSI's January 25, 2018 supplementation provided important additional information regarding its post-APA claims with very little time left in the schedule, and its February 16, 2018 supplementation did so on the last day of the discovery period. The questions facing the Court begin with whether SSI's late supplementation was nevertheless made "in a timely manner" for purposes of Rule 26(e)(1). The Court must also ask whether any failure to make timely supplementation was substantially justified or harmless. If the supplementation was not timely, was not substantially justified, and was not harmless, the Court must finally determine whether exclusion is justified or whether another course of action is appropriate.

### *Timeliness and Substantial Justification*

The issues of timeliness and substantial justification both implicate the reasons why SSI did not disclose the information it provided until the end of the discovery period. SSI states that its late supplementation was timely and substantially justified because SSI provided the information in January and February of 2018, shortly after Mr. Cunagin and Mr. Kopischke began preparing for their depositions. SSI represents that Messrs. Cunagin and Kopischke are busy professionals operating a new business venture, and they had a difficult time recalling all of the details about the post-APA promises that

GE allegedly made several years ago to commercialize SWIFT. They both state that their focus in the early period of this case was on the HeartVista program that they spent months developing in response to GE's September 2014 promise. Because of this early emphasis, they did not recall the other promises or details of promises made by GE until they reviewed materials in preparation for their depositions. [Cunagin Decl., ECF No. 147; Kopischke Decl., ECF No. 148.] SSI asserts that the disclosures of the newly identified promises and details at the end of the discovery period were therefore timely because SSI supplemented its interrogatory response as soon as SSI's principals shared the information with counsel.

**\*8** To put it bluntly, the Court is disappointed in SSI's handling of its response to GE's interrogatory concerning post-APA promises, and it shares GE's frustration about the late disclosures. Throughout this litigation, GE has endeavored, with minimal and belated success, to discern the true nature of SSI's claims related to a post-APA contract or actionable promises. [2] Of course, people have a difficult time remembering details about events that happened years in the past and SSI's principals cannot be expected to have perfect memories. However, SSI chose to bring this lawsuit and to base two of its claims on several unidentified post-APA promises. SSI knew for months that GE needed to learn the details about those alleged post-APA promises and SSI had months to provide GE the most basic information about its post-APA case. Instead, SSI waited until the very end of the discovery period to fulfill its discovery obligation. The proffered explanation that SSI's two employees only recalled critical details when they started reviewing information on the eve of their depositions suggests either that SSI did not act diligently to answer GE's discovery request earlier in the case, or that SSI's counsel did not act diligently in requiring SSI's principals to do so.

[2]     The precise scope of GE's post-APA breach of contract and promissory estoppel claims has also eluded the Court. The issue of SSI's incomplete disclosure of the alleged post-APA promises first came to the Court's attention when GE moved to dismiss the original complaint on May 12, 2017. [ECF No. 15 at 8, 13–17.] SSI added only one example of the alleged "repeated" promises when it amended its complaint a week later. SSI's failure to disclose the full extent of the promises came up again during the September 12, 2017 hearing on the motion to dismiss. [*See* ECF No. 63 at 7–8 (discussing

SSI's failure to disclose the substance of post-APA promises in an initial complaint, amended complaint, and in response to an interrogatory); *id.* at 23 (THE COURT: "One of the things that I'm grappling with is the lack of specificity around the promises, the consideration, and, frankly, the indication that there's an intent to induce.").]

GE's service of Interrogatory No. 1 in July of 2017 triggered SSI's obligation to act with reasonable diligence to provide GE with the responsive information in SSI's possession, custody, or control. Such a diligent response requires corporate employees to conduct a reasonable investigation so that the company can answer an interrogatory. *3M Innovative Properties Co. v. Tomar Elec.*, No. 05–cv–756 (MJD/AJB), 2006 WL 2670038, at *6 (D. Minn. Sept. 18, 2006) (requiring a company responding to a discovery request to conduct a reasonable investigation to fully respond to interrogatories and document requests); *Hickman v. Wal–Mart Stores, Inc.*, 152 F.R.D. 216, 223 (M.D. Fla. 1993) (same).

The record here shows that instead of diligently reviewing documents to give GE the information to which it was entitled, Mr. Cunagin and Mr. Kopischke waited until early 2018 to review documents to help identify the alleged representations made by GE that formed the basis of claims in the Amended Complaint in May of 2017. Mr. Kopischke states that he reviewed nearly 8,000 emails to prepare for his deposition in early 2018, and it was then that he remembered details of the additional promises disclosed at the end of the discovery period. [Kopischke Decl ¶¶ 4, 6.] Mr. Cunagin provides a similar account of reviewing documents between mid-January and February of 2018 in preparation for his deposition and then learning additional information about post-APA promises. [Cunagin Decl. ¶¶ 5–6.] However, it is clear from SSI's statement in the Amended Complaint that it believed there were "repeated" post-APA promises; counsel for SSI knew that they would need to provide more detailed information. There is nothing in the record that suggests Messrs. Cunagin and Kopischke could not have reviewed the same documents earlier in the case, which would have allowed SSI to tell GE what the promises were that formed the basis of SSI's post-APA claims. SSI certainly does not allege that the information Mr. Cunagin and Mr. Kopischke ultimately reviewed to refresh their recollections was unavailable until the end of the discovery period. *See* 8A C. Wright & A Miller, *Fed. Prac. & Proc. Civ.* § 2049.1, 1993 Expansion of Duty

to Supplement or Correct (3d ed.) ("[T]here is no excuse under the restyled rule for failure to supplement where the information was in the responding party's possession at the time the incomplete response was made.").

 **\*9**  Instead, SSI's principals state that they decided to focus on the HeartVista program earlier in the case. SSI's own explanation for why it supplemented its responses so late in the game shows that SSI's failure to provide the information earlier in the case was the product of a choice, not simply imperfect memory. SSI treated its duty to respond to GE's interrogatory about post-APA promises as an afterthought. Its last-minute disclosure is not made timely or substantially justified merely because SSI's two employees chose to wait until the end of the discovery period to familiarize themselves with information available to the company earlier in the litigation.

To be clear, the Court is not reaching this conclusion based on the notion that any time a party brings a claim it must remember and reveal every fact relevant to that claim right at the outset of the case. If that were required, there would be no need for Rule 26(e) to permit supplementation of disclosures or interrogatory answers. But where, as here, a plaintiff knows at the start of the litigation that it has deprived the defendant of information that is essential to understanding the reason it is being sued, the plaintiff cannot wait until the end of the discovery period to review the information that will allow it fully answer an interrogatory aimed at gathering precisely that undisclosed information. The information disclosed by SSI at the very end of discovery in this case goes well beyond mere details, and includes facts that form essential elements of SSI's post-APA contract and promissory estoppel claims.

SSI relies on *Ventura v. Kyle*, No. 12–cv–472 (RHK/AJB), 2013 WL 12145009 (D. Minn. Feb. 28, 2013), to argue that its close-of-discovery supplementation was timely. SSI's reliance on *Ventura* is misplaced. In reasoning that exclusion was not warranted where the plaintiff provided a supplemental answer to an interrogatory with only two weeks to go in the discovery period, the *Ventura* court noted that "Defendant may object that Plaintiff's supplementation was not made in a 'timely manner' given that the documentary record Plaintiff relies on was available for some time prior to Plaintiff's supplementation, but Plaintiff's supplemental responses

were made within the discovery period and months before the dispositive motion deadline and trial date." *Id.* at *2. However, this is far from an endorsement of timeliness and justifiability of a late disclosure, and it says nothing about how to interpret late supplementation of the type that occurred here. SSI's representatives have merely stated that "during the initial months of discovery" they focused on matters of greater concern to them, but waited until the very end of the discovery period to review information for their depositions. As noted above, the Court can only infer from this record that SSI viewed focusing on its litigation priorities as more important than actually identifying the post-APA promises that formed the very basis of two of SSI's claims. The *Ventura* court's observation does not address this scenario.

In sum, the Court finds that SSI's January 25, 2018 and February 16, 2018 supplementation was not "timely" for purposes of Rule 26(e)(1). The Court also finds that SSI's failure to timely supplement was not substantially justified for the same reasons.

### *Harmlessness*

Whether a failure to timely supplement is harmless for purposes of Rule 37(c)(1) sanctions is really a question of prejudice. Here the focus is on how SSI's untimely and unjustified disclosure of significant details about post-APA promises affected GE and whether anything short of exclusion of evidence can remedy whatever harm was done. GE described suffering two types of harm here, one of which is far more compelling than the other.

 **\*10**  First, in GE's memorandum in support of its motion, it set forth a tenuous theory of the prejudice it claims to have suffered due to SSI's untimely disclosures. [GE's Mem. in Supp. of Mot. to Strike at 28–33.] Specifically, GE asserted that because SSI had not revealed the details of the alleged post-APA promises, GE's own witnesses were unable to review the necessary information prior to their depositions, which caused GE's witnesses to admit they did not have a detailed or specific recollection about certain events and conversations. GE argued that this creates an unfair record, making its own witnesses' recollections seem hazy by comparison to the sharper recollections reflected by SSI's witnesses during their depositions, who were specifically prepared regarding the promises. [3] In turn, GE argues this would allow SSI to unfairly impeach GE's witnesses with their fuzzier

deposition testimony should they testify more definitively at trial.

[3]     It is noteworthy that GE also deposed Messrs. Cunagin and Kopischke after the late disclosures were made, meaning that GE was able to obtain relevant testimony about all the post-APA promises from SSI's own witnesses despite the belated supplementation of answers to Interrogatory No. 1. As a result, there is no basis to conclude that GE was prevented from asking SSI's witnesses questions about undisclosed promises.

Frankly, the Court finds this alleged harm to be speculative and relatively insignificant. To the extent that GE remains concerned about this potential prejudice, however, those concerns were rendered moot at the hearing. At the hearing on the current dispute, SSI's counsel committed to not attempting to impeach GE's witnesses with their prior testimony reflecting lack of memory on any details about post-APA promises that were not disclosed until after those witnesses were deposed. [4] [Apr. 19, 2018 Hr'g Tr. at 78:17–24, ECF No. 187.] The Court finds that this commitment cures this aspect of alleged prejudice caused by SSI's late disclosures, and as a result, exclusion is not required to prevent this identified form of harm.

[4]     At the hearing, the Court asked SSI's counsel whether he would agree not to engage in such impeachment or yield to an order to that effect. The Court interprets SSI's counsel's response as an agreement to refrain from such impeachment, making an order unnecessary.

At the hearing, GE articulated another way in which SSI's January 25, 2018 and February 16, 2018 supplementations are prejudicial, one that is more of a concern than the possibility of impeachment with fuzzy recollections described above. Because SSI did not disclose any information about GE's alleged commitment to commercialize SWIFT in a neuro application "within a year" until the last day of discovery, GE was unable to prepare its defense during the discovery period to address that specific assertion. Had SSI made this assertion earlier in the case, GE could have developed a defense to that claim, including marshaling its own facts to demonstrate that performance of such a promise within a year would be so impossible or impractical as to render the existence of such a promise unlikely or unenforceable. [*See* Apr. 19, 2018 Hr'g Tr. at 57:24–58:18.] The Court is persuaded that

SSI's untimely and unjustified disclosure of the "within a year" commercialization promise was prejudicial to GE because it interfered with GE's ability to prepare its defense on this point, or to use this fact to strengthen its defense in other areas.

The Court also finds that SSI did not provide any information about the involvement of Mr. Hausmann or Mr. Stahre in making post-APA promises until the very end of the discovery period. These allegations are significant because Mr. Hausmann and Mr. Stahre are current and former CEOs of GE, making any promises made by them simultaneously more significant and arguably less likely. The late disclosure of their alleged involvement prevented GE from preparing a defense that addressed these allegations, a reality that cannot be dismissed as harmless.

### *Appropriate Sanction*

**\*11** Having found that SSI's untimely and unjustified late supplementation of its response to GE's Interrogatory No. 1 was prejudicial in some respects, the Court must consider whether the exclusion of evidence of the late-disclosed facts as authorized by Rule 37(c)(1) is appropriate or whether some other remedy better addresses the harm. Here, the Court concludes that exclusion of evidence is not warranted because a brief continuance can cure any prejudice to GE.

With respect to the serious sanction of exclusion, the Court concludes that it is not necessary to remedy the prejudice to GE. For one thing, exclusion might prove unworkable given the reality that the facts that were not revealed in a timely manner are intertwined with facts that were timely disclosed and the evidence at issue will be introduced through narrative testimony of lay witnesses rather than through experts or easily excludable documents. More importantly, the availability of a continuance to cure the prejudice is particularly persuasive under these circumstances. A modest extension of the discovery deadline for GE will allow it to develop its defense regarding the last-minute disclosures, including the alleged promise to commercialize SWIFT in a neuro application within a year, Mr. Hausmann's alleged authorization of the September 12, 2014 promise, and Mr. Sahtre's alleged ratification of earlier promises in January of 2015. The Court also grants GE's alternative request to permit it to supplement its Rule 26(a)(1) disclosures to add Mr. Stahre as a witness.

## IV. SSI's Motion

SSI asks the Court to impose Rule 37(c)(1)'s exclusion sanction against GE because GE failed to provide timely supplementation of its responses to four different interrogatories (Interrogatories 2, 3, 6 and 7). As a remedy for this alleged failure, SSI seeks exclusion of all information included in supplemental responses to Interrogatories 6 and 7, and seeks exclusion of any evidence in support of a lengthy list of defenses set forth in GE's Answer. For the reasons that follow, the Court concludes that exclusion is not appropriate, and that no other sanction is justified.

### A. SSI's Discovery Regarding GE's Defenses and ATD Programs

On July 31, 2017, SSI served GE with its First Set of Interrogatories, which includes Interrogatories 2, 3, 6, and 7. Interrogatory 2 asked GE to disclose the factual basis for any contention that GE was not liable for a breach of the APA. Interrogatory 3 asked GE to disclose the factual basis for any contention that GE was not liable for breach of a claimed post-APA agreement. SSI asserts that with these contention interrogatories, SSI sought information about the basis for GE's defenses in the litigation, including any contention that SSI could not meet its burden of proof on its breach of contract claims and any affirmative defense for which GE bears the burden.

SSI's Interrogatory 6 asked GE to describe all of its policies and procedures applicable to ATD programs. Interrogatory 7 asked GE to describe every ATD program that related to Silent MRI Technology. These interrogatories seek facts about GE's ATD programs generally and the specific ATD programs that GE has conducted that deal with the type of technology at issue in this case.

### *GE's Initial Response*

**\*12** On August 30, 2017, GE served its initial response to SSI's Interrogatories. With respect to Interrogatories 2 and 3, GE's answer did not include much of a narrative response describing the factual basis for its defenses. Instead, GE stated that it would be providing documents as part of ongoing production and asserted that the

information responsive to Interrogatories 2 and 3 could be discerned from that production.

In response to Interrogatory 6, GE identified one document by Bates number. And in response to Interrogatory 7, GE provided some information about an ATD program that was created to evaluate SWIFT. GE also pointed to a lengthy series of Bates-labeled documents related to that ATD program.

### GE's First Supplemental Responses

On November 7, 2017, GE expanded upon its responses to Interrogatories 2 and 3 in a supplemental response. In response to Interrogatory 2 regarding the APA, GE stated that: (1) it complied with all its obligations under the APA; (2) it conducted an ATD program to evaluate SWIFT between 2011 and 2012; and (3) it determined that SWIFT was not appropriate for progression to a marketing program after evaluating its clinical and technical feasibility. GE also pointed to a large collection of Bates-labeled documents pursuant to Rule 33(d).

In response to Interrogatory 3 regarding any post-APA agreement, GE stated that: (1) the APA was an integrated contract that prohibited oral modification or amendment; and (2) "there is no 'post-APA agreement' by which GE promised 'to commercialize SWIFT,' and as such, GE cannot be liable for breach of a contract which does not exist." Again, GE pointed to a list of Bates-labeled documents pursuant to Rule 33(d). Of course, as discussed above in Part III of this Order, at this point SSI had not yet disclosed complete information about the alleged promises forming the basis of its post-APA claims; nor had SSI identified which post-APA promises formed enforceable contracts or agreements.

### GE's Answer to the Amended Complaint

On January 31, 2018, GE complied with the Court's Order allowing it to serve and file its Answer to the Amended Complaint within 14 days after the District Court's resolution of the partial motion to dismiss. [Ans., ECF No. 122.] In its Answer, GE asserts twenty-one separate "affirmative defenses," but the list includes both actual affirmative defenses for which GE would bear the burden and many other "defenses" that really amount to assertions that SSI would be unable to meet its burden of proof in various respects. [Ans. ¶¶ 64–84.] On the last day

of January, there were just over two weeks until the close of fact discovery on February 16, 2018.

### GE's Last Supplemental Response

On the final day of the discovery period, GE provided a supplemental response to the four interrogatories at issue. With respect to Interrogatory 2, GE asserted that as a result of the District Court's Order on the partial motion to dismiss, SSI's breach-of-the-APA claim is limited to whether GE failed to create an ATD program. GE asserts that it did not breach the APA because it created an ATD program, and referred SSI to its further description in its supplemental answer to Interrogatory 7 (which was served the same day).

**\*13** For Interrogatory 3, SSI provided the following additional information. GE explicitly denied that any post-APA promises or agreements to commercialize SWIFT were made. It specifically denied that it made any of the promises SSI had identified in response to GE's Interrogatory No. 1. GE identified a list of people with knowledge of the facts relating to GE's denial that such post-APA promises were made. GE further stated that none of the communications between its own personnel that allegedly made the post-APA promises reflect or include a promise or agreement regarding the commercialization of SWIFT. GE denied that any audio recordings of communications between GE and SSI include such promises and pointed to several Bates-labeled documents.

GE's final supplemental answer to Interrogatory 6, concerning the policies and procedures governing GE's ATD programs, also included additional information provided pursuant to Rule 33(d). GE stated that its policies and procedures for ATD programs are set forth in detail in specific Bates-labeled documents.

In its last supplemental response to Interrogatory 7, GE stated that it began planning and executing its ATD program for SWIFT in April 2011 when it began building the SWIFT development team and defining the project's scope. GE pointed to a spreadsheet, a project plan, and presentations related to the SWIFT ATD program. GE also referenced documents showing the tasks that it completed in the ATD program related to SWIFT. GE referenced email communications and additional documents showing that it was continuing to analyze SWIFT through June of 2012.

*Post–Discovery–Period Agreement and Discovery*
After GE served its Answer on January 31, 2018, SSI asked GE to agree to provide additional discovery concerning the list of twenty-one defenses that GE asserted in its responsive pleading. On February 6, 2018, the parties discussed a stipulation to allow limited discovery related to GE's affirmative defenses after the close of fact discovery. On February 8, 2018, GE indicated that it agreed "in theory" to SSI's request and asked SSI to send a copy of the discovery that SSI intended to serve so that GE could consider the request. GE also provided a draft of a stipulation. [ECF No. 164–4.]

On February 9, 2018, SSI responded in a letter noting that it had just served "basic interrogatories directed to [GE's] affirmative defenses." SSI's Third Set of Interrogatories to Defendant included Interrogatories 14 through 34. Each interrogatory asked GE to describe the factual basis for the contention made in each of GE's affirmative defenses. In SSI's letter, counsel stated that "[w]e do not at this time anticipate requiring further affirmative defense discovery, but reserve the right to do so after reviewing GE's interrogatory responses." [ECF No. 164–6.]

On February 16, 2018, the parties filed a stipulation to allow limited discovery to be conducted after the fact-discovery cutoff. [ECF No. 124.] GE agreed to provide substantive responses to the new interrogatories concerning affirmative defenses by March 12, 2018, and SSI reserved the right to seek additional discovery regarding GE's affirmative defenses if necessary after receiving the interrogatory responses. [ECF No. 124 at 4.] The Court adopted the parties' stipulation. [Order (Feb. 16, 2018), ECF No. 127.]

Rather than wait for the interrogatory answers that the parties agreed GE would provide by March 12, 2018, SSI raised the issue presented by its current motion for exclusion of evidence in a letter dated February 28, 2018. SSI sent this letter in response to GE's request that SSI withdraw portions of SSI's second and third supplemental responses to GE's Interrogatory No. 1, which, as described above, had disclosed entirely new significant information about post-APA promises. In its February 28th letter, SSI insisted, for the first time, that GE's responses to SSI's own Interrogatories 2 and 3 should have already contained the very information that SSI had just asked GE to provide in its post-

discovery-period interrogatories. [ECF No. 136–5.] SSI also argued that GE had made untimely supplementation of its answers to Interrogatories 6 and 7 by providing information about the policies and procedures for ATD programs and information about the ATD program created to evaluate SWIFT on the last day of discovery. [*Id.*]

**\*14** On March 12, 2018, GE served its responses to SSI's post-discovery-period interrogatories concerning the "affirmative defenses." These responses provide substantive information in narrative form about GE's position with respect to the affirmative and other defenses listed in its Answer, and referred to previously disclosed documents as well as deposition testimony. [*See, e.g.*, ECF No. 136–7 at 4–6 (describing the factual basis for GE's contention that GE fully performed its contractual obligations); *id.* at 8–9 (describing the basis for a statute of frauds defense); *id.* at 22–23 (describing authority-based defenses and denying that Mr. Polzin or Mr. Ahluwalia had authority to bind GE).] It does not appear from the record that SSI ever informed GE that the substance of these responses to the new interrogatories was deficient. Nor did SSI ask GE to allow it to conduct any additional "affirmative defense discovery," though it had reserved the right to do so after reviewing GE's responses. [5] Instead, it brought the instant motion to exclude, seeking to preclude GE from introducing any evidence to support almost any defense, affirmative or otherwise, on any motion or at trial.

[5]    The record before the Court strongly suggests that SSI had determined that it would bring the motion to exclude evidence regardless of GE's answers to the new interrogatories. [*See* ECF No. 136–5 at p. 2 (asserting that if GE refused to withdraw a list of affirmative defenses, SSI would bring its motion to exclude evidence); *id.* at p. 4 (requesting a meeting to confer about the issues at times before GE's answers to post-discovery-period interrogatories were due).] Indeed it appears that SSI was prompted to bring its motion, not by the alleged deficiencies in the post-discovery-period interrogatory responses, but by GE's indication that it was going to bring its own motion related to insufficient disclosures of post-APA promises. To the extent that, as GE asserts, SSI sought to make its untimely disclosures look on par with GE's discovery conduct, that effort has been unsuccessful.

**B. Discussion**

In its motion to exclude evidence under Rule 37(c)(1) SSI argues that GE provided untimely supplementation of its responses to Interrogatories 2, 3, 6, and 7. SSI asks the Court to prevent GE from offering any evidence relating to the following defenses:

— Estoppel, Waiver, Acquiescence, and Laches;

— Statute of Frauds;

— Statute of Limitations;

— Barred by express terms of the agreements;

— Impracticability, Impossibility of Performance, and Frustration of Purpose;

— Failure to provide notice of breach;

— Failure of consideration;

— Failure of performance;

— Promises are unenforceable, Promises are void, and Promises are indefinite;

— Absence of writing, Absence of clear and definite promise, and Absence of essential terms;

— Lack of authority, both actual and apparent;

— Failure to fulfill a condition precedent; and

— Not an enforceable contract, barred due to defects fatal to contract formation.

[SSI's Mot., ECF No. 132.] In addition, SSI asks the Court to preclude GE from offering any evidence concerning GE's policies and procedures for its ATD programs that was set forth in GE's February 16, 2018, supplemental response to Interrogatory 6. [*Id.*] Finally, SSI asks the Court to prevent GE from offering any evidence concerning GE's ATD program on quiet imaging that was set forth in GE's February 16, 2018 supplemental response to Interrogatory 7. [*Id.*] For several reasons, the Court finds that the sanction sought by SSI is inappropriate.

*"Affirmative Defenses"*

SSI's request for exclusion of evidence regarding GE's affirmative defenses is without merit. First, particularly with respect to GE's defenses to liability for alleged post-

APA promises, it strains credulity for SSI to argue that GE should have provided more information about each of its affirmative defenses regarding those promises when SSI waited until the last minute to provide details about its claims.[6] For example, SSI's own answer to GE's Interrogatory No. 1 made no reference to any basis for concluding that Mr. Ahluwalia or Mr. Polzin had the authority to bind GE to an agreement to commercialize SWIFT through a post-APA agreement until February 16, 2018. At that point SSI stated for the first time that Mr. Hausmann and Mr. Sahtre had given authorization for a post-APA promise or ratified an earlier post-APA promise. Similarly, SSI disclosed, for the first time on February 16, 2018, that GE's post-APA promises were to commercialize SWIFT in a neuro application "within a year." Because of this late disclosure, it would have been difficult, if not impossible, for GE to articulate any basis for a defense like impracticability or impossibility of performance on an earlier occasion. The Court finds that SSI's own late disclosure of essential information about its post-APA contract and promissory estoppel claims provides substantial justification for GE's provision of information about its defenses late in the discovery period and in response to the agreed upon post-discovery-period interrogatories.

6 Even as recently as the hearing on the current dispute, SSI could not articulate whether GE's alleged post-APA promises formed a single post-APA agreement or an unknown number of separate agreements. [Apr. 16, 2018 Hr'g Tr. at 36:14–22.] Nor did SSI specify what the precise terms of any such agreement(s) were, including when they were actually entered into and for what consideration. It is difficult to imagine that GE could be required to specify all of its defenses to claims which, to date, remain undefined.

**\*15** Second, SSI's position essentially ignores the parties' agreement for late discovery regarding the affirmative defenses disclosed when GE served Answer to the Amended Complaint at the end of January 2018; that agreement substantially mitigates any harm to SSI in this respect. SSI argues that it has suffered prejudice because GE's answers to the agreed upon post-discovery-period interrogatories "were cursory at best." [ECF No. 133 at 24.] The Court disagrees. GE provided substantial information in response to the final set of interrogatories. That information is certainly sufficient for SSI to evaluate the basis for GE's "affirmative defenses." SSI also complains that, although it received GE's responses to the

post-discovery period interrogatories, it was foreclosed from taking any deposition or document discovery related to the "affirmative defenses." This is simply untrue. When the parties stipulated to the use of post-discovery-period interrogatories, SSI reserved the right to seek additional discovery of documents and depositions regarding GE's "affirmative defenses," if needed. However, instead of asking GE for another deposition or for production of documents, SSI chose to bring this motion before it even received GE's answers to the interrogatories. This failure to even attempt to alleviate the prejudice that SSI now claims to have suffered weighs strongly against granting SSI the relief it seeks. *See Mathers v. Northshore Mining Co.*, 217 F.R.D. 474, 483 (D. Minn. 2003) (noting that defendants were aware of plaintiffs' experts' intention to supplement his report but "did not mitigate the prejudice it now claims by preparing a supplemental report, ... requesting a second deposition or requesting more time to obtain a supplemental report from its own expert").

Third, SSI asserts that it served Interrogatories 2 and 3 to learn information about GE's affirmative defenses because, early in the litigation, it anticipated that GE's Answer would not be served until late in the discovery period. [*See* ECF No. 133 at 6 ("SSI anticipated that the stay of GE's deadline to answer the amended complaint might result in a delay in the filing of GE's answer, including its affirmative defenses.").] Therefore, SSI argues it should not have had to wait until GE served its Answer and responded to post-discovery-period interrogatories to obtain information about GE's defenses. This argument is not persuasive. Given the way this case was litigated, one would expect SSI to have addressed the practical problems it "anticipated" could arise from a delay in receiving GE's Answer, either with the GE or the Corut. However, SSI's only communication to GE about Interrogatories 2 and 3 did not raise that issue and SSI never asked the Court to adjust the scedule to move up the Answer deadline or to move back the close of discovery.[7] The fact that SSI did not bring this issue to the attention of GE or the Court suggests that GE was justified in assuming SSI did not challenge the timeliness of its disclosures regarding GE's defenses. *See Litman v. Pac. Indem. Co.*, No. 02-cv-714 (JEL/JGL), 2003 WL 25674056, at *3 (D. Minn. Feb. 20, 2003) ("At this juncture it is important to note that there is nothing in the record which indicates that Plaintiffs ever expressed dismay with the timing of Defendant's disclosures. Plaintiffs do not even

argue that they contacted Defendant to discuss perceived inadequacies in Jillson's report. This lack of contact leads the Court to finds that Defendant was justified in assuming that [Plaintiff] did not challenge its compliance with Fed. R. Civ. P. 26(a)(2)(B).").

7    In fact, there is only one instance in the record, though not relied upon by SSI in its brief, suggesting that SSI raised an issue with GE's responses to Interrogatories 2 and 3 before GE served its Answer. On October 3, 2017, SSI asserted that GE's response to Interrogatories 2 and 3 were incomplete and asked for supplementation. However, SSI's letter did not raise concerns about how late GE's Answer would be served or suggest a modification to the schedule. SSI also did not raise any issue with respect to these contention interrogatories when the parties sought the Court's ruling on an informal discovery dispute later in October of 2017. [*See* Letter from L. Ellingson to Menendez, M.J. (Oct. 30, 2017) (on file with the Court); Letter from L. Ellingson to N. Frank (Oct. 3, 2017) (on file with the Court).]

In fact, SSI only raised the issue of the adequacy of the responses to Interrogatories 2 and 3 when GE threatened to bring a motion to exclude SSI's late-disclosed post-APA promises. This reality, coupled with the fact that the parties had already reached an agreement that GE would answer post-discovery-period interrogatories, renders SSI's claim that only the harshest sanction of exclusion will do unpersuasive. *See Bison Advisors LLC v. Kessler*, No. 14-cv-3121 (DSD/SER), 2016 WL 3525900, at *13 (D. Minn. Jan. 21, 2016) ("When these practical remedies are available to cure any prejudice to Defendants, the harsh sanction of excluding portions of expert reports is not the appropriate remedy, and Defendants desire for only the harshest sanction undermines their assertion of prejudice.").

### Interrogatory 6

**\*16**  SSI's efforts to exclude GE's final supplementation of its answer to Interrogatory 6 fare no better. Rule 26(e)(1) requires supplementation of an interrogatory answer in a timely manner when the party learns its previous answer was incomplete or incorrect and the additional or corrective information "has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). With respect to Interrogatory 6, GE did not fail to provide supplemental information as required by Rule 26(e)(1)

that would potentially trigger an exclusion sanction under Rule 37(c)(1) because the information GE added in its supplemental response had been made known to SSI during the discovery process.

In response to Interrogatory 6, GE represents that its final supplemental answer added references to two documents, both of which had been produced on September 22, 2017, almost five months before. [GE's Opp'n Mem. at 27–29, ECF No. 163.] One of the two documents was even marked and used rather extensively by SSI as an exhibit during a Rule 30(b)(6) deposition of GE. [*Id.* at 28.] Because GE's February 16, 2018 supplementation of its responses to SSI's Interrogatory 6 did not introduce anything that was new to SSI, Rule 37(c)(1) sanctions are not appropriate.

### *Interrogatory 7*

SSI's argument regarding Interrogatory 7 suffers from the same infirmity. GE's February 16, 2018 supplemental response to Interrogatory 7 referenced 38 documents and provided additional narrative about the ATD program that GE conducted for the SWIFT technology. GE represents that of these 38 documents, "35 were marked as exhibits in depositions: 34 were marked by SSI in its depositions of GE witnesses between December 19, 2017, and January 30, 2018, and one was marked by GE in its deposition of former SSI consultant and GE employee Steen Moeller on February 2, 2018." [GE's Opp'n Mem. at 29.] The other three documents that GE referenced were produced on either August 16, 2017 or September 22, 2017. [*Id.* at 30.] The identification of these 38 documents in the February 16, 2018 supplemental answer to Interrogatory 7 does not constitute a failure to provide information as required by Rule 26(e) because the information had otherwise been made available to SSI during the discovery process. Any claim of surprise about the relevance of these documents is belied by the record. GE's addition of them to its written answer is therefore not a basis for sanctions under Rule 37(c)(1).

SSI also argues that GE's supplemental response to Interrogatory 7 is untimely and inappropriate because it includes a narrative response that was not provided until the last day of discovery. However, the narrative discussion GE added to its response to Interrogatory 7 merely describes each of the documents, and does not improperly chart new territory.

In sum, SSI's efforts to preclude GE from introducing most of its defenses and from relying on documents previously disclosed but ultimately cross-referenced on the last day of discovery are unavailing. The Court concludes that the complained-of disclosures were not only not untimely when considered in context, but any harm to SSI created by the late-in-discovery revelations could easily have been cured by SSI through the post-discovery-period process they had already explored with GE. The exclusion of evidence requested by SSI is unwarranted.

### V. Order

**\*17** For the reasons discussed above, **IT IS HEREBY ORDERED THAT**:

1. SSI's Motion to Exclude Evidence Not Disclosed in Response to Interrogatories **[ECF No. 132]** is **DENIED**.

2. GE's Motion to Strike Portions of Plaintiff SSI's Second and Third Supplemental Answers to Interrogatory No. 1 **[ECF No. 138]** is **DENIED IN PART** to the extent it seeks to preclude the use of evidence pursuant to Fed. R. Civ. P. 37(c)(1), and **GRANTED IN PART** to the extent that GE is permitted to:

   a. Supplement its Rule 26(a)(1) disclosures as provided in this Order; and

   b. Conduct additional discovery relating to the information disclosed for the first time in SSI's Second and Third Supplemental Answers to Interrogatory No. 1.

3. The Scheduling Order [ECF No. 38] is **HEREBY AMENDED** as follows:

   a. Any additional fact discovery relating to the matters embraced by SSI's last two responses to GE's Interrogatory No. 1 shall be commenced in time to be completed by **July 6, 2018**.

   b. Any non-dispositive motions and supporting documents shall be filed and served on or before **July 27, 2018**.

   c. Dispositive motions and supporting documentation shall be served and filed by the moving party on or before **September 10, 2018**.

d. This case shall be ready for a jury trial at least 45 days after an order on any dispositive motions. The anticipated length of trial is **5-10** days.

**All Citations**

Slip Copy, 2018 WL 2047578

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 318786
United States District Court, D. Minnesota.

Semyon KLYUCH, Plaintiff,

v.

FREIGHTMASTERS, INC., Defendant.

No. Civ.03–6135 RAM/RLE.
|
Feb. 9, 2005.

**Attorneys and Law Firms**

Beth Bertelson, Bertelson Law Office, Mpls, MN, for Plaintiff.

James F. Baldwin, Moss & Barnett, Mpls, MN, for Defendant.

MEMORANDUM AND ORDER

MAGNUSON, J.

**\*1** This matter is before the Court on Defendant's Motions in Limine. Trial in this case is scheduled to begin on Monday, February 14, 2005. For the following reasons, the Motions are granted in part and denied in part.

Plaintiff Semyon Klyuch brings claims of race, religion and national origin discrimination. The Court previously denied the Motion for Summary Judgment filed by Defendant Freightmasters, Inc. ("Freightmasters"), and determined that Klyuch had presented sufficient probative evidence to create a genuine issue of fact for trial. Thus, the issue for trial is whether the evidence demonstrates that Freightmasters discriminated against Klyuch based on his race, religion, and national origin. Klyuch may use any kind of evidence, direct or indirect, to prove that Freightmasters intentionally discriminated against him.

DISCUSSION

A. Alleged Post–Termination Stray Remark
Freightmasters seeks to exclude an alleged remark made by Freightmasters' employee Timothy Beltz. Klyuch asserts that Beltz allegedly referred to Klyuch as a "fat, Jew friend," to fellow Freightmasters employee, Timothy

Kroska. Both Beltz and Kroska deny that Beltz made the statement. This alleged statement was also made after Klyuch was terminated. Freightmasters seeks to exclude this statement as irrelevant. Klyuch disagrees.

The Court agrees with Klyuch. The Court has determined that this allegedly discriminatory comment is a stray remark, and insufficient to mandate a direct evidence analysis. However, even as a stray remark made after the decision to terminate Klyuch, this alleged comment is relevant to show bias or animus by Beltz towards Klyuch. Indeed, this is the ultimate issue that remains for trial. Thus, Freightmasters' Motion on this point is denied.

B. Claim for Punitive Damages
Freightmasters seeks to strike Klyuch's claim for punitive damages. Under Title VII and 42 U.S.C. § 1981, the standard for punitive damages is the same: malice or reckless indifference to a federally protected right. *See e.g.,* *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1063 (8th Cir.1997). Under the Minnesota Human Rights Act ("MHRA"), punitive damages requires "clear and convincing evidence that the acts of the defendants show deliberate disregard for the rights or safety of others." Minn.Stat. § 549.20.

Freightmasters claims that the alleged discriminatory remarks are insufficient to support a claim for punitive damages. Indeed, these alleged discriminatory remarks, without more, may be insufficient. However, Klyuch intends to present other evidence to support his discrimination claims, including Freightmasters' failure to transfer him to a day shift position and the circumstances surrounding his termination. The Court finds Freightmasters' Motion premature at this juncture. However, depending on the evidence presented at trial, Freightmasters may renew its Motion on this point.

C. Klyuch's Back Pay and Front Pay Claims
**\*2** Klyuch seeks damages that include both back pay and front pay. Freightmasters contends that Klyuch has failed to permit discovery on his post-termination employment and wages. Specifically, Freightmasters contends that because Klyuch refuses to sign an authorization to release his employment information from his current employer, dismissal of these claims is appropriate. Klyuch acknowledges that he has failed to sign this release, but represents that he has nonetheless provided all relevant wage and benefit information regarding his current

EXHIBIT
13

employer. He further argues that signing an authorization to release his current employment information violates Minn.Stat. § 363A.15.

Freightmasters cites no authority for the proposition that a formal authorization for a release of information from an employer is the only means possible to evaluate front and back pay damages. However, Klyuch's reliance on Minn.Stat. § 363A.15 is also misplaced. Indeed, this lawsuit is a matter of public record precluding the existence of the privilege that Klyuch claims exists. Regardless, Klyuch represents that he has supplemented all discovery requests and provided Freightmasters with all relevant wage and benefit information pertaining to his current employer. Absent some evidence that this information is inaccurate or otherwise incomplete, the Court declines to dismiss Klyuch's claims for back and front pay. However, the Court requires that Klyuch supplement his tax record disclosures to include the 2004 tax year.

**D. Testimony of Witnesses Identified by Plaintiff**
On January 23, 2004, Klyuch issued his initial Rule 26 disclosures, and on December 17, 2004, Klyuch supplemented these disclosures by identifying specific witnesses. Freightmasters objects to the testimony of five witnesses that were identified for the first time in the supplemental disclosures: John Munson, Tom Ralke, Arcadio Torres, Alexander Klyuch, and Jake Dvoksin. Freightmasters contends that it is unduly prejudiced by the late disclosure of these witnesses, and that their purported testimony is irrelevant.

First, these witnesses are no surprise to Freightmasters. Torres, Klyuch and Dvoksin were all referred to in some capacity during summary judgment briefing. Further, Freightmasters has had all witness contact information for nearly two months, and has failed to take any initiative to inquire of these witnesses. These witnesses have information that relate to Klyuch's job performance and the work environment at Freightmasters, which is relevant and may be probative of discrimination. The Court disagrees with Freightmasters that exclusion of these witnesses is appropriate. Freightmasters' Motion is denied on this point.

**E. Attacks Against Tim Beltz**

Freightmasters seeks to exclude evidence that is purportedly irrelevant and attacks Freightmasters' employee, Tim Beltz. At summary judgment, the Court assumed that Beltz was the decisionmaker, as Klyuch asserted. However, the Court notes that this assumption was strictly for purposes of that Motion, and that whether or not Beltz was indeed a decisionmaker is an issue that remains for trial. Thus, the evidence that Freightmasters seeks to exclude in this Motion is relevant to this issue and will not be excluded.

**\*3** Freightmasters further seeks to exclude evidence regarding the allegedly derogatory comments made by Beltz. Although the Court has held that these comments are insufficient as a matter of law to mandate a direct evidence analysis, these allegedly derogatory comments may nonetheless be probative of discrimination. Whether such statements were made and whether such statements indicate a discriminatory animus is an issue that is disputed and therefore remains for the trier of fact. Freightmasters' Motion on this point is also denied.

**F. Exhibits from Plaintiff's Exhibit List**
Freightmasters seeks to exclude Freightmasters' personnel files of Ken Wood and Steve Hatcher. Freightmasters apparently disclosed these files during discovery and Klyuch now includes these documents in his exhibit list. Klyuch contends that this evidence is relevant to his claim for discrimination, because these documents demonstrate that Freightmasters treated Klyuch different than his non-Jewish and non-Russian colleagues, in regards to the terms and conditions of his employment. Klyuch does not intend to produce either Wood or Hatcher as witnesses, and because Freightmasters produced these files to Klyuch, Klyuch claims that there is no prejudice. The Court agrees with Klyuch, because this evidence may also be probative of discrimination. Thus, Freightmasters' Motion on this point is denied.

**G. Findings from Plaintiff's Unemployment Insurance Claim**
Klyuch obtained unemployment insurance benefits after his termination. Throughout these unemployment proceedings, Freightmasters allegedly characterized Klyuch's termination as a voluntary termination. Freightmasters seeks to introduce evidence of this characterization in an effort to rebut Klyuch's allegation that Freightmasters has offered inconsistent explanations

for termination. However, Freightmasters seeks an Order that this reference will not "open the door for Klyuch to introduce evidence about the unemployment findings."

Minn.Stat. § 268.105, subd. 5(c) states:

> Testimony obtained [in an unemployment benefit evidentiary hearing] may not be used or considered for any purpose, including impeachment, in any civil, administrative, or contractual proceeding, except by a local, state, or federal human rights agency with enforcement powers, unless the proceeding is initiated by the department.

According to Klyuch, the evidence that Freightmasters seeks to present is prohibited by this statute. However, this Court has noted that "a state legislature cannot purport to make binding pronouncements of law concerning what evidence may be privileged or otherwise admissible in a federal action involving claims based on federal law." *Robertson v. Federal Express Corp.,* File No. 02–4161 (D.Minn. Aug. 20, 2004) (Magnuson, J.) (citing *Baldwin v. Rice,* 144 F.R.D. 102, 106 (E.D.Cal.1992)). As the Federal Rules of Evidence require, privilege must be "governed by the principles of common law as they may be interpreted by the courts of the United States." Fed.R.Evid. 501. Thus, state privilege law is only binding in actions where state law controls the merits of the claims at issue.

**\*4** In this case, Klyuch's claims are premised on federal discrimination laws, and the existence of pendent state law claims does not change this analysis. Thus, the Court is not required to comply with the "unemployment information privilege." *See e.g., Freed v. Grand Court Lifestyles,* 100 F.Supp. 610 (S.D.Ohio 1998). However, the Court notes that Freightmasters proposes to tailor the evidence solely to its advantage.

The Court denies Freightmasters' Motion on this point and will not issue an Order as it requests. It is unfairly prejudicial to allow Freightmasters to introduce this evidence for substantive purposes while precluding Klyuch from using the same evidence. Furthermore, the standard for unemployment benefits is distinct from the standard for employment discrimination, and permitting the introduction of such evidence would only confuse the jury. Therefore, to avoid undue prejudice to either party, the Court excludes evidence from the unemployment insurance benefits hearing.

H. Alleged Termination Policy

Freightmasters seeks to exclude any evidence about particular hiring and termination procedures at Freightmasters. Freightmasters disputes that its hiring and termination policy is a condition of employment and rather that it is merely "aspirational" in nature. Thus, according to Freightmasters, evidence regarding the policy is irrelevant and prejudicial. Klyuch contends that he is entitled to present evidence that Freightmasters chose to disregard its hiring and termination procedures as evidence of discrimination.

The Court agrees with Klyuch. Although the hiring and termination procedures may not be formal conditions of employment, Freightmasters' failure to follow its termination procedures in this instance may support Klyuch's claim for discrimination. Whether or not Freightmasters consistently followed these policies is an issue for the fact finder and is highly relevant to Klyuch's claims. Freightmasters' reliance on various cases is unpersuasive to the Court. In fact, Freightmasters' arguments demonstrate that issues of fact relating to the procedures remain for trial, rather than support is Motion to Exclude. Thus, Freightmasters' Motion is also denied on this point.

I. Evidence of Past Discrimination Suffered by Plaintiff

Klyuch moved to the United States in the early 1980s from the Soviet Union, to escape both the racial and religious discrimination. Klyuch seeks to introduce evidence of this past discrimination, to demonstrate how this past discrimination has influenced Klyuch's propensity for severe emotional distress damages. Freightmasters seeks to exclude evidence of past discrimination, because it is irrelevant to the discrete allegations in this case. The Court agrees with Freightmasters. Evidence of past discrimination, nearly twenty-five years ago, is irrelevant to the allegations in the instant case. Thus, Freightmasters' Motion is granted on this point.

**J. Exhibit List**

 **\*5** Freightmasters seeks to amend its exhibit list to include three recently discovered electronic documents. According to Freightmasters, these documents are "germane to the outstanding issues" set to be tried. As soon as Freightmasters discovered this evidence, it provided them to opposing counsel. There is no evidence of bad faith on behalf of Freightmasters, and indeed the documents are relevant to the issues that are contested by the parties.

Klyuch contends that this late disclosure is unduly prejudicial and should be prohibited. The Court disagrees. Although the Court acknowledges the untimeliness of this disclosure, the probative value of this evidence outweighs any prejudice to Klyuch. Indeed, the issues for trial focus on the circumstances surrounding Klyuch's termination, and these documents are at the heart of this issue. Further, Klyuch will have an opportunity at trial to examine witnesses as to both the authenticity and content of these documents. Thus, Freightmasters' Motion on this point is granted.

**K. Forensic Inspection**
Klyuch contends that a forensic examination of Freightmasters' computer system is necessary to ensure that Freightmasters has disclosed all relevant documents that relate to this newly disclosed evidence. The Court also disagrees with Klyuch on this point. There is no evidence of bad faith on behalf of Freightmasters, and ordering a forensic inspection at this late juncture is unnecessary. Rather, the Court orders Freightmasters to produce any other documents that pertain or relate to these recently produced documents.

CONCLUSION
The issue for trial is whether Freightmasters discriminated against Klyuch, and the burden is on Klyuch to prove, by a preponderance of the evidence, that such discrimination occurred. Klyuch is entitled to use any evidence, direct or circumstantial, to prove his case. Accordingly, based on all the files, records and proceedings herein, IT IS HEREBY ORDERED that:

1. Defendant's Motion in Limine Regarding Alleged Post Termination Stray Remark (Clerk Doc. No. 48) is DENIED;

2. Defendant's Motion in Limine to Strike Claim for Punitive Damages (Clerk Doc. No. 50) is DENIED;

3. Defendant's Motion in Limine to Strike Plaintiff's Back Pay and Front Pay Claims (Clerk Doc. No. 52) is DENIED;

a. Plaintiff must supplement his disclosures to include his 2004 tax information;

4. Defendant's Motion in Limine to Strike Witnesses from and/or Limit Testimony of Witnesses Identified by Plaintiff (Clerk Doc. No. 54) is DENIED;

5. Defendant's Motion in Limine Regarding Irrelevant and Unsupported Attacks Against Tim Beltz (Clerk Doc. No. 56) is DENIED;

6. Defendant's Motion in Limine to Strike Exhibits from Plaintiff's Exhibit List (Clerk Doc. No. 58) is DENIED;

7. Defendant's Motion in Limine to Exclude Findings from Plaintiff's Unemployment Insurance Claim (Clerk Doc. No. 73) is DENIED in part and GRANTED in part;

8. Defendant's Motion in Limine to Preclude Alleged Termination Policy (Clerk Doc. No. 75) is DENIED;

 **\*6** 9. Defendant's Motion in Limine to Preclude Evidence of Past Discrimination Suffered by Plaintiff (Clerk Doc. No. 79) is GRANTED;

10. Defendant's Motion in Limine to Amend the Exhibit List (Clerk Doc. No. 88) is GRANTED; and

11. Plaintiff's Motion Requesting a Forensics Inspection of Freightmasters' Computer System (Clerk Doc. No. 94) is DENIED;

a. Freightmasters must produce any other documents that directly pertain or relate to the three recently discovered electronic documents.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 318786, 95 Fair Empl.Prac.Cas. (BNA) 461

2005 WL 318786, 95 Fair Empl.Prac.Cas. (BNA) 461

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Smith v. Loudoun County Public Schools, E.D.Va.,
February 18, 2016

2014 WL 2967920
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.

Bonnie Ellen REED, Plaintiff,
v.
WASHINGTON AREA METROPOLITAN
TRANSIT AUTHORITY, Defendant.

No. 1:14cv65.
|
Signed July 1, 2014.

**Attorneys and Law Firms**

Stephen H. Ratliff, Fairfax, VA, for Plaintiff.

Nicholas Stephen Nunzio, Jr., Patricia Buruwaa Donkor,
Washington Metropolitan Area Transit Authority,
Washington, DC, for Defendant.

### *MEMORANDUM OPINION*

JAMES C. CACHERIS, District Judge.

**\*1** Plaintiff Bonnie Ellen Reed ("Plaintiff") has filed
the instant personal injury action against the Washington
Metropolitan Area Transit Authority ("WMATA"),
seeking damages for injuries she sustained after falling
down the stairs at the Franconia–Springfield Metro
Station. Presently before the Court is Plaintiff's motion to
exclude the following individuals on WMATA's witness
list: Paul Kram, Jyotindra Shah, Hitendra Patel, and
Ormond Brad. (Mot. to Exclude [Dkt. 42] at 1.) Plaintiff
claims that "WMATA has failed to comply with Rule
26 ... with respect to the disclosure of [these] individuals ...
and Plaintiff would be prejudiced by permitting WMATA
to call these witnesses to testify at trial." (*Id.* at 2.) For
the reasons set forth below, the Court will grant Plaintiff's
motion.

### I. Background

The facts giving rise to the instant motion are largely
undisputed. On February 26, 2014, the Court issued a
scheduling order directing initial disclosures by March
5, 2014, Plaintiff's expert disclosures by March 10, 2014,
WMATA's expert disclosures by April 10, 2014, and
discovery completed by May 9, 2014. (Scheduling Order
[Dkt. 5] at 1–2.)

WMATA's initial disclosure, sent one day late on
March 6, 2014, identified only two individuals, Bryan
Crocheron and Larry Chisholm, likely to have
discoverable information pursuant to Rule 26(a)(1)(a).
(Pl.'s Mem. in Support [Dkt. 44] at 2.) In response
to Plaintiff's subsequent discovery request seeking
"every person not heretofore mentioned having personal
knowledge of the facts material to this case," WMATA
identified one additional individual, "ROCC Customer
Communications Specialist L. Bradley." (*Id.* Ex. 3.)

WMATA submitted its Rule 26(a)(2) disclosure on April
9, 2014. (Def.'s Expert Designation [Dkt. 12] at 1.) It
identified Dr. James Bruno as the only expert WMATA
would call at trial. (*Id.*) On April 16, 2014, WMATA
attempted to amend its Rule 26(a)(2) disclosure to add the
individuals now in dispute—Paul Kram, Jyotindra Shah,
Hitendra Patel, and Ormond Brad—as expert witnesses.
(Def.'s Mot. to Amend [Dkt. 14] Ex. 1.) Judge Anderson
denied WMATA's request.

On April 28, 2014, Plaintiff received WMATA's Second
Amended Answers to Plaintiff's Interrogatories. (Pl.'s
Mem. in Support, Ex. 6.) No other individuals were
identified as having personal knowledge of the facts
material to this case. (*Id.*)

On May 7, 2014, two days before the close of discovery,
the parties met for Rule 30(b)(6) depositions and
WMATA informed Plaintiff's counsel that it would
again be amending its discovery answers. (Def.'s Opp'n
[Dkt. 50] at 5.) According to WMATA, counsel
specifically "described the content of the [a]mendment
verbatim." (*Id.*) Plaintiff received WMATA's updated
discovery on May 12, 2014, which identified the witnesses
now in dispute as persons that "may have facts related
to WMATA's defense in the instant case." (Pl.'s Mem. in
Support at 3.) [1] WMATA has included these individuals
on its witness list.

EXHIBIT
14

Reed v. Washington Area Metropolitan Transit Authority; Not Reported in F.Supp.3d...

CASE 0:16-cv-01054-DTS   Doc. 264   Filed 04/12/19   Page 61 of 64

2014 WL 2967920

1   The parties dispute the precise date WMATA sent its amended discovery responses to Plaintiff. (*See* Pl.'s Mem. in Support at 3; Def.'s Opp'n at 5.) Nevertheless, it is uncontested that Plaintiff did not receive the updated responses until after the close of discovery on May 9, 2014. (*Id.*)

**\*2** Plaintiff now claims that these witnesses should be excluded because WMATA failed to disclose these individuals until after the close of discovery in violation of Rule 26 of the Federal Rules of Civil Procedure. (Pl.'s Mem. in Support at 6–9.) WMATA opposes Plaintiff's motion, arguing that it complied with Rule 26 because these witnesses were disclosed when it sought to designate them as experts on April 16, 2014. (Def.'s Opp' n at 2–4.) According to WMATA, "[t]he fact of the matter is, whether the individuals are classified as fact or expert witnesses, Plaintiff learned about them as early as April 15, 2014." (*Id.* at 3.) WMATA also claims that these witnesses were disclosed to Plaintiff "during its Fed.R.Civ.P. 30(b)(6) designations." (*Id.* at 4.) Thus, concludes WMATA, Plaintiff's motion should be denied because she "clearly was made aware of the witnesses and the relevant subject matter before the discovery close date." (*Id.* at 5.)

## II. Analysis

Rule 26(a)(1) of the Federal Rules of Civil Procedure requires that parties must provide the name and contact information of "each individual likely to have discoverable information-along with the subjects of that information-that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed.R.Civ.P. 26(a)(1)(A)(i). Under Rule 26(e), a party must supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed.R.Civ.P. 26(e). If any party does not "identify a witness as required by Rule 26(a) or (e)," then they are prevented from using that "witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless ." Fed.R.Civ.P. 37(c). The party facing sanctions bears the burden of establishing that its omission was justified or harmless. *Carr v. Deeds,* 453 F.3d 593, 602 (4th Cir.2006). The determination of whether a Rule 26(a)

or (e) violation is justified or harmless is entrusted to the broad discretion of the district court. *See Woodworker's Supply, Inc. v. Principal Mut. Ins. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir.1999).

It is undisputed that WMATA failed to identify any of the contested witnesses in its initial disclosures under Rule 26(a)(1). The earliest WMATA identified these individuals as potential fact witnesses was during the Rule 30(b)(6) depositions on May 7, 2014. Rule 26(e) requires a party to supplement initial disclosures "*in a timely manner.*" Fed.R.Civ.P. 26(e)(1)(A). Making a supplemental disclosure of a known fact witnesses a mere two days before the close of discovery, as is the case here, is not timely by any definition. *See SMD Software, Inc. v. EMove, Inc.,* No. 5:08–CV–403–FL, 2013 WL 5592808, at *5 (E.D.N.C. Oct. 10, 2013). Making matters worse, there is no question that WMATA was aware of these witnesses and their significance to this case well before May 7, 2014.

**\*3** WMATA, nevertheless, contends that it served functionally equivalent notice on April 16, 2014, when it "filed a Motion to Amend its previously filed Fed.R.Civ.P. 26(a)(2) Statement to add these same individuals as expert witnesses." (Def.'s Opp'n at 3.) WMATA's prior disclosure of these individuals as potential expert witnesses does not excuse its noncompliance with Rule 26(a)(1)(A)(i) and (e)(1)(A). "Generally all witnesses, regardless of their status, must be identified, with their contact information, in a party's Rule 26(a)(1)(A) disclosures." *Watson v. United States,* 485 F.3d 1100, 1108 (10th Cir.2007). To the extent WMATA sought to provide lay testimony from these individuals, it had a duty to disclose their identity and relevant subject matter in a timely fashion pursuant to Rule 26(a)(1). *See Gustafson v. Am. Family Mut. Ins. Co.,* No. 11–CV–01303–PAB–MEH, 2012 WL 5904048, at *5 (D.Colo. Nov. 26, 2012). This requirement became even more significant when Judge Anderson struck their proffered expert testimony, as Plaintiff was then under a false belief they would not be used at trial.

WMATA's attempt to shift the blame to Plaintiff because "[a]t any point during the four weeks between April 15, 2014, and the close of discovery Plaintiff could have noticed depositions of [these witnesses but] never did" is similarly a nonstarter. (Def.'s Opp'n at 4.) Plaintiff had no reason to seek discovery from these witnesses because Judge Anderson struck their testimony and WMATA

never provided notice that they would be presented in another capacity. *See Mehus v. Emporia State Univ.,* 326 F.Supp.2d 1213, 1218 (D.Kan.2004) (noting the "[p]laintiff had no reason to depose witnesses whom defendant did not identify"). Plaintiff's awareness of these individuals simply does not excuse WMATA from discharging its Rule 26 obligations to identify the subjects it will elicit for its own defense. *See Gustafson,* 2012 WL 5904048, at *3 ("[T]hat the opposing party may have known of the identity of a possible witness 'is no substitute for compliance with Rule 26.' " (citation omitted)).

The Court likewise rejects WMATA's claim that its noncompliance with Rule 26 is defensible as to Paul Kram and Hyintrindra Patel because they were deposed as corporate representative under Rule 30(b)(6). (Def.'s Opp' n at 4.) WMATA's argument on this point is as follows:

> Plaintiff conducted her depositions of Paul Kram and Hyintrindra Patel based on specific topics in the Fed. Civ. R. 30(b)(6) notice. Limiting herself to the Fed.R.Civ.P. 30(b)(6) topics was Plaintiff's own choice, but certainly not required. At the time of their depositions, Plaintiff had knowledge of the April 15, 2014, disclosures for weeks. She was well aware that these individuals also possessed information that related to WMATA's defenses. Plaintiff could have explored those subjects during the Fed.R.Civ.P. 30(b)(6) deposition or immediately after.

(*Id.*) Boiled down, WMATA argues that Plaintiff cannot complain of its failure to comply with Rule 26 when she had the opportunity to elicit testimony as to WMATA's defenses during the Rule 30(b)(6) depositions. Plaintiff, however, had no reason to go outside the identified topics because, as mentioned above, WMATA never provided

notice that these individuals would testify as fact witnesses at trial. Accordingly, Plaintiff's failure to explore further subjects during the Rule 30(b)(6) depositions is the result of WMATA's neglect and not her own carelessness.

**\*4** The Court further concludes that WMATA's failure to comply with its Rule 26 obligations is not excusable as "substantially justified or ... harmless." Fed.R.Civ.P. 37(c)(1). As discussed, WMATA has failed to provide any legitimate justification for delaying its identification of these witnesses until the close of discovery, or for failing to make, in substance, any Rule 26(a)(1) disclosure as to these witnesses. Moreover, WMATA's failure is obviously not harmless. A party's ability to order its discovery and select its witnesses for deposition is prejudiced by another party's failure to make sufficient Rule 26(a)(1) disclosures. *See Sender v. Mann,* 225 F.R.D. 645, 656 (D.Colo.2004). Plaintiff had no reason to depose these witnesses since their proffered testimony was stricken, and since discovery has long since closed, she is now unable to conduct any inquiry into their knowledge of this case.

This issue never would have arisen, of course, had WMATA simply complied with the perfunctory requirement of Rule 26(a)(1)(A)(i) and (e)(1)(A) and identified these individuals as possible fact witnesses. WMATA did not, either directly or otherwise. Accordingly, the Court finds that testimony from these individuals should be excluded under Rule 37(c)(1). *See Kullman v. New York,* No. 07–CV–716(GLS/DRH), 2009 WL 1562840, at *5–8 (N.D.N.Y. May 20, 2009).

### III. Conclusion

For the reasons set forth above, the Court will grant Plaintiff's motion and exclude WMATA from offering Paul Kram, Jyotindra Shah, Hitendra Patel, and Ormond Brad at trial.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2967920

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

CASE 0:16-cv-01054-DTS Doc. 264 Filed 04/12/19 Page 63 of 64

Transunion Intelligence LLC v. SearchAmerica Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12155778

2013 WL 12155778
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

TRANSUNION INTELLIGENCE
LLC and Trans Union LLC, Plaintiffs,

v.

SEARCHAMERICA INC., Defendant.

Civil No. 11-1075 (PJS/FLN)
|
Signed 11/27/2013

**Attorneys and Law Firms**

Michael Locklar, Glen Boudreax and Christopher Morris for Plaintiffs.

Scott Feldmann and Mark Jacobson for Defendant.

## ORDER

FRANKLIN L. NOEL, United States Magistrate Judge

**\*1 THIS MATTER** came before the undersigned United States Magistrate Judge on November 4, 2013 on Defendant's motion to strike an untimely disclosed witness (ECF No. 284). Specifically, Search America seeks to exclude the testimony of Kathy Babcock. Because SearchAmerica argued, in part, that Babcock's testimony was only relevant to the issue of willfulness, the Court held this order under advisement until TransUnion's motion for leave to amend the complaint in order to plead willful infringement was heard. *See* ECF No. 308.

Kathy Babcock is a former employee of TransUnion. ECF No. 286 at 5. TransUnion claims that Babcock is prepared to offer testimony that suggests Bruce Nelson, a former employee of SearchAmerica, approached her sometime in 2004 when she was employed at Advocates Health Care in Chicago. ECF No. 297, 2-4. Babcock claims that Nelson —who was allegedly aware of contract negotiations between ADSR [1] and Advocates—told Babcock that SearchAmerica could provide everything ADSR's product could do within 30-60 days. *Id.* Because Nelson wrote a white paper on ADSR's product prior to being employed by SearchAmerica, TransUnion argues that Babcock's testimony is evidence that "SearchAmerica

copied ADSR's product and thereby infringed on the patent." *Id.* at 6.

[1]     In 2005, non-party ADS Response Corp. (ADSR) brought a trade-secrets suit against SearchAmerica. The following year, ADSR voluntarily dismissed the suit. In 2007, TransUnion acquired ADSR.

SearchAmerica argues that TransUnion's late disclosure of Babcock is improper, particularly because TransUnion admits it was aware of Babcock for several weeks prior to their formal disclosure. [2] *Id.* at 6. At the hearing, SearchAmerica also suggested that Babcock's testimony would only be relevant to intent to infringe under a willful infringement analysis. [3] TransUnion contends that it wanted to ensure Babcock's relevance before disclosing her and that SearchAmerica cannot establish that her disclosure on the last day of discovery meets the Eighth Circuit's standard of untimeliness and bad faith necessary to trigger the harsh remedy of excluding a witness with relevant testimony.

[2]     TransUnion sent its amended Rule 26(a) disclosure identifying Babcock four minutes before the discovery deadline. ECF No. 286.

[3]     On November 20, 2013 this Court denied TransUnion's motion for leave to file an amended complaint in order to plead a willful infringement claim.

The Court agrees that TransUnion should have disclosed Babcock sooner. [4] However, because Babcock's testimony is potentially relevant to all of the claims made by TransUnion in this case, the harsh remedy of excluding her as a witness is not appropriate. *ELCA v. Enters v. Sisco Equip. Rental & Sales*, 53 F.3d 186, 190 (8th Cir. 1995) ("Exclusion of evidence is a harsh remedy and should be used sparingly.") TransUnion has alleged direct infringement of both patents in this case and induced infringement of the '937 patent. [5] "To prove infringement, the patentee must show that the accused device meets each claim limitation either literally or under the doctrine of equivalents." *Global Traffic Techs., LLC v. Emtrac Sys.*, 2013 U.S. Dist. LEXIS 73700, at \*45 (D. Minn. May 24, 2013). The elements of induced infringement include: (1) direct infringement by a third party; (2) the inducer's "knowledge" of acts alleged to constitute infringement"; and (3) the inducer's "specific intent and action to induce infringement." *Id.* at \*47. [6] The Court

EXHIBIT
15

2013 WL 12155778

concludes that Babcock's testimony is relevant, at a minimum, to TransUnion's induced infringement claim.

[4]    At the hearing, TransUnion admitted that it confirmed the relevancy of Babcock's testimony three days prior to the discovery deadline. Why TransUnion did not submit the amended disclosure at that time is unclear.

[5]    The two patents are directed to a computer-implemented method and corresponding software used to assess a person's eligibility to receive financial assistance for healthcare services.

[6]    TransUnion's induced infringement claim has survived a motion to dismiss. *See* ECF No. 205.

**\*2**  Based upon all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. SearchAmerica's motion to strike Kathy Babcock as a witness is **DENIED.**

2. Ms. Babcock shall be deposed no later than December 31, 2013. Her deposition shall last no longer than 2 hours.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12155778

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.