```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3    ------------------------------------------------------------
                                 )
      Fair Isaac Corporation, a   )   File No. 16-CV-1054
 4    Delaware corporation,       )   (WMW/DTS)
                                  )
 5              Plaintiff,        )
                                  )   Minneapolis, Minnesota
 6    vs.                         )   May 8, 2019
                                  )   2:05 p.m.
 7    Federal Insurance Company, an )  Courtroom 9E
      Indiana corporation, and Ace )
 8    American Insurance Company, a )
      Pennsylvania corporation,   )
 9                                )
                Defendants.       )
10    ------------------------------------------------------------

11           BEFORE THE HONORABLE DAVID T. SCHULTZ
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
12                      (MOTIONS HEARING)

13    APPEARANCES
       For the Plaintiff:         Merchant & Gould
14                                ALLEN W. HINDERAKER, ESQ.
                                  HEATHER J. KLIEBENSTEIN, ESQ.
15                                80 South 8th Street
                                  Suite 3200
16                                Minneapolis, MN 55402

17     For the Defendants:        Fredrikson & Byron, PA
                                  TERRENCE J. FLEMING, ESQ.
18                                CHRISTOPHER D. PHAM, ESQ.
                                  LEAH C. JANUS, ESQ.
19                                200 South 6th Street
                                  Suite 4000
20                                Minneapolis, MN 55402-1425

21     Court Reporter:            MARIA V. WEINBECK, RMR-FCRR
                                  1005 U.S. Courthouse
22                                300 South Fourth Street
                                  Minneapolis, Minnesota 55415
23

24
           Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

1                        **P R O C E E D I N G S**

2                          **IN OPEN COURT**

3                           **(2:05 p.m.)**

4              THE COURT:  Good afternoon.  Please be seated.

5              All right.  Good afternoon.  We're on the record

6       in the matter of Fair Isaac Corporation versus Federal

7       Insurance Company, Civil Number 16-1054.  Counsel for the

8       plaintiff, if you would note your appearances for the

9       record, please.

10             MS. KLIEBENSTEIN:  Yes, Your Honor.  Heather

11      Kliebenstein and Allen Hinderaker from Merchant & Gould.

12             THE COURT:  Good afternoon, Ms. Kliebenstein and

13      Mr. Hinderaker.

14             MR. FLEMING:  Good afternoon, Your Honor.  Terry

15      Fleming, Leah Janus, and Chris Pham representing the

16      defendants.

17             THE COURT:  Good afternoon, Mr. Fleming, Mr. Pham,

18      and Ms. Janus.

19             All right.  Here's what I think might be most

20      helpful for me.  First of all, I'll just tell you upfront

21      that my intention is to give you a ruling today given where

22      we are in the scheduling order.  I think that may serve the

23      parties better than awaiting a lengthy written order.  I'll

24      try and give you at least a cogent explanation for why I'm

25      doing what I'm doing when I decide what I'm doing, but let's

 1    start there.

 2            I think what might be most helpful, actually I was

 3    going to start with your motion to compel, but I remember

 4    now your motion to strike was filed first, correct,

 5    Ms. Kliebenstein?

 6            MS. KLIEBENSTEIN:  Yes, Your Honor.

 7            THE COURT:  All right.  Then we'll start with the

 8    motion to strike.

 9            MS. KLIEBENSTEIN:  Good afternoon, Your Honor.

10            THE COURT:  Good afternoon.

11            MS. KLIEBENSTEIN:  Our motion to strike seeks the

12    relief of striking 16 witnesses that were added to the

13    defendant's second supplemental initial disclosures at the

14    close of fact discovery on the afternoon of March 22nd.

15    These 16 new witnesses were not previously identified as

16    witnesses that Federal may use to support its claims and

17    defenses along with the subject matter of that knowledge.

18    They were not timely disclosed under Rule 26.  There's no

19    substantial justification, and there is harm to FICO.

20            In addition, I think what I'd like to talk about

21    first is why this is ripe for the Court to decide now

22    instead of waiting until closer to trial.  This motion is

23    being brought under Rule 26 for a violation of Rule 26, a

24    discovery rule.  Problems under Rule 26 are properly before

25    this Court to decide during discovery and prior to the non

1    dispositive motion deadline, and that's exactly what we have

2    here, a violation of Rule 26 at the close of discovery.

3          Striking these witnesses now and prohibiting them

4    from testifying at trial is the appropriate remedy at this

5    time for several reasons.  Mainly, for the reasons of

6    fairness and to enforce the rules of discovery.  It

7    shouldn't be the case that a party gets to add 16 new

8    witnesses on brand new subject matter not previously

9    identified in the case hours before discovery closes.  The

10   case schedule is firmly within the Court's control, and the

11   defendants cannot be allowed to ignore the rules.

12         Discovery must end.  We need a clear indication of

13   what witnesses may be brought to trial and what witnesses

14   cannot be brought to trial in order to properly prepare our

15   case.  If these witnesses were so important to the

16   defendants, they should have been identified earlier on the

17   26 disclosures.

18         Conversely, if the Court decides to not rule now

19   or decides to rule against FICO, that is essentially saying

20   that Federal may present these witnesses at trial on

21   subjects that FICO never knew about and never had an

22   opportunity to discover, which is contrary to the rules.

23         Now, I'll move into the merits on timeliness, the

24   substantial justification, and the harm to FICO.

25   Essentially, Federal's argument is that disclosure on the

1   last day of discovery is timely.  That's argument number

2   one.  The case law is clear that it's not.  An

3   impracticality, it certainly is not.  When those witnesses

4   were added on the afternoon of March 22nd, there was nothing

5   that FICO could have done to prevent or prohibit the

6   unfairness to FICO.  There was nothing left to do on that

7   afternoon.

8          The next argument is that Federal knew of these

9   witnesses, the identity of these witnesses prior to their

10  inclusion on the Rule 26(a) second supplemental disclosures,

11  but that's not the test under Rule 26(a) awareness of the

12  witness.  The test is has the disclosing party identified

13  the witnesses as somebody who may come to trial on a

14  particular subject matter?  Awareness of the witnesses in

15  this case, these 16 people would make them no different than

16  the hundreds of other people who are identified on Federal's

17  documents, in their document production, or their

18  interrogatory responses.  Defendants point to nothing that

19  discloses these people as potential trial witnesses in this

20  case for the subjects on which they were identified.

21          Now, as we move into each of the groups of the

22  witnesses, we can explain how the prejudice and the

23  untimeliness is true.  So the first group of people are

24  employees that verified interrogatory responses number 16

25  through 20:  Hutchinson, Fisher, Jerd, Seeley, and McCarthy.

1           And actually before I get into that, I'd like to

2      note that there are five witnesses that are not brought up

3      in Federal's brief at all.  There are five witnesses that

4      Federal does not make the contention that we knew about them

5      or should have in any way shape or form.  And those are

6      Schraer, Mencke, Theberge, Garnes and Verduin.  And I

7      apologize if I'm butchering all of those names.

8           But back to the verification responses.  Federal

9      says that we knew about these people and, therefore, they

10     didn't have to add them to their initial disclosures in time

11     because they were identified on verification pages for those

12     interrogatories.  Those interrogatories, mind you, were

13     served in 2017.  These people began showing up on the

14     verification pages at the end of 2018, but the verification

15     pages weren't signed until mid to late March.  So there was

16     no knowledge that they were in fact going to be the

17     verifying witnesses.

18          But, again, awareness of a person is not the test.

19     The verifications were not corrective information because

20     the verifications don't establish that the witnesses will

21     come to trial to support Federal's claims and defenses, and

22     the subject matter is broader.  If I could pull up --

23          THE COURT:  Could I ask you a quick question while

24     you're doing that?

25          MS. KLIEBENSTEIN:  Yes, Your Honor.

1          THE COURT:  Do you in the course of this

2     litigation, did you keep a list?  A lot of times if you get

3     a number of documents produced, you keep a running list of

4     names in the documents.  By any chance did you do that in

5     this case?

6          MS. KLIEBENSTEIN:  You know what, I have

7     historically not done that in recent years because -- no, I

8     did not because our electronic database does that for us.

9     We have to go in and ask any questions about who is on the

10    to and from line, so we don't keep a list, but we can access

11    a list.  I can tell you it would be hundreds of people.

12         THE COURT:  That was ultimately what I wanted to

13    know.

14         MS. KLIEBENSTEIN:  I can confirm that for you.

15    Another good example of the breadth of people involved in

16    this case, Interrogatories number 2 and 3, some of these

17    witnesses were identified, Mr. Ewen Setti, I believe is his

18    name, he was identified in response to Interrogatory Number

19    2 and 3, along with 34 other people.  So there's nothing in

20    those disclosures.  There's nothing in the documents that

21    would identify for us this is the guy.  This is the one that

22    they're going to bring to trial on a certain subject matter.

23         THE COURT:  What about -- maybe you're getting to

24    it, but what about their point that when they identified 15

25    witnesses on their original Rule 26 disclosure, FICO only

1    deposed three of them anyway.

2          MS. KLIEBENSTEIN:  I'm very glad you asked that

3    question.  It's an important issue to get right.  Out of

4    context, that statement is very misleading.  So when you go

5    back through the history of discovery, you can understand

6    our strategy and where we went.

7          Federal's initial disclosures dated March 17th

8    only had four witnesses on it.  So we have Ms. Palowski, and

9    then Henry Mirolyuz, Pamela Lopata, Ramesh Pandey.  Tom

10   Carretta is a FICO gentleman within our custody and control.

11   So we deposed three of those four people.  We did not depose

12   Ms. Pamela Lopata.  She's a lawyer.  And we deemed her

13   testimony to be entirely duplicative of that from

14   Ms. Palowski based on the documents.  So, at this time, we

15   chose to depose three of the four fact witnesses.

16         At the same time in 2017 and 2018, this is all we

17   had, so we developed a litigation strategy to get the

18   testimony that we need through use of 30(b)(6) depositions,

19   and we served three 30(b)(6) notices, 33 topics.  I think

20   maybe 80 include subparts, and that's how we went after the

21   factual information that we needed in this case.

22         And then in January of 2019, they supplemented to

23   add seven new witnesses.  And at that time, we took a look

24   at our strategy, and we took a look at our witnesses, and we

25   decided not to depose those seven people and here's why.

1        Three of those people were from outside of the United

2   States, and their subject matter was use of Blaze Advisor in

3   Canada, Australia and the UK.  Our 30(b)(6) topics have

4   covered that.  We felt like we needed on those subjects such

5   that we didn't need to go to Canada, Australia, and the UK

6   to depose them.

7            The other four witnesses in those January 2019

8   supplements, the other four people related to the 2006

9   contract negotiations.  We were comfortable with our

10  knowledge about that story both from the FICO and Federal

11  perspective, and we were also comfortable relying on

12  cross-examination should those witnesses come to trial.

13           So having committed to a 30(b)(6) deposition

14  testimony strategy, being willing to rely on

15  cross-examination at trial, and given the limited time

16  remaining in fact discovery, we chose to stay with our

17  current plan of deposition approach.

18           That all changed on March 22nd when there were 16

19  new witnesses that are primarily targeted to defense of the

20  damage's case, to possibly apportionment of the profits

21  relating to infringement under disgorgement analysis.  To

22  say that we wouldn't have deposed these people presumes a

23  fiction that if we had to go back and reassess if we had all

24  31 of these witnesses in front of us, what would we do?  We

25  would have a different discovery strategy.  We would attack

1    it differently.  I can assure you of that.

2              Would we depose all 16 of these witnesses?  That

3    would require a lot of analysis and for us to reassess the

4    case in its entirety.  But to say that we wouldn't have

5    deposed any of them any way is not, out of context, it's not

6    true.  So I'm very glad you asked that question.

7              Moving back to the timeliness, with regard to the

8    witnesses identified as having verified responses to the

9    interrogatories, the problem here is that while we may have

10   been able to discover the name of these witnesses, these

11   subjects that are shown in the second amended initial

12   disclosures are broader than simply explaining the

13   verification of those interrogatories.  And keep in mind

14   that 16 through 18 asked for, or 16 through 20 asked for the

15   gross written premium that went through Blaze Advisor

16   software.  So if you look at these subjects, it's much

17   broader.

18             We have the same problem moving into the group of

19   witnesses that helped, allegedly helped gather data in

20   response to requests for production 30 through 32.  While we

21   could have possibly found their name on some document

22   somewhere, that still doesn't disclose the subject matter of

23   the knowledge that's in the second amended initial

24   disclosures.  And mind you, this is much broader than laying

25   foundation for some charts produced in response to requests

1    for production 30 through 32.

2              Moving to Mr. Harkin, Federal contends that we had

3    an awareness of Mr. Harkin.  There was no need to disclose

4    him on the initial disclosures because we deposed him.

5    However, we weren't notified of Mr. Harkin's name until the

6    final week of discovery.  We were notified that he would be

7    the 30(b)(6) deponent on our topics in our last 30(b)(6)

8    notice and that deposition was to take place on March 25th.

9    He was added to the initial disclosures on the afternoon of

10   Friday, March 22nd.  To the extent that we could have

11   somehow ameliorated this prejudice over that weekend is --

12   that's an unfair proposition to put FICO in.

13             Further in that 30(b)(6) deposition, there could

14   not have been exploration of Mr. Harkin's knowledge as a

15   fact witness.  When any questions were asked outside of the

16   subjects of the 30(b)(6) notice, they were shut down by

17   counsel.  There was no exploration beyond his capacity as a

18   30(b)(6) deponent.  So in sum, the deposition of Harkin as a

19   30(b)(6) deponent is not akin to disclosure on the initial

20   disclosures.

21             We've discussed Mr. Setti before.  He's just one

22   individual listed on a number of documents with dozens of

23   other people.  He was identified in response to

24   interrogatories number 2 and 3, along with 34 other people.

25   The trouble with Mr. Setti is his subject matter is

1    knowledge regarding Blaze Advisor use in the United Kingdom.

2         Now, when defendants did their first supplemental

3    disclosures in January, an individual named David Gibbs was

4    identified on the same subject matter, and Mr. Gibbs is also

5    one of these 34 people identified in Interrogatories Number

6    2 or 3.  Clearly, he was the guy that was going to testify

7    on Blaze Advisor use in the United Kingdom.  We would have

8    no ability to guess that Mr. Setti would have been.

9         And, finally, moving on to Claudio, I won't even

10   try his last name because I know I won't get it right.

11   Federal contends it didn't need to add Claudio to the

12   initial disclosures because he was the individual

13   responsible for settlement discussions in this case.

14   However, that is not the same as telling FICO that Claudio

15   has discoverable information that Federal may use to support

16   its claims and defenses in this case.  The description for

17   his testimony is Blaze Advisor rules usage, not settlement

18   discussions.

19         Moving into substantial justification, there isn't

20   much in the response brief about that.  We don't get any

21   explanation as to why these witnesses that FICO should have

22   been aware of, why they weren't added before along with

23   their subject matter.  The contention is that this late

24   disclosure is substantially justified because the majority

25   were identified in discovery.

1          Essentially, Federal's lateness is okay because

2     Federal didn't need to disclose the witnesses anyways.

3     Again, awareness is not the test.  Late disclosure is not

4     substantially justified when it could have been avoided.  In

5     this case, the issues and the subject matter identified in

6     these newest witnesses, it's old subject matter, right?

7          In the initial Complaint, we sought damages for

8     disgorgement under the Copyright Act.  We've been before

9     Your Honor about damages documents time and time again.

10    Interrogatory Number 6 served in 2017 sought persons with

11    knowledge of Federal's revenue and profits attributable to

12    the software.

13         Interrogatory Number 7 sought persons with

14    knowledge of the business reasons for using software in

15    defendant's rules base business applications.  There's no

16    substantial justification.

17         Federal's next argument to show substantial

18    justification is that these witnesses will be foundational

19    only.  While as you can see with the topics that we've

20    reviewed here, it's not foundational.  The subject matter

21    doesn't say foundation to establish chart X, Y, Z.  It's

22    much broader than that, and you know how trial works.  When

23    we get to trial, if they're on the stand, they're going to

24    talk about a lot more than simply foundation for a document.

25         The late disclosure is not harmless.  We've talked

1    about the issue of FICO's trial strategy and how this

2    essentially changes the game six hours before the discovery

3    period is set to close and that's not how the rules are

4    supposed to work.  Had the defendants disclosed these trial

5    witnesses in a timely fashion, we would have had the ability

6    to make different choices and to structure our discovery

7    process differently.

8          Federal also makes the point that we depose

9    Mr. Harkin already, so there is no harm.  As we've talked

10   about, there was no chance to explore the subject matter of

11   his personal knowledge in that deposition.  We've also

12   discussed the disclosure of foundational witnesses and

13   having that be harmless.  The subject matter is not

14   foundational only.  It's going to go much broader than that.

15         In sum, we ask the Court to strike these witnesses

16   today.  We got into this a little bit on our phone call on

17   Friday with respect to the expert issues, but setting that

18   aside, we have a greater issue in this case that Federal

19   hasn't doubled not from two to four, not from one to two

20   witnesses, from 15 to 31, the potential witnesses that it

21   might bring to trial, and that is just not consistent with

22   the rules and not a fair practice in litigation.  And FICO

23   should not have to bear the prejudice and the financial

24   expense of handling that strategy.

25         THE COURT:  Is -- something you said earlier, with

1    respect to Mr. Setti, Mr. Hutchinson, Mr. Johnston, and

2    Mr. Fisher, as you were talking earlier I jotted down the

3    notes that they're now disclosed topics were covered in

4    30(b)(6) depositions, set aside whether or not that's true

5    for a second.  Okay.

6           And then let me just ask you with respect to the

7    other 12 as described in the Rule 26 disclosure, are those

8    descriptions covered by the other 30(b)(6) topics?  In other

9    words, have you gotten binding corporate testimony on the

10   topics that are described in the new witness disclosures?

11          MS. KLIEBENSTEIN:  I don't believe so, Your Honor.

12   So let's take, and I think we may have -- let's just take

13   them one by one.  Mr. Setti, so what we talked about is

14   Mr. Gibbs is an individual identified in January on the same

15   subject matter.

16          THE COURT:  Right.

17          MS. KLIEBENSTEIN:  Right.  So at the time,

18   deposing Mr. Gibbs in London while we were closing up

19   discovery was not a priority.  If we were at the beginning

20   of the discovery period, I would be interested in deposing

21   someone in London about rules usage.  We did go to London to

22   depose Oliver Clark, a FICO witness.  Let's pretend we're

23   back two years.  We may have deposed Mr. Setti or Mr. Gibbs

24   at that time.  I believe Ewen Setti is in London.

25          So do I think I have binding 30(b)(6) testimony on

1     the issue of knowledge regarding Blaze Advisor use in the

2     United Kingdom?  No, I don't.  I don't.  I do not think we

3     do.  We have some 30(b)(6) testimony from U.S. witnesses.

4     Would it be more comprehensive if the witness is in the UK?

5     Might be.  Again, we're speculating.

6          Mr. Hutchinson's knowledge regarding applications

7     that use Blaze Advisor in the United Kingdom and Europe,

8     that doesn't dovetail completely into one of our 30(b)(6)

9     topics.  And, again, he was, you know, I don't know what

10    they're going for with that topic, right, we're just

11    presuming that it would dovetail into a prior 30(b)(6)

12    topic.  The point, I think, for Mr. Hutchinson is that he

13    was involved somehow in pulling the responses to

14    interrogatories number 16 through 20.  That might be

15    slightly different than the technical --

16          Mr. Hinderaker may have something to say.

17    Johnston, moving to Johnston, Paul Johnston knowledge

18    regarding the company's financial operations in Europe.  No,

19    I don't have 30(b)(6) testimony on that topic.  Mr. Fisher,

20    knowledge regarding the applications that use Blaze Advisor

21    in Australia.  Again, that's similar to Mr. Setti.  While we

22    have some 30(b)(6) testimony generally on that topic, having

23    him come as a witness might add additional facts that we're

24    not aware of.

25          Are there any questions beyond those four

1    witnesses?  Mr. Hinderaker would like to pop up I believe.

2            MR. HINDERAKER:  I'm sorry about this, but in

3    light of your questioning, Your Honor, I took these 30(b)(6)

4    depositions, and so to that extent I might be a little more

5    familiar with what was actually asked and answered.  The

6    corporate representative on these topics of use of Blaze

7    Advisor was a gentleman by the name of Henry Mirolyuz, and

8    he was deposed as a corporate representative as well as

9    individually.  And so our topics would include, and we had

10   an idea of what the applications that use Blaze Advisor were

11   called.

12           And so my examination of Mr. Mirolyuz, for

13   example, would be was Blaze Advisor used in this

14   application, in this application, in this application, in

15   this application?  And he gave us his corporate knowledge.

16           In contrast to a description of Mr. Setti as an

17   example, in knowledge regarding Blaze Advisor's use in the

18   United Kingdom, Mr. Mirolyuz' corporate knowledge wasn't

19   that broad.  He knew what was responsive to the topics of

20   our 30(b)(6) deposition, but the topic wasn't give me a

21   complete description of, from the European point of view,

22   put yourself with the personal knowledge of Ewen Setti and

23   tell me what he would say.

24           So all of the topics are by definition going to

25   open up areas of examination that will be broader than the

1    specific topics of the 30(b)(6) deposition.

2            THE COURT:  And just to make sure I'm

3    understanding your point, the 30(b)(6) deposition focused on

4    which applications Blaze Advisor was used in the United

5    Kingdom, but this description is broader because it may

6    encompass not only the applications but how it was used, why

7    it was used, what advantage or non advantage they got out of

8    it.

9            MR. HINDERAKER:  Exactly, the application has

10   another dozen technologies inside the bundle.  Mr. Setti

11   could come and say the bundle of technologies that make

12   application X do all of these things.  The role of Blaze

13   Advisor and that whole bundle is something else.  None of

14   that was within a 30(b)(6) examination of Mr. Mirolyuz.

15           And so when we got in the end of January the Gibbs

16   identification, we just had to make a choice.  Did we get

17   enough from Mirolyuz on a binding 30(b)(6) nature?  And so

18   we've been to London once, it's late in the day.  We had to

19   make a choice.

20           THE COURT:  And probably back to you,

21   Ms. Kliebenstein, but I did ask the question setting aside

22   Setti, Hutchinson, Johnston and Fisher, the other newly

23   disclosed witnesses, is the description of their subject of

24   information different from, broader than, covered by the

25   30(b)(6) depo topics?  In other words, is there some

1    overlap, no overlap, complete overlap?

2              MS. KLIEBENSTEIN:  Different than or broader than,

3    right.  So some good examples are the witnesses that aren't

4    even brought up in Federal's brief, operations of the

5    financial lines unit.  We don't have 30(b)(6) testimony on

6    that.  Knowledge regarding underwriting service centers.  We

7    haven't even asked 30(b)(6) topic that would somehow include

8    that.  Work flow and use of Blaze Advisor, how work was

9    routed prior to use of Blaze Advisor.

10             Those are the most obvious examples, but we can go

11   through each one of them and I can confirm for you we don't

12   have 30(b)(6) testimony on something at all or this

13   testimony would be broader just like Mr. Hinderaker

14   explained.

15             THE COURT:  Okay.  Thank you.

16             Mr. Fleming, Mr. Pham, or Ms. Janus, whoever?

17             MR. FLEMING:  Good afternoon, Your Honor.

18             THE COURT:  Good afternoon.

19             MR. FLEMING:  Your Honor, both parties throughout

20   this case, which has gone on for a long time, have

21   supplemented their Rule 26 disclosures.  FICO supplemented

22   their disclosures, their initial disclosures were in May

23   2017, and the supplemental disclosures on February 12, 2018,

24   and February 22, 2019.  Most of the individuals who were

25   disclosed on March 22nd have been disclosed during the

1    course of discovery.

2         As you'll recall near the end of the case, there

3    was some tight time constraints as we were trying to obtain

4    different financial information, and we provided verified

5    interrogatories, first, by providing the name and actually

6    getting their signatures later on of Mike Hutchinson

7    relating to financial information, Australia, Stuart Fisher

8    in Australia, Traci Jerd related to Premium Booking, Paul

9    Seeley related to CSI, and Chase McCarthy related to CUW.

10   They were all disclosed to FICO as individuals verifying

11   Federal supplemental answers to FICO's interrogatories

12   numbers 16 through 20.

13        Now, Kevin Harkin was deposed at a Rule 30(b)(6)

14   deposition.  And I do not believe, although, I would have to

15   review again, I do not believe that there was any

16   instructions not to answer.  I mean all these different

17   depositions but for Bill Wade's deposition, counsel on both

18   sides maybe strayed beyond the topics.  There were

19   objections raised, but except for Bill Wade, they were not

20   instructions not to answer even though the attorney on

21   either side thought it went beyond the scope and went into

22   personal issues.

23        Significantly, Kevin Harkin, remember he was the

24   Rule 30(b)(6) deposition on a large number of topics dealing

25   mostly with financial information, but prior to his

1    deposition, in order to give the Rule 30(b)(6) information,

2    he consulted with Andrea Phillips in Canada, Mike Hutchinson

3    and Paul Johnston in the UK, Runesh Roy and Stuart Fisher in

4    Australia, Paul Seeley, Traci Jerd and Chase McCarthy in the

5    United States.  I mean that's how he pulled the information

6    together.  So they were certainly aware of all these people.

7         And then just continue to go through the list,

8    Ewen Setti is identified on more than 900 documents that we

9    exchanged during discovery.  Claudio Ghislanzoni, yes, he

10   was the person participating in the mediation but so was

11   Bill Wade.  I mean the fact that Bill Wade appeared at both

12   mediations didn't suggest to us that he was going to be a

13   witness at trial.  He's the chief architect.  He's

14   identified on 200 documents.

15        THE COURT:  But was he disclosed by the time of

16   the mediation as somebody with knowledge on their Rule 26(a)

17   disclosure?

18        MR. FLEMING:  He was, Your Honor.  I was pointing

19   to the mere fact that he participated in the mediation isn't

20   a factor that would make one think to the contrary.  I mean,

21   yes, he participated in the mediation because the chief

22   architect that they're aware of, and he's identified in 200

23   documents.

24        Now, three of the people we acknowledged, Andrea

25   Phillips, Runesh Roy and Paul Johnston assisted with the

1    preparation of financial material, and if they were called

2    at trial, they would just be called as foundational

3    witnesses.

4         Now, it is significant, you know, their strategy

5    as they set out was a Rule 30(b)(6) strategy.  That's how

6    they took their depositions.  We identified a lot of

7    witnesses before, and they didn't take many of those

8    depositions.  And when we came up with these additional

9    people, still there has not been a request to take their

10   depositions.  Trial is not until December.  And, you know,

11   we could certainly accommodate those requests if they wanted

12   to take their depositions.  Now --

13        THE COURT:  Let me ask you, let me interrupt for a

14   second.  One, he might as well answer why these witnesses

15   weren't disclosed.  Well, actually, let me back up.

16        How many new names did FICO disclose on

17   February 22nd of 2019, do you know?  Was it a lot?  Was it

18   just a couple?

19        MR. HINDERAKER:  I know, Your Honor.

20        MS. JANUS:  I don't have the answer in front of

21   me.  Oh, go ahead.

22        THE COURT:  Go ahead.

23        MR. HINDERAKER:  We identified a witness in

24   substitution of Mr. Chen because he had left the company, so

25   we found an employee on the same subject matter.  And the

1    other addition to that supplement was we disclosed to the

2    other side that we intend to call any witnesses who had been

3    deposed by designation of their depositions.  If there was

4    going to be a battle at some point can we use designated

5    testimony from depositions, we wanted to know about it.

6    Those were the two changes that were made at that time, Your

7    Honor.  We did not wholesale anything.

8              THE COURT:  Okay.  So, Mr. Fleming, what was the

9    reason for not dis -- you're sort of on the horns of a

10   dilemma, right?  I mean on the one hand you didn't disclose

11   these people until the last day of discovery, then you

12   disclosed them.  So you can't -- it's hard to say, well, we

13   didn't need to disclose them at all, but then we disclosed

14   them, right, because what's your purposes for disclosing

15   them at that point?

16             MR. FLEMING:  Because they may be called as

17   witnesses at trial.  Under Rule 26(e)(1)(A), a party is only

18   required to supplement its initial disclosures if the

19   additional or corrective information has not otherwise been

20   made known to the other parties during the discovery

21   process.

22             THE COURT:  Right.

23             MR. FLEMING:  There is no requirement to

24   supplement if the information were otherwise made known to

25   the opposing party during the discovery process.  It is our

1    position that the failure to supplement was harmless given

2    their strategy of Rule 30(b)(6) depositions, their

3    determination not to take personal depositions by and large,

4    and their ability to request depositions.

5          Now, we're in May.  It's still six months, seven

6    months before trial, and the important thing is what FICO is

7    requesting is an extreme remedy, and the exclusion of

8    witnesses is a harsh remedy that is highly disfavored.

9          In the *TransUnion* case, although the Court found

10   the plaintiff should have disclosed witnesses sooner, the

11   witnesses were relevant to the claims, and the harsh remedy

12   of excluding her as a witness is not appropriate.  We have

13   plenty of time before trial.  There is an alternative to

14   that harsh remedy.

15         We learned in that last -- when we were going at a

16   sprint for the last I don't know how long it was, and we

17   were talking with all of these people, we realized that it

18   would make sense, and we believed it would be appropriate to

19   name them.  And we realized at the time that if they wanted

20   to take their depositions, we would certainly be cooperative

21   in doing that.  That is a good alternative to the harsh

22   remedy of excluding a witness and not allowing our client to

23   present its case at trial.

24         THE COURT:  Okay.  Fair enough.  Anything else you

25   think I should know at this point?

1          MR. FLEMING:  Just so the record is clear, we

2     don't have the supplemental disclosures that were made in

3     February 2019 as to whether there was one.  We thought it

4     was more than that but we don't have it, but it's pretty

5     easy to look that up very quickly.

6          THE COURT:  Well, you know, I mean it is different

7     if it's a month before the end of discovery than the date

8     discovery ends.  How many of the witnesses of the new 16 --

9     well, first of all, do you intend, the parties intend to

10    bring dispositive motions?  Do we know?

11         MR. HINDERAKER:  We do.

12         THE COURT:  How about defendants?  Do you intend

13    to use these 16 witnesses, any of them for the purposes of

14    declarations or affidavits in support of or in opposition to

15    summary judgment?  Or are you unable to say at this point?

16         MR. FLEMING:  Unable to say.  I mean it would be

17    likely Kevin Harkin, the Rule 30(b)(6) deposition who has

18    all that financial information, and Claudio Ghislanzoni, who

19    was instrumental along with others in providing this usage

20    chart, which is the subject of another motion today.  So I

21    would see those two, but we have not made a decision on

22    that.

23         THE COURT:  Okay, and then others of these, and

24    those two or others have also been involved in the process

25    of providing information to the expert witnesses, correct?

1           MR. FLEMING:  Yes.

2           THE COURT:  Expert depos have not been started,

3     correct?

4           MR. HINDERAKER:  Correct.  Our report is -- the

5     opening report or the first reports haven't been served,

6     Your Honor.

7           THE COURT:  Right, and not the response and --

8           MR. HINDERAKER:  And not the reply.

9           THE COURT:  And not the replies.  Are there three

10    rounds or just two?

11          MR. HINDERAKER:  Three.  And then, Your Honor, I

12    believe the practice in addition to summary judgment the

13    Daubert motions will be July 26th is the summary judgment

14    deadline.  I think the Daubert motions will be at the same

15    time by necessity, and discovery deposition of experts

16    closes June 28th, so we have this month period for the

17    Daubert as well as the summary judgment.

18          THE COURT:  Okay.  Anything you need to say in

19    addition, Ms. Kliebenstein?

20          MS. KLIEBENSTEIN:  I'll be brief.  Counsel raised

21    the fact that we haven't made any requests to take

22    depositions.  The discovery period is over.  We are moving

23    into the summary judgment period.  The fact discovery, fact

24    discovery needs to be closed in order for summary judgment

25    to work the way that it's supposed to work.

1          Exclusion of witnesses is an extreme remedy, but

2     the prejudice to FICO on the other side of the fence should

3     these witnesses not be struck is also extreme.  There is no

4     justification here except for failure to prepare the case on

5     time.  The price, the penalty for that failure needs to be

6     felt by Federal and not FICO.  I think to put FICO in the

7     position to depose all of these individuals, while fact

8     discovery should be closed and summary judgments are being

9     prepared is additional prejudice and significant prejudice

10    to FICO as well.

11          THE COURT:  Thank you.  Mr. Fleming, anything

12    further on this?

13          MR. FLEMING:  Just this, Your Honor, what they're

14    requesting is a harsh remedy.  It's disfavored.  They claim

15    prejudice, but that's easily remedied.  If this Court told

16    us to cut down on that list to X, we'd be done by the end of

17    the day.  I think we have a pretty limited schedule of

18    depositions that are pretty short.

19          THE COURT:  Okay.  Thank you.  I'm going to take a

20    brief recess and then we're going to come back.  I'll be

21    back in two minutes.  We'll move to the motion to compel.

22    Okay?

23               (Short recess at 2:50 p.m.)

24               (In open court at 2:53 p.m.)

25          THE COURT:  All right.  Let's move to the motion

1   to compel, and what I would like, whoever from the defendant

2   is going to argue these, I want to start with you've proofed

3   them on your chart.  I'm going to use the chart as the

4   organizing principal here.  What I want you to do so the

5   first one really covers RFP 16, 17, 18, 32, 33, and 38.

6          So with those requests in mind, would you, whoever

7   is coming up to argue it, would you tell me what have you

8   gotten?  What is it you haven't gotten that you think you

9   need and why you need it?

10          Go ahead.

11          MR. FLEMING:  Your Honor, if you're ready, the

12   first set of documents relates to documents that Bill Wade

13   referred to during his last deposition.  The first one being

14   the notice from the finance department that FICO was no

15   longer offering six year software licenses.  As I understand

16   it, FICO has stated that it conducted a reasonable search

17   and couldn't find anything, without explaining what was the

18   search that was done, but this was a document that Mr. Wade

19   had referenced.

20          THE COURT:  Hang on a second, Mr. Fleming, you're

21   already in the column on what it is you want, correct?

22          MR. FLEMING:  Yes, moving parties last offer to

23   compromise.

24          THE COURT:  Right.  What I want to know before you

25   get there, just give me a general sense of 16, 17, 18, 32,

1   33, 38, in general, what are you looking for with those

2   requests for production?  Those all relate to damages or

3   what?  Just sort of a general description in layperson's

4   terms.

5          MR. FLEMING:  Yes.  In general terms, there are

6   topics regarding pricing methods and discount rates.

7          THE COURT:  Okay.

8          MR. FLEMING:  During Mr. Wade's deposition, he was

9   looking at this global pricing grid that they had produced,

10  and he said it was in effect since 2003.  And he said, but,

11  and then he went after point after point after point, well,

12  this one is no longer effective.  Well, this one has been

13  changed.  Well, this one has been changed.  And with regard

14  to each one of those, I inquired, and he referenced a

15  particular document, which includes things like a memorandum

16  stating that FICO was no longer offering six year software

17  license agreements, an e-mail stating that the maintenance

18  required on top of annual fees was increasing from 18 to 20

19  and then to 22 percent.  Documents which would bear out what

20  Mr. Wade said that Blaze is no longer being sold primarily

21  on a perpetual contract basis because of the global pricing

22  grid says to the contrary.

23         He says, Mr. Wade said that he had identified,

24  there's a document identifying it was a list of all Blaze

25  licenses and the type of license grant.  And there were

1    e-mails, spreadsheets and support logs relating to licensees

2    who had undergone mergers, acquisitions and changes in

3    control.

4           And I think the final document that came up during

5    Mr. Wade's deposition was a spreadsheet or other document

6    which bear, I'm sorry, their support log cases about the

7    usage of Blaze in relation to a dispute FICO had had with

8    Dell after its merger.  So there were those, there's seven

9    items.  And the --

10          THE COURT:  All right.  I'm sorry.  Believe me,

11   I've read everything, but you need to back up and go a

12   little bit more slowly.  The first is because now you're

13   using seven, and in your chart you have six.  The first is

14   this memo that FICO is not offering six year licenses,

15   right?

16          MR. FLEMING:  Yes.

17          THE COURT:  On Blaze Advisor.  The second thing is

18   the finance department e-mails about charging maintenance

19   fees.

20          MR. FLEMING:  Yes, increasing that charge from 18

21   to 20 and then to 22 percent.

22          THE COURT:  Okay, that seems to be number three on

23   your chart, not number two.

24          MR. FLEMING:  The maintenance.

25          THE COURT:  Right.  Well, looking at your chart,

1    is two different from three?

2              MR. FLEMING:  No, they are.  It's about a change

3    with regard to the maintenance.  I think those are one in

4    the same.

5              THE COURT:  Okay, one is more broadly stated than

6    the other, perhaps, but --

7              MR. FLEMING:  Yes.

8              THE COURT:  Number four, use of sales force.  Tell

9    me a little bit more about that.

10             MR. FLEMING:  During Mr. Wade's testimony, he said

11   that agents use sales force in order to price software

12   agreements, and I followed up in just asking what exactly he

13   was talking about.  So we were asking specifically about

14   FICO's use of this sales force and any pricing policies that

15   such records may reflect.  It appears from his testimony

16   that it was a way for like a salesman to use a software

17   product in order to price a software agreement for a

18   customer.

19             THE COURT:  Okay.  So www.salesforce.com is a

20   software product?

21             MR. FLEMING:  I assume that, Your Honor.

22             THE COURT:  Okay.  All right.  Next item is the

23   list of all customers who had an enterprise license and

24   identify the software license each customer has, is that

25   right?

 1          MR. FLEMING:  Yes.

 2          THE COURT:  Why if, for example, the customers are

 3     using some software even on an enterprise-wide basis, but

 4     it's something other than Blaze Advisor, why would that be

 5     relevant?

 6          MR. FLEMING:  Yeah, I mean obviously the list of

 7     customers using Blaze would be the most relevant.  It would

 8     be the most directly relevant.  But when our software

 9     experts can look at the prices charged to other customers on

10     other applications, they can extrapolate the data

11     presumably.

12          THE COURT:  Okay.  And then the last one on the

13     chart is e-mails, spreadsheets and "support logs" relating

14     to licensees who underwent mergers.  What are support logs?

15          MR. FLEMING:  That was the phrase that Mr. Wade

16     used when I was asking him how he would go about determining

17     which licensees had been involved in mergers, acquisitions

18     and changes in control.  He referenced e-mails, spreadsheets

19     and support logs that he would have to review in order to

20     determine that.

21          THE COURT:  Okay.  Anything else in this category

22     of RFPs 16 through 38?

23          MR. FLEMING:  Well, I mean the other -- there are

24     two other particular documents that are not on that

25     spreadsheet while preparing and looking through our memo and

1        Mr. Wade's deposition.  One was spreadsheet and other

2        documents which bear on the contention that Blaze is no

3        longer sold primarily on a perpetual contract basis.

4                MS. KLIEBENSTEIN:  Did you say spreadsheets?

5                MR. FLEMING:  The language from his deposition, he

6        said, "spreadsheets, tabulations, percentage calculations or

7        other documents."

8                THE COURT:  Okay.

9                MR. FLEMING:  And then the final thing, our

10       support log cases about the usage of Blaze that Mr. Wade

11       referenced in relation to a dispute FICO was having or had

12       with Dell after its merger.

13               THE COURT:  Say that again, I'm sorry.

14               MR. FLEMING:  Support log cases about the usage of

15       Blaze in relation to the dispute FICO had with Dell after

16       its merger.

17               THE COURT:  Every word you said was in English

18       and, yet, I have no idea what that means.

19               MR. FLEMING:  That phrase "support log cases" that

20       is a phrase Mr. Wade used, so that's what we asked for.

21       That is what he referenced in connection with a dispute that

22       he would review in connection with a dispute that FICO had

23       with Dell after its merger.

24               THE COURT:  Okay.

25               MR. FLEMING:  So those are the particular

1    documents we've requested.  Otherwise, with regard to

2    Federal's request numbers 32 through 38, I mean we have made

3    a motion to compel with regard to those broader requests

4    simply because of the paucity of the documents that have

5    been produced with regard to the calculation methods for

6    pricing and how discounts are determined on a customer by

7    customer basis.

8              THE COURT:  Well, that springboards to a broader

9    question, I think.  You need information about pricing, how

10   they go about pricing Blaze historically and over time,

11   right?

12             MR. FLEMING:  Yes.

13             THE COURT:  And that's the gist of that.  And

14   you're telling me that what you've gotten is insufficient

15   and suspiciously thin, I think.

16             MR. FLEMING:  That is what we are saying, Your

17   Honor.

18             THE COURT:  So what have you gotten regarding

19   Blaze pricing over time?  You've gotten the pricing guide,

20   right?

21             MR. FLEMING:  We've got the pricing guide.  We've

22   got the application grid.  We've got a 2006 price quote for

23   Chubb and a Power Point presentation that generally outlines

24   pricing options for Blaze.

25             THE COURT:  Other than what you identified when I

1     made you go through that list, what do you think is there

2     that you're not getting?  In what way is it sort of

3     obviously to you deficient?

4               MR. FLEMING:  It's like the discussion we had more

5     than a few months ago when FICO was seeking to obtain

6     responses to document requests 55 through 70 about the

7     business case for Blaze, where there was a process that

8     followed in terms of us being able to find out, well, what

9     custodians have you looked at and what are the search terms

10    to see if there is more?

11              But what we have, and we have the software license

12    agreement themselves, but that's the price without, you

13    know, the ability to determine how were those calculated and

14    how were the discounts calculated?  It can't be completely

15    subjective on a customer by customer basis.

16              THE COURT:  Though it would help you if it were,

17    right?

18              MR. FLEMING:  It would actually.  But I also don't

19    want to be surprised because there's been, you know, we've

20    now got an expert report where the expert relies real

21    heavily on Bill Wade with regard to a lot of these

22    discussions.  And when we have, you know, we haven't been

23    able to take his deposition fully.  He refers to a lot of

24    documents that haven't been produced.  It puts us in a

25    precarious position, I think.

1           THE COURT:  You're referring to the expert

2      deposition, correct?

3           MR. FLEMING:  The expert report.

4           THE COURT:  You haven't deposed him at all yet.

5           MR. FLEMING:  Correct.

6           THE COURT:  Okay.  He refers to documents that

7      have not been produced?

8           MR. FLEMING:  He refers to interviews with Bill

9      Wade.

10           THE COURT:  Okay.  Does he reference documents

11      that you don't have?

12           MR. FLEMING:  There was a -- we requested some

13      documents that they referenced that we weren't sure if they

14      produced those in a very timely manner.

15           THE COURT:  Okay.  Let me pause there and hear

16      from FICO on this array.

17           So, Ms. Kliebenstein, you'll have to bear with me,

18      I would find it helpful if you go through and respond to

19      each of these things I've written down, so I'm going to tell

20      you what I've written down, okay?

21           The first is some memo that provides notice that

22      FICO is not offering six year licenses on Blaze anymore.  Do

23      you know what memo that refers to?  It was apparently

24      referenced in the deposition of Mr. Wade.

25           And, Mr. Fleming, if my description is off, I

 1    expect you to jump up, okay?

 2              MR. FLEMING:  Yes.

 3              MS. KLIEBENSTEIN:  I have looked for that memo.

 4    We went to the finance department.  We cannot find it.  So

 5    I'll answer your specific questions and address after that

 6    the relevancy with respect to RFP 16 through 18, 32 to 33

 7    and 38, those are two different issues, but to answer your

 8    question specifically, we went to finance, we asked.  Can't

 9    find it, if it ever existed.

10              THE COURT:  Okay.  Have you talked to Bill Wade

11    about what he's referring to?

12              MS. KLIEBENSTEIN:  Yes, he recalls it, but he

13    doesn't have a copy.

14              THE COURT:  Okay.  But whatever descriptions he's

15    given you and whatever your conversations have informed your

16    search, I assume?

17              MS. KLIEBENSTEIN:  Yes, Your Honor.

18              THE COURT:  Okay.  Can't find it?

19              MS. KLIEBENSTEIN:  Unfortunately not.

20              THE COURT:  Okay.

21              MS. KLIEBENSTEIN:  A number of these documents

22    would help my case, so I have an interest in finding them as

23    well.

24              THE COURT:  Okay.  E-mails regarding the need to

25    increase maintenance charges, and then there's a greater

1   specificity that there were e-mails on that justification or

2   on that topic when the maintenance charges went from

3   18 percent to 20 percent to 22 percent.

4         MS. KLIEBENSTEIN:  We followed up with Mr. Wade

5   and then we followed up with the finance department that

6   would have been the department that would have issued such a

7   notice, and we don't have a record.  We don't records of

8   those any longer, of those e-mails any longer.

9         THE COURT:  Did those e-mails exist, according to

10   your finance people?

11         MS. KLIEBENSTEIN:  You know, I can't, I did not

12   ask that ultimate question.  My conversations with Mr. Wade

13   suggest he wasn't making that up, that he feels like he has

14   seen e-mails on that.  I think an e-mail would be a natural

15   way to get that out to the field, so I'm going to guess that

16   at one time or another, they did exist, but we cannot find a

17   record of them.

18         THE COURT:  Give me some idea of how you -- I

19   assume you're searching for those by way of bullion searches

20   or something of that nature.

21         MS. KLIEBENSTEIN:  The way that it was searched

22   was going to the custodians in the finance department and

23   having them search their records.

24         THE COURT:  Are you satisfied that you or your law

25   firm or whomever has provided adequate guidance and that

1    they have searched the custodians have, A, been the

2    appropriate custodians; and, B, searched broadly enough or

3    creatively enough to have found those, if they exist?

4         MS. KLIEBENSTEIN:  I'm confident that a reasonable

5    search has been done.  In addition to outside counsel

6    weighing in on the search, we also have in-house counsel and

7    an in-house paralegal that specializes in litigation who has

8    been assisting us.  So the right people have been on the job

9    asking the right questions.

10        THE COURT:  Do you happen to know, either of you,

11   when the charges were increased from 18 to 20 and then from

12   20 to 22?

13        MS. KLIEBENSTEIN:  Off the top of my head, I do

14   not.  I believe it is in the Wade testimony generally when

15   that occurred by at least a year.

16        THE COURT:  Okay.  Can you give me any sense, I

17   mean is this something that happened ten years ago?

18        MS. KLIEBENSTEIN:  Oh, no, Your Honor.  I think

19   the 22 percent, I think, was in the last year and a half.

20        THE COURT:  Okay.

21        MS. KLIEBENSTEIN:  And then the 20 percent --

22        MR. HINDERAKER:  20 percent was in place when Bill

23   Wade gave his original declaration.

24        MS. KLIEBENSTEIN:  Right, but it had been in place

25   for quite some time.  It could have been 2010, around there,

1      but that was not something so recent as 2017.

2              THE COURT:  Okay.  I'm assuming that you or your

3      law firm or whomever has given them a litigation hold notice

4      or you are aware that one was given, right?

5              MS. KLIEBENSTEIN:  Yes, Your Honor.

6              THE COURT:  Do you have any reason to think it

7      wasn't followed?

8              MS. KLIEBENSTEIN:  No, Your Honor.

9              THE COURT:  Next item, agents use salesforce.com

10     to price software agreements.  So, specifically, they were

11     looking for documents that describe how that is used and the

12     pricing policies that those documents would reflect.

13             MS. KLIEBENSTEIN:  Salesforce.com is an

14     application that a number of companies use in a number of

15     different industries as a repository for storing information

16     about the sales process.  So you can have a particular

17     client and everybody enters in the information into sales

18     force on their local desktop about that client so that

19     everybody can see what's going on.

20             THE COURT:  It's like a client management data.

21             MS. KLIEBENSTEIN:  It's a CRM.

22             THE COURT:  CRM, Client Relation Management.

23             MS. KLIEBENSTEIN:  Yep.  Now, Mr. Wade was wrong.

24     Sales force does not do pricing.  I have discovered that

25     it's an internal application called the Q that has a

 1    mechanism where you can input data about the client, and it

 2    will assist in generating -- it will assist in generating a

 3    quote.  I have a PowerPoint that has snap shots of how that

 4    works, and we're preparing that for production.

 5          Now, we don't have -- if that's all there is that

 6    would be of value because it's a native thing.  The prices,

 7    the quotes then go to the customers.  Does that make sense?

 8          THE COURT:  Not entirely.

 9          MS. KLIEBENSTEIN:  Okay.  The pricing and the

10    discounting and the quoting, even though it's facilitated by

11    the Q, all of the guidelines and the parameters are in the

12    documents that we've produced already.  The Q is just a

13    mechanism to help automate it.

14          THE COURT:  It applies those guidelines and

15    policies.

16          MS. KLIEBENSTEIN:  Exactly.

17          THE COURT:  By virtue of its application.

18          MS. KLIEBENSTEIN:  Exactly.  And the documents

19    that we produced on pricing in this case are the Blaze

20    Advisor agreements themselves that show the license fees.

21    FICO standard pricing matrix, which is about a three-page

22    document that sorts out how large is the company, how do

23    they want to use it, and then you can figure out where the

24    pricing might start on the grid.  And then FICO's global

25    price list, which is a 27-page document that outlines, and

1      it's from 2003.

2                  THE COURT:  It's been produced, right?

3                  MS. KLIEBENSTEIN:  Been produced in January of

4      this year in response to discovery requests issued on

5      December 28th.  We produced it on January 28th.

6                  THE COURT:  I seem to vaguely recall some

7      discussion about it, but --

8                  MS. KLIEBENSTEIN:  Right.  The issue that Federal

9      brought up is that we were somehow hiding it.  It wasn't

10     responsive.  If you look at RFP 16 through 18, it's not

11     responsive to those old discovery requests.  Mr. Wade was

12     deposed two weeks before our responses were due.  So we had

13     not produced it at the time of his January deposition.

14     There was no nefarious intent here.

15                 So FICO has a limited number of documents that

16     outline how it prices.  It uses that matrix and that pricing

17     guideline to figure out the parameters of where a licensee

18     will fall.  Pricing, however, is bespoke to some extent.

19     They follow the guidelines, but then they apply discounts,

20     and each one of those discounts is decided depending on who

21     the customer is, what the long-term relationship looks like,

22     and what service and support fees.

23                 You might compare it to law firm pricing, right?

24     You have a client that comes in, how much of a discount are

25     we going to give that client?  Well, it depends on who you

1    are and what you're doing and --

2              THE COURT:  Sigh, this time.

3              MS. KLIEBENSTEIN:  Right.

4              THE COURT:  Right, okay.

5              MS. KLIEBENSTEIN:  You understand that point.

6    It's different, but it's similar.

7              THE COURT:  Who decides that though?  If you have

8    a client, you're going to decide what discount to give them,

9    two questions really, one, are there written guidelines?

10   And, two, who ultimately makes that decision?

11             MS. KLIEBENSTEIN:  The written guidelines are in

12   the 2003 pricing matrix.

13             THE COURT:  Okay.

14             MS. KLIEBENSTEIN:  It's dated 2003.  It might be

15   surprising that that is the current pricing strategy

16   document, but it is.  It has not been updated in written

17   form.  Who decides?  Ultimately, it depends on the amount of

18   the discount.  I know that in this case in the 2016

19   discussions, FICO was offering 40, 50, maybe 60 percent of a

20   discount and that had to go all the way up to the C-suite,

21   so it depends on the nature of the discount.  I believe that

22   the discount is very small and within the parameters of the

23   pricing guidelines.  That the sales contacts can make that

24   decision on their own, but as it creeps up, it has to start

25   going up a little.  I'm not sure where those levels kick in,

1    but I do know there are different levels of permissions for

2    different levels of discounts.

3            I also know that FICO does not keep a list of its

4    licensees and the discounts provided.  We do have data that

5    shows licensees and the revenue received from them on an

6    annual basis, and I'm preparing that spreadsheet for

7    production as well.

8            THE COURT:  Okay.  I'm just going to make an

9    observation, the fact that you're preparing those things for

10   production, it's a little inconsistent with the prior

11   statement in a prior motion about we're not asking for

12   depositions, discoveries closed, but that's just an

13   observation.

14           MS. KLIEBENSTEIN:  That's a fair comment.  I think

15   when it comes through, when it comes to these 1 through 6,

16   we're simply trying to resolve a dispute.  I'm not

17   suggesting that I think these actually fall within the

18   discovery requests.  So when you look at request for

19   production 16, all documents that evidence refer or relate

20   to licensing revenues that you have received for the work

21   from 2006 to the present, we've objected to that.  What's

22   the relevance of that?

23           The dispute is between FICO and Federal in

24   relation to the dealings between those parties.  We've

25   already produced the Blaze Advisor agreements that have the

1      licensing revenues in them.  So me saying that I'll give

2      them a spreadsheet, I don't believe it's inconsistent.

3              THE COURT:  I do understand your point and that

4      was a bit gratuitous on my part.

5              But let me ask this a different way, I am being

6      just deposited right into the heart of FICO and told go out

7      and price Blaze Advisor, have the documents that you

8      produced included everything that somebody who was going to

9      do that function would use?

10             MS. KLIEBENSTEIN:  That has been reduced to

11     writing, yes.  There is some of that pricing that's bespoke

12     with experience in the company.  So could you use the

13     pricing matrix and the pricing guide to come up with a

14     license fee that's in the ballpark?  Yes, you could, but

15     then the salespeople, of course, use their discretion based

16     on what the value of the customer is to move that up or

17     down.  And that's what we've had, I don't know, 14 hours of

18     Bill Wade testimony about.  So there's been a sufficient

19     description of that bespoke aspect to pricing.  But, yes,

20     all pricing starts with the pricing matrix and the 2003

21     pricing guidelines.

22             THE COURT:  Okay.  Do you have or could you easily

23     compile a list of all FICO customers?  My notes don't

24     indicate a time frame, but a list of all FICO customers who

25     had enterprise wide software licenses.  Do you have such a

1    list or is that information readily available?

2           MS. KLIEBENSTEIN:  I think it could be compiled.

3    Blaze Advisor, right?

4           THE COURT:  Well, no, I was starting with

5    regardless of what the software is.

6           MS. KLIEBENSTEIN:  I don't know the answer to that

7    question.  We've objected consistently that anything beyond

8    Blaze Advisor is not apples to apples.

9           THE COURT:  Yeah, I imagine their point is that,

10   well, I've lost the thread on that one, but that their point

11   is that as a business practice, I think that what they

12   understand is FICO says we don't do enterprise-wide

13   licenses.  Am I right, Mr. Fleming?

14          MR. FLEMING:  What they're saying is that Blaze

15   used to be -- it was on a perpetual basis.  I think what

16   they're saying is today they do an application on a year by

17   year basis, the term.

18          MS. KLIEBENSTEIN:  The trend in software licensing

19   has been not perpetual but to ratchet it back to one, three,

20   five year terms.

21          THE COURT:  And not enterprise-wide?

22          MS. KLIEBENSTEIN:  Well, enterprise versus

23   application is a different beast compared to term.

24          THE COURT:  Yeah, right.

25          MS. KLIEBENSTEIN:  So they will do ELAs and

1     they'll do application based, but the terms half shifted

2     over the years, and Mr. Wade gave testimony on that.

3             Another distinction that needs to be taken into

4     consideration if we're compiling a list of FICO customers,

5     many of them are on cloud-based systems now, which is a

6     fundamentally different product way of pricing than Blaze

7     Advisor on premise.  So when we're talking apples to apples,

8     that's like a horse compared to an apple.  So pulling that

9     information and producing it has absolutely no bearing in

10    this case for other products and/or for cloud-based

11    licenses.

12            THE COURT:  Okay.  E-mails, spreadsheets, support

13    logs regarding customers that have gone through mergers,

14    acquisitions or other changes in control or changes in

15    control, I should say.  Have you produced such documents?

16            MS. KLIEBENSTEIN:  Not at this time, Your Honor.

17    We have made an offer to compromise.  On number 6, when you

18    compare that to request for production 16 through 18, 32,

19    33, and 38, it's not responsive.  Number 6 is responsive to

20    potentially responsive to different discovery requests that

21    we have objected to for different reasons.  I can go into

22    that now or we can wait on that issue.

23            THE COURT:  Why don't you go into now.  I guess

24    the first question is -- let me look back at this.  Okay.

25    Well, go ahead and get into it now.  Tell me why that's not

1      responsive or relevant or both.

2            MS. KLIEBENSTEIN:  If you move back into the

3      chart, well, let me close up the loop on 16 through 18, 32,

4      33, and 38, those all seek pricing, licensing, discount

5      financial information.  Information about licensees who

6      underwent mergers, acquisitions, changes and control,

7      different subject.

8            So to the extent they're being put under this

9      financial topic, that's not the right place to go.  I think

10     possibly these types of documents could relate to Request

11     For Production 46, Interrogatory 20, if you're moving back

12     into your chart on page 8.  Now, we have objected to that

13     discovery, but we've also provided answers to interrogatory

14     number 20.

15           We believe that information regarding other

16     licensees that underwent mergers or acquisitions and then

17     renegotiated their deal with FICO, that isn't relevant to

18     provide interpretative gloss as Federal's brief mentions

19     presentence to section 10.8 of the contract.

20           10.08 of the agreement, if you recall, is the

21     section on what happens if there's a merger or an

22     acquisition or change in control.  Now, in order to

23     interpret 10.8, we would have to determine that it's

24     ambiguous and that parole evidence will be useful.  Parole

25     evidence needs to be contemporaneous to the time and the

49

1    subject matter, the contract that's been entered.

2         So to the extent these additional discussions with

3    licensees who underwent mergers, acquisitions, changes of

4    control, to the extent those discussions were ever had or a

5    new deal was ever done, that has no bearing on 10.8.  That's

6    a separate deal.  So for those reasons, we don't think any

7    of those situations are relevant in this case.  However --

8         THE COURT:  Okay, go ahead.

9         MS. KLIEBENSTEIN:  We've compromised on that.  So

10   in preparation for -- well, we responded to interrogatory

11   number 20, which asks for such a list of licensees that

12   underwent mergers, acquisitions, changes of control.  We

13   have answered that.  We are also in the process of pulling

14   documents relating to our negotiations with that subset of

15   companies.

16        Now, the discovery though and Federal asks for

17   discussions with licensees where anything was renegotiated

18   for any reason beyond situations that involve Blaze Advisor,

19   or beyond situations that involve mergers, acquisitions,

20   changes of control.  That other group of situations can not

21   possibly be relevant to prove any case in this case.  So

22   we've agreed to go dig into the files for ten additional

23   licensees who underwent change of control, merger,

24   acquisition, and we renegotiated our deal with them.  Now,

25   federal's brief mentions 20-some --

1          THE COURT:  Hang on a second, is it just

2     renegotiated their deal with them?  Or is it or we sued

3     them?

4          MS. KLIEBENSTEIN:  Yes, Your Honor.  All of that.

5     I don't believe we actually had to litigate any of them or

6     we terminated, right.  Or they came to us and said there's a

7     merger acquisition, what do you think about this?  And we

8     said we're done with you.  We're not dealing with this.

9     That one is included in there too.

10          THE COURT:  Okay.

11          MS. KLIEBENSTEIN:  Now, the additional licensees

12     that Federal wants investigated, wants us to pull documents

13     for have no bearing.  So three of them, and I'll go through

14     these right now for the Court, three of them don't involve

15     Blaze Advisor at all, Unitran, Bank of Paris, Bank of

16     America.

17          Six of them involve a reseller short paying FICO,

18     so some Blaze Advisor software is sold not directly from

19     FICO to client but through a reseller that works with

20     software.  So we've had a number of situations where we

21     found out that these resellers haven't been paying the

22     royalties that they're supposed to.  So there's six of

23     those, Software AG, VNU Capital, Nests, two M docs disputes,

24     and First Data Corp.

25          THE COURT:  Okay.

1              MS. KLIEBENSTEIN:  And mind you, we have produced

2      some documents on all of these already, that's how they've

3      come to the attention of Federal.  And what I'm telling you

4      now that some don't involve Blaze Advisor and some involve

5      reseller agreements, you can tell this from the face of the

6      document that was cited in Federal's brief itself.  So this

7      information is readily available.

8              Another four --

9              THE COURT:  One other thing.

10             MS. KLIEBENSTEIN:  Yes.

11             THE COURT:  Have you limited your production so

12     that it does not include any of the following either e-mails

13     or spreadsheets or support logs?  Or are those forms of

14     documents all produced?

15             MS. KLIEBENSTEIN:  To the extent they're located

16     with a reasonable search, yes, Your Honor.

17             THE COURT:  Okay.

18             MS. KLIEBENSTEIN:  Now, the support log I'll just

19     diverge on that one for a little bit, because I don't think

20     there's an understanding about what a support log case is.

21     So a support log is I mean it's every time somebody calls

22     into FICO and says I've got a problem with my software

23     product, it's logged.  It's logged in their system, and they

24     can print reports out of that called a support log that show

25     whose been calling in.

1          Now, with the Dell dispute, I'm not sure what that

2   -- if that support log still exists or what it would say,

3   but that's what it would be about, someone is calling in

4   from Dell and asking for help with the software, and that

5   triggers somebody to go that's a strange request.  So that's

6   what a support log is.  I'm not sure why a support log would

7   be relevant to provide interpretive gloss on Section 10.8.

8   But if it comes up --

9          THE COURT:  It depends, you know, we don't know.

10         MS. KLIEBENSTEIN:  A support log is going to be a

11  technical request.  My glitch in Blaze Advisor isn't working

12  for XYZ reason.  It's not going to show anything about a

13  merger acquisition, change of control, scope of use, et

14  cetera.  But to the extent a control log is found in the

15  searching that we're doing, we will certainly produce it.

16  We will not withhold it.

17         Another group of licensees identified by Federal

18  involve assignments that don't involve a merger acquisition

19  or change of control, and those include Verizon,

20  Discover/DFS, Catamaran and Wells Fargo.  Two of the

21  licensees mentioned by Federal have been terminated for

22  unrelated reasons before a merger or acquisition or change

23  of control was reported up to FICO, and that was National

24  Bureau of Credit Histories and Xerox.

25         And, finally, one situation involved two entities

1     both having full end user license agreements that were

2     perpetual merging together, so there was nothing to

3     renegotiate.  So those are the subset that we are standing

4     our ground, and we're not searching for.

5            THE COURT:  Give me that third subset again.  Not

6     the identity but what is that category?

7            MS. KLIEBENSTEIN:  Of the two ELAs merging?

8            THE COURT:  No, the one before that.  So we've got

9     the ones that don't involve Blaze.  We've got the ones that

10    are resellers.  We've got the two that merge, and they both

11    already have end user perpetual licenses.  What's that other

12    category?

13           MS. KLIEBENSTEIN:  Instances where the FICO

14    license had already been terminated, so there was no

15    renegotiation of anything because FICO got wind of the

16    merger acquisition, and it didn't matter because the license

17    arrangements were already terminated, and that can be read

18    in Exhibits 39 and 13 of Federal's moving papers.

19           THE COURT:  Okay.  Support log cases regarding the

20    dispute with Dell after its merger.  Where are we on that?

21           MS. KLIEBENSTEIN:  Say that again.

22           THE COURT:  Support log cases regarding FICO's

23    dispute with Dell after its merger.

24           MS. KLIEBENSTEIN:  The support log cases, I

25    dispute the relevance, but if they're located --

1          THE COURT:  That's the same issue in other words.

2          MS. KLIEBENSTEIN:  Yes, Your Honor.

3          THE COURT:  The support log is the technical word.

4          MS. KLIEBENSTEIN:  Yes, Your Honor.  And I expect

5     to be in a position to produce those documents this Friday,

6     if not earlier.

7          THE COURT:  Okay.  All right.  One last question,

8     going back to salesforce.com, this CRM database, if you

9     will.  Isn't it possible that salespeople would use that

10    database and enter notes about client wants this pricing,

11    here's what I think we should do.  As you know, the

12    guideline says this, but we're going to do that.  Those

13    kinds of things that conceivably are relevant.

14         MS. KLIEBENSTEIN:  Possibly.  I don't know one way

15    or the other, but I would challenge your position on

16    relevancy.  So what are we trying to do here, right, what

17    does Federal need?  Their damages expert wants to know how

18    we price, and what various prices have been.

19         THE COURT:  Well, their damages expert wants

20    ultimately to get up and say they price however they damn

21    well please on an ad hoc basis, and so they're saying the

22    damages are a gazillion dollars, but in fact it would be

23    perfectly within their -- the way they behave if the damages

24    weren't a gazillion dollars, they could only be a hundred

25    thousand.  That's what I think they're saying.  And as to

1    that, I don't know, I think they might be right.

2              MS. KLIEBENSTEIN:  On that argument -- well, let's

3    back up a step.  FICO is in the software selling business.

4    If we're to go down the road that FICO has to produce all

5    communications, documents that might bear on pricing, the

6    number of custodians and the number of responsive documents

7    to that request would be astronomical.

8              They're in the business of software pricing.  We

9    have produced the guidelines that everyone uses to price.  I

10   don't know if we go down this road where does it end?  How

11   far do we have to go?  What's reasonable for a damages

12   expert to be able to make the point that you illustrate that

13   he might already have the evidence.

14             I just don't understand what additional evidence

15   beyond the testimony of Bill Wade explaining how the pricing

16   works is needed in balance and compared to the significant

17   burden on FICO to go find thousands and thousands and

18   thousands of e-mails that say, okay, let's move the discount

19   from 11 to 12.  That's my position on the issue.

20             THE COURT:  Well, that makes sense to me.  So

21   maybe it's better directed back to Mr. Fleming about where

22   if there is a line to be drawn, that is reasonable and

23   proportional that somehow gets at the issue that FICO prices

24   however they feel like pricing on any given day, where that

25   line would be drawn.  Because you're not going to tell me,

1    hey, I think the line could be drawn here as opposed to

2    there, right?

3         MS. KLIEBENSTEIN:  Well, you know, that's a good

4    point.  I think we've reached the line of reasonableness.

5    We produced all of the license agreements.  They know what

6    prices were charged to all of our other customers.  We've

7    produced the pricing documents that show how we price, and

8    they have a significant amount of testimony on that.  In my

9    mind, that's where the line is drawn.  I don't know how

10   20,000, 50,000 other e-mails moving a discount from 11 to

11   12 percent or changing --

12        Well, anyway, you can see that in the license

13   agreements and the pricing information that's in there, the

14   end result.  I don't understand what the relevancy would be

15   of the discussions and the chatter between the salespeople

16   leading up to making that deal when you've already got the

17   results of the deal.

18        THE COURT:  Okay.  Anything else,

19   Ms. Kliebenstein, on what I've said were 16 through 38?

20        MS. KLIEBENSTEIN:  No, Your Honor.

21        THE COURT:  Mr. Fleming, do you want to come back

22   up on that last point?  I just want to know, I mean she

23   makes a good point that discussions over price given that

24   they're are a software selling entity, I thought they were a

25   credit score entity, but what do I know that.  But given

1      that, how would you draw some reasonable bounds around it?

2              MR. FLEMING:  Right.  Well, Your Honor, we find

3      ourselves in a position where, just as an example, when

4      we're looking for documents relating to circumstances where

5      they've alleged breach and what happened after that relating

6      to a change in control agreement, they produce one document

7      from Oracle, which is a settlement agreement.  We serve a 30

8      party subpoena to Oracle asking for documents relating to

9      that.  We get a pile like this.

10             THE COURT:  What were those documents?

11             MR. FLEMING:  They were communications going back

12     and forth from Mr. Wade and Mr. Carretta and others saying

13     you've merged.  You're in breach of the agreement, pay us

14     two to six million dollars under these various policies.

15     Their responses going back and forth, and the negotiations,

16     very similar to this case, and very helpful.

17             THE COURT:  But I at least, maybe I'm wrong, but I

18     thought I heard Ms. Kliebenstein not strenuously object to

19     the notion of communications between FICO and a Blaze

20     Advisor licensee over what happens now that there's a change

21     in control that that's going to get produced.  Did I mishear

22     you?

23             MS. KLIEBENSTEIN:  No, Your Honor.  At the time of

24     the Wade depositions, we were still trying to work this out,

25     and we were standing on our objections.

1          THE COURT:  Okay.  But, so what I was getting at

2     is this notion that the sales force are putting notes into

3     salesforce.com that might be relevant and discoverable.  I

4     think that's true.  But in an ideal world, that whole

5     database, you know, you could search it and maybe there's a

6     few things that are relevant, but that's really not what

7     we're engaged in.  So if there's a principle way of reducing

8     that burden that is a compromise, I'm open to hearing it,

9     but otherwise I don't think that ordering them to search the

10    entire salesforce.com database is useful.

11          MR. FLEMING:  What we have right now are very

12    limited information about how pricing is made and then we

13    have the actual prices.  We have next to nothing about how

14    they're actually calculated in any particular case.  I mean

15    just as an example, e-mails that reference the 2003 pricing

16    guidelines.  That might be helpful, and it's a way to limit,

17    you know, the scope of these things, and it's more likely to

18    result in information about the calculation of particular

19    software license agreements.

20          THE COURT:  So what you're saying you lack, if I'm

21    hearing this, is you have the license agreements.  You know

22    what the license looks like.  It's perpetual.  It's

23    enterprise wide, whatever, and you know what the price is,

24    but you don't know what the components that are imbedded in

25    that price or how that price was calculated?

1          MR. FLEMING:  How that price was calculated?  Was

2     it based on the size of the company, the gross written

3     premiums?  Was it presumed usage or what?  If we had

4     communications between the parties related to that, that

5     would provide guidance as such.  We would know then how they

6     calculated the software license.

7          We don't know how the software license in this

8     agreement, how the price was calculated, but when you look

9     at other communications between the parties, just like with

10     regard to the Oracle negotiations, you get the back and

11     forth, and you understand actually how the number was

12     arrived at.

13          I mean there's talk about this bespoke doctrine or

14     common lower, or the subjective way of determining it.  I

15     mean if there are any e-mails that talk about the

16     calculation of the pricing under these circumstances, that

17     would be helpful.  We don't have anything like that.  I mean

18     you're right on the one hand, it's helpful if it's a

19     completely subjective case-by-case, they just know based on

20     experience, which they've actually said.  But if there are

21     any documents that address that beyond picking out of thin

22     air that would be helpful, and it's directly relevant.  I

23     mean it's a communications about pricing, which we are

24     missing right now.  We don't have that.  We just have the

25     price itself.  No way of determining how those numbers were

1     arrived at.

2              THE COURT:  Okay.  All right.  Let's move on to

3     RFP 46.

4              MS. KLIEBENSTEIN:  Your Honor, before we move on

5     -- before we move on, I have some documents that I'd like to

6     show you that can illustrate exactly what we've produced and

7     exactly what's known in this case on pricing.

8              So the first contention is that Federal doesn't

9     know how we priced it's 2006 license.  Here's the table that

10    goes through it, and this was the price quote given to

11    Federal.  So up here it discusses how, what the license

12    looks like.  Here's the discount, here's the maintenance,

13    training fees, et cetera.  They know how we priced in 2006.

14             THE COURT:  Yes, I think, at least as I hear

15    Mr. Fleming, he is saying something different, which is,

16    yeah, I can see -- is that showing up on yours?  Can you put

17    that back on for a second?  Are you seeing, tell me if you

18    see I just put a new arrow in here, do you see that?

19             MS. KLIEBENSTEIN:  Yes.

20             THE COURT:  Okay.  There it says, "volume discount

21    of 32 or 30 percent."  I can't read it very well.  I think

22    what Mr. Fleming is saying is, yeah, we see that that's the

23    volume discount you gave.  We have no clue why that's the

24    discount.  Where do you come up with that percentage as

25    opposed to 35 percent?  Is that just a number?

 1           MS. KLIEBENSTEIN:  The discounting is in part a

 2     judgment, but it's also in discount schedules.  This is the

 3     pricing matrix.  There they are, 27 pages of that kind of

 4     information.  We're not just making it up.

 5           Now this pricing matrix that I talk about, I would

 6     like to show that to you as well.  It's native in Excel, so

 7     it looks a little bit odd when you print it out, but it's

 8     attached as Exhibit 1 to our response briefs.  So here's the

 9     first page.  It gives all the various definitions for the

10     terms that you see on the pricing.

11           The second page is matrix.  So where do you fit?

12     Are you small, medium, large, very large?  And then so I'm

13     not an expert on this, so I'll do my best.  In this you're

14     seeing, this is the sizing matrix.  Once you determine the

15     size of a usage, then you go the price list to figure out

16     the price, right.

17           So this is our sizing matrix.  Peek number of

18     rules, so if you have 2,000 rules that you are running

19     through it, transactions per day, you are a small.  A medium

20     is 35,000.  Large is 600,000.  Very large is five million.

21     So this is the matrix that FICO uses when it gets a new

22     customer saying all right here's how we want to use Blaze

23     Advisor.  Here's the applications that we want to use it in

24     and how many rules we're going to run through it.

25           FICO pulls up this chart as a starting point and

1    figures out are you small, medium or large?  And then they

2    go back to the pricing to try to figure out where the

3    starting point is going to be for the price, and discounts

4    are applied after that.  It's not rocket science.  It's not

5    the case that there are absolutely no documents to figure

6    out how a license was priced.

7              On the Oracle issue, Federal has issued three

8    subpoenas.  One was to Dell.  I can't remember all of them.

9    For two of the other subpoenas, the responsive documents

10   were exactly identical to what we already produced in this

11   case.  Dell was an outlier.  We have stood and still are

12   standing on our objections that communications back and

13   forth between these licensees underwent mergers and

14   acquisitions is not relevant.  We're conceding on that

15   simply to resolve this dispute, and we'll be digging into

16   Oracle, but that outlier -- and there's no evidence that any

17   of those e-mails have any bearing on pricing as well.  So

18   those are my concerns.

19             THE COURT:  Okay.  All right.  Mr. Fleming, let's

20   go to 46.  Hang on, let me see how many more we have to do

21   here.  46, isn't this already --

22             MR. FLEMING:  I think we've been talking about

23   this.

24             THE COURT:  We've covered this, have we not?

25             MR. FLEMING:  I believe so.

1              THE COURT:  Number -- okay.  I think we talked

2      about 20 as well.  Interrogatory 20, do you see it

3      otherwise?

4              MR. FLEMING:  No, I believe we talked about that

5      as well.  Same issue.

6              THE COURT:  Okay.  30(b)(6) of William Wade.

7      Where are we on this?  What's the thing that you need or

8      what am I missing?

9              MR. FLEMING:  Well, there there's two items.  One

10     was just with regard to inquiries relating to the damage

11     analysis.  There were 25 instructions not to answer.  I

12     think this was the only time on it during all of the

13     depositions at least that certainly that I attended and that

14     I can recall that any instruction was given not to answer on

15     the grounds other than privilege, and this came after your

16     Court Order, which I thought was pretty straightforward.

17             THE COURT:  So are you asking -- what is it you

18     want?

19             MR. FLEMING:  I want to be able to ask Mr. Wade

20     those questions and get answers from him.  And the other

21     issue was I would also like time to inquire into these

22     documents relating to the change in control because I mean

23     the night before the deposition in a hotel room, you get an

24     amended interrogatory responses without even the Bates stamp

25     numbers identifying the companies that were at issue.  In

1    the past when they identified companies that were the

2    subject of that question, they gave the Bates stamps

3    numbers.

4         So we're running around, you know, late at night

5    or the next day all of these various documents, and we do as

6    well as we can under those circumstances to inquire about

7    it, but sometimes if you have a day in between the time that

8    the documents are produced and the deposition, you're able

9    to organize better and ask questions more coherently.  And

10   we also got the Oracle documents at the same time that

11   night, that day before, so I just want more time just in

12   fairness to ask the question.

13        I mean I went through the 25 questions that were

14   asked, I thought they were straightforward and should have

15   been answered with respect to the issue of damages, and the

16   facts supporting his analysis.

17        THE COURT:  And the instructions were grounded

18   primarily on exceeds the scope?

19        MR. FLEMING:  Yes.

20        THE COURT:  Okay.  And if I were to give you more

21   time because of the documents, how much time would you

22   envision?

23        MR. FLEMING:  Half a day.

24        THE COURT:  Okay.  Thank you.  Ms. Kliebenstein?

25        MS. KLIEBENSTEIN:  All right.  On the Wade issue,

1    we need to pay close attention to what the questions were

2    because the issue is not just scope.  It's work product as

3    well.  And so to back up, Mr. Wade has been deposed twice in

4    this case, once in January, once in April.  His personal

5    deposition was in January.  He was identified for April on

6    four topics, topic 9, 17, 18 and 23.  Topic 9 was limited by

7    the Court.  Federal may discover any underlying facts on

8    which a damages analysis could be constructed and any

9    damages calculations or estimates that FICO performed as

10   part of its business operations as distinct from analyses

11   with counsel.

12           Topics 17 and 18 were limited by the parties.  On

13   topics 17 and 18, it was only supposed to be questions on

14   the global price list that we were going through.  There's

15   no contention that Mr. Wade hasn't testified fully about the

16   global price list in topic 17 and 18.  Instead it focuses on

17   my instructions for Mr. Wade not to answer.

18           Now, those instructions fell into two buckets.

19   Bucket number one were questions that I deemed to be beyond

20   9, 17 and 18 as limited by the Court and between the parties

21   or that fell under work product.

22           The second bucket were questions that were totally

23   beyond 9, 17, 18 and 23.  The second bucket of questions is

24   pretty easy to dismiss of.  They were questions about audits

25   and contract interpretation.  He had already been deposed in

1    his individual capacity once.  They needed good cause to ask

2    him questions outside of those 30(b)(6) topics.  You can

3    find those questions repeated in our brief at pages 18.

4          Now, the pages, the questions that fell under 9,

5    17, and 18 start on page 15 of our brief, so the Court can

6    read them itself.  These questions, I deemed them to be

7    either falling outside of the Court's Order or work product

8    because they were why based questions.  Right.  They weren't

9    how based questions or what, but they were why.  And most of

10   the questions focused on a declaration that Mr. Wade

11   submitted in February of 2018, where he was explaining for

12   the Court on a previous motion to compel how pricing was

13   done at FICO.

14         And in connection with this, he submitted a chart

15   that outlined what the costs would be to Federal for an

16   annual perpetual license for all of the applications based

17   on the standard pricing that FICO does.  Now the questions

18   ran into trouble when Mr. Wade was asked why didn't you use

19   perpetual license rather than an annual license?  So, again,

20   that's a why question going into the damages strategy,

21   right?  That's work product.  That's outside the scope of

22   the Court's Order.

23         THE COURT:  Why did you use it in -- because this

24   has got both annual and perpetual, so what's the why

25   question refer to?  Why are you asserting that the damages

1     should be based on perpetual?

2               MS. KLIEBENSTEIN:  Based on annual.  Well, sorry,

3     I've confused this issue:

4               So an annual license is based on a percentage of a

5     perpetual license fee, and so that's why this data is in

6     here.  And in the paragraph previously, Mr. Wade explained

7     that his task in this declaration was to determine the

8     standard annual application based fee for the Chubb

9     applications.  And he was asked why did he do that instead

10    of just calculate a perpetual license and have that be the

11    damages base.  That's a why question.  It's not a how.  He

12    wasn't asked how did you determine the annual application

13    basis?  That would be something that he could have then

14    explained using the pricing list, here's how we go about it.

15              The questions that you see on page 15 through 17

16    of our brief are why questions about damages and lost

17    licensing fees.  That is either intertwined completely with

18    work product and our damages strategy, which Federal is free

19    to ask our damages expert about in a few weeks or falls

20    outside the scope of the Court's Order.  And so that was the

21    basis of the objections for those why questions.  And I

22    think it's apparent on the face of the questions when you

23    take a look at them.

24              Now, counsel later in the deposition after I

25    objected a number of times then would say, well, what's your

1    factual basis for using the annual instead of the perpetual,

2    but that's still getting at the why.  Those facts, to the

3    extent they are facts, are intertwined with and can't be

4    separated from work product.  Essentially, the information

5    that Federal wants is why is FICO pursuing the damages

6    strategy that it is?  And that is either expert testimony or

7    work product.

8         There are additional assertions as to why Mr. Wade

9    should be re-deposed.  For example, topic 23, counsel has

10   suggested that they did not get sufficient testimony on

11   topic 23, and I believe that they did.  Topic 23 is a very

12   broad topic.  All other instances in which FICO has

13   renegotiated or terminated a software license due to a

14   merger acquisition or other similar event affecting the

15   licensee, the facts surrounding such renegotiation and/or

16   termination and the change in license fee and structure.

17   Mr. Wade was able to answer nearly all questions about the

18   list of entities that FICO has renegotiated or terminated a

19   software license.

20        The day before we did amend our response to

21   interrogatory number 20.  It was not nefarious.  In

22   deposition preparation, you do learn additional instances,

23   additional examples through that preparation time, so we

24   added six different companies.  Half of them Federal had

25   already mentioned to us they thought should be on the list.

1    So we're not talking about a substantial amount of entities.

2            And, again, when you look at topic 23, it's very

3    basic.  Who are they and what are the facts surrounding it?

4    Well, we gave them our amended interrogatory number 20,

5    here's who they are, ask him questions about it.  He's ready

6    to talk about the facts surrounding it and the change in

7    license fee and the termination.  He did that.  He should

8    not have to sit for an additional deposition.

9            The third contention is the Oracle documents.

10   They serve those subpoenas weeks if not months before the

11   Wade deposition.  It's not on us that they didn't show up to

12   Federal's door step until the Friday before Mr. Wade's

13   deposition.  We never even got a copy of it.  I saw them for

14   the first time in his deposition.  If we would have gotten a

15   copy of them ahead of time, we would have certainly prepared

16   Mr. Wade on those.

17           So I think an additional deposition is

18   unwarranted.  Certainly the sanction of exclusion of his

19   testimony, he's testified for 11, 12, and 13 hours on

20   pricing, and this very declaration that we just went

21   through, that's an extreme remedy that has no basis.

22           THE COURT:  Okay.  Let's talk about Mr. Carretta's

23   deposition.

24           MR. FLEMING:  Your Honor, if I can just very

25   briefly follow-up on Wade.

1          THE COURT:  Sure.

2          MR. FLEMING:  Rather than characterizing by

3    category if you just go through and look at the questions

4    such as, "So if you're determining the loss licensed fees

5    based on an enterprise license agreement, would you use the

6    global price lift as a guideline for doing that?  Objection,

7    beyond the scope."

8          THE COURT:  Say that again.

9          MR. FLEMING:  The question on page 74, "So if

10   you're determining the lost license fees based on an

11   enterprise license agreement, would you use the global price

12   list as a guideline for doing that?  Direct him not to

13   answer."

14          "Question:  What's the factual basis for not

15   including a 60 percent discount in your analysis of the lost

16   license fees contained in your declaration?  Direct you not

17   to answer."

18          He talks on page 185 about we're going through one

19   of these agreements, and I ask him, "With regard to a

20   settlement, how are those on a going forward basis?  How are

21   the fees increased?  Objection, outside of the scope."

22          I mean they're pretty straightforward questions.

23   And I think that we go through those, you will see that

24   they're perfectly within the scope, and how else can I ask

25   about a damage analysis?

1            THE COURT:  You both need to remind me what that

2       damage analysis was truly for?

3            MR. FLEMING:  It was in a interrogatory responses

4       in response to the question as to what damages you've

5       suffered with regard to the lost license fees, not

6       disgorgement.  And it was also in a declaration they

7       submitted to the Court in connection with their motion to

8       compel back in -- in which you issued an order back in

9       February a year or so ago.

10           THE COURT:  Okay.

11           MR. FLEMING:  Okay, with regard to Mr. Carretta,

12      he was a designated witness to testify regarding deposition

13      topics number 4 and 22, which relates to FICO's knowledge

14      with respect to the use of Blaze Advisor software by

15      Federal, and the factual basis for all alleged unlicensed

16      uses of Blaze Advisor that FICO asserts for on the basis or

17      support its claims.

18           By and large, Carretta was unable to and refused

19      to basic questions regarding the basis for FICO's claim and

20      FICO's knowledge.  He could not recall whether certain

21      categories of uses form the basis for claims and then later

22      continued to refuse to answer reasonable questions about the

23      factual basis for its claims.  He basically just referred to

24      the Complaint and would go in no further detail.  So we ask

25      that that deposition be reopened and that he be directed to

1    answer questions relating to those two topics.

2            THE COURT:  Isn't this -- just bear with me for a

3    second.  Topic four, I'm assuming that goes to the defense

4    of acquiescence, right?

5            MR. FLEMING:  Yes.

6            THE COURT:  What did you know and when did you

7    know it?  Topic 22, factual basis for all alleged unlicensed

8    uses, are you asking by that in essence, what is your basis

9    for saying they were unlicensed uses?  Is that what you are

10   asking in essence?

11           MR. FLEMING:  Yes, it is.

12           THE COURT:  And why -- all right.  Let me hear

13   from Ms. Kliebenstein.

14           MS. KLIEBENSTEIN:  These topics are very broad.

15   The Carretta deposition went four-plus hours.  It's

16   absolutely not true that he refused to answer questions and

17   couldn't answer questions.  It's 50 some pages long, the

18   transcript.  I don't want Your Honor to have to read that to

19   understand that point.

20           When you look at topics 4 and 22, they are very

21   broad and a bit legal in nature, right.  You know, our best

22   witness would probably be either Mr. Hinderaker or myself

23   because there's a lot to unpack in those topics.  When a

24   party is crafting a 30(b)(6) topic, a party must be

25   sufficiently detailed in that notice so that the adverse

1      party can prepare their witness adequately.

2             In turn the responding party must make a

3      reasonable effort to pick the right witness and prepare them

4      to testify on behalf of the corporate knowledge, the

5      corporate knowledge.  That's an important distinction to

6      make in this situation.  There are legal conclusions and

7      work product issues that are wrapped up into topics 4 and

8      22.

9             Now, the main contention of Federal in its brief

10     is that Mr. Carretta was unable to answer basic questions.

11     That in and of itself, first of all, that's not true, but

12     the inability to answer some questions in a deposition is

13     not a basis under the case law to reopen that deposition.  A

14     moving party must establish that the witness was absolutely

15     not prepared on a topic.  While Mr. Carretta, there were a

16     few instances where he could not answer a few questions,

17     that's not a basis to reopen.

18             The second contention that I understood from

19     Federal's brief is that Mr. Carretta was not prepared

20     because in preparation for the deposition, he admitted that

21     he did not review Federal's Attorneys Eyes Only documents in

22     the case, and there's case law out there that says if you

23     ask a 30(b)(6) topic that asks for a corporate witness on

24     the other side that they need to review your own AEO

25     information, that's not corporate knowledge.  They don't

1    need to do that in order to respond properly to that topic.

2           I think what the next contention is is that

3    Mr. Carretta -- Mr. Carretta, throughout the deposition, I

4    sense frustration that he would not say these are all our

5    claims.  There are no more, done, done, done.  Mr. Carretta,

6    in his deposition, testified about the unlicensed uses that

7    are discussed in breadth in our complaints, the territorial

8    issues, using Canada, Australia, the United Kingdom.

9           He testified about the corporate knowledge

10   relating to the use that Federal, that FICO knows about in

11   response to 4 and 22 in those jurisdictions.  He also

12   testified about 10.8, what is FICO's position with regard to

13   the breach of 10.8?  And what use exceeded 10.8?  He

14   provided sufficient testimony, adequate testimony, testimony

15   at length, testimony that Federal has already had in other

16   depositions.

17          When I look at the situation, I'm not sure what

18   they want.  What do they need for their case that they're

19   not getting out of the Carretta deposition?  I think they

20   want some sort of promise from us that our claims are within

21   the four corners.  That's already in our Complaint and our

22   two Amended Complaints.  I'm not sure where else we're

23   supposed to go with the Carretta deposition.  So I have

24   concerns that if his deposition is reopened, what is the use

25   of that and what is the purpose?

1          He was prepared, adequately prepared.  He

2    testified about the corporate knowledge as of the time that

3    the Complaints were filed.  That's his duty under 30(b)(6).

4    He's fulfilled it.  So I don't think additional deposition

5    is necessary nor is it going to get anything useful in this

6    case.

7          THE COURT:  Okay.  Thank you.  Mr. Fleming, on the

8    privilege log issue, we have to take a break.  My court

9    reporter is dying.

10          MR. FLEMING:  We'll be very short, but we'll wait.

11          THE COURT:  Okay, well, I have one question for

12    you on the privilege log issue, and that is this.  The

13    description as I've seen it that is objectionable or that

14    you raise an objection to is the description that

15    essentially says e-mail to so-and-so requesting legal

16    advice, right?

17          MR. FLEMING:  Yes.

18          THE COURT:  In essence, that's what it is.  Did

19    Federal use similar descriptions?

20          MS. KLIEBENSTEIN:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MS. KLIEBENSTEIN:  And the description is legal

23    advice re Chubb.

24          THE COURT:  All right.  Let's take a break.  I

25    will give you whatever time you need when we come back,

1   Mr. Fleming, but I want to tell you what I'm going to do,

2   but I also have to find out if we have a court reporter here

3   then.  Okay.  So we'll take a break until 25 minutes to

4   five.  Okay.

5                    (Short recess at 4:22 p.m.)

6                    (In open court at 4:38 p.m.)

7          THE COURT:  All right.  We're back on the record

8   in FICO versus Federal Insurance, 16-CV-1054.

9          Mr. Fleming, before the break, you had something

10  you wanted to say so go right ahead.

11         MR. FLEMING:  Yes, Your Honor.  With regard to the

12  privilege log issue, we're not asking that the parties all

13  go through the enormous log of each description.  And if I

14  were to do something like that, I think the, you know,

15  what's sauce for the goose comment is fair enough.

16         But instead here we're talking about three

17  particular entries, and it's important because one of the

18  key issues in this case is use of Blaze outside of the

19  United States and whether FICO waived and acquiesced in it.

20  And there is a senior account executive who was sending

21  e-mails in November of 2008 saying that he believed that use

22  outside of the United States is available under the FICO

23  contract.

24         Carretta, their counsel, Mr. Carretta says, well,

25  it doesn't matter what any of these senior account

1    executives or any of the underlings.  That's not FICO taking

2    that position.  These three e-mails are from November 2008,

3    the exact time period when these FICO employees are sending

4    out these e-mails interpreting the contract in that way.

5    There appears to have been communications with Mr. Carretta

6    about that particular issue at that time.  And then after

7    that conversation, those senior account executives continued

8    to say, yeah, it's our understanding that Chubb has a

9    license that allows for use of Blaze outside of the United

10   States.        So these three logs are really critical to

11   Mr. Carretta's credibility.  And they are, you know, we're

12   not going into when people are creating these long logs if

13   neither side cares in allowing and agreeing to the good

14   faith of each side.  That's not at issue.  We're asking

15   about these three particular logs during a particular time

16   period, and they are too cursory under the rules, which the

17   laser focus on these and nothing further.  We're just saying

18   give us the subject matter.  Give us the re lane.

19            THE COURT:  Remind me of the numbers of the three

20   entries.

21            MR. FLEMING:  656, 662, 665.

22            THE COURT:  Okay.  I did have a question for you

23   going back a ways.  Earlier in the discussion about the

24   support logs, the description by Ms. Kliebenstein has the

25   sort of the ring of truth to it to me that this is technical

1    support and not likely to contain much, if any, information

2    about the licensing fees, et cetera, but I wanted to give

3    you a chance to respond to that.

4            MR. FLEMING:  I appreciate that, Your Honor.

5    Those words are Bill Wade's words as he's describing these

6    particular category of documents that relate to pricing.

7    Those are the terms he used, and I didn't inquire what

8    specifically he meant by that phrase, but that is the phrase

9    that he used in identifying these eight documents that

10   relate -- well, one or two of those document relating to

11   pricing.  So that's why we incorporated them in our

12   description.

13           THE COURT:  Okay.  Fair enough.  Anything else?

14           MR. FLEMING:  Nothing, Your Honor.

15           MS. KLIEBENSTEIN:  This privilege log issue is

16   a -- it's a dangerous one.  So when we look at the privilege

17   log itself, let's first answer the question of are the

18   descriptions sufficient?  The contention is the description

19   is not enough to evaluate privilege.  The descriptions are

20   this:  E-mail reflecting confidential communications with

21   counsel for the purpose of obtaining legal advice Re Chubb.

22   I haven't heard anything that suggests why that's not

23   sufficient to determine that the communications are

24   privileged.

25           THE COURT:  Well, I have a view on that.  It

1      doesn't agree with yours.  I don't think it's sufficient

2      because it's essentially saying the documents are privileged

3      because they're privileged.  Most times that description is

4      sufficient because you know that, you know, it's an e-mail

5      between Mr. Hinderaker and a business guy at FICO is like,

6      yeah, okay, I get that.  But having said that, they did the

7      same thing.

8              MS. KLIEBENSTEIN:  Exactly.  And to illustrate

9      that point further, draft legal agreement prepared by legal

10     counsel.  Those are some of the description entries of the

11     Federal privilege log, so if we're going to go down that

12     road, we both got to go down that road.

13             THE COURT:  Well, we're not going to go down that,

14     trust me.

15             MS. KLIEBENSTEIN:  What concerns me about this

16     issue is Federal says supplementing these descriptions is

17     important.  Important to what?  Important to determining

18     what the privilege communication is so they can then present

19     that at trial and put us in a precarious position of either

20     maintaining our privilege or producing communications to

21     prove that their contention is totally wrong.

22              I think that use in a privilege log, first of all,

23     privilege log is in evidence.  You can't use that at trial,

24     and the road that we're going down with supplementation is

25     probably for the ability to challenge the privilege and try

1    to get our communications out in the open.  Tom Carretta is

2    a lawyer.  Those are privilege communications and that is

3    completely contrary to the rules.

4              THE COURT:  He's in-house counsel.

5              MS. KLIEBENSTEIN:  That's right.  That's right.

6    He is a lawyer.

7              THE COURT:  Yeah, but there's, you know, there's

8    also the line of authority that says in-house counsel aren't

9    always engaged in the process of giving legal advice.  So

10   just because an in-house lawyer is involved -- actually just

11   because a lawyer is involved is not, you know, doesn't end

12   the inquiry.

13             MS. KLIEBENSTEIN:  I'm aware of those line of

14   cases and that's why we were careful to describe the

15   documents as obtaining legal advice and communicating legal

16   advice.

17             THE COURT:  Okay.  All right.  As I started this

18   today, I said I was going to endeavor to rule from the bench

19   not because this isn't complicated and not because certainly

20   writing a 40-page order on these issues would provide

21   guidance to somebody somewhere, but fact discovery is over.

22   Expert discovery is half over.

23             You're careening toward trial in six months or so,

24   and I think it would be unwise for me to sit on this.  So

25   I'm going to rule on these things now.  And since they are

1       all orders, the transcript and then the -- whether it's a

2       minute entry or a text only order will be sufficient for

3       purposes of appealing to Judge Wright, and we don't have an

4       issue about the timeliness of when that starts to run which

5       we would have if they were an R and R.

6              So on the motion to strike the witnesses involved

7       in the Rule 26(a) disclosures by Federal on March 22 of

8       2019, my findings are as follows:

9              I do find that the disclosure is untimely and one

10      for which there is no substantial justification in light of

11      Federal's statements about the knowledge of the existence of

12      the witnesses that would apply to both parties, certainly

13      more so to Federal than to FICO.

14             I would also note that the disclosure is

15      prejudicial or the timeliness or the untimeliness of the

16      disclosure is prejudicial because discovery is essentially

17      complete, and FICO is unable to reconfigure or reconsider

18      its discovery strategy.

19             I have a couple of observations about this whole

20      Rule 26 initial disclosure and supplementation issue though.

21      Number one, when I was in practice it always struck me as

22      the quintessential trap for the unwary.  I never liked the

23      idea that one could go through the case, everybody know

24      what's going on, everybody know who the witnesses are, and

25      then at the end of it, if you don't update your Rule 26(a)

1    disclosure to reflect the current realities of the discovery

2    process, somehow you're in jeopardy.

3           The other observation is that, again, this is a

4    personal observation.  When I was in practice, my discovery

5    strategy for identifying who to depose would certainly

6    consider the Rule 26(a) disclosure but was more acutely and

7    immediately driven by the documents that were produced as to

8    who I decided would depose, but that's my strategy.  That's

9    not everybody's strategy.  Other lawyers would do it

10   differently.

11          So I am going to order some remedial measures.  I

12   am not going to exclude the witnesses from testifying at

13   trial.  I think in the circumstances, it would be extremely

14   harsh, and it is not such that it can't be remedied now.

15          So the remedy is this, FICO may depose every last

16   one of the 16 witnesses as it sees fit between now and

17   trial.  It doesn't need to depose any, but it may depose

18   everyone.

19          Number two, those depositions will occur in

20   Minneapolis.

21          Number three, I am going to award fees to FICO

22   with respect to the depositions it takes.  I am going to

23   give further consideration to how that will be structured,

24   so the details of that will be included in the text only or

25   the minute entry order, whichever it is that comes out and

83

1    is on the ECF.  I'm not going to give you carte blanche.

2    You're not going to get every single one of your fees, but

3    you're going to get attorney's fees with respect to some

4    those depositions at least.  So that's the motion to strike.

5            Turning to the motion to compel, the easiest way

6    to do this is to describe what I am going to order that FICO

7    produce in this case going forward.

8            First of all, FICO will produce if it finds and if

9    it can't find and it's already made a diligent search for

10   the document I'm about to describe, then its met its

11   obligation, but that is the memo that provides notice that

12   Mr. Wade testified about that FICO will not be offering six

13   year licenses on Blaze.  If you have it, if you find it, it

14   must be produced.  If a reasonable and diligent search has

15   been undertaken, I have no basis to believe that it has not

16   been, then you've satisfied that obligation.

17           I will also order FICO to produce again to the

18   extent that further reasonable and diligent searches uncover

19   such documents, e-mails within the company or from the

20   company to customers specifically regarding the increase in

21   charge for maintenance fees, specifically, again including

22   the change from 18 percent to 20 percent and from 20 percent

23   to 22 percent, but that is further limited to Blaze Advisor.

24           Number three, I am not going to order production

25   or review of the salesforce.com database based on the

 1    representations of counsel that there is -- it was not used.

 2    However, to the extent that a diligent search has been or

 3    can be done of what I think you called "the Q,"

 4    Ms. Kliebenstein, that relate to sales force quoting or

 5    pricing of software agreements for Blaze, that should be

 6    reviewed and produced.

 7          Number four, FICO shall produce a list of all

 8    enterprise-wide software licensees to the Blaze Advisor

 9    software.

10          Number five, with the restrictions that

11    Ms. Kliebenstein mentioned about the four categories, one

12    that doesn't involve Blaze software; two, that's a reseller;

13    three, where the license had already been terminated; and,

14    four, where the two merging entities each had their own

15    perpetual license, taking those out of this description,

16    FICO shall produce e-mails, spreadsheets and support logs,

17    if that term means anything other than what Ms. Kliebenstein

18    described as customers calling in for technical support,

19    that relate to mergers, acquisitions and changes of control

20    by licensees of Blaze Advisor software.  Follow?

21          MS. KLIEBENSTEIN:  I think so.

22          THE COURT:  If we need a clarifying question along

23    the way, by all means stop me.

24          MS. KLIEBENSTEIN:  So we have, I think what you're

25    saying is e-mails, documents regarding the renegotiation or

 1   discussions about a license agreement.

 2            THE COURT:  Correct.

 3            MS. KLIEBENSTEIN:  After a licensee undergoes a

 4   merger, acquisition, change in control?

 5            THE COURT:  Correct, limited to Blaze Advisor

 6   software licensees.

 7            MS. KLIEBENSTEIN:  Okay, I'm clear.

 8            THE COURT:  Okay.  That was five.

 9            Number six, spreadsheets and other documents

10   indicating that Blaze or reflecting that Blaze Advisor is no

11   longer sold on a perpetual license basis.

12            Number seven, communications between FICO and

13   licensors of Blaze Advisor software that reflect

14   negotiations over the license fees.  So if there were

15   e-mails or documents sent between FICO and pick a licensee,

16   Dell or Oracle, at the time the license was being negotiated

17   that relate to pricing, those will be produced.

18            MS. KLIEBENSTEIN:  Is that in an instance relating

19   to a merger, acquisition, change in control?

20            THE COURT:  No, it's relating -- that's separate.

21   This is relating to the initial negotiation of the license

22   agreement or a renegotiation of the license agreement that

23   is not in the context of a merger, acquisition or change in

24   control.  Those cover the documents that I'm ordering FICO

25   to produce.

         1              With respect to both the 30(b)(6) deposition of

         2      Mr. Wade and the 30(b)(6) deposition of Mr. Carretta, I

         3      think the only responsible way for me to handle that is if

         4      the entire transcript for both deponents have not been

         5      produced, then, Mr. Fleming, I want the entire transcript

         6      for both deponents that are at issue, which I believe is

         7      only one transcript of Mr. Wade's multi-transcript

         8      deposition, correct?

         9              MR. FLEMING:  Yes.

        10              MS. KLIEBENSTEIN:  Your Honor, we produced that in

        11      response.

        12              THE COURT:  Is that part of this?

        13              MS. KLIEBENSTEIN:  Yes, Exhibit 4 is Mr. Wade's

        14      and Exhibit --

        15              THE COURT:  Right, I knew that you had submitted a

        16      transcript.  I just didn't know if it was complete.

        17              MS. KLIEBENSTEIN:  It is.

        18              THE COURT:  It is, okay.  Then no need to resubmit

        19      it.  I have it.  I am going to read the entire transcripts

        20      of each deposition, and I will let you all know whether

        21      there is further deposition proceedings to be had with

        22      respect to either Mr. Wade or Mr. Carretta.  Okay?

        23              Last thing, on the privilege log, I think the most

        24      prudent way to handle this circumstance, and I don't really

        25      want to do it, but I think this is the best way to handle

87

1    it, I would ask that FICO submit the documents referenced on

2    their privilege log at number 656, 662, and 665 for in

3    camera review by the Court.  And if I have an issue with

4    whether they're privileged or not, obviously, I'll be in

5    touch.

6              MS. KLIEBENSTEIN:  I have them right here, Your

7    Honor.

8              THE COURT:  Bring them on up.

9              MS. KLIEBENSTEIN:  I have those three and more.

10             THE COURT:  I'm only asking for those three.

11             MS. KLIEBENSTEIN:  Okay, then I'll submit it

12   later.

13             THE COURT:  Okay.  And in that applying the rule

14   of sauce for the goose and the gander, if you have three

15   documents on their privilege log that you are dying to have

16   me review, go ahead and identify them, but otherwise, okay?

17             MS. KLIEBENSTEIN:  Your Honor, we have our issue

18   of RFP 90 that we submitted a few letters about.

19             THE COURT:  Remind me of that issue.  That's

20   right.

21             MS. KLIEBENSTEIN:  Yes, Your Honor.  So we've been

22   going back and forth on 89 and 90, and RFP 90 requests

23   specific to each application that uses or used Blaze Advisor

24   software, all documents relating to the business rules of

25   each application.  What we're essentially looking for is the

1      rules that are running in that are used in Blaze Advisor on

2      the Federal applications today that's distinct and different

3      from 89, which Federal has produced a chart in response to.

4            So the two very different requests asking for two

5      very different types of documents, and we have not gotten a

6      response from Federal about whether we will be receiving the

7      rules that they have stored that are now running and being

8      used in Blaze Advisor.

9            THE COURT:  Are you in a position to respond now,

10     Mr. Pham?

11           MR. PHAM:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MR. PHAM:  Thank you, Your Honor.  So FICO has

14     prepared various letters with respect to requests 89 and 90.

15     It wasn't until May 2nd that they raised this issue for the

16     very first time regarding their request for the rules

17     themselves.  The two prior letters relating to these

18     requests 89 and 90, April 12th and April 17th, did not

19     address that at all.

20           With respect to their request for these rules

21     themselves, we spoke to our client, and it's our

22     understanding that these rules are themselves are in a

23     computer code known as structured rule language, and this

24     code is highly sensitive trade secret information that --

25           THE COURT:  Of course.

1          MR. PHAM:  Of course.  That if we had to, it could

2     possibly be extracted from some of the applications, may not

3     be able to be extracted from all of the applications.  And

4     with respect to the original rules themselves, those

5     documents, if our client were to undertake trying to locate

6     such documents, it would be, as I understand it, in quote a

7     massive undertaking that would take several employees

8     several weeks to try to uncover whether or not they even

9     exist.

10          But the rules themselves, they're not in any --

11     it's some kind of algorithm computer code.  And, you know,

12     we are trying to understand the purpose for why such highly

13     sensitive information is necessary when the document that

14     was produced in response to requests 89 and 90 provides

15     information with respect to the rules.

16          The document contains the Blaze rules capabilities

17     for each of the applications that use Blaze.  It includes

18     the number of rules for each of the applications, pretty

19     much all the answers to what was requested in request 89.

20          Our reading of request 90 was essentially a

21     catchall for that same type of information, and that

22     information is contained in the chart that has been updated

23     and produced to date.

24          THE COURT:  Give me an example of, just to make it

25     concrete for me, what a business rule would be in this

 1    context?  Is it if the client is excised, then do this?  Is

 2    that or how does -- give me something concrete.

 3              MR. PHAM:  So if I may refer to this chart, Your

 4    Honor, so, for example, CSI expresses an application that

 5    uses Blaze, and one of the functions is predictive

 6    modelling.  So you insert certain information, and it will

 7    decide what the risks are if you were to underwrite that

 8    policy.

 9              THE COURT:  Can you put that on the document

10    camera, please?

11              MR. PHAM:  And I also have multiple copies.

12              THE COURT:  There we go.  Would you mind focusing

13    it?  All right.  Okay, you can stay, Mr. Pham, because you

14    may be needed.

15              Ms. Kliebenstein, why don't you come back up.

16              MS. KLIEBENSTEIN:  Mr. Hinderaker is excited so

17    he's going to --

18              MR. HINDERAKER:  Could I do something today?

19              THE COURT:  All right.

20              MR. HINDERAKER:  After three hours, I'd like to do

21    something.  Well, as the Court knows, 89 is one thing, and

22    this chart that we're looking at is responsive to the

23    categories and information that 89 asked for.

24              90 is something else.  The Court asked for -- and,

25    by the way, the production of the information in that

1     structure format language is fine with us.  So I'd like to

2     use as an example why 90 is quite different from 89.

3               So, first, we should acknowledge that this chart

4     is a litigation created document providing as little

5     information as possible in all likelihood.  So one that's

6     easier for me to describe it, I can do it on any one if you

7     would like.  But under evolution, underwriting guidance for

8     Canada, well, we know that from 89 that Blaze Advisor is

9     used for underwriting guidance for Canada.  The documents

10    produced in response to 90 by way of the rules are going to

11    give us with detail the decision making that Blaze Advisor

12    implements in the context of, using this example, evolution.

13              So, Your Honor was asking the question, well, how

14    does this work?  The information is put into the

15    application.  How old is the applicant?  How many children?

16    Any education?  How many prior accidents?  Whatever the

17    rules are for making a determination of risk profile.  And

18    then all of the questions, well, if Blaze Advisor is used

19    for the entire array of effort for underwriting guidance

20    then all of the questions that are necessary to answer

21    applying the rules of the company to assess the risk profile

22    that the company is willing to undertake and the price at

23    which the company is willing to undertake that risk profile,

24    that is underwriting.

25              So if we go to trial with this document, Blaze

1    Advisor hardly does anything.  If we have the documents

2    responsive to request number 90, and by the way, the

3    plaintiffs said in their original response to that document

4    request we will produce these documents.

5            If we have the actual rules, then we will be able

6    to demonstrate that Blaze Advisor is not used to make a

7    decision, an automated decision of a minor aspect of

8    underwriting guidance, but the full breadth and scope of

9    whatever it is.

10           You know, similarly predictive modeling up in that

11   CSI Express.  As I understand it, that's a way in which the

12   software applying the company's rules will make the decision

13   for pricing.  So given the risk profile, given the risk

14   that's being underwritten, what price must we target for our

15   goals of profit margin so that we don't accept risks that we

16   don't want -- if we don't accept risks for too little, and

17   we don't lose the opportunity by overpricing.  That's an

18   element of underwriting.  But Blaze Advisor is used in all

19   of these regards.

20           THE COURT:  But how does that information, I can

21   see why -- I can see why you want it.  How is it necessary

22   to your case?

23           MR. HINDERAKER:  So then with that information and

24   the specifics about the decision making process that Blaze

25   Advisor automates, then that's the direct link to the

1    contribution to revenue from using Blaze Advisor.  So if the

2    decision making that's automated is to be able to respond to

3    the client, customer in real time with the bindable quote

4    straight through processing, the testimony will be that it

5    is more likely that customer is going to accept the policy,

6    and we're going to have a customer and it's going to be

7    revenue.

8            So all of this relates to how Blaze Advisor

9    contributes to or generates revenue, gross premium.  All of

10   this is about selling insurance.  Many of these applications

11   are used in what are called policy administration systems.

12   Like CSI Express, Decision Point, Evolution, Eezer.  They're

13   all called policy administration systems.  You cannot sell a

14   policy of insurance without a policy administration system.

15   There's a direct link to the use of Blaze Advisor and

16   contribution to revenue.  It's rather important to the

17   disgorgement of profits damages claim.

18           THE COURT:  Okay.  Thank you.

19           MR. PHAM:  And if I may, Your Honor, just a couple

20   of brief comments.  First, there were no documents

21   responsive to 89 and 90.  This, as counsel acknowledged, was

22   created for that purpose.

23           Point number two, the column that addresses

24   complexity and number of rules, that right there explains

25   how each of these applications, how complex they are,

1    meaning how many steps there are, and how many rules are

2    imbedded that in process.

3              So, for example, CSI Express for underwriting

4    guidance, high complexity, 12,800 rules are imbedded in

5    that.  So that provides information necessary to counsel's

6    point about understanding the function of these applications

7    and what it does throughout the process of issuing a policy,

8    those were topics of the 30(b)(6) depositions that FICO

9    took, and they were inquiring about each of the

10   applications, so help me understand what does CSI Express

11   do?  What is its function?  Decision Point, what is its

12   function?  Automated rules and process, how do those work?

13   Those were questions that were inquired of Federal's

14   witnesses with respect to the functioning of the

15   applications and how they are used in connection with these

16   rules.

17             THE COURT:  Okay.

18             MR. PHAM:  Right.  And on one final point, Your

19   Honor, is that what they're asking for now are the rules

20   themselves.  They're not asking for documents explaining

21   what each of these applications do.  They're asking for, as

22   you mentioned, these source codes, these computer codes, and

23   that itself is not going to explain what the documents do.

24             MR. PHAM:  Thank you.

25             THE COURT:  Thank you.

1          MR. HINDERAKER:  If I may have a couple quick

2     comments.  I just heard, I think, counsel say that these

3     documents responsive to Rule 90 don't exist.  In his first

4     comments, he said he can produce them under structured rule

5     language.  The documents exist in the databases and in the

6     systems of the defendants.  So they should be produced.

7          I understand, and I did ask questions what does

8     CSI Express do?  It's a policy administration system.  Is

9     CSI Express and does Blaze Advisor, is it one of the

10    technologies in CSI Express?  I know that.  Yes, it is.

11    They told me here too.  But if I have what I'm asking for in

12    document request 90, I'm going to know how robustly Blaze

13    Advisor is used in that application.  And I'm going to have

14    some more evidence and argument from that evidence with

15    respect to the contribution to revenue and the allocation of

16    the Blaze Advisor infringement to that contribution to

17    revenue.  So it appears a lot, it will provide a lot of

18    information on the robustness of the use of Blaze Advisor.

19         MR. PHAM:  And one final point on it, when I

20    mentioned that retrieving the source code was possible,

21    these are not documents that are available to be produced.

22    These are things that would have to be extracted from the

23    applications themselves.  That was the point I was making

24    when I said that, you know, in the event we're ordered to

25    produce the source code, that's the way we would go about

1    it.  Thank you.

2              THE COURT:  If you were to produce the source code

3    mechanically, how would you do that?

4              MR. PHAM:  As I understand it, IT personnel would

5    have to first see if it's possible to do.  I understand that

6    there are several steps in the process.  It will require

7    whether I think it was referred to as a plug-in was

8    available to extract the information, and so it's a highly

9    technical process that, unfortunately, I don't have the best

10   mind to explain it to Your Honor, but it's my understanding

11   that they may not even be available to extract from the

12   systems themselves.  They would have to find out if that was

13   feasible, and we can certainly make that inquiry.

14             THE COURT:  Well, make that inquiry for now, but

15   I'll tell you all honestly I don't feel comfortable making

16   that decision based on what I've heard today.

17             Mr. Hinderaker, is this something that your expert

18   needs or wants?

19             MR. HINDERAKER:  It's something that the barn door

20   is kind of closing on the expert reports.

21             THE COURT:  Right.

22             MR. HINDERAKER:  But as the defendants want to

23   point out, we're a number of months before trial, and the

24   use of the information at trial, and it might be used by one

25   of our employees, Blaze Advisor and its implementation at

1      Federal, as in all places, isn't open the box and plug it

2      in.  There's maybe $6 million of professional services that

3      were purchased to implement Blaze Advisor into the rules

4      environment of Federal for each of these -- for these

5      various applications.

6             So there are technical people on the fact side of

7      the equation who could very well use this information at

8      trial.  Whether I can use it through an expert, that's

9      another problem given the timing of the reports.

10            THE COURT:  Right.  But you would, essentially, if

11     you were going to use it, you would have, if you were using

12     it through a fact witness from your IT group, they would

13     come in and say, all right, these are the rules, here's how

14     it functions.  Somebody sitting at Federal enters the

15     following information and this, boom, spits out a quote or

16     what have you, and that is very robust and useful.

17            MR. HINDERAKER:  Whatever the facts are, yes.

18            Or, similarly, another maybe an easier example to

19     get my mind around, Federal puts on their witness and says,

20     well, this application of CSI Express has a bundle of a

21     dozen technologies.  Blaze Advisor is one of them.  So

22     what's the big deal about contribution to revenue?  If I can

23     show that what Blaze Advisor does is core is the mission

24     critical piece, so that the jury understands that having

25     also Adobe Acrobat generated document or another commodity

1    technology, I can put all of that in a proper context not by

2    argument, but by in fact how Blaze Advisor is used for

3    decisioning in the various applications.

4              THE COURT:  Okay.

5              MR. PHAM:  Nothing further, Your Honor.

6              THE COURT:  Okay.  I may want something additional

7    on this.  If I do, I need to think about it.  I'll let you

8    all know.  Okay?  Okay.  I hesitate to ask, but is there

9    anything further?

10             MS. KLIEBENSTEIN:  No, Your Honor.

11             MR. FLEMING:  No.

12             THE COURT:  Okay.  Thank you all.  We are in

13   recess.

14             (Court adjourned at 5:21 p.m.)

15                       *      *      *

16                   REPORTER'S CERTIFICATE

17        I, Maria V. Weinbeck, certify that the foregoing is

18   a correct transcript from the record of proceedings in the

19   above-entitled matter.

20

21             Certified by:  *s/ Maria V. Weinbeck*

22                            Maria V. Weinbeck, RMR-FCRR

23

24

25