UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>      Plaintiff,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation,<br><br>      Defendants. | Court File No. 16-cv-1054 (WMW/DTS)<br><br><br><br>**DEFENDANTS' OBJECTION TO THE COURT'S JUNE 4 ORDER** |

## **INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 72 and Local Rule 72.2, Federal Insurance Company and ACE American Insurance Company (collectively, "Federal") respectfully submit this objection to the following portions of the Magistrate's Order: (1) determining that the "Privilege Log Entry Numbers 656, 662, and 665 [the "Carretta/Hill/Schreiber emails"] are privileged and shall not be produced," and (2) requiring Federal "extract the repository files (.xml) and business object model files (JAE (JAVA Archive) files)" and produce such files (the "Blaze Rules"). (Dkt. 305).

# THE CARRETTA/HILL/SCHREIBER EMAILS

## I. THE CARRETTA/HILL/SCHREIBER EMAILS SHOULD BE REVIEWED BY THE COURT.

This case is about Federal's license to use FICO's Blaze software. A key issue in the case is the territorial scope of the license agreement. FICO has asserted throughout the litigation that Federal breached the license agreement by using Blaze outside of the United States. Federal asserts the license allowed global use.

Federal's position is supported by internal FICO emails discussing FICO's belief that the license allowed global use, and showing FICO's knowledge of Federal's use of Blaze outside of the United States. However, FICO's key witness—in house counsel, Thomas Carretta—has consistently denied that the license allowed global use, and has taken the position, under oath, that FICO did *not* know about and consent to Federal's use outside of the United States. Federal believes the Carretta/Hill/Schreiber emails listed on FICO's privilege log may contradict Carretta's testimony and FICO's position in this lawsuit. Federal challenges the privileged nature of the emails and, in the alternative, seeks a detailed log description of the advice set forth in the emails.

### A. In 2006, the Parties Entered into the License Agreement.

In December 2006, the parties entered into the license agreement and two amendments (collectively, the "License") that provided for Federal's global, enterprise-wide use of Blaze.

**B.     In 2008, FICO Explicitly Considered Federal's Use of Blaze in Europe and Determined that the License Allowed Global Use.**

In November 2008, FICO employees reviewed the License and the parties' prior negotiations to determine whether the License allowed global use. On November 17, 2008, FICO employees in charge of the Federal account—Russ Schreiber and Michael Sawyer—met with FICO's Client Services Partner in Europe—Richard Hill. They met to discuss "a plan for Chubb Europe" and determine whether the License allowed global use of Blaze:

```
*~*~*~*~*~*~*~*~*~*~*
All -

Please join this call to discuss the Chubb license agreement and a plan for Chubb Europe.  Attached are
the three SLSA contracts and the latest Chubb Annual report.
```

(Declaration of Christopher D. Pham ("Pham Decl."), Ex. 1).

At the same time, Hill consulted with FICO in-house counsel Thomas Carretta about the License. On November 12, 2008, Hill emailed Carretta about the License. (Pham Decl., Ex. 2, FICO's First Amended Privilege Log, Entry 656). On November 25, 2008, Carretta emailed Hill and Schreiber, and sent a separate email to Schreiber. (*Id.* at Entries 662 and 665).

On November 26, 2008, FICO concluded the License was a "Global license:"

3

> Message
> From: Wachs, Lawrence C (Larry) [/O=FAIRISAAC/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=LARRYWACHS]
> Sent: 11/26/2008 8:49:11 AM
> To: Schreiber, Russell (Russ) [RussSchreiber@fairisaac.com]
> Subject: Global View of Chubb
>
> In reviewing my notes and some archived e-mails it's apparent to me that the corporate ELA that was negotiated with Phil Folz and June Drewey intended to include the Global license. Here's one of the emails that was sent to lock the team before the first negotiation. "Global" is referenced twice. In my recollection they were adamant about keeping Global on the table but they did take Cobol, Smartforms off the table to wait for projects requiring that functionality.
> Call with any questions
>
> Larry

(Pham Decl., Ex. 3). Based on the timing and sequence of the Caretta emails and FICO's employees stating use was global, it appears likely Caretta interpreted the License as permitting use outside the United States.

After November 2008, Hill, Sawyer, and Schreiber repeatedly stated that the License allowed global use. For example, in August 2012, Hill emailed Schreiber confirming that the License allowed global use:

> Let me know . . . whether we can actually sell anything new here as I seem to remember their US blaze license allowed them the software for free . . . .

(Pham Decl., Ex. 4).

Sawyer, copying Schreiber, responded to Hill confirming Federal had a global, enterprise-wide license and that Federal was already using Blaze in the UK:

> They do have a Global ELA for Blaze and have an automated UW Application running in the UK already.

(*Id.*).[1]

---

[1] Additional emails in which FICO employees state the License Agreement permits global use are attached as Exhibit 5 to Pham Decl.

**C.      In March 2016, Carretta and FICO Asserted in Bad Faith that FICO Had Just "Become Aware" of Federal's Use of Blaze Outside of the United States.**

In March 2016, Carretta took the position in threatening correspondence to Federal that FICO had just learned of Federal's use of Blaze outside of the United States, and that such use was a breach of the License:

> Additionally, we have become aware of two UK installations of the subject software, which is outside the scope of the Agreement.

(Pham Decl., Ex. 6, Carretta Dep. Ex. 100).

> I notified you via email on March 11, 2016 that FICO had become aware of a further material breach due to the use of the Software outside the United States in two applications utilized in the United Kingdom.

(Pham Decl., Ex. 7, Carretta Dep. Ex. 103).  If, as Federal believes, the emails show that Caretta knew of use outside the United States, the above statements are false.

**D.      Carretta Testified Under Oath that FICO Did Not Know of Federal's Use of Blaze Outside of the United States, and Statements to the Contrary by Hill, Sawyer, and Schreiber Should be Disregarded.**

When asked about his statements in March 2016 that FICO had just "become aware" of Federal's use outside of the United States, Carretta reasserted FICO's position:

> Q:    You are writing it as if you just became aware [in March 2016]: 'Additionally, we have become aware of two UK installations,' as if this is new information, correct?
>
> A:    This was new information to me.
>
> ***
>
> Q:    Do you understand now it is a false statement?
>
> A:     It is not a false statement.

5

(Pham Decl., Ex. 8, Carretta Dep. Tr. I, 215:21-25, and 217:1-3).

Significantly, when Carretta was asked during his depositions about the statements by FICO employees that the License allowed global use, he took the position that the employees were wrong:

> Q: Does this [Sawyer's August 14, 2012 email] indicate to you that FICO was well aware of Chubb's use of Blaze in Europe as early as at least 2012?
>
> A: No.
>
> Q: Why not?
>
> A: It indicates that the client partner thinks he understands the contract and is making an opinion. It doesn't mean that FICO did.
>
> Q: Okay. And you think he's wrong about the contract?
>
> A: I do.

(*Id.* at Carretta Dep. Tr. I at 209:3-24).

> A: This is a sales guy, and there's just a layer of people relying on what other people think all the way down the line, so I don't know if he's even looked at the contract and he's not in a position to judge anyway.

(Pham Decl., Ex. 9, Caretta Dep. Tr. II 106:21-25 & 73:9-74:10 & Ex. 10). Again, based on the above, if the emails show that Caretta knew of use outside the United States, the above statements are false.

## II. THE COURT'S RULING ON FEDERAL'S MOTION TO COMPEL.

On February 5, 2019, FICO served its First Amended Privilege Log. (Pham Decl., Ex. 2). On April 5, 2019, Federal filed a motion to compel with respect to the Carretta/Hill/Schreiber emails. (Dkt. 237). On June 4, 2019, the Court held that, after

having conducted an *in camera* review of the documents, the documents were privileged and did not require FICO to amend its privilege log descriptions. (Dkt. 306).

### III. THE MAGISTRATE ERRED BY HOLDING THE COMMUNICATIONS AT ISSUE ARE PRIVILEGED AND FAILING TO REQUIRE FICO PROVIDE SUFFICIENT PRIVILEGE DESCRIPTIONS.

To determine whether the previous decision is clearly erroneous or contrary to law, the Court must conduct an independent *in camera* review. *PureChoice, Inc. v. Macke*, 2008 WL 4831790, at *7 (D. Minn. Nov. 3, 2008) (on review of magistrate judge's order conducting independent *in camera* review of allegedly privileged communications in order to determine if communications were in fact privileged.); *Heilman v. Waldron*, 287 F.R.D. 467 (D. Minn. 2012) (same).

The timing and sequence of the communications indicate that they should be reviewed for privilege by the Court. To the extent the communications are not privileged, the Court should order FICO to produce the documents.[2]

Overall, the Carretta emails, by their timing and the surrounding events, would seem to concern use outside of the United States and may state that such use was in Carretta's view allowed. If so, each statement he made at his deposition relating to FICO's prior position and knowledge of use outside of the United States would be untrue.

---

[2] To the extent the communications reveal Carretta was aware of use outside of the United States or that he concluded the License Agreement permitted global use, those facts would directly contradict Carretta's deposition testimony and FICO's position in this case. Such circumstances may justify a determination that the documents should be produced.

If, as Federal believes, the emails show that Caretta knew of use outside the United States, and even approved it, then FICO has abused the litigation process by taking a position it knows is without support. FICO cannot advance a position which it knows, because its General Counsel knows, is without legal validity, and simultaneously shield the documents which would reveal its litigation gamesmanship.

In the alternative, FICO should be compelled to update the descriptions of the documents on its privilege log. In particular, Federal is entitled to obtain the subject line of the emails (which was not provided on the privilege log) and a description of the actual topic of advice sought, including whether the topic of the email was Federal's use of Blaze outside of the United States. *Loftin v. Bande*, 258 F.R.D. 31, 33 (D.D.C. 2009) (finding privilege log descriptions "insufficient because they do not specify the subject matter of the teleconferences.").

## THE BLAZE RULES

### I.   FICO'S REQUEST FOR THE BLAZE RULES SOFTWARE CODE.

**A.   FICO's Request No. 90.**

On December 28, 2018, FICO served Request No. 90: "[s]pecific to each application that uses or used Blaze Advisor® software, all documents relating to the business rules of each application." (Pham Decl., Ex. 11). On January 28, 2019, Federal objected to this request and without waving its objections, responded it will produce non-privileged, responsive documents that are kept in the ordinary course of business. (Pham Decl., Ex. 12). On March 4, 2019, Federal served a Supplemental Response directing FICO to the Blaze Chart produced on March 4, 2019. (Pham Decl., Ex. 13).

On April 16, 2019, Federal produced an updated Blaze Chart in response to Request Nos. 89-90.  (Pham Decl., Ex. 14, Blaze Chart).  The Blaze Chart is a document that includes Federal's applications that use Blaze and the capabilities of the Blaze Rules. (*Id.*).  There are no documents kept in the ordinary course of business that contain the Blaze Rules themselves.

On May 2, 2019 FICO argued, *for the very first time*, that "Request No. 90 asks for the rules themselves," claiming it was entitled to the underlying software code. (Pham Decl., Ex. 15).  (Emphasis in original).

### B.     May 8, 2019 Motion Hearing and Order.

On May 8, 2019, the Court heard oral arguments relating to FICO's Request No. 90 and took the matter under advisement, but ordered that Federal "determine whether, when, and how the requested information can be extracted and produced and at what cost."  (Dkt. 288).  Pursuant to the Court's Order, Federal advised of two options for extracting and producing the Blaze Rules and the associated costs.  (Pham Decl., Ex. 16). In its May 28 response, FICO argues it needs the Blaze Rules to "show the integration of Federal's business rules into Blaze Advisor..."  (Pham Decl., Ex. 17).  However, FICO's May 28 letter demonstrates that FICO understands how Federal uses Blaze: "Federal uses business rules to determine whether to quote a risk and at what price," and that Blaze allows Federal to "make faster, more precise, and more consistent decisions while reducing the complexity and cost of those decisions."  (*Id.*).  FICO does not need the Blaze Rules to understand how Federal's business rules are integrated into Blaze.

9

FICO further argues it wants the Blaze Rules so that its experts can respond to Federal's expert reports. (*Id*.). FICO's experts do not need the Blaze Rules to do so. Indeed, Federal's experts did not have access to the Blaze Rules while preparing their reports. Moreover, FICO's expert witness, Bick Whitener, discusses at great length in his expert report how Federal uses Blaze, analyzing in detail every application FICO alleges uses Blaze. Overall, reviewing the Blaze Rules will not add anything more to what FICO (and its experts) already understands about Federal's use of Blaze.

Ultimately, FICO recommended that Federal produce the repository files and business object model files, indicating that "*[t]his is FICO's preferred method of receipt.*" (Pham Decl., Ex. 17). (Emphasis in original).

On May 30, 2019, Federal explained that FICO's "preferred method" is flawed. (Pham Decl., Ex. 18). The problem with FICO's proposal is that although FICO can take the files, plug them into a compatible Blaze version, and generate an English version of the Blaze Rules, Federal would not be able to check the accuracy of the business rules generated by FICO. In order to confirm the accuracy of FICO's processes, Federal would have to convert all of the files to English and compare them. (*Id*.).

### C.   June 4, 2019 Motion Hearing and Order.

On June 4, 2019, the Magistrate held a phone hearing regarding FICO's request for the Blaze Rules. (*See* Dkt. 306). The Court asked FICO *why* it needed the Blaze Rules. FICO explained that the Blaze Rules connects the alleged infringement to the revenues for its disgorgement claim. (Pham Decl., Ex. 19, at 7:20-24). Federal challenged FICO's contention arguing that FICO has failed to demonstrate *how* the

software code of the Blaze Rules enables FICO to make the connection between the alleged infringement and the revenues. (*Id*. at 8:3-11). The Magistrate stated that he was "a little uncertain as to why knowing the content of the rules themselves is truly necessary for connecting the alleged infringement to the revenues," and further, that he is "not persuaded that having the substance of the rules themselves really provides any greater reliability in terms of the quantification." (*Id*. at 11:2-4).

Next, the Court discussed *how* the Blaze Rules could be extracted and produced. In its May 28 letter, FICO indicated it preferred Federal extract and produce repository files and business object model files. (*See* Pham Decl., Ex. 17). Federal argued that it would not be able to verify the accuracy of the Blaze Rules generated by FICO. (*See* Pham Decl., Ex. 18). To Federal's point, the Magistrate cautioned that "it is a risky or at least uncertain proposition on FICO's part that it would be able to rely on [the Blaze Rules] or use [the Blaze Rules] effectively or introduce them because Federal is going to say it's not verified, it's not certain." (*See* Pham Decl., Ex. 19, at 11:22-25).

Despite being unpersuaded the Blaze Rules would enable FICO to make a connection between alleged infringement and Federal's revenues, and despite the unreliability of FICO independently generating an English version of the Blaze Rules, the Magistrate ordered Federal to extract and produce the Blaze Rules. In doing so, the Magistrate erred because his ruling contradicts the spirit of the discovery rules requiring FICO demonstrate relevance and a need for the discovery requested.

## II. THE MAGISTRATE ERRED BY REQUIRING FEDERAL TO PRODUCE IRRELEVANT AND UNUSABLE SOFTWARE CODE.

### A. The Software Code is Irrelevant.

FICO requested the software code underlying each of Federal's business rules that are implemented into Blaze, which the Magistrate granted. FICO argues the software code—all of which is developed and owned by Federal—is relevant to proving causal nexus on its disgorgement of profits claim. (*See* Pham Decl., Ex. 19, at 7:11-24).

Although the scope of permissible discovery under Rule 26 is broad, it is not unlimited. Rule 26(b)(1) provides that discovery must be limited to matters that are "relevant to any party's claim or defense," and discovery must be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The Eighth Circuit has cautioned district courts against applying the rule indiscriminately:

> While the standard of relevance in the context of discovery is broader than in the context of admissibility this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery.

*Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992); *see also Shukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 237 (D. Minn. 2013) (applying *Hofer* in affirming entry of protective order). As such, "[s]ome threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." *Hofer*, 981 F.2d at 380; *see also Bredemus v. Int'l Paper Co.*, 252 F.R.D. 529, 533-34 (D. Minn. 2008) ("notwithstanding the liberality of discovery, we will remain reluctant to allow any party

to roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so.").

FICO has not made the threshold showing of relevance. To proceed with its disgorgement claim, FICO must "first demonstrate a causal relationship between the infringement and the defendant's revenues." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001). FICO must prove profits are directly "attributable to the infringement" and merely showing "connection between use of the infringer's product and the revenues obtained is insufficient." *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 2013 Wl 5970065, at *5 (S.D.N.Y. Nov. 8, 2013).

The software code underlying Federal's business rules is not relevant to the issue of causal nexus—the code does not provide any information relevant to Federal's use of Blaze and Federal's revenue. At the motion hearing, the Magistrate repeatedly expressed doubt regarding the relevance of the software code to FICO's disgorgement claim. (*See* Pham Decl., Ex. 19, at 8:12-16). Indeed, even after FICO's explanation of relevance, the Magistrate was not convinced. (*Id.* at 11:1-4). Nonetheless, the Magistrate granted FICO's request, and his decision is contrary to law because FICO has not made (and cannot make) the required threshold showing of relevance.

### B.     The Software Code is Unusable.

The software code, in the form ordered to be produced by the Magistrate, is in an unreadable, unusable format. In response to FICO's request for the software code, Federal explained that producing the software code, in the format FICO requested, would result in an unusable product. (*See* Pham Decl., Ex. 18). At the hearing, the Magistrate

agreed that FICO's reliance on produced software code would be uncertain. (*See* Pham Decl., Ex. 19, at p. 11:22-25). FICO cannot show a need for software code that will be produced in an unreadable, unusable format. *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir. 1999) ("[e]ven if relevant, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information."); *see also Gilead Sciences v. Merck & Co., Inc.*, Case No. 5:13-cv-04057, 2016 WL 146574, at *1 (N.D. Cal. Jan. 13, 2016) ("a party seeking discovery of relevant, non-privileged information must show, before anything else, that the discovery sought is proportional to the needs of the case."). Federal should not be required to undergo the burden and expense of gathering software code for which FICO has no need and which is ultimately unusable in the format produced.

### C. The Software Code is Proprietary.

The software code is highly-confidential and commercially and competitively sensitive information. It represents the software code underlying business rules Federal developed. The software code is of no use to FICO, but would be incredibly valuable to Federal's competitors. *See Miscellaneous Docket Matter*, 197 F.3d at 925 ("[e]ven if relevant, discovery is not permitted… where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information.") Here, FICO has no need for the software code, which is not relevant to the issue of causal nexus, and the potential harm to Federal is substantial. FICO does not need the

14

underlying contents of the Blaze Rules to understand how Federal's business rules are integrated into Blaze. As such, Federal should not be required to produce the Blaze Rules.

## CONCLUSION

For the above reasons, Federal respectfully requests the Court conduct an *in camera* review of the communications identified on FICO's privilege log entries 656, 662 and 665. Federal further respectfully requests the Court vacate the portion of the Magistrate's Order compelling production of the Blaze Rules.

Dated:  June 18, 2019                                  s/ Terrence J. Fleming
                                                                        Terrence J. Fleming (#0128983)
                                                                        tfleming@fredlaw.com
                                                                        Leah C. Janus (#0337365)
                                                                        ljanus@fredlaw.com
                                                                        Christopher D. Pham (#0390165)
                                                                        cpham@fredlaw.com

                                                                        **FREDRIKSON & BYRON, P.A.**
                                                                        200 South Sixth Street, Suite 4000
                                                                        Minneapolis, MN  55402-1425
                                                                        Telephone:  612.492.7000

                                                                        *Attorneys for Defendants*