## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION, a  )
Delaware corporation,  )
   )
Plaintiff,  )
   )   Case No. 16-cv-1054(WMW/DTS)
v.  )
   )
FEDERAL INSURANCE COMPANY, an  )   **Jury Trial Demanded**
Indiana corporation, and ACE  )
AMERICAN INSURANCE COMPANY,  )
a Pennsylvania corporation,  )
   )
Defendants.  )
   )

### PLAINTIFF FAIR ISAAC CORPORATION'S FOURTH SET OF REQUESTS
### FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS
### FEDERAL INSURANCE COMPANY AND ACE AMERICAN INSURANCE COMPANY

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Fair Isaac

Corporation ("FICO") hereby requests that Defendants Federal Insurance Company ("Federal")

and ACE American Insurance Company ("ACE American") produce the following documents

and things requested below, in accordance with the Instructions and Definitions that follow.  The

requested documents and things must be produced at the offices of Merchant & Gould, 3200 IDS

Center, 80 South 8th Street, Minneapolis, MN 55402, within thirty days of the date of service of

these Requests, or at such other time and location as the parties may agree.  If Federal and/or

ACE American withholds from production any of the requested documents or things on any

ground (for example, on a claim of attorney-client privilege or work-product immunity), FICO

requests that Federal and/or ACE American provide, within thirty days of service of these

Requests, a schedule identifying the withheld documents and things and the basis for the

withholding.

**EXHIBIT**
**11**

These Requests are continuing, and responses thereto should be supplemented as required by the Federal Rules of Civil Procedure.

## INSTRUCTIONS AND DEFINITIONS

The Instructions and Definitions from FICO's First Set of Requests for Production of Documents are incorporated by reference as if fully set forth herein. Additionally:

"Legacy ACE American broker and agent" means all brokers and agents credentialed to sell or renew insurance policies issued by any insurance company that was directly or indirectly owned by ACE Limited.

"Legacy Chubb broker or agent" means all brokers and agents credentialed to sell or renew insurance policies issued by any insurance company that was directly or indirectly owned by The Chubb Corporation.

"Legacy ACE American insurance policy product" means all insurance policies issued by any insurance company that was directly or indirectly owned by ACE Limited.

### REQUESTS FOR PRODUCTION

**REQUEST NO. 79:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in the United States in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**REQUEST NO. 80:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in Canada in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**REQUEST NO. 81:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in

the United Kingdom and Europe in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**REQUEST NO. 82:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in Australia in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**REQUEST NO. 83:**  Documents sufficient to identify (a) each legacy ACE American insurance policy product supported by an application or applications using Blaze Advisor® software, and (b) each legacy ACE American insurance policy product planned to be supported by an application or applications using Blaze Advisor® software.

**REQUEST NO. 84:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in the United States in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**REQUEST NO. 85:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in Canada in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**REQUEST NO. 86:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in the United Kingdom and Europe in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**REQUEST NO. 87:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in Australia in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**REQUEST NO. 88:**  Documents sufficient to show the total number of insurance policies sold or renewed by legacy Chubb brokers and agents that issued from an insurance company formerly directly or indirectly owned by ACE Limited in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**REQUEST NO. 89:**  Specific to each application that uses or used Blaze Advisor® software, documents sufficient to show (a) the number of business rules in each application; (b) the type of business rules in each application, including, without limitation, underwriting, pricing, claims, renewal processing, and workflow, and (c) the number of daily and monthly batch and real-time business rule transactions for each application.

**REQUEST NO. 90:**  Specific to each application that uses or used Blaze Advisor® software, all documents relating to the business rules of each application.

Dated:  December 28, 2019

MERCHANT & GOULD P.C.

/s/ Heather Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2215
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com

*Attorneys for Plaintiff Fair Isaac
Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2018, a copy of the foregoing was emailed to the following attorneys of record:

Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Lora M. Friedemann (#0259615)
lfriedemann@fredlaw.com
Leah Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000 (tel)
 (612) 492-7077 (fax)


December 28, 2018                          s/Abigail Krueger
                                             Abigail Krueger

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

FAIR ISAAC CORPORATION,

Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY, a
Pennsylvania corporation,

Defendants.

Court File No.  16-cv-1054 (WMW/DTS)

**DEFENDANTS' RESPONSES TO
PLAINTIFF'S FOURTH SET OF
REQUESTS FOR PRODUCTION OF
DOCUMENTS**

---

To:   Plaintiff and its attorneys, Allen Hinderaker, Heather Kliebenstein, and Michael A.
      Erbele, Merchant & Gould PC, 3200 IDS Center, 80 South Eighth Street,
      Minneapolis, MN  55402.

Defendants Federal Insurance Company ("Federal") and Ace American Insurance

Company ("ACE") (collectively, "Defendants"), for their Responses to Plaintiff's Fourth

Set of Requests for Production of Documents, state and allege as follows:

## GENERAL RESPONSES AND OBJECTIONS

1.      Counsel's primary contact at Defendants had a death in the family, with the

out-of-town funeral today.  Defendants requested a short extension given today's return

date in light of these circumstances, which was unreasonably refused unless certain

conditions were satisfied.

2.      Defendants object to the Definitions and Instructions to the extent that they

seek to impose obligations on Defendants that either exceed, or are different from, what



EXHIBIT
12

is required under the Federal Rules of Civil Procedure, District of Minnesota Local Rules, and the Stipulated E-Discovery Order.

3.      Defendants object to the requests to the extent that they seek information protected from discovery under the attorney-client privilege or work product doctrine.

4.      Defendants' responses and objections are made to the best of Defendants' present knowledge, information, and belief.  Defendants' responses and objections are limited to information within its possession, custody, or control.  Defendants reserve the right to amend, supplement, or change any responses and objections if and when additional, different, or more accurate information becomes available and/or facts are developed.

5.      Defendants give these Responses subject to all objections to admissibility that may be interposed in this proceeding.

## RESPONSES TO FOURTH SET OF REQUESTS FOR PRODUCTION

**REQUEST NO. 79:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in the United States in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**RESPONSE:**      Defendants object to this request as overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks the name of every insurance company that issued every policy or renewal by quarter since January 2016.  Subject to and without waving these objections, or the general objections above, Defendants state that they will produce non-privileged, responsive documents that are

2

kept in the ordinary course of business at a mutually-acceptable time agreed by the parties. Discovery is continuing.

**REQUEST NO. 80:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in Canada in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**RESPONSE:**  Defendants object to this request as unduly burdensome to the extent it seeks information "by quarter."  Subject to and without waving this objection, or the general objections above, Defendants state that Chubb Insurance Company of Canada is the only insurance company that issued a policy or renewal in Canada in connection with which Blaze Advisor software® was used.  Additionally, Defendants direct Plaintiff to Federal Insurance Company's Third Supplemental Answer to Plaintiff's Interrogatory No. 19.  Finally, Defendants state that they will produce non-privileged, responsive documents that are kept in the ordinary course of business at a mutually-acceptable time agreed by the parties. Discovery is continuing.

**REQUEST NO. 81:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in the United Kingdom and Europe in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**RESPONSE:**  *See* Response to Request No. 79.

**REQUEST NO. 82:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in Australia in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**RESPONSE:**  *See* Response to Request No. 79.

65743844.1

**REQUEST NO. 83:** Documents sufficient to identify (a) each legacy ACE American insurance policy product supported by an application or applications using Blaze Advisor® software, and (b) each legacy ACE American insurance policy product planned to be supported by an application or applications using Blaze Advisor® software.

**RESPONSE:** Defendants object to this request as vague and ambiguous because it is unclear what is meant by "supported by" and ""planned to be supported by." Defendants further object to this request as seeking documents that are not relevant to any party's claims or defenses in this action.

**REQUEST NO. 84:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in the United States in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks the name of every insurance company that issued every policy or renewal by quarter since January 2016. Subject to and without waving these objections, or the general objections above, Defendants state that they will produce non-privileged, responsive documents that are kept in the ordinary course of business at a mutually-acceptable time agreed by the parties.

**REQUEST NO. 85:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in Canada in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**RESPONSE:** Defendants object to this request as unduly burdensome to the extent it seeks information "by quarter." Subject to and without waving this objection, or

4

the general objections above, Defendants state that there are no policies issued or

renewed by ACE American brokers and agents in Canada in connection with which Blaze

Advisor® software was used for the period January 16, 2016 to date.

**REQUEST NO. 86:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in the United Kingdom and Europe in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**RESPONSE:** *See* Response to Request No. 84.

**REQUEST NO. 87:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in Australia in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**RESPONSE:** *See* Response to Request No. 84.

**REQUEST NO. 88:** Documents sufficient to show the total number of insurance policies sold or renewed by legacy Chubb brokers and agents that issued from an insurance company formerly directly or indirectly owned by ACE Limited in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**RESPONSE:** *See* Response to Request No. 84.

**REQUEST NO. 89:** Specific to each application that uses or used Blaze Advisor® software, documents sufficient to show (a) the number of business rules in each application; (b) the type of business rules in each application, including, without limitation, underwriting, pricing, claims, renewal processing, and workflow, and (c) the number of daily and monthly batch and real-time business rule transactions for each application.

**RESPONSE:** Defendants object to this request as unduly burdensome and not

proportional to the needs of the case. Subject to and without waving these objections, or

the general objections above, Defendants state that they will produce non-privileged,

responsive documents that are kept in the ordinary course of business at a mutually-acceptable time agreed by the parties.

**REQUEST NO. 90:**   Specific to each application that uses or used Blaze Advisor® software, all documents relating to the business rules of each application.

**RESPONSE:**   Defendants object to this request as overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all" documents and is unlimited in time.  Subject to and without waving these objections, or the general objections above, Defendants state they will produce non-privileged, responsive documents that are kept in the ordinary course of business at a mutually-acceptable time agreed by the parties.

Dated: January 28, 2019

/s/ Christopher D. Pham
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Lora M. Friedemann (#0259615)
lfriedemann@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Phone:  (612) 492-7000
(612) 492-7077 (fax)

*Attorneys for Defendants*

65743844.1

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION,

Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY, a
Pennsylvania corporation,

Defendants.

Court File No.  16-cv-1054 (WMW/DTS)

**DEFENDANTS' SUPPLEMENTAL
RESPONSES TO PLAINTIFF'S
FOURTH SET OF REQUESTS FOR
PRODUCTION OF DOCUMENTS**

To:   Plaintiff and its attorneys, Allen Hinderaker, Heather Kliebenstein, and Michael A.
      Erbele, Merchant & Gould PC, 3200 IDS Center, 80 South Eighth Street,
      Minneapolis, MN  55402.

Defendants Federal Insurance Company ("Federal") and Ace American Insurance

Company ("ACE") (collectively, "Defendants"), for their Supplemental Responses to

Plaintiff's Fourth Set of Requests for Production of Documents, state and allege as

follows:

## GENERAL RESPONSES AND OBJECTIONS

1.      Defendants object to the Definitions and Instructions to the extent that they

seek to impose obligations on Defendants that either exceed, or are different from, what

is required under the Federal Rules of Civil Procedure, District of Minnesota Local

Rules, and the Stipulated E-Discovery Order.

**EXHIBIT
13**

2.      Defendants object to the requests to the extent that they seek information protected from discovery under the attorney-client privilege or work product doctrine.

3.      Defendants' responses and objections are made to the best of Defendants' present knowledge, information, and belief.  Defendants' responses and objections are limited to information within its possession, custody, or control.  Defendants reserve the right to amend, supplement, or change any responses and objections if and when additional, different, or more accurate information becomes available and/or facts are developed.

4.      Defendants give these Responses subject to all objections to admissibility that may be interposed in this proceeding.

## SUPPLEMENTAL RESPONSES TO FOURTH SET OF REQUESTS FOR PRODUCTION

**REQUEST NO. 79:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in the United States in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**SUPPLEMENTAL RESPONSE:**    Defendants object to this request as overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks the name of every insurance company that issued every policy or renewal by quarter since January 2016.   Subject to and without waving these objections, or the general objections above, Defendants direct Plaintiff to Federal Insurance Company's Supplemental Answers to Interrogatory Nos. 16 and 17 served on February 28, 2019 and March 2, 2019.  Discovery is continuing.

2

**REQUEST NO. 80:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in Canada in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**SUPPLEMENTAL RESPONSE:** Defendants object to this request as unduly burdensome to the extent it seeks information "by quarter." Subject to and without waving this objection, or the general objections above, Defendants direct Plaintiff to Federal Insurance Company's Fourth Supplemental Answer to Plaintiff's Interrogatory No. 19 served on February 28, 2019 and March 2, 2019. Discovery is continuing.

**REQUEST NO. 81:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in the United Kingdom and Europe in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**SUPPLEMENTAL RESPONSE:** Defendants object to this request as unduly burdensome to the extent it seeks information "by quarter." Subject to and without waving this objection, or the general objections above, Defendants direct Plaintiff to Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory Nos. 18 and 20 served on February 28, 2019. Discovery is continuing.

**REQUEST NO. 82:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in Australia in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**SUPPLEMENTAL RESPONSE:** Defendants object to this request as unduly burdensome to the extent it seeks information "by quarter." Subject to and without waving this objection, or the general objections above, Defendants direct Plaintiff to

Federal Insurance Company's Fourth Supplemental Answer to Plaintiff's Interrogatory No. 20 served on February 28, 2019.  Discovery is continuing.

**REQUEST NO. 83:**  Documents sufficient to identify (a) each legacy ACE American insurance policy product supported by an application or applications using Blaze Advisor® software, and (b) each legacy ACE American insurance policy product planned to be supported by an application or applications using Blaze Advisor® software.

**SUPPLEMENTAL RESPONSE:**  Defendants object to this request as vague and ambiguous because it is unclear what is meant by "supported by" and ""planned to be supported by."  Defendants further object to this request as seeking documents that are not relevant to any party's claims or defenses in this action.

**REQUEST NO. 84:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in the United States in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**SUPPLEMENTAL RESPONSE:**     Defendants object to this request as overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks the name of every insurance company that issued every policy or renewal by quarter since January 2016.   Subject to and without waving these objections, or the general objections above, Defendants direct Plaintiff to Federal Insurance Company's Supplemental Answers to Interrogatory Nos. 16 and 17 served on February 28, 2019 and March 2, 2019.  Discovery is continuing.

**REQUEST NO. 85:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in Canada in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**SUPPLEMENTAL RESPONSE:** Defendants object to this request as unduly burdensome to the extent it seeks information "by quarter." Subject to and without waving this objection, or the general objections above, Defendants state that there are no policies issued or renewed by ACE American brokers and agents in Canada that flowed through the Evolution application that used the Blaze Advisor® software for the period January 16, 2016 to date.

**REQUEST NO. 86:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in the United Kingdom and Europe in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**SUPPLEMETNAL RESPONSE:** Defendants object to this request as unduly burdensome to the extent it seeks information "by quarter." Subject to and without waving this objection, or the general objections above, Defendants state that there are no policies issued or renewed by ACE American brokers and agents in the United Kingdom that flowed through the EZER or Adapt applications that used the Blaze Advisor® software for the period January 16, 2016 to date.

**REQUEST NO. 87:** Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in Australia in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**SUPPLEMENTAL RESPONSE:** Defendants object to this request as unduly burdensome to the extent it seeks information "by quarter." Subject to and without waving this objection, or the general objections above, Defendants state that there are no policies issued or renewed by ACE American brokers and agents in Australia that

65743844.1

flowed through the Adapt application that used the Blaze Advisor® software for the

period January 16, 2016 to date.

**REQUEST NO. 88:** Documents sufficient to show the total number of insurance policies sold or renewed by legacy Chubb brokers and agents that issued from an insurance company formerly directly or indirectly owned by ACE Limited in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**SUPPLEMENTAL RESPONSE:** Defendants object to this request as unduly

burdensome to the extent it seeks information "by quarter." Subject to and without

waiving this objection, or the general objections above, Defendants direct Plaintiff to

Federal Insurance Company's Supplemental Answers to Interrogatory Nos. 16-20

served on February 28, 2019 and March 2, 2019. Discovery is continuing.

**REQUEST NO. 89:** Specific to each application that uses or used Blaze Advisor® software, documents sufficient to show (a) the number of business rules in each application; (b) the type of business rules in each application, including, without limitation, underwriting, pricing, claims, renewal processing, and workflow, and (c) the number of daily and monthly batch and real-time business rule transactions for each application.

**SUPPLEMENTAL RESPONSE:** Defendants object to this request as unduly

burdensome and not proportional to the needs of the case. Subject to and without

waiving these objections, or the general objections above, Defendants direct Plaintiff to

the documents produced on March 4, 2019.

**REQUEST NO. 90:** Specific to each application that uses or used Blaze Advisor® software, all documents relating to the business rules of each application.

**SUPPLEMENTAL RESPONSE:** Defendants object to this request as

overbroad, unduly burdensome, and not proportional to the needs of the case because it

seeks "all" documents and is unlimited in time. Subject to and without waiving these

6

objections, or the general objections above, Defendants direct Plaintiff to the documents

produced on March 4, 2019.

Dated:  March 4, 2019

/s/ Christopher D. Pham
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Lora M. Friedemann (#0259615)
lfriedemann@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Phone:  (612) 492-7000
(612) 492-7077 (fax)

*Attorneys for Defendants*

7

## Norvold, Deb

| | |
|---|---|
| **From:** | Pham, Christopher |
| **Sent:** | Tuesday, April 16, 2019 11:26 AM |
| **To:** | Allen Hinderaker; Heather Kliebenstein; Michael Erbele |
| **Cc:** | Fleming, Terrence; Janus, Leah |
| **Subject:** | FICO v. Federal - Blaze Chart |
| **Attachments:** | FED017912_0001_image-c-c-c.pdf; 65833895_1-c.pdf; FICO v. Federal - Federal's Fifth Supplemental Answer to ROG 16 and Sixt...-c-c.pdf |

Counsel,

Please be advised that the attached Blaze Chart will be updated relating to Adapt in Australia and produced by the end of the day.

With respect to CIS Claims, as we advised Judge Schultz in our letter dated January 30, 2019 (attached), Federal does not deploy an application called CIS claims, and such an application does not exist.  There is an application called ERCIS Claims, which is a claims system, but it does not use Blaze Advisor.  As stated in Federal's Fifth Supplemental Answer to Interrogatory No. 16 and Sixth Supplemental Answer to Interrogatory No. 17 (attached): "ERCIS Claims is a claims system (not a policy system), and therefore, there is no gross written premium or policy count associated with the application."  Because it does not use Blaze Advisor, ERCIS Claims is excluded from the Blaze Chart.

Thank you,



**Christopher D. Pham**
cpham@fredlaw.com
**200 South Sixth Street**
**Suite 4000**
**Minneapolis, MN  55402**
**612-492-7388 Phone**
**612-492-7077 Fax**

**Brenda Haberman**
**Legal Assistant/Paralegal**
bhaberman@fredlaw.com

**This is a transmission from the law firm of Fredrikson & Byron, P.A. and may contain information which is privileged, confidential, and protected by the attorney-client or attorney work product privileges. If you are not the addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this transmission in error, please destroy it and notify us immediately at our telephone number (612) 492-7000. The name and biographical data provided above are for informational purposes only and are not intended to be a signature or other indication of an intent by the sender to authenticate the contents of this electronic message.**



EXHIBIT
14

| Application | Blaze Rule Capability | Complexity / # of rules | Real-time transactions | | Batch Transactions -Run frequency |
|---|---|---|---|---|---|
| | | | Average # per month | Average # per Day | |
| CSI Express | Predictive Modeling - policy scoring | High 8300 | 750,000 - 1,000,000 | 45,500 | On average – twice per week |
| | Underwriting guidance | High 12800 | Service is disabled | | |
| Decision Point | Rate tables and Pricing Calculations | High 2250 | 10000 | 455 | N/A |
| | Eligibility determination | | 50000 | 2,300 | |
| | Endorsement generation | | 30000 | 1,400 | |
| | Data Normalization | | 50000 | 2,300 | |
| Automated Renewal Process | ARP1 - renewal categorization | High 3410 | N/A | N/A | Monthly |
| | ARP2 - Policy renewal automation, including endorsement generation | | | | Daily |
| CUW | Inventory Management & Workflow routing, assignments, scoring | Medium | 1.22 million per month | 55,000 | Nightly |
| | | 1502 | | 2,000 | |
| IRMA (Individual Rate Modification Application) | Rate tables and Pricing Calculations | Medium 622 | 184,072 | 8,350 | |
| TAPS (Texas Accident Prevention System) | Accident Prevention Compliance | Low 76 | N/A | N/A | Monthly |
| Premium Booking | Validation Rules for PARS | High 3120 | N/A | N/A | Daily |
| Evolution | Underwriting guidance for Canada | Medium 350 | N/A | N/A | Daily-Once |
| Adapt-ABL | Underwriting guidance for EUZ | Medium 1720 | N/A | N/A | Daily-Twice |
| EZER (Comm'l PAS in EUZ) | Renewal Policy categorization | Medium 910 | N/A | N/A | Daily-Once |

Attorneys' Eyes Only



January 30, 2019


Honorable David T. Schultz
United States District Court
9E U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415

Re:   Fair Isaac Corp. v. Federal Insurance Co., et al.
       No. 16-cv-01054-WMW-DTS (D. Minn. Filed April 21, 2016)

Dear Magistrate Schultz:

Defendants Federal Insurance Company and ACE American Insurance Company (collectively,
"Federal") respectfully request that the Court deny Plaintiff Fair Isaac Corporation's ("FICO")
request for evidentiary sanctions regarding FICO's Requests for Production of Documents Nos.
30-32 because Federal has complied with these requests, as further discussed below.

With respect to Interrogatory Nos. 16-20, FICO states that it "seeks the Court's assistance to []
compel full responses…"  However, at the motion hearing on December 17, 2018, the Court
correctly noted that Federal does not "have a problem with what's been asked." (*See* Dec. 17
Motion Hearing Transcript, p. 16, attached hereto as Exhibit A).  To be clear, Federal does not
object to providing full responses to these interrogatories.  And FICO is not moving for sanctions
regarding these interrogatories.

<u>Document Requests 30-32</u>

During the January 24 telephone hearing with the Court, FICO stated that it planned to bring a
motion regarding Interrogatory Nos. 16-20 and Requests Nos. 30-32.  This was the first time
Federal was informed about alleged deficiencies with Federal's recent production of documents
and updated Answers to Interrogatories.  Immediately following the telephone hearing with the
Court, counsel for Federal called counsel for FICO in an attempt to meet-and-confer about the
alleged deficiencies.  At FICO's request, a meet-and-confer was scheduled for the next day.  Due
to a scheduling change, counsel for Federal attempted to reach counsel for FICO to reschedule
the meet-and-confer twice, but counsel for FICO did not respond.

In its letter, FICO identified four issues with the spreadsheets that were produced: (1) failure to

Attorneys & Advisors  /  Fredrikson & Byron, P.A.
main 612.492.7000  /  200 South Sixth Street, Suite 4000
fax 612.492.7077  /  Minneapolis, Minnesota
fredlaw.com  /  55402-1425

MEMBER OF THE WORLD SERVICES GROUP   /   OFFICES
A Worldwide Network of Professional Service Providers   /   Minneapolis / Bismarck / Des Moines / Fargo / St. Paul / Monterrey, Mexico / Shanghai, China

January 30, 2019
Page 2

identify the geographic regions; (2) data for products and services lumped together; (3) the types of "losses" and "expenses" are not identified; and (4) the acronyms used are unidentified. Indeed, if the parties had a meet-and-confer, Federal could have addressed these items. In any event, however, FICO did not specifically ask for this information. Request Nos. 30-32 asked for financial information for "each line of business," and that was the basis for the information produced. Accordingly, the financial information provided complied with the requests, as noted below.

## Canada

The business unit in Canada known as Personal Risk Services (PRS) uses at least one application that uses Blaze Advisor®. Federal produced a spreadsheet that provides the following quarterly and annual financial information for PRS for the years 2015-2018:

- Gross Written Premium;
- Net Written Premium;
- Net Earned Premium;
- Total Losses;
- Total Expenses; and
- Net Underwriting Income.

(*See* FED017202, Exhibit C to Ms. Kliebenstein's Jan. 28 letter to the Court (hereinafter, the "FICO Letter")).

## Australia

The business unit in Australia known as Accident and Health (A&H) uses at least one application that uses Blaze Advisor®. Federal produced a spreadsheet that provides the following annual financial information for A&H for the years 2007-2018:

- Gross Written Premium;
- Net Written Premium;
- Net Earned Premium;
- Loss Incurred;
- Acquisition Costs; and
- Administrative Expenses.

(*See* FED017203, Exhibit C to the FICO Letter).

## United Kingdom

The business units in the United Kingdom known as Chubb Specialty Insurance (CSI), Chubb Commercial Insurance (CCI), and Accident and Health (A&H) use at least one application that

January 30, 2019
Page 3

uses Blaze Advisor®. Federal produced a spreadsheet that provides the following annual financial information for CSI, CCI, and A&H for the years 2011-2016:

- Written Premium;
- UPR FLUCN;[1]
- Earned Premium;
- Incurred Loss;
- Expenses; and
- Underwriting Result.[2]

(*See* FED017354, Exhibit C to the FICO Letter).

In addition, Federal produced a spreadsheet that provides the following annual financial information for CSI, CCI, and A&H for the years 2017-2018:

- Written Premium;
- Earned Premium;
- Commission Amount;
- Reported Loss; and
- Underwriting Profit.

(*See* FED017358, attached hereto as <u>Exhibit B</u>). This spreadsheet did not include loss reserves or administrative costs because the company stopped allocating those items to Legacy Chubb businesses (CSI, CCI, and A&H) after January 1, 2017.

### United States

The business units in the United States known as Chubb Specialty Insurance (CSI) and Chubb Commercial Insurance (CCI) use at least one application that uses Blaze Advisor®.[3] Federal produced a spreadsheet that provides the following quarterly and annual financial information for CSI and CCI for the years 2006-2015:

- Net Premiums Written;

---

[1] "UPR FLUCN" is the unearned premium that is getting accrued to the Balance Sheet for release in the future as the company "earns" the premium over the life of the policies.

[2] "Underwriting Result" is the P&L profit before investment income and tax.

[3] Corporate Business Systems (CBS) is not a separate line of business with financial information specific to those operations. The premiums generated by Premium Booking are accounted for in the company's overall accounting and the company's 10Ks provide the relevant information.

January 30, 2019
Page 4

- Net Premiums Earned;
- Net Losses Paid;
- Net Losses Incurred;
- Expenses Incurred; and
- Statutory Underwriting Income (Loss).

(*See* FED017204-FED017243, Exhibit D to the FICO Letter).

In addition, Federal produced annual financial information for the years 2016-2017 and through Quarter 3 for the year 2018, as follows:

- Net Premiums Written;
- Net Premiums Earned;
- Losses and Loss Expenses;
- Policy Acquisition Costs;
- Administrative Expenses; and
- Underwriting Income.

(*See* FED017355-FED017357, Exhibit D to the FICO Letter). Following the merger, the company's accounting practices combined what was previously known as strategic business units, i.e., CSI and CCI, so separate financials do not exist for each business unit post-merger as there was pre-merger (2006-2015).

FICO asserts that "[t]he data in these charts is overly broad because the charts report by line of business, not on an application basis or product/service basis." However, at the December 17 hearing, Court ordered as follows:

> On the RFPs [30-32], the information as to quarterly gross and net revenues and profits derived from *each line of business* that used Blaze Advisor for Chubb & Son and other business units has to be provided.

(*See* Exhibit A, p. 29 (emphasis added)).[4]

To the extent financial information was available by lines of business, Federal produced such information. For example, for Canada and Australia, there was only one line of business in each region that used Blaze Advisor – PRS in Canada and A&H in Australia – and therefore, financial

---

[4] At the December 17 hearing, the Court asked FICO's counsel whether it makes "a material difference whether you get it in the form of quarterly versus annual information," regarding the financial information in Requests 30-32, and FICO's counsel acknowledged that "annual" would suffice. (*See* Exhibit A, p. 9).

January 30, 2019
Page 5

information was provided by those lines of businesses through 2018.  For the United Kingdom, the financial information was also provided by lines of business – CSI, CCI, and A&H.

However, for the United States, financial information for the separate lines of business – CSI and CCI – is not available post-2015, because the company stopped segmenting financial information by lines of business (2006-2015).  (*See* FED017204-FED017243, Exhibit D to the FICO Letter). Therefore, the financial information available for the United States was combined for 2016-2018. (*See* FED017355-FED017357, Exhibit D to the FICO Letter).[5]

In sum, Federal has complied with the Court's Dec. 17 Order relating to Requests 30-32, and therefore, FICO's request for evidentiary sanctions must be denied.  FICO's requests only sought financial information for January 1, 2016 to the present, and Federal went above-and-beyond by producing financial information for the years it believes Blaze Advisor® was used.

## Interrogatory Nos. 16-20

At the December 17 motion hearing, the Court ordered as follows relating to Interrogatory Nos. 16-20:

> If you have premium dollars that are coming out of the *business line or business unit*, depending on the interrogatory, for which Blaze software - - Blaze Advisor software was anywhere in the stream of moving that to a premium, then you have to provide all that premium information.

(*See* Exhibit A, p. 30 (emphasis added)).  Federal provided gross written premium information by line of business as ordered.

### Interrogatory No. 16

Interrogatory No. 16 seeks gross written premium information for each year from 2007-2017 for applications that use Blaze Advisor® in the United States.

Federal provided gross written premium information for the following business lines and related applications for the years the information was available from 2007-2012:

- Chubb Specialty Insurance (CSI) – CSI eXPRESS (Automated Renewal Process);

---

[5] It should be noted that FICO's requests sought financial information only for January 1, 2016 to the present. Federal exceeded its obligations by producing financial information for the years it believes Blaze Advisor® was used.

January 30, 2019
Page 6

- Corporate Business Systems (CBS) – Premium Booking; and

- Chubb Commercial Insurance (CCI) – CUW, TAPS, and IRMA.

With respect to CSI, FICO asserts that Federal did not provide gross written premium information for applications named (1) Automated Renewal Process, (2) CIS Claims, (3) Decision Point, or (4) Profitability Indicator.

First, with respect to Automated Renewal Process, Federal did provide gross written premium information. That information is combined with the information for CSI eXPRESS. This information was obtained by running a query within the application.

Second, with respect to CIS Claims, during the November 13, 2018 deposition of Ramesh Pandey, who is the Chief Architect for North America, he testified that CIS Claims does not use Blaze Advisor®.

> Q:    Does the generic Chubb deploy an application called CIS
>        Claims using Blaze Advisor software?
>
> A:    No. CIS Claim does not even exist.

(Nov. 13, 2018 Deposition Transcript at 22:10-13, attached hereto as <u>Exhibit C</u>).

Third, with respect to Decision Point and Profitability Indicator, Federal will gather the gross written premium information for these additional applications.

With respect to CCI, Federal produced the gross written premium information combined for all three applications – CUW, TAPS, and IRMA – for the years requested (2007-2012). FICO notes that "Federal identified all written premiums issued by those applications as a lump sum for the three applications combined, without separately identifying the written premiums from each application." Federal believes that the total gross written premiums for CCI run through all three applications, and therefore, the gross written premiums were provided as a lump sum. In addition, Federal provided the information that it was able to obtain under the time constraints. To the extent FICO requires gross written premium information broken down by application, Federal will need to determine the feasibility of such a request.

### Interrogatory No. 17

Interrogatory No. 17 seeks gross written premium information for each quarter from March 30, 2016 to date, for applications that use Blaze Advisor® in the United States.

Federal provided gross written premium information for the following business lines and related applications for the years 2016-2017:

January 30, 2019
Page 7

- Financial Lines Unit (post-merger) – CSI eXPRESS (Automated Renewal Process); and

- Corporate Business Systems (CBS) – Premium Booking.

With respect to CSI, as noted above, Federal will gather the gross written premium information for the additional applications identified by Mr. Mirolyuz: Decision Point and Profitability Indicator, and will also provide the 2018 gross written premium information.

With respect to CCI, Federal believes the financial information produced with the Bates range FED017355-FED017357 is responsive to Requests 30-32. (*See* Exhibit D to the FICO Letter). FICO, however, argues that the "*net* written premium data…is overbroad and not linked in any way to gross written premiums from insurance policies in connection with which Blaze Advisor software was used." From Federal's perspective, the "net written premiums" simply exclude reinsurance premiums, which are premiums that Federal never receives, and therefore, is considered the "gross written premium." This is another instance in which a meet-and-confer between the parties would have been helpful in understanding what FICO is seeking and speaking through these concerns.

In any event, as a showing of good faith in addressing the concern presented by FICO, Federal will be producing additional financial information for CCI that has a specific line item for gross written premiums for the period 2016 through the third quarter of 2018.

### Interrogatory No. 18

Interrogatory No. 18 seeks quarterly gross written premium information from date of first use of Blaze Advisor® in the United Kingdom.

Federal provided quarterly gross written premium information for 2012-2018 for the applications EZER and Adapt, which use Blaze Advisor®. These are the applications used within the business lines CSI, CCI, and A&H in the United Kingdom. FICO argues that Federal did not identify which premiums came from Federal and which premiums came from its various related companies. As noted above, the Court ordered Federal to provide "premium dollars that are coming out of the business line or business unit…" and that is the manner in which Federal provided information, i.e., business lines CSI, CCI, and A&H, and for the applications EZER and Adapt.

### Interrogatory No. 19

Interrogatory No. 19 seeks quarterly gross written premium information from date of first use of Blaze Advisor® in Canada.

January 30, 2019
Page 8

Federal provided annual gross written premium information for 2015-2017 for the application Evolution, which uses Blaze Advisor®. This is the application used within the business line PRS in Canada. FICO asserts that no data was provided for 2018. That is incorrect. The 2018 gross written premium information is included in the financial information produced in response to Requests 30-32.

FICO also argues that Federal did not identify which premiums came from Federal and which premiums came from its various related companies. As noted above, the Court ordered Federal to provide "premium dollars that are coming out of the business line or business unit…" and that is the manner in which Federal provided information, i.e., business line PRS, and for the application Evolution.

FICO further asserts that no written premium information was provided for Broker Site or Adapt, which are two additional applications that Mr. Mirolyuz testified used Blaze Advisor® in Canada. In consulting with our client contact who is the Senior Vice President, Operations and IT, CIO in Canada, she indicated that Evolution is the only application in Canada that uses Blaze Advisor®.

In addition, during the Rule 30(b)(6) deposition of Federal on January 22, 2019, Ramesh Pandey, the designated corporate witness, testified that Evolution was the only application that used Blaze Advisor® in Canada.

> Q:     Any other applications that are using Blaze Advisor in
>         Canada, to your knowledge?
> A:     Evolution. Which, behind the scene using Renaissance.
>         The name Evolution, which is a front end of user interface.
>         Behind scene uses Renaissance.

(Jan. 22, 2019 Deposition Transcript at 50:4-9, attached hereto as Exhibit D). Renaissance and Evolution are essentially the same application. Mr. Pandey did not testify that any other applications use Blaze Advisor® in Canada.

**Interrogatory No. 20**

Interrogatory No. 20 seeks quarterly gross written premium information from date of first use of Blaze Advisor® in Australia.

Federal provided annual gross written premium information for 2010-2017 for the application Adapt, which uses Blaze Advisor®. This is the application used within the business line A&H in Australia. FICO asserts that no data was provided for 2018. That is incorrect. The 2018 gross written premium information is included in the financial information produced in response to Requests 30-32.

January 30, 2019
Page 9

FICO also argues that Federal did not identify which premiums came from Federal and which premiums came from its various related companies. As noted above, the Court ordered Federal to provide "premium dollars that are coming out of the business line or business unit..." and that is the manner in which Federal provided information, i.e., business line A&H, and for the application Adapt.

FICO further asserts that no written premium information was provided for Evolution, which is an additional application that Mr. Mirolyuz purportedly testified used Blaze Advisor® in Australia. That is incorrect. Mr. Mirolyuz did not testify that Evolution is used in Australia:

> Q:   Adapt uses Blaze Advisor?
> A:   Correct, for one of the functions.

(Exhibit B at 68:19-20).

> Q:   [Evolution] uses Blaze Advisor?
> A:   For one of the functions.

(Exhibit B at 69:22-23).

Mr. Mirolyuz does, however, testify that Evolution is used in Canada:

> Q:   And then let's go to Evolution. What is that application?
> A:   It's a policy admin system for specialty lines in Canada.

(*See* Exhibit B at 69:18-21).

In fact, during the Rule 30(b)(6) deposition of Federal on January 22, 2019, Ramesh Pandey, the designated corporate witness, testified that Australia does *not* use Evolution.

> Q:   Okay. And to your knowledge, does Australia also use Evolution?
> A:   No.

(*See* Exhibit D, at 48:16-18).

Conclusion

Federal has worked in good faith to produce a significant amount of information in a short period of time. Federal will provide gross written premium information for the applications Decision Point and Profitability Indicator, as well as the 2018 gross written premium information for CSI eXPRESS (Automated Renewal Process). Regarding Requests Nos. 30-32, Federal respectfully

January 30, 2019
Page 10

requests that the Court deny FICO's request for evidentiary sanctions because Federal has complied with these requests.

Best regards,

Christopher D. Pham
**Direct Dial:** 612.492.7388
**Email:** cpham@fredlaw.com

65794904.1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION, | Court File No. 16-cv-1054 (WMW/DTS) |
| Plaintiff, | |
| v. | **FEDERAL INSURANCE COMPANY'S** |
| | **FIFTH SUPPLEMENTAL ANSWER** |
| FEDERAL INSURANCE COMPANY, | **TO PLAINTIFF'S INTERROGATORY** |
| an Indiana corporation, and ACE | **NO. 16 AND SIXTH SUPPLEMENTAL** |
| AMERICAN INSURANCE COMPANY, a | **ANSWER TO PLAINTIFF'S** |
| Pennsylvania corporation, | **INTERROGATORY NO. 17** |
| Defendants. | |

To:   Plaintiff and its attorneys, Allen Hinderaker, Heather Kliebenstein and Michael A. Erbele, Merchant & Gould P.C., 3200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402.

Defendant Federal Insurance Company ("Federal"), for its Fifth Supplemental Answer to Plaintiff's Interrogatory No. 16 and Sixth Supplemental Answer to Plaintiff's Interrogatory No. 17, states and alleges as follows:

### **GENERAL RESPONSES**

1.     Federal objects to the Definitions and Instructions to the extent that they seek to impose obligations on Federal that either exceed, or are different from, what is required under the Federal Rules of Civil Procedure, District of Minnesota Local Rules, and the Stipulated E-Discovery Order.

2.     Federal objects to the requests to the extent that they seek information protected from discovery under the attorney-client privilege or work product doctrine.

3.      Federal's responses and objections are made to the best of Federal's present knowledge, information, and belief.   Federal's responses and objections are limited to information within its possession, custody, or control.   Federal reserves the right to amend, supplement, or change any responses and objections if and when additional, different, or more accurate information becomes available and/or facts are developed.

4.      Federal gives these Responses subject to all objections to admissibility that may be interposed in this proceeding.

**FIFTH SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 16**

**INTERROGATORY NO. 16:**   For all insurance policies in connection with which the Blaze Advisor® software was used, the gross written premium of Defendants 1 and the gross written premium of each related company, including the specific identification of each related company, for each year from 2007-2012. For clarity, this Interrogatory is not seeking investment income, other income, or capital and surplus accounts.

**SUPPLEMENTAL ANSWER:**   Defendants object to the request for "all" insurance policies and the request for information more than 10 years old as overbroad, unduly burdensome, and not proportional to the needs of this case.   Defendants also object to this Interrogatory as compound and impermissibly constituting multiple interrogatories, which are limited in number under the Federal Rules.   Defendants also object to this Interrogatory as vague and ambiguous in failing to identify the relevant "use" and calling for insurance policies "in connection with."   Defendants further object to this Interrogatory because "the gross written premium" of Defendants and the "gross written premium of each related company" are not relevant to any claim or defense in this action, including because Defendants' profits are not reasonably related to the alleged

2

infringement, as is necessary for FICO to obtain an award of the defendant's profits. *See, e.g., Francois v. Ruch*, 2006 WL 3735950, at *3 (C.D. Ill. Dec. 15, 2006). Defendants further object to the extent the Interrogatory seeks information not in the possession, custody, or control of Defendants, and thus exceed the scope of discovery under Federal Rule 26(b)(1).

Subject to, and without waiving these objections, Defendants state the following:

- For Chubb Specialty Insurance (CSI) business unit for the years identified below (pre-merger), the following applications used Blaze Advisor® software: CSI Express, Decision Point, Automated Renewal Process, and Profitability Indicator. The approximate gross written premiums, policy counts, and identification of the insurance writing companies that issued insurance policies that used these applications, in connection with which the Blaze Advisor® software was used, is provided in the charts below for the years requested. Discovery is continuing.

- **For Decision Point (DP):**

| Year / Writing Company | Gross Written Premium | Policy Count |
|---|---|---|
| **2012** | **$ 841,138.45** | **315** |
| CICNJ | $ 43,874 | 11 |
| FIC-D | $797,264.45 | 304 |
| **2011** | **$21,515.00** | **25** |
| FIC-D | $21,515.00 | 25 |

- **For CSI eXPRESS (CSIX), Automated Renewal Process (ARP), and Profitability Indicator(PI):**

| Year / Writing Company | Gross Written Premium | Policy Count |
|---|---|---|
| **2007** | **$535,562,441.59** | **26480** |
| **CSIX/ARP/PI** | **$411,831,105.63** | **16736** |
| ERII | $58,277,903.30 | 3254 |
| ERSIC | $9,371,205.00 | 368 |
| FIC-D | $297,654,366.14 | 12008 |
| VIG-D | $14,162,587.69 | 386 |
| CICC-CN | $32,365,043.50 | 720 |
| **New Business PI excluding DP** | **$123,731,335.96** | **9744** |
| ERII | $9,953,075.00 | 724 |
| ERSIC | $721,368.00 | 75 |

3

| | | |
|---|---|---|
| FIC-D | $111,978,546.96 | 8873 |
| VIG-D | $1,078,346.00 | 72 |
| **2008** | **$1,647,709,716.96** | **81305** |
| **CSIX/ARP/PI** | **$1,537,325,711.23** | **71254** |
| ERII | $215,268,902.92 | 13218 |
| ERSIC | $34,309,203.02 | 1557 |
| FIC-D | $1,147,027,596.80 | 51879 |
| VIG-D | $35,052,497.18 | 1729 |
| CICC-CN | $105,667,511.31 | 2871 |
| **New Business PI excluding DP** | **$110,384,005.73** | **10051** |
| ERII | $9,021,079.53 | 697 |
| ERSIC | $597,548.00 | 50 |
| FIC-D | $98,576,897.65 | 9217 |
| VIG-D | $2,188,480.55 | 87 |
| **2009** | **$1,600,826,011.19** | **81508** |
| **CSIX/ARP/PI** | **$1,506,514,316.52** | **73363** |
| ERII | $194,276,702.47 | 12207 |
| ERSIC | $31,409,594.04 | 1573 |
| FIC-D | $1,140,513,335.09 | 54821 |
| VIG-D | $35,693,057.72 | 1755 |
| CICC-CN | $104,621,627.20 | 3007 |
| **New Business PI excluding DP** | **$94,311,694.67** | **8145** |
| ERII | $6,680,477.08 | 584 |
| ERSIC | $464,553.00 | 41 |
| FIC-D | $83,789,151.59 | 7432 |
| VIG-D | $3,377,513.00 | 88 |
| **2010** | **$1,568,376,724.75** | **83750** |
| **CSIX/ARP/PI** | **$1,481,374,670.62** | **74633** |
| ERII | $159,069,222.21 | 10854 |
| ERSIC | $29,839,730.67 | 1500 |
| FIC-D | $1,160,731,158.10 | 57666 |
| VIG-D | $27,464,481.03 | 1397 |
| CICC-CN | $104,270,078.61 | 3216 |
| **New Business PI excluding DP** | **$87,002,054.13** | **9117** |
| ERII | $8,576,242.68 | 672 |
| ERSIC | $1,200,424.00 | 101 |
| FIC-D | $76,751,867.45 | 8323 |
| VIG-D | $473,520.00 | 21 |
| **2011** | **$1,580,943,278.49** | **85628** |
| **CSIX/ARP/PI** | **$1,485,590,454.28** | **76039** |

4

| | | |
|---|---:|---:|
| CICNJ | $112,740.00 | 11 |
| ERII | $151,037,252.06 | 10516 |
| ERSIC | $34,021,861.87 | 1593 |
| FIC-D | $1,181,357,358.75 | 60023 |
| VIG-D | $17,418,127.00 | 522 |
| CICC-CN | $101,643,114.60 | 3374 |
| **New Business PI excluding DP** | **$95,352,824.21** | **9589** |
| CICNJ | $303,777.00 | 40 |
| ERII | $8,454,998.04 | 663 |
| ERSIC | $1,221,594.00 | 88 |
| FIC-D | $85,355,418.17 | 8795 |
| VIG-D | $17,037.00 | 3 |
| **2012** | **$ 1,508,121,584.43** | **84933** |
| **CSIX/ARP/PI** | **$1,435,649,008.31** | **76787** |
| CICNJ | $7,827,401.52 | 669 |
| ERII | $123,450,577.97 | 8964 |
| ERSIC | $38,050,155.78 | 1626 |
| FIC-D | $1,153,902,459.39 | 61539 |
| VIG-D | $12,781,568.00 | 375 |
| CICC-CN | $99,636,845.65 | 3614 |
| **New Business PI excluding DP** | **$72,472,576.12** | **8146** |
| CICNJ | $1,142,317.00 | 112 |
| ERII | $2,580,177.00 | 247 |
| ERSIC | $594,746.00 | 33 |
| FIC-D | $68,064,968.12 | 7735 |
| PACIFICPI | $54,692.00 | 15 |
| VIG-D | $35,676.00 | 4 |

- CSI eXPRESS, Automated Renewal Process, and Profitability Indicator are combined all together in one chart because creating a separate chart for each application would result in triple-counting of the policy counts and gross written premiums. In other words, policies and premiums that go through one of these applications goes through the other two applications as well.

- For Corporate Business Systems (CBS), which is not a strategic business unit (SBU), the following application uses Blaze Advisor® software: Premium Booking. The approximate gross written premiums and policy counts that used these applications, in connection with which the Blaze Advisor® software was used, is provided in the charts below for the years requested. Discovery is continuing.

5

| Year | Gross Written Premium | Policy Count |
|------|----------------------|--------------|
| 2012 | $29,745,346.00 | 2,945 |

- Premium Booking did not start using Blaze Advisor® until 2012, and therefore, there is no information to produce for years 2007-2011.

- The data for Premium Booking is extracted from a mainframe DB2 table that is specifically tracking the policies that passed through the Premium Booking "rules" as constructed in/using the Blaze Advisor® tool. Unfortunately, this table does not include writing company and that information could not be correlated to the policy count/gross written premium values being provided.

- For the Chubb Commercial Insurance (CCI) business unit for the years identified below (pre-merger), the following applications use Blaze Advisor® software: CUW-IM, TAPS, and IRMA. The approximate gross written premiums, policy counts, and identification of the insurance writing companies that issued insurance policies that used these applications, in connection with which the Blaze Advisor® software was used, is provided in the charts below for the years requested. Discovery is continuing.

- **For CUW-IM:**

| YEAR | WRITING COMPANY | POLICY COUNT | WRITTEN PREMIUM |
|------|-----------------|--------------|-----------------|
| 2008 | CHUBB CUSTOM INSURANCE COMPANY | 3 | $129,335.00 |
| | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A. | 4 | $39,920.00 |
| | CHUBB EUROPEAN GROUP SE | 16 | $183,784.00 |
| | CHUBB INDEMNITY INSURANCE COMPANY | 1,852 | $103,322,677.00 |
| | CHUBB INSURANCE COMPANY OF CANADA | 8 | $222,472.00 |
| | CHUBB INSURANCE COMPANY OF NEW JERSEY | 1,303 | $24,462,200.00 |
| | FEDERAL INSURANCE COMPANY | 151,876 | $4,201,082,024.00 |
| | GREAT NORTHERN INSURANCE COMPANY | 25,331 | $747,513,504.00 |
| | NORTHWESTERN PACIFIC INDEMNITY COMPANY | 358 | $6,320,003.00 |
| | PACIFIC INDEMNITY COMPANY | 5,505 | $286,408,076.00 |
| | SAMSUNG FIRE & MARINE INSURANCE CO., LTD | 30 | $26,593,838.00 |
| | SUN INSURANCE OFFICE OF AMERICA INC. | 1 | $89,907.00 |
| | TEXAS PACIFIC INDEMNITY COMPANY | 200 | $1,205,973.00 |
| | VIGILANT INSURANCE COMPANY | 8,366 | $420,273,080.00 |
| 2009 | CHUBB CUSTOM INSURANCE COMPANY | 4 | $76,310.00 |
| | CHUBB DE MEXICO | 1 | $2,580.00 |
| | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A. | 9 | $97,884.00 |

6

|      |                                              |         |                  |
|------|----------------------------------------------|---------|------------------|
|      | CHUBB EUROPEAN GROUP SE                      | 26      | $208,523.00      |
|      | CHUBB INDEMNITY INSURANCE COMPANY            | 2,353   | $136,955,926.00  |
|      | CHUBB INSURANCE COMPANY OF CANADA            | 2       | $17,222.00       |
|      | CHUBB INSURANCE COMPANY OF NEW JERSEY        | 1,082   | $20,203,550.00   |
|      | FEDERAL INSURANCE COMPANY                    | 141,455 | $3,889,510,342.00 |
|      | GREAT NORTHERN INSURANCE COMPANY             | 25,696  | $743,274,793.00  |
|      | NORTHWESTERN PACIFIC INDEMNITY COMPANY       | 285     | $5,138,825.00    |
|      | PACIFIC INDEMNITY COMPANY                    | 5,095   | $316,683,766.00  |
|      | SAMSUNG FIRE & MARINE INSURANCE CO., LTD     | 11      | $6,429,996.00    |
|      | TEXAS PACIFIC INDEMNITY COMPANY              | 153     | $1,172,010.00    |
|      | VIGILANT INSURANCE COMPANY                   | 8,057   | $374,920,202.00  |
| 2010 | CHUBB CUSTOM INSURANCE COMPANY               | 1,040   | $122,103,178.00  |
|      | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A.    | 5       | $20,482.00       |
|      | CHUBB EUROPEAN GROUP SE                      | 15      | $105,501.00      |
|      | CHUBB INDEMNITY INSURANCE COMPANY            | 3,101   | $177,055,083.00  |
|      | CHUBB INSURANCE COMPANY OF CANADA            | 1       | $88,658.00       |
|      | CHUBB INSURANCE COMPANY OF NEW JERSEY        | 2,210   | $42,920,170.00   |
|      | CHUBB NATIONAL INSURANCE COMPANY             | 92      | $3,123,826.00    |
|      | CHUBB SEGUROS CHILE S.A.                     | 1       | $2,500.00        |
|      | EXECUTIVE RISK SPECIALTY INSURANCE COMPANY   | 52      | $8,697,695.00    |
|      | FEDERAL INSURANCE COMPANY                    | 137,371 | $3,698,684,632.00 |
|      | GREAT NORTHERN INSURANCE COMPANY             | 27,458  | $780,112,475.00  |
|      | NORTHWESTERN PACIFIC INDEMNITY COMPANY       | 133     | $1,914,352.00    |
|      | PACIFIC INDEMNITY COMPANY                    | 4,922   | $321,119,086.00  |
|      | SAMSUNG FIRE & MARINE INSURANCE CO., LTD     | 21      | $11,122,629.00   |
|      | TEXAS PACIFIC INDEMNITY COMPANY              | 48      | $561,491.00      |
|      | VIGILANT INSURANCE COMPANY                   | 7,116   | $337,428,287.00  |
| 2011 | CHUBB ARGENTINA DE SEGUROS, S.A.             | 1       | $5,000.00        |
|      | CHUBB CUSTOM INSURANCE COMPANY               | 3,491   | $385,518,178.00  |
|      | CHUBB DE MEXICO                              | 1       | $989.00          |
|      | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A.    | 1       | $2,580.00        |
|      | CHUBB EUROPEAN GROUP SE                      | 17      | $146,591.00      |
|      | CHUBB INDEMNITY INSURANCE COMPANY            | 3,716   | $226,657,032.00  |
|      | CHUBB INSURANCE COMPANY OF CANADA            | 4       | $21,549.00       |
|      | CHUBB INSURANCE COMPANY OF NEW JERSEY        | 3,136   | $70,496,940.00   |
|      | CHUBB NATIONAL INSURANCE COMPANY             | 441     | $15,385,996.00   |
|      | EXECUTIVE RISK INDEMNITY INC.                | 2       | $280,287.00      |
|      | EXECUTIVE RISK SPECIALTY INSURANCE COMPANY   | 198     | $19,035,150.00   |
|      | FEDERAL INSURANCE COMPANY                    | 138,433 | $3,880,746,649.00 |
|      | GREAT NORTHERN INSURANCE COMPANY             | 28,099  | $788,375,650.00  |
|      | NORTHWESTERN PACIFIC INDEMNITY COMPANY       | 46      | $433,898.00      |

|  |  | PACIFIC INDEMNITY COMPANY | 4,960 | $377,203,972.00 |
|---|---|---|---|---|
|  |  | SAMSUNG FIRE & MARINE INSURANCE CO., LTD | 18 | $10,144,642.00 |
|  |  | TEXAS PACIFIC INDEMNITY COMPANY | 5 | $25,153.00 |
|  |  | VIGILANT INSURANCE COMPANY | 7,905 | $326,713,561.00 |
| 2012 |  | CHUBB ARGENTINA DE SEGUROS, S.A. | 1 | $2,171.00 |
|  |  | CHUBB CUSTOM INSURANCE COMPANY | 3,149 | $362,776,790.00 |
|  |  | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A. | 4 | $11,268.00 |
|  |  | CHUBB EUROPEAN GROUP SE | 23 | $130,168.00 |
|  |  | CHUBB INDEMNITY INSURANCE COMPANY | 3,908 | $286,930,612.00 |
|  |  | CHUBB INSURANCE COMPANY OF CANADA | 1 | $2,487.00 |
|  |  | CHUBB INSURANCE COMPANY OF NEW JERSEY | 3,651 | $81,243,737.00 |
|  |  | CHUBB NATIONAL INSURANCE COMPANY | 406 | $16,658,095.00 |
|  |  | EXECUTIVE RISK INDEMNITY INC. | 2 | $292,610.00 |
|  |  | EXECUTIVE RISK SPECIALTY INSURANCE COMPANY | 182 | $17,683,967.00 |
|  |  | FEDERAL INSURANCE COMPANY | 137,255 | $4,079,734,667.00 |
|  |  | GREAT NORTHERN INSURANCE COMPANY | 28,105 | $810,808,702.00 |
|  |  | NORTHWESTERN PACIFIC INDEMNITY COMPANY | 1 | $595.00 |
|  |  | PACIFIC INDEMNITY COMPANY | 4,777 | $400,541,236.00 |
|  |  | SAMSUNG FIRE & MARINE INSURANCE CO., LTD | 2 | $630,548.00 |
|  |  | VIGILANT INSURANCE COMPANY | 7,082 | $318,640,317.00 |

- CUW-IM did not start using Blaze Advisor® until 2008, and therefore, there is no information to produce for 2007.

- **For IRMA:**

| YEAR | WRITING COMPANY | POLICY COUNT | WRITTEN PREMIUM |
|---|---|---|---|
| 2012 | CHUBB CUSTOM INSURANCE COMPANY | 124 | $595,754.00 |
|  | CHUBB DE MEXICO | 1 | $2,360.99 |
|  | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A. | 12 | $8,124.14 |
|  | CHUBB EUROPEAN GROUP SE | 4 | $51,563.72 |
|  | CHUBB INDEMNITY INSURANCE COMPANY | 1 | $2,199.00 |
|  | CHUBB INSURANCE COMPANY OF CANADA | 1365 | $5,547,323.51 |
|  | CHUBB INSURANCE COMPANY OF NEW JERSEY | 229 | $951,268.54 |
|  | CHUBB SEGUROS COLOMBIA S.A. | 1 | $24,878.52 |
|  | EXECUTIVE RISK SPECIALTY INSURANCE COMPANY | 4 | $3,735.00 |
|  | FEDERAL INSURANCE COMPANY | 9426 | $58,631,246.19 |
|  | GREAT NORTHERN INSURANCE COMPANY | 3184 | $15,000,997.57 |
|  | PACIFIC INDEMNITY COMPANY | 455 | $5,097,902.73 |
|  | VIGILANT INSURANCE COMPANY | 782 | $4,226,667.39 |

- IRMA did not start using Blaze Advisor® until 2012, and therefore, there is no information to produce for 2007-2011.

- TAPS did not start using Blaze Advisor® until 2013, and therefore, there is no information to produce for 2007-2012.

• ERCIS Claims is a claims system (not a policy system), and therefore, there is no gross written premium or policy count associated with the application.

• For the Surety business unit for the years identified below (pre-merger), the following application does **not** use Blaze Advisor® software: Cornerstone. However, as ordered by the Court, below are the approximate gross written premiums, policy counts, and identification of the insurance writing company that issued insurance policies that used Cornerstone:

| Year/Writing Company | Policy Count | Gross Written Premium |
|---|---|---|
| **2008** | **481,556** | **$307,351,621** |
| Chubb Ins Co of Canada | 13,729 | $8,420,284 |
| Federal Ins Co - Canada | 43 | $40,945 |
| Federal Insurance Co | 430,775 | $276,055,563 |
| Pacific Indemnity Co | 3,234 | $11,008,167 |
| Vigilant Insurance Co | 33,775 | $11,826,663 |
| **2009** | **430447** | **$282,380,066** |
| Chubb Ins Co of Canada | 12762 | $8,505,028 |
| Federal Ins Co - Canada | 20 | $2,500 |
| Federal Insurance Co | 384536 | $261,813,664 |
| Pacific Indemnity Co | 3344 | $1,569,949 |
| Vigilant Insurance Co | 29785 | $10,488,925 |
| **2010** | **408113** | **$271,330,135** |
| Chubb Ins Co of Canada | 12839 | $15,155,558 |
| Federal Ins Co - Canada | 19 | $0 |
| Federal Insurance Co | 363973 | $245,493,837 |
| Pacific Indemnity Co | 3315 | $4,715,975 |
| Vigilant Insurance Co | 27967 | $5,964,764 |
| **2011** | **379051** | **$262,102,758** |
| Chubb Ins Co of Canada | 12408 | $17,742,302 |
| Federal Ins Co - Canada | 2 | $0 |
| Federal Insurance Co | 336742 | $232,835,157 |
| Pacific Indemnity Co | 2989 | $5,741,267 |
| Vigilant Insurance Co | 26910 | $5,784,032 |
| **2012** | **355938** | **$211,057,807** |

9

| Chubb Ins Co of Canada | 12350 | $9,914,474 |
| Federal Ins Co - Canada | 12 | $4,223 |
| Federal Insurance Co | 315037 | $190,176,397 |
| Pacific Indemnity Co | 3333 | $5,447,405 |
| Vigilant Insurance Co | 25206 | $5,515,309 |

## SIXTH SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 17

**INTERROGATORY NO. 17:** For all insurance policies in connection with which the Blaze Advisor® software was used, the gross written premium of Defendants and the gross written premium of each related company, including the specific identification of each related company, for each quarter from March 30, 2016 to date. For clarity, this Interrogatory is not seeking investment income, other income, or capital and surplus accounts.

**ANSWER:** Defendants object to the request for "all" insurance policies as overbroad, unduly burdensome, and not proportional to the needs of this case. Defendants also object to this Interrogatory as compound and impermissibly constituting multiple interrogatories, which are limited in number under the Federal Rules. Defendants also object to this Interrogatory as vague and ambiguous in failing to identify the relevant "use" and calling for insurance policies "in connection with." Defendants further object to this Interrogatory because "the gross written premium" of Defendants and the "gross written premium of each related company" are not relevant to any claim or defense in this action, including because Defendants' profits are not reasonably related to the alleged infringement, as is necessary for FICO to obtain an award of the defendants' profits. *See, e.g.*, *Francois v. Ruch*, 2006 WL 3735950, at *3 (C.D. Ill. Dec. 15, 2006). Defendants further object to the extent the Interrogatory seeks information not in the possession, custody, or control of Defendants, and thus exceeds the scope of discovery under Federal Rule 26(b)(1).

Subject to, and without waiving these objections, Federal states the following:

- For the Financial Lines Unit (post-merger) for the years identified below, the following applications use Blaze Advisor® software: CSI Express, Decision Point, Automated Renewal Process, and Profitability Indicator. The approximate gross written premiums, policy counts, and identification of the insurance writing companies that issued insurance policies that used these applications, in connection with which the Blaze Advisor® software was used, is provided in the charts below for the years requested. Discovery is continuing.

- **For Decision Point (DP):**

| Year / Writing Company | Gross Written Premium | Policy Count |
|---|---|---|
| **2019** | **$1,347,731.00** | **466.00** |
| CICNJ | $80,257.00 | 19.00 |
| ERII | $14,133.00 | 1.00 |
| FIC-D | $1,253,341.00 | 446.00 |
| **2018** | **$4,814,337.77** | **1697.00** |
| CICNJ | $236,749.00 | 71.00 |
| ERII | $34,899.00 | 5.00 |
| FIC-D | $4,542,689.77 | 1621.00 |
| **2017** | **$4,319,855.92** | **1447.00** |
| CICNJ | $319,436.68 | 82.00 |
| ERII | $34,636.00 | 3.00 |
| FIC-D | $3,965,783.24 | 1362.00 |
| **2016** | **$3,547,608.80** | **1162.00** |
| CICNJ | $182,249.80 | 43.00 |
| ERII | $5,465.00 | 1.00 |
| FIC-D | $3,359,894.00 | 1118.00 |

- **For CSI eXPRESS (CSIX), Automated Renewal Process (ARP), and Profitability Indicator (PI):**

| Year / Writing Company | Gross Written Premium | Policy Count |
|---|---|---|
| **2016** | **$  1,526,511,534.36** | **90555** |
| **CSIX/ARP/PI** | **$  1,444,514,455.23** | **82191** |
| CICNJ | $  21,543,942.90 | 1893 |
| ERII | $  74,655,072.17 | 5326 |
| ERSIC | $  31,403,417.00 | 1466 |
| FIC-D | $  1,210,424,578.61 | 68552 |
| PACIFICPI | $  150,747.00 | 64 |
| VIG-D | $  7,425,581.00 | 98 |

11

| | | | |
|---|---|---|---|
| CICC-CN | $ | 98,911,116.55 | 4792 |
| **New Business PI excluding DP** | **$** | **81,997,079.13** | **8364** |
| CICNJ | $ | 2,212,095.00 | 268 |
| ERII | $ | 492,570.48 | 52 |
| ERSIC | $ | 1,026,440.46 | 72 |
| FIC-D | $ | 75,579,124.19 | 7694 |
| PACIFICPI | $ | 206,637.00 | 34 |
| CICC-CN | $ | 2,480,212.00 | 244 |
| **2017** | **$** | **1,462,910,856.49** | **91631** |
| **CSIX/ARP/PI** | **$** | **1,351,871,992.43** | **82188** |
| CICNJ | $ | 20,940,256.13 | 1999 |
| ERII | $ | 62,459,326.84 | 4808 |
| ERSIC | $ | 28,856,329.46 | 1389 |
| FIC-D | $ | 1,132,709,567.53 | 69042 |
| PACIFICPI | $ | 331,853.03 | 86 |
| VIG-D | $ | 6,697,327.00 | 71 |
| CICC-CN | $ | 99,877,332.44 | 4793 |
| **New Business PI excluding DP** | **$** | **111,038,864.06** | **9443** |
| CICNJ | $ | 2,916,920.00 | 250 |
| ERII | $ | 441,480.80 | 23 |
| ERSIC | $ | 1,256,712.58 | 93 |
| FIC-D | $ | 101,305,050.77 | 8483 |
| PACIFICPI | $ | 262,033.00 | 44 |
| VIG-D | $ | 3,346.00 | 1 |
| CICC-CN | $ | 4,853,320.91 | 549 |
| **2018** | **$** | **1,406,041,567.67** | **93653** |
| **CSIX/ARP/PI** | **$** | **1,268,911,770.98** | **82523** |
| CCIC | $ | 3,309,818.00 | 195 |
| CICNJ | $ | 22,833,376.00 | 2098 |
| ERII | $ | 49,158,127.00 | 4254 |
| ERSIC | $ | 11,370,649.00 | 797 |
| FIC-D | $ | 1,084,053,466.78 | 70090 |
| PACIFICPI | $ | 384,509.00 | 55 |
| VIG-D | $ | 5,071,070.00 | 53 |
| CICC-CN | $ | 92,730,755.20 | 4981 |
| **New Business PI excluding DP** | **$** | **137,129,796.69** | **11130** |
| CCIC | $ | 1,210,985.00 | 46 |
| CICNJ | $ | 3,180,349.00 | 376 |
| ERII | $ | 10,429.00 | 4 |
| ERSIC | $ | 1,377,654.00 | 100 |

| | | |
|---|---|---|
| FIC-D | $ 126,368,941.69 | 10050 |
| PACIFICPI | $ 101,678.00 | 21 |
| CICC-CN | $ 4,879,760.00 | 533 |
| **2019** | **$ 302,773,970.00** | **30021** |
| **CSIX/ARP/PI** | **$ 275,066,375.00** | **27267** |
| CCIC | $ 2,618,203.00 | 184 |
| CICNJ | $ 6,335,054.00 | 702 |
| ERII | $ 11,593,477.00 | 1323 |
| FIC-D | $ 241,187,027.00 | 23734 |
| PACIFICPI | $ 105,626.00 | 22 |
| VIG-D | $ 220,288.00 | 11 |
| CICC-CN | $ 13,006,700.00 | 1291 |
| **New Business PI excluding DP** | **$ 27,707,595.00** | **2754** |
| CCIC | $ 209,354.00 | 17 |
| CICNJ | $ 588,605.00 | 77 |
| FIC-D | $ 26,215,624.00 | 2562 |
| PACIFICPI | $ 5,075.00 | 2 |
| VIG-D | $ 2,296.00 | 1 |
| CICC-CN | $ 686,641.00 | 95 |

- CSI eXPRESS, Automated Renewal Process, and Profitability Indicator are combined all together in one chart because creating a separate chart for each application would result in triple-counting of the policy counts and gross written premiums. In other words, policies and premiums that go through one of these applications goes through the other two applications as well.

- For Corporate Business Systems (CBS), which is not a strategic business unit (SBU), the following application uses Blaze Advisor® software: Premium Booking. The approximate gross written premiums and policy counts that used these applications, in connection with which the Blaze Advisor® software was used, is provided in the charts below for the years requested. Discovery is continuing.

| Year | Gross Written Premium | Policy Count |
|---|---|---|
| 2018 | $500,850,828.90 | 57,023 |
| 2017 | $442,839,931.87 | 60,142 |
| 2016 | $503,432,073.43 | 57,219 |

- The data for Premium Booking is extracted from a mainframe DB2 table that is specifically tracking the policies that passed through the Premium Booking "rules" as constructed in/using the Blaze Advisor® tool. Unfortunately, this data does not include writing company and that information could not be correlated to the policy count/gross written premium values being provided.

- For the Chubb Commercial Insurance (CCI) business unit for the years identified below (post-merger), the following applications use Blaze Advisor® software: CUW-IM, TAPS, and IRMA. The approximate gross written premiums, policy counts, and identification of the insurance writing companies that issued insurance policies that used these applications, in connection with which the Blaze Advisor® software was used, is provided in the charts below for the years requested. Discovery is continuing.

- **For CUW-IM:**[1]

| YEAR | WRITING COMPANY | POLICY COUNT | WRITTEN PREMIUM |
|------|-----------------|--------------|-----------------|
| 2016 | CHUBB CUSTOM INSURANCE COMPANY | 2,127 | $217,444,131.00 |
| | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A. | 8 | $41,810.00 |
| | CHUBB EUROPEAN GROUP SE | 44 | $260,360.00 |
| | CHUBB INDEMNITY INSURANCE COMPANY | 4,475 | $515,778,122.00 |
| | CHUBB INSURANCE AUSTRALIA LIMITED | 6 | $223,981.00 |
| | CHUBB INSURANCE COMPANY LIMITED | 4 | $10,686.00 |
| | CHUBB INSURANCE COMPANY OF CANADA | 7 | $173,352.00 |
| | CHUBB INSURANCE COMPANY OF NEW JERSEY | 3,635 | $69,278,561.00 |
| | CHUBB NATIONAL INSURANCE COMPANY | 1,223 | $50,975,438.00 |
| | CHUBB SEGUROS BRASIL, S.A. | 2 | $4,281.00 |
| | EXECUTIVE RISK INDEMNITY INC. | 13 | $2,167,006.00 |
| | EXECUTIVE RISK SPECIALTY INSURANCE COMPANY | 28 | $4,528,627.00 |
| | FEDERAL INSURANCE COMPANY | 141,235 | $4,800,540,559.00 |
| | GREAT NORTHERN INSURANCE COMPANY | 30,523 | $868,809,231.00 |
| | PACIFIC INDEMNITY COMPANY | 4,568 | $426,214,814.00 |
| | VIGILANT INSURANCE COMPANY | 6,478 | $307,080,046.00 |
| | ACE American Insurance Co | 2,890 | $108,983,073.98 |
| | ACE Fire Underwriters Ins | 38 | $1,092,991.43 |
| | ACE Property and Casualty | 768 | $106,304,729.88 |

---

[1] We understand that this financial information includes policies that were brought in under a system that includes policies that are renewed using Blaze, but automatically at the same time includes the prior transaction involving the same policy regardless whether it uses Blaze. We are seeking a way to not include the prior policy since it results in the financial information having inflated numbers.

| | | | |
|---|---|---|---|
| | Illinois Union Insurance | 1,183 | $81,709,115.00 |
| | Indemnity Insurance Co of | 97 | $17,014,247.06 |
| | Pacific Employers Insurance | 6 | $469,700.00 |
| | Westchester Surplus Lines | 132 | $12,587,416.00 |
| | WFIC for Bus.Eff.1/1/11 | 1,010 | $31,266,954.00 |
| | | | |
| 2017 | CHUBB CUSTOM INSURANCE COMPANY | 1,119 | $125,046,576.00 |
| | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A. | 2 | $12,403.00 |
| | CHUBB EUROPEAN GROUP SE | 40 | $368,955.00 |
| | CHUBB INDEMNITY INSURANCE COMPANY | 5,986 | $581,425,852.00 |
| | CHUBB INSURANCE AUSTRALIA LIMITED | 2 | $5,554.00 |
| | CHUBB INSURANCE COMPANY LIMITED | 3 | $7,913.00 |
| | CHUBB INSURANCE COMPANY OF CANADA | 2 | $14,184.00 |
| | CHUBB INSURANCE COMPANY OF NEW JERSEY | 3,432 | $65,809,698.00 |
| | CHUBB NATIONAL INSURANCE COMPANY | 1,906 | $68,554,767.00 |
| | CHUBB SEGUROS BRASIL, S.A. | 2 | $16,297.00 |
| | EXECUTIVE RISK INDEMNITY INC. | 11 | $2,732,882.00 |
| | EXECUTIVE RISK SPECIALTY INSURANCE COMPANY | 11 | $1,102,030.00 |
| | FEDERAL INSURANCE COMPANY | 147,481 | $5,098,798,285.00 |
| | GREAT NORTHERN INSURANCE COMPANY | 31,605 | $912,720,319.00 |
| | PACIFIC INDEMNITY COMPANY | 4,825 | $468,474,693.00 |
| | VIGILANT INSURANCE COMPANY | 6,461 | $324,338,205.00 |
| | ACE American Insurance Co | 8,243 | $354,885,926.81 |
| | ACE Fire Underwriters Ins | 53 | $1,722,590.00 |
| | ACE Property and Casualty | 2,413 | $248,919,844.00 |
| | Illinois Union Insurance | 3,444 | $255,341,641.00 |
| | Indemnity Insurance Co of | 281 | $21,351,439.00 |
| | Pacific Employers Insurance | 21 | $869,381.00 |
| | Westchester Surplus Lines | 476 | $45,285,709.00 |
| | WFIC for Bus.Eff.1/1/11 | 2,246 | $67,191,783.00 |
| | | | |
| 2018 | CHUBB CUSTOM INSURANCE COMPANY | 610 | $68,563,377.00 |
| | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A. | 1 | $16,435.00 |
| | CHUBB EUROPEAN GROUP SE | 16 | $85,623.00 |
| | CHUBB INDEMNITY INSURANCE COMPANY | 4,962 | $443,033,892.00 |
| | CHUBB INSURANCE AUSTRALIA LIMITED | 1 | $25,208.00 |
| | CHUBB INSURANCE COMPANY LIMITED | 1 | $6,135.00 |
| | CHUBB INSURANCE COMPANY OF CANADA | 1 | $6,754.00 |
| | CHUBB INSURANCE COMPANY OF NEW JERSEY | 1,799 | $32,946,513.00 |
| | CHUBB NATIONAL INSURANCE COMPANY | 1,582 | $66,309,955.00 |
| | CHUBB SEGUROS BRASIL, S.A. | 1 | $642.00 |
| | EXECUTIVE RISK INDEMNITY INC. | 6 | $1,661,561.00 |
| | EXECUTIVE RISK SPECIALTY INSURANCE COMPANY | 3 | $213,165.00 |

|      | FEDERAL INSURANCE COMPANY | 90,925 | $3,558,748,157.00 |
|------|---------------------------|--------|-------------------|
|      | GREAT NORTHERN INSURANCE COMPANY | 22,807 | $710,266,687.00 |
|      | PACIFIC INDEMNITY COMPANY | 3,356 | $369,995,206.00 |
|      | VIGILANT INSURANCE COMPANY | 4,193 | $227,639,141.00 |
|      | ACE American Insurance Co | 6,740 | $274,751,661.00 |
|      | ACE Fire Underwriters Ins | 38 | $1,498,240.00 |
|      | ACE Property and Casualty | 1,971 | $191,070,156.00 |
|      | Illinois Union Insurance | 3,372 | $240,820,970.00 |
|      | Indemnity Insurance Co of | 175 | $13,196,308.00 |
|      | Pacific Employers Insurance | 14 | $51,084.00 |
|      | Westchester Surplus Lines | 602 | $49,388,448.00 |
|      | WFIC for Bus.Eff.1/1/11 | 1,273 | $36,242,321.00 |
| 2019 | CHUBB CUSTOM INSURANCE COMPANY | 43 | $6,693,927.00 |
|      | CHUBB INDEMNITY INSURANCE COMPANY | 486 | $50,083,542.00 |
|      | CHUBB INSURANCE COMPANY OF NEW JERSEY | 97 | $2,469,028.00 |
|      | CHUBB NATIONAL INSURANCE COMPANY | 124 | $6,526,910.00 |
|      | FEDERAL INSURANCE COMPANY | 6,032 | $417,370,954.00 |
|      | GREAT NORTHERN INSURANCE COMPANY | 1,745 | $97,044,347.00 |
|      | PACIFIC INDEMNITY COMPANY | 233 | $39,736,490.00 |
|      | VIGILANT INSURANCE COMPANY | 220 | $25,155,354.00 |
|      | ACE American Insurance Co | 374 | $13,255,599.00 |
|      | ACE Fire Underwriters Ins | 2 | $185,620.00 |
|      | ACE Property and Casualty | 23 | $7,502,715.00 |
|      | Illinois Union Insurance | 270 | $24,843,797.00 |
|      | Indemnity Insurance Co of | 4 | $66,049.00 |
|      | Westchester Surplus Lines | 3 | $538,022.00 |
|      | WFIC for Bus.Eff.1/1/11 | 18 | $174,830.00 |

- **For TAPS:**

| YEAR | WRITING COMPANY | POLICY COUNT | WRITTEN PREMIUM |
|------|-----------------|--------------|-----------------|
| 2016 | CHUBB INDEMNITY INSURANCE COMPANY | 207 | $73,264,108.51 |
|      | CHUBB NATIONAL INSURANCE COMPANY | 7 | $561,041.00 |
|      | FEDERAL INSURANCE COMPANY | 536 | $143,625,269.12 |
|      | GREAT NORTHERN INSURANCE COMPANY | 20 | $8,309,789.00 |
|      | PACIFIC INDEMNITY COMPANY | 79 | $42,217,709.72 |
|      | VIGILANT INSURANCE COMPANY | 47 | $17,102,989.00 |
| 2017 | CHUBB INDEMNITY INSURANCE COMPANY | 239 | $45,571,577.11 |
|      | CHUBB NATIONAL INSURANCE COMPANY | 10 | $1,864,828.00 |
|      | FEDERAL INSURANCE COMPANY | 496 | $144,179,731.68 |

16

| | GREAT NORTHERN INSURANCE COMPANY | 14 | $5,976,054.00 |
| | PACIFIC INDEMNITY COMPANY | 88 | $45,768,062.54 |
| | VIGILANT INSURANCE COMPANY | 34 | $8,858,947.00 |
| 2018 | CHUBB INDEMNITY INSURANCE COMPANY | 248 | $39,388,714.07 |
| | CHUBB NATIONAL INSURANCE COMPANY | 23 | $5,073,844.00 |
| | FEDERAL INSURANCE COMPANY | 484 | $123,103,492.27 |
| | GREAT NORTHERN INSURANCE COMPANY | 18 | $5,192,985.00 |
| | PACIFIC INDEMNITY COMPANY | 78 | $37,960,159.00 |
| | VIGILANT INSURANCE COMPANY | 19 | $5,771,749.00 |
| 2019 | CHUBB INDEMNITY INSURANCE COMPANY | 15 | $428,683.00 |
| | CHUBB NATIONAL INSURANCE COMPANY | 3 | $27,056.00 |
| | FEDERAL INSURANCE COMPANY | 54 | $5,438,248.00 |
| | PACIFIC INDEMNITY COMPANY | 13 | $1,779,809.00 |
| | VIGILANT INSURANCE COMPANY | 4 | $578,262.00 |

- **For IRMA:**

| YEAR | WRITING COMPANY | POLICY COUNT | WRITTEN PREMIUM |
|---|---|---|---|
| 2016 | ALBANY INSURANCE COMPANY | 1 | $7,252.00 |
| | CHUBB CUSTOM INSURANCE COMPANY | 92 | $615,040.00 |
| | CHUBB DE MEXICO | 2 | $19,419.68 |
| | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A. | 4 | $5,451.43 |
| | CHUBB INSURANCE AUSTRALIA LIMITED | 7 | $33,636.74 |
| | CHUBB INSURANCE COMPANY LIMITED | 6 | $3,758.22 |
| | CHUBB INSURANCE COMPANY OF CANADA | 1815 | $10,045,178.53 |
| | CHUBB INSURANCE COMPANY OF NEW JERSEY | 253 | $1,108,829.00 |
| | FEDERAL INSURANCE COMPANY | 11876 | $68,744,410.52 |
| | GREAT NORTHERN INSURANCE COMPANY | 3839 | $17,031,473.49 |
| | PACIFIC INDEMNITY COMPANY | 459 | $3,894,125.04 |
| | SELF-INSURED RETENTION | 1 | $750.00 |
| | VIGILANT INSURANCE COMPANY | 714 | $3,757,327.16 |
| 2017 | CHUBB CUSTOM INSURANCE COMPANY | 6 | $13,803.00 |
| | CHUBB DE MEXICO | 1 | $7,175.34 |
| | CHUBB DE MEXICO COMPANIA DE SEGUROS, S.A. | 2 | $4,582.26 |
| | CHUBB EUROPEAN GROUP SE | 1 | $32,575.09 |
| | CHUBB INSURANCE AUSTRALIA LIMITED | 2 | $10,500.40 |
| | CHUBB INSURANCE COMPANY LIMITED | 4 | $15,067.52 |
| | CHUBB INSURANCE COMPANY OF CANADA | 1863 | $10,196,153.18 |

17

|      | CHUBB INSURANCE COMPANY OF NEW JERSEY | 248   | $889,740.00      |
|------|----------------------------------------|-------|------------------|
|      | FEDERAL INSURANCE COMPANY              | 11534 | $66,294,342.58   |
|      | GREAT NORTHERN INSURANCE COMPANY       | 3723  | $16,015,552.22   |
|      | PACIFIC INDEMNITY COMPANY              | 420   | $2,860,462.66    |
|      | VIGILANT INSURANCE COMPANY             | 684   | $3,348,817.42    |
| 2018 | CHUBB CUSTOM INSURANCE COMPANY         | 2     | $4,782.00        |
|      | CHUBB INSURANCE COMPANY OF CANADA      | 1831  | $11,668,247.00   |
|      | CHUBB INSURANCE COMPANY OF NEW JERSEY  | 217   | $966,870.00      |
|      | FEDERAL INSURANCE COMPANY              | 10318 | $59,180,523.71   |
|      | GREAT NORTHERN INSURANCE COMPANY       | 3444  | $15,149,787.68   |
|      | PACIFIC INDEMNITY COMPANY              | 388   | $2,586,049.98    |
|      | VIGILANT INSURANCE COMPANY             | 644   | $3,085,724.04    |

- ERCIS Claims is a claims system (not a policy system), and therefore, there is no gross written premium or policy count associated with the application.

- For the Surety business unit for the years identified below (post-merger), the following application does **not** use Blaze Advisor® software: Cornerstone. However, as ordered by the Court, below are the approximate gross written premiums, policy counts, and identification of the insurance writing company that issued insurance policies that used Cornerstone:

| Year/Writing Company          | Policy Count | Gross Written Premium |
|-------------------------------|--------------|-----------------------|
| **2016**                      | **324291**   | **$237,436,826**      |
| Chubb Ins Co of Canada        | 13961        | $7,408,108            |
| Federal Insurance Co - Canada | 10           | $0                    |
| Federal Insurance Co          | 285113       | $220,608,093          |
| Great Northern Insurance Co   | 18           | $0                    |
| Pacific Indemnity Co          | 7427         | $5,000,954            |
| Vigilant Insurance Co         | 17762        | $4,419,671            |
| **2017**                      | **318828**   | **$259,641,111**      |
| Chubb Ins Co of Canada        | 13966        | $11,328,070           |
| Federal Insurance Co          | 280763       | $235,297,734          |
| Great Northern Insurance Co   | 20           | $670                  |
| Pacific Indemnity Co          | 7309         | $9,784,435            |
| Vigilant Insurance Co         | 16770        | $3,230,203            |
| **2018**                      | **303229**   | **$137,058,165**      |
| Chubb Ins Co of Canada        | 21276        | $14,657,186           |
| Federal Insurance Co          | 261448       | $116,145,727          |
| Great Northern Insurance Co   | 37           | $1,205                |

| | | |
|---|---|---|
| Pacific Indemnity Co | 6540 | $4,497,351 |
| Vigilant Insurance Co | 13928 | $1,756,697 |

Dated:  March 21, 2019

s/Terrence J. Fleming
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Lora M. Friedemann (#0259615)
lfriedemann@fredlaw.com
Leah Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

*Attorneys for Defendants*

## VERIFICATION

Paul Seeley states under oath that he is a AVP, Information Technology; that he is authorized to respond to Plaintiff's Interrogatory Nos. 16 and 17 on behalf of Federal Insurance Company as it relates to the Chubb Specialty Insurance (CSI) business unit (pre-merger) and the Financial Lines Unit (post-merger); that he has relied on directors, employees, agents, and attorneys to provide information used in formulating the answers to the above interrogatories; and that the answers are true and correct to the best of his knowledge.

_____
Paul Seeley

Subscribed and sworn to before me
this _____ day of _____, 2019.


_____
Notary Public

20

## VERIFICATION

C. Chase McCarthy states under oath that he is IT Lead, North America Commercial Middle Market/Chief Architect, Personal Risk Services; that he is authorized to respond to Plaintiff's Interrogatory Nos. 16 and 17 on behalf of Federal Insurance Company as it relates to the Chubb Commercial Insurance (CCI) business unit; that he has relied on directors, employees, agents, and attorneys to provide information used in formulating the answers to the above interrogatories; and that the answers are true and correct to the best of his knowledge.

_____
C. Chase McCarthy

Subscribed and sworn to before me
this _____ day of _____, 2019.

_____
Notary Public

21

## VERIFICATION

Tracie D. Jerd states under oath that she is a AVP, NA Enterprise Solutions; that she is authorized to respond to Plaintiff's Interrogatory Nos. 16 and 17 on behalf of Federal Insurance Company as it relates to Premium Booking; that she has relied on directors, employees, agents, and attorneys to provide information used in formulating the answers to the above interrogatories; and that the answers are true and correct to the best of her knowledge.

_____
　　　　　　　　　　　　　Tracie D. Jerd

Subscribed and sworn to before me
this _____ day of _____, 2019.


_____
Notary Public

22



3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Heather J. Kliebenstein
612.371.5213
hkliebenstein@merchantgould.com

May 2, 2019

**VIA EMAIL**

Christopher Pham
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Email: cpham@fredlaw.com

**Re:    *Fair Isaac Corp. v. Federal Insurance Co. et al.,*
         No. 16-cv-01054-WMW-DTS (D. Minn. filed April 21, 2016)**

Dear Chris:

I write as follow-up to your April 18, 2019 letter to Magistrate Judge Schultz regarding the status of Federal's production of documents responsive to Requests No. 89 and 90. As stated in our April 17 letter, "Defendants must produce documents in response to RFP 90."  In your April 18 response, you stated that FED017886 (later supplemented as FED017912 and FED017914, respectively) is the single document responsive to Request No. 90.

We disagree.  To date, Federal has not produced any documents in response to Request No. 90.  We write to ask you to immediately locate and produce documents in response to Request No. 90.  We will raise this issue at the May 8 hearing but write to give Federal an opportunity to cure this deficiency in advance.

By way of background, on December 28, 2018, FICO served Request No. 90 upon Defendants as part of FICO's Fourth Set of Requests for Production. Request No. 90 sought:

EXHIBIT
**15**

**REQUEST NO. 90**: Specific to each application that uses or used Blaze Advisor® software, all documents relating to the business rules of each application.

The plain language of Request No. 90 seeks documents showing the rules used by each of Federal's applications that use or used Blaze Advisor software, whether stored in a repository, a database, or elsewhere. Federal's January 28, 2019 written response stated that Federal would produce non-privileged documents responsive to Request No. 90.

**REQUEST NO. 90:** Specific to each application that uses or used Blaze Advisor® software, all documents relating to the business rules of each application.

**RESPONSE:** Defendants object to this request as overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all" documents and is unlimited in time. Subject to and without waving these objections, or the general objections above, Defendants state they will produce non-privileged, responsive documents that are kept in the ordinary course of business at a mutually acceptable time agreed by the parties.

On March 12, Federal stated in an email that Federal was "working as quickly" as it could to supplement its response to Request No. 90. Federal reiterated it was working on collecting and producing documents in response to Request No. 90 via email again on March 22. FICO did not move to compel production on the April 5 deadline for non-dispositive motions based on its reliance that Federal would indeed produce documents in response to Request No. 90. It was not until your April 18 letter to the Court that we understood Federal did not intend to produce any documents in response to Request No. 90.

Documents bearing production numbers FED017886 (later supplemented as FED017912 and FED017914, respectively) are not responsive to Request No. 90. Those charts are (although still deficient) responsive to Request No. 89, which sought:

**Request No. 89:** Specific to each application that uses or used Blaze Advisor® software, documents sufficient to show (a) the number of business rules in each application; (b) the type of business rules in each application, including, without limitation, underwriting, pricing, claims, renewal processing, and workflow, and (c) the number of daily and monthly batch and real-time business rule transactions for each application.

Request No. 90 asks for the <u>rules</u> themselves. Federal has access to the rules entered into Blaze Advisor. As Mr. Ivey testified, FICO does not keep copies of the rules that are implemented in its clients' applications—the rules must come from Federal.

May 2, 2019
Page **3** of **3**

Federal has not produced documents with the rules used by each of the Blaze-containing applications in response to Request No. 90.  Please confirm by **Monday, May 6** that Federal will collect the rules and produce such documents.

Respectfully,

Heather J. Kliebenstein

cc:     All Counsel of Record



May 23, 2019

**VIA ECF**

Honorable David T. Schultz
United States District Court
9E U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Allen Hinderaker
Heather Kliebenstein
Michael A. Erbele
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2215

Re:     Fair Isaac Corp. v. Federal Insurance Co., et al.
        No. 16-cv-01054-WMW-DTS (D. Minn. Filed April 21, 2016)

Dear Judge Schultz and Counsel:

Pursuant to the Court's May 8 Order, Federal has been ordered to "determine whether, when, and how the requested information can be extracted and produced and at what cost" regarding FICO's Request for Production of Documents No. 90. Federal reports that currently there are no tools/utilities to extract Blaze Advisor rules from the repository and convert them into a human readable format. However, Federal has two options:

1.     Federal can use the Blaze Advisor native utility to generate a Structured Rules Language ("SRL") code, which would take a several weeks to complete for all repositories across the enterprise, at a cost of approximately $10,000. The output of this utility is a file for each ruleset, which requires an extensive and technical understanding of the Blaze Advisor software. In addition, this information is highly-confidential and commercially and competitively sensitive information.

2.     Federal can go through the code and document the rules manually, i.e., rules harvesting. The Middle Market team has approximately 2,000 rules and they estimate this will take them about 20 weeks to complete. This is based on real data. Using this information, Federal estimates and assumes, given the fact it has about 26,000 rules to convert across the enterprise, that it will take about 260 weeks (about 10,400 hours) to complete the extraction. The rough order of magnitude estimate for this extraction would be approximately $500,000. This information is also highly-confidential and commercially and competitively sensitive information.

**EXHIBIT**

**16**

Please let us know if the Court requires any additional information.

Best regards,

Christopher D. Pham
**Direct Dial:** 612.492.7388
**Email:** cpham@fredlaw.com



3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402


Allen Hinderaker
612.371.5292
ahinderaker@merchantgould.com

May 28, 2019

**<u>VIA ECF</u>**

Honorable David T. Schultz
United States District Court
9E U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

**Re:** **_Fair Isaac Corp. v. Federal Insurance Co. et al.,_**
**No. 16-cv-01054-WMW-DTS (D. Minn. filed April 21, 2016)**

Dear Judge Schultz:

FICO appreciates the opportunity to comment on the importance of Federal producing documents responsive to RFP 90 in light of Federal's expert reports. RFP 90 states, "Specific to each application that uses or used Blaze Advisor® software, all documents relating to the business rules of each application." Business rules are logical statements (if/then) of what to do (what actions to take) in different distinct situations. Federal uses business rules to determine whether to quote a risk and at what price, for example. By using FICO's Blaze Advisor to automate Federal's decision-making, Federal is able to make faster, more precise, and more consistent decisions while reducing the complexity and cost of those decisions. This automation contributes to Federal selling more policies, capturing revenue, and increasing profits.

Since the beginning of this litigation, FICO has sought discovery on how Federal uses Blaze Advisor. This is important to FICO's proof of a nexus between Federal's revenues and Federal's infringing use of Blaze Advisor. Federal has repeatedly



EXHIBIT
17

obstructed FICO's efforts to understand the scope of Federal's usage of Blaze Advisor, forcing FICO to seek the Court's assistance in obtaining such discovery. (Dkt. 149 at 24-31; Dec. 17, 2018 Hearing Trans. 43:15-22; Dkt. 271.)

Federal contends that its production of FED017914 (a table identifying applications using Blaze Advisor with the purported application functions, number of rules, number of transactions, and other information) alleviates the need for Defendants to produce documents responsive to RFP 90. (Dkt. 278 at 2 (Prior version of table produced as FED017912 and filed with the Court as 278-1 at 1)). Nothing could be further from the truth. The table produced as FED017914 is a litigation-derived document. Aspects of the table contradict other Federal documents. While informative, the completeness and accuracy of FED017914 will be a matter for cross-examination. Federal's documents responsive to RFP 90 provide unsullied, objective evidence as to Federal's use of Blaze Advisor.

Federal withholds its business rules responsive to RFP 90 while at the same time challenging any nexus between Federal's revenues and Federal's use of Blaze Advisor. This is improper. Federal wants to have it both ways. Documents responsive to RFP 90 will show the integration of Federal's business rules into Blaze Advisor and the resultant automated decision making that contributes to Federal revenue.

Federal's experts, especially William S. McCarter, attempt to negate any contribution to revenue by Blaze Advisor because (he contends) Federal, not FICO, wrote the business rules. For example, Mr. McCarter states:

> 21.    Federal generates revenue and profits using its core competencies – not Blaze Advisor software, or any other software technology. Federal provides all the insurance expertise and makes all business decisions that are required to generate gross written premium revenue and profits. Additionally, Federal takes all the financial risk related to the insurance policies including future loss obligations.
> * * * *
> 23. . . . [I]t was Federal, not FICO or its products, that was responsible for the quality of the business rules that led to the business decisions that produce revenue. . . .

Federal has made its position clear. Federal attributes all of its revenue (and therefore profits) to the development and usage of its business rules, sans use of Blaze Advisor.

Honorable David T. Schultz
May 28, 2019
Page **3** of **3**

      FICO first requested Federal's business rules on December 28, 2018. Federal responded on January 28, 2019, stating it would "produce non-privileged, responsive documents that are kept in the ordinary course of business." It never has. In its May 23, 2019 letter, Federal asserts it will take several weeks to several years for it to produce the business rules. (Dkt. 299.) FICO requested these documents five months ago. Now, as FICO is responding to Federal's expert reports touting the significance of Federal's business rules, FICO is left waiting and wanting the business rules. Federal should not be permitted to tout the value of its business rules while at the same time withholding them from production.

      Federal overstates the complexity and burden of producing its business rules. Blaze Advisor allows for extraction of the business rules in multiple easy and efficient ways. Federal can produce the repository files (.xml) and business object model files (JAR (JAVA Archive) files)). FICO's counsel can then access these files on a local machine running Blaze Advisor at counsel's office. *This is FICO's preferred method of receipt.* As an alternative, Federal can also produce rules reports from the Blaze Advisor IDE (integrated development environment). Each of these options takes minutes per application to extract and will provide FICO with information responsive to RFP 90. The burden and cost to Federal is minimal. FICO is able to provide step-by-step instructions to do so.

      Federal's May 23, 2018 letter attempts to convince the Court that production of its business rules would be cost prohibitive and overly burdensome. In reality, much simpler, cost effective means exist to produce Federal's business rules. When balancing the burden and cost of production against FICO's need, Federal must be compelled to produce the business rules. Federal cannot rely on the business rules in defense and refuse to produce the rules. Thank you for your consideration of this request.

Respectfully,

Allen Hinderaker

Allen Hinderaker

cc:    All Counsel of Record (via ECF)



May 30, 2019

**VIA ECF**

Honorable David T. Schultz
United States District Court
9E U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Re:     Fair Isaac Corp. v. Federal Insurance Co., et al.
        No. 16-cv-01054-WMW-DTS (D. Minn. Filed April 21, 2016)

Dear Judge Schultz:

We write in response to FICO's May 28, 2019 letter to the Court regarding RFP 90 and FICO's request for Federal's business rules (the "Blaze Rules"), which, as the Court is aware, is highly-confidential and commercially and competitively sensitive information.

In his May 28 letter, FICO's counsel demonstrates an understanding of how Federal uses the Blaze Rules and the benefits he believes are derived therefrom. Specifically, the letter states as an example, that "Federal uses business rules to determine whether to quote a risk and at what price," and that Blaze Advisor allows Federal to automate decision-making, i.e., "make faster, more precise, and more consistent decisions while reducing the complexity and cost of those decisions."

After showing his understanding of Federal's use of Blaze Advisor, FICO's counsel then contradictorily asserts that it needs the documents responsive to RFP 90, i.e., the Blaze Rules, to "show the integration of Federal's business rules into Blaze Advisor..." FICO already has an acute understanding of how Federal uses Blaze Advisor. FICO does not need the Blaze Rules themselves to understand how Federal's business rules are integrated into Blaze Advisor.

Nevertheless, FICO further argues that it wants the Blaze Rules so that its experts can respond to "Federal's expert reports touting the significance of Federal's business rules…" FICO's experts do not need the Blaze Rules in order to respond to Federal's expert reports. Indeed, Federal's experts did not have access to any of the Blaze Rules while preparing their expert reports. Moreover, FICO's expert witness, Bick Whitener, discusses at great length in his expert report how Federal uses Blaze Advisor. Nearly two-thirds of his report (excluding the Appendices) is dedicated to analyzing in detail each and every Federal application that FICO alleges uses Blaze



EXHIBIT
**18**

VIA ECF
Page 2

Advisor.  The report explains, for example, how Federal's use of Blaze Advisor contributes to revenue by increasing the speed of response, improving efficiencies in underwriting, etc.  Simply put, reviewing the Blaze Rules will not add anything more to what FICO (and its experts) already understands about Federal's use of Blaze Advisor.

FICO then asserts that Federal never produced any documents even though Federal stated it would "produce non-privileged, responsive documents that are kept in the ordinary course of business."  That is simply because there are no documents kept in the ordinary course of business that contain the Blaze Rules, which FICO already knows since the parties are submitting letters to the Court relating to various processes for extracting the Blaze Rules from computer systems.

Finally, FICO suggests two options for Federal to produce the Blaze Rules.  The first option is for Federal to "produce the repository files (.xml) and business object model files (JAR (JAVA Archive) files))."  This option is essentially the same as what Federal stated in its May 23 letter to the Court, namely, that Federal can generate a file for each ruleset.  The problem with this proposed option is that although FICO can take the files, plug them into a compatible Blaze Advisor version, and generate an English version of the business rules, Federal would not be able to check the accuracy of the business rules generated by FICO.  In order to confirm the accuracy of the business rules generated from FICO's processes, Federal would have to convert all of the business-rule files to English in order to do a comparison, which goes back to the options indicated in Federal's May 23 letter.

The second option FICO proposes is to run reports from the IDE environment.  Although this option is technically possible, it will not provide FICO with a report that details all of the business rules.  Given Federal's version of Blaze Advisor, the report will not reflect "Rule Sets and Functions," but merely "Decision Tables."  Federal estimates the cost of this project to be $5,000.

Best regards,

Christopher D. Pham
**Direct Dial:** 612.492.7388
**Email:** cpham@fredlaw.com

66897808.1

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

2
-----------------------------------------------------------------
3                                    )
Fair Isaac Corporation,              ) File No. 16-CV-1054
4                                    )  (WMW/DTS)
        Plaintiff,                   )
5                                    )
vs.                                  ) Minneapolis, Minnesota
6                                    ) June 4, 2019
Federal Insurance Company            )
7  and ACE American Insurance        ) DIGITAL RECORDING
Company,                             )
8                                    )
        Defendants.                  )
9                                    )
-----------------------------------------------------------------
10
        BEFORE THE HONORABLE DAVID T. SCHULTZ
11    UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12         (TELEPHONE CONFERENCE)

13  APPEARANCES
    For the Plaintiff:     Merchant & Gould, PC
14  (Via Telephone)     HEATHER J. KLIEBENSTEIN, ESQ.
                        JOSEPH DUBIS, ESQ.
15                      Suite 3200
                        80 South Eighth Street
16                      Minneapolis, Minnesota 55402

17  For the Defendants:    Fredrikson & Byron
    (Via Telephone)     TERRENCE J. FLEMING, ESQ.
18                      CHRISTOPHER D. PHAM, ESQ.
                        LEAH C. JANUS, ESQ.
19                      Suite 4000
                        200 South Sixth Street
20                      Minneapolis, Minnesota 55402

21  Transcriber:        LORI A. SIMPSON, RMR-CRR
                        Suite 146
22                      316 North Robert Street

St. Paul, Minnesota 55101
23

24
        Proceedings recorded by digital recording; transcript
25  produced by computer.

2

1            P R O C E E D I N G S

2            IN OPEN COURT

3            THE COURT:  All right.  We are on the record in

4   the matter of Fair Isaac Corporation vs. Federal Insurance

5   Company, Civil No. 16-1054.

6            Counsel for FICO, if you would note your

7   appearances for the record, please.

8            MS. KLIEBENSTEIN:  Yes, Your Honor.  Heather

9   Kliebenstein and Joe Dubis of Merchant & Gould.

10           THE COURT:  Good morning.

11           And for the defendant?

12           MR. FLEMING:  Your Honor, Terry Fleming, Leah

13  Janus, and Chris Pham of the Fredrikson law firm

14  representing defendant.

15           THE COURT:  All right.  We have a number of things

16  that I want to accomplish today.  First, I will give you my

17  ruling on the privilege log entries.  Second, I will give

18  you my ruling on the documents requested to be produced by

19  FICO regarding negotiations over prices.  Third, we have to

20  look at the business rules issue.  And fourth, the

21  dissemination of the expert report.  So that's what was on

22  my agenda.

23           Turning first to the privilege log entries, I have

24  reviewed privilege log entry number 656, 662, and 665 from

25  FICO's privilege log and all three of the e-mail strings --

3

1   they are all three e-mail strings.  All three of them are,

2   in fact, privileged and I'll give you a little bit of my

3   rationale for that.

4            First of all, they're different e-mail chains, but

5   they spring from a common source and then privilege log

6   entry 662 and 665 then branch off and have unique

7   information or communications, but all three of them request

8   or provide legal advice.  You are entitled to know that the

9   legal advice concerns the interpretation of the software

10  license agreement.

11           There is -- as is always the case almost, there

12  are minor portions of the communications that are perhaps

13  not strictly speaking privileged, but they are so interwoven

14  with the privileged communications as to be incapable of

15  meaningful redaction.

16           To the extent that any of the communication

17  reflects business advice as opposed to legal advice, I have

18  reviewed that question carefully and the legal advice

19  portion clearly predominates over the business advice

20  portion, to the extent there is any.  And if one were to

21  attempt to extract the business advice portion, it would be

22  impossible to do that without revealing the content of the

23  legal advice.

24           So those three documents, entries number 656, 662,

25  and 665, are privileged and will not be produced.  Let me

4

1   pause there and ask if anyone has questions regarding that.

2            MS. KLIEBENSTEIN:  No questions from the

3   plaintiff, Your Honor.

4            THE COURT:  Any --

5            MR. FLEMING:  Your Honor, this is Terry Fleming.

6   One of the issues was the description of the entries and

7   you've stated that they concern the interpretation of the

8   software license agreement.  Is it possible to have a more

9   expansive description, such as in connection with --

10  concerning the interpretation of the SLA reuse outside of

11  the United States?

12           THE COURT:  I don't believe that would be either

13  necessary or appropriate.  So I am going to say no on that,

**EXHIBIT**
**19**

14   but by all means you are more than welcome to appeal that

15   issue to Judge Wright.

16       Okay.  Moving on to the letter from

17   Ms. Kliebenstein dated May 24, 2019 regarding the production

18   of documents relating to what they've described in their

19   letter as Query Number 1 and Query Number 2.  Let me ask

20   first if, Mr. Fleming, you wish to be heard on anything

21   relating to that issue.

22       MR. FLEMING:  Just very briefly, Your Honor.  The

23   only comment that we have in response to that letter relates

24   to the project that Federal had to undertake to respond to

25   FICO's Requests 55 through 70, which similarly required an

5

1   extensive document review project, well over a hundred hours

2   and costing Federal in excess of $40,000 in fees to

3   undertake that project.  That, nonetheless, had to do

4   with -- was required by the Court's order.  To the extent --

5       THE COURT:  Mr. Pham [sic], if I might interrupt

6   you for a second.  I'm sorry.  You were very, very faint and

7   I'm really struggling to hear you.  So if you could either

8   get closer to the speakerphone or pick up the phone or

9   whatever, but go again.  I'm sorry.

10       MR. FLEMING:  No problem, Your Honor.  Just wanted

11   to make the comment that Federal had to undertake a project

12   relating to FICO's Requests 55 through 70 in which well over

13   a hundred hours of time was spent reviewing documents at the

14   cost to Federal of -- in excess of $40,000.  In any event,

15   Federal complied with the Court's order and conducted the

16   review project.  So to the extent FICO is making the

17   argument that, you know, it's going to be costly for them to

18   conduct a review project, you know, Federal has already had

19   to do so.

20       THE COURT:  Okay.  Ms. Kliebenstein, briefly do

21   you wish to be heard on this topic beyond the content of

22   your letter?

23       MS. KLIEBENSTEIN:  I think our main focus is the

24   cost-benefit analysis with regards to this specific order

25   from the Court and essentially for the Court to decide what

6

1   is enough, what is enough collection and review to satisfy

2   the Court's order.  I think both parties have spent

3   significant amounts of money on document review and

4   production going both ways.

5       So I didn't hear -- what I didn't hear from

6   Federal was a need to get the more robust, more costly

7   Query 2 search results.  It sounds like the Query 1 would

8   satisfy what they're looking for.

9       THE COURT:  All right.  Anything further, Federal?

10       MR. FLEMING:  No, Your Honor.

11       THE COURT:  All right.  I am going to set this one

12   aside for a minute.  I want to turn to the other ones.  I'm

13   still thinking through that particular issue.  So we will

14   return to that.

15       Let's talk about the extraction of the business

16   rules and what's involved there.  Let me start by giving the

17   parties what I remember of the first order for production of

18   documents that I think bears on this to some degree.

19       As I recall, we had a motion early on in which

20   Federal resisted on the grounds that overhead or things of

21   that nature were not discoverable because they don't relate

22   to direct loss or direct profits to be disgorged.  I know

23   that that's a very imprecise way of phrasing it, but we had

24   that issue.  I ordered the discovery of it.  I think it

25   was -- in my view, the case law was very clear that it was

7

1   discoverable.

2       Now, this issue about extraction of the business

3   rules, as I understand FICO's position, they are essentially

4   arguing that they need the business rules in their entirety

5   to be extracted and produced because that will permit their

6   experts to determine how much of the profit is attributable

7   to the use of the software allegedly in violation of the

8   licensing agreement and as an infringement.

9       So far am I -- on a very high level, am I

10   summarizing this correctly, Ms. Kliebenstein?

11       MS. KLIEBENSTEIN:  I think so.  The way that I

12   would characterize it is Federal has stated throughout this

13   case and expert reports that it owns the rules.  The rules

14   themselves are what make the decision and Blaze Advisor is

15   just, you know, a glorified Excel spreadsheet.

16       And so that's why we asked for the rules in the

17   first place.  If we're going to get into the value of the

18   rules and what they drive in this case, then we should be

19   able to see the rules.

20       It's connected -- there is a revenue connection

21   there.  It has to deal with the disgorgement, you're exactly

22   right, Your Honor, both on the connection to revenue side

23   and then what profits are attributable or not attributable

24   to infringement.

25       THE COURT:  Okay.  Mr. Pham or Mr. Fleming or

8

1   Ms. Janus.

2        MR. FLEMING:  Thank you, Your Honor.

3    [Indiscernible.]  We haven't -- what we're having difficulty

4    understanding, Your Honor, is how doing the rules themselves

5    will allow FICO to demonstrate, you know, how Blaze

6    contributes to the profits.  Throughout FICO's expert's

7    opening report, it's clear that the expert understands how

8    Blaze is being used, how he foresees the benefits to be from

9    the use of Blaze, but there is no, you know, in-depth

10    discussion of how the rules themselves will help with that

11    process.

12        THE COURT:  Okay.  I have to confess,

13    Ms. Kliebenstein, I'm a little uncertain as to why knowing

14    the content of the rules themselves is truly necessary for

15    connecting the alleged infringement to the revenues.  I'm

16    struggling to see it, so maybe you should address that.

17        MS. KLIEBENSTEIN:  Sure, Your Honor.  I think

18    this -- as you said at the outset, this is another situation

19    where Federal is saying we're certain it's not relevant, so

20    don't worry about it.

21        The rules got loaded into Blaze Advisor and what

22    we think we can see when it's in its native environment is

23    not just the rules, like are you a man or a woman, are you

24    older than 65 or younger than 65, but how they interplay

25    within Blaze Advisor.  And that's an important piece in this

1    case.  What does Blaze Advisor do when the rules are put

2    into Blaze Advisor?  What value does Blaze Advisor add?  Is

3    it more than a glorified Excel spreadsheet?

4        And we can't fully evaluate that question until we

5    have Federal's rules and put them into Blaze Advisor, and

6    that's exactly what we've asked for in our most recent

7    letter to the Court.  We described a way that Federal can

8    provide us with the rules that we can then put into a native

9    environment here at Merchant & Gould and see how the whole

10    thing works.

11        FICO doesn't keep content -- FICO doesn't keep its

12    clients' rules internally for a number of different reasons,

13    one of which is confidentiality, setting aside the fact that

14    FICO and Federal spent $6.6 million in professional services

15    work together to not just develop the rules, but to get them

16    into a format and package them so that when they are put

17    into Blaze Advisor, that they'll work the right way.

18        So all this goes to the core question of what are

19    these rules doing and what is the value to Federal at the

20    end of the day, and we need these rules and to see them in

21    that native environment in order to test the reliability of

22    expert reports.

23        THE COURT:  All right.  Here's the way it sounds

24    to me.  It's -- first of all, I take at face value what the

25    Federal party is saying regarding the process, what it would

1    take to extract the rules as they perceive that to be, that

2    it would be prohibitively expensive and take too long,

3    although, honestly, I'm a little skeptical that it would

4    actually take 260 weeks' worth of time, but more to the

5    point --

6        MS. KLIEBENSTEIN:  Your Honor, if I could

7    interrupt?  And I apologize for interrupting.  We're not

8    asking for that Option 2.

9        THE COURT:  Yeah, I understand that.  I'll get to

10    that.

11        More to the point, it seems to me that what FICO

12    was trying to demonstrate is that by having Blaze Advisor,

13    two things happen:

14        One, the process of making these underwriting

15    judgments is made far quicker than if it were done by a

16    human by hand or however they would do it without the

17    software.

18        Number two, that having the software means that

19    they make -- they, Federal, make better, in terms of the

20    quality, risk assessments, thereby saving themselves money

21    by charging more appropriate premiums or declining to write

22    certain policies or the like.

23        And that -- honestly, my reaction is that that is,

24    so far as I've described it, that is rather unexceptional or

25    unobjectionable, that that, in fact, is, you know, obvious.

1    The harder question is how to quantify that and, honestly,

2    I'm not persuaded that having the substance of the rules

3    themselves really provides any greater reliability in terms

4    of the quantification.

5        That said, I do understand that you're asking for

6    an option which I believe Federal has said is really not

7    cost or time prohibitive and I'm trying to find the

8    reference to it, but essentially -- let me find the portion

9    here.

10        (Pause)

11        THE COURT:  Yeah, Federal reproducing repository

12    files and business object model files (JAE (JAVA Archive)

13    files).  Now, I understand that Federal's response to that

14    is that's potentially inaccurate and the only way we can

15    verify that those are the rules is by undertaking

16   considerable expense, et cetera, et cetera.

17   So all of that is my long-winded way of saying as

18   a discovery matter I will order Federal to produce or

19   extract, as FICO has described it, the repository files and

20   business object model files. And as I understand it, that

21   is between five and ten thousand dollars' worth of expense.

22   Having said that, however, I think it is a risky

23   or at least uncertain proposition on FICO's part that it

24   would be able to rely on those or use those effectively or

25   introduce them because Federal is going to say it's not

12

1   verified, it's not certain. That, it strikes me, is an

2   evidentiary fight and so I am -- I don't know what Judge

3   Wright will do with that fight, but it is a fight for a

4   later day.

5   So Federal will be ordered to extract those files.

6   I will put that into a minute order so that you'll have this

7   on the docket as well. But I'm not ordering them to do what

8   Federal describes as a very time-intensive, exceedingly

9   costly undertaking. All that, as I said, is with risk to

10   both sides when it comes to an evidentiary threshold.

11   All right. Let me turn to the fourth thing on the

12   agenda, which is the access to the expert reports. I've

13   read the letters, but I would find it beneficial to have a

14   little bit more fulsome argument on this point.

15   I am not clear in my mind why Federal needs to

16   have these reports shared as widely as they want them

17   shared. So let's start there. At the same time I will tell

18   you honestly I'm not so sure why Fair Isaac is as concerned

19   with the dissemination of the information there as they

20   appear to be.

21   So I would like to hear from both of you. Start

22   with Federal about [indiscernible].

23   MR. FLEMING: Well, Your Honor, we've been going

24   through this process on our side of wanting to discuss in

25   detail the experts' reports and primarily Mr. Zoltowski's

13

1   report and especially relating to the lost license fee

2   issues, and the inability to share that has really impeded

3   our ability to talk with key executives.

4   We are dealing with in-house counsel, who has been

5   organizing these meetings and contacts us. The difficulty

6   is as the process moves up through these various levels of

7   authority, there are more and more people brought in and

8   just as a practical matter it has been difficult for him to

9   have fulsome discussions and to respond to questions by you

10   know, very knowledgeable people in a lot of different areas.

11   We've tried -- they initially allowed us to have

12   one in-house counsel other than Kevin Murphy read the

13   experts' reports and then we talked about having a number of

14   other people.

15   And I've proposed most recently that so long as

16   any of those people sign the Exhibit B to the protective

17   order, which is a written assurance, that would provide all

18   necessary information and adequate protection to FICO.

19   But it really has impeded the ability to have

20   settlement discussions to the extent that I've requested.

21   And I understand FICO has agreed that we will not -- we will

22   stipulate to an extension on the time for the meet and

23   confer, which right now is June 5th, so that we can have

24   that any time prior to June 12th, simply because we are not

25   in a position to do that right now because they haven't been

14

1   able to have the discussion.

2   I mean, it's -- you know, the number of people

3   involved at various times and they keep having to bring in

4   then business lines and various, you know, upper echelon

5   people. It's not a static process on our end and it's a

6   very large corporation and they're asking for, you know,

7   extremely large sums of money, which has been changing over

8   time, and we haven't been able to keep the key executives

9   updated.

10   It wasn't until like last Tuesday that they were

11   able to provide the $37 million number they're now seeking

12   in lost license fees. And of course the people, the

13   executives who hear that want to get the backup and the data

14   and to challenge it so we can see -- they can understand

15   exactly, you know, what the issues are and what the risks

16   are.

17   So that's it in a nutshell, Your Honor.

18   THE COURT: Okay. Ms. Kliebenstein, let me ask

19   you a couple of factual questions. One, what is the amount

20   of damages, total amount of damages that are articulated in

21   your experts' various reports? I don't want duplicative

22   damages, but if it's [indiscernible] if you calculate it

23   this way it's 20 million and if you calculate it that way

24   it's 50 million, that's what I would like to know. Start

25   there, if you would.

15

1   MS. KLIEBENSTEIN: I will do my best. I was not

2   expecting that specific question. I think the lost license

3   fees for domestic and foreign are in the 37 million range in

4    our opening report and then our opening expert identified

5    the gross written premium dollars that are subject to

6    disgorgement, which was 30 billion.

7        MR. DUBIS:  [Indiscernible.]

8        MS. KLIEBENSTEIN:  Around 30 billion.  I could be

9    off on that.

10       THE COURT:  3-0 billion with a "b"?

11       MS. KLIEBENSTEIN:  Yeah.  Those are the amounts of

12   premiums that went through the software and then --

13       THE COURT:  And then it would be Federal's job to

14   cut that number down to profit, correct?

15       MS. KLIEBENSTEIN:  Yes.  And that number --

16       MR. DUBIS:  2.5.

17       MS. KLIEBENSTEIN:  -- is 2.5 billion, I think is

18   what their expert put out there.

19       THE COURT:  And forgive me and bear with me, but

20   are those numbers -- those are all alternative measures of

21   damage, 37 million versus 2.5 billion, correct?

22       MS. KLIEBENSTEIN:  No.  One is for breach of

23   contract and the other is for copyright disgorgement.

24       THE COURT:  Okay.  That's right.

25       Okay.  So in light of all of that, what's the

16

25   mutual exchange.

17

1        I originally proposed five people because I could

2    not understand why five people from IT and two people from

3    procurement needed AEO access in this case.

4        What's reflected in that $37 million figure and

5    all of the underlying statements in our damages report is

6    our pricing methodology and how FICO goes about pricing its

7    software, which is not something that they disclose

8    willingly and often.  It's AEO information.

9        I just cannot see and I have asked for an

10   explanation why does -- somebody from IT, somebody who is

11   developing applications, or people from procurement who are

12   negotiating contracts with vendors, what role do they have

13   in the settlement process such that they need to see this

14   information?  I didn't get a response to that.  So our next

15   proposal was:  All right.  Just, you know, for these five

16   people, tell us who they are and have them undertake the

17   mutual written assurance.

18       Any other instances in this case where we have

19   allowed additional people to view AEO information, we've

20   always exchanged names.  We've understood who it is.  And if

21   we have those names, we can understand -- we can assess

1    concern -- I will grant you that asking for 14 people is a

2    lot of people.  On the other hand, that's a lot of money.

3        MS. KLIEBENSTEIN:  Right.

4        THE COURT:  Even if it's just 37 million and

5    you're hoping that it's a fruitful discussion, what's the

6    danger in letting -- for example, in your letter you say

7    they want five senior IT management people to review this

8    stuff.  Why is that concerning in light of the fact they'll

9    sign the undertaking?

10       MS. KLIEBENSTEIN:  Here's how I frame the issue.

11   We've offered and we're happy to do a reciprocal exchange,

12   so a number of people on FICO's end get to see the expert

13   reports -- unredacted versions of the expert reports as well

14   in order to prepare for the settlement conference.

15       So on Federal's end, they obviously care about the

16   financial figures.  On our end, it would be fruitful and

17   helpful for our executives to review the expert reports to

18   understand the usage case, what's been going on at Federal

19   regarding the usage, and also the copyright disgorgement

20   case.

21       So the 37 million number can't go to Federal's

22   executives currently, but the disgorgement figures can

23   because those are based on Federal's dollars.  The opposite

24   is true for FICO.  So that's why I originally proposed a

22   whether they are at the proper level in IT, whether they're

23   at the proper level in procurement management and legal or

24   are they at a lower level and they're just trying to get

25   more witnesses access to our information so that they can

18

1    rebut the case instead of preparing for the settlement

2    conference.

3        So that was our concern on the 14 people and why

4    we originally proposed an exchange of five.  It's always

5    been with the offer of if you need more people, tell me

6    exactly why and what role they have in this case or give me

7    their name and we're happy to re-assess it.

8        So two things.  We want to know who so that we can

9    assess the why and we want it to be a mutual exchange on

10   both sides, and we're happy to provide names and written

11   assurances on our side.

12       THE COURT:  Is it your view that it has to be the

13   same number of recipients on each side of the V?

14       MS. KLIEBENSTEIN:  You know, reciprocity is

15   obviously important to my client as long as -- I do

16   understand that Chubb is a global organization and there may

17   be a number of people -- there may be more people that they

18   need to show it to than we do, but at some point it's got to

19  have an end, right?  So maybe it's 10, maybe it's 14, but we

20  need names and we need a limit on it.  It can't just keep

21  going and going and going so long as people execute the

22  written assurance.  If that's the case, then the designation

23  of AEO has no meaning --

24          THE COURT:  Right.

25          MS. KLIEBENSTEIN:  -- if anybody within the

                              19

1  company can see AEO information by simply signing a written

2  assurance.

3          THE COURT:  Okay.

4          MR. FLEMING:  Well, if I may respond?

5          THE COURT:  Go ahead, Mr. Fleming.

6          MR. FLEMING:  FICO is not in a position to say

7  whether certain individuals have certain roles or

8  responsibility or, you know, the gravitas or have the

9  ability within Chubb to make decisions.  They can't tell

10  that by giving them the name or even necessarily the titles.

11  This is an extremely large sum of money and as a result they

12  are bringing in people from across different divisions and a

13  lot of different areas.

14          But, I mean, this is a limited time frame.  I

15  mean, we're talking about just having the ability to engage

16  in settlement discussions.  FICO isn't claiming that in any

17  manner, that they aren't able to engage in settlement

18  discussions.  That's the only use we have.  We don't have

19  any other use.  We just want to be able to provide numbers

20  and to make an assessment of risk, and they are impeding our

21  ability to do that.  We can't do it right now.  We're not in

22  a position to comply with the court orders because they

23  won't allow access to these large numbers.

24          And with regard to -- I mean, reciprocality only

25  matters if there's a purpose in it.  If they don't have any

                              20

1  problem in engaging in settlement discussions, and we

2  haven't heard anything about that, then why does it need to

3  be reciprocal?

4          And there is a difference in the positions of the

5  parties.  Unlike Federal, FICO is serving Chubb's

6  competitors.  And especially with regards to the rules, they

7  could create solutions to competitors without ever revealing

8  anything, that we would have no way of knowing about it.  It

9  increases their ability to compete -- it increases the

10  ability of competitors to compete with Federal.  I mean,

11  we've got a legitimate issue as to why we don't want FICO to

12  have this information.  It isn't the same on their side.

13          THE COURT:  Okay.  In general I agree with

14  everything you've said, Mr. Fleming.  Let me ask you,

15  though, are you -- do you have an objection -- two

16  questions.  One, do you have an objection to identifying the

17  people with whom you wish to share the information so that

18  for some reason if FICO says, you know, we object to

19  so-and-so, then we can at least have a process for resolving

20  that objection?  Do you -- so question number one.  Do you

21  have an objection to sharing the names?

22          MR. FLEMING:  Well, if they sign the written

23  assurance, we would have to provide the names.

24          THE COURT:  Right.

25          MR. FLEMING:  It's just a question of speed and

                              21

1  process.

2          THE COURT:  Right.

3          MR. FLEMING:  We give the name.  I'm not saying

4  that FICO doesn't get back as soon as they can, but they

5  don't get back -- they can't give immediate responses.  And

6  then if there was -- I mean, I can't --

7          THE COURT:  Right.

8          MR. FLEMING:  -- imagine just in this scenario why

9  they would be not allowing somebody who is a key executive

10  who is involved in the settlement process to have access,

11  but then we have to go through another process of discussing

12  with the Court that person and it's just -- you know, more

13  days go by --

14          THE COURT:  Right.

15          MR. FLEMING:  -- and we're not able to have the

16  discussions we need to have to comply with the court order.

17          THE COURT:  Let me ask you the second question,

18  then.  Are any of these -- and I recognize the sensitivity

19  of this question.  Are any of the people with whom you would

20  be inclined or feel the need to share this information with

21  likely to be on Federal's witness list?

22          MR. FLEMING:  I mean, there are a couple people.

23  The person who is going to be present at the settlement

24  conference, a Mr. Ghislanzoni, the same person -- who is

25  also the same person who was at the previous settlement

                              22

1  conference, he's the head IP architect.

2          THE COURT:  Right.

3          MR. FLEMING:  There isn't anybody else who comes

4  to mind and I've seen the list and I didn't recognize any of

5  them as a witness, but I wasn't looking at it for that

6  purpose either.  I could --

7    THE COURT: Well, yeah, I -- you know, there was

8  one thing that FICO articulated that I can understand why

9  that would be potentially concerning.

10    Here's what I think we should do on this. You

11  know, first of all, a couple comments. I have to believe --

12  I have no way of knowing otherwise. I have to simply

13  believe that both parties are acting in good faith with

14  respect to the settlement conference. And whatever Federal

15  or Chubb's process is, really they are the only ones who can

16  judge whether or not John Smith executive needs the

17  information. And so I have to take both sides at their word

18  on this. And if it comes to light somehow later that this

19  appears to have been done in bad faith, we'll deal with it

20  then.

21    But in the meantime here's what I'm going to

22  order. I will give each side, for the purpose of preparing

23  for the settlement conference, up to 15 names. You're both

24  on your honor. You will shoot each other these names by the

25  close of business today. If one side objects to -- and with

                             23

1  titles. So John Smith, head of global IT or whatever.

2  Shoot the name and the title to opposing counsel by the

3  close of business today. By the close of business tomorrow

4  if either of you object to anyone on the other's list,

5  notify them of the objection by the close of business

6  tomorrow. And then -- so today is Tuesday. Tomorrow is

7  Wednesday. On Thursday I will resolve any objections if

8  there are any, and we'll have to set that up if there are

9  some. So that's how we'll deal with that.

10    I will tell you this. I am assuming and ordering

11  that all parties provide information under the assurance

12  that it will only be used for proper purposes. This isn't a

13  game of gotcha. This isn't a game that everybody is going

14  to skirt the rules.

15    I understand this is highly competitive, sensitive

16  information, but with the kind of dollars we're talking

17  about, we can't go in hamstringing either party from being

18  able to effectively prepare for and participate in the

19  settlement conference.

20    So that's what we're going to do on that one. Let

21  me pause there and see if there's any questions on that.

22    MR. FLEMING: Your Honor, so on Federal's side, so

23  what happens if three other people need to be involved in

24  the settlement discussions? For whatever reason we didn't

25  collect everybody that needed to be included and we need

                             24

1  additional names. What would be the process at that point?

2    THE COURT: You'll have to come back to court, and

3  we'll move very quickly.

4    MR. FLEMING: Okay.

5    THE COURT: Okay. All right. So going back to

6  the last issue, the one that I put aside for a moment, Query

7  Number 1 and Query Number 2 regarding the negotiations over

8  the licensing fees, for the time being I am going to order

9  only that FICO produce the documents responsive to Query

10  Number 1.

11    If for some reason think this should change or

12  if this issue arises again -- let me ask you this question,

13  Ms. Kliebenstein. If -- let's just assume for a second that

14  you're ordered to produce documents in response to Query 1

15  and then a month down the line I decide that was a foolish

16  decision and I should have said Query Number 2. Have I

17  introduced added complexity or expense by doing it in stages

18  like this?

19    MS. KLIEBENSTEIN: No, Your Honor.

20    THE COURT: Okay. So for the time being and with

21  no assurance that anything is going to change on this, FICO

22  will produce the documents responsive to Query 1. Okay?

23    MS. KLIEBENSTEIN: Understood.

24    THE COURT: Okay. While I have everybody on the

25  line, is there anything else we need to deal with, anything

                             25

1  that's not clear?

2    MS. KLIEBENSTEIN: Not from the plaintiff's

3  perspective.

4    THE COURT: Okay.

5    MR. FLEMING: I --

6    THE COURT: Go ahead, Mr. Fleming.

7    MR. FLEMING: I have two things. First of all, I

8  spoke with Al Hinderaker yesterday about this issue of

9  stipulating that we can extend the time to meet and

10  confer on settlement. Rather it being as it is now ordered

11  by June 5th, that we have it as long as it's prior to

12  June 12th, if that is acceptable with the Court.

13    THE COURT: That is fine with me.

14    MR. FLEMING: [Indiscernible.] Regarding

15  production of documents, is there a timeline for that

16  Query 1 production?

17    THE COURT: Ms. Kliebenstein, how much time does

18  FICO need to do that?

19    MS. KLIEBENSTEIN: Oh.

20    THE COURT: Yeah.

21    MS. KLIEBENSTEIN:  You know, I want to say two to

22  three weeks.  My only reservation is that our Query 1, we

23  didn't pull attachments at that time, so that number could

24  easily expand to ten to fifteen thousand documents, which

25  would -- two to three weeks would be aggressive.  So I will

26

1    get it pulled and get it put into our review database and

2  then I will follow up with Mr. Pham.

3    THE COURT:  Okay.  If -- certainly involve me if

4  need be.  My order, just so that we have an order, will be

5  produce them by close of business two weeks from Friday.  So

6  that would be June 20th.  If it turns out that that is not

7  feasible, then either you and Mr. Pham can work that out or

8  come back to court and we'll address it then.

9    MS. KLIEBENSTEIN:  The 21st or the 20th?

10    THE COURT:  Whatever the Friday is.  Is Friday the

11  21st?  I thought it was the 20th, but I'm --

12    MR. FLEMING:  The 21st.

13    THE COURT:  It's the 21st, isn't it?

14    MS. KLIEBENSTEIN:  Understood, Your Honor.

15    THE COURT:  Okay.  All right.  Well, thank you,

16  everyone.  And if anyone chooses to appeal any portion of

17  this, you'll have to order a transcript and it's obviously

18  audio recorded at this point, so that process takes a little

19  while as well.  So just factor that into your timing.  Okay?

20    MS. KLIEBENSTEIN:  Thank you, Your Honor.

21    THE COURT:  All right.

22    MR. FLEMING:  Thank you, Your Honor.

23    THE COURT:  We're in recess.  Thank you all.

24    MR. FLEMING:  All right.

25    (Court adjourned)

1

2

3    I, Lori A. Simpson, certify that the foregoing is a

4  correct transcript to the best of my ability from the

5  official digital recording in the above-entitled matter.

6

7    Certified by:  s/ Lori A. Simpson

8    Lori A. Simpson, RMR-CRR

9

10

11

12

13

14