## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **Jury Trial Demanded** |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) ) ) ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S OPPOSITION TO OBJECTION TO ORDER GRANTING-IN-PART PLAINTIFF'S MOTION TO COMPEL

## I.   INTRODUCTION

This case is about the breach of a Blaze Advisor software license agreement ("Agreement") between Fair Isaac Corporation ("FICO" or "Plaintiff") and Chubb & Son, a division of Federal Insurance Company.  Blaze Advisor is a decision management tool that automates business decisions.  Federal Insurance Company and ACE American Insurance Company (collectively "Federal" or "Defendants") use Blaze Advisor to automate the decisions related to the underwriting and sale of insurance.

Federal seeks a second *in camera* review of three privileged emails despite the fact it does not challenge the privilege determination by Judge Schultz.  It simply wants a do-over.

The Magistrate correctly found FICO's attorney-client communications privileged after thorough consideration *in camera*.  Federal's "challenge" to this ruling is merely argument of its waiver and estoppel defenses to the breach of contract claims, which have no relevance to the Magistrate's privilege determination.  The testimony of FICO's in-house counsel, Thomas Carretta, is fully consistent with FICO's position throughout this litigation.  This appeal is not the proper place to argue the waiver and estoppel defenses.

Federal also appeals the Order to produce the business rules that Blaze Advisor executes in connection with Federal's sale of insurance, as requested by Request for Production No. 90 ("RFP 90").  The business rules are relevant to the nexus between Federal's copyright infringement (the unauthorized use of Blaze Advisor) and revenue from the underwriting and sale of insurance.  The discovery goes to the core of the damages case for copyright infringement.  Federal has consistently obstructed FICO's discovery, forcing FICO repeatedly to seek the Court's assistance.  (Dkt. 60; Dkt. 107.) This appeal follows the same pattern.

In 2018, the Court denied Federal's previous appeal regarding related discovery relevant to the nexus between infringement and revenue, stating it "is both related and proportionate to the alleged acts of infringement."  (Dkt. 108 at 4.)  Judge Schultz's Order compelling production of Federal's business rules is similarly correct: the discovery is related and proportionate to FICO's claims.  Federal has not shown the decision to be clearly erroneous or contrary to law.  The Court should affirm.

II.    **Judge Schultz Correctly Determined That FICO's Attorney-Client Communications Are Privileged And Immune From Discovery.**

Federal moved to compel "FICO to provide sufficient description" of certain privilege log entries, including entries 656, 662, and 665.  (Dkt. 237 at 3, 24.)  Federal argued it "is entitled to the subject line of the emails and/or the actual topic of advice sought." (*Id.* at 25.)  Federal conceded its own privilege log did not conform to the standards it sought to impose on FICO.  (Ex. 1[1] at 75-76.)

Judge Schultz performed an *in camera* review of FICO's attorney-client communications and confirmed they are privileged: "I have reviewed privilege log entry number 656, 662, and 665 from FICO's privilege log.... All three of them are, in fact, privileged." (Ex. 2 at 2-3.)  He found them privileged because "all three of them request or provide legal advice." (*Id.* at 3.)

Judge Schultz granted Federal's request for a more detailed description: "You are entitled to know that the legal advice concerns the interpretation of the software license agreement." (*Id.*)  Federal obtained the "subject matter" of the privileged communications on which it moved to compel.  (Dkt. 237 at 25 (seeking "the actual topic of advice [in the privileged communications]").)

A.    **The decision is not clearly erroneous or contrary to law.**

Federal seeks disclosure of the substance of the privileged communication itself without basis.  Without showing the privilege decision to be clearly erroneous or contrary

_____

[1] All Exhibits are attached to the Declaration of Michael A. Erbele filed concurrently herewith.

to law, Federal asserts it is entitled to another *in camera* review and a more detailed

description of the subject matter of the privileged communications.

1.    The standard of review is extremely deferential.

A district court's review of a magistrate judge's order on a nondispositive matter

is "extremely deferential." *Coons v. BNSF Ry. Co.*, 268 F. Supp. 3d 983, 991 (D. Minn.

2017) (Wright, J.). The Court must affirm the order unless it is "clearly erroneous or

contrary to law." 28 U.S.C. § 636(b)(1)(A); *accord* Fed. R. Civ. P. 72(a); D. Minn. LR

72.2(a)(3). A ruling is clearly erroneous when the reviewing court "is left with the

definite and firm conviction that a mistake has been committed." *Coons*, 268 F. Supp. 3d

at 991. "A magistrate judge's ruling is contrary to law when it either fails to apply or

misapplies pertinent statutes, case law, or rules of procedure." *Id.*

2.    Federal has not met its threshold requirement to show additional *in camera* review is necessary.

Federal does not challenge Judge Schultz's privilege determination. Its request for

another *in camera* review is unsupported. An *in camera* review cannot be automatically

granted. "*In camera* review is not appropriate merely because a party requests the district

court undertake the endeavor." *Anheuser-Busch v. A-B Distribs.*, 1996 U.S. Dist. LEXIS

4906, at *2 (M.D. Fla. Mar. 28, 1996) (citing *United States v. Zolin*, 491 U.S. 554, 571

(1989)); *see also Jani-King Franchising v. Jani-King LTD.*,  2015 U.S. Dist. LEXIS

184600, at *3 (N.D. Tex. Feb. 6, 2015) (same). "A blanket rule allowing *in camera*

review ... would place the policy of protecting open and legitimate disclosure between

attorneys and clients at undue risk." *Zolin*, 491 U.S. at 571; *cf. Transunion Intelligence*

*LLC v. SearchAmerica*, 2013 U.S. Dist. LEXIS 197003, at *2-3 (D. Minn. Nov. 14, 2013)

4

("The purpose of the attorney-client privilege is to encourage full and frank communication between attorneys and their clients.") (internal quotation omitted).

Where, as here, there is no challenge to the merits of the Magistrate's privilege determination, a second *in camera* review is inappropriate. "There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *Zolin*, 491 U.S. at 571. Federal's request should be denied. *Jani-King*, 2015 U.S. Dist. LEXIS 184600, at *3; *Anheuser-Busch*, 1996 U.S. Dist. LEXIS 4906, at *2; *see also King v. Univ. Healthcare Sys.*, 645 F.3d 713, 720-21 (5th Cir. 2011) (affirming decision not to conduct *in camera* review where opposing party "offered only speculation" that the documents were not privileged).

Federal asserts a district judge "must" conduct a second *in camera* review when reviewing a Magistrate's decision. Its cited cases hold no such thing. *PureChoice* and *Heilman* do not discuss the standard for conducting a second *in camera* review and do not hold that the district court must conduct one. The judges in those cases simply performed an *in camera* review without discussing the standard, presumably based upon an adequate threshold showing that such review was necessary. (*See* Dkt. 315 at 7 (citing *Heilman v. Waldron*, 287 F.R.D. 467 (D. Minn. 2012) and *PureChoice v. Macke*, 2008 WL 4831790 (D. Minn. Nov. 3, 2008)).)

Federal points to no portion of the privilege determination that was clearly erroneous or contrary to law. Judge Schultz correctly determined FICO's attorney-client

communications are privileged because "all three of them request or provide legal advice." (Ex. 2 at 3.) The Court should affirm.

3.    Federal has shown no need for an additional description.

A privilege log must describe "the nature of the documents ... not produced or disclosed … in a manner that, ***without revealing information itself privileged or protected***, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5). Judge Schultz's description exceeds the legal requirement and provides Federal with the subject matter of the privileged emails:

> You are entitled to know that the legal advice concerns the interpretation of the software license agreement.

(Ex. 2 at 3.) Federal does not argue it cannot assess whether the documents are privileged based on that description.

Requiring e-mail subject lines as descriptions is improper, particularly where the subject line discloses the substance of the privileged communication. *See Pub. Citizen, Inc. v. United States Dep't of Educ.*, 2019 U.S. Dist. LEXIS 86003, at *14, 21-25 (D.D.C. May 22, 2019) (subject line of email chain withheld as its disclosure would reveal privilege); *United States v. Philip Morris USA*, 449 F. Supp. 2d 1, 943 (D.D.C. 2006).

Federal's sole cited case is not to the contrary. In *Loftin v. Bande*, the court found certain privilege log descriptions "insufficient because they do not specify the subject matter of the teleconferences." 258 F.R.D. 31, 33 (D.D.C. 2009). *Loftin* did not discuss e-mail subject lines, and did not hold that a party is "entitled" to obtain the subject line of a privileged e-mail. *Loftin* is fully consistent with Judge Schultz's decision. He provided

Federal an expanded description on the record showing the "subject matter" of the privileged communications.  Federal has shown no clear error in this holding.

**B.    Federal cannot invade the attorney-client privilege to impeach a witness.**

Federal seeks to test the memory of FICO in-house lawyer, Thomas Carretta.  It does not have that right using privileged communications.  Attorney-client communications are absolutely immune from discovery.  *Starr Indem. & Liab. v. Cont'l Cement*, 2012 U.S. Dist. LEXIS 170988, at *2-3 (E.D. Mo. Dec. 3, 2012) ("[I]t is the long established rule that confidential communications between an attorney and his client are absolutely privileged from disclosure against the will of the client.") (quoting *Diversified Indus. v. Meredith*, 572 F.2d 596, 601 (8th Cir. 1977)).  Because attorney-client communications are immune from discovery absent waiver, potential impeachment of a witness is not grounds to invade the attorney-client privilege.  *Starway v. Indep. Sch. Dist. No. 625*, 187 F.R.D. 595, 598 (D. Minn. 1999) ("While the [privileged] document may be favorable to the plaintiff, the court ... finds no implicit support for the unexplained assertion that it may prove helpful in establishing that someone lied under oath.").  Federal's contrived argument of impeachment is of no moment.

**C.    Federal's abuse of process argument is wholly unsupported.**

Federal attempts to connect privilege log entries 656, 662, and 665 to a series of communications involving three FICO sales personnel regarding the territorial scope of the Agreement.  Federal speculates: "Based on the timing and sequence of the [privileged] Carretta emails and FICO's employees stating use was global, it appears likely Carretta interpreted the License as permitting use outside the United States."  (Dkt.

315 at 4.)  Again, privileged communications are immune from discovery.  The argument is unavailing.

The argument is also meritless.  It ignores that the Agreement expressly requires any waiver of rights to be in writing.  It also ignores the testimony of the witnesses involved.  The underlying record shows Mr. Carretta's testimony is truthful, and FICO has not abused the litigation process.

> 1.   The Agreement contains a territorial limitation and an explicit "no waiver" provision.

Federal's evidence is merely that three sales personnel were temporarily mistaken regarding the territorial scope of the license (an understanding they later realized and acknowledged to be incorrect).  That does not constitute waiver or estoppel.  None had authority to waive or modify FICO's contractual rights.

The Agreement defines "Territory" in Paragraph 1 as:

"Territory", with respect to the installation and physical location of the Fair Isaac Products, means the United States of America.

(Ex. 3 at ¶1.)  The Agreement additionally contains explicit "no waiver of rights" and "no amendment of terms except in writing" provisions. (*Id.* at ¶10.4 ("No waiver of any rights of a party under this Agreement will be effective unless set forth in a writing signed by such party."); ¶10.5 ("This Agreement constitutes the full and entire understanding and agreement between the parties.... Any other terms or conditions or amendments shall not be incorporated herein or be binding upon any party unless expressly agreed to in a writing.").)

Federal also attempts to rely on negotiating history to show the Agreement was global. The cited history relates to discussions *before* Amendment Two was signed. (Dkt. 315 at 4.) Mr. Wachs testified that Amendment Two *as signed* did not expand the geographical scope of the Agreement. (Ex. 4 at 173:6-11 ("I don't see the wording, for example, change from a definition of territory, so there's some evidence that it did not include—that it was never finally accepted as global.").)

Contrary to Federal's arguments, the evidence shows Federal understood the Agreement was not worldwide:

| | |
|---|---|
| **From:** | Andrew Millyard/EUZ/ChubbMail |
| **Sent:** | Thursday, June 26, 2008 2:37 AM |
| **To:** | Russell Hodey <rhodey@chubb.com>; Craig Worth <craigworth@chubb.com> |
| **Subject:** | Fw: Fair Isaac Enterprise Licence |
| **Attach:** | pic07446.gif |

Hi Guys,

If you see below, the current licence is <u>not</u> a worldwide licence, nor does it cover Chubb's subsidiaries (us).

Interesting that Tamra does go on to mention on the last point that she can help amend the contract to include EUZ. It would be worth investigating exactly what is meant by this point. I would have assumed that would mean licencing costs from us??

Rgds,
Andrew

(Ex. 5.)

2. <u>Mr. Carretta's testimony is consistent with the proper interpretation of the Agreement.</u>

Federal impugns Mr. Carretta's testimony based solely on speculation of what it imagines as the substance of the privileged communications. (Dkt. 315 at 5-6.) Mr. Carretta's testimony is wholly consistent with the facts of record—there is no basis to

impeach him.  Mr. Carretta properly drew a distinction between FICO's corporate

knowledge and the mistaken understanding of three sales personnel.

Mr. Carretta explained that Mr. Sawyer's correspondence is not probative of

FICO's own corporate knowledge or the terms of the Agreement.

> Q.   Does this [Mr. Sawyer's e-mail] indicate to you that
>       FICO was well aware of Chubb's use of Blaze in Europe
>       as early as at least 2012?
>
> A.   No.
>
> Q.   Why not?
>
> A.   It indicates that the client partner thinks he understands
>       the contract and is making an opinion. It doesn't mean
>       FICO did.

(Ex. 6 at 209:14-21.)

Mr. Carretta testified that Mr. Sawyer's belief with respect to the scope of the

Agreement was wrong:

> Q.   And you think he's [Mr. Sawyer's] wrong about the
>       contract?
>
> A.   I do.

(*Id.* at 209:22-24.)

The mistaken beliefs of FICO's salespeople are irrelevant to the scope of the

Agreement.  Client partners such as Mr. Sawyer are not authorized representatives of

FICO:

> Q.   Is a client partner an authorized representative of FICO?
>
> A.   No.

(*Id.* at 211:24-212:1.)

Mr. Carretta explained written amendments are necessary to change the scope of

the Agreement:

> Q.    From your perspective, can the client rely upon the
>       client partner's response…?
>
> A.    ***I would point you to the contract that says you have to
>       have written amendments***.

(*Id.* at 213:2-18 (emphasis added) (objections omitted).)  Mr. Carretta's testimony is fully

consistent with the proper interpretation of the Agreement.  Even if privileged emails

could be used for impeachment, there is no sound basis to infer Mr. Carretta could be

impeached.

## III.    Judge Schultz Properly Ordered Federal To Produce The Business Rules.

Judge Schultz recognized the relevance of the business rules[2] and correctly

ordered Federal to produce them.  Federal argues the issues *de novo*, completely ignoring

the limited scope of review on appeal.  There is no showing Judge Schultz was wrong on

the law or abused his discretion.

---

[2] Federal's contention that RFP 90 seeks software code is wrong and a red-herring
argument.  The business rules are written using English language—not software
code.  One of the primary benefits of Blaze Advisor is the fact that business persons can
edit and maintain the rules in English (or any other language) without involvement from
IT.  The business rules reside in the Rules Repository of Blaze Advisor.  Following the
method of production FICO requested and the Court ordered, Federal will produce
contents from the Rules Repository on an electronic media.  Blaze Advisor software
located at FICO's counsel's office can then generate a report of the rules that reside in the
Repository.

### A. The Magistrate determined the rules were relevant and ordered production in the least burdensome manner.

Judge Schultz correctly recognized that Federal's rules were relevant to show the nexus between Federal's infringement and revenue:

> [W]hat FICO was trying to demonstrate is that by having Blaze Advisor ... the process of making these underwriting judgments is made far quicker than it if were done by a human or by hand or however they would do it without the software ... [and] they, Federal, make better, in terms of the quality, risk assessments, thereby saving themselves money by charging more appropriate premiums or declining to write certain policies.

(Ex. 2 at 10.)

Judge Schultz ordered Federal to produce the rules in the least onerous possible format, as repository files and business object model files.  This form of production can be accomplished at minimal burden and expense according to Federal's own representation to the Court.  (*Id.* at 11; *see also* Dkt. 299.)  There is no clear error or contradiction of law.

### B. The law and the facts demonstrate the rules are relevant in this case.

Federal further asserts the rules are not relevant to the issue of disgorgement of Federal's profits under the Copyright Act.  (Dkt. 315 at 13.)  A review of the law and the facts shows Federal's position is without merit.

RFP 90 states:

> Specific to each application that uses or used Blaze Advisor® software, all documents relating to the business rules of each application.

Federal stated in response it would produce non-privileged documents responsive to RFP 90.  (Ex. 7 at 6.)  Federal never took the position that RFP 90 sought irrelevant documents or information.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Information that meets these requirements is discoverable even if it would not be admissible in evidence.  *Id.*  Relevance "encompasses any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Hodges v. Pfizer, Inc.*, 2016 U.S. Dist. LEXIS 40747, at *5 (D. Minn. Mar. 28, 2016) (internal quotation omitted).

The Copyright Act lays out a burden-shifting mechanism for ascertaining profit "attributable to the infringement."  First, the "copyright owner is required to present proof ***only*** of the infringer's gross revenue."  17 U.S.C. § 504(b) (emphasis added).  Then the burden shifts to the infringer to provide the "deductible expenses" and "the elements of profit attributable to factors other than the copyrighted work."  *Id.*; *see also Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 795 (8th Cir. 2003).  At trial FICO will satisfy its burden and prove "some connection or relationship" between Federal's infringement and the gross revenue.  *Andreas*, 336 F.3d at 799.

The rules are relevant to this case.  The rules written into Blaze Advisor are logical statements (if/then) of what to do (what actions to take) in different factual situations. Federal uses Blaze Advisor to automatically execute its rules (make the appropriate decisions) to determine, for example, whether to quote a risk and at what price. Documents responsive to RFP 90 will show how Blaze Advisor contributes to revenue.

Federal placed the rules in the center of this litigation.  Federal attributes all its revenue to the rules themselves, attempting to distinguish between the rules *per se* and

13

the automated decisions made by Blaze Advisor based on those rules.  Federal cannot use

its business rules as both a sword and a shield.

### C.    The rules are useable in the format ordered by Judge Schultz.

Federal asserts production of the business rules as repository files and business

object model files "would result in an unusable product."  (Dkt. 315 at 13.)  This

argument is misplaced.  First, Federal represented that this format of production was

preferred because it would cause minimal burden.  (Dkt. 299.)  Second, FICO knows its

own product.  Production of the business rules in the format ordered by Judge Schultz is

understandable by FICO.  (Dkt. 301 at 3 (production in this format is "FICO's preferred

method of receipt").)

Federal contends it is necessary to translate the business rules to English before

production.  (*See* Dkt. 315 at 10.)  Not true.  When produced as repository files and

business object model files, Blaze Advisor will automatically generate a human-readable

report of the rules.  Judge Schultz rejected Federal's objections that the form of

production is potentially inaccurate.  He correctly determined that was an issue of

admissibility, not discovery.  (Ex. 2 at 11-12.)

### D.    The Stipulated Protective Order alleviates confidentiality concerns.

Federal finally objects to producing the rules because they are "highly-confidential

and commercially and competitively sensitive information."  (Dkt. 315 at 14-15.)  Any

concerns about disclosing the business rules to FICO are addressed by the Stipulated

Protective Order.  Information designated "Confidential – Attorneys' Eyes Only" can

only be seen by outside attorneys, designated in-house counsel, and independent

consultants, who are only allowed to use the information for purposes of this litigation. (Dkt. 44 at 6.) There is no basis to withhold the documents on grounds of confidentiality.

The Magistrate's decision makes common sense. FICO and Federal are not competitors. FICO is a software company. Federal is an insurance company. As part of the parties' ongoing professional relationship prior to the termination of the Agreement, FICO had access to Federal's business rules and performed extensive training of Federal on the integration of the business rules with Blaze Advisor software. Federal routinely contracted with FICO to assist Federal in the development and implementation of its rules. Federal's assertion of competitive harm is contrived.

## IV.    CONCLUSION

Federal's challenge to Judge Schultz's ruling is without basis. The Order should be affirmed in its entirety.

Dated: July 2, 2019                 MERCHANT & GOULD P.C.

/s/Heather J. Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2215
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com

*Attorneys for Plaintiff FICO*

15