# EXHIBIT 2

```
1                 UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     Fair Isaac Corporation,        )   File No. 16-CV-1054
4                                   )              (WMM/DTS)
            Plaintiff,              )
5                                   )
     vs.                            )   Minneapolis, Minnesota
6                                   )   June 4, 2019
     Federal Insurance Company      )
7    and ACE American Insurance     )   DIGITAL RECORDING
     Company,                       )
8                                   )
            Defendants.             )
9                                   )
     ------------------------------------------------------------

10

            BEFORE THE HONORABLE DAVID T. SCHULTZ
11      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12              (TELEPHONE CONFERENCE)

13   APPEARANCES
      For the Plaintiff:        Merchant & Gould, PC
14    (Via Telephone)           HEATHER J. KLIEBENSTEIN, ESQ.
                                JOSEPH DUBIS, ESQ.
15                              Suite 3200
                                80 South Eighth Street
16                              Minneapolis, Minnesota 55402

17    For the Defendants:       Fredrikson & Byron
      (Via Telephone)           TERRENCE J. FLEMING, ESQ.
18                              CHRISTOPHER D. PHAM, ESQ.
                                LEAH C. JANUS, ESQ.
19                              Suite 4000
                                200 South Sixth Street
20                              Minneapolis, Minnesota 55402

21    Transcriber:              LORI A. SIMPSON, RMR-CRR
                                Suite 146
22                              316 North Robert Street
                                St. Paul, Minnesota 55101
23

24
          Proceedings recorded by digital recording; transcript
25   produced by computer.
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3          THE COURT:  All right.  We are on the record in
4   the matter of Fair Isaac Corporation vs. Federal Insurance
5   Company, Civil No. 16-1054.
6          Counsel for FICO, if you would note your
7   appearances for the record, please.
8          MS. KLIEBENSTEIN:  Yes, Your Honor.  Heather
9   Kliebenstein and Joe Dubis of Merchant & Gould.
10          THE COURT:  Good morning.
11          And for the defendant?
12          MR. FLEMING:  Your Honor, Terry Fleming, Leah
13   Janus, and Chris Pham of the Fredrikson law firm
14   representing defendant.
15          THE COURT:  All right.  We have a number of things
16   that I want to accomplish today.  First, I will give you my
17   ruling on the privilege log entries.  Second, I will give
18   you my ruling on the documents requested to be produced by
19   FICO regarding negotiations over prices.  Third, we have to
20   look at the business rules issue.  And fourth, the
21   dissemination of the expert report.  So that's what was on
22   my agenda.
23          Turning first to the privilege log entries, I have
24   reviewed privilege log entry number 656, 662, and 665 from
25   FICO's privilege log and all three of the e-mail strings --

1    they are all three e-mail strings.  All three of them are,

2    in fact, privileged and I'll give you a little bit of my

3    rationale for that.

4            First of all, they're different e-mail chains, but

5    they spring from a common source and then privilege log

6    entry 662 and 665 then branch off and have unique

7    information or communications, but all three of them request

8    or provide legal advice.  You are entitled to know that the

9    legal advice concerns the interpretation of the software

10   license agreement.

11           There is -- as is always the case almost, there

12   are minor portions of the communications that are perhaps

13   not strictly speaking privileged, but they are so interwoven

14   with the privileged communications as to be incapable of

15   meaningful redaction.

16           To the extent that any of the communication

17   reflects business advice as opposed to legal advice, I have

18   reviewed that question carefully and the legal advice

19   portion clearly predominates over the business advice

20   portion, to the extent there is any.  And if one were to

21   attempt to extract the business advice portion, it would be

22   impossible to do that without revealing the content of the

23   legal advice.

24           So those three documents, entries number 656, 662,

25   and 665, are privileged and will not be produced.  Let me

4

1    pause there and ask if anyone has questions regarding that.

2              MS. KLIEBENSTEIN:  No questions from the

3    plaintiff, Your Honor.

4              THE COURT:  Any --

5              MR. FLEMING:  Your Honor, this is Terry Fleming.

6    One of the issues was the description of the entries and

7    you've stated that they concern the interpretation of the

8    software license agreement.  Is it possible to have a more

9    expansive description, such as in connection with --

10   concerning the interpretation of the SLA reuse outside of

11   the United States?

12             THE COURT:  I don't believe that would be either

13   necessary or appropriate.  So I am going to say no on that,

14   but by all means you are more than welcome to appeal that

15   issue to Judge Wright.

16             Okay.  Moving on to the letter from

17   Ms. Kliebenstein dated May 24, 2019 regarding the production

18   of documents relating to what they've described in their

19   letter as Query Number 1 and Query Number 2.  Let me ask

20   first if, Mr. Fleming, you wish to be heard on anything

21   relating to that issue.

22             MR. FLEMING:  Just very briefly, Your Honor.  The

23   only comment that we have in response to that letter relates

24   to the project that Federal had to undertake to respond to

25   FICO's Requests 55 through 70, which similarly required an

1    extensive document review project, well over a hundred hours

2    and costing Federal in excess of $40,000 in fees to

3    undertake that project.  That, nonetheless, had to do

4    with -- was required by the Court's order.  To the extent --

5              THE COURT:  Mr. Pham [sic], if I might interrupt

6    you for a second.  I'm sorry.  You were very, very faint and

7    I'm really struggling to hear you.  So if you could either

8    get closer to the speakerphone or pick up the phone or

9    whatever, but go again.  I'm sorry.

10             MR. FLEMING:  No problem, Your Honor.  Just wanted

11   to make the comment that Federal had to undertake a project

12   relating to FICO's Requests 55 through 70 in which well over

13   a hundred hours of time was spent reviewing documents at the

14   cost to Federal of -- in excess of $40,000.  In any event,

15   Federal complied with the Court's order and conducted the

16   review project.  So to the extent FICO is making the

17   argument that, you know, it's going to be costly for them to

18   conduct a review project, you know, Federal has already had

19   to do so.

20             THE COURT:  Okay.  Ms. Kliebenstein, briefly do

21   you wish to be heard on this topic beyond the content of

22   your letter?

23             MS. KLIEBENSTEIN:  I think our main focus is the

24   cost-benefit analysis with regards to this specific order

25   from the Court and essentially for the Court to decide what

1    is enough, what is enough collection and review to satisfy

2    the Court's order.  I think both parties have spent

3    significant amounts of money on document review and

4    production going both ways.

5            So I didn't hear -- what I didn't hear from

6    Federal was a need to get the more robust, more costly

7    Query 2 search results.  It sounds like the Query 1 would

8    satisfy what they're looking for.

9            THE COURT:  All right.  Anything further, Federal?

10           MR. FLEMING:  No, Your Honor.

11           THE COURT:  All right.  I am going to set this one

12   aside for a minute.  I want to turn to the other ones.  I'm

13   still thinking through that particular issue.  So we will

14   return to that.

15           Let's talk about the extraction of the business

16   rules and what's involved there.  Let me start by giving the

17   parties what I remember of the first order for production of

18   documents that I think bears on this to some degree.

19           As I recall, we had a motion early on in which

20   Federal resisted on the grounds that overhead or things of

21   that nature were not discoverable because they don't relate

22   to direct loss or direct profits to be disgorged.  I know

23   that that's a very imprecise way of phrasing it, but we had

24   that issue.  I ordered the discovery of it.  I think it

25   was -- in my view, the case law was very clear that it was

1    discoverable.

2              Now, this issue about extraction of the business

3    rules, as I understand FICO's position, they are essentially

4    arguing that they need the business rules in their entirety

5    to be extracted and produced because that will permit their

6    experts to determine how much of the profit is attributable

7    to the use of the software allegedly in violation of the

8    licensing agreement and as an infringement.

9              So far am I -- on a very high level, am I

10   summarizing this correctly, Ms. Kliebenstein?

11             MS. KLIEBENSTEIN:  I think so.  The way that I

12   would characterize it is Federal has stated throughout this

13   case and expert reports that it owns the rules.  The rules

14   themselves are what make the decision and Blaze Advisor is

15   just, you know, a glorified Excel spreadsheet.

16             And so that's why we asked for the rules in the

17   first place.  If we're going to get into the value of the

18   rules and what they drive in this case, then we should be

19   able to see the rules.

20             It's connected -- there is a revenue connection

21   there.  It has to deal with the disgorgement, you're exactly

22   right, Your Honor, both on the connection to revenue side

23   and then what profits are attributable or not attributable

24   to infringement.

25             THE COURT:  Okay.  Mr. Pham or Mr. Fleming or

1      Ms. Janus.

2           MR. FLEMING:  Thank you, Your Honor.

3      [Indiscernible.]  We haven't -- what we're having difficulty

4      understanding, Your Honor, is how doing the rules themselves

5      will allow FICO to demonstrate, you know, how Blaze

6      contributes to the profits.  Throughout FICO's expert's

7      opening report, it's clear that the expert understands how

8      Blaze is being used, how he foresees the benefits to be from

9      the use of Blaze, but there is no, you know, in-depth

10     discussion of how the rules themselves will help with that

11     process.

12          THE COURT:  Okay.  I have to confess,

13     Ms. Kliebenstein, I'm a little uncertain as to why knowing

14     the content of the rules themselves is truly necessary for

15     connecting the alleged infringement to the revenues.  I'm

16     struggling to see it, so maybe you should address that.

17          MS. KLIEBENSTEIN:  Sure, Your Honor.  I think

18     this -- as you said at the outset, this is another situation

19     where Federal is saying we're certain it's not relevant, so

20     don't worry about it.

21          The rules get loaded into Blaze Advisor and what

22     we think we can see when it's in its native environment is

23     not just the rules, like are you a man or a woman, are you

24     older than 65 or younger than 65, but how they interplay

25     within Blaze Advisor.  And that's an important piece in this

1    case.  What does Blaze Advisor do when the rules are put

2    into Blaze Advisor?  What value does Blaze Advisor add?  Is

3    it more than a glorified Excel spreadsheet?

4           And we can't fully evaluate that question until we

5    have Federal's rules and put them into Blaze Advisor, and

6    that's exactly what we've asked for in our most recent

7    letter to the Court.  We described a way that Federal can

8    provide us with the rules that we can then put into a native

9    environment here at Merchant & Gould and see how the whole

10   thing works.

11          FICO doesn't keep content -- FICO doesn't keep its

12   clients' rules internally for a number of different reasons,

13   one of which is confidentiality, setting aside the fact that

14   FICO and Federal spent $6.6 million in professional services

15   work together to not just develop the rules, but to get them

16   into a format and package them so that when they are put

17   into Blaze Advisor, that they'll work the right way.

18          So all this goes to the core question of what are

19   these rules doing and what is the value to Federal at the

20   end of the day, and we need these rules and to see them in

21   that native environment in order to test the reliability of

22   expert reports.

23          THE COURT:  All right.  Here's the way it sounds

24   to me.  It's -- first of all, I take at face value what the

25   Federal party is saying regarding the process, what it would

1    take to extract the rules as they perceive that to be, that

2    it would be prohibitively expensive and take too long,

3    although, honestly, I'm a little skeptical that it would

4    actually take 260 weeks' worth of time, but more to the

5    point --

6              MS. KLIEBENSTEIN:  Your Honor, if I could

7    interrupt?  And I apologize for interrupting.  We're not

8    asking for that Option 2.

9              THE COURT:  Yeah, I understand that.  I'll get to

10    that.

11              More to the point, it seems to me that what FICO

12    was trying to demonstrate is that by having Blaze Advisor,

13    two things happen:

14              One, the process of making these underwriting

15    judgments is made far quicker than if it were done by a

16    human or by hand or however they would do it without the

17    software.

18              Number two, that having the software means that

19    they make -- they, Federal, make better, in terms of the

20    quality, risk assessments, thereby saving themselves money

21    by charging more appropriate premiums or declining to write

22    certain policies or the like.

23              And that -- honestly, my reaction is that that is,

24    so far as I've described it, that is rather unexceptional or

25    unobjectionable, that that, in fact, is, you know, obvious.

1    The harder question is how to quantify that and, honestly,

2    I'm not persuaded that having the substance of the rules

3    themselves really provides any greater reliability in terms

4    of the quantification.

5         That said, I do understand that you're asking for

6    an option which I believe Federal has said is really not

7    cost or time prohibitive and I'm trying to find the

8    reference to it, but essentially -- let me find the portion

9    here.

10   (Pause)

11        THE COURT:  Yeah, Federal reproducing repository

12   files and business object model files (JAE (JAVA Archive)

13   files).  Now, I understand that Federal's response to that

14   is that's potentially inaccurate and the only way we can

15   verify that those are the rules is by undertaking

16   considerable expense, et cetera, et cetera.

17        So all of that is my long-winded way of saying as

18   a discovery matter I will order Federal to produce or

19   extract, as FICO has described it, the repository files and

20   business object model files.  And as I understand it, that

21   is between five and ten thousand dollars' worth of expense.

22        Having said that, however, I think it is a risky

23   or at least uncertain proposition on FICO's part that it

24   would be able to rely on those or use those effectively or

25   introduce them because Federal is going to say it's not

1    verified, it's not certain.  That, it strikes me, is an

2    evidentiary fight and so I am -- I don't know what Judge

3    Wright will do with that fight, but it is a fight for a

4    later day.

5              So Federal will be ordered to extract those files.

6    I will put that into a minute order so that you'll have this

7    on the docket as well.  But I'm not ordering them to do what

8    Federal describes as a very time-intensive, exceedingly

9    costly undertaking.  All that, as I said, is with risk to

10   both sides when it comes to an evidentiary threshold.

11             All right.  Let me turn to the fourth thing on the

12   agenda, which is the access to the expert reports.  I've

13   read the letters, but I would find it beneficial to have a

14   little bit more fulsome argument on this point.

15             I am not clear in my mind why Federal needs to

16   have these reports shared as widely as they want them

17   shared.  So let's start there.  At the same time I will tell

18   you honestly I'm not so sure why Fair Isaac is as concerned

19   with the dissemination of the information there as they

20   appear to be.

21             So I would like to hear from both of you.  Start

22   with Federal about [indiscernible].

23             MR. FLEMING:  Well, Your Honor, we've been going

24   through this process on our side of wanting to discuss in

25   detail the experts' reports and primarily Mr. Zoltowski's

1    report and especially relating to the lost license fee

2    issues, and the inability to share that has really impeded

3    our ability to talk with key executives.

4            We are dealing with in-house counsel, who has been

5    organizing these meetings and contacts us.  The difficulty

6    is as the process moves up through these various levels of

7    authority, there are more and more people brought in and

8    just as a practical matter it has been difficult for him to

9    have fulsome discussions and to respond to questions by, you

10   know, very knowledgeable people in a lot of different areas.

11           We've tried -- they initially allowed us to have

12   one in-house counsel other than Kevin Murphy read the

13   experts' reports and then we talked about having a number of

14   other people.

15           And I've proposed most recently that so long as

16   any of those people sign the Exhibit B to the protective

17   order, which is a written assurance, that would provide all

18   necessary information and adequate protection to FICO.

19           But it really has impeded the ability to have

20   settlement discussions to the extent that I've requested.

21   And I understand FICO has agreed that we will not -- we will

22   stipulate to an extension on the time for the meet and

23   confer, which right now is June 5th, so that we can have

24   that any time prior to June 12th, simply because we are not

25   in a position to do that right now because they haven't been

1    able to have the discussion.

2            I mean, it's -- you know, the number of people

3    involved at various times and they keep having to bring in

4    then business lines and various, you know, upper echelon

5    people.  It's not a static process on our end and it's a

6    very large corporation and they're asking for, you know,

7    extremely large sums of money, which has been changing over

8    time, and we haven't been able to keep the key executives

9    updated.

10           It wasn't until like last Tuesday that they were

11   able to provide the $37 million number they're now seeking

12   in lost license fees.  And of course the people, the

13   executives who hear that want to get the backup and the data

14   and to challenge it so we can see -- they can understand

15   exactly, you know, what the issues are and what the risks

16   are.

17           So that's it in a nutshell, Your Honor.

18           THE COURT:  Okay.  Ms. Kliebenstein, let me ask

19   you a couple of factual questions.  One, what is the amount

20   of damages, total amount of damages that are articulated in

21   your experts' various reports?  I don't want duplicative

22   damages, but if it's [indiscernible] if you calculate it

23   this way it's 20 million and if you calculate it that way

24   it's 50 million, that's what I would like to know.  Start

25   there, if you would.

1    MS. KLIEBENSTEIN:  I will do my best.  I was not

2    expecting that specific question.  I think the lost license

3    fees for domestic and foreign are in the 37 million range in

4    our opening report and then our opening expert identified

5    the gross written premium dollars that are subject to

6    disgorgement, which was 30 billion.

7          MR. DUBIS:  [Indiscernible.]

8          MS. KLIEBENSTEIN:  Around 30 billion.  I could be

9    off on that.

10         THE COURT:  3-0 billion with a "b"?

11         MS. KLIEBENSTEIN:  Yeah.  Those are the amounts of

12   premiums that went through the software and then --

13         THE COURT:  And then it would be Federal's job to

14   cut that number down to profit, correct?

15         MS. KLIEBENSTEIN:  Yes.  And that number --

16         MR. DUBIS:  2.5.

17         MS. KLIEBENSTEIN:  -- is 2.5 billion, I think is

18   what their expert put out there.

19         THE COURT:  And forgive me and bear with me, but

20   are those numbers -- those are all alternative measures of

21   damage, 37 million versus 2.5 billion, correct?

22         MS. KLIEBENSTEIN:  No.  One is for breach of

23   contract and the other is for copyright disgorgement.

24         THE COURT:  Okay.  That's right.

25               Okay.  So in light of all of that, what's the

1    concern -- I will grant you that asking for 14 people is a

2    lot of people.  On the other hand, that's a lot of money.

3              MS. KLIEBENSTEIN:  Right.

4              THE COURT:  Even if it's just 37 million and

5    you're hoping that it's a fruitful discussion, what's the

6    danger in letting -- for example, in your letter you say

7    they want five senior IT management people to review this

8    stuff.  Why is that concerning in light of the fact they'll

9    sign the undertaking?

10             MS. KLIEBENSTEIN:  Here's how I frame the issue.

11   We've offered and we're happy to do a reciprocal exchange,

12   so a number of people on FICO's end get to see the expert

13   reports -- unredacted versions of the expert reports as well

14   in order to prepare for the settlement conference.

15             So on Federal's end, they obviously care about the

16   financial figures.  On our end, it would be fruitful and

17   helpful for our executives to review the expert reports to

18   understand the usage case, what's been going on at Federal

19   regarding the usage, and also the copyright disgorgement

20   case.

21             So the 37 million number can't go to Federal's

22   executives currently, but the disgorgement figures can

23   because those are based on Federal's dollars.  The opposite

24   is true for FICO.  So that's why I originally proposed a

25   mutual exchange.

1           I originally proposed five people because I could

2      not understand why five people from IT and two people from

3      procurement needed AEO access in this case.

4           What's reflected in that $37 million figure and

5      all of the underlying statements in our damages report is

6      our pricing methodology and how FICO goes about pricing its

7      software, which is not something that they disclose

8      willingly and often.  It's AEO information.

9           I just cannot see and I have asked for an

10     explanation why does -- somebody from IT, somebody who is

11     developing applications, or people from procurement who are

12     negotiating contracts with vendors, what role do they have

13     in the settlement process such that they need to see this

14     information?  I didn't get a response to that.  So our next

15     proposal was:  All right.  Just, you know, for these five

16     people, tell us who they are and have them undertake the

17     mutual written assurance.

18          Any other instances in this case where we have

19     allowed additional people to view AEO information, we've

20     always exchanged names.  We've understood who it is.  And if

21     we have those names, we can understand -- we can assess

22     whether they are at the proper level in IT, whether they're

23     at the proper level in procurement management and legal or

24     are they at a lower level and they're just trying to get

25     more witnesses access to our information so that they can

1    rebut the case instead of preparing for the settlement

2    conference.

3              So that was our concern on the 14 people and why

4    we originally proposed an exchange of five.  It's always

5    been with the offer of if you need more people, tell me

6    exactly why and what role they have in this case or give me

7    their name and we're happy to re-assess it.

8              So two things.  We want to know who so that we can

9    assess the why and we want it to be a mutual exchange on

10   both sides, and we're happy to provide names and written

11   assurances on our side.

12             THE COURT:  Is it your view that it has to be the

13   same number of recipients on each side of the V?

14             MS. KLIEBENSTEIN:  You know, reciprocality is

15   obviously important to my client as long as -- I do

16   understand that Chubb is a global organization and there may

17   be a number of people -- there may be more people that they

18   need to show it to than we do, but at some point it's got to

19   have an end, right?  So maybe it's 10, maybe it's 14, but we

20   need names and we need a limit on it.  It can't just keep

21   going and going and going so long as people execute the

22   written assurance.  If that's the case, then the designation

23   of AEO has no meaning --

24             THE COURT:  Right.

25             MS. KLIEBENSTEIN:  -- if anybody within the

1    company can see AEO information by simply signing a written

2    assurance.

3              THE COURT:  Okay.

4              MR. FLEMING:  Well, if I may respond?

5              THE COURT:  Go ahead, Mr. Fleming.

6              MR. FLEMING:  FICO is not in a position to say

7    whether certain individuals have certain roles or

8    responsibility or, you know, the gravitas or have the

9    ability within Chubb to make decisions.  They can't tell

10   that by giving them the name or even necessarily the titles.

11   This is an extremely large sum of money and as a result they

12   are bringing in people from across different divisions and a

13   lot of different areas.

14             But, I mean, this is a limited time frame.  I

15   mean, we're talking about just having the ability to engage

16   in settlement discussions.  FICO isn't claiming that in any

17   manner, that they aren't able to engage in settlement

18   discussions.  That's the only use we have.  We don't have

19   any other use.  We just want to be able to provide numbers

20   and to make an assessment of risk, and they are impeding our

21   ability to do that.  We can't do it right now.  We're not in

22   a position to comply with the court orders because they

23   won't allow access to these large numbers.

24             And with regard to -- I mean, reciprocality only

25   matters if there's a purpose in it.  If they don't have any

1    problem in engaging in settlement discussions, and we

2    haven't heard anything about that, then why does it need to

3    be reciprocal?

4            And there is a difference in the positions of the

5    parties.  Unlike Federal, FICO is serving Chubb's

6    competitors.  And especially with regards to the rules, they

7    could create solutions to competitors without ever revealing

8    anything, that we would have no way of knowing about it.  It

9    increases their ability to compete -- it increases the

10   ability of competitors to compete with Federal.  I mean,

11   we've got a legitimate issue as to why we don't want FICO to

12   have this information.  It isn't the same on their side.

13           THE COURT:  Okay.  In general I agree with

14   everything you've said, Mr. Fleming.  Let me ask you,

15   though, are you -- do you have an objection -- two

16   questions.  One, do you have an objection to identifying the

17   people with whom you wish to share the information so that

18   for some reason if FICO says, you know, we object to

19   so-and-so, then we can at least have a process for resolving

20   that objection?  Do you -- so question number one.  Do you

21   have an objection to sharing the names?

22           MR. FLEMING:  Well, if they sign the written

23   assurance, we would have to provide the names.

24           THE COURT:  Right.

25           MR. FLEMING:  It's just a question of speed and

1   process.

2          THE COURT:  Right.

3          MR. FLEMING:  We give the name.  I'm not saying

4   that FICO doesn't get back as soon as they can, but they

5   don't get back -- they can't give immediate responses.  And

6   then if there was -- I mean, I can't --

7          THE COURT:  Right.

8          MR. FLEMING:  -- imagine just in this scenario why

9   they would be not allowing somebody who is a key executive

10  who is involved in the settlement process to have access,

11  but then we have to go through another process of discussing

12  with the Court that person and it's just -- you know, more

13  days go by --

14         THE COURT:  Right.

15         MR. FLEMING:  -- and we're not able to have the

16  discussions we need to have to comply with the court order.

17         THE COURT:  Let me ask you the second question,

18  then.  Are any of these -- and I recognize the sensitivity

19  of this question.  Are any of the people with whom you would

20  be inclined or feel the need to share this information with

21  likely to be on Federal's witness list?

22         MR. FLEMING:  I mean, there are a couple people.

23  The person who is going to be present at the settlement

24  conference, a Mr. Ghislanzoni, the same person -- who is

25  also the same person who was at the previous settlement

1    conference, he's the head IP architect.

2                THE COURT:  Right.

3                MR. FLEMING:  There isn't anybody else who comes

4    to mind and I've seen the list and I didn't recognize any of

5    them as a witness, but I wasn't looking at it for that

6    purpose either.  I could --

7                THE COURT:  Well, yeah, I -- you know, there was

8    one thing that FICO articulated that I can understand why

9    that would be potentially concerning.

10                Here's what I think we should do on this.  You

11   know, first of all, a couple comments.  I have to believe --

12   I have no way of knowing otherwise.  I have to simply

13   believe that both parties are acting in good faith with

14   respect to the settlement conference.  And whatever Federal

15   or Chubb's process is, really they are the only ones who can

16   judge whether or not John Smith executive needs the

17   information.  And so I have to take both sides at their word

18   on this.  And if it comes to light somehow later that this

19   appears to have been done in bad faith, we'll deal with it

20   then.

21                But in the meantime here's what I'm going to

22   order.  I will give each side, for the purpose of preparing

23   for the settlement conference, up to 15 names.  You're both

24   on your honor.  You will shoot each other these names by the

25   close of business today.  If one side objects to -- and with

1    titles.  So John Smith, head of global IT or whatever.

2    Shoot the name and the title to opposing counsel by the

3    close of business today.  By the close of business tomorrow

4    if either of you object to anyone on the other's list,

5    notify them of the objection by the close of business

6    tomorrow.  And then -- so today is Tuesday.  Tomorrow is

7    Wednesday.  On Thursday I will resolve any objections if

8    there are any, and we'll have to set that up if there are

9    some.  So that's how we'll deal with that.

10          I will tell you this.  I am assuming and ordering

11   that all parties provide information under the assurance

12   that it will only be used for proper purposes.  This isn't a

13   game of gotcha.  This isn't a game that everybody is going

14   to skirt the rules.

15          I understand this is highly competitive, sensitive

16   information, but with the kind of dollars we're talking

17   about, we can't go in hamstringing either party from being

18   able to effectively prepare for and participate in the

19   settlement conference.

20          So that's what we're going to do on that one.  Let

21   me pause there and see if there's any questions on that.

22          MR. FLEMING:  Your Honor, so on Federal's side, so

23   what happens if three other people need to be involved in

24   the settlement discussions?  For whatever reason we didn't

25   collect everybody that needed to be included and we need

1    additional names.  What would be the process at that point?

2         THE COURT:  You'll have to come back to court, and

3    we'll move very quickly.

4         MR. FLEMING:  Okay.

5         THE COURT:  Okay.  All right.  So going back to

6    the last issue, the one that I put aside for a moment, Query

7    Number 1 and Query Number 2 regarding the negotiations over

8    the licensing fees, for the time being I am going to order

9    only that FICO produce the documents responsive to Query

10   Number 1.

11        If I for some reason think this should change or

12   if this issue arises again -- let me ask you this question,

13   Ms. Kliebenstein.  If -- let's just assume for a second that

14   you're ordered to produce documents in response to Query 1

15   and then a month down the line I decide that was a foolish

16   decision and I should have said Query Number 2.  Have I

17   introduced added complexity or expense by doing it in stages

18   like this?

19        MS. KLIEBENSTEIN:  No, Your Honor.

20        THE COURT:  Okay.  So for the time being and with

21   no assurance that anything is going to change on this, FICO

22   will produce the documents responsive to Query 1.  Okay?

23        MS. KLIEBENSTEIN:  Understood.

24        THE COURT:  Okay.  While I have everybody on the

25   line, is there anything else we need to deal with, anything

1    that's not clear?

2            MS. KLIEBENSTEIN:  Not from the plaintiff's

3    perspective.

4            THE COURT:  Okay.

5            MR. FLEMING:  I --

6            THE COURT:  Go ahead, Mr. Fleming.

7            MR. FLEMING:  I have two things.  First of all, I

8    spoke with Al Hinderaker yesterday about this issue of

9    stipulating that we can extend the time to meet and

10   confer on settlement.  Rather it being as it is now ordered

11   by June 5th, that we have it as long as it's prior to

12   June 12th, if that is acceptable with the Court.

13           THE COURT:  That is fine with me.

14           MR. FLEMING:  [Indiscernible.]  Regarding

15   production of documents, is there a timeline for that

16   Query 1 production?

17           THE COURT:  Ms. Kliebenstein, how much time does

18   FICO need to do that?

19           MS. KLIEBENSTEIN:  Oh.

20           THE COURT:  Yeah.

21           MS. KLIEBENSTEIN:  You know, I want to say two to

22   three weeks.  My only reservation is that our Query 1, we

23   didn't pull attachments at that time, so that number could

24   easily expand to ten to fifteen thousand documents, which

25   would -- two to three weeks would be aggressive.  So I will

1    get it pulled and get it put into our review database and

2    then I will follow up with Mr. Pham.

3              THE COURT:  Okay.  If -- certainly involve me if

4    need be.  My order, just so that we have an order, will be

5    produce them by close of business two weeks from Friday.  So

6    that would be June 20th.  If it turns out that that is not

7    feasible, then either you and Mr. Pham can work that out or

8    come back to court and we'll address it then.

9              MS. KLIEBENSTEIN:  The 21st or the 20th?

10             THE COURT:  Whatever the Friday is.  Is Friday the

11   21st?  I thought it was the 20th, but I'm --

12             MR. FLEMING:  The 21st.

13             THE COURT:  It's the 21st, isn't it?

14             MS. KLIEBENSTEIN:  Understood, Your Honor.

15             THE COURT:  Okay.  All right.  Well, thank you,

16   everyone.  And if anyone chooses to appeal any portion of

17   this, you'll have to order a transcript and it's obviously

18   audio recorded at this point, so that process takes a little

19   while as well.  So just factor that into your timing.  Okay?

20             MS. KLIEBENSTEIN:  Thank you, Your Honor.

21             THE COURT:  All right.

22             MR. FLEMING:  Thank you, Your Honor.

23             THE COURT:  We're in recess.  Thank you all.

24             MR. FLEMING:  All right.

25        (Court adjourned)

1

2

3          I, Lori A. Simpson, certify that the foregoing is a

4     correct transcript to the best of my ability from the

5     official digital recording in the above-entitled matter.

6

7               Certified by:   *s/ Lori A. Simpson*

8                               Lori A. Simpson, RMR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25