# EXHIBIT 4

Lawrence Wachs    2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 326-4   Filed 07/02/19   Page 2 of 5

```
UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
-------------------------------------------X
FAIR ISAAC CORPORATION,

                                    PLAINTIFF,

         -against-        Case No.:
                          16-cv-1054

FEDERAL INSURANCE COMPANY and
ACE AMERICAN INSURANCE COMPANY,

                                    DEFENDANTS.
-------------------------------------------X


              DATE:  February 26, 2019
              TIME:  10:06 A.M.



        DEPOSITION of a Non-Party Witness, LAWRENCE WACHS, taken by the respective parties, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held at the offices of Merchant & Gould, P.C., 767 3rd Avenue, 23rd Floor, New York, New York 10017, before Jennifer Schwartz, a Notary Public of the State of New York.
```

Lawrence Wachs     2/26/2019
CASE 0:16-cv-01054-DTS   Doc. 326-4   Filed 07/02/19   Page 3 of 5
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 168**

1
2  Unless you have something there, I
3  can't remember that.
4     Q. Did you review documents from
5  2008 in preparation for the deposition
6  today, if you recall?
7     **A. I believe so. If they were part**
8  **of discovery, I saw them.**
9     Q. Do you have a recollection of
10 Mike Sawyer or Russ Schreiber
11 approaching you to discuss the Chubb
12 license in late 2008?
13    **A. Not specifically, no.**
14    Q. I'm showing you what's been
15 marked as deposition Exhibit 73. This
16 is an appointment from Mike Sawyer to
17 Ian Brody, Richard Hill, and Russ
18 Schreiber, correct?
19    **A. That's correct.**
20    Q. Do you know who Ian Brody and
21 Richard Hill are?
22    **A. No, I do not.**
23    Q. And in the note to the
24 appointment, it says, "All please join
25 this call to discuss the Chubb license

**Page 169**

1
2  agreement and plan -- and the plan for
3  Chubb Europe. Attached are the three
4  SLSA contracts and the latest Chubb
5  annual report," correct?
6     **A. Correct.**
7     Q. Was it your understanding at
8  this point that Chubb had approached
9  FICO about using Blaze in Europe?
10       MR. HINDERAKER: Objection,
11    lack of foundation.
12    **A. I was not an invitee at this**
13 **meeting and I can't say that I remember**
14 **the specifics of the meeting.**
15    Q. Okay. And I'm just using this
16 date to ask you whether -- as someone
17 who was involved with the Chubb
18 account, whether you have a
19 recollection of Chubb discussing...
20    **A. No, I do not.**
21    Q. You know, having access to Blaze
22 in Europe pursuant to enterprise
23 license agreement?
24    **A. No, I do not. No recollection.**
25    Q. Do you recall that around this

**Page 170**

1
2  time you were asked to look into the
3  Chubb license agreement in connection
4  with Chubb's request to have access to
5  Blaze in Europe?
6     **A. Conceivably, but I don't**
7  **remember the specifics of that**
8  **conversation. I believe there's an**
9  **e-mail to that effect though.**
10    Q. Okay. So do you recall that you
11 actually concluded that the ELA that
12 was negotiated with Chubb was a global
13 ELA?
14    **A. From the wording here, I cannot**
15 **conclude -- make that conclusion.**
16    Q. So I've handed you -- before you
17 go into the e-mail, I was asking the
18 question whether you recalled
19 concluding that it was a global ELA. I
20 take it you don't have a recollection
21 of that?
22    **A. I do not have a recollection of**
23 **that.**
24    Q. So I've handed you what's been
25 marked as Exhibit 116. Is this one of

**Page 171**

1
2  the documents you reviewed to prepare
3  for your deposition?
4     **A. Yes.**
5     Q. This is an e-mail from you to
6  Russ Schreiber dated November 26th,
7  2008, correct?
8     **A. That's right.**
9     Q. So this is about a
10 week-and-a-half after -- or two -- a
11 little less than two weeks after the
12 appointment planner that we looked at
13 which was marked Exhibit 73, correct?
14    **A. Right.**
15    Q. I'll give you a chance to review
16 the e-mail, let me know when you've
17 done that.
18    **A. Yeah, I reviewed the document.**
19    Q. Having reviewed the document, do
20 you recall what led you to writing this
21 e-mail?
22    **A. It appears that it was a request**
23 **by Russ Schreiber for my views on the**
24 **status of the ELA and whether it did**
25 **include a global provision or not.**

Lawrence Wachs    2/26/2019
CASE 0:16-cv-01054-DTS   Doc. 326-4   Filed 07/02/19   Page 4 of 5
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 172**

Q. And do you recall actually having a conversation with Russ Schreiber on that topic?

A. No, I don't have a recollection of that.

Q. You state that in reviewing your notes and some archived e-mails, "it's apparent to me that the corporate ELA that was negotiated with Phil Folz and June Drewry intended to include the global license, correct?

A. That is what I stated.

Q. So you concluded after reviewing archived e-mails and your notes that the ELA was a global license?

A. That, I don't agree with necessarily.  It says that it's apparent that it intended to include the global license but I can't tell you specifically that it did.

Q. Okay.  What is the distinction between what you're saying and what I said?

A. Well, the way I worded it, it's

**Page 173**

apparent that it intended to include a global license.  The question is in the final what was actually paid by Chubb would indicate that there's a difference of about $100,000 and I don't see the wording, for example, change from a definition of territory, so there's some evidence that it did not include -- that it was never finally accepted as global but I don't have the e-mail or any thread from Phil -- from Mark Laden to indicate what was finally agreed on at that private meeting that he attended, so I can't draw that conclusion.  It's apparent that they wanted global but I don't know if it ever came to fruition.

Q. So you just don't know -- but you believe that it was intended to include --

A. That's correct.

Q. -- the ELA was intended to include the global license?

A. That is what I said.

**Page 174**

MR. HINDERAKER:  We'll rely on the testimony on the record.

Q. And then you say, "In my recollection, they --"  meaning Chubb -- "were adamant about keeping global on the table," correct?

A. That's right.

Q. But they did take COBOL's smart forms off the table to wait for projects requiring that functionality, correct?

A. That's what I said, yes.

Q. Okay.  Now, did you -- do you recall talking with Russ Schreiber after you sent this e-mail?

A. No, I do not.

Q. Did you recall talking with anyone else at FICO relating to your conclusion that's set forth in the e-mail marked as 116?

A. No, I do not.

Q. Do you know whether, in fact, after November of 2008 FICO assisted Chubb in implementing the Blaze Advisor

**Page 175**

software in Europe?

MR. HINDERAKER:  Objection, lack of foundation.

A. I don't believe that that was the way I read the e-mail from the invitation of Mike Sawyer when he states that to -- license agreement and a plan for Chubb Europe, he's talking about a sales opportunity.

Q. So you don't know whether FICO interpreted the enterprise license agreement going forward as including global access or not, you just don't know?

A. I don't know.

Q. What notes are you referring to in your e-mail marked as 116?

A. It would be the notes that -- the e-mails that you produced here clearly, notes would have been perhaps notebooks of -- as I attended meetings, I may have taken notes at the meeting but --

Q. So handwritten notes that you

Lawrence Wachs    2/26/2019
CASE 0:16-cv-01054-DTS  Doc. 326-4   Filed 07/02/19   Page 5 of 5
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 176**

1
2  may have?
3     A. Handwritten notes, yes.
4     Q. Okay. And do you know where
5  those handwritten notes are today?
6     A. Thrown away years ago.
7     Q. Was that something that you took
8  with you when you left FICO?
9     A. The notebooks, yes.
10    Q. And do you know for a fact that
11 you don't have those anymore?
12    A. Yeah. We had a super storm,
13 Sandy, and most of those papers were in
14 the basement and no longer available.
15    Q. Do you think that Mark Laden
16 after having the meeting in December of
17 2008 with Chubb would have sent a
18 summary e-mail to the team that was
19 working on the deal describing what
20 took place?
21    MR. HINDERAKER: Objection,
22    asks for speculation.
23    A. I have no insight into that at
24 all.
25    Q. Do you recall any other

**Page 177**

1
2  involvement that you had with Chubb
3  after writing this November 26th, 2008,
4  e-mail?
5     A. Not at all.
6     Q. We talked about the fact that
7  you left either in 2008 or in 2009,
8  having gone through the e-mails we've
9  looked at today, do you have any better
10 recollection of when you think you left
11 FICO?
12    A. It was no later than the first
13 month or two of 2009.
14    Q. And you don't recall having any
15 other dealings with Chubb or questions
16 about the license agreement after this
17 e-mail marked as 116?
18    A. No, I do not. Mike Sawyer was
19 then the client partner, handled most
20 of the interaction with Chubb.
21    Q. Do you -- I think this is
22 encompassed in what I've asked but to
23 make it clear, do you recall if Russ
24 Schreiber responded by e-mail to this
25 e-mail which is marked as 116?

**Page 178**

1
2     A. I have -- I just don't know. I
3  don't remember.
4     Q. There is an e-mail in the
5  record, I'm not even going to mark it,
6  that's dated June 1, 2009, that's to
7  you, I don't see a response, I'm
8  assuming that was just sent to your --
9     A. Yep.
10    Q. Based on your testimony, it was
11 sent to your e-mail account after you
12 had left?
13    A. I'm sure it was.
14       (Whereupon, e-mail was
15    marked as Defendants' Exhibit 337
16    for identification as of this
17    date by the Reporter.)
18    Q. I'm showing you what's been
19 marked as Exhibit 337. I am showing
20 this to you to ask you to explain what
21 it is, there's no date. I have a guess
22 but I just -- I don't know, so after
23 you've had a chance to take a look at
24 it --
25    A. Sure.

**Page 179**

1
2     Q. -- let me know.
3     A. This is -- I guess, typical in
4  software installations, this is the
5  first communication that would flow
6  from the software provider, Fair Isaac,
7  FICO, to the client and it tells the
8  client what his software installation
9  procedure is and what process he has to
10 follow in order to install the software
11 on the client's service.
12    Q. So this would actually -- okay,
13 so the software is not being sent via
14 this e-mail, it's saying you can go get
15 the software at a download site?
16    A. It's either downloaded or it's
17 provided by a media -- by CD at the
18 time. What's misleading here is that
19 Jim Black did not send this --
20    Q. Right.
21    A. -- it's to Jim Black from the
22 delivery team at FICO to Mr. Black.
23    Q. Copied to you?
24    A. And copied to me, yes.
25    Q. So the first page of -- what's