# EXHIBIT 6

# FILED UNDER SEAL

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
CASE 0:16-cv-01054-DTS Doc. 327-1 Filed 07/02/19 Page 2 of 6
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1                  UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MINNESOTA

 3
     ------------------------------------------------------
 4   FAIR ISAAC CORPORATION, )
                             )
 5           Plaintiff(s),)
                             )
 6        vs.                ) File No. 16-cv-1054(WME/DTS)
                             )
 7   FEDERAL INSURANCE       )
     COMPANY,                )
 8   and ACE AMERICAN        )
     INSURANCE COMPANY,      )
 9                           )
             Defendant(s).)
10   ------------------------------------------------------

11

12

13                          CONFIDENTIAL

14                       ATTORNEYS' EYES ONLY

15

16                            DEPOSITION

17        The following is the videotaped deposition of

18   THOMAS CARRETTA, taken before Julie A. Brooks, Notary

19   Public, Registered Professional Reporter, pursuant to

20   Notice of Taking Deposition, at Fredrikson & Byron,

21   4000 US Bank Plaza, 200 South Sixth Street,

22   Minneapolis, Minnesota, commencing at 9:09 a.m.,

23   Tuesday, October 9, 2018.

24

25
```

Thomas Carretta — CONFIDENTIAL - ATTORNEYS' EYES ONLY — 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 327-1 Filed 07/02/19 Page 3 of 6

**Page 205**

1 asked for?
2 A. Well, I'm not FICO. I'm Tom. And you
3 are asking me, from my analysis, which I consider work
4 product.
5 Q. So you won't answer that question?
6 A. No.
7 Q. Is it your -- you were involved in
8 consulting relating to the negotiations between FICO
9 and Chubb in early 2016, correct?
10 A. You need to define as to what you mean
11 by "negotiations." I talked to Andrew via email and,
12 maybe, by mail.
13 Q. And you consulted with FICO people
14 relating to their negotiations, correct?
15 A. Not that I recall. They developed their
16 own business parameters for doing a deal.
17 Q. Okay. Did you have any input into
18 whether FICO would, ultimately, provide consent to the
19 license transfer?
20 MS. KLIEBENSTEIN: I'm going to object
21 to that on privilege.
22 You can answer yes or no.
23 THE WITNESS: I don't know what FICO
24 would do.
25 BY MS. JANUS:

**Page 206**

1 Q. Did you have any input to the analysis
2 of whether FICO would consent to a license transfer?
3 MS. KLIEBENSTEIN: Same objection. Same
4 instruction.
5 THE WITNESS: I can't answer that. You
6 are calling for my work product.
7 BY MS. JANUS:
8 Q. So you can't tell me whether you
9 provided advice on that issue?
10 MS. KLIEBENSTEIN: I think you can
11 answer yes or no, but that's it.
12 THE WITNESS: Over the course of time,
13 the answer is yes.
14 BY MS. JANUS:
15 Q. You referenced that Chubb's use changed.
16 When did it change?
17 A. What do you mean by "use"?
18 Q. That is what you said. You said that it
19 changed to include outside of the U.S.
20 A. What I said is that we got call tickets
21 logged by persons outside the United States calling in
22 to our maintenance system, and there's no reason that
23 we should be expecting those calls, because the system
24 was limited to the United States.
25 Q. Did you look into how long that use

**Page 207**

1 outside of the United States had been going on?
2 MS. KLIEBENSTEIN: I'm going to object
3 to that as attorney-client work product.
4 If you can answer that yes or no without
5 revealing your work product, you can do so. Otherwise,
6 please don't answer.
7 THE WITNESS: So if you could read back
8 that question so I understand it.
9 (Record read.)
10 MS. KLIEBENSTEIN: I think that calls
11 for work product.
12 THE WITNESS: That calls for attorney
13 work product.
14 BY MS. JANUS:
15 Q. Are you aware that FICO has been aware
16 of Chubb's use in Europe since at least 2012?
17 MS. KLIEBENSTEIN: Objection.
18 Mischaracterizes the prior testimony.
19 THE WITNESS: Am I aware that FICO is
20 aware that somebody at Chubb was misusing the software;
21 is that your question?
22 BY MS. JANUS:
23 Q. That's not my question.
24 A. Then --
25 Q. Are you aware that FICO was aware that

**Page 208**

1 Chubb used Blaze in Europe as early as 2012?
2 A. I was not aware of that.
3 Q. I'm showing you what's been marked as
4 Exhibit 47. Take a minute to review these emails, and
5 let me know when you are done.
6 A. Okay. I've read this.
7 Q. Okay. Have you seen this document
8 before?
9 A. Not that I remember.
10 Q. It is dated August 14th of 2012. It is
11 an email exchange between Mike Sawyer and Russ
12 Schreiber and Richard Hill. Do you know who Richard
13 Hill is?
14 A. He was a sales guy.
15 Q. Located in Europe?
16 A. In England.
17 Q. And you know -- we've talked about Russ
18 Schreiber and Mike Sawyer, correct?
19 A. I know Russ Schreiber and Mike Sawyer.
20 Q. They were your point people, from a
21 business perspective, relating to the license transfer
22 of the Chubb license, correct?
23 A. They were the business people engaging
24 with Chubb & Son, yes.
25 Q. And they are the ones who brought the

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 327-1 Filed 07/02/19 Page 4 of 6

1 issue to your attention, correct?
2     A.  Yes.
3     Q.  So you see here, at the bottom of the
4 first page of -- or the front page of Exhibit 47, it
5 says -- Mike Sawyer writes, "Richard, I am the CP for
6 Chubb." What is CP?
7     A.  Client partner.
8     Q.  "They do have a Global ELA for Blaze and
9 have automated UW Application running in the UK
10 already." Do you see that?
11     A.  I do.
12     Q.  What is UW application?
13     A.  I have no idea.
14     Q.  Does this indicate to you that FICO was
15 well aware of Chubb's use of Blaze in Europe as early
16 as at least 2012?
17     A.  No.
18     Q.  Why not?
19     A.  **It indicates that the client partner**
20 **thinks he understands the contract and is making an**
21 **opinion. It doesn't mean FICO did.**
22     Q.  Okay. And you think he's wrong about
23 the contract?
24     A.  I do.
25     Q.  Is it significant to you that the

Page 209

1 contract was interpreted by the client partner
2 throughout the term of the license and Chubb used the
3 license pursuant to that interpretation?
4     MS. KLIEBENSTEIN: Objection. Vague.
5 And I -- given his position as a lawyer, I think that's
6 going to call for work product as it relates to the
7 present dispute.
8     MS. JANUS: Are you going to answer the
9 question?
10     MS. KLIEBENSTEIN: If you need the
11 question re-read back to you, before you decide to
12 answer it --
13     THE WITNESS: No. You are asking me for
14 my analysis. That's work product.
15 BY MS. JANUS:
16     Q.  I'm just asking if -- I mean, you've
17 taken the position, in writing, to Chubb several times
18 that you just became aware of non-compliant uses
19 outside of the United States. That's correct?
20     A.  Yes.
21     Q.  I'm asking, wouldn't you want to know
22 about the way FICO actually conducted its business and
23 interpreted the contract during the pendency of the
24 license to form that conclusion?
25     MS. KLIEBENSTEIN: Same objection. The

Page 210

1 question calls for work product.
2     You can answer it if doing so won't
3 reveal any investigation work product.
4     THE WITNESS: I would want to know
5 what's in the file and what authorized officers of FICO
6 said.
7 BY MS. JANUS:
8     Q.  It does not matter to you how the client
9 partner at FICO interpreted the scope of the contract;
10 is that fair?
11     MS. KLIEBENSTEIN: I'm going to object
12 to that on work product grounds.
13     I'm going to instruct you not to answer.
14     (Instruction not to answer.)
15     THE REPORTER: I didn't get the answer.
16 I'm sorry.
17     THE WITNESS: The answer is: That's
18 work product, for sure, and I won't answer that.
19 BY MS. JANUS:
20     Q.  Is a client partner an authorized
21 representative of Chubb?
22     A.  No.
23     Q.  A client partner is the -- I'm sorry.
24 Is a client partner an authorized representative of
25 FICO?

Page 211

1     A.  No.
2     Q.  And the client partner is the FICO
3 employee who primarily interfaces with a particular
4 client, correct?
5     A.  **I don't know if I agree it is primarily.**
6 **They are one of the people that interface with**
7 **clients.**
8     Q.  Does any other position at FICO
9 interface with clients more than a client partner
10 would?
11     MS. KLIEBENSTEIN: Objection. Calls for
12 speculation, foundation.
13     THE WITNESS: I think the answer is
14 probably yes. There is professional services people
15 that are on engagements that involve many hours.
16 There's client partners. There's client service
17 managers. There's the maintenance organization.
18 There's all kinds of interfacing.
19 BY MS. JANUS:
20     Q.  And so if a client needs something,
21 whether it's additional product or additional services,
22 the client partner is often the first point of contact
23 for the client; is that fair?
24     A.  **I don't know if I'd agree with that. I**
25 **think every circumstance is different with the**

Page 212

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 327-1 Filed 07/02/19 Page 5 of 6

**Page 213**

1 relationships. They're part of the process.
2     Q. And if the client asks the client
3 partner what the scope of the software license is that
4 governs their relationship, can the client rely upon
5 the client partner's response to that question?
6     MS. KLIEBENSTEIN: Objection.
7 Foundation, speculation.
8     THE WITNESS: I don't know what your
9 client would do.
10 BY MS. JANUS:
11     Q. That's not my question. My question is:
12 From your perspective, can the client rely upon the
13 client partner's response to that question?
14     MS. KLIEBENSTEIN: Objection.
15 Foundation, speculation.
16     THE WITNESS: I would point you to the
17 contract that says you have to have written
18 amendments.
19 BY MS. JANUS:
20     Q. Can the client rely upon the client
21 partner's answer to the question?
22     A. I don't know what your clients can do.
23     Q. I'm not asking you if you know what my
24 client is going to do. I'm asking you whether, based
25 on your understanding, the client can rely upon the

**Page 214**

1 answer he or she gets from the client partner relating
2 to the scope of the contract?
3     A. The prior question asked me can the
4 client rely on what a client partner might say.
5     Q. About the scope of the contract, yeah.
6     A. My answer is I don't know what your
7 client is going to do. I'm not your client.
8     Q. But do you think they are entitled to
9 rely upon the answer they receive from the client
10 partner?
11     MS. KLIEBENSTEIN: Objection.
12 Speculation, foundation.
13     THE WITNESS: I don't know if they are
14 entitled or not. But they understand they have a
15 contract, and the contract, mutually agreed, says
16 they'll both agree to things in writing.
17 BY MS. JANUS:
18     Q. You don't know if they are entitled to
19 rely on what the client partner's answer is, though?
20     A. I think they've agreed that they are
21 only going to rely on what they agreed in writing.
22     Q. So they should not agree on what the
23 client partner says is the scope of the contract?
24     A. I didn't say that. I said that they can
25 rely on what the contract says, that they should rely

**Page 215**

1 on what they agreed to in writing.
2     (Exhibit 100 marked.)
3 BY MS. JANUS:
4     Q. I'm showing you what's been marked as
5 Exhibit 100. This is an e-mail from you to Andrew Hopp
6 at Chubb. In the first paragraph, in the middle of the
7 paragraph, you say, "Additionally, we have become aware
8 of two UK installations OF the subject software, which
9 is outside of the scope of the Agreement."
10     Again, so now do you understand that, in
11 fact, the business people at FICO had been aware of the
12 UK installations of the software for several years at
13 the time you wrote this email?
14     A. I don't know what those guys knew when.
15 I just know what I know.
16     Q. And you didn't check with them?
17     A. I checked the inquiries that were made
18 within the maintenance organization, somebody that logs
19 a ticket from overseas indicates that they have a
20 question about the software use or how it functions.
21     Q. You are writing it as if you just became
22 aware. "Additionally, we have become aware of two UK
23 installations," as if this is new information,
24 correct?
25     A. This was new information to me.

**Page 216**

1     Q. Okay. Did you think, maybe I should
2 check into how long the business people at FICO knew
3 about the U.K. installations prior to writing the
4 email?
5     MS. KLIEBENSTEIN: Objection. Calls for
6 work product.
7     THE WITNESS: It is absolutely work
8 product. I won't answer that question. I don't
9 appreciate your tone, either.
10 BY MS. JANUS:
11     Q. Well, you are representing here, we,
12 FICO, have become aware of two U.K. installations.
13 Your representation is this is new information to FICO.
14 That's false.
15     MS. KLIEBENSTEIN: Wait for a
16 question.
17     THE WITNESS: I'm waiting for your
18 question. You are just making an accusation.
19 BY MS. JANUS:
20     Q. Well, the question I asked was: Did you
21 think you should inquire as to whether that would be a
22 false statement?
23     A. You are again asking for work product
24 here. How I run my practice is my business. How I
25 interface with my clients is my business.

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS   Doc. 327-1   Filed 07/02/19   Page 6 of 6

**Page 217**

1  Q. Do you understand now it is a false
2  statement?
3  A. It is not a false statement.
4  MS. KLIEBENSTEIN: Objection. Hold on.
5  Objection. Argumentative, mischaracterizes his
6  testimony.
7  BY MS. JANUS:
8  Q. In the last paragraph, you state, "In
9  the hope that we can conclude a business based
10 settlement, I am enclosing an updated Amendment
11 designed to encompass an enterprise license to cure all
12 defects and enable New CHUBB to operate across all
13 geographies." "Let me know the direction of New Chubb
14 and if you'll be providing redlines and by when."
15 In your attachment in Exhibit 100,
16 Exhibit A lists the license fees that Chubb would be
17 required to pay, correct?
18 A. It has got some pricing in there, yes.
19 Q. And in this proposal that you sent on
20 March 23rd, the total net license and first year
21 support and maintenance fees are $4,298,250, correct?
22 A. Yes. Including maintenance, yes.
23 Q. So under this proposal, for Chubb to
24 continue using the Blaze software, they would be
25 required to pay an additional $4,298,250, correct?

**Page 218**

1  A. Yeah. In this proposal, yes. There's
2  some extra software in there, I think, Model
3  Translator.
4  (Exhibit 101 marked.)
5  BY MS. JANUS:
6  Q. I'm showing you what's been marked as
7  Exhibit 101. This appears to be Chubb's response to
8  the latest proposal. In this proposal, Chubb proposes
9  paying an additional $818,750 to continue using the
10 Chubb -- the Blaze software, correct?
11 A. No. Because it talks about different
12 changes within the license terms, as well. So for
13 instance, it has an SAS SRL bit in there and a few
14 other changes. I think this reflects what Chubb thinks
15 they need.
16 Q. And their proposal is to pay an
17 additional $818,750, correct?
18 A. That's what their proposal says, if I
19 understand it correctly, plus maintenance.
20 (Exhibit 102 marked.)
21 BY MS. JANUS:
22 Q. I'm showing you what's been marked as
23 102. This is -- oh, you have two copies there. One is
24 for your lawyer. This is an email dated March 27th
25 from Russ Schreiber to Tamra Pawloski. And he advises

**Page 219**

1  that the offer she sent was not acceptable to FICO,
2  correct?
3  A. I don't know. I haven't read this. It
4  looks like an explanation of FICO's -- a rejection of
5  their proposal from Tamra Pawloski and a reiteration of
6  what the FICO offer is.
7  Q. Ultimately, what ended up happening with
8  these proposals that went back and forth?
9  (Exhibit 103 marked.)
10 MS. KLIEBENSTEIN: This is 103?
11 THE WITNESS: Yes.
12 MS. KLIEBENSTEIN: Was there -- could
13 you read back that question?
14 BY MS. JANUS:
15 Q. What happened with the proposals that
16 went back and forth, ultimately?
17 A. They never reached agreement.
18 Q. Okay. And so what happened next?
19 A. Terminated the license by this letter.
20 Q. So Exhibit 103 is your license
21 termination letter?
22 A. Uh-huh.
23 Q. Yes?
24 A. Yes. Sorry.
25 Q. And the grounds for the termination are

**Page 220**

1  set forth in the letter; is that right?
2  A. They were stated in the earlier breach
3  notice and, additionally, in additional letters that
4  are referenced in this Exhibit 103.
5  Q. In your view, based on your experience
6  with FICO software licenses, what does it mean that
7  FICO cannot unreasonably withhold its consent to a
8  transfer of a license?
9  MS. KLIEBENSTEIN: Objection. Calls for
10 a legal conclusion. I'm going to -- and an expert -- I
11 mean, that's a legal issue, right, so --
12 THE WITNESS: You are asking me to draw
13 a legal conclusion about something and also for my
14 thought processes. I don't want to provide you my
15 thought processes, because they're work product --
16 MS. JANUS: Okay. So --
17 THE WITNESS: -- in the context of all
18 this.
19 BY MS. JANUS:
20 Q. So you are refusing to answer that
21 question?
22 A. Uh-huh.
23 Q. Yes?
24 A. Yes.
25 Q. Do you believe that Chubb's refusal to