# EXHIBIT 10



1420.5
.R47
2016

# Research Handbook on the History of Copyright Law

*Edited by*

Isabella Alexander
*University of Technology Sydney, Australia*

H. Tomás Gómez-Arostegui
*Lewis and Clark Law School, USA*

RESEARCH HANDBOOKS IN INTELLECTUAL PROPERTY



Cheltenham, UK • Northampton, MA, USA



EXHIBIT

10

# Contents

List of contributors                                                                                    xi

1. Introduction                                                                                        1
   Isabella Alexander and H. Tomás Gómez-Arostegui

PART I   HISTORIOGRAPHY

2. Copyright history in the advocate's arsenal                                                        7
   Barbara Lauriat
3. Law, aesthetics and copyright historiography: A critical reading of the
   genealogies of Martha Woodmansee and Mark Rose                                                    27
   Kathy Bowrey
4. The 'romantic' author                                                                             53
   Martha Woodmansee

PART II   UNITED KINGDOM PERSPECTIVES

5. The Stationers' Company in England before 1710                                                     81
   Ian Gadd
6. The anatomy of copyright law in Scotland before 1710                                              96
   Alastair J. Mann
7. Literary property in Scotland in the eighteenth and nineteenth centuries                         119
   Hector MacQueen
8. Music copyright in late eighteenth and early nineteenth century Britain                          139
   Nancy A. Mace
9. How art was different: Researching the history of artistic copyright                              158
   Elena Cooper
10. Determining infringement in the eighteenth and nineteenth centuries in
    Britain: 'A ticklish job'                                                                        174
    Isabella Alexander
11. Equitable infringement remedies before 1800                                                      195
    H. Tomás Gómez-Arostegui

PART III   INTERNATIONAL PERSPECTIVES

12. Proto-property in literary and artistic works: Sixteenth century papal
    printing privileges                                                                              237
    Jane C. Ginsburg
13. British colonial and imperial copyright                                                          268
    Catherine Seville

x   *Research handbook on the history of copyright law*

14. The public international law of copyright and related rights          288
    *Sam Ricketson*
15. El Salvador and the internationalisation of copyright                313
    *Jose Bellido*

PART IV   NATIONAL PERSPECTIVES

16. United States copyright, 1672–1909                                    335
    *Oren Bracha*
17. 'Cabined, cribbed, confined, bound in': Copyright in the Australian
    colonies                                                             372
    *Catherine Bond*
18. Aspects of French literary property developments in the eighteenth
    (and nineteenth) centuries                                          391
    *Frédéric Rideau*
19. Codified anxieties: Literary copyright in mid-nineteenth century Spain   423
    *Jose Bellido*

*Bibliography*                                                           444
*Index*                                                                  471

case'[159] or 'so certain',[160] but was instead 'doubtful',[161] and that 'other Judges might be of a contrary Opinion.'[162]

* * *

This is, unfortunately, all the space that we have to dedicate to injunctive relief. But I hope that this review, particularly when read in combination with my prior work on injunction practice, offers helpful guidance on the subject. It is now time to turn to disgorgement – the principal way in which the Court of Chancery awarded monetary relief in printing disputes before 1800. This is an area where, regrettably, there are fewer records. As a consequence, less can be said about it.

## 3.   DISGORGEMENT OF PROFITS

Although an accounting and disgorgement of a defendant's profits had existed as part of the writ of account in courts of common law long before 1800, the common-law writ appears never to have played a role in infringement disputes. Perhaps it had to do with the limited scenarios in which the writ was available – namely, cases involving guardians, bailiffs, or receivers – or the more cumbersome processes that sometimes attended it.[163] Instead, right holders pursued the remedy in equity. Courts granted this relief without express statutory authority, as the first statutes to mention it did not arise until near the turn of the twentieth century.[164]

### 3.1   The Earliest Disgorgement Order

Thanks to the work of Ronan Deazley,[165] we now know that the first instance of disgorgement likely arose in *Gay v Walker*, a case filed in 1729.[166] The plaintiff John

---

[159]   *Blackwell v Harper* (1740), printed in KL Perrin (ed), *Sir Dudley Ryder, Ryder Shorthand Documents* (1973) s 10, p 7.

[160]   *Blackwell v Harper* (1740) 2 Atk 93, 96.

[161]   Ibid.

[162]   *Blackwell v Harper* (1740) Barn Ch 210, 214. Lord Hardwicke was right to doubt himself because the common-law courts later ruled that the formalities were necessary to obtain the copyright in an engraving. Eg *Sayer v Dicey* (1770) 3 Wils KB 60 (CP) 61; *Bell v Wenman* (1781) Ll Hill MS 13, p 508, Ll Hill MS 20, pp 71, 73–74 (CP); *Hooper v Hogg* (1788) London Chronicle, 17 Apr 1788, p 374 (KB).

[163]   See generally John Mitford, *A Treatise on the Pleadings in Suits in the Court of Chancery by English Bill* (2nd edn, London 1787) 109–10; Jeremy (n 151) 504–05.

[164]   The first statute was the Fine Arts Act 1862, s 9 (25 & 26 Vict c 68). More widespread recognition came about in the UK in the Imperial Copyright Act 1911, s 6. The US added the remedy to its statutory scheme in 1909. Copyright Act 1909, s 25, 35 Stat 1075.

[165]   Deazley (n 123) 62–69.

[166]   *Gay v Walker* (1729) C12/1817/67. For more on the background of the dispute, see James R Sutherland, '"Polly" Among the Pirates' (1942) 37 Mod Lang Rev 291; Michael F Suarez, 'To What Degree Did the Statute of Anne (8 Anne, c. 19, [1709]) Affect Commercial Practices in Eighteenth-Century England?' in Lionel Bently, Uma Suthersanen and Paul Torremans (eds), *Global Copyright* (Edward Elgar 2010) 54.

Gay, author of the opera *Polly*, sued a printer and a host of others for infringing his copyright. After obtaining an injunction until answer,[167] the case proceeded for several years, partly because it was difficult to obtain answers from the numerous defendants. All the while, the injunction until answer remained in place. Gay died in 1732, after which the suit was revived by his sisters and administrators Catherine Baller and Joanna Fortescue. The suit eventually reached a hearing in 1737. There, the plaintiffs requested that the interlocutory injunction be made perpetual and, more importantly, that the defendants account for and disgorge any profits they had made. As was customary, the court considered the defendants' answers and other written proofs, which in this instance included depositions along with a newspaper advertisement promoting the defendant's book. It also considered what was alleged and admitted by counsel on each side. Defence counsel conceded, for example, that the estate held a copyright in the work: '[T]he plaintiff has proved the necessary Registers to make out Mr. Gay's title.'[168] After apparently having no trouble finding that the defendants had infringed, Lord Chancellor Hardwicke granted the relief sought. The order states in relevant part:

> His Lordshipp doth think fit and so Orders and Decrees That the Injunction formerly granted in this Cause to stay the Defendants from printing publishing and Vending the said Book be perpetual and It is further Ordered and Decreed That It be referred to Master Eld one [of the masters of this court] to take an Accountt against the severall Defendants (Except the Defendant Walker against whom the plaintiff now Waives any Accountt) of the profits of the books mentioned in the Bill printed published or sold by the said Defendants or any of them without the Consent of the plaintiff Intestate or of some person claiming under him[,] for Discovery whereof the said Defendants accounting are upon Oath to produce before the said Master all books Papers and writings which they have in their Custody or power relating thereto and are to be Examined on Interrogatoryes as the said Master shall direct in the taking of which Accountt the said Master is to make unto the said Defendants all just allowances and what upon the said Accountt shall be formed due from the severall Defendants after all just allowances deducted[.] It is Ordered and Decreed That the said Defendants [except Walker] ... do respectively pay the same to the Plaintiff as the said Master shall Direct[.] And It is further Ordered That the said Master do tax the plaintiff the Costs of the Suite hitherto which is to be paid to him by the said Defendants Except the Defendant Walker[,] and his Lordshipp doth Reserve the Costs of the Account untill after the said Master shall have made his Report.[169]

Although *Gay* appears to offer the first such order, I should note that other cases suggest that disgorgement may have been available in some printing disputes before 1737. Take, for example, *Wolfe v Payne*, which I have already discussed. There, the Lord Keeper indicated that if the case reached a hearing the defendant would be answerable for the infringing books 'alredye solde and uttred as this court shall

---

[167] *Gay v Walker* (1729) C33/351, f 305r.
[168] *Gay v Walker* sub nom *Baller v Walker* (1737) BL Add MS 36046, f 19r.
[169] *Gay v Walker* sub nom *Baller v Watson* (1737) C33/369, ff 315v–316v. It is sometimes said that Lord Chancellor Talbot presided at the hearing, eg *Blackwell v Harper* (1740) 2 Atk 93, 93, but this is incorrect. Lord Talbot died on 14 February 1736/7, Lord Hardwicke received the Great Seal on 21 February 1736/7, and the hearing in *Gay* occurred on 6 December 1737.

adiudge[.]'[170] The court may have had disgorgement in mind.[171] And in *Baskett v Parsons*, a case involving the patent of the King's Printer for printing Bibles in English, the King's Printer waived an account of profits despite prevailing at the hearing and obtaining a perpetual injunction. This suggests the remedy was thought to be available in 1718.[172] Nevertheless, unless further study sheds more light on the matter, *Gay* must still hold the title for the first printing suit to actually order the disgorgement of a defendant's profits.

## 3.2   The Legal Basis for the Award

Neither the order nor the few reports of *Gay* explain the legal basis for the award. For that we can only guess, but we do have compelling guidance from a case brought three years later under the Engraving Act of 1735.[173] In *Blackwell v Harper*, Lord Hardwicke stated that the Engraving Act implicitly authorized an account of profits because it contained a provision permitting a court to order a defendant to forfeit a penalty of 5 shillings per infringing print, the infringing plates, and the prints themselves. '[A]n Account of the profits', he stated, 'is founded on the forfeiture Clause only [of the Act] & this Court in Conformity to that directs such an Account because the Court will never decree a forfeiture'.[174] The Statute of Anne of 1710, which governed literary property, contained similar penalties and forfeitures,[175] and thus in *Gay* Lord Hardwicke probably believed that his award of profits was 'founded' on the similar clause contained in the 1710 statute. I should stress that in *Blackwell* the Lord Chancellor did not believe that the Engraving Act expressly empowered him to award profits. Indeed, he recognized that the statute called for penalties and forfeitures, something the Chancery would 'never decree'. Similarly, the statutory monetary penalties at least could only be recovered, by their terms, in a 'court[] of record',[176] which the Chancery, when sitting in equity, was most certainly not.[177]

Although the Engraving Act did not expressly address accountings, Lord Hardwicke sought to adhere to the Act. After stating that the account was founded on the 'forfeiture Clause', the Lord Chancellor denied an award of profits in *Blackwell* partly because the plaintiffs had not complied with certain statutory formalities, formalities the Lord Chancellor believed were necessary to recover the statutory penalties and forfeitures of the Act. Whereas the statute required that the name of the proprietor and

---

[170]   *Wolfe v Payne* (1563/4) C33/30, f 143ᵛ. See also the text to n 8.
[171]   cf WJ Jones, *The Elizabethan Court of Chancery* (Clarendon Press 1967) 459 (citing two 1580 cases where the defendant had already committed waste, and where the court appointed a commission to 'recompense the rightful owner, while the court in the interim sequestered the profits.').
[172]   *Baskett v Parsons* (1718) C33/329, ff 418ᵛ–419ʳ.
[173]   Engraving Copyright Act 1735, s 1 (8 Geo II c 13).
[174]   *Blackwell v Harper* (1740) BL Hargrave MS 412, ff 130ᵛ, 132ʳ.
[175]   Statute of Anne 1710, s 1 (8 Anne c 19).
[176]   Engraving Copyright Act 1735, s 1 (8 Geo II c 13).
[177]   See generally H Tomás Gómez-Arostegui, 'The Untold Story of the First Copyright Suit Under the Statute of Anne in 1710' (2010) 25 Berkeley Tech LJ 1247, 1331–38.

date of first publication appear on each engraving plate and every print,[178] only the name had appeared in *Blackwell*. Lord Hardwicke stated:

> But as To an Account of the profits[,] It will be very hard to involve the Publisher in an Account of them without his having notice of the Time of Publication – And an Account of the profits is founded on the forfeiture Clause only & this Court in Conformity to that directs such an Account because the Court will never decree a forfeiture & will have the proper allowances made – As therefore … [the plaintiff] has not entitled her self to the Penalty [under the Engraving Act] I will not direct any Account of the Profits.[179]

Lord Hardwicke also stated that he was inclined to deny the account on two other grounds. First, as I have previously noted, he was unsure whether the formalities were also necessary to secure the copyright itself.[180] And second, 'the Profits [were] … so extremely small.'[181]

Notably, the Lord Chancellor acknowledged his decision in *Gay*, where he had granted an award of profits. But he pointed out that the defendants there ultimately admitted that the plaintiff had complied with the formalities of the 1710 statute.[182] Interestingly, Lord Hardwicke thought there was something special about granting retrospective monetary relief because, in the end, he granted a perpetual injunction in *Blackwell* despite that remedy having no express statutory basis either.[183]

Lord Hardwicke was not the only Chancellor to question his authority to disgorge a defendant's profits. Indeed, some judges were even more categorical. Before Lord Hardwicke, Lord Chancellor Cowper expressly rejected a prayer for profits in 1710. The details of the underlying suit, *Horne v Baker*, may be found elsewhere.[184] Suffice it to say, the plaintiff sued for copyright infringement before the enactment of the Statute of Anne, and claimed to hold a common-law copyright in his work.[185] The defendant demurred to the complaint on various grounds on 9 January 1709/10,[186] but the argument on the demurrer did not occur until 10 May 1710, which was after the Statute of Anne had entered into force. Among other things, Lord Cowper preemptively rejected the prayer for profits:

> To make the defendant account for the proffits of what he has sold, is going too far; for the injury that the plaintiff has susteined ought to be the measure of the damage, & not the proffit, which the defendant has made.

---

[178]   Engraving Copyright Act 1735, s 1 (8 Geo II c 13).

[179]   *Blackwell v Harper* (1740) BL Hargrave MS 412, ff 130ᵛ, 131ᵛ–132ʳ. For an identical manuscript report, see BL Add MS 36015, p 248. cf *Blackwell v Harper* (1740) LI Hill MS 5, pp 39, 40 ('He decreed a perpetual Injunction but would not order an Account because it did not appear by the Bill when the Plaintiffs property first arose.').

[180]   *Blackwell v Harper* (1740) 2 Atk 93, 96; accord *Blackwell v Harper* (1740), printed in Perrin (n 159) s 10, p 7. See also text to n 162.

[181]   *Blackwell v Harper* (1740) Barn Ch 210, 214. See also *Whittingham v Wooler* (1817) 2 Swanst 428, 430 (declining to award profits where the profits were small).

[182]   *Blackwell v Harper* (1740) 2 Atk 93, 96.

[183]   Ibid.

[184]   Gómez-Arostegui, 'Untold Story' (n 177) 1299–309.

[185]   *Horne v Baker* (1709) C5/290/70, m 1.

[186]   Ibid m 2.

...

I am not willing to carry this matter so far, especially now the late act of parliament [ie, the Statute of Anne] has given another remedy in respect of the property in Coppies of Books.[187]

Despite the foregoing, it eventually came to be accepted that the court could exercise an inherent power to award profits, even when the copyright holder had not complied with the statutory formalities of the Statute of Anne.[188] This shift in thinking may have come about in part because the foregoing cases were unknown or disregarded. *Horne* and some of the reasoning in *Blackwell* appeared in manuscript reports alone, which naturally did not circulate as widely as reports that were published in print. It is also possible that a printed decision from Lord Hardwicke that dealt not with copyrights, but the cutting down of trees, came to influence thinking on the matter after 1768. In that context, Lord Hardwicke offered the following explanation for disgorging a defendant's profits on a decree: 'Where the bill is for an injunction, and waste has been already committed, the court, to prevent a double suit,' meaning a suit in equity for prospective relief and an action at law for retrospective relief, 'will decree an account, and satisfaction for what is past'.[189] He further stated: 'This is a general principle to prevent suits[;] and as some Decree must be made[,] [t]he Court will make a Compleat one.'[190]

In 1798, the King's Bench in *Beckford v Hood* effectively sanctioned an award of profits, even where a copyright holder had never registered a work at all. The case began in the Court of Chancery, where the copyright holder sought injunctive relief and a disgorgement of the defendant's profits.[191] After granting an interlocutory injunction, the court sent the parties to law to determine whether the plaintiff could maintain a suit against the defendant despite not having registered the work under the Statute of Anne.[192] The action in the King's Bench was to be brought 'for the profits arising from the sale' of the defendant's edition.[193] In the King's Bench the question was reformulated to concern ordinary damages, and the Bench held that an aggrieved party could bring an action under the Statute of Anne, despite not registering a work, and could also recover ordinary damages even though the statute did not expressly provide for

---

[187]   *Horne v Baker* (1710) LI Misc MS 10, p 1; accord *Horne v Baker* (1710) HLS MS 1169(b), p 154.

[188]   Eg *Nicoll v Simpson* (1768) C33/430, ff 251ᵛ–252ᵛ (disgorging profits despite the fact the copyright holder registered late).

[189]   *Jesus College v Bloome* (1745) 3 Atk 262, 262.

[190]   *Jesus College v Bloome* (1745) BL Add MS 36017, pp 121, 123. Although the court decided *Jesus College* in 1745, the account of the case in Atkyns's reports did not appear in print until 1768. For later printing disputes citing *Jesus College* as a ground for awarding profits, see *Universities of Oxford & Cambridge v Richardson* (1802) 6 Ves Jr 689, 700–01; *Grierson v Eyre* (1804) 9 Ves Jr 341, 346. cf also *Bacon v Jones* (1839) 4 My & Cr 433, 435 (citing *Jesus College* in a case involving a patent of invention).

[191]   *Beckford v Hood* (1797) C12/670/33, m 1.

[192]   *Beckford v Hood* (1797) C33/497, f 583ʳ⁻ᵛ.

[193]   *Beckford v Hood* (1797) C33/500, f 33ʳ.

such relief.[194] Soon after, the plaintiff returned to the Chancery on the equity reserved to obtain the defendant's profits instead.[195]

## 3.3   The Standard for Obtaining Profits

As I have explained elsewhere,[196] after 1737, it became usual for a claimant who succeeded on the merits to obtain an award of profits at the hearing. Barring a problem like that presented in *Blackwell*, all that seems to have been required was that the plaintiff seek and obtain a perpetual injunction. The number of cases awarding disgorgement is not extensive, however, partly because so few cases ever reached a hearing. As Justice Willes stated in *Millar v Taylor*: 'Few Bills against Pirates of Books are ever brought to a Hearing. If the Defendant acquiesces under [an interlocutory] Injunction, it is seldom worth the Plaintiff's while to proceed for an Account [and disgorgement of profits]; the Sale of the Edition being stopped.'[197] Making the number even smaller is the fact that a plaintiff could elect at the hearing to waive an award of profits, as occurred in *Baskett* and (partly) in *Gay*.[198] Nonetheless, I have encountered several decrees, in addition to the cases I have already mentioned, granting a disgorgement of the defendant's ill-gotten gains alongside a perpetual injunction. They include cases for infringement of the Statute of Anne,[199] common-law copyrights in published works,[200] common-law copyrights in unpublished works,[201] and printing patents.[202]

## 3.4   The Process for Assessing Profits

Unfortunately, we do not at present know much about the method of assessing the profits earned from infringement. For one, I have yet to encounter a manuscript report of proceedings before a master in such a case. Also hampering our understanding is the meagre number of records from the Court of Chancery itself. As previously mentioned, few copyright cases reached a decree. And of those that did, records that must have at one time existed are sometimes no longer extant. In other instances there are no records because the parties stipulated the amount of profits[203] or otherwise took it upon themselves to settle the account without the aid of a master. Nevertheless, broad outlines of the process are visible and they reveal nothing unusual or surprising.

---

[194]   *Beckford v Hood* (1798) 7 D & E 620 (KB).

[195]   *Beckford v Hood* (1798) C33/500, f 504$^{r-v}$.

[196]   Gómez-Arostegui, 'Prospective Compensation' (n 4) 1701–07.

[197]   *Millar v Taylor* (1769) 4 Burr 2303 (KB) 2324.

[198]   *Baskett v Parsons* (1718) C33/329, ff 418$^v$–419$^r$; *Gay v Walker* sub nom *Baller v Watson* (1737) C33/369, ff 315$^v$–316$^v$. See also eg *Dodsley v Kinnersley* (1761) Amb 403, 403.

[199]   Eg *Millar v Taylor* (1765) C33/426, f 60$^{r-v}$; *Bach v Longman* (1777) C33/447, ff 582$^v$–583$^r$.

[200]   Eg *Becket v Donaldson* (1772) C33/439, ff 26$^r$–27$^r$.

[201]   Eg *Macklin v Richardson* (1770) C33/436, ff 35$^v$–36$^r$.

[202]   Eg *Pyle v Falkener* (1774) C33/442, ff 309$^v$–311$^r$.

[203]   Eg *Mason v Murray* (1779) C33/452, ff 486$^r$–487$^r$.

226  *Research handbook on the history of copyright law*

As the decrees indicate, the usual approach was to examine the account, not at the hearing, but afterward.[204] The master was permitted to assess the defendant's profits down to the time of the proceedings before him, rather than being limited to the profits earned before the filing of the complaint.[205] In most cases, this liberal practice of assessment was unnecessary, given that interlocutory injunctions were nearly always in place. We also know that additional discovery, beyond what was produced for the preceding hearing of the cause, might be necessary to conduct the accounting properly. In such a case, if the witnesses necessary for the account were in 'town', meaning London, the master would attend to the matter himself. But if they were in the 'country' an appointed commission might take the account.[206]

One example of additional discovery survives in a set of interrogatories and responses taken in 1766 before Thomas Cuddon, one of the masters of the Court of Chancery. The questions and answers together are too lengthy to reproduce here, but I will print the former to give a sense of the inquiry:

1.st Interrogatory. Whether or not have you printed Published or Sold or Caused to be printed published or sold any Copy or Copies of two Volumes of Poems in the pleadings in this Cause mentioned to be wrote by Edward Young LL:D. deceased late Rector of Wellwyn in the County of Hertford without the Consent of the said Doctor Young or of any person Claiming under him[.] If yea[,] whether or not was or were the Copy or Copies of the said two Volumes of Poems so by you printed Published or Sold or Caused to be printed published or sold bound together in One Volume[.] If yea[,] how many Copies of the said two Volumes so bound together in One Volume as aforesaid have you at any time or times and when Vended and Sold or Caused to be Vended or Sold to any and what person and persons and whom by name and where such person or persons live or may be found and at [illegible] for what price or Sum of Money did you Vend and Sell or Cause to be Vended and Sold each of the said Copies respectively to the best of your Knowledge Remembrance and belief. Declare

2.d What Sum or Sums of Money did you really and truly lay out and Expend on Printing Binding and Publishing of the Several Copies of the said two Volumes of Poems in the first Interrogatory mentioned and inquired after so Bound up in One Volume as Aforesaid by you Printed Published or Sold and what was the true and Real prime Costs of each of the said Copies so by you Vended and Sold or Caused to be Vended and Sold and what profit did you receive or was you intitled to receive by the Sale of each of the said Copies so by you Vended or Sold or Caused to be Vended or Sold as Aforesaid and how much in the whole to the best of your Knowledge Remembrance and belief. Declare[207]

Following discovery it was then incumbent upon the master to issue a written report to the court. I have not unearthed the report in the aforementioned case, but another survives from a companion case filed against the same defendant for infringing a different work. The report is not lengthy, it spans only one page, but it nevertheless offers some insight into the process. The master stated in relevant part:

---

[204]  See Harrison (n 13) vol 2, 6–7.
[205]  I have found no printing disputes in which the court has expressly stated this rule. But for cases in other areas, see *Carleton v Brightwell* (1728) 2 P Wms 462, 463; *Archbishop of York v Stapleton* (1740/1) 2 Atk 136, 137; *Bulstrode v Bradley* (1747) 3 Atk 582, 582.
[206]  Bohun (n 13) 341–42, 427.
[207]  *Millar v Taylor* (1766) C111/166 (involving *The Complaint*).

... I [John Eames] have been attended by the Solicitors on both sides. And the said Defendant having been examined on Interrogatories exhibited before me touching the said Account[,] I find that on the 26.th Day of November 1768 he printed five hundred compleat Copies of the said Poems, & [sent 66 copies to certain booksellers and printers in Scotland in exchange for other books and otherwise sold 14,] ... printed under the Title of Thompson's Works; which said Copies so exchanged & sold amounted together to eighty Copies and that the clear Profits by him the said Defendant received by the Sale of the said Books in Exchange for the said eighty Copies amounted to the Sum of two pounds. – And I further find that the said Defendant did publish & sell one hundred and ten Copies of the said Poems which [were printed by, and which] he got in Exchange for other Books from[,] Alexander Donaldson of the City of Edinburgh ... bound in one Volume[.] And that the clear profits by him received by the Sale of the one hundred and ten Copies ... as aforesaid amounted to the Sum of two pounds fifteen shillings. Which said several Sums of two pounds and two pounds fifteen shillings making together the Sum of four pounds fifteen Shillings[,] I find to be the whole of the Moneys received by the said Defendant on the Account aforesaid and the same is to be paid to the said plaintiffs pursuant to the Directions of the said Decree which I humbly certify to this Honourable Court.[208]

Unless a party excepted to the report, it appears the Court of Chancery would usually confirm the award. This happened, for example, in the foregoing case.[209]

## 4. CONCLUSION

This chapter has offered an account of the two principal forms of relief available in the Court of Chancery before 1800. Despite what we presently know about equity practice in printing cases, there is still much we can learn. I have, in the preceding pages, highlighted a few areas that might benefit from more study, particularly by resort to analogous procedures and manuscript sources. Additional research may lead us to glean more about the notice requirements for injunctions until answer, the rigour of the review undertaken by judges on *ex parte* motions, the merit thresholds for injunctive relief, and the process for calculating profits.

---

208   *Millar v Taylor* sub nom *Grant v Taylor* (8 Feb 1772) C38/638 (involving *The Seasons*). This accounting followed the famous ruling in *Millar v Taylor* (1769) 4 Burr 2303 (KB). For another example of an accounting of profits, see *Bach v Longman* (1 Apr 1778) C38/675.
209   *Millar v Taylor* sub nom *Grant v Taylor* (1772) C33/437, f 161ʳ.

# EXHIBIT 11

# THE RIGHT TO JURY TRIAL IN A FEDERAL ACTION FOR TRADEMARK INFRINGEMENT OR UNFAIR COMPETITION

*By Bruce S. Sperling\**

Whether a party to an action in federal court for trademark infringement or unfair competition may demand a jury trial by "right" has been clothed in uncertainty ever since the United States Supreme Court's 1962 decision in Dairy Queen, Inc. v. Wood.[1]

Subsequent to that decision, at least two lower federal courts have arrived at opposite conclusions when faced with the substantially identical jury trial question.[2] This conflict can be traced to the Supreme Court's opinion in Dairy Queen which did not provide a clear analysis of the jury trial question, but rather set forth conclusory statements subject to ambiguous interpretation. This article attempts a clarification by means of a basic analysis of the problem.

## The Federal Rules of Civil Procedure

The matter of a jury trial in an action for trademark infringement and unfair competition in a United States District Court is initially governed by Rule 38(a) FRCP as follows:

> The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate.

Rule 38(a) does not provide for a jury trial, it merely "preserves" the "right" to such a trial. That "right" must be either "given by a statute" or "declared by the Seventh Amendment."[3] It must further be noted, as explained below, that a right to a jury trial may exist as to some but not all issues in a single litigation.

## No Right to Jury Trial Given by Statute

A right to a jury trial is not "given by a statute" as to any issue in a federal action for trademark infringement and unfair

---

* Member of the New York Bar; associate in the firm of von Maltitz, Derenberg, Kunin & Janssen, New York; Associate Member of USTA.

1. 369 US 469, 133 USPQ 294 (1962).
2. Holiday Inns of America, Inc. v. Lussi, 153 USPQ 158 (NDNY 1967) (jury); Kimberly-Clark v. Kleenize Chemical Corp., 135 USPQ 123 (ND Ga 1962) (no jury).
3. See also 5 Moore's Federal Practice 441 (2nd ed 1969).

EXHIBIT 11

competition. In fact, the Lanham Act[4] specifically refers to trial by a court. Section 34 affords to the "courts" power to "grant injunctions, according to the principles of equity." Section 35 states that "subject to the principles of equity," the plaintiff may recover "defendant's profits" and "any damages sustained." The Section further states "The Court shall assess such profits and damages or cause the same to be assessed under its direction." Thus, no jury trial as of right is created by the only controlling federal statute.[5]

### Jury Trial Under the Seventh Amendment

The Seventh Amendment does not create the "right" to jury trial, it only preserves that "right" as it existed in England "in suits at common law" prior to the adoption of the Amendment in 1791.[6] Thus, the Seventh Amendment preserves no right to a jury trial of issues that would have been heard in England prior to 1791 without a jury, either "in equity" (where, of course, there was no jury) or "at law" (insofar as nonfactual issues were concerned).[7]

#### Jury Issues

The English common law, as will be demonstrated below, has always treated an action solely for damages or profits as an action in the "law" courts with all factual issues being determined by a jury.[8] Thus, the Seventh Amendment would preserve the right to jury trial as to all factual issues in an analogous contemporary action seekingly only monetary relief.

#### Non-Jury Issues

An action for an injunction, however, was treated differently. Although the law of trademark infringement and unfair competition did not develop until after 1800 both in England and in this

---

4. Title 15 USC §1051 ff.
5. Trademark and unfair competition actions in federal courts may be governed by state or federal law as to substance, but only by federal law as to procedure [Moore's, supra note 3 at 92, 101]. Since no federal statute gives a right to a jury trial in a trademark infringement or unfair competition action, such right must be declared, if at all, by the Seventh Amendment.
6. Moore's, supra note 3 at 79, 85. The Seventh Amendment reads in pertinent part, "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, . . ."
7. Id at 86 and 9.
8. See, Hopkins on Trademarks, Tradenames and Unfair Competition 420 (4th ed 1924).

country,[9] analogous actions for patent and copyright infringement were known in England prior to 1791. They demonstrate that actions for an injunction, with or without appurtenant claims for damages or profits, would have been heard "in equity."[10] Any issue as to the amount of damages would have been referred to the "law" courts so that a jury might determine that issue alone.[11] Thus, in a federal trademark infringement or unfair competition suit there is no right to jury trial as to any issue relevant to the granting of an injunction. Those issues are to be determined by the court. If the court finds an infringement, then the Seventh Amendment would preserve the right to jury trial on the amount of damages due. However, if the court finds no infringement, there would be no issue as to the amount of damages, and the litigation would end.

The English practice prior to 1791 was discussed in detail in counsel's argument and Lord Eldon's opinion in Universities of Oxford and Cambridge v. Richardson.[12] Although that patent infringement action was decided in 1802, the opinion relied for all points on a precedent "of very high nature," Baskett v. Parsons (1718). Thus, the Oxford and Cambridge case provides an accurate indication of the English practice prior to 1791. That practice was as follows:

(1) An action for an injunction could only have been brought "in equity" since that remedy was not available at law.[13]

(2) The Chancellor would have decided all relevant issues of fact in rendering his decision as to the granting of an injunction.[14]

(3) The Chancellor also could have decided all the issues of common law relevant to the action. But often, out of custom, he referred difficult questions of law to the Courts of Common Law, to be determined without a jury on stipulated facts.[15]

(4) The plaintiff seeking an injunction could request, in addition, either an accounting of the defendant's profits, or his own damages, but not both.[16]

---

9. Schechter, Historical Foundations of Trade-Mark Law, 137-39 (1925); Kerly on Trade Marks 2-4 (8th ed by Lloyd 1960); Nims, Unfair Competition and Trade-Marks 4-6 (2nd ed 1917).
10. Supra note 3 at 22, 123.
11. Universities of Oxford and Cambridge v. Richardson, 6 Ves Jun 690 (1802).
12. Ibid.
13. See also, Moore, supra note 3 at 8.
14. Ibid.
15. See also, Millar v. Taylor, 4 Burr 2303, 2377, 2400 (1769); Hill v. University of Oxford, 1 Vern 275 (1684).
16. See also, Hopkins, supra note 8 at 420.

61

(a) If the plaintiff sought an accounting, the Chancellor would have determined the amount due together with all issues relevant to the injunction.

(b) If the plaintiff chose to claim his "damages," the issue as to the amount of the damage would have been referred to the court "at law" for a jury to determine. But all of the other issues relevant to the injunction would have been determined "in equity" by the Chancellor.

Therefore, in suits seeking an injunction against future infringement, the only possible right to jury trial preserved by the Seventh Amendment relates to the determination of the amount of damages if they are sought. The Amendment preserves no such right relating to any other issue.

## Development of the Law in America

The English practice for determining a claim for damages appurtenant to an equitable action for an injunction was not followed by the American federal courts. The American system had no provision for transferring certain issues between the "equity" and "law" sides of the court. Consequently, for reasons of expediency, American federal equity courts developed the policy of deciding all issues "incidental" to the equitable issues before them.[17]

### The Early American Cases

The early American cases in which an injunction was sought under the law of trademark infringement and unfair competition followed the English precedents and were heard "in equity"; but as explained above, all issues were determined by the courts without a jury. Along with an injunction, the plaintiff could seek both an accounting and damages with the amount of each being determined by the court without a jury. Thus, the first American cases in which an injunction was sought did not even recognize a limited right to jury trial as to the amount of damages.[18] The American view was that the defendant did not have a right to jury trial on any of the issues.[19]

---

17. See 4 Callmann, Unfair Competition Trademarks and Monopolies 242, fn 1 and 244, fn 8 (3rd ed 1970); Moore, supra note 3 at 116.
18. The Collins Co. v. Oliver Ames & Sons Corp., 18 Fed 561, 571 (SDNY 1882); Sawyer v. Horn, 1 Fed 24, 39 (CC D Md 1880) and see Hirsch v. Glidden Co., 79 F Supp 729, 78 USPQ 194 (SDNY 1948); Boucher v. Du Boyes, Inc., 137 F Supp 639, 109 USPQ 10 (SDNY 1955).
19. Moore, supra note 3 at 207.

The Effect of Dairy Queen on the Right to Jury Trial

The foregoing analysis of the right to jury trial in an action for trademark infringement and unfair competition is not contravened by the Supreme Court's decision in Dairy Queen, Inc. v. Wood.[20] That case involved a dispute between the parties to a trademark licensing agreement with the heart of the controversy being whether the license agreement was still in effect.

The plaintiff-licensor essentially asserted two separate claims: one on the license agreement for money past due; and the other (asserted in the event that the license was held to have been terminated), for trademark infringement and unfair competition seeking an injunction, an accounting and damages.

The District Court had struck the demand of the defendant, Dairy Queen, Inc., for a jury trial on the grounds that (1) the action was "purely equitable"; or (2) if legal issues were raised, they were merely "incidental" to the equitable issues. Thus, that court held that there was no right to a jury trial.[21]

The Supreme Court, in deciding that the right to jury trial did exist, made two holdings. First, relying on its opinion in Beacon Theatres,[22] the court held that the right to jury trial on certain issues could not be lost by characterizing those issues as "incidental" to an equitable claim. In the second part of its opinion, the court determined that the issues in Dairy Queen were, in fact, legal ones and therefore entitled to jury trial.

The court's latter holding is subject to ambiguous interpretation because it did not clearly specify which issues it considered to be entitled to jury trial and why they were so entitled. The implication of the decision is that all issues in the litigation were to be tried by a jury; but such a blanket endorsement of the right to jury trial would be incorrect. The court should have restricted the right to jury trial to issues relevant to (1) the contract claim for money due; and (2) the amount of the damages due for trademark infringement and unfair competition if such were found by the court to exist.

Further, inasmuch as the contract claim and the infringement claim contained common issues (i.e., whether the license agreement

20. Supra note 1.
21. McCullough v. Dairy Queen, Inc., 194 F Supp 686, 129 USPQ 400 (ED Pa 1961).
22. Beacon Theatres, Inc. v. Westover, 359 US 500 (1959). The court there held that the right to jury trial as to issues common to both a jury and a non-jury claim arising in the same litigation could not be lost by allowing prior determination of the non-jury claim.

had been terminated), it would have been proper under the Beacon Theatres rationale for the court to have required the contract claim to be tried by a jury prior to the determination of the separate infringement claim for an injunction, an accounting, and damages.

However, contrary to the implication of the opinion, the right to jury trial did not apply to all issues relevant to the infringement claim that might have remained unresolved after the determination of the contract claim. With respect to the infringement claim (which sought an injunction plus an accounting and damages) only the issue as to the amount of damages was triable by right to a jury. All other unresolved issues should have been tried by the court.

The Supreme Court's analysis of the issues presented in Dairy Queen unfortunately was cursory as represented by the following statement:

> . . . we think it plain that their [petitioners'] claim for a money judgment is a claim wholly legal in its nature however the complaint is construed. As an action on a debt allegedly due under a contract, it would be difficult to conceive of an action of a more traditionally legal character. [Footnote omitted.] And as an action for damages based upon a charge of trademark infringement, it [plaintiff's claim] would be no less subject to cognizance by a court of law.[23]

The ambiguity in the court's opinion is largely due to the sentence last quoted. That statement should be interpreted in context to mean that no matter how the issues inherent in a contract claim for damages are characterized (even as a claim for damages for trademark infringement) those issues are still entitled to the right to jury trial.

That statement should not be interpreted to mean that in any action for trademark infringement (or unfair competition) in which damages are sought, all issues are entitled to jury trial. Such broad interpretation would be contrary to the principles of the common law of England prior to 1791. Those principles, as explained above, would allow a jury trial of all issues in a trademark infringment action seeking a money judgment only. They would not allow a jury trial of all issues in an action seek-

---

23.  Supra note 1 at 477, 133 USPQ at 297.

ing an injunction plus a money judgment; then only the issue
as to the amount of damages would require a jury trial.

Moreover, the foregoing broad interpretation of the sentence
last quoted above would not be vindicated by the only cases cited
by the Supreme Court in support of that sentence.[24] Those cases
were Arnstein v. Porter[25] and Bruckman v. Hollzer.[26] Arnstein
was a copyright infringment case in which the plaintiff sought
only damages and not an injunction (as that opinion specifically
noted).[27] Bruckman was also a copyright infringement case.
There, three separate causes of action involving three separate
transactions were set forth. Plaintiff was allowed a jury trial
only as to the transaction for which monetary relief only was
sought. Neither of these cases held that a jury trial was required
in an action for copyright infringement (or trademark infringe-
ment) wherein an injunction plus damages were sought.

## Recent Decisions

Subsequent to Dairy Queen, several lower federal courts have
dealt with the question of the right to jury trial in actions for
trademark infringement and unfair competition. In Kimberly-
Clark v. Kleenize Chemical Corp.[28] the plaintiff brought an action
for trademark infringement and unfair competition seeking an
injunction, an accounting and damages. The court denied defen-
dant's jury trial demand as to all issues raised by the complaint.
The court reasoned that the Seventh Amendment did not apply
to actions that were "equitable in nature," and that plaintiff's
complaint presented such an action. The court later reconsidered
its determination in light of Dairy Queen, but again decided that
a jury trial was not required.[29] Dairy Queen was distinguished as
being an action at law on a contract claim for damages. Thus, in
Kimberly-Clark, jury trial was properly denied as to all issues
relevant to the injunction sought; but that opinion improperly
failed to allow for a jury determination of the amount of damages
due.

24.   Id at 477 fn 15, 133 USPQ at 297.
25.   154 F2d 464, 68 USPQ 288 (CA 2 1946).
26.   152 F2d 730, 68 USPQ 252 (CA 9 1946).
27.   Supra note 25 at 468, 68 USPQ 288.
28.   194 F Supp 876, 129 USPQ 341 (ND Ga 1961).
29.   Supra note 2.

65

In Coca-Cola Company v. Cahill,[30] plaintiff brought an action for trademark infringement and unfair competition seeking an injunction, an accounting of profits, but not its own damages. The court denied defendant's jury demand, citing Kimberly-Clark[31] with approval and holding that the complaint sought only equitable relief. Dairy Queen was distinguished as an action at law on a contract claim for damages.[32]

On the other hand, an opposite result was reached in Holiday Inns of America, Inc. v. Lussi.[33] There, plaintiff brought an action for trademark infringement and unfair competition seeking an injunction, the defendant's profits, and compensatory damages. That court incorrectly upheld the defendant's jury demand as to all issues, relying principally on Justice Black's above-quoted ambiguous statement in Dairy Queen.[34] That statement, as indicated in our prior discussion of Dairy Queen, is not applicable to a case where an injunction and damages are sought.

## Conclusion

The analysis herein has not attempted to determine whether a jury trial is proper or desirable in an action for trademark infringement and unfair competition. Rather, our purpose has been to determine the issues as to which jury trial is mandatory, if properly requested, in federal court, i.e., preserved by the Seventh Amendment or required by statute. In making that analysis, the Seventh Amendment has been given a literal construction which limits its "preservation of the right to jury trial" to those issues which, by analogy, would have enjoyed a jury trial under the common law of England prior to 1791.

In support of the literal construction proffered herein, the writer is aware of no policy consideration which would require the scope of the Seventh Amendment to be either expanded or contracted in respect to actions for trademark infringement and unfair competition. Certainly, as explained above, the Lanham Act calls for no expansion of the right to a jury trial.

Our analysis has indicated that a jury trial should be afforded "by right" in an action for trademark infringement when

---

30. 330 F Supp 354 (WD Okla 1971).
31. Supra note 2.
32. Supra note 30 at 355. Accord, Coca-Cola Company v. Wright, 171 USPQ 754 (WD Okla 1971).
33. Supra note 2.
34. Id at 160.

the only relief sought is a monetary judgment, be it an accounting of profits, damages, or both. On the other hand, if the plaintiff seeks an injunction against future infringement and an accounting for past infringement, there is no right to jury trial as to any issue. Finally, if plaintiff seeks his damages along with the injunction, there is a right to jury trial only as to the amount of damages.

———————