# EXHIBIT 1

# FILED UNDER SEAL



# Expert Report of Brooks L. Hilliard CMC® CCP

## Business Automation Associates, Inc.
## Phoenix, Arizona

In the matter of:

**Fair Isaac Corporation**

v.

**Federal Insurance Company and Ace American Insurance Company**

### Case No. 16-CV-1054 (WMW/DTS)

United States District Court
District of Minnesota

### CONFIDENTIAL – ATTORNEY'S EYES ONLY

May 31, 2019

**EXHIBIT 1**

Some opinions expressed in Federal's experts' reports either (a) include the expert's interpretation of the meaning of various provisions of the 2006 Software License and Maintenance Agreement ("License Agreement") at issue in this case, or (b) rely on an implicit assumption the expert report makes regarding how a particular license provision should be interpreted. It is my understanding that contractual interpretation is normally a legal matter rather than an Information Technology or business matter. The explanations of my opinions in this report focus on business and industry factors that can assist the Court or the finder of fact to understand any terms of art and/or the business context that licensors and licensees would normally use to determine what rights, obligations and/or restrictions are embodied by the provisions of the License Agreement.

## IV. SUMMARY OF OPINIONS

*Opinion #1:  The licensing limitations in the License Agreement are comparable to limitations customarily found in the license agreements of other commercial software providers. FICO applied these limitations in a manner that is consistent with the normal customs and practices of the commercial software industry.*

*Opinion #2:  FICO had good and sufficient reasons, consistent with the normal customs and practices of the commercial software industry, for conditioning its consent to the continued use of its Blaze Advisor software on Federal's willingness to accept a negotiated increase in the license price.*

*Opinion #3:  Dr. Kursh's contention that FICO's pricing and discounting practices are inconsistent with the customs and practices of the commercial software industry is unsupported and incorrect.*

*Opinion #4:  The terms "commercially reasonable" and "commercially unreasonable" used throughout the Kursh Report are so vague and undefined that judgments based on them are not supportable.*

*Opinion #5:  Mr. McCarter fails to support his contention that Blaze Advisor has minimal value to Federal because it is "industry agnostic", easily replaceable and only one of many technologies that*

Blaze Advisor software on computers outside the United States.[1]

2. **Non-assignment/Termination Clauses:** Dr. Kursh's opinion states that it was commercially unreasonable for FICO to terminate Chubb & Son's license for continued use of Blaze Advisor software after the acquisition and change of control of Federal. Here Dr. Kursh relies on his belief that despite the non-assignment provisions in Section 10.8, licensed entities being acquired (as Federal was) "would not expect to be confronted with such [a demand for termination of software licenses] …" and therefore FICO's termination of the License Agreement was inappropriate.[2]

3. **Verification and Audit Rights:** Dr. Kursh's report states that because FICO did not assert its Section 3.5 audit right, it had waived that right and had shown its true interest was artificially inflating Federal's license fees.[3]

In all three instances, Dr. Kursh's interpretation of the License Agreement provisions is contrary to the normal and customary way the provisions are commonly understood and applied in the commercial software industry.

A. Rebuttal to Opinion 1 of the Kursh Report: FICO's determination that Federal had breached the scope of the License Agreement

Dr. Kursh's opinion regarding FICO's determination that Federal violated the scope limitations of the License Agreement is inconsistent with the customs and practices of the commercial software industry.

*1. The license grant is limited to Affiliates of Chubb & Son*

Sections 2.1 and 2.1(c) of the License Agreement cover the license grant to Blaze Advisor software. The provisions specifically limit the license grant as follows:[4]

    2.1 License Grant to [Blaze Advisor software]. Subject to the terms, conditions and

---

[1] Kursh Report, dated May 17, 2019, paragraphs 70–89 on pages 22–30.

[2] *Id.*, paragraphs 90–98 on pages 30–32.

[3] *Id.*, paragraphs 137–140 on pages 48–49.

[4] Section 2.1 and 2.1(c) of the Blaze Advisor Software License and Maintenance Agreement (FICO0001702–1717) between Fair Isaac Corporation and Chubb & Son, a division of Federal

agree. Landy and Classen both discuss auditing the usage of licensed software,[39] but I have not quoted them because Dr. Kursh does not contend there was anything wrong with the audit requirement stated in Section 3.5.

The Kursh Report claims FICO's not invoking the audit right over the entire life of the license, from 2006 to 2016, was evidence that FICO did not care whether Federal was adhering to the Blaze Advisor license restrictions or not. Instead, he asserts, FICO used the acquisition, without the support of an audit, as an illegitimate pretext to force Federal to accept what he thinks is an unjustified increase in the license fees.

Because Dr. Kursh provides no viable explanation for his reasoning, he has no support for his opinion. A formal audit is not always required to justify an increase in the license fees, particularly for software products (like Blaze Advisor) where "list" pricing is based on very broad customer size ranges.[40] The normal custom and practice of the commercial software industry in circumstances where a licensor has a long working relationship with its licensee (as was the case here), would be for FICO to rely on Chubb & Son to maintain compliance with the license terms and, regardless of whether FICO was requesting periodic compliance audits, for Chubb & Son to notify FICO in advance if a license upgrade or revision was contemplated.

***Opinion #2: FICO had good and sufficient reasons, consistent with the normal customs and practices of the commercial software industry, for conditioning its consent to the continued use of its Blaze Advisor software on Federal's willingness to accept a negotiated increase in the license price.***

The Kursh Report's second opinion centers on a contention that, contrary to the requirement in Section 10.8 of the License Agreement, FICO unreasonably withheld its consent to the continued use of Blaze Advisor following the 2016 acquisition.[41] Dr. Kursh amplifies this claim in his fourth opinion where his report states that

---

[39] Landy, *op. cit.*, pages 880–881, and Classen, *op. cit.*, pages 242–246.

[40] FICO0057406 (2003 price list) and FICO0005468 (2008 pricing model).

[41] Kursh Report, *op. cit.*, paragraphs 90–94

option that would meet Federal's needs, and that Federal had installed Blaze Advisor outside the United States for an extended period without a valid license covering such use, FICO had more than met the normal and customary standards for commercial software providers. Under these circumstances, I cannot agree with Dr. Kursh's unsupported contention that FICO should have consented to the continued use of Blaze Advisor on the terms Federal proposed following the acquisition of Federal and the associated change of control.

### *Opinion #3: Dr. Kursh's contention that FICO's pricing and discounting practices are inconsistent with the customs and practices of the commercial software industry is unsupported and incorrect.*

In his third opinion, Dr. Kursh asserts that:[51]

- The way that FICO determines the license fees it quotes to prospective and current customers is inconsistent with software industry norms.
- The lost license fee damages calculated by FICO's damages expert ignored Federal's actual use of the Blaze Advisor software.

I have been involved with the marketing and pricing of business software for almost my entire professional career as an expert witness, information technology consultant to business, marketing executive (involved in setting software prices), product manager for technology products and as a commissioned salesperson. In my consulting capacity alone, I completed more than 200 engagements almost all of which involved evaluating competitive pricing proposals from multiple business software providers. Based on this experience, Dr. Kursh's first pricing contention is wrong and his second one ignores the relevant customs and practices of the commercial software industry.

Much of the support offered for the third opinion in the Kursh Report specifically references the factors and/or assumptions used by Mr. Zoltowski to calculate damages. I do not profess to be qualified as a damages expert so instead of

---

[51] Kursh Report, *op. cit.*, paragraphs 99–136 on pages 32–48.

- Using the acquisition of Federal as a pretext for what he believes is an illegitimate increase in Blaze Advisor license fees.
- Interpreting the term "consent shall not be unreasonably withheld" to mean something other than "consent must be granted".
- Enforcing license violations he believes FICO had ignored previously.
- Exercising the License Agreement's termination provision without giving Federal all the time it desired to cease using Blaze Advisor.
- Using illegitimate methods to compute FICO's monetary damages (FICO's damages expert).

All of these conclusions are unsubstantiated because Dr. Kursh is simply using the term "commercially unreasonable" as a proxy to describe any FICO action he disagrees with.

The expert's role, as I understand it, is not to make determinations (such as a determination on whether something is reasonable or not) that are supposed to be made by the Court or by a jury, but rather to provide information and/or determinations requiring specialized expertise, knowledge or skills that assist the judge or jury understand the evidence, so *they* can make the judgments they are designated to make.

The problem with Dr. Kursh's reasonableness assessments is that they fail to provide any helpful or useful criteria that the Court or a jury could use to determine whether FICO's licensing practices or Federal's business positions are commercially reasonable. For this reason, I do not believe the opinions in the Kursh Report supported by Dr. Kursh's "commercial reasonableness" criterion (apparently based solely on his personal interpretation of the meaning of the provisions in the License Agreement) are sufficiently reliable to be accepted.

***Opinion #5: Mr. McCarter fails to support his contention that Blaze Advisor has minimal value to Federal because it is "industry agnostic", easily replaceable and only one of many technologies that Federal employs to operate its insurance business. The evidence shows that FICO's***

### *Blaze Advisor provided critical capability, contributing to Federal's revenue that Chubb & Son had not developed internally.*

The McCarter Report uses several explanations to try to minimize Blaze Advisor's value to Federal, but his own reasons undercut his conclusions. I disagree with these opinions for the following reasons.

Mr. McCarter acknowledges there are ten software applications that deploy Blaze Advisor, and "leverage" its functionality.[81] This total of ten applications understates Federal's own application count of 15. These 15 applications were disclosed in a report attached to an e-mail sent to FICO by Ms. T. Pawloski, Federal's VP of Software Compliance and Optimization, Global Vendor Services Organization on February 25, 2016. McCarter does not explain this discrepancy).[82]

#### A. Blaze Advisor is integrated into "core" Federal applications

Mr. McCarter contends that Blaze Advisor is not a core technology:[83]

> Federal has only automated a small amount of the business rules and decisions that take place every day to conduct business. Blaze plays a small role in the business processing ecosystem at Federal.

However, the McCarter Report notes that Blaze Advisor is "integrated with core insurance applications that have ... insurance functionality [needed] for selling and servicing insurance policies."[84] The phrase "integrated with core ... applications" has special meaning to information technology professionals due to its use of the business computing terms of art, "integrated" and "core":

- "Integrated" normally means that a component application (Blaze Advisor in this case) is linked into a host application (here, an insurance application) in in a way that, *in the ideal*, would allow information to pass between them as if they were a single unified application. Depending on how "seamless" (*i.e.*, how close to the ideal) the integration is, this typically means that removal or

---

[81] McCarter Report, paragraph 85 on pages 24.

[82] FICO00001358–1359.

[83] McCarter Report, *op. cit.*, paragraph 74 on page 9.

[84] *Id.*, paragraph 91 on page 24.

- replacement of an integrated component is likely to be difficult, time consuming and to risk endangering the operation of the host application.
- "Core application" normally means that the functions that the application performs are critical to the business because they perform irreplaceable business functions that could cause significant business problems if they failed.

When application developers design and build a new "core" application it would be the normal custom and practice of the commercial software industry to avoid integrating externally developed components (like Blaze Advisor) whenever possible to avoid introducing externally uncontrolled risk factors that could affect the "core" application functionality. The fact that Chubb & Son chose to integrate Blaze Advisor into several of its core insurance applications is evidence that, contrary to McCarter's assertions, it has significant business value.

### B. Whether Blaze Advisor is "industry agnostic" does not determine how much value it contributes to Federal's business

Mr. McCarter contends that Blaze Advisor has little value to Federal because it is "industry agnostic". For example, the McCarter Report states:

- Blaze Advisor is "industry agnostic",[85] meaning its inherent capabilities are potentially usable in multiple industries and are not specifically focused to optimize its operation for any one industry.
- As delivered, Blaze Advisor[86] (a) includes no insurance-specific rules or capabilities that operate on their own, (b) cannot leverage FICO's insurance expertise because FICO is not in the insurance industry, and (c) requires a substantial implementation effort by knowledgeable Chubb & Son personnel (with significant and costly assistance from FICO) to know what rules to put into it, how to put those rules in, and how to test the rules to make sure they function properly. In addition, Blaze Advisor requires licensees like Chubb & Son to spend significant time and effort entering the rules and testing their operation.

---

[85] McCarter Report, paragraphs 26, 70 and 157 on pages 9, 20 and 42.

[86] *Id.*, paragraphs 21–22, 24, 26, 71–75 and 91 on pages 8, 8-9, 9, 20-21 and 24.

# EXHIBIT 2
# FILED UNDER SEAL

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
 2        _____

    FAIR ISAAC CORPORATION,        Court File No.
 3                                 16-cv-1054(WMS/DTS)
            PLAINTIFF,
 4
       VS.
 5
    FEDERAL INSURANCE COMPANY
 6  and ACE AMERICAN INSURANCE
    COMPANY,
 7
            DEFENDANTS.
 8  _____

 9

10

11

12  ------------------------------------------------------

13              VIDEOTAPED DEPOSITION OF

14                   BROOKS HILLIARD

15  ------------------------------------------------------

16

17

18

19

20

21

22

23

24

25  Taken June 19, 2019          By Brandi Bigalke, RPR
```

EXHIBIT 2

CASE 0:16-cv-01054-DTS Doc. 341 Filed 07/12/19 Page 12 of 20

Fair Isaac Corporation vs. Federal Insurance Company, et al.

cases multiple licenses.

Also in the consulting environment there were often multiple software licenses. If there were multiple, and in most cases there were, companies making proposals to my clients, I in many cases reviewed the licenses of more than just the desired or selected provider.

So while I say -- and perhaps 150 of those instances involved analyzing and negotiating software licenses, in many of those 150 I analyzed multiple software licenses, and in some of them I was involved in negotiation of multiple software licenses.

Q. In connection with your statement about your professional involvement in analyzing, drafting, and/or negotiating several hundred software licenses, what types of software are you referencing?

A. Business-oriented software.

Q. Such as what?

A. Many of them are what would be called enterprise software, which touches many areas within a business from operations to accounting to administrative. Many of them were specialized software for particular business

applications. Virtually all of them were business related -- business software -- related to business software rather than technical software or software oriented toward say controlling equipment or system software. Although there was some of that.

Q. With respect to your statement about your professional involvement in analyzing, drafting, and/or negotiating several hundred software licenses, did any of those licenses involve rules management software?

A. Yes.

Q. Could you identify those?

A. The one that comes to mind is an ongoing case that's covered by a protective order that I can't talk about, but most of them involve rules management relating to configuration. It could be configured to order manufacturing, it could be configuration relating to distribution of products.

So there would be rules as to what product can go with what product, or if you buy this one you have to buy that one, and you can't get that one because it doesn't work with it. So most of them were configuration management rules

that I recall.

Q. In the case that you referenced involving protective order, who were you retained by?

A. I was retained by a firm called AZA, Anaipakos something. This --

Q. Is this -- go ahead.

A. They're very lengthy names. The firm goes by the name of AZA.

Q. What does that stand for?

A. Anaipakos I believe is the name of the first individual. The second and third individuals, one's last name begins with Z and the next one begins with A.

Q. And who -- what is the party on the opposite side of that lawsuit?

A. Pardon me?

Q. Could you identify the party on the other side of that lawsuit?

A. Ford Motor Company.

Q. Where is that lawsuit venued?

A. Detroit.

Q. Do you know whether it's state court or federal court?

A. Federal.

Q. Do you know who the judge is?

A. No.

Q. Who are the attorneys for AZA?

A. They've changed over a period of time. AZA is the law firm, not the litigant. I was engaged by the law firm. And the one constant is a Mr. Mitby. Steven Mitby, M-I-T-B-Y.

Q. Who does AZA represent in that case?

A. A company called Versata, V-E-R-S-A-T-A.

Q. What is the subject matter of that lawsuit?

A. It's an intellectual property, trade secret -- well, there are a number of issues. My issues were related to trade secret.

Q. Does it involve software licenses?

A. Yes.

Q. Do you provide any -- have you provided any opinions in that case relating to software licenses?

A. I haven't provided any opinions in that case. I was a consulting expert.

Q. So in that case did you prepare an

1 issues in a summary judgment so that my testimony
2 was no longer relevant because all that remained
3 were damages issues, and I was not testifying
4 about damages.
5        The Court precluded me from
6 testifying, which I was not going to do anyway
7 because all of my -- all of the issues in my --
8 that I was addressing were liability issues. So
9 there was no -- it had become obvious that I was
10 not going to testify.
11        The Court did write a ruling that I
12 could not testify, but I was not going to at that
13 point anyway because none of my issues were still
14 at issue.
15    Q.   How many breach of contract cases
16 involving software license agreements have you
17 worked on as an expert witness?
18    **A.   Somewhere between 50 and 75 of the**
19 **cases that I've worked on have involved, to the**
20 **best of my recollection, an allegation of a**
21 **breach of contract.**
22    Q.   And a breach of contract involving
23 a software license agreement?
24    **A.   In almost every one of them, yes.**
25 **Well, actually, many of those dealt with software**    Page 53

1 implementation contracts. So probably only half
2 that number -- I don't know that I've ever broken
3 it out in terms of software license versus other
4 software-related contracts. So I don't know that
5 I could give you a breakout as to how many of
6 them specifically involved software licenses --
7 where there was an allegation of breach of a
8 software license as opposed to an allegation of a
9 breach of some term in a implementation or
10 maintenance, or some other software-related
11 contract. I just don't know. I've never -- I've
12 never attempted to determine that.
13    Q.   What's your best estimate as to the
14 number of cases involving breach of contract
15 involving a software license agreement that
16 you've worked on as an expert witness?
17        MR. HINDERAKER: Asked and
18 answered.
19        THE WITNESS: I would -- I'd have
20 to speculate. That's not something that I've
21 looked at. It's a substantial portion of the
22 cases involving software. On the order of half,
23 but that's -- it's not something I've ever
24 attempted to determine, so I'd be speculating.
25 BY MR. FLEMING:    Page 54

1    Q.   So you say it's in the order of one
2 half.
3        And when you say that, are you
4 referencing the 50 to 75 case number?
5    **A.   Yes.**
6    Q.   Okay. Have you ever testified in a
7 deposition or at trial or in arbitration other
8 than as an expert witness?
9    **A.   Yes.**
10    Q.   On how many occasions?
11    **A.   I can think of only one, but there**
12 **might be a second one.**
13    Q.   What were the circumstances of the
14 first one?
15    **A.   One was a dispute with a client,**
16 **and one was an automobile -- and the other that I**
17 **may have testified at would have been an**
18 **automobile accident. I'm not sure that there**
19 **was -- I actually gave deposition testimony in**
20 **that.**
21    Q.   So with regard to the automobile
22 accident, your involvement was as a witness, or
23 somebody who was involved in the accident?
24    **A.   I was involved in an automobile**
25 **accident.**    Page 55

1    Q.   And what were the circumstances of
2 the dispute with the client?
3        MR. HINDERAKER: Objection to
4 relevancy, beyond the scope of his engagement as
5 an expert in this testimony -- in this trial --
6 in this case.
7        THE WITNESS: The matter has been
8 amicably resolved.
9 BY MR. FLEMING:
10    Q.   Who was the client?
11    **A.   Yes.**
12    Q.   My question is who was the client?
13    **A.   I'm not at liberty to say that.**
14    Q.   Why are you not at liberty to say
15 that?
16    **A.   I have an agreement with the --**
17 **with the opposing party.**
18    Q.   Was this a civil lawsuit?
19        MR. HINDERAKER: Same objections as
20 to relevancy, beyond the scope of Mr. Hilliard's
21 engagement in this litigation as an expert
22 witness.
23        THE WITNESS: I'm not comfortable
24 answering that question. If the Court requires
25 me to answer it, I'll answer it.    Page 56

BY MR. FLEMING:
Q. You're not willing to say whether this dispute with the client involved a civil lawsuit?
A. I'm willing to answer whatever the Court requires me to answer. It's not relevant here. It's a -- it's a matter that's been amicably resolved.
Q. Where was the lawsuit venued?
MR. HINDERAKER: Same objections.
THE WITNESS: I'm not going to answer those questions unless so ordered.
BY MR. FLEMING:
Q. What were the circumstances of the dispute?
MR. HINDERAKER: Same objections.
THE WITNESS: I'm not going to answer that unless so ordered.
BY MR. FLEMING:
Q. When was the matter resolved?
MR. HINDERAKER: Same objections.
THE WITNESS: I'm not going to answer that unless so ordered by the Court.
BY MR. FLEMING:
Q. When was the matter initiated?

Page 57

MR. HINDERAKER: Same objections.
THE WITNESS: I've answered all the questions about that that I'm going to answer unless the Court requires me to answer others.
BY MR. FLEMING:
Q. Were you a plaintiff or a defendant in that case?
MR. HINDERAKER: Same objections.
THE WITNESS: I'm not going to answer that. I've given you all the answers -- all the information about that that I'm going to give you unless so ordered by the Court.
BY MR. FLEMING:
Q. Now, you are currently a named defendant in a lawsuit filed by Business Automation Associates, Inc. in Travis County, Texas, correct?
A. I am -- I'm a party to that case.
Q. Is that the matter that you were refusing to answer questions about?
MR. HINDERAKER: Same objections.
THE WITNESS: I'll answer that if so ordered by the Court.
BY MR. FLEMING:
Q. I'm just trying to figure out if

Page 58

we're talking about two separate matters or one matter that you're refusing to answer questions about.
Can you tell me that?
A. If so ordered.
Q. What is the nature of the lawsuit filed by Business Automation Associates against you as a defendant?
MR. HINDERAKER: Same objections.
THE WITNESS: There is no lawsuit filed by Business Automation Associates against me as a defendant. I am the principal and owner of Business Automation Associates, Inc.
BY MR. FLEMING:
Q. It's your testimony that you're not a named party in that case?
A. I am a named party, but I'm not -- the opposing party is not Business Automation Associates, Inc.
Q. Who is the opposing party?
MR. HINDERAKER: Same objections.
THE WITNESS: I'm not going to answer that unless so ordered. If you know about the case, I'm sure you know who the opposing party is.

Page 59

BY MR. FLEMING:
Q. Is the opposing party Versata Software, Inc.?
A. Yes.
MR. HINDERAKER: Same objections.
THE WITNESS: Yes.
BY MR. FLEMING:
Q. Was that a client of Business Automation Associates?
MR. HINDERAKER: Same objections.
THE WITNESS: They're the litigant. They were responsible for payment.
BY MR. FLEMING:
Q. And my question is whether Versata Software, Inc. was a client of Business Automation Associates, Inc.?
MR. HINDERAKER: Same objections.
THE WITNESS: The client was their law firm.
BY MR. FLEMING:
Q. I'm sorry, I didn't hear you.
A. The client was their law firm.
Q. Was this a expert witness retention in which you were retained by a law firm and your bills were paid by Versata Software, Inc.?

Page 60

```
1         MR. HINDERAKER: Same objections.
2         THE WITNESS: I'll answer that if
3  so ordered by the Court.
4         The matter has been amicably
5  resolved.
6  BY MR. FLEMING:
7     Q.   Is this the same Versata matter
8  that you referred to in Detroit similar issues to
9  this case?
10        MR. HINDERAKER: Same objections.
11        THE WITNESS: Same Versata.
12 BY MR. FLEMING:
13    Q.   Have you ever been retained by
14 counsel for Versata as an expert witness?
15    A.   Yes.
16    Q.   Is the law firm in that case that
17 retained you AZA?
18    A.   Yes.
19    Q.   Did you prepare an expert report in
20 that case?
21    A.   No.
22    Q.   Were you a consulting expert in
23 that case?
24    A.   Yes.
25    Q.   And did you subsequently sue        Page 61
```

```
1  Versata because they failed to pay your bill?
2         MR. HINDERAKER: Same objections.
3         THE WITNESS: The matter has been
4  amicably resolved -- amicably resolved.
5  BY MR. FLEMING:
6     Q.   So you're refusing to answer my
7  question as to whether you, the company that you
8  work with sued Versata for failure to pay your
9  expert consulting bill?
10    A.   I'm telling you what I'm allowed to
11 tell you.
12        MR. FLEMING: Mark this as the next
13 exhibit.
14        (Deposition Exhibit 503 was marked
15 for identification.)
16 BY MR. FLEMING:
17    Q.   Showing you what's been marked as
18 Exhibit 503. I'll represent to you that this is
19 a copy of the docket sheet for the lawsuit in
20 which the plaintiff is Business Automation
21 Associates and the defendant is Versata Software,
22 Inc.
23        So the complaint is a matter of
24 public record, is it not?
25    A.   Yes.                                Page 62
```

```
1     Q.   So what were the claims made by
2  your company Business Automation Associates,
3  Inc.?
4         MR. HINDERAKER: I have the same
5  objections.
6         THE WITNESS: I'm telling you what
7  I'm allowed to tell you. The matter has been
8  amicably resolved.
9  BY MR. FLEMING:
10    Q.   If the complaint is a matter of
11 public record, why would you not --
12    A.   You're welcome to get the public
13 record.
14    Q.   -- testify?
15        And my question is different than
16 that.
17        If the complaint is a matter of
18 public record, why can you not testify about the
19 claims made in the complaint?
20        MR. HINDERAKER: Same objections.
21        THE WITNESS: I will answer any
22 questions that the Court requires me to answer.
23 BY MR. FLEMING:
24    Q.   Did you sign any affidavits in this
25 case that are a matter of public record?  Page 63
```

```
1         MR. HINDERAKER: Same objections.
2         THE WITNESS: I don't recall.
3  BY MR. FLEMING:
4     Q.   What is the current status of the
5  lawsuit?
6         MR. HINDERAKER: Same objections.
7         THE WITNESS: It's amicably -- it
8  has been amicably resolved.
9  BY MR. FLEMING:
10    Q.   Did you ever file a dismissal of
11 the claims in the lawsuit?
12        MR. HINDERAKER: Same objections.
13        THE WITNESS: Not yet.
14 BY MR. FLEMING:
15    Q.   So it's still a pending matter?
16        MR. HINDERAKER: Same objections.
17        THE WITNESS: It has been amicably
18 resolved.
19 BY MR. FLEMING:
20    Q.   Because it looked like from looking
21 at the docket sheet that the matter has been
22 continued.
23        But at this point you haven't
24 filed -- none of the parties have filed a motion
25 to dismiss, correct?                       Page 64
```

**Page 65**

1 MR. HINDERAKER: Same objections.
2 THE WITNESS: You can judge from
3 the public record.
4 BY MR. FLEMING:
5 Q. But you're not willing to answer
6 that question, correct?
7 A. I'm willing to answer it if the
8 Court requires that I do, yes.
9 Q. But without a court order, you
10 won't respond?
11 A. I will not answer unless the Court
12 so requires me to.
13 Q. My question is different than that.
14 Will you answer without a court
15 order?
16 MR. HINDERAKER: Well, that is a
17 different question.
18 THE WITNESS: I -- I don't know
19 whether the court order -- a court order is the
20 way that a court would require me to answer. If
21 the Court requires me to give an answer, I will.
22 MR. FLEMING: Mark this as the next
23 exhibit.
24 (Deposition Exhibit 504 was marked
25 for identification.)

**Page 66**

1 BY MR. FLEMING:
2 Q. You referenced earlier in your
3 testimony today that there was one time that a
4 court had excluded your testimony, and that case
5 was entitled RedPrairie Corporation versus
6 Jerome's Furniture Warehouse; is that right?
7 A. Yes.
8 Q. What was your involvement in this
9 case?
10 A. I was engaged --
11 MR. HINDERAKER: Asked and
12 answered.
13 Go ahead.
14 THE WITNESS: I was engaged as a
15 liability expert in the case.
16 BY MR. FLEMING:
17 Q. On what topic?
18 A. There were disputes between the
19 licensor RedPrairie Corporation and the licensee
20 Jerome's Furniture Warehouse. I don't recall off
21 the top of my head whether the disputes were
22 software licensing issues, implementation issues,
23 or both. I wrote a report. I gave deposition
24 testimony.
25 Q. So if you turn to page 5, at the

**Page 67**

1 bottom of the first column it states that there
2 was a prior order limiting your expert report.
3 What's your understanding as to the
4 reason why the Court initially limited your
5 expert report?
6 A. I don't -- I don't recall.
7 Q. Now, at this point at the time of
8 this order, Jerome's Furniture Warehouse was
9 still attempting to call you possibly as a
10 rebuttal witness, correct?
11 A. Not that I'm aware of.
12 Q. Do you see in the middle of the
13 page where it says, "Jerome responds that it may
14 call Hilliard as a rebuttal witness, but cannot
15 know if he will be called to testify until it
16 sees what evidence RedPrairie presents"?
17 A. I see that, yes.
18 Q. Okay. So Jerome's was intending to
19 possibly call you as a rebuttal witness, correct?
20 MR. HINDERAKER: I object to
21 counsel's testimony. Asked and answered with
22 respect to Mr. Hilliard's memory and knowledge.
23 THE WITNESS: Could you repeat the
24 question, please.
25 (The requested portion was read

**Page 68**

1 back by the court reporter.)
2 THE WITNESS: The next question.
3 (The requested portion was read
4 back by the court reporter.)
5 THE WITNESS: You say they were
6 intending to possibly call me, and I'm not quite
7 sure what you're asking there.
8 I was not aware that they were
9 contemplating calling me as a rebuttal witness.
10 BY MR. FLEMING:
11 Q. But you are aware that the Court
12 precluded you from so testifying, correct?
13 A. I have a letter from my client that
14 I could provide to counsel and counsel could
15 provide to you. I believe Barrow, who is
16 referred to here, is RedPrairie's damages expert.
17 And I did not -- because all of the liability
18 questions were settled in summary judgment, I did
19 not rebut the damages expert's report because I'm
20 not a damages expert.
21 I don't know what, if any, issues
22 counsel thought might come up as evidence in the
23 trial on damages issues or -- I have no knowledge
24 relating to any specific intent to further
25 involve me in the damages case which was before

# EXHIBIT 6

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation,<br><br>    Defendants. | Court File No. 16-cv-1054 (WMW/TNL)<br><br>**DEFENDANTS' FIFTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO FAIR ISAAC CORPORATION** |

In accordance with Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants Federal Insurance Company and ACE American Insurance Company, request that Plaintiff Fair Isaac Corporation furnish responses to the following document requests within thirty (30) days of service. Defendants further request that the documents be produced on the 30th day following the date of service at Fredrikson & Byron, P.A., 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425.

## DEFINITIONS

1. "Document" has the broadest meaning that can be ascribed to it pursuant to the Federal Rules of Civil Procedure. Among other things, "document" means the original and any non-identical copy of any written, printed, electronic, recorded, graphic or photographic matter or sound reproduction, however produced or reproduced, including, but not limited to, correspondence, telegrams, other written communications, contracts, agreements, diaries, memoranda, logs, notes, forms,

**EXHIBIT 6**

analyses, projections, work papers, calendar and tape recordings, prepared or received by you, or in your possession, custody or control, and/or whose identity, existence, and location are known by you. As used herein, "document" shall include things, and "thing" shall include documents.

2.  "FICO," "you," or "your" means Plaintiff Fair Isaac Corporation, its employees, representatives, agents, attorneys, successors, predecessors, parent companies, subsidiaries, and any other persons or entities acting on its behalf or at its direction.

3.  "Federal" means Federal Insurance Company and its operating division Chubb & Son.

4.  "Work" and "Works" refers to the works referenced in Paragraph 10 of the Complaint.

5.  "Agreement" means the Software License and Maintenance Agreement between FICO and Federal.

## DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 52:** Please produce all documents that have been filed with the court or exchanged between the parties in case number D-1-GN-17-006229, captioned *Business Auotmation Associates, Inc. v. Versata Software, Inc.*, which is venued in the 200th Judicial District Court of Travis County, Texas.

**REQUEST FOR PRODUCTION NO. 53:** Please produce all communications between Brooks Hilliard and counsel for Versata Software, Inc., or any related entity,

from the case *Ford Motor Co. v. Versata Software Inc., et al.*, No. 2:15-cv-10628, venued in the Federal Court for the Eastern District of Michigan, or from any related case.

Dated: June 28, 2019　　　　　　　　　　FREDRIKSON & BYRON, P.A.

　　　　　　　　　　　　　　　　　　　/s/ Terrence J. Fleming
　　　　　　　　　　　　　　　　　　　Terrence J. Fleming (#0128983)
　　　　　　　　　　　　　　　　　　　tfleming@fredlaw.com
　　　　　　　　　　　　　　　　　　　Leah C. Janus (#0337365)
　　　　　　　　　　　　　　　　　　　ljanus@fredlaw.com
　　　　　　　　　　　　　　　　　　　Christopher D. Pham (#0390165)
　　　　　　　　　　　　　　　　　　　cpham@fredlaw.com
　　　　　　　　　　　　　　　　　　　**FREDRIKSON & BYRON, P.A.**
　　　　　　　　　　　　　　　　　　　200 South Sixth Street, Suite 4000
　　　　　　　　　　　　　　　　　　　Minneapolis, MN  55402-1425
　　　　　　　　　　　　　　　　　　　Phone:  (612) 492-7000
　　　　　　　　　　　　　　　　　　　(612) 492-7077 (fax)

　　　　　　　　　　　　　　　　　　　*Attorneys for Defendants*