# Exhibit 1
# (Filed Under Seal)



# Expert Report of Brooks L. Hilliard  CMC® CCP

## Business Automation Associates, Inc.
## Phoenix, Arizona

In the matter of:

### Fair Isaac Corporation

v.

### Federal Insurance Company and Ace American Insurance Company

### Case No. 16-CV-1054 (WMW/DTS)

United States District Court
District of Minnesota

### CONFIDENTIAL – ATTORNEY'S EYES ONLY

May 31, 2019



## I. INTRODUCTION

This report contains a true and accurate statement of my opinions, including explanations of the factors that support them, reached based on my personal analysis of the evidence in Fair Isaac Corporation ("FICO") v. Federal Insurance Company ("Federal") and Ace American Insurance Company ("Ace American"), a litigation relating to the licensing of FICO's Blaze Advisor software ("Blaze Advisor") by Chubb & Son ("Chubb & Son"), a division of Federal.  I affirm I am independent of the parties to this matter and their legal advisors.

I was engaged by Merchant & Gould PC on behalf of FICO, and asked to review and respond to the reports prepared by Federal/Ace American's experts, Dr. Steven Kursh and Mr. William McCarter, both dated May 17, 2019 (the "Kursh Report" and the "McCarter Report").

If called to testify, I anticipate that my testimony will concern the matters addressed in this report.  I note that the Kursh Report states, if this matter goes to trial, Dr. Kursh plans to use one or more exhibits or computerized presentations summarizing or supporting the opinions made in his report.  He explained that any computerized presentation may include materials taken directly from his report, and that he may also use the materials on which he relied in generating his report and other materials related to this matter as exhibits at trial.  I will likely use similar materials if this case proceeds to trial.

I plan to consider any additional information that may become available in this proceeding following the submission of this report and will modify or supplement my analysis and opinions accordingly.

This report is organized into eight parts: (1) A review of my expertise and qualifications, (2) A statement of my opinions, (3) The methods I used to reach my opinions, (4) A detailed explanation of the support for each opinion, (5) Publications, (6) Prior Testimony, (7) Compensation, and (8) Concluding notes.

## II. CONSULTING BACKGROUND

In my consulting practice over the past 37 years, my firm, Business Automation,

has consulted for more than 200 companies, governmental agencies and not-for-profit organizations.  My work has included the selection, implementation and ongoing support of business information technology applications, including both hardware and software for data and voice communication.  As a part of these consulting engagements, my clients have licensed and purchased (or were considering the license or purchase of) various types of general purpose and special purpose business software, including applications used in the financial industry.

Over the past 35 years, I have been engaged as an expert witness / consultant in more than 120 legal disputes.  These matters include (a) the implementation and performance of various business software applications, and (b) intellectual property disputes between computer software and/or systems suppliers.  Although most engagements have been settled out of court, I have given testimony numerous times in depositions, trials, hearings and arbitrations.

I am one of fewer than fifteen professionals in the world to be both a Certified Management Consultant™ (see Exhibit #1) and a Certified Computing Professional (see Exhibit #2).  My educational background includes a Master of Business Administration (MBA) degree from Harvard Business School and a Bachelor of Science degree in Mechanical Engineering with Deans' List academic honors from the Massachusetts Institute of Technology.  In addition, I have lectured on computer systems and programming for the Arizona State University School of Business and the American Management Association.  Prior to founding Business Automation Associates in 1980, I held both line and staff positions for several major computer companies where I had responsibilities in the areas of designing, developing, marketing and supporting a wide variety of computer products used in both business and government applications.  A copy of my professional biography is attached (see Exhibit #3).

In addition to my full-time consulting activities, I have served as a member of the Arizona State Bar Technology Task Force, written a book on computer selection (published by Dow Jones), published my own hard copy and electronic computer newsletters, provided commentary on computer issues for the nationally-syndicated MARKETPLACE news program on Public Radio International, conducted seminars, spoken professionally on various computer issues and been active in several civic organizations.  I am a past Board of Directors member for the Institute of Management Consultants USA, the Arizona Harvard Business School Alumni Association, the Arizona Chapter of the National Conference of Christians and

Jews, Devereux Foundation (Arizona), Junior Achievement of Central Arizona, the Phoenix 100 Rotary and have previously served as the Chairman of the Ethics Committee for the Institute of Management Consultants USA.  My firm, Business Automation, also maintains membership in the Arizona Technology Council and the Independent Computer Consultants Association.  And I am a member of the Arizona Harvard Business School Alumni Association, the MIT Alumni Association, the Phoenix 100 Rotary, the Institute for Management Consultants USA, the Institute of Electrical and Electronics Engineers ("IEEE") and the Project Management Institute ("PMI").

### III.  METHODS

To reach the opinions above, I relied on my experience in the industry and reviewed the documents, pleadings, deposition transcripts, expert reports and reference materials listed in Exhibit #4.  I also spoke in person and/or by telephone with FICO employee Bill Waid. Where I needed information that was not readily at hand from those resources, I researched issues (all of which are identified in the footnotes within this report) on the Internet.

It is my normal practice, when rendering opinions in legal matters, to use a rigorous and standardized methodology.  I have used that method here.  Although there are no mandatory analytic standards for the information technology consulting business, my methodology involves the normal consultative process of determination of the issue to be investigated, research and information gathering, review of potential hypotheses, rigorous analysis to determine the answer to the designated issue, and preparation of this report summarizing the results of the consulting effort.  In reaching my opinions, I rely only on factors generally relied upon and considered reliable by experts in my field.  As is my normal practice, I have taken care to apply my expertise related to the computer industry customs and practices relevant to this matter in an objective manner.

My opinions are based on my professional involvement in analyzing, drafting and/or negotiating several hundred software licenses in my consulting and expert witness engagements.  Based on this experience, I provide opinions about whether particular license provisions, and the wording used to express them, are common and consistent with the provisions customarily found in licenses for other comparable business software.

Some opinions expressed in Federal's experts' reports either (a) include the expert's interpretation of the meaning of various provisions of the 2006 Software License and Maintenance Agreement ("License Agreement") at issue in this case, or (b) rely on an implicit assumption the expert report makes regarding how a particular license provision should be interpreted.  It is my understanding that contractual interpretation is normally a legal matter rather than an Information Technology or business matter.  The explanations of my opinions in this report focus on business and industry factors that can assist the Court or the finder of fact to understand any terms of art and/or the business context that licensors and licensees would normally use to determine what rights, obligations and/or restrictions are embodied by the provisions of the License Agreement.

### IV.  SUMMARY OF OPINIONS

*Opinion #1:  The licensing limitations in the License Agreement are comparable to limitations customarily found in the license agreements of other commercial software providers.  FICO applied these limitations in a manner that is consistent with the normal customs and practices of the commercial software industry.*

*Opinion #2:  FICO had good and sufficient reasons, consistent with the normal customs and practices of the commercial software industry, for conditioning its consent to the continued use of its Blaze Advisor software on Federal's willingness to accept a negotiated increase in the license price.*

*Opinion #3:  Dr. Kursh's contention that FICO's pricing and discounting practices are inconsistent with the customs and practices of the commercial software industry is unsupported and incorrect.*

*Opinion #4:  The terms "commercially reasonable" and "commercially unreasonable" used throughout the Kursh Report are so vague and undefined that judgments based on them are not supportable.*

*Opinion #5:  Mr. McCarter fails to support his contention that Blaze Advisor has minimal value to Federal because it is "industry agnostic", easily replaceable and only one of many technologies that*

> *Federal employs to operate its insurance business. The evidence shows that FICO's Blaze Advisor provided critical capability, contributing to Federal's revenue that Chubb & Son had not developed internally.*

### V.  BASIS FOR OPINIONS

In addition, because I have been professionally involved in analyzing, drafting and/or negotiating several hundred software licenses in my consulting and expert witness engagements, the explanation of my opinions below also addresses whether particular license provisions, and the wording used to express them, are common and consistent with the provisions customarily found in licenses for other comparable business software.

The paragraphs that follow address each of my opinions stated above and explain the support for each of them.  In the instances where this support relies on the contract interpretation and/or contract enforceability issues described above, I have referenced them in the text.

*Opinion #1:  The licensing limitations in the License Agreement are comparable to limitations customarily found in the license agreements of other commercial software providers.  FICO applied these limitations in a manner that is consistent with the normal customs and practices of the commercial software industry.*

There are three areas where Dr. Kursh criticizes FICO's actions relating to the terms and conditions of the License Agreement:

1. **License Scope**:  Dr. Kursh's initial opinion states that it was commercially unreasonable for FICO to claim Federal breached the License Agreement by installing the Blaze Advisor software outside the United States.  Dr. Kursh's opinion states that FICO's resulting demand that Federal pay higher license fees to cure that breach was also commercially unreasonable, relying on a nonstandard interpretation of the License Agreement, specifically his assertion that Section 2 of the License Agreement allows Federal to install

Expert Report of Brooks Hilliard, dated 5/31/2019, page 30

- Using the acquisition of Federal as a pretext for what he believes is an illegitimate increase in Blaze Advisor license fees.
- Interpreting the term "consent shall not be unreasonably withheld" to mean something other than "consent must be granted".
- Enforcing license violations he believes FICO had ignored previously.
- Exercising the License Agreement's termination provision without giving Federal all the time it desired to cease using Blaze Advisor.
- Using illegitimate methods to compute FICO's monetary damages (FICO's damages expert).

All of these conclusions are unsubstantiated because Dr. Kursh is simply using the term "commercially unreasonable" as a proxy to describe any FICO action he disagrees with.

The expert's role, as I understand it, is not to make determinations (such as a determination on whether something is reasonable or not) that are supposed to be made by the Court or by a jury, but rather to provide information and/or determinations requiring specialized expertise, knowledge or skills that assist the judge or jury understand the evidence, so *they* can make the judgments they are designated to make.

The problem with Dr. Kursh's reasonableness assessments is that they fail to provide any helpful or useful criteria that the Court or a jury could use to determine whether FICO's licensing practices or Federal's business positions are commercially reasonable. For this reason, I do not believe the opinions in the Kursh Report supported by Dr. Kursh's "commercial reasonableness" criterion (apparently based solely on his personal interpretation of the meaning of the provisions in the License Agreement) are sufficiently reliable to be accepted.

**Opinion #5: Mr. McCarter fails to support his contention that Blaze Advisor has minimal value to Federal because it is "industry agnostic", easily replaceable and only one of many technologies that Federal employs to operate its insurance business. The evidence shows that FICO's**

### *Blaze Advisor provided critical capability, contributing to Federal's revenue that Chubb & Son had not developed internally.*

The McCarter Report uses several explanations to try to minimize Blaze Advisor's value to Federal, but his own reasons undercut his conclusions. I disagree with these opinions for the following reasons.

Mr. McCarter acknowledges there are ten software applications that deploy Blaze Advisor, and "leverage" its functionality.[81] This total of ten applications understates Federal's own application count of 15. These 15 applications were disclosed in a report attached to an e-mail sent to FICO by Ms. T. Pawloski, Federal's VP of Software Compliance and Optimization, Global Vendor Services Organization on February 25, 2016. McCarter does not explain this discrepancy).[82]

### A. Blaze Advisor is integrated into "core" Federal applications

Mr. McCarter contends that Blaze Advisor is not a core technology:[83]

> Federal has only automated a small amount of the business rules and decisions that take place every day to conduct business. Blaze plays a small role in the business processing ecosystem at Federal.

However, the McCarter Report notes that Blaze Advisor is "integrated with core insurance applications that have … insurance functionality [needed] for selling and servicing insurance policies."[84] The phrase "integrated with core … applications" has special meaning to information technology professionals due to its use of the business computing terms of art, "integrated" and "core":

- "Integrated" normally means that a component application (Blaze Advisor in this case) is linked into a host application (here, an insurance application) in in a way that, *in the ideal*, would allow information to pass between them as if they were a single unified application. Depending on how "seamless" (*i.e.*, how close to the ideal) the integration is, this typically means that removal or

---

[81] McCarter Report, paragraph 85 on pages 24.

[82] FICO00001358–1359.

[83] McCarter Report, *op. cit.*, paragraph 74 on page 9.

[84] *Id.*, paragraph 91 on page 24.

- replacement of an integrated component is likely to be difficult, time consuming and to risk endangering the operation of the host application.
- "Core application" normally means that the functions that the application performs are critical to the business because they perform irreplaceable business functions that could cause significant business problems if they failed.

When application developers design and build a new "core" application it would be the normal custom and practice of the commercial software industry to avoid integrating externally developed components (like Blaze Advisor) whenever possible to avoid introducing externally uncontrolled risk factors that could affect the "core" application functionality. The fact that Chubb & Son chose to integrate Blaze Advisor into several of its core insurance applications is evidence that, contrary to McCarter's assertions, it has significant business value.

### B. Whether Blaze Advisor is "industry agnostic" does not determine how much value it contributes to Federal's business

Mr. McCarter contends that Blaze Advisor has little value to Federal because it is "industry agnostic". For example, the McCarter Report states:

- Blaze Advisor is "industry agnostic",[85] meaning its inherent capabilities are potentially usable in multiple industries and are not specifically focused to optimize its operation for any one industry.
- As delivered, Blaze Advisor[86] (a) includes no insurance-specific rules or capabilities that operate on their own, (b) cannot leverage FICO's insurance expertise because FICO is not in the insurance industry, and (c) requires a substantial implementation effort by knowledgeable Chubb & Son personnel (with significant and costly assistance from FICO) to know what rules to put into it, how to put those rules in, and how to test the rules to make sure they function properly. In addition, Blaze Advisor requires licensees like Chubb & Son to spend significant time and effort entering the rules and testing their operation.

---

[85] McCarter Report, paragraphs 26, 70 and 157 on pages 9, 20 and 42.

[86] *Id.*, paragraphs 21–22, 24, 26, 71–75 and 91 on pages 8, 8-9, 9, 20-21 and 24.