# Exhibit 2
## (Filed Under Seal)

Brooks Hilliard   -   6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 356-1   Filed 07/19/19   Page 2 of 7

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2    _____
      FAIR ISAAC CORPORATION,           Court File No.
 3                                      16-cv-1054(WMS/DTS)
              PLAINTIFF,
 4
         VS.
 5
      FEDERAL INSURANCE COMPANY
 6    and ACE AMERICAN INSURANCE
      COMPANY,
 7
              DEFENDANTS.
 8    _____

 9

10

11

12    ------------------------------------------------------

13               VIDEOTAPED DEPOSITION OF

14                    BROOKS HILLIARD

15    ------------------------------------------------------

16

17

18

19

20

21

22

23

24

25    Taken June 19, 2019        By Brandi Bigalke, RPR
```

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 356-1 Filed 07/19/19 Page 3 of 7

cases multiple licenses.

Also in the consulting environment there were often multiple software licenses. If there were multiple, and in most cases there were, companies making proposals to my clients, I in many cases reviewed the licenses of more than just the desired or selected provider.

So while I say -- and perhaps 150 of those instances involved analyzing and negotiating software licenses, in many of those 150 I analyzed multiple software licenses, and in some of them I was involved in negotiation of multiple software licenses.

Q. In connection with your statement about your professional involvement in analyzing, drafting, and/or negotiating several hundred software licenses, what types of software are you referencing?

A. Business-oriented software.

Q. Such as what?

A. Many of them are what would be called enterprise software, which touches many areas within a business from operations to accounting to administrative. Many of them were specialized software for particular business

applications. Virtually all of them were business related -- business software -- related to business software rather than technical software or software oriented toward say controlling equipment or system software. Although there was some of that.

Q. With respect to your statement about your professional involvement in analyzing, drafting, and/or negotiating several hundred software licenses, did any of those licenses involve rules management software?

A. Yes.

Q. Could you identify those?

A. The one that comes to mind is an ongoing case that's covered by a protective order that I can't talk about, but most of them involve rules management relating to configuration. It could be configured to order manufacturing, it could be configuration relating to distribution of products.

So there would be rules as to what product can go with what product, or if you buy this one you have to buy that one, and you can't get that one because it doesn't work with it. So most of them were configuration management rules

that I recall.

Q. In the case that you referenced involving protective order, who were you retained by?

A. I was retained by a firm called AZA, Anaipakos something. This --

Q. Is this -- go ahead.

A. They're very lengthy names. The firm goes by the name of AZA.

Q. What does that stand for?

A. Anaipakos I believe is the name of the first individual. The second and third individuals, one's last name begins with Z and the next one begins with A.

Q. And who -- what is the party on the opposite side of that lawsuit?

A. Pardon me?

Q. Could you identify the party on the other side of that lawsuit?

A. Ford Motor Company.

Q. Where is that lawsuit venued?

A. Detroit.

Q. Do you know whether it's state court or federal court?

A. Federal.

Q. Do you know who the judge is?

A. No.

Q. Who are the attorneys for AZA?

A. They've changed over a period of time. AZA is the law firm, not the litigant. I was engaged by the law firm. And the one constant is a Mr. Mitby. Steven Mitby, M-I-T-B-Y.

Q. Who does AZA represent in that case?

A. A company called Versata, V-E-R-S-A-T-A.

Q. What is the subject matter of that lawsuit?

A. It's an intellectual property, trade secret -- well, there are a number of issues. My issues were related to trade secret.

Q. Does it involve software licenses?

A. Yes.

Q. Do you provide any -- have you provided any opinions in that case relating to software licenses?

A. I haven't provided any opinions in that case. I was a consulting expert.

Q. So in that case did you prepare an

Brooks Hilliard - 6/19/2019
CASE 0:16-cv-01054-DTS Doc. 356-1 Filed 07/19/19 Page 4 of 7
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  expert report?
2      A.  No.
3      Q.  In this case would you say that
4  analyzing comparable software licenses is
5  relevant to your task?
6      A.  Would I say that analyzing software
7  licenses is relevant, yes.
8      Q.  Would you say that analyzing
9  comparable software licenses is relevant to your
10 task?
11     A.  In terms of knowledge of what
12 comparable -- what is in comparable software
13 licenses, yes, very relevant.
14     Q.  How so?
15     A.  Well, because in many cases my
16 opinions deal with what is normal and customary
17 in software licenses for in -- for similar
18 specially purpose and general purpose business
19 software.
20     Q.  What experience do you have with
21 regard to the performance of obligations due
22 under a software license agreement?
23         MR. HINDERAKER:  Object to the
24 question as vague.
25         THE WITNESS:  I don't understand

Page 37

1  what you're asking me.
2  BY MR. FLEMING:
3      Q.  Have you provided -- have you
4  worked as an expert witness in any case involving
5  the question as to a party's obligations under a
6  software license agreement?
7          MR. HINDERAKER:  Same objection,
8  vagueness.
9          THE WITNESS:  In a general sense,
10 many of the cases involved what was in the
11 software license, as well as the actions of the
12 licensor and licensee.
13         As best I understand your question,
14 that's the most relevant answer I can give you.
15 BY MR. FLEMING:
16     Q.  And you're referencing cases in
17 which you've testified as an expert?
18     A.  Yes.
19     Q.  Okay.  Can you identify those
20 cases?
21         MR. HINDERAKER:  I'm going to
22 object to the question to the extent it's asking
23 for disclosures that are beyond Rule 26.  And
24 Mr. Hilliard's disclosures and conformance with
25 Rule 26 regarding his prior experience over the

Page 38

1  last, I think it's four years that are required
2  by the rule are in your possession.
3          MR. FLEMING:  Go ahead.
4          THE WITNESS:  I'd be happy to
5  address the cases on page 37 of my report, which
6  are the ones within the past four years.
7          And could you ask the question
8  again, or could we read back the question so that
9  I'm answering it specifically.
10         MR. HINDERAKER:  Sure.
11         (Whereupon, the requested portion
12 was read back by the reporter.)
13         THE WITNESS:  Could you read the
14 prior question.  When you say "those cases," I --
15 cases relating --
16         (Clarification by the court
17 reporter.)
18         MR. FLEMING:  You have to go to the
19 question before that.
20         THE WITNESS:  The prior question, I
21 think.
22         (The requested portion was read
23 back by the court reporter.)
24         THE WITNESS:  I'm trying to
25 remember the details of the cases.  The

Page 39

1  Hodell-Natco dealt with SAP's -- SAP America's
2  involvement in performance of services under a --
3  there may have been an implementation contract
4  rather than a software license.  I don't know
5  that there were licensing issues, but there may
6  have been.
7          State Controller's Office versus
8  SAP Public Services was an implementation
9  contract.  I reviewed the software license, but I
10 don't believe that there were software licensing
11 issues there.
12         The Gish versus Meisenheimer did
13 not have any.
14         The QAD versus Ingersoll-Rand did
15 involve software licensing issues, although I
16 don't recall specifically off the top of my head
17 what they were.
18         And the Armour Capital Management
19 versus SS&C Technology involved, as I recall,
20 both software licensing and implementation
21 issues.
22 BY MR. FLEMING:
23     Q.  So do you recall any cases in which
24 you've testified as an expert witness relating to
25 a party's obligations under a software license

Page 40

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 356-1 Filed 07/19/19 Page 5 of 7

1  MR. HINDERAKER: Same objections.
2  THE WITNESS: I'll answer that if
3 so ordered by the Court.
4  The matter has been amicably
5 resolved.
6 BY MR. FLEMING:
7  Q. Is this the same Versata matter
8 that you referred to in Detroit similar issues to
9 this case?
10  MR. HINDERAKER: Same objections.
11  THE WITNESS: Same Versata.
12 BY MR. FLEMING:
13  Q. Have you ever been retained by
14 counsel for Versata as an expert witness?
15  A. Yes.
16  Q. Is the law firm in that case that
17 retained you AZA?
18  A. Yes.
19  Q. Did you prepare an expert report in
20 that case?
21  A. No.
22  Q. Were you a consulting expert in
23 that case?
24  A. Yes.
25  Q. And did you subsequently sue

Page 61

1 Versata because they failed to pay your bill?
2  MR. HINDERAKER: Same objections.
3  THE WITNESS: The matter has been
4 amicably resolved -- amicably resolved.
5 BY MR. FLEMING:
6  Q. So you're refusing to answer my
7 question as to whether you, the company that you
8 work with sued Versata for failure to pay your
9 expert consulting bill?
10  A. I'm telling you what I'm allowed to
11 tell you.
12  MR. FLEMING: Mark this as the next
13 exhibit.
14  (Deposition Exhibit 503 was marked
15 for identification.)
16 BY MR. FLEMING:
17  Q. Showing you what's been marked as
18 Exhibit 503. I'll represent to you that this is
19 a copy of the docket sheet for the lawsuit in
20 which the plaintiff is Business Automation
21 Associates and the defendant is Versata Software,
22 Inc.
23  So the complaint is a matter of
24 public record, is it not?
25  A. Yes.

Page 62

1  Q. So what were the claims made by
2 your company Business Automation Associates,
3 Inc.?
4  MR. HINDERAKER: I have the same
5 objections.
6  THE WITNESS: I'm telling you what
7 I'm allowed to tell you. The matter has been
8 amicably resolved.
9 BY MR. FLEMING:
10  Q. If the complaint is a matter of
11 public record, why would you not --
12  A. You're welcome to get the public
13 record.
14  Q. -- testify?
15  And my question is different than
16 that.
17  If the complaint is a matter of
18 public record, why can you not testify about the
19 claims made in the complaint?
20  MR. HINDERAKER: Same objections.
21  THE WITNESS: I will answer any
22 questions that the Court requires me to answer.
23 BY MR. FLEMING:
24  Q. Did you sign any affidavits in this
25 case that are a matter of public record?

Page 63

1  MR. HINDERAKER: Same objections.
2  THE WITNESS: I don't recall.
3 BY MR. FLEMING:
4  Q. What is the current status of the
5 lawsuit?
6  MR. HINDERAKER: Same objections.
7  THE WITNESS: It's amicably -- it
8 has been amicably resolved.
9 BY MR. FLEMING:
10  Q. Did you ever file a dismissal of
11 the claims in the lawsuit?
12  MR. HINDERAKER: Same objections.
13  THE WITNESS: Not yet.
14 BY MR. FLEMING:
15  Q. So it's still a pending matter?
16  MR. HINDERAKER: Same objections.
17  THE WITNESS: It has been amicably
18 resolved.
19 BY MR. FLEMING:
20  Q. Because it looked like from looking
21 at the docket sheet that the matter has been
22 continued.
23  But at this point you haven't
24 filed -- none of the parties have filed a motion
25 to dismiss, correct?

Page 64

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 356-1   Filed 07/19/19   Page 6 of 7

**Page 173**

1 for identification.)
2 BY MR. FLEMING:
3    Q.   Is this the document you reference
4 on page 31 of your report?
5    **A.   Yes.**
6    Q.   And this was an attachment to an
7 e-mail sent by Tamara Pawloski; is that right?
8    **A.   Yes.**
9    Q.   Do you know what Ms. Pawloski's
10 position is?
11    **A.   She's the VP of Software Compliance**
12 and Optimization for Global Vendor Services
13 Organization for Chubb is what it says.  That's
14 her domain -- e-mail domain Chubb.com, and it
15 also says Chubb above her name.
16    Q.   And do you know who prepared the
17 attachment?
18    **A.   I don't recall whether I saw who**
19 prepared it and I don't recall -- I don't recall
20 if I saw who prepared it.
21    Q.   Do you know whether Ms. Pawloski
22 has any IT background or experience?
23    **A.   Well, if she is a VP of software**
24 compliance and optimization, she has response --
25 IT responsibility, but I don't know her

**Page 174**

1 background.
2    Q.   Okay.  You don't know what her
3 actual responsibilities were though, do you?
4    **A.   I just know what her title is,**
5 which would indicate some IT responsibility.  But
6 I don't -- I haven't seen her job description.
7    Q.   What technical requirements would
8 be needed to determine whether Blaze was actually
9 integrated into these 15 applications?
10    **A.   Someone -- most likely someone**
11 on -- in the IT -- with specific IT development
12 responsibility or someone working in the portion
13 of Chubb with IT development or deployment
14 responsibility.
15    Q.   And my question is really
16 different.  Not who you would talk to, but rather
17 what would you do or ask to see in order to
18 determine whether Blaze is actually integrated
19 into these 15 applications?
20         MR. HINDERAKER:  Objection; beyond
21 the scope.
22         THE WITNESS:  In my experience,
23 you'd have to talk to someone within Chubb who
24 was involved in these deployments.
25 BY MR. FLEMING:

**Page 175**

1    Q.   And what documents or what data
2 would you request to see in addition to talking
3 with somebody in the IT department?
4    **A.   It would depend on the**
5 organization.  In some cases talking to someone
6 who was involved in it would be sufficient.
7    Q.   Well, with regard to this
8 organization, how would you go about doing that?
9         MR. HINDERAKER:  This organization
10 being the defendant?
11         MR. FLEMING:  Federal, yeah.
12         MR. HINDERAKER:  Objection; lack of
13 foundation.
14         THE WITNESS:  I don't know enough
15 about Federal to say.
16 BY MR. FLEMING:
17    Q.   And you didn't attempt to go about
18 verifying those facts, that is whether in fact
19 Blaze was actually integrated into these 15
20 applications, did you?
21    **A.   I took the VP of software**
22 compliance and optimizations' word for it.
23    Q.   And my question is whether you took
24 any other steps to verify those facts, other than
25 reading the one e-mail and the attachment?

**Page 176**

1    **A.   I -- I did not.  I just trusted**
2 Ms. Pawloski.
3    Q.   You say in your heading A that
4 "Blaze Advisor is integrated into core Federal
5 operations."
6         What do you mean by integration and
7 core on pages 31, and you say the same on 32?
8    **A.   I'm responding to Mr. McCarter's**
9 report.  On page 9 of Mr. McCarter's report --
10 well, maybe it isn't -- I may have the page
11 number incorrect.  Maybe it's Paragraph 74.
12         MR. HINDERAKER:  Do you mind if I
13 help out by just -- I'd look at your footnote 84.
14         THE WITNESS:  Oh, I'm sorry.
15 Paragraph 91 on page 24.  You're correct.
16 Looking at the wrong footnote.
17         Where Mr. McCarter states, "Blaze
18 only works when it is integrated with core
19 insurance applications that have the required
20 insurance functionality and service policies,"
21 and then he identifies in Paragraph 88 above that
22 it's used in 10 of Federal's 1500 applications.
23         So I'm basically responding to what
24 Mr. McCarter writes, and then I'm explaining what
25 the term integrated -- the normal and customary

Brooks Hilliard   -   6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS   Doc. 356-1   Filed 07/19/19   Page 7 of 7

Page 177:

 1  understanding of the term integrated and core,
 2  and with relation to business applications of
 3  software.
 4  BY MR. FLEMING:
 5      Q.   And what two paragraphs are you
 6  reference, 88 and what other paragraph of
 7  Mr. McCarter's report?
 8      A.   91 on page 24.
 9      Q.   Okay.  So in response to my
10  question, what do you mean when you say
11  integrated?
12      A.   Well, I'm trying to -- I'm giving
13  the normal and customary industry understanding
14  of integrated since Mr. McCarter doesn't provide
15  that and I'm saying it normally means that a
16  component application, which would be Blaze
17  Advisor in this case, is linked into a host
18  application, here some insurance applications,
19  either the 10 referenced by Mr. McCarter or the
20  15 referenced by Ms. Pawloski, in a way that is
21  in the idea -- that in the ideal would allow
22  information to pass between them as if they were
23  a single unified application.
24          Now, this isn't always seamless.  I
25  said -- so I said depending on how seamless, how

Page 178:

 1  close to that ideal the integration is, this
 2  typically means that removal or replacement of an
 3  integrated component is likely to be difficult,
 4  time consuming and to risk endangering the
 5  operation of the host application.
 6          So I've defined what I mean by
 7  integrated since Mr. -- which I think is a normal
 8  and customary industry understanding, which is
 9  something that Mr. McCarter did not do.
10      Q.   So are you saying that the
11  applications are core or the application
12  components are core?
13      A.   Well, let's look at what McCarter
14  says.  And he says that Blaze only works when it
15  is integrated with core insurance applications,
16  what I refer to as the host applications where I
17  talk about integrated, that have the required
18  insurance functionality for selling and servicing
19  insurance policies.
20          So the applications would be either
21  the 10 that Mr. McCarter refers to in
22  Paragraph 88 and I think he itemizes them
23  actually in Paragraph 94 -- one, two, three,
24  four, five, six, seven, eight, nine -- yeah, he
25  itemizes them in Paragraph 94, or the 15 that

Page 179:

 1  were represented by the Chubb VP of software
 2  compliance and optimization.
 3      Q.   And my question is, in your
 4  opinion, are you saying that the applications are
 5  core or that the applications components are
 6  core?
 7      A.   I'm saying --
 8          MR. HINDERAKER:  I'm going to
 9  object to that question as vague.
10          THE WITNESS:  Hmm?
11          MR. HINDERAKER:  I object to the
12  question, as I don't understand it, as vague.
13          THE WITNESS:  Let me see if I can
14  clarify what I'm saying, is the 10 or 15
15  applications itemized by Ms. Pawloski or itemized
16  by Mr. McCarter are characterized by Mr. McCarter
17  as being core applications and he characterizes
18  them that way in Paragraph 91.
19  BY MR. FLEMING:
20      Q.   Well, there are -- you agree that
21  Blaze is only used in 10 of Federal's 1500
22  applications?
23          MR. HINDERAKER:  Objection; lack of
24  foundation.
25          THE WITNESS:  I think what I said

Page 180:

 1  is there are two different counts and there's --
 2  and Mr. McCarter doesn't account for the
 3  difference between the 15 identified by
 4  Ms. Pawloski and the 10 identified in his report.
 5  So I don't know whether the 10 or the 15 is
 6  correct.  And neither does apparently
 7  Mr. McCarter.
 8  BY MR. FLEMING:
 9      Q.   Okay.  I'm asking you a different
10  question.
11          Do you agree with Mr. McCarter's
12  statement that Blaze is only used in 10 of
13  Federal's 1500 applications?
14      A.   No.  It may be 15 or Ms. Pawloski
15  might be wrong.
16      Q.   I see.  So you don't disagree that
17  there's 1500 applications, but you disagree as to
18  whether there's 10 or 15 that use Blaze, correct?
19          MR. HINDERAKER:  Objection; lack of
20  foundation.
21          THE WITNESS:  I don't know whether
22  the 1500 is an approximate -- I'd be surprised if
23  it was exactly 1500, so I expect that's an
24  approximation.  I don't know how accurate it is.
25  BY MR. FLEMING: