# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054(WMW/DTS) |
| Plaintiff, | ) ) | **Jury Trial Demanded** |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY a Pennsylvania corporation, | ) ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF WILLIAM MCCARTER

# TABLE OF CONTENTS

I.    Introduction. ................................................................................................. 1

II.   Applicable legal standard. ............................................................................ 2

    A.   Federal bears the burden to show admissibility. ................................. 2

    B.   Expert testimony without a factual basis is not helpful to the trier of fact. ..................................................................................................... 3

    C.   General testimony based on "experience" is improper *ipse dixit* testimony. ........................................................................................... 4

    D.   Expert testimony based on an incorrect legal standard is inadmissible. ...................................................................................... 6

III.  Mr. McCarter's opinions challenging FICO's disgorgement claim are inadmissible. ................................................................................................ 7

    A.   Section 504(b) of the Copyright Act sets forth the statutory burdens for disgorgement of Federal's profits. .................................................. 7

    B.   Mr. McCarter's opinions on Blaze Advisor's connection to Federal's gross revenue and the portion of profits attributable to infringement are devoid of any factual basis or methodology of analysis; they are merely *ipse dixit*. ................................................................................ 8

        (1)   Mr. McCarter's opinions regarding Federal's "core competencies" lack a case-specific factual basis and are proffered without any methodology of analysis. ........................... 10

        (2)   Mr. McCarter's opinions about "bad business rules" lack a case-specific factual basis and are proffered without any methodology of analysis. ................................................................ 11

        (3)   Mr. McCarter's opinions regarding customer purchasing preferences lack a case-specific factual basis and are proffered without any methodology of analysis. ........................... 13

        (4)   Mr. McCarter's opinions about Federal's business model are untethered from case-specific facts. ................................................ 14

        (5)   Mr. McCarter's opinions about the qualitative and quantitative use of Blaze Advisor lack a case-specific factual analysis and are *ipse dixit*. ............................................................... 17

    C.   Mr. McCarter offers no opinion on Federal's "deductible expenses"; any such testimony must be excluded. ...................................................... 19

D.    Mr. McCarter's opinions regarding apportionment of Federal's profits to factors other than infringement are unsupported, unquantified, and too generalized to be helpful to the jury.........................19

    (1)    Mr. McCarter's apportionment opinions are mere speculation; they fail to provide the jury a basis to apportion Federal's profits. .......................................................................................19

    (2)    McCarter's apportionment opinions related to "efficiencies" lack case-specific factual basis or methodology of analysis...........21

IV.    Mr. McCarter's opinions on non-infringing alternatives to Blaze Advisor are based on legally irrelevant considerations—contrary to applicable law—and must be excluded. ...............................................................24

A.    Mr. McCarter's use of the patent law "non-infringing alternatives" concept is contrary to law under the Copyright Act. ..................................25

B.    Mr. McCarter's application of the "non-infringing alternatives" concept is unsupported by any methodology or case-specific facts. ..........27

C.    Mr. McCarter's "non-infringing alternative" opinion is irrelevant to the determination of disgorged profits. .......................................................29

V.    Conclusion. ..........................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Med. Sys. v. Laser Peripherals, LLC*,
  712 F. Supp. 2d 885 (D. Minn. 2010) ............................................................................. 6

*Andreas v. Volkswagen of Am., Inc.*,
  336 F.3d 789 (8th Cir. 2003) ............................................................................. 7, 19

*Apple, Inc. v. Samsung Elecs. Co.*,
  No. 11-CV-01846, 2012 U.S. Dist. LEXIS 90877 (N.D. Cal. June 29,
  2012) ............................................................................. 6

*Aviva Sports, Inc. v. Fingerhut Direct Mktg.*,
  829 F. Supp. 2d 802 (D. Minn. 2011) ............................................................*passim*

*C.R. Bard, Inc. v. Bos. Sci. Corp.*,
  99-1304, 2000 U.S. App. LEXIS 16090 (Fed. Cir. July 7, 2000) ............................... 27

*Design Ideas, Ltd. v. Things Remembered, Inc.*,
  No. 07-3077, 2009 U.S. Dist. LEXIS 38374 (C.D. Ill. May 6, 2009) .................. 18, 20

*EZ Dock, Inc. v. Schafer Sys.*,
  No. 98-2364, 2003 U.S. Dist. LEXIS 3634 (D. Minn. March 8, 2003) ....................... 4

*Fahmy v. Jay Z*,
  07-cv-5715, 2015 U.S. Dist. LEXIS 129446 (C.D. Cal. Sept. 24, 2015) ........ 18, 21, 23

*Gregerson v. Vilana Fin., Inc.*,
  No. 06-1164 ADM/AJB, 2008 U.S. Dist. LEXIS 11727, at *13 (D.
  Minn. Feb. 15, 2008) ............................................................................. 29

*Insignia Sys. v. News Am. Mktg. In-Store, Inc.*,
  2011 U.S. Dist. LEXIS 5558 ............................................................................. 5, 23

*Joiner*, 522 U.S. at 146 ............................................................................. 13

*Kapps, M.D. v. Biosense Webster*, *Inc.*,
  813 F. Supp. 2d 1128 (D. Minn. 2011) ............................................................................. 4

*Kaufman Co. v. Lantech, Inc.*,
  926 F.2d 1136 (Fed. Cir. 1991) ............................................................................. 27

*Khoury v. Philips Med. Sys.*,
614 F.3d 888 (8th Cir. 2010) ................................................................. 3

*M2M Sols. LLC v. Motorola Sols., Inc.*,
No. 12-33-RGA, 2016 U.S. Dist. LEXIS 22944 (D. Del. Feb. 25, 2016) .................. 26

*Meds. Co. v. Mylan Inc.*,
No. 11-cv-1285, 2014 U.S. Dist. LEXIS 38714 (N.D. Ill. March 25,
2014) ........................................................................................... 6

*N. Star Mut. Ins. Co. v. Zurich Ins. Co.*,
269 F. Supp. 2d 1140 (D. Minn. 2003) ....................................................... 3

*Noskowiak v. Bobst Sa*,
No. 04-C-0642, 2005 U.S. Dist. LEXIS 19536 (E.D. Wis. Sept. 2, 2005) ................. 6

*Oracle Am., Inc. v. Google Inc.*,
No. C 10-03561, 2011 U.S. Dist. LEXIS 136172 (N.D. Cal. Nov. 28,
2011) .......................................................................................... 26

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
575 F.2d 1152 (6th Cir. 1978) ............................................................... 25

*Polski v. Quigley Corp.*,
538 F.3d 836 (8th Cir. 2008) ................................................................. 3

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
606 F.3d 262 (6th Cir. 2010) ................................................................. 4

*Roper v. Kawasaki Heavy Indus., Ltd.*,
No. 1:13-CV-03661-ELR, 2015 U.S. Dist. LEXIS 187419 (N.D. Ga.
June 29, 2015) ................................................................................. 26

*Rottlund Co. v. Pinnacle Corp.*,
No. 01-1980, 2004 U.S. Dist. LEXIS 16723 (D. Minn. Aug. 20, 2004) ................. 3, 6

*Sanny v. Trek Bicycle Corp.*,
No. 11-2936 ADM/SER, 2013 U.S. Dist. LEXIS 65559, at *47 (D.
Minn. May 8, 2013) ........................................................................... 5

*Somnis v. Country Mut. Ins. Co.*,
840 F. Supp. 2d 1166 (D. Minn. 2012) ....................................................... 5

**Statutes**

17 U.S.C. 504(b) ...........................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii) ................................................................. 4

Fed. R. Evid. 402 ....................................................................................... 6

Fed. R. Evid. 403 .................................................................................. 6, 29

Fed. R. Evid. 702 ............................................................................ 2, 3, 5, 6

## I.      Introduction.

This case is about the breach of a Blaze Advisor software license agreement ("Agreement") between Fair Isaac Corporation ("FICO" or "Plaintiff") and Chubb & Son, a division of Federal Insurance Company, and the resulting copyright infringement by Federal Insurance Company and ACE American Insurance Company (collectively "Federal"). Blaze Advisor is a decision management tool that automates business decisions. Defendants use Blaze Advisor to automate decisions related to the underwriting and sale of insurance. Federal's proposed industry expert, William McCarter, seeks to opine on (1) FICO's claim for recovery of profits; and (2) "the use of Blaze Advisor in conducting Federal's day-to-day insurance business and the role that Blaze has on Federal's insurance revenue and profits." (Kliebenstein Decl. Ex. 1 ("McCarter Rep."), ¶5.)[1]

Mr. McCarter states five primary opinions in his expert report:

1. Federal generates revenue and profits using its core competencies—people, products/processes, and technology. (*Id.* ¶¶21-22, 33, 105, 115-116, 129, 145, Appendix B (¶¶155-158).)

2. Blaze Advisor, at most, contributes to efficiencies, which did not contribute to revenue growth. (*Id.* ¶¶23, 40-43, 60, 127-128, 134, 139-140.)

3. Blaze Advisor did not contribute to revenue because Federal implemented "bad business rules" that led to a decrease in profit (*Id.* ¶23, 75, 82, 126.)

4. Federal had many alternatives to Blaze Advisor including: Excel spreadsheets, manual lookup procedures, hard-coding rules, and competitors' rule engine software systems. (*Id.* ¶¶26, 28, 76-80, 103.)

---

[1] For the Court's convenience, FICO has provided the Expert Report of R. Bickley (Bick) Whitener, the expert report Mr. McCarter challenges. (Kliebenstein Decl. Ex. 2.)

5. When purchasing products, customers do not care about the use of Blaze Advisor. (*Id.* ¶27.)

In an attempt to support these conclusions, Mr. McCarter offers additional opinions about Federal's business model (*id.* ¶¶54-67), the proportion of Federal's business rules implemented by Blaze Advisor (*id.* ¶74), and Federal's internal software applications and third party software usage (*id.* at Appendix A).

Mr. McCarter's testimony should be excluded because (1) he does not have a sufficient case-specific factual basis upon which to apply his general experience to this case; and (2) a methodology of analysis is absent. As a result, these opinions are simply Mr. McCarter's say-so untethered from the facts of the case. In addition, his opinions are premised on an incorrect legal standard; they are irrelevant and unhelpful to the jury. The Court should exercise its gatekeeping role and exclude these portions of Mr. McCarter's testimony.

## II. Applicable legal standard.

### A. Federal bears the burden to show admissibility.

Expert testimony is not automatically admissible. Rather, the party seeking to rely on such testimony must prove the expert's opinions have a reliable evidentiary basis and the opinions are relevant to the issues of the case. *See* Fed. R. Evid. 702; 703. Rule 702 requires that expert opinions (1) help the trier of fact to understand the evidence or to determine a fact in issue, and (2) are based on sufficient facts or data. Fed. R. Evid. 702.

The proponent of the expert testimony bears the burden of demonstrating by a preponderance of the evidence that:

- The expert is *qualified* – whether through knowledge, skill, experience, training, or education;

- The proposed testimony is *relevant* – it will assist the trier of fact in understanding the evidence or determining a fact in issue with respect to the correct legal standard; and

- The testimony is *reliable* – it is based on sufficient facts or data and is the product of reliable principles or methods.

*Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010); *N. Star Mut. Ins. Co. v. Zurich Ins. Co.*, 269 F. Supp. 2d 1140, 1147 (D. Minn. 2003); *Rottlund Co. v. Pinnacle Corp.*, No. 01-1980, 2004 U.S. Dist. LEXIS 16723, at *86-88 (D. Minn. Aug. 20, 2004). As the proponent of Mr. McCarter's testimony, Federal bears the burden of proving *Daubert's* exacting standards are met. *Polski v. Quigley Corp.*, 538 F.3d 836, 841 (8th Cir. 2008). Federal cannot meet its burden because Mr. McCarter's opinions lack sufficient facts, lack a methodology of analysis, and are based on an incorrect legal standard.

### B.     Expert testimony without a factual basis is not helpful to the trier of fact.

To be admissible, an expert's opinion must be based on sufficient case-specific facts or data. Fed. R. Evid. 702(b). Expert testimony without sufficient factual support does not satisfy the reliability or helpfulness prong of Rule 702. *See id.*; *Aviva Sports, Inc. v. Fingerhut Direct Mktg.*, 829 F. Supp. 2d 802, 825-27 (D. Minn. 2011) (excluding expert testimony where expert rendered conclusion regarding consumer's impressions but expert had no factual basis to form conclusion and further noting expert failed to account for other factors that could affect consumers' purchasing decisions); *N. Star Mut.*, 269 F.

Supp. 2d at 1147-48; *EZ Dock, Inc. v. Schafer Sys.,* No. 98-2364, 2003 U.S. Dist. LEXIS 3634, at *7 (D. Minn. March 8, 2003) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Aviva Sports*, 829 F. Supp. 2d at 826-27 (excluding expert testimony as *ipse dixit* where expert relied on experience but failed to link to the case).

In practice, expert opinion must "sufficiently connect[] the proposed testimony with the facts of the case." *EZ Dock*, 2003 U.S. Dist. LEXIS 3634, at *5-6; *Kapps, M.D. v. Biosense Webster*, *Inc.*, 813 F. Supp. 2d 1128, 1148-49 (D. Minn. 2011) (requiring expert connect his opinion to the underlying data). Otherwise, the proffered opinion is not helpful to the jury.

C. **General testimony based on "experience" is improper *ipse dixit* testimony.**

A report must contain a "complete statement" of the expert's opinions, "the basis and reasons for them," and "the facts or data considered" by the expert in forming the opinions. Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). The report must outline the reasoning, including how and why the expert reached a particular result. Opinions that simply state a conclusion are not helpful to the jury. *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005)) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.")

Where an expert is relying on experience alone as support for a stated conclusion, the expert must explain: 1) how that experience leads to the conclusion reached, 2) why that experience provides a sufficient basis for the opinion, and 3) how the experience is reliably applied to the facts.  Fed. R. Evid. 702 advisory committee's note (2000). Without an adequate explanation of why and how an expert's experience supports a conclusion, such testimony is unhelpful to the jury and should be excluded.  *Aviva Sports, Inc.*, 829 F. Supp. 2d at 826-27 (excluding expert testimony based primarily on experience as unhelpful because expert failed to explain how experience led to conclusion, why experience provided sufficient basis for opinion, and how experience applied to facts).

An expert may educate the jury about *general* principles under Rule 702.  *Insignia Sys. v. News Am. Mktg. In-Store, Inc.*, 2011 U.S. Dist. LEXIS 5558, at *7-13 (D. Minn. Jan 4, 2011 (expert could testify generally about purchasing behavior of consumer packaged goods companies but excluded testimony as to specific likely reactions of consumer packaged goods companies to Defendant's communication).  An expert, however, may not may not testify to conclusions the jury is equally capable of reaching. *Sanny v. Trek Bicycle Corp.*, No. 11-2936 ADM/SER, 2013 U.S. Dist. LEXIS 65559, at *47 (D. Minn. May 8, 2013) ("A jury could, and should, draw its own conclusions about the testimony and data using common sense."); *see also Somnis v. Country Mut. Ins. Co.*, 840 F. Supp. 2d 1166, 1173 (D. Minn. 2012) (same).

### D.   Expert testimony based on an incorrect legal standard is inadmissible.

Testimony based on an erroneous understanding of the applicable legal standard is unhelpful to the jury. *Rottlund Co.*, 2004 U.S. Dist. LEXIS 16723, at *86-88 (finding testimony regarding originality unhelpful where it was based on wrong legal standard); *Am. Med. Sys. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 900-01 (D. Minn. 2010); *see also Meds. Co. v. Mylan Inc.*, No. 11-cv-1285, 2014 U.S. Dist. LEXIS 38714, at *11-15 (N.D. Ill. March 25, 2014) (excluding expert testimony on topic because opinions were legally flawed and therefore not helpful to the jury); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2012 U.S. Dist. LEXIS 90877, at *27-31 (N.D. Cal. June 29, 2012) (excluding expert testimony as unreliable and unhelpful under Rule 702 and prejudicial under Rule 403 where damages analyses were contrary to law).

Opinions based on a flawed understanding of the law are irrelevant, likely to confuse the jury, and cause prejudice to the other party. *Noskowiak v. Bobst Sa*, No. 04-C-0642, 2005 U.S. Dist. LEXIS 19536, at *14-20 (E.D. Wis. Sept. 2, 2005) (looking to Rules 402 and 403, explaining that expert testimony based on an incorrect legal standard is irrelevant and may confuse the jury, noting that cross examination will not cure an expert's application of the wrong standard, and excluding such testimony). Testimony premised on an erroneous understanding of the law is properly excluded under Rules 402, 403, and 702.

**III.     Mr. McCarter's opinions challenging FICO's disgorgement claim are inadmissible.**

**A.     Section 504(b) of the Copyright Act sets forth the statutory burdens for disgorgement of Federal's profits.**

Under § 504(b), a "copyright owner is entitled to recover … any profits of the infringer that are attributable to the infringement …" Section 504 lays out a burden-shifting mechanism to determine an infringer's profits "attributable to the infringement." 17 U.S.C. § 504(b); *see also Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 795 (8th Cir. 2003).

First, the "copyright owner is required to present proof only of the infringer's gross revenue." *Id.* Then the burden shifts to the infringer to (1) present evidence of the "deductible expenses" to prove profits derived from the gross revenue, and (2) "the elements of profit attributable to factors other than the copyrighted work." *Id.*; *see also Andreas*, 336 F.3d at 795.  Mr. McCarter's proffered opinions span each element of the § 504(b) determination.  They should be excluded because they fail to meet the *Daubert* standard.  Mr. McCarter's opinions as to each aspect of the calculation are inadmissible. The Court should exclude paragraphs 21-30, 44-99, 101-105, 113-121, 126-140, 145, 147, 150-152, 154-158, and Appendix A.

7

### B.   Mr. McCarter's opinions on Blaze Advisor's connection to Federal's gross revenue and the portion of profits attributable to infringement are devoid of any factual basis or methodology of analysis; they are merely *ipse dixit*.

Mr. McCarter's opinions conflate FICO's burden to prove the Defendants' gross revenue and Defendant's burden to prove what portion of profit, if any, is not attributable to infringement.  He addresses the parties' different burdens of proof without distinction:

21.   Federal generates revenue and profits using its core competencies – not Blaze Advisor software, or any other software technology. Federal provides all the insurance expertise and makes all business decisions that are required to generate gross written premium **revenue and profits**. Additionally, Federal takes all the financial risk related to the insurance policies including future loss obligations.

23.   … Federal's use of Blaze in connection with some of its software applications does not contribute to Federal's overall gross written premium **revenue and profit** in any appreciable sense….Federal, at times, implemented rules that reduced gross premium revenue and revenue growth based on its underwriting requirements. Federal also had, at times, quality issues with rules that led to bad decisions. A fast decision using a bad business rule does not mean a good business decision that leads to gross written premium revenue and revenue growth.

30.   Federal's **revenue and profits** are not attributable to its use of a single piece of software like Blaze in a complex system that ultimately drives Federal's financial results.

120.   Federal's gross written premium **revenue and profits** are the result of Federal's insurance knowledge, expertise, and access to insurance markets; its insurance products, business logic, and data; and its complex harmonization of individual technologies and production skills used to conduct insurance business.

121.   Federal did not **profit** from the use of Blaze. Federal **profits** are from its core insurance business. Federal is not a software company and would not benefit as a software company from a software breach.

122.   Mr. Whitener's overall opinion is that Blaze contributed to gross written premium revenue generation and generated profits for Federal. I

disagree with Mr. Whitener's opinion. Federal's **revenue and profits** are not attributable to Federal's use of Blaze.

(*See, e.g.*, McCarter Rep., ¶¶21, 23, 30, 120-122 (emphasis added).)

Mr. McCarter's proffered reasons for these opinions, whether to challenge FICO's burden of proof or directed to Defendants' burden of proof, are the same.  In every instance, the opinion is not tethered to case-specific facts; there is no methodology of factual analysis; and the opinion is merely the *ipse dixit* conclusion of Mr. McCarter.

Mr. McCarter opines:

- Federal's "core competencies" of people, process, and technology contributes to Federal's revenues and profits;

- Federal's use of "bad business rules" in connection with Blaze Advisor negatively influence Federal's revenues and profits;

- Blaze Advisor is irrelevant to Federal's customers' purchasing preferences;

- Federal's business activities are similar to an IBM insurance industry business activity model; and

- Federal's use of Blaze Advisor is insignificant because Federal automates only a small portion of its business rules within Blaze Advisor and utilizes 1,000 software applications and 40 third party technologies.

(*See generally* McCarter Rep., ¶¶21-30.)  Mr. McCarter relies on nothing more than his *ipse dixit* "experience."  These opinions must be excluded.

> **(1)    Mr. McCarter's opinions regarding Federal's "core competencies" lack a case-specific factual basis and are proffered without any methodology of analysis.**

Mr. McCarter proffers his opinion that Federal generates revenue using its "core competencies" without any analysis of case-specific facts.  Mr. McCarter opines Federal's "core competencies," not Blaze Advisor, contribute to Federal's revenues:

> 21.    Federal generates revenue and profits using its core competencies – not Blaze Advisor software, or any other software technology. Federal provides all the insurance expertise and makes all business decisions that are required to generate gross written premium revenue and profits. Additionally, Federal takes all the financial risk related to the insurance policies including future loss obligations.
>
> 22.    FICO does not have an insurance core competency. FICO makes no decisions that result in improved premium revenue and assumes no financial risk on the policies that are processed by software applications that may have used Blaze as a technology. Blaze is a small technology of a very large company ecosystem of people, process, and technology.

(McCarter Rep., ¶¶21-22; *see also id.* ¶¶29, 44-53, 68, 70-72, 83-84, 97, 99, 103-104, 114-116, 118-121, 129, 132-133, 135-136, 138, 150-152, Appendix B (¶¶155-158).)

Mr. McCarter offers no facts, methodology, or analysis for arriving at his "core competencies" opinions.  Mr. McCarter confirmed in his deposition:

> Q. And what was your methodology to arrive at the opinions regarding what are Federal's core competencies?
>
> A. Based on my experience. Evaluating what they do.
>
> Q. Did you speak to anyone at Federal about their core competencies?
>
> A. Not directly, but indirectly by talking about their technology, their underwriting, their – the markets they were in.

(Kliebenstein Decl. Ex. 3 ("McCarter Depo. Tr.") 101:20-102:3.)

Mr. McCarter's Report is silent regarding any process used to arrive at these opinions.  He identifies no case-specific facts that tie his general experience to this case. *See* paragraphs 21-22, 33, 105, 115-116, 129, and Appendix B (¶¶155-158).  His deposition confirmed there was no analysis of case-specific facts that informs his opinions. Mr. McCarter's "core competencies" opinions should be excluded, including paragraphs 21-22, 29, 44-53, 68, 70-72, 83-84, 97, 99, 103-104, 114-116, 118-121, 129, 132-133, 135-136, 138, 150-152, 154, 156-158.

> **(2)     Mr. McCarter's opinions about "bad business rules" lack a case-specific factual basis and are proffered without any methodology of analysis.**

Mr. McCarter opines Blaze Advisor does not contribute to growth because Federal implemented "bad business rules." (McCarter Rep., ¶ 23, 73, 75, 81-82, 126.) Mr. McCarter's opinions are untethered from any case-specific facts. Mr. McCarter opines:

> 23.     … Federal, at times, implemented rules that reduced gross premium revenue and revenue growth based on its underwriting requirements. Federal also had, at times, quality issues with rules that led to bad decisions. A fast decision using a bad business rule does not mean a good business decision that leads to gross written premium revenue and revenue growth.

> 75.     … If Federal loads inaccurate business rules, the decision will not provide the intended results. Federal can potentially lose gross written premium revenue and/or incur losses from using Blaze with inaccurate business rules. For example; if business rule is miscoded and allows a decision to approve a high risk driver for an auto policy, the company would not generate enough gross written premium relative to the risk.

> 82.     … If Federal loads a business rule that causes Federal to lose policies or increase claims, Federal would suffer financial harm.

> 126.    … The use of Blaze can cause insurance companies to lose premium revenue because the quality of business rule decides whether a fast decision

11

is a good decision. If Federal loads inaccurate business rules, the decision will not provide the intended results.

Mr. McCarter has no evidence Federal implemented "bad business rules."

Federal's implementation of "bad business rules" is a hypothetical. When asked his basis, Mr. McCarter admitted he had no case-specific facts to support his opinion:

> Q. So this sentence, "Federal at times implemented rules that reduced gross written premium revenue," –
>
> A. Um-hm.
>
> Q. – that's a hypothetical?
>
> **A.** It's based on my experience.
>
> Q. Because you don't know one way or the other whether that actually happened at Federal?
>
> **A. I don't have the evidence of the number of policies or the rates. No.**

(McCarter Depo. Tr. 118:8-17 (emphasis added); *see also* 118:18-119:4.) He further testified:

> Q. So other than the generalized corporate loss ratio, you don't have any specific evidence of your opinions in Paragraph 126?
>
> **A. No**.

(*Id.* 222:21-24; *see also id.* 116:1-4.)

Whether Federal ever implemented "bad business rules" (an irrelevant question to disgorgement of Defendants' profits) is outside the scope of Mr. McCarter's opinions. He has no basis to say one way or the other. He did not consider any case-specific facts and, consequently, there is no analysis leading to his conclusions "bad business rules" were implemented. His opinion exists entirely in the hypothetical realm detached from

case-specific facts.[2]  Hypotheticals are unhelpful to the jury.  The case should be decided

on its facts.  Additionally, nothing other than his *ipse dixit* supports the hypothetical.  *See*

*Joiner*, 522 U.S. at 146; *Aviva Sports, Inc.*, 829 F. Supp. 2d at 826-27.  The Court should

exclude paragraphs 23, 73, 75, 81-82, and 126.

> ### (3)   Mr. McCarter's opinions regarding customer purchasing preferences lack a case-specific factual basis and are proffered without any methodology of analysis.

Mr. McCarter's opinion that customers are not influenced by Blaze Advisor when

purchasing insurance products, and that agents and brokers are not influenced by the use

of Blaze Advisor in the sale of insurance products is devoid of any analysis of case-

specific facts. Mr. McCarter opines:

> 27.   Further, it is my opinion that when purchasing insurance products customers are not influenced by and do not care what rules management system the insurance company uses. Blaze software is invisible to agents and brokers that may potentially use an application that also uses Blaze as a technology.
>
> 52.   Federal's organization is complex and large and made up of insurance experts that make all the business rules and decisions relative to its business operations.  FICO does not provide any insurance knowledge to support Federal's business operation. FICO also does not provide any insurance business rules or decisions with Blaze. Additionally, Blaze is not visible to operational employees of Federal and not visible to agents and brokers that interact with Federal employees.

(McCarter Rep., ¶¶27, 52; *see also id.* ¶¶96, 104.) Mr. McCarter confirmed he conducted

no analysis of case-specific facts to inform these opinions:

---

[2] To the contrary, evidence shows Federal's business rules are outperforming its competition. (Kliebenstein Decl. Ex. 4 at 5-6, 8 (2018 Annual Report); *id.* Ex. 5 at 65 (identifying underwriting profit at 16%) (Bakewell Expert Report).)

Q. And you haven't done any investigation to determine what percentage of that experience is related to Blaze Advisor; correct?

**A. I have not**.

(McCarter Depo. Tr. 112:11-14.)

Mr. McCarter did nothing to inform his opinions that the benefits Blaze Advisor provides to the customer experience and the sale of insurance (i.e. faster quotes, more efficient data collection methods, etc.) do not influence sales.  He proffers the negative opinion based on nothing other than it is his opinion.  *See Aviva Sports, Inc.*, 829 F. Supp. 2d at 826-27. Paragraphs 27, 52, 96, and 104 should be excluded.

### (4)     Mr. McCarter's opinions about Federal's business model are untethered from case-specific facts.

Mr. McCarter's opinions about the scope of use of Blaze Advisor in Federal's business are untethered from case-specific facts. His testimony regarding paragraphs 54 through 67 should be stricken.

Mr. McCarter opines on Federal's business processes using a generalized chart purportedly prepared by IBM obtained by Mr. McCarter online, not a Federal business document:



(McCarter Rep., ¶54.)  He then opines on the "minimal" use of Blaze Advisor in the

business activities depicted in the IBM graphic. (*Id.* ¶¶55-67.)  Mr. McCarter concludes:

> 59.    Blaze is utilized, sometimes minimally, in a small number of work
> items. FICO provides a view of where Blaze maps to the business processes
> (or work items) of an insurance company.[3] Blaze is not a significant part of
> Federal's business activities based on my review of the use of Blaze.

(*Id.* ¶59.)

---

[3] Mr. McCarter cites an April 2010 presentation by Chubb employee Henry Mirolyuz
identifying Chubb's business functionalities linked to Blaze Advisor.  (McCarter Rep.,
¶59 (citing FED000171 at 11 (included as Kliebenstein Decl. Ex. 6)).)  Mr. McCarter
offers no justification for attributing this document to FICO when the presentation
undisputedly contains Chubb's logo and Chubb's employee on the cover page.
Moreover, Mr. McCarter ignores the further expansion of Federal's use of Blaze Advisor
between April 2010 and at least March 30, 2016, the date of termination.

The IBM graphic and Mr. McCarter's opinion are untethered from case-specific facts.  There is no evidence this chart is normally used by professionals in his field.  Mr. McCarter admits he does not know if the IBM "model" is the same as Federal's internal organization:

> Q. Did you confirm with anyone at Federal that they do in fact do all of these work items and activities?
>
> A. No I did not. I did not.
>
> Q. And did you confirm with anyone from Federal that in fact each work item within an activity group is associated with business rules and decisions made by employees within the Federal business operation?
>
> A. No.

(McCarter Depo. Tr. 162:24-163:8.)  Mr. McCarter concedes these opinions are not based on the facts of the case:

> Q. So this is not a diagram of Federal specifically?
>
> A. No. It's -- correct. It's an industry model for a property and casualty insurance company.
>
> Q. And did you -- is it your opinion that this model applies to Federal?
>
> A. Yes.
>
> Q. And how -- how did you arrive at that opinion?
>
> **A. Based on my experience. …**

(*Id.* 161:1-8 (emphasis added).)

There is no case-specific factual analysis to which Mr. McCarter applies his general experience.  He assumes the IBM model has relevance to the business of Federal

without a factual basis to do so.  These opinions are pure *ipse dixit*.  Paragraphs 54-67

should be excluded.

> **(5)   Mr. McCarter's opinions about the qualitative and quantitative use of Blaze Advisor lack a case-specific factual analysis and are *ipse dixit*.**

Mr. McCarter opines:

69.     Federal is a global company with over 35,000 employees, locations, insurance products, and distribution channels. Federal performs thousands of business activities and work items to sell and services insurance policies. Each activity potentially has business rules and decisions. Only a fraction of Federal's business rules and decisions were ever loaded into Blaze to assist Federal with employees work items of its business. The use of Blaze within Federal is in a limited set of activities and insurance products. Blaze's use is relatively small based on my experience with 7 insurance companies in North American that are part of the Allianz Group and with a number of insurance clients that I have worked with in the past 22 years.

74.     Federal has only automated a small amount of the business rules and decisions that take place every day to conduct business. Blaze plays a small role in the business processing ecosystem at Federal.

87.     Federal has approximately 1500 applications that make up Marketing, External Facing, Policy Administration, Chubb Portfolio, Reporting, Corporate Reporting that are used for Commercial and Specialty insurance business.

88.     Blaze is only used in 10 of Federal's 1,500 applications. Additionally, each application is made up of multiple internally developed programs and potentially uses Third-party technologies. It is common for insurance companies to leverage functionality from third-party software providers who specialize in certain software functions.

89.     Based on my review of Third-Party technologies used by Federal, Blaze is 1 of 45 Third-Party software technologies used by Federal.

90.     Based on my review, I am estimating that Federal has a total of 1,545 technologies that are used to build and implement its business applications. Blaze is 1 technology of Federal's 1,545 technologies or 0.06%.

(McCarter Rep., ¶¶69, 74, 87-90; *see also id.* ¶¶24, 30, 59, 85-86, 91-95, 97-98, 101-105, 117, 147, 150, 155, Appendix A.)

Mr. McCarter conceded he did not consider any case-specific facts in forming these opinions.

> Q. So you don't have any documentary support for your opinion that only a fraction of Federal's business rules and decisions were ever loaded into Blaze; right?
>
> A. **It's in my experience, based on my experience** of operating all these systems for an insurance company.

(McCarter Depo. Tr. 182:23-183:4 (emphasis added); *see also id.* 184:16-185:6.)

Opining on arbitrary, unconnected values is not helpful to the jury. *See Fahmy v. Jay Z*, 07-cv-5715, 2015 U.S. Dist. LEXIS 129446, at *9 (C.D. Cal. Sept. 24, 2015). Mr. McCarter's opined values—35,000, 1500, 1545, and 45—do not assist the jury in understanding Blaze Advisor's contribution to Federal's revenues and profits. Mr. McCarter offers no comparative analysis to link these numbers to Federal's revenues or profits. (*See* McCarter Rep., ¶¶ 69, 74, 87-90.) McCarter offers no opinion to help the jury attribute Federal's revenues to Federal's infringement. *See Design Ideas, Ltd. v. Things Remembered, Inc.*, No. 07-3077, 2009 U.S. Dist. LEXIS 38374, at *13-14 (C.D. Ill. May 6, 2009) (excluding unhelpful expert opinion where jury was left to speculate when expert offered no methodology to quantitatively measure profits calculation) These opinions are untethered from any case-specific facts. Testimony regarding various values unrelated to the issue of profits to be disgorged from the use of Blaze Advisor (not all Federal revenue) is unhelpful to the jury and likely to only cause confusion. Paragraphs

24, 30, 59, 69, 74, 85-95, 97-98, 101-105, 117, 147, 150, 155, and Appendix A should be excluded.

**C.     Mr. McCarter offers no opinion on Federal's "deductible expenses"; any such testimony must be excluded.**

Mr. McCarter purports to offer opinions related to Federal's profits.  (McCarter Rep., ¶ 5.)  Under § 504(b), the determination of profits requires evidence of "deductible expenses."  17 U.S.C. § 504(b); *see also Andreas*, 336 F.3d at 795.  Mr. McCarter offers no analysis on deductible expenses, rendering any testimony about profits unrelated to § 504(b) and unhelpful to the jury. To the extent Mr. McCarter's opinions are directed to profits (rather than the apportionment of profits not attributable to infringement discussed above), they should be excluded.  He offers no analysis of deductible expenses.

**D.     Mr. McCarter's opinions regarding apportionment of Federal's profits to factors other than infringement are unsupported, unquantified, and too generalized to be helpful to the jury.**

**(1)     Mr. McCarter's apportionment opinions are mere speculation; they fail to provide the jury a basis to apportion Federal's profits.**

Mr. McCarter's opinions directed to the apportionment of Federal's profits attributable to non-infringing factors should be excluded because they lack a case-specific factual basis, have no methodology of analysis and are nothing more than *ipse dixit* is addressed above.  His opinions directed to apportionment should be excluded for a second reason.  His listing of various non-infringing factors that could contribute to profits are offered without any quantification or actual apportionment.  There is no case-

specific factual analysis.  The opinions are speculation.  (*See, e.g.*, McCarter Rep., ¶¶21, 29-30, 120, 122, 129, 134, 137-140, 154.)

Courts have excluded experts from proffering generalized and unhelpful opinions regarding apportionment.  In *Design Ideas, Ltd. v. Things Remembered, Inc.*, No. 07-3077, 2009 U.S. Dist. LEXIS 38374, at *13-14 (C.D. Ill. May 6, 2009), the court excluded portions of defendant's damages expert's apportionment opinion because it was unhelpful to the jury. In *Design Ideas*, defendant's expert opined on factors, besides copyright infringement, that contributed to defendant's profits.  The expert failed to provide an "opinion concerning the *portion* of the profits that were attributable" to other factors. *Id.* (emphasis added). The court excluded the expert's opinion as unhelpful because the opinion amounted to "general observations." *Id*. Without the "correct percentage of total revenues or profits that would be attributable to" other factors, "the jury would be left to speculate." *Id*.

Here, Mr. McCarter's opinions (*see, e.g.*, McCarter Rep., ¶¶21, 29-30, 120, 122, 129, 134, 137-140, 154) are no different from the unhelpful opinions excluded in *Design Ideas*.  *See* 2009 U.S. Dist. LEXIS 38374 at *13-14.  Mr. McCarter describes other factors to which Federal's profits could be attributable. He offers no opinion on "the *portion* of the profits that were attributable" to such other factors. He offers no calculations, quantifications, or percentages that would assist the trier of fact. Instead, he offers "general observations" and leaves the jury to speculate on the impact of such factors. This is improper.  Like the court in *Design Ideas*, this Court should exclude Mr. McCarter's opinions on apportionment.

Any contention Mr. McCarter's apportionment of zero constitutes a reliable quantification helpful to the jury fails. His apportionment of zero is equally arbitrary and speculative; it too is offered in the absence of any case-specific factual analysis and without any methodology of analysis. Applying "precise percentage[s]" without means or methodology is unreliable, unhelpful, and likely to confuse the jury. *Fahmy*, 2015 U.S. Dist. LEXIS 129446, at *9 (excluding expert testimony where opinion arbitrarily assigned numerical percentages without any methodology or basis to support the percentages). Mr. McCarter's opinion on apportionment lacks any support for his purported quantification of zero.

### (2)   McCarter's apportionment opinions related to "efficiencies" lack case-specific factual basis or methodology of analysis.

McCarter's opinions on whether Federal saved expenses because of the infringing use of Blaze Advisor (i.e. whether Federal was more "efficient" in connection with the realization of gross written premium in connection with which Blaze Advisor was used) are without analysis of case-specific facts. Mr. McCarter opines:

> 60.    Federal's business activities are unique to Federal. Blaze potentially improved the efficiency of certain decisions or workflows; however, it is difficult to measure any efficiencies that Blaze may have provided to Federal's business activity.

> 127.   Mr. Whitener cites a Federal power point slide that highlights reasons for Federal adoption of Blaze. The reasons are based on efficiencies and not based on revenue generation. Additionally, while these benefits are aspirational, there is no guarantee the benefits are realized. The reasons focus on speed of decision making, reducing time, reusing rules, reducing operational costs, elevating decisions, and increasing control of decisions The efficiency benefits are only achieved if Federal's business rules are accurately implemented in Blaze.

21

128. It is my opinion, none of the efficiency benefits guarantee improvement in gross written premium revenue or revenue growth. I have seen no objective measures from Mr. Whitener that show this either. It has been my experience that efficiencies are targeted in advance, measured over time, and tied back to the actual use of software in terms of reduced hours or volumes processed. It has also been my experience that efficiencies are hard to monitor and manage without a significant up front effort to baseline the metrics that will be agreed upon between the software supplier and client.

134. Even if Federal loads accurate business rules into Blaze, the benefits are efficiencies in labor. Blaze is not attributable to the gross written premium or profits. Federal makes all the decisions that lead to revenue and profit.

(*Id.* ¶¶60, 127-128, 134; *see also* ¶¶23, 25, 113, 130-131, 139-140, 145.) This is just Mr.

McCarter's say-so devoid of any analysis of case-specific facts.

Mr. McCarter admits in his report: "[I]t is difficult to measure any efficiencies that

Blaze may have provided to Federal's business activity." (*Id.* ¶60.) Mr. McCarter

concedes he undertook no methodology of analysis to support his opinion:

Q. In Paragraph 56, you state in your report – I'm sorry, 60, Paragraph 60.

A. Okay.

Q. You state, "It is difficult to measure any efficiencies that Blaze may have provided to Federal's business activity."

A. Yes.

Q. And why is that? What's the basis for that opinion?

A. There was -- there was no methodology, there was no benchmarking, there was nothing done, and as a matter of fact, I don't know that it did create any efficiencies. I don't -- I don't think it contributed significantly to the efficiency.

Q. And what's the basis for that statement, that Blaze Advisor did not contribute significantly to efficiencies?

A. Based on how I'm seeing it used within the business processes of Federal.

**Q. But you did not undertake any effort to measure the efficiencies; correct?**

**A. Yeah.** Nor did anyone set benchmarks to provide the efficiencies.

* * * *

Q. So you wouldn't be able to quantify whether the saved expenses were zero dollars or a billion from use of Blaze Advisor; right?

* * * *

THE WITNESS: It would -- I would not be able to -- definitely would not be on the higher end of your -- your range, and I don't believe you can tie the efficiencies directly to Blaze.

(McCarter Depo. Tr. 167:8-168:5 (emphasis added), 169:3-12 (objection omitted).)

When asked for the basis for these opinions Mr. McCarter confirmed it was only his experience, not the facts of the case.

Q. Did you undertake any study to test that opinion?

A. **That's based on my experience.**

(*Id.* 234:13-14 (emphasis added); *see also id.* 65:1-11.)

Mr. McCarter's untested and unverified observations on efficiencies are not factually supported, and are unhelpful to the jury. *See Insignia Sys.*, 2011 U.S. Dist. LEXIS 5558, at *7-13; *Aviva Sports*, 829 F. Supp. 2d at 826-27. Mr. McCarter must be excluded from opining on "efficiencies" and by correlation Federal's profits, including paragraphs 25, 60, 113, 127-128, 130-131, 134, 139-140, and 145.

IV.   **Mr. McCarter's opinions on non-infringing alternatives to Blaze Advisor are based on legally irrelevant considerations—contrary to applicable law—and must be excluded.**

Mr. McCarter opines relating to three different "alternatives" he believes Federal could have used instead of Blaze Advisor:

> 26.    Blaze is analogous to an Excel spreadsheet that must be loaded with data and rules in order to generate output.

> 76.    Based on my experience, there are three alternatives for business rules management in the insurance industry: 1) manual lookup; 2) hard-coding in applications; and 3) a business rules engine.

> 77.    The first alternative is manually looking up business rules and decisions in documents as part of insurance policy processing. Underwriters create underwriting manuals that guide decisions on which policies to approve. Actuaries create rate sheets to be used by underwriters to retrieve a rate for policy coverage. Manual look-ups continue to be used by insurance companies where appropriate. Some of Federal's applications that utilize Blaze could be using a manual lookup approach today. This includes the Texas Accident Preventions System.

> 78.    The second alternative is having programmers hard-code business rules in insurance processing applications. Many policy administration systems utilize a combination of hard-coding and externalize rules systems. Again, hard-coding may be a good alternative for the appropriate application that has infrequent rule changes.

> 79.    The third alternative is a business rules engine. Business rule engines allow companies to externalize the hard-coded business rules from the insurance applications and share the rules with multiple applications in a system. Business rules engines are evolving to become a technology of Decision Management Systems and Business Process Management Systems.

> 80.    FICO Blaze competes in the business rules management system market globally. The top business rules management vendors include IBM, Oracle, and FICO. IBM leads the market with 22.45% market share followed by Oracle with 18.93% market share. FICO is third in global market share with 12.93%.

(*Id.* ¶¶26, 76-80, 104; *see also id.* ¶28.)

Federal intends to use this testimony to contend Blaze Advisor has no value and no connection to Federal's revenues and profits.  Mr. McCarter's testimony is improper. "Noninfringing alternative" is a patent law concept with no relevance to the Copyright Act's disgorgement of profits under § 504(b).  Opinions on noninfringing alternatives directed to the disgorgement of profits are premised on an incorrect legal standard.

Mr. McCarter's "noninfringing alternatives" opinions also fail to correctly apply patent law.  He undertook no analysis to determine if the alternatives were "acceptable"; meaning in patent law that they have all the benefits of Blaze Advisor.

Mr. McCarter's use of the "noninfringing alternatives" concept is merely a way to put fancy dress on the common fact that other, older technologies were used by insurance companies before the advances offered by Blaze Advisor.  This is meaningless under § 504(b), which addresses the disgorgement of profits from the infringing use of Blaze Advisor.

A.     **Mr. McCarter's use of the patent law "non-infringing alternatives" concept is contrary to law under the Copyright Act.**

Mr. McCarter (and Mr. Bakewell, Federal's damages expert in reliance on McCarter) intends to offer opinions about non-infringing alternatives,[4] in part, to support

---

[4] "Noninfringing alternatives" is a concept derived from patent law where the patentee must prove the absence of acceptable, noninfringing alternatives to recover lost profits. *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978).  The ***plaintiff's*** lost profits are at issue in a patent case.  Here, under the Copyright Act, the issue is disgorgement of ***defendant's*** profits from infringement.  While noninfringing alternatives may be relevant to proving lost sales, noninfringing alternatives have no bearing on the sales a copyright infringer actually makes and that are the subject of disgorgement.

25

Federal's defense to disgorgement of Federal's profits.  Under Section 504(b) of the

Copyright Act, FICO is entitled to Federal's profits "attributable to the infringement and

are not taken into account in computing actual damages." 17 U.S.C. § 504(b).  As the

Northern District of California Court stated, "[n]on-infringing alternatives have nothing

to do with [disgorgement]." *Oracle Am., Inc. v. Google Inc*., No. C 10-03561, 2011 U.S.

Dist. LEXIS 136172, at *16 (N.D. Cal. Nov. 28, 2011).  In *Oracle*, Google's expert

opined that the existence of noninfringing alternatives was a basis to decrease the

wrongful profits attributable to the infringement.  *Id*. The court struck all opinions that

"non-infringing alternatives should in any way affect the calculation of infringer's profits

under 17 U.S.C. 504(b)." (*Id.* at *17.)

Here, the Court should do likewise. There is no basis in law for Mr. McCarter's

non-infringing alternative opinion, rendering his opinion irrelevant and unhelpful. *See id.*

at *14-16. All opinions that non-infringing alternatives should in any way affect the

disgorgement of Federal's profits under 17 U.S.C. § 504(b), including paragraphs 26, 28,

76-80 and 104 should be excluded.[5]

---

[5] Because Federal's damages expert W. Christopher Bakewell exclusively relies on Mr.
McCarter's inadmissible noninfringing alternative opinion (Kliebenstein Decl. Ex. 5
(Bakewell Expert Report) ¶¶131-132), Mr. Bakewell should also be precluded from
offering such opinions. *M2M Sols. LLC v. Motorola Sols., Inc*., No. 12-33-RGA, 2016
U.S. Dist. LEXIS 22944, at *22-23 (D. Del. Feb. 25, 2016) (excluding damages expert
due to reliance on excluded "industry" expert); *Roper v. Kawasaki Heavy Indus., Ltd*.,
No. 1:13-CV-03661-ELR, 2015 U.S. Dist. LEXIS 187419, at *48 (N.D. Ga. June 29,
2015) (finding reliance on another excluded expert to be alone a sufficient reason to
exclude expert as unreliable).  This is the subject of a separate motion directed to the
Bakewell testimony.

**B.      Mr. McCarter's application of the "non-infringing alternatives"
concept is unsupported by any methodology or case-specific facts.**

Even if noninfringing alternatives are legally relevant to a disgorgement claim,

Mr. McCarter's "noninfringing alternatives" opinion must be excluded.  His application

of the patent law concept is entirely unsupported.  Mr. McCarter offers no analysis to

determine if purported alternatives would be "acceptable."  Indeed, he cannot. Mr.

McCarter's alternatives are not exchangeable with Blaze Advisor.  In patent law, a non-

infringing alternative must actually be exchangeable with whatever is accused of patent

infringement. *See C.R. Bard, Inc. v. Bos. Sci. Corp*., 99-1304, 2000 U.S. App. LEXIS

16090, at *8 (Fed. Cir. July 7, 2000) ("To be an acceptable noninfringing substitute, the

alternative product must have the advantages of the patented product.")  Furthermore,

"[t]o be deemed acceptable, the alleged acceptable noninfringing substitute must

not…possess characteristics significantly different from the patented product." *Kaufman*

*Co. v. Lantech, Inc*., 926 F.2d 1136, 1142 (Fed. Cir. 1991)

Here, Mr. McCarter admits his purported substitutes cannot meet this standard:

Q. And you don't know one way or the other if Federal could have achieved
the same results using a different alternative; correct?

A. I don't know if they could or they couldn't.").)

(McCarter Depo. Tr. 245:25-246:3.)

Q.  … Did you undertake any investigation to determine whether Federal
could take Blaze out of the applications that use Blaze and use the manual
lookup methodology and receive the -- achieve the same results in the same
time?

A. I did not do that analysis. No.

27

(*Id.* 199:8-14; *see also id.* 209:25-210:12 (admitting he did not know how many people it would take Federal to manually perform the 1.22 million transactions a month performed with Commercial Underwriting Workstation, an application that uses Blaze Advisor).)

Mr. McCarter further testified:

> Q. But you have not undertaken an independent study to determine whether manual lookup, hard coding, or any other third party –
>
> A. No.
>
> Q. -- software database could be inserted for Blaze?
>
> A. Correct. I have not."

(*Id.* 210:21-211:1.)  Similarly, Mr. McCarter had no factual basis to conclude that other technologies could be substituted for Blaze Advisor in any of Federal's other applications:

> Q. … So you don't have an opinion one way or the other as to the cost or expense Chubb would have incurred to use an Excel spreadsheet instead of Blaze Advisor in the TAPS application –
>
> A. I do not.
>
> Q. And you don't -- you have not undertaken an analysis to determine whether the use of a spreadsheet in the TAPS application instead of Blaze Advisor would yield the same results; correct?
>
> A. **I – I'm going by the word, the folks I spoke with, that they could use it that way.**

(*Id.* 180:18-181:5 (emphasis added); *see also id.* 181:9-19; 200:8-12 (admitting he did not know one way or the other whether Federal could have replaced CSI eXPRESS with the manual lookup method), 201:20-23 (same).)

These opinions supported only by Mr. McCarter's *ipse dixit* should be excluded.

C.   **Mr. McCarter's "non-infringing alternative" opinion is irrelevant to the determination of disgorged profits.**

Mr. McCarter's "non-infringing alternative" opinion based on the fact other, older technologies could be used is meaningless and must be excluded.  Section 504(b) of the Copyright Act seeks to provide "just compensation" for the infringement.  *Gregerson v. Vilana Fin., Inc*., No. 06-1164 ADM/AJB, 2008 U.S. Dist. LEXIS 11727, at *13 (D. Minn. Feb. 15, 2008) (quoting *Sheldon v. Metro-Goldwyn Pictures Corp*., 309 U.S. 390, 399, 60 S. Ct. 681, 84 L. Ed. 825 (1940)).  Disgorged profits are based on what happened—copyright infringement using Blaze Advisor, not on what did not happen— use of an older, different technology.  17 U.S.C. § 504(b).  Mr. McCarter's testimony identifying other, older technologies that insurance companies have used is irrelevant and untethered from Federal's infringing use of Blaze Advisor.  Such an opinion must be excluded to prevent undue confusion.  *See* Fed. R. Evid. 403.

## V.   Conclusion.

Mr. McCarter's opinions are unhelpful to the fact finder.  His opinions lack any connection to the facts of the case and are devoid of any methodology of analysis.  Mr. McCarter's opinions are merely his say-so.  This is improper and likely to confuse the jury.  Mr. McCarter's testimony challenging FICO's disgorgement claim must be excluded, including paragraphs 21-30, 44-99, 101-105, 113-121, 126-140, 145, 147, 150-152, 154-158, and Appendix A.

Dated: July 26, 2019

        MERCHANT & GOULD P.C.

        <u>/s/Heather J. Kliebenstein</u>
        Allen Hinderaker, MN Bar # 45787
        Heather Kliebenstein, MN Bar # 337419
        Michael A. Erbele, MN Bar # 393635
        Joseph W. Dubis, MN Bar # 398344
        MERCHANT & GOULD P.C.
        3200 IDS Center
        80 South Eighth Street
        Minneapolis, MN  55402-2215
        Tel:  (612) 332-5300
        Fax:  (612) 332-9081
        ahinderaker@merchantgould.com
        hkliebenstein@merchantgould.com
        merbele@merchantgould.com
        jdubis@merchantgould.com

        Attorneys for Plaintiff FICO