**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| FAIR ISAAC CORPORATION, | Court File No.  16-cv-1054 (WMW/DTS) |
| Plaintiff, | |
| v. | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE PORTIONS OF EXPERT REPORT AND TESTIMONY OF RANDOLPH BICKLEY WHITENER** |
| Defendants. | |

## INTRODUCTION

Bick Whitener is Plaintiff Fair Isaac Corporation's ("FICO") causation expert. Whitener purports to "opine on the contribution to gross written premium made by the FICO Blaze Advisor decision rules management system[], which was incorporated into applications deployed by [Defendants]."  Although he purports to be a causation expert Whitener has, in fact, conducted no causation analysis.  Instead, Whitener opines on the "qualitative value" of Blaze.  Whitener's report and testimony as it relates to causation for establishing FICO's claim for disgorgement of indirect profits should be excluded in its entirety for two reasons.

*First*, Whitener's opinions should be excluded because they ignore the statutory standard for disgorgement under the Copyright Act.  Under the Copyright Act it is the plaintiff's obligation to establish a *causal nexus* between the alleged infringement and a revenue stream that bears a *legally significant relationship* to the infringement.  That

burden is heightened where, as here, the copyright owner seeks indirect profits—profits that do not result from selling an infringing product.  Whitener fails to conduct any meaningful analysis that would support a claim that Federal's use of Blaze *caused* Federal to earn any portion of the $30.9 billion revenue stream he identifies.

Indeed, Whitener does not provide a causation opinion at all.  He admits he cannot say one way or the other whether Federal's use of Blaze actually affected Federal's revenues or profits.  Instead, his opinion is that Blaze "contributed" some indeterminate amount to the $30.9 billion revenue figure.  Further, Whitener's selected revenue steam—$30.9 billion spread across 26 entities, 24 of which are not even named parties— is not a revenue steam bearing a legally significant relationship to the infringement.  The opinion, therefore, is irrelevant to the disgorgement analysis.

*Second*, Whitener's "qualitative value" opinions should be excluded because he admits that he has used no data and employed no methodology whatsoever to test his conclusion that Blaze "contributed" to Defendants' revenues.  Thus, his opinions are not based upon sufficient data or reliable methods as the Federal Rules require.  Instead, the majority of his initial report is copied directly from discovery materials (most of which are FICO's marketing materials) and the rest of his report is merely Whitener's *ipse dixit*[1] regarding software he used for the first time the day before his deposition (which took place weeks after he drafted his reports) and which, he admits, is a type of software he has never used during his time in the insurance industry.

---

[1] Latin for "he himself said it."

## FACTUAL BACKGROUND

### I.   FICO retains its causation expert, Bick Whitener.

FICO's counsel retained Whitener "to provide … testimony with respect to the insurance industry and the role of decision management software in that industry." (Declaration of Terrence J. Fleming ("Fleming Decl."), Ex. 1, Whitener's Report, at 1.) More specifically, Whitener was designated to act as FICO's causation expert on its claim to recover indirect profits under the Copyright Act.   (*Id.*)   In that capacity, Whitener was asked to "opine on the contribution to gross written premium made by the FICO Blaze Advisor decision rules management system… which was incorporated into applications deployed by [Federal]."   (*Id.*)   Whitener purports to provide his opinions based on his "skills, knowledge, experience, education, and training in the insurance and insurance technology industries[.]"   (*Id.*)

### II.   Whitener lacks sufficient experience to provide opinions regarding the role of decision management software in the insurance industry.

Although he has general experience in the insurance industry, Whitener admits he has "never worked with decision management software" like Blaze:

> Q.   Okay.  Because you have never worked with decision management software, correct?
>
> A.   Correct.   I have worked with rules, underwriting guidelines, underwriting criteria, but not specifically business management software.

(Fleming Decl., Ex. 2, Whitener Depo., at 119:7-11.)  He also admits that he has never used Blaze.  (*Id.*, Whitener Depo., at 104:25-105:2.)   Instead, his knowledge of the software is limited to an hour-and-a-half demonstration he received from FICO the day

before his deposition, after he submitted his report.  (*Id*., Whitener Depo., at 21:12-18; 104:25-105:5.)  He has also never seen or used the Federal applications that incorporate Blaze.  (*Id*., Whitener Depo., at 147:7-9.)  Indeed, when asked whether he conducted any analysis regarding Blaze as incorporated into Federal applications he stated that he had seen documents "articulat[ing] the various and sundry components" of the applications but "spent less than one second reviewing those."  (*Id*., Whitener Depo., at 101:13-15.)

**III.    Whitener failed to conduct a causation analysis, and his failure to conduct any quantitative analysis forced him to admit he did not know whether Blaze impacted Federal's profits or revenue.**

In his report, Whitener concludes that "Blaze Advisor contributes to the increase in volume and accuracy of transactions, which in turn contributes to Chubb revenue" by increasing (1) the "speed of transactions," (2) "the ease of use for agents and brokers," and (3) "accuracy and adequacy of pricing."   (Fleming Decl., Ex. 1, Whitener Rep., at 10-13; Fleming Decl., Ex. 2, Whitener Depo., at 99:16-25.)   Despite his summary conclusions above, Whitener admits he has seen no evidence and cannot testify as to whether Blaze affected Federal's revenues or profits in any way:

> Q.    I take it you don't know whether Blaze Advisor actually contributed to an increase in revenue or profit at Federal, correct?
>
> A.    That would require a quantification. I have done no quantification, no.

(Fleming Decl., Ex. 2, Whitener Depo., at 157:24-158:3.)

Not only is Whitener unable to say, one way or the other, whether Blaze actually affected Federal's revenues or profits, but he also cannot say whether, in fact, Federal's

use of Blaze actually resulted in an increase to the speed of transactions, ease of use for

agents or brokers, or accuracy and adequacy of pricing:

> Q.   Can you quantify—
>
> A.   I was never asked to quantify anything.
>
> Q.   So you cannot quantify any contribution that Blaze has on any of the factors you just listed?
>
> A.   That is correct.  I was not asked to quantify anything.  It's out of the scope of my agreement and arrangement.

(*Id*., Whitener Depo., at 102:20-103:1.)  Since Whitener cannot quantify the time savings

or efficiencies, his opinion that such things occur must rely on other sound methods of

determination to be admissible.  They do not. Despite being FICO's causation expert,

Whitener has conducted no "but for" analysis or quantification; his opinion is limited to

the "qualitative value" of what, if anything, Blaze contributed.  (*Id*., Whitener Depo., at

98:20-22.)

## ARGUMENT

**I.    Standard.**

"The admissibility of expert testimony is governed by Federal Rule of Evidence

702; under Rule 702 the trial judge acts as a 'gatekeeper' screening evidence for

relevance and reliability."  *Polski v. Quigley Corp.*, 538 F.3d 836, 838 (8th Cir. 2008)

(citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  FICO has the

burden of proving that its experts' testimony is admissible by a preponderance of the

evidence.  *Id.* at 841.

Federal Rule of Evidence 702 permits a court to admit expert testimony if it is (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) delivered by a witness who has reliably applied these principles and methods to the facts of the case. Fed. R. Evid. 702. Speculative expert testimony is inadmissible. *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). A damages theory must be based on "sound economic and factual predicates." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).

Additionally, the Supreme Court has emphasized that expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," *Daubert*, 509 U.S. at 591, and that trial courts should exclude expert testimony that "is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146.

## II.   Whitener's "contribution" opinion fails to show the required causal nexus between Federal's revenues and its use of Blaze and is, therefore, inadmissible.

FICO seeks, as a remedy for alleged copyright infringement, disgorgement of Federal's profits. 17 U.S.C. § 504(b). The Copyright Act permits a successful plaintiff to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Direct profits are profits that result from selling infringing material. *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). Indirect profits are profits that do not. *Id.* Here, Federal never sold any material containing Blaze, and thus, FICO seeks to recover indirect profits. FICO admits as much.

6

Because FICO seeks indirect profits, it is FICO's burden to show causation on its disgorgement claim in the first instance. *Mackie*, 296 F.3d at 914; *Univ. of Col. Found. v. Am. Cynamid Co.*, 196 F.3d 1366, 1375 (Fed. Cir. 1999) (holding that the plaintiff has the "burden" to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur).

Courts apply a heightened standard to that burden, due to the speculative nature of indirect profits. *Univ. of Col. Found.*, 196 F.3d at 1375 (upholding district court's ruling that plaintiff did not meet burden to show a causal nexus with defendant's profits citing to Nimmer treatise for proposition that claims for indirect profits rarely succeed). "[I]ndirect profit claims" are "at-best highly speculative" and so "the decision to send those claims to the jury should be relatively rare." William F. Patry, *Patry on Copyright*, § 22:131.

The Copyright Act, therefore, "creates a two-step framework for recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of the infringement." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).

The required nexus is "a legally sufficient causal link between the infringement and subsequent indirect profits." *Mackie*, 296 F.3d at 915. The district court looks to whether the copyright holder has "proffer[ed] sufficient *non-speculative* evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement." *Id.* at 916 (emphasis added). If the copyright

owner fails to offer sufficient evidence the district court will deny recovery of profits. *Polar Bear*, 384 F.3d at 711 ("[w]hen an infringer's profits are only remotely and speculatively attributable to infringement, courts will deny recovery to the copyright owner.").

### A.       Whitener's "contribution" opinion is irrelevant to determining whether a causal nexus exists.

Whitener is FICO's causation expert responsible for carrying FICO's burden outlined above.  Whitener does not provide any opinion related to the amount which Blaze contributed to revenue, which revenue streams (of $30.9 billion) it contributed to, or the extent to which that contribution relates to Federal's profits (if at all).  He has not done any analysis from which he could provide such an opinion.  (Fleming Decl., Ex. 2, Whitener Depo., at 81:5-10; 154:11-15.)  Instead, Whitener provides what he calls a "qualitative value"[2] analysis of Blaze from which he opines that—apparently based on the relative quality of the Blaze product—the product "contributed" to Federal's revenue. (*Id.*, Whitener Depo., at 12:14-20.)  It is Whitener's opinion that Blaze "contributed" some indeterminate amount to the $30.9 billion revenue figure FICO presents.  The opinion is far too speculative and attenuated to meet FICO's burden to establish causal nexus and is, therefore, inadmissible.

---

[2] As outlined in detail below, although Whitener purports to opine on the "value" of the Blaze product he admits he has never used the product, his only exposure to the product was an hour-and-a-half demo of it the day before his deposition (after he wrote his report), and that during his time in the insurance industry he did not work with decision management software at all.  (Fleming Decl., Ex. 2, Whitener Depo., at 21:12-18; 104:25-105:2; 119:7-11; 147:7-9.)

### 1.     Whitener's opinion regarding the "qualitative value" of Blaze is irrelevant and insufficient to establish a causal nexus.

Whitener opines that the "qualitative value" he prescribes to Blaze means that Blaze must have contributed to revenue. (Fleming Decl., Ex. 2, Whitener Depo., at 98:2-5.)   The Copyright Act is not concerned with the relative "value" of Blaze.   The Copyright Act requires there be a causal nexus between use and the defendant's revenues. Simply put, the importance of a product's function to a company – its "relative value" – says nothing about whether that function causes any revenues or profits.   The "relative value" is therefore irrelevant to this analysis.

The *Complex Systems, Inc. v. ABN Ambro Bank N.V.* case is factually analogous and instructive on this point.   No. 08 Civ. 7497(KBF), 2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013).   *Complex Systems* concerned use of software known as BankTrade that was embedded in defendant's banking system and facilitated transactions.   *Id.* at \*1.   The plaintiff claimed it was entitled to recover indirect profits from defendant's use of the software, which use infringed plaintiff's copyrights because defendant's license had expired. *Id.*

In seeking to establish the requisite causal nexus, the plaintiff's expert opined regarding the relative value of the software—he provided that defendant "would face significant operational hurdles in its trade finance business if it were to immediately turn off BankTrade, and that it would take years and tens of millions of dollars to bring an alternative system online." *Id.* at \*8.

In assessing whether the plaintiff had established a causal nexus based on its expert's opinions, the court reviewed disgorgement case law comprehensively stating that the standard is "causation" and that "mere connection or usage alone [is] insufficient." *Id.* at \*5. Instead, the "copyright owner must meet the statutory requirement of showing attribution." *Id.* at \*5. In other words, the plaintiff must establish "that the profits the copyright owner [seeks] to disgorge were *caused* . . . [by] the infringement." *Id.* (emphasis original).

Applying those principles to the experts' opinions related to the software's relative value or importance to the business, the court held that the testimony was inadmissible because "[i]t is plain . . . that [the expert] *assumes* a *causal* nexus." *Id.* at \*8 (emphasis original). The software's value was irrelevant because it did not demonstrate causation:

> [Plaintiff] fails to provide any evidence in support of the "causation" assertions embedded in these claims. There is no evidence that a single specific transaction would have occurred but for BankTrade or would not have occurred without BankTrade. BankTrade need not be the sole causal factor—but, there must be evidence that it is a causal factor.

*Id.* at \*13.

In *Int'l Business Machines Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128(PAC), 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013), the district court excluded defendant's damages expert testimony regarding over $100 million in alleged indirect profits evidence. *See id.* at \*18. There, the plaintiff alleged the defendant infringed its Informix software—a software providing back office functions that act as an intermediary between financial institutions. *Id.* at \*3. The defendant acknowledged that immediate disruption

of use of the software would have a "devastating effect" on its business.  *Id.*

Nevertheless, the court excluded evidence on indirect profits, reasoning as follows:

> IBM points to nothing more than BCG's repeated statement that Informix software is "integral" to its operations and that the sudden removal or failure of the Informix software would have devastating consequences to BCG's operational efficiency.  But simply saying that copyrighted material "may have played an 'important,' 'significant' or 'meaningful' role" is insufficient, particularly where, as part of BGC's information technology infrastructure, it comprises only a portion of what enabled BGC to conduct its business profitably.

*Id.*   *4.   The relative "value," "significance" or "importance" of the software was irrelevant because it did not establish causation.

Here, like the experts in *Complex Systems* and *IBM*, Whitener provides no evidence of causation, but instead assumes a causal nexus based entirely on the relative "value" of Blaze.  Whitener seeks to opine that because (a) Federal used Blaze, and (b) he believes Blaze was important to Federal, then (c) it must have contributed to revenue. However, as the court concluded in *Complex Systems*, neither use nor importance equals *causation*.  2013 WL 5970065, at *11 ("Use is, of course, not necessarily evidence of causation.").  And Whitener, by his own admission, conducted no causation analysis. Like the expert in *Complex Systems*, Whitener cannot point to "a single specific transaction [that] would have occurred but for [the software] or would not have occurred without [the software]."  *Id.* at *13.  Because Whitener admits he has conducted no causation analysis, and merely purports to testify regarding the relative value of the product, his expert opinion is irrelevant to FICO's indirect profits claim.  His testimony and report, therefore, must be excluded.

11

**2.     The revenue stream upon which Whitener relies is too speculative and attenuated to satisfy the causal nexus requirement.**

In addition, Whitener provides no opinion or explanation relative to the $30.9 billion revenue stream FICO claims is relevant.  "[A] copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement." *Polar Bear,* 384 F. 3d at 711.  Here, FICO has selected a $30.9 billion revenue stream which covers 26 entities (only 2 of which are named in this litigation).  In doing so, FICO has merely "toss[ed] up an undifferentiated gross revenue number[.]" *Id.*

The revenue stream is so large and undifferentiated that it would be impossible for the Court or a jury to apportion out those profits that are not attributable to the infringement without resorting to sheer speculation.[3] *Polar Bear,* 384 F.3d at 708; H.R. Rep. No. 94-1476 at 161 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5777 ("[t]he language of the subsection makes clear that only those profits 'attributable to the infringement' are recoverable; where some of the defendant's profits result from the infringement and other profits are caused by different factors, it will be necessary for the

---

[3] Whitener takes the $30.9 billion figure from Federal's best efforts to answer FICO's Interrogatory No. 16-20, which required Federal to identify "the gross written premium… from all insurance policies in connection with which the Software [Blaze] was used." Essentially, FICO asked Federal to identify every instance in which a policy went through or touch one of its applications that uses Blaze.  Answering the interrogatory with any precision—ensuring no duplication, over counting etc.—is next to impossible. The interrogatory is akin to asking a law firm to identify every instance it used Xerox in connection with each specific case at the firm.  Complicating matters further, here, Federal was attempting to respond to that question for insurance companies that span the globe and have billions in gross written premium revenue.

court to make an apportionment."). Whitener's failure to conduct any quantitative analysis and, instead, assert that Blaze "contributed" to some portion of that $30.9 billion figure exacerbates the problem. Whitener's failure to opine on the appropriate revenue stream is further reason for concluding his analysis is irrelevant to the causal nexus requirement.[4] Additionally, the revenue stream is not appropriate given it includes revenues associated with 24 entities that are not parties in this litigation. (*See* Zoltowski Rep. at Schedule 7.0.) Indeed, $29.5 billion of the $30.9 billion (or 95.5%) comes from these 24 non-party entities.

Because Whitener provides no causation analysis and relies on a revenue stream that does not "bear a legally significant relationship to the infringement" his analysis is irrelevant to the disgorgement analysis and must be excluded.

### III. Whitener's "contribution" opinion is not supported by any reliable methodology or reliable facts and data.

Aside from being inadmissible due to its irrelevance to the causal nexus analysis, Whitener's expert report is a paradigmatic example of the *ipse dixit* school of expert testimony that *Daubert* and its progeny declared inadmissible. *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (9th Cir. 2000) ("Talking off the cuff—deploying neither

---

[4] FICO's damages expert Neil Zoltowski's explanation is that Defendants, including their parent company and all of their subsidiaries and affiliates operate as a "single economic unit." As outlined in Federal's memorandum related to Neil Zoltowski, the theory must be excluded because it has no legal underpinning and was manufactured specifically to address the fact that, at some point during litigation FICO realized that it is prohibited from seeking to disgorge profits from unnamed parties. In order to avoid that pleading failure, Zoltowski manufacture his "single economic theory" which seeks to disgorge profits from 24 entities that are not parties to this litigation.

data nor analysis—is not an acceptable methodology.")   Whitener admits he has conducted no analysis to determine whether Blaze affected Federal's profits in any way:

> Q. I take it you don't know whether Blaze Advisor actually contributed to an increase in revenue or profit at Federal, correct?
>
> A. That would require a quantification. I have done no quantification, no.

(Fleming Decl., Ex. 2, Whitener Depo., at 157:24-158:3.) Nonetheless he concludes based solely on his experience that Federal's use of Blaze contributed to its revenues. (Fleming Decl., Ex. 1, Whitener Rep., at 14-35.)

### A. Whitener's opinion that Blaze "contributes" to Federal's revenues is inadmissible because it is not based on any methodology.

Whitener concedes he performed no "but for" analysis to determine if any of the $30.9 billion in revenue at issue was caused in any respect by the use of Blaze.  Instead, he offers that he "knows" it "must have" caused some profits based on his "experience" in the insurance industry alone.   His statements amount to nothing more than an inadmissible "trust me" assertion that is based entirely on his experience:

> Q. Okay.  But you have not measured whether, in fact, the automated decision software makes those functions faster, correct?
>
> A. That is correct.  I will, however, point to you that I have a significant amount of gray hair and 41 years of experience[.]

(Fleming Decl., Ex. 2, Whitener Depo., at 13:19-14:1.)

An expert is required to "demonstrate in some *objectively verifiable way* that the expert has both chosen a reliable . . . method and followed it faithfully."  *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1319 n.11 (9th Cir. 1995)

14

(emphasis added).  Whitener mentions no theory or technique that he used to conclude that Blaze "contributes" to Federal's revenue.  (*Id.*, Whitener Depo., at 114:9-18.)  Here "[b]ecause the theory or technique used is unknown, there is no proof that [Whitener's] methods of evaluation have been or even can be tested."  *Colony Holdings, Inc. v. Texaco Refining & Mktg., Inc.*, No. SACV00217DOC(MLGX), 2001 WL 1398403, at *3 (C.D. Cal. Oct. 29, 2001).  Likewise, because Whitener's conclusions have "not been tested *at all*, it has never been subjected to peer review and publication, nor has it been generally accepted in the scientific community, nor does it have a known or potential rate of error." *Polski v. Quigley Corp.*, 538 F.3d 836, 840 (8th Cir. 2008) (emphasis original). Whitener's opinion amounts to little more than an assertion that he's an expert, and therefore he knows best—such opinions are inadmissible under *Daubert*.

Instead of a stated methodology, Whitener purports to rely on his "gray hair" and "41 years of experience" in the insurance industry to justify his opinions.  (Fleming Decl., Ex. 2, Whitener Depo., 13:22-14:1.)  In general, "[a] witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."  *Zenith Elecs. Corp. v. WH-T Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).  Applying this principle, courts routinely exclude causation experts whose testimony is not based on a reliable methodology or, as here, any methodology at all.  *Reinsdorf v. Skechers USA*, 922 F. Supp. 2d 866, 879 (C.D. Cal. 2013) (court excluded causal nexus expert's testimony because the expert's analysis was not based on a reliable methodology and "essentially amounts to, 'I have a lot of experience with brands and marketing, therefore I can divine that 50–75% of this large, successful,

company's profits come from Reinsdorf's photographs.'"); *Masterson Mktg, Inc. v. KSL Recreation Corp.*, 495 F. Supp. 2d 1044, 1051 (S.D. Cal. 2007) (causal nexus opinion excluded as unduly speculative where it "lack[ed] a stated methodology"). This Court should similarly follow this well-established precedent and exclude Whitener's opinion that Federal's use of Blaze "contributed" to its revenue because it is not supported by any methodology.

Additionally, in the limited circumstances in which an expert is admitted and "relies solely or primarily on his experience" the expert "must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *In re Toyota Motor Corp. Unintended Acceleration,* 978 F. Supp. 2d 1053, 1067 (C.D. Cal. 2013) (quoting Fed. R. Evid. 702 advisory committee's note (2000)).

Whitener does not have the technical expertise or background to opine as to whether Federal's use of Blaze contributed anything to Federal's revenue. Whitener has never used Blaze. (Fleming Decl., Ex. 2, Whitener Depo., at 104:25-105:2.) He has no other experience with the technology in practice at any company. (*Id*., Whitener Depo., at 45:11-15; 119:7-11.) His knowledge of the software is limited to an hour-and-a-half demonstration he received from FICO the day before his deposition. (*Id*., Whitener Depo., at 21:12-18; 104:25-105:5.) He has also never seen or used the Federal applications that incorporate Blaze. (*Id*., Whitener Depo., at 147:7-9.) In fact, not only does Whitener have no knowledge about Blaze or Federal's use of Blaze, but he additionally has never worked with that general type of software:

16

> Q.      Okay.  Because you have never worked with decision management software, correct?
>
> A.      Correct.   I have worked with rules, underwriting guidelines, underwriting criteria, but not specifically business management software.

(*Id.*, Whitener Depo., at 119:7-11.)  This Court, therefore, should prohibit Whitener from opining that, based solely on his experience, Blaze must have contributed to Federal's revenue.

## B.      Whitener's unsupported opinion that Blaze "contributes" to Federal's revenue is not based on sufficient facts or data.

Whitener's opinion lacks any foundation in reliable data—he admits he conducted no analysis to determine whether his opinion, that Blaze makes transactional processing faster, is correct.  (*Id.*, Whitener Depo., at 14:6-14.)  An expert must is required to rely upon reliable facts and data when forming his conclusions.  Fed. R. Evid. 702; *see also Smith v. Cangieter*, 462 F.3d 920, 924 (8th Cir. 2006) (excluding expert witness when he did "not offer the results of any testing to demonstrate that his theory was accurate[.]").  Whitener has not done so here.  Instead, his opinions are based entirely on his experience.

Whitener admits he has analyzed no data at all and did not even consider how he could go about confirming his opinion that Blaze made transactional processing faster and, taking the analysis a necessary step further, actually increased Federal's revenue:

> A.      I have zero data and I have not spent one minute thinking about how I would do that [determine whether use of Blaze actually made transactional processing faster and increased Federal's revenue].

17

(Fleming Decl., Ex. 2, Whitener Depo., at 154:11-15.)  Whitener admits he has conducted

no analysis whatsoever to determine whether Federal's use of Blaze actually made

transactional processing faster and, if it did, how that affected Federal's revenue if at all.

This flaw applies to each of Whitener's opinions regarding how Blaze contributed

to Federal's revenue.  Whitener opines that "Blaze advisor contributes to the increase in

volume and accuracy of transactions, which in turn contributes to Chubb revenue" and

then provides six bullet-pointed opinions all of which essentially relate to increasing

transaction speed. (Fleming Decl., Ex. 1, Whitener Rep., at 10-11.)  He admits, however,

that he has no idea whether these opinions are in fact true with respect to Federal's use of

Blaze:

> Q.     Okay.  Do you know whether Blaze increased the speed of
> response to quote requests in Federal?
>
> A.     I performed no quantitative analysis in this process, no.  I do
> not know.
>
> Q.     So you just don't know whether Federal increased the speed
> of making renewal offers because of its use of Blaze, correct?
>
> A.     That is correct.

(Fleming Decl., Ex. 2, Whitener Depo., at 135:14-18; 136:8-11.)  Federal's counsel went

through each of Whitener's six bullet-pointed opinions to which Whitener responded he

had no way of knowing if they were correct with respect to Federal's use of Blaze

because he had been provided no data and conducted no quantitative analysis.  (*Id*.,

Whitener Depo., 135:14-141:4.)

## CONCLUSION

Based on the foregoing, Federal respectfully requests the Court exclude Whitener's report and testimony as it relates to disgorgement of indirect profits in its entirety.

Dated:  July 26, 2019

*/s/Terrence J. Fleming*

Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

***Attorneys for Defendants***