# EXHIBIT 2

# FILED UNDER SEAL

CASE 0:16-cv-01054-DTS   Doc. 382-1   Filed 07/26/19   Page 2 of 28
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.



```
 1                UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
 2
      - - - - - - - - - - - - - - - - - - - - - - - - -
 3
      FAIR ISAAC CORPORATION,
 4
                      Plaintiff,
 5
           v.            Court File No. 16-cv-1054 (WMW/DTS)
 6
      FEDERAL INSURANCE COMPANY,
 7    an Indiana corporation, and ACE
      AMERICAN INSURANCE COMPANY,
 8    a Pennsylvania corporation,

 9                    Defendants.

10    - - - - - - - - - - - - - - - - - - - - - - - - -

11                    VIDEO DEPOSITION

12          The following is the video deposition of

13    RANDOLPH BICKLEY WHITENER, taken before Jean F.

14    Soule, Notary Public, Registered Professional

15    Reporter, pursuant to Notice of Taking Deposition,

16    at the law office of Fredrikson & Byron, P.A.,

17    200 South Sixth Street, Suite 4000, Basswood

18    Conference Room, Minneapolis, Minnesota, commencing

19    at 8:56 a.m., Thursday, June 27, 2019.

20

21                    *     *     *

22

23

24          C O N F I D E N T I A L

25          ATTORNEYS' EYES ONLY
```

EXHIBIT
**2**

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

**Page 7**

1  Q.   This is your first time?
2  A.   **That is correct.**
3  Q.   Okay.  Tell me, what did you do to
4  prepare for your deposition today?
5  A.   **At this point, I believe you are**
6  **asking me the types of research I did, I believe**
7  **you are asking me the types of documents I looked**
8  **at; is that correct?**
9  Q.   I'm asking you what you did to prepare
10 for your deposition today?
11 A.   **Aah.**
12 Q.   Yes.
13 A.   **A different question.  Thank you.  I**
14 **mounted a plane in the great State of Alabama, flew**
15 **to the great State of Minnesota, and I met with the**
16 **attorneys present.**
17 Q.   Okay.
18 A.   **I have also reviewed --**
19       MR. HINDERAKER:  You don't have to
20 reveal any communications or the work product of
21 meetings with lawyers since you came to Minnesota.
22 BY MS. JANUS:
23 Q.   Okay.  And continue with your answer?
24 A.   **Then I will -- that will suffice.**
25 Q.   Okay.  And so you reviewed documents?

---

**Page 8**

1  A.   **Yes.**
2  Q.   Okay.  Which documents did you review
3  to prepare for your deposition?
4  A.   **I reviewed the original report I**
5  **wrote, dated 4-19; I have reviewed the response to**
6  **the other expert witness's rebuttal of my report,**
7  **that's dated 5-31; and I reread the RFI published**
8  **by Chubb in February of 2006, I believe it was.**
9  Q.   Did you do anything else or review any
10 other materials to prepare for your deposition?
11       MR. HINDERAKER:  And, again, my
12 direction not to disclose the communications and
13 the work that you did in Minnesota with lawyers.
14       THE WITNESS:  As I reread my report,
15 if I saw a footnote -- you will recall my report is
16 highly footnoted -- and I wanted to refresh my
17 visual view of that document, I opened it up to
18 refresh my memory.
19 BY MS. JANUS:
20 Q.   So you looked at some of the documents
21 that are cited in your footnotes?
22 A.   **That is correct.**
23 Q.   Okay.  Anything else?
24 A.   **No.**
25 Q.   Did you speak with anyone other than

---

**Page 9**

1  the attorneys here to prepare for your deposition?
2  A.   **No.  Unless you count the conversation**
3  **with my wife, which said, hey, would you pretty**
4  **please book me for a plane ticket to, or with the**
5  **associate at Merchant & Gould, whose name I do not**
6  **know, that made the hotel arrangements for me.**
7  Q.   Okay.  What are your opinions in this
8  matter?
9  A.   **My opinions in this matter only relate**
10 **to the qualitative use of software in the property**
11 **casualty writing of insurance policies process, be**
12 **that writing new business or renewal, and how**
13 **software can help in the quote, bind, book, issue**
14 **process that I articulate in the reports.**
15 Q.   Okay.  So that is what your opinion in
16 this matter relates to, correct?
17 A.   **That is what my professional opinion**
18 **in this matter relates to, and what my report and**
19 **the rebuttal speak to.**
20 Q.   Okay.  And what is the opinion that
21 you provide in this litigation?
22 A.   **My opinion is that automated decision**
23 **software and business rules management systems do,**
24 **in fact, contribute to creation of revenue through**
25 **the three primary vehicles an insurance company**

---

**Page 10**

1  uses to pursue growth, and those are speed, speed
2  comes in two flavors, there are -- then there is
3  ease of doing business, and then there is precision
4  of price.
5  Q.   How does automated decision software
6  contribute to the creation of revenue, in your
7  opinion?
8  A.   **In my opinion, automated decisioning**
9  **improves speed in two ways.  The first one is it**
10 **improves the speed of response, in terms of requests**
11 **for quotes or in terms of processing rules.  The**
12 **second is it improves the ease of doing business by**
13 **requiring less effort on behalf of an agent and**
14 **broker and, thereby, on behalf of their customer,**
15 **the applicant or policyholder, and it provides**
16 **precision in pricing in that it makes sure that the**
17 **adequate accurate information is available to the**
18 **underwriting process and can provide, in fact, I**
19 **will call it statistical actuarial guidance into**
20 **what the needed adequate accurate premium is for**
21 **the risk.**
22 Q.   And that statistical guidance, how
23 does it provide statistical guidance?
24 A.   **It will look at the attributes of**
25 **the -- I will refer to it as the application, the**

---

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

| | |
|---|---|
| 1 prospective risk, and it will say -- it will go | 1 processing faster, does it make speed of bringing |
| 2 through a statistical model, a set of algorithms | 2 new product to market faster, does it improve the |
| 3 that come back and say for this set of risk | 3 ability of the company in its underwriting process |
| 4 characteristics you need X amount of premium to | 4 to better define the, quote unquote, accurate and |
| 5 cover the cost of the raw materials, the | 5 precise price. |
| 6 manufacturing cost, the administrative cost, | 6     Q.    So you're talking about whether |
| 7 et cetera. | 7 automated decision software makes certain decisions |
| 8     Q.    Now, is your opinion in this matter | 8 at an insurance company faster, correct? |
| 9 generally about automated decision software? | 9     A.    Not sure I understand the question. |
| 10     A.    No. | 10     Q.    You said that the quantitative |
| 11         MR. HINDERAKER:  Objection to the | 11 evaluation assesses whether the software makes the |
| 12 extent the question is vague. | 12 speed of transactional processing faster? |
| 13 BY MS. JANUS: | 13     A.    Agree. |
| 14     Q.    You can go ahead and answer. | 14     Q.    Right?  And whether it makes the speed |
| 15     A.    My decision is based on the value of | 15 of -- |
| 16 automated decision software and, then, Blaze as the | 16     A.    Agree. |
| 17 selected automated decision software tool. | 17     Q.    -- new products faster? |
| 18     Q.    Okay.  You provided some testimony | 18     A.    Agree. |
| 19 about the speed, the ease of doing business, the | 19     Q.    Okay.  But you have not measured |
| 20 precision of price, right? | 20 whether, in fact, the automated decision software |
| 21     A.    Correct. | 21 makes those functions faster, correct? |
| 22     Q.    Do you have an opinion as to those | 22     A.    That is correct.  I will, however, |
| 23 matters specifically in this case? | 23 point to you that I have a significant amount of |
| 24     A.    Yes. | 24 gray hair and 41 years of experience, and I saw |
| 25     Q.    Okay.  What is that? | 25 this at other companies, other insurance companies |
| <div align="right">Page 11</div> | <div align="right">Page 13</div> |
| 1     A.    As I stated before, automated decision | 1 for which I worked and -- no, I'll close there. |
| 2 software improves all three of those aspects of the | 2     Q.    You also said that your qualitative |
| 3 quote, bind, book, issue process, and Federal chose | 3 analysis is that automated decision software |
| 4 Blaze Advisor®, and Blaze Advisor contributed to | 4 improves the ability to define accurate -- |
| 5 those three things on behalf of Federal. | 5     A.    Ade -- adequate precise premium. |
| 6     Q.    Did you measure what contribution you | 6     Q.    Adequate precise premium.  But you did |
| 7 believe Blaze had to the three things you've | 7 not measure in this case whether Blaze Advisor |
| 8 mentioned? | 8 improved that ability to define accurate and |
| 9     A.    I used the term attributes. | 9 adequate price? |
| 10     Q.    Attributes? | 10     A.    I will reiterate my earlier statement. |
| 11     A.    And that was not within the scope of | 11 I was not asked to provide any quantitative |
| 12 my responsibilities. | 12 analysis of any aspects of this case. |
| 13     Q.    What do you mean by that? | 13     Q.    So the answer to my question is no? |
| 14     A.    What is not clear about it?  My -- my | 14     A.    Correct. |
| 15 responsibilities, as are articulated, were to | 15         (Whereupon, Deposition Exhibit No. 513 |
| 16 provide a qualitative evaluation of decision -- the | 16 was marked for identification, and a copy is |
| 17 automated decision software and, then, Blaze | 17 attached and hereby made a part of this deposition.) |
| 18 Advisor as that chosen automated decision software. | 18 BY MS. JANUS: |
| 19 I have never been asked to provide an assessment of | 19     Q.    Showing you what's been marked as |
| 20 any quantitative numbers. | 20 Deposition Exhibit 513, do you recognize |
| 21     Q.    So when you say "qualitative | 21 Exhibit 513? |
| 22 evaluation," explain for someone who is not in your | 22     A.    I recognize the front page and the |
| 23 industry or has your background, what do you mean | 23 back page as the beginning and the ending of the |
| 24 by that? | 24 report I created. |
| 25     A.    Does it make speed of transactional | 25     Q.    Okay.  Take a look at the document |
| <div align="right">Page 12</div> | <div align="right">Page 14</div> |

**Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019**
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1 itself and let me know when you've satisfied
2 yourself that it's a copy of your initial report in
3 this matter.
4        (Reporter's Note:  The witness is
5 reviewing Exhibit No. 513 for approximately two
6 minutes.)
7        THE WITNESS:  [Witness coughing]
8 Pardon me.
9        (Reporter's Note:  The witness
10 continues reviewing Exhibit No. 513 for
11 approximately five more minutes.)
12        THE WITNESS:  Finished.
13 BY MS. JANUS:
14    Q.    Okay.  Is that the expert report that
15 you initially submitted in this matter?
16    **A.    I will agree that upon cursory review**
17 **this does appear to be an entirety.  But, being the**
18 **precise underwriter that I have been for so many**
19 **years, until I laid your copy, your soft copy of**
20 **the document and my soft copy of the document and**
21 **ran a compare, I would not agree that it's exactly**
22 **the same.**
23    Q.    Okay.  My question for you is, is
24 Exhibit 513 a copy of the initial expert report you
25 submitted in this matter?

Page 15

1    **A.    And my answer is it appears to be.**
2    Q.    Excellent.  All right.  Do you have
3 any reason to think that Exhibit 513 is not a copy
4 of the initial expert report you submitted in this
5 matter?
6    **A.    I am a witness for plaintiff, you are**
7 **counselor for the defense.  That leaves a question.**
8 **I have no reasonable belief, based on my cursory**
9 **review of the document, that it is incorrect.  But**
10 **I will not absolutely state that it is because I**
11 **haven't taken it through the due diligence process**
12 **I normally take things through.**
13    MS. JANUS:  Okay.  Did you come,
14 Mr. Hinderaker, with a copy of Mr. Whitener's
15 expert report today?
16    MR. HINDERAKER:  Sure.
17    MS. JANUS:  Okay.  Can we mark that
18 as --
19    MR. HINDERAKER:  No, you can't mark --
20    MS. JANUS:  -- Exhibit 514?
21    MR. HINDERAKER:  No, you cannot mark
22 my working copy as Exhibit -- we can --
23    MS. JANUS:  Would you -- I mean --
24    MR. HINDERAKER:  We have no -- as he
25 just said, there's no -- there's no reason to think

Page 16

1 that it's not the expert report.  If you're
2 representing to us that it is, and I assume that
3 you are, then let's proceed forward with 513.
4        MS. JANUS:  Okay, sounds good.
5 BY MS. JANUS:
6    Q.    So we'll proceed forward with
7 Exhibit 513 being a copy of the initial expert
8 report you submitted in this matter, fair?
9    **A.    Fair.**
10    Q.    Okay.  I'm going to hand you a copy of
11 Exhibit 514.
12        (Whereupon, Deposition Exhibit No. 514
13 was marked for identification, and a copy is
14 attached and hereby made a part of this deposition.)
15 BY MS. JANUS:
16    Q.    Do you recognize Exhibit 514?
17    **A.    Again, I recognize the first page and**
18 **the last page as the pages of 514 that I submitted**
19 **to Merchant & Gould, I will be happy to review this**
20 **document in a similar fashion, if you would like.**
21    Q.    Yes.  I would like to know whether the
22 Exhibit 514 is a copy of the reply expert report
23 you submitted in this matter?
24        (Reporter's Note:  The witness is
25 reviewing Exhibit No. 514 for approximately three

Page 17

1 minutes.)
2        THE WITNESS:  Ready.
3 BY MS. JANUS:
4    Q.    Okay.  Does Exhibit 514 appear to be a
5 copy of your reply expert report submitted in this
6 matter?
7    **A.    It does appear to.**
8    Q.    All right.  Let's start with
9 Exhibit 513, which is your initial report.  On
10 page 1, you state that you are being paid $200 an
11 hour for your work in this matter?
12    **A.    That is correct.**
13    Q.    And how much have you billed to date
14 for your work in this matter?
15    **A.    On a rounded to thousands basis,**
16 **$167,000.**
17    Q.    In Information Considered, you note
18 that you had a discussion with Bill Waid on
19 November 12th, 2018, correct?
20    **A.    That is correct.**
21    Q.    Is that the only discussion you had
22 with anyone other than the attorneys at
23 Merchant & Gould to form the conclusions that
24 you've reached in this matter?
25    **A.    At the time of the writing of this**

Page 18

CASE 0:16-cv-01054-DTS   Doc. 382-1   Filed 07/26/19   Page 6 of 28
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 document, yes.
2    Q.   Okay.  Have you had discussions with
3 anyone other than Bill Waid and other than the
4 attorneys at Merchant & Gould in forming your
5 conclusions in this matter?
6    A.   My conclusions as represented by the
7 initial report, my conclusions as represented by
8 the rebuttal report reply, or my conclusions as
9 stated earlier in the testimony?
10   Q.   You -- you -- your conclusions in this
11 matter, so it's all-encompassing?
12   A.   All-encompassing.  I have had a demo
13 of the Blaze Advisor software.
14   Q.   Okay.  And when did that take place?
15   A.   Earlier this week.
16   Q.   What day?
17   A.   Today is the 27th?
18        MR. HINDERAKER:  Yes.
19        THE WITNESS:  The 26th.
20 BY MS. JANUS:
21   Q.   So yesterday?
22   A.   Yesterday.
23   Q.   Okay.
24   A.   I'm sorry, I choose to be a little
25 more precise.

Page 19

1    Q.   Well, you were there.  So I take it
2 you know whether anyone else was present, correct?
3    A.   I know who was in the room.  Thiago
4 was not, it was a WebEx -- or some similar
5 Internet-based tool.
6    Q.   So you -- so you were located at
7 Merchant & Gould?
8    A.   Correct.
9    Q.   Okay.  And Thiago was not at
10 Merchant & Gould?
11   A.   Correct.
12   Q.   When did the demonstra -- dem -- we
13 can refer to it as a demo of Blaze, when did that
14 again?
15   A.   Yesterday at 10:00 a.m. Central
16 Daylight Time.
17   Q.   How long did it last?
18   A.   Approximately an hour and 30 minutes.
19   Q.   Describe the demo for me?
20   A.   Be more specific, please.  I --
21   Q.   I don't -- I need to know sort of the
22 basics about what the demo entailed before I can be
23 more specific.
24   A.   Okay.  He showed me how to create
25 rules, how to -- for lack of a better descrip --

Page 21

1    Q.   Who provided the demo?
2    A.   His first name was Thiago, T-H-I-A-G-O.
3    Q.   Okay.  What was his last name?
4    A.   That's an excellent question, I don't
5 remember.
6    Q.   Okay.  What was his role?
7    A.   He provided the demo.
8    Q.   Where is he employed?
9    A.   He's employed by FICO.
10   Q.   Do you know what his position at FICO
11 is?
12   A.   I do not.
13   Q.   Who was present during the -- and I
14 take it by demo, you mean a demonstration of --
15   A.   Correct.
16   Q.   Okay.  Who was present at the
17 demonstration?
18   A.   The people in this room, excluding
19 your company's representatives, the videographer
20 and the court reporter, so --
21   Q.   Mr. Hinderaker, Mr. Woodward?
22   A.   And myself.
23   Q.   Okay.  And was Thiago the only other
24 individual present for the demo?
25   A.   To the best of my knowledge.

Page 20

1 description, concatenate rules, he showed me how
2 the various levels of technology supported by Blaze
3 Advisor dot net, Cobalt, Java feed to a centralized
4 repository and access that repository, and he gave
5 me a very brief overview of modifying a rule.
6    Q.   Was this a prepared demonstration, in
7 the sense that was there a presentation that went
8 along with it, or was it simply a more informal
9 conversation that you were having with Thiago?
10   A.   I would describe it as a more informal
11 conversation, although Thiago did pull up one slide
12 from previous presentations, but he did not -- he
13 would not do what I describe as making a presentation
14 to me.
15   Q.   Was the demonstration of Blaze
16 specific to any company's use of Blaze?
17   A.   Not really, no.
18   Q.   Okay.  Was Blaze -- was the
19 demonstration of Blaze that you received yesterday
20 connected to any particular program or industry?
21   A.   I would describe his presentation as
22 theoretical, but in executing the demonstration of
23 creating rules -- the things I described, he chose
24 to use a college admissions scenario.
25   Q.   Okay.  So he didn't give you a

Page 22

CASE 0:16-cv-01054-DTS   Doc. 382-1   Filed 07/26/19   Page 7 of 28
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 23**

1 demonstration that was specific to the insurance
2 industry, for instance?
3    A.   That is correct.
4    Q.   Okay. And he didn't give you a
5 demonstration that had anything to do with Federal's
6 use of Blaze?
7    A.   Also --
8    Q.   Correct?
9    A.   Also correct.
10    Q.   Blaze out of the box does not have any
11 rules in it, correct?
12    A.   That is correct, to the best of my
13 understanding. The art -- the artifacts don't give
14 me enough information to really know what Federal
15 and what Blaze had at the beginning.
16    Q.   Your understanding is that Blaze, as a
17 software tool, does not have any specific subject
18 matter, for instance?
19    A.   That is correct.
20    Q.   Correct? It does not import any
21 expertise in any industry, correct?
22    A.   I disagree with that.
23    Q.   Does it have any rules out of the box
24 relating to the insurance industry, for example?
25    MR. HINDERAKER: I'm going to -- my

**Page 25**

1 mentioned that he showed you how to concatenate
2 rules; is that right?
3    A.   Yes, concatenate.
4    Q.   Concatenate?
5    A.   Yeah.
6    Q.   And what do you mean by that?
7    A.   Well, in the world that I live in, in
8 the underwriting world, rarely do you make decisions
9 based on one single data element, you consider
10 multiple. So he showed me how to have the
11 individual rules interact with each other.
12    So the -- so if you have three rules,
13 the first rule could be based on an and statement,
14 so it's inclusive, but then the next two rules
15 could be based on an or statement, meaning it's one
16 or the other. That's what I mean.
17    Linked the rules might be a better
18 word than concatenate, but --
19    Q.   To link, did you say?
20    A.   Yes.
21    Q.   And he showed you how to create rules,
22 you said?
23    A.   Yes.
24    Q.   Okay. And how is that done, how is --
25 what is your understanding of how you create rules?

**Page 24**

1 only objection is to the phrase "out of the box,"
2 which is vague and inaccurate.
3 BY MS. JANUS:
4    Q.   Do you know what I mean by out of the
5 box?
6    A.   I know what I believe out of the box
7 means. I have no idea what you mean.
8    Q.   Okay. What do you interpret out of
9 the box to mean?
10    A.   Let's -- let's go to a personal
11 computer example, because most people understand
12 that. You buy shrink-wrap software. Let's pretend
13 that it's Microsoft Office. You cut the shrink
14 wrap, take out the disk, you load the software, and
15 it has only the executable code in it, it contains
16 no data.
17    So, if that's the definition of out of
18 the box, I suspect, but do not know, that Federal
19 received a out-of-the-box version of Blaze Advisor.
20    Q.   And, essentially, what you've
21 described as when it first received or downloaded
22 Blaze Advisor from FICO, we'd characterize that as,
23 essentially, out of the box?
24    A.   Yes.
25    Q.   Okay. Going back to the demo, you've

**Page 26**

1    A.   I -- I believe you are giving me way
2 too much credit for my memory from the demo. I'm
3 not sure I can describe that.
4    It's a -- it's -- it has the -- it has
5 the ability for you to say this is the name of a
6 rule, and the criteria for that rule it has to
7 be -- and I'm going to -- it has to be not sand and
8 gravel, trucking companies.
9    Q.   Okay. And speaking about Blaze
10 generally now, is it your understanding that the
11 rules that are put into Blaze come from the
12 business expertise of the entity that's using
13 Blaze?
14    A.   I'm not quite sure what you mean by
15 the phrase "put into."
16    Q.   Okay. Well, what would -- how would
17 you describe the rules in Blaze?
18    A.   As I -- as I articulate in the report,
19 there is -- there is -- it's a multistep process.
20 So there's creation of the rules, and based on the
21 artifacts, the rules were created by the -- the
22 definition of the rules. Okay. We will not write
23 sand and gravel trucks, as an example, was created
24 by Federal. But then there's the writing of the
25 rule into the software. Artifacts indicate that

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 39**

1  **Advisor, and if the rule is you can't do this if**
2  **the person is age 21 and under and you want to**
3  **change that to 25 and under, you highlight the 1,**
4  **and you press the delete key, you type in 5, and**
5  **then you save it.**
6      THE WITNESS:  Thank you, Allen.
7      MR. HINDERAKER:  You're welcome.
8  BY MS. JANUS:
9      Q.   Did the presentation yesterday or the
10 demo yesterday refer in any way to Federal?
11     **A.   No.**
12     Q.   Did Thiago discuss Federal's use of
13 Blaze?
14     **A.   No.**
15     Q.   Do you know whether Thiago had any
16 knowledge of Federal's use of Blaze?
17     **A.   No.**
18     Q.   Did you discuss the deposition today
19 with Thiago?
20     **A.   No.**
21     THE WITNESS:  Excuse me.  My sinuses
22 are not particularly fond of Minnesota, the great
23 State of Minnesota.
24     MS. JANUS:  We've been going about an
25 hour.  If you want to take a quick break?

**Page 40**

1      THE WITNESS:  I think I can go like
2  ten more minutes.
3      MS. JANUS:  Okay.
4      THE WITNESS:  But I am going to need a
5  break shortly.
6      MS. JANUS:  All right.  Well, why
7  don't we just break now and then --
8      THE WITNESS:  That's fine.
9      MS. JANUS:  -- we can reconvene.
10     THE WITNESS:  Okay.
11     THE VIDEOGRAPHER:  Going off the
12 record.  The time is 10:00 a.m.
13     (Break from 10:00 to 10:08.)
14     THE VIDEOGRAPHER:  We're back on the
15 record.  The time is 10:08 a.m.
16 BY MS. JANUS:
17     Q.   You have referred to artifacts several
18 times this morning.  What do you mean by that?
19     **A.   I mean the case documents that I have**
20 **been provided for reading, review and use.**
21 **Artifacts is a -- is a insurance industry**
22 **technological term.  All business requirements, for**
23 **instance, are referred to as artifacts.**
24     Q.   Other than the demo that you received
25 from Thiago, have you had any other conversations

**Page 41**

1  with anyone in preparing your reports?
2      MR. HINDERAKER:  Again, exclusive of
3  lawyers.
4      THE WITNESS:  Well, then, my response
5  is exclusive of attorneys, no.
6  BY MS. JANUS:
7      Q.   Okay.  And the demonstration you had
8  yesterday with Thiago was the first time that you
9  had talked with anyone at FICO other than Bill
10 Waid, correct?
11     **A.   Yes, that is correct.**
12     Q.   You refer to the conversation you had
13 with Bill Waid on November 12th, 2018, in your
14 report.  Was that a conversation over the phone?
15     **A.   Yes.**
16     Q.   How long did it last?
17     **A.   Oh, I'm sorry, I couldn't guess.  If**
18 **you want me to pull a number out of the air, I'd**
19 **say 45 minutes.  It was -- it was longer than**
20 **15 minutes and it was less than two hours,**
21 **45 minutes.**
22     Q.   And did you have only one conversation
23 with Mr. Waid?
24     **A.   That is correct.**
25     Q.   What did you discuss with Mr. Waid

**Page 42**

1  during the conversation?
2      MR. HINDERAKER:  I believe there were
3  lawyers involved --
4      THE WITNESS:  That is correct.
5      MR. HINDERAKER:  -- in that
6  conversation.  So we'll maintain a work product and
7  a privilege objection.  I don't have any quarrel
8  with you asking about whether any of that
9  conversation bears on the opinions that are
10 reported.  But the conversation per se with the
11 lawyers involved and the work product, I -- I
12 instruct you not to disclose that.
13 BY MS. JANUS:
14     Q.   Did your conversation with Bill Waid
15 inform any of the opinions that you have in this
16 matter?
17     **A.   No.**
18     Q.   Why did you list it under information
19 considered in your report on page 1?
20     **A.   Because I felt that not to list it**
21 **would be erroneous on my part, because I, in fact,**
22 **talked with him.**
23     Q.   Okay.  And your testimony is that none
24 of the information that you obtained during your
25 conversation with Mr. Waid has any bearing at all

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

1  on your opinions in this matter?

2     **A.   Correct.**

3     Q.   What topics did you discuss with

4  Mr. Waid during the call in November 12th?

5        MR. HINDERAKER:  I object to that as

6  work product and attorney-client privilege.

7  BY MS. JANUS:

8     Q.   Are you --

9        MR. HINDERAKER:  And I instruct you

10 not to answer.

11 BY MS. JANUS:

12    Q.   Are you following that instruction?

13    **A.   I am.**

14    Q.   What questions did you ask Mr. Waid

15 during your conversation on November 12th, 2018?

16       MR. HINDERAKER:  I have the same

17 objections, and I instruct you not to answer.

18       THE WITNESS:  I follow the advice of

19 counsel for plaintiff.

20 BY MS. JANUS:

21    Q.   What answers did Mr. Waid give to the

22 questions that you asked him on November 12th, 2018?

23       MR. HINDERAKER:  I have the same

24 objections, and I instruct the witness not to

25 answer.

Page 43

---

1        THE WITNESS:  I comply with plaintiff

2  counsel's request.

3  BY MS. JANUS:

4     Q.   Did -- Who was present on the phone

5  call with Mr. Waid on November 12th, 2018?

6     **A.   There were four people involved in the**

7  **phone call, myself, Mr. Waid and two lawyers.**

8        THE WITNESS:  The lawyers names?

9        MR. HINDERAKER:  If she wants to know,

10 that's fine.

11       THE WITNESS:  Mr. Woodward and

12 Missus -- if I wouldn't --

13       MR. HINDERAKER:  Kliebenstein.

14       THE WITNESS:  Yeah, Mrs. Kliebenstein.

15 I always -- I don't get -- I don't have a problem

16 with the Stein, it's the Klee (phonetic), because

17 I'm prone to turn her into a Kly (phonetic).  I'm

18 sorry, continue, please.

19 BY MS. JANUS:

20    Q.   All right.  Let's talk about your

21 education and experience, which begins on page 2 of

22 your report.

23    **A.   I'm there.**

24    Q.   Okay.  You write that you "have worked

25 in many parts of the insurance industry, including

Page 44

---

1  underwriting, financial management, planning,

2  product development, project management, general

3  (field operations) management, and business

4  management of technology," correct?

5     **A.   That is correct.**

6     Q.   And so would you say it's a fair

7  characterization that most of your experience in

8  the insurance industry does not directly relate to

9  technology?

10    **A.   No.**

11    Q.   Only one of the categories of

12 experience that you list -- and having worked in

13 many parts of the insurance industry -- includes

14 any direct connection to technology, correct?

15    **A.   I agree with that statement.**

16    Q.   Okay.  And that's the last one that

17 you list, the business management of technology,

18 correct?

19    **A.   Correct.**

20    Q.   You say you've had experience

21 underwriting, correct?

22    **A.   Correct.**

23    Q.   And as -- when you say experience

24 underwriting, describe what type of experience,

25 just in general terms, you're referring to?

Page 45

---

1     **A.   As an underwriter -- I was an**

2  **underwriter twice, in Hartford, Connecticut, and**

3  **in -- the second time in Washington, D.C.  My**

4  **general responsibilities will be similar to --**

5  **which you will hear almost any underwriter describe,**

6  **I was responsible for interfacing with and selling**

7  **The Hartford to independent agents in a -- a**

8  **specific defined territory.  I was responsible for**

9  **underwriting for that group of agents, every new**

10 **business application that came in that they**

11 **submitted.  I was responsible for reviewing and**

12 **underwriting any changes to policies that were**

13 **submitted by those agents that required**

14 **underwriting attention.  I was responsible for**

15 **reviewing renewals that were come -- policies that**

16 **were coming up for renewal to determine whether we**

17 **wanted to make any modifications or we were just**

18 **going to allow the renewal to continue as is.  I**

19 **was responsible for underwriting what The Hartford**

20 **called risk alerts.  So if the claims department**

21 **flagged a specific claim as needing scrutiny and**

22 **that claim was for a policy submitted by one of the**

23 **agents for which I was responsible, I would review**

24 **that policy almost immediately after the claims**

25 **occurrence had taken place.  That's a 50,000 foot**

Page 46

---

CASE 0:16-cv-01054-DTS   Doc. 382-1   Filed 07/26/19   Page 10 of 28
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 47**

1  overview.
2     Q.    Okay.  I take it in your work as an
3  underwriter, your expertise, your personal
4  expertise was important to the performance of your
5  underwriting duties?
6     A.    Yes.
7     Q.    Your personal judgment was crucial in
8  the performance of your underwriting duties, correct?
9     A.    Yes.
10    Q.    Would you say your expertise and
11 judgment in underwriting were the most important
12 aspects of your success as an underwriter?
13    A.    No.
14    Q.    What was?
15    A.    I -- I do not undervalue the
16 importance of that expertise.  However, that is one
17 part of a Rubik's Cube.
18          So my ability to have a high level
19 of -- are you familiar with the phrase EQ, emotional
20 quotient, and be able to interface with a very,
21 very diverse agency plant and then a very, very
22 diverse group of people inside of the agency plant
23 in combination with various other departments, such
24 as claims, loss control, marketing, and my peers in
25 other underwriting departments, such as bond and

**Page 48**

1  commercial lines, was very important.  That's one
2  of the reasons I like the underwriting, because you
3  actually have your hands in so much of the business.
4     Q.    So you're -- you said emotional
5  quotient?
6     A.    Yes.
7     Q.    And do you sometimes refer to that as
8  emotional intelligence?
9     A.    Some people do.
10    Q.    Okay.
11    A.    When I grew up, it was EQ.  Now it's
12 EI.
13    Q.    Okay.  And that --
14    A.    But it's the same thing.
15    Q.    Same thing, okay.  And so your EQ or
16 EI was crucial to your success as an underwriter?
17    A.    Agreed.
18    Q.    Okay.  Did you use technology as an
19 underwriter with The Hartford?
20    A.    Define technology, please.  A
21 Monroe -- a Monroe JD-30 calculator is technology.
22 I had a Monroe JD-30 calculator on my desk.  Okay.
23 Did I interface and type into the policy admin
24 system?  No.
25    Q.    Okay.  So The Hartford had a policy

**Page 49**

1  admin system?
2     A.    Multiple admin policy systems.
3     Q.    But you did not use the policy admin
4  system as an underwriter?
5     A.    This was 1977, that is correct.
6     Q.    Did you as an underwriter define rules
7  that were used by The Hartford to underwrite
8  insurance?
9     A.    At what point in time?
10    Q.    Any point in time?
11    A.    Yes.
12    Q.    Okay.  When did you do that?
13    A.    That would have been when -- pardon
14 me.  That would have been when I was now back --
15 back up in home office, excuse me, and had come
16 back to the underwriting department from the
17 planning department.
18    Q.    Do you have a rough time period on
19 that?
20    A.    Um, I believe I came back from the
21 planning department in late nineteen eighty -- yes,
22 '84, yeah, give or take a century.
23    Q.    And we'll go through the experience
24 that you've listed.  But just in general terms,
25 what was your role in creating rules that were used

**Page 50**

1  in the underwriting process?
2     A.    We would have an annual review.  So,
3  at this point, I was in what was called the line of
4  business.  Today you would know it as the product
5  department, and we would -- we would have an annual
6  review using multiple data sources, actuarial data,
7  profit and loss statements for our various products
8  by jurisdiction, and that jurisdiction was down
9  into the individual rating territory, and we would
10 look and we would see if we wanted to modify our
11 rules, add rules, subtract rules, change from 21 to
12 25, change from sand and gravel to U-Haul vans,
13 kind of a thing.
14    Q.    So you looked at the data that you had
15 based on past performance, correct?
16    A.    I'm not -- I'm not sure I understand
17 the question.
18    Q.    Well, you described --
19    A.    As it relate -- as it relates to my
20 time at The Hartford?
21    Q.    Yes.
22    A.    Okay.  Now restate the question,
23 please.
24    Q.    Okay.  So you -- you -- you were
25 describing the process of creating rules when you

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  into a consumer's decision to purchase a given
2  insurance product. I take it you'd agree with me
3  that if an insurance company uses Blaze in some
4  aspect of the process to underwrite an insurance
5  product for a particular customer, that the use of
6  Blaze in and of itself would not influence that
7  customer's decision to purchase the product, would
8  you agree with that?
9        **A.    I agree that the direct consumer, be**
10  **it a business or a family entity, personal lines,**
11  **does not see or care about any of the technologies**
12  **that an insurance company takes to -- I'm going to**
13  **use the word fulfill, fulfill its insurance**
14  **process, be it policy issuance, be it claims, be it**
15  **billing. The consumer is oblivious to that. I**
16  **probably would --**
17        MR. HINDERAKER:  Go ahead, finish your
18  answer.
19        THE WITNESS:  I probably would not
20  make the same statement for the broker.
21  BY MS. JANUS:
22     Q.    So the consumer that you referred to
23  does not care whether Federal uses Blaze in any of
24  its processes in connection with selling or
25  administering a given insurance policy, fair?

Page 75

1        MR. HINDERAKER:  The question
2  misstates the answer, and I object for that reason.
3        THE WITNESS:  May I answer?
4        MS. JANUS:  Yes.
5        THE WITNESS:  Or respond?
6        MR. HINDERAKER:  Yes, you may.
7        THE WITNESS:  Okay.  Thank you.  Just
8  asking for the rules.
9        The consumer cares that the value
10  proposition, a combination of coverages, exclusions
11  and price, meet their needs and their expectation.
12  Okay.  The insurance company cares that the -- oh,
13  and, I'm sorry, I need to put speed in there.  All
14  right.  So -- so if you look at speed of response
15  and you look at adequacy of price in combination
16  with the proposed package, the consumer cares about
17  that.  The broker --
18  BY MS. JANUS:
19     Q.    I'm sorry, let me just stick with my
20  question for a moment.  I want to make sure I've
21  got an answer to my question.
22        I asked you whether you would agree
23  that the consumer does not care that Federal may
24  use Blaze as a part of its complex processes to
25  issue or underwrite a particular insurance product?

Page 76

1        MR. HINDERAKER:  I'm going to object
2  to the argumentative nature of that.  He was trying
3  to answer --
4        MS. JANUS:  No, no, no, no, don't
5  coach him, don't coach him.
6        MR. HINDERAKER:  I'm not.
7        MS. JANUS:  Al, I'll stop you there.
8        MR. HINDERAKER:  Fine.
9        MS. JANUS:  Let's not get into that.
10  It was a fair question, it wasn't argumentative.
11        MR. HINDERAKER:  And you --
12        MS. JANUS:  I want an answer.
13        MR. HINDERAKER:  I was just trying to
14  say, he was trying to answer that question.  So let
15  him finish his answer, please.
16        MS. JANUS:  Please don't raise your
17  voice with me.
18        MR. HINDERAKER:  Oh, I wasn't --
19        MS. JANUS:  And stop coaching the
20  witness.  As soon as I get to a question you don't
21  like, you start coaching.  Okay.
22        MR. HINDERAKER:  I --
23        MS. JANUS:  Let's stop it now.  He's
24  your expert, he should be able to handle it.
25        MR. HINDERAKER:  I like your --

Page 77

1        MS. JANUS:  All right.  I'm going to --
2        MR. HINDERAKER:  I like -- I liked
3  your question.
4        MS. JANUS:  I'm going to --
5        MR. HINDERAKER:  And I'd like him to
6  have a chance to answer.
7  BY MS. JANUS:
8     Q.    I'm going to ask my question again,
9  and I'd like an answer to it, and I think -- I
10  think your previous answers pretty obviously
11  suggest this.  I just want to make it clear on the
12  record, as I'm entitled to do, I'm entitled to
13  create the record.
14        You would agree with me, I take it,
15  based on your previous testimony, that a consumer
16  making a decision to purchase an insurance product
17  from Federal does not care whether or not Blaze was
18  used at any point in the process of selling or
19  underwriting that insurance product, correct?
20     **A.    Correct.**
21     Q.    You would agree with me that, in fact,
22  a consumer making a decision to purchase an
23  insurance product from Federal does not know that
24  Blaze was used at any point in the process in
25  selling or underwriting that product, correct?

Page 78

**Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY** - 6/27/2019
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1  A.  The consumer is oblivious to any of
2  the tools the insurance company uses to construct,
3  deliver and fulfill their products.  They don't
4  want to know.
5  Q.  And there are many, many tools that an
6  insurance company uses to do that, correct?
7  A.  I've never seen an insurance company
8  have less than three.  To say many, I can't speak
9  to that.
10  Q.  There are many technologies that an
11  insurance company -- let's talk about Federal.
12  Federal uses many, many technologies in conducting
13  its business, correct?
14  A.  Yes.
15  Q.  Blaze is one technology that Federal
16  uses, correct?
17  A.  Pardon me.  That is correct.
18  Q.  Is it fair to say that to the extent
19  Blaze is used by Federal it's in the background,
20  correct?
21  A.  From whose perspective?
22  Q.  The consumer's.
23  A.  Correct.
24  Q.  It is a back office issue, correct?
25  A.  It is a back office issue that creates
Page 79

1  things about which the consumer greatly cares.
2  Q.  Unbeknownst, its use is unbeknownst to
3  the consumer, correct?
4  A.  The consumer is not concerned about
5  how those three things are created, they're just
6  concerned that those three things exist.
7  Q.  You would agree with me that Federal
8  does not market or sell Blaze, correct?
9  A.  Excuse me.  Yes.  I -- I would agree
10  that I have no indication that they do that or have
11  any interest in doing that.
12  Q.  You would agree with me that Blaze is
13  just one part of Federal's IT infrastructure,
14  correct?
15  A.  As I articulate in my reply to
16  Mr. McCarter's report, it is one of many
17  technologies.  But my job was not to value the
18  size of -- not value -- to evaluate qualitatively
19  the size of Federal's technology footprint, but it
20  is one of many.
21  Q.  So you did not conduct an analysis of
22  how significant a part of Federal's IT infrastructure
23  Blaze is?
24  A.  Significant is an ambiguous word.
25  There are multiple ways to find that.  One -- one
Page 80

1  can, in fact, be, as Mr. McCarter pointed out, the
2  raw arithmetical, it's one of -- and off the top of
3  my head I don't remember his number, let's say a
4  thousand, it's one of a thousand technologies.
5  That is irrelevant in my opinion.  I'm
6  not measuring, I'm not evaluating, I'm not trying
7  to quantify the impact of the overall footprint of
8  a company.  I'm evaluating the value -- the
9  qualitative value of a software in executing the
10  insurance process.
11  Q.  Let's go back to your background.  We
12  talked about product development.  You also list
13  product management?
14  A.  Yes.
15  Q.  What -- what does that refer to?
16  A.  Do you recall my description of the
17  insurance product as rates, rules and forms?
18  So, in product management, for a
19  specified jurisdiction for a period of time, a
20  defined period of time, and for the departments of
21  insurance that regulate the insurance industry, my
22  responsibility was management of -- I'll use the
23  management term, management of the definition of
24  the rates, rules and forms within my scope of
25  geographic regulatory and agent responsibilities.
Page 81

1  Q.  So the focus of product management is
2  not technology, correct?
3  A.  Uh, correct.
4  Q.  You also did general (field operations)
5  management?
6  A.  Also correct.
7  Q.  And is -- what is general (field
8  operations) management?
9  A.  General (field operations) management
10  is -- may -- may I couch this in terms of Federal?
11  MR. HINDERAKER:  Sure.
12  THE WITNESS:  Okay.  Federal makes
13  reference to their underwriters who are out in the
14  field and the fact that they had three centers.
15  Okay.  I was a manager of all of the service people
16  and all of the processors and about 90 percent of
17  the underwriting function inside of an office.  So
18  we were the interface to the agent.  We were the
19  ones where the new business applications arrived on
20  those people's desks.
21  BY MS. JANUS:
22  Q.  The focus of your general (field
23  operations) management was not technology, correct?
24  A.  I struggle to answer this one,
25  respectfully.  I -- I -- I respectfully point out
Page 82

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 that I am going to struggle to answer this one
2 because one of the reasons that they sent me there
3 was I knew technology and we had to reengineer the
4 office.
5        So, in the course of time that that
6 was off -- that I was at that office, we did a
7 number of reengineering, redesign of the physical
8 plant things, and technology, both telephone
9 technology and policy admin processing technology
10 were some of the big changes we made.  We moved out
11 of -- we -- we moved out of a green screen -- Are
12 you familiar with the phrase green screen from a
13 technology standpoint?  Yeah.  It's -- it's not
14 what you see when you go home and you launch your
15 computer.  Your computer is giving you a graphical
16 user interface, you use a mouse.  That didn't exist
17 back in those days.  It was a green screen.  All
18 you could do was hit up and down arrows to move
19 from field to field.
20        We replaced that Cobalt system, dumb
21 terminals, with a local area network, Compaq
22 Presario 33 personal computers, and we installed an
23 entire networking system.  It was actually a star
24 topology, if that means anything to you, and
25 migrated all of those people I was talking about
Page 83

1 This is -- this is the part of the --
2 this is a part of my career where I actually
3 authored rules on the piece of paper, not for the
4 system because it was going to go to a Cobalt-based
5 system.  And then, after we had done that, we had
6 36 what we call strategic initiatives, specific
7 projects that had to be implemented over the course
8 of the next three years, and they looked at me and
9 said, go make it happen.
10        As part of that, the information
11 technology department looked and said we can't get
12 all of this done and everything else, and I
13 implemented what I call a priority management
14 system that took all existing projects and tabled
15 them, and then every programming hour inside of a
16 month we re -- we monthly released at The Hartford
17 in those days, typical of a Cobalt system, a
18 Cobalt-based system, and so -- we had 55 programmers,
19 and they spent their time on nothing but did not
20 have a document that had my signature on it.  I set
21 the priorities.
22        Now, obviously, my boss wanted to know
23 what was going on.  But in the three years we were
24 doing this, he never changed the priority on me.  I
25 was well-known in the IT department of The Hartford.
Page 85

1 that used the computer, we put in a gateway so that
2 the personal computers could talk to a controller,
3 a gateway that would then talk to the mainframe.
4    Q.    So by -- are -- are you saying that
5 you managed -- you were the general manager of an
6 IT department that performed those functions?
7    A.    No.  I was the -- I will not call
8 myself the general manager because my boss was
9 called the general manager.  But I was the manager
10 responsible for making the telephone system and the
11 transition to the personal computers happen across
12 122 people in that office.
13    Q.    And then you mentioned business
14 management of technology?
15    A.    Yes.
16    Q.    And what do you mean by that?
17    A.    In approximately 1987, we discovered
18 that we were doing an outstanding job of poorly
19 executing the acquire adequate premium process.  I
20 was in home office at this time, I was at
21 headquarters, and my upline dragged me into a room,
22 and we sat down and we, over the course of about
23 three days, crafted a plan of all of the things we
24 wanted to do from a technology statement -- I'm
25 sorry, statement -- standpoint to close holes.
Page 84

1 Some of them even liked me.
2    Q.    You were at Hartford from 1977 through
3 what year?
4    A.    I believe it was 1993.
5    Q.    Did The Hartford use a rules
6 management software?
7    A.    No.  May I point out that they didn't
8 exist at that time.
9    Q.    How did The Hartford implement its
10 rules?
11    A.    Mr. McCarter's strategy or alternative
12 number two.  Our rules were hard coded into the
13 Cobalt.
14    Q.    When you left The Hartford -- let me
15 stick with The Hartford for a moment, actually.
16 You talk about --
17    A.    [Witness coughs] Excuse me.
18    Q.    -- Equifax's CLUE, C-L-U-E?
19    A.    Comprehensive loss underwriting
20 exchange.
21    Q.    Is that what you were just referring?
22    A.    No.
23    Q.    No, okay.  What is -- explain what
24 CLUE is?
25    A.    CLUE is a third-party information
Page 86

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1   A.   A policy administration system is the
2   system that executes an insurance company's quote,
3   bind, book, issue process for multiple transactions.
4   In addition, it executes the termination process
5   for policies that an insurance company may have
6   already sold.  It is the -- it is the core database
7   of characteristics.  I'm 64 years old, that's an
8   insure -- that's an insurance characteristic.  I
9   have gray hair, that's not an insurance
10   characteristic.
11      So it -- it was the -- it was the
12   prelim -- it is the preliminary database as it
13   relates to that quote, bind, book, issue terminate
14   and -- change-and-terminate process, it's the
15   engine.  Oh, pardon me.
16   Q.   Federal, I take it, has policy
17   administration systems?
18   A.   Multiple.
19   Q.   Are any of those policy administration
20   systems at issue in this case?
21   A.   Yes.  Well, the use of Blaze Advisor
22   as the rules management system or the automated
23   decision system as used by several of those policy
24   administration systems is part of this case or
25   is -- is relevant to this case.
Page 95

1   Q.   Which systems are those?
2   A.   Memory test.  All right.  So may I go
3   to my report?
4   Q.   Sure.
5   A.   All right.  CSI Express is used by the
6   Chubb Specialty Insurance small business unit -- or
7   strategic business unit.  Excuse me.
8   Q.   Which paragraph of your report are you
9   looking at?
10   A.   I am looking at multiple paragraphs,
11   but let's start on page 7, section V, paragraph 28.
12   Q.   Okay.
13   A.   Shall I continue?
14   Q.   So CSI Express is a policy --
15   A.   Administration system.
16   Q.   Administration system.  And CSI
17   Express was developed by Federal, correct?
18   A.   I cannot answer that question.  I
19   don't know.  I mean, I didn't do a history of
20   Federal's deployment of technology.  I will say
21   this, I expect so, but I cannot definitively
22   confirm or deny that.
23   Q.   Okay.  And CSI Express was in use at
24   Federal prior to Federal's use of Blaze, correct?
25   A.   The artifacts indicate that that is
Page 96

1   the case, yes.
2   Q.   Blaze is used in CSI Express, correct?
3   A.   The artifacts indicate that that is
4   the case, yes.
5   Q.   It is one small part of CSI Express,
6   correct?
7   A.   CSI Express uses multiple technologies.
8   It is a component of that.  The relative size or
9   significance of it depends on your denominator.  So
10   I can't respond to that.
11   Q.   Okay.  So you don't know how
12   significant of a component Blaze is within CSI
13   Express?
14   A.   Significance of component cannot be
15   assessed until you tell me what the denominator is.
16   Are you measuring it as one against X numbers of
17   technologies, are you measuring it against the
18   relative functional value that each of the
19   individual components contributes to the quote,
20   bind, book, issue process?  I don't know what your
21   denominator is.
22   Q.   Well, how would you -- did you -- did
23   you measure -- let me ask it this way.  Did you
24   measure the relative significance of Blaze in CSI
25   Express as compared to the other technologies that
Page 97

1   are used in CSI Express?
2   A.   I submit to you that my entire report
3   is an evaluation of the functional value of Blaze
4   Advisor inside of multiple of the Federal policy
5   administration systems.
6   Q.   And we're talking about CSI Express
7   first.
8   A.   Okay.
9   Q.   My question for you is, did you do any
10   measurement or analysis of how significant a part
11   of CSI Express Blaze is?
12      MR. HINDERAKER:  I'd like to object to
13   the question as multiple in form, one is
14   significance, the other is analysis.  Which are you
15   asking?
16      MS. JANUS:  I think you mean
17   measurement or analysis.
18   BY MS. JANUS:
19   Q.   So let's start with measurement?
20   A.   I did not quantitatively measure in
21   terms of this report.  My responsibility was
22   qualitative and functional.
23   Q.   So are you able to opine as to the
24   specific value that comes from CSI Express that is
25   attributable to Blaze?
Page 98

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1    A.   I'm able to opine the functional value
2  attributable to Blaze as it relates to the execution
3  of business rules inside of the policy administration
4  system which is using the software.
5    Q.   What is that?
6    A.   In this case we're discussing CSI
7  Express.
8    Q.   Right.  But you're saying you're able
9  to opine on the functional value?
10   A.   Yes.
11   Q.   Okay.
12   A.   Oh, good.
13   Q.   And what do you --
14   A.   Good.  I'm sorry.  Now I understand
15 your question.  Okay.
16       So let's go back to my three things
17 that are important: speed, ease of doing business,
18 and accuracy and adequacy of the price.  Blaze
19 functionally makes all of those better.  It improves
20 the speed of response for the independent broker.
21 It makes the job of the independent broker easier,
22 which translates then into the ease that the
23 applicant or customer experiences, and it is
24 contributing to the adequacy of the price for the
25 proposed coverage package.

Page 99

1  Express?
2    A.   Here specifically we're discussing CSI
3  Express, yes.
4    Q.   And as we've established, Blaze is one
5  small part of CSI Express?
6    A.   As long as you and I agree that your
7  measurement is footprint, yes.  If you and I are
8  discussing functional value, no.  You choose.  Not
9  meaning to be disrespectful, it's got to be one or
10 the other.
11   Q.   Do you know what the other components
12 of CSI Express are?
13   A.   There are artifacts that articulate
14 the various and sundry components.  I assure you I
15 spent less than one second reviewing those.
16   Q.   How can you have an opinion as to
17 Blaze's contribution to speed, ease of doing
18 business or adequacy of price if you do not know
19 what the other components of the complex application
20 it resides in -- namely, CSI Express -- are?
21   A.   CSI Express is a policy administration
22 system.  It quotes.  But going to inside of CSI
23 Express, specifically Decision Point as -- just as
24 one example, CSI Express Decision Point won't quote
25 if it doesn't meet the definition of the rules, the

Page 101

1    Q.   Are those all functions that CSI
2  Express performs or Blaze specifically?
3    A.   Both.
4    Q.   Have you done an analysis of what
5  amount of improvement to speed, ease of doing
6  business, adequacy of price is attributable to
7  Blaze --
8    A.   That --
9    Q.   -- as opposed to CSI Express?
10   A.   That was outside of the scope of my
11 responsibilities.
12   Q.   So you can't opine as to what
13 improvements, if any, in terms of speed, ease of
14 doing business or adequacy of price are specifically
15 attributable to Blaze, correct?
16   A.   Quantitatively, no.  Qualitatively,
17 yes, the things I've already articulated.
18   Q.   The things you've articulated, though,
19 relate to the functioning of CSI Express generally,
20 correct?
21   A.   They relate to the -- to all of the
22 tools and mechanisms used by the owner of the
23 software, Federal, to execute their quote, bind,
24 book, issue, modify, terminate processes.
25   Q.   And here we're talking about CSI

Page 100

1  risk attribute.
2       That's why insurance companies have
3  rules, to frame for their distribution system -- in
4  this case independent agents and brokers -- the
5  definition of their risk appetite.  I've been working
6  with underwriting insurance rules and the use of
7  technology to make those processes better for the
8  brokers and agents for a really long time.
9    Q.   You have never worked with a policy
10 administration that utilizes a rules management
11 software, correct?
12   A.   Correct.
13   Q.   The value that you've articulated as
14 speed, ease of doing business, and adequacy of
15 price, would you characterize those as efficiencies?
16   A.   No.  Again, it's Rubik's Cube.
17 There's written premium impact, there's loss cost
18 impact, and there is expense impact across the use
19 of a system like this.
20   Q.   Can you quantify --
21   A.   I was never asked to quantify anything.
22   Q.   So you cannot quantify any contribution
23 that Blaze has on any of the factors you just listed?
24   A.   That is correct.  I was not asked to
25 quantify anything.  It's out of the scope of my

Page 102

**Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019**
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1 agreement and arrangement.

2      MS. JANUS:  All right.  Let's take a

3 short break.

4      THE WITNESS:  Sure.  My blad --

5      THE VIDEOGRAPHER:  Going off the

6 record.  The time is 11:39 a.m.

7      (Break from 11:39 to 12:30.)

8      THE VIDEOGRAPHER:  We're back on the

9 record.  The time is 12:30 p.m.

10      THE WITNESS:  [Witness coughing] Pardon

11 me.

12 BY MS. JANUS:

13      Q.    All right.  Mr. Whitener (phonetic

14 Wit-ner), you understand you're still under oath?

15      A.    I do.

16            Would you please use Whitener

17 (phonetic White-ner)?

18      Q.    Oh, sure.

19      A.    You'll get a better response from --

20      Q.    My apologies.

21      A.    No, no, no worries.  I can't tell you

22 how many times I've made that statement in the years.

23      Q.    If you could turn to your report,

24 let's start on page 4 of Exhibit 513.  And this

25 section of the report is entitled FICO's Blaze

Page 103

1 Advisor® Decision Management Software, correct?

2      A.    Yeah, section IV.

3      Q.    How would you characterize the facts

4 and data that you relied upon in forming the

5 conclusions you've reached in section IV of your

6 report?

7      A.    I would characterize them as my

8 fundamental belief based on noted artifacts, based

9 on a functional analysis of the software that shows

10 that Blaze Advisor contributes to the automate --

11 automated decisioning of Federal's business units,

12 wherein it is deployed, it's not deployed in all

13 the business units, and that Blaze Advisor is

14 highly regarded by the industry analyst community,

15 and I note that through the quoting of a Forrester

16 group, Research group's document, where they

17 analyzed the functionality and the future vision of

18 various and sundry decision management systems.

19      Q.    And you mentioned a functional

20 analysis of the software.  Are you referring to

21 Chubb's software -- Federal's software, I should

22 say?

23      A.    No.  In this section I am referring to

24 the Blaze Advisor decision software.

25      Q.    And that is a software that you have

Page 104

1 never used, correct?

2      A.    That is correct.

3      Q.    And that's a software that you had

4 never seen demonstrated until yesterday, correct?

5      A.    Also correct.

6            (Whereupon, Deposition Exhibit No. 515

7 was marked for identification, and a copy is

8 attached and hereby made a part of this deposition.)

9 BY MS. JANUS:

10      Q.    Showing you what's been marked as

11 Exhibit 515 --

12            MR. HINDERAKER:  Thank you.

13 BY MS. JANUS:

14      Q.    -- this is the document that you

15 reference in footnote 1 of your report?

16      A.    May -- may I have a moment, please?

17      Q.    Oh, sure.

18      A.    Thank you, thank you.  Ah,

19 double-sided.

20      Q.    And, Mr. Whitener, the question before

21 you is, could you confirm that this is the document

22 that you've cited in footnote 1 of your report?

23 And that's on page 4 of your report.

24      A.    Coming.  It is.

25      Q.    Okay.  And --

Page 105

1      A.    Well, let me rephrase that.  This --

2 this is -- this footnote does, in fact, relate to

3 the quote -- to a quote that is documented here.

4 There are multiple artifacts that this quote is in.

5 This is the one I choose for -- choose to use for

6 the footnote in the report.

7      Q.    Sure.  Okay.  As authority for the

8 point you're making in paragraph 21, correct?

9      A.    Yes.

10      Q.    Okay.  And Exhibit 515 is a FICO

11 document, correct?

12      A.    Interestingly, its front name on the

13 document is Henry Mirolyuz, a Chubb employee.  The

14 presentation is a FICO™ Forum:  Decision Management

15 Tools User Group, and both companies' logos are on

16 the document.  To the extent that each of those

17 entities contributed to this, I cannot speak.

18      Q.    Okay.  So you don't know who as

19 between FICO and Federal authored what in this

20 document, correct?

21      A.    That is correct.

22      Q.    Take a look at the page marked 57211?

23      A.    I'm there.

24      Q.    This has a list of Lessons Learned,

25 correct?

Page 106

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1      A.    That is the title of the specific
2  page.
3      Q.    Did you take the Lessons Learned page
4  into account in forming your opinions in this
5  matter?
6      A.    I read this document. I noted that
7  Lessons Learned reflected two things, that Chubb
8  had a solid -- Federal, I'm sorry, had a solid
9  process in postmortem review of their implementation
10 efforts, and I -- I noted the items indicated
11 that the -- because they were doing a postmortem,
12 the implementation could have gone, in their
13 opinion, possibly more effectively, efficiently.
14 Again, Dr. Covey's two parameters.
15     Q.    There were problems with the
16 implementation of Blaze at Federal?
17     A.    I can't say that. This is a Lessons
18 Learned. You could have the best implementation in
19 the world and still do a Lessons Learned.
20     Q.    The second bullet point in Lessons
21 Learned is "Need to establish the rule harvesting
22 procedures for BAs." Do you see that?
23     A.    I do.
24     Q.    Do you know what is meant by BAs?
25     A.    I can speculate that it means business
                                              Page 107

1  analysts. That certainly is the preponderance of
2  the use of capital B, capital A that I've used in
3  my career.
4      Q.    And rules harvesting is the process of
5  identifying the defined rules, as you referred to
6  earlier in the day, correct?
7      A.    I believe rule harvesting meant
8  going -- or, I'm sorry, means, as respects this
9  document, going to multiple sources to insure that
10 as they begin to put those rules into Blaze Advisor
11 they're going to multiple sources to make sure that
12 they have as many of the rules as they can identify.
13     Q.    So it's a process of identifying the
14 defined rules of Federal, correct?
15     A.    Yes.
16     Q.    And that's a crucial part of the
17 process of having a successful implementation of
18 Blaze, correct?
19     A.    Yes.
20     Q.    In fact, if you implement Blaze and
21 you don't have good rules, the result will be
22 negative --
23           MR. HINDERAKER: Asked and answered.
24 BY MS. JANUS:
25     Q.    -- for a company, correct?
                                              Page 108

1           MR. HINDERAKER: Asked and answered.
2           THE WITNESS: If you implement rules
3  in Blaze and the quoting -- or, I'm sorry, the
4  coding or the building of the rules, coding in
5  Cobalt, building in new technology, is in some way
6  flawed, or if the rule is in some way flawed and
7  the testing process of expected outcomes doesn't
8  produce -- doesn't catch that, you will produce an
9  undesired result.
10 BY MS. JANUS:
11     Q.    The only way Blaze is useful to an
12 insurance company is if the rules that are in Blaze
13 are the right rules, correct?
14     A.    Again, referring to my reference to
15 the Rubik's Cube, there are multiple things that
16 impact and influence the P&L of an in -- of a
17 property and casualty insurance company, and so if
18 the rules are not correct, then, a less than
19 desirable P&L cause -- I'm sorry, effect will come
20 out of that.
21     Q.    Right, and I want this to be as
22 efficient as we can have it today. So I'd ask that
23 you listen to the question and answer it.
24           My question was, the only way that
25 Blaze is useful to an insurance company is the
                                              Page 109

1  rules that are in Blaze are the right rules, you
2  would agree with that, correct?
3           MR. HINDERAKER: Objection, asked and
4  answered.
5           THE WITNESS: I agree that it is
6  important that the rules be correct. I agree that
7  the overall contribution to the touchpoints we've
8  discussed earlier will not be as good if the rules
9  are incorrect.
10 BY MS. JANUS:
11     Q.    Right, but my question -- I'm entitled
12 to a yes or no answer to my question. My question
13 is, the only -- the only way Blaze could ever have
14 value to an insurance company is if the rules that
15 are in Blaze are the right rules?
16           MR. HINDERAKER: I'm going to lodge my
17 objection. Counsel is not entitled to a yes or no
18 answer if a yes or no answer is not the witness's
19 truthful testimony.
20           MS. JANUS: Please stop coaching the
21 witness.
22           MR. HINDERAKER: I don't think I did.
23 And if you wish to maintain your position that no
24 answer except a yes or no answer is an acceptable
25 one, you're free to do that, and I'm free to lodge
                                              Page 110

CASE 0:16-cv-01054-DTS   Doc. 382-1   Filed 07/26/19   Page 18 of 28

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 the fact that we're here to give truthful testimony.
2 BY MS. JANUS:
3     Q.    You can answer my question.  Is that
4 correct?
5     A.    **In a isolated view of the complex**
6 **Rubik's Cube of insurance, yes, but it is an**
7 **isolated view.**
8     Q.    The next bullet point is that training
9 is required for a developer to become familiar with
10 new technology, correct?
11     A.    **It is.**
12     Q.    The next bullet point is --
13     A.    **Pardon me.**
14     Q.    "-- Lack of established design best
15 practices and standards which complicates design of
16 BR projects and prevents from utilizing full
17 potential of Blaze Advisor rule engine."  Is BR
18 business rules?
19     A.    **I -- I suspect so.  Artifacts have**
20 **that BR associated with the definition of business**
21 **rules.**
22     Q.    So does it appear to you that a lack
23 of established design best practices and standards
24 can prevent the utilization of the full potential
25 of the Blaze Advisor rule engine?
Page 111

1     Q.    So, at this point in time, there was
2 an identification that there was no knowledge
3 sharing between strategic business units, correct?
4     A.    **That is correct.**
5     Q.    Take a look at the page marked 57213,
6 please?
7     A.    **I am there.**
8     Q.    Well, actually, I'm sorry.
9     A.    **That's okay.**
10     Q.    57212 first.
11     A.    **Okay.**
12     Q.    So --
13     A.    **Got it, I'm there.**
14     Q.    So the second quote is -- states, "To
15 achieve corporate consistency and have any tool
16 become a corporate asset, you need a central area
17 to help manage that we 'stay the course'," correct?
18     A.    **It does state that, yes.**
19     Q.    It goes on to state on the third
20 quote, "Without a Rules COE we will not efficiently
21 leverage the learnings across multiple rules
22 implementations thereby increasing costs, gain the
23 benefits of rule reuse, and potentially not meet
24 Architecture and business objectives," correct?
25     A.    **The document does state that.**
Page 113

1           MR. HINDERAKER:  Object to the
2 question to the extent it misstates the document.
3           THE WITNESS:  I agree that
4 implementations of any technology inside of an
5 insurance company are more efficient and effective
6 if before the implementation starts best practices
7 for the implementation have been defined.  So, to
8 that extent, I would say yes.
9 BY MS. JANUS:
10     Q.    They identify that the testing stat --
11 strategy needs to be changed, correct?
12     A.    **That is stated in the document.**
13     Q.    That the new environment configuration
14 was required to host the rule engine, correct?
15     A.    **It does state that, yes.**
16     Q.    And that there's "Scattered
17 knowledge - no knowledge sharing between SBUs,"
18 correct?
19     A.    **It does state that, yes.**
20     Q.    And that's -- what do you understand
21 SBUs to stand for?
22     A.    **In several of the artifacts, Chubb**
23 **refers to its SBUs as strategic business units, and**
24 **it identifies them as Chubb Specialty, Chubb**
25 **Commercial, and Chubb Personal Lines.**
Page 112

1     Q.    So there's discussion of the use of
2 Blaze not meeting business objectives, correct?
3     A.    **I disagree with that.  This is -- this**
4 **is a statement that in the implementation process**
5 **there are things that they can do better from a**
6 **project management perspective.  I'm not sure those**
7 **things point to anything relative to the functional**
8 **value of Blaze.**
9           **My experience would tell me that every**
10 **insurance company -- and this is one of the things**
11 **that Mr. McCarter and I agree on.  Every insurance**
12 **company, technology is not their core competency.**
13 **So when they deploy new technology, regardless of**
14 **that new technology there can be bumps in the road**
15 **and there is learning to be done from that.  But it**
16 **relates not to the value of the software, it**
17 **relates to the efficiency and effectiveness of the**
18 **implementation process.**
19     Q.    And you just don't know in this case
20 whether --
21           THE WITNESS:  I'm sorry, pardon me.
22 Thank you.
23           MR. HINDERAKER:  Sure.
24 BY MS. JANUS:
25     Q.    Whether there was a concern that the
Page 114

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 implementation of Blaze was not meeting business
2 objectives, correct?
3     A.   I -- I cannot make that assessment
4 based on artifacts.
5         (Reporter's Note:  Mr. Hinderaker is
6 getting the witness another glass of water.)
7         THE WITNESS:  Thank you, Allen.
8         MR. HINDERAKER:  Uh-huh, you're
9 welcome.
10 BY MS. JANUS:
11     Q.   In paragraph 22, you state that "Blaze
12 Advisor provides companies across industries with a
13 scalable solution that delivers unprecedented
14 agility and actionability for smarter business
15 decisions," right?
16     A.   I do.
17     Q.   And that's based on a FICO press
18 release, correct?
19     A.   It is based on FICO documentation.  I
20 do not recall whether it was a press release.
21     Q.   And you found it at the FICO website,
22 correct?
23     A.   Um, yes.
24     Q.   That's a statement that's not based on
25 your experience but on the information FICO publishes

Page 115

1     A.   Okay, agreed.
2     Q.   If you take a look at the page you
3 cite to, which is 270-0012?
4     A.   0012 is just simply a -- an overview,
5 maybe it's 112.  It's 112, I believe.  What
6 footnote is that, 5?  Yeah.
7     Q.   It should be 270-0012.
8     A.   I'm sorry, I thought you said 0002.
9 Yes.  Now I'm comfortable.
10     Q.   Okay.  And this is a FICO-generated
11 slide of a PowerPoint presentation, correct?
12     A.   I believe that is correct.  I cannot
13 say definitively that that is correct.
14     Q.   In fact, it's branded with FICO, and,
15 then, at the top it says FICO's Point of View,
16 correct?
17     A.   Correct.
18     Q.   And so this FICO-generated PowerPoint
19 slide is what you are relying upon for this
20 statement that I read in the first paragraph of 23?
21     A.   Correct.
22         MR. HINDERAKER:  You meant first
23 sentence of 23.
24         MS. JANUS:  Thank you.
25 BY MS. JANUS:

Page 117

1 about its products, correct?
2     A.   In isolation, yes.
3         (Whereupon, Deposition Exhibit No. 516
4 was marked for identification, and a copy is
5 attached and hereby made a part of this deposition.)
6 BY MS. JANUS:
7     Q.   Showing you what's been marked as
8 Exhibit 516 --
9     A.   Sorry.  Thank you.
10     Q.   -- you cite to -- well, take a look at
11 516, and my preliminary question for you is, is
12 this the document that you cite to in paragraphs --
13 or, I'm sorry, in footnotes 4 and 5?
14         Can you identify it from the Bates
15 label on the first page?
16     A.   I agree that the Bates label is the
17 Bates label used in the footnote.
18     Q.   Okay.  And you cite to this document
19 as support for the statement that "Blaze Advisor
20 improves, automates, and connects organizational
21 decisions to enhance business performance through
22 the application of key technologies," correct?  And
23 that's, I'm sorry --
24     A.   Is that number --
25     Q.   -- the first sentence of 23.

Page 116

1     Q.   Likewise, for the second sentence of
2 23, correct?
3     A.   Correct.
4         (Whereupon, Deposition Exhibit No. 517
5 was marked for identification, and a copy is
6 attached and hereby made a part of this deposition.)
7 BY MS. JANUS:
8     Q.   Paragraph 24, you rely on the document
9 that I've just marked as Exhibit 517, correct?
10     A.   Only in part.
11     Q.   What else do you rely upon for
12 paragraph 24?
13     A.   My experience in managing the product
14 management functions of insurance companies, my
15 experience working and interfacing with the
16 actuarial department of insurance companies.  The
17 statement dava "-- Data-driven analysis is applied
18 to insurance processes such as underwriting, claims
19 adjudication, and renewals" does not have a
20 footnote to it.
21     Q.   Okay.  So that's based on your
22 experience?
23     A.   Correct.
24     Q.   Okay.  And then you say, "Decision
25 Management software such as Blaze Advisor automate,

Page 118

**Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019**

**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1 improve, and connect decisions across an enterprise

2 enabling better decisions," correct?

3     **A.**   I do say that, yes.

4     Q.   And you --

5     **A.**   **And I foot -- and I footnote that to**

6 **this document.**

7     Q.   Okay.  Because you have never worked

8 with decision management software, correct?

9     **A.**   **Correct.  I have worked with rules,**

10 **underwriting guidelines, underwriting criteria, but**

11 **not specifically business management software.**

12     Q.   And the document that you -- that you

13 cite to, which is marked as Exhibit 517, is a

14 general document relating to decision management,

15 correct?

16     **A.**   **I'm not sure I can say that**

17 **specifically.  The document is a Chubb enterprise**

18 **piece describing why decision management is**

19 **important to the desired future plans and the**

20 **implementation of those plans inside of Defendant.**

21     Q.   Does the document specifically relate

22 to Blaze?

23     **A.**   **Uh, yes, I believe so.  If you -- if**

24 **you look at 0011, I recognize many of these**

25 **projects as having Blaze functionality with them.**

1     **A.**   Yes, but if I can give an example.

2 One of the deployments of Blaze was -- the acronym

3 is ARP, automated renewal processing.  That's a

4 process.  It is a use of technology to execute a

5 process involving rules so that identified past the

6 rules renewals do not have to be touched by human

7 hands.

8         I have no reason to believe that this

9 document wasn't created because the Defendant had

10 acquired, licensed a software, and was now trying

11 to get the organization to understand the overall

12 power of the software.

13     Q.   Well, my question is that according to

14 the document itself, decision management is defined

15 as not simply technology, correct?

16     **A.**   Yes.

17     Q.   Okay.  Take a look at the Reasons for

18 Adoption page, which is the next page?

19     **A.**   I'm there.

20     Q.   This is the reasons for adoption of

21 decision management, correct?

22     **A.**   I believe so.

23     Q.   And nowhere in the reasons for

24 adoption is there a statement that the revenue of

25 the company will increase, correct?

1     Q.   Okay.  But there's no specific

2 reference to Blaze in the document?

3     **A.**   **There is, in fact, no specific**

4 **reference to Blaze as a software in the document**

5 **that I recall.  Let me finish looking at the**

6 **document.**

7         **The last page has a specific reference**

8 **to Blaze, page -- page 0015.**

9     Q.   Okay.  If you look at page 275-0004?

10     **A.**   I am there.

11     Q.   This is talking about what decision

12 management is, correct?

13     **A.**   Yes.

14     Q.   And the second bullet point under What

15 is it states, "Approach -- not necessarily only

16 technology, approach encapsulates processes,

17 methodology and internal capabilities," correct?

18     **A.**   **It does state that, yes.**

19     Q.   So decision management, according to

20 this document that you're relying upon, is not

21 simply about Blaze, according to the document,

22 correct?

23     **A.**   **I disagree with that.**

24     Q.   The document states that it's not

25 necessarily only technology, correct?

1     **A.**   That is correct.  It is not

2 specifically stated.

3     Q.   Nowhere in the document under Reasons

4 for Adoption is there a statement that the profits

5 of the company will increase, correct?

6     **A.**   Again, correct.  I simply point out

7 that this is -- if you go to the opening slide,

8 0001 --

9     Q.   You've answered my question.

10         MR. HINDERAKER:  You may finish your

11 answer.

12         THE WITNESS:  Thank you.

13         This is a presentation relative to

14 enterprise architecture.  I would not expect those

15 kind of statements to be in the enterprise

16 architecture.  This is relating to deploying the

17 Blaze Advisor software inside of the various

18 servers, systems, databases, et cetera, et cetera,

19 for the client.

20 BY MS. JANUS:

21     Q.   You've answered the question.  Thank

22 you.

23         You wouldn't expect those types of

24 issues to be mentioned in a document like this,

25 because the use of the software was not measured in

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  consistency and greater agility as efficiencies?
2       MR. HINDERAKER:  Objection, asked and
3  answered.
4       THE WITNESS:  The document does state
5  that those things come from the efficiency of
6  automation.
7  BY MS. JANUS:
8     Q.    Is it fair to say that the -- in your
9  opinion, the value that Blaze provides to a company
10 is realized through efficiencies?
11    A.    Absolutely not.
12    Q.    Well, the values that you've
13 identified here you are referring to as efficiencies,
14 correct?
15    A.    Automation makes speed improve.
16 Improved speed increases the probability that you
17 will have opportunities to quote, that you will
18 convert quotes, and that you will then execute the
19 book -- the bind and the book and the issue part of
20 the process.  Increased precision and consistency
21 insures, a) that you eliminate variability from the
22 decisions, the judgment in underwriters, and
23 increased precision improves the probability that
24 your adequate accurate premium is sellable in the
25 marketplace.
                                            Page 131

1        Does automation help accomplish all of
2  those things?  Yes, but the result -- that's a --
3  that's a -- that's that's a cause.  I look at cause and
4  effect.  That's a cause.  The effect is higher
5  quote volume, more converted quotes, better price
6  point.
7     Q.    Through efficiencies?
8     A.    Through deployment of automation.
9     Q.    Which you've said here is an
10 efficiency, correct, in paragraph 29?
11       MR. HINDERAKER:  Objection, takes
12 the -- takes the paragraph out of context.
13       THE WITNESS:  Do I have that artifact
14 in front of me?
15 BY MS. JANUS:
16    Q.    Yes.  It's Exhibit 516.
17    A.    Thank you.  Ah, excellent.  Thank you.
18    Q.    So if you look at the site that you
19 use in that for that sentence, which is in
20 paragraph 516270-0012, this is, again, the FICO
21 PowerPoint that -- slide that we've referred to
22 earlier, correct?
23    A.    270 is that is correct.
24    Q.    Okay.  And this slide doesn't mention
25 the word efficiencies, correct?
                                            Page 132

1     A.    I believe not.  I can go back and
2  check very rapidly.
3     Q.    That's your word?
4     A.    I'm sorry?
5     Q.    That's your word, efficiencies?
6     A.    I chose to write that, yes.
7     Q.    Okay.
8     A.    Twelve.
9     Q.    All right.  The next sentence of
10 paragraph 29 says the "Use of Blaze Advisor enables
11 an insurance company to increase the volume and
12 accuracy of transactions in an efficient manner,"
13 correct?
14    A.    It does.
15    Q.    Again, you're referring to the
16 efficiencies that you opine are gained from using
17 Blaze Advisor, correct?
18       MR. HINDERAKER:  Objection,
19 misstatement.
20       THE WITNESS:  In isolation, that
21 sentence does, in fact, reference efficiency.
22 Efficiency is one of the three components that I
23 articulate in my report.
24 BY MS. JANUS:
25    Q.    Efficiency is the -- in your opinion,
                                            Page 133

1  the value that Blaze offers to Federal, correct?
2     A.    Incorrect.
3     Q.    But you believe it is one of the
4  aspects of value offered?
5     A.    I offer three values in my report.
6  One is to revenue, one is to cost of raw materials,
7  one is to expense.  Efficiency does, in fact,
8  impact expense.
9     Q.    Okay.
10    A.    But that is one of three values I
11 articulate.
12    Q.    All right.  So you -- In the next
13 sentence of paragraph 29 you state, "Blaze Advisor
14 contributes to the increase in volume and accuracy
15 of transactions, which in turn contributes to Chubb
16 revenue," correct?
17    A.    I do state that, yes.
18    Q.    All right.  So that's the revenue
19 component of your conclusion?
20    A.    In isolation on that page, yes.  In
21 isolation in that sentence, yes.  That is the
22 beginning of my -- beginning is probably the wrong
23 word.  That is a contribution to my argument that
24 Blaze Advisor improves the quote, bind, book, issue
25 process speed, which influences revenue.
                                            Page 134

**Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019**
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

---

1     Q.    Okay. And so let's talk about the
2 speed. So your first bullet point is "Increasing
3 speed of response to quote requests," correct?
4     **A.    That is correct.**
5     Q.    How did you conclude that Federal
6 increased the speed of response to quote requests?
7     **A.    I did not conclude that Federal**
8 **increased that. I concluded that inside of the**
9 **approximately 1,000 insurance companies that**
10 **transact property casualty business, they are all**
11 **looking to do things faster, and it's widely**
12 **recognized that responding to quotes faster**
13 **increases quote conversion.**
14     Q.    Okay. Do you know whether Blaze
15 increased the speed of response to quote requests
16 in Federal?
17     **A.    I performed no quantitative analysis**
18 **in this process, no. I do not know.**
19     Q.    The next bullet point is "Increasing"
20 the "speed of making renewal offers," correct?
21     **A.    Correct.**
22     Q.    How did you conclude -- or I'm -- Did
23 you conclude that Federal increased the speed of
24 making renewal offers because of its use of Blaze?
25     **A.    I did no qualitative research or**

Page 135

---

1 **definition inside of my report.**
2     MR. HINDERAKER: Did you mean
3 quantitative or qualitative?
4     THE WITNESS: I'm sorry. Quali --
5 quanti -- I didn't -- I did zero quantitative
6 research. I -- I didn't have any numbers.
7 BY MS. JANUS:
8     Q.    So you just don't know whether Federal
9 increased the speed of making renewal offers
10 because of its use of Blaze, correct?
11     **A.    That is correct.**
12     Q.    The next bullet is "Increasing" the
13 "speed at which new products can be introduced, due
14 to Blaze Advisor's agility," correct?
15     **A.    Correct.**
16     Q.    Same question. I take it you do not
17 know whether Federal increased the speed at which
18 new products were introduced due to Blaze Advisor,
19 correct?
20     **A.    Correct, with the caveat of there is**
21 **one artifact, there is one point made in multiple**
22 **artifacts that they improved the speed of**
23 **implementing rules, either new rules or modifications**
24 **to existing rules, from three to six months to two**
25 **to three days.**

Page 136

---

1     Q.    Okay. But you don't know whether
2 there was an actual increase in speed at Federal in
3 which new products were introduced to the market,
4 correct?
5     **A.    Correct, within the caveat of the**
6 **artifacts do state -- and today, in this specific**
7 **instance, I'm thinking about the premium**
8 **modernization project, that they were able to**
9 **acquire a, I believe, $20 million book of business**
10 **through the acquisition process from Star Aviation,**
11 **and they needed Blaze Advisor execution of the**
12 **premium modernization product to be able to book**
13 **that premium.**
14     Q.    Premium -- premium modernization
15 product?
16     **A.    Yes. It's one of the non-policy admin**
17 **deployments of Blaze Advisor inside of defendant.**
18     Q.    And this is a document that you cite
19 in support of your conclusion that there's
20 increasing speed?
21     **A.    I can't speak to that. I -- I would**
22 **have to go back and check the documents.**
23     Q.    Is it fair to say that you simply
24 don't know whether there was increased speed at
25 Federal in which new products were introduced due

Page 137

---

1 to Blaze Advisor?
2     **A.    It is fair to say that I don't**
3 **remember the number of the artifacts. So I can't**
4 **tell you where the cit -- whether the citations are**
5 **related to that or something else.**
6     Q.    So you just don't know?
7     **A.    Correct.**
8     Q.    The next bullet is "Increasing speed
9 at which product changes involving product and
10 underwriting rules can be implemented, due to Blaze
11 Advisor's agility," correct?
12     **A.    Correct.**
13     Q.    Is it true that you do not know
14 whether Federal increased the speed at which
15 product changes involving product underwriting
16 rules can be implemented due to Blaze Advisor's
17 agility?
18     **A.    I made no quantitative analysis in any**
19 **of the deployments. There are artifacts that refer**
20 **to writing rules faster and implementing regulatory**
21 **changes in less time period.**
22     Q.    But you do not know whether Federal
23 actually increased the speed at which product
24 changes involving product and underwriting rules
25 were implemented?

Page 138

---

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1    A.    Agree.
2    Q.    The next bullet is "Increasing" the
3 "speed to market by ensuring compliance with
4 corporate and statutory reporting requirements,"
5 correct?
6    A.    That is correct.
7    Q.    Is it true that you do not know
8 whether Federal increased its speed to market by
9 ensuring compliance with corporate and statutory
10 reporting requirements?
11    A.    Yes.
12    Q.    The next bullet is "Increasing the
13 precision and accuracy of a quote, thereby
14 increasing the" profitability of the quote offer
15 will be --
16    A.    Probability.
17    Q.    I'm sorry.  Thank you.  "...the
18 probability the quote offer will be accepted"?
19    A.    Agree.
20    Q.    And is it true that you do not know
21 whether Federal increased the precision and
22 accuracy of its quotes, thereby increasing the
23 probability of the quote offer was accepted?
24    A.    Yes.
25    Q.    The next bullet is "Increasing the

Page 139

1 not know whether Federal increased the ease of use
2 for agents and brokers by way of those three bullet
3 points underneath?
4    A.    You are correct.
5        MR. HINDERAKER:  Are you done with
6 this -- are you done with this line?
7        MS. JANUS:  Sure.
8        MR. HINDERAKER:  I mean, I don't
9 want --
10        MS. JANUS:  Yeah, no.
11        MR. HINDERAKER:  I don't want to take
12 a break if you're in the midst of --
13        MS. JANUS:  A break is fine.
14        THE VIDEOGRAPHER:  Going off the
15 record.  The time is 1:28 p.m.
16        (Break from 1:28 to 1:37.)
17        THE VIDEOGRAPHER:  We're back on the
18 record.  The time is 1:37 p.m.
19 BY MS. JANUS:
20    Q.    Moving on in your report to page 13.
21    A.    I'm there.
22        (Whereupon, Deposition Exhibit No. 519
23 was marked for identification, and a copy is
24 attached and hereby made a part of this deposition.)
25 BY MS. JANUS:

Page 141

1 precision and adequacy of a renewal offer, thereby
2 increasing the probability" that "the renewal...will
3 be accepted," correct?
4    A.    Correct.
5    Q.    Is it true that you do not know
6 whether Federal increased the precision and
7 accurate -- adequacy of renewal offers, thereby
8 increasing the probability the renewal offers would
9 be accepted?
10    A.    I prefer the statement I do not have
11 any quantitative information that Federal did or
12 did not increase the stated attributes.
13    Q.    Okay.
14    A.    So --
15    Q.    But -- and so I guess --
16    A.    So -- so I think the answer to your
17 question is yes.
18    Q.    Okay.  You do not know?
19    A.    I do not know.
20    Q.    The next bullet in "Increasing the
21 ease of use for agents and brokers," and then you
22 list three ways in which the ease of use for agents
23 and brokers is increased, correct?
24    A.    I do.
25    Q.    And is it correct to say that you do

Page 140

1    Q.    Showing you what's been marked as
2 Exhibit 519, this is the document that you rely
3 upon for your conclusions in paragraph 30 of the
4 report, correct?
5    A.    Yes.
6    Q.    And this appears to be a draft of a
7 request -- RFI, correct, request for information?
8    A.    Yes, although Chubb & Sons mixes their
9 nomenclature.  They -- they refer to it both as an
10 RFP, a request for proposal, and an RFI, request
11 for information.
12    Q.    Okay.
13    A.    But the fundamental answer is yes.
14    Q.    Okay.  So this is the document that
15 you've relied upon for your conclusion in
16 paragraph 30, correct?
17    A.    Correct.
18    Q.    Do you know whether this is the final
19 RFI?
20    A.    I do not.  I know that this is the
21 artifact that I was provided.
22    Q.    Fair to say that the statements in the
23 RFI are forward-looking?
24    A.    Fair to say that the statements in the
25 RFI are forward-looking in that Chubb & Sons offer

Page 142

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019

Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  of the RFI were looking to increase their
2  functionality relative to the points in the RFI.
3     Q.    It was an aspirational document?
4     A.    I'm uncomfortable with the word
5  aspirational.  Is a we're going to make a decision,
6  give me information so we can decide whether to
7  include you in the decision analysis or not.
8     Q.    The document is not specific to Blaze,
9  correct?
10    A.    That is correct, from the perspective
11 of they would have sent this document to multiple --
12 pardon me, excuse me, multiple software providers
13 requesting those software providers provide them
14 information that they would take through a decision
15 management process to say I -- I -- I want to talk
16 to these people, that people.  It's that kind of
17 document.  It's not specific to Blaze, it's specific
18 to the decision about what software are we going to
19 license.
20    Q.    In paragraph 31 --
21    A.    My document?
22    Q.    Yes.
23    A.    Okay.
24    Q.    Of your report.
25    A.    Thank you.

Page 143

1     Q.    You -- the last sentence states,
2  "Chubb needed automated decision management software
3  that would allow Chubb to scale its business so it
4  could take on...new revenue streams," correct?
5     A.    Correct.
6     Q.    And you cite to the deposition of
7  Mr. Wachs, correct?
8     A.    That is correct.
9     Q.    And Mr. Wachs was a FICO employee,
10 correct?
11    A.    Correct.
12    Q.    Mr. Wachs was employed at FICO through
13 the end of 2008, correct?
14    A.    I cannot speak to that.
15    Q.    Okay.  You don't recall his deposition
16 testimony about the length of his employment at
17 FICO?
18    A.    No.
19    Q.    And you also cite to the document
20 we've marked as Exhibit 516, correct?
21    A.    Six -- nineteen, sixteen, sixteen?  I
22 do.
23    Q.    And, again, that is you cite to
24 page 16 of Exhibit 516?
25    A.    I'm sorry, page 16?

Page 144

1     Q.    Correct.
2     A.    Yes.
3     Q.    Okay.  And that's a FICO marketing
4  PowerPoint slide, correct?
5     A.    Correct.
6     Q.    You do not cite to any facts to
7  support the statements you make in paragraph 32 of
8  your report, correct?
9     A.    I'm sorry, your question is I do not
10 cite to anything?
11    Q.    Correct.
12    A.    That is correct.
13    Q.    The next section of your report is
14 Chubb's Use of Blaze Advisor Contributes to Gross
15 Written Premium, correct?
16    A.    Section VII, correct.
17    Q.    In forming any of the opinions you
18 reached in this case, did you conduct a comparison
19 between the functionalities of Blaze compared to
20 other competing business rules management software?
21    A.    In the preparing of my report, I
22 provided a qualitative value of automated
23 decisions.  How Blaze fit into that, I did no
24 quantitative research at all, and I did not look at
25 any other potential decision management softwares.

Page 145

1     Q.    Do you know whether there are
2  competing decision management softwares that
3  Federal could have used instead of Blaze that would
4  provide the same functionality Blaze does?
5     A.    I can say yes to that inside of the
6  caveat that the RFI I'm sure went to more than
7  FICO, because if it didn't there would have been no
8  purpose for the RFI.
9     Q.    Okay.  Other than the RFI going to
10 other software providers, do you have any knowledge
11 of the functionality that any competing rules
12 management softwares provide?
13    A.    I cite to the Forrester Research
14 industry analysts group's new wave of
15 decision-making that articulates, I believe, but
16 won't swear to, ten different providers of decision
17 management software.
18    Q.    So it's fair to say that Federal could
19 use another decision management software to perform
20 the functions that Blaze performs at this point?
21    A.    I prefer to say that it is fair to say
22 that any of the software providers of decision
23 management software that responded to the RFI
24 could, in fact, have won that request for proposal,
25 request for information, but the fact remains FICO

Page 146

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  did.  And I don't -- I only know tangentially the
2  name of one of the other groups, and if you ask me
3  to quote it, I couldn't.  It's in an artifact.
4  But -- but at the end of the day, there were
5  multiple companies requested, FICO won the bid.
6  Excuse me.
7      Q.    Have you used any of the applications
8  that Federal has that implement Blaze?
9      A.    I have not.
10     Q.    All right.  The first application that
11 you discuss on page 14 is CSI Express, correct?
12     A.    Correct.
13     Q.    You're aware that CSI Express is a
14 large application within Federal, correct?
15     A.    Correct.
16     Q.    And --
17     A.    With its primary responsibility being
18 policy administration.
19     Q.    And Blaze is one aspect of that
20 application, correct?
21     A.    Yes.  Blaze is the automated
22 decision-making part of that application.
23     Q.    Can you explain where in the process
24 of the CSI Express application Blaze is used?
25     A.    At a 100,000-foot level, CSI Express

Page 147

1  deployment of Blaze has the definition of acceptable
2  and unacceptable policy risk characteristics as it
3  relates to appetite.  In addition, CSI Express
4  through Blaze has a predictive analytics function
5  called profitability indicator, and in addition --
6  so -- so you've got new business and you've got
7  renewals.  In addition, CSI Express using Blaze
8  Advisor is contributing to the evaluation of the
9  risk characteristics for upcoming potential
10 renewals.
11     Q.    Do you know specifically what
12 functions in CSI Express Blaze performs versus
13 functions that other technologies and programming
14 performs?
15     A.    Could you define what functions are
16 for me, please?
17     Q.    My question is -- I guess you can
18 interpret it the way you would.
19     A.    So, for -- so, for instance, rating is
20 a function, so price -- you know, three times two
21 is six.  Okay.  Blaze is looking, where deployed,
22 at the risk characteristics of the submitted
23 application.  It is looking at the risk
24 characteristics of the renewal, it is assessing
25 those as it relates to what I refer to as the

Page 148

1  protection of the capital.
2      Q.    And how do you have that understanding?
3      A.    It's a combination of the artifacts
4  and years of experience.  So when I refer to
5  capital, I'm actually talking about the accuracy
6  and the precision of the price.
7      Q.    Do you have an understanding of how
8  CSI Express is actually used within Federal?
9      A.    My understanding is that CSI Express
10 is the policy administration system.  It is going
11 to provide the functional capability to quote a
12 prospective policy or to quote an upcoming renewal.
13 It has the ability to make the underwriting
14 decision on acceptability or price point.  It is
15 used to then make an offer of re -- of binding, and
16 if binding, passing information into the premium
17 booking process to book the policy, and then
18 sending a communication to some kind of fulfillment
19 center, which will produce paper sometimes called
20 an insurance policy.  It will also send information
21 to the remittance processing so that a demand for
22 premium can take place.
23     Q.    Would you characterize CSI Express as
24 a pretty complex application?
25     A.    I would classify every single policy

Page 149

1  administration system I've ever seen as a complex
2  system.
3      Q.    Do you have an understanding of the
4  complexities of CSI Express?
5      A.    Could I request that you give me
6  something to work with other than understanding?
7      Q.    Just do you have any knowledge of the
8  complexities of CSI Express?
9      A.    I have looked at multiple policy
10 administration systems for each of the market
11 segments I described, the commercial specialty,
12 commercial main street, personal lines.  Have I
13 looked at CSI Express specifically?  No.  But I
14 will -- I will tell you that all of those systems
15 carry a level of complexity to them.
16     Q.    And, again, we've said before, but
17 Blaze is just one small component of that complex
18 policy administration system, correct?
19     A.    And I reiterate, if you are using a
20 denominator of number of softwares that contribute
21 to CSI Express, the percentage will be small, that
22 is articulated by Mr. McCarter's report.  However,
23 in -- I would never in any way, shape or form
24 describe the role Blaze plays as small as it
25 relates to improving the speed, making ease of

Page 150

CASE 0:16-cv-01054-DTS   Doc. 382-1   Filed 07/26/19   Page 26 of 28
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 151**

1 doing business, and establishing the adequate
2 accurate price point. You can't call those in the
3 insurance process small, because the rate, the
4 quote, the bind, the book, and the issue processes
5 do not work unless that's done.
6    Q.   How have you attributed speed to Blaze
7 specifically within the complex application that is
8 CSI Express?
9    A.   If -- I have done no level of
10 quantitative work. So you're asking me to provide
11 you my thoughts on did it make it better by one
12 day, by two days, by three days? I can't provide
13 you that. That was out of the scope of my work.
14    Q.   I take it, then, you also don't know
15 whether Blaze specifically versus some other
16 technology within CSI Express contributes to the
17 speed that you've opined CSI Express delivers,
18 correct?
19    A.   If I took the architectural footprint,
20 which you've referenced several times, there are --
21 pardon me -- components of the architectural process
22 that contribute to that rate. A -- a system does
23 two times three much faster than a human being does
24 two times three and with an incredibly higher
25 accuracy rate. But you -- you -- you do not --

**Page 152**

1 it's a Rubik's Cube, as I said earlier. You don't
2 sit down and look at components of the software and
3 say this component makes this happen or that happen.
4 It performs a function.
5    The functions that Blaze Advisor
6 specifically -- I would say -- if I were talking
7 about any of the ten, whose names I don't know or
8 remember, decision management systems that Forester
9 Research included in their report, all of those are
10 designed to improve the quote, bind, book, issue
11 process, which is critical to the accumulation of
12 written premium. If you quote and don't convert --
13 and I don't know what these numbers are, but
14 Federal has a quote number coming in, I don't know
15 what that number is, Federal has a quote converted
16 to policy number, I don't know what that number is,
17 but there is a direct link between those three
18 items. You can talk to almost any insurance
19 executive, I quoted Mark Watson of Argo, a couple
20 of other people, about their view of the need to
21 make these kind of advancements in use of
22 technology to accelerate and execute the quote,
23 bind, book, issue process.
24    Q.   My question was, you did not do an
25 analysis to determine whether the speed that you

**Page 153**

1 attribute to CSI Express results from the fact that
2 Blaze Advisor is in CSI Express or from other
3 technologies and functionalities that are in CSI
4 Express, correct?
5    A.   That is correct. I have done no --
6    Q.   You've answered the question.
7    A.   -- quanti --
8    Q.   Go ahead.
9    MR. HINDERAKER: You may finish your
10 answer.
11    THE WITNESS: I have repeatedly said I
12 did zero quantification assessment of this situation.
13 BY MS. JANUS:
14    Q.   In fact, you do not know whether CSI
15 Express actually increased the speed of response to
16 requests for quote at Federal, correct?
17    A.   That is correct. That would require
18 data.
19    Q.   In your mind, would it be even
20 possible to measure the contribution that Blaze has
21 to the speed that you've discussed CSI Express
22 creating?
23    A.   Having had the privilege of giving
24 that question zero thought, I can't answer it.
25 That --

**Page 154**

1    Q.   So you --
2    A.   That --
3    Q.   -- just don't --
4    A.   That requires thought.
5    Q.   So you just don't know whether it
6 would be possible -- possible to measure that?
7    MR. HINDERAKER: Misstates --
8 objection, misstates the answer.
9 BY MS. JANUS:
10    Q.   Is that correct?
11    A.   I have zero data and I have not spent
12 one minute thinking about how I would do that.
13 I -- I live in a world where most things are
14 possible. The question is what does it take to get
15 it done.
16    (Whereupon, Deposition Exhibit No. 520
17 was marked for identification, and a copy is
18 attached and hereby made a part of this deposition.)
19 BY MS. JANUS:
20    Q.   Showing you what's been marked as
21 Exhibit 520, this is the CSI Express component view
22 that was contained in Mr. McCarter's report.
23    A.   Yes, from Mr. McCarter's report.
24    Q.   Do you agree with me based on this
25 component view that CSI Express is a complex

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  application involving many technologies?
2       A.    Yes.
3       Q.    Do you know what all of the various
4  components that are depicted in this chart do in
5  CSI Express?
6       A.    All?
7       Q.    Yes.
8       A.    No.  Some of the -- some of their
9  acronyms, I don't even know what they mean.
10      Q.    Do you know what each of these
11 components contributes to what you have opined are
12 the benefits of CSI Express?
13      A.    I'm not sure I opined that C -- that
14 anything other than Blaze Advisor provided benefits
15 to CIS.  So as relates to this current state
16 exhibit, CI -- Blaze Advisor inside of CIS Express
17 contributes to the benefits I articulate, but I
18 can't speak to any of the other systems.
19            I can -- I can tell you generally
20 speaking in the insurance industry what an under
21 man -- underwriting manager workbench does, I can
22 tell you what product figuration does, but I can't
23 answer the specific question you're asking.
24      Q.    Turning back to your report, in
25 paragraph 36?

Page 155

1       A.    I'm there, I'm there.
2       Q.    You state that "CSI eXPRESS's use of
3  Blaze Advisor contributes to revenue by increasing
4  the speed of response to a request for a quote
5  and...speed of making renewal offers," correct?
6       A.    I do.
7       Q.    And we've discussed that you don't
8  actually know whether the speed of response was
9  increased, correct -- at Federal, I should say?
10      A.    I have no quantification.
11      Q.    You don't know whether the speed of
12 making renewal offers was increased, correct?
13      A.    I have no quantification.
14      Q.    How have you concluded that CSI
15 Express's use of Blaze Advisor contributes to
16 revenue?
17      A.    So I go back to my three original
18 points.  There -- insurance companies try to improve
19 their positions in getting more quotes, converting
20 more quotes, hanging on to more renewals through
21 three fundamental strategies: speed -- that's both
22 speed of response and speed to market -- ease of
23 doing business, and adequate accurate pricing.
24      Q.    Okay.  And so you're basing your
25 opinion that CSI Express's use of Blaze Advisor

Page 156

1  contributes to revenue on general goals of
2  insurance companies in the industry?
3       A.    Not exactly.  I am basing my opinion
4  on the fact that every insurance company that I've
5  ever talked with is focused on that quote, bind,
6  book, issue process for new business and for
7  renewals, and that Blaze Advisor contributes to
8  getting responses inside of the quote process faster,
9  contributes to getting accurate adequate premium
10 faster, it contributes to easing the burden on the
11 independent agent or broker, meaning ease of doing
12 business, and it contributes to the relative
13 adequacy and acc -- attaining the adequate and
14 accurate premium.
15      Q.    And -- but you did not actually
16 analyze whether it did contribute to those things
17 you've just listed at Federal, correct?
18      A.    I did no quantification, that is
19 correct.
20      Q.    Do you know whether Blaze Advisor
21 actually increased or decreased the revenues of
22 Federal?
23      A.    I have done no quantification.
24      Q.    I take it you don't know whether Blaze
25 Advisor actually contributed to an increase in

Page 157

1  revenue or profit at Federal, correct?
2       A.    That would require a quantification.
3  I have done no quantification, no.
4       Q.    You do not cite to any authority in
5  paragraph 36, correct?
6       A.    That is correct.
7       Q.    And --
8       A.    So -- so when I don't cite, you should
9  assume that I am relying on 41 years and a lot of
10 gray hair in this business.
11      Q.    So your opinion in paragraph 36 is
12 based upon your experience in the industry?
13      A.    And conversations at industry
14 conferences with other insurance executives, and
15 conversations at industry conferences with software
16 vendors.
17      Q.    Those are conversations you had in
18 connection with authoring your report?
19      A.    No.
20      Q.    Are those conversations you had about
21 Blaze Advisor?
22      A.    Conversations I had -- no.  I --
23 conversations I generally have making sure that I
24 keep my mind aware of what's going on in the
25 insurance industry.  I have not discussed Blaze

Page 158

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  Advisor with any other insurance or vendor personnel.
2      Q.   Are those conversations that you had
3  about Federal or Chubb?
4      A.   No.
5      Q.   Paragraph 37 -- oh, one other question.
6  In paragraph 36 you state, "CSI eXPRESS's use of
7  Blaze Advisor contributes to revenue," correct?
8      A.   I do.
9      Q.   Do you mean to say CSI Express
10 contributes to revenue?
11     A.   I do not.
12     Q.   How does CSI Express's use of Blaze
13 Advisor contribute to revenue?
14     A.   This goes back to the quote, bind,
15 book, issue process for a new business.  Okay.
16 CSI Express uses Blaze Advisor to make decisions on
17 what are acceptable risk attributes as it respects
18 Federal's risk appetite.  Blaze Advisor contributes
19 to the adequate -- the calculation of adequate
20 accurate premium, and Blaze Advisor where deployed
21 this way says, yes, we'll write this policy, no,
22 we'll write this policy, and sends the instructions
23 for a quote letter to go out.  There is a direct
24 connection between Blaze Advisor's operation inside
25 of CSI Express and the quote, bind, book, issue
                                              Page 159

1  executed by their people, but in some instances
2  they are executed by an automated decision system,
3  in this case, Blaze Advisor.
4      Q.   You said that the effect is an
5  acceleration and less effort.  Those are
6  efficiencies, you'd agree with me on that, right?
7      A.   I agree that less effort is an
8  efficiency, but I don't think efficiency and impact
9  to revenue are unrelated.  In fact, I think they're
10 very related.
11     Q.   Paragraph 37, once again, you do not
12 cite to any authority for the conclusions you reach
13 in that paragraph, correct?
14     A.   That is correct.
15     Q.   Is that paragraph based solely on your
16 experience in the industry?
17     A.   And the conversations I have had with
18 other insurance executives and with software vendors
19 about their sales and marketing approach for the
20 industry.
21     Q.   When did you have those conversations?
22     A.   Pick a time across the last 20 years
23 and you can plug that date in.
24     Q.   Okay.  So how is that different from
25 your experience in the insurance industry?
                                              Page 161

1  process of a property casualty insurance company.
2      Q.   And you say that it uses Blaze Advisor
3  to make decisions, but those decisions are actually
4  made using the rules that the -- that the company,
5  Federal, has defined using its expertise, correct?
6      A.   I disagree with that statement.  The
7  decisions -- in my mind, there's a difference
8  between the definition of the rule, transferring
9  that rule into the technology, and, then, the
10 execution of the rule.
11         So as long as an automated decision
12 system is executing that rule, which is Blaze
13 Advisor, you are accelerating the process, you are
14 requiring less effort on behalf of your underwriters
15 and your agents, and you are approaching the best
16 possible price point, the adequacy and accuracy of
17 premium for the defined risk characteristics.
18     Q.   But you're using the rules that the
19 business has generated through its expertise,
20 correct?
21     A.   I agree that the rules are authored by
22 the underwriting function of the company, they are
23 not necessarily executed by the underwriting
24 function of the company.  In some instances inside
25 of Chubb their underwriting rules are, in fact,
                                              Page 160

1      A.   It's not.
2      Q.   Okay.
3      A.   But --
4      Q.   So those --
5      A.   But --
6      Q.   -- are conver -- sorry.
7      A.   But -- but the -- the statement my
8  experience in the insurance industry apply --
9  implies I am operating in isolation.  I want the
10 record to show, no, I -- I talk -- I attend the
11 IA -- I have attended the ISA, I've attended the
12 ACORD.  I'm dropping a lot of things you don't
13 understand.  I'll be happy to explain them.
14         But there are gatherings of the
15 industry, and there are conversations that happen
16 between executives of insurance industry, and I
17 don't want that to be missed.  I don't want the
18 record to think that I am relying solely on the --
19 the thought process of Bick Whitener.  I'm talking
20 to other people, not specifically about Blaze
21 Advisor, not specifically about Federal, but about
22 the insurance industry and the execution of our
23 processes, including the quote, bind, book, issue
24 process.
25     Q.   And those conversations were not
                                              Page 162