UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MINNESOTA

C.A. No. 16-cv-1054 (WMW/DTS)

-------------------------------------------

FAIR ISAAC CORPORATION, )

Plaintiff )

v. )

FEDERAL INSURANCE COMPANY AND ACE )

AMERICAN INSURANCE COMPANY, )

Defendants )

-------------------------------------------

CONFIDENTIAL TRANSCRIPT

ATTORNEYS' EYES ONLY

DEPOSITION OF MICHAEL SAWYER

October 2, 2018

Courtyard Marriott

35 Foxborough Boulevard

Foxborough, Massachusetts

EXHIBIT 6

*********

Court Reporter: Amie D. Rumbo

event shall be deemed to be an assignment subject to this section."

So in my interpretation of the contract, it is deemed that the proposed transaction of ACE acquiring Chubb would be deemed an assignment, and the first sentence in the state -- in provision 10.8 says that, "No party shall, without the prior written consent of the party, assign or transfer this agreement." So my interpretation was that the proposed merger, change of control, or acquisition would constitute an assignment which would require FICO's written approval.

The sentence continues with "and," so now it layers another, in my interpretation, another restriction on it that the client shall also make no expanded use of the Fair Isaac products as a result of such an event unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld.

So my interpretation here is -- and from a business perspective, my reading of this would suggest that you could have -- an assignment was going to occur and that required approval by

Page 125

FICO regardless of whether the second half, how that second half of the sentence gets handled. Russ's relation -- comments related to that provision would be whether or not the potential expanded use of the product driven by the acquisition would be of the size or scale that would require additional consent from FICO that would be deemed reasonable. And so my position on this was, given the scale of the acquisition, that the likelihood for expanded use of the product would be substantial, and therefore, there would be a second criteria that we would need to apply in approving any sort of assignment under the contract.

Q. So it's your interpretation of Section 10.8 that there are two separate consents that are required?

MR. HINDERAKER: Objection. Misstates his testimony.

A. So what I said is that you need -- you need to get FICO's consent for both parts of this sentence, but the fact that the second -- the fact that Russ was referencing the second half doesn't invalidate the fact that an assignment

Page 126

would have occurred under the contract given the change of control, merger acquisition.

Q. So it's your interpretation that FICO's consent was required first with respect to the merger, right?

MR. HINDERAKER: I object. Misstates the testimony. With respect to the merger?

Q. Well, it's your interpretation of the contract that the merger constituted an assignment of transfer, correct?

A. At the time when these e-mails were drafted --

Q. Yep.

A. -- my assertion was that the proposed deal between Chubb and ACE would constitute a change of control and would require an assignment under the contract, which would require FICO's consent.

Q. Okay. So first of all, it's your interpretation of Section 10.8 that FICO had to provide prior written consent of a transfer, which included a change in control or this merger --

MR. HINDERAKER: Objection. Vague.

Page 127

Q. -- right?

A. My interpretation is that -- I mean, it's very clear in the very first line of the contract, right. "Neither party shall, without the prior written consent of the other party, assign or transfer this agreement or any part hereto." Right. In the event of change or control, right, you need to get consent from FICO for an assignment.

Q. Okay. So first of all, it's your interpretation that Chubb needed to get FICO's consent, prior written consent, of an assignment or a transfer of this agreement and that the merger or change of control constituted such an assignment of transfer?

A. Yes.

Q. Okay. That took awhile, but we got there.

And secondly, you're saying there was a second consent that would be required and that, specifically, if FICO made an expanded use -- excuse me, if Chubb made an expanded use of the FICO product as a result of any such event, that is the merger, FICO -- yeah, FICO also had to

Page 128

provide written consent to that?

MR. HINDERAKER: Objection. Misstates the earlier testimony.

Q. Go ahead.

**A. I mean, the contract is clear, right, that the client shall not make expanded use of the Fair Isaac products unless Fair Isaac provides written consent.**

Q. Okay. Now, did you have any reason to believe that Chubb, as a result of the merger or subsequent to the merger, made any expanded use of Blaze Advisor?

**A. Yes. I did have conversations throughout the period of time from when the merger was made -- planned merger or acquisition was made public until the date that it actually closed with Henry Mirolyuz about activities that were underway in discussions with ACE around specifically the speciality insurance business of Chubb and ACE where they both had books of business and which systems and platforms would be likely used to administer that business going forward.**

**My understanding from that discussion, or those discussions, were that**

**because of the size and scale of the Chubb book of business in the speciality lines space, that it was more likely than not that the decision would be made in the future to migrate operations from the Legacy ACE business onto the Legacy Chubb systems, and specifically, the underwriting and renewal underwriting applications for which Blaze Advisor was a part of.**

Q. So you say there were discussions with Henry Mirolyuz about what may happen following the merger?

**A. That is correct.**

Q. And my question was are you aware of any evidence that there actually was expanded use following the merger?

**A. No.**

Q. So you would agree that if there was no expanded use following the merger, Section 10.8 doesn't require a consent?

MR. HINDERAKER: Objection. Misstates testimony.

**A. No.**

MR. HINDERAKER: And objection to the extent it asks for a legal conclusion.

**A. And so no. That does not reflect my testimony. I was clear, right, that any action that required -- that triggers the assignment clause requires approval. So in the event of a change of control of client or if a client is merged with, acquired, or acquired by another entity or undergoes a reorganization or otherwise acquires the rights to proces the business of another entity, each such event shall be deemed an assignment.**

Q. Okay. Just so I'm clear, you know, we've been through this. You've stated that it's your understanding of Section 10.8 that two different consents were needed?

MR. HINDERAKER: I also object to that as misstating his testimony. We will rely on the record, obviously, but that does misstate his testimony.

**A. I've been clear that any event that is defined -- that, as defined as an assignment in this agreement, requires consent by FICO. It also says in the agreement that, you know, as such of that result, you should not make expanded use of the product without written consent.**

**So my interpretation of this is not that there are two separate consents. It's -- my interpretation is that if one of these events occurs that triggers an assignment, that you need to have discussion with FICO around gaining their assent for the transfer or assignment of the license, right, and that these elements would be discussed as part of that discussion around the assignment. That's my interpretation.**

Q. Okay. And I had understood that.

**A. Okay.**

Q. But with regard to the issue as to Chubb, if Chubb -- where it says that "Chubb shall make no expanded use of the FICO product as a result of any such event unless and until FICO provides such written consent," if there was no expanded use of the FICO project after the merger --

**A. Um --**

Q. -- there would be no reason for Chubb to get FICO's consent as to that issue, that is the issue relating to expanded use?

**A. I also --**

MR. HINDERAKER: Let me speak my

objections. I object to that it misstates testimony. I object to the mischaracterization of it, and I object to the legal characterization of 10.8, and I object to the witness being asked for a legal characterization.

**A. So in my interpretation of this, Chubb had the duty to seek and get FICO's written consent for an assignment. They failed to do so. So at no point were we ever able to have a discussion with the client, being Chubb in this case, around their intended use of the product going forward. So at the time when this event occurred, the fact that no written consent was provided for the assignment is what triggered, you know, our action in sending that letter to Chubb notifying them of the breach.**

Q. Okay. And I understand your position, but with respect to this issue as to whether Chubb actually had or engaged in an expanded use of its FICO products, it's your testimony that you're aware of no evidence that, following the merger, it did so?

MR. HINDERAKER: Objection to the

extent of the foundation.

**A. Yeah. I was not in a position to know what was happening inside of the walls at Chubb around discussions for using the platform. Immediately following the conclusion of the transaction, Chubb did not share any evidence with us that would suggest that they planned to use the scope -- the product in an expanded scope.**

Q. Okay.

**A. But lack of Chubb providing evidence does not substantiate the potential, and we were asking for a discussion around their planned use. My view on this is that you're asking, again, for my interpretation on this. We didn't even get to Section 2 because Section 1, we never granted our rights for the assignment to begin with.**

Q. Okay. But let's just deal right now with the expanded use issue. Following the merger, you agree that you are aware of no evidence that FICO engaged in more expansive use of the FICO products as compared to the use of which it was making before the merger?

MR. HINDERAKER: I think you meant

to say Chubb.

**A. Yeah.**

Q. Chubb, yeah.

**A. For clarity, after the merger, I had no evidence supplied to me that would indicate that Chubb used the product in an expanded way.**

Q. Okay.

**A. But as I said, prior to the actual transaction closing, I did have conversations with representative -- with Henry Mirolyuz from Chubb who had shared potential plans for it which caused our concern under the contract.**

Q. So are there any e-mails going back and forth between you and Henry Mirolyuz about the planned post-merger activity?

**A. I am not certain. There is -- I do remember one exchange I had with Henry -- whether it was an e-mail or not, I am not certain -- indicating that Accenture was a significant vendor partner of ACE and would likely be involved in any post-merger transformation projects or integration projects, and Henry had inquired about our experience partnering or working with Accenture, but I couldn't be certain if that was an e-mail or**

**a side conversation that Henry and I had.**

Q. Okay. Other than that discussion or possible e-mail, are you aware of any other e-mails going back and forth between you and Henry Mirolyuz relating to planned activities by FICO post-merger?

MR. HINDERAKER: I object to the question as saying any other e-mails. Misstates the testimony.

Q. Go ahead.

**A. I am -- I cannot recall any other communications between me and Henry on the topic.**

Q. Okay. Now, going back to Section 10.8 and the language relating to where it says, in the middle of that paragraph, "which shall not be unreasonably withheld," do you -- what is it that you understand is meant by that, and specifically, what is it that you understand will not be unreasonably withheld?

**A. Right. So my interpretation of this is that when FICO licenses their software, they license it for a specific scope of use, which is driven by a number of parameters in our pricing model. And so my interpretation of this language**

**is that if, through the assignment of the license, there is a change to one of those pricing parameters for the software for the scope of use, that, you know, we would evaluate the impact of that and determine whether or not FICO is being fairly compensated for the use of their product.**

**I would say it probably goes further in terms of making sure that the type of use of the product is one that is -- aligns with, you know, the values of Fair Isaac and what we license our software for.**

Q. And what is your basis for stating that that is what is meant by "will not be unreasonably withheld"?

**A. That's my reading of the contract. That's the way I personally interpret it. You know --**

Q. Well, I mean, is it based on any communications between Chubb and FICO?

MR. HINDERAKER: Asked and answered.

**A. Not between Chubb and FICO, no.**

Q. And is it based on any communications that you've had with anybody at

FICO?

MR. HINDERAKER: Again, to the extent that that question would be revealing a privileged communication, then I instruct you not to answer, but if you can answer it otherwise, then go ahead.

**A. Sure. You've already shown me --**

Q. Wait a minute. My question was, was it based on any communications that you have had with anybody at FICO?

MR. HINDERAKER: That's right. Same objection.

Q. Go ahead.

**A. So we've already -- you've shown me in this Exhibit 80 discussions I had with Russ Schreiber specific to that provision in the contract. So yes, that is in the record. Beyond that, there may have been privileged conversations with counsel.**

Q. Okay. Is your understanding of the meaning of that phrase based on any conversations that you've had with anybody at Chubb?

MR. HINDERAKER: Asked and answered. Go ahead.

**A. No.**

Q. Is it based on any communications that you're aware of prior to the Chubb merger?

MR. HINDERAKER: Objection. Vague.

**A. Communications with who?**

Q. With anybody.

MR. HINDERAKER: For any period of time? Objection. Vague.

THE COURT REPORTER: I didn't hear you.

MR. FLEMING: There was a period of time prior to the Chubb merger.

Q. Was it based on any communications that you're aware of that occurred prior to the Chubb merger?

MR. HINDERAKER: Okay. Now we have a time frame.

MR. FLEMING: There was a time frame already. That was in the question. Look at the transcript.

**A. If I'm understanding the question correctly as I just stated, right, in Exhibit 80, you can see I had conversations with Russ Schreiber regarding that provision in the**

**contract. Other than that, I cannot recall having that discussion with others.**

Q. Is it based on any communications you've had with the persons who were involved in negotiating the contracts and specifically the software license agreement between Chubb and FICO?

MR. HINDERAKER: Objection to the extent of what is the meaning of it. Vague.

**A. As I testified earlier, Russ Schreiber was the client partner, to my knowledge, at FICO who negotiated the software license agreements with Chubb. And so via Exhibit 80, yes, I did discuss that with the individual who negotiated those contracts with Chubb.**

Q. Are you aware of any writing prior to October 7th, 2015, which references your -- which provides support for your interpretation of the phrase unreasonably withheld in this contract?

**A. So is the question did I receive communications from somebody else internally at FICO to substantiate my interpretation of the contract, is that the question?**

Q. Yeah. Or helped you arrive at that interpretation?

Message

**From:** Russ Schreiber [RussSchreiber@fico.com]
**Sent:** 7/1/2015 10:43:09 AM
**To:** Mike Sawyer [MikeSawyer@fico.com]
**Subject:** Re: Ace to Buy Chubb for $28.3 Billion With Greenberg in Charge - July 1, 2015

That said, driving costs out will be interesting and there may be a major license transfer

Russ

m 917.214.2614
Sent from my phone

On Jul 1, 2015, at 11:39 AM, Mike Sawyer <MikeSawyer@fico.com> wrote:
Wow...Not good.

**Mike Sawyer**
Client Partner, Insurance & Healthcare

**FICO**
Boston, MA

T 508 530 3116
C 617 401 1380
mikesawyer@fico.com
www.fico.com

**From:** Russ Schreiber
**Sent:** Wednesday, July 01, 2015 11:38 AM
**To:** Lamont Boyd
**Cc:** Joanne Gaskin; Vance Gudmundsen; Mike Sawyer
**Subject:** Re: Ace to Buy Chubb for $28.3 Billion With Greenberg in Charge - July 1, 2015

Holy cow

Russ

m 917.214.2614
Sent from my phone

On Jul 1, 2015, at 11:33 AM, Lamont Boyd <LamontBoyd@fico.com> wrote:
Having just started integration of the acquired Fireman's Fund personal lines book, ACE pulls off another, much larger acquisition.

Chubb has always steered clear of credit-based insurance scores (because their affluent clients are "special"), but ACE is a strong believer in credit. This could be another "backdoor win" for FICO CBIS.....

Lamont

EXHIBIT 121 10-24-18 LV01H

http://www.bloomberg.com/news/articles/2015-07-01/ace-to-purchase-chubb-for-28-3-billion-with-greenberg-in-charge

Message

**From:** Mike Sawyer [MikeSawyer@fico.com]
**Sent:** 10/7/2015 9:13:41 AM
**To:** Russ Schreiber [RussSchreiber@fico.com]
**Subject:** RE: Chubb Language
**Attachments:** 30073_ChubbandSon_SftwrLicMaintAgmt-Blaze_6-30-06.pdf; 33073_ChubbandSon_Blaze_AmendTwo-toSLSA_12-28-06.pdf; 30274_ChubbandSon_Blaze_Amend1-toSftwrLicMaintAgmt_8-1-06.pdf

See attached. I don't see anything on GWP in the agreements.

**Mike Sawyer**
Client Partner, Insurance & Healthcare

**FICO**
Boston, MA

T 508 530 3116
C 617 401 1380
mikesawyer@fico.com
www.fico.com

**From:** Russ Schreiber
**Sent:** Wednesday, October 07, 2015 10:10 AM
**To:** Mike Sawyer
**Subject:** Re: Chubb Language

Nothing in the contract? I can dig up proposal but it was a decade ago

Russ

m 917.214.2614

Sent from my phone

On Oct 7, 2015, at 9:55 AM, Mike Sawyer <MikeSawyer@fico.com> wrote:

No. I wasn't at FICO when this deal was signed. Do you have any of the proposal information? I know that our standard Blaze Advisor price book and likely the pricing sheet that needed to be completed for FP&A at the time for rev rec would have been based on GWP.

**Mike Sawyer**
Client Partner, Insurance & Healthcare

**FICO**

Boston, MA

T 508 530 3116

C 617 401 1380

mikesawyer@fico.com

www.fico.com

**From:** Russ Schreiber
**Sent:** Wednesday, October 07, 2015 9:53 AM
**To:** Mike Sawyer
**Subject:** RE: Chubb Language

Is the license specifically tied to GWP?

Russ Schreiber

m +1.917.214.2614

**From:** Mike Sawyer
**Sent:** Wednesday, October 07, 2015 9:41 AM
**To:** Russ Schreiber
**Subject:** RE: Chubb Language

I am not as concerned about it. Chubb had $12.3B in GWP in 2014 compared to ACE's $23B. Our pricing model is based on GWP so I would think that tripling the size of the GWP of business by acquisition should be significant enough to get around the "unreasonably withheld" language.

**Mike Sawyer**

Client Partner, Insurance & Healthcare

**FICO**

Boston, MA

T 508 530 3116

C 617 401 1380

mikesawyer@fico.com

www.fico.com

**From:** Russ Schreiber
**Sent:** Wednesday, October 07, 2015 9:33 AM
**To:** Mike Sawyer
**Subject:** RE: Chubb Language

The unreasonably withheld bit has me a little concerned so it may come down to a "how did we size" the enterprise discussion

Russ Schreiber
m +1.917.214.2614

**From:** Mike Sawyer
**Sent:** Wednesday, October 07, 2015 8:44 AM
**To:** Russ Schreiber
**Subject:** Chubb Language

I think we are in a good spot. See below. First excerpt is from the original MSLA and states they have no assignment rights. The second is also from the MLSA and defines Enterprise License. It's pretty restrictive and excludes Parent Company which is what I think ACE would be. The third is from the amendment when they picked up the ELA option. It provides some more flexibility as it relates to subsidiaries and affiliates, but not parent company.

<image001.png>

<image002.png>

For purposes of this Amendment Two, the Enterprise-Wide License shall mean that Client and its Affiliates may use the Fair Isaac Product for their internal business purposes, with no limitation on the number of Seats or CPUs, subject to and in accordance with all of the provisions of the Agreement. "Affiliates" shall mean any other entity directly or indirectly controlled by Client, where "control" means the ownership of more than 50% of the aggregate of all voting interests (representing the right to vote for the election of directors or other managing authority) in an entity. Such other entity is an Affiliate only during the period that such "control" exists. Client shall at all times be responsible for its Affiliates' use of the Fair Isaac Products.

**Mike Sawyer**
Client Partner, Insurance & Healthcare

**FICO**

Boston, MA

T 508 530 3116

C 617 401 1380

mikesawyer@fico.com

www.fico.com

Message

**From:** Natasha Fowlin [NatashaFowlin@fico.com]
**Sent:** 11/13/2015 1:32:58 PM
**To:** Mike Sawyer [MikeSawyer@ficorp.onmicrosoft.com]
**Subject:** RE: Chubb - Ace License review

Ok I figured as much ... Monday it is and if we need to move then you let me know.

Thanks ☺

**Natasha N. Fowlin**
Administrative Support
**FICO**
1500 Broadway Suite 1101
New York, NY 10036

T 646 733 2424
C 917 543 3137
NatashaFowlin@fico.com

**From:** Mike Sawyer
**Sent:** Friday, November 13, 2015 2:32 PM
**To:** Natasha Fowlin <NatashaFowlin@fico.com>
**Subject:** RE: Chubb - Ace License review

No...I am on plane to San Diego on Tuesday. Let's try for Monday.

**Mike Sawyer**
Client Partner, Insurance & Healthcare

**FICO**
Boston, MA

T 508 530 3116
C 617 401 1380
mikesawyer@fico.com
www.fico.com

EXHIBIT
9

EXHIBIT
81
Sawyer
10-2-18 AR

**From:** Natasha Fowlin
**Sent:** Friday, November 13, 2015 2:32 PM
**To:** Mike Sawyer
**Subject:** RE: Chubb - Ace License review

Is Tuesday morning at 930am et better ?

**Natasha N. Fowlin**

Administrative Support

**FICO**

1500 Broadway Suite 1101

New York, NY 10036

T 646 733 2424

C 917 543 3137

NatashaFowlin@fico.com

**From:** Mike Sawyer
**Sent:** Friday, November 13, 2015 2:30 PM
**To:** Natasha Fowlin <NatashaFowlin@fico.com>
**Subject:** RE: Chubb - Ace License review

That's day care pick up time. Not sure if my wife can do it on Monday or not. Go ahead and book it and I will ask to move it later if she can't do it.

**Mike Sawyer**

Client Partner, Insurance & Healthcare

**FICO**

Boston, MA

T 508 530 3116

C 617 401 1380

mikesawyer@fico.com

www.fico.com

**From:** Natasha Fowlin
**Sent:** Friday, November 13, 2015 2:27 PM
**To:** Mike Sawyer
**Subject:** FW: Chubb - Ace License review

Can you do Monday 5pm et ?

**Natasha N. Fowlin**
Administrative Support
**FICO**
1500 Broadway Suite 1101
New York, NY 10036

T 646 733 2424
C 917 543 3137
NatashaFowlin@fico.com

**From:** Russ Schreiber
**Sent:** Friday, November 13, 2015 2:22 PM
**To:** Natasha Fowlin <NatashaFowlin@fico.com>
**Cc:** Mike Sawyer <MikeSawyer@fico.com>; Bill Waid <BillWaid@fico.com>
**Subject:** Chubb - Ace License review

Tasha, can you put 30 minutes on the calendar for this group to discuss Ace's acquisition of Chubb and potential licensing expansion fees.

Russ Schreiber
m +1.917.214.2614

Redacted

On Jan 8, 2016, at 1:09 PM, Mike Sawyer <MikeSawyer@fico.com> wrote:

Elie -

EXHIBIT
10

Confidential FICO0003090

FICO0003090 Schreiber Russ

Thanks for the call this afternoon. As discussed, attached are Chubb's Blaze Advisor license agreement for your review. Chubb acquired its current Blaze Advisor license scope via 3 incremental purchases and I have attached all 3 documents in chronological order. The net result is that Chubb currently has a perpetual Enterprise Wide License for the Java and .NET versions of the platform for use in the territory of the US.

The acquisition of Chubb by ACE would trigger Section 10.8 (No Assignment clause) of the base license agreement. Therefore, we would like to start the discussions and process to ensure you remain in compliance with your license and have the license grants necessary to support the organization post transaction close.

Please let me know once you have reviewed the agreements and your suggested next steps.

Best regards,

Mike Sawyer

Client Partner, Insurance & Healthcare

FICO

Boston, MA

T 508 530 3116

C 617 401 1380

<mailto:mikesawyer@fico.com> mikesawyer@fico.com

www.fico.com

From: Mike Sawyer
Sent: Friday, January 08, 2016 12:35 PM
To: emerheb@chubb.com
Subject: FICO Follow Up

Hi Elie -

Happy New Year! I am following up on the voicemail I left you before the holiday. Can you please let me know when you have availability next week for a discussion regarding Chubb's license for Blaze Advisor and the impacts of the pending ACE acquisition?

Thank you,

Mike Sawyer

Client Partner, Insurance & Healthcare

FICO

Boston, MA

T  508 530 3116

C  617 401 1380

mikesawyer@fico.com

www.fico.com

<30073_ChubbandSon_SftwrLicMaintAgmt-Blaze_6-30-06.pdf>

<30274_ChubbandSon_Blaze_Amend1-toSftwrLicMaintAgmt_8-1-06.pdf>

<33073_ChubbandSon_Blaze_AmendTwo-toSLSA_12-28-06.pdf>

Confidential                                                                                                                    FICO0003092
FICO0003090                                                                                                                  Schreiber Russ