# EXHIBIT 4

## FILED UNDER SEAL

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY       10/24/2018
CASE 0:16-cv-01054-DTS   Doc. 401-2   Filed 07/26/19   Page 2 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1            CONFIDENTIAL - ATTORNEYS' EYES ONLY

2            UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
3
   -------------------------------x
4
   FAIR ISAAC CORPORATION,
5
                    Plaintiff,
6         v.                        Court File No.
                                    16-cv-1054 (WMW/DTS)
7
   FEDERAL INSURANCE COMPANY
8  and ACE AMERICAN INSURANCE
   COMPANY,
9
                    Defendants.
10
   -------------------------------x
11

12   ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

13   VIDEOTAPED DEPOSITION OF RUSSELL SCHREIBER

14              New York, New York

15         Wednesday, October 24, 2018

16                8:52 a.m.

17

18

19

20

21
   Reported by:
22 LYNN VAN DEN HENDE
   CRR, RMR, RPR, CSR-NY, CSR-CA, CSR-IL
23 JOB NO: 39215

24

25

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS Doc. 401-2 Filed 07/26/19 Page 3 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1              CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2

 3

 4                        October 24, 2018

 5                           8:52 a.m.

 6

 7              Videotaped deposition of RUSSELL

 8         SCHREIBER, held at the offices of Merchant &

 9         Gould, 767 Third Avenue, 23rd Floor, New

10         York, New York, pursuant to Notice, before

11         Lynn Van Den Hende, Certified Realtime

12         Reporter, Registered Merit Reporter, State

13         of New York Certified Shorthand Reporter,

14         State of California Certified Shorthand

15         Reporter, State of Illinois Certified

16         Shorthand Reporter, Registered Professional

17         Reporter, and Notary Public within and for

18         the State of New York.

19

20

21

22

23

24

25
```

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS  Doc. 401-2  Filed 07/26/19  Page 4 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1            CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2     A P P E A R A N C E S:

 3

 4     FOR THE PLAINTIFF:

 5          Merchant & Gould

 6          3200 IDS Center

 7          80 South Eighth Street

 8          Minneapolis, Minnesota 55402-2215

 9          612-332-5300

10          BY:   ALLEN W. HINDERAKER, ESQ.

11                ahinderaker@merchantgould.com

12

13     FOR THE DEFENDANTS:

14          FREDRIKSON & BYRON, P.A.

15          200 South Sixth Street, Suite 4000

16          Minneapolis, MN 55402-1425

17          612-492-7000

18          BY:   LEAH C. JANUS, ESQ.

19                ljanus@fredlaw.com

20

21     ALSO PRESENT:

22          JAMES WOODWARD, Fair Isaac Corporation

23          KEVIN S. MURPHY, Chubb

24          KEVIN MARTH, Videographer

25
```

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS   Doc. 401-2   Filed 07/26/19   Page 5 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

## Page 20

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 works, right?

2     Q.   As part of your responsibilities

3 as client partner would you also generally be

4 familiar with the licenses that governed the

5 relationships with the clients that you

6 worked with?

7     A.   So generally, yes.

8     But there were licenses that folks

9 had that I didn't even know, I wasn't even

10 aware of.

11     Q.   But generally the scope of the

12 license with a given client was something

13 that you were familiar with?

14     A.   Or I had to figure it out.

15     But, yes, yeah, sure.

16     Q.   And that would be important for

17 what you are doing as a client partner, I

18 take it, because you need to know whether

19 there are additional products or services

20 that could be sold to a given client,

21 correct?

22     A.   At one end or -- or if that

23 product was being sunset and they needed to

24 know that it was being, you know, shelved in

Page 20

## Page 21

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 two years, that we can up and manage their --

2 their way through that process.

3     Q.   Yeah.  And you would also need to

4 know how widely that client is able to use

5 the software that they've licensed under the

6 terms of their license, correct?

7     A.   Say that again, please.

8     Q.   You'd also need to know how widely

9 that client is able to use the software that

10 they've licensed under the term of their

11 license?

12     A.   Right.  So if you mean -- do you

13 mean like what the scope of the license is?

14     Q.   Yeah.

15     A.   Because "widely" is -- I'm not

16 sure -- yeah, so if you said -- I would

17 certainly want to read the scope of the

18 license, yeah, yeah.  I guess.

19     Q.   When did you first begin to work

20 with Chubb?

21     A.   Chubb was my first client.  Chubb

22 was my -- my entrée into FICO.  That's -- you

23 know, put me on the map.

24     So that would have been February,

Page 21

## Page 22

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 maybe March of '16.

2     So within a month or two we

3 received an RFI, and I led the response.

4     MR. HINDERAKER:  Can I -- I think

5 you said '16?  February --

6     A.   Oh, I meant '6.  Did I say '16?

7     I meant 2006.  Thank you.

8     Q.   So you said you received an RFI in

9 the spring of 2006?

10     A.   Right.  I want to say February or

11 March.  So early -- late winter, early

12 spring, yeah.  It was right away.

13     Q.   And what is an RFI?

14     A.   It could have been an RFP, but it

15 was request for information would be an RFI.

16     It might have been an RFP, a

17 request for proposal.

18     But it was a document that we

19 received to be able to present to Chubb a

20 solution and pricing and an approach to the

21 problem.

22     Q.   And do you recall -- it was a

23 while ago, but do you recall off the top of

24 your head just generally what the nature of

Page 22

## Page 23

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 the request for information or proposal was

2 from Chubb?

3     A.   Oh, yeah, yeah.  Yeah.  It's

4 funny -- no, it's funny how things you

5 remember.

6     Anyway so -- so this was to create

7 an automated renewals platform for their

8 specialty lines of business.

9     They had like a -- I forget, like

10 170 or maybe 120 different products in

11 that -- in that business.

12     And so that would be like small

13 manufacturers maybe or nurses or, you know,

14 plumbers.

15     But what they called specialty

16 lines.

17     And so the way they sold those

18 products is they have the underwriting

19 process where they'd have an underwriter like

20 price out how risky is this thing and then

21 set out an insurance price premium.

22     And what was happening is they had

23 a corporate initiative.  Their agenda was to

24 be able to sell to a larger market, which

Page 23

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS Doc. 401-2 Filed 07/26/19 Page 6 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  meant smaller value, smaller dollar value.
3      So like -- I forget the numbers,
4  but I want to say the average policy price
5  was maybe -- let's call it $100,000 for this
6  discussion.
7      They wanted to be able to move
8  down to a bigger market, more prospective
9  customers.
10     Say the average policy is $20,000.
11 So, you know, moving to like the Fortune 100s
12 to the Fortune 10,000, that kind of concept.
13     The way their business worked at
14 that time was they would write the new
15 policy, they'd get a new prospect, and they'd
16 assess the risk.
17     And then they would -- if they won
18 the work, they'd book the policy, and they'd
19 have a new customer.
20     The problem was that on renewals
21 they would do a full review of the -- each
22 policy, so that it was effectively
23 underwriting the whole customer from scratch,
24 which is very expensive.
25     So the premise of this RFI or RFP

Page 24

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  or request for a pitch was -- or solution was
2  how can they automate the underwriting -- the
3  renewal process so that they could move into
4  a business model where they were -- had less
5  manual intervention with the renewal process.
6      So they're going to be some
7  insurance customers that would just, you
8  know, not even touch this, just automatically
9  renew it.
10     There were others I think that
11 were high risk. They need to really do full
12 underwriting. There were some that were in
13 the middle.
14     So they called that the low touch,
15 no touch, high touch is -- you know, and it's
16 become pretty big in the industry now.
17 Q.   And the idea was this renewal
18 process would become a low touch?
19 A.   So they would be able to segment
20 the customers across these 170 or 200 plus
21 products. And, again, don't quote me on the
22 product count, but there was hundreds of
23 them. They could segment the customers at
24 the renewal process into high touch, low

Page 25

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  touch, no touch.
3      So if they had -- the high touch
4  once were the most expensive ones to renew,
5  because you had to go send people out, look
6  at the buildings, you know -- you know, check
7  the headcount, make sure the staff is right.
8      So it's how do you price that
9  premium.
10     Whereas the no touch, it's like
11 our auto insurance. You just get a new bill
12 for the next year, right?
13     So they were trying to get more
14 into the low to no touch.
15 Q.   And for folks who aren't familiar
16 with either the insurance industry or Blaze,
17 can you describe in general terms how a
18 product like Blaze would be used in a
19 solution like this?
20 A.   Sure.
21     So insurance policies are annual
22 policies. So about three months before the
23 end of a year the policy information and the
24 claim information would be -- would be
25 transferred, be fed into a Blaze engine.

Page 26

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1      And the Blaze software would look
2  at that information. And rules would be --
3  rules in Blaze would be applied to it.
4      So the rule -- a rule might be,
5  oh, there were no claims this year. So that
6  means we could do a low or no touch.
7      Or they had claims this year, so
8  now it must be a high touch.
9      And the magic here was that
10 Blaze -- the rules that we're talking about
11 were set up in such a way that human beings
12 could -- could maintain them.
13     So it didn't require like some,
14 you know, MIT Ph.D.
15     A regular business analyst could
16 maintain those business rules.
17     So -- right, so once a year a feed
18 would come in, rules would be compared.
19     And then the policies would be
20 segmented into high touch, low touch, no
21 touch.
22 Q.   And I take it that in a process
23 like that while Blaze is involved Blaze is
24 actually incorporated somehow into an

Page 27

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS   Doc. 401-2   Filed 07/26/19   Page 7 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  the scope of the license --
2
3  A.   Oh, yeah.
4  Q.   -- that was being negotiated?
5  A.   Yeah, absolutely.  Yeah, yeah.
6  Q.   What do you recall about those
7  discussions?
8  A.   Right.  So the initial license was
9  very much desired to be for specialty lines,
10  which is U.S. business, right?  Specialty
11  U.S.
12       As we got to contracting it became
13  apparent they couldn't get the deal done for
14  the June 30 window that they had talked
15  about.
16       So we broke out an expansion to
17  include the specialty division, and then for
18  the rest of the U.S. business.
19       If they did -- if they -- you
20  know -- so they had -- I want to say it was a
21  May -- June -- May -- June 30 would have been
22  the first license signature for the named
23  application of CSI underwriting, or something
24  like that, whatever the name was.  I'm sure
25  you have the contract.  You can look it up.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2       Then somewhere over the summer it
3  would have been an expansion to be a CSI
4  divisional license.
5       So that would be -- that would
6  exclude personal lines, commercial lines,
7  claims business, any corporate overhead.
8       It was just literally within that
9  specialty lines business.
10       And then they had an option to buy
11  out by the calendar year end -- I think it
12  was calendar year end -- in ELA for the
13  rest -- I'm sorry, for commercial, personal
14  lines and claims, which we called it
15  basically an enterprise license.
16  Q.   All right.  And were you
17  involved -- I guess describe your role in
18  negotiating or discussing the scope of those
19  licenses as they were --
20  A.   Yeah.  So I was the face.  I was
21  the guy.
22       So it was -- I led FICO.  And then
23  on the other side was Owen Williams for
24  Chubb.
25       Again, there were multiple layers

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2  of negotiation, people involved.
3       So you had the Blaze salespeople
4  dealing with procurement.
5       But in terms of how much and
6  what's the scope, it was really between Owen
7  and I.  And his boss at some point got
8  involved.
9  Q.   And so you said "ELA."  That
10  stands for enterprise license agreement?
11  A.   Yes.
12  Q.   Okay.  And with respect to Chubb,
13  was your understanding that that essentially
14  allowed Chubb to use Blaze throughout its
15  enterprise?
16  A.   Chubb -- we have to be careful
17  what Chubb is, because Chubb's a messy
18  organization.  I mean that in a -- in a -- in
19  a subjective way.
20       I just mean like there's a lot of
21  organizational lines and overlap.
22       So -- so from the Chubb Insurance
23  level down, Chubb & Sons, policy -- I'm
24  sorry, personal lines, commercial lines,
25  specialty lines, and the claims, those were

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2  the operating business units under Chubb &
3  Sons as we understood it at that time.
4       And it was very much U.S. focused.
5  Q.   Was the license -- the enterprise
6  license that was ultimately negotiated
7  however a global enterprise license?
8  A.   No, no.  There was rumor of that.
9  But, no.
10  Q.   Okay.  Did you ever understand it
11  to be a global enterprise license?
12  A.   No, no.
13       I may have had a hiccup once or
14  twice where people -- I've had people read
15  parts of agreements.  Let's say, oh, they
16  haven't read the whole agreement and say it's
17  global.
18       And I'd just correct them and say,
19  no, I was there.  It was not global.
20       And I'd get an email that would
21  say, oh, it's global.  And I'd make some
22  committing moments where I didn't really
23  refer back to the documents.  I might have
24  said it was global.
25       But I never, ever told Chubb it

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS   Doc. 401-2   Filed 07/26/19   Page 8 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 was global. I've never had a contract that
2 said it was global, so --
3     And I woke up every day thinking
4 this was a U.S. license.
5 Q.  So --
6 A.  'Cause global is all after the
7 fact. This was U.S. They asked for global
8 as a contract renewal. But it was after the
9 pricing was all set. We had the three steps
10 in the contract.
11     So they didn't really talk about
12 global till -- till the end of the
13 discussion -- till -- till they were ready to
14 pull the trigger on the enterprise license.
15     We didn't price it that way.
16 Q.  So they didn't talk about global
17 until -- until after the enterprise license
18 was entered into or while the enterprise
19 license was being negotiated?
20 A.  So the enterprise license was
21 negotiated in -- prior to June of '6, right?
22     So June 30 -- that pricing, I'm
23 pretty sure we had the three steps in the
24 agreement.

Page 36

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1     I haven't looked at this in a
2 couple years now, right? I'd be interested
3 to see if it has the three steps in the
4 agreement.
5     And that was very much U.S., as we
6 were -- I don't recall exactly when, but I
7 believe as they were getting ready to sign
8 the -- the -- or pull the trigger or they
9 gave us the word that they want to move to
10 the enterprise, global came up.
11     And -- and either Owen or Mark
12 brought it up to me and said, we didn't price
13 global. And so it kind of came up. And it
14 got put back down.
15 Q.  And that would have close to
16 the -- or in the December --
17 A.  It would have been in '06.
18 Q.  Right. And so I'm just trying to
19 understand, you're saying they really brought
20 it up late, towards the end of 2006?
21 A.  To me.
22 Q.  Okay.
23 A.  Right.
24 Q.  And then --

Page 37

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 A.  Of course we really got to
2 remember -- so we went into this thing
3 selling a named application for -- for
4 renewals.
5     It was very much went in with a
6 very specific problem to solve and very
7 specific solution to that problem.
8     And then while we were in there we
9 gave them options to expand their use.
10 Q.  Were you aware that Chubb in
11 Europe was using Blaze pursuant to the ELA?
12 A.  I did become aware at some point,
13 yes.
14     But it was never really clear to
15 me that there -- maybe it was clear. I don't
16 remember now because it's been a few years
17 since I've looked at this.
18     But there was talk of them using
19 it for development to try it out, proof of
20 concept.
21     But I don't recall ever -- did
22 they use it in anchor for running their
23 business, you know.
24     So I just don't recall. We can

Page 38

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 look. I'm sure -- I'm sure in your stack
2 we'll see something that says something
3 there.
4 Q.  So you just don't recall whether
5 you were aware that Chubb Europe was using
6 Blaze?
7 A.  No, I know that -- I recall that
8 they had their hands on it.
9     I don't recall that it was used in
10 production.
11     So what I mean by that is they
12 could have used it to test out ideas, to --
13 for proof of concepts that were not used in
14 the actual running of their business.
15     Does that make sense?
16 Q.  (Nodding.)
17 A.  Okay.
18 Q.  Did you --
19 A.  And I just don't remember when I
20 became aware.
21 Q.  Okay. So it's --
22 A.  I know I was aware at the end. I
23 just don't remember how -- how far from then.
24 Q.  And by "the end" you mean --

Page 39

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS   Doc. 401-2   Filed 07/26/19   Page 9 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Q.   You said you couldn't remember.

A.   Right.

Q.   And so my question -- my follow-up question to you was it's possible then that in November 2008 after going through an internal analysis of the Chubb ELA you concluded that it was in fact a global ELA?

MR. HINDERAKER:  And my objection is lack of foundation, asks for speculation.

A.   But I still answer the question anyway.

MR. HINDERAKER:  Yes, the best you can.

A.   Okay.  So it's -- I'm sorry, one more time -- is it possible that I concluded that it was a global ELA?

I'd state that all things are possible.

Is it possible in the moment that with Larry saying yeah, yeah, yeah, yeah, yeah, yeah, I might have said, okay, maybe.

And then I would have done the rest of the work to find out what I really

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

thought.

So it's possible in a moment, in a flash I might have said, okay, maybe you're right.

Q.   Okay.  Now, presumably these conversations were taking place because Chubb Europe wanted to use Blaze, right?

A.   Or -- that's one possible -- that's one possible reason.

Q.   Okay.  Or FICO --

A.   -- sell it to --

THE COURT REPORTER:  Excuse me, excuse me.  You need to speak one at a time.

So what was the question?

Q.   Or that FICO Europe wanted to sell Blaze to Chubb Europe, that's another possibility for the reason for the conversation, correct?

A.   Correct.

Q.   Do you recall what precipitated the conversation?

A.   No.

Q.   In any event, do you recall that a

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

decision was made about what position FICO would take with respect to whether the Chubb Blaze ELA was global?

A.   Do I recall?  No.

Q.   As you sit here today, do you believe that FICO made the decision to treat the Chubb Blaze ELA as a global ELA?

A.   No, 'cause we'd have an amendment -- we'd an Amendment Four that said it's global.  And we don't have that.  Or amendment whatever.

Q.   Do you believe that FICO allowed -- knowingly allowed Chubb to use the Blaze ELA outside of the United States?

A.   Knowingly allowed -- how do you mean that?

Just -- so I'm wondering, you know, before the fact or after the fact kind of.  So do we knowingly say, go ahead and use it?

Q.   Yeah.

A.   No.

We might have found out about something and said, you know what, don't

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

break the relationship.  It's a good customer.  It's a small use.  Let it go for a while till it becomes important.

Q.   Okay.  So in your view --

A.   But that would have been -- we'd not --

Q.   So in your view you don't believe that Chubb ever said to -- I'm sorry, strike that.

You don't believe that FICO ever said to Chubb, go ahead and use it in Europe?

Is that part correct?

A.   That is correct.

Q.   But you think it's possible that FICO knew that Chubb was using it in Europe and made a decision not to take steps to stop Chubb from using it in Europe?

MR. HINDERAKER:  I'll object to the form of the question as asking for speculation.

A.   I'm sorry, so I believed -- do I believe that they -- I could have learned that they were using it and said, don't rock the boat, Chubb's a great customer, we love

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS Doc. 401-2 Filed 07/26/19 Page 10 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1  their reference, it's a small use, it's not
2  material?  It's possible.
3       That would be something -- that
4  would be a decision I would have made, say
5  don't rock -- it's not material, if it was a
6  minor use for like a concept idea.  But,
7  yeah.
8       Q.   Okay.  And so in that case in your
9  mind you were knowingly allowing Chubb to use
10 the Blaze software outside of the scope of
11 the license?
12      MR. HINDERAKER:  Object to the
13 question to the extent it asks for a
14 legal conclusion.
15      Also misstates his prior
16 testimony.  You.
17      Can try to answer the question the
18 best you can.
19      A.   I'm sorry, give me the question
20 again.
21      Q.   In that case you were knowingly
22 allowing Chubb to use the Blaze software
23 outside of the scope of the license?
24      MR. HINDERAKER:  Same objections.

Page 140

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1       Go ahead.
2       A.   I -- knowingly I may have known.
3       I don't know that I know that I
4  knew that I know, you know.
5       Q.   It's possible -- you can't recall
6  whether you knew, but it's possible?
7       A.   It's possible --
8       MR. HINDERAKER:  Objection, asks
9  for speculation.  Go ahead.
10      A.   It's -- it's --
11      MR. HINDERAKER:  Anything is
12 possible.  Go ahead.
13      A.   Right.  It's certainly possible.
14      It's possible I knew that they had
15 some small use and didn't hold them to the
16 letter of the law for a moment.
17      Q.   Or the letter of the license?
18      A.   That's what I meant, yeah, letter
19 of license, yeah.  Or the spirit of the
20 license, quite frankly.
21      (Exhibit 117, Email dated
22 6/3/2009, Bates FICO0003146 through
23 FICO0003147, marked for identification.)
24      Q.   I'm showing you what's been marked

Page 141

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1  as Exhibit 117.
2       A.   David Taylor.
3       Q.   After you've had a chance to look
4  at this, let me know.
5       (Document review.)
6       Okay.
7       Q.   All right.  So if we start at the
8  first in time email, which is on the back --
9       A.   Okay.  First in time email.
10      Q.   That's from David Taylor to Ian
11 Brodie and you --
12      A.   Uh-huh.
13      Q.   -- and others?
14      Do you think Ian Brodie would have
15 been the client partner for Chubb at this
16 time?
17      A.   Yes.
18      Q.   Do you know where Ian Brodie is
19 now?
20      A.   He's running tattoo removal
21 parlors in Boston.
22      You don't get to say that often,
23 do you?  Actually as of two years ago.  So I
24 don't know where he is now.

Page 142

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1       Q.   Okay.  And did you say he's
2  running them or --
3       A.   Right.
4       Q.   Like he actually works in --
5       A.   No, he owns -- he owns a string of
6  laser removals.  Apparently a very big
7  business.
8       Q.   Okay.  And in the Boston area?
9       A.   I believe so, yes.
10      Q.   Okay.  To your knowledge, he's not
11 in the industry anymore?
12      A.   That's right.
13      Q.   Okay.  And then David Taylor, who
14 is that?  Have we --
15      A.   David Taylor would have been an
16 alliance person.
17      Alliance is between -- ACN is
18 Accenture.
19      Okay.
20      A.   All right.  So we had business
21 relationships with Accenture where we would
22 help them, they would help us.
23      You know, it's an alliance.  It's
24 a teaming agreement.  So David Taylor and Bob

Page 143

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS Doc. 401-2 Filed 07/26/19 Page 11 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  A.  Right.
2  Q.  -- and I would probably have said,
3  no, which that does involve whether Chubb can
4  use Blaze in Europe.  That's why I'm
5  confused.
6  A.  Okay.
7  Q.  Do you recall -- is it that you
8  don't recall the conversation --
9  A.  Yeah, so --
10  Q.  You're just guessing?
11  A.  So Richard just called me and
12  said, can we sell them Blaze.
13  And I'd say, I think so.  Let's
14  check the contract.
15  And I'd get -- an email exchange
16  would go here.  It would be a little bit
17  different.
18  Then Mike would go and pull up --
19  he'd pull up Amendment Three instead of --
20  oh, it looks like they have a global 'cause
21  there's no territory.
22  And we'd say -- we'd go back, we'd
23  churn around on this stuff.
24  But at the end of the day the

Page 184

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  agreement was the agreement was the agreement
2  was the agreement.
3  And so if I missed -- or if I let
4  them off the hook on a small usage, it didn't
5  change the nature of the agreement, that -- I
6  never signed anything that gave them a global
7  ELA, ever.
8  Q.  But you let them use Blaze in
9  Europe?
10  A.  It looks like I did.  I may have.
11  I don't recall doing so.
12  I certainly didn't get asked and I
13  certainly didn't say, go ahead.
14  I may have found out about a use
15  after the fact.
16  I never -- if you show me
17  something that says, go right ahead and use
18  it, I'll be surprised.
19  Q.  Well, I've shown you documents
20  from November of 2008 in which Richard Hill
21  is involved and the topic to be discussed is
22  the Chubb license agreement and the plan for
23  Chubb Europe.
24  A.  Right.

Page 185

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  Q.  And then documents showing that in
2  fact Chubb was using Blaze in Europe.
3  So do you think a reasonable
4  person could look at those documents and
5  conclude that the conclusion at the time was
6  the ELA allows Chubb to use Blaze in Europe?
7  A.  No.
8  Why, you ask?  I don't know that
9  that meeting ever took place.
10  I don't see any meeting notes.  I
11  don't see any conclusions.
12  There's usually a meeting, agenda,
13  minutes, who attended, what the decisions
14  were.  I haven't seen that there.
15  So if you showed me an invite --
16  Q.  Where would the meeting agenda be
17  kept?
18  A.  I don't know.  Whoever set up the
19  meeting.
20  So who set up this meeting?  This
21  was a --
22  Q.  Mike Sawyer.
23  A.  So it would be in the meeting
24  invite, or it would be a separate document.

Page 186

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  Q.  When you referred to notes from a
2  meeting like this, what type of notes would
3  you generally expect to see?
4  A.  I would see a conclusion.
5  You know, attendees meeting,
6  meeting notes, right.
7  So who attended the meeting, what
8  the topic was, what were the outcomes.
9  Q.  And who would you have expected in
10  connection with 73 would have kept those
11  notes?
12  A.  73, either -- probably Mike.  It
13  could have been Ian.
14  In this case Mike was -- oh, yeah,
15  so, Mike.  Who set up the meeting?  Here,
16  from Sawyer.  So he would have likely taken
17  the notes.
18  But it could have been Ian.  Ian
19  was big on taking the notes.  Ian was a big
20  believer -- whoever had the pen had the
21  outcome.
22  Q.  And in your experience what would
23  happen to those notes after the meeting?
24  A.  They should have been shared.

Page 187

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0.16-cv-01054-DTS Doc. 401-2 Filed 07/26/19 Page 12 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2  A.  Okay.
3  Q.  Showing you what's been marked as
4  Exhibit 120.
5      (Exhibit 120, Email dated April
6  14, 2014, with attachment, Bates
7  FICO0057223 through FICO0057227, marked
8  for identification.)
9  A.  Oh, from me.
10  Q.  This is an email from you dated
11  April 2014.
12      (Document review.)
13  Q.  Do you recall sending this email?
14  A.  No.  But I could have easily.
15      Oh, I just forwarded an email
16  though.  I see.  Okay.  I'm forwarding an
17  email, okay.
18  Q.  And so you're forwarding it to
19  Marlene Zimmerling, Andrew DiStefano.
20      Who are they?
21  A.  So those would be the Larry Wachs
22  and Dale Zwizinski of today, of that time
23  period -- oh, I'm sorry, sales -- Blaze
24  salesperson and Blaze sales engineer
25  respectively.

Page 212

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2  Q.  And do you recall why it is that
3  you're sending them information about Chubb
4  contacts and projects summary around April of
5  2014?
6  A.  Specifically, no.
7      But they were new hires around
8  that time.  And it would have been a welcome
9  to FICO and here's Chubb, is my suspicion.
10  Q.  And attached to the email is a
11  couple of slides.
12      The second page of the slides
13  reads, "Chubb Blaze Projects."
14      Do you see that?
15  A.  I do see that.
16  Q.  And "Chubb International" is
17  listed?
18  A.  I do see that.
19  Q.  And it says, "EUZ Automated
20  Underwriting" under it, correct?
21  A.  I do see that.
22  Q.  Is it fair to say that you were
23  aware that Chubb International was one of
24  Chubb's current Blaze projects in April of
25  2014?

Page 213

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2  A.  Not from this.  Not from this.
3  Q.  Okay.
4  A.  Yeah.
5  Q.  Why is that?
6  A.  'Cause I just forwarded this.
7      Someone else said, you know, Mike
8  give me this stuff, give me the projects
9  Chubb's working on.  He gave it to me, and I
10  forwarded it on.
11      So chances are I didn't read this,
12  by the way.  So this does not tell me that I
13  was aware of their projects.
14  Q.  Okay.  Do you take the position
15  you were not aware of Chubb's use of Blaze
16  in -- Chubb Europe's use of Blaze in 2014?
17  A.  In 2014 -- yeah, I do.  I don't
18  recall it.
19      So this -- this Exhibit 57 where
20  it says they've got global or whatever it is,
21  I would have thought maybe from then they
22  started using it, 'cause, again, I told them
23  here that it looks like they have a global,
24  right?  Whatever that was, exhibit whatever.
25      So they may have started using it

Page 214

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2  then in earnest by mistake.
3  Q.  When you say "by mistake," you
4  mean you just --
5  A.  I was mistaken.  I didn't do my
6  homework and pull up the contracts and look
7  at it.  Someone said.
8  Q.  Okay.  So you just assumed it was
9  global?
10  A.  Yeah.
11  Q.  Okay.  And that was the first time
12  you assumed it was global?
13  A.  Yeah.
14      In fact I'm surprised I assumed it
15  was global ever.  You know, you surprised me
16  that I actually said it was global to anyone
17  ever, so -- but obviously I said it.
18  Q.  We've seen several emails where
19  other people have said it's global that
20  you're on, and you didn't ever say, no,
21  that's wrong, or correct those other
22  statements?
23  A.  We haven't seen any -- anything to
24  that effect that I responded to any of those
25  emails.

Page 215

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS  Doc. 401-2  Filed 07/26/19  Page 13 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1
2  We haven't seen a single response
3  to any of those emails, right?
4  Q.  Right.
5  A.  We haven't seen any response, that
6  they're correct or incorrect.
7  Q.  Right.
8  And so tell me, do you actually
9  recall ever responding to one of those emails
10  in any way, responding to a statement that
11  the Chubb ELA is global?
12  MR. HINDERAKER:  Objection.  Rely
13  on the record.
14  A.  So the only recollection I have is
15  the email that you've shown me.
16  Q.  Exhibit 57?
17  A.  Right.  Is that the one that
18  says --
19  (Document review.)
20  A.  Right.  Exhibit 57 is the only
21  place --
22  Q.  Okay.  So we don't have --
23  MR. HINDERAKER:  Did you get a
24  chance to finish your answer?
25  A.  So Exhibit 57 is the only place

Page 216

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1
2  that I responded as to whether or not there
3  was a license.
4  Q.  A global license?
5  A.  Right.
6  Q.  Okay.  So we do not have any
7  writing from you in connection with any of
8  the emails on this topic indicating that you
9  believe the license is limited to the United
10  States, is that fair?
11  A.  No, you haven't shown me any.
12  I'm not saying there aren't any.
13  You haven't shown me any.
14  And what's kind of interesting
15  here it says, pull up the contract --
16  And even that one email that says
17  it's global, I also say pull up the -- pull
18  up the contract.
19  Q.  So we don't have any emails here
20  today that we've looked at in which you have
21  said in writing the Chubb ELA is limited to
22  the United States, is that a fair statement?
23  A.  That's a fair statement.
24  Q.  Okay.  Do you think you ever wrote
25  anything like that in an email during your

Page 217

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1
2  time at Chubb and FICO?
3  A.  Probably.  Likely.
4  I don't know, I don't know, I
5  don't know.  I just don't know.  I just don't
6  know.
7  Q.  You just don't know?
8  A.  I'm telling you you'll find that
9  I'm probably the least -- of all the people
10  involved I have probably the fewest emails of
11  anyone in your -- in your discovery.
12  I'm not a big email person.
13  Q.  So the question though is do you
14  actually have a specific recollection --
15  A.  One way or the?
16  Q.  -- of ever sending an email that
17  says something to the effect of the Chubb ELA
18  is limited to the United States?
19  A.  I remember having very specific
20  positions that it was.
21  I can't tell you if I put in it an
22  email or it was a phone call with Sawyer or a
23  phone call with Brodie saying it's a U.S.,
24  U.S., U.S., U.S.
25  I just can't tell you if it was an

Page 218

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1
2  email or a phone call.
3  Q.  So let's go through all of those.
4  A.  Okay.
5  Q.  Okay?  Because I just have to
6  create a record about what you actually
7  remember and what you are guessing you may
8  have done.
9  A.  Okay.
10  Q.  So as I understand your testimony,
11  you don't have a specific recollection of
12  ever sending an email saying that the Chubb
13  ELA is limited to the U.S. United States?
14  A.  That's correct.
15  Q.  Okay.  You have written at least
16  one email saying it is a global ELA, correct?
17  A.  I did not have a recollection of
18  that until you showed it to me though either.
19  But, yes, that's correct.
20  Q.  Okay.  And you've been on other
21  emails that reference the ELA as being a
22  global ELA?
23  A.  Well, there's the Larry Wachs one.
24  Q.  And Mike Sawyer one?
25  A.  Right.

Page 219