# EXHIBIT 6

# FILED UNDER SEAL

In the Matter Of:

*FAIR ISAAC CORPORATION*

*vs*

*FEDERAL INSURANCE COMPANYT, ET AL.*

*TAMRA PAWLOSKI*

*January 18, 2019*

CONFIDENTIAL



CONFIDENTIAL
TAMRA PAWLOSKI - 01/18/2019

```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF MINNESOTA

 3   -----------------------------------------x

 4   FAIR ISAAC CORPORATION, a Delaware
     corporation,
 5                  Plaintiff,

 6                         Case No.  16-cv-1054

 7                  v.

 8   FEDERAL INSURANCE COMPANY, an
     Indiana corporation, and ACE
 9   AMERICAN INSURANCE COMPANY, a
     Pennsylvania corporation,
10                  Defendants.

11   -----------------------------------------x

12                  8:30 a.m.
                    January 18, 2019
13
                    767 Third Avenue
14                  New York, New York

15                  * CONFIDENTIAL *

16         DEPOSITION of TAMRA PAWLOSKI, a Plaintiff

17   in the above entitled matter, pursuant to Notice,

18   before Stephen J. Moore, a Registered Professional

19   Reporter, Certified Realtime Reporter and Notary

20   Public of the State of New York.

21

22   Job No. MP-204293
```

Page 2

1  A P P E A R A N C E S:
2
3       MERCHANT & GOULD, P.C.
4            Attorneys for Plaintiff
5            3200 IDS Center
6            80 South Eighth Street
7            Minneapolis, Minnesota 55402-2215
8
9       BY:  HEATHER KLIEBENSTEIN, ESQ.
10
11      FREDRIKSON & BYRON, P.A.
12           Attorneys for Defendants
13           200 South Sixth Street
14           Minneapolis, Minnesota 55402-1425
15
16      BY:  TERRENCE J. FLEMING, ESQ.
17           tfleming@fredlaw.com
18
19  ALSO PRESENT:
20      JAMES WOODWARD, ESQ.
21           FICO
22

Page 3

1  EXAMINATION BY                                PAGE
2  MS. KLIEBENSTEIN                                7
3  MR. FLEMING                                   233
4  MS. KLIEBENSTEIN - Continued                  236
5           E X H I B I T S
6  237  E-mail with attachment              31    3
7  238  E-mail dated June 26, 2013          40   11
8  239  E-mail and attachment               44   15
9  241  E-mail                              48   14
10 240  E-mail                              50    9
11 242  E-mail                              52    9
12 243  E-mail string from 2008             59   13
13 244  E-mail                              60   19
14 245  E-mail dated February 7, 2011,      74   12
15 246  E-mail                              78   10
16 247  E-mail string                       88    5
17 248  E-mail and attachment              100   13
18 249  Calendar notice and attachments    111   19
19 250  Email                              120    9
20 251  E-mail with attachment             124    6
21
22

Page 4

1  252  E-mail with attachments STRAUSS    129   14
2
3  253  E-mail                             154   10
4
5  254  E-mail                             158    8
6
7  255  E-mail                             160   12
8
9  256  E-mail                             163   19
10
11 257  Letter from Mike Sawyer to         168   12
12      Tamra Pawlowski
13
14 258  E-mail                             174    8
15
16 259  Letter (attachment to Exhibit      174    8
17      258)
18
19 260  E-mail                             182    5
20
21 261  E-mail with attachments            185    5
22

Page 5

1  262  E-mail with attachments            194    8
2
3  263  E-mail                             196    9
4
5  264  E-mail                             202    1
6
7  265  E-mail                             203    9
8
9  266  E-mail with attachment             205   16
10
11 267  E-mail                             208   13
12
13 268  E-mail                             215    7
14
15 269  E-mail                             220    9
16
17 270  E-mail                             222    5
18
19
20
21
22

Page 86

1   Q   And that -- what was that
2   example, what was the name of that?
3   A   Metastorm, it was a workflow
4   tool.
5   Q   Was there any rule of thumb as
6   to when -- taking Europe, for example, was
7   there any general rule of thumb as to when the
8   European IT group would install a software --
9   install a piece of software on a European
10  software versus the U.S. server?
11      MR. FLEMING:  Objection,
12      foundation.
13  A   I'm sure there was, but I don't
14  know it, I was not made aware of what that
15  criteria would be.
16  Q   So you were just mentioning
17  Metastorm?
18  A   Metastorm.
19  Q   Metastorm, and you mentioned
20  when individuals outside the United States
21  would use it, it would be slow and clunky?
22  A   Yes.

Page 87

1   Q   Why was that?
2       MR. FLEMING:  Objection,
3       foundation.
4   A   So from a nontechnical response,
5   it's because you had -- it had to go across the
6   pond, so because it wasn't direct right there,
7   there was access bandwidth, what they called
8   bandwidth issues.
9   Q   And why was -- was Metastorm
10  only -- was Metastorm only installed in the
11  United States.
12      I'm sorry, that was a bad
13  question, was the Metastorm software tool only
14  installed on a United States server?
15      MR. FLEMING:  Objection,
16      foundation.
17  A   Initially, yes, and then we
18  expanded it.
19  Q   And you expanded it in what way?
20  A   I believe that they -- so they
21  went to the U.K. and actually because of the
22  fact that it was slow, we did put it in the

Page 88

1   U.K.
2       MS. KLIEBENSTEIN:  I am handing
3       you what's been marked as Exhibit 247.
4       (The above described document was
5       marked Exhibit 247 for identification as
6       of this date.)
7   Q   Are you familiar with this
8   e-mail string?
9   A   Yes.
10  Q   In the bottom Peter Davis on
11  September 28, 2012 wrote to you, "EZ are
12  looking at possibly using FICO Blaze Advisor
13  for a project next year and are questioning the
14  license we have.
15      "I know we are unlimited
16  enterprise use, but wanted to check with you
17  that there are no geographic restrictions.  Is
18  our Blaze enterprise license for global use?"
19      Do you recall answering Peter's
20  question?
21  A   I did not, I delegated it.
22  Q   And you delegate it to whom?

Page 89

1   A   Bob Schmidt.
2   Q   Who is that?
3   A   He was one of my team members
4   who is now responsible for software.
5   Q   Do you know if Bob Schmidt
6   responded to his question?
7   A   I would hope he did.  I would
8   hope he did, I don't know.
9   Q   And I note that in Pete's e-mail
10  he says that we are unlimited enterprise use.
11      What did that phrase mean to
12  you?
13  A   That we had unlimited rights,
14  enterprise rights.
15  Q   And do you know where Peter
16  would have gotten the information that the
17  Blaze Advisor software license was for
18  unlimited enterprise use?
19  A   I'm going to assume that it was
20  based upon feedback that he had received from
21  either myself or the contract itself.
22      MR. FLEMING:  Tamra, she's asking

Page 6

1    THE VIDEOGRAPHER:  This is the
2    start of media labeled number 1 of the
3    video recorded deposition of Tamra
4    Pawloski in the matter Fair Isaac
5    Corporation versus Federal Insurance
6    Company and ACE American Insurance
7    Company in the United States District
8    Court, District of Minnesota.
9         Today is January 18, 2019, the time
10   is 8:43 a.m., and we are located at 767
11   Third Avenue, New York, New York.
12        My name is Rodolfo Duran.  I am the
13   legal video specialist, the court reporter
14   is Stephen Moore, and we are both in
15   association with Epiq.
16        Will counsel please introduce
17   themselves.
18        MS. KLIEBENSTEIN:  Heather
19   Kliebenstein from Merchant & Gould on
20   behalf of the Plaintiff, and with me is
21   Jim Woodward of FICO.
22        MR. FLEMING:  Terry Fleming of

Page 7

1    the Frederikson & Byron firm
2    representing Defendants.
3         THE VIDEOGRAPHER:  Will the court
4    reporter please swear in the witness.
5
6    T A M R A    P A W L O S K I,    called as
7        a witness, having been first duly sworn by
8        the Notary Public, was examined and
9        testified as follows:
10
11   EXAMINATION BY
12   MS. KLIEBENSTEIN:
13
14        Q    Good morning, Ms. Pawloski.
15        A    Good morning.
16        Q    Have you ever been deposed
17   before?
18        A    Yes.
19        Q    How many times?
20        A    Just once.
21        Q    So, you've been through this
22   before.

Page 8

1         What I'll be doing is asking you
2    questions throughout the day and you'll be
3    answering.
4         If there is anything that you
5    don't understand, feel free to ask me to
6    clarify.
7         Your counsel may object from
8    time to time, and unless he instructs you not
9    to answer, you are to go ahead and answer.
10        The court reporter does best
11   when we don't talk over each other, when we
12   talk one at a time, and when we give verbal
13   answers instead of nonverbal cues, such as head
14   nods and the like.
15        Do you have any questions before
16   we start?
17        A    No.
18        Q    All right, here we go.
19             Ms. Pawloski, where do you work
20   today?
21        A    I work for AIG.
22        Q    What do you do for AIG?

Page 9

1         A    I am their IT asset manager.
2         Q    How long have you been the IT
3    asset manager of AIG?
4         A    Ten months.
5         Q    What are your job duties as the
6    IT manager at AIG?
7         A    So, I have global responsibility
8    for all IT, software and hardware assets.
9         Q    Global responsibility for what?
10   What about the hardware and IT assets?
11        A    Tracking and monitoring.
12        Q    Does that work involve dealing
13   with vendors?
14        A    Yes.
15        Q    In what way?
16        A    Understanding their
17   entitlements, working with them in case -- in
18   case of a compliance, doing negotiations with
19   them, et cetera.
20        Q    You used the word entitlement,
21   what did you mean by that?
22        A    So, in a contract there are

CONFIDENTIAL
TAMRA PAWLOSKI - 01/18/2019                    Pages 90..93

Page 90

 1    what you know, not your assumptions, not
 2    your guessing.
 3           THE WITNESS:  Okay.
 4    A     Then I don't know.
 5    Q     Let's pull out 241 and 242.  We
 6    will finish up this line.
 7           241 an e-mail from -- e-mail
 8    chain in June of 2008, correct?
 9    A     Yes.
10    Q     And in it you stated that the
11    current license to Blaze advisors is not
12    worldwide, correct?
13    A     I did.
14    Q     And you also stated that the
15    limitations were five seats used solely in
16    conjunction with the named application,
17    correct?
18           MR. FLEMING:  This has been asked
19       and answered.  I object on that basis.
20    A     Yes.
21    Q     Am I understanding you correct
22    that after you sent this e-mail, Mark

Page 91

 1    Bartholemew --
 2    A     Berthume.
 3    Q     -- Berthume, reached out to
 4    you?
 5    A     Yes.
 6           MR. FLEMING:  Objection, asked
 7       and answered.  You've asked these
 8       identical questions.
 9    Q     And can you tell me when that
10    phone call occurred?
11    A     I can't tell you exactly when.
12    Q     Was it months after this e-mail,
13    years?
14    A     Days, days.
15    Q     What did Mark say to you?
16           MR. FLEMING:  Objection, that's
17       been asked and answered.
18    A     Mark stated that we had an
19    amendment and then sent me the amendment.
20    Q     And is that amendment an
21    attachment to Exhibit 242?
22    A     It is.

Page 92

 1    Q     And that was the amendment that
 2    was e-mailed to you?
 3    A     Correct.
 4    Q     Did you review the amendment at
 5    that time?
 6    A     I did.
 7    Q     After reviewing that amendment,
 8    did your opinion on the scope of the license
 9    change?
10    A     Yes.
11    Q     In what way?
12    A     In reading this summary alone it
13    states that from Jim Black, who actually did
14    the negotiation of the contract, that it was a
15    minimum two upgrades CSI divisional license to
16    a worldwide enterprise license, and then if you
17    go through to the actual amendment itself, it
18    actually states under scope and quantity, on
19    page 1 of 3 of amendment number 2, the
20    enterprise-wide.
21    Q     Can you point me to where you
22    were looking at?

Page 93

 1    A     Right here.
 2    Q     Looking in the table?
 3    A     Yes, in the table.
 4    Q     Under where it says, "scope,
 5    quantity?"
 6    A     Yes, section 1.
 7    Q     And so enterprise-wide, to you
 8    meant that Blaze Advisor could be used globally
 9    by anyone, correct?
10           MR. FLEMING:  Objection, same
11       question has been asked and answered.
12    A     Yes.
13    Q     The word anyone, who would that
14    include?
15    A     The corporation, so the use
16    within the corporation.
17    Q     The corporation being whom?
18    A     All of the employees.
19    Q     All of the employees of whom?
20    A     Chubb & Son, a division of
21    Federal.
22    Q     All of the employees of Chubb &

Page 94

1  Son, a division of Federal?
2      A     Wasn't there a -- is this the
3  full amendment number 2?
4            Because it's one of an -- I see
5  3 of 3, I don't have 2 of 3 in my copy.
6            MR. FLEMING:  I think the pages
7       are mispaginated.
8            THE WITNESS:  Are they?
9      Q     They are there, it starts with
10 2, 1 and 3.
11     A     Oh, okay.
12     A     And then it also says the
13 affiliates, right, "Affiliates shall mean any
14 entity directly or indirectly controlled by
15 client, control means the ownership of more
16 than 50 percent."
17           That's traditionally in all of
18 our contracts, so that's why I couldn't find it
19 before.
20     Q     And the client was Chubb & Son,
21 a division of Federal, correct?
22     A     Yes.

Page 95

1      Q     Who were the affiliates of Chubb
2  & Son?
3      A     All of the other entities that
4  sat underneath Chubb & Son, a division of
5  Federal, I'm not exactly sure what all -- who
6  all of them were.
7      Q     A corporate org chart would tell
8  us who the affiliates of Chubb & Sons were?
9      A     I believe so; yes.
10     Q     Now, at this time when you
11 reviewed this second amendment after the call
12 with Mark, did you also go look at the original
13 license in conjunction with the amendment?
14     A     No.
15     Q     And why not?
16     A     Because Mark was pretty clear
17 that there was an enterprise-wide contract.
18     Q     What was Mark's position again?
19     A     He was CIO of our Chubb
20 specialty insurance.
21     Q     Did Mark tell you where he had
22 gotten the information that the Blaze Advisor

Page 96

1  license was enterprise-wide with no
2  restrictions?
3      A     He negotiated the deal.
4      Q     So his information didn't come
5  from Chubb's legal department?
6      A     No.
7      Q     When you were talking with Mark,
8  was your conversation limited to the topic of
9  use of the software?
10     A     It was around the negotiations.
11     Q     Did you discuss at all the
12 issue -- well, let me phrase it again a
13 different way.
14           Your conversation with Mark was
15 about the use of the software, not the physical
16 location of the software, correct?
17     A     Correct.
18     Q     And did you talk with Mark at
19 all in that phone conversation about any
20 restrictions about the physical location of
21 the --
22           MS. KLIEBENSTEIN:  I apologize,

Page 97

1       scratch that.
2      Q     In your conversation with Mark,
3  did you talk at all about the installation and
4  physical location of Blaze Advisor as opposed
5  to the use?
6      A     No, it was just -- it was an
7  enterprise-wide license.
8      Q     Did you have any role in the
9  process of merging ACE and Chubb?
10           MR. FLEMING:  You are talking
11      about negotiating that transaction?
12     A     Yeah, I'm sorry, I don't know
13 what you're asking.
14     Q     Well, I can skip to the more --
15 what I'm looking for is just a general
16 understanding of your role in the process of
17 merging ACE and Chubb.
18           That can be negotiation of a
19 part, something else, you tell me?
20           MR. FLEMING:  You are beginning a
21      few topic, after these questions can we
22      take a five minute break?