**EXHIBIT 8**

**FILED UNDER SEAL**

Message

| | |
|---|---|
| **From:** | Boone, Jandeen M [/O=FAIRISAAC/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=JANDEENBOONE] |
| **Sent:** | 6/6/2006 3:49:34 PM |
| **To:** | 'jwblack@chubb.com' [jwblack@chubb.com] |
| **CC:** | Wachs, Lawrence C (Larry) [larrywachs@fairisaac.com] |
| **Subject:** | Revised MSA and Software License and Maintenance Agreement |
| **Attachments:** | Chubb MSA redline.doc; Blaze Form Software License and Maintenance Services Agreement 06 02 06.doc |

Jim,

Thank you for your time on the phone yesterday. Attached is an updated version of the MSA with my changes in tracked format. After you've had an opportunity to review the changes, please contact me to discuss the remaining open items. I'm also attaching our standard Blaze Software License and Maintenance Agreement for your review.

I believe the Statements of Work will be sent to you this afternoon as well.

I look forward to talking with you soon. Thank you.

Jandeen M. Boone

Legal Counsel

Fair Isaac Corporation

901 Marquette Ave.

Minneapolis, MN 55402

612.758.5425



DEPOSITION
EXHIBIT JFS
305
Boone 2-6-19
PENGAD 800-631-6989

Confidential

Final

# MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") is made by and between Chubb & Son, a division of Federal Insurance Company, an Indiana corporation, having its principal office at 15 Mountain View Road, Warren, New Jersey, 07059 and Fair Isaac Corporation ("Vendor") having an office at 901 Marquette Avenue, Suite 3200, Minneapolis, MN 55402. The purpose of this Agreement is to set forth the terms and conditions that are acceptable to the parties for the performance of certain professional services by Vendor for Chubb in connection with its renewal processing rules maintenance project.

In consideration of the mutual promises made by Chubb and Vendor, the parties agree as follows:

1. **Definitions**

**1.a** Chubb: "Chubb" shall mean Chubb & Son, a division of Federal Insurance Company, for itself and as servicer for The Chubb Corporation and its non-insurance company subsidiaries, or as manager of its insurance company subsidiaries.

**1.b** Cooperation: "Cooperation" shall mean Chubb's general cooperation and provision of access to such information as may be reasonably required by Vendor in order to perform its obligations under this Agreement, including without limitation: (a) providing data and materials in the format and according to the specifications required by Vendor, (b) for onsite services, providing Vendor with full access to office accommodations, facilities, equipment, security access information, and software interfaces to Chubb's other business applications; (c) providing personnel assistance as may be reasonably requested by Vendor from time to time; (d) complying with all terms, conditions, and requirements set forth in this Agreement; and (e) cooperating with Vendor to make decisions and communicate information in a timely manner.

**1.c** Intellectual Property Rights: "Intellectual Property Rights" shall mean any and all intellectual property rights, however recognized, including, but not limited to, copyright, patent, trademark, trade dress, service mark, trade secret, or any other intellectual property right whether now existing or developed or created during the term of this Agreement.

**1.d** Invention: "Invention" shall mean any and all inventions, innovations, processes, techniques, works of authorship, developments, derivations, contributions, supplements, enhancements, and modifications, and any copies, adaptations, documentation, algorithms, notes, or records thereof, including, but not limited to, computer programs, including both source and object versions thereof, and attendant specifications and source code listings, authored, made, developed, or conceived of and reduced to practice by, or under the direction of, Vendor during the term and within the scope of this Agreement.

**1.e** Taxes: "Taxes" shall mean all present and future taxes, duties, import deposits, assessments, and other governmental charges (and any related penalties and interest not attributable to the fault or delay of Vendor), however designated, that are now or hereafter imposed by or under any governmental authority or agency that are: (i) associated with the performance by Vendor of its obligations under this Agreement; (ii) associated with the payment of any amount by Chubb to Vendor pursuant to this Agreement; (iii) based on the license or use of any Vendor-provided product or service; or (iv) associated with the importation of any Vendor-provided product into or use of any Vendor-provided service within a country other than the United States, excepting only (v) Vendor's corporate franchise Taxes and Taxes imposed on Vendor's net income by the governmental authorities or agencies in such jurisdictions as Vendor is required to pay such taxes; (vi) withholding, employment, and payroll taxes relating to Vendor's employees; and (vii) personal property taxes on Vendor property.

Confidential

FICO0000166_0001

Final

**2.** **Scope of Services**

**A.**      Chubb hereby retains the services of Vendor and Vendor hereby agrees to provide services as described in a mutually agreed upon work order(s) (or "statement of work") which may be entered into from time to time and is incorporated herein and attached hereto this Agreement as Appendix A ("Services"). ~~Chubb has entered this Agreement on the basis of the knowledge, experience, abilities, qualifications and representations as presented by Vendor. Vendor shall provide the Services in such a manner as to permit Chubb to have full benefit of Vendor's knowledge, experience, abilities, qualifications and business contacts. Vendor shall use its best efforts to perform the Service in a prompt, diligent and professional manner and in accordance with specifications and performance requirements including, but not limited to, the intermediate and final delivery schedules, set forth therein. (see warranty section)~~ Vendor's employees will observe Chubb's working and security rules.

**B.**      The specifications and performance requirements set forth in Appendix A can be modified only upon the mutual written agreement of the parties. ~~Unless otherwise stated, Vendor shall use its best efforts to adhere to the schedule set forth~~ in Appendix A,~~ all time periods and schedules are estimates only.~~

**C.**      Appendix A sets forth any material assumptions and Chubb responsibilities (collectively, the "Assumptions") upon which Vendor has relied in agreeing to perform the Services. Any deviations from, or failure of Chubb to meet its obligations with respect to, the Assumptions may result in additional fees and expenses and/or changes to schedules or Deliverables. In addition, Chubb acknowledges that the Assumptions also include Chubb's Cooperation.

**3.** **Service Rates; Expenses**

**A.**      Chubb agrees to pay Vendor, in exchange for Services rendered, a fee in accordance with Appendix A, attached hereto.

**B.**      Prices do not include reasonable travel and associated out-of-pocket expenses incurred by Vendor in connection with this Agreement, which Chubb agrees to reimburse at Vendor's actual cost.  Chubb shall not be liable to Vendor for any other expenses paid or incurred by Vendor unless otherwise agreed to in writing signed by a duly authorized representative of Chubb.

**C.** Chubb shall only be liable for the pro rata share of any payments owed, equal to the number of days in which Vendor actually provided services, in any month in which this Agreement is terminated.

**D.** Charges under this Agreement are stated exclusive of any applicable Taxes, and Chubb will be solely responsible for, and shall pay or reimburse Vendor for, all Taxes. Vendor shall promptly remit to the appropriate tax authority all Taxes collected from Chubb on account of Chubb's tax obligations, if any, and Vendor shall indemnify Chubb against any and all losses, costs, and expenses (including reasonable attorneys' fees) which result from Vendor's violations of its obligations under this section. If Vendor receives a refund of any such Taxes attributable to amounts paid under this Agreement by Chubb, Vendor shall pay such refunded amount to Chubb within 30 days of its receipt.

**4.** **Service Payment and Expense Reimbursement**

**A.**      Chubb will pay within the greater of (a) forty-five (45) days of the invoice date; or (b) thirty (30) days of Chubb's actual receipt of invoices, for Services rendered and expenses incurred under this Agreement. ~~,~~ All amounts are payable in US Dollars in accordance with the instructions provided in the invoice or other instructions provided by Vendor. ~~Without prejudice to its other rights and remedies, if Fair Isaac does not receive any payment within 30 days from~~

*Formatted:* Font color: Auto, Not Strikethrough

*Formatted:* Font color: Auto, Not Strikethrough

Confidential

Final

~~the date it is due, Vendor may terminate this Agreement, including any licenses herein, but not until Vendor has given Chubb written notice, and the amount remains unpaid 30 days after Vendor gives such notice. Chubb shall reimburse Vendor for all costs related to any proceedings to collect any past-due amounts, including without limitation all attorneys' fees and expenses. Except as otherwise expressly provided, no refunds are available, except for those invoices subject to a good faith dispute by Chubb. Chubb shall notify Vendor within twenty (20) days of actual receipt of an invoice that it intends to dispute said invoice.~~

**B.** Chubb may, at its option and without prior notice and during normal business hours, audit Vendor's records reasonably related to the invoices issued pursuant to Section 3.A, above. Vendor shall keep sufficient records at its principal place of business to allow Chubb to audit the invoices, which records will be maintained for twenty-four (24) months from the date of creation. Chubb acknowledges that it and its employees, subcontractors or agents may, in the course of conducting an audit, be exposed to information which is confidential or proprietary to Vendor. Chubb agrees to treat all of Vendor's Confidential Information as confidential information, maintaining such information in strict confidence, using at least the same level of care that Chubb uses to avoid unauthorized use or disclosure of its own most confidential information that it did not wish to become public. For purposes of this Section, "Vendor's Confidential Information" is that information belonging to, or in the possession or control of, Vendor that has been clearly labeled by Vendor as confidential or that under the circumstances ought to be reasonably identifiable as confidential.

**5.** **Independent Contractor; Employees**

**A.** Neither Vendor nor Vendor's employees are or shall be deemed to be employees of Chubb. Vendor shall be solely responsible for the payment of compensation (including provision for employment taxes, federal, state and local income taxes, workers compensation and any similar taxes) associated with the employment of Vendor's employees. Vendor shall also be solely responsible for obtaining and maintaining all requisite work permits, visas, and any other documentation. Vendor represents that Vendor, its employees, and those parties authorized by Chubb under Section 5(C), are authorized to perform such Services under this Agreement.

**B.** Vendor acknowledges that because Vendor is engaged in its own independently established business, neither Vendor, Vendor's employees, nor those parties authorized by Chubb under Section 5(C) are eligible for, nor shall they participate in, any pension, health, or other employee benefit plan of Chubb.

**C.** Vendor shall take appropriate measures to ensure that its employees, and those parties authorized by Chubb under this subsection, who perform Services are competent to do so and that they observe the provisions of Section 7, **Confidential Information; Non-Disclosure.** None of the Services under this Agreement shall be provided by anyone other than Vendor's own employees, unless Vendor first obtains the prior written consent of Chubb.

**D.** Vendor reserves the right to determine which of its personnel will be assigned to perform the Services and to replace or reassign such personnel during the term hereof. However, should Chubb have a concern about any Vendor personnel performing the Services, those concerns should be brought to the attention of the Vendor Project Manager, and Vendor will make commercially reasonable efforts to remedy the situation to Chubb's satisfaction.

**6.** **Ownership and Use of Work Product: License to Deliverables**

Ownership of deliverables shall be as stated in a statement of work.Chubb acknowledges that~~VENDOR acknowledges that all Services provided under this Agreement, including, but not limited to~~

> **Formatted:** Font color: Auto, Not Strikethrough

Confidential

Final

~~all Inventions, shall be a work made for hire. VENDOR agrees that all Inventions conceived of, made, or reduced to practice by VENDOR or under its direction during the term and within the scope of this Agreement or association with Chubb shall be work made for hire and shall be the sole and complete property of Chubb, and that any and all Intellectual Property Rights in or to the Services provided under this Agreement and any work product resulting from the Services including, but not limited to all Inventions, shall be retained by Vendor.~~   In the event ownership of deliverables is vested in Vendor, then, ~~U~~upon final payment of all amounts due to Vendor under this Agreement, Vendor grants to Chubb a perpetual, non-transferable, non-sublicensable, non-exclusive license to use, copy, and modify those deliverables that are specifically identified in ~~Attachment A~~ a statement of work as being created for use by Chubb as part of the Services ("Deliverables") solely for Chubb's internal business purposes, subject to ~~relating thereto shall vest in Chubb.  If for any reason such work is deemed not to be work made for hire, VENDOR hereby grants, transfers and assigns all rights, title and interest in such work to Chubb. For the avoidance of doubt, the phrase "work made for hire" under this Agreement does not in any way apply to or govern the terms of the 2005 National Automotive Insurance Study or any other VENDOR syndicated study where such studies shall be governed by~~ the terms and conditions of ~~t~~his Agreement. Chubb agrees that it will use such Deliverables only within the scope of the foregoing license.  This Agreement does not grant any right or license to any Vendor products other than the Deliverables, it being understood that all rights in the technology and methods used in creating the Deliverables and all other rights are retained by and will remain with Vendor. In no event will Vendor be precluded from providing services for others that are similar to the services or from developing, for itself or for others, materials that are similar to or competitive with the Deliverables. In addition, Vendor will be free to use its general knowledge, skills, and experience, and any ideas, concepts, know-how, and techniques developed by Vendor in connection with the performance of the Services.~~the standard form VENDOR Purchase of Services and License Agreement ("PSLA").~~

Also, the underlying and pre-existing intellectual property that went into creation of the deliverables under this Agreement, including all techniques, know-how, and other proprietary information shall remain the sole and exclusive intellectual property of VENDOR.  Any reference or use of the VENDOR name (and associated logo) shall be prohibited without the express written consent of the Head of the Corporate Communications Department at VENDOR.

In addition, the VENDOR names and service marks, any questionnaire(s) developed and/or used in connection with the Services (the "Questionnaire") are and shall remain the property of VENDOR, and Chubb will not obtain any ownership interest in the underlying ideas, concepts, know-how and techniques used by VENDOR to develop or generate the Study, the Questionnaire and any reports.

Chubb may use the results of the Study(s) or Services, any Reports, and the data contained therein for internal purposes. Chubb may also disclose the information in the Study(s) or Services, and any Reports to third parties provided neither the VENDOR name nor service marks are disclosed in connection therewith, but may not disclose copies of the Study(s) or Reports, in whole or in part, to third parties unless such disclosure is approved pursuant to Section below.

No portion of the Study(s) or Services bearing VENDOR Marks may be disclosed, and no other disclosure of the VENDOR Marks may be made, unless the entire text of each proposed disclosure is first submitted to VENDOR for review, along with a statement of the parties to whom Chubb proposes to make the disclosure, and samples which are accurate and true representations of the final form of the proposed disclosure, and the disclosure is first "Approved As Is" on the written form that J.D Power then uses for such purposes. If any changes of any kind whatsoever are made to the content of the disclosure or the parties to whom Chubb proposes to make the disclosure, the proposed disclosure must again be submitted to VENDOR for review and approval.

**7.**    **Confidential Information; Non-Disclosure**

Confidential                                                   FICO0000166  0004

Final

**A.**     In order that each party may perform its obligations under this Agreement, it may be necessary for the other party ("Discloser") to disclose to such party ("Recipient") or its employees or agents certain information and material which may be considered to be sensitive, confidential and/or proprietary to the Discloser, its affiliates, subsidiaries, customers, insureds, agents, directors, officers or employees. Any and all Confidential Information, as defined below in Section 7(C), disclosed to or obtained by the Recipient, its employees, subcontractors, or agents, in the performance of the Recipients obligations, shall be deemed confidential and proprietary information belonging to the Discloser. In recognition of the foregoing, the Recipient covenants and agrees: (a) that it will maintain all Confidential Information of the Discloser in strict confidence, using appropriate administrative, technical and physical safeguards to protect Confidential Information to avoid its unauthorized use or disclosure; (b) that it will not, directly or indirectly, copy, reproduce, sell, assign, license, market, transfer, or disclose any Confidential Information of the Discloser to any third party without the Discloser's prior written consent; (c) that it will not make use of any Confidential Information of the Discloser for its own purposes or the benefit of anyone or any other entity other than the Discloser, except as otherwise expressly provided under this Agreement; (d) that at any time the Discloser may so request, it will deliver to the Discloser or, at of the Discloser's option, will certify the destruction of, all memoranda, noted, records, reports, media, and other documents, and all copies thereof, regarding or including any Confidential Information of the Discloser which the Recipient may then possess or have under its control; and (e) that it will take no action with respect to Confidential Information of the Discloser that is inconsistent with the confidential and proprietary nature of such information.

**B.**     The Recipient shall not disclose Confidential Information of the Discloser, except to its employees, or any other party authorized by the Discloser pursuant to Section 5(C), having a need to know such information in connection with the performance of its obligations or services. The Recipient shall instruct all such employees and authorized parties as to their obligations under this Section, and shall advise them of their obligations to be bound by the terms and conditions of this Section prior to their being given access to Confidential Information of the Discloser. The Recipient acknowledges that it shall remain responsible and liable for its employees' compliance with the terms of this Section.

**C.**     For purposes of this Agreement, "Confidential Information" shall include all confidential and proprietary information of the Discloser, whether in written, oral, electronic, magnetic, photographic, optical, or any other form now existing or created or developed during the term of this Agreement, including, but not limited to, the following: (a) information relating to the Discloser's planned or existing computer systems, system architecture, computer hardware, computer software, source code, object code, documentation, program libraries, program listings, processing methods, technical processes and operational methods; (b) information regarding planned or existing insurance policies, insurance coverage, insurance premiums, insurance endorsements, claims procedures, or other information that describes how insurance activities are administered and managed; (c) customer data, customer lists, sales, profits, pricing, and other financial information; (d) information regarding the Discloser's existing or planned sales and marketing activities or strategies; (e) information regarding the Discloser's existing or planned organizational restructuring, business affairs, and business initiatives; (f) confidential information regarding the Discloser's customers, insureds, employees, directors and officers; (g) confidential information of a third party licensed to, possessed by, or in the control of the Discloser, and which the Discloser is or may be obligated to treat as confidential or proprietary; and (h) any other information relating to the Discloser which is not generally known to the public or within the industries and trades in which the Discloser competes or which may otherwise be protected by state trade secret law.

**D.**     Notwithstanding Section 7(C), Confidential Information shall not include information that (a) is or becomes generally known to the public, not as a result of an act, omission, or disclosure by the Recipient, (b) is rightfully in the possession of the Recipient prior to this Agreement, (c) is independently developed by the Recipient without use of the Discloser's Confidential

Confidential                                                                                 FICO0000166 0005

Formatted: No underline, Font color: Auto

Final

Information, (d) is received by the Recipient in good faith and without restriction from a third party, not under a confidentiality obligation to either party, or (e) is disclosed pursuant to a court or regulatory order, provided that the Recipient immediately notifies the Discloser upon receipt of such order and cooperates with the Discloser in obtaining appropriate protection from the authority issuing the order.

**E.**     This Section shall survive the termination of this Agreement.

**8.     Warranty**

Vendor warrants that (i) it will perform the Services as described in each statement of work in a professional and workmanlike manner in accordance with generally acceptable industry practices; and (ii) it has the resources necessary to provide the Services. Chubb's sole remedy and Vendor's sole obligation pursuant to this warranty shall be for Chubb to notify Vendor in writing of any alleged warranty defect within thirty (30) days after the defective services were performed, and Vendor shall correct the defects promptly.

**98.     Term**

This Agreement shall be deemed effective as of Contract Effective Date, regardless of the date on which it is actually signed by both parties, and shall continue until terminated pursuant to Section 9. Termination.

**910.     Termination**

**A.**     This Agreement shall terminate:

    **(1)**     if a party has committed a material breach of this Agreement and has failed to remedy such breach within 30 days after receipt of written notice from the non-breaching party identifying the breach and requiring it to be remedied.

    **(2)**     upon written notice from either party if the other party (i) becomes insolvent or seeks protection under the Federal Bankruptcy Act or any other state laws relating to insolvency; (ii) makes a general assignment for the benefit of creditors; or (iii) suffers or permits the appointment of a receiver or a trustee for its business or assets.

**B.**     Chubb shall be responsible for payment for Services until the effective date of termination.

**C.**     On termination of this Agreement for any reason, each party will promptly deliver to the other party or destroy all Confidential Information of such other party that is in its possession.

**1011.     Insurance**

Vendor shall maintain, during the term of this Agreement, workers' compensation coverage in compliance with the laws of each state in which the Services or any portion thereof are to be performed. Vendor shall additionally maintain, at all relevant times:

**A.**     Automobile Liability Insurance in the amount of $1,000,000 for each occurrence with respect to all vehicles used in connection with the Services, and

**B.**     Commercial General Liability Insurance covering personal injury and property damages in the amount of $2,000,000 for each occurrence, and

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

**Formatted:** Font: (Default) Arial, Complex Script Font: Arial

Final

C.    Errors and Omissions coverage during the term of this Agreement with liability limits of not less than $1,000,000 per occurrence.

12~~1~~.    **Indemnity**

A.    Each party, at its own expense, shall indemnify, and hold harmless the other party and its directors, officers, employees, agents, successors and assigns and defend any action brought against such other party, with respect to any claim, demand, cause of action, debt, liability, or expense, including attorney's and expert witness fees and court and settlement costs, due to third party claims for bodily injury or damage to tangible personal property to the extent caused by the fault or negligence of the indemnifying party in its performance of its obligations under this Agreement.

B.    Vendor will, at its own expense, indemnify and hold harmless Chubb and its directors, officers, employees, agents, successors and assigns and defend any action against Chubb brought by a third party to the extent that the action is based upon a claim that a Vendor Deliverable provided in this Agreement directly infringes any U.S. registered copyright, or misappropriates any trade secret recognized as such under the Uniform Trade Secrets Act, and Vendor will pay those costs and damages finally awarded against Chubb in any such action that are specifically attributable to such claim or those costs and damages agreed to in a monetary settlement of such action. Notwithstanding the foregoing, Vendor shall have no obligation with respect to any infringement or misappropriation claim to the extent a claim is caused by any deliverables or other materials provided by Chubb, or any adherence by Vendor to any directions, specifications, suggestions or other input provided by Chubb. ~~Vendor, at its own expense, shall indemnify, and hold harmless Chubb, and its directors, officers, employees, agents, successors, assigns, and customers, and defend any action brought against Chubb, with respect to any claim, demand, cause of action, debt, liability, or expense, including attorney's and expert witness fees and court and settlement costs, due to claims arising from or related to any claim of Intellectual Property Rights infringement by a third party, or claims of unfair competition or trade secret violation, and any other claim arising out of Chubb's use or possession of any products, materials, or Services provided by or developed by Vendor under this Agreement. Vendor's duty to indemnify Chubb hereunder shall not apply if the claim or cause of action was the result of Vendor performing Services in accordance with specifications or instructions developed or provided by Chubb, to the extent that following such specifications or instructions resulted in the violation of a third party's intellectual property rights.~~

C.    The indemnified party shall have the option to assume control of such defense. In addition, the indemnified party agrees to: (a) promptly notify the indemnifying party in writing of each claim for which indemnification is sought hereunder, and (b) cooperate with the indemnifying party at the indemnifying party's expense in connection with the defense or settlement of each such claim. ~~but shall not select counsel or settle any claim without the prior written approval from the indemnified party, which approval shall not be unreasonably withheld.~~ The indemnifying party shall also allow the indemnified party the right of free association during such defense, and shall keep the indemnified party adequately informed of all developments and strategies related to such defense.

12.    **Governing Law**

This agreement shall be governed by, subject to, and, enforced and interpreted in accordance with the laws of the State of New York, including the remedies available for breach hereof, without regard to its conflict of laws principle.

Chubb & Son Confidential Information                                          Page 7 of 11

Confidential                                                          FICO0000166  0007

Final

### 13.    Entire Agreement

This Agreement, and the attachments hereto, constitutes the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes all prior discussions, understandings, and agreements between the parties.  No alteration or modification of this Agreement shall have any force or effect unless such modification is in writing, signed by duly authorized representatives of both parties, and affixed to this Agreement in the form of an addendum.

### 14.    Severability

If any of the provisions contained in this Agreement are held to be illegal, invalid, or unenforceable, the enforceability of the remaining provisions shall not be impaired and the Agreement shall continue as if such illegal, invalid, or unenforceable provisions are not contained in this Agreement.

### 15.    Assignment

This Agreement may not be assigned by either party without the prior written approval of the non-assigning party.  Except for the prohibition on assignment contained in the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties to this Agreement.

### 16.    Notices

Notices with regard to this Agreement shall be delivered in person or sent via United States first class postage prepaid, certified or registered mail, or sent via a recognized traceable shipping service (i.e. FEDEX, UPS, etc.) to the persons and addresses listed below:

Chubb:        ~~Dennis Bostedo~~James Black
              Vendor Management Group
              Chubb & Son, a division of Federal Insurance Company
              15 Mountain View Road
              Warren, New Jersey  07059

Vendor:       Fair Isaac Corporation
              Attn: Contracts Administrator
              3661 Valley Centre Drive
              San Diego, CA 92130

### 17.    Publicity

Vendor shall not make use of Chubb's name, logo, trademarks or service-marks, or its association with Chubb arising either from discussions leading to this Agreement or from the Agreement itself, for publicity, advertising, marketing or other purposes without the express written consent of Chubb in each instance.

### 18.    Captions.

Captions and section headings used in this agreement are for convenience only and are not a part of this agreement and should not be used in construing it.

### 19.    Limitation of Liability

A.      NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT OR ANY PRODUCT, SERVICE, OR DELIVERABLE PROVIDED BY

Confidential                                                          FICO0000166  0008

Final

VENDOR UNDER THIS AGREEMENT, EVEN IF THE RESPONSIBLE PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE.  HOWEVER, THIS LIMITATION SHALL NOT APPLY TO DAMAGES OF ANY KIND RELATED TO (1) MATERIAL BREACH OF THE PROVISIONS OF THIS AGREEMENT RELATING TO PROTECTION OF CONFIDENTIAL INFORMATION, AND (2) VIOLATIONS OF EITHER PARTY'S INTELLECTUAL PROPERTY RIGHTS (INCLUDING UNAUTHORIZED USE).

**B.**     With respect to the performance of each party under this Agreement, in no event shall either party be liable to the other party, any of its officers, directors, employees, or shareholders, or to any third party, whether a claim be in tort (except for any claim based upon fraud), contract, or otherwise for any amount in excess of the total fees paid by Chubb to Vendor under this Agreement during the 12 months immediately preceding the date of the most recent claim that gave rise to such liability, except that this limitation shall not apply to any claim based upon (1) material breach of the provisions of this Agreement relating to protection of Confidential Information, or (2) violations of either party's intellectual property rights (including unauthorized use).  In addition, notwithstanding the foregoing, Chubb's obligation to pay amounts owed to Vendor under this agreement for products and services provided by Vendor under this Agreement (including costs of collection of unpaid amounts) is independent of and not subject to the foregoing limitation.

**C.**     Vendor does not warrant that any product, service, or deliverable provided by Vendor will (i) meet Chubb's requirements, (ii) operate in combination with hardware, software, systems or data not expressly specified in writing by Vendor, (iii) meet any performance level, resource utilization, response time, or system overhead requirements, or (iv) operate uninterrupted, free of errors, or without delay. WITHOUT LIMITING THE FOREGOING, VENDOR MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, AND HEREBY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE. CHUBB IS SOLELY RESPONSIBLE FOR ITS USE OF ANY PRODUCTS, SERVICES, AND DELIVERABLES PROVIDED BY VENDOR UNDER THIS AGREEMENT AND FOR ANY LIABILITY ARISING OUT OF DATA OR CONTENT SUPPLIED BY CHUBB.

> **Formatted:** Font color: Auto, Strikethrough

Confidential                                                                 FICO0000166_0009

Final

20.    **Force Majeure**.

No delay in or failure of performance by either party under this Agreement will be considered to be a breach hereof if and to the extent that such delay or failure of performance is caused by an occurrence or occurrences beyond the reasonable control of the party affected.

**IN WITNESS WHEREOF, the parties hereto, each acting with due and proper authority and acknowledging that they have read this Agreement, understand it and agree to be bound by its terms, have executed this Agreement, as of the date first set forth above in Section 8:**

**CHUBB & SON,**                          **Vendor Name**
**a division of Federal Insurance Company,**   "Vendor"
for itself and as servicer for The Chubb Corp.
and its non-insurance company subsidiaries, or
as manager of its insurance company subsidiaries.
"Chubb"

_____        _____
Signature                      Signature

By:_____            By:_____

Title:_____           Title:_____

Date:_____            Date:_____

Chubb & Son Confidential Information               Page 10 of 11

Document comparison done by DeltaView on Thursday, June 01, 2006 2:47:11 PM

| Input: | |
|---|---|
| Document 1 | file:////Stpfile01/Legal/MplsMULegal/Individual Folders-MPS/JIM WOODWARD/Chubb/Chubb MSA (FIC 2-22-06 edits-CLEAN).doc |
| Document 2 | file:////Stpfile01/Legal/MplsMULegal/Individual Folders-MPS/JIM WOODWARD/Chubb/Chubb MSA (Chubb edits-CLEAN).doc |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 14 |
| Deletions | 10 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 24 |

Confidential

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | | | Page 1 of 17 |
|---|---|---|---|
| FI Contract Number: | | | FI LR# _____ |

## SOFTWARE LICENSE AND MAINTENANCE AGREEMENT
### Blaze Advisor

This Software License and Maintenance Agreement ("**Agreement**") is entered into as of _____, 2006 ("**Effective Date**") between Fair Isaac Corporation ("**Fair Isaac**") and Chubb & Son, a division of Federal Insurance Company ("**Client**") and describes the terms and conditions under which Fair Isaac shall provide to Client the Blaze Advisor products and related maintenance services described below.

**1.     Definitions**

The following terms, as used in this Agreement with initial capital letters, in the singular or the plural, will have the meanings set forth below.  Other terms may be defined in context within this Agreement:

"**CPU**" means a single core central processing unit.  For multi-core central processing units, each core will count as one "CPU".

"**Documentation**" means the *Blaze Advisor User Guide* provided in either HTML or PDF format.

"**Fair Isaac Products**" means the Blaze Advisor products listed in Section 1 of Exhibit A.  The Blaze Advisor Development product allows a developer to utilize design and testing tools and to run a non-production deployment environment for testing use only.  The Blaze Advisor Deployment product consists of the Blaze Advisor Rule Server and Engine and allows the software to be run on a system handling production-level processing.

"**Seat**" means an identified individual user on a single personal computer or workstation.

"**Territory**" means the United States of America.

**2.     License Grant**

2.1     <u>License Grant to Fair Isaac Products</u>.  Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes, but only within the Territory, and subject to the additional limitations set forth below and/or listed in Exhibit A.

        (a)     <u>Seat/CPU License</u>.  If the "Scope/Quantity" of the license for any Fair Isaac Product is designated in Exhibit A as limited to a specified number of "Seats" or "CPUs", then Client's use of such Fair Isaac Product shall not exceed the number of Seats or CPUs, as applicable, that are set forth in Exhibit A for such Fair Isaac Product.

        (b)     <u>Named Application License</u>.  If the "Scope/Quantity" of the license for any Fair Isaac Product is designated in Exhibit A as "Named Application", then, subject to any "Seat" or "CPU" limitation that may also apply, Client may use such Fair Isaac Product only in connection with the particular Named Application of Client that is defined in Exhibit A.  Under no circumstances may Client use such Fair Isaac Products on a stand-alone basis or in connection with any other application.

        [(c)     <u>Enterprise-Wide License</u>.  If the "Scope/Quantity" of the license for any Fair Isaac Product is designated in Exhibit A as "Enterprise-Wide", then Client may use such Fair Isaac Product on an unlimited number of Seats or CPUs, as applicable; provided, however, that such use is for Client's use only and not for use by any of Client's affiliated, subsidiary, or parent companies.] *[Delete if not applicable.]*

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | | Page 2 of 17 |
|---|---|---|
| FI Contract Number: | | FI LR# _____ |

2.2     License to Documentation.  Subject to the terms, conditions, and limitations of this Agreement, Fair Isaac grants to Client a non-exclusive, non-transferable, limited license to use the Documentation during the Term for its internal business purposes, but only within the Territory, and only in accordance with Client's license grant of the applicable Fair Isaac Product.  Client shall not have the right to modify the Documentation, combine the Documentation with other works, or create derivative works from the Documentation without Fair Isaac's written permission.  In the event that Fair Isaac does give permission, such modifications, combinations, or derivatives which include the Documentation shall become Fair Isaac's intellectual property and be used only in support of Client's permitted use of the Fair Isaac Product.

2.3     Platforms/Options.  Client obtains the right to use only the version of the Fair Isaac Product for the specific supported platform(s) that are noted in Exhibit A (i.e., Java, COBOL or .NET). If no platform is noted in Exhibit A, Client has the right to use the Fair Isaac Product only for the supported platform(s) that is(are) initially delivered to Client.  If Client desires versions of the Fair Isaac Product for additional supported platforms, an additional fee applies. Unless specifically noted as being purchased in the Exhibit A, Client does not obtain any right to options or additional related products (e.g., Compiled Sequential, SmartForms) by virtue of its purchase of a license to the Fair Isaac Product.

**3.      Rights and Restrictions**

3.1     License Restrictions.  Client represents and warrants that it and its employees shall not: (i) use the Fair Isaac Products or Documentation for any purpose other than the internal business operations of Client or in any other manner that exceeds the scope of any license granted under this Agreement or that otherwise constitutes a breach of this Agreement; (ii) alter, change, modify, adapt, translate or make derivative works of the Fair Isaac Products; (iii) reverse engineer, decompile, disassemble, or otherwise attempt to reduce the object code of any Fair Isaac Products to human perceivable form or permit others to do so; (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products by, any third party or by any individuals other than the employees of Client; (v) assign, sublicense, lease, transfer or distribute the Fair Isaac Products, or operate any Fair Isaac Product for timesharing, rental, outsourcing, or service bureau operations (or otherwise for the benefit of any party other than Client), or train persons other than permitted users; (vi) disclose or publish performance benchmark results for any Fair Isaac Product without Fair Isaac's prior written consent; or (vii) (if applicable) use any provided third party software except as solely in conjunction with the Fair Isaac Product.

3.2     Reservation Of Rights Not Granted.  Fair Isaac reserves all rights not expressly granted to Client under this Agreement.  Without limiting the foregoing, Fair Isaac retains and reserves sole and exclusive worldwide right, title and interest in and to the Fair Isaac Products, Documentation, any custom code developed in whole or part by Fair Isaac (if applicable), and any other Fair Isaac software or materials, and in all patents, trademarks, copyrights, trade secrets, and all other intellectual property and proprietary rights therein, and any Fair Isaac know-how related thereto, subject to only the limited, non-exclusive, license rights granted herein.  Nothing in this Agreement shall limit in any way Fair Isaac's right to develop, use, license, create derivative works of, or otherwise exploit Fair Isaac intellectual property or to permit third parties to do so.

3.3     Permission for Back-Up Copy.  Client may reproduce the object code of the Fair Isaac Product and the Documentation for the purposes of exercising the license rights granted under this Agreement on a backup CPU in the event of a malfunction that renders the primary CPU inoperable. This license shall only be effective for the period of such inoperability or the expiration or termination of the primary license to the Fair Isaac Product, whichever first occurs.

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 3 of 17 |
|---|---|
| FI Contract Number: | FI LR# _____ |

3.4   <u>Notice Reproduction</u>. To the extent Client is provided reproduction rights, Client must reproduce on each copy of the Fair Isaac Product and Documentation any copyright, patent, or trademark notice, and any other proprietary legends that were provided in the originals.

3.5   <u>Verification and Audit Rights</u>. On Fair Isaac's written request, Client shall provide to Fair Isaac a written certification executed by an authorized officer of Client that provides the following information: (i) verification that the Fair Isaac Products are being used in accordance with the provisions of this Agreement; (ii) list of the locations at which the Fair Isaac Products are or have been operated during the preceding twelve (12) month period; and (iii) the number of Seats, CPU's and/or applications accessing or utilizing the Fair Isaac Products (as applicable).  Upon not less than ten (10) days prior written notice to Client, Fair Isaac may, at its expense, audit Client's use of the Fair Isaac Products.  Any such audit shall be conducted during regular business hours at Client's facilities and shall interfere as little as reasonably possible with Client's business activities.  Audits shall be conducted no more than twice annually.  If Client is discovered to be using more licenses than the number of licenses Client has purchased, or in the event Fair Isaac learns that Client has materially breached this Agreement as determined by such audit, then Client shall bear the expense of such audit.

4.   **Services**

4.1   <u>Maintenance Services</u>.  Subject to the payment of the applicable Maintenance Fees described in Exhibit A, Fair Isaac shall provide Client with the Maintenance Services described in Exhibit B.

4.2   <u>Other Services</u>.  From time to time, Fair Isaac may provide Client with professional services related to the Fair Isaac Product as mutually agreed between the parties.  Such professional services shall be performed only upon the execution of a Statement of Work which references the Master Services Agreement, entered into by and between the parties on June ___, 2006.

5.   **Warranties and Limitation of Liability**

5.1   <u>Conformity to Specifications</u>. Subject to Client's compliance with the terms and conditions of this Agreement, Fair Isaac warrants that the Fair Isaac Product will conform in all material respects to its Documentation for a period of thirty (30) days from the initial date of delivery.  Fair Isaac will, at its own expense and as its sole obligation, and Client's exclusive remedy, for any breach of this warranty, correct any reproducible error in the Fair Isaac Product reported to Fair Isaac by Client in writing (along with all information available to Client that is relevant to verifying, diagnosing, or correcting the error) or replace the Fair Isaac Product during the warranty period.

5.2   <u>WARRANTY DISCLAIMER</u>. Fair Isaac does not warrant that the Fair Isaac Products, Documentation or Maintenance Services will (i) meet Client's requirements, (ii) operate in combination with hardware, software, systems or data not expressly specified in writing by Fair Isaac, (iii) meet any performance level, resource utilization, response time, or system overhead requirements, or (iv) operate uninterrupted, free of errors, or without delay.  Fair Isaac is not responsible for problems caused by: (a) use of the Fair Isaac Products outside the scope of this Agreement or the Documentation; (b) modification, alteration or changes to the Fair Isaac Products (or tangible copy thereof) not made by Fair Isaac; (c) changes in, or modifications to, the operating characteristics of the Client's system or any component thereof that is inconsistent with the requirements of the Documentation; (d) use of the Fair Isaac Products with hardware or software that is not represented in the Documentation as interoperable with the Fair Isaac Products; or (e) accident, physical, electrical or magnetic stress, unauthorized alterations, failure of electric power, environmental controls, or causes other than ordinary use.  EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS ARTICLE 5, FAIR ISAAC MAKES NO OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, UNDER THIS AGREEMENT AND

*Fair Isaac Confidential*

 FICO0000178

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 4 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

HEREBY DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE.  CLIENT IS SOLELY RESPONSIBLE FOR ITS USE OF ANY PRODUCTS, SERVICES, AND DELIVERABLES PROVIDED BY FAIR ISAAC UNDER THIS AGREEMENT AND FOR ANY LIABILITY ARISING OUT OF DATA OR CONTENT SUPPLIED BY CLIENT.

5.4    LIMITATION OF LIABILITY.  IN NO EVENT WILL FAIR ISAAC BE LIABLE UNDER ANY THEORY OF RECOVERY (INCLUDING BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, TORT AND STRICT LIABILITY) FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, CONSEQUENTIAL (INCLUDING, BUT NOT LIMITED TO, LOSS OF INCOME, PROFIT OR SAVINGS) OR PUNITIVE DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY FAIR ISAAC PRODUCT OR SERVICE, EVEN IF FAIR ISAAC HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE. WITHOUT LIMITING THE FOREGOING, FAIR ISAAC'S AGGREGATE LIABILITY IN CONNECTION WITH THIS AGREEMENT UNDER ANY AND ALL THEORIES OF RECOVERY (INCLUDING BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, TORT AND STRICT LIABILITY) SHALL BE LIMITED TO THE AMOUNT PAID BY CLIENT (EXCLUDING IMPLEMENTATION FEES AND REIMBURSED EXPENSES) FOR THE APPLICABLE FAIR ISAAC PRODUCT OR SERVICE DURING THE 12 MONTHS IMMEDIATELY PRECEDING THE DATE OF THE MOST RECENT CLAIM THAT GAVE RISE TO SUCH LIABILITY.

6.    **Indemnification**

6.1    Intellectual Property Indemnification. Fair Isaac will defend at its own expense any action against Client brought by a third party to the extent that the action is based upon a claim that the Fair Isaac Product directly infringes any U.S. registered patent or U.S. registered copyright, or misappropriates any trade secret recognized as such under the Uniform Trade Secrets Act, and Fair Isaac will pay those costs and damages finally awarded against Client in any such action that are specifically attributable to such claim or those costs and damages agreed to in a monetary settlement of such action.

6.2    Conditions. Fair Isaac's indemnification obligations under this Article are conditioned upon: (a) Client notifying Fair Isaac promptly in writing of such action; (b) Client giving Fair Isaac sole control of the defense thereof and any related settlement negotiations; (c) Client's compliance with the terms and conditions of this Agreement, including without limitation the license(s) granted by Fair Isaac; and (d) Client cooperating with Fair Isaac in such defense (including without limitation, by making available to Fair Isaac all documents and information in Client's possession or control that are relevant to the infringement or misappropriation claims, and by making Client's personnel available to testify or consult with Fair Isaac or its attorneys in connection with such defense).

6.3    Fair Isaac's Options. If the Fair Isaac Product becomes, or in Fair Isaac's opinion is likely to become, the subject of an infringement or misappropriation claim, Fair Isaac may, at its option and expense, either: (a) procure for the Client the right to continue to exercise the Fair Isaac Product license; (b) replace or modify the Fair Isaac Product so that it becomes non-infringing; or (c) if neither option (a) or (b) is available, terminate Client's license for the Fair Isaac Product concerned.

6.4    Exclusions. Notwithstanding the foregoing, Fair Isaac will have no obligation with respect to any infringement or misappropriation claim based upon: (a) any violation of the terms of Client's license or any license restrictions, or for use of the Fair Isaac Product for any purpose not intended by Fair Isaac; (b) any combination or use of the Fair Isaac Product with other products, equipment, software, or data not

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 5 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

supplied or approved in writing by Fair Isaac; (c) any modification of the Fair Isaac Product pursuant to specifications required by client or any modification made by any entity other than Fair Isaac; or (d) any claim of infringement or misappropriation that would have been avoided had Client upgraded to a new version or release of the Fair Isaac Product.

6.5     ENTIRE LIABILITY. THIS ARTICLE STATES FAIR ISAAC'S ENTIRE LIABILITY AND CLIENT'S SOLE AND EXCLUSIVE REMEDY FOR INFRINGEMENT AND ALL INFRINGEMENT AND MISAPPROPRIATION CLAIMS AND ACTIONS

7.      **Confidential Information**

7.1     Confidential Information. A party receiving Confidential Information under the Agreement is referred to as "**Recipient**," and a party disclosing Confidential Information is referred to as "**Discloser**." For the purposes of the Agreement, "**Confidential Information**" is described as follows and shall include any information which relates to: the financial and/or business operations of the Discloser, including, but not limited to, marketing and product plans, ideas, concepts, business plans, financial condition, employees, inventions, algorithms, decision technology and/or models, processes, designs, specifications, drawings, samples, improvements, developments, applications, engineering, manufacturing and marketing data and plans, software code (object and source), functionality, security procedures and approaches, know-how, customer names and information, experimental work, distribution arrangements and trade secrets, and/or ideas. Such Confidential Information may be produced in a variety of forms, including but not limited to: any and all verbal, electronic, and/or written communications (whether in the form of slides, handouts, letters, memoranda, agreements, facsimile transmissions, meetings, conference and other telephone calls, diskettes, files, tapes, and/or any other mode) and/or related concepts, proposals, data sources, pricing, schedules, development efforts (including source code, object code and/or documentation), numerical data processing algorithms, product and software design specifications. The Fair Isaac Products, Documentation and related materials shall be deemed the Confidential Information of Fair Isaac.

7.2     Purpose for Disclosure. Recipient may use Confidential Information of the Discloser only for the purposes of exercising its rights and fulfilling its obligations under the Agreement.

7.3     Limitations on Disclosure and Use. Recipient agrees to use the same degree of care, but no less than a reasonable degree of care, to protect against the unauthorized disclosure or use of Discloser's Confidential Information as it uses to protect its own Confidential Information. Recipient agrees to disclose Confidential Information only to its employees who have a need to know for the above stated purpose, and who are bound by obligations of confidentiality no less restrictive than the terms of the Agreement. Recipient shall not remove any proprietary notices of Discloser from Discloser's Confidential Information. During the course of the Agreement, the Recipient may from time to time provide the Discloser with comments, suggestions or other input regarding the Discloser's Confidential Information. The Recipient agrees that the Discloser has an unrestricted, worldwide, royalty-free right to use such comments, suggestions, or other input for any purpose and in any manner, and to authorize others to do so.

7.4     Exclusions. Recipient shall have no obligation under the Agreement as to Confidential Information of Discloser which: (a) is known to Recipient at the time of disclosure; (b) is independently developed by Recipient without reference to or use of the Discloser's Confidential Information; (c) is obtained by Recipient without restriction on disclosure or use from another source without a breach of any obligation of confidentiality owed by such source to Discloser; or (d) is or becomes part of the public domain through no wrongful act of Recipient or any party that obtained the information from Recipient. If Recipient is served with any subpoena or other legal process or a court or governmental request or order requiring or purporting to require the disclosure of any of Discloser's Confidential Information, Recipient shall, unless prohibited by law, promptly notify Discloser of such fact and cooperate fully (at Discloser's expense) with the Discloser

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 6 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

and its legal counsel in opposing, seeking a protective order, seeking to limit, or appealing any such legal process, request, or order to the extent deemed appropriate by the Discloser.

7.5     Injunctive Relief. The parties acknowledge that the remedies at law for breach of any covenant relating to the protection of Confidential Information may be inadequate, and each party shall be entitled to seek injunctive relief for any breach of the provisions of the Agreement relating to the protection of its Confidential Information or intellectual property rights. Nothing contained in this Section shall be construed as limiting the parties' rights to any other remedies at law, including the recovery of damages for breach of the Agreement.

## 8.     Payment Terms

8.1     Invoices and Payment. Client shall pay the fees and charges set forth in Exhibit A. All fees, charges, and expenses invoiced under this Agreement will be due and payable by Client in United States Dollars within thirty (30) days of Client's receipt of an invoice. Each unpaid invoice shall bear a late charge of 1.5% per month, or the maximum rate permitted by law, whichever is less. In addition to all other remedies available at law or in equity, if any payment is not received by Fair Isaac within thirty (30) days from the date of the invoice, Fair Isaac shall have the right to terminate the pertinent product license or service after giving Client written notice and thirty (30) days to cure. Client shall reimburse Fair Isaac for all costs related to any proceedings to collect any past-due amounts, including without limitation all attorneys' fees and expenses. Except as otherwise expressly provided in this Agreement, no refunds are available.

8.2     Expenses. Prices do not include reasonable travel and associated out-of-pocket expenses incurred by Fair Isaac, which are billed to Client at cost. Client agrees to reimburse Fair Isaac for all such travel-related expenses Fair Isaac incurs in connection with this Agreement.

8.3     Taxes and other Charges. Client shall be solely responsible for, and shall pay or reimburse Fair Isaac for, all Taxes. "**Taxes**" means all present and future taxes, duties, import deposits, assessments, and other governmental charges (and any related penalties and interest), however designated, that are now or hereafter imposed by or under any governmental authority or agency that are: (i) associated with the performance by Fair Isaac of its obligations hereunder; (ii) associated with the payment of any amount by Client to Fair Isaac pursuant to this Agreement; (iii) based on the license or use of any Fair Isaac Product; or (iv) associated with the importation of any Fair Isaac Product into any country other than the United States, excepting only taxes imposed on Fair Isaac's net income by the United States and each state thereof (and their political subdivisions). To the extent Client is required to withhold income taxes on any payment made to Fair Isaac pursuant to applicable tax law, Client may withhold such tax to the extent such tax (a) does not exceed the appropriate withholding amount applicable under relevant tax treaties and (b) qualifies as a creditable foreign tax by the United States government. Client agrees to send the appropriate certified tax receipt to Fair Isaac promptly upon payment of such tax. If a certified tax receipt issued by the taxing authority evidencing such payment and suitable for Fair Isaac to obtain a tax credit in the United States is not received by Fair Isaac within thirty (30) days after the date of the invoice, Client will be responsible for paying the full invoice amount.

8.4     Mode of Payment. Client agrees to remit all payments due to Fair Isaac in accordance with the instructions provided in the invoice or other instructions provided by Fair Isaac.

9.     **Term**

*Fair Isaac Confidential*

FICO0000181

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 7 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

9.1    Term. Unless earlier terminated, this Agreement and the license(s) granted hereunder shall commence upon the Effective Date and shall continue in full force in perpetuity, or, if applicable, for the duration of the applicable license term set forth in Exhibit A if such term is not perpetual ("Term").

9.2    Events of Termination. This Agreement may be terminated upon the occurrence of any of the following events:

(a)    Uncured Breach. Either party may terminate this Agreement for a breach by the other party of any of the material terms of this Agreement, or numerous breaches of duties or obligations hereunder that cumulatively constitute a material breach if the breaching party fails to cure the breach(es) within 30 days from receipt of written notice from the non-breaching party identifying the breach(es) and requiring them to be remedied.

(b)    Insolvency. Either party may terminate this Agreement if the other party ceases to conduct business in the ordinary course or is declared insolvent or bankrupt, or makes an assignment of substantially all of its assets for the benefit of creditors, or a receiver is appointed, or any proceeding is demanded by, for or against the other party under any provision of bankruptcy or insolvency legislation.

(c)    Violation of License or Confidentiality Obligations. Fair Isaac may immediately terminate this Agreement, without a requirement for prior notice or a cure period, if Client violates any terms of the licenses granted in this Agreement. Either party may immediately terminate this Agreement by written notice to the other party if the other party materially breaches any of the provisions of this Agreement relating to the protection of Confidential Information or Intellectual Property.

9.3    Effect of Termination. Upon expiration or termination of this Agreement for any reason, all licenses granted hereunder shall terminate immediately, all support and maintenance obligations shall cease, Client shall immediately cease using all Fair Isaac Product(s) and related documentation (including all intellectual property arising from or related to the foregoing), shall remove all copies of the Fair Isaac Product(s) and related documentation from Client's computers and systems, and shall either (i) destroy all copies of the Fair Isaac Product(s), related documentation, and other Fair Isaac Confidential Information and intellectual property in Client's possession; or (ii) return to Fair Isaac all copies of the Fair Isaac Product(s), related documentation, and other Fair Isaac Confidential Information and intellectual property in Client's possession. Client shall provide to Fair Isaac a written certification signed by an authorized office of Client certifying that Client has complied with the foregoing. Upon termination of this Agreement, all fees and other charges provided for hereunder will become immediately due and payable to Fair Isaac, and Client shall immediately remit all unpaid fees to Fair Isaac.

9.4    Survival. Rights to payment and the following rights and obligations under this Agreement will survive any termination or expiration of this Agreement: Article 1 (Definitions), Section 3.1 (License Restrictions), Section 3.2 (Reservation of Rights Not Granted), Section 5.3 (Warranty Disclaimer), Section 5.4 (Limitation of Liability), Article 7 (Confidential Information), Section 9.3 (Effect of Termination), Section 9.4 (Survival), and Article 10 (Provisions of General Applicability).

10.    Provisions of General Applicability

10.1    Relationship of the Parties. Fair Isaac and Client are independent contractors and will have no power to bind the other party or to create any obligation or responsibility on behalf of the other party. This Agreement shall not be construed as creating any partnership, joint venture, agency, or any other

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | | Page 8 of 17 |
|---|---|---|
| FI Contract Number: | | FI LR# |

form of legal association that would impose liability upon one party for the act or failure to act of the other party.

10.2    Counterparts. This Agreement may be executed in counterparts, which taken together shall constitute one single agreement between the parties.

10.3    Section Headings. The section and subsection headings used herein are for reference and convenience only, and will not enter into the interpretation hereof.

10.4    No Waiver. No delay or omission by either party to exercise any right or power with respect to any of the terms or conditions of this Agreement will impair any right or power or be construed to be a waiver thereof. A waiver by either party of any of the terms and conditions of this Agreement will not be construed to be a waiver of any other term or condition of this Agreement. No waiver of any rights of a party under this Agreement will be effective unless set forth in a writing signed by such party.

10.5    Entire Agreement. This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof, and supersedes all prior or contemporaneous proposals and all other oral or written understandings, representations, conditions, and other communications between the parties relating to such subject matter, as well as the terms of all existing or future purchase orders and acknowledgments. Each party represents and warrants to the other party that in entering into this Agreement it has not relied on any representations, promises, or assurances from another party or any employee, officer, director, representative, attorney, or affiliate of another party not expressly contained in this Agreement.  Any other terms or conditions or amendments shall not be incorporated herein or be binding upon any party unless expressly agreed to in a writing signed by authorized representatives of Client and Fair Isaac.

10.6    Construction; Severability. This Agreement will not be more strongly construed against either Party, regardless of who is more responsible for its preparation. If any provision of this Agreement is held to be unlawful or invalid under applicable law, then such provision will be ineffective only to the extent of such illegality or invalidity, without invalidating the remainder of such provision or any of the remaining provisions of this Agreement.

10.7    Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of law or international law, including without limitation the 1980 United Nations Convention on Contracts for the International Sale of Goods, as revised.

10.8    No Assignment. Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof.  In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent.  Any attempt to assign or transfer all or any part of this Agreement without first obtaining such written consent will be void and of no force or effect. Notwithstanding the foregoing, Fair Isaac may perform any or all of its obligations through any subsidiary or affiliated company, and may assign this Agreement by merger, reorganization, consolidation, or sale of all or substantially all its assets.

10.9    Force Majeure. Notwithstanding anything to the contrary herein, Fair Isaac shall not be deemed to be in default of any provision of this Agreement or be liable to Client or to any third party for any delay, error, failure in performance or interruption of performance due to any act of God, terrorism, war,

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 9 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

insurrection, riot, boycott, strike, interruption of power service, interruption of communications service, labor or civil disturbance, act of any other person not under the control or direction of either party or other similar cause. Fair Isaac shall give Client reasonable written notification of any material or indefinite delay due to such causes.

10.10   Press Releases; Publicity.   Fair Isaac will be allowed to issue a press release stating factual information regarding the relationship between Fair Isaac and Client at the time this Agreement is signed. Fair Isaac shall first submit to Client such press release for Client's approval, which approval may not be unreasonably withheld or be delayed more than 5 business days. The parties may issue additional press releases or publicity from time to time as mutually agreed by the parties. All press releases or other publicity sought to be issued by either or both parties pursuant to this section must, prior to release, be reviewed and approved by each party, which approval may not be unreasonably withheld or be delayed more than 5 business days. Subject to Client's prior written consent (which must not be unreasonably or arbitrarily withheld), Fair Isaac may include Client's name in its marketing and promotional materials regarding the availability of any of its products or services to other clients.

10.11   Notices.   Any notices required to be given by one party to the other under the Agreement must be in writing, must reference the Fair Isaac Legal Request (LR) number set forth above, and must be sent to the recipient's address or facsimile number for notices set forth on the page of this Agreement titled "Instructions and Contact Information." Such notices will be deemed given upon the earlier of (i) actual delivery, whether personally, by a recognized international overnight delivery carrier, or by facsimile (provided that the facsimile notice is promptly confirmed in writing using another method for giving notice provided in this section), or (ii) five business days after being mailed by certified or registered mail, first class, postage prepaid.. The date a notice sent by facsimile is deemed to have been given will be the date of actual receipt, but no faxed notice will be effective unless promptly confirmed in writing as set forth above. Either party may change its address or facsimile number for notices at any time by giving notice to the other party.

10.12   No Third Party Beneficiaries.   Nothing in the Agreement is to be deemed to create any right or benefit in any person not a party to this Agreement.

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 10 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

IN WITNESS WHEREOF, Fair Isaac and Client have caused this Agreement to be signed in duplicate and delivered by their duly authorized representatives as of the Effective Date.

**FAIR ISAAC CORPORATION**          **CLIENT – CHUBB & SON**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date Signed: _____          Date Signed: _____

| *Fair Isaac Use Only:* | | Created: 2 June 2006 |
|---|---|---|
| Short Name: | Client #: | Acct. Exec.: |
| OE Order #: | System #: | Royal Blue #: |
| Sales Approval: | Notes: | |

**Please complete the information on the following page.**

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 11 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

## INSTRUCTIONS AND CONTACT INFORMATION

*Instructions to Client:*

　　1.　　*Appropriate corporate officer should execute 2 copies of the document.*

　　2.　　*Complete all requested information below:*

**Addresses for Notices:**

|  | **For Client:** | **For Fair Isaac:** |
|---|---|---|
| **Address:** | | Fair Isaac Corporation |
| | | Attn: Contracts Administrator |
| | | 3661 Valley Centre Drive |
| **City/State:** | | San Diego, CA 92130 |
| | | Reference FI LR # |
| **Zip/Code:** | | Fax: 858-523-4450 |
| **Country:** | | |
| **Attention :** | | |
| **Fax:** | | |

*Compete Information below if different from above:*

| | **Return executed contract to Client at:** | **Send Software to:** | **Client's Billing Information:** |
|---|---|---|---|
| **Address:** | | | |
| | | | |
| **City/State:** | | | |
| **Zip/Code:** | | | |
| **Attention :** | | | |
| **Phone:** | | | |
| **Fax (optional):** | | | |
| **Email (optional):** | | | |

　　3.　　*Return 2 completed and executed copies to:*

　　　　Fair Isaac Corporation
　　　　Attn: Contracts Administration
　　　　3661 Valley Centre Drive
　　　　San Diego, CA 92130

　　　　If time is of the essence, please fax to:

　　　　858-523-4450

　　　　Questions? Call 858-369-8259

*Fair Isaac Confidential*

FICO0000186

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 12 of 17 |
|---|---|
| FI Contract Number: | FI LR# _____ |

**EXHIBIT A**
**PRICING AND PAYMENT**

1.   **BLAZE ADVISOR LICENSE AND SUPPORT AND MAINTENANCE FEES**

| Product | Item # | Initial Term (Perpetual or No. of Years) | Scope/Quantity | Price | Total |
|---|---|---|---|---|---|
| Blaze Advisor Development<br><br>Version: 6.0<br>Platform: [Cobol/.Net/JAVA] | 280-DVLI-03 (Perpetual)<br><br>280-DVST-09 (Dev Seat Recurring)<br><br>280-SELI-03 (Site and Enterprise) | Perpetual | [For use on up to ___ Seats]<br>- or -<br>[Named Application]<br>- or -<br>[Enterprise-Wide] | $ | $ |
| Blaze Advisor Deployment<br><br>Version: 6.0<br>Platform: [Cobol/.Net/JAVA] | 280-DPLI-03 (Perpetual)<br><br>280-DPLY-03 (Annual)<br><br>280-SELI-03 (Site and Enterprise) | Perpetual | [For use on up to ___ CPUs]<br>- or -<br>[Named Application]<br>- or -<br>[Enterprise-Wide] | $ | $ |
| Compiled Sequential for Blaze Advisor Deployment<br><br>Version: 6.0<br>Platform: [Cobol/.Net/JAVA] | 280-SQPL-03 (Perpetual)<br><br>280-SQAL-03 (Annual)<br><br>280-SELI-03 (Site and Enterprise) | Perpetual | [For use on up to ___ CPUs]<br>- or -<br>[Named Application]<br>- or -<br>[Enterprise-Wide] | $ | $ |
| SmartForms for Blaze Advisor<br><br>Version: 6.0<br>Platform: [Cobol/.Net/JAVA] | | Perpetual | [For use on up to ___ CPUs]<br>- or -<br>[Named Application]<br>- or -<br>[Enterprise-Wide] | $ | $ |
| Documentation for Blaze Advisor:<br>• User guide (available in HTML or PDF) | N/A | Perpetual | 1 set | Electronic copy included with software license | $ |

*Fair Isaac Confidential*

FICO0000187

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | | Page 13 of 17 |
|---|---|---|
| FI Contract Number: | | FI LR# |

| Support and Maintenance Fee for Blaze Advisor Software: | 280-OOMN-08 | Initial Term: One year | | 1 | $ Per Year: 18% of Total License Fees | $ Year One (Annual fee thereafter subject to annual adjustment) |
|---|---|---|---|---|---|---|
| TOTAL LICENSE AND FIRST YEAR SUPPORT AND MAINTENANCE FEES – (US Dollars) | | | | | | $ |

**Definition of Named Application:** With respect to any license set forth above with a "Scope/Quantity" of "Named Application", Client's "Named Application" is defined as follows:
[_____].

## 2.    TRAINING FEES

| Product | Item # | Quantity | Price | Total |
|---|---|---|---|---|
| Training Classes:<br><br>Fair Isaac to provide the following classes:<br>• [list class name] – X day class.<br>• [list class name] – X day class. | 280-OOTR-06 | [___] Classes to be held at Client's site. Price is per class and includes up to twelve (12) students<br>- or -<br>Classes to be held at Fair Isaac's site. Price is per student. | $ (per class/per student) | $ |
| | | | TOTAL TRAINING FEES (US Dollars) | $ |

## 3.    PAYMENT

**3.1    License Fees.** Client agrees to pay the license fees described above upon execution of this Agreement.

**3.2    Maintenance Fees.** Client agrees to pay the support and maintenance fees for the first year upon execution of this Agreement, and annually thereafter in advance while the maintenance term is in effect. Client agrees that the maintenance fee set forth above covers only the licenses to the Fair Isaac Products set forth in this Agreement and does not cover any other licenses to the Fair Isaac Products granted to Client under any other agreement. The total maintenance fee for the Fair Isaac Products for future years shall be calculated based on the total license fees paid by Client for the Fair Isaac Products under this Agreement and all other agreements.

**3.4    Training Fees.** Client agrees to pay the training fees described above upon execution of this Agreement.

**3.5    Expenses.** Prices do not include reasonable travel and associated out-of-pocket expenses incurred by Fair Isaac, which will be billed to Client at cost. Client agrees to reimburse Fair Isaac for all such travel-related expenses Fair Isaac incurs in connection with this Agreement.

**Unless Client signs this Agreement and returns it to Fair Isaac by [_____], prices and terms are subject to change.**

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 14 of 17 |
|---|---|
| FI Contract Number: | FI LR# _____ |

**EXHIBIT B**
**FAIR ISAAC SOFTWARE SUPPORT AND MAINTENANCE POLICY**

## 1. DEFINITIONS

"**FIC**" means Fair Isaac Corporation and its subsidiaries.

"**Errors**" means persistent malfunctions, inherent within the Software, that prevent the Software from operating according to its technical documentation.

For software to be installed at locations in North America, Asia, and South America, "**Product Support Hours**" (United States) are 6:00 a.m. to 5:00 p.m. Pacific Time, Monday through Friday, excluding holidays observed by FIC in the United States. Support services will be provided from the United States.

For software to be installed at locations in Europe, Middle East, and Africa, "**Product Support Hours**" (U.K.) are 8:30 a.m. to 5:00 p.m. UK Time, Monday through Friday, excluding holidays observed by FIC in the United States. Support services will be provided from the United States.

"**Software**" means the following software product(s) that are licensed by Client:

The Fair Isaac Products listed on Exhibit A.

## 2. SUPPORT AND MAINTENANCE SERVICES GENERALLY

**2.1.** Subject to payment of the appropriate Maintenance fees by Client, and compliance by Client with the terms of the applicable license agreement, FIC agrees to provide Client with support and maintenance services for the Software as set forth in this policy.

**2.2.** FIC provides support and maintenance services for licensed Software during both implementation and production use when operated on supported platforms installed on designated or approved equipment. Support is currently provided in the English language only.

**2.3.** Subject to Section 5.1.4, maintenance includes any standard Software versions and releases generally made available to FIC's clients that are current on Maintenance fees. Such versions and releases will be provided to Client pursuant to this policy on a when and if available basis.

## 3. TECHNICAL SUPPORT

**3.1.** FIC will make commercially reasonable efforts, during Product Support Hours, to address Client's questions about the Software, to resolve operating problems that are attributable to the Software, and to resolve verified, reproducible Errors in the Software.

**3.2.** Client agrees: (a) to set up primary and secondary liaisons who have been trained on the Software; (b) that all support requests will be centralized through the primary and secondary liaisons; (c) to submit support requests to FIC Product Support; (d) to comply with the attached guidelines for submitting support requests; (e) to use commercially reasonable efforts to diagnose and resolve problems in the operation of the Software prior to contacting FIC for support; and (f) to use commercially reasonable efforts to verify that reported problems are due to a malfunction of the Software, and not due to the operating system, hardware, data, interfaces, or improper use of the Software, prior to contacting FIC for support.

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 15 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

## 4. TERM; TERMINATION; REINSTATEMENT

**4.1.** FIC's support and maintenance obligations under this policy commence upon shipment of the Software and will continue for an initial term of one year. Maintenance fees will be invoiced on an annual basis in advance. For as long as FIC makes maintenance for the Software generally available to all of its customers, the support and maintenance service will automatically renew for consecutive one-year terms unless Client gives FIC 30 days' written notice, prior to the end of the current term, of its intent not to renew. Support and maintenance during renewal terms will be subject to the Support and Maintenance Policy in effect at the time of renewal. Maintenance fees applicable to renewal terms may be increased by FIC, but no such increase may exceed the most recently available annual change in the CPI. **"CPI"** means the Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for All Items, 1982-84=100, as published by the US Bureau of Labor Statistics.

**4.2.** FIC may terminate support and maintenance services under this policy upon 30 days' written notice if Client is in breach under this policy or any license agreement relating to the Software and does not cure the breach within such 30-day period. FIC will have no obligation to resume support and maintenance services following such a termination for cause.

**4.3.** FIC may, at its sole discretion, reinstate lapsed support and maintenance services, in accordance with its then-current policies, upon payment by Client of the applicable reinstatement fee.

## 5. EXCLUSIONS

**5.1.** Services outside the scope of this policy are subject to availability of resources and will be charged for separately at FIC's then-current rates for such services. The following services are outside the scope of this policy:

> **5.1.1.** Support services provided outside of Product Support Hours.

> **5.1.2.** Support service that becomes necessary due to failure of computer hardware, equipment or programs not provided by FIC; negligence of Client or any third party; operator error; improper use of hardware or software (including the Software); any problem or loss not solely attributable to the Software; problems stemming from Client not applying all required maintenance releases; or problems due to unauthorized modification or adaptation of the Software by Client.

> **5.1.3.** Development, customization, coding, installation, integration, consulting and training.

> **5.1.4.** Optional, separately-priced Software features that may, from time to time, be made available by FIC with new versions or releases of the Software.

**5.2** Unless otherwise indicated in the applicable Order Form or license agreement, FIC has no obligation to provide support or maintenance services for other than (a) the current release of the Software and (b) one prior release of the Software, but only for a maximum of one year after release of a subsequent release.

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 16 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

**6. SEVERITY LEVELS AND RESPONSE TIMES.** Upon Client's report of a problem with the Software, an FIC representative will acknowledge such report by issuing a confirmation to Client, either by phone or email, and FIC will assign a Severity Level to the problem based on the type of issue reported, according to the following schedule:

| Severity | Condition | Response Time/Action |
|---|---|---|
| 1 | **Production Down Emergency:** An Error in the production environment that inhibits all or substantially all of the Software from functioning in accordance with its documentation. A severity "one" problem is both severe and mission-critical.: | Provide (a) a phone response within 1 hour during FIC's Product Support Hours and (b) an action plan within 4 hours for the development of a patch or a bypass for the Error. Following the development of the patch or bypass, FIC will notify the Client of inclusion of the patch or a solution in a revision of the Software. Once identified and logged, FIC will provide all necessary services to resolve a Severity-One condition on a diligent-efforts priority basis seven days per week until that condition has been patched or bypassed. |
| 2 | **Production Impaired:** An Error in the production environment where major functionality of the Software is inhibited, but the Error does not materially disrupt the Client's business | Provide (a) a written or phone response within 4 hours during FIC's Product Support Hours and (b) an action plan within 2 business days for a bypass for the Error or (c) an action plan within 5 business days for developing a patch for the Error. Following the development of the patch or bypass, FIC will notify the Client of inclusion of the patch or a solution in a revision of the Software. The Error will be worked on during Product Support Hours. |
| 3 | **Production Inhibited:** An Error in the production environment where a feature of the Software is inhibited, but the Error does not materially disrupt the Client's business | Provide (a) a written or phone response within one business day and (b) Consider for correction or inclusion in the next revision of the Software. |
| 4 | **General Assistance:** A "how to" question; an Error that is minor or cosmetic in nature; or an enhancement request to be considered for a future revision of the Software | Provide (a) a written or phone response within 2 business days and (b) Consider for correction or inclusion in the next revision of the Software. |

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 17 of 17 |
|---|---|
| FI Contract Number: | FI LR# _____ |

**Fair Isaac Product Support**
**Problem Submission Guidelines**

We encourage clients to first consult the appropriate documentation for the product they are using (installation guides, reference manuals, user guides, product release notes, etc.). Release notes will typically include contents of the release, installation/license information, known limitations, product support, and compatibility information. Other reference materials should also be consulted as needed for related components such as database management systems, compilers, operating systems, etc. For Fair Isaac products with web-based self-service, visit the support web site to search for known questions, solutions and technical notes.

If you've completed this initial research and are still unable to resolve your problem, the next step is to contact Product Support. The following information is critical to resolving a problem:

- Your client ID (a 4-digit number communicated to you either by your Engagement Manager or during your first contact with Product Support) or license number (if applicable).
- Your phone number and email address
- The name and version of the Fair Isaac software to which the issue pertains. For incidents submitted via email, please be sure to include the **product name** on the subject line of the email.
- The name and version of the operating system and database.
- The environment in which the error is occurring (development, test or production).
- Both a general statement and a detailed description of the problem, including any relevant error messages.
- Frequency with which the condition occurs and at what intervals.
- Can the problem be replicated, and if so, the steps taken to recreate the problem.
- Any changes that may have been made to the environment (for example, maintenance work that may have been performed or any hardware/software changes made to the server, workstation, operating system, or data feed).
- Any changes to the Fair Isaac application, including new configuration or software upgrades.
- Copies of the Fair Isaac product log files, configuration files, and screen prints of errors.

**Troubleshooting Tips:**

- Isolate the problem as precisely as possible using debugging facilities and error logs as appropriate, and try to find a consistent way to reproduce it.
- Whenever possible, modify a Fair Isaac provided example or test case to cause the same problem.
- If the problem is not consistently reproducible, check whether it may be related to insufficient memory, memory leaks, search paths, or files that may be missing from certain directories or the class path.
- Verify that the versions of the database, compilers, operating system, browser, drivers, etc. that are in use are certified and supported by Fair Isaac.
- Identify any other changes that may have occurred in your environment that may have an impact on the Fair Isaac solution (for example, database maintenance, service pack deployment, upgrade of a system component, operating system patches, etc.)
- Try to reproduce the problem on another platform or test system.
- If applicable, try to isolate various components of your solution to simplify the troubleshooting (for example, pull out a subset of rules or code from the bulk of your application). Support can assist you best if we get a small sample of your application to work with. If possible send us a small test case with instructions, so we can run the test case.

*Fair Isaac Confidential*