# EXHIBIT 35

# FILED UNDER SEAL

```
 1                UNITED STATES DISTRICT COURT

 2                         FOR THE

 3                   DISTRICT OF MINNESOTA

 4

 5            C.A. No. 16-cv-1054 (WMW/DTS)

 6      ---------------------------------------------

 7      FAIR ISAAC CORPORATION,                     )

 8                              Plaintiff           )

 9      v.                                          )

10      FEDERAL INSURANCE COMPANY AND ACE           )

11      AMERICAN INSURANCE COMPANY,                 )

12                              Defendants          )

13      ---------------------------------------------

14                   CONFIDENTIAL TRANSCRIPT

15                    ATTORNEYS' EYES ONLY

16

17              DEPOSITION OF MICHAEL SAWYER

18                     October 2, 2018

19                    Courtyard Marriott

20                  35 Foxborough Boulevard

21                 Foxborough, Massachusetts

22

23                       *********

24              Court Reporter:  Amie D. Rumbo
```

```
 1    APPEARANCES:

 2     MERCHANT & GOULD

 3     Allen W. Hinderaker, Esq.

 4     3200 IDS Center

 5     80 South Eighth Street

 6     Minneapolis, Minnesota  55402-2215

 7     (612) 332-5300

 8     ahinderaker@merchantgould.com

 9     Counsel for the Plaintiff

10

11    FREDRIKSON & BYRON, P.A.

12    Terrence J. Fleming, Esq.

13    200 South Sixth Street, Suite 4000

14    Minneapolis, Minnesota  55402-1425

15    (612) 492-7000

16    tfleming@fredlaw.com

17    Counsel for the Defendants

18

19    ALSO PRESENT:

20    James Woodward, Vice President, Legal, Fair Isaac

21    Corporation

22

23    Kevin Murphy, Senior Counsel Global Legal for

24    Chubb
```

**Page 37**

believe I was mostly a coordinator in this effort. Those two individuals were the authoritative figures on the relationship with Chubb.

Q. Was it your understanding that the basic FICO software license excluded client affiliates from using the license?

MR. HINDERAKER: Could I ask a clarifying question? When you say basic, are you talking about the license with Chubb or just --

MR. FLEMING: In general.

MR. HINDERAKER: Just a general.

A. I'm not aware of what our standard language was related to affiliates, although it was a common item for negotiation with clients in general.

Q. What was a common part of negotiation?

A. Determining the definition of affiliates within the contracts.

Q. Okay. Do you recall any discussions in 2008 as to whether the FICO license agreement permitted use by a Chubb affiliate in Europe?

**Page 38**

MR. HINDERAKER: Same clarifying question. Are we talking about the Chubb license or just general licenses now?

MR. FLEMING: This license.

MR. HINDERAKER: Okay. Thank you.

A. No, I do not recall any discussion that took place in 2008.

Q. Do you recall any discussions about that topic while you were at FICO?

A. I do.

Q. What do you recall?

A. I recall, at some point after I assumed responsibility as client partner for Chubb, reviewing the agreements and at that point in time, I realized the territory clause within the original software license service agreement. And you know, it clarified for me, you know, the scope of amendment two based on that territory clause. And it highlighted for me, you know, a potential discrepancy in the way that my predecessors had, you know, interpreted that clause.

Q. And when you're talking about your predecessors, are you referencing Ian Brodie or

**Page 39**

anybody else?

A. Ian Brodie and Russ Schreiber.

Q. How had they interpreted that clause; what was the discrepancy that you just referenced?

MR. HINDERAKER: Which question do want? Objection. And multiple questions. Which question do you want answered?

A. Can you clarify your question, please?

Q. What discrepancy are you referencing?

A. The extent to which the enterprise license in amendment two applies from a territory perspective.

Q. What do you mean by that?

A. I can't speak to, you know, Ian or Russ's interpretation of the agreement; however, based on knowledge that I had, you know, in working with Henry Mirolyuz and the team at Chubb, that there may have been some use of the products for Chubb businesses outside the United States. And so when I read the agreements, went back through the territory, I, you know, highlighted

**Page 40**

that to Russ Schreiber. I can't be certain on the date.

Q. So when you say you highlighted that to Russ Schreiber, are you referencing an e-mail that you sent him at that time?

A. No. It would have been in discussion.

Q. Was it ever memorialized in an e-mail?

A. I couldn't recall for the nine years that I worked at FICO if I wrote an e-mail or not, but most likely it was in discussion with Russ.

Q. And when was that discussion?

A. So it would be during the period of time that I was a client partner responsible for the Chubb account. So it was somewhere between March 2010 and February 2014. My guess is it's in that period of time when I was responsible for the account.

Q. So in responding to that question, you were referencing the LinkedIn document, right?

A. Yes.

Q. So you don't have a separate

---

**Page 41**

1  recollection of it without referencing a document;
2  is that fair?
3      A.   That is correct.  I was referencing
4  Exhibit 72 just to refresh my mind of the period
5  of time in which I served in that role at FICO.
6      Q.   Okay.  So let's talk about what you
7  had learned from Henry Mirolyuz about the use of
8  the Blaze product for Chubb business outside of
9  the United States.  What did you learn from him?
10     A.   So I -- in multiple conversations
11 with Henry, largely centered around presentations
12 that Henry would do internally to Chubb folks
13 around the use of Blaze Advisor, there was
14 reference to an application of Blaze Advisor for
15 renewal processing, I believe, supporting their UK
16 business.  And I also engaged in conversations
17 with Henry about some interest that the European
18 unit had around a decision simulation product that
19 FICO also offered.  But I do not recall having any
20 direct conversations with members of, you know, a
21 European team for Chubb.
22     Q.   So was it your understanding that
23 prior to your determination that you had a
24 difference in how one would interpret the license

---

**Page 42**

1  agreement than the manner in which your
2  predecessors interpreted it, that prior to that
3  time, FICO had taken the position with Chubb that
4  the use of Blaze with regard to Chubb's Canadian
5  company and its European company was within the
6  scope of the license?
7           MR. HINDERAKER:  I have two
8       objections.  One, it misstates his earlier
9       testimony; and two, it presumes someone
10      speaking on behalf of FICO as a corporation.
11     A.   Yeah.  I cannot speak to, you know,
12 what positions my predecessors may have taken with
13 Chubb in respect to their license agreement, so I
14 can't answer that question.
15     Q.   Well, you referenced this
16 discrepancy and the manner in which your
17 predecessors had interpreted this provision.  How
18 do you know how they had interpreted this
19 provision?
20     A.   Sure.  So I don't believe that they
21 ever told me this is how we interpreted it, right.
22 I think that conversation that I had with Russ
23 was, you know, directed to Russ in the way that
24 said that I, as through my role, had become aware,

---

**Page 43**

1  right, of use of the product to support the
2  Chubb's European business and, you know, making
3  Russ aware that upon my reading of the contract,
4  despite how things have been operating previously,
5  that I did not think that was in compliance with
6  our license agreement.
7      Q.   Okay.  So you said that.  What was
8  Russ saying?
9      A.   I don't recall Russ's exact
10 reaction to it, other than the fact that, you
11 know, Chubb, it was an important client of ours at
12 the time, right, and that, you know, it was not
13 the right time to take action on that.  So I was
14 not given any direction on how to proceed.
15     Q.   And did you follow that direction?
16     A.   I did.
17     Q.   So what action were you
18 contemplating or suggesting?
19          MR. HINDERAKER:  Objection.
20      Assumes facts.
21     A.   I do not recall coming into that
22 meeting with a recommendation.  You know, at this
23 point in my career, I was a fairly junior software
24 sales representative, right, and so I did not have

---

**Page 44**

1  a tremendous amount of experience of dealing with
2  these types of issues, right, and so the course
3  that I took was to report my concern to my
4  management.
5      Q.   So you didn't have a suggestion or
6  a recommendation; rather, you came to Russ
7  Schreiber and told him that you interpreted this
8  contract differently than he did?
9      A.   Correct.
10          MR. HINDERAKER:  Objection.
11      Misstates the testimony.
12     Q.   Go ahead.
13     A.   Correct.
14     Q.   Okay.
15     A.   Well, let me clarify.  I went to
16 him and expressed that I have a concern, right,
17 about what I know about the Chubb account, right,
18 and how I interpret the contract.  As I've said, I
19 cannot speculate on how Russ interpreted the
20 contract.
21     Q.   Well, if you -- why did you believe
22 there was a discrepancy, then, in the way that you
23 interpreted it and the way your predecessors had?
24 You've explained -- let me --

**Page 97**

1  referencing?
2  A.  Where he references that they do
3  have a Blaze ELA, and we're working on model
4  central POC.
5  Q.  So why does that lead you to
6  conclude that you had that discussion with
7  Schreiber after that?
8  A.  Because as you look further in the
9  chain, it does not appear that I raised a concern
10 about Russ's perspective on the license grant that
11 Chubb had.
12 Q.  But wait a minute, I thought you
13 had said that when you raised this issue with
14 Russ, he said this isn't the time to raise it?
15 A.  I did testify to that.  That is
16 correct.
17 Q.  Well, I mean, from your
18 perspective, Russ never changed his view of the
19 proper interpretation of the contract, correct?
20      MR. HINDERAKER:  Objection.  Lack
21   of foundation.
22 A.  I can't -- I can't definitively say
23 that yes or no.
24 Q.  Well, I'm saying from your

**Page 98**

1  perspective, did you ever hear him have -- express
2  an interpretation of the contract that was
3  consistent with your interpretation?
4  A.  Yes.  At some point, his
5  perspective -- and I'm not saying it was in that
6  meeting that I had when I first raised the issue,
7  but Russ did at one point in time express to me
8  that there would be a proper place and time to
9  address that potential license compliance issue.
10 You know, Russ, as the leader of our insurance
11 group, had purview to things that I didn't have
12 purview to in the overall scope of our
13 relationships with our clients, and I followed his
14 direction.
15 Q.  No, I understand that.  Are you
16 saying that during that conversation that you had
17 with Russ in which he said something to the effect
18 of this isn't the time to raise this, that he
19 further said at some point, there may be a proper
20 time?
21 A.  I can't recall the exact
22 conversation.  What I can recall is that I did
23 discuss this issue with Russ at one point in time,
24 and you know, the -- what I took from that

**Page 99**

1  conversation was that it was not the right time to
2  take any action associated with a potential
3  license compliance issue.
4  Q.  But he didn't agree with your -- he
5  didn't express agreement with your interpretation,
6  right?
7  A.  As I testified before, I do not
8  remember his exact position on the subject.
9  Q.  Okay.  So Mr. Sawyer, if, in fact,
10 he had a different interpretation and Exhibit 47
11 simply reflects that different interpretation, why
12 would the fact that he's simply reciting his
13 interpretation lead you to some conclusion as to
14 when that conversation with Russ occurred in which
15 you expressed your different interpretation?
16      MR. HINDERAKER:  I'll object to
17   that as argumentative and misstating the
18   chronology of the testimony.
19 A.  As I've testified, I do not know
20 what point in time I had that conversation with
21 Russ.  I cannot be certain, so I cannot be certain
22 whether this e-mail chain predates or postdates
23 that conversation.
24 Q.  Okay.  And you're referencing the

**Page 100**

1  e-mail chain in Exhibit 47?
2  A.  That is correct, yes.
3      MR. FLEMING:  All right.  I would
4   like to break for lunch right now.
5      MR. HINDERAKER:  Okay.
6      MR. FLEMING:  It's noon.
7      MR. HINDERAKER:  Do you have any
8   guess, any guess, about the rest of the day?
9      MR. FLEMING:  Well, I have a seven
10  o'clock flight -- We're off the record.
11     THE VIDEOGRAPHER:  Do you want to
12  go off the record?
13     MR. FLEMING:  Please.
14     THE VIDEOGRAPHER:  The time is
15  11:59.  We're off the record.
16       (Break taken.)
17     THE VIDEOGRAPHER:  The time is
18  12:53.  We're back on the record.
19 BY MR. FLEMING:
20 Q.  Mr. Sawyer, looking at Exhibit 47,
21 which was the last exhibit we looked at, if you
22 look at page 2, Mr. Schreiber says in his e-mail
23 to Mr. Hill in which you're copied, it says quote,
24 "They do have a Blaze ELA," unquote, and he goes

**Page 101**

1  on. And then in response to that on the first
2  page, the following e-mail, you say, quote,
3  "Richard, I am the CP for Chubb. They do have a
4  global ELA for Blaze," unquote, and the sentence
5  goes on.
6      So why did you insert "global"? I
7  mean, Russ Schreiber says "Blaze ELA," and then
8  you said "global ELA." Why do you say that?
9      A.   So I can't remember for certain why
10 I chose to add that particular word into my
11 sentence. I would have to infer what the reason
12 for that. Most likely, it was to reflect my
13 understanding of Russ's e-mail to clarify it for
14 Richard, since Richard was in the UK. But I can't
15 remember writing this e-mail in detail, so I can't
16 speak to exactly what was going through my head at
17 the time.
18     Q.   And how did you clarify it, how
19 does that wording clarify the issue?
20          MR. HINDERAKER: Objection. Vague.
21     A.   The intent behind that, as I said,
22 I can't be certain, but as I'm reading the e-mail
23 and the chain here, I would believe that my intent
24 was to clarify for Richard who was in the UK that

**Page 102**

1  Russ's e-mail suggested that they were authorized
2  to use the software for support of UK business.
3      Q.   Okay. And did you make that
4  determination after reading the license agreement
5  and the amendments?
6      A.   I do not know.
7      Q.   Okay. By that time, you had been a
8  client partner for some time, right?
9      A.   That is correct.
10     Q.   And you were the person responsible
11 for the licensing process with regard to the
12 particular customer, right?
13     A.   I want to be clear, right. I was
14 responsible for the relationship with the client.
15 I was not responsible for the drafting of those
16 particular license agreements or the intent behind
17 the license agreements when they were drafted back
18 in 2006.
19     Q.   You would agree that you would not
20 have written that statement about there being a
21 global ELA without having reviewed the applicable
22 licensing agreements?
23     A.   I can't say that with certainty
24 either. It's very possible that I had a

**Page 103**

1  conversation with Russ, and based on the
2  conversation I had with Russ, I followed up with
3  Richard. So I can't say for certain that I
4  reviewed the license agreements before I drafted
5  that e-mail.
6      Q.   Even though at this time you had
7  been the client partner for close to three years?
8          MR. HINDERAKER: Objection.
9  Argumentative. Asked and answered.
10     A.   My statement was in response to
11 your question before I wrote this e-mail. So I
12 interpreted your question as before I penned this
13 e-mail, did I go read the contract agreements, and
14 my answer to that is I am -- cannot say that I
15 did. That does not mean -- my statement does not
16 mean that I did not read the contracts at some
17 point prior to me drafting that e-mail, just that
18 I did not necessarily read the contracts right
19 prior to drafting that e-mail. Does that make
20 clarify? Thank you.
21     Q.   During your employment at FICO, on
22 how many occasions did you interpret a software
23 license agreement with respect to the issue of use
24 outside of the United States?

**Page 104**

1          MR. HINDERAKER: Objection. Vague.
2  This agreement or all of the agreements?
3          MR. FLEMING: The Chubb agreement.
4      A.   I don't think I can answer that
5  with any certainty. I mean, I would guess it
6  would have to be a handful of times.
7      Q.   On each occasion, did you respond
8  similarly to the way that you responded in
9  Exhibit 47?
10         MR. HINDERAKER: Objection. Vague.
11     A.   I can't say that I did. I'm not
12 aware of all the potential times that this issue
13 may have come up, and you know, we're talking
14 about, you know, an extended period of time where
15 there was many e-mails or conversations I had, and
16 I can't recall how I would have responded in each
17 instance.
18     Q.   Would you agree that you never
19 responded on any occasion that the Chubb software
20 license precluded use outside of the United
21 States?
22         MR. HINDERAKER: Objection. Vague.
23 Responded -- both as to responded and as to
24 time frame.

**Page 109**

 1  following the question.
 2  Q. Okay.
 3  A. I'm trying to.
 4  Q. Okay. I'll start over from the
 5  beginning.
 6  A. Sure. Sure.
 7  Q. The question was during your
 8  employment at FICO, on how many occasions did you
 9  review and interpret the software license
10  agreement relating to Chubb and address the issue
11  of use of Blaze outside of the United States?
12  A. I'm unclear on what you mean by
13  "address the issue." What does me addressing the
14  issue mean in the context of your question?
15  Q. Do you recall any discussions where
16  anybody at FICO inquired whether a particular use
17  of Blaze outside of the United States was within
18  the scope of the license?
19  A. You know, well, throughout the
20  testimony, you've presented a number of exhibits
21  to me that shows that on a handful of occasions
22  that has -- that did occur, and you have, you
23  know, the written responses in the e-mails of how
24  I responded. As I testified, once I became aware

**Page 110**

 1  of a potential contract compliance issue of my new
 2  understanding of the actual language of the
 3  agreement, when that issue came up again, upon
 4  review of a request from Chubb or internally,
 5  whatever sparked that meeting, is when I escalated
 6  the issue to Russ Schreiber, who again was my boss
 7  and actually was the representative of FICO who
 8  negotiated those contracts.
 9  Q. Okay. Other than those
10  circumstances, which you've already testified
11  about this morning --
12  A. Okay.
13  Q. -- the circumstances reflected in
14  the e-mails that we reviewed, and other than the
15  communication with Russ Schreiber that you've
16  detailed, do you recall any other instance where
17  you reviewed and interpreted the software license
18  agreement dealing with Chubb in connection with an
19  inquiry relating to the use of Blaze outside of
20  the United States?
21  A. So the only other time that I can
22  recall would have been in -- let's see, it would
23  have been late 2015, I believe, when -- and I may
24  have the year off there, but when we were made

**Page 111**

 1  aware of the potential acquisition of Chubb by
 2  ACE, I was asked to review the contracts related
 3  to, you know, our standard provisions around
 4  assignment of a license. And so at that time, I
 5  would have reviewed the agreements in whole in
 6  response to, you know, that request internally.
 7  Q. Who asked you to review the
 8  contracts?
 9  A. I can't say for certainty, but most
10  likely it would have been Russ Schreiber.
11  Q. Okay. And after you were requested
12  to do that, what happened next?
13  A. So based on us identifying the
14  assignment language in the contract, our
15  interpretation of the language in that, our
16  understanding of the proposed acquisition of Chubb
17  by ACE, we made an outreach, or I made an outreach
18  specifically to a member of the Chubb sourcing
19  team to request a meeting to discuss the potential
20  acquisition and the potential impact on their
21  existing license agreement.
22  Q. Who did you reach out to?
23  A. A gentleman by the name of Elie
24  Merheb.

**Page 112**

 1  Q. And what was his title or role?
 2  A. He was, I believe, at that time an
 3  AVP and some vendor management type role. He had
 4  been my main sourcing contact on a prior contract
 5  that I had negotiated for professional services,
 6  and at the time, he had directed me that he was my
 7  main point of contact for contracting with Chubb.
 8  Q. And what happened next?
 9  A. I did not get a response from Elie.
10  So my original outreach was in early December, the
11  December before the transaction closed between ACE
12  and Chubb.
13  Q. So December 2015?
14  A. That sounds correct to me.
15      I did not hear from Elie, so in
16  early January, I followed up with Elie via e-mail
17  to let him know that I hadn't heard a response
18  back from him and raising the issue again as that
19  we were hearing that the transaction was getting
20  imminent and we wanted to make sure we had an
21  opportunity to discuss the issue with them prior
22  to the transaction happening.
23  Q. Then what happened?
24  A. My recollection is that Elie then

just based on the close nature of our working
relationship, but I can't recall that I called him
at 9:00 a.m. on a specific date or anything like
that.

Q. Okay. Can you turn to Exhibit 69?

A. 69. Yes.

Q. The March 30th, 2016, attachment, page 2.

A. Okay.

Q. At the end of the first paragraph, Mr. Carretta says, quote, "Further, FICO had notified its Chubb client contact prior to the merger that consent was required," end quote. Do you know what he's referencing?

MR. HINDERAKER: Objection. Asking for Mr. Carretta's intention.

A. I do not. I can only speak to the communications that I had with Chubb prior to the merger and that communication was with Elie in which I advised him that based on what we knew about the potential merger, that 10.8 could apply. You know, as I recall the events, given the merger hadn't been completed at the time that I spoke to Elie, you know, I would not have been definitive,

Page 197

right, in stating that it will apply, and so when I read Tom's note, that last sentence in the first paragraph, I do not believe that I would have been the person that would have communicated that it is required. I would have communicated that it is possible that it will be required based on what we know about the planned merger, so.

Q. Can you turn to Exhibit 83. I'm referencing the e-mail from Bill Waid to Tamra Pawloski dated March 23rd, 2016. Do you see the third paragraph where it states, quote, "Given this fact, I see no other outcome than Chubb extending Blaze Advisor to a global license," unquote?

A. Yes, I do see that.

Q. Now, it was your opinion that they already had a global license, right?

MR. HINDERAKER: Objection. Misstates testimony. Time frame. Misleading.

A. Yeah. As I've testified, over the time of my employment at FICO, as I took over as client partner sometime thereafter of the Chubb account and upon reviewing the contracts, I

Page 198

discovered what I believe to be a discrepancy between the way that, you know, Chubb had interpreted their license and the way that FICO had been operating prior to that. At which point, you know, my reading of the contract suggests that the license was restricted by the territory definition in the master license agreement, which restricted to use in the United States or to the United States territory.

Q. Okay. Do you have Exhibit 47 before you?

A. 47. Oh, here it is. Yes.

Q. On the e-mail at the bottom of the page, you state in an e-mail to Richard Hill, do you not, quote, "They do have a global ELA for Blaze," unquote?

A. Yes, I see that.

Q. All right. Did you ever inquire of anybody at Chubb what corporate entity was using Blaze?

A. Not that I'm aware of, no.

Q. Do you know anybody at FICO who did that?

A. No. I am not aware of that

Page 199

transpiring.

Q. Okay. Finally on Exhibit 82, we're looking at the criteria for sizing Blaze Advisor applications. Why isn't the gross written premiums one of the criteria?

MR. HINDERAKER: Objection. Lack of foundation.

A. I don't know. You would have to ask Bill Waid who generated the exhibit.

Q. Okay. Would it be your testimony that those are the -- when it says -- in the second paragraph where it says, "Absent these parameters, we can derive them from book of business or other key business metrics," is it your testimony that that includes gross written premiums?

A. So there is -- in what Bill has shared here, right, with me, is a spreadsheet that includes parameters. FICO also used a pricing engine that is integrated with Salesforce. And as part of that, there are drop-down fields that the salesperson is responsible for completing. And, you know, upon my departure from FICO, that was in place, and gross written premium was one of the

Page 200