# EXHIBIT 36

# FILED UNDER SEAL

```
                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA


   FAIR ISAAC CORPORATION, a Delaware  ) Case No. 16-cv-1054(WMW/DTS)
   corporation,                        )
                                       )
             Plaintiff,                )
                                       )
   FEDERAL INSURANCE COMPANY, an       )
   Indiana corporation,                )
                                       )
             Defendant.                )
        _____


                  DEPOSITION OF OLIVER CLARK

     a witness herein, called for examination, taken by and
   before Emma White, Court Reporter, at CMS Cameron McKenna
      Nabarro Olswang, LLP, Cannon Place, 780 Cannon Street,
                      London EC4N 6AF,
                      United Kingdom


           Tuesday, 11 September 2018 at 9.05 am




                           CONFIDENTIAL

                       ATTORNEYS' EYES ONLY
```

```
 1                APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs:

 3            Fredrikson & Byron, P.A.
              200 South Sixth Street
 4            Suite 4000
              Minneapolis, MN 55402
 5            Phone: (612)-492-7349
              ljanus@fredlaw.com
 6            BY: LEAH JANUS, ESQ.

 7   On behalf of the Defendants:

 8            Merchant & Gould
              3200 IDS Center
 9            80 South Eighth Street
              Minneapolis, MN 55402
10            Phone: (612)-371-5292
              Email: Ahinderaker@merchantgould.com
11            BY: ALLEN HINDERAKER, ESQ.

12   Also Present:      Court Reporter, Emma White
                        Ms Linda Fleet, Videographer
13                      Mr Jim Woodward, FICO

14

15

16

17

18

19

20

21

22

23

24

25
```

Oliver Clark - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 9/11/2018
Fair Isaac Corporation vs. Federal Insurance Company

CASE 0:16-cv-01054-DTS   Doc. 401-32   Filed 07/26/19   Page 4 of 8

## Page 10

1  Q  Okay, and when was that?
2  A  I cannot recall exactly when I was contacted about this.
3  Q  Can you give me a rough idea? Was it a couple of weeks
4     ago? A couple of months ago?
5  A  Again I cannot answer with any precision on that
6     question.
7  Q  What documents did you review?
8  A  I reviewed email communications.
9  Q  How did you go about doing that?
10 A  Just using my personal computer the company provides me
11    with.
12 Q  Okay, so you reviewed email communications that are in
13    your mailbox?
14 A  Yes.
15 Q  Okay.
16    Do you know whether those email communications have
17    been produced in this lawsuit?
18 A  I do not.
19 Q  How did you locate the email communications that you
20    reviewed?
21 A  I file my email communications by customer.
22 Q  Okay, and so -- take me through the steps you used to
23    locate the emails that you reviewed to prepare for the
24    deposition.
25 A  I referred to the file on Chubb and reviewed emails

## Page 11

1     contained within that folder.
2  Q  Okay, and is it your practice to file both sent and
3     received emails in your Chubb folder?
4  A  Typically only received.
5  Q  Okay.
6     Is there a process by which your company files sent
7     emails?
8  MR HINDERAKER: Objection, lack of foundation.
9  BY MS JANUS:
10 Q  As far as you know?
11 A  I'm not aware of any policy on that topic.
12 Q  Okay.
13    Do you have a practice for filing sent emails?
14 A  I do not have a systematic practice for filing sent
15    emails.
16 Q  By that I take it you mean sometimes you file them and
17    sometimes you don't? Is that fair?
18 A  Yes.
19 Q  Were there sent emails in your Chubb email folder?
20 A  I do not recall.
21 Q  Do you recall approximately how many emails are in your
22    Chubb email folder?
23 A  I do not recall.
24 Q  Can you give me a ballpark? Is it more than a thousand
25    or closer to a couple of hundred?

## Page 12

1  A  I cannot quantify the number of emails in that folder.
2  Q  Well, did you look at every email?
3     Let me clarify the question. Did you look at every
4     email in your Chubb email folder in preparation for this
5     deposition?
6  A  I cannot say that I reviewed every email.
7  Q  Would it have been too time-consuming to review every
8     email?
9  MR HINDERAKER: Objection, vague.
10 A  Sorry, could you clarify the question?
11 BY MS JANUS:
12 Q  Why didn't you review every email?
13 A  My intention was to familiarize myself with the rough
14    timelines for dates, the approximate dates of
15    interactions.
16 Q  So do you have an approximate -- approximation of how
17    many emails you reviewed?
18 MR HINDERAKER: Asked and answered.
19 BY MS JANUS:
20 Q  Go ahead.
21 A  I cannot put a number on the number of emails.
22 Q  How much time did you spend reviewing the emails?
23 A  It was in the order of one hour or two.
24 Q  And what were you -- you said you were looking for
25    approximate timelines for interactions. What, in

## Page 13

1     particular, were you looking for in reviewing the
2     emails?
3  A  My intention was to -- because this was a number of
4     years ago -- was just to understand when I started
5     interacting with the client, and when I last contact --
6     interacted with the client.
7  Q  Were you also reviewing the emails checking for any
8     particular content?
9  A  It was -- my intention was to familiarize myself with
10    the overall shape of the interactions with the customer.
11 Q  What do you mean by, "Overall shape"?
12 A  As I said earlier, the periods when I started
13    interacting and when I finished and when the activity,
14    the main activities, took place.
15 Q  What is your position at FICO?
16 A  I'm a director in the Pre-Sales Consulting division,
17    working within a line of business responsible for one of
18    the three lines of business that FICO provides.
19 Q  Director in the Pre-Sales Consulting division? Is that
20    correct?
21 A  Yes --
22 Q  Okay.
23 A  -- of one of the lines of business.
24 Q  Of one of the lines of business, and which line of
25    business?

**Page 18**

1  introduce lines of business in our region.
2  Q  When was that?
3  A  I cannot precisely remember when that took place.
4  Q  So is it fair to say that prior to the reorganization
5     your focus was on the Decision Management tools, even
6     though the company wasn't organized with Decision
7     Management Suite being a separate line of business?
8  A  Could you repeat the question sorry?
9  Q  Sure.
10     I'm just -- is it fair to say that prior to the
11     reorganization your focus was on Pre-Sales Consulting in
12     the Decision Management tools space?
13 A  That -- that was my focus, yes.
14 Q  Okay, and the effect of the reorganization was -- did
15    the reorganization have a practical effect on your focus
16    or did it change your focus in some way?
17 A  Sorry, could you expand on, "Practical effect"?
18 Q  Yeah, I'm just trying to understand if your duties were
19    roughly the same -- though you were getting promotions,
20    your duties or your focus at FICO was relatively the
21    same over the yours you've been there.
22 A  With the exception of the management responsibilities,
23    yes.
24 Q  Okay.
25    Is the -- so describe for me what, "Pre-Sales

**Page 19**

1  Consulting", is.
2  A  So, my primary responsibility is to help the company
3     develop new business.  So, to progress opportunities,
4     so -- opportunities for license or for services, or --
5     for license or for services, in conjunction with the
6     client partner who is the salesperson responsible for
7     a specific account.
8  Q  And you are performing those duties in connection with
9     the Decision Management Suite?  Is that correct?
10 A  My primary focus is on --
11 Q  Okay.
12 A  -- the Decision Management Suite, yes.
13 Q  And what is, "Blaze"?
14 A  Blaze Advisor is a software product.
15 Q  Can you describe for someone who's not in your line of
16    business, or familiar with Blaze Advisor, what it is?
17 A  It is classified as a decision rules management system
18    designed to allow for the management and execution of
19    business decisions in a way that makes them easy to
20    change quickly.
21 Q  Is Blaze Advisor one of the products that FICO sells?
22 A  Yes.
23 Q  And is it a product that is within the Decision
24    Management Suite line of business?
25 A  Yes.

**Page 20**

1  Q  So would you consider yourself to be a specialist in the
2     Blaze Advisor software?
3  A  We consider ourselves generalists in decision
4     management, and -- yeah.  We consider ourselves
5     generalists in the field of decision management.
6  Q  Okay. I don't know what -- what do you many by that?
7  A  So our -- the primary focus of pre-sales consulting is
8     to match customers' business requirements against the
9     capabilities that FICO can offer, regardless of the
10    underlying software.
11 Q  You are trying to, or your goal as Pre-Sales Consultant
12    is to sell FICO's products and services to customers;
13    correct?
14 A  That is one of our objectives, is it develop business
15    for the company.
16 Q  And so that FICO recognizes revenue from either the
17    licensing of its software or the sale of its services?
18    Is that fair?
19 A  Correct.
20 Q  You mentioned two categories for business development.
21    One you said was opportunities for license.  Is that
22    correct?
23 A  Yes.
24 Q  What do you mean by, "Opportunities for license"?
25 A  So, if the customer or a prospect has an upcoming

**Page 21**

1  project and there is a match of their requirements to
2  the capabilities of our technology, then the opportunity
3  is there for a license to be provided to that prospect
4  or customer.
5  Q  Is that -- is licensing software one of the primary
6     sources of revenue for FICO?
7  MR HINDERAKER:  Objection, lack of foundation.
8  A  Could you repeat the question, please?
9  BY MS JANUS:
10 Q  Sure.
11    As far as you know, based on your experience as
12    a director in Pre-Sales Consulting, is licensing revenue
13    a major source of revenue for FICO?
14 MR HINDERAKER:  Objection, lack of foundation.
15 A  It is one of the -- my understanding is that it's one of
16    the principal components of the company's revenue.
17 BY MS JANUS:
18 Q  What is your experience with licensing in your role as
19    a director, or -- I should -- let me get at it that way.
20    Strike that.
21    What is your role in the licensing process at FICO?
22 A  My -- the licensing process is handled by people outside
23    of my role.  I may make suggestions -- intended usage of
24    the solution.
25 Q  What do you mean by that?

## Page 34

1  A  This was for something called, "Decision Simulator".
2  Q  Are you involved in determining the proper scope of a
3     FICO software license?
4  MR HINDERAKER:  Objection, vague.
5  A  Could you clarify what you mean by, "Proper scope"?
6  BY MS JANUS:
7  Q  Do you have -- do you have an understanding of generally
8     what the scope of a license would mean in your business?
9  A  The scope is often defined by the customer in, for
10    example, their own documentation.  So if it's
11    a proposal, they will say -- give a written indication
12    of the extent to which they would like to use the
13    software.  So, yes, inasmuch as I will often read the
14    customer's documentation that they provide and
15    internally agree what it is we think the customer is
16    trying to do.
17 Q  What are ways that you are familiar with of limiting the
18    scope of a FICO software license?
19 MR HINDERAKER:  Objection, vague, assumes facts not in
20    evidence, foundation.
21 A  Sorry, the question was ... could you repeat the
22    question please?
23 BY MS JANUS:
24 Q  Can you read it back?
25       (RECORD READ)

## Page 35

1  A  So, my line of work, this tends to be often based on the
2     business application that the technology will be used
3     within.
4  Q  So a license may be limited in scope based on the
5     business application?
6  A  It may be.
7  Q  Are there other ways that you're familiar with that FICO
8     might limit the scope of its software license?
9  A  Again, I must make it clear that this is not
10    something -- I'm neither involved in the creation or the
11    modification of any legal agreements, but I am aware of
12    occasions where we have restricted based on number of
13    applications processed.
14 Q  What do you mean by, "Applications processed"?
15 A  Number of -- so, in the example of a bank, how many
16    credit card applications can they make per year through
17    the software.
18 Q  Anything else?  Any other limitations on scope that
19    you're familiar with in your role at FICO?
20 A  Again, I understand that the licenses can be restricted
21    based on geography.
22 Q  Anything else?
23 A  I believe those are the principal restrictions.
24 Q  In terms of the geographical limitations, does FICO in
25    Europe occasionally grant software licenses that are

## Page 36

1     limited to Europe?
2  MR HINDERAKER:  Objection, lack of foundation.
3  A  As I explained, that's something that I'm not personally
4     involved in.
5  BY MS JANUS:
6  Q  But you're familiar with the concept, I take it?
7  A  I'm familiar with the concept, yes.
8  Q  And if FICO in Europe generates an opportunity to
9     license its software to a client in Europe, how is that
10    revenue recognized?
11 MR HINDERAKER:  Objection, lack of foundation.
12 A  I'm not familiar with the precise revenue recognition
13    rules.
14 BY MS JANUS:
15 Q  Okay.
16    Generally though, do you understand that FICO in
17    Europe would actually be credited with that generation
18    of revenue if it originated a license in Europe?
19 MR HINDERAKER:  Same objection.  Lack of foundation.
20 A  I believe so, given the way that the company has been
21    set up.
22 BY MS JANUS:
23 Q  Fair to say that FICO in Europe then prefers to work on
24    licensing opportunities when there is an opportunity to
25    generate revenue through a license in Europe?

## Page 37

1  MR HINDERAKER:  Objection, lack of foundation, misstates
2     prior testimony.
3  A  So, could you repeat the question again?  So ...
4  BY MS JANUS:
5  Q  Does FICO in Europe prefer to work on opportunities that
6     present an opportunity to generate licensing revenue for
7     FICO in Europe?
8  MR HINDERAKER:  Same objections.
9  A  I think it's worth distinguishing between FICO in Europe
10    and the individual people who develop that business, but
11    for the salespeople I would say yes.
12 BY MS JANUS:
13 Q  Okay.
14    Are you a salesperson?
15 A  I'm a Pre-Sales Consultant.
16 Q  Is there an element of your compensation that is tied to
17    sales that you generate?
18 A  My target is regional and collective.
19 Q  So I think that means the answer is, "Yes"?
20 A  The answer is that my target is reached through the
21    contributions of all members of the Pre-Sales Consultant
22    team combined.
23 Q  So, your Pre-Sales Consultant team in Europe has
24    a target number of sales -- amount of sales that it
25    needs to reach per quarter?

**Page 50**

1  A  I did not know.
2  Q  So the next time that you encountered Chubb during your
3  time at FICO was in 2013; correct?
4  A  That is, I believe, the next time, yes.
5  Q  And you said that you recall there was an inbound
6  enquiry from Chubb in Europe.  Is that correct?
7  A  So I said that there was an enquiry that came in to --
8  somehow, I do not recall -- came into the client
9  partner.
10 Q  Okay, and who was that?
11 A  That was Richard Hill.
12 Q  And what do you recall about that?
13 A  I do not recall the details.  I was -- I do not recall
14 the details of the enquiry.
15 Q  Okay.  Did you engage with Chubb at that time?
16 A  Yes.
17 Q  Okay.
18 A  Not immediately, but at some point soon afterwards.
19 Q  When the enquiry came in, did you understand the status
20 of Chubb's license for Blaze Advisor?
21 A  Can you expand on what you mean by, "Status"?
22 Q  Did you understand whether Chubb had a license for Blaze
23 Advisor?
24 A  I did not know whether they were or were not at that
25 precise moment in time.

**Page 51**

1  Q  Okay.
2     Did you find out as you were working with Chubb
3  what -- whether Chubb had a license for Blaze Advisor?
4  A  The customer said -- our contact at Chubb said early on
5  in an email that they had a global license for Blaze
6  Advisor and that they were in contact with the team in
7  the US to managed that.
8  Q  So your contact at Chubb said that?
9  A  Yes.
10 Q  And this was in 2013?
11 A  I believe so, yes.
12 Q  In an email?
13 A  Yes.
14 MR HINDERAKER:  And if you have those emails you could use
15 them rather than go through the memory test.
16 BY MS JANUS:
17 Q  Did you discuss the status of Chubb's license for Blaze
18 Advisor with your colleagues at FICO?
19 A  I had a communication from a colleague internally that
20 echoed what the customer had said.
21 Q  Would it be your practice to do some internal due
22 diligence about what the status of a customer's software
23 license is?
24 MR HINDERAKER:  Same objection as to vagueness of status.
25

**Page 52**

1  BY MS JANUS:
2  Q  Go ahead.
3  A  So, the question -- could you repeat the question
4  please?
5  Q  Would it be your practice to verify the status and the
6  scope of a client's license for FICO software internally
7  through FICO?
8  A  It would not be my responsibility to validate that.
9  Q  But would it be your practice to make sure, as you're
10 working with a client, that either the use you're
11 assisting with is already licensed or that a new license
12 would be contemplated?
13 A  So my practice would be to -- I had the same information
14 from the client and from an internal source.  I had no
15 reason to doubt that information.
16 Q  Okay, and here that information was that there was
17 a global license for Blaze?
18 A  Yes.
19 Q  Who at Chubb were you working with?
20 A  This is Ewen Setti.
21 Q  Okay.
22 A  Initially.
23 Q  What did that -- what did your work with Chubb entail?
24 MR HINDERAKER:  Objection, vague as to time.
25

**Page 53**

1  BY MS JANUS:
2  Q  In the 2013 time period.
3  A  My work with Chubb in that time period was to handle the
4  enquiry.  As I said earlier, it was -- the intention was
5  to understand what the customer was trying to achieve,
6  so I gave a presentation to Ewen on the current
7  capabilities of the software, because customers often
8  don't, themselves, keep up with what's available in the
9  latest version, so I saw that as a -- something I was
10 willing to do just to make sure the client was aware of
11 the current capabilities of the system.
12 Q  What was Chubb proposing to use Blaze Advisor for during
13 this time period?
14 MR HINDERAKER:  Objection, assumes facts not in evidence.
15 A  So, Ewen was mentioning that they were in the course of
16 a project to use the system for an auto-renewals use
17 case.
18 BY MS JANUS:
19 Q  What did you understand that to mean?
20 A  I am not an insurance specialist, but my understanding
21 was that the system would be used to decide which
22 policies could be renewed without any further
23 underwriting and which policies would require
24 underwriting at the time of renewal.
25 Q  Was it your understanding at that time that Chubb in

**Page 54**

1 Europe was already using Blaze in certain ways?
2 A That was my perception.
3 Q And was that based on conversations with Mr Setti?
4 A Yes.
5 Q Did you also learn that from conversations with your
6   colleagues at FICO?
7 MR HINDERAKER: Objection, vague. What is, "That"?
8 A Yes. Can you be more specific?
9 BY MS JANUS:
10 Q Did you also -- did you also learn that Chubb was using
11   Blaze in Europe from your colleagues at FICO?
12 A I did not receive that information.
13 Q It was your understanding, I take it, that the use
14   Mr Setti was asking you about for Chubb in Europe's
15   application was within the scope of Chubb's license for
16   Blaze Advisor? Is that correct?
17 A I was not acting to interpret the license, but I was,
18   based on the information Ewen was giving me, working on
19   the assumption that this usage was legitimate.
20 Q What information was that?
21 A So the -- Ewen mentioned that they were planning to use
22   the software for a new project, or were in the course of
23   doing so, and there was an implication that they were
24   already using it for other areas.
25 Q And so based on the information that he was going to use

**Page 55**

1   the software on a new project you assumed that it was
2   allowed under the license?
3 A The contact said quite clearly it was a global license
4   and that he was in contact with his colleagues in the US
5   who maintained that.
6 Q You said, "The contact said"? You mean Ewen said?
7 A Ewen wrote --
8 Q "Ewen wrote"? Okay. Okay.
9 A -- that.
10 Q Okay, but also based on the information you received
11   from your colleagues at FICO did you understand that
12   Chubb's contemplated use of Blaze Advisor was within the
13   scope of the license?
14 A That is correct. Yes.
15 Q Okay, so it wasn't an assumption that you had simply
16   based upon comments made by Ewen Setti; correct?
17 A Correct.
18 Q So I'll ask the question again.
19    Was it your understanding at the time you were
20   working with Chubb in Europe that Chubb's contemplated
21   use of Blaze Advisor in Europe was within the scope of
22   Chubb's license to use Blaze Advisor?
23 MR HINDERAKER: Objection to the extent it asks for a legal
24   conclusion. Objection to the extent it misstates his
25   prior testimony.

**Page 56**

1 BY MS JANUS:
2 Q Go ahead.
3 A Sorry, can you repeat the question for me?
4 Q Do you not recall the question?
5 A It was a long question. I want to make sure that I
6   answer it correctly.
7 Q Was it your understanding at the time you were working
8   with Chubb in Europe in 2013 that the contemplated use
9   of Blaze Advisor by Chubb in Europe was within the scope
10   of Chubb's license to use Blaze Advisor?
11 MR HINDERAKER: Same objections.
12 A The usage of a system was implied by Ewen that it was
13   already in place in Europe, and I made no interpretation
14   of the license, but I was taking what the client had
15   said in good faith and I saw no reason to question their
16   interpretation of the agreement.
17 BY MS JANUS:
18 Q But you just testified that your understanding of the
19   scope of the license was based upon your colleagues at
20   FICO's statements relating to the scope of the license
21   as well; correct?
22 A I made no interpretation of the scope of the license,
23   but I was told by the customer that this was global, and
24   the implication was that this usage was entitled.
25 Q The implication? What do you mean by, "The implication

**Page 57**

1   was"?
2 A So the customer contact mentioned that they implied that
3   they already had usage in Europe and the fact that they
4   were embarking on subsequent projects gave me no reason
5   to doubt their interpretation of their license.
6 Q Okay, so your testimony is that your understanding of
7   the fact that the usage was within the scope of Chubb's
8   license for Blaze Advisor came entirely from Ewen Setti?
9 A I was also advised internally that the scope, or the
10   entitlement, was a global entitlement.
11 Q Okay, but you left that out when you say why you thought
12   the use contemplated by Chubb was within the scope of
13   the license. Why is that?
14 MR HINDERAKER: Objection, argumentative, and it also wasn't
15   left out. It was in his prior testimony.
16 MS JANUS: Please don't coach the witness.
17 MR HINDERAKER: I'm not. Please don't argue.
18 BY MS JANUS:
19 Q I'm not.
20 A I did mention the fact I had been -- I had heard similar
21   from an internal source, and I also mentioned that given
22   the fact I had heard it, the same thing, from two
23   places, I had no reason to doubt the legitimacy of the
24   usage.
25 Q FICO was aware, clearly, that Chubb was using the Blaze