# EXHIBIT 38

# FILED UNDER SEAL

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 401-34 Filed 07/26/19 Page 2 of 5

```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2      -------------------------------------------------------
        FAIR ISAAC CORPORATION,
 3
                              Plaintiff,
 4

 5         v.             Court File No. 16-cv-1054(WMW/DTS)

 6


 7      FEDERAL INSURANCE COMPANY,
        an Indiana corporation, and ACE
 8      AMERICAN INSURANCE COMPANY,
        a Pennsylvania corporation,
 9
                              Defendants.
10      -------------------------------------------------------

11


12


13                       VIDEO DEPOSITION OF

14                         THOMAS CARRETTA

15                         MARCH 22, 2019

16                            9:31 A.M.

17


18


19                           CONFIDENTIAL

20                       ATTORNEYS' EYES ONLY

21


22


23


24


25
```

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 401-34   Filed 07/26/19   Page 3 of 5

```
 1                    VIDEO DEPOSITION of THOMAS CARRETTA,
 2        taken pursuant to Notice and agreement of and
 3        between counsel at the offices of Fredrikson &
 4        Byron, P.A., 200 South Sixth Street, Suite 4000,
 5        Minneapolis, Minnesota, at approximately 9:31
 6        a.m. on March 22, 2019, before Jodi M.
 7        Weisenburger, Notary Public, County of Hennepin,
 8        State of Minnesota, to be used in the
 9        above-entitled cause.
10
11                       A P P E A R A N C E S:
12
13        On behalf of Plaintiff(s):
14            Heather J. Kliebenstein, Esquire
              MERCHANT & GOULD, P.C.
15            3200 IDS Center
              80 South Eighth Street
16            Minneapolis, Minnesota 55402
              612-371-5213
17            Hkliebenstein@merchantgould.com
18
19        On behalf of Defendant(s):
20            Leah Janus, Esquire
              FREDRIKSON & BYRON, P.A.
21            200 South Sixth Street, Suite 4000
              Minneapolis, Minnesota 55402
22            612-492-7000
              Ljanus@fredlaw.com
23
24        ALSO PRESENT: Jim Woodward.
          VIDEOGRAPHER: Kurt Glenn
25
```

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 401-34   Filed 07/26/19   Page 4 of 5

**Page 44**

1 our clients all have the same kind of clauses in
2 our agreement.  It's a typical thing in
3 everybody's contracts because it defines the
4 boundaries of what's going to be done.
5     People have conversations all the time
6 about how can we potentially solve this and how do
7 we solve this, but you can't solve it until you
8 actually agree to go solve the problem.
9 Q.  So in terms of knowledge, we were talking about
10 what FICO's knowledge is of these uses that FICO
11 alleges were outside of the license, and let me
12 ask the question.  Do you understand now today
13 that Mike Sawyer was aware of use in the United
14 Kingdom during the term of the license?
15     MS. KLIEBENSTEIN:  Objection, calls for
16 speculation.
17     THE WITNESS:  FICO's knowledge of use is
18 what's in our contracts, and we reference back to
19 those contracts because it doesn't -- what happens
20 is it doesn't permeate the entity, the FICO
21 entity, until we have contracts because that
22 triggers all kinds of things.  So, for instance,
23 there might be software license and then that
24 implicates having maintenance terms, so the
25 maintenance organization is advised of it, the

**Page 45**

1 accounting people are advised of it, and so that
2 knowledge then becomes spread.  And people like
3 Mike Sawyer or Russ Schreiber know they can't sign
4 contracts.  It has to follow the contract process
5 so that we can become fully aware that there are
6 things going on.
7     So do I know on behalf of FICO that Mike
8 Sawyer knew something about the United Kingdom?
9 No.
10 BY MS. JANUS:
11 Q.  So as you -- your testimony is that Mike Sawyer
12 did not know about Chubb's use in the United
13 Kingdom?
14 A.  I don't know what Mike Sawyer knows.
15 Q.  Is it relevant to you in determining what FICO
16 knows about use?
17 A.  Again, our process --
18 Q.  Answer the question I asked.  I'm entitled to an
19 answer to the question I asked.
20 A.  Yeah, and I'm answering the question.
21     MS. KLIEBENSTEIN:  Could you repeat that
22 question for me?
23 BY MS. JANUS:
24 Q.  I'm simply -- I'm trying to understand what FICO's
25 knowledge of use was.  That's what the topic is.

**Page 46**

1 I can't seem to get an answer to it because
2 there's just circular references to agreements.
3     My question then was -- because I can't
4 get an answer to that, I said, did Mike Sawyer
5 know, and --
6     MS. KLIEBENSTEIN:  And I just wanted the last
7 question reread, that's all, so he could answer
8 it.
9     MS. JANUS:  Okay.
10     (The question was read back by the court
11         reporter.)
12     THE WITNESS:  What's "it"?
13 BY MS. JANUS:
14 Q.  Mike Sawyer's knowledge.
15 A.  Mike Sawyer's knowledge is dependent on the
16 circumstances; in other words, if he's out
17 promoting something, we wouldn't know that
18 necessarily unless he entered into the sales force
19 that, okay, I'm thinking of an opportunity here.
20     What's relevant is Mike knows that he
21 can't authorize the distribution of software
22 without a contract.
23 Q.  Can you answer the question I asked?
24 A.  Can I hear the question again?
25     (The question was read back by the court

**Page 47**

1         reporter.)
2     THE WITNESS:  And my answer was we look to
3 the records.  Mike doesn't have authority, none of
4 the salespeople have authority to say go run off
5 and do something different, and that's because
6 we're honoring not only our policies but because
7 the contract says you need to -- Chubb needs to
8 sign off before they want to be responsible for
9 anything.
10     So if Mike has sales puffery or something
11 like that saying, hey, I think we might be able to
12 solve the problem this way or the other, that's
13 not hugely relevant, no.
14 BY MS. JANUS:
15 Q.  Is Mike Sawyer's knowledge of the use of Blaze by
16 Chubb in Europe relevant to you in determining
17 FICO's knowledge of the use of Blaze by Chubb in
18 Europe?
19 A.  No, it's not binding on us.
20 Q.  What if Mike Sawyer consulted with you about the
21 use of Blaze in Europe?
22 A.  If Mike had knowledge of some facts or said X
23 company in Europe wants to use the software, Mike
24 would follow the process of asking -- you know,
25 first following through the sales process to enter

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 401-34 Filed 07/26/19 Page 5 of 5

**Page 104**

1  Mr. Schreiber is not one of those who has the
2  authority to bind the company. That's limited to
3  a very small group of people.
4        And this process would have flowed
5  through to surface, and obviously it never
6  surfaced because I don't believe there's any
7  contracts signed for any of this stuff in the
8  existing agreements that we have.
9  BY MS. JANUS:
10 Q. When you say that this isn't a very clear
11   exchange, with respect to whether the enterprise
12   license allows the use of Blaze in Europe, would
13   you say it's a clear exchange?
14 A. No.
15 Q. What is unclear about it?
16 A. Mr. Schreiber says, "You can pull up the contracts
17   in pramata for precise answers." He says it was
18   done years ago, so he obviously hasn't looked at
19   anything, so that tells me he hasn't looked at
20   anything, he's just guessing.
21 Q. Anything else unclear about the exchange?
22 A. Yeah, I'm not even sure what he's talking about
23   for regional or -- regional or -- he says, "I'd
24   sell them regional." I don't know what that
25   means.

**Page 105**

1 Q. And Decision Simulator, that's like an add-on
2   software to Blaze; is that correct?
3 A. Honestly I don't know the answer to that. It's a
4   product. That's as much as I know.
5 Q. But it's a separate product from Blaze?
6 A. Yes.
7 Q. And do you know whether Decision Simulator can
8   only be used in connection with Blaze?
9 A. I don't know.
10 Q. Showing you what's been attached -- what's been
11   previously marked as Exhibit 60, this is -- let me
12   know when you've had a chance to take a look at
13   it.
14 A. Okay.
15 Q. Have you seen this document before?
16 A. No.
17 Q. This is an exchange between -- well, let's look at
18   the second e-mail on Exhibit 60 which is an e-mail
19   from Andy Moffat to Hamish at Chubb, correct?
20 A. Yes.
21 Q. And it's dated April 1, 2015, correct?
22 A. Yes.
23 Q. And the e-mail we were looking at that's marked as
24   Exhibit 57 was dated March 26, 2015, correct?
25 A. Yes.

**Page 106**

1 Q. So this is just a few days after that?
2 A. Like five days later.
3 Q. And in this e-mail -- and -- apologies, Andy
4   Moffat is a senior account executive at FICO
5   located in London, correct?
6 A. That's what his address says, yes.
7 Q. And in this e-mail, Mr. Moffat writes to Hamish at
8   Chubb and says, "Please see the attached proposal
9   for the licensing costs and associated training
10   for Decision Simulator. The prices are heavily
11   discounted in line with the existing Blaze
12   contract. No additional Blaze license(s) are
13   needed as it is covered within the overall global
14   Blaze ELA." Do you see that?
15 A. I do.
16 Q. So based on this e-mail, would you conclude that
17   FICO believed that use of Blaze in Chubb Europe
18   was allowed under the license?
19 A. No, I wouldn't conclude that.
20 Q. And why is that?
21 A. This is a sales guy, and there's just a layer of
22   people relying what other people think all the way
23   down the line, so I don't know if he's even looked
24   at the contract and he's not in a position to
25   judge anyway.

**Page 107**

1 Q. If you look at the attachment to the e-mail, there
2   is a formal proposal attached, right?
3 A. Yes, it says, "This document is FICO's proposal."
4 Q. And he certainly would have needed approval from
5   higher-ups to make a proposal like this, correct?
6 A. No. The system is automated where they're given
7   pricing, they have a pricing engine and then they
8   can discount based upon a certain amount of
9   parameters, so I can't tell any of that here, but
10   he could have definitely made a proposal on his
11   own.
12 Q. And the proposal assumes that the Blaze Advisor
13   enterprise license applies to Chubb Europe,
14   correct?
15 A. The asterisk says, "Assuming that Chubb have
16   already had Blaze Fundamentals and RMA training."
17   I don't see anything about underlying license.
18 Q. Well, if you look at subpart B, Project
19   Requirements --
20 A. Yes.
21 Q. -- it says, "Decision Simulator to be included in
22   existing Blaze ELA contract."
23 A. Uh-huh.
24 Q. Do you see that?
25 A. Uh-huh.