# EXHIBIT 4

## FILED UNDER SEAL

Page 1

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF MINNESOTA

3

4        CASE NUMBER:  16-cv-1054 (WMW/DTS)

5        ----------------------------------------------------

6        Fair Isaac Corporation, a Delaware corporation,

7           Plaintiff,

8        versus

9        Federal Insurance Company, and Indiana

         corporation, and ACE American Insurance Company, a

10       Pennsylvania corporation,

11          Defendants.

         ----------------------------------------------------

12

13

14            VIDEOTAPED DEPOSITION OF EXPERT WITNESS

15

16                         STEVEN KURSH

17

18

19

20

21

22

23

24

25       TAKEN:  25 June 2019          BY:  Jackie McKone

Page 2

```
 1  APPEARANCES:
 2
 3  MERCHANT GOULD
    80 South Eighth Street, Suite 3200
 4  Minneapolis, Minnesota  55402
    PHONE:   (612) 332-5300
 5  FAX:     (612) 332-9081
    E-MAIL:  hkliebenstein@merchantgould.com
 6
    BY:  Heather Kliebenstein
 7  For the Plaintiff
 8
 9  FREDRIKSON BYRON
    200 South Sixth Street, Suite 4000
10  Minneapolis, Minnesota  55402
    PHONE:   (612) 492-7000
11  FAX:     (612) 492-7077
    E-MAIL:  tfleming@fredlaw.com
12
    BY:  Terrence Fleming
13  For the Defendants
14
15
16  Also present:
17  James Woodward, FICO
18
19
20
21
22  Videographer: Kyle Peterson, Paradigm
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3  Examination by Ms. Kliebenstein, Page 6
 4
 5            E X H I B I T S
 6
 7  Exhibit 513   Kursh expert report, Page 7
 8  Exhibit 514   Ruling/Kursh testimony, Page 49
 9  Exhibit 515   Ruling/Kursh testimony, Page 49
10  Exhibit 516   Sizing matrix, Page 96
11
12       PREVIOUSLY MARKED EXHIBITS
13
14  Exhibit 314   Software agreement, Page 119
15           FICO 0002276-2296
16  Exhibit 421   Global price list, Page 80
17           FICO 0057386-7412
18
19
20
21
22
23
24
25
```

Page 4

```
 1            P R O C E E D I N G S
 2      The following is the videotaped deposition
 3  of expert witness Steven Kursh taken at Merchant
 4  Gould, 80 South Eighth Street in Minneapolis,
 5  Minnesota commencing at 9:36 a.m. on 25 June 2019
 6  pursuant to notice.
 7            * * *
 8      THE VIDEOGRAPHER:  Good morning we are
 9  going on the record.  The time is 9:36 a.m.      0
10  Today's date is June 25th, 2019.
11      Please note that the microphones are
12  sensitive.  They pick up whispering private
13  conversations, cellular interference.  Please turn
14  off all cellphones or place them away from the
15  microphones as they can interfere with the
16  deposition's audio.  Audio and video recording
17  will continue to take place unless all parties
18  agree to go off the record.
19      This is Media Unit 1 of the video recorded
20  deposition of Steven Kursh taken by counsel for
21  the plaintiff in the matter of Fair Isaac
22  Corporation versus Federal Insurance Company et
23  al. filed in the United States District Court,
24  District of Minnesota.  This deposition is being
25  held at Merchant and Gould PC located at 80 South
```

Page 5

```
 1  Eighth Street, Suite 3200, Minneapolis, Minnesota
 2  55402.
 3      My name is Kyle Peterson from the firm
 4  Veritext Legal Solutions.  I'm the videographer.
 5  The court reporter is Jackie McKone from the firm
 6  Veritext Legal Solutions.  I am not authorized to
 7  administer an ago oath.  I'm not related to any
 8  party in this action or am I financially
 9  interested in the outcome.
10      Counsel would you please identify
11  yourselves and the parties you represent.
12      MS. KLIEBENSTEIN:  Heather Kliebenstein for
13  Merchant Gould on -- on behalf of the plaintiff.
14      MR. FLEMING:  Terry Fleming of the
15  Fredrikson firm representing defendants.
16      MS. KLIEBENSTEIN:  Terry, did you -- are we
17  good on the screen?  Did you just look through the
18  video?
19      MR. FLEMING:  I did.
20      MS. KLIEBENSTEIN:  Okay.
21      MR. FLEMING:  Yeah.
22      THE VIDEOGRAPHER:  Would the reporter
23  please swear in the witness, and then we can
24  proceed.
25            * * *
```

Page 178

1 have got the nine factor application sizing grid,
2 which supposedly guides the pricing, and yet in
3 actuality, at least in regard to this matter, Mr.
4 Waid and his team, and I do not mean this in a
5 derogatory way, priced on other factors as well
6 but looking just as transactions, and CSI Express
7 as an example, yes, that's what I did, but
8 nonetheless you can compare the number of
9 transactions to the grid and use CSI Express as
10 well.
11 Q. You say priced based on transactions. Can you
12 identify for me in Exhibit 16 which column of
13 transactions you were referring to?
14 A. I looked at both the average number per month and
15 the average number per day.
16 Q. Now, taking CSI Express specifically, do you know
17 whether or not the average number per month of
18 realtime transactions for CSI Express in Exhibit
19 16 is that number the same for the average
20 realtime transactions per month for the CSI policy
21 renewal application back in 2006?
22 A. You'll need to show me on this chart. Again, I'm
23 looking at CSI Express. I don't see CSI policy
24 renewal on the chart.
25 Q. Well, look back at Exhibit 13. In the middle

Page 179

1 second paragraph, it says, "I have qualified the
2 license as .net or dot," -- "or Java, and that it
3 pertains only to CSI policy renewal application,
4 and that it qualifies as a small application at
5 $200,000."
6 A. Okay, but I don't see it in the chart here in
7 Exhibit 16, the interrogatory response.
8 Q. So how can exhibit -- how can -- how can --
9 A. The only place you see CSI -- sorry.
10 MR. FLEMING: Wait for the question.
11 BY MS. KLIEBENSTEIN:
12 Q. How can Exhibit 13 then provide a basis on which
13 to price the CSI Express application in 2019?
14 A. The way to price -- Mr. Bakewell goes through his
15 analysis with respect to pricing. I didn't do
16 damages. So I think your question is more
17 appropriately put forth to him.
18 Q. In Exhibit 17, you identified CSI Express as a
19 small application; correct?
20 A. Correct. Exhibit -- right. Exhibit 17. Yes.
21 Q. What supports that opinion? What evidence?
22 A. It's my understanding, again, from Exhibit 13, and
23 that there is no other CSI that is -- and
24 there is no example of CSI otherwise in Exhibit 16
25 among the applications I assumed those to be with

Page 180

1 respect to pricing the same.
2 Q. So you're assuming CSI policy renewal and CSI
3 Express are the same applications?
4 A. With respect to pricing, and again, even if we
5 were to make CSI Express using the same chart of
6 the number of transactions and the nine factor
7 application grid, you'll find that the answers --
8 again, it would -- if it's -- if I made a mistake,
9 again, I stand corrected. I saw no evidence in
10 the documents that those were different, but if it
11 is, that's fine. We could then use CSI Express
12 using the average number of transactions, using
13 the nine factor grid and it comes out as medium,
14 and the net effect on the pricing after you
15 consider enterprise licensing -- remember, this is
16 an enterprise license, not an application license,
17 and I discuss that in my report, as well as the
18 discounts, and Mr. Zoltowski ignored those in his
19 work, ignored the enterprise license, ignored the
20 discounts, as well as made other issues. As I
21 discuss in my report.
22 Q. Do you know whether or not --
23 A. Made other assumptions based on the data he was
24 given by Mr. Waid, Mr. Zoltowski did not do any
25 indication -- any independent verification of that

Page 181

1 data.
2 Q. Doctor Kursh, my questions aren't about other
3 people, other opinions. My questions are about
4 your opinions, and my next question this. Let's
5 look at Paragraph 109.
6 Do you have any information as to the
7 average number per month realtime transactions
8 that went through this CSI application referenced
9 in Paragraph 109 in 2006?
10 A. And your question is what again please?
11 Q. For the CSI application from June 2006 that's
12 referenced in Paragraph 109, do you have any data
13 on the transactions that went through that
14 application at that time in 2006?
15 A. What I have is among the evidence, there may be
16 other evidence, that -- if you take a look at
17 Bates Number FICO 0002286, it states in the second
18 sentence, "The application currently known as CSI
19 Express," open paren, "which is Chubb's specialty
20 insurance underwriting an automated policy renewal
21 application and its supporting system
22 applications, excluding claims, point of sale data
23 capture, billing and marketing applications," and
24 I see a license fee charged of 173750. That's
25 what I used in my work.

46 (Pages 178 - 181)

Page 182

1       Now, if you take a look at the Blaze
2   capability in Exhibit 16, under CSI Express, it
3   says predictive modeling, it says underwriting
4   guidance, and that ties into what is defined as
5   the named application called then CSI Express.
6   The 173750.
7 Q.  That wasn't my question.
8 A.  I'm sorry.
9 Q.  My question was:  Do you have any data on the
10  number of realtime transactions that went through
11  CSI in 2006?
12 A.  I don't recall seeing any evidence in that regard
13  as I sit here.
14 Q.  And looking at the sizing chart, a small
15  application would have about 2000 peak rule
16  transactions per day; is that right?
17 A.  That's correct.
18 Q.  And does it appear today that CSI Express has 2000
19  peak rule transactions per day?
20 A.  Well, if you take the -- I would need to look at
21  the discovery response, Number 89, and so I can't
22  answer that as I sit here.
23 Q.  Isn't Exhibit 16 the discovery response to RFP 89?
24 A.  Yes.  Again, I would have to look at this, and I
25  would need -- I'll go back and look.

Page 183

1 Q.  So in preparing your opinions, you did not base
2   your opinions on the sizing data from 2019;
3   correct?
4 A.  Actually, in preparing my opinions, I was looking
5   at Mr. Zoltowski's report, and Mr. Zoltowski used
6   information provided to him by Mr. Waid.  As to
7   where Mr. Waid got that information from, again,
8   there was no discussion of that in Mr. Waid's
9   deposition as to his specific methodology that
10  could be replicable, but Mr. Zoltowski used and
11  took Mr. Waid's information whole cloth.  He did
12  not do his own analyses, and I was rebutting Mr.
13  Zoltowski.
14 Q.  But you're not providing an affirmative opinion on
15  the pricing of -- you're not providing an
16  affirmative opinion on the sizing of Federal
17  applications; isn't that right?
18 A.  My opinion, which is in my report, is that it was
19  commercially unreasonable for FICO through its
20  expert damages expert to make assumptions that are
21  inconsistent with FICO's practices regarding its
22  pricing.  Even assuming that I made a mistake, and
23  again, I'm human, I make mistakes, that doesn't
24  change my opinion that was commercially
25  unreasonable for Mr. Zoltowski on behalf of his

Page 184

1   client, FICO, to exclude in his damages
2   calculations standard price discounts, tying
3   together licensing attributes with the merger,
4   their own sizing methodology, enterprise versus
5   applications.  He didn't consider enterprise, and
6   yet Mr. Waid in his own testimony says that.  He
7   ignores, again, the fact that what the license
8   provides is a enterprise-wide license on a global
9   basis, and he incorrectly assumes applications.
10      It's all in my report.  It's commercially
11  unreasonable for Mr. Zoltowski based solely on Mr.
12  Waid's work to come forward and do that damages
13  work.  As to the specifics of pricing, again,
14  that's Mr. Bakewell's province.  I'm not a damages
15  -- I'm not providing a damages analysis in this
16  litigation.
17 Q.  I'm trying to drill down on whether you're
18  providing affirmative opinions on the sizing
19  Federal applications.  Are you or aren't you?
20 A.  I'm providing an affirmative opinion with the
21  sizing of the applications which ties into the
22  number of transactions is inconsistent by FICO
23  throughout this litigation.  It is commercially
24  unreasonable for FICO not to provide its specific
25  methodology that can be replicable on sizing which

Page 185

1   then ties into pricing that's commercially -- and
2   along with other factors that I discuss in that
3   section of my report.
4 Q.  Well, isn't your sizing of CSI Express as small in
5   2019 inconsistent with the number of transactions
6   that are reflected in Exhibit 16?
7 A.  I have two comments.  Yes, it appears it to be,
8   and second, it doesn't matter.  Even if I made the
9   mistake there, it doesn't matter to my overall
10  opinion.
11      There are a host of other factors which
12  support my opinion that it was commercially
13  unreasonable for Mr. Zoltowski on behalf of FICO
14  to make those assumptions in his damages work
15  because that's not how software -- again, customs
16  and practices in the industry.
17      If you don't price on applications, you
18  price on enterprise.  You give discounts just like
19  FICO does.  It's not just customs and practice in
20  the industry.  It's also FICO's own historic
21  practices.  That's what I'm providing an opinion
22  on.
23 Q.  Exhibit 22 on Page 44 --
24 A.  One more question, and then I'd like a break.
25  Okay.  I'm there.

47 (Pages 182 - 185)

Page 186

1 Q. Your sizing of the Federal international
2    applications is also predicated on your sizing of
3    CSI Express from 2019 as a small application; is
4    that correct?
5 A. Exhibit 22 is more than that because Mr. Zoltowski
6    used software applications on an international
7    basis that do not use Blaze. That's commercially
8    -- and so that's part of what Exhibit 22 does, and
9    yes, I size them using CSI Express, and again,
10   even if we size them correctly, it doesn't matter.
11   My opinion remains the same. If I made a mistake,
12   the opinion is still the same, i.e., what I
13   discuss in Section C in regard to Mr. Zoltowski's
14   work on behalf of FICO.
15      MS. KLIEBENSTEIN: Okay. We can take a
16   break.
17      THE WITNESS: Thank you.
18      THE VIDEOGRAPHER: We are going off the
19   record, and the time now is 4:23 p.m.          0
20      (Whereupon a short break was taken from
21   4:23 p.m. to 4:30 p.m.)                         0
22      THE VIDEOGRAPHER: We are back on the
23   record. This marks the beginning of Media 6 in
24   the deposition of Steven Kursh. The time now is
25   4:30 p.m.                                       0

Page 187

1    BY MS. KLIEBENSTEIN:
2 Q. Is it your opinion that after this lawsuit was
3    filed Federal would have negotiated with FICO to
4    purchase an enterprise license for Blaze Advisor
5    instead of purchasing licenses on an application
6    by application basis?
7 A. I've seen e-mail discussions -- this goes to Ms.
8    Tamara's -- Pawloski, in her deposition, some of
9    the back and forth. I can't speak on behalf of
10   what the thinking was from either FICO personnel,
11   or Federal.
12      However given that an enterprise license
13   existed from December 2006, one would expect that
14   they would have -- they being both sides would
15   have done an enterprise license.
16      Additionally as I noted earlier, Mr. Waid's
17   testimony in regard to applications versus
18   enterprise license also is there. If I may
19   rephrase, it would be enterprise licenses.
20 Q. In Paragraph 126, the report states, "Most
21   enterprises would typically purchase enterprise
22   level licenses in this situation." Is that your
23   opinion?
24 A. Yes.
25 Q. And what do you mean by in this situation?

Page 188

1 A. The situation where, let's say for example, an
2    audit is done, a true-up, and it is discovered
3    that the licensee has made some mistakes in
4    reporting among usage, that the parties would come
5    together and negotiate additional licensing fees.
6       Additionally another example would be here.
7    When the parties get together, given that there's
8    an enterprise license, then they would continue to
9    have an enterprise license. It would be unusual,
10   although it may happen, that the grant of the
11   license -- as the licensee, you would want the
12   grant of rights by the licensor to enable you to
13   continue doing business the same way you're doing
14   business, and as a licensor, the licensor can
15   decide what it wants to do, but relative to
16   customs and practices in the industry, you want
17   the parties to come together and negotiate, and it
18   would typically be in enterprise lawsuits.
19 Q. Is it your opinion that the parties would do that
20   today. Or is your opinion based in 2016?
21 A. I don't understand your question.
22 Q. Well, I'm just trying to understand. We've had
23   three years, three-plus years of litigation. Is
24   it your opinion that today FICO should do an audit
25   and give Federal an enterprise-wide license?

Page 189

1 A. You've got a bunch of different issues in there.
2    If you could ask me different specific questions,
3    I'll do my best to answer.
4 Q. In providing your opinion that most enterprises in
5    this situation would typically purchase enterprise
6    level licenses, are you presuming 10.8 is breached
7    or not?
8 A. I'm assuming -- again, Paragraph 126 is in my
9    rebuttal to Mr. Zoltowski's report. Mr. Zoltowski
10   didn't consider enterprise licenses.
11      When the party -- if -- Mr. Zoltowski in
12   doing his damages work, in my view, consistent
13   with customs and practices in the industry,
14   licensees and licensors have enterprise licenses
15   will continue to do so. Mr. Zoltowski provided,
16   nor did any of your other experts, provide any
17   reasoning nor evidence from filings by the parties
18   that would indicate it would be anything other
19   than an enterprise license.
20      Now, that's the damages work, but you asked
21   me a different question before about what the
22   parties could or should have done, and if you ask
23   that question again, I will do my best to answer
24   it, but that's different than what Mr. Zoltowski
25   assumed, which is what I'm addressing in Paragraph

48 (Pages 186 - 189)