Message

| | |
|---|---|
| **From:** | Boone, Jandeen M [/O=FAIRISAAC/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=JANDEENBOONE] |
| **Sent:** | 6/27/2006 9:54:54 PM |
| **To:** | 'jwblack@chubb.com' [jwblack@chubb.com] |
| **CC:** | Wachs, Lawrence C (Larry) [larrywachs@fairisaac.com]; Haines, John K [JohnHaines@fairisaac.com] |
| **Subject:** | Revised License Agreement |
| **Attachments:** | SLSA redline 06 27 06.doc |

Jim,

Attached is a redlined, revised license agreement incorporating the changes you requested to the extent Fair Isaac is able to agree to them. I still need to update the business terms of the deal (Exhibit A), but I wanted to get this version of the agreement to you so you can start reviewing it. Please contact me to discuss the redlines after you've had an opportunity to review them. Thank you.

Jandeen M. Boone

Legal Counsel

Fair Isaac Corporation

901 Marquette Ave.

Minneapolis, MN 55402

612.758.5425





Confidential

FICO0000131

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | | Page 1 of 17 |
|---|---|---|
| FI Contract Number: | | FI LR# |

### SOFTWARE LICENSE AND MAINTENANCE AGREEMENT
### Blaze Advisor

This Software License and Maintenance Agreement ("**Agreement**") is entered into as of _____, 2006 ("**Effective Date**") between Fair Isaac Corporation ("**Fair Isaac**") and Chubb & Son, a division of Federal Insurance Company ("**Client**") and describes the terms and conditions under which Fair Isaac shall provide to Client the Blaze Advisor products and related maintenance services described below.

**1.    Definitions**

The following terms, as used in this Agreement with initial capital letters, in the singular or the plural, will have the meanings set forth below.  Other terms may be defined in context within this Agreement:

"**CPU**" means a single core central processing unit.  For multi-core central processing units, each core will count as one "CPU".

"**Documentation**" means the *Blaze Advisor User Guide* provided in either HTML or PDF format.

"**Fair Isaac Products**" means the Blaze Advisor products listed in Section 1 of Exhibit A.  The Blaze Advisor Development product allows a developer to utilize design and testing tools and to run a non-production deployment environment for testing use only.   The Blaze Advisor Deployment product consists of the Blaze Advisor Rule Server and Engine and allows the software to be run on a system handling production-level processing.

"**Seat**" means an identified individual user on a single personal computer or workstation.

"**Territory**" with respect to the installation and physical location of the Fair Isaac Products means the United States of America.

**2.    License Grant**

2.1    License Grant to Fair Isaac Products.  Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a perpetual (subject to the provisions of Article 9), non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes, but only within the Territory, and subject to the additional limitations set forth below and/or listed in Exhibit A.

(a)    Seat/CPU License.  If the "Scope/Quantity" of the license for any Fair Isaac Product is designated in Exhibit A as limited to a specified number of "Seats" or "CPUs", then Client's use of such Fair Isaac Product shall not exceed the number of Seats or CPUs, as applicable, that are set forth in Exhibit A for such Fair Isaac Product.

(b)    Named Application License.  If the "Scope/Quantity" of the license for any Fair Isaac Product is designated in Exhibit A as "Named Application", then, subject to any "Seat" or "CPU" limitation that may also apply, Client may use such Fair Isaac Product only in connection with the particular Named Application of Client that is defined in Exhibit A.  Under no circumstances may Client use such Fair Isaac Products on a stand-alone basis or in connection with any other application.

(c)    Enterprise-Wide License.  If the "Scope/Quantity" of the license for any Fair Isaac Product is designated in Exhibit A as "Enterprise-Wide", then Client may use such Fair Isaac Product on an unlimited number of Seats or CPUs, as applicable; provided, however, that such use is for Client's use

*Fair Isaac Confidential*

Confidential

FICO0000132  0001

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 2 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

~~only and not for use by any of Client's affiliated, subsidiary, or parent companies.~~ *[Delete if not applicable.]*

2.2     License to Documentation.  Subject to the terms, conditions, and limitations of this Agreement, Fair Isaac grants to Client a perpetual (subject to the provisions of Article 9) non-exclusive, non-transferable, limited license to use the Documentation during the Term for its internal business purposes, ~~but only within the Territory,~~ and only in accordance with Client's license grant of the applicable Fair Isaac Product.  Client shall not have the right to modify the Documentation, combine the Documentation with other works, or create derivative works from the Documentation without Fair Isaac's written permission.  In the event that Fair Isaac does give permission, such modifications, combinations, or derivatives which include the Documentation shall become Fair Isaac's intellectual property and be used only in support of Client's permitted use of the Fair Isaac Product.

2.3     Platforms/Options. Client obtains the right to use only the version of the Fair Isaac Product for the specific supported platform(s) that are noted in Exhibit A (i.e., Java, COBOL or .NET). If no platform is noted in Exhibit A, Client has the right to use the Fair Isaac Product only for the supported platform(s) that is(are) initially delivered to Client.  If Client desires versions of the Fair Isaac Product for additional supported platforms, an additional fee applies. Unless specifically noted as being purchased in the Exhibit A, Client does not obtain any right to options or additional related products (e.g., Compiled Sequential, SmartForms) by virtue of its purchase of a license to the Fair Isaac Product.

**3.     Rights and Restrictions**

3.1     License Restrictions.  Client represents and warrants that it and its employees shall not: (i) use the Fair Isaac Products or Documentation for any purpose other than the internal business operations of Client or in any other manner that exceeds the scope of any license granted under this Agreement or that otherwise constitutes a breach of this Agreement; (ii) alter, change, modify, adapt, translate or make derivative works of the Fair Isaac Products; (iii) reverse engineer, decompile, disassemble, or otherwise attempt to reduce the object code of any Fair Isaac Products to human perceivable form or permit others to do so; (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products by, any third party or by any individuals other than the employees of Client; (v) assign, sublicense, lease, transfer or distribute the Fair Isaac Products, or operate any Fair Isaac Product for timesharing, rental, outsourcing, or service bureau operations (or otherwise for the benefit of any party other than Client), or train persons other than permitted users; (vi) disclose or publish performance benchmark results for any Fair Isaac Product without Fair Isaac's prior written consent; or (vii) (if applicable) use any provided third party software except as solely in conjunction with the Fair Isaac Product.

3.2     Reservation Of Rights Not Granted.  Fair Isaac reserves all rights not expressly granted to Client under this Agreement.  Without limiting the foregoing, Fair Isaac retains and reserves sole and exclusive worldwide right, title and interest in and to the Fair Isaac Products, Documentation, any custom code developed in whole or part by Fair Isaac (if applicable), and any other Fair Isaac software or materials, and in all patents, trademarks, copyrights, trade secrets, and all other intellectual property and proprietary rights therein, and any Fair Isaac know-how related thereto, subject to only the limited, non-exclusive, license rights granted herein.  Nothing in this Agreement shall limit in any way Fair Isaac's right to develop, use, license, create derivative works of, or otherwise exploit Fair Isaac intellectual property or to permit third parties to do so.

3.3     Permission for Back-Up Copy. Client may reproduce the object code of the Fair Isaac Product and the Documentation for the purposes of exercising the license rights granted under this Agreement on a backup CPU/server in the event of a malfunction that renders the primary CPU/server inoperable. This

*Fair Isaac Confidential*

FICO0000132  0002

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 3 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

license shall only be effective for the period of such inoperability or the expiration or termination of the primary license to the Fair Isaac Product, whichever first occurs.

3.4    Notice Reproduction. To the extent Client is provided reproduction rights, Client must reproduce on each copy of the Fair Isaac Product and Documentation any copyright, patent, or trademark notice, and any other proprietary legends that were provided in the originals.

3.5    Verification and Audit Rights.  Upon not less than ten (10) days prior written notice to Client, Fair Isaac may, at its expense, audit Client's use of the Fair Isaac Products. Any such audit shall be conducted during regular business hours at Client's facilities and shall interfere as little as reasonably possible with Client's business activities.  Audits shall be conducted no more than once annually.  On Fair Isaac's written request, Client shall provide to Fair Isaac a written certification executed by an authorized officer of Client that provides the following information: (i) verification that the Fair Isaac Products are being used in accordance with the provisions of this Agreement; (ii) list of the locations at which the Fair Isaac Products are or have been operated during the preceding twelve (12) month period; and (iii) the number of Seats, CPU's and/or applications accessing or utilizing the Fair Isaac Products (as applicable). Upon not less than ten (10) days prior written notice to Client, Fair Isaac may, at its expense, audit Client's use of the Fair Isaac Products.  Any such audit shall be conducted during regular business hours at Client's facilities and shall interfere as little as reasonably possible with Client's business activities. Audits shall be conducted no more than twice annually.  If Client is discovered to be using more licenses than the number of licenses Client has purchased, or in the event Fair Isaac learns that Client has materially breached this Agreement as determined by such audit, then Client shall bear the expense of such audit.

3.6    Use by Third Party.  Fair Isaac acknowledges that Client's information technology infrastructure operations have been outsourced to ACS Commercial Solutions, Inc. and Fair Isaac hereby grants ACS, its affiliates, and their respective employees, agents, consultants and subcontractors (collectively "ACS") the right to use the Fair Isaac Products and Documentation on behalf of Client for the sole and exclusive purpose of fulfilling ACS's obligations to provide information technology services to Client. Client shall be responsible for ensuring ACS's compliance with the terms and conditions of this Agreement and Client shall be liable to Fair Isaac for any breach of this Agreement by ACS.  The rights granted to ACS herein shall not be extended to any other third party without the prior express written consent of Fair Isaac.

**Formatted: Underline**

## 4.    Services

4.1    Maintenance Services.  Subject to the payment of the applicable Maintenance Fees described in Exhibit A, Fair Isaac shall provide Client with the Maintenance Services described in Exhibit B.

4.2    Other Services.  From time to time, Fair Isaac may provide Client with professional services related to the Fair Isaac Product as mutually agreed between the parties. Such professional services shall be performed only upon the execution of a Statement of Work which references the Master Services Agreement, entered into by and between the parties on June 9, 2006.

*Fair Isaac Confidential*

FICO0000132  0003

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 4 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

## 5. Warranties and Limitation of Liability

5.1   Conformity to Specifications. Subject to Client's compliance with the terms and conditions of this Agreement, Fair Isaac warrants that the Fair Isaac Product will conform in all material respects to its Documentation for a period of thirty (30) days from the initial date of delivery. Fair Isaac will, at its own expense and as its sole obligation, and Client's exclusive remedy, for any breach of this warranty, correct any reproducible error in the Fair Isaac Product reported to Fair Isaac by Client in writing (along with all information available to Client that is relevant to verifying, diagnosing, or correcting the error) or replace the Fair Isaac Product during the warranty period.

5.2   Warranty of Title. Fair Isaac represents and warrants that it owns or has all of the necessary rights in respect to the Fair Isaac Products and Documentation and has the full power and authority to grant the rights and licenses granted to Client herein.

5.3   Non-Interference Warranty. Fair Isaac represents and warrants that the Fair Isaac Products and any medium on which such products are delivered will not contain, when delivered, any timer, clock, counter, product keys, expiry codes, viruses, worms, Trojan horses, backdoors or other codes or devices that may prevent Client from using the Fair Isaac Products at any time in accordance with this Agreement, or other limiting design or routine or uncorrected known vulnerability that may cause software or any data generated or used by it to be erased, become inoperable or inaccessible, or that may otherwise cause such software to become temporarily or permanently incapable of performing in accordance with this Agreement; Notwithstanding the forgoing, Client acknowledges that the Fair Isaac Products may contain license controlling devices which require the input of a license key string upon installation. Failure to input the correct license key string upon installation (which shall be provided to Client upon delivery of the Fair Isaac Products) will cause the Fair Isaac Products to be inoperable until the correct license key string is inputted. No such license key string shall be deemed to be a breach of this warranty.

5.4   Year 2000 Warranty. Fair Isaac represents and warrants that the Fair Isaac Products shall be capable of storing, retrieving, interfacing and processing completely and accurately all data and information involving dates beyond December 31, 1999.

5.5   WARRANTY DISCLAIMER. Fair Isaac does not warrant that the Fair Isaac Products, Documentation or Maintenance Services will (i) meet Client's requirements, (ii) operate in combination with hardware, software, systems or data not expressly specified in writing by Fair Isaac, (iii) meet any performance level, resource utilization, response time, or system overhead requirements, or (iv) operate uninterrupted, free of errors, or without delay. Fair Isaac is not responsible for problems caused by: (a) use of the Fair Isaac Products outside the scope of this Agreement or the Documentation; (b) modification, alteration or changes to the Fair Isaac Products (or tangible copy thereof) not made by Fair Isaac; (c) changes in, or modifications to, the operating characteristics of the Client's system or any component thereof that is inconsistent with the requirements of the Documentation; (d) use of the Fair Isaac Products with hardware or software that is not represented in the Documentation as interoperable with the Fair Isaac Products; or (e) accident, physical, electrical or magnetic stress, unauthorized alterations, failure of electric power, environmental controls, or causes other than ordinary use. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS ARTICLE 5, FAIR ISAAC MAKES NO OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, UNDER THIS AGREEMENT AND HEREBY DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE. CLIENT IS SOLELY RESPONSIBLE FOR ITS USE OF ANY PRODUCTS, SERVICES, AND DELIVERABLES PROVIDED BY FAIR ISAAC UNDER THIS AGREEMENT AND FOR ANY LIABILITY ARISING OUT OF DATA OR CONTENT SUPPLIED BY CLIENT.

*Fair Isaac Confidential*

FICO0000132  0004

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 5 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

5.6     LIMITATION OF LIABILITY. EXCEPT FOR (i) A BREACH OF CONFIDENTIALITY BY EITHER PARTY, (ii) FAIR ISAAC'S INDEMNIFICATION OBLIGATIONS, OR (iii) CLIENT'S BREACH OF FAIR ISAAC'S INTELLECTUAL PROPERTY, IN NO EVENT WILL FAIR ISAAC EITHER PARTY BE LIABLE UNDER ANY THEORY OF RECOVERY (INCLUDING BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, TORT AND STRICT LIABILITY) FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, CONSEQUENTIAL (INCLUDING, BUT NOT LIMITED TO, LOSS OF INCOME, PROFIT OR SAVINGS) OR PUNITIVE DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY FAIR ISAAC PRODUCT OR SERVICE, EVEN IF FAIR ISAAC THE PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE. WITHOUT LIMITING THE FOREGOING, AND EXCEPT IN THE CASE OF (a) A BREACH OF CONFIDENTIALITY BY EITHER PARTY, (b) FAIR ISAAC'S INDEMNIFICATION OBLIGATIONS, or (c) CLIENT'S BREACH OF FAIR ISAAC'S INTELLECTUAL PROPERTY, FAIR ISAAC'S BOTH PARTIES' AGGREGATE LIABILITY IN CONNECTION WITH THIS AGREEMENT UNDER ANY AND ALL THEORIES OF RECOVERY (INCLUDING BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, TORT AND STRICT LIABILITY) SHALL BE LIMITED TO THE AMOUNT PAID BY CLIENT (EXCLUDING IMPLEMENTATION FEES AND REIMBURSED EXPENSES) FOR THE APPLICABLE FAIR ISAAC PRODUCT OR SERVICE DURING THE 12 MONTHS IMMEDIATELY PRECEDING THE DATE OF THE MOST RECENT CLAIM THAT GAVE RISE TO SUCH LIABILITY.

## 6.     Indemnification

6.1     Intellectual Property Indemnification. Fair Isaac will defend at its own expense any action against Client, its directors, officers, employees, agents, successors, and assigns brought by a third party to the extent that the action is based upon a claim that the Fair Isaac Product or Documentation directly infringes any U.S. registered patent or U.S. registered copyright, or misappropriates any trade secret recognized as such under the Uniform Trade Secrets Act, and Fair Isaac will pay those costs (including reasonable attorneys' fees) and damages finally awarded against Client in any such action that are specifically attributable to such claim or those costs and damages agreed to in a monetary settlement of such action.

6.2     Conditions. Fair Isaac's indemnification obligations under this Article are conditioned upon: (a) Client notifying Fair Isaac promptly in writing of such action; (b) Client giving Fair Isaac sole control of the defense thereof and any related settlement negotiations; provided, however, Client may assign counsel of its own choosing, and at its own expense, to provide legal advice to Client in any action where Client is a named party; (c) Client's compliance with the terms and conditions of this Agreement, including without limitation the license(s) granted by Fair Isaac; and (d) Client fully cooperating with Fair Isaac in such defense. (including without limitation, by making available to Fair Isaac all documents and information in Client's possession or control that are relevant to the infringement or misappropriation claims, and by making Client's personnel available to testify or consult with Fair Isaac or its attorneys in connection with such defense).

6.3     Fair Isaac's Options. If the Fair Isaac Product becomes, or in Fair Isaac's opinion is likely to become, the subject of an infringement or misappropriation claim, Fair Isaac may, at its option and expense, either: (a) procure for the Client the right to continue to exercise the Fair Isaac Product license; (b) replace or modify the Fair Isaac Product so that it becomes non-infringing; or (c) if neither option (a) or (b) is available, terminate Client's license for the Fair Isaac Product concerned.

*Fair Isaac Confidential*

Confidential

FICO0000132  0005

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 6 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

6.4     Exclusions. Notwithstanding the foregoing, Fair Isaac will have no obligation with respect to any infringement or misappropriation claim based upon: (a) any violation of the terms of Client's license or any license restrictions, or for use of the Fair Isaac Product for any purpose not intended by Fair Isaac; (b) any combination or use of the Fair Isaac Product with other products, equipment, software, or data not supplied or approved in writing by Fair Isaac; (c) any modification of the Fair Isaac Product pursuant to specifications required by client or any modification made by any entity other than Fair Isaac; or (d) any claim of infringement or misappropriation that would have been avoided had Client upgraded to a new version or release of the Fair Isaac Product.

6.5     ENTIRE LIABILITY.  THIS ARTICLE STATES FAIR ISAAC'S ENTIRE LIABILITY AND CLIENT'S SOLE AND EXCLUSIVE REMEDY FOR INFRINGEMENT AND ALL INFRINGEMENT AND MISAPPROPRIATION CLAIMS AND ACTIONS

**7.     Confidential Information**

7.1     Confidential Information.  The exchange of confidential information hereunder shall be governed by the confidentiality provisions set forth in the Master Services Agreement dated June 9, 2006.

**8.     Payment Terms**

8.1     Invoices and Payment.  Client shall pay the fees and charges set forth in Exhibit A.  All fees, charges, and expenses invoiced under this Agreement will be due and payable by Client in United States Dollars within the greater of forty-five (45) days of the invoice date or thirty (30) days of Client's actual receipt of an invoice. Each unpaid invoice shall bear a late charge of 1.5% per month, or the maximum rate permitted by law, whichever is less. In addition to all other remedies available at law or in equity, iIf any payment is not received by Fair Isaac within thirty (30) days the timeframes set forth above, from the date of the invoice, Fair Isaac shall have the right to terminate the pertinent product license or service after giving Client written notice and thirty (30) days to cure. Client shall reimburse Fair Isaac for all costs related to any proceedings to collect any past-due amounts, including without limitation all attorneys' fees and expenses.  Except as otherwise expressly provided in this Agreement, no refunds are available.

8.2     Expenses. Prices do not include reasonable travel and associated out-of-pocket expenses incurred by Fair Isaac, which are billed to Client at cost. Client agrees to reimburse Fair Isaac for all such travel-related expenses Fair Isaac incurs in connection with this Agreement.

8.3     Taxes and other Charges. Client shall be solely responsible for, and shall pay or reimburse Fair Isaac for, all Taxes. **"Taxes"** means all present and future taxes, duties, import deposits, assessments, and other governmental charges (and any related penalties and interest), however designated, that are now or hereafter imposed by or under any governmental authority or agency that are: (i) associated with the performance by Fair Isaac of its obligations hereunder; (ii) associated with the payment of any amount by Client to Fair Isaac pursuant to this Agreement; (iii) based on the license or use of any Fair Isaac Product; or (iv) associated with the importation of any Fair Isaac Product into any country other than the United States, excepting only taxes imposed on Fair Isaac's net income by the United States and each state thereof (and their political subdivisions). To the extent Client is required to withhold income taxes on any payment made to Fair Isaac pursuant to applicable tax law, Client may withhold such tax to the extent such tax (a) does not exceed the appropriate withholding amount applicable under relevant tax treaties and (b) qualifies as a creditable foreign tax by the United States government. Client agrees to send the appropriate certified tax receipt to Fair Isaac promptly upon payment of such tax. If a certified tax receipt issued by the taxing authority evidencing such payment and suitable for Fair Isaac to obtain a tax credit in

*Fair Isaac Confidential*

Confidential

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 7 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

the United States is not received by Fair Isaac within thirty (30) days after the date of the invoice, Client will be responsible for paying the full invoice amount.

8.4     Mode of Payment. Client agrees to remit all payments due to Fair Isaac in accordance with the instructions provided in the invoice or other instructions provided by Fair Isaac.

9.     **Term**

9.1     Term. Unless earlier terminated, this Agreement and the license(s) granted hereunder shall commence upon the Effective Date and shall continue in full force in perpetuity, or, if applicable, for the duration of the applicable license term set forth in Exhibit A if such term is not perpetual ("**Term**").

9.2     Events of Termination. This Agreement may be terminated upon the occurrence of any of the following events:

(a)     Uncured Breach. Either party may terminate this Agreement for a breach by the other party of any of the material terms of this Agreement, or numerous breaches of duties or obligations hereunder that cumulatively constitute a material breach if the breaching party fails to cure the breach(es) within 30 days from receipt of written notice from the non-breaching party identifying the breach(es) and requiring them to be remedied.

(b)     Insolvency. Either party may terminate this Agreement if the other party ceases to conduct business in the ordinary course or is declared insolvent or bankrupt, or makes an assignment of substantially all of its assets for the benefit of creditors, or a receiver is appointed, or any proceeding is demanded by, for or against the other party under any provision of bankruptcy or insolvency legislation.

(c)     Violation of License or Confidentiality Obligations. Fair Isaac may immediately terminate this Agreement, without a requirement for prior notice or a cure period, if Client violates any terms of the licenses granted in this Agreement. Either party may immediately terminate this Agreement by written notice to the other party if the other party materially breaches any of the provisions of this Agreement relating to the protection of Confidential Information or Intellectual Property.

9.3     Effect of Termination. Upon expiration or termination of this Agreement for any reason, all licenses granted hereunder shall terminate immediately, all support and maintenance obligations shall cease, Client shall immediately cease using all Fair Isaac Product(s) and related documentation (including all intellectual property arising from or related to the foregoing), shall remove all copies of the Fair Isaac Product(s) and related documentation from Client's computers and systems, and shall either (i) destroy all copies of the Fair Isaac Product(s), related documentation, and other Fair Isaac Confidential Information and intellectual property in Client's possession; or (ii) return to Fair Isaac all copies of the Fair Isaac Product(s), related documentation, and other Fair Isaac Confidential Information and intellectual property in Client's possession. Client shall provide to Fair Isaac a written certification signed by an authorized officer of Client certifying that Client has complied with the foregoing. Upon termination of this Agreement, all fees and other charges provided for hereunder will become immediately due and payable to Fair Isaac, and Client shall immediately remit all unpaid fees to Fair Isaac.

9.4     Survival. Rights to payment and the following rights and obligations under this Agreement will survive any termination or expiration of this Agreement: Article 1 (Definitions), Section 3.1 (License Restrictions), Section 3.2 (Reservation of Rights Not Granted), Section 5.3 (Warranty Disclaimer),

*Fair Isaac Confidential*

FICO0000132 0007

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | | Page 8 of 17 |
|---|---|---|
| FI Contract Number: | | FI LR# |

Section 5.4 (Limitation of Liability), Article 7 (Confidential Information), Section 9.3 (Effect of Termination), Section 9.4 (Survival), and Article 10 (Provisions of General Applicability).

**10.      Provisions of General Applicability**

10.1      Relationship of the Parties. Fair Isaac and Client are independent contractors and will have no power to bind the other party or to create any obligation or responsibility on behalf of the other party. This Agreement shall not be construed as creating any partnership, joint venture, agency, or any other form of legal association that would impose liability upon one party for the act or failure to act of the other party.

10.2      Counterparts. This Agreement may be executed in counterparts, which taken together shall constitute one single agreement between the parties.

10.3      Section Headings. The section and subsection headings used herein are for reference and convenience only, and will not enter into the interpretation hereof.

10.4      No Waiver. No delay or omission by either party to exercise any right or power with respect to any of the terms or conditions of this Agreement will impair any right or power or be construed to be a waiver thereof. A waiver by either party of any of the terms and conditions of this Agreement will not be construed to be a waiver of any other term or condition of this Agreement. No waiver of any rights of a party under this Agreement will be effective unless set forth in a writing signed by such party.

10.5      Entire Agreement. This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof, and supersedes all prior or contemporaneous proposals and all other oral or written understandings, representations, conditions, and other communications between the parties relating to such subject matter, as well as the terms of all existing or future purchase orders and acknowledgments. Each party represents and warrants to the other party that in entering into this Agreement it has not relied on any representations, promises, or assurances from another party or any employee, officer, director, representative, attorney, or affiliate of another party not expressly contained in this Agreement.  Any other terms or conditions or amendments shall not be incorporated herein or be binding upon any party unless expressly agreed to in a writing signed by authorized representatives of Client and Fair Isaac.

10.6      Construction; Severability. This Agreement will not be more strongly construed against either Party, regardless of who is more responsible for its preparation. If any provision of this Agreement is held to be unlawful or invalid under applicable law, then such provision will be ineffective only to the extent of such illegality or invalidity, without invalidating the remainder of such provision or any of the remaining provisions of this Agreement.

10.7      Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of ~~California~~ New York, without regard to principles of conflicts of law or international law, including without limitation the 1980 United Nations Convention on Contracts for the International Sale of Goods, as revised.

10.8      No Assignment. Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof. In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent, which will not be unreasonably

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 9 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

withheld. Any attempt to assign or transfer all or any part of this Agreement without first obtaining such written consent will be void and of no force or effect. Notwithstanding the foregoing, Fair Isaac may perform any or all of its obligations through any subsidiary or affiliated company, and may assign this Agreement by merger, reorganization, consolidation, or sale of all or substantially all its assets.

10.9    Force Majeure. Notwithstanding anything to the contrary herein, ~~Fair Isaac~~ neither party shall ~~not~~ be deemed to be in default of any provision of this Agreement or be liable to ~~Client~~ the other or to any third party for any delay, error, failure in performance or interruption of performance due to any act of God, terrorism, war, insurrection, riot, boycott, strike, interruption of power service, interruption of communications service, labor or civil disturbance, act of any other person not under the control or direction of either party or other similar cause. ~~Fair Isaac~~ The party impacted by the force majeure event shall give ~~Client~~ the other party reasonable written notification of any material or indefinite delay due to such causes.

10.10    Press Releases: Publicity.   Fair Isaac will be allowed to issue a press release stating factual information regarding the relationship between Fair Isaac and Client at the time this Agreement is signed. Fair Isaac shall first submit to Client such press release for Client's approval, which approval may not be unreasonably withheld or be delayed more than 5 business days. The parties may issue additional press releases or publicity from time to time as mutually agreed by the parties. All press releases or other publicity sought to be issued by either or both parties pursuant to this section must, prior to release, be reviewed and approved by each party, which approval may not be unreasonably withheld or be delayed more than 5 business days. Subject to Client's prior written consent (which must not be unreasonably or arbitrarily withheld), Fair Isaac may include Client's name in its marketing and promotional materials regarding the availability of any of its products or services to other clients.

10.11    Notices.   Any notices required to be given by one party to the other under the Agreement must be in writing, must reference the Fair Isaac Legal Request (LR) number set forth above, and must be sent to the recipient's address or facsimile number for notices set forth on the page of this Agreement titled "Instructions and Contact Information." Such notices will be deemed given upon the earlier of (i) actual delivery, whether personally, by a recognized international overnight delivery carrier, or by facsimile (provided that the facsimile notice is promptly confirmed in writing using another method for giving notice provided in this section), or (ii) five business days after being mailed by certified or registered mail, first class, postage prepaid.. The date a notice sent by facsimile is deemed to have been given will be the date of actual receipt, but no faxed notice will be effective unless promptly confirmed in writing as set forth above. Either party may change its address or facsimile number for notices at any time by giving notice to the other party.

10.12    No Third Party Beneficiaries. Nothing in the Agreement is to be deemed to create any right or benefit in any person not a party to this Agreement.

*Fair Isaac Confidential*

FICO0000132_0009

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 10 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

IN WITNESS WHEREOF, Fair Isaac and Client have caused this Agreement to be signed in duplicate and delivered by their duly authorized representatives as of the Effective Date.

**FAIR ISAAC CORPORATION**          **CLIENT – CHUBB & SON**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date Signed: _____          Date Signed: _____

| *Fair Isaac Use Only:* | | Created: 2 June 2006 | |
|---|---|---|---|
| Short Name: | Client #: | Acct. Exec.: | |
| OE Order #: | System #: | Royal Blue #: | |
| Sales Approval: | Notes: | | |

**Please complete the information on the following page.**

*Fair Isaac Confidential*

FICO0000132_0010

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 11 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

## INSTRUCTIONS AND CONTACT INFORMATION

*Instructions to Client:*

1. *Appropriate corporate officer should execute 2 copies of the document.*

2. *Complete all requested information below:*

**Addresses for Notices:**

|  | **For Client:** | **For Fair Isaac:** |
|---|---|---|
| **Address:** | | Fair Isaac Corporation |
| | | Attn: Contracts Administrator |
| | | 3661 Valley Centre Drive |
| **City/State:** | | San Diego, CA 92130 |
| | | Reference FI LR # _____ |
| **Zip/Code:** | | |
| | | Fax: 858-523-4450 |
| **Country:** | | |
| **Attention :** | | |
| **Fax:** | | |

*Compete Information below if different from above:*

| **Return executed contract to Client at:** | **Send Software to:** | **Client's Billing Information:** |
|---|---|---|
| **Address:** | | |
| **City/State:** | | |
| **Zip/Code:** | | |
| **Attention :** | | |
| **Phone:** | | |
| **Fax (optional):** | | |
| **Email (optional):** | | |

3. *Return 2 completed and executed copies to:*
   Fair Isaac Corporation
   Attn: Contracts Administration
   3661 Valley Centre Drive
   San Diego, CA 92130

   If time is of the essence, please fax to:
   858-523-4450

   Questions? Call 858-369-8259

*Fair Isaac Confidential*

FICO0000132  0011

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 12 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

## EXHIBIT A
## PRICING AND PAYMENT

### 1.   BLAZE ADVISOR LICENSE AND SUPPORT AND MAINTENANCE FEES

| Product | Item # | Initial Term (Perpetual or No. of Years) | Scope/Quantity | Price | Total |
|---|---|---|---|---|---|
| Blaze Advisor Development Platform: JAVA | 280-DVLI-03 (Perpetual) | Perpetual | For use on up to 5 Seats to be used solely in conjunction with the Named Application | $ | $ |
| Blaze Advisor Deployment Platform: JAVA | 280-DPLI-03 (Perpetual) | Perpetual | Named Application | $ | $ |
| Documentation for Blaze Advisor: • User guide (available in HTML or PDF) | N/A | Perpetual | 1 set | Electronic copy included with software license | $ |
| Support and Maintenance Fee for Blaze Advisor Software: | 280-OOMN-08 | Initial Term: One year | 1 | $ Per Year: 18% of Total License Fees | $ Year One (Annual fee thereafter subject to annual adjustment) |
| TOTAL LICENSE AND FIRST YEAR SUPPORT AND MAINTENANCE FEES – (US Dollars) | | | | | $ |

**Definition of Named Application:** With respect to any license set forth above with a "Scope/Quantity" of "Named Application", Client's "Named Application" is defined as follows:
[                                                                    ].

### 2.   TRAINING FEES

| Product | Item # | Quantity | Price | Total |
|---|---|---|---|---|
| Training Classes: Fair Isaac to provide the following classes: • [list class name] – X day class. • [list class name] – X day class. | 280-OOTR-06 | [__] Classes to be held at Client's site. Price is per class and includes up to twelve (12) students - or - Classes to be held at Fair Isaac's site. Price is per student. | $ (per class/per student) | $ |
| | | TOTAL TRAINING FEES (US Dollars) | | $ |

*Fair Isaac Confidential*

FICO0000132  0012

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 13 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

## 3.     PAYMENT

**3.1     License Fees.**  Client agrees to pay the license fees described above upon execution of this Agreement.

**3.2     Maintenance Fees.**  Client agrees to pay the support and maintenance fees for the first year upon execution of this Agreement, and annually thereafter in advance while the maintenance term is in effect.  Client agrees that the maintenance fee set forth above covers only the licenses to the Fair Isaac Products set forth in this Agreement and does not cover any other licenses to the Fair Isaac Products granted to Client under any other agreement.  The total maintenance fee for the Fair Isaac Products for future years shall be calculated based on the total license fees paid by Client for the Fair Isaac Products under this Agreement and all other agreements.

**3.3     Training Fees.**  Client agrees to pay the training fees described above upon execution of this Agreement.

**3.4     Expenses.**     Prices do not include reasonable travel and associated out-of-pocket expenses incurred by Fair Isaac, which will be billed to Client at cost. Client agrees to reimburse Fair Isaac for all such travel-related expenses Fair Isaac incurs in connection with this Agreement.

**Unless Client signs this Agreement and returns it to Fair Isaac by June 30, 2006, prices and terms are subject to change.**

*Fair Isaac Confidential*

Confidential

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 14 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

## EXHIBIT B
## FAIR ISAAC SOFTWARE SUPPORT AND MAINTENANCE POLICY

### 1. DEFINITIONS

"**FIC**" means Fair Isaac Corporation and its subsidiaries.

"**Errors**" means persistent malfunctions, inherent within the Software, that prevent the Software from operating according to its technical documentation.

For software to be installed at locations in North America, Asia, and South America, "**Product Support Hours**" (United States) are 6:00 a.m. to 5:00 p.m. Pacific Time, Monday through Friday, excluding holidays observed by FIC in the United States. Support services will be provided from the United States.

For software to be installed at locations in Europe, Middle East, and Africa, "**Product Support Hours**" (U.K.) are 8:30 a.m. to 5:00 p.m. UK Time, Monday through Friday, excluding holidays observed by FIC in the United States. Support services will be provided from the United States.

"**Software**" means the following software product(s) that are licensed by Client:

The Fair Isaac Products listed on Exhibit A.

### 2. SUPPORT AND MAINTENANCE SERVICES GENERALLY

**2.1.** Subject to payment of the appropriate Maintenance fees by Client, and compliance by Client with the terms of the applicable license agreement, FIC agrees to provide Client with support and maintenance services for the Software as set forth in this policy.

**2.2.** FIC provides support and maintenance services for licensed Software during both implementation and production use when operated on supported platforms installed on designated or approved equipment. Support is currently provided in the English language only.

**2.3.** Subject to Section 5.1.4, maintenance includes any standard Software versions and releases generally made available to FIC's clients that are current on Maintenance fees. Such versions and releases will be provided to Client pursuant to this policy on a when and if available basis.

### 3. TECHNICAL SUPPORT

**3.1.** FIC will make commercially reasonable efforts, during Product Support Hours, to address Client's questions about the Software, to resolve operating problems that are attributable to the Software, and to resolve verified, reproducible Errors in the Software.

**3.2.** Client agrees: (a) to set up primary and secondary liaisons who have been trained on the Software; (b) that all support requests will be centralized through the primary and secondary liaisons; (c) to submit support requests to FIC Product Support; (d) to comply with the attached guidelines for submitting support requests; (e) to use commercially reasonable efforts to diagnose and resolve problems in the operation of the Software prior to contacting FIC for support; and (f) to use commercially reasonable efforts to verify that reported problems are due to a malfunction of the Software, and not due to the operating system, hardware, data, interfaces, or improper use of the Software, prior to contacting FIC for support.

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 15 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

## 4. TERM; TERMINATION; REINSTATEMENT

**4.1.** FIC's support and maintenance obligations under this policy commence upon shipment of the Software and will continue for an initial term of one year. Maintenance fees will be invoiced on an annual basis in advance. For as long as FIC makes maintenance for the Software generally available to all of its customers, the support and maintenance service will automatically renew for consecutive one-year terms unless Client gives FIC 30 days' written notice, prior to the end of the current term, of its intent not to renew. Support and maintenance during renewal terms will be subject to the Support and Maintenance Policy in effect at the time of renewal. Maintenance fees applicable to renewal terms may be increased by FIC, but no such increase may exceed the lesser of three percent (3%) or the most recently available annual change in the CPI. **"CPI"** means the Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for All Items, 1982-84=100, as published by the US Bureau of Labor Statistics.

**4.2.** FIC may terminate support and maintenance services under this policy upon 30 days' written notice if Client is in breach under this policy or any license agreement relating to the Software and does not cure the breach within such 30-day period. FIC will have no obligation to resume support and maintenance services following such a termination for cause.

**4.3.** FIC may, at its sole discretion, reinstate lapsed support and maintenance services, in accordance with its then-current policies, upon payment by Client of the applicable reinstatement fee.

## 5. EXCLUSIONS

**5.1.** Services outside the scope of this policy are subject to availability of resources and will be charged for separately at FIC's then-current rates for such services. The following services are outside the scope of this policy:

> **5.1.1.** Support services provided outside of Product Support Hours.

> **5.1.2.** Support service that becomes necessary due to failure of computer hardware, equipment or programs not provided by FIC; negligence of Client or any third party; operator error; improper use of hardware or software (including the Software); any problem or loss not solely attributable to the Software; problems stemming from Client not applying all required maintenance releases; or problems due to unauthorized modification or adaptation of the Software by Client.

> **5.1.3.** Development, customization, coding, installation, integration, consulting and training.

> **5.1.4.** Optional, separately-priced Software features that may, from time to time, be made available by FIC with new versions or releases of the Software.

**5.2** Unless otherwise indicated in the applicable Order Form or license agreement, FIC has no obligation to provide support or maintenance services for other than (a) the current release of the Software and (b) one prior release of the Software, but only for a maximum of one year after release of a subsequent release.

*Fair Isaac Confidential*

FICO0000132  0015

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 16 of 17 |
|---|---|
| FI Contract Number: | FI LR# |

**6. SEVERITY LEVELS AND RESPONSE TIMES.** Upon Client's report of a problem with the Software, an FIC representative will acknowledge such report by issuing a confirmation to Client, either by phone or email, and FIC will assign a Severity Level to the problem based on the type of issue reported, according to the following schedule:

| Severity | Condition | Response Time/Action |
|---|---|---|
| 1 | **Production Down Emergency:** An Error in the production environment that inhibits all or substantially all of the Software from functioning in accordance with its documentation. A severity "one" problem is both severe and mission-critical.: | Provide (a) a phone response within 1 hour during FIC's Product Support Hours <u>and</u><br><br>(b) an action plan within 4 hours for the development of a patch or a bypass for the Error.<br><br>Following the development of the patch or bypass, FIC will notify the Client of inclusion of the patch or a solution in a revision of the Software.<br><br>Once identified and logged, FIC will provide all necessary services to resolve a Severity-One condition on a diligent-efforts priority basis seven days per week until that condition has been patched or bypassed. |
| 2 | **Production Impaired:** An Error in the production environment where major functionality of the Software is inhibited, but the Error does not materially disrupt the Client's business | Provide (a) a written or phone response within 4 hours during FIC's Product Support Hours <u>and</u><br><br>(b) an action plan within 2 business days for a bypass for the Error <u>or</u><br>(c) an action plan within 5 business days for developing a patch for the Error.<br><br>Following the development of the patch or bypass, FIC will notify the Client of inclusion of the patch or a solution in a revision of the Software.<br><br>The Error will be worked on during Product Support Hours. |
| 3 | **Production Inhibited:** An Error in the production environment where a feature of the Software is inhibited, but the Error does not materially disrupt the Client's business | Provide (a) a written or phone response within one business day <u>and</u><br><br>(b) Consider for correction or inclusion in the next revision of the Software. |
| 4 | **General Assistance:** A "how to" question; an Error that is minor or cosmetic in nature;  or an enhancement request to be considered for a future revision of the Software | Provide (a) a written or phone response within 2 business days <u>and</u><br><br>(b) Consider for correction or inclusion in the next revision of the Software. |

*Fair Isaac Confidential*

FICO0000132  0016

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | | Page 17 of 17 |
|---|---|---|
| FI Contract Number: | | FI LR# |

### Fair Isaac Product Support
### Problem Submission Guidelines

We encourage clients to first consult the appropriate documentation for the product they are using (installation guides, reference manuals, user guides, product release notes, etc.). Release notes will typically include contents of the release, installation/license information, known limitations, product support, and compatibility information. Other reference materials should also be consulted as needed for related components such as database management systems, compilers, operating systems, etc. For Fair Isaac products with web-based self-service, visit the support web site to search for known questions, solutions and technical notes.

If you've completed this initial research and are still unable to resolve your problem, the next step is to contact Product Support. The following information is critical to resolving a problem:

- Your client ID (a 4-digit number communicated to you either by your Engagement Manager or during your first contact with Product Support) or license number (if applicable).
- Your phone number and email address
- The name and version of the Fair Isaac software to which the issue pertains. For incidents submitted via email, please be sure to include the **product name** on the subject line of the email.
- The name and version of the operating system and database.
- The environment in which the error is occurring (development, test or production).
- Both a general statement and a detailed description of the problem, including any relevant error messages.
- Frequency with which the condition occurs and at what intervals.
- Can the problem be replicated, and if so, the steps taken to recreate the problem.
- Any changes that may have been made to the environment (for example, maintenance work that may have been performed or any hardware/software changes made to the server, workstation, operating system, or data feed).
- Any changes to the Fair Isaac application, including new configuration or software upgrades.
- Copies of the Fair Isaac product log files, configuration files, and screen prints of errors.

### Troubleshooting Tips:

- Isolate the problem as precisely as possible using debugging facilities and error logs as appropriate, and try to find a consistent way to reproduce it.
- Whenever possible, modify a Fair Isaac provided example or test case to cause the same problem.
- If the problem is not consistently reproducible, check whether it may be related to insufficient memory, memory leaks, search paths, or files that may be missing from certain directories or the class path.
- Verify that the versions of the database, compilers, operating system, browser, drivers, etc. that are in use are certified and supported by Fair Isaac.
- Identify any other changes that may have occurred in your environment that may have an impact on the Fair Isaac solution (for example, database maintenance, service pack deployment, upgrade of a system component, operating system patches, etc.)
- Try to reproduce the problem on another platform or test system.
- If applicable, try to isolate various components of your solution to simplify the troubleshooting (for example, pull out a subset of rules or code from the bulk of your application). Support can assist you best if we get a small sample of your application to work with. If possible send us a small test case with instructions, so we can run the test case.

*Fair Isaac Confidential*

FICO0000132 0017

```
 1              UNITED STATES DISTRICT COURT

 2                        FOR THE

 3                DISTRICT OF MINNESOTA

 4

 5              C.A. No. 16-cv-1054 (WMW/DTS)

 6      ---------------------------------------------

 7      FAIR ISAAC CORPORATION,                    )

 8                          Plaintiff             )

 9      v.                                         )

10      FEDERAL INSURANCE COMPANY AND ACE          )

11      AMERICAN INSURANCE COMPANY,                )

12                          Defendants            )

13      ---------------------------------------------

14              CONFIDENTIAL TRANSCRIPT

15              ATTORNEYS' EYES ONLY

16

17          DEPOSITION OF MICHAEL SAWYER

18              October 2, 2018

19              Courtyard Marriott

20              35 Foxborough Boulevard

21              Foxborough, Massachusetts

22

23                   *********

24          Court Reporter:  Amie D. Rumbo
```

EXHIBIT
10

**Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018**
**Fair Isaac Corporation vs. Federal Insurance Company**

| | |
|---|---|
| 1   A.   That is correct, but it was limited | 1   selling FICO's solution, all solutions into the |
| 2   to our fraud security and compliance solutions, so | 2   insurance and health care segment. |
| 3   FICO had undergone a reorganization and as part of | 3     Q.   And how did that differ from when |
| 4   that focused the sales staff on -- more | 4   you were acting as a contract partner or client |
| 5   specifically on products versus accounts, and I | 5   partner? |
| 6   focused for that period of September 2016 to June | 6     A.   In the client partner role, I was a |
| 7   of 2017 only on our fraud security and compliance | 7   direct quota carrying sales rep responsible for |
| 8   solutions for the most part. | 8   the actual development of new business.  As the |
| 9     Q.   So was that a job that was | 9   segment leader, I was a sales manager.  So I had a |
| 10   different than the job you had before? | 10   team of folks that were responsible for the direct |
| 11     A.   Yes, it was.  It was reporting to a | 11   client engagement and sales. |
| 12   different individual.  It reported into our fraud | 12     Q.   And why did you leave FICO in -- |
| 13   security and compliance business unit.  As opposed | 13   first of all, did you leave FICO in November 2017? |
| 14   to previously, I reported to the leader of the | 14     A.   I did. |
| 15   insurance group at FICO, but largely the | 15     Q.   And why did you leave FICO? |
| 16   responsibilities were the same in terms of selling | 16     A.   Again, to pursue another career |
| 17   new products into client accounts in insurance and | 17   opportunity that I thought offered me a position |
| 18   health care, but focused on fraud, security, and | 18   that better fit my career direction. |
| 19   compliance solutions. | 19     Q.   Let me ask you some general |
| 20     Q.   Who were you reporting to before as | 20   questions.  How does FICO generate revenues, or |
| 21   the leader of the insurance group? | 21   during the time that you were employed at FICO, |
| 22     A.   I reported to Russ Schreiber. | 22   how did it generate revenue? |
| 23     Q.   And who were you reporting to when | 23     MR. HINDERAKER:  I'm going to |
| 24   you were working in the insurance and health care | 24   object to the question to the extent that you |
| Page 21 | Page 23 |
| 1   segment group involving fraud, security, and | 1   don't have foundation to do it, but to the |
| 2   compliance solutions? | 2   extent you can answer, go ahead. |
| 3     A.   Bob Shiflet. | 3     A.   FICO operates largely in two |
| 4     Q.   Now, during this time period when | 4   separate business units.  One is a scores unit |
| 5   you were working with regard to fraud security and | 5   which develops and offers syndicated analytic |
| 6   compliance solutions, did Chubb continue to be a | 6   sores to the marketplace, such as your FICO credit |
| 7   client? | 7   score.  There are others in that portfolio, and |
| 8     A.   They did. | 8   then they operate a software segment.  That |
| 9     Q.   Okay.  And were you responsible for | 9   software segment develops software applications |
| 10   the other services that were provided to Chubb | 10   and software tools, which they sell to a variety |
| 11   during that time? | 11   of industries which generates revenue through |
| 12     A.   Yes. | 12   software licenses, software maintenance and |
| 13     MR. FLEMING:  Let the record | 13   support contracts, professional services, and |
| 14   reflect that Kevin Murphy, senior counsel, | 14   probably some other additional commercial |
| 15   global leader at Chubb, is also here. | 15   vehicles, but largely those are the main sources. |
| 16   BY MR. FLEMING: | 16     Q.   And are you familiar with the Blaze |
| 17     Q.   And then your final position at | 17   Advisor? |
| 18   FICO as a segment leader of insurance and health | 18     A.   Yes. |
| 19   care from July 2017 to November 2017? | 19     Q.   What does Blaze Advisor do; what is |
| 20     A.   That is correct. | 20   its function? |
| 21     Q.   And what were your duties in that | 21     A.   Blaze Advisor is a business rules |
| 22   position? | 22   management system.  It is a domain agnostic piece |
| 23     A.   I was a sales leader for a team of | 23   of software that is designed to allow companies to |
| 24   sales and presales resources responsible for | 24   build out decision logic, business rules, |
| Page 22 | Page 24 |

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

---

**Page 25**

1  deployment of analytic models, decision trees to
2  help automate decisioning.
3       Q.    And Blaze is one of the products
4  that FICO sells; is that correct?
5       A.    Yes, that is correct.
6       Q.    What was your involvement in the
7  licensing process at FICO during your employment
8  there?
9       A.    It varied by role in the
10 organization.  When I was in the manager of client
11 services position when I began at FICO, I was
12 purely in a support function where the client
13 partners that I reported to were responsible for
14 the contracts that we would enter into with
15 clients.  When I became a client partner, I took
16 on responsibility for the negotiation of the
17 contracts with clients for new services as well as
18 to up-sell for additional products.  And so I was
19 responsible for orchestrating the contracting
20 process in combination with, you know, FICO
21 business leadership as well as our legal teams.
22       And then as a segment leader, I was
23 in more of an oversight role of the quota carrying
24 reps that were managing that process that I had

---

**Page 26**

1  when I was a client partner.
2       Q.    Who were the client partners
3  responsible for the Chubb relationship during the
4  time that you were employed at FICO?
5       A.    When I started at FICO, Russ
6  Schreiber, I believe, was the assigned client
7  partner.  Following Russ, I believe it was a
8  gentleman named Ian Brodie, B-r-o-d-i-e.  Then I
9  was responsible for the Chubb account.  I do not
10 know with certainty who was responsible for the
11 Chubb account during the year that I spent away
12 from FICO.  When I returned to FICO in, I think it
13 was, 2016 or -- let's see, or 2015, I resumed
14 responsibility for the Chubb account and largely
15 held that almost until the end of my time there
16 with the firm.
17       Q.    So through like March of 2017?
18       A.    I held it through -- at least
19 through June of 2017.
20       Q.    And when did you first assume that
21 role?
22       A.    It would have been when I first
23 became a client partner in March of 2010.
24       Q.    And what were your -- was anybody

---

**Page 27**

1  else responsible for the Chubb relationship at the
2  time that you were responsible?
3       A.    I should clarify that I was
4  responsible for our North American business.  FICO
5  was not organized in our insurance segment to have
6  a global account owner.  We were responsible
7  for -- I was responsible for Chubb domestically in
8  the U.S.  And no, there was nobody else that would
9  have had the same responsibility that I did for
10 the account in the U.S. during that time.
11       Q.    So during that time period that you
12 were employed at FICO, to your knowledge, who was
13 responsible for Chubb outside of the United
14 States?
15       MR. HINDERAKER:  I'm going to
16    object to lack of foundation, but to the
17    extent that you know.
18       A.    So I can't speak to every geography
19 around the world.  I think, but I'm not one
20 hundred percent certain, that Richard Hill in the
21 UK had responsibility for EMEA.  For what time
22 frames, I cannot be certain.  Outside of EMEA, I
23 don't know who would have had responsibility for
24 the accounts.

---

**Page 28**

1       Q.    And when you said "domestically" in
2  your last response, is that the same as the United
3  States?
4       A.    Yes.  The United States.
5       MR. HINDERAKER:  Do you want water?
6       THE WITNESS:  Yes, please.
7       Q.    And let me clarify something.  All
8  of my questions are premised on what you know or
9  what is to your knowledge.  So if you don't have
10 knowledge or you don't have any understanding
11 about the circumstance that I am asking about,
12 just let me know that.  All right?
13       A.    Fair enough.  Thank you.
14       Q.    So during the time that you were
15 the client partner responsible for the Chubb
16 relationship, how many other accounts were you
17 also the client partner responsible for?
18       A.    As I said earlier, roughly 30 to 40
19 accounts that had recurring baseline revenue and
20 then all new sales opportunities within my
21 geographic region, regardless of whether FICO had
22 a relationship with those clients previously.
23       Q.    So during the time that you worked
24 at FICO, was your compensation dependent on the

---

Page 29

1  revenues generated by particular clients?
2      A.   Yes.
3      Q.   How so?
4      A.   As a client partner, the
5  compensation models changed from year to year, but
6  in general, they had two major components.  The
7  first was a revenue target and the second would be
8  what they refer to as a bookings target.
9      Q.   I'm sorry, I didn't hear you.
10      A.   A bookings, b-o-o-k-i-n-g-s.  So on
11  a bookings target, that would be the total
12  contract value of a new sale that FICO expected to
13  recognize as part of that contract.  So that is a
14  new business-focused metric.  The revenue
15  component was a combination of existing baseline
16  revenue from contracts that had been booked in
17  prior quarters.  So ensuring that revenue was
18  recognized by FICO, plus any new revenue that was
19  generated based on contracts that were booked
20  during the fiscal year.  So that combination made
21  up my quota targets.  In addition to that, I did
22  have a base salary.
23      Q.   Okay.
24           MR. FLEMING:  Mark this as

Page 30

1  Exhibit 73 and hand it to the client.
2           (Exhibit 73 marked for identification.)
3      Q.   Can you identify this document?
4      A.   It appears to be an e-mail from me
5  in November 0 2014 -- November 14, 2008, to Ian
6  Brodie, Rich Hill, and Russell Schreiber for a
7  meeting to discuss the Chubb license.
8           MR. HINDERAKER:  Well, then, for
9  the record, the question was "this document,"
10  and I believe you just identified the first
11  of three different documents that were
12  presented to you as Exhibit 73.  Counsel, do
13  you intend all three documents to be
14  Exhibit 73?
15           MR. FLEMING:  I do.
16           MR. HINDERAKER:  And are you making
17  a representation by combining them together
18  that all three belong to this top appointment
19  notice?
20           MR. FLEMING:  Yeah.  I'm not going
21  to make any representations today.
22           MR. HINDERAKER:  One way or the
23  other?
24           MR. FLEMING:  Right.

Page 31

1           MR. HINDERAKER:  Okay.
2  BY MR. FLEMING:
3      Q.   So Mr. Sawyer, could you read the
4  text of your e-mail to these gentlemen?
5      A.   Yes.  It says, "All, please join
6  this call to discuss the Chubb license agreement
7  and plan for Chubb Europe.  Attached are the three
8  SLSA contracts and the latest Chubb annual
9  report."
10      Q.   So do you recall sending out this
11  e-mail?
12      A.   No, I do not.
13      Q.   Okay.  You agree that you did send
14  out the e-mail at that time, right?
15      A.   It appears so based on the e-mail
16  that you presented me.
17      Q.   And the text of the e-mail states
18  that you are attaching three SLSA contracts and
19  the latest Chubb annual report, and do you see the
20  attachments to this e-mail?
21      A.   Yes, I do.
22      Q.   All right.  So does this refresh
23  your recollection at all as to whether you sent
24  out this appointment along with copies of the

Page 32

1  Chubb license agreements and the most recent Chubb
2  annual report?
3      A.   As I stated, I do not recall
4  sending this e-mail.  You know, I do -- after
5  seeing the e-mail, I do believe that this is
6  something that I would have sent, but I don't
7  recall actually physically doing it.
8      Q.   Yeah.  Fair enough.
9           And do you recall what was the
10  reason for setting up this appointment and sending
11  these documents?
12      A.   Most likely, it was a request from
13  Ian Brodie who I reported to at this time and who
14  was the client partner for Chubb.  As a client
15  support manager, it would be my role to help
16  organize and coordinate meetings for FICO in
17  support of Ian.  At this point in time, I believe
18  that Russel Schreiber was the leader of the
19  insurance group at FICO, so we would have included
20  Russ as well.
21      Q.   And do you recall what the reason
22  was for the discussion, or do you recall what was
23  discussed at this meeting?
24      A.   I do not.

**Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018**
**Fair Isaac Corporation vs. Federal Insurance Company**

Page 37

```
 1  believe I was mostly a coordinator in this effort.
 2  Those two individuals were the authoritative
 3  figures on the relationship with Chubb.
 4        Q.    Was it your understanding that the
 5  basic FICO software license excluded client
 6  affiliates from using the license?
 7        MR. HINDERAKER:  Could I ask a
 8  clarifying question?  When you say basic, are
 9  you talking about the license with Chubb or
10  just --
11        MR. FLEMING:  In general.
12        MR. HINDERAKER:  Just a general.
13        A.    I'm not aware of what our standard
14  language was related to affiliates, although it
15  was a common item for negotiation with clients in
16  general.
17        Q.    What was a common part of
18  negotiation?
19        A.    Determining the definition of
20  affiliates within the contracts.
21        Q.    Okay.  Do you recall any
22  discussions in 2008 as to whether the FICO license
23  agreement permitted use by a Chubb affiliate in
24  Europe?
```

Page 38

```
 1        MR. HINDERAKER:  Same clarifying
 2  question.  Are we talking about the Chubb
 3  license or just general licenses now?
 4        MR. FLEMING:  This license.
 5        MR. HINDERAKER:  Okay.  Thank you.
 6        A.    No, I do not recall any discussion
 7  that took place in 2008.
 8        Q.    Do you recall any discussions about
 9  that topic while you were at FICO?
10        A.    I do.
11        Q.    What do you recall?
12        A.    I recall, at some point after I
13  assumed responsibility as client partner for
14  Chubb, reviewing the agreements and at that point
15  in time, I realized the territory clause within
16  the original software license service agreement.
17  And you know, it clarified for me, you know, the
18  scope of amendment two based on that territory
19  clause.  And it highlighted for me, you know, a
20  potential discrepancy in the way that my
21  predecessors had, you know, interpreted that
22  clause.
23        Q.    And when you're talking about your
24  predecessors, are you referencing Ian Brodie or
```

Page 39

```
 1  anybody else?
 2        A.    Ian Brodie and Russ Schreiber.
 3        Q.    How had they interpreted that
 4  clause; what was the discrepancy that you just
 5  referenced?
 6        MR. HINDERAKER:  Which question do you
 7  want?  Objection.  And multiple questions.
 8  Which question do you want answered?
 9        A.    Can you clarify your question,
10  please?
11        Q.    What discrepancy are you
12  referencing?
13        A.    The extent to which the enterprise
14  license in amendment two applies from a territory
15  perspective.
16        Q.    What do you mean by that?
17        A.    I can't speak to, you know, Ian or
18  Russ's interpretation of the agreement; however,
19  based on knowledge that I had, you know, in
20  working with Henry Mirolyuz and the team at Chubb,
21  that there may have been some use of the products
22  for Chubb businesses outside the United States.
23  And so when I read the agreements, went back
24  through the territory, I, you know, highlighted
```

Page 40

```
 1  that to Russ Schreiber.  I can't be certain on the
 2  date.
 3        Q.    So when you say you highlighted
 4  that to Russ Schreiber, are you referencing an
 5  e-mail that you sent him at that time?
 6        A.    No.  It would have been in
 7  discussion.
 8        Q.    Was it ever memorialized in an
 9  e-mail?
10        A.    I couldn't recall for the nine
11  years that I worked at FICO if I wrote an e-mail
12  or not, but most likely it was in discussion with
13  Russ.
14        Q.    And when was that discussion?
15        A.    So it would be during the period of
16  time that I was a client partner responsible for
17  the Chubb account.  So it was somewhere between
18  March 2010 and February 2014.  My guess is it's in
19  that period of time when I was responsible for the
20  account.
21        Q.    So in responding to that question,
22  you were referencing the LinkedIn document, right?
23        A.    Yes.
24        Q.    So you don't have a separate
```

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

1  recollection of it without referencing a document;
2  is that fair?
3      A.   That is correct.  I was referencing
4  Exhibit 72 just to refresh my mind of the period
5  of time in which I served in that role at FICO.
6      Q.   Okay.  So let's talk about what you
7  had learned from Henry Mirolyuz about the use of
8  the Blaze product for Chubb business outside of
9  the United States.  What did you learn from him?
10      A.   So I -- in multiple conversations
11  with Henry, largely centered around presentations
12  that Henry would do internally to Chubb folks
13  around the use of Blaze Advisor, there was
14  reference to an application of Blaze Advisor for
15  renewal processing, I believe, supporting their UK
16  business.  And I also engaged in conversations
17  with Henry about some interest that the European
18  unit had around a decision simulation product that
19  FICO also offered.  But I do not recall having any
20  direct conversations with members of, you know, a
21  European team for Chubb.
22      Q.   So was it your understanding that
23  prior to your determination that you had a
24  difference in how one would interpret the license

Page 41

1  agreement than the manner in which your
2  predecessors interpreted it, that prior to that
3  time, FICO had taken the position with Chubb that
4  the use of Blaze with regard to Chubb's Canadian
5  company and its European company was within the
6  scope of the license?
7          MR. HINDERAKER:  I have two
8  objections.  One, it misstates his earlier
9  testimony; and two, it presumes someone
10  speaking on behalf of FICO as a corporation.
11      A.   Yeah.  I cannot speak to, you know,
12  what positions my predecessors may have taken with
13  Chubb in respect to their license agreement, so I
14  can't answer that question.
15      Q.   Well, you referenced this
16  discrepancy and the manner in which your
17  predecessors had interpreted this provision.  How
18  do you know how they had interpreted this
19  provision?
20      A.   Sure.  So I don't believe that they
21  ever told me this is how we interpreted it, right.
22  I think that conversation that I had with Russ
23  was, you know, directed to Russ in the way that
24  said that I, as through my role, had become aware,

Page 42

1  right, of use of the product to support the
2  Chubb's European business and, you know, making
3  Russ aware that upon my reading of the contract,
4  despite how things have been operating previously,
5  that I did not think that was in compliance with
6  our license agreement.
7      Q.   Okay.  So you said that.  What was
8  Russ saying?
9      A.   I don't recall Russ's exact
10  reaction to it, other than the fact that, you
11  know, Chubb, it was an important client of ours at
12  the time, right, and that, you know, it was not
13  the right time to take action on that.  So I was
14  not given any direction on how to proceed.
15      Q.   And did you follow that direction?
16      A.   I did.
17      Q.   So what action were you
18  contemplating or suggesting?
19          MR. HINDERAKER:  Objection.
20  Assumes facts.
21      A.   I do not recall coming into that
22  meeting with a recommendation.  You know, at this
23  point in my career, I was a fairly junior software
24  sales representative, right, and so I did not have

Page 43

1  a tremendous amount of experience of dealing with
2  these types of issues, right, and so the course
3  that I took was to report my concern to my
4  management.
5      Q.   So you didn't have a suggestion or
6  a recommendation; rather, you came to Russ
7  Schreiber and told him that you interpreted this
8  contract differently than he did?
9      A.   Correct.
10          MR. HINDERAKER:  Objection.
11  Misstates the testimony.
12      Q.   Go ahead.
13      A.   Correct.
14      Q.   Okay.
15      A.   Well, let me clarify.  I went to
16  him and expressed that I have a concern, right,
17  about what I know about the Chubb account, right,
18  and how I interpret the contract.  As I've said, I
19  cannot speculate on how Russ interpreted the
20  contract.
21      Q.   Well, if you -- why did you believe
22  there was a discrepancy, then, in the way that you
23  interpreted it and the way your predecessors had?
24  You've explained -- let me --

Page 44

**Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018**
**Fair Isaac Corporation vs. Federal Insurance Company**

1    A.   Sure.

2    Q.   You've explained how you

3  interpreted it, and my question is why did you

4  believe there was the discrepancy between the way

5  that you interpreted it and the way that your

6  predecessors interpreted it?

7    A.   Sure.  So you know, as you see here

8  in Exhibit 73, there was a meeting in 2008, right,

9  with my predecessors discussing this issue.  You

10  know, I've already testified that through

11  conversations with Henry, I was aware that there

12  was an application that was supporting Chubb

13  Europe.  So based on the understanding that that

14  exists -- existed, my assumption that my

15  predecessor was aware of it as well led me to my,

16  you know, assumption that I was interpreting the

17  contract language differently than my

18  predecessors.

19    Q.   All right.  Well, so when you spoke

20  with Russ Schreiber and told him of your

21  interpretation, did he react, did he tell you what

22  his interpretation was?

23    A.   I cannot recall.

24    Q.   Okay.  Let's look at the language

Page 45

1  that I think you're referencing.  If you look at

2  the software agreement which follows on page 1

3  under "territory," could you read that out loud?

4    A.   Yes.  "Territory.  With respect to

5  the installation and physical location of the Fair

6  Isaac products means the United States of

7  American."

8    Q.   And when you've testified -- when

9  you testified earlier today about this territory

10  limitation that you interpreted differently than

11  your predecessors, is that the provision that

12  you're referencing?

13    A.   It's that provision in combination

14  with the language in amendment two.

15    Q.   Okay.  And let's turn to amendment

16  two then.  That's the Bates Stamp Number 2294.  Do

17  you have difficulty finding it?

18    A.   I see it, yes.

19    Q.   Okay.

20    A.   Is there a specific question that

21  you have on it?

22    Q.   Right.  You had testified that your

23  interpretation of the software license was

24  different than your predecessors was based on

Page 46

1  the territory limitation that you just read in the

2  initial contract, but in addition, you said your

3  interpretation was based on a combination of that

4  territorial provision and a provision in the

5  second amendment.  So my question was, what

6  provision in the second amendment are you

7  referencing?

8    A.   Sure.  So I do want to be clear,

9  right.  You stated that it was different than the

10  interpretation of my predecessors.  I want to make

11  it clear that it's my perceived -- my perception

12  of their interpretation.  That's an important

13  point, because I do not have definitive knowledge

14  of exactly how Ian Brodie or Russ Schreiber viewed

15  this.

16        The language specifically is on

17  page 2 in the top paragraph.

18    Q.   Could you read that?

19    A.   Sure.  So it starts in the third

20  sentence where it says, "subject to and in

21  accordance with all the provisions of the

22  agreement."

23        So when I read this, I think the

24  original place you would look when you go to an

Page 47

1  amendment of this sort at FICO is you would look

2  at what the definition of the scope of that

3  agreement is, right, which is defined in both the

4  table on page 1 as enterprise wide and then you

5  read the first paragraph on page 2 that starts

6  with "The purpose of this amendment two, the

7  enterprise license shall mean that the client and

8  its affiliates may use the product for their

9  internal business purposes with no limitation

10  or on the number of seats, or CPUs, subject to and

11  in accordance with all provisions of the

12  agreement."

13        So when I read that provision, it

14  led me back to the original software license

15  agreement and the definition of territory.  At

16  that point in time, I recognized that, you know,

17  when you read the two agreements together,

18  enterprise wide as listed in amendment two is

19  constrained by the territory restriction in the

20  master -- in the master agreement, which would

21  restrict use of the product as, you know, outlined

22  in the territory definition in the master

23  agreement.

24    Q.   So just to be clear, the paragraph

Page 48

1  that you were referencing in the second amendment
2  to the software license in the service agreement
3  is on page 2, and you were referencing this
4  particular provision which I will now read.
5      Quote, "The purpose of this
6  amendment two, the enterprise wide license shall
7  mean that client and its affiliates may use the
8  Fair Isaac product for their internal business
9  purposes with no limitation on the number of seats
10  or CPUs, subject to and in accordance with all the
11  of provisions of the agreement," unquote.
12  Correct?
13      A.   That is correct.
14      Q.   Okay.  Now, at this time that you
15  came to this determination, which was sometime
16  between March 2010 and February 2014, was it your
17  understanding based on communications that you had
18  with Henry Mirolyuz and others at Chubb that Chubb
19  had the same interpretation of these provisions as
20  your predecessors did?
21      A.   You know, I have a hard time
22  speaking to what Henry's perception was of the
23  agreement.  You know, and through my time at FICO
24  and generally in my career, you know, I have been

Page 49

1  very careful not to make contract interpretations
2  on behalf of my clients.
3      So when there is, you know,
4  question about the scope of the license agreement,
5  you know, my approach has, you know, typically
6  been to provide the contract or the language to my
7  client to allow them to interpret the language for
8  themselves.
9      So I do not remember or recall
10  making the definitive statement to Henry or Chubb
11  as to what the scope of their license agreement
12  was.
13      Q.   Right.  And I'm not asking about
14  what you told them, but rather, based on their
15  actions and statements, did it appear to you that
16  Chubb interpreted this contract the same way that
17  your predecessors did?
18      A.   Based on their behavior, I would
19  say that's a fair statement.
20      Q.   Okay.  I mean, from your
21  perspective, Henry Mirolyuz and others at Chubb
22  were not in any way concealing the fact that Chubb
23  was using apps, using Blaze in Chubb Europe and in
24  Chubb Canada, correct?

Page 50

1      A.   So with respect to Chubb Europe,
2  Henry was very open about the use of the software
3  to support Europe.  You used a phrase "an
4  application in Europe."  I'm not aware of where
5  the actual technology sat for that application,
6  but he was open about, you know, the use of the
7  software for the benefit of Europe.
8      With respect to Canada, I was
9  unaware that Chubb was using the software for the
10  benefit of Canada.  I did have a number of
11  conversations with Henry about a potential use of
12  the software in Canada.  And as a sales
13  professional, right, advancing the use of our
14  software product, I do recall offering to Henry to
15  meet with his team in Canada, help them understand
16  the capabilities of our software product to
17  evaluate it for their use case, but to my best
18  recollection, the Chubb Canadian team did not take
19  up that offer.
20      And you know, following that, you
21  know, my communication with Henry on the subject,
22  you know, would, you know, die out.  And so I was
23  not certain at any point in time until, you know,
24  late in the dispute that something had actually

Page 51

1  happened in Canada in terms of the use of the
2  software.  But again, I didn't -- even with that,
3  I don't know where the software physically
4  resided.
5      Q.   When did you have these discussions
6  with Henry Mirolyuz about the potential of using
7  the app in Canada?
8      A.   I can't recall when that occurred.
9      Q.   Did it occur prior to or after the
10  time that you determined that your interpretation
11  of the software license agreement was different
12  than your predecessors?
13      A.   I can't be certain; however, I
14  think the -- my response to the inquiry from Henry
15  would -- in terms of what I was being asked to do
16  in terms of sales, probably wouldn't have varied
17  much regardless of the timing of that, right.  If
18  a client were to come to me and suggest that we
19  have a potential new use for your software,
20  whether that would be, you know, something as
21  licensed under their current license agreement or
22  would be a new sales, new license sale
23  opportunity, I would still offer to support the
24  client in a similar way to help them evaluate the

Page 52

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

Page 53

1  use case of the software, you know, whether it be
2  to try and sell professional services or sell a
3  license. So because I would have reacted in a
4  very similar way to that request from Henry, I
5  couldn't be certain if it was before or after.
6      Q.    So you did not relate to Henry
7  Mirolyuz at that time that you believed that the
8  current software license agreement between Chubb
9  and FICO would not extend to use by Chubb Canada?
10     A.    No. I can definitively say, no, I
11  did not.
12         MR. HINDERAKER: When you are at a
13     good spot, let's take a little break.
14         MR. FLEMING: All right. This is a
15     good spot. Ten minutes.
16         MR. HINDERAKER: Sure. Ten minutes
17     is fine.
18         THE VIDEOGRAPHER: The time is
19     10:05. We are off the record.
20         (Break taken.)
21         THE VIDEOGRAPHER: The time is
22     10:20. We're back on the record.
23  BY MR. FLEMING:
24     Q.    Mr. Sawyer, prior to the time you

Page 54

1  became the client partner, would you agree that it
2  was not your responsibility to understand as a
3  software license agreement -- the software license
4  agreements with your customers?
5      A.    I would say it was my
6  responsibility in combination with the client
7  partner who owned the client relationship to
8  understand the scope of our services for the
9  client, but it was not -- as I was not the sole
10  responsible party for administration of the
11  account, I was, you know, serving the client
12  partner who has ultimate say in how things
13  progressed with the client.
14     Q.    So certainly when you became a
15  contract partner, you understood it was your
16  responsibility to understand the FICO's software
17  license agreements with the customers that you
18  serviced?
19     A.    I want to clarify that my title was
20  client partner, not contract partner.
21     Q.    Client, excuse me.
22     A.    And yes. When you are the client
23  partner for an account at FICO, it is your
24  responsibility to understand the contracts

Page 55

1  associated with your assigned accounts.
2      Q.    Now, you've testified about the
3  circumstance in which you reviewed the software
4  license agreement with Chubb and arrived at this
5  interpretation that was different than your
6  predecessors. And my question is why is it that
7  you were looking at the Chubb software license
8  agreements at that time?
9      A.    I can't recall what generated my
10  requirement to look at the contracts.
11     Q.    And you provided like a four-year
12  window where that might have occurred somewhere,
13  if I'm right, between March 2010 and
14  February 2014?
15     A.    During that period of time when I
16  was -- that stretch of time when I was a client
17  partner in my first stint at FICO, which would
18  have been March 2010 to February 2014, correct.
19     Q.    Okay. Is there any way that you
20  could narrow that time period to better determine
21  when it was that you arrived at this
22  interpretation?
23     A.    Not with any degree of certainty, I
24  cannot.

Page 56

1      Q.    How soon after you arrived at the
2  that interpretation did you have the discussion
3  that you related with Russ Schreiber?
4      A.    I can't recall specifically. I
5  can't recall.
6      Q.    Well, I mean, would it have been
7  within a few weeks?
8      A.    I'm speculating. I don't remember
9  the actual event, but it seems logical that it
10  would be within a couple of weeks, yes.
11     Q.    Okay. And what's the best that you
12  can recall about that conversation you had with
13  Russ Schreiber, what you said and what he said?
14     A.    I don't recall the actual
15  conversation. I can recall that I raised the
16  issue to him. I know that I left that meeting
17  without, you know, any specific action to address
18  any concerns with Chubb, or the client, or to the
19  best of my recollection with others within FICO,
20  but I cannot recall the specifics of the
21  discussion.
22     Q.    Do you recall what you told him
23  about what -- about your interpretation?
24     A.    I don't remember the specific words

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

1   event shall be deemed to be an assignment subject
2   to this section."
3          So in my interpretation of the
4   contract, it is deemed that the proposed
5   transaction of ACE acquiring Chubb would be deemed
6   an assignment, and the first sentence in the
7   state -- in provision 10.8 says that, "No party
8   shall, without the prior written consent of the
9   party, assign or transfer this agreement." So my
10  interpretation was that the proposed merger,
11  change of control, or acquisition would constitute
12  an assignment which would require FICO's written
13  approval.
14         The sentence continues with "and,"
15  so now it layers another, in my interpretation,
16  another restriction on it that the client shall
17  also make no expanded use of the Fair Isaac
18  products as a result of such an event unless and
19  until Fair Isaac provides such written consent,
20  which will not be unreasonably withheld.
21         So my interpretation here is -- and
22  from a business perspective, my reading of this
23  would suggest that you could have -- an assignment
24  was going to occur and that required approval by

Page 125

1   FICO regardless of whether the second half, how
2   that second half of the sentence gets handled.
3   Russ's relation -- comments related to that
4   provision would be whether or not the potential
5   expanded use of the product driven by the
6   acquisition would be of the size or scale that
7   would require additional consent from FICO that
8   would be deemed reasonable.  And so my position on
9   this was, given the scale of the acquisition, that
10  the likelihood for expanded use of the product
11  would be substantial, and therefore, there would
12  be a second criteria that we would need to apply
13  in approving any sort of assignment under the
14  contract.
15      Q.   So it's your interpretation of
16  Section 10.8 that there are two separate consents
17  that are required?
18          MR. HINDERAKER:  Objection.
19  Misstates his testimony.
20      A.   So what I said is that you need --
21  you need to get FICO's consent for both parts of
22  this sentence, but the fact that the second -- the
23  fact that Russ was referencing the second half
24  doesn't invalidate the fact that an assignment

Page 126

1   would have occurred under the contract given the
2   change of control, merger acquisition.
3       Q.   So it's your interpretation that
4   FICO's consent was required first with respect to
5   the merger, right?
6           MR. HINDERAKER:  I object.
7   Misstates the testimony.  With respect to the
8   merger?
9       Q.   Well, it's your interpretation of
10  the contract that the merger constituted an
11  assignment of transfer, correct?
12      A.   At the time when these e-mails were
13  drafted --
14      Q.   Yep.
15      A.   -- my assertion was that the
16  proposed deal between Chubb and ACE would
17  constitute a change of control and would require
18  an assignment under the contract, which would
19  require FICO's consent.
20      Q.   Okay.  So first of all, it's your
21  interpretation of Section 10.8 that FICO had to
22  provide prior written consent of a transfer, which
23  included a change in control or this merger --
24          MR. HINDERAKER:  Objection.  Vague.

Page 127

1       Q.   -- right?
2       A.   My interpretation is that -- I
3   mean, it's very clear in the very first line of
4   the contract, right.  "Neither party shall,
5   without the prior written consent of the other
6   party, assign or transfer this agreement or any
7   part hereto."  Right.  In the event of change or
8   control, right, you need to get consent from FICO
9   for an assignment.
10      Q.   Okay.  So first of all, it's your
11  interpretation that Chubb needed to get FICO's
12  consent, prior written consent, of an assignment
13  or a transfer of this agreement and that the
14  merger or change of control constituted such an
15  assignment of transfer?
16      A.   Yes.
17      Q.   Okay.  That took awhile, but we got
18  there.
19          And secondly, you're saying there
20  was a second consent that would be required and
21  that, specifically, if FICO made an expanded
22  use -- excuse me, if Chubb made an expanded use of
23  the FICO product as a result of any such event,
24  that is the merger, FICO -- yeah, FICO also had to

Page 128

**Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018**
**Fair Isaac Corporation vs. Federal Insurance Company**

1 provide written consent to that?
2     MR. HINDERAKER: Objection.
3 Misstates the earlier testimony.
4     Q.   Go ahead.
5     A.   I mean, the contract is clear,
6 right, that the client shall not make expanded use
7 of the Fair Isaac products unless Fair Isaac
8 provides written consent.
9     Q.   Okay. Now, did you have any reason
10 to believe that Chubb, as a result of the merger
11 or subsequent to the merger, made any expanded use
12 of Blaze Advisor?
13     A.   Yes. I did have conversations
14 throughout the period of time from when the merger
15 was made -- planned merger or acquisition was made
16 public until the date that it actually closed with
17 Henry Mirolyuz about activities that were underway
18 in discussions with ACE around specifically the
19 speciality insurance business of Chubb and ACE
20 where they both had books of business and which
21 systems and platforms would be likely used to
22 administer that business going forward.
23     My understanding from that
24 discussion, or those discussions, were that
                                    Page 129

1 because of the size and scale of the Chubb book of
2 business in the speciality lines space, that it
3 was more likely than not that the decision would
4 be made in the future to migrate operations from
5 the Legacy ACE business onto the Legacy Chubb
6 systems, and specifically, the underwriting and
7 renewal underwriting applications for which Blaze
8 Advisor was a part of.
9     Q.   So you say there were discussions
10 with Henry Mirolyuz about what may happen
11 following the merger?
12     A.   That is correct.
13     Q.   And my question was are you aware
14 of any evidence that there actually was expanded
15 use following the merger?
16     A.   No.
17     Q.   So you would agree that if there
18 was no expanded use following the merger,
19 Section 10.8 doesn't require a consent?
20     MR. HINDERAKER: Objection.
21 Misstates testimony.
22     A.   No.
23     MR. HINDERAKER: And objection to
24 the extent it asks for a legal conclusion.
                                    Page 130

1     A.   And so no. That does not reflect
2 my testimony. I was clear, right, that any action
3 that required -- that triggers the assignment
4 clause requires approval. So in the event of a
5 change of control of client or if a client is
6 merged with, acquired, or acquired by another
7 entity or undergoes a reorganization or otherwise
8 acquires the rights to proces the business of
9 another entity, each such event shall be deemed an
10 assignment.
11     Q.   Okay. Just so I'm clear, you know,
12 we've been through this. You've stated that it's
13 your understanding of Section 10.8 that two
14 different consents were needed?
15     MR. HINDERAKER: I also object to
16 that as misstating his testimony. We will
17 rely on the record, obviously, but that does
18 misstate his testimony.
19     A.   I've been clear that any event that
20 is defined -- that, as defined as an assignment in
21 this agreement, requires consent by FICO. It also
22 says in the agreement that, you know, as such of
23 that result, you should not make expanded use of
24 the product without written consent.
                                    Page 131

1 So my interpretation of this is not
2 that there are two separate consents. It's -- my
3 interpretation is that if one of these events
4 occurs that triggers an assignment, that you need
5 to have discussion with FICO around gaining their
6 assent for the transfer or assignment of the
7 license, right, and that these elements would be
8 discussed as part of that discussion around the
9 assignment. That's my interpretation.
10     Q.   Okay. And I had understood that.
11     A.   Okay.
12     Q.   But with regard to the issue as to
13 Chubb, if Chubb -- where it says that "Chubb shall
14 make no expanded use of the FICO product as a
15 result of any such event unless and until FICO
16 provides such written consent," if there was no
17 expanded use of the FICO project after the
18 merger --
19     A.   Um --
20     Q.   -- there would be no reason for
21 Chubb to get FICO's consent as to that issue, that
22 is the issue relating to expanded use?
23     A.   I also --
24     MR. HINDERAKER: Let me speak my
                                    Page 132

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

---

Page 133

1  objections.  I object to that it misstates
2  testimony.  I object to the
3  mischaracterization of it, and I object to
4  the legal characterization of 10.8, and I
5  object to the witness being asked for a legal
6  characterization.
7       A.   So in my interpretation of this,
8  Chubb had the duty to seek and get FICO's written
9  consent for an assignment.  They failed to do so.
10  So at no point were we ever able to have a
11  discussion with the client, being Chubb in this
12  case, around their intended use of the product
13  going forward.  So at the time when this event
14  occurred, the fact that no written consent was
15  provided for the assignment is what triggered, you
16  know, our action in sending that letter to Chubb
17  notifying them of the breach.
18       Q.   Okay.  And I understand your
19  position, but with respect to this issue as to
20  whether Chubb actually had or engaged in an
21  expanded use of its FICO products, it's your
22  testimony that you're aware of no evidence that,
23  following the merger, it did so?
24            MR. HINDERAKER:  Objection to the

---

Page 134

1  extent of the foundation.
2       A.   Yeah.  I was not in a position to
3  know what was happening inside of the walls at
4  Chubb around discussions for using the platform.
5  Immediately following the conclusion of the
6  transaction, Chubb did not share any evidence with
7  us that would suggest that they planned to use the
8  scope -- the product in an expanded scope.
9       Q.   Okay.
10      A.   But lack of Chubb providing
11  evidence does not substantiate the potential, and
12  we were asking for a discussion around their
13  planned use.  My view on this is that you're
14  asking, again, for my interpretation on this.  We
15  didn't even get to Section 2 because Section 1, we
16  never granted our rights for the assignment to
17  begin with.
18      Q.   Okay.  But let's just deal right
19  now with the expanded use issue.  Following the
20  merger, you agree that you are aware of no
21  evidence that FICO engaged in more expansive use
22  of the FICO products as compared to the use of
23  which it was making before the merger?
24            MR. HINDERAKER:  I think you meant

---

Page 135

1  to say Chubb.
2       A.   Yeah.
3       Q.   Chubb, yeah.
4       A.   For clarity, after the merger, I
5  had no evidence supplied to me that would indicate
6  that Chubb used the product in an expanded way.
7       Q.   Okay.
8       A.   But as I said, prior to the actual
9  transaction closing, I did have conversations with
10  representative -- with Henry Mirolyuz from Chubb
11  who had shared potential plans for it which caused
12  our concern under the contract.
13      Q.   So are there any e-mails going back
14  and forth between you and Henry Mirolyuz about the
15  planned post-merger activity?
16      A.   I am not certain.  There is -- I do
17  remember one exchange I had with Henry -- whether
18  it was an e-mail or not, I am not certain --
19  indicating that Accenture was a significant vendor
20  partner of ACE and would likely be involved in any
21  post-merger transformation projects or integration
22  projects, and Henry had inquired about our
23  experience partnering or working with Accenture,
24  but I couldn't be certain if that was an e-mail or

---

Page 136

1  a side conversation that Henry and I had.
2       Q.   Okay.  Other than that discussion
3  or possible e-mail, are you aware of any other
4  e-mails going back and forth between you and Henry
5  Mirolyuz relating to planned activities by FICO
6  post-merger?
7            MR. HINDERAKER:  I object to the
8  question as saying any other e-mails.
9  Misstates the testimony.
10      Q.   Go ahead.
11      A.   I am -- I cannot recall any other
12  communications between me and Henry on the topic.
13      Q.   Okay.  Now, going back to
14  Section 10.8 and the language relating to where it
15  says, in the middle of that paragraph, "which
16  shall not be unreasonably withheld," do you --
17  what is it that you understand is meant by that,
18  and specifically, what is it that you understand
19  will not be unreasonably withheld?
20      A.   Right.  So my interpretation of
21  this is that when FICO licenses their software,
22  they license it for a specific scope of use, which
23  is driven by a number of parameters in our pricing
24  model.  And so my interpretation of this language

---

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

1   is that if, through the assignment of the license,
2   there is a change to one of those pricing
3   parameters for the software for the scope of use,
4   that, you know, we would evaluate the impact of
5   that and determine whether or not FICO is being
6   fairly compensated for the use of their product.
7           I would say it probably goes
8   further in terms of making sure that the type of
9   use of the product is one that is -- aligns with,
10  you know, the values of Fair Isaac and what we
11  license our software for.
12      Q.   And what is your basis for stating
13  that that is what is meant by "will not be
14  unreasonably withheld"?
15      A.   That's my reading of the contract.
16  That's the way I personally interpret it.  You
17  know --
18      Q.   Well, I mean, is it based on any
19  communications between Chubb and FICO?
20          MR. HINDERAKER:  Asked and
21      answered.
22      A.   Not between Chubb and FICO, no.
23      Q.   And is it based on any
24  communications that you've had with anybody at

Page 137

1   A.   No.
2       Q.   Is it based on any communications
3   that you're aware of prior to the Chubb merger?
4           MR. HINDERAKER:  Objection.  Vague.
5       A.   Communications with who?
6       Q.   With anybody.
7           MR. HINDERAKER:  For any period of
8   time?  Objection.  Vague.
9           THE COURT REPORTER:  I didn't hear
10  you.
11          MR. FLEMING:  There was a period of
12  time prior to the Chubb merger.
13      Q.   Was it based on any communications
14  that you're aware of that occurred prior to the
15  Chubb merger?
16          MR. HINDERAKER:  Okay.  Now we have
17  a time frame.
18          MR. FLEMING:  There was a time
19  frame already.  That was in the question.
20  Look at the transcript.
21      A.   If I'm understanding the question
22  correctly as I just stated, right, in Exhibit 80,
23  you can see I had conversations with
24  Russ Schreiber regarding that provision in the

Page 139

1   FICO?
2           MR. HINDERAKER:  Again, to the
3   extent that that question would be revealing
4   a privileged communication, then I instruct
5   you not to answer, but if you can answer it
6   otherwise, then go ahead.
7       A.   Sure.  You've already shown me --
8       Q.   Wait a minute.  My question was,
9   was it based on any communications that you have
10  had with anybody at FICO?
11          MR. HINDERAKER:  That's right.
12  Same objection.
13      Q.   Go ahead.
14      A.   So we've already -- you've shown me
15  in this Exhibit 80 discussions I had with Russ
16  Schreiber specific to that provision in the
17  contract.  So yes, that is in the record.  Beyond
18  that, there may have been privileged conversations
19  with counsel.
20      Q.   Okay.  Is your understanding of the
21  meaning of that phrase based on any conversations
22  that you've had with anybody at Chubb?
23          MR. HINDERAKER:  Asked and
24  answered.  Go ahead.

Page 138

1   contract.  Other than that, I cannot recall having
2   that discussion with others.
3       Q.   Is it based on any communications
4   you've had with the persons who were involved in
5   negotiating the contracts and specifically the
6   software license agreement between Chubb and FICO?
7           MR. HINDERAKER:  Objection to the
8   extent of what is the meaning of it.  Vague.
9       A.   As I testified earlier, Russ
10  Schreiber was the client partner, to my knowledge,
11  at FICO who negotiated the software license
12  agreements with Chubb.  And so via Exhibit 80,
13  yes, I did discuss that with the individual who
14  negotiated those contracts with Chubb.
15      Q.   Are you aware of any writing prior
16  to October 7th, 2015, which references your --
17  which provides support for your interpretation of
18  the phrase unreasonably withheld in this contract?
19      A.   So is the question did I receive
20  communications from somebody else internally at
21  FICO to substantiate my interpretation of the
22  contract, is that the question?
23      Q.   Yeah.  Or helped you arrive at that
24  interpretation?

Page 140

Depo International, Inc.
(763) 591-0535 | info@depointernational.com        Page 38 (137 - 140)

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

| | |
|---|---|
| 1 which is the expanded use? | 1 other client, I guess two clients who had engaged |
| 2     MR. HINDERAKER:  And so now my | 2 in a merger apart from Chubb and FICO's reaction |
| 3 objection.  The long preamble to the question | 3 to that.  Were you aware of any other clients, |
| 4 misstates the testimony with respect to | 4 even if they're not your clients, of FICO that |
| 5 consents in the plural, and thereafter | 5 were involved in mergers or acquisitions? |
| 6 becomes -- if you can understand it | 6     A.   I'm aware that in the course of |
| 7 thereafter, go ahead, but. | 7 normal business these things occur and likely that |
| 8     A.   No.  You know, as I've explained, | 8 occurred for other FICO clients, but I'm not |
| 9 I'm not an attorney.  I read one sentence, right, | 9 knowledgeable of specific instances of that |
| 10 that -- it's a compound sentence and that phrase | 10 occurring. |
| 11 that you're referring to such consent will not be | 11     Q.   How would you go about determining |
| 12 unreasonably withheld is all part of that one | 12 those client names at FICO if you were still at |
| 13 sentence.  I am not capable of parsing it in a -- | 13 FICO? |
| 14 you know, in a way that a lawyer would to | 14     A.   So you know, our legal team |
| 15 determine if that applies to the first part of the | 15 maintains the contracts associated with all of the |
| 16 sentence or the second part only.  I read it as | 16 client agreements at FICO.  There is a contract |
| 17 one compound sentence after which that language is | 17 library and so a search of that contract library |
| 18 a part of. | 18 would be the most logical way that I could think |
| 19     So you know, I would read this | 19 of to get to that information.  I'm not aware of |
| 20 that, from a business perspective, my knowledge of | 20 any other tracking mechanism that FICO would |
| 21 why this is included in an agreement is to protect | 21 employ to keep track of that type of -- |
| 22 us from a merger of the type that Chubb and ACE | 22     Q.   Who would be the persons most |
| 23 executed where FICO does not -- is not fairly | 23 knowledgeable at FICO about clients who have |
| 24 compensated for the potential use of its software | 24 engaged in mergers or acquisitions? |
| Page 189 | Page 191 |
| 1 by the new organization and that dialogue needs to | 1     MR. HINDERAKER:  Objection.  Lack |
| 2 happen between the firms around, one, are we | 2 of foundation. |
| 3 agreeing to the entity that they're going to | 3     A.   As I said, the legal team manages |
| 4 assign it to; and secondly, for the scope of use | 4 the contracts associated with that, so you know, |
| 5 of that product, is it consistent with the terms | 5 the leadership of the contract team within the |
| 6 under which we originally agreed and licensed the | 6 legal department would be my best... |
| 7 product. | 7     Q.   Who's that? |
| 8     Going much deeper than that I think | 8     A.   As of the time that I left FICO, it |
| 9 is out of my area of expertise, quite frankly. | 9 was Tom Carretta.  I'm not sure if he still serves |
| 10 And I know you feel like you're having a hard time | 10 in that capacity. |
| 11 getting an answer from me.  It's not because I'm | 11     Q.   Okay.  You referenced the fact that |
| 12 being evasive.  It's because it's at the point | 12 you made a call in early December 2015 in advance |
| 13 where I don't know how else to address your | 13 of your January 8th e-mail to Elie.  Could you say |
| 14 question. | 14 with anymore certainty when you made that call? |
| 15     Q.   All right. | 15     A.   I cannot on a specific date, but |
| 16     MR. FLEMING:  Let's take a | 16 FICO traditionally shuts down for the week between |
| 17 five-minute break. | 17 Christmas and New Year.  So an educated guess |
| 18     THE VIDEOGRAPHER:  The time is | 18 would be before I logged off for the holidays, so |
| 19 3:29.  We're off the record. | 19 sometime probably within the first three weeks of |
| 20     (Break taken.) | 20 December. |
| 21     THE VIDEOGRAPHER:  The time is | 21     Q.   Would you have kept track of that |
| 22 3:45.  We're back on the record. | 22 in any way.  If you had stayed at FICO, would |
| 23 BY MR. FLEMING: | 23 there have been any way to check that? |
| 24     Q.   Mr. Sawyer, you talked about one | 24     A.   No.  I did not routinely log my |
| Page 190 | Page 192 |

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

1   client phone calls in any database or anything
2   like that.
3       Q.   So there was -- we've talked about
4   this time lag between FICO finding out about the
5   prospective merger and reaching out to FICO.  Why
6   didn't anybody at FICO, to your knowledge, reach
7   out sooner, just given -- we've gone through some
8   of these e-mails that, from FICO's perspective,
9   was also a revenue opportunity.  So why was there
10  such a delay?
11      MR. HINDERAKER:  Objection.
12      A.   I would reflect the testimony
13  earlier when I answered that question.
14      Q.   So why was there such a delay?
15      MR. HINDERAKER:  Objection.  Asks
16  for speculation.  Outside of the scope of the
17  witness's knowledge.
18      A.   I testified --
19      Q.   From your perspective?
20      A.   As I testified earlier, it's my
21  understanding that from -- when organizations
22  enter into a merger transaction like this, those
23  firms have a process in place where they analyze
24  the contracts that -- vendor contracts of the two
Page 193

1   organizations that are coming together and
2   proactively will engage with vendors to understand
3   the vendor's position on the merger.  And so our
4   expectation from my understanding was we were
5   hoping that Chubb would come to the table with us.
6       Once we started to get more clarity
7   around the date that the transaction might close,
8   in the spirit of our relationship, we proactively,
9   while not required to under the contract,
10  proactively reached out to Chubb to engage in
11  dialogue.
12      Q.   You said earlier that you reached
13  out when you learned --
14      MR. HINDERAKER:  I'm sorry.  Go
15  ahead.
16      Q.   -- when you learned that the merger
17  was more imminent.  How did you learn that?
18      A.   So I can't pinpoint the specific
19  conversation that I had right before that outreach
20  to Elie, but I was in continual conversation with
21  Henry Mirolyuz.  As we pursued other deals and
22  opportunities, Chubb was evaluating using some of
23  FICO's other products and, as such, I was
24  continually having dialogue with Henry on that.
Page 194

1       I was on site in Warren several
2   times, I believe, meeting with other folks around
3   those other products.  And as part of those
4   discussions, I got a sense of the time frame that
5   they were looking at for the completion of the
6   merger.
7       Q.   Do you have Exhibit 65 before you?
8   It was redacted covered.
9       A.   Yes, I do.
10      Q.   Turn to page 2.
11      A.   Okay.
12      Q.   I'm referencing the last sentence
13  of the first paragraph where it says, "The net
14  result is that Chubb currently has a perpetual
15  enterprise-wide license for the job and net
16  version of the platform for use in the territory
17  of the United States."
18      You said that you had a discussion
19  with Russ Schreiber about that issue before
20  drafting the e-mail.  And my question is when was
21  that discussion with Schreiber?
22      MR. HINDERAKER:  Asked and answered
23  multiple times.  I object.
24      A.   So I don't know exactly when the
Page 195

1   conversation happened with Russ.  I can -- based
2   on the timeline here in this exhibit, you know,
3   it's clear to me that we came back from holiday
4   over the break.  We still had not heard from Elie.
5   It's likely that I had a conversation with Russ
6   around this time about what's the next course of
7   action we should do, given Elie has not responded
8   to my original outreach, which was the -- you
9   know, the genesis of writing that e-mail on the
10  8th.  And so I don't recall everything that was
11  discussed during that time, but I would imagine
12  that that's when I discussed it with Russ.
13      Q.   Do you recall that conversation
14  with Schreiber, what was said?
15      A.   No, I do not.
16      Q.   Okay.  Do you recall anything about
17  it?
18      A.   I worked with Russ for nine years.
19  I had daily dialogue with him multiple times per
20  day.  It's difficult for me to remember every
21  conversation that I had with him, especially when
22  you're going back two plus years now.  So no, I
23  don't.  You know, it's -- it's a logical
24  conclusion that I would have discussed it with him
Page 196

1  just based on the close nature of our working
2  relationship, but I can't recall that I called him
3  at 9:00 a.m. on a specific date or anything like
4  that.
5      Q.   Okay.  Can you turn to Exhibit 69?
6      A.   69.  Yes.
7      Q.   The March 30th, 2016, attachment,
8  page 2.
9      A.   Okay.
10     Q.   At the end of the first paragraph,
11 Mr. Carretta says, quote, "Further, FICO had
12 notified its Chubb client contact prior to the
13 merger that consent was required," end quote.  Do
14 you know what he's referencing?
15         MR. HINDERAKER:  Objection.  Asking
16 for Mr. Carretta's intention.
17     A.   I do not.  I can only speak to the
18 communications that I had with Chubb prior to the
19 merger and that communication was with Elie in
20 which I advised him that based on what we knew
21 about the potential merger, that 10.8 could apply.
22 You know, as I recall the events, given the merger
23 hadn't been completed at the time that I spoke to
24 Elie, you know, I would not have been definitive,

Page 197

1  right, in stating that it will apply, and so when
2  I read Tom's note, that last sentence in the first
3  paragraph, I do not believe that I would have been
4  the person that would have communicated that it is
5  required.  I would have communicated that it is
6  possible that it will be required based on what we
7  know about the planned merger, so.
8      Q.   Can you turn to Exhibit 83.  I'm
9  referencing the e-mail from Bill Waid to Tamra
10 Pawloski dated March 23rd, 2016.  Do you see the
11 third paragraph where it states, quote, "Given
12 this fact, I see no other outcome than Chubb
13 extending Blaze Advisor to a global license,"
14 unquote?
15     A.   Yes, I do see that.
16     Q.   Now, it was your opinion that they
17 already had a global license, right?
18         MR. HINDERAKER:  Objection.
19 Misstates testimony.  Time frame.
20 Misleading.
21     A.   Yeah.  As I've testified, over the
22 time of my employment at FICO, as I took over as
23 client partner sometime thereafter of the Chubb
24 account and upon reviewing the contracts, I

Page 198

1  discovered what I believe to be a discrepancy
2  between the way that, you know, Chubb had
3  interpreted their license and the way that FICO
4  had been operating prior to that.  At which point,
5  you know, my reading of the contract suggests that
6  the license was restricted by the territory
7  definition in the master license agreement, which
8  restricted to use in the United States or to the
9  United States territory.
10     Q.   Okay.  Do you have Exhibit 47
11 before you?
12     A.   47.  Oh, here it is.  Yes.
13     Q.   On the e-mail at the bottom of the
14 page, you state in an e-mail to Richard Hill, do
15 you not, quote, "They do have a global ELA for
16 Blaze," unquote?
17     A.   Yes, I see that.
18     Q.   All right.  Did you ever inquire of
19 anybody at Chubb what corporate entity was using
20 Blaze?
21     A.   Not that I'm aware of, no.
22     Q.   Do you know anybody at FICO who did
23 that?
24     A.   No.  I am not aware of that

Page 199

1  transpiring.
2      Q.   Okay.  Finally on Exhibit 82, we're
3  looking at the criteria for sizing Blaze Advisor
4  applications.  Why isn't the gross written
5  premiums one of the criteria?
6          MR. HINDERAKER:  Objection.  Lack
7  of foundation.
8      A.   I don't know.  You would have to
9  ask Bill Waid who generated the exhibit.
10     Q.   Okay.  Would it be your testimony
11 that those are the -- when it says -- in the
12 second paragraph where it says, "Absent these
13 parameters, we can derive them from book of
14 business or other key business metrics," is it
15 your testimony that that includes gross written
16 premiums?
17     A.   So there is -- in what Bill has
18 shared here, right, with me, is a spreadsheet that
19 includes parameters.  FICO also used a pricing
20 engine that is integrated with Salesforce.  And as
21 part of that, there are drop-down fields that the
22 salesperson is responsible for completing.  And,
23 you know, upon my departure from FICO, that was in
24 place, and gross written premium was one of the

Page 200

CASE 0:16-cv-01054-DTS   Doc. 436   Filed 07/26/19   Page 35 of 86
Chris Ivey  -  3/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2      -----------------------------------------------------
       FAIR ISAAC CORPORATION,
3
                      Plaintiff,
4

5         v.              Court File No. 16-cv-1054(WMW/DTS)

6

7      FEDERAL INSURANCE COMPANY,
       an Indiana corporation, and ACE
8      AMERICAN INSURANCE COMPANY,
       a Pennsylvania corporation,
9
                      Defendants.
10     -----------------------------------------------------

11

12

13                    VIDEO DEPOSITION OF

14                        CHRIS IVEY

15                     MARCH 14, 2019

16                       8:41 A.M.

17

18

19

20

21

22

23

24

25
```

EXHIBIT
11

**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

**Page 6**

1     THE VIDEOGRAPHER:  We're now on the video
2 record.  This is the deposition of Mr. Chris Ivey
3 in the matter of Fair Isaac Corporation versus
4 Federal Insurance Company, et al., Case No.
5 16-cv-1054.  This video deposition is being
6 recorded on March 14, 2019, in Minneapolis,
7 Minnesota.  The court reporter is Jodi
8 Weisenburger representing Depo International.  My
9 name is Kurt Glenn representing Depo
10 International.  The time now is 8:41 a.m.
11     Will counsel please identify themselves
12 for the record beginning with the noticing
13 attorney?
14     MS. JANUS:  Leah Janus, Fredrikson & Byron
15 for defendants.
16     MS. KLIEBENSTEIN:  Heather Kliebenstein of
17 Merchant & Gould for the plaintiffs, and Emily
18 Perhach for the plaintiffs.
19     CHRIS IVEY:
20 called as a witness, after having been first duly
21 sworn, was examined and testified as follows:
22     EXAMINATION
23 BY MS. JANUS:
24 Q.  Good morning.
25 A.  Good morning.

**Page 7**

1 Q.  Please state your name for the record.
2 A.  Chris Ivey.
3 Q.  And Mr. Ivey, you've had your deposition taken
4    before?
5 A.  I have.
6 Q.  Okay.  And so you're generally familiar with the
7    rules for the deposition; is that fair?
8 A.  Generally, yep.
9 Q.  Okay.  Just so that we're on the same page, I'll
10    ask you some questions, you're here to provide answers.
11    You're under oath.  Do you understand that?
12 A.  I do, yep.
13 Q.  So your testimony here is provided as if you're in
14    a court of law for a judge and a jury.  Do you
15    understand that?
16 A.  I do.
17 Q.  I'll try to wait until you're finished speaking
18    before I speak, and I'd ask that you do the same
19    so that we're not both speaking at the same time.
20    Is that okay?
21 A.  That's -- yep, makes sense.
22 Q.  Okay.  And then if you don't understand a question
23    that I ask, please ask me to rephrase it or tell
24    me that you don't understand it, otherwise I'll
25    assume that you have understood it.  Okay?

**Page 8**

1 A.  Okay.
2 Q.  What is your current employment?
3 A.  I'm employed by FICO.
4 Q.  What is your position?
5 A.  Vice president of -- I run product support.
6 Q.  Vice president of product support?
7 A.  Correct.
8 Q.  Where are you based?
9 A.  Fairfax, Virginia.
10 Q.  How long have you been vice president of product
11    support?
12 A.  About five years now.
13 Q.  So from 2014?
14 A.  Yeah, I think it was around 2014.
15 Q.  Prior to being vice president of product support,
16    what was your employment?
17 A.  I was -- various roles, but all within the
18    Professional Services Group at FICO from about
19    2003 when I joined the company to 2014.
20 Q.  You said various roles within the Product Services
21    Department?
22 A.  Within the Professional Services Group, yeah.
23 Q.  Can you describe what roles you held from 2003 to
24    2014?
25 A.  Sure.  So I started out in the Blaze Advisor

**Page 9**

1    Professional Services Group implementing Blaze
2    Advisor.  My role at that time probably -- my
3    title would have been consultant, something like
4    that.
5        I then progressed through those years
6    into a senior consultant doing something similar,
7    and I think around 2000 -- 2006 perhaps I moved
8    into sort of an operations role within the
9    Professional Services Group, and then I progressed
10    to take over some of the product implementation
11    groups within Professional Services throughout
12    that time.  So I would have progressed through
13    being a director and a senior director.
14 Q.  You said you progressed to take over what?
15 A.  Sorry.  So I progressed -- I -- so I was in the
16    Blaze Advisor group implementing Blaze Advisor,
17    and then ultimately took over that group, kind
18    of -- I became the head of that group --
19 Q.  Okay.
20 A.  -- and then progressed to take over other product
21    and solution groups in addition to that.
22 Q.  So did you remain the head of the Blaze Advisor
23    group as well?
24 A.  I did.
25 Q.  Okay.  And this is all within the Professional

Chris Ivey  -  3/14/2019
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1    Services Group?
2  **A.  Correct.**
3  Q.  Okay.  What is the Professional Services Group?
4  **A.  The Professional Services Group is the group**
5    **within the company that implements the solutions**
6    **for customers.**
7  Q.  So it's the group within FICO that --
8  **A.  Correct.**
9  Q.  -- implements solutions?
10 **A.  That implements solutions, correct, that assist**
11   **customers in implementing solutions, our -- FICO's**
12   **solutions.**
13 Q.  So if we are talking specifically about Blaze
14   Advisor for the moment, for someone who's not in
15   your industry, can you describe for me what you
16   mean by a group that assists the customer with
17   implementing FICO solution?  So with respect to
18   Blaze Advisor, what do you mean if you were going
19   to describe it to someone who isn't in your
20   industry?
21 **A.  So the way I would describe the way the company is**
22   **set up is that we have a development group that**
23   **develops products.  We then have a -- so we go and**
24   **we have a sales group that goes and sells those**
25   **products to the customers, and then the customers**
                                                  Page 10

1    need to implement those products within their own
2    **systems or infrastructure -- right? -- and to**
3    **configure them for their use.  That's where the**
4    **Professional Services Group comes in, and they**
5    **would assist customers with, you know, learning**
6    **the software and implementing it.**
7  Q.  So for Blaze Advisor, the Professional Services
8    Group would assist with the implementation of
9    Blaze Advisor at a customer or a client?
10 **A.  Correct.**
11 Q.  Okay.
12 **A.  Yep.**
13 Q.  Blaze Advisor I take it is not a product that a
14   customer could purchase and use, quote/unquote,
15   out of the box; is that correct?
16 **A.  That's correct.**
17 Q.  It needs to be integrated with the customer's
18   preexisting systems, correct?
19 **A.  Correct.**
20 Q.  And is that process of integration something that
21   the Professional Services Group handles at FICO?
22 **A.  Yes.**
23 Q.  Okay.  Did we finish going through your work
24   experience at FICO?
25 **A.  Yes.**
                                                  Page 11

1  Q.  And so we ended with you being vice president of
2    product support?
3  **A.  Correct.**
4  Q.  Okay.
5  **A.  Yep, that's where I am now.**
6  Q.  And that's been since 2014?
7  **A.  Yes.**
8  Q.  Throughout your time at FICO, you've worked on
9    issues relating to professional services for Blaze
10   Advisor.  Is that a fair statement?
11 **A.  Sorry, say that one more time.**
12 Q.  Well, is Blaze Advisor -- your work with Blaze
13   Advisor a constant throughout your time at FICO?
14 **A.  It was -- it was up until I moved in -- well, even**
15   **when I moved into product support, I now own the**
16   **product support for Blaze Advisor in addition to**
17   **other things.  So Blaze Advisor was, yes, kind of**
18   **a constant in underlying what I was doing**
19   **throughout my work areas.**
20 Q.  Okay.  What is -- is there a difference between
21   the Professional Services Group and product
22   support?
23 **A.  There is.**
24 Q.  Okay.
25 **A.  So I guess continuing my earlier discussion about**
                                                  Page 12

1    what product development does, what sales does,
2    and then professional services helps to implement
3    once the -- you know, a customer has purchased the
4    product or software; and typically after it's been
5    implemented, they will be turned over to product
6    support for ongoing kind of support and
7    maintenance assistance.
8  Q.  When did you -- was it 2014 that you transitioned
9    to product support?
10 **A.  Correct.  Yes.**
11 Q.  So up until that time it had been professional
12   services?
13 **A.  Yep.**
14 Q.  And if -- what is the difference --
15        I understand the description you gave me
16   about, you know, there's professional service
17   implementing and then product support after
18   implementation.
19 **A.  Right.**
20 Q.  What is the difference in terms of the amount or
21   the type of work that's being performed between
22   professional services and product support?
23 **A.  Generally I would say -- I mean, it's very**
24   **different.  Professional services is assisting a**
25   **customer to implement the software and all the**
                                                  Page 13

Chris Ivey - 3/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 things associated with that.
2     Product support is really there for if
3 there's a problem with the software that's
4 running. So they're not going to offer assistance
5 or provide best practices or anything like that.
6 They're simply there to -- if the system were to,
7 say, go down for some reason or it doesn't run,
8 they would call us and say, hey, it's not running,
9 can we have some help getting it back up and
10 running. It's sort of that break, fix type of --
11 if that makes sense.
12 Q. Prior to 2003, what was your employment?
13 A. I worked at a company called Seurat, S-E-U-R-A-T,
14 which was a CRM company.
15 Q. How long did you work there?
16 A. Three years.
17 Q. Prior to that?
18 A. I worked for the three years before that at
19 American Management Systems also based out of
20 Fairfax, Virginia.
21 Q. Okay. Prior to that?
22 A. Prior to that I was in college.
23 Q. Okay. And where did you go to college?
24 A. James Madison University.
25 Q. What degree did you receive?

Page 14

1 A. A bachelor of business administration.
2 Q. Any other schooling since then?
3 A. I did -- I went to Virginia Tech for a master's in
4 business administration.
5 Q. Did you do that while you were working?
6 A. I did.
7 Q. Anything else?
8 A. No, that's it.
9 Q. When did you first become involved with the Chubb
10 account at FICO?
11 A. It would have been when we started the
12 relationship, so in the -- I believe it was in the
13 2006 time frame which was around that time when I
14 was moving into an operations type role.
15 Q. And that is something you mentioned. What do you
16 mean you were moving into an operations type role?
17 A. So rather than implementing the software myself, I
18 was assisting with kind of the operations of the
19 Blaze group, meaning revenue and pipeline and
20 things like that.
21 Q. More of a management role?
22 A. More of a management role.
23 Q. You had previous to 2006 worked directly with FICO
24 customers on implementing Blaze?
25 A. Yes.

Page 15

1 Q. Okay. And as a part of that, did you go work at
2 those customers' sites in-house to assist with
3 implementation?
4 A. I did.
5 Q. Okay. When you first became involved with the
6 Chubb account, what was occurring with that
7 account?
8 A. I'll say I don't recollect a lot at that time.
9 It's quite a while ago. I would have been working
10 with the Statements of Work that we would have
11 been doing with Chubb, and I was working with Mike
12 Sawyer on that sort of relationship and the
13 Statements of Work.
14 Q. And what is a Statement of Work?
15 A. A Statement of Work is a contract with -- usually
16 with the Professional Services Group and a
17 customer defining what the Professional Services
18 Group will do for that customer.
19 Q. And so in Chubb's case, Chubb and FICO entered
20 into Statements of Work?
21 A. Yes.
22 Q. Okay. And those related to the license to use
23 Blaze?
24 A. Correct. Yes.
25 Q. Okay. And your recollection is that you became

Page 16

1 involved in that sort of when it was starting in
2 2006?
3 A. I believe so.
4 Q. Okay.
5 A. Not 100 percent sure, but yeah, that would have
6 been around the time that I was helping. I do
7 recall working with Mike Sawyer on some of the
8 Statements of Work.
9 Q. Any other involvement that you recall with
10 the Chubb account?
11 A. No direct involvement that I can recall. I
12 wouldn't have been implementing -- you know,
13 helping to deliver any of the services or
14 anything.
15 Q. Okay. Did you attend meetings with Chubb?
16 A. None that I specifically recall. Likely if we
17 were generating SOWs at that time, I would have
18 been on a call to help define the scope of it.
19 Q. You said generating what?
20 A. The Statements of Work.
21 Q. Okay. You call it a SOW?
22 A. SOW, yeah.
23 Q. Okay. S-O-W?
24 A. S-O-W, yep.
25 Q. Okay. So you may have been on calls, but you

Page 17

Chris Ivey - 3/14/2019
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1  don't recall?
2  A.  That's right.
3  Q.  Okay.  Were you involved with the Chubb account
4     then from 2006 on?
5  A.  In that they were a part of my group's -- I think
6     we had a number of Statements of Work that were
7     delivered throughout a period of years, so I was
8     probably involved in some way in those Statements
9     of Work; and then as I took over the Blaze Advisor
10    group, I would have been involved just in the --
11    they were within the confine -- you know, the
12    context of the group I was running.
13 Q.  And are you aware that your area of knowledge as
14    it relates to this case has been described as --
15    by -- has been described by FICO as knowledge of
16    professional services provided by FICO?
17 A.  Yes.
18 Q.  Is that an area of your knowledge?
19 A.  That is an area of knowledge, yes.
20 Q.  And Statements of Work with Chubb & Son?
21 A.  Correct.
22 Q.  Okay.
23    (Exhibit No. 338 was marked for identification.)
24    BY MS. JANUS:
25 Q.  Showing you what's been marked as Exhibit 338 --
                                          Page 18

1  A.  All right.
2  Q.  -- have you seen this document before?
3  A.  I'm aware of the document.  I have -- but -- I've
4     seen it in general, but I haven't read through it.
5  Q.  This is the Master Services Agreement between
6     Chubb and FICO, correct?
7  A.  Yes, it does look like that.
8  Q.  Do you know what the significance of this
9     agreement is as it relates to the work that you
10    do?
11 A.  I was not typically involved in the MSA or the
12    Master Services Agreement preparation, but I -- it
13    generally would be the umbrella over which the
14    Statements of Work would exist.
15 Q.  Okay.
16    (Exhibit No. 339 was marked for identification.)
17    BY MS. JANUS:
18 Q.  I'm showing you what's been marked as Exhibit 339.
19    Are you familiar with this document?
20 A.  Familiar in that it looks to be a Statement of
21    Work between Chubb and FICO, Chubb & Son and FICO.
22 Q.  Okay.  Do you recall having any involvement in
23    creating this Statement of Work?
24 A.  I don't have any recollection of creating this
25    Statement of Work, but it would have been around
                                          Page 19

1     the time that I was assisting with Statements of
2     Work, but I don't recall this one in particular.
3  Q.  Do you know whether this is the first or one of
4     the first Statements of Work between Chubb and
5     FICO?
6  A.  I don't know.
7  Q.  Looking at the date of June 2006, does that
8     indicate to you that it was around the time
9     that --
10 A.  Yeah, so far -- yeah, I think our relationship was
11    beginning around that time, so that would have
12    been -- yeah.
13       And looking at some of the services here,
14    it looks like these would have been services we
15    would typically provide at the beginning of an
16    engagement.
17 Q.  So I would like to talk about the services that
18    are being described.  If you take a look at number
19    1, Description of Services, is that generally
20    where whatever the professional services are that
21    are being contracted for would be described?
22 A.  Yes.
23 Q.  And let's go through what services are being
24    contemplated in this Statement of Work.  So in the
25    second full paragraph under number 1 it states,
                                          Page 20

1     "Fair Isaac will collaborate with key Client
2     stakeholders to conduct a Blaze Advisor
3     pre-project analysis."  What is that?
4  A.  A lot of times we would go into -- a client would
5     purchase our software but not really understand
6     the scope of how long it was going to take to
7     implement it or what -- different -- a lot of
8     different ways to implement it, so a lot of times
9     instead of signing up for a large implementation
10    right off the bat, they would say, all right,
11    let's come in and kind of figure out the size of
12    the bread box, if that makes sense.
13 Q.  What's going to be involved in implementing the
14    software?
15 A.  Right, and doing kind of -- yeah.  Yes.
16 Q.  Please.  And what?
17 A.  Just doing an analysis, right, of what the
18    implementation would look like.
19 Q.  Okay.  And then it goes on, "to perform discovery
20    and analysis activities for the Pending Renewal
21    Creation and Classification solution."
22 A.  Okay.
23 Q.  What does that mean?
24 A.  I would think that that is the name of the project
25    that Chubb & Son had picked for their -- the
                                          Page 21

Chris Ivey - 3/14/2019
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1  solution they were implementing.
2  Q.  And do you know what solution that was at this
3  time?
4  **A.  I do not.**
5  Q.  It says "Activities associated with this" --
6  "associated to this analysis directly support the
7  implementation phases; define, design, develop,
8  and deploy." What does that mean?
9  **A.  So Fair Isaac would usually implement in sort of a**
10  **four phase approach of, you know, define the**
11  **solution and design it out, develop it out and**
12  **then deploy it. So I think this is saying that**
13  **the activities here would lead into those kind of**
14  **implementation phases.**
15  Q.  So those are all phases of implementation?
16  **A.  Correct.**
17  Q.  Okay. "During this analysis, Fair Isaac will
18  collaborate with the Client's team in the
19  performance of the following." In what ways,
20  generally speaking, and with respect to Blaze,
21  would there be collaboration with the client's
22  team?
23  **A.  Usually in the -- there would be meetings with the**
24  **team, so workshops, sit around and -- obviously we**
25  **need to learn the business and learn what the**

Page 22

1  Q.  Any rules that would ultimately be used by Blaze
2  would be developed by Chubb ultimately, correct?
3  **A.  Not necessarily, but -- the business knowledge**
4  **would come from Chubb, but the development of the**
5  **rules may be a blend of the rules that would have**
6  **come from Chubb as well as sort of domain**
7  **knowledge that we would have brought with the**
8  **implementation.**
9  **So we would typically go in and talk**
10  **through -- they may have said, we want to do**
11  **something this way with the rule, but we say, you**
12  **know, there are other ways to do it given -- you**
13  **know, in ways to optimize the software and things**
14  **like that. So sort of a blended approach.**
15  Q.  Okay.
16  **A.  Yep.**
17  Q.  So the business knowledge comes from Chubb,
18  correct?
19  **A.  Chubb's knowledge of their vision and what they**
20  **want to do, yep, that's right.**
21  Q.  And then that informs what rules will ultimately
22  be implemented in Blaze?
23  **A.  Yes.**
24  Q.  And the actual implementation is a blend of FICO
25  and Chubb working together?

Page 24

1  implementation would look like.
2  Q.  "The depth and breadth of coverage on each of the
3  following are dependent upon budgeted hours." So
4  it will depend upon how many hours of FICO's time
5  Chubb is purchasing; is that fair?
6  **A.  That seems like it, yep.**
7  Q.  Okay. And then if we go to a), it says, "Discuss
8  and document the Client's vision for using a
9  Business Rules application to support the
10  solution." What is this describing?
11  **A.  So they had purchased a business rules software,**
12  **so I think it's -- it's stating that it's trying**
13  **to discuss what their vision was in purchasing**
14  **that software.**
15  Q.  So how they wanted to use it?
16  **A.  Correct. Yes.**
17  Q.  How Chubb wanted to use it?
18  **A.  Yes.**
19  Q.  Okay. And the business rules software is Blaze,
20  right?
21  **A.  Yes.**
22  Q.  Okay. And Blaze does not -- when Chubb purchased
23  Blaze, Blaze did not come with a set of rules that
24  Chubb could use in its business, correct?
25  **A.  Correct.**

Page 23

1  **A.  Yes.**
2  Q.  This subpart a) under number 1 in Exhibit 339 is
3  the initial discussion between the companies about
4  what Chubb wants to accomplish, right?
5  **A.  Correct.**
6  Q.  Okay. Subpart b), "Identify key client roles and
7  resources that will be necessary to support the
8  development of the Solution." Seems relatively
9  self-explanatory, but I'm not in your industry.
10  Can you explain what that means?
11  **A.  I think it's just identifying the parties on both**
12  **sides that will be -- I guess it says client**
13  **roles, so identifying the key client, Chubb &**
14  **Son's SMEs, the subject-matter experts.**
15  Q.  So what does that mean, subject-matter experts?
16  **A.  The people familiar with the Chubb & Son business.**
17  Q.  So FICO is not in the insurance industry, correct,
18  with respect to Blaze? I mean --
19  **A.  We don't sell insurance if that's --**
20  Q.  Right.
21  **A.  -- what you're asking.**
22  Q.  Yep, that was what I was asking.
23  **A.  Yep.**
24  Q.  And Blaze is not a product that is specific in
25  some way to the insurance industry, correct?

Page 25

Chris Ivey  -  3/14/2019
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1 A.  Correct.

2 Q.  Blaze doesn't come, quote/unquote, out of the box

3     with any rules that relate to the insurance

4     industry, correct?

5 A.  Correct.

6 Q.  And when I say "out of the box," what does that

7     mean to you?

8 A.  In the fashion in which it's delivered from FICO

9     initially.

10 Q.  As it's purchased?

11 A.  As it's purchased, yeah.

12 Q.  Okay.  Subpart c) is, "Review existing documented

13     process, workflows, and business rules associated

14     with the Solution."  What does that mean?

15 A.  So that's where we would have been working with

16     the Chubb & Son SMEs to review material that they

17     had relevant to the implementation of the

18     software.

19 Q.  And these are the processes, workflows and rules

20     that Chubb has pre-Blaze implementation, correct?

21 A.  I believe so.  It doesn't say that, but it's

22     existing, so yeah.

23 Q.  Okay.  And is one of the purposes of subpart c) to

24     figure out or talk about how Blaze will ultimately

25     be integrated into the existing processes,

Page 26

1     the architecture of the system or anything, so I

2     don't know if it was one component or if it was --

3     I don't know the architecture of the system.

4     Sorry.

5 Q.  Okay.  Well, generally that would be a typical

6     solution, would be that if a client has an

7     existing software application, the implementation

8     would involve Blaze Advisor becoming a component

9     of that application.

10     MS. KLIEBENSTEIN:  Objection, foundation.

11     THE WITNESS:  It would be -- Blaze Advisor

12     would be integrated into their systems as the

13     business rules management system, if that's what

14     you're asking.

15     BY MS. JANUS:

16 Q.  Okay.  Subpart e) is, "Identify and document types

17     and categories of any new rules services that will

18     need to be part of the Solution."  What is being

19     described there?

20 A.  So based on, you know, their vision of what they

21     want the business to look like -- sorry, Chubb &

22     Son's vision of what they want the business to

23     look like going forward, this is likely where

24     our -- where Fair Isaac professional services

25     starts to help with what new rules services should

Page 28

1     workflows and business rules associated with the

2     solution?

3 A.  I think so.  Typically, yeah.

4 Q.  Subpart d), "Review and catalogue existing

5     business rules for Blaze Advisor conversation" --

6     no, I'm sorry.

7 A.  "Conversion."

8 Q.  Yep, thank you.  "Review and catalogue existing

9     business rules for Blaze Advisor conversion from

10     Client's current rules services within Client's

11     existing software applications."  What does d)

12     mean?

13 A.  So we would -- I don't know that I can interpret a

14     lot more than what it says.  I mean, review and

15     catalogue the existing rules for -- from the

16     client -- from Chubb & Son's systems.

17 Q.  What does Blaze Advisor conversion refer to?

18 A.  So that would mean that we are -- again, in the

19     context of implementing Blaze Advisor, we're going

20     to take the existing knowledge and then convert it

21     to Blaze Advisor.

22 Q.  So Blaze Advisor -- the intent will be that Blaze

23     Advisor becomes one component of the client's

24     software application, correct?

25 A.  I don't know specifically because I don't recall

Page 27

1     we be looking at in terms of the insurance space,

2     and so it's -- you can see it going through the,

3     you know, let's catalogue what we've got, let's

4     talk about what we're going to need to have, and

5     that's kind of the path here.

6 Q.  What are rules services?  And I ask that, for just

7     a description of it, for someone who really isn't

8     in your industry and isn't familiar with what you

9     do.

10 A.  Okay.  So a rules service would be a technology --

11     I'm trying to think -- it would be a deployed

12     program in which we would take in data, make

13     decisions on that data and then pass some

14     resulting decision out.

15 Q.  And so this subpart e) is talking about

16     identifying types and categories of any new rules

17     services that will need to be part of the

18     solution.  So essentially -- I guess, how would

19     that be done?  What is the process of identifying

20     new -- identifying types and categories of new

21     rules services?

22 A.  There would have been a discussion, again, the

23     workshop type of discussion about how, you know,

24     we want to make decisions now around this area or

25     that area or something like that, and okay, well,

Page 29

Chris Ivey  -  3/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  A.  Correct.

2  Q.  They were created from Chubb's business

3  information and Chubb's business needs, correct?

4  A.  Correct.

5  (Exhibit No. 342 was marked for identification.)

6  BY MS. JANUS:

7  Q.  Showing you what's been marked as Deposition

8  Exhibit 342, this is a -- this is the Software

9  License and Maintenance Agreement which is

10  actually dated after the Statement of Work we just

11  looked at as Exhibit 339, correct?

12  A.  Correct.

13  Q.  And are you generally familiar with this document?

14  A.  I wouldn't have been at the time.  Now I am -- I'm

15  somewhat familiar with it, yes, from -- since I'm

16  in product support, I'm familiar with the -- more

17  of the maintenance type of aspects of it.

18  Q.  What do you mean maintenance type of aspects of

19  it?

20  A.  Just as it relates to that we provide support.

21  And I'm actually not sure.  This one is so long

22  ago.  I don't know that it --

23      So actually, this looks different I

24  believe than it is -- I am -- so I'm not really

25  familiar with this document now.

Page 50

1  Q.  Were you involved at all with negotiating the

2  agreement?

3  A.  I was not.

4  Q.  Are you aware of what the scope is of the license

5  Chubb purchased for Blaze?

6  A.  I'm not.

7  Q.  And I'd ask that question in addition with respect

8  to the two amendments to the license agreement

9  marked as Exhibit 342.  Are you aware of those

10  documents?  They're not attached to Exhibit 342,

11  but --

12  A.  So which ones are they?  Sorry.

13  Q.  They're Amendment 1 and 2 to the license

14  agreement.  Are you familiar with those?

15  A.  No.

16  (Exhibit No. 343 was marked for identification.)

17  BY MS. JANUS:

18  Q.  Showing you what's been marked as 343, this is a

19  Statement of Work dated August 11, 2006 between

20  Chubb and FICO, correct?

21  A.  Correct.

22  Q.  And are you familiar with this document?

23  A.  Not -- I'm not familiar with it, no.

24  Q.  Were you involved in --

25  A.  I mean --

Page 51

1  Q.  -- the document?  Were you involved in negotiating

2  or --

3  A.  Again, maybe around the time I may have been.  I

4  don't recall specifically.

5  Q.  Under Section 1, Description of Services, Section

6  1.1, Project Background, appears to set forth a

7  description of the services that will be provided

8  under this Statement of Work, correct?

9  A.  Correct.

10  Q.  Can you take the time you need to review it and

11  then --

12  A.  Okay.  Yep.

13  Q.  -- I'd like to ask you generally about what types

14  of services would be provided.

15  A.  Okay.  I can speak generally to it.

16  Q.  Okay.  What services were being contemplated in

17  this Statement of Work?

18  A.  So it looks like this is a -- this would have been

19  a full -- full project type of Statement of Work

20  to help really -- like we've talked about all the

21  way from beginning to end, sort of help define

22  what the project was going to look like, design

23  it, do the architecture, implement it, develop it

24  and then deploy it.

25  Q.  And this is for the project -- it's called Chubb

Page 52

1  Turbo Batch Renewal project?

2  A.  Correct.

3  Q.  Are you familiar with that project?

4  A.  I am not, or I don't recall it.

5  Q.  There's a description of it in 1.1, Project

6  Background, right?

7  A.  There is.

8  Q.  It states, "The application supports Chubb

9  underwriters and their assistants at Chubb's

10  renewal centers by classifying specialty lines

11  policies during Chubb's batch policy renewal

12  process," correct?

13  A.  Correct.

14  Q.  "Generally described, the Application is a batch

15  process that assesses specialty lines insurance

16  policies with pending renewals and categorizes

17  them for treatment," correct?

18  A.  Correct.

19  Q.  And then it says, "The Application will be

20  modified to use a rules service to perform the

21  assignment of categories," correct?

22  A.  Correct.

23  Q.  So that's -- that last sentence refers to a

24  modification to the existing application to

25  incorporate Blaze, correct?

Page 53

Chris Ivey - 3/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  A.  Yeah.  Correct, that's what's written.  I think in
2  this -- it usually would mean that -- a lot of
3  times we'd have customers that have an application
4  that's kind of hard coded so it would be difficult
5  to change and manage and all of that, so you're
6  bringing in a business rules management solution
7  to make it easier to change rules and to do all
8  these other things.
9       So usually -- I think when we're saying
10  modified, maybe -- it might not be that their
11  application is being modified.  It might be that
12  they're taking that application and putting it
13  into a rule service in order to do all the things
14  given what else is in here.  I'm speculating,
15  but --
16  Q.  So you don't know if that's what happened in this
17  case?
18  A.  I don't know.
19  Q.  Okay.  In that situation, the rules would already
20  exist, in a sense, in the preexisting application,
21  correct?
22  A.  Yep, the business logic would be in there.
23  Q.  Okay.  And so it's just a matter of converting
24  that business logic into the rules that would be
25  used in Blaze?
                                        Page 54

1  A.  Correct.
2  Q.  Okay.  And that conversion process is really what
3  FICO's expertise helps with, correct?
4  A.  Correct.
5  Q.  The actual development of the rules or the
6  business logic, as you've said, resides with
7  Chubb, correct?
8  A.  Correct, in that -- with just the amendment that
9  I've been saying around -- I think we provide
10  value during -- you know -- during our services
11  around the ways in which they --
12       So Chubb & Son might say we want to
13  arrive at this decision.  There's a number of ways
14  to get there, and we might work with them based
15  on, you know, our knowledge of previous
16  implementations and things to arrive at -- how we
17  reach the ultimate decision, but yes.
18  Q.  Yes, the rules come from Chubb and --
19  A.  The business logic -- the decision -- the ultimate
20  decision comes from Chubb, yeah, how they want to
21  decide on a customer.
22  Q.  And Chubb ultimately -- I think you testified
23  earlier, Chubb decides on what rules it wants to
24  use to get there as well, correct?
25  A.  Correct.  Yep.
                                        Page 55

1       MS. KLIEBENSTEIN:  Are you okay?  Do you want
2  to take a break?  We've been going for about an
3  hour and a half.
4       THE WITNESS:  Yeah, we can take a break.
5       MS. JANUS:  Sure, anytime.
6       THE WITNESS:  Take a quick bathroom break?
7       MS. JANUS:  Absolutely.
8       (Recess taken from 10:02 a.m. to 10:11 a.m.)
9  BY MS. JANUS:
10  Q.  Mr. Ivey, we were talking about Exhibit 343 which
11  is a Statement of Work.
12  A.  Correct.
13  Q.  Underneath the paragraph we were just reviewing,
14  so the third paragraph under 1.1, the document
15  states, "Overall, the business requirement is for
16  the rules processing solution to include the
17  following functionality," and then there's a list
18  of four bullet points, correct?
19  A.  Correct.
20  Q.  And the rule processing solution refers to what?
21  A.  I would believe it's the Turbo Batch Renewal
22  application, the --
23  Q.  Is it specifically the integration or the --
24  A.  It would be the new rule service in which we were,
25  yeah, changing the existing application over to
                                        Page 56

1  Blaze.
2  Q.  Okay.
3  A.  So the new Blaze, yeah.
4  Q.  And Blaze would be a component of that
5  application, correct?
6  A.  It could be.  I don't know what else the
7  application does, but it would be the rules
8  processing component of a -- if there was a
9  broader solution.
10  Q.  Do you know that, with respect to the project
11  being discussed in Exhibit 343, that, in fact,
12  Blaze was one component of a broader technology
13  platform that Chubb used?
14  A.  I don't know.  I don't recall the specific
15  application.
16  Q.  Do you know enough about FICO's assistance and
17  work with Chubb on Blaze to know that Chubb
18  implemented Blaze in applications that it used
19  that involved broader technology platforms than
20  just Blaze?
21  A.  Yeah, I can't speak specifically to Chubb, but I
22  would say that that would be typical of a
23  customer, right, that the -- that, for instance,
24  you have an application that's taken from the --
25  from perhaps a customer and that -- you know, we
                                        Page 57

Chris Ivey - 3/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  A. Okay.
2  Q. -- relating to the Document Print Project?
3  A. Correct.
4  Q. What does that relate to?
5  A. I don't recall that project.
6     (Exhibit Nos. 376 and 377 were marked for
7        identification.)
8  BY MS. JANUS:
9  Q. Showing you what's been marked as document 377,
10    this is a change order dated October 15, 2010, and
11    this is Extension of Rule Maintenance & Versioning
12    Strategy for Chubb Specialty Insurance, correct?
13 A. This is -- sorry, can you repeat that?
14 Q. What does this relate to?
15 A. Oh, sorry, yes, the Extension of Rule Maintenance
16    & Versioning Strategy for Chubb Specialty
17    Insurance.
18 Q. And what is that?
19 A. I don't know what the CSI project was, but it
20    sounds like we were helping them to walk through
21    issues that -- concerns they had about maintaining
22    and versioning their business rules.
23 Q. What does versioning business rules mean?
24 A. That would be like we talked earlier about how you
25    would implement a -- or change a rule or implement
Page 134

1  a rule and -- or change a rule in a test
2  environment and then promote it to production, so
3  it would take over a new version which you could
4  then -- you know, if things didn't go well, you
5  presumably roll back to the last version.
6     (Exhibit No. 378 was marked for identification.)
7  BY MS. JANUS:
8  Q. Showing you what's been marked as document 378.
9     MS. KLIEBENSTEIN: We missed 376. We can --
10    I mean, you can just stick it in there. Whatever.
11    This is 377. 375.
12    MS. JANUS: Oh, I have 376.
13    MS. KLIEBENSTEIN: You have it right there?
14    MS. JANUS: Oh, I bet -- what's your 375?
15    MS. KLIEBENSTEIN: Here's 375.
16    MS. JANUS: Yeah, okay. That's correct. So
17    can I have that -- 377 back?
18    THE WITNESS: 377 back?
19    MS. JANUS: Well, no, forget it. Just keep
20    that.
21    THE WITNESS: Okay.
22    MS. KLIEBENSTEIN: So this is 77?
23    MS. JANUS: Yep. And now you have 378?
24    THE WITNESS: I do.
25    MS. JANUS: Which is June 1, 2010? No.
Page 135

1     MS. KLIEBENSTEIN: October 29th.
2     THE WITNESS: October 29, yeah.
3     MS. JANUS: Okay. That's 378?
4     MS. KLIEBENSTEIN: Just put it on the next
5  one.
6     MS. JANUS: Right. I just don't know what --
7        378 -- okay -- October 29, 2010 Statement
8  of Work change order.
9     THE WITNESS: Correct.
10 BY MS. JANUS:
11 Q. Take a moment to review this and let me know what
12    it relates to.
13 A. It looks as though it's another consulting
14    assistance type of Statement of Work that talks to
15    kind of us bringing in some industry expertise
16    around insurance personal lines.
17 Q. Where are you looking?
18 A. Part ii.
19 Q. Where specifically?
20 A. Sorry. I guess I'm just talking generally over
21    the -- we're going to -- consulting assistance for
22    the following, that we would do an industry --
23    bringing -- consult them on an industry overview,
24    the rules taxonomy, rules harvesting, underwriting
25    rules use cases.
Page 136

1  Q. So generally, I -- obviously we can read the
2  document, but --
3  A. Right.
4  Q. -- what -- explain in your own words what this
5  Statement of Work would relate to then.
6  A. It generally sounds like -- okay. So it's in the
7  context of Center of Excellence, so it's a
8  continuation of the -- I think the education
9  around the -- of the Center of Excellence at
10 Chubb.
11 Q. And it's for 320 hours?
12 A. Correct.
13 Q. Based on this and other Statements of Work we've
14 seen, it appears that FICO had detailed knowledge
15 of Chubb's Center of Excellence?
16 A. I mean, I would assume that we knew what, yeah,
17 what Chubb was trying to achieve with the Center
18 of Excellence and that this was part of the
19 education, yeah.
20 Q. In connection with that, I take it that FICO would
21 have to have knowledge of how Blaze was being
22 used?
23 A. I mean, again, I think we -- you know, we
24 participated in enough of the projects here, based
25 on the Statements of Work, that we knew how it was
Page 137

Chris Ivey  -  3/14/2019

**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1    being used in those projects.

2          As far as the Center of Excellence, it

3    seems like the Center of Excellence is a little

4    more agnostic like we talked about where it's kind

5    of a Center of Excellence, so it's not based on

6    one specific project.

7  Q.  Right.  So it's more generalized, right?

8  A.  Correct.

9  Q.  And it relates presumably to all of the uses of

10    Blaze within the Chubb entities, correct?

11  A.  Correct.

12  Q.  We've seen Statements of Work that really aren't

13    related to a particular project as well, correct?

14  A.  Correct.

15  Q.  Those Statements of Work, some of them have

16    provided that FICO will provide general support to

17    Chubb in connection with Blaze, correct?

18  A.  Correct.

19  Q.  Showing you what's been marked as Exhibit 376,

20    this is an amendment dated November 5, 2010 and

21    it's an extension of time, correct?

22  A.  Correct.

23  Q.  Is that the primary purpose of this or are there

24    other --

25  A.  It does seem to be the primary purpose of this.

Page 138

1  A.  I'm not aware.  I don't know.

2  Q.  Okay.

3  A.  There may have been.

4    (Exhibit No. 380 was marked for identification.)

5  BY MS. JANUS:

6  Q.  Showing you what's been marked as Deposition

7    Exhibit 380, this is a document that we are

8    producing today, Heather, that shows the payments

9    from Chubb to FICO.  Have you -- you testified you

10    did not know what the payments from Chubb to FICO

11    were in total, correct?

12  A.  That's correct.

13  Q.  If you take a look at the last page of Exhibit

14    380, you see the line Total for Currency?

15  A.  Yes.

16  Q.  The number there is $6,619,560.  Do you see that?

17  A.  I do.

18  Q.  Do you know whether that represents the amount

19    that Chubb has paid to FICO in connection with the

20    Blaze Advisor software and the professional

21    services it received?

22  A.  I can't speak to that.

23  Q.  Do you have any reason to think that that number

24    is inaccurate?

25  A.  I mean, if -- I have no reason to believe that

Page 140

1    Wish to extend the timeframe.  It seems like

2    they've changed the allocation of hours, but

3    essentially it's moving, yeah, little pieces

4    around.

5    (Exhibit No. 379 was marked for identification.)

6  BY MS. JANUS:

7  Q.  Showing you what's been marked as Exhibit 379,

8    this is a Statement of Work dated July 8, 2011.

9    Take a moment to review this, let me know --

10  A.  Yep.  Okay.

11  Q.  What does this relate to?

12  A.  So this is another Blaze Advisor fundamentals job

13    course delivered to Chubb.

14  Q.  Do you know whether there were additional

15    Statements of Work entered into after 2011?

16  A.  I don't know.

17  Q.  Are Statements of Work and the monies paid

18    pursuant to Statements of Work on top of

19    maintenance fees?

20  A.  Yes.

21  Q.  Or I should say in addition to maintenance fees?

22  A.  Yes.

23  Q.  Okay.  And you said you don't know whether there

24    were additional Statements of Work entered into by

25    Chubb and FICO?

Page 139

1    this isn't a document that shows all the payments

2    to FICO and that it totals 6.6 million if that's

3    what you're asking.

4  Q.  Okay.  We talked about the number of hours that

5    FICO spent providing professional services to

6    Chubb in connection with Blaze, correct?

7  A.  Correct.

8  Q.  Would it surprise you if it was more than 3,000

9    hours over the course of the license agreement?

10  A.  It wouldn't surprise me based on what we've looked

11    at.

12  Q.  Would you agree with me that FICO had in-depth

13    knowledge of the ways in which the Chubb group of

14    entities were using Blaze?

15  A.  I think there were specific individuals at various

16    points in time, yes, that had knowledge of the

17    projects, to my knowledge.

18          I know territories are an issue here, so

19    I know that those resources were North American

20    based and would have been aware what I perceive to

21    be the North American projects that we were

22    working on.

23  Q.  So sticking with your answer for a moment then, so

24    FICO had in-depth knowledge of the projects that

25    involved Blaze that were being carried out in

Page 141

Chris Ivey  -  3/14/2019

Fair Isaac Corporation vs. Federal Insurance Company, et al.

| | |
|---|---|
| 1    North America? | 1    pursuant to Topic 6 of the deposition notice |
| 2   **A.**   **Yes.** | 2    marked as 340, right? |
| 3   Q.   Let's talk about FICO's knowledge of projects in | 3   **A.**   **Correct.** |
| 4    other territories as well. | 4   Q.   Okay. And so my question was, did FICO know about |
| 5   **A.**   **Okay.** | 5    the use of Blaze outside of the United States by |
| 6   Q.   FICO had some knowledge, I take it, of projects | 6    Chubb or any affiliated entity? |
| 7    that Chubb was carrying out relating to Blaze in | 7   **A.**   **Yep.** |
| 8    the UK, correct? | 8   Q.   And your answer was that you don't have personal |
| 9   **A.**   **In my review of Mike Sawyer's testimony, that's --** | 9    knowledge of that and that you have to defer to |
| 10    **generally they were -- there was discussion of** | 10    the testimony of Mike Sawyer and Russell |
| 11    **this topic, yes.** | 11    Schreiber, correct? |
| 12   Q.   And so my question to you is, was FICO aware that | 12   **A.**   **Correct.** |
| 13    Chubb was using Blaze in the UK, in Europe? | 13   Q.   And so what about Oliver Clark, did you review his |
| 14   **A.**   **I can't speak personally to it, but I will rely on** | 14    testimony? |
| 15    **Mike Sawyer's testimony. I wouldn't presume to** | 15   **A.**   **I did review his testimony as well, yeah.** |
| 16    **dispute anything that was in his testimony.** | 16   Q.   Okay. So do you defer to that testimony as well? |
| 17   Q.   Sure. And so the answer is yes, that FICO was | 17   **A.**   **I guess I can speak to what I believe they had** |
| 18    aware that Chubb was using Blaze in Europe? | 18    **testified on if I'm sort of acting as** |
| 19    MS. KLIEBENSTEIN: Objection, asked and | 19    **representative?** |
| 20    answered. | 20   Q.   Yeah. Yep. |
| 21    THE WITNESS: I'll just -- | 21   **A.**   **I guess that's what -- now I realize what** |
| 22   BY MS. JANUS: | 22    **you're --** |
| 23   Q.   I don't think -- okay. | 23   Q.   Yep. Yep. |
| 24   **A.**   **Sorry.** | 24   **A.**   **So I believe that -- okay. In the testimony that** |
| 25   Q.   I get that you're relying on Mike Sawyer's | 25    **I read, I believe Mike and Russ knew of some** |
| Page 142 | Page 144 |
| 1    testimony. | 1    **limited use of -- whether it be a POC or something** |
| 2   **A.**   **Yeah.** | 2    **they were doing in the UK. I don't recall if** |
| 3   Q.   I just haven't got an answer to the question yet. | 3    **Oliver had knowledge of that. He seemed like he** |
| 4    Okay. So the question is, was FICO aware that | 4    **was more in the sales aspect of it, but I think** |
| 5    Chubb was using the Blaze software in Europe? | 5    **that Mike and Russ were available and I think that** |
| 6   **A.**   **So I can't personally answer that because I don't** | 6    **Russ testified that he believed it to be very** |
| 7    **know, but I know that Mike Sawyer and Russ were** | 7    **small and sort of testing the waters type of thing** |
| 8    **deposed on that topic. I don't know their** | 8    **and that given we had a good relationship with** |
| 9    **specific answers. I mean, it was obviously a long** | 9    **Chubb that -- that he -- you know, he knew of it** |
| 10    **testimony, so I'll have to rely on their knowledge** | 10    **anyway that -- yeah.** |
| 11    **of it. I was not personally aware of any use.** | 11   Q.   Okay. So there was knowledge that Chubb or an |
| 12   Q.   Sure. Okay. I get that. | 12    affiliated entity was using Blaze in Europe? FICO |
| 13   **A.**   **Okay.** | 13    did have knowledge of use of Blaze in Europe? |
| 14    MS. JANUS: So let's maybe -- I'll circle | 14   **A.**   **Mike and Russ knew this, yes.** |
| 15    back to that in a moment, but can we just take a | 15   Q.   Okay. And they were the primary people at FICO in |
| 16    quick -- | 16    charge of the Chubb account, correct? |
| 17    THE WITNESS: Yeah. | 17   **A.**   **They were the sales teams in charge of the Chubb** |
| 18    MS. JANUS: -- 5-, 7-minute break and then | 18    **account, or the sales personnel, yes.** |
| 19    reconvene? | 19   Q.   Okay. Well -- and is that sort of the primary |
| 20    THE WITNESS: Yeah. | 20    person in charge of the -- |
| 21    (Recess taken 1:20 p.m. to 1:29 p.m.) | 21   **A.**   **Yes.** |
| 22   BY MS. JANUS: | 22   Q.   -- account? |
| 23   Q.   So we were talking about FICO's knowledge of the | 23   **A.**   **Sorry. Yes. Yes.** |
| 24    use of Blaze outside of the United States, and | 24   Q.   Okay. Was there any assistance provided by FICO |
| 25    you've been designated to testify about that topic | 25    for Chubb's use of Blaze outside of the United |
| Page 143 | Page 145 |









FICO Insurance Forum: New York

Game Changing Technology for Insurance Success
November 1, 2011
New York City

Positioning for Growth:
A Legacy System Modernization Story

Mike Meyer
Assistant Vice President
Chubb Group of Insurance
Companies

Diptesh Patel
Sr. Systems Architect
Chubb Group of Insurance
Companies

Mike Sawyer
Client Services
FICO

Date, 2011





# Agenda

» FICO Introduction

» Premium Booking Modernization Project

   » Background

   » Chubb & FICO Collaboration

   » Things we learned

» BRMS Implementation using Blaze Advisor

» Questions



FED006784_0002





# The Chubb Group of Insurance Companies

## Premium Booking Modernization Project

© 2011 Fair Isaac Corporation. Confidential.

Confidential





Premium Booking Modernization Program
A Legacy Modernization Story

## » The Chubb Group of Insurance Companies

» Chubb Corporation is a holding company for a family of property and casualty insurance and affiliated companies known as The Chubb Group of Insurance Companies or Chubb.

&raquo; Chubb is the eleventh-largest P&C U.S. insurer with a worldwide network of 120 offices and 10,200 worldwide employees in 27 countries.

&raquo; According to Fortune magazine, Chubb is the 176th largest U.S.-based corporation. Forbes listed Chubb as one of America's 400 Best Big Companies

» In 2010, the Chubb Corporation reported $50 billion in assets and $13 billion in revenues.

» Chubb serves commercial and personal customers through approximately 8,500 independent agents and brokers worldwide.

» Three of Chubb's member companies are among the select insurers that have achieved A.M. Best Company's highest rating for more than 50 years. Chubb also earns high ratings from Standard & Poor's and Moody's for financial strength.

©2011 Fair Isaac Corporation. Confidential.

FICO

FED006784_0004



**FICO.**

## Premium Booking Modernization Program
### A Legacy Modernization Story

## Background

The legacy systems that support the policy booking capability serve as the gateway to our downstream financial systems. Booked business must be validated for compliance to Chubb's policy and product rules before it can flow downstream. Adding new business involves a time consuming and complicated integration effort with the booking system.

## Legacy Booking Systems Characteristics

- Business rules embedded in 1000+ COBOL programs
- Little transparency of business rules and business process

  - Obsolete and inaccurate rules being executed
  - Rules not organized around business model
  - Duplicated rules across modules



© 2011 Fair Isaac Corporation. Confidential.

FED006784_0005



**FICO.**

Premium Booking Modernization Program
A Legacy Modernization Story

## Legacy System Challenges

- Dependency on key business and IT subject matter experts for new integrations
- Redundant and inconsistent application of policy validation rules by multiple policy administration systems
- Redundant and tightly coupled point to point integrations with booking services
- Multi-day batch process
- Manual error correction process
- Legacy architecture not conducive to SOA



FED006784_0007







## Premium Booking Modernization Program
A Legacy Modernization Story

## The Business Goal

The primary goal of the Premium Booking Modernization Program is to improve the flexibility and responsiveness of Chubb's premium booking capabilities to more quickly and efficiently respond to new business opportunities.

» More effectively enable speed to market for new business opportunities

» Reduce dependency on key business and IT subject matter experts

» Reduce complexity associated with premium booking and downstream integration processing

» Reduce IT development and maintenance costs by establishing an architecture for premium booking and downstream integration that aligns with the Enterprise Business, Information, Application and Technical Architectures

## The Business opportunity

Chubb Custom Market (CCM) had the opportunity to increase revenue by $25 million in new business. In April 2008 a decision was made to build an enterprise booking capability to support CCM's program business platform expansion.

©2011 Fair Isaac Corporation. Confidential.

FED006784_0009





# Premium Booking Modernization Program
A Legacy Modernization Story

## Key Elements of the Premium Booking Modernization Program

» Booking Services Consumer Integration Process Standardization
  » Premium Booking Knowledge Network (PBKN)
  » Wiki, playbooks, engagement process documentation
  » SME directory

» Knowledge Management
  » Rules harvesting and documentation
  » Rules analysis, translation, and business validation
  » Booking metadata repository

» Technical and Information Architecture
  » Enterprise Architecture – reference architecture, development methods and tools
  » Integration Competency Center (ICC) - SOA reference architecture, infrastructure
  » Business Rules CoE—BRMS expertise and Blaze Advisor support
  » Information Services—Common Integration Model (CIM) business objects, Metadata repository

» Program Management
  » Large distributed team
  » High level of collaboration and coordination required
  » Highly visible effort
  » Vendor management, Strategic Partnerships

© 2011 Fair Isaac Corporation. Confidential.



# FICO.

## Premium Booking Modernization Program
### A Legacy Modernization Story

## What We Learned



FED006784_0011

# Premium Booking Modernization Program
## A Legacy Modernization Story

**FICO**

# Booking Services Consumer Integration Process Standardization



page | discussion | view source | history

## Premium Booking Services - Main Page
(Redirected from Main Page)

### Welcome to the Premium Booking Wiki

The purpose of this Wiki is to provide an area to collaborate and share information related to the Premium Booking Process.

- For more information on policies and procedures visit the About Premium Booking Wiki page.



**search**

[ Go ] [ Search ]

navigation
- Main Page
- Check list
- Recent changes
- Random page
- Help

toolbox
- What links here
- Related changes
- Upload file
- Special pages
- Printable version
- Permanent link

#### Overview

Premium Booking Overview

#### Integration Process

- Integration with Premium Booking
  - Integration Process
  - Integration Process Tools and Templates

#### Business and Data Requirements

- Premium Booking Validation Rules
  - PVX2 Source System Document Cross Validation Rules
  - PVX3 Source System Document Cross Validation Rules
  - Transaction Processing Rules

#### Organization

- Premium Booking Knowledge Network
- Subject Matter Expert (SME) Directory

#### Architecture and Strategy

- Current Systems Architecture
- Future Architecture
- MPS Risk Analysis

#### Projects/Priorities

- Premium Booking Modernization Project
  - Program Charters
  - Initiative Profiles

#### Integration Initiatives

- SAS Analytics
- @Vantage

©2011 Fair Isaac Corporation. Confidential.

FED006784_0012





FED006784_0013



FED006784_0014



# Premium Booking Modernization Program
## A Legacy Modernization Story

# FICO.

## Technical and Information Architecture



**Blaze IDE—Reusable Templates**



**RMA Design**

**Reusable Caching Framework**

## Business Rules—Business Object Model

© 2011 Fair Isaac Corporation. Confidential.









FED006784_0017



# Premium Booking Modernization Program
## A Legacy Modernization Story



## Results

### 2009 vs. 2010
### CCM Program Business
Gross Written Premium by Account Month



**400% increase** in Gross Written Premium processed via the Integration Platform compared to same time last year: $15 mil 06/2009 vs $60 mil as 06/2010

» Integration of new products to booking and down stream financial feeds reduced from months to weeks.

» Business rules around Premium Booking are now understood and documented in a single, accessible repository. Our business customers verified harvested rules and eliminated a significant number of outdated, incorrect, and redundant rules.

» Single point of contact for all integrations, Premium Booking Knowledge Network (PBKN).

» Single common integration model for all business that interfaces with the Premium Booking Capability. Common Integration Model, CIM Book object definition.

» Increase in booked premium from CCM business.





Premium Booking Modernization Program
A Legacy Modernization Story

## Things to Take Away from Our Experience

» Importance of standard processes, development methodologies and tools, common integration models.

» Establishment of Enterprise Architecture best practices and target architecture.

» Collaboration and communication is key when dealing with a team composed of many diverse departments and CoEs with responsibility for building various components of the solution.

» Need to develop the skills and gain experience in roles such as Rules Analyst, Rules Architect, and Rules Developer.

» Importance of foundational work harvesting, verifying, analyzing business rules before any solution is designed.

» Choosing the right vendor to partner with before taking on a major, high visibility project.

©2011 Fair Isaac Corporation. Confidential.

FED006784_0019





The Chubb Group of Insurance Companies

BRMS Implementation Using Blaze Advisor

© 2011 Fair Isaac Corporation. Confidential.

FED006784_0020



Premium Booking Modernization Program
A Legacy Modernization Story

FICO.

# Background tasks

» Caching of data

   » Data cached from DB2 and TMF

   » Avoid leaving rule service to make call to database

» Object Model

   » CIM Book model pre-defined by Integration Competency Center (ICC)

   » Created as a Java object for use as BOM

   » Added sections for Abstractions



©2011 Fair Isaac Corporation. Confidential.

FED006784_0021

**FICO.**

# Premium Booking Modernization Program
## A Legacy Modernization Story

## Software version

» IDE:  Blaze Advisor 6.9.3 (moving to 6.10.2 soon)

» RMA: Next Generation RMA

» Web Server:  WAS 7

» SCM: CVS



**FICO.**

Premium Booking Modernization Program
A Legacy Modernization Story

# Roles and Responsibilities

**Rules Analyst**
» Creates Rule Requirements docs

**Rules Architect**
» Analyzes Rule Requirements
» Designs Blaze and Java artifacts

**Blaze Developer**
» Builds Blaze Artifacts

**Java Developer**
» Builds Java Artifacts

**Rules Developer**
» Enters rule through RMA
» Unit testing using BRUnit

**CVS Administrator**
» Determines CVS Branching needs and creates CVS Branches as needed
» Merges code across CVS Branches or to CVS Head
» Builds rule services

**QA**
» Testing using Black Box Tester

23



# Premium Booking Modernization Program
## A Legacy Modernization Story

## Repository Layout

## Rule Repository based on BOM layout

» Policy

» Location

» Base Coverage

» Specific Coverage



© 2011 Fair Isaac Corporation. Confidential.

FED006784_0024



# Premium Booking Modernization Program
## A Legacy Modernization Story

FICO

## Repository Layout (Cont'd.)

### Separate Test Project per Ruleset

» End up with large number of Projects

» Better performance in RMA

» Ease in Navigation



- Testing
  - CommonTestProject
  - BusinessTestCases
  - AbstractionTestProject
  - BaseCoverageTestProject
    - BaseCoverageCommonBookCovOnlyRulesetTestProject
    - BaseCoverageCommonRulesetTestProject
    - BaseCoverageKnockOutRulesetTestProject
    - BaseCoverageMultiCoverageRulesetTestproject
    - BaseCoveragePremiumAndLossBookCovOnlyRulesetTestProject
    - BaseCoveragePremiumAndLossRulesetTestProject
    - BaseCoverageRequiredRulesetTestProject
    - SpecificCoverageMultiCoverageRulesetTestProject
  - SurchargeRulesetTestProject
  - CommercialPropertyRulesetTestProject
  - CommercialPropertyTestProject
  - ExceptionsTestProject
  - GeneralLiabilityTestProject
  - LocationTestProject
  - PolicyTestProject
  - AbstractionTests
  - CoverageTests
  - ExceptionTests
  - LocationTests
  - PolicyTests

© 2011 Fair Isaac Corporation. Confidential.

22

FED006784_0025

## Premium Booking Modernization Program
### A Legacy Modernization Story

» Rulesets
  » Rules stored separately
    » Change Management
    » Concurrent development

» Abstractions

» Decision Tables (pseudo)
  » Actually implemented as rulesets
  » Requirements managed and maintained as a Decision Table

Confidential

FED006784_0026





**Premium Booking Modernization Program**
A Legacy Modernization Story

## Rule Flow

» Policy, Location and Base Coverage in Rule Flow

» Specific Coverage implemented programmatically using apply ruleset()

 » Created Decision Flow Template

©2011 Fair Isaac Corporation. Confidential.

22

FED006784_0027



# FICO.

## Premium Booking Modernization Program
### A Legacy Modernization Story

# Rule Flow

**Manage specific coverage flow;**

- commercialStructure canada CommercialPropertyBookingCoverages   abLocation Selection   Rulesets to be Invoked
- commercialStructure commercialPropertyBookingCoverages   abLocation Selection   Rulesets to be Invoked
- businessOperations generalLiabilityBookingCoverages   abLocation Selection   Rulesets to be Invoked
- businessOperations generalLiabilityBookingCoverages   abLocation Selection   Rulesets to be Invoked
- businessOperations generalLiabilityBookingCoverages   abLocation Selection   Rulesets to be Invoked

©2011 Fair Isaac Corporation. Confidential.

22

FED006784_0028



FICO.

Premium Booking Modernization Program
A Legacy Modernization Story

## Rule Flow

**Select abLocation(s) for coverage: " CanadaCommercialPropertyBookingCoverage " :**

Abstract value abLocation is in list
{
  Canadian
  Domestic
  Foreign
}

© 2011 Fair Isaac Corporation. Confidential.



**Premium Booking Modernization Program**
A Legacy Modernization Story

## Rule Flow

**Rulesets to be invoked for the coverage: " CanadaCommercialPropertyBookingCoverage "**

**Exception Rulesets :**
- RS_CommonPropertyBookingCoverageExceptionRuleset

**Data Validation Rulesets :**
- RS_CommonPropertyBookingCoverageRuleset
- RS_CanadaCommercialPropertyBookingCoverageRuleset

© 2011 Fair Isaac Corporation. Confidential.



Premium Booking Modernization Program
A Legacy Modernization Story

FICO.

## Working with FICO Professional Services



» FICO Principal Rules Architect
  » POC
  » Performance Testing
» FICO Solutions Integration Architect
  » System Architecture
  » Black Box Tester
» FICO Decision Analyst
  » Rules analysis
» FICO Rules Architect
  » Application Design
  » Deployment
» FICO Rules Developer
  » Application Development

FED006784_0031



Premium Booking Modernization Program
A Legacy Modernization Story

## Using Blaze APIs

### Login Page



FED006784_0032



Premium Booking Modernization Program
A Legacy Modernization Story

## Using Blaze APIs



Change
Management
Administration





# Premium Booking Modernization Program
## A Legacy Modernization Story

# Using Blaze APIs

## User Management







# FICO.

## Premium Booking Modernization Program
## A Legacy Modernization Story

# Using Blaze APIs

## Project BOM





© 2011 Fair Isaac Corporation. Confidential.



Premium Booking Modernization Program
A Legacy Modernization Story

## Using Blaze APIs

**Global Update**
» Update entire workspace

**Copy/Paste**
» Copy/paste an instance (rules and test cases)

© 2011 Fair Isaac Corporation. Confidential.

FED006784_0036

# Questions

**FICO.**

Premium Booking Modernization Program
A Legacy Modernization Story

FED006784_0037





FED006784_0038

Message

| | |
|---|---|
| **From:** | Sawyer, Michael L (Mike) [/O=FAIRISAAC/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MIKESAWYER] |
| **Sent:** | 8/14/2012 2:44:56 PM |
| **To:** | Hill, Richard [RichardHill@fico.com] |
| **CC:** | Schreiber, Russell (Russ) [RussSchreiber@fico.com]; Jacobson, Laurence Charl (Larry) [LarryJacobson@fico.com] |
| **Subject:** | RE: Chubb (again) |

It's probably 2-3 years old at this point.  They did a POC of Blaze vs Drools and selected Blaze.  I helped some folks at Chubb US put together a position paper to influence their decision.  I believe it is automated renewal underwriting.

Mike Sawyer
Client Partner - Insurance & Healthcare

FICO
Boston, MA

T  617 589 4651
C  617 401 1380
mikesawyer@fico.com
www.fico.com

-----Original Message-----
From: Hill, Richard
Sent: Tuesday, August 14, 2012 3:43 PM
To: Sawyer, Michael L (Mike)
Cc: Schreiber, Russell (Russ); Jacobson, Laurence Charl (Larry)
Subject: Re: Chubb (again)

Thanks Mike

Its just come in as a lead so will speak with the Chubb guy tomorrow.

Have cc'd Larry as he was involved with me a while ago when we tried to extend Blaze to Chubb UK.

Do you know more about the UW app in the UK as that's a new one to me?

Thanks
Richard Hill
Client Services - Partner
+44 (0)7930 451758
www.fico.com

Sent using Blackberry
Apologies for typos or brevity

----- Original Message -----
From: Sawyer, Michael L (Mike)
Sent: Tuesday, August 14, 2012 01:54 PM
To: Hill, Richard
Cc: Schreiber, Russell (Russ)
Subject: RE: Chubb (again)

Richard -

I am the CP for Chubb.  They do have a Global ELA for Blaze and have an automated UW Application running in the UK already.  As Russ pointed out, our upside is around Model Central, Decision Simulator and PS and we are doing a MC POC for them right now.  Blaze Advisor is the standard for rule deployments at Chubb and their enterprise architect has mandated that any project that requires a rule engine will use Blaze.  Henry Mirolyuz is the technical resource at Chubb responsible for Blaze and pretty much all projects run through him.

Let me know how I can help.

Mike Sawyer
Client Partner - Insurance & Healthcare

FICO



EXHIBIT
13



EXHIBIT
47

Confidential - Attorneys' Eyes Only

Boston, MA

T  617 589 4651
C  617 401 1380
mikesawyer@fico.com
www.fico.com

-----Original Message-----
From: Schreiber, Russell (Russ)
Sent: Tuesday, August 14, 2012 12:54 PM
To: Hill, Richard
Cc: Sawyer, Michael L (Mike)
Subject: Re: Chubb (again)

They do have a blaze ela, we're working a model central poc.  The need model central, simulator and always buy services in varying quantities

Check w mike sawyer on the lay of the land

Russ Schreiber
+1 917 214 2614

----- Original Message -----
From: Hill, Richard
Sent: Tuesday, August 14, 2012 11:34 AM
To: Schreiber, Russell (Russ)
Subject: Chubb (again)

Hey Russ

Chubb UK have started being interested in Blaze (again) and I'll try and speak with the new contact who apparently wants to do a POC for underwriting.

If memory serves, Owen Williams was the FICO supportive VP in Chubb Speciality and Ian Brodie the CP.

Let me lknow if anything has changes - good or bad - and more importantly whether we can actually sell anything new here as I seem to remember their US blaze license allowed them the software for free...

Hope all good with you and you enjoyed the London Olympics on TV

R
Richard Hill
Client Services - Partner
+44 (0)7930 451758
www.fico.com

Sent using Blackberry
Apologies for typos or brevity

Confidential - Attorneys' Eyes Only