Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
CASE 0:16-cv-01054-DTS   Doc. 460-8   Filed 08/08/19   Page 1 of 5
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1                UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MINNESOTA

 3
    ----------------------------------------------------
 4  FAIR ISAAC CORPORATION, )
                            )
 5           Plaintiff(s),  )
                            )
 6       vs.                ) File No. 16-cv-1054(WME/DTS)
                            )
 7  FEDERAL INSURANCE       )
    COMPANY,                )
 8  and ACE AMERICAN        )
    INSURANCE COMPANY,      )
 9                          )
             Defendant(s).  )
10  ----------------------------------------------------

11

12

13                         CONFIDENTIAL

14                      ATTORNEYS' EYES ONLY

15

16                          DEPOSITION

17       The following is the videotaped deposition of

18  THOMAS CARRETTA, taken before Julie A. Brooks, Notary

19  Public, Registered Professional Reporter, pursuant to

20  Notice of Taking Deposition, at Fredrikson & Byron,

21  4000 US Bank Plaza, 200 South Sixth Street,

22  Minneapolis, Minnesota, commencing at 9:09 a.m.,

23  Tuesday, October 9, 2018.

24                                              ┌─────────┐
                                                │ EXHIBIT │
25                                              │    8    │
                                                └─────────┘
```

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS   Doc. 460-8   Filed 08/08/19   Page 2 of 5

1   APPEARANCES:

2
        On Behalf of Plaintiff(s):
3
            Heather Kliebenstein, Esquire
4           MERCHANT & GOULD
            80 South Eighth Street, Suite 3200
5           Minneapolis, Minnesota 55402
            (612) 332-5300
6
            James Woodward, Esquire
7           FICO

8
        On Behalf of Defendant(s):
9
            Leah Janus, Esquire
10          FREDRIKSON & BYRON
            200 South Sixth Street, Suite 4000
11          Minneapolis, Minnesota 55402
            (612) 492-7373
12          cpham@fredlaw.com

13

14      Also present:

15          Scott Breckheimer, videographer

16

17

18

19

20

21

22

23

24

25

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS Doc. 460-8 Filed 08/08/19 Page 3 of 5

**Page 57**

1 is attached to here as this exhibit.
2  And then the third document is Amendment
3 Two to that same software license agreement, services
4 agreement.
5  Q. Okay. And generally, the Software
6 License and Maintenance Agreement was entered into
7 first, correct, in June of 2006?
8  A. Right. June 30, 2006, is the date of
9 the Software License and Maintenance Agreement.
10  Q. Okay. And then Amendment One followed
11 in August of 2006?
12  A. This one is dated August 1st, 2006.
13  Q. Then Amendment --
14  A. Amendment One, excuse me.
15  Q. Amendment Two followed in December of
16 2006, correct?
17  A. It is dated December 28th, 2006.
18  Q. Again, you weren't involved in actually
19 negotiating or drafting these documents?
20  A. No, I wasn't.
21  Q. One of your colleagues at the time
22 was?
23  A. That is correct.
24  Q. You mentioned that you learned, at some
25 point, that software was being used outside of the

**Page 58**

1 scope of the license; is that correct?
2  A. Yes.
3  Q. Point us to what in the contract you are
4 relying on for that position.
5  A. Is the question about when I thought
6 about it, or is the question what I think is violated?
7 I don't understand the question.
8  Q. What you think is violated.
9  A. Okay. So the Software License and
10 Maintenance Agreement and the two amendments are one
11 understanding of the parties. And as I've said before,
12 all of these terms and conditions work in tandem with
13 each other so that there are clauses that talk about
14 license restrictions, deemed assignments, confidential
15 information, and so on.
16  And I believe that they violated the
17 agreement because of the activities that they undertook
18 at Chubb & Son and that I can look to this agreement
19 and say, well, one of the elements of it is the
20 territory is the installation and physical location of
21 the software.
22  My understanding is it is not located --
23 Chubb & Son has been using it outside the United
24 States, as well as inside the United States.
25  Q. So let's start with that.

**Page 59**

1  A. Okay.
2  Q. And then we can continue on with other
3 aspects that you'd like to -- that you'd like to point
4 out.
5  MS. KLIEBENSTEIN: Were you done with
6 your answer?
7  THE WITNESS: I am done.
8 BY MS. JANUS:
9  Q. So you referenced the territory,
10 correct?
11  A. Yes.
12  Q. Okay. And that is on the first page,
13 page 1 of 16, of the Software License and Maintenance
14 Agreement. How is it that -- so how is it that you
15 read the territory to prohibit use of the software
16 outside of the United States?
17  A. Because Article 2 says, Subject to the
18 terms, conditions, and limitations of the Agreement,
19 Fair Isaac grants. One of the terms is the
20 "Territory," which it specifically says, "Territory"
21 means with respect to the installation and physical
22 location of the Fair Isaac products.
23  Q. It means the United States of America?
24  A. It means the United States of America.
25  Q. You are looking at paragraph 2.1 to

**Page 60**

1 determine what the scope of the grant is for use,
2 correct?
3  A. In part.
4  Q. And that's -- the license grant to Fair
5 Isaac products, that's a very typical term in FICO's
6 software license agreements, correct?
7  MS. KLIEBENSTEIN: Objection.
8 Speculation.
9  THE WITNESS: I don't know what the
10 question is. Are you saying there's a license grant,
11 typically, in our license agreements?
12 BY MS. JANUS:
13  Q. Correct, that is my question.
14  A. There are typical license grants in
15 license agreements.
16  Q. Pretty key term of a license agreement,
17 right?
18  A. It is one of the terms.
19  Q. Yes. And it is the granting language of
20 the license, correct?
21  A. Not exclusively.
22  Q. Okay. But it is one place that you look
23 to to see what license is being granted in this
24 agreement, correct?
25  A. Right, it is one of the components of

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 460-8 Filed 08/08/19 Page 4 of 5

**Page 101**

1 and FICO in connection with that license agreement; is
2 that fair?
3     A. I didn't negotiate the deal, so I don't
4 have any knowledge of it.
5     Q. So you don't know. You are just
6 speculating about why it is that it was drafted in that
7 way?
8     A. Well, I was trying to be responsive to
9 your question.
10     Q. Is it your position that the agreement,
11 that Exhibit 80, which is the Chubb & Son license
12 agreement, limits the use of Blaze anywhere outside of
13 the United States?
14     A. 80 has some extra material, I guess, so
15 this is not part of the agreement, these emails.
16     Q. I've been referring to Exhibit 80 as
17 these three documents that we're discussing as the
18 Chubb & Son agreement.
19     A. Okay. I'm just trying to be clear.
20     Q. Yeah.
21     MS. KLIEBENSTEIN: 80 is marked as the email
22 plus the --
23     THE WITNESS: Yeah.
24 BY MS. JANUS:
25     Q. We're talking about the documents that I

**Page 102**

1 tabbed as the license agreements relating to Chubb &
2 Son, correct?
3     MS. KLIEBENSTEIN: Could you either ask
4 the question again or re-read it.
5 BY MS. JANUS:
6     Q. Yeah, I can ask it. Is it your position
7 that the Chubb license agreement prohibits Chubb's use
8 of the Blaze software outside of the United States?
9     A. The agreement and the two amendments
10 that we've been talking about limit the use to the
11 United States for physical installation and physical
12 location.
13     Q. Okay. So my question for you is: Does
14 that mean that, in your view, the license prohibits
15 Chubb from using the software outside of the United
16 States?
17     A. I didn't write it. But I can tell you,
18 it says, with respect to the installation and physical
19 location of the product means the United States of
20 America.
21     And it is also dependant on the Chubb &
22 Son business segment of this Federal Insurance Company,
23 so that is another factor to consider in its ability to
24 be used elsewhere. But they all have to be
25 employees.

**Page 103**

1     Q. So it says with -- you are talking about
2 the territory definition. You are saying, "with
3 respect to the installation and physical location of
4 the Fair Isaac products." What does that mean?
5     A. Well, this software is installed at the
6 client's premises, so it is not a SAS product or a
7 hosted product that can be remotely accessed. This is
8 installed at the client's premises, and so that's why
9 it talks about physical installation -- excuse me,
10 physical location and installation. It is installed
11 somewhere in the United States on behalf of Chubb &
12 Son.
13     Q. Can it be used outside of the United
14 States?
15     MS. KLIEBENSTEIN: Objection. Vague.
16 BY MS. JANUS:
17     Q. Or is installation and physical location
18 the same as use, in your view?
19     A. The software is given to the client and
20 has certain configurability. I don't know how they
21 configured it.
22     Q. Is installation and physical location
23 the same as use, in your view?
24     A. I view it that way.
25     Q. Okay. So you view this clause relating

**Page 104**

1 to territory to, essentially, mean that territory means
2 use within the United States of America?
3     MS. KLIEBENSTEIN: I'm going to object
4 to that as calling for a legal conclusion. Are you
5 asking for his factual understanding or a legal
6 interpretation?
7     MS. JANUS: Whatever his interpretation
8 is. I would expect it is legal, since this is his job,
9 to interpret FICO licenses but --
10     THE WITNESS: Let me try and answer
11 your question. You asked earlier if the word -- having
12 the words "territory" in here is a superfluous term.
13 The answer is no. Otherwise, it wouldn't be in the
14 agreement. So it is an important term.
15     And it says, "with respect to the
16 installation and physical location." That means the
17 products must be installed in the United States.
18     And since they are behind the firewall,
19 because it is an internal business purpose, that means
20 nobody outside of the firewall should be using it.
21 BY MS. JANUS:
22     Q. So your view is: When it says, "with
23 respect to the installation and physical location of
24 the Fair Isaac Products, means the United States of
25 America," that limits use anywhere other than the

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS  Doc. 460-8  Filed 08/08/19  Page 5 of 5

Page 105

1 United States of America?
2   A.  Well, because there's a whole host of
3 laws that impact that.
4   Q.  I'm asking for the answer to my
5 question.
6   A.  I'm trying to answer your question.
7   Q.  No.  But you just started not answering
8 my question.
9   A.  Well, you asked the question, does it
10 limit the use to the United States?
11   Q.  Yes.  That's what I am trying to
12 understand.
13   A.  And the answer is, when you look at this
14 agreement, there's no export right clause.  And I don't
15 expect you are familiar with this.  But that means --
16 access outside of the United States is a deemed export,
17 so you would have to have the permission of the U.S.
18 government to do that, number one, within their rules.
19 And when you add territory in there, that means use is
20 implied to be in the United States.
21   Q.  Okay.  So in terms of the territory
22 clause, installation and physical location, in your
23 view, means use?
24   A.  In the United States.
25   Q.  Okay.  And, therefore, there can be no

Page 106

1 permissible use outside of the United States, fair?
2   MS. KLIEBENSTEIN:  Objection.  Vague and
3 calls for speculation.
4   THE WITNESS:  The permissions are in the
5 agreement.
6 BY MS. JANUS:
7   Q.  I'm asking about the agreement.  So what
8 was unclear about my question?  Are there permissible
9 uses outside of the United States, under your reading
10 of the license agreement?
11   A.  I don't think so.
12   Q.  Okay.  So the answer to my question
13 would have been, yes, there are no permissible uses
14 outside of the U.S., in your view.
15   A.  My answer would be that I don't view it
16 as permissible uses outside of the United States.
17   Q.  Because you could not have a use that
18 did not involve an installation of the software; is
19 that fair?
20   A.  Right.  You are not allowed to install
21 it outside the United States.
22   Q.  And any use outside of the United States
23 would involve installation of the software?
24   A.  Well, to be able to access it, yeah.
25 That's what I mean by the firewall.

Page 107

1   Q.  All right.  Are there any other
2 provisions of the Chubb license agreement that are --
3 that support your position that use outside of the
4 United States is not allowed?
5   A.  Sure.  So there's a clause, as an
6 example, that says -- let me find it for you.  We've
7 talked about the entire agreement is guiding this.
8   Q.  And that is which clause?
9   A.  The Entire Agreement clause is Section
10 10.5.
11     And then I don't know if I've mentioned
12 this.  But Clause 10.12, No Third Party Beneficiaries,
13 means that there's -- the agreement is not deemed to
14 create any right or benefit to a person not a party to
15 this agreement.
16     There's a clause that provides that you
17 can't assign the agreement to any third party.  There's
18 two of those clauses.  Or transfer without our prior
19 consent.  There's the clause that deals with -- I'm
20 looking for it right now.  It should be.
21   Q.  So we're sticking on territory right
22 now, right?
23   A.  No.  But all of these impact territory.
24 That's what I am saying.
25   Q.  Well, I don't understand that.  Because,

Page 108

1 as you know, the agreement was expanded to become an
2 enterprisewide license agreement, correct, in December
3 of 2006?
4   A.  "Enterprise" being a defined term.
5   Q.  Enterprisewide license agreement, right?
6   A.  Yeah, as defined.
7   Q.  Okay.  And that included affiliates,
8 correct?  We can go over all this in more detail.  But
9 I just want to make clear that what I am talking about
10 is the use outside of the United States right now.
11   A.  Right.  Well, let me finish answering my
12 question about the United States.  So there's a clause
13 that says you are going to comply with law.
14   Q.  Okay.  Point me to the specific clauses.
15   A.  Okay.  10.7.
16   Q.  Governing Law?
17   A.  Yep.  So the agreement is governed by
18 New York law.  And there's a reason that was chosen.
19 Because New York law construes these very strictly,
20 license agreements.  And other laws apply, federal law.
21 So there's no right to export, for instance, in here.
22 So unless you ask for the right to export, your law is
23 strictly construed.  It means you don't have the right
24 to export.  So that implicates territory.
25   Q.  Okay.