Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 460-14 Filed 08/08/19 Page 1 of 3

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
 2
     - - - - - - - - - - - - - - - - - - - - - - - - - -
 3
     FAIR ISAAC CORPORATION,
 4
                     Plaintiff,
 5
         v.            Court File No. 16-cv-1054 (WMW/DTS)
 6
     FEDERAL INSURANCE COMPANY,
 7   an Indiana corporation, and ACE
     AMERICAN INSURANCE COMPANY,
 8   a Pennsylvania corporation,

 9                   Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - -

11                       VIDEO DEPOSITION

12         The following is the video deposition of

13   NEIL J. ZOLTOWSKI, taken before Jean F. Soule,

14   Notary Public, Registered Professional Reporter,

15   pursuant to Notice of Taking Deposition, at the law

16   office of Fredrikson & Byron, P.A., 200 South Sixth

17   Street, Suite 4000, Mille Lacs Conference Room,

18   Minneapolis, Minnesota, commencing at 8:09 a.m.,

19   Friday, June 14, 2019.

20

21                       *    *    *

22

23                  C O N F I D E N T I A L

24                  ATTORNEYS' EYES ONLY

25
```

EXHIBIT 14

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019
CASE 0:16-cv-01054-DTS Doc. 460-14 Filed 08/08/19 Page 2 of 3
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 203**

1 Q. In paragraph 106 you state "that
2 Courts require defendants to meet strict guidelines
3 and parameters in proving overhead expenses
4 incurred to generate accused revenues from
5 copyright infringement," and you cite two cases in
6 Footnote 174; is that right?
7 A. That's correct.
8 Q. How did you obtain these two cases?
9 A. I believe the Alexander v. Chesapeake
10 case may have been provided by counsel. I was
11 familiar with the Frank Music case just from my
12 experience at work in the intellectual property
13 industry.
14 Q. And in paragraph 108 you admit that
15 you relied on Mr. Whitener entirely to show a
16 causal nexus; is that true?
17 A. I state there that I'm relying upon
18 Bick Whitener and his analysis related to causal
19 nexus. I think I discussed some of the pieces of
20 information that I reviewed that helped me validate
21 the fact that his opinion related to a causal nexus
22 was reasonable.
23 Q. And you conducted no independent
24 analysis to determine that, in fact, there was a
25 causal nexus, rather, you relied on Mr. Whitener;

**Page 204**

1 is that fair?
2 A. I think it's fair to state that with
3 the caveat I -- in my last answer, which is I did
4 review information that was cited by Mr. Whitener
5 in his report analysis that allowed me to feel his
6 opinions on this issue were reasonable.
7 Q. Paragraph 112 you state that FICO
8 offered steep discounts to Defendants to resolve
9 this dispute in the post-merger negotiations. What
10 is your source for saying that?
11 A. I think that's just my interpretation
12 of the discounts that were offered.
13 Q. What do you mean by that?
14 A. Meaning that's my terminology in terms
15 of steep discounts. I know there were discounts
16 provided, and there were different offers made by
17 FICO to defendants. Steep would be my terminology.
18 Q. And my question is more focused on
19 FICO's intentions in offering these discounts.
20 What was your basis for saying that?
21 A. I'm not sure I understand your
22 question. Could you repeat it, please?
23 Q. It says FICO offered steep discounts
24 to resolve the dispute. What is the basis for your
25 understanding of FICO's intentions at that time?

**Page 205**

1 A. I spoke about this earlier, but the
2 intentions of FICO when it enters into licenses
3 such as what it was negotiating with the defendants
4 is a long-term relationship, and that's demonstrated
5 by the fact that I think more than 6.6 million in
6 professional fees were received by FICO from
7 defendants over the course of -- the course of the
8 period that the agreement was effective and active,
9 and that's why I state that it historically has
10 been lucrative in my report at the end of that
11 sentence.
12 And so I believe FICO's expectations
13 in those actual negotiations was that they had an
14 expectation the relationship with defendants would
15 continue forward as a long-term relationship, which
16 would result in additional professional fees, which
17 is what FICO's expectation is typically entering
18 into negotiations like that.
19 MR. FLEMING: Why don't we take a
20 five-minute break right now.
21 THE VIDEOGRAPHER: Going off the
22 record. The time is now 2:37 p.m.
23 (Break from 2:37 to 2:43.)
24 (Whereupon, Deposition Exhibit No. 464
25 was marked for identification, and a copy is

**Page 206**

1 attached and hereby made a part of this deposition.)
2 THE VIDEOGRAPHER: We're back on the
3 record. The time is now 2:43 p.m.
4 BY MR. FLEMING:
5 Q. Mr. Zoltowski, showing you what's been
6 marked as Exhibit 464, can you identify this
7 document?
8 A. These are supplemental schedules to my
9 schedules attached to my initial report.
10 Q. And when did you prepare these?
11 A. This week.
12 Q. And what was the purpose in preparing
13 these schedules?
14 A. So, on page 42 of my initial report,
15 in paragraph 121, I state in terms of FICO's actual
16 damages as it relates to copyright infringement
17 that "The Copyright Act permits recovery of actual
18 damages suffered as a result of the infringement.
19 As discussed above in Section VII(A), FICO has lost
20 deployment and development seat license, support,
21 and maintenance fee." And what I am attempting to
22 do here is just provide clarity as I realize that
23 there's a difference statute of limitations that,
24 therefore, changes certain of the fees that were --
25 lost license fees that were quantified.

**Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019**
CASE 0:16-cv-01054-DTS Doc. 460-14 Filed 08/08/19 Page 3 of 3
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 And so if you look at the Supplemental
2 Schedule 3.0, you can see that based on the breach
3 of contract cause of action my opinion is the lost
4 sife -- software license fees are 37.4 million, and
5 when you look at the same lost sife -- lost software
6 license fees under a copyright infringement cause
7 of action, based upon just timing, that number is
8 reduced to $34.1 million.
9   So, again, this is just for clarity in
10 providing my opinion as to the quantification of
11 damages for lost license fees under FICO's actual
12 damages and the copyright infringement claim.
13  Q.  And are the -- could you explain the
14 pages 2 and 3?  Have you made revisions in your
15 prior schedules?
16  A.  So if you look at Schedule 4.0 of my
17 initial report, you will see that the supplemental
18 schedule is exactly the same.  There's been no
19 change based upon this timing issue related to the
20 statute of limitations.
21  Q.  Uh-huh.
22  A.  However, in Supplemental Schedule 5.0,
23 you can see that there's been changes to a few of
24 the line items, specifically ADAPT Australia, ADAPT
25 UK, and EZER, which is E-Z-E-R, for the UK and

Page 207

1 Europe.
2   So based upon the changes which are
3 reflected in this supplemental schedule, which is
4 based on the fact that damages period starts three
5 years before the filing date of the complaint,
6 which is April 21st, 2016, the result of this
7 supplemental schedule is 17.9 million, which is a
8 reduction from my initial Schedule 5 under a breach
9 of contract cause of action, which is 21.3 million.
10  MR. FLEMING:  All right.  All right.
11 I have no further questions.  I appreciate your
12 time.
13  THE WITNESS:  Thank you.
14  MS. KLIEBENSTEIN:  I have a few.
15
16   EXAMINATION
17 BY MS. KLIEBENSTEIN:
18  Q.  Mr. Zoltowski, you were asked earlier
19 about who created the rules that are used in
20 Federal's copy of Blaze Advisor earlier.  Do you
21 remember that?
22  A.  I do.
23  Q.  Have you reviewed the rules used in
24 Federal's copy of Blaze Advisor?
25  A.  No, I have not.

Page 208

1  Q.  And why is that?
2  A.  I don't believe they have been
3 produced in this proceeding, which would allow me
4 to review those rules.
5  Q.  And so you haven't been able to sit
6 down with anyone at FICO to determine who wrote the
7 rules in Federal's copy of Blaze Advisor?
8  A.  That's correct.
9  Q.  You were asked several questions about
10 your specific experience earlier in the morning.
11 Do you recall those questions?
12  A.  I do.
13  Q.  And what is it that you would say is
14 your -- is your profession?
15  A.  I describe my profession, I guess it's
16 a consultant from a broad perspective.  But my
17 experience over the past 20 years has been in the
18 intellectual property industry, specifically
19 performing valuation work, providing consulting
20 services as it relates to licensing of intellectual
21 property, and the analysis and quantification of
22 damages from an expert witness perspective in
23 the -- a dispute setting.
24   And, as I stated, I've been doing this
25 for over 20 years, and it has covered a wide array

Page 209

1 of cases under all forms of intellectual property,
2 be it patent infringement, copyright infringement,
3 trademark infringement, trade secrets
4 misappropriation.  I've worked on a lot of tort
5 cases related to unfair competition.  I've worked
6 on a number of breach of contract matters,
7 specifically one which is a pricing -- a issue
8 related to pricing of a -- of actually a product
9 called the tantalum, which is a component that's
10 used in mobile phones, and I mention that case
11 because I worked on it for six years, and I think I
12 spent two or three of those years at a white board,
13 laying out all of the different scenarios, I think
14 we're up to over a hundred scenarios as to how you
15 could potentially price that product under that
16 agreement.
17   So in a -- from a 10,000-foot level,
18 that's my experience and expertise.
19  Q.  And during your deposition you were
20 asked a number of questions about the content
21 between paragraphs 30 through 50 of your report
22 that relate to the economic unit at issue in this
23 case.  Do you recall those questions?
24  A.  I do.
25  Q.  Have you been a part of any

Page 210