<pre>
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
    ------------------------------------------------------------
3   Fair Isaac Corporation,        )
                                   )   File No. 16-CV-1054
4            Plaintiff,            )           (WMM/DTS)
    v.                             )
5                                  )
    Federal Insurance Company, an  )   Minneapolis, Minnesota
6   Indiana corporation; and ACE   )   July 30, 2019
    American Insurance Company, a  )   1:00 p.m.
7   Pennsylvania corporation,      )
                                   )
8            Defendants.           )
    ------------------------------------------------------------
9
               BEFORE THE HONORABLE DAVID T. SCHULTZ
10        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
              (AUDIO TRANSCRIPTION OF:  MOTIONS HEARING)
11
    APPEARANCES
12    For the Plaintiff:          MERCHANT & GOULD, PC
                                  ALLEN HINDERAKER, ESQ.
13                                HEATHER KLIEBENSTEIN, ESQ.
                                  80 S. 8th St., #3200
14                                Minneapolis, Minnesota 55402

15    For the Defendants:         FREDRIKSON & BYRON, PA
                                  TERRENCE FLEMING, ESQ.
16                                CHRISTOPHER PHAM, ESQ.
                                  CHRISTIAN HOKANS, ESQ.
17                                200 S. 6th St., #4000
                                  Minneapolis, Minnesota 55402
18
      Court reporter:             DEBRA BEAUVAIS, RPR-CRR
19                                300 S. 4th St., #1005
                                  Minneapolis, Minnesota 55415
20

21

22
         Proceedings recorded by mechanical stenography;
23   transcript produced by computer.

24

25
</pre>

1          **P R O C E E D I N G S**

2              **IN OPEN COURT**

3              THE LAW CLERK:  All rise.

4              THE COURT:  Good afternoon.  Please be seated.

5              Okay.  Good afternoon.  We are on the record in

6      the matter of Fair Isaac v. Federal Insurance, Civil No.

7      16-1054.

8              Counsel for Fair Isaac, if you would note your

9      appearance for the record, please.

10             MR. HINDERAKER:  Your Honor, Allen Hinderaker and

11     Heather Kliebenstein from Merchant & Gould, and James

12     Woodward, Vice President, Deputy General Counsel from Fair

13     Isaac.

14             THE COURT:  Good afternoon to the three of you.

15             Counsel for Federal, if you would note your

16     appearance as well.

17             MR. FLEMING:  Good afternoon, Your Honor.  Terry

18     Fleming, Christian Hokans, and Chris Pham of the Fredrikson

19     firm representing the defendants.

20             THE COURT:  Good afternoon to the three of you.

21             All right.  We have two motions:  one to strike

22     the jury demand with respect to the award of profits, and

23     the second for a motion to compel some responses to

24     discovery.

25             My recollection is the motion to strike was the

1    first filed.  Is that correct?

2              MR. FLEMING:  Yes.

3              THE COURT:  All right.  Mr. Fleming, I have read

4    everything.  You know, if you can be as reasonably brief as

5    possible, that would be appreciated.

6              MR. FLEMING:  Thank you, Your Honor.

7              Your Honor, defendants move for an order striking

8    plaintiff's demand for a jury trial as a remedy for

9    disgorging any of the defendants' profits attributable to

10   the use of Blaze under the Copyright Act.  The reason is the

11   copyright disgorgement remedy does not satisfy the Supreme

12   Court's test for a jury trial right under the Seventh

13   Amendment.

14             First of all, we believe this is the appropriate

15   Court to bring this argument.  When you look at the

16   statutory provision stating the magistrate's authority under

17   28 U.S.C. 636, there's certainly nothing precluding bringing

18   the motion here.  The local rules are the same.

19             There is a lack of precise authority or clarity as

20   to whether a motion like this should be brought in the first

21   instance before this Court or the Article III judge, but

22   presumably this Court's order will be appealed to Judge

23   Wright, who will have de novo review.

24             THE COURT:  I have every confidence that this

25   Court's order will be appealed to Judge Wright whichever way

1    I go.

2            I'll just tell you that I agreed with them that

3    this should be directed to Judge Wright in the first

4    instance.  Judge Wright's chambers agreed with you,

5    therefore, it's here.  All right?

6            MR. FLEMING:  All right.  Thank you.

7            THE COURT:  Okay.

8            MR. FLEMING:  The parties do agree, I believe, on

9    the governing standard here.  There's a two-factor test

10   which the Supreme Court established in *Tull v. United States*

11   in which the first factor asked the Court to compare the

12   statutory action to 18th century actions brought in the

13   courts of England prior to the merger of the courts of law

14   and equity.  And the second factor asked the court to

15   examine the remedy sought and determine whether it is legal

16   or equitable in nature.

17           Now, the Supreme Court has clarified that an award

18   of profits under Section 504(b) is not intended to be

19   punitive, but, rather, it is a restitutional remedy that is

20   equitable in nature.

21           In the *Petrella* case and in a number of cases

22   directly analogous to copyright law, courts have recently

23   concluded the jury right does not exist for this type of

24   equitable relief.

25           Perhaps a case most on point is the federal

1    circuit's decision in *Texas Advanced Optoelectronic*

2    *Solutions* decided last year.  And in determining whether

3    disgorgement remedies under trade secret law would not be

4    sent to the jury, the court analyzed that remedy to

5    equitable disgorgement remedies and copyright, patent, and

6    trademark law.

7            Specifically, the court applied the Supreme

8    Court's two-part test, and it concluded that for Seventh

9    Amendment purposes, claims of patent, copyright or trademark

10   infringement are appropriate analogs of the trade secret law

11   claim here.  And from what we have seen no disgorgement

12   remedy was available at law in 1791 for these claims.

13           And, importantly, when characterizing the remedy

14   under the second part of that test, the federal circuit

15   citing *Petrella* noted that recently the Supreme Court

16   treated recovery of the defendant's profits in a copyright

17   infringement case as an equitable remedy.

18           The Eleventh Circuit recently applied the same

19   test to conclude that there's no jury right for a

20   disgorgement remedy in the context of a trademark

21   infringement case in the *Hard Candy, LLC* case.

22           Now, applying the Seventh Amendment test to the

23   Copyright Act should yield the same result here.  First, of

24   course, this isn't every motion that we've brought before

25   the Court looking at precedence from the 19th century, but

1   the scholars would have looked specifically at this issue

2   have concluded that in the context of intellectual property

3   disgorgement, remedies were handled by the English courts of

4   equity in the 18th century.

5            We've cited two scholars -- Gomez-Arostegui and

6   also Bruce Sperling -- who have come to that exact

7   conclusion.  Of course, the federal circuit court in the

8   *Texas Advanced* case, applying the same analysis, came to

9   that same conclusion.

10           And I'm not sure there's a direct disagreement

11  about that, at least based on the motion papers, whether

12  FICO has found some inconsistent scholarly authority or not.

13  It does not appear to be so.

14           So I think the first factor certainly favors the

15  fact that there should be a court trial, rather than a jury

16  trial.

17           So then the second factor is analyzing how the

18  courts have characterized disgorgement of profits.  And they

19  have characterized disgorgement of profits as equitable.

20  Certainly in the *Petrella* case the court's recent

21  characterization is consistent with this precedent because

22  the Copyright Act disgorgement remedy the court says is not

23  punitive; rather, it is restitution.  It's to restore the

24  status quo, which is a classic equitable remedy.  And that's

25  what it seeks to do here.

1      There's one other consideration and that's the

2   functional considerations as between a court and a jury.

3   The functional considerations here weigh in our favor

4   because it is difficult, and likely impossible, to

5   disaggregate all the various causal factors that go into or

6   contribute to Federal's profits.

7      To simply give a jury a billion dollar number with

8   no further direction, no expert testimony seeking to

9   quantify how much of that profit is attributable to Blaze,

10  which is exactly what we're going to have here if that

11  remedy is allowed to go to the jury, which, of course, we

12  disagree with, that just invites chaos and not a reasoned

13  manner of coming to a decision.

14      I think the *Unilock* case is most instructive on

15  this issue of the functional considerations.  In that case

16  the jury was presented with the issue of the reasonable

17  royalty for a very small component of a much larger software

18  program, and the plaintiff's damages expert used a

19  questionable method for calculating this royalty, which

20  involved presenting a gross revenue figure to the jury that

21  amounted to $19 billion.

22      The federal circuit affirmed the trial-court

23  decision vacating the damages award based on a prejudice

24  caused by this tactic.  And the court talked about the

25  mischief presenting this $19 billion number without any

1    direction -- the type of mischief it caused.

2         The court concluded the disclosure that a company

3    has made $19 billion in revenue from an infringing product

4    cannot help but skew the damage horizon for the jury

5    regardless of the contribution of the patented component to

6    this revenue.

7         I'd like to address just two things in FICO's

8    response, and then I'll take your advice about keeping this

9    short, absent any questions.

10        THE COURT:  I may have a couple for you, but go

11   ahead.

12        MR. FLEMING:  Okay.  First of all, FICO in

13   discussing *Petrella* says that *Petrella* was decided in the

14   way it was because of the plaintiff's pursuit of profits

15   after a long and deliberative delay, and that here there was

16   no calculated delay.

17        As this Court knows, we have the exact opposite

18   view -- that is, that discovery has shown that FICO knew

19   about the foreign use issue for at least eight years before

20   filing a lawsuit.  So, if anything, their argument undercuts

21   their argument about having a jury right in this case, and

22   it shows why *Petrella* is right on point.

23        THE COURT:  The way I read FICO's brief on

24   *Petrella* and the way I read *Petrella* as well is along these

25   lines:  I think what they're saying is -- the footnote 1 in

1    *Petrella* the court did not say claims for profits are per se

2    equitable in nature, and that that was in the context of

3    Justice Ginsburg talking about whether or not laches was a

4    defense to -- could be used as a defense to the damage

5    action in derogation of the statute of limitations.  And

6    what Justice Ginsburg said was, No, it can't be, but laches

7    may bear on the issue of disgorgement of profits.  And then

8    she dropped a footnote and the footnote basically said, at

9    least as I read it, this is not clear whether this is legal

10   or equitable, and then it references the Restatement.

11          And if you look at the Restatement, particularly

12   Comment B and Comment C, it says, Pinning the label

13   restitution just doesn't help the analysis, which,

14   unfortunately, if that's true I guess where I come down is

15   that case didn't really help make a decision on the Seventh

16   Amendment issue that you've raised.

17          And it's tempting to think about it in terms of,

18   well, is this restitution, is it disgorgement, but what I

19   think the footnote cautions against is letting that label

20   drive the conclusion.

21          Do you see that as -- do you disagree with that, I

22   guess?

23          MR. FLEMING:  Right.  Well, I mean, certainly the

24   federal circuit disagreed and saw that footnote as

25   clarifying that an award of profits, first of all, is not

1    intended to be punitive.  It's rather a restitutional remedy

2    that is equitable in nature.

3           It was only a footnote.  It was in the context of

4    a laches argument.  But certainly courts since that case has

5    been decided have read it as finding that the copyright

6    damages in this case really are equitable.

7           And when you look at it, I mean, disgorgement as a

8    remedy what it does is restore the status quo.  It does it

9    by awarding damages.  But that type of remedy on its face

10   certainly is an equitable relief that they are seeking.

11          THE COURT:  Well, it's certainly not compensatory,

12   and it's distinguished in the statute from damages.

13          MR. FLEMING:  Right.  The statute allows the

14   actual damages and then the damages attributable to the

15   profits which aren't covered by the actual damages.

16          I mean, the actual damages are clearly

17   compensatory.  And these other damages, which can be awarded

18   in addition, are to restore the status quo.  They're not to

19   compensate.  They're in addition to compensation.

20          THE COURT:  Have you found any case -- and I'll

21   just tell you I haven't looked long and hard, but the little

22   I've looked I haven't found any -- that directly challenged

23   -- raised the issue that you've raised:  Can you strike a

24   jury in a copyright case on the issue of the alleged

25   infringer's profits that are to be disgorged?  I have not.

1          MR. FLEMING:  Yeah, we have not found a post-*Tull*

2     case that follows the analysis directly on point.

3          But what has happened, there has been a period of

4     time, and in recent years more and more courts are looking

5     at *Tull* and then the gradual development in one IP case

6     after another in taking a hard look at disgorgement.  And

7     there's been a number of appellate cases that have held by

8     analogy and even citing copyright damages as equitable.

9          THE COURT:  *Petrella*.  Okay.  But not directly

10     addressing it in the copyright context?

11          MR. FLEMING:  Not directly addressing it in the

12     copyright context, but it is by analogy.  And there is no

13     reason or logic that one would treat damages in that context

14     any different than any other IP cases, because if you're

15     talking about disgorgement damages, it's the same logic.

16     It's restoring the status quo.  It's something different

17     than compensation.

18          THE COURT:  I'm not even sure it's restoring --

19     I'm not even sure I would call it restoring the status quo.

20     And if it's not punitive, I'm not sure what it is.  But it's

21     more akin to unjust enrichment it seems to me.  But then,

22     there again, the Restatement still talks about -- the label

23     unjust enrichment sounds equitable but cautions against

24     following the label as the thing that determines the

25     outcome, if you will.

1          MR. FLEMING:  Right.  But typically in unjust

2     enrichment cases those are determined by the court, not by a

3     jury.  I mean, there's various mechanisms of dealing with

4     it, but that's in most cases not just labeled as equitable,

5     but treated for purposes of things like whether a jury trial

6     is allowed.

7          THE COURT:  I notice that they cited a number of

8     cases post-*Petrella* citing *Petrella* in which the court

9     essentially said, I'm not really sure what to do.  I'm going

10    to throw up my hands and I'll use an advisory jury.

11         MR. FLEMING:  We've seen that, Your Honor.  I

12    mean, the real difficulty, unless there is an advisory jury

13    separate from the jury, is that the type of prejudice that

14    we saw in the *Unilock* case would be caused if you have this

15    advisory jury listen to the same evidence.

16         THE COURT:  So then if that weren't the case, then

17    how would it work procedurally at trial?  Would the case go

18    in and then you'd have a separate later segment related

19    strictly to the calculation of profits and then the remedy

20    of disgorgement if the court saw fit?  Is that how it would

21    work out procedurally?

22         MR. FLEMING:  Well, I mean, there are a number of

23    ways.  Mr. Hinderaker and I have had an extremely short

24    discussion about that because it naturally raises that

25    issue.

1          But one way is to have -- I mean, these are

2     typically going to be introduced by experts.  So if the

3     expert were to testify in front of the jury and then the

4     jury were excused, then the expert could provide that

5     testimony to the court.  I mean, that's one way of doing it

6     for each one of the experts that address that issue.

7          Or, as you say, you just try the entire case,

8     which would probably be cleaner in a lot of ways, and then

9     have a post-jury presentation of the evidence.

10          THE COURT:  Have you filed motions in limine and

11     summary judgments yet?

12          MR. HINDERAKER:  We just filed last Friday the

13     summary-judgment motions and both sides' *Daubert* motions.

14          THE COURT:  Yeah, I meant *Daubert* motions.

15          So is one of the motions -- if Judge Wright were

16     to find in your favor, is one of the motions that the

17     evidence of lost profits -- and I apologize for not having

18     looked -- can't go in at all because it's not causally

19     related to the alleged infringement?

20          MR. FLEMING:  The disgorgement.  Yes, that is

21     absolutely one of the motions.

22          THE COURT:  Okay.  So if that were to be granted,

23     whatever I did would become moot, in essence?

24          MR. FLEMING:  Yes.

25          THE COURT:  Okay.  Okay.  Keep going.  Sorry.

1          MR. FLEMING:  All right.  Oh, the only other point

2    relates to there's a lot of discussion about whether the

3    word "court" appears in different provisions of the statute

4    itself.

5          And we had been doing further research, and I have

6    with me a report from the House Judiciary Committee at the

7    time this was being determined, and the court said -- or,

8    excuse me, the committee said, specifically on page 90 of

9    this report, that with regard to this particular section, it

10   anticipated that the court would be deciding the issue

11   relating to the disgorgement and the determination of the

12   amount of profits attributable to the infringing product.

13          THE COURT:  What is the citation for that?

14          MR. FLEMING:  May I approach?

15          THE COURT:  Please.

16          MR. FLEMING:  This is the report of the House

17   Judiciary Committee beginning on page 89, where it says,

18   "Actual damages and profits."  Then we go to the next page,

19   page 90, it says exactly what I reported.

20          THE COURT:  Okay.  Anything further, Mr. Fleming?

21          MR. FLEMING:  Not right now, Your Honor.  Thank

22   you.

23          THE COURT:  Thank you.

24          Mr. Hinderaker, will you be arguing --

25          MR. HINDERAKER:  I will not.

1            THE COURT:  -- or Ms. Kliebenstein?

2            MR. HINDERAKER:  I will not, Your Honor.

3            THE COURT:  Okay.

4            MS. KLIEBENSTEIN:  Good afternoon, Your Honor.

5            THE COURT:  Good afternoon.

6            MS. KLIEBENSTEIN:  At the outset, I have not yet

7     reviewed this House report.  If we could have permission to

8     submit a short letter reply, that would be appreciated.

9            THE COURT:  I think that's appropriate.

10           MS. KLIEBENSTEIN:  Okay.

11           THE COURT:  Can you file that reply by Friday?

12           MS. KLIEBENSTEIN:  Yes.

13           THE COURT:  Okay.  And can you do it in three

14    pages or less?

15           MS. KLIEBENSTEIN:  Yes.

16           THE COURT:  Okay.  That would be great.  That is

17    the order then, a three-page letter reply no later than

18    close of business on Friday.

19           MS. KLIEBENSTEIN:  Your Honor, my initial thought

20    in hearing Federal's comments on their motion is this is not

21    the case to change precedent.  There is a wall of precedent

22    that gives the calculation of recovery of profits to juries.

23    We see that in the post-*Petrella* cases that we have cited in

24    our brief and pre-*Petrella* cases.  And there's a reason for

25    that.  It is because juries are -- have been for centuries

1  -- given the task of calculating money damages.  And that

2  task is honored in every circuit and particularly in the

3  Eighth Circuit.

4           You can look at the *Cass County* decision for a

5  good framework on how the Eighth Circuit treats what is

6  appropriate for juries to do.

7           The reason I say that this is not the case to

8  change precedent is because the law doesn't support it and

9  because of the reason behind Federal's request.  It's not

10  going to change what Federal wants to change.  And by that I

11  mean Federal's argument is that FICO shouldn't have a right

12  to a jury trial because the revenues subject to recovery are

13  really big, that there's prejudice from that, that it's

14  difficult for the jury to decide.

15           I'll address the prejudice issue separately, but

16  turning to the recovery of profits number, that billion

17  dollar number, even if the Court decides to take

18  disgorgement on its own, that number is still going to be in

19  the case.  It's still going to be before the jury, and

20  there's several reasons why.

21           Federal has put its profits, its revenues at issue

22  in this case in a number of different ways, primarily on the

23  issue of contract damages and actual damages.  In their

24  damages reports responding to ours their damages and other

25  experts take the position that an enterprise license is the

1   proper framework for breach of contract damages, not an

2   application-based license.

3             As we've told you before, Your Honor, the baseline

4   for FICO's calculation of an enterprise license is the

5   revenues of the licensee.  So to the extent contract damages

6   are in the case, which they will be, those numbers are going

7   to be before the jury.

8             Secondly, Federal also takes the position that the

9   2016 negotiations provide a framework for how the jury

10  should look at the contract damages.

11            In 2016, the parties were discussing an

12  enterprise-type license and application-based-type license.

13  In the correspondence going back and forth it lists

14  Federal's revenues.

15            Those documents, Federal will likely put them

16  before the jury, and they can't redact out the revenues.

17  That would be an unfair prejudicial thing to do from FICO's

18  perspective.

19            Third, Federal's damages expert has said, FICO is

20  asking for too much money -- not just on the disgorgement

21  side, but on the actual damages and the breach-of-contract

22  damages.

23            If FICO gets that award, it's a windfall to FICO.

24  Why?  Because FICO is much smaller and its revenues are much

25  smaller than Chubb-ACE Insurance's revenues.  Again, that

1      puts it squarely back in the case.

2             So even if this Court decides disgorgement -- the

3      calculation of revenues is for the judge to do -- those

4      billion dollar numbers are still going to be in this case.

5             *Unilock* is distinctly different.  That was a

6      patent case where a reasonable royalty was being calculated.

7      The damages expert in that case -- and his name will forever

8      be known amongst patent litigators -- threw up 19 billion,

9      and it was not relevant to the calculation of a reasonable

10     royalty.  That's not what we have here.

11            We did not come up with these billion dollar

12     revenues out of whole cloth.  They came from the

13     interrogatory responses that are connected to the

14     infringement.

15            We're not asking for disgorgement of all of

16     Federal's profits.  It's a fundamentally different thing.

17     And *Unilock* should not be used as a basis to take the

18     recovery of profits calculation away from FICO.

19            THE COURT:  When you say that the expert in

20     *Unilock* simply threw up the $19 billion number and that it

21     wasn't relevant, I -- at least am hearing you say that

22     reasonable royalty is not calculated off the revenues of the

23     infringer?  Is that what you're saying?  And, therefore, the

24     19 billion had no place in the case?

25            MS. KLIEBENSTEIN:  In that case the reasonable

1    royalty was not calculated off the 19 billion.  It can be.

2    It depends on the patent case.  Right?  You can go about a

3    reasonable royalty as a percentage of gross sales or you can

4    go about it as a dollar amount per unit.  So there are a

5    number of different ways to calculate it.

6              So I don't want to pretend in a reasonable royalty

7    context that the gross revenue stream is never relevant.  It

8    just depends on how the expert goes about it.

9              THE COURT:  Okay.

10             MS. KLIEBENSTEIN:  So *Unilock* is very

11   distinguishable, and a read of that case will illustrate

12   that.

13             While I'm on the prejudice topic, the billion

14   dollar topic, that has to do with the functional

15   considerations.  When we're looking at whether an issue

16   should be before a judge or a jury, under the *Tull* case we

17   look at the historical precedent, what the case law is

18   today, analyze the remedy.  And then in the *Markman* case the

19   Supreme Court brought about these functional considerations.

20             While it sounds interesting to say in this case

21   here the functional considerations say the judge should do

22   the recovery calculation, that's not what *Markman* was about.

23             *Markman* was a patent case.  And prior to the

24   *Markman* decision, the issue of claim construction was

25   handled by juries, which created a lot of inconsistencies in

1    decisions overall and with respect to single patent claims.

2    You would have multiple jury verdicts construing claims in

3    different ways.

4         The Supreme Court took up the issue and said the

5    functional considerations in that case dictated that claim

6    construction should be for the judge.  And the reason was

7    looking at the issue across all similar cases -- all claim

8    construction, not just is claim construction hard in that

9    case but easy in that case, all cases -- that is the type of

10   issue that should be before a judge.  And the reason was to

11   create judicial consistency.

12        Now, the case defined a functional consideration

13   as a matter of the sound administration of justice.  One

14   judicial actor is better positioned than another to decide

15   an issue in question.  That works for claim construction.

16   That works for categorically equitable issues, such as

17   injunctions where judges are weighing irreparable harm and

18   other issues that involve equity or mens rea or intent or

19   culpability.  Those are typically for the judge.

20        Monetary calculations, on the other hand, are for

21   juries.  There is nothing that stands out about a recovery

22   of profits remedy in a copyright case that makes it

23   difficult or onerous for a jury.  In fact, they've been

24   doing that for decades.

25        Federal says that the prejudice is having this

1    billion dollar number in front of the jury, but that's not

2    prejudice.  That's just a fact of the case.  You can exclude

3    evidence under 403 where the prejudicial effects outweigh

4    the probative value.  Right?  That's the standard for

5    prejudice.

6             Here these revenues are the damages horizon for

7    FICO.  We didn't make the numbers up.  The fact that those

8    figures are bad for Federal's case does not mean they're

9    prejudicial under the law.

10            So I think when you look at the issues in this

11   manner, the functional considerations go away.  Federal is

12   asking for a favor in this case because it thinks it's going

13   to be tricky in this case.  That's not the kind of

14   functional consideration that the Supreme Court was

15   considering in the *Markman* decision.

16            Now moving backward to historical actions.  The

17   *Sid & Marty* case that we cited has a really good discussion

18   about the history of the Copyright Act and the remedies in

19   the Copyright Act, and it also does a good job of

20   distinguishing the Lanham Act from the Copyright Act.

21            The parties don't dispute that copyright actions

22   have historically been tried to juries.  The *Sid & Marty*

23   case also noted that from time to time equitable remedies --

24   the injunction would be decided by a court in equity and

25   would also take the recovery of profits remedy simply as a

1    matter of convenience so that a party did not have to have

2    duplicative litigation.

3            But setting aside the history, I think the

4    precedent and an analysis in this case are the most

5    instructive.  As I've mentioned earlier, there's a wall of

6    precedent that is in FICO's favor on this issue.  And I

7    don't think that footnote 1 in *Petrella* was meant to alter

8    that case law.

9            While I was preparing for this hearing, I ran

10   across -- I can't remember if it was *Sid & Marty*, but if it

11   wasn't, it was another circuit case that cautioned about the

12   danger of overreading footnotes in the Supreme Court.  And

13   the quote was:  "The Supreme Court does not often hide

14   elephants in mouse holes."  And I feel like this is what

15   footnote 1 in *Petrella* has become.

16           Justice Ginsburg was clear that the award -- the

17   recovery of profits issue, was protean in nature.  It

18   changes.  Sometimes it's legal.  Sometimes it's equitable.

19   Sometimes it has flavors of both.  That footnote has no

20   bearing on whether the issue should be decided by the judge

21   or jury.

22           THE COURT:  Let me stop you there.  Not that it

23   ultimately matters -- I do think that what -- if you read

24   footnote 1 and then read it in light of what it cites, the

25   Restatement, when they talk -- when Justice Ginsburg talks

23

1    about the protean quality of restitution, she's not talking

2    about the disgorgement of profits.  At least if she is using

3    the same expression in the same way that the Restatement is,

4    she is talking about the protean quality of the phrase

5    "restitution" because it is shifting from one case to the

6    next as to whether it's equitable or legal, et cetera.

7         So I get your argument.  I think that might be a

8    little bit of a stretch for what she's saying, but I'm not

9    so sure that that case -- I don't think it says what Federal

10   is saying it says.

11        MS. KLIEBENSTEIN:  I agree with Your Honor on your

12   construction of protean referring to restitution.  I'm on

13   the same page as you.

14        What I think is really interesting -- and I have

15   spent way too much time with *Petrella*.  I've read the oral

16   argument and all of the decisions and the briefs going up.

17   And I don't know why Ginsburg included that footnote in it,

18   but what I find really interesting is that it did not

19   expressly overrule *Feltner*, which is, I believe, a 1998

20   decision on statutory damages under the Copyright Act.

21        And in that case, the Supreme Court said that, In

22   contrast, the Copyright Act does not use the term "court" in

23   the subsection addressing awards of actual damage in profits

24   (see Section 504(b)), which generally are thought to

25   constitute legal relief.

1          So *Feltner* stands as it is.  We have a footnote in

2    *Petrella*.  I don't think that overturning precedent based on

3    a footnote in *Petrella* when you could equally read *Feltner*

4    as supporting a different construction is the way to go

5    about resolving the issue before the Court today.

6          I also note that *Feltner* stated that a monetary

7    remedy is not equitable simply because it is not fixed or

8    readily calculated from a fixed formula, which is sort of

9    the argument of Federal.  Right?  This is difficult to do,

10   therefore, it should be for a court.  When you look at

11   *Feltner*, it doesn't support that instruction.

12         We've talked about *Petrella* at length.  I think

13   that whatever Ginsburg was going for is limited to that

14   case, which is -- you know, I don't think it can be -- even

15   accepting the evidence that Federal mentioned about FICO

16   allegedly knowing about use eight years ago, in *Petrella* it

17   was a much different situation.

18         The plaintiff testified in deposition that she was

19   waiting to sue for 18 plus years solely for the time when

20   the profits were high.  So there was a different intent

21   there.  There was a different mens rea.

22         *Texas Advanced*, moving on to the federal circuit,

23   I don't think that that decision is applicable either.  The

24   federal circuit is primarily a patent court.  Copyright

25   issues are not often appealed to that court, neither are

1    Lanham Act appeals, unless they come up from the PTAB.

2              Now, what I find lacking in *Texas Advanced* is a

3    robust discussion of the Texas state trade-secret law

4    compared to the Lanham Act compared to the Copyright Act

5    compared to the Patent Act.

6              Now, if you look at *Sid & Marty*, the Ninth Circuit

7    did a much better job of juxtaposing the different areas of

8    intellectual property and what the fundamental purposes

9    behind those forms of intellectual property are.

10             There's robust case law on the differences between

11   the Copyright Act and Lanham Act, including from a damages

12   perspective.  So I do not look at *Texas Advanced* as setting

13   the bar that recovery of profits in a copyright case is

14   solely for a judge.

15             The other cases cited by Federal and what Federal

16   wants to link this case to are trademark cases.  They are

17   not analogous.  The Lanham Act and Copyright Act are

18   fundamentally different statutes.

19             The language discussing 1117, the statute that

20   governs disgorgement of profits under the Lanham Act, is

21   statutorily and there are significant judicially created

22   differences.

23             In the trademark context, 1117 says that the court

24   shall assess profits and damages according to the

25   circumstances of the case in its discretion under equity.

1       What you have in trademark cases, in all of the cases that

2       are cited by the defendants, is a robust framework that

3       looks at willfulness, intent, culpability, actual confusion,

4       other plus factors that courts look to to consider whether

5       or not to award recovery of profits and how much.

6               Willful infringement in many districts is a bar.

7       If you don't have willful infringement, you don't get

8       recovery of profits.  That's a stark contrast to Section

9       504(b) of the Copyright Act.  504(b) says you can get actual

10      damages and recovery of profits and here's how you calculate

11      recovery of profits.

12              In establishing the infringer's profits, the

13      copyright owner is required to present proof only of the

14      infringer's gross revenue.  The infringer is required to

15      prove his or her deductible expenses and the elements of

16      profits attributable to other than copyrighted work.

17              I don't want to dumb it down so much to say it is

18      math, but 504(b) certainly does not take into account, as a

19      threshold matter, any equitable factors, plus factors,

20      willfulness, mens rea, intent.  That's what makes it

21      fundamentally different from the Lanham Act and other

22      restitutional remedies.  And that, I think, is what takes it

23      squarely back to the jury.  The jury is in the position of

24      calculating money damages with instructions like that.

25              So moving on to an analysis of the remedy.  And I

1   have been getting into this a bit already.  Several sections

2   of the Copyright Act say that they are for the court to

3   decide:  injunctions, impounding, attorney's fees, and

4   costs.

5           504(c), which I don't think has been brought up to

6   this Court, is about statutory damages.  And that sentence

7   in 504(c) says that the court is to decide the award of

8   statutory damages.  But under *Feltner* and *Cass County*, the

9   jury is given the ability to calculate statutory damages.

10          So that's another interesting wrinkle in the

11  Copyright Act.  Even in an area where it says the court is

12  to determine statutory damages, the Supreme Court has said,

13  No, no, because that's punitive in nature, we're going to

14  give that to the jury.  In *Cass County*, the Eighth Circuit

15  messaged that point two or three years before *Feltner* did.

16          So monetary awards are typically for the jury.  As

17  I've stated, 504(b) is clear and it gives instructions on

18  how those calculations are to be made.  There's no

19  discretion.  There's no equitable factors.  They're

20  determining credibility of witnesses and documents and

21  determining damages amounts.  Looking at this remedy under

22  the Copyright Act, this is clearly something for the jury to

23  decide.

24          One thing that I've done in preparing both our

25  response brief and for this argument is to think how can I

1    juxtapose the Copyright Act from things I know to be for the

2    court, that I know to be equitable.  Well, those would be

3    things like injunctions, laches.  Those are involving not

4    subjective judgments, but judgments that are discretionary

5    in nature, that are judicial in nature; again, willfulness,

6    culpability.

7           Equitable issues, such as what is irreparable for

8    an injunction, that's not what we have with 504(b), and

9    that's why courts time and time again have given that

10   calculation to the jury.

11          Again, given all that, I think that the sound

12   decision in this case would be that this situation right

13   here, this case right here is not the one to change

14   precedent.

15          THE COURT:  Okay.  Thank you.

16          Mr. Fleming.  So a quick question for you.  This

17   is a motion to strike the jury demand.  That's the remedy

18   that you seek as it were.

19          MR. FLEMING:  Yes.

20          THE COURT:  If I conclude that you're right, that

21   there's no right to a jury trial under the Seventh

22   Amendment, and then I conclude it's appropriate to strike

23   the jury demand, doesn't Judge Wright still have the

24   authority to say, They don't have a right to a jury, they

25   can't demand one, but I can decide or I'm going to let the

1    jury decide this, maybe not, or I'm going to use an advisory

2    jury?  Assuming Judge Wright were to affirm what I was

3    doing, is that still hers under sort of this procedural

4    rubric?

5              MR. FLEMING:  I don't believe the former because

6    there is no right to a jury under the Seventh Amendment.

7    That claim should be struck.

8              I mean, there are courts which have allowed

9    advisory juries on that.  I mean, the difficulty with that

10   is what we've discussed, is to the extent that there is a

11   functional reason for not having the jury it undercuts all

12   of those reasons by allowing the same evidence to be

13   presented with instructions to ignore it.  But I think that

14   would be difficult.

15             THE COURT:  Okay.

16             MR. FLEMING:  First of all, there is no wall of

17   precedent because the issue has never been squarely

18   addressed.  There isn't cases that have directly addressed

19   this issue in the context of disgorgement in a copyright

20   case.

21             Following the *Tull* decision and certainly the

22   other recent case law from other jurisdictions -- *Sid &*

23   *Marty*, of course, are pre-*Tull* -- and with regard to

24   *Feltner*, first of all, the case doesn't cite any profit

25   cases.  It only cites actual damages cases.

1          And, secondly, I mean, the oddity of the decision

2     is it's interpreting 504(c), which does use the word "court"

3     as determining the damages, but then it determines that

4     despite use of the word "court" in the Copyright Act they

5     allow the jury to decide that issue.  But you have the House

6     Judiciary Report, which very clearly at least shows the

7     legislative intent at the time the court was going to decide

8     the 504(b) issue of attribution.

9          I'd like to address this issue about that the jury

10     is going to hear -- let's say there is not an advisory jury,

11     there is an advisory jury and a separate jury, which becomes

12     cumbersome certainly -- the argument about they are going to

13     hear about the billions of dollars in revenues anyway, they

14     may, but it's a completely different context.

15          Their experts, first of all, don't provide damages

16     based on an enterprise license.  It's an application-based

17     license.  They may hear that at the beginning, back in 2006,

18     they looked at the revenues of Federal and in 2016 at the

19     time of the terminations they looked at the revenues of

20     Federal, but the fact that this is a big company -- and then

21     at that time, you may recall, the beginning software license

22     agreement was $1.3 million.  And in 2016, they proposed 3.5

23     million.  So when they give a number they have proposed is

24     3.5 million, even though at that time there were billions in

25     revenues, it's a different context than telling a jury,

1   well, there are revenues of, they say, $30 billion of gross

2   written premiums that use these applications, that use

3   Blaze, and they give no further guidance as to how to go

4   about quantifying how much the use of Blaze can actually

5   contribute either on a percentage basis or otherwise.

6         So to say it's just like math, well, no math that

7   I know.  They're just giving a large number without any

8   direction or instruction by their experts as to how you

9   quantify how much it actually contributed to the profits.

10  That's the prejudice when you have a billion dollar number

11  with absolutely no direction.  It's not math because there

12  isn't any instruction or direction or quantification.

13        THE COURT:  I think that issue -- well, as I'm

14  hearing it on the one hand, you're saying it's just a number

15  that's untethered to anything in the real world or

16  untethered to anything that somehow is causally related to

17  the infringing activities -- allegedly infringing

18  activities.

19        They say not our problem.  If you want to knock

20  that number down, it's your burden to do that.  All of which

21  is a long-winded way of leading me to the notion that really

22  that question about whether any of this is admissible is

23  really the fundamental issue in some ways.  But I'm not

24  deciding that.  Right?

25        MR. FLEMING:  Right.  Well, it is.  I mean, that's

1    the larger issue, the more significant issue.  We will be

2    arguing that on another day.

3                THE COURT:  Right.  Okay.  Sorry, I didn't mean to

4    cut you off.

5                MR. FLEMING:  Well, and the only other point was

6    the argument made that monetary calculations are for the

7    jury.  Well, not always, because there are claims that are

8    unequivocally equitable in which an award is provided by the

9    court.  I mean, the unjust enrichment is the one that

10   immediately leaps to mind, but other -- any damages that are

11   not compensatory.

12               So it's not just for the jury.  There are cases

13   where there are equitable claims where the judge, and not

14   the jury, determines what the damages are.

15               Thank you, Your Honor.

16               THE COURT:  Okay.  Thank you.

17               Tiny bit.  Very brief.

18               MS. KLIEBENSTEIN:  I neglected to mention this in

19   my opening argument, but the rebuttal refocused the issue.

20   It's too early to decide this issue.  The issue of what goes

21   to the jury versus the judge is intertwined with the

22   organization of trial.

23               What experts are in or out, what expert opinions

24   are in or out, whether our disgorgement claim survives

25   summary judgment -- if it does, it should be presumed to

1    have legs and not speculative to the jury -- what evidence

2    is coming in, what evidence isn't coming in -- the

3    discussion about whether the revenues of Federal would or

4    would not be in the case just now, it highlights that there

5    is so much more to crystallize about this case pretrial.

6    And looking at this issue in isolation today without the

7    greater context for how the case is going to be organized in

8    a few months, I think it gives too much to Federal.  It

9    presumes too much about the case.  And it has the risk of

10   creating prejudice to FICO in a number of different ways.

11   So I think the issue isn't ripe.

12             THE COURT:  Okay.  Thank you.

13             All right.  Hang on one sec.

14             (A brief discussion was held off the record.)

15             THE COURT:  All right.  The motion to strike is

16   deemed submitted.

17             Mr. Fleming, or whomever, if you want to address

18   the motion to compel discovery from the expert whose name

19   escapes me now.

20             MR. PHAM:  Thank you, Your Honor.  Federal

21   respectfully requests that the Court --

22             THE COURT:  Hold on one second.  Note your

23   appearance for the argument.

24             MR. PHAM:  Sure, Your Honor.  Chris Pham, P-H-A-M,

25   on behalf of defendants.

1          THE COURT:  Okay.  Thank you.  Sorry, Mr. Pham.

2          MR. PHAM:  Thank you, Your Honor.

3          Federal respectfully requests that the Court order

4    FICO to respond fully to defendants' fifth set of Request

5    For Production of Documents and order FICO to produce their

6    expert, Brooks Hilliard, for another deposition to respond

7    fully to the questions he previously refused to answer

8    during his first deposition.

9          The documents that are being sought by Federal are

10   relevant and discoverable because they relate to the

11   expert's prior testimony and his qualifications.

12         The documents from the Texas and Michigan

13   proceedings, which were mentioned in Federal's briefs, are

14   discoverable for two main reasons:

15         First, they go to the expert's qualifications to

16   serve as an expert in this case.  Indeed, Mr. Hilliard

17   himself identified the Michigan proceeding as being relevant

18   to the experience that forms the basis for his opinions in

19   this case.

20         Based on the company that hired Mr. Hilliard,

21   their allegations from the Texas proceeding, it appears that

22   the documents will show that Mr. Hilliard does not have an

23   understanding of the software at issue in this case.  And

24   the software at issue in this case relates to rules

25   management, which is the same type of software.

1          Second, the portion of documents in the Texas case

2     also go to Hilliard's credibility as a witness more

3     generally.  Discovery from experts is liberal and includes

4     impeachment materials.

5          In this case, Hilliard provides opinions about the

6     technical capabilities of Blaze without citing any sources

7     other than his experience.

8          In this case, FICO retained Mr. Hilliard as a

9     testifying expert to "review and respond to the reports

10    prepared by Federal ACE American's experts, Dr. Steven Kursh

11    and Mr. William McCarter."

12         Hilliard relies on his experience in the

13    commercial software industry, which is a technical industry,

14    as the basis for his opinions.  And he provides technical

15    opinions including "FICO's Blaze Advisor provided critical

16    capability contributing to Federal's revenue."

17         During his deposition, Mr. Hilliard was asked to

18    identify his experience with licenses involving rules

19    management software, like Blaze Advisor.  Mr. Hilliard

20    identified a recent case, the Michigan proceeding, as the

21    basis for that experience.

22         THE COURT:  Was his deposition -- Mr. Hilliard's

23    deposition -- taken before you served the fifth request for

24    production?

25         MR. PHAM:  Yes, Your Honor.  Mr. Hilliard's

1    deposition took place on June 19th, and we served the

2    discovery request on June 28th.

3             THE COURT:  Okay.  And so in his deposition he was

4    asked to identify the experiences with licenses involving

5    rules management software, and that's when he identified the

6    Michigan matter, right?

7             MR. PHAM:  That is correct, Your Honor.

8             THE COURT:  Did that then relate back to his

9    justification for saying why he was knowledgeable in the

10   area was his prior experience with such licenses?

11            MR. PHAM:  That's our understanding.  And,

12   therefore, during the deposition inquiry was made into his

13   experience with that Michigan proceeding, and Mr. Hilliard

14   during the deposition indicated several times that he was

15   not going to answer.

16            At no point during his deposition did FICO's

17   counsel instruct Mr. Hilliard to respond or not to provide

18   an answer, but he on his own volition refused to answer

19   questions, which goes to our second request.

20            THE COURT:  That strikes me as good judgment on

21   the part of FICO's counsel, not to instruct him not to

22   answer.  But go ahead.

23            MR. PHAM:  Thank you, Your Honor.

24            So that leads to our second request, which is that

25   Mr. Hilliard's deposition be re-opened.  As I mentioned, he

1  was not instructed by counsel not to respond, and he has

2  provided no cognizable privilege for not responding.

3           THE COURT:  Okay.

4           MR. PHAM:  So overall we would respectfully

5  request that the Court re-open Mr. Hilliard's deposition.

6           THE COURT:  Okay.  Let me ask you this, Mr. Pham:

7  Was there any -- from your perspective -- I may hear a

8  different perspective in a moment, but you, Federal, could

9  have subpoenaed documents from Mr. Hilliard, correct?

10          MR. PHAM:  I believe under the rules they were

11  possible, correct.

12          THE COURT:  I think under the rules you can do

13  that.  Right?

14          MR. PHAM:  Correct.

15          THE COURT:  What did you have that would have led

16  you to be on notice prior to his deposition that you should

17  subpoena materials related to the Michigan matter?

18          MR. PHAM:  Prior to his deposition, Your Honor, we

19  were not aware of neither the Michigan proceeding or the

20  Texas proceeding.

21          THE COURT:  Was the Michigan proceeding more than

22  four years ago or four years before his report?

23          MR. FLEMING:  I believe it's an ongoing case.

24          MR. PHAM:  I believe it is an ongoing case.

25          THE COURT:  Say that again.

1          MR. FLEMING:  I believe it's an ongoing case.

2          THE COURT:  I see.  Okay.

3          Was it disclosed as testimony given in his report?

4     I don't mean to put you on the spot, Mr. Pham.

5          MR. FLEMING:  It wasn't, because he was a

6     consulting expert.

7          THE COURT:  Okay.  Gotcha.

8          Okay.  Thank you, Mr. Pham.

9          MR. PHAM:  Thank you, Your Honor.

10          MR. HINDERAKER:  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          MR. HINDERAKER:  Just to pick up on the Court's

13     last couple questions and just as a reminder to us all,

14     26(a)(2) requires that an expert disclose within the last

15     four years the instances in which the expert has given

16     testimony by way of trial or deposition.

17          THE COURT:  Right.

18          MR. HINDERAKER:  Mr. Hilliard's disclosure in his

19     expert report was complete and accurate in accordance with

20     the rules.  As counsel for Federal just said, Mr. Hilliard

21     did not issue a report in this Michigan proceeding matter.

22     He was a consulting expert.

23          In the context of being an consulting expert, I

24     would like to remind us of, what is it, 26(b)(4)(D):

25     Experts who are employed only for trial preparation.

1   Experts who are employed only for trial preparation are not

2   subject to discovery with respect to that underlying work

3   product, unless it falls within Rule 35 -- that's medical,

4   of course -- or on a showing of exceptional circumstances by

5   the moving party.  And we have no effort to show exceptional

6   circumstances, let alone the notion that there would be

7   exceptional circumstances.

8          Mr. Hilliard, when he was asked a question about

9   being involved in any matter which had a rules-based

10  technology, identified this Michigan proceeding.  He went on

11  to say that the rules-based technology was really a

12  configuration kind of software.  You know, you want to buy a

13  car, I want red tires, they come with this or whatever.  But

14  it's a rules-based penumbra, and he identified it as such.

15  And then he said that he had been engaged.

16         And it was -- his engagement was with respect to

17  -- the case itself was a trade secret matter.  What his

18  engagement technically or actually was in that case was not

19  explored; although, it was in response to a question about

20  being involved in licensing in a rules-based technology

21  matter.

22         So he mentioned that there was a protective order

23  in that case, and Mr. Fleming asked no further questions.

24  He did not inquire about the Michigan proceedings any

25  further.  There was never an instance where Mr. Hilliard

1    refused to answer a question that was directed to his

2    experience in the Michigan proceeding.

3           Now, under 26(b)(4)(D) it was appropriate for

4    Mr. Fleming to acknowledge that the rules do not permit

5    discovery into the work product of non-testifying experts in

6    other matters.  But now if I might, Your Honor, get maybe

7    even more deeper or directly to the real point of this all.

8           The underlying premise of Mr. Pham's argument, the

9    underlying premise of the motion that's before you is that

10   Mr. Hilliard is a technical expert on behalf of FICO in this

11   case and he is not.  He was engaged to opine on software

12   licensing in the software industry, and that is all that he

13   has opined on.

14          So if his experience in Michigan, which is not

15   discoverable -- if it related to technical matters in rules

16   kind of software, which is not discoverable, it doesn't

17   matter because he's not given any technical issues in this

18   case; one hundred percent software licensing, software

19   industry issues.

20          He responded to Mr. Kursh primarily in his report.

21   And Mr. Kursh is the defendant's software licensing expert.

22   And there's one opinion in which he responded to

23   Mr. McCarter, who is defendants' technical expert.  And

24   Mr. Hilliard's response to Mr. McCarter has nothing to do

25   with the technology of Blaze Advisor, and it has nothing to

1    do with the technology of any rules kind of software.

2              The report is in part of Mr. Fleming's declaration

3    before the Court.  And from that we know that Mr. Hilliard

4    was only responding to Mr. McCarter's reference to the fact

5    that Blaze Advisor -- defendants' expert says, Blaze Advisor

6    is used in core applications and is integrated into those

7    core applications.  That's what their expert said.

8              Hilliard, as a software industry expert, said,

9    well, core and integration -- integration into -- if you

10   take software and integrate it into a core application, what

11   that means in the software industry is that the technology

12   is important.  You have integrated it into one of your core

13   applications.  You have made it central to it.  And that's

14   all that he says in his report.

15             McCarter says, Blaze Advisor isn't worth anything

16   because it's industry agnostic.  All Hilliard said is it is

17   industry agnostic, but that doesn't mean it's not valuable.

18   That's just a software industry fellow talking.

19             McCarter said there are alternatives to Blaze

20   Advisor.  And then Hilliard responds, Well, yes, and how

21   does that change the equation?  McCarter says that Blaze

22   Advisor is of little importance to the company.  And

23   Hilliard says they have been using it for all these years.

24   And in 2006, when they did their RFI seeking this

25   technology, they said we need rules-based management

1    automated decision technology to move into the mid market.

2    There's not a sentence in Hilliard's report that speaks to

3    Blaze Advisor from a technical point of view.

4            So the underlying premise here that Hilliard is a

5    technical expert is false.  That underlying premise is used

6    to try to leverage something out of the Michigan proceeding

7    which is not discoverable because it's work product,

8    non-testifying expert.  And he answered every question that

9    was put to him about the Michigan proceeding.

10           So then we get to Mr. Hilliard's dirty laundry.

11   He brought a fee dispute -- he sued in Texas over undue

12   fees.  And in response to that, as night follows day, the

13   defendant says, You were a crummy expert.  And Mr. Hilliard

14   then on his own, on his own -- told on the record, though --

15   I have an agreement now with the other side and all I can

16   tell you is it has been amicably resolved.  And he says on

17   the record, I am telling you what I can tell you.  It has

18   been amicably resolved.  Now if a court intervenes, I've got

19   my get-out-of-jail card.

20           But then that begs a question should we be going

21   down this path at this stage of this litigation to put

22   Mr. Hilliard's performance in an unrelated matter on trial,

23   which will then cause us to have to unearth the truth of

24   what the defendant in the fee dispute says to try to beat

25   back the claim?  And now we're just down a rabbit hole of

1    collateral matters.  And so the only real, in my judgment,

2    the only real purpose that I can see in this whole effort is

3    to try to find some dirty laundry to hang up around

4    Mr. Hilliard on completely collateral matters that relate to

5    his fee dispute.

6         I think then I just want to turn to the document

7    request, Your Honor.  This Court's Scheduling Order and the

8    local rules say that you must serve your discovery in time

9    to have it completed by the deadline.  The defendants did

10   not do that.

11        The defendants have a mechanism, I guess, to

12   extend the discovery period if they can come to you and show

13   you good cause and need and not prejudice to us and balance

14   the case and say in these circumstances all right, but the

15   defendants didn't do that.  They served us a set of document

16   requests on the afternoon at the end of the discovery period

17   for experts.  And that document request is way out of time

18   under the Court's Scheduling Order.  It's improper.

19        It's also improper because Hilliard is a

20   non-testifying expert in the Michigan proceeding.  So

21   Document Request 53 is about the Michigan proceeding.  They

22   are not entitled to that discovery under Rule 34 without an

23   extraordinary showing under Rule 26, 26(b)(4)(D).  And

24   Request 52 is all of the correspondence and filings in the

25   Texas proceeding about your fee dispute, which is completely

1    collateral and unrelated to Mr. Hilliard's testimony in this

2    case as a software expert.

3              The district court in Nebraska had occasion to

4    look at the issue of a defendant or a party trying to use

5    Rule 34 to get around the discovery limitations of Rule 26

6    and drew the conclusion that Rule 26 gives a balanced, fair

7    way of handling expert discovery.  And Rule 26 does not --

8    and Rule 34 does not expand the scope of that discovery.

9    When you're doing discovery against experts, you do it

10   within the context of Rule 26.

11             And, as we've already talked about, if there is

12   discovery to be had beyond the 10 years of publications, the

13   four years of testifying, there is a mechanism and it's

14   called show extraordinary circumstances.  The *Morris v. BNSF*

15   *Railroad* in 2014 from Nebraska is exactly appropriate

16   because Rule 34 does not expand on expert discovery of Rule

17   26.

18             So it's way late out of time and it's not

19   appropriate even if it was in time.  And 53 relates to work

20   product that's not discoverable, and 52 relates to these

21   collateral issues.  So, Your Honor, I think the appropriate

22   outcome here is that the motion is denied.

23             We've asked for our attorney's fees.  And I'm not

24   going to spend another five minutes arguing about that, but

25   there is something a bit egregious when you are served with

1    document requests and you have to face a motion to compel to

2    produce documents when the request isn't appropriate under

3    the Court's own Scheduling Order by a month.

4           And it's egregious to be asked to bring an expert

5    to testify about non -- to come another -- they don't want

6    just a moment, eight hours of deposition to testify about

7    collateral matters when management of the rules themselves

8    make work product outside of discovery except in

9    extraordinary circumstances, but we're here under these same

10   circumstances.

11          Thank you.

12          THE COURT:  Go ahead, Mr. Pham.

13          MR. PHAM:  Thank you, Your Honor.  A few brief

14   comments.

15          First, with respect to the opinion of

16   Mr. Hilliard, he is responding to Federal's technical

17   experts.  Mr. McCarter is a business world management

18   software expert, and he is opining on the -- or addressing

19   the causal connection between Blaze and Federal's profits.

20          And, as Mr. Hinderaker acknowledged, Mr. Hilliard

21   specifically is addressing certain industry terms that

22   Mr. McCarter references:  integration, core.  Those are

23   technical terms in a technical industry, and the opinion

24   related to that nexus is very much a technical opinion.

25          Mr. Hilliard is providing opinions that Blaze

1    contributes to Federal's profits, and he cannot provide that

2    type of opinion if, as the Texas fee dispute document

3    suggests, he does not understand how the software works.

4    There has to be an understanding of how Blaze software works

5    to be able to opine on that contribution.

6              With respect to the request for the Michigan

7    documents, Mr. Hinderaker appears to be addressing a

8    work-product privilege, but that privilege belongs to

9    Versada and not to Mr. Hilliard.

10             And with respect to Rule 26, the rule contemplates

11    that the relevancy of an expert's prior testimony is fair

12    game in discovery, and so Rule 26 does not limit the

13    discovery upon expert witnesses.

14             With respect to the procedural arguments about the

15    timing, as I mentioned earlier, Your Honor, this issue came

16    up during the deposition which took place on June 19th, and

17    immediately after that Federal did serve their document

18    requests prior to the expert discovery deadline.  Indeed,

19    the Court has the ability to allow deviations from its own

20    scheduling orders, as well.

21             Nothing further, Your Honor.

22             THE COURT:  Thank you, Mr. Pham.

23             Mr. Hinderaker.

24             MR. HINDERAKER:  Mr. Pham just represented that

25    Mr. Hilliard testifies about the causal relationship between

1    the revenue and the use of Blaze Advisor, and with the

2    Court's permission, I'd be happy to give a copy of

3    Mr. Hilliard's entire report of 30 some pages and present

4    that to Your Honor, because to stand here and say that

5    Mr. Hilliard testifies to a causal relationship between

6    revenue and technology -- revenue and Blaze Advisor from a

7    technical point of view is beyond my ability to respond to

8    except to give you the report.

9           Secondly, we just heard the argument that it's

10   proper to have discovery into prior testimony of an expert.

11   Five minutes ago, we all were acknowledging that

12   Mr. Hilliard did not testify in the Michigan proceeding.

13          Thank you.

14          THE COURT:  Mr. Fleming, did you want to address

15   something?

16          MR. FLEMING:  Well, if they would stipulate that

17   Mr. Hilliard won't provide any expert opinions relating to

18   the causal nexus because he does in his report, based on

19   what we just heard, if they are willing to stipulate he is

20   not going to --

21          THE COURT:  I doubt you're going to get the

22   stipulation you're seeking.

23          I think it would be sensible for me to have a copy

24   of the report.  All right?  Any objection on Federal's part?

25          MR. FLEMING:  No.

1          THE COURT:  Okay.  Mr. Hinderaker, I will take a

2     copy of Mr. Hilliard's report if you want to send that over

3     to chambers.

4          MR. HINDERAKER:  Should we hand deliver it to you

5     tomorrow?

6          THE COURT:  That would be lovely.

7          MR. HINDERAKER:  We will.

8          THE COURT:  Okay.  This motion is also submitted.

9          Let me ask the parties while I have them, other

10    than these matters, is everything else of a pretrial nature

11    that might come before me, is that all done, all the

12    discovery?  I know we had some additional depositions that

13    were ordered and things of that nature.

14          MR. HINDERAKER:  Your Honor, as for the plaintiff,

15    absent the 16 witnesses that we have the right to depose

16    before trial -- and, just as a reminder, the Court's order

17    for Federal to produce the rules themselves are on appeal to

18    Judge Wright.  So depending on the outcome of that, I'm

19    hopeful to have some production.  Your order, if sustained,

20    we'll have more discovery.

21          But directly to your point, I'm not anticipating

22    from the plaintiff's point of view cause to be bringing any

23    motions before Your Honor.

24          THE COURT:  Okay.  Mr. Fleming.

25          MR. FLEMING:  We're not anticipating bringing any

1    motions either.

2            We would request that with regard to those 15

3    depositions that we be given reasonable notice.  There was a

4    request for depositions for declarants in the

5    summary-judgment motions with one week's notice for some

6    people that could've been coming as far away as London.  We

7    would ask the courtesy that when these depositions are

8    scheduled that we be given a reasonable amount of time so we

9    can make arrangements.

10           MR. HINDERAKER:  Your Honor, we have no objection

11   to doing the best we can do under the circumstances.  But

12   given the fact that we didn't know if there were any

13   declarants on the summary-judgment motion until about 5:00

14   on Friday, we gave notice ahead of time that we'd be asking

15   for it.  We did what we could, and we'll do what we can in

16   the future.

17           THE COURT:  All right.  Anything further?

18           MR. FLEMING:  Nothing.

19           THE COURT:  Okay.  I guess that's it.

20           What are the dates for your *Daubert* and

21   summary-judgment motion arguments?

22           MR. HINDERAKER:  September 24.

23           THE COURT:  Okay.  All right.  So certainly if

24   these orders are out before September 24, that won't -- if

25   they're not out until September 24, that doesn't prejudice

1    you in any meaningful way, does it?  Okay.  Well, it's my

2    aim to get them out before then, but I just want to have a

3    sense of the timing.

4              Okay.  Thank you.  Motions are submitted.  We're

5    in recess.

6              (Court adjourned at 2:24 p.m.)

7                         *     *     *

8              I, Debra Beauvais, certify that the foregoing is a

9    correct transcript from the record of proceedings in the

10   above-entitled matter.

11             Certified by:  *s/Debra Beauvais*
                              Debra Beauvais, RPR-CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25