# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) | Case No. 16-cv-1054 (WMW/DTS) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Jury Trial Demanded** |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) | **FILED UNDER SEAL** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | | |

# PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF BROOKS HILLIARD

# <u>TABLE OF CONTENTS</u>

I.      Introduction ............................................................................................................ 1

II.     Mr. Hilliard is solely a rebuttal expert, pointing out flaws in Federal's expert
        opinions. ................................................................................................................ 2

III.    Opinion #1 is supported by objective evidence of industry custom and practice
        applied to the case-specific facts. ......................................................................... 4

        A.      Experts may opine on industry customs and standards. ............................... 5

        B.      Mr. Hilliard's opinion regarding FICO's assertion of breach based on
                installation outside the United States is properly grounded in evidence
                of industry custom and practice. ............................................................... 7

        C.      Mr. Hilliard's opinion regarding termination due to a violation of
                Paragraph 10.8 is properly grounded in evidence of industry custom
                and practice. .............................................................................................. 9

        D.      Mr. Hilliard's opinions regarding FICO's decision not to exercise its
                audit rights was supported by industry custom and practice, his
                experience, and case-specific facts. ......................................................... 11

        E.      Mr. Hilliard's citation to the Agreement does not legally interpret the
                Agreement. .............................................................................................. 12

IV.     Mr. Hilliard's Opinion #2 is supported by the case-specific facts applied to
        Mr. Hilliard's own experience. ............................................................................. 14

        A.      Admissible rebuttal expert testimony points out the flaws and facts
                ignored by the opening expert. ................................................................. 14

        B.      Opinion #2 points out the flaws in Dr. Kursh's report and contains a
                proper factual basis. ................................................................................. 16

V.      Mr. Hilliard's Opinion #3 is relevant and admissible rebuttal testimony. ............. 19

        A.      Mr. Hilliard's opinions solely rebut Dr. Kursh's opinions. ......................... 20

        B.      Mr. Hilliard's Opinion #3 is relevant and properly limited to his area of
                expertise. ................................................................................................. 21

VI.     Opinion #4 is admissible to show the flaws in Dr. Kursh's conclusions
        regarding commercial reasonableness. ................................................................... 22

VII.  Federal's challenge to Opinion #5 is contrary to law and misses the purpose of
      Mr. Hilliard's opinion..........................................................................................24

      A.    As a rebuttal expert, Mr. Hilliard is not required to present evidence of
            but for causation; Federal's challenge ignores the law. ..............................25

      B.    Opinion #5 is admissible rebuttal testimony properly supported by the
            record.............................................................................................................27

      C.    Mr. Hilliard's opinions regarding whether Blaze Advisor is
            "integrated" or "core" to Federal's applications is properly grounded in
            industry experience......................................................................................28

VIII. Conclusion..............................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andreas v. Volkswagen of Am., Inc.*,
  336 F.3d 789 (8th Cir. 2003) ....................................................................... 26

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*,
  829 F. Supp. 2d 802 (D. Minn. 2011).............................................. 3, 15, 18

*Bombardier Rec. Prods. v. Arctic Cat Inc.*,
  No. 12-2706, 2017 U.S. Dist. LEXIS 26517 (D. Minn. Feb. 24, 2017)......... 15, 18, 29

*Bombardier Rec. Prods. v. Arctic Cat, Inc.*,
  No. 12-cv-2706, 2016 U.S. Dist. LEXIS 184531 (D. Minn. Apr. 19,
  2016) ............................................................................................................ 3

*Cattanach v. Burlington N. Santa Fe, LLC*,
  No. CIV. 13-1664 JRT/JSM, 2015 U.S. Dist. LEXIS 124718 (D. Minn.
  Sept. 18, 2015) ......................................................................................... 6, 13

*Cedar Hill Hardware & Constr. Supply v. Ins. Corp. of Hannover*,
  563 F.3d 329 (8th Cir. 2009) ...............................................................*passim*

*CitiMortgage, Inc. v. Just Mortg., Inc.*,
  No. 4:09 CV 1909 DDN, 2012 U.S. Dist. LEXIS 43522 (E.D. Mo. Mar.
  29, 2012) ..................................................................................................... 5

*Dayva Int'l v. Award Prods. Corp.*,
  97-1397, 1998 U.S. App. LEXIS 4386 (Fed. Cir. Mar. 11, 1998) ............................. 26

*Dwyer Instruments v. Sensocon, Inc.*,
  873 F. Supp. 2d 1015 (N.D. Ind. 2012) ....................................................... 26

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*,
  545 F. Supp. 1314 (S.D.N.Y. 1982)......................................................... 6, 11

*Highland Capital Mgmt., L.P. v. Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008)................................................. 4, 15, 18

*Honeywell Int'l Inc. v. ICM Controls Corp.*,
  No. 11-cv-569, 2017 U.S. Dist. LEXIS 11692 (D. Minn. Jan. 26, 2017) .................. 26

*Int'l Cards Co. v. Mastercard Int'l, Inc.*,
No. 13 CIV. 2576 (LGS), 2016 U.S. Dist. LEXIS 165225 (S.D.N.Y.
Nov. 29, 2016) ................................................................................................... 6, 11, 12

*KW Plastics v. U.S. Can Co.*,
199 F.R.D. 687 (M.D. Ala. 2000) ........................................................................*passim*

*Oracle Am., Inc. v. Google Inc.*,
No. C 10-03561 WHA, 2011 U.S. Dist. LEXIS 131706 (N.D. Cal. Nov.
15, 2011) ........................................................................................................... 3, 6, 7, 13

*Oracle USA, Inc. v. Rimini St., Inc.*,
No. 2:10-CV-00106-LRH, 2015 U.S. Dist. LEXIS 118412 (D. Nev.
Sept. 3, 2015) ............................................................................................................... 6

*Plasti Dip Int'l, Inc. v. Rust-Oleum Brands Co.*,
No. 14-cv-1831, 2017 U.S. Dist. LEXIS 32464 (D. Minn. Feb. 13,
2017) ................................................................................................... 14, 15, 22, 29

*Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*,
321 F. Supp. 2d 469 (N.D.N.Y. 2004) .................................................................. 6, 11

*Summit Elec. Supply Co., Inc. v. Int'l Bus. Machines Corp.*,
No. CIV 07-431 MCA/DJS, 2010 U.S. Dist. LEXIS 146665 (D.N.M.
Sept. 30, 2010) .................................................................................................. 18, 19, 22

*TCBY Sys. v. RSP Co.*,
33 F.3d 925 (8th Cir. 1994) .................................................................................*passim*

*United States v. Vesey*,
338 F.3d 913 (8th Cir. 2003) ................................................................................... 14

*Vanderbilt Mortg. & Fin., Inc. v. Flores*,
No. C-09-312, 2010 U.S. Dist. LEXIS 116434 (S.D. Tex. Nov. 1, 2010) ................... 5

*Wholesale Grocery Prods. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL,
2017 U.S. Dist. LEXIS 178805 (D. Minn. Oct. 24, 2017) ........................................ 15

*Wood v. Houghton Mifflin Harcourt Publ'g Co.*,
589 F. Supp. 2d 1230 (D. Colo. 2008) ..................................................................... 26

**Statutes**

17 U.S.C. § 504(b) .................................................................................................... 26, 27

## I.     Introduction

This case is about the breach of a Blaze Advisor software license agreement ("Agreement") between Fair Isaac Corporation ("FICO" or "Plaintiff") and Chubb & Son, a division of Federal Insurance Company, and the resulting copyright infringement by Defendants Federal Insurance Company and ACE American Insurance Company (collectively "Federal").  FICO offers the testimony of Brooks Hilliard, a software licensing expert with over 35 years of experience, to rebut Federal's licensing expert, Dr. Steven Kursh, and Federal's insurance industry expert, Mr. William McCarter.[1]  Federal intends to call Dr. Kursh to testify on the interpretation of the Agreement and the commercial reasonableness of FICO's actions in response to Federal's breach.  Federal intends to call Mr. McCarter to testify that Blaze Advisor has minimal value to its business.  Mr. Hilliard provides the jury with valuable context regarding the flaws in these opinions.

Federal seeks to exclude Mr. Hilliard's rebuttal opinions, but its challenges are meritless.  Mr. Hilliard's opinions are proper rebuttal testimony.  They provide a point-by-point rebuttal, including identification of pertinent case-specific facts Federal's experts ignored.  Mr. Hilliard's opinions assess FICO's assertion of breach and termination of the Agreement against the normal customs and practices of the

---

[1] FICO has moved to exclude to the testimony of Dr. Kursh and Mr. McCarter because their testimony is unreliable, contrary to law, and consists of inadmissible legal conclusions.  (Dkt. 362; Dkt. 371.)  The Court should grant FICO's motions and exclude the testimony of Dr. Kursh and Mr. McCarter in its entirety.  Mr. Hilliard's rebuttal testimony then becomes unnecessary.

commercial software industry and the case-specific facts to assist the jury in its interpretation of the Agreement.  Federal's challenge to the factual basis of Mr. Hilliard's opinion goes solely to weight, not admissibility.  Finally, Federal's challenge to Mr. Hilliard's rebuttal of Mr. McCarter is premised on the wrong law.  There is no legal requirement for FICO to prove but for causation between Federal's infringement and its revenue, and Mr. Hilliard does not state a technical opinion on FICO's burden of proof. Mr. Hilliard's conclusion that Blaze Advisor is valuable to Federal's business only explains Mr. McCarter's use of the terms "integrated" into "core," which have specialized meaning in the software industry.  Mr. Hilliard's opinion is admissible to rebut Mr. McCarter's conclusion to the contrary.  Federal has shown no basis to exclude it, and its motion should be denied in its entirety.

## II.      Mr. Hilliard is solely a rebuttal expert, pointing out flaws in Federal's expert opinions.

Federal argues Mr. Hilliard offers improper rebuttal testimony that should have been submitted with opening expert reports.  (Dkt. 388 at 4-5.)  A review of Mr. Hilliard's report shows his testimony only directly rebuts Federal's licensing expert, Dr. Steven Kursh, and Federal's insurance industry expert, Mr. William McCarter.  Mr. Hilliard will only be brought to trial if Mr. Kursh and Mr. McCarter testify during Federal's case-in-chief.

Federal's argument regarding "improper tactics" ignores the Scheduling Order in this case, which does not mandate expert disclosure deadlines based on each party's burden of proof.  (Dkt. 205 at 2.)  It provides that "Plaintiff's Rebuttal Reports" were due

2

May 31, 2019, and that "[e]ach side may call up to 3 experts." (*Id.*)  Mr. Hilliard's rebuttal report complies with the Scheduling Order *in this case*.

Oracle v. Google is distinguishable.  The scheduling order *in that case* mandated the disclosure of opening expert reports and reply reports based on the parties' respective burdens of proof.  *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 U.S. Dist. LEXIS 131706, at *5-7 (N.D. Cal. Nov. 15, 2011).  After its initial expert report on damages, Oracle served two reply reports on damages—one by its initial damages expert and another by a newly retained second damages expert.  *Id.* at *9.  The court excluded the reply of the second damages expert given the scheduling order's burden-based disclosure requirement and the undue "expansion" of expert reports on damages.  *Id.* at *11.  *Oracle* is inapposite here, where Mr. Hilliard's testimony fully complies with the Scheduling Order.

Federal suggests Mr. Hilliard's testimony is somehow improper because his testimony relates to the Agreement between the parties.  A subject that relates to FICO's breach of contract claim does not turn his testimony into improper rebuttal.  Here, Mr. Hilliard's sole purpose is to critique and explain the work of Federal's experts, Dr. Kursh and Mr. McCarter.  This is proper rebuttal testimony.  *Bombardier Rec. Prods. v. Arctic Cat, Inc.*, No. 12-cv-2706 (ADM/LIB), 2016 U.S. Dist. LEXIS 184531, at *74 (D. Minn. Apr. 19, 2016) ("A rebuttal or reply expert report is proper if the intent of the report is solely to contradict or rebut evidence on the same subject matter identified by the opposing party's expert report."); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829

F. Supp. 2d 802, 834-35 (D. Minn. 2011) (same); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 187 (S.D.N.Y. 2008) (same).

The job of a rebuttal expert is to testify about the flaws inherent in another expert's methodologies that assumed or ignored certain facts. *KW Plastics v. U.S. Can Co.*, 199 F.R.D. 687, 692 (M.D. Ala. 2000). This is precisely what Mr. Hilliard does. In contrast, the cases cited by Federal at page 4 of its brief involve situations where the disclosing party raised entirely new testimony, not in direct response to the opposing party's experts. These cases are not applicable to Mr. Hilliard's testimony, for the reasons discussed throughout this memorandum. Here, FICO should be allowed to critique and explain Dr. Kursh's testimony through Mr. Hilliard.

## III.     Opinion #1 is supported by objective evidence of industry custom and practice applied to the case-specific facts.

Mr. Hilliard's first opinion discusses whether the terms in the License Agreement are common in the industry:

> **Opinion #1:** The licensing limitations in the License Agreement are comparable to limitations customarily found in the license agreements of other commercial software providers. FICO applied these limitations in a manner that is consistent with the normal customs and practices of the commercial software industry.

(Dkt. 390 Ex. 1 ("Hilliard Rep."), at 6.)  Federal argues these opinions legally interpret the Agreement and/or are not based on sufficient facts. A review of Mr. Hilliard's actual opinions demonstrates these accusations are not true.

Federal attacks Mr. Hilliard for what he did not do—determine whether FICO's specific conduct toward Federal was consistent with industry practice. (Dkt. 388 at 5

("Hilliard has not conducted any analysis of FICO's **conduct** toward Federal") (emphasis in original).) This challenge fails. An assessment of the parties' conduct would have been inadmissible. Mr. Hilliard opinions do not invade the provenance of the jury. That is one of the problems with Dr. Kursh's report. (Dkt. 371 at 18-23, 28-30.) Judging the Agreement against the parties' conduct is the role of the jury. Understanding the Agreement in view of the customs and practices of the industry, as Mr. Hilliard has done, is permissible and will aid the jury in making its own conclusion.

### A.   Experts may opine on industry customs and standards.

The parties agree that an expert witness may not substantively interpret a contract because that is a function reserved for the judge and jury. *See, e.g.*, *CitiMortgage, Inc. v. Just Mortg., Inc.*, No. 4:09 CV 1909 DDN, 2012 U.S. Dist. LEXIS 43522, at *5 (E.D. Mo. Mar. 29, 2012); *Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. C-09-312, 2010 U.S. Dist. LEXIS 116434, at *15 (S.D. Tex. Nov. 1, 2010). Dr. Kursh crosses this boundary consistently, as explained more fully in FICO's motion to exclude the testimony of Dr. Kursh. (Dkt. 371 at 14-17.)

It is permissible, however, for an expert to provide an opinion on the customs and practices in an industry generally, which allows the trier of fact to evaluate the terms of the contract and the parties' conduct against the background of industry custom. *See Cedar Hill Hardware & Constr. Supply v. Ins. Corp. of Hannover*, 563 F.3d 329, 344 (8th Cir. 2009) (affirming admission of expert testimony on insurance industry customs and practices; "Industry-wide practices are relevant to the question of whether [the defendant] act[ed] within acceptable boundaries based on information it ha[d] received in

5

a given case."); *TCBY Sys. v. RSP Co.*, 33 F.3d 925, 929 (8th Cir. 1994) (same; "[W]e believe the expert's testimony helped the jury understand what is reasonable in the franchise industry."); *Int'l Cards Co. v. Mastercard Int'l, Inc.*, No. 13 CIV. 2576 (LGS), 2016 U.S. Dist. LEXIS 165225, at *22 (S.D.N.Y. Nov. 29, 2016) ("[The expert's] testimony regarding industry practice and custom with regard to payment card transaction processing is relevant and helpful. [It] will provide background information that will help the jury…."); *Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480-81 (N.D.N.Y. 2004) (same); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1372 (S.D.N.Y. 1982) (same).

It is also permissible for an expert to refer to contract terms in expressing an opinion, as long as that opinion does not interpret the contract. *See, e.g.*, *Int'l Cards*, 2016 U.S. Dist. LEXIS 165225, at *22; *Rondout Valley*, 321 F. Supp. 2d at 479; *Fund of Funds*, 545 F. Supp. at 1372; *cf. Cattanach v. Burlington N. Santa Fe, LLC*, No. CIV. 13-1664 JRT/JSM, 2015 U.S. Dist. LEXIS 124718, at *23-27 (D. Minn. Sept. 18, 2015) (noting that experts may refer to the law in giving their opinions).

Other courts agree and have admitted Mr. Hilliard's opinions on similar occasions. *See, e.g.*, *Oracle USA, Inc. v. Rimini St., Inc.*, No. 2:10-CV-00106-LRH, 2015 U.S. Dist. LEXIS 118412 (D. Nev. Sept. 3, 2015). In *Oracle*, the Court admitted Mr. Hilliard's rebuttal opinion showing that the opposing expert ignored evidence of the customs and practices of the commercial software industry. *Id.* at *20 ("Hilliard is a certified management consultant and a certified computing professional. His opinions … both rebut specific assertions made by Oracle's expert and provides relevant industry

context.").  The Court rejected Oracle's argument that Mr. Hilliard's opinions were legal

opinions and found his rebuttal permissible because it was offered to show industry

practice and not to substantively interpret the license agreement at issue.  *Id.* at *20-21

("Defendants state that they are not proffering Hilliard's expert testimony to interpret the

software licenses agreements.  Therefore, the court shall deny Oracle's challenge on this

issue at this time.").  The Court admitted Mr. Hilliard's opinions because they provided

valuable insight into industry practice that would assist the jury: "Additionally, the court

finds that Hilliard's testimony about industry standards, customs, and practice is

relevant…. In his expert report, Hilliard provides testimony and analysis of the ordinary

practices in the industry. The court finds that such testimony will assist the jury…." *Id.* at

*21.  Here, Mr. Hilliard's Opinion #1 conforms to these standards.

> **B.**    **Mr. Hilliard's opinion regarding FICO's assertion of breach based on installation outside the United States is properly grounded in evidence of industry custom and practice.**

The first prong of Mr. Hilliard's Opinion #1 rebuts Dr. Kursh's opinion that

FICO's assertion of breach based on installation and use of Blaze Advisor outside the

United States was not commercially reasonable. (Declaration of Heather Kliebenstein

("Kliebenstein Decl.") Ex. 1 ("Kursh Rep."), ¶¶ 70-71, 75-89, 90-98.)  Federal contends

these opinions are "based solely on Hilliard's interpretation of the license grant and

territory provisions in the License."  (Dkt. 388 at 6.)  A review of Mr. Hilliard's actual

opinions demonstrates they are properly grounded in his experience, objective evidence

of industry custom and practice, and the case-specific facts.

In rebuttal, Mr. Hilliard first opines that it is common in the industry to license

software only to a licensee and its Affiliates.  He relies on his experience and treatises:

> Based on my professional experience reviewing hundreds of software license agreements, license grant provisions similar to Sections 2.1 and 2.1(c) of the FICO License Agreement are common in such agreements. This is supported by multiple sources including Mr. Gene Landy's 2008 book, *The IT/Digital Legal Companion*....
>
> * * *
>
> In the Selected Model Forms section at the end of the sixth edition of *A Practical Guide to Software Licensing for Licensee and Licensor*, H. Ward Classen includes an annotated sample license agreement where he provides sample language for an "Affiliates" limitation in a software license agreement. . . .

(Hilliard Rep., 8-9.)  Mr. Hilliard notes the Agreement (through Amendment Two)

identifies Chubb & Son and its Affiliates as the licensee.  (*Id*.)

Next, Mr. Hilliard opines: "Dr. Kursh's first opinion is further flawed because

there is a territory restriction in the Blaze Advisor License Agreement based on the

Definitions in Section 1 and the License Grant in Section 2.1."  (Hilliard Rep., 9.)  This

opinion is based on his experience, objective evidence of industry custom, and the case-

specific facts:

> FICO's imposition of a territorial limitation was normal and customary for the commercial software industry in my experience. Classen supports this in his explanation of the use of geographic restrictions on licensed software:
>
> > Most licensors seek to limit the use of the licensed software to a specific country or site, for example, the United States....

(Hilliard Rep., 11.)

> It should not have been a surprise to Chubb & Son in 2016 that the Section 1 Territory restriction applied to the Section 2 license grant because that had

been known to Chubb & Son since at least June 2006, when Chubb & Son
was negotiating with FICO to acquire a world-wide license to Blaze Advisor.

(Hilliard Rep., 9.)  Based on evidence of industry custom and practice, including

additional citations to the Landy and Classen treatises, Mr. Hilliard concludes that

FICO's determination of breach based on extra-territorial installation was consistent with

the customs and practices of the commercial software industry:

> … FICO's determination that Federal had breached the License Agreement
> and not cured the breach within the cure period was entirely consistent with
> the customs and practices of the commercial software industry.

(Hilliard Rep., 13.)  For these reasons, Mr. Hilliard's rebuttal opinion is admissible

because it is grounded in evidence of industry practice and provides the jury with

valuable context regarding the customs and practices of the commercial software

industry.  *See Cedar Hill*, 563 F.3d at 344; *TCBY*, 33 F.3d at 929.

## C.   **Mr. Hilliard's opinion regarding termination due to a violation of Paragraph 10.8 is properly grounded in evidence of industry custom and practice.**

Next, Federal argues Mr. Hilliard's opinions relating to Paragraph 10.8 is an

impermissible legal opinion because it "is based on Hilliard's interpretation of 10.8 and

9.2 of the License."  (Dkt. 388 at 7.)  This assertion fails.  Mr. Hilliard's opinions rebut

Dr. Kursh's opinions that under Paragraph 10.8 FICO's termination of the Agreement

following Federal's breach and failure to cure was not commercially reasonable.  (Kursh

Rep., ¶¶ 90-98.)

Mr. Hilliard first determines that no-assignment provisions like Paragraph 10.8 and termination provisions like Paragraph 9.2 are common in the commercial software industry:

> In my experience: (a) license provisions prohibiting assignments similar to Section 10.8, and (b) license provisions relating to termination similar to those in Section 9.2, are common in the commercial software industry.
>
> Therefore, once FICO learned that Federal was acquired and had undergone a change of control, its decision to termination Federal's license following the parties' failure to reach an agreement, relying on Sections 10.8 and 9.2 of the License Agreement, was fully consistent with the normal customs and practices of the commercial software industry.

(Hilliard Rep., 14.)  In reaching this conclusion, he relies on at least ten citations from industry publications, including the treatises Landy and Classen and form license agreements, which show FICO's termination decision is consistent with industry custom. (Hilliard Rep., 14-16.)

Against this backdrop of industry custom and his experience, Mr. Hilliard provides several case-specific facts that will assist the jury in determining whether FICO's conduct was in accord with the normal customs and practices of the commercial software industry:

> … Given the change in Chubb & Son's status after the acquisition, the normal custom and practice of the commercial software industry would have been for Federal and FICO to negotiate the price and terms under which FICO would consent to the continued use of Blaze Advisor by the new entity.
>
> FICO had good and justifiable reasons for negotiating the conditions for its consent to the continued use of Blaze Advisor.  Federal's unwillingness to agree to adequate compensation to FICO … was inconsistent with the customs and practices of the commercial software industry.

> Even assuming any FICO employees actually knew about Federal's use of Blaze Advisor in connection with insurance policies from companies outside the United States, the fact that FICO did not take action immediately would not have waived FICO's right to act on that knowledge at a later time because the License Agreement includes a "No Waiver" provision (Section 10.4).
>
> Federal could have ceased using Blaze Advisor as soon as FICO notified Federal that it was in breach of the License Agreement. Alternatively, it would have been consistent with the normal customs and practices of the commercial software industry for Federal and FICO to have negotiated agreeable terms to allow Federal to cease its use within an agreed and feasible time period….

(Hilliard Rep., 18-19.)

As with his opinion on the scope of the license, Mr. Hilliard's opinions regarding FICO's termination of the Agreement are based on and apply industry custom and practice to case-specific facts. Mr. Hilliard's rebuttal of Dr. Kursh is admissible. It is based on case-specific facts viewed in light of objective evidence of industry custom and practice. *See Cedar Hill*, 563 F.3d at 344; *TCBY*, 33 F.3d at 929; *Int'l Cards*, 2016 U.S. Dist. LEXIS 165225, at *22; *Rondout Valley*, 321 F. Supp. 2d at 479; *Fund of Funds*, 545 F. Supp. at 1372.

### D.    Mr. Hilliard's opinions regarding FICO's decision not to exercise its audit rights was supported by industry custom and practice, his experience, and case-specific facts.

Federal does not seriously challenge Mr. Hilliard's rebuttal opinion on FICO's audit rights. It merely states that Mr. Hilliard did not cite any sources, which is incorrect. (Dkt. 388 at 7-8.) As the final portion of his first opinion, Mr. Hilliard concludes that Dr. Kursh's opinion regarding audit rights is unsupported. Dr. Kursh opined that FICO's decision not to exercise its audit rights under Paragraph 3.5 of the Agreement was not

11

commercially reasonable.  (Kursh Rep., ¶¶ 137-140.)  Mr. Hilliard shows in rebuttal that

Dr. Kursh's opinion on this point is not supported by evidence of industry practice, and

that FICO's decision not to exercise its audit rights was reasonable:

> A formal audit is not always required to justify an increase in the license fees,
> particularly for software products (like Blaze Advisor) where "list" pricing
> is based on very broad customer size ranges. The normal custom and practice
> of the commercial software industry in circumstances where a licensor has a
> long working relationship with its licensee (as was the case here), would be
> for FICO to rely on Chubb & Son to maintain compliance with the license
> terms and, regardless of whether FICO was requesting periodic compliance
> audits, for Chubb & Son to notify FICO in advance if a license upgrade or
> revision was contemplated.

(Hilliard Rep., 20.)

Mr. Hilliard confirmed that this opinion is supported by objective evidence of

industry custom and practice, and found further citation unnecessary because Dr. Kursh

did not contend the audit requirement itself was unreasonable:

> Landy and Classen both discus auditing the usage of licensed software, but
> I have not quoted them because Dr. Kursh does not contend there was
> anything wrong with the audit requirement stated in Section 3.5.

(Hilliard Rep., 20.)  Mr. Hilliard's opinion regarding audit rights is proper rebuttal.

### E.   Mr. Hilliard's citation to the Agreement does not legally interpret the Agreement.

Both Dr. Kursh and Mr. Hilliard cite to and discuss the Agreement between the

parties.  Of course, Mr. Hilliard must do so to rebut Dr. Kursh.  But, Mr. Hilliard's proper

approach is fundamentally different from Dr. Kursh's inadmissible approach.

It is permissible for an expert to refer to the contract so long as the expert does not

offer a substantive interpretation of the contract.  *See Int'l Cards*, 2016 U.S. Dist. LEXIS

165225, at *22; *Cattanach*, 2015 U.S. Dist. LEXIS 124718, at *23-27.  Here, Mr.

Hilliard does just that.  He uses the terms of the contract to provide opinions that Dr.

Kursh's testimony is contrary to the normal customs and practices of the commercial

software industry.  Mr. Hilliard explained the distinction at his deposition:

> Q.  How does the scope of your opinion differ from the scope of Dr. Kursh's
> report?
>
> A.  … *[T]here are some areas in his report where it seems to me he reached
> legal conclusions*, and—as a layperson it seems that way.  And I tried to
> address my report in such a way that I would address perhaps issues related
> to those legal conclusions, but *I didn't address legal determinations*.

(Kliebenstein Decl. Ex. 2 ("Hilliard Dep."), 9:21-10:10 (emphasis added).)  He confirmed

he was not opining on the legal meaning of the Agreement, and that his opinion on this

point was confined to evidence of industry practice:

> Q.  Are you providing an expert opinion on the meaning of a contract in this
> case?
>
> A.  *Not in the legal sense of the meaning*. I mean, I understand how certain
> terms in a contract are generally understood in the industry by both licensees
> and licensors, or customers and suppliers. But in terms of the legal meaning
> of a contract, I'm not—*I have no opinions on the legal meaning*. I can
> address how various terms are normally and customarily understood by
> parties to contracts, including software licenses.

(Hilliard Dep., 91:17-92:4 (emphasis added).)

Like the opinion admitted in *Oracle*, FICO is offering Mr. Hilliard's rebuttal

opinion to show that Dr. Kursh's opinions regarding the commercial reasonability of

FICO's conduct are unsupported by the actual customs and practices of the commercial

software industry.  This opinion is admissible to permit the trier of fact to evaluate the

terms of the contract and the parties' conduct against the background of industry custom.[2]

*See Cedar Hill*, 563 F.3d at 344; *TCBY*, 33 F.3d at 929.

## IV.    Mr. Hilliard's Opinion #2 is supported by the case-specific facts applied to Mr. Hilliard's own experience.

Federal contends Mr. Hilliard's Opinion #2 lacks a proper methodology because

the opinion is a "biased, selective timeline of the negotiations."  (Dkt. No. 388 at 8.)

These arguments are not supported by the record.

### A.    Admissible rebuttal expert testimony points out the flaws and facts ignored by the opening expert.

Expert opinions must be "reliable or trustworthy in an evidentiary sense, so that, if

the finder of fact accepts it as true, it provides the assistance the finder of fact requires."

*Plasti Dip Int'l, Inc. v. Rust-Oleum Brands Co*., No. 14-cv-1831, 2017 U.S. Dist. LEXIS

32464, at *5 (D. Minn. Feb. 13, 2017) (quoting *Lauzon v. Senco Prods., Inc*., 270 F.3d

681, 686 (8th Cir. 2001)).  The test of reliability is flexible.  *Id.* at *6 (quoting *Kumho*

*Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).  Experience-based expert

testimony is "reliable if the expert 'explains how that experience leads to the conclusion

reached, why that experience is a sufficient basis for the opinion, and how that experience

is reliably applied to the facts."  *United States v. Vesey*, 338 F.3d 913, 917 (8th Cir.

---

[2] Federal makes numerous challenges to Mr. Hilliard's opinions based on its view of the merits of the case.  (*See, e.g.*, Dkt. 388 at 7 ("It is undisputed that the merger involving Federal's parent did not cause it to expand its use of Blaze…."), 9 ("What Hilliard conveniently omits here is that these employees had known about the merger for six months….").)  These challenges assume Federal's view of the facts and have nothing to do with the *Daubert* standard.  They are also wrong on the merits, as shown in FICO's concurrently filed Opposition to Federal's Motion for Summary Judgment.  Mr. Hilliard's opinions are admissible to aid the trier of fact in assessing the evidence.

2003)(quoting advisory committee's notes to Rule 702). "Expert testimony must be excluded 'only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury.'" *Plasti Dip*, 2017 U.S. Dist. LEXIS 32464, at *6 (quoting *Bonner v. ISP Techs., Inc*., 259 F.3d 924, 929-30 (8th Cir. 2001)).

It is well-accepted that a rebuttal expert may explain the facts and record evidence ignored by the opening expert, thereby pointing out the flaws in the opposing expert's analysis. *See Highland Capital*, 551 F. Supp. 2d at 187; *Aviva*, 829 F. Supp. 2d at 834-35; *KW Plastics*, 199 F.R.D. at 692. *KW Plastics* is instructive and explains the proper role for a rebuttal expert in testifying regarding the record evidence. A characterization of the record evidence on rebuttal is relevant and admissible to criticize the opposing expert:

> [The rebuttal expert] can testify as to the flaws that he believes are inherent in a … report that implicitly assumes or ignores the above facts… All in all, [the rebuttal expert] can testify, and place in his expert report, his view of relevant facts *X, Y*, and *Z* and whether he accepts or rejects the same. [The rebuttal expert's] testimony is inadmissible to prove or disprove the facts being discussed, but it is admissible to inform the jury of the basis of [the rebuttal expert's] report and his criticism of [the opposing expert]….

*KW Plastics*, 199 F.R.D. at 692-93 (internal citations omitted).

Further, challenges to the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility. *Bombardier Rec. Prods. v. Arctic Cat Inc.*, No. 12-2706, 2017 U.S. Dist. LEXIS 26517, at *5 (D. Minn. Feb. 24, 2017) (quoting *Loudermill v. Dow Chem. Co*., 863 F.2d 566, 570 (8th Cir. 1988)); *see also In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2017 U.S. Dist. LEXIS 178805, at *16-17 (D. Minn. Oct. 24, 2017).

**B.**     **Opinion #2 points out the flaws in Dr. Kursh's report and contains a
proper factual basis.**

Mr. Hilliard's Opinion #2 shows a proper methodology and factual basis as a

rebuttal opinion to Dr. Kursh.  Mr. Hilliard's second opinion states as follows:

> **Opinion #2:** FICO had good and sufficient reasons, consistent with the
> normal customs and practices of the commercial software industry, for
> conditioning its consent to the continued use of its Blaze Advisor software
> on Federal's willingness to accept a negotiated increase in the license price.

(Hilliard Rep., 20.)

This opinion is a direct rebuttal to Dr. Kursh's opinion that, contrary to the

requirement in Paragraph 10.8 of the Agreement, FICO unreasonably withheld its

consent to the continued use of Blaze Advisor following the 2016 merger.  (Kursh Rep.,

¶¶ 90-94.)  In rebuttal, Mr. Hilliard shows that Dr. Kursh's opinion "is not supported by

the facts." (Hilliard Rep., 21.)  Mr. Hilliard points out that Dr. Kursh's opinion ignores

key case-specific facts, and details the impact of that evidence on Dr. Kursh's conclusion:

> The Kursh Report's second opinion centers on a contention that, contrary to
> the requirement in Section 10.8 of the License Agreement, FICO
> unreasonably withheld its consent to the continued use of Blaze Advisor
> following the 2016 acquisition…. This characterization of what happened in
> the wake of the 2016 corporate acquisition is not supported by the facts.

(Hilliard Rep., 20-21.)  Mr. Hilliard lists specific evidence Dr. Kursh ignored, including:

> FICO personnel, including Mr. Russ Schreiber and Mr. Mike Sawyer,
> communicated with Chubb & Son by telephone and e-mail in late 2015 and
> early 2016, … suggesting that "[FICO] would like to start the discussions
> and process to ensure that [Chubb & Son remains] in compliance with [its
> Blaze Advisor] license and have the license grants necessary to support the
> organization [after the acquisition is completed]."

> With no immediate progress in resolving the issues related to the acquisition,
> FICO sent Chubb & Son a notice of breach by FedEx approximately two

16

weeks after the acquisition was finalized, which initiated the 30-day cure period….

There were additional communications between FICO and Chubb & Son, including communications between in-house counsel for both parties. FICO extended the original 30-day cure period, which would have ended on February 29, 2016, to March 30 with both parties exchanging offers.

FICO proposed at least three options as part of that communication, including an option that bundled Blaze Advisor with one additional application…. FICO proposed a Blaze Advisor-only alternative as well, but this was not discounted as heavily as the bundled application option.

As negotiations between FICO and Chubb & Son continued in 2016, FICO learned of several installations of the Blaze Advisor software that had previously been done outside the United States during the years prior to the acquisition … but it continued to pursue an updated licensing alternative that would cover those installations and resolve the license assignment issue associated with the acquisition.

By March 30, 2016 … with no resolution to the licensing issue, FICO notified Chubb & Son it was terminating the Blaze Advisor license in accordance with Section 9.2 of the License Agreement.

(Hilliard Rep., 21-22.)  Based on these case-specific facts, Mr. Hilliard concluded FICO's

termination of the Agreement was in alignment with the normal and customary standards

of the commercial software industry:

> Considering the time and effort that FICO expended attempting to negotiate a mutually agreeable price … for a licensing opinion that would meet Federal's needs, and that Federal had installed Blaze Advisor outside the United States for an extended period without a valid license covering such use, FICO had more than met the normal and customary standard for commercial software providers.

(Hilliard Rep., 22-23.)

Federal contends that Mr. Hilliard ignored relevant facts.  (Dkt. No. 388 at 9-10.)

He did not ignore the facts listed by Federal in its brief—these were facts in Dr. Kursh's

report that Mr. Hilliard reviewed.  Like the rebuttal testimony admitted in *KW Plastic*s,

Mr. Hilliard's opinion regarding the history of the parties' pre-termination communications is offered to show the flaws in Dr. Kursh's report, which ignores that key evidence.  (Hilliard Rep., 20-23.)  Mr. Hilliard's discussion of the parties' communications places Dr. Kursh's opinion in context and shows the jury where Dr. Kursh omitted key facts.  Mr. Hilliard's opinions provide facts that Dr. Kursh did not consider, as a rebuttal expert should do.  *See Highland Capital*, 551 F. Supp. 2d at 187; *Aviva*, 829 F. Supp. 2d at 834-35; *KW Plastics*, 199 F.R.D. at 692.

Federal argues Mr. Hilliard's Opinion #2 is unreliable "because Hilliard does not explain his methodology for arriving at this opinion." (Dkt. 388 at 8.)  Mr. Hilliard's opinions satisfy the "flexible" test for reliability under *Daubert*, particularly on an issue such as this, where the scientific method has no application.  *See Bombardier*, 2017 U.S. Dist. LEXIS 26517, at *3-8 (D. Minn. Feb. 24, 2017).  Here, Mr. Hilliard's Opinion #2 is a direct rebuttal to Dr. Kursh's opinions that provides additional case-specific facts in view of his decades of consulting experience in the commercial software industry.  This is a proper methodology.  *See Highland Capital*, 551 F. Supp. 2d at 187; *Aviva*, 829 F. Supp. 2d at 834-35; *KW Plastics*, 199 F.R.D. at 692.

When faced with similar challenges to the reliability of Mr. Hilliard's testimony, courts have rejected such challenges and admitted the testimony.  *See, e.g.*, *Summit Elec. Supply Co., Inc. v. Int'l Bus. Machines Corp.*, No. CIV 07-431 MCA/DJS, 2010 U.S. Dist. LEXIS 146665, at *8-28 (D.N.M. Sept. 30, 2010).  In *Summit*, the Court found that Mr. Hilliard's opinion, which was based on his experience applied to the evidence in that case, reliable and admissible:

> Mr. Hilliard, relying on his experience as a business software consultant, outlined what an expert in software selection would expect to see in candidate software and then, using IBM's documents, concluded that the Wholesale Express product did not meet those professional expectations. There is no indication, in this regard, that Mr. Hilliard has not employed "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Id.* at *18 (quoting *Goebel v. Denver & Rio Grande W. R.R.*, 346 F.3d 987, 992 (10th Cir. 2003)).  Here, Mr. Hilliard's opinion that FICO had good and sufficient reasons for conditioning its consent to the continued use of its Blaze Advisor software on Federal's willingness to accept a negotiated increase in the license price is based on the case-specific facts in view of his experience.  This opinion is reliable and helpful to the trier of fact.  Federal has shown no basis to exclude it.

## V.   Mr. Hilliard's Opinion #3 is relevant and admissible rebuttal testimony.

In Opinion #3, Mr. Hilliard responds to Dr. Kursh's opinions regarding FICO's pricing and licensing structures.  Dr. Kursh opines that the way that FICO determines the license fees it quotes to prospective and current customers is inconsistent with software industry norms; and that the lost license fee damages calculated by FICO's damages expert ignored Federal's actual use of the Blaze Advisor software.  (Kursh Rep., ¶¶ 99-136.)

In rebuttal, Mr. Hilliard states his third opinion:

**Opinion #3:** Dr. Kursh's contention that FICO's pricing and discounting practices are inconsistent with the customs and practices of the commercial software industry is unsupported and incorrect.

(Hilliard Rep., 23.)  To support this opinion, Mr. Hilliard concludes that the general method FICO uses to calculate license fees is normal and customary for the commercial

19

software industry.  (Hilliard Rep., 24-26.)  He next concludes that Dr. Kursh's criticism

of FICO's sizing and pricing in this case has no basis because it is unsupported by the

case-specific facts.  (Hilliard Rep., 26-28.)  Federal argues these opinions are not rebuttal

and not relevant.  Federal is wrong on both issues.

### A.      Mr. Hilliard's opinions solely rebut Dr. Kursh's opinions.

Federal seeks to exclude Mr. Hilliard's Opinion #3 as improper rebuttal testimony

because it is consistent with Dr. Kursh's opinions.  (Dkt. 388 at 12-14.)  Federal's

arguments wholly ignore the substance of Mr. Hilliard's opinion.  To frame the issue, Dr.

Kursh's report provides lengthy opinions that FICO's method of calculating license fees

in this case is inconsistent with industry norms.

To rebut this opinion, Mr. Hilliard begins by analyzing FICO's *general* pricing

and licensing framework.  Mr. Hilliard first lists factors commonly considered in the

commercial software industry to price license agreements, based on Mr. Hilliard's

experience.  (Hilliard Rep., 24.)  Mr. Hilliard applies these industry norms to FICO's own

pricing practices and concludes that, contrary to Dr. Kursh's conclusion, FICO's general

pricing and licensing practices are consistent with industry standards:

> Dr. Kursh's claim that "the assumptions behind FICO's models used to
> calculate those fees are not commercially reasonable" is unsupportable. The
> criteria FICO cites in its pricing documents include several of the same
> considerations I listed above, which is supported by (a) both Landy's and
> Classen's writings about software licensing, and (b) the January and April
> deposition testimony given by Mr. Waid (the senior FICO executive with
> responsibility for Blaze Advisor).

(Hilliard Rep., 24-25.)

Mr. Hilliard then points out five specific areas in which Dr. Kursh's opinions about FICO's pricing *in this case* are factually unsupported:

- Dr. Kursh ignores the record evidence showing that Federal used 15 Blaze-containing insurance applications, not 10 as Dr. Kursh assumes;

- Dr. Kursh's assertion that Federal does not owe additional license fees for use of the Blaze Advisor license outside of the United States because Chubb & Son's license was designated as being enterprise-wide ignores geographic limitations of the Agreement;

- Dr. Kursh's conclusion on application sizing is flawed because it ignores the 30(b)(6) deposition testimony of William Waid, which explains how to use FICO's sizing matrix to determine the correct size classification for any potential licensee;

- Dr. Kursh's use of hypothetical negotiation scenarios fails to support his damages opinion because "damages calculations are properly based only on facts, not hypotheticals" and that "[t]here is no normal custom or practice of the commercial software industry that would have dictated that such negotiations would or should have occurred"; and

- Dr. Kursh's use of a discount of up to 90 percent is factually unsupported because it comes from a single online article published in 2004 involving general-purpose database software.

(Hiliard Rep., 26-28.)  Mr. Hilliard's Opinion #3 is a point-by-point rebuttal of Dr. Kursh, which is the proper role of a rebuttal expert. *See Kw Plastics*, 199 F.R.D. at 692.

**B.**   **Mr. Hilliard's Opinion #3 is relevant and properly limited to his area of expertise.**

Federal further asserts that Opinion #3 is irrelevant because, in Federal's view, it does not support the analysis of FICO's damages expert, Mr. Zoltowski.  (Dkt. 388 at 15 ("To the extent Hilliard is not opining on the [*sic*] anything related to Mr. Zoltowski's damages calculation it is … not relevant to any issue before the Court or a future trier of fact.").)  Federal's challenge misses the point.  Mr. Hilliard is not stating an affirmative

opinion on damages.  He is a rebuttal expert whose opinion is confined to rebutting Dr. Kursh's opinions.

Mr. Hilliard properly limited his opinion to rebutting those portions of Dr. Kursh's conclusions that are within his area of expertise—the customs and practices of the commercial software industry:

> [T]he Kursh Report specifically references the factors and/or assumptions used by Mr. Zoltowski to calculate damages. I do not profess to be qualified as a damages expert so instead of addressing Mr. Zoltowski's financial calculations, the following paragraphs focus on the areas where I do have relevant experience and expertise.

(Hilliard Rep., 23-24.) This rebuttal testimony is relevant to assist the jury in determining the commercial reasonableness of the facts underlying FICO's pricing and discount practices.  *See Plasti Dip*, 2017 U.S. Dist. LEXIS 32464, at *5 (In terms of relevance, the evidence "must be useful to the finder of fact in deciding the ultimate issue of fact."); *see also Summit Elec. Supply Co.*, 2010 U.S. Dist. LEXIS 146665, at *6-8 (finding Mr. Hilliard qualified to testify regarding the customs and practices of the commercial software industry).  Federal provided no basis to exclude Opinion #3, which is proper rebuttal testimony.

## VI.    Opinion #4 is admissible to show the flaws in Dr. Kursh's conclusions regarding commercial reasonableness.

Federal argues Hilliard Opinion #4 is inadmissible because it is legally irrelevant.

Mr. Hilliard's fourth opinion states:

> **Opinion #4:** The terms "commercially reasonable" and "commercially unreasonable" used throughout the Kursh Report are so vague and undefined that judgments based on them are not supportable.

22

(Hilliard Rep, 29.)  Federal argues that Mr. Hilliard has no basis to challenge Dr. Kursh's opinions because experts may testify on commercial reasonability.  Again, Federal misses the point of Mr. Hilliard's opinions.  Mr. Hilliard does not state that opinions on commercial reasonability are *per se* improper.  His Opinion #4 questions the lack of objective evidence supporting Dr. Kursh's opinions on "commercial reasonability" *in this case*.

Dr. Kursh provides his opinion about the commercial reasonableness of FICO's conduct.  Dr. Kursh opines that FICO's conduct, including asserting the territorial limitation of the Agreement; terminating the Agreement following Federal's breach; withholding consent to assignment following the merger; and calculating damages based on its standard rates, were not, in his view, commercially reasonable.  (Kursh Rep., ¶¶ 70-71, 75-89, 90-98, 99-136.)

In rebuttal, Mr. Hilliard shows that Dr. Kursh never articulated any consistent, industry-accepted definition of commercial reasonableness or linked those terms to any objective evidence of industry practice:

> Despite this extensive use, Dr. Kursh neglects to meaningfully define these terms, nor does he cite any learned treatise that might explain their meaning…. Dr. Kursh does not explain his qualifications or any specific work he has done to determine either Federal's or (in particular) FICO's customs and practices and he does not explain what methods he uses to make assessments based on the combination of these factors. If Dr. Kursh intends commercially reasonable to refer to some specific industry accepted standard of care, he fails to explain how one could determine whether any procedure or practice met that standard of care or not.

23

(Hilliard Rep., 29.)  The lack of objective support for Dr. Kursh's opinion means that, in practice, "Dr. Kursh is simply using the term 'commercially unreasonable' as a proxy to describe any FICO action he disagrees with." (Hilliard Rep., 30.)

Federal argues these Hilliard opinions must be stricken because case law allows experts to opine on commercial reasonableness.  (Dkt. 388 at 15.)  FICO agrees that experts can opine on industry standards.  But there is one significant difference between the expert testimony in Federal's cited cases and Dr. Kursh's opinion: a basis in objective evidence of industry custom and practice.  For example, the expert testimony admitted in *Monroe Federal Savings* applied "objective criteria used in the industry to determine a commercially reasonable, good faith response."  (Dkt. 388 at 16.)

Mr. Hilliard's rebuttal testimony points out these same flaws:

> The problem with Dr. Kursh's reasonableness assessments is that they fail to provide any helpful or useful criteria that the Court or a jury could use to determine whether FICO's licensing practices are commercially reasonable.

(Hilliard Rep., 30.)  Contrary to Federal's assertion, Mr. Hilliard's rebuttal is consistent with the guiding law and relevant to show that Dr. Kursh's opinions regarding commercial reasonableness are unsupported by objective evidence and therefore fail to provide any criteria that would aid the trier of fact.  Mr. Hilliard's rebuttal pointing out these flaws should be admitted in its entirety.

## VII.   Federal's challenge to Opinion #5 is contrary to law and misses the purpose of Mr. Hilliard's opinion.

Federal challenges Opinion #5 as *ipse dixit* and lacking a reliable methodology because it is not based on a "causation analysis."  (Dkt. No. 388 at 18.)  Federal's expert

Mr. McCarter opines that Blaze Advisor has minimal value to Federal.[3]  In rebuttal to

Mr. McCarter, Mr. Hilliard's Opinion #5 states:

> **Opinion #5:** Mr. McCarter fails to support his contention that Blaze Advisor has minimal value to Federal because it is "industry agnostic", easily replaceable and only one of many technologies that Federal employs to operate its insurance business. The evidence shows that FICO's Blaze Advisor provided critical capability, contributing to Federal's revenue that Chubb & Son had not developed internally.

(Hilliard Rep., 30-31.)  As discussed below, FICO has no burden to perform "causation

analyses," and Mr. Hilliard's opinions are factually supported.  Federal's challenge

misses the point.  Mr. Hilliard provides a specific rebuttal to Mr. McCarter's use of terms

of art that have specialized meanings in the software industry—"integrated" and "core."

He is not stating a technical opinion on "causation" as Federal asserts.

A.     **As a rebuttal expert, Mr. Hilliard is not required to present evidence of but for causation; Federal's challenge ignores the law.**

Throughout this case, Federal has tried to flip the burdens of proof to avoid

damages.  In this *Daubert* motion, Federal contends Mr. Hilliard's Opinion #5 should be

excluded as contrary to law because Mr. Hilliard did not conduct a but for causation

analysis and therefore he "cannot quantify any contribution to revenue."  (Dkt. 388 at

18.)  Federal's challenge is based on an incorrect reading of law and misstates the

substance of Mr. Hilliard's opinion.  Mr. Hilliard is not stating a technical opinion

---

[3] FICO moved to exclude the testimony of Mr. McCarter.  (*See* Dkt. 361.)  If the Court grants that motion and excludes Mr. McCarter's testimony, Mr. Hilliard's rebuttal opinions on this point become unnecessary.  If the Court admits Mr. McCarter's testimony, however, it should also admit Mr. Hilliard's rebuttal to provide the jury valuable context.

regarding FICO's burden of proof.  Mr. Hilliard's opinion is confined to a rebuttal of Mr. McCarter.

Under § 504(b) of the Copyright Act, FICO's burden of proof is only to prove Federal's gross revenue connected to or related to infringement.  *Andreas v. Volkswagen of Am., Inc*., 336 F.3d 789, 799 (8th Cir. 2003) ("[T]he copyright holder must first establish some connection or relationship between the infringement and the profits he seeks."); *see also Dwyer Instruments v. Sensocon, Inc.*, 873 F. Supp. 2d 1015, 1041-42 (N.D. Ind. 2012); *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, 589 F. Supp. 2d 1230, 1248 (D. Colo. 2008).  This district has found "connection" to mean the infringement "contributes to" profits.  *Honeywell Int'l Inc. v. ICM Controls Corp.*, No. 11-cv-569 (JNE/TNL), 2017 U.S. Dist. LEXIS 11692, at *12, 15-16 (D. Minn. Jan. 26, 2017) (rejecting more onerous reading of § 504(b)).  "Connection" does not mean "but for" causation.  *Dayva Int'l v. Award Prods. Corp.*, 97-1397, 1998 U.S. App. LEXIS 4386, at *6 (Fed. Cir. Mar. 11, 1998); *see also Dwyer Instruments*, 873 F. Supp. 2d 1015 at 1041-42 (rejecting argument that infringement did not "cause" a single sale).

Mr. Hilliard was not required to conduct a but for causation analysis in order to qualify to have opinions rebutting Mr. McCarter regarding the value of Blaze Advisor to Federal.  Federal's challenge to Mr. Hilliard's methodology based on its incorrect legal standard must fail.  *See Honeywell*, 2017 U.S. Dist. LEXIS 11692, at *19.

### B.    Opinion #5 is admissible rebuttal testimony properly supported by the record.

By focusing on the burdens of proof under § 504(b), Federal again misses the point of Mr. Hilliard's Opinion #5.  Mr. Hilliard is not opining on what revenues should be subject to disgorgement—FICO's burden under §504(b).  Instead, Mr. Hilliard is solely rebutting Mr. McCarter's analysis regarding the value of Blaze Advisor to Federal.

Opinion #5 is properly supported by facts and a reliable methodology.  Mr. Hilliard rebuts five specific points in Mr. McCarter's report.  Mr. Hilliard relies on (1) industry experience, (2) a review of Mr. McCarter's opinions, and (3) the case-specific facts.  Based on this information, Mr. Hilliard disagrees with Mr. McCarter's opinions and instead concludes:

- Blaze Advisor has significant business value because it is "integrated" into "core" applications of Federal, according to the industry specific meaning of these terms used by Mr. McCarter;

- Whether Blaze Advisor is "industry agnostic" does not determine how much value it contributes to Federal's business;

- The presence of competing alternative products does not diminish the value of Blaze Advisor;

- Federal's effort to continue using Blaze Advisor discredits its claim that Blaze Advisor has little importance to the company; and

- The number of Applications and Technologies used by Federal has no bearing to the value of Blaze Advisor to Federal's business.

(Hilliard Rep., 30-36.)  Each of these five conclusions are grounded in Mr. Hilliard's experience and the case-specific facts, and are admissible to rebut Mr. McCarter.

Mr. Hilliard's report expands on each of these conclusions throughout Opinion #5. Mr. Hilliard identifies Mr. McCarter's deficiencies and provides a rebuttal based on Mr. Hilliard's own industry experience and the case-specific facts.  (Hilliard Rep., 30-36.) These opinions are proper rebuttal testimony to point out deficiencies in Mr. McCarter's opinions regarding the value of Blaze Advisor software.

     **C.**    **Mr. Hilliard's opinions regarding whether Blaze Advisor is "integrated" or "core" to Federal's applications is properly grounded in industry experience.**

Federal's brief singles out and attacks Mr. Hilliard's opinion that Blaze Advisor has value to Federal because Blaze Advisor is integrated into core Federal applications. Mr. Hilliard directly responds to Mr. McCarter's opinion that Blaze Advisor "only works when it is integrated with core insurance applications that have the required insurance functionality for selling and servicing policies."  (Dkt. No. 388 at p. 19.)  Mr. Hilliard accepts Mr. McCarter's statement that Blaze Advisor is integrated into core Federal applications and explains why Blaze Advisor has significant business value.  (Hilliard Rep., 31-32.)

Mr. Hilliard explains that Mr. McCarter's opinion on the subject is contrary to Mr. McCarter's own report and to industry terms of art:

> Mr. McCarter contends that Blaze Advisor is not a core technology:
>
> > Federal has only automated a small amount of the business rules and decisions that take place every day to conduct business. Blaze plays a small role in the business processing ecosystem at Federal.
>
> However, the McCarter Report notes that Blaze Advisor is "integrated with core insurance applications that have … insurance functionality [needed] for selling and servicing insurance policies."  The phrase "integrated with core

… applications" has special meaning to information technology professionals due to its use of the business computing terms of art, "integrated" and "core"….

(Hilliard Rep., 31-32.)  At his deposition, Mr. Hilliard explained that his opinion was responsive to Mr. McCarter's opinions and based on his understanding of ordinary and customary meaning in the commercial software industry.

> Q.  You say in your heading A that "Blaze Advisor is integrated into core Federal operations." What do you mean by integration and core …?
>
> A.  I'm responding to Mr. McCarter's report…. Where Mr. McCarter states, "Blaze only works when it is integrated with core insurance applications that have the required insurance functionality and service policies," and then he identifies … that it's used in 10 of Federal's 1500 applications. So I'm basically responding to what Mr. McCarter writes, and then I'm explaining what the term integrated – the normal and customary understanding of the term integrated and core, and with relation to business applications of software.

(Hilliard Dep., 176:3-177:3.)

> Q.  Okay. So in response to my question, what do you mean when you say integrated?
>
> A.  … I'm giving the normal and customary industry understanding of integrated since Mr. McCarter doesn't provide that….

(Hilliard Dep., 177:9-23.)

Mr. Hilliard's rebuttal of Mr. McCarter is properly based on his industry experience as properly applied to Mr. McCarter's own language.  Mr. Hilliard's opinion is admissible to give industry context to the terms used by Federal's own expert.  *See Cedar Hill*, 563 F.3d at 344; *TCBY*, 33 F.3d at 929.  Any challenge to Mr. Hilliard's opinion is resolved by cross-examination, not exclusion.  *Bombardier Rec. Prods*., 2017 U.S. Dist. LEXIS 26517, at *5; *Plasti Dip*, 2017 U.S. Dist. LEXIS 32464, at *5.

29

## VIII.  Conclusion

The Court should admit Mr. Hilliard's opinions, which are relevant and proper to rebut Federal's experts Dr. Kursh and Mr. McCarter.  If the Court excludes the inadmissible testimony of Dr. Kursh and Mr. McCarter as FICO has requested (*see* Dkt. 362; Dkt. 371), Mr. Hilliard's rebuttal testimony becomes unnecessary.  If the Court admits the testimony of Dr. Kursh and Mr. McCarter, however, it should also admit the testimony of Mr. Hilliard, who provides the jury with valuable context regarding the flaws in their opinions.


Dated: August 26, 2019

MERCHANT & GOULD P.C.

/s/ Heather Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN  55402
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com

*Attorneys for Plaintiff Fair Isaac Corporation*