# EXHIBIT 1

**FILED UNDER SEAL**

Brooks Hilliard - 6/19/2019
CASE 0:16-cv-01054-DTS Doc. 478 Filed 08/26/19 Page 2 of 8
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2   _____
     FAIR ISAAC CORPORATION,        Court File No.
 3                                  16-cv-1054(WMS/DTS)
            PLAINTIFF,
 4
        VS.
 5
     FEDERAL INSURANCE COMPANY
 6   and ACE AMERICAN INSURANCE
     COMPANY,
 7
            DEFENDANTS.
 8   _____

 9

10

11

12   ------------------------------------------------------

13              VIDEOTAPED DEPOSITION OF

14                   BROOKS HILLIARD

15   ------------------------------------------------------

16

17

18

19

20

21

22

23

24

25   Taken June 19, 2019         By Brandi Bigalke, RPR
```

Brooks Hilliard - 6/19/2019
CASE 0:16-cv-01054-DTS  Doc. 478  Filed 08/26/19  Page 3 of 8
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 5**

1 DEPOSITION OF BROOKS HILLIARD, is taken on this 19th
2 day of June, 2019, at 200 South Sixth Street, Suite
3 4000, Minneapolis, Minnesota, commencing at 8:00 a.m.
4
5     THE VIDEO OPERATOR: This is the
6 videographer speaking, Scott Breckheimer with
7 Depo International. Today is June 19, 2019. The
8 time is 7:59 a.m. We are at 200 South Sixth
9 Street, Suite 4000, Minneapolis, Minnesota 55402
10 to take the video deposition of Brooks Hilliard
11 in the matter of Fair Isaac Corporation vs.
12 Federal Insurance Company, et al.
13     Would counsel please introduce
14 yourselves for the record.
15     MR. FLEMING: Terry Fleming and
16 Christian Hokans of the Fredrikson firm
17 representing Defendants Federal Insurance Company
18 and Ace American Insurance Company.
19     MR. HINDERAKER: Allen Hinderaker
20 from Merchant & Gould, and Jim Woodward, Vice
21 President, General Counsel's Office of Fair
22 Isaac, the Plaintiff.
23         EXAMINATION
24 BY MR. FLEMING:
25   Q.   Good morning, Mr. Hilliard.

**Page 6**

1   A.   Good morning.
2     THE VIDEO OPERATOR: Would the
3 court reporter please administer the oath.
4         BROOKS HILLIARD
5 Called as a witness and having been first duly
6 sworn, testifies as follows:
7     MR. HINDERAKER: Before you begin,
8 Terry, just some housekeeping items but I might as
9 well do them now.
10     Mr. Hilliard discovered just a couple
11 corrections I guess you'd say in the -- in his
12 footnotes. So on page 8 of his report at
13 Footnote 7, the general reference to Classen is
14 correct, it's just that the particular page
15 reference to 42, just delete that.
16     And then on page 17, Footnote 32, the
17 reference should be to page 113, not 114.
18     MR. FLEMING: All right.
19         EXAMINATION
20 BY MR. FLEMING:
21   Q.   All right. Mr. Hilliard, with
22 regard to those, did you -- how did you -- first
23 of all, you agree with those corrections, I take
24 it?
25   A.   I do.

**Page 7**

1   Q.   Okay. And how did it -- how did
2 you determine that those corrections were
3 necessary?
4   A.   I went yesterday and checked the
5 references to Landy and Classen to make sure that
6 they were all correct, and just to review what it
7 said in the book, in the two books, and found
8 that those needed to be corrected.
9     MR. FLEMING: Mark this as
10 Exhibit 500, please.
11     (Deposition Exhibit 500 was marked
12 for identification.)
13 BY MR. FLEMING:
14   Q.   Mr. Hilliard, showing you what's
15 been marked as Exhibit 500.
16     Is that your expert report in this
17 case?
18   A.   Yes, it is.
19   Q.   All right. Turn to page 2.
20     Do you say on page 2 that you were
21 engaged by Merchant & Gould on behalf of FICO and
22 asked to review and respond to the report
23 prepared by Federal, Ace American's experts
24 Dr. Steven Kursh and William Carter?
25   A.   Yes. McCarter, I believe.

**Page 8**

1   Q.   So you are providing expert
2 testimony responding to the report provided by
3 Dr. Kursh and Mr. McCarter; is that right?
4   A.   Yes.
5   Q.   And are you providing expert
6 opinions in response to all of their opinions in
7 their report, or just the areas that you
8 explicitly discuss in your rebuttal report?
9   A.   Just the areas I explicitly discuss
10 in my rebuttal report.
11   Q.   And what is your hourly rate?
12   A.   $500 an hour.
13   Q.   And how much -- how many hours have
14 you spent on this matter to date, roughly?
15   A.   Prior to -- as of the time I
16 completed the report, it was a little under 160
17 hours, I believe.
18     MR. FLEMING: Mark this as
19 Exhibit 501.
20     (Deposition Exhibit 501 was marked
21 for identification.)
22 BY MR. FLEMING:
23   Q.   Showing you what's been marked as
24 Exhibit 501, is this the expert report of
25 Dr. Kursh?

Brooks Hilliard - 6/19/2019
CASE 0:16-cv-01054-DTS Doc. 478 Filed 08/26/19 Page 4 of 8
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 9**

1  A. I haven't reviewed every page, but
2  it appears to be, yes.
3  Q. Could you turn to page 6 of
4  Dr. Kursh's report, Paragraph 12.
5  A. I'm there. Would you like me to
6  read Paragraph 12?
7  Q. Please.
8  A. Okay. I've read.
9  Q. So is it your understanding that
10 Paragraph 12 states the scope of Dr. Kursh's
11 assignment?
12 A. That's my understanding. I
13 didn't -- when I reviewed his report, I didn't
14 ensure that everything he wrote fell within these
15 bounds.
16 Q. Would you say that the scope of
17 what you were opining about in this case is the
18 same as Dr. Kursh's?
19 A. There are areas that Dr. Kursh
20 addressed that I did not address.
21 Q. How does the scope of your opinion
22 differ from the scope of Dr. Kursh's report?
23 A. He addresses some damages issues
24 even though he's not a damages expert, and I
25 address some of the underlying facts related to

**Page 10**

1  the damages issues -- or what seem to me to be
2  damages issues in his report, but I didn't
3  directly address damages.
4     There may be some -- there are some
5  areas in his report where it seems to me he
6  reaches legal conclusions, and -- as a layperson
7  it seems that way. And I tried to address my
8  report in such a way that I would address perhaps
9  issues related to those legal conclusions, but I
10 didn't address legal determinations. Those are
11 the differences that come to mind.
12 Q. All right. Mr. Hilliard, I've
13 noticed since the beginning of this deposition
14 that you're staring straight ahead as opposed to
15 looking at me in response to the question. I've
16 never seen a witness do that before.
17    Why are you doing that?
18 A. Well, the camera is straight ahead,
19 and you're recording this on camera so I'm just
20 looking at the camera.
21 Q. Okay.
22    MR. FLEMING: Would you mark this
23 as Exhibit 502.
24    (Deposition Exhibit 502 was marked
25 for identification.)

**Page 11**

1  BY MR. FLEMING:
2  Q. Showing you what's been marked as
3  Exhibit 502, is this the expert report of William
4  McCarter?
5  A. It appears to be. I haven't
6  examined every page, but it would appear to be
7  the same report of Mr. McCarter that I have
8  reviewed previously.
9  Q. Can you turn to page 4 of
10 Mr. McCarter's report, Paragraph 5.
11 A. I'm there.
12 Q. Does Paragraph 5 state the scope of
13 the assignment that Mr. McCarter undertook?
14 A. Once again, I haven't reviewed the
15 report paragraph by paragraph to determine
16 whether it all fits within the scope, but this
17 seems to be a fair summary.
18 Q. And is the scope of what you're
19 opining about in this case the same as
20 Mr. McCarter's, or not?
21 A. I'm addressing some of the factual
22 issues that underlie his opinions, but not
23 necessarily all of his opinions. And I have
24 opinions on the relevance or accuracy of the
25 support for his opinions. I don't know that it

**Page 12**

1  would be accurate to say that I've directly
2  addressed each of his opinions.
3  Q. Other than what you've stated, how
4  does the scope of your opinion differ from
5  Mr. McCarter's assignment?
6  A. No different than what I've stated.
7  Q. Okay. Are you an insurance
8  industry expert?
9  A. I'm not.
10 Q. What prior experience do you have
11 with respect to the insurance industry?
12 A. Well, as an IT consultant I've had
13 both insurance companies and insurance agencies
14 as clients, and I've worked closely with them in
15 helping them define their information technology
16 needs and acquire software applications, and
17 hardware in some cases, to -- which were complete
18 systems to meet those needs.
19    So I've spent a fair amount of
20 time, probably a half a dozen clients over the
21 years that were either insurance companies or
22 insurance agencies. I don't recall whether I've
23 ever been engaged as an expert witness in a
24 lawsuit relating to the insurance industry.
25 Q. So your prior experience with

Brooks Hilliard   -   6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 478   Filed 08/26/19   Page 5 of 8

**Page 89**

1  A.  Yes.  Roofing.
2  Q.  Roofing.
3      And the other case is the
4  Hodell-Natco Industries matter?
5  A.  Yes.
6  Q.  Okay.  So those are five matters?
7  A.  Yes.
8  Q.  Okay.  And it's your testimony that
9  there are cases other than those in which a court
10 has precluded you from providing certain expert
11 opinions or limited your testimony in some
12 fashion, but you don't recall any others?
13 A.  There are other cases where the
14 Court limited my testimony, but did not preclude
15 me from testifying.
16 Q.  How --
17 A.  But I don't recall them.
18 Q.  If you wanted to determine what
19 other cases that a court made such an order, how
20 would you go about doing that?
21 A.  I have no idea because I -- I don't
22 necessarily have -- these go back years, and I
23 don't necessarily have the records related to
24 them.
25 Q.  When was the order in the second

**Page 90**

1  Oracle case in the federal court in Atlanta, when
2  was the order issued?
3  A.  I don't recall the date.  It would
4  be on the order of 10 years ago, but it could be
5  8, it could be 15, it could be 18 years ago.
6  I -- I don't recall.  Could be more, actually.  I
7  did a number of cases during the 1990s.
8  Q.  Do you recall in that Oracle case
9  in Atlanta what was the opinion that the Court
10 precluded on the ground that it was not proper
11 subject for expert witness testimony but rather
12 was for the factfinder?
13     MR. HINDERAKER:  Objection; asked
14 and answered.
15     THE WITNESS:  I don't recall.  I
16 think it -- it may have been an opinion on the
17 meaning of a contract, but it may not have been.
18 I know that has -- courts were less stringent
19 back in the 1990s and early 2000s about allowing
20 expert testimony on the meaning of contracts.
21     So I was allowed to give opinions
22 of that nature in some cases and the Court did
23 not preclude it, and in other cases counsel asked
24 me to address those issues, but then the Court
25 precluded me from testifying about them.

**Page 91**

1  The rigorous -- my observation
2  would be that the rigorousness of courts with
3  relation to that issue has increased from over
4  the last 20 years.
5  BY MR. FLEMING:
6  Q.  On how many occasions has your
7  proffered expert opinion on the meaning of a
8  contract been excluded by a court?
9  A.  I can't -- I don't know off the top
10 of my head.
11 Q.  Could be anywhere from 5 to 20
12 times?
13 A.  Could be anywhere from five to --
14 probably from three to eight times, maybe.  But I
15 don't know how I would go back and determine
16 that.
17 Q.  Are you providing an expert opinion
18 on the meaning of a contract in this case?
19 A.  Not in the legal sense of the
20 meaning.  I mean, I understand how certain terms
21 in a contract are generally understood in the
22 industry by both licensees and licensors, or
23 customers and suppliers.
24     But in terms of the legal meaning
25 of a contract, I'm not -- I have no opinions on

**Page 92**

1  the legal meaning.  I can address how various
2  terms are normally and customarily understood by
3  parties to contracts, including software
4  licenses.
5  Q.  And my question wasn't whether you
6  were providing an opinion on the legal meaning of
7  a contract.
8      My question is whether you are
9  providing expert testimony on the meaning of a
10 contract in this case?
11     MR. HINDERAKER:  So I'll object to
12 the question as vague, asked and answered.
13     Go ahead.
14     THE WITNESS:  I need a definition
15 of meaning in order to answer that.
16 BY MR. FLEMING:
17 Q.  So have you heard that word before?
18 A.  I have.
19 Q.  And in fact, wasn't it you that
20 just used the phrase meaning of a contract in
21 response to one of my questions?
22 A.  Yes.
23 Q.  Okay.  How did you -- what was your
24 understanding of what that word meant when you
25 first used it, or when you referenced it recently

Brooks Hilliard   -   6/19/2019
CASE 0:16-cv-01054-DTS   Doc. 478   Filed 08/26/19   Page 6 of 8
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 93**

in your testimony?

A. Well, I gave you the context, and I said to the extent that you're referring to the legal meaning of portions of the contract, I'm not testifying about that.

To the extent that my opinions relate to how contracts are generally understood, I am testifying about that. So I'm trying to give you all connotations of meaning, and distinguishing about what I'm -- distinguishing between what I'm testifying about and what I have opinions about, and what I'm not testifying about what I don't have opinions about.

Q. Has a court ever excluded your testimony on the topic of "industry practices, customs, and standards of care"?

A. I don't believe so. I can't recall ever being precluded from testifying on that basis.

Q. You were involved as an expert witness in the Hodell-Natco Industries versus SAP America case, were you not?

A. Yes.

Q. And you were an expert witness for the Defendant, SAP America?

**Page 94**

A. The codefendant, yes.

MR. FLEMING: Will you mark this as the next exhibit, please.

(Deposition Exhibit 506 was marked for identification.)

BY MR. FLEMING:

Q. Showing you Exhibit 506, have you seen this order from the Hodell-Natco Industries case?

A. I haven't looked at it in any detail recently.

Q. But have you seen --

A. I have seen it, yes.

Q. Okay. Could you read the order on pages 3 to 8. Actually I can shorten this up for you. The conclusions are on pages 7 to 8, if you could go and review those pages.

A. Okay. After I read those, I may want to go back and read the prior, but I'll read those.

Q. Sure. And I'm not stopping you. My question doesn't really go to those prior pages.

The Court's conclusions with regard to the motion to exclude your testimony are on

**Page 95**

pages 7 and 8, are they not?

A. Let me read.

I believe the Court's ruling is more than just page 7 and 8. It goes on up through page 11. But I've read that section.

What question would you like to ask me?

Q. Well, in this case, in fact, the Court did grant a motion to exclude your testimony relating to the explanation of the various standards of care in the business software industry; isn't that right?

MR. HINDERAKER: Objection; the opinion speaks for itself in terms of the analysis. And to the extent the question doesn't include that, it's misstating the record.

THE WITNESS: I'm reading from page 7. "The Court concludes that Mr. Hilliard's testimony as to the various practices and standards of care in the business software industry is irrelevant to the issues the jury must decide."

So it was not an exclusion based on my knowledge or ability to address industry standards and practices -- customs and practices.

**Page 96**

In fact, if you go on through pages 8, 9, 10, and 11, the Court specifically says that I was qualified to address certain of those issues, but it did preclude certain issues that it determined were irrelevant to the -- or certain opinions that it determined were irrelevant to the issues the jury must decide, not based on my inability to address those issues.

MR. FLEMING: Could you read my question again.

I'd like an answer to the question I asked.

(The requested portion was read back by the court reporter.)

MR. HINDERAKER: Objection; misstates the record. He's answered. I object to that question as argumentative and misstating the record. The testimony was not excluded for his ability to testify on standards of the practice.

THE WITNESS: Some of my opinions were excluded because the Court determined they were not relevant to the issues the jury must decide.

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 478 Filed 08/26/19 Page 7 of 8

1 for identification.)
2 BY MR. FLEMING:
3  Q.  Is this the document you reference
4 on page 31 of your report?
5  A.  Yes.
6  Q.  And this was an attachment to an
7 e-mail sent by Tamara Pawloski; is that right?
8  A.  Yes.
9  Q.  Do you know what Ms. Pawloski's
10 position is?
11  A.  She's the VP of Software Compliance
12 and Optimization for Global Vendor Services
13 Organization for Chubb is what it says. That's
14 her domain -- e-mail domain Chubb.com, and it
15 also says Chubb above her name.
16  Q.  And do you know who prepared the
17 attachment?
18  A.  I don't recall whether I saw who
19 prepared it and I don't recall -- I don't recall
20 if I saw who prepared it.
21  Q.  Do you know whether Ms. Pawloski
22 has any IT background or experience?
23  A.  Well, if she is a VP of software
24 compliance and optimization, she has response --
25 IT responsibility, but I don't know her

Page 173

1 background.
2  Q.  Okay. You don't know what her
3 actual responsibilities were though, do you?
4  A.  I just know what her title is,
5 which would indicate some IT responsibility. But
6 I don't -- I haven't seen her job description.
7  Q.  What technical requirements would
8 be needed to determine whether Blaze was actually
9 integrated into these 15 applications?
10  A.  Someone -- most likely someone
11 on -- in the IT -- with specific IT development
12 responsibility or someone working in the portion
13 of Chubb with IT development or deployment
14 responsibility.
15  Q.  And my question is really
16 different. Not who you would talk to, but rather
17 what would you do or ask to see in order to
18 determine whether Blaze is actually integrated
19 into these 15 applications?
20      MR. HINDERAKER: Objection; beyond
21 the scope.
22      THE WITNESS: In my experience,
23 you'd have to talk to someone within Chubb who
24 was involved in these deployments.
25 BY MR. FLEMING:

Page 174

1  Q.  And what documents or what data
2 would you request to see in addition to talking
3 with somebody in the IT department?
4  A.  It would depend on the
5 organization. In some cases talking to someone
6 who was involved in it would be sufficient.
7  Q.  Well, with regard to this
8 organization, how would you go about doing that?
9      MR. HINDERAKER: This organization
10 being the defendant?
11      MR. FLEMING: Federal, yeah.
12      MR. HINDERAKER: Objection; lack of
13 foundation.
14      THE WITNESS: I don't know enough
15 about Federal to say.
16 BY MR. FLEMING:
17  Q.  And you didn't attempt to go about
18 verifying those facts, that is whether in fact
19 Blaze was actually integrated into these 15
20 applications, did you?
21  A.  I took the VP of software
22 compliance and optimizations' word for it.
23  Q.  And my question is whether you took
24 any other steps to verify those facts, other than
25 reading the one e-mail and the attachment?

Page 175

1  A.  I -- I did not. I just trusted
2 Ms. Pawloski.
3  Q.  You say in your heading A that
4 "Blaze Advisor is integrated into core Federal
5 operations."
6      What do you mean by integration and
7 core on pages 31, and you say the same on 32?
8  A.  I'm responding to Mr. McCarter's
9 report. On page 9 of Mr. McCarter's report --
10 well, maybe it isn't -- I may have the page
11 number incorrect. Maybe it's Paragraph 74.
12      MR. HINDERAKER: Do you mind if I
13 help out by just -- I'd look at your footnote 84.
14      THE WITNESS: Oh, I'm sorry.
15 Paragraph 91 on page 24. You're correct.
16 Looking at the wrong footnote.
17      Where Mr. McCarter states, "Blaze
18 only works when it is integrated with core
19 insurance applications that have the required
20 insurance functionality and service policies,"
21 and then he identifies in Paragraph 88 above that
22 it's used in 10 of Federal's 1500 applications.
23      So I'm basically responding to what
24 Mr. McCarter writes, and then I'm explaining what
25 the term integrated -- the normal and customary

Page 176

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 478   Filed 08/26/19   Page 8 of 8

 1 understanding of the term integrated and core,
 2 and with relation to business applications of
 3 software.
 4 BY MR. FLEMING:
 5     Q.    And what two paragraphs are you
 6 reference, 88 and what other paragraph of
 7 Mr. McCarter's report?
 8     A.    91 on page 24.
 9     Q.    Okay.  So in response to my
10 question, what do you mean when you say
11 integrated?
12     A.    Well, I'm trying to -- I'm giving
13 the normal and customary industry understanding
14 of integrated since Mr. McCarter doesn't provide
15 that and I'm saying it normally means that a
16 component application, which would be Blaze
17 Advisor in this case, is linked into a host
18 application, here some insurance applications,
19 either the 10 referenced by Mr. McCarter or the
20 15 referenced by Ms. Pawloski, in a way that is
21 in the idea -- that in the ideal would allow
22 information to pass between them as if they were
23 a single unified application.
24           Now, this isn't always seamless.  I
25 said -- so I said depending on how seamless, how

Page 177

 1 close to that ideal the integration is, this
 2 typically means that removal or replacement of an
 3 integrated component is likely to be difficult,
 4 time consuming and to risk endangering the
 5 operation of the host application.
 6           So I've defined what I mean by
 7 integrated since Mr. -- which I think is a normal
 8 and customary industry understanding, which is
 9 something that Mr. McCarter did not do.
10     Q.    So are you saying that the
11 applications are core or the application
12 components are core?
13     A.    Well, let's look at what McCarter
14 says.  And he says that Blaze only works when it
15 is integrated with core insurance applications,
16 what I refer to as the host applications where I
17 talk about integrated, that have the required
18 insurance functionality for selling and servicing
19 insurance policies.
20           So the applications would be either
21 the 10 that Mr. McCarter refers to in
22 Paragraph 88 and I think he itemizes them
23 actually in Paragraph 94 -- one, two, three,
24 four, five, six, seven, eight, nine -- yeah, he
25 itemizes them in Paragraph 94, or the 15 that

Page 178

 1 were represented by the Chubb VP of software
 2 compliance and optimization.
 3     Q.    And my question is, in your
 4 opinion, are you saying that the applications are
 5 core or that the applications components are
 6 core?
 7     A.    I'm saying --
 8           MR. HINDERAKER:  I'm going to
 9 object to that question as vague.
10           THE WITNESS:  Hmm?
11           MR. HINDERAKER:  I object to the
12 question, as I don't understand it, as vague.
13           THE WITNESS:  Let me see if I can
14 clarify what I'm saying, is the 10 or 15
15 applications itemized by Ms. Pawloski or itemized
16 by Mr. McCarter are characterized by Mr. McCarter
17 as being core applications and he characterizes
18 them that way in Paragraph 91.
19 BY MR. FLEMING:
20     Q.    Well, there are -- you agree that
21 Blaze is only used in 10 of Federal's 1500
22 applications?
23           MR. HINDERAKER:  Objection; lack of
24 foundation.
25           THE WITNESS:  I think what I said

Page 179

 1 is there are two different counts and there's --
 2 and Mr. McCarter doesn't account for the
 3 difference between the 15 identified by
 4 Ms. Pawloski and the 10 identified in his report.
 5 So I don't know whether the 10 or the 15 is
 6 correct.  And neither does apparently
 7 Mr. McCarter.
 8 BY MR. FLEMING:
 9     Q.    Okay.  I'm asking you a different
10 question.
11           Do you agree with Mr. McCarter's
12 statement that Blaze is only used in 10 of
13 Federal's 1500 applications?
14     A.    No.  It may be 15 or Ms. Pawloski
15 might be wrong.
16     Q.    I see.  So you don't disagree that
17 there's 1500 applications, but you disagree as to
18 whether there's 10 or 15 that use Blaze, correct?
19           MR. HINDERAKER:  Objection; lack of
20 foundation.
21           THE WITNESS:  I don't know whether
22 the 1500 is an approximate -- I'd be surprised if
23 it was exactly 1500, so I expect that's an
24 approximation.  I don't know how accurate it is.
25 BY MR. FLEMING:

Page 180