## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| Plaintiff, | ) ) | **Jury Trial Demanded** |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT
REPORT AND TESTIMONY OF RANDOLPH BICKLEY WHITENER**

## <u>TABLE OF CONTENTS</u>

I.    *Daubert* challenges premised on incorrect legal standards must fail. ..............................1

    A.    Section 504(b) requires a "connection" between infringement and
          revenue—not causation...........................................................................................2

          (1)    The copyright owner need only show the infringing use of the
                copyrighted work is "connected to" defendant's gross revenues. ...........2

          (2)    The infringer bears the burden of proving deductible expenses and
                the burden of apportioning profits to factors other than infringement......4

    B.    Federal overstates and misapplies FICO's burden for disgorgement. ...................6

          (1)    A "but for" causation is not the standard in the Eighth Circuit or
                District of Minnesota. .............................................................................6

          (2)    No "heightened" burden exists for indirect profits cases..........................8

          (3)    Federal—not FICO or Mr. Whitener—is required to quantify the
                apportionment of Federal's profits to factors other than infringement......9

    C.    Federal misstates or altogether ignores controlling case law...............................10

II.   As an insurance industry expert, Mr. Whitener is qualified to opine on the
    contribution between Federal's use of Blaze Advisor to automate decision making
    and Federal's revenue. .....................................................................................................11

    A.    An expert may be qualified by knowledge, skill, experience, training, or
          education. .............................................................................................................11

    B.    Mr. Whitener has relevant expertise in the insurance industry, including
          underwriting, rules development, and technology implementation....................12

    C.    Federal's challenge to Mr. Whitener based on qualifications fails......................15

          (1)    Mr. Whitener is qualified with more than "general experience in the
                insurance industry." ...............................................................................15

          (2)    Mr. Whitener has experience with decision management software. ........16

          (3)    Mr. Whitener was not disclosed as a Blaze Advisor *technical* expert.....17

III.  Mr. Whitener employed reliable methodology in his analysis of Blaze Advisor's
    contribution to Federal's revenue. ...................................................................................19

    A.    An expert's opinion is reliable if it is trustworthy in an evidentiary sense..........19

B.      Mr. Whitener's methodology analyzed how insurance companies generate revenue, what factors relate to the generation of that revenue, and then how Blaze Advisor contributed to the generation of Federal's revenue....................... 19

    (1)      Mr. Whitener analyzed how insurance companies generate revenue. ...... 20

    (2)      Mr. Whitener analyzed factors relating to the sale of insurance (i.e. generation of revenue). ........................................................................... 21

    (3)      Mr. Whitener showed how Federal uses Blaze Advisor to achieve each of the factors contributing to revenue. .............................................. 21

C.      Federal's challenges to Mr. Whitener's methodology fail.................................. 23

IV.     Mr. Whitener's analysis of Federal's use of Blaze Advisor is relevant and helpful to the jury. ........................................................................................................................ 25

A.      An expert's opinion is relevant if it is useful to the finder of fact in deciding the ultimate issue of fact. ................................................................................... 25

B.      Mr. Whitener's opinion that Blaze Advisor contributes to Federal's revenue is grounded in case-specific facts—including Federal's own documents. .......... 26

C.      Federal's contention Mr. Whitener's opinions are not based on sufficient facts or data must fail. ........................................................................................ 27

V.      Federal's challenge to Mr. Whitener's purported opinions on revenue streams and revenue amounts is baseless................................................................................................ 27

VI.     Conclusion ..................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andreas v. Volkswagen of Am., Inc.*,
    336 F.3d 789 (8th Cir. 2003) ......................................................................... *passim*

*Balsley v. LFP, Inc.*,
    691 F.3d 747 (6th Cir. 2012) ................................................................................3

*Blackman v. Hustler Magazine, Inc.*,
    800 F.2d 1160 (1986)............................................................................................6

*Block v. Woo Young Medical Company*,
    937 F. Supp. 2d 1028 (D. Minn. 2013)................................................23, 26, 27

*Bombardier Rec. Prods. v. Arctic Cat Inc.*,
    2017 U.S. Dist. LEXIS 26517 (D. Minn. Feb. 24, 2017) ................................ *passim*

*Bonner v. ISP Techs., Inc.*,
    259 F.3d 924 (8th Cir. 2001) ..............................................................................19

*Charter Sch. Capital, Inc. v. Charter Asset Mgmt. Fund, LP*,
    2017 WL 6536585 (C.D. Cal. Jan. 17, 2017) .............................................................6

*Complex Sys. v. ABN Ambro Bank N.V.*,
    2013 U.S. Dist. LEXIS 160291 (S.D.N.Y. Nov. 8, 2013) .......................................3

*DaimlerChrysler Servs. v. Summit Nat'l*,
    2006 U.S. Dist. LEXIS 4282 (E.D. Mich. Jan. 26, 2006) .......................................4

*Data General Corp. v. Grumman Sys. Support Corp.*,
    36 F.3d 1147 (1st Cir. 1994)................................................................................4

*Dayva Int'l v. Award Prods. Corp.*,
    1998 U.S. App. LEXIS 4386  (Fed. Cir. Mar. 11, 1998).................................2, 3, 4

*Dwyer Instruments v. Sensocon, Inc.*,
    873 F. Supp. 2d 1015 (N.D. Ind. 2012) .........................................................2, 4, 9

*Fournier v. McCann Erickson*,
    242 F. Supp. 2d 318 (S.D.N.Y. 2003).................................................................3

*Garcia v. Coleman*,
    2009 U.S. Dist. LEXIS 29458 (N.D. Cal. Mar. 24, 2009).......................................3

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)...................................................................................5

*Honeywell Int'l Inc. v. ICM Controls Corp.*,
2017 U.S. Dist. LEXIS 11692 (D. Minn. Jan. 26, 2017)................................. *passim*

*IBM v. BGC Partners, Inc.*,
2013 U.S. Dist. LEXIS 59779 (S.D.N.Y. Apr. 25, 2013)........................................3

*In Design v. Lauren Knitwear Corp.*,
782 F. Supp. 824 (S.D.N.Y. 1991)...................................................................5

*Intel Corp. v. Future Link Sys., LLC*,
2017 U.S. Dist. LEXIS 91699 (D. Del. June 1, 2017)........................................17

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)...................................................................................19

*Lauzon v. Senco Prods., Inc.*,
270 F.3d 681 (8th Cir. 2001) .................................................................19, 26

*Loudermill v. Dow Chem. Co.*,
863 F.2d 566 (8th Cir. 1988) ........................................................................26

*Mackie v. Rieser*,
296 F.3d 909 (9th Cir. 2002) ......................................................................7, 8

*Marmo v. Tyson Fresh Meats, Inc.*,
457 F.3d 748 (8th Cir. 2006) ........................................................................26

*Oracle Am., Inc. v. Google Inc.*,
2016 U.S. Dist. LEXIS 58819 (N.D. Cal. May 3, 2016) .....................................6, 9

*Phoenix Renovation Corp. v. Rodriguez*,
258 F. Appx. 526 (4th Cir. 2007).....................................................................2

*Plasti Dip Int'l, Inc. v. Rust-Oleum Brands Co.*,
2017 U.S. Dist. LEXIS 32464 (D. Minn. Feb. 13, 2017) ................................ *passim*

*Polar Bear Prods. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004) .....................................................................3, 11

*Robinson v. GEICO Gen. Ins. Co.*,
447 F.3d 1096 (8th Cir. 2006) .........................................................11, 12, 15, 18

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
309 U.S. 390 (1940)...................................................................................5

*United States v. Vesey*,
    338 F.3d 913 (8th Cir. 2003) ...........................................................................19, 25

*Universal Furniture Int'l, Inc. v. Collezione Europa, USA, Inc.*,
    599 F. Supp. 2d 648 (M.D.N.C. 2009) .............................................................3, 4, 5

*University of Colorado Foundation, Inc. v. Am. Cyanamid Co.*,
    196 F.3d 1366 (Fed. Cir. 1999)................................................................................10

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
    2011 U.S. Dist. LEXIS 112846 (D. Md. Sep. 30, 2011) .................................2, 5, 9

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    2017 U.S. Dist. LEXIS 178805 (D. Minn. Oct. 24, 2017) ....................................26

*William A. Graham Co. v. Haughey*,
    568 F.3d 425 (3d Cir. 2009)......................................................................................3

*Wood v. Houghton Mifflin Harcourt Publ'g Co.*,
    589 F. Supp. 2d 1230 (D. Colo. 2008).................................................................2, 4, 9

**Statutes**

17 U.S.C. § 504(b) ...................................................................................... *passim*

**Other Authorities**

Fed. R. Evid. 702 ...........................................................................1, 11, 19, 25

Fed. R. Evid. 703 .........................................................................................17

Ninth Circuit Manual of Model Jury Instructions, § 17.34.............................................8

v

Rejection of expert testimony is the exception not the rule.  Defendants Federal Insurance Co. and ACE American Insurance Co.'s (collectively "Federal") challenge to the opinions of Fair Isaac Corporation's ("FICO") expert R. Bickley Whitener fail.  Mr. Whitener satisfies the requirements under Federal Rule of Evidence 702 and *Daubert*— qualified, reliable methodology, and relevance to the case.  Exclusion is improper.

Federal repeatedly misstates FICO's burden of proof for disgorgement under 17 U.S.C. § 504(b), shifting Federal's own burdens of proof to FICO.  Federal also improperly portrays Mr. Whitener as FICO's "technical" expert.  Undoubtedly, it is easier to challenge Mr. Whitener for what he is not than what he is.  Mr. Whitener is an expert in the insurance industry—including underwriting, rules development, and technology implementation.  He is qualified to opine on Federal's use of Blaze Advisor in the sale of insurance, and Blaze Advisor's connection and contribution to Federal's revenue from those sales.  Mr. Whitener employed a reliable methodology of analyzing revenue generation in the insurance industry and the contribution automated decision-making with Blaze Advisor makes to the generation of Federal's revenue.  Mr. Whitener's opinions are admissible under *Daubert*.

I.     ***Daubert* challenges premised on incorrect legal standards must fail.**

Federal challenges Mr. Whitener's opinions as failing to meet the "burdens" of § 504(b) (e.g. "but for" causation, quantification, testing, etc.).  (Dkt. 380 at 2, 4-5, 14-15, 17.)  Federal ignores controlling case law.  *Compare* Dkt 380 *with Honeywell Int'l Inc. v. ICM Controls Corp.*, No. 11-cv-569, 2017 U.S. Dist. LEXIS 11692, at *12, 15-16 (D. Minn. Jan. 26, 2017).  Federal misstates FICO's burden and redirects its own

1

apportionment (i.e. quantification) burden to FICO.  Federal's *Daubert* challenge must fail because it is premised on an incorrect legal standard.

        **A.**    **Section 504(b) requires a "connection" between infringement and revenue—not "but for" causation.**

            **(1)**    **The copyright owner need only show the infringing use of the copyrighted work is "connected to" defendant's gross revenues.**

Under § 504(b) of the Copyright Act, FICO's burden of proof is only to prove Federal's gross revenue connected to or related to infringement.  *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 799 (8th Cir. 2003) ("[T]he copyright holder must first establish some connection or relationship between the infringement and the profits he seeks."); *see also Dwyer Instruments v. Sensocon, Inc.*, 873 F. Supp. 2d 1015, 1041-42 (N.D. Ind. 2012); *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, 589 F. Supp. 2d 1230, 1248 (D. Colo. 2008).  This is not an "onerous evidentiary burden."  *Victor Stanley, Inc. v. Creative Pipe, Inc.*, No. MJG-06-2662, 2011 U.S. Dist. LEXIS 112846, at *13 (D. Md. Sep. 30, 2011) (quoting *Phoenix Renovation Corp. v. Rodriguez*, 258 F. Appx. 526, 534-35 (4th Cir. 2007)).  This District has found "connection" to mean the infringement "contributes to" profits.  *Honeywell Int'l Inc. v. ICM Controls Corp.*, 11-cv-569, 2017 U.S. Dist. LEXIS 11692, at *12, 15-16 (rejecting more onerous reading of § 504(b)).

"The statute does not require proof of causation but only of gross revenue." *Dayva Int'l v. Award Prods. Corp.*, 97-1397, 1998 U.S. App. LEXIS 4386 at *6 (Fed. Cir. Mar. 11, 1998); *see also Dwyer Instruments*, 873 F. Supp. 2d at 1041-42 (rejecting argument that infringement did not "cause" a single sale).  FICO need not "put a . . . buyer on the stand to testify that she bought the [insurance policy] because of the [infringement]."

*Andreas*, 336 F.3d at 797.  A causal connection requires only that the revenue is reasonably related to the infringement. *William A. Graham Co. v. Haughey*, 568 F.3d 425, 443 (3d Cir. 2009).  "Connection" does not require the copyright owner to prove the revenue is "directly tied solely to the infringement." *Fournier v. McCann Erickson*, 242 F. Supp. 2d 318, 327 (S.D.N.Y. 2003).  The infringement need not be the "only reason" or "main reason" for the revenue. *Garcia v. Coleman*, No. C-07-2279, 2009 U.S. Dist. LEXIS 29458, at *11-12 (N.D. Cal. Mar. 24, 2009).  Indeed, the infringement need only "partially cause[]" the profits. *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).

The copyright owner's burden of proof is met by showing gross revenue connected to the infringement and not to other aspects of the infringer's business. *Universal Furniture Int'l, Inc. v. Collezione Europa, USA, Inc.*, 599 F. Supp. 2d 648, 653 (M.D.N.C. 2009) ("Gross revenue is calculated only as to the gross revenue for the infringer's line of business or project related to the infringement, and not the infringer's gross revenue from all of its commercial endeavors.")(internal quotation omitted); *see also Balsley v. LFP, Inc.*, 691 F.3d 747, 770 (6th Cir. 2012); *Dayva Int'l*, 1998 U.S. App. LEXIS 4386, at *6.

Proffering undifferentiated revenues is insufficient.  *Complex Sys. v. ABN Ambro Bank N.V.*, No. 08 Civ. 7497, 2013 U.S. Dist. LEXIS 160291, at *38 (S.D.N.Y. Nov. 8, 2013) ("CSI does not even limit its request to solely those transactions that occurred on BankTrade.  Instead, CSI seeks all sums that it believes should be credited to BankTrade, including those that did not themselves 'flow through' the software."); *IBM v. BGC*

3

*Partners, Inc.*, 10 Civ. 128, 2013 U.S. Dist. LEXIS 59779, at *11 (S.D.N.Y. Apr. 25,

2013) (rejecting claim to all of defendant's pre-tax income); *DaimlerChrysler Servs. v.*

*Summit Nat'l*, No. 02-71871, 2006 U.S. Dist. LEXIS 4282, at *11 (E.D. Mich. Jan. 26,

2006) (rejecting claim to infringer's "entire gross revenue").

Establishing a connection between infringement and defendant's revenue, even a

small connection, satisfies plaintiff's burden. *Dwyer Instruments*, 873 F. Supp. 2d at

1041-42 (finding it is a matter for apportionment when profits attributable to other

factors); *Wood*, 589 F. Supp. 2d at 1248 ("[T]here is no logic to the proposition that

because [defendant] may have earned only small profits from the use of his photographs,

it therefore earned no profits that [plaintiff] may recover under § 504(b).")  The "statute

does not differentiate between great and small profits."  *Wood*, 589 F. Supp. 2d at 1248.

> **(2)    The infringer bears the burden of proving deductible expenses and the burden of apportioning profits to factors other than infringement.**

FICO's burden, as stated, is to prove Federal's gross revenue. 17 U.S.C. § 504(b).

When FICO meets its burden to prove gross revenue connected to infringement, "a

rebuttable presumption that the defendant's revenues *are entirely attributable* to the

infringement arises." *Andreas*, 336 F.3d at 796 (emphasis added) (acknowledging

standard); *see also Dayva Int'l*, 1998 U.S. App. LEXIS 4386, at *8 (quoting *Data*

*General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1173 (1st Cir. 1994)).

The burden then shifts to Federal to prove the "deductible expenses" as well as

"the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C.

§ 504(b); *see also Andreas*, 336 F.3d at 795.  *Universal Furniture*, 599 F. Supp. 2d at

653.   The Supreme Court has held that "an infringer who commingles infringing and noninfringing elements 'must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him.'" *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 567 (1985) (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 406 (1940)).

"If [Federal] wishes to establish that its operating expenses are deductible expenses, it has the burden of proving that each item of general expense contributed to the production of the infringing items, and of further offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue." *Victor Stanley*, 2011 U.S. Dist. LEXIS 112846, at *14-16 (internal quotation omitted); *see also Universal Furniture*, 599 F. Supp. 2d at 660 (requiring sufficient nexus between claimed expense and unlawful revenue generation before deduction); *In Design v. Lauren Knitwear Corp.*, 782 F. Supp. 824, 832-33 (S.D.N.Y. 1991).  Any doubts resulting from Federal's failure to present adequate proof of its costs are resolved in favor of FICO.  *Universal Furniture*, 599 F. Supp. 2d at 661.  ["A]ny uncertainty as to profits that is caused by the defendant's failure to keep adequate records of costs will be resolved in favor of the plaintiff."  *In Design*, 782 F. Supp. at 832-33.

If Federal fails to carry its burdens to prove deductible expenses related to the unlawfully generated revenue and to prove what, if any, profits are not attributable to infringement, FICO is entitled to 100% of Federal's gross revenues. *Universal Furniture*, 599 F. Supp. 2d at 661; *see also Blackman v. Hustler Magazine, Inc*., 800 F.2d 1160, 1164 (D.C. Cir. 1986) ("Plaintiff carried its burden; defendant did not. Since the statutory

scheme calls for subtracting defendant's proof from that of the plaintiff, and since

defendant's proof was found to be zero, the figure proven by plaintiff winds up

establishing the profits from the Hustler issues in question."); *see also Charter Sch.*

*Capital, Inc. v. Charter Asset Mgmt. Fund*, LP, 14-3385, 2017 WL 6536585, at *11 (C.D.

Cal. Jan. 17, 2017).  There is no reason for FICO and its expert to proffer evidence of or

opine on deductible expenses or apportionment. *See Oracle Am., Inc. v. Google Inc*., No.

C 10-03561, 2016 U.S. Dist. LEXIS 58819, at *23-24 (N.D. Cal. May 3, 2016).

### B.      Federal overstates and misapplies FICO's burden for disgorgement.

#### (1)     A "but for" causation is not the standard in the Eighth Circuit or District of Minnesota.

Federal repeatedly posits an incorrect legal standard for the parties' relative

burdens for disgorgement.  (Dkt. 380 at 1-2, 6-8, 14.)[1]  Federal demands that FICO, and

by extension its expert Mr. Whitener, prove "but for" causation to satisfy its burden under

§ 504(b).  (*See id.*)  Federal cites to <u>no</u> controlling Eighth Circuit or District of Minnesota

precedent to establish such an improper, heightened burden.  The controlling case law is

clear.  *Andreas* requires only "some connection or relationship between the infringement

and the profits he seeks." 336 F.3d at 799.  *Andreas* makes no reference to a "but for"

standard.  *See id.*  Rather, *Andreas* explicitly rejects such a burden.  336 F.3d at 797 ("But

we reject the notion that Andreas was required to put a TT buyer on the stand to testify

---

[1] Defendants' motion for summary judgment on FICO's disgorgement claim relies on the same incorrect legal standard for the parties' relative burdens for disgorgement. Defendants' motion for summary judgment must also fail.

that she bought the car because of the commercial in order to meet his burden of a causal connection.").

In *Honeywell*, recent controlling law from the District of Minnesota, the court interpreted the "connection" requirement under *Andreas* to mean the work "contributed" to the profits. 2017 U.S. Dist. LEXIS 11692, at *12, 15-16. *Honeywell* did not apply a "but for" standard; to the contrary, it rejected a more onerous burden suggested by non-controlling Ninth Circuit precedent. *Id.* at *17-19 ("[Plaintiff] is not required to prove such a narrow causal nexus.").

Relying on *Mackie v. Rieser*, 296 F.3d 909, 915 (9th Cir. 2002), Federal contends FICO must prove "a legally sufficient causal link between the infringement and subsequent indirect profits." (Dkt. 380 at 7). *Mackie* is not controlling law. This District rejected any reading of *Mackie* that is inconsistent with the controlling Eighth Circuit precedent of *Andreas. See Honeywell*, 2017 U.S. Dist. LEXIS 11692, at *17-19.

FICO's proof at trial, however, will be sufficient to satisfy its burden even under the phrasing of *Mackie*: proving a "legally sufficient causal link between the infringement and subsequent indirect profits." Proof of Federal's gross revenue in "connection" with Federal's infringement will be based on Federal's admissions. (*See* Declaration of Allen W. Hinderaker ("Hinderaker Decl.") Ex. 1-4.) Federal's interrogatory answers detail the gross revenue in connection with which Blaze Advisor was used. The gross revenue FICO proffers is limited to that revenue derived from insurance sales connected to infringement. FICO's disgorgement claim is tailored to the infringement. FICO's proof

7

is not an undifferentiated revenue amount. These facts of gross revenue connected to or related to the infringement are outside the scope of Mr. Whitener's engagement.

FICO will also prove, including with the expert testimony of Mr. Whitener, that Federal's use of Blaze Advisor to automate the decision-making process "contributed" to the generation of that revenue from sales in connection with which Blaze Advisor was used. Proof of the gross revenue connected to infringement with proof the infringement contributed to the generation of that revenue is proof of "a legally sufficient causal link," satisfying *Mackie*'s more onerous standard. *See Mackie*, 296 F.3d at 915; *cf.* Ninth Circuit Manual of Model Jury Instructions, § 17.34 (June 2019) (requiring plaintiff only prove causal relationship between the infringement and the profits generated indirectly from infringement).

### (2)   No "heightened" burden exists for indirect profits cases.

Federal cites to non-controlling case law to suggest FICO faces a "heightened" burden to prove a connection to revenue because this is an indirect profits case. (Dkt. 380 at 2, 7.) *Andreas*, controlling precedent in this circuit <u>and</u> an indirect profits case, explicitly dismisses such a characterization of a copyright owner's burden:

> Although cases distinguish between direct and indirect profits, the statute does not. We agree that in an indirect profits case the profits "attributable" to the infringement are more difficult to quantify. *But that difficulty does not change the burden of proof established by the statute.* The burden of establishing that profits are attributable to the infringed work often gets confused with the burden of apportioning profits between various factors contributing to the profits. The plaintiff has the "burden" to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur. The nexus requirement exists in both direct and indirect profits cases.

8

336 F.3d at 796 (emphasis added) (internal quotation and citation omitted).

The facts may be more complex in an indirect profits case, but the burden of proof is the same. (*Id.*)  It is not an "onerous evidentiary burden." *Victor Stanley*, 2011 U.S. Dist. LEXIS 112846, at *13.  FICO need only prove a connection between the infringement and Federal's gross revenue, such that Federal's infringement contributed to its revenues.  No heightened burden exists.

### (3)   Federal—not FICO or Mr. Whitener—is required to quantify the apportionment of Federal's profits to factors other than infringement.

Federal attempts to redirect its own burden of apportionment to FICO and Mr. Whitener.  Federal challenges Mr. Whitener's opinions because he failed to "quantify" the portion of revenue attributable to Federal's infringement.  (Dkt. 380 at 4-5, 13-14, 18.)  Federal demands Mr. Whitener "test" the connection (*id.* at 2, 15, 17), another way of demanding that FICO and Mr. Whitener quantify the portion of revenue attributable to Federal's infringement.  FICO is not required to offer an opinion or present evidence on apportionment, and Mr. Whitener's opinions are not deficient because they apply the correct legal standard.  *See* 17 U.S.C. § 504(b); *Oracle*, 2016 U.S. Dist. LEXIS 58819, at *23-24.  Apportionment is *exclusively* the burden of Federal.  *See* 17 U.S.C. § 504(b); *Andreas*, 336 F.3d at 796 ("The burden of proving apportionment (i.e., the contribution to profits of elements other than the infringed property), is the defendant's."); *Oracle*, 2016 U.S. Dist. LEXIS 58819, at *23-24.  FICO need only prove a connection, not the quantification of the connection.  *Dwyer Instruments*, 873 F. Supp. 2d at 1041-42

(finding it is a matter for apportionment when profits attributable to other factors); *Wood*, 589 F. Supp. 2d at 1248.  The burden to quantify apportionment remains for Federal.

### C.   Federal misstates or altogether ignores controlling case law.

Federal fails to cite *Andreas*, controlling precedent in this Circuit and an indirect profits case.  Federal fails to acknowledge that "contribution" is the standard in this District.  *See Honeywell*, 2017 U.S. Dist. LEXIS 11692, at *12, 15-16.  Indeed, Federal takes a position directly contrary to law.  (Dkt. 380 at 8 ("Whitener's 'contribution' opinion is irrelevant to determining whether a causal nexus exists.").)  Such a challenge based on an incorrect legal standard fails.  *Honeywell*, 2017 U.S. Dist. LEXIS 11692, at *11-23.

In *Honeywell*, the defendant brought a *Daubert* challenge against plaintiff's expert based on a misreading of controlling case law identical to Federal's current position.  *Id.* After analyzing controlling case law—including *Andreas*—the court stated that defendant's interpretation of law was incorrect.  *Id.* at *17-19.  The *Honeywell* court then reasoned: "If [defendant's] interpretation of § 504(b) is unpersuasive, so too is its argument that [plaintiff's expert's] testimony relating to [plaintiff's] copyright damages must be excluded as based on an incorrect standard."  *Id.* at *19.  The court denied the *Daubert* challenge on that ground.  Here, the Court should do likewise.  Federal argues from an incorrect legal standard—a standard rejected in this Circuit and District.  *See id.* *11-20; *Andreas*, 336 F.3d at 795-96.  It must be rejected.

Federal's reliance on non-controlling law is misplaced.  Federal cites to *University of Colorado Foundation, Incorporated v. American Cyanamid Company*, 196 F.3d 1366,

1375 (Fed. Cir. 1999).  (Dkt. 380 at 7.)  *University of Colorado* provides no support to

Federal.  The case offers no analysis of the evidence related to the University meeting its

burden.  Instead, the Federal Circuit summarily affirmed the district court's ruling.

     *Polar Bear Products v. Timex Corporation*, 384 F.3d 700 (9th Cir. 2004), also

fails to support Federal.  (Dkt. 380 at 7-8.)  *Polar Bear Products* holds the "profits sought

are those that arise from the infringement" and that a plaintiff may not "toss up an

undifferentiated gross revenue number."  *Id.* at 711.  *Polar Bear Products* affirmed the

award of indirect profits for two of three sought categories of revenues—the revenues

that related to infringement.  *Id.* at 715 (contrasting revenues from trade shows where

infringing work was displayed with retail purchasers who never witnessed infringement).

Here, Federal admits the gross revenue detailed in its interrogatory answers is connected

to the infringement – the use of Blaze Advisor.  FICO's proof is not an "undifferentiated

gross revenue number."

## II.    As an insurance industry expert, Mr. Whitener is qualified to opine on the contribution between Federal's use of Blaze Advisor to automate decision making and Federal's revenue.

### A.    <u>An expert may be qualified by knowledge, skill, experience, training, or education.</u>

     An expert is one qualified by "by knowledge, skill, experience, training, or

education."  Fed. R. Evid. 702.  Rule 702 requires that "the area of the witness's

competence matches the subject matter of the witness's testimony."  *Robinson v. GEICO*

*Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006).  An expert need not have "personal

experience" on matters he or she is not being relied upon for expert opinions.

*Bombardier Rec. Prods. v. Arctic Cat Inc.*, No. 12-2706, 2017 U.S. Dist. LEXIS 26517, at *18-20, 46-48 (D. Minn. Feb. 24, 2017) (denying *Daubert* motions challenging experts' qualifications because experts had never ridden a snowmobile or attended an oval ice race, respectively). "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson*, 447 F.3d at 1100.

### B.   Mr. Whitener has relevant expertise in the insurance industry, including underwriting, rules development, and technology implementation.

FICO relies on Mr. Whitener as an expert "with respect to the insurance industry and the role of decision management software in that industry." (*See* Dkt. 382 at 5.)  Mr. Whitener offers opinions on the value of using automated decision-making to execute business rules in processes related to the sale of insurance. (*See id.*)  As detailed in Mr. Whitener's report, Mr. Whitener has over 40 years of relevant experience. (*Id.* at 6-8, 67-71.)  In particular, Mr. Whitener has experience in the following relevant areas:

- Experience in underwriting insurance policies and overseeing the underwriting of policies;

- Experience in rules development and writing; and

- Experience in implementing technology, including policy administration systems[2].

---

[2] A policy administration system is the application that runs an insurance company's business.  The policy administration system operates the quote, book, bind, and issue process for new business applications; it handles modifications (i.e. endorsements) to existing policies; it operates the quote, bind, book, issue aspects of policy renewal; and it executes termination of policies.  (Dkt. 382 at 64 ¶171.)  A policy administration system is vital to an insurance company's operation of business and generation of revenue.  (*Id.* at 58 ¶155.)

Mr. Whitener has experience in underwriting insurance policies.  Mr. Whitener began his career in 1977 working for The Hartford, a property and casualty insurance company, akin to Federal's parent Chubb Ltd.  (Dkt. 382 at 6 ¶9.)  There, Mr. Whitener completed The Hartford's underwriting training program and served as a permanent underwriter in the personal lines department.  (*Id.*)  Mr. Whitener also spent time in management ranks overseeing the underwriting of insurance policies.  Mr. Whitener oversaw underwriting for a 10 state regional office as part of The Hartford's implementation of Equifax's C.L.U.E. (Comprehensive Loss Underwriting Exchange). (*Id.* at 7 ¶12.) This experience is relevant to the instant case because it provided Mr. Whitener experience with business rules[3], reviewing applications and issuing quotes, and understanding the value of automated decision-making relative to manual review of business rules.  Mr. Whitener experienced the value of speedy responses and precision. When business rules are applied manually, variance of precision occurs as some underwriters are better than others.  (*See id.* at 65-66 ¶¶176-78.)  Automated decision-making normalizes a company's performance to its best operating underwriters.  (*Id.*)

Mr. Whitener has experience in rules development and writing.  At Atlanta Casualty Companies, Mr. Whitener was the business lead for the implementation of an

---

[3] Business rules are logical statements (if/then) of what to do (what actions to take) in different distinct situations. Federal uses business rules to determine whether to quote a risk and at what price, for example. By using FICO's Blaze Advisor to automate Federal's decision-making, Federal is able to make faster, more precise, and more consistent decisions while reducing the complexity and cost of those decisions. (Hinderaker Decl. Ex. 8 at 6.)

internet-based Point-of-Sale (POS) guaranteed quote system for a new product offering.

This system required the authoring and execution of business rules for the new product.

(*Id.* at 70.)  Mr. Whitener was part of a two-person team that wrote the rules for the new

product. Through these experiences, Mr. Whitener learned the value of writing good

business rules versus bad business rules and learned the value of writing business rules

that underwriters could implement.

Mr. Whitener has experience in implementing technology, including policy

administration systems.  Mr. Whitener has had multiple experiences implementing

technology to improve insurance companies' performance through technology.  At The

Hartford, Mr. Whitener worked with the technology staff to implement a "home grown"

policy administration system built in the Cobol language[4].  (*Id.* at 71.)  At Prudential

P&C Insurance Company, Mr. Whitener served as the Director of Information Systems

responsible for selecting a vendor policy administration system to replace Prudential's

existing Cobol system.  (*Id.* at 7 ¶14.)  At Atlanta Casualty Companies, Mr. Whitener

implemented an internet-based Point-of-Sale (POS) guaranteed quote system.  This

system required implementing business rules so each policy application was either

declined or offered a quote on the spot.  (*Id.* at 70.)  At American Reliable, Mr. Whitener

facilitated the implementation of a new policy administration system using the Duck

---

[4] Use of the Cobol language required "hard-coding" rules into the software code of the
application.  Hard coding rules is a time consuming effort that future software like Blaze
Advisor sought to minimize.

14

Creek platform[5].  (*Id.* at 69.)  This experience is relevant because insurance companies today cannot rely on manual review or hard coding of business rules.  Instead, insurance companies require business rules to be automated and accessible to the business entities. As an example, Federal uses Blaze Advisor to conduct at least 8,300 "high" complexity business rules on about 1 million transactions per month. (*See* Hinderaker Decl. Ex. 5.) Automating decision-making increases the speed of quotations, improves the precision of quotations, and enhances the ease of doing business with Federal —all aspects that contribute to the sale of insurance policies.

Mr. Whitener has professional experience that informs his opinions relevant to this matter.  Mr. Whitener's expertise is defined by his knowledge, skill, experience, training, and education in the insurance, underwriting, and technology fields, which matches the subject matter of his opinions. *See Robinson*, 447 F.3d at 1101.  To the extent Federal perceives a "gap" in Mr. Whitener's qualifications, this is a matter for cross examination. *Id.* at 1100.

C.   **Federal's challenge to Mr. Whitener based on qualifications fails.**

(1)   **Mr. Whitener is qualified with more than "general experience in the insurance industry."**

Federal's characterization of Mr. Whitener as an expert with "general experience in the insurance industry" (Dkt. 380 at 3) misstates Mr. Whitener's qualifications and

---

[5] Duck Creek is a P&C insurance platform that exists to handle most of the day-to-day operations for a P&C insurance carrier. Duck Creek, like Blaze Advisor, allows a user to externalize the business rules.  *See* https://www.duckcreek.com/duck-creek-platform-in-detail/.

ignores the value Mr. Whitener's experience and expertise brings to this case.  As discussed above, Mr. Whitener is an expert with respect to the "insurance industry and the role of decision management software in that industry."  (*See* Dkt. 382 at 5.)  Mr. Whitener offers opinions on the value of using automated decision-making to execute business rules in processes related to the sale of insurance.  (*See id.*)  Mr. Whitener has professional experience that touches each of the relevant aspects of the sale of insurance in the property and casualty insurance industry, namely underwriting, business rule writing and development, and implementing technology to use automated decision-making software.  *See* Section II(B), *supra*.  Mr. Whitener's expertise has informed his opinions on Federal's use of Blaze Advisor in the sale of insurance, and Blaze Advisor's connection and contribution to Federal's revenue.

### (2)    Mr. Whitener has experience with decision management software.

Federal alleges Mr. Whitener has no experience with decision management software, like Blaze Advisor.  (Dkt. 380 at 3-4.)  This is false.  Mr. Whitener has experience with decision management systems that 1) automate decisions and 2) externalize the business rules (i.e. not hard coding).  Mr. Whitener described his experience with Duck Creek while at American Reliable Insurance Company, a subsidiary of Assurant, Inc., in his deposition.  (Hinderaker Decl. Ex. 6, 90:23-91:15.) Duck Creek is a property and casualty insurance software that automates decisions related to policy quotations, claims processing, and billing while allowing the user to

externalize the business rules.[6]  Mr. Whitener's experience with and implementation of

Duck Creek is highly relevant to the instant case.  Federal chooses to ignore this

testimony.  Mr. Whitener's report discloses his additional experience with the selection

and implementation of policy administration systems that have business rule management

components.  (*See* Dkt. 382 at 7-8 ¶¶17, 19-20; *id.* at 68-69.)

> ### (3) Mr. Whitener was not disclosed as a Blaze Advisor *technical* expert.

Federal claims Mr. Whitener is not qualified because he has no experience with

Blaze Advisor or Federal's applications utilizing Blaze Advisor.[7]  (Dkt. 380 at 3-4.)

Federal's argument is unavailing.  Contrary to Federal's portrayal (*id.* at 16), Mr.

Whitener was not disclosed as a Blaze Advisor *technical* expert.  FICO employs

numerous individuals skilled in the use of Blaze Advisor.  Mr. Whitener is permitted to

rely on the expertise of FICO's employees in combination with the case specific facts and

his experience with rules management systems. *See* Fed. R. Evid. 703; *Intel Corp. v.*

*Future Link Sys., LLC*, No. 14-377-LPS, 2017 U.S. Dist. LEXIS 91699, at *17 (D. Del.

June 1, 2017).  Federal's attempt to identify Mr. Whitener as a Blaze Advisor technical

expert (i.e. one with experience coding Blaze Advisor or implementing Blaze Advisor)

minimizes the value of Mr. Whitener's opinions in helping the jury understand the value

---

[6] Duck Creek Technologies, "The Duck Creek Platform,"
https://www.duckcreek.com/duck-creek-platform-in-detail/.

[7] Defendants do not consider specific experience with Blaze Advisor a necessary
qualification for their insurance industry expert, Mr. William McCarter as he has no
personal experience with Blaze Advisor.  (Hinderaker Decl. Ex. 9, 49:18-50:3.)  Mr.
McCarter admits he only had general awareness of Blaze Advisor, but testified to no use
of Blaze Advisor.  (*Id.*)

of automated decision-making to underwriting and the generation of revenue.  This is improper.

Moreover, Federal's challenge to Mr. Whitener's qualifications is legally baseless.  Mr. Whitener's opinions on the value of using automated decision-making to execute business rules in processes related to the sale of insurance do not require specific experience with Blaze Advisor.  Indeed, courts in this district have rejected such exacting experience requirements.  *See Bombardier Rec. Prods.*, 2017 U.S. Dist. LEXIS 26517, at *18-20, 46-48.  In *Bombardier*, each party brought a *Daubert* motion challenging the other party's expert on snowmobile design on the basis that the experts had no personal experience riding a snowmobile or viewing snowmobile sleds in operation, respectively.  *Id.*  The court rejected these challenges finding the experts' opinions were grounded in their education and relevant personal experience and that the parties were not relying of the experts for that specific type of expertise.  *Id.* at *20.

This Court should reject Federal's qualification challenge like the *Bombardier* court did.  Here, Federal challenges Mr. Whitener because he has no personal experience with Blaze Advisor.  (Dkt. 380 at 3-4.)  Mr. Whitener, however, is not being offered as a Blaze Advisor expert.  Mr. Whitener is offered as an expert with respect to the "insurance industry and the role of decision management software in that industry."  (*See* Dkt. 382 at 5.)  As to this expertise, Mr. Whitener has sufficient qualifications to render his opinions.  *See* Section II(B), *supra*.  Mr. Whitener, like the experts in *Bombardier*, need not have such exacting personal experience.  To the extent Federal perceives a "gap" in Mr.

18

Whitener's qualifications, this is a matter for cross examination. *Robinson*, 447 F.3d at 1100. Federal's challenge to Mr. Whitener's qualifications must be denied.

### III.   Mr. Whitener employed reliable methodology in his analysis of Blaze Advisor's contribution to Federal's revenue.

#### A.   An expert's opinion is reliable if it is trustworthy in an evidentiary sense.

Expert opinions must be "reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Plasti Dip Int'l, Inc. v. Rust-Oleum Brands Co.*, No. 14-cv-1831, 2017 U.S. Dist. LEXIS 32464, at \*5 (D. Minn. Feb. 13, 2017) (quoting *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)).  The test of reliability is flexible.  *Id.* at \*6 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).  Experience-based expert testimony is "reliable if the expert 'explains how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Vesey*, 338 F.3d 913, 917 (8th Cir. 2003) (quoting advisory committee's notes to Rule 702). "Expert testimony must be excluded 'only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury.'"  *Plasti Dip*, 2017 U.S. Dist. LEXIS 32464, at \*6  (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001)).

B.     **Mr. Whitener's methodology analyzed how insurance companies generate revenue, what factors relate to the generation of that revenue, and how Blaze Advisor contributed to the generation of Federal's revenue.**

Mr. Whitener employed a reliable methodology to analyze the connection between Federal's use of Blaze Advisor and Federal's gross revenue.  Mr. Whitener provided an industry overview of revenue generation in the property and casualty insurance industry and then tied case-specific facts to link Federal's use of Blaze Advisor to Federal's revenue.  Mr. Whitener analyzed 1) how insurance companies generate revenue, 2) what factors impact the sale of insurance (i.e. generation of revenue), and 3) how Federal uses Blaze Advisor to achieve each of the factors contributing to the sale of insurance.  Mr. Whitener relied on his experience, industry publications, and case-specific facts when arriving at his opinions.

(1)     **Mr. Whitener analyzed how insurance companies generate revenue.**

Mr. Whitener's report includes an overview of the insurance industry.  (Dkt. 382 at 36-46.)  This overview focuses on revenue generation.  Mr. Whitener discussed how insurance companies sell policies through the use of independent agents and brokers, exclusive agents, and direct marketing.  (*Id.* at 41-42.)  Mr. Whitener discussed the property and casualty insurance industry and how it is broken down into different market segments and lines of business, each of which may have different profitability levels and which require a different focus to generate revenue.  (*Id.* at 44-48.)  Mr. Whitener discussed the function and role of underwriting in the sale of insurance.  (*Id.* at 48-50.)  Mr. Whitener's analysis of how insurance companies generate revenue through the

quotation, bind, book, and issuance of insurance policies established a reference point to

analyze how insurance companies, specifically Federal, generate revenue.

> **(2)** **Mr. Whitener analyzed factors relating to the sale of insurance (i.e. generation of revenue).**

Mr. Whitener's report includes an analysis of factors that contribute to the sale of

insurance. (*Id.* at 62.) Mr. Whitener identified the three main factors that contribute to

the generation of revenue (i.e. sale of insurance):

1) Speed (faster individual policy underwriting, respond before competitors respond, in expanding markets or products, for product modifications or new product introduction, get the implementation done as quickly as possible);

2) Ease of doing business (require agents or brokers to provide less data, be clear in underwriting appetite, do not make a mistake with the billing and remittance processing, have efficient and effective claims adjudication, etc.); and

3) Price (get a precise, adequate premium for the risk – When doing industry underwriting training I frequently say "I do not want one penny that is not needed but I want every penny that is.")

(*Id.* at 62 ¶162.) Mr. Whitener then elaborated on each of these factors. (*Id.* ¶¶163-175.)

As part of this analysis, Mr. Whitener analyzed how technology is used to achieve each

of these factors. (*See id.*) Mr. Whitener relied on industry publications and his own

experience.

> **(3)** **Mr. Whitener showed how Federal uses Blaze Advisor to achieve each of the factors contributing to revenue.**

Mr. Whitener then connected his analysis to Federal's use of Blaze Advisor

related to the factors driving the sale of insurance (*Id.* at 11-39.):

- Enabling Defendants to process more transactions and with greater accuracy: more transactions generate more revenue and greater accuracy makes pricing more competitive;

- Increasing the speed of response to quote requests: the conversion rate of quotes to sales improves with speed of response;

- Increasing the speed of making renewal offers: increased speed improves the rate of renewals;

- Increasing the speed at which new products can come to market because of the agility of Blaze Advisor: the sooner a new product is in the market the sooner revenue is generated and advantage is achieved over competitors;

- Increasing speed to market by ensuring compliance with corporate and statutory reporting requirements;

- Increasing the precision and adequacy of a quote, thereby increasing the probability the quote offer will be accepted;

- Increasing the precision and adequacy of a renewal offer, thereby increasing the probability the renewal offer will be accepted;

- Increasing the ease of use for agents and brokers to do business with Defendants, thereby (a) increasing the chance the agent and broker will bring its next customer to Defendants, (b) reducing the time an underwriter spends on an application making the underwriter more available to assist sales, and (c) improving the accuracy of data used in the underwriting process leading to a more precise, adequate premium offer.

(*See Id.* at 14-17 (omitting explanations of each factor.)

Mr. Whitener then analyzed each of Federal's 17 applications that use or used Blaze Advisor and identified specifically what each application does, how Blaze Advisor functions within the application, and how the functions Blaze Advisor accomplishes achieve the factors that contribute to the sale of insurance. (*Id.* 18-39.) Mr. Whitener relies on Federal's own documents and the testimony of Federal's witnesses, in combination with his experience, to draw his opinions.

22

C.     **Federal's challenges to Mr. Whitener's methodology fail.**

Federal contends Mr. Whitener employed no methodology to arrive at his opinions.  (Dkt. 380 at 2, 15-17.)  This is false.  As described above, Mr. Whitener employed a reliable methodology to analyze the connection between the generation of revenue in the insurance industry, factors that impact the sale of insurance, and Federal's use of Blaze Advisor to achieve the sale of insurance.  Mr. Whitener relied on his experience, industry publications, and case-specific facts.  Courts in this district reject similar challenges to methodology.  In *Block v. Woo Young Medical Company*, defendant argued plaintiff's expert did "not have a sound methodology, but rather simply states various alleged facts and does not draw them together based on any expertise." 937 F. Supp. 2d 1028, 1047 (D. Minn. 2013).  The court disagreed:

> [T]he Court finds that [the expert's] opinions are supported by a sufficiently reliable methodology.  She has grounded her opinions in sources including [defendant's] internal documents, pertinent scientific literature, and publicly available documents, as well as her expertise. She also provided adequate descriptions for the bases for her opinions. The Court thus finds that her opinions are sufficiently supported to survive [defendant's] motion and that any challenges to these opinions can be adequately addressed through objections at trial, if appropriate, and though cross examination.

*Id.*

Mr. Whitener likewise grounded his opinions in Federal's documents and testimony, industry literature, publicly available documents, and his own expertise.  *See id*.  Mr. Whitener has provided adequate descriptions for the bases of his opinions.  *See id.*  His opinions are reliable.  Federal does not and cannot argue that Mr. Whitener's

opinions are so fundamentally unsupported that they can offer no assistance to the jury. *Plasti Dip*, 2017 U.S. Dist. LEXIS 32464, at *6.  Exclusion is improper.

Federal contends Mr. Whitener's methodology was unreliable because he conducted no "but for" or quantification analysis.  (Dkt. 380 at 5, 14.)  Neither FICO nor Mr. Whitener was required to conduct such analyses.  *See* Section I, *supra*.  "But for" is not the legal standard under 17 U.S.C. § 504(b) and quantification is Federal's burden, not FICO's.  *See Andreas*, 336 F.3d at 799.  Federal's challenge to Mr. Whitener's methodology based on its incorrect legal standard must fail.  *See Honeywell*, 2017 U.S. Dist. LEXIS 11692, at *19.

Federal further challenges the reliability of Mr. Whitener's methodology because he conducted no analysis regarding the components of Federal's applications.  Again, he was not required to do so.  As Mr. Whitener opined in his reply report, the size of Blaze Advisor's "footprint" is irrelevant to Blaze Advisor's contribution to Federal's revenues:

> 22.  Mr. McCarter's implicit suggestion that each of the fifty-nine (59) business activities is equally important and equally weighted is wrong. Treating each application with equal importance is no more than measuring the size that any one technology occupies within the defendant's overall technology footprint. The issue is not how big Blaze Advisor's contribution to Chubb's technology footprint is. The issue is the value of Blaze Advisor in executing decisions in the functions that drive revenue.

(Hinderaker Decl. Ex. 7 at 13 ¶22.)

Not all software applications are created equal.  Indeed, not all application components are created equal.  Quantifying the total number of Federal's applications or licensed software components has no bearing on Blaze Advisor's contribution to Federal's revenue.  Mr. Whitener, instead, analyzed the function of Blaze Advisor in each

24

of Federal's applications utilizing Blaze Advisor and how these functions generate revenue.  (*See* Dkt. 382 at 18-39.)  Mr. Whitener evaluated the benefit to automated decision-making to each of Federal's applications.  (*See id.*)  Mr. Whitener's methodology supports his opinions.  Federal's "footprint" argument is inapposite.

Federal further challenges Mr. Whitener's methodology contending Mr. Whitener cannot rely on his experience because he lacks "technical expertise or background." (Dkt. 380 at 16.)  As previously discussed, Mr. Whitener has experience and expertise in all relevant aspects of the insurance industry—underwriting, rule drafting, and technology implementation. Mr. Whitener was not identified as a Blaze Advisor *technical* expert.  Mr. Whitener's opinions do not require an expertise in the technical aspects of Blaze Advisor; rather, they require expertise in the interaction between underwriting and automated decision-making, expertise Mr. Whitener certainly has.  *See* Section II(C)(3), *supra*.  Mr. Whitener is permitted to rely on his experience—his experience in the interaction between underwriting and automated decision-making.  *See Vesey*, 338 F.3d at 917.  Federal makes no challenge to Mr. Whitener's methodology based on experience when correctly identifying what Mr. Whitener was disclosed as an expert for.  Federal's *Daubert* challenge should be denied.

## IV.    **Mr. Whitener's analysis of Federal's use of Blaze Advisor is relevant and helpful to the jury.**

### A.    **An expert's opinion is relevant if it is useful to the finder of fact in deciding the ultimate issue of fact.**

An expert's opinion must be helpful to the trier of fact. Fed. R. Evid. 702(a).  In terms of relevance, the evidence "must be useful to the finder of fact in deciding the

ultimate issue of fact." *Plasti Dip*, 2017 U.S. Dist. LEXIS 32464, at *5 (quoting *Lauzon*, 270 F.3d at 686). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bombardier Rec. Prods*., 2017 U.S. Dist. LEXIS 26517, at *5 (quoting *Loudermill v. Dow Chem. Co*., 863 F.2d 566, 570 (8th Cir. 1988)); *see also In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-MD-2090, 2017 U.S. Dist. LEXIS 178805, at *16-17 (D. Minn. Oct. 24, 2017). "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Plasti Dip*, 2017 U.S. Dist. LEXIS 32464, at *5 quoting (*Marmo v. Tyson Fresh Meats, Inc*., 457 F.3d 748, 758 (8th Cir. 2006)).

### B. Mr. Whitener's opinion that Blaze Advisor contributes to Federal's revenue is grounded in case-specific facts—including Federal's own documents.

As previously described, Mr. Whitener analyzed how insurance companies generate revenue, what factors relate to the generation of that revenue, and how Blaze Advisor contributed to the generation of Federal's revenue. Mr. Whitener grounded his opinions in Federal's documents, testimony, industry literature, and publicly available documents, as well as his expertise. Mr. Whitener considered case-specific facts including documents, discovery responses, and deposition transcripts. (Dkt. 382 at 72-74.) Indeed, in describing his opinions regarding the connection of Blaze Advisor to Federal's revenue, Mr. Whitener exhaustively supported his opinions citing to Federal's documents, industry literature, and publicly available documents. (*See, e.g.*, Dkt. 382 at 8-39.) The basis of Mr. Whitener's opinions is proper. *See Block*, 937 F. Supp. 2d at

26

1047. Any challenge to Mr. Whitener's opinions is resolved by cross-examination, not exclusion. *Bombardier Rec. Prods.*, 2017 U.S. Dist. LEXIS 26517, at *5; *Plasti Dip*, 2017 U.S. Dist. LEXIS 32464, at *5.

## C.   Federal's contention Mr. Whitener's opinions are not based on sufficient facts or data must fail.

Federal contends Mr. Whitener's opinions are not based on sufficient facts or data. Nothing could be further from the truth. A review of Mr. Whitener's report (Dkt. 382) and its exhaustive footnoting evidences the falsity of Federal's claims. Mr. Whitener's opinions on Blaze Advisor's contribution to Federal's revenues are highly substantiated, using case-specific facts including Federal's own documents and testimony. The basis of Mr. Whitener's opinions is proper. *See Block*, 937 F. Supp. 2d at 1047. Federal's challenge must fail.

## V.   Federal's challenge to Mr. Whitener's purported opinions on revenue streams and revenue amounts is baseless.

Federal contends the "revenue stream upon which Whitener relies is too speculative and attenuated to satisfy the causal nexus requirement." (Dkt. 380 at 12-13.) Federal's argument has no relevance to Mr. Whitener's opinions. The facts of the gross revenue connected to or related to the infringement are outside the scope of Mr. Whitener's engagement. Mr. Whitener offered no opinion on Federal's revenue streams. Federal's statements to the contrary are false. Federal's challenge to Mr. Whitener based on his purported reliance on a revenue stream is a red hearing and must be ignored.

## VI.   Conclusion

Federal's challenges to Mr. Whitener must fail.  Federal repeatedly applies an incorrect legal standard for 17 U.S.C. § 504(b) and ignores the controlling law of this Circuit and District.  Mr. Whitener has relevant expertise to opine on Blaze Advisor's contribution to Federal's revenue connected to the infringement.  Mr. Whitener utilized reliable methodology and linked his opinions to the facts of the case.  To the extent Federal disagrees, this is a matter for cross-examination.

Dated: August 26, 2019

MERCHANT & GOULD P.C.

/s/ Allen Hinderaker
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN  55402
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com

*Attorneys for Plaintiff Fair Isaac Corporation*