**EXHIBIT 6**

**FILED UNDER SEAL**

**Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019**
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**
CASE 0:16-cv-01054-DTS   Doc. 483-5   Filed 08/26/19   Page 2 of 4

```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2
     - - - - - - - - - - - - - - - - - - - - - - - - - - -
 3
     FAIR ISAAC CORPORATION,
 4
                       Plaintiff,
 5
          v.              Court File No. 16-cv-1054 (WMW/DTS)
 6
     FEDERAL INSURANCE COMPANY,
 7   an Indiana corporation, and ACE
     AMERICAN INSURANCE COMPANY,
 8   a Pennsylvania corporation,

 9                    Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - -

11                       VIDEO DEPOSITION

12            The following is the video deposition of

13   RANDOLPH BICKLEY WHITENER, taken before Jean F.

14   Soule, Notary Public, Registered Professional

15   Reporter, pursuant to Notice of Taking Deposition,

16   at the law office of Fredrikson & Byron, P.A.,

17   200 South Sixth Street, Suite 4000, Basswood

18   Conference Room, Minneapolis, Minnesota, commencing

19   at 8:56 a.m., Thursday, June 27, 2019.

20

21                        *    *    *

22

23

24                  C O N F I D E N T I A L

25                    ATTORNEYS' EYES ONLY
```

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 483-5   Filed 08/26/19   Page 3 of 4

**Page 87**

1  product owned by what today is known as LexisNexis.
2  It was first created by Equifax's insurance services
3  division, which later morphed into a freestanding
4  company called ChoicePoint, which was later
5  purchased by LexisNexis. CLUE is a database of
6  multiple lines of businesses today occurrences from
7  a claims standpoint.
8        The Hartford was one of the first ten
9  companies to participate in CLUE. We were -- we
10 were a -- an original supplier, if you will. One
11 of the -- one of the things that we did was once a
12 month we cut a tape of all of our current claims
13 activities for the identified market segment
14 products and shipped it to Equifax. Equifax had
15 that coming in from a number of companies, and they
16 consolidated it all into a database, and if you
17 provided to the database you could, whenever you
18 wanted to, make a call into the database to find
19 out if Bick Whitener had a claim in the -- that was
20 in the database, comprehensive loss underwriting
21 exchange.
22     Q.   Then you went to Equifax, correct?
23     A.   Yeah. They kind of liked the work I
24 did on behalf of The Hartford and -- and CLUE.
25     Q.   And you worked to -- would you say as

**Page 88**

1  a sales representative for Equifax products?
2     A.   I would absolutely not say that.
3  Thank you.
4     Q.   Okay.
5     A.   I was the assistant vice president of
6  their property information products for the --
7  that -- that they sold for the underwriting process.
8  So I had zero sales responsibilities except that --
9  I spoke insurance. So if we had a sales rep that
10 really felt like he needed to take someone -- or he
11 or she needed to take someone with them who spoke
12 insurance, I would get a phone call and would be
13 released to go accompany the person.
14     Q.   You then went to Prudential?
15     A.   That is correct.
16     Q.   Okay. And you were the director of
17 information services -- systems? I'm sorry.
18     A.   Yes, systems.
19     Q.   Okay. Did Prudential use a rules
20 management software?
21     A.   No. Again, they didn't exist at that
22 period of time. So Prudential was operating in
23 that -- in a that hard-coding-of-the-rules
24 environment.
25        Allow me to point out that Prudential

**Page 89**

1  brought me there because they wanted to mi -- they
2  wanted to migrate their policy admin, billing and
3  claims systems into a fresher technology, and they
4  wanted my expertise in that. That's why they
5  brought me there.
6     Q.   Then you went to a midsize personal
7  auto insurance company, correct?
8     A.   That is incorrect.
9     Q.   Oh, after a sabbatical?
10    A.   Yes.
11    Q.   Okay.
12    A.   I was the chief vampire for the State
13 of Alabama for the American Red Cross. Anybody
14 that asked you to give blood or took blood from you
15 reported to me.
16    Q.   At the midsize personal auto insurance
17 company, you were the product manager, correct?
18    A.   I held three different positions for
19 that company, all three of which were in the
20 product department.
21    Q.   Did that company use a rules
22 management software?
23    A.   No. Again, they were in alternative
24 number two, hard coded into Cobalt.
25    Q.   Then you went to --

**Page 90**

1        THE WITNESS: Allen? I'm sorry.
2        MR. HINDERAKER: Sure, be happy to.
3        THE WITNESS: Thank you.
4        (Reporter's Note: Mr. Hinderaker gets
5  the witness another glass of water.)
6  BY MS. JANUS:
7     Q.   -- a business process outsourcer in
8  Montana?
9     A.   That is correct. Wait. Yes, that is
10 correct.
11    Q.   And did that entity use a rules
12 management system?
13    A.   It did not.
14    Q.   In 2004, you became the director of
15 project management for a midsize P&C insurance
16 carrier, correct?
17    A.   That is correct.
18    Q.   Which company was that?
19    A.   It's a small -- well, it's a midsize
20 insurance company called American Reliable. Today
21 they are owned by Globe Indemnity. Globe Indemnity
22 purchased them approximately 18 months ago.
23    Q.   Did that company have a rules
24 management software?
25    A.   No. In fact, that company brought me

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
CASE 0:16-cv-01054-DTS - Doc. 483-5 - Filed 08/26/19 - Page 4 of 4
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 91**

there because they wanted to transition software, and one of the decision criteria that we put together was the ability to get out of the hard coding of rules to software that we ultimately selected allowed us to do that.

Q. And what software was that?
A. Duck Creek.
Q. Duck Creek is a software that insurance companies use for rules management, correct?
A. Duck Creek is a software that allows rules to be built inside of policy admin or billing or claims, and its interfaces are set up so that the consumer -- I'm sorry, the business people, be it product managers or corporate underwriting, can, in fact, modify the rules.

You'll enjoy my story about the selection process.

MR. HINDERAKER: Wait for a question.

BY MS. JANUS:
Q. Did you consider Blaze in the process of selecting software while you were at that company?
A. To the best of my knowledge, Blaze did not exist. So, no. To the best of my knowledge at that time.

**Page 92**

Q. When did you select software for the company?
A. Two thousand -- You told me I arrived there in 2004?
Q. It looks like it from your --
A. Yeah.
Q. -- report.
A. If that's -- if that's -- if that's what it says, 2004. It took us less than a year to make the decision on the selection of software.
Q. Then you became the general manager of a Midwest division of a midsize P&C personal auto insurance company?
A. That is correct.
Q. Which company was that?
A. The company in those days was known as Unitrin Specialty, and actually Unitrin, Unitrin Specialty was a strategic business unit within Unitrin. Today you will know them as Kemper.
Q. Did that company use a business rules management software?
A. Not to my -- not to my knowledge.
Q. You did not have occasion to work with a rules management software while you were there?
A. That is correct.

**Page 93**

Q. That was not a part of your job responsibility?
A. That is correct.
Q. And, then, you were -- How long were you with that company?
A. Memory test, huh? Um, three-and-a-half years.
Q. Because the next entrance you -- or the next item you have is in 2009. You went to work for a small technology services company that sold implementation services of vendor policy administration systems to P&C insurance companies?
A. Correct.
Q. Which company was that?
A. Its name was Discoverture Solutions. It is now Mindtree.
Q. What does that mean, sold implementation services of vendor policy administration systems?
A. The vendor landscape in policy administration systems in those days had approximately 65 different vendors that offered a policy administration system. This company specialized in providing professional services in much the way -- much the same way that FICO

**Page 94**

provides professional services to Federal, and they would go in and they would help with the actual implementation of the licensed software.
Q. For policy administration systems?
A. Primarily. It could be other things. It could be billing, it could be -- it could be claims. We even -- we even dabbled in management reporting, but we only did -- we didn't market that. If somebody requested us to help with that, we would.
Q. Does that -- did that position in 2009 have anything to do with rules management software?
A. It had -- I'm going to say no.
Q. And you were there until 2014; is that correct?
A. That is correct. No, 2013.
Q. Okay. What did you do between 2013 and 2014?
A. Prepared to move to beautiful scenic Huntsville in the great State of Alabama. We had aging parent issues.
Q. Let's talk about Federal's use of Blaze. We've talked about at various times this morning policy administration systems. In general terms, what is a policy administration system?