# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

FAIR ISAAC CORPORATION,

       Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY, a
Pennsylvania corporation,

       Defendants.

Court File No.  16-cv-1054 (WMW/DTS)

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION TO
EXCLUDE TESTIMONY OF
WILLIAM MCCARTER**

---

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    I.    MCCARTER HAS EXTENSIVE EXPERIENCE IN THE
        INSURANCE INDUSTRY AND WITH INSURANCE
        SOFTWARE INCLUDING RULES MANAGEMENT
        SOFTWARE LIKE BLAZE. ......................................................... 2

        A.    The Scope and Purpose of McCarter's Opinions. ............................ 2

        B.    McCarter's Insurance Industry Experience. ....................................... 3

        C.    McCarter's Software Experience. ...................................................... 4

        D.    The Depth of McCarter's Relevant Experience is Illustrated
            by Comparing him to Whitener's Lack of Relevant
            Experience. ......................................................................................... 4

    II.    MCCARTER UNDERTOOK AN EXTENSIVE REVIEW OF
        CASE-SPECIFIC FACTS AND DATA IN REACHING HIS
        CONCLUSIONS. ........................................................................ 5

LEGAL STANDARD ......................................................................................... 7

ARGUMENT ....................................................................................................... 9

    I.    MCCARTER'S OPINIONS EXPLAINING THE LACK OF A
        NON-SPECULATIVE CAUSAL NEXUS BETWEEN BLAZE
        AND FEDERAL'S PROFITS ARE ADMISSIBLE UNDER
        *DAUBERT*. ............................................................................... 9

        A.    Experts May Rely On Their Experience. ........................................... 9

        B.    McCarter Applied his Considerable Experience to the Facts
            of This Case Regarding Federal's Use of Blaze. ............................ 10

            1.    McCarter's "core competencies" opinion is admissible
                because it applies to all insurance companies,
                including Federal. ................................................................ 12

2.  McCarter's opinion regarding Federal's use of business rules is admissible because it demonstrates that Blaze cannot contribute to profits without a host of other factors, including proper human inputs. ..................... 14

3.  McCarter's "consumer preferences" opinion is admissible because it is based on McCarter's review of Federal's use of Blaze and his experience of how software like Blaze is used in the industry generally. ........... 16

4.  McCarter's opinions using an industry-wide model are admissible because the model applies to property and casualty insurance companies, like Federal. ........................ 17

5.  McCarter's opinions that Blaze does not contribute to profits are admissible and are not mere *ipse dixit.* ............... 20

II.  MCCARTER'S OPINIONS RELATED TO BOTH DEDUCTIBLE EXPENSES AND APPORTIONMENT ARE ADMISSIBLE .................. 21

A.  McCarter's apportionment opinions are admissible and bolster the apportionment analysis of Federal's damages expert, Christopher Bakewell. ........................................... 21

B.  FICO misrepresents Federal's burden with respect to deductible expenses. ......................................................... 24

III.  MCCARTER'S OPINIONS ON ALTERNATIVE PRODUCTS TO BLAZE ARE ADMISSIBLE BECAUSE THEY ARE RELEVANT TO MULTIPLE ISSUES IN DISPUTE. .................................................. 25

A.  McCarter's Opinions Related To Comparable Products Help Demonstrate How Inflated FICO's Damages Claims Are. .............. 25

B.  McCarter's Opinions are Helpful in Demonstrating FICO's Failure to Establish a Causal Nexus on Its Disgorgement Claim. ...................................................................... 27

CONCLUSION ..................................................................... 28

## INTRODUCTION

William McCarter is Defendants Federal Insurance Company and Ace American Insurance Company's ("Federal") insurance industry expert.  McCarter was retained to review and evaluate FICO's disgorgement of profits claim, to provide his opinion regarding Federal's use of Blaze in conducting its day-to-day business and to determine whether Federal's use of Blaze plays any role in generating Federal's revenue and profits. FICO's motion seeks to exclude McCarter.

The bulk of FICO's motion argues that McCarter's reliance on his experience is improper and that his testimony must be excluded as *ipse dixit*.  FICO, in making this argument, glosses over the substantial work McCarter performed to understand Federal's use of Blaze and indiscriminately picks from McCarter's deposition those portions in which McCarter refers to his experience.  McCarter's opinions are not *ipse dixit*.

McCarter interviewed no less than 11 current and former Federal employees related to the use of Blaze at Federal; he reviewed and analyzed all of the non-expert depositions taken in this case (19 in total) as well as the associated exhibits; he reviewed an additional 136 other documents produced by Federal and 43 documents produced by FICO during discovery in the case; he relied on numerous outside resources related to business rules management systems, like Blaze.  McCarter then applied his substantial experience to the facts he analyzed to reach his opinions in this case.  McCarter's thorough review of the facts coupled with his extensive experience in the insurance industry render his opinions reliable and admissible.  The Court should reject FICO's motion, which miscomprehends the principle of *ipse dixit* testimony.

## BACKGROUND

I.   **MCCARTER HAS EXTENSIVE EXPERIENCE IN THE INSURANCE INDUSTRY AND WITH INSURANCE SOFTWARE INCLUDING RULES MANAGEMENT SOFTWARE LIKE BLAZE.**

   A.   **The Scope and Purpose of McCarter's Opinions.**

McCarter provides rebuttal opinions to FICO's expert witness, Randolph Bickley Whitener, who claims that Federal's use of Blaze as one of many components within some of Federal's software applications "contributes to" Federal's profits. (Whitener Rep., ¶ 29.)[1] McCarter rebuts this claim by applying his considerable experience in the insurance industry and specifically with insurance software solutions and services to demonstrate the ways in which Federal actually used Blaze in its business. After doing so, McCarter arrived at various conclusions, the central one being that "Federal's use of Blaze in connection with some of its software applications does not contribute to Federal's overall gross written premium revenue and profit in any appreciable sense." (McCarter Rep., ¶ 23.)[2]

McCarter's expert rebuttal opinions are relevant to FICO's copyright claim for profit disgorgement. In order to survive summary judgment on its claim to disgorge Federal's profits "attributable" to its use of Blaze, FICO must provide evidence that some

_____

[1] Whitener's report was submitted in connection with Federal's Motion to Exclude Portions of Expert Report and Testimony of R. Whitener. The report is Exhibit 1 to the Declaration of Terrence J. Fleming, dated July 26, 2019. (*See* Dkt. 381-382.) Whitener's report is cited in this memorandum as "Whitener Rep."

[2] McCarter's report was submitted in connection with Federal's Motion for Summary Judgment. The report is Exhibit 2 to the Declaration of Terrence J. Fleming, dated July 26, 2019. (*See* Dkt. 432 at 16-71.) McCarter's report is cited in this memorandum as "McCarter Rep."

of Federal's profits are, in fact, attributable to Blaze. *See* 17 U.S.C. § 504(b). To do so, it is well-established that FICO bears the burden of proving causation, i.e. that a "causal nexus" exists between Blaze and Federal's profits. *See, e.g.*, *Mackie v. Rieser*, 296 F.3d 909, 915 (9th Cir. 2002); *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08 CIV. 7497 KBF, 2013 WL 5970065, at *7 (S.D.N.Y. Nov. 8, 2013); *Int'l Bus. Mach. Corp. v. BGC Partners, Inc.*, No. 10 CIV. 128 PAC, 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25, 2013); *Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 330 (S.D.N.Y. 2008); *DaimlerChrysler Servs. v. Summit Nat.*, No. 02-71871, 2006 WL 208787, at *4 (E.D. Mich. Jan. 26, 2006). In his report, however, McCarter explains how FICO lacks any evidence of this necessary causal element for various reasons, most notably that "Blaze is a small technology of a very large company ecosystem" involved in the sale of insurance products. (McCarter Rep., ¶ 22.)

### B.    McCarter's Insurance Industry Experience.

McCarter has extensive experience in the insurance industry. He has worked for insurance companies for 22 years. (*Id.* at ¶ 7.) His experience includes serving as the Chief Information Officer for a major insurer and asset management company – Allianz of North America. (*Id.* at ¶ 8.) As a CIO, McCarter's responsibilities included managing "the information technology supporting all property and casualty insurance lines of business including insurance products like those sold by Federal." (*Id.* at ¶ 9.) Overall, throughout the course of McCarter's career, he has "worked with many of the largest insurance companies in the world in various roles." (*Id.* at ¶ 13.) Apart from Allianz, McCarter's industry experience includes working with "Farmers Insurance Group, The

3

Travelers, Liberty Mutual Insurance, GEICO, Progressive, and American International Group (AIG)." (*Id.*)  As a result of his work in the insurance industry, McCarter was named "one of the Elite Eight CIOs by Insurance and Technology Magazine." (*Id.* at ¶ 14.)

### C.    McCarter's Software Experience.

McCarter's career has focused on the technologies that insurance companies use to run their businesses.  McCarter's "specific focus on core insurance software solutions and services" has, in his own words, given him "a perspective on how the insurance and software industries relate to one another." (*Id.* at ¶ 7.)  Of particular relevance to this case, after leaving Allianz, McCarter became the Chief Operating Officer for ePolicy Solutions, a role in which he was responsible for "managing the product design, development, and implementation" of an insurance technology product that included a business rules management component similar to Blaze. (*Id.* at ¶ 10.)  Later, as Senior Vice President of Insurance Solutions for a global information technology company, McCarter was responsible for overseeing product lines that included a business rules management product that competed with Blaze. (*Id.* at ¶ 8.)  Additionally, McCarter has "participated in or managed multiple large complicated implementations of policy administration systems and business rules management software." (*Id.* at ¶ 13.)

### D.    The Depth of McCarter's Relevant Experience is Illustrated by Comparing him to Whitener's Lack of Relevant Experience.

McCarter's experience provides a sufficient basis for him to render his opinions. This fact is best illustrated by comparing his experience to that of FICO's industry (and

causation) expert, Bick Whitener.  Unlike McCarter who was the CIO for multiple major insurers, Whitener has only ever held non-technical business positions for insurance companies.  (McCarter Rep., ¶¶ 8-9; Whitener Tr. at 44:20-45:19.)[3]  McCarter helped design business rules management software products and assisted in the technical implementation of those products within insurance companies.  (McCarter Rep., ¶¶ 10, 13.)  In comparison, Whitener wrote general rules for the sale of insurance products, but he admits that he would "then rely on my IT compatriots to implement the rule, test it and make sure it was doing as prescribed."  (Whitener Tr. at 52:18-20.)  Indeed, Whitener was not even aware that one of the insurance companies he worked for used Blaze. (*Compare* Whitener Tr. at 92:15-22 (testifying that he did not know whether his employer from 2004 to 2007, Unitrin Insurance, used Blaze) *with* FICO0057765[4] (April 2007 letter from Unitrin noting that "we deploy Blaze Decision System in our environment").)  Finally, Whitener testified that he believed Blaze as implemented at Federal is a form of "artificial intelligence," which it is not based on any widely-accepted definition of this term.  (Whitener Tr. at 227:25-229:25.)

## II.  MCCARTER UNDERTOOK AN EXTENSIVE REVIEW OF CASE-SPECIFIC FACTS AND DATA IN REACHING HIS CONCLUSIONS.

In condensing numerous paragraphs from McCarter's expert report into one sentence summaries, FICO's motion glosses over the detailed support that McCarter

---

[3] Whitener's deposition transcript is submitted in connection with this opposition as Exhibit 1 to the Declaration of Terrence J. Fleming in Support of Federal's Opposition to FICO's Motion to Exclude Testimony of W. McCarter, dated August 26, 2019 ("Fleming Decl.").  Whitener's transcript is cited in this memorandum as "Whitener Tr."
[4] FICO0057765 is attached as Exhibit 2 to the Fleming Decl.

provides for his opinions about the role of Blaze within Federal's enterprise.  (Dkt. No. 362 at 1-2.)  In order to understand how Federal used Blaze, McCarter conducted 11 interviews of employees working in various roles throughout the Chubb Group of Insurance Companies and reviewed numerous case-specific documents including documents produced in discovery, deposition transcripts, and interrogatory responses. (McCarter Rep., App. C.)  He also relied on outside reference materials applicable to the insurance and software industries more generally.  (*Id.* at Apps. A-C.)

FICO's counsel was repeatedly unable to identify unsupported portions of McCarter's opinions during his deposition.  When questioned about his support for his understanding of Federal's business model, McCarter pointed out that his conclusions were based on industry-wide characteristics of insurance companies.  (*See, e.g.*, McCarter Tr.[5] at 138:22-139:11;  160:19-161:19;  181:9-19.)  McCarter also confirmed that insurance consumers as well as most of Federal's own employees were not even aware that Federal used Blaze.  He confirmed this fact by checking the user interfaces of certain Blaze-integrated applications and interviewing Federal employees that use the applications on a day-to-day basis.  (*Id.* at 73:23-74:6; 159:2-19.)[6]  When asked how he formed his opinions about FICO's pricing for Blaze, McCarter pointed out that during his career he had "been involved in writing a number of [] software license agreements for…

---

[5]  McCarter's deposition transcript is attached as Exhibit 3 to the Fleming Decl. McCarter's transcript is cited in this memorandum as "McCarter Tr."
[6]  FICO seeks to exclude this opinion as "unreliable" despite the fact that Whitener, FICO's *own* industry expert, agreed with McCarter on this point.  (Whitener Tr. at 75:2-78:20) (agreeing that customers "do[] not see or care about any of the technologies that an insurance company takes to… fulfill its insurance process.").

rules engines." (*Id.* at 214:6-8.)   Finally, McCarter was able to describe the various components besides Blaze making up a Federal application when presented with a component-level chart. (*Id.* at 190:3-24.)   Whereas, when Whitener was presented with the same chart he admitted that "some of their [*sic*] acronyms, I don't even know what they mean." (Whitener Tr. at 155:3-23.)

These excerpts from McCarter's deposition are a small fraction of the many examples that demonstrate how McCarter applied his extensive experience to the facts of this case to reach a reliable conclusion rebutting Whitener.   Accordingly, for the reasons outlined below, FICO's Motion to Exclude McCarter's Testimony should be denied.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.   It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   "The main purpose of *Daubert* exclusion is to prevent juries from being swayed by dubious scientific testimony."   *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011).   When making the reliability and relevancy determinations, a district court may consider: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review

7

or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Id.*; *see also Daubert*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one.").

Rebuttal expert testimony is that which "is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)." *See* Fed. R. Civ. P. 26(a)(2)(D)(ii) (emphasis added). "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681 KBF, 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015). As such, "[t]here is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." *Id.* Additionally, expert testimony using a different technique or discussing a different issue is proper rebuttal, where that opinion "expose[s] a potential flaw in [the affirmative expert's] method" or otherwise refutes the subject matter of the affirmative expert's analysis. *Humphreys v. Regents of Univ. of California*, No. C 04-03808 SI, 2006 WL 1867713, at *6 (N.D. Cal. July 6, 2006).

## ARGUMENT

**I.    MCCARTER'S OPINIONS EXPLAINING THE LACK OF A NON-SPECULATIVE CAUSAL NEXUS BETWEEN BLAZE AND FEDERAL'S PROFITS ARE ADMISSIBLE UNDER *DAUBERT*.**

FICO claims McCarter's opinions must be excluded because he relied upon his extensive experience in the insurance industry.  (Dkt. 362 at 8-18.)[7]  In doing so, FICO mischaracterizes the law on experiential and industry experts and seeks to impose a far higher burden than the law requires.  FICO mischaracterizes McCarter's analysis as relying entirely on his experience when, in fact, McCarter conducted an extensive, thorough review of Federal's use of Blaze from which he applied his experience to come to his conclusions.

### A.    Experts May Rely On Their Experience.

Contrary to FICO's assertions, an expert's reliance on his or her experience does not automatically turn their opinions into inadmissible *ipse dixit*.  (Dkt. 362 at 4) (arguing expert "testimony based on experience is improper *ipse dixit* testimony").  Experts are entitled to rely on their experience in reaching their conclusions.  *Russell v. Whirlpool Corp.*, 702 F.3d 450, 457-58 (8th Cir. 2012) (affirming district court's admission of expert's causation opinions that relied on his experience); *Gaudreault v. Elite Line Servs., LLC*, 22 F. Supp. 3d 966, 972 (D. Minn. 2014) (admitting expert opinions "based in the principles and methods that he knows from his experience" where expert "applie[d] those principles and methods to the facts and circumstances surrounding" the case).  Indeed,

---

[7] FICO's Memorandum in Support of Its Motion to Exclude Testimony of W. McCarter, filed July 26, 2019 can be found at Docket entry 362.  For ease of reference it is cited in this memorandum as "Dkt. 362."

although "[e]xpert testimony must rest on reliable principles and methods" the "relevant reliability concerns may focus upon personal knowledge or experience rather than scientific foundations." *U.S. v. Holmes*, 751 F.3d 846, 850, 2014 WL 1876127, at *2 (8th Cir. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

Here, McCarter's reliance on his experience, which is coupled with a significant, thorough review and analysis of the case-specific facts, is reliable and his opinions admissible.

### B.   McCarter Applied his Considerable Experience to the Facts of This Case Regarding Federal's Use of Blaze.

McCarter is not only qualified based on his experience, he employed a proper methodology of taking his extensive experience and using it, as well as other resources, to reach a reliable conclusion: a single software component used in a few of an insurance company's applications does not contribute to the company's profits in any "appreciable sense." McCarter's opinions are not, as FICO argues, "untethered to case-specific facts."

In coming to his conclusions, McCarter conducted substantial analysis of the case-specific facts. He interviewed no less than 11 current and former Federal employees related to the use of Blaze at Federal:

| Federal Employee | Position |
| --- | --- |
| Henry Mirolyuz | Application Architect |
| Kevin Murphy | Senior Legal Counsel |
| Ellen Garnes | Operations Process Manager |
| Helen Mencke | Associate Vice President, OPA Business Process Owner |

| Nancy Verduin | Vice Presient, Operations, Business Process Manager |
|---|---|
| Michael Schraer | Senior Vice President Underwriting, Chief Products Officer |
| Alissa Theberge | Senior Vice President Underwriting, Officer |
| Jennifer Santucci | Vice President Underwriting, Officer |
| Ramesh Pandey | Vice President, Systems, North American Architecture |
| Phillip Folz | Division IT Controller |
| Claudio Ghilanzoni | Chief Enterprise Architect |

(McCarter Rep., ¶ 16.)  He reviewed and analyzed all of the non-expert depositions taken in this case (19 in total) as well as the associated exhibits.  (*Id.* at App. C at 44-45.)  He additionally reviewed approximately 136 other documents produced by Federal and 43 documents produced by FICO during discovery in the case.  (*Id.* at 45-49.)  Aside from these case-specific documents, McCarter additionally relied on numerous outside resources related to business rules management systems, like Blaze.  (*Id.* at 50-51.)  From this, McCarter applied his substantial experience in the insurance industry to come to his opinions.

To claim, as FICO does in its motion, that McCarter's opinions—which he provides based on his experience after his review and analysis of the substantial case documents outlined above—are *ipse dixit* opinions "untethered to case-specific facts" is without merit.   Each of his opinions, as outlined below, is admissible.

11

### 1. McCarter's "core competencies" opinion is admissible because it applies to all insurance companies, including Federal.

FICO seeks to exclude McCarter's opinions and testimony regarding insurance company's "core competencies" or, in other words, the factors that contributed to an insurance company's revenue and profitability. McCarter intends to testify that Federal's profits and revenue result not from its use of Blaze, but from numerous other factors that determine an insurance company's success. (McCarter Rep., ¶ 21.) Those factors include, for example, Federal's knowledge, expertise and access to insurance markets, its insurance products, business logic and data, and its integration of individual technologies and production skills. (*Id.* at ¶ 115.) FICO claims that because McCarter's opinion relies on his experience in the insurance industry it is inadmissible *ipse dixit*.

McCarter's reliance on his experience does not render his opinions *ipse dixit*. *Gaudreault v. Elite Line Servs., LLC*, 22 F. Supp. 3d 966, 973 (D. Minn. 2014) (admitting aviation safety expert and rejecting *ipse dixit* argument in negligence case: "Rule 702 requires only that an expert's 'experience ... bear a close relationship to [his] opinion'; it does not require an airtight fit."). Indeed, in the context of a copyright infringement claim where, as here, the plaintiff seeks to disgorge profits courts have allowed defendant's experts—relying on their experience—to testify regarding the factors that contribute to defendant's profits. *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4065465, at *12 (S.D. Tex. Oct. 9, 2010) (on copyright infringement claim admitting industry expert testimony "regarding the factors that contribute to the success of a convenience store"); *see Fahmy v. Jay Z*, 2015 WL 5680299, at *3 (C.D. Cal. Sept. 24,

2015) (on copyright infringement claim holding "defendants may present [the expert's] testimony regarding the factors that contribute to the success of musicians and their music, as well as the relative importance of these factors.").

The *Interplan Architects* case is instructive.  There, the plaintiff, an architectural design firm, sued the defendant for copyright infringement alleging the defendant used its architectural design plans in the layout of its convenience stores.  *Interplan Architects*, 2010 WL 4065465, at *1.  The plaintiff sought to disgorge profits.  *Id.*  The defendant sought to introduce an industry expert to opine on "the factors that contribute to the success of a convenience store."  *Id.* at *12.  The court admitted the opinions based upon the expert's experience in the industry:

> [H]is opinions regarding the factors that contribute to the success of
> a convenience store… are also reliable in that they are based upon
> Mr. Mitchell's twenty-five years of experience in the convenience
> store industry … he may offer general, non-quantitative opinions
> regarding the factors that impact a store's performance based upon
> his years of practical experience in the industry.

*Id.* at *13.  Similarly, in *Jay Z*, the court admitted an expert's opinions regarding the factors that contribute to the success of musicians.  *Jay Z*, 2015 WL 5680299, at *3  (on copyright infringement claim holding "defendants may present [the expert's] testimony regarding the factors that contribute to the success of musicians and their music, as well as the relative importance of these factors.").

McCarter seeks to do precisely what the experts in *Interplan Architects* and *Jay Z* were allowed to do—testify as to what factors contribute to Federal's success; more specifically, what factors contribute to Federal's revenue and profits.  The opinions are

relevant to demonstrate Federal's profits are not attributable to its minimal use of Blaze—a single software component that Federal utilizes in some of its applications. The opinions are also reliable based on McCarter's substantial experience in the industry. This Court should follow the reasoning set forth in *Interplan Architects*, *Jay Z* and other well established case law that permits experts to rely upon their experience and admit these opinions.

> **2.     McCarter's opinion regarding Federal's use of business rules is admissible because it demonstrates that Blaze cannot contribute to profits without a host of other factors, including proper human inputs.**

McCarter intends to opine that Federal's profits and revenue derive from the manner in which its employees use Blaze, not the use of Blaze itself. Blaze is not a software that is specific to the insurance industry—as McCarter points out, it is industry agnostic. Federal employees create business rules based upon their knowledge and experience in the insurance industry, which are then loaded into Blaze. As such, McCarter intends to opine that Federal's profits and revenue depend upon the quality of the business rules Federal creates, not use of the software itself. (*See* McCarter Rep., ¶¶ 23, 73, 75, 81, 82, & 126.)

FICO claims that McCarter's opinion is inadmissible because he conducted no quantitative analysis to determine the precise number of rules that resulted in a reduction or increase in profits. (Dkt. 362 at 12.) That is not the purpose of the opinion. McCarter's opinion is intended to respond to FICO's causation expert, Bick Whitener. Whitener intends to opine that Blaze "contributes to Chubb revenue" by increasing the

14

speed of transactions and the accuracy and adequacy of pricing. (Whitener Rep., ¶ 29.)

Whitener conducted no quantitative analysis. Whitener admits that despite opining that

Blaze "contributed to Chubb revenue" he cannot say whether Blaze affected Federal's

revenues or profits in any way:

> Q.    I take it you don't know whether Blaze Advisor actually
>        contributed to an increase in revenue or profit at Federal,
>        correct?
>
> A.    That would require a quantification. I have done no
>        quantification, no.

(Whitener Tr., at 157:24-158:3.)

McCarter rebuts Whitener's opinion.   McCarter provides that Whitener's

assumptions are erroneous. In the first instance, Whitener conducted no analysis to

determine whether, in fact, Blaze increases the "speed of transactions":

> Q:    Have you done an analysis of what amount of improvement
>        to speed, ease of doing business, adequacy of price is
>        attributable to Blaze…
>
>                           *    *    *
>
> A:    That was outside of the scope of my responsibilities.

(Whitener Tr. 100:4-11.) However, even assuming he did, McCarter points out that the

business rules are created by Federal employees, not Blaze. The quality of the rules

determines whether Federal's profits rise or fall. Further, Blaze does not increase the

"accuracy and adequacy of pricing" because the business rules associated with pricing are

created by Federal employees, not Blaze.

15

McCarter's opinion is also not, as FICO argues, a mere hypothetical. McCarter relies on his review of Federal's use of Blaze and his significant industry experience with rules management systems, which demonstrate that Federal's profits are attributable to the quality of the rules its employees created, not the use of an industry agnostic software tool into which those rules were loaded. McCarter's opinions on this issue are proper rebuttal testimony and should be admitted.

### 3. McCarter's "consumer preferences" opinion is admissible because it is based on McCarter's review of Federal's use of Blaze and his experience of how software like Blaze is used in the industry generally.

FICO seeks to exclude McCarter's opinion that customers were unaware of and did not care that Federal made use of Blaze. (McCarter Rep., ¶¶ 27, 52, 96, 104.) The opinion is based on McCarter's review of the Federal applications that incorporate Blaze and his interviews with Federal employees who use those applications on a day-to-day basis. McCarter opines that customers, brokers, agents and Federal employees generally do not know or care what rules management system Federal employs.

FICO claims McCarter did not conduct any "analysis of case-specific facts" to reach this conclusion. That is incorrect. McCarter confirmed that use of Blaze is not known to the user in his review and analysis of the application interface. (McCarter Tr. at 159:2-15) ("I looked at the – at the screens that were the UI that supported the applications that are involved here, and the – the customers, the policyholders, the agents don't know that rules engine set behind there."). His interviews with Federal employees that use the applications additionally confirmed this fact. (*Id.* at 73:6-74:21) (interview

with underwriter confirming that when she uses an application that uses Blaze "[s]he's using the functionality that is – the user interface gives her, and it doesn't say this is Blaze or a rule issue.  It's all handled behind the scenes"  and further explaining that "[t]here's functionality that sits behind the scenes, not just Blaze, many other components that sit behind the scenes that are utilized that are not even visible to most of these people").  McCarter's review and analysis of Federal's use of Blaze, in addition to his experience in the insurance industry generally, confirm the accuracy of this opinion.

Further, FICO's own expert agrees that customers do not know or care about Federal's use of Blaze or its use of any decision management software.  Whitener agreed that customers "do[] not see or care about any of the technologies that an insurance company takes to… fulfill its insurance process."  (Whitener Tr. at 75:2-78:20.)  He stated:

> I agree that the direct consumer, be it a business or a family entity, personal lines, does not see or care about any of the technologies that an insurance company takes to – I'm going to use the word fulfill, fulfill its insurance process, be it policy issuance, be it claims, be it billing.  The consumer is oblivious to that.

(*Id.* at 75:9-15.)  McCarter's opinion—which is in agreement with FICO's own expert and is based on his review of the relevant record and interviews with Federal employees who use Blaze—is admissible.

> ### 4. McCarter's opinions using an industry-wide model are admissible because the model applies to property and casualty insurance companies, like Federal.

FICO expends substantial space in its briefing arguing that McCarter's opinions at Paragraphs 54 to 67 should be excluded solely because he relies on a model that depicts

17

the operations for a property and casualty insurance company.   (Dkt. 362 at 14-17.)
McCarter's use of the industry model is appropriate and his opinions that rely on the
model are admissible.

McCarter relies on the industry model to demonstrate the relative complexities of
a property and casualty insurance company.   (McCarter Rep., ¶¶ 54-67.)   McCarter
explains that the diagram is "a summary of the functional business model for a property
and casualty insurance company." (*Id.* at 54.)   The model generally outlines the various
functions of a property and casualty insurance business which include, for example, (1)
marketing, (2) product operations, (3) policy acquisition, (4) underwriting, (5) policy
administration, (6) claims management, (7) billing and collection, (8) management of
customer dialogue, (9) channel management, (10) customer relationship management,
and (11) enterprise resource management. (*Id.*)   McCarter opines that Blaze is not used
in a large portion of these business functions.   For example, Blaze is not used in
marketing, claims management, billing and collection, management of customer
dialogue, channel management, customer relationship management, and enterprise
resource management.   Additionally, for business functions in which Blaze does play a
role, its role is minor.   For example, McCarter notes that policy acquisition includes the
following business functions: (1) prospecting, (2) referral support, (3) new business
processing, (4) needs analysis, (5) channel sales support, and (6) prospect quoting. (*Id.*)
Blaze does not play any role in prospecting, referral support, new business processing,
needs analysis or channel sales support—Blaze is only used in the prospect quoting
function.   The opinions are useful to the trier of fact as they depict the relative

18

complexities of a property and casualty insurance company and the relatively minor role
Blaze played at Federal.

The opinion is not, as FICO argues, "untethered from case-specific facts."  Federal
is a property and casualty insurance company that operates in the manner depicted by the
industry model.  McCarter, through his interviews of Federal employees and review of
case documents, identified those portions of Federal's business in which Blaze is utilized.
He also determined those portions of the business that do not use Blaze.  He analyzed the
use with respect to each of these business functions and concluded "Blaze is not a
significant part of Federal's business activities . . . ."  (*Id.* at ¶ 59.)

FICO complains that the industry model was prepared by IBM to generally
describe the functional operations of a property and casualty insurance company.  FICO
claims because the model does not depict Federal's business operation specifically and,
instead, depicts insurance business models generally, it is not reliable.  FICO has done
nothing to demonstrate that Federal does not operate in the manner depicted in the
industry model.  It has not proposed any other model.  In any event, any weaknesses that
FICO claims exist based on McCarter's reliance on this industry model (as opposed to
some other model) is properly addressed by the jury in weighing the evidence.  It is not a
proper basis for exclusion.  *Hose v. Chi. Nw. Transp. Co.*, 70 F. 3d 968, 974 (8th Cir.
1996) ("As a general rule, the factual basis of an expert opinion goes to the credibility of
the testimony, not the admissibility, and it is up to the opposing party to examine the
factual basis for the opinion in cross-examination. Only if an expert's opinion is so
fundamentally unsupported that it can offer no assistance to the jury must such testimony

19

be excluded.") (internal citations omitted). The industry model and McCarter's opinions that rely on the model should be admitted.

### 5.    McCarter's opinions that Blaze does not contribute to profits are admissible and are not mere *ipse dixit.*

McCarter intends to opine on the relatively minor role Blaze played at Federal. (McCarter Rep., ¶¶ 22, 53, 74, 105, 117.)  FICO claims McCarter's opinions regarding Federal's use of Blaze are *ipse dixit* that "lack a case-specific factual analysis."  (Dkt. 362 at 17.)  The opinion is supported by McCarter's experience in the industry and his review of the facts in this case.

The paragraphs in McCarter's report which FICO cites to demonstrate McCarter *did* analyze the case-specific facts.  For example, FICO cites to the following paragraphs in McCarter's report each of which is an analysis of case-specific facts that demonstrate Federal's use of Blaze is minor:

| Paragraph | Case-Specific Fact |
|---|---|
| **87** | "Federal has approximately 1500 applications that make up Marketing, External Facing, Policy Administration, Chubb Portfolio, Reporting, Corporate Reporting that are used for Commercial and Specialty insurance business." |
| **88** | "Blaze is only used in 10 of Federal's 1,500 applications. Additionally, each application is made up of multiple internally developed programs and potentially uses Third-party technologies. It is common for insurance companies to leverage functionality from third-party software providers who specialize in certain software functions." |
| **89** | "Based on my review of Third-Party technologies used by Federal, Blaze is 1 of 45 Third-Party software technologies used by Federal." |

| 90 | "Based on my review, I am estimating that Federal has a total of 1,545 technologies that are used to build and implement its business applications. Blaze is 1 technology of Federal's 1,545 technologies or 0.06%." |
|---|---|
| 98 | "CSI Express is 1 of Federal's 1500 applications.  Blaze is also 1 of 20 the Third-Party technologies used in CSI Express." |
| 117 | "Blaze was integrated into 10 of Federal's 107 proprietary insurance applications that supported a small portion of Federal's business operations." |

The values support McCarter's conclusion—they demonstrate the minor role Blaze played at Federal.  Based on his review of these facts and his experience in the insurance industry, McCarter came to a reasonable conclusion:

> Blaze is a minor part of Federal's technology used to assist employees in better rules management.

(McCarter Rep., ¶ 105.)   The opinion is relevant to demonstrating Blaze did not contribute in an appreciable sense to the $30.9 billion revenue stream FICO has identified as relevant to its disgorgement claim.  FICO has not demonstrated these opinions are *ipse dixit*; the opinions should be admitted.

## II.  MCCARTER'S OPINIONS RELATED TO BOTH DEDUCTIBLE EXPENSES AND APPORTIONMENT ARE ADMISSIBLE.

### A.  McCarter's apportionment opinions are admissible and bolster the apportionment analysis of Federal's damages expert, Christopher Bakewell.

McCarter intends to testify that Federal's gross written premium revenue and profits do not result from its use of Blaze, but instead result from its "core competencies" which include a myriad of factors.  (McCarter Rep., ¶ 21.)  FICO claims these opinions are inadmissible as it relates to apportionment.  FICO argues first that the opinions are

21

too "generalized" to assist on the apportionment issue and second, that courts require experts give an exact percentage or numerical value for apportionment.  FICO is wrong on both points.

The opinions are not too generalized.  In this context courts routinely allow experts to testify regarding the factors that contribute to a defendant's profits. *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4065465, at *13 (S.D. Tex. Oct. 9, 2010) (admitting expert to testify regarding "the factors that contribute to the success of a convenience store"); *Fahmy v. Jay Z*, 2015 WL 5680299, at *3 (C.D. Cal. Sept. 24, 2015) ("[D]efendants may present [the expert's] testimony regarding the factors that contribute to the success of musicians and their music, as well as the relative importance of these factors.").  This Court should do the same.

Courts do not require experts provide an exact percentage or numerical figure in the context of apportionment.  In support of its position on this point, FICO cites to a single, unpublished case from the Central District of Illinois.  *See Design Ideas, Ltd. v. Things Remembers, Inc.*, 2009 WL 1259035 (C.D. Ill. May 6, 2009).  The opinion has never been cited by a single copyright case.  The opinion is also inapposite.  *Design Ideas* is a direct profits case in which the defendant sold "Flower Candle Baskets" that the plaintiff alleged copied its design for a similar "Star Candle Basket."  *Id.* at *4.  The plaintiff sought to disgorge profits.  The defendant's expert was excluded because he merely compared the plaintiff's and defendant's profit margins.  *Id.*  The expert was not excluded, as FICO asserts, because he failed to provide an exact numerical figure or percentage:

> [The expert] determined that the profit margins were the same, so he concluded that the infringement of Design Ideas' copyright had no impact on Things Remembered's profits. This makes no sense. The Star Candle Basket and the Flower Candle Basket are decorative baskets that hold candles. The fact that they had similar profit margins, at best, implied that the decorations on each product contributed similar amounts to the profits, but the comparison does not provide any information about the amount of the profits attributable to the decorations on either basket. Thus, the evidence on which [the expert] relied does not support his conclusion. This opinion is barred.

*Id.* The opinion does not, as FICO claims, stand for the proposition that courts require an expert provide an exact figure or percentage. (Dkt. 362 at 20.)

FICO does not cite to any case law requiring an expert provide an opinion regarding the exact percentage or that an expert's failure to do so is a basis for exclusion. In fact, courts conclude the opposite—due to the "delicate exercise" that "apportionment" requires "a precise numerical figure" is not required." *John G. Danielson, Inc. v. Winchester-Conant Prop., Inc.*, 322 F.3d 26, 48 n.11, 50 (1st Cir. 2003) (reversing profit calculation but affirming decision to admit industry experts who, like McCarter, only listed the other factors that drove profits as opposed to giving an exact percentage; court reasoned that "[a]pportionment is ultimately a delicate exercise informed by considerations of fairness and public policy, as well as fact" and that "when the jury is given the proper standard rather than instructed to look for mathematical exactness, it will be less important for WCP to produce a precise numerical figure."). McCarter is not required to provide an exact percentage in providing an apportionment opinion. FICO's attempt to require him to do so should be rejected.

23

### B.     FICO misrepresents Federal's burden with respect to deductible expenses.

Federal's damages expert, Christopher Bakewell, has provided a detailed analysis of deductible expenses.  (Bakewell Rep., ¶¶ 185-205.)[8]  Some of McCarter's opinions may additionally be relevant to the deductible expenses issue.  (*See, e.g.*, McCarter Rep., ¶¶ 39-43.)  It appears—although it is unclear from FICO's briefing—that FICO seeks to exclude these opinions.  (Dkt. 362 at 19.)

In doing so, FICO mischaracterizes the burden of the defendant in demonstrating deductible expenses.   With respect to deductible expenses, "it is not necessary for [defendant's] proof to be precise and perfect[.]"  *In Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 564 (2d Cir. 1994), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994).   "[R]easonable approximations constitute satisfactory evidence[.]"  *Id.*; *see also Mendler v. Winterland Concessions Co.*, No. C 96-2624 TEH, 2000 WL 1281168, at *3 (N.D. Cal. Sept. 6, 2000) (stating that when it comes to proving deductible expenses under the Copyright Act "defendant's proof need not be precise and perfect, especially where there is no evidence of bad faith . . . summaries of costs may be considered, even though they may be challenged as 'self-calculated' and 'unverified,' so long as their proponents are subject to cross-examination so that any inaccuracies can be revealed.") (internal citations omitted).   McCarter's opinions aid the trier of fact by

---

[8]  Bakewell's report was submitted in connection with FICO's Motion to Exclude Testimony of C. Bakewell.   The report is Exhibit 1 to the Declaration of Heather J. Kliebenstein, dated July 26, 2019.  (*See* Dkt. 423-424.)  Bakewell's report is cited in this memorandum as "Bakewell Rep."

adding greater detail and context to Bakewell's deductible expenses analysis. The opinions are, therefore, admissible.

## III. MCCARTER'S OPINIONS ON ALTERNATIVE PRODUCTS TO BLAZE ARE ADMISSIBLE BECAUSE THEY ARE RELEVANT TO MULTIPLE ISSUES IN DISPUTE.

### A. McCarter's Opinions Related To Comparable Products Help Demonstrate How Inflated FICO's Damages Claims Are.

McCarter opines on certain alternatives to business rules management systems that are used in the industry as well as products that compete with Blaze such as software designed by IBM and Oracle. (McCarter Rep., ¶¶ 76-80.) FICO clings to McCarter's use of the word "alternatives" to assert McCarter is incorrectly applying a principle from patent law—the availability of "non-infringing alternatives." McCarter is not applying patent law—he's opining on the availability of alternatives and competing products as relevant to demonstrate the relatively minor role Blaze plays at an insurance company like Federal. Putting FICO's semantics aside, the issue is whether the availability of alternatives to rules business management systems and the availability and costs associated with products that compete with Blaze are relevant.

The issue is relevant to FICO's actual damages, i.e., its calculation of lost license fees. The availability of products that compete with Blaze, and the costs associated with those products, demonstrate that FICO's lost license fee calculation—which amounts to $37 million—is significantly inflated. McCarter—Federal's industry expert—will opine on the relative availability and use of alternatives or other software products that compete with Blaze.

The relevance of alternatives and competing products is proven by FICO's own case law. FICO relies on one unpublished, non-binding case from the Northern District of California to argue McCarter's opinions are not relevant. *See Oracle Am. Inc. v. Google Inc.*, 2011 WL 5914033 (N.D. Cal. Nov. 28, 2011). However, in that case the court held that competing products (or "non-infringing alternatives") *are relevant* to the calculation of actual damages under the Copyright Act:

> Our court of appeals has held that Section 504(b) was enacted to explicitly provide for two *distinct* monetary remedies—actual damages and recovery of wrongful profits—to serve different purposes. Damages for lost license fees, derived from a hypothetical negotiation, fall under the rubric of actual damages. As Dr. Cox makes clear in his report, the existence of "multiple acceptable and effective" non-infringing alternatives "at little or no additional cost" greatly reduces the lost license fees. This order finds this aspect [of the expert's opinion] acceptable.

*Id.* at *4 (internal citations omitted). FICO's actual damages—its purported lost license fees—must be calculated based on a "hypothetical negotiation" that determines "the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use . . . ." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001). McCarter's opinions that alternatives to business rules management systems exist and, additionally, that competing products are available (at substantially less cost that FICO's $37 million lost license fee calculation) are relevant to actual damages. Therefore, McCarter's opinions are admissible.

26

**B.     McCarter's Opinions are Helpful in Demonstrating FICO's Failure to Establish a Causal Nexus on Its Disgorgement Claim.**

FICO contends the opinions are legally irrelevant to FICO's disgorgement claim. McCarter's opinions are relevant to demonstrate the minor role Blaze—and business management rules software generally—play at a large insurance company like Federal. The relatively insignificant role Blaze plays at Federal is relevant to FICO's failure to establish a causal nexus between use of Blaze and Federal's profits.

As noted above, FICO is relying on one non-binding opinion, *Oracle v. Google*. The holding in *Oracle* on the disgorgement issue was limited and does not apply here. *Oracle* concluded that competing products are not relevant to *calculating* the *amount* of profits.  In *Oracle*, the plaintiff argued that Google's expert "inappropriately opined that non-infringing alternatives would provide a basis for calculating wrongful profit." *Oracle*, 2011 WL 5914033, at *4.  Google's expert opined that "[t]he ready availability of obviously acceptable non-infringing alternatives" demonstrated that "the 'element of profit'… is very small or zero."  *Id.*  In other words, he opined that the existence of non-infringing alternatives was relevant to calculating profits—that the non-infringing alternatives proved profits were "zero."  The expert did not analyze or explain how "the availability of non-infringing alternatives supposedly decreased the wrongful profits . . . ."  *Id.*

In determining the admissibility of the opinion, as outlined above, the court held the availability of non-infringing alternatives was relevant to determining actual damages, i.e., lost license fees.  *Id.*  The court then analyzed the relevance of non-

27

infringing alternatives to calculating profits.  The court noted that there is "no controlling authority" on the issue, but concluded the existence of non-infringing alternatives is not relevant to "calculating wrongful profit":

> There is no controlling authority on the issue of whether the existence of non-infringing alternatives should be considered when calculating disgorgement damages under Section 504(b) … Non-infringing alternatives have nothing to do with [calculating profits]. The motion to strike portions of Dr. Cox's report that opined that non-infringing alternatives would provide a basis for calculating wrongful profit is **GRANTED**.

*Id.  Oracle* did not hold, as FICO represents, that competing products are never relevant to a disgorgement claim under the Copyright Act.  *Oracle* held that the mere existence of non-infringing alternatives (with no further analysis or opinion) is not relevant to *calculating* profits.

Here, the issue is different than the issue the court was addressing in *Oracle*.  The issue is whether profits are recoverable at all.  The ready availability of alternatives and competing products at low costs is certainly relevant in showing that Blaze's contribution is minor.  McCarter's opinions—which demonstrate the insignificant role Blaze plays at Federal—are relevant to whether profits are recoverable in the first instance, i.e., whether FICO can establish a causal nexus between the alleged infringement and Federal's profits.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request the Court deny Plaintiff's Motion to Exclude Testimony of William McCarter.

Dated:  August 26, 2019

s/ Terrence J. Fleming
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Christian V. Hokans (#0400377)
chokans@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000

*Attorneys for Defendants*

67578660 v3

29