**EXHIBIT 9**

**FILED UNDER SEAL**

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS   Doc. 492-8   Filed 08/26/19   Page 2 of 6

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
 2
     - - - - - - - - - - - - - - - - - - - - - - - - - -
 3
     FAIR ISAAC CORPORATION,
 4
                    Plaintiff,
 5
          v.            Court File No. 16-cv-1054 (WMW/DTS)
 6
     FEDERAL INSURANCE COMPANY,
 7   an Indiana corporation, and ACE
     AMERICAN INSURANCE COMPANY,
 8   a Pennsylvania corporation,

 9                  Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - -

11                    VIDEO DEPOSITION

12        The following is the video deposition of

13   NEIL J. ZOLTOWSKI, taken before Jean F. Soule,

14   Notary Public, Registered Professional Reporter,

15   pursuant to Notice of Taking Deposition, at the law

16   office of Fredrikson & Byron, P.A., 200 South Sixth

17   Street, Suite 4000, Mille Lacs Conference Room,

18   Minneapolis, Minnesota, commencing at 8:09 a.m.,

19   Friday, June 14, 2019.

20

21                    *    *    *

22

23              C O N F I D E N T I A L

24                ATTORNEYS' EYES ONLY

25
```

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 492-8 Filed 08/26/19 Page 3 of 6

1 determine the reasonableness or reliability of
2 FICO's standard rate tables?
3    A.   My analysis would include what I told
4 you, which is information provided demonstrating
5 that they've been using this rate table for
6 15 years and many companies have entered into
7 licenses using this information. That would
8 demonstrate to me that it's reasonable and reliable.
9    Q.   So what independent analysis did you
10 do?
11    A.   I was provided information that I
12 reviewed related to that and agreements that were
13 signed by entities using this information.
14    Q.   So your entire independent analysis to
15 determine the reasonableness or reliability of
16 FICO's standard rate tables was to look at other
17 software license agreements and to learn that FICO
18 had been using these tables for some time and had
19 entered into other software license agreements?
20    A.   That's fair. And when you say "some
21 time," some time is, I believe, more than 15 years,
22 which demonstrates to me the reasonableness and
23 reliability of a pricing matrix, because if an
24 entity used certain pricing that was unacceptable
25 in the marketplace, they would not have any

Page 63

1 licensees, and they would have to change that
2 pricing. By being able to use the same pricing
3 matrix for more than 15 years demonstrates to me
4 that it is more than reasonable and reliable.
5    Q.   Now, it's also your opinion -- and
6 this is on page 43 of your report -- that FICO may
7 be entitled to $28.4 billion based upon Federal's
8 generated gross written premiums from the
9 applications utilizing Blaze in the United States
10 and that FICO may be entitled to $2.5 million [sic]
11 based on FICO's gross written premiums from
12 non-U.S. applications using Blaze, correct?
13    A.   That's correct, based upon the
14 information that was available in this proceeding.
15    Q.   And you arrived at these numbers based
16 upon the testimony in this case, the discussions
17 with Mr. Whitener and defendants' production of
18 information relating to gross premiums; is that
19 right?
20    A.   That's correct.
21         THE WITNESS: And when we get to a
22 stopping point for your line of questioning, could
23 we take a break --
24         MR. FLEMING: Sure.
25         THE WITNESS: -- so I could use the

Page 64

1 restroom?
2         MR. FLEMING: I'll be -- I'll be
3 fairly quick about this line of questioning.
4         THE WITNESS: Sure.
5 BY MR. FLEMING:
6    Q.   Now, what independent analysis did you
7 do to determine the reasonableness or reliability
8 of Mr. Whitener's assessment?
9    A.   Could you repeat that question? I'm
10 sorry.
11    Q.   What independent analysis did you do
12 to determine the reasonableness or reliability of
13 Mr. Whitener's assessments?
14    A.   My understanding is Mr. Whitener has
15 significant insurance expertise, and he's rendering
16 his own expert opinions in this matter. I found
17 his qualifications to be quite impressive based
18 upon his experience, and his opinions relate to the
19 insurance industry and his expertise in that regard.
20    Q.   And my question is really on a
21 separate topic. What independent analysis did you
22 do? You didn't do anything, did you?
23    A.   As I stated, I looked at his
24 qualifications and I spoke with him on numerous
25 occasions, but I think his qualifications speak for

Page 65

1 themselves.
2    Q.   And other than that, you did nothing?
3    A.   That's correct.
4    Q.   You know what, this question is going
5 to take longer. Why don't we take a five-minute
6 break and --
7    A.   Sure.
8    Q.   -- come back.
9    A.   Sure. I would just like to say one
10 more thing, because I think I misspoke, in that
11 Mr. Whitener looked at a number of pieces of
12 information related to his opinions, I also looked
13 at those pieces of information.
14    Q.   Well, are those pieces of information
15 something that you didn't refer to in your report?
16    A.   No. I referred to review of his
17 expert report and discussions with him, and I
18 reviewed the documents that he cited in his report.
19         MR. FLEMING: Okay. All right. Why
20 don't we take a five-minute break.
21         THE WITNESS: Thank you.
22         THE VIDEOGRAPHER: We're going off the
23 record. The time is now 9:56 a.m.
24         (Break from 9:56 to 10:06.)
25         THE VIDEOGRAPHER: We're back on the

Page 66

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019
CASE 0:16-cv-01054-DTS   Doc. 492-8   Filed 08/26/19   Page 4 of 6
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 67**

1 record. The time is now 10:06 a.m.
2 BY MR. FLEMING:
3     Q. Mr. Zoltowski, what is your
4 understanding about what the Blaze Software does
5 for each one of the fifteen applications at issue?
6     A. I outline that in my report on
7 pages 25 through 36.
8     Q. What is your understanding as to who
9 created the rules that are used within the Blaze
10 Advisor software system at Federal?
11     A. My understanding is that when it comes
12 to the rules creation that an end client, such as
13 Federal, would come up with the rules, but FICO
14 would perform the implementation based upon standards
15 of work or at the front end of the implementation
16 of the product.
17     Q. And what do you mean by the
18 implementation?
19     A. The deployment of the software.
20     Q. It's your understanding that FICO had
21 no involvement in the creation of the rules
22 themselves, though, correct?
23     A. I believe that FICO is part of the
24 process of getting those rules to appropriately run
25 within the system, and they have expertise in their

**Page 68**

1 experience of working with those rules. But I
2 believe the client, like Federal, would come up with
3 the -- how they wanted the rule to be structured
4 for use within the software.
5     Q. And the creation of the rule itself,
6 correct?
7     A. Determining how it wants the software
8 to perform would be Federal coming up with the
9 rule. I think the -- the software itself and
10 the -- actually getting the rules into the software
11 is what's really important to make sure that it's
12 using -- or employing and -- employing those rules
13 effectively to get the appropriate results based
14 upon those rules.
15     Q. So who wrote the pages 25 to 33?
16     A. It would be I and my team under my
17 direction.
18     Q. I mean, can you explain to me what
19 Blaze Software does with respect to Decision Point?
20 Do you have to go to the page and read it or do you
21 happen to know that?
22     A. There are 15 applications here. I
23 don't know what each of them are off the top of my
24 head.
25     Q. Okay.

**Page 69**

1     A. I didn't memorize all of this related
2 to how the applications or Blaze is used within
3 each of these 15 applications.
4     Q. Did you do any independent analysis to
5 determine the reasonableness or reliability of
6 FICO's assumption that Federal's gross premiums
7 were derived from the use of Blaze in each of these
8 applications?
9     A. Could you repeat that question?
10     Q. What independent analysis did you do
11 to determine the reasonableness or reliability of
12 FICO's assumption that Federal's gross premiums
13 were derived from the use of Blaze in each of these
14 applications?
15     MS. KLIEBENSTEIN: Object to form.
16     THE WITNESS: I'm going to try to
17 answer your question, but I don't believe it was a
18 FICO assumption. I believe that there was
19 information on the record that was provided by the
20 defendants related to the amount of revenue in
21 terms -- or the gross written premiums that ran
22 through each of these applications, which was
23 provided in interrogatory responses.
24 BY MR. FLEMING:
25     Q. So did you do any independent

**Page 70**

1 analysis?
2     A. To test if the -- if the defendants
3 were -- amounts the defendants provided related to
4 each of those was correct, is that your question?
5     Q. Whether they were derived from the use
6 of Blaze in each of the applications?
7     A. My understanding, and based upon
8 Mr. Whitener's opinion as well as my review of the
9 information he provided in his report and my review
10 of the other information, is that there is a
11 connection between the use of Blaze Advisor
12 software by the defendants and revenue.
13     Q. Now, you state that you're not
14 providing any opinion relating to liability, correct?
15     A. That's correct.
16     Q. And are you also not providing any
17 opinion as to what would be a commercially
18 reasonable software price?
19     A. I'm providing an opinion as to the
20 appropriate damages in the form of lost license
21 fees.
22     Q. And my question was different than
23 that.
24     Would you agree that you are not
25 providing an opinion as to what would be a

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 492-8 Filed 08/26/19 Page 5 of 6

**Page 207**

1  And so if you look at the Supplemental
2  Schedule 3.0, you can see that based on the breach
3  of contract cause of action my opinion is the lost
4  sife -- software license fees are 37.4 million, and
5  when you look at the same lost sife -- lost software
6  license fees under a copyright infringement cause
7  of action, based upon just timing, that number is
8  reduced to $34.1 million.
9      So, again, this is just for clarity in
10 providing my opinion as to the quantification of
11 damages for lost license fees under FICO's actual
12 damages and the copyright infringement claim.
13     Q.  And are the -- could you explain the
14 pages 2 and 3?  Have you made revisions in your
15 prior schedules?
16     A.  So if you look at Schedule 4.0 of my
17 initial report, you will see that the supplemental
18 schedule is exactly the same.  There's been no
19 change based upon this timing issue related to the
20 statute of limitations.
21     Q.  Uh-huh.
22     A.  However, in Supplemental Schedule 5.0,
23 you can see that there's been changes to a few of
24 the line items, specifically ADAPT Australia, ADAPT
25 UK, and EZER, which is E-Z-E-R, for the UK and

**Page 208**

1  Europe.
2      So based upon the changes which are
3  reflected in this supplemental schedule, which is
4  based on the fact that damages period starts three
5  years before the filing date of the complaint,
6  which is April 21st, 2016, the result of this
7  supplemental schedule is 17.9 million, which is a
8  reduction from my initial Schedule 5 under a breach
9  of contract cause of action, which is 21.3 million.
10     MR. FLEMING:  All right.  All right.
11 I have no further questions.  I appreciate your
12 time.
13     THE WITNESS:  Thank you.
14     MS. KLIEBENSTEIN:  I have a few.
15
16           EXAMINATION
17 BY MS. KLIEBENSTEIN:
18     Q.  Mr. Zoltowski, you were asked earlier
19 about who created the rules that are used in
20 Federal's copy of Blaze Advisor earlier.  Do you
21 remember that?
22     A.  I do.
23     Q.  Have you reviewed the rules used in
24 Federal's copy of Blaze Advisor?
25     A.  No, I have not.

**Page 209**

1      Q.  And why is that?
2      A.  I don't believe they have been
3  produced in this proceeding, which would allow me
4  to review those rules.
5      Q.  And so you haven't been able to sit
6  down with anyone at FICO to determine who wrote the
7  rules in Federal's copy of Blaze Advisor?
8      A.  That's correct.
9      Q.  You were asked several questions about
10 your specific experience earlier in the morning.
11 Do you recall those questions?
12     A.  I do.
13     Q.  And what is it that you would say is
14 your -- is your profession?
15     A.  I describe my profession, I guess it's
16 a consultant from a broad perspective.  But my
17 experience over the past 20 years has been in the
18 intellectual property industry, specifically
19 performing valuation work, providing consulting
20 services as it relates to licensing of intellectual
21 property, and the analysis and quantification of
22 damages from an expert witness perspective in
23 the -- a dispute setting.
24     And, as I stated, I've been doing this
25 for over 20 years, and it has covered a wide array

**Page 210**

1  of cases under all forms of intellectual property,
2  be it patent infringement, copyright infringement,
3  trademark infringement, trade secrets
4  misappropriation.  I've worked on a lot of tort
5  cases related to unfair competition.  I've worked
6  on a number of breach of contract matters,
7  specifically one which is a pricing -- a issue
8  related to pricing of a -- of actually a product
9  called the tantalum, which is a component that's
10 used in mobile phones, and I mention that case
11 because I worked on it for six years, and I think I
12 spent two or three of those years at a white board,
13 laying out all of the different scenarios, I think
14 we're up to over a hundred scenarios as to how you
15 could potentially price that product under that
16 agreement.
17     So in a -- from a 10,000-foot level,
18 that's my experience and expertise.
19     Q.  And during your deposition you were
20 asked a number of questions about the content
21 between paragraphs 30 through 50 of your report
22 that relate to the economic unit at issue in this
23 case.  Do you recall those questions?
24     A.  I do.
25     Q.  Have you been a part of any

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019
CASE 0:16-cv-01054-DTS Doc. 492-8 Filed 08/26/19 Page 6 of 6
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 211**

engagements in your professional work experience where you did work to understand the corporate and/or economic structure of a company?

A. I guess, generally speaking, I've been involved in a number of cases where we would look at corporate structure. You know, as an economic damages expert, that would be part of an analysis. And, more specifically, I recall cases that I've been involved with that relate to alter ego analyses, which I guess would be, in my opinion, another way of saying a single economic unit analysis that relates to, you know, piercing the corporate veil and understanding the corporate structure of an entity.

Q. The corporate structure, but what about the economic structure of a company?

A. That would be part of it, and that's part of all of the work we would do related to that type of alter ego analysis.

MS. KLIEBENSTEIN: Okay. No further questions.

FURTHER EXAMINATION
BY MR. FLEMING:

Q. You testified that you're not aware of who wrote the rules that are in Blaze at Federal;

**Page 212**

is that right?

A. That's correct.

Q. You know that FICO did not write those rules?

A. You know, I don't have an understanding as to who is responsible for writing the rules.

Q. Do you have any reason to believe that FICO is responsible for writing those rules?

A. I -- I don't know the answer to that question.

Q. Well, have you asked anybody within FICO whether they wrote the rules? That would be pretty easy to determine, wouldn't it?

A. I know that they provide input as it relates to the implementation of those rules, and that may also relate to input as to how to specifically write the rules to appropriately get the results that the client is seeking from its software.

Again, I don't have insight as to who specifically wrote all of the rules.

Q. Have you asked anybody at FICO as to whether they had any role in actually writing the rules?

**Page 213**

A. I don't recall if I asked that question. I know we've discussed this topic, and I've been informed just how I answered the last question, which is that there's input provided and that they do provide part of the work related to building the rules. But, again, I don't have insight into who has written what rules of all the rules that are provided or put into the system for Blaze Advisor for the defendants.

Q. But it would be -- you would agree it would be pretty easy to find out whether FICO has actually written any of the rules?

A. I think I answered that question by stating I -- I understand that they provide input. I don't know if they've specifically written an entire rule or if they're just providing input in building the rules appropriately so it works in the system.

Q. Okay. Have you reviewed the statements of work in this case, the implementation engagements as between FICO and Federal?

A. I think I looked at some of those. I'd have to check and see the Bates numbers and make sure they're on my documents considered list.

Q. Okay. And do those indicate in any

**Page 214**

way that FICO had any role in actually writing the rules that have been placed in Blaze at Federal?

A. I don't recall.

MR. FLEMING: All right. Okay. No further questions.

MS. KLIEBENSTEIN: All right.

THE VIDEOGRAPHER: This concludes the deposition of Neil Zoltowski. The time is now 2:53 p.m.

(Whereupon, the deposition of NEIL J. ZOLTOWSKI was concluded at 2:53 p.m.)