# Exhibit 2
## (Filed Under Seal)

In the Matter Of:

*FAIR ISAAC CORPORATION*

*vs*

*FEDERAL INSURANCE COMPANYT, ET AL.*

___

*TAMRA PAWLOSKI*

*January 18, 2019*

___

CONFIDENTIAL



CONFIDENTIAL
TAMRA PAWLOSKI - 01/18/2019

```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF MINNESOTA

 3   ----------------------------------------x

 4   FAIR ISAAC CORPORATION, a Delaware
     corporation,
 5                  Plaintiff,

 6                        Case No.  16-cv-1054

 7                  v.

 8   FEDERAL INSURANCE COMPANY, an
     Indiana corporation, and ACE
 9   AMERICAN INSURANCE COMPANY, a
     Pennsylvania corporation,
10                  Defendants.

11   ----------------------------------------x

12                  8:30 a.m.
                    January 18, 2019
13
                    767 Third Avenue
14                  New York, New York

15                  * CONFIDENTIAL *

16         DEPOSITION of TAMRA PAWLOSKI, a Plaintiff

17   in the above entitled matter, pursuant to Notice,

18   before Stephen J. Moore, a Registered Professional

19   Reporter, Certified Realtime Reporter and Notary

20   Public of the State of New York.

21

22   Job No. MP-204293
```

Page 2

```
 1  A P P E A R A N C E S :
 2
 3       MERCHANT & GOULD, P.C.
 4            Attorneys for Plaintiff
 5            3200 IDS Center
 6            80 South Eighth Street
 7            Minneapolis, Minnesota 55402-2215
 8
 9       BY:  HEATHER KLIEBENSTEIN, ESQ.
10
11       FREDRIKSON & BYRON, P.A.
12            Attorneys for Defendants
13            200 South Sixth Street
14            Minneapolis, Minnesota 55402-1425
15
16       BY:  TERRENCE J. FLEMING, ESQ.
17            tfleming@fredlaw.com
18
19  ALSO PRESENT:
20       JAMES WOODWARD, ESQ.
21            FICO
22
```

Page 3

```
 1  EXAMINATION BY                              PAGE
 2  MS. KLIEBENSTEIN                               7
 3  MR. FLEMING                                  233
 4  MS. KLIEBENSTEIN - Continued                 236
 5            E X H I B I T S
 6  237  E-mail with attachment           31    3
 7  238  E-mail dated June 26, 2013       40   11
 8  239  E-mail and attachment            44   15
 9  241  E-mail                           48   14
10  240  E-mail                           50    9
11  242  E-mail                           52    9
12  243  E-mail string from 2008          59   13
13  244  E-mail                           60   19
14  245  E-mail dated February 7, 2011,   74   12
15  246  E-mail                           78   10
16  247  E-mail string                    88    5
17  248  E-mail and attachment           100   13
18  249  Calendar notice and attachments 111   19
19  250  Email                           120    9
20  251  E-mail with attachment          124    6
21
22
```

Page 4

```
 1  252  E-mail with attachments STRAUSS  129   14
 2
 3  253  E-mail                           154   10
 4
 5  254  E-mail                           158    8
 6
 7  255  E-mail                           160   12
 8
 9  256  E-mail                           163   19
10
11  257  Letter from Mike Sawyer to       168   12
12       Tamra Pawlowski
13
14  258  E-mail                           174    8
15
16  259  Letter (attachment to Exhibit    174    8
17       258)
18
19  260  E-mail                           182    5
20
21  261  E-mail with attachments          185    5
22
```

Page 5

```
 1  262  E-mail with attachments          194    8
 2
 3  263  E-mail                           196    9
 4
 5  264  E-mail                           202    1
 6
 7  265  E-mail                           203    9
 8
 9  266  E-mail with attachment           205   16
10
11  267  E-mail                           208   13
12
13  268  E-mail                           215    7
14
15  269  E-mail                           220    9
16
17  270  E-mail                           222    5
18
19
20
21
22
```

CONFIDENTIAL
TAMRA PAWLOSKI - 01/18/2019                    Pages 6..9

Page 6

1    THE VIDEOGRAPHER:  This is the
2    start of media labeled number 1 of the
3    video recorded deposition of Tamra
4    Pawloski in the matter Fair Isaac
5    Corporation versus Federal Insurance
6    Company and ACE American Insurance
7    Company in the United States District
8    Court, District of Minnesota.
9         Today is January 18, 2019, the time
10   is 8:43 a.m., and we are located at 767
11   Third Avenue, New York, New York.
12        My name is Rodolfo Duran.  I am the
13   legal video specialist, the court reporter
14   is Stephen Moore, and we are both in
15   association with Epiq.
16        Will counsel please introduce
17   themselves.
18        MS. KLIEBENSTEIN:  Heather
19   Kliebenstein from Merchant & Gould on
20   behalf of the Plaintiff, and with me is
21   Jim Woodward of FICO.
22        MR. FLEMING:  Terry Fleming of

Page 7

1    the Frederikson & Byron firm
2    representing Defendants.
3         THE VIDEOGRAPHER:  Will the court
4    reporter please swear in the witness.
5
6    T A M R A    P A W L O S K I,    called as
7         a witness, having been first duly sworn by
8         the Notary Public, was examined and
9         testified as follows:
10
11   EXAMINATION BY
12   MS. KLIEBENSTEIN:
13
14   Q    Good morning, Ms. Pawloski.
15   A    Good morning.
16   Q    Have you ever been deposed
17   before?
18   A    Yes.
19   Q    How many times?
20   A    Just once.
21   Q    So, you've been through this
22   before.

Page 8

1    What I'll be doing is asking you
2    questions throughout the day and you'll be
3    answering.
4         If there is anything that you
5    don't understand, feel free to ask me to
6    clarify.
7         Your counsel may object from
8    time to time, and unless he instructs you not
9    to answer, you are to go ahead and answer.
10        The court reporter does best
11   when we don't talk over each other, when we
12   talk one at a time, and when we give verbal
13   answers instead of nonverbal cues, such as head
14   nods and the like.
15        Do you have any questions before
16   we start?
17   A    No.
18   Q    All right, here we go.
19        Ms. Pawloski, where do you work
20   today?
21   A    I work for AIG.
22   Q    What do you do for AIG?

Page 9

1    A    I am their IT asset manager.
2    Q    How long have you been the IT
3    asset manager of AIG?
4    A    Ten months.
5    Q    What are your job duties as the
6    IT manager at AIG?
7    A    So, I have global responsibility
8    for all IT, software and hardware assets.
9    Q    Global responsibility for what?
10   What about the hardware and IT assets?
11   A    Tracking and monitoring.
12   Q    Does that work involve dealing
13   with vendors?
14   A    Yes.
15   Q    In what way?
16   A    Understanding their
17   entitlements, working with them in case -- in
18   case of a compliance, doing negotiations with
19   them, et cetera.
20   Q    You used the word entitlement,
21   what did you mean by that?
22   A    So, in a contract there are

Page 86

1  Q    And that -- what was that
2  example, what was the name of that?
3  A    Metastorm, it was a workflow
4  tool.
5  Q    Was there any rule of thumb as
6  to when -- taking Europe, for example, was
7  there any general rule of thumb as to when the
8  European IT group would install a software --
9  install a piece of software on a European
10 software versus the U.S. server?
11      MR. FLEMING:  Objection,
12      foundation.
13 A    I'm sure there was, but I don't
14 know it, I was not made aware of what that
15 criteria would be.
16 Q    So you were just mentioning
17 Metastorm?
18 A    Metastorm.
19 Q    Metastorm, and you mentioned
20 when individuals outside the United States
21 would use it, it would be slow and clunky?
22 A    Yes.

Page 87

1  Q    Why was that?
2       MR. FLEMING:  Objection,
3       foundation.
4  A    So from a nontechnical response,
5  it's because you had -- it had to go across the
6  pond, so because it wasn't direct right there,
7  there was access bandwidth, what they called
8  bandwidth issues.
9  Q    And why was -- was Metastorm
10 only -- was Metastorm only installed in the
11 United States.
12      I'm sorry, that was a bad
13 question, was the Metastorm software tool only
14 installed on a United States server?
15      MR. FLEMING:  Objection,
16      foundation.
17 A    Initially, yes, and then we
18 expanded it.
19 Q    And you expanded it in what way?
20 A    I believe that they -- so they
21 went to the U.K. and actually because of the
22 fact that it was slow, we did put it in the

Page 88

1  U.K.
2       MS. KLIEBENSTEIN:  I am handing
3       you what's been marked as Exhibit 247.
4       (The above described document was
5       marked Exhibit 247 for identification as
6       of this date.)
7  Q    Are you familiar with this
8  e-mail string?
9  A    Yes.
10 Q    In the bottom Peter Davis on
11 September 28, 2012 wrote to you, "EZ are
12 looking at possibly using FICO Blaze Advisor
13 for a project next year and are questioning the
14 license we have.
15      "I know we are unlimited
16 enterprise use, but wanted to check with you
17 that there are no geographic restrictions.  Is
18 our Blaze enterprise license for global use?"
19 Q    Do you recall answering Peter's
20 question?
21 A    I did not, I delegated it.
22 Q    And you delegate it to whom?

Page 89

1  A    Bob Schmidt.
2  Q    Who is that?
3  A    He was one of my team members
4  who is now responsible for software.
5  Q    Do you know if Bob Schmidt
6  responded to his question?
7  A    I would hope he did.  I would
8  hope he did, I don't know.
9  Q    And I note that in Pete's e-mail
10 he says that we are unlimited enterprise use.
11      What did that phrase mean to
12 you?
13 A    That we had unlimited rights,
14 enterprise rights.
15 Q    And do you know where Peter
16 would have gotten the information that the
17 Blaze Advisor software license was for
18 unlimited enterprise use?
19 A    I'm going to assume that it was
20 based upon feedback that he had received from
21 either myself or the contract itself.
22      MR. FLEMING:  Tamra, she's asking

Page 90

1  what you know, not your assumptions, not
2  your guessing.
3         THE WITNESS:  Okay.
4     A   Then I don't know.
5     Q   Let's pull out 241 and 242.  We
6  will finish up this line.
7         241 an e-mail from -- e-mail
8  chain in June of 2008, correct?
9     A   Yes.
10    Q   And in it you stated that the
11 current license to Blaze advisors is not
12 worldwide, correct?
13    A   I did.
14    Q   And you also stated that the
15 limitations were five seats used solely in
16 conjunction with the named application,
17 correct?
18        MR. FLEMING:  This has been asked
19        and answered.  I object on that basis.
20    A   Yes.
21    Q   Am I understanding you correct
22 that after you sent this e-mail, Mark

Page 91

1  Bartholemew --
2     A   Berthume.
3     Q   -- Berthume, reached out to
4  you?
5     A   Yes.
6         MR. FLEMING:  Objection, asked
7         and answered.  You've asked these
8         identical questions.
9     Q   And can you tell me when that
10 phone call occurred?
11    A   I can't tell you exactly when.
12    Q   Was it months after this e-mail,
13 years?
14    A   Days, days.
15    Q   What did Mark say to you?
16        MR. FLEMING:  Objection, that's
17        been asked and answered.
18    A   Mark stated that we had an
19 amendment and then sent me the amendment.
20    Q   And is that amendment an
21 attachment to Exhibit 242?
22    A   It is.

Page 92

1     Q   And that was the amendment that
2  was e-mailed to you?
3     A   Correct.
4     Q   Did you review the amendment at
5  that time?
6     A   I did.
7     Q   After reviewing that amendment,
8  did your opinion on the scope of the license
9  change?
10    A   Yes.
11    Q   In what way?
12    A   In reading this summary alone it
13 states that from Jim Black, who actually did
14 the negotiation of the contract, that it was a
15 minimum two upgrades CSI divisional license to
16 a worldwide enterprise license, and then if you
17 go through to the actual amendment itself, it
18 actually states under scope and quantity, on
19 page 1 of 3 of amendment number 2, the
20 enterprise-wide.
21    Q   Can you point me to where you
22 were looking at?

Page 93

1     A   Right here.
2     Q   Looking in the table?
3     A   Yes, in the table.
4     Q   Under where it says, "scope,
5  quantity?"
6     A   Yes, section 1.
7     Q   And so enterprise-wide, to you
8  meant that Blaze Advisor could be used globally
9  by anyone, correct?
10        MR. FLEMING:  Objection, same
11        question has been asked and answered.
12    A   Yes.
13    Q   The word anyone, who would that
14 include?
15    A   The corporation, so the use
16 within the corporation.
17    Q   The corporation being whom?
18    A   All of the employees.
19    Q   All of the employees of whom?
20    A   Chubb & Son, a division of
21 Federal.
22    Q   All of the employees of Chubb &

Page 94

1  Son, a division of Federal?
2      A    Wasn't there a -- is this the
3  full amendment number 2?
4           Because it's one of an -- I see
5  3 of 3, I don't have 2 of 3 in my copy.
6           MR. FLEMING:  I think the pages
7      are mispaginated.
8           THE WITNESS:  Are they?
9      Q    They are there, it starts with
10 2, 1 and 3.
11     A    Oh, okay.
12     A    And then it also says the
13 affiliates, right, "Affiliates shall mean any
14 entity directly or indirectly controlled by
15 client, control means the ownership of more
16 than 50 percent."
17          That's traditionally in all of
18 our contracts, so that's why I couldn't find it
19 before.
20     Q    And the client was Chubb & Son,
21 a division of Federal, correct?
22     A    Yes.

Page 95

1      Q    Who were the affiliates of Chubb
2  & Son?
3      A    All of the other entities that
4  sat underneath Chubb & Son, a division of
5  Federal, I'm not exactly sure what all -- who
6  all of them were.
7      Q    A corporate org chart would tell
8  us who the affiliates of Chubb & Sons were?
9      A    I believe so; yes.
10     Q    Now, at this time when you
11 reviewed this second amendment after the call
12 with Mark, did you also go look at the original
13 license in conjunction with the amendment?
14     A    No.
15     Q    And why not?
16     A    Because Mark was pretty clear
17 that there was an enterprise-wide contract.
18     Q    What was Mark's position again?
19     A    He was CIO of our Chubb
20 specialty insurance.
21     Q    Did Mark tell you where he had
22 gotten the information that the Blaze Advisor

Page 96

1  license was enterprise-wide with no
2  restrictions?
3      A    He negotiated the deal.
4      Q    So his information didn't come
5  from Chubb's legal department?
6      A    No.
7      Q    When you were talking with Mark,
8  was your conversation limited to the topic of
9  use of the software?
10     A    It was around the negotiations.
11     Q    Did you discuss at all the
12 issue -- well, let me phrase it again a
13 different way.
14          Your conversation with Mark was
15 about the use of the software, not the physical
16 location of the software, correct?
17     A    Correct.
18     Q    And did you talk with Mark at
19 all in that phone conversation about any
20 restrictions about the physical location of
21 the --
22          MS. KLIEBENSTEIN:  I apologize,

Page 97

1      scratch that.
2      Q    In your conversation with Mark,
3  did you talk at all about the installation and
4  physical location of Blaze Advisor as opposed
5  to the use?
6      A    No, it was just -- it was an
7  enterprise-wide license.
8      Q    Did you have any role in the
9  process of merging ACE and Chubb?
10          MR. FLEMING:  You are talking
11     about negotiating that transaction?
12     A    Yeah, I'm sorry, I don't know
13 what you're asking.
14     Q    Well, I can skip to the more --
15 what I'm looking for is just a general
16 understanding of your role in the process of
17 merging ACE and Chubb.
18          That can be negotiation of a
19 part, something else, you tell me?
20          MR. FLEMING:  You are beginning a
21     few topic, after these questions can we
22     take a five minute break?

Page 138

1  North America -- North American contract.
2           I don't know the difference
3  between what or his intent of this, because
4  there was really their priority list on what
5  they were going to do.
6      Q    So, the column enterprise/region
7  you believe could refer to where the vendor
8  contract was executed?
9           Is that, am I understanding that
10 correctly?
11     A    No, it would be who the
12 individual was who was going to be working it.
13          Was it the global person, was it
14 the North America person, was it the European
15 person or was it the Asia Pac contracts
16 manager.
17     Q    So you had contract managers
18 with each region and a global contracts
19 manager?
20     A    That was Dennis, yes.
21     Q    All right, I think -- actually
22 one more question on this.

Page 139

1           Keep on the second tab and go to
2  the page that mentions Fair Isaac.  I will see
3  if I can find it, too.
4           Let me know when you are there.
5      A    I am here.
6           MR. FLEMING:  Under tab 2?
7           MS. KLIEBENSTEIN:  That's
8      correct.
9      Q    It starts, the mention of Fair
10 Isaac starts four rows down, correct?
11     A    Yes.
12     Q    And in the column under type of
13 document it says MSA.  Do you see that?
14     A    Yes.
15     Q    What does MSA refer to, if you
16 know?
17     A    Master services agreement, and
18 master software agreement, they use that
19 interchangeably.
20     Q    Why is the license not listed
21 there instead?
22          MR. FLEMING:  Objection,

Page 140

1  foundation.
2      A    I'm sorry, where do you mean why
3  it's not listed?
4      Q    In row 4, under the column type
5  of document, it says MSA, it doesn't say
6  license agreement.
7      A    I think I'm looking at the wrong
8  tab.  I'm looking at -- I'm in -- hold on.  I'm
9  in the wrong section, I'm in tab 1.  I'm sorry.
10          MR. FLEMING:  My objection is
11     lack of foundation.
12     A    Okay, I found it.
13          No, I didn't.  This is tab 1,
14 right?  Am I missing something?
15     Q    I will hand you this one, if you
16 want to just look at this one.
17     A    I have to look at tab 2, okay.
18     Q    So --
19     A    Oh, this is the one I did have
20 out, right?
21          So tab 2, North American
22 consolidation, okay.  So if you go down to the

Page 141

1  top line, correct, but if you go down four from
2  that, right, in that same column it says Blaze
3  Advisor software MSA.
4           So, I'm sorry, that's why it
5  confused me.
6      Q    And my question was MSA refers
7  to the master services agreement, correct?
8      A    I said master services or master
9  software agreement, both.
10     Q    So the master software agreement
11 could be the license agreement?
12     A    It could be, absolutely.  In the
13 system it just said, you only had one
14 allocation for it.
15          MS. KLIEBENSTEIN:  I think that
16     we can break for lunch.
17          THE VIDEOGRAPHER:  The time is
18     12:12 p.m.  We are going off the record.
19          (At this point in the proceedings
20     there was a luncheon recess, after which
21     the deposition continued as follows:)
22          THE VIDEOGRAPHER:  This is the

CONFIDENTIAL
TAMRA PAWLOSKI - 01/18/2019          Pages 142..145

Page 142
1  start of media labeled number 4.  The
2  time is now 1:06 p.m. and we are back on
3  the record.
4
5  CONTINUED EXAMINATION BY
6  MS. KLIEBENSTEIN:
7
8      Q    Good afternoon, Ms. Pawloski.
9           I presume you are familiar with
10 the lawsuit that we are here over today,
11 correct?
12     A    I am.
13     Q    And it's my understanding that
14 the parties tried to negotiate to work out
15 their disagreements starting in the beginning
16 of 2016.
17          Does that sound about right to
18 you?
19     A    That's right.
20     Q    What was your role in those
21 discussions?
22     A    I had the initial discussions

Page 143
1  with the sales team from FICO, as well as
2  follow-up role with my senior leadership
3  throughout the discussions in what I'll call
4  negotiations.
5      Q    And going back to that, I'm
6  sorry, when did those discussions that you were
7  having with FICO start?
8      A    I want to say March of 2016, but
9  I can't remember the exact -- it was the
10 beginning of 2016.
11     Q    And what was your understanding
12 of the problem at a basic level?
13     A    At first I wasn't quite sure,
14 but then --
15          MR. FLEMING:  I'm going to object
16     to the extent that your answer requires
17     you to discuss any attorney-client
18     communications, and to that extent you
19     should not respond.
20     A    So my recollection was that FICO
21 was looking to increase our usage, so we had
22 two things going on.

Page 144
1           One is we had a request for
2  additional product, and the other request was
3  that we were not within our license rights from
4  FICO.
5      Q    And with respect to the issue
6  that Chubb was not within its license rights,
7  are you referring to the license granted in
8  Exhibit 240 and its addendums?
9      A    Correct.
10     Q    Did you have any discussion
11 about the scope of that license with anyone
12 from FICO?
13     A    Yes.
14          MR. FLEMING:  Okay, go ahead.
15     Q    In those discussions with FICO,
16 did you ever say -- did you ever provide them
17 your position on whether or not Chubb was
18 within its license rights?
19     A    I don't recall giving a
20 position.
21          I know we talked about what the
22 contract stated, and even had the agreement

Page 145
1  out.
2      Q    The issue with respect to the
3  license rights, again thinking about your
4  conversations with FICO, the issue was the
5  problem was triggered by the merger between ACE
6  and Chubb, isn't that right?
7      A    That's right.
8      Q    What was your understanding of
9  FICO's position about compliance with license
10 rights after the merger?
11          MR. FLEMING:  Just to be clear,
12     you're asking based on what she heard
13     from FICO?
14          MS. KLIEBENSTEIN:  Exactly.
15     A    So, what my understanding from
16 FICO was, that because of the merger, ACE now
17 could use the license and so therefore we
18 should pay for that.
19     Q    Would you pull up Exhibit 240.
20          Is this the contract that you
21 walked through with the FICO people?
22     A    And 241, or 242, I'm sorry.

CONFIDENTIAL
TAMRA PAWLOSKI - 01/18/2019                Pages 146..149

Page 146
1   Q     Did you talk with the FICO
2   people during one conversation or many
3   conversations about the contract terms?
4   A     It was a few, it was a couple,
5   actually, yeah.
6   Q     Let's turn to section 10.8 of
7   Exhibit 240.
8         Was this one of the sections
9   that you discussed with the FICO people?
10  A     This was one of the sections
11  that the FICO people did look at and asked us
12  to review, yes.
13  Q     Did you understand the FICO
14  position to be that because a merger had
15  happened, there was a change of control at the
16  "client"?
17  A     That was their position.
18  Q     And what was your response to
19  that position in those FICO meetings?
20  A     At that point we were discussing
21  utilization.  We didn't -- I didn't touch that,
22  that's a legal term, so I was more on the

Page 147
1   business side for the business requirements.
2         I didn't touch the assignment,
3   control, any of that.  So we were talking about
4   the use of the license from a compliance
5   perspective.
6   Q     So your position is that you
7   personally did not have any conversations with
8   FICO personnel about whether a change of
9   control happened with the "client?"
10  A     Not -- no, not with the -- the
11  only time that we had those discussions was
12  with legal.
13  Q     Was that internal at the new
14  Chubb entity with your lawyers?
15  A     Once, with the lawyers, that was
16  correct.
17  Q     Do you know one way or the other
18  if the GSS group reviewed section 10.8 in their
19  work reviewing contracts during due diligence?
20  A     Yes.
21  Q     Yes, they did review 10.8?
22  A     They knew it was -- it was in

Page 148
1   there, so this went to legal.
2   Q     Do you have any -- do you know
3   of any documents that would show the GSS group
4   read Exhibit 240, and in particular, section
5   10.8?
6   A     Not that I can recall.
7   Q     Would there be any mention of
8   this agreement on a spreadsheet that GSS
9   maintained?
10  A     Yes, there were several mentions
11  of it, even on some of the spreadsheets that we
12  looked at, right?
13        MR. FLEMING:  You are referencing
14     the spreadsheets you looked at today?
15        THE WITNESS:  Today, yes.
16  Q     Could you identify one of those
17  for me?
18  A     Sure.  So, 248 had --
19  Q     248 had what?
20  A     Had FICO's name in it.
21  Q     Correct, but does 248 show that
22  the GSS group read section 10.8 of Exhibit 240?

Page 149
1   A     No.  What I stated was that we
2   said it was included in the contract, not that
3   we read it, or that, just that it was there and
4   that it was handed over and that's on this list
5   here, that we provided to our general counsel,
6   Maureen.
7   Q     The list in Exhibit 248 is a
8   list --
9         MS. KLIEBENSTEIN:  Strike that.
10  Q     My understanding of Exhibit 248
11  is that its attachment is a list of vendors who
12  had contracts in the Novatus system, correct?
13  A     Yes.
14  Q     But then the GSS group went back
15  and reviewed those contracts to determine which
16  did and did not have change of control --
17  A     Yes.
18  Q     -- termination provisions,
19  correct?
20  A     Correct.
21  Q     How do I know that GSS read this
22  specific agreement?

Page 174
1   Q    So you did have conversations
2   about the pricing methodology used by FICO,
3   just after this March 2nd letter?
4   A    Correct.
5   Q    I am handing you what I have
6   marked Exhibits 258 and 259.
7        (The above described documents were
8         marked Exhibits 258 and 259 for
9         identification as of this date.)
10  Q    Are you familiar with these
11  documents?
12  A    Yes.
13  Q    So 259 is a second copy of page
14  2 of 258, because you can't really read.
15       You only got one page of 258?
16  A    Yes.
17       MS. KLIEBENSTEIN:  Then together
18  we have a complete document.
19  Q    Looking at 258 and 259, is
20  Exhibit 259 the letter that was e-mailed to you
21  from Mike Sawyer on March 6, 2016?
22  A    Yes, it was.

Page 175
1   Q    And this is four days after the
2   date of the letter we looked at in 257, is that
3   correct?
4   A    That's correct.
5   Q    So between March 2nd and March
6   6th, did you have any conversations with FICO
7   personnel about the business negotiations?
8   A    Yes.
9   Q    And what were those
10  conversations?
11  A    Actually at this point it got
12  escalated to my leadership.
13       So Bill Harlam and myself had a
14  discussion with Bill Waid on the numbers to
15  help us understand why, we were very confused
16  as why they came in so high, so we had a phone
17  call with Bill.
18  Q    What did Bill tell you, what do
19  you recall?
20  A    That he was going to come back
21  and give us an explanation for how they came to
22  the numbers.

Page 176
1        He did not provide that on the
2   phone.
3   Q    Do you recall anything else that
4   was discussed in that phone call?
5   A    No, I was not lead on the call.
6   Q    You mentioned the name Bill
7   Harlan?
8   A    Harlam.
9   Q    Who was he?
10  A    He was my new boss.
11  Q    And your old boss was?
12  A    Bill Stickle.
13  Q    Bill Stickle.  Did Bill Harlam
14  come from legacy ACE?
15  A    Yes, he did.
16  Q    What was Bill Harlem's role at
17  Chubb LTD?
18  A    He was the head of vendor
19  management.
20  Q    So, did the vendor management,
21  after the merger did the vendor management
22  functions of ACE and Chubb merge together as a

Page 177
1   group?
2   A    Yes.
3   Q    And some people stayed and some
4   people went?
5   A    That's correct.
6   Q    So looking at the letter that is
7   Exhibit 259, walk me through your understanding
8   of the pricing options and the license options
9   provided by FICO to you.
10  A    So the intent of this letter was
11  to show us from legacy Chubb pricing to the new
12  Chubb LTD pricing.
13       And this was the first time for
14  myself that I knew it was based upon revenue.
15  I was not aware of that prior to this.
16       So this is just -- this letter
17  now outlines what the legacy Chubb revenue was
18  in 2006 -- yeah, 2006.
19       And then what the 2016 combined
20  company revenues were, and then how Blaze
21  was -- how the equation, how FICO priced their
22  product.

CONFIDENTIAL
TAMRA PAWLOSKI - 01/18/2019                Pages 178..181

Page 178
1   Q   And you understood at this time
2   that the pricing you were seeing was based on
3   the estimated U.S. revenue of the new company,
4   correct?
5   A   Correct.
6   Q   Not that you agreed with the
7   pricing, just that that's what the new U.S.
8   revenue was the basis for the pricing from
9   FICO's perspective?
10  A   Correct.
11  Q   And Chubb rejected this offer,
12  correct?
13  A   Yes.
14  Q   And why was that?
15      MR. FLEMING:  I'm going to object
16      to the extent it requires disclosure of
17      its attorney-client communications.
18      On the basis of privilege you
19      should not disclose those.
20  A   Can you ask your question again?
21  Q   Sure.
22      Why did Chubb reject this offer?

Page 179
1   A   Because once again, senior
2   leadership felt that this was -- this license
3   fee was still extremely high in comparison to
4   the investment already made with FICO.
5   Q   Did you believe that -- well,
6   Chubb's position in these business
7   negotiations, it was not that -- Chubb didn't
8   think it needed to pay a new license fee at
9   all, did it?
10      MR. FLEMING:  I object to the
11      extent it calls for attorney-client
12      communications, which you should not
13      disclose on the basis of privilege.
14  A   No, we didn't.  We had a hard
15  time with that.
16  Q   So the issue wasn't -- the
17  problem from the business perspective from
18  Chubb's point of view wasn't that FICO's
19  pricing model was flawed, rather that Chubb
20  already had a license and shouldn't be forced
21  to pay more, correct?
22      MR. FLEMING:  I object, misstates

Page 180
1   her prior testimony, and it's multiple
2   questions.
3   A   Can you repeat that again?
4   Q   Sure, I will try.
5       Chubb rejected this offer in
6   Exhibit 259, correct?
7   A   Yes.
8   Q   And the reason Chubb rejected
9   this offer is -- well, I will ask it a
10  different way.
11      Was the reason Chubb rejected
12  this offer because FICO bases its licensing
13  figures on company revenue?
14  A   No.
15  Q   So the problem with this offer
16  wasn't -- wasn't FICO's pricing models, it was
17  instead the history between the parties and
18  because Chubb thought it had already had a
19  license, right?
20      MR. FLEMING:  Objection, multiple
21      questions and misstates her prior
22      testimony.

Page 181
1   A   No, there was -- we still had an
2   issue with this pricing model.
3   Q   Chubb had a problem with the
4   ultimate price, not necessarily the model,
5   correct?
6       MR. FLEMING:  Objection, that's
7       been asked and answered.
8   A   No, we had a problem with the
9   model as well.
10  Q   Can you tell me what the problem
11  with the model was?
12      MR. FLEMING:  I object to the
13      extent it calls for attorney-client
14      privileged communications.
15  A   If you take a look at the global
16  revenue, it's $14 billion at an estimate of $11
17  billion for $2.4 million.
18      In 2016 it was 20, but yet we
19  were asked to pay double if not triple what we
20  were paying from when we originally purchased.
21      So, the calculation of how they
22  came to 20, that was not disclosed, just that

Page 202
1  marked Exhibit 264 for identification, as
2  of this date.)
3     Q     Do you recognize this e-mail?
4     A     Yes.
5     Q     This e-mail mentions that you
6  need to be at a meeting with MarketStance,
7  "who, like FICO is claiming because we are
8  bigger we need to pay them more."
9           Do you recall, is that true?
10    A     No, in the end we actually -- it
11 was my interpretation of what they were asking
12 for, but it was not the correct interpretation.
13    Q     What was MarketStance asking you
14 for?
15    A     We were expanding our platform
16 for what we do with MarketStance from a
17 marketing perspective, and so we were actually
18 making the request.
19    Q     Was it your understanding that
20 the dispute with FICO in 2016 from Chubb's
21 point of view was that FICO was saying that
22 because Chubb was bigger, Chubb needed to pay

Page 203
1  FICO more?
2     A     That was my interpretation.
3     Q     Did Bill respond to this e-mail?
4     A     Yes, he just said yes, you can
5  dial in.
6     Q     I am handing you what has been
7  marked as Exhibit 265.
8           (The above described document was
9           marked Exhibit 265 for identification as
10          of this date.)
11    Q     Do you recall receiving this
12 e-mail?
13    A     Yes.
14    Q     The top of the e-mail, it
15 mentions the discussion that was to occur the
16 morning after this e-mail on the 23rd of March,
17 2016.
18          Did you have that discussion
19 with FICO?
20    A     Yes.
21    Q     Do you recall what was discussed
22 in that March 23 meeting?

Page 204
1     A     I don't recall exactly what was
2  discussed, I just know it was a very short
3  meeting.
4     Q     Why does that stand out in your
5  mind, that it was a short meeting?
6     A     Because Bill Harlam
7  traditionally didn't have short meetings.
8     Q     And so why was this meeting
9  short?
10    A     Because it was very succinct,
11 the conversation, and to the point, and so
12 there was not a lot to be discussed.
13    Q     I see in the third paragraph of
14 that Bill Waid had secured from FICO's CEO a 60
15 percent discount on the Global Enterprise Blaze
16 Advisor plus Global Enterprise Model
17 Translator.
18          Do I understand that that
19 discount wasn't high enough, wasn't what Chubb
20 was looking for?
21    A     At that particular time Chubb
22 was not entertaining moving forward with the

Page 205
1  Global Enterprise Model Translator.
2     Q     And why was that, if you recall?
3           MR. FLEMING:  I object to the
4           extent it calls for attorney-client
5           communications on privilege grounds.
6     A     Because of the letters, because
7  of the -- of where we were in negotiations, we
8  weren't going to be expanding use of any FICO
9  products.
10    Q     So it was because of the
11 dispute, not the underlying technology?
12    A     Correct.
13    Q     I am handing you what has been
14 marked as Exhibit 266.
15          (The above described document was
16          marked Exhibit 266 for identification, as
17          of this date.)
18    Q     Are you familiar with this
19 e-mail and its attachment?
20    A     I am.
21    Q     Can you tell me what it is?
22    A     This is Mike coming back to us

CONFIDENTIAL
TAMRA PAWLOSKI - 01/18/2019          Pages 206..209

Page 206

1  and saying based upon the note below from Bill,
2  this is the best and final offer that FICO will
3  put on the table and entertain.
4       Q    And this offer was rejected,
5  correct?
6       A    Yes.
7       Q    And why was that?
8            MR. FLEMING:  Objection to the
9       extent it calls for attorney-client
10      privileged communications.
11      A    Because once again, it was not
12 what Chubb expected to pay for the license; it
13 was too high.
14      Q    And it was too high based on the
15 history between the parties, is that correct?
16      A    That is correct.
17      Q    So if you were looking at these
18 prices, pretend there had been no relationship
19 between the parties, ever, and this was the
20 very first negotiation, you wouldn't have had
21 the same reaction, correct?
22           MR. FLEMING:  Objection,

Page 207

1       hypothetical, calls for speculation,
2       incomplete foundation.
3       Q    No answer?  You can answer.
4       A    Based upon other -- my history,
5  and what I've been doing with software
6  licensing, and with what we have paid for other
7  tools, I would still have a problem with that
8  number.
9       Q    Meaning you thought it was too
10 high?
11      A    Yes.
12      Q    But in this negotiation you
13 thought it was too high because -- because of
14 the history between the parties?
15           MR. FLEMING:  Objection,
16      misstates your prior testimony.
17      A    Because it -- yes, because it
18 does -- there is history there.
19      Q    And Chubb's counter to the offer
20 in Exhibit 266 is in Exhibit 263, the March
21 25th, 2016 e-mail, correct?
22      A    No, there were other discussions

Page 208

1  that happened afterwards, but I wasn't privy to
2  them -- I wasn't on the call.
3            I was privy to them, but I was
4  not on the calls.
5       Q    You mentioned you were privy to
6  them.  What do you recall hearing about those
7  discussions?
8       A    That it was between the CIO and
9  somebody at FICO.
10      Q    Handing you what has been
11 marked as Exhibit 2667.
12           (The above described document was
13      marked Exhibit 267 for identification as
14      of this date.)
15      Q    Do you recall receiving this
16 e-mail?
17      A    Yes.
18      Q    And did you review the
19 attachment to the e-mail?
20      A    Yes.
21      Q    Can you explain to me what the
22 purpose of this e-mail and its attachment were?

Page 209

1       A    So, stated prior, this was the
2  document by which there was the ACE
3  applications and the Chubb applications.
4            And then what was targeted for
5  what was called rationalization at the time,
6  but what was our end result going to look like.
7       Q    Meaning what was going to be
8  combined at the end of the day with the new
9  company?
10      A    What we were going to continue
11 to use; not necessarily the combined, but what
12 we were going to utilize.
13      Q    Then I see under the rating
14 rules row, it mentions FICO Blaze Advisor under
15 the Chubb column.
16           Do you see that as well?
17      A    I do.
18      Q    And then what does the
19 information in the target column reflect?
20      A    That means that we hadn't made a
21 decision, it was TBD.  We were either going to
22 be ODM or FICO.

Page 234

1  believe.
2          I don't recall who the -- one of
3  the salesmen.
4     Q    Is it Russ Schreiber?
5     A    Yes.
6     Q    Did you have any discussions
7  with Russ Schreiber as to whether use of Blaze
8  by Chubb in the United Kingdom was permissible
9  under the agreement?
10    A    No, because I wouldn't have
11 thought they would send consultants there if it
12 was not permissible.
13    Q    So if you just walk through the
14 process of why there was a statement of work
15 and how that was proposed, just the timeline.
16    A    So, what will happen is we will
17 get a request from the business asking us if --
18 to put together the SOW.
19         I would contact FICO to arrange
20 that, and it is practice at Chubb that the
21 business also contacts FICO to go over what
22 their requirements are so the two of them can

Page 235

1  agree.
2          I'm on some of those calls and
3  not on some of those calls.
4          Then what we do is we take what
5  has been agreed and put it into a statement of
6  work and ensure that statement of work is
7  correct, including what's going to be delivered
8  and the deliverables, and from there it gets
9  signed.
10    Q    And then what happens next?
11    A    Then the SOW goes to the
12 business partner for them to work on, so they
13 contact FICO and the consultants go to wherever
14 they need to go.
15    Q    And did you understand that two
16 FICO representatives went to London?
17    A    Yes, that was outlined in the
18 SOW.
19    Q    And what was your understanding
20 of what did they do in London?
21    A    They were the architects that
22 helped with the assessment, and then also we

Page 236

1  wanted to make sure that we were putting FICO
2  in correctly, so, the assessment and
3  installation.
4     Q    And what was your understanding
5  as to what they installed?
6     A    It was clear that was -- it was
7  the Blaze Advisor product.
8     Q    Where was it installed?
9     A    In the U.K. data center on, I
10 believe our mainframe in the U.K.
11    Q    At any point during that process
12 did anybody from FICO suggest that the use or
13 installation of Blaze in the United Kingdom was
14 outside the scope of the sales force license
15 agreement?
16    A    No.
17         MR. FLEMING:  Okay, I have no
18    further questions.
19
20 CONTINUED EXAMINATION BY
21 MS. KLIEBENSTEIN:
22

Page 237

1     Q    So the event you were just
2  talking about, when did this occur?
3     A    2011, yes, 2011 or 2012; I
4  believe it was 2011.
5     Q    Were you in the United
6  Kingdom --
7     A    No.
8     Q    -- when the work was being done?
9     A    No.
10    Q    So when you are talking about
11 the installation and the assessment, you
12 weren't personally there?
13    A    No, that was managed by the
14 business.
15    Q    And how did you come across that
16 knowledge?
17    A    In the statement of work that
18 was signed off by two -- by both companies as
19 to what was going to be delivered, and then
20 before payment, I validated that it happened.
21    Q    So these were tasks that were
22 outlined in the statement of work?

CONFIDENTIAL
TAMRA PAWLOSKI - 01/18/2019                Pages 238..241

Page 238
```
 1      A      Correct.
 2      Q      A written statement of work?
 3      A      Yes.
 4      Q      Do you know if that statement of
 5   work has been produced in this lawsuit?
 6      A      I don't know.
 7             I know it wasn't one of the ones
 8   that you have shown me.
 9      Q      Did anyone from Chubb & Sons
10   check with legal to make sure that what was
11   going to happen -- well, was the SOW Chubb &
12   Sons' standard SOW?
13      A      It was.
14      Q      So it wouldn't have gone to
15   Chubb & Sons' legal?
16      A      That's correct.
17      Q      Do you know whether it went
18   through FICO's legal department?
19      A      I do not know.
20      Q      Do you know if Mr. Schreiber
21   checked with FICO legal?
22      A      I do not, no.
```

Page 239
```
 1      Q      You mentioned briefly you don't
 2   recall any discussions with respect to this
 3   statement of work as to whether it was okay
 4   under the agreement, correct?
 5      A      Yeah, I don't recall.
 6      Q      But there weren't -- you don't
 7   recall discussions one way or the other,
 8   whether this was or was not okay?
 9      A      That's correct, I don't recall.
10      Q      And so what was your role with
11   respect to this statement of work?
12      A      I helped to draft it on to the
13   template and work it through the process that
14   we have outlined, that I have outlined a couple
15   of times already.
16             So, getting it through to
17   signature, making sure everybody was agreed
18   with what the business terms were in the SOW,
19   agree with the pricing, and got a final
20   signature approval for it.
21      Q      And what application -- what
22   software application did the statement of work
```

Page 240
```
 1   involve?
 2      A      This one was a CPI print
 3   application.
 4      Q      That's the name for it?
 5      A      Yes, I believe that was -- I
 6   knew it had to do something with print.
 7      Q      Do you know one way or the other
 8   whether Blaze Advisor was installed on servers
 9   in the United Kingdom pursuant to this
10   statement of work?
11      A      Yes.
12             Yes, it was installed, because
13   they gave me validation when we were paying the
14   invoice.
15      Q      What was that validation?
16      A      That the deliverables outlined
17   in that SOW were completed.
18      Q      Who gave that you validation?
19      A      The project manager.
20      Q      And who is the project manager?
21      A      I don't remember.
22             MS. KLIEBENSTEIN:  All right, I
```

Page 241
```
 1   don't have any further questions.
 2             MR. FLEMING:  Nothing further.
 3   We will read and sign.
 4             THE VIDEOGRAPHER:  The time is
 5   3:58 p.m. and we are going off the
 6   record.
```