# Exhibit 9
## (Filed Under Seal)

Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS Doc. 503-6 Filed 08/26/19 Page 2 of 6

```
 1                UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
 2
     - - - - - - - - - - - - - - - - - - - - - - - - - -
 3
     FAIR ISAAC CORPORATION,
 4
                       Plaintiff,
 5
          v.            Court File No. 16-cv-1054 (WMW/DTS)
 6
     FEDERAL INSURANCE COMPANY,
 7   an Indiana corporation, and ACE
     AMERICAN INSURANCE COMPANY,
 8   a Pennsylvania corporation,

 9                     Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - -

11                       VIDEO DEPOSITION

12          The following is the video deposition of

13   JANDEEN BOONE, taken before Jean F. Soule, Notary

14   Public, Registered Professional Reporter, pursuant

15   to Notice of Taking Deposition, at the law office

16   of Merchant & Gould, 3200 IDS Center, 80 South

17   Eighth Street, Conference Room 32H, Minneapolis,

18   Minnesota, commencing at 9:05 a.m., Wednesday,

19   February 6, 2019.

20
                            *    *    *
21

22

23              C O N F I D E N T I A L

24                 ATTORNEYS' EYES ONLY

25
```

Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
CASE 0:16-cv-01054-DTS Doc. 503-6 Filed 08/26/19 Page 3 of 6
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1   APPEARANCES:

 2


 3
         On Behalf of the Plaintiff:
 4
             Heather Kliebenstein, Esquire
 5           MERCHANT & GOULD, P.C.
             3200 IDS Center
 6           80 South Eighth Street
             Minneapolis, Minnesota 55402-2215
 7           Phone:  (612) 332-5300
             e-mail:  hkliebenstein@merchantgould.com
 8


 9       On Behalf of the Defendants:

10           Leah C. Janus, Esquire
             FREDRIKSON & BYRON, P.A.
11           200 South Sixth Street
             Suite 4000
12           Minneapolis, Minneosta 55402-1425
             Phone:  (612) 492-7000
13           e-mail:  ljanus@fredlaw.com


14


15       Also Present:  James Woodward, Esquire
                        Vice President, Legal
16                      Fair Isaac Corporation


17


18       The Videographer:  Mr. Scott Breckheimer


19


20


21


22


23


24


25
```

Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 503-6 Filed 08/26/19 Page 4 of 6

PROCEEDINGS

Whereupon, the video deposition of JANDEEN BOONE was commenced at 9:05 a.m. as follows:

* * *

THE VIDEOGRAPHER: This is the videographer speaking, Scott Breckheimer with Depo International. Today is February 6th in the year 2018 [sic]. The time is 9:05 a.m. We are at 80 South Eighth Street, Suite 3200, Minneapolis, Minnesota 55402, to take the video deposition of Jandeen Boone in the matter of, excuse me, Fair Isaac Corporation versus Federal Insurance Company, et al.

Will counsel please introduce themselves for the record?

MS. KLIEBENSTEIN: Heather Kliebenstein and Jim Woodward on behalf of the Plaintiffs.

MS. JANUS: Leah Janus on behalf of the Defendants.

THE VIDEOGRAPHER: Will the court reporter please administer the oath?

* * *

(Reporter's Note: The oath was administered by the court reporter.)

MS. BOONE: I do.

Page 3

THE VIDEOGRAPHER: You may begin.

MS. JANUS: Thank you.

* * *

JANDEEN BOONE,
after having been first duly sworn,
deposes and says under oath as follows:

***

EXAMINATION
BY MS. JANUS:

Q. Good morning.
A. Good morning.
Q. Please state your name.
A. Jandeen Boone.
Q. What is your address?
A. 409 Reflection Road, Apple Valley, Minnesota 55124.
Q. Thank you, Ms. Boone. My name is Leah Janus. I represent the defendants in this lawsuit. We haven't met before today, correct?
A. Correct.
Q. My understanding is that you're being represented by counsel for the plaintiffs here today; is that correct?
A. Yes.
Q. Have you had your deposition taken

Page 4

before?
A. Yes.
Q. Okay. You're probably familiar with the ground rules, but just so that we are on the same page, I'll ask you questions, you're here to provide answers. You understand that you're under oath today, providing testimony as if you were in a court of law, correct?
A. Yes.
Q. Okay. If you don't understand a question, please feel free to ask me to clarify or rephrase. Okay?
A. Okay.
Q. If you don't do that, I'll assume you understood the question, fair?
A. That's fair.
Q. Okay. And you're doing a fine job of this already, but words and oral responses are required rather than gestures or nods of the head, that type of thing. Okay?
A. Okay.
Q. Okay. Ms. Boone, where are you employed?
A. Ecolab, Incorporated.
Q. And what is your position?

Page 5

A. Associate General Counsel for the Institutional Business.
Q. How long have you been at Ecolab?
A. Just shy of four years.
Q. So you started there in 2015, 2014?
A. February of 2015.
Q. Where were you before Ecolab?
A. Pentair.
Q. And what were the approximate dates of your employment with Pentair?
A. January 2009 through January of 2015.
Q. Prior to -- And what was your position at Pentair?
A. Associate General Counsel for the Filtration Business Unit.
Q. Prior to Pentair, what was your employment?
A. It was a company called MGI Pharma.
Q. What was your position with MGI Pharma?
A. I think my title was Associate General Counsel.
Q. What were the approximate dates of your employment with MGI Pharma?
A. 2007 -- November of 2007 until January of 2009.

Page 6

Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 503-6 Filed 08/26/19 Page 5 of 6

**Page 119**

1  MS. JANUS: I didn't specify. I'm
2  just asking the question.
3  MS. KLIEBENSTEIN: Okay. I'll just
4  object as vague, then.
5  THE WITNESS: Well, the client, which
6  is Chubb & Son, a division of Federal Insurance
7  Company, has a right to use the Fair Isaac products
8  subject to the terms and conditions and limitations
9  of the agreement, which would include use so long
10 as the Fair Isaac products are installed and the
11 physical location is within the United States, and,
12 then, the additional limits that are in the
13 Exhibit A, which is the chart outlining the seats
14 and application limitations.
15 BY MS. JANUS:
16     Q.  And Exhibit A does not contain any
17 additional territorial limitations on the scope,
18 correct?
19     MS. KLIEBENSTEIN: Are you in
20 Exhibit A of the main agreement?
21     MS. JANUS: Yes.
22     MS. KLIEBENSTEIN: Okay.
23     THE WITNESS: There is no additional
24 territorially -- territorial limitation in
25 Exhibit A, other than that it's subject to the

**Page 120**

1  terms and conditions of the agreement, which has a
2  territory restriction.
3  BY MS. JANUS:
4      Q.  So based on your interpretation of the
5  license agreement, is use out -- use of Blaze by
6  Chubb outside of the United States allowed?
7      MS. KLIEBENSTEIN: Objection, vague as
8  to -- as to time and entity.
9  BY MS. JANUS:
10     Q.  At the time that agreement was entered
11 into and became enterprise-wide, was use by Chubb
12 of Blaze outside of the United States allowed?
13     MS. KLIEBENSTEIN: Objection, vague.
14     THE WITNESS: Yeah. I mean, I think
15 that's multiple questions. So the original license
16 grant is only to Chubb & Son, a division of Federal
17 Insurance Company. It's not until Amendment Two
18 where we get to an enterprise-wide license.
19 BY MS. JANUS:
20     Q.  Okay. So let's take the software
21 license agreement, Amendment One and Amendment Two
22 all together as comprising together the Enterprise
23 License Agreement. Is that fair?
24     A.  Okay.
25     Q.  Under your interpretation of the

**Page 121**

1  Enterprise License Agreement, is use of Blaze
2  outside of the United States allowed?
3      MS. KLIEBENSTEIN: Objection, vague as
4  to time.
5      THE WITNESS: My interpretation would
6  be taking the agreement, Amendment One and
7  Amendment Two collectively as the software license
8  would be that after Amendment Two was signed,
9  Chubb & Sons, a division of Federal Insurance, along
10 with its affiliates, which, again, is a defined
11 term, entities that are controlled by Chubb & Son,
12 a division, are allowed to use the Fair Isaac
13 products so long as they are installed and the
14 physical location is within the United States.
15 BY MS. JANUS:
16     Q.  So, in your view, there's no
17 geographical limitation for the use of Blaze?
18     A.  For the use, no. For the installation
19 and the physical location, yes. It has to be here
20 in the United States.
21     Q.  And do you know whether use of Blaze
22 in a country outside of the United States is
23 possible without installation also occurring
24 outside of the United States?
25     MS. KLIEBENSTEIN: Objection,

**Page 122**

1  speculation.
2      THE WITNESS: Yeah. I don't know.
3  BY MS. JANUS:
4      Q.  What do you base your conclusion that
5  the installation must be -- and, I'm sorry,
6  installation and physical location must be within
7  the United States upon?
8      A.  Because that's how Territory is
9  defined, which is a part of the License Grant --
10 excuse me. Again, in 2.1, which is the License
11 Grant, it says it's "Subject to the terms,
12 conditions and limitations of this Agreement."
13     The installation and physical location
14 of the products has to be in the United States of
15 America. That would be a term, condition or
16 limitation of the agreement that would apply to the
17 License Grant.
18     Q.  Is there anything else in the license
19 agreement that you believe supports your
20 interpretation of the territorial restriction as
21 you've described it?
22     A.  Well, I haven't read the entire
23 agreement or the two amendments, but the provisions
24 you've asked me to look at, I haven't read anything
25 that ever expands the definition of Territory. So

Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY -- 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS Doc. 503-6 Filed 08/26/19 Page 6 of 6

**I've no reason to believe it was ever expanded outside of having installation and physical location in the United States.**

Q. And my question really is, do you believe, you know, based on your experience working with these types of agreements and this agreement specifically, that there are any other provisions of the agreement that are relevant to the analysis of what the territorial scope of the license is?

A. **Well, again, I mean, I haven't read the entire license. So I don't know if there's anything else in here referencing Territory or not. So I don't know.**

Q. Okay.

A. **I'm not sure that it's necessary for there to be any other reference.**

Q. Why don't you just take a look through the document and let me know if you believe there are other provisions that are relevant to the territorial scope of the license?

(Reporter's Note: The witness is reviewing Exhibit No. 314 for approximately two minutes.)

THE WITNESS: I mean, I would say section 3.6, which is Use by Third Party. It

Page 123

doesn't specifically reference the word Territory, but it does say that ACS Commercial Solutions, which is Client's information technology infrastructure operations have been outsourced to ACS Commercial, and they're -- I mean, Fair Isaac is granting ACS the right to use the Fair Isaac products "provided that such use is otherwise subject to the terms and conditions of this Agreement and does not exceed the limitations on use and other restrictions set forth herein."

So I would say the territory restriction is also a part of that provision because it's subject -- their use, ACS's use is subject to the terms and conditions of the agreement.

MS. JANUS: Okay.

(Reporter's Note: The witness is reviewing Exhibit No. 314 for approximately three minutes.)

THE WITNESS: So -- and we already talked about Amendment One and Amendment Two, which are subject to the terms and conditions of the agreement. So the territory restriction would still apply in those amendments.

BY MS. JANUS:

Q. Based on the language we looked at in

Page 124

the first paragraph and at least in Amendment Two, paragraph 3, was your previous testimony, correct?

A. **Yes, and in Amendment One it's also in paragraph 3.**

Q. Okay. Anything else?

A. No.

Q. With respect to Amendment Two, this was entered into in late December 2006, correct?

A. Yes.

Q. And your testimony was that you can't recall being involved in the negotiation of it, but you saw the stamp that you, you know, were involved at some level in it, correct?

A. Yes.

Q. Were you aware that Amendment Two was the subject of negotiations between the business people at FICO and the business people at Chubb?

A. No.

Q. Were you a part of any of those negotiations as far as you can recall?

A. Not that I recall, no.

Q. Do you recall any conversations with anyone at Chubb relating to the terms of Amendment Two?

A. No.

Page 125

Q. Do you recall any conversations with anyone at Chubb relating to any aspect of the license agreement?

A. No.

Q. Is it possible that Tom Carretta was involved from the legal side of things at FICO in the negotiation of Amendment Two?

A. **I don't know.**

Q. Take a look back at 310, and if you look at page 3 of 16 again, in the first -- line 16, line 17, line 15, those are -- appear to be e-mails dated December 21, 2006, that are to or from Carretta, correct?

A. Yes.

Q. Does that indicate to you that Carretta was involved in the negotiation of Amendment Two?

A. **Um, the -- I mean, I don't recall what his involvement would have been, but in the To line where it's talking about a Contracts Committee, I don't recall for certain, but we had a Contracts Committee -- I don't know if this is -- if --**

MS. KLIEBENSTEIN: I'll jump in here and -- and caution you, this is a -- this is a privilege log. If what you're going to say about the Contracts Committee is going to reveal

Page 126