# Exhibit 18
## (Filed Under Seal)

```
 1                 UNITED STATES DISTRICT COURT

 2                          FOR THE

 3                   DISTRICT OF MINNESOTA

 4

 5             C.A. No. 16-cv-1054 (WMW/DTS)

 6    ---------------------------------------------

 7      FAIR ISAAC CORPORATION,                     )

 8                             Plaintiff       )

 9      v.                                          )

10      FEDERAL INSURANCE COMPANY AND ACE           )

11      AMERICAN INSURANCE COMPANY,                 )

12                             Defendants      )

13    ---------------------------------------------

14                  CONFIDENTIAL TRANSCRIPT

15                  ATTORNEYS' EYES ONLY

16

17             DEPOSITION OF MICHAEL SAWYER

18                    October 2, 2018

19                    Courtyard Marriott

20                 35 Foxborough Boulevard

21               Foxborough, Massachusetts

22

23                     *********

24         Court Reporter:  Amie D. Rumbo
```

CASE 0:16-cv-01054-DTS   Doc. 503-15   Filed 08/26/19   Page 3 of 7

```
 1        APPEARANCES:

 2         MERCHANT & GOULD

 3         Allen W. Hinderaker, Esq.

 4         3200 IDS Center

 5         80 South Eighth Street

 6         Minneapolis, Minnesota  55402-2215

 7         (612) 332-5300

 8         ahinderaker@merchantgould.com

 9         Counsel for the Plaintiff

10

11        FREDRIKSON & BYRON, P.A.

12        Terrence J. Fleming, Esq.

13        200 South Sixth Street, Suite 4000

14        Minneapolis, Minnesota  55402-1425

15        (612) 492-7000

16        tfleming@fredlaw.com

17        Counsel for the Defendants

18

19        ALSO PRESENT:

20        James Woodward, Vice President, Legal, Fair Isaac

21        Corporation

22

23        Kevin Murphy, Senior Counsel Global Legal for

24        Chubb
```

**Page 57**

1    I used.  But the premise of the conversation was

2    that, you know, upon my reading of the amendment

3    two and the language around territory in the

4    software license agreement that, you know, a broad

5    interpretation of ELA beyond the United States, I

6    felt was an incorrect interpretation of the

7    contract based on the language that I read.

8        Q.    And did you talk at all about your

9    interpretation compared with the actual use by

10   Chubb?

11       A.    I can't be certain, but logically,

12   I would not bring up that point to Russ if there

13   was not something that, you know, generated a

14   thought around the use of the software outside of

15   the territory and the country.

16       Q.    Okay.

17       A.    Whether that use is, you know,

18   existing or, you know, potential future use, I

19   couldn't be certain.

20           MR. FLEMING:  Mark this as

21     Exhibit 74.

22      (Exhibit 74 marked for identification.)

23       Q.    Mr. Sawyer, is this an e-mail from

24   you to Henry Mirolyuz dated July 22nd, 2009?

**Page 58**

1        A.    Yes.  Exhibit 74 represents an

2    e-mail that I sent to Henry Mirolyuz in July

3    of 2009.

4        Q.    And do you recall sending this

5    e-mail to him?

6        A.    No, I do not.

7        Q.    In that e-mail, you attach a Blaze

8    case study with Aviva in the United Kingdom and

9    you say, quote, "That might serve as a good source

10   of information as you try and promote the use of

11   Blaze in the Europe," unquote.  Do you see that?

12       A.    I do, yes.

13       Q.    Do you recall providing Henry

14   Mirolyuz with this Blaze case study?

15       A.    No, I do not.

16       Q.    Would you agree that in this e-mail

17   you are attempting to assist Henry Mirolyuz in

18   promoting the use of Blaze in Europe?

19       A.    Yes.

20       Q.    Okay.  So it would be fair to say,

21   at least at this time, which is prior to the time

22   you became a client partner, that you did not

23   believe that the use of Blaze in Europe would be

24   in violation of the software agreement?

**Page 59**

1        A.    That is not a correct statement.

2        Q.    Okay.

3        A.    As a representative of FICO, my

4    role would have been to help support and promote

5    sales of product.  So if the use of Blaze in

6    Europe represented a new sales opportunity for

7    FICO, I would have helped Henry promote that as

8    well.  So I do not agree with your statement that

9    this definitively says that I agreed that their

10   existing licensing agreement included Europe.

11       Q.    So in the ordinary course, when

12   would you have had a discussion with Henry

13   Mirolyuz about the scope of the software license,

14   if, at that time, you believed that the license

15   would not allow use of Blaze in Europe?

16       A.    At this point in time, it would not

17   be my responsibility to have that conversation.

18   As you see on this e-mail, Ian Brodie is copied.

19   Ian is the client partner at that time.  I would

20   have been supporting Ian in this effort with

21   Henry, and it's likely that, you know, based on a

22   conversation that Ian had with Henry that Ian

23   requested that I pull this relevant case study and

24   send it over to Henry.  So as it relates to this

**Page 60**

1    specific e-mail, it would not have been in my

2    scope of responsibility.

3           MR. FLEMING:  Mark this as Exhibit

4      75.

5      (Exhibit 75 marked for identification.)

6        Q.    Mr. Sawyer, is this an e-mail from

7    Tom Bradley to Ian Brodie that you and others were

8    copied on concerning Chubb insurance follow-up?

9        A.    Yes.  That appears to be correct.

10       Q.    Okay.  And there's an e-mail chain,

11   and the e-mail below is an e-mail from Ian Brodie

12   to Tom Bradley copying you and the same people on

13   the same subject; is that right?

14       A.    Yes, that appears correct.

15       Q.    Do you recall the substance of this

16   e-mail?

17       A.    I do not.  I have it in front of

18   me.  I can read it, but I do not recall a -- this

19   e-mail to Tom Bradley.  In fact, I couldn't even

20   recall Tom Bradley as a CFO of FICO, so no.

21       Q.    You discussed earlier in your

22   testimony the premium validation application.

23   What was that project?  Could you explain it?

24       A.    Yes.  So the premium validation

| | |
|---|---|
| 1 project was in Chubb's corporate business systems | 1 one reflected in this e-mail? |
| 2 unit based in Warren, New Jersey where they had a | 2 A. Professional services fees as |
| 3 COBOL system in place, which I believe was called | 3 reflected in this e-mail and other projects of |
| 4 PARSE, and Chubb was having resource constraints | 4 similar nature as well as software maintenance and |
| 5 finding qualified COBOL developers to maintain the | 5 support. |
| 6 large volume of premium data validation rules in | 6 Q. All right. |
| 7 that system, and they were looking for | 7 MR. FLEMING: Mark this as Exhibit |
| 8 alternatives for technologies to support that | 8 76. |
| 9 validation edits and, ultimately, Chubb selected | 9 (Exhibit 76 marked for identification.) |
| 10 to utilize FICO's Blaze Advisor for that project. | 10 Q. Let me know when you've had a |
| 11 Q. Do you see in the second paragraph | 11 chance to look through it. |
| 12 where -- in the second paragraph of the e-mail | 12 A. Okay. |
| 13 below where Mr. Brodie says, quote, "Chubb already | 13 Q. Let's look first at the e-mail at |
| 14 has an enterprise license for Blaze. This is the | 14 the bottom of page 1. That is an e-mail from |
| 15 professional services proposal to assist them with | 15 Russel Schreiber to you and others dated |
| 16 the design and development of that application," | 16 March 28th, 2012; is that right? |
| 17 unquote. | 17 A. That is correct. |
| 18 What do you understand that Mr. | 18 Q. And at that time, you were a client |
| 19 Brodie meant by that? | 19 partner at FICO? |
| 20 A. If you give me a minute to read the | 20 A. That is correct. |
| 21 e-mail. | 21 Q. And he's asking with regard to the |
| 22 MR. HINDERAKER: And I'll object to | 22 third and fourth quarters, what's the pipeline, |
| 23 the extent it's asking for Mr. Brodie's | 23 what are the commit deals, what's the forecast. |
| 24 intentions or subject of intentions. | 24 What is he talking about? |
| Page 61 | Page 63 |
| 1 A. Okay. Based on the e-mail, it | 1 A. So he's asking for what is your |
| 2 suggests that the intended use of the Blaze | 2 total pipeline as a salesperson of potential sales |
| 3 Advisor software for the PARSE project in Warren, | 3 opportunities across your territory. What are the |
| 4 New Jersey would fall with inside the scope of the | 4 commit deals, what deals are you committing as a |
| 5 existing Chubb licensing agreement, and therefore, | 5 salesperson that you will close in the quarter. |
| 6 the commercial proposal that we had put in place | 6 And based on that, what is your booking and |
| 7 for that project that Ian was seeking executive | 7 revenue forecast associated with your territories |
| 8 level approval for was strictly professional | 8 for the two quarters. |
| 9 services. | 9 Q. So he's asking about deals or |
| 10 Q. So then in the third paragraph it | 10 projects that are already in the door and new |
| 11 talks about the size of this engagement as being | 11 deals? |
| 12 approximately a million dollars over the next 12 | 12 A. No. This would all be prospective |
| 13 to 15 months; is that right? | 13 deals. |
| 14 A. That is correct. That is stated | 14 Q. I see. |
| 15 here. | 15 And you respond at the top of the |
| 16 Q. So you talked earlier in your | 16 page the next day stating "I've cleaned up SF this |
| 17 testimony about the various sources of revenue | 17 morning." Is that Salesforce? |
| 18 generated by FICO. With regard to Chubb as a | 18 A. That is. |
| 19 client, during the time that you were a client | 19 Q. And is that a software application? |
| 20 partner, were any fees generated via sales of | 20 A. Salesforce is -- at the time, was |
| 21 licenses to Chubb? | 21 FICO's CRM system and used for their sales force |
| 22 A. Not that I'm aware of, no. | 22 to manage pipelines. |
| 23 Q. All the revenue that were generated | 23 Q. And you reference "the attached |
| 24 related to professional services fees such as the | 24 report to show deals by quarter with the |
| Page 62 | Page 64 |

Page 117

1  2015, it would be impossible to make the assertion
2  that Chubb has violated the license agreement.
3  The transaction had not occurred yet.
4      So our concern was that the
5  proposed transaction may impact that provision and
6  wanted to engage the client in dialogue to get a
7  better understanding of the process that they were
8  going through around the acquisition and whether
9  or not they felt like this provision in their
10  contract was going to be impacted by the proposed
11  transaction.
12      Q.    All right.  All right.  Showing you
13  what's been marked as Exhibit 79.
14      (Exhibit 79 marked for identification.)
15      Q.    Do you recognize these e-mails?
16      A.    Yes.  Upon seeing it, I can recall
17  these messages.
18      Q.    Looking at the bottom of the page,
19  it looks like it's an e-mail from Lamont Boyd to
20  Russ Schreiber.  Who is Lamont Boyd?
21      A.    Lamont Boyd is a director or senior
22  director in FICO's scoring business unit.
23      Q.    Was this -- you were copied.  Russ
24  Schreiber forwarded this e-mail to you.  Was this

Page 118

1  the first that you had heard about the ACE merger?
2      A.    Proposed merger, yes, I believe so.
3      Q.    What was your understanding of what
4  Lamont Boyd meant by, quote, "This could be
5  another backdoor win for FICO, CBIS"?
6      A.    CBIS relates to a FICO product
7  called Credit Based Insurance Scores, which are
8  leveraged by a significant number of personal
9  lines insurance carriers to assess the risk posed
10  by an applicant for insurance.  What Lamont is
11  saying here is that Chubb historically, in their
12  personal lines division, had not used Credit Based
13  Insurance Scores, but ACE had, and so Lamont is
14  suggesting that upon completion of the merger, the
15  ACE folks who are in charge of their risk
16  department may influence Chubb to use the Credit
17  Based Insurance Scoring solutions in their book of
18  business.
19      Q.    And why did you respond in the
20  middle of the page an e-mail, it looks like, to
21  Russ dated July 1st, 2015, "Wow, not good"?
22      A.    Sure.  So as best I can recall, you
23  know, my concern would be that because Chubb was
24  getting acquired by ACE, that you know, our

Page 119

1  relationships with, you know, decision makers at
2  Chubb may -- we may lose some relationships
3  because ACE being the acquirer, may, you know,
4  take a stronger role in deciding future direction
5  of the company, and Chubb was a significantly more
6  significant client than ACE was for FICO at the
7  time.
8      MR. FLEMING:  Mark this as
9  Exhibit 80.
10      (Exhibit 80 marked for identification.)
11      Q.    So do you recall this e-mail chain
12  which begins with an e-mail from you dated
13  October 7th to Russ Schreiber and ends with a --
14  that's dated October 7th, 2015, and ends with an
15  e-mail from you to Russ Schreiber dated later that
16  same day?
17      A.    I don't recall this e-mail
18  exchange, but I don't contest it's accuracy.
19      Q.    Okay.  Let's look at the first
20  e-mail, which is on the third page, Bates stamped
21  number FICO 1700 and that's an e-mail from you to
22  Russ Schreiber dated October 7th, 2015, and you
23  say, quote, "I think we're in a good spot.  See
24  below.  The first excerpt is from the original

Page 120

1  MSLA and states they have no assignment rights.
2  The second results from the MLSA and defines
3  Enterprise License.  It's pretty restrictive and
4  excludes Parent Company which is what I think ACE
5  would be.  The third is from the amendment when
6  they picked up the ELA option.  It provides some
7  more flexibility as it relates to subsidiaries and
8  affiliates, but not parent company," end quote.
9      Now, you testified before when we
10  first started here after lunch, you talked about
11  in late 2015, your actions after learning of the
12  proposed ACE acquisition of Chubb.  And is this
13  what you were -- does this reflect what you were
14  talking about in terms of reviewing the license
15  agreement so far as it relates to the assignment?
16      A.    Yes, I believe so.  As I testified
17  and as you can see here, my initial note is to
18  Russ Schreiber.  You previously asked me who would
19  have directed me to do the analysis of the
20  contract, and I answered Russ Schreiber.  So based
21  on Russ' request, this would have been my review
22  of the contract to provide him with the
23  information that I saw in the contract for him to
24  interpret.

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY -- 10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

CASE 0:16-cv-01054-DTS Doc. 503-15 Filed 08/26/19 Page 7 of 7

1  objections.  I object to that it misstates

2  testimony.  I object to the

3  mischaracterization of it, and I object to

4  the legal characterization of 10.8, and I

5  object to the witness being asked for a legal

6  characterization.

7  **A.  So in my interpretation of this,**

8  **Chubb had the duty to seek and get FICO's written**

9  **consent for an assignment.  They failed to do so.**

10  **So at no point were we ever able to have a**

11  **discussion with the client, being Chubb in this**

12  **case, around their intended use of the product**

13  **going forward.  So at the time when this event**

14  **occurred, the fact that no written consent was**

15  **provided for the assignment is what triggered, you**

16  **know, our action in sending that letter to Chubb**

17  **notifying them of the breach.**

18  Q.  Okay.  And I understand your

19  position, but with respect to this issue as to

20  whether Chubb actually had or engaged in an

21  expanded use of its FICO products, it's your

22  testimony that you're aware of no evidence that,

23  following the merger, it did so?

24  MR. HINDERAKER:  Objection to the

Page 133

1  extent of the foundation.

2  **A.  Yeah.  I was not in a position to**

3  **know what was happening inside of the walls at**

4  **Chubb around discussions for using the platform.**

5  **Immediately following the conclusion of the**

6  **transaction, Chubb did not share any evidence with**

7  **us that would suggest that they planned to use the**

8  **scope -- the product in an expanded scope.**

9  Q.  Okay.

10  **A.  But lack of Chubb providing**

11  **evidence does not substantiate the potential, and**

12  **we were asking for a discussion around their**

13  **planned use.  My view on this is that you're**

14  **asking, again, for my interpretation on this.  We**

15  **didn't even get to Section 2 because Section 1, we**

16  **never granted our rights for the assignment to**

17  **begin with.**

18  Q.  Okay.  But let's just deal right

19  now with the expanded use issue.  Following the

20  merger, you agree that you are aware of no

21  evidence that FICO engaged in more expansive use

22  of the FICO products as compared to the use of

23  which it was making before the merger?

24  MR. HINDERAKER:  I think you meant

Page 134

1  to say Chubb.

2  **A.  Yeah.**

3  Q.  Chubb, yeah.

4  **A.  For clarity, after the merger, I**

5  **had no evidence supplied to me that would indicate**

6  **that Chubb used the product in an expanded way.**

7  Q.  Okay.

8  **A.  But as I said, prior to the actual**

9  **transaction closing, I did have conversations with**

10  **representative -- with Henry Mirolyuz from Chubb**

11  **who had shared potential plans for it which caused**

12  **our concern under the contract.**

13  Q.  So are there any e-mails going back

14  and forth between you and Henry Mirolyuz about the

15  planned post-merger activity?

16  **A.  I am not certain.  There is -- I do**

17  **remember one exchange I had with Henry -- whether**

18  **it was an e-mail or not, I am not certain --**

19  **indicating that Accenture was a significant vendor**

20  **partner of ACE and would likely be involved in any**

21  **post-merger transformation projects or integration**

22  **projects, and Henry had inquired about our**

23  **experience partnering or working with Accenture,**

24  **but I couldn't be certain if that was an e-mail or**

Page 135

1  **a side conversation that Henry and I had.**

2  Q.  Okay.  Other than that discussion

3  or possible e-mail, are you aware of any other

4  e-mails going back and forth between you and Henry

5  Mirolyuz relating to planned activities by FICO

6  post-merger?

7  MR. HINDERAKER:  I object to the

8  question as saying any other e-mails.

9  Misstates the testimony.

10  Q.  Go ahead.

11  **A.  I am -- I cannot recall any other**

12  **communications between me and Henry on the topic.**

13  Q.  Okay.  Now, going back to

14  Section 10.8 and the language relating to where it

15  says, in the middle of that paragraph, "which

16  shall not be unreasonably withheld," do you --

17  what is it that you understand is meant by that,

18  and specifically, what is it that you understand

19  will not be unreasonably withheld?

20  **A.  Right.  So my interpretation of**

21  **this is that when FICO licenses their software,**

22  **they license it for a specific scope of use, which**

23  **is driven by a number of parameters in our pricing**

24  **model.  And so my interpretation of this language**

Page 136