CASE 0:16-cv-01054-DTS   Doc. 510-4   Filed 08/26/19   Page 1 of 8
Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
 2
     - - - - - - - - - - - - - - - - - - - - - - - - - -
 3

     FAIR ISAAC CORPORATION,
 4
                 Plaintiff,
 5
          v.            Court File No. 16-cv-1054 (WMW/DTS)
 6
     FEDERAL INSURANCE COMPANY,
 7   an Indiana corporation, and ACE
     AMERICAN INSURANCE COMPANY,
 8   a Pennsylvania corporation,

 9               Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - -

11                     VIDEO DEPOSITION

12         The following is the video deposition of

13   JANDEEN BOONE, taken before Jean F. Soule, Notary

14   Public, Registered Professional Reporter, pursuant

15   to Notice of Taking Deposition, at the law office

16   of Merchant & Gould, 3200 IDS Center, 80 South

17   Eighth Street, Conference Room 32H, Minneapolis,

18   Minnesota, commencing at 9:05 a.m., Wednesday,

19   February 6, 2019.

20

21                       *    *    *

22

23               C O N F I D E N T I A L

24               ATTORNEYS' EYES ONLY

25
```

EXHIBIT 6

CASE 0:16-cv-01054-DTS   Doc. 510-4   Filed 08/26/19   Page 2 of 8
Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

### Page 15

1 there was a renegotiation of the license, were you
2 involved in any situation like that during your
3 time at FICO?
4       MS. KLIEBENSTEIN: Objection, asked
5 and answered.
6       THE WITNESS: Do you want me to answer?
7       MS. KLIEBENSTEIN: Yeah. Not that I
8 specifically recall, no.
9 BY MS. JANUS:
10    Q.   Do you have any knowledge of
11 negotiations like that taking place while you were
12 at FICO?
13    **A.**   **Not that I remember, no.**
14    Q.   You were involved in negotiating the
15 Chubb license agreement?
16    **A.**   **Yes.**
17    Q.   When did you first become involved in
18 that?
19    **A.**   **I don't remember.**
20    Q.   Let me shift gears for a second. What
21 did you do to prepare for your deposition today?
22       MS. KLIEBENSTEIN: I -- I'll object to
23 that on attorney-client privilege. You can -- you
24 can answer as long as you don't disclose
25 communications between us.

### Page 16

1       THE WITNESS: I had a meeting two
2 weeks ago with Heather.
3 BY MS. JANUS:
4    Q.   Did you review any documents?
5    **A.**   **Yes.**
6    Q.   Which documents did you review?
7    **A.**   **The license agreement between FICO and**
8 **Chubb, two amendments to that agreement, and that**
9 **was it.**
10    Q.   Did you review any e-mails?
11    **A.**   **Not that I recall, no.**
12    Q.   Did you review any of the negotiation,
13 the redlines of the license agreement?
14    **A.**   **I did not specifically look at any**
15 **redline documents, no.**
16    Q.   Okay. Anything else to prepare for
17 today?
18    **A.**   **I had a follow-up call yesterday with**
19 **Heather and Jim Woodward.**
20    Q.   Did you review any documents in
21 connection with that follow-up call?
22    **A.**   **No.**
23    Q.   On your own, did you review any
24 documents to prepare for the deposition?
25    **A.**   **No.**

### Page 17

1    Q.   All right. So going back to the
2 license agreement with Chubb, you don't have an
3 independent recollection of when you first became
4 involved in that, correct?
5    **A.**   **Correct.**
6    Q.   Do you recall how it was that you
7 became involved in the Chubb license agreement?
8    **A.**   **No, not specifically. I mean, other**
9 **than it would have been assigned to me through the**
10 **system.**
11    Q.   Okay. Do you recall who you worked
12 with at FICO in connection with the Chubb license
13 agreement?
14    **A.**   **I did not recall the other names until**
15 **having conversations with Heather, other people**
16 **that have -- were involved in the deal, but I did**
17 **not independently recall that, no.**
18    Q.   Sitting here today, do you actually
19 recall working with business people at FICO on the
20 Chubb license?
21    **A.**   **I'm not sure I understand your**
22 **question.**
23    Q.   Sure. I understand that you probably
24 haven't thought about this situation for quite some
25 time before the last couple of weeks. But now that

### Page 18

1 you've possibly had your recollection refreshed to
2 a certain extent, do you recall now, sitting here
3 today, working with business people at FICO in
4 connection with the Chubb license agreement?
5    **A.**   **No, not really.**
6    Q.   Okay. Do you recall what the scope of
7 the Chubb license agreement was?
8    **A.**   **Just like sitting here, not**
9 **specifically, no. I mean, if you want me to look**
10 **at it, I'm happy to do that, but I don't recall**
11 **from memory.**
12       (Whereupon, Deposition Exhibit No. 305
13 was marked for identification, and a copy is
14 attached and hereby made a part of this deposition.)
15 BY MS. JANUS:
16    Q.   Showing you what's been marked as
17 Deposition Exhibit 305, this is an e-mail from you
18 to Jim Black, with a copy to Larry Wachs, correct?
19    **A.**   **Yes.**
20    Q.   The date is June 6th, 2006, and the
21 subject is Revised MSA and License -- Software
22 License and Maintenance Agreement, correct?
23    **A.**   **Yes.**
24    Q.   Who is Jim Black?
25    **A.**   **He's a person at Chubb. I don't know**

CASE 0:16-cv-01054-DTS   Doc. 510-4   Filed 08/26/19   Page 3 of 8
Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

what his role was.
Q. Do you recall working with Jim Black in connection with the Chubb license agreement?
A. No.
Q. Who was Lawrence Wachs? How -- first of all, do you know how to pronounce his last name, is it Wachs (phonetic, woks)?
A. I believe it's Wachs (phonetic, wax).
Q. Wachs. Who is Lawrence Wachs?
A. Other than a business person at Fair Isaac, I don't recall what his role was.
Q. Do you recall that he was one of the primary business people you were dealing with in connection with the Chubb license agreement?
A. No.
Q. Did you get direction from the FICO business people regarding the appropriate scope of the Chubb license agreement?
A. I don't remember, other than what was in their request form.
Q. Is the scope and the various categories of the scope that you identified, is that something that you determine as a person in the general counsel's office or is that something that you work with FICO business people to

Page 19

determine and then negotiate with the customer?
A. That would be purely a business decision.
Q. So, in general, you would get your direction from the FICO business people about what the appropriate scope of the license would be?
A. Yes.
Q. And that applies to what software is at issue in the license, correct?
A. Yes.
Q. What applications are at issue in the license, correct?
A. Yes.
Q. If there are seat restrictions in the license, correct?
A. Yes.
Q. If there are territory restrictions in the license, correct?
A. Yes.
Q. And, then, you said anything else relevant to how the customer was going to use the software generally is the category of the scope, correct?
A. Yes.
Q. In this situation, is it fair for us

Page 20

to assume that Lawrence Wachs -- Wachs was involved in giving you that direction about scope for the Chubb license agreement?
   MS. KLIEBENSTEIN: Objection, calls for speculation.
   THE WITNESS: I would say, since he's copied on the e-mail, that would be a reasonable conclusion, yes.
BY MS. JANUS:
Q. Do you recall the circumstances that led to you sending this e-mail on June 6th, 2006, to Jim Black at Chubb?
A. No.
Q. The e-mail says it's attaching the updated version of the MSA, which is a Master Services Agreement, correct?
A. Yes.
Q. And the standard Blaze Software License and Maintenance Agreement, correct?
A. Yes.
Q. Do you recall what it was that you were negotiating in terms of the MSA in early June of 2006?
A. No.
Q. Do you know whether this is your first

Page 21

communication with Chubb relating -- actually, just with Chubb?
A. No.
Q. You just don't know?
A. I don't -- I mean the e-mail says, "Attached is an updated version of the MSA." So it would seem there were prior versions.
Q. And if there were prior versions, then, there was likely prior communication between you and Chubb relating to those versions?
A. I don't recall, but that would seem likely, yes.
Q. Take a look at the Master Services Agreement. So generally, based on your experience at FICO, what is a Master Services Agreement as it relates to Blaze?
A. Um, as much as I recall, this would outline services that our Professional Services Team was going to do for the client relative to their Blaze Software.
Q. And what is the Professional Services Team?
A. I don't recall their full scope of what they all did, but they would have been a team that would interface with the customer and their

Page 22

CASE 0:16-cv-01054-DTS   Doc. 510-4   Filed 08/26/19   Page 4 of 8
Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

## Page 23

1 use of the software.
2 Q. So these are technical -- or employees
3 of FICO with technical expertise that would assist
4 Chubb with Chubb's use of Blaze?
5 A. Yes.
6 Q. In the Master Services Agreement under
7 definitions, 1.a states, "'Chubb' shall mean
8 Chubb & Son, a division of Federal Insurance
9 Company, for itself and as servicer for The Chubb
10 Corporation and its non-insurance company
11 subsidiaries, or as manager of its insurance company
12 subsidiaries." Do you see that?
13 A. Yes.
14 Q. And what did you understand that to
15 mean?
16 A. Um, I'm not sure I understand what you
17 are asking me to -- to answer.
18 Q. Did you have an understanding that the
19 description here, "Chubb & Son, a division of
20 Federal Insurance Company, for itself and as
21 servicer of The Chubb Corporation and its
22 non-insurance company subsidiaries, or as manager
23 of its insurance company subsidiaries," did you
24 have an understanding of what that meant when you
25 were negotiating the Master Services Agreement?

## Page 24

1 A. I don't recall.
2 Q. Were you involved in determining what
3 the proper entity was on Chubb's side to enter into
4 agreements with FICO?
5 A. Can you repeat that?
6 Q. Sure. Were you involved in
7 determining what the proper Chubb entity was for
8 purposes of entering into agreements with FICO?
9 A. No. That would have been the business.
10 Q. Did you understand that this entity
11 listed in 1.a was the entity that FICO was
12 negotiating with for purposes of the Master Services
13 Agreement?
14 A. Well, I think the entity that FICO was
15 entering into this MSA with was Chubb & Son, a
16 division of Federal Insurance Company, which is in
17 the opening paragraph of the MSA.
18 Q. And, then, the definition of Chubb is
19 in 1.a, correct?
20 A. Yes.
21 Q. And that is also the notation above
22 the signature block on the last -- or the second to
23 last page of the document, correct?
24 A. Chubb & Son, a division of Federal
25 Insurance Company, yes.

## Page 25

1 Q. Well, there's language under that
2 noted above the signature block as well, correct?
3 A. Yes.
4 Q. Okay. So did you understand that for
5 purposes of the Master Services Agreement the
6 contracting entity included Chubb & Son, a division
7 of Federal Insurance Company, for itself and as
8 servicer of The Chubb Corporation and its
9 non-insurance company subsidiaries, or as manager
10 of its insurance company subsidiaries?
11 MS. KLIEBENSTEIN: Objection, asked
12 and answered.
13 THE WITNESS: That's the name on the
14 signature block, yes.
15 BY MS. JANUS:
16 Q. And was it your understanding that
17 this entity that I just described, that's listed on
18 the signature block for the MSA, was the same
19 entity that you were dealing with in connection
20 with the license agreement and statements of work
21 and other agreements that were being negotiated at
22 the same time?
23 A. I don't believe the entity in the
24 license agreement is consistent with the -- the
25 entity in the license agreement is Chubb & Son, a

## Page 26

1 division of Federal Insurance Company, without the
2 additional language.
3 Q. So you believed you were -- What's the
4 difference to you, what does that difference mean
5 to you?
6 A. Well, I'm not sure why there was a
7 difference, and the language difference to me
8 doesn't change the scope of the license. I mean,
9 they were Chubb & Son, a division of Federal
10 Insurance Company, is listed as a potential
11 servicer for The Chubb Corporation. I don't know
12 what that means today. I don't recall what that
13 would mean.
14 Q. There was no significance to you in
15 the difference of the language between the
16 signature block on the Master Services Agreement
17 we're looking at and the description of client in
18 the license agreement?
19 A. Well, I haven't read the Master
20 Services Agreement, but how Chubb is used as a
21 defined term and, then, how it's used throughout
22 the agreements, I don't know if that has some
23 relevance. To me, the license agreement is with
24 Chubb & Son, a division of Federal Insurance
25 Company. I don't know why the extra language was

CASE 0:16-cv-01054-DTS   Doc. 510-4   Filed 08/26/19   Page 5 of 8
Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

### Page 27

1 on the MSA.
2    Q.   And, again, my question was, is there
3 a sig -- is there any significance in your mind to
4 that difference?
5    A.   No.
6    Q.   Was it your intent to negotiate --
7 strike that.
8         The Master Services Agreement and the
9 license agreement were being negotiated around the
10 same time and in connection with the same
11 transaction, correct?
12   A.   Yes.
13   Q.   In other words, the Master Services
14 Agreement is ancillary to the Blaze license
15 agreement?
16   **A.   In this specific instance or generally**
17 **speaking?**
18   Q.   In this specific instance?
19   **A.   Yes.**
20   Q.   Does that mean that essentially you
21 don't -- I mean, you don't have the Master Services
22 Agreement if you don't have the Chubb license --
23 the Chubb Blaze license, right? The purpose of the
24 Master Services Agreement was to assist with the
25 implementation of the software that was the subject

### Page 28

1 of the Blaze license with Chubb, correct?
2   **A.   Yes.**
3   Q.   Was it your intent when you were
4 negotiating the Master Services Agreement and the
5 Chubb license agreement to enter into those
6 agreements with the same entity on Chubb's side?
7         MS. KLIEBENSTEIN: Objection, calls
8 for speculation.
9         THE WITNESS: Yeah. I don't recall
10 what my intent was.
11 BY MS. JANUS:
12   Q.   Would there -- Can you think of a
13 reason why you would enter into the Master Services
14 Agreement with a different entity or group of
15 entities than you would enter into the Chubb
16 license agreement?
17   **A.   I don't think they are different,**
18 **because the opening paragraphs of both agreements,**
19 **where we're identifying the parties to the**
20 **agreement, are aligned.**
21   Q.   Okay. And so fair to say, then, that
22 just as with the Master Services Agreement, the
23 Chubb license agreement was entered into with
24 Chubb & Son, a division of Federal Insurance
25 Company, and that would include this description

### Page 29

1 that's included in the Master Services Agreement,
2 correct?
3   **A.   No.**
4   Q.   For it -- No?
5   **A.   Okay, sorry.**
6   Q.   Well, just so we're clear, that
7 description is "for itself and as" a "servicer for
8 The Chubb Corporation, and its non-insurance company
9 subsidiaries, or as manager of its insurance company
10 subsidiaries," your testimony is that description
11 is not included or -- or does not apply to
12 Chubb & Son, a division of Federal, as it entered
13 into the license agreement?
14        MS. KLIEBENSTEIN: Leah, where are we?
15 I think you were quoting from something, but I --
16        MS. JANUS: 1.a of the Master Services
17 Agreement.
18        MS. KLIEBENSTEIN: I'm going to ask
19 you to ask that question again, because I didn't
20 understand it myself, for purposes of objections.
21 BY MS. JANUS:
22   Q.   Your testimony is that the Master
23 Services Agreement and the license agreement were
24 negotiated contemporaneously, correct?
25   **A.   Yes.**

### Page 30

1   Q.   My question for you is, was it FICO's
2 intent, your intent as an agent of FICO, to enter
3 into those two agreements with the same entity, the
4 same client?
5        MS. KLIEBENSTEIN: Objection,
6 foundation, calls for speculation.
7        THE WITNESS: Yeah. I believe I
8 answered that question. I don't recall what my
9 intent was at the time.
10 BY MS. JANUS:
11   Q.   Okay. But the Master Services
12 Agreement clearly is ancillary to or dependent upon
13 the software license agreement, correct?
14   **A.   It is ancillary to the software**
15 **license agreement, yes.**
16   Q.   Okay. And we discussed the definition
17 of Chubb in 1.a of the Master Services Agreement,
18 correct?
19   **A.   Yes.**
20   Q.   And so my question to you is, is it
21 fair to read that definition of Chubb to apply also
22 to the Chubb & Son, a division of Federal, that is
23 in the software license agreement?
24   **A.   No, because if that had been the**
25 **intent, that would have been written in the**

CASE 0:16-cv-01054-DTS   Doc. 510-4   Filed 08/26/19   Page 6 of 8
Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 specific territory restriction listed in Amendment
2 Two, correct.
3 BY MS. JANUS:
4   Q.   Well, I want to be clear about the
5 language of Amendment Two to the Software License
6 and Services Agreement. And so my question to you
7 is simply about the language of Amendment Two to
8 the Software License and Services Agreement. Okay?
9   A.   Okay.
10   Q.   The language in Amendment Two to the
11 Software License and Services Agreement does not
12 contain on its face a limitation to the territorial
13 scope of the license, correct?
14      MS. KLIEBENSTEIN: Objection, asked
15 and answered.
16      THE WITNESS: I would disagree.
17 Because Amendment Two is subject to the terms of
18 the agreement, which has a territory restriction in
19 it, so --
20 BY MS. JANUS:
21   Q.   So point me to the language you're
22 looking at in Amendment Two?
23   A.   Right at the beginning. It's, "This
24 **Amendment Two...is effective as of December 28,**
25 **2006...and amends the Software License and Services**
Page 107

1 **Agreement entered into on June 30, 2006, as amended**
2 **on August 1, 2006 (collectively the 'Agreement') by**
3 **and between Fair Isaac Corporation...and**
4 **Chubb & Sons, a division of Federal Insurance**
5 **Company ('Client')," so --**
6   Q.   Okay. So that's the language that you
7 were referring to in your previous answer; is that
8 correct?
9   A.   **Yes. This Amendment Two is only**
10 **amending the agreement with regard to the chart**
11 **that's outlined in section 1 of Amendment Two.**
12 **It's taking out the chart that was -- well, the**
13 **previous licenses granted, to use the specific**
14 **language in the amendment, and replacing those**
15 **licenses with these licenses. Nothing else in the**
16 **agreement is changing. So the territorial**
17 **restriction in the agreement remains in effect.**
18   Q.   And by the territorial restriction,
19 you're talking about the definition of Territory
20 that we looked at?
21   A.   **Correct, which says "installation and**
22 **physical location...means the United States of**
23 **America."**
24   Q.   Okay. So back to my question about
25 Amendment Two to the Software License and Services
Page 108

1 Agreement. Other than that first paragraph that
2 you just read, in your view, is there any other
3 aspect of Amendment Two to the Software License and
4 Services Agreement that relates in any way to a
5 territorial restriction on the scope of the license?
6   A.   **Well, I mean, if you read section 3,**
7 **the second sentence, "Except as expressly amended**
8 **by this Amendment Two, the provisions of the**
9 **Agreement continue in full force and effect." So**
10 **there is no change to the territory because it's**
11 **not been stated in this Amendment Two.**
12   Q.   Other than, in your view, the first
13 paragraph and paragraph 3, would you agree with me
14 that there is no reference to a territorial
15 limitation on the scope of the license in Amendment
16 Two?
17   A.   **I guess I disagree with the premise**
18 **that you're -- started from.**
19   Q.   Okay. I -- so I understand you're
20 talking about what you believe, how you've
21 interpreted Amendment Two and the license agreement.
22 I'm entitled to create a record relating to the
23 documents that is accurate.
24      My question relates to the language in
25 Amendment Two and whether there's any explicit
Page 109

1 reference to a territorial restriction on the scope
2 of the license in Amendment Two itself?
3   A.   **No, there is not, other than it's**
4 **referenced to the agreement.**
5   Q.   Thank you.
6      Do you know whether entities within
7 the Chubb corporate structure were located outside
8 the United States at the time Amendment Two was
9 entered into?
10   A.   No, I do not.
11   Q.   Was that something -- Do you recall
12 whether that was something you were aware of one
13 way or another at the time you were negotiating the
14 license agreement?
15   A.   No, I don't recall.
16   Q.   At the top of the second page of
17 Amendment Two there's a paragraph that relates to
18 the meaning of enterprise-wide license, correct?
19   A.   Yes.
20   Q.   And it states that, "For purposes of
21 this Amendment Two, the Enterprise-Wide License
22 shall mean that Client and its Affiliates may use
23 the Fair Isaac Product for their internal business
24 purposes, with no limitation on the number of Seats
25 or CPU's, subject to and in accordance with all of
Page 110

CASE 0:16-cv-01054-DTS   Doc. 510-4   Filed 08/26/19   Page 7 of 8
Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

## Page 111

1  the provisions of the Agreement," correct?
2  **A.  Yes.**
3  Q.  And then it defines affiliates by
4  saying "'Affiliates' shall mean any other entity
5  directly or indirectly controlled by Client, where
6  'control' means the ownership of more than 50% of
7  the aggregate of all voting interests (representing
8  the right to vote for the election of directors or
9  other managing authority) in an entity," correct?
10  **A.  Yes.**
11  Q.  Were you involved in drafting that
12  language?
13  **A.  Not that I specifically recall, no.**
14  Q.  Do you know whether that language came
15  from FICO?
16  **A.  I do not.**
17  Q.  Did you believe that language expanded
18  the scope of the Chubb license to include affiliates?
19       MS. KLIEBENSTEIN:  Objection, calls
20  for speculation.
21       THE WITNESS:  Well, it says that "the
22  Enterprise-Wide License shall mean that Client and
23  its Affiliates," as Affiliates is defined.  So,
24  yes.  Although it would be odd for a division to
25  have affiliates but -- since a division is not a

## Page 112

1  legal entity.
2  BY MS. JANUS:
3  Q.  Did you know that FICO was contracting
4  with something that was not a legal entity in
5  connection with the software license agreement?
6  **A.  Well, I mean, I knew FICO was**
7  **contracting with Chubb & Son, a division of Federal**
8  **Insurance Company, so --**
9  Q.  Did you know that FICO was contracting
10  with something that, as you put it, was not a legal
11  entity?
12  **A.  Well, I would say a division is not a**
13  **legal entity.  However, in my experience within**
14  **FICO and outside of FICO, there are instances where**
15  **divisions of companies enter into agreements for --**
16  **I don't know what purpose, their own budgeting**
17  **purposes or whatever purpose, I don't know, but I**
18  **have seen other divisions of other companies enter**
19  **into agreements, yes.**
20  Q.  So it didn't seem out of the ordinary
21  to you that a division was entering into the
22  software license agreement?
23  **A.  I don't recall at the time, but it**
24  **obviously did.**
25  Q.  It did seem unusual to you that --

## Page 113

1  **A.  No.  That a division obviously did**
2  **enter --**
3  Q.  Oh.
4  **A.  -- into a software license agreement.**
5  Q.  Right, and -- and --
6  **A.  Sorry.**
7  Q.  And I guess my -- that doesn't strike
8  you as unusual?
9  **A.  No.**
10  Q.  It was FICO's intent to enter into a
11  software license agreement allowing the licensee to
12  use the software, correct?
13  **A.  Yes.**
14  Q.  So there was no intent on FICO's part
15  to prevent Chubb or its affiliates from actually
16  using Blaze due to the fact that it was Chubb & Son,
17  a division of Federal Insurance Company that
18  entered into the license; is that fair?
19       MS. KLIEBENSTEIN:  Objection,
20  mischaracterizes the document.
21       THE WITNESS:  I mean, the intent of
22  the original license agreement and, then, since --
23  was for Chubb & Son, a division of Federal
24  Insurance, to use the limited license that was
25  originally granted.  The enterprise license was --

## Page 114

1  the intent was for Chubb & Son, a division of
2  Federal Insurance Company and its affiliates, to
3  the extent it even had any, to use the software.
4  BY MS. JANUS:
5  Q.  And FICO was involved in assisting
6  with the implementation of that use, correct?
7       MS. KLIEBENSTEIN:  Objection, calls
8  for speculation.
9       THE WITNESS:  I don't understand the
10  question.
11  BY MS. JANUS:
12  Q.  Well, we looked at Statements of Work
13  and the Master Services Agreement that contain
14  terms providing for FICO to assist Chubb with the
15  use of Blaze, correct?
16       MS. KLIEBENSTEIN:  Objection,
17  foundation and speculation.
18       THE WITNESS:  I don't know about
19  assist in the use of the software.  I would say the
20  implementation of the software.
21  BY MS. JANUS:
22  Q.  Okay.  And it would be implemented so
23  that it could be used, correct?
24  **A.  Yes.  Well, by Chubb & Son.**
25  Q.  Well, you -- so I want to make sure

CASE 0:16-cv-01054-DTS Doc. 510-4 Filed 08/26/19 Page 8 of 8
Jandeen Boone - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 2/6/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

## Page 115

1 I'm clear on this. When you say "by Chubb & Son,"
2 are you taking the position that when you entered
3 into the license there were -- there was some
4 understanding that it was only going to be a part
5 of Chubb that was able to access the software once
6 it was enterprise-wide?
7   A.  Well, the license grant is to
8 **Chubb & Son, a division of Federal Insurance**
9 **Company. Once it's enterprise-wide, the license is**
10 **to Chubb & Son, a division of Federal Insurance**
11 **Company and its affiliates, which would be -- I**
12 **mean, again, the definition of affiliates, "directly**
13 **or indirectly controlled by Client," which is**
14 **Chubb & Son, a division of Federal, "where 'control'**
15 **means the ownership of more than 50% of the**
16 **aggregate of all voting interests."**
17      So, I mean, if you're looking at an
18 **org chart and you have Chubb & Son sitting**
19 **somewhere on the org chart as a division of Federal**
20 **Insurance Company, if they controlled any entity**
21 **down here, an affiliate, they would be allowed to**
22 **use the software, but it wouldn't go up the chart**
23 (indicating).
24   Q.  Okay. And do you know whether FICO
25 did any sort of analysis about what this

## Page 116

1 enterprise-wide license would apply to in terms of
2 the Chubb entities?
3   A.  I don't know.
4   Q.  Would you have expected FICO to do an
5 analysis about that?
6      MS. KLIEBENSTEIN: Objection, calls
7 for speculation.
8      THE WITNESS: I don't know.
9 BY MS. JANUS:
10   Q.  Are you aware or were you aware that
11 the enterprise -- Were you aware of how the
12 enterprise license pricing was arrived at?
13   A.  No.
14      MS. KLIEBENSTEIN: Are we at a good
15 spot for a lunch break?
16      MS. JANUS: Let me just finish up a
17 couple questions on Amendment Two, if that's okay.
18      MS. KLIEBENSTEIN: Yep.
19 BY MS. JANUS:
20   Q.  You mentioned the affiliates language,
21 and then you said although it seems odd for a
22 division to have affiliates. Why would FICO have
23 included the language relating to affiliates if it
24 believed it would be meaningless?
25   A.  I don't know.

## Page 117

1   Q.  Do you know if FICO believed the
2 inclusion of affiliates would actually expand the
3 scope of the Chubb license to use Blaze?
4      MS. KLIEBENSTEIN: Objection,
5 foundation.
6      THE WITNESS: Can you repeat the
7 question?
8 BY MS. JANUS:
9   Q.  Do you believe that FICO -- strike
10 that.
11      Do you know whether FICO believed that
12 the addition of affiliates to the enterprise-wide
13 license expanded the scope of Chubb's Blaze license?
14      MS. KLIEBENSTEIN: Objection,
15 foundation.
16      THE WITNESS: No, I don't know that.
17      MS. JANUS: Okay, let's break.
18      THE VIDEOGRAPHER: Going off the
19 record. The time is 12:35 p.m.
20      (Break from 12:35 to 1:27.)
21      THE VIDEOGRAPHER: We're back on the
22 record. The time is 1:27 p.m.
23 BY MS. JANUS:
24   Q.  Ms. Boone, sticking with Exhibit 314,
25 which is the final license agreement and Amendments

## Page 118

1 One and Two, for the time being, I want to talk
2 about the main Software License and Maintenance
3 Agreement.
4      We talked about the definition of
5 Territory and the License Grant paragraph, which is
6 2.1, in connection with the negotiations that led
7 to the final agreement, correct?
8   A.  Yes.
9   Q.  Looking at the final agreement, what
10 is your view of the territorial scope of the Chubb
11 license to use Blaze?
12   A.  Well, the software -- the Fair Isaac
13 **products, I should say, have to be installed and**
14 **the physical location of them has to be within the**
15 **United States.**
16   Q.  Are there any other aspects or
17 limitations to the territorial scope, in your view,
18 of the Chubb Blaze license agreement?
19   A.  As far as the territory goes, no, as
20 **long as it's installed and the physical location is**
21 **the United States.**
22   Q.  Do you believe that allows Chubb to
23 use the Blaze software globally?
24      MS. KLIEBENSTEIN: What Chubb entity
25 are you meaning?