HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
TAMRA PAWLOSKI - 01/18/2019

```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF MINNESOTA

 3   ------------------------------------------x

 4   FAIR ISAAC CORPORATION, a Delaware
     corporation,
 5                  Plaintiff,

 6                         Case No.  16-cv-1054

 7             v.

 8   FEDERAL INSURANCE COMPANY, an
     Indiana corporation, and ACE
 9   AMERICAN INSURANCE COMPANY, a
     Pennsylvania corporation,
10                  Defendants.

11   ------------------------------------------x

12                  8:30 a.m.
                    January 18, 2019
13
                    767 Third Avenue
14                  New York, New York

15                  * CONFIDENTIAL *

16         DEPOSITION of TAMRA PAWLOSKI, a Plaintiff

17   in the above entitled matter, pursuant to Notice,

18   before Stephen J. Moore, a Registered Professional

19   Reporter, Certified Realtime Reporter and Notary

20   Public of the State of New York.

21

22   Job No. MP-204293
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
TAMRA PAWLOSKI - 01/18/2019       Pages 178..181

Page 178

1  Q    And you understood at this time
2  that the pricing you were seeing was based on
3  the estimated U.S. revenue of the new company,
4  correct?
5  A    Correct.
6  Q    Not that you agreed with the
7  pricing, just that that's what the new U.S.
8  revenue was the basis for the pricing from
9  FICO's perspective?
10 A    Correct.
11 Q    And Chubb rejected this offer,
12 correct?
13 A    Yes.
14 Q    And why was that?
15      MR. FLEMING: I'm going to object
16      to the extent it requires disclosure of
17      its attorney-client communications.
18      On the basis of privilege you
19      should not disclose those.
20 A    Can you ask your question again?
21 Q    Sure.
22      Why did Chubb reject this offer?

Page 179

1  A    Because once again, senior
2  leadership felt that this was -- this license
3  fee was still extremely high in comparison to
4  the investment already made with FICO.
5  Q    Did you believe that -- well,
6  Chubb's position in these business
7  negotiations, it was not that -- Chubb didn't
8  think it needed to pay a new license fee at
9  all, did it?
10      MR. FLEMING: I object to the
11      extent it calls for attorney-client
12      communications, which you should not
13      disclose on the basis of privilege.
14 A    No, we didn't. We had a hard
15 time with that.
16 Q    So the issue wasn't -- the
17 problem from the business perspective from
18 Chubb's point of view wasn't that FICO's
19 pricing model was flawed, rather that Chubb
20 already had a license and shouldn't be forced
21 to pay more, correct?
22      MR. FLEMING: I object, misstates

Page 180

1  her prior testimony, and it's multiple
2  questions.
3  A    Can you repeat that again?
4  Q    Sure, I will try.
5       Chubb rejected this offer in
6  Exhibit 259, correct?
7  A    Yes.
8  Q    And the reason Chubb rejected
9  this offer is -- well, I will ask it a
10 different way.
11      Was the reason Chubb rejected
12 this offer because FICO bases its licensing
13 figures on company revenue?
14 A    No.
15 Q    So the problem with this offer
16 wasn't -- wasn't FICO's pricing models, it was
17 instead the history between the parties and
18 because Chubb thought it had already had a
19 license, right?
20      MR. FLEMING: Objection, multiple
21      questions and misstates her prior
22      testimony.

Page 181

1  A    No, there was -- we still had an
2  issue with this pricing model.
3  Q    Chubb had a problem with the
4  ultimate price, not necessarily the model,
5  correct?
6       MR. FLEMING: Objection, that's
7       been asked and answered.
8  A    No, we had a problem with the
9  model as well.
10 Q    Can you tell me what the problem
11 with the model was?
12      MR. FLEMING: I object to the
13      extent it calls for attorney-client
14      privileged communications.
15 A    If you take a look at the global
16 revenue, it's $14 billion at an estimate of $11
17 billion for $2.4 million.
18      In 2016 it was 20, but yet we
19 were asked to pay double if not triple what we
20 were paying from when we originally purchased.
21      So, the calculation of how they
22 came to 20, that was not disclosed, just that

Page 182

1  the revenue was the basis.
2     Q    I am handing you what's been
3  marked as Exhibit 260.
4           (The above described document was
5           marked Exhibit 260 for identification as
6           of this date.)
7     Q    Are you familiar with this
8  e-mail?
9     A    Yes.
10    Q    In this e-mail, Henry -- you
11 e-mailed Henry Mirolyuz on March 14, 2016,
12 "Henry, have any proof that FICO knew we
13 deployed Blaze Advisor internationally?"
14         Why did you ask Henry that
15 question?
16    A    That was based upon
17 attorney-client privilege.
18    Q    And what was Mr. Mirolyuz'
19 answer?
20    A    I don't recall, actually.
21         MR. FLEMING: To be clear, you
22         are asking her why she asked the

Page 183

1           question, not whether she had knowledge
2           of FICO deploying Blaze internationally,
3           correct?
4           MS. KLIEBENSTEIN: Correct, and
5           then --
6     Q    Was there any response from
7  Mr. Mirolyuz?
8     A    We had several discussions on
9  several points with FICO, and I don't recall
10 this specific -- his specific response to this.
11    Q    And you asked him this question
12 because legal asked you to ask him this
13 question?
14    A    Correct.
15    Q    So you didn't ask him this
16 question for purposes of the business
17 negotiations that were going on?
18    A    No.
19    Q    When you were talking with FICO
20 personnel, did international use of Blaze
21 Advisor ever come up?
22    A    Yes.

Page 184

1     Q    In what way?
2     A    So, in 2011 I was part of a
3  negotiation with the SOW on work where FICO
4  were sending two employees over to assist us
5  with an assessment and implementation of Blaze
6  in our London office.
7           And so that was the first time
8  I've had discussions with FICO on the
9  international part.
10          Because we, as the other SOWs
11 that we had gone through, same thing, I had to
12 look at the requirements and all of that from
13 that perspective.
14          And then the next time we
15 brought it up was during the discussions of
16 what products were using Blaze, after the
17 February 2016 letter.
18    Q    And the February 2016 letter you
19 are referring to is from whom to whom?
20    A    There was a letter to our
21 general counsel, the general counsel at ACE,
22 and documenting, and I can't remember the

Page 185

1  specifics.
2     Q    I am handing you what has been
3  marked as Exhibit 261.
4           (The above described document was
5           marked Exhibit 261 for identification, as
6           of this date.)
7     Q    Are you familiar with this
8  e-mail and its attachment?
9     A    I am.
10    Q    Was this your response to the
11 FICO offer in Exhibit 259?
12    A    Yes.
13    Q    To be clear, it's the attachment
14 that's Chubb's response?
15    A    That's correct.
16    Q    Okay, now let's move to the
17 attachment.
18          Can you walk me through the
19 different rows and columns to explain the
20 methodology used by Chubb in this response?
21          Let me ask a predicate question.
22    A    Sure.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
TAMRA PAWLOSKI - 01/18/2019      Pages 186..189

Page 186

1  Q   You were responding to the
2  option 1 offer, correct, not the option 2
3  offer?
4       A   That's correct.
5       Q   So this was responding to option
6  1 for a North American enterprise license,
7  correct?
8       A   This was our response to an
9  enterprise license.
10      Q   Restricted geographically at
11 all?
12      A   We incorporated in the two
13 non-U.S. deployments, so it did open it up from
14 just in North America.
15      Q   Okay, but the proposal on the
16 table was a -- that's being discussed in
17 Exhibit 261 is enterprise for the U.S. and two
18 non-U.S. deployments?
19      A   Yes, it is in response to option
20 number 1 of 557, Exhibit 557.
21      Q   Just so we're clear, deployment
22 in this context, that word means the same as we

Page 187

1  discussed before?
2       A   It does.
3       Q   Okay, now we are ready.  Walk me
4  through the Chubb counteroffer.
5       A   There were several individuals
6  who had input into this, so although I
7  responded to Bill Waid, so I will walk through
8  it as I can recall, as best as I can recall.
9           So we took a look at what the
10 revised numbers were for 2006, because when we
11 looked at the 2006 numbers that were initially
12 here, those numbers were actually the current
13 before the acquisition.
14          They weren't actually the 2006
15 revenue or gross and premium numbers, so that's
16 what the revised numbers up above were for.
17          And so we went back to validate
18 what that was, and that's why you'll see the
19 difference from a -- so the first three lines
20 represents the estimated U.S. revenues versus
21 what FICO had, okay?
22          Then second, we went down to the

Page 188

1  revised numbers based upon the change from 11.2
2  to 9.56, and that's what the $2 million
3  represents.
4           Likewise for deployment; took
5  the same methodology, and therefore kind of
6  went down and used that same.
7           Now all you're doing is adding
8  the two, so the 2, 3 and then the discount that
9  was applied gave us the total of 1.2, and so
10 therefore we overpaid our license, the original
11 license when we originally purchased it, back
12 in 2006 based upon this.
13          Because -- well -- and so there
14 should have -- and then we overpaid the license
15 as well as overpaid the maintenance.
16      Q   Let me ask you a couple of
17 questions on that.
18      A   Sure.
19      Q   So U.S. revenue went -- what
20 FICO used in the 2006 negotiations was $11.2
21 billion?
22      A   Correct.

Page 189

1       Q   And then the revised numbers,
2  you went back and looked at the actuals, and it
3  was $9.56 billion?
4       A   Yes.
5       Q   And so when you go down to
6  deployment and development, you shrank those
7  numbers by the same percentage?  Am I
8  understanding that right?
9       A   The allocated percent, like a
10 formula.
11      Q   So essentially 9.56 is about
12 8/10 of 11.2, right, so the deployment number
13 that you provided went down by that same
14 percentage?
15      A   Right.
16      Q   So that's how that was.
17          The development figure, that
18 also went down by the same percentage, correct?
19      A   That's correct.
20      Q   And then the overpayment of
21 maintenance, how was that calculated?
22      A   Because we currently -- we had

Page 230

```
 1      3:35 p.m. and we are going off the
 2      record.
 3              (At this point in the proceedings
 4      there was a recess, after which the
 5      deposition continued as follows:)
 6              THE VIDEOGRAPHER:  This is the
 7      start of media labeled number 6.  The
 8      time now is 3:43 p.m. and we are back on
 9      the record.
10      Q    So, you mentioned a few times
11 that after February or March of 2016 in the
12 negotiations with FICO that it went up the
13 chain to senior leadership.
14           Who were the people that you are
15 referring to in that senior leadership group?
16      A    Bill Harlam, Rob Hilgan, Kevin
17 Shirran and Andrew Hopp.
18      Q    Andrew Hopp is the general
19 counsel, is that correct?
20      A    That's correct.
21      Q    Bill Harlam was the CIO?
22      A    No, Bill was my boss, he was the
```

Page 231

```
 1 head of vendor management.
 2      Q    Who is Rob Hilgan?
 3      A    Rob Hilgan was Bill's boss.
 4      Q    What was his role?
 5      A    Operations.
 6      Q    Chief of operations?
 7      A    Yeah -- no, he wasn't the Chief
 8 Operating Officer, he just had IT operations.
 9      Q    And Kevin Shirran, who was that
10 and what was his role?
11      A    Officially our CIO, global CIO.
12      Q    Now, when we were looking at
13 Exhibit -- the very last exhibit with the CHear
14 report, we were talking about the Blaze Advisor
15 being approved for use in Evolution and Russ
16 Hodey was the IT application contact.
17           Do you recall that?
18      A    Yes.
19           I'm sorry, here we go.
20      Q    I wanted to cross-reference that
21 to other exhibits.  You mentioned that it
22 probably related to the e-mails we had already
```

Page 232

```
 1 discussed relating to Australia with Russ
 2 Hodey.
 3           Were those the e-mails at
 4 Exhibits 268 and 269?
 5      A    No, they were the ones in an
 6 earlier, that we did -- hold on a second, I
 7 think it was Exhibit 244.
 8           And what is he asking?  Not 244,
 9 I'm sorry.  It was 241 and 243.
10      Q    So I note your -- in Exhibit 241
11 your response was that the license was not
12 worldwide, correct?
13      A    Yes, but then shortly after, as
14 stated, that was corrected.
15      Q    An it was corrected by Mark?
16      A    Berthume.
17           MS. KLIEBENSTEIN:  All right.  No
18      further questions.
19           MR. FLEMING:  I have just a
20      couple of follow-up relating to Exhibit
21      260.
22
```

Page 233

```
 1 EXAMINATION BY
 2 MR. FLEMING:
 3
 4      Q    My question --
 5           MS. KLIEBENSTEIN:  Hold on just a
 6      second.  Let me see 260, please.
 7      Q    What knowledge do you have that
 8 FICO knew that Chubb deployed Blaze in the
 9 United Kingdom?
10      A    I worked on a statement of work
11 with -- where two of the consultants from FICO
12 were sent to the U.K. to install and to do an
13 assessment and then an installation of the FICO
14 product, Blaze product.
15      Q    And who prepared the statement
16 of work?
17      A    It was joint between the
18 business partner, myself and FICO.
19      Q    And who at FICO was working on
20 this?
21      A    I know it wasn't Mike Sawyer,
22 because he wasn't there at the time, I don't
```

Page 234

1 believe.
2           I don't recall who the -- one of
3 the salesmen.
4      Q    Is it Russ Schreiber?
5      A    Yes.
6      Q    Did you have any discussions
7 with Russ Schreiber as to whether use of Blaze
8 by Chubb in the United Kingdom was permissible
9 under the agreement?
10     A    No, because I wouldn't have
11 thought they would send consultants there if it
12 was not permissible.
13     Q    So if you just walk through the
14 process of why there was a statement of work
15 and how that was proposed, just the timeline.
16     A    So, what will happen is we will
17 get a request from the business asking us if --
18 to put together the SOW.
19          I would contact FICO to arrange
20 that, and it is practice at Chubb that the
21 business also contacts FICO to go over what
22 their requirements are so the two of them can

Page 235

1 agree.
2           I'm on some of those calls and
3 not on some of those calls.
4           Then what we do is we take what
5 has been agreed and put it into a statement of
6 work and ensure that statement of work is
7 correct, including what's going to be delivered
8 and the deliverables, and from there it gets
9 signed.
10     Q    And then what happens next?
11     A    Then the SOW goes to the
12 business partner for them to work on, so they
13 contact FICO and the consultants go to wherever
14 they need to go.
15     Q    And did you understand that two
16 FICO representatives went to London?
17     A    Yes, that was outlined in the
18 SOW.
19     Q    And what was your understanding
20 of what did they do in London?
21     A    They were the architects that
22 helped with the assessment, and then also we

Page 236

1 wanted to make sure that we were putting FICO
2 in correctly, so, the assessment and
3 installation.
4      Q    And what was your understanding
5 as to what they installed?
6      A    It was clear that was -- it was
7 the Blaze Advisor product.
8      Q    Where was it installed?
9      A    In the U.K. data center on, I
10 believe our mainframe in the U.K.
11     Q    At any point during that process
12 did anybody from FICO suggest that the use or
13 installation of Blaze in the United Kingdom was
14 outside the scope of the sales force license
15 agreement?
16     A    No.
17          MR. FLEMING:  Okay, I have no
18     further questions.
19
20 CONTINUED EXAMINATION BY
21 MS. KLIEBENSTEIN:
22

Page 237

1      Q    So the event you were just
2 talking about, when did this occur?
3      A    2011, yes, 2011 or 2012; I
4 believe it was 2011.
5      Q    Were you in the United
6 Kingdom --
7      A    No.
8      Q    -- when the work was being done?
9      A    No.
10     Q    So when you are talking about
11 the installation and the assessment, you
12 weren't personally there?
13     A    No, that was managed by the
14 business.
15     Q    And how did you come across that
16 knowledge?
17     A    In the statement of work that
18 was signed off by two -- by both companies as
19 to what was going to be delivered, and then
20 before payment, I validated that it happened.
21     Q    So these were tasks that were
22 outlined in the statement of work?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
TAMRA PAWLOSKI - 01/18/2019         Pages 238..241

Page 238

1  A   Correct.
2  Q   A written statement of work?
3  A   Yes.
4  Q   Do you know if that statement of
5  work has been produced in this lawsuit?
6  A   I don't know.
7      I know it wasn't one of the ones
8  that you have shown me.
9  Q   Did anyone from Chubb & Sons
10 check with legal to make sure that what was
11 going to happen -- well, was the SOW Chubb &
12 Sons' standard SOW?
13 A   It was.
14 Q   So it wouldn't have gone to
15 Chubb & Sons' legal?
16 A   That's correct.
17 Q   Do you know whether it went
18 through FICO's legal department?
19 A   I do not know.
20 Q   Do you know if Mr. Schreiber
21 checked with FICO legal?
22 A   I do not, no.

Page 239

1  Q   You mentioned briefly you don't
2  recall any discussions with respect to this
3  statement of work as to whether it was okay
4  under the agreement, correct?
5  A   Yeah, I don't recall.
6  Q   But there weren't -- you don't
7  recall discussions one way or the other,
8  whether this was or was not okay?
9  A   That's correct, I don't recall.
10 Q   And so what was your role with
11 respect to this statement of work?
12 A   I helped to draft it on to the
13 template and work it through the process that
14 we have outlined, that I have outlined a couple
15 of times already.
16     So, getting it through to
17 signature, making sure everybody was agreed
18 with what the business terms were in the SOW,
19 agree with the pricing, and got a final
20 signature approval for it.
21 Q   And what application -- what
22 software application did the statement of work

Page 240

1  involve?
2  A   This one was a CPI print
3  application.
4  Q   That's the name for it?
5  A   Yes, I believe that was -- I
6  knew it had to do something with print.
7  Q   Do you know one way or the other
8  whether Blaze Advisor was installed on servers
9  in the United Kingdom pursuant to this
10 statement of work?
11 A   Yes.
12     Yes, it was installed, because
13 they gave me validation when we were paying the
14 invoice.
15 Q   What was that validation?
16 A   That the deliverables outlined
17 in that SOW were completed.
18 Q   Who gave that you validation?
19 A   The project manager.
20 Q   And who is the project manager?
21 A   I don't remember.
22     MS. KLIEBENSTEIN: All right, I

Page 241

1  don't have any further questions.
2      MR. FLEMING: Nothing further.
3  We will read and sign.
4      THE VIDEOGRAPHER: The time is
5  3:58 p.m. and we are going off the
6  record.