```
 1              UNITED STATES DISTRICT COURT

 2                        FOR THE

 3                DISTRICT OF MINNESOTA

 4

 5            C.A. No. 16-cv-1054 (WMW/DTS)

 6   ---------------------------------------------

 7   FAIR ISAAC CORPORATION,                     )

 8                              Plaintiff        )

 9   v.                                          )

10   FEDERAL INSURANCE COMPANY AND ACE           )

11   AMERICAN INSURANCE COMPANY,                 )

12                              Defendants       )

13   ---------------------------------------------

14               CONFIDENTIAL TRANSCRIPT

15                ATTORNEYS' EYES ONLY

16

17           DEPOSITION OF MICHAEL SAWYER

18                  October 2, 2018

19                 Courtyard Marriott

20               35 Foxborough Boulevard

21              Foxborough, Massachusetts

22

23                      *********

24          Court Reporter:  Amie D. Rumbo
```

**EXHIBIT 21**

**Page 33**

Q. Okay. Would it have been a regular practice to have periodic discussions about particular client accounts in which you would send all various license agreements along with the most recent public information about the client?

A. No.

Q. So this would not have been something that was done, say, on a quarterly basis or an annual basis, right?

A. No, it would not.

Q. So instead, the reason for this would have been to have a discussion about a particular project; is that fair?

MR. HINDERAKER: Objection. Lack of foundation.

A. I do not recall the genesis for this meeting, and it would be speculating to determine why I sent this out.

Q. Right. And I'm not asking you to speculate, but would you periodically send out, at the request of the contract partner, the various software licenses for a particular account and the most recent client information in order to discuss a new project or an existing project?

**Page 34**

A. That -- yes. So, you know, if there was a question, a new project, dialogue that the client partner would have with the account, yes, it would be in my scope of responsibility to coordinate a discussion on behalf of that client partner and to, you know, gather relevant materials internally to support those discussions.

Q. Okay. And would there have been any other reason to have sent out all of the software licenses for a particular client and the most recent information about that client other than to discuss either a new project or a pending project?

A. It's possible, but I think most likely it was to discuss a project or an inquiry from the client.

Q. Okay. Fair enough. And you don't recall a particular project that was discussed in connection with this e-mail; is that fair?

A. I do not.

Q. Do you see the reference to a plan for Chubb Europe?

A. Yes, I see that.

Q. What was the plan for Chubb Europe?

**Page 35**

A. I do not know.

Q. Now, were you, at that time, familiar with the actual license and the amendments that Chubb had with FICO?

A. I cannot be certain if I had reviewed them prior to this meeting or not. So I can't say yes or no to that question.

Q. Did you have any understanding as to the -- at that time as to the geographical scope of the FICO license with Chubb?

A. Not that I can recall. At that point in time, it would have been the client partner's responsibility for managing that. So Ian Brodie would have been the client partner at that time and that would be in his responsibility.

Q. Now, were you familiar at that time or did you familiarize yourself with the Chubb software license and the amendments to that license?

A. I most likely did. FICO stores their contracts separately in the contracts library based upon, you know, each executable agreement, and so the three contracts that you provided here in Exhibit 73 would have been stored

**Page 36**

separately within our contract system. And based on that, you know, I can't be certain that I did trace everything back through all the separate contracts. You know, it's most likely I would have gone and read the amendment, too, right, as the most recent to reflect the status of the relationship. So I cannot be certain that I went back and read the full 17 pages of the original agreement.

Q. So are you familiar with this software license and maintenance agreement?

A. Generally, yes.

Q. Okay.

A. Not the specifics as it pertains to the unique language for Chubb.

Q. Do you recall, at that time, when there was a discussion about a plan for Chubb Europe any internal discussions about the scope of this software license and maintenance agreement?

A. I do not. You know, looking at the attendees on that list, Ian Brodie was the client partner who was responsible for that. Russ Schreiber was the client partner when the license agreements were sold to Chubb. So I was -- I

Page 37

1  believe I was mostly a coordinator in this effort.
2  Those two individuals were the authoritative
3  figures on the relationship with Chubb.
4      Q.  Was it your understanding that the
5  basic FICO software license excluded client
6  affiliates from using the license?
7          MR. HINDERAKER: Could I ask a
8      clarifying question? When you say basic, are
9      you talking about the license with Chubb or
10     just --
11         MR. FLEMING: In general.
12         MR. HINDERAKER: Just a general.
13     A.  I'm not aware of what our standard
14  language was related to affiliates, although it
15  was a common item for negotiation with clients in
16  general.
17     Q.  What was a common part of
18  negotiation?
19     A.  Determining the definition of
20  affiliates within the contracts.
21     Q.  Okay. Do you recall any
22  discussions in 2008 as to whether the FICO license
23  agreement permitted use by a Chubb affiliate in
24  Europe?

Page 38

1          MR. HINDERAKER: Same clarifying
2      question. Are we talking about the Chubb
3      license or just general licenses now?
4          MR. FLEMING: This license.
5          MR. HINDERAKER: Okay. Thank you.
6      A.  No, I do not recall any discussion
7  that took place in 2008.
8      Q.  Do you recall any discussions about
9  that topic while you were at FICO?
10     A.  I do.
11     Q.  What do you recall?
12     A.  I recall, at some point after I
13  assumed responsibility as client partner for
14  Chubb, reviewing the agreements and at that point
15  in time, I realized the territory clause within
16  the original software license service agreement.
17  And you know, it clarified for me, you know, the
18  scope of amendment two based on that territory
19  clause. And it highlighted for me, you know, a
20  potential discrepancy in the way that my
21  predecessors had, you know, interpreted that
22  clause.
23     Q.  And when you're talking about your
24  predecessors, are you referencing Ian Brodie or

Page 39

1  anybody else?
2      A.  Ian Brodie and Russ Schreiber.
3      Q.  How had they interpreted that
4  clause; what was the discrepancy that you just
5  referenced?
6          MR. HINDERAKER: Which question do
7      want? Objection. And multiple questions.
8      Which question do you want answered?
9      A.  Can you clarify your question,
10  please?
11     Q.  What discrepancy are you
12  referencing?
13     A.  The extent to which the enterprise
14  license in amendment two applies from a territory
15  perspective.
16     Q.  What do you mean by that?
17     A.  I can't speak to, you know, Ian or
18  Russ's interpretation of the agreement; however,
19  based on knowledge that I had, you know, in
20  working with Henry Mirolyuz and the team at Chubb,
21  that there may have been some use of the products
22  for Chubb businesses outside the United States.
23  And so when I read the agreements, went back
24  through the territory, I, you know, highlighted

Page 40

1  that to Russ Schreiber. I can't be certain on the
2  date.
3      Q.  So when you say you highlighted
4  that to Russ Schreiber, are you referencing an
5  e-mail that you sent him at that time?
6      A.  No. It would have been in
7  discussion.
8      Q.  Was it ever memorialized in an
9  e-mail?
10     A.  I couldn't recall for the nine
11  years that I worked at FICO if I wrote an e-mail
12  or not, but most likely it was in discussion with
13  Russ.
14     Q.  And when was that discussion?
15     A.  So it would be during the period of
16  time that I was a client partner responsible for
17  the Chubb account. So it was somewhere between
18  March 2010 and February 2014. My guess is it's in
19  that period of time when I was responsible for the
20  account.
21     Q.  So in responding to that question,
22  you were referencing the LinkedIn document, right?
23     A.  Yes.
24     Q.  So you don't have a separate