CASE 0:16-cv-01054-DTS   Doc. 510-20   Filed 08/26/19   Page 1 of 5
Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1              CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2                 UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
 3
       -------------------------------x
 4
       FAIR ISAAC CORPORATION,
 5
                         Plaintiff,
 6           v.                              Court File No.
                                             16-cv-1054 (WMW/DTS)
 7
       FEDERAL INSURANCE COMPANY
 8     and ACE AMERICAN INSURANCE
       COMPANY,
 9
                         Defendants.
10
       -------------------------------x
11

12       ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

13       VIDEOTAPED DEPOSITION OF RUSSELL SCHREIBER

14                    New York, New York

15               Wednesday, October 24, 2018

16                        8:52 a.m.

17

18

19

20

21
       Reported by:
22     LYNN VAN DEN HENDE
       CRR, RMR, RPR, CSR-NY, CSR-CA, CSR-IL
23     JOB NO: 39215

24

25
```

EXHIBIT 22

CASE 0:16-cv-01054-DTS  Doc. 510-20  Filed 08/26/19  Page 2 of 5
Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Q. And new business, are there buckets in particular when you're talking about the insurance market that you're looking at for new business?

A. How do you mean "buckets"?

Q. Well, FICO sells software?

A. Right.

Q. That's a source of revenue generation for FICO, right? That might be one area of revenue generation that would apply to the insurance market?

A. Right.

Q. Is that fair?

A. So there's software and services, yes.

And the software is multiple lines. And the services have multiple lines, yes.

Q. And "services," you mean professional services?

A. Right.

Q. And that would be -- describe for me generally what that means in the context of FICO?

Page 12

A. That would mean -- we had a consulting staff. I assume we still have a consulting staff.

But there were people that were paid on the hour to work at or for clients directly.

Kind of like lawyering, you get a billing rate and --

Q. And the skill that these folks offered was technical skill with the software?

A. When you say "technical," that means a lot of different things.

But so they had skill -- some had technical skills in software. Some had technical skills in gathering user requirements.

Some had technical skills in an industry, insurance in my case, or it could have been banking or contract in another case.

So -- so they did have technical skills that would warrant a customer paying multihundreds of, you know, dollars an hour

Page 13

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

for that service.

Q. So sticking with the insurance market, there's software licensing revenues --

A. That's right.

Q. -- and then professional services?

Those are the two main forms of revenue generation in the insurance market for FICO, is that fair?

A. Those are two of them. Are they the two main?

There is also maintenance.

And then there is also scores, like, you know, the FICO credit score, your personal credit score. We have FICO insurance scores as well.

Q. Okay, okay. And would that be in the software sales bucket, or no?

A. No. That would be in the revenue bucket. But that was a different kind of -- it was analytic sales.

Q. Okay. So when you started, you were in charge of the northeast insurance market.

Page 14

And you've described that to mean essentially you were responsible for the revenues that FICO realized from the northeast insurance market.

In terms of your actual job duties, what did that look like generally?

A. So it was planning, how do we achieve revenue goals; work -- work back and forth with the leadership at that time to set a goal and then see how we could fit into it based on the tools that we had.

It would be working with various sales teams. Like I know we're here to talk about Blaze. So the Blaze had a sales team.

There were other products and other sales teams.

So I'd work with all those teams to see what we're going to bring to a customer or to a territory.

We'd set up road shows. We'd have marketing events where a hotel room would have 80 people invited and tell our story.

Q. Were you also in a role of client partner at times?

Page 15

CASE 0:16-cv-01054-DTS   Doc. 510-20   Filed 08/26/19   Page 3 of 5
Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

A. Yes, yes.

Q. Okay.

A. In fact, I think that was our title. I think -- so like any other organization, they've gone through changes -- well, why don't you just ask the question?

Q. No, I think you're anticipating what my question is.

MR. HINDERAKER: So answer the --

THE WITNESS: No, I'll keep going. I just --

MR. HINDERAKER: No, no, I'm just trying to say let counsel ask a question, and then you can answer what she asks you.

THE WITNESS: Okay.

BY MS. JANUS:

Q. It's so much easier.

Yeah, so you were saying the client partner role.

And it sounded like maybe -- in my mind I've heard in the context of this case reference to client partners.

A. Uh-huh.

Page 16

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Q. And I'm trying to figure out where what you're describing fits in with the client partner role at FICO.

A. Right. So -- so probably my business card at the time might have said, "vice president, client partner."

So client partner was a -- at that time was a -- a organizational construct to bring industry experts or industry folks into the FICO fold and be focused on client relationships and making sure we're able to bridge the FICO technologies with industries.

And so the people that did that -- I was one of them -- were called client partners.

Q. As part of your job were you familiar generally with the way the clients you were responsible for used Blaze?

A. Yes.

Q. That was one of your job responsibilities?

A. Yes.

Q. Why was that?

A. Well, for -- there are multiple

Page 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

dimensions to it.

But one was to help sell the next one. So I could say, aha, well, you know, insurance company, you know, X uses it for something. And that's a -- that's a great kind of, you know, horizontal application that other insurers could be thinking about doing.

And not -- obviously not a confidential handling -- you know, insure confidential -- I would insure confidential information by understanding how one insurance company uses it.

At that point I can then help others understand the art of the possible with the technology.

So that was one reason why we had to know what they were doing.

Another reason was to be able to bring the rest of FICO to bear and to help.

Q. With that particular client?

A. Yeah. So I'd bring a professional services person in to help integrate, say, Blaze and Duck Creek. You know, pick a

Page 18

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

product, whatever.

Q. And the client partner would need to understand how a given client was using Blaze in order to facilitate FICO's continued support of the use of Blaze?

A. Within -- within bounds.

So it's interesting how there were some clients that were open to Camono we worked very closely with.

And there were other clients -- some were in the city here -- that I would knock on the door and say, hey, I just took over this part of the business and I'd like to meet you, see what you're doing. They'd say, no, thank you. We don't want -- we don't want a relationship. We just bought your software.

So there were some customers that kept a very -- their use very close to the vest and they wouldn't really tell us, and they would just pay their bills.

And there were others that we were very close with.

That's pretty much how the world

Page 19

CASE 0:16-cv-01054-DTS   Doc. 510-20   Filed 08/26/19   Page 4 of 5
Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

works, right?

Q. As part of your responsibilities as client partner would you also generally be familiar with the licenses that governed the relationships with the clients that you worked with?

A. So generally, yes.

But there were licenses that folks had that I didn't even know, I wasn't even aware of.

Q. But generally the scope of the license with a given client was something that you were familiar with?

A. Or I had to figure it out.

But, yes, yeah, sure.

Q. And that would be important for what you are doing as a client partner, I take it, because you need to know whether there are additional products or services that could be sold to a given client, correct?

A. At one end or -- or if that product was being sunset and they needed to know that it was being, you know, shelved in

Page 20

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

two years, that we can up and manage their -- their way through that process.

Q. Yeah. And you would also need to know how widely that client is able to use the software that they've licensed under the terms of their license, correct?

A. Say that again, please.

Q. You'd also need to know how widely that client is able to use the software that they've licensed under the term of their license?

A. Right. So if you mean -- do you mean like what the scope of the license is?

Q. Yeah.

A. Because "widely" is -- I'm not sure -- yeah, so if you said -- I would certainly want to read the scope of the license, yeah, yeah. I guess.

Q. When did you first begin to work with Chubb?

A. Chubb was my first client. Chubb was my -- my entrée into FICO. That's -- you know, put me on the map.

So that would have been February,

Page 21

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

maybe March of '16.

So within a month or two we received an RFI, and I led the response.

MR. HINDERAKER: Can I -- I think you said '16? February --

A. Oh, I meant '6. Did I say '16? I meant 2006. Thank you.

Q. So you said you received an RFI in the spring of 2006?

A. Right. I want to say February or March. So early -- late winter, early spring, yeah. It was right away.

Q. And what is an RFI?

A. It could have been an RFP, but it was request for information would be an RFI.

It might have been an RFP, a request for proposal.

But it was a document that we received to be able to present to Chubb a solution and pricing and an approach to the problem.

Q. And do you recall -- it was a while ago, but do you recall off the top of your head just generally what the nature of

Page 22

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

the request for information or proposal was from Chubb?

A. Oh, yeah, yeah. Yeah. It's funny -- no, it's funny how things you remember.

Anyway so -- so this was to create an automated renewals platform for their specialty lines of business.

They had like a -- I forget, like 170 or maybe 120 different products in that -- in that business.

And so that would be like small manufacturers maybe or nurses or, you know, plumbers.

But what they called specialty lines.

And so the way they sold those products is they have the underwriting process where they'd have an underwriter like price out how risky is this thing and then set out an insurance price premium.

And what was happening is they had a corporate initiative. Their agenda was to be able to sell to a larger market, which

Page 23

CASE 0:16-cv-01054-DTS   Doc. 510-20   Filed 08/26/19   Page 5 of 5
Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 24**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

meant smaller value, smaller dollar value.

So like -- I forget the numbers, but I want to say the average policy price was maybe -- let's call it $100,000 for this discussion.

They wanted to be able to move down to a bigger market, more prospective customers.

Say the average policy is $20,000. So, you know, moving to like the Fortune 100s to the Fortune 10,000, that kind of concept.

The way their business worked at that time was they would write the new policy, they'd get a new prospect, and they'd assess the risk.

And then they would -- if they won the work, they'd book the policy, and they'd have a new customer.

The problem was that on renewals they would do a full review of the -- each policy, so that it was effectively underwriting the whole customer from scratch, which is very expensive.

So the premise of this RFI or RFP

**Page 25**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

or request for a pitch was -- or solution was how can they automate the underwriting -- the renewal process so that they could move into a business model where they were -- had less manual intervention with the renewal process.

So they're going to be some insurance customers that would just, you know, not even touch this, just automatically renew it.

There were others I think that were high risk. They need to really do full underwriting. There were some that were in the middle.

So they called that the low touch, no touch, high touch is -- you know, and it's become pretty big in the industry now.

Q. And the idea was this renewal process would become a low touch?

A. So they would be able to segment the customers across these 170 or 200 plus products. And, again, don't quote me on the product count, but there was hundreds of them. They could segment the customers at the renewal process into high touch, low

**Page 26**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

touch, no touch.

So if they had -- the high touch once were the most expensive ones to renew, because you had to go send people out, look at the buildings, you know -- you know, check the headcount, make sure the staff is right.

So it's how do you price that premium.

Whereas the no touch, it's like our auto insurance. You just get a new bill for the next year, right?

So they were trying to get more into the low to no touch.

Q. And for folks who aren't familiar with either the insurance industry or Blaze, can you describe in general terms how a product like Blaze would be used in a solution like this?

A. Sure.

So insurance policies are annual policies. So about three months before the end of a year the policy information and the claim information would be -- would be transferred, be fed into a Blaze engine.

**Page 27**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

And the Blaze software would look at that information. And rules would be -- rules in Blaze would be applied to it.

So the rule -- a rule might be, oh, there were no claims this year. So that means we could do a low or no touch.

Or they had claims this year, so now it must be a high touch.

And the magic here was that Blaze -- the rules that we're talking about were set up in such a way that human beings could -- could maintain them.

So it didn't require like some, you know, MIT Ph.D.

A regular business analyst could maintain those business rules.

So -- right, so once a year a feed would come in, rules would be compared.

And then the policies would be segmented into high touch, low touch, no touch.

Q. And I take it that in a process like that while Blaze is involved Blaze is actually incorporated somehow into an