<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3   Fair Isaac Corporation,        )
                                    )    File No. 16-CV-1054
 4            Plaintiff,            )            (WMM/DTS)
     v.                             )
 5                                  )
     Federal Insurance Company, an  )    Minneapolis, Minnesota
 6   Indiana corporation; and ACE   )    August 22, 2019
     American Insurance Company, a  )    1:30 p.m.
 7   Pennsylvania corporation,      )
                                    )
 8            Defendants.           )
     ------------------------------------------------------------
 9
                 BEFORE THE HONORABLE DAVID T. SCHULTZ
10          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                        (MOTIONS HEARING)
11
     APPEARANCES
12    For the Plaintiff:           MERCHANT & GOULD, PC
                                   ALLEN HINDERAKER, ESQ.
13                                 JOSEPH DUBIS, ESQ.
                                   80 S. 8th St., #3200
14                                 Minneapolis, Minnesota 55402

15    For the Defendants:          FREDRIKSON & BYRON, PA
                                   TERRENCE FLEMING, ESQ.
16                                 LEAH JANUS, ESQ.
                                   CHRISTIAN HOKANS, ESQ.
17                                 200 S. 6th St., #4000
                                   Minneapolis, Minnesota 55402
18
      Court reporter:              DEBRA BEAUVAIS, RPR-CRR
19                                 300 S. 4th St., #1005
                                   Minneapolis, Minnesota 55415
20

21

22
          Proceedings recorded by mechanical stenography;
23   transcript produced by computer.

24

25
</pre>

1          **P R O C E E D I N G S**

2                **IN OPEN COURT**

3          THE LAW CLERK:  All rise.

4          THE COURT:  Good afternoon.  Be seated.

5          MR. HINDERAKER:  Good afternoon.

6          THE COURT:  All right.  We are on the record in

7     the matter of Fair Isaac Corporation v. Federal Insurance

8     Company, et al, Civil No. 16-1054.

9          Counsel for the plaintiff, if you would note your

10    appearance for the record, please.

11         MR. HINDERAKER:  Your Honor, Allen Hinderaker and

12    Joe Dubis from Merchant & Gould, and James Woodward, Vice

13    President and Deputy General Counsel at FICO.

14         THE COURT:  Good afternoon to the three of you.

15         Counsel for the defendant, if you would note your

16    appearance for the record.

17         MR. FLEMING:  Good afternoon, Your Honor.  Terry

18    Fleming, along with Leah Janus and Christian Hokans, of the

19    Fredrikson Law Firm representing the defendants.

20         THE COURT:  Good afternoon to the three of you.

21         All right.  Mr. Fleming, it is your motion.  If

22    you'd come on up to the podium.  Before you start, let me

23    ask you a question.  Was there anything about the Complaint

24    or what was it about the Complaint that led you to not plead

25    the statute of limitations as an affirmative defense

1    initially?  And for these purposes I'm just referring to the

2    Second Amended Complaint.  Okay?

3         MR. FLEMING:  Yes, Your Honor.  Your Honor, the

4    initial Complaint was filed back in April 2016, and there

5    are a breach-of-contract claim and a copyright-infringement

6    claim.

7         With regard to the breach-of-contract claim, the

8    Complaint focuses on alleged violations of Sections 10.8,

9    which is not at issue here, but Section 3.1 also, which is

10   the provision dealing with license restrictions.  And at the

11   time we filed our initial answer and the amended answers, we

12   had no reason to believe that the statute of limitations was

13   at play, that it was an issue.

14        The Complaint itself, of course, doesn't mention

15   the word "territory" or "installation."  And as we went

16   through discovery in the briefing process, we still did not

17   believe that the statute of limitations was an issue.

18        We understood that FICO from the very beginning --

19   when the merger occurred back in 2016, when Mr. Carretta and

20   Mr. Sawyer were making demands of Federal, in their demand

21   letters they referenced alleged violations of the License

22   Agreement based on use.  They say nothing about

23   installation.

24        When we go through discovery in response to our

25   interrogatory responses, we ask specific questions asking

1    FICO to identify the third parties that received access to

2    Blaze in violation of the agreement, and they identify only

3    foreign entities and non-compliant applications outside of

4    the United States.

5         With regard to their responses to interrogatories

6    relating to damages, they characterized their damages as

7    being based on unlicensed "use," not unlicensed

8    "installation."  We took depositions of Mr. Carretta.  In

9    response to questions, he basically said there was no

10   distinction between installation and use.  He said they're

11   synonymous.

12        When we received their expert reports, Neil

13   Zoltowski, who was their key primary damages expert, said

14   specifically -- he quantified their damages as being 21.3

15   million in lost licensing fees resulting from improper

16   usage.

17        So then, of course, even more recently in FICO's

18   motion in support of their motion to exclude testimony of

19   Steve Kursh for three pages (pages 15 to 18) they talk about

20   the distinction between use and installation, and they say

21   in a footnote "This distinction matters."  Yet when you go

22   to their memorandum in response to our motion, they say on

23   page 1, "Federal brings this motion for leave to amend based

24   on a false premise.  Federal creates a distinction without a

25   difference."  I mean, it's got to be one or the same.  There

1    either is a distinction or there isn't.

2            From the very beginning, when the initial demands

3    were made of our client, as we went and looked at the

4    Complaint, as we looked through the responses to discovery

5    and also, of course, their damages limited their damage

6    calculations for improper usage to the applicable

7    limitations period, so there was no reason to believe there

8    was a need to raise the affirmative defense of statute of

9    limitations.

10            Then in their motion that they filed just last

11   month they say that -- so just to step back a little bit,

12   under Section 3.1 there is two alleged breaches.  One deals

13   with this territorial provision, which is the one at issue

14   and substantively important in our discussion today.  But

15   there's another alleged violation that they've brought a

16   motion for summary judgment on relating to the signatory of

17   the License Agreement.

18            Just to be clear, the statute of limitations

19   doesn't impact that argument.  I mean, we have a substantive

20   argument that when an unincorporated division signs a

21   contract, there is well-established case law that it is the

22   corporation itself which is the signing entity for all

23   contractual purposes.

24            THE COURT:  Let me stop you for a second.

25            MR. FLEMING:  Yes.

1          THE COURT:  You raise a question that I want to

2    make sure I understand.

3          On the copyright claims -- let's just take those

4    for a second -- this argument does not have any consequence,

5    correct?  Whether the statute of limitations is pleaded or

6    not pleaded, they get to go back three years from the filing

7    of the Complaint, correct?

8          MR. FLEMING:  They get to go back three years, but

9    I don't believe they can rely upon a circumstance that gives

10   rise to liability that goes back before the six or the three

11   years.

12         THE COURT:  I'm trying to make sure I understand

13   exactly why.  The parties care quite clearly about this

14   issue and care very deeply, and I want to understand for

15   sure what exactly the consequence is.

16         So is it your argument that the triggering event,

17   at least under what you would now say is FICO's theory of

18   the case, is the installation OUS and that that is the

19   triggering event of both the infringement and the breach of

20   contract?

21         MR. FLEMING:  Yes.

22         THE COURT:  And your point would be that -- set

23   aside the breach of contract -- then on the infringement

24   claim you're saying that if the triggering event is the

25   installation and that were more than three years ago, there

1     would be no copyright infringement -- viable

2     copyright-infringement claim because it was too long ago, at

3     least for those applications or those installations OUS?

4              MR. FLEMING:  If that is their triggering event

5     which gives rise to the liability, they have to make an

6     argument there is a continuing use or a continuing

7     violation --

8              THE COURT:  Right.

9              MR. FLEMING:  -- and I don't believe they can

10    under the breach-of-contract claim.  They rely on, of

11    course, New York law, as they must, but they cite three

12    cases, none of which cases hold that installing software is

13    a continuing breach.  Rather, there's three cases -- there

14    is the *Garron* case, which involves a continuing breach of an

15    implied covenant of habitability in the landlord-tenant

16    dispute.

17             There's the *Airco Alloys* case, which simply states

18    as a question of fact whether a breach claim is still

19    actionable as a continuing breach and makes clear that such

20    claims accrue based on each breach.  There has to be a

21    breach within the limitations period.

22             And their final case, *Meadowbrook Farms,*

23    specifically held that since the plaintiff only seeks

24    damages for alleged breaches that occurred in the six years

25    prior to the commencement of the action, the causes of

1    action are not time barred.

2         So none of those cases hold that there is a

3    continuing -- that installing software is a continuing

4    breach.

5         And then with regard to the copyright-infringement

6    case, that's more complicated.  I mean, first of all,

7    generally acts of Congress don't apply outside of the

8    territory of the United States.  They try to get around that

9    issue by arguing this predicate act doctrine, which was

10   first established by Learned Hand in 1939.  Very few cases

11   have discussed the case since then.  The Eighth Circuit has

12   certainly not approved it or utilized it in any manner.

13        But they would have to show, in order for the

14   predicate act doctrine to apply, that any of the named

15   defendants in this lawsuit profited from the foreign

16   installations such that the court would gain jurisdiction

17   under this doctrine.  There's simply been no showing of

18   that.  And, of course, it made no explanation as to how

19   merely using software abroad constitutes copyright

20   infringement.  So there are those burdens that they have.

21        THE COURT:  Is that because use abroad is abroad?

22   Is that what you're saying, that it's not copyright

23   infringement because it's use abroad?

24        MR. FLEMING:  Yes.

25        THE COURT:  Okay.  A couple of observations, I

1    guess.  One, in preparation for this hearing, I went back

2    and I re-read the Complaint, specifically the Second Amended

3    Complaint, and here's what I thought you would say in answer

4    to my question:  If you read the Second Amended Complaint,

5    it seems to me it's a fair reading -- there's three

6    captions, if you will, that are italicized in the Second

7    Amended Complaint.  The first is *Breach of the*

8    *Non-Assignment Provision*, paragraph 10.8 of the agreement.

9    And that makes it clear that that breach occurred as of the

10   date of the merger, January of 2016.

11        The next caption is *Breach of the Prohibition*

12   *Against Disclosing FICO Products to Third Parties Or*

13   *Permitting Use of or Access to FICO Products By Third*

14   *Parties*, paragraph 3.1 of the license granted by the

15   agreement.  And then there are some allegations in that

16   segment that talk about Chubb & Son as distinguished from

17   the third parties.  I'll come back to this point in a

18   second.

19        Then the third caption is *Breach of*

20   *Post-Termination Obligations*, and that's clearly after 2016,

21   after January of 2016, because it was terminated after the

22   merger.

23        So I guess my observation is -- and I'm sure

24   you're not going to disagree with me; I suspect

25   Mr. Hinderaker will -- that it's not an unreasonable reading

1    of the Complaint in light of those captions, but then with

2    the following paragraphs that the breach first begins with

3    the merger in 2016.  And the allegations with respect to

4    3.1, disclosure (paragraph 3.1) could certainly be

5    interpreted to refer to disclosure to parties that were

6    unauthorized which occurred -- again, it was disclosed to

7    them by virtue of the merger.  Are you following me?

8              MR. FLEMING:  Yes.

9              THE COURT:  And so whether or not that's what was

10   intended or whether or not that's the only reading, it

11   strikes me that that's one possible reading.  And if that

12   were the reading, then there would be no reason to plead the

13   statute of limitations.  Right?

14             MR. FLEMING:  Agreed.

15             THE COURT:  Okay.  I know I'll hear from FICO

16   about why that's wrong, but -- okay.

17             I'm still really struggling to understand why

18   unauthorized use -- let me put it this way:  The testimony

19   or the statement by Mr. Carretta that installation and use

20   are the same I must not be following, because you keep

21   bringing it up and I keep thinking that helps them.  So

22   explain that to me.

23             MR. FLEMING:  Well, the difficulty or --

24   allegations of continued use could be a continuing breach,

25   but continuing -- or it could be a continuing breach or

1    continuing copyright infringement use.  But installation

2    itself is not a continuing violation.  So it does make a

3    difference.

4         THE COURT:  But, again, that brings me back to my

5    first question.  It only makes a difference in that it may

6    cut off some period of damages.

7         Now, set aside copyright for a second.  Assuming

8    continuous use is a breach of the agreement itself and

9    they're right on it, the best that this argument gets you is

10   a shorter damages period.  Am I tracking on that?

11        MR. FLEMING:  You're right about that.

12        THE COURT:  Okay.  And that issue -- assuming this

13   is allowed, how that affects the ultimate merits, that's

14   going to be up to Judge Wright.

15        MR. FLEMING:  Agreed.

16        THE COURT:  On the copyright issue, again, it

17   seems to me that we're still in the same place.  I don't

18   think their -- their copyright-infringement case going back

19   three years from the date of the initiation of the lawsuit

20   includes use within the United States, correct?

21        MR. FLEMING:  Yes.

22        THE COURT:  So I'm back to my square one.  If

23   you're wildly successful, it seems to me I'm hearing three

24   possible results:  You don't get the amendment so you don't

25   get it.  You get the amendment, but you're partially

1    successful in convincing Judge Wright of some things.  Or

2    you get the amendment and you're wildly successful.  What

3    happens in the latter two of those circumstances?

4              MR. FLEMING:  In terms of?

5              THE COURT:  What happens to their claims --

6              MR. FLEMING:  Well, if it's just a cut-off, they

7    are able to go back to that time period up until the

8    limitations period.

9              THE COURT:  Right.

10             MR. FLEMING:  But if they can't use the

11   circumstance itself to establish liability because it's

12   beyond that six-year time period, the claim itself would be

13   time barred.

14             THE COURT:  But if their argument is the License

15   Agreement as a matter of contract was breached, at least as

16   I hear it in the words of Mr. Carretta, by installation and

17   thereafter use, that's all you've got, right?  I mean, that

18   argument is assuming on my part this is not a triggering

19   event.  It's a triggering event plus events thereafter that

20   are also breach.

21             MR. FLEMING:  Plus continued use you're saying?

22             THE COURT:  Right.

23             MR. FLEMING:  If they can't use the circumstance

24   that is over six years old to establish that there was

25   improper -- that there was installation and breach of the

1    agreement, they don't have anything that occurred within the

2    six- or the three-year time period that establishes

3    liability for installation and we're successful in arguing

4    that the continued use doctrine is not applicable in these

5    circumstances, the entire claim should be thrown out.

6              THE COURT:  Okay.  Even if you're allowed to make

7    that argument, if they convince Judge Wright that use

8    outside the United States is a breach, that claim goes back

9    six years from the beginning of the lawsuit regardless of

10   the installation date, true?

11             MR. FLEMING:  Yes.

12             THE COURT:  All right.  I just want to make sure I

13   understand fully what's at stake here.  Sorry, I didn't mean

14   to cut you off from your argument.

15             MR. FLEMING:  All right.  Well, I have made most

16   of the argument in responding to your questions.

17             The other issue is whether there is any prejudice

18   to FICO from allowing the defense at this time.  There is no

19   prejudice.  They had the opportunity -- they took the

20   opportunity to take repeated depositions and Rule 30(b)(6)

21   depositions of Henry Mirolyuz and the topic related to

22   installation.  They had full ability to take the deposition.

23   They didn't seek to ask any further questions or any other

24   type of discovery on that issue.  And those facts are the

25   facts.  Additional discovery would not change any of that.

1    They had a full opportunity to look into the issue of

2    installation, and they took advantage of that opportunity.

3    So it's just an additional defense, which is prejudicial to

4    them to the extent it cuts off relief, but it's not unfairly

5    prejudicial.

6         THE COURT:  You know, that 30(b)(6) deposition

7    strikes me as a fact that cuts both ways.  It appears to me

8    to cut in your favor on the question of prejudice.  Why

9    doesn't it cut in their favor on the question of notice to

10   you and therefore diligence in seeking the amendment?

11        MR. FLEMING:  Because they had no reason not to

12   inquire about the entire time period in which there was any

13   installation.  They had no reason to inquire to a narrower

14   degree than they would now if we had identified the statute

15   of limitations as an affirmative defense in the first

16   instance.

17        They had every reason to inquire about any further

18   installations that occurred.  Instead, they had a full

19   opportunity to do that with the person knowledgeable about

20   it without any restraints.  I think they took Henry's

21   deposition three different times.  And they didn't ask for

22   any further discovery on this issue and they could have.

23        THE COURT:  I think they would say -- hang on a

24   second -- well, looking at the Second Amended Notice of

25   Deposition, and I'm using the shorthand version of it as

1    iterated in FICO's brief and I'm paraphrasing, but the

2    topics include, for example, identification of each entity

3    directly or indirectly controlled by Federal and each

4    subsidiary of Federal that has installed the Blaze Advisor

5    software on its servers from June 2006 to the date of the

6    deposition, including the date of each such installation.

7         Were there installations that were not inquired

8    about in your view?  In other words, here's what I am

9    getting at:  I'm trying to avoid a game of got ya on either

10   side.  And, you know, if the answer is they had a deposition

11   that included the topic of all such installations, the date

12   of each such installation, and they got testimony on all of

13   that, then I have a hard time seeing the prejudice, other

14   than they'd have to defend a legal argument, which is not

15   prejudice.  But if there's installation -- there's facts

16   about installations that were not disclosed, whether it's

17   Federal's fault or FICO's fault, then it's a slightly

18   different situation.

19        So to the extent that you can and will say, are

20   there installations OUS that are not already disclosed to

21   FICO?

22        MR. FLEMING:  Not that I'm aware of.  Remember,

23   Your Honor, the Rule 30(b)(6) depositions were pretty

24   wide-ranging.  And I don't recall any time I attempted -- I

25   know there was no time I was successful in cutting off any

1    questioning on those topics.  So they had the full range and

2    the opportunity to ask those questions.  I mean, there

3    wasn't any limitation on that.  And they went out there for

4    the very reason of asking questions on that topic.

5              And, of course, those topics included both

6    installation and use.  There had been no distinction between

7    those topics, so they were very wide-ranging.  I mean, it's

8    not like there was just one limited deposition on

9    installation and one limited deposition on use.  There were

10   several depositions, and there was a full opportunity to ask

11   questions about those items.

12             THE COURT:  Okay.  Thank you, Mr. Fleming.

13   Anything further?

14             MR. FLEMING:  No, nothing further, Your Honor.

15             THE COURT:  Okay.  Thank you.

16             MR. HINDERAKER:  Good afternoon, Your Honor.

17             THE COURT:  Good afternoon.

18             MR. HINDERAKER:  You started with a question to

19   Mr. Fleming and I don't think you got an answer to it.  And

20   then throughout Mr. Fleming's presentation there were

21   various questions, and some I followed, some of the answers

22   I did not follow, and I'm going to try to at least be clear

23   about my understanding of all those various things.  And,

24   please, if I'm not clear or there's more questions,

25   obviously, that's why I'm here.

1        This motion is being brought three plus years

2   after this started.  The Court looked at the Second Amended

3   Complaint.  The allegations that you focused on, Your Honor,

4   were in the first Complaint, the second Complaint, and the

5   Second Amended Complaint.  That core basis of our claims has

6   always been that way.  The amendments were to add parties or

7   do other things, but the fact of the allegation setting

8   forth as a breach the disclosure of Blaze Advisor to third

9   parties -- and those third parties are identified, all of

10  them as being outside of the United States -- has been in

11  the action since April 21, 2016.

12        Independent of that allegation has been the fact

13  that persons not employees of Chubb & Son, and for today's

14  purposes we can say persons not employees of Federal to then

15  eliminate that distinction, were using and accessing Blaze

16  Advisor without authority, those being the three entities

17  outside of the United States.

18        The Second Amended Complaint added two more

19  entities being third-party consultants to one in Canada and

20  one in Chubb Australia.  So that's always been there, that

21  we have the installation -- oh, and, I'm sorry, under the

22  copyright claims, rather than use language from the

23  Agreement like "disclosure," we use language from the

24  Copyright Act like "distribution."

25        So it has never been one thing.  It has never been

1    unauthorized use.  It has never been only installation.  It

2    has always been two things:  one, installation outside of

3    the United States, and use outside of the United States

4    because of the installation.

5         There's a statement in the defendant's brief to

6    Your Honor in this case, "FICO has never asserted that use

7    outside the United States is a permitted use."  I fully

8    agree.  And it goes on to say, that may allow foreign use of

9    the software, but which -- may allow foreign use but which

10   prohibits foreign installation.  And I read that and I said

11   what in the world does that mean?  Does that mean that on

12   our theory of the case there was an installation of Blaze

13   Advisor outside of the United States and it's sitting there

14   dormant doing nothing and never used?  Of course,

15   installation outside of the United States is the necessary

16   predicate, if you will, by which the second violation was --

17   or another violation of the agreement, being the use and

18   access of it by third parties.

19        So from my reading of the Complaint, that has

20   always been there.  I appreciate the Court's reading the

21   various elements of the Complaint as if it was setting out a

22   chronology, but it never says that in the Complaint.  And

23   the structure followed the history in which the parties'

24   termination of the contract occurred.  The first even was

25   the merger.  In the context of the negotiations about that

1     it was discovered that there's non-compliant installations

2     outside of the United States.  So it's always been those two

3     things.

4              If I might put something on the Elmo here.  So

5     with it always being those two things, the 30(b)(6)

6     deposition of Mr. Mirolyuz, the first one, was about half a

7     day.  All of this conversation about exhaustive and every

8     stone unturned, looked under, et cetera, Mr. Mirolyuz

9     answered questions that I put to him.  Most of the time I

10    knew more about when installations occurred than he did

11    because I gave him the documents to show that.  So the 2009

12    document that's a part of this hearing came out of my file

13    to Mr. Mirolyuz at that deposition.  The 2010, of course,

14    also came out of my file, but it's inside the statute of

15    limitations.  So we were in the process of demonstrating

16    there was that breach of the installations.

17             I want to flip to the prejudice for just a second.

18    It's quite unfair to change the rules when the game is over

19    with.  And if there was a statute of limitations issue pled,

20    we would have then had reason and cause to inquire about not

21    only the May 2009 first installation in the U.K., but every

22    succeeding installation in the U.K.

23             Blaze Advisor, when it was originally licensed,

24    was licensed to a particular version at the time and over

25    time.  So I think we've gone from I want to say 6 or 6.5 to

1    7.1.  Over time we go through various versions.  Over time

2    various versions are -- Chubb & Son, the licensee in the

3    United States, gets new versions, current versions, and

4    those versions could've been distributed by Chubb & Son to

5    the U.K. or Australia or Canada on other dates than I was

6    aware of from emails.  So there would have been a great deal

7    of diligence involved in following up on all of that had the

8    statute of limitations been a defense.

9          Now, at the time of that deposition, there was

10   certainly no doubt that we were interested in installation,

11   and statute of limitations was not asserted as a defense at

12   that time.

13         There was also no doubt at that time that any

14   presumed chronology from the ordering of the Complaint has

15   no meaning because I'm inquiring about installations that

16   are pre termination of the agreement.

17         So we have, just to show kind of briefly, if you

18   can read that, not to read it, but there is this provision

19   in the License Agreement which is license restrictions.  I

20   think it's Exhibit 1 to Mr. Fleming's declaration.  There is

21   a (i) that says you represent and warrant that you will use

22   the software in accordance with the agreement.  And there is

23   a (iv), you represent and warrant that you will not permit

24   any third parties to see it.  And then there is a (v), you

25   will not transfer or distribute.

1          So the Complaint attaches the agreement to it and

2     therefore all of the allegations -- the Complaint

3     incorporates the license, incorporates the license

4     restrictions.  And counsel for the defendant is fully able

5     to read the agreement and see that we allege breach of 3.1.

6          This is the first page of the agreement, Your

7     Honor.  Then you will see under the Definitions section

8     there is the term "territory."  Without going through the

9     whole argument, there is a dispute between the defendants

10    and the plaintiff about whether the term "territory" is an

11    operative provision of the agreement.

12         The defendants would like to say that it's not an

13    operative provision to the agreement, in which case they

14    want to say that because they know that installation is a

15    claim and they want to say it's not an operative term of the

16    agreement so they can defend against the claim of

17    installation.

18         The other counter side of the argument is that

19    2.1, which is the use provision, the grant of license right

20    is subject to all of the terms and the territorial

21    definition is one of those terms.

22         This notion that there is not awareness of the

23    claims, the defendant took at least six depositions of fact

24    witnesses of FICO people beginning in September 2018.  And

25    in every one of those depositions, Your Honor, FICO's

1    counsel asked -- Federal's counsel asked FICO witnesses do

2    you see the word territory in paragraph 2.1 for the argument

3    that there is no restriction on where the software should be

4    installed in the agreement to try to defend our claims.

5    There's been awareness of that issue from the outset because

6    of the Complaint as I read it.  But thereafter there was no

7    doubt in my mind that the defendants knew it because they

8    inquired about the territorial restrictions and its

9    operative nature in the Complaint in every deposition that

10   they took.

11          THE COURT:  Let me go back to one of my questions,

12   because your argument is making that question come up in my

13   mind again, and that is set aside the claim that the

14   installation of the software outside the United States is a

15   claim.  Just set that aside.  You also have a claim that the

16   use of the software exceeded the license.  And is your

17   argument then use outside the United States is itself a

18   breach of the License Agreement and therefore it's also

19   copyright infringement -- well, leave the second part of

20   that off for a second because of the territorial limits of

21   the Copyright Act?

22          MR. HINDERAKER:  With respect to the contract

23   action, and I believe the defendants acknowledge this in

24   their brief as one of the reasons that they didn't assert

25   the statute of limitations originally, their argument is we

1    only knew that foreign use was a breach, which I've just

2    tried to say is nonsense, and therefore because there is

3    continuing foreign use there is a continuing breach and

4    therefore the statute of limitations doesn't apply and

5    therefore that's why we didn't plead it, that's what's in

6    their brief.

7              But to answer your question, the continuing use of

8    Blaze Advisor outside of the United States by the employees

9    of Chubb Europe, Chubb Canada, Chubb Australia, yes, that's

10   a continuing breach of the representation and warranties by

11   Federal -- well, it was a continuing breach up until the

12   time the agreement was terminated, yes.

13             THE COURT:  Their argument, though, is there's

14   nothing -- again, set aside the installation claim.  Their

15   argument is there is nothing in the License Agreement that

16   prohibits extraterritorial use or there is?

17             MR. HINDERAKER:  All right.  So I'm --

18             THE COURT:  I'm sorry.  I know I'm confusing this.

19             MR. HINDERAKER:  To sort it out -- let's sort it

20   out because we're talking different things.  FICO will go to

21   trial on the proposition that the term "territory" is one of

22   the terms of the agreement.

23             THE COURT:  Of the agreement, right.

24             MR. HINDERAKER:  Paragraph 2.1 says it's subject

25   to the terms, therefore, software must be installed in the

1    United States.  So now we have the instance of the software

2    is installed outside of the United States.  That's a breach.

3         Now the software outside of the United States is

4    being used in support of the sale of insurance of these

5    different entities and that is also a breach.  It's a breach

6    of 3.1 (iv).

7         THE COURT:  Right.  Can you put 3.1 back up.

8         MR. HINDERAKER:  Yes.  So the language is "or

9    permit the use or access of the Fair Isaac products by any

10   third party or any individuals other than employees of

11   client."

12        THE COURT:  If software is installed in the United

13   States on a server that is owned by or located in -- well,

14   the server of an appropriate entity under the agreement,

15   okay, software is sitting there, but somebody in the U.K. is

16   allowed from the U.K. to access that software for purposes

17   of underwriting or pricing insurance that is being sold in

18   the U.K., is that a violation of the agreement?

19        MR. HINDERAKER:  Yes.

20        THE COURT:  All right.  So --

21        MR. HINDERAKER:  There's another hypothetical.

22        THE COURT:  Go ahead.

23        MR. HINDERAKER:  Software is installed in the

24   United States.  It is being used by the appropriate entity.

25        THE COURT:  In the United States.

1          MR. HINDERAKER:  In the United States.  And it is

2     supporting business operations of entities outside of the

3     United States.  That's okay.

4          THE COURT:  So in terms of what's permitted,

5     according to FICO's position, as long as I (Chubb & Sons)

6     have this software loaded on my server, as long as I (an

7     employee of Chubb & Sons) is using the software because I'm

8     on the phone with somebody from the U.K. and I'm using the

9     software and I say, okay, the answer to your question what

10    you should price this at is X, that's all fine?

11         MR. HINDERAKER:  That's all fine.

12         THE COURT:  But both the installation and the use

13    by people outside the United States is your claim?  And in

14    the second part where --

15         MR. HINDERAKER:  For the pre termination

16    activities.

17         THE COURT:  For the pre termination activities.

18    All activities post termination are a violation.  But for

19    the pre termination activities if the software -- well,

20    whether or not -- wherever it's installed, if it's used

21    outside the United States directly accessed by people who,

22    in your view, are not appropriate persons to use the

23    software, it's a violation of the agreement?

24         MR. HINDERAKER:  It's a different lawsuit.  It's

25    not our fact pattern.  But it's a violation of the

1    agreement.

2           THE COURT:  Yeah, it's a different fact pattern,

3    but legally it's sort of non-consequential.  What I'm

4    getting at is -- back to my first question, which is this

5    seems like a tempest in a teapot because, at least in your

6    argument, installation is a violation and every time they

7    use it is a violation, right?

8           MR. HINDERAKER:  Outside the United States.

9           THE COURT:  Right.  And I get that we don't have a

10   fact pattern that says they were using it, but it was only

11   installed in the U.S.  It would be a different lawsuit.  But

12   it was installed in the U.K., used in the U.K.  Even

13   allowing for the statute of limitations, it doesn't seem to

14   affect anything other than going back six years from the

15   time the Complaint was filed, unless their argument is the

16   triggering event means it's all out, and the triggering

17   event is installation.

18          MR. HINDERAKER:  That whole triggering event, let

19   me -- I want to talk about the triggering event.  Let me

20   first answer your question.  The first answer to your

21   question is yes, there is a continuing breach by the

22   continuous use of the software outside of the United States.

23          I also believe, because counsel used the word "act

24   of installation," as if that's a one-time thing, I put up

25   the "territory" definition again.  The warranty of abiding

1    by the contract is the software with respect to *the*

2    installation and physical location, it will be the United

3    States.  It's not about -- the contract claim is about the

4    continuing location of the software.  When the software was

5    installed in the U.K., that was a breach.  The fact that

6    it's still installed in the U.K. is still a breach.

7          So on the futility argument prong of this

8    presentation on the contract side there is a continuing

9    wrong of use and access by third parties outside the United

10   States; there was.  And there was a continuing continuous

11   breach of the installation from the moment of

12   installation -- 2009, the earliest one I'm aware of.  That

13   provision was in continuous violation.

14         So I think that in part answers the triggering

15   event argument in the sense that on the contract side there

16   is no event that isn't continuous.

17         On the copyright side, pre termination only.  The

18   Copyright Act of the six exclusive acts of copyright, one of

19   them is distribution, 17 U.S.C. 106.  That's an act, sending

20   it out.

21         So I was inquiring of Mr. Mirolyuz about the

22   installations outside of the United States.  That is a

23   predicate act of copyright infringement.  And under the

24   predicate act doctrine, which no circuit has rejected,

25   although not every circuit has addressed it, the remedial

1    scope from that predicate act is the three years from filing

2    the complaint, regardless of when the predicate act

3    occurred.

4          So a distribution outside of the three-year period

5    that we're alleging in this case, because it's a domestic

6    violation of the Copyright Act for exploitation outside of

7    the United States, the statute of limitations doesn't bar

8    the three years of damages even if the distribution is

9    beyond that.  So there's futility.

10          Now, we also had other questions -- you know, as

11    you know from the brief, another set of depositions was --

12    about building on installation was about where is the

13    software hosted and what versions of the software are hosted

14    where and when, which, of course, put them on notice again

15    of what they always knew, that installation was part of the

16    deal, and that was a long time ago as well, not after the

17    game is over with.

18          Going back, however, to the continuous breaches, I

19    mean, we know that there was a distribution to Canada in

20    2010 December inside of the statute of limitations.  We know

21    there was a distribution of a different version of Blaze

22    Advisor in Europe in September of 2013.  And we know there

23    was another distribution in Canada in 2015.  The factual

24    record with respect to Australia is a little murkier.  Our

25    perfect 30(b)(6) witness didn't know.  And, again, if the

1    statute of limitations mattered, those are the sort of

2    questions that we would have drilled down on to learn of

3    every installation after April, within the three-year period

4    for a copyright claim and our contract claim for the

5    six-year period.  So if we had reason to press for

6    additional discovery to get around, if you will, all the

7    claims within the statutory period, we would have been on

8    notice to do that.

9         Now, in terms of does it matter at the end of the

10   day in terms of damages, our damages case on the contract

11   side only goes back six years.  Our damages case on the

12   copyright side only goes back three years.  We were aware

13   that -- you know, not to be pigs and also to not get

14   ourselves in trouble, and we had no reason to think that --

15   well, if the Court agrees with us that under the predicate

16   act doctrine the copyright claims cannot be barred and

17   therefore the amendment is futile, then that's the answer to

18   this motion.

19        If the Court thinks that the amendment is not

20   futile, that there's some merit to the statute of

21   limitations, then that's where the heightened prejudice to

22   us just hits the roof, because then if we should have made

23   more discovery of installations within the three-year period

24   of copyright, then we would have.  But there was no reason

25   to do that because the defense wasn't pled and it was

1    waived, and we knew we had these continuing breaches.  And

2    from our point of view, we believe the predicate act

3    doctrine makes it futile.  We complied with the predicate

4    act doctrine, keeping our damages within the three-year

5    period and that was that.

6           But if the Court disagrees that that doesn't make

7    the copyright action futile, well, then we have a big

8    surprise on our hands because we didn't take the discovery

9    to satisfy what now turns out to be a gap.  I think it is

10   futile, but if the Court disagrees, then we should have been

11   here on this motion some years ago in time to take the

12   discovery.

13          Thank you, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          Mr. Fleming.  How does all of this tie in with

16   what I understand to be a very big portion of your defense

17   and maybe even a portion of your summary-judgment motion,

18   which is it was an enterprise-wide license?  Right?  And

19   you're construing "enterprise-wide" to mean the whole

20   shebang, right?

21          MR. FLEMING:  Yes.

22          THE COURT:  Which would include U.K., and

23   Australia, and Canada.  If you're right on that, then they

24   lose no matter what.  Right?  If you're wrong on that --

25   well, I've understood both of your arguments, but I'm still

1    struggling with why -- other than the argument about, you

2    know, the predicate act, which isn't for the copyright side

3    a time issue I don't think; and for the contract action I'm

4    not persuaded that it matters because you can call it

5    continuous use if you want, but under their interpretation

6    each use is its own breach.  So I'm still struggling with

7    why this much matters.  And I know in some measure that's

8    for Judge Wright to figure out, but -- sorry, that's a

9    rambling question.  If you perceive a question in there,

10   answer it, by all means.

11              MR. FLEMING:  Well, there is a lot of different

12   issues that have to be settled with regard to each provision

13   of the Software License Agreement.  Either party may prevail

14   on various of those arguments.  And specifically with regard

15   to Section 3.1, this issue about Chubb & Son as the

16   signatory, it confuses things when we're addressing this

17   argument about use and installation because it's a

18   completely separate argument.  But when there's a discussion

19   about it, it sometimes appears as if you're talking about

20   installation and use, but you're really talking about the

21   entity or the signatory argument.

22              If we are successful on the signatory argument --

23   that is, that as a matter of law an unincorporated division

24   signing a contract is the same as the corporation signing

25   the contract so that for all purposes Federal is the client

1    and had use of the software according to the agreement, then

2    the fact that there was use outside of the United States,

3    its entities (Federal's entities) were using the Blaze

4    software.  So that whole argument about the violation of

5    Section 3.1 simply by virtue of who the entity was that was

6    using it is gone.  And I think we will be successful on

7    that.

8         Then the only argument they have is with regard to

9    the territorial limitation.  And with regard to that,

10   there's evidence that there had been a territorial

11   limitation in the license grant itself and during the

12   negotiations it was removed, so it's only in the

13   definitional section.

14        If we are successful that there is no territorial

15   limitation by virtue of the fact that there is simply a

16   definition, but there's no agreement about its use, we

17   believe the whole claim under Section 3.1 gets dismissed,

18   both for purposes of the breach of contract and the

19   copyright investment.  So this isn't just a tempest in a

20   teapot.  It's an issue of a fair amount of significance.

21        To make the argument that we're changing the

22   rules, one of the issues was installation.  Why would you

23   think you have to stop and not ask about all of the

24   installations, which I think he did in any event?  Why

25   wouldn't he -- in case the court rules to the contrary about

1    continuing use or continuing violations, why wouldn't he

2    because of the uncertainty about that?  And there weren't

3    any constraints.  It just makes sense if one is asking about

4    the installation pursuant to this contract that one would

5    follow through and ask everything about it.  Nobody would

6    not ask a question because they think the statute of

7    limitations is not at issue so we don't have to ask anything

8    more.  It doesn't make very practical sense if you're in the

9    moment and you have the topic that you would preclude asking

10   questions about that for that reason.  That was one of the

11   topics of inquiry, and there's no reason why there wouldn't

12   have been and there is no reason to believe there wasn't a

13   full and robust inquiry into that issue and that there is

14   nothing more to ask.

15         So that argument about changing the rules because

16   of this defense I don't believe is a credible one.  There

17   was no reason -- there was a full opportunity to ask those

18   questions and nothing changes.  There's no response that is

19   any different whether there is a statute of limitations or

20   not.

21         The argument was made about the long delay, but

22   the Eighth Circuit has been clear.  In *Dennis v. Dillard*, it

23   said unequivocally that delay alone is insufficient to deny

24   a motion for leave to amend.  And as long as there is good

25   cause and there's no prejudice, the motion to amend to add

1     an affirmative defense should be allowed.

2              THE COURT:  Let me ask you this:  So have you

3     raised the statute of limitations defense yet in either your

4     affirmative summary judgment or your responsive briefing to

5     theirs?

6              MR. FLEMING:  Our responses are due on Monday, and

7     we will be raising it then.

8              THE COURT:  Okay.  Does that mean from your

9     perspective that you need a -- well, I'm assuming, first of

10    all, if I deny the motion, you're going to raise it anyway.

11    If I grant the motion, you would want it by Monday, right?

12             MR. FLEMING:  That, of course, would be ideal, but

13    it's --

14             THE COURT:  Right.  Well, and I'm going to

15    endeavor to do that one way or another.  But okay.  Okay.

16    Sorry.  Keep going, Mr. Fleming.  Anything else?

17             MR. FLEMING:  Just the final point is it's

18    somewhat repetitive.  I was listening with interest to the

19    questions about, well, what in your opinion is permitted and

20    what's not permitted, because there have been varying

21    answers over time given both in discovery and in the motions

22    that are about to be argued.  But, as I understand it, the

23    statement was if software is installed in the United States

24    but United Kingdom allowed access to the software, would

25    that be a violation, and the answer was yes, but I believe

1    that's where this issue about Chubb & Son is the signatory

2    causes confusion, because if we're successful on that issue

3    --

4              THE COURT:  Right.

5              MR. FLEMING:  -- then I don't believe they would

6    claim that use outside -- as long as the software was

7    installed in the United States that allowing uses outside of

8    the United States is a violation.  So it's a more nuanced

9    response than the one that was provided and it's

10   significant, I think.

11             THE COURT:  Well, in that circumstance they would

12   only be able to fall back on the fact of installation

13   outside the U.S. and the argument that the "territory" term

14   is part of the terms and conditions of the contract and

15   specifically the grant of license in 3.1 or 2.1 -- I think

16   it's 3.1.

17             MR. FLEMING:  3.1 is the license restriction.  2.1

18   is the license grant.

19             THE COURT:  Okay.  So it would be -- in that

20   circumstance, the only -- if the Court were to find in your

21   favor on the entity definition, then the only argument they

22   would have is that the territory restriction is actually a

23   term of the agreement and it does get incorporated into the

24   license grant of 2.1.

25             MR. FLEMING:  Right.

1          THE COURT:  But if you step back from that for a

2     second -- and probably in answer to this -- but if you were

3     giving a license to the entire entity, some of which was

4     physically located outside the United States, why would you

5     impose that restriction of you can use it, you're all free

6     to use it, just don't load it on your computers outside the

7     United States?

8          MR. FLEMING:  It makes no sense.  It doesn't make

9     any sense.  But the whole argument about Chubb & Son, an

10     unincorporated division, being the signatory, I mean, an

11     enterprise license for Chubb & Son, the unincorporated

12     division is meaningless and they acknowledge that.  They say

13     still it should be Chubb & Son.

14          I mean, the enterprise license, which was based on

15     -- as they say, the main metric was the revenues of the

16     overall entity, there is no reason to be using the revenues

17     of the overall, all Chubb families' revenues, to determine

18     the license fees unless the thought was the enterprise

19     license was going to be used throughout the Chubb & Son --

20     the Chubb families, which includes use outside of the United

21     States.

22          THE COURT:  Anything else?

23          MR. FLEMING:  Nothing, Your Honor.

24          THE COURT:  Okay.  Mr. Hinderaker.

25          MR. HINDERAKER:  Yes, sir.  You and Mr. Fleming

1  had a conversation about if the agreement was

2  enterprisewide, and I think by way of your questions you

3  said what I would have said -- that is, an agreement

4  enterprisewide and for conversation purposes let's say it's

5  with Federal, that doesn't negate a different term in the

6  agreement that says you shall use it in the United States --

7  you shall only have it installed in the United States.

8          Now, the last question the Court asked is, well,

9  why?  What's the story?  Well, during the negotiations for

10  the original License Agreement, FICO sent out its standard

11  terms and it said the use will be in the United States.

12          Chubb & Son -- and the fellow is an employee of

13  Chubb & Son -- responded and said "global."  And what FICO

14  did in response is say to the extent that we can agree to

15  your terms, it is make the installation physically in the

16  United States, and then the language about use didn't have

17  any further restrictions.

18          And the reason for that, Your Honor, is that --

19  and just as I said earlier and we said in our brief -- if

20  the software is installed in the United States, it can be

21  used in support of business operations that happen to be

22  outside of the United States as long as it's Chubb & Son or

23  Federal for our conversation that's using the software to

24  support those other members of the Chubb family.  And there

25  are practical limitations that follow from that.

1          So there are data privacy issues between

2    countries, for example.  There's issues in terms of being

3    able to have applications that operate in realtime if you

4    are trying to support Australia from Raleigh, North

5    Carolina.  And where it boils down to FICO, it was would you

6    like to have global rights?  That will cost $1.1 million

7    more.  And Chubb said, Well, we don't want to pay that much.

8          So the compromise was we had Chubb & Son in the

9    U.S., and we know that Chubb & Son is supporting various

10   writing companies -- various other insurance companies.  And

11   as long as the software is installed in the U.S. and Chubb &

12   Son people are using it, they can support business

13   operations outside the United States.  It's technically

14   possible.  It's not as robust.  And they did not pay the

15   license fee for the more robust solution.

16          THE COURT:  Well, and, as a practical matter,

17   there is no way to police it anyway.  If all they're doing

18   is using it internally to support people across the pond,

19   you're never going to know that.

20          MR. HINDERAKER:  That's probably true about

21   anything in terms of the license until you discover it, you

22   know.  And, like I'm saying, that kind of a usage for the

23   licensee isn't as robust as if they had the right to install

24   it in the U.K., so they didn't pay as much either.

25          Question was put why weren't more questions asked

1    at the 30(b)(6) deposition about the predicate acts?  Why

2    weren't documents produced before that deposition and only

3    afterwards?  I mean, it's really simple to stand at the

4    podium and say that back in 2018 it would have been done

5    perfectly because there was a perfect set of discovery at

6    the time and everything had been produced, but you know how

7    many times we've been before you on discovery not produced.

8          And on the question of the briefing, Your Honor,

9    the affirmative briefs for our affirmative summary judgment,

10   those have been served.  We are going to receive -- the

11   parties are going to on Monday file their responses to what

12   they received.  So I'm hearing that on Monday I'm going to

13   get a whole new -- I mean, depending on your ruling, but

14   counsel would give us a whole new set of issues to respond

15   to, what, within the remaining 2,000 words of the 12,000

16   limitations?

17         So to suggest that this is going to be raised for

18   the first time in an opening summary judgment brief in which

19   case there is an opportunity to respond simply isn't true

20   because the opening summary judgment briefs have been

21   served.

22         Thank you.

23         THE COURT:  Go ahead.

24         MR. FLEMING:  Just briefly, Your Honor.

25         We heard today from Judge Wright that the summary

1    judgment hearing motion date is going to get continued, and

2    I immediately responded and said, Let's have two more weeks

3    for briefing and it was rejected.  And they knew we were

4    going to raise this argument since we've had our meet and

5    confer and we're having this motion today about a statute of

6    limitations defense on this issue.  I mean, there's no

7    surprise.  They know about it.

8              And just two other quick things.  This chronology

9    that was just put forth about the negotiating and refusing a

10   more fulsome license agreement, that never happened.  They

11   paid for an enterprise license.  They paid more for it.  It

12   went from an application to a division to an enterprise

13   license.  I mean, the testimony is pretty clear about that.

14   There is nothing that would support a claim that there was a

15   broader license that was provided or suggested that they

16   wouldn't pay for.

17             Finally, we've made some point of this, is there

18   any way to police this.  They could have audited to find out

19   the actual use at any time.  That was part of the agreement.

20   They just never chose to exercise that.

21             THE COURT:  One observation before you speak,

22   Mr. Hinderaker.  I think it's quite clear in all of this

23   discussion that teasing out the issue of the statute of

24   limitations, distinct from all of the merits that you both

25   talked about, is difficult at best.

1          And one thing I want to make clear I'm not going

2     to do, obviously, is decide the merits of it.  And in that

3     regard, you know, I will forewarn FICO, of all the

4     magistrate judges here, I probably deny amendments on the

5     grounds of futility far more than anyone else.  I think some

6     of the magistrate judges' view is that's not my job.  That's

7     really a dispositive issue.  Obviously, I view it

8     differently.

9          When we're this close to summary judgment and then

10    trial and the issue of the summary judgment -- or of the

11    statute of limitations is so interwoven with the merits, I

12    am unlikely to deny the amendment on grounds of futility,

13    because it seems like the prudent thing to do in all of

14    those circumstances of this case is to defer to Judge Wright

15    on that.  I'm just giving you a forewarning on that.  But,

16    obviously, I'll consider the argument.  So just an

17    observation.

18         Anything further, Mr. Fleming?

19         MR. FLEMING:  No, Your Honor.  Thank you.

20         THE COURT:  All right.  I am going to give

21    Mr. Hinderaker the last word.  All right?

22         MR. FLEMING:  Yes.

23         THE COURT:  All right.

24         MR. HINDERAKER:  If I wasn't clear about those

25    negotiations, let me try to say it again.  During the

1    negotiations, they happened to be in December 2006, for

2    enterprise-wide rights, they chose to amend the agreement to

3    have enterprise-wide rights.

4            What you and I were talking about earlier was

5    whether those enterprise-wide rights would be global or not

6    and we priced them for global.  We gave them a price for

7    global they did not accept.  So, as a consequence, the

8    agreement was not changed and it was not global.  I hope I

9    was clear about that.

10           THE COURT:  I understand it or at least I'm

11   deluding myself into thinking I understand it.

12           Okay.  So here's what I think I will do:

13   Obviously, this is an important issue, and I will give it

14   all the time and attention it merits.  Again, I feel like

15   I'm in that circumstance where if I'm really serving the

16   parties' interests, it would behoove me to decide the motion

17   and then verbally or orally on the record give you the

18   ruling.  That way you know what things -- where you sit and

19   whoever is aggrieved or somehow if you're both aggrieved,

20   you can appeal that to Judge Wright as quickly as possible.

21           I'm not going to do it today, but I will go look

22   at it now.  And I suspect that I'll have my JA call you or

23   email you with a time on Monday, and I'll announce the

24   ruling then with at least sufficient detail that you will

25   understand the ruling and the rationale for it and you can

1    respond accordingly.  Okay?  Okay.

2          And I know we're sitting on a couple of other

3    motions on which we're making progress.  That's all I'll say

4    about that.  Okay?

5          MR. HINDERAKER:  Very good.

6          THE COURT:  Thanks, everyone.  We're in recess.

7          (Court adjourned at 2:50 p.m.)

8                          *      *      *

9          I, Debra Beauvais, certify that the foregoing is a

10   correct transcript from the record of proceedings in the

11   above-entitled matter.

12          Certified by:   *s/Debra Beauvais*
                            Debra Beauvais, RPR-CRR
13

14

15

16

17

18

19

20

21

22

23

24

25