```
 1                  UNITED STATES DISTRICT COURT

 2                           FOR THE

 3                    DISTRICT OF MINNESOTA

 4

 5              C.A. No. 16-cv-1054 (WMW/DTS)

 6     ---------------------------------------------

 7     FAIR ISAAC CORPORATION,                     )

 8                              Plaintiff          )

 9     v.                                          )

10     FEDERAL INSURANCE COMPANY AND ACE           )

11     AMERICAN INSURANCE COMPANY,                 )

12                              Defendants         )

13     ---------------------------------------------

14                   CONFIDENTIAL TRANSCRIPT

15                    ATTORNEYS' EYES ONLY

16

17              DEPOSITION OF MICHAEL SAWYER

18                      October 2, 2018

19                     Courtyard Marriott

20                   35 Foxborough Boulevard

21                  Foxborough, Massachusetts

22

23                         *********

24              Court Reporter:  Amie D. Rumbo
```

**EXHIBIT 2**

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

CASE 0:16-cv-01054-DTS Doc. 545-1 Filed 09/09/19 Page 2 of 4

### Page 5

PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are on the record. This is the video operator speaking, Bob Giannini, with court reporter Amie Rumbo with Depo International, Inc. Today's date is October 2nd, 2018 and the time is 8:55 a.m. We are here at the Courtyard by Marriott located at 35 Foxboro Boulevard, Foxboro, Massachusetts, to take the videotaped deposition of Mike Sawyer in the matter of Fair Isaac Corporation versus Federal Insurance Company and ACE American Insurance Company. This is case number 16-CV-1054 (WMW-DTS). Will counsel please state their appearance for the record.

MR. HINDERAKER: For the plaintiff, Fair Isaac Corporation, Allen Hinderaker of Merchant & Gould and James Woodward, vice president and deputy general counsel of Fair Isaac.

MR. FLEMING: For defendants, Terry Fleming of Fredrikson & Byron law firm.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

### Page 6

MICHAEL SAWYER,
having been first duly sworn an oath,
was examined and testified as follows:

DIRECT EXAMINATION
BY MR. FLEMING:

Q. Good morning, Mr. Sawyer.
A. **Good morning.**
Q. I'm Terry Fleming. I represent the defendants in this case. Can you please state your full name and work address.
A. **Sure. It's Michael Lemuel Sawyer. Currently, I work at 201 Jones Road in Waltham, Massachusetts.**
Q. Have you had your deposition taken before?
A. **No, I have not.**
Q. Have you ever testified before?
A. **No.**
Q. Do you understand that you're under oath?
A. **I do.**
Q. All right.
MR. FLEMING: Can you mark this as

### Page 7

Exhibit 71.
(Exhibit 71 marked for identification.)
Q. Mr. Sawyer, is this the subpoena that you received in connection with your testimony today?
A. **Yes.**
Q. All right. And are you represented by counsel today?
A. **Yes.**
Q. And when did you retain counsel?
A. **Officially earlier this week.**
Q. Could you identify your counsel?
A. **Yes. It's Mr. Hinderaker.**
Q. All right. So what is your understanding of what this lawsuit is about?
MR. HINDERAKER: I'm going to have to instruct you on that. So if you can answer that question without invading the attorney-client communications with either myself or Mr. Woodward, the attorney for FICO, then you should answer it, but if you cannot answer that question without disclosing privileged communications, then I instruct you not to answer.

### Page 8

THE WITNESS: Okay.
A. **My understanding of the dispute relates to the use of the Blaze Advisor software, which FICO licensed to Chubb & Sons Insurance back in 2006 and their subsequent use of that in compliance with the license agreement.**
Q. And when did you first learn about this lawsuit?
A. **I was first made aware of the lawsuit I guess probably in April or May of 2016. I know that a letter was sent to Chubb & Sons indicating that Fair Isaac was terminating their license for breach. The exact date that the lawsuit was filed after it, I'm not certain.**
Q. All right. And what did you do to prepare for the deposition today?
A. **I met with my counsel yesterday for a number of hours. Other than that, nothing.**
Q. Did you review any documents in preparation for your testimony today?
A. **No, I did not.**
Q. All right. Did you review any deposition transcripts?
A. **No.**

**Page 9**

Q. Did you search for or review any documents that you had kept after leaving FICO?

A. No.

Q. All right. Could you tell me in general terms your educational background and work history?

A. Sure. I have a bachelor's degree from the University of Michigan, a master's degree from the University of Southern California. I've held numerous positions since I graduated from college in either insurance consulting or software technology firms.

Q. Could you walk through your employment history?

A. From the date that I graduated college?

Q. Please.

A. Sure. So for the first eight months of my career, I worked at a small third-party administrator of 401(k) plans in Michigan called Freedom One Financial. After that, I worked for roughly three years —

Q. Could we — what's your date of birth?

**Page 10**

A. 1/29/79.

Q. Okay. If you can put -- when you're going through your employment history, if you could attach time periods --

A. Sure.

Q. -- for your employment, that would be appreciated.

A. Sure. So roughly 2001 to 2002 at a third-party administrator for 401(k) plans in Detroit called Freedom One Financial. From 2002 to roughly 2005, I worked at Sun Life Financial. From 2005 to 2007, I worked at BearingPoint Consulting. It was formerly known as KPMG Consulting. From 2007 to 2015, I worked at FICO. For 2015, I worked at a company at that time which was known as Connolly Healthcare. It then changed names during my time there to Connolly Eye Health Technologies.

I then returned to FICO from I guess — maybe I may have misstated the year. I think I was — 2014 is when I was at Connolly and Connolly Eye Health. I then returned to FICO in 2015 until October of 2017, and since October — since November of 2017, I've worked at a company

**Page 11**

called Verscend Technologies, which just last Friday changed names to Cotiviti.

Q. What does Verscend Technologies/ Cocivity?

A. Cotiviti. It's Cotiviti, C-o-t-i-v-i-t-i. We are a health care focused organization that sells software and analytics, the majority to health plans to help them with risk, quality performance, and payment accuracy.

MR. FLEMING: Would you mark this as Exhibit 72.

(Exhibit 72 marked for identification.)

THE COURT REPORTER: Would you mind giving the instruction of speaking one at a time.

MR. FLEMING: Pardon?

THE COURT REPORTER: Would you mind giving the instruction of speaking one at a time.

MR. FLEMING: Sure.

Q. Because we have a court reporter here who is trying to take down everything that is said, it's helpful to her and to both the parties also if you would wait until the end of my

**Page 12**

question and then respond so that neither of us are talking over each other, and I'll try to do the same.

A. Okay.

Q. Is that acceptable?

A. Yes.

Q. All right. Showing you what's been marked as Exhibit 72, can you identify that document?

A. Yes, I can. It is my LinkedIn profile.

Q. And did you provide all of the information that's on that page, on that document?

A. Yes.

Q. All right. It must be an old picture.

A. Yeah. I can't recall when that was taken.

Q. All right. I didn't recognize you when you came in the room to tell you the truth. I'm glad you've got your license.

So let's walk through your employment at FICO, if we could. So if we turn to the second page there, it looks like your first

**Page 13**

1 stint at FICO was between September 2007 and
2 February 2014; is that right?
3     A.    That is correct.
4     Q.    And could you tell me, are those
5 titles that are listed on the LinkedIn page
6 correct that you were manager of client services
7 from September 2007 to February 2010, and then the
8 client partner insurance and health care
9 March 2010 to February 2014?
10     A.    Yes, they are correct. My formal
11 title for the first position was likely customer
12 support manager in the official docket at FICO.
13     Q.    Customer support manager?
14     A.    Correct.
15     Q.    And what were your duties as
16 customer support manager during that time period?
17     A.    They were a blend of sales as well
18 as account service for existing clients within the
19 insurance and health care business segment. I
20 supported client partners who owned the
21 responsibility for sales as well as service
22 delivery to our existing clients.
23     Q.    And what were your duties as client
24 partner insurance and health care from March 2010

**Page 14**

1 to February 2014?
2     A.    In that capacity, I would have
3 owned a portfolio of client accounts where I was
4 responsible for the baseline revenue associated
5 with those accounts, as well as I was a quota
6 carrying sales rep for new revenue generation.
7 Again, all within the insurance and health care
8 segment.
9     Q.    So who -- what clients were
10 included in your portfolio of client accounts
11 during that time period?
12     A.    There's too many to list. I
13 probably had somewhere between 30 and 40 existing
14 revenue generating accounts that were part of my
15 portfolio. And then I managed probably all new
16 business development for roughly eight or nine
17 states, primarily the Northeast and Mid-Atlantic.
18 So in any given year, I interacted with probably
19 50 or 60 different organizations.
20     Q.    And was Chubb one of those
21 organizations?
22     A.    Yes. Chubb was one of those
23 organizations during that entire period of 2010 to
24 2014.

**Page 15**

1     Q.    Was Chubb one of your more
2 significant accounts during that time period?
3     A.    How would you define significant?
4     Q.    In terms of revenue and time that
5 you spent on the account?
6     A.    During that period of my time there
7 from 2010 to 2014, I would say yes to both of
8 those criteria. They were a significant revenue
9 generating account, as well as the time spent.
10     Q.    So could you estimate how much
11 revenue would being generated from Chubb during
12 that time period in general terms?
13     A.    I would -- so there's multiple
14 revenue streams that would occur. One would be
15 software maintenance payments and then the second
16 would be professional services that we offered,
17 consulting services. The maintenance is easier to
18 estimate as that was a recurring fee. You know,
19 roughly $250,000 I would estimate on an annual
20 basis.
21     Professional services was a lot
22 more intermittent. There was a large project that
23 we did for Chubb that probably crosses over those
24 two positions somewhere between 2009 into the time

**Page 16**

1 when I was client partner. I would estimate that,
2 you know, you're looking at roughly a million
3 dollars of professional services associated with
4 that project. There was probably a few other
5 smaller-sized deals, you know, $100,000 type deals
6 in there, but nothing else significant.
7     Q.    What project was that?
8     A.    I believe Chubb referred to it as
9 the "premium booking modernization project."
10     Q.    What did that entail?
11     MR. HINDERAKER: Objection. Lack
12     of foundation. To the extent you know.
13     A.    Chubb had a large COBOL based
14 application that had grown up over many years that
15 was designed to validate data from their policy
16 administration systems downstream into their
17 financial ledgers. That project was to replace
18 that COBOL decisioning application with the Fair
19 Isaac Blaze Advisor product.
20     Q.    And who did you work with, with
21 regard to that project?
22     A.    The sponsor was a woman named Nancy
23 Halpin-Birkner. I believe the individual who
24 signed the contracts was a gentleman by the name