**EXHIBIT 16**

**FILED UNDER SEAL**

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS  Doc. 561-14  Filed 09/09/19  Page 2 of 9

```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2    ------------------------------------------------------
      FAIR ISAAC CORPORATION,
 3
                        Plaintiff,
 4

 5         v.             Court File No. 16-cv-1054(WMW/DTS)

 6

 7    FEDERAL INSURANCE COMPANY,
      an Indiana corporation, and ACE
 8    AMERICAN INSURANCE COMPANY,
      a Pennsylvania corporation,
 9
                        Defendants.
10    ------------------------------------------------------

11

12

13                       VIDEO DEPOSITION OF

14                         THOMAS CARRETTA

15                         MARCH 22, 2019

16                            9:31 A.M.

17

18

19                           CONFIDENTIAL

20                       ATTORNEYS' EYES ONLY

21

22

23

24

25
```

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 561-14   Filed 09/09/19   Page 3 of 9

**Page 40**

1 A. It depends on the context.
2 Q. Do you know whether that was the case in this
3    situation?
4 A. There was a salesperson definitely who was
5    contacting various elements of the Chubb
6    Corporation. There were several people actually,
7    and depends on what part of the world they're in,
8    but there may be other people that are interacting
9    that might be considered primary. Depends on what
10   part of the organization.
11        So if there was an engineer of Chubb &
12   Sons in the United States entering a log ticket,
13   he might have a conversation with somebody in the
14   maintenance organization and that person would be
15   the primary contact. So it depends on the
16   purpose, and you haven't defined the purpose.
17 Q. Okay. Mike Sawyer was the client partner for much
18   of the Chubb/FICO relationship, correct?
19 A. He was the client partner for the United States
20   elements of Chubb & Sons, and then if there were
21   opportunities outside of Chubb & Sons, he would
22   probably be the person that would contact them,
23   yes.
24 Q. And he was -- do you understand that he was sort
25   of the primary point person at FICO for Chubb?

**Page 41**

1 A. For the United States.
2 Q. So Chubb in Europe may have had other point
3    people, but for the United States, Mike Sawyer?
4 A. Yeah, it's just a matter of geographic
5    convenience.
6 Q. Okay. What about Russ Schreiber, is he a
7    lower-level person?
8 A. Russ was Mike Sawyer's boss, so he's up a level.
9 Q. Okay. And would you characterize him as a
10   lower-level person?
11 A. No.
12 Q. What was his position?
13 A. He was the manager for the insurance group.
14 Q. Now, you said there could be chatter between
15   lower-level people or low-level people. What is
16   the significance of that to you? Why did you say
17   that?
18 A. Because our agreement with Chubb was if we're
19   going to do work for you it has to be in a
20   Statement of Work, and that's for everybody's
21   benefit because, you know, we want to make sure
22   we're operating within the agreement of what we're
23   going to provide; and Chubb doesn't want us to do
24   any work that isn't authorized because it can
25   create problems, and so that's why they have a

**Page 42**

1    clause that says we only do it if we have a
2    written Statement of Work.
3 Q. And so the significance of that statement, I take
4    it, is that you don't believe that chatter between
5    low-level people should bind FICO?
6        MS. KLIEBENSTEIN: Objection, calls for a
7    legal conclusion.
8        THE WITNESS: They're not authorized to bind
9    us.
10 BY MS. JANUS:
11 Q. Okay. So statements made by FICO to Chubb by the
12   salespeople are not binding on FICO?
13 A. Well, by the agreement of the parties, it has to
14   be written. And so they'll have conversations and
15   say, I have this problem, do you have a solution;
16   well, we might be able to do it like this. So
17   there's engagement going on, but it's not work.
18   In that sense, it's trying to identify problems,
19   potential solutions.
20       If they find a solution that the client,
21   in this case Chubb & Sons, wants to pursue, they
22   would enter into a written Statement of Work. So
23   no, that conversation is not binding. It's just
24   normal conversation.
25 Q. What about conversations about uses outside of the

**Page 43**

1    United States being within the scope of the
2    license, are those binding?
3 A. No, the only things that are binding are what's in
4    the contracts because that's part of the deal that
5    Chubb wanted, is they said, we don't want to be
6    responsible and FICO doesn't want to be
7    responsible, it must be in a written agreement.
8 Q. So as far as you're concerned, Mike Sawyer or Russ
9    Schreiber could have had as many conversations as
10   they wanted with Chubb people saying, go ahead,
11   use it in Europe, use it in Canada, we'll help you
12   use it in Europe, we'll help you use it in Canada,
13   but those aren't binding on FICO. Is that your
14   position?
15       MS. KLIEBENSTEIN: Objection, calls for
16   speculation and I think we're way outside of the
17   30(b)(6) topic with this line of questioning. You
18   can answer that if you can.
19       THE WITNESS: Well, it really is speculating.
20 BY MS. JANUS:
21 Q. I'm asking the question.
22 A. Our people know that they have to have written
23   Statements of Work or they have to have license
24   agreements, and we have a policy that says that;
25   and then we follow the client's policy which --

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 561-14   Filed 09/09/19   Page 4 of 9

**Page 44**

1  our clients all have the same kind of clauses in
2  our agreement. It's a typical thing in
3  everybody's contracts because it defines the
4  boundaries of what's going to be done.
5       People have conversations all the time
6  about how can we potentially solve this and how do
7  we solve this, but you can't solve it until you
8  actually agree to go solve the problem.
9  Q. So in terms of knowledge, we were talking about
10 what FICO's knowledge is of these uses that FICO
11 alleges were outside of the license, and let me
12 ask the question. Do you understand now today
13 that Mike Sawyer was aware of use in the United
14 Kingdom during the term of the license?
15      MS. KLIEBENSTEIN: Objection, calls for
16 speculation.
17      THE WITNESS: FICO's knowledge of use is
18 what's in our contracts, and we reference back to
19 those contracts because it doesn't -- what happens
20 is it doesn't permeate the entity, the FICO
21 entity, until we have contracts because that
22 triggers all kinds of things. So, for instance,
23 there might be software license and then that
24 implicates having maintenance terms, so the
25 maintenance organization is advised of it, the

**Page 45**

1  accounting people are advised of it, and so that
2  knowledge then becomes spread. And people like
3  Mike Sawyer or Russ Schreiber know they can't sign
4  contracts. It has to follow the contract process
5  so that we can become fully aware that there are
6  things going on.
7       So do I know on behalf of FICO that Mike
8  Sawyer knew something about the United Kingdom?
9  No.
10      BY MS. JANUS:
11 Q. So as you -- your testimony is that Mike Sawyer
12 did not know about Chubb's use in the United
13 Kingdom?
14 A. I don't know what Mike Sawyer knows.
15 Q. Is it relevant to you in determining what FICO
16 knows about use?
17 A. Again, our process --
18 Q. Answer the question I asked. I'm entitled to an
19 answer to the question I asked.
20 A. Yeah, and I'm answering the question.
21      MS. KLIEBENSTEIN: Could you repeat that
22 question for me?
23      BY MS. JANUS:
24 Q. I'm simply -- I'm trying to understand what FICO's
25 knowledge of use was. That's what the topic is.

**Page 46**

1  I can't seem to get an answer to it because
2  there's just circular references to agreements.
3       My question then was -- because I can't
4  get an answer to that, I said, did Mike Sawyer
5  know, and --
6       MS. KLIEBENSTEIN: And I just wanted the last
7  question reread, that's all, so he could answer
8  it.
9       MS. JANUS: Okay.
10      (The question was read back by the court
11           reporter.)
12      THE WITNESS: What's "it"?
13 BY MS. JANUS:
14 Q. Mike Sawyer's knowledge.
15 A. Mike Sawyer's knowledge is dependent on the
16 circumstances; in other words, if he's out
17 promoting something, we wouldn't know that
18 necessarily unless he entered into the sales force
19 that, okay, I'm thinking of an opportunity here.
20      What's relevant is Mike knows that he
21 can't authorize the distribution of software
22 without a contract.
23 Q. Can you answer the question I asked?
24 A. Can I hear the question again?
25      (The question was read back by the court

**Page 47**

1            reporter.)
2       THE WITNESS: And my answer was we look to
3  the records. Mike doesn't have authority, none of
4  the salespeople have authority to say go run off
5  and do something different, and that's because
6  we're honoring not only our policies but because
7  the contract says you need to -- Chubb needs to
8  sign off before they want to be responsible for
9  anything.
10      So if Mike has sales puffery or something
11 like that saying, hey, I think we might be able to
12 solve the problem this way or the other, that's
13 not hugely relevant, no.
14 BY MS. JANUS:
15 Q. Is Mike Sawyer's knowledge of the use of Blaze by
16 Chubb in Europe relevant to you in determining
17 FICO's knowledge of the use of Blaze by Chubb in
18 Europe?
19 A. No, it's not binding on us.
20 Q. What if Mike Sawyer consulted with you about the
21 use of Blaze in Europe?
22 A. If Mike had knowledge of some facts or said X
23 company in Europe wants to use the software, Mike
24 would follow the process of asking -- you know,
25 first following through the sales process to enter

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 561-14 Filed 09/09/19 Page 5 of 9

**Page 48**

in that opportunity into the sales force system and then he would want to nurture that until it matured to a level that other people would get involved.

Q. What if -- that wasn't my question, but what if Mike Sawyer came to Chubb legal and said Chubb -- can Chubb in Europe use the software --

MS. KLIEBENSTEIN: Objection, calls for speculation. This is also --

BY MS. JANUS:

Q. -- would that --

MS. KLIEBENSTEIN: -- outside of the 30(b)(6).

MS. JANUS: I don't think it is. I'm trying to understand the position that FICO did not know of use in Europe prior to the merger.

MS. KLIEBENSTEIN: But you're asking for facts, the factual basis in the 30(b)(6), and this is a speculative question that is making up facts that are not part of the record.

BY MS. JANUS:

Q. Did -- were you consulted about Chubb's use of Blaze in Europe prior to the merger?

A. No.

Q. You're absolutely positive about that?

**Page 49**

A. Yes.

Q. Did you review your records to determine whether you were consulted about it?

A. Following the merger is when we reviewed our records.

Q. Yeah, that's not my question. I'm asking, did you review your records to determine whether you were consulted about Chubb's use of Blaze in Europe prior to the merger?

A. No.

Q. So that my question is clear, I'm asking at any time post merger or pre-merger, did you go back and review your records to determine whether you were consulted about that issue pre-merger?

A. So you asked -- the first question is post merger. Yes, we did an investigation and became aware, so I think that's clear.

Prior to the merger we didn't have a reason to go back and look, so there was nothing to look for, no one asked to look for anything.

Q. When you looked back post merger, did you determine that you had been consulted about Chubb's use in Europe?

A. I'm not sure I understand your question. Could you ask a different --

**Page 50**

Q. You investigated post merger, correct?

A. Yes.

Q. Okay. And did that investigation reveal that you had been consulted about Chubb's use in Europe prior to the merger?

A. No.

Q. Are you aware that Chubb -- I'm sorry, that FICO knew that Chubb was considering using Blaze in Europe prior to the merger?

A. As I mentioned, there's sales chatter and there were contacts always trying to be made between a Mike Sawyer or Russ Schreiber or some other sales person as part of their job, so they would have been in contact with Chubb & Sons and potentially other groups like whoever would be Chubb Corporation entities in Europe because of the sales process.

Q. And do you know that they were aware that Chubb in Europe was using Blaze?

A. No, because I previously testified that the contracts stack is our knowledge base. Prior to that, unless there's an agreement, we don't know about it; and we have a process to identify those agreements.

Q. Okay. Are you aware that Mike Sawyer and Russ

**Page 51**

Schreiber knew that Chubb in Europe was using Blaze?

A. No.

Q. And is that -- did you -- well --

Showing you what's previously been marked as Exhibit 73 -- Heather, this is what I'm going to show him. It's big and I don't have an extra copy, but we've seen it many times.

MS. KLIEBENSTEIN: Okay.

BY MS. JANUS:

Q. The document previously marked as Exhibit 73 is a meeting appointment from Mike Sawyer to Ian Brodie, Richard Hill and Russ Schreiber, correct?

A. The agreement identifies an e-mail appointment request from Michael Sawyer to Ian Brodie, Richard Hill and Russ Schreiber, correct.

Q. And the date of the appointment is November 14, 2008, correct?

A. No. November 17, 2008.

Q. Oh, thank you. The date that it was sent is November 14, 2008, correct?

A. Yes.

Q. Okay. And then the appointment is set for November 17, 2008, correct?

A. Yes.

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 561-14 Filed 09/09/19 Page 6 of 9

Q. And then at the top of the same page, he says, "I have forwarded this request to the FICO Account Executive for Chubb," right?

A. Yes.

Q. And then if you look at the bottom of page -- the page marked 1770, Andy Moffat at FICO writes to Russ Schreiber, and this is on March 26, 2015, it says, "Hi Russ, I hope you are well," and then he talks about a meeting with Chubb in London to do some work with them, and he says, "1. Additional Blaze license for commercial property (European wide)," and then "2. Check if they have Decision Simulator as part of the contract," and then he says, "Can you help here?" Is that right?

A. Yes.

Q. So Andy Moffat at FICO is writing to Russ Schreiber inquiring about getting assistance on selling Chubb Europe additional licenses, right?

A. Yes, additional Blaze license and Decision Simulator.

Q. And then Russ Schreiber writes back and says, "Chubb has Global ela for Blaze but no simulator," right?

A. Yes.

Q. So Russ Schreiber concluded that Chubb Europe

Page 100

would not need an additional license for Blaze in Europe, correct?

A. I'm not sure if he concluded that because he says, "You can pull up the contracts" (unintelligible.)

THE COURT REPORTER: Wait, can you start over?

THE WITNESS: Sure.

THE COURT REPORTER: "I'm not sure if he concluded that because he says, 'you can pull up the contracts and" --

THE WITNESS: -- "in pramata" -- P-R-A-M-A-T-A -- "for precise answers." It was done years ago, so he's obviously working off memory.

BY MS. JANUS:

Q. Well, let's go through it, see what he's referring to there. So in response to his message that Chubb has global ela for Blaze, Andy Moffat writes back and says, "Thanks Russ, so to summarise there's no additional licensing costs for this except to include Decision Simulator." See that?

A. No. Which page are you on?

Q. This is the page marked 1770.

A. Okay.

Q. And in the middle of the page Russ Schreiber says,

Page 101

"Chubb has global ela for Blaze."

A. Right, he wrote that.

Q. Okay. And then Andy Moffat writes back confirming. He says, "So to summarise there's no additional licensing costs for this except to include Decision Simulator - would that be a regional addition or global?" See that?

A. Yes.

Q. And then Russ's response to that is, "I'd sell them regional," right?

A. Yes.

Q. And there he's talking about Decision Simulator, right?

A. I don't know. It doesn't say that.

Q. Well, can you tell that from the question that Andy Moffat asks?

A. No. I don't know what he's referring to, regional or sales elsewhere.

Q. And then Andy Moffat responds, "Thanks Russ, Can we get an idea of what the license cost for the ELA is and then we can try to work out a cost for Decision Simulator," right?

A. Yes.

Q. And that's when Russ responds, "It was done years ago...in multi steps. Rough order of magnitude

Page 102

1.5 - 1.9 million. You can pull up the contracts in pramata for precise answers," right?

A. That's right.

Q. So it appears Russ is saying that in response to the question about license costs for the ELA, right?

A. It doesn't say that. It just says, "pull up the contracts in pramata for precise answers."

Q. So you can't tell whether -- from the context of the e-mail whether that's what it's referring to?

A. No.

Q. Based on this e-mail exchange, would you conclude that FICO knew that Chubb Europe was using Blaze as of March of 2015?

A. No.

Q. Would you conclude that FICO believed that Chubb Europe could use Blaze pursuant to the enterprise license?

A. No.

Q. Why not?

MS. KLIEBENSTEIN: Objection, calls for a legal conclusion.

THE WITNESS: This is not a very clear exchange, number 1; number 2, it's clearly a sales cycle; and number 3, as I've explained,

Page 103

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
CASE 0:16-cv-01054-DTS Doc. 561-14 Filed 09/09/19 Page 7 of 9
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 104

1 Mr. Schreiber is not one of those who has the
2 authority to bind the company. That's limited to
3 a very small group of people.
4     And this process would have flowed
5 through to surface, and obviously it never
6 surfaced because I don't believe there's any
7 contracts signed for any of this stuff in the
8 existing agreements that we have.
9 BY MS. JANUS:
10 Q. When you say that this isn't a very clear
11 exchange, with respect to whether the enterprise
12 license allows the use of Blaze in Europe, would
13 you say it's a clear exchange?
14 A. No.
15 Q. What is unclear about it?
16 A. Mr. Schreiber says, "You can pull up the contracts
17 in pramata for precise answers." He says it was
18 done years ago, so he obviously hasn't looked at
19 anything, so that tells me he hasn't looked at
20 anything, he's just guessing.
21 Q. Anything else unclear about the exchange?
22 A. Yeah, I'm not even sure what he's talking about
23 for regional or -- regional or -- he says, "I'd
24 sell them regional." I don't know what that
25 means.

Page 105

1 Q. And Decision Simulator, that's like an add-on
2 software to Blaze; is that correct?
3 A. Honestly I don't know the answer to that. It's a
4 product. That's as much as I know.
5 Q. But it's a separate product from Blaze?
6 A. Yes.
7 Q. And do you know whether Decision Simulator can
8 only be used in connection with Blaze?
9 A. I don't know.
10 Q. Showing you what's been attached -- what's been
11 previously marked as Exhibit 60, this is -- let me
12 know when you've had a chance to take a look at
13 it.
14 A. Okay.
15 Q. Have you seen this document before?
16 A. No.
17 Q. This is an exchange between -- well, let's look at
18 the second e-mail on Exhibit 60 which is an e-mail
19 from Andy Moffat to Hamish at Chubb, correct?
20 A. Yes.
21 Q. And it's dated April 1, 2015, correct?
22 A. Yes.
23 Q. And the e-mail we were looking at that's marked as
24 Exhibit 57 was dated March 26, 2015, correct?
25 A. Yes.

Page 106

1 Q. So this is just a few days after that?
2 A. Like five days later.
3 Q. And in this e-mail -- and -- apologies, Andy
4 Moffat is a senior account executive at FICO
5 located in London, correct?
6 A. That's what his address says, yes.
7 Q. And in this e-mail, Mr. Moffat writes to Hamish at
8 Chubb and says, "Please see the attached proposal
9 for the licensing costs and associated training
10 for Decision Simulator. The prices are heavily
11 discounted in line with the existing Blaze
12 contract. No additional Blaze license(s) are
13 needed as it is covered within the overall global
14 Blaze ELA." Do you see that?
15 A. I do.
16 Q. So based on this e-mail, would you conclude that
17 FICO believed that use of Blaze in Chubb Europe
18 was allowed under the license?
19 A. No, I wouldn't conclude that.
20 Q. And why is that?
21 A. This is a sales guy, and there's just a layer of
22 people relying what other people think all the way
23 down the line, so I don't know if he's even looked
24 at the contract and he's not in a position to
25 judge anyway.

Page 107

1 Q. If you look at the attachment to the e-mail, there
2 is a formal proposal attached, right?
3 A. Yes, it says, "This document is FICO's proposal."
4 Q. And he certainly would have needed approval from
5 higher-ups to make a proposal like this, correct?
6 A. No. The system is automated where they're given
7 pricing, they have a pricing engine and then they
8 can discount based upon a certain amount of
9 parameters, so I can't tell any of that here, but
10 he could have definitely made a proposal on his
11 own.
12 Q. And the proposal assumes that the Blaze Advisor
13 enterprise license applies to Chubb Europe,
14 correct?
15 A. The asterisk says, "Assuming that Chubb have
16 already had Blaze Fundamentals and RMA training."
17 I don't see anything about underlying license.
18 Q. Well, if you look at subpart B, Project
19 Requirements --
20 A. Yes.
21 Q. -- it says, "Decision Simulator to be included in
22 existing Blaze ELA contract."
23 A. Uh-huh.
24 Q. Do you see that?
25 A. Uh-huh.

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 561-14 Filed 09/09/19 Page 8 of 9

**Page 108**

1 Q. Yes?
2 A. Yes, I do. There's a bullet there.
3 Q. Okay. So does that indicate to you that the
4  proposal also consistent with the e-mail is made
5  on the premise that the Blaze enterprise license
6  applies to Chubb Europe?
7 A. That appears to be what Andy Moffat thinks, again,
8  based upon this chain of e-mails, but one
9  person doesn't -- nobody has read the contract and
10  they just keep remembering certain things, so it's
11  just a proposal.
12 Q. Who would need to have approved this for you to
13  say that FICO knew that Chubb Europe was using
14  Blaze and the license covered Chubb Europe?
15    MS. KLIEBENSTEIN: Objection, calls for a
16  legal conclusion.
17    THE WITNESS: It goes through a process --
18  there's a whole number of steps of processes, and
19  at a particular point in that process it needs to
20  go in front of the finance group, it needs to go
21  in front of the legal group, it needs to manifest
22  itself in a signed agreement. Until there's a
23  signed agreement, it's nothing.
24    BY MS. JANUS:
25 Q. Well -- so here we're talking about -- or I should

**Page 109**

1  say -- I'm talking about Exhibit 60, and Andy
2  Moffat has sent an e-mail about an existing
3  license, right?
4 A. No, it says what it says.
5 Q. And I asked a question.
6 A. He says that he wants to sell a proposal for
7  licensing training for Decision Simulator, and he
8  references what he believes is an overall global
9  Blaze ELA.
10 Q. Right. And so my questions for you have been
11  about his statement relating to the existing
12  global Blaze ELA. Do you understand that?
13 A. Uh-huh.
14 Q. Yes?
15 A. Yes.
16 Q. Okay. And so his statement is, "No additional
17  Blaze license(s) are needed as it is covered
18  within the overall global Blaze ELA," right?
19 A. That's what he says, yes.
20 Q. Okay. So my question for you is, who -- and your
21  position has been that this statement is not
22  binding on FICO because Andy Moffat is a senior
23  account executive, right?
24 A. He does not have authority to sign contracts, no.
25  He can't bind the company.

**Page 110**

1 Q. Right, but is your position -- my question was
2  different than that. My question was, is it your
3  position that this statement "No additional Blaze
4  license(s) are needed as it is covered within the
5  overall global Blaze ELA" is not binding on FICO
6  because Andy Moffat is a senior account executive?
7 A. Right, he's just the senior account executive and
8  they don't have authority to bind the company.
9 Q. Okay. Now, who would have needed to approve this
10  position relating to Chubb's use of Blaze in
11  Europe for it to be binding on FICO?
12 A. Like I said, it would go through a process and
13  then be incorporated into an agreement and then a
14  number of people would have to approve it, so the
15  finance people would have to approve it, the
16  product person has to approve it, the legal folks
17  have to approve it; and that would be in general.
18  At a minimum, those folks would have to approve
19  it.
20 Q. But how does that apply when you already have an
21  agreement that's being discussed?
22 A. It works exactly the same way every time and you
23  end up with a contract, either a Statement of
24  Work, a licensed schedule or some other contract
25  signed by both parties.

**Page 111**

1 Q. Right, but this statement he's making is about an
2  existing enterprise license agreement, right?
3 A. But he's still talking -- first of all, he's
4  obviously mistaken, right, because of that set of
5  errors I guess that I referred to, but it's also
6  adding onto an existing agreement, so the whole
7  thing gets refiltered again through the approval
8  process.
9 Q. And I'm just -- I'm really just asking about how
10  that would apply, how your analysis would apply
11  where there's no --
12    He's not talking about entering into
13  another Blaze enterprise license agreement, right?
14  He's talking about the existing Blaze enterprise
15  license agreement?
16 A. That's what he thinks.
17 Q. Okay. And so is it your position that it really
18  doesn't matter what anyone at FICO said to anyone
19  at Chubb about the existing enterprise license
20  agreement or the scope of the agreement?
21 A. What I'm saying is that the parties both agreed
22  that the only thing that's binding is something
23  signed by both parties. Everything else is just
24  conversations and informational.
25    So Andy is not allowed to bind the

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 3/22/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 561-14 Filed 09/09/19 Page 9 of 9

**Page 112**

1 company, and Chubb Corporation or whoever is going
2 to sign it knows their own contract says, no, we
3 don't want anything unless we have a signed
4 agreement. That's what the parties agreed.
5 Q. Would it change your analysis of the proposal if
6 it was sent to Bill Wade for approval prior to
7 being sent to Chubb?
8 A. No, because Bill Wade is not authorized to sign
9 contracts.
10 Q. Would it change your analysis if it was sent to
11 legal, to FICO legal, prior to being sent to
12 Chubb?
13 A. No.
14 Q. Why not?
15 A. We just sent it to them. They'd still have to
16 work on it and it still would have to go through
17 the process. That process, like I said, is you
18 review the existing agreement, you get approvals
19 from the product people, from the professional
20 services people if there's implementation work,
21 the training people if there's training involved,
22 the finance people, and then an authorized person
23 in sales, so you have to get all of them in order
24 for it to go through.
25 Q. So if legal had approved the Decision Simulator

**Page 113**

1 proposal, that would not make a difference to you
2 in terms of your analysis of whether FICO knew
3 that Chubb in Europe was using Blaze?
4 A. No, legal doesn't approve proposals. Legal
5 approves contracts.
6 Q. In terms of FICO's knowledge of Chubb Europe's use
7 of Blaze, does Exhibit 60 show you that FICO knew
8 about the use of Blaze in Europe as of April of
9 2015?
10 A. I don't know what Chubb in Europe was doing in
11 2015. This document doesn't seem to confirm it
12 one way or the other to me.
13 Q. So the answer is no, Exhibit 60 does not --
14 A. No.
15 Q. -- indicate to you that FICO knew that Chubb
16 Europe was using Blaze?
17 A. No.
18 Q. Let's talk about audits. I'm showing you what's
19 been marked as Exhibit 314.
20 A. Okay. Thank you.
21 Q. I take it you recognize this document?
22 A. I do.
23 Q. What is it?
24 A. This is a Software License and Maintenance
25 Agreement for Blaze Advisor.

**Page 114**

1 Q. With whom?
2 A. It's between Fair Isaac Corporation and Chubb &
3 Son, a division of Federal Insurance Company.
4 Q. Does this license provide FICO with certain audit
5 rights?
6 A. Give me a moment, please. There's a Provision 3.5
7 that refers to it, yes.
8 Q. What are the audit rights that FICO had under the
9 license agreement?
10 A. It indicates, "On Fair Isaac's written request,
11 Client shall provide to Fair Isaac a written
12 certification executed by an authorized officer of
13 Client that provides the following information:
14 verification that Fair Isaac Products are being
15 used in accordance with the provisions of this
16 agreement, a list of the locations which the Fair
17 Isaac Products are or have been operated in the
18 preceding twelve month period; and (iii), the
19 number of Seats, CPU's or applications accessing
20 or utilizing the Fair Isaac Products (as
21 applicable)."
22 Q. Did Fair Isaac ever exercise its verification in
23 audit rights under the license agreement?
24 A. No.
25 Q. Why not?

**Page 115**

1 A. Most of our clients are longstanding and we only
2 use that when a dispute comes up, so there wasn't
3 any reason to do that. We didn't have a dispute
4 with them until the merger.
5 Q. Who makes the decision on behalf of FICO to
6 exercise audit rights?
7 A. That would be typically the senior executives, so
8 somebody who was authorized to sign the contracts
9 or had any VP title in combination with people who
10 would be able to effectuate the audit, the right
11 people who understand what this is; and then the
12 legal department would be involved typically too.
13 These are rare.
14 Q. So senior executives and then you said the people
15 to implement the audit?
16 A. Yeah, so if -- somebody has to write a letter, and
17 it's usually from a business group saying please
18 confirm. So that's what I mean by -- I don't know
19 who that would be, but --
20 Q. Please confirm?
21 A. What your use is in accordance with 3.5.
22 Q. Why are they only used if there's a dispute?
23 A. Well, we trust our customers. We talk to them,
24 you know, fairly regularly, as we discussed,
25 through the client partner and have very