CASE 0:16-cv-01054-DTS   Doc. 565   Filed 09/09/19   Page 1 of 6
Brooks Hilliard  -  6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2
     _____
     FAIR ISAAC CORPORATION,          Court File No.
3                                     16-cv-1054(WMS/DTS)
              PLAINTIFF,
4
        VS.
5
     FEDERAL INSURANCE COMPANY
6    and ACE AMERICAN INSURANCE
     COMPANY,
7
              DEFENDANTS.
8    _____

9

10

11

12   - - - - - - - - - - - - - - - - - - - - - - - - - -

13              VIDEOTAPED DEPOSITION OF

14                  BROOKS HILLIARD

15   - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17

18

19

20

21

22

23

24

25   Taken June 19, 2019      By Brandi Bigalke, RPR

Brooks Hilliard  -  6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1    A.    I didn't consider this to be -- I
2 didn't know that this was considered testimony.
3 I didn't give a deposition.  The case settled and
4 didn't go out -- didn't go to -- didn't go to
5 trial.
6          If I should have included this, I
7 apologize for not having done so.
8    Q.    So have you provided expert reports
9 within the last five -- within the last four
10 years other than this report and the cases
11 identified on page 37?
12   A.    Yes.
13   Q.    How many?
14   A.    I don't know off the top of my
15 head.
16   Q.    Can you provide an estimate?
17   A.    In the last four years, maybe four
18 per year on average.  Maybe more.  I -- I
19 don't -- I would have to look at that spreadsheet
20 and then go back and -- the spreadsheet
21 doesn't -- I don't have a column for whether I
22 produced a report in the spreadsheet so.
23          But the spreadsheet would allow me
24 to identify the clients in the last four years,
25 and then I could go back and look to see whether

Page 113

1 I produced a report.
2    Q.    So going back to Exhibit 508 and
3 the expert report in that case, could you turn to
4 page 11 of 45.  Page number is on the top of the
5 page in the upper right.
6    A.    Yes.
7          MR. HINDERAKER:  The court pages?
8 I'm sorry, the court pages?
9          MR. FLEMING:  Page 11 of 45.
10         MR. HINDERAKER:  Per the Court's
11 document?
12         THE WITNESS:  It's the page that
13 says "basis of opinions" sort of in the middle,
14 is that the one?
15         MR. FLEMING:  Right.  Yes.
16         MR. HINDERAKER:  Okay.
17 BY MR. FLEMING:
18   Q.    Your first opinion is that it is
19 the normal custom and practice of the software
20 industry for software licensors to notify
21 potential users that their software is licensed,
22 to require such users to execute a license
23 agreement, and often to impose various
24 restrictions on the transfer or use of the
25 software; is that right?

Page 114

1    A.    That's my stated opinion, yes.
2    Q.    So would you agree that when FICO
3 found out about foreign uses by Federal, if it
4 truly believed the uses were unlicensed, it would
5 have been industry practice to notify Federal of
6 this fact?
7          MR. HINDERAKER:  Same objection;
8 outside the scope.
9          THE WITNESS:  Can you repeat the
10 question, please.
11         (The requested portion was read
12 back by the court reporter.)
13         THE WITNESS:  My experience would
14 be that sometimes licensors would notify
15 licensees immediately.  Sometimes they might wait
16 for a more appropriate -- what they might deem a
17 more appropriate time if they found out about
18 something that at the time did not seem to be
19 significant enough to bring it up immediately.
20 BY MR. FLEMING:
21   Q.    And can you give me an example of
22 that in your experience when a licensor found out
23 about unlicensed use but determined to wait until
24 a later time because it did not believe it was
25 significant or for whatever reason you stated?

Page 115

1    A.    I -- I don't know that off the top
2 of my head I can give you an example outside of
3 this case where that occurred, but I've -- I'm
4 sure I've seen that, but I can't give you a
5 specific example.
6          What I have seen a lot of is
7 licensors who become aware of something that they
8 feel is inconsistent with the license or contract
9 with a customer with which they have a
10 significant cooperative relationship that's
11 important to them where they decide as long as
12 the perceived potential violation is minor, that
13 it isn't worth disrupting the relationship with
14 the client to make an issue of it unless and
15 until it becomes more significant or a major -- a
16 more significant violation.
17         So minor discrepancies between
18 contractual terms and -- are often put off or
19 overlooked as long as they remain relatively
20 insignificant.  I've seen lots of instances of
21 that.
22   Q.    So you've seen lots of instances of
23 that.
24         In any of those cases are you aware
25 in instances like that where the licensor has

Page 116

CASE 0:16-cv-01054-DTS   Doc. 565   Filed 09/09/19   Page 3 of 6
**Brooks Hilliard   -   6/19/2019**
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

<sup>1</sup> later sued and sought damages for the prior use
<sup>2</sup> outside of the license which it did not complain
<sup>3</sup> about at the time and allowed to proceed?
<sup>4</sup>     **A.     Seemed to me that that's a complex**
<sup>5</sup> question. I'm not sure it's not a compound
<sup>6</sup> question, but I -- I don't recall any that
<sup>7</sup> specifically fit that characterization as I
<sup>8</sup> under -- as best I understand it.
<sup>9</sup>         MR. FLEMING: All right. Why don't
<sup>10</sup> we break now.
<sup>11</sup>         Do you want to break -- try for a
<sup>12</sup> half hour and try to get back at -- let's go off
<sup>13</sup> the record.
<sup>14</sup>         THE VIDEO OPERATOR: Going off the
<sup>15</sup> record. The time is 11:35.
<sup>16</sup>         (Thereupon, a break was taken, and
<sup>17</sup> then the proceedings continued as follows:)
<sup>18</sup>         THE VIDEO OPERATOR: We're back on
<sup>19</sup> the record. The time is 12:11 p.m.
<sup>20</sup> BY MR. FLEMING:
<sup>21</sup>     Q.     Mr. Hilliard, could you turn to
<sup>22</sup> Exhibit 508, the Microsoft case expert report.
<sup>23</sup>     **A.     I have it in front of me.**
<sup>24</sup>     Q.     Could you turn to page 29 of 45, on
<sup>25</sup> the upper right hand of the page where it says 29

Page 117

<sup>1</sup> of 45.
<sup>2</sup>         Do you see where in paragraph 45
<sup>3</sup> you say in part that based on your experience,
<sup>4</sup> you understand that the level of control the
<sup>5</sup> licensor's business model needs depends on
<sup>6</sup> keeping accurate records of, among other things,
<sup>7</sup> whether the licensed user's usage of the license
<sup>8</sup> software remains in compliance with the license
<sup>9</sup> terms and conditions?
<sup>10</sup>         Is that right?
<sup>11</sup>     **A.     Let me read the whole thing.**
<sup>12</sup>     Q.     Sure.
<sup>13</sup>     **A.     Okay.**
<sup>14</sup>     Q.     That is what you say, right?
<sup>15</sup>     **A.     You know, I didn't see it as you**
<sup>16</sup> were reading it. If we could just read back.
<sup>17</sup>         (The requested portion was read
<sup>18</sup> back by the court reporter.)
<sup>19</sup>         THE WITNESS: Yes, I see that.
<sup>20</sup> BY MR. FLEMING:
<sup>21</sup>     Q.     Okay. And you say that in the
<sup>22</sup> expert report that I just read from, correct?
<sup>23</sup>     **A.     That's correct.**
<sup>24</sup>     Q.     Okay. And then you say immediately
<sup>25</sup> after that, "In order to maintain this control,

Page 118

<sup>1</sup> it is the normal custom and practice of most
<sup>2</sup> commercial software licensors to monitor who has
<sup>3</sup> custody of the usable -- of the usable copies of
<sup>4</sup> their software to the greatest extent possible."
<sup>5</sup>         Right?
<sup>6</sup>     **A.     Yes, I wrote that.**
<sup>7</sup>     Q.     Okay. Yet you say in your report
<sup>8</sup> in this case, the very first exhibit that we
<sup>9</sup> referenced today on page 19 to 20, you give your
<sup>10</sup> opinion that it was consistent with industry
<sup>11</sup> standards for FICO to never conduct any auditing
<sup>12</sup> of Chubb use employees, right?
<sup>13</sup>     **A.     You're characterizing what I wrote**
<sup>14</sup> or quoting something specifically?
<sup>15</sup>     Q.     I am characterizing what you wrote.
<sup>16</sup>     **A.     Could you read back his**
<sup>17</sup> characterization to me, please.
<sup>18</sup>         (The requested portion was read
<sup>19</sup> back by the court reporter.)
<sup>20</sup>         THE WITNESS: That's a reasonably
<sup>21</sup> fair characterization of what I wrote.
<sup>22</sup> BY MR. FLEMING:
<sup>23</sup>     Q.     Okay. So how is that opinion
<sup>24</sup> consistent with your report from the Microsoft
<sup>25</sup> case about keeping accurate records to -- as to

Page 119

<sup>1</sup> whether the license users' usage of the license
<sup>2</sup> software remains in compliance and for the other
<sup>3</sup> opinion that most commercial software license
<sup>4</sup> user monitor who has custody of the usual copies
<sup>5</sup> of their software?
<sup>6</sup>     **A.     Well, in the Microsoft case we're**
<sup>7</sup> talking about consumer software -- shrink wrap
<sup>8</sup> consumer software.
<sup>9</sup>         (Clarification by the court
<sup>10</sup> reporter.)
<sup>11</sup>         THE WITNESS: We're talking about
<sup>12</sup> shrink wrap consumer, I believe it was the
<sup>13</sup> Microsoft Office applications if I recall
<sup>14</sup> correctly. And it is not practical in a consumer
<sup>15</sup> shrink wrap software, particularly for versions
<sup>16</sup> that are sold to individual consumers as opposed
<sup>17</sup> to versions that are sold to corporations for
<sup>18</sup> corporate internal use, it's not practical to
<sup>19</sup> give the responsibility to the customer to
<sup>20</sup> monitor their own usage and be responsible for
<sup>21</sup> the license compliance.
<sup>22</sup>         In business applications such as
<sup>23</sup> the one we're -- at issue in this case, and in
<sup>24</sup> business applications in general, there is very
<sup>25</sup> often a cooperative, ongoing relationship,

Page 120

Brooks Hilliard  -  6/19/2019

Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 partnership almost -- and I don't mean
2 partnership in the legal sense -- relationship
3 between the licensor and the large corporate
4 licensee where the licensor and licensee agree
5 that the licensee will be responsible for
6 monitoring their own usage and notifying the
7 licensor when there are changes that would
8 require some change to the license fees.
9        And while it's normal and customary
10 for licensors to have the ability to request an
11 audit, very often, although not always, the
12 responsibility for running the audit is the
13 customer's or the licensee's responsibility, not
14 the licensor's.  But because of the ongoing large
15 corporate relationship -- trust relationship that
16 develops between a licensor and a major corporate
17 licensee, the licensor trusts the licensee to
18 advise it of usage that might trigger some change
19 to the fee level.
20        So on the one hand you have the
21 consumer-oriented shrink wrap customers, on the
22 on the other hand you have the corporate
23 relationship.  In both cases the licensor wants
24 to ensure accurate -- an accurate determination
25 of who is using, but the responsibility and the    Page 121

1 necessary requirement for audit differs from one
2 to the other.  That's why there's no conflict
3 between the two.
4 BY MR. FLEMING:
5    Q.    Let's look at your first opinion in
6 your report in this case.
7        MR. HINDERAKER:  Which page is
8 that, please?
9        MR. FLEMING:  On Page 6.
10        THE WITNESS:  Are we finished with
11 the Microsoft?
12        MR. FLEMING:  I'm not asking a
13 question about that right now.
14 BY MR. FLEMING:
15    Q.    On Page 6, your first opinion is
16 that the licensing limitations in the license
17 agreement are comparable to limitations
18 customarily found in the license agreements of
19 other commercial software providers.
20        FICO applies these limitations in
21 the manner that's consistent with the normal
22 customs and practices of the commercial software
23 industry, right?
24    A.    Yes.
25    Q.    And you base your -- one of the    Page 122

1 sources that supports your interpretations is a
2 textbook by Ward Classen; is that right?
3    A.    My primary source of my expertise
4 is my experience, but I have referred to
5 Mr. Classen's book as a learned treatise, if you
6 will, that basically takes the same -- the same
7 view that I do.  So it's not just my own
8 experience that I'm relying on.
9        MR. FLEMING:  Would you mark this
10 as the next exhibit.
11        (Deposition Exhibit 509 was marked
12 for identification.)
13 BY MR. FLEMING:
14    Q.    Showing you what's been marked as
15 Exhibit 509, which is an excerpt from the Classen
16 book that you reference.
17    A.    Yes.
18    Q.    Could you turn to page 577.
19    A.    Okay.
20    Q.    It's the last page of this exhibit.
21 Do you see where it says, "The vendors
22 implementation team should carefully monitor --"
23    A.    What paragraph are we talking
24 about?
25    Q.    The first paragraph.    Page 123

1        MR. HINDERAKER:  Okay.
2 BY MR. FLEMING:
3    Q.    The first full sentence -- the
4 second full sentence.
5    A.    Second full sentence, okay.
6 Starting on the third line.
7    Q.    Yeah.  Why don't you go ahead and
8 read it out loud.
9    A.    "The vendor's implementation team
10 should carefully monitor each party's obligations
11 and immediately notify the vendor's management
12 team if the customer fails to meet any of its
13 contractual obligations or if the vendor is in
14 danger of not meeting one of its own..."
15    Q.    Commitments?
16    A.    Commitments.  Yeah, it is the
17 vendor.  Yes.
18    Q.    Doesn't that statement indicate to
19 you that FICO should have notified Federal if it
20 thought any use could potentially exceed the
21 scope of the license?
22    A.    It's one factor, but if you read
23 the whole book, the book talks about relying
24 on -- there are other areas which talk about
25 relying on self monitoring and talk about the    Page 124

Brooks Hilliard  -  6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 relationship between the licensor and the
2 licensee. So if this were the whole book, it
3 would conflict, but if you take this in the
4 context of what else Classen writes, it is a
5 factor.
6        And certainly if it's a major
7 obligation or a -- a major contractual obligation
8 as addressed here, I would agree that the more
9 promptly it's addressed, the better, but it is
10 normal and customary in the industry to look at
11 these things in context of the whole relationship
12 and bring up things at the proper time if they
13 are not known to be substantive at the time
14 they're discovered.
15      Q.    But in terms of the question I
16 asked and the statement from the Classen book
17 that you reference as a source in your report,
18 that excerpt indicates that FICO should have
19 notified Federal if it thought any use could
20 potentially exceed the scope of the license,
21 correct?
22        MR. HINDERAKER: Objection;
23 argumentative, and also asked and answered.
24        THE WITNESS: If that one paragraph
25 were the entire book, it would certainly conflict

Page 125

1 with my opinion. But when that one paragraph is
2 taken in the context of the rest of the book, it
3 doesn't.
4 BY MR. FLEMING:
5      Q.    So do you think Classen has it
6 wrong when he says that?
7        MR. HINDERAKER: Objection;
8 misstates his testimony.
9 BY MR. FLEMING:
10      Q.    Do you disagree with his
11 recitation?
12      **A.    I agree that that's certainly a**
13 factor. And I think he's right to cite that as
14 an issue. Particularly if the failure to meet
15 contractual obligations is known to be
16 substantive or potentially substantive. But you
17 can't just look at this one paragraph and ignore
18 the other 800 pages of the book.
19      Q.    And with regard to the excerpt I
20 just read on page 577, wouldn't that indicate
21 that FICO should have notified Federal if it
22 thought that its use outside of the United States
23 exceeded the scope of the license at the time
24 that FICO learned about it?
25        MR. HINDERAKER: Objection; asked

Page 126

1 and answered.
2        THE WITNESS: Can you repeat the
3 question.
4        (The requested portion was read
5 back by the court reporter.)
6        THE WITNESS: Are you asking me to
7 assume that this was the only paragraph in the
8 entire book?
9 BY MR. FLEMING:
10      Q.    I'm asking you if that excerpt that
11 I read from page 577 of the Classen book that you
12 used as a source indicates that FICO should have
13 notified Federal if it believed that its use
14 outside of the United States exceeded the scope
15 of the license at the time they learned about it?
16      **A.    It indicates to me that that should**
17 be a consideration for FICO, but this is not the
18 only thing that Classen says and there are
19 other -- it has to be taken in the context of the
20 whole relationship. And Classen does deal with
21 that in the book.
22        I'm not saying you should ignore or
23 this should be ignored. What I'm saying is it
24 should be a consideration, but it's not the only
25 consideration, nor is it the overriding

Page 127

1 consideration.
2      Q.    Now, in the excerpt I just read,
3 Classen says nothing about that being a factor or
4 consideration, correct?
5      **A.    This is page 577 of Chapter 24 of a**
6 book that's more than 800 pages long. He didn't
7 just write this one paragraph. He wrote the
8 whole book.
9        And you can't say just because it
10 doesn't say it's a factor as opposed to the
11 entire idea. When you know that it's one 7-line
12 paragraph out of an 800 page book, it's obviously
13 just a factor.
14      Q.    But in the excerpt that I just
15 read, Classen says nothing about that being just
16 a consideration, rather he says the vendor should
17 immediately notify the vendor's management team
18 if the customer fails to meet any of its
19 contractual obligations, right?
20      **A.    He says --**
21        MR. HINDERAKER: Asked and
22 answered.
23        THE WITNESS: He says that, yes.
24 That's not all he says of course.
25 BY MR. FLEMING:

Page 128

1  Q.   I wasn't asking if that's all that
2 he says.
3  **A.   Good.**
4  Q.   Let's turn to your report in this
5 case on page 7.
6  **A.   I'm there.**
7  Q.   And you say here that the license
8 grant is limited to affiliates of Chubb & Son?
9  **A.   What are you referring to?  Oh,**
10 **point 1?**
11  Q.   Point 1.  Isn't that what you
12 say --
13  **A.   That's a --**
14  Q.   Don't you say, "The license grant
15 is limited to affiliates of Chubb & Son"?
16  **A.   That's a heading for the following**
17 **paragraphs starting on that page and going**
18 **through the heading on page 9, yes.**
19  Q.   Okay.  I read the heading
20 correctly, didn't I?
21  **A.   You did, yes.**
22  Q.   Okay.  Could you identify all the
23 affiliates of Chubb & Son?
24  **A.   Chubb & Sons is a -- is the**
25 **licensee.  Chubb & Sons, a division of Federal is**   Page 129

1 a licensee and I don't know that it has -- well,
2 affiliates is defined on the following page
3 within the license agreement.
4  And it says, "Affiliates shall mean
5 any other entity directly or indirectly
6 controlled by Chubb & Sons where control means
7 the ownership of more than 50 percent of the
8 aggregate of all voting interests of the entity."
9  So Chubb & Sons as a division of
10 another company doesn't -- it's a division.  It
11 doesn't own directly or indirectly more than 50
12 percent of any other entity.  So there would be
13 no affiliates as affiliates is laid out in the
14 contract.  In the license agreement.
15  Q.   So your heading says, "The license
16 grant is limited to affiliates of Chubb & Son,"
17 and your testimony is that there are no
18 affiliates of Chubb & Son; is that right?
19  **A.   Yes.**
20  Q.   So in other words, you're saying
21 the license grant is not -- is not provided to
22 any entity?
23  MR. HINDERAKER:  Objection;
24 misstates his testimony.
25  THE WITNESS:  And pardon me. It   Page 130

1 probably would have been clearer for me to say is
2 limited to Chubb & Son and affiliates of Chubb &
3 Son so.  But the distinction I'm trying to make
4 is -- in this section relates to affiliates.
5  So no, the licensee is Chubb & Son.
6 And if there were affiliates, which there are
7 not, it would also include affiliates.  So Chubb
8 & Son is the only licensee as I understand it as
9 affiliates is defined in the license.
10 BY MR. FLEMING:
11  Q.   So you say the license grant is
12 limited to affiliates of Chubb & Son, and now
13 you're saying there are no affiliates, and what
14 you meant to say is that the license grant is
15 limited to Chubb & Son?
16  **A.   And affiliates, if any.  Once**
17 again, I'm rebutting what Dr. Kursh says.  And he
18 has -- and I'm making a distinction between what
19 I'm saying and what Dr. Kursh has written.
20  And so this subhead here is really
21 a characterization of what follows.  The opinion
22 is the opinion as stated on Page 6, and then
23 these are explanations of how that opinion is
24 supported.
25  And it would probably have been   Page 131

1 more accurate to summarize -- to have the subhead
2 say limited to Chubb & Son and affiliates of
3 Chubb & Son if there were such affiliates.
4  Q.   But you're saying there are no such
5 affiliates, so what you meant to say was the
6 license grant is limited to Chubb & Son, right?
7  **A.   That would be another way -- that**
8 would be an accurate way of stating what I'm
9 stating, yes.
10  Q.   Okay.  And what is Chubb & Son?
11  **A.   According to all the documents I've**
12 seen, Chubb & Son is a division of Federal,
13 Federal Insurance Company.
14  Q.   And what do you mean by a division?
15  **A.   Well, a better question would be**
16 what does -- no, let me think about that.
17  My understanding in the normal and
18 customary business understanding based on my
19 knowledge of business practices, a division is an
20 unincorporated entity within a corporation.
21  So it's distinct from a subsidiary
22 where a subsidiary is often separately
23 incorporated.  A division would be a subentity
24 that is not itself a corporation.
25  Q.   Is it your understanding that Chubb   Page 132