HENRY MIROLYUZ - 01/11/2019

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2

 3

 4      _____

 5
        FAIR ISAAC CORPORATION, a      X
 6      Deleware corporation

 7                  Plaintiff(s)

 8
            -vs-                       X     CASE NO. 16-cv-1054
 9                                            (WMW/DTS)
        FEDERAL INSURANCE COMPANY, an
10      Indiana corporation, and ACE
        AMERICAN INSURANCE COMPANY, a
11      Pennsylvania corporation
                                       X
12                  Defendant(s)

13      _____

14

15

16            DEPOSITION OF HENRY MIROLYUZ

17

18         DATE:   JANUARY 11, 2019

19              HELD AT:

20          HUSEBY - CONNECTICUT
              249 Pearl Street
21          Hartford, Connecticut

22                  ---

23

24         Dawn C. Mahoney, LSR #142

25
```

EXHIBIT 4

Page 10

1  this as efficiently as possible and as respectfully to
2  the witness as possible.
3         MR. HINDERAKER:  And Counsel, we will
4     be doing the same thing, on some of your upcoming
5     noticed depositions, designating those witnesses
6     for some topics, and I'll asking for the same
7     courtesies.
8         MR. FLEMING:  I understand your
9     position.  This is the second day that
10    Mr. Mirolyuz has appeared for a deposition, at
11    great inconvenience on both occasions.  I believe
12    you ought to be able to conclude the individual
13    deposition and the topics that he's been
14    designated for in one day, and we do not have any
15    agreement beyond that.
16  Q    (By Mr. Hinderaker)  And I understand,
17  Mr. Mirolyuz, you've been designated for three topics?
18  A    I believe so.
19  Q    Okay.  One of those topics, 15, I was
20  advised last night about 8:30 p.m.  So if we can in
21  the future give a little bit more notice that would be
22  appreciated.
23       I've had -- the court report has marked this
24  as Exhibit 178.  You'll see it's a subpoena to
25  testify today.  Do you understand that you are here to

Page 11

1  testify pursuant to subpoena?
2  A    I do.
3         MR. FLEMING:  Did you say 158?
4         MR. HINDERAKER:  I said 178.
5  Q    This, sir, is Deposition Exhibit 179.  Have
6  you seen this 30(b)(6) Notice of Deposition before
7  this morning?
8  A    I did.
9  Q    Okay.  So just to reaffirm, you intend to
10  testify on a 30(b)(6) basis to Topics 15, 16 and 17.
11  Is that correct?
12  A    That is correct.
13  Q    Thank you.  When we last met during a
14  30(b)(6) deposition, I asked you for who you were
15  employed by at that time.  You answered CHUBB, IT
16  Claims, and we just go let it go at that and we moved
17  on.  I'd like to get more clarity at the moment.  I
18  understand that you've left the employment?
19  A    Correct.
20  Q    Okay.  At the time you left your employment,
21  what was the specific company for whom you were
22  working?  What was on your paycheck?
23  A    I believe -- I do not recall, quite frankly.
24  I did see my paycheck.  I have a direct deposit.  So
25  quite frankly, I'm never interested what's in the

Page 12

1  paycheck.  My assumption was I was employed by CHUBB.
2  Q    CHUBB is a big thing.  So my particular
3  question is:  Were you employed by Ace American
4  Insurance Company just before you left?
5  A    I'm not sure.  Again, I do not -- I cannot
6  answer your question one way or another.  My
7  assumption is irrelevant in that case.
8  Q    Pardon me?
9  A    My assumption is irrelevant --
10        (Court reporter asked for
11    clarification.)
12  A    -- is probably irrelevant in this case.  I
13  do not know because I haven't looked in my paycheck.
14  Q    All right.  So you don't know one way or the
15  other?
16  A    Yes, exactly.
17  Q    Who employs you now?
18  A    Altair Technical Services.
19  Q    And when did you start that employment?
20  A    January 1st of 2019.
21  Q    Do you recall when you moved from your
22  position working with Blaze Advisor software to we'll
23  call it CHUBB IT Claims?
24  A    I believe in the beginning of 2015.
25  Q    Now, the merger between CHUBB and Ace was

Page 13

1  2016?
2  A    Correct.
3  Q    And so you think it was a year before the
4  merger?
5  A    A year before, yes.  Because of the internal
6  reorganization.
7         (Plaintiff's Exhibit 180 marked for
8     identification.)
9  Q    As you'll see, Exhibit 180 is a May 21, 2009
10  e-mail, and you are on the string of e-mails, so you
11  see.  It references an EUZ meeting with Henry to work
12  on proof of concept to implement Blaze and EEU.  Are
13  you familiar with that?
14  A    Yes.
15  Q    My question to you, sir -- and when we were
16  together before, you mentioned that while Blaze
17  Advisor had been hosted -- was hosted on servers in
18  Canada, CHUBB was in -- big CHUBB was in the process
19  of migrating Blaze Advisor and Blaze Advisor
20  applications to servers in North Carolina?
21  A    Correct.
22  Q    Okay.  I'm going to have a similar set of
23  questions with respect to Europe and the UK.  Could
24  the European CHUBB company benefit -- use Blaze
25  Advisor applications for the sale of insurance

Page 14

1  policies in Europe with those applications and Blaze
2  Advisor hosted in the United States?
3     A    I do not have this information.
4     Q    Okay.  So technically, you don't know the
5  answer to that one way or the other?
6     A    Yes, exactly.
7     Q    In this e-mail, then, Russell Hodey reports
8  that they'd like to do a proof of concept to prove the
9  usage and implementation of Blaze over in the EUZ.  So
10 to run the proof of concept they had to install Blaze
11 Advisor in the UK.
12    A    They could or could not.  It doesn't
13 necessarily mean that it physically was installed in
14 the UK.
15    Q    You don't know one way or the other?
16    A    I don't know one way or another.
17    Q    All right.  It could have been installed
18 only in the United States and had Blaze Advisor
19 applications in the UK?
20    A    Used by UK but installed in the United
21 States.  It could have been.
22    Q    Technically that's possible?
23    A    Technically it's possible.  Was it there or
24 not?  I cannot tell you.
25    Q    Whether they did or not, I understand.  But

Page 15

1  technically it is possible?
2     A    Correct.
3     Q    And their e-mail concludes that this
4  obviously depends on us being able to use the
5  Enterprise license agreement for all elements of
6  Blaze.  Henry said he will confirm this shortly.
7          Do you recall following up on that?
8     A    I did not follow -- I follow up with Patrick
9  Sullivan, who was the chief architect at that time at
10 CHUBB.  And as you can see on that e-mail, he
11 confirmed that we have unlimited licenses.
12    Q    Okay.  What he says is, "We have unlimited
13 developer licenses."
14    A    Correct.
15    Q    Did you have any conversations with anyone
16 with respect to the geographic scope of the license?
17    A    No, I did not.
18           (Plaintiff's Exhibit 181 marked for
19       identification.)
20    Q    Mr. Mirolyuz, do you recognize 181 as an
21 e-mail you received from Russell Hodey around May 22,
22 2009?
23    A    I do.
24    Q    Thank you.
25           (Plaintiff's Exhibit 182 marked for

Page 16

1       identification.)
2     Q    Mr. Mirolyuz, do you recognize this as an
3  e-mail dated May 28, 2009 that you received from
4  Russell Hodey?
5     A    Yes, I do.
6     Q    Do you conclude from this document that
7  Blaze Advisor was installed in Europe?
8     A    I do not.
9     Q    Do you know one way or the other?
10    A    I don't.
11           (Plaintiff's Exhibit 183 marked for
12       identification.)
13           MR. HINDERAKER:  Counsel, you'll have
14       to look over his shoulder.  I don't have a second
15       copy for some reason.  I have many copies of the
16       second page but not the first page.
17    Q    Do you recognize this as an e-mail dated
18 November -- Exhibit 183.  Do you have it, sir?
19           MR. FLEMING:  Just one second.
20    Q    Do you recognize Exhibit 183 as an e-mail of
21 dated November 5, 2009 between yourself -- well, from
22 Craig Thompson?
23    A    I do not because I don't believe I'm on this
24 e-mail.
25    Q    I'm not suggesting that you are.  Do you see

Page 17

1  that this an e-mail November 5, 2009 from Craig
2  Thompson to a number of people?
3     A    Yes, I do.
4     Q    All right.  And I'm just going to ask you
5  for your understanding of what it might mean.  You see
6  it says, "Can either of you answer which version of
7  Blaze you're running on?"
8           Let me back up.  Do you know who Stuart
9  Fisher is?
10    A    No.  He's somebody in the European zone.
11 But who he is, I don't know.
12    Q    And Russell Hodey is in the European zone as
13 well?
14    A    Yes.
15    Q    All right.  And Craig Thompson, is he --
16 where does he come from?
17    A    He was in United States.
18    Q    All right.  So we have somebody from the
19 United States asking folks in Europe, "Can either of
20 you answer which version of Blaze you're running on?"
21    A    Correct.
22    Q    Understood.  The next sentence says, "I
23 assume you're running on our infrastructure over
24 here."  Craig Thompson is saying that.
25           I understand you're not on the e-mail.  What

Page 18

1  does that mean?
2     A    Can you repeat the question, please?
3     Q    Mr. Thompson says, "I assume you're running
4  on our infrastructure over here."  My question is:
5  What does that mean?
6     A    His assumption is that the Blaze is being
7  run on the infrastructure in the United States.
8  That's my understanding of the statement.
9     Q    Thank you.  And of course, whether that's
10 right or wrong is not something you know.  But again,
11 it would be technically possible to do that?
12    A    Correct.
13    Q    Okay.  This is Exhibit 154 from an earlier
14 deposition.  I just have some questions to you about
15 it.  I understand this date is after -- I understand
16 the date, 2018.  But you're familiar with reports that
17 are called ChEAR reports or CHUBB Enterprise
18 Application Registry?
19    A    Correct, I am.
20    Q    Could you explain what they are for me,
21 please?
22    A    This is the repository or registry of all
23 the application -- production application at CHUBB.
24    Q    Okay.  As a repository of the production
25 applications at CHUBB, is it a report that reports on

Page 19

1  the status of things as of the date of the report?
2     A    Correct.  As they're entered into the
3  repository.
4     Q    The status of those things as information is
5  entered into the repository?
6     A    Correct.
7     Q    Thank you.  So if I was to -- let's look at
8  the last page of this exhibit, 154, sort of up in the
9  top third:  Asia Pacific, Evolution, Evolution Asia
10 Pacific, Technology, and then under Technology
11 Version, Technology Blaze Advisor and then under
12 Technology Version, Blaze Advisor 7.1.  Do you see
13 that line?
14         MR. FLEMING:  On what page?
15         MR. HINDERAKER:  The last page.
16         MR. FLEMING:  No Bates stamp on it,
17    right?
18         MR. HINDERAKER:  That's correct.
19         THE WITNESS:  Evolution.  My apologies.
20    It's not what -- I think my last page is
21    different from your last page.
22         MR. HINDERAKER:  Well, that's trouble.
23         MR. FLEMING:  Yeah, my last page is
24    different also.
25         MR. HINDERAKER:  Here we go again.  So

Page 20

1     let's try -- I was working off of something else.
2     Sorry.
3     Q    (By Mr. Hinderaker)  Go to the fifth page
4  in.  Now it's on the bottom third -- Asia Pacific,
5  Evolution Asia Pacific, Blaze Advisor, and then Blaze
6  Advisor 7.1.  Do you see that line?
7     A    Correct.
8     Q    Okay.  This is telling us that Blaze Advisor
9  7.1 is being used for Evolution in the Asia Pacific
10 zone?
11    A    What it tells me is that the Evolution
12 application was used by Asia Pacific.
13    Q    Yes.  And is it saying that that application
14 is running on Blaze 7.1?
15    A    It's using Blaze 7.1.  Correct.
16    Q    Okay, thank you.
17         MR. HINDERAKER:  Whatever the next one
18    is.
19         (Plaintiff's Exhibit 184 marked for
20    identification.)
21    Q    So I've given you Exhibit 184, which is, by
22 it's heading -- well, it's dated April 9, 2008 and, by
23 it's heading, it's another ChEAR monthly
24 maintenance -- another ChEAR report.  Do you agree?
25    A    Agree.

Page 21

1     Q    Would you go to what's marked as page 8 of
2  26 in the document?
3     A    Yeah.
4     Q    If we go --
5         MR. FLEMING:  Wait a minute.  So this
6    goes from -- how many pages in are you talking
7    about?
8         MR. HINDERAKER:  The page is numbered
9    at the bottom, 8 of 26.
10        MR. FLEMING:  Okay.  Because it's
11   numbered at the beginning pages.  Okay.  8 of 26.
12    Q    (By Mr. Hinderaker)  So on page 8 of 26, if
13 we go down, what, five and six lines, it's telling us
14 that Blaze Advisor 6.1 and 6.5X are being used.  Can
15 you tell from this exhibit where that use is?
16    A    No.  And actually, it doesn't tell that it's
17 being used.  It's says it's being available as a
18 technology.
19    Q    Oh, okay.  Thank you.  So that it's meaning?
20    A    Correct.
21    Q    It's available as an technology.  Whether
22 it's used or not, we don't know from this exhibit?
23    A    Correct.
24    Q    If it is used, where it's used, we don't
25 know from this exhibit?

Page 22

1    A    We don't know.
2    Q    This is an exhibit from your earlier
3    deposition when we talked about installations in the
4    UK. As you see, the document comes -- it's from
5    yourself to Richard Johnson and others.
6        Can you confirm for me that as of this date
7    this document reports that Blaze Advisor 6.7 is being
8    used in Europe?
9    A    It does not confirm that it was used. All
10   it confirm is that I provide the information where
11   they can -- if they choose so to download the
12   software. But it does not confirm that it was used.
13   Q    All right. SO if at this time they were to
14   download Blaze Advisor from that internal site of
15   CHUBB, it would be version 6.7 that would be
16   downloaded?
17   A    Correct.
18        (Plaintiff's Exhibit 185 marked for
19       identification.)
20   Q    I'm showing you -- you have Exhibit 185, an
21   e-mail dated May 25, 2010. Dean Lawton, is he from
22   Europe?
23   A    According to the e-mail heading, yes, he is.
24   Q    Okay. And are all of the recipients from
25   Europe, according to the header?

Page 23

1    A    That is correct.
2    Q    And then the carbon copy is Ewen Setti.
3    He's European, he's from London as well?
4    A    Yes. Yes, he is.
5    Q    Okay. Do you know what the application
6    Adapt/Adapt BE is?
7    A    To my knowledge, it's a policy
8    administration system for the, I believe, ABL line of
9    business.
10   Q    What is the ABL line of business?
11   A    I do not -- I do not recall. It's accident
12   and death, I believe, benefits. But that's my
13   assumption.
14   Q    And would you give us the meaning of a
15   policy administration system?
16   A    It's an application which allows to book,
17   bind and issue policies -- insurance policies for the
18   specific line of business.
19   Q    Do brokers and agents use it?
20   A    Sometimes. I'm not sure about this
21   particular case.
22   Q    Okay. I guess let's just talk about policy
23   administration systems in general and your knowledge
24   about that. As a general statement, brokers and
25   agents use policy administration systems to sell

Page 24

1    insurance to their customers?
2    A    It's primarily -- to my knowledge, it's
3    primarily used by the internal staff, basic
4    information provided by brokers and agents. Of
5    course, there could be exception to that rule. But as
6    a general rule, it's for the internal staff.
7    Q    All right. So then based upon information
8    provided by the brokers and agents, the policy
9    administration system then responds to the broker and
10   agent with the proposed solution or the proposed
11   policy and a quote for that policy?
12   A    Correct. And if they accept it, they book,
13   bind and issue the policy.
14   Q    And then if the agent accepts the -- or the
15   customer accepts the policy, the agent then does
16   something -- provides information, and as a
17   consequence, the policy administration system presents
18   to the agent the information that binds -- the
19   customer has a binding insurance policy and it's
20   booked and the deal is done, correct?
21        (Plaintiff's Exhibit 186 marked for
22       identification.)
23   Q    Now you have Exhibit 186. This is an
24   e-mail. I acknowledge that you are not showing on the
25   chain. Could you identify John Sarnese, please?

Page 25

1    A    He is the architect at CHUBB IT. He was at
2    that time. He was an architect at CHUBB IT.
3    Q    CHUBB where?
4    A    CHUBB IT.
5    Q    CHUBB IT. In the U.S.?
6    A    In the U.S.
7    Q    And Patrick Sullivan, as you said, was chief
8    architect?
9    A    Chief architect.
10   Q    In the U.S.?
11   A    Correct.
12   Q    And then the subject matter of the
13   attachment is Blaze Platform Application Usage Matrix.
14   If we look at the last page -- I'm asking for your
15   interpretation of the last page.
16        MR. FLEMING: Literally, the last page
17       that I have is this; it has two words on it.
18       MR. HINDERAKER: How about the second
19       to the last page?
20   Q    So it starts off with "SBU" as the column
21   header?
22   A    Correct.
23   Q    That means business unit?
24   A    Correct.
25   Q    Do you know what "S" stands for?

Page 26

1   A   Service Business Unit.
2   Q   Okay. And then do you know what "CAH"
3  stands for?
4   A   CAH, Canadian Accident and Health.
5   Q   And on the third line is -- and Canadian
6  Accident and Health, does that -- do you understand
7  that to mean that the Adapt ABL is an application that
8  is run in Canada?
9   A   Correct.
10  Q   Okay. And then we have CAH NEU Adapt, and
11 you understand that that is -- that application called
12 Adapt is also run in the European zone?
13  A   I cannot answer this one way or another.
14  Q   Okay.
15  A   Because I'm not familiar with that
16 abbreviation, "CAH NEU."
17  Q   Fair enough. The top three lines have Blaze
18 version Blaze Advisor 7.1 listed. Do you interpret
19 that as saying that Blaze Advisor 7.1 is the version
20 being used for Adapt ABL and Adapt?
21  A   Correct.
22  Q   And then in red -- and then you see the next
23 three entries in red with different Blazer Advisor
24 versions. Do you have any understanding of what the
25 red designates?

Page 27

1   A   Red designate that we are behind the current
2  version. So 7.1 is the current version. That
3  particular application could be using version which is
4  behind the current one.
5   Q   Okay. SO then we go down the remainder of
6  that column, we would have the same answers to those
7  questions: When it's in black, that's the version
8  that is being used, and when it's in red, it
9  designates that the version being used is behind the
10 most recent version?
11  A   Correct.
12  Q   All right. And then there are the entries
13 with cross-throughs?
14  A   Yes.
15  Q   Do you know what those mean?
16  A   The cross-through mean the application has
17 been upgraded to more recent version. At some point
18 it was behind Blaze Advisor 6.9 and now it's Blaze
19 Advisor 7.1.
20  Q   Thank you.
21        (Plaintiff's Exhibit 187 marked for
22        identification.)
23  Q   I'm now giving you Exhibit 187, October 9,
24 2013. And if you go to the table at the back, you'll
25 see that it's very similar to the table that I just

Page 28

1  showed you. I'd like to direct my questions to the
2  second to the last line where it says "EUZ" and then
3  "Exari Pilot." Do you see where I'm saying?
4   A   Yeah.
5   Q   Do you know what the application Exari Pilot
6  is?
7   A   I do not.
8   Q   The document itself says it's running on
9  Blaze Advisor version 7.1. Do you agree?
10  A   Yes, according to the table.
11  Q   According to the table. Okay. Do you find
12 in that nicely organized stack the second exhibit, the
13 30(b)(6)?
14  A   This one?
15  Q   Yes, sir. If you would go to Topic 15,
16 which is on page 8.
17  A   Because mine ends on page 7.
18  Q   How can that be? Can I see it?
19  A   Sure.
20  Q   Got it. Let's go to page 5, Topic 15, and
21 you'll see, just to set the table, Topic 15 is any
22 assistance by FICO, including identification of the
23 FICO employees in the installation of Blaze Advisor
24 software on servers located outside of the United
25 States, including, but not limited to, the United

Page 29

1  Kingdom, Canada, and Australia. This is one of the
2  topics you've been designated to testify.
3        MR. FLEMING: I'd like to just raise at
4        this time, at the prior deposition, beginning on
5        page 36 and continuing through page 57, you asked
6        questions of Mr. Mirolyuz about that exact topic.
7        We're going to object to any questions in which
8        you are simply repeating the same question where
9        he's already responded to that.
10       MR. FLEMING: Well, then raise your
11       objection when you wish.
12  Q   So Mr. Mirolyuz, we talked about the
13 assistance, this topic of the assistance of FICO in
14 the installations outside of the United States before.
15       My understanding is that you do not have any
16 firsthand knowledge of FICO personnel assisting in the
17 installation of Blaze Advisor outside of the United
18 States, correct?
19  A   Correct.
20  Q   Have you done anything to prepare yourself
21 to testify to this topic today giving us the knowledge
22 of the corporation?
23  A   I reviewed the e-mails, reviewed the
24 information which was available to me, as well as I
25 had discussion with the CHUBB employees.

Page 142

1  Q  Have you seen it before?
2  A  Let me take a look.
3  Q  Sure, please do.
4  A  No, I do not. I'm not part of the
5  leadership team.
6  Q  Say that again.
7  A  I was not part of the leadership team.
8  Q  Do you have any doubt that this is a set of
9  slides presented to the senior leadership team at
10 CHUBB?
11 A  I cannot say one way or another. It looks
12 authentic but, again, I cannot say one way or another.
13 Q  Got it. Do you know what CHUBB's "Premium
14 Booking" means?
15 A  It's what we discussed before; it's a
16 downstream service or application which allows booking
17 or the recording of the premium of the policies that
18 have been booked, binded and issued.
19 Q  Okay. Do you know if that helps CHUBB
20 respond to new business opportunities?
21 A  No.
22 Q  You don't know one way or the other?
23 A  It does not. It just records the premiums
24 of business underwritten.
25 Q  Would you turn to the third page of this

Page 143

1  document to the leadership? "The primary business
2  goal..." I'm looking before the bullet points. "The
3  primary goal of the premium booking modernization
4  program is to improve the flexibility and
5  responsiveness of CHUBB's premium booking and
6  downstream integration process" --
7  A  Yeah.
8  Q  -- "to allow the company to more quickly and
9  efficiently respond to new business opportunities."
10 A  Yeah.
11 Q  Do you disagree with that?
12 A  I cannot disagree. If it's written here, I
13 cannot disagree. I don't have a knowledge if it uses
14 to any of the booking of new business. To my
15 knowledge, Premium Booking is just a recording.
16 Q  To your knowledge?
17 A  To my knowledge. Correct.
18 Q  The Premium Booking Modernization was
19 implemented?
20 A  Yes, it was.
21 Q  And of course, it uses Blaze Advisor,
22 correct?
23 A  It does. As one of the components.
24 Q  As one of the components.
25      (Plaintiff's Exhibit 205 marked for

Page 144

1  identification.)
2  Q  Can you identify Exhibit 205 for us, please?
3  A  Release 3 - Profitability Indicator Business
4  Requirements.
5  Q  Defined book -- and then Renewal
6  requirements, defined book requirements.
7  A  Correct.
8  Q  We have a date of 5/7/2009. Is this a kind
9  of document -- is this document one that was prepared
10 by the business analyst?
11 A  Correct. Yes, it is.
12 Q  On page 00004, in the fourth paragraph it's
13 giving some history, Release 1, then it goes to
14 Release 2, created the functionality for the scoring
15 engine.
16 A  Yes.
17 Q  Scoring engine. What is that? Is that
18 Profitability Indicator?
19 A  Profitability.
20 Q  Data Services. What is that?
21 A  I cannot not even guess.
22 Q  Okay. Underwriting Guidance we've spoken
23 about.
24 A  Correct.
25 Q  Integration with CSI eXpress for new

Page 145

1  business models and new business underwriting
2  processes we've spoken about.
3  A  We talk about it. Yes.
4  Q  And now this Release 3 says, Includes
5  generating Profitability Indicator -- well, PI means
6  Profitability Indicator? Yes?
7  A  Yes.
8  Q  Information for renewal policies using
9  renewal models and also scoring defined book of
10 business. What does that mean?
11 A  I do not have a definition more the "defined
12 book of business."
13 Q  But renewal policies using renewal models
14 and scoring, that's the Profitability Indicator?
15 A  Correct. It has a separate implementation
16 or separate models for the new business and later
17 releasing models for the renewal.
18 Q  For the renewal. And this Release 3 for the
19 renewal business, that was implemented and deployed
20 using Blaze Advisor?
21 A  To my knowledge it was.
22      (Plaintiff's Exhibit 206 marked for
23      identification.)
24 Q  Can you identify Exhibit 206 for us, please?
25 A  It is e-mail from Nancy Halpin Birkner to a

Page 146

1  number of people at CHUBB, Owen Williams and,
2  actually, Patrick Sullivan.
3      Q    And you've identified for us Owen Williams
4  and Patrick Sullivan already?
5      A    Yes, I did.
6      Q    And then attached that is Premium Booking
7  Modernization Policy Transaction Validation Business
8  Rules Solution Recommendation.
9      A    Yes.
10     Q    Were you a part of the development of this
11 document?
12     A    I was providing the estimate services;
13 however, the document itself was created by Michael
14 Meyer.  Mike Meyer.
15     Q    And you were providing the what services?
16     A    Subject matter expert.
17     Q    Subject matter expert.
18     A    SME.
19     Q    So you were the subject matter expert
20 relative to Blaze Advisor for the Premium Booking
21 Modernization project?
22     A    Correct.
23     Q    Again, the Premium Booking Modernization
24 project was fulfilled, deployed, and implemented?
25     A    Yes, it was.

Page 147

1           (Plaintiff's Exhibit 207 marked for
2       identification.)
3      Q    I've given you Exhibit 207.  Do you see on
4  the first slide it's "Adapt BE Broker System."
5      A    Yes, I do.
6      Q    Can you identify Dean Lawton, International
7  ANH IT Manager?
8      A    I cannot.
9      Q    Were you part of the International IT
10 Managers Meeting of September 21, 2009?
11     A    No, I was not.
12     Q    That document bears the CHUBB logo in the
13 upper left?
14     A    Yes, it is.
15     Q    Okay.  So do you agree with me that this is
16 a set of slides from the International IT Manager's
17 Meeting of September 21, 2009 for CHUBB?
18     A    I cannot agree or disagree with you because,
19 again, I was not part of that meeting.  Anything can
20 be printed on the paper.  It was used or not, I cannot
21 speak to that.
22          (Plaintiff's Exhibit 208 marked for
23      identification.)
24     Q    Now, you have Exhibit 210 --
25          COURT REPORTER:  208.

Page 148

1           MR. HINDERAKER:  Whatever you say.
2      Q    -- Exhibit 208, another presentation to the
3  Senior Leadership -- another Senior Leadership
4  Presentation of October 2009.  Were you a part of this
5  one at all?
6      A    No, I was not.  I am not part of Senior
7  Leadership team.
8           MR. HINDERAKER:  So let's change tapes.
9           THE VIDEOGRAPHER:  This is the end Of
10     Media Unit Number 3.  Going off record.  The time
11     would be approximately 2:56.
12          (Plaintiff's Exhibit 209 marked for
13     identification.)
14          (Recess taken from 2:56 to 2:09.)
15          THE VIDEOGRAPHER:  We're back on
16     record.  This is the beginning of Media Number 4.
17     The time would be approximately 3:09.  You may
18     continue.
19     Q    (By Mr. Hinderaker)  You have now Exhibit
20 209.  That's there.
21     A    Thank you.
22     Q    As you see, it bears the title "FICO
23 Professional Services, CHUBB & Son, CSI/PI
24 Underwriting Guidance Project, Blaze Advisor Decision
25 Definition Document."

Page 149

1      A    Yes, it is.
2      Q    Do you recall the context of this work,
3  Exhibit 209?
4      A    Yes, I do.
5      Q    And what was it?
6      A    It is initial implementation of PI and
7  Underwriting Guidance for CSI eXpress.
8      Q    And that was, of course, implemented?
9      A    Yes, it was.
10          (Plaintiff's Exhibit 210 marked for
11     identification.)
12     Q    If you could identify Exhibit 210, please.
13     A    Enterprise IT Strategy Appendices.
14     Q    Do you recall the document from your time at
15 CHUBB?
16     A    No, I do not.
17     Q    Can you tell from the document it's
18 authorship?
19     A    I cannot.  It doesn't bear the CHUBB logo or
20 I don't see anything except from prepared by
21 Enterprise IT Strategy team.
22     Q    At CHUBB, was there an Enterprise IT
23 Strategy team?
24     A    I'm not aware of such team.
25          (Plaintiff's Exhibit 211 marked for