*16-cv-1054 (WMW/DTS)*

# EXHIBIT 4
# *(Filed Under Seal)*

```
 1                UNITED STATES DISTRICT COURT

 2                           FOR THE

 3                   DISTRICT OF MINNESOTA

 4

 5              C.A. No. 16-cv-1054 (WMW/DTS)

 6      ------------------------------------------

 7      FAIR ISAAC CORPORATION,                  )

 8                              Plaintiff        )

 9      v.                                       )

10      FEDERAL INSURANCE COMPANY AND ACE        )

11      AMERICAN INSURANCE COMPANY,              )

12                              Defendants       )

13      ------------------------------------------

14                  CONFIDENTIAL TRANSCRIPT

15                   ATTORNEYS' EYES ONLY

16

17          DEPOSITION OF MICHAEL SAWYER

18                   October 2, 2018

19                  Courtyard Marriott

20               35 Foxborough Boulevard

21               Foxborough, Massachusetts

22

23                      *********

24           Court Reporter:  Amie D. Rumbo
```

EXHIBIT 4

**Page 193**

1 client phone calls in any database or anything
2 like that.
3    Q.   So there was -- we've talked about
4 this time lag between FICO finding out about the
5 prospective merger and reaching out to FICO. Why
6 didn't anybody at FICO, to your knowledge, reach
7 out sooner, just given -- we've gone through some
8 of these e-mails that, from FICO's perspective,
9 was also a revenue opportunity. So why was there
10 such a delay?
11       MR. HINDERAKER: Objection.
12    A.   I would reflect the testimony
13 earlier when I answered that question.
14    Q.   So why was there such a delay?
15       MR. HINDERAKER: Objection. Asks
16 for speculation. Outside of the scope of the
17 witness's knowledge.
18    A.   I testified --
19    Q.   From your perspective?
20    A.   As I testified earlier, it's my
21 understanding that from -- when organizations
22 enter into a merger transaction like this, those
23 firms have a process in place where they analyze
24 the contracts that -- vendor contracts of the two

**Page 194**

1 organizations that are coming together and
2 proactively will engage with vendors to understand
3 the vendor's position on the merger. And so our
4 expectation from my understanding was we were
5 hoping that Chubb would come to the table with us.
6       Once we started to get more clarity
7 around the date that the transaction might close,
8 in the spirit of our relationship, we proactively,
9 while not required to under the contract,
10 proactively reached out to Chubb to engage in
11 dialogue.
12    Q.   You said earlier that you reached
13 out when you learned --
14       MR. HINDERAKER: I'm sorry. Go
15 ahead.
16    Q.   -- when you learned that the merger
17 was more imminent. How did you learn that?
18    A.   So I can't pinpoint the specific
19 conversation that I had right before that outreach
20 to Elie, but I was in continual conversation with
21 Henry Mirolyuz. As we pursued other deals and
22 opportunities, Chubb was evaluating using some of
23 FICO's other products and, as such, I was
24 continually having dialogue with Henry on that.

**Page 195**

1 I was on site in Warren several
2 times, I believe, meeting with other folks around
3 those other products. And as part of those
4 discussions, I got a sense of the time frame that
5 they were looking at for the completion of the
6 merger.
7    Q.   Do you have Exhibit 65 before you?
8 It was redacted covered.
9    A.   Yes, I do.
10    Q.   Turn to page 2.
11    A.   Okay.
12    Q.   I'm referencing the last sentence
13 of the first paragraph where it says, "The net
14 result is that Chubb currently has a perpetual
15 enterprise-wide license for the job and net
16 version of the platform for use in the territory
17 of the United States."
18       You said that you had a discussion
19 with Russ Schreiber about that issue before
20 drafting the e-mail. And my question is when was
21 that discussion with Schreiber?
22       MR. HINDERAKER: Asked and answered
23 multiple times. I object.
24    A.   So I don't know exactly when the

**Page 196**

1 conversation happened with Russ. I can -- based
2 on the timeline here in this exhibit, you know,
3 it's clear to me that we came back from holiday
4 over the break. We still had not heard from Elie.
5 It's likely that I had a conversation with Russ
6 around this time about what's the next course of
7 action we should do, given Elie has not responded
8 to my original outreach, which was the -- you
9 know, the genesis of writing that e-mail on the
10 8th. And so I don't recall everything that was
11 discussed during that time, but I would imagine
12 that that's when I discussed it with Russ.
13    Q.   Do you recall that conversation
14 with Schreiber, what was said?
15    A.   No, I do not.
16    Q.   Okay. Do you recall anything about
17 it?
18    A.   I worked with Russ for nine years.
19 I had daily dialogue with him multiple times per
20 day. It's difficult for me to remember every
21 conversation that I had with him, especially when
22 you're going back two plus years now. So no, I
23 don't. You know, it's -- it's a logical
24 conclusion that I would have discussed it with him

CASE 0:16-cv-01054-DTS   Doc. 581-3   Filed 09/23/19   Page 4 of 5

Michael Sawyer - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/2/2018
Fair Isaac Corporation vs. Federal Insurance Company

**Page 197**

just based on the close nature of our working relationship, but I can't recall that I called him at 9:00 a.m. on a specific date or anything like that.

Q. Okay. Can you turn to Exhibit 69?
A. 69. Yes.
Q. The March 30th, 2016, attachment, page 2.
A. Okay.
Q. At the end of the first paragraph, Mr. Carretta says, quote, "Further, FICO had notified its Chubb client contact prior to the merger that consent was required," end quote. Do you know what he's referencing?
MR. HINDERAKER: Objection. Asking for Mr. Carretta's intention.
A. I do not. I can only speak to the communications that I had with Chubb prior to the merger and that communication was with Elie in which I advised him that based on what we knew about the potential merger, that 10.8 could apply. You know, as I recall the events, given the merger hadn't been completed at the time that I spoke to Elie, you know, I would not have been definitive,

**Page 198**

right, in stating that it will apply, and so when I read Tom's note, that last sentence in the first paragraph, I do not believe that I would have been the person that would have communicated that it is required. I would have communicated that it is possible that it will be required based on what we know about the planned merger, so.

Q. Can you turn to Exhibit 83. I'm referencing the e-mail from Bill Waid to Tamra Pawloski dated March 23rd, 2016. Do you see the third paragraph where it states, quote, "Given this fact, I see no other outcome than Chubb extending Blaze Advisor to a global license," unquote?
A. Yes, I do see that.
Q. Now, it was your opinion that they already had a global license, right?
MR. HINDERAKER: Objection. Misstates testimony. Time frame. Misleading.
A. Yeah. As I've testified, over the time of my employment at FICO, as I took over as client partner sometime thereafter of the Chubb account and upon reviewing the contracts, I

**Page 199**

discovered what I believe to be a discrepancy between the way that, you know, Chubb had interpreted their license and the way that FICO had been operating prior to that. At which point, you know, my reading of the contract suggests that the license was restricted by the territory definition in the master license agreement, which restricted to use in the United States or to the United States territory.

Q. Okay. Do you have Exhibit 47 before you?
A. 47. Oh, here it is. Yes.
Q. On the e-mail at the bottom of the page, you state in an e-mail to Richard Hill, do you not, quote, "They do have a global ELA for Blaze," unquote?
A. Yes, I see that.
Q. All right. Did you ever inquire of anybody at Chubb what corporate entity was using Blaze?
A. Not that I'm aware of, no.
Q. Do you know anybody at FICO who did that?
A. No. I am not aware of that

**Page 200**

transpiring.

Q. Okay. Finally on Exhibit 82, we're looking at the criteria for sizing Blaze Advisor applications. Why isn't the gross written premiums one of the criteria?
MR. HINDERAKER: Objection. Lack of foundation.
A. I don't know. You would have to ask Bill Waid who generated the exhibit.
Q. Okay. Would it be your testimony that those are the -- when it says -- in the second paragraph where it says, "Absent these parameters, we can derive them from book of business or other key business metrics," is it your testimony that that includes gross written premiums?
A. So there is -- in what Bill has shared here, right, with me, is a spreadsheet that includes parameters. FICO also used a pricing engine that is integrated with Salesforce. And as part of that, there are drop-down fields that the salesperson is responsible for completing. And, you know, upon my departure from FICO, that was in place, and gross written premium was one of the

metrics that the salesperson was responsible for completing. So I can't speak to why it's not on this particular document, but in some of the other tools that FICO provided to the salespeople to price and scope engagements, it was a prominent criteria.

Q. All right.

MR. FLEMING: I have no further questions.

CROSS-EXAMINATION
BY MR. HINDERAKER:

Q. I just have the matter of clarification that I raised before, before -- today earlier after one of the breaks. If we could go to Exhibit 54, please.

MR. HINDERAKER: And I've asked the court reporter to pull up the question and answer that I want to see if there's reason to clarify. So if you could do that, please, and then read the two questions and the answers after Mr. Sawyer gets ready, and we'll go from there.

A. Okay, I have the exhibit.

Page 201

THE COURT REPORTER: One moment. So, "question --

MR. HINDERAKER: Are you there?

THE COURT REPORTER: Yes.

BY MR. HINDERAKER:

Q. So Mr. Sawyer, looking at Exhibit 54, I want to direct your attention to the top of the exhibit and, in particular, to the sentence that Mr. Fleming pointed out or directed you to being, quote, "I know of no restrictions in the license that prevent them from doing so?"

MR. HINDERAKER: And now with that in mind, I'd like to have the question that Mr. Fleming put and then your answers read back, please, to you.

(Previous questions and answers read back as follows:)

"QUESTION: And do you recall how you responded?

"ANSWER: No, I do not.

"QUESTION: Okay. Now, at this point in time, you had arrived at your interpretation that you discussed this morning that was different than your

Page 202

predecessors'?

"ANSWER: As I testified earlier, I'm not sure of the date that I became aware of it, so I cannot say definitively one way or another. You know, I do not recall how I responded to Oliver and this e-mail."

A. Okay. Yes. There is one clarification I would like to make in my response to that last question. My statement said I am not sure how I responded to Oliver. I am not certain that I did respond to Oliver. So it is not a -- the question is not method of communication, it's both the question of whether I responded, and if I did, how I responded, and I am not certain that I responded to Oliver in any way in response to his e-mail.

MR. HINDERAKER: Thanks. That's the only question I have.

MR. FLEMING: All right. No follow-up.

MR. HINDERAKER: Okay. All right.

MR. FLEMING: Do we need to mark this confidential to all the documents marked attorneys' eyes only, et cetera?

Page 203

MR. HINDERAKER: Yes. So if you can mark the transcript confidential, attorneys' eyes only, please, and then the exhibits are already similarly marked if it's appropriate for them to be so.

THE VIDEOGRAPHER: The time is --

MR. HINDERAKER: I'm sorry. And one last thing, we will read and sign.

THE VIDEOGRAPHER: The time is 4:04. That concludes today's deposition. We are off the record.

THE COURT REPORTER: Mr. Hinderaker, what's your order of the transcript?

MR. HINDERAKER: I am going to ask somebody to call you. I am going to ask Kristin Drieman to call you and tell you the specifics about that.

THE COURT REPORTER: Okay. I can e-mail you.

MR. HINDERAKER: It will be in the two-week time, normal time frame, but the certain requirements that we have I'd like her to tell you.

Page 204