<u>16-cv-1054 (WMW/DTS)</u>

# EXHIBIT 5
# *(Filed Under Seal)*

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3   Fair Isaac Corporation,            )
                                        )  File No. 16-CV-1054
 4        Plaintiff,                    )       (WMW/DTS)
     v.                                 )
 5                                      )
     Federal Insurance Company, an      )  Minneapolis, Minnesota
 6   Indiana corporation; and ACE       )  August 22, 2019
     American Insurance Company, a      )  1:30 p.m.
 7   Pennsylvania corporation,          )
                                        )
 8        Defendants.                   )
     ------------------------------------------------------------
 9
                 BEFORE THE HONORABLE DAVID T. SCHULTZ
10           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                           (MOTIONS HEARING)
11
     APPEARANCES
12   For the Plaintiff:         MERCHANT & GOULD, PC
                                ALLEN HINDERAKER, ESQ.
13                              JOSEPH DUBIS, ESQ.
                                80 S. 8th St., #3200
14                              Minneapolis, Minnesota 55402

15   For the Defendants:        FREDRIKSON & BYRON, PA
                                TERRENCE FLEMING, ESQ.
16                              LEAH JANUS, ESQ.
                                CHRISTIAN HOKANS, ESQ.
17                              200 S. 6th St., #4000
                                Minneapolis, Minnesota 55402
18
     Court reporter:            DEBRA BEAUVAIS, RPR-CRR
19                              300 S. 4th St., #1005
                                Minneapolis, Minnesota 55415
20

21

22
          Proceedings recorded by mechanical stenography;
23   transcript produced by computer.

24

25
```

```
 1    United States.  So now we have the instance of the software
 2    is installed outside of the United States.  That's a breach.
 3            Now the software outside of the United States is
 4    being used in support of the sale of insurance of these
 5    different entities and that is also a breach.  It's a breach
 6    of 3.1 (iv).
 7            THE COURT:  Right.  Can you put 3.1 back up.
 8            MR. HINDERAKER:  Yes.  So the language is "or
 9    permit the use or access of the Fair Isaac products by any
10    third party or any individuals other than employees of
11    client."
12            THE COURT:  If software is installed in the United
13    States on a server that is owned by or located in -- well,
14    the server of an appropriate entity under the agreement,
15    okay, software is sitting there, but somebody in the U.K. is
16    allowed from the U.K. to access that software for purposes
17    of underwriting or pricing insurance that is being sold in
18    the U.K., is that a violation of the agreement?
19            MR. HINDERAKER:  Yes.
20            THE COURT:  All right.  So --
21            MR. HINDERAKER:  There's another hypothetical.
22            THE COURT:  Go ahead.
23            MR. HINDERAKER:  Software is installed in the
24    United States.  It is being used by the appropriate entity.
25            THE COURT:  In the United States.
```

1          MR. HINDERAKER:  In the United States.  And it is
2     supporting business operations of entities outside of the
3     United States.  That's okay.
4          THE COURT:  So in terms of what's permitted,
5     according to FICO's position, as long as I (Chubb & Sons)
6     have this software loaded on my server, as long as I (an
7     employee of Chubb & Sons) is using the software because I'm
8     on the phone with somebody from the U.K. and I'm using the
9     software and I say, okay, the answer to your question what
10    you should price this at is X, that's all fine?
11         MR. HINDERAKER:  That's all fine.
12         THE COURT:  But both the installation and the use
13    by people outside the United States is your claim?  And in
14    the second part where --
15         MR. HINDERAKER:  For the pre termination
16    activities.
17         THE COURT:  For the pre termination activities.
18    All activities post termination are a violation.  But for
19    the pre termination activities if the software -- well,
20    whether or not -- wherever it's installed, if it's used
21    outside the United States directly accessed by people who,
22    in your view, are not appropriate persons to use the
23    software, it's a violation of the agreement?
24         MR. HINDERAKER:  It's a different lawsuit.  It's
25    not our fact pattern.  But it's a violation of the

1   agreement.
2           THE COURT: Yeah, it's a different fact pattern,
3   but legally it's sort of non-consequential. What I'm
4   getting at is -- back to my first question, which is this
5   seems like a tempest in a teapot because, at least in your
6   argument, installation is a violation and every time they
7   use it is a violation, right?
8           MR. HINDERAKER: Outside the United States.
9           THE COURT: Right. And I get that we don't have a
10  fact pattern that says they were using it, but it was only
11  installed in the U.S. It would be a different lawsuit. But
12  it was installed in the U.K., used in the U.K. Even
13  allowing for the statute of limitations, it doesn't seem to
14  affect anything other than going back six years from the
15  time the Complaint was filed, unless their argument is the
16  triggering event means it's all out, and the triggering
17  event is installation.
18          MR. HINDERAKER: That whole triggering event, let
19  me -- I want to talk about the triggering event. Let me
20  first answer your question. The first answer to your
21  question is yes, there is a continuing breach by the
22  continuous use of the software outside of the United States.
23          I also believe, because counsel used the word "act
24  of installation," as if that's a one-time thing, I put up
25  the "territory" definition again. The warranty of abiding

1   by the contract is the software with respect to *the*
2   installation and physical location, it will be the United
3   States.  It's not about -- the contract claim is about the
4   continuing location of the software.  When the software was
5   installed in the U.K., that was a breach.  The fact that
6   it's still installed in the U.K. is still a breach.
7            So on the futility argument prong of this
8   presentation on the contract side there is a continuing
9   wrong of use and access by third parties outside the United
10  States; there was.  And there was a continuing continuous
11  breach of the installation from the moment of
12  installation -- 2009, the earliest one I'm aware of.  That
13  provision was in continuous violation.
14           So I think that in part answers the triggering
15  event argument in the sense that on the contract side there
16  is no event that isn't continuous.
17           On the copyright side, pre termination only.  The
18  Copyright Act of the six exclusive acts of copyright, one of
19  them is distribution, 17 U.S.C. 106.  That's an act, sending
20  it out.
21           So I was inquiring of Mr. Mirolyuz about the
22  installations outside of the United States.  That is a
23  predicate act of copyright infringement.  And under the
24  predicate act doctrine, which no circuit has rejected,
25  although not every circuit has addressed it, the remedial

1   scope from that predicate act is the three years from filing
2   the complaint, regardless of when the predicate act
3   occurred.
4           So a distribution outside of the three-year period
5   that we're alleging in this case, because it's a domestic
6   violation of the Copyright Act for exploitation outside of
7   the United States, the statute of limitations doesn't bar
8   the three years of damages even if the distribution is
9   beyond that.  So there's futility.
10          Now, we also had other questions -- you know, as
11  you know from the brief, another set of depositions was --
12  about building on installation was about where is the
13  software hosted and what versions of the software are hosted
14  where and when, which, of course, put them on notice again
15  of what they always knew, that installation was part of the
16  deal, and that was a long time ago as well, not after the
17  game is over with.
18          Going back, however, to the continuous breaches, I
19  mean, we know that there was a distribution to Canada in
20  2010 December inside of the statute of limitations.  We know
21  there was a distribution of a different version of Blaze
22  Advisor in Europe in September of 2013.  And we know there
23  was another distribution in Canada in 2015.  The factual
24  record with respect to Australia is a little murkier.  Our
25  perfect 30(b)(6) witness didn't know.  And, again, if the

1   statute of limitations mattered, those are the sort of
2   questions that we would have drilled down on to learn of
3   every installation after April, within the three-year period
4   for a copyright claim and our contract claim for the
5   six-year period.  So if we had reason to press for
6   additional discovery to get around, if you will, all the
7   claims within the statutory period, we would have been on
8   notice to do that.
9         Now, in terms of does it matter at the end of the
10  day in terms of damages, our damages case on the contract
11  side only goes back six years.  Our damages case on the
12  copyright side only goes back three years.  We were aware
13  that -- you know, not to be pigs and also to not get
14  ourselves in trouble, and we had no reason to think that --
15  well, if the Court agrees with us that under the predicate
16  act doctrine the copyright claims cannot be barred and
17  therefore the amendment is futile, then that's the answer to
18  this motion.
19        If the Court thinks that the amendment is not
20  futile, that there's some merit to the statute of
21  limitations, then that's where the heightened prejudice to
22  us just hits the roof, because then if we should have made
23  more discovery of installations within the three-year period
24  of copyright, then we would have.  But there was no reason
25  to do that because the defense wasn't pled and it was

1   waived, and we knew we had these continuing breaches.  And
2   from our point of view, we believe the predicate act
3   doctrine makes it futile.  We complied with the predicate
4   act doctrine, keeping our damages within the three-year
5   period and that was that.
6          But if the Court disagrees that that doesn't make
7   the copyright action futile, well, then we have a big
8   surprise on our hands because we didn't take the discovery
9   to satisfy what now turns out to be a gap.  I think it is
10  futile, but if the Court disagrees, then we should have been
11  here on this motion some years ago in time to take the
12  discovery.
13         Thank you, Your Honor.
14         THE COURT:  Okay.  Thank you.
15         Mr. Fleming.  How does all of this tie in with
16  what I understand to be a very big portion of your defense
17  and maybe even a portion of your summary-judgment motion,
18  which is it was an enterprise-wide license?  Right?  And
19  you're construing "enterprise-wide" to mean the whole
20  shebang, right?
21         MR. FLEMING:  Yes.
22         THE COURT:  Which would include U.K., and
23  Australia, and Canada.  If you're right on that, then they
24  lose no matter what.  Right?  If you're wrong on that --
25  well, I've understood both of your arguments, but I'm still

1   struggling with why -- other than the argument about, you
2   know, the predicate act, which isn't for the copyright side
3   a time issue I don't think; and for the contract action I'm
4   not persuaded that it matters because you can call it
5   continuous use if you want, but under their interpretation
6   each use is its own breach.  So I'm still struggling with
7   why this much matters.  And I know in some measure that's
8   for Judge Wright to figure out, but -- sorry, that's a
9   rambling question.  If you perceive a question in there,
10  answer it, by all means.
11              MR. FLEMING:  Well, there is a lot of different
12  issues that have to be settled with regard to each provision
13  of the Software License Agreement.  Either party may prevail
14  on various of those arguments.  And specifically with regard
15  to Section 3.1, this issue about Chubb & Son as the
16  signatory, it confuses things when we're addressing this
17  argument about use and installation because it's a
18  completely separate argument.  But when there's a discussion
19  about it, it sometimes appears as if you're talking about
20  installation and use, but you're really talking about the
21  entity or the signatory argument.
22              If we are successful on the signatory argument --
23  that is, that as a matter of law an unincorporated division
24  signing a contract is the same as the corporation signing
25  the contract so that for all purposes Federal is the client

1  and had use of the software according to the agreement, then
2  the fact that there was use outside of the United States,
3  its entities (Federal's entities) were using the Blaze
4  software. So that whole argument about the violation of
5  Section 3.1 simply by virtue of who the entity was that was
6  using it is gone. And I think we will be successful on
7  that.
8         Then the only argument they have is with regard to
9  the territorial limitation. And with regard to that,
10 there's evidence that there had been a territorial
11 limitation in the license grant itself and during the
12 negotiations it was removed, so it's only in the
13 definitional section.
14        If we are successful that there is no territorial
15 limitation by virtue of the fact that there is simply a
16 definition, but there's no agreement about its use, we
17 believe the whole claim under Section 3.1 gets dismissed,
18 both for purposes of the breach of contract and the
19 copyright investment. So this isn't just a tempest in a
20 teapot. It's an issue of a fair amount of significance.
21        To make the argument that we're changing the
22 rules, one of the issues was installation. Why would you
23 think you have to stop and not ask about all of the
24 installations, which I think he did in any event? Why
25 wouldn't he -- in case the court rules to the contrary about

CASE 0:16-cv-01054-DTS   Doc. 581-4   Filed 09/23/19   Page 12 of 19

33

continuing use or continuing violations, why wouldn't he because of the uncertainty about that? And there weren't any constraints. It just makes sense if one is asking about the installation pursuant to this contract that one would follow through and ask everything about it. Nobody would not ask a question because they think the statute of limitations is not at issue so we don't have to ask anything more. It doesn't make very practical sense if you're in the moment and you have the topic that you would preclude asking questions about that for that reason. That was one of the topics of inquiry, and there's no reason why there wouldn't have been and there is no reason to believe there wasn't a full and robust inquiry into that issue and that there is nothing more to ask.

    So that argument about changing the rules because of this defense I don't believe is a credible one. There was no reason -- there was a full opportunity to ask those questions and nothing changes. There's no response that is any different whether there is a statute of limitations or not.

    The argument was made about the long delay, but the Eighth Circuit has been clear. In *Dennis v. Dillard*, it said unequivocally that delay alone is insufficient to deny a motion for leave to amend. And as long as there is good cause and there's no prejudice, the motion to amend to add

DEBRA BEAUVAIS, RPR-CRR
612-664-5102

1  had a conversation about if the agreement was
2  enterprisewide, and I think by way of your questions you
3  said what I would have said -- that is, an agreement
4  enterprisewide and for conversation purposes let's say it's
5  with Federal, that doesn't negate a different term in the
6  agreement that says you shall use it in the United States --
7  you shall only have it installed in the United States.
8        Now, the last question the Court asked is, well,
9  why?  What's the story?  Well, during the negotiations for
10 the original License Agreement, FICO sent out its standard
11 terms and it said the use will be in the United States.
12       Chubb & Son -- and the fellow is an employee of
13 Chubb & Son -- responded and said "global."  And what FICO
14 did in response is say to the extent that we can agree to
15 your terms, it is make the installation physically in the
16 United States, and then the language about use didn't have
17 any further restrictions.
18       And the reason for that, Your Honor, is that --
19 and just as I said earlier and we said in our brief -- if
20 the software is installed in the United States, it can be
21 used in support of business operations that happen to be
22 outside of the United States as long as it's Chubb & Son or
23 Federal for our conversation that's using the software to
24 support those other members of the Chubb family.  And there
25 are practical limitations that follow from that.

DEBRA BEAUVAIS, RPR-CRR
612-664-5102

1          So there are data privacy issues between
2    countries, for example.  There's issues in terms of being
3    able to have applications that operate in realtime if you
4    are trying to support Australia from Raleigh, North
5    Carolina.  And where it boils down to FICO, it was would you
6    like to have global rights?  That will cost $1.1 million
7    more.  And Chubb said, Well, we don't want to pay that much.
8          So the compromise was we had Chubb & Son in the
9    U.S., and we know that Chubb & Son is supporting various
10   writing companies -- various other insurance companies.  And
11   as long as the software is installed in the U.S. and Chubb &
12   Son people are using it, they can support business
13   operations outside the United States.  It's technically
14   possible.  It's not as robust.  And they did not pay the
15   license fee for the more robust solution.
16         THE COURT:  Well, and, as a practical matter,
17   there is no way to police it anyway.  If all they're doing
18   is using it internally to support people across the pond,
19   you're never going to know that.
20         MR. HINDERAKER:  That's probably true about
21   anything in terms of the license until you discover it, you
22   know.  And, like I'm saying, that kind of a usage for the
23   licensee isn't as robust as if they had the right to install
24   it in the U.K., so they didn't pay as much either.
25         Question was put why weren't more questions asked

1  at the 30(b)(6) deposition about the predicate acts?  Why
2  weren't documents produced before that deposition and only
3  afterwards?  I mean, it's really simple to stand at the
4  podium and say that back in 2018 it would have been done
5  perfectly because there was a perfect set of discovery at
6  the time and everything had been produced, but you know how
7  many times we've been before you on discovery not produced.
8          And on the question of the briefing, Your Honor,
9  the affirmative briefs for our affirmative summary judgment,
10 those have been served.  We are going to receive -- the
11 parties are going to on Monday file their responses to what
12 they received.  So I'm hearing that on Monday I'm going to
13 get a whole new -- I mean, depending on your ruling, but
14 counsel would give us a whole new set of issues to respond
15 to, what, within the remaining 2,000 words of the 12,000
16 limitations?
17         So to suggest that this is going to be raised for
18 the first time in an opening summary judgment brief in which
19 case there is an opportunity to respond simply isn't true
20 because the opening summary judgment briefs have been
21 served.
22         Thank you.
23         THE COURT:  Go ahead.
24         MR. FLEMING:  Just briefly, Your Honor.
25         We heard today from Judge Wright that the summary

 1    judgment hearing motion date is going to get continued, and
 2    I immediately responded and said, Let's have two more weeks
 3    for briefing and it was rejected. And they knew we were
 4    going to raise this argument since we've had our meet and
 5    confer and we're having this motion today about a statute of
 6    limitations defense on this issue. I mean, there's no
 7    surprise. They know about it.
 8            And just two other quick things. This chronology
 9    that was just put forth about the negotiating and refusing a
10    more fulsome license agreement, that never happened. They
11    paid for an enterprise license. They paid more for it. It
12    went from an application to a division to an enterprise
13    license. I mean, the testimony is pretty clear about that.
14    There is nothing that would support a claim that there was a
15    broader license that was provided or suggested that they
16    wouldn't pay for.
17            Finally, we've made some point of this, is there
18    any way to police this. They could have audited to find out
19    the actual use at any time. That was part of the agreement.
20    They just never chose to exercise that.
21            THE COURT: One observation before you speak,
22    Mr. Hinderaker. I think it's quite clear in all of this
23    discussion that teasing out the issue of the statute of
24    limitations, distinct from all of the merits that you both
25    talked about, is difficult at best.

```
 1              And one thing I want to make clear I'm not going
 2   to do, obviously, is decide the merits of it.  And in that
 3   regard, you know, I will forewarn FICO, of all the
 4   magistrate judges here, I probably deny amendments on the
 5   grounds of futility far more than anyone else.  I think some
 6   of the magistrate judges' view is that's not my job.  That's
 7   really a dispositive issue.  Obviously, I view it
 8   differently.
 9              When we're this close to summary judgment and then
10   trial and the issue of the summary judgment -- or of the
11   statute of limitations is so interwoven with the merits, I
12   am unlikely to deny the amendment on grounds of futility,
13   because it seems like the prudent thing to do in all of
14   those circumstances of this case is to defer to Judge Wright
15   on that.  I'm just giving you a forewarning on that.  But,
16   obviously, I'll consider the argument.  So just an
17   observation.
18              Anything further, Mr. Fleming?
19              MR. FLEMING:  No, Your Honor.  Thank you.
20              THE COURT:  All right.  I am going to give
21   Mr. Hinderaker the last word.  All right?
22              MR. FLEMING:  Yes.
23              THE COURT:  All right.
24              MR. HINDERAKER:  If I wasn't clear about those
25   negotiations, let me try to say it again.  During the
```

1   negotiations, they happened to be in December 2006, for
2   enterprise-wide rights, they chose to amend the agreement to
3   have enterprise-wide rights.
4       What you and I were talking about earlier was
5   whether those enterprise-wide rights would be global or not
6   and we priced them for global. We gave them a price for
7   global they did not accept. So, as a consequence, the
8   agreement was not changed and it was not global. I hope I
9   was clear about that.
10      THE COURT: I understand it or at least I'm
11  deluding myself into thinking I understand it.
12      Okay. So here's what I think I will do:
13  Obviously, this is an important issue, and I will give it
14  all the time and attention it merits. Again, I feel like
15  I'm in that circumstance where if I'm really serving the
16  parties' interests, it would behoove me to decide the motion
17  and then verbally or orally on the record give you the
18  ruling. That way you know what things -- where you sit and
19  whoever is aggrieved or somehow if you're both aggrieved,
20  you can appeal that to Judge Wright as quickly as possible.
21      I'm not going to do it today, but I will go look
22  at it now. And I suspect that I'll have my JA call you or
23  email you with a time on Monday, and I'll announce the
24  ruling then with at least sufficient detail that you will
25  understand the ruling and the rationale for it and you can

```
 1    respond accordingly.  Okay?  Okay.
 2              And I know we're sitting on a couple of other
 3    motions on which we're making progress.  That's all I'll say
 4    about that.  Okay?
 5              MR. HINDERAKER:  Very good.
 6              THE COURT:  Thanks, everyone.  We're in recess.
 7              (Court adjourned at 2:50 p.m.)
 8                          *    *    *
 9              I, Debra Beauvais, certify that the foregoing is a
10    correct transcript from the record of proceedings in the
11    above-entitled matter.
12              Certified by:  s/Debra Beauvais
                                Debra Beauvais, RPR-CRR
13
```