## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054(WMW/DTS) |
| Plaintiff, | ) ) | **Jury Trial Demanded** |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY a Pennsylvania corporation, | ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DR. STEVEN KURSH

# TABLE OF CONTENTS

I.   Introduction. ................................................................................................... 1

II.  Applicable legal standard. ............................................................................. 2

    A.   Federal bears the burden to show admissibility. ............................................. 2

    B.   Experts cannot interpret contract language. ................................................... 3

    C.   Experts cannot opine on the conduct of the parties....................................... 4

    D.   Expert testimony without a factual basis is not helpful to the jury. .............. 5

    E.   General testimony based on "experience" is improper *ipse dixit* testimony. ...................................................................................................... 6

    F.   Expert testimony that summarizes the factual record is not helpful. ............ 7

III. Dr. Kursh's opinions regarding the commercial reasonableness of FICO's termination of the Agreement for violation of Paragraph 2.1 is improper legal analysis and not based on sufficient facts. ............................................... 8

    A.   Dr. Kursh usurps the role of the Court by interpreting the geographic scope of Paragraph 2.1 of the Agreement. ................................................... 9

    B.   Dr. Kursh's contract-based testimony does not shed light on an ambiguous term or a term of art. ............................................................... 11

    C.   Dr. Kursh's opinions on the commercial reasonableness of terminating the Agreement for installation outside the United States is based solely on the parties' conduct, without any evidence of industry customs. .................................................................................................. 12

    D.   Dr. Kursh's opinion on "use" and "installation" is based solely on the parties' conduct, without any evidence of industry customs. .................... 15

    E.   The remainder of Dr. Kursh's opinions on the geographic scope of the Agreement simply restate facts. .............................................................. 17

IV.  Dr. Kursh's opinions regarding the breach of Paragraph 10.8 of the Agreement is improper legal analysis and not based on sufficient facts. ............ 18

    A.   Dr. Kursh improperly opines on the interpretation of Paragraph 10.8........ 18

    B.   Dr. Kursh's contract-based testimony does not shed light on an ambiguous term or a term of art. ............................................................... 21

    C.   Dr. Kursh's opinions that FICO's termination of the Agreement due to breach of Paragraph 10.8 was not commercially reasonable is based only on the parties' conduct, without any evidence of industry customs. ...................................................................................................... 22

D.      Dr. Kursh's remaining opinions on Paragraph 10.8 simply restate facts. ...........................................................................................24

V.      Dr. Kursh's opinions on the amount of damages for breach of contract are factually unsupported *ipse dixit*. ...........................................................24

A.      Dr. Kursh's statements identifying which Federal applications use Blaze Advisor merely restates the factual record. .......................................25

B.      Dr. Kursh's "Sizing" Opinion is Factually Wrong. ...................................25

C.      Dr. Kursh's opinion that the parties would have entered into an enterprise license at a discount is based on the wrong law and is factually unsupported. ...................................................................................30

1.      Dr. Kursh's opinions focus on what Federal would have paid FICO to license Blaze Advisor, not FICO's loss. ...........................31

2.      Dr. Kursh's opinions fail to connect general conclusions to the facts of this case with evidence of industry practice. .....................32

D.      Dr. Kursh's opinion regarding audit rights is inadmissible. .......................34

VI.     Conclusion .......................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Actuate Corp. v. Aon Corp.*,
   2012 U.S. Dist. LEXIS 87185 (N.D. Cal. June 18, 2012) .................................... 14, 17

*Auto-Chlor Sys. of Minn., Inc. v. JohnsonDiversey*,
   328 F. Supp. 2d 980 (D. Minn. 2004) .............................................................. 5, 13, 23

*Aviva Sports, Inc. v. Fingerhut Direct Mktg.*,
   829 F. Supp. 2d 802 (D. Minn. 2011) ...................................................................... 5, 7

*Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*,
   886 N.E.2d 127 (N.Y. 2008) .......................................................................................... 31

*CitiMortgage, Inc. v. Just Mortg., Inc.*,
   No. 4:09 CV 1909 DDN, 2012 U.S. Dist. LEXIS 43522 (E.D. Mo. Mar.
   29, 2012) .......................................................................................................... 3, 11, 21

*Coyote Portable Storage, LLC v. PODS Enters.*,
   No. 1:09-CV-1152-AT, 2011 U.S. Dist. LEXIS 51899 (N.D. Ga. May
   16, 2011) ............................................................................................................................ 4

*Crawford Supply Grp., Inc. v. Bank of Am., N.A.*,
   No. 09 C 2513, 2011 U.S. Dist. LEXIS 117670 (N.D. Ill. Oct. 12, 2011) ........... *passim*

*DP Concrete Prods., LLC v. Am. Spring Wire Corp.*,
   No. 2:08 CV 571, 2010 U.S. Dist. LEXIS 5727 (W.D. La. Jan. 25,
   2010) .................................................................................................................. 3, 11, 21

*Elorac, Inc. v. Sanofi-Aventis Can., Inc.*,
   No. 14 C 1859, 2017 U.S. Dist. LEXIS 133449 (N.D. Ill. Aug. 21,
   2017) ............................................................................................................. 5, 14, 17, 32

*EZ Dock, Inc. v. Schafer Sys.*,
   No. 98-2364, 2003 U.S. Dist. LEXIS 3634 (D. Minn. March 8, 2003) ...... 6, 30, 33, 34

*Highland Capital Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ......................................................... 7, 17, 18, 24

*Holland Loader Co. v. FlSmidth A/S*,
   313 F. Supp. 3d 447 (S.D.N.Y. 2018) ........................................................................ 31

*Insignia Sys. v. News Am. Mktg. In-Store, Inc.*,
    2011 U.S. Dist. LEXIS 5558 ........................................................................ 4

*J&H Holding Co. v. Kloss*,
    2013 U.S. Dist. LEXIS 162473 (E.D.N.Y. Nov. 13, 2013) .................................. 31, 32

*Kapps, M.D. v. Biosense Webster*, *Inc.*,
    813 F. Supp. 2d 1128 (D. Minn. 2011) ......................................... 6, 30, 33, 34

*Khoury v. Philips Med. Sys.*,
    614 F.3d 888 (8th Cir. 2010) .................................................................... 3

*LaSalle Bank Nat. Ass'n v. CIBC Inc.*,
    No. 08 CIV. 8426 WHP HBP, 2012 U.S. Dist. LEXIS 18503 (S.D.N.Y.
    Feb. 14, 2012) ........................................................................ 7, 17, 18, 24

*Minasian v. Standard Chartered Bank, PLC*,
    109 F.3d 1212 (7th Cir. 1997) .................................................................. 23

*Missionary Benedictine Sisters, Inc. v. Hoffman, LLC*,
    No. 4:11CV3180, 2015 U.S. Dist. LEXIS 76482 (D. Neb. June 12,
    2015) ........................................................................................ 4, 10, 21

*N. Star Mut. Ins. Co. v. Zurich Ins. Co.*,
    269 F. Supp. 2d 1140 (D. Minn. 2003) .............................................. *passim*

*Polski v. Quigley Corp.*,
    538 F.3d 836 (8th Cir. 2008) .................................................................... 3

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
    606 F.3d 262 (6th Cir. 2010) .................................................................... 6

*Rottlund Co. v. Pinnacle Corp.*,
    No. 01-1980, 2004 U.S. Dist. LEXIS 16723 (D. Minn. Aug. 20, 2004) ....................... 3

*Sanny v. Trek Bicycle Corp.*,
    No. 11-2936 ADM/SER, 2013 U.S. Dist. LEXIS 65559, at *47 (D.
    Minn. May 8, 2013) .................................................................... *passim*

*Somnis v. Country Mut. Ins. Co.*,
    840 F. Supp. 2d 1166 (D. Minn. 2012) ..................................... 5, 13, 33, 35

*Vanderbilt Mortg. & Fin., Inc. v. Flores*,
    No. C-09-312, 2010 U.S. Dist. LEXIS 116434 (S.D. Tex. Nov. 1, 2010) .. 4, 11, 21, 23

*In re Viagra Prods. Liab. Litig.*,
    658 F. Supp. 2d 950 (D. Minn. 2009) .......................................................... 7, 17, 18, 24

*Weitz Co., LLC v. Lexington Ins. Co.*,
    786 F.3d 641 (8th Cir. 2015) ........................................................................................ 3

## Other Authorities

Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii) .......................................................................................... 6

Fed. R. Evid. 403 ................................................................................................................... 2

Fed. R. Evid. 702 ....................................................................................................... *passim*

Fed. R. Evid. 703 ................................................................................................................... 2

I.   **Introduction.**

This case is about the breach of a Blaze Advisor software license agreement ("Agreement") between Fair Isaac Corporation ("FICO" or "Plaintiff") and Chubb & Son, a division of Federal Insurance Company, and the resulting copyright infringement by Defendants Federal Insurance Company and ACE American Insurance Company (collectively "Federal"). Blaze Advisor is a decision management tool that automates business decisions. Defendants use Blaze Advisor to automate decisions related to the underwriting and sale of insurance.

Federal's proposed licensing expert, Dr. Steven Kursh, seeks to opine on the interpretation of the license agreement ("Agreement") and the commercial reasonableness of FICO's actions. (*See* Declaration of Heather Kliebenstein ("Kliebenstein Decl."), Ex. 1 (hereafter "Kursh Rep.").) Dr. Kursh states four primary opinions in his report:

1. FICO's actions with respect to Paragraph 2.1 and the geographic scope of the Agreement were commercially unreasonable. (*Id.* ¶¶45, 69-89, 105).)

2. FICO improperly withheld consent to assignment under Paragraph 10.8 of the Agreement following the acquisition of Federal and improperly terminated the Agreement, which was commercially unreasonable. (*Id.* ¶¶45, 90-98.)

3. FICO's damages calculations for breach of contract are commercially unreasonable. (*Id.* ¶¶99-136.) Dr. Kursh's opinion regarding FICO's damages is broken into four primary sub-opinions:

   a. FICO over-counted the number of Federal applications that use Blaze Advisor. (*Id.* ¶¶101-105.)

   b. FICO incorrectly applied its sizing methodology for determining application-based license fees. (*Id.* ¶¶106-124.)

    c.  FICO incorrectly assumes that Federal would not purchase an enterprise license. (*Id.* ¶¶125-131.)

    d.  FICO's damages calculation should include a price discount. (*Id.* ¶¶134-136.)

4.  FICO should have exercised its audit rights to avoid this lawsuit.  (*Id.* ¶¶137-140.)

Dr. Kursh's opinions, in their entirety, violate Rule 403, 702 and 703.  Dr. Kursh opines on the meaning of Paragraphs 2.1 and 10.8 of the Agreement.  This testimony is substantive contract interpretation, which is the provenance of the Court.  Dr. Kursh opines that FICO was commercially unreasonable in terminating the Agreement, but fails to define what is commercially reasonable or provide case-specific facts to educate the jury to make its conclusions.  His opinions of "commercial reasonableness" depend on his interpretation of the contract.  Dr. Kursh's rebuttal of FICO's damages calculations is not based on sufficient facts or data, and consists of nothing more than *ipse dixit*.  Finally, Dr. Kursh merely summarizes the factual record throughout his report, which is not helpful to the jury and is prejudicial to FICO.  Dr. Kursh confirmed the insufficiencies of his opinions at his deposition. (Kliebenstein Decl. Ex. 2 (hereafter "Kursh Dep.").)  The Court should exercise its gatekeeping authority under *Daubert* and exclude Dr. Kursh's proposed opinions in their entirety.

## II.   **Applicable legal standard.**

### A.   <u>**Federal bears the burden to show admissibility.**</u>

Expert testimony is not automatically admissible. The party seeking to rely on such testimony must prove the expert's opinions have a reliable evidentiary basis and the evidence gathered is relevant to the issues of the case.  *See* Fed. R. Evid. 702; 703.  Rule

702 requires that expert opinions (1) help the trier of fact to understand the evidence or to determine a fact in issue, and (2) are based on sufficient facts or data.  Fed. R. Evid. 702.

The proponent of the expert testimony bears the burden of demonstrating by a preponderance of the evidence that:

- The expert is *qualified* – whether through knowledge, skill, experience, training, or education;

- The proposed testimony is *relevant* – it will assist the trier of fact in understanding the evidence or determining a fact in issue under the correct legal standard; and

- The testimony is *reliable* – it is based on sufficient facts or data and is the product of reliable principles or methods.

*Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010); *N. Star Mut. Ins. Co. v. Zurich Ins. Co.*, 269 F. Supp. 2d 1140, 1147 (D. Minn. 2003);  *Rottlund Co. v. Pinnacle Corp.*, No. 01-1980, 2004 U.S. Dist. LEXIS 16723, at *86-88 (D. Minn. Aug. 20, 2004). As the proponent of Dr. Kursh's testimony, Federal bears the burden of proving *Daubert*'s exacting standards are met.  *Polski v. Quigley Corp.*, 538 F.3d 836, 841 (8th Cir. 2008).  Federal cannot meet its burden.

B. **Experts cannot interpret contract language.**

 "[E]xpert testimony on legal matters is not admissible."  *CitiMortgage, Inc. v. Just Mortg., Inc.*, No. 4:09 CV 1909 DDN, 2012 U.S. Dist. LEXIS 43522, at *5 (E.D. Mo. Mar. 29, 2012).  Contract interpretation is reserved for the judge and jury.  *DP Concrete Prods., LLC v. Am. Spring Wire Corp.*, No. 2:08 CV 571, 2010 U.S. Dist. LEXIS 5727, at *3 (W.D. La. Jan. 25, 2010); *see also Weitz Co., LLC v. Lexington Ins. Co.*, 786 F.3d 641, 647 (8th Cir. 2015) (noting that an expert's interpretation of

contractual terms is "a clear invasion of the interpretative responsibilities and legal pronouncements of the trial judge."); *Missionary Benedictine Sisters, Inc. v. Hoffman, LLC*, No. 4:11CV3180, 2015 U.S. Dist. LEXIS 76482, at *8 (D. Neb. June 12, 2015) ("[T]o the extent [the expert's] opinions involve the interpretation of contract provisions, they are inadmissible."); *Coyote Portable Storage, LLC v. PODS Enters.*, No. 1:09-CV-1152-AT, 2011 U.S. Dist. LEXIS 51899, at *8 (N.D. Ga. May 16, 2011) ("The construction of a contract is a matter of law for the court, and expert legal opinion is not admissible under Fed. R. Evid. 702.").

### C.    Experts cannot opine on the conduct of the parties.

Experts can testify about customs and practices in a particular industry generally, but they cannot usurp the role of the court or the jury to evaluate the parties' conduct against that standard.  *Vanderbilt Mortg. & Fin., Inc. v. Flores*, No. C-09-312, 2010 U.S. Dist. LEXIS 116434, at *15-16 (S.D. Tex. Nov. 1, 2010).  Experts cannot (1) interpret the contract in light of industry custom and practice; or (2) opine on the commercial reasonableness of the parties' conduct.  *See Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, No. 09 C 2513, 2011 U.S. Dist. LEXIS 117670, at *8-9 (N.D. Ill. Oct. 12, 2011).

An expert may educate the jury about *general* principles under Rule 702.  *Insignia Sys. v. News Am. Mktg. In-Store, Inc.*, 2011 U.S. Dist. LEXIS 5558, at *7-13 (D. Minn. Jan 4, 2011 (expert could testify generally about purchasing behavior of consumer packaged goods companies but excluded testimony as to specific likely reactions of consumer packaged goods companies to Defendant's communication).  An expert, however, may not may not testify to conclusions the jury is equally capable of reaching.

*Sanny v. Trek Bicycle Corp.*, No. 11-2936 ADM/SER, 2013 U.S. Dist. LEXIS 65559, at *47 (D. Minn. May 8, 2013) ("A jury could, and should, draw its own conclusions about the testimony and data using common sense."); *see also Somnis v. Country Mut. Ins. Co.*, 840 F. Supp. 2d 1166, 1173 (D. Minn. 2012) (same).

Accordingly, generalized conclusions about commercial reasonableness based only on "experience" are inadmissible.  *See Crawford Supply Grp., Inc.*, 2011 U.S. Dist. LEXIS 117670, at *8-9 (excluding expert opinion on commercial reasonableness where "[the expert] has not articulated what specific aspects of his banking experience support his conclusions regarding the [defendant's] conduct."); *Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, No. 14 C 1859, 2017 U.S. Dist. LEXIS 133449, at *50-51 (N.D. Ill. Aug. 21, 2017) (excluding expert testimony of industry practice where the expert "is unable to connect that principle to this case based on any particularized facts"); *cf. Auto-Chlor Sys. of Minn., Inc. v. JohnsonDiversey*, 328 F. Supp. 2d 980, 1007 (D. Minn. 2004) ("To show that Defendants did not observe 'reasonable commercial standards of fair dealing' in the commercial dishwashing industry, Plaintiffs must produce background evidence of the manner in which other marketers of parts/equipment and chemicals similar to that of Defendants set their prices … . Such evidence is critical.") (internal quotations omitted).

### D.    <u>Expert testimony without a factual basis is not helpful to the jury.</u>

To be admissible, an expert's opinion must be based on case-specific facts or data. Fed. R. Evid. 702(b).  Expert testimony without sufficient factual support does not satisfy the reliability or helpfulness prongs of Rule 702.  *See id.*; *Aviva Sports, Inc. v. Fingerhut Direct Mktg.*, 829 F. Supp. 2d 802, 825-27 (D. Minn. 2011) (excluding expert testimony

where expert rendered conclusion regarding consumer's impressions but expert had no factual basis to form conclusion); *N. Star Mut. Ins. Co.*, 269 F. Supp. 2d at 1147-48; *EZ Dock, Inc. v. Schafer Sys.,* No. 98-2364, 2003 U.S. Dist. LEXIS 3634, at *7 (D. Minn. March 8, 2003) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

In practice, expert opinion must "sufficiently connect[] the proposed testimony with the facts of the case." *EZ Dock*, 2003 U.S. Dist. LEXIS 3634, at *5-6; *Kapps, M.D. v. Biosense Webster*, *Inc.*, 813 F. Supp. 2d 1128, 1148-49 (D. Minn. 2011) (requiring expert connect his opinion to the underlying data).  Otherwise, the proffered opinion is not helpful to the jury.

### E.    General testimony based on "experience" is improper *ipse dixit* testimony.

A report must contain a "complete statement" of the expert's opinions, "the basis and reasons for them," and "the facts or data considered" by the expert in forming the opinions.  Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii).  The report must outline the reasoning, including how and why the expert reached a particular result.  Opinions that simply state a conclusion are not helpful to the jury.  *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005)) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.")

Where an expert is relying on experience alone as support for a stated conclusion, the expert must explain: 1) how that experience leads to the conclusion reached, 2) why that experience provides a sufficient basis for the opinion, and 3) how the experience is reliably applied to the facts.  Fed. R. Evid. 702 advisory committee's note (2000). Without an adequate explanation of why and how an expert's experience supports a conclusion, such testimony is unhelpful to the jury and should be excluded.  *Aviva Sports, Inc.*, 829 F. Supp. 2d at 826-27 (excluding expert testimony based primarily on experience as unhelpful because expert failed to explain how experience led to conclusion, why experience provided sufficient basis for opinion, and how experience applied to facts).

### F.   <u>Expert testimony that summarizes the factual record is not helpful.</u>

Expert testimony that merely summarizing the factual record is unhelpful and prejudicial.  *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005) (An expert may not simply "rehash[] otherwise admissible evidence about which he has no personal knowledge, such evidence—taken on its own—is inadmissible").  While an expert must rely on facts, an expert cannot be presented to the jury for the purpose of constructing a factual narrative based upon record evidence.  *Id.*; *see also LaSalle Bank Nat. Ass'n v. CIBC Inc.*, No. 08 CIV. 8426 WHP HBP, 2012 U.S. Dist. LEXIS 18503, at *36-37 (S.D.N.Y. Feb. 14, 2012) (excluding portions of expert testimony consisting "principally [of] recitations of facts that must be offered by witnesses with first-hand knowledge" and further noting that the expert "restating the testimony concerning these matters serves no purpose"); *In re Viagra Prods. Liab. Litig.*,

658 F. Supp. 2d 950, 965 (D. Minn. 2009) (excluding expert testimony relying on an interpretation of record evidence because the jury was equally capable of evaluating the evidence: "Because the jury is equally capable of evaluating this particular evidence, Dr. Blume's opinion on this matter must be excluded.").

III.   **Dr. Kursh's opinions regarding the commercial reasonableness of FICO's termination of the Agreement for violation of Paragraph 2.1 is improper legal analysis and not based on sufficient facts.**

Dr. Kursh intends to tell the jury how to interpret Paragraph 2.1[1] of the Agreement and that FICO's assertions of breach (under his interpretation) was not commercially reasonable.  Dr. Kursh states:

> 70.    In its 2016 negotiations with Federal, FICO took the position that it recently discovered uses that breached the License Agreement. FICO then attempted to leverage that alleged breach in its negotiations with Federal.

> 71.    FICO's position was not commercially reasonable based on my experience in the industry. First, the License Agreement does not limit use or installation to the United States. Rather, it is an enterprise-wide license, without any applicable limitations. Second, FICO's statements and conduct throughout the license relationship shows that FICO believed and treated the License Agreement as allowing enterprise-wide use and installation that was not limited to the United States.

(Kursh Rep., ¶¶ 70-71; *see also id.* ¶¶75-89.)

---

[1] FICO's Second Amended Complaint states a claim for breach of Section 3.1 of the Agreement.  Paragraph 3.1 states in pertinent part:

> 3.1 <u>License Restrictions</u>.  Client represents and warrants that it and its employees shall not (i) use the Fair Isaac Products or Documentation … in any manner that exceeds the scope of any license granted under this Agreement … .

Federal breached Paragraph 3.1 by using Blaze Advisor in violation of the territorial restriction of Paragraph 2.1 of the Agreement.

These opinions are problematic for two related reasons, which are addressed in turn.  First, Dr. Kursh's opinions interpreting the Agreement usurp the role of the Court. Second, Dr. Kursh's opinions of "commercially reasonable" are based on his contract interpretation and his factual case narrative without identification or discussion of any industry standards or norms.  These opinions are *ipse dixit* and impermissible factual narrative.  Dr. Kursh should not be allowed to testify regarding the opinions raised in paragraphs 70-89 of his report.

> **A.    Dr. Kursh usurps the role of the Court by interpreting the geographic scope of Paragraph 2.1 of the Agreement.**

Dr. Kursh opines that the Agreement does not limit use or installation of Blaze Advisor to the United States.  (Kursh Rep., ¶¶71, 75, 77-79, 89.)  This opinion is based on: (1) the definition and placement of the word "Territory" in Paragraph 1, and (2) the license grant of Paragraph 2.1.  Paragraph 1 defines the term "Territory":

> "Territory", with respect to the installation and physical location of Fair Isaac Products, means the United States of America.

(Kliebenstein Decl. Ex. 3.)  Paragraph 2.1 of the Agreement addresses the scope of the license grant, "[s]ubject to the terms, conditions and limitation of the Agreement":

> 2.1 License Grant to Fair Isaac Products.  Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a perpetual (subject to the provisions of Article 9), non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes, subject to the additional limitations set forth below and/or listed in Exhibit A.

(*Id.*) Dr. Kursh concludes the license grant allows for use or installation inside and outside the United States because Paragraph 2.1 does not expressly include the word "Territory":

> 72.     [T]he Agreement, Paragraph 2 License Grant does not include any language about Federal's use or installation being limited to a specific geographic area.

> 75.     It is my opinion, that if the intent of the parties was to limit the territory to a specific area, then I would have expected FICO to follow industry customs and practices by calling out the limitation within the license grant clause. FICO, however, did not do so.

> 79.     While the term "territory" is defined in the June 2006 Agreement at Section 1 – Definitions, it is never used in the Agreements nor any of the amendments. As you can see in the exhibit below, the term "territory" is not used in the License Grant section. This is not consistent with industry customs or practices in the software licensing field.

Dr. Kursh further interpreted the agreement in his deposition:

> A.     In other words … if they wanted to have a territory limitation under the license grants, they should have called it out under Section 2, the license grant. They did not do so.

(Kursh Dep., 134:7-12.)

Dr. Kursh's opinions are his interpretation of Paragraph 2.1 of the Agreement. Contract interpretation is the provenance of the Court.  Determination of the parties' intention during contracting (if material facts are in dispute) is the provenance of the jury—fully capable of rendering its decision on the factual record.  Dr. Kursh's opinion provides no special expertise.  He only opines on what the Court or the jury should conclude.  *See Missionary Benedictine Sisters, Inc.*, 2015 U.S. Dist. LEXIS 76482, at *8 ("[T]o the extent [the expert's] opinions involve the interpretation of contract provisions,

they are inadmissible."); *CitiMortgage, Inc.*, 2012 U.S. Dist. LEXIS 43522, at *5 (excluding expert testimony "purport[ing] to make legal conclusions concerning whether [the plaintiff] acted in good faith and whether the terms of the contract are inconsistent, ambiguous, and unreasonable"); *Vanderbilt Mortg. & Fin., Inc.*, 2010 U.S. Dist. LEXIS 116434, at *13-16 (same); *DP Concrete Prods.*, 2010 U.S. Dist. LEXIS 5727, at *3 (same).

### B.   Dr. Kursh's contract-based testimony does not shed light on an ambiguous term or a term of art.

An expert may opine on the industry meaning of a term of art or to explain an ambiguous term.  *See CitiMortgage, Inc.*, 2012 U.S. Dist. LEXIS 43522, at *5.  Dr. Kursh's opinions regarding the geographic scope do not explain any terms of art or ambiguous terms.  Regarding ambiguity, Dr. Kursh stated in his deposition he did not have any opinion on the ambiguity of Paragraph 2.1 or the term "Territory."  (Kursh Dep. at 10-11.)  Further, Dr. Kursh agreed in his deposition that the word "Territory" is not a term of art and contrasted this term with "CPU," which he considered to be a term of art:

> Q.   Is the word territory, kind of like the word CPU, a term of art in the software licensing industry?
>
> A.   I would say CPU is. Because if we were to walk out of here and go up to someone on the street and say what is CPU, they would look at us with a question mark, unless they are familiar with the software industry. By contrast, ***I think territory is a common English word***.

(Kursh Dep., 132:1-12 (objection omitted) (emphasis added).)  Because the word "Territory" is not a term of art and Dr. Kursh did not consider the ambiguity of terms, his opinions interpreting whether the Agreement includes a territorial restriction under

Paragraph 2.1 are not admissible.  Dr. Kursh should not be allowed to testify regarding the opinions raised in paragraphs 71, 75, 77-79, 89 of his report.

> **C.      Dr. Kursh's opinions on the commercial reasonableness of terminating the Agreement for installation outside the United States is based solely on the parties' conduct, without any evidence of industry customs.**

In addition to opining on how the Court should construe the territorial scope of Paragraph 2.1 of the Agreement, Dr. Kursh further opines that FICO's breach of contract claim based on Paragraph 2.1 is not commercially reasonable.  (Kursh Rep., ¶¶71, 81-89.) His opinions are general and conclusory, and are not tied to any case-specific facts:

> 71.     FICO's position was not commercially reasonable based on my experience in the industry.  First, the License Agreement does not limit use or installation to the United States.  Rather, it is an enterprise-wide license, without any applicable limitations.  ***Second, FICO's statements and conduct throughout the license relationship shows that FICO believed and treated the License Agreement as allowing enterprise-wide use and installation that was not limited to the United States***.

> 75.     It is my opinion, that if the intent of the parties was to limit the territory to a specific area, then I would have expected FICO to follow industry customs and practices by calling out the limitation within the license grant clause. FICO, however, did not do so.

> 87.     It is my opinion that FICO's accusations of breaches of the agreement that contradicted the License Agreement's terms and the parties' performance under the License Agreement, were not commercially reasonable.

> 88.     For years, FICO consented to and allowed Federal to use and install Blaze outside of the United States. For FICO to suddenly take a contrary position during post-merger negotiations was not commercially reasonable or consistent with good faith conduct in the industry.

(Kursh Rep., ¶¶71 (emphasis added), 75, 87-88.)

Dr. Kursh relies on his selected factual narrative of a FICO sales report (*id.* ¶81), three (3) emails (*id.* ¶¶82-84), and a single question and answer from one deposition of a FICO employee (*id.* ¶¶85-86). Dr. Kursh then concludes FICO's accusation of breach was not commercially reasonable or consistent with good faith in the industry. (*Id.* ¶¶87-89.)

These opinions are unreliable because they lack sufficient evidence. Fed. R. Evid. 702. An expert may not testify about the commercial reasonableness of the parties' conduct. *See Crawford Supply Grp.*, 2011 U.S. Dist. LEXIS 117670, at *8-9. An expert may only discuss commercial reasonableness and industry standards generally; the conclusions to be reached are the provenance of the court and jury. *See* Section II(C). Admissible testimony on commercial reasonableness must define commercial reasonableness and produce background evidence of those commercial standards. *Auto-Chlor Sys. Of Minn.*, 328 F. Supp. 2d at 1007 (("To show that Defendants did not observe 'reasonable commercial standards of fair dealing' … Plaintiffs must produce background evidence of the manner in which other marketers of parts/equipment and chemicals similar to that of Defendants set their prices. … Such evidence is critical.").

For example, in *Sanny*, 2013 U.S. Dist. LEXIS 65559, at *47, Judge Montgomery excluded expert testimony on reasonableness that was based only on testimony and documents from the case. Judge Montgomery concluded "[a] jury could, and should, draw its own conclusions about the testimony and data using common sense." *Id.*; *see also Somnis*, 840 F. Supp. 2d at 1173 (same).

Like the experts excluded in *Sanny*, *Crawford* and *Elorac*, Dr. Kursh did not provide any evidence of industry standards for commercial reasonableness surrounding software license usage and the proper grounds for terminating a software license. Instead, his conclusions are only based on his interpretation of the Agreement and his selected factual narrative of the case. Dr. Kursh does not provide a jury with any evidence by which to compare FICO and Federal's actions and behaviors versus "industry standard" actions and behaviors. Dr. Kursh simply concludes FICO's behavior is not commercially reasonable—telling the jury what to decide. Dr. Kursh's opinions are pure *ipse dixit*.

This is not the first time Dr. Kursh has improperly offered opinions on the parties' conduct devoid of any other evidence of industry practice. In *Actuate Corp. v. Aon Corp.*, Dr. Kursh similarly opined on the conduct of the parties at issue without linking it to any underlying evidence of industry custom. 2012 U.S. Dist. LEXIS 87185, at *9 (N.D. Cal. June 18, 2012). Judge Alsup cautioned that Dr. Kursh's proposed testimony on "the particular contracts and conduct at issue in this action" was problematic and would likely be excluded:

> [E]ven though Dr. Kursh is qualified to testify about industry custom, for reasons discussed, he will be limited on direct examination about custom and practice in the software industry, and likely be precluded from testimony about the particular contracts and conduct at issue in this action.

*Id.* Likewise, here, Dr. Kursh's proposed opinions focus solely on his interpretation of the Agreement and his summary of the parties' conduct. The Court should not permit Dr. Kursh to testify regarding the opinions set forth in paragraphs 71 and 81-89 of his report.

### D.    <u>Dr. Kursh's opinion on "use" and "installation" is based solely on the parties' conduct, without any evidence of industry customs.</u>

Dr. Kursh opines without basis that there is no distinction between "use" and "installation".

Dr. Kursh's interpretation of Paragraph 2.1 and the "commercial reasonableness" of FICO's conduct is tainted by his factually baseless opinion that "use" and "installation" of Blaze Advisor software are one and the same:[2]

> 71.    … [T]he License Agreement does not limit use or installation to the United States. …
>
> In my opinion, installation and use are the same with respect to Blaze. One cannot use the Blaze software without installing it. … Therefore, when I refer to "use" in this report I am referring generally to both use and installation.

(Kursh Rep., ¶71 n.20; Kursh Dep., 119:10-16.)  Dr. Kush admitted in his deposition, however, there *was* a distinction between use and installation because one could access the software from a remote location:

> Q.    Do you know whether or not it's possible to use the software, Blaze Advisor software in a location different from where the Blaze Advisor software was installed?
>
> A.    … [I]n my experience, to do an enterprise-wide license, software like Blaze, one should be able to access the software from a remote location. ***So it would not be on your server, but you would be using the software on your computer***.

---

[2] This distinction matters.  As discussed in Section III(A) above, as defined in the Agreement: "'Territory', with respect to the ***installation*** and physical location of Fair Isaac Products, means the United States of America."  (Kliebenstein Decl. Ex. 3 (emphasis added).)  Under the terms of the Agreement, extra-territorial installation is prohibited.

(Kursh Dep., 121:4-15 (emphasis added).)  Dr. Kursh's opinion that use = installation in the industry is wrong, based on his own admission.

Moreover, his opinion that use = installation is unsupported.  He testified that the basis for this opinion was paragraphs 77-89 of his report "relative to the customs and practices of the industry":

> Q.   In Paragraph 71, the second sentence says, "First, the license agreement does not limit use or installation to the United States." What is your support for that statement?
>
> A.   I'll ask you please to turn to Paragraph 77, and that will then run through Paragraph 89, and we can go through each one of those paragraphs if you like.
>
> * * *
>
> That's the basis of my opinion.
>
> Q.   I don't want to go through each page, paragraph, but in general, Paragraphs 77 through – through 89 the support for those opinions are documents and testimony from this case; correct?
>
> A.   Relative to customs and practices in the industry.

(Kursh Dep., 112:11-25.)

These sources do not provide any independent basis for Dr. Kursh to conclude that "use" is the same as "installation."  Paragraphs 77-89 include only the terms of the Agreement (Kursh Rep., ¶¶77-79); Dr. Kursh's characterization of the parties' conduct, and the record evidence (*id.* ¶¶80-86); and Dr. Kursh's own unsubstantiated conclusion that FICO's assertion of breach based on use outside of the United States was "not commercially reasonable" (*id.* ¶¶87-89).  There is no reference to industry custom and practice.

16

Dr. Kursh admitted that he has never seen or used Blaze Advisor:

Q.   Have you – have you seen a demonstration or interacted with any of
     the applications at Federal that use Blaze Advisor?

A.   No.

(Kursh Dep., 38:11-14.)  Dr. Kursh has no expertise specific to Blaze Advisor and he does not reference any industry sources that themselves relate to Blaze Advisor.  He has no basis to opinion on the distinction between "use" and "installation."

Dr. Kursh's reliance on "customs and practices in the industry" fares no better. Admissible testimony on industry standards must define those standards and produce background evidence of the same.  *See Elorac, Inc.*, 2017 U.S. Dist. LEXIS 133449, at *50-51; *Sanny*, 2013 U.S. Dist. LEXIS 65559, at *47; *Actuate Corp.*, 2012 U.S. Dist. LEXIS 87185, at *9; *Crawford Supply Grp.*, 2011 U.S. Dist. LEXIS 117670, at *8-9.  Dr. Kursh did not present any evidence that use means the same thing as installation in similar license agreements or corresponding evidence of industry practice.  Instead, his conclusions are only based on his interpretation of the Agreement and his selected factual narrative of the case.  The jury does not need Dr. Kursh to summarize the factual record; it is unhelpful and prejudicial.  *See Highland Capital Mgmt.*, 379 F. Supp. 2d at 468-69; *LaSalle Bank Nat. Ass'n*, 2012 U.S. Dist. LEXIS 18503, at *36-37; *In re Viagra Prods.*, 658 F. Supp. 2d at 965.

### E.   The remainder of Dr. Kursh's opinions on the geographic scope of the Agreement simply restate facts.

Dr. Kursh's recount of documents and testimony in paragraphs 73-74, 76, and 77-86 merely present a selected summary of the factual record.  Dr. Kursh does not apply

any software industry expertise in the summary of these documents and testimony. The jury does not need Dr. Kursh to summarize the factual record; it is unhelpful and prejudicial. *See Highland Capital Mgmt.*, 379 F. Supp. 2d at 468-69 (rehashing admissible evidence is inadmissible); *LaSalle Bank Nat. Ass'n*, 2012 U.S. Dist. LEXIS 18503, at \*36-37 (restating factual record "serves no purpose"); *In re Viagra Prods.*, 658 F. Supp. 2d at 965 (excluding expert interpretation of record because jury can evaluate record). It is well within the capabilities of the jury to assess witness testimony and the evidentiary record. The Court should strike paragraphs 73-74, 76, 77-86 of the Kursh Report as an unhelpful factual narrative that is prejudicial.

IV.   **Dr. Kursh's opinions regarding the breach of Paragraph 10.8 of the Agreement is improper legal analysis and not based on sufficient facts.**

FICO asserts breach of contract and copyright infringement due to Federal's continued use of the Blaze Advisor software after it underwent a change of control and acquisition event deemed to be an assignment under Paragraph 10.8. Dr. Kursh's Report (¶¶90-98) interprets Paragraph 10.8, and based on that interpretation, opines on FICO's commercial reasonableness. As with his opinion on Paragraph 2.1 discussed above, Dr. Kursh's opinion regarding Paragraph 10.8 is inadmissible for interpreting the Agreement and opining on "commercial reasonableness." Dr. Kursh cannot proffer these opinions for the same reasons discussed in Section III above.

A.   **Dr. Kursh improperly opines on the interpretation of Paragraph 10.8.**

Dr. Kursh opines that FICO was commercially unreasonable in withholding consent to the assignment of the Agreement following the merger:

90.     FICO used the "No Assignment" clause in the software license agreement to demand additional license fees from Federal in a commercially unreasonable manner.

(Kursh Rep., ¶¶90-98.)  To get to this conclusion, paragraphs 92-94 of Dr. Kursh's

Report interpret Paragraph 10.8 as only requiring FICO's written consent if Federal

expands use of Blaze Advisor software.  Dr. Kursh's Report emphasizes the language in

Paragraph 10.8 that he interprets:

92.     The June 2006 "No Assignment" clause in Paragraph 10.8 states that:

a.      Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof. In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and Client shall make **no expanded use** of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent, **which will not be unreasonably withheld**. Any attempt to assign or transfer all or any part of this Agreement without first obtaining such written consent will be void and of no force or effect.

93.     FICO's Mr. Sawyer testified at his deposition that he did not know of any expanded use by Federal after the merger.

A.      For clarity, after the merger, I had no evidence supplied to me that would indicate that Federal used the product in an expanded way.

94.     Hence, even if Federal were required to obtain consent pursuant to this clause, FICO's unilateral actions based on the argument of expanded use are not commercially reasonable.

(Kursh Rep., ¶¶92-94 (emphasis original).)

(Il)logically, Dr. Kursh's report leaps from: (1) Paragraph 10.8 of the Agreement with strategic highlighting; (2) to a statement that FICO had no evidence of "expanded use" of Blaze Advisor; (3) to a conclusion that FICO was unreasonable in asserting Federal breached Paragraph 10.8.  Dr. Kursh leaps from (1) to (3) based on his interpretation that FICO's consent is only required under Paragraph 10.8 when there is "expanded use" and his assertion FICO's "unilateral actions" were "based on the argument of expanded use."[3]  Again, Dr. Kursh usurps the role of court and jury.

Dr. Kursh confirmed his opinion interprets Paragraph 10.8 in his deposition:

> Q.    So your opinions regarding Paragraph 10.8 are based on your belief that written consent from FICO was only needed if there was expanded use? Did I get that right?
>
>        * * * *
> A.    Correct.

(Kursh Dep., 148:17-23.)  Dr. Kursh agreed that his opinions parse the meaning of "and" in the phrase "and client shall make no expanded use" in Paragraph 10.8:

> A.    … However, FICO's actions were commercially unreasonable … . [T]here was no expanded use of the Fair Isaac products by Federal. So even with the change in control, it's an and in my reading of 10.8 … .
>
> Q.    So if the decision as to whether or not there is – is a breach of 10.8 is a decision for the trier of fact, why are you giving any opinions as to the – the presence of an and in 10.8?

---

[3] Expanded use is not a condition upon which the required FICO consent under Paragraph 10.8 depends.  Dr. Kursh's assertion that FICO based its decisions on an argument of expanded use has no basis in fact.  The false assertion is juxtaposed to the testimony of Mr. Sawyer to support his *ipse dixit* opinions.

A.      … My opinion is there was no expanded use[4] and the language in Section 10.8. … Since there was no expanded use, Federal did not need to get written consent because they were not violating the provisions of Section 10.8.

(Kursh Dep., 141:9-142:6.)  Based on his report and this deposition testimony, Dr. Kursh opines that FICO's termination of the Agreement following Federal's breach was not commercially reasonable:

94.      Hence, even if Federal were required to obtain consent pursuant to this clause, FICO's unilateral actions based on the argument of expanded use are not commercially reasonable.

(Kursh Rep., ¶94.)

Dr. Kursh bases this conclusion on his interpretation of the Agreement—that expanded use is necessary before FICO's consent to continued use of Blaze Advisor was required.  The Court should exclude this testimony as usurping the role of the Court and jury.  *See Vanderbilt Mortg. & Fin., Inc.*, 2010 U.S. Dist. LEXIS 116434, at *13-16; *see also Missionary Benedictine Sisters, Inc.*, 2015 U.S. Dist. LEXIS 76482, at *8; *CitiMortgage, Inc.*, 2012 U.S. Dist. LEXIS 43522, at *5; *DP Concrete Prods.*, 2010 U.S. Dist. LEXIS 5727, at *3.

**B.      Dr. Kursh's contract-based testimony does not shed light on an ambiguous term or a term of art.**

While experts may opine on the industry meaning of a term of art to explain an ambiguous term, Dr. Kursh's opinions regarding the meaning of Paragraph 10.8 do not

---

[4] To the extent Dr. Kursh intended to broaden his report in his deposition and to make a factual conclusion that there was no expanded use in 2016, this is a fact issue for the jury to conclude.

explain any terms of art or ambiguous terms.  Regarding ambiguity, Dr. Kursh stated in

his deposition he did not have any opinion on the ambiguity of Paragraph 10.8.  (Kursh

Dep. at 10-11.)  Dr. Kursh also confirmed that "No Assignment" provisions such as

Paragraph 10.8 are not exclusive to the software industry:

> Q.    So you don't know one way or the other if – if no assignment
> provisions are exclusive to software license agreements?
>
> A.    … I wouldn't say they are exclusive. You would expect to see no
> assignment in other industries, for example, in biotech, for example,
> in other kinds of rights, grant – or agreements between parties, but ***I
> wouldn't say exclusive to the software industry*** … .

(Dr. Kursh Dep., 157:24-158:9 (emphasis added).)  Because Paragraph 10.8 is not

exclusive to the software industry and Dr. Kursh did not consider Paragraph 10.8

ambiguous, Dr. Kursh's opinions set forth in paragraphs 90-94 are not admissible.

> ### C.    Dr. Kursh's opinions that FICO's termination of the Agreement due to breach of Paragraph 10.8 was not commercially reasonable is based only on the parties' conduct, without any evidence of industry customs.

Based on his interpretation of Paragraph 10.8, and his selected case narrative, Dr.

Kursh opines on the commercial reasonableness of FICO's termination of the Agreement.

His opinions are general and conclusory:

> 94.    Hence, even if Federal were required to obtain consent pursuant to
> this clause [Paragraph 10.8], FICO's unilateral actions based on the
> argument of expanded use are not commercially reasonable.
>
> 95.    Turning to FICO's unilateral actions in withholding consent and
> attempting to terminate the Agreement, these actions were also not
> commercially reasonable given how Blaze was integrated into Federal's
> operations. When FICO made the argument that it would terminate the
> Agreement, it, as I note above, was likely well aware that it would not be
> possible for Federal to cease using Blaze immediately upon their demand.

> 98.     [P]arties to a software license agreement do not expect that they will
> be confronted with unreasonable demands … which also shows that FICO's
> actions in refusing consent without justification were not commercially
> reasonable.

(Kursh Rep., ¶¶94-95, 98.)  Dr. Kursh's only support for these conclusions is a single

deposition passage from two FICO employees.  (Kursh Rep., ¶¶93, 95-98.)

This type of generalized, factually unsupported opinions about "commercial

reasonableness" are inadmissible.  *See, e.g.*, *Sanny*, 2013 U.S. Dist. LEXIS 65559, at

\*47; *Crawford Supply Grp.*, 2011 U.S. Dist. LEXIS 117670, at \*8-9; *Auto-Chlor Sys. Of

Minn.*, 328 F. Supp. 2d at 1007.  There is no reference to any industry customs or

practices related to when a licensee undergoes a change of control, acquisition, or merger.

Dr. Kursh does not cite to any learned treatise that might explain the phrase or discuss a

typical course of conduct.

Instead, Dr. Kursh simply uses the term "commercially unreasonable" as a proxy

to describe any FICO action with which he disagrees.  This testimony is inadmissible.

*See, e.g.*, *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1215-16 (7th Cir.

1997) (affirming district judge's rejection of expert's opinion that party's actions were

"commercially reasonable" where the expert "did not gather any data on the subject,

survey the published literature, or do any of the other things that a genuine expert does

before forming an opinion"); *Vanderbilt Mortg. & Fin., Inc.*, 2010 U.S. Dist. LEXIS

116434, at \*15-16 ("[W]hen an expert purporting to testify regarding customary practices

of a trade or business gives his opinion as to the legal standards which he believes govern

the case, or goes on to apply those standards to the contract at issue, this must be

excluded."). The Court should not allow Dr. Kursh to opine on the topics raised in paragrpahs 90-98 of his report.

### D.     Dr. Kursh's remaining opinions on Paragraph 10.8 simply restate facts.

Dr. Kursh's recount of documents and testimony in paragraphs 92-93, 95-98 merely summarizes the factual record.  Dr. Kursh does not apply any software industry expertise in the summary of these documents and testimony.  The jury does not need Dr. Kursh to summarize the factual record; it is unhelpful and prejudicial.  *See Highland Capital Mgmt.*, 379 F. Supp. 2d at 468-69 (rehashing admissible evidence is inadmissible); *LaSalle Bank Nat. Ass'n*, 2012 U.S. Dist. LEXIS 18503, at *36-37 (restating factual record "serves no purpose"); *In re Viagra Prods.*, 658 F. Supp. 2d at 965 (excluding expert interpretation of record because jury can evaluate record).  It is well within the capabilities of the jury to assess witness testimony and the evidentiary record.

## V.     Dr. Kursh's opinions on the amount of damages for breach of contract are factually unsupported *ipse dixit.*

Dr. Kursh's report attacks FICO's breach of contract damages claim.  FICO seeks damages based on the license fees it lost from the unauthorized use of Blaze Advisor.  Dr. Kursh attempts to rebut FICO's damages in a variety of ways.  These opinions are inadmissible as factually wrong based on Dr. Kursh's own admission in his deposition, lacking facts and methodology, or simply recounting documents/testimony in the record without applying any expertise.  The Court should not allow testimony based on the opinions set forth in paragraphs 99-136 of the Kursh Report.

A. **Dr. Kursh's statements identifying which Federal applications use Blaze Advisor merely restates the factual record.**

In paragraphs 102-105, Dr. Kursh opines that FICO's damages calculation is too high because FICO "mistakenly assumes" six (6) applications in FICO's calculations use Blaze Advisor. The source of this opinion is solely the record evidence, including the deposition testimony of Mr. Kevin Harkin, Federal's 30(b)(6) witness who has no independent knowledge of applications using Blaze Advisor. (Kursh Rep., ¶¶102-104.) Dr. Kursh is simply parroting Federal employees and adds no knowledge or industry experience to his summary of Federal's view of the facts. (Kursh Rep., ¶104; *see also* Kursh Dep., 156:25-157:3.)

He also concludes that no foreign application should be in FICO's damages calculation because the Agreement is global and Federal did not breach Paragraph 2.1 of the Agreement. (*Id.* ¶105.) This statement is simply contract interpretation again, and necessarily depends on Dr. Kursh's view of Paragraph 2.1. The parties dispute the applications that use Blaze Advisor. The jury will make that decision based on the evidence; Dr. Kursh's opinion on how to resolve the factual dispute is unhelpful to the trier of fact and should be excluded.

B. **Dr. Kursh's "Sizing" Opinion is Factually Wrong.**

Dr. Kursh's opinions include a rebuttal of FICO's "sizing" of the applications underlying FICO's damages calculations. (Kursh Rep., ¶¶106-124.) FICO's breach of contract damages claim seeks a separate license fee for each of the 17 Federal software applications that used Blaze Advisor outside of the terms of the license agreement. FICO





In 2019, Federal produced a chart listing many of the applications that use Blaze

Advisor and the extent of use. (Kursh Rep. ¶113; Kliebenstein Decl. Ex. 6.)



Mr. Neil Zoltowski, FICO's damages expert, reviewed this data and FICO's

pricing and sizing matrices with Mr. William Waid, FICO's Vice President and General

Manager of the Decision Management Line of business. Using this data, Mr. Waid

classified Federal's size of use of Blaze Advisor for each application as small, medium, large or very large.  Mr. Zoltowski took those results and calculated the license fees owed using the standard pricing matrix.

To rebut this opinion, Dr. Kursh opines that the sizing performed by FICO was wrong: "[Mr. Zoltowski's] pricing estimates … are inflated and the sizing of these licenses is inconsistent with FICO's own sizing methodology."  (Kursh Rep., ¶107; *see also id.* ¶¶108-124.)  Dr. Kursh performed his own sizing exercise.  (*Id.* ¶¶108-124.)



(Kursh Rep., ¶115.)

Dr. Kursh's attempted sizing rebuttal is fatally flawed.  He did not use applicable sizing data from the damages period (2016-2019) and instead relied on a single

████████████████████████████████████████████

████████████████████████████████████████

███████████

Dr. Kursh admitted in his deposition that he used the wrong data.  (Kursh Dep.,

181-186.)  Dr. Kursh agreed that his sizing conclusions were inconsistent with the 2019

sizing data produced in this case:

> Q.     … [I]sn't your sizing of CSI Express as small in 2019 inconsistent
>        with the number of transactions that are reflected in Exhibit 16?
>
> A.     … Yes, it appears it [sic] to be.

(Kursh Dep., 185:4-7.) Dr. Kursh admitted that he did not use current 2019 sizing data.

Dr. Kursh also agreed that he did not have 2006 sizing data:

> Q.     My question was: Do you have any data on the number of realtime
>        transactions that went through CSI in 2006?
>
> A.     I don't recall seeing any evidence in that regard as I sit here.
>
> * * * *
>
> Q.     Your sizing of the Federal international applications is also predicated on
>        your sizing of CSI Express from 2019 as a small application; is that
>        correct?
>
> A. … [Y]es, I size them using CSI Express.

 (Kursh Dep., 182:9-13, 186:1-14.)

As he admits, Dr. Kursh's sizing analysis is fatally flawed and ignores the relevant

facts, including the actual daily transaction data underlying FICO's sizing matrix.  One

data point from 2006 is not a basis to opine on the sizing of 17 applications in 2019.  Dr.

Kursh's opinions regarding application sizing stated in Paragraphs 106-124 should be

excluded in their entirety.  *Kapps, M.D.*, 813 F. Supp. 2d at 1148-49; *N. Star Mut. Ins. Co.*, 269 F. Supp. 2d at 1147; *EZ Dock, Inc.*, 2003 U.S. Dist. LEXIS 3634, at *5-6.

> **C.**    **Dr. Kursh's opinion that the parties would have entered into an enterprise license at a discount is based on the wrong law and is factually unsupported.**

Dr. Kursh opines that FICO's damages for breach of contract should be a single-fee enterprise license that is heavily discounted by ███████  (Kursh Rep., ¶¶125-136.) Dr. Kursh opines that Federal would not have agreed to an application-based license fee, sans discount, as reflected in FICO's damages expert report.  For example, Dr. Kursh concludes that Federal "would have negotiated" a single-fee enterprise license.  He opines:

> 125.    … Federal would have negotiated with FICO to purchase divisional enterprise licenses for Blaze instead of purchasing licenses on an application-by-application basis. …
>
> 126.    Most enterprises would typically purchase enterprise-level licenses in this situation. …

(*See generally* Kursh Rep., ¶¶125-131.)  Dr. Kursh then concludes FICO's application-based damages calculation is not commercially reasonable:

> 136.    It is my opinion that FICO's demands for more license fees and the assumptions behind FICO's models used to calculate those fees are not commercially reasonable and ignore Federal's actual use of Blaze.

(Kursh Rep., ¶136.)

Regarding discounts, Dr. Kursh opines that FICO's breach of contract damages figures should be lowered with a discount.  Dr. Kursh opines:

> 134.    It is an industry custom and practice to provide price discounts to licensees, particularly if discounts have been provided in the past. …

(Kursh Rep., ¶¶134-136.)  These opinions have no basis in law and are factually lacking any evidence of industry experience.

1. **Dr. Kursh's opinions focus on what Federal would have paid FICO to license Blaze Advisor, not FICO's loss.**

These opinions on enterprise licensing and discounting presume the legal standard for damages arising from breach of contract is what Federal would have paid FICO for an ongoing license.  It is not.  Under New York law, in breach of contract actions, "the nonbreaching party may recover general damages which are the natural and probable consequence of the breach."  *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008).  Here, FICO is entitled to expectation damages, *i.e.*, the loss in value to the plaintiff resulting from the defendant's breach.  *See Holland Loader Co. v. FlSmidth A/S*, 313 F. Supp. 3d 447, 480 (S.D.N.Y. 2018); *J&H Holding Co. v. Kloss*, 2013 U.S. Dist. LEXIS 162473, at *6-7 (E.D.N.Y. Nov. 13, 2013); *Bi-Economy Mkt.*, 886 N.E.2d at 130.  Here, that breach resulted in the unauthorized use of Blaze Advisor on 17 applications for 3+ years.  FICO's standard annual application-fee pricing is the measure of that loss.

Dr. Kursh admitted his opinions are premised on the (incorrect) assumption that the parties are in the position of an arm's length transaction of a willing buyer/seller:

> Q.   And why was it commercially unreasonable for Mr. Zoltowski to not consider, as you say, an enterprise level license?
>
> A.   Because companies in an arm's length transaction would typically do, as I state, an enterprise level license.

(Dr. Kursh Dep., 191:8-13.)  This faulty premise infects Dr. Kursh's opinions on

discounts and enterprise licensing.  The non-breaching party seeking damages from the

breaching party in litigation is not an arm's length transaction.  Based on his erroneous

view of the relevant legal standard, Dr. Kursh never considered that Federal has been in

breach of the Agreement for over three years.  Instead, Dr. Kursh focused on "Federal's

actual use of Blaze" and what amount "Federal would have negotiated" to pay.  (Kursh

Rep., ¶¶136-137.)  Legally, the measure of damages for breach of contract is not

Federal's "actual use" of Blaze Advisor but FICO's loss.  *J&H Holding Co.*, 2013 U.S.

Dist. LEXIS 162473, at *6-7.  Federal's demands and view of the case is not relevant to

answer the question of what FICO is owed for 3+ years of use of Blaze Advisor without a

license.

> ### 2.     Dr. Kursh's opinions fail to connect general conclusions to the facts of this case with evidence of industry practice.

Dr. Kursh's opinions are not helpful to the jury because Dr. Kursh fails to connect

his conclusion to any facts regarding industry practice.  Regarding his enterprise license

opinions, Dr. Kursh does not define "commercial reasonableness" in the enterprise/

application based license context.  Dr. Kursh cites no evidence showing the type of

enterprise licenses other licensees "would typically purchase … in this situation."  Dr.

Kursh does not discuss what scope of enterprise license the parties would negotiate.  His

opinion is based on his say-so devoid of any analysis of case-specific facts.  This opinion

is inadmissible.  *Crawford Supply Grp., Inc.*, 2011 U.S. Dist. LEXIS 117670, at *8-9; *see*

*also Elorac, Inc.*, 2017 U.S. Dist. LEXIS 133449, at *50-51.

Dr. Kursh does not identify any specific, applicable industry practices for discounting.  Dr. Kursh's only cited evidence is FICO's own discount list and two FICO contracts (*see* Kursh Rep., ¶135 n.57), which the jury does not need expert testimony to interpret.  The jury is capable of weighing the evidence regarding the FICO's discount practices and Federal's three-year breach of the Agreement.  *See Somnis*, 840 F. Supp. 2d at 1173.

Dr. Kursh admitted in his deposition he has no experience to bring to the table on these issues:

> Q.    How many instances have you been involved in pricing negotiations where one party was in breach of a contract for three years?
>
> A.    Well, the way you've defined that is going to be very narrow.
>
>        * * * *
>
> Q.    So you were not a party to those negotiations?
>
> A.    No

(Kursh Dep., 192:24-193:3, 193:20-21.)  Dr. Kursh has no experience to offer on pricing in this case, on these facts.  Opinions based on a faulty premise are unreliable. *Kapps, M.D.,* 813 F. Supp. 2d at 1148-49; *N. Star Mut. Ins. Co.*, 269 F. Supp. 2d at 1147; *EZ Dock, Inc.*, 2003 U.S. Dist. LEXIS 3634, at *5-6.

Dr. Kursh's opinions regarding discounts are also contrary to his other opinions. Dr. Kursh's report also explains:

- There is no 'magic' discount level that is readily applied among companies or for specific software products.

- Licensors consider the total, long-term value of a licensing relationship when pricing software licenses because these deals "will typically include services, ongoing maintenance, upgrades and additional use, updates, reference[s], and opportunities for more revenues from additional license sales of other products and services."

- The term "discount" for software licenses "is a misnomer in this context" because the license fees that software vendors charge are negotiated in light of the broader relationship between the licensor and licensee.

(Kursh Rep., ¶¶60, 62.)  Under Dr. Kursh's own framework, a discount would not apply in this case.  In the 3+ years since FICO terminated the Agreement, FICO has not generated any fees from Federal despite its continued use of Blaze Advisor.  There is no expanded business opportunity to be lured in with a discount.  Dr. Kursh's conclusion that FICO should have included a discount in its damages calculation is contrary to his own opinion.  The opinions expressed in ¶¶ 134-136 are unreliable and should be excluded.  *Kapps, M.D.,* 813 F. Supp. 2d at 1148-49; *N. Star Mut. Ins. Co.*, 269 F. Supp. 2d at 1147; *EZ Dock, Inc.*, 2003 U.S. Dist. LEXIS 3634, at *5-6.

### D.      Dr. Kursh's opinion regarding audit rights is inadmissible.

Dr. Kursh opines that FICO's decision not to exercise its audit rights under the Agreement following Federal's breach was commercially unreasonable:

138.    … FICO could have invoked the audit right as soon as they became aware of the merger but chose not to and, instead, have pursued litigation.

139.    … Not exercising this right to support such an allegation was not commercially reasonable and is further evidence that FICO was improperly trying to leverage the merger to collect unjustified fees.

140.    … If FICO truly believe that the license was limited by territory, then industry norms dictate that it would have exercised this audit right.

(Kursh Rep., ¶¶137-140.)

This opinion is not helpful to the jury. Dr. Kursh does not identify any specific, applicable industry practices that would be relevant to FICO's audit right. Dr. Kursh's only cited evidence is the Agreement itself and the deposition testimony of two FICO witnesses. (*See* Kursh Rep., ¶¶138-139 and notes 58-59.) This opinion usurps the role of the jury, which is capable of weighing the evidence with respect to FICO's audit right and drawing its own conclusion. *See Somnis*, 840 F. Supp. 2d at 1173. The opinions expressed in ¶¶ 136-140 are inadmissible and should be excluded.

VI.   **Conclusion**

Dr. Kursh's opinions are unreliable and unhelpful to the fact finder. His opinions contain improperly legal conclusions that invade the province of the Court, contain only Dr. Kursh's *ipse dixit* untethered from the case-specific facts, and merely restate the parties' actions while offering no independent or critical analysis. Under these circumstances, the Court should exercise its gatekeeping role and exclude Dr. Kursh's proposed opinions in their entirety.

Dated: October 11, 2019

MERCHANT & GOULD P.C.

/s/Heather J. Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2215
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com

Attorneys for Plaintiff FICO