# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) | Case No. 16-cv-1054 (WMW/DTS) |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Jury Trial Demanded** |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) | **FILED UNDER SEAL** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF FEDERAL'S
<u>LIABILITY FOR BREACH OF CONTRACT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................ iv

I.      Introduction ...................................................................................... 1

II.     The terms of the Agreement .............................................................. 1

        A.      FICO and Chubb & Son, a division of Federal, are the parties to the
                Agreement. ............................................................................... 1

        B.      Paragraph 3.1 of the Agreement imposed license restrictions: Blaze
                Advisor could be used only for the internal business purposes of Chubb
                & Son, by Chubb & Son employees, and only in a manner that did not
                exceed the scope of the license grant. ........................................ 3

                (1)     The license grant restricted the installation and physical location
                        of Blaze Advisor to the United States and license restrictions
                        prohibited transfer or distribution. ...................................... 3

                (2)     The Agreement restricts use of Blaze Advisor to Chubb & Son
                        employees and prohibits, except for one express exception, use
                        and access by third parties.................................................. 5

        C.      Paragraph 10.8 requires FICO's consent to continued use of Blaze
                Advisor should Chubb & Son undergo a change of control by merger
                or acquisition: an event deemed to be an assignment under the
                Agreement. ............................................................................... 6

        D.      Paragraph 9.3 requires cessation of use of Blaze Advisor upon
                termination of the Agreement. ................................................... 7

III.    Breach of the Agreement is factually undisputed. .............................. 8

        A.      Blaze Advisor was transferred, distributed, and installed outside the
                United States................................................................................ 8

        B.      Persons not employees of Chubb & Son and third party consultants used
                and accessed Blaze Advisor. ...................................................... 9

        C.      Federal and its division Chubb & Son were acquired and underwent a
                change of control in January 2016 and continued using Blaze Advisor
                without FICO consent. ................................................................ 9

D.    Defendants continue using Blaze Advisor after termination of the Agreement. ...................................................................................... 10

IV.   Argument ................................................................................................ 11

A.    New York law of contract construction. ...................................... 11

B.    Federal breached Paragraph 3.1 because Blaze Advisor was installed and physically located outside the United States. ....................................... 13

(1)   Federal contends the term Territory is meaningless. ...................... 14

(2)   Federal contends Amendment Two changes the territorial restriction. ....................................................................................... 15

(3)   Federal contends Amendment Two permits the non-US installations of Blaze Advisor because those companies are "affiliates." ................................................................................... 16

C.    Federal breached Paragraph 3.1 because persons not employees of Chubb & Son and unauthorized third party consultants were permitted use and access of Blaze Advisor. ................................................................ 17

D.    Federal breached Paragraph 10.8 using Blaze Advisor without FICO's consent. ...................................................................................... 18

(1)   Federal contends FICO's consent is required only if Blaze Advisor use is expanded. ................................................................ 18

a.    The proper construction of Paragraph 10.8 .......................... 19

b.    Defendants expanded their use of Blaze Advisor. ............... 22

E.    Defendants are in breach of Paragraph 9.3 ................................. 23

F.    Defendants' affirmative defenses of waiver and estoppel should be stricken as a matter of law. ........................................................... 24

(1)   The Agreement has an express no waiver clause: waiver fails as a matter of law. ............................................................................. 24

(2)   The Agreement forecloses estoppel as a matter of law. ................ 25

(3)   Factually, waiver fails as a matter of law. ..................................... 26

a.   A mistaken understanding that the Agreement granted global rights cannot waive the territorial restriction of the Agreement. ...........................................................................27

b.   When the mistaken understanding of global rights was corrected, the intention was to enforce the territorial restriction...............................................................................29

c.   None of the salespersons had authority to waive FICO's contractual rights. ....................................................30

(4)   Factually, estoppel fails as a matter of law: there is nothing to submit to the jury...............................................................31

a.   Federal installed Blaze Advisor outside the United States on its own accord, not in reliance on FICO. ........................31

b.   The mistaken belief of global rights is not a knowingly false representation...............................................32

c.   The FICO salespersons did not have actual or apparent authority to modify the agreement. ........................................33

(5)   Affirmative defenses not asserted are waived.................................33

G.   Defendants' counterclaims should be dismissed.........................................34

V.   Conclusion. .............................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3Com Corp. v. Banco*,
    171 F.3d 739 (2d Cir.1999) ........................................................................ 13

*Alessi Equip. v. Am. Piledriving Equip.*,
    No. 18-3976, 2019 U.S. Dist. LEXIS 26866 (S.D.N.Y. Feb. 20, 2019) ...................... 34

*Baraliu v. Vinya Capital, L.P.*,
    765 F. Supp. 2d 289 (S.D.N.Y. 2011) ...................................................... 34

*Borkan v. Quest Med.*,
    No. 95-10381, 1996 U.S. Dist. LEXIS 11207 (S.D.N.Y. Aug. 7, 1996) .............. 13, 22

*CDR-Wantagh v. Shell Oil*,
    No. 07-CV-4497, 2011 U.S. Dist. LEXIS 146396 (E.D.N.Y. Dec. 20,
    2011) ........................................................................................ 13

*Cohan v. Movtady*,
    751 F. Supp. 2d 436 (E.D.N.Y. 2010) ...................................................... 34

*Commerce Funding v. Comprehensive Habilitation Servs.*,
    No. 01 Civ. 3796, 2005 U.S. Dist. LEXIS 2832 (S.D.N.Y. Feb. 24,
    2005) ........................................................................................ 30

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch*,
    232 F.3d 153 (2d Cir. 2000) ................................................................ 11

*Crane Co. v. Coltec Indus.*,
    171 F.3d 733 (2d Cir. 1999) ................................................................ 19

*Diamond Castle Partners IV PRC v. IAC/InterActivecorp*,
    918 N.Y.S.2d 73 (N.Y. App. Div. 2011) .................................................... 14

*Dollar v. Smithway Motor Xpress*,
    710 F.3d 798 (8th Cir. 2013) ................................................................ 33

*Empire Props. v. Manufacturers Trust*,
    43 N.E.2d 25 (N.Y. 1942) .................................................................... 19

*Ferraro v. Janis*,
    880 N.Y.S.2d 201 (2009) .................................................................... 26

iv

*Fin. Techs. Int'l v. Smith*,
   247 F. Supp. 2d 397 (S.D.N.Y. 2002).........................................................................25

*Gallien v. Conn. Gen. Life Ins.*,
   49 F.3d 878 (2d Cir. 1995)........................................................................................13

*Gary Friedrich Enter. v. Marvel Characters*,
   716 F.3d 302 (2d Cir. 2013)......................................................................................12

*Global Funding Grp. v. 133 Community Road*,
   251 F. Supp. 3d 527 (E.D.N.Y. 2017) ......................................................................12

*GSAA Home Equity Trust 2006-2 v. Wells Fargo Bank*,
   133 F. Supp. 3d 1203 (D.S.D. 2015) .........................................................................11

*Harris v. Provident Life & Accident Ins.*,
   310 F.3d 73 (2d Cir. 2002)........................................................................................34

*Hunt Ltd. v. Lifschultz Fast Freight*,
   889 F.2d 1274 (2d Cir. 1989).....................................................................................12

*JA Apparel v. Abboud*,
   568 F.3d 390 ..............................................................................................................12

*John R. Sand & Gravel v. United States*,
   552 U.S. 130 (2008)...................................................................................................33

*Johnson v. Blaukat*,
   453 F.3d 1108 (8th Cir. 2006) ...................................................................................11

*JRT v. TCBY Sys.*,
   52 F.3d 734 (8th Cir. 1995) .......................................................................................11

*Kass v. Kass*,
   696 N.E.2d 174 (1998)...............................................................................................12

*Keitel v. E\*TRADE Fin. Corp.*,
   61 N.Y.S.3d 218 (N.Y. App. Div. 2017) ...................................................................26

*Las Pameras De Ossining Restaurant v. Midway Center*,
   968 N.Y.S.2d 529 (N.Y. App. Div. 2013) .................................................................14

*Learning Care Grp. v. Armetta*,
   No. 13-CV-1540, 2014 U.S. Dist. LEXIS 140132 (D. Conn. Sept. 30,
   2014) ..........................................................................................................................33

*In re Lehman Bros.*,
   Nos. 11 Civ. 6052, 11 Civ. 6053, 2012 U.S. Dist. LEXIS 158022
   (S.D.N.Y. June 5, 2012) ...................................................................... 12, 19

*Lockheed Martin Transp. Sec. Sols. v. MTA Capital Constr.*,
   Nos. 09 Civ. 4077, 09 Civ. 6033, 2014 U.S. Dist. LEXIS 131395
   (S.D.N.Y. Sep. 16, 2014) ............................................................................ 25

*Mellon Bank v. United Bank*,
   31 F.3d 113 (2d Cir. 1994) .................................................................. 11, 13

*Metro Funding Corp. v. Westbl AG*,
   No. 10 Civ. 1382, 2010 U.S Dist. LEXIS 26680 (S.D.N.Y. 2010) ............................ 33

*Miller v. Solem*,
   728 F.2d 1020 (8th Cir. 1984) ..................................................................... 11

*Minskoff v. Am. Exp. Travel Related Servs.*,
   98 F.3d 703 (2d Cir. 1996) .......................................................................... 31

*Motorola Mobility v. ITC*,
   553 Fed. Appx. 971 (Fed. Cir. 2014) ............................................................ 20

*MVP Health Plan v. Optuminsight*,
   No. 1:13-CV-1578, 2016 U.S. Dist. LEXIS 189263 (N.D.N.Y. Sept. 30,
   2016) ......................................................................................................... 24

*Nycal v. Inoco PLC*,
   988 F. Supp. 296 (S.D.N.Y. 1997) ............................................................... 13

*O'Connor v. Collins*,
   147 N.E. 65 (N.Y. 1925) .............................................................................. 27

*PBTC Int'l Bank v. Amsteel Int'l*,
   No. 88-3940, 1991 U.S. Dist. LEXIS 7023 (S.D.N.Y. May 22, 1991) ...................... 31

*Peck v. Peck*,
   649 N.Y.S.2d 22 (N.Y. App. Div. 1996) ....................................................... 27

*Pink Supply v. Hiebert, Inc.*
   788 F.2d 1313 (8th Cir. 1986) ..................................................................... 11

*Reyes v. Metromedia Software*,
   840 F. Supp. 2d 752 (S.D.N.Y. 2012) .......................................................... 11

*Ruttenberg v. Davidge Data Sys.*,
   626 N.Y.S.2d 174 (N.Y. App. Div. 1995) ................................................... 12

*Rybovich Boat Works v. Atkins*,
   587 So. 2d 519 (Fla. Dist. Ct. App. 1991) ................................................ 26

*Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*,
   601 F.3d 1159 (11th Cir. 2010) ................................................................ 26

*Towers Charter & Marine v. Cadillac Ins.*,
   894 F.2d 516 (2d Cir. 1990)....................................................................... 24

*Travelers Cas. & Sur. v. Dormitory Auth.*,
   735 F. Supp. 2d 42 (S.D.N.Y. 2010).......................................................... 27

*U.S. Bank v. Lightstone Holdings*,
   960 N.Y.S.2d 18 (N.Y. App. Div. 2013) ................................................... 12

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic*,
   No. 13-1686, 2017 U.S. Dist. LEXIS 222471 (D. Minn. Oct. 12, 2017) ..................... 8

*Weeks Marine v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*,
   No. 08 Civ. 9878, 2011 U.S. Dist. LEXIS 95358 (S.D.N.Y. Aug. 24,
   2011) .......................................................................................................... 25

*Well Luck v. F.C. Gerlach & Co.*,
   421 F. Supp. 2d 553 (E.D.N.Y. 2005) ....................................................... 12

*Werking v. Amity Estates*,
   2 N.Y.2d 43 (N.Y. 1956) ............................................................... 27, 28, 33

*World Fuel Servs. v. SE Shipping Lines Pte Ltd.*,
   No. 10-4605, 2011 U.S. Dist. LEXIS 129295 (E.D. La. Nov. 8, 2011) ..................... 26

*World Trade Center Props. v. Hartford Fire Ins.*,
   345 F.3d 154 (2d Cir. 2003)....................................................................... 19

*ZBD Constructors v. Billings Generation*,
   No. 09 Civ. 6667, 2011 U.S. Dist. LEXIS 40433 (S.D.N.Y. Mar. 25,
   2011) .................................................................................................. 25, 26

## Other Authorities

Fed. R. Civ. P. 8(c)(1) ...................................................................................... 33

Fed. R. Civ. P. 12(b)........................................................................................ 33

Fed. R. Civ. P. 15(a) ............................................................................................ 33

Fed. R. Civ. P. 30(b)(6) ......................................................................................... 8

Fed. R. Civ. P. 56(a) ............................................................................................ 11

I.      **Introduction**

Fair Isaac Corporation ("FICO") respectfully moves for summary judgment finding Federal Insurance Company ("Federal") liable for breach of contract. The undisputed facts prove breach of Paragraphs 3.1, 10.8, and 9.3 of the 2006 Blaze Advisor Software License and Maintenance Agreement ("Agreement") between FICO and Chubb & Son, an unincorporated division of Federal. Contract construction is a matter of law. The facts proving each violation of the Agreement are undisputed. Federal is liable for breach of the Agreement.[1]

II.     **The terms of the Agreement**

A.      <u>**FICO and Chubb & Son, a division of Federal, are the parties to the Agreement.**</u>

The Agreement derived from FICO's response to a Request for Information ("RFI") from "Chubb and Son, a Division of Federal Insurance Company, for itself and as servicer for the Chubb Corporation and its non-insurance company subsidiaries, or as manager of its insurance company subsidiaries." (Declaration of Allen Hinderaker ("Decl."), Ex. 1.) Chubb & Son is an unincorporated division of Federal[2]. (Dkt. 137, ¶3.)

---

[1] Issues remaining for trial include damages resulting from the breach of contract, copyright infringement, damages and disgorgement of profits attributable to the infringement, and injunctive relief.

[2] Chubb & Son, Inc., a New York corporation, was the original defendant. The parties stipulated that the proper defendant is Federal. (Dkt. 33.) The Court issued an Order substituting Federal as the defendant February 1, 2017. (Dkt. 35.)

The Chubb Corporation was a holding company for several, separately organized property and casualty insurance companies.  (Decl., Ex. 2 at 4.)  Federal was the principal property and casualty insurance company of the Chubb Corporation.  (*Id.*)  The division Chubb & Son was, as stated in the RFI, a manager of Chubb Corporation insurance company subsidiaries.  (Decl., Ex 3.)  Chubb & Son provided, among other things, day-to-day management and operating personnel for various property and casualty insurance companies, including Federal and its wholly owned subsidiaries.  (Decl., Ex. 2 at 3-4.)

Chubb & Son issued its RFI regarding Blaze Advisor because a "key strategic initiative" for the Specialty Line of insurance products was "expanding and growing the business into mid-market and smaller accounts."  (Decl., Ex. 1 at 5.)  Blaze Advisor automates business decisions, and Chubb & Son knew automated decision-making was necessary to facilitate the higher volume of transactions required by the mid-market, while also freeing time of its underwriters to focus on higher value opportunities.  (Decl., Ex. 4, 24:20-25, 25:1-17.)

The parties signed the Agreement on June 30, 2006.  (Decl., Ex. 5.)  "Client" is a defined term meaning "Chubb & Son, a division of Federal Insurance Company."  (*Id.*) (Decl., Ex. 6, 94:20-22.)  Chubb & Son licensed the right to use Blaze Advisor in connection with one named application known as CSI Express, an underwriting and automated policy renewal application.  (Decl., Ex. 5.)

On August 1, 2006, the parties signed Amendment One.  (*Id.*)  The meaning of "Client" did not change.  Chubb & Son exercised its option to convert the Agreement to a

Divisional license "for use solely by the Chubb Specialty Lines Division … ." (Decl., Ex. 5.)

On December 28, 2006, the parties signed Amendment Two. (*Id.*) Again, the "Client" was Chubb & Son. The license scope increased to "Enterprise-Wide." The use rights granted Chubb & Son extended to the Commercial and Personal Lines as well as the Specialty Line. (*Id.*)

**B.** **Paragraph 3.1 of the Agreement imposed license restrictions: Blaze Advisor could be used only for the internal business purposes of Chubb & Son, by Chubb & Son employees, and only in a manner that did not exceed the scope of the license grant.**

Paragraph 3.1 states in pertinent part:

3.1 <u>License Restrictions</u>.   Client represents and warrants that it and its employees shall not (i) use the Fair Isaac Products or Documentation for any purpose other than the internal business operations of Client or in any manner that exceeds the scope of any license granted under this Agreement or that otherwise constitutes a breach of this Agreement; * * * (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products by, any third party or by any individuals other than employees of Client; (v) … transfer or distribute the Fair Isaac Products … .

(1) **The license grant restricted the installation and physical location of Blaze Advisor to the United States and license restrictions prohibited transfer or distribution.**

Chubb & Son represented and warranted by Paragraph 3.1 that it would not use Blaze Advisor "in any manner that exceeds the scope of any license granted under this Agreement." It further represented and warranted that it would not "(v) … transfer or distribute the Fair Isaac Products."

The Agreement, as the preamble states, "describes the terms and conditions under which Fair Isaac shall provide to Client the Blaze Advisor products and related

3

maintenance services described below."  "Territory" is a term in Section 1 Definitions: "The following terms, as used in this Agreement … will have the meanings set forth below."  "'Territory', with respect to installation and physical location of the Fair Isaac Products, means the United States."  (Decl., Ex. 5.)

The license grant, Paragraph 2.1, states: "Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client … ."  The license grant is subject to the term "Territory":  The installation and physical location of Blaze Advisor used by Chubb & Son must be in the United States.  Neither Amendment changed the territorial restriction.  The grant of enterprise-wide rights of Amendment Two is expressly "subject to and in accordance with all of the provisions of the Agreement." (*Id.*)

In negotiation, FICO first proposed its standard-form Blaze Advisor license agreement.  (Decl., Ex. 7, 32-33; Ex. 8.)  It states that "Territory" "means the United States of America" and expressly references the territorial limitation in the license grant of Paragraph 2.1 by including the phrase, "but only within the Territory … ."  (*Id.*) Chubb & Son countered seeking worldwide rights: "Territory" means ~~the United States of America~~ World-wide.  (Decl., Ex. 9.)

FICO rejected a grant of worldwide rights and proposed a provision permitting Chubb & Son to use Blaze Advisor to benefit business operations outside the United States so long as the installation and physical location of the software was in the United States.  FICO modified the term "Territory" to address more than geography.  FICO proposed and Chubb & Son agreed: "Territory, with respect to the installation and

physical location of the Fair Isaac Products, means the United States of America."
(Decl., Ex. 7, 73:1-23; Ex. 10.)  The parties also modified the grant of use rights in
Paragraph 2.1, omitting the phrase "but only within the Territory," and keeping "[s]ubject
to the terms, conditions and limitations of this Agreement."  (*Id.*)

Chubb & Son's license to use "for its internal business purposes" under Paragraph
2.1 was without a geographical limitation so long as the "installation and physical
location of the Fair Isaac Products" was in the United States.  (*Id.*)  Discussed below, it is
undisputed that Chubb & Son transferred and distributed Blaze Advisor for installation
outside the United States.

> (2)   **The Agreement restricts use of Blaze Advisor to Chubb & Son
> employees and prohibits, except for one express exception, use
> and access by third parties.**

Chubb & Son represented and warranted by Paragraph 3.1 that it would not
"(iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac
Products by, any third party or by any individuals other than the employees of Client."
The Agreement makes one exception in Paragraph 3.6, granting ACS Commercial
Solutions, Inc., to whom Chubb & Son had outsourced its information technology
infrastructure operations, rights to use.  (Decl., Ex. 5.)  The provision concludes, "The
rights granted to ACS herein shall not be extended to any other third party without the
prior express written consent of Fair Isaac."  (*Id.*)

Discussed below, it is undisputed that persons not employees of Chubb & Son and
two third-party consultants used and accessed Blaze Advisor.

C.     **Paragraph 10.8 requires FICO's consent to continued use of Blaze Advisor should Chubb & Son undergo a change of control by merger or acquisition: an event deemed to be an assignment under the Agreement.**

Paragraph 10.8 of the Agreement states in pertinent part:

10.8 <u>No Assignment</u>.  Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof.  In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld. Any attempt to assign or transfer all or any part of this Agreement without first obtaining such written consent will be void and of no force or effect.  * * * *

Should the Client undergo a change of control through acquisition, merger, or otherwise, the entity with whom FICO chose to license is not the same.  The basis of the original bargain has changed, and the basis for pricing the original license may have changed as well.  Bill Waid, FICO's General Manager of Decision Management Software, explains: "[T]he value of our software must be revisited … . We valued our software and we priced our software on the revenues of the entity that we do business with, that has changed."  (Decl., Ex. 11, 155:24-156:3; Decl., Ex. 12, 27:14-22.)

Revenue is a proxy for the value of the software to the licensee.  Again, Mr. Waid explained: "The enterprise agreement provides for the use of Blaze Advisor in sort of an unrestricted fashion … . The measure of that value to an organization … is a function of many things, but our sole metric is revenue."  (Decl., Ex. 11, 152:12-19.)

6

Paragraph 10.8 of the Agreement preserves FICO's right to control the distribution of its copyrighted software, choose with whom it licenses, and maintain the principle on which its software is valued.  A change of control or acquisition of the Client is "deemed to be an assignment subject to this section," which requires "prior written consent."  If FICO's prior consent to continued use of Blaze Advisor is not requested, Paragraph 10.8 provides "and Client shall make no expanded use of the Fair Isaac Products … unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld."

Discussed below, it is undisputed the ownership of Federal changed – necessarily changing the ownership of its division Chubb & Son – because of a January 2016 merger between ACE Limited and the Chubb Corporation.  It is also undisputed that FICO's terms for consent to the continued use of Blaze Advisor were rejected. Defendants continue to use Blaze Advisor without FICO's consent.

> **D.**     **Paragraph 9.3 requires cessation of use of Blaze Advisor upon termination of the Agreement.**

Paragraph 9.3 details the consequences of termination:

> Effect of Termination.   Upon … termination of this Agreement for any reason, all licenses granted hereunder shall terminate immediately, all support and maintenance obligations shall cease, Client shall immediately cease using all Fair Isaac Product(s) and related documentation * * * *

Discussed below, it is undisputed that FICO terminated the Agreement effective March 31, 2016; yet Defendants continue to use Blaze Advisor.

III.    **Breach of the Agreement is factually undisputed.**

    A.    <u>**Blaze Advisor was transferred, distributed, and installed outside the United States.**</u>

Chubb & Son transferred, distributed, and disclosed Blaze Advisor for installation outside the United States.  In binding 30(b)(6) testimony, Henry Mirolyuz, Senior Systems Architect, admits Blaze Advisor was distributed and then installed on servers in the United Kingdom and Canada.  (Decl., Ex. 13, 26:3-24, 27:11-19.)[3]  He further admits the Blaze Advisor installations in the United Kingdom and Canada supported business applications used in connection with the sale of insurance in Europe and Canada.  (*Id.* 30:2-9, 31:2-14.)

Richard Johnson, an Analyst Developer at Chubb Insurance Europe, wrote to Mr. Mirolyuz on May 26, 2009, requesting access to Chubb & Son's Blaze Advisor files. (Decl., Ex.13, 33:6-10; Ex. 14.)  The same day, Mr. Mirolyuz provided Chubb Insurance Europe with the installation instructions for "Blase [sic] Advisor 6.7."  (Decl., Ex. 15.) Mr. Mirolyuz confirmed on May 28, 2009, that Chubb Insurance Europe had successfully downloaded Blaze Advisor.  (Decl., Ex. 14.)  Chubb Insurance of Canada installed Blaze Advisor in December 2010.  (Decl., Ex. 16.)  Mr. Zhang, Senior IT Architect, confirmed installation of Blaze Advisor in Canada by email on December 6, 2010.  (Decl., Ex. 17.) The installation of Blaze Advisor outside the United States is undisputed.

---

[3] Rule 30(b)(6) testimony is "binding on the organization".  *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic*, No. 13-1686, 2017 U.S. Dist. LEXIS 222471, at *18 (D. Minn. Oct. 12, 2017).

**B.** **Persons not employees of Chubb & Son and third party consultants used and accessed Blaze Advisor.**

Defendants admit Chubb Insurance Company of Europe SE, Chubb Insurance Company of Canada, and Chubb Insurance Company of Australia Limited "made use of Blaze Advisor® software." (Decl., Ex. 18 at 4-6.) Each of these insurance companies was wholly owned by Federal; their employees were not employees of Chubb & Son.

Federal also admits that third party consultants to these companies, AppCentric and DWS Group, used and accessed Blaze Advisor. (Decl., Ex. 19 at 2-3.) AppCentric is an IT vendor that provided services to Chubb Insurance of Canada to develop the business application Evolution. (Decl., Ex. 13, 72:15-25; Ex. 19 at 2-3.) Evolution uses Blaze Advisor. (Decl., Ex. 20, 21.) AppCentric's work continued into 2015-2016, expanding to include design and development of Evolution for Chubb Insurance Australia. (Decl., Ex. 22 at 3.)

DWS Group worked with Chubb Insurance Australia and AppCentric to design and develop Evolution for Australia. (Decl., Ex. 23.) In early 2016, DWS Group took control of the Evolution for Australia project to, among other things, "Replace/Modify the Blaze business rules for CAZ [Canada] to fit APZ's [Australia] business rules requirements." (Decl., Ex. 24.)

**C.** **Federal and its division Chubb & Son were acquired and underwent a change of control in January 2016 and continued using Blaze Advisor without FICO consent.**

The Chubb Corporation wholly owned Federal and its division Chubb & Son before January 15, 2016. (Decl., Ex. 18 at 2-3.) Effective January 15, 2016, Federal and

its division Chubb & Son were acquired and underwent a change of control. ACE INA Holdings, Inc. became the parent of Federal. (*Id.*) ACE INA Holdings, Inc. was a wholly owned subsidiary of ACE Limited. (*Id.*) Following merger, the Chubb Corporation (the former parent of Federal and its division Chubb & Son) ceased to exist (*id.*) and ACE Limited changed its name to Chubb Limited. (*Id.*)

It is undisputed that FICO's prior written consent to the event "deemed to be an assignment subject to this section" under Paragraph 10.8 was not requested. FICO gave notice of breach on January 27, 2016, closing by saying "FICO is willing to entertain a business resolution of the matter within the next thirty (30) days." (Decl., Ex. 25.) The parties' negotiations were unsuccessful. FICO's final offer of March 22, 2016, was rejected. (Decl., Ex. 26.)

### D.    Defendants continue using Blaze Advisor after termination of the Agreement.

Following rejection of FICO's final offer, FICO terminated the Agreement by letter dated March 30, 2016, the termination effective the next day, March 31, 2016. (Decl., Ex. 27.) FICO stated:

> Please take further notice of the provisions of Section 9.3 of the Agreement. As noted in my January 27, 2016, letter, FICO considers New Chubb's current use, and any future use, of the software as a breach of the Agreement and willful infringement of all applicable intellectual property rights … ."

(*Id.*) Federal admits it continued using Blaze Advisor on and after termination of the Agreement. (Decl., Ex. 28 at 2.)

IV.   **Argument**

Summary judgment is proper when "the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The "evidence and all fair inferences from it must be viewed in the light most favorable to the non-moving party... ." *Johnson v. Blaukat*, 453 F.3d 1108, 1112 (8th Cir. 2006).

The opposition cannot rely on argument or re-allegation. *JRT v. TCBY Sys.*, 52 F.3d 734, 737 (8th Cir. 1995).  Inadmissible hearsay is equally unavailing.  The party opposing summary judgment must show that admissible evidence will be available at trial to establish a genuine issue of material fact. *See Pink Supply v. Hiebert, Inc.¸* 788 F.2d 1313, 1319 (8th Cir. 1986); *Miller v. Solem*, 728 F.2d 1020, 1026 (8th Cir. 1984).

Summary judgment is proper when the contract language at issue is unambiguous, and the acts or omissions constituting breach are undisputed.  *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch*, 232 F.3d 153, 157 (2d Cir. 2000); *GSAA Home Equity Trust 2006-2 v. Wells Fargo Bank*, 133 F. Supp. 3d 1203, 1220 (D.S.D. 2015).

A.   <u>**New York law of contract construction.**</u>

New York law governs the Agreement. (Decl., Ex. 5.)  Whether the language of a contract is clear or ambiguous is a question of law to be decided by the court.  *Mellon Bank v. United Bank*, 31 F.3d 113, 115 (2d Cir. 1994).  A contract provision is not ambiguous simply because the parties disagree over its construction or urge alternative interpretations.  *Reyes v. Metromedia Software*, 840 F. Supp. 2d 752, 755 (S.D.N.Y.

2012); *Hunt Ltd. v. Lifschultz Fast Freight*, 889 F.2d 1274, 1277 (2d Cir. 1989).  The

Court's primary objective in interpreting a contract is to give effect to the intent of the

parties when they entered into the contract as revealed by the language of their

agreement.  *See In re Lehman Bros.*, Nos. 11 Civ. 6052, 11 Civ. 6053, 2012 U.S. Dist.

LEXIS 158022, at *34 (S.D.N.Y. June 5, 2012); se*e also Gary Friedrich Enter. v. Marvel

Characters*, 716 F.3d 302, 313 (2d Cir. 2013) ("When interpreting a contract [under New

York law], the intention of the parties should control, and the best evidence of intent is

the contract itself.").  Contract construction is a legal question.  *Well Luck v. F.C.

Gerlach & Co.*, 421 F. Supp. 2d 553, 539 (E.D.N.Y. 2005).

To give effect to the parties' intent, the Court must consider the contract as a

whole.  Examination of the entire contract safeguards against an interpretation that would

render any individual provision superfluous.  *Global Funding Grp. v. 133 Community

Road*, 251 F. Supp. 3d 527 (E.D.N.Y. 2017).  The Court must give meaning to all the

terms and provisions.  *U.S. Bank v. Lightstone Holdings*, 960 N.Y.S.2d 18, at 19 (N.Y.

App. Div. 2013).  It is improper to construe contract language as meaningless if it can be

made effective by any reasonable construction of the contract.  *JA Apparel v. Abboud*,

568 F.3d 390, 407, no. 4 (2d Cir. 2009); *Ruttenberg v. Davidge Data Sys.*, 626 N.Y.S.2d

174, 177 (N.Y. App. Div. 1995).

Parol evidence cannot create ambiguity.  *In re Lehman Bros. Inc.*, 2012 U.S. Dist.

LEXIS 158022, at *35-36 n.17; *Kass v. Kass*, 696 N.E.2d 174, 180 (1998) ("Ambiguity

is determined by looking within the four corners of the document, not to outside

sources.")  Yet, the Court may look to parol evidence and resolve ambiguity as a matter

of law when "the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary." *3Com Corp. v. Banco do Brasil*, 171 F.3d 739, 746–47 (2d Cir.1999) (internal quotation marks omitted); *Nycal v. Inoco PLC*, 988 F. Supp. 296, 299, n.9–11 (S.D.N.Y. 1997) (collecting cases)*.* Similarly, summary judgment is warranted when the non-moving party fails to show any relevant, admissible evidence supporting that party's interpretation. *See Mellon Bank*, 31 F.3d at 116; *see also Borkan v. Quest Med.*, No. 95-10381, 1996 U.S. Dist. LEXIS 11207, at *9 (S.D.N.Y. Aug. 7, 1996). When "extrinsic evidence of the parties' intent is not available, then contractual ambiguity presents not an issue of fact, but an issue of law for the court to rule on." *CDR-Wantagh v. Shell Oil*, No. 07-CV-4497, 2011 U.S. Dist. LEXIS 146396, at *30-31 (E.D.N.Y. Dec. 20, 2011) (quoting *Gallien v. Conn. Gen. Life Ins.*, 49 F.3d 878, 884 (2d Cir. 1995).

### B.     Federal breached Paragraph 3.1 because Blaze Advisor was installed and physically located outside the United States.

As detailed in Section II.B.1, Chubb & Son represented and warranted in Paragraph 3.1 that it would not exceed the scope of the license grant under the Agreement, and it would not transfer or distribute Blaze Advisor. Territory is one of the terms of the Agreement; it restricts the installation and physical location of Blaze Advisor to the United States. It is undisputed that Chubb & Son distributed Blaze Advisor for installation at Chubb Insurance of Europe SE, Chubb Insurance Company of Canada, and Chubb Insurance Company of Australia Limited. *See* Section III.A. Summary judgment is warranted.

13

(1)    **Federal contends the term Territory is meaningless.**

Defendants contend the term Territory is meaningless because the phrase "but only within the Territory" is absent from Paragraph 2.1. They assert the license grant is without geographic limitation, ignoring that "Territory" is a term and that Paragraph 2.1 is "[s]ubject to the terms, conditions, and limitations of this Agreement."

The issue for decision is one of law. It is a cardinal rule of contract construction that no portion of a contract should be meaningless. *Diamond Castle Partners IV PRC v. IAC/InterActivecorp*, 918 N.Y.S.2d 73, 75 (N.Y. App. Div. 2011). All provisions should have force and effect. *Las Pameras De Ossining Restaurant v. Midway Center*, 968 N.Y.S.2d 529, 532 (N.Y. App. Div. 2013).

The exchange of drafts leading to the signed Agreement is undisputed. *See* Section II.B.1. FICO rejected Chubb & Son's request for global rights. Jandeen Boone, FICO's contract lawyer engaged in drafting the Agreement explained: "Territory" addressed installation and physical location, not usage. (Decl., Ex. 7, 74:12-14.) Removing the phrase "but only within the Territory" did not change the meaning of Paragraph 2.1 because "the License Grant is subject to the terms and conditions of the agreement … thereby incorporating the Territory. So, again, I think it's just a different way of saying it." (Decl., Ex. 7, 77:1-6.) Ms. Boone explained:

Q. So, in your view, there's no geographical limitation for the use of Blaze?

A. For the use, no. For the installation and the physical location, yes. It has to be here in the United States.

(*Id.* 121:16-20.)

Contract construction is for the Court.  The meaning of "Territory" is not ambiguous.  The issue for decision is to give the term "Territory" full force and effect. The term is not meaningless because the phrase "but only within the Territory" is not expressly in Paragraph 2.1.  Paragraph 2.1 is subject to the terms of the Agreement.

Furthermore, while parol evidence cannot create ambiguity, all parol evidence confirms that FICO rejected Chubb & Son's request for global rights.  No extrinsic evidence supports Defendants' contention.  Under the Agreement, Chubb & Son (through its employees) could use Blaze Advisor to support business operations outside the United States so long as the installation and physical location of Blaze Advisor was in the United States.

> (2)     **Federal contends Amendment Two changes the territorial restriction.**

Amendment Two did not amend the territorial restriction of the Agreement.  It expanded the license scope to the enterprise of Chubb & Son, a division of Federal. Chubb & Son was no longer limited to using Blaze Advisor solely within the Specialty Lines Division, the scope of Amendment One.  It could use Blaze Advisor to the full scope of its enterprise, including Commercial and Personal Lines.

The grant of the enterprise-wide license to Chubb & Son was expressly "subject to and in accordance with all of the provisions of the Agreement."  (Decl., Ex. 5.)  The Miscellaneous provision further states: "Except as expressly amended by this Amendment Two, the provisions of the Agreement continue in full force and effect." Amendment Two did not change the Territorial term of the Agreement.  (*Id*.)

(3)    **Federal contends Amendment Two permits the non-US installations of Blaze Advisor because those companies are "affiliates."**

Amendment Two states: "Client and its Affiliates may use the Fair Isaac Product for their internal business purposes … subject to and in accordance with all of the provisions of the Agreement."  "Affiliates" means another entity "directly or indirectly controlled by Client."  (*Id.*)  As Chubb & Son's Vice President of Vendor Management and Sourcing testified: "Affiliates" in Amendment Two are "the other entities that sat underneath Chubb & Son, a division of Federal, I'm not exactly sure what all – who all of them were."  (Decl., Ex. 6, 95:1-6.)

There were none.  Chubb & Son is an unincorporated division of Federal.  (Dkt. 137, ¶3.)  It is not a legal entity.  It is incapable of having "affiliates."

Chubb Insurance Company of Europe SE, Chubb Insurance Company of Canada, and Chubb Insurance Company of Australia were each wholly owned subsidiaries of Federal before the change of control and acquisition of January 2016.  Federal is not the Client under the Agreement.  It is impossible to give the affiliate language of Amendment Two meaning, because Amendment Two is with Chubb & Son, an unincorporated division of Federal.

Defendants' "affiliates" contention is also irrelevant.  Amendment Two did not amend the territorial restriction of the Agreement.  If Chubb & Son could have affiliates permitted to use Blaze Advisor, the installation and physical location must be in the United States.

16

The territorial restriction must be given full force and effect. The breach of that restriction is undisputed. FICO is entitled to summary judgment of liability for breach of Paragraph 3.1.

C. **Federal breached Paragraph 3.1 because persons not employees of Chubb & Son and unauthorized third party consultants were permitted use and access of Blaze Advisor.**

As detailed in Section II.B.2, Chubb & Son represented and warranted in Paragraph 3.1 that it would not disclose or permit use or access of Blaze Advisor to any individual not an employee of Chubb & Son or to any third party. It is undisputed that persons not employees of Chubb & Son used and accessed Blaze Advisor. It is also undisputed that third party consultants to Chubb Insurance Canada and Chubb Insurance Australia accessed and used Blaze Advisor. *See* Section III.B.

The Agreement is unambiguous. The License Grant, Paragraph 2.1, is to Chubb & Son "for its internal business purposes … ." The License to Documentation, Paragraph 2.2, is for "its internal business purposes … ." Chubb & Son represented and warranted under Paragraph 3.1 that its use was for no purpose but "the internal business operations of Client" and that no third party and no individual other than a Chubb & Son employee will be permitted "use or access." The clarity of the prohibition against use and access by anyone not an employee of Chubb & Son or by any third party is underscored by the fact the parties carved out a single express exception for third party use, Paragraph 3.6.

The facts are undisputed. Employees of Federal foreign subsidiaries were not Chubb & Son employees. AppCentric and DWS Group were unauthorized third-party

17

users of Blaze Advisor.  FICO is entitled to summary judgment of liability of breach of

Paragraph 3.1 for this second reason.

**D.**    **Federal breached Paragraph 10.8 using Blaze Advisor without FICO's consent.**

As detailed in Section II.C., Paragraph 10.8 preserves FICO's right to choose with

whom it licenses and protects the integrity of its pricing of enterprise licenses.  It is

undisputed that FICO's final terms to consent to continued use of Blaze Advisor were

rejected.  It is also undisputed the Defendants continue using Blaze Advisor following

termination of the Agreement.  *See* Sections III.C. and D.  Summary judgment is

warranted.

**(1)**    **Federal contends FICO's consent is required only if Blaze Advisor use is expanded.**

The issue for decision is one of law: the meaning of Paragraph 10.8.  It is

undisputed the merger of ACE Limited and Chubb Corporation resulted in new

ownership of Federal.  Chubb & Son underwent the same change of ownership – it being

an unincorporated part of Federal.  It is also undisputed that FICO did not consent to the

continued use of Blaze Advisor following this event deemed to be an assignment.

Federal ignores the full body of the paragraph and contends one phrase ("and

Client shall make no expanded use of the Fair Isaac Products as a result of  any such

event unless and until Fair Isaac provides such written consent") means FICO's consent

is not required if use is not expanded.  Federal seeks to re-write Paragraph 10.8 to create

an exception to the required consent.  (Dkt. 137, ¶10.)

Paragraph 10.8 must be considered in its entirety, giving meaning to each word and phrase.  When the plain meaning of a word lends itself to one reasonable interpretation that interpretation controls.  *In re Lehman Bros.*, 2012 U.S. Dist. LEXIS 158022, at *34; *Crane Co. v. Coltec Indus.*, 171 F.3d 733, 737 (2d Cir. 1999).  None of the words or phrases should be rendered superfluous.  *See* Section IV.A.  Additionally, the Court's construction must consider the commercial context, including the purpose the provision is intended to serve.  *Empire Props. v. Manufacturers Trust*, 43 N.E.2d 25, 28 (N.Y. 1942).  The Court should not adapt an interpretation that produces an absurd result. *World Trade Center Props. v. Hartford Fire Ins.*, 345 F.3d 154, 184 (2d Cir. 2003).

Federal's contention violates each of these rules of contract construction. Moreover, Blaze Advisor use did expand.  Blaze Advisor is used in connection with insurance sales of legacy ACE Limited companies, and legacy ACE Limited underwriters use Commercial Underwriting Workstation, a business application that uses Blaze Advisor, in support of those sales.

### a.    *The proper construction of Paragraph 10.8*

The first sentence of Paragraph 10.8 states:

> Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof.

The meaning is clear.  The second sentence has two parts.  The first part states:

> In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, <u>each such event</u> shall be deemed to be an assignment <u>subject to this section</u> … .

(Emphasis added).  The meaning is clear.  A change of control or acquisition is deemed an assignment.  Each deemed assignment, "each such event," is "subject to this section" requiring the prior written consent of the first sentence.  Defendants' contention that consent is only required if use is expanded renders the first sentence and "subject to this section" of the second sentence meaningless.

The second part of the second sentence, upon which the whole of Defendants' contention rests, states:

> … and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent … . (Emphasis added).

The meaning is clear.  The two parts of the second sentence are connected by the conjunctive "and."  The conjunctive "and" joins two elements of equal grammatical value; each element must be given full force and effect.  *Cf. Motorola Mobility v. ITC*, 553 Fed. Appx. 971, 975 (Fed. Cir. 2014).  "And" must be given its plain meaning.  Defendants' contention renders "such written consent" meaningless and the first sentence to which "such" refers meaningless.

The third sentence states:

> Any attempt to assign or transfer all or any part of this Agreement without first obtaining such written consent will be void and of no force or effect.

(Emphasis added).  The meaning is clear.  Defendants' contention that consent is only required if Blaze Advisor use expands renders the third sentence and its reference to such written consent of the first sentence meaningless as well.

20

Paragraph 10.8 is fundamental to FICO's right to choose with whom it licenses Blaze Advisor and the integrity of its pricing for enterprise licenses. The extrinsic evidence of the commercial purpose of Paragraph 10.8 is undisputed. FICO prices its enterprise license "looking at the entity as a whole, we look at the entire revenue of the entity, and that becomes the foundational basis for the license pricing." (Decl., Ex. 11, 38:5-9.) The extent Blaze Advisor is used over the perpetual life of the license is irrelevant to enterprise pricing. The "sole metric [for pricing] is revenue." (*Id.* 152:12-19.) Defendants' contention flies in the face of the purpose of the provision.

The commercial purpose of the second part of the second sentence of Paragraph 10.8 is also undisputed. Ms. Boone explained:

> Well, from a commercial attorney perspective, when you have an M&A deal, whenever you're looking at material contracts as part of the due diligence, most of them have some kind of assignment provision, sometimes they require consent, sometimes they don't. But the M&A attorneys really don't ever let consent get in the way of the deal closing, so they don't wait around for prior written consent of the other parties who are in contracts with the entity that's being acquired or that's merging.

> So once the deal closes, it's kind of the commercial attorney's jobs usually, at least in my experience, to clean up all of this consent that – all the consents that are required for assignment. So while that's happening, there's a negotiation going on with the other parties to the contracts that are requiring consent, and while that's happening the client is allowed to continue to use the software, in this instance, within the scope of its license. But if no resolution happens and no consent is given, then the agreement terminates.

(Decl., Ex. 7, 42:2-24.) Defendants agree. One of their retained experts, Steven Kursh, relies on Ms. Boone's testimony to confirm the commercial context: "the commercial attorney's job is to get consent for assignment after M&A finishes getting the deal closed." (Dkt. 374 at 33 ¶97.) The second part of the second sentence maintains the

status quo during consent negotiations.  Expanded use is not a precondition.  No extrinsic evidence supports Federal's contention.

Defendants re-writing to say, "except that FICO's consent shall not be required if Client does not expand use of the Fair Isaac Products as a result of any such event" produces an absurd result.  The re-writing conflicts with the words and phrases of the Paragraph in its full context and defeats the commercial purpose of the provision.  There is no admissible evidence to support Defendants' interpretation, requiring the entry of summary judgment even if the provision was ambiguous.  *Borkan*, 1996 U.S. Dist. LEXIS 11207, at *9 ("If all the extrinsic evidence supports a single interpretation, the court may grant summary judgment for the party advocating the interpretation, almost as if the language had been unambiguous in the first place.").

### b.       *Defendants expanded their use of Blaze Advisor.*

Discovery revealed Federal started planning integration of the technologies of the legacy companies before the merger's effective date.  The draft Specialty Lines System Integration Roadmap dated September 2015 is one example of planning to expand the use of Blaze Advisor in the new post-merger entity.  (Decl., Ex. 29.)  Expanded use of Blaze Advisor to support legacy ACE Limited underwriters, Phase 1 of CUW-IM Support for ACE Processing, was underway by January 12, 2016.  (Decl., Ex. 30.) Phase 1 leveraged the efficiencies of [Chubb's] centralized processing model "and expand it to include ACE business."  This required "the use of [Chubb's] CUW Inventory Management (CUW-IM) system," a business application that uses Blaze Advisor.  (*Id.*; Decl., Ex. 19 at 6-8.)

Phase 2 of this integration was underway by April 2016.  (Decl., Ex. 31.)

Defendants also admit Blaze Advisor was used in connection with insurance policies

sold by legacy ACE Limited insurance companies beginning in 2016, including ACE

American Insurance Co., ACE Fire Underwriters Ins., and ACE Property and Casualty.

(Decl., Ex. 32.)

Yet, this expanded use of Blaze Advisor is irrelevant to the proper construction of

Paragraph 10.8: FICO's prior written consent was required, and the status quo

maintained during negotiations for consent.  Defendants' continued use of Blaze

Advisor without FICO's consent breaches Paragraph 10.8.  FICO is entitled to summary

judgment.

### E.  <u>Defendants are in breach of Paragraph 9.3</u>

Federal's breach of Paragraph 3.1 is breach of the "terms of the licenses granted in

this Agreement" invoking the right to "immediately terminate this Agreement" under

Paragraph 9.2(c).  Federal's breach of Paragraph 10.8 is breach of a "material term[] of

this Agreement" invoking the right to terminate the Agreement absent cure within 30

days under Paragraph 9.2(a).

FICO gave notice of breach with the opportunity to cure on January 27, 2016.

(Decl., Ex. 25.)  The 30-day cure period was extended to permit further negotiations.

FICO gave written notice of termination of the Agreement March 30, 2016.  (Decl., Ex.

27.)

Defendants use Blaze Advisor today in breach of Paragraph 9.3, which provides,

among other things: "Client shall immediately cease using all Fair Isaac Product(s) and

related documentation … ." FICO is entitled to summary judgment of liability for breach of Paragraph 9.3.

**F.      Defendants' affirmative defenses of waiver and estoppel should be stricken as a matter of law.**

Defendants assert FICO waived its right to enforce the territorial restriction of the Agreement or is estopped from doing so. The waiver and estoppel defenses have no bearing on Federal's breach of Paragraph 3.1 for permitting persons not employees of Chubb & Son and unauthorized third parties use and access to Blaze Advisor, or breach of Paragraph 10.8 for the continued use of Blaze Advisor without consent.

The waiver and estoppel defenses fail as a matter of law. They are expressly foreclosed by the Agreement. In addition, the undisputed facts demonstrate the defenses are meritless, apart from the contractual prohibition. There is nothing to submit to the jury.

**(1)      The Agreement has an express no waiver clause: waiver fails as a matter of law.**

Paragraph 10.4 of the Agreement states:

> No Waiver. No delay or omission by either party to exercise any right or power with respect to any of the terms or conditions of this Agreement will impair any right or power or be construed to be a waiver thereof. A waiver by either party of any of the terms and conditions of this Agreement will not be construed to be a waiver of any other term or condition of this Agreement. No waiver of any rights of a party under this Agreement will be effective unless set forth in writing by such party.

New York law enforces contractual provisions prohibiting waiver absent a writing signed by the parties. *MVP Health Plan  v. Optuminsight*, No. 1:13-CV-1578, 2016 U.S. Dist. LEXIS 189263, at *23-25 (N.D.N.Y. Sept. 30, 2016); *Towers Charter & Marine v.*

24

*Cadillac Ins.*, 894 F.2d 516, 521-22 (2d Cir. 1990).  Defendants wrongly contend, discussed below, that actions of FICO sales employees waived FICO's rights.  Accepting Federal's contention does not change the result.  Where an agreement contains a no-waiver provision, "a party's failure to insist upon strict compliance is not considered a waiver of his right to demand exact compliance."  *Fin. Techs. Int'l v. Smith*, 247 F. Supp. 2d 397, 407 (S.D.N.Y. 2002); *see also Lockheed Martin Transp. Sec. Sols. v. MTA Capital Constr.*, Nos. 09 Civ 4077, 09 Civ. 6033, 2014 U.S. Dist. LEXIS 131395, at *72-73 (S.D.N.Y. Sep. 16, 2014).  Any other outcome renders Paragraph 10.4 meaningless.  Federal's waiver defense fails as a matter of law.

(2)   <strong>The Agreement forecloses estoppel as a matter of law.</strong>

Paragraph 10.4, quoted above, includes both a "no waiver provision" and the requirement that a waiver must be in writing to be effective.  Paragraph 10.5 includes both an integration provision and the requirement that an amendment to the Agreement must be in writing.  Paragraph 10.5 states in pertinent part:

> <u>Entire Agreement</u>.  This  Agreement  constitutes  the  full  and  entire understanding and agreement between the parties with regard to the subject matter hereof * * * Any other terms or conditions or amendment shall not be incorporated herein or be binding upon any party unless expressly agreed to in writing signed by authorized representatives of Client and Fair Isaac.

These contractual provisions "bar[] the assertion of an estoppel claim."  *Weeks Marine v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, No. 08 Civ. 9878, 2011 U.S. Dist. LEXIS 95358, at *36-37 (S.D.N.Y. Aug. 24, 2011).

"No waiver" and "amendments only in writing" provisions bar estoppel claims for the same reason they bar the defense of waiver.  *ZBD Constructors v. Billings*

25

*Generation*, No. 09 Civ. 6667, 2011 U.S. Dist. LEXIS 40433, at *22-26 (S.D.N.Y. Mar.

25, 2011).  As a matter of law, reliance on the words or conduct of FICO salespersons in

light of these provisions of the Agreement is unreasonable.  *World Fuel Servs. v. SE*

*Shipping Lines Pte Ltd.*, No. 10-4605, 2011 U.S. Dist. LEXIS 129295, at *16-17 (E.D.

La. Nov. 8, 2011) ("Thus, SESL could not reasonably rely on any verbal "waiver" … .

Thus, the doctrine of equitable estoppel is unavailable to SESL."); *Sacred Heart Health*

*Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1182 (11th Cir. 2010)

(quoting *Rybovich Boat Works v. Atkins*, 587 So. 2d 519, 522 (Fla. Dist. Ct. App. 1991))

("[T]he 'buyer's affirmative defenses of waiver and estoppel were defeated as a matter of

law by the provisions of the contract itself.'").

(3)   <strong>Factually, waiver fails as a matter of law.</strong>

Waiver "requires proof of an intentional relinquishment of a known right with

both knowledge of its existence and an intention to relinquish it." *ZBD Constructors*,

2011 U.S. Dist. LEXIS 40433, at *23.  New York law requires waiver to be

"unmistakably manifested" and not "inferred from a doubtful or equivocal act." *Keitel v.*

*E\*TRADE Fin. Corp.*, 61 N.Y.S.3d 218, 219 (N.Y. App. Div. 2017)

There is no evidence of any communication or statement from FICO to Federal, or

its division Chubb & Son, waiving the territorial restriction of the Agreement. *See*

*Ferraro v. Janis*, 880 N.Y.S.2d 201, 203 (2009) (waiver requires "a clear manifestation

of intent to relinquish a contractual protection" and "such an intent is not to be inferred

from mere silence.") (internal citations omitted).

The only evidence is internal communications between FICO salespersons expressing an erroneous understanding of the territorial scope of the Agreement, which they later discovered was wrong.  None of these salespersons had authority to waive FICO contract rights, had they communicated their misunderstanding to Defendants.  The defense fails as a matter of law.

> ### a.  A mistaken understanding that the Agreement granted global rights cannot waive the territorial restriction of the Agreement.

Waiver of contractual rights cannot result from mistake, negligence, oversight, or thoughtlessness; waiver is not inferred from mere silence.  *Travelers Cas. & Sur. v. Dormitory Auth.*, 735 F. Supp. 2d 42, 66 (S.D.N.Y. 2010); *Peck v. Peck*, 649 N.Y.S.2d 22, 23 (N.Y. App. Div. 1996); *O'Connor v. Collins*, 147 N.E. 65, 66 (N.Y. 1925).  The sole basis for Defendants' waiver defense is the mistaken belief (later corrected) of three FICO salespersons, Russell Schreiber, Michael Sawyer, and Oliver Clark, that the Agreement granted global rights.  Because each was mistaken about the territorial restriction, they could not intentionally relinquish an unknown contractual right.  *See Werking v. Amity Estates*, 2 N.Y.2d 43, 52 (N.Y. 1956) (finding no waiver where the plaintiff had no knowledge of the right he was charged with having knowingly and intentionally relinquished.)

Mr. Schreiber understood the Agreement "was very much U.S. focused."  (Decl., Ex. 4, 35:4).  Nevertheless, in an internal FICO email dated March 26, 2015, to his London colleagues, including Oliver Clark, he said: "Chubb has global ela for blaze but

no simulator." (Decl., Ex. 33)  When presented with the internal email, Mr. Schreiber

testified:

> A. I was mistaken.  I didn't do my homework and pull up the contracts and look at it.  Someone said.
>
> Q. Okay.  So you assumed it was global?
>
> A. Yeah.
>
> Q. Okay.  And that was the first time you assumed it was global?
>
> A. Yeah.  In fact I'm surprised I assumed it was global ever. * * *

(Decl., Ex. 4, 215:5-15.)

Mr. Schreiber was clear FICO never "said to Chubb, go ahead and use it in

Europe." (*Id.* 139:11-14, 138:18-23.)  He was equally clear that "I never, ever told

Chubb it was global." (*Id.* 35:25-36:2.)

Mike Sawyer mistakenly described the Agreement as "a Global ELA" in an

internal FICO email dated August 14, 2012.  (Decl., Ex. 34.)  He had no recollection of

reviewing the Agreement before sending the email.  (Decl., Ex. 35, 102:306, 102:19-

103:5.)

Oliver Clark was a pre-sales consultant, working with other FICO salespersons to

develop new business.  (Decl., Ex. 36, 13:15-18, 19:2-7.)  In 2013, he assisted sales

efforts with Chubb Europe, working with Ewen Setti.  (Decl., Ex. 36, 50:2-16.)  Mr.

Setti told Mr. Clark by email dated 12 September 2013: "We're using a global Blaze

Advisor license, which is maintained by our colleagues in Chubb in the U.S." (Decl.,

Ex. 37).  Mr. Clark confirmed Chubb Europe told him it "had a global license for Blaze

Advisor and that they were in contact with the team in the US to manage that." (Decl., Ex. 36, 51:4-7.)

Mr. Clark verified that understanding internally with FICO colleagues. (*Id*. 51:17-20.) He did not personally review the Agreement, having received the same (mistaken) information from Chubb and his FICO colleagues. (*Id*. 52:13-18, 54:21-55:9.) He testified: "The usage of a system was implied by Ewen [Chubb Europe] that it was already in place in Europe, and I made no interpretation of the license, but I was taking what the client had said in good faith and I saw no reason to question their interpretation of the agreement." (*Id*. 56:12-16.) Mr. Clark's misunderstanding of the territorial scope of the Agreement, based exclusively on what he was told by others, is just that: a mistaken understanding.

> ### b.   *When the mistaken understanding of global rights was corrected, the intention was to enforce the territorial restriction.*

At some point, the documents suggest Mr. Schreiber was aware of Blaze Advisor use in Europe. (Decl., Ex. 4, 185:9-12.) ("It looks like I did. I may have.") He was clear that "I certainly didn't get asked and I certainly didn't say, go ahead." (Decl., Ex. 4, 185:13-14.) It is equally clear he had no intention to waive FICO contract rights. Enforcement of the contractual provision would be at the appropriate time. (*Id*. 141:15-17) ("It's possible I knew that they had some small use and didn't hold them to the letter of the law for a moment.").)

After his email of August 2012, Mr. Sawyer "became aware of a potential contract compliance issue of my new understanding of the actual language of the agreement[.]"

(Decl., Ex. 35, 109:24-110:3, 198:21-199:9.)  Mr. Sawyer had reviewed the Agreement

and he "realized the territory clause within the original software license agreement."  (*Id.*

38:12-22.)  He escalated the issue to Mr. Schreiber – his boss.  (*Id.* 110:5-8.)  He made

"Russ aware that … despite how things have been operating previously, that I did not

think that was in compliance with our license agreement." (*Id.* 43:3-6.)  Mr. Schreiber

said, "there would be a proper place and time to address that potential license

compliance issue." (*Id.* 98:8-9.)  When the mistaken understanding was discovered, the

intention was to enforce, not waive, FICO's contractual rights.

### c.     *None of the salespersons had authority to waive FICO's contractual rights.*

Messrs. Schreiber, Sawyer, and Clark did not have authority to waive FICO's

contractual right to restrict Blaze Advisor installation to the United States had they

known of that right (correctly understood the Agreement) and intended to do so.   Persons

allegedly waiving contract rights must have actual authority or apparent authority to

waive those rights. *Commerce Funding v. Comprehensive Habilitation Servs.*, No. 01

Civ. 3796, 2005 U.S. Dist. LEXIS 2832, at *62-68 (S.D.N.Y. Feb. 24, 2005).

It is undisputed that Messrs. Schreiber, Sawyer, and Clark did not have authority

to waive FICO's contract rights.  Thomas Carretta, FICO's Vice President of Legal and

Deputy General Counsel, testified: "Mr. Schreiber is not one of those who have the

authority to bind the company.  That's limited to a very small group of people."  (Decl.,

Ex. 38, 104:1-3.)  He further testified "Mike [Sawyer] doesn't have authority, none of the

salespeople have authority to say go run off and do something different[.]  (*Id.* 47:3-5.)

30

Apparent authority requires proof the principal FICO, by its words or deeds, caused Federal to reasonably believe authority to waive contract rights was extended to its agents, Schreiber, Sawyer, or Clark. *Minskoff v. Am. Exp. Travel Related Servs.*, 98 F.3d 703, 708 (2d Cir. 1996). There is no evidence FICO held out any of these salespersons as having authority to waive contract rights.

> (4) **Factually, estoppel fails as a matter of law: there is nothing to submit to the jury.**

Estoppel requires proof of (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The party asserting estoppel must show with respect to itself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in its position. *PBTC Int'l Bank v. Amsteel Int'l*, No. 88-3940, 1991 U.S. Dist. LEXIS 7023, at *19-21 (S.D.N.Y. May 22, 1991).

> a. ***Federal installed Blaze Advisor outside the United States on its own accord, not in reliance on FICO.***

On June 25, 2008, Tamra Pawloski, Chubb & Son Global Strategic Sourcing, advised her colleagues the Agreement "is <u>not</u> a worldwide license." (Decl., Ex. 6, 90:10-13; Ex. 41 (emphasis original).) The next year by email dated May 21, 2009, she advised her colleagues otherwise, saying the Agreement is "a worldwide enterprise license." (Decl., Ex. 39.) On May 26, 2009, Mr. Mirolyuz of Chubb & Son sent Richard Johnson of Chubb Europe a link to download Blaze Advisor 6.7. (Decl., Ex. 15.) On May 28, 2009, he confirmed the download was successful. (Decl., Ex. 14.) Chubb Europe was

ready to go live with its Blaze Advisor application on September 8, 2009. ("We have implemented (due to go live at the start of October) the first set of rules and are very happy with the ease of using Blaze.") (Decl., Ex. 40.)

Chubb & Son distributed Blaze Advisor for installation at Chubb Europe by Chubb Europe accessing a Chubb & Son internal link.  (Decl., Ex. 13, 35:24-36:19.)[4] Chubb & Son installed Blaze Advisor in Europe relying on its own mistaken understanding the Agreement was worldwide.  There is no evidence upon which a jury could find reliance on FICO assurances the Agreement granted global rights before the installation of Blaze Advisor in Europe.  The estoppel defense fails as a matter of law.

> ### b.  *The mistaken belief of global rights is not a knowingly false representation.*

As detailed in Section F.3.a, three FICO salespersons mistakenly believed between 2012 and 2015 the Agreement was global in scope.  A mistaken understanding by definition is not a knowingly false representation – the "true facts" of the territorial restriction are unknown.  Equally dispositive, there is no evidence anyone from FICO told Chubb & Son the Agreement was global in scope.  The misunderstanding of the FICO salespersons was an internal discussion.  "To constitute estoppel the person sought to be estopped must do some act or make some admission with an intention of influencing the conduct of another…the other party, too, must have acted upon the

---

[4]Any technical assistance from FICO in installation resulted from Chubb & Son or Chubb Europe contacting the FICO help desk. (Decl., Ex. 42, 30:19-31:02.)  There is no evidence help desk technicians intentionally relinquished a known right, made a knowingly false statement about the territorial scope of the Agreement, or had authority waive or modify any term of the Agreement.

strength of such admission or conduct." *Werking*, 2 N.Y.2d 43 at 53 (internal citations omitted).  The necessary proof that FICO made a knowingly false statement is absent.  The estoppel defense fails as a matter of law.

### c.   *The FICO salespersons did not have actual or apparent authority to modify the agreement.*

As with waiver, "a corporation can only be estopped when the actions in question have been induced by a duly authorized agent." *Learning Care Grp. v. Armetta*, No. 13-CV-1540, 2014 U.S. Dist. LEXIS 140132, at *36 (D. Conn. Sept. 30, 2014).  As detailed in Section F.3.c., Messrs. Schreiber, Sawyer, and Clark did not have actual or apparent authority to orally modify the Agreement.

### (5)   **Affirmative defenses not asserted are waived.**

Defendants may assert "course of dealing" when arguing the waiver and estoppel defenses.  "Course of dealing" is not asserted as a separate defense.  The defense is waived. *John R. Sand & Gravel v. United States*, 552 U.S. 130, 133 (2008) (observing that an affirmative defense is a defense that "the defendant must raise at the pleadings stage and that is subject to rules of forfeiture and waiver") (citing Fed. R. Civ. P. 8(c)(1), 12(b), 15(a)); *Dollar v. Smithway Motor Xpress*, 710 F.3d 798, 807 (8th Cir. 2013).

The "course of dealing" contention fails as a matter of law because Paragraph 10.5 of the Agreement provides that no other terms shall be binding "unless expressly agreed to in a writing signed by the [parties]."  Defendants have no evidence of a writing altering the terms of the Agreement. *See Metro Funding Corp. v. Westbl AG*, No. 10 Civ. 1382, 2010 U.S Dist. LEXIS 26680, at *66 (S.D.N.Y. 2010).

33

Factually, proof of oral modification of a contract must include all the elements necessary to form a contract, including valid consideration. *Baraliu v. Vinya Capital, L.P.*, 765 F. Supp. 2d 289, 298 (S.D.N.Y. 2011); *Cohan v. Movtady*, 751 F. Supp. 2d 436, 442 (E.D.N.Y. 2010). There is no evidence of an oral modification of the Agreement to submit to the jury.

### G.  Defendants' counterclaims should be dismissed.

Defendants plead two counterclaims. Count One is entitled "Breach of Contract." Count Two is entitled "Breach of Implied Covenant of Good Faith and Fair Dealing." Count One must be dismissed for all the reasons FICO is entitled to summary judgment. FICO's termination of the Agreement was not a breach. Count Two is based on the same factual allegations as Count One. It fails for the same reasons.

Count Two also fails because it does not state a claim under New York law. A party who asserts breach of contract is foreclosed from further asserting breach of implied duties. *Harris v. Provident Life & Accident Ins.*, 310 F.3d 73, 81 (2d Cir. 2002). A claim for breach of implied duties is redundant to a breach of contract claim and must be dismissed. *Alessi Equip. v. Am. Piledriving Equip.*, No. 18-3976, 2019 U.S. Dist. LEXIS 26866, at *9 (S.D.N.Y. Feb. 20, 2019).

## V.  Conclusion.

For the reasons stated, FICO respectfully requests summary judgment that Federal is liable for breach of Paragraphs 3.1, 10.8, and 9.3 of the Agreement and requests the Court strike the affirmative defenses of waiver and estoppel.

Dated: July 26, 2019

MERCHANT & GOULD P.C.

/s/ Allen Hinderaker
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2215
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com

Attorneys for Plaintiff FICO