# EXHIBIT 3
# (Redacted)

## (Previously Filed Under Seal as DI 401-1)

1360043

**MASTER SERVICES AGREEMENT**

This Master Services Agreement ("**Agreement**") is made by and between Chubb & Son, a division of Federal Insurance Company, an Indiana corporation, for tself and as servicer for The Chubb Corporation and its non-insurance company subsidiaries, and as manager of its insurance company subsidiaries ("**Chubb**") having its principal office at 15 Mountain View Road, Warren, New Jersey, 07059, and Fair Isaac Corporation ("**Fair Isaac**") having an office at 1901 Marquette Avenue, Suite 3200, Minneapolis, MN 55402.

In consideration of the mutual promises made by Chubb and Fair Isaac and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Scope of Services.**

   a. Chubb hereby retains the services of Fair Isaac and Fair Isaac hereby agrees to provide services as described in each mutually agreed upon work order ("**Statement of Work**"), which may be entered into from time to time and which shall be incorporated herein and attached as an Appendix A to this Agreement ("**Services**"). Each Statement of Work entered hereunder shall be sequentially numbered as Appendix A-"X" (for example, the first statement of work shall be identified as Appendix A-1 and the second statement of work, if any, shall be identified as Appendix A-2). Chubb has entered this Agreement on the basis of the knowledge, experience, abilities, and qualifications of Fair Isaac.. Fair Isaac shall perform the Services in a prompt, diligent and professional manner and in accordance with performance or service requirements, set forth herein. Fair Isaac's Representatives (as defined below) will observe Chubb's working and security rules while on Chubb property provided such working and security rules are provided to Fair Isaac's Representatives prior to the commencement of Services..

   b. The service and performance requirements set forth in the applicable Statement of Work can be modified only upon mutual agreement of the parties.

2. **Service Rates: Expenses.**

   a. Chubb agrees to pay Fair Isaac, in exchange for Services rendered, a fee in accordance with the applicable Statement of Work.

   b. Prices do not include reasonable travel and associated out-of-pocket expenses incurred by Fair Isaac in connection with this Agreement, which Chubb agrees to reimburse at Fair Isaac's actual cost. Expenses shall be subject to Chubb's travel and expense policy, which is attached hereto as Exhibit 1. Chubb shall not be liable to Fair Isaac for any other expenses paid or incurred by Fair Isaac unless otherwise agreed to in writing signed by a duly authorized representative of Chubb.

   c. Charges under this Agreement are stated exclusive of any applicable taxes, and Chubb will be solely responsible for, and shall pay or reimburse Fair Isaac for, all taxes. Fair Isaac shall promptly remit to the appropriate tax authority all taxes collected from Chubb on account of Chubb's tax obligations, if any, and Fair Isaac shall indemnify Chubb against any and all losses, costs, and expenses (including reasonable attorneys' fees) which result from Fair Isaac's violations of its obligations under this Section. If Fair Isaac receives a refund of any such taxes attributable to amounts paid under this Agreement by Chubb, Fair Isaac shall pay such refunded amount to Chubb within 30 days of its receipt.

   d. Unless otherwise expressly stated in the respective Statement of Work, Fair Isaac shall not be entitled to payment of, and Chubb shall not be obligated to pay for, Services that are first billed for in an invoice that is received by Chubb more than one hundred and eighty (180) days after the date on which the Services for which payment is sought was rendered.

3. **Service Payment and Expense Reimbursement.**

   a. Chubb will pay Fair Isaac within the greater of (a) forty-five (45) days of the invoice date or (b) thirty (30) days of Chubb's actual receipt of the invoice, for Services rendered and the reimbursable

EXHIBIT 363

PENGAD 800-631-6989

expenses incurred in connection with such Services. All amounts are payable in US Dollars in accordance with the instructions provided in the invoice or other instructions provided by Fair Isaac.

b. Chubb may, at its option and without prior notice and during normal business hours, audit Fair Isaac's records related to the invoices issued pursuant to Section 3.a., above. Fair Isaac shall keep sufficient records at its principal place of business to allow Chubb to audit the invoices, which records will be maintained for twenty-four (24) months from the date of creation. Chubb acknowledges that it and its employees, subcontractors or agents may, in the course of conducting an audit, be exposed to information which is confidential or proprietary to Fair Isaac. Chubb agrees to treat all of Fair Isaac's Confidential Information as confidential information, maintaining such information in strict confidence, using at least the same level of care that Chubb uses to avoid unauthorized use or disclosure of its own most confidential information that it did not wish to become public. For purposes of this Section, "Fair Isaac's Confidential Information" is that information belonging to, or in the possession or control of, Fair Isaac that has been clearly labeled by Fair Isaac as confidential or that under the circumstances ought to be reasonably identifiable as confidential.

4. <u>Term.</u> This Agreement shall be deemed effective as of **<u>August 17th, 2009 ("Effective Date")</u>**, regardless of the date on which it is actually signed by both parties, and shall continue until terminated pursuant to Section 10. The terms of this Agreement shall remain in full force and effect both during the continuation of the Services or Fair Isaac's association with Chubb and after the termination of such Services or association for any reason.

5. **<u>Independent Contractor Relationship.</u>**

a. The relationship between Chubb and Fair Isaac shall be that of an independent contractor. Nothing in the Agreement shall be interpreted or construed as creating, establishing, continuing or re-establishing any employer-employee, partnership, joint venture, or agency relationship.

b. Fair Isaac shall be available to render the Services at such times as Chubb may reasonably request. Fair Isaac shall determine the method, manner and means by which the Services will be performed, and control the sequence of same. However, Fair Isaac shall confer with Chubb regarding Fair Isaac's plans and proposed schedule prior to rendering the Services.

c. Neither party is an agent of the other party and is not authorized, and shall have no authority, to make any representation, contract or commitment on behalf of the other party, or otherwise bind the other party in any respect whatsoever.

d. Fair Isaac shall not be entitled, and shall inform all Fair Isaac's officers, directors, members, owners, employees, representatives and agents that they are not entitled, to any benefits Chubb may make available to its employees, such as, by way of example but not limitation, group insurance, profit-sharing or retirement benefits, in connection with the Services, the relationship established by the Agreement, or any payments made hereunder. However, the Agreement shall not limit, restrict, enlarge or otherwise affect any compensation earned or retirement benefits to which Fair Isaac or any officer, director, member, owner, employee, representative or agent of Fair Isaac may be entitled from, through or on behalf of Chubb of which such person vested as of or prior to the Effective Date.

e. SUPPLIER DOES NOT REASONABLY ANTICIPATE THAT ANY OFFICER, DIRECTOR, MEMBER, OWNER, EMPLOYEE, REPRESENTATIVE OR AGENT OF SUPPLIER PREVIOUSLY EMPLOYED BY CHUBB WILL PROVIDE SERVICES IN AN AMOUNT THAT WILL EXCEED 49% OF THE AVERAGE LEVEL OF BONA FIDE SERVICES PERFORMED OVER THE 36-MONTH PERIOD OF SUCH PERSON'S PRIOR EMPLOYMENT WITH CHUBB PRECEDING THE EFFECTIVE DATE (the **"Services Ceiling"**). SUPPLIER SHALL ADVISE SUCH PERSONS THAT HE OR SHE SHALL BE SOLELY RESPONSIBLE FOR ANY TAXES, FINES, INTEREST OR PENALTIES (**"Assessments"**) IMPOSED UPON, RELATED TO OR ARISING FROM THE SERVICES PERFORMED BY SUCH PERSON EXCEEDING THE SERVICES CEILING, INCLUDING ANY ASSESSMENTS UNDER SECTION 409A OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED.

f. Fair Isaac shall be solely responsible for all income tax returns (and all costs related thereto) that are required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of the Services and receipt of fees hereunder.

g. Chubb shall not withhold or make payments for social security, make unemployment insurance or disability insurance contributions, or obtain worker's compensation insurance in connection with any payments made to Fair Isaac.

h. Fair Isaac shall comply, and shall accept exclusive liability for non-compliance, with all applicable federal, state and local laws, rules and regulations, including obligations such as payment of all taxes, social security, disability and other contributions based on or in connection with fees paid under this Agreement.

i. Without limiting Fair Isaac's other obligations hereunder, Fair Isaac shall indemnify, hold harmless and defend Chubb against any and all liabilities, taxes or contributions, including penalties, fines and interest, in connection with any non-compliance, with all applicable federal, state and local laws, rules and regulations, including obligations such as payment of all taxes, social security, disability and other contributions based on fees paid under the Agreement.

j. Fair Isaac reserves the right to determine which of its personnel will be assigned to perform the Services and to replace or reassign such personnel during the term hereof. However, should Chubb have a concern about any Fair Isaac personnel performing the Services, those concerns should be brought to the attention of the Fair Isaac Project Manager, and Fair Isaac will make commercially reasonable efforts to remedy the situation to Chubb's satisfaction.

k. Fair Isaac shall take appropriate measures to ensure that its employees, and agents or subcontractors under this subsection, who perform Services are competent (and, when legally required, fully licensed) to do so, and that they observe the provisions of the Confidential Information; Non-Disclosure obligations set forth in Section 0 below. None of the Services under this Agreement shall be provided by anyone other than Fair Isaac's own employees, unless Fair Isaac first obtains the prior written consent of Chubb and, unless otherwise authorized in writing by Chubb, all work performed in connection with the Services are to be performed within the United States of America.

6. <u>**Background Check.**</u>

a. Unless and to the extent prohibited by applicable law or inconsistent with Fair Isaac's standard hiring practices, prior to allowing a Fair Isaac Representative to perform any part of the Services, Fair Isaac will ensure that the background checks described below ("**Background Checks**") have been performed for that Fair Isaac Representative no more than one year before that person(s) first performs any part of the Services.

i. U.S. citizenship and immigration check (All employees must be either United States citizens or have one of the documents currently accepted by the U.S. Citizenship and Immigration Services ("**USCIS**") or its predecessors as proof of employment eligibility);

ii. Office of Foreign Access Control Specially Designated Nationals List ("**OFAC SDN List**") check;

iii. social security number (or local equivalent in the relevant jurisdiction(s)) verification;

iv. criminal felony and misdemeanor check (or local equivalent in the relevant jurisdiction) (last 7 years multi-county and multi-state);

v. reference/education/prior employment check; and

b. Fair Isaac shall not allow any person to perform any part of the Services if the Background Checks indicate that:

i. the person is not a U.S. Citizen or does not have one of the documents currently accepted by USCIS as proof of employment eligibility;

ii. the person is listed on the OFAC SDN List;

iii. the person has supplied a name and social security number that do not match;

iv. the person has been found to have engaged in criminal acts that involve fraud, dishonesty, breach of trust or bodily injury or constitute a felony (or locally equivalent criminal conduct) under applicable law;

v. there are material discrepancies in references, education or prior employment that Fair Isaac believes or, using reasonable judgment, should believe disqualifies the person from performing all or any part of the Services; or

c. Upon Chubb's reasonable notice to Fair Isaac, not more than once per 12-month period during the term of this Agreement, Fair Isaac shall promptly provide to Chubb a written certification that provides verification that that Fair Isaac is in compliance with the foregoing.

7 <u>Non-Raiding/Non-Disparagement.</u>

a. During this term of the Agreement and for one (1) year after the termination of the Agreement, Chubb and Fair Isaac agree not to offer employment to or solicit the other companies employees or persuade, encourage or induce any such employee (a) to cease his or her employment with their company, (b) to become employed by or affiliated in any capacity with any other person or firm, or (c) to contact or communicate with any such employee(s) for any purpose prohibited by this paragraph ("**Recruits**"; "**Recruiting**"; "**Recruitment**"), without the prior written consent of the other party; provided, however, the foregoing restrictions shall not apply to good faith general advertisements for employment placed on a national or regional basis in newspapers and similar public job postings that do not target any such employee.

b. Neither company, nor any company Representative, shall intentionally make any oral or written statement which disparages, or is reasonably perceived by the other company to disparage, the image or reputation of the other company.

b. Each party acknowledges that any material breach of this Section will cause irreparable injury to the other party for which monetary damages alone would be an inadequate remedy. Therefore, each party shall be entitled to injunctive relief upon any material breach of this Section 7.

d. The foregoing provisions of this Section shall not in any way limit such other remedies as may be available pursuant to the Agreement or at law or in equity, to address any breach thereof.

8. <u>Ownership and Use of Work Product.</u>

a. Ownership of deliverables shall be as stated in each Statement of Work. In the event ownership of deliverables is vested in Fair Isaac, then, upon final payment of all amounts due to Fair Isaac under this Agreement, Fair Isaac grants to Chubb a perpetual, non-transferable, non-sublicensable, non-exclusive license to use, copy, and modify those deliverables that are specifically identified in a Statement of Work as being created for use by Chubb as part of the Services ("**Deliverables**") solely for Chubb's internal business purposes, subject to the terms and conditions of this Agreement. Chubb agrees that it will use such Deliverables only within the scope of the foregoing license. This Agreement does not grant any right or license to any Fair Isaac products other than the Deliverables, it being understood that all rights in the technology and methods used in creating the Deliverables and all other rights are retained by and will remain with Fair Isaac. In no event will Fair Isaac be precluded from providing services for others that are similar to the services or from developing, for itself or for others, materials that are similar to or competitive with the Deliverables. In addition, Fair Isaac will be free to use its general knowledge, skills, and experience, and any ideas, concepts, know-how, and techniques developed by Fair Isaac in connection with the performance of the Services.

b. Also, the underlying and pre-existing intellectual property that went into creation of the deliverables under this Agreement, including all techniques, know-how, and other proprietary information shall remain the sole and exclusive intellectual property of Fair Isaac. Any reference or use of the Fair Isaac name (and associated marks) shall be prohibited without the express written consent of the Head of the Corporate Communications Department at Fair Isaac.

c. Chubb will retain all intellectual property and licensing rights to its pre-existing intellectual property, including any rules, conditions, and custom components provided to the Fair Isaac.

9. **Confidential Information; Non-Disclosure.**

a. In order that each party may perform its obligations under this Agreement, it may be necessary for the other party (**"Discloser"**) to disclose to such party (**"Recipient"**) or its employees or agents certain information and material which may be considered to be sensitive, confidential and/or proprietary information and material of the Discloser, its affiliates, subsidiaries, customers, insureds, agents, directors, officers or employees. Confidential Information, as defined below, shall be deemed confidential and proprietary information belonging to Discloser. In recognition of the foregoing, Recipient covenants and agrees: (a) that Recipient and Recipient Representatives will maintain Confidential Information in strict confidence using appropriate administrative, technical and physical safeguards to protect Confidential Information to avoid its unauthorized use or disclosure; (b) that Recipient will not, directly or indirectly, copy, reproduce, sell, assign, license, market, transfer, or disclose Confidential Information to any third party, or allow any Recipient Representative to do any of the foregoing, without Discloser's prior written consent; (c) that neither Recipient nor any Recipient Representative will make use of Confidential Information except as is reasonably necessary in furtherance of the Purpose, and in no event, will Recipient or any Recipient Representative use Confidential Information for its own purposes or the benefit of anyone or any other entity other than Discloser; (d) that, within 10 business days after Discloser may so request, Recipient will deliver to Discloser or, at Discloser's direction, will destroy all Confidential Information, including memoranda, notes, records, reports, media, other documents, and all copies of the foregoing regarding or containing Confidential Information, which Recipient or any Recipient Representative may then possess or have under its control and shall deliver to Discloser a written certification as to Recipient's compliance with such request; (e) that neither Recipient nor any Recipient Representative will take any action with respect to Confidential Information that is inconsistent with the confidential and proprietary nature of such information; and (f) that, in the event Recipient becomes aware of a potential or actual unauthorized use or disclosure of Confidential Information by Recipient, its employees or any other Recipient Representative, Recipient shall immediately notify and cooperate with Discloser in taking any and all reasonable measures to prevent or minimize such unauthorized use or disclosure of Confidential Information.

b. Recipient shall not disclose Confidential Information, except to Recipient Representatives, in each case, having a bona fide need to know such information in connection with the purpose. Recipient shall instruct each Recipient Representative as to Recipient's obligations under this Agreement, and shall direct such Recipient Representatives to comply with the terms and conditions of this Agreement prior to their being given access to Confidential Information. Recipient acknowledges that it shall remain responsible and liable for the compliance with the terms of this Agreement by Recipient Representatives.

c. For purposes of this Agreement, **"Confidential Information"** shall mean and include any and all information of Discloser, whether in written, oral, electronic, magnetic, photographic, optical, or any other form now existing or created or developed during the term of this Agreement, including, but not limited to, the following: (a) information regarding planned or existing insurance policies, insurance coverage, insurance premiums, insurance endorsements, claims procedures, or other information that describes how insurance activities are administered and managed; (b) information relating to Discloser's planned or existing computer systems, system architecture, computer hardware, computer software, source code, object code, documentation, program libraries, program listings, processing methods, technical processes and operational methods; (c) customer, former customer, applicant and claimant data in any form of any type; (d) customer lists, and sales, profits, pricing, and other financial information; (e) information regarding Discloser's existing or planned sales and marketing activities or strategies; (f) information regarding Discloser's existing or planned organizational restructuring, business affairs, and business initiatives; (g) information regarding Discloser's customers, insureds, former insureds, applicants, claimants, employees, directors and officers; (h) confidential information of a third party licensed to, possessed by, or in the control of Discloser, and which Discloser is or may be obligated to treat as confidential or proprietary; (i) the Purpose and the existence of discussions between Discloser and Recipient regarding the Purpose; and (j) any other information relating to Discloser or its customers, former customers, employees applicants and claimants which is not generally known to the public or within the industries and trades in which Discloser competes or which may otherwise be protected by trade secret or privacy law.

d. Notwithstanding the foregoing, Confidential Information shall not include information that Recipient demonstrates through credible evidence (a) is or becomes generally known to the public, not as a result of an act, omission, or disclosure by Recipient, (b) is known to Recipient prior to the date of disclosure by or on behalf of Discloser and other than as a result of a breach of an obligation of confidentiality with respect to such information, (c) is received by Recipient in good faith and without restriction from a third party who is not under any obligation of confidentiality with respect to such information, or (d) is disclosed pursuant to a court or regulatory order, provided that Recipient promptly notifies Discloser upon receipt of such order (to the extent such notice is not prohibited by law) and reasonably cooperates with Discloser (at Discloser's expense for out-of-pocket costs) in obtaining appropriate protection from the authority issuing the order.

e. As used in this Agreement, each party's "Representative(s)" shall mean directors, officers and employees, affiliates (as such term is defined in Rule 405 of the regulations promulgated under the Securities Act of 1933, as amended) of the party, and legal counsel and independent accountants, in each case, utilized or retained by the party to assist the party in providing or receiving services or performing its obligations in connection with the Purpose. Representatives also may include other third parties (as same may be permitted hereunder), provided that prior to receiving Confidential Information, Discloser shall ensure that each such third party has entered into a confidentiality agreement directly enforceable by Recipient that contains terms and conditions that are at least as protective of the Confidential Information as those specified in this Agreement. Recipient acknowledges that it shall remain responsible and liable for each Recipient Representative's compliance with the terms of any confidentiality agreement entered into by such Recipient Representative.

f. Without limiting any other obligations of Recipient hereunder, Recipient acknowledges that the buying or selling of securities based upon any material, non-public information that may be contained within the Confidential Information would be prohibited and Recipient agrees to advise any Recipient Representative with access to such Confidential Information that they may be subject to certain restrictions and prohibitions in connection with the purchase and/or sale of securities based upon such Information.

g. This Section shall survive the termination of this Agreement.

10. **Termination.**

a. Services under this Agreement shall terminate:

i. upon written notice from either party if the other party (i) becomes insolvent or seeks protection under the Federal Bankruptcy Act or any other state laws relating to insolvency; (ii) makes a general assignment for the benefit of creditors; or (iii) suffers or permits the appointment of a receiver or a trustee for its business or assets.

ii. a party has committed a material breach of this Agreement and has failed to remedy such breach within 30 days after receipt of written notice from the non-breaching party identifying the breach and requiring it to be remedied.

b. Chubb shall be responsible for payment for Services until the effective date of termination.

c. On termination of this Agreement for any reason, each party will promptly deliver to the other party or destroy all Confidential Information of such other party that is in its possession.

11 **Insurance.**

a. General: Throughout the duration of this Agreement, Fair Isaac shall maintain insurance coverages set forth below at or above the minimum amounts and types set forth herein. All insurance coverages will be at the sole expense of Fair Isaac.

b. Required Insurance Coverages and Minimum Limits:

i. Workers Compensation:

(A) Form: Providing coverage to all employees in all states where operations will be performed.

(B) Limit: Statutory Limits.

ii. Employer's Liability:

(A) Form: Including an All States Endorsement.

(B) Limit: $1,000,000 per occurrence.

iii. Commercial General Liability:

(A) Form: Simplified ISO Commercial General Liability Insurance with coverage on a primary, non-contributing, occurrence basis including but not limited to premises operations, medical payments, products/completed operations, personal injury and contractual liability coverage.

(B) Limit: $1,000,000 per occurrence. If the CGL coverage contains a General Aggregate Limit, such General Aggregate shall apply separately to each project.

iv. Automobile:

(A) Form: Business Auto Coverage Form; including all owned, leased, non-owned, and hired automobiles to be used by Fair Isaac.

(B) Limit: Minimum of combined single limit of $1,000,000 each accident for bodily injury and property damage.

v. Excess Umbrella Liability:

(A) Form: Following form basis over, but not limited to, Fair Isaac's Commercial General Liability, Automobile Liability, and Employer's Liability insurance.

(B) Limit: $10,000,000 per occurrence and in the annual aggregate.

vi. Professional Liability (Errors and Omissions):

(A) Form: Covering financial loss sustained by Chubb or a third party due to the rendering or failure to render professional services to Chubb.

(B) Limit: $10,000,000 per occurrence and in the annual aggregate.

vii. Property Insurance:

(A) Form: "Special Form" or all risk-type equivalent - replacement cost property insurance on tools, equipment, and property owned or rented by Fair Isaac used in the performance of any resulting contract, the capital value of which is not included in the cost of the work or service. Such insurance shall include an endorsement providing that Fair Isaac and their insurance underwriter waive rights of subrogation against Chubb.

(B) Limit: Value of assets

c. Insurance Companies: All insurance required herein shall be carried with responsible insurance companies of recognized standing, licensed to do business in the state where operations are to be performed, and have and retain an A.M. Best's Insurer Financial Strength Rating of at least "A-" and be within an A.M. Best's Financial Size Category of at least VII.

d. Evidence of Insurance / Additional Insured Status: Under Fair Isaac's Commercial General Liability, Excess Umbrella Liability, Automobile, and Errors and Omissions policies, the following shall be named by express endorsement as Additional Insureds with respect to liability arising out of the Services, including liability within the products-completed operations hazard:

The Chubb Corporation,
its subsidiaries, affiliates, and assigns
15 Mountain View Road
Warren, New Jersey 07059.

i. Fair Isaac's Commercial General Liability Insurance policy shall include form CG 24 04, Waiver of Transfer of Rights of Recovery Against Others To Us, with the above additional insureds appearing in the form's schedule.

ii. Fair Isaac will deliver to Chubb certificates of insurance as evidence of the insurance and limits stipulated herein, with provisions for not less than thirty (30) days prior written notice

to Chubb in the event of material alteration or cancellation of such insurance. In addition to the above, such certificates of insurance shall 1) have attached to them the Additional Insured endorsement and the CG 24 04 naming the above additional insureds, 2) will be in dollar amounts at or above the amounts as specified herein, and 3) shall specify the location of the operations. Fair Isaac shall subsequently provide Chubb with certificates of insurance for renewals of such policies. Coverage provided to the additional insureds by Fair Isaac will be primary, and not excess over or contributing with any insurance maintained by the additional insureds. All deductibles shall be at the sole cost and expense of Fair Isaac.

iii. In the event that Fair Isaac fails to furnish such requested Certificates of Insurance or fails to maintain such insurance during the term of the Agreement, Chubb shall have the right to terminate this Agreement or any specific Statement of Work or withhold any or all payments until Fair Isaac has complied with all of the Insurance Requirements.

e. Non-limitation of Insurance. It is understood that the above required insurance represent minimum insurance requirements and may not be all the types of insurance normally carried by contractors/vendors in similar operation or size as Fair Isaac for their commercial activities and Chubb offers no comment on the sufficiency of same for Fair Isaac. Therefore, compliance with the type and minimum limits of insurance stipulated in this Agreement will not, in itself, be construed to be a limitation of liability of Fair Isaac. All insurance required of Fair Isaac will be primary, and not excess over or contributing with any insurance maintained by Chubb.

f. Contravention of Insurance. Fair Isaac will not intentionally do, allow or permit anything to be done on, in or to the Services that will affect, impair or contravene any policies of insurance that may be carried on the operations or any part thereof, or the use thereof, against loss, damage or destruction by fire, casualty, public liability, or otherwise.

g. Waiver of Subrogation. Fair Isaac shall be responsible for insuring its own personal property used in the performance of the operations defined. To the fullest extent permitted by applicable law, Fair Isaac agrees to look solely to its insurers, and does hereby release and waive any and all rights it has now, or may have in the future, to recover against Chubb, or any of its respective trustees, beneficiaries, general or limited partners, directors, officers, agents, servants, subsidiaries, affiliates or employees (collectively, the "Releasees") for loss or damage to personal property, and for claims of injury to, or death of, employees of Fair Isaac in any way relating to or resulting from the work performed or to be performed under or in connection with any resulting contract, including claims for contribution, indemnity or reimbursement of worker's compensation benefits. Fair Isaac hereby agrees that its insurers (and the insurers of any subcontractors) shall waive all rights of subrogation with respect to claims against the Releasees arising out of the Services. Chubb does not assume any liability of any nature or kind for bodily injuries or property damages, or any other damages, arising out of Fair Isaac's performance of the operations in connection with any resulting contract.

h. Subcontractors: All subcontractor(s) or supplementary provider(s) of any tier of Fair Isaac retained by Fair Isaac shall also be bound by all the Insurance Requirements otherwise applicable to Fair Isaac. Should the subcontractor(s) or supplementary provider(s) insurance not apply for any reason, Fair Isaac's insurance shall take the place of such subcontractor's insurance and become primary at no cost to Chubb. Fair Isaac shall be responsible for obtaining appropriate insurance certificates from any subcontractor(s) or supplementary provider(s) of any tier contracted in connection with the operations included under any resulting contract.

12. **Indemnity**

a. Each party, at its own expense, shall indemnify, and hold harmless the other party and its parents, affiliates, subsidiaries and their directors, officers, employees, agents, successors, and assigns, and defend any action brought against such other party with respect to any claim, demand, cause of action, debt, liability, or expense, including attorney's and expert witness fees and court and settlement costs, due to third party claims for bodily injury or damage to tangible personal property to the extent caused by the fault or negligence of the indemnifying party in its performance under this Agreement.

b. Fair Isaac, at its own expense, shall indemnify, and hold harmless Chubb and its directors, officers, employees, agents, successors, and assigns, and defend any action brought against a Chubb to the extent that the action is based upon a claim that a Fair Isaac Deliverable provided by or developed by Fair Isaac under this Agreement directly infringes ay U.S. registered copyright or misappropriates any trade secret recognized as such under the Uniform Trade Secrets Act, and Fair Isaac will pay those

costs and damages finally awarded against Chubb in any such action that is specifically attributable to such claim or those costs and damages agreed to in a monetary settlement of such action. Notwithstanding the foregoing Fair Isaac shall have no obligation with respect to any infringement or misappropriation claim to the extent that a claim is caused by any deliverables or other materials provided by Chubb or any adherence by Fair Isaac to any directions, specifications, suggestions or other input by Chubb.

c. Fair Isaac shall, at its own expense and option shall either (a) procure for Chubb a license to use such Deliverable, or any part thereof; (b) modify such Deliverable, or any part thereof, so that it does not infringe on any third party's rights; provided, however, that such modifications shall not prevent such Deliverable, , or any part thereof, from performing its document and specified functions; and/or (c) provide Chubb with substitute or replacement deliverable, or any part thereof, and a right to use the same, provided that replacement deliverable, or any part thereof, will (alone or in combination with that portion of the Deliverable, which is not subject to the infringement or misappropriation claim), perform the documented and specified functions of the Deliverable. In the event that Fair Isaac is unable to accomplish (a), (b) or (c) above, Fair Isaac will refund all of the monies paid by Chubb in connection with the infringing Deliverable, or infringing part thereof, under the applicable Statement of Work.

d. The indemnifying party shall have the option to assume control of such defense. In addition, the indemnified party agrees to: (a) promptly notify the indemnifying party in writing of each claim for which indemnification is sought hereunder, and (b) cooperate with the indemnifying party at the indemnifying party's expense in connection with the defense or settlement of each such claim. The indemnifying party shall also allow the indemnified party the right of free association during such defense, and shall keep the indemnified party adequately informed of all developments and strategies related to such defense.

13. **Governing Law.**

The Agreement shall be governed by, subject to, enforced and interpreted in accordance with the laws of the State of New Jersey, applicable to agreements made entirely within that State, including the remedies available for breach hereof, without regard to its conflict of laws principle. Fair Isaac and Chubb expressly exclude the application of the United Nations Convention on Contracts for the International Sale of Goods, if otherwise applicable.

a. Performance Compliance. In rendering the Services, Fair Isaac shall comply with all applicable laws, regulations, rules, ordinances or other requirements imposed by all governing authorities in the relevant jurisdiction(s) with jurisdiction over Fair Isaac for said Services, if any.

14. **Interpretation.**

Each party has had the opportunity to seek the advice of counsel of that party's own choosing regarding this Agreement. As such, the language of this Agreement is not to be presumptively interpreted in favor of or against either of the parties based upon that party being responsible for the drafting of same. The word "includes" and its syntactical variants means "includes, but is not limited to" and corresponding syntactical variant expressions. Unless the context clearly requires, the word, "or" is not exclusive. As used in this Agreement, the singular or the plural (even if the singular or plural version of a defined term is involved), shall be deemed to include the others wherever and whenever the context so requires.

15. **Warranty.**

Fair Isaac warrants that (i) it will perform the Services as described in each Statement of Work in a professional and workmanlike manner in accordance with generally acceptable industry practices; and (ii) it has the resources necessary to provide the Services. Chubb's sole remedy and Fair Isaac's sole obligation pursuant to this warranty shall be for Chubb to notify Fair Isaac in writing of any alleged warranty defect within thirty (30) days after the defective services were performed, and Fair Isaac shall correct the defects promptly.

16. **Limitation of Liability and Warranty Disclaimer**

a. NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS

AGREEMENT OR ANY PRODUCT, SERVICE, OR DELIVERABLE PROVIDED BY FAIR ISAAC UNDER THIS AGREEMENT, EVEN IF THE RESPONSIBLE PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE. HOWEVER, THIS LIMITATION SHALL NOT APPLY TO DAMAGES OF ANY KIND RELATED TO (1) MATERIAL BREACH OF THE PROVISIONS OF THIS AGREEMENT RELATING TO PROTECTION OF CONFIDENTIAL INFORMATION, AND (2) VIOLATIONS OF EITHER PARTY'S INTELLECTUAL PROPERTY RIGHTS (INCLUDING UNAUTHORIZED USE).

b. With respect to the performance of each party under this Agreement, in no event shall either party be liable to the other party, any of its officers, directors, employees, or shareholders, or to any third party, whether a claim be in tort (except for any claim based upon fraud), contract, or otherwise for any amount in excess of the total fees paid by Chubb to Fair Isaac under this Agreement during the 12 months immediately preceding the date of the most recent claim that gave rise to such liability, except that this limitation shall not apply to any claim based upon (1) material breach of the provisions of this Agreement relating to protection of Confidential Information, or (2) violations of either party's intellectual property rights (including unauthorized use). In addition, notwithstanding the foregoing, Chubb's obligation to pay amounts owed to Fair Isaac under this agreement for products and services provided by Fair Isaac under this Agreement (including costs of collection of unpaid amounts) is independent of and not subject to the foregoing limitation.

c. Fair Isaac does not warrant that any product, service, or deliverable provided by Fair Isaac will (i) meet Chubb's requirements, (ii) operate in combination with hardware, software, systems or data not expressly specified in writing by Fair Isaac, (iii) meet any performance level, resource utilization, response time, or system overhead requirements, or (iv) operate uninterrupted, free of errors, or without delay. WITHOUT LIMITING THE FOREGOING, FAIR ISAAC MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, AND HEREBY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE. CHUBB IS SOLELY RESPONSIBLE FOR ITS USE OF ANY PRODUCTS, SERVICES, AND DELIVERABLES PROVIDED BY FAIR ISAAC UNDER THIS AGREEMENT AND FOR ANY LIABILITY ARISING OUT OF DATA OR CONTENT SUPPLIED BY CHUBB.

17. <u>Force Majeure.</u>

No delay in or failure of performance by either party under this Agreement will be considered to be a breach hereof if and to the extent that such delay or failure of performance is caused by an occurrence or occurrences beyond the reasonable control of the party affected.

18. <u>Entire Agreement; Waiver; Amendment.</u>

a. This Agreement, any Exhibits, Appendices, Addenda, Amendments or schedules thereto, constitutes the entire agreement and understanding between the parties with respect to the subject of the Agreement, and supersedes any prior discussions, understandings, and agreements between the parties with regard to same. The waiver of any provision of the Agreement or this Addendum must be evidenced in a writing bearing a Manual Signature (as defined below) on behalf of the waiving party. No amendment, alteration or modification of the Agreement shall have any force or effect unless such modification is in a writing bearing a Manual Signature on behalf of both parties. For the purpose of this Agreement, a "Manual Signature" shall mean the pen and ink signature of that party's authorized representative on paper.

b. Chubb and Fair Isaac expressly agree that nothing set forth in any purchase order, invoice, acknowledgement or similar document delivered in connection with this Agreement or any Statement of Work, including pre-printed terms and conditions, shall add to or modify the terms of this Agreement. Each of the parties hereto specifically rejects all such additions and modifications.

19. <u>Severability.</u> If any of the provisions contained in this Agreement are held to be illegal, invalid, or unenforceable, the enforceability of the remaining provisions shall not be impaired and the Agreement shall continue as if such illegal, invalid, or unenforceable provisions are not contained in this Agreement.

20. <u>Assignment.</u> This Agreement may not be assigned by either party without the prior written approval of the non-assigning party. Any purported assignment in violation of the foregoing sentence shall be null and void

and of no force or effect. Except for the prohibition on assignment contained herein, this Agreement shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties to this Agreement.

21. **Notices.** Notices with regard to this Agreement shall be delivered in person or sent via United States first class postage prepaid, certified or registered mail, or sent via a recognized traceable shipping service (i.e. FEDEX, UPS, etc.) to the persons and addresses listed below:

If to Chubb:

Chubb & Son, a division of Federal Insurance Company
Global Strategic Sourcing
15 Mountain View Road
Warren, New Jersey 07059
Attn: Robert Schmidt, Contract Manager
Telephone: (908) 902-5141
E-mail Address: rschmidt@chubb.com

With a copy to: Chubb & Son, a division of Federal Insurance Company
General Counsel WTO M1-051
15 Mountain View Road
Warren New Jersey 07059

If to Fair Isaac: Fair Isaac Corporation
3661 Valley Centre Drive, Suite 500
San Diego, CA 9213
Attn: Contracts Administrator

With a copy to: Fair Isaac Corporation
901 Marquette Avenue, Suite 3200
Minneapolis, MN 565402
Attn: Mike Sawyer
Telephone: (617) 589-4651
E-mail Address: MikeSawyer@fico.com

22. **Publicity.** Fair Isaac shall not make use of Chubb's name, logo, trademarks or service-marks, or its association with Chubb arising either from discussions leading to this Agreement or from the Agreement itself, for publicity, advertising, marketing or other purposes without the express written consent of Chubb in each instance.

23. **Captions.** Captions and section headings used in this Agreement are for convenience only, are not a part of this Agreement and should not be used in construing it.

24. **Survival** The respective rights and obligations of the parties set forth in Sections 2, 4, 6, 7, 8, 9, 11, 12, 13, 16 and 24 of this Agreement shall indefinitely survive the expiration or termination of this Agreement to the extent necessary to the intended preservation of such rights and obligations.

25. **Force Majeure.** No delay in or failure of performance by either party under this Agreement will be considered to be a breach hereof if and to the extent that such delay or failure of performance is caused by an occurrence or occurrences beyond the reasonable control of the party affected.

26. **Counterparts.** This Agreement or any appendices, amendment, alteration of modification thereto may be executed in any number of counterparts, each of which will be deemed to be an original copy of the relevant document, and all of which, when taken together, shall be deemed to constitute one and the same agreement. The delivery by facsimile of a copy of a counterpart signature page bearing a Manual Signature on behalf of a party is as effective as executing and delivering the original counterpart signature page to the other party.

27. **Representation of Authority to Enter Agreement.** Each of the parties represents that the persons and entities executing this Agreement have the legal authority to do so, and the individuals signing on behalf of each party are properly authorized to execute this Agreement on behalf of the entity.

1360043

**IN WITNESS WHEREOF, the parties hereto, each acting with due and proper authority and acknowledging that they have read this Agreement, understand it and agree to be bound by its terms, have executed this Agreement, to be effective as of the date first set forth above in Section 40 above:**

**Chubb & Son**, a division of Federal Insurance Company, for itself and as servicer for The Chubb Corporation and its non-insurance company subsidiaries, and as manager of its insurance company subsidiaries ("Chubb")

Signature

Printed Name

Title

Date

**Fair Isaac Corporation**
("Fair Isaac")

Signature

Aaron Jaeger
Printed Name Director
Financial Planning & Analysis

Title

Date

| Fair Isaac Statement of Work | Page 1 of 5 |
|---|---|
| Fair Isaac Contract Number: | FI LR# 1319435 |

## Appendix A-1
## STATEMENT OF WORK

This Statement of Work ("**SOW**") is effective as of September __, 2009 and is issued pursuant to and is subject to the Master Services Agreement ("**Agreement**") between Fair Isaac Corporation ("**Fair Isaac**") and Chubb & Son, a division of Federal Insurance Company ("**Chubb or Client**") with an effective date of August 17, 2009.

Capitalized terms used herein that are defined in the Agreement will have the meanings given to such terms in the Agreement.

**Project Overview**

Chubb is partnering with Fair Isaac to develop a Policy Validation Decision Service ("**PVDS**"). The project will be developed in multiple phases, including PVDS Rule Services, PVDS Support Services and a Test Bed Application. Each phase will encompass a full software development lifecycle and the extension or enhancement of the services and testing tools from the preceding phase. Fair Isaac will provide updates on key checkpoints to align with the Chubb project governance dashboard during each phase. The description of Services for phase 1 is set forth Attachment 1 to this SOW and the description of services for subsequent phases and any applicable deliverables will be set forth in additional attachments.

1. **Description of Services**

Fair Isaac will provide Chubb with guidance, mentoring, and general assistance ("**Assistance**") in the implementation of Chubb's Premium Booking Validation Services ("**PVDS**"). Such Assistance may include the following:

(a) Decision analysis, definition, and specification of PVDS business rules, and the authoring of decision definition and requirement harvesting documents.
(b) Analysis, design, and specification of the PVDS business rule repository ("**Repository**"), and the authoring of Repository design documentation.
(c) Analysis, design, and specification of the PVDS business rule maintenance application ("**RMA**").
(d) Analysis, design, and specification for the deployments of the PVDS decision services ("**Deployments**"), and the authoring of technical design documentation.
(e) Analysis, design, and specification of a brUnit test environment, and the definition of unit testing requirements documentation.
(f) Analysis, design, and specification of an assembly testing framework using Fair Isaac's black box tester ("**BBTester**") framework.
(g) Knowledge and insight into how the Blaze Advisor® components of PVDS will integrate with Chubb's enterprise Services Oriented Architecture ("**SOA**").
(h) Implementation of the above described designs and specifications.
(i) Unit Testing.
(j) Implementation and knowledge transfer associated with applicable BRMS Industry and Blaze Advisor® product best practices.
(k) Early exposure to and experience with full SDLC for BRMS development for Chubb PVDS team members.
(l) Rapid development of v1.0 rule service and RMA.
(m) Definition of extensible BRMS design based upon Chubb's representative requirements ("**Policy Rules**").
(n) Establishment of foundation for a test early, test often methodology.

2. **Deliverables**

Fair Isaac will provide weekly status reports in a MS Word format which will include key tasks completed during the week, key tasks for the upcoming week, billable hours used, and project related risks/issues.

3. **Out of Scope Services**

Any service not specifically itemized in Section 1 (Description of Services), are not within the scope of Services provided by Fair Isaac pursuant to this SOW.

4. **Assumptions and Client Responsibilities**

The following are Fair Isaac's assumptions and Client's responsibilities upon which Fair Isaac has relied in agreeing to perform the Services. Any deviation from these assumptions, or Client's failure to meet any of the responsibilities itemized below, may result in additional fees and expenses and/or changes to schedules or Deliverables:

(a) Scope and Tool Assumptions

- (i) Any network infrastructure requirements for this solution will be the responsibility of Client. This includes additional network equipments, network bandwidths and setup services. Any additional hardware/software licenses as required will be at Client's cost.
- (ii) Client acknowledges that any custom code created hereunder (**"Custom Code"**) will be maintained by the Client and is outside the standard Fair Isaac Support and Maintenance Policy.
- (iii) Due to the part time nature of some resources and to facilitate proper resource scheduling, Fair Isaac and Client will mutually agree to a resource plan during the first week of the project. Changes to the resource plan must be mutually agreeable and Fair Isaac requires a minimum of two weeks notice to increase or decrease utilization of a resource.

(b) Client Responsibility

- (i) Integration, system, and user testing will be performed by Client with assistance from Fair Isaac.
- (ii) Client will not hold Fair Isaac invoice payments, due to schedule delays as a result of Client delays in resolving problems identified as Client owned.
- (iii) Client's request for any change in Services must be in writing. This requirement pertains to all such requests including but not limited to requests for changes to scope, duration, and schedule. Fair Isaac will not be obligated to perform tasks described in Client's request until both of the parties agree in writing to the proposed change.
- (iv) Client will meet the responsibilities set forth in this section and will use all reasonable efforts to avoid delay.
- (v) Client will complete any facility modifications required at the implementation site at lest two weeks prior to the scheduled installation.

(c) Fair Isaac Responsibility

- (i) Provide Fair Isaac resources with suitable knowledge and experience to perform the Services specified herein.
- (i) Fair Isaac will provide weekly status and the numbers of hours expended on the project to Chubb management.
- (ii) Fair Isaac will meet the responsibilities set forth in this section and will use all reasonable efforts to avoid delay.

(d) Fair Isaac Availability

- (i) Fair Isaac will make personnel sufficiently available to interact with the Chubb. team in order to develop expertise in the product.
- (ii) Fair Isaac architect and development leads will be available to meet with the Chubb project management members as needed or on a weekly basis.
- (iii) During the term of this Sow and subject to the hours estimated herein, key Fair Isaac personnel will be available as needed to: answer key questions regarding business requirements of the application functionality, application architecture and design and attend status meetings as required by Chubb.

(e) Client Availability

(iv) Client will make personnel sufficiently available to interact with the Fair Isaac consultant team members for the purposes of delivering the services under this SOW.

(v) Client project management members will be available on a weekly basis to meet with Fair Isaac project management.

(vi) Client's key users or business analysts will be available as needed to: answer key questions regarding supplied data; participate in joint application design ("**JAD**") sessions; and attend status meetings as requested by Fair Isaac. This availability is especially critical during the inception of the engagement described in this SOW.

(vii) Client personnel who can authoritatively speak to the goals, scope and business requirements of the application functionality required must be available throughout the entire first week of the project. Fair Isaac will schedule meetings and JAD sessions for subsequent weeks during the course of the project and will provide as much advance notice to Client as possible.

(f) Working Conditions and Accommodations

(i) Client will provide general cooperation and make available to Fair Isaac under this SOW, access to information that is reasonably required to allow Fair Isaac to perform its obligations under this SOW, including without limitation: (i) providing data and materials in the format and according to the specifications required by Fair Isaac, (ii) for onsite services, providing Fair Isaac with necessary access to office accommodations (including personal workspace with local telephone extensions and broadband Internet access for Fair Isaac consultants using Fair Isaac laptop computers), facilities, equipment (including workstations for each Fair Isaac consultant), complete and accurate information and data from its officers, agents, and employees, and suitably configured computer products, software interfaces to Client's other business applications; (iii) providing personnel assistance as is reasonably requested by Fair Isaac; (iv) complying with all terms, conditions, and requirements set forth in this SOW and the Agreement; and (v) cooperating with Fair Isaac to make decisions and communicate information in a timely manner (collectively, "**Cooperation**" or "**Cooperate**"). Client acknowledges that these are essential to performance of any Services, and that Fair Isaac will not be liable for any deficiency in performing the Services if the deficiency results from Client's failure to provide full Cooperation.

(ii) Fair Isaac staff will design, develop, and test decision management ("DM") solutions using Fair Isaac laptops.

(iii) Fair Isaac personnel will work remotely from Fair Isaac offices, and travel as necessary to ensure project success.

(iv) While on site at Client's location, Fair Isaac's performance of Services will be during standard local business hours except on national holidays, bank holidays, Fair Isaac corporate holidays or other holidays as mutually agreed otherwise.

5. **Fees and Payment Terms**

Fair Isaac will provide Client the Fair Isaac professional service estimated to complete phases 1 through 4 of the project on a time and material basis. The hourly rates set forth below are based on total volume and provided that the hours are utilized prior to the expiration date, Fair Isaac shall provide the services at the costs specified herein. In the event that Client does not utilize the hours by the expiration date, the parties agree that the pricing shall be renegotiated based on Fair Isaac's then current professional services rates. The table below set forth in the table below does not include reasonable travel and living expenses, which will be billed to Client at cost. Client agrees to reimburse Fair Isaac for all such travel-related expenses Fair Isaac incurs in connection with this SOW as specified in the Agreement. Fair Isaac will invoice for the Services and related expenses on a monthly basis as Services are performed and the expenses incurred, and Client will pay each invoice in accordance with the payment terms specified in the Agreement.

**Chubb Volume Purchase Table:**

| Service Description | Product # | Estimated Hours | Hourly Rate** | Expiration Date |
| --- | --- | --- | --- | --- |
| Professional Services as described above | 280-OOCN-02 | 1-1500 hours | [redacted] | Mar 31, 2010 |
| Professional Services as described above | 280-OOCN-02 | 1501-3000 | [redacted] | Sep 30, 2010 |
| Professional Services as described above | 280-OOCN-02 | 3001-4500 | [redacted] | Mar 31, 2011 |
| Professional Services as described above | 280-OOCN-02 | 4501-6000 | [redacted] | June 30, 2011 |
| | | | | |

*The discounted hourly rate is a one-time offer and does not establish precedence for hourly rates on future engagements.

6. **Term and Termination**

This SOW becomes effective on the date when Services are commenced hereunder and will continue until June 30, 2011 or hours expended, hereunder, whichever is the earliest to occur. Client may terminate this SOW for cause if Fair Isaac ceases doing business, or otherwise terminates its business operations, or if Fair Isaac materially breaches any material provision of this SOW or the Agreement and fails to cure such breach within 30 days of written notice describing the breach. Fair Isaac may suspend its performance under and/or terminate this SOW for cause if Client ceases doing business, or otherwise terminates its business operations, or materially breaches any material provision of this SOW or the Agreement (including with respect to payment obligations) and fails to cure such breach within 30 days of written notice describing the breach. In the event that the Services specified in this SOW are delayed for a period of 90 days or more, Fair Isaac may terminate this SOW for convenience with no further liability or performance obligations. If this SOW is not signed by September 30, 2009 the offer extended in this SOW will expire. Terms of this agreement will apply to all phases of the project.

7. **Client Special Requirements**

Prior to the commencement of the Services, Client will notify Fair Isaac in writing if Client has any special policies or requirements regarding the following: (a) facility access or security; (b) Fair Isaac's access to Client's network and other software programs;

8. **Scope Management / Change Control**

Any proposed alterations to the project are to be submitted pursuant to the Change Control Process. Client and Fair Isaac will seek in good faith (not to exceed 7 business days) to reach agreement on the proposed change. If agreement is reached, the change will be reflected in a Change Order to this SOW signed by both parties, which will specify the modifications and the work called for, including but not limited to any changes to the scope, fees and schedule. Any terms and conditions included on the quote, purchase order, or other purchasing documentation have no effect and all services provided under such will be governed by the terms and conditions of the Agreement.

9. **General**

This SOW, together with the applicable provisions of the Agreement, constitutes the entire agreement of the parties with respect to the subject matter of this SOW and supersedes any prior oral or written proposals, representations, promises or agreements. This SOW is subject to the terms and conditions of the Agreement, but in the case of any conflict between the terms of this SOW and the terms of the Agreement, the terms of this SOW will control.

| Fair Isaac Statement of Work | Page 5 of 5 |
|---|---|
| Fair Isaac Contract Number: | FI LR# 1319435 |

9. **General**

This SOW, together with the applicable provisions of the Agreement, constitutes the entire agreement of the parties with respect to the subject matter of this SOW and supersedes any prior oral or written proposals, representations, promises or agreements. This SOW is subject to the terms and conditions of the Agreement, but in the case of any conflict between the terms of this SOW and the terms of the Agreement, the terms of this SOW will control.

IN WITNESS WHEREOF, Fair Isaac and Client have caused this SOW to be signed in duplicate and delivered by their duly authorized representatives as of the date first set forth above.

| FAIR ISAAC CORPORATION | | CHUBB & SON, A DIVISION OF FEDERAL INSURANCE COMPANY | |
|---|---|---|---|
| By: | [signature] | By: | [signature] |
| Name: | Aaron Jaeger | Name: | ROBERT DADD |
| Title: | Director Financial Planning & Analysis | Title: | SVP |
| Date Signed: | 9/22/09 | Date Signed: | 9/22/2009 |

1319435

## ATTACHMENT 1 TO APPENDIX A-1 STATEMENT OF WORK

This Attachment 1 ("**Attachment 1**") is effective as of September __, 2009 and is issued pursuant to and is subject to Appendix A-1 Statement of Work to the Master Services Agreement ("**Agreement**") between Fair Isaac Corporation ("**Fair Isaac**") and Chubb & Son, a division of Federal Insurance Company ("**Chubb or Client**") dated September ___ 2009.

Capitalized terms used herein that are defined in the Agreement and the Appendix will have the meanings given to such terms in the Agreement and Appendix.

Within ten days of Fair Isaac's receipt of this Attachment 1 signed by an authorized representative of Client and the scheduling of Fair Isaac consultants; Fair Isaac will commence the performance of the following services ("**Services**") for phase 1 of the Policy Validation Decision Service ("**PVDS**") project.

### 1. Description of Services for Iteration 1– PVDS

Key Activities: Fair Isaac will provide Client with guidance, mentoring, and/or general assistance ("Assist") for following services;

PVDS Rule Requirements Analysis –

- » Review PVDS rule requirements
- » Advise on best practices for harvesting and analysis of business rule requirements
- » Advise on updates to Fair Isaac's Fair Isaac Rational Unified Process ("**FIRUP**") methodology as such pertain to the harvesting and analysis of business rule requirements
- » Assist Client in updating to Fair Isaac's FIRUP templates for harvesting and analyzing business rule requirements
- » Assist in the harvesting and analysis of PVDS business rule requirements

PVDS Rules Services -

- » Create Repository physical structure
- » Create core PVDS Rule Service for Policy Rules, including
  - » Import BOM
  - » Entry point(s)
  - » Ruleflow
  - » Define all rulesets
  - » Develop core templates
  - » Generate OOTB RMA
  - » Create brUnit Framework
- » Implement and unit test up to 80 Policy rules
- » Integrate with stubs for caches
- » Deploy POJO Rule Service to TestBed
- » Assist with the preparation of FIRUP documentation for policy
- » Assist with the development of POJO rule service and OOTB RMA

PVDS Support Services -

- » Assist with the authoring of detailed design of a set of Blue Box Processes
  - » Booking transaction MDB
  - » Pre and post Services

- » Cache manager
- » Assist with the configuration of a development environment available on Blue Box
  - » WebSphere
  - » MQ setup on Blue Box
- » Assist with the definition of requirements of stubs for cache to support environment
- » Assist with the definition of requirements for CIMBook v1.0 Structure
- » Assist with the development of a detailed design document v1.0 Blue Box
- » Assist with conducting a simple test between BBTester and Core PVDS Rule Service

Test Bed Application

- » Assist with the authoring of functional requirements for test bed – v1.0
- » Assist with the implementation of a Test Bed environment utilizing Fair Isaac's BBtester framework - base version available
  - » Supports Web Service and Direct
  - » Upgrade to handle simple CIMBook format
- » Assist in preparing a detailed design document that will support the functional gaps between the base version of BBTester and functional requirements v1.0.

**2. Deliverables:**

Fair Isaac will provide weekly status reports in a MS Word format which will include key tasks completed during the week, key tasks for the upcoming week, billable hours used, and project related risks/issues.

**3. Fees.**

Fair Isaac will provide the Services on a time and materials basis. Travel-related expenses are not included. Chubb agrees to pay all reasonable and actual travel-related fees and expenses and any other out-of-pocket expenses associated with the provision of Services in accordance with the Agreement. The schedule of estimated hours and rates are as described below. The estimated number of hours set forth below is a non-binding estimate only, it being understood that Fair Isaac does not guarantee that it can complete the Services described in this SOW within such estimated number of hours. Fair Isaac will invoice for the Services performed and expenses incurred on a monthly basis, and Chubb will pay each invoice in accordance with the payment terms set forth in the Agreement.

**Estimated Fees:**

| Service Description | Product # | Estimated Hours | Hourly Rate | Price |
|---|---|---|---|---|
| EDM Technology Professional Services as described above | 280-OOCN-02 | 1500 | [redacted] | [redacted] |
| EDM Technology Professional Services as described above | 280-OOCN-02 | 200 | [redacted] | [redacted] |
| Total Fees for Iteration 1 | | | | [redacted] |

The parties agree that if additional hours are needed to complete the Services for iteration 1, such additional hours will be based on the volume price table in Appendix A-1, subject to the expiration date specified therein.

1319435

**4. Termination**

This Attachment 1 becomes effective on the date when Services are commenced hereunder and will continue until the Services are complete or the hours are expended, hereunder, whichever is the earliest to occur. This Attachment 1 may be terminated in accordance with the termination terms specified in the agreement.

**5. General**

This Attachment 1, together with Appendix A-1 and the applicable provisions of the Agreement, constitutes the entire agreement of the parties with respect to the subject matter of this Attachment 1 and supersedes any prior oral or written proposals, representations, promises or agreements. This Attachment 1 is subject to the terms and conditions of Appendix A-1 and the Agreement.

IN WITNESS WHEREOF, Fair Isaac and Client have caused this SOW to be signed in duplicate and delivered by their duly authorized representatives as of the date first set forth above.

| **FAIR ISAAC CORPORATION** | | **CHUBB & SON, A DIVISION OF FEDERAL INSURANCE COMPANY** | |
|---|---|---|---|
| By: | [signature] | By: | [signature] |
| Name: | Aaron Jaeger | Name: | R.F. Dmeo |
| Title: | Director Financial Planning & Analysis | Title: | SVP |
| Date Signed: | 7/22/09 | Date Signed: | 9/30/2009 |



# *MASTER SERVICES AGREEMENT*

This Master Services Agreement ("Agreement") is made by and between Chubb & Son, a division of Federal Insurance Company, an Indiana corporation, having its principal office at 15 Mountain View Road, Warren, New Jersey, 07059 and Fair Isaac Corporation ("Vendor") having an office at 901 Marquette Avenue, Suite 3200, Minneapolis, MN 55402. This Agreement shall be effective as of June 9, 2006 (the "Effective Date"). The purpose of this Agreement is to set forth the terms and conditions that are acceptable to the parties for the performance of certain professional services by Vendor for Chubb in connection with its renewal processing rules maintenance project.

In consideration of the mutual promises made by Chubb and Vendor, the parties agree as follows:

1. **Definitions**

**1.a** Chubb: "Chubb" shall mean Chubb & Son, a division of Federal Insurance Company, for itself and as servicer for The Chubb Corporation and its non-insurance company subsidiaries, or as manager of its insurance company subsidiaries.

**1.b** Cooperation: "Cooperation" shall mean Chubb's general cooperation and provision of access to such information as may be reasonably required by Vendor in order to perform its obligations under this Agreement, including without limitation: (a) providing data and materials in the format and according to the specifications required by Vendor, (b) for onsite services, providing Vendor with full access to office accommodations, facilities, equipment, security access information, and software interfaces to Chubb's other business applications; (c) providing personnel assistance as may be reasonably requested by Vendor from time to time; (d) complying with all terms, conditions, and requirements set forth in this Agreement; and (e) cooperating with Vendor to make decisions and communicate information in a timely manner.

**1.c** Intellectual Property Rights: "Intellectual Property Rights" shall mean any and all intellectual property rights, however recognized, including, but not limited to, copyright, patent, trademark, trade dress, service mark, trade secret, or any other intellectual property right whether now existing or developed or created during the term of this Agreement.

**1.d** Invention: "Invention" shall mean any and all inventions, innovations, processes, techniques, works of authorship, developments, derivations, contributions, supplements, enhancements, and modifications, and any copies, adaptations, documentation, algorithms, notes, or records thereof, including, but not limited to, computer programs, including both source and object versions thereof, and attendant specifications and source code listings, authored, made, developed, or conceived of and reduced to practice by, or under the direction of, Vendor during the term and within the scope of this Agreement.

**1.e** Taxes: "Taxes" shall mean all present and future taxes, duties, import deposits, assessments, and other governmental charges (and any related penalties and interest not attributable to the fault or delay of Vendor), however designated, that are now or hereafter imposed by or under any governmental authority or agency that are: (i) associated with the performance by Vendor of its obligations under this Agreement; (ii) associated with the payment of any amount by Chubb to Vendor pursuant to this Agreement; (iii) based on the license or use of any Vendor-provided product or service; or (iv) associated with the importation of any Vendor-provided product into or use of any Vendor-provided service within a country other than the United States, excepting only (v) Vendor's corporate franchise Taxes and Taxes imposed on Vendor's net income by the governmental authorities or agencies in such jurisdictions as Vendor is required to pay such taxes; (vi) withholding, employment, and payroll taxes relating to Vendor's employees; and (vii) personal property taxes on Vendor property.

LR# 24461

2. **Scope of Services**

A. Chubb hereby retains the services of Vendor and Vendor hereby agrees to provide services as described in a mutually agreed upon work order(s) (or "statement of work") which may be entered into from time to time and is incorporated herein and attached hereto this Agreement as Appendix A ("Services"). Vendor's employees will observe Chubb's working and security rules.

B. The specifications and performance requirements set forth in Appendix A can be modified only upon the mutual written agreement of the parties.

C. Appendix A sets forth any material assumptions and Chubb responsibilities (collectively, the "Assumptions") upon which Vendor has relied in agreeing to perform the Services. Vendor shall use commercially reasonable efforts to adhere to the schedule set forth in Appendix A. Any deviations from, or failure of Chubb to meet its obligations with respect to, the Assumptions may result in additional fees and expenses and/or changes to schedules or Deliverables. In addition, Chubb acknowledges that the Assumptions also include Chubb's Cooperation.

3. **Service Rates; Expenses**

A. Chubb agrees to pay Vendor, in exchange for Services rendered, a fee in accordance with Appendix A, attached hereto.

B. Prices do not include reasonable travel and associated out-of-pocket expenses incurred by Vendor in connection with this Agreement, which Chubb agrees to reimburse at Vendor's actual cost. Expenses shall be subject to Chubb's travel and expense policy, which is attached hereto as Exhibit 1. Chubb shall not be liable to Vendor for any other expenses paid or incurred by Vendor unless otherwise agreed to in writing signed by a duly authorized representative of Chubb.

C. Chubb shall only be liable for the pro rata share of any payments owed, equal to the number of days in which Vendor actually provided services, in any month in which this Agreement is terminated.

D. Charges under this Agreement are stated exclusive of any applicable Taxes, and Chubb will be solely responsible for, and shall pay or reimburse Vendor for, all Taxes. Vendor shall promptly remit to the appropriate tax authority all Taxes collected from Chubb on account of Chubb's tax obligations, if any, and Vendor shall indemnify Chubb against any and all losses, costs, and expenses (including reasonable attorneys' fees) which result from Vendor's violations of its obligations under this section. If Vendor receives a refund of any such Taxes attributable to amounts paid under this Agreement by Chubb, Vendor shall pay such refunded amount to Chubb within 30 days of its receipt.

4. **Service Payment and Expense Reimbursement**

A. Chubb will pay within the greater of (a) forty-five (45) days of the invoice date; or (b) thirty (30) days of Chubb's actual receipt of invoices, for Services rendered and expenses incurred under this Agreement. All amounts are payable in US Dollars in accordance with the instructions provided in the invoice or other instructions provided by Vendor.

B. Chubb may, at its option and without prior notice and during normal business hours, audit Vendor's records reasonably related to the invoices issued pursuant to Section 3.A, above. Vendor shall keep sufficient records at its principal place of business to allow Chubb to audit the invoices, which records will be maintained for twenty-four (24) months from the date of creation. Chubb acknowledges that it and its employees, subcontractors or agents may, in the course of

conducting an audit, be exposed to information which is confidential or proprietary to Vendor. Chubb agrees to treat all of Vendor's Confidential Information as confidential information, maintaining such information in strict confidence, using at least the same level of care that Chubb uses to avoid unauthorized use or disclosure of its own most confidential information that it did not wish to become public. For purposes of this Section, "Vendor's Confidential Information" is that information belonging to, or in the possession or control of, Vendor that has been clearly labeled by Vendor as confidential or that under the circumstances ought to be reasonably identifiable as confidential.

5. **Independent Contractor; Employees**

**A.** Neither Vendor nor Vendor's employees are or shall be deemed to be employees of Chubb. Vendor shall be solely responsible for the payment of compensation (including provision for employment taxes, federal, state and local income taxes, workers compensation and any similar taxes) associated with the employment of Vendor's employees. Vendor shall also be solely responsible for obtaining and maintaining all requisite work permits, visas, and any other documentation. Vendor represents that Vendor, its employees, and those parties authorized by Chubb under Section 5(C), are authorized to perform such Services under this Agreement.

**B.** Vendor acknowledges that because Vendor is engaged in its own independently established business, neither Vendor, Vendor's employees, nor those parties authorized by Chubb under Section 5(C) are eligible for, nor shall they participate in, any pension, health, or other employee benefit plan of Chubb.

**C.** Vendor shall take appropriate measures to ensure that its employees, and those parties authorized by Chubb under this subsection, who perform Services are competent to do so and that they observe the provisions of Section 7, **Confidential Information; Non-Disclosure.** None of the Services under this Agreement shall be provided by anyone other than Vendor's own employees, unless Vendor first obtains the prior written consent of Chubb.

**D.** Vendor reserves the right to determine which of its personnel will be assigned to perform the Services and to replace or reassign such personnel during the term hereof. However, should Chubb have a concern about any Vendor personnel performing the Services, those concerns should be brought to the attention of the Vendor Project Manager, and Vendor will make commercially reasonable efforts to remedy the situation to Chubb's satisfaction.

6. **Ownership and Use of Work Product; License to Deliverables**

Ownership of deliverables shall be as stated in each statement of work. In the event ownership of deliverables is vested in Vendor, then, upon final payment of all amounts due to Vendor under this Agreement, Vendor grants to Chubb a perpetual, non-transferable, non-sublicensable, non-exclusive license to use, copy, and modify those deliverables that are specifically identified in a statement of work as being created for use by Chubb as part of the Services ("Deliverables") solely for Chubb's internal business purposes, subject to the terms and conditions of this Agreement. Chubb agrees that it will use such Deliverables only within the scope of the foregoing license. This Agreement does not grant any right or license to any Vendor products other than the Deliverables, it being understood that all rights in the technology and methods used in creating the Deliverables and all other rights are retained by and will remain with Vendor. In no event will Vendor be precluded from providing services for others that are similar to the services or from developing, for itself or for others, materials that are similar to or competitive with the Deliverables. In addition, Vendor will be free to use its general knowledge, skills, and experience, and any ideas, concepts, know-how, and techniques developed by Vendor in connection with the performance of the Services.

JUN-22-2006 10:27AM CHUBB & SON EXECUTIVE RISK 860 408 2139 TO:860 408 2139 NO.927 P.6/11
06/21/2006 11:06 FAX 8583888988 FAIR, ISAAC & CO. 005

Also, the underlying and pre-existing intellectual property that went into creation of the deliverables under this Agreement, including all techniques, know-how and other proprietary information shall remain the sole and exclusive intellectual property of VENDOR. Any reference or use of the VENDOR name (and associated marks) shall be prohibited without the express written consent of the Head of the Corporate Communications Department at VENDOR.

In addition, the VENDOR names and service marks, any questionnaire(s) developed and/or used in connection with the Services (the "Questionnaire") are and shall remain the property of VENDOR, and Chubb will not obtain any ownership interest in the underlying ideas, concepts, know-how and techniques used by VENDOR to develop or generate the Study, the Questionnaire and any reports.

Chubb may use the results of the Study(s) or Services, any Reports, and the data contained therein for internal purposes. Chubb may also disclose the information in the Study(s) or Services, and any Reports to third parties provided neither the VENDOR name nor service marks are disclosed in connection therewith, but may not disclose copies of the Study(s) or Reports, in whole or in part, to third parties unless such disclosure is approved pursuant to Section below.

Chubb will retain all intellectual property and licensing rights to its pre-existing intellectual property, including any rules, conditions, and custom components provided to the Vendor.

No portion of the Study(s) or Services bearing VENDOR Marks may be disclosed, and no other disclosure of the VENDOR Marks may be made, unless the entire text of each proposed disclosure is first submitted to VENDOR for review, along with a statement of the parties to whom Chubb proposes to make the disclosure, and samples which are accurate and true representations of the final form of the proposed disclosure, ~~and the disclosure is first "Approved As Is" on the written form that J.D Power then uses for such purposes~~. If any changes of any kind whatsoever are made to the content of the disclosure or the parties to whom Chubb proposes to make the disclosure, the proposed disclosure must again be submitted to VENDOR for review and approval.

MB

7. Confidential Information; Non-Disclosure

A. In order that each party may perform its obligations under this Agreement, it may be necessary for the other party ("Discloser") to disclose to such party ("Recipient") or its employees or agents certain information and material which may be considered to be sensitive, confidential and/or proprietary to the Discloser, its affiliates, subsidiaries, customers, insureds, agents, directors, officers or employees. Any and all Confidential Information, as defined below in Section 7(C), disclosed to or obtained by the Recipient, its employees, subcontractors, or agents, in the performance of the Recipients obligations, shall be deemed confidential and proprietary information belonging to the Discloser. In recognition of the foregoing, the Recipient covenants and agrees: (a) that it will maintain all Confidential Information of the Discloser in strict confidence, using appropriate administrative, technical and physical safeguards to protect Confidential Information to avoid its unauthorized use or disclosure; (b) that it will not, directly or indirectly, copy, reproduce, sell, assign, license, market, transfer, or disclose any Confidential Information of the Discloser to any third party without the Discloser's prior written consent; (c) that it will not make use of any Confidential Information of the Discloser for its own purposes or the benefit of anyone or any other entity other than the Discloser, except as otherwise expressly provided under this Agreement; (d) that at any time the Discloser may so request, it will deliver to the Discloser or, at of the Discloser's option, will certify the destruction of, all memoranda, notes, records, reports, media, and other documents, and all copies thereof, regarding or including any Confidential Information of the Discloser which the Recipient may then possess or have under its control; and (e) that it will take no action with respect to Confidential Information of the Discloser that is inconsistent with the confidential and proprietary nature of such information.

RECEIVED TIME JUN. 22. 10:05AM

Confidential - Attorneys' Eyes Only FICO0021681

B. The Recipient shall not disclose Confidential Information of the Discloser, except to its employees, or any other party authorized by the Discloser pursuant to Section 5(C), having a need to know such information in connection with the performance of its obligations or services. The Recipient shall instruct all such employees and authorized parties as to their obligations under this Section, and shall advise them of their obligations to be bound by the terms and conditions of this Section prior to their being given access to Confidential Information of the Discloser. The Recipient acknowledges that it shall remain responsible and liable for its employees' compliance with the terms of this Section.

C. For purposes of this Agreement, "Confidential Information" shall include all confidential and proprietary information of the Discloser, whether in written, oral, electronic, magnetic, photographic, optical, or any other form now existing or created or developed during the term of this Agreement, including, but not limited to, the following: (a) information relating to the Discloser's planned or existing computer systems, system architecture, computer hardware, computer software, source code, object code, documentation, program libraries, program listings, processing methods, technical processes and operational methods; (b) information regarding planned or existing insurance policies, insurance coverage, insurance premiums, insurance endorsements, claims procedures, or other information that describes how insurance activities are administered and managed; (c) customer data, customer lists, sales, profits, pricing, and other financial information; (d) information regarding the Discloser's existing or planned sales and marketing activities or strategies; (e) information regarding the Discloser's existing or planned organizational restructuring, business affairs, and business initiatives; (f) confidential information regarding the Discloser's customers, insureds, employees, directors and officers; (g) confidential information of a third party licensed to, possessed by, or in the control of the Discloser, and which the Discloser is or may be obligated to treat as confidential or proprietary; and (h) any other information relating to the Discloser which is not generally known to the public or within the industries and trades in which the Discloser competes or which may otherwise be protected by state trade secret law.

D. Notwithstanding Section 7(C), Confidential Information shall not include information that (a) is or becomes generally known to the public, not as a result of an act, omission, or disclosure by the Recipient, (b) is rightfully in the possession of the Recipient prior to this Agreement, (c) is independently developed by the Recipient without use of the Discloser's Confidential Information, (d) is received by the Recipient in good faith and without restriction from a third party, not under a confidentiality obligation to either party, or (e) is disclosed pursuant to a court or regulatory order, provided that the Recipient immediately notifies the Discloser upon receipt of such order and cooperates with the Discloser in obtaining appropriate protection from the authority issuing the order.

E. This Section shall survive the termination of this Agreement.

8. <u>Warranty</u>

Vendor warrants that (i) it will perform the Services as described in each statement of work in a professional and workmanlike manner in accordance with generally acceptable industry practices; and (ii) it has the resources necessary to provide the Services. Chubb's sole remedy and Vendor's sole obligation pursuant to this warranty shall be for Chubb to notify Vendor in writing of any alleged warranty defect within thirty (30) days after the defective services were performed, and Vendor shall correct the defects promptly.

9. <u>Term</u>

This Agreement shall be deemed effective as of Contract Effective Date, regardless of the date on which it is actually signed by both parties, and shall continue until terminated pursuant to Section ~~X~~ 18 Termination.

MB

RECEIVED TIME JUN.22. 10:05AM

**10. Termination**

**A.** This Agreement shall terminate:

**(1)** if a party has committed a material breach of this Agreement and has failed to remedy such breach within 30 days after receipt of written notice from the non-breaching party identifying the breach and requiring it to be remedied.

**(2)** upon written notice from either party if the other party (i) becomes insolvent or seeks protection under the Federal Bankruptcy Act or any other state laws relating to insolvency; (ii) makes a general assignment for the benefit of creditors; or (iii) suffers or permits the appointment of a receiver or a trustee for its business or assets.

**B.** Chubb shall be responsible for payment for Services until the effective date of termination.

**C.** On termination of this Agreement for any reason, each party will promptly deliver to the other party or destroy all Confidential Information of such other party that is in its possession.

**11. Insurance**

Vendor shall maintain, during the term of this Agreement, workers' compensation coverage in compliance with the laws of each state in which the Services or any portion thereof are to be performed. Vendor shall additionally maintain, at all relevant times:

A. Automobile Liability Insurance in the amount of $1,000,000 for each occurrence with respect to all vehicles used in connection with the Services, and

B. Commercial General Liability Insurance covering personal injury and property damages in the amount of $2,000,000 for each occurrence, and

C. Errors and Omissions coverage during the term of this Agreement with liability limits of not less than $1,000,000 per occurrence.

**12. Indemnity**

**A.** Each party, at its own expense, shall indemnify, and hold harmless the other party and its directors, officers, employees, agents, successors and assigns and defend any action brought against such other party, with respect to any claim, demand, cause of action, debt, liability, or expense, including attorney's and expert witness fees and court and settlement costs, due to third party claims for bodily injury or damage to tangible personal property to the extent caused by the fault or negligence of the indemnifying party in its performance of its obligations under this Agreement.

**B.** Vendor will, at its own expense, indemnify and hold harmless Chubb and its directors, officers, employees, agents, successors and assigns and defend any action against Chubb brought by a third party to the extent that the action is based upon a claim that a Vendor Deliverable provided in this Agreement directly infringes any U.S. registered copyright, or misappropriates any trade secret recognized as such under the Uniform Trade Secrets Act, and Vendor will pay those costs and damages finally awarded against Chubb in any such action that are specifically attributable to such claim or those costs and damages agreed to in a monetary settlement of such action. Notwithstanding the foregoing, Vendor shall have no obligation with

respect to any infringement or misappropriation claim to the extent a claim is caused by any deliverables or other materials provided by Chubb, or any adherence by Vendor to any directions, specifications, suggestions or other input provided by Chubb.

C. The indemnifying party shall have the option to assume control of such defense. In addition, the indemnified party agrees to: (a) promptly notify the indemnifying party in writing of each claim for which indemnification is sought hereunder, and (b) cooperate with the indemnifying party at the indemnifying party's expense in connection with the defense or settlement of each such claim. The indemnifying party shall also allow the indemnified party the right of free association during such defense, and shall keep the indemnified party adequately informed of all developments and strategies related to such defense.

**13. Governing Law**

This agreement shall be governed by, subject to, and, enforced and interpreted in accordance with the laws of the State of New York, including the remedies available for breach hereof, without regard to its conflict of laws principle.

**14. Entire Agreement**

This Agreement, and the attachments hereto, constitutes the entire agreement and understanding between the parties with respect to the subject matter of this Agreement, and supersedes all prior discussions, understandings, and agreements between the parties. No alteration or modification of this Agreement shall have any force or effect unless such modification is in writing, signed by duly authorized representatives of both parties, and affixed to this Agreement in the form of an addendum.

**15. Severability**

If any of the provisions contained in this Agreement are held to be illegal, invalid, or unenforceable, the enforceability of the remaining provisions shall not be impaired and the Agreement shall continue as if such illegal, invalid, or unenforceable provisions are not contained in this Agreement.

**16. Assignment**

This Agreement may not be assigned by either party without the prior written approval of the non-assigning party. Except for the prohibition on assignment contained in the preceding sentence, this Agreement shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties to this Agreement.

**17. Notices**

Notices with regard to this Agreement shall be delivered in person or sent via United States first class postage prepaid, certified or registered mail, or sent via a recognized traceable shipping service (i.e. FEDEX, UPS, etc.) to the persons and addresses listed below:

Chubb: James Black
Vendor Management Group
Chubb & Son, a division of Federal Insurance Company
15 Mountain View Road
Warren, New Jersey 07059

Vendor: Fair Isaac Corporation
Attn: Contracts Administrator
3661 Valley Centre Drive
San Diego, CA 92130

**18. Publicity.**

Vendor shall not make use of Chubb's name, logo, trademarks or service-marks, or its association with Chubb arising either from discussions leading to this Agreement or from the Agreement itself, for publicity, advertising, marketing or other purposes without the express written consent of Chubb in each instance.

**19. Captions.**

Captions and section headings used in this agreement are for convenience only and are not a part of this agreement and should not be used in construing it.

**20. Limitation of Liability**

**A.** NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT OR ANY PRODUCT, SERVICE, OR DELIVERABLE PROVIDED BY VENDOR UNDER THIS AGREEMENT, EVEN IF THE RESPONSIBLE PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE. HOWEVER, THIS LIMITATION SHALL NOT APPLY TO DAMAGES OF ANY KIND RELATED TO (1) MATERIAL BREACH OF THE PROVISIONS OF THIS AGREEMENT RELATING TO PROTECTION OF CONFIDENTIAL INFORMATION, AND (2) VIOLATIONS OF EITHER PARTY'S INTELLECTUAL PROPERTY RIGHTS (INCLUDING UNAUTHORIZED USE).

**B.** With respect to the performance of each party under this Agreement, in no event shall either party be liable to the other party, any of its officers, directors, employees, or shareholders, or to any third party, whether a claim be in tort (except for any claim based upon fraud), contract, or otherwise for any amount in excess of the total fees paid by Chubb to Vendor under this Agreement during the 12 months immediately preceding the date of the most recent claim that gave rise to such liability, except that this limitation shall not apply to any claim based upon (1) material breach of the provisions of this Agreement relating to protection of Confidential Information, or (2) violations of either party's intellectual property rights (including unauthorized use). In addition, notwithstanding the foregoing, Chubb's obligation to pay amounts owed to Vendor under this agreement for products and services provided by Vendor under this Agreement (including costs of collection of unpaid amounts) is independent of and not subject to the foregoing limitation.

**C.** Vendor does not warrant that any product, service, or deliverable provided by Vendor will (i) meet Chubb's requirements, (ii) operate in combination with hardware, software, systems or data not expressly specified in writing by Vendor, (iii) meet any performance level, resource utilization, response time, or system overhead requirements, or (iv) operate uninterrupted, free of errors, or without delay. WITHOUT LIMITING THE FOREGOING, VENDOR MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, AND HEREBY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE. CHUBB IS SOLELY RESPONSIBLE FOR ITS USE OF ANY PRODUCTS, SERVICES, AND DELIVERABLES PROVIDED BY VENDOR UNDER THIS AGREEMENT AND FOR ANY LIABILITY ARISING OUT OF DATA OR CONTENT SUPPLIED BY CHUBB.

**21. Force Majeure.**

No delay in or failure of performance by either party under this Agreement will be considered to be a breach hereof if and to the extent that such delay or failure of performance is caused by an occurrence or occurrences beyond the reasonable control of the party affected.

**IN WITNESS WHEREOF, the parties hereto, each acting with due and proper authority and acknowledging that they have read this Agreement, understand it and agree to be bound by its terms, have executed this Agreement, as of the date first set forth above in Section 8:**

**CHUBB & SON,**
**a division of Federal Insurance Company,**
for itself and as servicer for The Chubb Corp. and its non-insurance company subsidiaries, or as manager of its insurance company subsidiaries.
"Chubb"

Mark Berthiaume
Signature

By: MARK BERTHIAUME

Title: SENIOR VICE PRESIDENT

Date: 6/9/06

**Fair Isaac Corporation**
"Vendor"

Signature

By: Daniel S. Chelew

Title: Vice President Financial Planning & Analysis

Date: June 19, 2006