# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| Plaintiff, | ) ) | **Jury Trial Demanded** |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY a Pennsylvania corporation, | ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF W. CHRISTOPHER BAKEWELL

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION .................................................................................... 1

II.  APPLICABLE STANDARD ................................................................... 2

    A.   Federal bears the burden to show admissibility. ............................ 2

    B.   Expert testimony based on an incorrect legal standard is
        inadmissible. ................................................................................... 3

    C.   Expert testimony without a factual basis is inadmissible. ............. 3

    D.   General testimony based on "experience" is improper *ipse dixit*
        testimony. ....................................................................................... 4

III. THE COURT SHOULD EXCLUDE MR. BAKEWELL'S OPINIONS
    REGARDING LOST LICENSE FEES.................................................. 6

    A.   Mr. Bakewell's breach of contract opinions are premised on the
        "intrinsic value" of Blaze Advisor to Federal—the wrong legal
        standard for breach of contract damages. ...................................... 7

    B.   Mr. Bakewell's opinions that FICO's damages should be based on
        an enterprise license fee with a discount applied should be excluded. ......... 9

        1.   Mr. Bakewell's opinions on enterprise licensing and
            discounts relies on inadmissible testimony from Dr. Kursh. ........... 10

        2.   Mr. Bakewell's opinion on the parties' prior negotiations
            ignores the record evidence. ................................................ 11

        3.   Mr. Bakewell's reliance on the Oracle and Dell negotiations
            is inadmissible. .................................................................... 14

    C.   Mr. Bakewell's opinion on non-infringing alternatives should be
        excluded.......................................................................................... 16

    D.   Mr. Bakewell's opinion on the applications that use Blaze Advisor
        merely restates the record evidence. ............................................. 17

    E.   Mr. Bakewell's opinion on "sizing" relies on Dr. Kursh's
        inadmissible opinion....................................................................... 17

IV.  THE COURT SHOULD EXCLUDE MR. BAKEWELL'S TESTIMONY
    ON ACTUAL DAMAGES .................................................................. 19

V.   THE COURT SHOULD EXCLUDE MR. BAKEWELL'S TESTIMONY
    REGARDING DISGORGEMENT ...................................................... 19

    A.   Mr. Bakewell's opinions on the burdens of proof under 17 U.S.C.
        § 504(b) are irrelevant because they are based on an incorrect legal
        standard. ........................................................................................ 19

        1.      Mr. Bakewell's opinions relating to the burden of proof to identify gross revenues are based on an incorrect legal standard. ........................................................................ 20

        2.      Mr. Bakewell incorrectly opines FICO has the burden to prove deductible expenses. ............................................ 21

        3.      Mr. Bakewell incorrectly opines FICO has the burden to prove the elements of profit attributable to factors other than the copyrighted work. ............................................. 22

    B.     Mr. Bakewell's opinion identifying the revenues subject to disgorgement under 17 U.S.C. § 504(b) is factually unsupported. ............. 22

        1.      Mr. Bakewell's reconstruction of gross written premium values is unsupported and inadmissible. ............................ 23

        2.      Mr. Bakewell's opinion on the applications using Blaze Advisor simply weighs the record evidence. .................................. 25

    C.     Mr. Bakewell's opinions regarding FICO's burden to prove a connection between the revenue stream and the infringement is conclusory and not tied to the facts of this case. ........................................ 25

        1.      Mr. Bakewell's opinion on the "value" of Blaze Advisor relies on Mr. McCarter's inadmissible opinion. ............................. 26

        2.      Mr. Bakewell's opinion that FICO would receive a windfall is legally irrelevant under 17 U.S.C. § 504(b). ..................................... 27

        3.      Mr. Bakewell's opinion on non-infringing alternatives is contrary to law and unsupported. ....................................... 28

    D.     Mr. Bakewell's opinions on apportionment and expense deductions—issues on which Federal bears the burden—are unsupported and contrary to law. ................................................ 29

        1.      Mr. Bakewell's apportionment opinions are based on a flawed understanding of the law. ................................................ 29

        2.      Mr. Bakewell's expense and loss deductions are untethered to the infringement and the legal standards. ........................................ 31

           a.      Mr. Bakewell improperly deducted expenses and losses associated with gross written premiums that did not touch Blaze Advisor. ................................................... 33

           b.      Mr. Bakewell improperly reduced Federal's revenues with "bulk" expenses not tied to the revenue in this case. ............ 35

VI.    CONCLUSION ........................................................................ 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Med. Sys. v. Laser Peripherals*,
   712 F. Supp. 2d 885 (D. Minn. 2010) ............................................................. 3

*Andreas v. Volkswagen of Am.*,
   336 F.3d 789 (8th Cir. 2003) ......................................................... 20, 21, 22

*Apple v. Samsung Elecs.*,
   No. 11-CV-01846, 2012 U.S. Dist. LEXIS 90877 (N.D. Cal. June 29,
   2012) ............................................................................................................. 3

*Aviva Sports v. Fingerhut Direct Mktg.*,
   829 F. Supp. 2d 802 (D. Minn. 2011) ....................................................... 3, 5

*In re Baycol*,
   532 F. Supp. 2d 1029 (D. Minn. 2007) ........................................................ 11

*Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*,
   886 N.E.2d 127 (N.Y. 2008) ......................................................................... 7

*Carlson v. C.H. Robinson*,
   Nos. 02-3780, 02-4261, 2005 U.S. Dist. LEXIS 5677 (D. Minn. Mar.
   30, 2005) ................................................................................................ 13, 25

*Dayva Int'l v. Award Prods.*,
   No. 97-1397, 1998 U.S. App. LEXIS 4386 (Fed. Cir. Mar. 11, 1998) ...... 21

*Design Ideas v. Things Remembered*,
   No. 07-3077, 2009 U.S. Dist. LEXIS 38374 (C.D. Ill. May 6, 2009) .......... 30, 31

*EZ Dock v. Schafer Sys.*,
   No. 98-2364, 2003 U.S. Dist. LEXIS 3634 (D. Minn. March 8, 2003) ......... 4

*Fournier v. McCann Erickson*,
   242 F. Supp. 2d 318 (S.D.N.Y. 2003) ......................................................... 21

*Gaste v. Kaiserman*,
   863 F.2d 1061 (2d Cir. 1988) ...................................................................... 35

*Gaylord v. United States*,
   777 F.3d 1363 (Fed. Cir. 2015) ................................................................... 15

*Hamil Am., Inc. v. GFI*,
193 F.3d 92 (2d Cir. 1999) .......................................................................... 32, 33, 34, 35

*Holland Loader Co. v. FlSmidth A/S*,
313 F. Supp. 3d 447 (S.D.N.Y. 2018) ...................................................................... 7, 8

*In Design v. Lauren Knitwear Corp.*,
782 F. Supp. 824 (S.D.N.Y. 1991) ............................................................................ 36

*Insignia Sys. v. News Am. Mktg. In-Store, Inc.*,
2011 U.S. Dist. LEXIS 5558 ......................................................................... 5, 13, 25

*Intelligent Verification Sys. v. Microsoft Corp.*,
No. 2:12-cv-525, 2015 U.S. Dist. LEXIS 43042 (E.D. Va. Mar. 24,
2015) ........................................................................................................................ 15

*J&H Holding Co. v. Kloss*,
No. 12 CV 5738 (NGG)(RML), 2013 U.S. Dist. LEXIS 162473
(E.D.N.Y. Nov. 13, 2013) ................................................................................ 7, 8, 15

*Kapps, M.D. v. Biosense Webster, Inc.*,
813 F. Supp. 2d 1128 (D. Minn. 2011) ...................................................................... 4

*Khoury v. Philips Med. Sys.*,
614 F.3d 888 (8th Cir. 2010) ...................................................................................... 2

*Law Bulletin Pub. Co. v. Rodgers*,
No. 87 C 0873, 1988 U.S. Dist. LEXIS 13497 (N.D. Ill. Nov. 23, 1988) ................. 27

*M2M Sols. v. Motorola Sols.*,
No. 12-33-RGA, 2016 U.S. Dist. LEXIS 22944 (D. Del. Feb. 25, 2016) ............ *passim*

*Meds. Co. v. Mylan*,
No. 11-cv-1285, 2014 U.S. Dist. LEXIS 38714 (N.D. Ill. March 25,
2014) .......................................................................................................................... 3

*N. Star Mut. Ins. v. Zurich Ins.*,
269 F. Supp. 2d 1140 (D. Minn. 2003) .................................................................. 2, 4

*Noskowiak v. Bobst Sa*,
No. 04-C-0642, 2005 U.S. Dist. LEXIS 19536 (E.D. Wis. Sept. 2, 2005) ................. 3

*Oracle Am. v. Google Inc.*,
No. C 10-03561, 2011 U.S. Dist. LEXIS 136172 (N.D. Cal. Nov. 28,
2011) .................................................................................................................. 28, 29

iv

*Polski v. Quigley Corp.*,
    538 F.3d 836 (8th Cir. 2008) .................................................................. 2

*R.C. Olmstead, Inc. v. CU Interface*,
    606 F.3d 262 (6th Cir. 2010) .................................................................. 4

*Raimondi v. Olenicoff*,
    No. SACV 12-2094, 2015 U.S. Dist. LEXIS 174961 (C.D. Cal. July 7,
    2015) ...................................................................................................... 15

*Rottlund v. Pinnacle*,
    No. 01-1980, 2004 U.S. Dist. LEXIS 16723 (D. Minn. Aug. 20, 2004) ................... 2, 3

*Sanny v. Trek Bicycle Corp.*,
    No. 11-2936 ADM/SER, 2013 U.S. Dist. LEXIS 65559 (D. Minn. May
    8, 2013) .................................................................................................... 5

*Somnis v. Country Mut. Ins.*,
    840 F. Supp. 2d 1166 (D. Minn. 2012) ..................................... 5, 13, 17, 25

*Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers*,
    377 F. App'x 303 (4th Cir. 2010) ......................................................... 33

*Universal Furniture Int'l v. Collezione Europa, USA*,
    599 F. Supp. 2d 648 (M.D.N.C. 2009) .............................................. 32, 34

*Victor Stanley v. Creative Pipe*,
    No. MJG-06-2662, 2011 U.S. Dist. LEXIS 112846 (D. Md. Sep. 30,
    2011) ................................................................................................. 32, 34

*William A. Graham Co. v. Haughey*,
    568 F.3d 425 (3d Cir. 2009) ................................................................. 21

*William A. Graham Co. v. Haughey*,
    646 F.3d 138 (3d Cir. 2011) ................................................................. 27

## Statutes

17 U.S.C. § 504(b) .................................................................... *passim*

## Other Authorities

Fed. R. Civ. P. 26(a)(2)(B) ........................................................... 4

Fed. R. Evid. 402 ............................................................................ 3

Fed. R. Evid. 403 ................................................................................. 3, 6, 9, 22

Fed. R. Evid. 702 ............................................................................... *passim*

## I.    INTRODUCTION

Federal's proposed damages expert, W. Christopher Bakewell, seeks to rebut the

testimony of FICO's damages expert, Mr. Neil Zoltowski, with respect to the lost license

fees and copyright disgorgement damages to which FICO is entitled.  (*See* Declaration of

Heather Kliebenstein ("Kliebenstein Decl.") Ex. 1 (hereafter "Bakewell Rep."), Ex. 2.)

Mr. Bakewell critiques FICO's calculations for lost license fees for breach of contract

(Bakewell Rep., ¶¶114-156) and, separately, actual damages and disgorgement of profits

under the Copyright Act (*id.* ¶¶157-205).  Mr. Bakewell offers lengthy factual recitations

of his characterization of FICO and Federal's negotiations regarding the Agreement in

2006 and 2016 (*id.* ¶¶52-71), and his characterization of FICO's negotiations with third

parties Oracle and Dell regarding Blaze Advisor license agreements following the merger

of each of these companies (*id.* ¶¶72-102).

Mr. Bakewell's testimony identified above should be excluded.  Mr. Bakewell

relies on an incorrect legal standard for his breach of contract opinions, namely, an

"intrinsic valuation" of Blaze Advisor from Federal's perspective, not the loss to FICO.

Mr. Bakewell's additional opinions attempting to reduce FICO's breach of contract

damages are likewise based on an improper interpretation of the law, irrelevant facts and

inadmissible testimony from other Federal experts (Dr. Steven Kursh and Mr. William

McCarter).  Mr. Bakewell similarly relies on an incorrect legal standard for his

disgorgement of profits opinions, placing all burdens of proof on FICO.  Further, his

attempts to reduce the revenue stream subject to disgorgement are again based on an

improper legal standard and factually unsupported.  Mr. Bakewell's cost/expense

reductions and apportionment opinions fail for similar reasons. Mr. Bakewell's opinions should be stricken in their entirety.

## II.    APPLICABLE STANDARD

### A.    Federal bears the burden to show admissibility.

Expert testimony is not automatically admissible. Rather, the party seeking to rely on such testimony must prove the expert's opinions have a reliable evidentiary basis and are relevant to the issues of the case. *See* Fed. R. Evid. 702; 703. Rule 702 requires that expert opinions: (1) help the trier of fact understand the evidence or determine a fact in issue; and (2) are based on sufficient facts or data. Fed. R. Evid. 702.

The proponent of the expert testimony bears the burden of demonstrating by a preponderance of the evidence that:

- The expert is *qualified* – whether through knowledge, skill, experience, training, or education;

- The proposed testimony is *relevant* – it will assist the trier of fact in understanding the evidence or determining a fact in issue; and

- The testimony is *reliable* – it is based on sufficient facts or data and is the product of reliable principles or methods.

*Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010); *N. Star Mut. Ins. v. Zurich Ins.*, 269 F. Supp. 2d 1140, 1147 (D. Minn. 2003); *Rottlund v. Pinnacle*, No. 01-1980, 2004 U.S. Dist. LEXIS 16723, at *86-88 (D. Minn. Aug. 20, 2004). As the proponent of Mr. Bakewell's testimony, Federal bears the burden of proving *Daubert's* exacting standards are met. *Polski v. Quigley Corp.*, 538 F.3d 836, 841 (8th Cir. 2008).

### B.    Expert testimony based on an incorrect legal standard is inadmissible.

Testimony based on an erroneous understanding of the applicable legal standard is unhelpful to the jury.  *Rottlund*, 2004 U.S. Dist. LEXIS 16723, at *86-88 (finding testimony regarding originality unhelpful where it was based on wrong legal standard); *Am. Med. Sys. v. Laser Peripherals*, 712 F. Supp. 2d 885, 900-01 (D. Minn. 2010); *see also Meds. Co. v. Mylan*, No. 11-cv-1285, 2014 U.S. Dist. LEXIS 38714, at *11-15 (N.D. Ill. March 25, 2014) (excluding expert testimony on topic because opinions were legally flawed and therefore not helpful to the jury); *Apple v. Samsung Elecs.*, No. 11-CV-01846, 2012 U.S. Dist. LEXIS 90877, at *27-31 (N.D. Cal. June 29, 2012) (excluding expert testimony as unreliable and unhelpful under Rule 702 and prejudicial under Rule 403 where damages analyses were contrary to law).

Opinions based on a flawed understanding of the law are irrelevant, likely to confuse the jury, and cause prejudice to the other party.  *Noskowiak v. Bobst Sa*, No. 04-C-0642, 2005 U.S. Dist. LEXIS 19536, at *14-20 (E.D. Wis. Sept. 2, 2005) (expert testimony based on an incorrect legal standard is irrelevant and may confuse the jury, noting that cross examination will not cure an expert's application of the wrong standard, and excluding such testimony).  Testimony premised on an erroneous understanding of the law is properly excluded under Rules 402, 403, and 702.

### C.    Expert testimony without a factual basis is inadmissible.

To be admissible an expert's opinion must be based on case-specific facts or data. Fed. R. Evid. 702(b).  Expert testimony without sufficient factual support does not satisfy the reliability or helpfulness prongs of Rule 702.  *See id.*; *Aviva Sports v. Fingerhut*

*Direct Mktg.*, 829 F. Supp. 2d 802, 825-27 (D. Minn. 2011) (excluding expert testimony where expert rendered conclusion regarding consumer's impressions but expert had no factual basis to form conclusion and further noting expert failed to account for other factors that could affect consumers' purchasing decisions); *N. Star Mut. Ins.*, 269 F. Supp. 2d at 1147-48; *EZ Dock v. Schafer Sys.*, No. 98-2364, 2003 U.S. Dist. LEXIS 3634, at *7 (D. Minn. March 8, 2003) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

In practice, an expert opinion must "sufficiently connect the proposed testimony with the facts of the case." *EZ Dock*, 2003 U.S. Dist. LEXIS 3634, at *5-6; *Kapps, M.D. v. Biosense Webster*, *Inc.*, 813 F. Supp. 2d 1128, 1148-49 (D. Minn. 2011) (requiring expert connect his opinion to the underlying data). Otherwise, the proffered opinion is not helpful to the jury.

### D.     General testimony based on "experience" is improper *ipse dixit* testimony.

A report must contain a "complete statement" of the expert's opinions, "the basis and reasons for them," and "the facts or data considered" by the expert in forming the opinions. Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). The report must outline the reasoning, including how and why the expert reached a particular result. Opinions that simply state a conclusion are not helpful to the jury. *R.C. Olmstead, Inc. v. CU Interface*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d

655, 657 (6th Cir. 2005)) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.")

Where an expert is relying on experience alone as support for a stated conclusion, the expert must explain: 1) how that experience leads to the conclusion reached, 2) why that experience provides a sufficient basis for the opinion, and 3) how the experience is reliably applied to the facts. Fed. R. Evid. 702 Advisory Committee's Note (2000). Without an adequate explanation of why and how an expert's experience supports a conclusion, such testimony is unhelpful to the jury and should be excluded. *Aviva Sports*, 829 F. Supp. 2d at 826-27 (excluding expert testimony based primarily on experience as unhelpful because expert failed to explain how experience led to conclusion, why experience provided sufficient basis for opinion, and how experience applied to facts).

An expert may educate the jury about *general* principles under Rule 702. *Insignia Sys. v. News Am. Mktg. In-Store, Inc.*, 2011 U.S. Dist. LEXIS 5558, at *7-13 (D. Minn. Jan 4, 2011 (expert could testify generally about purchasing behavior of consumer packaged goods companies but excluded testimony as to specific likely reactions of consumer packaged goods companies to Defendant's communication). An expert, however, may not may not testify to conclusions the jury is equally capable of reaching. *Sanny v. Trek Bicycle Corp.*, No. 11-2936 ADM/SER, 2013 U.S. Dist. LEXIS 65559, at *47 (D. Minn. May 8, 2013) ("A jury could, and should, draw its own conclusions about the testimony and data using common sense."); *see also Somnis v. Country Mut. Ins.*, 840 F. Supp. 2d 1166, 1173 (D. Minn. 2012) (same).

## III.    THE COURT SHOULD EXCLUDE MR. BAKEWELL'S OPINIONS REGARDING LOST LICENSE FEES.

Mr. Bakewell's opinions on lost license fees (Bakewell Rep., ¶¶114-156) are

inadmissible because they are premised upon an incorrect legal standard, factually

unsupported, and invade the province of the jury:

- Mr. Bakewell's opinions are based on the incorrect legal standard, namely, an "intrinsic valuation" of Blaze Advisor from Federal's perspective, not the loss to FICO (*id.* ¶¶114-156);

- Mr. Bakewell's opinions reducing FICO's damages to a single fee enterprise license subject to a ▅▅▅▅▅ discount improperly rely on inadmissible testimony from Dr. Steven Kursh (another Federal expert), a skewed narrative of the parties' pre-lawsuit negotiations and non-comparable settlement agreements with third parties (*id.* ¶¶138-143, 149);

- Mr. Bakewell's opinions suggesting FICO's damages should be reduced because "non-infringing alternatives" exist lack any evidentiary support (*id.* ¶¶121-134);

- Mr. Bakewell's attempt to reduce the number of applications at issue is a factual decision for the jury (*id.* ¶¶150-151);

- Mr. Bakewell's reduction in the size of the applications at issue relies on inadmissible testimony from Dr. Kursh (*id.* ¶¶155-156).

The jury will be confused and FICO will be prejudiced if Mr. Bakewell is allowed

to opine on these subjects.  Because Mr. Bakewell applies the wrong legal standard, the

fundamental problems with Mr. Bakewell's breach of contract opinions are not a matters

that smart cross examination can cure.  The Court should exercise its gatekeeping role

under FRE 403 and 702 and exclude these opinions.

A.   **Mr. Bakewell's breach of contract opinions are premised on the "intrinsic value" of Blaze Advisor to Federal—the wrong legal standard for breach of contract damages.**

Mr. Bakewell's lost licensing fee opinions are premised on a framework that is contrary to law. Under New York law, in breach of contract actions, "the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008). Here, FICO is entitled to expectation damages, *i.e.*, the loss in value to the plaintiff resulting from the defendant's breach. *See Holland Loader Co. v. FlSmidth A/S*, 313 F. Supp. 3d 447, 480 (S.D.N.Y. 2018); *J&H Holding Co. v. Kloss*, No. 12 CV 5738 (NGG)(RML), 2013 U.S. Dist. LEXIS 162473, at *6-7 (E.D.N.Y. Nov. 13, 2013); *Bi-Economy Mkt.*, 886 N.E.2d at 130.

Federal's breach resulted in the ongoing unauthorized use of Blaze Advisor on 17 applications for nearly four years. The measure of that loss is FICO's standard Blaze Advisor application fee for each application used without license for the period of the unlicensed use. This is the value lost to FICO over the period of Federal's breach.

Mr. Bakewell rejects the legally appropriate measure of damages. Instead, he considers the appropriate measure of FICO's breach of contract damages to be the "intrinsic value" of the Blaze Advisor software to ***Federal***:

> 19.   Although Mr. Zoltowski says that he analyzed "value," his overall methodology lacks consideration of valuation principles. Mr. Zoltowski repeatedly disregarded many important considerations that related to value, including: ... (iii) evidence of the relatively limited intrinsic value that is provided by Blaze Advisor, and the fact that it is only one part of Federal's overall business.

> 120.   Mr. Zoltwoski's lost license fees theory is overreaching and not focused on the intrinsic value of the license....

(Bakewell Rep., ¶¶19, 120.)  Mr. Bakewell further attempts to measure "intrinsic value" according to the parties' pre-suit negotiations in 2016, and concludes that the "intrinsic value" of Blaze Advisor is less than FICO's lost license fee because Federal rejected FICO's 2016 pre-suit offers as "too high":

> 20.   In this case, contemporaneous evidence regarding the intrinsic value associated with the issues in this case is shown in the parties' actual negotiations…. In March 2016, FICO proposed three different licensing options to Federal that ranged from ███████████████. But Federal rejected this offer because according to Ms. Pawloski, "it was not what [Federal] expected to pay for the license; it was too high." ...

(*Id.* ¶20.)  However, the remedy for breach of contract is not the amount the breaching party is willing to pay.

Scattered throughout Mr. Bakewell's report are the words "cost approach," "income approach" and "market approach."  Mr. Bakewell uses these words to frame his opinion that the amount of money owed to FICO is ***only*** the amount of money that Federal would pay to continue licensing Blaze Advisor.  Mr. Bakewell intends to tell the jury the proper damages framework is to calculate the "intrinsic value" of Blaze Advisor to Federal.  (*Id.* ¶¶121-123, 129, n. 174; *see generally* ¶¶121-156.)

Mr. Bakewell's breach of contract damages framework is contrary to New York law.  Mr. Bakewell should have approached the issue from the perspective of FICO's loss (*i.e.*, expectation damages), which is the proper measure of damages.  *See, e.g.*, *Holland Loader Co.*, 313 F. Supp. 3d at 480; *J&H Holding Co.*, 2013 U.S. Dist. LEXIS 162473, at *6-7.  Here, that breach resulted in the unauthorized use of Blaze Advisor on 17

applications for nearly four years.  FICO's standard annual application-fee pricing for the period of unauthorized use is the measure of that loss; not the purported "intrinsic value" to Federal.  This is FICO's standard price for Blaze Advisor licenses, which is the value lost to FICO over the period of Federal's breach.

The jury should not be tainted with Mr. Bakewell's legally unsound theories.  Under Rule 403 and 702, the Court should exclude Mr. Bakewell's opinions on FICO's breach of contract damages (¶¶114-156) in their entirety.  They have no basis in law.

**B.     Mr. Bakewell's opinions that FICO's damages should be based on an enterprise license fee with a discount applied should be excluded.**

Mr. Bakewell opines that FICO's lost license fee calculation is "commercially unrealistic" and "results in inflated calculations" because Federal would have only paid for a single fee enterprise license.  (Bakewell Rep., ¶¶135-137.)  Regarding discounts, Mr. Bakewell opines that FICO's application based license fee calculation should be reduced by a ███████ discount.  (*Id.* ¶¶142-143, 149.)

Notably, again, Mr. Bakewell's framework is premised on the "intrinsic value" of Blaze Advisor from Federal's perspective—not the loss to FICO.  These opinions should be excluded for the additional reason they are based on inadmissible testimony from Dr. Steven Kursh (Federal's licensing expert), a skewed recitation of the parties' 2016 pre-suit negotiations and non-comparable third party agreements.

1.   **Mr. Bakewell's opinions on enterprise licensing and discounts relies on inadmissible testimony from Dr. Kursh.**

Mr. Bakewell's opinion that the parties would have negotiated an enterprise license is based entirely on Dr. Kursh.  (Bakewell Rep., ¶¶135, 140.)  His deposition confirms reliance on Dr. Kursh:

Q.   Do you have an opinion that a different [licensing] framework should have been used in this case?

A.   ...***Doctor Kursh has some opinions that respond to Mr. Zoltowski and explain that Mr. Zoltowski's framework of named applications is unreasonable***.

(Kliebenstein Decl. Ex. 3 (hereafter "Bakewell Dep."), 24:4-17 (emphasis added).)

Mr. Bakewell's discount-related opinions are also based entirely on Dr. Kursh. (Bakewell Rep., ¶143.)  Mr. Bakewell admitted he relied entirely on Dr. Kursh for the substance of his discounting opinion because it was too difficult to determine a discount percentage from the other license agreements he purportedly considered:

Q.   In calculating the discount to apply, did you – did you tabulate the different discounts that are given to any of the customers in Exhibit 12?

A.   I think I did that at one point, ***or tried to do it, you know, some of those licenses are more difficult than others to figure out a discount because they could be implicit***.

   ***Ultimately I'm relying on Dr. Kursh for that assumption. He's the software licensing expert***.

Q.   For the assumption of the amount of discount that should apply in this case?

A.   Correct. He has an opinion about that, and all I can do is confirm the reasonableness of his opinions, and they certainly seem reasonable,

10

and consistent with my experience, and the evidence I've seen, ***but the specific number that comes from him***.

(Bakewell Dep., 160:2-19 (emphasis added).)

These back door opinions from Dr. Kursh are inadmissible.  As shown in FICO's concurrently filed Motion to Exclude Dr. Kursh, Dr. Kursh's opinions on the concept of an enterprise license and discounts are *ipse dixit*; improper opinion on the parties' state of mind; and invades the province of the jury.  Because Mr. Bakewell's opinions rise or fall with Dr. Kursh[1], ¶¶134-141 should be stricken.  *See M2M Sols. v. Motorola Sols.*, No. 12-33-RGA, 2016 U.S. Dist. LEXIS 22944, at *22-23 (D. Del. Feb. 25, 2016) (excluding opinion of damages expert that relied upon another inadmissible expert opinion).

### 2.    Mr. Bakewell's opinion on the parties' prior negotiations ignores the record evidence.

Next, Mr. Bakewell concludes the parties would have negotiated an enterprise license including discounts because this was one of the options discussed during their negotiations in 2016. As shown above in Section III.A, this opinion, premised on what Mr. Bakewell thinks Federal would be willing to pay in a license negotiation, should be excluded because it is based on the incorrect legal standard.

Mr. Bakewell's selective summary of the parties' pre-suit negotiations should also be excluded because it merely presents Federal's view of the factual record without

---

[1] To the extent it was not derived from Dr. Kursh, Mr. Bakewell's opinion that the parties would have negotiated an enterprise license agreement improperly opines on the parties' intent and state of mind (*e.g.*, what they would have done in a hypothetical circumstance). Such opinions are inadmissible.  *See In re Baycol*, 532 F. Supp. 2d 1029, 1069 (D. Minn. 2007) (excluding expert opinion regarding "motive, knowledge, intent or state of mind"). "The question of corporate intent is one for the jury, not for an expert."  *Id.*

analysis and therefore invades the province of the jury.  Mr. Bakewell attempts to rely on

the parties' negotiations for his conclusion that they would have negotiated an enterprise

license including discounts:

> 70.    ...Based on the 2016 negotiations between FICO and Federal, the highest option FICO offered Federal was an enterprises license for ███
> ████████.... All FICO's offers to Federal included discounts that ranged from ████████████████.
>
> 71.    ...FICO and Federal did not discuss a named application type license and instead discussed an enterprise license that included ██████████ ██████.
>
> 135.    ...FICO's 2006 amended license agreement and 2016 negotiation with Federal were in the form of an ELA....
>
> 140.    ...[D]r. Kursh also explained to me that in his experience, FICO and Federal would continue with the ELA type of agreement that was in place in 2006 and discussed in the 2016 negotiations.
>
> 145.    During FICO's 2016 negotiations with Federal, FICO proposed discounts ████████████████.... Mr. Zoltowski disregarded this evidence, too

(Bakewell Rep., ¶¶70-71, 135, 140, 145.)  These opinions ignore two key facts:

First, an application-based license *was* on the table during these negotiations.  As

Mr. Bakewell acknowledges, one of the options under consideration was an application

license for "up to 15 named applications":

> Option Two: ***FICO proposed [] Blaze Advisor perpetual deployment licenses for up to 15 named applications*** including up to 100 development seats for a license fee of ██████████████████████
> █████████████████████████

(*Id.* ¶59 (emphasis added).)

Second, Federal has been in breach of the agreement for over three (3) years.

According to Dr. Kursh, discounts are offered to incent additional business:

- Licensors consider the total, long-term value of a licensing relationship when pricing software licenses because these deals "will typically include services, ongoing maintenance, upgrades and additional use, updates, reference[s], and opportunities for more revenues from additional license sales of other products and services."

- The term "discount" for software licenses "is a misnomer in this context" because the license fees that software vendors charge are negotiated in light of the broader relationship between the licensor and licensee.

(*See* Dkt. 374, ¶¶60, 62.)  A discount would not apply in this case.  Federal is in breach. Federal does not pay FICO any professional services fees for additional work.  There is no expanded business opportunity to be lured in with a discount.  At issue now is the remedy for breach.

Cherry picking the record evidence, including documents and deposition testimony, does not provide a reliable basis or sufficient factual support to satisfy Rule 702.  *See Insignia Sys.*, 2011 U.S. Dist. LEXIS 5558, at *13-14; *Carlson v. C.H. Robinson*, Nos. 02-3780, 02-4261 (JNE/JGL), 2005 U.S. Dist. LEXIS 5677, at *9 (D. Minn. Mar. 30, 2005).  Mr. Bakewell's conclusion that the parties would have negotiated an enterprise license ignores facts, and his testimony on the issue should be excluded.

Finally, Mr. Bakewell's conclusion brings no independent expertise to bear on this issue.  He merely restates the factual record and tells the jury which conclusion to reach from this evidence.  The jury is capable of determining from these facts what effect, if any, to give the parties' failed negotiations in 2016 and whether FICO's request for application-based damages is reasonable.  *Somnis*, 840 F. Supp. 2d at 1173 (excluding

13

expert testimony that would invade the province of the jury and warning that permitting an expert "to draw an inference that the jury can reach on its own would do little more than put his imprimatur on the defendant's case, and, in essence, simply tell the jury what result to reach.) (internal quotations and citation omitted).  Mr. Bakewell's opinions at ¶¶70-71 and ¶¶135-145 are not useful and should be excluded.

### 3.    Mr. Bakewell's reliance on the Oracle and Dell negotiations is inadmissible.

Mr. Bakewell also relies on FICO's negotiations with the third parties Oracle and Dell in support of his conclusion that FICO and Federal would have negotiated an enterprise license and/or a discount.  (Bakewell Rep., ¶¶72-102.)  Historically, FICO engaged in settlement discussions with Dell and, separately, Oracle after each underwent a merger event.  Mr. Bakewell contends that FICO's breach of contract damages should be similar to what those third parties paid FICO.  (*Id.* ¶¶89, 102.)

Mr. Bakewell opined that because Dell and Oracle received ██████████████████ ██████████████████████ (*Id.* ¶¶89, 141, 145; *see also* ¶¶72-102.)  He confirmed the ████████████████████████████████████████████ ██████████

Q.    In the discount – the discount you applied is ████████████ ██████; is that right?

A.    Yes.  I think that based upon what Mr. Kursh said and other information I've said, ***including Oracle which said, you know, they are used to*** ████████████████████████, ***that's a reasonable estimate of the applicable discount that would apply***. . . .

(Bakewell Dep., 158:25-159:7.)

Mr. Bakewell's reliance on the Dell and Oracle negotiations is not helpful to the trier of fact. As shown in Section III.A above, the proper measure of damages is the actual loss to FICO (expectation damages). FICO's negotiations with third parties are irrelevant under New York law. *See J&H Holding Co.*, 2013 U.S. Dist. LEXIS 162473, at *6-7.

Even if these negotiations are considered, only ***comparable*** agreements and negotiations are relevant to damages. "[T]he use of past licenses as evidence must always take account of economically relevant differences between the circumstances of those licenses and the circumstances of the matter in litigation." *Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015); *Raimondi v. Olenicoff*, No. SACV 12-2094, 2015 U.S. Dist. LEXIS 174961, at *6 (C.D. Cal. July 7, 2015) (same). Here, Mr. Bakewell offers no evidence that these other license agreements and negotiations are comparable to the facts of this case, which is required to show their relevance.

Mr. Bakewell's opinion fails to "take account of the economically relevant differences" between FICO's negotiations with Oracle and Dell and the present case. This opinion is irrelevant, unreliable, and should be excluded. *M2M Sols.*, 2016 U.S. Dist. LEXIS 22944, at *25-30 (excluding damages expert whose opinion "improperly relies on licenses that are not economically comparable"); *Intelligent Verification Sys. v. Microsoft Corp.*, No. 2:12-cv-525, 2015 U.S. Dist. LEXIS 43042, at *15-18 (E.D. Va. Mar. 24, 2015) (same).

**C.    Mr. Bakewell's opinion on non-infringing alternatives should be excluded.**

Mr. Bakewell concludes Mr. Zoltowski's license fee calculation is overstated because he did not account for alleged noninfringing alternatives to Blaze Advisor. (Bakewell Rep., ¶¶121, 126, 130; *see generally* ¶¶122-134.)  This opinion is also premised on the incorrect belief that the framework for damages is the "intrinsic value" to Federal—not the loss to FICO.

Mr. Bakewell's non-infringing alternative opinion also lacks factual support.  He relied entirely on Mr. McCarter for the substance of his opinion:

> 131.    Mr. McCarter told me that Federal could have implemented the following alternatives....
>
> 132.    I understand from Mr. McCarter that each of these alternatives would provide the same or essentially similar functionality as Blaze Advisor.

(*Id.* ¶¶131-132; *see also id.* notes 186-191, 194-195 (citing "Interview of Mr. McCarter" as the source for ¶¶131-132).)  As shown in FICO's concurrently filed Motion to Exclude Mr. McCarter, Mr. McCarter's identification of non-infringing alternatives is inadmissible because this opinion is legally irrelevant and factually unsupported.  Mr. McCarter did not assess if these alternatives had "similar functionality" to Blaze Advisor. Because these opinions exclusively rely on Mr. McCarter's inadmissible opinion, Mr. Bakewell's opinion regarding "non-infringing alternatives" should also be excluded.  *See M2M Sols.*, 2016 U.S. Dist. LEXIS 22944, at *22-23.

**D.     Mr. Bakewell's opinion on the applications that use Blaze Advisor merely restates the record evidence.**

Mr. Bakewell attempts to reduce FICO's damages by "adjusting" Mr. Zoltowski's calculation for applications that do not use Blaze Advisor.  (Bakewell Rep., ¶¶150-151.) In Mr. Bakewell's view, "Mr. Zoltowski's analysis is overstated because he included Federal's applications that do not purport to use Blaze Advisor." (*Id.* ¶150.)

The source of this opinion is solely the record evidence—not his expertise.  (*Id.* notes 224-229; *see also* Bakewell Dep., 50:20-51:1.)  Mr. Bakewell admitted in his deposition that he did not independently assess whether or not the applications used Blaze Advisor:

> Q.     Mr. Bakewell, you have not gone into the applications themselves to confirm whether Blaze Advisor is or isn't used in them; correct?
>
> A.     Correct.  I'm not a technical expert.

(Bakewell Dep., 51:10-13.)

This opinion should be excluded because Mr. Bakewell brings no specific expertise to bear on the issue and therefore usurps the role of the jury.  Mr. Bakewell's conclusion simply instructs the jury which conclusion to reach from the record evidence. *See Somnis*, 840 F. Supp. 2d at 1173 (excluding expert testimony that would invade the province of the jury).

**E.     Mr. Bakewell's opinion on "sizing" relies on Dr. Kursh's inadmissible opinion.**

Finally, Mr. Bakewell attempts to reduce FICO's claimed lost license fees by attacking the sizing performed by Mr. Zoltowski in calculating his application-based license.  (Bakewell Rep., ¶¶152-156.)  FICO prices application-based license fees on the

17

size of a customer's application. ████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

Mr. Bakewell offers a different sizing framework in his report.  (*Id.* ¶¶155-156;

Exs. 2.0, 2.1, 3.0, 3.1.)  The sole source of Mr. Bakewell's sizing opinion was Dr. Kursh,

Federal's industry expert.  (*Id.* ¶¶155-156.)  Mr. Bakewell confirmed his reliance on Dr.

Kursh's sizing opinion at his deposition:

> Q.     The sizing that's presented in your report that's from reliance on
>        Doctor Kursh?
>
> A.     He did that analysis specifically. Yes.

(Bakewell Dep., 199:2-5.)

Dr. Kursh's sizing opinion is fundamentally flawed and inadmissible.  As shown

in FICO's concurrently filed Motion to Exclude Dr. Kursh, Dr. Kursh erroneously

attempts to size applications in use during the damages period (2016-2019) on the size of

a single application in use in 2006.  Dr. Kursh also ignored the relevant transaction data

that forms the basis of FICO's application sizing.  When pressed, Dr. Kursh admitted his

sizing calculation was wrong.  (*See* Kliebenstein Decl. Ex. 4, 182:9-13; 185:4-7; 186:1-

14.)  Since Mr. Bakewell based his sizing opinion entirely on Dr. Kursh's inadmissible

analysis, paragraphs 155-156 should be excluded.  *See M2M Sols.*, 2016 U.S. Dist.

LEXIS 22944, at *22-23.

## IV.   THE COURT SHOULD EXCLUDE MR. BAKEWELL'S TESTIMONY ON ACTUAL DAMAGES

FICO's claim for actual damages under 17 U.S.C. § 504(b) is consistent with its

breach of contract damages.  Mr. Bakewell's opinions regarding FICO's claim for actual

damages (Bakewell Rep., ¶¶130, 137) should be excluded for the same reasons, and in

the same ways, as Mr. Bakewell's opinions regarding FICO's breach of contract

damages.

## V.   THE COURT SHOULD EXCLUDE MR. BAKEWELL'S TESTIMONY REGARDING DISGORGEMENT

The Court should exclude Mr. Bakewell's opinions relating to FICO's

disgorgement damages under 17 U.S.C. § 504(b).  (*Id.* ¶¶157-205.)  Mr. Bakewell

consistently applies the wrong burdens of proof.  His opinions on FICO's elements of

proof, namely an identification of the revenues connected to infringement, are premised

on an erroneous understanding of the law and inconsistent factual sources.  Mr.

Bakewell's opinions on Federal's burdens of proof—apportionment and deduction of

expenses—has no legal basis and is factually unsupported.  The Court should exercise its

gatekeeping role and exclude these opinions.

### A.   Mr. Bakewell's opinions on the burdens of proof under 17 U.S.C. § 504(b) are irrelevant because they are based on an incorrect legal standard.

To frame the issue, the statutory relief for recovery of profits is set forth in 17

U.S.C. § 504(b):

The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, ***and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages***. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

Section 504 lays out a burden-shifting mechanism for ascertaining profit "attributable to the infringement." First, the "copyright owner is required to present proof only of the infringer's gross revenue." 17 U.S.C. § 504(b). Then the burden shifts to the infringer to (1) present evidence of the "deductible expenses" to prove profits derived from the gross revenue, and (2) "the elements of profit attributable to factors other than the copyrighted work." *Id.*; *see also Andreas v. Volkswagen of Am.*, 336 F.3d 789, 795 (8th Cir. 2003). Mr. Bakewell's opinions misallocate this burden of proof. They are contrary to law and should be excluded.

### 1.    Mr. Bakewell's opinions relating to the burden of proof to identify gross revenues are based on an incorrect legal standard.

It is FICO's burden to "present proof only of the infringer's gross revenue." 17 U.S.C. § 504(b). But Mr. Bakewell opines that FICO must prove that a specific percentage or fraction of revenues is connected to Federal's infringement. For example:

164.    ...***Mr. Zoltowski provided no sound methodology to calculate the fraction of revenues or profits attributable to Blaze***....

(Bakewell Rep., ¶164 (emphasis added); *see also* ¶¶169, 173, 177.)

Mr. Bakewell's opinion is contrary to the legal standard. As copyright owner, FICO need only present proof of Federal's gross revenue. Here, FICO will present the

gross written premium from insurance policies in connection with which Blaze Advisor was used: the act of infringement.  When FICO meets its burden, "a rebuttable presumption that the defendant's revenues ***are entirely attributable*** to the infringement arises."  *Andreas*, 336 F.3d at 796 (emphasis added) (acknowledging standard); *see also Dayva Int'l v. Award Prods.*, No. 97-1397, 1998 U.S. App. LEXIS 4386, at *8 (Fed. Cir. Mar. 11, 1998) (quoting *Data Gen. v. Grumman Sys. Support*, 36 F.3d 1147, 1173 (1st Cir. 1994)).

Proof of a specific percentage of a revenue stream that is wholly and solely from the infringement is not required from a plaintiff.  *Dayva*, 1998 U.S. App. LEXIS 4386, at *6 ("The statute does not require proof of causation but only of gross revenue.").  Nexus only requires the revenues be reasonably related to the infringement.  *William A. Graham Co. v. Haughey*, 568 F.3d 425, 443 (3d Cir. 2009).  Nexus does not require the copyright owner to prove the revenues are "directly tied solely to the infringement." *Fournier v. McCann Erickson*, 242 F. Supp. 2d 318, 327 (S.D.N.Y. 2003).  Mr. Bakewell's opinions in ¶¶164, 169, 173 and 177 are based on an incorrect legal standard and should be excluded.

### 2. Mr. Bakewell incorrectly opines FICO has the burden to prove deductible expenses.

Mr. Bakewell further opines FICO has the burden to prove deductible expenses. (Bakewell Rep., ¶¶161, 185-187; *see also* Bakewell Dep., 47:14-20.)  This opinion is contrary to simple common sense—Federal is the only party with data regarding its expenses.  It is also based on a flawed understanding of the law.  Under Section 504(b),

the infringer must prove deductible expenses.  *Id.*; *see also Andreas*, 336 F.3d at 795.

Mr. Bakewell's attempt to shift this burden to FICO is inconsistent with the forthcoming

jury instructions and would confuse the jury.  Under Rules 403 and 702, Mr. Bakewell

should not be allowed to testify regarding the opinions set forth in ¶¶161 and 185-187.

> ### 3.   Mr. Bakewell incorrectly opines FICO has the burden to prove the elements of profit attributable to factors other than the copyrighted work.

Next, Mr. Bakewell intends to tell the jury that FICO needs to prove what portion

of Federal's profits are attributable to factors other than Federal's infringement:

> 170.   ...[T]he evidence indicates that the large majority, if not all, of
> Federal's gross written premiums are attributable to factors unrelated to the
> use of Blaze Advisor applications and that fall outside the scope of any
> allegedly unlawful conduct in this matter. And Mr. Zoltowski has not
> shown otherwise....

(Bakewell Rep., ¶170, *see also* ¶¶172-173, 177.)  As with expenses, apportionment is

Federal's burden, not FICO's burden.  Under Section 504(b), the infringer must prove

"the elements of profit attributable to factors other than the copyrighted work."  *Id.*; *see*

*also Andreas*, 336 F.3d at 795.  Mr. Bakewell should not be allowed to instruct the jury

on what FICO "should have addressed" as stated in ¶¶170-177.

> ### B.   Mr. Bakewell's opinion identifying the revenues subject to disgorgement under 17 U.S.C. § 504(b) is factually unsupported.

Mr. Bakewell's report identifies the gross revenues that are the starting point for a

disgorgement analysis.  He opines that Mr. Zoltowski's revenue calculation is overstated.

In Mr. Bakewell's view, there is less revenue subject to potential disgorgement, but he

arrives at this conclusion by using wrong (and unsubstantiated) data.  Mr. Bakewell also

removes from his calculations several software applications that are presently accused of

infringement.  In doing so, he performs the job of the jury.  Mr. Bakewell's opinions

regarding revenue subject to disgorgement are inadmissible and should be excluded.

### 1. Mr. Bakewell's reconstruction of gross written premium values is unsupported and inadmissible.

During discovery, FICO asked for Federal's revenue connected to use of Blaze

Advisor.  Federal produced that data in response to interrogatories:

> **INTERROGATORY NO. 17:** For all insurance policies in connection
> with which the Blaze Advisor® software was used, the gross written
> premium of Federal and the gross written premium of each related
> company, including the specific identification of each related
> company, for each quarter from March 30, 2016 to date….

Interrogatory Nos. 18-20 sought the same information for the United Kingdom,

Canada, and any other country (including Australia).

Mr. Bakewell did not consistently use Federal's own data in his calculation of the

revenue subject to FICO's disgorgement claim.  Instead, his calculations compile gross

revenue from a variety of (unverified) sources not kept in the ordinary course of business:

business unit financial data prepared for this litigation; some of Federal's interrogatory

responses (but only when these values were lower than the business unit data); and a

spreadsheet of raw data relating to the CUW[2] application (produced after FICO's expert

reports were due).  (Bakewell Rep., ¶¶182-185; Exs. 6.0, 7.1, 7.2, 7.3.)  Mr. Bakewell's

calculations are as follows:

---

[2] Mr. Bakewell stated in his deposition that the "revised CUW data" was created by
Federal in an attempt to screen out duplicative gross written premium dollars in the data
provided in response to Interrogatory No. 17.  (Bakewell Rep., ¶¶182, 184; Bakewell
Dep., 99:12-25.)  But Mr. Bakewell was unable to identify any duplicative entries in the
response to Interrogatory No. 17.  (Bakewell Dep., 100:1-6.)

| Segment | Source of Mr. Bakewell's Calculation |
|---|---|
| United States<br>Bakewell Rep., Ex. 6.0 | **CUW Application (2016-2018):** Federal's "revised" CUW data spreadsheet.<br><br>**CUW Application (2019):** Gross written premiums for CUW from Federal's interrogatory responses, adjusted by applying the 3 year average (2016 to 2018) ratio (*i.e.*, gross written premiums from revised CUW data to gross written premiums from the interrogatory responses) to the 2019 gross written premiums.<br><br>**Other Applications (2016-2019):** Revised data in combination with the gross written premiums data from the interrogatory responses. |
| Australia<br>Bakewell Rep., Ex. 7.1 | **2016-2019:** Gross written premiums from Federal's Australia business segment financials. (FED017884_001.) |
| Europe/U.K.<br>Bakewell Rep., Ex. 7.2 | **2016-2019:** Gross written premiums from Federal's Interrogatory Responses. (FED017885_0001.) |
| Canada<br>Bakewell Rep., Ex. 7.3 | **2016-2019:** Gross written premiums from Federal's Canada business segment financials (FED017883_0001). |

Mr. Bakewell provided no coherent methodology by which he selected revenue data to compile his recalculated gross written premiums. Rather, his "methodology" seems to be a calculated attempt to reduce the claimed revenue to the greatest extent possible. For example, Mr. Bakewell chose to use the data in Federal's interrogatory responses to calculate the Europe/U.K. values because it was lower than the data in the business segment financials he otherwise used:

> Since the gross written premiums from the business segment financials are greater than or similar to the gross written premiums in the Interrogatory Responses, I have used the gross written premiums from the Interrogatory Responses for the years 2016 to 2018.

(Bakewell Rep., Ex. 7.2; Bakewell Dep., 142:15-21.)

Mr. Bakewell's selection of gross written premium data brings no independent expertise to bear on the case-specific facts. His "analysis" employs no sound

methodology to determine, on a principled basis, which gross written premium source to use.  Mr. Bakewell simply chooses to use whichever data source reports the lower amounts.

Cherry picking the record evidence, as Mr. Bakewell has done to compile his recalculated gross written premiums, does not provide a reliable basis or sufficient factual support to satisfy Rule 702.  *See Carlson*, 2005 U.S. Dist. LEXIS 5677, at *9; *see also Insignia*, 2011 U.S. Dist. LEXIS 5558, at *13-14.  Mr. Bakewell's reconstructed values conflict with Federal's verified interrogatory responses and should be excluded.

> ### 2.     Mr. Bakewell's opinion on the applications using Blaze Advisor simply weighs the record evidence.

Mr. Bakewell opines that Mr. Zoltowski's gross written premium calculation is overstated because it includes applications that do not use Blaze Advisor.  (Bakewell Rep., ¶¶175-176, 194.)  But, as shown above in Section III.D, Mr. Bakewell's opinion regarding the applications that use Blaze Advisor merely instructs the jury which conclusion to reach from the record evidence.  This opinion is inadmissible.  *See Somnis*, 840 F. Supp. 2d at 1173.

> ### C.     Mr. Bakewell's opinions regarding FICO's burden to prove a connection between the revenue stream and the infringement is conclusory and not tied to the facts of this case.

Mr. Bakewell also opines there is no connection between Federal's copyright infringement and its revenues for at least two reasons: (1) Blaze Advisor has no value to Federal; and (2) an award of disgorgement of profits would be a financial windfall to FICO.  (Bakewell Rep., ¶¶163-166, 169.)   This testimony is premised on an incorrect legal standard, ignoring the remedies for copyright infringement as provided in Section

504(b). Additionally, the proffered opinions are conclusory and without factual support.

The Court should exclude them.

### 1. Mr. Bakewell's opinion on the "value" of Blaze Advisor relies on Mr. McCarter's inadmissible opinion.

In Mr. Bakewell's view, there is no connection between Federal's infringement

and its revenue because Blaze Advisor is a small portion of Federal's claims process:

> 164.   ...I discussed in Section 3.3, that Blaze is a relatively small piece of Federal's claims process. Mr. Zoltowski provided no sound methodology to calculate the fraction of revenues or profits attributable to Blaze, and instead offers figures that are clearly overinclusive....

Mr. Bakewell relies on the analysis of Mr. McCarter, Federal's industry expert, for the

conclusions reached in Section 3.3:

> 35.   William McCarter ... explained to me that Blaze Advisor is an "agnostic" business solution. According to Mr. McCarter, by "agnostic," he means that FICO does not provide the actual rules that are put into Blaze. As an example, Mr. McCarter explained to me that Blaze Advisor is similar to a blank Excel worksheet. A user must input data and rules into the software to make it work. I understand that Federal provides the rules, processes, decisions, and technology to make the entire process work.

> 36.   Mr. McCarter also told me Federal utilizes approximately 1,500 different applications. Mr. McCarter further explained that only ten of the 1,500 applications actually use Blaze Advisor.

> 37.   I understand Blaze Advisor is just one of approximately 20 different technologies in the CSI eXPRESS application and just one of approximately 15 to 20 different technologies in the CUW application alone.

(Bakewell Rep., ¶¶35-37 and notes 29-36 (citing "Interview of Mr. McCarter" as the

source for ¶¶35-37).)  As shown in FICO's concurrently filed Motion to Exclude Mr.

McCarter, Mr. McCarter proffers these opinions without reference to or analysis of any

case-specific facts and (consequently) there is no methodology of analysis to support these opinions.  Mr. Bakewell's conclusion relies entirely on Mr. McCarter's inadmissible analysis and should be excluded.  *See M2M Sols.*, 2016 U.S. Dist. LEXIS 22944, at *22-23.

### 2. Mr. Bakewell's opinion that FICO would receive a windfall is legally irrelevant under 17 U.S.C. § 504(b).

Mr. Bakewell further attempts to rebut Mr. Zoltowski's revenue calculation by concluding it would be an improper windfall to FICO:

> 164.   ...[A] remedy based upon the disgorgement of Federal's profits would be unrelated to, and significantly exceed, the potential value (if any) received by Federal from the alleged infringement and would result in an economic windfall to FICO.

(Bakewell Rep., ¶164; *see also* ¶¶165, 171.)  Mr. Bakewell confirmed this opinion in his deposition.  (Bakewell Dep., 17:12-20.)

Whether a disgorgement of profits under Section 504(b) would create a "windfall" to the copyright owner is irrelevant.  The purpose of the statue is clear: to take away the incentive to infringe and prevent the infringer from unfairly benefitting from the infringement. "Damages are awarded to compensate the copyright owner for losses from the infringement, ***and profits are awarded to prevent the infringer from unfairly benefiting from a wrongful act***."  *William A. Graham Co. v. Haughey*, 646 F.3d 138, 144 (3d Cir. 2011) (emphasis added) (quoting H.R. Rep. No. 94-1476, at 161 (1976)). Whether the recovery is greater than the copyright owner's own profits is irrelevant.  *See, e.g.*, *Law Bulletin Pub. Co. v. Rodgers*, No. 87 C 0873, 1988 U.S. Dist. LEXIS 13497, at *11 (N.D. Ill. Nov. 23, 1988) ("If the infringer made greater profits than the copyright

owner lost, the owner is allowed to capture the additional profit even though it does not represent a loss to him.").  Mr. Bakewell's "windfall" opinion is irrelevant and contrary to law.  It would not assist the trier of fact and should be excluded.

> ### 3.  Mr. Bakewell's opinion on non-infringing alternatives is contrary to law and unsupported.

In Mr. Bakewell's view, Mr. Zoltowski's disgorgement calculation is also flawed and lacks nexus because he did not account for "alternatives" to Blaze Advisor.

> 130.   There are other alternatives that are informative of value.... In his report, Mr. Zoltwoski did not even investigate or consider the issue at all. As a result, Mr. Zoltowski cannot provide any assurance that his calculations are sufficiently tied to (*i.e.* have a nexus to) any "actual damages" that are "suffered ... as a result of the infringement."

> 165. ...[T]he contemporaneous economic evidence shows that there are available substitutes to Blaze Advisor.  Federal could reasonably discontinue the contracts for Blaze Advisor because it would have options to use other substitute solutions.

(Bakewell Rep., ¶¶130 (quoting 17 U.S.C. § 504(b)), 165; *see also* ¶¶121-134.)

As shown in Section III.C above, Mr. Bakewell's noninfringing alternative opinion lacks factual support.  His conclusions regarding noninfringing alternatives are based solely on the inadmissible analysis of Mr. McCarter and should be excluded.  *See M2M Sols.*, 2016 U.S. Dist. LEXIS 22944, at *22-23 (excluding opinion of damages expert that relied upon another inadmissible expert opinion).

As applied to copyright damages, Mr. Bakewell's noninfringing alternative opinion is also contrary to law.  "Non-infringing alternatives have nothing to do with [disgorgement]."  *Oracle Am. v. Google Inc*., No. C 10-03561, 2011 U.S. Dist. LEXIS 136172, at *14-16 (N.D. Cal. Nov. 28, 2011) (striking expert opinion that "non-infringing

alternatives should in any way affect the calculation of infringer's profits under 17 U.S.C. 504(b).") There is no basis in the law for Mr. Bakewell's non-infringing alternative opinion, rendering his opinion irrelevant and unhelpful. *See id.* at *14-16.

All opinions that non-infringing alternatives should in any way affect the calculation of Federal's profits under 17 U.S.C. § 504(b), including ¶¶126-134 and ¶¶163-166, should be excluded.

> ### D.   Mr. Bakewell's opinions on apportionment and expense deductions—issues on which Federal bears the burden—are unsupported and contrary to law.

After addressing the portions of Section 504(b) that are FICO's burden to prove, Mr. Bakewell attempts to meet Federal's burden to prove expenses and identify the portions of profit that are attributed to elements other than the infringement.  Mr. Bakewell's opinions on both issues are premised on incorrect legal standards and factually unsupported *ipse dixit*.  They should be excluded.

> #### 1.   Mr. Bakewell's apportionment opinions are based on a flawed understanding of the law.

Mr. Bakewell seeks to reduce Mr. Zoltowski's disgorgement calculation because, in his opinion, "the large majority, if not all" of Federal's profits are attributable to factors other than Federal's infringement:

> 170.   ...[T]he evidence indicates that the large majority, if not all, of Federal's gross written premiums are attributable to factors unrelated to the use of Blaze Advisor applications and that fall outside the scope of any allegedly unlawful conduct in this matter.... These factors include (but are not necessarily limited to), the know-how of its workforce, management abilities, brand recognition, existing customer relationships, pricing, and service quality, all of which are key drivers of Federal's gross written premiums.

(Bakewell Rep., ¶¶170; *see also* ¶¶167-169, 171-174.)

Mr. Bakewell opines, generally, that Federal's profits are due to factors such as product offerings, brand recognition, financial strength, price, distribution system, customer service, technology, insurance renewals, and existing customer relationships (among others).  (*Id.* ¶¶43, 172.)

Mr. Bakewell's apportionment opinions are too general to have value; they do not identify a portion of the profits attributed to any of these factors.  Whether and to what degree any of these factors contributes to profits is speculation, nothing more.  When it comes to a defendant's burden under Section 504(b), an expert must provide more than unquantified observations regarding profit apportionment.  In *Design Ideas v. Things Remembered*, the court excluded portions of defendant's damages expert's apportionment opinion because it was unhelpful to the jury.  No. 07-3077, 2009 U.S. Dist. LEXIS 38374, at *13-14 (C.D. Ill. May 6, 2009).  There, defendant's expert opined on factors, besides copyright infringement, that could contribute to defendant's profits.  The expert failed to provide an "opinion concerning the ***portion*** of the profits that were attributable" to other factors.  *Id.* (emphasis added).  The court excluded the expert's opinion as unhelpful because the opinion amounted to "general observations."  *Id*.  Without the "correct percentage of total revenues or profits that would be attributable to" other factors, "the jury would be left to speculate."  *Id*.

Mr. Bakewell's apportionment opinions (¶¶167-174) are no different from the unhelpful opinions excluded in *Design Ideas*.  Mr. Bakewell describes other factors to which Federal's profits are purportedly attributable.  Mr. Bakewell, however, offers no

opinion on "the *portion* of the profits that were attributable" to such other factors or a methodology by which they can be quantified.  Mr. Bakewell did not calculate a percentage of revenue attributable to *any* of these other factors, despite admitting that, if necessary, he could "get out the toolbox" and perform these calculations.  (Bakewell Dep., 63:12-15; *see also id.* 53:10-63:11.)  Mr. Bakewell offers no calculations, quantifications, or percentages that would assist the trier of fact.  Instead, he leaves the jury to speculate on the impact of such factors.  This is improper.  Like the court in *Design Ideas*, this Court should exclude Mr. Bakewell's apportionment opinions.

**2.     Mr. Bakewell's expense and loss deductions are untethered to the infringement and the legal standards.**

Mr. Bakewell's attempted deduction of expenses and losses is similarly inadmissible because it is premised on an incorrect legal standard.  (Bakewell Rep., ¶¶185-205.)  As a result, the expense and loss deductions are overbroad, untethered to the revenue stream connected to the infringement.  By way of background, in this case "loss" refers to dollars paid out for claims submitted by policy holders.  "Expense" refers to money spent running the business, such as money spent on salaries, facilities, marketing, etc.  Mr. Bakewell deducted expenses and losses as follows:

194.     *First*, I calculated Federal's gross written premiums[3] (gross revenue) associated with applications that used Blaze Advisor....

195.     *Second*, I deducted Federal's reinsurance costs to determine Federal's net written premium....

---

[3] Mr. Bakewell's recalculation of Federal's gross written premiums is inadmissible for the reasons stated in Section V.B.1 above.

196.   *Third*, I adjusted the net written premiums to reflect the amount of earned premiums ... as reflected in Federal's profit and loss statements for the relevant business segments and lines of business.

197.   *Fourth*, I deducted losses and LAE expenses incurred by Federal associated with the earned premiums.... I estimated the losses and LAE expenses based on Federal's actual loss ratio as reported in the profit and loss statements for the relevant business segments and lines of business....

199.   *Fifth,* I deducted commissions expenses incurred by Federal. Commissions expenses comprise the direct selling costs of the insurance policies.... I estimated Federal's commissions expenses attributable to the subject earned premiums based on Federal's actual reported commissions expenses as a percentage of earned premiums as reported in the profit and loss statements for the relevant business segments and lines of business.

200.   *Sixth*, I deducted general and administrative expenses and taxes, licenses and fees incurred.... General and administrative expenses include underwriter salaries and benefits, professional fees and advertising and marketing costs among other expenses.... I understand that these costs cannot be attributed to specific insurance policies, but are allocated to the lines of business.

(Bakewell Rep., ¶¶ 194-197, 199-200.)

Profits under Section 504(b) must be those profits from the gross revenue attributable to the infringement.  The relevant profits cannot be determined by deducting all costs and expenses of the business.  Again, Mr. Bakewell ignores the correct legal standard.

The reduction of gross revenue to profits from that revenue stream by accounting for "deductible expenses" is a two-step process.  First, the infringer must show "sufficient nexus between each expense claimed and the sales of the unlawful goods."  *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 107 (2d Cir. 1999); *Victor Stanley v. Creative Pipe*, No. MJG-06-2662, 2011 U.S. Dist. LEXIS 112846, at *14-16 (D. Md. Sep. 30, 2011); *Universal*

*Furniture Int'l v. Collezione Europa, USA*, 599 F. Supp. 2d 648, 600 (M.D.N.C. 2009).

This requires "proving that each item of general expense contributed to the production of

the infringing items." *Thomas M. Gilbert Architects, P.C. v. Accent Builders &*

*Developers*, 377 F. App'x 303, 310 (4th Cir. 2010).  Second, Federal must "offer[] a fair

and acceptable formula for allocating a given portion of overhead to the particular

infringing items in issue."  *Id.*; *see also Hamil*, 193 F.3d at 107.

> a.   ***Mr. Bakewell improperly deducted expenses and losses***
> ***associated with gross written premiums that did not touch***
> ***Blaze Advisor.***

Here, Mr. Bakewell's expense and loss reductions are not tied to the specific

revenue stream at issue, gross written premium from insurance in connection with which

Blaze Advisor was used.  (Bakewell Rep., ¶¶194-197, 199-201.)  Mr. Bakewell

calculated expense and loss deductions from general business-unit level data.

Furthermore, his report acknowledges the data did not match the revenue stream; it was

over inclusive.  (*Id.* ¶¶188-189, 192, 200.)  Mr. Bakewell admitted this expense

information included expenses from policies in connection with which Blaze Advisor

was not used.  (*Id.* ¶¶188-189; Bakewell Dep., 123:17-20.)

Mr. Bakewell confirmed at his deposition that regarding losses his data

included losses from claims paid out on insurance policies that did not touch Blaze

Advisor:

> Q.   And do you understand that … included in this data are policies
> that—that did not touch Blaze Advisor?
>
> A.   Yes.

(Bakewell Dep., 123:17-20.)  He admitted the loss data does not correlate to gross written premium from policies in connection with which Blaze Advisor was used.  Indeed, he conceded the loss data did not correlated to any policy.  Mr. Bakewell used loss data that are mere estimates based on lines of business, not individual policies.  (Bakewell Rep., ¶197 ("I estimated the losses and LAE expenses based on Federal's actual loss ratio as reported in the profit and loss statements for the relevant business segments and lines of business."); Bakewell Dep., 127:21-128:25.)  He conceded the *actual* loss for "[e]very policy is going to be different."  (Bakewell Dep., 128:20-21.)  It was Mr. Bakewell's hope that these individual differences averaged out: "In actuality ... all you can do as an insurance company is try to estimate what your loss ratio is going to be, and it averages out...."  (*Id.* 128:21-25.)  Under the Copyright Act, the reduction of gross revenue attributable to the infringement is not based on generalized companywide or business unit wide data that might "average out."  Profit can only be determined from "deductible expenses" that contributed to the infringing revenue stream.

Mr. Bakewell provided no support for this opinion, nor did he link the claimed loss ratio to specific insurance policies connected to Blaze Advisor.  These expenses have no relationship to the actual insurance policies in connection with which Blaze Advisor was used.  They are not proper deductions.  *See Hamil*, 193 F.3d at 107; *Victor Stanley*, 2011 U.S. Dist. LEXIS 112846, at *14-16; *Universal Furniture*, 599 F. Supp. 2d at 600.  Mr. Bakewell's over inclusive expense and loss deductions at ¶¶185-205 should be excluded.

### b.     *Mr. Bakewell improperly reduced Federal's revenues with "bulk" expenses not tied to the revenue in this case.*

The general and administrative expenses and taxes Mr. Bakewell deducts are not even tangentially related to the business units that use Blaze Advisor, let alone to the revenue stream from the insurance in connection with which Blaze Advisor was used. Federal's Rule 30(b)(6) witness on Federal's financial data, Mr. Harkin, testified that general and administrative expenses and taxes were "bulk" expenses. (Kliebenstein Decl. Ex. 5, 55:25-58:25.)  These expenses are allocated to the various Chubb business entities as a percentage based on written premium percentages.  (*Id*. 132:7-134:14.)  Thus, if one Chubb business entity generated 30% of the corporate wide gross written premiums, 30% of the general, administrative and tax expenses would be allocated to that Chubb business entity.  The allocation has nothing to do with which entity, business unit, or insurance policy generated the expense.  It also has nothing to do with whether the expense contributed to the revenue connected to the use of Blaze Advisor.

Here, Mr. Bakewell's opinions reduce Federal's revenues using these allocated expenses.  (Bakewell Rep., ¶¶199, 201.)  But Mr. Bakewell confirmed at his deposition that he knew these expenses were "allocated based upon [business segments and lines of business] written premiums percentage."  (Bakewell Dep., 129:22-23; *see also id.* 129:1-130:12.)  Reducing Federal's revenues by using expenses with no tie to the revenue attributable to infringement is legally wrong.  It does not link the expenses to the infringement.  *See Gaste v. Kaiserman*, 863 F.2d 1061, 1071 (2d Cir. 1988) (rejecting a 90 percent deduction of expenses to an infringing song that represented 90 percent of the

35

infringer's sales); *In Design v. Lauren Knitwear Corp.*, 782 F. Supp. 824, 835 (S.D.N.Y. 1991) (rejecting deduction of expenses based on pro rata percentage of revenues).  Mr. Bakewell's expense deductions are contrary to law and unhelpful to the trier of fact. They should be excluded.

## VI.    CONCLUSION

Mr. Bakewell's opinions are unreliable and unhelpful to the fact finder. Under these circumstances, the Court should exercise its gatekeeping role and exclude Mr. Bakewell's testimony, including: ¶¶18-22, 35-37, 43-45, 49-102, 103-113, 114-156, 157-205, 206-210.


Dated: October 11, 2019

MERCHANT & GOULD P.C.

/s/Heather J. Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2215
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com

Attorneys for Plaintiff FICO