# EXHIBIT 3
## (Redacted)

**(Previously Filed Under Seal as DI 424-2)**

Page 1

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF MINNESOTA

3

4       CASE NUMBER:  16-cv-1054 (WMW/DTS)

5       ------------------------------------------------------

6       Fair Isaac Corporation, a Delaware corporation,

7         Plaintiff,

8       versus

9       Federal Insurance Company, an Indiana corporation,

        and ACE American Insurance Company, a Pennsylvania

10      corporation,

11        Defendants.

        ------------------------------------------------------

12

13

14          VIDEOTAPED DEPOSITION OF EXPERT WITNESS

15

16                      CHRIS BAKEWELL

17

18

19

20

21

22

23

24

25      TAKEN:  28 June 2019          BY:  Jackie McKone

Page 2

```
1    APPEARANCES:
2
3    MERCHANT GOULD
     80 South Eighth Street, Suite 3200
4    Minneapolis, Minnesota  55402
     PHONE:   (612) 332-5300
5    FAX:     (612) 332-9081
     E-MAIL:  hkliebenstein@merchantgould.com
6
     BY:  Heather Kliebenstein
7    For the Plaintiff
8
9    FREDRIKSON BYRON
     200 South Sixth Street, Suite 4000
10   Minneapolis, Minnesota  55402
     PHONE:   (612) 492-7000
11   FAX:     (612) 492-7077
     E-MAIL:  tfleming@fredlaw.com
12
     BY:  Terrence Fleming
13   For the Defendants
14
15
16   Also present:
17   James Woodward, FICO
18
19
20
21
22   Videographer:  Kyle Peterson, Veritext
23
24
25
```

Page 3

```
1              I N D E X
2
3    Examination by Ms. Kliebenstein, Page 5
4
5            E X H I B I T S
6
7    Exhibit 522   Bakewell report, Page 4
8    Exhibit 523   Interrogatory answers, Page 91
9    Exhibit 524   Flash drive, Page 102
10   Exhibit 525   Native file, Page 103
11         FED 017915_0001
12   Exhibit 526   Zoltowski report, Page 140
13
14       PREVIOUSLY MARKED EXHIBITS
15
16   Exhibit 257   Negotiation options, Page 171
17   Exhibit 409   Native file, Page 122
18         FED 017882_0001-0020
19   Exhibit 413   Native file, Page 136
20         FED 017885_0001
21   Exhibit 416   Native file, Page 131
22         FED 17884_0001-0003
23   Exhibit 418   Native file, Page 145
24         FED 017883_0001-0004
25
```

Page 4

```
1              P R O C E E D I N G S
2        The following is the videotaped deposition
3    of expert witness Chris Bakewell taken at Merchant
4    Gould, 80 South Eighth Street in Minneapolis,
5    Minnesota commencing at 9:07 a.m. on 28 June 2019
6    pursuant to notice.
7                    * * *
8        (Whereupon material was marked for
9    identification as Exhibit 522.)
10       THE VIDEOGRAPHER:  Good morning.  We are
11   now going on the record.  The time is 9:08 a.m.
12   Today's date is June 28, 2019.
13       Please note that the microphones are
14   sensitive.  They pick up whispering, private
15   conversations, and cellular interference.  Please
16   turn off all cellphones or place them away from
17   the microphones as they can interfere with the
18   deposition audio.  Audio and video recording will
19   continue to take place unless all parties agree to
20   go off the record.
21       This is Media Unit 1 of the video recorded
22   deposition of Chris Bakewell taken by counsel for
23   the plaintiff in the matter of Fair Isaac
24   Corporation versus Federal Insurance et al. filed
25   in the United States District Court, District of
```

Page 5

```
1    Minnesota.  This deposition is being held at
2    Merchant and Gould PC located at 80 South Eighth
3    Street, Suite 3200, in Minneapolis, Minnesota
4    55402.
5        My name is Kyle Peterson of Veritext Legal
6    Solutions.  I'm the videographer.  The court
7    reporter is Jackie McKone from the firm Veritext
8    Legal Solutions.  I am not authorized to
9    administer an oath.  I am not related to any party
10   in this action or am I financially interested in
11   the outcome.
12       Counsel, will you please identify
13   yourselves, and the parties you represent.
14       MS. KLIEBENSTEIN:  Heather Kliebenstein
15   from Merchant and Gould from the plaintiff FICO.
16       MR. FLEMING:  Terry Fleming of the
17   Fredrikson law firm representing defendants.
18       THE VIDEOGRAPHER:  Will the reporter please
19   swear in the witness, and we can proceed.
20                   * * *
21              CHRIS BAKEWELL
22   after having been duly sworn deposes and says
23         under oath as follows:
24                   * * *
25              EXAMINATION
```

Page 6

BY MS. KLIEBENSTEIN:

1    Q.   Good morning Mr. Bakewell.  How are you today?

2    A.   Good morning.  I'm fine.  Thank you.

3    Q.   All right.  So welcome to Minneapolis.

4    A.   Thank you.

5    Q.   What were you asked to do in this case?

6    A.   Well, it's outlined in my report, but at a high

7         level, it's to assess damages and

8         financial-related issues under the assumption of

9         liability.

10   Q.   And what is the expertise that you're offering in

11        this case?

12   A.   Well, I'm an expert in finance and valuation.

13        I've quantified damages quite a few times.  I'm an

14        expert in particular area of valuation of

15        intellectual property and intangible assets.  I

16        think those are primarily the skills that I bring.

17   Q.   And you're not an expert in software licensing; is

18        that correct?

19   A.   So in this case -- I do have expertise in software

20        licensing, but that's not the expertise that I'm

21        being actually asked to use.

22   Q.   And your expertise in software licensing that you

23        just mentioned is that -- is that from serving as

24        an expert witness in litigation?

Page 7

1    A.   Well, I've worked for a company for eight years,

2         and I was the CFO of some businesses, and I was

3         responsible for licensing the software that we

4         used in the enterprise, and then throughout my

5         career as a consultant, I've been involved in

6         issues that relate software licensing and

7         valuation, including in the context of damages but

8         also consulting projects.

9             I have a professional designation,

10        certified licensing professional, and in part, the

11        award of that is based on my experience in -- in

12        licensing, including licensing software.

13   Q.   And your experience with that company for eight

14        year what was that company?

15   A.   The name of the company was Wartsila,

16        W-A-R-T-S-I-L-A.

17   Q.   You were the CFO?

18   A.   I was the CFO of our investment group, not of the

19        corporation.  I was the controller of North

20        America, which was the biggest subsidiary at the

21        time, and I had some other responsibilities.  I

22        was a controller and I forget exactly what my

23        title was of -- of a business that we acquired and

24        we turned into what we call our peer energy

25        business.  That was in Amsterdam, and I was

Page 8

1         responsible for all the systems integration over

2         to SAP.  We licensed SAP at the time and were

3         moving all the enterprise stuff over.

4    Q.   And what were the years you were with Wartsila?

5         Did I get that right?

6    A.   Wartsila.  I think it was 1995 through about 2001.

7         A little bit maybe longer on either side.

8    Q.   And what were the -- what were the revenues in

9         general, the annual revenues -- you were -- you

10        were the controller of the North American group;

11        correct?

12   A.   That was one of the positions that I held.

13   Q.   One of the positions.  What would you say the

14        annual revenues were for that company while you

15        were with it?

16   A.   The North American subsidiary, or for the entire

17        company?

18   Q.   Why don't we do both.

19   A.   So the North American subsidiary our revenues were

20        500 to $800 million dollars per year, and the

21        corporation was, like, between I'd say 3 and $4

22        billion.  Something like that.

23   Q.   What is your experience in the insurance industry?

24   A.   I've worked on matters as a consultant in the

25        insurance industry.  I had a matter not long ago

Page 9

1         for a company called Great West, another insurance

2         company, and I've had other assignments kind of

3         here and there throughout my career.

4    Q.   And that's as a consultant in the financial space?

5    A.   Yes.

6    Q.   In preparing your opinions, did you presume

7         liability?

8    A.   Yes.

9    Q.   Did you make any presumptions about burdens of

10        proof with respect to damages?  And we can start

11        with -- let's start with lost license, or the

12        breach of contract damages.  Did you make any

13        presumptions about who has the burden of proof?

14   A.   Well, my understanding would have been outlined in

15        -- in my report in detail, which I don't have a

16        copy of yet.  You have one sitting right there.

17   Q.   I have marked as Exhibit 522 a copy of your

18        report.

19   A.   Thank you.

20   Q.   And this is a copy of your report with all of the

21        exhibits and schedules; correct?

22   A.   Well, I'll accept your representation that that's

23        so.  It appears to be.  That's my answer.  Period.

24   Q.   So then I'll go back to my question.  What

25        presumptions did you make about the -- the burdens

3 (Pages 6 - 9)

Page 10

1  of proof with respect to breach of contract
2  damages?
3  A.  Well, generally speaking, in terms of breach of
4  contract damages, I understand that it's your
5  burden.  It's the plaintiff's burden.  Generally
6  speaking.
7  Q.  Okay, and what about with respect to actual
8  damages for copyright infringement?
9  A.  As -- are you distinguishing actual damages from
10  disgorgement or --
11  Q.  I am.
12  A.  So actual damages my understanding -- we can try
13  to find this in my report, but I think just from
14  memory --
15  MR. FLEMING:  Object to the extent it calls
16  for a legal conclusion.
17  THE WITNESS:  From memory, generally
18  speaking, I understand that to be your burden, but
19  let me see here.  I have this outlined on -- my
20  understanding of it on Pages 31 and 32.  I'm
21  making assumptions as a damages expert and not as
22  a lawyer.
23  BY MS. KLIEBENSTEIN:
24  Q.  Okay.  That's your -- that's your answer.
25  With respect to copyright disgorgement, did

Page 11

1  you make any presumptions about burdens of proof
2  with respect to copyright disgorgement?
3  MR. FLEMING:  Objection to the extent it
4  calls for legal conclusion.
5  THE WITNESS:  Again, you're saying
6  presumptions, and I'm responding and saying
7  assumptions that I'm making --
8  BY MS. KLIEBENSTEIN:
9  Q.  Sure.
10  A.  -- because I'm not a lawyer.  So I only make
11  assumptions about what the applicable framework
12  is, and my understanding is as a -- as a damages
13  expert that in terms of the burden, it is your
14  burden, the plaintiff's burden to identify proof
15  of revenues subject to there needing to be a nexus
16  to the allegations in the case, and then I think
17  there's some question as to sort of what the
18  burdens are for proving -- the costs you would
19  deduct from these revenues some people say, hey,
20  that's the defendant's burden.
21  My general understanding is though that
22  it's -- there could be more case law and nuances
23  involved in that, and in any event, it's -- I
24  regard it as something where Mr. Zoltowski and I
25  have an obligation to try to get things right and

Page 12

1  not get caught up in whose -- what's burden --
2  whose burden is what.
3  Q.  Understood.  So we talked about proof of revenues,
4  nexus, costs would be either, and then there's a
5  third element that I see in Paragraph 106 that at
6  the very end of that italicized paragraph I see
7  the phrase, "Elements of profitable," -- "profit
8  attributable to factors other than the copyright
9  at work."
10  What was your assumption regarding whose
11  burden it was to prove elements of profit
12  attributable to factors other than the copyright
13  at work?
14  MR. FLEMING:  Objection to the extent it
15  calls for a legal conclusion.
16  THE WITNESS:  My understanding, not as a
17  lawyer but as a practitioner, is that this relates
18  to two issues, two words where I think that
19  there's some overlap between what I understand and
20  where I understand the law to be, and where
21  finance and economics are, and those words are
22  nexus and apportionment, and I think that there's
23  an obligation for a practitioner in my field to
24  insure that the analysis has a nexus to something
25  that is defined and that you apportion so that you

Page 13

1  present values that are reasonable and not
2  irrelevant and not misleading.
3  BY MS. KLIEBENSTEIN:
4  Q.  So am I hearing you correct that the burden --
5  your assumption was the burden of proof to prove
6  elements of profit attributable to factors other
7  than the copyright of work falls on both the
8  plaintiff and the defendant?
9  MR. FLEMING:  Object to the extent ti calls
10  for lemon conclusion.
11  THE WITNESS:  That's not what I said.
12  BY MS. KLIEBENSTEIN:
13  Q.  Tell me how I got that wrong.
14  A.  Because you used way less words than I did.  I
15  explained that in a more detailed way.
16  Q.  Other than the fact that I used fewer words, where
17  did I get it wrong?
18  A.  You didn't use my words, and you oversimplified
19  what I said.  I took, like, two or three
20  paragraphs to explain what my assumptions were,
21  and you tried to boil it down to four words, and
22  it's not correct.
23  Q.  And my question is:  Can you identify for me where
24  I got it wrong?
25  MR. FLEMING:  Objection.  Asked and

Page 14

1   answered twice.
2        THE WITNESS: Yes. You oversimplified it.
3   BY MS. KLIEBENSTEIN:
4   Q. Okay. In what way did I oversimplify it?
5        MR. FLEMING: Objection. Asked and
6   answered. Objection.
7        THE WITNESS: You used too few of words,
8   and you disregarded the detail of the answer that
9   I provided by using too few words.
10  BY MS. KLIEBENSTEIN:
11  Q. The words nexus and attributable do those words
12  mean different things to you in the context of
13  copyright disgorgement?
14       MR. FLEMING: Object to the extent it calls
15  for legal conclusion.
16       THE WITNESS: I'd have to know the context
17  of how you're using those words.
18  BY MS. KLIEBENSTEIN:
19  Q. Well, you used those words in your prior answer
20  and -- well, strike that.
21       In the context of copyright disgorgement
22  damages, what does the word nexus mean to
23  you in your professional judgment?
24  A. I think that nexus means that you -- there needs
25  to be some connection to the allegations and to

Page 15

1   whatever it is that you're trying to apply a
2   valuation skill set to. If you're a valuation
3   professional.
4   Q. You used the phrase some connection. Is that a
5   precise percentage, or not?
6        MR. FLEMING: Object to the extent it calls
7   for legal conclusion.
8        THE WITNESS: I would need to know more
9   about what it is that you're asking, or when --
10  what the context is. I don't see it is as being
11  anything where there's, like, a bright line rule,
12  but I could see where there's some instances where
13  there would be a percentage that could be derived.
14  BY MS. KLIEBENSTEIN:
15  Q. Instances where there could be a percentage
16  derived, and I'm asking a slightly different
17  question. When you use the phrase some
18  connection, I understand that there -- strike
19  that.
20       Now moving to the word attributable, within
21  the context of the phrase profit attributable to
22  factors other than the copyright of work, in your
23  experience as a damages expert, what does the word
24  attributable mean to you in that context?
25       MR. FLEMING: Object to the extent it calls

Page 16

1   for a legal conclusion.
2        THE WITNESS: Well, I think what you're
3   referring to is I have a paragraph beginning with,
4   "I further understand that," and then I go on and
5   I cite to the code, US code, and that's what I
6   understand and I'm assuming is the applicable
7   standard. It also appears a couple other times in
8   my report, that phrase, Paragraphs 104 and 105.
9   BY MS. KLIEBENSTEIN:
10  Q. Yes. I'm asking what you think that word means in
11  your professional experience.
12       MR. FLEMING: Same objection.
13       THE WITNESS: Those words?
14  BY MS. KLIEBENSTEIN:
15  Q. The word attributable that appears in your report
16  several times.
17  A. Well, they mean what they mean in the context of
18  each area that I've cited it. There's a couple
19  places where it's used. One is profits of the
20  infringer that are attributable to the
21  infringement and are not taken into account in
22  computing the actual damages, and another is --
23  relates to elements of profit attributable to
24  factors other than the copyrighted work, and so I
25  think that what both of those terms generally try

Page 17

1   to go to is determining what the boundaries are,
2   the economic boundaries are of whatever it is that
3   is the intangible asset or intellectual property
4   that you're trying to value.
5   Q. And what paragraphs were you just looking at when
6   you were answering that question?
7   A. I was looking at Section 3.6 of my report, which
8   is Paragraphs 103 through 107.
9   Q. Okay. Is your opinion relating to disgorgement of
10  profits is that based on the presumption that you
11  believe that -- strike that.
12       You believe that if FICO to receive the
13  amounts set forth in Mr. Zoltowski's report for
14  copyright infringement disgorgement of profits
15  that FICO would be receiving a windfall; is that
16  correct?
17  A. I say that in several places. Yes.
18  Q. So that's your opinion?
19  A. Yes. I think that the numbers he quantified would
20  represent a windfall.
21  Q. And is it your opinion that in connection with
22  copyright disgorgement that FICO should receive no
23  more than the value Federal received from the
24  alleged infringement?
25  A. Where do you -- where are you reading from? Is

Page 18

1  there a place in my report that I said that?
2  Q.  You know, I don't know that you expressly said
3     that.  So I'm just trying to test the boundaries
4     of how I understand your opinion, and I understand
5     the windfall aspect, and so I'm trying to
6     understand what the -- what the financial and
7     economic underpinnings of your -- the way that you
8     approached your work in this case.
9        So I asked you about the windfall.  The
10    question I asked is:  Your opinions relating to
11    disgorgement damages are they based on the
12    presumption that FICO should receive no more than
13    the value received by Federal from the alleged
14    infringement?
15       MR. FLEMING:  Objection.  Vague.
16       THE WITNESS:  I don't recognize the -- that
17    phrase or term.
18    BY MS. KLIEBENSTEIN:
19 Q.  Okay.  So your answer is no?
20 A.  No.  That's not my answer.  I just said I didn't
21    recognize that phrase or term.  That's different
22    than the terminology that I used in my report.
23 Q.  And that may be so, but I'm asking you to -- well,
24    you did the work for your report; right?
25 A.  Sure.

Page 19

1  Q.  What is it about that question that's difficult to
2     answer?
3  A.  It's not difficult.  I thought I gave you a clear
4     answer.  I didn't recognize that from my report.
5  Q.  Okay.  So if it -- if it's not in your report,
6     you're not going to answer the question?
7  A.  No.  I didn't say that at all.  I just said that I
8     didn't recognize that from my report.  I took the
9     time to explain my understanding of the law and to
10    explain my understanding of the standards that are
11    required for Mr. Zoltowski or I to arrive at a
12    reasonable and reliable conclusion from -- in
13    terms of the field that we practice in and where
14    we're experts, and I provided that level of detail
15    in my -- in my report.
16 Q.  Okay.  So you can't answer that question one way
17    or the other?
18       MR. FLEMING:  Objection.  Misstates the
19    testimony.
20       THE WITNESS:  I think I did answer the
21    question.  I don't understand why you're saying
22    that I -- I'm not answering the question.  I'm
23    answering the question very directly.
24       MS. KLIEBENSTEIN:  Okay.
25    BY MS. KLIEBENSTEIN:

Page 20

1  Q.  At Paragraph 158 in your report, in the second
2     line, I see the phrase "financial and economic
3     nexus," and I'm wondering with regard to the
4     phrase financial nexus, what does that mean within
5     the context of your report?
6  A.  Well, it means what I describe throughout my
7     report, but if you want to substitute another word
8     to help in the understanding, I think that another
9     word would be connection.  There needs to be some
10    sort of connection.
11       Another phrase that might be helpful is you
12    need to define the economic boundaries of what it
13    is that your math yields and connect that to
14    whatever the claims are that are being made in the
15    case.  That's how I think about nexus.
16 Q.  Financial nexus?
17 A.  I think so.
18 Q.  So what about economic nexus; what is your
19    definition of economic nexus?
20 A.  It would be be the same.  I'm using that -- I think
21    the fields of finance and economics are closely
22    related, and I'm using that I think to --
23    interchangeably there.
24 Q.  So why didn't you just use the word nexus instead
25    of financial and economic nexus?

Page 21

1  A.  Because I think you could have -- it's possible
2     that you could have a technical nexus, and I'm I
3     think clarifying that this relates to the field of
4     finance, and valuation, and economics.
5  Q.  So what's a technical nexus?
6  A.  Sometimes technical experts are asked to do
7     comparisons or make connections using their skill
8     sets.
9  Q.  And in that last sentence of 158, you write, "I
10    understand that any profits of the infringer must
11    be attributable to the infringement.  Mr.
12    Zoltowski has not shown how this is so in his
13    analysis."
14 A.  Correct.
15 Q.  Are you -- is your assumption that Mr. Zoltowski
16    had -- had a -- had the burden to show profits of
17    the infringer that are attributable to the
18    infringement?
19       MR. FLEMING:  Objection.  Calls for legal
20    conclusion.
21       THE WITNESS:  No.  I wouldn't say that
22    that's the assumption that I made.
23    BY MS. KLIEBENSTEIN:
24 Q.  I understand from your report that you disagree
25    with Mr. Zoltowski's figures for lost license fees

6 (Pages 18 - 21)

Page 22

1      for breach of contract; is that right?
2  A.   There's a lot of things that I said I disagree
3      with.  Sure.
4  Q.   Well, that's just one part; right?
5  A.   Correct.
6  Q.   Okay.  So focusing on the breach of contract, I
7      want to understand -- I'm trying to understand
8      where you're serving in a responsive rebuttal role
9      and where you have affirmative opinions.
10         Does your report contain an opinion as to
11     what you believe is the proper framework to assess
12     breach of contract damages?
13         MR. FLEMING:  Can you repeat the question
14     please?
15         MS. KLIEBENSTEIN:  I can just ask it again.
16     I'll wait until Mr. Bakewell is ready.
17         THE WITNESS:  I'm -- what -- he asked you
18     to repeat the question?
19         MS. KLIEBENSTEIN:  Yeah.  I'll ask it again
20     when you're ready.
21         THE WITNESS:  Oh sure.  Go ahead.
22         MS. KLIEBENSTEIN:  Now it scrolled all the
23     way down.  Yeah.  Just read it.
24         (Whereupon the material was read by the
25     shorthand reporter.)

Page 23

1          THE WITNESS:  I think that it does.
2  BY MS. KLIEBENSTEIN:
3  Q.   Can you point me to where?  Well, let me -- yeah.
4      Why don't you direct me to where you're looking in
5      your report.
6  A.   Well, two things.  First of all, I'm describing
7      and responding to what Mr. Zoltowski did, and I'm
8      citing to his report, and I don't have his report.
9      So it would be helpful to see that because I'm
10     trying to make the same assumptions regarding the
11     applicable standards, and then I think when you
12     read my report, it's clear that Mr. Zoltowski is
13     just by the name of what he's -- what we both
14     framed his analysis as -- as well as what he does
15     he's trying to do some sort of lost software fee
16     or lost profits, which is a but-for type of
17     analysis.
18 Q.   So separate from Mr. Zoltowski's opinion, what is
19     your opinion on the proper framework for breach of
20     contract?  Is it -- is it enterprise?  Is it named
21     application?  Is it something else?
22 A.   I don't understand your question.
23 Q.   Mr. Zoltowski put forth a named application
24     damages analysis for the breach of contract claim;
25     right?

Page 24

1  A.   We can call it that if you like.
2  Q.   Sure.
3  A.   I'll accept that.
4  Q.   Okay, and my question is:  Do you have an opinion
5      that a different framework should be used in this
6      case?
7  A.   Well, there's two parts to my answer there.  First
8      of all, I think the form is less important than
9      the substance, and so whether it's a license where
10     there's named applications or it's an enterprise
11     license, that's less important to me than trying
12     to get at the value of what it is that is the --
13     is the focus of the wrongdoings as alleged, and
14     the second part of my answer is I think that
15     Doctor Kursh has some opinions that respond to Mr.
16     Zoltowski on this and explain that Mr. Zoltowski's
17     framework of named applications is unreasonable.
18         I think that from a financial and economic
19     perspective Mr. Zoltowski's focus on the form
20     rather than the substance results in him making
21     some errors and deviating from the -- the
22     footprint, financial and economically, of what it
23     is that he's -- that he's trying to measure.
24         There's, like, a cascading effect from the
25     error.  So that's my response to your question.

Page 25

1  Q.   Moving on to actual damages for copyright
2      infringement, separate from disgorgement, does
3      your report have a framework for what you see as
4      the appropriate damages amount or actual damages?
5  A.   Well, the framework would be as -- as I outlined
6      in Section 3.6, and then as I incorporated from
7      reference to Mr. Zoltowski's report about what the
8      framework is.  So I do have a section on that,
9      3.6.
10 Q.   I see your Section 3.6 on the overall general
11     legal framework.  My question was focused on the
12     damages calculation for actual damages.  Do you
13     have an affirmative calculation for actual damages
14     for copyright infringement?
15 A.   Let me see if I can find the spot in my report.
16     This answer is a little more challenging for me
17     because Mr. Zoltowski didn't really define what
18     the copyrights are that he's trying to value, and
19     so I'm trying to be as responsive to him and his
20     analysis as I can.
21         There's one place in my report that
22     replicates the specific modules that Mr. Zoltowski
23     identified, and I'm trying to find it.  It's in
24     26, Paragraph 26 where there's copyright
25     registration numbers, a table of copyright

Page 26

1    registration numbers. What I'm referring to here
2    is that Mr. Zoltowski doesn't disaggregate his
3    analysis in a way that's specific to each of these
4    copyrights.
5 Q.    And why should Mr. Zoltowski have done that?
6 A.    Well, if he's going to use his financial and
7    valuation skill set and offer numbers that he's
8    going to refer to as values, which he clearly
9    does, he needs to define what it is that he's
10    valuing.
11 Q.    And you believe that what should be valued is the
12    -- the registered works under the copyright
13    registrations?
14 A.    If you're claiming to arrive at a value that's
15    specific to the copyrights, there needs to be some
16    sort of connection to the copyrights.
17 Q.    Do you have an understanding of what these
18    copyright registrations identified in Paragraph 26
19    cover?
20 A.    Yes.
21 Q.    What is that?
22 A.    It's what's described in the complaint. There's a
23    typo here. It says, "Second and amended company."
24    It should say complaint I think on Page 3. If you
25    have the complaint, that's the understanding of

Page 27

1    the assumptions I made.
2 Q.    And in -- in your report, I don't see anywhere
3    where you independently value the copyrighted
4    works. Am I correct about that?
5 A.    Well, I haven't seen where those copyrights have
6    been distinguished from anything else that is --
7    that was licensed, and so I think you're right,
8    and you're wrong.
9        You're right in that I don't have a
10    specific number for each of these copyrights, but
11    that's because Mr. Zoltowski hasn't defined what
12    these are economically, and I haven't seen any
13    evidence that these are anything of substance
14    economically. So there, there's no number.
15        However, I think you can also assume, and
16    as I wrote in my report, I've tried to make the
17    assumption that let's -- let's assume that Mr.
18    Zoltowski is correct and -- and if this is indeed
19    his assumption, that the copyrights overlap
20    conceptually with what is -- what the alleged
21    wrongdoings are, that -- in other words, that the
22    entirety of the -- of what's covered under the
23    contract is also copyrighted, that they are
24    coextensive, and under that scenario, I've made
25    adjustments to what Mr. Zoltowski has done to try

Page 28

1    to correct for at least some of his errors.
2 Q.    And these --
3 A.    So that's why I say yes or no.
4 Q.    Okay, and the adjustments primarily were adding --
5    adding a discount and modifying the number of
6    applications at issue; am I right about that?
7 A.    No. I think his -- there's some other things that
8    are -- that are there, but if you're talking about
9    what is quantified in the schedules, like, 2 and
10    2.1 for those corrections, I think you're
11    capturing a bunch of them.
12 Q.    Are there any other quantifiable adjustments as --
13    as it relates to actual damages for copyright
14    infringement?
15 A.    Well, the main one is you reduce it to zero
16    because Mr. Zoltowski hasn't defined what the
17    copyrights are economically.
18 Q.    Does your report state anywhere that the actual
19    damages FICO should receive for copyright
20    infringement are zero?
21 A.    I think that I've said very clearly that Mr.
22    Zoltowski didn't define what it is that he's
23    valuing, and I think it follows from that that if
24    there's -- if there's a lack of definition, it's
25    zero or a null value, nothing's been identified.

Page 29

1    I think I said that repeatedly.
2 Q.    You say repeatedly that the damages award should
3    be zero?
4 A.    I didn't say that. I used that specific term, but
5    I did say that he hasn't shown that there's a
6    nexus. He hasn't defined what the copyrights are,
7    and I think it follows from the fact that -- from
8    an economic point of view what the copyrights are,
9    and I think it follows from that -- that the
10    number is either zero or it's not a number, it's a
11    null value, that he has not done anything
12    reliable, with all due respect, from a financial
13    and economic point of view, and that results in a
14    null value.
15 Q.    As far as quantifiable adjustments, other than the
16    null value, those quantifiable adjustments are all
17    reflected in Exhibits 2 through -- why don't you
18    tell me.
19        Other than the null value, can you identify
20    for me where else your quantifiable adjustments
21    are as it relates to actual damages for copyright
22    infringement?
23 A.    Well, there's a variety of calculations starting
24    at Exhibit 1 I think through -- I think through
25    about Exhibit 10. Then there's some narratives in

Page 30

1    my report where I describe some other things
2    conceptually.
3 Q.  With regard to copyright disgorgement damages, I
4    think that your report -- you opine that Mr.
5    Zoltowski is wrong about his assessment of
6    copyright damages for disgorgement; correct?
7 A.  That's one of the things that I said.  Sure.
8 Q.  And now, again, I'm trying to understand your
9    affirmative opinions as they relate to copyright
10   disgorgement.  Your report does not contain an
11   opinion regarding whether any of Federal's profits
12   have a connection to Blaze Advisor; is that
13   correct?
14 A.  No.  That's wrong.
15 Q.  Tell me why I'm wrong.
16 A.  I think the evidence shows that there is no
17   connection, that -- I think I've explained at
18   length, and I can do this without even looking at
19   any parts of my report, how there isn't a
20   connection between revenues and Blaze Advisor.
21   It's not a software that I understand
22   fundamentally is used to create revenues.  There's
23   no economic analysis or evidence that shows that
24   it creates revenues.
25       I think that conceivably there's

Page 31

1    potentially some cost savings elements over, say,
2    for example, doing the same work manually, but
3    there's also substitute products that are
4    available, and so I think that provides some
5    indication of what the economic boundaries are of
6    the -- of the software, and then I describe in my
7    report how the value of software works, and I've
8    confirmed that that's how it works in this field
9    where you can assess income-generating
10   opportunities, I call that the income approach, or
11   attributes I should say instead of opportunities,
12   cost savings versus alternatives, call that the
13   cost approach, and then market-derived inputs were
14   considerations that, in this industry, reflects
15   the cost and the income approach is what I call
16   fundamental economic attributes, and the value of
17   software will tend to manifest in terms of market
18   values, and -- and that's what I say would provide
19   the best measure, but that's subject to conducting
20   some sort of analysis of what's attributable to
21   the copyrighted works as opposed to other things.
22       So without doing another level of what I'll
23   call apportionment here, that would yield an
24   inflated results still.  So I talk about that, and
25   I basically just described the second half of my

Page 32

1    report for you.
2 Q.  I didn't understand something at the end of that
3    answer.  We were talking -- you were talking about
4    market value, and then you said that that's
5    subject to conducting some sort of analysis of
6    what's attributable to the copyrighted works as
7    opposed to other things.
8        Is that analysis done at the application
9    level, or in the insurance context the policy sale
10   level?  What were you referring to there?
11 A.  Well, I wasn't referring to anything that
12   specific.  What I was saying is what I said
13   earlier, that if you have copyrights that
14   conceivably those copyrights could be coextensive
15   with the entire software product, although that's
16   I think rarely the case that you can copyright
17   something that is identical to economically what
18   the product is that's sold, and so you need to
19   define the boundaries of each and compare them and
20   make a reduction that is specific to the
21   copyrights.  That's what I was referring to.
22 Q.  Okay.  So is it your opinion in your report
23   that there is zero connection between the gross written
24   premiums at issue in this case and Blaze Advisor?
25 A.  I haven't seen anything that is -- that shows that

Page 33

1    there's a reliable connection other than
2    conceivably the cost savings types of attributes
3    that I described in my -- in my report.
4        I think it's wrong frankly for Mr.
5    Zoltowski to claim that there's a connection
6    between all of the revenues and Blaze Advisor.  I
7    think it's -- wrong is -- I'm being polite.
8 Q.  So your answer was I haven't -- haven't seen
9    anything that shows there is a reliable
10   connection.  Got it.  Understood that.  My
11   question is a little bit different.
12       Have you seen anything that shows you for
13   sure 100 percent there's zero connection?  Is that
14   your opinion?
15       MR. FLEMING:  Objection to the first part
16   of that before stating the question misstates his
17   testimony.
18       MS. KLIEBENSTEIN:  I actually typed it out
19   realtime so it's accurate.
20       MR. FLEMING:  Same objection.
21       THE WITNESS:  I don't understand your
22   question.
23   BY MS. KLIEBENSTEIN:
24 Q.  I mean, it's kind of a circumstantial versus
25   direct question; right?  So I can say that I've

9 (Pages 30 - 33)

Page 34

1  seen something with my own eyes and I know for 100
2  percent that it's true versus I haven't seen
3  anything that disproves it, proves it one way or
4  the other. So my question is relating to that.
5       Your testimony was, "I haven't seen
6  anything that shows there is a reliable
7  connection," and I just want to confirm your
8  opinion one way or the other whether you
9  affirmatively believe 100 percent that there is
10 zero connection between the gross written premiums
11 at issue here and Blaze Advisor.
12      MR. FLEMING: Just to clarify, you had a
13 long lead-up to that question, and I'm assuming
14 the only thing that you're asking had nothing to
15 do with the lead-up but just the question itself;
16 correct?
17      MS. KLIEBENSTEIN: That's correct. I'm
18 just trying to get the context so we don't go
19 round and round on this for too long.
20      THE WITNESS: I have an open mind. I try
21 to consider, frankly, your perspective when I'm
22 assuming liability, and I haven't seen in Mr.
23 Zoltowski's report or the reports or declarations
24 of the experts that he's relying upon any sort of
25 reliable direct evidence of that type of value,

Page 35

1  and that's important to me because I'm assuming
2  that Mr. Zoltowski is able to do that, and the
3  fact that he didn't is to me direct evidence that
4  there isn't such a connection. So that's Part 1.
5       Part 2 is that I interviewed Mr. Kursh or
6  Doctor Kursh and Mr. McCarter about this, as well
7  as people at Federal, and they all told me that
8  there is no connection, and so that's another
9  category of direct evidence that there isn't a --
10 a connection between revenues and Blaze Advisor.
11      So there's several categories of direct
12 evidence if you look at it that way, as I think
13 you're -- you described in your preamble to your
14 question that lead me to conclude that there
15 aren't any -- there isn't a revenue connection.
16 BY MS. KLIEBENSTEIN:
17 Q.  What about the applications -- let me back up.
18    You understand that Blaze Advisor is used in
19    certain applications at Federal; correct?
20 A.  Yes.
21 Q.  Did you ask anybody at Federal whether the
22    applications that contain Blaze Advisor drove
23    revenue in any way?
24 A.  Yes.
25 Q.  And what was the answer?

Page 36

1  A.  I think it depends on the context of the question
2     and which application that it is.
3  Q.  So what about -- what about CSI Express?
4  A.  What page of my report is that?
5  Q.  I think you can look at Page 47.
6       MR. FLEMING: So just so that I'm clear,
7     when you say what about CSI Express, is that the
8     question --
9       MS. KLIEBENSTEIN: I'll ask the question
10    again.
11      MR. FLEMING: Okay.
12      THE WITNESS: I didn't think there was a
13    question pending. That's why I was waiting.
14 BY MS. KLIEBENSTEIN:
15 Q.  Page 47.
16 A.  Okay.
17 Q.  Are you there?
18 A.  I am. It's right here.
19 Q.  We were talking about your discussions with
20    Federal employees, and my question was: At the
21    application level, did -- did you speak with
22    anyone -- do you have an understanding one way or
23    another as to whether CSI Express contributes to
24    revenue in any way at Federal at the application
25    level?

Page 37

1       MR. FLEMING: Okay. So the question is
2     whether he asked anybody at Federal that question?
3       MS. KLIEBENSTEIN: No. I'll ask it again.
4  BY MS. KLIEBENSTEIN:
5  Q.  Mr. Bakewell, do you have an understanding one way
6     or the other as to whether CSI Express contributes
7     in any way at Federal to revenues at the
8     application level?
9  A.  What do you mean revenues at the application
10    level? There are no revenues at the application
11    level.
12 Q.  I'll ask it a different way. Do you have an
13    understanding one way or the other whether CSI
14    Express, the application, drives or contributes to
15    revenue in any way at Federal?
16 A.  Yes.
17 Q.  In what way?
18 A.  It doesn't.
19 Q.  And what is your source for that opinion?
20 A.  That's what I've been looking for to see which
21    specific person I could cite you to based upon
22    what I've written. I don't know that I can give
23    you one particular person.
24      You can see in Paragraph 15 that I
25    interviewed a whole bunch of people, and the

Page 38

1    questions that I asked were of this nature.  I
2    would think -- well, the person I would start with
3    is Mr. Iannuzzi, and what -- what he told me is
4    that it doesn't drive revenues.
5 Q.  And what was his -- what was his reasoning?
6 A.  Generally speaking, it's that it could be -- this
7    is a -- it's something that could be replaced, and
8    that it's the business process and not the
9    software that -- and the business process
10   including the people and their knowledge that
11   drives revenues as well as the sort of historical
12   business relationships, and the brand, and that
13   the software just supports the business, the
14   business first.
15 Q.  And your thoughts on CSI Express and whether it
16   contributes in any way at Federal that's solely
17   based on your conversation with Federal employees,
18   including Mr. Iannuzzi?
19 A.  Iannuzzi, and no, it's not solely based on that.
20 Q.  What else is it based on?
21 A.  I've cited to a lot of documents.  One that comes
22   to mind is I have -- and Mr. Zoltowski had this
23   too I think that Federal produced it, business
24   process flow charts that describe how the
25   technology is organized and how it supports a

Page 39

1    business process, and I think that Mr. Zoltowski
2    would have been well served to have spent more
3    time trying to study those and understand them
4    frankly.  With all due respect.
5 Q.  I heard you say earlier that when I asked you
6    about the different applications and whether they
7    drive or contribute to revenue you said it depends
8    on -- it depends.  With the answer to CSI Express,
9    can you identify any on this list that you have
10   information that they could contribute to revenue?
11 A.  What I had in mind there in -- in leaving myself a
12   little bit of room is that when I spoke with some
13   people they described how making sound decisions
14   can help, is helpful to the business, and they
15   weren't able to provide any sort of specific
16   measure or anything like that, but they -- from
17   their perspective I think had sort of the same
18   open mind that I did when I was investigating this
19   issue that, hey, you know, if we make better
20   decisions, I suppose maybe that might be a good
21   thing, and maybe there's some connection to
22   revenues, but I'm not in a position to really
23   judge that, I'm more of a technical person, or I
24   don't have the -- the seniority to really see
25   that, and so some people did say things like that

Page 40

1    to me, or others I followed up when they said, oh,
2    now I understand your question, I'll look into
3    that, and an example of that would be Mr. Pandey,
4    Ramesh Pandey, and when they did that
5    investigation, they said, you know Chris, you need
6    to really -- and what I what I learned here from
7    my research is we've got a business process, and
8    then we've got some software that supports our
9    business process, and really the business process
10   is first, and then what Mr. Pandey said
11   specifically, he's one of the people who gave me
12   business process flow charts, he's, like, look,
13   this Blaze stuff it's really just a small part of
14   our business, not even business process, our
15   technical footprint, and that's -- that led to
16   some of the organization or flow charts, the flow
17   charts that I understand have been produced.
18       So that's -- that's why I was leaving some
19   room in my answer.
20       MR. FLEMING:  When you come to a natural
21   stopping point, I'd like to take a break.  We've
22   been going for over an hour.
23       MS. KLIEBENSTEIN:  Sure.  Just a few
24   minutes.
25   BY MS. KLIEBENSTEIN:

Page 41

1 Q.  So the applications that you understand from your
2    interviews those enable business processes; did I
3    get that right?
4 A.  No.
5 Q.  How did I get that wrong?
6 A.  I used a lot more words than that.  I wouldn't say
7    it that way.
8 Q.  Did that make it wrong though?
9 A.  Not always.  Not always, but that really
10   oversimplifies it, and I didn't say that there was
11   a connection like that.
12 Q.  So the -- the applications are part of the
13   business process; would you agree with that?
14 A.  They support a business process.
15 Q.  They support a business process, and what is your
16   understanding of the business processes that these
17   applications support?
18 A.  They are all different.
19 Q.  Correct, but do you -- can you -- can you name one
20   of the business processes that these applications
21   support?
22 A.  There's some underwriting functions that -- and
23   some pricing functions.
24 Q.  Separate from the applications and separate from
25   Blaze Advisor software, did you talk to anybody

11 (Pages 38 - 41)

Page 42

1    about the business processes and whether those
2    drive or contribute to revenue at Federal at all?
3  A.   I spoke with a lot of people about that.
4  Q.   Did you say about that?
5  A.   I did.
6  Q.   Okay.  I just couldn't hear you, and what -- what
7    did -- what were you told about the business
8    processes that these applications support and
9    whether they do or don't drive revenue?
10 A.   Well, every business is different, and the
11    business process comes first, and the software
12    that's used only supports the business process,
13    and the business process is -- as I understand it
14    have been developed over literally decades if not
15    a century, and there's people that provide value
16    too through their knowledge, and those are the
17    aspects that really drive value at the business.
18 Q.   So you would agree that the business processes
19    that the applications support do contribute to
20    revenue at Federal?
21 A.   The business processes contribute to revenue.
22    There's applications that support the business
23    processes.  There's all kind of applications, but
24    it would be wrong to mix the two like you did in
25    your answer, misleading, or in your

Page 43

1 1   re-characterization of my answer that you
2 2   rephrased as a question.  I think somebody had to
3 3   use the restroom.
4 4 Q.  Just one second.
5 5 A.  Okay.
6 6      MS. KLIEBENSTEIN:  Okay.  We can take a
7 7   break.
8 8      THE WITNESS:  Thank you.
9 9      THE VIDEOGRAPHER:  We are going off the
10 10   record.  The time now is 10:14 a.m.
11 11      (Whereupon a short break was taken from
12 12      10:14 a.m. to 10:33 a.m.)
13 13      THE VIDEOGRAPHER:  We are back on the
14 14   record.  It this marks the beginning of Media 2 in
15 15   the deposition of Chris Bakewell.  The time now is
16 16   10:34 a.m.
17 17   BY MS. KLIEBENSTEIN:
18 18 Q.  All right Mr. Bakewell, just to close up this line
19 19   of questioning so that I'm clear, if you turn to
20 20   Page 47 in your report.
21 21 A.  Okay.
22 22 Q.  So the list of applications on Page 47 can you
23 23   tell me which -- can you identify for me which of
24 24   those applications you have been informed do
25 25   contribute to revenue?

Page 44

1 A.   I don't think any do ultimately.  I gave you I
2    think more context for that in our prior
3    discussion, but I think that if I had to boil it
4    down, I would say no.  I said that at the
5    beginning of our discussion.
6 Q.   Does your report -- does your report express an
7    opinion that all of Federal's revenues and profits
8    are driven by something other than Blaze Advisor?
9 A.   I think yes and no is the answer to that question.
10 Q.   Explain that for me.
11 A.   I think that fundamentally it seems to be that way
12    because of the reasons that I described for you
13    earlier, that the business is a century old, it's
14    complex, it involves people.  I discuss a lot of
15    this throughout my report just to try to give you
16    as concise an answer as possible.  I'll leave it
17    there.
18       I discussed earlier how your experts and
19    designees have been unable to identify anything,
20    despite that being their task, that is specific to
21    any incremental revenues or profits.
22       I discussed how I interviewed Doctor Kursh
23    and Mr. McCarter, and their opinion is that there
24    is no connection.  So that's all falls in the
25    category of zero or null or none , and then I also

Page 45

1    said that, hey, I've got an open mind, and I've
2    tried to leave open the possibility that there
3    might be some, and you and I discussed earlier,
4    and this is also in my report, how the cost,
5    income, and market approaches are interrelated,
6    and the best measure of any sort of incremental
7    footprint would be manifest or show up in the
8    market-derived data points, and I discussed that
9    too.
10 Q.   You mentioned incremental revenues and profit, and
11    incremental footprint.  What do you mean by those
12    phrases?
13 A.   I thought that's what you're asking me.
14 Q.   Maybe.  I'm not in your industry though so I just
15    want to make sure I understand what you mean by
16    the phrase, let's start with, incremental
17    footprint.
18 A.   That's what we're supposed to measure is
19    incremental.
20 Q.   The incremental change that Blaze Advisor does or
21    doesn't add; is that what that phrase means?
22 A.   It has to be incremental to Blaze, or specific to
23    the allegations in this case.
24 Q.   Did you, in your report, create a model for FICO's
25    damages based on FICO's disgorgement claim?

Page 46

1 A. What do you mean create a model?

2 Q. Did you create a damages model responding to Mr.
3 Zoltowski's model as to what would be the
4 appropriate measure of damages for disgorgement?

5 A. He doesn't really have a model. He just says
6 everything. That's not really a model.

7 Q. My question is: Do you have a model for what you
8 view as the appropriate amount of damages for
9 copyright disgorgement in this case?

10 A. Well, my assumption is what I laid out. If that's
11 what your -- if you mean by a model. I laid that
12 out in Section 3.6.

13 Q. And I don't mean the legal framework. I mean -- I
14 mean a damages model with dollar figures in it.

15 A. Is that a question?

16 Q. Yes.

17 A. I don't understand it.

18 Q. Does your report provide an affirmative opinion as
19 to what should be the damages amount for copyright
20 disgorgement in this case?

21 A. Yes.

22 Q. What is that?

23 A. Well, I think, there again, the specific most
24 succinct answer is that it's probably a null
25 value, that Mr. Zoltowski hasn't identified

Page 47

1 anything that's specific to the allegations in
2 this case, and I haven't seen how the allegations
3 in this case specifically create value or relate
4 to value other than sort of the market-derived
5 data points, and then in response to Mr.
6 Zoltowski's, with all due respect, vague and
7 inflated figures, I provide context for the costs
8 that would apply without accepting that what he's
9 doing is correct.

10     What he's done, frankly, is so wrong that
11 it's challenging to respond his analysis in, like,
12 a specific way, but I've tried to be as specific
13 as I can, and one of the things that he's done
14 without conceding -- without me conceding that
15 he's identified a reliable set of revenues is he
16 totally missed the boat on -- on cost. He didn't
17 even try, which is a problem because it relates to
18 and it shows his lack of either understanding of
19 the business or willingness to endeavor in an
20 analysis of understanding the business.

21 Q. Does your report provide an opinion about which
22 Federal applications are accused of infringing
23 FICO's copyrights in breaching the agreement?

24 A. An opinion of that?

25 Q. Yeah.

Page 48

1 A. I make assumptions about that. I don't offer
2 opinions about liability. I would have assumed
3 everything you claim infringes -- infringes, if
4 that's the word that you used, and all the
5 wrongdoings that you've claimed are in fact
6 wrongdoings. I've made that assumption.

7 Q. Your opinions though remove some of the
8 applications that FICO has accused of infringement
9 and breach of contract; is that right?

10 A. What are you referring to?

11 Q. Look on Page 45, and the header at the top is Mr.
12 Zoltowski's Analysis is Overstated because He
13 Includes Applications that Do Not Use Blaze
14 Advisor. Do you understand that it's FICO's
15 position that the applications with -- with Xs by
16 them in the table below that do use Blaze Advisor?

17 A. I think that that may or may not be your position.
18 My experience is that as discovery proceeds in
19 matters like this that plaintiffs often times will
20 learn that their allegations are not entirely
21 accurate, and they will adjust, and one of the
22 ways that they can adjust is through their
23 experts, like Mr. Zoltowski, can elect based upon
24 the evidence and discovery that's occurred to be
25 more specific and accurate and not include certain

Page 49

1 things in his analysis, and I frankly think there
2 was evidence there that he should have recognized
3 and -- and credited.

4     If he doesn't credit that, I'm fine making
5 the assumptions that somehow you're going to prove
6 that those applications use Blaze Advisor. I'm
7 only making assumptions about liability, and I'm
8 indicating that my analysis is flexible, and that
9 whatever the record evidence shows that should be
10 included.

11     For whatever reason, Mr. Zoltowski isn't
12 willing to each make those -- those sort of basic
13 concessions, which I think is -- is problematic,
14 but part of my job here is to -- is to highlight
15 that issue, and to show what the impact would be,
16 and how you account for it to be helpful to the
17 fact finder.

18 Q. I'll represent to you that FICO does believe all
19 of these applications use Blaze Advisor. Looking
20 at Exhibit 1, your report does not contain an
21 alternative damages framework for those
22 applications that you have listed as does not use
23 Blaze Advisor; is that right?

24 A. No. That's not true. I think your interpretation
25 is a little too narrow of what I'm doing.

13 (Pages 46 - 49)

Page 50

1    What I'm doing here is responding to what
2  Mr. Zoltowski is saying, and he's -- he's assuming
3  I suppose that you're going to prove up every
4  single one of your claims, and I can make that
5  same assumption too and incorporate the same
6  numbers that he does, but there's -- there's
7  evidence, as I understand it, and it wouldn't be
8  the first time I've seen this, where discovery
9  proceeded and it came to light that there are
10  certain applications that don't use Blaze Advisor,
11  or don't infringe, and in that case, they need to
12  be deducted, and there's all kind of, like,
13  combinations of -- of results. I'm indicating one
14  here in Exhibit 1 for example.
15    It could be that CUW is found by the fact
16  finder not to be something that belongs on the
17  list, and it's easy enough to -- to make that sort
18  of adjustment. I'm indicating one set of
19  adjustments that I understand applies.
20  Q.  And who provided you with the assumption that the
21  applications with Xs by them on Page 45 do not use
22  Blaze Advisor?
23  A.  Well, not just to me. It's from deposition
24  testimony of Mr. Harkin and Mr. Pandey. It's from
25  Fed's answers. Footnotes -- I've had this all

Page 51

1  documented in Footnotes 224 through 229.
2  Q.  So you have done no independent analyses, separate
3  from reviewing the materials in this lawsuit and
4  speaking with people at Federal, to confirm which
5  applications do or do not use Blaze Advisor?
6  A.  That question doesn't even make sense. You said I
7  didn't do any independent research except for the
8  independent research that I did? That doesn't
9  make sense.
10  Q.  Mr. Bakewell, you have not gone into the
11  applications themselves to confirm whether Blaze
12  Advisor is or isn't used in them; correct?
13  A.  Correct. I'm not a technical expert.
14  Q.  Have you ever seen a demonstration of Blaze
15  Advisor?
16  A.  Yes.
17  Q.  Tell me about that.
18  A.  I've looked at -- there's descriptions in
19  marketing materials. There's a couple of
20  marketing materials that are very detailed that I
21  think provide a demonstration of Blaze Advisor.
22    I think at different points I went -- sort
23  of did some of my own Internet research and, like,
24  looking at YouTube videos and stuff. I can't
25  remember specifically what I saw, but I did see

Page 52

1  some reference to Blaze Advisor in doing that type
2  of general Internet research. Those would be the
3  places that come to mind.
4  Q.  Did you -- did you see how Blaze Advisor works
5  within Federal?
6  A.  Yes.
7  Q.  Tell me about that.
8  A.  I think there my understanding was developed more
9  from looking at flow charts. I had already
10  developed an understanding of how the product
11  worked and what the interface looked like from the
12  materials that I described to you a moment ago,
13  and so then when I spoke with, for example, Mr.
14  Pandey, he described thing to me, and then Fed
15  produced those flow charts. That all kind of fit
16  together and gave me an understanding for how the
17  systems would work at Federal.
18  Q.  Have you reviewed the rules that are within Blaze
19  Advisor at Federal?
20  A.  Some of them. I'm not a technical expert, but
21  I've seen some information that gave me an
22  understanding of that as a lay person.
23  Q.  And what materials are you referring to?
24  A.  Marketing materials, deposition testimony, and the
25  like.

Page 53

1  Q.  But not the rules themselves that are in Blaze
2  Advisor today?
3  A.  I may have. I can't remember if I've seen that
4  type of stuff specifically from -- from Federal,
5  or if that's the understanding that I gained is
6  from combining general rules descriptions that
7  I've seen with testimony and other documents and
8  diagrams. I don't have -- I'd have to have my
9  memory refreshed.
10  Q.  Moving to Paragraph 44.
11  A.  Okay.
12  Q.  The last sentence says, "Annual sales activity is
13  principally driven by customer renewals of
14  existing policies."
15  A.  Correct. That's one of the things I was referring
16  to earlier.
17  Q.  Do you know what percent of Federal's revenues in
18  any given year are from customer renewals of
19  existing policies?
20  A.  I've seen that, but I don't have a number
21  memorized.
22  Q.  And is this sentence true -- you know, I see that
23  it's from a general industry publication. Is that
24  true at Federal?
25  A.  Definitely.

14 (Pages 50 - 53)

1 Q.  And how do you know that?
2 A.  Because the businesses that comprise Federal are
3      some of the oldest and most established businesses
4      in the country.  In addition to seeing more
5      specific information and testimony.
6 Q.  Is it your opinion in your report that Federal's
7      existing customer relationships drive revenue?
8 A.  Yes.
9 Q.  And do you know what percent of Federal's revenue
10     existing customer relationships drive?
11 A.  I don't think I can give you a specific number,
12     but it's very high.
13 Q.  And what's your -- what's your support for that?
14 A.  Same things we just discussed.
15 Q.  Which are -- just so I've got it right, why don't
16     you recap those, that support for me.
17 A.  Sure.  Just broadly, we talked about how this
18     industry works, property and casualty insurance,
19     and the cites that you asked me about in
20     Paragraphs 44 and I think 43.  We talked about the
21     Federal businesses and their long history.  This
22     is also explained in annual reports of Chubb, and
23     then I referred to deposition testimony and other
24     documents that describe how Chubb's business works
25     fundamentally, and ACE, and Federal.

1 Q.  But you haven't seen a marketing survey or
2      anything like that that says existing customer
3      relationships drive 33 percent of revenues?
4      Nothing that specific; is that correct?
5 A.  There's nothing that is -- has a number like 33
6      percent in response to a question like you just
7      provided that I've seen.  The information that
8      I've seen is more fundamental than that, and
9      pervasive.
10 Q.  I also saw you mention strong management team
11     throughout your report.  Do you believe that
12     Federal's revenues are generated by a strong
13     management team as well?
14 A.  I do.
15 Q.  And can you identify a percent for me?
16 A.  I can't give you a percentage for that.
17 Q.  And is your support for that opinion the same
18     types of information we just discussed?
19 A.  Yes.
20 Q.  The next is know-how of Federal's workforce.  Is
21     it your opinion that the know-how of Federal's
22     workforce contributes to revenues at Federal?
23 A.  Absolutely.
24 Q.  And do you know a percent?
25 A.  No.

1 Q.  And what is your support for that statement?
2 A.  Which statement?  No or yes?
3 Q.  Your -- the support for your statement that
4      know-how of the workforce at Federal attributes --
5      attributes or contributes to revenue?
6 A.  It comes from gaining an understanding of the
7      business and the industry that it operates in.  It
8      comes from financial statements and annual
9      reports.  It comes from documents prepared in the
10     ordinary course of business as well as deposition
11     testimony.  Those would be some examples and not
12     an exhaustive list.
13 Q.  I'm going to try to ask this generally.  Maybe we
14     can, maybe we can't.
15 A.  Let's try.
16 Q.  I have a few -- I have about ten other things on
17     my list that I want to ask you the same questions
18     about the percentage -- the percentage of revenue
19     that is attributable to these different factors
20     and then your support for that.  So I'll -- I'll
21     list them, and if we have to go through them one
22     at a time, let me know; brand recognition, ability
23     to maintain strong financial ratings, underwriting
24     expertise, business infrastructure, global
25     presence, price, product offerings, scope and type

1      of distribution system, customer service quality,
2      and use of technology.
3          So for that -- that bucket of factors, can
4      you tell me what percent of Federal's revenues are
5      attributable to those different elements?
6 A.  I don't think I have a specific percentage for
7      each of those.
8 Q.  Do you have a specific percentage for any of them?
9 A.  Not committed to memory.  There might be a
10     document somewhere that measures something like
11     that, but I can't give you anything off the top of
12     my head.
13 Q.  Do you believe those things, those aspects of
14     Federal's business attribute to the revenue?
15 A.  I don't understand your question.  What do you
16     mean attribute to?
17 Q.  Is Federal's revenue -- couldn't identify a
18     percentage, but is Federal's revenue in general
19     attributed to all of those factors I just listed?
20 A.  I don't know what you mean by attributed to there.
21     That sounds like an easy enough word, but that can
22     be like, a term of art in my field.  So it's --
23     it would be easier if you use a different word for
24     me.
25 Q.  Why don't we try just one and see if we can work

Page 58

1  through it.  So brand recognition.
2  A.  Yes.
3  Q.  Do you believe that any of Federal's revenue is
4  attributed to brand recognition?
5  A.  Attributable to?  Toward it?  What do you mean?
6  Why did you say attributed to in the past tense?
7  That's a weird -- that's weird to me.
8  Q.  I can use attributable.
9  A.  Okay.
10  Q.  Brand recognition.  Are any of Federal's revenues
11  attributable to brand recognition?
12  A.  Yes.
13  Q.  And do you know a specific percent?
14  A.  I can't tell you a specific number.
15  Q.  And what is your support for your opinion that
16  Federal -- Federal's revenues are attributable to
17  brand recognition?
18  A.  Well, there's two things fundamentally.  First
19  that Chubb and ACE are two very highly regarded
20  brands, and my experience is that in a field like
21  this that you can -- it's possible to identify a
22  specific value that's attributable to a brand, or
23  to brands like those, and second, Chubb just went
24  through a re-branding effort, and I just read
25  about it recently where Chubb's management talked

Page 59

1  about the value expects to create from that brand
2  and the refinement on the Chubb side, and the
3  integration of the ACE business, and the reasons
4  why it -- it did that relate to revenues, and
5  that's described at length in documents that I've
6  seen.
7  Q.  So the next subject is the ability to maintain
8  strong financial ratings.  Is it your opinion that
9  Federal's revenues are attributable to the ability
10  to maintain strong financial ratings?
11  A.  Yes.
12  Q.  Do you have a percentage?
13  A.  No.  I can't give you a percentage.  Not right --
14  sitting right here.  If I was tasked with doing
15  that, I might be able to.
16  Q.  And what is your support for that opinion, that
17  Federal's revenues are attributable to the ability
18  to maintain strong financial ratings?
19  A.  Well, it's how the business works, and I think
20  that there's some examples from my experience
21  where if you're an insured you can be required to
22  obtain insurance from a company that has a certain
23  rating.  That wouldn't be unusual for me to see in
24  a contract, and that's consistent with how Federal
25  describes its business in a variety of places that

Page 60

1  I've seen.
2  Q.  The next is underwriting expertise.  Are Federal's
3  revenues attributable to underwriting expertise?
4  A.  Yes.
5  Q.  Do you have a percent?
6  A.  No.
7  Q.  And what is your support for that opinion?
8  A.  It's from understanding how the business works
9  fundamentally is -- and the different sources that
10  I gave you for each of the other categories would
11  probably apply to this category as well.
12  Q.  If you were tasked with trying to figure out a
13  percentage of the revenues that were attributable
14  to underwriting expertise, how would you go about
15  doing that?
16  A.  At the highest level, I would use the tools that I
17  have in my -- my toolbox as a valuation expert,
18  and those -- in the toolbox, there's three big
19  bins that I put the tools into.
20       One would be what I'll call income
21  approach, that bin.  The other one would be the
22  cost approach, and the -- the third would be the
23  market approach, and I would think about what
24  tools are available under each of those bins.
25       Under the income approach, I would -- I'm

Page 61

1  inclined to say that's probably going to be the
2  best fit here, and surveys would be -- would be
3  one way to do it.  I think I could do some
4  comparisons using statistics between companies
5  that have different ratings and see if there's a
6  correlation between ratings changes and revenues.
7       That's just off the top of my head how I
8  would go about doing -- solving that problem.
9  Q.  Business infrastructure.  Is it your opinion that
10  Federal's business structure -- strike that.  Let
11  me ask it again.  Are Federal's revenues
12  attributable to its business structure?
13  A.  You said business infrastructure, and then you
14  said business structure.  Which one do you mean?
15  Q.  I mean infrastructure.  I get so flummoxed trying
16  to say attributable that I can't say it.  Go
17  ahead.
18  A.  I don't understand your question.  I don't think
19  that was a question.
20  Q.  Are Federal's revenues attributable to business
21  infrastructure?
22  A.  Maybe.
23  Q.  Are Federal's revenues attributable to its global
24  presence?
25  A.  Yes.

16 (Pages 58 - 61)

Page 62

1 Q.  And can you identify the percent of Federal's
2     revenues that are attributable to its global
3     presence?
4 A.  I can't give you a specific number as I sit here
5     right now.
6 Q.  If you were asked to try to come up with a
7     specific number, how would you go about doing
8     that?
9 A.  I'd get my toolbox out that I just described for
10    you, has three big compartments in it, and then
11    think about what specific tools within each
12    compartment or which compartment I would try to
13    use and.
14 Q.  And what is your support for your opinion that
15    Federal's revenues are attributable to its global
16    presence?
17 A.  Because there are businesses that operate globally
18    and they require global insurance companies,
19    global coverage, and I think that if somehow
20    Federal artificially -- this is very artificial by
21    the way in the case of Federal and its companies,
22    was only able to operate in one geography, then
23    there would be -- I'd have to do some thinking
24    about what the impact is of that, and my
25    experience is that having worked for a global

Page 63

1     company and observed the globalization trends,
2     particularly as they affect the United States,
3     that's a consideration in the real world.
4 Q.  And price and product offerings; do you have an
5     opinion as to whether Federal's revenues are
6     attributable to prices and product offerings?
7 A.  Yes.
8 Q.  And can you identify a percentage of Federal's
9     revenues that are attributable to price and
10    product offerings?
11 A.  Not that broadly as I sit here right now.
12 Q.  If you were tasked with figuring out a percentage,
13    how would you go about doing that?
14 A.  I would get out the toolbox and think about the
15    tools in each compartment that I would use.
16 Q.  And what is your support for your opinion that
17    Federal's revenues are attributable to its product
18    offerings and their prices?
19 A.  Well, let's address each one.  The first one,
20    product offerings, your -- it's such a circular --
21    what's the word?  It's self-referencing or
22    tautology.  If you -- you need product offerings
23    to generate revenues.  So that's the first one,
24    and then the second one, pricing, that's an issue
25    that I'm always interested in studying.  Price

Page 64

1     elasticity and demand is, like, one of the
2     fundamental considerations as a -- as a
3     financial/economic expert that I -- I'm interested
4     in understanding anytime I assess a business and
5     measuring when it's appropriate.
6 Q.  Thinking about the insurance industry
7     specifically, is there anything -- anything else
8     that -- beyond the fact that you need products to
9     sell to make money?  Is there any other support
10    for your opinion that Federal's product offerings
11    the revenues are attributable to Federal's product
12    offerings?
13 A.  Sure.
14 Q.  And what's that?
15 A.  Well, another thing that comes to mind is I can
16    draw on my own experience when I was in industry
17    one of the things I was responsible for was
18    managing and procuring property casualty --
19    property and casualty insurance, and I -- I can
20    remember that figuring out the different vendors
21    and their relationships with brokers and how
22    things were underwritten was an important part of
23    that decision-making process, and I actually -- I
24    can remember taking -- I actually took a week once
25    to take a deep dive and learn all about that

Page 65

1     stuff.  I went to the Lloyd's Market in London,
2     and toured that, and interviewed people, and tried
3     to learn as much as I could because it was an
4     important part of our business.  So I have a very
5     good understanding I think of how that -- how that
6     works.
7         The product offerings and mix, and having a
8     different sources for different products can be
9     important.  Sometimes it would make sense to have
10    multiple services and products purchased from one
11    underwriter and broker, and sometimes it would
12    make sense to -- to split that stuff up.  That's
13    important.
14 Q.  So you mentioned a trip to Lloyd's in London; is
15    that right?
16 A.  Sure.  Yeah.  I did.  I mentioned that.
17 Q.  For what purpose?
18 A.  I was trying to give some color to my answer and
19    what I was remembering about how I learned that
20    products -- different products are important.
21 Q.  And -- and what was the purpose of this trip?
22 A.  To learn how -- I mean, that's a market that's
23    been around for literally centuries, and to learn
24    how the industry has developed over the years.
25 Q.  And was there a particular -- was there a

17 (Pages 62 - 65)

Page 66

1   particular research question you had when you --
2   when you scheduled that trip, or were you trying
3   to solve a business problem?
4   A.   Well, both.  I knew that it was a responsibility
5      that I had.  I was tasked with addressing some
6      problems that we had, and I wanted to learn as
7      much as I could about the insurance industry and
8      how it worked.
9          We owned some assets that we had insured,
10     and we had some projects that were insured and
11     we had to get insured, and it was my job and
12     so I wanted to learn as much as I could about it,
13     and that was a great opportunity that was
14     presented to me.
15  Q.   And this is while you were working at?
16  A.   Wartsila, W-A-R-T-S-I-L-A.
17  Q.   Okay, and you mentioned you were tasked with
18     addressing some problems that we had.  What were
19     those problems specifically?
20  A.   We spent a lot of money on insurance for projects
21     that were underway as well as -- this was when I
22     worked for -- I was the -- my job title was
23     managing director of I think finance or treasury
24     control and administration for what was our --
25     basically our investment fund, and we were

Page 67

1   spending a lot of money on insurance, and the
2   program -- we didn't really have a well
3   thought-out strategy.  We had just accumulated a
4   bunch of assets, and there was an opportunity to
5   improve what we were doing, and it was my job.
6   Q.   Did you come away from that week at Lloyd's of
7      London with any conclusions?
8   A.   Probably.
9   Q.   Do you remember what they were?
10  A.   Not really.  It was more, you know, sometimes when
11     you learn, you learn specific facts and you
12     memorize some things just like in school, and
13     those things tend to disappear, right, but the
14     things, the principles that you learn as opposed
15     to things memorialization the principles tend to
16     stick with you, and those principles stuck with
17     me.
18  Q.   Am I hearing you right that one of the principles
19     you took away from that was having a broad product
20     offering was a good thing for an insurance
21     company?
22  A.   No.
23  Q.   Do you have an opinion on that one way or the
24     other?
25  A.   I do.

Page 68

1   Q.   And what is it?
2   A.   Can be a good thing.
3   Q.   In what circumstances can having a broad product
4      offering be a good thing, and in what
5      circumstances can it be a bad thing?
6   A.   Well, it makes sense for your customers it's a
7      good thing, and if you are just compiling a bunch
8      of businesses together that there aren't
9      interrelationships with and that you can't make
10     work together better than they would be
11     independently, then it's probably not so good.
12  Q.   That's pretty true across all industries; wouldn't
13     you agree?
14  A.   I think so.
15  Q.   Okay.  Scope and type of distribution system.
16     That's our next factor that's listed in your
17     report.  Is it your opinion that Federal's
18     revenues are attributable to the scope and type of
19     distribution system that Federal has?
20  A.   Probably.  I would need to know more.  I would say
21     maybe.
22  Q.   And customer service default; do you have an
23     opinion as to whether Federal's revenues are
24     attributable to customer service quality?
25  A.   I think it seems plausible to me, but I would have

Page 69

1   to say maybe there too.  Because I would need to
2   define that a little more specifically.
3   Q.   And use of technology; do you have an opinion
4      whether Federal's revenues are attributable to
5      Federal's use of technology?
6   A.   Like all of its technology, generally, maybe.  I'd
7      have to know more specifics.  I mean, certainly
8      the proposition, as I said earlier, is -- is
9      plausible.  That's one of the things -- one of the
10     things that collectively would relate to revenues,
11     but if we're going to get more granular, then I
12     need to know more about the specific aspects that
13     you're talking about.
14  Q.   In your report, Paragraph 35, you have some
15     sentences that are cited to Mr. McCarter.  One of
16     them is that Blaze Advisor is an agnostic business
17     solution, and another is that Blaze Advisor is
18     similar to a blank Excel worksheet.
19         Is your support for those opinions -- your
20     support for your opinions is your conversation
21     with Mr. McCarter; correct?
22  A.   Sort of.  I mean, that's what I listed in
23     Paragraph 35, but there's other things that
24     support that -- those statements as well.
25         For example, Federal's marketing

Page 70

1  literature, its data sheets -- not Federal's. I'm
2  sorry. I meant FICO's and the data sheets that
3  are specific to Blaze Advisor that I've seen.
4  I've seen other information as well, but that
5  would be an example.
6        I don't -- when I write a footnote, my
7  intent is not to provide like an exhaustive list
8  of everything that I've seen that might support or
9  relate to a statement in my report.
10 Q.  I see in Paragraphs 36 and 37 that you also spoke
11     to Mr. McCarter about the different applications
12     and technologies that Federal -- Federal employs;
13     is that correct?
14 A.  I must have missed a word in your question. It
15     probably was a fine question, but I missed
16     something.
17 Q.  Let's just go to 36.
18 A.  Okay.
19 Q.  You learned from Mr. McCarter that Federal
20     utilizes approximately 1500 different
21     applications; correct?
22 A.  Yes.
23 Q.  And do you have an opinion as to what percent of
24     Federal's revenues are attributable to those 1500
25     applications collectively?

Page 71

1  A.  No.
2  Q.  What about any individual application; do you have
3      any estimation as to what percentage -- well, let
4      me ask it a different way.
5          Do you have an opinion as to whether
6      Federal's revenues are attributable to these 1500
7      applications?
8  A.  All 1500? I'd have to study that further.
9  Q.  Do you know individually what any of these
10     applications do besides the ones that contain
11     Blaze Advisor that are at issue in this case?
12 A.  Yes.
13 Q.  What do they do?
14 A.  Well, there's accounting software, and there's
15     other types of applications that are typical to
16     underwriting businesses, recordkeeping type of
17     information.
18 Q.  And did -- did Mr. McCarter tell you that, or are
19     you just relying on your own business experience?
20 A.  I think he gave me maybe a little more color.
21     This is not a transcript of my interview with him,
22     and I think that he provided some further context
23     of what he was saying in the -- when he listed the
24     1500 applications.
25 Q.  In Paragraph 37, you reference that Blaze Advisor

Page 72

1  is just one of approximately 20 different
2  technologies in CSI Express?
3  A.  Correct.
4  Q.  And one of 15 to 20 different technologies in CUW;
5      correct?
6  A.  Correct.
7  Q.  Do you know what the other technologies in CSI
8      Express and CUW do, what their functions are?
9  A.  Yes.
10 Q.  What are they?
11 A.  Well, if I wanted to give you something more
12     specific, I know that there's flow charts that
13     I've seen that have more granular details, but
14     generally speaking, they relate to the flow of
15     information, and business process, and some
16     different analytics that are done.
17 Q.  Did you conduct a study as to what these other
18     technologies -- let me ask it a different way.
19         Did you conduct a study for these other
20     technologies whether Federal's revenues are
21     attributable in any way to these other
22     technologies?
23 A.  I asked about generally. I don't think that I did
24     a study of each of those and tried to measure the
25     revenues that are specifically attributable to

Page 73

1  each element, but certainly an understanding,
2  you're trying to gain an understanding of how the
3  business worked and what those process flow
4  diagrams related to. That's something that I
5  asked Mr. Pandey and Mr. McCarter about.
6  Q.  Is it your opinion in your report that FICO is
7      only entitled to profits from the actual named
8      defendants themselves?
9          MR. FLEMING: Objection. Calls for legal
10     conclusion.
11         THE WITNESS: I'm trying to think of a way
12     to answer it.
13         MS. KLIEBENSTEIN: Let me ask this question
14     again.
15         THE WITNESS: Okay.
16         MS. KLIEBENSTEIN: If I could.
17         THE WITNESS: Sure.
18     BY MS. KLIEBENSTEIN:
19 Q.  Is it your opinion in your report that FICO may
20     only attempt to disgorge the profits from the
21     actual named defendants themselves?
22         MR. FLEMING: Same objection. Calls for
23     legal conclusion.
24         THE WITNESS: So I'm trying to think of a
25     way to answer it. That's not the same as the

Page 74

1    objection that's being made, but frankly, I have
2    really viewed that all along as being a legal
3    issue.  I was surprised that Mr. Zoltowski was so
4    willing to offer opinions about that issue.  They
5    don't seem appropriate to me.
6    BY MS. KLIEBENSTEIN:
7  Q.  Your report states that you don't believe Mr.
8    Zoltowski has proven all the entities in his
9    report were, quote-unquote, one; is that right?
10 A.  Where?  Where are you?
11 Q.  I'm at 168.  So the very last sentence on the Page
12    51 starts with, "These are ordinary business
13    relationships, and Mr. Zoltowski has provided no
14    financial basis for effectively transforming these
15    separate entities into one for the purposes of a
16    damages assessment."
17 A.  Correct.  I said that.
18 Q.  Do you have an opinion on what -- what would need
19    to be shown in your mind to prove a financial
20    basis for transforming these separate entities
21    into one?
22 A.  Well, I think these -- let's look at these three
23    sentences, and I'll give you a little more insight
24    into why I chose the words that I did.
25       So the sentence that starts, "These are

Page 75

1    ordinary business relationships, and Mr. Zoltowski
2    has provided no financial basis," and it goes on,
3    no financial basis is I'm saying, look, this is a
4    legal issues, but to the extent Mr. Zoltowski is
5    allowed to talk about this type of stuff
6    financially, there's no basis for him combining
7    this stuff together; right?  That's what I'm
8    trying to make clear there.
9       The next sentence starts with, "It is my
10    understanding that," well, that's -- I've done
11    this throughout my report, and it's pretty
12    standard for a financial expert, a damages expert
13    to write this language, to use this language in
14    two instances.  One, where they are making
15    assumptions about technology, and two, where they
16    are making assumptions about the law.  That's a
17    statement that signals I think very clearly that,
18    hey, it's a legal issue, I can just tell you what
19    my understanding is, but I'm not a lawyer, I'm not
20    offering any legal opinions.
21       So -- and then I go on.  I say, "He has no
22    financial basis," and the context of this as it's
23    gone on for -- this is, like, Page 52, 168
24    paragraph, it's, like, look, if he's allowed to
25    testify about this stuff, then financially he

Page 76

1    hasn't done his job, and then third, I say here
2    again, from a financial perspective, I'm making it
3    clear that this is just from a financial
4    perspective, and I'm not offering a legal opinion,
5    but certainly from a financial perspective, he has
6    no basis to -- to sweep all this other stuff in
7    because it's not tied to the evidence.
8       I think there's a word that's missing here,
9    Mr. Zoltowski's claims are not tied to the
10    evidence and would result in a windfall to FICO.
11       So that's sort of giving you some context
12    for this and maybe some further understanding as
13    to how I'm using certain terms in my report.
14 Q.  So no -- and it's that financial basis that I
15    don't understand.  So I heard you say there's no
16    basis financially for combining this stuff
17    together.
18       What would provide a basis financially to
19    -- to quote your words, combine this stuff
20    together?  Do that make sense?
21       MR. FLEMING:  Object to the extent it calls
22    for a legal conclusion.
23       THE WITNESS:  No it doesn't make sense.
24    Can you ask that again?
25       MS. KLIEBENSTEIN:  Sure.

Page 77

1    BY MS. KLIEBENSTEIN:
2  Q.  Not asking for a legal conclusion, not asking you
3    to opine on the law.  I'm focusing on your use of
4    the phrase financial basis, that you don't --
5    correct me if I'm wrong, you don't see a financial
6    basis in Mr. Zoltowski's report to combine the
7    revenues from these different entities; is that --
8    am I getting that right?
9       MR. FLEMING:  Same objection.
10       THE WITNESS:  Well, setting aside the fact
11    that this is a legal issue, he hasn't, like,
12    financially or economically shown that all this
13    stuff is combined.  That's basically one and the
14    same.  He hasn't shown that at all.  I mean, he
15    hasn't even come close.  Totally, totally missed
16    the mark frankly, and with all due respect.
17    BY MS. KLIEBENSTEIN:
18 Q.  And I'm asking how would you go about it if you
19    were asked to assess whether financially or
20    economically these entities -- their revenues can
21    be combined.  How would you go about that
22    assessment?
23 A.  I'll tell you what I would do, because this comes
24    up from time to time, is I would be really careful
25    to understand where the law and where finance and

Page 78

1  economics is aligned and where it's not aligned,
2  and I would look at this from an economic point of
3  view, meaning looking at accounting rules is,
4  like, not going to do it. I know that from
5  experience. It's incomplete and myopic. It's
6  only one discipline within business, and I know
7  also from experience that the way the law
8  generally treats this is with some pretty straight
9  guidelines, and you can get some guidance from
10  doing some research into -- into alter ego and
11  principles that come from that, and then I would
12  want to ask the lawyers a whole bunch of questions
13  about what standards might apply in this
14  jurisdiction, in this court, why it's even
15  relevant.
16      It's not -- it's not an issue I think to be
17  taken lightly like Mr. Zoltowski has, and it's
18  certainly not one where you're going to get a
19  complete answer if you only view the problem
20  through the lens of accounting.
21 Q. So you would -- you would take a -- an approach
22  that's more economically focused at the very
23  least?
24 A. You know, I don't know. Definitely what I would
25  do -- I'm telling you some of the concerns that I

Page 79

1  have and how I would go at solving the problem.
2  Because ultimately this is a legal question, and
3  it's a question that, you know, a lot of courts
4  say it's only their province to solve it. A lot
5  of judges are, like, you know what, I'll -- I'll
6  just deal with that issue, I don't need expert
7  opinion, and I think that, frankly, Mr. Zoltowski
8  should have thought about that too, and I can only
9  tell you, since you're asking me under oath, how I
10  would go about thinking about this problem.
11  That's what you just asked me; right?
12 Q. So when you mentioned you would look at it
13  economically, I'm not an economist, what does that
14  -- what does that phrase mean? What does it
15  entail; looking at something economically?
16 A. I think you need to look at it holistically and
17  combining all the -- the disciplines within --
18  within the business field, not just accounting.
19  That's what I mean by economically.
20      You can't just look at it through the lens
21  of -- that an accountant would because that's
22  going to give you an incomplete view of the
23  problem; right?
24      It's very rules-based approach toward
25  financial reporting generally, and that can be

Page 80

1  helpful to people who are reading financial
2  statements and know the -- the rules that apply so
3  they can do some financial analysis, but it's not
4  helpful to really understanding the business in
5  and of itself. So you need more. I mean, you got
6  to -- you can't just use that narrow lens and
7  think that you're providing a holistic business
8  opinion, and that's setting aside -- again, in my
9  answers, and I've tried to do this throughout my
10  report, that's setting aside this concern that I
11  have about the law and my deference frankly to the
12  court and this judge. If this judge wants to
13  solve this problem on his own, that wouldn't be
14  unusual to me, and I would totally defer.
15 Q. You mentioned all the disciplines within the
16  business field, and you listed accounting as one.
17  What are the other disciplines within the business
18  field?
19 A. I think that in terms of alter ego analyses -- by
20  the way, they -- my experience is it will draw
21  upon all of these, and it includes business in
22  general, like management, how the business is
23  managed, human resources, and organizational
24  behavior, finance, accounting, and economics, and
25  information systems.

Page 81

1 Q. Infection systems being? Give me an example.
2 A. Well, how the business is set up to process things
3  on an automated basis. How payroll is done for
4  example is something that can be automated.
5 Q. So not just -- so it's broader than -- when you
6  say information systems, to me my mind goes to the
7  applications at issue here. You're talking about
8  broader information --
9 A. There's only one type of computer application --
10  there's all kind of computer applications that are
11  used in business, like, when I go with my -- with
12  my son who is visiting colleges now, there's
13  departments in the college of business that are,
14  like, have followed the names that I just gave
15  you. There's organizational behavior department,
16  there's a information systems department, there's
17  a finance department, an economics department,
18  accounting department.
19 Q. Okay.
20      MR. FLEMING: We've been going for an hour.
21  Do you mind if we take a short break?
22      THE WITNESS: I could use a break.
23      MS. KLIEBENSTEIN: Yeah.
24      THE WITNESS: I've been drinking a lot of
25  coffee here.

21 (Pages 78 - 81)

Page 82

1    MS. KLIEBENSTEIN:  Can we do just a short
2  one, and then we'll -- we'll go for about another
3  45 minutes and break for lunch.
4    MR. FLEMING:  Sure.
5    MS. KLIEBENSTEIN:  Does that work?
6    THE VIDEOGRAPHER:  We're going off the
7  record.  The time is 11:38 a.m.
8    (Whereupon a short break was taken from
9    a.m. to 11:48 a.m.)
10    THE VIDEOGRAPHER:  We are back on the
11  record.  This marks the beginning of Media 3 in
12  the deposition of Chris Bakewell.  The time now is
13  11:49 a.m.
14    MR. FLEMING:  Say Heather, at the beginning
15  of the deposition, I don't know if you mentioned
16  that Jim Woodward, in-house counsel, is present,
17  but he is, and I'm just making a note of that for
18  the record.
19    MS. KLIEBENSTEIN:  Thank you.
20    MR. FLEMING:  Yup.
21  BY MS. KLIEBENSTEIN:
22  Q.  Can we go to the chart on Paragraph 180.
23  A.  Okay.
24  Q.  I'm trying to figure out where the -- where the
25    numbers from this table come from.  Can you -- can

Page 83

1    you tell me the -- where those numbers come from
2    in your report; certain schedule?
3  A.  Let's see if I can find it quickly.  I can make a
4    note to look for that over -- since we have a
5    break coming up.  I think that's -- that's a fair
6    question that's not cited to.  Rather than sit
7    here, I can't find it immediately, but I know it's
8    somewhere.  I'll find out and get back to you.
9  Q.  Okay.  Generally what was your process when you --
10    talking about copyright disgorgement and the gross
11    written premiums that form the base of that award,
12    what was your process in identifying the gross
13    written premiums that are at issue in this case?
14  A.  So there was -- let's see if we're talking about
15    the same thing.  So there were discovery requests,
16    and there were responses that occurred over a
17    period of time, and then there were refinements
18    that were made to that information and then
19    spreadsheet that was produced, and generally
20    speaking, my -- my process involved understanding
21    that information, the context of the answers, what
22    happened in the response, and how Mr. Zoltowski
23    characterized it.  Trying to combine all that
24    together.
25  Q.  In Paragraph 193 you write, "Federal is entitled

Page 84

1    to deduct the costs it incurs to generate
2    revenue."  Was it your assumption that Federal was
3    entitled to deduct all of its costs it incurs to
4    generate revenue, or just a portion?
5  A.  I think that the appropriate deductions are of
6    costs that are required to generate whatever
7    revenues are identified.
8  Q.  And so when you use the phrase generate revenue in
9    Paragraph 193, you mean generate the revenues that
10    -- generate which revenues; all of the Federal
11    revenues, or just the ones that have been put
12    forth in Mr. Zoltowski's report?
13  A.  I don't really mean either of those things.
14  Q.  What do you mean?
15  A.  I mean that those are costs that have a
16    relationship with an economic tie or a financial
17    tie to whatever it is the revenue stream that is
18    being analyzed, and there's issues with the
19    revenue stream that I talk about prior to this at
20    some length, and there needs to be a connection
21    between the costs and the revenues, and also in
22    part -- I think that I see this in some court
23    opinions, and it can be -- for somebody who is
24    speaking maybe a little more freely about
25    principles as opposed to, like, using words as

Page 85

1    terms of art, I think that costs can also relate
2    to apportionment.  There's conceptually -- there
3    can be revenues that are unrelated that need to be
4    subtracted out that some people see like cost
5    deductions.
6  Q.  Understood, but in Paragraph 193, you're just
7    talking about what a normal lay person would refer
8    to as a cost and expense; correct?
9  A.  I think so.  I think within the context of that
10    paragraph appearing in the middle of a -- a longer
11    discussion.
12  Q.  For the costs -- and -- and you did some work to
13    deduct costs from the revenue stream identified by
14    Mr. Zoltowski; correct?
15  A.  Some.
16  Q.  Some, and when you were doing that work, did you
17    take into consideration whether any of the costs
18    you were working with were fixed available,
19    semi-variable?
20  A.  Of course.
21  Q.  And how did -- in what way?  How did that impact
22    your analysis?
23  A.  So I wanted to understand how the costs behaved,
24    and I described that in -- above that paragraph
25    and below that paragraph and looked at specific

Page 86

1  categories of costs, and I described those, like,
2  I went first, second, third.  I describe what the
3  financial and economic relationship is to the
4  revenues that were identified, and then I think
5  overriding all this, I see this issue come up,
6  when people overreach in terms of revenues, they
7  miss a basic principle, or when there's a wide
8  variety of revenues -- a wide range of revenues
9  that are identified.
10       If you're identifying a wide range of
11  revenues, you're going to need a wide range of
12  costs to support those revenues.  It's not
13  reasonable to think that those -- those wide range
14  of revenues can just exist without costs to
15  support them, and I didn't see that in Mr.
16  Zoltowski's report at all, but that's a principle
17  that I think applies to everything that I'm
18  describing here.
19       I discuss direct variable costs, for
20  example, in Paragraph 197.  I use that same
21  terminology in -- in that paragraph.
22  Q.  You mentioned earlier you wanted -- you wanted to
23  understand how costs behave.  Why, when you were
24  doing your analysis, did you want to understand
25  how costs behave?

Page 87

1  A.  So that the appropriate costs can be identified in
2  relation to the revenue stream that Mr. Zoltowski
3  is setting forth, and then I tried to make my
4  analysis and my description as flexible as
5  possible due to the -- due to two reasons.
6       One, the systematic errors in Mr.
7  Zoltowski's report, and two, you know, sometimes
8  what I'll see in a situation like this is where
9  there's a initial report, and a rebuttal report,
10  and a reply report that in the reply the
11  plaintiff's expert will recognize that, hey, you
12  know, Mr. Bakewell had some things that he
13  observed that I really should account for in my
14  analysis and make some adjustments.  An expert
15  like Mr. Zoltowski often will do that.  So I
16  wanted to write my report in a way that permitted
17  that sort of interaction.
18  Q.  You mentioned that you -- you wanted to understand
19  how the costs behave so that the appropriate costs
20  could be identified.  What do you mean by an
21  appropriate cost?
22  A.  Costs that are deductible and attributable to the
23  revenues that are appropriate.
24  Q.  So what would be an inappropriate cost, a cost
25  that couldn't be deducted?

Page 88

1  A.  I think when you're identifying such a broad range
2  of revenues, when you're identifying all the
3  revenues, you need to subtract all the costs.
4  That's one way to respond to your question.  So
5  all the costs apply that I've identified in my
6  report.
7       I think that Mr. Zoltowski identifies a
8  narrower stream of revenues, or if in some way the
9  -- the fact finder has a narrower stream of
10  revenues than what Mr. Zoltowski identifies, then
11  we can think about each of these categories that
12  -- that I've described in my report and whether or
13  not they behave in a way that's linked to the
14  revenue stream.
15  Q.  Is direct another way to refer to a fixed cost?
16  A.  No.
17  Q.  They are different?
18  A.  Yes.
19  Q.  How are they different?
20  A.  They are -- in some ways, they are the opposite.
21  Q.  Explain that to me.
22  A.  Well, sometimes fixed costs don't have any
23  relationship to -- to anything, they are just
24  costs, and in that case, they wouldn't be direct,
25  but that's when they would be the opposite, but at

Page 89

1  other times, when -- if you accuse a wide range of
2  revenues, you need fixed costs to support those
3  revenues, and when you look over a long period of
4  time as a business, you can manage your costs and
5  make them move along with the revenues, then those
6  fixed costs become variable.
7       So it's not an absolute rule that fixed
8  costs and direct costs can mean the opposite
9  thing, but sometimes it can.
10  Q.  So for the fixed costs that you deducted here, did
11  you undertake any investigation to determine if
12  Federal had managed those costs and made them move
13  along with revenues?
14  A.  I did, and which fixed costs are you -- what are
15  you calling fixed costs?  Because I don't think I
16  deducted fixed costs in the sense of the costs
17  that relate to the revenue that Mr. Zoltowski
18  identified.
19       As I mentioned earlier, all costs that
20  might be fixed, if you're looking at them
21  narrowly, become variable over time.  I think you
22  recognized that when you asked me the question,
23  but I don't know what fixed costs you have in
24  mind.  You seem to have something when you asked
25  me that.

23 (Pages 86 - 89)

Page 90

1  Q.  We'll get to that further when I have examples in
2      front of us.  Can you define for me the phrase
3      stream of revenue?
4          MR. FLEMING:  I take it you're asking in
5      connection with a paragraph in his report as
6      opposed to in general.
7          MS. KLIEBENSTEIN:  Well, he just brought up
8      that phrase in his testimony about -- I think it
9      was in the context of if the court identifies a
10     certain stream of revenue, and I just wanted to
11     make sure I knew what that phrase meant.
12         THE WITNESS:  It would be an amount and the
13     nature of those revenues.  That's what I was
14     referring to.
15     BY MS. KLIEBENSTEIN:
16 Q.  An amount -- an amount and the nature of those
17     revenues.  I don't -- I don't understand that.
18     Can you try me again?
19         MR. FLEMING:  Try you again in --
20     BY MS. KLIEBENSTEIN:
21 Q.  Try to answer that again in a different way
22     that ...
23 A.  I think it's pretty clear, but let's say that you
24     have a business where you're cutting lawns and
25     you're trimming trees, and it's a yard service

Page 91

1      business, and one stream of revenues might come
2      from trimming trees, and the other would be from
3      cutting the lawns, and you can call each of those
4      streams of revenues.
5  Q.  Okay.
6          (Whereupon material was marked for
7      identification as Exhibit 523.)
8      BY MS. KLIEBENSTEIN:
9  Q.  I'm handing you what's been marked as Exhibit 523.
10     This is a verified copy of Federal's responses to
11     interrogatory numbers 16 and 17.  Have you seen
12     this document before?
13 A.  I think so.
14 Q.  And is it your understanding that Mr. Zoltowski
15     used his baseline for the gross written premiums
16     identified in his report Federal's responses to
17     interrogatories, including the answers in Exhibit
18     524 -- 23?
19 A.  Well, he can speak for himself, but I think
20     generally speaking that's true.  I'd have to
21     double -- I wish I had that type of memory where I
22     could tell you this is what he used specifically,
23     but generally, he used a document like this.
24     Sure.
25 Q.  And do you have an understanding of what gross

Page 92

1      written premium dollars are reported in -- let's
2      focus on Interrogatory 17, that one.
3  A.  Okay.
4  Q.  Do you have an understanding of what revenue
5      stream is reported in response to Interrogatory
6      Number 17?
7  A.  I do.
8  Q.  What is that?
9  A.  Let me find it here.
10 Q.  Go to Page 10.  If that helps.
11 A.  Thank you.  I think the answer does a pretty
12     decent job of explaining this, especially the
13     objections.
14         The issue here is that these are businesses
15     that have revenue streams that aren't driven by
16     the Blaze Advisor software, and so Federal doesn't
17     really keep its records in the way that's
18     requested under Interrogatory 17, and the
19     information that's provided is kind of a best
20     effort to respond to this request, which doesn't
21     really match ordinary course recordkeeping, and
22     that's reflected in the objections and provides
23     context for some of these numbers, really all of
24     the numbers.
25 Q.  The interrogatory asked for gross written premiums

Page 93

1      for insurance policies in connection with which
2      the Blaze Advisor software was used; correct?
3  A.  Sort of.  Not entirely.
4  Q.  Not sure?
5  A.  That's not what I said at all.
6  Q.  Okay.
7  A.  I said sort of, not entirely.  I was saying that
8      your question wasn't accurate.  I wasn't saying
9      that I had any lack of certainty on my answer.
10 Q.  So with regard to the response in Interrogatory
11     Number 17, for the gross written premiums that are
12     listed, do you know one way or the other whether
13     those gross written premiums run through
14     applications in connection with which Blaze
15     Advisor software was used?
16 A.  What do you mean run through applications?  You
17     lost me where you're starting to use that
18     terminology.  What -- what are you referring to,
19     or where are you getting those words?
20 Q.  Looking at -- you did not use the gross written
21     premium in response to Interrogatory Number 17 to
22     calculate gross written premium figures in your
23     report; is that right?
24 A.  I went to the underlying source and attempted to
25     solve the problem, at least some of the problem

24 (Pages 90 - 93)

Page 94

1  that is identified in the -- from the context of
2  this.
3      So I think this all can be traced to the
4  same source, but there's additional analysis that
5  needs to be done to this information.  So I think
6  the answer is kind of a yes and no.
7 Q.  Looking at Exhibit 6, Exhibit 6 in your report.
8 A.  Okay.
9 Q.  I see a total of 14 billion under the select gross
10   written premiums.  Do you see that as well?
11 A.  No.  Where are you?
12 Q.  At the top of Exhibit 6.
13 A.  I see that number.
14 Q.  And from what document did that number come from?
15 A.  Blaze IM --
16      (Whereupon the reporter asked the witness
17  to repeat the answer.)
18      THE WITNESS:  It's a document called Blaze
19  IM Abstract-Final.  It's not a document -- well, I
20  guess it's a document.  Sort of.  It's a file.
21  BY MS. KLIEBENSTEIN:
22 Q.  So that number did not come from the response to
23  Interrogatory Number 17?
24 A.  Yes and no.  It came from the same source, but
25  there's additional -- this is overinclusive by

Page 95

1  definition, and the objections and the context of
2  this I think it makes it clear that it's
3  overinclusive.  Mr. Zoltowski should have
4  understood that.
5 Q.  In what way is the response to Interrogatory
6  Number 17 overinclusive?
7 A.  Because it includes what Federal is trying to do
8  is respond specifically to this question in I
9  think maybe an overinclusive way.  So it's at
10  least -- it doesn't want to be accused of making
11  judgments or reducing the number arbitrarily, and
12  so what Federal is saying in this answer is that,
13  look, we don't keep information about Blaze
14  Advisor having gross written premiums because
15  Blaze Advisor doesn't generate gross written
16  premiums, but what we're going to do is give you
17  the information of companies that used Blaze
18  Advisor, and what can happen here is that -- and
19  it does happen here and why you need to go to the
20  -- to the underlying document that I described is
21  that the same policy could be written, and it
22  could be counted multiple times using the way the
23  data is produced.  That's my understanding.
24 Q.  Separate from the multiple counting issue, is it
25  your position that the response to Interrogatory

Page 96

1  Number 17 includes policies and do not touch Blaze
2  Advisor in any way?
3 A.  I think that that's a possibility what -- driven
4  by the difficulty of answering this question where
5  Blaze Advisor doesn't generate revenue and there's
6  not revenues kept that are attributable to Blaze
7  Advisor.  So what Federal tried to do is -- is
8  provide information that is -- if it's going to
9  err in its estimates err on the side of being
10  overinclusive, and so it seems to me that there's
11  going to be instances that fit the description you
12  just provided by definition of the way that it
13  responded.
14 Q.  Do you know for a fact that there are policies
15  included in the response to Interrogatory 17 that
16  do not touch Blaze Advisor in any way?
17 A.  In any way at all?
18 Q.  Correct.
19 A.  Depends how you define that.
20 Q.  Let's take CSI Express.  Let me ask it a different
21  way.  The interrogatory responses only list policy
22  counts for policies that run through applications
23  that contain Blaze Advisor; correct?
24 A.  Where is that?
25 Q.  Well, the table at the top on Page 11 is

Page 97

1  DecisionPoint; right?
2 A.  Yes.
3 Q.  And that's an application that contains Blaze
4  Advisor; correct?
5 A.  Yes.
6 Q.  CSI Express is right below that along with ARP and
7  profitability indicator; correct?
8 A.  Yes.
9 Q.  And those use Blaze Advisor; correct?
10 A.  As part of that.  They have Blaze Advisor in them.
11 Q.  Yes.  I'll agree with that.  So those policies
12  that run through DecisionPoint and CSI Express I
13  will call those policies as touching Blaze
14  Advisor.
15 A.  I wouldn't.
16 Q.  Why not?
17 A.  Because they don't necessarily touch it.  You have
18  to look at the business flow and the business
19  process and see whether they actually do it, and
20  the business process there's some ORG charts or
21  business process charts that show how it's
22  relatively complicated, and there may be instances
23  where you could write a policy where you don't use
24  Blaze Advisor, at least in concept.
25      You'd have to go through and trace through

Page 98

1 every single instance and see whether or not it
2 did or had to according to the business process
3 the flow charts, and my recollection is is that
4 those flow charts are relatively complicated, and
5 if you trace them through, sort of like you trace
6 through a -- in -- in, like, a maze, sometimes you
7 may hit Blaze Advisor, and sometimes you may not,
8 and my understanding from the people who pulled
9 this information together is that it wouldn't
10 really be possible to go through and trace through
11 every single written policy that went through the
12 business process that I'm discussing, and so the
13 assumption was made that they'll -- they included
14 instances that could in concept touch Blaze
15 Advisor but don't necessarily do it.
16      So they wanted to be -- when they pulled
17 this information, Federal wanted to be responsive,
18 and to the extent it produced information be
19 overinclusive as opposed to under-inclusive.
20 Q.   So if I'm understanding you right, there could be
21 a policy that goes through DecisionPoint, for
22 example, the application, and it goes through a
23 part of DecisionPoint that doesn't touch Blaze
24 Advisor?
25 A.   I'd have to look at DecisionPoint and the process,

Page 99

1 the flow chart that I talked about and try to
2 figure that out on my own and see if I could.
3      I would -- I think a more efficient way to
4 get an answer to that question is go directly to
5 somebody from the company.
6      So without saying that that -- if we're
7 using that as a -- as an example, as opposed to
8 something that's, like, absolutely true, I'd use
9 that as an example to describe the type of
10 critical thinking that you'd have to go through in
11 understanding the data and how it was compiled.
12 Q.   So taking Interrogatory Number 17, this response
13 in particular, you believe the data is
14 overinclusive; is that right?
15 A.   Sort of.  In the way that's described, I think
16 it's -- it's clear that that's how it was
17 compiled.  So in one way, it's not.  In one way,
18 it's responsive directly and therefore not
19 overinclusive because it's described, the
20 assumptions are described, but when it gets down
21 to trying to use it for the things that Mr.
22 Zoltowski tried to use it for, yes, it's
23 overinclusive.
24      That's the issue that I describe in detail
25 in my report.

Page 100

1 Q.   Do you have any specific examples of any of gross
2 written premiums listed on Interrogatory Number 17
3 that run through the applications listed but do
4 not touch Blaze Advisor?
5 A.   I don't know that I can give you an example.  I'd
6 have to talk to a business person.
7 Q.   And there were other similar -- there were other
8 interrogatory responses, this one is in the US,
9 there's others for the Canada, Australia, and the
10 EU, UK.  Do you understand that as well?
11 A.   Yes.
12 Q.   And is your critique of those interrogatory
13 responses the same?
14 A.   I'm not critiquing the interrogatory responses,
15 and I want to say something here for the record
16 that I think that what Mr. Zoltowski is saying and
17 accusing Federal of, frankly, he should retract,
18 and to the extent he's accusing me of doing
19 something, he should retract those statements.  He
20 should go back and look at what he wrote and --
21 and consider the allegations he's making.  They
22 are very serious.
23      I think that what's happening here is that
24 a company, Federal, is trying to be responsive to
25 requests for information that doesn't exist, and

Page 101

1 it should be considered in that context, and so to
2 try to accuse me, and I don't know if you did this
3 on purpose or not with your last question of doing
4 something wrong or misleading, I -- I take
5 exception to.
6 Q.   No.  I'm just trying to understand your position
7 as to why the interrogatory responses are not --
8 shouldn't be the starting point for gross written
9 premium.
10 A.   They can be the starting point, but they need to
11 be considered in their context.  They shouldn't be
12 taken out of context or be considered myopically.
13 There's a whole back and forth and there's context
14 for this interrogatory and the response.  There
15 is.  It's lengthy.
16 Q.   I know it well.
17 A.   It's lengthy.
18 Q.   Mr. Fleming and I lived that for a year.  So I'm
19 trying to do this efficiently without going
20 through each of the interrogatories, but we can do
21 that if you would like.
22      So we've got Interrogatories 18, 19, and 20
23 that ask for the same information but for
24 different geographies.  You're aware of that;
25 correct?

Page 102

1 A.  Yes.
2 Q.  And your opinions regarding the data that's
3     reported in Interrogatory Number 17 are those
4     opinions the same for the data reported in 18, 19,
5     and 20?
6 A.  Are the -- I didn't hear the word you said, the
7     issues?
8 Q.  Your opinions relating to the data.
9 A.  Well, I don't know that they are actually
10    opinions.  I'm trying to ground this in facts, and
11    I think that those facts that you and I just
12    discussed apply to these interrogatory responses
13    in context.  Those aren't my opinions.
14        MS. KLIEBENSTEIN:  Terry, I'm going to give
15    you this one.
16        (Whereupon material was marked for
17    identification as Exhibit 524.)
18        MS. KLIEBENSTEIN:  I'm going to mark
19    Exhibit 525 -- 524.
20        MR. FLEMING:  I'm wondering --
21        MS. KLIEBENSTEIN:  I have a paper bit too.
22        MR. FLEMING:  What are you going to have
23    Mr. Bakewell use?
24        MS. KLIEBENSTEIN:  I wanted him -- I was
25    wondering if he could just look at your screen to

Page 103

1     authenticate what it is, and then we can go to the
2     paper to discuss.
3         MR. FLEMING:  Okay.
4         MS. KLIEBENSTEIN:  That's all.
5         (Whereupon material was marked for
6     identification as Exhibit 525.)
7     BY MS. KLIEBENSTEIN:
8 Q.  Mr. Bakewell, your counsel has a native text file
9     on a thumb drive on his computer, and I'm handing
10    you what I've now marked as Exhibit 525, which is
11    a snip of the -- the first screen viewable --
12    viewable page of that text file, if you will, and
13    I want to confirm what we're looking at.  I see in
14    your report there's a reference to a file called
15    CUW/Blaze IM Extract.
16 A.  Which page are you referring to?  By the way, he's
17    not my counsel.  Just so you know.
18 Q.  Fair -- fair enough.
19 A.  Which page are you referring to.
20 Q.  Blaze IM Extract is Exhibit 6 on the third page.
21 A.  Okay.
22 Q.  At the top.  I was provided --
23 A.  Oh.  I see.  Got it.  Blaze IM Extract-Final.
24    This is what I was referring earlier to is that --
25    you're saying it's that file.

Page 104

1 Q.  Yes, and I want you to confirm looking on Mr.
2     Fleming's laptop whether the text file in Exhibit
3     525 -- actually the text file in Exhibit 524 is
4     that file Blaze IM extract-final.
5         MS. KLIEBENSTEIN:  Do you have it up Terry?
6         MR. FLEMING:  Do not.  You know what?  I
7     don't want to use up all your time.  You can find
8     it quicker than I can.
9         MS. KLIEBENSTEIN:  Are you on the thumb
10    drive?
11        MR. FLEMING:  I can't ...
12        THE WITNESS:  Sometimes your computer
13    doesn't work, it happens with mine, it doesn't
14    recognize when you put a thumb drive in there,
15    can't figure out what's going on.
16        MR. FLEMING:  Do you want us to use --
17    BY MS. KLIEBENSTEIN:
18 Q.  Mr. Bakewell, let's turn to Exhibit 525.
19 A.  Okay.
20 Q.  And I'll represent to you what we're looking at is
21    the first viewable screenshot of what is in that
22    text file, and does this look like the first
23    viewable screen from the file titled Blaze IM
24    Extract Final?
25 A.  I don't know if it's the first viewable screen,

Page 105

1     but it looks familiar, and I'll accept your
2     representation if we're looking at the right
3     document.  We can do that.
4 Q.  I think I am.  We got this with a Bates number.
5     It was identified as something different in your
6     report so that's what we're trying to sort out.
7     Maybe Terry can help.
8 A.  We try.
9         MR. FLEMING:  I can't help by looking at it
10    on my computer.
11    BY MS. KLIEBENSTEIN:
12 Q.  Let's go through each of the columns.  They don't
13    have headers so we're struggling with how to
14    interpret the data.
15        Can you identify for me what information is
16    contained in each of the columns?
17 A.  I can.  I think there's a policy number on the
18    left, and then there's two more columns that have
19    the applicable dates, the beginning -- well, these
20    seem to be the same date.  I think that's -- well,
21    some of them have different dates.  I need to
22    check and see.  The next one I think is the
23    company that wrote the policy.  The next one is
24    the type in general, and then there's a
25    subcategory, and then there's an amount.

Page 106

1 Q. Do you recall what the -- did you ask Federal to
2   prepare this data set?
3 A. I think I see it as a request that we've both made
4   frankly.
5 Q. Why?
6 A. Because Federal is trying to respond to your
7   interrogatories, and then I said, hey, we need to
8   do some more analysis of this if I understand this
9   data correctly, and so we got the native file.
10 Q. And what does this file represent? What type of
11   information is in the file?
12 A. It's the underlying data behind the response to
13   the interrogatory. I think.
14 Q. And how did you use this data in preparing your
15   report?
16 A. To try to eliminate the double counting issue that
17   I described in my report.
18 Q. And walk me through the steps that you did -- walk
19   me through the steps that you took with respect to
20   this data in Exhibit 525. What did you do to
21   eliminate the double counting as you see it?
22 A. We used Excel and did sorts.
23 Q. Sorted for what?
24 A. Multiple -- same policy number.
25 Q. So you sorted for -- you said multiple, same

Page 107

1   policy number. You sorted for the multiple same
2   policy number?
3 A. Maybe I said that, but I didn't mean to say it
4   exactly like that. There's instances -- there's
5   multiple instances where the same policy number
6   would exist in a row. So we sorted by policy
7   number and identified instances where there's the
8   same policy number and where the amount would have
9   been included under the categories identified in
10   Mr. Zoltowski's report more than once and
11   corrected it so that it only -- well, corrected
12   isn't the right word, studied it so that we only
13   counted that same policy once to arrive at the
14   correct result. Unlike Mr. Zoltowski. So the
15   correction is to what Mr. Zoltowski did.
16 Q. And Mr. Zoltowski did not have access to the data
17   in Exhibit 524; correct?
18 A. I don't think that's true.
19 Q. I'll represent to you that Exhibit 524 was not
20   produced during discovery.
21 A. He could have asked for it. My experience is that
22   that would be a -- a customary thing to ask for
23   and to study. It doesn't -- that's neither here
24   nor there from my perspective. I'm not faulting
25   Mr. Zoltowski for doing that, but he did have a

Page 108

1   reply report where he didn't endeavor to use this
2   data at all, and so I don't think it's factually
3   correct for you to say he didn't have access to
4   this information because he issued a report, his
5   reply report where he clearly had access to this.
6 Q. Do you know how Federal queried their system to
7   identify the policies identified in this data set?
8 A. I did at one point in time. I asked about that.
9 Q. And do you know what criteria Federal used to
10   identify the relevant records?
11 A. I think it asked if the criteria used are
12   consistent with the interrogatory requests.
13 Q. And do you know what policies Federal included in
14   this data set?
15 A. All of the ones that it described in the
16   interrogatory as having the relationship to Blaze
17   Advisor that's described in the interrogatory and
18   the response.
19 Q. So the text file in Exhibit 524 is the underlying
20   data or is the underlying policy information for
21   the data shown in Interrogatory Number 17?
22 A. That's my understanding. It comes from the same
23   system of record.
24 Q. So looking at -- looking at Exhibit 525 and 524,
25   how do I know which policies went through

Page 109

1   DecisionPoint, CSI Express, CUW, the applications
2   that are listed in Interrogatory Number 17?
3 A. I think based upon what I see here in 525 and the
4   interrogatory response there -- there is some
5   assumptions that were made regarding which of
6   these descriptions went into which category.
7 Q. When you say some assumptions were made regarding
8   which of these descriptions went into which
9   category, which descriptions and which category
10   are you referring to?
11 A. The descriptions in Bakewell 525 and the
12   categories provided in the interrogatory response
13   and -- done. Period. I wouldn't say and.
14 Q. And what were those assumptions?
15 A. I'm just looking to see if we actually need to
16   make those assumptions from the gross written
17   premium information. I think we're just
18   eliminating the multiple instances of the same
19   policy occurring and eliminating double counting
20   in that way, and then we check it against business
21   segment income statements, as I describe in
22   Section 4.3.
23     So I can go back and double check and see
24   if we have further information that might be
25   helpful to -- if Mr. Zoltowski has an interest in

1  analyzing this data, I would be happy to do that,
2  but I'd have to discuss that with -- I mean, that
3  relates to whatever the discussions you've been
4  having with Mr. Fleming. I think you have all the
5  information that we do.
6 Q. But you agree that we don't have the know-how on
7  our end to figure out how to reconcile the text
8  file with the interrogatory responses; correct?
9 A. I can't agree with that.
10 Q. Well, sitting here today, you're having a hard
11  time explaining how I could replicate your
12  results; correct?
13 A. No.
14 Q. So then can you walk me through how I could use
15  Exhibits 5 -- Exhibit 524 and Interrogatory Number
16  17 to address the double counting issue that you
17  see?
18 A. I would do just what I said and sort that data by
19  policy number and figure out where the same policy
20  occurs more than once, and I was trying to be
21  helpful to you by describing other things that --
22  comparisons that you might do.
23 Q. So I could sort --
24 A. But I said very clearly in my answer, and if
25  that's how you want this to proceed, I'd be happy

1  to go that way. If you're going to characterize
2  me being helpful as struggling, then I'll stop
3  trying to be helpful, and I'll just give you
4  specific answers to your questions.
5 Q. So I can sort the data -- Step 1 is to sort the
6  data to figure out where there's duplicative
7  policy numbers; right?
8 A. Correct.
9 Q. But then the link that I'm struggling with is how
10  do I know which policy went through the different
11  applications?
12 A. I would categorize -- I would do another sort by
13  the description, the categories, the following
14  three categories with verbal, with text, and I
15  would compare those to the business process
16  records that you also have copies of to map those
17  against what you've accused. I mean, this is your
18  lawsuit you're making the accusations of using
19  Blaze Advisor.
20      So I would sort this -- here is what I
21  would do, if you want to answer the question that
22  you just posited, I'll give you even more detail.
23  I would sort this by column, and let's -- let's
24  seem that each of these columns follows what Excel
25  has with Column A, B, C, D, et cetera. I would

1  sort first by Column A, and then I would sort by
2  Column D, and Column E, and Column F, and I would
3  make subtotals for each of those, and where
4  there's policy numbers that appear more than once,
5  I would look to eliminate the policy that appears
6  more than once and compare those to the totals
7  that I have, and then where I've categorized it by
8  entity, according to this sort that I've just
9  done, as well as -- that's Column D and Column E
10  and F, I would match those sorts up against what
11  you've accused in this case and the application
12  that uses Blaze Advisor, and those are your
13  accusations. So that's how I would do that.
14      Pretty straightforward. Surprised Mr.
15  Zoltowski didn't do it. Instead, he made
16  accusations that I think he should retract.
17 Q. Let's move to Paragraph 82, and then we can take a
18  break for lunch.
19 A. Okay. Page 82 or Paragraph 82? I forgot.
20 Q. Paragraph, but it might be the wrong -- maybe it's
21  182.
22      MR. FLEMING: Which one?
23      THE WITNESS: That's what we're tying to
24  figure out.
25      MS. KLIEBENSTEIN: 182.

1 BY MS. KLIEBENSTEIN:
2 Q. Going to Paragraph 184, there's a statement again,
3  "The CUW gross written premium data relied on by
4  Mr. Zoltowski included policies and associated
5  gross written premiums that were captured multiple
6  times in the data for other applications such as
7  CSI Express and Premium Bookings." Your source
8  there is an interview with Mr. McCarthy.
9 A. Correct.
10 Q. And he's the industry expert?
11 A. The industry expert? I don't think so. Let me
12  see.
13 Q. Who is Mr. McCarthy?
14 A. Chase McCarthy is the information technology lead.
15  He's an employee.
16 Q. And how many conversations did you have with Mr.
17  McCarthy?
18 A. One.
19 Q. And what is -- I know his job title. What is his
20  role? What does he do at Federal?
21 A. I think he works in the information technology
22  group.
23 Q. And did he pull this -- this data?
24 A. I don't know if he pulled it, but he was familiar
25  with it, and he was prepared to answer these

Page 114

1    questions.
2  Q.  What did you talk with Mr. McCarthy about?
3  A.  How he pulled the information, or Federal pulled
4      the information.
5  Q.  Anything else?
6  A.  I think anywhere I cite to him in my report that's
7      what I would have spoken with him about.  So I
8      don't see anything else.  I think that I asked him
9      about the -- the data and whether it included
10     policies that were captured multiple times, like I
11     discussed, and he confirmed that it did because of
12     the reasons that we discussed earlier, the
13     interrogatory and the response, and the challenges
14     that Federal had in responding because the
15     interrogatory doesn't match what it does in the
16     ordinary course of business.
17         MS. KLIEBENSTEIN:  All right.  We can take
18     a break for lunch.
19         THE WITNESS:  All right.  Thank you.
20         THE VIDEOGRAPHER:  We are going off the
21     report.  The time now is 12:51 p.m.
22         (Whereupon a lunch break was taken from
23     12:51 p.m. to 1:41 p.m.)
24         THE VIDEOGRAPHER:  We are back on the
25     record.  This marks the beginning of Media 4 in

Page 115

1      the deposition of Chris Bakewell.  The time now is
2      1:42 p.m.
3  BY MS. KLIEBENSTEIN:
4  Q.  Mr. Bakewell, can you turn to Exhibit 5 of your
5      report.
6  A.  Sure.
7  Q.  Can you explain to me at a 10,000 foot level what
8      data -- what calculations are shown in Exhibit 5?
9  A.  So in Exhibit 5, we're using, or I'm using the
10     actual numbers versus what Mr. Zoltowski used to
11     eliminate the double counting issue that we
12     discussed earlier, and that's detailed in Exhibit
13     6.  We were going through Exhibit 6 earlier.
14  Q.  Okay.  So the --
15  A.  Go ahead.
16  Q.  No.  Go ahead.
17  A.  I was going to volunteer something that related to
18     a question you asked me earlier that I promised to
19     get you something during lunch.
20  Q.  Sure.
21  A.  You want to do that now?
22  Q.  Yeah.
23  A.  So you were asking about Paragraph 180.
24  Q.  Yes.  The citation for that.
25  A.  There's a table underneath there, and the -- the

Page 116

1      sources are generally from Exhibit 8, but I think
2      it would be helpful if I gave you a work paper as
3      well to show where the sources came from, and so I
4      spoke with Mr. Fleming and we agreed that I'll
5      give that to him, and then he will give that to
6      you.
7  Q.  Okay.
8  A.  I don't know, in the next couple of days or
9      whatever.
10  Q.  So the support is Exhibit 8?
11  A.  Generally speaking, but the specific numbers you
12     have to do a couple of things to them, and we have
13     a work paper that describes that.
14  Q.  Okay.
15  A.  It should make it totally clear.
16  Q.  So going back to Exhibit 5.
17  A.  Okay.
18  Q.  Exhibit 5, the gross written premium figures take
19     care of that double counting issue that you
20     raised; correct?
21  A.  Correct.
22  Q.  And then I see a number at the bottom of the first
23     page, about 2.456 billion, and what does that
24     number reflect?
25  A.  That's the profit, the underwriting profit

Page 117

1      assuming a 16 percent profit margin.
2  Q.  Assuming a 16 percent profit margin, or is the
3      result a 16 percent profit margin?
4  A.  Either way.
5  Q.  Essentially the -- what figures did you add and
6      subtract to get the 2.456?
7  A.  I think it's the -- if you take 16 percent of
8      14.14 -- oh.  Well, there are specific numbers for
9      -- so 16 percent of 16.1 million equals 2.45
10     million -- 2.45 billion and 16.2 billion on the
11     top line.
12  Q.  And where did the 16 percent come from?
13  A.  That comes from the 8 series of exhibits.  So
14     Exhibit A, where it says percent net earned
15     premiums in 2018, that's 16 percent and the loss
16     ratio of 18.4 percent.
17  Q.  So here is what I'm trying to clarify.  These
18     percentages came from other calculations that you
19     did, not from, like, an industry publication or
20     anything like that?
21  A.  That's not exactly right, but I -- I considered
22     industry data in -- in providing those estimates,
23     but there's other calculations that I did.  So
24     you're right in part, but there's a part of my
25     report where I discuss some comparisons to the

30 (Pages 114 - 117)

Page 118

1    industry.
2 Q. Fully understood. I'm just trying to figure out
3    where the math comes from to get these very
4    specific numbers just in the exhibits.
5 A. Correct.
6 Q. So the 16 percent; how was that calculated back in
7    Exhibit 8.0?
8 A. It uses a loss ratio.
9 Q. And are we sure we're talking about the right
10   thing? Because I see in Exhibit 8 that's a 2018
11   figure, and Exhibit 5.0 doesn't have dates on it.
12 A. I think we applied the 2018 figures to the overall
13   time frame. I think that's kind of a generous
14   assumption if my recollection is correct. Because
15   there's other years where it's lower.
16 Q. So you ...
17 A. You know, it could be -- I'd have to check this.
18   I think that it ends up being mostly 2018 because
19   of the time frame -- or the window of the damages
20   period. I think we actually matched it to the
21   damages period specifically, and it ends up being
22   it's driven by 2018.
23 Q. Well, if you look back at Exhibit 6.0.
24 A. Okay.
25 Q. I see 4.6, 4.7, and 4.3 for 2016, 2017, and 2018.

Page 119

1    Does that change your thought process?
2 A. No.
3 Q. No?
4 A. I said no.
5 Q. So the 2.456 on Exhibit 5.0 represents -- I just
6    want to make sure I got this right. That
7    represents the underwriting profit assuming a 16
8    percent loss ratio; is that right?
9 A. The loss ratio is an opposite number, but yeah, 1
10   minus the loss ratio.
11 Q. Okay, and that's the underwriting profit for all
12   of the years --
13 A. That are in the data I think, but it's largely
14   it's driven by 2018 because that's the
15   biggest portion of the window.
16 Q. By what metric '2018 is the biggest portion of the
17   window by what metric?
18 A. Your allegations in this case. It's a function of
19   time, right, from the contract expiring from 2016.
20   So, like, Exhibit 6 has 2016, 2017, 2018, and
21   2019.
22 Q. Um-hm.
23 A. And that's the period or -- that's covered under
24   your allegations; right?
25 Q. Correct.

Page 120

1 A. And 2018 all I'm saying when I look at the 2018
2    number and it matched it's not surprising because
3    out of those 24 plus 12 so 36 months 2018 is a
4    third of it, and it's the -- one of the larger
5    years in terms of gross written premiums. So --
6    and it didn't surprise me that the number matched.
7       I think it's a combination of all of these,
8    and maybe the 17 percent -- the difference between
9    the 17 percent and the 16 percent is a rounding
10   difference, but it's directionally the same.
11 Q. So I see throughout these charges the phrase loss
12   ratio, and what is the loss ratio and how is it
13   calculated?
14 A. Well, I describe that in my report. I described
15   that in Section 4.3. I describe how the combined
16   ratio is -- combined loss ratio is 84 percent, and
17   I discuss the components of that in the preceding
18   paragraphs.
19 Q. And how did you use -- how did you use the loss
20   ratio in developing your opinions?
21 A. To determine what sort of costs are required to
22   support a business like this.
23 Q. And so let's take the loss ratio on Exhibit 5.0.
24   It's 56 percent.
25 A. That's the before expenses; right? That's the

Page 121

1    loss ratio before expenses?
2 Q. Correct.
3 A. Okay.
4 Q. Were you just -- when you just testified use the
5    loss ratio to determine what sort of costs
6    required to support the business you were maybe
7    referring to the combined ratio?
8 A. Correct.
9 Q. Okay. Let's move to Exhibit 7.
10 A. Okay.
11 A. Actually, 8 while we're in the United States.
12   Finish that out. Okay. So starting with Exhibit
13   8, at a 10,000 foot level, what am I looking at in
14   Exhibit 8?
15 A. This is looking at the income statements of the
16   businesses that had income statement prepared by
17   Federal.
18 Q. Is that US or international?
19 A. It's both I think. I mean, it's detailed in the
20   exhibits that follow as UK entities, Canada, US,
21   North America.
22 Q. So 8 is a rollup of all the -- all the exhibits
23   under 8, 8.1, 8.2?
24 A. Yeah.
25 Q. Okay. So then let's move on to 8.1. Handing you

Page 122

1   what has been marked as Exhibit 409 previously in
2   this case, and I see at the third page of 8.1 that
3   your source is FED 1788, which is this Exhibit
4   409.  Is that -- is that accurate?
5  A.   Yes.
6  Q.   And how did you use Exhibit 409 when determining
7       your calculations in Exhibit 8.1?
8  A.   I aggregated them in the ways that I described in
9       -- in my -- in the exhibit.  I basically took this
10      data and sorted it or re-characterized --
11      recalculated it to be consistent with the format
12      that I've laid out in these series of exhibits.
13 Q.   And the gross written premium figures in Exhibit
14      8.1 did they come from Exhibit 409?
15 A.   I think so.  It says yes.  It's source, Number 1,
16      is on Page 3 of 3.  I say it's -- I cite to the
17      same document.
18 Q.   Right.  The reason I ask is I don't see that
19      little Footnote 1.  Oh.  It's at the very top.
20      Okay.
21          So for the gross written premiums, we
22      looked at the data in Interrogatory Number 17
23      before lunch.  Why did you use gross written
24      premiums from Exhibit 409 and not Interrogatory
25      Number 17?

Page 123

1  A.   Because this is a source that as I'm looking at
2       the businesses that are associated with cost.
3       This data was produced in this case, and it's --
4       this is more of an ordinary course of business
5       document that shows how costs are allocated to
6       businesses in the ordinary course of business.
7  Q.   Exhibit 409 was prepared solely for litigation;
8       isn't that right?
9  A.   I'm not certain.  I think this actually comes
10      closer to what the company does in the ordinary
11      course of business.  It might have been a pull or
12      a query that was made in response to a request
13      that was in connection with this litigation, but
14      this is more of a ordinary course type of report.
15      It comes from the system of record as I understand
16      it.
17 Q.   And do you understand that Mr. Harkin testified
18      that included in this data are policies that --
19      that did not touch Blaze Advisor?
20 A.   Yes.  So that's what I was trying to say in my
21      prior answer, and that's what I've tried to
22      explain in my report at length is that Blaze
23      Advisor isn't a separate business at all within
24      Federal, and to get -- to respond to your demands
25      for information or requests for information, there

Page 124

1   are special queries and things that need to be
2   run, and there's not costs that are allocated or
3   revenues in the ordinary course of business.
4       So what this does is at least says, hey,
5   how do your costs behave for your businesses in
6   the ordinary course, are there reports where you
7   -- that you generate in the ordinary course that
8   might be helpful to understand what your cost
9   structure is, and these types of categorizations
10  in Exhibit 409 relate to that, or they answer that
11  question.
12 Q.   Do you also understand that included in Exhibit
13      409 are policies that don't run through the
14      applications that are at issue in this lawsuit?
15 A.   That's possible.  Again, this is an ordinary
16      course of business report that relates to how the
17      business is actually run, and that's what we have
18      to look at to study costs.
19 Q.   Do you know what percentage of the policies
20      recorded in Exhibit 409 did go through the
21      applications that include Blaze Advisor?
22 A.   I think you could compare the estimates that are
23      specific to Blaze Advisor to these numbers and
24      derive a percentage as a proxy, to use as a proxy.
25      I don't know that I've done that, but you could do

Page 125

1   that.
2  Q.   And the data in Exhibit 409 includes Canada;
3       correct?
4  A.   Yes.
5  Q.   And it doesn't include gross written premium from
6       writing companies that were Legacy ACE writing
7       companies; correct?
8  A.   I'd have to check, but I think all of these are
9       for Chubb from my memory.  It's whatever the title
10      is.  I don't think ACE was rolled up into this
11      data.
12 Q.   Now, the losses and expenses.  Let's take the
13      losses first, losses and LAE incurred.  How did
14      you calculate in Exhibit 8.1 the losses and LAE
15      incurred?
16 A.   This comes from the document is what happened in
17      the ordinary course of business.
18 Q.   And so you believe that the losses were
19      appropriate to deduct as a cost in this case?
20 A.   For the purposes that I did it, yes.
21 Q.   Why is that?
22 A.   Because Mr. Zoltowski didn't identify any costs,
23      and he's got a problem with nexus, as you and I
24      have discussed at length and is described
25      throughout my report, and I'm constrained in that

Page 126

1  regard in that his starting points are a little
2  bit unrealistic, but I do think it -- it would be
3  compound the error to say that, well, because
4  you've got these revenues that are problematic,
5  I'm not going to measure costs or there aren't any
6  costs.
7        So instead, what I say is, well, what's
8  kind of the best way to look at costs when you're
9  basically accusing the entirety of a business, and
10  so I looked at the reporting information that was
11  available in this case and I got from the public
12  domain to try to estimate what sort of costs would
13  be associated with an insurance business, and
14  certainly one of the major categories of insurance
15  is that you're going to have some losses.  You
16  write premiums, and then you have losses that
17  accrue against the premiums written, and so in
18  that way, it's relevant to try to understand how
19  those costs behave, and if Mr. Zoltowski --
20  Zoltowski is trying to say that there's revenues
21  that are generated by Blaze, well, there's going
22  to be costs, there's going to be underwriting
23  losses.
24        That's what I'm trying to estimate there,
25  or at least demonstrate, using the best available

Page 127

1  information.
2  Q.  Do you know how -- in Exhibit 409, do you know how
3      the losses and LAE incurred were calculated in
4      Exhibit 409?
5  A.  Let me see if I describe that in my report.  I
6      think that this actually comes from actual losses
7      and loss estimates that are made in the business
8      in the ordinary course of business.  It comes from
9      the system of record.
10 Q.  So they are -- they are tracked in a -- I remember
11     Mr. Harkin used the words bulk and direct?
12 A.  Yes.
13 Q.  Those in your opinion would be direct?
14 A.  I'd have to review his testimony about bulk and
15     direct.  I know that there's some timing
16     allocations that need to be done.  I defer to what
17     he said more specifically.
18        What's -- what I do remember sitting here
19     is it comes from their system of record.  It's how
20     they manage the business in the ordinary course.
21 Q.  And with regard to the losses, is there a
22     one-to-one correlation with respect to losses
23     compared to the gross written premiums such that
24     gross written premium goes up a dollar and the
25     loss goes up a dollar, or not?

Page 128

1  A.  I think generally speaking the directionality is
2      what's in the data.  I think the losses and LA --
3      LAE incurred are 53 to 58 percent of the premiums
4      that are written based upon Exhibit 8.1 for Chubb
5      specialty and commercial insurance segments in
6      North America to use one example.
7  Q.  My question is how do the costs -- how do the
8      losses vary with a change in the gross written
9      premium?
10 A.  If you write a premium, that means you're selling
11     insurance, and you have an expected loss
12     associated with whatever the premium is that you
13     write.  That's how -- that's why you have
14     underwriters and insurance companies, to try to
15     figure out what the odds are that there will be a
16     loss against the dollar and revenues that you
17     write.
18 Q.  Could -- some policies, you would agree though,
19     have greater losses than other policies; correct?
20 A.  Yeah.  Sure.  Every policy is going to be
21     different.  In actuality, all you have to do --
22     all you can do as an insurance company is try to
23     estimate what your loss ratio is going to be, and
24     it averages out, and that's what you try to
25     manage.

Page 129

1  Q.  And let's move to the expenses incurred on 409.
2      Let me ask it a different way.  On 8.1, I see a
3      line item for expenses.  What -- what buckets of
4      expenses were included in that line item?
5  A.  I understand commissions, general administrative,
6      and dividends.
7  Q.  And do you know how Federal tracks and allocates
8      the general, and administrative, and the taxes,
9      licenses, fees, the TLF expenses?
10 A.  I think that it tries to -- if my recollection is
11     correct, it tries to allocate as much as it can
12     directly to the business, and to the extent
13     there's any re-allocations that needs to be done,
14     those are done on an activity based costing basis.
15 Q.  What do you mean by activity based costing basis?
16 A.  The company tries to look and see how to allocate
17     costs so it matches how the business is run, and
18     my recollection from speaking with people at Fed
19     is that most of the allocations when they are
20     done, when they don't have the amount to put
21     directly into the income statements for those
22     businesses, are allocated based upon written
23     premiums percentage.
24 Q.  And do you know how they were -- those expenses
25     were allocated on Exhibit 409?

33 (Pages 126 - 129)

Page 130

1 A. Like I just described.
2 Q. So for those expenses that are allocated on a
3 gross written premium basis, do you have any
4 information about whether or how those expenses
5 vary with a change in gross written premium?
6 A. They do. By definition, that's how they are being
7 allocated, and they are allocated on an
8 activity-based costing system, and that's how they
9 behave is a function of gross written premiums.
10 Q. That's how the allocation behaves; correct?
11 A. Well, the idea is that the allocations are
12 supposed to match the business behavior.
13 Q. And what evidence do we have in this case that the
14 allocations do match the business behavior of
15 Federal?
16 A. Well, I'm relying upon what Federal witnesses told
17 me and what they told you during their
18 depositions. So we have that as evidence, and I
19 think also we have fundamental analysis of the
20 business and my research. I think it's reasonable
21 to expect that a company that is writing insurance
22 and collects premiums for writing insurance is
23 going to manage its business so that if the
24 premiums go up or down that they put the
25 appropriate infrastructure in place to support

Page 131

1 managing that.
2 Q. Do you disagree with Mr. Harkin's testimony
3 regarding Exhibit 409?
4 A. No. I considered what he said.
5 Q. Let's move to Exhibit 8.2.
6 A. Okay.
7 Q. 8.2 focuses on Australia; correct?
8 A. Correct.
9 Q. And for Australia, what was your support for your
10 data regarding the gross written premium?
11 A. I think that comes from FED 017884_001.
12 Q. I'm handing you that document that was previously
13 marked as Exhibit 416, and I apologize, this is so
14 small.
15 A. I don't think you have to apologize.
16 Q. My copy is a tiny bit bigger.
17 A. Oh. Okay.
18 Q. Not by much. Okay. So looking at 8.2, how does
19 Exhibit 8.2 relate to Exhibit 7.1?
20 A. 7.1? Oh. So what I'm doing I explain in Footnote
21 Number 1 is that Mr. Zoltowski has identified some
22 gross written premiums, and there's not, as we
23 discussed, an ordinary course of business report
24 that has costs allocated according to what he's
25 done, and so I use what is prepared in the

Page 132

1 ordinary course what does match and is doable by
2 Federal to provide a proxy or an estimate for the
3 applicable costs. That's what I say basically in
4 Footnote Number 1.
5 Q. So 7.1 is a comparison of your data in 8.2
6 compared to Mr. Zoltowski; is that a proper
7 description?
8 A. No.
9 Q. Looking at 8.2, I see the -- the gross written
10 premium in 2013 starts with 27, and then when I
11 look back to 7.1, I see that it's 19. Why are
12 those two numbers different?
13 A. I think I'm using the numbers that Mr. Zoltowski
14 estimated. I think in 7.1 I'm taking Zoltowski's
15 -- Mr. Zoltowski's estimates, and then in 8.2, I'm
16 taking a look at ordinary course costs and
17 financial reporting and how it estimates those
18 costs, and then I go back to 7.1 and I say, well,
19 you know, we got to put some costs against the
20 revenues. It's not like this revenue stream, even
21 as flawed as it is, wouldn't have any costs
22 associated with it. So I take what was done in
23 the ordinary course and then allocate it.
24 Q. Okay. So moving to 8.2, the source for your data
25 is solely 17884. So how did you -- did you use

Page 133

1 the same methodology regarding the figures
2 calculated for losses incurred that we talked
3 about with regard to the US data?
4 A. Yes.
5 Q. And the -- the same answers for expenses; used the
6 same methodology to calculate the expenses?
7 A. True.
8 Q. And are the -- are the -- do you have any quarrel
9 with Mr. Harkin's testimony regarding FED 17884?
10 A. What are you talking about? What testimony?
11 Q. He -- he testified about 17884 and what -- what
12 was included under the losses and the expenses and
13 how to read the documents. So I'm just wondering
14 in I can look to his testimony to understand how
15 17884 can be interpreted, or if -- if you
16 disagreed with any of his testimony and thought he
17 was wrong?
18 MR. FLEMING: So are you referring to,
19 like, a paragraph or a number of pages in Harkin's
20 testimony?
21 MS. KLIEBENSTEIN: No.
22 THE WITNESS: Is that a question for me?
23 BY MS. KLIEBENSTEIN:
24 Q. Yes.
25 A. I think that whatever Mr. Harkin said he said, and

Page 134

1   I would accept.  I don't recall anything that I
2   disagreed with, but I do think that whatever he
3   said or did needs to be considered in its proper
4   context, and so I think that's the best I can do
5   without you being more specific.
6  Q.  For your gross written premium calculations in
7   Exhibit 8.2, you did not use Federal's
8   interrogatory response relating to Australia and
9   the gross written premiums that touch Blaze
10   Advisor in Australia; is that right?
11  A.  I think what I'm doing in 8.2 is trying to
12   understand costs, and so I'm taking ordinary
13   course information, and it might match what's in
14   that interrogatory response, but that would be
15   sort of coincidental.  What I'm really focused on
16   in that series of exhibits is costs, cost
17   structure.
18  Q.  Mr. Harkin testified that the net earned premium
19   and the net written premium were derived.  Do you
20   recall that testimony?
21  A.  I wish I had that type of memory.  I don't, but
22   that's not surprising to me.
23  Q.  And when I asked him what -- what does derived
24   mean, he said, "There were assumptions applied to
25   the written premium poll to approximate what would

Page 135

1   have been in the earned," -- "the net earned
2   premium associated with these policies haven't
3   been able to identify underwriting income at that
4   level."
5       Did you take that into account when you
6   used FED 17884 in your calculations in Exhibit
7   8.2?
8  A.  Yes.  I was aware of that.
9  Q.  And were you -- were you concerned that those
10   figures were derived?
11  A.  No.
12  Q.  And why not?
13  A.  Because that's normal.  That's how businesses
14   operate.
15  Q.  And for the expenses reported in 17884, did you
16   deduct all the losses and expenses are reflected
17   in that document in your Exhibit 8.2?
18  A.  I think the numbers should match.  I think so.  If
19   that's what you mean.
20  Q.  So 7.2 and 8.3, moving on to Europe.
21  A.  That sounds exciting.  Okay.
22  Q.  Can you explain to me the relationship between
23   Exhibit 7.2 and 8.3?
24  A.  It's the same.  8.3 is -- oh, and this is UK;
25   right?  7.2 -- 7.2 is Europe and 8.3 is UK, and so

Page 136

1   we're using that UK business, which I think
2   includes Europe, the European businesses, at least
3   for a time being, to estimate the costs that would
4   apply under what you've accused as being
5   applicable to Europe.
6  Q.  So confirming that I understand what you just
7   said, you used costing data from the UK to -- and
8   then applied that to application -- or gross
9   written premiums in both the UK and Europe?
10  A.  Used the best available estimate, and I'd have to
11   check if this UK business included Europe in the
12   income statement.
13       So in 7.2, we have information about what
14   you've accused.  There's a product that is in
15   Europe, and there's two products that are in the
16   UK, and then I'm trying to estimate what applies
17   to those revenues in terms of costs, and so I use
18   the ordinary course report that was -- that's in
19   the 8.3.
20  Q.  I'm handing you what has been marked as Exhibit
21   413, which is FED 17885.
22  A.  Okay.
23  Q.  Is this the costing data you were just referring
24   to?
25  A.  It appears to be.

Page 137

1  Q.  And I see down in --
2  A.  Yes.
3  Q.  -- Footnote 4, the report states, "I was not
4   provided with business segment financials for the
5   years 2013 to 2015.  As such, I have used the
6   two-year average ratio from 2016 to 2017."
7       Why did you not have business segment
8   financials for 2013 to 2015?
9  A.  I don't know.
10  Q.  Did you ask Federal for that data?
11  A.  Yes.
12  Q.  And you didn't -- didn't get any?
13  A.  Correct.
14  Q.  In preparing -- were you told why you couldn't
15   have any?
16  A.  Probably.
17  Q.  In Exhibit 7.2, can you walk me through how you
18   calculated the gross written premiums?
19  A.  It's the same as the others where I had what Mr.
20   Zoltowski identified, and then we went through the
21   analysis that I discussed earlier, and then we
22   wanted to estimate or I wanted to estimate what
23   the costs are that would apply using ordinary
24   course of business reporting is what I determined
25   would be the best way to estimate what those costs

Page 138

1    are, and that's what I used in the 8 series
2    exhibits to look at the business and how its
3    managed in the ordinary course and how costs
4    behaved, and then I went back and allocated that
5    I'm using the percentages in Exhibit 7.2.
6  Q.  The gross written premiums in Exhibit 7.2 are
7    based on interrogatory response; correct?
8  A.  Well, Mr. Zoltowski's is, is that.  We talked
9    about the issues with that.
10 Q.  Yes, but did you -- for your calculations, did you
11   use the interrogatory responses or Exhibit 413?
12 A.  Well, for the gross written premiums, I used that
13   other exhibit, the document, the native file.  I
14   got rid of the double counting stuff; right?  We
15   talked about that earlier for the revenue stream,
16   and then for costs that applied, then I used this
17   413.
18 Q.  For EU and UK data?
19 A.  Well, maybe I'm mistaken.  Oh.  I do.  I have a
20   Footnote Number 3.  Fair.  Fair question.  I did
21   use interrogatory responses for this.  That's what
22   I used to do to deal with the double counting
23   issue.  Fair enough.  That's a good question.
24 Q.  So how did the -- using the interrogatory
25   responses deal with the double counting issue?

Page 139

1  A.  Well, it didn't.  There is a double counting issue
2    in there, and to deal with it, I used these
3    ordinary course of business reports.  It's not
4    that -- well, that's right.  That's what I did.
5    I'll leave it there.
6  Q.  Well, but the double counting issue only dealt
7    with CUW -- CUW and CSI Express, correct, and
8    Premium Booking?
9  A.  I'd have to look and see what Mr. Zoltowski did on
10   Schedule 11.1 of his report.  Do you have that?
11   That's what I cite to in my footnote for Exhibit
12   7.2.
13 Q.  I'm not asking about Mr. Zoltowski's numbers.  I'm
14   asking about the numbers that your team calculated
15   below that, and so my understanding CSI Express,
16   CUW, and Premium Booking are US applications, and
17   in the EU, we have Adapt, EZER -- Adapt and EZER.
18   So is it your belief that the double counting
19   issue extends to Adapt and EZER?
20 A.  I'll have to see what I cite in Exhibit 7.2 to Mr.
21   Zoltowski's report, Schedule 11.1.  So if I could
22   see that, I think that would refresh my memory as
23   to what is causing this discrepancy I'm citing to
24   that for that reason.
25 Q.  Okay.  I'll have something in a minute.  We'll

Page 140

1    just table that and keep going.
2  A.  Okay.
3  Q.  So in 8.3, walk me through how you used Exhibit
4    413 to calculate the losses and expenses in
5    Exhibit 8.3.
6  A.  Well, I utilized the document that was produced by
7    Federal to categorize these costs and calculate
8    these loss ratios or expense ratios.  How are we
9    doing with time?  I actually could use a break to
10   use the restroom.
11 Q.  2:30.
12 A.  I know it hasn't been that long but --
13 Q.  That's okay.  We can take a break.
14 A.  Okay.  Thank you.
15       THE VIDEOGRAPHER:  We are going off the
16   record.  The time now is 2:37 p.m.
17       (Whereupon a short break was taken from
18   2:37 p.m. to 2:49 p.m.)
19       (Whereupon material was marked for
20   identification as Exhibit 526.)
21       THE VIDEOGRAPHER:  We are back on the
22   record.  This marks the beginning of Media 5 in
23   the deposition of Chris Bakewell.  The time now is
24   2:50 p.m.
25 BY MS. KLIEBENSTEIN:

Page 141

1  Q.  Mr. Bakewell, I'd like to turn back to Exhibit 7.2
2    and talk about why you used the interrogatory
3    responses to generate the gross written premium in
4    7.2.
5        You asked for Mr. Bakewell's report so you
6    could see Schedule 11.1 --
7  A.  You meant to say Mr. Zoltowski's report.  You said
8    Mr. Bakewell's --
9  Q.  I apologize.
10 A.  That's all right.  Okay.  I know where you are,
11   but I don't know what your question is.
12 Q.  My question was:  Why did you use the
13   interrogatory responses to calculate the gross
14   written premium amounts in Exhibit 7.2?
15 A.  Oh.  You mean for 2013 through 2015?  So what I
16   wrote at the very last sentence is, "I was not
17   provided with business segment financials for the
18   years 2013 to 2015.  As such, I've used gross
19   written premiums from interrogatory responses for
20   those years."  Is that what you're referring to?
21 Q.  No.  The first sentence in Footnote 3 of 7.2 says,
22   "I have used the gross written premiums from the
23   interrogatory responses for the years 2013 to
24   2019."
25 A.  So I go on and I go through 2013, '14, '15, '16,

1    '17, and '18.  So for every year, I have an
2    explanation as to why.  I do it in reverse order.
3    I discuss 2016 through 2018 first, and I say that
4    I used the information for the interrogatory
5    responses, from the interrogatory responses
6    because the business segment financials are
7    greater than or similar to the gross written
8    premiums in the interrogatory responses.  So
9    that's why I used it for those years, and then I
10   didn't have information from 2013 through 2015,
11   and so what I used for those years was the gross
12   written premiums from the interrogatory responses.
13   That's why I used that information kind of
14   overall.
15 Q.  So for 2016 through 2018, why didn't you use the
16      business segment financials for the gross written
17      premium dollars?
18 A.  Since the gross written premiums from the business
19      segment financials are greater than or similar to
20      the gross written premiums in the interrogatory
21      responses.  Just as I wrote.
22 Q.  And I'm wondering why -- why that criteria -- why
23      that criteria stuck out in your mind.  The --
24 A.  Didn't stick out.
25 Q.  Oh.

1 A.  This isn't like the type of work where that's
2      going to stick out in my mind, but I can tell you
3      what it -- what happened or what I was thinking
4      just sort of in a plain sense.
5 Q.  Please do.
6 A.  The reason why is because what we're trying to get
7      -- at least whether I understood we were trying
8      to get at in your allegations is some sort of
9      measure that relates to Blaze Advisor, and Federal
10      has consistently said, hey, look, we don't keep
11      that information in the ordinary course of
12      business, and it doesn't generate revenues, and
13      there's all kind of discussions back and forth
14      about that over a protracted period of time, and
15      then what Fed did is -- Federal did is produced
16      information that it believes was the most
17      responsive to your request, albeit it's
18      overinclusive.  It related to its aspect of its
19      business that uses Blaze Advisor, and it was a
20      subset of the information that applied to the
21      business overall, albeit very close to the
22      business overall, and so I used that information
23      because it seemed to go in a direction of what
24      your allegations are in this case, and on top of
25      that, what I also did is I disclosed my

1    assumptions so that if you disagreed with it or
2    Mr. Zoltowski disagreed with it he could just make
3    changes to it.
4 Q.  Did you --
5 A.  That's what was in my mind.
6 Q.  Did you ask for business segment financials for
7      the years 2013 to 2015?
8 A.  Yes.
9 Q.  And did you receive them?
10 A.  No.
11 Q.  So let's move to 8.3.  How did you calculate the
12      loss figures in 8.3?
13 A.  Came from the document I think that I cited.  It's
14      from the document that I cited to in Exhibit 413.
15 Q.  So you adopted the figures of the losses and
16      expenses in Exhibit 413?
17 A.  I think so.  Yes.
18 Q.  And what is your understanding of the expenses
19      that are reported in Exhibit 413?  Meaning, how
20      are they -- how are they tracked and allocated?
21 A.  In the ordinary course of business, this is --
22      this reflects ordinary course of business
23      information, and I think it's the same as what we
24      discussed for the other businesses where Federal
25      will allocate the costs that it can and where it

1    can't, and it needs to -- or I said allocate the
2    costs where it can.  I meant expense the costs to
3    the business where it can, and then where it needs
4    to allocate, it uses activity-based costing to do
5    that, and the primary means of allocation is by
6    written premium.  That's my recollection as I sit
7    here right now.
8 Q.  Let's move to Canada in 8.4.
9 A.  Okay.
10 Q.  I'm handing you what's been marked as Exhibit 418.
11      For your gross written premiums in Exhibit 8.4,
12      did you use the figures from Exhibit 418?
13 A.  I did.
14 Q.  And why did you use 418 instead of the
15      interrogatory responses?
16 A.  For the same reasons that I discussed with the
17      others is that this has details about how the
18      business is managed in the ordinary course, and
19      how costs behave.
20 Q.  And we don't know in Exhibit 418 what percentage
21      of the gross written premium are from policies
22      that touch applications that include Blaze
23      Advisor; isn't that right?
24 A.  It's sort of right.  I mean, this is a proxy for
25      trying to estimate what the costs are.  We don't

1  have the Blaze Advisor related information because
2  it's not kept in the ordinary course of business.
3  So this is the best estimate that I can find, as I
4  discussed earlier, and as I described in my
5  report.
6  Q.  Exhibit 418 was created for this litigation, but I
7  understand you believe that Exhibit 418 includes
8  -- Exhibit 418 is kept in the ordinary course of
9  business; is that right?
10 A.  The data is.  I think this particular printout or
11 query might have been done for this litigation,
12 but generally speaking, it's information that is
13 kept in the ordinary course of business, and it
14 uses the type of reporting that is done in the
15 ordinary course of business.
16 Q.  And when you -- just so I make sure we're on the
17 same page, when you say kept in the ordinary
18 course of business, what do you mean by that?
19 A.  It comes out of the system of record, and it was a
20 query made of that.
21 Q.  And it's -- you mentioned it's the type of report
22 that is in the ordinary course of business.  What
23 do you mean by that?
24 A.  Looking at loss ratios and expense ratios is the
25 way a business is managed.

1  Q.  Did you ask Federal for more detailed information
2  regarding its losses and expenses that are
3  reflected in the exhibits we've gone through
4  today?
5  A.  I think I asked for the most detailed information
6  that would be reasonable to provide and that was
7  kept in the ordinary course and wouldn't be overly
8  burdensome.
9  Of course I always want more detail, and I
10 have a thirst for information, but I also think
11 have a responsibility to the process and to
12 everyone to make sure that my requests are
13 realistic, and that's what I meant by not being
14 overly burdensome.
15 So this seemed to me to be a good balance.
16 It was sufficient for my work, and I was
17 satisfied.
18 Q.  And for losses and expenses reflected in Exhibit
19 8.4, did you -- did you adopt without modification
20 the losses and expenses that are reflected in
21 Exhibit 418?
22 A.  Well, I had to modify this in terms of, like,
23 performing calculations and synthesizing this
24 information.  I assumed that it's correct, and it
25 seems correct to me without, like, doing a

1  complete and unnecessary audit.  I inquired about
2  it to check its reasonableness.
3  So I think that's a way that is more
4  accurate to describe what I did as opposed to
5  adopting without modification.  Like you said.
6  Q.  Understanding the work that you did, I'm just
7  trying to confirm the numbers match.
8  A.  They should match.
9  Q.  Okay, and why did you not use -- strike that.  I
10 already asked that.  Look at Exhibit 10 of your
11 report.
12 A.  Okay.
13 Q.  Can you tell me what information is shown in
14 Exhibit 10?
15 A.  This is a -- these are loss ratios, and expense
16 ratios, and combined ratios from other companies
17 in the space.
18 Q.  And how did you select the other companies that
19 are on this chart?
20 A.  I think these are often cited in the materials
21 that I've seen as being the peers of Chubb.
22 Q.  So this is a list that you determined to be the
23 peers of Chubb?
24 A.  I don't know that I determined it or if it's sort
25 of a consensus view.  I might have described this

1  in my report.
2  These seem to be the companies that were
3  consistently identified as being its peers.  Might
4  be somewhere where I describe this in my report.
5  It's getting late in the day.  I thought I
6  mentioned it, but I'm not the only one who has
7  taken this view.  There's other analysts who
8  identified these same companies.
9  Q.  And what is the purpose of Exhibit 10 as it
10 relates to your overall opinions?
11 A.  It's just to check the reasonableness of the
12 information that was provided by Chubb to make
13 sure that it was consistent with peers and the
14 industry I think to -- it's also to help provide
15 context for Chubb's information, and to show that
16 this is how the businesses in this space are all
17 managed, they all use the same sort of view of how
18 costs behave, and categorization of costs
19 according to loss and expense ratios.
20 Q.  Is it your opinion that FICO's damages for breach
21 of contract should be determined by analyzing
22 hypothetical negotiation between FICO and the
23 defendants?
24 A.  Thought that was strange when I read Mr.
25 Zoltowski's report that I accused me of doing

38 (Pages 146 - 149)

Page 150

1  that. I thought that was unfounded on his part,
2  and I think that he also mischaracterized what a
3  hypothetical negotiation is supposed to be about
4  and reflected a misunderstanding of it, and I say
5  that because, even if I did use a hypothetical
6  negotiation, I'm not certain that that would be
7  wrong to do.
8      I'm not saying that I did, but the
9  hypothetical negotiation idea relates to a
10  valuation principle of fair market value, and the
11  idea is to go back at whatever the idea of the
12  wrongdoing was and figure out what reasonable
13  parties would have negotiated, and while that's
14  got a special term, and in the patent world, that
15  same concept applies outside litigation to valuing
16  really anything tangible or intangible as of a
17  certain date. It's the definition of fair market
18  value is the price that would change hands between
19  willing and reasonable parties each with access to
20  the same information or reasonable knowledge of
21  facts at a given point in time under no compulsion
22  to buy or sell, and that's almost the same
23  standard that's applied in a licensing sense in a
24  hypothetical negotiation.
25      So to bring this all full circle to wrap up

Page 151

1  my answer, I didn't say it was a hypothetical
2  negotiation, but even if I did, I don't think
3  that's a problem.
4  Q.  In that hypothetical -- I understand your answer.
5  I just want to understand this hypothetical
6  negotiation concept fully.
7      In a hypothetical negotiation in this case,
8  how do you -- how do you -- how do you set the
9  parties' mindsets? And that's a really broad
10  question, but it boils down to this: Does -- do
11  you presume that Federal -- Federal has the
12  mindset that it -- it has liability or rather that
13  the two parties are just coming to a table to
14  negotiate a new deal at -- at an arm's length
15  transaction?
16      MR. FLEMING: Object. Multiple questions.
17  Misstates his testimony.
18      THE WITNESS: Are you asking me if I
19  assumed any of those things, or is that a choice,
20  like a checklist? Do I get to choose from the
21  menu like I'm going to dinner? I don't understand
22  your question.
23  BY MS. KLIEBENSTEIN:
24  Q.  Sure, and I -- I'm trying to understand this from
25  your valuation principles and from an industry --

Page 152

1  damages industry perspective.
2      If you're -- you're on a case where you're
3  analyzing a hypothetical negotiation. What
4  mindset do you give each of the parties?
5      MR. FLEMING: Objection. Vague.
6  BY MS. KLIEBENSTEIN:
7  Q.  Does that make sense?
8  A.  Let me respond, and we'll see if it's helpful.
9      I'm a financial analyst and a valuation
10  expert, and to me, it's about performing a
11  financial analysis and figuring out what the
12  intrinsic value is, another thing that we can talk
13  about that if you want, but I'm interested in the
14  fundamental and intrinsic value of whatever it is
15  I'm valuing, and I want to consider what that is
16  and in the marketplace and using the toolkit that
17  I described for you earlier, and I want to analyze
18  it and study it, and I'm assuming that anybody
19  else, including the parties to the hypothetical
20  negotiation want to do the same thing, and so it's
21  not about, like, mindsets or that type of thing.
22  It's about figuring out what this stuff is worth
23  and what would be fair. It's about fair market
24  value.
25      That's the way I approach my analysis in

Page 153

1  the patent world and everywhere else, and it's not
2  about trying to figure out what's in the parties'
3  mindsets, and what I -- it's about figuring out
4  what's right, fundamentally and intrinsically, and
5  I have a real problem with what Mr. Zoltowski did
6  here and what he wrote in his reply report because
7  he's violating the principles that he should be
8  complying with, and where I'm saying that there's
9  a big problem is that he's taking this view that
10  he can accept what his client says they want and
11  not consider what the market is like whatsoever.
12  He's taking list prices, and disregarding
13  discounts, and that just violates the spirit of
14  what you're supposed to do if you're claiming to
15  do a valuation.
16      So I hope that's responsive and helps move
17  things along.
18  Q.  So your focus when you come to a project like this
19  is not -- is focused on the -- the asset that's at
20  issue, and not --
21  A.  Or the claim.
22  Q.  The claim, and not how the parties feel about it?
23  A.  Yeah. I think it's our job to take the emotion
24  out of it and try to figure out what's right.
25  Q.  So when you were -- when you were developing your

Page 154

1　opinions, you didn't -- you didn't presume that
2　FICO was required to license Blaze Advisor to
3　Federal?
4　A.　I did.  I assumed that there was some sort of
5　breach of a license or copyright infringement that
6　occurred and there needs to be payment
7　commensurate with that liability.
8　Q.　So did you approach the project with the
9　assumption that -- did you approach the project
10　with -- let me ask it a different way.
11　　　Did you take into account at all whether or
12　not FICO was entitled to withhold the license for
13　Blaze Advisor?
14　A.　I don't know what you mean by that.
15　Q.　You know what?  Strike that.  I think you answered
16　it.
17　　　So in your report, I -- I take your
18　position to be that Mr. Zoltowski should have
19　placed more -- your criticism of Mr. Zoltowski is
20　that he didn't consider FICO's other licenses with
21　its licensees; correct?
22　A.　Well, I don't think he adequately studied the
23　backdrop or the context.  I wouldn't limit it to
24　that.
25　Q.　And do you feel that you undertook a study of

Page 155

1　those other license agreements?
2　A.　I studied the context and the background I think
3　at length.
4　Q.　And what was your conclusion as to the role those
5　agreements play in this case?
6　　　MR. FLEMING:  Objection.  Vague.
7　　　THE WITNESS:  I don't know what those
8　agreements are that you're talking about.
9　BY MS. KLIEBENSTEIN:
10　Q.　They are identified --
11　A.　Which ones?
12　Q.　They are identified in Exhibit 12.  So the
13　agreements identified in Exhibit 12 what was --
14　what was your ultimate opinion stemming from your
15　review of those agreements?
16　A.　Well, they all provided context.  They helped me
17　understand the industry a little bit better and
18　FICO's licensing practices.
19　　　I think that I used two examples from these
20　to provide some context and support the
21　observation that I had that the prices that people
22　are willing to pay are a function of the fact that
23　there's alternatives that are available.
24　　　Both Dell and Oracle are instructive in
25　that regard that there's companies that say, hey,

Page 156

1　you know, I don't want to use your product anymore
2　and I've got other options here, and they work
3　something out, and it's not a situation like I've
4　seen where there's no other way to do things,
5　there's no alternatives, where there's no
6　commoditization, and it's truly proprietary in the
7　sense that you can only use one company's products
8　or you're going to totally lose out.
9　　　There's different ways to accomplish
10　basically the same objective, and that's reflected
11　in -- in the data that I've seen and the case
12　studies that I've provided those examples from
13　Oracle and from Dell, and also I would say that
14　it's not -- those are also instances where there
15　were companies that combined their businesses
16　together, and FICO's reaction to that was to
17　dispute the scope of the license.  So that kind of
18　helped me I think understand overall the
19　circumstances of what's going on here.
20　Q.　Did you calculate how much Mr. Zoltowski's damages
21　numbers should be reduced in view of these other
22　agreements with third parties?
23　A.　Yes.  I think you can derive that from my -- from
24　my calculations.  Not specifically from these.
25　They provide context, but they show that Mr.

Page 157

1　Zoltowski's claim that FICO could just license at
2　100 percent of whatever is in its price list
3　without some give and take is not justifiable.
4　Q.　Can you point me to in your report where you
5　calculate a number as to how much Mr. Zoltowski's
6　damages number should be reduced in view of these
7　other agreements with third parties?
8　A.　I can give you a lot of examples so I'll just give
9　you a couple.  Let's start with Exhibit 1 where I
10　illustrate that Mr. Zoltowski doesn't focus in on
11　where the applications are actually used.
12　　　I think we saw some instances from Dell and
13　Oracle where the parties agreed to focus in on,
14　hey, where would you have to use our software, and
15　I think that's instructive for making that
16　assumption.
17　　　I think that Mr. Zoltowski's assumptions
18　regarding maintenance are unreasonable.  I make
19　adjustments in the four series of exhibits for
20　that.  I think that I discuss other issues that
21　are in part informed by Dell and Oracle is in 35
22　and 36.  I think both Dell and Oracle said, hey,
23　we've got other options here, and our business
24　isn't benefited in the way that you claim.  I
25　think Oracle even said we're not used to paying

Page 158

1   for applications like this anything, and if you
2   want to make money for a commoditized product like
3   this, then let's talk about consulting and
4   maintenance, and that's where they would expect,
5   and that relates to the next thing that I want to
6   talk about, and that's discounts.
7       Mr. Zoltowski ignores the fact that it's
8   industry practice to discount software, and I
9   think you can reduce his estimates by ████████
10  ████████████████████. So there's
11  another -- there's another number.
12       Probably others, but those are instructive
13  examples I think.
14 Q.  Do you know how many of the license agreements in
15   Exhibit 12 are enterprise license agreements?
16 A.  Probably I could look and see from looking at
17   them.  As I said earlier at the beginning of the
18   day, I was more focused on their substance as
19   opposed to their form.
20 Q.  Do you know how many are application based, named
21   application based?
22 A.  Same answer.  I mean, I could tell by probably
23   looking at them and adding them up, but I was more
24   interested in substance over the form.
25 Q.  ████████████████████████████████



13 Q.  Do you know if every FICO licensee gets a
14   discount?
15 A.  I don't know if every single one does.  I wouldn't
16   be surprised if there's exceptions.
17 Q.  ████████████████████████████████
████████████████████
████████████████████████████████
22 A.  It's late in the day.  I don't know if I discuss
23   that in my report or not.  I thought I saw some
24   information about that at some point in the course
25   of my work, but I don't remember what it is or

Page 160

1   where I would find that in my report.
2 Q.  In calculating the discount to apply, did you --
3   did you tabulate the different discounts that are
4   given to any of the customers in Exhibit 12?
5 A.  I think I did that at one point, or tried to do
6   it, you know, some of those licenses are more
7   difficult than others to figure out a discount
8   because they could be implicit.
9       Ultimately I'm relying upon Doctor Kursh
10  for that assumption.  He's the software licensing
11  expert.
12 Q.  For the assumption of the amount of discount that
13   should apply in this case?
14 A.  Correct.  He has an opinion about that, and all I
15   can do is confirm the reasonableness of his
16   opinions, and they certainly seem reasonable, and
17   consistent with my experience, and the evidence
18   I've seen, but the specific number that comes from
19   him.
20 Q.  And we touched on these briefly, but just to close
21   the loop, you criticized Mr. Zoltowski for not
22   taking into consideration the Oracle and Dell
23   agreements; correct?
24 A.  Generally.  I think more my criticism is around
25   the lack of context in his analysis.  Those would

Page 161

1   have been two good case studies for him to spend
2   time on to understand this industry a little
3   better and confirm the reasonableness of his
4   analysis.
5 Q.  And why do you believe the Oracle and Dell
6   agreements are pertinent in this case?
7 A.  Because they provide context.  I think they are
8   examples of broader considerations that affect the
9   industry.  That's all.
10 Q.  And other than the discount and the maintenance
11   fees, did you calculate how much Mr. Zoltowski's
12   damages number should be reduced based on the
13   Oracle and Dell agreements?
14 A.  Well, I gave some other examples of -- of that in
15   another question, and I think ultimately what
16   those are instructive of is, hey, there's a
17   marketplace that is at work here, and there's
18   other companies that offer alternative software,
19   and that companies also have an option to develop
20   solutions on their own, and to me, that's
21   instructive of the fact that trying to deviate
22   from what was actually paid in the past that's --
23   in a way that's specific to -- or I guess the
24   deviation would lack specificity to the intrinsic
25   value of what's being licensed.  That would be --



Page 162

1    that's unreasonable.
2 Q.  In your report, you analyze the parties' 2016
3    negotiations; is that right?
4 A.  I discuss them.  Yes.  Where are you?
5 Q.  I think it starts at Paragraph 61.
6 A.  Okay.
7 Q.  Well, no.  It's a little bit before.
8 A.  Okay.
9 Q.  So for the 2016 negotiations, why -- why did you
10    analyze them in the preparation of your opinions?
11 A.  Well, because we know there what -- how the
12    parties -- we have insight into the fact that the
13    parties were actually in negotiations.  By the
14    way, there's -- at this table on Page 18, and it
15    just reminded me I should bring something to your
16    attention, because in those negotiations, FICO,
17    you and your client represented the amount that I
18    have in the table on Page 18, ▮▮▮▮▮▮ as
19    being past deployment and license fees.  Mr.
20    Zoltowski estimated a different number.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Because for Amendment 1,
22    there's credit that is discussed in the amendment,
23    but FICO your client doesn't appear to have
24    recognized in its negotiations, or at least its
25    characterizations.

Page 163

1    So I used the numbers that came from your
2    client's documentation, ▮▮▮ but there's another
3    way to calculate this that Mr. Zoltowski used.
4    Just bringing that to your attention.
5    This is all -- the same thing applies to
6    the support maintenance fees by the way.  This is
7    all relevant because what it shows is that there
8    were amounts that were actually paid in the past
9    for the software that is alleged to have been
10    misused either through breach of contract or
11    copyright infringement, and anytime you have
12    licenses or negotiations around the actual asset
13    that's at issue, I think that's going to be
14    instructive.
15 Q.  So the 2016 negotiations did you find them
16    relevant to the breach of contract claim, the
17    damages for the breach of contract claim?
18 A.  I think they provided context for all the claims.
19 Q.  So for damages for breach of contract, actual
20    damages for copyright infringement and copyright
21    disgorgement?
22 A.  Yes.
23 Q.  What context -- what relevancy did the 2016
24    negotiations have for copyright disgorgement?
25 A.  They help provide some context for this issue in

Page 164

1    nexus.
2 Q.  In what way?
3 A.  Well, there was no point at which FICO said you're
4    using this to generate all these revenues, and we
5    want a license that's based upon all your revenues
6    for underwriting.
7    I mean, that's unreasonable, to be polite,
8    for Mr. Zoltowski to suggest that there's some
9    sort of nexus there when his own client in the
10    ordinary course of business never claimed there
11    was a -- a nexus that the -- the software that it
12    was providing created all the underwriting
13    revenues.  That's just not plausible.
14 Q.  Are you aware of how FICO prices its enterprise
15    licenses?
16 A.  Yes.
17 Q.  And what is that?

14 Q.  You've --
15 A.  From a financial and economic perspective.  With
16    all due respect to Mr. Zoltowski.
17 Q.  You keep bringing up -- I understand that you're
18    two experts who disagree, but you seem a little
19    personally bothered by Mr. Zoltowski's report; is
20    that true?
21 A.  No.  Not at all.

Page 166

1  A.  Well, there's calculations that I've seen in the
2     negotiations, and ████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████. It's trying to
5     say that you should pay more if you're bigger.
6         That's -- that's what I understand those
7     documents are trying to do, and those documents
8     can -- and the interactions, those things speak
9     for themselves.  So if you have specific
10    questions, I'll be glad to answer them.
11 Q.  So the 2006 negotiations you also addressed the
12    2006 negotiations in your report; correct?
13 A.  Yes.
14 Q.  And do you see the 2006 negotiations as having a
15    bearing on -- on all of the different damages
16    claims?
17 A.  What do you mean having a bearing?
18 Q.  Are relevant to the determination of the damages
19    for breach of contract; actual damages and
20    copyright disgorgement?
21 A.  I think they are useful for context.
22 Q.  How are they useful for context for copyright
23    disgorgement?
24 A.  Because they help describe what the copyrights
25    actually might be, and how they might create value

Page 167

1     for the business, and so they relate to the issue
2     in nexus.
3  Q.  Are you referring to the dollar amounts floated
4     back and forth in the 2016 negotiations?
5  A.  I think I'm more referring to the nature of the
6     discussions than I am the dollar amounts, but I
7     think the dollar amounts help provide context too.
8     The parties were focused in and around numbers
9     that were not anywhere near what Mr. Zoltowski is
10    holding out as being relevant.
11 Q.  In 2016, do you have an opinion one way or the
12    other if Federal had been told it was in breach of
13    the license agreement would Federal have responded
14    to the different offers from FICO in the same way?
15       MR. FLEMING:  Objection.  Calls for
16    speculation.
17       THE WITNESS:  I don't understand your
18    question.  Can you re-ask that please?
19       MS. KLIEBENSTEIN:  Sure.
20    BY MS. KLIEBENSTEIN:
21 Q.  2016, the parties are negotiating, and my question
22    is:  Do you have an opinion one way or the other
23    if Federal would have rejected the various offers
24    from FICO if Federal had been operating under the
25    belief that it was liable for breach of contract

Page 168

1     and copyright infringement?
2         MR. FLEMING:  Objection.  Multiple
3     questions.  Calls for speculation.
4         THE WITNESS:  I think I'd have to see those
5     documents to know a little bit more about your
6     question in the context of your question.
7     BY MS. KLIEBENSTEIN:
8  Q.  In 2016, do you know -- do you have an opinion
9     about Federal's mindset during those 2016
10    negotiations?
11       MR. FLEMING:  Objection.  Vague.
12       THE WITNESS:  I'm not offering an opinion
13    about somebody's mindset.  I'm a financial analyst
14    and valuation expert.  I'm interested in
15    performing a financial analysis.
16       We talked about that earlier where I think
17    this phrase hypothetical negotiation can sometimes
18    be a little bit of a misnomer, and the job of an
19    expert, damages expert is to perform a financial
20    analysis.  So I refer back to that part of my
21    testimony.
22    BY MS. KLIEBENSTEIN:
23 Q.  But the discussions in 2016 Federal you would
24    agree did not believe it was liable for breach of
25    contract and copyright infringement?

Page 169

1  A.  I haven't studied that issue.  I don't know.  What
2     I will say is that there's two -- there's a bunch
3     -- there's a range of possibilities, one of which
4     people often time forget about, and that is that
5     you can have a good faith disagreement about
6     something and still be willing to assume that the
7     other part is -- the other party is correct for
8     the sake of moving a discussion along, but I don't
9     know -- I'll just leave it there.  You're looking
10    at me look you're confused.
11 Q.  That's my thinking look.
12 A.  I was trying to make sure that I was being
13    responsive to your question.
14 Q.  You're -- no.  That's just an interesting
15    perspective.  So to close it up, your analyses
16    didn't focus one way or the other on what Federal
17    -- what beliefs they brought to the table, whether
18    they thought that they were liable for
19    infringement breach of contract or not?
20       MR. FLEMING:  Objection.  Asked and
21    answered.
22       THE WITNESS:  I didn't make a
23    determination, and I don't have any opinions about
24    that.  I know from experience that there's a range
25    of possibilities, and that's how I considered that

43 (Pages 166 - 169)

Page 170

1      information, and that's what I was trying to
2      summarize in my last answer, and what I was adding
3      to that is that a lot of times people will assume
4      that a party is in outright denial when -- or not
5      admitting even for the sake of moving a discussion
6      along, like, hypothetically what a reasonable
7      outcome would be.
8           So you need to consider the full range of
9      possibilities, and that's what I'm trying to say
10     when I am responding to your question that I'm
11     looking at that information with an open mind.
12     BY MS. KLIEBENSTEIN:
13  Q.  In Paragraph 71 -- Paragraph 71, second sentence,
14     it says, "FICO and Federal did not discuss a named
15     application type license and instead discussed an
16     enterprise license that included discounts up to
17     ███████████████     That sentence was
18     referring to the 2016 negotiations; correct?
19  A.  I think so.
20  Q.  But the parties -- the original Option 2 was a
21     named application option; isn't that right?
22  A.  I think ultimately what -- I'd have to look and
23     see what the -- and check what the document says.
24     I'm not trying to re-characterize documents or
25     anything like that.  I think that they discuss

Page 171

1      what they discussed.
2           They -- most important part I think there's
3      a sentence that follows that says if FICO and
4      Federal did not discuss the type of license
5      agreement that Mr. Zoltowski is proposing that's
6      what I'm trying to get at ultimately.  So that's
7      kind of a transition sentence that leads to the
8      next one.
9   Q.  Here is Exhibit 257.  I'm looking at Option 2.  So
10     just to confirm, the parties -- the parties did
11     discuss a named application type license in 2016.
12  A.  Sort of.  Not -- not exactly.  This is what I'm
13     trying to get at with pointing you to the next
14     sentence, and also my earlier statements about
15     economic substance over form.
16          They might in this page say, hey, we're
17     going to talk about 15 named applications, but
18     they don't describe where he has the  They just
19     roll up a number of $6.8 million dollars, and
20     that's not the type of license agreement where Mr.
21     Zoltowski is -- is discussing where he has the
22     applications actually named, and then he tries to
23     calculate an amount that's specific to each
24     application categorizing them as small, medium,
25     large.

Page 172

1           So I think this is -- the statement that
2      I'm making that's more about substance than it is
3      about form.
4   Q.  Moving on to the Oracle agreement and the Dell
5      agreement, those were settlement agreements in the
6      context of a dispute and possible lawsuit threat;
7      correct?
8   A.  What do you mean settlement agreements and
9      possible lawsuit?  Can you be more specific?
10  Q.  Well, in both contexts, FICO was discussing
11     initiating suit if the parties didn't come to a
12     resolution; isn't that right?
13  A.  That may have been referred to.
14  Q.  You're not sure without looking at the agreements?
15  A.  Well, I would just want to make sure that I'm
16     characterizing it properly.  I mean, documents say
17     what they say.
18  Q.  And Dell -- you know that Dell is still a customer
19     of FICO.  Do you know if Dell acts as a referral
20     source for FICO?
21  A.  I don't know.
22  Q.  Do you know how much they pay in maintenance and
23     service fees?
24  A.  I said earlier I don't know.
25  Q.  Do you know whether they license any other FICO

Page 173

1      products?
2   A.  I couldn't tell you off the top of my head.
3   Q.  And do you know how much Dell has paid FICO in
4      professional services fees since 2013?
5   A.  I don't think I can give you a specific amount as
6      I sit here right now.
7   Q.  What is your definition of intrinsic value as you
8      define it in your report?
9   A.  I think that actually Mr. Zoltowski looked it up
10     and put it in his reply report, and I don't think
11     I had a problem with whatever that definition is
12     that he provided.
13          Ultimately what you're trying to get at
14     with intrinsic value is the -- the value that's
15     specific to that asset.
16  Q.  And so is that the value -- are you -- with
17     intrinsic value, are you looking at the value of
18     Blaze Advisor in general or Blaze Advisor as it
19     relates to Federal?
20  A.  I think both.
21  Q.  Okay, and do you know if FICO's standard list
22     prices are based on Blaze Advisor's intrinsic
23     value to FICO?
24  A.  What do you mean the intrinsic value to FICO?
25     That doesn't make sense.

44 (Pages 170 - 173)

Page 174

1  Q.   So intrinsic value is the value that is specific
2       to that asset; right?
3  A.   That's what I said we can use as a working
4       definition at a high level.
5  Q.   Yeah, and the intrinsic value of -- of an asset
6       can -- I mean, it can have different values
7       depending on who you are; correct?
8  A.   Yes and no.
9  Q.   So for -- well, I'll ask my question a different
10      way.  Do you know if FICO's standard list prices
11      for its software are based on intrinsic value?
12 A.   I haven't seen any evidence that they are based on
13      any valuation principles at all.  Yet Mr.
14      Zoltowski relies upon that.
15 Q.   And to determine whether FICO's standard list
16      prices are based on intrinsic value, what type of
17      evidence would you want to look at?
18 A.   I would want to know if they relate to incremental
19      income, value over alternatives, and match what
20      the market actually pays, not what the list prices
21      are.  So those are the three big buckets within my
22      toolbox as a valuation expert, cost marketing
23      income approach, just restated in a slightly
24      different way for that context.
25 Q.   Does your report contain an affirmative opinion on

Page 175

1       the intrinsic value of Blaze Advisor?
2  A.   I think I certainly include analyses and
3       calculations that have that consideration in mind.
4       So I think that all of my calculations go in the
5       direction of intrinsic or fundamental value.
6  Q.   Do you believe in this case that the appropriate
7       measure of damages for breach of contract is the
8       intrinsic value of Blaze Advisor?
9  A.   I think that's a concept that is useful.  I think
10      ultimately the -- the law will determine what the
11      appropriate remedy is, and if it's a but-for
12      analysis or lost license fees, I think certainly
13      it's helpful to consider the economic value of
14      whatever the asset is in the context, or whatever
15      the contract would cover, and so I think it's an
16      ingredient.
17          The actual amount is something that's
18      determined by law, but using the -- my skill set
19      and Mr. Zoltowski's skill set we both should be
20      embracing the idea of fundamental economic value,
21      and that's the -- intrinsic value is another word
22      for that.
23 Q.   And does --
24 A.   Otherwise we're not using our -- our respective
25      areas of expertise.

Page 176

1  Q.   Does the intrinsic value of Blaze Advisor include
2       maintenance and support -- an assessment of
3       maintenance and support fees as well?
4  A.   It can if those have a reliable connection to
5       whatever the contractual claim or the intangible
6       asset is.
7  Q.   In assessing the intrinsic value of Blaze Advisor
8       as it relates to the claims in this case, would
9       that also include an assessment of more than the
10      software and the software license such as
11      marketing support, potential to license other
12      products, professional services, things like that?
13 A.   If you're talking about in context of a breach of
14      contract, I would want to know what all the
15      economic aspects are of that contract and the
16      potential activities, economic activities that
17      would be associated with that contract and related
18      breach.
19 Q.   So those other items could come into play in some
20      cases?
21 A.   Conceptually they could.  You need to tie them to
22      the facts and circumstances of each particular
23      case.
24 Q.   I think we've discussed this a little bit, but
25      from whose perspective is intrinsic value

Page 177

1       determined?  Is it -- is it Federal's, FICO's, the
2       open market?
3  A.   Well, it's really the parties.  So Federal and
4       FICO, that's what I'm trying to say, is what -- is
5       this worth to each of them and what would result
6       in a payment that the parties would agree upon,
7       and the marketplace provides some backdrop for
8       that.
9  Q.   And to assess what is -- what is this worth to
10      FICO --
11          MR. FLEMING:  What is?  What worth?
12          MS. KLIEBENSTEIN:  The intrinsic value of
13      the software.  What is it worth from FICO's
14      perspective.
15      BY MS. KLIEBENSTEIN:
16 Q.   What facts do you have in your report that have a
17      bearing on what it's worth to FICO?
18 A.   I don't understand your question.  To assess what
19      it's worth to FICO?
20 Q.   I can restate it again.
21 A.   Sure.
22 Q.   We were talking about from whose perspective
23      intrinsic value is measured, open market, FICO
24      Federal, and I understood you to say it's the
25      party -- it's both the parties; is that right?

Page 178

1  A.  In part.
2  Q.  In part, and my question is:  From of the value
3       from FICO's perspective, what facts are in your
4       report that have a bearing on the value from
5       FICO's perspective?
6  A.  I think the fact that FICO recognizes that it's in
7       a marketplace where discounting is standard.  So
8       that consideration.  Certainly FICO is being
9       reasonable and considering that this is a
10      bilateral exchange, not just a demand that has to
11      be met, that it would recognize those practices.
12           I think knowing that this contract had been
13      entered into in the past and it covered at least
14      some similar space I think knowing what happened
15      in the past is -- it would be reasonable for FICO
16      to consider.
17           I think understanding and a willingness to
18      consider at least Federal's perspectives I think
19      that would be something in a bilateral negotiation
20      that would be reasonable for FICO to consider.
21  Q.  When you're measuring intrinsic value, when you're
22      doing that work, what do you do when it's clear
23      from the evidence that the parties don't agree on
24      the intrinsic value?  How do you get to a number
25      in that sort of situation?

Page 179

1  A.  Well, you consider what the options are and
2       whether a party could license other software or
3       develop its own applications.  That would be one
4       area.
5  Q.  Got it.
6  A.  Or if it creates incremental income, or specific
7       cost savings.  Those would be other ways to look
8       at it.
9  Q.  Do you know if FICO and Federal did an intrinsic
10      an analysis of the intrinsic value of Blaze
11      Advisor when they were negotiating in 2016?
12  A.  I wouldn't expect for them to do it in the same
13      way that a valuation expert would do it, but the
14      principles that they considered are present and
15      were present.
16           I think we know that Federal knew that it
17      had other options that it could use Blaze Advisor,
18      or use alternatives to Blaze Advisor or develop
19      its own alternatives to Blaze Advisor.  We talked
20      about that at length.  We know that it had from
21      its negotiations some desire to see what the basis
22      was for the claims that FICO was making, like, how
23      do you think this is helping out, and what sort of
24      value does it create for our business, and so from
25      Federal's perspective, those types of

Page 180

1       considerations that a valuation expert, or an
2       economist, or a financial analyst would look at
3       are present, albeit in different sort of words but
4       the concepts are present, and then from I think
5       FICO's perspective, those concepts are present
6       too.
7            FICO knew that there were other companies
8       that had been able to move away, that there were
9       competitors that FICO had competitors that offered
10      comparable products and that helped determine a
11      market price.  I think that FICO wanted to
12      negotiate the highest price that it could without
13      any discounts, but it reflected in its
14      negotiations a willingness to provide discounts.
15           So again, from FICO's perspective, we see
16      the principles that I've been talking about
17      present, maybe in different terms or different
18      words, but those general principles are present.
19           MR. FLEMING:  Can we take a short break?
20      We've been going for over an hour.
21           MS. KLIEBENSTEIN:  Sure.
22           THE VIDEOGRAPHER:  We are going off the
23      record.  The time now is 4:01 p.m.
24           (Whereupon a short break was taken from
25      4:01 p.m. to 4:12 p.m.)

Page 181

1            THE VIDEOGRAPHER:  We are back on the
2       record.  This marks the beginning of Media 6 in
3       the deposition of Chris Bakewell.  The time now is
4       4:12 p.m.
5       BY MS. KLIEBENSTEIN:
6  Q.  All right.  Let's talk about the cost approach,
7       the income approach, and the market approach.
8            Am I understanding you correctly that those
9       three pieces form the underpinnings for the
10      determination of intrinsic value?
11  A.  They can.  I mean, those are -- if you take
12      everything that's in the skill set of an
13      economist, or a finance person, or somebody who
14      does valuation, you can put them into those three
15      buckets, and it's -- it's -- I found it to be a
16      useful way to describe my expertise in a way that
17      ordinary people can understand.
18  Q.  And when you're -- when you're applying this
19      framework, do you always have to consider all
20      three, the cost, the income, and the market, or
21      can just one of those factors be instructive of
22      the value of the asset?
23  A.  Your question is sort of like -- has a non
24      sequitur in it, like, I don't mean that like it
25      sounds like I'm not being nice when I say that.  I

Page 182

1    mean it to be nice to try to help you formulate a
2    better question.
3        Those -- those three -- you described three
4    things at the beginning and then you compared that
5    to one when you said or, and it didn't really
6    follow.  So maybe you could re-ask the question --
7  Q.  Sure.
8  A.  -- I'm trying to help you ask a good one.
9  Q.  Cost, income, market approach.  Those are three
10    tools that you use to determine the value of a
11    claim or an asset?
12  A.  That's true.
13  Q.  Okay, and I'm wondering if it's -- if it's an and
14    or an or.  Do you have to assess all of them when
15    you're trying to determine the value of an asset
16    of a claim, or are there certain instances where
17    you can rely on only one of those three?
18  A.  So you can consider all -- you should consider all
19    the possible ways that you can measure something,
20    and then those might not always be a fit, and it's
21    plausible that you could say that there's only one
22    way that applies, fits the facts and circumstances
23    of the case, and when there's multiple tools that
24    you can use, you're supposed to reconcile them
25    against one another.

Page 183

1  Q.  And do you believe the cost approach in this case
2    should be considered with respect to determining
3    the breach of contract damages?
4  A.  I think the cost approach provides some insights.
5    I'm not sure if it provides a total value that I
6    would use, but I think it provides some insights
7    into the fact that the licensee of Blaze --
8    licensees of Blaze have the option to do other
9    things, and that's instructive I think as a
10    principle, but I don't know that I get a value out
11    of that analysis.
12  Q.  And what about with respect to copyright damages;
13    do you believe the cost approach should be
14    considered to inform the amount for disgorgement
15    in this case?
16  A.  So my understanding of law for copyright
17    infringement damages is that if you're talking
18    about reasonable royalty or lost royalty income
19    alternatives are informative, and copyright law --
20    I'm not a lawyer, but I'm just telling you my
21    understanding, has -- is starting to recognize
22    some of those principles in the cases that come
23    out that I've seen over time.
24        In terms of disgorgement, I don't know that
25    I've seen the idea of alternatives discussed or

Page 184

1    not discussed.  I think that what I've seen, and
2    I'm talking as a lay person which is just general
3    understanding of the law, is a direction toward
4    nexus, that there needs to be a connection to
5    whatever the allegations are in the case, and I
6    don't know that I've seen the cost approach
7    referred to either way, but that's -- those are
8    just answers as -- that I can give you as a lay
9    person regarding my understanding of the law.  I'm
10    not offering a legal opinion.
11  Q.  And what about the income approach and market
12    approach; do you believe those two approaches
13    should be considered when determining the
14    disgorgement amount here?
15  A.  My answer would be the same.  I don't know that
16    the laws discuss those.  I think those are helpful
17    or instructive to understanding the issues of
18    nexus and whether or not revenues have a
19    reasonable connection to the copyright, but I
20    think the law describes more of a -- ideas related
21    to nexus.  That's my understanding, or uses
22    terminology to describe ideas that includes the
23    word nexus.
24        Without being a lawyer, I'm just telling
25    you what my understanding is in general.

Page 185

1  Q.  What facts does your report identify as pertinent
2    to the damages analysis in this case under the
3    cost approach?
4  A.  I have a section in my report where I discuss how
5    -- maybe we can find it.  Do you have that page
6    number where I discuss what the alternatives are?
7  Q.  1 -- Page 35.
8  A.  Thank you.  Oh.  Right.  So I go on and I ask Mr.
9    McCarter some questions about, hey, what else --
10    what are the options, how else would you
11    accomplish the same result that the accused
12    functionality claims to accomplish, and he
13    provided me with some examples, and I think that's
14    helpful to understand what the economic footprint
15    is and the substitute products of the claims that
16    are at issue here.
17  Q.  Any other -- anything else that's pertinent to the
18    cost approach?
19  A.  Those are the areas I discussed in my report, and
20    that's kind of the idea behind considering that.
21        I mean, that -- that's going to be somewhat
22    instructive as to market values.  If there's
23    different options and competition, that's going to
24    show up in market values.
25  Q.  And so the first one I see is manual decisions,

Page 186

1   manuals lookup procedure.  Is your support for
2   your opinions relating to the manual decision
3   alternative is that solely from Mr. McCarter?
4 A.   No.  I think that's consistent with what people
5   from Fed told me, particularly Mr. Iannuzzi that,
6   hey, that wouldn't be as efficient, but if Federal
7   had to do that, it could.
8 Q.   Do you have any knowledge whether Federal could
9   achieve the same results in the same period of
10   time that it has with Blaze Advisor doing the
11   manual lookup procedure?
12 A.   Yeah.  I said it would be less efficient.
13 Q.   And do you know whether Federal would experience
14   additional costs using the manual lookup
15   procedure?
16 A.   It might.  That's why I haven't used it as a value
17   to quantify an amount.
18 Q.   Did you ask anyone at Federal whether it would
19   cost extra to use the manual lookup procedure
20   instead of Blaze Advisor?
21 A.   I did.  I discussed that with Mr. Iannuzzi and
22   others, and I -- I told you that a moment ago.
23 Q.   And -- and you said it might additional cost?
24 A.   Correct.  It might.  He said that in some
25   instances they could do things manually and it

Page 187

1   might be better actually, or -- but in others,
2   it's better to automate, and there the value is
3   really in automation, and what he was trying to I
4   think convey, at least from my perspective, and
5   this is reasonable and I think instructive too is
6   that the value is really in the business process
7   and the people that are making decisions that --
8   there's tools that are available to help support
9   the decisions, but this is -- this technology
10   isn't, like, a total replacement for the business
11   process or the -- the human aspects of making
12   decisions.
13 Q.   And what about hard coding?  Your support for your
14   statements about hard coding is Mr. McCarter; is
15   that correct?
16 A.   Yes, and I also spoke with Mr. Iannuzzi about
17   that.
18 Q.   And do you know if Federal could achieve the same
19   results in the same period of time using hard
20   coding instead of Blaze Advisor?
21 A.   I think it would be what I wrote, that it's less
22   efficient, it would have been closer to Blaze
23   Advisor or substitute products.  You're at least
24   moving in the right direction.  I mean, I'm
25   providing here an order in Paragraph 131 to help

Page 188

1   understand or put into context what the software
2   does, and here you're at least going in the right
3   direction that you'd be able to automate, but I
4   think you lose some flexibility, and in some
5   instances, as Mr. Iannuzzi told me and Mr.
6   McCarter said, it might actually be better, but in
7   most instances, it would be better to have a more
8   flexible tool than something that would need to be
9   modified every time the business changed.
10 Q.   A more flexible tool would be Blaze Advisor or
11   something like Blaze Advisor?
12 A.   That's where I have the next thing in sequence
13   called Other Products.  There's a bullet point
14   called Other Products.  So this is building up
15   conceptually how to think about solving this
16   problem.
17 Q.   So under the next products, you identify IBM,
18   Oracle, or CA; is that right?
19 A.   Yes.
20 Q.   And do you know why Federal did not purchase the
21   IBM ODM software product?
22 A.   I think Federal decided to actually go in another
23   direction and develop kind of what I'll call its
24   own homegrown solution using a tool called Drools.
25 Q.   Did you report -- does your report contain any

Page 189

1   information about how much the IBM, Oracle, or CA
2   technology business rules management software
3   costs?
4 A.   At one point, I knew that and saw that.  I don't
5   know if I have something that that's specific
6   that's in my report.
7 Q.   Does your report contain any descriptions of the
8   IBM, Oracle, and CA technology products so that we
9   can confirm they have the same features and
10   functions as Blaze Advisor?
11 A.   I relied upon Mr. McCarter for that.  So that's
12   something to ask him.  I would defer to him for
13   that.  Also Mr. Iannuzzi told me about that.
14 Q.   Tell me about your call with Mr. Iannuzzi.
15 A.   What would you like to know?
16 Q.   What -- what you gentlemen talked about.
17 A.   We talked about his role in the business, and the
18   Drools solution, and these alternative software
19   products, and the things I cited to him for in my
20   report and that we discussed today.  I don't think
21   there's anything else.
22 Q.   ████████████████████████████

48 (Pages 186 - 189)



Page 194

1  Q.  The income approach; what facts does your report
2      identify as pertinent to this case under the
3      income approach?
4  A.  Well, I discussed how if I'm trying to measure the
5      fundamental, or intrinsic value, or just the value
6      of an asset Mr. Zoltowski uses just the term
7      value, and I think we're all talking about the
8      same thing, then -- or we should be, what I'm
9      trying to get at is whether or not there's any
10     evidence of incremental income, like changes in
11     revenue, increases in revenue, or any cost savings
12     like reduced cost, or some combination of both,
13     and we talked about that earlier at the beginning
14     of the day.
15 Q.  And are there any are there any facts in your
16     report that identify any facts that relate to the
17     income approach?  Specific facts --
18 A.  There's a lot.  I discuss it in my report, and the
19     main thing we've talked about throughout today and
20     I mentioned earlier is that Mr. Zoltowski is
21     saying that he's an expert in valuation and that
22     he's providing values, but he hasn't identified
23     anything that I would say gets categorized under
24     the income approach.  He hasn't identified any
25     incremental income or cost savings, and I haven't

Page 195

1      seen any of that stuff in the ordinary course of
2      business, and there's reasons I think
3      fundamentally why, and we talked about that
4      throughout the day.
5  Q.  And what about the market approach; what facts
6      does your report identify as pertinent to the
7      damages analysis in this case under the market
8      approach?
9  A.  There's other licenses, and there's license
10     negotiations.  There's these actual contracts that
11     are alleged to have been breached, and what the
12     past payments were.  Those would be some examples.
13 Q.  Were the licenses identified in Exhibit 12 -- did
14     you undertake any analysis to determine which
15     involved -- which involved -- which included
16     additional marketing assistance on behalf of the
17     licensee?
18 A.  I don't understand that question.
19 Q.  So do you understand that from time to time when
20     FICO engages with their customers in order to
21     achieve further discounts that licensees will give
22     marketing support, referrals, case studies, things
23     of that nature?
24 A.  That wouldn't be unusual.  I've seen that in
25     businesses like this.

Page 196

1  Q.  And those types of -- those types of arrangements
2      give a licensor additional value beyond the
3      license fee itself; correct?
4  A.  It can.
5  Q.  It can, and when you were reviewing the agreements
6      in Exhibit 12, did you undertake to analyze which
7      agreements reflected those additional marketing
8      assistance?
9  A.  Some of them might say that.  It wouldn't surprise
10     me.  Sometime people will put that in a license,
11     and sometimes they won't.
12         My experience is that -- two things.  Some
13     companies are more willing than others to commit
14     to doing something like that, or put it in
15     writing, or even to do it, but most -- most
16     companies are willing to kind of just get along
17     with everyone, and if -- the principle is that,
18     hey, look, if you do a good job, I'd be more than
19     happy to talk to people about you're doing a good
20     job, and if you're frustrating me and not doing a
21     good job, then I'll try to be polite but you
22     probably shouldn't use me as a reference.
23 Q.  Do you know if that's how FICO does its marketing
24     relationships, or is that just a --
25         MR. FLEMING:  Foundation.

Page 197

1      BY MS. KLIEBENSTEIN:
2  Q.  -- industry-wide observation?
3         MR. FLEMING:  Objection.  Foundation.
4      Time.
5         THE WITNESS:  I think I'd have to know more
6      specifics.  I'm just telling you what my
7      experience is and how the evidence I've reviewed
8      in this case is consistent with my experience, and
9      the fact that it might be referred to in a license
10     or two that needs to be considered in context, and
11     I've just provided you the context.  You can't
12     take that stuff out of context.
13     BY MS. KLIEBENSTEIN:
14 Q.  Did you review the amount of consulting fees that
15     each of the licensees identified in Exhibit 12
16     paid to FICO to date?
17 A.  I tried to.  That's a little -- I don't know that
18     I have access to that information specifically.  I
19     know how much has been paid by Fed though.  That's
20     the $6.7 million dollar number that I cite to,
21     maybe it's 6.6, and I know that FICO seeks to
22     provide consulting services and charge for those
23     services.
24 Q.  In your report --
25 A.  Oh.  I discuss that under Oracle too in my

50 (Pages 194 - 197)

Page 198

1     discussion of Oracle how Oracle regarded that.
2  Q.  Moving to a different topic, the pricing matrix
3     topic --
4  A.  What is that?  I don't know what you're talking
5     about.  Are you changing subjects to pricing?
6  Q.  It is totally different.  Yes.
7  A.  Okay.  That's --
8  Q.  Page 47.
9  A.  I follow you.
10 Q.  I'm doing some cleanup.
11 A.  All right.
12 Q.  So I'm moving to 47 to give you an anchor.
13 A.  Thank you.
14       MR. FLEMING:  You're talking Paragraph 47?
15       MS. KLIEBENSTEIN:  Page.
16       THE WITNESS:  All right.
17 BY MS. KLIEBENSTEIN:
18 Q.  This is just an anchor to start our conversation.
19    I understand your report provides different sizing
20    levels for the applications that are accused of
21    infringement in this case; is that correct?
22 A.  In part.  I know where you are.  There's a table.
23    So I see that table.
24 Q.  You said in part.  How did you not agree with
25    that, my question in totality?

Page 199

1  A.  Because I'm relying upon Doctor Kursh for this.
2  Q.  And so that's my question.  The sizing that's
3     presented in your report that's from reliance on
4     Doctor Kursh?
5  A.  He did that analysis specifically.  Yes.
6  Q.  Okay.  Do you know how much time you and your team
7     have spent on your report to date?
8  A.  I don't have the number of hours other than my
9     own.
10 Q.  Do you know the fees that have been charged to
11    Federal for your report to date?
12 A.  Yes.
13 Q.  And what is that?
14 A.  Approximately $250,000.
15 Q.  And I counted -- when I looked at your CV, I
16    counted 94 engagements in the last 4 years; is
17    that right?
18 A.  It's a little bit -- I mean, you can count that
19    document, but that would be overinclusive.  That
20    would be an overstatement.
21 Q.  In what way?
22 A.  Because that document is at least over the last
23    four years.  My assistant pulls that together, and
24    her instruction is to include at least what's in
25    the last four years, and that's kind of a hard

Page 200

1     task frankly, and so it includes more than the
2     last four years.  It's overinclusive.
3  Q.  Are there any cases that should be added to this
4     list?
5  A.  No.
6  Q.  How many expert reports did you sign and serve in
7     May of this year?
8  A.  I don't know.
9  Q.  You don't know?
10 A.  No.
11 Q.  Was it more than five, less than five?
12 A.  I don't know.
13 Q.  How many reports have you signed and served in
14    June of this year?
15 A.  Maybe two, three.
16 Q.  But you can't remember may?
17       MR. FLEMING:  Objection.  Asked and
18    answered twice already.  That would be the third
19    time.
20       THE WITNESS:  This is -- it's June.  It's
21    the end of June.  I don't remember May.  It's the
22    end of the day.  So I don't know.  I gave you an
23    estimate for June.
24 BY MS. KLIEBENSTEIN:
25 Q.  Was it more than one in May?

Page 201

1  A.  Probably.
2  Q.  Was it more than two?
3  A.  I don't know.
4  Q.  Did you attend any trials in May of 2019?
5  A.  Maybe.  I don't remember one.  I don't think so.
6  Q.  So is that a zero, or a one, or you don't know?
7  A.  I don't remember attending one.  It's possible
8     there was a trial that I attended and testified at
9     recently in Houston involving another party called
10    Federal, Fedd actually F-E-D-D, Fedd Wireless.
11    That may have been in -- in May.
12 Q.  For the transcripts identified on in Paragraph 14
13    of your report, which did you personally review?
14 A.  I think all of them frankly.  It's a lot of
15    transcripts and testimony.  I will say that
16    there's -- there's some I reviewed in more detail
17    than others, and I also asked people to highlight
18    or flag certain points, certain parts within some
19    of these transcripts.
20 Q.  Tell me about your interview with Ellen Garnes.
21 A.  With who?
22 Q.  Ellen Garnes, commercial product analyst.
23 A.  I think that she may have been on a call along
24    with Mr. Pandey, but I'm -- I'm trying to -- I'm
25    trying to be responsive and not guess.  I'm sort

51 (Pages 198 - 201)

1    of pulling things together to give you a
2    reasonable estimate, but I don't recall Ms. Garnes
3    saying much frankly because I think she was on a
4    call that I had with someone else.
5 Q.  And did she say anything on that call?
6 A.  I think so.
7 Q.  And what do you recall?
8 A.  Here's what I can tell you why this list is so
9    long is that I had a bunch of questions for people
10   about how the accused functionality works, where
11   it sat, how to measure it, how to measure the
12   financial activities associated with -- with it,
13   to the extent you could at all, and I had a lot of
14   what I'll say relative to at least other cases
15   kind of exploratory discussions, and I think
16   that's driven by the fact of what I kind of came
17   to learn over time is that's driven by the fact
18   that this Blaze Advisor product is -- or software
19   is -- is not something that generates revenues, as
20   we've discussed, and it's just one aspect of many
21   within the business kind of deeply in the -- in
22   the business is just one aspect of the -- is the
23   flow charts that I've discussed characterized.
24      So there's a list of names here that's
25   lengthy because a couple of calls we had we had

1    multiple people on the call, and I asked general
2    questions that were, like, exploratory in nature,
3    introduced myself and said, hey, these are the
4    types of problems I'm trying to address and solve,
5    and this is the type of information I'd like to
6    see, and then there were followups and the like.
7      So that's a long answer.  Hopefully that's
8    helpful.
9 Q.  I -- what did you speak about with Ms. Garnes?
10 A.  I think it was -- it falls under the
11   categorization that I just provided you with.  It
12   was background about the business and where Blaze
13   Advisor sits.
14 Q.  And what did she tell you?
15 A.  I think she -- I don't remember.
16 Q.  Ms. Verduin, Nancy Verduin; what did you speak
17   with her about?
18 A.  Verduin.  The same.  She's from the commercial
19   underwriting group.  I think she mostly listened
20   to questions and maybe had questions back for me
21   about understanding what it is that we were hoping
22   to study.
23 Q.  And do you recall what questions did you ask Nancy
24   Verduin?
25 A.  No.  Just that they were exploratory, and she was

1    probably on a call with multiple people.
2 Q.  Do you recall what she told you?
3 A.  Not other than what I just said.
4 Q.  Helen Mencke; what did you speak with Ms. Mencke
5    about?
6 A.  Same thing.  I'll give you the same answer.  She
7    was on background calls.
8 Q.  And so you don't remember what she told you
9    specifically?
10 A.  Not specifically.
11 Q.  What about generally?
12 A.  You know, I think one way it would be maybe
13   helpful to you in understanding this list and the
14   people's roles is that if there's something that I
15   relied upon somebody specifically for or found
16   particularly useful I would have cited to them in
17   a footnote in my report.
18      Otherwise I think that I'm going to give
19   you the same answer, that these people -- I spoke
20   with them about and gained a background
21   understanding of information, and the business,
22   and Blaze Advisor.
23 Q.  So for Ms. Mencke, you don't recall what she said
24   to you?
25 A.  I think that falls in the same category.

1 Q.  And Mr. Schraer; same answer?
2 A.  Yes.
3 Q.  Alissa Theberge?
4 A.  That's the same.
5 Q.  So you don't recall what she said to you
6    specifically either?
7 A.  Yeah.  She's in the same category that I just
8    provided.
9 Q.  What about Kevin Harkin?
10 A.  I think that's a little bit different.  Mr. Harkin
11   I can remember speaking about what sort of
12   information would be relevant financially, how he
13   could respond to the interrogatory questions, what
14   sort of financial information could be produced.
15      I think some of the production of financial
16   information that I relied upon in my report were
17   either the result of -- or I cited to in my report
18   were produced as a result of my request to Mr.
19   Harkin, and then I would have interviewed them --
20   him about those documents and their meaning, and
21   he might have had some questions about how to
22   respond to some of your discovery requests.
23 Q.  What about Ramesh Pandey; what did you speak with
24   Mr. Pandey about?
25 A.  I spoke with him a couple of times, and one time I

Page 206

1  spoke with him I remember there were multiple
2  people on the call.  The next time there might
3  have been other people on the call but it was
4  primarily me and him speaking, and I had questions
5  for him about business process, where Blaze
6  Advisor sits.  I think that some of the documents
7  that were produced that are flow charts came about
8  as a result of my questions.
9       I said, hey, do you have any -- any flow
10  charts or business process diagrams to keep in the
11  ordinary course of business, and he said sure, and
12  then I saw that information was produced, and I
13  asked him about it.
14 Q.  What about Tracie Jerd; what did you talk to Ms.
15  Jerd about?
16 A.  I think the remaining names are going to be the
17  same.  I don't -- I'd have to look in a footnote
18  to my report.  If -- if there's not a footnote,
19  the best I'll be able to tell you is that there
20  was background, or she was a one of multiple
21  people that was on a call.
22 Q.  And what about Jennifer Stantucci; what did you
23  speak with Ms. Stantucci about?
24 A.  I think the same thing.  I recall maybe a little
25  bit more.  I think I spoke with her relatively

Page 207

1  early on, several months prior to my report, but
2  -- and about understanding the business.
3 Q.  What about Chase McCarthy; what did you speak with
4  him about?
5 A.  I think he might have been on a call with Mr.
6  Pandey, and I spoke primarily with Mr. Pandey.
7  That's how I remember it.
8 Q.  And finally, Claudio Ghislanzoni; what did you
9  speak with Claudio about?
10 A.  I don't have a specific recollection so I'd say
11  background.  Unless there's a footnote where I
12  cite to him.
13      MS. KLIEBENSTEIN:  All right.  No further
14  questions.
15      MR. FLEMING:  All right.  We will read and
16  sign.  Thank you.
17      THE VIDEOGRAPHER:  This marks the end of
18  the deposition of Chris Bakewell.  The time now is
19  4:56 p.m.  We're off the record.
20      (Whereupon the deposition adjourned at 4:56
21  p.m.)
22
23
24
25

Page 208

1  STATE OF MINNESOTA  )
2                      ) SS
3  COUNTY OF HENNEPIN  )
4
5  I Jacqueline McKone, certified shorthand reporter
   and notary public for the State of Minnesota,
6  certify there came before me the deponent herein
   who was sworn by me to testify to the truth
7  concerning the matters in the cause, and I certify
   this transcript is a true transcript of my
8  original shorthand notes.
9  I certify I am neither attorney nor counsel for,
   nor related to, nor employed by any of the parties
10  to the action in which this deposition is taken;
   and furthermore, I am not a relative or employee
11  of any attorney or counsel employed by the parties
   hereto or financially interested in this action.
12
   The cost of the original transcript has been
13  charged to the party noticing the deposition, and
   all parties ordering copies are charged at the
14  same rate for such copies.
15
   IN WITNESS WHEREOF, I have affixed my notary seal
16  this day:  2 July 2019
17
18
19  Jacqueline McKone
20
21
22
23
24
25

Page 209

1           Veritext Legal Solutions
2              1100 Superior Ave
                  Suite 1820
3             Cleveland, Ohio 44114
              Phone: 216-523-1313
4
   July 9, 2019
5
   To: Terrence Fleming, Esq.
6
   Case Name: Fair Isaac Corporation v. Federal Insurance Company
7
   Veritext Reference Number: 3404762
8
   Witness:  Chris Bakewell      Deposition Date:  6/28/2019
9
10  Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

53 (Pages 206 - 209)

Page 210

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3404762
CASE NAME: Fair Isaac Corporation v. Federal Insurance Company
DATE OF DEPOSITION: 6/28/2019
WITNESS' NAME: Chris Bakewell
    In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
    I have made no changes to the testimony
as transcribed by the court reporter.

_____
Date            Chris Bakewell
    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

    They have read the transcript;
    They signed the foregoing Sworn
        Statement; and
    Their execution of this Statement is of
        their free act and deed.

    I have affixed my name and official seal

this _____ day of_____, 20____.

    _____
    Notary Public
    _____
    Commission Expiration Date

---

Page 211

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3404762
CASE NAME: Fair Isaac Corporation v. Federal Insurance Company
DATE OF DEPOSITION: 6/28/2019
WITNESS' NAME: Chris Bakewell
    In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
    I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
    I request that these changes be entered
as part of the record of my testimony.

    I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.

_____
Date            Chris Bakewell

    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
    They have read the transcript;
    They have listed all of their corrections
        in the appended Errata Sheet;
    They signed the foregoing Sworn
        Statement; and
    Their execution of this Statement is of
        their free act and deed.
    I have affixed my name and official seal
this _____ day of_____, 20____.
    _____
    Notary Public
    _____
    Commission Expiration Date

---

Page 212

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 3404762
PAGE/LINE(S) /      CHANGE      /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Date            Chris Bakewell
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .

    _____
    Notary Public

    _____
    Commission Expiration Date

**0**

**0001**   3:11,20
**0001-0003**   3:22
**0001-0004**   3:24
**0001-0020**   3:18
**001**   131:11
**017882**   3:18
**017883**   3:24
**017884**   131:11
**017885**   3:20
**017915**   3:11

**1**

**1**   4:21 29:24 35:4
   43:1 49:20 50:14
   111:5 119:9
   122:15,19 131:21
   132:4 157:9
   162:21 185:7
**1.3**   162:20
**1.47**   162:18 163:2
**10**   29:25 43:10
   92:10 148:10,14
   149:9
**10,000**   115:7
   121:13
**100**   33:13 34:1,9
   157:2
**102**   3:9
**103**   3:10 17:8
**104**   16:8
**105**   16:8
**1054**   1:4
**106**   12:5
**107**   17:8
**10:14**   43:10,12
**10:33**   43:12
**10:34**   43:16
**11**   43:11 96:25
**11.1**   139:10 141:6

**11.1.**   139:21
**1100**   209:1
**11:38**   82:7
**11:48**   82:9
**11:49**   82:13
**12**   43:12 120:3
   155:12,13 158:15
   160:4 195:13
   196:6 197:15
**122**   3:17
**127**   190:10,16
**128**   190:10,16
   192:22
**12:51**   114:21,23
**13**   43:13
**131**   3:21 187:25
**136**   3:19
**14**   43:14 94:9
   141:25 201:12
**14.14**   117:8
**140**   3:12
**145**   3:23
**15**   37:24 43:15
   72:4 141:25
   171:17
**1500**   70:20,24 71:6
   71:8,24
**158**   20:1 21:9
**16**   1:4 43:16 91:11
   117:1,2,3,7,9,12
   117:15 118:6
   119:7 120:9
   141:25
**16.1**   117:9
**16.2**   117:10
**168**   74:11 75:23
**17**   43:17 91:11
   92:2,6,18 93:11,21
   94:23 95:6 96:1
   96:15 99:12 100:2
   102:3 108:21

**109:2 110:16**
   120:8,9 122:22,25
   142:1
**171**   3:16
**1788**   122:3
**17884**   3:22 132:25
   133:9,11,15 135:6
   135:15
**17885**   136:21
**179**   190:15,15,18
   191:6
**18**   43:18 101:22
   102:4 142:1
   162:14,18
**18.4**   117:16
**180**   82:22 115:23
**181**   192:13
**182**   112:21,25
   192:13
**1820**   209:2
**184**   113:2
**19**   43:19 101:22
   102:4 132:11
**193**   83:25 84:9
   85:6
**197**   86:20
**1995**   8:6
**1:41**   114:23
**1:42**   115:2

**2**

**2**   28:9 29:17 35:5
   43:2,14 170:20
   171:9 208:16
**2.1**   28:10
**2.45**   117:9,10
**2.456**   116:23 117:6
   119:5
**20**   43:20 72:1,4
   101:22 102:5
   210:16 211:22
   212:22

**200**   2:9
**2001**   8:6
**2006**   166:11,12,14
**2013**   132:10 137:5
   137:8 141:15,18
   141:23,25 142:10
   144:7 173:4
**2015**   137:5,8
   141:15,18 142:10
   144:7
**2016**   118:25
   119:19,20 137:6
   142:3,15 162:2,9
   163:15,23 167:4
   167:11,21 168:8,9
   168:23 170:18
   171:11 179:11
**2017**   118:25
   119:20 137:6
**2018**   117:15
   118:10,12,18,22
   118:25 119:14,14
   119:16,20 120:1,1
   120:3 142:3,15
**2019**   1:25 4:5,12
   119:21 141:24
   201:4 208:16
   209:4
**20924**   208:18
**21**   43:21
**216-523-1313**
   209:3
**22**   43:22
**224**   51:1
**229**   51:1
**23**   43:23 91:18
**24**   43:24 120:3
**25**   43:25
**250,000**   199:14
**257**   3:16 171:9

**26**   25:24,24 26:18
170:17
**27**   132:10
**28**   1:25 4:5,12
**2:30**   140:11
**2:37**   140:16,18
**2:49**   140:18
**2:50**   140:24

**3**

**3**   8:21 26:24 43:3
82:11 122:16,16
138:20 141:21
**3.6**   17:7 25:6,10
**3.6.**   25:9 46:12
**31**   10:20
**32**   10:20
**3200**   2:3 5:3
**33**   55:3,5
**332-5300**   2:4
**332-9081**   2:5
**3404762**   209:7
210:2 211:2 212:2
**35**   69:14,23 157:21
185:7
**36**   70:10,17 120:3
157:22
**37**   70:10 71:25
**38**   191:6

**4**

**4**   3:7 8:21 43:4
114:25 137:3
199:16
**4.3**   118:25
**4.3.**   109:22 120:15
**4.6**   118:25
**4.7**   118:25
**40**   158:9 159:1
**4000**   2:9
**409**   3:17 122:1,4,6
122:14,24 123:7

**124:10,13,20**
125:2 127:2,4
129:1,25 131:3
**413**   3:19 136:21
138:11,17 140:4
144:14,16,19
**416**   3:21 131:13
**418**   3:23 145:10,12
145:14,20 146:6,7
146:8 147:21
**43**   54:20
**44**   53:10 54:20
**44114**   209:2
**45**   48:11 50:21
82:3
**47**   36:5,15 43:20
43:22 198:8,12,14
**492-7000**   2:10
**492-7077**   2:11
**4:01**   180:23,25
**4:12**   180:25 181:4

**5**

**5**   3:3 43:5 110:15
115:4,8,9 116:16
116:18 140:22
**5.0**   118:11 119:5
**5.0.**   120:23
**500**   8:20
**500,000**   191:16,19
**51**   74:12
**52**   75:23
**522**   3:7 4:9 9:17
**523**   3:8 91:7,9
**524**   3:9 91:18
102:17,19 104:3
107:17,19 108:19
108:24 110:15
**525**   3:10 102:19
103:6,10 104:3,18
106:20 108:24
109:3,11

**526**   3:12 140:20
**53**   128:3
**55402**   2:4,10 5:4
**56**   120:24
**58**   128:3

**6**

**6**   43:6 94:7,7,12
103:20 115:13,13
119:20 181:2
**6.0.**   118:23
**6.6**   197:21
**6.7**   197:20
**6.8**   171:19
**6/28/2019**   209:8
210:3 211:3
**60**   158:10 159:1
170:17
**61**   162:5
**612**   2:4,5,10,11

**7**

**7**   43:7 121:9
**7.1**   131:19,20
132:5,11,14,18
**7.2**   135:20,23,25
135:25 136:13
137:17 138:6
139:20 141:1,14
141:21
**7.2.**   138:5 139:12
141:4
**71**   170:13,13

**8**

**8**   43:8 116:1,10
117:13 118:10
121:11,13,14,22
121:23 138:1
**8.0**   118:7
**8.1**   121:23 122:2,7
122:14 125:14
128:4 129:2

**8.1.**   121:25
**8.2**   121:23 131:7
131:18,19 132:5,9
132:15,24 134:7
134:11 135:7,17
**8.2.**   131:5
**8.3**   135:20,23,24
135:25 140:3
144:12
**8.3.**   136:19 140:5
144:11
**8.4**   145:11 147:19
**8.4.**   145:8
**80**   2:3 4:4 5:2
**800**   8:20
**82**   112:17,19,19
**84**   120:16

**9**

**9**   43:9 209:4
**91**   3:8
**94**   199:16
**9:07**   4:5
**9:08**   4:11

**a**

**a.m.**   4:5,11 43:10
43:12,12,16 82:7,9
82:9,13
**ability**   56:22 59:7
59:9,17
**able**   35:2 39:15
59:15 62:22 135:3
180:8 188:3 192:8
206:19
**absolute**   89:7
**absolutely**   55:23
99:8
**abstract**   94:19
**absurd**   165:11
**accept**   9:22 24:3
105:1 134:1

153:10
**accepting** 47:8
**access** 107:16
 108:3,5 150:19
 197:18
**accomplish** 156:9
 185:11,12
**account** 16:21
 49:16 87:13 135:5
 154:11
**accountant** 79:21
**accounting** 71:14
 78:3,20 79:18
 80:16,24 81:18
**accrue** 126:17
**accumulated** 67:3
**accurate** 33:19
 48:21,25 93:8
 122:4 148:4
**accusations**
 111:18 112:13,16
**accuse** 89:1 101:2
**accused** 47:22
 48:8 95:10 111:17
 112:11 136:4,14
 149:25 185:11
 198:20 202:10
**accusing** 100:17
 100:18 126:9
**ace** 1:9 54:25
 58:19 59:3 125:6
 125:10
**achieve** 186:9
 187:18 195:21
**acknowledge**
 210:11 211:16
**acquired** 7:23
**act** 210:14 211:20
**action** 5:10 208:10
 208:11

**activities** 176:16
 176:16 202:12
**activity** 53:12
 129:14,15 130:8
 145:4
**acts** 172:19
**actual** 10:7,9,12
 16:22 25:1,4,12,13
 28:13,18 29:21
 73:7,21 115:10
 127:6 163:12,19
 165:6 166:19
 175:17 195:10
**actuality** 128:21
**adapt** 139:17,17
 139:19
**add** 45:21 117:5
**added** 200:3
**adding** 28:4,5
 158:23 170:2
**addition** 54:4
**additional** 94:4,25
 186:14,23 191:4,8
 191:9 195:16
 196:2,7
**address** 63:19
 110:16 203:4
 209:15
**addressed** 166:11
**addressing** 66:5
 66:18
**adequately** 154:22
**adjourned** 207:20
**adjust** 48:21,22
**adjustment** 50:18
**adjustments** 27:25
 28:4,12 29:15,16
 29:20 50:19 87:14
 157:19
**administer** 5:9

**administration**
 66:24
**administrative**
 129:5,8
**admitting** 170:5
**adopt** 147:19
**adopted** 144:15
**adopting** 148:5
**advisor** 30:12,20
 32:24 33:6 34:11
 35:10,18,22 41:25
 44:8 45:20 48:14
 48:16 49:6,19,23
 50:10,22 51:5,12
 51:15,21 52:1,4,19
 53:2 69:16,17
 70:3 71:11,25
 92:16 93:2,15
 95:14,15,18 96:2,5
 96:7,16,23 97:4,9
 97:10,14,24 98:7
 98:15,24 100:4
 108:17 111:19
 112:12 123:19,23
 124:21,23 134:10
 143:9,19 145:23
 146:1 154:2,13
 173:18,18 175:1,8
 176:1,7 179:11,17
 179:18,19 186:10
 186:20 187:20,23
 188:10,11 189:10
 189:23 191:18,21
 202:18 203:13
 204:22 206:6
**advisor's** 173:22
**affect** 63:2 161:8
**affirmative** 22:9
 25:13 30:9 46:18
 174:25

**affirmatively** 34:9
**affixed** 208:15
 210:15 211:21
**aggregated** 122:8
**agnostic** 69:16
**ago** 8:25 52:12
 186:22 192:12
**agree** 4:19 41:13
 42:18 68:13 97:11
 110:6,9 128:18
 168:24 177:6
 178:23 198:24
**agreed** 116:4
 157:13 193:6,10
**agreement** 47:23
 167:13 171:5,20
 172:4,5 192:20
**agreements** 155:1
 155:5,8,13,15
 156:22 157:7
 158:14,15 160:23
 161:6,13 172:5,8
 172:14 196:5,7
**ahead** 22:21 61:17
 115:15,16
**al** 4:24
**albeit** 143:17,21
 180:3
**aligned** 78:1,1
**alissa** 205:3
**allegations** 11:16
 14:25 45:23 47:1
 47:2 48:20 100:21
 119:18,24 143:8
 143:24 184:5
**alleged** 17:24
 18:13 24:13 27:20
 163:9 195:11
**allocate** 129:11,16
 132:23 144:25
 145:1,4

**allocated**   123:5
124:2 129:22,25
130:2,7,7 131:24
138:4 144:20
**allocates**   129:7
**allocation**   130:10
145:5
**allocations**   127:16
129:13,19 130:11
130:14
**allowed**   75:5,24
**alter**   78:10 80:19
**alternative**   49:21
161:18 186:3
189:18
**alternatives**   31:12
155:23 156:5
174:19 179:18,19
183:19,25 185:6
**amended**   26:23
**amendment**
162:21,22
**america**   7:20
121:21 128:6
**american**   1:9 8:10
8:16,19
**amount**   25:4 46:8
46:19 90:12,16,16
105:25 107:8
129:20 160:12
162:17 171:23
173:5 175:17
183:14 184:14
186:17 197:14
**amounts**   17:13
141:14 163:8
167:3,6,7
**amsterdam**   7:25
**analyses**   14:22
51:2 80:19 169:15
175:2

**analysis**   12:24
21:13 23:14,17,24
25:20 26:3 30:23
31:20 32:5,8
47:11,20 48:12
49:1,8 80:3 85:22
86:24 87:4,14
94:4 106:8 130:19
137:21 152:11,25
160:25 161:4
168:15,20 175:12
179:10 183:11
185:2 195:7,14
199:5
**analyst**   152:9
168:13 180:2
201:22
**analysts**   149:7
**analytics**   72:16
**analyze**   152:17
162:2,10 196:6
**analyzed**   84:18
**analyzing**   110:1
149:21 152:3
**anchor**   198:12,18
**annual**   8:9,14
53:12 54:22 56:8
**annually**   191:19
**answer**   9:23 10:24
14:8,19 18:19,20
19:2,4,6,16,20
24:7,14 25:16
32:3 33:8 35:25
39:8 40:19 42:25
43:1 44:9,16
46:24 65:18 73:12
73:25 78:19 90:21
92:11 93:9 94:6
94:17 95:12 99:4
110:24 111:21
113:25 123:21

124:10 151:1,4
158:22 166:10
170:2 184:15
203:7 204:6,19
205:1
**answered**   14:1,6
154:15 169:21
200:18
**answering**   17:6
19:22,23 96:4
**answers**   3:8 50:25
80:9 83:21 91:17
111:4 133:5 184:8
**anybody**   35:21
37:2 41:25 152:18
**anymore**   156:1
**anytime**   64:4
163:11
**apologize**   131:13
131:15 141:9
**appear**   112:4
162:23 210:11
211:15
**appearances**   2:1
**appearing**   85:10
**appears**   9:23 16:7
16:15 112:5
136:25
**appended**   211:11
211:18
**applicable**   11:11
16:6 23:11 105:19
132:3 136:5 159:6
191:17
**application**   23:21
23:23 32:8 36:2
36:21,24 37:8,9,10
37:14 71:2 81:9
97:3 98:22 112:11
136:8 158:20,21
170:15,21 171:11

171:24
**applications**   24:10
24:17 28:6 35:17
35:19,22 39:6
41:1,12,17,20,24
42:8,19,22,23
43:22,24 47:22
48:8,13,15 49:6,19
49:22 50:10,21
51:5,11 70:11,21
70:25 71:7,10,15
71:24 81:7,10
93:14,16 96:22
100:3 109:1
111:11 113:6
124:14,21 139:16
145:22 157:11
158:1 171:17,22
179:3 198:20
**applied**   118:12
134:24 136:8
138:16 143:20
150:23 158:25
**applies**   50:19
86:17 136:16
150:15 163:5
182:22
**apply**   15:1 47:8
60:11 78:13 80:2
88:5 102:12 136:4
137:23 159:7
160:2,13
**applying**   181:18
**apportion**   12:25
**apportionment**
12:22 31:23 85:2
**approach**   31:10
31:13,15 60:21,22
60:23,25 78:21
79:24 152:25
154:8,9 174:23

**[approach - back]**

181:6,7,7 182:9
183:1,4,13 184:6
184:11,12 185:3
185:18 194:1,3,17
194:24 195:5,8
**approached** 18:8
**approaches** 45:5
184:12
**appropriate** 25:4
46:4,8 64:5 74:5
84:5 87:1,19,21,23
125:19 130:25
175:6,11
**approximate**
134:25
**approximately**
70:20 72:1 191:19
199:14
**arbitrarily** 95:11
**area** 6:15 16:18
179:4
**areas** 175:25
185:19
**arm's** 151:14
**arp** 97:6
**arrangements**
196:1
**arrive** 19:11 26:14
107:13
**art** 57:22 85:1
**artificial** 62:20
**artificially** 62:20
**aside** 77:10 80:8
80:10
**asked** 6:6,22 13:25
14:5 18:9,10 21:6
22:17 37:2 38:1
39:5 54:19 62:6
72:23 73:5 77:19
79:11 89:22,24
92:25 94:16

107:21 108:8,11
114:8 115:18
134:23 141:5
147:5 148:10
169:20 200:17
201:17 203:1
206:13
**asking** 15:9,16
16:10 18:23 34:14
45:13 77:2,2,18
79:9 90:4 115:23
139:13,14 151:18
**aspect** 18:5 143:18
202:20,22
**aspects** 42:17
57:13 69:12
176:15 187:11
**assess** 6:8 22:11
31:9 64:4 77:19
177:9,18 182:14
**assessing** 176:7
**assessment** 30:5
74:16 77:22 176:2
176:9
**asset** 17:3 153:19
163:12 173:15
174:2,5 175:14
176:6 181:22
182:11,15 194:6
**assets** 6:16 66:9
67:4
**assignment** 210:2
211:2 212:2
**assignments** 9:2
**assistance** 195:16
196:8
**assistant** 199:23
**associated** 113:4
123:2 126:13
128:12 132:22
135:2 176:17

192:1,5 202:12
**assume** 27:15,17
169:6 170:3
**assumed** 48:2
147:24 151:19
154:4
**assuming** 16:6
34:13,22 35:1
50:2 117:1,2
119:7 152:18
**assumption** 6:9
12:10 13:5 21:15
21:22 27:17,19
46:10 48:6 50:5
50:20 84:2 98:13
118:14 154:9
157:16 160:10,12
**assumptions** 10:21
11:7,11 13:20
23:10 27:1 48:1
49:5,7 75:15,16
99:20 109:5,7,14
109:16 134:24
144:1 157:17
**attached** 211:7
**attempt** 73:20
**attempted** 93:24
**attend** 201:4
**attended** 201:8
**attending** 201:7
**attention** 162:16
163:4
**attorney** 208:9,11
**attributable** 12:8
12:12 13:6 14:11
15:20,21,24 16:15
16:20,23 21:11,17
31:20 32:6 56:19
57:5 58:5,8,11,16
58:22 59:9,17
60:3,13 61:12,16

61:20,23 62:2,15
63:6,9,17 64:11
68:18,24 69:4
70:24 71:6 72:21
72:25 87:22 96:6
165:10
**attribute** 57:14,16
**attributed** 57:19
57:20 58:4,6
**attributes** 31:11
31:16 33:2 56:4,5
**audio** 4:18,18
**audit** 148:1
**australia** 100:9
131:7,9 134:8,10
**authenticate** 103:1
**authorize** 211:11
**authorized** 5:8
**automate** 187:2
188:3
**automated** 81:3,4
**automation** 187:3
**available** 31:4
60:24 85:18
126:11,25 136:10
155:23 187:8
**ave** 209:1
**average** 137:6
**averages** 128:24
**award** 7:11 29:2
83:11
**aware** 101:24
135:8 164:14

| **b** |

**b** 3:5 111:25
**back** 9:24 35:17
43:13 82:10 83:8
100:20 101:13
109:23 114:24
116:16 118:6,23
132:11,18 138:4

[back - breach]                                                     Page 6

140:21 141:1
143:13 150:11
167:4 168:20
181:1 203:20
209:15
**backdrop**   154:23
177:7
**background**   155:2
203:12 204:7,20
206:20 207:11
**bad**   68:5
**bakewell**   1:16 3:7
4:3,22 5:21 6:2
22:16 37:5 43:15
43:18 51:10 82:12
87:12 102:23
103:8 104:18
109:11 115:1,4
140:23 141:1
181:3 207:18
209:8 210:4,9
211:4,13 212:20
**bakewell's**   141:5,8
**balance**   147:15
**base**   83:11
**based**   7:11 17:10
18:11 37:21 38:17
38:19,20 45:25
48:23 79:24 109:3
128:4 129:14,15
129:22 130:8
138:7 145:4
158:20,21 159:2
161:12 164:5,25
165:24 173:22
174:11,12,16
**baseline**   91:15
**basic**   49:12 86:7
**basically**   31:25
66:25 77:13 122:9
126:9 132:3

156:10
**basis**   74:14,20
75:2,3,6,22 76:6
76:14,16,18 77:4,6
81:3 129:14,15
130:3 179:21
**bates**   105:4
**bearing**   166:15,17
177:17 178:4
**beginning**   16:3
43:14 44:5 82:11
82:14 105:19
114:25 140:22
158:17 181:2
182:4 194:13
**behalf**   195:16
**behave**   86:23,25
87:19 88:13 124:5
126:19 130:9
145:19 149:18
**behaved**   85:23
138:4
**behaves**   130:10
**behavior**   80:24
81:15 130:12,14
**belief**   139:18
167:25
**beliefs**   169:17
**believe**   17:11,12
22:11 26:11 34:9
49:18 55:11 57:13
58:3 74:7 99:13
125:18 146:7
161:5 164:23
165:23 168:24
175:6 183:1,13
184:12
**believes**   143:16
**belongs**   50:16
**benefited**   157:24

**best**   31:19 45:6
61:2 92:19 126:8
126:25 134:4
136:10 137:25
146:3 206:19
**better**   39:19 68:10
155:17 161:3
182:2 187:1,2
188:6,7 193:4,12
**beyond**   64:8 196:2
**big**   60:18 62:10
153:9 174:21
**bigger**   131:16
166:5
**biggest**   7:20
119:15,16
**bilateral**   178:10
178:19
**billion**   8:22 94:9
116:23 117:10,10
**bin**   60:21
**bins**   60:19,24
**bit**   8:7 33:11 39:12
102:21 126:2
131:16 155:17
162:7 168:5,18
176:24 199:18
205:10 206:25
**blank**   69:18
**blaze**   30:12,20
32:24 33:6 34:11
35:10,18,22 40:13
41:25 44:8 45:20
45:22 48:13,16
49:6,19,23 50:10
50:22 51:5,11,14
51:21 52:1,4,18
53:1 69:16,17
70:3 71:11,25
92:16 93:2,14
94:15,18 95:13,15

95:17 96:1,5,6,16
96:23 97:3,9,10,13
97:24 98:7,14,23
100:4 103:15,20
103:23 104:4,23
108:16 111:19
112:12 123:19,22
124:21,23 126:21
134:9 143:9,19
145:22 146:1
154:2,13 173:18
173:18,22 175:1,8
176:1,7 179:10,17
179:18,19 183:7,8
186:10,20 187:20
187:22 188:10,11
189:10,23 191:18
191:20 202:18
203:12 204:22
206:5
**boat**   47:16
**boil**   13:21 44:3
**boils**   151:10
**booking**   139:8,16
**bookings**   113:7
**bothered**   165:19
**bottom**   116:22
**boundaries**   17:1,2
18:3 20:12 31:5
32:19
**brand**   38:12 56:22
58:1,4,10,11,17,22
59:1
**branding**   58:24
**brands**   58:20,23
**breach**   9:12 10:1,3
22:1,6,12 23:19,24
48:9 149:20 154:5
163:10,16,17,19
166:19 167:12,25
168:24 169:19

175:7 176:13,18
183:3
**breached** 195:11
**breaching** 47:23
**break** 40:21 43:7
43:11 81:21,22
82:3,8 83:5
112:18 114:18,22
140:9,13,17
180:19,24
**briefly** 160:20
**bright** 15:11
**bring** 6:17 150:25
162:15
**bringing** 163:4
165:17
**broad** 67:19 68:3
88:1 151:9
**broader** 81:5,8
161:8
**broadly** 54:17
63:11
**broker** 65:11
**brokers** 64:21
**brought** 90:7
169:17
**bucket** 57:3
**buckets** 129:3
174:21 181:15
**building** 188:14
**bulk** 127:11,14
**bullet** 188:13
**bunch** 28:11 37:25
67:4 68:7 78:12
169:2 202:9
**burden** 9:13 10:5
10:5,18 11:13,14
11:14,20 12:1,2,11
13:4,5 21:16
**burdens** 9:9,25
11:1,18

**burdensome** 147:8
147:14
**business** 7:23,25
38:8,9,12,13,14,23
39:1,14 40:7,9,9
40:12,14,14 41:2
41:13,14,15,16,20
42:1,7,10,11,12,13
42:17,18,21,22
44:13 47:19,20
54:24 56:7,10,24
57:14 59:3,19,25
60:8 61:9,10,12,13
61:14,20 64:4
65:4 66:3 69:16
71:19 72:15 73:3
74:12 75:1 78:6
79:18 80:4,7,16,17
80:21,22 81:2,11
81:13 89:4 90:24
91:1 97:18,18,20
97:21 98:2,12
100:6 109:20
111:15 114:16
120:22 121:6
123:4,6,11,23
124:3,16,17
125:17 126:9,13
127:7,8,20 129:12
129:17 130:12,14
130:20,23 131:23
136:1,11 137:4,7
137:24 138:2
139:3 141:17
142:6,16,18
143:12,19,21,22
144:6,21,22 145:3
145:18 146:2,9,13
146:15,18,22,25
157:23 159:20
164:10 167:1

179:24 187:6,10
188:9 189:2,17
192:17 193:5
195:2 202:21,22
203:12 204:21
206:5,10,11 207:2
**businesses** 7:2
54:2,3,21 62:17
68:8 71:16 92:14
121:16 123:2,6
124:5 129:22
135:13 136:2
144:24 149:16
156:15 195:25
**buy** 150:22
**byron** 2:9

**c**

**c** 4:1 111:25
**ca** 188:18 189:1,8
209:25
**calculate** 93:22
125:14 133:6
140:4,7 141:13
144:11 156:20
157:5 161:11
163:3 171:23
**calculated** 118:6
120:13 127:3
133:2 137:18
139:14
**calculating** 160:2
**calculation** 25:12
25:13
**calculations** 29:23
115:8 117:18,23
122:7 134:6 135:6
138:10 147:23
156:24 166:1
175:3,4
**call** 7:24 24:1
31:10,12,15,23

60:20 91:3 97:13
188:23 189:14
201:23 202:4,5
203:1 204:1 206:2
206:3,21 207:5
**called** 9:1 94:18
103:14 188:13,14
188:24 201:9
**calling** 89:15
**calls** 10:15 11:4
12:15 13:9 14:14
15:6,25 21:19
73:9,22 76:21
167:15 168:3
202:25 204:7
**canada** 100:9
121:20 125:2
145:8
**captured** 113:5
114:10
**capturing** 28:11
**care** 116:19
**career** 7:5 9:3
**careful** 77:24
**cascading** 24:24
**case** 1:4 6:6,12,20
11:16,22 18:8
20:15 24:6 32:16
32:24 45:23 46:9
46:20 47:2,3
50:11 62:21 71:11
83:13 88:24
112:11 119:18
122:2 123:3
125:19 126:11
130:13 143:24
151:7 152:2 155:5
156:11 160:13
161:1,6 175:6
176:8,23 182:23
183:1,15 184:5

185:2 194:2 195:7
195:22 197:8
198:21 209:6
210:3 211:3
**cases** 176:20
183:22 200:3
202:14
**casualty** 54:18
64:18,19
**categories** 35:11
60:10 86:1 88:11
107:9 109:12
111:13,14 126:14
**categorization**
149:18 203:11
**categorizations**
124:9
**categorize** 111:12
140:7
**categorized** 112:7
194:23
**categorizing**
171:24
**category** 35:9
44:25 60:11 109:6
109:9,9 204:25
205:7
**caught** 12:1
**cause** 208:7
**causing** 139:23
**cellphones** 4:16
**cellular** 4:15
**centuries** 65:23
**century** 42:15
44:13
**certain** 35:19
48:25 50:10 59:22
76:13 83:2 90:10
123:9 150:6,17
182:16 201:18,18

**certainly** 69:7
73:1 76:5 78:18
126:14 160:16
175:2,12 178:8
**certainty** 93:9
**certificate** 211:11
**certification** 210:1
211:1
**certified** 7:10
208:5
**certify** 208:6,7,9
**cetera** 111:25
**cfo** 7:2,17,18
**challenges** 114:13
**challenging** 25:16
47:11
**change** 45:20
119:1 128:8 130:5
150:18 209:13,14
211:8 212:3
**changed** 188:9
**changes** 61:6
144:3 194:10
209:12 210:7
211:7,9
**changing** 198:5
**characterization**
43:1
**characterizations**
162:25
**characterize** 111:1
170:24
**characterized**
83:23 122:10
202:23
**characterizing**
172:16
**charge** 197:22
**charged** 199:10
208:13,13

**charges** 120:11
**chart** 82:22 99:1
148:19
**charts** 38:24 40:12
40:16,17 52:9,15
72:12 97:20,21
98:3,4 202:23
206:7,10
**chase** 113:14
207:3
**check** 105:22
109:20,23 118:17
125:8 136:11
148:2 149:11
170:23
**checklist** 151:20
**choice** 151:19
**choose** 151:20
**chose** 74:24
**chris** 1:16 4:3,22
5:21 40:5 43:15
82:12 115:1
140:23 181:3
207:18 209:8
210:4,9 211:4,13
212:20
**chubb** 54:22 58:19
58:23 59:2 125:9
128:4 148:21,23
149:12
**chubb's** 54:24
58:25 149:15
**circle** 150:25
**circular** 63:20
**circumstances**
68:3,5 156:19
176:22 182:22
**circumstantial**
33:24
**citation** 115:24

**cite** 16:5 37:21
114:6 122:16
139:11,20 197:20
207:12
**cited** 16:18 38:21
69:15 83:6 144:13
144:14 148:20
189:19 192:11
204:16 205:17
**cites** 54:19
**citing** 23:8 139:23
**civil** 210:5 211:5
**claim** 23:24 33:5
45:25 48:3 153:21
153:22 157:1,24
163:16,17 164:18
165:4,6,12 176:5
182:11,16
**claimed** 48:5
164:10
**claiming** 26:14
153:14
**claims** 20:14 50:4
76:9 159:9 163:18
165:8 166:16
176:8 179:22
185:12,15
**clarify** 34:12
117:17
**clarifying** 21:3
**claudio** 207:8,9
**cleanup** 198:10
**clear** 19:3 23:12
36:6 43:19 75:8
76:3 90:23 95:2
99:16 116:15
178:22
**clearly** 26:8 28:21
75:17 108:5
110:24

[cleveland - confirm] Page 9

cleveland 209:2
client 153:10
  162:17,23 164:9
client's 163:2
close 43:18 77:15
  143:21 160:20
  169:15
closely 20:21
closer 123:10
  187:22
code 16:5,5
coding 187:13,14
  187:20
coextensive 27:24
  32:14
coffee 81:25
coincidental
  134:15
collectively 69:10
  70:25
collects 130:22
college 81:13
colleges 81:12
color 65:18 71:20
column 111:23,25
  112:1,2,2,2,9,9
columns 105:12
  105:16,18 111:24
combination
  120:7 194:12
combinations
  50:13
combine 76:19
  77:6 83:23
combined 77:13
  77:21 120:15,16
  121:7 148:16
  156:15
combining 53:6
  75:6 76:16 79:17

come 40:20 52:3
  62:6 67:6 77:15
  78:11 82:25 83:1
  86:5 91:1 94:14
  94:22 117:12
  122:14 153:18
  172:11 176:19
  183:22
comes 38:21 42:11
  56:6,8,9 64:15
  77:23 108:22
  117:13 118:3
  123:9,15 125:16
  127:6,8,19 131:11
  146:19 160:18
coming 83:5
  151:13
commencing 4:5
commensurate
  154:7
commercial 128:5
  201:22 203:18
commission
  210:19 211:25
  212:25
commissions
  129:5
commit 196:13
committed 57:9
commoditization
  156:6
commoditized
  158:2
companies 61:4
  62:18,21 95:17
  125:6,7 128:14
  148:16,18 149:2,8
  155:25 156:15
  161:18,19 164:18
  180:7 196:13,16

company 1:9,9 7:1
  7:13,14,15 8:14,17
  9:1,2 26:23 59:22
  63:1 67:21 99:5
  100:24 105:23
  123:10 128:22
  129:16 130:21
  209:6 210:3 211:3
company's 156:7
comparable
  180:10
compare 32:19
  111:15 112:6
  124:22
compared 127:23
  132:6 182:4
comparison 132:5
comparisons 21:7
  61:4 110:22
  117:25
compartment
  62:12,12 63:15
compartments
  62:10
competition
  185:23
competitors 180:9
  180:9
compiled 99:11,17
compiling 68:7
complaint 26:22
  26:24,25
complete 78:19
  148:1
completed 190:12
  209:15
complex 44:14
complicated 97:22
  98:4
complying 153:8

components
  120:17
compound 126:3
comprise 54:2
compulsion
  150:21
computer 81:9,10
  103:9 104:12
  105:10
computing 16:22
conceding 47:14
  47:14
conceivably 30:25
  32:14 33:2
concept 97:24
  98:14 150:15
  151:6 175:9
concepts 180:4,5
conceptually
  27:20 30:2 85:2
  176:21 188:15
concern 80:10
concerned 135:9
concerning 208:7
concerns 78:25
concessions 49:13
concise 44:16
conclude 35:14
conclusion 10:16
  11:4 12:15 13:10
  14:15 15:7 16:1
  19:12 21:20 73:10
  73:23 76:22 77:2
  155:4
conclusions 67:7
conduct 72:17,19
conducting 31:19
  32:5
confirm 34:7 51:4
  51:11 103:13
  104:1 148:7

160:15 161:3
171:10 189:9
**confirmed**  31:8
114:11
**confirming**  136:6
**confused**  169:10
**connect**  20:13
**connection**  14:25
15:4,18 17:21
20:9,10 26:16
30:12,17,20 32:23
33:1,5,10,13 34:7
34:10 35:4,8,10,15
39:21 41:11 44:24
84:20 90:5 93:1
93:14 123:13
176:4 184:4,19
193:24
**connections**  21:7
**consensus**  148:25
**consider**  34:21
100:21 152:15
153:11 154:20
170:8 175:13
178:16,18,20
179:1 181:19
182:18,18
**consideration**  63:3
85:17 158:10
160:22 175:3
178:8
**considerations**
31:14 64:2 161:8
180:1
**considered**  101:1
101:11,12 117:21
131:4 134:3
169:25 179:14
183:2,14 184:13
197:10

**considering**  178:9
185:20
**consistent**  59:24
108:12 122:11
149:13 160:17
186:4 197:8
**consistently**
143:10 149:3
**constrained**
125:25
**consultant**  7:5
8:24 9:4
**consulting**  7:8
158:3 197:14,22
**contain**  22:10
30:10 35:22 49:20
71:10 96:23
174:25 188:25
189:7
**contained**  105:16
**contains**  97:3
**context**  7:7 14:12
14:16,21 15:10,21
15:24 16:17 20:5
32:9 34:18 36:1
44:2 47:7 71:22
75:22 76:11 83:21
85:9 90:9 92:23
94:1 95:1 101:1
101:11,12,13
102:13 134:4
149:15 154:23
155:2,16,20
156:25 160:25
161:7 163:18,23
163:25 166:21,22
167:7 168:6 172:6
174:24 176:13
188:1 191:14
197:10,11,12

**contexts**  172:10
**continue**  4:19
**contract**  9:12 10:1
10:4 22:1,6,12
23:20,24 27:23
48:9 59:24 119:19
149:21 163:10,16
163:17,19 166:19
167:25 168:25
169:19 175:7,14
175:15 176:14,15
176:17 178:12
183:3
**contracts**  195:10
**contractual**  176:5
**contribute**  39:7,10
42:2,19,21 43:25
**contributes**  36:23
37:6,14 38:16
55:22 56:5
**control**  66:24
**controller**  7:19,22
8:10
**conversation**
38:17 69:20
198:18
**conversations**
4:15 113:16
**convey**  187:4
**copies**  111:16
208:13,14
**copy**  9:16,17,20
91:10 131:16
**copyright**  10:8,25
11:2 12:8,12 13:7
14:13,21 15:22
17:14,22 25:1,14
25:24,25 26:12,18
28:13,19 29:21
30:3,6,9 32:16
46:9,19 83:10

154:5 163:11,20
163:20,24 166:20
166:22 168:1,25
183:12,16,19
184:19
**copyrighted**  16:24
27:3,23 31:21
32:6
**copyrights**  25:18
26:4,15,16 27:5,10
27:19 28:17 29:6
29:8 32:13,14,21
47:23 166:24
**corporation**  1:6,6
1:9,10 4:24 7:19
8:21 209:6 210:3
211:3
**correct**  6:19 8:11
9:21 13:4,22
17:16 21:14 22:5
27:4,18 28:1 30:6
30:13 34:16,17
35:19 41:19 47:9
51:12,13 53:15
55:4 69:21 70:13
70:21 72:3,5,6
74:17 77:5 85:8
85:14 93:2 96:18
96:23 97:4,7,9
101:25 107:14,17
108:3 110:8,12
111:8 113:9
116:20,21 118:5
118:14 119:25
121:2,8 125:3,7
128:19 129:11
130:10 131:7,8
137:13 138:7
139:7 147:24,25
154:21 160:14,23
166:12 169:7

170:18 172:7
174:7 186:24
187:15 189:24
196:3 198:21
**corrected** 107:11
107:11
**correction** 107:15
**corrections** 28:10
209:12 211:17
**correctly** 106:9
181:8
**correlation** 61:6
127:22
**cost** 31:1,12,13,15
33:2 45:4 47:16
60:22 85:4,8
87:21,24,24 88:15
123:2 124:8
125:19 134:16
174:22 179:7
181:6,20 182:9
183:1,4,13 184:6
185:3,18 186:19
186:23 190:17
191:14,19,20
194:11,12,25
208:12
**costing** 129:14,15
130:8 136:7,23
145:4
**costs** 11:18 12:4
47:7 84:1,3,6,15
84:21 85:1,12,13
85:17,23 86:1,12
86:14,19,23,25
87:1,19,19,22 88:3
88:5,22,24 89:2,4
89:6,8,8,10,12,14
89:15,16,16,19,23
120:21 121:5
123:5 124:2,5,18

125:22 126:5,6,8
126:12,19,22
128:7 129:17
131:24 132:3,16
132:18,19,21
134:12,16 136:3
136:17 137:23,25
138:3,16 140:7
144:25 145:2,2,19
145:25 149:18,18
186:14 189:3
190:14,21 191:4
**counsel** 4:22 5:12
82:16 103:8,17
208:9,11
**count** 199:18
**counted** 95:22
107:13 199:15,16
**counting** 95:24
106:16,21 109:19
110:16 115:11
116:19 138:14,22
138:25 139:1,6,18
**country** 54:4
**counts** 96:22
**county** 208:3
210:10 211:15
**couple** 16:7,18
51:19 116:8,12
157:9 202:25
205:25
**course** 56:10
85:20 92:21
114:16 123:4,6,11
123:14 124:3,6,7
124:16 125:17
127:8,20 131:23
132:1,16,23
134:13 136:18
137:24 138:3
139:3 143:11

144:21,22 145:18
146:2,8,13,15,18
146:22 147:7,9
159:24 164:10
190:25 195:1
206:11
**court** 1:1 4:25 5:6
78:14 80:12 84:22
90:9 210:7
**courts** 79:3
**cover** 26:19
175:15
**coverage** 62:19
**covered** 27:22
119:23 178:13
**create** 30:22 45:24
46:1,2 47:3 59:1
166:25 179:24
**created** 146:6
164:12
**creates** 30:24
179:6
**credit** 49:4 162:22
**credited** 49:3
**criteria** 108:9,11
142:22,23
**critical** 99:10
**criticism** 154:19
160:24
**criticized** 160:21
**critique** 100:12
**critiquing** 100:14
**csi** 36:3,7,23 37:6
37:13 38:15 39:8
72:2,7 96:20 97:6
97:12 109:1 113:7
139:7,15
**customary** 107:22
**customer** 53:13,18
54:7,10 55:2 57:1
68:22,24 159:18

172:18
**customers** 68:6
160:4 195:20
**cutting** 90:24 91:3
**cuw** 50:15 72:4,8
103:15 109:1
113:3 139:7,7,16
**cv** 1:4 199:15

| d |
|---|

**d** 3:1 4:1 111:25
112:2,9 201:10,10
**damages** 6:8,14
7:7 9:10,12 10:2,4
10:8,9,12,21 11:12
14:22 15:23 16:22
18:11 22:12 23:24
25:1,4,4,12,12,13
28:13,19 29:2,21
30:3,6 45:25 46:2
46:4,8,14,19 49:21
74:16 75:12
118:19,21 149:20
152:1 156:20
157:6 161:12
163:17,19,20
166:15,18,19
168:19 175:7
183:3,12,17 185:2
195:7
**data** 45:8 47:5
70:1,2 95:23
99:11,13 102:2,4,8
105:14 106:2,9,12
106:14,20 107:16
108:2,7,14,20,21
110:1,18 111:5,6
113:3,6,23 114:9
115:8 117:22
119:13 122:10,22
123:3,18 125:2,11
128:2 131:10

132:5,24 133:3
136:7,23 137:10
138:18 146:10
156:11
date 4:12 105:20
150:11,17 190:7
197:16 199:7,11
209:8 210:3,9,19
211:3,13,25
212:20,25
dates 105:19,21
118:11
day 149:5 158:18
159:22 194:14
195:4 200:22
208:16 210:16
211:22 212:22
days 116:8 209:18
deal 79:6 138:22
138:25 139:2
151:14
dealt 139:6
dear 209:10
decades 42:14
decent 92:12
decided 188:22
decision 64:23
186:2
decisionpoint 97:1
97:12 98:21,23,25
109:1
decisions 39:13,20
185:25 187:7,9,12
declarations 34:23
deduct 11:19 84:1
84:3 85:13 125:19
135:16
deducted 50:12
87:25 89:10,16
deductible 87:22

deductions 84:5
85:5
deed 210:14
211:20
deemed 209:19
deep 64:25
deeply 202:21
default 68:22
defendant 13:8
defendant's 11:20
defendants 1:11
2:13 5:17 73:8,21
149:23
defer 80:14 127:16
189:12
deference 80:11
define 20:12 25:17
26:9 28:22 32:19
69:2 90:2 96:19
173:8
defined 12:25
27:11 28:16 29:6
definitely 53:25
78:24
definition 20:19
28:24 95:1 96:12
130:6 150:17
173:7,11 174:4
delaware 1:6
dell 155:24 156:13
157:12,21,22
159:17,17,20
160:22 161:5,13
172:4,18,18,19
173:3
demand 64:1
178:10
demands 123:24
demonstrate
126:25

demonstration
51:14,21
denial 170:4
department 81:15
81:16,17,17,18
209:22
departments
81:13
depending 174:7
depends 36:1 39:7
39:8 96:19
deploying 191:2
deployment
162:19
deponent 208:6
deposes 5:22
deposition 1:14
4:2,18,22 5:1
43:15 50:23 52:24
54:23 56:10 82:12
82:15 115:1
140:23 181:3
207:18,20 208:10
208:13 209:8,11
210:1,3 211:1,3
depositions 130:18
derive 124:24
156:23 166:3
derived 15:13,16
31:13 45:8 47:4
134:19,23 135:10
describe 20:6 30:1
31:6 38:24 54:24
86:2 99:9,24
109:21 120:14,15
127:5 148:4 149:4
166:24 171:18
181:16 184:22
193:10
described 26:22
31:25 33:3 35:13

39:13 44:12 52:12
52:14 59:5 62:9
85:24 86:1 88:12
95:20 99:15,19,20
106:17 108:15,17
120:14 122:8
125:24 130:1
146:4 148:25
152:17 182:3
191:7
describes 59:25
116:13 184:20
describing 23:6
86:18 110:21
description 87:4
96:11 111:13
132:7
descriptions 51:18
53:6 109:6,8,9,11
189:7
designation 7:9
designees 44:19
desire 179:21
despite 44:20
detail 9:15 14:8
19:14 99:24
111:22 147:9
201:16
detailed 13:15
51:20 115:12
121:19 147:1,5
details 72:13
145:17
determination
166:18 169:23
181:10
determine 89:11
120:21 121:5
174:15 175:10
180:10 182:10,15
195:14

**determined**
137:24 148:22,24
149:21 175:18
177:1
**determining** 17:1
122:6 183:2
184:13
**develop** 161:19
179:3,18 188:23
**developed** 42:14
52:8,10 65:24
**developing** 120:20
153:25 193:4
**development**
189:22
**deviate** 161:21
**deviating** 24:21
**deviation** 161:24
**diagrams** 53:8
73:4 193:19
206:10
**difference** 120:8
120:10
**differences** 193:9
**different** 14:12
15:16 18:21 24:5
33:11 37:12 39:6
41:18 42:10 51:22
56:19 57:5,23
60:9 61:5 64:20
65:8,8,20 70:11,20
71:4 72:1,4,16,18
77:7 88:17,19
90:21 96:20
101:24 105:5,21
111:10 128:21
129:2 132:12
154:10 156:9
160:3 162:20
166:15 167:14
174:6,9,24 180:3

180:17,17 185:23
198:2,6,19 205:10
**difficult** 19:1,3
160:7
**difficulty** 96:4
**dinner** 151:21
**direct** 23:4 33:25
34:25 35:3,9,11
86:19 88:15,24
89:8 127:11,13,15
**direction** 143:23
175:5 184:3
187:24 188:3,23
**directionality**
128:1
**directionally**
120:10
**directly** 19:23
99:4,18 129:12,21
**director** 66:23
**disaggregate** 26:2
**disagree** 21:24
22:2 131:2 165:18
**disagreed** 133:16
134:2 144:1,2
**disagreement**
169:5
**disappear** 67:13
**discipline** 78:6
**disciplines** 79:17
80:15,17
**disclosed** 143:25
**discount** 28:5
158:8,25,25 159:6
159:14 160:2,7,12
161:10
**discounting** 178:7
**discounts** 153:13
158:6 159:5 160:3
170:16 180:13,14
195:21

**discovery** 48:18
48:24 50:8 83:15
107:20 205:22
**discrepancy**
139:23
**discuss** 44:14
86:19 103:2 110:2
117:25 120:17
142:3 157:20
159:22 162:4
170:14,25 171:4
171:11 184:16
185:4,6 194:18
197:25
**discussed** 44:18,22
45:3,8 54:14
55:18 102:12
114:11,12 115:12
125:24 131:23
137:21 144:24
145:16 146:4
162:22 170:15
171:1 176:24
183:25 184:1
185:19 186:21
189:20 193:20
194:4 202:20,23
**discussing** 98:12
171:21 172:10
**discussion** 44:3,5
85:11 169:8 170:5
198:1
**discussions** 36:19
110:3 143:13
167:6 168:23
202:15
**disgorge** 73:20
**disgorgement**
10:10,25 11:2
14:13,21 17:9,14
17:22 18:11 25:2

30:3,6,10 45:25
46:4,9,20 83:10
163:21,24 165:11
166:20,23 183:14
183:24 184:14
**disproves** 34:3
**dispute** 156:17
172:6 190:23
**disregarded** 14:8
**disregarding**
153:12
**distinguished** 27:6
**distinguishing**
10:9
**distribution** 57:1
68:15,19
**district** 1:1,2 4:25
4:25
**dive** 64:25
**dividends** 129:6
**doable** 132:1
**doctor** 24:15 35:6
44:22 160:9 199:1
199:4
**document** 57:10
91:12,23 94:14,18
94:19,20 95:20
105:3 122:17
123:5 125:16
131:12 135:17
138:13 140:6
144:13,14 170:23
199:19,22
**documentation**
163:2
**documented** 51:1
**documents** 38:21
53:7 54:24 56:9
59:5 133:13 166:7
166:7 168:5
170:24 172:16

193:15,23 205:20
206:6
**doing** 31:2,22 47:9
49:25 50:1 52:1
59:14 60:15 61:8
62:7 63:13 67:5
78:10 85:16 86:24
100:18 101:3
107:25 131:20
134:11 140:9
147:25 149:25
164:20 165:12
166:4 178:22
186:10 196:14,19
196:20 198:10
**dollar** 46:14
127:24,25 128:16
167:3,6,7 197:20
**dollars** 8:20 92:1
142:17 171:19
**domain** 126:12
**double** 91:21
106:16,21 109:19
109:23 110:16
115:11 116:19
138:14,22,25
139:1,6,18
**draw** 64:16 80:20
**drinking** 81:24
**drive** 3:9 38:4 39:7
42:2,9,17 54:7,10
55:3 103:9 104:10
104:14
**driven** 44:8 53:13
92:15 96:3 118:22
119:14 202:16,17
**drives** 37:14 38:11
**drools** 188:24
189:18 191:15,20
191:24,25 192:1,2
192:15,18,20

**drove** 35:22
**dts** 1:4
**due** 29:12 39:4
47:6 77:16 87:5,5
165:16
**duly** 5:22
**duplicative** 111:6

**e**

**e** 2:5,11 3:1,5 4:1,1
112:2,9 201:10
**earlier** 32:13 39:5
44:13,18 45:3
53:16 69:8 86:22
89:19 103:24
114:12 115:12,13
115:18 137:21
138:15 146:4
152:17 158:17
168:16 171:14
172:24 194:13,20
**early** 207:1
**earned** 117:14
134:18 135:1,1
**easier** 57:23
**easy** 50:17 57:21
**economic** 17:2
18:7 20:2,12,18,19
20:25 24:18 29:8
29:13 30:23 31:5
31:16 64:3 78:2
84:16 86:3 165:15
171:15 175:13,20
176:15,16 185:14
**economically**
24:22 27:12,14
28:17 32:17 77:12
77:20 78:22 79:13
79:15,19 164:21
**economics** 12:21
20:21 21:4 78:1
80:24 81:17

**economist** 79:13
180:2 181:13
**effect** 24:24
**effectively** 74:14
**efficient** 99:3
186:6,12 187:22
**efficiently** 101:19
**effort** 58:24 92:20
**ego** 78:10 80:19
**eight** 7:1,13
**eighth** 2:3 4:4 5:2
**either** 8:7 12:4
29:10 47:18 84:13
117:4 163:10
184:7 205:6,17
**elasticity** 64:1
**elect** 48:23
**element** 12:5 73:1
**elements** 12:7,11
13:6 16:23 31:1
57:5
**eliminate** 106:16
106:21 112:5
115:11
**eliminating**
109:18,19
**ellen** 201:20,22
**email** 209:17
**embracing** 175:20
**emotion** 153:23
**employed** 208:9
208:11
**employee** 113:15
208:10
**employees** 36:20
38:17
**employment** 191:9
**employs** 70:12
**enable** 41:2
**enclosed** 209:11

**endeavor** 47:19
108:1
**ends** 118:18,21
**energy** 7:24
**engagements**
199:16
**engages** 195:20
**entail** 79:15
**entered** 178:13
211:9
**enterprise** 7:4 8:3
23:20 24:10
158:15 164:14,24
165:22,23 170:16
**entire** 8:16 32:15
210:5 211:5
**entirely** 48:20
93:3,7
**entirety** 27:22
126:9
**entities** 74:8,15,20
77:7,20 121:20
**entitled** 73:7 83:25
84:3 154:12
**entity** 112:8
**equals** 117:9
**err** 96:9,9
**errata** 209:13,18
211:7,10,18 212:1
**error** 24:25 126:3
**errors** 24:21 28:1
87:6
**especially** 92:12
**esq** 209:5
**essentially** 117:5
**established** 54:3
**estimate** 126:12
126:24 128:23
132:2 136:3,10,16
137:22,22,25
145:25 146:3

159:6 200:23
202:2
**estimated** 132:14
162:20
**estimates** 96:9
117:22 124:22
127:7 132:15,17
158:9
**estimation** 71:3
**et** 4:24 111:25
**eu** 100:10 138:18
139:17
**europe** 135:20,25
136:2,5,9,11,15
**european** 136:2
**event** 11:23
**evidence** 27:13
30:16,23 34:25
35:3,9,12 48:24
49:2,9 50:7 76:7
76:10 130:13,18
160:17 174:12,17
178:23 194:10
197:7
**exactly** 7:22 107:4
117:21 171:12
**examination** 3:3
5:25
**example** 31:2 40:3
50:14 52:13 69:25
70:5 81:1,4 86:20
98:22 99:7,9
100:5 128:6
**examples** 56:11
59:20 90:1 100:1
155:19 156:12
157:8 158:13
161:8,14 185:13
195:12
**excel** 69:18 106:22
111:24

**exception** 101:5
**exceptions** 159:16
**exchange** 178:10
**exciting** 135:21
**excuse** 190:15
**executed** 211:10
**execution** 210:14
211:19
**exhaustive** 56:12
70:7
**exhibit** 3:7,8,9,10
3:12,16,17,19,21
3:23 4:9 9:17
29:24,25 49:20
50:14 91:7,9,17
94:7,7,12 102:17
102:19 103:6,10
103:20 104:2,3,18
106:20 107:17,19
108:19,24 110:15
115:4,8,9,12,13
116:1,10,16,18
117:14 118:7,10
118:11,23 119:5
119:20 120:23
121:9,12,14 122:1
122:3,6,7,9,13,14
122:24 123:7
124:10,12,20
125:2,14 127:2,4
128:4 129:25
131:3,5,13,19,19
134:7 135:6,17,23
136:20 137:17
138:5,6,11,13
139:11,20 140:3,5
140:20 141:1,14
144:14,16,19
145:10,11,12,20
146:6,7,8 147:18
147:21 148:10,14

149:9 155:12,13
157:9 158:15
160:4 171:9
195:13 196:6
197:15
**exhibits** 3:14 9:21
29:17 110:15
117:13 118:4
121:20,22 122:12
134:16 138:2
147:3 157:19
**exist** 86:14 100:25
107:6
**existing** 53:14,19
54:7,10 55:2
**expect** 130:21
158:4 179:12
193:22
**expected** 128:11
190:12
**expects** 59:1
**expense** 85:8
140:8 145:2
146:24 148:15
149:19
**expenses** 120:25
121:1 125:12
129:1,3,4,9,24
130:2,4 133:5,6,12
135:15,16 140:4
144:16,18 147:2
147:18,20
**experience** 7:11
7:13 8:23 15:23
16:11 48:18 58:20
59:20 62:25 64:16
71:19 78:5,7
80:20 107:21
160:17 169:24
186:13 196:12
197:7,8

**expert** 1:14 4:3
6:13,15,18,25
10:21 11:13 15:23
51:13 52:20 60:17
64:3 75:12,12
79:6 87:11,14
113:10,11 152:10
160:11 168:14,19
168:19 174:22
179:13 180:1
194:21 200:6
**expertise** 6:11,20
6:21,23 56:24
60:2,3,14 175:25
181:16
**experts** 19:14 21:6
34:24 44:18 48:23
165:18
**expiration** 210:19
211:25 212:25
**expiring** 119:19
**explain** 13:20 19:9
19:10 24:16 44:10
88:21 115:7
123:22 131:20
135:22
**explained** 13:15
30:17 54:22
192:23
**explaining** 92:12
110:11
**explanation** 142:2
**exploratory**
202:15 203:2,25
**express** 36:3,7,23
37:6,14 38:15
39:8 44:6 72:2,8
96:20 97:6,12
109:1 113:7 139:7
139:15 166:3

expressly  18:2
extends  139:19
extent  10:15 11:3
    12:14 13:9 14:14
    15:6,25 75:4
    76:21 98:18
    100:18 129:12
    190:20 202:13
extra  186:19
extract  103:15,20
    103:23 104:4,24
eyes  34:1
ezer  139:17,17,19

**f**

f  112:2,10 201:10
fact  13:16 29:7
    35:3 48:5 49:17
    50:15 64:8 77:10
    88:9 96:14 155:22
    158:7 161:21
    162:12 178:6
    183:7 190:22
    197:9 202:16,17
factor  68:16
factors  12:8,12
    13:6 15:22 16:24
    56:19 57:3,19
    181:21
facts  67:11 102:10
    102:11 150:21
    176:22 177:16
    178:3 182:22
    185:1 194:1,15,16
    194:17 195:5
factually  108:2
fair  1:6 4:23 83:5
    103:18,18 138:20
    138:20,23 150:10
    150:17 152:23,23
    209:6 210:3 211:3

faith  169:5
falls  13:7 44:24
    203:10 204:25
familiar  105:1
    113:24
far  29:15
faulting  107:24
fax  2:5,11
features  189:9
fed  3:11,18,20,22
    3:24 52:14 122:3
    129:18 131:11
    133:9 135:6
    136:21 143:15
    186:5 197:19
fed's  50:25
fedd  201:10,10
federal  1:9 4:24
    17:23 18:13 35:7
    35:19,21 36:20,24
    37:2,7,15 38:16,17
    38:23 42:2,20
    47:22 51:4 52:5
    52:17,19 53:4,24
    54:2,21,25 55:22
    56:4 58:16 59:24
    62:20,21 68:19
    70:12,12,19 83:25
    84:2,10 89:12
    92:16 95:7,12
    96:7 98:17 100:17
    100:24 106:1,6
    108:6,9,13 113:20
    114:3,14 121:17
    123:24 129:7
    130:15,16 132:2
    137:10 140:7
    143:9,15 144:24
    147:1 151:11,11
    154:3 167:12,13
    167:23,24 168:23

169:16 170:14
    171:4 173:19
    177:3,24 179:9,16
    186:6,8,13,18
    187:18 188:20,22
    190:2,3 191:4
    192:14,17 199:11
    201:10 209:6
    210:3 211:3
federal's  30:11
    44:7 53:17 54:6,9
    55:12,20,21 57:4
    57:14,17,18 58:3
    58:10,16 59:9,17
    60:2 61:10,11,20
    61:23 62:1,15
    63:5,8,17 64:10,11
    68:17,23 69:4,5,25
    70:1,24 71:6
    72:20 91:10,16
    134:7 168:9 177:1
    178:18 179:25
    189:22
fee  23:15 191:16
    191:18 196:3
feel  153:22 154:25
    191:1
feels  193:5
fees  21:25 129:9
    161:11 162:19
    163:6 172:23
    173:4 175:12
    176:3 191:8,9,9,24
    197:14 199:10
fewer  13:16
fico  2:17 5:15
    17:12,15,22 18:12
    28:19 48:8 49:18
    73:6,19 76:10
    149:22 154:2,12
    157:1 159:13,18

159:21 162:16,23
    164:3,14,23 165:4
    165:23 167:14,24
    170:14 171:3
    172:10,19,20,25
    173:3,23,24 177:4
    177:10,17,19,23
    178:6,8,15,20
    179:9,22 180:7,9
    180:11 190:23
    191:1 195:20
    196:23 197:16,21
fico's  45:24,25
    47:23 48:14 70:2
    149:20 154:20
    155:18 156:16
    165:22 173:21
    174:10,15 177:1
    177:13 178:3,5
    180:5,15
field  12:23 19:13
    21:3 31:8 57:22
    58:20 79:18 80:16
    80:18
fields  20:21
figure  60:12 82:24
    99:2 104:15 110:7
    110:19 111:6
    112:24 118:2,11
    128:15 150:12
    153:2,24 160:7
figures  21:25
    46:14 47:7 93:22
    116:18 117:5
    118:12 122:13
    133:1 135:10
    144:12,15 145:12
figuring  63:12
    64:20 152:11,22
    153:3

**file** 3:10,17,19,21
  3:23 94:20 103:8
  103:12,14,25
  104:2,3,4,22,23
  106:9,10,11
  108:19 110:8
  138:13
**filed** 4:24
**final** 94:19 103:23
  104:4,24
**finally** 207:8
**finance** 6:13 12:21
  20:21 21:4 66:23
  77:25 80:24 81:17
  181:13
**financial** 6:9 9:4
  18:6 20:2,4,16,25
  24:18,22 26:6
  29:12 56:8,23
  59:8,10,18 64:3
  74:14,19 75:2,3,12
  75:22 76:2,3,5,14
  77:4,5 79:25 80:1
  80:3 84:16 86:3
  132:17 152:9,11
  165:15 168:13,15
  168:19 180:2
  202:12 205:14,15
**financially** 5:10
  75:6,25 76:16,18
  77:12,19 205:12
  208:11
**financials** 137:4,8
  141:17 142:6,16
  142:19 144:6
**find** 10:13 25:15
  25:23 83:3,7,8
  92:9 104:7 146:3
  160:1 163:15
  185:5 209:11

**finder** 49:17 50:16
  88:9
**fine** 6:3 49:4 70:15
**finish** 121:12
**finished** 190:1
**firm** 5:7,17
**first** 23:6 24:7
  33:15 38:14 40:10
  42:11 50:8 58:18
  63:19,23 86:2
  103:11 104:21,22
  104:25 112:1
  116:22 125:13
  141:21 142:3
  185:25
**fit** 52:15 61:2
  96:11 182:20
**fits** 182:22
**five** 200:11,11
**fixed** 85:18 88:15
  88:22 89:2,6,7,10
  89:14,15,16,20,23
**flag** 201:18
**flash** 3:9
**flawed** 132:21
**fleming** 2:12 5:16
  5:16 10:15 11:3
  12:14 13:9,25
  14:5,14 15:6,25
  16:12 18:15 19:18
  21:19 22:13 33:15
  33:20 34:12 36:6
  36:11 37:1 40:20
  73:9,22 76:21
  77:9 81:20 82:4
  82:14,20 90:4,19
  101:18 102:20,22
  103:3 104:6,11,16
  105:9 110:4
  112:22 116:4
  133:18 151:16

152:5 155:6
  167:15 168:2,11
  169:20 177:11
  180:19 196:25
  197:3 198:14
  200:17 207:15
  209:5
**fleming's** 104:2
**flexibility** 188:4
**flexible** 49:8 87:4
  188:8,10
**floated** 167:3
**flow** 38:24 40:12
  40:16,16 52:9,15
  72:12,14 73:3
  97:18 98:3,4 99:1
  193:19 202:23
  206:7,9
**flummoxed** 61:15
**focus** 24:13,19
  92:2 153:18
  157:10,13 169:16
**focused** 25:11
  78:22 134:15
  153:19 158:18
  167:8
**focuses** 131:7
**focusing** 22:6 77:3
**follow** 121:20
  182:6 198:9
**followed** 40:1
  81:14
**following** 4:2
  111:13
**follows** 5:23 28:23
  29:7,9 111:24
  171:3
**followups** 203:6
**foot** 115:7 121:13
**footnote** 70:6
  122:19 131:20

132:4 137:3
  138:20 139:11
  141:21 190:15,18
  191:6 192:13
  204:17 206:17,18
  207:11
**footnotes** 50:25
  51:1
**footprint** 24:22
  40:15 45:7,11,17
  185:14
**foregoing** 210:13
  211:18
**forget** 7:22 169:4
**forgot** 112:19
**form** 24:8,19
  83:11 158:19,24
  171:15 172:3
  181:9
**format** 122:11
**formulate** 182:1
**forth** 17:13 23:23
  84:12 87:3 101:13
  143:13 167:4
**forward** 209:15
**found** 50:15
  181:15 204:15
**foundation** 196:25
  197:3
**four** 13:21 157:19
  199:23,25 200:2
**frame** 118:13,19
**framed** 23:14
**framework** 11:11
  22:11 23:19 24:5
  24:17 25:3,5,8,11
  46:13 49:21
  181:19
**frankly** 33:4 34:21
  39:4 47:10 49:1
  74:1 77:16 79:7

**[frankly - gross]**

80:11 100:17
106:4 165:12
200:1 201:14
202:3
**fredlaw.com** 2:11
**fredrikson** 2:9
5:17
**free** 210:14 211:20
**freely** 84:24
**front** 90:2
**frustrating** 196:20
**full** 150:25 170:8
**fully** 118:2 151:6
**function** 119:18
130:9 155:22
190:22
**functional** 192:23
193:1
**functionality**
185:12 202:10
**functions** 41:22,23
72:8 189:10
**fund** 66:25
**fundamental**
31:16 55:8 64:2
130:19 152:14
175:5,20 194:5
**fundamentally**
30:22 44:11 54:25
58:18 60:9 153:4
195:3
**further** 16:4 71:8
71:22 76:12 90:1
109:24 195:21
207:13
**furthermore**
208:10

**g**

**g** 4:1
**gain** 73:2

**gained** 53:5
204:20
**gaining** 56:6
**garnes** 201:20,22
202:2 203:9
**general** 8:9 11:21
25:10 52:2 53:6
53:23 57:18 80:22
90:6 105:24 129:5
129:8 173:18
180:18 184:2,25
203:1
**generally** 10:3,5
10:17 16:25 38:6
56:13 69:6 72:14
72:23 78:8 79:25
83:9,19 91:20,23
116:1,11 128:1
146:12 160:24
191:10 204:11
**generate** 63:23
84:1,4,6,8,9,10
95:15 96:5 124:7
141:3 143:12
164:4
**generated** 55:12
126:21
**generates** 202:19
**generating** 31:9
**generous** 118:13
**gentlemen** 189:16
**geographies**
101:24
**geography** 62:22
**gesture** 159:10
**getting** 77:8 93:19
149:5
**ghislanzoni** 207:8
**give** 37:22 44:15
54:11 55:16 57:11
59:13 62:4 65:18

72:11 74:23 79:22
81:1 95:16 100:5
102:14 111:3,22
116:5,5 152:4
157:3,8,8 173:5
184:8 195:21
196:2 198:12
202:1 204:6,18
**given** 53:18
150:21 160:4
**giving** 76:11
**glad** 166:10
**global** 56:24 61:23
62:2,15,18,19,25
**globalization** 63:1
**globally** 62:17
**go** 4:20 9:24 16:4
17:1 22:21 34:18
56:21 60:14 61:8
61:16 62:7 63:13
70:17 75:21 77:18
77:21 79:1,10
81:11 82:2,22
92:10 95:19 97:25
98:10 99:4,10
100:20 103:1
105:12 109:23
111:1 115:15,16
124:20 130:24
132:18 141:25,25
143:23 150:11
175:4 185:8
188:22
**goes** 75:2 81:6
98:21,22 127:24
127:25
**going** 4:11 19:6
26:6,8 40:22 43:9
49:5 50:3 56:13
61:1 69:11 78:4
78:18 79:22 81:20

82:6 86:11 95:16
96:8,11 101:19
102:14,18,22
104:15 111:1
113:2 114:20
115:13,17 116:16
126:5,15,21,22
128:20,23 130:23
140:1,15 143:2
151:21 156:8,19
163:13 171:17
180:20,22 185:21
185:23 188:2
193:4 204:18
206:16
**good** 4:10 6:2,3
39:20 65:5 67:20
68:2,4,7,11 138:23
147:15 161:1
169:5 182:8 193:6
196:18,19,21
**goodwill** 159:9
**gould** 2:3 4:4 5:2
5:15
**granular** 69:11
72:13
**great** 9:1 66:13
**greater** 128:19
142:7,19
**gross** 32:23 34:10
83:10,12 91:15,25
92:25 93:11,13,20
93:22 94:9 95:14
95:15 100:1 101:8
109:16 113:3,5
116:18 120:5
122:13,21,23
125:5 127:23,24
128:8 130:3,5,9
131:10,22 132:9
134:6,9 136:8

137:18 138:6,12
141:3,13,18,22
142:7,11,16,18,20
145:11,21
**ground** 102:10
**group** 7:18 8:10
113:22 203:19
**guess** 94:20
161:23 201:25
**guidance** 78:9
**guidelines** 78:9
**guys** 190:23

### h

**h** 3:5
**half** 31:25
**handing** 91:9
103:9 121:25
131:12 136:20
145:10
**hands** 150:18
**happen** 95:18,19
**happened** 83:22
125:16 143:3
178:14
**happening** 100:23
**happens** 104:13
**happy** 110:1,25
196:19
**hard** 110:10
187:13,14,19
199:25
**harkin** 50:24
123:17 127:11
133:25 134:18
205:9,10,19
**harkin's** 131:2
133:9,19
**head** 57:12 61:7
173:2
**header** 48:11

**headers** 105:13
**hear** 42:6 102:6
**heard** 39:5 76:15
**hearing** 13:4
67:18
**heather** 2:6 5:14
82:14
**held** 5:1 8:12
**helen** 204:4
**help** 20:8 39:14
105:7,9 149:14
163:25 166:24
167:7 182:1,8
187:8,25
**helped** 155:16
156:18 180:10
193:20
**helpful** 20:11 23:9
39:14 49:16 80:1
80:4 109:25
110:21 111:2,3
116:2 124:8 152:8
175:13 184:16
185:14 203:8
204:13
**helping** 179:23
**helps** 92:10 153:16
**hennepin** 208:3
**hereto** 208:11
**hey** 11:19 39:19
45:1 75:18 87:11
106:7 124:4
143:10 155:25
157:14,22 161:16
171:16 185:9
186:6 190:20,24
193:8 196:18
203:3 206:9
**high** 6:7 54:12
174:4

**highest** 60:16
180:12
**highlight** 49:14
201:17
**highly** 58:19
**historical** 38:11
**history** 54:21
**hit** 98:7
**hkliebenstein** 2:5
**hm** 119:22
**holding** 167:10
**holistic** 80:7
**holistically** 79:16
**homegrown**
188:24
**hope** 153:16
**hopefully** 203:7
**hoping** 203:21
**hour** 40:22 81:20
180:20
**hours** 199:8
**house** 82:16
**houston** 201:9
**human** 80:23
187:11
**hundred** 165:9,10
**hypothetical**
149:22 150:3,5,9
150:24 151:1,4,5,7
152:3,19 168:17
**hypothetically**
170:6

### i

**iannuzzi** 38:3,18
38:19 186:5,21
187:16 188:5
189:13,14 190:19
190:24 192:7,23
**ibm** 188:17,21
189:1,8

**idea** 130:11 150:9
150:11 175:20
183:25 185:20
**ideas** 184:20,22
**identical** 32:17
**identification** 4:9
91:7 102:17 103:6
140:20
**identified** 25:23
26:18 28:25 46:25
47:15 84:7 85:13
86:4,9 87:1,20
88:5 89:18 91:16
94:1 105:5 107:7
107:9 108:7
131:21 137:20
149:3,8 155:10,12
155:13 194:22,24
195:13 197:15
201:12
**identifies** 88:7,10
90:9
**identify** 5:12
11:14 13:23 29:19
39:9 43:23 44:19
55:15 57:17 58:21
62:1 63:8 105:15
108:7,10 125:22
135:3 185:1
188:17 190:17
194:2,16 195:6
**identifying** 83:12
86:10 88:1,2
**ignores** 158:7
**illustrate** 157:10
**immediately** 83:7
**impact** 49:15
62:24 85:21
**implemented**
192:3

implicit  160:8
important  24:8,11
  35:1 64:22 65:4,9
  65:13,20 171:2
improve  67:5
inappropriate
  87:24
inclined  61:1
include  48:25
  124:21 125:5
  145:22 175:2
  176:1,9 199:24
included  49:10
  96:15 98:13 107:9
  108:13 113:4
  114:9 123:18
  124:12 129:4
  133:12 136:11
  170:16 191:15
  195:15 209:13
includes  48:13
  80:21 95:7 96:1
  125:2 136:2 146:7
  184:22 200:1
including  7:7,12
  38:10,18 91:17
  152:19 159:3
inclusive  98:19
income  31:9,10,15
  45:5 60:20,25
  109:21 121:15,16
  129:21 135:3
  136:12 174:19,23
  179:6 181:7,20
  182:9 183:18
  184:11 194:1,3,10
  194:17,24,25
incomplete  78:5
  79:22
incorporate  50:5
  190:11

incorporated  25:6
  211:12
increased  191:10
increases  194:11
incremental  44:21
  45:6,10,11,16,19
  45:20,22 174:18
  179:6 191:3
  194:10,25
incurred  125:13
  125:15 127:3
  128:3 129:1 133:2
  192:24 193:2
incurring  190:20
  191:5
incurs  84:1,3
independent  51:2
  51:7,8
independently
  27:3 68:11
indiana  1:9
indicating  49:8
  50:13,18 209:13
indication  31:5
indicator  97:7
individual  71:2
individually  71:9
industries  68:12
industry  8:23,25
  31:14 45:14 53:23
  54:18 56:7 64:6
  64:16 65:24 66:7
  113:10,11 117:19
  117:22 118:1
  149:14 151:25
  152:1 155:17
  158:8 159:11
  161:2,9 197:2
infection  81:1
inflated  31:24
  47:7

inform  183:14
  193:25
information  39:10
  52:21 54:5 55:7
  55:18 70:4 71:17
  72:15 80:25 81:6
  81:8,16 83:18,21
  92:19 94:5 95:13
  95:17 96:8 98:9
  98:17,18 100:25
  101:23 105:15
  106:11 108:4,20
  109:17,24 110:5
  113:14,21 114:3,4
  123:25,25 126:10
  127:1 130:4
  134:13 136:13
  142:4,10,13
  143:11,16,20,22
  144:23 146:1,12
  147:1,5,10,24
  148:13 149:12,15
  150:20 159:3,24
  170:1,11 189:1
  197:18 203:5
  204:21 205:12,14
  205:16 206:12
informative
  183:19 193:25
informed  43:24
  157:21
infrastructure
  56:24 61:9,13,15
  61:21 130:25
infringe  50:11
infringement  10:8
  16:21 17:14,24
  18:14 21:11,18
  25:2,14 28:14,20
  29:22 48:8 154:5
  163:11,20 168:1

168:25 169:19
  183:17 198:21
infringer  16:20
  21:10,17
infringes  48:3,3
infringing  47:22
ingredient  175:16
initial  87:9
initiating  172:11
inputs  31:13
inquired  148:1
insight  74:23
  162:12
insights  183:4,6
instance  98:1
instances  15:12,15
  75:14 96:11 97:22
  98:14 107:4,5,7
  109:18 156:14
  157:12 182:16
  186:25 188:5,7
instruction  199:24
instructive  155:24
  157:15 158:12
  161:16,21 163:14
  181:21 183:9
  184:17 185:22
  187:5
insurance  1:9,9
  4:24 8:23,25 9:1
  32:9 54:18 59:22
  62:18 64:6,19
  66:7,20 67:1,20
  93:1 126:13,14
  128:5,11,14,22
  130:21,22 209:6
  210:3 211:3
insure  12:24
insured  59:21 66:9
  66:10,11

**intangible** 6:16 17:3 150:16 176:5
**integration** 8:1 59:3
**intellectual** 6:16 17:3
**intent** 70:7
**interaction** 87:17
**interactions** 166:8
**interchangeably** 20:23
**interest** 109:25
**interested** 5:10 63:25 64:3 152:13 158:24 168:14 208:11
**interesting** 169:14
**interface** 52:11
**interfere** 4:17
**interference** 4:15
**international** 121:18
**internet** 51:23 52:2
**interpret** 105:14
**interpretation** 49:24
**interpreted** 133:15
**interrelated** 45:5
**interrelationships** 68:9
**interrogatories** 91:17 101:20,22 106:7
**interrogatory** 3:8 91:11 92:2,5,18,25 93:10,21 94:23 95:5,25 96:15,21 99:12 100:2,8,12 100:14 101:7,14

102:3,12 106:13 108:12,16,17,21 109:2,4,12 110:8 110:15 114:13,15 122:22,24 134:8 134:14 138:7,11 138:21,24 141:2 141:13,19,23 142:4,5,8,12,20 145:15 205:13
**interview** 71:21 113:8 201:20
**interviewed** 35:5 37:25 44:22 65:2 205:19
**interviews** 41:2
**intrinsic** 152:12 152:14 161:24 173:7,14,17,22,24 174:1,5,11,16 175:1,5,8,21 176:1 176:7,25 177:12 177:23 178:21,24 179:9,10 181:10 194:5
**intrinsically** 153:4
**introduced** 203:3
**investigating** 39:18
**investigation** 40:5 89:11
**investment** 7:18 66:25
**involved** 7:5 11:23 83:20 195:15,15
**involves** 44:14
**involving** 201:9
**irrelevant** 13:2
**isaac** 1:6 4:23 209:6 210:3 211:3

**issue** 28:6 32:24 34:11 39:19 49:15 63:24 71:11 74:3 74:4 75:18 77:11 78:16 79:6 81:7 83:13 86:5 92:14 95:24 99:24 106:16 110:16 115:11 116:19 124:14 138:23,25 139:1,6,19 153:20 163:13,25 167:1 169:1 185:16
**issued** 108:4
**issues** 6:9 7:6 12:18 75:4 84:18 102:7 138:9 157:20 184:17
**italicized** 12:6
**item** 129:3,4
**items** 176:19

**j**

**jackie** 1:25 5:7
**jacqueline** 208:5 208:19
**james** 2:17
**jennifer** 206:22
**jerd** 206:14,15
**jim** 82:16
**job** 49:14 66:11,22 67:5 76:1 92:12 113:19 153:23 168:18 196:18,20 196:21
**judge** 39:23 80:12 80:12
**judges** 79:5
**judgment** 14:23
**judgments** 95:11
**july** 208:16 209:4

**june** 1:25 4:5,12 200:14,20,21,23
**jurisdiction** 78:14
**justifiable** 157:3

**k**

**keep** 92:17 95:13 140:1 143:10 165:17 206:10
**kept** 96:6 146:2,8 146:13,17 147:7
**kevin** 205:9
**kind** 9:2 33:24 42:23 50:12 52:15 81:10 92:19 94:6 118:13 126:8 142:13 143:13 156:17 171:7 185:20 188:23 190:25 196:16 199:25 202:15,16 202:21
**kliebenstein** 2:6 3:3 5:14,14 6:1 10:23 11:8 13:3 13:12 14:3,10,18 15:14 16:9,14 18:18 19:24,25 21:23 22:15,19,22 23:2 33:18,23 34:17 35:16 36:9 36:14 37:3,4 40:23,25 43:6,17 73:13,16,18 74:6 76:25 77:1,17 81:23 82:1,5,19,21 90:7,15,20 91:8 94:21 102:14,18 102:21,24 103:4,7 104:5,9,17 105:11 112:25 113:1 114:17 115:3

133:21,23 140:25
151:23 152:6
155:9 167:19,20
168:7,22 170:12
177:12,15 180:21
181:5 197:1,13
198:15,17 200:24
207:13
**knew** 66:4 90:11
179:16 180:7
189:4
**know** 14:16 15:8
18:2,2 34:1 37:22
39:19 40:5 53:17
53:22 54:1,9
55:20,21,24 56:4
56:22 57:20 58:13
67:10 68:20 69:7
69:12 71:9 72:7
72:12 78:4,6,24,24
79:3,5 80:2 82:15
83:7 87:7,12
89:23 93:12 96:14
100:5 101:2,16
102:9 103:17
104:6,25 108:6,9
108:13,25 110:6
111:10 113:19,24
116:8 118:17
124:19,25 127:2,2
127:15 129:7,24
132:19 137:9
140:12 141:10,11
145:20 148:24
154:14,15 155:7
156:1 158:14,20
159:4,13,15,17,20
159:22 160:6
162:11 164:19
168:5,8 169:1,9,24
172:18,19,21,22

172:24,25 173:3
173:21 174:10,18
176:14 179:9,16
179:20 183:10,24
184:6,15 186:13
187:18 188:20
189:5,15,25 190:5
190:7,13 191:22
191:23 192:1,4,6
192:14,16,19
193:6 196:23
197:5,17,19,21
198:4,22 199:6,10
200:8,9,12,22
201:3,6 204:12
**knowing** 178:12
178:14
**knowledge** 38:10
42:16 150:20
186:8
**kursh** 24:15 35:5,6
44:22 159:2 160:9
199:1,4
**kyle** 2:22 5:5

**l**

**l** 7:16 66:16
**la** 128:2
**lack** 28:24 47:18
93:9 160:25
161:24
**lae** 125:13,14
127:3 128:3
**laid** 46:10,11
122:12
**language** 75:13,13
**laptop** 104:2
**large** 171:25
**largely** 119:13
**larger** 120:4 159:5
164:18

**late** 149:5 159:22
**law** 5:17 11:22
12:20 19:9 75:16
77:3,25 78:7
80:11 175:10,18
183:16,19 184:3,9
184:20
**lawns** 90:24 91:3
**laws** 184:16
**lawsuit** 51:3
111:18 124:14
172:6,9
**lawyer** 10:22
11:10 12:17 75:19
183:20 184:24
**lawyers** 78:12
**lay** 52:22 85:7
184:2,8
**lead** 34:13,15
35:14 113:14
**leads** 171:7
**learn** 48:20 64:25
65:3,22,23 66:6,12
67:11,11,14
202:17
**learned** 40:6 65:19
70:19
**leave** 44:16 45:2
139:5 169:9
**leaving** 39:11
40:18
**led** 40:15
**left** 105:18
**legacy** 125:6
**legal** 5:5,8 10:16
11:4 12:15 14:15
15:7 16:1 21:19
25:11 46:13 73:9
73:23 74:2 75:4
75:18,20 76:4,22
77:2,11 79:2

184:10 209:1
212:1
**lemon** 13:10
**length** 30:18 59:5
84:20 123:22
125:24 151:14
155:3 179:20
**lengthy** 101:15,17
202:25
**lens** 78:20 79:20
80:6
**letter** 209:19
**level** 6:8 19:14
31:22 32:9,10
36:21,25 37:8,10
37:11 60:16 115:7
121:13 135:4
174:4
**levels** 198:20
**liability** 6:10 9:7
34:22 48:2 49:7
151:12 154:7
**liable** 167:25
168:24 169:18
**license** 9:11 21:25
24:9,11 154:2,5,12
155:1 156:17
157:1 158:14,15
162:19 164:5,24
165:8,11 167:13
170:15,16 171:4
171:11,20 172:25
175:12 176:10,11
179:2 191:8,16,18
192:20 195:9
196:3,10 197:9
**licensed** 8:2 27:7
161:25
**licensee** 159:13
183:7 195:17

**licensees** 154:21
164:25 165:25
183:8 195:21
197:15
**licenses** 129:9
154:20 160:6
163:12 164:15
165:1,22,23,24
195:9,13
**licensing** 6:18,21
6:23 7:3,6,10,12
7:12 150:23
155:18 160:10
165:2,7
**licensor** 196:2
**light** 50:9
**lightly** 78:17
**limit** 154:23
**line** 15:11 20:2
43:18 117:11
129:3,4 164:25
165:25 209:13
211:7 212:3
**link** 111:9
**linked** 88:13
**list** 39:9 43:22
50:17 56:12,17,21
70:7 96:21 148:22
153:12 157:2
173:21 174:10,15
174:20 192:12
200:4 202:8,24
204:13
**listed** 49:22 57:19
68:16 69:22 71:23
80:16 93:12 100:2
100:3 109:2 211:7
211:17
**listened** 203:19
**listing** 211:7

**literally** 42:14
65:23
**literature** 70:1
**litigation** 6:25
123:7,13 146:6,11
150:15
**little** 8:7 25:16
33:11 39:12 49:25
69:2 71:20 74:23
84:24 122:19
126:1 155:17
161:2 162:7
165:18 168:5,18
176:24 193:11
197:17 199:18
205:10 206:24
**lived** 101:18
**lloyd's** 65:1,14
67:6
**located** 5:2
**london** 65:1,14
67:7
**long** 8:25 34:13,19
54:21 89:3 140:12
159:8 190:3 202:9
203:7
**longer** 8:7 85:10
**look** 35:12 36:5
40:2,12 48:11
74:22 75:3,24
78:2 79:12,16,20
83:4 89:3 95:13
97:18 98:25
100:20 102:25
104:22 112:5
118:23 120:1
124:18 126:8
129:16 132:11,16
133:14 138:2
139:9 143:10
148:10 158:16

164:19,21 169:10
169:11 170:22
174:17 179:7
180:2 190:20,24
193:18,21 196:18
206:17
**looked** 51:18
52:11 85:25
122:22 126:10
173:9 199:15
**looking** 17:5,7
23:4 30:18 37:20
49:19 51:24 52:9
78:3 79:15 89:20
93:20 94:7 103:13
104:1,20 105:2,9
108:24,24 109:15
121:13,15 123:1
131:18 132:9
146:24 158:16,23
169:9 170:11
171:9 172:14
173:17
**looks** 105:1
**lookup** 186:1,11
186:14,19
**loop** 160:21
**lose** 156:8 188:4
**loss** 117:15 118:8
119:8,9,10 120:11
120:12,16,19,23
121:1,5 127:7,25
128:11,16,23
140:8 144:12
146:24 148:15
149:19
**losses** 125:12,13
125:13,14,18
126:15,16,23
127:3,6,21,22
128:2,8,19 133:2

133:12 135:16
140:4 144:15
147:2,18,20
**lost** 9:11 21:25
23:15,16 93:17
175:12 183:18
**lot** 22:2 38:21 41:6
42:3 44:14 66:20
67:1 79:3,4 81:24
157:8 170:3
194:18 201:14
202:13
**lower** 118:15
**lunch** 82:3 112:18
114:18,22 115:19
122:23

**m**

**madam** 209:10
**mail** 2:5,11
**main** 28:15 194:19
**maintain** 56:23
59:7,10,18
**maintenance**
157:18 158:4
161:10 163:6
172:22 176:2,3
191:23 192:5
**major** 126:14
**making** 10:21 11:7
24:20 39:13 49:4
49:7 64:23 75:14
75:16 76:2 82:17
95:10 100:21
111:18 157:15
172:2 179:22
187:7,11
**manage** 89:4
127:20 128:25
130:23
**managed** 80:23
89:12 138:3

145:18 146:25
149:17
**management**
55:10,13 58:25
80:22 189:2
**managing** 64:18
66:23 131:1
**manifest** 31:17
45:7 165:6
**manpower** 191:11
**manual** 185:25
186:2,11,14,19
**manually** 31:2
186:25
**manuals** 186:1
**map** 111:16
**margin** 117:1,2,3
**mark** 77:16
102:18
**marked** 3:14 4:8
9:17 91:6,9
102:16 103:5,10
122:1 131:13
136:20 140:19
145:10
**market** 31:13,17
32:4 45:5,8 47:4
60:23 65:1,22
150:10,17 152:23
153:11 174:20
177:2,23 180:11
181:7,20 182:9
184:11 185:22,24
195:5,7
**marketing** 51:19
51:20 52:24 55:1
69:25 174:22
176:11 195:16,22
196:7,23
**marketplace**
152:16 159:11

161:17 177:7
178:7
**marks** 43:14 82:11
114:25 140:22
181:2 207:17
**match** 92:21
112:10 114:15
130:12,14 132:1
134:13 135:18
148:7,8 174:19
**matched** 118:20
120:2,6
**matches** 129:17
**material** 4:8 22:24
91:6 102:16 103:5
140:19 192:23
**materials** 51:3,19
51:20 52:12,23,24
148:20
**math** 20:13 118:3
**matrix** 198:2
**matter** 4:23 8:25
**matters** 8:24
48:19 208:7
**maze** 98:6
**mccarter** 35:6
44:23 69:15,21
70:11,19 71:18
73:5 185:9 186:3
187:14 188:6
189:11
**mccarthy** 113:8
113:13,14,17
114:2 207:3
**mckone** 1:25 5:7
208:5,19
**mean** 14:12,22
15:24 16:17,17
20:4 33:24 37:9
45:11,15 46:1,11
46:13,13,14 57:16

57:20 58:5 61:14
61:15 65:22 69:7
69:22 77:14 79:14
79:19 80:5 84:9
84:13,14,15 87:20
89:8 93:16 107:3
110:2 111:17
121:19 129:15
134:24 135:19
141:15 145:24
146:18,23 154:14
158:22 164:7
166:17 172:8,16
173:24 174:6
181:11,24 182:1
185:21 187:24
199:18
**meaning** 78:3
144:19 205:20
**means** 14:24 16:10
20:6 45:21 128:10
145:5
**meant** 70:2 90:11
141:7 145:2
147:13
**measure** 24:23
31:19 39:16 45:6
45:18 46:4 72:24
126:5 143:9 175:7
182:19 194:4
202:11,11
**measured** 177:23
**measures** 57:10
**measuring** 64:5
178:21
**media** 4:21 43:14
82:11 114:25
140:22 181:2
**medium** 171:24
**memorialization**
67:15

**memorize** 67:12
**memorized** 53:21
**memory** 10:14,17
53:9 57:9 91:21
125:9 134:21
139:22
**mencke** 204:4,4,23
**mention** 55:10
**mentioned** 6:24
45:10 65:14,16
66:17 79:12 80:15
82:15 86:22 87:18
89:19 146:21
149:6 194:20
**menu** 151:21
**merchant** 2:3 4:3
5:2,15
**merchantgould.c...**
2:5
**met** 178:11
**methodology**
133:1,6
**metric** 119:16,17
**microphones** 4:13
4:17
**middle** 85:10
**midwest** 209:17
212:1
**million** 8:20 117:9
117:10 162:18,21
171:19 197:20
**mind** 34:20 38:22
39:11,18 45:1
52:3 64:15 74:19
81:6,21 89:24
142:23 143:2
144:5 170:11
175:3
**mindset** 151:12
152:4 168:9,13

**mindsets** 151:9 152:21 153:3
**mine** 104:13
**minneapolis** 2:4 2:10 4:4 5:3 6:4
**minnesota** 1:2 2:4 2:10 4:5 5:1,3 208:1,5
**minus** 119:10
**minute** 139:25
**minutes** 40:24 82:3
**mischaracterized** 150:2
**misleading** 13:2 42:25 101:4
**misnomer** 168:18
**missed** 47:16 70:14,15 77:15
**missing** 76:8
**misstates** 19:18 33:16 151:17
**mistaken** 138:19
**misunderstanding** 150:4
**misused** 163:10
**mix** 42:24 65:7
**model** 45:24 46:1 46:2,3,5,6,7,11,14
**modification** 147:19 148:5
**modified** 188:9
**modify** 147:22
**modifying** 28:5
**modules** 25:22
**moment** 52:12 186:22 192:12
**money** 64:9 66:20 67:1 158:2
**months** 120:3 190:6 207:1

**morning** 4:10 6:2 6:3
**move** 89:5,12 112:17 121:9,25 129:1 131:5 144:11 145:8 153:16 180:8
**moving** 8:3 15:20 25:1 53:10 132:24 135:20 169:8 170:5 172:4 187:24 198:2,12
**multiple** 65:10 95:22,24 106:24 106:25 107:1,5 109:18 113:5 114:10 151:16 168:2 182:23 203:1 204:1 206:1 206:20
**myopic** 78:5
**myopically** 101:12

**n**

**n** 3:1 4:1
**name** 5:5 7:15 23:13 41:19 209:6 210:3,4,15 211:3,4 211:21
**named** 23:20,23 24:10,17 73:7,21 158:20 170:14,21 171:11,17,22
**names** 81:14 202:24 206:16
**nancy** 203:16,23
**narratives** 29:25
**narrow** 49:25 80:6
**narrower** 88:8,9
**narrowly** 89:21
**native** 3:10,17,19 3:21,23 103:8

106:9 138:13
**natural** 40:20
**nature** 38:1 90:13 90:16 167:5 195:23 203:2
**near** 167:9
**necessarily** 97:17 98:15
**need** 15:8 20:12 32:18 40:5 50:11 63:22 64:8 68:20 69:1,12 74:18 79:6,16 80:5 85:3 86:11 88:3 89:2 95:19 101:10 105:21 106:7 109:15 124:1 127:16 170:8 176:21 188:8
**needing** 11:15
**needs** 14:24 20:9 26:9,15 84:20 94:5 129:13 134:3 145:1,3 154:6 184:4 197:10
**negotiate** 151:14 180:12
**negotiated** 150:13
**negotiating** 167:21 179:11
**negotiation** 3:16 149:22 150:3,6,9 150:24 151:2,6,7 152:3,20 168:17 178:19
**negotiations** 162:3 162:9,13,16,24 163:12,15,24 166:2,11,12,14 167:4 168:10 170:18 179:21

180:14 195:10
**neither** 107:23 208:9
**net** 117:14 134:18 134:19 135:1
**never** 164:10 165:7
**new** 151:14 193:3
**nexus** 11:15 12:4 12:22,24 14:11,22 14:24 20:3,4,15,16 20:18,19,24,25 21:2,5 29:6 125:23 164:1,9,11 167:2 184:4,18,21 184:23
**nice** 181:25 182:1
**non** 181:23
**normal** 85:7 135:13
**north** 7:19 8:10,16 8:19 121:21 128:6
**notarized** 209:14
**notary** 208:5,15 209:25 210:10,18 211:15,23 212:23
**note** 4:13 82:17 83:4 209:12
**notes** 208:8
**nothing's** 28:25
**notice** 4:6
**noticing** 208:13
**nuances** 11:22
**null** 28:25 29:11 29:14,16,19 44:25 46:24
**number** 1:4 27:10 27:14 28:5 29:10 29:10 53:20 54:11 55:5 58:14 62:4,7 92:6 93:11,21

94:13,14,22,23
95:6,11 96:1
99:12 100:2 102:3
105:4,17 106:24
107:1,2,5,7,8
108:21 109:2
110:15,19 116:22
116:24 119:9
120:2,6 122:15,22
122:25 131:21
132:4 133:19
138:20 157:5,6
158:11 160:18
161:12 162:20
171:19 178:24
185:6 197:20
199:8 209:7,13
**numbers**  17:19
25:25 26:1,7 50:6
82:25 83:1 91:11
92:23,24 111:7
112:4 115:10
116:11 117:8
118:4 124:23
132:12,13 135:18
139:13,14 148:7
156:21 163:1
167:8 211:7

**o**

**o**  4:1
**oath**  5:9,23 79:9
**object**  10:15 13:9
14:14 15:6,25
76:21 151:16
**objection**  11:3
12:14 13:25 14:5
14:6 16:12 18:15
19:18 21:19 33:15
33:20 73:9,22
74:1 77:9 152:5
155:6 167:15

168:2,11 169:20
197:3 200:17
**objections**  92:13
92:22 95:1
**objective**  156:10
**obligation**  11:25
12:23
**observation**
155:21 197:2
**observed**  63:1
87:13
**obtain**  59:22
**occurred**  48:24
83:16 154:6 193:1
**occurring**  109:19
**occurs**  110:20
**odds**  128:15
**odm**  188:21
**offer**  26:7 48:1
74:4 161:18
**offered**  180:9
**offering**  6:11
67:20 68:4 75:20
76:4 168:12
184:10
**offerings**  56:25
63:4,6,10,18,20,22
64:10,12 65:7
**offers**  167:14,23
**official**  210:15
211:21
**oh**  22:21 40:1
103:23 117:8
122:19 131:17,20
135:24 138:19
141:15 142:25
185:8 190:15
197:25
**ohio**  209:2
**okay**  10:7,24 14:4
17:9 18:19 19:5

19:16,24 22:6
24:4 28:4 32:22
36:11,16 37:1
42:6 43:5,6,21
53:11 58:9 66:17
68:15 70:18 73:15
81:19 82:23 83:9
91:5 92:3 93:6
94:8 103:3,21
104:19 112:19
115:14 116:7,14
116:17 118:24
119:11 121:3,9,10
121:12,25 122:20
131:6,17,18
132:24 135:21
136:22 139:25
140:2,13,14
141:10 145:9
148:9,12 162:6,8
173:21 182:13
198:7 199:6
**old**  44:13
**oldest**  54:3
**once**  64:24 107:10
107:13 110:20
112:4,6
**ones**  71:10 84:11
108:15 155:11
**open**  34:20 39:18
45:1,2 170:11
177:2,23
**operate**  62:17,22
135:14
**operates**  56:7
**operating**  167:24
**opine**  30:4 77:3
**opinion**  17:9,18,21
18:4 22:10 23:18
23:19 24:4 30:11
32:22 33:14 34:8

37:19 44:7,23
46:18 47:21,24
54:6 55:17,21
58:15 59:8,16
60:7 61:9 62:14
63:5,16 64:10
67:23 68:17,23
69:3 70:23 71:5
73:6,19 74:18
76:4 79:7 80:8
127:13 149:20
155:14 160:14
167:11,22 168:8
168:12 174:25
184:10
**opinions**  9:6 18:10
22:9 24:15 30:9
48:2,7 69:19,20
74:4 75:20 84:23
102:2,4,8,10,13
120:20 149:10
154:1 160:16
162:10 169:23
186:2
**opportunities**
31:10,11
**opportunity**  66:13
67:4
**opposed**  31:21
32:7 67:14 84:25
90:6 98:19 99:7
148:4 158:19
**opposite**  88:20,25
89:8 119:9
**option**  161:19
170:20,21 171:9
183:8
**options**  3:16 156:2
157:23 179:1,17
185:10,23

**oracle** 155:24
156:13 157:13,21
157:22,25 159:3
160:22 161:5,13
172:4 188:18
189:1,8 197:25
198:1,1
**order** 142:2
187:25 195:20
**ordering** 208:13
**ordinary** 56:10
74:12 75:1 92:21
114:16 123:4,6,10
123:14 124:3,6,7
124:15 125:17
127:8,20 131:23
132:1,16,23
134:12 136:18
137:23 138:3
139:3 143:11
144:21,22 145:18
146:2,8,13,15,17
146:22 147:7
164:10 181:17
190:25 195:1
206:11
**org** 97:20
**organically**
190:25 192:4
**organization**
40:16
**organizational**
80:23 81:15
**organized** 38:25
**original** 170:20
208:8,12
**outcome** 5:11
170:7
**outlandish** 165:13
**outlined** 6:7 9:14
10:19 25:5

**outright** 170:4
**outside** 150:15
**overall** 25:10
118:12 142:14
143:21,22 149:10
156:18
**overinclusive**
94:25 95:3,6,9
96:10 98:19 99:14
99:19,23 143:18
199:19 200:2
**overlap** 12:19
27:19
**overly** 147:7,14
**overreach** 86:6
**overriding** 86:5
**oversimplified**
13:18 14:2
**oversimplifies**
41:10
**oversimplify** 14:4
**overstated** 48:12
**overstatement**
199:20
**owned** 66:9

**p**

**p** 4:1
**p.m.** 114:21,23,23
115:2 140:16,18
140:18,24 180:23
180:25,25 181:4
207:19,21
**page** 3:3,7,8,9,10
3:12,16,17,19,21
3:23 26:24 36:4,5
36:15 43:20,22
48:11 50:21 74:11
75:23 92:10 96:25
103:12,16,19,20
112:19 116:23
122:2,16 146:17

162:14,18 171:16
185:5,7 191:5
198:8,15 209:13
209:15 211:7
212:3
**pages** 10:20
133:19
**paid** 161:22 163:8
173:3 197:16,19
**pandey** 40:3,4,10
50:24 52:14 73:5
201:24 205:23,24
207:6,6
**paper** 102:21
103:2 116:2,13
**paragraph** 12:5,6
16:3 20:1 25:24
26:18 37:24 53:10
69:14,23 71:25
75:24 82:22 83:25
84:9 85:6,10,24,25
86:20,21 90:5
112:17,19,20
113:2 115:23
133:19 162:5
170:13,13 187:25
190:9,9,15 198:14
201:12
**paragraphs** 13:20
16:8 17:5,8 54:20
70:10 120:18
190:16
**part** 7:10 22:4
24:14 33:15 35:4
35:5 40:13 41:12
49:14 64:22 65:4
84:22 97:10 98:23
117:24,24 150:1
157:21 168:20
169:7 171:2 178:1
178:2 198:22,24

211:9
**particular** 6:15
37:23 65:25 66:1
99:13 146:10
176:22
**particularly** 63:2
186:5 204:16
**parties** 4:19 5:13
150:13,19 151:9
151:13 152:4,19
153:2,22 156:22
157:7,13 162:2,12
162:13 167:8,21
170:20 171:10,12
172:11 177:3,6,25
178:23 208:9,11
208:13
**parts** 24:7 30:19
201:18
**party** 5:9 169:7
170:4 177:25
179:2 201:9
208:13
**patent** 150:14
153:1
**pay** 155:22 164:18
165:5 166:5
172:22
**paying** 157:25
**payment** 154:6
177:6
**payments** 195:12
**payroll** 81:3
**pays** 174:20
**pc** 5:2
**peer** 7:24
**peers** 148:21,23
149:3,13
**pending** 36:13
**pennsylvania** 1:9

**people** 11:19 35:7
37:25 38:10 39:13
39:25 40:11 42:3
42:15 44:14 51:4
65:2 80:1 85:4
86:6 98:8 129:18
155:21 169:4
170:3 181:17
186:4 187:7
196:10,19 201:17
202:9 203:1 204:1
204:19 206:2,3,21
**people's** 204:14
**percent** 33:13 34:2
34:9 53:17 54:9
55:3,6,15,24 57:4
58:13 60:5 62:1
70:23 117:1,2,3,7
117:9,12,14,15,16
118:6 119:8 120:8
120:9,9,16,24
128:3 157:2
158:10 159:1
165:9,10 170:17
**percentage** 15:5
15:13,15 55:16
56:18,18 57:6,8,18
59:12,13 60:13
63:8,12 71:3
124:19,24 129:23
145:20 165:2,3,24
166:3,3
**percentages**
117:18 138:5
**perform** 168:19
**performing**
147:23 152:10
168:15
**period** 9:23 83:17
89:3 109:13
118:20,21 119:23

143:14 186:9
187:19
**permitted** 87:16
**person** 37:21,23
38:2 39:23 52:22
85:7 100:6 181:13
184:2,9
**personally** 165:19
201:13 210:11
211:15
**perspective** 24:19
34:21 39:17 76:2
76:4,5 107:24
152:1 165:15
169:15 176:25
177:14,22 178:3,5
179:25 180:5,15
187:4
**perspectives**
178:18
**pertinent** 161:6
185:1,17 194:2
195:6
**pervasive** 55:9
**peterson** 2:22 5:5
**phone** 2:4,10
209:3
**phrase** 12:7 15:4
15:17,21 16:8
18:17,21 20:2,4,11
45:16,21 77:4
79:14 84:8 90:2,8
90:11 120:11
168:17
**phrases** 45:12
**pick** 4:14
**pieces** 181:9
**place** 4:16,19 18:1
25:21 130:25
**placed** 154:19

**places** 16:19 17:17
52:3 59:25 192:11
**plain** 143:4
**plaintiff** 1:7 2:7
4:23 5:15 13:8
**plaintiff's** 10:5
11:14 87:11
**plaintiffs** 48:19
**plausible** 68:25
69:9 164:13
182:21
**play** 155:5 176:19
**please** 4:13,15
5:12,18 22:14
143:5 167:18
209:11,11
**plus** 120:3
**point** 23:3 29:8,13
40:21 78:2 101:8
101:10 108:8
150:21 157:4
159:24 160:5
164:3 188:13
189:4
**pointing** 171:13
**points** 45:8 47:5
51:22 126:1
201:18
**policies** 53:14,19
93:1 96:1,14,22
97:11,13 108:7,13
108:25 113:4
114:10 123:18
124:13,19 128:18
128:19 135:2
145:21
**policy** 32:9 95:21
96:21 97:23 98:11
98:21 105:17,23
106:24 107:1,2,5,6
107:8,13 108:20

109:19 110:19,19
111:7,10 112:4,5
128:20
**polite** 33:7 164:7
196:21
**poll** 134:25
**portion** 84:4
119:15,16
**posited** 111:22
**position** 39:22
48:15,17 95:25
101:6 154:18
**positions** 8:12,13
**possibilities** 169:3
169:25 170:9
**possibility** 45:2
96:3
**possible** 21:1
44:16 58:21 87:5
98:10 124:15
172:6,9 182:19
201:7
**potential** 165:25
176:11,16
**potentially** 31:1
193:8
**practice** 19:13
158:8
**practices** 155:18
178:11
**practitioner** 12:17
12:23
**pragmatic** 193:7
193:12,13
**preamble** 35:13
**preceding** 120:17
**precise** 15:5
**premium** 92:1
93:21,22 101:9
109:17 113:3,7
116:18 122:13

125:5 127:24
128:9,10,12 130:3
130:5 131:10
132:10 134:6,18
134:19,25 135:2
139:8,16 141:3,14
142:17 145:6,21
premiums 32:24
34:10 83:11,13
91:15 92:25 93:11
93:13 94:10 95:14
95:16 100:2 113:5
117:15 120:5
122:21,24 126:16
126:17 127:23
128:3 129:23
130:9,22,24
131:22 134:9
136:9 137:18
138:6,12 141:19
141:22 142:8,12
142:18,20 145:11
preparation
162:10
prepare 106:2
prepared 56:9
113:25 121:16
123:7 131:25
preparing 9:6
106:14 137:14
presence 56:25
61:24 62:3,16
present 2:16 13:1
82:16 179:14,15
180:3,4,5,17,18
presented 66:14
199:3
presume 9:6
151:11 154:1
presumption
17:10 18:12

presumptions 9:9
9:13,25 11:1,6
pretty 68:12 75:11
78:8 90:23 92:11
112:14
previously 3:14
122:1 131:12
price 56:25 63:4,9
63:25 150:18
157:2 180:11,12
prices 63:6,18
153:12 155:21
164:14 165:24
173:22 174:10,16
174:20
pricing 41:23
63:24 164:24
198:2,5
primarily 6:17
28:4 206:4 207:6
primary 145:5
principally 53:13
principle 86:7,16
150:10 183:10
196:17
principles 67:14
67:15,16,18 78:11
84:25 151:25
153:7 174:13
179:14 180:16,18
183:22
printout 146:10
prior 14:19 44:2
84:19 123:21
207:1
private 4:14
probably 46:24
60:11 61:1 67:8
68:11,20 70:15
137:16 158:12,16
158:22 196:22

201:1 204:1
problem 47:17
61:8 66:3 78:19
79:1,10,23 80:13
93:25,25 125:23
151:3 153:5,9
173:11 188:16
problematic 49:13
126:4
problems 66:6,18
66:19 203:4
procedure 186:1
186:11,15,19
210:5 211:5
proceed 5:19
110:25
proceeded 50:9
proceeds 48:18
process 38:8,9,24
39:1 40:7,9,9,12
40:14 41:13,14,15
42:11,12,13 64:23
72:15 73:3 81:2
83:9,12,20 97:19
97:20,21 98:2,12
98:25 111:15
119:1 147:11
187:6,11 193:19
206:5,10
processes 41:2,16
41:20 42:1,8,18,21
42:23
procuring 64:18
produced 38:23
40:17 52:15 83:19
95:23 98:18
107:20 123:3
140:6 143:15
205:14,18 206:7
206:12

product 32:15,18
52:10 56:25 63:4
63:6,10,17,20,22
64:10,11 65:7
67:19 68:3 136:14
156:1 158:2
188:21 201:22
202:18
production 205:15
209:15,17,22
products 31:3
64:8 65:8,10,20,20
136:15 156:7
173:1 176:12
180:10 185:15
187:23 188:13,14
188:17 189:8,19
192:15
professional 7:9
7:10 14:23 15:3
16:11 173:4
176:12
profit 12:7,11 13:6
15:21 16:23 45:10
116:25,25 117:1,2
117:3 119:7,11
profitability 97:7
profitable 12:7
profits 16:19
17:10,14 21:10,16
23:16 30:11 44:7
44:21 73:7,20
program 67:2
project 153:18
154:8,9 189:22,23
190:4,8 193:16,21
193:24,25
projects 7:8 66:10
66:20
promised 115:18

**proof** 9:10,13 10:1
  11:1,14 12:3 13:5
**proper** 22:11
  23:19 132:6 134:3
**properly** 172:16
**property** 6:16
  17:3 54:18 64:18
  64:19
**proposing** 171:5
**proposition** 69:8
**proprietary** 156:6
**protracted** 143:14
**prove** 12:11 13:5
  49:5 50:3 74:19
**proven** 74:8
**proves** 34:3
**provide** 31:18
  39:15 42:15 46:18
  47:7,21 51:21
  70:7 76:18 96:8
  132:2 147:6
  149:14 155:20
  156:25 161:7
  163:25 167:7
  180:14 197:22
**provided** 14:9
  19:14 50:20 55:7
  71:22 74:13 75:2
  92:19 96:12
  103:22 109:12
  137:4 141:17
  149:12 155:16
  156:12 163:18
  173:12 185:13
  197:11 203:11
  205:8
**provides** 31:4
  92:22 177:7 183:4
  183:5,6 198:19
**providing** 80:7
  117:22 164:12

**province** 79:4
  187:25 194:22
**proving** 11:18
**proxy** 124:24,24
  132:2 145:24
**public** 126:11
  208:5 210:10,18
  211:15,23 212:23
**publication** 53:23
  117:19
**pull** 113:23 123:11
**pulled** 98:8,16
  113:24 114:3,3
**pulling** 202:1
**pulls** 199:23
**purchase** 188:20
**purchased** 65:10
  192:14
**purpose** 65:17,21
  101:3 149:9
**purposes** 74:15
  125:20
**pursuant** 4:6
**put** 23:23 60:19
  84:11 104:14
  129:20 130:24
  132:19 173:10
  181:14 188:1
  196:10,14

## q

**quality** 57:1 68:24
**quantifiable** 28:12
  29:15,16,20
**quantified** 6:14
  17:19 28:9
**quantify** 186:17
**quarrel** 133:8
**queried** 108:6
**queries** 124:1
**query** 123:12
  146:11,20

**question** 9:24
  11:17 13:23 15:17
  17:6 18:10 19:1,6
  19:16,21,22,23
  22:13,18 23:22
  24:4,25 25:11
  33:11,16,22,25
  34:4,13,15 35:14
  36:1,8,9,13,20
  37:1,2 40:2 43:2
  44:9 46:7,15 51:6
  55:6 57:15 61:18
  61:19 66:1 70:14
  70:15 73:13 79:2
  79:3 83:6 88:4
  89:22 93:8 95:8
  96:4 99:4 101:3
  111:21 115:18
  124:11 128:7
  133:22 138:20,23
  141:11,12 151:10
  151:22 161:15
  167:18,21 168:6,6
  169:13 170:10
  174:9 177:18
  178:2 181:23
  182:2,6 195:18
  198:25 199:2
**questioning** 43:19
**questions** 38:1
  56:17 78:12 111:4
  114:1 151:16
  166:10 168:3
  185:9 202:9 203:2
  203:20,20,23
  205:13,21 206:4,8
  207:14
**quicker** 104:8
**quickly** 83:3
**quite** 6:14

**quote** 74:9 76:19

## r

**r** 4:1 7:16 66:16
**raised** 116:20
**ramesh** 40:4
  205:23
**range** 86:8,10,11
  86:13 88:1 89:1
  169:3,24 170:8
**rarely** 32:16
**rate** 208:14
**rating** 59:23
**ratings** 56:23 59:8
  59:10,18 61:5,6
**ratio** 117:16 118:8
  119:8,9,10 120:12
  120:12,16,16,20
  120:23 121:1,5,7
  128:23 137:6
**ratios** 140:8,8
  146:24,24 148:15
  148:16,16 149:19
**reaction** 156:16
**read** 22:23,24
  23:12 58:24
  133:13 149:24
  207:15 210:5,6,12
  211:5,6,17
**reading** 17:25
  80:1 209:19
**ready** 22:16,20
**real** 63:3 153:5
**realistic** 147:13
**really** 25:17 39:22
  39:24 40:6,9,13
  41:9 42:17 46:5,6
  67:2,10 74:2
  77:24 80:4 84:13
  87:13 92:17,21,23
  98:10 134:15
  150:16 151:9

177:3 182:5 187:3
187:6 191:2 193:5
**realtime** 33:19
**reason** 49:11
122:18 139:24
143:6 164:23
209:14 211:8
212:3
**reasonable** 13:1
19:12 86:13
130:20 147:6
150:12,19,20
159:5 160:16
170:6 178:9,15,20
183:18 184:19
187:5 193:9 202:2
**reasonableness**
148:2 149:11
160:15 161:3
**reasoning** 38:5
**reasons** 44:12 59:3
87:5 114:12
145:16 195:2
**rebuttal** 22:8 87:9
**recalculated**
122:11
**recall** 106:1 134:1
134:20 202:2,7
203:23 204:2,23
205:5 206:24
**recap** 54:16
**receipt** 209:18
**receive** 17:12,22
18:12 28:19 144:9
**received** 17:23
18:13
**receiving** 17:15
**recognition** 56:22
58:1,4,10,11,17
**recognize** 18:16
18:21 19:4,8

87:11 104:14
178:11 183:21
**recognized** 49:2
89:22 162:24
**recognizes** 178:6
**recollection** 98:3
118:14 129:10,18
145:6 191:13
207:10
**reconcile** 110:7
182:24
**record** 4:11,20
43:10,14 49:9
82:7,11,18 100:15
108:23 114:25
123:15 127:9,19
140:16,22 146:19
180:23 181:2
207:19 211:9
**recorded** 4:21
124:20
**recording** 4:18
**recordkeeping**
71:16 92:21
**records** 92:17
108:10 111:16
**reduce** 28:15
158:9
**reduced** 156:21
157:6 161:12
194:12
**reducing** 95:11
**reduction** 32:20
**refer** 26:8 85:7
88:15 168:20
**reference** 25:7
52:1 71:25 103:14
190:11 196:22
209:7 210:2 211:2
**referenced** 210:11
211:15

**referencing** 63:21
**referral** 172:19
**referrals** 195:22
**referred** 54:23
172:13 184:7
190:18 191:5
197:9
**referring** 16:3
26:1 32:10,11,21
48:10 52:23 53:15
90:14 93:18
103:16,19,24
109:10 121:7
133:18 136:23
141:20 167:3,5
170:18
**refinement** 59:2
**refinements** 83:17
**reflect** 116:24
**reflected** 29:17
92:22 135:16
147:3,18,20 150:4
156:10 180:13
196:7
**reflects** 31:14
144:22
**refresh** 139:22
**refreshed** 53:9
**regard** 11:24 20:3
30:3 93:10 126:1
127:21 133:3
155:25
**regarded** 58:19
198:1
**regarding** 12:10
23:10 30:11 102:2
109:5,7 131:3,10
133:1,9 147:2
157:18 184:9
**registered** 26:12

**registration** 25:25
26:1
**registrations**
26:13,18
**rejected** 167:23
**relate** 7:6 30:9
47:3 59:4 69:10
70:9 72:14 85:1
89:17 124:10
131:19 167:1
174:18 194:16
**related** 5:9 6:9
20:22 73:4 115:17
143:18 146:1
176:17 184:20
208:9
**relates** 12:17
16:23 21:3 28:13
29:21 47:17 110:3
124:16 143:9
149:10 150:9
158:5 173:19
176:8 190:10
191:10
**relating** 17:9
18:10 34:4 102:8
134:8 186:2
193:15
**relation** 87:2
**relationship** 84:16
86:3 88:23 108:16
135:22 192:17
**relationships**
38:12 54:7,10
55:3 64:21 74:13
75:1 159:8 196:24
**relative** 202:14
208:10
**relatively** 97:22
98:4 206:25

relevancy 163:23
relevant 78:15
  108:10 126:18
  163:7,16 166:18
  167:10 205:12
reliable 19:12
  29:12 33:1,9 34:6
  34:25 47:15 176:4
reliance 199:3
relied 113:3
  189:11 193:13
  204:15 205:16
relies 174:14
rely 182:17
relying 34:24
  71:19 130:16
  160:9 192:7 199:1
remaining 206:16
remedy 175:11
remember 51:25
  53:3 64:20,24
  67:9 127:10,18
  159:25 200:16,21
  201:5,7 203:15
  204:8 205:11
  206:1 207:7
remembering
  65:19
reminded 162:15
remove 48:7
renewals 53:13,18
repeat 22:13,18
  94:17
repeatedly 29:1,2
rephrased 43:2
replace 189:23
replaced 38:7
replacement
  187:10 190:4,8
replacing 191:18
  191:20

replicate 110:11
replicates 25:22
reply 87:10,10
  108:1,5 153:6
  173:10
report 3:7,12 6:7
  9:15,18,20 10:13
  16:8,15 17:7,13
  18:1,22,24 19:4,5
  19:8,15 20:1,5,7
  21:24 22:10 23:5
  23:8,8,12 25:3,7
  25:15,21 27:2,16
  28:18 30:1,4,10,19
  31:7 32:1,22 33:3
  34:23 36:4 43:20
  44:6,6,15 45:4,24
  46:18 47:21 49:20
  54:6 55:11 68:17
  69:14 70:9 73:6
  73:19 74:7,9
  75:11 76:13 77:6
  80:10 83:2 84:12
  86:16 87:7,9,9,10
  87:16 88:6,12
  90:5 91:16 93:23
  94:7 99:25 103:14
  105:6 106:15,17
  107:10 108:1,4,5
  114:6,21 115:5
  117:25 120:14
  123:14,22 124:16
  125:25 127:5
  131:23 136:18
  137:3 139:10,21
  141:5,7 146:5,21
  148:11 149:1,4,25
  153:6 154:17
  157:4 159:23
  160:1 162:2
  165:19 166:12

  173:8,10 174:25
  177:16 178:4
  185:1,4,19 188:25
  188:25 189:6,7,20
  190:17 192:10,22
  194:1,16,18 195:6
  197:24 198:19
  199:3,7,11 201:13
  204:17 205:16,17
  206:18 207:1
reported 92:1,5
  102:3,4 135:15
  144:19
reporter 5:7,18
  22:25 94:16 208:5
  210:7
reporting 79:25
  126:10 132:17
  137:24 146:14
reports 34:23
  54:22 56:9 124:6
  139:3 200:6,13
represent 5:13
  17:20 49:18
  104:20 106:10
  107:19
representation
  9:22 105:2
represented
  162:17
representing 5:17
represents 119:5,7
request 92:20
  106:3 123:12
  143:17 205:18
  211:9,11
requested 92:18
requests 83:15
  100:25 108:12
  123:25 147:12
  205:22

require 62:18
required 19:11
  59:21 84:6 120:21
  121:6 154:2
  209:25
research 40:7 51:7
  51:8,23 52:2 66:1
  78:10 130:20
resolution 172:12
resources 80:23
  191:3
respect 9:10 10:1
  10:7,25 11:2
  29:12 39:4 47:6
  77:16 106:19
  127:22 165:16
  183:2,12
respective 175:24
respond 24:15
  47:11 88:4 92:20
  95:8 106:6 123:24
  152:8 205:13,22
responded 96:13
  167:13
responding 11:6
  23:7 46:2 50:1
  114:14 170:10
response 24:25
  47:5 55:6 83:22
  92:5 93:10,21
  94:22 95:5,25
  96:15 99:12
  101:14 106:12
  108:18 109:4,12
  114:13 123:12
  134:8,14 138:7
responses 83:16
  91:10,16 96:21
  100:8,13,14 101:7
  102:12 110:8
  138:11,21,25

141:3,13,19,23
142:5,5,8,12,21
145:15
**responsibilities**
7:21
**responsibility**
66:4 147:11
**responsible** 7:3
8:1 64:17
**responsive** 22:8
25:19 98:17 99:18
100:24 143:17
153:16 169:13
201:25
**restate** 177:20
**restated** 174:23
**restroom** 43:3
140:10
**result** 76:10
107:14 117:3
177:5 185:11
205:17,18 206:8
**results** 24:20
29:13 31:24 50:13
110:12 186:9
187:19
**retract** 100:17,19
112:16
**returned** 209:18
**revenue** 35:15,23
36:24 37:15 39:7
39:10 42:2,9,20,21
43:25 54:7,9 56:5
56:18 57:14,17,18
58:3 84:2,4,8,17
84:19 85:13 87:2
88:14 89:17 90:3
90:10 92:4,15
96:5 132:20
138:15 165:2,3
194:11,11

**revenues** 8:8,9,14
8:19 11:15,19
12:3 30:20,22,24
33:6 35:10 37:7,9
37:10 38:4,11
39:22 44:7,21
45:10 47:15 53:17
55:3,12,22 57:4
58:10,16 59:4,9,17
60:3,13 61:6,11,20
61:23 62:2,15
63:5,9,17,23 64:11
68:18,23 69:4,10
70:24 71:6 72:20
72:25 77:7,20
84:7,9,10,11,21
85:3 86:4,6,8,8,11
86:12,14 87:23
88:2,3,8,10 89:2,3
89:5,13 90:13,17
91:1,4 96:6 124:3
126:4,20 128:16
132:20 136:17
143:12 164:4,5,13
164:19,25 165:3,5
165:7,25 184:18
202:19
**reverse** 142:2
**review** 127:14
155:15 197:14
201:13 209:12
210:1 211:1
**reviewed** 52:18
197:7 201:16
**reviewing** 51:3
196:5
**rid** 138:14
**right** 6:4 8:5 9:16
11:25 18:24 22:1
22:4 23:25 27:7,9
28:6 33:25 36:18

41:3 43:18 48:9
49:23 54:15 59:13
59:14 62:5 63:11
65:15 67:13,18
74:9 75:7 77:8
79:11,23 93:23
97:1,6 98:20
99:14 105:2
107:12 111:7
114:17,19 117:21
117:24 118:9
119:6,8,19,24
120:25 122:18
123:8 134:10
135:25 138:14
139:4 141:10
145:7,23,24 146:9
153:4,24 159:1
162:3 170:21
172:12 173:6
174:2 177:25
181:6 185:8
187:24 188:2,18
190:18 198:11,16
199:17 207:13,15
**role** 22:8 113:20
155:4 189:17
**roles** 204:14
**roll** 171:19
**rolled** 125:10
**rollup** 121:22
**room** 39:12 40:19
**round** 34:19,19
**rounding** 120:9
**row** 107:6
**royalties** 165:3
**royalty** 183:18,18
**rule** 15:11 89:7
**rules** 52:18 53:1,6
78:3 79:24 80:2
189:2 210:5 211:5

**run** 93:13,16
96:22 97:12 100:3
124:2,13,17
129:17

**s**

**s** 3:5 4:1 7:16
66:16 209:15
211:8,8 212:3
**sacrifice** 193:1
**sacrifices** 192:24
**sake** 169:8 170:5
**sale** 32:9
**sales** 53:12
**sap** 8:2,2
**sat** 202:11
**satisfied** 147:17
**savings** 31:1,12
33:2 179:7 194:11
194:25
**saw** 51:25 55:10
157:12 159:23
189:4 206:12
**saying** 11:5,6
19:21 32:12 50:2
71:5 75:3 93:7,8
95:12 99:6 100:16
103:25 120:1
150:8 153:8
194:21 202:3
**says** 5:22 26:23
46:5 53:12 55:2
117:14 122:15
124:4 141:21
153:10 170:14,23
171:3 191:17
**scenario** 27:24
**schedule** 83:2
139:10,21 141:6
**scheduled** 66:2
**schedules** 9:21
28:9

school 67:12
schraer 205:1
scope 56:25 68:15
   68:18 156:17
   193:22
screen 102:25
   103:11 104:23,25
screenshot 104:21
scrolled 22:22
seal 208:15 210:15
   211:21
second 20:1 24:14
   26:23 31:25 43:4
   58:23 63:24 86:2
   170:13
section 17:7 25:6,8
   25:10 46:12
   109:22 120:15
   185:4
see 10:19 12:5,6
   15:10,12 20:2
   23:9 25:3,10,15
   27:2 37:20,24
   39:24 51:25 52:4
   53:22 57:25 59:23
   61:5 70:10 77:5
   83:3,14 84:22
   85:4 86:5,15 87:8
   94:9,10,13 97:19
   98:1 99:2 103:13
   103:23 105:22
   106:3,21 109:3,15
   109:23 110:17
   113:12 114:8
   116:22 118:10,25
   120:11 122:2,18
   127:5 129:2,16
   132:9,11 137:1
   139:9,20,22 141:6
   152:8 158:16
   166:14 168:4

170:23 179:21
180:15 185:25
198:23 203:6
seeing 54:4 159:4
seeks 197:21
seen 27:5,12 32:25
   33:8,12 34:1,2,5
   34:22 47:2 50:8
   51:14 52:21 53:3
   53:7,20 55:1,7,8
   59:6 60:1 70:3,4,8
   72:13 91:11
   148:21 156:4,11
   160:18 165:1,6,7
   166:1 174:12
   183:23,25 184:1,6
   192:20 193:15
   195:1,24
segment 109:21
   137:4,7 141:17
   142:6,16,19 144:6
segments 128:5
select 94:9 148:18
self 63:21
sell 64:9 150:22
selling 128:10
semi 85:19
seniority 39:24
sense 51:6,9 65:9
   65:12 68:6 76:20
   76:23 89:16 143:4
   150:23 152:7
   156:7 173:25
   193:14
sensitive 4:14
sentence 21:9
   53:12,22 74:11,25
   75:9 141:16,21
   170:13,17 171:3,7
   171:14 191:17

sentences 69:15
   74:23
separate 23:18
   25:2 41:24,24
   51:2 74:15,20
   95:24 123:23
sequence 188:12
sequitur 181:24
series 117:13
   122:12 134:16
   138:1 157:19
serious 100:22
serve 200:6
served 39:2
   200:13
service 57:1 68:22
   68:24 90:25
   172:23
services 65:10
   173:4 176:12
   197:22,23
serving 6:24 22:8
set 15:2 17:13 26:7
   47:15 50:18 81:2
   106:2 108:7,14
   151:8 175:18,19
   181:12
sets 21:8
setting 77:10 80:8
   80:10 87:3
settlement 172:5,8
sheet 209:13 211:7
   211:10,18 212:1
sheets 70:1,2
short 43:11 81:21
   82:1,8 140:17
   180:19,24
shorthand 22:25
   208:5,8
show 21:16 45:7
   49:15 97:21 116:3

149:15 156:25
185:24
shown 21:12 29:5
   74:19 77:12,14
   108:21 115:8
   148:13 209:16
shows 30:16,23
   32:25 33:9,12
   34:6 47:18 49:9
   123:5 163:7
side 8:7 59:2 96:9
sign 200:6 207:16
signals 75:17
signature 208:18
   209:14
signed 200:13
   210:13 211:18
significant 191:3
signing 209:19
similar 69:18
   100:7 142:7,19
   178:14 193:19
sincerely 209:21
single 50:4 98:1,11
   159:15
sir 209:10
sit 62:4 63:11 83:6
   145:6 173:6
sits 203:13 206:6
sitting 9:16 59:14
   110:10 127:18
situation 87:8
   156:3 178:25
sixth 2:9
sizing 198:19
   199:2
skill 15:2 21:7
   26:7 175:18,19
   181:12
skills 6:17

**slightly** 15:16
174:23
**small** 40:13
131:14 171:24
**snip** 103:11
**software** 6:18,20
6:23 7:3,6,12
23:15 30:21 31:6
31:7,17 32:15
38:9,13 40:8
41:25 42:11 71:14
92:16 93:2,15
157:14 158:8
160:10 161:18
163:9 164:11
174:11 176:10,10
177:13 179:2
188:1,21 189:2,18
191:8,18 192:3,15
202:18
**sold** 32:18
**solely** 38:16,19
123:7 132:25
186:3
**solution** 69:17
188:24 189:18
**solutions** 5:6,8
161:20 209:1
212:1
**solve** 66:3 79:4
80:13 93:25 203:4
**solving** 61:8 79:1
188:15
**somebody** 43:2
84:23 99:5 181:13
190:1 204:15
**somebody's**
168:13
**somewhat** 185:21
**son** 81:12

**sorry** 70:2
**sort** 11:17 20:10
23:15 26:16 31:20
32:5 34:24 38:11
39:15,17 45:6
47:4 49:12 50:17
51:22 52:1 69:22
76:11 87:17 93:3
93:7 94:20 98:5
99:15 105:6
110:18,23 111:5,5
111:12,20,23
112:1,1,8 120:21
121:5 126:12
134:15 143:4,8
145:24 148:24
149:17 154:4
159:9 164:9
171:12 178:25
179:23 180:3
181:23 201:25
205:11,14
**sorted** 106:23,25
107:1,6 122:10
**sorts** 106:22
112:10
**sound** 39:13
**sounds** 57:21
135:21 181:25
**source** 37:19
93:24 94:4,24
113:7 122:3,15
123:1 132:24
172:20
**sources** 60:9 65:8
116:1,3
**south** 2:3,9 4:4 5:2
**space** 9:4 148:17
149:16 178:14
**speak** 36:21 91:19
166:8 203:9,16

204:4 205:23
206:23 207:3,9
**speaking** 10:3,6,18
38:6 51:4 72:14
83:20 84:24 91:20
116:11 128:1
129:18 146:12
205:11 206:4
**speaks** 192:10
**special** 124:1
150:14
**specialty** 128:5
**specific** 25:22 26:3
26:15 27:10 29:4
32:12,20 37:21
39:15 44:20 45:22
46:23 47:1,12,12
48:25 54:5,11
55:4 57:6,8 58:13
58:14,22 62:4,7,11
67:11 69:12 70:3
72:12 85:25 100:1
111:4 116:11
117:8 118:4
124:23 134:5
160:18 161:23
166:9 171:23
172:9 173:5,15
174:1 179:6 189:5
192:2 193:5
194:17 207:10
**specifically** 6:22
40:11 47:3 51:25
53:4 64:7 66:19
69:2 72:25 91:22
95:8 118:21
127:17 156:24
192:9 197:18
199:5 204:9,10,15
205:6

**specificity** 161:24
190:5
**specifics** 69:7
197:6
**speculation**
167:16 168:3
**spend** 161:1
**spending** 67:1
**spent** 39:2 66:20
190:7 199:7
**spirit** 153:13
**split** 65:12
**spoke** 39:12 42:3
52:13 70:10 116:4
187:16 190:1
204:19 205:25
206:1,25 207:6
**spoken** 114:7
**spot** 25:15
**spreadsheet** 83:19
**ss** 208:2
**standard** 16:7
75:12 150:23
173:21 174:10,15
178:7
**standards** 19:10
23:11 78:13
**stantucci** 206:22
206:23
**start** 9:10,11 38:2
45:16 157:9
198:18
**starting** 29:23
93:17 101:8,10
121:12 126:1
183:21
**starts** 74:12,25
75:9 132:10 162:5
165:9
**state** 28:18 208:1,5
210:10 211:15

**statement** 56:1,2,3
70:9 75:17 113:2
121:16 136:12
172:1 210:13,14
211:19,19
**statements** 56:8
69:24 80:2 100:19
109:21 121:15
129:21 171:14
187:14 193:13
**states** 1:1 4:25
63:2 74:7 121:11
137:3 192:22
**stating** 33:16
**statistics** 61:4
**stemming** 155:14
**step** 111:5
**steps** 106:18,19
**stick** 67:16 142:24
143:2
**stop** 111:2
**stopping** 40:21
**straight** 78:8
**straightforward**
112:14
**strange** 149:24
**strategy** 67:3
**stream** 84:17,19
85:13 87:2 88:8,9
88:14 90:3,10
91:1 92:5 132:20
138:15
**streams** 91:4
92:15
**street** 2:3,9 4:4 5:3
**strike** 14:20 15:18
17:11 61:10 148:9
154:15
**strong** 55:10,12
56:23 59:8,10,18

**structure** 61:10,12
61:14 124:9
134:17
**struggling** 105:13
111:2,9
**stuck** 67:16
142:23
**studied** 107:12
154:22 155:2
169:1
**studies** 156:12
161:1 195:22
**study** 39:3 71:8
72:17,19,24
107:23 124:18
152:18 154:25
203:22
**studying** 63:25
**stuff** 8:3 40:13
51:24 53:4 65:1
65:12 75:5,7,25
76:6,16,19 77:13
138:14 152:22
190:11 195:1
197:12
**subcategory**
105:25
**subject** 11:15
31:19 32:5 59:7
**subjects** 198:5
**subscribed** 210:10
211:14 212:21
**subset** 143:20
**subsidiary** 7:20
8:16,19
**substance** 24:9,20
27:13 158:18,24
171:15 172:2
**substitute** 20:7
31:3 185:15
187:23

**subtotals** 112:3
**subtract** 88:3
117:6
**subtracted** 85:4
**successful** 164:20
**succinct** 46:24
**sufficient** 147:16
**suggest** 164:8
**suit** 172:11
**suite** 2:3,9 5:3
209:2
**summarize** 170:2
**superior** 209:1
**support** 41:14,15
41:17,21 42:8,19
42:22 54:13,16
55:17 56:1,3,20
58:15 59:16 60:7
62:14 63:16 64:9
69:19,20,24 70:8
86:12,15 89:2
116:10 120:22
121:6 130:25
131:9 155:20
163:6 176:2,3,11
186:1 187:8,13
191:23 195:22
**supports** 38:13,25
40:8 42:12
**suppose** 39:20
50:3
**supposed** 45:18
130:12 150:3
153:14 182:24
**sure** 11:9 18:25
22:3,21 24:2 30:7
33:13 40:23 45:15
54:17 64:13 65:16
73:17 76:25 82:4
90:11 91:24 93:4
115:6,20 118:9

119:6 128:20
146:16 147:12
149:13 151:24
166:2 167:19
169:12 172:14,15
177:21 180:21
182:7 183:5 192:6
193:7 206:11
**surprise** 120:6
196:9
**surprised** 74:3
112:14 159:16
**surprising** 120:2
134:22
**survey** 55:1
**surveys** 61:2
**swear** 5:19
**sweep** 76:6
**sworn** 5:22 208:6
210:10,13 211:14
211:18 212:21
**synthesizing**
147:23
**system** 57:1 68:15
68:19 108:6,23
123:15 127:9,19
130:8 146:19
**systematic** 87:6
**systems** 8:1 52:17
80:25 81:1,6,16

**t**

**t** 3:5 7:16 66:16
**table** 25:25 48:16
82:25 96:25
115:25 140:1
151:13 162:14,18
169:17 198:22,23
**tabulate** 160:3
**take** 4:19 40:21
43:6 64:25 78:21
81:21 85:17 90:4

96:20 101:4
112:17 114:17
116:18 117:7
120:23 125:12
132:22 135:5
140:13 153:23
154:11,17 157:3
180:19 181:11
197:12
**taken** 1:25 4:3,22
16:21 43:11 78:17
82:8 101:12
114:22 140:17
149:7 180:24
208:10
**talk** 31:24 41:25
75:5 84:19 100:6
114:2 141:2
152:12 158:3,6
171:17 181:6
196:19 206:14
**talked** 12:3 54:17
54:20 58:25 99:1
133:2 138:8,15
168:16 179:19
189:16,17 194:13
194:19 195:3
**talking** 28:8 32:3,3
36:19 69:13 81:7
83:10,14 85:7
118:9 133:10
155:8 176:13
177:22 180:16
183:17 184:2
194:7 198:4,14
**tangible** 150:16
**task** 44:20 200:1
**tasked** 59:14
60:12 63:12 66:5
66:17

**tautology** 63:22
**taxes** 129:8
**team** 55:10,13
139:14 199:6
**technical** 21:2,5,6
39:23 40:15 51:13
52:20
**technologies** 70:12
72:2,4,7,18,20,22
**technology** 38:25
57:2 69:3,5,6
75:15 113:14,21
187:9 189:2,8
**tell** 13:13 29:18
30:15 43:23 51:17
52:7 57:4 58:14
71:18 75:18 77:23
79:9 83:1 91:22
143:2 148:13
158:22 173:2
189:14 190:3
201:20 202:8
203:14 206:19
**telling** 78:25
183:20 184:24
197:6
**ten** 56:16
**tend** 31:17 67:13
67:15
**tense** 58:6
**term** 18:17,21
29:4 57:22 150:14
159:8 194:6
**terminology** 18:22
86:21 93:18
184:22
**terms** 10:3 11:13
16:25 19:13 31:17
76:13 80:19 85:1
86:6 120:5 136:17
147:22 180:17

183:24
**terrence** 2:12
209:5
**terry** 5:16 102:14
104:5 105:7
**test** 18:3
**testified** 121:4
123:17 133:11
134:18 201:8
**testify** 75:25 208:6
**testimony** 19:19
33:17 34:5 50:24
52:24 53:7 54:5
54:23 56:11 90:8
127:14 131:2
133:9,10,14,16,20
134:20 151:17
168:21 201:15
210:6,7 211:6,9,12
**text** 103:8,12
104:2,3,22 108:19
110:7 111:14
**tfleming** 2:11
**thank** 6:3,5 9:19
43:8 82:19 92:11
114:19 140:14
185:8 198:13
207:16
**theberge** 205:3
**thing** 34:14 39:21
52:14 64:15 67:20
68:2,4,5,7 83:15
89:9 107:22
118:10 152:12,20
152:21 158:5
163:5 188:12
194:8,19 204:6
206:24
**things** 11:25 14:12
22:2 23:6 28:7
30:1,7 31:21 32:7

39:25 47:13 49:1
53:15 54:14 56:16
57:13 58:18 64:17
64:22 67:12,13,14
67:15 69:9,10,23
81:2 84:13 87:12
99:21 110:21
116:12 124:1
151:19 153:17
156:4 164:22
166:8 176:12
182:4 183:9
186:25 189:19
191:25 193:10
195:22 196:12
202:1
**think** 6:17 8:6
10:13 11:16 12:18
12:22 14:24 16:2
16:10,25 17:19
19:20 20:8,15,17
20:20,22 21:1,3
23:1,11 24:8,14,18
26:24 27:7,15
28:7,10,21,23 29:1
29:7,9,24,24 30:4
30:16,17,25 31:4
32:16 33:4,7
35:12 36:1,5,12
38:2,23 39:1,17
43:2 44:1,2,3,9,11
46:23 48:17 49:1
49:13,24 51:21,22
52:8 54:11,20
57:6 59:19 60:23
61:3,18 62:11,19
63:14 65:5 66:23
68:14,25 71:20,22
72:23 73:11,24
74:22 75:17 76:8
78:16 79:7,16

80:7,19 83:5 84:5
84:22 85:1,9,9
86:4,13,17 88:1,7
88:11 89:15,21
90:8,23 91:13,19
92:11 94:3,5 95:2
95:9 96:3 99:3,15
100:16,23 102:11
105:4,17,20,22
106:3,13 107:18
108:2,11 109:3,17
110:4 112:16
113:11,21 114:6,8
116:1 117:7
118:12,13,18,20
119:13 120:7
121:19 122:15
123:9 124:22
125:8,10 126:2
127:6 128:1,2
129:10 130:19,20
131:11,15 132:13
132:14 133:25
134:2,4,11 135:18
135:18 136:1
139:22 144:13,17
144:23 146:10
147:5,10 148:3,20
149:14 150:2
151:2 153:23
154:15,22 155:2
155:19 156:18,23
157:12,15,17,20
157:22,25 158:9
158:13 159:2
160:5,24 161:7,15
162:5 163:13,18
166:21 167:5,7
168:4,16 170:19
170:22,25 171:2
172:1 173:5,9,10

173:20 175:2,4,9,9
175:12,15 176:24
178:6,12,14,17,18
179:16,23 180:4
180:11 183:4,6,9
184:1,16,20
185:13 186:4
187:4,5,21 188:4
188:15,22 189:20
190:6,12,19
191:10,15,25
193:17,20 194:7
195:2 197:5 201:5
201:14,23 202:3,6
202:15 203:10,15
203:19 204:12,18
204:25 205:10,15
206:6,16,24,25
207:5
**thinking**  62:23
64:6 79:10 99:10
143:3 169:11
**third**  12:5 60:22
76:1 86:2 103:20
120:4 122:2
156:22 157:7
200:18
**thirst**  147:10
**thirty**  209:18
**thought**  19:3
45:13 67:3 79:8
119:1 133:16
149:5,24 150:1
159:23 169:18
**thoughts**  38:15
**threat**  172:6
**three**  13:19 60:18
62:10 74:22
111:14 174:21
181:9,14,20 182:3
182:3,9,17 200:15

**thumb**  103:9
104:9,14
**ti**  13:9
**tie**  84:16,17
176:21
**tied**  76:7,9
**time**  4:11 7:21 8:2
19:9 39:3 43:10
43:15 50:8 56:22
77:24,24 82:7,12
83:17 89:4,21
104:7 108:8
110:11 114:21
115:1 118:13,19
119:19 136:3
140:9,16,23
143:14 150:21
161:2 169:4
180:23 181:3
183:23 186:10
187:19 188:9
190:1 195:19,19
197:4 199:6
200:19 202:17
205:25 206:2
207:18
**times**  6:14 16:7,16
48:19 89:1 95:22
113:6 114:10
170:3 205:25
**timing**  127:15
**tiny**  131:16
**title**  7:23 66:22
113:19 125:9
**titled**  104:23
**tlf**  129:9
**today**  6:2 53:2
110:10 147:4
159:21 189:20
194:19

**today's**  4:12
**told**  35:7 38:3 42:7
130:16,17 137:14
167:12 186:5,22
188:5 189:13
190:19 193:3,11
204:2,8
**tool**  188:8,10,24
189:22 193:3
**toolbox**  60:17,18
62:9 63:14 174:22
**toolkit**  152:16
**tools**  60:16,19,24
62:11 63:15
182:10,23 187:8
**top**  48:11 57:11
61:7 94:12 96:25
103:22 117:11
122:19 143:24
164:25 165:25
173:2 191:5
192:22
**topic**  198:2,3
**total**  94:9 183:5
187:10
**totality**  198:25
**totally**  47:16 77:15
77:15 80:14
116:15 156:8
198:6
**totals**  112:6
**touch**  96:1,16
97:17 98:14,23
100:4 123:19
134:9 145:22
**touched**  160:20
**touching**  97:13
**toured**  65:2
**trace**  97:25 98:5,5
98:10

traced 94:3
tracie 206:14
tracked 127:10
  144:20
tracks 129:7
transaction
  151:15
transcribed 210:7
transcript 71:21
  208:7,7,12 209:11
  209:12 210:5,12
  211:5,11,17
transcripts 201:12
  201:15,19
transforming
  74:14,20
transition 171:7
treasury 66:23
treats 78:8
trees 90:25 91:2
trends 63:1
trial 201:8
trials 201:4
tried 13:21 27:16
  45:2 47:12 65:2
  72:24 80:9 87:3
  96:7 99:22 123:21
  160:5 197:17
tries 129:10,11,16
  171:22
trimming 90:25
  91:2
trip 65:14,21 66:2
true 34:2 49:24
  53:22,24 68:12
  91:20 99:8 107:18
  133:7 165:20
  182:12 208:7
truly 156:6
truth 208:6

try 10:12 11:25
  16:25 27:25 34:20
  44:15 47:17 56:13
  56:15 57:25 62:6
  62:12 90:18,19,21
  99:1 101:2 105:8
  106:16 126:12,18
  128:14,22,24
  153:24 164:18
  182:1 196:21
trying 15:1 17:4
  18:3,5 22:7 23:10
  23:15 24:11,23
  25:18,19,23 30:8
  34:18 39:3 60:12
  61:15 65:18 66:2
  73:2,11,24 75:8
  82:24 83:23 95:7
  99:21 100:24
  101:6,19 102:10
  105:6 106:6
  110:20 111:3
  117:17 118:2
  123:20 126:20,24
  134:11 136:16
  143:6,7 145:25
  148:7 151:24
  153:2 161:21
  166:4,7 169:12
  170:1,9,24 171:6
  171:13 173:13
  177:4 182:8,15
  187:3 194:4,9
  201:24,25 203:4
turn 4:16 43:19
  104:18 115:4
  141:1
turned 7:24
twice 14:1 200:18
two 12:18,18
  13:19 23:6 24:7

42:24 58:18,19
  75:14,15 87:5,7
  105:18 132:12
  136:15 137:6
  151:13 155:19
  161:1 165:18
  169:2 184:12
  196:12 197:10
  200:15 201:2
tying 112:23
type 23:16 34:25
  53:4 56:25 68:15
  68:18 71:16 75:5
  81:9 91:21 99:9
  105:24 106:10
  123:14 134:21
  143:1 146:14,21
  152:21 170:15
  171:4,11,20
  174:16 203:5
typed 33:18
types 33:2 55:18
  71:15 124:9
  179:25 193:23
  196:1,1 203:4
typical 71:15
typo 26:23

**u**

uk 100:10 121:20
  135:24,25 136:1,7
  136:9,11,16
  138:18
ultimate 155:14
ultimately 44:1
  79:2 160:9 161:15
  170:22 171:6
  173:13 175:10
um 119:22
unable 44:19
underlying 93:24
  95:20 106:12

108:19,20
underneath
  115:25
underpinnings
  18:7 181:9
understand 10:4
  10:18 12:19,20
  15:18 16:4,6 18:4
  18:4,6 19:21
  21:10,24 22:7,7
  23:22 30:8,21
  32:2 33:21 35:18
  39:3 40:2,17 41:1
  42:13 45:15 46:17
  48:14 50:7,19
  57:15 61:18 76:15
  77:25 85:23 86:23
  86:24 87:18 90:17
  100:10 101:6
  106:8 123:15,17
  124:8,12 126:18
  129:5 133:14
  134:12 136:6
  146:7 151:4,5,21
  151:24 155:17
  156:18 159:18
  161:2 165:17
  166:6 167:17
  177:18 181:17
  185:14 188:1
  191:17 193:20
  195:18,19 198:19
understanding
  9:14 10:12,20
  11:12,21 12:16
  19:9,10 20:8
  26:17,25 36:22
  37:5,13 41:16
  47:18,20 52:8,10
  52:16,22 53:5
  56:6 60:8 64:4

65:5 73:1,2 75:10
75:19 76:12 80:4
83:20 91:14,25
92:4 95:23 98:8
98:20 99:11
108:22 139:15
144:18 148:6
178:17 181:8
183:16,21 184:3,9
184:17,21,25
192:2 203:21
204:13,21 207:2
**understood** 12:3
33:10 85:6 95:4
118:2 143:7
177:24
**undertake** 89:11
195:14 196:6
**undertook** 154:25
**underway** 66:21
**underwriter** 65:11
**underwriters**
128:14
**underwriting**
41:22 56:23 60:2
60:3,14 71:16
116:25 119:7,11
126:22 135:3
164:6,12 203:19
**underwritten**
64:22
**unfounded** 150:1
**unit** 4:21
**united** 1:1 4:25
63:2 121:11
**unnecessary** 148:1
**unquote** 74:9
**unrealistic** 126:2
**unreasonable**
24:17 157:18
162:1 164:7 191:1

**unrelated** 85:3
**unsuccessful**
164:24
**unusual** 59:23
80:14 195:24
**use** 6:22 13:18
15:17 20:24 26:6
43:3 48:13,16
49:6,19,22 50:10
50:21 51:5 57:2
57:23 58:8 60:16
62:13 63:15 69:3
69:5 75:13 77:3
80:6 81:22 84:8
86:20 93:17,20
97:9,23 99:8,21,22
102:23 104:7,16
106:14 108:1
110:14 120:19,19
121:4 122:6,23
124:24 128:6
131:25 132:25
134:7 136:17
138:11,21 140:9
140:10 141:12
142:15 145:12,14
148:9 149:17
150:5 156:1,7
157:14 174:3
179:17,18 182:10
182:24 183:6
186:19 196:22
**useful** 166:21,22
175:9 181:16
204:16
**uses** 112:12 118:8
143:19 145:4
146:14 184:21
194:6
**utilized** 140:6

**utilizes** 70:20

**v**

**v** 209:6 210:3
211:3
**vague** 18:15 47:6
152:5 155:6
168:11
**valid** 164:21
**valuation** 6:13,15
7:7 15:2,2 21:4
26:7 60:17 150:10
151:25 152:9
153:15 168:14
174:13,22 179:13
180:1 181:14
194:21
**value** 17:4,23
18:13 24:12 25:18
26:14 27:3 28:25
29:11,14,16,19
31:7,16 32:4
34:25 42:15,17
46:25 47:3,4
58:22 59:1 150:10
150:18 152:12,14
152:24 161:25
166:25 173:7,14
173:14,16,17,17
173:23,24 174:1,1
174:5,11,16,19
175:1,5,8,13,20,21
176:1,7,25 177:12
177:23 178:2,4,21
178:24 179:10,24
181:10,22 182:10
182:15 183:5,10
186:16 187:2,6
194:5,5,7 196:2
**valued** 26:11
**values** 13:1 26:8
31:18 174:6

185:22,24 194:22
**valuing** 26:10
28:23 150:15
152:15
**variable** 85:19
86:19 89:6,21
**variety** 29:23
59:25 86:8
**various** 167:23
**vary** 128:8 130:5
**vendor** 191:9
**vendors** 64:20
**verbal** 111:14
**verduin** 203:16,16
203:18,24
**verified** 91:10
**veritext** 2:22 5:5,7
209:1,7 212:1
**veritext.com.**
209:17
**versus** 1:8 4:24
31:12 33:24 34:2
115:10
**video** 4:18,21
**videographer** 2:22
4:10 5:6,18 43:9
43:13 82:6,10
114:20,24 140:15
140:21 180:22
181:1 207:17
**videos** 51:24
**videotaped** 1:14
4:2
**view** 29:8,13 46:8
78:3,19 79:22
148:25 149:7,17
153:9 156:21
157:6
**viewable** 103:11
103:12 104:21,23
104:25

**viewed** 74:2
**violates** 153:13
**violating** 153:7
**visiting** 81:12
**volunteer** 115:17

**w**

**w** 7:16 66:16
**wait** 22:16
**waiting** 36:13
**waived** 209:19
**walk** 106:18,18
  110:14 137:17
  140:3
**want** 20:7 22:7
  34:7 45:15 56:17
  78:12 86:24 95:10
  100:15 103:13
  104:1,7,16 110:25
  111:21 115:21
  119:6 147:9 151:5
  152:13,15,17,20
  153:10 156:1
  158:2,5 164:5
  172:15 174:17,18
  176:14
**wanted** 66:6,12
  72:11 85:23 86:22
  86:22 87:16,18
  90:10 98:16,17
  102:24 137:22,22
  180:11
**wants** 80:12
**wartsila** 7:15 8:4,6
  66:16
**way** 13:14,15 14:4
  18:7 19:16 22:23
  26:3 34:3,8 35:12
  35:23 36:22,24
  37:5,7,12,13,15,17
  38:16 41:7 44:11
  47:12 61:3 62:21

67:23 71:4 72:18
  72:21 73:11,25
  78:7 80:20 85:21
  87:16 88:4,8,13,15
  90:21 92:17 93:12
  95:5,9,22 96:2,12
  96:16,17,21 99:3
  99:15,17,17
  103:16 109:20
  111:1 117:4 126:8
  126:18 129:2
  137:25 146:25
  148:3 152:25
  154:10 156:4
  157:24 159:11,11
  161:23 162:14
  163:3,6 164:2,21
  167:11,14,22
  169:16 174:10,24
  179:13 181:16,16
  182:22 184:7
  190:9 191:14
  193:9 199:21
  204:12
**ways** 48:22 88:20
  122:8 156:9 179:7
  182:19
**we've** 40:7,8,21
  81:20 101:22
  106:3 147:3
  157:23 176:24
  180:20 194:19
  202:20
**week** 64:24 67:6
**weird** 58:7,7
**welcome** 6:4
**went** 51:22 58:23
  65:1 86:2 93:24
  98:11 108:25
  109:6,8 111:10
  137:20 138:4

**west** 9:1
**whatsoever**
  153:11
**whereof** 208:15
**whispering** 4:14
**wide** 86:7,8,10,11
  86:13 89:1 197:2
**willing** 49:12 74:4
  150:19 155:22
  169:6 196:13,16
**willingness** 47:19
  178:17 180:14
**windfall** 17:15,20
  18:5,9 76:10
**window** 118:19
  119:15,17
**wireless** 201:10
**wish** 91:21 134:21
**withhold** 154:12
**witness** 1:14 4:3
  5:19 6:25 10:17
  11:5 12:16 13:11
  14:2,7,16 15:8
  16:2,13 18:16
  19:20 21:21 22:17
  22:21 23:1 33:21
  34:20 36:12 43:8
  73:11,15,17,24
  76:23 77:10 81:22
  81:24 90:12 94:16
  94:18 104:12
  112:23 114:19
  133:22 151:18
  155:7 167:17
  168:4,12 169:22
  197:5 198:16
  200:20 208:15
  209:8,11 210:1,4
  210:11 211:1,4,15
**witnesses** 130:16

**witness'** 209:14
**wmw** 1:4
**wondering** 20:3
  102:20,25 133:13
  142:22 182:13
**woodward** 2:17
  82:16
**word** 14:22 15:20
  15:23 16:10,15
  20:7,9,24 48:4
  57:21,23 63:21
  70:14 76:8 102:6
  107:12 175:21
  184:23
**words** 12:18,21
  13:14,16,18,21
  14:7,9,11,11,17,19
  16:13 27:21 41:6
  74:24 76:19 84:25
  93:19 127:11
  180:3,18
**work** 12:9,13 13:7
  15:22 16:24 18:8
  18:24 31:2 52:17
  57:25 68:10 82:5
  85:12,16 104:13
  116:2,13 143:1
  147:16 148:6
  156:2 159:25
  161:17 178:22
**worked** 7:1 8:24
  52:11 62:25 66:8
  66:22 73:3
**workforce** 55:20
  55:22 56:4
**working** 66:15
  85:18 174:3 190:3
**works** 26:12 27:4
  31:7,8,21 32:6
  52:4 54:18,24
  59:19 60:8 65:6

113:21 159:11,12
202:10
**worksheet**  69:18
**world**  63:3 150:14
153:1
**worth**  152:22
177:5,9,11,13,17
177:19
**wrap**  150:25
**write**  21:9 70:6
75:13 83:25 87:16
97:23 126:16
128:10,13,17
**writing**  125:6,6
130:21,22 196:15
**written**  32:23
34:10 37:22 83:11
83:13 91:15 92:1
92:25 93:11,13,20
93:22 94:10 95:14
95:15,21 98:11
100:2 101:8
109:16 113:3,5
116:18 120:5
122:13,21,23
125:5 126:17
127:23,24 128:4,8
129:22 130:3,5,9
131:10,22 132:9
134:6,9,19,25
136:9 137:18
138:6,12 141:3,14
141:19,22 142:7
142:12,16,18,20
145:6,11,21
**wrong**  13:13,17,24
27:8 30:5,14,15
33:4,7 41:5,8
42:24 47:10 77:5
101:4 112:20
133:17 150:7

**wrongdoing**
150:12
**wrongdoings**
24:13 27:21 48:5
48:6
**wrote**  27:16
100:20 105:23
141:16 142:21
153:6 187:21
190:14,22 192:10

|   x   |
|-------|

**x**  3:1,5
**xs**  48:15 50:21

|   y   |
|-------|

**yard**  90:25
**yeah**  22:19,23
23:3 47:25 65:16
81:23 115:22
119:9 121:24
128:20 153:23
174:5 186:12
205:7
**year**  7:14 8:20
53:18 101:18
137:6 142:1
190:13 191:16
200:7,14
**years**  7:1 8:4
65:24 118:15
119:12 120:5
137:5 141:18,20
141:23 142:9,11
144:7 199:16,23
199:25 200:2
**yield**  31:23
**yields**  20:13
**youtube**  51:24
**yup**  82:20

|   z   |
|-------|

**zero**  28:15,20,25
29:3,10 32:23
33:13 34:10 44:25
201:6
**zoltowski**  3:12
11:24 19:11 21:12
21:15 23:7,12,23
24:16 25:17,22
26:2,5 27:11,18,25
28:16,22 30:5
33:5 35:2 38:22
39:1 46:25 48:23
49:11 50:2 74:3,8
74:13 75:1,4
78:17 79:7 83:22
85:14 87:2,15
88:7,10 89:17
91:14 95:3 99:22
100:16 107:14,15
107:16,25 109:25
112:15 113:4
115:10 125:22
126:19,20 131:21
132:6,13 137:20
139:9 144:2 153:5
154:18,19 157:10
158:7 159:9
160:21 162:20
163:3 164:8 165:8
165:16 167:9
171:5,21 173:9
174:14 194:6,20
**zoltowski's**  17:13
21:25 23:18 24:16
24:19 25:7 34:23
46:3 47:6 48:12
76:9 77:6 84:12
86:16 87:7 107:10
132:14,15 138:8
139:13,21 141:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.