# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| Plaintiff, | ) ) | **Jury Trial Demanded** |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) ) ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF NEIL ZOLTOWSKI

## **TABLE OF CONTENTS**

I.    Introduction ...................................................................................................... 1

II.   The legal standard supports denying Federal's motion .............................. 2

III.  Mr. Zoltowski's calculation of lost license fees is admissible ................... 4

    A.   Mr. Zoltowski's lost license fee calculations are supported by his experience, case-specific facts and information from Mr. Waid. ................ 5

    B.   Mr. Zoltowski fairly excluded discounts from his named-application calculation. ................................................................................................ 16

    C.   Mr. Zoltowski properly rejected non-comparable agreements and negotiations. ............................................................................................. 20

        1.   Mr. Zoltowski properly rejected the parties' prior negotiations. ..... 20

        2.   Mr. Zoltowski properly rejected third party settlement agreements ............................................................................................. 22

    D.   Mr. Zoltowski's application-based framework is consistent with both New York contract law and copyright law .................................................. 24

        1.   Mr. Zoltowski's damages framework is consistent with New York contract law. ............................................................................. 24

        2.   Mr. Zoltowski's calculation of actual damages under the Copyright Act is proper under applicable law. ............................... 26

    a.   Mr. Zoltowski properly calculated actual damages based on objective evidence of market value ........................................................................ 26

    b.   Federal's cases are distinguishable and confirm the admissibility of Mr. Zoltowski's opinions. .................................................................................. 28

IV.   Mr. Zoltowski's calculation of disgorgement damages is admissible ................. 30

    A.   The relevant law allows recovery of profits that stem from the predicate acts of infringement: Mr. Zoltowski's testimony is not irrelevant as a matter of law ............................................................................................ 31

    B.   Mr. Zoltowski's testimony of the interconnectedness of Defendants' writing companies provides valuable context to aid the trier of fact. ......... 33

i

1.     Mr. Zoltowski's identification of revenue subject to disgorgement is proper because Federal disclosed revenue from multiple writing companies; Mr. Zoltowski properly assumed liability. ........................................................................... 34

2.     Mr. Zoltowski's testimony about Defendants' corporate and economic structure is relevant and will aid the trier of fact. ............ 36

3.     Mr. Zoltowski is qualified to provide context regarding other writing companies. ......................................................................... 40

C.     Mr. Zoltowski's analysis does not solely rely on Mr. Whitener. ................ 42

V.     Conclusion .............................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks v. Verizon Communs.*,
  694 F.3d 1312 (Fed. Cir. 2012)......................................................................4

*Apple v. Motorola*,
  757 F.3d 1286 (Fed. Cir. 2014)......................................................................3

*Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*,
  886 N.E.2d 127 (N.Y. 2008)........................................................................24

*Bombardier Rec. Prods. v. Arctic Cat Inc.*,
  No. 12-2706, 2017 U.S. Dist. LEXIS 26517 (D. Minn. Feb. 24, 2017)..............*passim*

*Brennan v. Reinhart Institutional Foods*,
  211 F.3d 449 (8th Cir. 2000) ...........................................................12, 14, 16

*Clark by & Through Clark v. Heidrick*,
  150 F.3d 912 (8th Cir. 1998) .........................................................................4

*Gaylord v. United States*,
  777 F.3d 1363 (Fed. Cir. 2015).....................................................................23

*In re Genetically Modified Rice Litig.*,
  666 F. Supp. 2d 1004 (E.D. Mo. 2009).........................................................3

*Gray v. Perry*,
  No. 215CV05642CASJCX, 2019 U.S. Dist. LEXIS 113807 (C.D. Cal.
  July 5, 2019)................................................................................................28

*Gusmao v. GMT Grp., Inc.*,
  No. 06 CIV. 5113 (GEL), 2008 U.S. Dist. LEXIS 58462 (S.D.N.Y.
  Aug. 1, 2008) ..............................................................................................24

*Holland Loader Co. v. FlSmidth A/S*,
  313 F. Supp. 3d 447 (S.D.N.Y. 2018.)..............................................20, 24, 25

*Honeywell Int'l v. ICM Controls*,
  45 F. Supp. 3d 969 (D. Minn. 2014) ...............................................................3

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*,
   No. 4:08-cv-03181, 2010 U.S. Dist. LEXIS 114306 (S.D. Tex. Oct. 27,
   2010) ........................................................................................................ 30

*J&H Holding Co. v. Anthony Kloss & Impact Envtl. Redmediation*,
   12 CV 5738, 2013 U.S. Dist. LEXIS 162473 ...................................... 20, 25

*Kozlov v. Associated Wholesale Grocers*,
   818 F.3d 380 (8th Cir. 2016) ...................................................................... 3

*Leonard v. Stemtech Health Scis., Inc.*,
   No. 08-cv-067-LPS-CJB, 2013 U.S. Dist. LEXIS 138446 (D. Del. Sep.
   23, 2013) .................................................................................................. 28

*Lexington Prods. Ltd. v. B.D. Commc'ns, Inc.*,
   677 F.2d 251 (2d Cir. 1982)................................................................. 24, 25

*Los Angeles News Serv. v. Reuters TV Int'l, Ltd.*,
   149 F.3d 987 (9th Cir. 1998) .................................................................... 31

*Maryland Cas. Co. v. Thermo-O-Disc, Inc.*,
   137 F.3d 780 (4th Cir. 1998) ...................................................................... 3

*Montgomery v. Noga*,
   168 F.3d 1282 (11th Cir. 1999) ................................................................ 27

*Nelson v. Wal-Mart Stores*,
   No. 2:04-CV-00171, 2009 U.S. Dist. LEXIS 28708 (E.D. Ark. Jan. 13,
   2009) .......................................................................................................... 3

*On Davis v. Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001)................................................................. 28, 29

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,
   No. 09-61490-Civ, 2011 U.S. Dist. LEXIS 62969 (S.D. Fla. June 7,
   2011) ........................................................................................................ 36

*Plasti Dip Int'l, Inc. v. Rust-Oleum Brands Co.*,
   No. 14-cv-1831, 2017 U.S. Dist. LEXIS 32464 (D. Minn. Feb. 13,
   2017) .......................................................................................................... 6

*Raimondi v. Olenicoff*,
   No. SACV 12-2094, 2015 U.S. Dist. LEXIS 174961 (C.D. Cal. July 7,
   2015) ........................................................................................................ 23

*Recursion Software, Inc. v. Double-Take Software, Inc.*,
    No. 4:10-CV-403, 2012 U.S. Dist. LEXIS 63299 (E.D. Tex. May 4,
    2012) ................................................................................................. 28, 29

*Robinson v. GEICO Gen. Ins. Co.*,
    447 F.3d 1096 (8th Cir. 2006) ............................................................ 40, 42

*Robroy Indus. Tex., LLC v. Thomas & Betts Corp.*,
    No. 2:15-CV-512-WCB, 2017 U.S. Dist. LEXIS 54230 (E.D. Tex. Apr.
    10, 2017) ................................................................................................. 36

*Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*,
    321 F. Supp. 2d 469 (N.D.N.Y. 2004) .................................................... 12

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
    26 F. Supp. 134 (S.D.N.Y. 1938)....................................................... 31, 36

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
    106 F.2d 45 (2d Cir. 1939)...................................................................... 31

*Structural Polymer Grp., Ltd. v. Zoltek Corp.*,
    543 F.3d 987 (8th Cir. 2008) .................................................... 12, 14, 16

*Tel. Co. of Missouri v. Johnson Pub. Co.*,
    671 F. Supp. 1514 (W.D. Mo. 1987), *aff'd*, 855 F.2d 604 (8th Cir. 1988) ................ 27

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    No. C 04-02123 WHA, 2008 U.S. Dist. LEXIS 124780 (N.D. Cal. May
    22, 2008) ................................................................................................. 14

*Tire Eng'g & Distrib., Ltd. Liab. Co. v. Shandong Linglong Rubber Co.*,
    682 F.3d 292 (4th Cir. 2012) .................................................................. 31

*Tractebel Energy Mktg., Inc v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007)...................................................................... 25

*U.S. Salt, Inc. v. Broken Arrow, Inc.*,
    No. 07-1988, 2008 U.S. Dist. LEXIS 43376 (D. Minn. May 30, 2008)..................... 15

*Wood v. Minn. Mining & Mfg.*,
    112 F.3d 306 (8th Cir. 1997) ......................................................... 3, 6, 11

## Statutes

17 U.S.C. § 504(b).....................................................................*passim*

**Other Authorities**

Fed. R. Evid. 702 ..................................................................................*passim*

Fed. R. Evid. 703 ........................................................................................ 14, 16

## I.    Introduction

This case is about the breach of a Blaze Advisor software license agreement
("Agreement") between Fair Isaac Corporation ("FICO" or "Plaintiff") and Chubb &
Son, a division of Federal Insurance Company, and the resulting copyright infringement
by Defendants Federal Insurance Company and ACE American Insurance Company
(collectively "Federal" or "Defendants").  FICO offers the testimony of Mr. Neil
Zoltowski, a damages expert with over 20 years of experience, to calculate the damages
resulting from Federal's breach of the Agreement and resulting copyright infringement.
Mr. Zoltowski states three primary opinions:

- FICO's lost license fee damages resulting from Federal's breach of contract
  total $37.4 million (Dkt. 408 Ex. 1 ("Zoltowski Rep."), ¶ 110; Schedule 3.0
  (Dkt. 408 at 61));

- FICO's actual damages resulting from Federal's copyright infringement
  total $34.1 million (Zoltowski Rep., ¶ 121; Supplemental Schedule 3.0
  (Dkt. 408 at 138)); and

- Federal's gross revenue subject to disgorgement under 17 U.S.C. § 504(b)
  totals $30.9 billion (Zoltowski Rep., ¶ 111; Schedule 3.0, 8.0, 9.0 (Dkt. 408
  at 61, 68-69)).

These opinions are consistent with the law and based on a reliable methodology in view
of the case-specific facts.  They will aid the trier of fact and are admissible under Rule
702.

The Court should deny Federal's motion to exclude Mr. Zoltowski's expert
testimony.  Federal's challenges are meritless.  FICO may recover the value of its lost
license fees (*i.e.*, expectation damages) under New York law and its actual damages
under copyright law.  Mr. Zoltowski properly measured that loss according to FICO's

1

standard pricing methodology, which has been in place since 2003. Federal's challenges—that Mr. Zoltowski should have used a different license structure, applied a discount, or capped damages at the value of FICO's settlements with third parties—go to weight, not admissibility. Mr. Zoltowski considered each of these factors and provided a reasoned analysis for rejecting them. Mr. Zoltowski's testimony exceeds the safeguards of Fed. R. Evid. 702.

Mr. Zoltowski's disgorgement calculation is also admissible. FICO's burden under the Copyright Act is solely to prove Federal's gross revenue connected to the infringing use of Blaze Advisor. Consistent with FICO's statutory burden, Mr. Zoltowski relied on Federal's verified interrogatory responses to provide the gross revenue connected to the infringement.

Federal's argument that Mr. Zoltowski made up a "single economic unit" theory of liability is a red herring. Mr. Zoltowski did not invent a novel theory of liability, as Federal claims. As a damages expert, he properly assumed liability and detailed the various revenue streams subject to disgorgement. His observations regarding Federal's corporate and economic structure are consistent with the law and will educate the trier of fact. Mr. Zoltowski's opinions are admissible, and the Court should reject Federal's challenge in its entirety.

## II.   The legal standard supports denying Federal's motion

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which explains: "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

2

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Court's gatekeeping role under Rule 702 and *Daubert* is to evaluate whether an expert's principles and methodology are sound. *Kozlov v. Associated Wholesale Grocers*, 818 F.3d 380, 394 (8th Cir. 2016); *Honeywell Int'l v. ICM Controls*, 45 F. Supp. 3d 969, 977 (D. Minn. 2014). The Court should not "overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another." *Apple v. Motorola*, 757 F.3d 1286, 1314-15 (Fed. Cir. 2014).

A *Daubert* motion response is not the occasion for FICO to prove its case. FICO does "not 'have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.'" *Maryland Cas. Co. v. Thermo-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998) (emphasis in the original); *see also In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1032 (E.D. Mo. 2009); *Nelson v. Wal-Mart Stores*, No. 2:04-CV-00171, 2009 U.S. Dist. LEXIS 28708, at *5-6 (E.D. Ark. Jan. 13, 2009).

Expert testimony should be excluded only if it "is so fundamentally unsupported that it can offer no assistance to the jury." *Wood v. Minn. Mining & Mfg.*, 112 F.3d 306, 309 (8th Cir. 1997) (internal quotation omitted). Federal's disagreements with FICO's

expert conclusions or factual assumptions and considerations underlying those conclusions "go to the weight to be afforded the testimony and not its admissibility." *ActiveVideo Networks v. Verizon Communs.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). Doubts concerning whether an expert's testimony will be useful should generally be resolved in favor of admissibility. *Clark by & Through Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998).

### III.   Mr. Zoltowski's calculation of lost license fees is admissible

FICO is entitled to recover lost license fees as 1) damages resulting from Federal's breach of the Agreement and 2) actual damages for copyright infringement.  Mr. Zoltowski calculated the amounts.  FICO is entitled to $37.4 million in lost license fees resulting from Federal's breach of the agreement and $34.1 million in lost license fees as actual copyright damages.  (Zoltowski Rep., Supplemental Schedule 3.0 (Dkt. 408 at 138).)  Mr. Zoltowski calculated both figures using the same methodology—the value of FICO's lost license fees, measured according to FICO's standard prices.  The difference between $37.4 and $34.1 million results from the six-year statute of limitations for breach of contract claims and three-year statute of limitations for copyright infringement.

Federal's challenges to Mr. Zoltowski's lost license fee opinion are meritless. (Dkt. 406 at 7-15.)  Federal contends Mr. Zoltowski's calculations are inadmissible because they are based solely on testimony from Mr. William Waid, a FICO employee. This challenge fails because Mr. Zoltowski used his expertise in conjunction with FICO's standard pricing practices in place for over 15 years to determine the application-based license fees—his opinion is not the say-so of one fact witness.  Federal next asserts Mr.

4

Zoltowski should have included a discount in his calculation.  But Mr. Zoltowski correctly determined a discount would not apply because the economic bases for a discount—for example, the expectation of future professional service fees, incremental sales, and client referrals—were lacking.  Federal further asserts Mr. Zoltowski should have capped damages at the prices shown in FICO's settlement discussions with Federal and agreements with third parties.  Again, this challenge fails because Mr. Zoltowski correctly determined none of these other factual situations were comparable to the present case.  Federal finally asserts Mr. Zoltowski's framework is inconsistent with contract law and copyright law.  This challenge fails based on a review of the applicable law.  Any concerns Federal may have go to the weight and not the admissibility of Mr. Zoltowski's testimony, which exceeds the safeguards of Fed. R. Evid. 702.

   **A.    Mr. Zoltowski's lost license fee calculations are supported by his experience, case-specific facts and information from Mr. Waid.**

   Mr. Zoltowski calculated the value of FICO's lost license fees resulting from Federal's breach of the Agreement and copyright infringement.  Based on his expertise, he determined the proper framework to quantify FICO's loss was an annual application-based license:

> 113.   The appropriate measure of FICO's lost domestic license fees for the period from March 31, 2016 (i.e., the termination date) to December 2019 (i.e., the trial ready date in this matter) is FICO's annual named-application deployment and development seat license fees for the period each Blaze Advisor application is used without FICO's licensed consent….

(Zoltowski Rep., ¶ 113.)  Mr. Zoltowski's opinion regarding actual copyright damages is the same in substance as his lost license fee opinion:

> 121.   The Copyright Act permits recovery of actual damages suffered as a result of the infringement…. FICO has lost deployment and develop[ment] seat license, support, and maintenance fees.

(*Id.* ¶ 121.)  As Mr. Zoltowski explained, the application-based structure "is the appropriate measure of loss to FICO because it reflects the value of its software for each year of unlicensed use in each unlicensed application…."  (*Id.* ¶ 113)

Federal challenges Mr. Zoltowski's application-based framework as unreliable, because no other FICO licensee has purchased an application-based license for 17 applications.  (Dkt. 406 at 11.)  Federal contends Mr. Zoltowski should have used an enterprise license framework.  (*Id.* at 11.)  Federal also challenges Mr. Zoltowski's reliance on a fact witness, Mr. Waid.  (*Id.* at 11-14.)  These challenges are meritless.

Under the law, expert opinions must be "reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Plasti Dip Int'l, Inc. v. Rust-Oleum Brands Co*., No. 14-cv-1831, 2017 U.S. Dist. LEXIS 32464, at *5 (D. Minn. Feb. 13, 2017) (quoting *Lauzon v. Senco Prods., Inc*., 270 F.3d 681, 686 (8th Cir. 2001)).  The test of reliability is flexible.  *Id.* at *6 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).  "Expert testimony must be excluded 'only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury.'"  *Wood*, 112 F.3d at 309.  Mr. Zoltowski's opinions are supported and they will assist the jury.  Federal's challenges fail.

### 1. The application-based framework is supported by the evidence and Mr. Zoltowski's experience.

Federal contends Mr. Zoltowski should have calculated lost license fees using an enterprise license framework instead of an application-based framework. This challenge fails. Mr. Zoltowski's selection of an application-based framework (instead of an enterprise license) is reliable and factually supported. As he explained, the application-based structure "is the appropriate measure of loss to FICO because it reflects the value of its software for each year of unlicensed use in each unlicensed application." (Zoltowski Rep., ¶ 113.) Mr. Zoltowski determined an enterprise license would ***not*** appropriately capture the value of the lost license fees resulting from Federal's breach:

> 65.   … [A] hypothetical negotiation culminating in a perpetual ELA [enterprise license agreement] is the wrong lens through which to evaluate FICO's lost license fees in this matter. Based on the facts of this case as I understand them, FICO's lost license fees should be evaluated only in light of Defendants' unauthorized exploitation of Blaze Advisor both before and after FICO termination the SLM Agreement in 2016.

(Dkt. 408 Ex. 2 ("Zoltowski Reply"), ¶ 65.) Mr. Zoltowski determined that an application-based license, not an enterprise license, most appropriately captured the "objective measure of FICO's lost license fees":

> 66.   ***There is no other objective measure of FICO's lost license fees than its list prices for each application that Defendants are accused of wrongfully using***….

(*Id.* ¶ 66 (emphasis added).)

Mr. Zoltowski's selection of an application-based license is supported by the case-specific facts and his expertise. While Federal may disagree that an application-based

calculation is the proper method of calculating FICO's lost license fee damages, the resolution of that question is for the jury.

> **2.      Mr. Zoltowski's calculations are supported by the case-specific facts and his experience.**

Next, Federal argues Mr. Zoltowski's calculations under that framework are not supported by the evidence.  A review of Mr. Zoltowski's methodology and the evidence shows his opinions are adequately supported.  Mr. Zoltowski calculated the value of the application-based license using FICO's standard pricing methodology used with all of its customers.  This calculation quantifies FICO's actual loss.  For decades, FICO has priced application-based license fees on the size of a customer's application.  (Declaration of Heather Kliebenstein ("Kliebenstein Decl.") Ex. 1, 23:9-25:8.)  In accordance with FICO's standard pricing methodology, applications fall into one of four categories depending on the anticipated size of use of Blaze Advisor: small, medium, large or very large.  (*Id.* 23:9-15.)

In order to determine whether an application is small, medium, large, or very large, FICO uses a standard sizing framework employing various criteria to "size" an application:



(Dkt. 408 at 163.)  Again, this framework has been in place since at least 2003.

(Kliebenstein Decl. Ex. 2, 24:19-22.)

In 2019, Federal produced a chart listing many of the applications that use Blaze
Advisor and the extent of use.



(Kliebenstein Decl. Ex. 3.)  Importantly, FICO asked for this data during discovery
because this is the type of data that FICO would use to price a license fee for the
infringing applications *in any pricing situation*.

Mr. Zoltowski reviewed this data and FICO's pricing and sizing matrices with Mr.
William Waid, FICO's Vice President and General Manager of the Decision
Management Line of Business.  Mr. Waid has priced licenses for hundreds of FICO's
licensees—his job is to approve prices for FICO's decision management software
licenses, including Blaze Advisor licenses.  (Kliebenstein Decl. Ex. 4, 10:24-11:18.))
Using Federal's data, Mr. Waid classified Federal's size of use of Blaze Advisor for each

application as small, medium, large or very large.  (Zoltowski Rep., ¶¶ 101-108, 113-117.)  Mr. Zoltowski took those results and calculated the license fees and support and maintenance fees using the standard pricing matrix, as he explained:



(*Id.* ¶ 114.)

Mr. Zoltowski's application-based calculation provides a rational basis for calculating FICO's damages.  While Federal may disagree with his calculation, any issues regarding the application-based framework are for cross-examination.  Mr. Zoltowski's calculation is not so "fundamentally unsupported that it can offer no assistance to the jury." *Wood*, 112 F.3d at 309.  It accounts for the objective value of FICO's lost license fees, measured according to FICO's standard pricing documents and policies in place since 2003.

Federal's unauthorized use of Blaze Advisor is egregious.  Mr. Zoltowski's calculation is not unreliable simply because no other third party has used FICO's software on so many applications, for so long, outside the license relationship.  Federal's objection is best addressed through cross-examination, not exclusion. *See Bombardier Rec. Prods. v. Arctic Cat Inc.*, No. 12-2706, 2017 U.S. Dist. LEXIS 26517, at *5 (D. Minn. Feb. 24, 2017) ("As a general rule, the factual basis of an expert opinion goes to

the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

### 3. Mr. Zoltowski's reliance on Mr. Waid to confirm the calculations is appropriate.

Federal challenges Mr. Zoltowski's reliance on Mr. Waid. (Dkt. 406 at 9-14.) This challenge is meritless. It is well-accepted that in forming an opinion, a damages expert may rely on both the case-specific facts revealed in discovery and information received from client representatives. *See Structural Polymer Grp., Ltd. v. Zoltek Corp.*, 543 F.3d 987, 998 (8th Cir. 2008) (affirming admission of damages expert opinion based on information received from client representative: "SP's damages expert, Donna Smith, calculated SP's lost profits based primarily on a document created by SP's then-Managing Director … budget figures kept in the ordinary course of business by SP, conversations with SP management, deposition testimony of Zoltek personnel, and Zoltek's annual reports and investor presentations."); *Brennan v. Reinhart Institutional Foods*, 211 F.3d 449, 451-52 (8th Cir. 2000) (same); *Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 479 (N.D.N.Y. 2004) (same). Where an expert opinion on damages is properly supported by case-specific facts, the weight to be given to that opinion is "properly left to the jury." *Structural Polymer*, 543 F.3d at 998.

In order to ensure his calculations were consistent with FICO's standard pricing practices, Mr. Zoltowski worked with Mr. Waid to calculate the specific amount of the lost license fees. (Zoltowski Rep., ¶ 114.) Mr. Zoltowski applied his own expertise in determining that the application-based license structure was correct, and then properly

relied on Mr. Waid in the specific computation of those license fees.  The deposition

testimony quoted at length in Federal's brief illustrates this point and shows that Mr.

Zoltowski used his independent expertise to select the application-based methodology.

(Dkt. 406 at 13.)  In contrast to Federal's assertion, this testimony supports the

admissibility of Mr. Zoltowski's testimony:

> Q.  With regard to your expert opinion relating to lost license fees, what expert opinions do you provide other than what Mr. Waid provided you with and the arithmetic you performed in order to create the tables relating to lost license fees?
>
> A.  … *I provided expertise related to understanding what's the appropriate structure of the license based upon the facts and circumstances here* and what is the appropriate pricing based on that structure, and Mr. Waid provided inputs in terms of the quantification piece based upon FICO's standard pricing for the named application licenses.
>
> Q.  And what specifically in you report did you provide expert opinions on other than those inputs provided by Mr. Waid and the arithmetic in the graphs?
>
> A.  I think I just answered that question, but *it's a determination of the appropriate structure of the license* based upon the information available and the facts and circumstances.
>
> Q.  The appropriate structure meaning what?
>
> A.  … I have my own opinion, *which is that's based upon a named application license structure*, and that's the expertise I'm providing.

(Dkt. 412 at 127, 137:13-138:23 (emphasis added).)  Once he selected the application-

based methodology, Mr. Zoltowski's reliance on Mr. Waid for the specific calculation is

permissible.[1]  *Structural Polymer*, 543 F.3d at 998; *Brennan*, 211 F.3d at 451-52; Fed. R. Evid. 703.

Federal's cases are distinguishable.  (*See* Dkt. 406 at 9-10.)  Unlike those cases, FICO is not relying on Mr. Zoltowski's opinion as a "conduit" to prove the truth of undisclosed hearsay statements.  For example, in *Therasense*, the expert's opinion was based solely on experiments conducted by the plaintiff.  *Therasense, Inc. v. Becton, Dickinson & Co.*, No. C 04-02123 WHA, 2008 U.S. Dist. LEXIS 124780, at *18-19 (N.D. Cal. May 22, 2008).  The expert did not "participate in, observe, or supervise any of the experiments," and the plaintiff did not permit the defendant to depose the employee who performed the experiments.  *Id.*  Instead, the plaintiff "conceal[ed] all of the tests from discovery during all phases of discovery under a claim of privilege."  *Id.*  The underlying facts at issue were "sprung on all opponents only after the close of fact discovery" through the guise of expert testimony.  *Id.*  Under those circumstances, the court excluded the expert testimony, which it found to be "[w]ithout any foundation."  *Id.*

The concerns addressed in *Therasense* are wholly absent here.  The facts Mr. Waid provided to Mr. Zoltowski are no secret to Federal.  Mr. Waid gave extensive sworn testimony regarding FICO's application-based license pricing, the 2003 Global Price List, and the nine-factor sizing matrix in his February 5, 2018, declaration and in

---

[1] The fact that Mr. Waid's February 5, 2018 declaration also includes an application-based calculation simply reflects FICO's standard pricing practices, which have been unchanged since 2003.  FICO's own pricing guidelines ultimately provide the basis for FICO's lost license fees, so it is no surprise that Mr. Zoltowski's calculation is consistent with the calculation in Mr. Waid's declaration.

his two depositions on January 16, 2019, and April 4, 2019.  Federal had ample

opportunity to examine and challenge Mr. Waid regarding the basis of FICO's pricing

and licensing structures.  FICO also intends to call Mr. Waid as a fact witness at trial,

during which Federal can cross-examine both Mr. Waid and Mr. Zoltowski regarding the

facts underlying FICO's lost license fees.

*U.S. Salt* is also distinguishable.  There, the expert did not speak to the individuals

who prepared the documents he relied upon and he did nothing to verify their accuracy.

*U.S. Salt, Inc. v. Broken Arrow, Inc.*, No. 07-1988, 2008 U.S. Dist. LEXIS 43376, at *4

(D. Minn. May 30, 2008).  Instead, he simply adopted the assumptions and estimates

provided by the plaintiff's president and owner, which the court found insufficient to

support his opinion.  *Id.* at *4-6.

Unlike the expert in *U.S. Salt*, Mr. Zoltowski did not merely adopt Mr. Waid's

recommendations without verification.  He walked through each of the calculations with

Mr. Waid to confirm he was comfortable with the analysis:

> Q.   My question is, rather, whether you did any independent analysis to
> determine the accuracy of the size of the application as reflected in this
> column called Size in Table 7 on page 40 of your report?
>
> A.  I would say it was not independent by myself and my team, but it was in
> conjunction with Mr. Waid.
>
> Q.  So did you question any of the determinations that Mr. Waid made as to
> the size of the application that went on this chart on page 40?
>
> A.  ***We walked through each of them and made sure I was comfortable with
> how he sized them***.

(Dkt. 412 at 109-10., 42:21-43:9 (emphasis added).)

15

Finally, Mr. Zoltowski confirmed in his deposition that he ***did*** have the independent expertise to perform the application-based pricing calculation on his own, but that he valued Mr. Waid's experience in pricing application licenses:

> A.  I have the expertise to take the numbers provided by the defendants to match up to this application sizing matrix. However, Mr. Waid uses this every day as part of his business, and, therefore, I appreciated his expertise in determining the appropriate size.

(*Id.* at 109, 41:9-14.)

In order to ensure consistency with FICO's standard pricing practices, Mr. Zoltowski properly relied on Mr. Waid to calculate application size once he determined that was the correct license structure.  That reliance is permissible.  *Structural Polymer*, 543 F.3d at 998; *Brennan*, 211 F.3d at 451-52; Fed. R. Evid. 703.  Federal's challenge is properly addressed through the cross-examination of both Mr. Waid and Mr. Zoltowski at trial.  There is no basis to exclude Mr. Zoltowski's testimony.

### B.    Mr. Zoltowski fairly excluded discounts from his named-application calculation.

Federal challenges Mr. Zoltowski's exclusion of discounts from his lost license fee calculation.  This challenge is meritless.  Mr. Zoltowski did not ignore discounts, as Federal asserts.  Mr. Zoltowski excluded discounts in calculating application-based lost license fees because he determined the economic reasons for applying a discount were absent.  During the pendency of the Agreement, for example, FICO received $6.7 million in professional service fees from Federal.  (Zoltowski Rep., ¶ 58.)  Mr. Zoltowski explained that the expectation of professional service fees received over a long-term client relationship provides an economic basis for discounting:

> 59.    … [W]hen FICO licenses Blaze Advisor, it expects to generate additional professional services fees over and above the amounts for the license and associated support and maintenance. These professional services fees also serve as incentives for FICO to discount the corresponding deployment license fees in light of the total fees that may be generated in connection with Blaze Advisor.

(*Id.* ¶ 59.)  Other bases for discounts include "the opportunity to make incremental product sales and the chance to receive referrals for new customers."  (Zoltowski Reply, ¶ 73.)

In the present adversarial breach situation, however, there is no expectation of future professional service fees, incremental sales, or client referrals.  Federal has been in breach of the Agreement for over 3 years.  There is no additional business opportunity, incremental sales, or client referrals to be lured in with a discount.

Mr. Zoltowski appropriately excluded discounts because there is no objective economic basis to provide one:

> 72.    Similar to my opinion that lost license fees should be calculated annually by named application, ***there is also no objective basis to discount FICO's standard license fees in my damages calculations***….

> 73.    … FICO's customary discounting practices are based upon, among other things, its anticipated long-term relationships with licensees. Like FICO's pre-2016 history with Federal, these long-term relationships are lucrative because they lead to consulting and other service fees, the opportunity to make incremental product sales and the chance to receive referrals for new customers. As a result, software companies sometimes discount deployment license fees in light of the broader relationship and anticipated service revenues.

> 75.    No such parallel exists between FICO and Defendants in this matter. In the three (3) years since FICO terminated the SLM Agreement, I understand FICO has not generated any fees from Defendants despite its continued use of Blaze Advisor. This is in contrast to the $6.7 million in fees that FICO earned from Federal between 2006 and 2016.

(*Id.* ¶¶ 72 (emphasis added), 73, 75.)

Mr. Zoltowski confirmed in his deposition he excluded a discount because the objective economic basis was lacking:

> Q.   But you'd agree that [FICO's] standard discount was generally 40 percent, right?
>
> A.   … I remember seeing discounts up to 40 percent, and, *as I stated, that's with the expectation of professional service fees.*
>
> *And that's different than the contract we have here, where FICO had no expectation of professional service fees because Federal or … defendants had stated that they were going to move forward without any sort of input or use of those professional services going forward for FICO.*

(Dkt. 412 at 124, 124:25-125:12 (emphasis added).) [2]

Federal contends that Mr. Zoltowski should have applied the discounts given to other FICO licensees.  (Dkt. 406 at 18-19.)  This challenge fails.  Not all FICO licensees receive discounts, and the decision to grant a discount is discretionary based on the ongoing professional relationship with the client.  Testifying as FICO's corporate designee on the topic of pricing, Mr. Waid explained:

> Q.   … [W]ould you characterize them as the mandatory prices or guidelines?

---

[2] Federal attempts to criticize Mr. Zoltowski's discount opinion based on the testimony of Brooks Hilliard, FICO's licensing expert.  (Dkt. 406 at 23.)  That challenge fails.  In the quoted testimony, Mr. Hilliard was referring to the discount FICO offered during the parties' pre-suit discussions in March 2016, before the termination of the Agreement.  (Dkt. 415 at 34, 235:1-16.)  The economic conditions underlying a discount—including the potential for professional services fees, incremental sales, and client referrals during an ongoing relationship—were still present at that time.  That is not true now, when Federal has been in breach of the Agreement for over 3 years.  Mr. Hilliard's testimony is fully consistent with Mr. Zoltowski's discounting opinion.

A.  I would say it is our pricing guideline.  It is how we price.... What is operational is how you discount.

Q.  How so?

A.  … [T]here are standard discounting levels based upon the volume of the purchase with certain authorities who can actually approve that.

But we always look at the overall business relationship of the client when we actually do our pricing; and so, the adjustments can be made based upon that overall relationship.

Q.  Are discounts always provided?

A. Not always, no....

(Kliebenstein Decl. Ex. 1, 25:3-23.) Mr. Zoltowski's exclusion of a discount *in this case* was appropriate based on his review of the case-specific facts.  Mr. Zoltowski is not aware of any situation that is comparable to the present case:

> 67.    … I am not aware of documents or testimony describing a situation between FICO and another customer that parallels the circumstances in this case or that suggests FICO discounted license fees for objectively unauthorized and unlicensed use of Blaze Advisor software.

(Zoltowski Reply, ¶ 67.)

The economic reasons for discounting are not present here, and Mr. Zoltowski was correct to exclude a discount.  Mr. Zoltowski's choice not to apply a discount will be subject to cross-examination, which is the best way of challenging his opinion. *Bombardier Rec. Prods.*, 2017 U.S. Dist. LEXIS 26517, at *5.  Federal has shown no basis to exclude it, and its challenge should be rejected.

19

C.     **Mr. Zoltowski properly rejected non-comparable agreements and negotiations.**

Federal asserts that Mr. Zoltowski should have considered the parties' prior negotiations and FICO's settlement agreements with third parties. (Dkt. 406 at 18-19, 22-24.) This challenge fails. Mr. Zoltowski *did* consider this evidence. (*See* Zoltowski Rep., ¶¶ 51-66; Zoltowski Reply, ¶¶ 9-13, 20-21, 49-51, 56, 59-60, 62, 65-70, 112.) Federal simply does not like the conclusions he drew from it. This is an issue for cross-examination, not exclusion. *See Bombardier*, 2017 U.S. Dist. LEXIS 26517, at *5 ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.").

1.     **Mr. Zoltowski properly rejected the parties' prior negotiations.**

Federal attempts to exclude Mr. Zoltowski's opinions because the lost license fees are more than what Federal paid under the Agreement and the parties' pre-suit negotiations in 2016. (Dkt. 406 at 18.) Federal's challenge misapplies the law. Under New York law, FICO's contract damages are expectation damages measuring FICO's actual loss. *See, e.g.*, *Holland Loader Co. v. FlSmidth A/S*, 313 F. Supp. 3d 447, 480 (S.D.N.Y. 2018.); *J&H Holding Co. v. Anthony Kloss & Impact Envtl. Redmediation*, 12 CV 5738, 2013 U.S. Dist. LEXIS 162473, at *6-7. Federal seeks to measure damages based on what *it* would be willing to pay, and criticizes Mr. Zoltowski for exceeding the cost of the original license. This challenge necessarily fails, as it is premised on the wrong law.

The license structure and discounts offered in the parties' 2016 negotiations are irrelevant. Those negotiations assumed an ongoing business relationship, and FICO offered a greater discount and favorable license terms in a good faith attempt to resolve the dispute and maintain the relationship. (Kliebenstein Decl. Ex. 4, 150:10-12 ("I secured a 60 percent discount, which is an increase from where we were, to just move beyond and settle this….").) Federal rejected that offer. The Court should not entertain its back-door attempt to recapture terms on the table in March 2016.

Contrary to Federal's assertion, Mr. Zoltowski did fully consider the terms of the parties' Agreement and 2016 negotiations. (*See* Zoltowski Rep., ¶¶ 51-59 (evaluating the case-specific facts regarding the parties' 2006 negotiations, the terms of the Agreement and Amendments, and the professional services FICO provided Federal), 60-69 (evaluating the case-specific facts regarding Federal's breach of the Agreement and the parties' 2016 negotiations).) After considering these facts, Mr. Zoltowski determined they had no effect on the lost license fee calculation because the facts and circumstances have materially changed:

> 59.    … [T]he parties negotiated for approximately three (3) months, but ultimately reached an impasse over the terms of a new agreement. Among the parties' disagreements was the appropriate fee payable to FICO, and as a result, FICO terminated the SLM agreement. Federal was free to accept or reject FICO's offer…. However, Federal chose not to accept FICO's license offer….

> 112.  … With respect to FICO's actual negotiations with Federal in 2016, I understand that FICO offered steep discounts to Defendants to resolve the dispute and to retain the ongoing business relationship, which had historically been lucrative. These lower prices reflected not only the potential to FICO of earning additional fees but also to resolve the dispute without litigation.

21

(Zoltowski Reply, ¶¶ 59, 112.)

As it stands now, Federal has been in breach of the Agreement for over three years.  Following the breach, any considerations supporting an alternative license structure or discount as in March 2016 are no longer present.  Federal may not cap its damages at the cost of a license before the breach.  Mr. Zoltowski explained:

> 60.     I am aware of no damages theory that suggests the appropriate remedy for breaching a contract and using the plaintiff's property without permission is the price the wrongdoer _wanted_ to pay prior to the breach or theft.  A damages remedy in this vein would suggest that property owners are not free to set prices but are, instead, required to accept the prices set by wrongdoers.

(_Id._ ¶ 60 (emphasis original).)  Mr. Zoltowski properly considered and rejected the parties' 2016 negotiations because they were no longer comparable following Federal's three-year plus breach.  Any issues Federal may have with this conclusion go to weight, not admissibility.

### 2.      Mr. Zoltowski properly rejected third party settlement agreements.

Federal further challenges Mr. Zoltowski's opinion because, in its view, Mr. Zoltowski's lost license fees should be the amount FICO charged Oracle and Dell to resolve license disputes.[3]  (Dkt. 406 at 19 ("Zoltowski did not rely on evidence of FICO's

---

[3] Federal also claims Mr. Zoltowski's exclusion of third party agreements is inconsistent with Mr. Hilliard's opinion.  (Dkt. 406 at 23.)  Once again, that challenge misrepresents Mr. Hilliard's testimony.  Mr. Hilliard stated that other license agreements were relevant to his task of determining whether FICO's assertion of breach and termination of the Agreement were consistent with the customs and practices of the commercial software industry.  (Dkt. 415 at 32, 37:3-22.)  He did _**not**_ say that such agreements were relevant for calculating the amount of FICO's lost license fee damages.

prior out-of-court settlements with other Blaze licensees that FICO accused of breach.").)

Historically, FICO engaged in settlement discussions with Dell and, separately, Oracle

after each underwent a merger event.  Federal contends that FICO's breach of contract

damages should be similar to what those third parties paid FICO, and that Mr. Zoltowski

improperly ignored them.  This challenge also fails.

Mr. Zoltowski **did** consider FICO's out-of-court settlements, including settlements

with Oracle and Dell, but found them inapplicable because they were not factually

comparable to the present case, and were therefore not relevant in calculating damages:

> 67.    … FICO's history of licensing Blaze Advisor to different customers
> has no bearing on the fees it has lost as a result of Defendants' wrongful and
> continued use.

> 68.    … Unlike this matter … Oracle stopped using Blaze Advisor in
> accordance with the terms of FICO's customary license agreement. Not
> surprisingly, the parties negotiated a relatively low final payment
> commensurate with Oracle's discontinued use….

> 70.    … FICO's settlement with Dell suggests nothing about the license
> fees sufficient to compensate FICO in this matter…. None of these facts were
> present in the 2016 negotiation between FICO and Federal.

(Zoltowski Reply, ¶¶ 67-68, 70)

As Federal recognizes, only comparable agreements and negotiations are relevant

to damages.  *See Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015);

*Raimondi v. Olenicoff*, No. SACV 12-2094, 2015 U.S. Dist. LEXIS 174961, at *6 (C.D.

Cal. July 7, 2015) (same).  After considering the facts surrounding those transactions, Mr.

Zoltowski determined FICO's third party negotiations and agreements were not

comparable.  He was right not to include them in his calculation.  Any issues resulting

from Mr. Zoltowski's consideration and rejection of FICO's other settlements is an issue for cross-examination and does not affect the admissibility of his testimony.

### D. Mr. Zoltowski's application-based framework is consistent with both New York contract law and copyright law.

Finally, Federal contends Mr. Zoltowski's damages framework of an application-based license is inadmissible because it does not appropriately measure damages FICO suffered under the law.  (Dkt. 406 at 8.)  This challenge fails.  Mr. Zoltowski's methodology and calculation is consistent with applicable law.  Federal's challenges to Mr. Zoltowski's choice of license structure and his calculation go to weight, not admissibility.

### 1. Mr. Zoltowski's damages framework is consistent with New York contract law.

According to New York contract law, FICO's damages for breach of the Agreement are general damages flowing directly from the breach.  *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008).  In New York, the non-breaching party is entitled to its expectation damages, *i.e.*, the loss in value resulting from the breach.  *Holland Loader Co.*, 313 F. Supp. 3d at 480.  Expectation damages are "the natural and probable consequence of the breach."  *Gusmao v. GMT Grp., Inc.*, No. 06 CIV. 5113 (GEL), 2008 U.S. Dist. LEXIS 58462, at *36 (S.D.N.Y. Aug. 1, 2008). Expectation damages are general damages.  *Bi-Economy Mkt,* 886 N.E.2d at 130.

Under the law, with respect to the amount of damages to remedy the breach, New York courts do not require "scientific rigor in the calculation of damages."  *Lexington Prods. Ltd. v. B.D. Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982).  Instead, "where a

24

wrong has been done, the courts will endeavor to make a reasonable estimate of damages," and the complaining party need only provide a "rational basis for computation of damages." *Id.* (vacating lower court judgment and remanding to award damages); *see also Tractebel Energy Mktg., Inc v. AEP Power Mktg., Inc*., 487 F.3d 89, 110-11 (2d Cir. 2007) (holding that plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of a breach).

Here, Mr. Zoltowski sought to calculate the actual value lost to FICO resulting from Federal's breach of the Agreement.  Based on his expertise, the proper framework to quantify this loss was an annual application-based license.  As Mr. Zoltowski explained, the application-based structure "is the appropriate measure of loss to FICO because it reflects the value of its software for each year of unlicensed use in each unlicensed application…."  (Zoltowski Rep., ¶ 113.)  Mr. Zoltowski's named application framework is consistent with New York law.  His choice of an application-based license structure measures the actual loss to FICO resulting from Federal's breach of the Agreement (*i.e.*, expectation damages), which is the proper measure of damages.  *See, e.g.*, *Holland Loader Co.*, 313 F. Supp. 3d at 480; *J&H Holding Co.*, 2013 U.S. Dist. LEXIS 162473, at *6-7.  Here, that breach resulted in the unauthorized use of Blaze Advisor on 17 applications for nearly four years.  FICO's standard annual application-fee pricing for the period of unauthorized use is the measure of that loss; not the purported value to Federal.  Federal's challenge to Mr. Zoltowski's chosen framework to calculate damages due to Federal's breach of the Agreement fails under the law.

### 2.   Mr. Zoltowski's calculation of actual damages under the Copyright Act is proper under applicable law.

The Copyright Act provides for the recovery of actual damages resulting from the infringement. 17 U.S.C. § 504(b) ("The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement.").  Mr. Zoltowski's framework for calculation of actual damages under the Copyright Act was identical to the framework for calculation of damages for breach of contract.  (Zoltowski Rep., ¶ 121.)  Mr. Zoltowski calculated the value of FICO's actual loss measured by its standard prices in place since 2003.  (*Id.*)  Federal challenges Mr. Zoltowski's calculation of actual copyright damages on the basis that he did not perform a "hypothetical negotiation" to determine market value.  (Dkt. No. 406 at 15-16.)  This challenge fails.  A hypothetical negotiation may be one way to show market value, but it is not the only way.  Mr. Zoltowski's calculation is grounded in objective evidence of market value.  Federal's argument that a different measure should be used is best addressed through cross-examination, not exclusion.

### a.   Mr. Zoltowski properly calculated actual damages based on objective evidence of market value.

Federal's criticism of Mr. Zoltowski's actual damages calculation is meritless. (Dkt. 406 at 20.)  Federal asserts that under the law "the appropriate measure of damages is the 'fair market value' of a Blaze license covering Federal's alleged unlicensed uses." (Dkt. 406 at 15.)  FICO's damages claim *is* based on what the market has accepted since at least 2003: its standard application-based pricing.  Mr. Zoltowski calculated FICO's actual copyright damages as the value of the license fees FICO lost as a result of

26

Federal's infringement, which is an undiscounted, application-based license for each of the 17 applications used during the infringement.  (Zoltowski Rep., ¶¶ 101-106, 113-117.)  As shown above in Section III(A), Mr. Zoltowski's actual damages calculation was based on objective evidence of the actual value of Blaze Advisor, namely, FICO's 2003 Global Price List and nine-factor sizing matrix.  (Kliebenstein Decl. Ex. 1, 23:9-15.)  FICO's established rates have provided the standard price for Blaze Advisor licenses since 2003.  (*Id.* 24:19-22.)  Mr. Zoltowski's use of FICO's established rates as a measure of actual damages *is* a reasonable approximation of market value.

Federal attempts to measure "fair market value" according to what *it* would be willing to pay.  This is the wrong measure of damages.  *See Montgomery v. Noga*, 168 F.3d 1282, 1295-96 (11th Cir. 1999) (affirming $43,900 actual damages award where copyright owner otherwise sold $2000 unlimited use license: "While the defendants correctly note that Montgomery sold $2,000 unlimited use licenses … *the jury certainly was permitted to find that Montgomery would not have offered such a license to the defendants*.") (emphasis added); *see also Tel. Co. of Missouri v. Johnson Pub. Co*., 671 F. Supp. 1514, 1524-25 (W.D. Mo. 1987), *aff'd*, 855 F.2d 604 (8th Cir. 1988) (awarding copyright owner damages based on the loss of the copyright owner's standard licensing fee).  Here, FICO based its damages measurement on FICO's documented standard prices that were in place over a decade before this lawsuit began.  Any questions regarding Mr. Zoltowski's use of FICO's established rates to provide objective evidence of fair market value are issues for cross-examination, not exclusion.  *See Bombardier Rec. Prods*., 2017 U.S. Dist. LEXIS 26517, at *5.

27

Courts recognize that an expert's choice of a specific framework for calculating actual copyright damages is an issue for cross-examination, not exclusion.  *See, e.g.*, *Leonard v. Stemtech Health Scis., Inc.*, No. 08-cv-067-LPS-CJB, 2013 U.S. Dist. LEXIS 138446, at *17 (D. Del. Sep. 23, 2013) (denying *Daubert* challenge to expert's choice of methodology for calculating actual copyright damages: "the Court determines that any limitations as to Professor Sedlik's proposed testimony in this regard are more appropriately pursued by way of cross-examination, as opposed to exclusion via *Daubert* and its progeny."); *see also Gray v. Perry*, No. 215CV05642CASJCX, 2019 U.S. Dist. LEXIS 113807, at *63-65 (C.D. Cal. July 5, 2019) (same).  As the court stated in Federal's cited case *Recursion Software* (Dkt. 406 at 17), "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Recursion Software, Inc. v. Double-Take Software, Inc.*, No. 4:10-CV-403, 2012 U.S. Dist. LEXIS 63299, at *11 (E.D. Tex. May 4, 2012).

### b.    Federal's cases are distinguishable and confirm the admissibility of Mr. Zoltowski's opinions.

Federal's cited cases are distinguishable and confirm the admissibility of Mr. Zoltowski's actual damages opinion.  In *On Davis*, the Second Circuit **reversed** the district court's denial of actual damages and remanded for calculation of actual damages. *On Davis v. Gap, Inc.*, 246 F.3d 152, 161 (2d Cir. 2001) ("Therefore, to the extent the district court dismissed the case because Davis's evidence of the market value of a license fee was too speculative, we believe this was error.").  The court endorsed calculating actual damages based on the value of the infringing use and held that the

inherent uncertainty in that calculation does not preclude recovery: "We recognize also that finding the fair market value of a reasonable license fee may involve some uncertainty…. Given our long-held view that in assessing copyright damages 'courts must necessarily engage in some degree of speculation,' some difficulty in quantifying the damages attributable to infringement should not bar recovery." *Id.* at 166-167. Likewise, any uncertainty in Mr. Zoltowski's calculation does not preclude recovery. That uncertainty is best resolved through cross-examination, not exclusion.

*Recursion Software* is similarly distinguishable and supports Mr. Zoltowski's opinions. There, the expert relied on the 15 *Georgia-Pacific* factors from patent law to calculate a hypothetical lost license fee, which the court explained "are not typically used" to calculate copyright damages. 2012 U.S. Dist. LEXIS 63299, at *16-17, 20-21. The expert based his *Georgia-Pacific* analysis on license agreements for uses of the plaintiff's other "various products," not the software at issue in the case. *Id.* at *20-22. The Court found that the expert's use of these other agreements was not comparable to the infringing use at issue in the case, and that the other factors considered in the expert's *Georgia-Pacific* analysis were inapplicable. *Id.* at *26 ("[T]he remaining factors, as they are applied by Bell in this case, are irrelevant to the calculation of actual damages in this case. Therefore, the Court finds that Bell's report is not relevant to assist the jury to determine a fact in issue."). Mr. Zoltowski did not conduct a *Georgia-Pacific* analysis based on non-comparable license agreements. To the contrary, as shown above, Mr. Zoltowski properly excluded the non-comparable *Oracle* and *Dell* agreements from his analysis. *Recursion Software* supports Mr. Zoltowski's analysis.

29

*Interplan* is similarly distinguishable. There, the court struck portions of a declaration submitted by the plaintiff's President because the estimation of damages he presented was not supported by any corroborating evidence:

> Mr. Meijer's statement that he "would have charged [C.L. Thomas] a licensing fee of $25,000 for each additional store or site" ***cannot alone establish the amount of actual damages*** to which Plaintiff is entitled. Mr. Meijer fails to represent that $25,000 is the fair market value for a licensing fee…. The license fee of $25,000 appears to be nothing more than Mr. Meijer's subjective calculation. ***On its own***, it is not a proper measure of Plaintiff's actual damages.

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-cv-03181, 2010 U.S. Dist. LEXIS 114306, at *36 (S.D. Tex. Oct. 27, 2010) (emphasis added). In contrast, Mr. Zoltowski recognized that the proper value of FICO's lost license fees was the value lost to FICO and based his calculation on objective evidence of the same. Federal's disagreement with Mr. Zoltowski's measure of market value does not warrant exclusion of his opinion, which is reliable and grounded in case-specific facts.

## IV.   Mr. Zoltowski's calculation of disgorgement damages is admissible

Federal attacks Mr. Zoltowski's opinions relating to disgorgement of Federal's profits on the basis that it allegedly includes profits from unnamed defendants. Federal's challenge to Mr. Zoltowski's methodology fails under the law and under the facts. He correctly assumed liability in accord with applicable law and calculated the dollar amounts associated with gross written premiums connected to Federal's infringing use of Blaze Advisor. Mr. Zoltowski's observations regarding the corporate structure and contractual relationships of Federal's wholly owned subsidiaries and pool members will aid the trier of fact in determining disgorgement damages.

30

### A. The relevant law allows recovery of profits that stem from the predicate acts of infringement: Mr. Zoltowski's testimony is not irrelevant as a matter of law.

Federal challenges Mr. Zoltowski's disgorgement analysis because, in its view, under the law FICO cannot seeks profits from entities who are not named in this lawsuit.[4] (Dkt. 406 at 25-28.)  Federal is wrong on the law.  The remedial scope of the Copyright Act reaches all profits that stem from the predicate acts of infringement.  The wrongdoer is liable for the full scope of the wrong.  The disgorgement remedy of the Copyright Act captures all revenue attributable to Federal's predicate wrongful acts of infringement. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir. 1939); *see also Tire Eng'g & Distrib., Ltd. Liab. Co. v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 308 (4th Cir. 2012); *Los Angeles News Serv. v. Reuters TV Int'l, Ltd.*, 149 F.3d 987, 990-92 (9th Cir. 1998).

The predicate act doctrine derives from Judge Learned Hand's decision in *Sheldon.*  In *Sheldon*, the copyright owner sued the movie-theater parent company, Loew's, Inc., for the profits generated by Loew's and its non-party subsidiaries. 26 F. Supp. 134, 135 (S.D.N.Y. 1938).  On appeal, Judge Learned Hand affirmed disgorgement of Loew's profits derived from its subsidiaries because 1) Loew's, the parent, was the "real tortfeasor", and 2) Loew's benefited from the infringement.  106 F.2d at 52.

---

[4] Federal's calculation of profits from non-named parties ($29.5 billion of $30.9 billion) is not supported by the facts.  Federal Insurance Co. and ACE American Insurance Co. account for $ 27.65 billion of FICO's proffered revenue.

The facts are no different here.  FICO seeks disgorgement of profits *from* Federal Insurance Company and ACE American Insurance Company, the named defendants. Defendants wholly own the non-party writing companies and have agreements with others to share revenue.  (Zoltowski Rep. at ¶¶ 30-50.)  Defendants are the "real tortfeasors" and they with their wholly owned subsidiaries and pool members are a single business.  (*Id*.)  The fact these writing companies are not Defendants is of no moment. The named Defendants are the infringers, and the remedial scope of the Copyright Act includes disgorgement from the wrongdoers of all profits stemming from their infringement, which includes the revenue of all of the writing companies that sell insurance in connection with the use of Blaze Advisor.  The legal and economic realities of the case confirm the scope of the benefit to Defendants.

During discovery, FICO asked for Federal's revenue connected to the use of Blaze Advisor.  Federal produced that data in response to interrogatories:

> **INTERROGATORY NO. 17:** For all insurance policies in connection with which the Blaze Advisor® software was used, the gross written premium of Federal and the gross written premium of each related company, including the specific identification of each related company, for each quarter from March 30, 2016 to date….

(Kliebenstein Decl. Ex. 5.)  Interrogatory Nos. 18-20 sought the same information for the United Kingdom, Canada, and any other country (including Australia).  (*Id.* Ex. 6-8.) Federal answered Interrogatory Nos. 17-20, identifying its subsidiaries and pool members (each related company) and the amount of revenue each realized using Blaze Advisor. (*Id.* Ex. 5-8.)

Further, the evidence also shows that Defendants share all revenue with their related writing companies. (Zoltowski Rep., ¶¶ 30-50.) Federal's answers admit each of the wholly owned subsidiaries and pool members are related companies. Defendants, their wholly owned subsidiaries and their pool members are a single business. (*Id.*) The single nature of their business is reflected, in accordance with standard accounting principles, in Defendants' consolidated financial statements. Defendants acknowledge this economic realty by choosing to file consolidated federal income tax returns that include all of their wholly owned subsidiaries. (Zoltwoski Rep., ¶ 47 n.79.) To deny FICO the disgorgement of profits from Defendants' subsidiaries and pooling members is to deny FICO the "profits of the infringer that are attributable to the infringement."

### B.   Mr. Zoltowski's testimony of the interconnectedness of Defendants' writing companies provides valuable context to aid the trier of fact.

Mr. Zoltowski's reports contain two related, but distinct, subject matters that Federal challenges. First, Mr. Zoltowski's report provides testimony pointing out the interconnectedness of the gross revenue of Defendants and their wholly owned subsidiaries and pool members. Federal attempts to cast Mr. Zoltowski's testimony regarding the evidence that connects the Defendants and their writing companies' gross revenue as a novel theory. As addressed above, it is not. The remedial scope of the Copyright Act includes the predicate act doctrine. Second, Mr. Zoltowski calculates the revenue resulting from the sale of insurance in connection with which Blaze Advisor has been used. This is also proper—Mr. Zoltowski's calculation of revenue is FICO's burden

under Section 504(b) of the Copyright Act.  Each of these subjects and Federal's

challenges are discussed below.

> **1.    Mr. Zoltowski's identification of revenue subject to
> disgorgement is proper because Federal disclosed revenue from
> multiple writing companies; Mr. Zoltowski properly assumed
> liability.**

As copyright owner, FICO need only present proof of Federal's gross revenue.  17

U.S.C. § 504(b).  Consistent with FICO's statutory burden, and based on the revenue

disclosed in Federal's verified interrogatory answers, Mr. Zoltowski provided his opinion

that FICO may[5] be entitled to disgorge the profits from the gross written premiums

generated using Blaze Advisor of $30.9 billion:

> 111.    FICO may be entitled to disgorge Defendants' profits from written
> premiums generated using Blaze Advisor.  Between March 31, 2016 and
> March 2019, Defendants generated gross written premiums in the Untied
> States of $28.4 billion.  FICO may also be entitled to disgorge the profits
> from written premiums generated by certain foreign entities that used Blaze
> Advisor in Canada, Australia, the United Kingdom and certain other
> European countries between April 2013 and March 2019 of $2.5 billion.  In
> total, FICO may be entitled to disgorge the profits from written premiums
> generated using Blaze Advisor of $30.9 billion.

(Zoltowski Rep., ¶ 111 (internal citations omitted).)  Mr. Zoltowski confirmed he

conducted his disgorgement opinion in accord with Section 504(b):

> I understand based on the Copyright Act (17 U.S.C. § 504(b)) that: "In
> establishing the infringer's profits, the copyright owner is required to present
> proof only of the infringer's gross revenue, and the infringer is required to
> prove his or her deductible expenses and the elements of profit attributable

---

[5] Federal appears to take issue with Mr. Zoltowski's use of "may."  (Dkt. 406 at 5.)
However, this usage is consistent with Mr. Zoltowski's assumption of liability.
(Zoltowski Rep., ¶ 112.)  If Federal is found to be liable for copyright infringement,
FICO may disgorge its profits.  As Federal recognizes, Mr. Zoltowski "does not provide
any opinions related to liability."  (Dkt. 406 at 3 n.1.)

to factors other than the copyrighted work." As a result, the damages presented related to copyright infringement damages reflect the dollar amounts associated with gross written premiums through Defendants' allegedly infringing use of Blaze Advisor.

(*Id.* ¶ 111 n.228.)

As discussed above in Section IV(A), FICO is entitled to all profits attributable to Federal's infringement. Mr. Zoltowski used Federal's own gross revenue data in his calculation of the revenue subject to FICO's disgorgement claim. Federal disclosed revenue from "insurance policies in connection with which the Blaze Advisor® software was used" of $30.9 billion. That is the number Mr. Zoltowski used. He did not state an affirmative opinion regarding whether certain revenue was appropriate to disgorge. He simply assumed the gross revenue Federal admits resulted from Federal's infringing use of Blaze Advisor is subject to disgorgement:

> 112. For purposes of my damages analysis, I have assumed that Defendants Federal and ACE American are liable for the causes of action asserted by FICO and as a result of Defendants' actions, FICO has suffered economic harm, and/or Defendants have realized improper economic benefits.

(*Id.* ¶ 112)

No Opinion Regarding Writing Companies Subject to Damages

> 109. … I have analyzed the many relationships between the Defendants and the various writing companies that generated gross written premiums from applications using Blaze Advisor. I understand that whether the Defendants are liable for the infringing use of Blaze Advisor by writing companies with different legal and/or contractual relationships is a legal question to be resolved by the Court.

(Zoltowski Reply, ¶ 109.)

An assumption of liability is proper for a damages expert.  *See Robroy Indus. Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 U.S. Dist. LEXIS 54230, at *12-14 (E.D. Tex. Apr. 10, 2017) (collecting cases and noting this principle is "beyond serious challenge"); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-Civ, 2011 U.S. Dist. LEXIS 62969, at *10 (S.D. Fla. June 7, 2011) ("An expert witness, however, may assume liability for purposes of calculating damages.").  The ultimate question of which revenue streams are subject to disgorgement is an issue for the trier of fact as instructed on the law by the Court.  As shown above, and discussed in detail in FICO's concurrently filed Opposition to Federal's Motion for Summary Judgment, it is well supported that FICO may disgorge profits from Defendants' subsidiaries and pooling members when such profits are "attributable to the infringement."  Mr. Zoltowski's assumption of liability is consistent with the law.  *See Sheldon*, 26 F. Supp. at 135.

> **2.**     **Mr. Zoltowski's testimony about Defendants' corporate and economic structure is relevant and will aid the trier of fact.**

Federal's next challenge is about Mr. Zoltowski's testimony regarding the interconnectedness of Defendants and their writing companies.  Federal's contention that Mr. Zoltowski states a novel and unsupported "single economic unit" theory is a red herring.  (Dkt. 406 at 25-27.)  Federal would have the Court believe that Mr. Zoltowski "invented" a new theory to permit the disgorgement of profits from Defendants' other writing companies.  (*Id.*)  This assertion misses the mark.  Mr. Zoltowski does not state an opinion on liability or the specific revenue streams subject to disgorgement, which he

properly recognized as issues for the trier of fact under the Court's legal instructions. He simply provided an analysis of Defendants' corporate and economic structure to aid the trier of fact in determining the specific revenue streams subject to disgorgement and understanding the gross revenue Federal disclosed in its interrogatory responses.

The facts support Mr. Zoltowski's report relating to the interconnectedness of Defendants and their writing companies. For example, Federal's interrogatory responses provide the gross revenue connected to Federal's infringing use of Blaze Advisor and connected to each related company (per the interrogatory), which Federal calls writing companies:

- **For CSI eXPRESS (CSIX), Automated Renewal Process (ARP), Profitability Indicator (PI), and Defined Book Run (DBR):**

| Year / Writing Company | Gross Written Premium | Policy Count |
|---|---|---|
| **2016** | **$1,526,511,534.36** | **90555** |
| **CSIX/ARP/PI** | **$1,444,514,455.23** | **82191** |
| CICNJ | $21,543,942.90 | 1893 |
| ERII | $74,655,072.17 | 5326 |
| ERSIC | $31,403,417.00 | 1466 |
| FIC-D | $1,210,424,578.61 | 68552 |
| PACIFICPI | $150,747.00 | 64 |
| VIG-D | $7,425,581.00 | 98 |
| CICC-CN | $98,911,116.55 | 4792 |
| **New Business PI excluding DP** | **$81,997,079.13** | **8364** |
| CICNJ | $2,212,095.00 | 268 |
| ERII | $492,570.48 | 52 |
| ERSIC | $1,026,440.46 | 72 |
| FIC-D | $75,579,124.19 | 7694 |
| PACIFICPI | $206,637.00 | 34 |
| CICC-CN | $2,480,212.00 | 244 |
| **2017** | **$1,462,910,856.49** | **91631** |

(Kliebenstein Decl. Ex 5.)

The interrogatories sought gross written premium from "related companies," and Defendants provided that information in response. Defendants admit the writing

companies are "related."  Mr. Zoltowski's report provides valuable context that will aid

the trier of fact in evaluating the sources of revenue in Federal's interrogatory responses,

including the revenue from other "related" writing companies.  He explained that in the

insurance industry, the revenues of wholly owned subsidiaries "roll up" to their parent

corporations due to the corporate structure of those companies:

> 30.    The financial results of Defendants, the corresponding subsidiaries of both, and the related Chubb entities are consolidated with Chubb INA Holdings, Inc. and Chubb Limited (i.e., the ultimate parent) to reflect that the combinations of parents plus subsidiaries are, in fact, a single economic unit…. [B]oth Federal and ACE American are currently direct (Federal) and indirect (ACE American) subsidiaries of Chubb INA Holdings, Inc., and both are also parents of several subsidiaries, all of which roll up and are reported in total with Chubb Limited.

> 34.    Since the Acquisition, Chubb Limited's financial statements have included the financial results of both Federal and ACE American.  Federal has seven (7) domestic and five (5) foreign subsidiaries that Chubb Limited reports on a consolidated basis in 2018.  All except one (1) are wholly-owned by Federal, and of these twelve (12) subsidiaries, several wrote and issued insurance policies with applications using Blaze Advisor between 2016 and 2019.

> 35.    Similarly, ACE American has fourteen (14) domestic and two (2) foreign entities that Chubb Limited reports on a consolidated basis in 2018.  All are wholly-owned by ACE American, and of these sixteen (16) subsidiaries, several wrote and issued insurance policies with applications using Blaze Advisor between 2016 and 2019.

(Zoltowski Rep., ¶¶ 30, 34, 35 (internal citations omitted).)

He also explained that insurance companies such as Defendants engage in pooling

arrangements to increase efficiencies and meet state regulatory requirements:

> 36.    The pooling arrangements between Defendants and the members of their pools also demonstrate that these groups of entities are a single economic unit rather than independent businesses.  Pooling arrangements are characterized by the sharing of premiums, losses, and expenses among a

group of participant companies…. In fact, most of the pool members for both ACE American and Federal are also their wholly-owned subsidiaries.

37. … [I]nsurance companies under a pooling agreement function as a single business with the insurance company identified as the pool leader at the head….

39. … [E]ven though each insurance policy is underwritten by an individual writing company … the policy is ultimately managed, serviced and insured by the pool's lead company's assets (e.g., human capital, financial assets and otherwise) rather than any individual insurance company within the pool. In this way, the pool lead and members function as a single business unit despite the number of individual writing companies that comprise the pool.

(*Id.* ¶¶ 36, 37, 39.)

His description of the writing company corporate structure, insurance company pooling arrangements, and related issues will provide context to the trier of fact in determining whether the gross revenue of the writing companies are "attributable to the infringement" and thus properly disgorged from Defendants. Mr. Zoltowski explained this distinction at his deposition:

Q. Now, in your reply, paragraph 109, that paragraph is entitled, quote, No Opinion Regarding Writing Companies Subject to Damages, unquote. So are you walking back from this whole concept of a single economic unit?

A. … I think I stated what the … meaning of the exercise was and what I set out to do, ***which was provide education to the court or trier of fact to make a determination***.

Q. So why did you feel the need to say here, quote, No Opinion Regarding Writing Companies Subject to Damages, unquote?

A. Because it's not for me to decide if the companies—***this goes back to the legal question as to who is responsible for damages. This would be for the trier of fact, this would [be] for the jury, for the judge to determine***.

39

*I'm simply providing information regarding the fact that the company operates as a single economic unit, and based upon that information and other information, which the jury or judge decides to utilize, will make a determination as to which entities are subject to damages should liability be found*.

Q.  I thought your purpose in this entire exercise that you engaged in in your expert report as to whether all of these various entities are a single economic unit was to support the idea that all of these various units, including the writing companies, are subject to damages?

A.  *The purpose of the exercise was to educate the Court as to what the corporate structure looks like for the entities involved in this proceeding, but I don't have a legal opinion as to which ones are subject to damages*.

(Dkt. 412 at 122, 116:12-117:23 (emphasis added).)

Based on an assumption of liability, Mr. Zoltowski provided an analysis of the various subsidiary relationships and pooling arrangements.  This analysis is relevant and admissible to educate the trier of fact.  *See* Fed. R. Evid. 702.

### 3.    Mr. Zoltowski is qualified to provide context regarding other writing companies.

Federal's challenge to Mr. Zoltowski's qualifications is meritless.  (Dkt. 406 at 27.)  An expert is one qualified by "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Rule 702 requires that "the area of the witness's competence matches the subject matter of the witness's testimony."  *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006).  An expert need not have "personal experience" on matters he or she is not being relied upon for expert opinions. *Bombardier Rec. Prods.*, 2017 U.S. Dist. LEXIS 26517, at *18-20, 46-48.  "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility."  *Robinson*, 447 F.3d at 1100.

Here, Mr. Zoltowski is more than qualified to educate the trier of fact on

Defendants' corporate and economic structure.  He is a partner of the financial services

firm StoneTurn Group, LLP, and has been involved in hundreds of financial and

economic consulting engagements over the past 20 years, including numerous

engagements for Fortune 500 companies:

> 1.      … I have provided financial and economic consulting services –
> including economic valuation of intellectual property such as patents, trade
> secrets, trademarks and copyrights – to counsel and client companies for
> more than 20 years. I have been involved with, and/or managed, hundreds of
> financial consulting engagements with the majority of these products
> concerning economic damages, including numerous engagements on behalf
> of Fortune 500 companies.

(Zoltowski Rep., ¶ 1; *see also* Dkt. 412 at 101-02, 9:6-9, 11:13-18.)

He has also received multiple professional certifications over that time, including

Certified Valuation Analyst, Master Analyst in Financial Forensics, and Certified

Licensing Professional.  (Zoltowski Rep., ¶ 2.)

Mr. Zoltowski confirmed at his deposition that he has prior experience evaluating

the corporate and economic structure of companies:

> Q.  … [Y]ou were asked a number of questions about the content between
> paragraphs 30 through 50 of your report that relate to the economic unit at
> issue in this case. Do you recall those questions?
>
> A.  I do.
>
> Q.  Have you been a part of any engagements in your professional work
> experience where you did work to understand the corporate and/or economic
> structure of a company?
>
> A.  … I've been involved in a number of cases where we would look at
> corporate structure. You know, as an economic damages expert, that would
> be part of an analysis….

Q.   The corporate structure, but what about the economic structure of a company?

A.   That would be part of it….

(Kliebenstein Decl. Ex. 9, 210:19-211:19.)

Mr. Zoltowski's qualifications are not in doubt.  Based on his decades of experience in financial and economic consulting, in addition to his prior expert witness work on the same topic, Mr. Zoltowski is qualified to testify regarding the financial and economic structure of the writing companies disclosed in Federal's interrogatory responses.  *See Bombardier Rec. Prods.*, 2017 U.S. Dist. LEXIS 26517, at *18-20, 46-48.  Any gaps in Mr. Zoltowski's qualifications go to the weight of his testimony and provide no basis to exclude it altogether.  *See Robinson*, 447 F.3d at 1100.

### C.   Mr. Zoltowski's analysis does not solely rely on Mr. Whitener.

Federal finally asserts that Mr. Zoltowski's disgorgement analysis should be excluded because it "rel[ies] entirely on the inadmissible causation opinions of FICO's other experts."  (Dkt. 406 at 28.)  This analysis fails.  Federal's characterization of the relationship between Mr. Zoltowski's opinion and Mr. Whitener's opinion is wrong[6].  Mr. Zoltowski does not rely entirely on Mr. Whitener as a prerequisite for his analysis.

---

[6] FICO will carry its burden to prove the connection between use of Blaze Advisor and gross revenue as well as showing Blaze Advisor contributes to that revenue through the expert testimony of Mr. Whitener and fact witnesses.  As shown in FICO's concurrently filed Opposition to Federal's Motion to Exclude Mr. Whitener, Federal's challenges to his testimony necessary fail.  The Court should deny Federal's motion and admit Mr. Whitener's testimony.

Mr. Zoltowski's opinion is based on his review of the documents and testimony, not just

Mr. Whitener:

> 124.   ***Based on my review of the documents produced and testimony given
> in this matter*** as well as my discussions with Bick Whitener, Defendants'
> use of Blaze Advisor contributes to the generation of gross written
> premiums….

(Zoltowski Rep., ¶ 124 (emphasis added).)

While he cited Mr. Whitener's testimony in his reply, he also cited other evidence,

including Federal's interrogatory answers:

> 108.   ... I understand that Bick Whitener, FICO's industry expert in this
> matter, explained the causal nexus between Defendants' use of Blaze
> Advisor and its corresponding gross written premiums from that use. ***To the
> extent that a causal nexus is required in a damages expert report,
> Defendants reported in interrogatory responses the gross written
> premiums from policies processed through applications using the Blaze
> Advisor software***….

(Zoltowski Reply, ¶ 108 (emphasis added).)  In his deposition, Mr. Zoltowski confirmed

that in addition to speaking to Mr. Whitener, he reviewed all evidence cited by Mr.

Whitener and other evidence in the case.  (Kliebenstein Decl. Ex. 9, 65:11-66:18; Dkt.

412 at 128, 140:16-141:11.)  Mr. Zoltowski testified: "there are a number of pieces of

information that one could conclude there is a reasonable connection."  (Dkt. 412 at 128,

141:8-11.)  Federal's challenge to Mr. Zoltowski should be rejected.

## V.     Conclusion

Federal has shown no basis to exclude the testimony of Mr. Zoltowski.  Mr.

Zoltowski has relevant expertise to opine on FICO's lost license fees and copyright

damages.  Mr. Zoltowski utilized reliable methodology and linked his opinions to the

facts of the case.  Fed. R. Evid. 702.  His opinions are admissible and will aid the trier of

fact in calculating damages.  To the extent Federal disagrees, this is a matter for cross-

examination.  The Court should deny Federal's motion in its entirety.


Dated: August 26, 2019

MERCHANT & GOULD P.C.

/s/ Heather Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN  55402
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com

*Attorneys for Plaintiff Fair Isaac Corporation*