## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Jury Trial Demanded** |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) ) ) ) ) | **FILED UNDER SEAL** |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM
## <u>IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

I.      Introduction. ..................................................................................................... 1

II.     Chubb & Son, a division of Federal, entered into the Agreement with FICO. ...... 2

        A.      The Agreement restricts the installation and physical location of Blaze
                Advisor to the United States; it does not bar use of Blaze Advisor to
                support business operations outside the United States. .............................. 3

        B.      No relevant, admissible evidence supports Defendants' interpretation
                of the territorial restriction of the Agreement: FICO is entitled to
                summary judgment. ................................................................................... 7

                (1)     There is no evidence that FICO helped install Blaze Advisor
                        outside the United States. ............................................................ 11

                (2)     Argument is not evidence. ............................................................ 12

        C.      An unincorporated division cannot have "affiliates": Amendment Two
                did not permit non-US installations of Blaze Advisor. ............................ 13

III.    The terms and conditions of the Agreement cannot be waived, and the
        Agreement cannot be amended without a signed writing. ................................. 13

        A.      Defendants misstate the 2008 facts. ......................................................... 15

        B.      The parties' mistaken beliefs regarding the territorial restriction of the
                Agreement do not excuse Federal's breach of the Agreement. ............... 16

IV.     FICO terminated the Agreement because, among other reasons, Federal
        continued to use Blaze Advisor without FICO's consent in breach of
        Paragraph 10.8. ................................................................................................. 17

        A.      Defendants' interpretation of Paragraph 10.8 violates the rules of
                contract construction and ignores the commercial purpose of the
                provision. ................................................................................................. 19

        B.      Defendants distort the meaning of "expanded use." ................................ 20

        C.      Defendants' contention FICO unreasonably withheld consent to the
                continued use of Blaze Advisor fails as a matter of law. ......................... 23

V.      Chubb & Son distributed Blaze Advisor for installation outside the United
        States in breach of license restrictions of the Agreement: a domestic
        infringement of FICO copyrights. ...................................................................... 26

i

A.   Allowing installation abroad is an act of distribution that exceeds the scope of the license granted to Federal. .................................................... 26

B.   Federal's contentions it is not liable for copyright infringement because the Agreement granted global rights and because the foreign insurance companies were affiliates of Federal fail as a matter of law. .. 27

C.   Federal's contention FICO waived its contract rights and thereby authorized Federal's infringing acts fails as a matter of law. .................. 27

VI.   Federal's use of Blaze Advisor after termination of the Agreement is copyright infringement as a matter of law............................................................. 28

VII.   The fact FICO is damaged is certain, not speculative.  The amount of those damages presents genuine issues of material fact for trial. ................................. 29

VIII.   FICO's damages arise from Defendants' unauthorized use of Blaze Advisor and their violation of FICO's intellectual property—its copyrights.  FICO's damages claims are not limited by contract. ........................................................ 33

IX.   FICO's disgorgement claim under the Copyright Act is not speculative.  The evidence proving those damages will be presented at trial. ................................. 34

A.   Federal relies on an incorrect interpretation of § 504(b)........................... 34

(1)   FICO must prove a "connection" between Federal's infringement and Federal's revenue – not "but for" causation. .... 34

(2)   Federal ignores controlling precedent. ........................................... 36

(3)   Federal's software cases are inapposite. ........................................ 37

B.   FICO's evidence to be presented at trial satisfies its burden of proof under § 504(b). ....................................................................................... 39

C.   Federal—not FICO—bears the burden of quantifying what profits are not attributable to infringement. .................................................................. 41

(1)   Federal bears burden of disentangling the contribution of infringement from other factors. .................................................... 41

(2)   Federal's arguments that Blaze Advisor is a small part of its total technology footprint, the role of its human capital, and other alleged non-infringing factors relate to Federal's burden of proof; they are not grounds for summary judgment against FICO............................................................................................. 42

ii

D.      FICO is entitled to disgorgement from Defendants for all profits attributable to infringement (insurance sold in connection with which Blaze Advisor was used), regardless of the entity that sold the insurance..................................................................................... 42

X.      Conclusion ........................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*3 Com v. Banco de Brasil,*
171 F.3d 739 (2d Cir. 1999)......................................................................... 8, 11

*A & M Records, Inc. v. Napster,*
239 F.3d 1004 (9th Cir. 2001) .......................................................................... 26

*Am. Nat'l Bank & Tr. Co. of Chi. v. Chi Title & Tr. Co.*
134 Ill. App. 3d 772 (1985) ............................................................................... 6

*Anascape, Ltd. v. Microsoft,*
2008 U.S. Dist. LEXIS 111828 (E.D. Tex. April 25, 2008)......................... 16

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)........................................................................................ 39

*Andreas v. Volkswagen of Am., Inc.,*
336 F.3d 789 (8th Cir. 2003) ....................................................................*passim*

*Astoria Bedding v. Northside P'ship.,*
657 N.Y.S.2d 796 (N.Y. App. Div. 1997.) ..................................................... 23

*Balsley v. LFP, Inc.,*
691 F.3d 747 (6th Cir. 2012) ..................................................................... 36, 39

*Bell v. Taylor,*
827 F.3d 699 (7th Cir. 2016) .......................................................................... 30

*Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.,*
886 N.E.2d 127 (N.Y. 2008)............................................................................ 33

*City of Rockford v. Mallinckrodt ARD,*
360 F. Supp. 2d 730 (N.D. Ill. 2019) ................................................................ 6

*Complex Sys. v. ABN Ambro Bank N.V.,*
2013 U.S. Dist. LEXIS 160291 (S.D.N.Y. Nov. 8, 2013)..................... 36, 38

*Daiichi Seihan USA v. Infinity USA,*
625 N.Y.S.2d 527 (N.Y. App. Div. 1995) ..................................................... 14

*DaimlerChrysler Servs. v. Summit Nat'l*,
   2006 U.S. Dist. LEXIS 4282 (E.D. Mich. Jan. 26, 2006)....................................36, 38

*Dayva Int'l v. Award Prods. Corp.*,
   1998 U.S. App. LEXIS 4386 (Fed. Cir. Mar. 11, 1998)........................................35, 36

*Doc. Sec. Sys., Inc. v. Coupons.com, Inc.*,
   55 F. Supp. 3d 485 (W.D.N.Y. 2014) ..............................................................30

*Dwyer Instruments v. Sensocon, Inc.*,
   873 F. Supp. 2d 1015 (N.D. Ind. 2012) ...........................................................35

*Encyclopedia Brown Prods. v. Home Box Office*,
   1994 U.S. Dist. LEXIS 21372 (S.D.N.Y. Oct. 15, 1998) ...........................................28

*Fin. Techs. Int'l. v. Smith*,
   247 F. Supp. 2d 397 (S.D.N.Y. 2002)..............................................................14

*Fournier v. McCann Erickson*,
   242 F. Supp. 2d 318 (S.D.N.Y. 2003)..............................................................36

*Galderma Labs. v. Paddock Labs.*,
   2011 U.S. Dist. LEXIS 32196 (N.D. Tex. Mar. 28, 2011) ..........................................15

*Garcia v. Coleman*,
   2009 U.S. Dist. LEXIS 29458 (N.D. Cal. Mar. 24, 2009)...........................................35

*Gusmao v. GMT Grp., Inc.*,
   2008 U.S. Dist. LEXIS 58462 (S.D.N.Y. Aug. 1, 2008) ............................................33

*Hoag v. Chancellor, Inc.*,
   677 N.Y.S.2d 531 (N.Y. App. Div. 1998) ..........................................................23

*Honeywell Int'l Inc. v. ICM Controls Corp.*,
   2017 U.S. Dist. LEXIS 11692 (D. Minn. Jan. 26, 2017).......................................35, 37

*IBM v. BGC Partners, Inc.*,
   2013 U.S. Dist. LEXIS 59779 (S.D.N.Y. Apr. 25, 2013)......................................36, 38

*Ingersoll Milling Mach. v. M/V Bodena*,
   616 F. Supp. 493 (S.D.N.Y. 1985).................................................................14

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*,
   2010 WL 4366990 (S.D. Tex. Oct. 27, 2010).......................................................30

*JRT v. TCBY Sys.*,
   52 F.3d 734 (8th Cir. 1995) ....................................................... 1

*Las Palmeras De Ossining Rest. v. Midway Ctr.*,
   968 N.Y.S.2d 529 (N.Y. App. Div. 2013) ................... 5

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital*,
   424 F.3d 195 (2d Cir. 2005)........................................ 6

*Latham Land I, LLC v. TGI Friday's, Inc.*,
   948 N.Y.S.2d 147 (N.Y. App. Div. 2012) ................... 34

*Lexington Prods. Ltd. v. B.D. Commc'ns, Inc.*,
   677 F.2d 251 (2d Cir. 1982)........................................ 29

*Los Angeles News Serv. v. Reuters TV Int'l.*,
   149 F.3d 987 (9th Cir. 1998) .................................. 27, 43

*Matarese v. Moore–McCormack Lines*,
   158 F.2d 631 (2d Cir. 1946)........................................ 29

*Mellon Bank, N.A. v. United Bank*,
   31 F.3d 113 (2d Cir. 1994.)........................................ 11

*Microsoft Corp. v. AGA Sols., Inc.*,
   589 F. Supp. 2d 195 (E.D.N.Y. 2008) ....................... 26

*Montgomery v. Noga*,
   168 F.3d 1282 (11th Cir. 1999) ................................. 32

*Murray Walter, Inc. v. Sarkisian Bros.*,
   589 N.Y.S.2d 613 (N.Y. App. Div. 1992) ................... 14

*Nassau Beekman v. Ann/Nassau Reality*,
   960 N.Y.S.2d 70 (2013) ............................................... 14

*Nat'l Westminster Bank, U.S.A. v. Ross*,
   130 B.R. 656 (S.D.N.Y. 1991)...................................... 15

*Norwest Fin. v. Fernandez*,
   86 F. Supp. 2d 212 (S.D.N.Y. 2000)............................ 14

*Oracle Am., Inc. v. Google Inc.*,
   2016 U.S. Dist. LEXIS 58819 (N.D. Cal. May 3, 2016) ........... 42

*Phoenix Renovation Corp. v. Rodriguez*,
　258 F. Appx. 526 (4th Cir. 2007)................................................................. 35

*Pink Supply v. Hiebert*,
　788 F.2d 1313 (8th Cir. 1986) ............................................................... 1, 12

*PNC Bank, N.A. v. Wolters Kluwer Fins. Servs.*,
　73 F. Supp. 3d 358 (S.D.N.Y. 2014)........................................................... 34

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
　106 F.2d 45 (2d Cir. 1939)........................................................................ 43

*Silver v. Rochester Sav. Bank*,
　424 N.Y.S.2d 945 (N.Y. App. Div. 1980) .................................................. 23

*Tel. Co. of Missouri v. Johnson Pub. Co.*,
　671 F. Supp. 1514 (W.D. Mo. 1987) .......................................................... 32

*Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*,
　682 F.3d 292 (4th Cir. 2012) ............................................................... 26, 43

*Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*,
　371 F.3d 105 (2d Cir. 2004)...................................................................... 29

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
　487 F.3d 89 (2d Cir. 2007)........................................................................ 29

*Tri-Marketing, Inc. v. Mainstream Marketing Services, Inc.*,
　2010 WL 1924456 (D. Minn. May 12, 2010)............................................. 37

*Trunzo v. Allstate Ins.*,
　2006 U.S. Dist. LEXIS 68566 (W.D. Pa. Sept. 25, 2006)............................. 7

*Universal City Studios Prods. LLLP v. Bigwood*,
　441 F. Supp. 2d 185 (D. Me. 2006) .......................................................... 26

*Universal Furniture Int'l, Inc. v. Collezione Europa, USA*,
　599 F. Supp. 2d at 653 ........................................................................ 36, 39

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
　2011 U.S. Dist. LEXIS 112846 (D. Md. Sep. 30, 2011) ............................. 35

*Washington v. Kellwood Co.*,
　2015 U.S. Dist. LEXIS 144343 (S.D.N.Y. Oct. 14, 2015) .................... 29, 30

*Weber v. GE Grp. Life Assur.*,
    2007 U.S. Dist. LEXIS 17016 (N. D. Okla. Mar. 9, 2007) .......................................... 7

*William A. Graham Co. v. Haughey*,
    568 F.3d 425 (3d Cir. 2009)........................................................................... 35

*Wood v. Houghton Mifflin Harcourt Publ'g Co.*,
    589 F. Supp. 2d 1230 (D. Colo. 2008)....................................................... 35

**Statutes**

17 U.S.C. § 106 .......................................................................................... 26

17 U.S.C. § 504(b).................................................................................*passim*

I.     **Introduction.**

Fair Isaac Corporation ("FICO") requests summary judgment that Federal

Insurance Company ("Federal") breached Paragraphs 3.1, 10.8, and 9.3 of the Blaze

Advisor Software License And Maintenance Agreement ("Agreement").  (Dkt. 398.)

Paragraph 10.5 of the Agreement states: "This Agreement constitutes the full and entire

understanding and agreement between the parties with regard to the subject matter

hereof[.]"  The Court must give effect to the parties' intent when making the contract *as*

*revealed by the language of their agreement.*  (Dkt. 28 at 5.)  The material facts of intent

when the Agreement was signed are undisputed.

Defendants' summary judgment motion directed to the Agreement presents legal

issues of contract construction for the Court to resolve.  The material facts regarding

Federal's breach of the Agreement are not in genuine dispute.  Lawyer argument does not

create a genuine dispute of material fact; internal communications after the Agreement

was signed are not evidence of the parties' intent; and lawyer argument based on

inadmissible evidence and discovery disclosures are equally unavailing.  *JRT v. TCBY*

*Sys.*, 52 F.3d 734, 737 (8th Cir. 1995); *Pink Supply v. Hiebert¸* 788 F.2d 1313, 1319 (8th

Cir. 1986).  FICO is entitled to summary judgment that Federal breached the Agreement.

Defendants' summary judgment motion directed to the Agreement must be rejected.

The remainder of Defendants' summary judgment motion must also be rejected.

The unauthorized distribution of Blaze Advisor by Chubb & Son to foreign insurance

companies infringed FICO's copyrights.  The use of Blaze Advisor by Federal and ACE

American Insurance Company ("ACE American") after FICO properly terminated the

1

Agreement is copyright infringement.  Defendants' summary judgment motion directed to these issues is premised on an erroneous view of the law and ignores the parties' genuine disputes of material fact.  FICO's damages for breach of the Agreement, Defendants' liability for copyright infringement, and FICO's copyright damages are all issues for trial.

## II.    Chubb & Son, a division of Federal, entered into the Agreement with FICO.

Throughout, Defendants assert Federal is a party to the Agreement.  The assertion flies in the face of the Agreement itself: "This Software License and Maintenance Agreement ("**Agreement**") is entered into as of June 30, 2006 ("**Effective Date**") between Fair Isaac Corporation ("**Fair Isaac**") and Chubb & Son, a division of Federal Insurance Company ("**Client**") …."  The assertion also ignores the RFI leading to the Agreement was from Chubb & Son, a division of Federal (Decl., Ex. 1); the testimony of its own witnesses ("Q. And the client was Chubb & Son, a division of Federal, correct? A. Yes.") (Decl., Ex. 2 at 94:20-22.); SEC filings of the Chubb Corporation (Decl., Ex. 3) ("Chubb & Son, a division of Federal (Chubb & Son), is the manager of several U.S. subsidiaries in the P&C Group."); and the sworn declaration of the Senior Vice President and Treasurer of Chubb & Son, a division of Federal, filed in the Northern District of California (Decl. Ex. 4.).

Federal is a party to the lawsuit because it is responsible for the actions of its unincorporated division, Chubb & Son.  FICO's claims were originally filed against Chubb & Son, Inc., a New York Corporation and wholly owned subsidiary of the Chubb Corporation.  (Dkt. 1, ¶ 3.)  Subsequently, FICO learned Chubb & Son, Inc. had been

inactive since January 1, 1998. (Decl. Ex. 4.)) It also learned that Chubb & Son, a division of Federal, assumed the operations of Chubb & Son, Inc. on that date. (*Id.*) The parties then stipulated that the proper defendant is Federal. (Dkt. 33.)

The assertion Federal entered into the Agreement with FICO because the parties agreed the New York Corporation, Chubb & Son, Inc., was the wrong party to the lawsuit is a non sequitur. Federal is a party to the lawsuit because it is responsible for the actions of its unincorporated division. Federal's legal liability does not expand the scope of the Agreement. The Agreement only grants rights to Chubb & Son, the unincorporated division – the Client.

A. **The Agreement restricts the installation and physical location of Blaze Advisor to the United States; it does not bar use of Blaze Advisor to support business operations outside the United States.**

Defendants ignore the distinction between the installation and physical location of Blaze Advisor and the use of Blaze Advisor. The Agreement restricts installation and physical location to the United States. It does not restrict Chubb & Son's use of Blaze Advisor to support business operations of entities located outside the United States. For example, Chubb & Son installed Blaze Advisor at its Dallas, Texas, data center to support the sale of insurance in Latin America. (Decl., Ex. 5 at 157:06-09, 14-16.) That did not breach the Agreement. Chubb & Son also installed Blaze Advisor at its Toronto data center to support the sale of insurance in Canada. That breached the Agreement. The territorial restriction of the Agreement is not a grant of unrestricted global rights.

When FICO rejected a grant of worldwide rights, it modified the term "Territory" to address more than geography. While installation and physical location of Blaze

3

Advisor was restricted to the United States, the geographic scope of use was not so restricted – and the phrase "but only within the Territory" was removed from the license grant, Paragraph 2.1.  This is undisputed.

Defendants' argument that the territorial restriction was "*specifically negotiated out*" (Dkt. 445 at 6), or "the parties intentionally omitted any territorial restriction" (Dkt. 445 at 7), or the parties "specifically negotiated to *remove* the reference to 'Territory' in the License Grant Section" (Dkt. 445 at 17) has no basis in the evidence.  Chubb & Son's June 26, 2006, response to FICO's standard form Blaze Advisor Agreement rewrote the term "Territory" to mean "World-wide" and kept the phrase "but only within the Territory" in the license grant of Paragraph 2.1.  (Decl., Ex. 6.)  The territorial restriction was not negotiated out, or omitted, or removed at the insistence of Chubb & Son.  The inclusion or the exclusion of the phrase "but only within the Territory" in Paragraph 2.1 was not negotiated at all.

The day after receipt of Chubb & Son's proposed changes, FICO responded, stating: "Attached is a redlined, revised license agreement incorporating the changes you requested <u>to the extent Fair Isaac is able to agree to them.</u>" (Decl., Ex. 7.)  Defendants omit the underscored words in making their argument.  (Dkt. 445 at 6.)[1]  FICO rejected "Territory" meaning world-wide rights and changed the term "Territory" to mean installation and physical location of Blaze Advisor was restricted to the United States.

---

[1] Defendants also substitute [Federal] for "you" in Ms. Boone's transmittal to advance the false contention Federal was a party to the Agreement.  Ms. Boone's email was to jwblack@chubb.com.  (Decl., Ex. 7.)  James W. Black was from the Vendor Management Department of Chubb & Son.  (Decl., Ex. 8.)

Consistent with this modification, FICO omitted the phrase "but only within the

Territory" from Paragraph 2.1.  FICO rejected Chubb & Son's proposal of world-wide

rights and modified the Agreement to distinguish between (a) installation and physical

location and (b) use.  The FICO lawyer and drafter of this change, Jandeen Boone,

explained:

> Q. So, in your view, there's no geographical limitation for the use of Blaze?
>
> A. For the use, no.  For the installation and the physical location, yes.  It
> has to be here in the United States.

(Decl., Ex. 9 at 121:16-20).  The Agreement was signed three days later with no further

changes. (Decl., Ex. 10.)

Contracts must be read as a whole to determine the parties' purpose and to give

effect to the parties' intent.  The Court's role is to give "a practical interpretation to the

language employed so that the parties' reasonable expectations are realized. * * * A

contract should not be interpreted in such a way as to leave one of its provisions

substantially without force or effect."  *Las Palmeras De Ossining Rest. v. Midway Ctr.*,

968 N.Y.S.2d 529, 532 (N.Y. App. Div. 2013) (internal quotations omitted).

As the preamble to the Agreement states, the whole of the Agreement "describes

the terms and conditions under which Fair Isaac shall provide to Client the Blaze Advisor

products…."  Paragraph 2.1 states, "Subject to the terms, conditions, and limitations of

this Agreement, Fair Isaac hereby grants…."  The provision incorporates within the

"License Grant to Fair Isaac Products" all the terms of the Agreement.  One of those

terms is "Territory."  It is not ambiguous.  The installation and physical location of Blaze

Advisor must be in the United States.  Contrary to Defendants' argument, the term "Territory" is used in the Agreement.  Paragraph 2.1 is expressly subject to all of the terms of the Agreement, including "Territory."  "Territory" must be given full force and effect – it is not meaningless.

Defendants' case law is not to the contrary.  *City of Rockford v. Mallinckrodt ARD*, 360 F. Supp. 2d 730 (N.D. Ill. 2019), decided a motion to dismiss.  The issue was whether cost containment language in the recitals of an agreement created a binding obligation.  *Id.* at 765.  The court stated the rule: recitals are generally not binding "unless referred to in the operative portion of the agreement."  *Id.* at 766.  Because the recital was "alluded to in the operative terms of the PBM agreement," the motion to dismiss was denied.  *Id.* at 767.  The territorial restriction here is not a recital, and the term is referred to in an operative portion of the Agreement.   *City of Rockford* underscores one of the primary tenants of contract interpretation: "…the contract should be construed so as to give full meaning and effect to all of its provisions."  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital*, 424 F.3d 195, 206 (2d Cir. 2005).  The Agreement here does more than "allude" to the territorial restriction.  It is a term of the Agreement, and the license grant is expressly "[s]ubject to the terms, conditions, and limitations of the Agreement." (Decl., Ex. 10.)[2]

---

[2] *City of Rockford* cited an earlier Illinois decision, *Am. Nat'l Bank & Tr. Co. of Chi. v. Chi Title & Tr. Co.¸*134 Ill. App. 3d 772 (1985) addressing whether a recital was an operative part of the agreement.  That court concluded the recital was binding because the agreement was entered into "for and in consideration of" the recitals.  *Id.* at 776.  The Agreement here expressly states in its preamble that the Agreement "describes the terms

*Trunzo v. Allstate Ins.*, No. CV-04-1789, 2006 U.S. Dist. LEXIS 68566 (W.D. Pa. Sept. 25, 2006) also does not support Defendants. *Trunzo* addressed whether a defined term in an insurance policy that was not used in a particular provision was operative. While the *Trunzo* court granted summary judgment, as Defendants state, they fail to disclose that summary judgment was granted because the policy was ambiguous and was construed against the insurance company. *Id.* at *26. If the Agreement was ambiguous, FICO is still entitled to summary judgment because all of the parol evidence leads to only one conclusion: installation and physical location of Blaze Advisor was restricted to the United States. The Agreement was not global in scope.

*Weber v. GE Grp. Life Assur.*, No. 05-CV-165, 2007 U.S. Dist. LEXIS 17016 (N. D. Okla. Mar. 9, 2007), is similarly unhelpful to Defendants. The decision repeats the rule that a defined term (or a recital) is an operative part of an agreement when it is used in the agreement. *Id.* at *16. Here, the territorial restriction is used in the Agreement.

**B.**     **No relevant, admissible evidence supports Defendants' interpretation of the territorial restriction of the Agreement: FICO is entitled to summary judgment.**

The Agreement was signed June 30, 2006. All extrinsic evidence related to the territorial restriction of the Agreement is embodied in the three emails and redline document exchanges between FICO and Chubb & Son detailed above (Decl., Exs. 6-7, 11.) No reasonable juror could find the Agreement is global in scope. The only

---

and conditions under which Fair Isaac shall provide to Client the Blaze Advisor products…."

reasonable conclusion is that installation and physical location of Blaze Advisor licensed to Chubb & Son was restricted to the United States.  The meaning of the Agreement is a matter of law when "the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary." *3 Com v. Banco de Brasil*, 171 F.3d 739, 746-47 (2d Cir. 1999).

Defendants focus on Amendment Two (Decl., Ex. 10 at 20), which expanded the license scope to enterprise wide.  (Dkt. 445 at 9.)  The relevant issue is the geographic scope of those enterprise wide rights.

Amendment Two was negotiated in December 2006 and signed on December 28, 2006.  The only evidence related to those negotiations that Defendants reference is a November 26, 2008[3], FICO internal email from Lawrence Wachs to Russell Schreiber. (Dkt. 445 at 13 (citing Dkt. 434 at 6).)  The only relevant portion of the 2008 email is the attached December 12, 2006, email from Mr. Wachs to various FICO personnel recounting 2006 negotiations, and in particular the December 2006 negotiations for the enterprise-wide license; only that history bears on the parties' intent at the time Amendment Two was signed.

Defendants focus on that part of Mr. Wachs's 2008 email in which he summarizes the 2006 negotiations stating, "they were adamant about keeping Global on the table[.]"

---

[3] Defendants' arguments also reference various other communications from 2008 through 2015.  After-the-fact documents are not admissible extrinsic evidence of the parties' intent in entering into Amendment Two.  *Murray Walter, Inc. v. Sarkisian Bros.*, 589 N.Y.S.2d 613, 616 (N.Y. App. Div. 1992) (post-contract subjective understanding is not a probative aid to interpretation).

(Dkt. 445 at 6.)  The remainder of that sentence, which Defendants omit, is "but they did take Cobol, Smartforms off the table to wait for projects requiring that functionality." (Dkt. 434 at 6.)  The email confirms the June 30, 2006, Agreement was not global in scope because while Chubb & Son chose to delay the purchase of some functionality, it sought pricing for global rights in December 2006.  FICO's pricing in December 2006 for global rights was ███████ (Dkt. 434 at 6 ("We countered by dropping to ███████ and adding in the unlimited dev. ███████

Mr. Wachs's deposition explained his email: "It's apparent that they wanted global but I don't know if it ever came to fruition."  (Decl. Ex. 12 at 173:16-18.)  He noted that the Agreement was not amended to be global in scope and further noted "The question is in the final what was actually paid by Chubb."  (*Id.* at 173:3-4.)

The ███████ price FICO proposed was "net terms," meaning the incremental additional amount for a global license "after giving full credit for the ███████ of amendment number 1."  (*Id.* at 204:12-23.)  When signed, Amendment Two was not priced at an incremental amount of ███████; it was priced at an incremental amount of only ███████.  (Decl., Ex. 10, Amendment Two.)  Amendment Two was not priced for global rights.

The undisputed evidence is that Chubb & Son did not agree to the global price for Amendment Two.  It entered into Amendment Two, "subject to and in accordance with all of the provisions of the Agreement."  (Dkt. 434 at 4.)[4]  The territorial restriction of the

---

[4] Defendants note that Paragraph 1 of Amendment Two provides that all previous licenses granted to Client under the Agreement are terminated and superseded.  (Dkt. 445

Agreement was not amended.  Bill Waid, one of the persons to whom Mr. Wachs sent his

December 12, 2006, email and the person responsible for FICO Blaze Advisor pricing

explained:

> A.  No.  That is not what I said.  I said we start with the global revenue



(Decl., Ex 13 at 103:16-104:1)  Amendment Two was "Not priced for global."  (Decl.,

Ex. 14 at 112:9.)

FICO rejected Chubb & Son's June 2006 request to grant a world-wide license.

The Agreement signed June 30, 2006, restricts installation and physical location of Blaze

Advisor to the United States.  All extrinsic evidence directed to the Agreement confirms

that understanding.  The December 2006 negotiations for Amendment Two confirm

Chubb & Son understood the Agreement was not global in scope; it requested pricing for

an expansion of license scope to include global; and was unwilling to pay that price.  It

entered into Amendment Two at a lower price with no amendment of the Agreement to

include global rights.  There is no extrinsic evidence to the contrary. There is nothing for

---

at 8.)  While true, it is also irrelevant.  The expansion of the license grant to enterprise-
wide did not remove the territorial restriction in the Agreement.  The expanded license
remained "subject to all of the provisions of the Agreement, which the "Miscellaneous"
section of Amendment Two made clear: "the provisions of the Agreement continue in
full force and effect."

the jury to decide.  Because no reasonable juror could decide to the contrary, the

Agreement restricts the installation and physical location of Blaze Advisor to the United

States as a matter of law.  *3 Com*, 171 F.3d at 746-47; *Mellon Bank, N.A. v. United Bank*,

31 F.3d 113, 116 (2d Cir. 1994.)

>  **(1)  There is no evidence that FICO helped install Blaze Advisor outside the United States.**

Defendants assert "FICO took affirmative steps to help FICO [*sic*] install Blaze

outside of the United States."  (Dkt. 445 at 18.)  They rely on the testimony of Pamela

Pawloski, Chubb & Son Global Strategic Souring, and a FICO report delivered to Chubb

& Son on March 11, 2011.  (Dkt. 438 at 21; Dkt. 439.)  Ms. Pawloski testified that FICO

assisted with the CPI print application in the UK based on her belief that it was outlined

on the parties' Statement of Work ("SOW"). (Decl. Ex. 2 at 239:21-240:3, 235:15-18.)

Ms. Pawloski was not in the UK when this work was allegedly done in 2011-2012.  (*Id.*

at 237:1-14.)  All of her testimony is hearsay.

The undisputed facts show that Chubb Europe downloaded and installed Blaze

Advisor by accessing an internal Chubb & Son link, with the assistance of Henry

Mirolyuz of Chubb & Son, at least two years earlier.  (Decl., Ex. 15.)  It is also beyond

dispute that the SOW for the CPI print project says nothing about FICO assistance in the

UK, contrary to Mr. Pawloski's hearsay testimony.  (Decl., Ex. 16.)[5]  Summary judgment

---

[5] A second SOW relating to CPI print is dated after 2011-2012.  It too says nothing about
FICO assistance in the UK. (Decl., Ex. 17.)

can neither be granted nor defended against on the basis of inadmissible testimony.  *Pink Supply*, 788 F.2d at 1319.

In addition to Ms. Pawloski's inadmissible testimony, Defendants rely on two sentences of a 259 page report.  (Dkt. 445 at 21-22 (citing Fleming Decl. Ex. 31 (Dkt. 439)).)  There is no mention of assisting any installation of Blaze Advisor in the UK.  In truth, what Defendants characterize as "affirmative steps to…install Blaze outside the United States" are instances in which FICO salespersons are working with Chubb & Son to sell more services and more product. For example, FICO salesperson Michael Sawyer testified:

> A.  As a representative of FICO, my role would have been to help support and promote sales of product.  So if the use of Blaze in Europe represented a new sales opportunity for FICO, I would have helped Henry [Mirolyuz] promote that as well.  So I do not agree with your statement that this definitively says that I agreed that their existing licensing agreement included Europe.

(Decl., Ex. 18 at 59:3-10.)

### (2)    Argument is not evidence.

Defendants present argument, not evidence, by stringing unconnected documents together.  Defendants assert that Russ Schreiber, Michael Sawyer, and Richard Hill met on November 17, 2008, to discuss "a plan for Chubb Europe."  (Dkt. 445 at 13.)  The subject of that meeting was "Chubb License Discussion."  (Dkt. 437 at 1.)  Defendants' contention this November 17, 2008, meeting was to determine if global use was permitted relies on Fleming Exs. 13 and 6. (Dkt. 436 at 85; Dkt. 434 at 6.)  Exhibit 13 involves a potential sales opportunity at Chubb UK, dated nearly four years later –

August 14, 2012.  (Dkt. 436 at 85-86.)  There is no connection to a November 17, 2008, meeting.  Exhibit 6 is the email from Mr. Wachs is dated nine days after the November 17, 2008 meeting he did not attend.  (Dkt. 434 at 6.)  Messrs. Sawyer and Hill are not on Mr. Wachs's email.  Defendants present only misleading argument ungrounded in fact. In this example, the argument connects three separate email strings sent at different times involving different people and different subjects.  Summary judgment cannot be granted or defended against based on unsupported lawyer arguments and not evidence.

### C.     An unincorporated division cannot have "affiliates": Amendment Two did not permit non-US installations of Blaze Advisor.

Because an unincorporated division, Chubb & Son, is incapable of having "affiliates," it is impossible to give the affiliate language of Amendment Two meaning. (Dkt. 398 at 16-17.)  Defendants evidently agree.  Their contention the non-US installations of Blaze Advisor were authorized because the foreign entities were once Federal affiliates depends on the false notion Federal was the Client under the Agreement.  (Dkt. 445 at 20.)  Equally fatal to Defendants' contention is the fact Amendment Two did not amend the territorial restriction of the Agreement.  Thus, even if Federal were a party to the Agreement and the foreign entities their affiliates, the installation and physical location of Blaze Advisor outside the United States would still breach the Agreement.  (*See* Dkt. 433 at 1.)

## III.     The terms and conditions of the Agreement cannot be waived, and the Agreement cannot be amended without a signed writing.

Defendants argue that (1) in 2008 FICO confirmed the Agreement was global in scope (Dkt. 445 at 8-9, 17); (2) FICO repeatedly said during the period 2012-2015 that

the Agreement allowed global use (Dkt. 445 at 10, 18, 20); and (3) FICO decided to wait to press the issue of non-compliance with the territorial restriction of the Agreement (Dkt. 445 at 10-11).  All of these arguments are irrelevant as a matter of law.

The parties' post-contract communications and course of dealing are not evidence of the parties' intent when the Agreement was made.  *Murray Walter, Inc.*, 589 N.Y.S.2d 613 at 616; *Ingersoll Milling Mach. v. M/V Bodena,* 616 F. Supp. 493, 506 (S.D.N.Y. 1985).

Additionally, and as detailed in FICO's memorandum in support of its summary judgment motion (Dkt. 398 at 34), Paragraph 10.5 of the Agreement is an integration provision that requires any amendment of the Agreement to be in writing.  (Dkt. 433 at 7-8.)  Defendants' post-contract communications and course of dealing arguments fail. *Nassau Beekman v. Ann/Nassau Reality*, 960 N.Y.S.2d 70, 74 (2013) ("Since the contract of sale provided that any amendments or modifications must be in a signed writing … the contract cannot be changed by an executory agreement that is not in a signed writing."); *Daiichi Seihan USA v. Infinity USA*, 625 N.Y.S.2d 527, 528 (N.Y. App. Div. 1995) (contract's integration clause prohibited alleged oral modifications).

Paragraph 10.4 is a "no-waiver" provision that further requires any waiver to be in writing.  (Dkt. 433 at 7.)  "Under New York law, where an agreement contains a no-waiver provisions such as this one, 'a party's failure to insist upon strict compliance is not considered a waiver of his right to demand exact compliance.'" *Fin. Techs. Int'l. v. Smith*, 247 F. Supp. 2d 397, 407 (S.D.N.Y. 2002); *Norwest Fin. v. Fernandez*, 86 F.

Supp. 2d 212, 230 (S.D.N.Y. 2000) (same). Again, the post-contract communications and course of dealing arguments fail as a matter of law.

The single case Defendants reference in support of their waiver argument, *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991), is inapposite. Unlike the Agreement here, the contract at issue in *Nat'l Westminster Bank* did not have a "no waiver" provision like Paragraph 10.4.[6]

Defendants' arguments are unavailing as a matter of law. FICO's motion to strike Defendants' affirmative defenses of waiver and estoppel as well as their "course of dealing" arguments should be granted. (Dkt. 398 at 33-34.)

A.    **Defendants misstate the 2008 facts.**

Defendants baldly assert that FICO's counsel Thomas Carretta "reviewed the License Agreement and concluded that foreign use was allowed." (Dkt. 445 at 17.) Their only basis for this unsupported claim is FICO's privilege log. Defendants reference two entries, 656 dated November 12, 2008, and 662 dated November 25, 2008. (Dkt. 445 at 9.) Both entries relate to "legal advice re Chubb." Magistrate Judge Schultz further disclosed that the entries "concern the interpretation of the software license agreement." (Decl., Ex. 19 at 3:4-10) Defendants' assertion that a conclusion regarding the Agreement was reached, let alone the one they claim, is wild speculation deserving no consideration. *Galderma Labs. v. Paddock Labs.*, 09-cv-002, 2011 U.S. Dist. LEXIS

---

[6] The undisputed facts show that Defendants' waiver defense also fails because they cannot prove the essential elements of waiver. (Dkt. 398 at 33-34; *see also* Section III.B., *infra*).

32196, *13 (N.D. Tex. Mar. 28, 2011) (Objection to reliance on privilege log as summary judgment evidence sustained.); *Anascape, Ltd. v. Microsoft*, 06-cv-158, 2008 U.S. Dist. LEXIS 111828, *10 (E.D. Tex. April 25, 2008) ("Accordingly, the court will decline Anascape's offer to speculate on the existence of evidence based on privilege logs.").

Defendants also rely on the notice for a November 17, 2008, meeting (Fleming Ex. 14) and Mr. Wachs' November 26, 2008, email recounting the December 2006 negotiations, discussed above (Dkt. 434 at 6.). They assert "[t]he FICO employee who negotiated the deal reviewed his notes and concluded that the parties' agreement was global." (Dkt. 445 at 17, 9.) The meeting notice simply states, "Chubb License Discussion." Notably, Mr. Wachs was not an attendee. As detailed above, his 2008 email dated nine days after the "Chubb License Discussion" meeting he did not attend makes no conclusions regarding the scope of the license. Mr. Wachs's email recounts the December 2006 negotiations for a global license as of sixteen days before Amendment Two was signed. Sixteen days later, Chubb & Son did not agree to the global fee of an incremental $1,100,000. Defendants' argument is not evidence.

B.    **The parties' mistaken beliefs regarding the territorial restriction of the Agreement do not excuse Federal's breach of the Agreement.**

In 2008, Chubb & Son correctly understood the Agreement was not global in scope. (Decl., Ex. 2 at 90:1-13; Ex. 20) (the Agreement "is <u>not</u> a worldwide license.") (Emphasis original). In 2009, Chubb & Son concluded otherwise. (Decl., Ex. 21.) FICO's Memorandum in support of its summary judgment motion addresses the misunderstanding of three of its salespersons (not executives as improperly labeled by

Defendants), eventually corrected, regarding the global scope of the Agreement.  (Dkt. 398 at 26-30.)  These misunderstandings are of no moment to enforcement of the Agreement as written.  (*Id.*)

## IV.   FICO terminated the Agreement because, among other reasons, Federal continued to use Blaze Advisor without FICO's consent in breach of Paragraph 10.8.

Defendants assert "[t]he second sentence of § 10.8 applies to mergers." (Dkt. 445 at 7.)  Throughout their Memorandum, Paragraph 10.8 of the Agreement is characterized as an "assignment by merger" clause.  (E.g. Dkt. 445 at 21.)  This is context for the argument there was no change of control. (Dkt. 445 at 22.)[7]  The declaration of John Taylor, upon which the argument relies, and Defendants' admissions belie the argument.

Mr. Taylor states at ¶ 6 of his Declaration, "Federal thus became a subsidiary of ACE INA Holdings, Inc."  (Dkt. 442.)  Before the merger of ACE Limited and the Chubb Corporation, Defendants admit Federal was a subsidiary of the Chubb Corporation.  They further admit the Chubb Corporation no longer exists.  It is undisputed that Federal,

---

[7] Defendants' reference to the Court's decision in response to Chubb & Son, Inc.'s Rule 12(b)(6) motion to dismiss is inapposite.  (Dkt. 445 at 22-23, n.7.)  The Court's statement that "on the existing record" the Court could not reject the contention Paragraph 10.8 did not apply because the merger was between parent companies has no bearing to the current case.  Chubb & Son, Inc., the New York Corporation, is no longer a party to the lawsuit.  The record is now fully developed.  Paragraph 10.8 applies because, as Federal admits, Federal, including its division Chubb & Son, was acquired by another company, ACE INA Holdings, Inc., and underwent a change of control.  The merger of the parent companies is not the reason Paragraph 10.8 is invoked.

including its division Chubb & Son, was acquired by ACE INA Holdings, Inc. and is now under different control.[8]  (Decl., Ex. 22.)

Paragraph 10.8 applies because "In the event of a change of control of Client, or if Client is…acquired by…another entity…each such event shall be deemed to be an assignment subject to this section[.]"  Because Federal, and thereby its division Chubb & Son, was acquired, ownership changed.[9]  As a consequence of the change of ownership, the Client became part of a much larger family of insurance companies, changing the basis for pricing the enterprise license.  (Decl., Ex. 13 at 38:5-9.)  The basis upon which FICO entered into the Agreement fundamentally changed.  Michael Sawyer explained the business purpose of Paragraph 10.8 as follows:

> So you know, I would read this that, from a business perspective, my knowledge of why this is included in an agreement is to protect us from a merger of the type that Chubb and ACE executed where FICO does not – is not fairly compensated for the potential use of its software by the new organization and that dialogue need to happen between the firms around, one, are we agreeing to the entity that they're going to assign it to; and secondly, for the scope of the use of that product, is it consistent with the terms under which we originally agreed and licensed the product.

(Decl., Ex. 14 at 189:19-190:7.)

---

[8] Defendants state: "Defendants Federal and ACE American did not merge – they remained separate entities, now in the same family of insurance companies. (Dkt. 445 at 4.)  This is true and irrelevant.  Paragraph 10.8 applies because Federal was acquired and underwent a change of control.

[9] Only three of the fourteen former directors of the Chubb Corporation joined the board of Chubb Limited (ACE Limited having changed its name of Chubb Limited.)  Thirteen members of the sixteen member board of Chubb Limited are legacy ACE Limited directors.  (Decl., Ex. 23.)

A.    **Defendants' interpretation of Paragraph 10.8 violates the rules of
contract construction and ignores the commercial purpose of the
provision.**

Defendants agree the first sentence of Paragraph 10.8 applies to assignments:

FICO's prior written consent is required.  They would rewrite the remainder of the

provision to make expanded use (as they define it) a condition for consent because "the

assignee[10] is *related* to the client."  (Dkt. 445 at 22) (Emphasis original.)  There is no

difference between an assignment to a new customer and the deemed assignment to an

entity wholly under different ownership.  In each case there is a fundamental change to

the basis upon which FICO entered into the Agreement.  Furthermore, this illogical

argument is spun from whole cloth.  There is no evidence, and Defendants reference

none, of the commercial purpose of Paragraph 10.8 as limited by Defendants.

Defendants' interpretation emphasizes "such written consent" in the second part of

the second sentence of Paragraph 10.8 by italics, and ties that "such written consent" to

the "prior written consent" of the first sentence.  (Dkt. 445 at 21.)  The interpretation

ignores, or renders superfluous, the language that makes various events, including

acquisition and change of control, deemed assignments "subject to this section."  The

events deemed to be assignments are not conditioned on use.  This section, being

Paragraph 10.8, requires consent before the event that is the deemed assignment.  The

required prior written consent is not conditioned on use.  Defendants' interpretation

further ignores, or renders superfluous, the conjunctive "and" between the first and

---

[10] The argument overlooks the fact the acquisition and change of control is deemed an
assignment.

19

second parts of the second sentence.  FICO's consent is required before the deemed

assignment, and the status quo must be maintained while the breach is cured (obtaining

consent) or the Agreement may be terminated.  The two parts of the second sentence are

not connected by "except that."  Defendants' contention that expanded use (as they define

it) is a precondition to obtaining FICO's consent ignores the full context of the provision

and the commercial purpose the provision is intended to serve.  (Dkt. 398 at 18-22.)

Defendants' interpretation also reads out the last sentence of the provision (*compare* Dkt.

445 at 11 *with id.* at 25) that *any* assignments without written consent are void and have

no force.

### B.    <u>Defendants distort the meaning of "expanded use."</u>

In 2016 when Federal was acquired and underwent a change of control, the scope

of the Agreement was enterprise-wide.  The fee for that enterprise-wide Agreement was

set in December 2006 based on revenue.  Revenue is the sole metric for enterprise pricing

and acts as a proxy for the value of Blaze Advisor to the Client—use is irrelevant.  (Decl.,

Ex. 13 at 38:5-9; 152:12-19.)  An enterprise-wide license does not limit or otherwise

control the extent of use.  ("The enterprise agreement provides for the use of Blaze

Advisor in sort of an unrestricted fashion…." (Decl., Ex. 13 at 152:12-14.))

Because revenue and not use is the basis for pricing an enterprise license,

Defendants' contention that expanded use (as they define it) is a condition for consent

under Paragraph 10.8 is, at bottom, a rejection of FICO's decades long pricing model for

enterprise licenses.  Under a grant of enterprise-wide rights, the licensee has the right to

use Blaze Advisor as extensively as it wishes.  Hence, argument and discussion about whether actual use expanded or not is off point.

Defendants' contention it did not expand use (as they define it) because FICO did not have evidence of Blaze Advisor's use post-merger is a red herring.  (Dkt. 445 at 13.) It presumes the improbable if not the impossible: the immediate integration of Blaze Advisor into the larger new company.  It also presumes an access to information that did not exist.  Mr. Sawyer explained:

> Yeah.  I was not in a position to know what was happening inside the walls of Chubb around discussions for using the platform, immediately following the conclusions of the transaction.
>
> * * * *
>
> But the lack of Chubb providing evidence does not substantiate the potential, and we were asking for a discussion around their planned use.

(Decl., Ex. 18 134:2-6, 10-13.)

Defendants' further argument that it offered to limit use to the then existing 15 applications, during negotiations to cure the breach of Paragraph 10.8, exemplifies their distorted notion of expanded use.  (Dkt. 445 at 13, 22.)  Saying, as Chubb & Son did, that "all usage remains with the same named applications" (*id.* at 17) equates the number of named applications with the extent of use.  It is a false equation.  Mr. Schreiber, one of the FICO salespersons involved in the negotiations, saw the proposal as bad faith.  He explained, "[b]ut at that point when they said we can do whatever we want with – as long as we call it 15 names, it was not a serious proposal." (Decl., Ex. 14 at 324:6, 326:22-25.) Having 15 named applications says nothing about the extent to which those applications execute substantially more transactions, and – more importantly – it says nothing about

21

the integration of those 15 applications into the much larger new post-merger entity for the benefit of business operations of that much larger post-merger entity.

"Expand" means, among other things, to increase the extent, to increase the volume. (Decl., Ex. 24.)  Federal, including its division Chubb & Son, in the new post-merger Chubb Limited is part of a much larger organization with significantly increased revenue.



Federal breached Paragraph 10.8 when it failed to request FICO's consent to continued use of Blaze Advisor before the acquisition and change of control deemed to be an assignment.  FICO gave notice, the breach was not cured, and the Agreement was

terminated.  (Dkt. 438 at 8-9, 19.)  Discovery revealed that Federal started planning for the integration of Blaze Advisor into the new larger company before the merger was effective, and has in fact integrated Blaze Advisor into Chubb Limited to benefit business operations of legacy ACE.  (Decl., Ex. 26-28)

### C.  Defendants' contention FICO unreasonably withheld consent to the continued use of Blaze Advisor fails as a matter of law.

Paragraph 10.8 provides that consent to the continued use of Blaze Advisor because of the deemed assignment event "will not be unreasonably withheld."  (Decl., Ex. 10.)  FICO did not withhold its consent.  It is undisputed that Chubb & Son rejected the terms under which FICO's consent would be granted.

"[T]he standard for determining whether consent was unreasonably withheld is an objective one."  *Hoag v. Chancellor, Inc.*, 677 N.Y.S.2d 531, 535 (N.Y. App. Div. 1998); *Astoria Bedding v. Northside P'ship.*, 657 N.Y.S.2d 796, 797 (N.Y. App. Div. 1997.)  The case upon which Defendants rely, *Silver v. Rochester Sav. Bank*, 424 N.Y.S.2d 945 (N.Y. App. Div. 1980), is not to the contrary.

The *Silver* court looked at the relevant objective factors and concluded it was not reasonable for the bank to condition its consent on an increased rate of interest on the unpaid balance of the mortgage.  Additionally, the bank's demand was "an intrinsic breach of the bank's account with the plaintiff."  *Id.* at 948.  *Silver* does not stand for the proposition FICO's consent conditioned on additional license fees is *per se* unreasonable. *Silver* ruled: "The rights of the parties under the above-quoted terms of the mortgage depend upon their intention in placing such provisions therein."  *Id.* at 947.  It is

undisputed that the commercial purpose of Paragraph 10.8 is to protect the value of Blaze Advisor by maintaining the integrity of FICO's pricing for enterprise-wide licenses. (Dkt. 398 at 6, 21.)

When the Chubb Corporation and ACE Limited merger was announced, FICO's Michael Sawyer and Russell Schreiber were conscious of acting reasonably under Paragraph 10.8, Mr. Sawyer saying: " ███████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ (Dkt. 438 at 1.)  Chubb & Son did not contact FICO to begin discussions under Paragraph 10.8, causing Mr. Sawyer to reach out to Chubb & Son twice.  (Dkt. 438 at 5, Decl., Ex. 29.) Substantive discussions to cure the breach of Paragraph 10.8 began after FICO gave notice of breach on January 27, 2016.  (Decl., Ex. 30.)

FICO's best and final offer to continued use of Blaze Advisor post-merger presented three options, all of which included steep discounts.  (Decl., Ex. 31.) ████████ ██████████████████████████ FICO's goal was to continue the relationship.  (Decl., Ex. 14 at 344:6-8) ("Really wasn't looking to do anything, other than figure out how do we stay whole and continue the relationship.")

Chubb & Son understood that the much larger entity could use Blaze Advisor post-merger under the enterprise-wide scope of the Agreement, and FICO sought payment for that expanded grant of rights.  (Decl., Ex. 2 at 145:15-18.) ████████████ ██████████████████████████████████ (*Id.* at 177:13-15.)

Chubb & Son rejected FICO's best and final offers because "it was not what Chubb expected to pay for the license, it was too high." (*Id.* at 206:4-13.)

It is undisputed that FICO applied its decade's long pricing model for enterprise license agreements as the basis for its consent to grant the significantly larger post-merger entity the right to use Blaze Advisor. No evidence suggests FICO applied this model any differently in its dealings with Chubb & Son than in any other negotiation. The fact is Chubb & Son did not think it needed to pay a new license fee at all because of the merger. (*Id.* at 179:7-15 ("No, we didn't. We had a hard time with that.")

Chubb & Son is bound to honor the Agreement it made, including Paragraph 10.8. The commercial purpose of the provision was to enable FICO to control with whom it licensed and to protect the value of Blaze Advisor and the integrity of FICO's pricing for enterprise licenses. The change of control and acquisition of Federal, the event deemed an assignment, had consequences under the Agreement. The fact Chubb & Son wished otherwise is a quarrel with the contract it made, not the actions of FICO. Defendants' contention FICO unreasonably withheld its consent fails as a matter of law for lack of proof. All of the objective facts show the reasons and the reasonableness of FICO's position.

**V.     Chubb & Son distributed Blaze Advisor for installation outside the United States in breach of license restrictions of the Agreement: a domestic infringement of FICO copyrights.**

**A.     Allowing installation abroad is an act of distribution that exceeds the scope of the license granted to Federal.**

Federal asks this Court to dismiss FICO's copyright claim relating to foreign companies because FICO cannot assert a copyright infringement claim based on use outside the United States.  (Dkt. 445 at 19-20.)  Federal misstates FICO's claim.  FICO claims Federal infringed FICO copyrights by its unauthorized distribution of Blaze Advisor in the United States.  Federal is liable for damages stemming from that infringement, including profits from the foreign exploitation of Blaze Advisor.

This claim is not an extra-territorial application of the Copyright Act.  It is undisputed that Chubb & Son distributed Blaze Advisor for installation outside the United States.  (Decl., Ex. 15, 32; Section II(A), *supra*.)  This breached the Agreement, including Paragraph 3.1(v).  Unauthorized distribution is infringement of copyright.  17 U.S.C. § 106; *A & M Records, Inc. v. Napster*, 239 F.3d 1004, 1014 (9th Cir. 2001); *Universal City Studios Prods. LLLP v. Bigwood*, 441 F. Supp. 2d 185, 190 (D. Me. 2006); *Microsoft Corp. v. AGA Sols., Inc.,* 589 F. Supp. 2d 195, 201 (E.D.N.Y. 2008).

Chubb & Son directly infringed FICO copyrights in the United States by distributing Blaze Advisor for download and installation outside the United States.  Federal is liable for this domestic violation of the Copyright Act.  It is also responsible for all damages resulting from the foreign exploitation of these domestic predicate acts of infringement.  *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d

26

292, 308 (4th Cir. 2012); *Los Angeles News Serv. v. Reuters TV Int'l.*, 149 F.3d 987, 990-92 (9th Cir. 1998). FICO's claim for copyright infringement based on violation of the territorial restrictions of the Agreement is legally proper.

**B.** **Federal's contentions it is not liable for copyright infringement because the Agreement granted global rights and because the foreign insurance companies were affiliates of Federal fail as a matter of law.**

Federal's contention the Agreement granted global rights fails as a matter of law. The Agreement restricted installation and physical location of Blaze Advisor to the United States, and further restricted use of and access to Blaze Advisor to employees of Chubb & Son. Federal, through its Chubb & Son division, breached these restrictions of the Agreement as a matter of law. (*See* Dkt. 398 at 3-5, 8-9, 13-18.) The distributions of Blaze Advisor were not licensed; they infringed copyright.

The fact the foreign insurance companies to whom Chubb & Son distributed Blaze Advisor were affiliates of Federal is unavailing. Federal is not a party to the Agreement. (Dkt. 433 at 1; Section II, *supra*.) Additionally, Amendment Two did not amend the territorial restriction limiting installation and physical location of Blaze Advisor to the United States. (Dkt. 434 at 3-5; Section II(C), *supra*.)

**C.** **Federal's contention FICO waived its contract rights and thereby authorized Federal's infringing acts fails as a matter of law.**

As a matter of law, Federal's waiver and estoppel defenses should be stricken. Its arguments based on a "course of dealing" fail for the same reasons. The Agreement contains a no waiver provision and an integration clause. (*See* Section III, *supra*.) In

27

addition to the contractual prohibitions, Federal cannot show essential facts necessary to prove these defenses.  (*See* Dkt. 398 at 24-34.)

## VI.   Federal's use of Blaze Advisor after termination of the Agreement is copyright infringement as a matter of law.

Federal's assertion that breach of Paragraph 10.8 of the Agreement does not give rise to copyright infringement misses the mark entirely.  (Dkt. 445 at 24-25.)  As the Court earlier observed when ruling on the Rule 12(b)(6) motion to dismiss, "Chubb & Son relies on inapposite cases."  (Dkt. 28 at 14.)

FICO terminated the Agreement effective March 31, 2016, because Federal breached license restrictions of Paragraph 3.1 and continued to use Blaze Advisor without consent in breach of Paragraph 10.8.  FICO's copyright infringement claims are based on the fact Federal's use of Blaze Advisor post-termination is unlicensed – there is no Agreement.  *Encyclopedia Brown Prods. v. Home Box Office*, 91 Civ. 4092, 1994 U.S. Dist. LEXIS 21372, *21 (S.D.N.Y. Oct. 15, 1998) ("[W]hen the…license is terminated, the copyright proprietor may hold his former grantee liable as an infringer for subsequent use of the work")

As the Court said earlier: "The cases Chubb & Son cites merely support the proposition that a licensee *acting within the scope of the license* cannot be sued for copyright infringement."  (Dkt. 28 at 14) (Emphasis original.)  None of Defendants' cases address copyright infringement after the license is terminated.  Here, the license is terminated.  Defendants' arguments based on a distinction between "conditions" and "covenants" is meaningless.

28

**VII.     The fact FICO is damaged is certain, not speculative.  The amount of those damages presents genuine issues of material fact for trial.**

Federal seeks dismissal of FICO's breach of contract and actual damages claims by asserting the damages are "speculative."  (Dkt. 445 at 26-28.)  Its argument is directed to the measure of damages, and it highlights the dispute of material facts regarding the proper measure of those damages.

Under New York law, the "rule which proscribes the recovery of uncertain and speculative damages applies where the fact of damages is uncertain, not where the amount is uncertain."  *Matarese v. Moore–McCormack Lines*, 158 F.2d 631, 637 (2d Cir. 1946); *see also Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co*., 371 F.3d 105, 109 (2d Cir. 2004).  Here, the fact of damage is certain.

In assessing the amount of damages to remedy the breach, New York courts do not require "scientific rigor in the calculation of damages." *Lexington Prods. Ltd. v. B.D. Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982).  Instead, "where a wrong has been done, the courts will endeavor to make a reasonable estimate of damages," and the complaining party need only provide a "rational basis for computation of damages." *Id.* (vacating lower court judgment and remanding to award damages); *see also Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc*., 487 F.3d 89, 110-11 (2d Cir. 2007) (holding that plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of a breach).

*Washington v. Kellwood Co*., No. 05CV10034 MHD, 2015 U.S. Dist. LEXIS 144343, at *42-44 (S.D.N.Y. Oct. 14, 2015) espoused the same principles.  The Court

noted the fact of damage was undisputed and that uncertainty in amount is inherent in any damages calculation. *Id*. Uncertainty in the amount alone did not render the plaintiff's damages claim "speculative." *Id*. The court denied summary judgment and held damages would be determined in light of the evidence at trial. *Id*.

Federal's cases do not hold otherwise. In each, the plaintiff failed to show <u>any</u> damage resulted from the wrong. *Doc. Sec. Sys., Inc. v. Coupons.com, Inc.*, 55 F. Supp. 3d 485, 497-498 (W.D.N.Y. 2014) (reasonable royalty theory dismissed where no evidence regarding how to calculate a royalty); *Bell v. Taylor*, 827 F.3d 699, 709-10 (7th Cir. 2016) (no relevant sales records); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 08-cv-3181, 2010 WL 4366990, *11, *43 (S.D. Tex. Oct. 27, 2010) (conclusory and self-serving testimony insufficient).

In contrast, it is undisputed that FICO prices the fee granting the right to use Blaze Advisor in a business application based on the size of the customer's application. FICO has consistently used this pricing framework since at least 2003, and it has been accepted in the marketplace. (Decl., Ex. 25, 24:19-22.)



23:9-25:8; Ex. 33.)



The amount of lost license fees for the 17 applications Defendants have wrongfully used for the period of that wrongful use – the amount necessary to remedy the breach – is the result of applying FICO's standard pricing to Defendants' wrongful use. Defendants' wrongful use includes their admissions directed to the extent of use (the size) of these applications. (*See* Decl., Ex. 35.) *See Tel. Co. of Missouri v. Johnson Pub. Co.*, 671 F. Supp. 1514, 1524–25 (W.D. Mo. 1987), aff'd, 855 F.2d 604 (8th Cir. 1988) (awarding copyright owner damages based on the loss of the copyright owner's standard licensing fee).

Federal ignores the evidence that refutes its argument and measures "fair market value" according to what it would be willing to pay. This is the wrong measure of damages, *see Montgomery v. Noga*, 168 F.3d 1282, 1295-96 (11th Cir. 1999) (affirming damages award based on standard pricing calculation even though defendant offered

other damages calculations that would have resulted in lower damages award). Damages

presents a genuine dispute of material fact for the jury's consideration following trial.

**VIII.   FICO's damages arise from Defendants' unauthorized use of Blaze Advisor and their violation of FICO's intellectual property—its copyrights. FICO's damages claims are not limited by contract.**

Federal attempts to defeat FICO's damages claim by arguing damages are limited

because Paragraph 5.6 of the Agreement prohibits certain recoveries. (Dkt. 445 at 28.)

Not so.

The limitation of liability in Paragraph 5.6 of the Agreement expressly excludes

"CLIENT'S VIOLATION OF FAIR ISAAC'S INTELLECTUAL PROPERTY

(INCLUDING UNAUTHRORIZED USE)[."] Defendants concede the limitation of

liability does not apply to FICO's copyright claims—a violation of FICO's intellectual

property. (Dkt. 445 at 28.) FICO's breach of contract claims are based on unauthorized

use, another express exception, and all damages flow from that unauthorized use. FICO's

claim for lost license fees arise from the unauthorized use of Blaze Advisor in 17

applications. The contention Paragraph 5.6 has application to this lawsuit is meritless.[11]

FICO's damages for breach of the Agreement are expectation damages flowing

directly from the breach, not consequential as Federal contends (Dkt. 445 at 32). *Bi-*

*Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008);

*Gusmao v. GMT Grp., Inc.*, No. 06 CIV. 5113, 2008 U.S. Dist. LEXIS 58462, at *36

---

[11] ACE American is an unlicensed user of Blaze Advisor and was never a party to the Agreement. Defendants' arguments regarding the limitation of liability provision of Paragraph 5.6 have no application to the claims against ACE American.

(S.D.N.Y. Aug. 1, 2008) (Expectation damages are "the natural and probable consequence of the breach.").

In contrast, consequential damages are those damages that do not directly flow from breach. Consequential or special damages compensate for additional losses that are incurred as a result of the breach and that were within the contemplation of the parties when the contract was made. *Latham Land I, LLC v. TGI Friday's, Inc.*, 948 N.Y.S.2d 147, 152-53 (N.Y. App. Div. 2012).

The single case Defendants reference, *PNC Bank, N.A. v. Wolters Kluwer Fins. Servs.*, 73 F. Supp. 3d 358 (S.D.N.Y. 2014), is not to the contrary. It too distinguishes between general damages and consequential damages. *Id.* at 370-371. Defendants' bald assertion FICO's damages are consequential is meritless.

## IX.   FICO's disgorgement claim under the Copyright Act is not speculative. The evidence proving those damages will be presented at trial.

Federal's assertion that FICO's disgorgement claim should be dismissed on summary judgment profoundly misinterprets the law and ignores the controlling law of this Circuit and District. FICO's evidence at trial will prove its right to these damages. The evidence, if any, Federal has to support its contrary view are also matters for trial.

### A.   Federal relies on an incorrect interpretation of § 504(b).

### (1)   FICO must prove a "connection" between Federal's infringement and Federal's revenue – not "but for" causation.

Under § 504(b) of the Copyright Act, FICO's burden of proof is only to prove Federal's gross revenue connected to or related to infringement. *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 799 (8th Cir. 2003) ("[T]he copyright holder must first

establish some connection or relationship between the infringement and the profits he seeks."); *see also Dwyer Instruments v. Sensocon, Inc.*, 873 F. Supp. 2d 1015, 1041-42 (N.D. Ind. 2012); *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, 589 F. Supp. 2d 1230, 1248 (D. Colo. 2008). This is not an "onerous evidentiary burden." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, No. MJG-06-2662, 2011 U.S. Dist. LEXIS 112846, at *13 (D. Md. Sep. 30, 2011) (quoting *Phoenix Renovation Corp. v. Rodriguez*, 258 F. Appx. 526, 534-35 (4th Cir. 2007)). This District has found a "connection" to mean the infringement "contributes to" profits. *Honeywell Int'l Inc. v. ICM Controls Corp.*, No. 11-cv-569, 2017 U.S. Dist. LEXIS 11692, at *12, 15-16 (D. Minn. Jan. 26, 2017) (rejecting more onerous reading of § 504(b)).

"Connection" does not mean "but for" causation. "The statute does not require proof of causation but only of gross revenue." *Dayva Int'l v. Award Prods. Corp.*, 97-1397, 1998 U.S. App. LEXIS 4386, at *6 (Fed. Cir. Mar. 11, 1998); *see also Dwyer Instruments*, 873 F. Supp. 2d 1015 at 1041-42 (rejecting argument that infringement did not "cause" a single sale). A causal connection requires only that the revenue is reasonably related to the infringement. *William A. Graham Co. v. Haughey*, 568 F.3d 425, 443 (3d Cir. 2009). "Connection" does not require the copyright owner to prove the revenue is "directly tied solely to the infringement." *Fournier v. McCann Erickson*, 242 F. Supp. 2d 318, 327 (S.D.N.Y. 2003); *Garcia v. Coleman*, No. C-07-2279, 2009 U.S. Dist. LEXIS 29458, at *11-12 (N.D. Cal. Mar. 24, 2009) (infringement need not be the "only" or "main reason" for the revenue). In other words, FICO need not "put a … buyer

35

on the stand to testify that she bought the [insurance policy] because of the [infringement]." *Andreas*, 336 F.3d at 797.

FICO's burden of proof is met by showing the gross revenue connected to the infringement and not to other aspects of the infringer's business. *Universal Furniture Int'l, Inc. v. Collezione Europa, USA*, 599 F. Supp. 2d 648, 653 (M.D.N.C. 2009) ("Gross revenue is calculated only as to the gross revenue for the infringer's line of business or project related to the infringement, and not the infringer's gross revenue from all of its commercial endeavors."); *see also Balsley v. LFP, Inc.*, 691 F.3d 747, 770 (6th Cir. 2012); *Dayva Int'l*, 1998 U.S. App. LEXIS 4386, at *6. Proffering undifferentiated revenues is insufficient. *Complex Sys. v. ABN Ambro Bank N.V.*, No. 08 Civ. 7497, 2013 U.S. Dist. LEXIS 160291, at *38 (S.D.N.Y. Nov. 8, 2013) ("CSI does not even limit its request to solely those transactions that occurred on BankTrade."); *IBM v. BGC Partners, Inc.*, 10 Civ. 128, 2013 U.S. Dist. LEXIS 59779, at *11 (S.D.N.Y. Apr. 25, 2013); *DaimlerChrysler Servs. v. Summit Nat'l*, No. 02-71871, 2006 U.S. Dist. LEXIS 4282, at *11 (E.D. Mich. Jan. 26, 2006) (rejecting claim to infringer's "entire gross revenue").

### (2)      Federal ignores controlling precedent.

Federal fails to cite *Andreas*, controlling precedent in this Circuit <u>and</u> an indirect profits case. The controlling case law is clear. Under *Andreas*, causation is only "some connection or relationship between the infringement and the profits he seeks." 336 F.3d at 799. *Andreas* does not require "but for" causation. *See id.* Moreover, *Andreas*, an indirect profits case itself, makes clear there is no heightened burden for proving disgorgement of indirect profits. 336 F.3d at 796 ("Although cases distinguish between

36

direct and indirect profits, the statute does not.  We agree that in an indirect profits case the profits "attributable" to the infringement are more difficult to quantify.  *But that difficulty does not change the burden of proof established by the statute.*") (emphasis added).

In *Honeywell*, recent controlling law from the District of Minnesota, the court interpreted the "connection" requirement under *Andreas* to mean the work "contributed" to the profits.  2017 U.S. Dist. LEXIS 11692, at *12, 15-16.  *Honeywell* made no mention of a "but for" causation standard; rather, it rejected non-controlling Ninth Circuit precedent contrary to *Andreas*.  *Id.* at *17-19 ("[Plaintiff] is not required to prove such a narrow causal nexus.").

Federal cites *Tri-Marketing, Inc. v. Mainstream Marketing Services, Inc.*, No. 09-13, 2010 WL 1924456, at *4 n.4 (D. Minn. May 12, 2010), without analysis. (Dkt. 445 at 33.)  The court's discussion of damages was limited to a footnote, which the court acknowledged it "need not reach."  *Id.  Honeywell*, which post-dates *Tri-Marketing*, fully addresses disgorgement under § 504(b) and the controlling Eight Circuit precedent, *Andreas*.

### (3)     Federal's software cases are inapposite.

Federal's reliance on software cases is unpersuasive.  Each is inapposite because the copyright owner made no attempt to connect the claimed revenue to the infringement (i.e. the copyright owner proffered undifferentiated revenue).  In *Complex Systems v. ABN Ambro Bank N.V.*, Complex Systems did not limit its claim to the revenue connected to the infringement. 2013 U.S. Dist. LEXIS 160291, at *37-38 (S.D.N.Y. Nov.

8, 2013), ("CSI seeks recovery from too large a swath of ABN activities …. CSI does not even limit its request to solely those transactions that occurred on BankTrade.").  Instead, it sought disgorgement from down-stream revenues unrelated to the actual use of BankTrade.  *Id.* at *17.  The *Complex* court recognized that software copyright holders— including Complex on a different record—"could demonstrate a sufficient causal nexus, even when multiple factors are contributing to a company's profits."  2013 U.S. Dist. LEXIS 160291, at *41.

In *IBM v. BGC Partners, Inc*., IBM sought all of defendant's pre-tax income, independent of any relationship to the infringement.  2013 U.S. Dist. LEXIS 59779, at *11 (S.D.N.Y. Apr. 25, 2013).  In *DaimlerChrysler Servs. v. Summit Nat'l*, DaimlerChrysler demanded defendant's "entire gross revenue," again independent of any connection or relationship to the infringement.  2006 U.S. Dist. LEXIS 4282, at *11 (E.D. Mich. Jan. 26, 2006).

*IBM* is also inapposite for a second reason.  IBM failed to show a relationship between the infringing use of the software and revenue because the Informix software was used to generate reports and invoices for "administratively processing trades ***after their execution.***"  *Id.* at *10 (emphasis added).  2013 U.S. Dist. LEXIS 59779, at *12-13.  Here, Blaze Advisor is used in the quote, bind, book, and issue process for the sale of insurance—the process that generates revenue.  Blaze Advisor automates the processes to sell insurance.  It is not an after-the-fact analysis tool.

Unlike these inapposite cases, FICO's proof is not directed to all of Federal's gross revenue.  FICO's proof is limited to gross revenue connected to the infringement

and not to other aspects of the infringer's business. *Universal Furniture*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d at 770.

### B.  FICO's evidence to be presented at trial satisfies its burden of proof under § 504(b).

On summary judgment, all facts and inferences must be drawn in FICO's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  FICO's trial evidence satisfies its burden of proof under § 504(b).  Proof of the gross revenue that is the basis of FICO's disgorgement claim is provided by Defendants' interrogatories where they admit to the amount of gross revenue from the sale of insurance in connection with which Blaze Advisor was used.  (*See* Decl., Ex. 36-39.)  The gross revenue is not "undifferentiated." It is specific to the infringement: the unauthorized use of Blaze Advisor.

FICO's trial proof will also show that Blaze Advisor *contributed* to this revenue. FICO's expert on the insurance industry, including underwriting, rules development, and technology implementation, will testify that automated decision making with Blaze Advisor contributes to revenue by, among other things:

- Enabling Defendants to process more transactions and with greater accuracy: more transactions generate more revenue and greater accuracy makes pricing more competitive;

- Increasing the speed of response to quote requests: the conversion rate of quotes to sales improves with speed of response;

- Increasing the speed of making renewal offers: increased speed improves the rate of renewals;

- Increasing the speed at which new products can come to market because of the agility of Blaze Advisor: the sooner a new product is in the market the sooner revenue is generated and advantage is achieved over competitors;

- Increasing speed to market by ensuring compliance with corporate and statutory reporting requirements;

- Increasing the precision and adequacy of a quote, thereby increasing the probability the quote offer will be accepted;

- Increasing the precision and adequacy of a renewal offer, thereby increasing the probability the renewal offer will be accepted;

- Increasing the ease of use for agents and brokers to do business with Defendants, thereby (a) increasing the chance the agent and broker will bring its next customer to Defendants, (b) reducing the time an underwriter spends on an application making the underwriter more available to assist sales, and (c) improving the accuracy of data used in the underwriting process leading to a more precise, adequate premium offer.

FICO' trial proof will also include the admissions of Defendants that the business justification for developing business applications using Blaze Advisor was revenue generation:

- Blaze Advisor was initially licensed to allow Chubb & Son to capture a "key strategic initiative" by "expanding and growing the business into mid-market and smaller accounts." (Hinderaker Decl. Ex. 1 at 5);

- Blaze Advisor is used in CSI Express, Evolution, ADAPT, and EZER applications—policy administration systems that function in the quote, bind, book, and issuance of insurance policies, which results in revenue generation.

- Automated decision-making leads to consistent, precise decisions preventing revenue from being left "on the table." (*Id.* Ex. 40 at 26);

- Use of Blaze Advisor's ability to reuse and repurpose business rules allowed Chubb Custom Markets, a Federal subsidiary, to capture a $25 million business opportunity. (*Id.* Ex. 41 at 9);

- Use of predictive analytics, which Blaze Advisor does in Federal's Profitability Indicator application, "drive[s] profitable behaviors." Raising real-time decision making raises revenue. (*Id.* Ex. 42 at 1);

40

- In its 2018 Annual Report, Chubb Limited, Defendants' parent company, reported "operational excellence and execution" with respect to underwriting, which leads to "profitability." (*Id.* Ex. 43 at 5.) Chubb Limited also reported, "Technology is a competitive weapon" and identified the "industry's arms race" as the use of technology to "improve risk selection and pricing along … while improving the customer experience." (*Id.* at 14.)

Defendants' summary judgment motion is premised on an incorrect legal standard. FICO's burden is to prove the gross revenue connected to infringement and the fact infringement contributed to that revenue. FICO's evidence at trial will satisfy that burden. Defendants' contentions ignore there are genuine issues of material fact in dispute.

### C.  Federal—not FICO—bears the burden of quantifying what profits are not attributable to infringement.

#### (1)  Federal bears burden of disentangling the contribution of infringement from other factors.

FICO's burden, as stated, is to prove Federal's gross revenue. 17 U.S.C. § 504(b). When the copyright owner meets its burden, "a rebuttable presumption that the defendant's revenues *are entirely attributable* to the infringement arises." *Andreas*, 336 F.3d at 796 (emphasis added)(acknowledging standard). The burden of proof then shifts to Federal to prove both the "deductible expenses" and "the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b); *Andreas*, 336 F.3d at 795.

Federal's contention that FICO does not quantify the profits to be disgorged misses the mark. FICO has identified the relevant gross revenue, and now the burden of

proof to show deductible expenses and any apportionment rests with Federal.[12] *See*

*Oracle Am., Inc. v. Google Inc*., No. 10-03561, 2016 U.S. Dist. LEXIS 58819, at *23-24

(N.D. Cal. May 3, 2016).

> **(2)** **Federal's arguments that Blaze Advisor is a small part of its total technology footprint, the role of its human capital, and other alleged non-infringing factors relate to Federal's burden of proof; they are not grounds for summary judgment against FICO.**

Federal raises other factors that may contribute to Federal's profits, including

other software, Federal's human skill set, and Federal's business rules.  (Dkt. 445 at 35-

38.)  These factors relate to Federal's burden—not FICO's burden of proof.  They have

no bearing on Federal's summary judgment motion.

> **D.** **FICO is entitled to disgorgement from Defendants for all profits attributable to infringement (insurance sold in connection with which Blaze Advisor was used), regardless of the entity that sold the insurance.**

FICO is entitled to all profits attributable to Federal's infringement.  Federal

challenges FICO's disgorgement claim contending that FICO seeks profits from entities

who are not named in this lawsuit.[13]  (Dkt. 445 at 38-39.)  The contention misstates

FICO's disgorgement claim.  FICO seeks disgorgement of profits *from* Federal Insurance

Company and ACE American Insurance Company, the named defendants.  Federal's

---

[12] Federal's argument includes reference to the fact FICO's expert, Mr. Whitener, did not test or quantify the extent Blaze Advisor contributed to Federal's gross revenue in connection with which Blaze Advisor was used.  That argument fails because, as here, Federal profoundly misunderstands the law.

[13] Federal's calculation of profits from non-named parties ($29.5 billion of $30.9 billion) is not supported by the facts.  Federal Insurance Co. and ACE American Insurance Co. account for $ 27.65 billion of FICO's proffered revenues.  (Decl., Ex. 44.)

42

unauthorized distribution of Blaze Advisor before the Agreement was terminated was copyright infringement.  Defendants' continued use of Blaze Advisor is copyright infringement.  By those acts of infringement, Defendants admit that they and various other writing companies sell insurance in connection with which Blaze Advisor was and is used.  (Decl., Ex. 36-39.)

The remedial scope of the Copyright Act reaches all profits that stem from the predicate acts of infringement.  The wrongdoer is liable for the full scope of the wrong.  Defendants wholly own the non-party writing companies and have agreements with others to share revenue.  The disgorgement remedy of the Copyright Act captures all revenue attributable to Defendants' wrongful acts of infringement.  *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir. 1939); *see also Tire Eng'g & Distrib.*, 682 F.3d at 308; *Los Angeles News Serv.*, 149 F.3d at 990-92.

The predicate act doctrine derives from Judge Learned Hand's decision in *Sheldon.*  In *Sheldon*, the copyright owner sued the movie-theater parent company, Loew's, Inc., for the profits generated by Loew's and its non-party subsidiaries. 26 F. Supp. 134, 135 (S.D.N.Y. 1938).  On appeal, Judge Learned Hand affirmed disgorgement of Loew's profits derived from its subsidiaries because 1) Loew's, the parent, was the "real tortfeasor", and 2) Loew's benefited from the infringement.  106 F.2d at 52.

The facts are no different here.  Defendants are the "real tortfeasors" and they benefit from the sales of their wholly owned subsidiaries and pooling members.  The fact these writing companies are not defendants is of no moment.  The named Defendants are the infringers, and the remedial scope of the Copyright Act includes disgorgement from

43

the wrongdoers of all profits stemming from their infringement, which includes the revenue of all of the writing companies that sell insurance in connection with the use of Blaze Advisor. The legal and economic realities of the case confirm the scope of the benefit to Defendants.

Federal answered Interrogatory Nos. 17-20 identifying its wholly owned subsidiaries and pool members and the amount of revenue each realized using Blaze Advisor. (Decl., Ex. 36-39).) Federal's answers admit each of the wholly owned subsidiaries and pool members are related companies. Defendants, their wholly owned subsidiaries and their pool members are a single business. (*See generally* Decl., Ex. 23 at 10-17.) The single nature of their business is reflected, in accordance with standard accounting principles, in Defendants' consolidated financial statements. The consolidated statements reflect the realities of the single business. Defendants acknowledge this economic realty by choosing to file consolidated federal income tax returns that include all of their wholly owned subsidiaries. (*Id.* Ex. 45 at 14.8-14.9.)

Defendants (with their subsidiaries) also function as a single business through their pooling arrangements. (*See id.* Ex. 46 at 26-27.) Pooling arrangements are agreements whereby companies share premiums, losses, and expenses amongst the pool members and identify the pool leader (e.g. parent) as the head. Pooling arrangements also allow for shared services—staffed and managed by the pool leader but paid for by the pool members. Insurance policies, regardless of the name on the policy's declaration page, are managed, serviced and insured by the pool's lead – the Defendants. FICO's

claim for damages is to recover from Defendants the "profits of the infringer that are attributable to the infringement."

Federal's cited cases do not contend otherwise. (Dkt. 445 at 39.) Federal cites cases contending that disgorgement liability is several and "each defendant is only liable to the copyright plaintiff to the extent of its own profits derived from the infringing activity." (*Id.*) FICO seeks to disgorge the profits Defendants realize from the infringing use of Blaze Advisor—profits that include those of its wholly owned subsidiaries and pooling members.

## X.    Conclusion

For all the reasons stated, the Court should deny Defendants' motion for summary judgment.

Dated: August 26, 2019

MERCHANT & GOULD P.C.

/s/ Allen Hinderaker
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2215
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com

45

*Attorneys for Plaintiff Fair Isaac Corporation*