# EXHIBIT 12
# (Redacted)

**(Previously Filed Under Seal as DI 503-9)**

Lawrence Wachs — 2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS  Doc. 606-1  Filed 10/23/19  Page 2 of 9

```
                UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
                ---------------------------------------X
                FAIR ISAAC CORPORATION,

                                      PLAINTIFF,

                      -against-        Case No.:
                                       16-cv-1054


                FEDERAL INSURANCE COMPANY and
                ACE AMERICAN INSURANCE COMPANY,

                                      DEFENDANTS.
                ---------------------------------------X


                           DATE:  February 26, 2019

                           TIME:  10:06 A.M.



                     DEPOSITION of a Non-Party

              Witness, LAWRENCE WACHS, taken by the

              respective parties, pursuant to a

              Subpoena and to the Federal Rules of

              Civil Procedure, held at the offices of

              Merchant & Gould, P.C., 767 3rd Avenue,

              23rd Floor, New York, New York 10017,

              before Jennifer Schwartz, a Notary

              Public of the State of New York.
```

Lawrence Wachs    2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 606-1   Filed 10/23/19   Page 3 of 9

```
 1

 2   A P P E A R A N C E S:

 3


 4   MERCHANT & GOULD, P.C.
        Attorneys for the Plaintiff
 5      FAIR ISAAC CORPORATION
        767 3rd Avenue, 23rd Floor
 6      New York, New York 10017
        BY:   ALLEN W. HINDERAKER, ESQ.
 7      ahinderaker@merchantgould.com

 8


 9   FREDRIKSON & BYRON, P.A.
        Attorneys for the Defendants
10      FEDERAL INSURANCE COMPANY and
        ACE AMERICAN INSURANCE COMPANY
11      200 South Sixth Street, Suite 4000
        Minneapolis, Minnesota 55402
12      BY:   LEAH C. JANUS, ESQ.
        ljanus@fredlaw.com
13

14
     ALSO PRESENT:
15      James Woodward -
        Fair Isaac Corporation
16      Kevin Marth -
        Videographer
17

18

19                *         *         *

20

21

22

23

24

25
```

Lawrence Wachs    2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 606-1   Filed 10/23/19   Page 4 of 9

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*    *    *    *

Lawrence Wachs     2/26/2019
CASE 0:16-cv-01054-DTS   Doc. 606-1   Filed 10/23/19   Page 5 of 9
Fair Isaac Corporation vs. Federal Insurance Company, et al.

THE VIDEOGRAPHER: Good morning. This is the videographer speaking. My name is Kevin Marth, here on behalf of Depo International. Today's date is February 26th, 2019, and the time is 10:07 a.m. We are at the offices of Merchant & Gould in New York, New York, to take the video deposition of Mr. Lawrence Wachs in the matter of Fair Isaac Corporation versus Federal Insurance Company and ACE American Insurance Company in the U.S. District Court of Minnesota. At this time would counsel please introduce yourselves for the record.

MR. HINDERAKER: Allen -- oh, sorry. Go ahead.

MS. JANUS: Leah Janus, Fredrikson & Byron for defendants.

MR. HINDERAKER: Allen

Page 4

Hinderaker, Merchant & Gould, along with Jim Woodward, vice president deputy general counsel of FICO, on behalf of the plaintiffs or the plaintiff.

THE VIDEOGRAPHER: At this time would the court reporter please swear in the witness and we may proceed.

L A W R E N C E   W A C H S, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MS. JANUS:

Q. Please state your name for the record.
**A. My name is Lawrence Wachs.**
Q. And what is your address?
**A. 912 Whitehall Drive, Valley Stream, New York 11581.**
Q. Mr. Wachs, my name is Leah Janus, I represent the defendants in

Page 5

the lawsuit that you are here to testify in. We have not met before today, correct?
**A. That's correct.**
Q. Are you represented by counsel for FICO here today?
**A. I am.**
Q. Okay. Have you had your deposition taken before?
**A. In this matter?**
Q. Ever.
**A. Yes.**
Q. Okay. I take it then you're relatively familiar with how this works, but just so that we're on the same page, you're here to provide testimony, you understand you're under oath, correct?
**A. I do.**
Q. Okay. So you're providing testimony as if you are in a court of law before a judge and a jury, you understand that?
**A. I do.**

Page 6

Q. I'll ask you questions. When you answer, it's important that you use words rather then shrugs or gestures, okay?
**A. Fine.**
Q. If you don't understand a question that I've asked you, please ask me to rephrase it or restate it and I will. If you don't do that, I will assume that you've understood, fair?
**A. Good.**
Q. Okay. I want to start just with a little bit of background information. Where did you receive your education and tell us what degrees you obtained.
**A. I obtained a degree -- bachelor of arts degree with a major in economics from Brooklyn College in 1968.**
Q. In what year were you born?
**A. 1947.**
Q. Are you currently employed?
**A. No.**
Q. What was your last -- most

Page 7

Lawrence Wachs  2/26/2019
CASE 0:16-cv-01054-DTS  Doc. 606-1  Filed 10/23/19  Page 6 of 9
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Unless you have something there, I can't remember that.

Q. Did you review documents from 2008 in preparation for the deposition today, if you recall?

A. I believe so. If they were part of discovery, I saw them.

Q. Do you have a recollection of Mike Sawyer or Russ Schreiber approaching you to discuss the Chubb license in late 2008?

A. Not specifically, no.

Q. I'm showing you what's been marked as deposition Exhibit 73. This is an appointment from Mike Sawyer to Ian Brody, Richard Hill, and Russ Schreiber, correct?

A. That's correct.

Q. Do you know who Ian Brody and Richard Hill are?

A. No, I do not.

Q. And in the note to the appointment, it says, "All please join this call to discuss the Chubb license

Page 168

agreement and plan -- and the plan for Chubb Europe. Attached are the three SLSA contracts and the latest Chubb annual report," correct?

A. Correct.

Q. Was it your understanding at this point that Chubb had approached FICO about using Blaze in Europe?

        MR. HINDERAKER: Objection, lack of foundation.

A. I was not an invitee at this meeting and I can't say that I remember the specifics of the meeting.

Q. Okay. And I'm just using this date to ask you whether -- as someone who was involved with the Chubb account, whether you have a recollection of Chubb discussing...

A. No, I do not.

Q. You know, having access to Blaze in Europe pursuant to enterprise license agreement?

A. No, I do not. No recollection.

Q. Do you recall that around this

Page 169

time you were asked to look into the Chubb license agreement in connection with Chubb's request to have access to Blaze in Europe?

A. Conceivably, but I don't remember the specifics of that conversation. I believe there's an e-mail to that effect though.

Q. Okay. So do you recall that you actually concluded that the ELA that was negotiated with Chubb was a global ELA?

A. From the wording here, I cannot conclude -- make that conclusion.

Q. So I've handed you -- before you go into the e-mail, I was asking the question whether you recalled concluding that it was a global ELA. I take it you don't have a recollection of that?

A. I do not have a recollection of that.

Q. So I've handed you what's been marked as Exhibit 116. Is this one of

Page 170

the documents you reviewed to prepare for your deposition?

A. Yes.

Q. This is an e-mail from you to Russ Schreiber dated November 26th, 2008, correct?

A. That's right.

Q. So this is about a week-and-a-half after -- or two -- a little less than two weeks after the appointment planner that we looked at which was marked Exhibit 73, correct?

A. Right.

Q. I'll give you a chance to review the e-mail, let me know when you've done that.

A. Yeah, I reviewed the document.

Q. Having reviewed the document, do you recall what led you to writing this e-mail?

A. It appears that it was a request by Russ Schreiber for my views on the status of the ELA and whether it did include a global provision or not.

Page 171

Lawrence Wachs  2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 606-1   Filed 10/23/19   Page 7 of 9

**Page 172**

Q. And do you recall actually having a conversation with Russ Schreiber on that topic?
A. No, I don't have a recollection of that.
Q. You state that in reviewing your notes and some archived e-mails, "it's apparent to me that the corporate ELA that was negotiated with Phil Folz and June Drewry intended to include the global license, correct?
A. That is what I stated.
Q. So you concluded after reviewing archived e-mails and your notes that the ELA was a global license?
A. That, I don't agree with necessarily. It says that it's apparent that it intended to include the global license but I can't tell you specifically that it did.
Q. Okay. What is the distinction between what you're saying and what I said?
A. Well, the way I worded it, it's

**Page 173**

apparent that it intended to include a global license. The question is in the final what was actually paid by Chubb would indicate that there's a difference of about ▇▇▇▇ and I don't see the wording, for example, change from a definition of territory, so there's some evidence that it did not include -- that it was never finally accepted as global but I don't have the e-mail or any thread from Phil -- from Mark Laden to indicate what was finally agreed on at that private meeting that he attended, so I can't draw that conclusion. It's apparent that they wanted global but I don't know if it ever came to fruition.
Q. So you just don't know -- but you believe that it was intended to include --
A. That's correct.
Q. -- the ELA was intended to include the global license?
A. That is what I said.

**Page 174**

MR. HINDERAKER: We'll rely on the testimony on the record.
Q. And then you say, "In my recollection, they --" meaning Chubb -- "were adamant about keeping global on the table," correct?
A. That's right.
Q. But they did take COBOL's smart forms off the table to wait for projects requiring that functionality, correct?
A. That's what I said, yes.
Q. Okay. Now, did you -- do you recall talking with Russ Schreiber after you sent this e-mail?
A. No, I do not.
Q. Did you recall talking with anyone else at FICO relating to your conclusion that's set forth in the e-mail marked as 116?
A. No, I do not.
Q. Do you know whether, in fact, after November of 2008 FICO assisted Chubb in implementing the Blaze Advisor

**Page 175**

software in Europe?
MR. HINDERAKER: Objection, lack of foundation.
A. I don't believe that that was the way I read the e-mail from the invitation of Mike Sawyer when he states that to -- license agreement and a plan for Chubb Europe, he's talking about a sales opportunity.
Q. So you don't know whether FICO interpreted the enterprise license agreement going forward as including global access or not, you just don't know?
A. I don't know.
Q. What notes are you referring to in your e-mail marked as 116?
A. It would be the notes that -- the e-mails that you produced here clearly, notes would have been perhaps notebooks of -- as I attended meetings, I may have taken notes at the meeting but --
Q. So handwritten notes that you

Lawrence Wachs     2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 606-1   Filed 10/23/19   Page 8 of 9

**Page 200**

year they did succeed in accepting considerably more business than they had in the previous year for no increase of staff.
Q. This is identified in an earlier deposition as Exhibit 330, dated November 3, 2006. Placing a time, it's after the June license agreement, it's after the divisional and it's before the second amendment. Do you know who prepared Exhibit 330?
A. I did.
Q. And what was the purposes of Exhibit 330?
A. Sales training within FICO.
Q. So internal -- internal to FICO?
A. Yes.
Q. And I think maybe the title tells us what we need to know, but would you just give us a general description of what this document was intended to say and teach?
A. It was a full client journey document here which described the

**Page 201**

business need, the intended solution, how we built the solution, and the results of the implementation.
Q. Okay. And is this fair to say that this summarizes your firsthand experience in that process of selling to Chubb?
A. Certainly.
Q. Maybe just a couple more questions about this. If you go to the page that is 5877 where it says Chubb specialty insurance business and it has the bullet points.
A. Yes.
Q. What was the source of this information that's on this letter?

[redacted]

**Page 202**

about what would have come from the annual report.
Q. And then on the next page, which is 5878, my same -- same question: What was the source of your understanding of the Chubb current state?
A. Initially, in that first response, it was the RFI, and it was refined through subsequent weekly conversations with the technology team headed by Sully.
Q. And then on the next page, 5879, you lay out the vision statement and then you lay out success criteria, do you know if the success -- do you know if the success criteria were met?
A. I do know that they automated their renewals in short order. I do know that from the testimony of the businesspeople that they did -- were able to access and modify the rules and through the analysis tools of the Blaze Advisor product, they would be able to

**Page 203**

know which rules are the best rules and which rules are the worst rules and, in effect, modify them accordingly.
Q. I'm going to change topics a little bit and if you could find Exhibit 113 as well as Exhibit 110, which is an agreement, software license agreement. Exhibit 113 is the -- your e-mail of December 12, 2006.
A. You said 113?
Q. Yeah, 113. If I could help you, I would. It looks like this.
A. I don't have it.
Q. All right. I've got it here. Let's work off of my copy.
A. Okay.
Q. 113. And then if you'd get the amendment number 2 in front of you from the 110 exhibit.
A. Did you say 110?
Q. Yeah, it's a license agreement. Here we go, this is it, this is 110.
A. Okay.
Q. So find in 110 amendment number

Lawrence Wachs    2/26/2019
CASE 0:16-cv-01054-DTS   Doc. 606-1   Filed 10/23/19   Page 9 of 9
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 204

2, it's on -- its Bates number is 1718 on the bottom right-hand corner.
  A. Yep.
  Q. Okay. As you saw -- as we saw in your earlier testimony when you go to the second page, amendment number 2, there is no limitation on the number of development seats, agreed -- or developer seats?
  **A. Agreed.**

[redacted]

  **A. Agreed.**
  Q. Now, if you could find Exhibit 112, please.

Page 205

  **A. Yeah.**
  Q. You were asked about this exhibit, of course, and you were directed to the second question on the second page and I'm going to direct you to that and without rereading the question number 2, under that is your response being "there are no usage or redistribution restrictions within Chubb in any of the options within the seat limitations of options 1 and 2," understood?
  **A. Right.**
  Q. So my question with respect -- my question with respect to your answer is whether you had any meaning of Chubb other than Chubb the client in terms of the license agreement?
  **A. I never differentiated, unfortunately.**
      MR. HINDERAKER: Thank you for your time. That's my questions.
      THE WITNESS: Sure.

Page 206

      THE VIDEOGRAPHER: This concludes the deposition. We are going off the record at 3:50 p.m.
        (Whereupon, at 3:50 P.M., the Examination of this witness was concluded.)

          0     0     0     0