# EXHIBIT 14
# (Redacted)

**(Previously Filed Under Seal as DI 503-11)**

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS  Doc. 606-2  Filed 10/23/19  Page 2 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1              CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2                UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
 3
     --------------------------------x
 4
     FAIR ISAAC CORPORATION,
 5
                    Plaintiff,
 6           v.                            Court File No.
                                           16-cv-1054 (WMW/DTS)
 7
     FEDERAL INSURANCE COMPANY
 8   and ACE AMERICAN INSURANCE
     COMPANY,
 9
                    Defendants.
10
     --------------------------------x
11

12      ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

13      VIDEOTAPED DEPOSITION OF RUSSELL SCHREIBER

14                   New York, New York

15              Wednesday, October 24, 2018

16                      8:52 a.m.

17

18

19

20

21
     Reported by:
22   LYNN VAN DEN HENDE
     CRR, RMR, RPR, CSR-NY, CSR-CA, CSR-IL
23   JOB NO: 39215

24

25
```

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
CASE 0:16-cv-01054-DTS   Doc. 606-2   Filed 10/23/19   Page 3 of 13
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1   CONFIDENTIAL - ATTORNEYS' EYES ONLY

2

3

4                October 24, 2018

5                   8:52 a.m.

6

7       Videotaped deposition of RUSSELL

8   SCHREIBER, held at the offices of Merchant &

9   Gould, 767 Third Avenue, 23rd Floor, New

10  York, New York, pursuant to Notice, before

11  Lynn Van Den Hende, Certified Realtime

12  Reporter, Registered Merit Reporter, State

13  of New York Certified Shorthand Reporter,

14  State of California Certified Shorthand

15  Reporter, State of Illinois Certified

16  Shorthand Reporter, Registered Professional

17  Reporter, and Notary Public within and for

18  the State of New York.

19

20

21

22

23

24

25

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 606-2   Filed 10/23/19   Page 4 of 13

```
 1            CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2   A P P E A R A N C E S:

 3

 4   FOR THE PLAINTIFF:

 5        Merchant & Gould

 6        3200 IDS Center

 7        80 South Eighth Street

 8        Minneapolis, Minnesota 55402-2215

 9        612-332-5300

10        BY:   ALLEN W. HINDERAKER, ESQ.

11              ahinderaker@merchantgould.com

12

13   FOR THE DEFENDANTS:

14        FREDRIKSON & BYRON, P.A.

15        200 South Sixth Street, Suite 4000

16        Minneapolis, MN 55402-1425

17        612-492-7000

18        BY:   LEAH C. JANUS, ESQ.

19              ljanus@fredlaw.com

20

21   ALSO PRESENT:

22        JAMES WOODWARD, Fair Isaac Corporation

23        KEVIN S. MURPHY, Chubb

24        KEVIN MARTH, Videographer

25
```

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 606-2   Filed 10/23/19   Page 5 of 13

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

being negotiated with Chubb?

A. No, no.

What this says is that we were seeking to have a discussion internally about pricing a global ELA.

What I don't see is the next step out of this that says, oh, you're approved to do it. You're not approved to do it.

So this is Larry and I guess my ask for pricing approval to do something. Different than being granted pricing approval.

Q. And ultimately FICO did end up providing or deciding to go with a global ELA, correct?

A. Wrong. No.

Q. Okay. And so let's take a look at Amendment Two to the software license agreement, which is Exhibit 110.

A. 110, okay. Amendment Two, okay.

Q. So Amendment Two actually has a license fee of ▮▮▮▮▮, correct?

A. That's right.

Q. Okay. And unlimited development

Page 108

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

seats, right?

A. That's right.

Q. Okay. While the license was being negotiated, so while prices were going back and forth, Larry Wachs was referring to the fact that he was at ▮▮▮▮▮ or a global ELA and unlimited license seats, correct?

A. Okay.

Q. So does that change your thinking at all about whether the ELA that was ultimately entered into was in fact a global ELA?

A. It does not.

I mean, Larry's asking for a pricing approval to the people that could give it to him, but he never got it. I never got it.

Q. And what are you saying that based on? Is that based on a specific conversation?

A. That's based on the deal we did. There's no global. There's no -- there's no product control. There's no export stuff.

Page 109

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

This doesn't change the territory. It's USA, USA, USA. They did the deal.

So we did a lot of machinations because Jim Black asked for global. So Larry kept frothing about asking for global.

It was never approved at that price. We never did a global.

Q. Who made the decision not to approve that price specifically for global?

A. So that would have been Mark Layden at that time.

Q. Okay. And do you recall hearing from Mark Layden that you could do a deal for the United States, but not for global?

A. I do not.

Q. So are you just assuming that these conversations occurred without specific recollections of them?

A. Which conversations?

Q. The conversations you're talking about that lead you to believe it was a -- it was not a global deal.

A. Right, I have no evidence that we actually got approval for a global deal.

Page 110

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

I have Larry asking for a global deal, but no -- nothing that shows me I got approval to do a global deal.

Q. Okay. And so that's what you're basing your conclusion that it was not a global deal on?

A. That's part of it.

Part of it was I was having -- I was the one that Owen called and said, hey, can we just make this global.

And I said I can't afford to do a global.

Q. Okay. So you actually told Chubb --

A. I personally told Chubb.

Q. Okay. You told Owen --

A. Williams.

Q. -- Williams at Chubb that he could not get a global deal?

A. For this price.

Q. For what price?

A. For the pricing that was -- you know, that they said, oh, they can't -- they backed off everything. They didn't have the

Page 111

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 606-2   Filed 10/23/19   Page 6 of 13

## Page 112

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

projects. They wanted a lower price.

    I said, yeah, for the global I need a number. Whatever that number was -- you know, again, this is 2006 now, so --

    It would have been a very quick conversation that we had.

    Owen said can we do this global.

    Not priced for global.

    It could have been Berthiaume, Owen and Mark. It may have been Berthiaume, Mark Berthiaume. Owen and Mark.

Q.  Do you remember when that conversation took place?

A.  In -- sometime in December of 2006 as we were finishing things -- finishing things up.

Q.  Did you ever put anything like that in an email to anyone at Chubb?

A.  I don't think so, not that I recall. I wouldn't have needed to.

Q.  Why do you say nobody needed to?

A.  I say I wouldn't have needed to, 'cause I had a conversation as the executive responsible for the account with the guys

## Page 113

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

that were binding it, the account guys.

    What's really missing from this though is all the -- I forgot, what about all the export stuff that would have to be here if it was global.

    So that's nowhere in this document.

    Just the export controls, you know, congatulates to North Korea. There's all the documentation that goes with selling a license outside of the United States.

    That's not here.

Q.  That would be documentation FICO would provide?

A.  That would be the contracts, you know, required legal -- I forget the terms. It's been a while since I've been in this business, but it's export control documentation, whatever that is.

Q.  I'm showing you what has been marked as Exhibit 114.

    (Exhibit 114, Meeting planner and an agenda, with attachment, from Owen Williams to Chubb people and Mr.

## Page 114

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Schreiber, Bates FED011914_0001 and FED011915_0001 through FED011915_0049, marked for identification.)

A.  Owen --

Q.  I just have a couple basic questions for you on this one.

A.  Okay.

Q.  So this is a meeting planner and an agenda and an attachment from Owen Williams to a bunch of Chubb people and you, right?

A.  Yes.

Q.  And the subject is, "Scoring Engine for Predictive Model/Risk Portfolio Management Workstation Meeting"?

A.  Right.

Q.  Do you just generally recall what this referred to?

A.  No, I really don't.

    Huh. No, I don't. I'd have to -- I can look through it if you want, but I don't.

Q.  There's a Fair Isaac PowerPoint deck --

## Page 115

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

A.  Yeah, do you want me to look at it?

Q.  Just take -- you don't have to read it in detail, just -- I have a couple general questions for you about it.

    But if you take a quick look at it and let me know.

    MR. HINDERAKER: Look at it as much as you need to to be comfortable.

    (Document review.)

A.  Okay.

Q.  So is this a PowerPoint presentation that Fair Isaac prepared?

    MR. HINDERAKER: Objection, lack of foundation.

A.  I don't know.

Q.  Okay. You didn't prepare it?

A.  I did not prepare this.

Q.  Or if you did, you don't recall it?

A.  I did not -- I didn't. I'm pretty sure I did not prepare this.

Q.  And my question is -- I mean, it appears to be a Fair Isaac presentation in

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS   Doc. 606-2   Filed 10/23/19   Page 7 of 13

## Page 188

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

There should have been an email that had gone out said, here's the conclusions.

If there was a question.

Again, that assumes a meeting took place. I don't know if this meeting took place, right?

This is just an invite.

Q. Right.

A. Right. So it may not have happened.

Q. Do you have any reason to think it didn't happen?

A. No. But I have no reason to think it did.

You know how many meetings I have that never took place on my calendar?

I have no reason to believe that meeting happened.

It probably did. But I haven't seen any conclusion that said it did.

Q. It probably did though, right?

A. You know, I was trying to be polite. Who knows?

## Page 189

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Q. Okay.

A. I was really trying to be kind.

Q. Well, we also looked at the email that Larry Wachs sent 12 days after the meeting on November 14, 2008 that is also talking about whether or not the ELA --

A. This is 116?

Q. -- is global?

Yeah.

A. Yeah, so Larry was convinced.

The problem is the agreement doesn't say it. There's nothing in any agreements that say it's global.

So Larry has convinced himself.

Q. And so there was internal disagreement about the scope of the Chubb ELA, is that fair?

A. No -- well, yeah, sure, if you want to say Larry was convinced, right?

But there was -- Larry was the lowest man on the totem pole in every document you're looking at -- well, that's not true. Sally Holt and Dale Zwizinski were lower than Larry.

## Page 190

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Q. Well, you were saying you were partners with Larry in the pursuit of Chubb?

A. That's right.

Q. And Larry was the lead on most of the negotiations, right?

A. No.

Q. Who was the lead?

A. So Larry -- Larry was facing off with procurement. And I faced off with the buyers.

The buyers were the CIOs in the division at that time.

Q. Who was that?

A. That was Owen and then Mark Berthiaume.

Q. Okay. And Larry was facing off with who?

A. Jim Black, who's an administrative --

Q. Okay. Does the fact that Larry followed up with you 12 days after these November 14 meeting planners indicate to you that in all likelihood that meeting did take place?

## Page 191

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

A. No.

Q. Does it reinforce for you that in November of 2008 you as an internal team were actively debating whether Chubb's use of Blaze in Europe would be allowed under the ELA?

A. Just say it again, please.

I was reading at the same time you were speaking.

Q. Does it reinforce for you that in November of 2008 FICO as an internal team was debating -- actively debating whether Chubb's use of Blaze in Europe was allowed under the ELA?

A. What does "actively" mean to you? You can shrug and I get to shrug?

I just don't know.

Plus it came up. It was active -- actively -- it was active -- I'm thinking, oh, we've got a team, we're on a conference table, we're working an issue.

But this was not that.

Q. Okay.

A. We never really huddled around and

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 606-2 Filed 10/23/19 Page 8 of 13

## Page 192

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

said, you know, we got to solve this.

We may -- if someone sent an email, like, oh, I got some emails from back in the day.

So "actively" means we got a project team, we're solving a problem.

That's not active to me.

This was someone asked a question. So Larry threw an answer out. We had a meeting scheduled. Did it take place? Maybe, maybe not.

Q. Okay. Do you know what answer was ultimately given to Chubb Europe?

MR. HINDERAKER: Objection. The question assumes facts not in evidence.

Q. Go ahead.

A. No, I do not know if someone told Chubb Europe something.

Q. But we know that at least Richard Hill's recollection as of August 14 of 2012 was that he seemed to remember their U.S. Blaze license allowed them the software for free, right?

## Page 193

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

MR. HINDERAKER: Objection, misstates the document.

A. No, that -- no, that's wrong. Richard says I think they have software for free.

Richard Hill in this document says I seem to remember the U.S. Blaze license allowed them to the software for free.

He does quote a U.S. Blaze license though. He calls it a U.S. Blaze license.

Q. But he's asking about whether he in Europe can sell Blaze to Chubb Europe?

A. Yeah.

Q. And his conclusion is, I recall that the U.S. Blaze license allowed them the software for free, right?

A. Right.

But his conclusion doesn't say, oh, I reviewed the contract, oh -- you know, he didn't -- it's just kind of -- Richard is -- I'm not going to characterize people.

Richard did not read the agreements. I'll say that.

Q. You met with Chubb Europe in

## Page 194

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

December of 2012?

A. Well, I met with some people in Chubb in Europe, in the U.K., yeah, in the U.K. office.

I don't remember who they were. Do you have a calendar on that?

I did meet with people in the U.K. though.

Q. And what did you talk about?

A. Decision simulators I recall predominantly.

I don't recall if we discussed Blaze. I just don't recall. We may have.

Q. You were meeting with Chubb Europe as a current client though, correct?

A. As Chubb is a current client. Chubb was -- I'm not saying Chubb Europe was a current client.

Q. Right. But you understood that Chubb Europe was using Blaze at the time of your meeting with them?

A. I don't know. I don't -- you'd have to show me --

Q. You don't recall?

## Page 195

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

A. Yeah.

Q. It's possible that you knew that Chubb Europe was using Blaze at the time of your meeting?

A. I would have taken them head on. If I knew they were using Blaze when I met them, chances are really good I would have said, we have a problem.

If it was in my face like that, chances are I would have said, we have a problem. Chances are really good I would have said, we have a problem.

Q. I'm showing you what's been marked as Exhibit 118.

(Exhibit 118, Email chain, Bates FED004808_0001 through FED004808_0007, marked for identification.)

(Document review.)

Q. This is an email exchange between you and Setti.

Do you remember him?

A. I think it's a he -- a she, but -- actually it's kind of fun.

I didn't until I saw this. So it

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 606-2 Filed 10/23/19 Page 9 of 13

**Page 320**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

by FICO.

Q. Okay.

Q. And --

A. This is a Chubb document though.

MR. HINDERAKER: Yeah, it is, yes.

THE WITNESS: Okay.

MR. HINDERAKER: Of course.

BY MS. JANUS:

Q. The document -- I don't know that there's more. I mean, you're telling me there's more to this document.

I don't know that that's the case.

A. I don't know either.

Q. Okay. So you don't know if there were more pages than what's here?

A. That's right. I don't know that.

It looks like it's incomplete. It just feels like there ought to be a second page on something like this.

But, okay, maybe there's nothing here.

Q. Okay. The proposal is that the parties renegotiate the license to downgrade and limit the use of Blaze Advisor

**Page 321**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

development and deployment to reflect Chubb's actual usage of 15 named applications and 100 seats of Blaze Advisor development at no extra cost to Chubb. "All usage now and going forward does not and will not change from that permitted under the current license agreement and all usage remains with the same named applications."

Do you see that?

A. Yep.

Q. Okay. So essentially the proposal appears to be -- actually the scope of the license will be downgraded, right?

A. That's what the words on the page say. I don't agree with that at all.

But keep going. Keep going.

Q. Okay. And the usage will not change from that that's permitted under the current license, correct?

A. That's what it says, okay. But that's not a downgrade. That's -- so it kind of defeats -- self -- it's an internal -- it conflicts with itself.

Q. Well, the proposal contemplates

**Page 322**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

that the license would actually be limited to 15 named applications, right?

A. Yeah.

Q. And those are the current -- according to the proposal, currently used applications, correct?

A. Right.

Q. There is no limit on number of applications in the Chubb enterprise license, is there?

A. "All usage remains with the same" -- there is no limit on --

The global dispute notwithstanding, right.

So that's right. They could have --

Q. So -- so --

A. -- they could have 500 applications in the United States easily.

Q. Okay.

A. Yeah, right.

Q. Okay. So what they're saying is we're going -- we understand we could have unlimited applications under our ELA, but

**Page 323**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

we're going to limit it to the 15 applications that we are actually using Blaze in, right?

A. Right.

Q. And we're going to limit ourselves to 100 seats of Blaze Advisor development, so development seats, correct?

A. Right.

Q. And we discussed the fact previously that the current ELA does not have a limit on development seats, correct?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. So this would create yet another limit in the license that didn't exist when Chubb purchased the license?

A. That's true.

Q. In addition to that, Chubb has said that the use will not change from that permitted under the current license agreement and all use -- usage remains with the same named applications?

A. That's what it says so far.

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 606-2 Filed 10/23/19 Page 10 of 13

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Q. Okay. What -- so what, I guess, was your response to receiving this proposal?

A. I thought this was a terrible proposal.

I thought it was a bad faith proposal to be at this stage making a proposal like this.

It was disgraceful actually.

Q. Why is that?

A. Well, under the proposal Chubb shall write to change the applications utilized in the Blaze Advisor software any time in its sole discretion.

Q. So long as they don't exceed the amount of 15 though?

A. So -- so what that means is they could create an application, call it "FICO the sucker" which wrappers CSI Express, Decision Point, Automated Renewal Process, CUW, all the --

THE COURT REPORTER: Excuse me, you've got to slow down. "Wrappers" what?

A. Wrappers the first ten

Page 324

applications, and it will be treated like one named application.

So to me that was a really disingenuous proposal.

And the fact that we were four days away from the breach -- I mean, from the termination period was just bad -- felt like such bad faith.

There was no recognition of limits on revenue, CPUs.

There was no constraint here.

In fact, they went the other way, saying, you know what, yeah, as long as we call it 15 of anything and we get to make it up as Chubb.

Q. So was your main concern about this proposal that Chubb reserved the right to change the applications so long as the applications didn't exceed an amount of 15?

A. That's the most glaring concern, yeah. That like jumps off the page. And it's -- it's -- it wasn't good.

Q. Okay. So if that provision, which is the second sentence of the paragraph under

Page 325

the heading "Utilization of Blaze Advisor Deployment," if that provision had been taken out, would this proposal have been satisfactory to FICO?

A. No. But it would have been a step towards it being solvable.

There are ways this could have been solved long before we got to four days before the end of the no-cure period.

Q. Okay.

A. But we're not talking about those things. Here we are.

So this is what they gave us.

Q. Okay. So if that part of the provision -- if that part of the proposal had been taken out, then in your view FICO and Chubb could have worked together on a proposal like this to come to a resolution?

A. Possibly, possibly. It required a lot more.

But at that point when they said we can do whatever we want with -- as long as we call it 15 names, it was not a serious proposal.

Page 326

Q. Did you get back to Chubb and say, okay, thank you for your proposal; take out that provision allowing the right to change applications and we'll actually consider it and see if we can come to --

A. No, not that I recall.

But if they would have done this before the breach, then we -- we have a different -- we would have loved to have worked out a transition deal.

But the fact that we're -- I literally had to declare -- I had to get Tom Carretta to tell them we were terminating it.

I mean, that was -- there was no good faith in any of this.

So I don't know what we did after this. I could tell you when I got this, it wasn't seen as real.

Q. And so --

A. I didn't see it as real.

Q. And the most significant piece of that would have been this right to change provision that we talked about, and is it the timing of the proposal as well?

Page 327

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 606-2 Filed 10/23/19 Page 11 of 13

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

A. Those would have been two big pieces of it.

Q. Okay.

A. It was kind of dead on arrival at that point, the way it came across.

Q. So regardless of -- basically what you're saying is Chubb waited too long, and they really could not make a proposal at this point that didn't involve significant payments to FICO --

A. No, not necessarily.

Q. -- for us to consider it?

A. Not necessarily.

MR. HINDERAKER: I'm going to object to the question as misstating your prior to testimony.

Q. Okay. So --

A. Yeah, no. I'm not going to propose now.

But they could have -- if we were -- said that we need to solve it, we need a bridge, we need to do something, we would have figured out something.

We wanted to keep Chubb as a

Page 328

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

customer.

To do what we did too, we were really backed in a corner, despite the hoopla around, you know, the -- Mike's email, you

point in time you were still willing to work with them on a reasonable proposal?

A. Absolutely.

Q. And really the only thing that made the proposal marked as Exhibit 94 unreasonable in your mind was this right to change the applications provision?

A. No, I said that was the first thing that jumped off and slapped me in the face about it.

There was a lot more to it. There was no scope around any of it.

If we're going to do a transitional thing, we're going to bury an

And we knew that they had lost track of use. This was the use inventory

Page 329

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

they gave us that day.

But we knew there was other stuff out there. We didn't know what it was. But we knew there had to be. It's been there for a decade.

There's lot more defining of what scope would have been needed to be to --

And it would have been a transition. They would have had to do some sort of transitory thing, I think.

But I don't know, 'cause we never got to that point.

By the time we got your attention or the time Chubb decided to pay attention, it was -- it was already known about. It was escalated.

Q. Well, that's confusing to me.

Because you keep saying that despite the timing, which of course FICO knew about the transaction for seven months before bringing it up with Chubb --

A. Chubb knew about it too. Chubb knew about it before seven months.

Q. Chubb knew about it.

Page 330

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

But as we've discussed, Chubb had no idea that FICO's plan was to attempt to use the transaction as a mechanism to charge multiples of million of dollars in extra licensing fees.

MR. HINDERAKER: Objection to counsel's argument.

Go ahead.

Counsel is just arguing. And it's just taking up time.

Q. All right, let's -- let's stick to the --

A. We didn't have that plan.

Q. Let's stick to the questions and answers then. How about that?

MR. HINDERAKER: Fantastic.

A. Fantastic.

Q. Take a look at Exhibit 95 previously marked.

A. So on February 26, okay.

Q. So Tamra sent her proposal, which is marked as Exhibit 94, on February 25 at 2:06 p.m. Eastern, correct?

A. I'm sorry, which one -- so Tamra

Page 331

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 606-2 Filed 10/23/19 Page 12 of 13

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

A. It's pretty straightforward.

So once you reach about three or four named applications, the pricing model -- maybe it's five. I don't remember anymore.

But once you reach a certain level of named applications it exceeds the cost and the pricing engine for a next price application.

Q. Well, but the enterprise application in option one doesn't have a limitation as to the number of named applications?

A. Yeah, so let me say it again.

[redacted]

Page 340

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Q. So was this proposal, option number two, just your way of sort of saying, we didn't like that proposal you made, Tamra, and -- and in fact even though it's a more

[redacted] more than we would otherwise for a broader license?

A. No. In fact it would have been the other way.

We were going to say, listen, Tamra, you know, it makes a lot more sense to buy an enterprise.

The way our model works -- and it's our software, and it's our model -- a price model of our software is it's much more financially wise to just do the enterprise upgrade instead of trying to do named applications.

Q. Well, unless you are in a situation where you had an enterprise license and there was a transaction, and now the licensor is taking the position that you have to pay more money.

MR. HINDERAKER: Argumentative.

Page 342

[redacted]

Q. So it would cost them more to limit the license -- under this proposal it would cost them more to buy a more limited license?

A. They would be buying a different type of license, but, yes. And the scope is more limited.

But it's not just them. It's a cost to anybody. It's not -- it's not a Chubb thing.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Counsel's argument.

A. This is before or after breach?

MR. HINDERAKER: It's not a question.

THE WITNESS: Oh, I'm sorry, it's not a question?

MR. HINDERAKER: It's not a question.

BY MS. JANUS:

Q. So if Tamra had made that proposal that's marked as 94 prior to the close of the Ace merger, would you have just negotiated about that proposal and taken out the provision relating to a right to change applications?

MR. HINDERAKER: Objection, asks for a hypothetical.

Go ahead.

A. Oh, I can?

MR. HINDERAKER: Sure.

A. This is what it boils down to.

I mean, if someone engaged us when we tried to engage or before we tried to engage, we would have found a way to let them

Page 343

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY -- 10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS Doc. 606-2 Filed 10/23/19 Page 13 of 13

## Page 344

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

transition in a way that would have had to maintain a really great working relationship.

Loved the client, want to maintain a reference.

Really wasn't looking to do anything, other than figure out how do we stay whole and continue the relationship.

And was there a license opportunity? Yes, there was.

But more important to us was that long-term client relationship. T▇▇▇ ▇▇▇▇ would have come and went.

But I had Chubb as a customer for a decade. And now a lawsuit? Come on.

Q. Did -- when did you leave Chubb?

A. FICO?

Q. Yeah, sorry. FICO?

A. At the end of '16.

Right, '17 I was free.

Q. And was your separation from FICO your choice?

A. Yes.

Q. Did anyone at FICO ask you to leave?

## Page 345

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

A. No.

Q. Did you leave FICO for any reason in connection with the Chubb license issues?

A. No. No, I made enough money. It was time for me to move on to the next chapter.

In fact this is the most dressed I've been in weeks.

Q. I'm showing you what's been previously marked as Exhibit 98.

(Document review.)

A. 3/11.

Q. This is an email from Tom Carretta, and he says -- to Chubb.

And he says:

"I understand the respective business teams have made some progress. While this process has an elongated longer than expected and has been exasperated by finding two noncompliant applications outside the authorized U.S. territory" --

Do you know what he's referring to there?

A. No.

## Page 346

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

Q. Is he referring to --

A. Actually, you know, he's referring to the U.K. applications. But he doesn't name them here, so I'm -- here -- but that's what it is.

Q. Had you informed Tom Carretta of those uses prior to him becoming engaged in this dispute?

MR. HINDERAKER: I object.

Asking -- trying to invade an attorney-client privileged communication.

I instruct you not to answer.

(Instruction Not to Answer.)

Q. Of course those uses weren't new to you, correct?

A. Of course -- I don't know. I just don't know. I just don't know. I mean, right --

Q. You knew about use of Blaze in at least the U.K. prior to --

A. I knew of one, yeah.

Q. Well, and we've seen emails where there was another one discussed that you were

## Page 347

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

on.

A. Is that right? Are you sure?

Q. Yeah.

A. Okay. I'd have to see that.

Q. The record is what it is.

A. Yeah, yeah. I'd have to see it.

I don't remember it that way, but okay.

Q. But you knew about uses in the U.K. prior to Tom Carretta starting to write letters on this dispute, correct?

A. Whether that's true or not doesn't -- they're still unauthorized, noncompliant.

Noncompliance versus Russ said, oh, yeah, that's global, that's different than being compliant, right?

Q. And do you think that they were unauthorized uses even if FICO said to Chubb, you're up, yes, you can use Blaze in Europe under the Chubb ELA?

MR. HINDERAKER: Objection.

A. Yeah.

Sorry.