# EXHIBIT 1
## (Redacted)

**(Previously Filed Under Seal as DI 541)**

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS  Doc. 610  Filed 10/23/19  Page 2 of 4

```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
 2
     - - - - - - - - - - - - - - - - - - - - - - - - -
 3
     FAIR ISAAC CORPORATION,
 4
                   Plaintiff,
 5
          v.            Court File No. 16-cv-1054 (WMW/DTS)
 6
     FEDERAL INSURANCE COMPANY,
 7   an Indiana corporation, and ACE
     AMERICAN INSURANCE COMPANY,
 8   a Pennsylvania corporation,

 9                Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - -

11                     VIDEO DEPOSITION

12         The following is the Rule 30(b)(6) video

13   deposition of Fair Isaac Corporation, given by

14   M WILLIAM PAUL WAID, taken before Jean F. Soule,

15   Notary Public, Registered Professional Reporter,

16   pursuant to Notice of Taking Deposition, at the law

17   office of Fredrikson & Byron, P.A., 200 South Sixth

18   Street, Suite 4000, Basswood Conference Room,

19   Minneapolis, Minnesota, commencing at 9:03 a.m.,

20   Wednesday, January 16, 2019.

21

22                       *    *    *

23

24                  C O N F I D E N T I A L

25                   ATTORNEYS' EYES ONLY
```

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS  Doc. 610  Filed 10/23/19  Page 3 of 4

**Page 147**

1  sizing exercise that we've already covered.
2    Q.   You asked -- FICO asked Tamra to fill
3  out a sizing questionnaire, and she provided that?
4    A.   We did ask for the information, but
5  she didn't have that information.
6    Q.   Okay.  I must have misunderstood you.
7         Were you provided with something from
8  Federal prior to providing these options?
9    A.   Yes.  I believe that Tamra actually
10 sent us a proposal before this, and included in
11 that proposal was the list of these 15 named
12 applications.
13   Q.   Do you recall -- Did you talk with her
14 by telephone, then, the next day?
15   A.   Uh, yeah.  I believe I spoke with her
16 per this -- as the e-mail outlined for the
17 scheduled call.
18   Q.   So did you have other direct
19 communications with Tamra or her boss?
20   A.   I -- I believe I did.  I don't recall
21 if they were before or after.  But, yes, I -- I
22 know I've had other direct conversations with them.
23   Q.   Did you have direct communications
24 with anyone else connected with Federal with
25 respect to those negotiations?

**Page 148**

1    A.   I did not.
2    Q.   Showing you what's been marked as
3  Exhibit 99, this is an e-mail from Mike Sawyer to
4  you dated March 23rd, 2016?
5    A.   It is dated March 23rd, 2016.  This is
6  not an e-mail to me, it's an e-mail to the audience
7  on this e-mail thread that I issued below.  He's
8  addressing this to everyone, not to me.
9    Q.   You are one of the -- you're the first
10 addressee on the e-mail, right?
11   A.   That's because I drafted the original
12 e-mail that he replied all to.
13   Q.   So, in your e-mail, which is below,
14 dated March 22nd, 2016, what was your purpose in
15 sending your e-mail?
16   A.   I don't understand the question.
17   Q.   Why did you send this e-mail?
18        First let me ask the foundational
19 question.  You sent this e-mail, right?
20   A.   I did send this e-mail, yes.
21   Q.   Okay.  And my question is, why did you
22 send it, what was the purpose that you had in
23 sending it?
24   A.   This is a follow-up to the discussions
25 that I was having with Bill and Tamra to resolve

**Page 149**

1  and finalize negotiations for the additional fees
2  that would be required as a triggering for the
3  acquisition event.
4    Q.   So what was your proposal?
5    A.   Are you asking me to read the e-mail?
6    Q.   To the extent it contained a proposal,
7  yes.
8    A.   Okay.  This attachment has been cut
9  off, it's not complete.  Do you have the full?
10   Q.   Do not.
11   A.   So, in -- in the course of our
12 discussions, progressing from the initial proposal --
13 or the proposal in Exhibit 97 and the subsequent
14 conversation that I had with Tamra to try to
15 resolve this matter, one of the things that was
16 discussed was that in previous engagements with the
17 client they were interested in our SRL converter
18 for SAS models.
19        In short, this is a capability that
20 would allow the client to take SAS models that they
21 build in SAS and generate Blaze compatible code
22 automatically, that can then be used by Blaze
23 Advisor projects for the purposes of executing
24 those analytic models.  The process of doing that
25 saves considerable amount of time for our clients,

**Page 150**

1  in this case here, the client in question, and
2  that -- this proposal in here is outlining that we
3  did a proof of concept with agreement with Tamra
4  that we would do that and include that in our
5  proposal, since there was interest in it.  This is
6  simply rounding out that we finished that proof of
7  concept, we executed the model, it performed within
8  the parameters that they wanted.
9         Furthermore, I went on to say, in
10 order to resolve this matter, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  And,
15 furthermore, I punctuated to Tamra that we felt
16 there was enough negotiation here, this was our
17 best and final offer, we weren't going to move from
18 this, and that we were seeking to resolve this
19 matter by March 30th.
20   Q.   So what was her response?
21   A.   If I recall correctly, it was a
22 request to escalate a conversation between the
23 client CIO and my CEO.
24   Q.   Who are those people?
25   A.   Well, my CEO is Will Lansing.  And,

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
CASE 0:16-cv-01054-DTS Doc. 610 Filed 10/23/19 Page 4 of 4
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 151

1  I'm sorry, I don't remember the CIO's name.
2      Q.   Did that meeting occur?
3      A.   That phone call did occur.
4      Q.   Were you present or in the room or --
5      A.   I was not.
6      Q.   Did you hear what happened in that
7  subsequent phone call?
8      A.   I simply got an update from Will
9  Lansing that the call did not go well.
10     Q.   Any other detail?
11     A.   No, I -- and I don't have any other
12 detail.
13         MR. HINDERAKER: Do you think we're
14 soon done or should we take another break?
15         MR. FLEMING: Why don't we take a
16 five-minute break. We're getting there.
17         MR. HINDERAKER: And then we're soon
18 done?
19         THE VIDEOGRAPHER: Going off the
20 record. The time is 3:29 p.m.
21         (Break from 3:29 to 3:40.)
22         THE VIDEOGRAPHER: We're back on the
23 record. The time is 3:40 p.m.
24 BY MR. FLEMING:
25     Q.   Mr. Waid, what is the rationale for

Page 152

1  demanding more fees when a company with whom FICO
2  has a contractual relationship involving Blaze
3  Software undergoes a change in control or a merger?
4  [redacted]
11     Q.   Any other reason or rationale?
12 [redacted]

Page 153



Page 154

1  under the circumstances that we've been discussing
2  whether there is increased use post-merger?
3          MR. HINDERAKER: Object to --
4          MR. FLEMING: Let me put it
5  differently, and then you can state your objection
6  now if you want.
7          MR. HINDERAKER: I'll ask -- I'll wait
8  for the question you're putting.
9          MR. FLEMING: Okay.
10 BY MR. FLEMING:
11     Q.   What -- Does FICO attempt to determine
12 in the circumstances where there's been a merger
13 whether there is increased use of Blaze post-merger?
14     A.   I'm going to ask you what does
15 increased use mean?
16     Q.   What do you -- what would your
17 understanding of increased use be, what's ambiguous
18 about that?
19     A.   Huh. If two entities merge where
20 there's an acquisition to gain business synergies,
21 by what definition do you define increased use if
22 not for the fact that you now have a new entity
23 that generates revenue in a totally different scale
24 than the one contemplated in the agreement in the
25 first place? So you tell me what is actually --