# EXHIBIT 5
## (Redacted)

### (Previously Filed Under Seal as DI 365-3)

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 16-cv-1054 (WMW/DTS) ) |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania Corporation, | ) ) ) ) ) |
| Defendant. | ) ) |

**EXPERT REPORT OF
W. CHRISTOPHER BAKEWELL
REGARDING DAMAGES**

**May 17, 2019**

Respectfully Submitted,

_WCBakewell_

W. Christopher Bakewell

128. 

129. By this, I am referring to the fact that Federal would have far more negotiating leverage than Mr. Zoltowski envisions (to the extent that he considers this at all) and that FICO has not "lost" anything beyond what it would be able to obtain in an ordinary course negotiation.

130. There are other alternatives that are informative of value that were disregarded by Mr. Zoltowski. In his report, Mr. Zoltowski did not even investigate or consider this issue at all. As a result, Mr. Zoltowski cannot provide any assurance that his calculations are sufficiently tied to (*i.e.*, have a nexus to) any "actual damages" that are "suffered… as a result of the infringement."[184]

---

▇▇▇ Considering such costs would amount to considering value attributable to lock in or hold up, and not the intrinsic value of the software itself (let alone its copyrighted aspects). Lock in artificially inflates value (Oliver Hart and John Moore, "Incomplete Contracts and Renegotiation," Econometrica, July 1988). A more appropriate measure is thus provided by looking at the actual license agreement and negotiations between FICO and Federal. Moreover, Mr. Zoltowski has not demonstrated any intrinsic value specifically attributable to the use of Blaze Advisor.
[180] Interview of Mr. Iannuzzi.
[181] Interview of Mr. Iannuzzi.
[182] ▇▇▇ While this does not yield a specific value, this further shows that when faced by an unreasonable license fee demand that is not based on intrinsic value, companies are able to implement an alternative solution.
[183] This also helps show that Mr. Zoltowski's calculations are not actual damages that are "suffered… as a result of the infringement." 17 U.S.C. §504(b).
[184] 17 U.S.C. §504(b).

131. Mr. McCarter also told me that Federal could have implemented the following alternatives at or leading up to the time it was alleged of infringement:[185]

- *Manual Decisions*. I understand from Mr. McCarter that Federal could have manually looked up information in underwriting manuals to make the determinations.[186] Mr. McCarter explained that the manual process would not have been as efficient as Blaze Advisor, but it would have been an alternative to paying the overstated license fee calculated by Mr. Zoltowski.[187]

- *Hard Coding*. I understand from Mr. McCarter that Federal could have implemented what they did prior to using Blaze Advisor, which was hard coding rules into the applications.[188] According to Mr. McCarter, hardcoding would not have been as efficient as Blaze Advisor, but it would have been an alternative to paying the license fee calculated by Mr. Zoltowski.[189]

- *Other Products*. I understand from Mr. McCarter that Federal could have implemented an alternative rules-based software from one of FICO's competitors such as IBM, Oracle or CA Technology.[190] Mr. McCarter explained that these alternative products would have been commercially and technically acceptable at the time of the alleged infringement.[191] In early 2006, Federal was considering taking a license to IBM's ODM software because ACE already had the application.[192] According to Tamra Pawloski, Federal's Former Vice President of Vendor Management Hardware and Software, Federal "had multiple discussions with IBM."[193]

---

[185] I note that just because an alternative or substitute has not been implemented, it does not mean that option is not feasible or not acceptable. Licensees or alleged infringers do not simply switch to an existing alternative or develop new available alternatives each and every time they are accused of infringement. To do so any time there is disagreement about permissible use would be unreasonable and disruptive. The decision not to switch to an alternative is not, by itself, evidence that such a switch was not possible or would not have occurred.
[186] Interview of Mr. McCarter.
[187] Interview of Mr. McCarter.
[188] Interview of Mr. McCarter.
[189] Interview of Mr. McCarter.
[190] Interview of Mr. McCarter; Global Business Rules Management System (BRMS) Market Forecasts & Opportunities (2014-2024), TechSciResearch, p. 122.
[191] Interview of Mr. McCarter; Global Business Rules Management System (BRMS) Market Forecasts & Opportunities (2014-2024), TechSciResearch, p. 122.
[192] Deposition of Tamra Pawloski, January 18, 2019, p. 211; FED001150_0001; FED001151_0001-002.
[193] Deposition of Tamra Pawloski, January 18, 2019, p. 211; FED001150_0001; FED001151_0001-002.

132. Mr. McCarter told me that each of these alternatives would provide the same or essentially similar functionality as Blaze Advisor.[194] Mr. McCarter also told me that each of these alternatives were available at or leading up to the time it was alleged of infringement.[195]

133. By not considering Federal's next-best alternatives to Blaze Advisor, or considering the incremental impact over substitute products, Mr. Zoltowski could not have measured the "value" of Blaze Advisor. Nevertheless, this is what Mr. Zoltowski claims to have done. This results in Mr. Zoltowski measuring more than the value, if any, of Blaze Advisor, and reaching a "lost licensing fee" measure that is significantly overstated.

134. Moreover, Mr. Zoltowski is assuming that FICO would have negotiated a license with Federal at whatever value FICO requested, without any discounts. But this does not consider that there is a competitive market with substitute products that are available, and that significant discounting is ordinary as reflected not only in these past negotiations but other negotiations, too (*see* discussion provided in **Section 3.5**). This is further evidence that Mr. Zoltowski's analysis yields results that are commercially unreasonable and inflated conclusions, including the ▬▬▬▬▬ in discounts.[196]

*Mr. Zoltowski's Analysis Is Also Commercially Unrealistic In That He Calculated A Named Application License Instead Of An Enterprise License*

135. As I discussed in detail in **Section 3.5**, FICO's 2006 amended license agreement and 2016 negotiations with Federal were in the form of an ELA that included discounts. Mr. Kursh told me that ELAs are common in the software industry.[197] The reason why is that companies want to have the freedom to operate and grow their businesses, without concern that they would have to go back and renegotiate all of their software licenses after the fact.[198] This is

---

[194] Interview of Mr. McCarter.
[195] Interview of Mr. McCarter.
[196] FED004635_0001; FED004636_0001; FED000352_0001-002; FED000353_0001; ORCL_FICO00000051; FICO0060402-404; FICO0060423-426; FICO0057386-412; Deposition of William Waid, January 16, 2019, p. 66-67, 134-136.
[197] Interview of Mr. Kursh.
[198] Interview of Mr. Kursh.

**Comparison of the Expense Ratios Between Business Segment/Line of Business Financials and Comparable Public Companies**

|  | For the Years Ending December 31, | | |
| --- | --- | --- | --- |
|  | **2016** | **2017** | **2018** |
| **Business Segment/Line of Business Financials** | 27% | 29% | 28% |
| **Comparable Public Companies [1]** |  |  |  |
| Low | 30% | 29% | 29% |
| **Median** | **33%** | **33%** | **32%** |
| High | 34% | 34% | 36% |
| **Average** | **32%** | **32%** | **32%** |

**Note:**
[1] Includes Chubb Limited; The Travelers Companies, Inc.; The Hanover Insurance Group, Inc.; American International Group, Inc.; and W.R. Berkley Corporation

202. As summarized in the foregoing table, Federal's actual expense ratio is generally consistent, albeit on the low end, of the observed range in industry benchmark expense ratios and the expense ratios of comparable public companies.[289]

203. The following table summarizes Federal's underwriting profits from estimated gross written premiums that processed through Blaze Advisor applications and compares them to Mr. Zoltowski's estimate (*see* also **Exhibit 5**):

---

[289] Again, adopting Federal's actual expense ratio is conservative, meaning that I were to adopt the higher expense ratios observed in industry benchmarks and comparable public companies, the expenses would be higher and the underwriting profit would be smaller.

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

**Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual**
*(in US$ millions)*

|  | Mr. Zoltowski's Estimate | Federal Actual |
|---|---|---|
| **Gross Written Premiums** | $ 30,876 | $ 16,189 |
| Net Written Premiums | | $ 14,688 |
| **Net Earned Premiums** | | $ 15,364 |
| Less: Losses | | $ (8,560) |
| *Loss Ratio* | Was not estimated by Mr. Zoltowski | 56% |
| Less: Expenses (incl. commissions, G&A, taxes, dividends & other expenses) | | $ (4,348) |
| *Expense Ratio* | | 28% |
| **Underwriting Profit** | | $ 2,456 |
| *% of Net Earned Premiums* | | 16% |
| *Combined Loss Ratio* | | 84% |

204. Federal's underwriting profit calculations show a combined ratio of 84%. This combined ratio is consistent with industry benchmarks and comparable public companies (*see* **Exhibit 10**).

205. To recap, and absent establishing an economic nexus or causal link between any profits Federal received and the alleged infringement, a calculation of Federal's profits is inappropriate in these circumstances. As I discussed above, from a financial perspective my analysis is overinclusive relative to the claims in this case. By this I mean that it does not isolate gross written premiums and associated profits (if any) attributable to the alleged infringement, as opposed to other factors unrelated to any alleged infringement.

### 4.4   Summary

206. As I discussed at length above, Mr. Zoltowski's calculations are not tied to the allegations in this case. Both his "lost license fees" calculations and his "disgorgement" calculations lack

nexus to the allegations in this case for various reasons. Moreover, Mr. Zoltowski's disgorgement calculations exclude analysis of costs and associated business activities.

207. Although Mr. Zoltowski says that he analyzed "value," his overall methodology lacks consideration of valuation principles. Mr. Zoltowski repeatedly disregarded many important considerations that related to value, including: (i) historical licensing practices between the parties, and as a result overestimated the scope of what would be licensed; (ii) ordinary and customary licensing practices in the field, including discounting; and (iii) evidence of the relatively limited intrinsic value that is provided by Blaze Advisor, and the fact that it is only one part of Federal's overall business.

208. In this case, contemporaneous evidence regarding the intrinsic value associated with the issues in this case is shown in the parties' actual negotiations as I discussed in **Section 3.5**. In March 2016, FICO proposed three different licensing options to Federal that ranged from ███████████████. But Federal rejected this offer because according to Ms. Pawloski, "it was not what [Federal] expected to pay for the license; it was too high."[290] This shows that, particularly relative to Mr. Zoltowski's estimates, the parties recognized that Blaze Advisor had a much smaller financial footprint. Moreover, Mr. Zoltowski has not demonstrated any intrinsic value specifically attributable to the use of Blaze Advisor.

209. In **Section 4.2**, I discussed the adjustments that I made to Mr. Zoltowski's lost license fee estimates. I performed a calculation that adjusts Mr. Zoltowski's calculations for Federal's accused applications that do not use Blaze Advisor and also adjusts for Mr. Kursh's corrected size classification. After making these adjustments, Mr. Zoltowski's U.S. quantification decreases by ███████ to ███████ and his foreign quantification decreases by ███████ ███████ (*see* **Exhibits 3.0** and **3.1**) before a discount is applied. Assuming only a █

---

[290] Deposition of Tamra Pawloski, January 18, 2019, p. 206.