# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

FAIR ISAAC CORPORATION,

        Plaintiff,

    v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY,
a Pennsylvania corporation,

        Defendants.

Court File No.  16-cv-1054 (WMW/DTS)

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO
EXCLUDE EXPERT REPORT AND
TESTIMONY OF BROOKS
HILLIARD**

---

## <u>INTRODUCTION</u>

Brooks Hilliard provides five opinions in his rebuttal report based on his experience in the "software industry."  Each of these five opinions fails to satisfy Rule 702's reliability requirements.

Hilliard's first and second opinions should be excluded because they amount to improper legal conclusions, in which Hilliard provides his own interpretation of the license and two subsequent amendments at issue in this litigation.  Hilliard's third opinion must be excluded because it is improper rebuttal testimony.  Hilliard purports to rebut the opinions of Federal's expert Dr. Steven Kursh regarding FICO's damages expert's analysis of lost licensing fees and whether those fees are consistent with industry customs, but his analysis expressly does not "pertain to the basis Mr. Zoltowski's uses for his damages calculations."  If Hilliard does not intend to opine on Mr. Zoltowski's calculation of lost licensing fees then his opinion on this point is irrelevant.  Hilliard's

fourth opinion, that Defendants' expert Dr. Kursh should not be allowed to opine on the commercial reasonableness of FICO's actions should be excluded because, contrary to Hilliard's assertion, courts commonly permit expert testimony regarding whether a party's conduct was commercially reasonable or is in accordance with its duty of good faith.  Finally, Hilliard's fifth opinion, which is that Blaze "contributed to" Federal's revenues and has "significant business value" should be excluded because Hilliard admits he has conducted no causation analysis, cannot say whether use of Blaze actually contributed to revenue and his opinion, like that of Mr. Whitener, amounts to *ipse dixit*[1] that is not supported by any reliable data or methodology.

## BACKGROUND

Brooks Hilliard is FICO's expert on customs and norms in the "commercial software industry."  (Declaration of Terrence J. Fleming ("Fleming Decl."), Ex. 1, Brooks Hilliard Rebuttal Expert Report, ("Hilliard Rep.") at 7.)  Hilliard's rebuttal expert report, served on May 31, 2019, purports to address the opinions of Federal's experts, Steve Kursh and William McCarter.  (*Id.*, at 1.)  Hilliard was retained to provide rebuttal opinions; specifically to "review and respond to the reports prepared by Federal/Ace American's experts, Dr. Steven Kursh and Mr. William McCarter[.]"  (*Id.* at 2.)  The opinions are based on Hilliard's "experience" in the software industry.  (*Id.* at 4.)  Hilliard does not have any experience in the insurance industry.  (*See id.* at 2-4.)

---

[1] Latin for "he himself said it."

2

The method Hilliard used in developing his opinions consisted of relying on his "experience in the industry" talking with "FICO employee Bill Waid" and "research[ing] issues . . . on the Internet."  (*Id.* at 4-5.)

## **ARGUMENT**

### I.    **Standard.**

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702; under Rule 702 the trial judge acts as a 'gatekeeper' screening evidence for relevance and reliability." *Polski v. Quigley Corp.*, 538 F.3d 836, 838 (8th Cir. 2008) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  FICO has the burden of proving that its experts' testimony is admissible by a preponderance of the evidence.  *Id.* at 841.

Under Rule 702, expert testimony is admissible if it is (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) delivered by a witness who has reliably applied these principles and methods to the facts of the case. Fed. R. Evid. 702.  The Supreme Court has emphasized that expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," *Daubert*, 509 U.S. at 591, and that trial courts should exclude expert testimony that "is connected to existing data only by the *ipse dixit* of the expert."   *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997).

## II.     Brooks Hilliard's opinions based on his purported industry experience are inadmissible.

### A.     Because Hilliard is a rebuttal expert, his opinions must be excluded from consideration at summary judgment and during FICO's case-in-chief at trial.

Hilliard's role is limited to that of a "rebuttal expert" in this case, which means that FICO cannot use his opinions to support opposition to summary judgment or its case-in-chief at trial.  Hilliard's position is limited to that of a rebuttal expert because FICO chose not to disclose an opening expert report from him.  Instead, FICO waited to see how Federal's experts would respond to the opening reports from FICO's experts Zoltowski and Whitener, and then served Hilliard's first report as a reply.  Courts strike expert reports when parties engage in this tactic.  *See, e.g.*, *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 5572835, at *3 (N.D. Cal. Nov. 15, 2011) ("A party with the burden of proof on an issue should not be allowed to secretly prepare an army of 'rebuttal' experts to attack the opposition reports"); *Ford Motor Co. v. Versata Software, Inc.*, No. 15-11624, 2018 WL 5306637, at *5-6 (E.D. Mich. Feb. 8, 2018) (striking reply from new expert because it concerned "matters on which the party bears the burden of proof" and as such "Rule 26 fairly calls for disclosure of the witness (and the report) at the deadline of opening reports"); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *12 (N.D. Cal. Apr. 4, 2014) ("[p]laintiffs will not be allowed to sandbag' Defendants with new analysis that should have been included at the very least in Dr. Leamer's opening merits report.").  That this tactic is improper should come as no surprise to FICO because, as noted in Federal's

4

recent Motion to Compel (Dkt. No. 337.), Hilliard served as an expert in the *Versata* case cited above.  However, in this case the more appropriate course of action is to simply limit Hilliard to the role he purports to fill – rebutting whatever testimony Federal presents at trial from its experts.  As that testimony will not be known until trial, Hilliard's opinions cannot support any affirmative claim by FICO at the summary judgment stage or at trial.

Besides the procedural limitations of Hilliard's opinions, however, several parts of his report do not satisfy the requirements of Rule 702.  Specifically, all of Hilliard's opinions are inadmissible—even as rebuttal—because they do not have a reliable basis in the facts or Hilliard's limited expertise in the areas relevant to this dispute.

### B.     Hilliard's first and second opinions should be excluded because they are unreliable and amount to improper legal conclusions.

#### 1.     Hilliard's first opinion.

Hilliard's first opinion, that FICO "applied" the terms of the License at issue "in a manner that is consistent with the normal customs and practices of the commercial software industry" is inadmissible.  (Fleming Decl., Ex. 1, Hilliard Rep., at 6.)  Hilliard has not conducted any analysis of FICO's ***conduct*** toward Federal to determine whether, in fact, FICO's application of the terms of the License were consistent with the customs and practices of the industry.  Instead, Hilliard interprets the actual content of the License and opines as to whether various provisions are commonly seen in the industry.

Hilliard's opinion is an attempt to interpret the License's actual content, which improperly invades the province of the trier of fact.  "[A]n expert may not interpret a

contract for the jury." *Levinson v. Westport Nat'l Bank*, 3:09-CV-00269 (VLB), 2012 WL 4489260, at *4 (D. Conn. Sept. 28, 2012); *Trident Seafoods Corp. v. Commonwealth Ins. Co.*, 850 F. Supp. 2d 1189, 1196-97 (W.D. Wash. 2012) (excluding expert's "interpretation of the meaning of the policy language"); *Westfield Ins. Co. v. Sheehan Const. Co., Inc.*, 564 F.3d 817, 819 n.1 (7th Cir. 2009) (noting that district court properly struck expert affidavit opining on the meaning of a contract).

Hilliard's first opinion involves opining on the interpretation of the license grant provisions in the License and Amendment Two (§ 2), the assignment provision in the License (§ 10.8), and the audit provision in the License (§ 3.5). (Fleming Decl., Ex. 1, Hilliard Rep., at 6-7; and Exs. 2-4, License Agreement and Amendments.) First, Hilliard opines that FICO's demand for additional fees following the 2016 merger "is the type of resolution . . . I would normally expect to be acceptable to all parties." (*Id.*, Ex. 1, Hilliard Rep., at 13.) This opinion is based solely on Hilliard's interpretation of the license grant and territory provisions in the License. Hilliard opines that under his *interpretation* of the license grant, the reference to "Chubb & Son, a Division of Federal." (*Id.* at 12-13.) This means that the licensee has actually been Federal's unincorporated division, Chubb & Son, all along. Based on his reading of the contract then, any use of Blaze by a Federal employee outside of this division constituted a breach of contract. (*Id.* at 12 ("Blaze Advisor was licensed to the Chubb & Son division of Federal, not to Federal itself or to any Federal affiliate").) Second, Hilliard opines that the License is limited to use inside the United States based, again, on his reading of the definitions section of the contract, as well as several related emails. (*Id.* at 9-11.)

6

Within his first opinion, Hilliard argues that it was commercially reasonable for FICO to withhold its consent after the 2016 merger and to terminate the License when Federal did not agree to FICO's demands for additional fees.  This opinion is based on Hilliard's interpretation of § 10.8 and § 9.2 of the License.  (*Id.*, Ex. 1, Hilliard Rep., at 13-19.)   He opines that § 10.8 requires that "the status quo must be maintained" following a "change of control" merger, but ignores the fact that the status quo *was* maintained following the merger.[2]  (*Id.* at 14.)  It is undisputed that the merger involving Federal's parent did not cause it to expand its use of Blaze when FICO accused Federal of breach.  (*Id.*, Ex. 6, Michael Sawyer Depo., at 130:13-16; 133:18-134:8; 135:4-6.) Hilliard also quotes selections from various textbooks.  (*Id.*, Ex. 1 at 15-17.)  He argues these selections support his position that, again, based on the text of the agreement FICO was justified in exercising its termination rights under 9.2  based on "Federal's unwillingness to agree to adequate compensation to FICO" following the merger.  (*Id.* at 18.)

Third, regarding audit rights, Hilliard begins by summarizing Federal's position as being that "FICO used the acquisition, without the support of an audit, as an illegitimate pretext to force Federal to accept what [Kursh] thinks is an unjustified increase in the license fees."  (*Id.* at 20.)  This is exactly what happened and the reason the Parties are before the Court today.  In the remainder of this section, however, Hilliard opines –

---

[2] During his deposition, Hilliard provided an alternative interpretation of § 10.8 as including an implicit period when a licensee may use Blaze without expanding its use following an assignment, but if the parties do not come to an agreement regarding continued use, only then is the continued use a breach.  (Fleming Decl., Ex. 5, Hilliard Depo., at 205 – 212.)

without citing any sources – that FICO was justified in never auditing Federal's use of Blaze.  (*Id.*)  He states this opinion despite acknowledging elsewhere in his report that FICO knew of Federal's foreign use of Blaze for years.  (*Id.* at 9 n.9)

Hilliard's first opinion, that FICO's response to the merger comports with § 3.1 and § 10.8, is based on his interpretation of the text of the License itself.  His opinions are not based on an examination of FICO's ***conduct*** in light of commercial software industry norms, rather they are based on an examination of the ***text*** of these disputed provisions.  These opinions do not display any discernible methodology other than Hilliard's opinion that, based on his experience, this is how he interprets the License.  At his deposition, Hilliard was unable to explain how his opinions differed from legal interpretation in any meaningful way.  (*Id.*, Ex. 5, Hilliard Depo., at 17-24, 151 ("Q. So you're interpreting the contract? A. I'm giving you my understanding of what would be a normal and customary understanding in the industry of what industry people would look at this contract and understand from it."))  Therefore, Hilliard's first opinion invades the province of the trier of fact and should be excluded under Rule 702.  *See, e.g.*, *Levinson*, 2012 WL 4489260 at *4; *Trident Seafoods Corp.*, 850 F. Supp. 2d at 1196-97; *Westfield Ins. Co.*, 564 F.3d at 819 n.1.

### 2.      Hilliard's second opinion.

Hilliard's second opinion does provide his opinions on the reasonableness of FICO's conduct in response to the merger, but these opinions are unreliable as well because Hilliard does not explain his methodology for arriving at this opinion.  Rather, Hilliard merely presents a biased, selective timeline of the negotiations following the

merger in 2016 and then concludes that "FICO had more than met the normal and customary standards for commercial software providers." (*Id.*, Ex. 1, Hilliard Rep., at 21-23.) By not explaining or even acknowledging the facts that go against his position in this section, and also not explaining how his experience allows him to arrive at his conclusions, Hilliard has not provided anything like the reliable facts and methodology that Rule 702 calls for. *See Reinsdorf v. Skechers USA*, 922 F. Supp. 2d 866, 879 (C.D. Cal. 2013) (excluding expert report that "essentially amounts to, 'I have a lot of experience with brands and marketing, and can therefore divine that 50–75% of this large, successful, company's profits come from [plaintiff]'s photographs.'").

The facts that Hilliard omitted from his timeline of the post-merger negotiations illustrate why his opinions are not based on reliable facts or data, and also why FICO's disclosure of Hilliard's opinions for the first time in a reply report was an improper attempt to "have the last word." *See Oracle*, 2011 WL 5572835, at *3. Hilliard writes that the FICO employees in charge of Federal's account began communicating with Federal about the merger "by telephone and e-mail in late 2015 early 2016, before the acquisition occurred." (*Id.*, Ex. 1, Hilliard Rep., at 21). What Hilliard conveniently omits here is that these employees had known about the merger for six months by this time and had been strategizing on how to extract additional licensing fees from Federal as a result of it. (*See id.*, Ex. 7, Deposition Ex. 121; Ex. 8, Deposition Ex. 123; Ex. 9, Deposition Ex. 81.) Additionally, this "telephone communication" in December 2015 was actually an unanswered voicemail that a FICO employee left just before the holidays. (*Id.*, Ex. 10, FICO0003090.) Thus, the first substantive communication between FICO

and Federal regarding the merger was a notice of breach sent by FICO two weeks after the merger occurred.  (*Id.*, Ex. 11, Deposition Ex. 90.)

When Federal received FICO's demand letter, it immediately responded by explaining that "our initial findings indicate that the applications that have been utilizing the Blaze Advisor Software since 2006 are currently running in the exact same fashion as prior to the merger transaction" – i.e. no expanded use under § 10.8.  (*Id.*, Ex. 12, FED000050.)   Further, Hilliard omitted that immediately thereafter, FICO's in house counsel Thomas Carretta, who had made several similar allegations of breach against FICO customers following mergers, began accusing Federal of breach in a similar manner.  (*Id.*, Ex. 11; Ex. 13, ORCL_FICO00000001; Ex. 14, FICO0061245; Ex. 15, FICO0060446.)   Nor does Hilliard consider that Carretta lied during these negotiations, claiming he had never known Federal's affiliates were using Blaze outside the United States, when he had actually known about such uses for eight years.  (*Id.*, Ex. 16, Excerpts from FICO's First Amended Privilege Log, Entries 656 and 662.)   Finally, Hilliard's characterization of the conclusions of the negotiations is biased as well because Ms. Pawloski's statement that she would "talk to our executives" does not immediately lead to the conclusion that FICO was forced to file suit immediately thereafter.  (*Id.*, Ex. 17, FICO0000379.)   If Hilliard had included all these facts in his version of events, it is hard to fathom how he could have concluded that FICO "more than met the normal and customary standards for commercial software providers" during the post-merger negotiations.

Finally, Hilliard's second opinion fails to apply a reliable methodology, and it is excludable on this basis as well.  As described more fully below, Hilliard admits that his experience is not in the insurance industry and public filings from a recent lawsuit make clear that he is unfamiliar with the type of software at issue in this dispute.  Thus, Hilliard does not have a reliable basis upon which to interpret whether FICO's demand that Federal immediately cease using Blaze if it refused to pay additional licensing fees was reasonable in light of the relevant industry norms.

### C.  Hilliard's third opinion is inadmissible because it is nonresponsive rebuttal testimony and not relevant.

Hilliard's third opinion responds to Kursh's opinion that Zoltowski's damages analysis is flawed and not supported by industry standards associated with pricing and discounting practices.  (Fleming Decl., Ex. 18, Kursh Rep., at 32-48.)  In response, Hilliard opines that FICO's pricing and discounting practices are consistent with industry customs.  (*Id.*, Ex. 1, Hilliard Rep., at 23-28.)

Hilliard's opinion is inadmissible for two reasons.  The opinions are inadmissible, first, because they are not responsive to and in fact support Kursh's opinion.  As such Hilliard's opinion is not proper rebuttal testimony.   The opinion is additionally inadmissible because it is irrelevant.   After stating he's responding to Kursh's opinions regarding Zoltowski's calculation of lost license fees and whether those fees conform with industry custom and practices Hilliard explicitly states his opinions do not "pertain to the basis Mr. Zoltowski uses for his damages calculations[.]"  (*Id.*, Ex. 1, Hilliard Rep., at 26.)   To the extent Hilliard is providing no analysis of Zoltowski's license fee

calculation, and the opinions from Kursh that Hilliard seeks to rebut specifically relate to Zoltowski's damages calculation, it is unclear what relevance Hilliard's opinions have to any issue before the Court or a future trier of fact.

### 1. Hilliard's opinion is not proper rebuttal testimony because it is not responsive to and in fact supports Kursh's opinion.

Hilliard's third opinion is improper rebuttal testimony. (*Id.*, Ex. 1, Hilliard Rep., at 23-28.) It fails to address Kursh's opinion and, in fact, supports Kursh's and Federal's position. Kursh provides that when calculating lost license fees Zoltowski—FICO's damages expert—ignored the realities of software pricing and discounting stating that Zoltowski, among other things: (1) incorrectly assumes Federal would not purchase an enterprise-wide license and would instead (at greatly inflated prices) purchase a license application-by-application,[3] and (2) ignores FICO's standard discount structure.[4] (*Id.*, Ex. 18, Kursh Rep., at 32-48.)

Hilliard agrees with the above statements. Hilliard first opines that it is "normal custom" in the industry "for providers of commercial software to vary the prices they charge for software licenses" based on, among other things, the "type of software license," including whether that license is an "enterprise" or "perpetual" license. (*Id.*, Ex.

---

[3] FICO admits a licensee has never purchased an application-by-application license of the type it proposes it is entitled to as damages in this case. (Dkt. No. 77, Sealed Declaration of William Waid, at ¶ 11.)

[4] Kursh additionally opines that Zoltowski's lost licensing fees calculation is flawed because it: (1) assumes several Federal applications use Blaze that do not, (2) ignores the fact the License permits use of Blaze globally, (3) incorrectly applies FICO's sizing methodology, and (4) incorrectly assumes Federal would not purchase an enterprise-wide license. (*Id.*, Ex. 18, Kursh Rep., at 32-47.)

1, Hilliard Rep., at 24.)   Hilliard then opines that providing customers with "an extra discount" on top of any standard discounts is "consistent with the customs and practices of the commercial software industry."   (*Id.* at 25.)   Indeed, Hilliard admits ███

███████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████.   (*Id.* at 27.)   Indeed, the only disagreement Hilliard appears to have is the amount of the relative discount that applies, which is not an explicit opinion Kursh provides.   Hilliard's only critique of Kursh on this point is that Kursh relied on what Hilliard feels is a dated article published in 2004.   (*Id.* at 28.)   Ironically, Hilliard provides the criticism while at the same time opining that FICO's pricing—which relies on a more dated price list from 2003—is reliable and consistent with industry norms and customs.   (*Id.* at 27 n.74 citing FICO00000830 (FICO's 2003 Price List available at Dkt. No. 79).)

In addition, Hilliard provides that it is "normal custom and practice of the industry for providers of commercial software to vary the prices they charge for software licenses based on numerous **measurable and/or estimable metrics**[5]" (*Id.*, Ex. 1, Hilliard Rep., at 24.) ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

---

[5] FICO takes the position that calculating an enterprise-wide license as damages in this case is impossible because the "factors" associated with calculating the enterprise-wide license fee are "incapable of an answer."   (*Id.*, Ex. 19, Written Answers to Questions from the Rule 30(b)(6) Deposition of William Waid, at Response to Transcript Lines 83:19.)   Hilliard takes the exact opposite position stating that the numerous factors are "measureable and/or estimable metrics[.]"   (*Id.*, Ex. 1, Hilliard Rep., at 24.)

████████████████████████████████████████████████[7] *Zoltowski*

*considered none of these factors.*  Instead he relied, entirely, on FICO's 2003 price list

and FICO's employee William Waid's application of the price list.[8]  Hilliard's opinion—

that discounts and enterprise-wide licensing are standard in the industry, among other

factors Zoltowski did not consider—supports Kursh's position.

## 2.    Hilliard's opinion is otherwise irrelevant.

The remainder of Hilliard's third opinion is irrelevant to any issue before the

Court or a future trier of fact.  After stating that his opinions do not "pertain to the basis

Mr. Zoltowski's uses for his damages calculations" Hilliard goes on to opine to precisely

those issues.  (*Id.*, Ex. 1, Hilliard Rep., at 26-28.)  If his opinions do not pertain to

Zoltowski's damages calculation and whether it purports with industry customs they are

irrelevant.

Through his third opinion Hilliard purports to rebut Kursh's opinion that

Zoltowski's analysis is not consistent with industry customs for calculating license fees.

(*Id.* at 23) (stating he is rebutting Kursh's opinions related to "[t]he lost license fee

---

[6] Federal paid FICO approximately ████████████  in additional services fees over the course of the parties' relationship.  (Fleming Decl., Ex. 20, Deposition Ex. 380 at FED017887_0037 (listing totals fees as ████████████ )

[7] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████ *Id.* at ¶ 135
n.57.)

[8] Federal has moved to exclude Zoltowski's report and testimony on this point. The analysis on this point can be found at Argument Section II.A.2.b of Federal's Memorandum in Support of Defendants' Motion to Exclude Expert Report and Testimony of Neil J. Zoltowski.

damages calculated by FICO's damages expert [Zoltowski]").  To the extent Hilliard is not opining on the anything related to Mr. Zoltowski's damages calculation it is not appropriate rebuttal testimony and is further, not relevant to any issue before the Court or a future trier of fact.

### D.   Hilliard's fourth opinion is inadmissible because experts commonly testify to the commercial reasonableness of a party's actions.

In his fourth opinion, Hilliard takes issue with Kursh's opining as to the commercial reasonableness of FICO's actions.  (*Id.*, Ex. 1, Hilliard Rep., at 29-30.) Hilliard does not provide his own analysis of whether FICO actions were commercially reasonable but, instead, merely asserts that Kursh's analysis on this point is too "vague" and "undefined" to be admissible.  (*Id.* at 29.)  Of course that issue is for the Court, not an expert, to decide.  In any event contrary to Hilliard's assertion, experts are commonly admitted to opine on the commercial reasonableness of a party's actions

For example, in *Monroe Federal Savings* the plaintiff's experts sought to "testify about what constitutes commercially reasonable, good-faith practices in the banking industry, and conclude that [plaintiff] did in fact act within those standards." *Monroe Fed. Savs. and Loan Ass'n v. NEA Galtier Parking*, 2013 WL 12284502, at *1 (S.D. Ohio Feb. 13, 2013).  Among other things, the plaintiff's expert sought to opine on whether defendant's "action and inaction" with respect to their agreements with defendant were commercially reasonable taken in "good faith" and were "fair" based on "industry customs."  *Id.* at *2.  The defendant sought to have the experts excluded arguing, like Hilliard argues here, that "there is no requirement of commercial reasonableness and no

implied covenant of good faith and fair dealing" on the facts of the case.  *Id.* at *4.  The

court concluded the argument was "misplaced" reasoning:

> Neither the existence nor the source of the duties of commercial
> reasonability and good faith and fair dealing are at issue.  What is at issue is
> whether the experts' experience and analysis make their opinions reliable
> pursuant to Fed. R. Civ. P. 702.

*Id.* at *4.  The court went on to analyze the experts' opinions and admitted both after

concluding they applied "objective criteria used in the industry to determine a

commercially reasonable, good faith response" and that their "technical, specialized

training, and knowledge in the banking-industry… will be helpful to the trier of fact in

assessing the duties of commercial reasonableness and good faith and fair dealing in the

specialized context at issue in this case."  *Id.*

Other courts have applied the same principle to admit testimony regarding the

commercial reasonableness of a party's actions in the context of a party's performance

under a contract.  *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir.

2010) (affirming district court's admission of expert who testified as to party's

commercial reasonableness in "performance of financial technology services agreements"

opining as to whether party "performed its services in a commercially reasonable

manner.").  The same principles apply here.

Although Hilliard provides that "'commercially reasonable' is not… a term of art

in either the business or the information technology community" the case law holds

otherwise and courts commonly admit expert testimony on this point.  (*Id.*, Ex. 1, Hilliard

Rep., at 29.)  This Court should, therefore, strike Hilliard's fourth opinion as irrelevant

and follow the principles outlined above to admit Kursh's opinions regarding commercial reasonableness of FICO's actions based on his extensive knowledge of the software licensing industry.

> **E.   Hilliard's fifth opinion is inadmissible because, like Whitener, he has not relied upon sufficient data and he has employed no methodology to show that his opinion is anything more than speculation.**

On the basis of a scant six-pages of his expert report Hilliard seeks to opine that Blaze "provided critical capability, contributing to Federal's revenue[.]" (Fleming Decl., Ex. 1, Hilliard Rep., at 31-36.) The opinion is provided in support of FICO's indirect profit disgorgement claim, in which FICO seeks to recover some indeterminate amount of a *$30.9 billion revenue stream*.

Hilliard provides five rebuttal opinions to McCarter's report:

- That the phrase "integrated with core… applications" taken from McCarter's report has "special meaning" to "technology professionals" that indicates the applications have "significant business value."

- Whether Blaze is industry agnostic does not determine its value.

- The presence of alternative competing products does not diminish value.

- Federal's continued use of Blaze shows its importance to the company.

- The number of applications that use Blaze has no bearing on the value of Blaze.

(*Id.* at 31-36.)

From these five opinions—and only these five opinions—Hilliard concludes "Blaze Advisor provided critical capability, contributing to Federal's revenue[.]" (*Id.* at 31.) Like Whitener, Hilliard conducted no causation analysis—as required by the Copyright Act. *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir.

2004) ("copyright claimant must first show a causal nexus between the infringement and the gross revenue . . . .")  The opinions are not based on sufficient facts and data and Hilliard has employed no reliable methodology as required by the Federal Rules.  Like Whitener, Hilliard asks the Court to rely on his *ipse dixit*.  The Court should exclude this opinion in its entirety.

> **1.    Hilliard's opinion that Blaze "contributed to revenue" is not supported by sufficiently reliable facts or data nor is it based on a reliable methodology.**

Hilliard has provided the five rebuttal opinions above from which he concludes Blaze "contributed to revenue."  (Fleming Decl., Ex. 1, Hilliard Rep. at 31-36.)  An expert is required to "demonstrate in some *objectively verifiable way* that the expert has both chosen a reliable . . . method and followed it faithfully."  *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1319 n.11 (9th Cir. 1995) (emphasis added).  Hilliard provides no theory or technique that he used to conclude that Blaze "contributes" to Federal's revenue.  (Fleming Decl., Ex. 1, Hilliard Rep., at 31-36.)

Like Whitener, Hilliard admits he has conducted no causation analysis and that he cannot quantify any contribution to revenue.  (*Id.*, Ex. 5, Hilliard Depo., at 187:22-188:18.)  (admitting "I can't quantify it" when asked "So can you quantify at all the contribution that Blaze makes to the revenue as you state in your opinion?").)  Instead his opinion is based on his five rebuttal opinions.  None of those opinions have anything to with whether Blaze contributed to revenue.  For example, whether Blaze is "industry agnostic" or not does not show Blaze contributed to revenue.  (*Id.*, Ex. 1, Hilliard Rep., at 32-33.)  The issue of whether Blaze is the "market leader" or not has no bearing on

18

Federal's revenue.  (*Id.* at 34.)  Likewise, Federal's continued use of Blaze over the years does not demonstrate that the software contributed to Federal's revenue.  (*Id.*)  Likewise, the number of applications Federal chose to use Blaze on does not demonstrate the software contributed to revenue.  (*Id.* at 36.)  None of these opinions, even if accepted as true, show Blaze contributed anything to Federal's revenue.  For these reasons, Hilliard's opinion that Blaze "contributed to revenue" must be excluded.

### 2.    Hilliard's opinion that Blaze has "significant business value" is wholly speculative.

Hilliard concludes Blaze contributed to revenue, in part, based on his opinion that Blaze has "significant business value."  (*Id.*, Ex. 1, Hilliard Rep., at 31-32.)  Hilliard's conclusion that Blaze has "significant business value" is based entirely on Hilliard's analysis of a "term of art" he says is contained in Paragraph 91 of McCarter's report. (*Id.*)  Paragraph 91 of McCarter's report states:

> Blaze only works when it is integrated with core insurance applications that have the required insurance functionality for selling and servicing policies.

(*Id.*, Ex. 21, William McCarter Expert Report, ¶ 91.)  From this, Hilliard has cherry-picked the phrases "integrated" and "core" and provided his own definition of each.  (*Id.*, Ex. 1, Hilliard Rep., at 31.)  It is Hilliard's opinion, applying his definitions, that these words—"integrated" and "core"— are "terms of art" that prove "significant business value."  (*Id.* at 32.)

The opinion is entirely speculative.  Hilliard has no idea whether even, in fact, Blaze is "integrated" into the Federal applications.  (*Id.*, Ex. 5, Hilliard Depo., at 175:17-22.)  Hilliard has conducted no value analysis of the Blaze product.  (*Id.* at 240:3-7.)

What Hilliard has done is taken a paragraph of McCarter's report out of context, cherry-picked two words from that paragraph, provided his own definition for those two words without citations, and concluded based on his own *ipse dixit* these are "terms of art." (*Id.*, Ex. 1, Hilliard Rep., at 31.)   From that thought process Hilliard concludes Blaze is a "significant business value." (*Id.* at 32.)  The opinion must be excluded as it is not based on reliable facts or data nor is it premised on a reliable methodology.

## CONCLUSION

Based on the foregoing, Federal respectfully requests the Court exclude the expert report and testimony of Brooks Hilliard in its entirety.

Dated:  July 26, 2019

s/ Terrence J. Fleming
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
**Fredrikson & Byron, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

*Attorneys for Defendants*