CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 1 of 20

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
 2    _____
      FAIR ISAAC CORPORATION,      Court File No.
 3                                 16-cv-1054(WMS/DTS)
              PLAINTIFF,
 4
        VS.
 5
      FEDERAL INSURANCE COMPANY
 6    and ACE AMERICAN INSURANCE
      COMPANY,
 7
              DEFENDANTS.
 8    _____

 9

10

11

12    ------------------------------------------------

13              VIDEOTAPED DEPOSITION OF

14                   BROOKS HILLIARD

15    ------------------------------------------------

16

17

18

19

20

21

22

23

24

25    Taken June 19, 2019       By Brandi Bigalke, RPR
```

**EXHIBIT 5**

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 2 of 20
Brooks Hilliard  -  6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 13**

regard to insurance companies would be with respect to implementing software and hardware solutions for them?

A. That's not exactly what I said. It would be with respect to surveying their information technology needs, finding systems that met those needs, evaluating those systems with my clients, helping my clients make a determination, and then following through to the -- following through the process of the implementation which would generally have been done by the supplier of the systems. I would not have done the implementation myself, but I would have monitored that process from beginning to end.

Q. But you do not recall as you sit here today any occasion in which you have been retained as an expert witness with respect to the insurance industry; is that fair?

A. As I sit here today, I don't recall any.

Q. What would you need to do to refresh your recollection about that? Do you list anywhere all the cases where you have been retained as an expert witness?

**Page 14**

A. I do have a list on my office computer. It doesn't necessarily have the industry for each -- involving each of the matters, so I'd have to -- I might have to go back and look at some of the information I've retained, and for some things it may go back several years to refresh my memory of the industry.

In most cases if I look at the litigants, I would remember the industry, but I can't say necessarily in every instance.

Q. Could you describe this list that you've just referenced?

A. It's a computerized spreadsheet.

Q. And what are rows and columns and categories on that spreadsheet?

A. Client number, some sort of a designation of the case. In most cases it would be the parties to the case, although perhaps some of the earlier ones it might just be the law firm that was my client. It tells whether I testified in the case, whether the testimony was deposition testimony, trial testimony, arbitration testimony, what type of case it was. It could be e-discover. I've done some e-discovery cases.

**Page 15**

It could be -- many of the cases are issues between -- regarding the performance or functionality or implementation of computer systems. There are intellectual property cases. There are software licensing or contracting cases, and a few other random.

So it tells the type. Keep a record of the state it was in. Those are the columns I recall.

Q. Can you turn to your report, Exhibit 500. Could you turn to page 3. Could I grab your report for a second.

A. (Witness complying.)

Q. Thank you.

On the top of page 3 you reference the fact that your work has included the selection, implementation, and ongoing support for business information technology applications.

Did I read that accurately?

A. Yes.

Q. Is it fair to say that the majority of your experience related to software has related to implementation and not on software licensing issues?

A. Almost all of those engagements

**Page 16**

involve not just the selection of the system but the negotiation of the software license service, maintenance license -- service and maintenance agreement, in some cases hardware contracts.

So I point out there are some 200 of those engagements. I would say that in a hundred -- well over 150 of them I was involved in the review of the contract, the contract negotiation with my client's in-house counsel or law firm.

Q. Have you worked as an expert witness in other cases involving the interpretation of a software license agreement?

A. I've worked in a good number of cases. Somewhere between 30 and 50 where the primary issues dealt with software contracts. And I don't believe it's the role of the expert to interpret the meaning of a contract, and so in most of those cases -- I think that's the role of the Court or the jury.

In most of those cases, my focus has been on providing information that would be helpful to the Court or to the jury in their determination of what the meaning of the contract was. So that's a substantial portion of the

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 3 of 20

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 17**

1 cases I've been involved in.
2  Q. So it's your belief or
3 understanding that it's not the purpose of an
4 expert witness to interpret the meaning of a
5 contract?
6  A. In most cases the Court is looking
7 to the expert to provide assistance to the finder
8 of fact in determining the meaning of the
9 contract rather than producing the expert's
10 opinion of what the meaning is.
11  Q. In response to my question, do you
12 believe or understand that it is not the purpose
13 of an expert witness to interpret the meaning of
14 a contract?
15  A. By interpret you mean reach an
16 opinion as to what the meaning is?
17     Is that what you're asking?
18  Q. You understand what the word
19 "interpret" means, don't you?
20  A. Well, it has multiple connotations.
21  Q. Well --
22  A. So I'm trying to get some
23 clarification.
24  Q. How would you define the meaning of
25 the word "interpret"?

**Page 18**

1  A. If one defined -- well, I would
2 look at multiple ways of doing that. One way
3 would be interpret terms of art and issues within
4 the contract relating to the contract and to the
5 events that the contract covers that would be
6 helpful to determine the meaning of the contract.
7     The other way of looking at it
8 would be stating an opinion as to the meaning of
9 the contract.
10    My engagements have been in the
11 former area rather than trying to express an
12 opinion as to what the contract means.
13  Q. So you've given two different
14 definitions of interpret just now; is that right?
15  A. Two different connotations I guess.
16  Q. Okay. Using the first connotation,
17 would you agree that it's your belief or
18 understanding that it is not the purpose of an
19 expert witness to interpret the meaning of the
20 contract?
21  A. I would state it differently.
22     MR. HINDERAKER: I was just going
23 to say we're not offering Mr. Hilliard as a legal
24 expert, or offering legal opinions.
25     THE WITNESS: And I would not state

**Page 19**

1 it the way you stated it in your question.
2 BY MR. FLEMING:
3  Q. How would you state it?
4  A. I would state -- could we repeat
5 the question, please.
6     (The requested portion was read
7 back by the court reporter.)
8     THE WITNESS: And the way I would
9 state it would be that it is the purpose of the
10 expert witness to assist the finder of fact in
11 determining the meaning of the contract.
12 BY MR. FLEMING:
13  Q. Okay. And I'm asking you a
14 different question. I'd like an answer to my
15 question.
16  A. Sure.
17  Q. Do you agree --
18  A. Sorry if I'm not being responsive.
19  Q. Do you agree or understand that it
20 is not the purpose of an expert witness to
21 interpret the meaning of the contract?
22     MR. HINDERAKER: Same objection;
23 asked and answered, and now we've already
24 clarified the vagueness of it. So object as
25 vague.

**Page 20**

1     THE WITNESS: I've tried to --
2 rather than state it as a negative, I've tried to
3 state what I believe -- what I understand my role
4 as an expert is rather than what it is not. I'm
5 having difficulty responding to your question as
6 to what it is not.
7     And if we use my first definition
8 of interpret, which I think was the preamble to
9 your question, if I recall correctly, then that
10 is the purpose of an expert.
11 BY MR. FLEMING:
12  Q. Have you responded?
13  A. If you'd like I could say it's not
14 the second definition of interpret that I -- or
15 second connotation of interpret that I gave.
16  Q. And do you understand that in your
17 expert report you have not -- well, let me ask
18 that differently.
19     Have you interpreted the meaning of
20 the software license of the contract, and
21 specifically the software license agreement that
22 is at issue in this case -- let me rephrase that.
23     In your report do you attempt to
24 interpret the meaning of the contract at issue in
25 this case?

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 4 of 20

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 21**

MR. HINDERAKER: I'll object to the question to the extent it's asking for a legal opinion, or to the extent it's asking Mr. Hilliard to draw the jury's conclusion in this case.

THE WITNESS: Can I answer?

MR. HINDERAKER: Yes.

THE WITNESS: My opinions address issues that would help the finder of fact be that the Court or the jury understand the meaning of the contract. My opinions are not directed to telling the finder of fact what the meaning of the contract is.

BY MR. FLEMING:

Q. So do you have any opinions relating to the interpretation or meaning of the software license agreement in this case?

A. That was not -- that's outside the scope of what I was asked to do.

Q. So it's your testimony that you don't have any opinions concerning the meaning of the software license agreement or the interpretation of the software license agreement?

MR. HINDERAKER: Again, to the extent the question is asking for -- suggesting

**Page 22**

Mr. Hilliard is here as a legal witness, he's not. The report, however, speaks for itself in terms of opinions that he expresses regarding the contract.

I don't know what the trick is of the question.

THE WITNESS: The vagueness of the word "interpret" is what I'm having difficulty with. I am not, and my opinions do not address the meaning of the -- of what the contract says or the meaning of the contract.

My opinions address issues that are designed to assist the finder of fact in making its determination of the meaning.

BY MR. FLEMING:

Q. So it would be fair to say that you do not have any opinions concerning the appropriate interpretation of the contract at issue in this case?

MR. HINDERAKER: Asked and answered, misstates his earlier testimony.

THE WITNESS: If you substitute the word "meaning" for "interpretation," which I think is a clearer word, then the answer would be correct.

**Page 23**

MR. FLEMING: Okay. And I'm not asking you to substitute that, I'm asking for a response to my question.

Could you read the question again, please.

(The requested portion was read back by the court reporter.)

MR. HINDERAKER: Same objections regarding Mr. Hilliard is not a legal expert. Same objections regarding asked and answered.

THE WITNESS: Can you clarify for me what it is -- how I should understand the word "interpret" or "interpretation," please.

BY MR. FLEMING:

Q. So earlier today you gave two different connotations to that word.

Do you recall that?

A. Yes.

Q. Using the first connotation.

A. **The first connotation would be** assist -- providing assistance as to what is in the contract and how issues or phrases in the contract should be or are customarily understood within the industry, the computer industry, in a way that would be helpful to the finder of fact,

**Page 24**

using that definition of interpretation, that is what my report addresses.

Q. If you were to use the second connotation of that word "interpret" that you have provided, how would you respond to the question?

A. **The second connotation would be** interpret means having an opinion as to the meaning of the contract. And my report does not -- my opinions do not address the meaning of the contract or portions of the contract.

Q. Are you a member of any professional groups dedicated to licensing such as the Licensing Executives Society?

A. No.

Q. Do you have any degrees or qualifications relating to licensing?

A. **I have qualifications relating to** licensing.

Q. Do you have any degrees related to licensing?

A. **Not specifically, no.**

Q. Do you have in general a degree relating to licensing?

A. **I have an MBA degree.**

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 5 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  Q.  In licensing?
2      MR. HINDERAKER: That wasn't --
3  objection; argumentative. Not the question.
4      THE WITNESS: I have an MBA degree,
5  and as part of my MBA degree I studied a number
6  of business issues, including contract-related
7  issues. That wasn't the focus of my MBA degree.
8  BY MR. FLEMING:
9  Q.  What was the focus?
10 A.  **My specialization was marketing.**
11 Q.  So you would agree that you do not
12 have a degree relating to licensing?
13 A.  **I don't have a law degree, if**
14 that's what you're asking. I have an MBA degree
15 that -- which is related, but is not specific to
16 licensing.
17 Q.  And when you say your MBA degree is
18 related to licensing, in fact, the focus of your
19 MBA degree was in marketing, right?
20 A.  **The MBA degree covered all aspects**
21 of business. You have to choose an area to do an
22 MBA thesis, and the area in which I did my thesis
23 was marketing.
24     But in studying for my MBA degree I
25 covered accounting, I covered marketing, I

Page 25

1  covered business policy, I covered personnel
2  human relations. I covered almost every aspect
3  of business, and many of the issues I studied
4  involved legal issues. But that was not my focus
5  area, and that's not the area where I did my MBA
6  research report.
7  Q.  Are you suggesting that you had
8  classes during your MBA experience relating to
9  licensing?
10 A.  **I graduated Harvard Business School**
11 in 1973. I was actually in the class of 1970,
12 but I spent three years between my first and
13 second years of my MBA program in the U.S.
14 military.
15     Harvard has a particular way of
16 teaching business using case method, and the
17 cases covered all aspects of each situation. In
18 many cases legal aspects.
19     I can't quote you from the early
20 '70s or late '60s the specific cases that I had
21 that dealt with legal issues, but there were
22 cases.
23 Q.  In response --
24     MR. FLEMING: Could you read my
25 question again.

Page 26

1      I'd like a response to what I
2  actually asked.
3      (The requested portion was read
4  back by the court reporter.)
5      THE WITNESS: I had -- all of the
6  classes at Harvard Business School when I was
7  there, a hundred percent were case method. Some
8  of the cases had contractual issues in them.
9  Software licensing was not a major issue at the
10 time.
11     I don't recall specific cases that
12 addressed software licensing, but many of the
13 cases included legal and contractual issues that
14 had to be considered. That was not the primary
15 focus of any case that I recall.
16 BY MR. FLEMING:
17 Q.  Did any of those cases involve
18 licensing issues?
19 A.  **I don't specifically recall any.**
20 Q.  Okay. On page 4 of your report
21 you note that you spoke in person and/or by
22 telephone with FICO employee Bill Wade; is that
23 right?
24 A.  **Yes. It was by telephone actually.**
25 Q.  Why did you say "and/or by

Page 27

1  telephone" then?
2  A.  **At the time I wrote the report, I**
3  had that -- I had that wording in there, and I
4  probably should have taken out the "in person"
5  portion because -- but there was a compressed
6  time frame from the availability of the --
7  Dr. Kursh's report and Mr. McCarter's report.
8  And in that compressed time frame I neglected to
9  take out that wording.
10 Q.  So on how many occasions did you
11 speak with Mr. Wade?
12 A.  **One or -- I think it was just one**
13 occasion.
14 Q.  And what was the length of that
15 communication?
16 A.  **45 minutes, give or take.**
17 Q.  So you had just one phone call with
18 Mr. Wade, and that phone call lasted about 45
19 minutes, correct?
20 A.  **That's correct.**
21 Q.  Did you discuss anything with him
22 related to this case that's not included in your
23 report?
24     MR. HINDERAKER: So we're going
25 to -- let me just give a cautionary instruction

Page 28

CASE 0:16-cv-01054-DTS  Doc. 616-4  Filed 10/23/19  Page 6 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 145**

of foundation.

THE WITNESS: I -- I never looked at that specifically. I'm not prepared to answer that. It's not something that I looked at. It wasn't within the scope of what I looked at, or was asked to look at.

BY MR. FLEMING:

Q. You say that it's something you didn't take a look at, yet on pages 7 through 9 of your report you're giving opinions relating to the license grant provided by the software license agreement, right?

A. The only issue I looked at there was the territory issue. I didn't look at -- in terms of the different versions of the license agreement from -- that were negotiated.

Q. The territory issue, where does it say anything about territory in pages 7 through 9, Section A1?

A. What I'm telling you is I didn't look at earlier versions of -- that were not signed versions of the license agreement with respect to the issues discussed from the bottom of page 7 through the top of page 9.

Q. Okay. Let me see if I understand.

**Page 146**

You're not providing any opinions as to the scope of the license grant, rather your opinion just relates to the territorial issue?

A. You mis --

Q. Is that fair?

A. No, you mischaracterized what I said.

Q. All right. Well, let's look at the territory issue.

A. Okay.

Q. Okay. One other question before we get there.

Within the defendant corporations, who do you understand actually uses the Blaze Advisor software?

A. People in the Chubb & Son division of Federal.

Q. And why do you believe that?

A. Well, my understanding is those are the ones that are covered -- the individuals that are covered by the license.

Q. And my question is different than that. Do you understand who actually uses the Blaze Advisor software and have used it since the license agreement was executed?

**Page 147**

A. Both validly license users and those who may or may not be validly licensed? Are you asking me to comment whether I have knowledge on both validly licensed users and others who may or may not be validly licensed?

Q. I think my question is pretty clear. What is your understanding as to which entities actually use Blaze Advisor software?

MR. HINDERAKER: Over? And your period of time I think was 2006 to date?

MR. FLEMING: Yes.

MR. HINDERAKER: Just to be clear. And my objection is outside -- my objection is lack of foundation.

THE WITNESS: I'm aware of users who are Chubb & Son employees. I'm aware that there were users of the software who were employees of companies affiliated with Federal or affiliated with the pre merger Chubb Corporation. I'm aware of -- those are the ones I'm aware of.

I'm not sure whether there are users of the -- well, there are -- since the merger, there are users of Chubb -- there are users of the software who are employees of Chubb, Limited who may or may not be employees of Chubb

**Page 148**

& Son.

BY MR. FLEMING:

Q. Okay. And just to go back. Could you identify any employee of Chubb & Son?

A. Well, and there are also users of the development portion of the software, as opposed to end user portion who are outside consultants employed by divisions of Chubb Corporation pre merger and/or Chubb, Limited post merger.

Q. And can you identify any employee of Chubb & Son at any time? One person?

A. Not off the -- I've seen a lot of e-mails and I believe some of them -- to the best of my recollection some of them had sig sections, a section underneath where it says the name of the person where it identifies their position and company. And I believe some of them were Chubb & Son to the best of my recollection, but I'm not recalling that any specific employee that it said that on their e-mail or on letters or memos that were produced in this case.

Q. All right. On page 10 of your report, you reference the June 26, 2006, draft of the software license agreement where the phrase

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 7 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 149

1 worldwide -- worldwide was removed from the Blaze
2 license; is that right?
3   A.   At the top of the page, I reference
4 a June 26 draft where the United States of
5 America was lined through and worldwide was
6 substituted.
7       And then in the following paragraph
8 I reference a June 27 draft which changes that
9 section to read, "territory with respect to the
10 installation and physical location of the Fair
11 Isaac products means the United States."
12       So a change from territory means
13 worldwide in the June 26, to territory with
14 respect to the installation and physical location
15 means the United States of America in the
16 June 27th.
17       Is that what you're asking about?
18   Q.   Let me show you what's previously
19 been marked as Exhibit 312. Have you reviewed
20 this e-mail and this draft of the software
21 license agreement before?
22   A.   This is an exhibit to -- whose
23 deposition is this an exhibit to?
24   Q.   This is an e-mail from Jandeen
25 Boone, the same person you referenced.

Page 150

1       MR. HINDERAKER: He was asking if
2 you know whose deposition this was an exhibit to.
3       MR. FLEMING: Well, I mean, it says
4 Boone deposition at the bottom of the tab --
5       THE WITNESS: Then I have seen it
6 because --
7       MR. FLEMING: -- I'm assuming that
8 was --
9       THE WITNESS: -- I looked at the
10 exhibits to the Boone deposition.
11 BY MR. FLEMING:
12   Q.   Okay. And do you see where on this
13 draft under the license grant, the phrase in
14 Section 2.1, "but only within the territory and"
15 is redlined out?
16   A.   I see that.
17   Q.   What is your understanding as to
18 why the parties would agree to remove territory
19 from the license grant if, as you say, they meant
20 to incorporate this term into the section?
21   A.   The license grant says "subject to
22 the terms, conditions and limitations of this
23 agreement," and up above it says the following
24 terms of which territory is one, so the License
25 Grant 2.1 is subject to the terms including the

Page 151

1 term territory, which limits the installation and
2 physical location.
3       But taking it out of Section 2.1
4 doesn't necessarily restrict usage with the
5 same -- at least as I understand it, and I'm not
6 a lawyer.
7       But looking at it from what would
8 be my view and what I believe is normal and
9 customary, that taking it out of here would open
10 usage outside of the territory, where the
11 territory limits installation and physical
12 location.
13   Q.   So you're interpreting the
14 contract?
15   A.   I'm giving you my understanding of
16 what would be a normal and customary
17 understanding in the industry of what industry
18 people would look at this contract and understand
19 from it.
20   Q.   So are you familiar with other FICO
21 Blaze software agreements that actually have a
22 reference to the territory in the license grant
23 section?
24   A.   In the two weeks that I had to do
25 this report, I don't recall whether I saw any

Page 152

1 other such agreements. I may have, but I don't
2 recall having seen any other such agreements.
3   Q.   Okay. So you've referenced a
4 couple of times short time period you had between
5 receiving the report and writing the report.
6       Are you saying that because that
7 posed some obstacles to you in providing the
8 report that you wanted to prepare and provide?
9   A.   No. What I'm saying is from the
10 date when Dr. Kursh and Mr. McCarter's reports
11 that I was rebutting became available until the
12 date when my report was due, I had a limited
13 period of time.
14       I focused my time on the subject of
15 my opinions that are stated Opinions 1 through 5.
16 I didn't necessarily look at issues that did not
17 seem to me -- such as license agreements with
18 other FICO licensees, that didn't seem to be --
19 to me to be relevant to rebutting Dr. Kursh's
20 opinions.
21   Q.   Well, let's look at Dr. Kursh's
22 report on page 23, if you could.
23   A.   I don't believe -- oh.
24       MR. HINDERAKER: Yeah, it's one --
25       THE WITNESS: 501? Is it 501?

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 8 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 153

    MR. HINDERAKER: Yeah, 501.
    THE WITNESS: What page?
    MR. FLEMING: Page 23.
    THE WITNESS: Yes. What paragraph are we looking at?
BY MR. FLEMING:
    Q. Do you see paragraph 74?
    A. Yes.
    Q. Can you read paragraph 74 out loud.
    A. "Other license agreements executed between FICO and its licensees also support Mr. Walch's assumption by referring to territory within their license grant sections."
    Q. Okay. Given that Mr. Kursh referred to other license agreements executed between FICO and its licensees that had -- that refer to territory within their license grant sections, why didn't you review the FICO agreements involving Blaze that had such provisions?
    A. I wasn't rebutting that particular point. If you look at my report, my opinion is that the licensing limitations in the license agreement are comparable to the limitations customarily found in the license agreements of

Page 154

other commercial software providers.
    FICO applied these limitations in a manner that is consistent with the normal customs and practices of the commercial software industry.
    Dr. Kursh's Paragraph 74 isn't necessarily relevant to that opinion.
    Q. Have you ever worked with a global software license agreement before?
    A. By worked -- by "worked with" do you mean reviewed or been involved in negotiating?
    Q. Either.
    A. I've certainly reviewed them, yes.
    Q. Have you ever testified as an expert witness relating to global software license agreements?
    A. I believe I have but I can't -- I can't recall specifically off the top of my head.
    Q. As you -- I didn't mean to interrupt you.
    A. A specific one.
    Q. So as you sit here today, you can't identify any prior case in which you've testified as an expert witness relating to a global

Page 155

software license agreement, correct?
    A. As I sit here today, I can't think of one right now, but I've certainly reviewed them in the course of other expert engagements. As background material, I don't know necessarily that I testified about them.
    Q. What significance would you give to the fact that FICO had other license agreements involving Blaze which did have territory provisions in the license grant itself?
    MR. HINDERAKER: Object to the question as argumentative, misstates the record.
    THE WITNESS: I haven't looked at all of the factors related to that, and my opinion doesn't address that issue.
    I'm not really able or prepared to give you an answer or a conclusion to that question as we sit here today, and wouldn't be without further study specifically directed to that question.
BY MR. FLEMING:
    Q. On page 7 of your report in referencing Dr. Kursh's opinions relating to the license scope, the termination clause and audit rights, you state that his interpretation of

Page 156

these provisions is contrary to the normal and customary way the provisions are commonly understood and applied in the commercial software industry, correct?
    A. Yes.
    Q. So you have an interpretation of the license agreement that's contrary to the ones that Dr. Kursh provided, correct?
    A. What I'm saying is Dr. Kursh's interpretation is not normal and customary in my view based on my experience, and I've supported that with others, specifically Landy and Classen, who take the same view. So it's not my opinion alone.
    But it's based on my understanding of Kursh's interpretation being out of -- out of step. Not normal and customary.
    Q. So your interpretation of the license agreement provisions relating to license scope, termination clause and audit rights is contrary to Dr. Kursh's interpretation of those provisions; is that correct?
    A. That's not exactly what I said. What I --
    Q. Just to be clear, I'm not stating

CASE 0:16-cv-01054-DTS Doc. 616-4 Filed 10/23/19 Page 9 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

the table on 2 -- on Bates 2118. This is a pretty strange document.
BY MR. FLEMING:
Q. Does Amendment 2 make any reference to a territorial limitation?
A. Yes.
Q. Where does it say territorial limitation?
A. It says, "Subject to and in accordance with the provisions of the agreement," and the agreement is the agreement beginning on page 208 which has the territorial limitation.
Q. Where are you reading from?
A. I'm reading from page Bates 227, page 2 of 3 of Amendment 2 where it says, "For purposes of this amendment to the Enterprise Wide License shall mean the client and its affiliates may use the Fair Isaac product for their internal business purposes with no limitation on the number of seats or CPUs, subject to and in accordance with all the provisions of the agreement."
That's what I'm referring to.
MR. HINDERAKER: Is this a time for a break, Terry?

Page 169

MR. FLEMING: Yeah, I'll be done in a second.
BY MR. FLEMING:
Q. With your interpretation of the agreement meaning the initial agreement, the First Amendment and the Second Amendment, right?
A. It's my belief that that's what that refers to.
Q. Because it's defined on the first page of Amendment 2, correct?
A. Yes.
Q. Okay. And finally, when it says in Section 1, "all previous licenses granted to client under the agreement shall be terminated and superceded by the license," quote, is it your interpretation that that refers only to the graph or matrix on the First Amendment?
A. It's the table on Bates 218, I'm reading that to refer to the table on 226 supersedes the table on 2118 and/or the table on 218 because those are the tables that specify what the licenses are for.
Q. Even though that phrase that we just read, the second full sentence, Paragraph 1, doesn't refer to a table but rather says "all

Page 170

previous licenses shall be terminated and superceded," correct?
A. That's the preamble to the table. The licenses are the licenses to the software products enumerated in the table that immediately follows that, which are different in some respects to those enumerated on 2118 and 218.
MR. FLEMING: All right. Why don't we take a break.
THE VIDEO OPERATOR: Going off the record. The time is 1:45 p.m.
(Thereupon, a break was taken, and then the proceedings continued as follows:)
THE VIDEO OPERATOR: We're back on the record. The time is 1:58 p.m.
BY MR. FLEMING:
Q. Mr. Hilliard, let's look at your fifth opinion that starts on page 30 of your report and you state that, "Mr. McCarter fails to support his contention that Blaze Advisor has minimal value to Federal because it is industry agnostic, easily replaceable and only one of many technologies that Federal employs to operate its insurance business. The evidence shows that FICO's Blaze provided critical capability,

Page 171

contributing to Federal's revenue that Chubb & Son had not developed internally."
Did I read your opinion correctly?
A. I believe so, yes.
Q. Now, you would agree that you are not an expert in the insurance industry, correct?
A. It's not my specialty. I have significant knowledge, but it's certainly not my specialty.
Q. And in response to my question, you don't consider yourself to be an expert in the insurance industry, do you?
A. I don't hold myself out as an insurance industry expert. That's correct.
Q. And you don't have any expertise in how insurance companies operate; is that correct?
A. No.
Q. Did you examine the entirety of the defendant's business operations in the course of preparing your report?
A. No.
Q. On page 31 of your report you reference a document that states that Federal utilizes Blaze in 15 applications.
(Deposition Exhibit 511 was marked

Page 172

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 10 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

for identification.)
BY MR. FLEMING:
Q. Is this the document you reference on page 31 of your report?
A. Yes.
Q. And this was an attachment to an e-mail sent by Tamara Pawloski; is that right?
A. Yes.
Q. Do you know what Ms. Pawloski's position is?
A. She's the VP of Software Compliance and Optimization for Global Vendor Services Organization for Chubb is what it says. That's her domain -- e-mail domain Chubb.com, and it also says Chubb above her name.
Q. And do you know who prepared the attachment?
A. I don't recall whether I saw who prepared it and I don't recall -- I don't recall if I saw who prepared it.
Q. Do you know whether Ms. Pawloski has any IT background or experience?
A. Well, if she is a VP of software compliance and optimization, she has response -- IT responsibility, but I don't know her

Page 173

background.
Q. Okay. You don't know what her actual responsibilities were though, do you?
A. I just know what her title is, which would indicate some IT responsibility. But I don't -- I haven't seen her job description.
Q. What technical requirements would be needed to determine whether Blaze was actually integrated into these 15 applications?
A. Someone -- most likely someone on -- in the IT -- with specific IT development responsibility or someone working in the portion of Chubb with IT development or deployment responsibility.
Q. And my question is really different. Not who you would talk to, but rather what would you do or ask to see in order to determine whether Blaze is actually integrated into these 15 applications?
MR. HINDERAKER: Objection; beyond the scope.
THE WITNESS: In my experience, you'd have to talk to someone within Chubb who was involved in these deployments.
BY MR. FLEMING:

Page 174

Q. And what documents or what data would you request to see in addition to talking with somebody in the IT department?
A. It would depend on the organization. In some cases talking to someone who was involved in it would be sufficient.
Q. Well, with regard to this organization, how would you go about doing that?
MR. HINDERAKER: This organization being the defendant?
MR. FLEMING: Federal, yeah.
MR. HINDERAKER: Objection; lack of foundation.
THE WITNESS: I don't know enough about Federal to say.
BY MR. FLEMING:
Q. And you didn't attempt to go about verifying those facts, that is whether in fact Blaze was actually integrated into these 15 applications, did you?
A. I took the VP of software compliance and optimizations' word for it.
Q. And my question is whether you took any other steps to verify those facts, other than reading the one e-mail and the attachment?

Page 175

A. I -- I did not. I just trusted Ms. Pawloski.
Q. You say in your heading A that "Blaze Advisor is integrated into core Federal operations."
What do you mean by integration and core on pages 31, and you say the same on 32?
A. I'm responding to Mr. McCarter's report. On page 9 of Mr. McCarter's report -- well, maybe it isn't -- I may have the page number incorrect. Maybe it's Paragraph 74.
MR. HINDERAKER: Do you mind if I help out by just -- I'd look at your footnote 84.
THE WITNESS: Oh, I'm sorry. Paragraph 91 on page 24. You're correct. Looking at the wrong footnote.
Where Mr. McCarter states, "Blaze only works when it is integrated with core insurance applications that have the required insurance functionality and service policies," and then he identifies in Paragraph 88 above that it's used in 10 of Federal's 1500 applications.
So I'm basically responding to what Mr. McCarter writes, and then I'm explaining what the term integrated -- the normal and customary

Page 176

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 11 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

understanding of the term integrated and core, and with relation to business applications of software.

BY MR. FLEMING:

Q. And what two paragraphs are you reference, 88 and what other paragraph of Mr. McCarter's report?

A. 91 on page 24.

Q. Okay. So in response to my question, what do you mean when you say integrated?

A. Well, I'm trying to -- I'm giving the normal and customary industry understanding of integrated since Mr. McCarter doesn't provide that and I'm saying it normally means that a component application, which would be Blaze Advisor in this case, is linked into a host application, here some insurance applications, either the 10 referenced by Mr. McCarter or the 15 referenced by Ms. Pawloski, in a way that is in the idea -- that in the ideal would allow information to pass between them as if they were a single unified application.

Now, this isn't always seamless. I said -- so I said depending on how seamless, how close to that ideal the integration is, this typically means that removal or replacement of an integrated component is likely to be difficult, time consuming and to risk endangering the operation of the host application.

So I've defined what I mean by integrated since Mr. -- which I think is a normal and customary industry understanding, which is something that Mr. McCarter did not do.

Q. So are you saying that the applications are core or the application components are core?

A. Well, let's look at what McCarter says. And he says that Blaze only works when it is integrated with core insurance applications, what I refer to as the host applications where I talk about integrated, that have the required insurance functionality for selling and servicing insurance policies.

So the applications would be either the 10 that Mr. McCarter refers to in Paragraph 88 and I think he itemizes them actually in Paragraph 94 -- one, two, three, four, five, six, seven, eight, nine -- yeah, he itemizes them in Paragraph 94, or the 15 that were represented by the Chubb VP of software compliance and optimization.

Q. And my question is, in your opinion, are you saying that the applications are core or that the applications components are core?

A. I'm saying --

MR. HINDERAKER: I'm going to object to that question as vague.

THE WITNESS: Hmm?

MR. HINDERAKER: I object to the question, as I don't understand it, as vague.

THE WITNESS: Let me see if I can clarify what I'm saying, is the 10 or 15 applications itemized by Ms. Pawloski or itemized by Mr. McCarter are characterized by Mr. McCarter as being core applications and he characterizes them that way in Paragraph 91.

BY MR. FLEMING:

Q. Well, there are -- you agree that Blaze is only used in 10 of Federal's 1500 applications?

MR. HINDERAKER: Objection; lack of foundation.

THE WITNESS: I think what I said is there are two different counts and there's -- and Mr. McCarter doesn't account for the difference between the 15 identified by Ms. Pawloski and the 10 identified in his report. So I don't know whether the 10 or the 15 is correct. And neither does apparently Mr. McCarter.

BY MR. FLEMING:

Q. Okay. I'm asking you a different question.

Do you agree with Mr. McCarter's statement that Blaze is only used in 10 of Federal's 1500 applications?

A. No. It may be 15 or Ms. Pawloski might be wrong.

Q. I see. So you don't disagree that there's 1500 applications, but you disagree as to whether there's 10 or 15 that use Blaze, correct?

MR. HINDERAKER: Objection; lack of foundation.

THE WITNESS: I don't know whether the 1500 is an approximate -- I'd be surprised if it was exactly 1500, so I expect that's an approximation. I don't know how accurate it is.

BY MR. FLEMING:

Page 177
Page 178
Page 179
Page 180

(763) 591-0535 | info@depointernational.com

Depo International, Inc.

Page 48 (177 - 180)

CASE 0:16-cv-01054-DTS Doc. 616-4 Filed 10/23/19 Page 12 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 181

1  Q.  How many of those 1500 applications
2  are core applications?
3      MR. HINDERAKER:  Objection; beyond
4  scope, lack of foundation.
5      THE WITNESS:  I don't know the
6  answer to that and Mr. McCarter's report doesn't
7  give me any insight.
8  BY MR. FLEMING:
9  Q.  How many of those applications in
10 your opinion contribute to Federal's revenues?
11     MR. HINDERAKER:  Objection; scope
12 and -- outside the scope.
13     THE WITNESS:  I don't know and
14 Mr. McCarter doesn't identify that.
15 BY MR. FLEMING:
16 Q.  How long have you been testifying
17 as an expert witness?  For how many years?
18 **A.  My first testimony was sometime**
19 during the 1980s.
20 Q.  So close to 40 years?
21 **A.  35, yeah.**
22 Q.  And you provide four expert reports
23 a year and have testified over a hundred times as
24 an expert witness; is that right?
25 **A.  Yes.**

Page 182

1  Q.  Okay.  Have you ever before
2  provided an expert opinion as to whether a
3  software application contributes to a company's
4  overall revenue?
5  **A.  By the way, your calculations are**
6  wrong because back in the '80s and '90s, it was
7  far fewer expert engagements because I was doing
8  more consulting work and the number of expert
9  reports during that time frame was far fewer.
10     Have I ever -- but getting to your
11 question, I have often testified about whether a
12 software application was a critical application
13 to the revenue or profitability of the user, yes.
14 That's been a significant area of where I've
15 testified.
16 Q.  And tell me the cases where you
17 have provided an expert opinion as to whether a
18 software application contributes to the company's
19 overall revenues.
20 **A.  I believe that was part of my**
21 testimony in Hodell-Natco.  I don't recall
22 whether I addressed that in my deposition
23 testimony in Oracle-Rimini.  I don't recall about
24 QAD versus Ingersoll-Rand.  I just don't recall
25 that one.

Page 183

1  Certainly the Summit-IBM case, the
2  importance of the applications to the revenue
3  and -- to the revenue was integral there.  And
4  almost all of the cases related to
5  implementation -- not all, but almost all of the
6  cases related to implementation or functionality
7  of ARP business-related software, the importance
8  and the affect of the software on the operations,
9  and in most cases also on the revenue of -- of
10 the licensee was a major or significant issue.
11 And if it wasn't the revenue, it was
12 profitability.  But in most cases both.
13 Q.  How can you determine whether Blaze
14 contributed to Federal's revenue if you have no
15 expertise with respect to the insurance industry
16 and you did not examine the entirety of the
17 defendant's business operations?
18 **A.  You've mischaracterized what I said**
19 earlier about having no expertise with regard to
20 the insurance industry.
21 Q.  Well, you're not an expert with
22 regard to the insurance industry, correct?
23 **A.  I have expertise.  I have had**
24 multiple clients in the insurance industry, both
25 insurance companies and insurance agencies, where

Page 184

1  as a consultant I was involved in helping them
2  determine their needs, what business
3  functionality they needed in a computer system to
4  increase their revenue and profitability, and
5  whether various software applications would
6  assist them in doing so.
7      And then following through on the
8  implementation to see that the software was in
9  fact doing what it was purported to do, and
10 making the contributions to, in most cases,
11 profitability or efficiency because once the
12 implementation was complete, I didn't always stay
13 long enough to determine the revenue effects.
14 But I knew that the revenue effects were one of
15 the objectives.  So I do have expertise there.
16 Q.  But you don't consider yourself to
17 be an expert with respect to the insurance
18 industry?
19 **A.  I have enough expertise to render**
20 the opinions that I rendered based on my
21 experience.  That's not my specialty.
22 Q.  Okay.  And my question is do you
23 now consider yourself to be an expert with
24 respect to the insurance industry or not?
25 **A.  I have sufficient expertise to**

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 13 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

render the opinions that I've rendered. I haven't gone beyond where my expertise leads me. I do not characterize myself today as a specialist in insurance -- in the insurance industry with the ability to have general broad expertise applicable to all aspects.

But I have the expertise and I -- to render the opinions that I've rendered based on the materials that I reviewed.

Q. Do you agree with Mr. McCarter when he says in Paragraph 89 of his report that Blaze is 1 of 45 third party technologies used by Federal?

A. I didn't attempt to verify that, and apparently neither did Mr. McCarter because he doesn't cite any sources for that. It just makes that as a statement, so there -- without sources I can't even evaluate what he said.

Same with the -- the 1500 applications, he does cite a source there. But he doesn't cite a source for the 45 technologies, so I don't have the inside information and certainly Mr. McCarter doesn't provide anything.

Q. Do you believe that all of the third-party software technologies used by Federal

Page 185

contribute to Federal's overall revenues?

A. I have no idea.

Q. Do you agree with Mr. McCarter where he says in paragraph 90 that Federal has a total of 1,545 technologies that are used to build and implement its business applications?

A. Once again, he doesn't identify the 1,545 technologies and cites no source for it.

Q. Do you --

A. I -- I have no way of verifying or disputing it.

Q. Do you believe that all of the technologies that are used to build and implement Federal's business applications contribute to Federal's revenues?

A. I don't have enough -- I don't know what they are, I don't have enough information to make a determination there, and apparently neither does Mr. McCarter or he would have cited it.

Q. Can you quantify the contribution that Blaze makes to Federal's revenues?

A. Not any further than the chairman and CEO of Chubb does in the annual statement where he credits to the technology component of

Page 186

what he's doing for making Chubb competitive in the mid market and smaller market for insurance policies when the RFI that went out in 2006 said that that was the specific purpose for Chubb's licensing of Blaze in the first place.

So I can't do any more quantification than the chairman of Chubb does.

Q. The chairman of Chubb doesn't mention Blaze Advisor in the report that you're referencing, does he?

A. No.

Q. How many technologies -- he only references technology in general, correct?

A. That's my recollection, yes.

Q. How many technologies would you estimate a company of Chubb's size employs?

A. Lots. I -- I can't give you a number.

Q. 10, a thousand, 10,000?

A. I have no basis to dispute Mr. McCarter's estimate, nor to verify it.

Q. So can you quantify at all the contribution that Blaze makes to the revenue as you state in your opinion?

A. I know from the RFI that the

Page 187

purpose of Blaze Advisor was to increase revenue in the mid market and smaller market. I know that Chubb acquired the license to Blaze Advisor for that purpose.

I know that Chubb was not successful in that market prior to implementing Blaze Advisor, and I know that it was successful in that the chairman and CEO identified technology as being a principal reason for that in that market.

In terms of the -- so and the way he describes the success is exactly the way that it was the objective for Blaze Advisor was described in the RFI. I can't quantify it, but there's a direct line between the purpose of Blaze Advisor as described in the RFI in 2006 and the results identified by the chairman in 2018 I believe.

Q. Well, we've talked about the results as discussed by the chairman in which he did not identify Blaze but rather just technology, and you have acknowledged that there are many, many technologies utilized by Federal, correct?

A. Yes.

Page 188

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 14 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

MR. FLEMING: Okay. Can you mark this as the next exhibit.

(Deposition Exhibit 512 was marked for identification.)

BY MR. FLEMING:

Q. Showing you Exhibit 512, is this the RFI you were referencing?

A. I believe so. I identified Bates 57284 and this begins with 57280, and 284 is actually the introduction so. And I believe that's what I quoted is what's on 284.

Q. So your reference to the RFI was actually a reference to a draft document which contains red lining; is that correct?

A. Yes.

Q. Okay. So you don't even know if this is the final version or if there was a final version?

A. That's correct.

Q. You don't know if this document was ever sent to FICO or any other company?

A. I didn't see a final version among the Bates marked documents. It's my understanding that this is the document that FICO responded to and I believe there's testimony to

that effect. I don't recall in whose deposition that testimony occurred, but I believe there's testimony to the effect that this is the document.

Q. You're saying it is the final document?

A. It is this document. I don't know whether there ever was a final or whether -- I don't recall whether FICO responded to this draft or to a final.

Q. Okay. So you just don't know one way or another?

A. Correct.

Q. And you don't know if the document was ever actually sent to FICO or any other company, correct?

A. I believe there's testimony to that -- I believe I recall testimony to that effect.

Q. Testimony by whom?

A. It may have been Mr. Wade, but I don't recall for certain as we sit here today.

MR. HINDERAKER: Are you representing there is that testimony in the record?

MR. FLEMING: I'm asking him, I'm not asking you.

MR. HINDERAKER: And I'm not answering you. I'm just asking you if you're making a representation.

MR. FLEMING: I'm asking a question that I want an answer to.

MR. HINDERAKER: Okay.

BY MR. FLEMING:

Q. Did somebody testify to that?

A. That's my recollection, yes, but I don't recall.

Q. You don't recall whom?

A. Whom it was that -- who it was.

Q. You don't know who wrote the RFI or what their expertise or position is; is that right?

A. Well, it was Chubb & Son. I don't recall if I saw a document indicating who at Chubb & Son it was.

Q. Or what their position is?

A. Don't recall whether I saw a document to that effect.

Q. And you quote this draft document stating that Chubb Specialty Insurance division

was looking to expand into mid market and smaller accounts; is that right?

A. Yes.

Q. What are the mid market and smaller market accounts for Chubb Specialty Insurance?

A. There are accounts that are -- of mid -- what business would call mid size, not Fortune 500 type or equivalent.

Mid market is generally understood to be companies in the range of several million dollars in volume a year up to perhaps hundreds of millions of dollars of revenue per year and not including companies that have revenues of billions of dollars.

That's -- that's the general industry understanding --

Q. What industry?

A. American business.

Q. Okay. Let's focus on the insurance industry.

What are mid market and smaller accounts in the insurance industry?

A. There was some description of that as I recall in the annual report or reports, but I don't recall -- I don't recall the industries.

Page 192

(763) 591-0535 | info@depointernational.com
Page 51 (189 - 192)
Depo International, Inc.

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 15 of 20
Brooks Hilliard   -   6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 201**

1 related after the merger?
2  A.  Ace Limited acquired -- to the best
3 of my knowledge, Ace Limited acquired Chubb
4 Corporation and became the parent company and
5 changed its name to Chubb Limited.
6       Regarding the sub -- the corporate
7 structure underneath Chubb Limited, that's not an
8 issue -- that's not something I've looked at.
9  Q.  Now, on page 13 of your report you
10 state that "Under Section 10.8 of the Blaze
11 license, a change in control is deemed to be an
12 assignment that requires FICO's consent."
13       Is that right?
14  A.  What are you quoting?
15  Q.  On page 13.
16  A.  At the bottom of the page?
17  Q.  Uh-huh.
18  A.  I'm saying the provision states
19 that the change of control is deemed to be an
20 assignment that requires FICO's consent.  This --
21  Q.  Okay.  That's --
22  A.  Not that the change of control
23 requires FICO's consent, but the assignment
24 requires FICO's consent.
25  Q.  Well, the agreement provides that

**Page 202**

1 the change of control is -- what you state is
2 "This provision states that a change of control
3 is deemed to be an assignment that requires
4 FICO's consent", correct?
5  A.  I'm paraphrasing where it says
6 neither FICO nor Chubb & Son shall, without prior
7 written consent of the other party, assign or
8 transfer this agreement or any part thereof.  In
9 the event of a change of control, or if Chubb is
10 merged with, acquired by, or acquires another
11 entity, that shall be deemed to be an assignment
12 subject to this section.
13       So what it's saying is that an
14 assignment requires FICO's consent, and that a
15 change of control is deemed to be an assignment.
16  Q.  What does --
17  A.  And an assignment requires FICO's
18 consent.
19  Q.  What does a change of control
20 within the meaning of this agreement mean to you?
21  A.  I believe it's identified.  I'll
22 have to look at the agreement, and I know you
23 gave it to me as a --
24  Q.  Is that it right in front of you?
25  A.  Well, actually it states here that

**Page 203**

1 the change of control is not what I'm referring
2 to necessarily, or the change of control which I
3 understand to include such things as being merged
4 with, acquired by, or acquires.  And it was since
5 Chubb Corporation was acquired by Ace, that would
6 be the change of control I'm referring to here.
7  Q.  Okay.  And I'm asking you more
8 generally what does a change of control, as
9 stated in this agreement, mean to you?
10       MR. HINDERAKER:  I'm going to
11 object to the extent it's asking for a legal
12 conclusion.
13       THE WITNESS:  I'm just looking at
14 the words of the agreement in 10.8.
15 BY MR. FLEMING:
16  Q.  So is this an unusual provision or
17 is it -- have you seen this type of provision in
18 other software license agreements, or is this the
19 first time you've come across this?
20  A.  I have seen it in other license
21 agreements, and Landy refers to it and I've
22 quoted Landy on page 15 describing a change of
23 control.  A very similar provision and he -- I've
24 referred to it in a couple places.
25       I think Classen also talks about

**Page 204**

1 the same issue and I've referenced Classen on
2 page 16.  And I've -- as I say, I'm relying
3 primarily on my own experience.  I've seen
4 similar provisions.
5  Q.  Okay.  So --
6  A.  In contracts and software licenses.
7  Q.  So given all that, what is your
8 understanding of what is meant by "change of
9 control" as used in this agreement?
10  A.  In this case I'm referring to the
11 acquisition by Ace.  That's what I'm referring
12 to.
13  Q.  Okay.  And regardless of what
14 you're referring to, my question is what is your
15 understanding as to what is meant by "change of
16 control" in this agreement?
17       You say that you've seen it before.
18 You say that it's used in a number of other
19 agreements.
20       What's your understanding as to
21 what is meant by "change in control," or don't
22 you have an understanding?
23  A.  My understanding as it's used in
24 this agreement is just what it says in
25 Section 10.8.

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 16 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  Q.  And namely by that you mean what?
2  A.  **A merger acquisition.**
3  Q.  But Section 10.8 says "in the event
4  of a change in control or if the client is merged
5  with, acquired, or acquires another entity,"
6  correct?
7  A.  **That's what it says.**
8  Q.  Okay. So my question is what is
9  your understanding as to what is meant by change
10 of control in this agreement, or don't you have
11 an understanding?
12 A.  **The general understanding would be**
13 **new ownership because general understanding**
14 **within industry would be new ownership. It's**
15 **similar to what Landy and Classen say.**
16     **So the belt and suspenders approach**
17 **of having the "and" in the 10.8 doesn't to me**
18 **make change of control any different than the --**
19 **new ownership could be described in any of these**
20 **ways.**
21 Q.  So what is your understanding of
22 what the phrase means that -- in Section 10.8
23 that client shall make no expanded use of the
24 Fair Isaac products as a result of any such event
25 unless and until Fair Isaac provides such written

Page 205

1  consent?
2  A.  **That upon the event of a, let's say**
3  **acquisition of Chubb, which is what actually**
4  **happened here, that until Fair Isaac provides**
5  **consent during that interim period, that the**
6  **licensee is not allowed to make any expanded use**
7  **during that interim period.**
8  Q.  So based on that understanding, if
9  the licensee does not engage in any expanded use,
10 does this agreement require that consent be
11 obtained in the event of a merger?
12 A.  **Yes, because there's a deemed**
13 **assignment, and that assignment requires consent.**
14 Q.  So how does the provision relating
15 to expanded use play into that?
16    If there's a merger but no expanded
17 use, is it your understanding that there has to
18 be consent?
19 A.  **The way this normally happen --**
20 **what is normal and customary is that corporations**
21 **don't hold up mergers because one of the**
22 **corporations might have a software license that**
23 **requires some consent.**
24    **What normally happens is that same**
25 **thing that began to happen in this instance, that**

Page 206

1  the licensor and the licensee begin discussions
2  about what would be required for consent. An
3  agreement is reached in the normal case. If
4  there are issues, then there's a 30-day cure
5  period.
6     So during the period of time after
7  the event and prior to the initiation of a 30-day
8  cure period, as well as during the 30-day cure
9  period, there can be no expansion of use. And
10 it's normal and customary that when issues come
11 up between licensors and licensees if there's a
12 specified 30-day cure period, that very often
13 those cure periods get extended if there are --
14 further issues that need further discussion.
15 Q.  Of course section --
16 A.  **And so it would be also during any**
17 **expansion of 30-day cure period.**
18 Q.  Of course Section 10.8 doesn't
19 reference any 30-day period, correct?
20 A.  **Well, Section 10.8 says that the**
21 **consent is required, and that any attempt to**
22 **assign or transfer without first obtaining such**
23 **written consent will be null and void and of no**
24 **affect. And that ties in with -- and the consent**
25 **is required, that ties in with I believe it's 9.2**

Page 207

1  **which deals with termination in the event of an**
2  **uncured breach.**
3     **So the violation would be the**
4  **attempted assignment, and so that goes -- refers**
5  **directly to 9.2 which does have the 30-day cure**
6  **period.**
7  Q.  So Section 10.8, this provision
8  that says, "The client shall make no expanded use
9  of the FICO product as a result of any such an
10 event unless and until FICO provides such written
11 consent," so what happens in your opinion in the
12 event that there is a merger but no expanded use?
13    MR. HINDERAKER: Objection; asked
14 and answered.
15    THE WITNESS: If there's a merger,
16 there is a deemed assignment, there is to be no
17 expanded use during the period where consent is
18 being discussed, and in most cases granted, after
19 discussions and negotiations. And -- but if
20 consent is not granted, then the assignment is
21 null and void, and that's when the termination
22 provision comes into play.
23    So the expanded use can't go on
24 forever because the assignment becomes null and
25 void, and the license is no longer effective.

Page 208

CASE 0:16-cv-01054-DTS Doc. 616-4 Filed 10/23/19 Page 17 of 20

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 209**

BY MR. FLEMING:

Q. But what if -- what if there is no expanded use, is there any need to get consent under those circumstances?

MR. HINDERAKER: Objection; asked and answered.

THE WITNESS: Yes, because the assignment occurred without consent, which -- and that assignment becomes null and void.

In this case the deemed assignment is to Ace, and it became null and void, so the software was no -- Ace is a separate company, entirely different potential licensee. There is no license for Ace. The license is to Chubb & Son, which no longer exists as a separate entity. It has been acquired, so consent is -- is required for that assignment. When the consent isn't received, the assignment is null and void, the license goes away.

BY MR. FLEMING:

Q. So if I understand your testimony, the provision in here dealing with expanded use, your interpretation is that that just applies to this 30-day time period where there's a negotiation with regard to consent to the

**Page 210**

assignment?

A. I'm just reading what the words of provision 10.8 say --

Q. And what I just said, do you disagree with that or not?

A. I do disagree with that.

Q. And how so?

A. Well, first of all, in most cases there is no 30-day cure period because the organizations work out the conditions for the assignment prior to a termination -- or prior to an initiation of a cure period. So that no expanded use would be applicable during that time. And in most cases, as I say, there is no notice, there is no cure period. The ex -- there are discussions until consent is received, and there's no expanded use during that time frame.

If there is a notice and there is a cure period, then the expanded use provision applies during that period as well.

Q. So it's your understanding that there is a violation of a no-assignment provision, correct?

A. I'm just reading what 10.8 says. It says there's a deemed assignment -- it says

**Page 211**

that assignment cannot be done without consent, that if -- when there's the acquisition, the deemed assignment has occurred, it's an occurrence of the deemed assignment without consent. And that if that persists, then the assignment is void and of no force or effect, meaning -- and the assignment is of the license. So if there is no assignment, the license goes away.

Q. Okay. Just so that we're clear, you're saying that there was a violation of the no assignment provision under Section 10.8, correct?

A. It's my understanding of what normal and customary meaning of 10.8 would have that affect, yes.

Q. Okay. So which entity assigned the Blaze license to which entity? Explain what the violation of the no assignment provision was here.

A. It was the acquisition of Chubb & Son by Ace which automatically caused the deemed assignment which never received consent.

Q. So what is your understanding as to whom Chubb & Son assigned the license to?

**Page 212**

What was the violation?

MR. HINDERAKER: Objection; question assumes facts not in evidence, argumentative therefore.

THE WITNESS: And also it -- that's a legal -- I don't know the answer, and that's a -- I think that's a legal question that I'm not sure that I would answer.

BY MR. FLEMING:

Q. Well, are you stating that Section 10.8 was violated because Ace acquired Federal, or because Ace acquired Chubb & Son?

A. Ace acquired Chubb & Son by acquiring Federal.

Q. So was there any increased use following the merger by Chubb & Son?

A. I haven't addressed that issue.

Q. You don't know --

A. During the period after -- between the merger and the termination is what you're asking about?

Q. At any time.

A. There was unlicensed -- there was -- Mr. McCarter -- actually there was use that violated the territory restriction in the

CASE 0:16-cv-01054-DTS  Doc. 616-4  Filed 10/23/19  Page 18 of 20
Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

contract, which would have been unlicensed use. I'm not sure whether that falls under the definition of increased use.

I'm unaware of -- unaware of increased use during the period from the end of January until the termination. There may have been, but if so I'm not aware of it.

Q. On page 15 of your report you quote Landy as saying "Companies may want the right to terminate the software license in an unwanted change of control situation," right?

A. Yes.

Q. What are some scenarios where withholding consent to an assignment would be reasonable?

A. Well, certainly all of the circumstances in this case would be -- would be such circumstances. But in cases where the new licensee was far -- was a different company exposed the licensor to different risks, and where the new licensee was far larger and had much greater use of the software, I believe either Landy or Classen states that that's something that software companies would customarily want to protect themselves in that

Page 213

event by requiring consent before allowing such assignment.

Q. What are scenarios where withholding consent to an assignment would be unreasonable?

MR. HINDERAKER: Object to the hypothetical question.

THE WITNESS: I haven't -- I haven't tried to address that issue.

BY MR. FLEMING:

Q. I'm just asking you, give me some scenarios where withholding consent would be unreasonable.

Is your answer you just don't know, you can't think of any circumstances?

A. Let's say software was licensed to me and I were to die and my wife were to assume the license for that software, I would think withholding consent for such a transfer would not be reasonable.

Q. Can you think of any other scenarios, or just your death?

MR. HINDERAKER: Same objection with respect to hypotheticals.

THE WITNESS: I'm not meaning to be

Page 214

all inclusive, but there could be a change of ownership of a company where one had to be bought out all the stock of the other -- where there was one stockholder, he sold all or part of his holdings to another stockholder, the company was essentially the same company before and after, in that case it might, depending on other circumstances.

But conceivably there would be circumstances in such a situation where it wasn't one company acquiring another, but just the change of ownership of an existing system, conceivably under some circumstances that would be a -- similar to the case of my death and passing my license on to my wife.

BY MR. FLEMING:

Q. What if there was a change in control where it was contemplated that there would be no increased use of Blaze?

MR. HINDERAKER: But what?

Objection; vague.

THE WITNESS: It would depend on circumstances. And certainly as -- I believe that in those cases and as described by Landy and Classen, those cases, there would have to be some

Page 215

discussion of consent.

In most of those cases there would be consent, but there would have to be discussion and some negotiation as to what was required for such consent.

BY MR. FLEMING:

Q. Well, why would there have to be a discussion about what consideration would be given under those circumstances if it wasn't contemplated that there would be increased use of the license?

MR. HINDERAKER: Objection; question is hypothetical, and the question assumes facts within the hypothetical.

MR. FLEMING: Go ahead.

THE WITNESS: Contemplation that there would be no increased use isn't the same as there being no increased use, number one.

Number two, if the contract specifically said that such a transfer required consent regardless of increased use, then there would be good reason to require consent and some consideration.

BY MR. FLEMING:

Q. You say on page 18 of your report

Page 216

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 19 of 20
Brooks Hilliard   -   6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Advisor? I think you've -- that's the question I'd like an answer to.

A. When I'm referring to similar to Blaze Advisor, what I'm referring to is business application software. And in some cases that would be special purpose business applications such as Blaze Advisor. In other cases it would be general purpose business application software such as, for instance, Oracle Financials or PeopleSoft ERP software. PeopleSoft now being a part of Oracle. Or Lawson software or others. And I'm familiar -- and so all of those would be business application software like Blaze Advisor.

Q. Okay.

A. And that's what I'm familiar with.

Q. Would you agree that database software is an example of system software, the category of software that includes operating systems which is entirely different from application software like Blaze that perform business functions?

A. Yes.

Q. Okay. What are some other examples of application software in the market today?

A. Oracle Financials, SAP-1, Lawson's

Page 237

ARP software, SAP's R/3. Boy, I mean, Microsoft Dynamics. I think there are four -- at least three different Microsoft Dynamics' products. There are software applications for different kinds of professional businesses and so forth.

The ones I've given you are brand name products that you might have heard of.

Q. What is your understanding as to who are the main competitors to Blaze software in the marketplace?

A. Yeah, I looked at the main competitors that were listed in the Forester report. And as we sit here today, I'm not recalling them off the top of my head.

Q. On page 26 of your report you state that commercial software pricing methods are very fluid.

Are you saying it's impossible to quantify the market rate for a license in this situation?

A. I don't understand your question. What do you mean by the market rate for a license?

Q. What do you mean when you say that commercial software pricing methods are very

Page 238

fluid?

A. I mean that for different business -- business software and different software licensors, pricing can be very -- everything from very rigid as it would for off-the-shelf consumer software or off-the-shelf software that gets installed by businesses with no implementation or customization, on up to very variable by company and licensor ranging from hundreds of dollars to millions of dollars with discounts ranging from nothing to a substantial portion of list price.

And you'd have to look at individual -- individual software -- markets for individual software applications, ERP applications. General purpose ERP applications might be one thing, special purpose -- and by ERP I mean general purpose business software. The term ERP means enterprise resource planning. The name doesn't connote what it actually is. It's a -- comes out historically.

Q. So did you --

A. So it just depends on the software. But by very fluid I mean the amount of the license varies by type of software, and the level

Page 239

of discounting varies both by type of software and by market.

Q. Did you attempt to determine the fair market value of the Blaze software license as of 2016 or presently?

A. I have not attempted to do that, no.

Q. How would you go about doing that?

A. The fair market value. The fair market value is what FICO sells it for to its customers. So you'd have to look at the way -- what price FICO has determined to sell its software licenses at, and whether it's able to sell substantial numbers of licenses at those prices.

Q. But you have not provided an opinion as to the fair market value of the Blaze license either as of 2016 or presently, correct?

A. Correct.

MR. FLEMING: All right. That's all I have.

MR. HINDERAKER: Okay. I guess I have one question.

EXAMINATION
BY MR. HINDERAKER:

Page 240

CASE 0:16-cv-01054-DTS   Doc. 616-4   Filed 10/23/19   Page 20 of 20
Brooks Hilliard  -  6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  Q.   Mr. Hilliard, has your testimony
2 ever been limited in a court, arbitration, or any
3 other forum for reasons that you were -- for
4 reasons that you were not qualified as an expert
5 to provide the opinion?
6  **A.   No.**
7      MR. HINDERAKER:  We will read and
8 sign.
9      MR. FLEMING:  All right.
10     THE VIDEO OPERATOR:  This concludes
11 the deposition.  The time is 3:55 p.m.
12     (Whereupon, the videotaped
13 deposition was terminated at 3:55 p.m.)

Page 241