## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION,

        Plaintiff,

    v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY,
a Pennsylvania corporation,

        Defendants.

Court File No.  16-cv-1054 (WMW/DTS)

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO
EXCLUDE EXPERT REPORT AND
TESTIMONY OF NEIL J.
ZOLTOWSKI**

## INTRODUCTION

Neil Zoltowski is Plaintiff Fair Isaac Corporation's ("FICO") expert on damages. Defendants Federal Insurance Company ("Federal") and ACE American Insurance Company ("ACE American") move to exclude Mr. Zoltowski's opinions in their entirety because none of them satisfy the reliability requirements of Federal Rule of Evidence 702.

Zoltowski purports "to assess and quantify the economic damages sustained by FICO and the economic benefits received by [Federal and ACE American]."  There are several fatal flaws in Zoltowski's "assessment," each of which compels exclusion.

*First*, Zoltowski merely parrots numbers and theories provided to him by a FICO executive named William Waid and copies totals directly from interrogatories. Zoltowski's "quantification" amounts to performing basic arithmetic – he added these numbers together.  Waid's testimony via Zoltowski's expert report should be excluded

because this tactic is prejudicial and it does not use the proper method for calculating FICO's alleged lost license fees under the Copyright Act.

*Second*, Zoltowski's damages figures are unreliable because they are speculative and do not comport with damages allowed by law. Instead of calculating FICO's alleged lost license revenue on a fair market basis, Zoltowski ignored all evidence of what a comparable license might cost, and employed a method – dictated by FICO witnesses – designed to maximize the potential damage figure.

*Third*, Zoltowski's damages figures are unreliable because he invented a new economic theory – called the "single economic unit" in his reports – which he claims allows FICO to disgorge profits from two dozen entities that are not even parties to this lawsuit. This theory is not based on any reliable principles or methods, or based on any caselaw. Even if this testimony were not inherently unreliable it violates well-established law. This testimony should be excluded because FICO cannot recover from unnamed parties as a matter of law.

## BACKGROUND

FICO designated Zoltowski as its damages expert. In this role, Zoltowski purports "to assess and quantify the economic damages sustained by FICO and the economic benefits received by [Defendants] assuming Defendants are found liable." (Declaration of Terrence J. Fleming, Ex. 1, Neil Zoltowski Expert Report ("Zoltowski Rep."), at 2.) Zoltowski has submitted two expert reports in this case, an initial report and a rebuttal report in response to Federal's damages expert, Christopher Bakewell. (*Id.*, Ex. 1, Zoltowski Rep.; Ex. 2, Neil Zoltowski Reply Report ("Zoltowski Reply Rep.".) He has

also submitted a supplemental set of schedules in order to rectify a mistake related to the statutes of limitations applicable to FICO's breach of contract and copyright infringement claims.  (*Id.*, Ex. 3, Suppl. Schedules 3.0, 4.0, and 5.0 to Zoltowski Report.)

Zoltowski claims to calculate FICO's recovery under two theories, actual damages and the equitable remedy of disgorgement of profits.[1]  (*Id.*, Ex. 1, Zoltowski Rep., at 38-39.)

For the first category of recovery FICO is claiming—actual damages—Zoltowski calculates that FICO is entitled to either $37,362,272 under a breach of contract theory or $34,069,940 under a copyright infringement theory.  (*Id.* at 38.)

Zoltowski claims that the "appropriate measure" of FICO's actual damages is "FICO's annual named-application deployment and development seat license fees for the period each Blaze Advisor application is used without FICO's licensed consent."  (*Id.* at 39.)   This method ignores how FICO actually sold licenses to Federal and others, and thus bears no resemblance to actual market value.  For instance:

- Zoltowski calculates lost license fees for *each individual* software application that FICO alleges used Blaze without a license. (*Id.* at 39.) Federal did not buy a license from FICO which separately charged for each

---

[1] Zoltowski does not provide any opinions related to liability.  (*Id.*, Ex. 1, Zoltowski Rep., at 2.)  Thus, Zoltowski's opinions, in part, will become irrelevant to the issues in dispute if the Court grants Federal's Motion for Summary Judgment and dismisses FICO's claims for disgorgement of profits for lacking the required causal nexus and its claims for damages for being speculative.  (*See* Motion for Summary Judgment at Argument § V and § VII.)  For the purposes of the present Motion, however, Federal seeks to exclude Zoltowski's opinions for failing to satisfy the reliability requirements of Rule 702.

application (a "per-application" license). (*Id.*, Ex. 4, Amendment Two to Software License and Maintenance Agreement.)  Rather, Federal purchased an enterprise license – charging one price for any and all applications Federal chose to enable with Blaze.  (*Id.*)  FICO admits that it never in its history sold a "per application" license for as many applications as Zoltowski uses.  (Dkt. No. 77, Sealed Declaration of William Waid ("Waid Decl."), ¶ 11.)

- Zoltowski ignores that Federal purchased a single "enterprise-wide" license with a single fee, and that  (Fleming Decl., Ex. 5,

- Zoltowski also calculated lost license fees based on an annual fee basis, instead of using a perpetual fee like the one Federal paid under its original license and that

- Zoltowski did not apply a discount to his damages model, despite the fact that FICO testified, and its                         , that it gives a

███████████████████████████████ (*Id.*, Ex. 5 at

FICO0057388-57389; Ex. 6, at FICO0043609; Ex. 7, at FICO0047399; Ex.

8, FED000351.)

- Zoltowski ignores the significant maintenance fees Federal paid over the
  life of the relationship which were in excess of ███████ (*Id.*, Ex. 9, Dep.
  Ex. 380 at FED017887_0037 (listing total fees paid by Federal under the
  License Agreement at ████████████

As detailed further below, based on these decisions and the addition of certain

other fees, Zoltowski arrived at a $37.4 million figure, which is approximately ██ times

higher than the price Federal originally paid FICO for its perpetual, enterprise-wide

license to use Blaze in 2006.   (*Id.*, Exs. 3, 10-11 (original total license fees were

████████████

For the second category of recovery FICO seeks—disgorgement of profits—

Zoltowski's only opinion is that "FICO *may* be entitled to disgorge the profits from

written premiums generated using Blaze Advisor of $30.9 billion."  (*Id.*, Ex. 1, Zoltowski

Rep., at 39 (emphasis added).)  Zoltowski has refrained from providing any opinions on

the actual amount of profits that FICO is entitled to recover based on its copyright

infringement claim.   He also provides no opinions as to whether FICO can satisfy its

initial burden under the Copyright Act to prove that Federal's use of Blaze *caused* profits,

except to note that he copied his $30.9 billion gross revenue figure directly from

Federal's interrogatory responses.  (*Id.* at Schedule 10.3 note (a) and Schedule 11.1 note

(a); *see also* Ex. 2, Zoltowski Reply Rep., at 34, ¶ 108.)  Instead, FICO is relying entirely

on its causation expert, Mr. Whitener, and its industry expert, Mr. Hilliard, to satisfy its burden of showing a non-speculative causal nexus between Federal's profits and its use of Blaze.  (*Id.* at 41; *id.*, Ex. 12, Brooks Hilliard Expert Report ("Hilliard Rep."), at 30-36.)  Zoltowski thus claims that his only duty with regard to the profits FICO is claiming here is to present this $30.9 billion figure, which represents gross revenues from the sale of insurance policies that a Blaze-integrated software application may have come into contact with at some point.  (*Id.*, Ex. 13-17, Federal's Responses to FICO's Interrogatories 16 – 20 (asking for "the gross written premium . . . from all insurance policies in connection with which the Software was used.")

Additionally, Zoltowski's $30.9 billion gross revenue figure incorporates profits from 24 entities that are not parties to this litigation.  (*Id.*, Ex. 1, Zoltowski Rep., at Schedule 12.0.)  These unnamed parties are various entities within the Chubb and ACE American families of insurance companies.  (*Id.*)  These third parties earned approximately $29.5 billion out of the $30.9 billion.  (*Id.* at Schedule 7.0.)  Zoltowski claims that FICO can recover profits from these unnamed parties based on a new theory he created called the "single economic unit."  (*Id.* at 10-17)  Zoltowski admits he knows of no other expert, academic, or other person using that theory for any purpose.  (*Id.*, Ex. 18, Neil Zoltowski Deposition Transcript ("Zoltowski Depo."), at 91:17-93:20.)

As detailed in Federal's Motion for Summary Judgment, FICO cannot recover profits from unnamed parties as a matter of law, which means Zoltowski's theory, like the rest of his opinions, are inadmissible as a matter of law.  Accordingly, Federal

submits this motion to exclude all of Zoltowski's opinions under Federal Rule of Evidence 702.

## ARGUMENT

### I.    Standard.

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702; under Rule 702 the trial judge acts as a 'gatekeeper' screening evidence for relevance and reliability." *Polski v. Quigley Corp.*, 538 F.3d 836, 838 (8th Cir. 2008) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  FICO has the burden of proving that its experts' testimony is admissible by a preponderance of the evidence.  *Id.* at 841.

Under Rule 702, expert testimony is admissible if it is (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) delivered by a witness who has reliably applied these principles and methods to the facts of the case. Fed. R. Evid. 702.  The Supreme Court has emphasized that expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute" and that trial courts should exclude expert testimony that "is connected to existing data only by the *ipse dixit* of the expert."  *Daubert*, 509 U.S. at 591; *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997).

### II.   Zoltowski's damages opinions are inadmissible.

A damages theory must be based on "sound economic and factual predicates." *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F. 3d 1302, 1311 (Fed. Cir. 2002).  A

damages theory is inadmissible under Rule 702 if it is "based, in large part, on speculation . . . rather than on any substantiated facts."  *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004).

### A. Zoltowski's lost license fee opinions are inadmissible.

As noted above, Zoltowski opines that the "appropriate measure" of damages that FICO suffered as a result of Federal's alleged unlicensed use of Blaze is the value of a license covering that use.  (*Id.*, Ex. 1, Zoltowski Rep., at 39.)  To determine the value of such a license, Zoltowski does not rely on any objective measure of value such as analyzing comparable licenses or researching the market for comparable products. Instead, Zoltowski employed the following flawed methodology to arrive at his figures for FICO's actual damages:

> (List Price by Software Application Size + "Multi-Platform Uplift" Fee + "Development Seat" Fee + Annual Support & Maintenance Fee) x Number of Years of Alleged Infringing Use

(*Id.* at Schedules 6.0, 6.1, 7.0, 7.1.)  The sources underlying this flawed methodology are Mr. Waid and FICO's 2003 FICO Price List.  There was no independent analysis.

Not surprisingly, this formula resulted in overstated damages figures that bear no resemblance to actual license value.  Zoltowski's claim that FICO lost either $34,069,940 or $37,362,272 as a result of Federal's unlicensed use of Blaze is inadmissible on several grounds.

1.    **Zoltowski's lost license fee opinions should be excluded because he is merely acting as a conduit for Mr. Waid's unreliable opinions.**

a.    **Experts cannot simply parrot their client's unreliable opinions.**

Expert testimony that merely parrots testimony supplied by a non-expert is inadmissible. *See, e.g.*, *Williams v. Illinois*, 567 U.S. 50, 80 (2012) ("trial courts can screen out experts who would act as mere conduits for hearsay"); *Arista Records LLC v. Usenet.com*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) ("An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge."); *Ask Chems., LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) ("[The expert's] wholesale adoption of Plaintiff's estimates, without revealing or apparently even evaluating the bases for those estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis."). The court in *Therasense, Inc. v. Becton, Dickinson & Co.*, No. C 04–02123 WHA, 2008 WL 2323856 (N.D. Cal. May 22, 2008), addressed the danger in admitting this kind of "expert" testimony:

> One of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion. . . . [N]o professional should reasonably rely on such a rigged and biased source of information for any materially important fact to his or her opinion[.]

*Id.* at *1-*2.

*US Salt, Inc. v. Broken Arrow, Inc.*, No. CIV. 07-1988 RKH/JSM, 2008 WL 2277602 (D. Minn. May 30, 2008), *aff'd*, 563 F.3d 687 (8th Cir. 2009), is particularly

analogous to this case.  In *US Salt*, the court set a trial solely on the issue of what amount of damages were caused by the defendant's refusal to ship salt in violation of the parties' contract.  *Id.* at *1.  Before the trial, however, the court precluded the plaintiff's damages expert from testifying.  *Id.*  The court's decision was based on the fact that the expert had "relied almost exclusively on the assumptions and estimates provided by [plaintiff's] president and owner."  *Id.*  The court held—and the 8th Circuit affirmed—that the expert's "wholesale acceptance of [the president's] projections without any verification of these estimates or any independent market analysis is simply too speculatively to submit to a jury."  *Id.* at *2.  Similarly, here, Zoltowski relied almost exclusively on the assumptions and estimates of Mr. Waid without any verification of these estimates or any independent market analysis.

### b.    Zoltowski's lost license fee methodology originated with Mr. Waid.

A review of FICO's discovery responses demonstrates that it is using the same improper strategy as the plaintiff in *US Salt*.  2008 WL 2277602, at *2.  FICO has consistently described the damages it is seeking as "lost license fees" or "commercially reasonable fees" that approximate the value of a license for Federal's alleged unlicensed use of Blaze.  (Fleming Decl., Exs. 19-21, FICO's Responses to Federal's Interrogatories at Response to Interrogatory No. 6.)  After Federal filed a motion to compel FICO to detail its damages, FICO submitted a declaration from Mr. Waid that purported to provide the proper methodology for calculating FICO's lost license fees.  (Dkt. No. 77, Waid Decl.)

Mr. Waid's methodology was based on a single document from 2003 that FICO now claims provides the "standard" pricing for Blaze licenses in 2019 as well. (Waid Decl., ¶ 6; *see also* Dkt. No. 79, Exhibit A to Waid Decl.) The 2003 price list provides general information on how to "size" a software application that uses Blaze and prices that correspond to each of these "sizes." (Dkt. No. 79.) In his declaration, Waid described his methodology for calculating a Blaze license price based on these sizes. (Dkt. No. 77, ¶ 9.) Waid first stated that while FICO prices its Blaze licenses "in several different ways," he chose "[a]pplication-based pricing."[2] (*Id.*) He did not explain why he chose application-based pricing as opposed to the enterprise-wide license pricing Federal, and numerous other Blaze licensees of its size, had paid in the past. Finally, Waid chose the perpetual license price that corresponded to the size of each application, ██████████████████████████████ and then multiplied by the number of years. (*Id.* ¶ 7.) Again, Waid did not explain why he did not use perpetual pricing – one price for perpetual use, which is the structure of Federal's contract. (Fleming Decl., Ex. 4.)

### c.    Zoltowski admitted he copied Waid's opinions.

Zoltowski has admitted that he copied Waid's methodology wholesale, and even a cursory review of his expert reports confirms this fact. Zoltowski's analysis of FICO's

---

[2] Application based pricing means a license is priced based on how many applications the client wishes to enable with Blaze. If there are three, FICO "sizes" those applications as small, medium or large, then calculates the price for each of the three applications and adds them. This is in contrast to an ELA, or enterprise license, which charges one price and allows the client to use Blaze in as many applications as it wants, regardless of size.

lost license fees spans just three pages in his initial report.  (Fleming Decl., Ex. 1, Zoltowski Rep. at 39-41 (Section VII.A).)  Similar to Waid, Zoltowski calculated a "named-application" license fee without explaining why he did not use an enterprise license fee.  (*Id.* at 39.)  He also priced his license fees based on the size of each Federal application that FICO claims used Blaze.  (*Id.* at 40.)

However, no conjecture is necessary to determine that Zoltowski derived his opinions from Waid because Zoltowski stated so in his report:

> For my calculations, I relied upon William Waid . . . to classify each of the applications incorporating Blaze Advisor as small, medium, large, or very large.  Mr. Waid also identified the number of development seat licenses that Defendants would have required to maintain each of these applications.

(*Id.* at 39.)  Zoltowski also cites to his private interview of Waid, Waid's original declaration, and Waid's deposition testimony as the primary sources in this section of his report.  (*Id.* at 39-41, Schedules 6.0, 6.1, 7.0, 7.1 (*see* "Notes/Source(s)").)  The only departures that Zoltowski made from Waid's declaration from the Motion to Compel were to add two new categories of fees – both of which were also supplied by Waid.  (*Id.* Schedules 6.1 and 7.1 at notes (b) and (d) (describing "Development Seat Fees" and "Multi-Platform Uplift Fees").)

When Federal's damages expert questioned Zoltowski because he "did not cite to any evidence or documentation to support his theory" regarding lost license fees, Zoltowski was unable to produce any such evidence or documentation in response. (Fleming Decl., Ex. 22, Christopher Bakewell Expert Report ("Bakewell Rep."), at ¶ 138.)  In his reply report, Zoltowski only responded with a short section entitled "Named

Application is the Correct License Structure." (*Id.*, Ex. 2, Zoltowski Reply Rep., at 21-22.) However, the only source that he cited in this section was, once again, Waid. (*Id.*)

At his deposition, Zoltowski repeatedly confirmed that he relied on Waid to provide him with the size as well as the other inputs necessary to arrive at his license fees. (*Id.*, Ex. 18, Zoltowski Depo., at 40-46; 49-53.)   The following exchange is particularly revealing:

> Q.   With regard to your expert opinion relating to lost license fees, what expert opinions do you provide other than what Mr. Waid provided you with and the arithmetic you performed in order to the create the tables relating to lost license fees?
>
> A.   [ ] I provided expertise related to understanding what's the appropriate structure of the license based upon the facts and circumstances here and what is the appropriate pricing based upon that structure, and Mr. Waid provided inputs in terms of the quantification piece based upon FICO's standard pricing for the named application licenses.
>
> Q.   And what specifically in your report did you provide expert opinions on other than those inputs provided by Mr. Waid and the arithmetic in the graphs?
>
> A.   I think I just answered that question, but it's a determination of the appropriate structure of the license based upon the information available and the facts and circumstances.
>
> *       *       *
>
> Q.   The named application license structure was a [*sic*] very structure that Mr. Waid had already provided in his declaration prior to the time you were retained as an expert, right?
>
> A.   He had provided a quantification based upon that type of license and that declaration, that's correct.

(*Id.* at 137:3-139:7.)   While Zoltowski claimed to have used his expertise, along with facts, to determine the appropriate license structure, he could not detail those facts nor could he explain how he arrived at the structure he used.   (*Id.* at 52:15-53:21; 137:13-138:25.)   Thus, vague references to determining the appropriate "structure" of the license do not change the result.   The only supportable conclusion is that Zoltowski adopted the license structure Waid used.

Incredibly, when asked why Mr. Waid should not be the one testifying instead of him, Zoltowski openly admitted:

> [I]f you had a company witness testifying as an expert witness related to the structure of a license and the damages related to that, *it would likely create some bias* . . .

(*Id.* at 139:21-23.)   Zoltowski's only purpose in this litigation is to present Waid's conclusions under the guise of expert testimony.

As numerous courts have recognized—including the 8th Circuit in *US Salt*—where an expert is simply acting as a mouthpiece for a biased client the testimony is inadmissible.   2008 WL 2277602, at *2; *see also Williams*, 567 U.S. at 80; *Arista Records LLC*, 608 F. Supp. 2d at 424; *Therasense*, 2008 WL 2323856, at *1-*2; *Ask Chems., LP*, 593 F. App'x at 510.[3]

---

[3]   Zoltowski's testimony on lost license fees should also be excluded because it does not require an expert to do simple arithmetic.   *See, e.g.*, *Triad Capital Management, LLC v. Private Equity Capital Corporation*, 2010 WL 10076450, at *3 (N.D. Ill. 2010) (excluding expert testimony that did "nothing more than add up eight line-items of expenses [plaintiff] incurred in negotiating and preparing to consummate the deal" because "[a] jury can do simple math and read.").

### 2.     Zoltowski's lost license fee opinions should be excluded because they do not apply the proper methodology under copyright law.

"[I]f the grounds used by [the] expert to calculate damages" are not "legally acceptable" or the expert does not apply "the appropriate legal formula to determine damages in a particular case," the expert's methodology must be excluded.  *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 2006 WL 5242377, at \*3, \*5 (D. Nev. Mar. 6, 2006), *aff'd* 523 F.3d 1051 (9th Cir. 2008); *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1148, 1156 (N.D. Cal. 2003) ("Reliable methodology requires that the legal grounds used by an expert to calculate damages be legally acceptable.").

Here, the appropriate measure of damages is the "fair market value" of a Blaze license covering Federal's alleged unlicensed uses.  *Nucor Corp. v. Tennessee Forging Steel Serv., Inc.*, 513 F.2d 151, 153 n.3 (8th Cir. 1975); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001); *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016).  FICO, and thus Zoltowski, have rejected this well-established methodology, using an application-based pricing model multiplied by years of use that greatly inflates the damages figure and bears no relation to the actual market-rate for Blaze.  Therefore, Zoltowski's lost license fee opinions should be excluded.

### a.     Lost license fee damages must approximate the "fair market value" of a hypothetical license.

The Copyright Act provides that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement."  17 U.S.C. § 504(b).  These actual damages are the "fair market value" of its lost licensing fees. *Nucor Corp.*, 513 F.2d at 153 n.3 ("'[f]air value' is the market value of the [use]"); *On*

*Davis*, 246 F.3d at 166 ("In order to make out his claim that he has suffered actual damage because of the infringer's failure to pay the fee, the owner must show that the thing taken had a fair market value."); *Bell*, 827 F.3d at 709 (accord).  "The fair market value of a copyrighted work is derived from an objective, not a subjective, inquiry."  *See, e.g.*, *On Davis*, 246 F. 3d at 166 ("The question is not what the owner would have charged, but rather what is the fair market value."); *Bell*, 827 F.3d at 709 ("[Plaintiff]'s subjective belief as to the fair market value . . . is not enough to prove damages"); *DaimlerChrysler Servs. v. Summit Nat.*, No. 02-71871, 2006 WL 208787, at *2 (E.D. Mich. Jan. 26, 2006) ("The Court holds that [plaintiff] may not rely on its own subjective estimate as to the price it would have charged [defendant] given [defendant's] predicament.").

This methodology requires determining "the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use."  *On Davis*, 246 F.3d at 167.  In constructing this hypothetical negotiation, courts consider various types of evidence.  The most important pieces are "benchmark licenses" that authorize similar uses to the ones made by the defendant.  *See, e.g.*, *Recursion Software, Inc. v. Double-Take Software, Inc.*, No. 4:10-CV-403, 2012 WL 1576252, at *6 (E.D. Tex. May 4, 2012) quoting *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4366990, at *11 (S.D. Tex. Oct. 27, 2010); *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 331 (S.D.N.Y. 2003) (collecting cases).  Courts also consider the fees and license types that a plaintiff has offered the defendant in the past.  This inquiry also includes the application of a copyright owner's "standard discounting policy" if one

16

exists. *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 981 (4th Cir. 1990) (vacating damages award where "under [plaintiff]'s standard discounting policy, the fifth, sixth, and seventh licenses each would have cost 25 percent of $35,000").  Past settlement offers that a copyright owner has made to other parties it accused of infringement are also a relevant measure of value.  *Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*, No. 10 CIV. 128(PAC), 2013 WL 1775437, at *10 (S.D.N.Y. Apr. 25, 2013).

Courts regularly exclude experts and dismiss parties' claims entirely where they do not rely on the fair market value methodology or corresponding objective evidence. *Recursion Software, Inc.*, 2012 WL 1576252, at *7-9 (excluding damages expert); *Country Road Music, Inc.*, 279 F. Supp. 2d at 331-32 (excluding damages expert); *Interplan Architects, Inc.*, 2010 WL 4366990, at *11, *43 (granting defendant summary judgment on actual damages portion of plaintiff's infringement claim where claim relied on affidavit containing "subjective calculation" of what plaintiff "would have charged"); *Bell*, 827 F.3d at 709  (granting summary judgment where "the price that [Plaintiff] listed on his website is not sufficiently concrete to show the fair market value").  For example, the court in *Recursion Software, Inc. v. Double-Take Software, Inc.* excluded a damages expert in a case like this one, which involved lost license fees for a software product. 2012 WL 1576252 at *7-8.  The court reasoned as follows:

> [T]he Court finds that Bell's report is not relevant to assist the jury to determine a fact in issue.  The question before the jury is the fair market value of . . . the actual alleged use of the copyrighted material made by Defendant.  Bell's report does not address this question.  In addition, Bell's report is not the product of reliable principles or methods because he does not use appropriate comparable license agreements to determine a hypothetical license fee.

*Id.* at *9.  Here, Zoltowski did significantly less than the expert in *Recursion Software*.

<blockquote>

**b.      Zoltowski admitted he did not apply the fair market value methodology.**

</blockquote>

It is clear from even a brief review of Zoltowski's report that he did not adopt the methodology described above to obtain an objective measure of fair market value for a license covering Defendants' use of Blaze.   The expert in *Recursion Software* was excluded because he did not base his lost license fee opinions on sufficiently comparable license agreements.  *Id.* at *9.  But Zoltowski did not base his opinions on *any* license agreements.  Zoltowski has never identified a single Blaze license agreement that FICO sold for anywhere even remotely close to $37,362,272.

Further, Zoltowski did not base his lost license fee figures on any other objective evidence of the kind outlined above.  He did not base his figures upon the structure of the license Federal purchased.  Federal's cost was ███████ Zoltowski calculates █ times that much.   Federal had a perpetual license paying one price for perpetual use; Zoltowski's method assesses an annual charge.  Federal had an enterprise-wide license – one price for as many applications as it wanted; Zoltowski's method charges fifteen different prices for fifteen supposed applications.  Federal had a discount and was offered as high as ████ Zoltowski includes no discount.  (*Id.*, Ex. 3 (applying "███████ Credit for license fees [already] paid"; Ex. 8.)

Zoltowski did not base his figures on market realities of FICO's Blaze sales either. He ignored FICO's pricing guide that says Blaze is sold on an enterprise basis.  (*Id.*, Ex. 5, FICO Global Price List at FICO0057392.) ███████████████████

████████████████████████████████████████ (*Id.* at FICO0057388-

57389.)  In fact, he made no pretense that he was attempting to reflect market reality –

when asked why he did not include a discount he answered that a discount is used when a

future relationship is likely, and due to the litigation no discount should be provided.

(*Id.*, Ex. 18, Zoltowski Depo., at 124:18-125:19.); *see also DaimlerChrysler Servs.*, 2006

WL 208787 at *2 ("The Court holds that [plaintiff] may not rely on its own subjective

estimate as to the price it would have charged [defendant] given [defendant's]

predicament.").

Zoltowski did not rely on evidence of FICO's prior out-of-court settlements with

other Blaze licensees that FICO accused of breach ███████████████████████

█████████████████████████████ (*Id.*, Ex. 23 █████████████ Ex. 24

████████████ Ex. 25 ████████████████████████

He did not rely on market prices for products that are comparable to Blaze (there are

many).  (*Id.*, Ex. 22, Bakewell Rep., at ¶ 131.)  Ultimately, he did not use any objective

evidence of fair market value at all.  Zoltowski even rejected the methodology of

hypothesizing what price "a willing buyer and a willing seller would have agreed for the

use," which is precisely what case law requires.  *On Davis*, 246 F.3d at 167; (*see* Fleming

Decl., Ex. 2, Zoltowski Reply Rep., at 18 n.97 (criticizing Federal's expert for

"attempt[ing] to create an imaginary hypothetical negotiation between the parties")).

Zoltowski did not retreat from these deficiencies during his deposition, and instead

consistently admitted that he relied entirely on Mr. Waid for his inputs instead of doing

his own independent analysis of such facts as referenced above.  (*Id.*, Ex. 18, Zoltowski

19

Depo., at 38:8-16.)  Zoltowski's methodology boils down to taking various inputs from the subjective testimony of Mr. Waid and then finding the corresponding prices on FICO's 2003 price list.  (*See* Dkt. No. 79.)

This type of approach to calculating fair market value is no different than the *Bell* case, where summary judgment was allowed because the plaintiff's damages were based on a price "listed on his website," 827 F.3d at 709, or the *Country Road Music* case, which excluded an expert because his estimate was based on "a single, inapposite license."   279 F. Supp. 2d at 331.  And it amounts to even less than the expert who was excluded in *Recursion Software*, who at least examined ten license agreements.   2012 WL 1576252 at *7.  Accordingly, this Court should exclude Zoltowski's opinions on lost license fees because he failed to apply either the proper "facts or data" or the proper "methods" as required by Rule 702.  Fed. R. Evid. 702(b)-(c).

### 3.    Zoltowski's lost license fee opinions should be excluded because they are unreliable and speculative.

Aside from acting as a mouthpiece for Waid's biased opinions and refusing to adopt the correct legal foundation, a key reason that Zoltowski's lost license fee opinions should be excluded is that they are massively inflated and contradicted by nearly all of the evidence in the record.  This is the very definition of an unreliable damages opinion, which *Daubert* and Rule 702 were meant to weed out before trial.  *See LaserDynamics, Inc.* 694 F.3d at 81 (remanding for a new trial where "the jury's verdict was based on an expert opinion that finds no support in the facts in the record.").

Several analogous cases beyond *Recursion Software* also illustrate the point that when experts provide speculative opinions regarding lost license fees, their testimony should be excluded and the party's claim for these damages should be dismissed.  First, in *Bell* the Seventh Circuit affirmed the decision to enter summary judgment against a plaintiff who attempted to support his lost license fee claim with an "affidavit and website price listing."  827 F.3d at 709.  Second, in *Document Security Systems v. Coupons.com*, 55 F. Supp. 3d 485 (W.D.N.Y. 2014), a case that FICO has relied on in the past, the court also granted summary judgment to the defendant in a dispute over the unlicensed use of technology.  *Id.* at 497.[4]  The court found the plaintiff's reliance on two dissimilar license agreements unpersuasive, and noted that "Plaintiff had no standard licensing arrangement, but rather, it negotiated each licensing agreement separately based on various factors that differ from client to client."  *Id.* at 498.  Finally, in *Laserdynamics, Inc. v. Quanta Computer, Inc,* the Federal Circuit remanded for a new trial where the plaintiff's expert testimony "was untethered from the patented technology at issue and the many licenses thereto and, as such, was arbitrary and speculative."  694 F.3d at 81. There are no meaningful distinctions between these cases and Zoltowski's lost license fee opinions.

Just as in *Recursion*, *Bell*, *Document Systems*, and *Laserdynamics,* FICO has never presented a reliable factual basis for its inflated lost license fee claims, which explains why its expert cannot provide one now.  In trying to justify its opposition to producing

---

[4]  *Document Security Systems* is cited in FICO's Opposition to Federal's Motion to Compel, Dkt. No 75, at 9.

past Blaze license agreements, Waid admitted that "[t]o my knowledge, a FICO licensee has never entered into a license agreement for the use of the Blaze Advisor software on an application basis with fifteen separate applications." (Dkt. No. 77, Waid Decl., ¶ 11.) Zoltowski is therefore claiming that this license structure represents fair market value when FICO admits that it has *never* sold such a license.

The proper structure based on facts would be Federal's perpetual, enterprise-wide license. But when Waid was compelled to answer what that price might be, he stated that FICO is "incapable" of answering and has "no corporate knowledge" when it comes to what the price would be for a perpetual, enterprise-wide license of the kind Federal actually purchased. (Fleming Decl., Ex. 26, Waid Rule 30(b)(6) Written Responses, at 2-3.) This binding admission from a Rule 30(b)(6) deponent is enough to show that Zoltowski's lost license fee calculation is without any foundation, and thus speculative.

In addition, even a cursory review of the available evidence shows that Zoltowski's lost license fee figures are unsupportable. Zoltowski opines that the value of a Blaze license covering Federal's use is $37.4 million. However, FICO offered enterprise-wide license agreements to companies like ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ Further, FICO's out-of-court settlement agreements with the other Blaze licensees it accused of breach following a merger show that it accepted sums of ████████████████████████████████████████████ (*Id.*, Exs. 23-24.)

22

███████████████████████████████████████████

████████████  (Declaration of Ramesh Pandey in Support of Federal's Motion for Summary Judgment at ¶ 8.)  This evidence makes it clear that FICO and Zoltowski have avoided relying on objective evidence in calculating lost license fees because doing so would reveal that their damages figures are baseless.

Further emphasizing the speculative nature of Zoltowski's lost license fee opinions is the fact that even FICO's own software industry expert, Brooks Hilliard, does not support them.  While Zoltowski followed his client's lead in testifying that examining benchmark licenses was "irrelevant," Hilliard testified that "analyzing comparable software licenses" is "very relevant" in this case.  (*Id.*, Ex. 18, Zoltowski Depe., at 17:12-13; Ex. 34, Brooks Hilliard Deposition Tr. ("Hilliard Depo."), at 37:3-13.)  Zoltowski also testified that factoring FICO's standard discounting policy into his analysis would be inappropriate.  (*Id.*, Ex. 18, Zoltowski Depo., at 125:13-19.)  Whereas, when asked whether a ████████████ FICO had given other Blaze licensees would be appropriate here, Hilliard answered:

> [D]iscounts vary, but it would – for a discount for an expanded license with a major client with potential worldwide use, it's certainly within the range that would be normal and customary.

(*Id.*, Ex. 34, Hilliard Depo., at 235:12-16.)  FICO cannot claim to present reliable expert opinions about lost software license fees when those opinions are contradicted by its own software industry expert.

Zoltowski's lost license fee opinions must be excluded because, rather than reflecting reality, they are engineered to state the highest possible value for FICO's

claims in this case.  They do not represent the fair value of a Blaze license, but rather merely represent what FICO wishes it could charge.  *See, e.g.*, *On Davis*, 246 F.3d at 166 ("The question is not what the owner would have charged, but rather what is the fair market value."); *Document Sec. Sys., Inc.*, 55 F. Supp. 3d at 497 ("A reasonable royalty *cannot* be calculated based merely upon what the Plaintiff claims that it 'would have charged' the defendant.") (Emphasis in original).

### B.      Zoltowski's disgorgement opinions are inadmissible.

Zoltowski's expert opinions on FICO's claim for disgorgement of profits amounts to the following statement: "FICO may be entitled to disgorge the profits from gross written premiums generated using Blaze Advisor of $30.9 billion."  (*Id.*, Ex. 1, Zoltowski Rep., at 39.)  It is difficult to describe just how misleading it is to state that a minor software component used in a few of a large company's software applications "generated" $30.9 billion dollars in revenue.  (*Id.*)  However, this topic is described more fully in Federal's accompanying motion to exclude the opinions of FICO's causation expert, Mr. Whitener.  For present purposes, Zoltowski's disgorgement opinions are inadmissible under Rule 702 for two reasons.  First, 95% of this $30.9 billion figure is based on revenues of parties which are not even defendants in this case.  Second, the foundation for the remainder of Zoltowski's disgorgement opinion is inadmissible because it relies on the inadmissible opinions of Whitener, which means Zoltowski's opinions on this topic lack an adequate foundation and are inadmissible as well.

###### 1.     Zoltowski's Single Economic Unit Theory is Inadmissible.

As the Supreme Court noted in *Daubert* a "pertinent consideration" in considering expert testimony "is whether the theory or technique has been subjected to peer review… because it increases the likelihood that substantive flaws in methodology will be detected." 509 U.S. at 593.  Thus, courts regularly exclude expert witnesses who invent unreliable theories to suit their preferred outcomes in litigation. *See, e.g.*, *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 298 (8th Cir. 1996) (affirming exclusion of expert testimony where plaintiffs "offer[ed] no testimony regarding the general acceptance of either [the expert]'s theory or his methodology").  Zoltowski's "single economic unit" theory fits this mold.

###### a.     The origins of Zoltowski's theory.

On February 28, 2019, Federal provided responses to interrogatories in which FICO asked for the following data concerning Federal and its many related companies:

> For all insurance policies in connection with which the Blaze Advisor software was used, the gross written premium of Defendants l and the gross written premium of each related company, including the specific identification of each related company…

(Fleming Decl., Exs. 13-17.)  This question is akin to asking a law firm how many of its cases "used" Microsoft Excel, but Federal made its best effort to provide the requested data.  (*Id.*)  FICO then gave these interrogatory responses to Zoltowski, who then employed a similar methodology to his lost license fee calculation – he added them up. (*Id.*, Ex. 1, at Schedule 10.3 note (a) and Schedule 11.1 note (a); *see also* Ex. 2, Zoltowski Reply Rep., at 34, ¶ 108.)  In doing so, however, Zoltowski identified a

problem to FICO's counsel, namely, that approximately 95% of the gross revenue identified in Federal's interrogatory responses was earned by companies other than Federal and ACE American.  (*Id.*, Ex. 1, Zoltowski Rep., at Schedules 8.0 and 9.0.)

Zoltowski came up with his "single economic unit" theory at the direction of FICO's counsel in an attempt to cover up the inherent flaws in FICO's disgorgement claim.  At his deposition, Zoltowski explained the questions his team had regarding this data as follows:

> [W]e had a question as to the defendants who were named were, obviously, these two entities, Federal and ACE, and there are a number of entities based upon their corporate structure which, obviously, did not include that name . . .

(Id., Ex. 18, Zoltowski Depo., at 96:15-21.)  Zoltowski then testified that he was "not sure" who came up with the theory, but that it came out of a "discussion we had with counsel."  (*Id.* at 97:5.)  The theory, which is outlined in pages 10 through 17 of Zoltowski's initial expert report, concludes that Defendants and all of their "corresponding subsidiaries" plus "the ultimate parent" are a "single economic unit":

> Defendants, the corresponding subsidiaries of both, and the related Chubb entities are consolidated with Chubb INA Holdings, Inc. and Chubb Limited (i.e. the ultimate parent) to reflect that the combinations of parents plus subsidiaries, are, in fact, a single economic unit.

(*Id.*, Ex. 1, Zoltowski Rep., at 10.)  Zoltowski manufactured this theory in an attempt to inflate revenues to $30.9 billion as opposed to the $1.5 billion in gross revenues that were earned by the Defendants, Federal and Ace American.  (*Id.* at 10–17.)  Zoltowski's theory is inadmissible for two reasons.

**b.   Zoltowski's theory is irrelevant because FICO cannot recover profits from unnamed parties as a matter of law.**

The first reason that Zoltowski should be precluded from testifying as to his single economic unit theory is that it is irrelevant as a matter of law.  *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minnesota, LLC*, No. 09-CV-3037 (SRN/LIB), 2014 WL 12597430, at *15 (D. Minn. Mar. 11, 2014) (finding expert testimony unnecessary on issue that court had already disposed of at summary judgment stage).  As detailed more fully in Federal's accompanying Motion for Summary Judgment, it is a basic principle of law that FICO cannot recover profits from unnamed parties.  (Federal's Memorandum in Support of Motion for Summary Judgment at Argument § VII.B.4.)  Accordingly, Zoltowski's should be precluded from opining on his single economic unit theory at trial on this basis alone.

**c.   Zoltowski's theory does not satisfy the requirements of Rule 702.**

Even if Zoltowski's theory was relevant to the issues in dispute (which it is not), it would still be inadmissible because it does not satisfy the requirements of Rule 702. Zoltowski's theory is cobbled together from various accounting rules, tax code provisions, insurance industry "pooling agreements," annual reports, and vague allusions to the fact that Defendants "benefit economically" from these unnamed entities. (Fleming Decl., Ex. 1, Zoltowski Rep., at 10-17.)  However, Zoltowski admitted in his deposition that he is not a tax expert, or an insurance expert, and that his accounting expertise is derived from a few accounting courses he took as an undergraduate as well as some unspecified "trainings" he participated in throughout his career.  (*Id.*, Ex. 18,

Zoltowski Depo., at 7:10, 28:11-29:6, 115:2-3.)   Zoltowski also could not name any journals, scholars, or even other cases that reference much less adopts his single economic unit theory.  (*Id.* at 91:17-93:20.)  Zoltowski's justification for this theory after recounting these facts was that "there's always new concepts being created."  (*Id.* at 93:17-20.)  That may be the case, but when those concepts are not based upon an expert's relevant experience and serve only to artificially inflate a party's damages claim, they are not admissible.

**d.**     **Zoltowski's other disgorgement opinions are inadmissible because they rely on the inadmissible causation opinions of FICO's other experts.**

Zoltowski's other opinions related to disgorgement, including the remaining $1.5 billion in gross revenues left after excluding unnamed parties, are also inadmissible because these opinions rely entirely on the inadmissible causation opinions of FICO's other experts.   An expert's opinion is inadmissible where it relies on another expert whose relevant testimony is later found to be inadmissible.  *Edwards v. Safety-Kleen Corp., 61 F. Supp. 2d 1354*, 1358 (S.D. Fla. 1999) ("Because the Court has found Dr. Kopstein's conclusions as to exposure level to be unreliable, however, Dr. Daum's conclusions as to causation are suspect and, therefore, are likewise inadmissible."). Zoltowski is no stranger to this rule of law, as his opinions were recently excluded on this basis in another case in which he testified as to a party's lost profits.  (Fleming Decl., Ex. 18, Zoltowski Depo., at 74:16-77:5; *see also* Ex. 35, Order from *Positron Systems Inc. v. Wyle Labs*.)   Since the same is true here, the Court should preclude Zoltowski from providing any testimony at trial regarding disgorgement.

28

## **CONCLUSION**

Based on the foregoing, Federal respectfully requests the Court exclude the expert report and testimony of Neil J. Zoltowski in its entirety.

Dated:  July 26, 2019

s/ Terrence J. Fleming
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

*Attorneys for Defendants*