**Exhibit 2**
**(Unsealed)**
**(Previously Filed Under Seal as Dkt. 408)**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION,

     Plaintiff,

v.

FEDERAL INSURANCE COMPANY, and
ACE AMERICAN INSURANCE COMPANY

     Defendants.

Case No. 16-CV-1054(WMW/DTS)

**REPLY EXPERT REPORT OF
NEIL J. ZOLTOWSKI
WITH RESPECT TO DAMAGES**

Respectfully submitted this 31st day of May, 2019

_____

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

EXHIBIT
2

# TABLE OF CONTENTS

I.    ASSIGNMENT ................................................................................................ 1

II.   PRIOR OPINIONS ......................................................................................... 1

III.  SUMMARY OF DEFENDANTS' REPORTS ................................................ 2

    A.  Understanding of Mr. Bakewell's Opinions Regarding Damages ......................... 2

        *i.*    FICO's Lost License Fees ............................................................... 2

            a)  Hypothetical License Derived from "Intrinsic Value" of Blaze Advisor ............. 3

            b)  Blaze License Structure ................................................................ 4

            c)  Defendants' Applications Not Accused of Using Blaze Advisor ......................... 5

            d)  Correct Sizing of Defendants' Blaze Advisor Applications ................................. 5

            e)  Annual Support and Maintenance Fee Percentage ................................ 5

            f)  Discount on All Named Application Lost License Fees ........................................ 5

        *ii.*   Bakewell's Rebuttal Opinions Regarding Lost License Fees ...................................... 6

        *iii.*  Defendants' Profits Attributable to the Use of Blaze Advisor ................................... 6

        *iv.*  Bakewell's Rebuttal Opinions Regarding Defendants' Profits Attributable to Use of FICO Copyrights ......................................................................... 7

            a)  Plaintiff Did Not Prove a Causal Nexus Between Use of Blaze Advisor and Defendants' Profits ................................................................ 7

            b)  Plaintiff Did Not Deduct Any Expenses from Gross Written Premiums Reported by Federal .................................................................... 7

            c)  FICO Accused Applications That Do Not Use Blaze Advisor ............................ 7

            d)  FICO Cannot Claim Profits from Certain Writing Companies Subject to FICO's Copyright Infringement Claims ................................................. 8

            e)  Defendants Made Errors in the Reported Gross Written Premiums Provided to FICO ......................................................................... 9

            f)  Defendants Made Errors in the Defendants Financial Summaries Provided to FICO ......................................................................... 12

            g)  "Federal's Actual" Profits from Infringing Use of Blaze Advisor ..................... 13

    B.  Understanding of Dr. Kursh's Opinions Regarding FICO's Lost License Fees ................ 14

        *i.*    FICO Incorrectly Calculated the Sizes of Federal's Blaze Advisor Applications ..... 14

        *ii.*   Certain Federal Blaze Advisor Applications Are Not Subject to FICO's Breach of Contract Allegations ............................................................... 15

        *iii.*  The Hypothetical License for Defendants' Use of Blaze Advisor Would Be an ELA ................................................................................. 16

        *iv.*  Mr. Zoltowski's Lost License Fees are Inconsistent with 2006 SLM Agreement .... 16

        *v.*   FICO's Interpretation of the SLM Agreements and Corresponding Fee Requirement Are Incorrect and Not Commercially Reasonable ..................................... 16

i

      *vi.*   Mr. Zoltowski Should Have Applied Discounts to His Lost Licensee Fee Computations ................................................................................................. 17

IV.   REPLY TO DEFENDANTS' OPINIONS REGARDING DAMAGES ................................. 17

    A.  Reply to Mr. Bakewell's Opinions Regarding FICO's Lost License Fees........................ 17

        *i.*    A Work of Unsubstantiated Opinions.............................................................. 17

        *ii.*   Incorrect Use of a Hypothetical Negotiation Framework ............................... 17

        *iii.*  Valuation Approaches Described by Bakewell Irrelevant to Lost License Fees....... 19

        *iv.*  Named Application is the Correct License Structure ...................................... 21

        *v.*   Applications Using Blaze Identified by Plaintiff............................................. 22

        *vi.*  No Basis for Discounts on FICO Prices .......................................................... 22

    B.  Reply to Mr. Bakewell's Opinions Regarding Defendants' Profits from Use of Blaze Advisor................................................................................................................................ 23

        *i.*    Defendants' Customary Expense Classification and Allocation Methodologies ...... 23

        *ii.*   Limitations of the Defendants Financial Summaries Produced by Defendants ........ 24

        *iii.*  Mr. Bakewell's Opinion Regarding the Correct Sources for Gross Written Premiums That Ran Through Blaze Advisor Applications ......................................... 27

        *iv.*  Unsubstantiated Adjustments to Defendants' Reported Gross Written Premiums ... 27

        *v.*   Applications Using Blaze Advisor Identified by Plaintiff................................ 28

        *vi.*  Revised Gross Written Premiums for CUW Application ............................... 29

             a)  "Blaze IM Extract-Final" Source ....................................................... 29

             b)  FED017915 Source ............................................................................ 29

        *vii.*  Mr. Bakewell's "Federal Actual" Financial Summaries are Mislabeled and Misrepresented............................................................................................... 30

             a)  Gross Written Premiums..................................................................... 30

             b)  Underwriting Profits .......................................................................... 31

             c)  Expenses Do Not Match Premiums .................................................... 32

             d)  Overhead Expenses Not Directly Related to Reported Gross Written Premiums ......................................................................................... 33

        *viii.* Defendants Bear the Burden of Proving Deductible Expenses ................... 33

        *ix.*  Causal Nexus Between Copyright Infringement and Revenues........................... 34

        *x.*    No Opinion Regarding Writing Companies Subject to Damages ..................... 34

    C.  Reply to Dr. Kursh's Opinions Regarding Damages........................................................ 35

        *i.*    The Prices FICO Offered Federal Are Commercially Reasonable........................... 35

        *ii.*   FICO Correctly Calculated the Sizes of Federal's Blaze Advisor Applications ....... 35

## LIST OF SCHEDULES

| Schedule Number | Description |
|---|---|
| 1.0 | Curriculum Vitae of Neil J. Zoltowski |
| 2.0 | Documents Considered |
| 3.0 | Summary of CUW Application Gross Written Premiums by Writing Company |
| 4.0 | Summary of CUW Application Gross Written Premiums by Product Type |
| 5.0 | Summary of CUW Application Gross Written Premiums by Policy |

## I.    ASSIGNMENT

1.    I have been asked by Counsel for Plaintiff Fair Isaac Corporation ("FICO") to review, evaluate, and respond to the analyses and opinions, in whole or in part, set forth by W. Christopher Bakewell in his report entitled Expert Report of W. Christopher Bakewell Regarding Damages, dated May 17, 2019 ("Bakewell Report").  I understand Mr. Bakewell has been retained by Federal Insurance Company and ACE American Insurance Company (collectively "Federal" or "Defendants") to rebut my opinions regarding the damages owed by Defendants in this matter as outlined in my expert report dated April 19, 2019 ("Affirmative Report").

2.    I have also been asked to review, evaluate and respond to the analysis and opinions of Steven R. Kursh in his report entitled Expert Report of Steven R. Kursh, Ph. D., CSDP, CLP, dated May 17, 2019 ("Kursh Report").  My responses to the Kursh Report are limited to the opinions rendered by Mr. Kursh that are responsive to my Affirmative Report.

3.    My work on this matter is ongoing.  This report summarizes my current opinions given the information available to date.  If additional information is produced, I may modify or supplement my analyses and opinions.

## II.    PRIOR OPINIONS

4.    I previously submitted my Affirmative Report on April 19, 2019, and except as reflected herein, my prior opinions have not changed.  In my Affirmative Report, I assessed and quantified the economic damages sustained by FICO and the improper economic benefits realized by the Defendants, assuming the Defendants are found liable for the alleged wrongful acts described in, among other things, FICO's Second Amended Complaint, including claims for breach of contract and copyright infringement.

5.    Specifically, I concluded in my Affirmative Report that FICO has lost deployment license, development seat license, and support and maintenance fees totaling $37.4 million from Defendants' unlicensed and unauthorized use of Blaze Advisor between April 2010 and December 2019.  This includes $16.1 million in fees for Defendants' unauthorized use of Blaze Advisor in

the United States and $21.3 million for lost fees in Canada, Australia, the United Kingdom, and certain other countries in the European zone.[1]

6.     Additionally, FICO may be entitled to disgorge Defendants' profits for written premiums generated using Blaze Advisor software totaling $30.9 billion from Defendants' unauthorized use and distribution of Blaze Advisor between April 2013 and March 2019.  This includes $28.4 billion of gross written premiums generated in the United States and $2.5 billion of gross written premiums generated by certain foreign entities that used Blaze Advisor in Canada, Australia, the United Kingdom, and certain other countries in the European zone.[2]

## III.    SUMMARY OF DEFENDANTS' REPORTS

### A.    Understanding of Mr. Bakewell's Opinions Regarding Damages

#### i.    FICO's Lost License Fees

7.     Mr. Bakewell did not create his own damages model for the amount of license fees that FICO lost as a result of Federal's wrongful use of Blaze Advisor.[3]  Instead, he made "adjustments" to my named application lost license fee calculation for the almost four years of Defendants' unsanctioned use of Blaze Advisor.[4]  Despite his opinion that the parties (i.e., FICO and Federal) would have negotiated a Blaze Advisor license structured as an enterprise license agreement ("ELA"), he derived his calculations by "adjust[ing]" certain inputs to the named application model in my Affirmative Report.[5]

8.     In his view, FICO's lost license fees based upon a named application license structure total $3.8 million for U.S. usage and $2.3 million for foreign usage between April 2010 and December 2019, a total of $6.1 million.[6]

---

[1] Affirmative Report at 38-39, par. 110-111 and **Schedule 3.0**.
[2] Affirmative Report at 38-39, par. 110-111 and **Schedule 3.0**.
[3] Bakewell Report at 66-67, par. 209.
[4] Bakewell Report at 66-67, par. 209 and Exhibits 1.0-4.7.
[5] Bakewell Report at 66-67, par. 209 and Exhibits 1.0-4.7.
[6] Bakewell Report at 66-67, par. 209 (Footnote 291-292) and Exhibits 3.0-3.1.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

a)    *Hypothetical License Derived from "Intrinsic Value" of Blaze Advisor*

9.    According to Mr. Bakewell, my lost license fee calculation is "overreaching" because it "is not focused on the intrinsic value of the license."[7] In his opinion, the "intrinsic value" of a software license with sufficient rights to cover Defendants' accused usage of Blaze Advisor should be determined using "fundamentals of valuing intellectual property rights and intangible assets."[8] The "fundamentals" that Mr. Bakewell described in his report are commonly used to determine reasonable royalties for patent infringement by reconstructing a hypothetical negotiation between the parties around the time of first infringement.[9]

10.    In this context, Mr. Bakewell appears to use the terms "intrinsic value"[10] and "investment value"[11] synonymously.  Specifically, he describes the "intrinsic value" of a software license to Blaze Advisor in terms of the value specific to Federal, a concept more closely associated to a premise known as "investment value."[12] By definition, "intrinsic value" is separate from an asset's market value and is based on both qualitative and quantitative factors unique to that asset.[13]

11.    To determine the "intrinsic value" of a software license for Defendants' use of Blaze Advisor, he reframed the parties' _actual_ negotiations to place them in the context of a _hypothetical_ negotiation.[14] According to Mr. Bakewell, the parties (i.e., FICO and Federal) would consider the

---

[7] Bakewell Report at 35, par. 120.

[8] Bakewell Report at 35-36, par. 121.

[9] Bakewell Report at 35-38, 40-41, par. 121-123, 129, 135-137 and Footnote 174.  The concepts of a hypothetical negotiation, non-infringing alternative, cost of non-infringing alternatives, comparable license agreements, "economic hold up," "negotiating leverage," and a "reasonable outcome of a negotiation" are all concepts frequently used to quantify a reasonable royalty for infringing a patent.

[10] Intrinsic Value is defined as: "The value that an investor considers, on the basis of an evaluation or available facts, to be the "true" or "real" value that will become the market value when other investors reach the same conclusion." (*International Glossary of Business Valuation Terms* as published in Valuing a Business:  The Analysis and Appraisal of Closely Held Companies, 5th Ed., 2008 at 1072.)

[11] Investment Value is defined as "The value to a particular investor based on individual investment requirements and expectations."  (*International Glossary of Business Valuation Terms* as published in Valuing a Business:  The Analysis and Appraisal of Closely Held Companies, 5th Ed., 2008 at 1072.)

[12] *See*, generally, Bakewell Report at 8, 26, 66, par. 20, 88, 208.  ("*Intrinsic value* (sometimes called *fundamental value*) differs from *investment value* in that it represents an analytical judgment of value based on the perceived characteristics inherent in the investment, not tempered by characteristics peculiar to any one investor, but rather tempered by how these perceived characteristics are interpreted by one analyst versus another."  Valuing a Business: The Analysis and Appraisal of Closely Held Companies, 5th Ed., 2008 at 44.)

[13] https://www.investopedia.com/terms/i/intrinsicvalue.asp.

[14] Bakewell Report at 35-36, par. 121-123

---

3

"intrinsic value" of the intellectual property rights and intangible assets (e.g., Blaze Advisor) "in the context of a hypothetical negotiation for a software license" to determine if the license fee was "economically justified."[15]

12.     Mr. Bakewell suggests that the "intrinsic value" of Blaze Advisor controls the amount the parties would have negotiated for a hypothetical software license to Blaze Advisor.  He also suggests that Federal was not willing pay the _actual_ software license fee offered by FICO in 2016 because it was more than the "intrinsic value" that Federal placed on Blaze Advisor.  In his view, FICO's negotiations with Oracle are illustrative of the principle that if the license is "above the intrinsic or market value, one can move in another direction."[16]

13.     In lieu of Defendants' unlicensed use of Blaze Advisor between 2016 and 2019, Mr. Bakewell suggests that the parties would have negotiated a "reasonable" software license consistent with Federal's view regarding the "intrinsic value" of this license.[17]  According to Mr. Bakewell, the license fees that Federal wanted to pay in light of its view of the "intrinsic value" of a Blaze Advisor software license is the "reasonable" amount upon which the parties would have agreed.[18]  In other words, Mr. Bakewell concluded that FICO "has not 'lost' anything beyond what it would be able to obtain in an ordinary course negotiation" with Federal.[19]

b)     _Blaze License Structure_

14.     Mr. Bakewell also concluded that FICO and Federal would have negotiated an ELA for a hypothetical software license to Blaze Advisor.[20]  According to Mr. Bakewell, an ELA is the only license structure that is "economically or financially reasonable."[21]  As explained above and based upon my review of the Bakewell Report, Mr. Bakewell has not given a separate opinion regarding the appropriate lost ELA license fees potentially owed to FICO.

---

[15] Bakewell Report at 35-36, par. 121 and Footnote 174.

[16] Bakewell Report at 26, par. 88.

[17] Bakewell Report at 35, 66, par. 120, 208.  Mr. Bakewell did not give a separate opinion regarding the license fees to which FICO may be entitled based upon Federal's foreign use of Blaze Advisor before 2016.

[18] Bakewell Report at 40-41, par. 135.

[19] Bakewell Report at 38, par. 129.

[20] Bakewell Report at 40-42, par. 135-140.

[21] Bakewell Report at 40-41, par. 135.

c)      *Defendants' Applications Not Accused of Using Blaze Advisor*

15.    Mr. Bakewell subtracted from **Schedules 4.0** and **5.0** of my Affirmative Report the lost license fees for CIS Claims, Cornerstone, ADAPT (U.K.), Evolution (Australia), Exari (U.K.) and Broker Site (Canada) because, in his opinion, these applications "do not use Blaze Advisor."[22]  I understand that Mr. Bakewell determined which Defendant applications are accused by FICO of wrongfully using Blaze Advisor based upon testimony of certain Defendant witnesses.[23]

d)      *Correct Sizing of Defendants' Blaze Advisor Applications*

16.    Relying upon the opinions of Dr. Kursh, Mr. Bakewell determined that every Blaze Advisor application except CUW should be classified as "Small" according to FICO's sizing criteria.[24]  Dr. Kursh determined that CUW is appropriately sized as "medium."[25]

e)      *Annual Support and Maintenance Fee Percentage*

17.    Fifteen percent (15%) is the appropriate percentage of FICO's deployment license fee for support and maintenance services according to Mr. Bakewell.[26]  As explained in my Affirmative Report, the support and maintenance fees are customarily paid annually.[27]

f)      *Discount on All Named Application Lost License Fees*

18.    Mr. Bakewell concluded that FICO would have given Defendants a deployment license discount of "only 40 percent" on the hypothetical license for Blaze Advisor.[28]  He applied this discount to his named application lost license fee calculation that he derived from the model in my Affirmative Report.[29]

---

[22] Bakewell Report at 45-46, par. 150, figure entitled "Summary of Federal's Applications Included in Mr. Zoltowski's Lost Software Licensing Fee Calculation" and Exhibits 1.0-1.1, 3.0-3.1, 4.2-4.3, 4.6-4.7.
[23] Bakewell Report at 45-46, par. 150 and figure entitled "Summary of Federal's Applications Included in Mr. Zoltowski's Lost Software Licensing Fee Calculation."
[24] Bakewell Report at 48, par. 155-156 and Exhibits 2.0-2.1.
[25] Bakewell Report at 48, par. 155-156 and Exhibits 2.0-2.1.
[26] Bakewell Report at Exhibits 4.0-4.3.
[27] *See*, generally, Affirmative Report at 17-18, par. 52, 55-56.
[28] Bakewell Report at 66-67, par. 209.
[29] Bakewell Report at 66-67, par. 209.

5

*ii.*     Bakewell's Rebuttal Opinions Regarding Lost License Fees

19.     Mr. Bakewell stated that I have not "establish[ed] any economic or technical nexus between any claimed damages and FICO's allegations of wrongdoings" and, according to Mr. Bakewell, I am presumably required to do so to determine FICO's lost license fees.[30]

20.     Mr. Bakewell surmised that I "disregarded FICO's and Federal's 2006 SLM Agreement and 2016 negotiations" to form my opinion about the type of software license (e.g., named application) that will compensate FICO for Defendants' wrongful acts in this matter.[31]  As a result, Mr. Bakewell concluded that my named application lost license fee calculations are "speculative," as well as "commercially unrealistic and results in inflated conclusions."[32]

21.     He also presumed that I "disregarded" and "failed to consider the discounts that normally apply in software licenses" as well as the "evidence" pertinent to FICO's licensing history that he discusses in the Bakewell Report.[33]

22.     Finally, Mr. Bakewell concluded that my calculations are overstated and speculative because I included certain of the Defendants' applications that are not, or cannot be, accused of using Blaze Advisor.[34]

*iii.*     Defendants' Profits Attributable to the Use of Blaze Advisor

23.     Based upon his compilation of Defendants' disparate sources of gross written premiums (of which I discuss in greater detail below), Mr. Bakewell concluded that Federal earned an "underwriting profit" of $2.5 billion, or 16% of net earned premiums, on the gross written premiums processed through the Defendants' applications that use the Blaze Advisor solution.[35] Mr. Bakewell concluded that both direct costs and overhead expenses such as "underwriter salaries and benefits, professional fees and advertising and marketing costs, among other expenses" are

---

[30] Bakewell Report at 7, 33, 65, par. 18, 112, 206. Although not stated explicitly, Mr. Bakewell implies that I am required to establish such a nexus with respect to FICO's breach of contract allegations.

[31] Bakewell Report at 22, 41, par. 71, 136.

[32] Bakewell Report at 22, 41, par. 71, 136.

[33] Bakewell Report at 43, par. 143-144.

[34] Bakewell Report at 45, par. 150 and figure entitled "Summary of Federal's Applications Included in Mr. Zoltowski's Lost Software Licensing Fee Calculation."

[35] Bakewell Report at 64-65, par. 203-204, Exhibit 5.0 and figure entitled "Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual."

6

appropriately deducted from the gross written premiums reported by Defendants because they "are necessary for the operation of Federal's business and sale of insurance policies."[36]

24.     Mr. Bakewell did not perform his own analysis of the portion of those profits attributable to Defendants' infringing use of Blaze Advisor between 2013 and 2019.[37]

> *iv.*     Bakewell's Rebuttal Opinions Regarding Defendants' Profits Attributable to Use of FICO Copyrights

>> a)     *Plaintiff Did Not Prove a Causal Nexus Between Use of Blaze Advisor and Defendants' Profits*

25.     In Mr. Bakewell's opinion, I am required to "identify or focus on a revenue stream with a supportable nexus to the alleged wrongdoings."[38]  Because I have purportedly not "identified" or "established" the nexus between "any profits Federal received and the alleged infringement," my "calculations are analytically deficient."[39]

>> b)     *Plaintiff Did Not Deduct Any Expenses from Gross Written Premiums Reported by Federal*

26.     Mr. Bakewell concluded that because I made "no attempt to deduct any of the costs incurred to realize the gross written premiums," my opinions and calculations regarding the gross written premiums generated by Defendants using Blaze Advisor are "errant."[40]

>> c)     *FICO Accused Applications That Do Not Use Blaze Advisor*

27.     Mr. Bakewell subtracted from Defendants' disclosures and **Schedules 10.2** and **11.2** of my Affirmative Report the reported gross written premiums for Cornerstone, ADAPT (U.K.), and Evolution (Australia) because, in his opinion, these applications "do not use Blaze Advisor."[41]

---

[36] Bakewell Report at 63, par. 200-201.
[37] Bakewell Report at 65-67, par. 205-206, 210.
[38] Bakewell Report at 9, 33, 48-49, par. 22, 122, 157, 161.
[39] Bakewell Report at 48-49, par. 157, 161.
[40] Bakewell Report at 49-50, par. 161-162.
[41] Bakewell Report at 45-46, 53-54, 61, par. 150, 175-176, 194, figure entitled "Summary of Federal's Applications Included in Mr. Zoltowski's Lost Software Licensing Fee Calculation" and Exhibit 5.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                          **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Based on these deductions, I understand that Mr. Bakewell determined which Defendant applications infringe FICO's copyrights based upon testimony of certain Defendant witnesses.[42]

> d)     *FICO Cannot Claim Profits from Certain Writing Companies Subject to FICO's Copyright Infringement Claims*

28.     Mr. Bakewell criticizes my calculations of the reported gross written premiums because I also counted certain writing companies using Blaze Advisor that are not subsidiaries of the Defendants.[43]   In other words, he argues that the "generalized sources" I cited describing the legal and contractual relationships between the writing companies and the Defendants do not support a claim for infringing use, and accordingly, the gross written premiums should be excluded.[44] According to Mr. Bakewell, "FICO is only entitled to profits from the actual named defendants themselves" because I have 'provided no *financial basis* for doing otherwise."[45]

29.     Nonetheless, Mr. Bakewell included in his calculations the gross written premiums for every writing company listed as a subsidiary under Chubb INA Holdings.[46]   As explained in my Affirmative Report, Chubb INA Holdings is the direct parent company of Federal Insurance Company and the indirect parent ACE American Insurance Company.[47]   As a result, Mr. Bakewell's calculations include the gross written premiums for Federal Insurance Company, ACE American Insurance Company, and every other subsidiary reported under Chubb INA Holdings, none of which are named defendants in this matter. Mr. Bakewell excluded only those entities that are not subsidiaries of Chubb INA Holdings.[48]

---

[42] Bakewell Report at 45-46, par. 150 and figure entitled "Summary of Federal's Applications Included in Mr. Zoltowski's Lost Software Licensing Fee Calculation."

[43] Bakewell Report at 51-52, par. 168.

[44] Bakewell Report at 51-52, par. 168-169.

[45] Bakewell Report at 51-52, par. 168.

[46] *See*, generally, Bakewell Report at Exhibits 6.0, 7.1-7.2.

[47] Affirmative Report at 10, par. 30.

[48] *See*, generally, Bakewell Report at Exhibits 6.0, 7.1-7.2. These include subsidiaries with pooling agreements with Federal Insurance Company or ACE American Insurance Company.

e) *Defendants Made Errors in the Reported Gross Written Premiums Provided to FICO*

30.    Mr. Bakewell also identified several purported errors that Federal made in its interrogatory responses relating to the gross written premiums generated from policies that touched Blaze Advisor.    Mr. Bakewell criticizes my supposed "failure" to perform certain "tests of reasonableness" on the gross written premiums by application reported by Defendants in its interrogatory responses to FICO.[49]  It is through his so-called "tests of reasonableness" that Mr. Bakewell concludes that certain premiums in Defendants' interrogatory responses are "fundamentally flawed" and often overstated.[50]  To test for errors in Defendants' interrogatory responses, he compares these gross written premiums to those reported in the Defendants Financial Summaries (defined below).[51]  Mr. Bakewell concluded that in every instance, the result of his "test" indicated Defendants overreported gross written premiums in the interrogatory responses. Stated differently, in his view, "by definition," Defendants' reported gross written premiums by application should be less than the Defendants Financial Summaries (defined below), but they are not.[52] Mr. Bakewell's "tests" never indicated Defendants underreported gross written premiums.[53]

31.    Consequently, he made several "adjustments" (i.e., corrections) to Defendants' reported gross written premiums to account for these purported errors.  Mr. Bakewell relied upon at least three (3) different sources to calculate the gross written premiums that "ran through Blaze Advisor applications."[54]  He determined which of these sources is the most accurate based upon his so-called "reasonableness tests" and his conversations with certain of the Defendants' personnel.  The following are the three (3) sources for gross written premiums that Mr. Bakewell relied upon:

---

[49] Bakewell Report at 55-56, par. 181.

[50] Bakewell Report at 35, 54-56, par. 120, 177-181.

[51] Bakewell Report at 55, par. 180 and figure entitled "Comparison of Gross Written Premiums Between Federal's Business Segment/Lines of Business Financials and Mr. Zoltowski".

[52] Bakewell Report at 55, par. 181.

[53] Bakewell Report at 55-56, par. 180-181 and figure entitled "Comparison of Gross Written Premiums Between Federal's Business Segment/Lines of Business Financials and Mr. Zoltowski".

[54] *See*, generally, Bakewell Report at Exhibits 6.0-7.3.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    CONFIDENTIAL – ATTORNEYS' EYES ONLY

- **Blaze IM Extract-Final** – Gross written premiums for policies that run through CUW that purportedly excludes duplicate entries resulting from policies that ran through more than one application[55];

- **Interrogatory Responses** – Includes gross written premiums specifically related to insurance policies generated through applications that used Blaze Advisor[56]; and

- **Business Segments/Lines of Business Financials ("Defendants Financial Summaries")** – Gross written premiums from certain lines of businesses and/or products that may have involved the use of Blaze Advisor.[57]

32.    **Table 1** summarizes the sources Mr. Bakewell relies upon to calculate gross written premiums for Defendants' domestic applications.

**Table 1: Summary of Mr. Bakewell's Sources for Domestic Gross Written Premiums**[58]

| Application | Source | Basis |
|---|---|---|
| Commercial Underwriting Workstation (CUW) | Blaze IM Extract-Final | Defendant's Interrogatory Responses appear to contain duplications |
| CSI eXPRESS | Interrogatory Responses | *n/a* |
| Premium Booking | | |
| Texas Accident Prevention System (TAPS) | | |
| Cornerstone | *n/a* | Does not use Blaze Advisor |
| Individual Rate Modification Application (IRMA) | Interrogatory Responses | *n/a* |
| Decision Point | | |

33.    For the EZER application used in Europe and the U.K., Mr. Bakewell argues that the gross written premiums reported in Defendants' interrogatory responses are the appropriate sources. Specifically, Mr. Bakewell explains in his Exhibit 7.2 that the gross written premiums reported in

---

[55] Bakewell Report at 56, par. 182 and Exhibit 9.0.

[56] Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 16 and Sixth Supplemental Answer to Plaintiff's Interrogatory No. 17, dated March 21, 2019 at 3-19; Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 18, dated March 21, 2019 at 3; Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 19, dated March 2, 2019 at 3; Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 20, dated March 21, 2019 at 3-5.

[57] Deposition of Kevin Harkin, dated March 25, 2019 ("Harkin Deposition") at Exhibit 409 (FED017882_0001), Exhibit 413 (FED017885_0001), Exhibit 416 (FED017884_0001), Exhibit 418 (FED017883_0001).

[58] Bakewell Report at Exhibit 6.0.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    CONFIDENTIAL – ATTORNEYS' EYES ONLY

the Defendants Financial Summary for Europe and U.K (i.e., FED017885) are greater than or similar to the gross written premiums reported in Defendants' interrogatory responses.[59] As a result, Mr. Bakewell implies that the Defendants Financial Summary for Europe and U.K. must be overstated and includes policies that do not use Blaze Advisor.[60]

34.     Second, for the Evolution application used in Canada, Mr. Bakewell argues that the gross written premiums reported in the Defendants Financial Summary for Canada (i.e., FED017883) is the appropriate source. Specifically, Mr. Bakewell explains in his Exhibit 7.3 that the gross written premiums reported in Defendants' interrogatory responses are approximately 30% greater than the gross written premiums reported in the Defendants Financial Summary for Canada.[61] Accordingly, Mr. Bakewell reaches the opposite conclusion – specifically, Mr. Bakewell purports that the interrogatory responses must be overstated and include not only duplicate of policies, but also policies unrelated to the Blaze Advisor software.[62]

35.     **Table 2** summarizes the sources Mr. Bakewell relies upon to calculate gross written premiums for Defendants' foreign applications.

**Table 2: Summary of Mr. Bakewell's Sources for Foreign Gross Written Premiums**[63]

| Application | Source | Basis |
|---|---|---|
| ADAPT (Australia) | Interrogatory Responses | Defendants Financial Summary for Australia reports the same gross written premiums as Defendant's Interrogatory Responses |
| Evolution (Australia) | n/a | Does not use Blaze Advisor |
| ADAPT (U.K.) | n/a | Does not use Blaze Advisor |
| EZER (Europe) | Interrogatory Responses | Defendants Financial Summary for the Europe and U.K. (i.e., FED17885) reports gross written premiums that are greater than Defendant's Interrogatory Responses |
| EZER (U.K.) | | |
| Evolution (Canada) | Defendants Financial Summary for Canada (i.e., FED017883) | Defendant's Interrogatory Responses appear to contain duplications |
| Broker Site (Canada) | n/a | Broker Site and Evolution share the same underlying database |

---

[59] Bakewell Report at Exhibit 7.2 (Footnote 3).
[60] Bakewell Report at Exhibit 7.2 (Footnote 3).
[61] Bakewell Report at Exhibit 7.3 (Footnote 2).
[62] Bakewell Report at Exhibit 7.3 (Footnote 2).
[63] Bakewell Report at Exhibits 7.1-7.3.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                              **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

36.     To summarize, Mr. Bakewell determined that Defendants overreported gross written premiums in several years based on his analysis of disparate sources that he believes contradict Defendants' disclosures.  Similarly, he determined that Defendants did not underreport gross written premiums in any year.

37.     Additionally, Mr. Bakewell concluded that Defendants also overreported the gross written premiums for policies that ran through the CUW application.  In collaboration with, and relying upon, documents prepared by Defendants' personnel, he also deducted from Defendants' reported gross written premiums for CUW those policies that purportedly also "ran through both CUW and another application, specifically CSI eXPRESS or Premium Booking."[64]

> f)      *Defendants Made Errors in the Defendants Financial Summaries Provided to FICO*

38.     In addition to the purported errors (e.g., overstatements) that he identified in Defendants' reported gross written premiums by application, Mr. Bakewell also "adjusted" some purportedly overreported premiums provided to FICO in "Federal's Business Segment/Line of Business Financials" (defined above as "Defendants Financial Summaries").[65] Specifically, he concluded that Defendants' overreported gross written premiums in the Defendants Financial Summaries, so he decreased these amounts to calculate "Federal Actual" profit margins on gross written premiums that ran through Blaze Advisor.[66] (See **Tables 1** and **2** for a list of "adjustments" Mr. Bakewell made to Defendants' financial reports).

39.     Consistent with this conclusion, Mr. Bakewell performs "tests of reasonableness" that highlighted the disparity between those gross written premiums reported by application and those reported in the Defendants Financial Summaries.[67]  He noted that this disparity exists because the

---

[64] Bakewell Report at 56, par. 182 and Exhibit 9.0.

[65] Bakewell Report at Exhibit 7.2 (Footnote 3).

[66] Bakewell Report at Exhibits 7.0, 7.2, 7.3.

[67] Bakewell Report at 55, par. 180 and Exhibit 6.0 and figure entitled "Comparison of Gross Written Premiums Between Federal's Business Segment/Line of Business Financials and Mr. Zoltowski."  The Business Segment/Line of Business Financials gross written premiums in the above table are the sum of all premiums reported in Bakewell Exhibits 8.1-8.4.

Defendants Financial Summaries "include all of the gross written premiums earned by the company, including policies…that did not use Blaze Advisor."[68]

40.     Mr. Bakewell also concluded that the Defendants Financial Summaries are not representative of the profits Defendants' earned on accused gross written premiums.  According to Mr. Bakewell, "these profit and loss statements reflect an overinclusive (i.e., conservative) approximation of profit and loss for Blaze Advisor related lines of business."[69]  As previously explained, Mr. Bakewell has endeavored to "adjust," or correct, for these deficiencies in the records reported to FICO.

41.     Finally, Mr. Bakewell also suggested that I should have relied upon the Defendants Financial Summaries to calculate profits attributable to the use of FICO's copyrights despite the "lack of such information [profits and losses from use of Blaze Advisor]."[70]

g)     *"Federal's Actual" Profits from Infringing Use of Blaze Advisor*

42.     Despite the limitations he identified in the Defendants Financial Summaries, Mr. Bakewell deduced that his "Federal Actual" profit and loss summaries reflect Defendants' actual underwriting profits on its gross written premiums.[71]  Mr. Bakewell defined "Federal Actual" profit and loss statement as his adjusted/corrected Defendants Financial Summaries prepared by Defendants for this litigation.[72]  As previously explained, to arrive at his "Federal Actual" profit and loss calculations, he reduced certain gross written premiums, excluded certain Blaze Advisor applications, and subtracted purportedly duplicative premiums reported by Defendants to FICO, among other adjustments/corrections.[73]

---

[68] Bakewell Report at 55, par. 181.

[69] Bakewell Report at 58, par. 189.

[70] Bakewell Report at 58, par. 188.

[71] Bakewell Report at 65, par. 204-205 and figure entitled "Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual."

[72] Bakewell Report at 65, par. 204-205 and figure entitled "Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual."

[73] Bakewell Report at 58, 65, par. 188-189, 204-205, Exhibits 5.0, 7.0-7.3 and figure entitled "Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual."

43.

Mr. Bakewell summed the values of each of his individual summaries for all years to create a single summary of all writing companies, business segments, and/or lines of business (foreign and domestic) to calculate an underwriting profit, profit margin, and combined loss ratio for all years.[74]  He applied his combined underwriting profit margin and combined loss ratio to the sum of all gross written premiums for which he determined FICO may be entitled to Defendants' profits.[75]

44.    Based upon Mr. Bakewell's calculations, Defendants generated underwriting profits of $2.5 billion on Mr. Bakewell's adjusted/corrected "gross written premiums processed through the Blaze Advisor Applications."[76]  Again, his profit computation includes certain writing companies that Mr. Bakewell opines are not subject to FICO's damages claims, certain applications that FICO allegedly cannot prove use Blaze Advisor, and corrections to Defendants' gross written premiums and profit and loss summaries, among other adjustments/corrections.[77]

### B.    Understanding of Dr. Kursh's Opinions Regarding FICO's Lost License Fees

*i.*    FICO Incorrectly Calculated the Sizes of Federal's Blaze Advisor Applications

45.    Dr. Kursh states that the "inconsistencies" between the application sizes in my Affirmative Report, FICO's April 2018 interrogatory response, and the application sizes he personally estimated "show[] that they [FICO] are not using commercially reasonable methods to arrive at their sizing conclusions."[78] Specifically, the sizes of Federal's Blaze Advisor applications based upon updated discovery are wrong because they are inconsistent with the sizes estimated by FICO in April 2018 before Defendants produced records showing FICO's actual activity. Dr. Kursh further explained that the updated sizes referenced in my Affirmative Report are incorrect because

---

[74] Bakewell Report at 65, par. 204-205, figure entitled "Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual" and Exhibits 5.0, 7.0-7.3.

[75] Bakewell Report at 65, par. 204-205, figure entitled "Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual" and Exhibits 5.0, 7.0-7.3.

[76] Bakewell Report at 65, par. 204-205 and figure entitled "Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual."

[77] Bakewell Report at 65, par. 204-205 and figure entitled "Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual."

[78] Kursh Report at 39-44, par. 115-124 and Exhibits 17-22.

he has "not seen evidence that shows" FICO's methodology "can be reproduced to size licenses consistently."[79]

46.    Finally, Dr. Kursh argued that ACE Limited's acquisition of Chubb Corporation on January 14, 2016 (the "Acquisition" or "Merger") did not change the size of Federal's Blaze Advisor applications based upon the nine criteria in FICO's Application Sizing Matrix ("ASM").[80] In other words, "none of the nine factors in the FICO applications sizing grid were impacted materially as a consequence of the acquisition."[81]

47.    As a result of these purported inconsistencies, Dr. Kursh concluded that the application sizes calculated by William Waid and referenced in my Affirmative Report are wrong, and his interpretation and application of FICO's ASM is correct.[82]   According to Dr. Kursh, a more accurate way to size Defendants' Blaze Advisor Applications is to use the size of CSI eXPRESS in 2006 "as a proxy for the other Federal [domestic] apps" because CSI eXPRESS had the second largest average monthly transactions reported by Defendants.[83]   Dr. Kursh also estimated the sizes of Defendants' foreign Blaze Advisor applications "to stay consistent with how FICO sized CSI."[84]

   *ii.*     Certain Federal Blaze Advisor Applications Are Not Subject to FICO's Breach of Contract Allegations

48.    Consistent with Mr. Bakewell's opinions, I understand that Dr. Kursh determined which of the Defendants' Blaze Advisor applications are accused of using Blaze Advisor by relying upon testimony of certain Defendant witnesses.[85]   Based upon his infringement determinations, Dr. Kursh concluded that I "incorrectly assume[d] that several Federal applications use Blaze."[86]

---

[79] Kursh Report at 41, par. 118.
[80] Kursh Report at 44, par. 123
[81] Kursh Report at 47, par. 133.
[82] Kursh Report at 39, 44, par. 115, 122 and Exhibits 17 and 22.
[83] Kursh Report at 39-40, par. 114 and Exhibits 16-17.
[84] Kursh Report at 44, par. 122 and Exhibit 22.
[85] Kursh Report at 34, par. 102, Exhibit 10 and Footnotes 32-37.
[86] Kursh Report at 34, Section 1, par. 102, Exhibit 10.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

      *iii.*    The Hypothetical License for Defendants' Use of Blaze Advisor Would Be an ELA

49.    Consistent with Mr. Bakewell's view, Dr. Kursh concluded that FICO and Federal would have negotiated an ELA for Defendants' infringing use of Blaze Advisor after FICO terminated the SLM Agreement in 2016.[87]   In other words, the parties would have agreed upon an ELA similar to the one Defendants rejected in 2016.  Dr. Kursh arrived at this conclusion based upon at least his view that "most enterprises would typically purchase enterprise-level licenses in this [hypothetical] situation" and FICO's "prior licensing practices with Federal."[88]  By calculating FICO's lost license fees for each named application, in Dr. Kursh's view, my calculations are "artificially inflated."[89]

      *iv.*    Mr. Zoltowski's Lost License Fees are Inconsistent with 2006 SLM Agreement

50.    In Dr. Kursh's opinion, my lost license fee calculations are "inconsistent with [the] 2006 licensing sale for the same products to the same division [Specialty Insurance Lines]."[90]  Dr. Kursh was not able to find "evidence in the discovery materials to justify this increase in license fees between 2006 and 2016-2019.[91]

      *v.*    FICO's Interpretation of the SLM Agreements and Corresponding Fee Requirement Are Incorrect and Not Commercially Reasonable

51.    Finally, in Dr. Kursh's opinion, FICO's interpretation of, and rights under, the SLM Agreement are incorrect.[92]  According to Dr. Kursh, the license fees that FICO offered Federal in 2016 "ignore the terms of the license agreement, ignore Federal's actual use of Blaze, and are not supported by Blaze's actual fair market value."[93]  He also deduced that the assumptions used to calculate FICO's lost license fees are "not commercially reasonable."[94]  Taken together, Dr. Kursh judged that FICO's enforcement of Section 10.8 of the SLM Agreement was an attempt at

---

[87] Kursh Report at 45, par. 125.
[88] Kursh Report at 45, par. 125-126.
[89] Kursh Report at 45, par. 125.
[90] Kursh Report at 47, par. 131.
[91] Kursh Report at 47, par. 131.
[92] Kursh Report at 13, 21 par. 45, 69.
[93] Kursh Report at 13, 21 par. 45, 69.
[94] Kursh Report at 48, par. 136.

16

"leveraging the merger to extract more money from Federal based on a commercially unreasonable interpretation of the Parties' prior agreements."[95]    In effect, Dr. Kursh suggests that any incremental license fees required by FICO were commercially unreasonable, unfounded and based upon FICO's incorrect legal interpretation of its rights under the SLM Agreement.

> *vi.*    Mr. Zoltowski Should Have Applied Discounts to His Lost Licensee Fee Computations

52.    Based on its historical discounts and those listed in its 2003 Global Price List, Dr. Kursh decided that I should have used "FICO's standard cumulative pricing discounts."[96]

## IV.    REPLY TO DEFENDANTS' OPINIONS REGARDING DAMAGES

53.    I incorporate by reference my preceding discussions of the opinions contained in the Bakewell and Kursh Reports as they relate to Defendants' allegedly wrongful conduct and corresponding damages in this matter.  The following are my replies to Mr. Bakewell's and Dr. Kursh's opinions as I understand them from my reading of each person's corresponding report.

### A.    Reply to Mr. Bakewell's Opinions Regarding FICO's Lost License Fees

> *i.*    A Work of Unsubstantiated Opinions

54.    The damages theories, legal conclusions, purported "valuation" approaches, and unsupported opinions contained in the Bakewell Report incorrectly attempt to reframe the relationship between the parties, the overriding software license agreement, Defendants' unlawful activities, and Plaintiff's causes of action.  More specifically, the Bakewell Report is guided by a couple of overarching themes (e.g., intrinsic value) that serve only to misdirect and confuse the issues regarding FICO's causes of action and corresponding damages remedies.  Consequently, I have endeavored to redirect and refocus the issues in this matter to untangle the Bakewell Report's attempt to misrepresent the facts and circumstances in this matter.

> *ii.*    Incorrect Use of a Hypothetical Negotiation Framework

55.    Based on the facts in this case and FICO's causes of action in this matter, Mr. Bakewell's purported reconstruction of a hypothetical negotiation to determine FICO's damages is wholly

---

[95] Kursh Report at 13, 21 par. 45, 69.
[96] Kursh Report at 47, par. 134.

incorrect and unsupported.  The hypothetical negotiation framework is commonly used to estimate a reasonable royalty for infringing a patent and is constrained by a number of patent-specific assumptions that do not apply to a breach of contract cause of action.[97]  Unlike a hypothetical negotiation for a patent license, based upon the facts and circumstances in this instance, there is no requirement that Federal and FICO enter into a license, and the rights conveyed in such a patent-license negotiation are entirely dissimilar from those conveyed in the SLM Agreement, among other differences.

56.    Further, Mr. Bakewell's hypothetical negotiation framework is incorrectly based on the premise that FICO and Federal would have negotiated a software license fee commensurate with the "intrinsic value" of Blaze Advisor to Defendants.  The Bakewell Report provides no basis for the underlying implication that Federal could or would have negotiated a license more consistent with Mr. Bakewell's or Defendants' opinion of the corresponding "intrinsic value."  This assertion is not supported by the facts in this case, including the parties' actual negotiations in 2016.

57.    Mr. Bakewell's hypothetical negotiation dictated by the so-called "intrinsic value" of Blaze Advisor is no more than a red herring.  In other words, it is a theory proposed by Mr. Bakewell in order to reconstruct the facts and circumstances relevant to the price he believes Defendants' _should_ _have_ paid for its unlicensed use of Blaze Advisor.

58.    In reality, I understand that FICO was, and continues to be, under no compulsion to offer Federal a price that _Federal_ _believed_ was less than or equal to the so-called "intrinsic value" of Blaze Advisor.  I am also not aware of documents or testimony that suggest FICO ever priced Blaze Advisor to be consistent with the so-called "intrinsic value" as the term is described by Mr. Bakewell.  To the contrary, and as explained in my Affirmative Report, FICO has been using the ASM and related Category Pricing Matrix ("CSM") to price Blaze Advisor since 2003.  Based on

---

[97] _See_, generally, _Georgia-Pacific v. United States Plywood Corp._, 318 F. Supp. 1116, 1120-21 (S.D. N.Y. 1970), _modified and aff'd_, 446 F.2d 295 (2d Cir.), _cert. denied_, 404 U.S. 870 (1971).  (Mr. Bakewell ignores the facts and circumstances surrounding the parties to this dispute.  As discussed below, FICO and the Defendants' held actual negotiations in early 2016 that were unsuccessful as the parties were unable to reach an agreement.  However, it appears Mr. Bakewell did not like the outcome of the actual negotiations between the parties and so he has made an attempt to create an imaginary hypothetical negotiation between the parties in order to help him reach the opinions he wishes to render in this matter.  Unfortunately, Mr. Bakewell has no basis or support.)

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

the list of licenses in Exhibit 12.1 of the Bakewell Report, dozens of well-known companies have licensed Blaze Advisor under these terms since 2003 when FICO adopted this methodology.[98]

59.    In realty, the parties negotiated for approximately three (3) months, but ultimately reached an impasse over the terms of a new agreement.  Among the parties' disagreements was the appropriate fee payable to FICO, and as a result, FICO terminated the SLM Agreement.  Federal was free to accept or reject FICO's offer, especially given the supposed lack of value and ease of replacing Blaze Advisor.  However, Federal chose not to accept FICO's license offer and as of the issuance of this report has still not replaced Blaze Advisor with another solution.  In fact, according to Mr. Bakewell, Defendants plan to replace Blaze Advisor with its own internal solution in December 2019 – more than three-and-one-half (3.5) years after FICO terminated the license agreement between the parties.[99]  This is an ordinary outcome in business but not one contemplated under the hypothetical negotiation framework which *requires* the *patent* licensor and licensee to enter into an agreement (i.e., willing licensor and willing licensee).[100]

60.    I am aware of no damages theory that suggests the appropriate remedy for breaching a contract and using the plaintiff's property without permission is the price the wrongdoer *wanted* to pay prior to the breach or theft.  A damages remedy in this vein would suggest that property owners are not free to set prices but are, instead, required to accept the prices set by wrongdoers.

      *iii.*   Valuation Approaches Described by Bakewell Irrelevant to Lost License Fees

61.    Mr. Bakewell describes so-called "valuation principles" and "fundamentals of valuing intellectual property rights and intangible assets" out of context to disguise, or otherwise confuse, the hypothetical negotiation framework he uses to reframe FICO's damages claim.  By way of example, Mr. Bakewell describes the patent concept of "alternatives to using the accused functionality" as a tenant of the cost approach to valuation.[101]  He goes on to suggest that the income approach to valuation contemplates a comparison of whether "a particular solution

---

[98] Bakewell Report at Exhibit 12.1.
[99] Bakewell Report at 37, par. 127.
[100] *See*, generally, *Georgia-Pacific v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120-21 (S.D. N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870 (1971).
[101] Bakewell Report at 35-36, par. 121.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**          **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

provides opportunities to create incremental income" compared to alternatives.[102] His description of the "income approach" mixes several patent damages concepts typically analyzed in connection with a *Georgia-Pacific* factor analysis, an exercise often reconciled in the context of a hypothetical negotiation.[103] This "valuation" terminology as defined and used in the Bakewell Report (i.e., hypothetical negotiation) is not instructive for purposes of determining FICO's lost license fees.

62.     In the context of one of these "valuation principles," Mr. Bakewell claims that the availability and low cost of Blaze Advisor alternatives available to Defendants suggests the application has very little "intrinsic value."[104] In other words, Mr. Bakewell asserts that there were multiple alternatives to Blaze Advisor available to Federal in 2016, so Federal could simply walk away if FICO asked for a license fee in excess of the "intrinsic value."[105]

63.     However, he goes on to contradict these statements by suggesting that FICO is not entitled to "lock in" or "hold up" value, which are additional patent damages concepts suggesting Federal did not have readily available alternatives.[106] Despite these purported alternatives, Mr. Bakewell explained that Defendants are "developing software on an expedited basis…[and] incurring additional costs" to create a Blaze Advisor alternative on a condensed timeline ending in December 2019.[107]

64.     Notwithstanding my disagreement with the relevance of Mr. Bakewell's "intrinsic value" analysis and hypothetical negotiation, Defendants' continued worldwide and unlicensed use of Blaze Advisor is a more instructive indication of the value of Blaze Advisor than the annual cost of a purported alternative solution that has yet to be implemented more than three (3) years after the license agreement was terminated by FICO.

---

[102] Bakewell Report at 36, par. 122.

[103] Bakewell Report at 36, par. 122. Mr. Bakewell's description of the market approach in unintelligible in my opinion, so I have not attempted to explain how he defines this term.

[104] Bakewell Report at 35-37, 40, par. 121-123, 126, 134. Based upon Mr. Bakewell's definitions and/or descriptions of the three "valuation principles," non-infringing alternatives could be explained in the context of any of them.

[105] Bakewell Report at 37-40, par. 126-133.

[106] Bakewell Report at 37-38, par. 127 (Footnote 179).

[107] Bakewell Report at 37-38, par. 127 (Footnote 179).

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                              **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

iv.    Named Application is the Correct License Structure

65.    I disagree with Mr. Bakewell and Dr. Kursh that FICO should be allowed to recover only the "commercially reasonable" amount or the "intrinsic value" of the Blaze Advisor software license Federal and FICO "would have" negotiated in 2016.   As previously explained, a hypothetical negotiation culminating in a perpetual ELA is the wrong lens through which to evaluate FICO's lost license fees in this matter.   Based on the facts of this case as I understand them, FICO's lost license fees should be evaluated only in light of Defendants' unauthorized exploitation of Blaze Advisor both before and after FICO terminated the SLM Agreement in 2016.

66.    There is no other objective measure of FICO's lost license fees than its list prices for each application that Defendants are accused of wrongfully using.   Based upon its anticipated future use and the scheduled trial date in this matter, Defendants will have improperly used Blaze Advisor for close to four (4) years in the United States, and even longer in foreign locations, by the end of 2019.[108]

67.    As a general premise, FICO's history of licensing Blaze Advisor to different customers has no bearing on the fees it has lost as a result of Defendants' wrongful and continued use. Nonetheless, I am also not aware of documents or testimony describing a situation between FICO and another customer that parallels the circumstances in this case or that suggests FICO discounted license fees for objectively unauthorized and unlicensed use of Blaze Advisor software.

68.    Mr. Bakewell's suggestion that FICO's agreement with Oracle after the Sun Microsystems merger is somehow indicative of FICO's lost license fees lacks credulity.[109]   Unlike this matter and as explained in the Bakewell Report, Oracle stopped using Blaze Advisor in accordance with the terms of FICO's customary license agreement.[110]   Not surprisingly, the parties negotiated a relatively low final payment commensurate with Oracle's discontinued use.[111]   If, like Oracle,

---

[108] Bakewell Report at 37, Footnote 179.  According to Mr. Bakewell, Defendants are in the process of developing an alternative solution that is "expected to be completed, tested and implemented by December 31, 2019."
[109] Bakewell Report at 26, par. 88.
[110] Bakewell Report at 25, par. 82.
[111] Bakewell Report at 26, par. 87.

Defendants had ceased using Blaze Advisor and returned it to FICO, one could infer that there may be a similar result.

69.     Mr. Bakewell also suggests that FICO's settlement with Dell and EMC following the merger of these two licensees also reflects "the value of software [Blaze Advisor]" that FICO and Dell put on it.[112] He also concluded that the settlement resulted in an enterprise license, was derived from the parties' past licenses and included significant discounts.[113]

70.     Similarly, FICO's settlement with Dell suggests nothing about the license fees sufficient to compensate FICO in this matter.  Considering this settlement for the sake of argument, neither licensee was an insurance company, and I do not have information about how either Dell or EMC used Blaze Advisor.  In addition, both Dell and EMC were FICO licensees before the merger, so both entities presumably had already paid FICO license fees.[114]  Taken together, it appears this negotiation was a reconciliation of the two existing agreements into a single license commensurate with the needs of the combined company.  None of these facts were present in the 2016 negotiation between FICO and Federal.

### v.     Applications Using Blaze Identified by Plaintiff

71.     Mr. Bakewell's position that certain applications do not use Blaze Advisor is a factual question to be determined by the trier of fact.  For purposes of calculating damages, I have assumed that the applications identified by Plaintiff use, or have used, Blaze Advisor.  If it is demonstrated that certain of the Defendants' applications do not use Blaze Advisor, I may adjust my analysis if appropriate.

### vi.     No Basis for Discounts on FICO Prices

72.     Similar to my opinion that lost license fees should be calculated annually by named application, there is also no objective basis to discount FICO's standard license fees in my damages calculations.  In fact, Dr. Kursh explained that "there is no 'magic' discount level that is readily applied among companies or for specific software products."[115]

---

[112] Bakewell Report at 30-31, par. 102.
[113] Bakewell Report at 30-31, par. 102.
[114] Deposition of William Waid, dated April 2, 2019 at Exhibit 427 (FICO0016269-285 at 269).
[115] Kursh Report at 16, par. 60.

73.     In addition, FICO's customary discounting practices are based upon, among other things, its anticipated long-term relationships with licensees.[116]   Like FICO's pre-2016 history with Federal, these long-term relationships are lucrative because they lead to consulting and other service fees, the opportunity to make incremental product sales and the chance to receive referrals for new customers.[117]   As a result, software companies sometimes discount deployment license fees in light of the broader relationship and anticipated service revenues.[118]

74.     Dr. Kursh clearly explained this relationship.  According to Dr. Kursh, licensors consider the total, long-term value of a licensing relationship when pricing software licenses because these deals "will typically include services, ongoing maintenance, upgrades and additional use, updates, reference[s], and opportunities for more revenues from additional license sales of other products and services."[119]  As a result, the term discount for software licenses "is a misnomer in this context" because the license fees that software vendors charge are negotiated in light of the broader relationship between the licensor and licensee.[120]

75.     No such parallel exists between FICO and Defendants in this matter.  In the three (3) years since FICO terminated the SLM Agreement, I understand FICO has not generated any fees from Defendants despite its continued use of Blaze Advisor.[121]  This is in contrast to the $6.7 million in fees that FICO earned from Federal between 2006 and 2016.[122]

### B.     Reply to Mr. Bakewell's Opinions Regarding Defendants' Profits from Use of Blaze Advisor

#### i.     Defendants' Customary Expense Classification and Allocation Methodologies

76.     Chubb Limited, the parent company under which Defendants' results of operations are reported, classifies expenses as either "direct" or "bulk" and tracks these expenses through a

---

[116] *See*, generally, Kursh Report at 20-21, par. 68.

[117] *See*, generally, Kursh Report at 17-18, 20-21, par. 62, 65, 68.

[118] *See*, generally, Kursh Report at 16-18, par. 60, 62.

[119] Kursh Report at 17, par. 62.

[120] Kursh Report at 16, par. 60.

[121] *See*, generally, Affirmative Report at 23-25, par. 68-71.

[122] Affirmative Report at 19-20, par. 58-59.

variety of different means.[123] Direct expenses (e.g., commissions paid to agents and brokers) are associated with an individual insurance policy and accordingly, Chubb Limited tracks and reports direct expenses on a policy level.[124] Bulk expenses are incurred to run Chubb Limited globally and are, therefore, allocated on a line of business level, which is the "lowest level of granularity" possible.[125] Bulk expenses cannot be linked to a particular insurance *policy*.[126] According to Mr. Harkin, bulk expenses are typically "incurred in part of running the operations or complying with regulatory guidelines" and include general and administrative costs, taxes, licenses and fees.[127]

77.     Further, I understand bulk expenses are tracked in a "larger bucket" and allocated (e.g., apportioned) at the line of business level on a "variety of bases depending on the nature of the expense."[128] For example, the Finance Department does "not do any work that directly correlates to an individual product," so these expenses are allocated as a percentage of the "gross written premiums and/or bulk reserves associated with each product."[129] Thus, if a particular line of business represents 80% of Chubb Limited's total gross written premiums, then 80% of the Finance Department's expenses are allocated to that particular line of business.[130]

> *ii.*   Limitations of the Defendants Financial Summaries Produced by Defendants

78.     The Defendants Financial Summaries that Mr. Bakewell relied upon and that form part of his "Federal Actual" calculations do not reflect the profits Defendants earned on insurance policies that were processed using Blaze Advisor. The following is a brief explanation of how these summaries were created and what information is contained therein.  As explained hereafter, the

---

[123] Harkin Deposition at 55.

[124] Harkin Deposition at 55, 131-132.

[125] Harkin Deposition at 55-56, 130-132.

[126] Harkin Deposition at 55-56, 131-134.  In certain situations, it may be possible to link a bulk expense to a specific product type, but Chubb Limited does not do this in the ordinary course of business. For example, if an underwriter worked on only a single product type, Chubb Limited could attribute that individual's salary to that product type.

[127] G&A expenses include salaries and benefits for staff, IT expenses, travel expenses, and specific advertising and consulting costs. Additionally, taxes, licenses and fees represent a premium tax that is paid on an individual state basis and are allocated based on Chubb Limited's best ability to determine the products within a particular state. Harkin Deposition at 55-56, 131-134.

[128] Harkin Deposition at 132-133.

[129] Harkin Deposition at 132-133.

[130] Harkin Deposition at 132-133.

so-called "adjustments" that Mr. Bakewell made to these to summaries when he rolled them into the "Federal Actual" summary does not cure these limitations.

79.     Defendants produced four (4) so-called "business segment/lines of business financial summaries" (i.e., the "Defendants Financial Summaries") for the following regions: (i) North America; (ii) Australia; (iii) Europe and U.K.; and (iv) Canada. Mr. Harkin, Chubb Limited's Senior Vice President in North America Finance, testified that the Defendants Financial Summaries were created for the purposes of this litigation, are not prepared in the ordinary course of business and do not reconcile to Defendants' actual internal or publicly reported financial statements.[131] According to Mr. Harkin, these summaries are Defendants' attempt to approximate the premiums, losses, expenses and underwriting income of the relevant lines of businesses and/or products that _may_ have run through Blaze Advisor.[132]  In other words, I understand the Defendants Financial Summaries are proxies for the actual insurance policies that "ran through Blaze Advisor."  **Table 3** is a list of the Defendants Financial Summaries matched to the Blaze Advisor application each is intended to approximate:

**Table 3: Defendants' "Business Segments/Lines of Business" Financial Summaries**

| Region[133] | Years | Proxy for | Description |
|---|---|---|---|
| North America | 2016-2018 | Domestic Applications | Lines of businesses within the Chubb Commercial Insurance and Chubb Specialty Insurance in U.S. and Canada[134] |
| Australia | 2007-2019 | ADAPT[135] | Accident and Health products in Australia that used the Blaze Advisor software[136] |
| Europe and U.K. | 2016-2018 | EZER and/or ADAPT[137] | Accident and Health and Chubb Specialty Insurance products in Europe and U.K.[138] |
| Canada | 2015 - 2018 | Evolution[139] | All Personal Lines products within Personal Risk Services[140] |

---

[131] _See_, generally, Harkin Deposition at 121, 165, 200.

[132] _See_, generally, Harkin Deposition at 118, 119, 139, 143, 150, 164-166, 195-196, 210-211.

[133] _See_, generally, Harkin Deposition at Exhibit 409 (FED017882_0001), Exhibit 413 (FED017885_0001), Exhibit 416 (FED017884_0001), Exhibit 418 (FED017883_0001).

[134] Harkin Deposition at 118-120, 139, 141, 143, 150. I understand these lines of business in the Legacy Chubb business units would fall under the North American P&C Commercial business segment of Chubb Limited.

[135] Harkin Deposition at 194.

[136] Harkin Deposition at 194.

[137] Harkin Deposition at 164.

[138] Harkin Deposition at 164-167.

[139] Harkin Deposition at 204.

[140] Harkin Deposition at 205, 210-211.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

80.     As explained in detail below, I understand the Defendants Financial Summaries provided by the Defendants in this matter were not compiled using the same methods that Chubb Limited uses to prepare internally reported financial statements. On the contrary, I understand the Defendants Financial Summaries provided by the Defendants are derived from ad hoc estimates possibly representative of the profits Defendants earned from using FICO's copyrighted software and were created for the purpose of this litigation.[141]

81.     Mr. Harkin described several apparent limitations to the data presented in the Defendants Financial Summaries.[142]   I have summarized these limitations in detail in the next several paragraphs.

82.     Based upon Mr. Harkin's testimony, I can only characterize the Defendants Financial Summaries as cobbled together from disparate accounting and/or management systems.[143]   It is important to note that, with the exception of Australia, the remaining three (3) derive from gross written premiums that are _not_ specific to the policies that Defendants reported involved the use of Blaze Advisor.[144]   Mr. Harkin confirmed there is no link between the gross written premiums in these three (3) Defendants Financial Summaries to those reported in the Defendants' interrogatory responses, which specifically identify the gross written premiums related to the applications that used Blaze Advisor.[145]

83.     In addition, based upon Mr. Harkin's testimony, the net premiums, losses incurred, expenses and underwriting income in the Defendants Financial Summaries are estimates, or approximations, and not the actual offsets and expenses incurred from the generation of these gross written premiums.[146]   I understand from Mr. Harkin that these overhead expenses, profits and losses are derived from various assumptions and related calculations and are only approximations of Defendants' actual profit/loss margins on certain types of insurance policies.[147]   In other words,

---

[141] *See*, generally, Harkin Deposition at 118-122, 139, 143, 150, 164-167, 194-196, 210-211.

[142] *See*, generally, Harkin Deposition at 118-125, 165-166, 194-196, 200, 210.

[143] *See*, generally, Harkin Deposition at 118-122, 139, 143, 150, 164-167, 194-196, 210-211.

[144] *See*, generally, Harkin Deposition at 121, 166, 210.

[145] *See*, generally, Harkin Deposition at 121, 166, 210.

[146] *See*, generally, Harkin Deposition at Exhibit 409 (FED017882_0001), Exhibit 413 (FED017885_0001), Exhibit 416 (FED017884_0001), Exhibit 418 (FED017883_0001).

[147] *See*, generally, Harkin Deposition at 118-122, 139, 143, 150, 164-167, 194-196, 210-211.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                                    **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Defendants queried the gross written premiums from a certain subset of policies purportedly relevant to business segments/lines of business and then applied percentages to approximate the losses, reinsurance, overhead expenses and so forth to create the four (4) Defendants Financial Summaries.  Defendants then provided these summaries are exemplars of its profits on the gross written premiums reported by Blaze Advisor application.[148]

84.     Further, the Defendants Financial Summary for North America excludes premiums from Legacy ACE writing companies and may also include premiums from policies that are unrelated to Blaze Advisor.[149]

> *iii.*     Mr. Bakewell's Opinion Regarding the Correct Sources for Gross Written Premiums That Ran Through Blaze Advisor Applications

85.     As described in detail in my Affirmative Report, I have relied on the gross written premiums reported in Defendants' interrogatory responses in my calculation of Defendants' gross written premiums from using Blaze Advisor.[150] It appears that Mr. Bakewell mixes Defendants' reports of gross written premiums for each application by "cherry picking" the source that best matches his subjective and inconsistent reasoning.  By doing so, he effectively concludes that some sources of Defendants' gross written premiums are more accurate than the information reported in Defendants' interrogatory responses.  Additionally, Mr. Bakewell has not reconciled the apparent inconsistencies with Defendants' gross written premium disclosures included in the Defendants Financial Summaries.[151] (See **Table 1** and **Table 2** of this report for a list of "adjustments" Mr. Bakewell made to Defendants' financial reports).

> *iv.*     Unsubstantiated Adjustments to Defendants' Reported Gross Written Premiums

86.     I am unaware of any "tests" that can be used as a basis to confirm or refute the veracity of Mr. Bakewell's opinion that Defendants made several errors in reporting gross written premiums.  Absent information or testimony to the contrary, I have assumed that Defendants' interrogatory

---

[148] *See*, generally, Harkin Deposition at 118-152, 163-175, 193-203, 209-218.

[149] Harkin Deposition at 121-124.

[150] *See*, generally, Affirmative Report at 42, par. 122 and Exhibits 8.0-12.0.

[151] *See*, generally, Bakewell Report at 54-57, par. 177-184 and Exhibits 7.0-7.3.

responses are the most accurate accounting of the gross written premiums processed using a Blaze Advisor application.

87. As described in more detail in the subsequent paragraphs, it is my opinion that Mr. Bakewell's adjustments to my calculation are not only inconsistent and/or unsubstantiated, but also unnecessary and erroneous.

*v.*    Applications Using Blaze Advisor Identified by Plaintiff

88. I understand Defendants' position that certain applications do not use Blaze Advisor is a factual question to be determined by the trier of fact. Accordingly, for the purposes of calculating damages for Defendants' infringement of FICO's copyrights, I have assumed that the foreign and domestic applications identified by Plaintiff infringe FICO's copyrights through the use of the Blaze Advisor software.  If Plaintiff is unable to demonstrate that certain of the applications infringe FICO's copyrights through the use of the Blaze Advisor software, I may adjust my analysis to the extent necessary.

89. Further, it is my understanding Mr. Bakewell's opinion that Defendants' interrogatory responses include duplicates of certain policies and corresponding premiums processed through more than one application is premature. I understand the trier of fact will ultimately determine which of the Defendants' applications infringe FICO's copyrights through the use of the Blaze Advisor software. Therefore, I have calculated the accused gross written premiums associated with each application in the event the Court determines that only certain applications infringe FICO's copyrights.

90. With respect to the ADAPT application in the U.K., I understand Defendants contend this application does not use Blaze Advisor and should be removed from my calculation of Defendants' gross written premiums.[152] In my Affirmative Report and related exhibits, I used the label "ADAPT (UK)" to summarize the gross written premiums reported by the ADAPT application for the Chubb Specialty Insurance, Chubb Commercial Insurance and Accident and Health business units in Europe.[153] This application was simply mislabeled, but does, in fact, include the gross written

---

[152] Bakewell Report at Exhibit 7.2 (Footnote 2).
[153] *See*, generally, Affirmative Report at 40, par. 114 (Table 7) and Exhibits 9.0, 11.0-12.0; Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 20, dated March 21, 2019 at 3-5.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

premiums reported for the ADAPT application in the European zone (i.e., not U.K.) and should not be removed from my calculations.

    *vi.*    <u>Revised Gross Written Premiums for CUW Application</u>

    a)    *"Blaze IM Extract-Final" Source*

91.    As previously explained, Mr. Bakewell relied upon a document prepared by Federal personnel and produced outside of the ordinary course of discovery that purportedly corrected certain errors in Defendants' gross written premiums for the CUW application.  Specifically, I understand Mr. Bakewell relied on a file titled, "Blaze IM Extract-Final" that supposedly removed policies (and associated gross written premiums) which utilized both CUW and another application (i.e., CSI eXPRESS and Premium Booking).[154] I have not yet received or had the opportunity to analyze a file with this name.  According to Mr. Bakewell, the revised CUW gross written premium data represents on average a 62% decrease in the CUW gross written premiums reported in Defendants' interrogatory responses.[155]

92.    I understand that there is no testimony or other information explaining how the "Blaze IM Extract-Final" file was created. Absent additional information about how Defendants' personnel prepared this document for Mr. Bakewell, I cannot determine the relevance or reliability of these records.

93.    There are also facts that draw into question the accuracy of this document.  For example, I understand from testimony given by Mr. Mirolyuz that no policies processed using CUW are also recorded in Premium Booking.[156]  Similarly, I understand from Mr. Mirolyuz that renewal policies in CSI eXPRESS are also not processed using CUW.[157]

    b)    *FED017915 Source*

94.    Subsequent to my receipt of the Bakewell Report, Defendants produced a large text file (FED017915) containing what appears to be policy, product type, writing company and line of

---

[154] Bakewell Report at 56, figure entitled "Comparison of the Gross Written Premiums for the CUW Application Between Federal's Revised CUW Data and the Data Used by Mr. Zoltowski" and Exhibits 6.0 (Footnote 2) and 9.0.
[155] Bakewell Report at 56, figure entitled "Comparison of the Gross Written Premiums for the CUW Application Between Federal's Revised CUW Data and the Data Used by Mr. Zoltowski" and Exhibit 6.0 (Footnote 2).
[156] Deposition of Henry Mirolyuz, dated January 11, 2019 ("Mirolyuz 1/11/19 Deposition") at 80-81.
[157] Mirolyuz 1/11/19 Deposition at 80.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**    **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

business level records for the years 1976 to 2019, but none of the fields (e.g., column headers) in the document are labeled.[158]  I compared the one currency field in this data set to the totals by "Writing Company Name" in Exhibit 9.0 of the Bakewell Report, and the amounts for each writing company are the same for the same years (e.g., 2016-2018).  Although I can infer that this is the same data set cited by Mr. Bakewell, I do not have any more information about it than I do about the "Blaze IM Extract-Final," so it is no more useful than the data provided in "Blaze IM Extract-Final" for analyzing the veracity of Mr. Bakewell's claims.

95.     Subject to the aforementioned limitations, if these records do reflect the policies processed using CUW, they suggest the level of granularity Defendants are capable of querying (e.g., policy level).  It also indicates how Defendants queried its systems for the relevant policies.  Specifically, this data set includes records of policies that could not have been processed using CUW because CUW did not exist before approximately June 2009.[159] In the period starting March 31, 2016 (i.e., termination of the SLM Agreement), there appears to be approximately 48 different product types, which comprises approximately 158,000 individual policies.[160]  These facts suggests Defendants used one or more variables (in addition to or in lieu of Blaze Advisor application) to identify potentially relevant policies using Blaze Advisor.

*vii.*   Mr. Bakewell's "Federal Actual" Financial Summaries are Mislabeled and Misrepresented

a)    *Gross Written Premiums*

96.     Mr. Bakewell compiles his gross written premiums from the domestic and foreign applications together as the starting point in calculating the underwriting profits on premiums generated using Blaze Advisor.  Specifically, as described above, this compilation includes gross written premiums from three (3) different sources that were arbitrarily selected based on Mr. Bakewell's "reasonableness tests."

---

[158] FED017915_0001.

[159] I understand that by June 2009, the CUW application had over 6,000 uses in the United States and Canada. (Affirmative Report at 28, par. 78.)

[160] See **Reply Schedules 4.0** and **5.0**. I understand Mr. Bakewell appears to analyze the data in this text file (i.e., FED017915_0001) starting in January 2016 through December 2018 (e.g., see Bakewell Report at Exhibit 9.0). I understand that the relevant period for copyright damages begins on March 31, 2016. Accordingly, I have analyzed the data in this text file starting with this date.

97.     Nonetheless, Mr. Bakewell disingenuously labels his compilation of gross written premiums as "Federal Actual," when in reality, this compilation is far from actual and appears to be an attempt to 'cherry pick' from dissimilar and inconsistent sources to suit his opinions.  In fact, there is no link between Mr. Bakewell's compiled "Federal Actual" gross written premiums and Defendants' actual internal or publicly reported financial statements. To put it simply, there is nothing "actual" about Mr. Bakewell's compiled "Federal Actual" gross written premiums; instead, Mr. Bakewell's compiled calculation is mislabeled and misrepresented in an attempt to convey legitimacy to the underlaying data and methods used to create it.

b)      *Underwriting Profits*

98.     Mr. Bakewell uses this mislabeled and erroneous compilation of the gross written premiums (both domestic and foreign) as the starting point to calculate the "underwriting profits" intended to serve as the *proxy* for Defendants' profits on policies processed through Blaze Advisor. (See **Table 1** and **Table 2** of this report for the gross written premium sources Mr. Bakewell uses as the starting point).

99.     I understand Mr. Bakewell uses the following two (2) methods to approximate the expenses and losses he uses to create his "Federal Actual" summary.[161]  Both methods ultimately rely on the Financial Summaries for the four (4) regions provided by the Defendants, either directly or indirectly.  Mr. Bakewell uses either:

- The costs, expenses and losses, *as a percentage of net premiums*, in the business segments/lines of business financial summaries; or

- The *absolute values* of costs, expenses and losses calculated in the business segments/lines of business financial summaries.

100.    As described in detail above, the Defendants Financial Summaries contain several limitations and inconsistencies, including that they were created only for this litigation, fail to reconcile with Defendants' actual financial statements, and are *not* specific to the policies reported in Defendants' interrogatory responses.   Given these limitations, any reliance, derivations, approximations, and calculations based on the Defendants Financial Summaries does not

---

[161] *See*, generally, Bakewell Report at 62-63, par. 197-200 and Exhibits 7.1-7.3.

accurately reflect the profits that Defendants earned on gross written premiums generated using Blaze Advisor.

### c)   *Expenses Do Not Match Premiums*

101.    Not only are Mr. Bakewell's "Federal Actual" computations improper, but they also result in matching disparities as the costs and expenses do not correspond with Defendants' reported gross written premiums.  The matching of revenues to the corresponding expenditure of resources to generate them is commonly referred to as the matching principle and is a central tenet of financial accounting.[162]  By virtue of how Defendants compiled the source documents and Mr. Bakewell's subsequent "adjustments" to create his "Federal Actual" summary, the expenses in these documents simply do not match, or otherwise correspond to, the actual expenses that Defendants incurred to generate the gross written premiums reflected in its interrogatory responses.  Consequently, the "Federal Actual" underwriting profit calculated by Mr. Bakewell is no more accurate or reliable, and likely less so, than a Chubb Limited segment level income statement.

102.    For example, Mr. Bakewell mixed disparate sources for both gross written premiums and the corresponding costs in the same periods.  For the applications used in Europe and the U.K., Mr. Bakewell relies on the gross written premiums reported in Defendant's *interrogatory responses* for years 2013-2018.[163]  In effect, he replaces the gross written premiums reported by Defendants for the Europe and U.K. Financial Summary (i.e., FED017885) to derive the related costs and profits.[164]  Specifically, he deducts the costs and expenses in the Europe/UK Financial Summary from the gross written premiums in Defendants' interrogatory responses for the 2016-2018 period.[165]  Similarly, Mr. Bakewell uses a 2-year average ratio from 2016-2017 to estimate the costs for 2013-2015 (as a percentage of revenue) and then applies these percentages to the gross written premiums from Defendants' interrogatory responses.[166]

---

[162] International Accounting Standards Board (IASB) – International Accounting Standards 18 – Revenue (14-19 Sale of Goods).
[163] Bakewell Report at Exhibit 7.2 (Footnote 2).
[164] FED017885_0001.
[165] Bakewell Report at Exhibit 7.2 (Footnote 2).
[166] Bakewell Report at Exhibit 7.2 (Footnote 3).

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

103.    Taken together, the costs *calculated* by Mr. Bakewell, either directly from the Defendants Financial Summaries or estimated based on common-size ratios, do not reflect the actual expenses that Defendants incurred to generate the gross written premiums reported in the interrogatory responses. Stated differently, there is an inherent mismatch between the expenses and the gross written premiums and thus, the resulting "Federal Actual" underwriting profit calculated by Mr. Bakewell does not match the gross written premiums that ran through a Blaze Advisor application.

> ### d)    *Overhead Expenses Not Directly Related to Reported Gross Written Premiums*

104.    As previously explained, Chubb Limited's bulk expenses are not directly linked to any individual policy reported by Defendants in this matter.[167]   In the context of Mr. Bakewell's "Federal Actual" compilation, his "G&A (Administration) and TLF (Taxes, Licenses and Fees)" line item is presumably intended to reflect bulk expenses.[168]   Defendants' bulk expenses are appropriately categorized as overhead, and consistent with this classification, Chubb Limited allocates them using common cost accounting variables for internal reporting purposes.[169] However, and as explained by Mr. Harkin, these bulk expenses do not correlate to any individual policy, so they should not be deducted from Defendants' revenues attributable to its infringement of FICO's copyrights. [170]

> ### viii.    Defendants Bear the Burden of Proving Deductible Expenses

105.    I understand that the Defendants bear the burden of proving deductible expenses based on the copyright statute.[171] Mr. Bakewell, in fact, recited the relevant statute in his report:[172]

> In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.[173]

---

[167] Harkin Deposition at 55-56.
[168] Bakewell Report at 63, par. 200.
[169] *See*, generally, Harkin Deposition at 132-133.
[170] Harkin Deposition at 55-56.
[171] Affirmative Report at 41, par. 119.
[172] Bakewell Report at 31-32, par. 106.
[173] 17 U.S.C. §504(b).

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    **CONFIDENTAL – ATTORNEYS' EYES ONLY**

106.    In addition to proving direct expenses attributable to the infringement, I understand that Courts also require defendants to meet strict guidelines and parameters in proving overhead expenses incurred to generate accused revenues from copyright infringement.[174] As explained in the previous section, Mr. Bakewell has not shown that either the direct or the overhead expenses in his Federal Actual computation are related to Defendants' use of Blaze Advisor.

107.    However, Mr. Bakewell wrongly shifts the burden to the Plaintiff and ultimately fails to provide an opinion regarding the appropriate deductible expenses. Further, the Defendants Financial Summaries produced by the Defendants and relied upon by Mr. Bakewell are not reliable, or at a minimum, not a reasonable representation of the expenses incurred to generate the gross written premiums reported by the Defendants.

### *ix.*    Causal Nexus Between Copyright Infringement and Revenues

108.

It is my understanding that a causal nexus between copyright infringement and revenues is generally the subject of technical and/or industry experts. I understand that Bick Whitener, FICO's industry expert in this matter, explained the causal nexus between Defendants' use of Blaze Advisor and its corresponding gross written premiums from that use.[175]  To the extent that a causal nexus is required in a damages expert report, Defendants reported in interrogatory responses the gross written premiums from policies processed through applications using the Blaze Advisor software. I understand Blaze Advisor is used by Defendants to price, quote, manage and renew policies, among many other processes used to sell insurance.

### *x.*    No Opinion Regarding Writing Companies Subject to Damages

109.    As described in detail in my Affirmative Report, I have analyzed the many relationships between the Defendants and the various writing companies that generated gross written premiums from applications using Blaze Advisor.[176]  I understand that whether the Defendants are liable for the infringing use of Blaze Advisor by writing companies with different legal and/or contractual relationships is a legal question to be resolved by the Court.

---

[174] I understand that Defendants must provide evidence that costs and expenses specifically contribute to the accused revenues. Further, I understand no expense deductions are allowed if the expense did not specifically contribute to the infringing act. (*Alexander v. Chesapeake*, 60 F. Supp. 2d 544, 550-551 (E.D. Va. 1999); *Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985).)

[175] Expert Report of R. Bickley (Bick) Whitener dated April 19, 2019 at 7-35, par. 28-98.

[176] *See*, generally, Affirmative Report at 10-17, par. 30-50.

**REPLY EXPERT REPORT OF N. ZOLTOWSKI**
**CASE NO. 16-CV-1054 (WMW/DTS)**                    **CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### C.     Reply to Dr. Kursh's Opinions Regarding Damages

110.    Dr. Kursh's opinions largely parallel Mr. Bakewell's.  To the extent I addressed the same opinions set forth by Mr. Bakewell, I have not restated the same information in the following paragraphs.

#### i.     The Prices FICO Offered Federal Are Commercially Reasonable

111.    As previously explained, FICO has been using the ASM and related CSM to price Blaze Advisor since 2003.  Based on the list of licensees in Exhibit 12.1 of the Bakewell Report, dozens of well-known companies have licensed Blaze Advisor under these terms since 2003 when FICO adopted this methodology.[177]

112.    Again, there is no objective basis for discounting the rates in my lost license fee calculations.  Dr. Kursh, in fact, gave the best explanation for why these fees should _not_ be discounted when, as here, the licensor does not have a contractual or other expectation of a long-term relationship with the licensee.  With respect to FICO's actual negotiations with Federal in 2016, I understand that FICO offered steep discounts to Defendants to resolve the dispute and to retain the ongoing business relationship, which had historically been lucrative.  These lower prices reflected not only the potential to FICO of earning additional fees but also to resolve the dispute without litigation.

#### ii.     FICO Correctly Calculated the Sizes of Federal's Blaze Advisor Applications

113.    With respect to the appropriate sizes of Defendants' applications, I am not a software pricing expert and have, therefore, not attempted to apply FICO's ASM.  I relied upon William Waid's classifications based upon his interpretation of FICO's ASM.[178]  I understand Mr. Waid is the FICO executive who has been responsible for pricing Blaze Advisor since 2003.

114.    I understand that Mr. Waid re-evaluated the sizes of each application based upon the most recent discovery produced by Defendants in this proceeding in 2019.  The estimates he prepared in April 2018 were based on the more limited information available at that time. Consequently,

---

[177] Bakewell Report at Exhibit 12.1.
[178] Affirmative Report at 40, par. 114.

the sizes in my Affirmative Report are more accurate because they are based on more complete information.

115.   I disagree with Dr. Kursh's opinion that a more accurate way to size Defendants' applications is to use the size of CSI eXPRESS in 2006 "as a proxy for the other Federal [domestic] apps."[179]   I have seen no documents or testimony to suggest that FICO ever priced a customer's application based upon the size of another.   In addition, I would not expect the size of CSI eXPRESS in 2006 to have any bearing on the size of other Defendant applications in 2016.   Based upon my understanding of FICO's pricing mechanisms, sizing each application using CSI eXPRESS in 2006 as a proxy does not comport to FICO's actual nine factor ASM and is no more accurate than a baseless guess.

---

[179] Kursh Report 39-40, par. 114 and Exhibits 16-17.