**Exhibit 18**
**(Redacted)**
**(Previously Filed Under Seal as Dkt. 412)**

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 2 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3    - - - - - - - - - - - - - - - - - - - - - - - - -

4    FAIR ISAAC CORPORATION,

5                   Plaintiff,

6         v.            Court File No. 16-cv-1054 (WMW/DTS)

7    FEDERAL INSURANCE COMPANY,
     an Indiana corporation, and ACE
     AMERICAN INSURANCE COMPANY,
8    a Pennsylvania corporation,

9                   Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - -

11                  VIDEO DEPOSITION

12        The following is the video deposition of

13   NEIL J. ZOLTOWSKI, taken before Jean F. Soule,

14   Notary Public, Registered Professional Reporter,

15   pursuant to Notice of Taking Deposition, at the law

16   office of Fredrikson & Byron, P.A., 200 South Sixth

17   Street, Suite 4000, Mille Lacs Conference Room,

18   Minneapolis, Minnesota, commencing at 8:09 a.m.,

19   Friday, June 14, 2019.

20

21                 *      *      *

22

23              C O N F I D E N T I A L

24             ATTORNEYS' EYES ONLY

25

**EXHIBIT**
**18**

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

P R O C E E D I N G S

Whereupon, the deposition of NEIL J. ZOLTOWSKI was commenced at 8:09 a.m. as follows:

* * *

THE VIDEOGRAPHER: We're on the record. Today's date is June 14th, 2019. The time is now 8:09 a.m. This is the deposition of Neil Zoltowski in the matter of Fair Isaac Corporation versus Federal Insurance Company, et al. We are located at 200 South Sixth Street, Minneapolis, Minnesota. The videographer's name is David Jenkins, appearing on behalf of Depo International. The court reporter's name is John -- Jean Soule, also appearing on behalf of Depo International.

Will counsel please introduce themselves and their affiliations?

MR. FLEMING: Terry Fleming and Christian Hokans of the Fredrikson firm, representing Defendants.

MS. KLIEBENSTEIN: Heather Kliebenstein from Merchant & Gould, on behalf of the Plaintiff.

THE VIDEOGRAPHER: Will counsel please into -- well, will the court reporter please swear in the witness?

Page 3

* * *

(Reporter's Note: The oath was administered by the court reporter.)

MR. ZOLTOWSKI: I do.

* * *

NEIL J. ZOLTOWSKI,
after having been first duly sworn,
deposes and says under oath as follows:

***

EXAMINATION

BY MR. FLEMING:

Q.   Good morning, Mr. Zoltowski. How are you doing?

A.   I'm well, thank you.

Q.   Okay. Why don't we start by marking your actual report and reply report.

MR. FLEMING: What did we decide it was, Exhibits?

MR. HOKANS: Four fifty-five.

MR. FLEMING: Four fifty-five and four fifty-six.

(Discussion off the record.)

(Whereupon, Deposition Exhibit Nos. 455 and 456 were marked for identification, and copies are attached and hereby made a part of

Page 4

this deposition.)

THE COURT REPORTER: Should I hand it to him?

MR. FLEMING: Please.

THE WITNESS: Thank you.

BY MR. FLEMING:

Q.   Mr. Zoltowski, could you just verify that Exhibits 455 and 456 are your initial expert report and rebuttal report?

A.   The -- 455 is my initial expert report, 456 is my reply report, although it does not have the exhibits attached or the schedules.

Q.   Okay. I will get a -- I will attach those schedules before we end today.

A.   I know the -- one of the schedules, I believe Schedule 5.0, is -- it's fairly long, I think over 2,000 pages. So I'm not sure you need to print that one out, unless --

Q.   Not going to --

A.   -- you want to.

Q.   -- attach that one.

A.   Want that one.

Q.   All right. Is your resume attached as the first schedule to your initial report?

A.   It is.

Page 5

Q.   The education section of your resume lists a B.A. in economics; is that right?

A.   That's correct.

Q.   Is that your only degree from a college or a university?

A.   I have -- I've done coursework in -- Masters coursework at Boston University, but I did not receive a degree.

Q.   At Boston College, did you say?

A.   University.

Q.   Boston University. How many courses did you take?

A.   Gosh, it was over ten years ago. I think it was a semester or two, part-time. So it was either two or three, if I recall correctly.

Q.   What were the courses in?

A.   They were part of the Masters framework for economics at Boston University.

Q.   Why didn't you complete it?

A.   I became a partner with my firm, and the travel became too much to try to keep up with the education on top of all of the work.

Q.   So, in response to my question whether the B.A. in economics is your only degree from a college or university, your answer would be yes,

Page 6

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 4 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 that is the only degree, correct?
2   A.   That's correct.
3   Q.   Are you a certified public accountant?
4   A.   I am not.
5   Q.   Do you have any training in
6 accounting?
7   A.   I've taken accounting courses as part
8 of my Bachelor's degree, and, then, also over the
9 course of my career of 23 years I've done a number
10 of trainings, either as part of certain
11 certifications or as part of certain firms that
12 I've been an employee at.
13   Q.   What accounting courses did you take?
14   A.   I believe in my Bachelor's degree one
15 was Introduction to Accounting, and I think there
16 was a cost accounting one as well.
17   Q.   Do you have any experience with the
18 pricing of software?
19   A.   Other than -- I guess I would answer
20 that with yes, as part of my work as a consultant
21 and expert witness related to damages, but I have
22 not held a position within a company where I've
23 priced software.
24   Q.   What has been your experience as an
25 expert with regard to the pricing of software?

Page 7

1   A.   I have managed several cases or served
2 as an expert witness where I've rendered opinions
3 or supported an expert who has rendered opinions
4 related to the value of software when it comes to
5 damages in those particular cases.
6   Q.   And in what cases did -- did you say
7 you testified as a witness in those cases?
8   A.   In certain cases.  In others I was the
9 lead or the first lieutenant, I guess you would
10 say, managing the case for the testifier.
11   Q.   Can you identify those cases where you
12 were a testifying witness?
13   A.   In cases that involved software
14 included Personnel Department v. CareerBuilder,
15 which is the fourth one down on page 3 of my CV.
16 Fitness Gaming Corporation v. ICON Health & Fitness
17 related to software per se.  It was the exercise
18 equipment that included gaming, gaming technology
19 on it, which includes software.  The two Symantec
20 matters on the top of page 4 both included software.
21 Minitab v. EngineRoom included software, statistical
22 software.  I believe Top Agent Network v. Zillow
23 included software.  Adobe Systems V. A & S
24 Electronics related to the resale of software.
25 Smartling v. Easyling and Skawa included -- the

Page 8

1 products at issue were software.  However, the
2 issues were related to the trademarks and trade
3 dress of that software.  I don't recall if Brooks
4 Automation v. PTB Sales included software or not,
5 it may have, as part of the cryogenic technology
6 that case focused on.  And I don't have a listing
7 of all the cases I've managed over my career, which
8 has spanned hundreds, but I know some of those have
9 included software.
10   Q.   Right.  And in response to my question
11 as to those cases in which you testified as an
12 expert witness in the cases that involved software
13 licensing, have you identified all of those?
14   A.   To the best of my knowledge, yes.
15   Q.   Okay.  What is your claimed area of
16 expertise in this case?
17   A.   I am providing expert opinions related
18 to economic damages.
19   Q.   How many times have you testified as
20 an expert witness at trial?
21   A.   At trial?  I just testified last week,
22 and I forget if that's third or fourth.  I think
23 it's four.
24   Q.   Four times?
25   A.   Four times.

Page 9

1   Q.   Has the court ever -- has a court ever
2 excluded your testimony?
3   A.   Uh, no.
4   Q.   How many breach of contract cases have
5 you worked on involving software license agreements?
6   A.   To answer that with any specificity, I
7 would have to go back through my career of cases
8 I've worked on and managed.  I can go through my CV
9 in terms of where I've been serving as an expert.
10 And could you repeat your question for me just so I
11 can make sure I answer it correctly?
12   Q.   How many breach of contract -- contract
13 cases have you worked on involving software license
14 agreements?
15   A.   I don't believe I've served as an
16 expert where I've rendered opinions in that regard,
17 but I do recall that there have been cases where
18 I've served as an -- or served as a -- an employee
19 or a partner who has been supporting an expert
20 related to breach of contract damages in terms of
21 software agreements.  Again, I would have to go
22 back through my career and look at the cases.
23   Q.   So, in response to my question, you
24 have not worked on any prior cases as an expert
25 witness involving software license agreements in

Page 10

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 5 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 11**

1 which there was a breach of contract claim?

2  **A.  That's correct.**

3  Q.  Have you -- How many cases involving

4 software license agreements have you worked on in

5 which there have been copyright infringement claims?

6  **A.  Adobe Systems v. A & S Electronics**

7 **involved the resale of Adobe software products.  So**

8 **it was a reseller agreement, not -- maybe not a**

9 **software license per se, but that's one.  And,**

10 **then, as I stated, the Brooks Automation v. PTB**

11 **Sales case has copyright infringement claims.  I**

12 **just don't recall if there was a software component**

13 **related to this cryogenic technology or not.  And,**

14 **then, with the caveat that I could go back through**

15 **my list of hundreds of cases and let you know if**

16 **there are cases where there were copyright**

17 **infringement allegations that I worked on that**

18 **related to software licenses.**

19  Q.  Have you testified as an expert in any

20 case involving copyrights in which you opined on

21 lost sales?

22  **A.  I just want to make sure I understand**

23 **your question.  You're saying -- is it correct that**

24 **you're saying actual damages quantification related**

25 **to lost sales by the plaintiff?**

**Page 12**

1  Q.  Yes.

2  **A.  Okay.  Would you like me to go through**

3 **my list again?**

4  Q.  If that will help you answer the

5 question.

6  **A.  Sure.  And just to be clear, is your**

7 **question either as a plaintiff or defendant?**

8  Q.  Correct.

9  **A.  Each of these copyright cases, Adobe**

10 **Systems v. A & S Electronics, again, Brooks**

11 **Automation, v. PTB Sales, Kangaroo Manufacturing v.**

12 **Amazon, Pennies2Platinum v. Amazon, all included**

13 **copyright infringement allegations where one of the**

14 **damages remedies that was opined -- that I opined**

15 **to or rebutted related to actual damages of lost**

16 **sales.**

17  Q.  Can you go to the beginning of your

18 initial report, the first paragraph?

19  **A.  Okay.**

20  Q.  You say in the first paragraph that

21 you have provided financial and economic consulting

22 services, including economic valuation of

23 intellectual property, such as copyrights; is that

24 right?

25  **A.  Uh, correct.**

**Page 13**

1  Q.  How do you generally go about

2 ascertaining the economic value of a copyrighted

3 work?

4  **A.  And are you talking about just a**

5 **valuation of a copyright or are you talking about**

6 **in the context of litigation related to damages?**

7  Q.  Let's talk about valuation first, and

8 then let's talk about litigation?

9  **A.  Sure.  From a valuation perspective,**

10 **obviously, it would depend on what the copyright is**

11 **and what the reason for the valuation is, but there**

12 **are typically three approaches to valuation: the**

13 **market approach, the cost approach, and the income**

14 **approach.  And depending on the information**

15 **available, the reasons for the valuation, you could**

16 **use one or multiple of those approaches in your**

17 **valuation of those copyrights or that copyright.**

18  Q.  What about with respect to litigation?

19  **A.  With litigation, it would depend upon**

20 **the facts and circumstances and information**

21 **available.  My understanding of the Copyright Act**

22 **and the statute as it relates to damages is that**

23 **actual damages and -- actual damages suffered by a**

24 **plaintiff are available as a measure of damages,**

25 **and, then, disgorgement of defendants' profits**

**Page 14**

1 would be another category of damages available

2 under the statute.

3  Q.  So, in this case, you haven't done any

4 valuation using a market approach, cost approach or

5 income approach; is that fair?

6  **A.  I guess I would answer the question**

7 **this way, which is, components of all of those**

8 **approaches are typically embedded in damages**

9 **quantification.  I didn't set out to use one of**

10 **those specific approaches because in this case we**

11 **are not valuing a copyright, we are quantifying**

12 **damages related to the harm suffered or the**

13 **improper benefits realized by the defendant, and,**

14 **therefore, the framework doesn't lend itself to**

15 **using one of those three approaches in -- as far as**

16 **the information available in this case.**

17  Q.  Let me -- let me follow up on that.

18  Are you saying that you did use the

19 market approach or the market valuation method in

20 any way with respect to your expert report in this

21 case or not?

22  **A.  I would answer that by saying I**

23 **assessed the information available and understood**

24 **that there were facts and circumstances surrounding**

25 **the negotiations between the parties, as well as**

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1 other agreements that FICO has entered into, and
2 based upon that information, I concluded that most
3 of that information was irrelevant to the
4 quantification of damages for this -- these two
5 particular parties.
6   Q.   Let me see if I understand your
7 testimony.
8       You considered the negotiations
9 between the parties, but you ultimately determined
10 that that was not relevant with respect to your
11 expert opinion as to lost profits; is that fair?
12   A.   I don't think that's completely
13 correct. I think the negotiations -- or the failed
14 negotiations, I should say, were relevant to
15 helping me understand the facts and circumstances
16 between the parties, which then assisted in my
17 determination of damages as it relates to the --
18 what I felt the parties would have entered into for
19 an agreement.
20   Q.   So are you saying that the negotiations
21 of the parties was relevant to your expert opinion
22 only as to helping you understand the context and
23 the background?
24   A.   The negotiations -- I guess the way I
25 would answer it is this way, and, that is, this

Page 15

1 construct is different than many other cases in
2 that we had a breach of a contract and the parties
3 terminated a license and the parties negotiated to
4 renew that license and those negotiations failed,
5 and at that point the plaintiff continued using the
6 software without authorization. And, therefore,
7 that helped me in understanding the framework or
8 structure as to how I would quantify damages
9 between the parties.
10   Q.   So when you earlier said that you
11 considered the negotiations of the parties and you
12 considered the other software license agreements
13 but ultimately determined they were not relevant
14 with respect to the opinion that you were providing,
15 what did you mean by that?
16   A.   I said most of the information was
17 irrelevant. So the negotiations were relevant.
18 The other agreements, after I assessed them, I
19 determined were irrelevant because the construct of
20 those agreements did not factor into -- or did not
21 have the same set of facts and circumstances
22 related to two parties who were at that point
23 adversarial based upon a breach of the contract and
24 a termination of a contract and a renegotiation
25 that failed of that contract.

Page 16

1   Q.   So when you said that you considered
2 the negotiations of the parties and the other
3 software license agreements but ultimately
4 determined that they were not relevant to your
5 opinion, what you meant by that was that you
6 considered the other software license agreements
7 and those were not relevant?
8   A.   Correct. If you read -- reread my
9 answer, I said most of the information is not
10 relevant. So I guess the way I would categorize
11 that is the negotiations were relevant. I also
12 looked at the agreements, but the agreements I
13 determined were irrelevant.
14   Q.   Okay. And how many other agreements
15 did you look at? First of all, what agreements did
16 you look at?
17   A.   If I recall, there were a number of
18 agreements that were exhibits to Mr. Waid's
19 deposition -- I think his second deposition, if I
20 recall correctly -- and I or the persons under my
21 direction reviewed those.
22   Q.   Okay. Other than those agreements,
23 did you review any other software license agreements
24 involving FICO and Blaze?
25   A.   I know there were a number of other

Page 17

1 ones that we did review at some point, I just don't
2 recall all of them, and I know there were a number
3 that were summarized by Mr. Bakewell, that if we
4 hadn't looked at those previously we looked at
5 subsequently and had the same determination, which
6 was they were not relevant to the analysis.
7   Q.   Just ballpark, what -- what is the
8 number of other FICO software license agreements
9 involving Blaze that you reviewed?
10   A.   At this point, it would be any that
11 were produced in this -- oh, I'm sorry, not
12 produced, but any that were cited by Mr. Bakewell
13 and, then, that were part of the Waid deposition.
14 There might be others, but those are the ones I
15 recall as I sit here today.
16   Q.   Okay. Did you review any other
17 software license agreements other than those cited
18 by Mr. Bakewell and that were attached as exhibits
19 in Mr. Waid's depositions?
20   A.   As I just stated, there may have been,
21 I just don't recall as I sit here today.
22   Q.   Now, earlier, when you were talking
23 about the background circumstances, you said that
24 there was a breach of contract and the parties
25 terminated the license; is that right?

Page 18

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1      A.    That may have been what I said, yes.

2      Q.    Okay.  Now, you're not making any

3 expert opinion as to liability in this case, right?

4      A.    I am not.

5      Q.    So when you say there was a breach of

6 contract, you're not stating an expert opinion, are

7 you?

8      A.    I am not, and maybe it's -- I

9 misspoke.  The agreement was terminated.

10     Q.    Okay.  When you say that the parties

11 terminated the license, are you suggesting that

12 FICO and Federal agreed to terminate the license?

13     A.    No.  I'm just stating that the parties

14 terminated the license.  I believe FICO sent notice

15 to defendants that it was terminating the license

16 based upon the assignment provision and a breach of

17 the contract based upon certain provisions within

18 that contract.

19     Q.    Okay.  Just so that I'm clear, is it

20 your understanding that the parties, meaning FICO

21 and Federal, voluntarily terminated the contract?

22     A.    As I stated, I know FICO sent notice

23 to terminate the contract after failed renegotiations

24 of that contract.

25     Q.    Okay.  So earlier when you said that

Page 19

1 the parties terminated the contract, what you are

2 now saying is that FICO sent notice of a

3 termination of the contract; is that fair?

4      A.    That's fair.  Again, I'm not offering

5 an opinion as to liability, I'm just stating what I

6 understand to be certain facts and circumstances.

7      Q.    All right.  So we were talking about

8 your background, as stated in the first paragraph

9 of your initial report, and specifically the

10 economic valuation of intellectual property such as

11 copyright, we talked about the three valuation

12 approaches, and you said in litigation there's two

13 types of remedies: actual and disgorgement.

14           How do you typically go about

15 ascertaining the actual damages in copyright cases?

16     A.    Actual damages could be quantified in

17 different ways.  It could be lost profits.  In the

18 situation like this, it's the lost license fees to

19 FICO.  It would really just depend on the facts and

20 circumstances of the case as to what those actual

21 damages may be.

22     Q.    So they're -- you don't have a general

23 way of ascertaining lost license fees or lost

24 profits in copyright cases?

25     A.    I guess I'd need you to explain your

Page 20

1 question a little better.  I'm sorry.

2      Q.    Well, you've testified -- you have

3 testified as an expert in copyright cases involving

4 lost profits, right?

5      A.    Correct.

6      Q.    Okay.  And you also worked as a key

7 member, you've referenced several times, in those

8 type of cases, also, correct?

9      A.    That's correct.

10     Q.    And my question is, how do you

11 generally go about determining the lost profits in

12 those cases?

13     A.    It would depend on the facts and

14 circumstances of the case, but generally you're

15 looking at what is the harm suffered through the

16 infringement of those copyrights in those

17 particular matters, and you're looking at based

18 upon that infringement are there lost sales that

19 have occurred and have been suffered by the

20 plaintiff, and, then, from those lost sales are

21 there profits that, you know, are generated from

22 those revenues from those lost sales.

23     Q.    And how do you generally go about

24 determining lost sales?

25     A.    You would look at the sales that were

Page 21

1 made by a defendant -- and, again, it depends on

2 the facts and circumstances of the case.  But

3 generally you would see if there were sales made by

4 defendant through those infringements that then

5 would have been made by the plaintiff, therefore,

6 being lost sales, and, then, from those lost sales,

7 you would determine the profits that are

8 attributable to those revenues.

9           In this situation, it's not lost

10 profits per se, but it's a license agreement, and,

11 therefore, it's lost license fees.  So it's a

12 little bit of a different construct.

13     Q.    Have you testified as an expert in

14 other cases involving lost license fees?

15     A.    I've worked on and testified in a

16 number of cases involving license agreements and

17 assessing those license agreements to determine if

18 the value of those agreements is comparable to an

19 agreement that would be the issue in, you know, the

20 particular case I'm working on.  But I don't recall

21 any particular cases that fit the construct I think

22 you're stating.

23     Q.    So you have never testified before in

24 a case involving software licenses on the topic of

25 lost profits?

Page 22

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1     A.    Could you repeat that question?

2     MR. FLEMING:  Could you read the

3 question again?

4     (Whereupon, the court reporter read

5 back the following question: "So you have never

6 testified before in a case involving software

7 licenses on the topic of lost profits?")

8     THE WITNESS:  As I stated prior, the

9 Brooks Automation v. PTB Sales case I believe

10 involved lost profits, I just don't forget -- I --

11 I forget if it involved software.  There are a

12 number of other cases on here, like the two Symantec

13 cases, the Minitab case and -- I'm trying to see if

14 there are others, that relate to software.  And

15 although they did not relate to lost profits, I

16 would say they related to -- those related to

17 reasonable royalties, which would be the market

18 approach to valuation.  And the Top Agent Network,

19 which relates to trade secret misappropriation of

20 software, that was a cost approach that I took on

21 that case.

22 BY MR. FLEMING:

23     Q.    So, in response to my question as to

24 whether you've testified before in a case involving

25 a software license on the topic of lost profits, is

Page 23

1     A.    Correct.  It's just a select

2 representation of industries.  There's --

3     Q.    Where is that?

4     A.    There might be others.

5     Q.    Where in your report do you reference

6 that?

7     A.    I don't reference it in my report, but

8 there is a -- it's part of my CV, on page 2 of my

9 CV.

10     Q.    So when you identify on page 2 various

11 representative industry experience, you identify

12 insurance as one of those areas or one of those

13 industries; is that right?

14     A.    That's right.

15     Q.    What prior experience have you had

16 with respect to insurance?

17     A.    The first case under my Expert

18 Designations and Testimony is Great American

19 Insurance and Novartis v. TA Operating Corp., that's

20 one; and, then, the Lon Sherman v. Mark Shub case,

21 which is the fifth one down, also involved insurance,

22 I believe, related to a -- a trust, if I remember

23 that correctly.

24     Q.    So the two cases that you've worked on

25 as an expert in which the insurance industry was

Page 25

1 your response that the one case may be the Brooks

2 case except it's not clear whether that involved

3 software or not?

4     A.    That's correct.  I know I've worked on

5 a number of cases that I've managed that related to

6 those issues.  But, again, I'd have to go revisit

7 the hundreds of cases I've worked on to get you a

8 clear list of those.

9     Q.    Right.  And apart from the cases that

10 you worked on, in response to my question about

11 cases you've worked on as an expert witness, the

12 one case that you've worked on as an expert witness

13 would be the Brooks case, except with the

14 qualification that that might not have involved

15 software?

16     A.    Correct.

17     Q.    Okay.  Now, in the first paragraph of

18 your initial report you also say that you have --

19 you identify in your report the various industries

20 that you've worked in -- not that you've worked in,

21 but the industries, the various industries in which

22 you have provided expert testimony in?

23     A.    In my report or in my CV?  I'm sorry,

24 where are you?

25     Q.    In your CV.

Page 24

1 involved is the Great American Insurance Company of

2 New York case, and the Competitive Edge case?

3     A.    No.  It was the fifth one down, the

4 Lon Sherman v. Mark Shub case.

5     Q.    Oh.  And what was the general -- can

6 you give me some background just generally on what

7 the Great American Insurance case related to?

8     A.    I will try my best, that was over ten

9 years ago.  But it related to a -- a truckload of

10 pharmaceuticals that was stolen from a truck stop

11 in New Jersey, and the question was what is the

12 value of those pharmaceuticals that were taken, and

13 the insurance piece of that was that -- I believe

14 the insurance company was try -- stepping in on

15 behalf of Novartis, and I don't recall the issues

16 surrounding insurance per se in that case, since it

17 was ten years ago.

18     Q.    So your recollection is that the

19 plaintiff, Great American Insurance Company had

20 stepped in on behalf of the initial plaintiff as

21 subrogor or some such thing?

22     A.    That's what I can recall.

23     Q.    Sure.  But you can't recall whether

24 the case actually involved the insurance industry

25 as such, is that fair, also?

Page 26

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

**Page 27**

1    A.   I know it did involve the insurance
2  industry to a -- some degree, I just don't recall
3  exactly what those issues were given it was so long
4  ago.
5    Q.   Okay.  And did it involve anything
6  other than insurance coverage issues?
7    A.   I don't believe so.
8    Q.   Okay.  Just so that we're clear,
9  you're saying that it did just concern insurance
10  coverage issues or it did not involve just
11  insurance coverage issues?
12    A.   I believe it may have just included
13  insurance coverage issues.
14    Q.   Okay.  And what about the second case
15  you identified, the Lon Sherman matter, just
16  generally what did that case involve?
17    A.   It involved exactly what it states
18  there, is all I can tell you.  That was a small
19  case that I worked on ten years ago, and I have
20  very little recollection of it.
21    Q.   The description doesn't appear to
22  relate to the insurance industry at all; isn't that
23  right?
24    A.   That's correct.
25    Q.   Okay.  But your recollection is that

---

**Page 28**

1  there was some insurance industry connection with
2  that case?
3    A.   Yes, because it -- I do recall it was
4  a malpractice dispute which involved malpractice
5  insurance.
6    Q.   Okay.  So, again, the second case that
7  you identified probably just involved an insurance
8  coverage issue, that was the insurance industry
9  component; is that fair?
10    A.   I honestly don't recall.
11    Q.   So when you identify on your resume
12  that you have representative industry experience in
13  insurance, you are referencing there just two
14  cases, both of which just involved insurance
15  coverage issues and no other fact or circumstance
16  relating to the insurance industry?
17    A.   Those are the two where I've been
18  designated as an expert.  There -- if I recall
19  correctly, I just can't speak to the hundreds of
20  cases I've worked on where others have involved
21  insurance related issues that I've worked on over
22  the course of my 23-year career.
23    Q.   Okay.  But as you sit here today, when
24  you have identified insurance as one of the
25  representative industry experience that you have

---

**Page 29**

1  had, the only thing that you can recall today are
2  two cases involving insurance coverage issues, right?
3    A.   Yes, with the caveat that I don't
4  recall exactly the issues of the Shub case that I
5  talked about, which may have involved more than
6  just the insurance coverage issues.
7    Q.   Earlier in your testimony you said
8  that three of the valuation approaches that you use
9  when appraising copyrights are the market approach,
10  the cost approach and the income approach, correct?
11    A.   Correct.
12    Q.   And you talked about and we discussed
13  the extent to which you used the market approach in
14  your expert report in this case.  To what extent,
15  if any, did you use the cost approach in connection
16  with your expert report in this case?
17    A.   In terms of the cost approach, what
18  one is looking at is what would be the costs to, in
19  this situation, replace the FICO Blaze Advisor®
20  software, and when I look at the available options,
21  while there may have been options out there,
22  defendants have continued to use the Blaze Advisor
23  software and have not replaced it over the course
24  of these last three plus years.
25  ████████████████████████████████████

---

**Page 30**

1  ████████████████████████████████████
2  ████████████████████████████████████
3  But, again, that would be more than three-and-a-half
4  years following the termination of the license.
5    Q.   And how do the factual circumstances
6  that you just related, how do those respond to the
7  question as to whether you used the cost approach
8  in your expert report?
9    A.   Well, I assessed that there were -- or
10  if there were any available options out there, and
11  my conclusion is that based upon the activities of
12  the plaintiffs, in that they decided not to replace
13  the software over the course of three plus years,
14  there were -- there -- in their eyes not an option
15  available for them to use in replacing the Blaze
16  Advisor software, and, hence, they chose to continue
17  using the Blaze Advisor software.
18    Q.   Well, did you take any other steps to
19  determine whether there were -- whether there are
20  alternatives?
21    A.   I understand there are certain
22  products out there that provide decision management
23  software solutions.
24    Q.   Okay.  And what are those?
25    A.   I know IBM provides one.  I think

---

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 10 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 31**

3 I don't know any of the others off the top of my
4 head.
5    Q.    What are the cost of those
6 alternatives?
7    A.    I don't know the cost of the IBM
8 product. I don't think it actually matters to the
9 construct here.
12    Q.    Why did you say that cost of those
13 does not matter to this construct?
14    A.    Because the plaintiffs have not
15 migrated away from the Blaze Advisor product, which
16 demonstrates to me that it's an essential part of
17 their business, because if they could have easily
18 replaced it they would have in the last three years.
19    Q.    If, in fact, the alternative that
22 on the lost profits analysis and specifically
23 FICO's claimed damages based on its lost license
24 fees?
25    A.    Because in this situation what I'm

**Page 32**

1 quantifying is the harm to FICO based upon the
2 unauthorized usage of software for three plus
3 years. I'm not looking back to a hypothetical
4 construct of the two parties negotiating for a
5 license to the Blaze Advisor software at this -- at
6 that time. We know the parties did negotiate and
7 failed to come to an agreement.
13    Q.    Do you understand that Federal's
14 position in this case, so that there has been
15 no breach of the contract, so they are able to
16 continue to use the software license agreement,
17 which is a perpetual enterprise license?
18    A.    My understanding is, as I stated
19 previously, that the agreement has been terminated,
20 and I'm operating under that construct.
21    Q.    So why didn't you consider what you
22 just characterized as the hypothetical concept of
23 two parties negotiating a software license
24 agreement?
25    A.    Because in this situation we have two

**Page 33**

1 parties that did negotiate. So I don't need to
2 re-create a fantasy world of a hypothetical
3 negotiation between two parties who have already
4 negotiated and failed to come to an agreement. We
5 have facts on the record. We have evidence of the
6 two parties negotiating. We know the parties
7 failed to come to an agreement.
8    Q.    Have you in other cases used this
9 hypothetical concept of two parties negotiating a
10 software license agreement?
11    A.    I have used the hypothetical
12 negotiation in a number of cases, mostly related to
13 patent infringement, and those patents may have
14 related to or involved software, but that's part of
15 the case law under the patent damages, and that
16 guide -- provides guidance that a hypothetical
17 negotiation framework is appropriate to use in
18 those instances.
19    Q.    So it would be your testimony that
20 this hypothetical negotiation concept would be
21 appropriate in cases involving patent damages but
22 not outside of that area based on the case law?
23    A.    I didn't state that. I stated that
24 I've worked on cases where I've used the
25 hypothetical negotiation related to patent

**Page 34**

1 infringement allegations.
2    Q.    And my question is, do you believe it
3 is appropriate to use that same concept outside of
4 the patent damages --
5    A.    It would depend --
6    Q.    -- area?
7    A.    -- on the facts and circumstances of
8 the case. But I would also state that while the
9 patent law states that the hypothetical licensor
10 and licensee are willing licensor and willing
11 licensee and will come to an agreement. I don't
12 believe that same construct is specific to other
13 forms of intellectual property damages. And in a
14 situation like this, where we have a terminated
15 license and a breach of the contract, you know,
16 FICO has no reason and does not need to willingly
17 enter into a license.
18    Q.    So have you ever used the hypothetical
19 negotiation concept outside of the -- outside of
20 cases involving patent damages?
21    A.    I may have, I just don't recall the
22 facts and circumstances surrounding it.
23    Q.    So you may have. Does that mean it
24 would be appropriate to use that concept outside of
25 the patent damages area?

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 11 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

A.    Again, it would depend on the facts
and circumstances of the particular case. I don't
feel it lends itself to this particular case.
Q.    But in response to my question, you do
believe that that concept would be available and
appropriate outside of the patent damages area?
A.    Again, I think it would depend on the
facts and circumstances of the case. But the
hypothetical negotiation construct is -- I believe
is different when it comes to other forms of
intellectual property.
Q.    How --
A.    And it doesn't have the same structure
in terms of strictly defining that the parties have
to enter into a license.
Q.    All right. Your report lists
interviews with Bick Whitener and William Waid; is
that correct?
A.    That's correct.
Q.    Have you talked with anyone else at
FICO in preparing your reports?
A.    No, I have not.
Q.    Going back to your initial report, in
paragraphs 5 and 6 you set out what your assignment
was in this case; is that correct?

Page 35

A.    That's correct.
Q.    And what was your assignment or what
was your assignment?
A.    As I stated in my report, I have been
retained as a damages expert in this matter by
Merchant & Gould, counsel for Plaintiff FICO, to
assess and quantify the economic damages sustained
by FICO and the economic benefits received by
defendants, assuming that the defendants are found
liable for the alleged wrongful acts described in
the Second Amended Complaint, among other things,
and these claims include breach of contract and
copyright infringement.
Q.    So what was your methodology for
assessing and quantifying these two categories of
damages in this case, can you describe that in
plain terms?
A.    Sure. I assessed the available
information, I under -- got an understanding from a
copyright infringement perspective the available
remedies, which I know through my career, but I
always like to confirm that through authoritative
text, as well as speaking with counsel, to make
sure I understand the categories of damages
available.

Page 36

After reviewing the information, I
quantified damages for the breach of contract
related to -- or in the form of the lost license
fees to FICO based upon a named application license;
and as for copyright infringement, I quantified
damages based upon the actual harm suffered by
FICO, which is also in the form of the lost license
fees; and, then, also quantified damages based upon
the improper economic benefits received by defendants
through their unauthorized use of the software.
MR. FLEMING: All right. I'm going on
to a different topic. Why don't we take a
five-minute break, we've been going about an hour.
THE WITNESS: Is there a restroom
nearby?
THE VIDEOGRAPHER: We're going off the
record. The time is now 9:03 a.m.
(Break from 9:03 to 9:11.)
THE VIDEOGRAPHER: We're back on the
record. The time is now 9:11 a.m.
BY MR. FLEMING:
Q.    Mr. Zoltowski, could you turn to page
38 of your initial report?
A.    Okay.
Q.    It's your opinion, as reflected in

Page 37

your initial report on page 38, that FICO lost a
deployment license, development seat license,
support and maintenance fees totaling $37.4 million
from Federal's unlicensed and unauthorized use of
Blaze; is that right?
A.    Correct, between the time period
April 2010 and December 2019.
Q.    Now, you reached these lost license
fees -- if I can characterize that longer description
that you provided, these lost license fees, you
reached those lost license fee numbers by utilizing
the price of each of the 15 named applications that
Mr. Waid provided to you based upon FICO's nine
criteria as defined in FICO's rate tables; is that
right?
A.    That's a fair summary.
MR. FLEMING: Now, can you mark this
as the next exhibit?
THE REPORTER: That's 457.
(Whereupon, Deposition Exhibit No. 457
was marked for identification, and a copy is
attached and hereby made a part of this deposition.)
THE WITNESS: Thank you.
BY MR. FLEMING:
Q.    What I'm showing you is a document

Page 38

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 12 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 marked as Exhibit 457, which I will represent to
2 you is attached as a exhibit to a declaration that
3 Mr. Waid signed.  Are the last two pages of this
4 exhibit, the second to the last page, first of all,
5 does that set out the nine criteria that you
6 reference?
7    **A.   Yes.**
8    Q.   And on the next page is the FICO rate
9 tables that you referenced?
10    **A.   That's correct.**
11    Q.   Now, Mr. Waid did the analysis of how
12 to classify the 15 applications as small, medium,
13 large or very large; isn't that right?
14    **A.   Based upon his expertise of pricing**
15 **these licenses for many years, that's correct.**
16    Q.   Okay.  And I wasn't asking as to
17 whether he uses expertise or not.  My question is
18 whether it was Mr. Waid who did the analysis as to
19 how to classify those 15 applications as to small,
20 medium, large or very large?
21    **A.   Mr. Waid did provide me that**
22 **information, correct.**
23    Q.   Okay.  And how did he do that?
24    **A.   He took information that was provided**
25 **by the defendants regarding those applications and**

Page 39

1 **used that information based upon this application**
2 **sizing matrix to size those based upon that**
3 **information, and based upon that information**
4 **related to the sizing I used the pricing matrix to**
5 **price the named application license for each of**
6 **those applications.**
7    Q.   So, for example, the -- on page 40,
8 Mr. Waid did the analysis for CSI Express and
9 determined, with respect to the last page of
10 Exhibit 457, that it was a large -- it was large
11 for purposes of this category pricing matrix,
12 correct?
13    **A.   Correct.**
14    Q.   Okay.  Can you tell me in detail how
15 Mr. Waid did that, how he made the determination
16 that it was large?
17    **A.   That's a better question for Mr. Waid**
18 **since he is the one who is -- has the expertise in**
19 **pricing.**

1
2
3    Q.   So when you say that is a better
4 question to ask Mr. Waid than you, is that because
5 you do not have the expertise to make the
6 determination as to whether to categorize each
7 application in accordance with this category
8 pricing matrix on the last page of Exhibit 457?
9    **A.   I have the expertise to take the**
10 **numbers provided by the defendants to match up to**
11 **this application sizing matrix.  However, Mr. Waid**
12 **uses this every day as part of his business, and,**
13 **therefore, I appreciated his expertise in**
14 **determining the appropriate size.  And, then, from**
15 **that information it -- one would go -- which is**
16 **what I did, is go to the pricing matrix and price**
17 **each named application based upon that information.**
18    Q.   Well, did you have any input into the
19 determination of the size, which is reflected in
20 the graph on page 40, Table 7?
21    **A.   I understood what the information was**
22 **that was provided by defendants, and I understand**
23 **this matrix from speaking with Mr. Waid and through**
24 **his deposition, but Mr. Waid ultimately sized each**
25 **of these applications.**

Page 41

1    Q.   And you didn't do any independent
2 analysis as to the size, you, rather, relied upon
3 Mr. Waid doing that analysis?
4    **A.   I relied upon the person whose**
5 **expertise every day of pricing software based upon**
6 **this sizing matrix, that's correct.**
7    Q.   Okay.  And just to make sure you
8 understand my question, you did not do any
9 independent analysis in determining the size of the
10 application which appears on page 40 in Table 7 of
11 your report?
12    **A.   I would state it this way, which is I**
13 **looked at the information and understand how you**
14 **would plug it into the matrix, but ultimately I**
15 **relied upon Mr. Waid's expertise, who does this**
16 **every day, to confirm that the understanding I had**
17 **was in line with his understanding and how he would**
18 **price it.**
19    Q.   Okay.  Mr. Zoltowski, we all
20 understand how the matrix is used.
21      My question is, rather, whether you
22 did any independent analysis to determine the
23 accuracy of the size of the application as
24 reflected in this column called Size in Table 7 on
25 page 40 of your report?

Page 42

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 13 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1    A.   I would say it was not independent by
2 myself and my team, but it was in conjunction with
3 Mr. Waid.
4    Q.   So did you question any of the
5 determinations that Mr. Waid made as to the size of
6 the application that went on to this chart on
7 page 40?
8    A.   We walked through each of them and
9 made sure I was comfortable with how he sized them.
10    Q.   Okay.  Well, let's talk about CSI
11 Express, how did you walk through CSI Express?
12    A.   I would need the data from defendants
13 to do that, because the data from the defendants is
14 what drives the sizing.
15    Q.   So are you able yourself to take that
16 data and size each of these applications?
17    A.   I can align them with the matrix, but
18 there are -- Mr. Waid has the expertise of using
19 this every day, and there are certain of these
20 categories I believe that outrank other categories
21 as they price, and so Mr. Waid's expertise was
22 helpful in understanding how they use this on --
23 each and every day to price their licenses.  But,
24 again, I would need the data from the defendants in
25 order to walk through the sizing.
Page 43

1    Q.   Are you telling me if you have that
2 data that you could size them yourself, without any
3 assistance by Mr. Waid?
4    A.   I could generally understand what the
5 sizing would be.  But, again, Mr. Waid has the
6 expertise to do that sizing based upon the matrix
7 which he uses every day.
8    Q.   And, in any event, in this case you
9 didn't engage in that analysis, Mr. Waid did?
10    A.   I engaged in that analysis with
11 Mr. Waid, as I said, in conjunction with Mr. Waid.
12    Q.   Well, I thought you said that Mr. Waid
13 actually made the determination as to the size that
14 appears in the graph on page 40.
15    A.   He --
16    Q.   Am I wrong about that?
17    A.   He made the final determination,
18 that's correct.
19    Q.   Okay.  Can you go through any of these
20 applications right now and tell me how Mr. Waid
21 arrived at that determination as to size?
22    A.   If you'd like to provide me the data
23 from the defendants, I could do that.  But, again,
24 Mr. Waid would probably be the better person to ask
25 those questions to.
Page 44

1    Q.   Now, it's the classification as to
2 size that, in part, drives the rate that is applied;
3 is that right?
4    A.   Correct.  You take the information
5 from the sizing matrix and you would apply that to
6 the pricing matrix.
7    Q.   Now, you also relied upon Mr. Waid's
8 determination that the number of development seat
9 licenses that Federal would have required to
10 maintain each of these applications, correct?
11    A.   That's correct.
12    Q.   And how did Mr. Waid go about making
13 those determinations?
14    A.   Mr. Waid made those determinations
15 based upon the information provided by Federal or
16 if -- or -- I believe that's how he did it.  I
17 don't recall, because that is his expertise related
18 to sizing in terms of development seats.
19    Q.   So you didn't have any involvement in
20 the determination of the seats as reflected in the
21 column on Table 7 on page 40 of your report?
22    A.   That is correct.
23    Q.   And you did not conduct any
24 independent analysis?
25    A.   Uh, no, I did not.
Page 45

1    Q.   Can you tell me any more detail as to
2 how Mr. Waid arrived at his determination other
3 than saying he looked at information provided by
4 defendants?
5    A.   I know that he used his expertise in
6 understanding of the defendants' business from the
7 license that was effective for the ten-year period
8 prior to the termination of the agreement and
9 information that was produced in this matter.
10    Q.   So, in other words, the only knowledge
11 you have as to how Mr. Waid arrived at the number
12 of seats on this graph is that he used information
13 provided by defendants and he utilized his
14 expertise; is that fair?
15    A.   That's fair.
16    Q.   What does that mean, the number of
17 development seat licenses that Federal would have
18 required to maintain each of these applications?
19    A.   Those are the number of development
20 seats, meaning the number of authorized users for
21 the development of the product at the client's site.
22    Q.   Now, based upon Mr. Waid's analysis of
23 the size of the application and the development
24 seats required, you applied FICO's standard rate
25 table to determine that FICO has lost license fees
Page 46

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

**Page 47**

1  of $37.4 million, correct?

2      A.    That's correct, and that would also

3  include the maintenance and support fees annually.

4      Q.    Let's go to your schedule in your

5  initial report, look at Schedule 4 and Schedule 5.

6  I don't see any pages on the bottom that can

7  otherwise direct you.

8      A.    Okay.

9      Q.    Are these two schedules the summary of

10  the total lost license fees inside the United

11  States and outside the United States?

12      A.    Yes.  Schedule 4 is for domestic

13  applications, and Schedule 5 is a summary of lost

14  fees for foreign applications.

15      Q.    Okay.  And let's walk through how you

16  arrived at that.  Let's go to Schedule 7 and 7.1.

17      A.    Okay.

18      Q.    First, how did you arrive at

19  Schedule 7.1 as to the deployment license?  Do you

20  see that column in Schedule 7.1?

21      A.    I do.

22      Q.    How did you -- And you prepared these

23  tables?

24      A.    I or persons working under my

25  direction.

---

**Page 48**

1      Q.    Okay.  And it was you or your group

2  and not Mr. Waid or somebody at FICO who prepared

3  the tables?

4      A.    That's correct.  It was -- it was me

5  or my team, that was directed under my supervision.

6      Q.    And how did you arrive at the

7  deployment license number in Schedule 7.1?

8      A.    So, for each application, as was

9  identified by defendants in their interrogatory

10  responses as applications that utilized the Blaze

11  Advisor software, we then took information also

12  provided by the defendants related to the size of

13  those applications and from that information used

14  the application sizing matrix in conjunction with

15  Mr. Waid to determine the size.

16          For example, the first one is ADAPT,

17  and it's in Australia.  The size for that

18  application was determined to be large.  When you

19  take that information and you look at the category

20  pricing matrix, the deployment license fee under a

21  large sizing for an entity is $750,000, and so that

22  was what went into that adjusted deployment

23  license -- or, I'm sorry, the deployment license

24  column.

25      Q.    And just to clarify, the $750,000 is

---

**Page 49**

1  for a perpetual license as opposed to an annualized

2  fee?

3      A.    That's correct.

4      Q.    Okay.  And, then, Schedule 7.0, you

5  take the number from the far right column entitled

6  Perpetual License, which is the sum of the

7  deployment license and the deployment seat license

8  fees; is that correct?

9      A.    I'm sorry, could you repeat that?

10      Q.    The far right column entitled

11  Perpetual License on Schedule 7.1, is that the sum

12  of the deployment licenses and the development seat

13  licenses?

14      A.    That's correct.

15      Q.    And you took that column on the far

16  right, and that is the same column that you have as

17  at first column in Schedule 7.0, right?

18      A.    That's correct.

19      Q.    And your purpose in 7.1 was to

20  determine the annual fee?

21      A.    That's correct.

22      Q.    And you determined the annual fee by

23  taking the perpetual license by a conversion factor

24  of 0.45 and, then, adding the support and

25  maintenance to that number to obtain the total

---

**Page 50**

1  license, support, and maintenance fee; is that

2  right?

3      A.    That's correct, that would be the

4  total license, support, and maintenance fee

5  annually for each of these applications.

6      Q.    And you determined the annual license

7  fee by multiplying the perpetual license number by

8  a conversion factor; is that right?

9      A.    Uh, yes.  That's the standard way that

10  FICO converts a perpetual license to an annual

11  license in the ordinary course of business.

12      Q.    So you did that, and you multiply that

13  by a conversion factor of 0.45; is that right?

14      A.    That's correct.

15      Q.    And that is a number not that you came

16  up with but, rather, was provided by Mr. Waid; is

17  that right?

18      A.    It was provided by Mr. Waid and also

19  provided by FICO, I believe, in the interrogatory

20  response.  And, as I stated, it's how FICO does

21  that conversion from perpetual to annual license in

22  its everyday operations.

23      Q.    And, then, you also added a annual

24  support and maintenance fee by multiplying the

25  annual license fee by 22 percent; is that right?

---

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 15 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1   A.   Correct.
2   Q.   And, again, that is a number provided
3 by Mr. Waid and not by you independently; is that
4 correct?
5   A.   It was provided by Mr. Waid, and it
6 was also part of a interrogatory response. And,
7 then, subsequently I've seen documentation related
8 to that 22 percent fee being the standard fee that
9 is charged by FICO in its ordinary course of
10 business, and that change was made internally at
11 the company sometime in 2015.
12   Q.   And let's go backwards in your report
13 to Schedule 6.0 and 6.1.
14   A.   Okay.
15   Q.   These are the domestic named
16 application annual fees and the domestic
17 application perpetual license fee calculations; is
18 that right?
19   A.   That is correct.
20   Q.   And you engaged in these calculations
21 in the exact same manner as the calculations that
22 we just went through with respect to Schedules 7.0
23 and 7.1; is that right?
24   A.   That's right.
25   Q.   Let me just for example, taking CI --

Page 51

1 worked in conjunction with Mr. Waid. Are you
2 talking about something other than what you've
3 already testified about that you haven't told me
4 about yet?
5   A.   No, I'm not. And I think if you --
6   Q.   Okay.
7   A.   -- went back in the transcript I
8 stated that I worked in conjunction with Mr. Waid
9 but that he ultimately provided the sizing.
10   Q.   Right. And I didn't understand you to
11 testify that you actually did anything other than
12 rely upon Mr. Waid in determining the size. Do I
13 have that wrong?
14   A.   As I stated, I worked with Mr. Waid to
15 understand the prize -- the sizing process. So I
16 looked at the data in conjunction with Mr. Waid.
17 But, again, he ultimately provided the size.
18   Q.   And you didn't do any independent
19 analysis? You're not changing your testimony about
20 that?
21   A.   No, I'm not.
22   Q.   Okay. Let's go back, then, to
23 Schedule 4 and 4.1. So could you explain how
24 you -- you prepared these two chart -- these two
25 graphs, I take it, Schedule 6.0 and 6.1 -- I'm

Page 53

1 CSI Express, Mr. Waid provided the size on page 40
2 of your report as large. So you then utilized the
3 category pricing matrix on Exhibit 457 and took the
4 number associated with the large application of
5 $750,000 and inserted it as the first entry in the
6 column entitled employment -- Deployment License;
7 is that right?
8   A.   That's correct, with the caveat that I
9 worked in conjunction with Mr. Waid to determine
10 the size. And, as I stated, he ultimately provided
11 the size, but we worked in conjunction with him to
12 understand that sizing and then applied that sizing
13 to the pricing ourselves and then built these
14 schedules from that information.
15   Q.   Yeah. I mean, you keep saying you
16 worked in conjunction with Mr. Waid, and I'm not
17 sure based on your testimony to date how it is that
18 you did that, other than Mr. Waid provide you
19 with the size based on his expertise and his review
20 of the information provided by Federal?
21   A.   Is that a question?
22   Q.   Well, did you do anything other than
23 that? I mean, you've already testified as to what
24 you did, and now you're answering your questions by
25 saying -- qualifying your responses by saying you

Page 52

1 sorry, Schedule 4.0 and Schedule 5.0?
2   A.   Correct.
3   Q.   I'm looking first at 4.0. Where did
4 you get the first number for CSI Express for
5 license, support, and maintenance of $634,095?
6   A.   That --
7   Q.   Did you take that from the last column
8 in Schedule 6.0?
9   A.   That's correct.
10   Q.   Okay. Which is the sum of the annual
11 license and the support and maintenance, as you've
12 described before, correct?
13   A.   That is correct.
14   Q.   And you did the same with regard to
15 each of the other applications, both for
16 Schedule 4.0 and Schedule 5.0, and you multiplied
17 that by -- with regard to the United States,
18 3.7 years, and with regard to the -- outside of the
19 United States application by the number of years
20 that you believed the application has been used?
21   A.   That's correct.
22   Q.   And we've just gone through the
23 process by which you arrived at the total lost fees
24 for the United States of 16 million approximately
25 and outside of the United States lost license fees

Page 54

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  of approximately 21.2 million; is that right?
2      A.    That's correct.
3      Q.    Now, how exactly did you use your
4  expertise in arriving at those numbers other than
5  taking the information that Mr. Waid provided by
6  you and the conversion factor that Mr. Waid provided
7  to you and the annual monthly -- annual maintenance
8  fees that Mr. Waid provided to you?
9          I mean, it appears that you just
10  prepared these charts and did mathematical
11  calculations, you didn't do anything else.  Do I
12  have that wrong?
13      A.    I would answer that by saying the
14  expertise is in understanding what the construct of
15  the license should be based upon the available
16  information, and while it may appear that it's
17  simply arithmetic, it is also understanding from
18  the available information what applications are
19  applicable based upon what defendants have provided
20  in response interrogatories, it's understanding the
21  copyright statute and the statute of limitations
22  related to the damages periods that are applicable
23  and appropriate for the each of the applications,
24  and, as I stated, working with Mr. Waid to
25  understand the sizing and then applying that to

Page 55

1  determine the pricing.
2      Q.    So I understand that you worked hard
3  in getting an understanding of all of those things
4  that you just itemized.  But in terms of your
5  expert opinion as to the lost license fees, what
6  did you do other than provide arithmetic
7  calculations?
8      A.    I think I just answered that question.
9      Q.    Okay.  And you didn't do anything else
10  other than what you just described, understanding
11  all those items and doing the arithmetic
12  calculations, right?
13      A.    As I stated, it's -- the expertise
14  comes in understanding the appropriate structure
15  of the license as it relates to damages in this
16  case.
17      Q.    Now, who made the determination to
18  present the lost license fees based on annualized
19  application fees, annualized license fees for each
20  application for 15 different applications?
21      A.    I made that determination.
22      Q.    Had you seen that done before by FICO?
23      A.    I don't recall if they've entered into
24  a license that's similar to this particular license.
25          MR. FLEMING:  Will you mark this as

Page 56

1  the next exhibit?
2          THE COURT REPORTER:  It's 458.
3          (Whereupon, Deposition Exhibit No. 458
4  was marked for identification, and a copy is
5  attached and hereby made a part of this deposition.)
6  BY MR. FLEMING:
7      Q.    Showing you what's been marked as 458,
8  have you seen this declaration of Mr. Waid before?
9      A.    I have.
10      Q.    And you saw this declaration of
11  William Waid before you prepared the analyses which
12  are in Schedules 4.0 through Schedule 7.1; isn't
13  that right?
14      A.    That's correct.
15      Q.    And the chart that Mr. Waid prepared
16  on page 4 is awfully similar to the charts that you
17  prepared, isn't it?
18      A.    Well, there's one table in here and I
19  have a number of schedules.  So I wouldn't say
20  they're --
21      Q.    Right.  But you've read the
22  declaration, and you understand how Mr. Waid
23  describes how you go about determining lost license
24  fees based on an annualized application approach,
25  correct?

Page 57

1      A.    That's correct.
2      Q.    And that is the approach that you
3  used, correct?
4      A.    That is the approach that I adopted
5  as -- in my determination of appropriate and
6  applicable damages after my review of the
7  information and data in this case.
8      Q.    And did you consider any other
9  approaches or did you do what Mr. Waid dictated?
10      A.    I considered other approaches, but
11  based upon the facts and circumstances and the
12  termination of the license, the failed negotiations
13  of the parties and that this license is essentially
14  a bridge or gap-fill for Federal to move from one
15  software solution to another, that was the
16  determination I made.
17      Q.    So you don't recall having reviewed
18  all the other software license that FICO has
19  entered into involving Blaze; is that right?
20      A.    I believe I spoke about the ones that
21  I remember reviewing, correct.
22      Q.    On how many other occasions has FICO
23  ever had a software license agreement based on
24  using annualized prices for 15 applications?
25      A.    I don't recall.

Page 58

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 17 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 commercially reasonable software price?

2     A.   I guess I'll restate my answer, which

3 is I've provided what is my opinion as to the

4 reasonable damages related to the lost license fees

5 based upon the pricing of the Blaze Advisor by FICO.

6     Q.   Well, is it your opinion that the

7 damages numbers that you have provided for lost

8 license fees, that those are, in fact, commercially

9 reasonable software prices?

10     A.   I would need you to define what you

11 mean by commercially reasonable. I find them to be

12 reasonable as the appropriate damages based upon

13 the information available and the pricing as

14 FICO -- the pricing FICO uses for its Blaze Advisor

15 product.

16     Q.   Well, you're not an expert on software

17 pricing, correct?

18     A.   I have expertise in working on cases

19 that include software pricing, but I am not an

20 expert on the pricing of or the setting of prices

21 of software.

22     Q.   So if you're not an expert on software

23 pricing, you would not be -- you would not have

24 expertise in the area of determining whether a

25 particular price for a software license agreement

Page 71

---

1 is or is not a commercially reasonable software

2 price, correct?

3     A.   Well, I'm not sure that's fair. In my

4 experience in working with software agreements in

5 cases related to software has allowed me to review

6 lots and lots of agreements related to the pricing

7 of software.

8         In this case, I found it reasonable

9 that the pricing used by FICO has been used for

10 more than 15 years, and I've used that pricing in

11 the determination of damages in this case based

12 upon the facts and circumstances.

13     Q.   And I'm really asking a different

14 question. I'm wondering whether you are putting

15 yourself out here in this case as an expert on what

16 would be a commercially reasonable price for a

17 software license agreement or not?

18     A.   I have determined damages based upon

19 the lost license fees. In terms of am I offering

20 myself as an expert for the -- pricing the MSRP,

21 let's say, of a software product, I am not offering

22 expertise in that regard.

23     Q.   How many times have you spoken with

24 Mr. Whitener?

25     A.   I believe I spoke with Mr. Whitener

Page 72

---

1 two or three times.

2     Q.   And how long were these conversations?

3     A.   I don't recall, but they would likely

4 be somewhere between 30 and 60 minutes.

5     Q.   How many times did you speak with

6 Mr. Waid?

7     A.   Um, I believe I spoke with Mr. Waid

8 two times.

9     Q.   And how long were those conversations?

10     A.   Those would probably be a little on

11 the long -- I think longer, I would say probably 45

12 to 60 minutes.

13     Q.   Did you discuss anything in either of

14 those conversations -- in any of those conversations

15 with Mr. Whitener or Mr. Waid that did not make it

16 into your report?

17     A.   I think the opinions I've rendered

18 include what I learned from both of them during

19 those phone calls. I did not provide a -- you

20 know, a summary and -- and notes, as I don't take

21 notes related to those calls, in my report. But my

22 opinions reflect what I learned from those

23 individuals during those calls.

24     Q.   That the report reflects that, did you

25 say?

Page 73

---

1     A.   My report opinions.

2     Q.   Were you an expert witness in the case

3 titled Positron Systems, Inc. versus Wyle (phonetic

4 While) Laboratories, Inc.?

5     A.   Uh, yes, I was. It's Wyle (phonetic

6 Wy-lee), is how you pronounce the --

7     Q.   W-Y-L-E is pronounced Wyle?

8     A.   Yes.

9     Q.   And who were you retained by, what

10 side?

11     A.   I was retained by the plaintiff,

12 Positron. I was retained by counsel for Positron.

13 I was retained by counsel on behalf of Positron,

14 and the law firm was Caldwell Leslie, who was

15 subsequently acquired by Boies Schiller.

16     Q.   And in your expert report, did you

17 make a calculation related to the parties' profits?

18     A.   I'm just trying to remember the facts

19 and circumstances of that case. I believe I -- I

20 did perform a analysis related to the lost profits

21 of Positron, actually of both entities, because

22 they were partners in a contract with the U.S.

23 Government.

24     Q.   Do you recall in general terms what

25 was your expert testimony in that case -- or your

Page 74

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 18 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 expert opinion, I should say?

2     **A.**    **My expert opinion related to the lost**

3 **profit that would have been earned on these products**

4 **had they been commercialized.**

5     Q.    And what were the products?

6     **A.**    **The products were very large x-ray**

7 **machines, in simple terms, used for detecting**

8 **corrosion on aircraft in the military, and actually**

9 **could be used for commercial applications as well.**

10     Q.    And in your report, did you rely on

11 numbers from another expert?

12     **A.**    **I don't recall.**

13     Q.    Are you familiar with a Mr. Ditchey?

14     **A.**    **Oh, yes.**

15     Q.    Who is he?

16     **A.**    **Mr. Ditchey was an airline expert or**

17 **an expert with significant expertise in the airline**

18 **industry and, also, with government contracts and**

19 **military contracts.**

20     Q.    And in your report, did you rely on

21 his report that provided projections relating to

22 sales?

23     **A.**    **Yes, given his expertise and**

24 **understanding of the market related to how this**

25 **product could be applied and the applications for**

Page 75

1 which it could be applied to both in the military

2 and for commercial applications, I utilized his

3 expertise for those metrics.

4     Q.    Did the court in that case exclude

5 your testimony?

6     **A.**    **The court excluded Mr. Ditchey's**

7 **testimony, and as a result, because his testimony**

8 **was stricken, I was unable to render an opinion as**

9 **to lost profits.**

10     Q.    So when I asked you earlier today

11 whether your testimony had ever been excluded, why

12 didn't you relate the circumstances of this

13 Positron case?

14     **A.**    **Frankly, I forgot that that transpired,**

15 **because when we went to trial, which happened**

16 **many -- a year or two after, I testified to the**

17 **opinions I could testify to. But, also, it was**

18 **Mr. Ditchey's opinions that were stricken, and**

19 **because I relied upon his opinions, I was unable to**

20 **testify to those opinions related to lost profits.**

21     Q.    Well, your -- the Court actually

22 granted Wyle's motion to exclude your expert

23 opinion, correct?

24     **A.**    **Based upon the fact that Mr. Ditchey's**

25 **opinions were stricken.**

Page 76

1     Q.    In response to my question, the Court

2 ruled that your testimony should be excluded,

3 right?

4     **A.**    **Based upon that motion, which related**

5 **to striking Mr. Ditchey's testimony, that's correct.**

6     Q.    So you're not disagreeing that the

7 Court did that, are you, or are you?

8     **A.**    **No, I'm not.**

9     Q.    Okay. So, when I asked you earlier

10 today whether your testimony had ever been excluded

11 and you answered no, that wasn't accurate, was it?

12     **A.**    **It was accurate at that time to the**

13 **best of my knowledge. But I also consider that**

14 **testimony, as you characterized it as being**

15 **stricken, as it was inputs that were relying upon**

16 **another expert whose opinions were stricken and**

17 **that results in my opinion also being excluded.**

18     Q.    So let's -- let's be clear.

19     When you testified earlier in response

20 to my question as to whether your testimony as an

21 expert had ever been excluded and you said no, that

22 wasn't accurate?

23     **A.**    **It wasn't accurate based on the way**

24 **you're characterizing it. But the methodology I**

25 **employed wasn't stricken, it was excluded because**

Page 77

1 of the fact that Mr. Ditchey's opinion was

2 excluded.

3     Q.    But you're not denying that it was

4 excluded by the Court in response to a motion to

5 exclude your testimony, are you?

6     **A.**    **No, I'm not.**

7     Q.    Okay. And you're saying you forgot

8 about it. But this was as recently as June 2018

9 when that order was issued, right?

10     **A.**    **I don't recall the timing.**

11     Q.    Well --

12     **A.**    **If you want to provide it, that's**

13 **fine. I move from case to case very quickly.**

14     MR. FLEMING: Will you mark this as

15 the next exhibit?

16     THE REPORTER: That's 459.

17     (Whereupon, Deposition Exhibit No. 459

18 was marked for identification, and a copy is

19 attached and hereby made a part of this deposition.)

20 BY MR. FLEMING:

21     Q.    Showing you what's been marked as

22 Exhibit 459, is that the Order from the Court

23 excluding your testimony?

24     **A.**    **It looks to be a copy of it, yes.**

25     Q.    And was this in June 2018?

Page 78

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 19 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 79**

1    A.    It is.

2         Thank you for refreshing my memory.  I

3  was always taught that a deposition isn't a memory

4  test.

5    Q.    I'm sorry, you just said?

6    A.    I said I was always taught that a

7  deposition wasn't a memory test.  So thank you for

8  refreshing my memory.

9    Q.    So I would have thought as somebody

10 who makes a living as an expert witness that it

11 would be pretty easy to remember whether your

12 testimony has ever been excluded or not.  But

13 you're telling me you just forgot about it, right?

14    A.    And I also stated that the way it's

15 characterizing -- and you can read it in the Order,

16 "is that Zoltowski is excluded, but if plaintiff

17 convinces the Court that Ditchey should not be

18 excluded she will consider Zoltowski."

19         So, again, it was contingent on

20 Mr. Ditchey's opinion as to why I was excluded, not

21 on my methodology that was employed.

22    Q.    So how many other times has your

23 testimony been excluded?

24    A.    This is the only one that I can

25 recall, now that you've refreshed my memory.

**Page 80**

1    Q.    So -- just so that I'm clear, that

2  wouldn't be -- whether you've been excluded in

3  another case wouldn't be something of such

4  significance that you would immed -- it would

5  immediately come to mind to you, right?

6    A.    If my methodology that was employed

7  was found by the Court to be unsound, then, yes.

8  But my methodology was not ruled by the Court to be

9  unsound, it was that the inputs I used for that

10 methodology could not be used.

11    Q.    So it may be that there's other cases

12 where your testimony has been excluded but you just

13 don't remember it today, right?

14    A.    I don't believe so.

15    Q.    All right.  Now, you also testified as

16 an expert in the case entitled Shepard Fairey

17 versus Associated Press?

18    A.    I did.

19    Q.    And that was a copyright infringement

20 case?

21    A.    Correct.

22    Q.    And in that case you testified that a

23 license fee generated by Getty Images' automated

24 online system for isolated uses of certain Getty

25 photographs was a proper measure of the Associated

**Page 81**

1  Press's actual damages; is that correct?

2    A.    I believe that's correct.

3    Q.    So in that case did you -- how did you

4  go about determining the damages?

5    A.    I was brought into opine as to the

6  appropriate license fee that should have been paid

7  for use of that image, and my recollection is I

8  used the standard pricing that was used by the AP

9  in licensing its images and based upon the type of

10 usage and the volume of usage.

11    Q.    And how did you obtain that

12 information?

13    A.    I believe that information was either

14 publicly available or produced in that proceeding

15 or both.

16    Q.    And did you offer any testimony in

17 that case as to why your determination of the lost

18 profits was the appropriate measure for the

19 Associated Press's actual damages?

20    A.    Could you repeat that question?

21    Q.    Did you ever provide testimony or

22 information in your expert report as to why the

23 lost profits as you determined it was the

24 appropriate measure for determining the actual

25 damages -- I'm sorry, the lost license fees, I

**Page 82**

1  should say, not the lost profits?

2    A.    I don't recall what my report stated,

3  but I rendered an opinion that was related to what

4  I believed to be the appropriate lost license fees

5  based upon the information and data and facts and

6  circumstances in that case.

7    Q.    And am I correct that you determined

8  the lost license fees by simply going online and

9  getting the pricing from Getty Images' automated

10 online system?

11    A.    As I stated, I don't recall if it was

12 publicly available or produced in the matter or

13 both.  But it was based upon their standing --

14 standard pricing for use of images for various uses

15 and, then, the volume of those uses.

16    Q.    Now, just to go back for a second, is

17 it your position that a negotiation framework that

18 we talked about earlier is not relevant if it is

19 not a patent case?

20    A.    It's my opinion that the negotiation --

21 hypothetical negotiation framework isn't appropriate

22 in this particular case and that it's typically

23 used when terminating a reasonable royalty in a

24 patent infringement case as it relates to damages.

25    Q.    And that's based on the case

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

1      A.   That's correct, typically in a patent
2  infringement damages context.
3      Q.   But not limited to patent cases, right?
4      A.   I believe I have rendered opinions
5  related to a royalty in other IP cases.  I don't
6  recall if the construct was the same, including a
7  willing licensor and a licensee.  It may have
8  included a hypothetical negotiation construct, but
9  I don't think the requirement that the parties need
10  to come to a conclusion or come to an agreement may
11  have been part of each of those analyses.
12      Q.   What do you mean by the phrase
13  reasonable royalty?
14      A.   It would be -- a royalty would be the
15  amount of money paid for use of -- in the context
16  of intellectual property, use of that intellectual
17  property.  A reasonable royalty is terminology, I
18  believe, from case law.  But reasonable is, I
19  believe, supposed to mean that it is reasonable in
20  nature in terms of the price being paid and the
21  structure of it in terms of the license.
22      Q.   Now, in this case, you've stated that
23  a measure similar to reasonable royalties is an
24  inappropriate measure of damages in this case,
25  correct?

Page 87

---

1      A.   I -- I don't recall exactly the
2  terminology I used, but I believe I was stating in
3  response to Mr. Bakewell's opinion that the
4  hypothetical negoti -- negotiation construct, which
5  is used typically in patent damages to determine
6  the appropriate reasonable royalty, is not
7  applicable and appropriate in this instance.
8      Q.   And you would say that the
9  hypothetical negotiation framework is similar to
10  the -- is a damage measure similar to reasonable
11  royalties?
12      A.   The hypothetical negotiations is -- is
13  a framework or construct that can be used to
14  determine a reasonable royalty.
15      Q.   And is it your opinion in that case
16  that a measure similar to reasonable royalties is
17  an inappropriate measure of damages in this case?
18      A.   My opinion is that based upon the
19  information available and the facts and circumstances
20  that using a hypothetical negotiation framework is
21  inappropriate, and especially in regards to
22  Mr. Bakewell's opinion, which seems to disregard
23  the fact that the parties did enter negotiations
24  and failed to reach an agreement, and that's my
25  disagreement.

Page 88

---

1      Q.   So, in response to my question, is it
2  your opinion in this case that a measure similar to
3  reasonable royalties is an inappropriate measure of
4  damages in this case?
5      A.   I'm having a hard time answering the
6  question only because when you think of license
7  fees one could analogize license fees in this
8  instance to a royalty, and, therefore, my
9  determination of the actual damages could -- if one
10  wanted to try to categorize it as a royalty, could
11  maybe do that.  But my opinion is -- as to the lost
12  license fees is based upon the construct I've laid
13  out in my report.
14      Q.   So in response to my question, are you
15  saying that using a measure similar to reasonable
16  royalties is or is not an appropriate measure of
17  damages in this case?
18      A.   Well, I think the terminology is
19  making it confusing, because my disagreement is
20  using a hypothetical negotiation construct is
21  inappropriate.
22      Q.   Will you look to paragraph 55 of your
23  rebuttal report?
24      A.   Do you mean my reply report?
25      Q.   Your reply.

Page 89

---

1      A.   And you said which paragraph?  I'm
2  sorry.
3      Q.   Fifty-five.
4      A.   Okay.
5      Q.   So are you stating in this paragraph
6  that it's inappropriate in this case to use a
7  measure of damages based on a reasonable royalty?
8      A.   This relates to an opinion that says
9  Mr. Bakewell incorrectly used the hypothetical
10  negotiation framework, and that negotiation
11  framework is commonly used in patent infringement
12  damages quantification.
13      Q.   So are you stating in that paragraph,
14  or not, that using a measure similar to reasonable
15  royalties is an inappropriate measure of damages in
16  this case?
17      A.   I think I answered that before.  My
18  opinion is that a hypothetical negotiation framework
19  isn't appropriate to apply in this case.  As I
20  stated, I -- I just feel uncomfortable saying it's
21  a royalty, that's not specifically applicable here
22  because, as I stated, I'm quantifying lost license
23  fees, and someone could characterize those license
24  fees as royalties.  But with that caveat, yes.
25      Q.   Okay.  Now, early in your report,

Page 90

---

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 91**

1 paragraphs -- your initial report, paragraph 30 to
2 50 you write an opinion about the single economic
3 unit; is that right?
4     A.    Which paragraph?
5     Q.    I think it's beginning of paragraph
6 30?
7     A.    Okay.
8     Q.    Now, have you ever provided an opinion
9 relating to, quote, single economic unit, unquote,
10 before?
11     A.    Not in these specific terms. I have
12 rendered opinions related to the companies and
13 their -- and their constructs per se in terms of
14 damages and -- applicable damages to the companies
15 involved, but not under the terminology of a single
16 economic unit.
17     Q.    Where did that terminology come from,
18 that phrase single economic unit, is it -- is it
19 from a case or legal precedent?
20     A.    I don't recall. It may be from a
21 specific case that may have included that type of
22 terminology.
23     Q.    Why don't you cite the case?
24     A.    It may have just been -- may have just
25 been overlooked if that's the case. I just don't

**Page 92**

1 recall.
2     Q.    You don't actually recall that it
3 comes from a case, do you?
4     A.    I don't recall.
5     Q.    Okay. So it may not have been cited
6 because it isn't based on a case?
7     A.    As I stated, I don't recall. It may
8 have been.
9     Q.    Okay. I mean, is there any other
10 expert or scholar or any other person that you are
11 aware of who have written on this concept of,
12 quote, single economic unit, unquote?
13     A.    I don't know.
14     Q.    So did you create that concept out of
15 thin air for the first time for this case?
16     A.    I don't think it's a concept. Maybe
17 the terminology that's used, the single economic
18 unit might be a novel terminology, but the -- the
19 actual discussion and the relationship between the
20 parties in terms of their corporate structure and
21 the benefits received by each of those entities
22 under the, you know, umbrella as defined in this
23 write-up, I don't think that type of -- that type
24 of write-up or analysis is -- is novel. Just the
25 language of a single economic unit may be something

**Page 93**

1 that has not been used before.
2     Q.    I mean, have you seen it in any
3 publication or journal or book or any other writing?
4     A.    I don't recall if I have or have not.
5     Q.    Have you ever testified as to that
6 concept, quote, single economic unit, unquote,
7 before?
8     A.    I have not in those terms.
9     Q.    Do you know of anybody who has?
10     A.    I don't know.
11     Q.    Do you think it's strange that you're
12 referring to this concept that has never, to your
13 knowledge, appeared before in any case or
14 publication?
15     A.    No.
16     Q.    Why not?
17     A.    Because there's always new concepts
18 being created. I don't find that it's never been
19 discussed in these terms, as a single economic
20 unit, to be problematic.
21     Q.    So what are the -- what do you
22 consider to be the consequences for purposes of
23 your expert opinion as to whether or not defendants,
24 the corresponding subsidiaries of both and the
25 related Chubb entities, all of whom are

**Page 94**

1 subsidiaries of an ultimate parent Chubb Limited,
2 are a, quote, single economic unit, unquote?
3         THE WITNESS: Could you read that back
4 to me, please?
5         (Whereupon, the court reporter read
6 back the following question: "What do you consider
7 to be the consequences for purposes of your expert
8 opinion as to whether or not defendants,
9 the corresponding subsidiaries of both and the
10 related Chubb entities, all of whom are
11 subsidiaries of an ultimate parent Chubb Limited,
12 are a, quote, single economic unit, unquote?")
13         THE WITNESS: I'm not sure I
14 understand what you mean by the consequences.
15 BY MR. FLEMING:
16     Q.    What does it matter for purposes of
17 your expert opinion? You spent a lot of time
18 talking about it and supporting it, and I am
19 inquiring what does it matter, what is the
20 consequence for purposes of your report as to
21 whether all those entities are considered a single
22 economic unit or not?
23     A.    My understanding is that ultimately
24 this will be a legal question determined by the
25 trier of fact, but it relates to which entities

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 22 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 would be responsible or required to pay damages as
2 it relates to the unauthorized use of the software
3 and the allegations as such under the causative
4 action.
5    Q.    Are you saying that if these entities
6 are not considered a single economic unit, for
7 example, the defendants may not be liable for any
8 damages caused by the writing companies, for
9 example?
10    A.    Again, I -- this is a legal question
11 for the trier of fact.  I've simply looked at this
12 from an economic perspective, that all of these
13 entities are related in their reporting and
14 reporting requirements and their choice to do so,
15 and at the end of the day this will be a legal
16 determination by the trier of fact as to which
17 entities are liable for damages.
18    Q.    And tell me specifically, what do you
19 mean that the consequence would go to the issue of
20 what entities are required to pay damages?
21    A.    Again, this is a legal issue related
22 to which parties would be required to pay damages.
23 But the question I think you're asking -- I'm going
24 to try to answer it as best I can.
25         I understand that the defendants, the

Page 95

1 named defendants are Federal Insurance Company and
2 ACE America Insurance Company, and as a result of
3 that -- those circumstances, the question becomes,
4 if those entities are found to be liable, which of
5 the entities which fall under their corporate
6 structure would be included in that damages
7 quantification, and as I stated, I'm simply
8 providing information to arm a trier of fact with
9 an understanding of the construct or corporate
10 structure from an economic perspective to assist in
11 that determination.
12    Q.    Okay.  So did somebody ask you to
13 address this issue of single economic unit so that
14 this legal issue could be addressed in the future?
15    A.    It was a discussion we had with
16 counsel because we had a question as to the
17 defendants who were named are, obviously, these
18 two entities, Federal and ACE, and there are a
19 number of entities based upon their corporate
20 structure which, obviously, did not include that
21 name, and we wanted to understand that corporate
22 structure and made a determination that in order to
23 explain it appropriately from an economic
24 perspective that there was a relationship between
25 all these parties that it was -- it made sense to

Page 96

1 include a section like this in this report.
2    Q.    I see.  So was it your idea to include
3 this section about single economic unit?
4    A.    I'm not sure whose idea it was.  It
5 was a discussion we had with counsel, and we
6 brought it up that there was this issue that we
7 from a damages perspective wanted to make sure we
8 understood.
9    Q.    So let me see if I understand it.
10         If instead of Federal and ACE as the
11 named parties this case had been brought against
12 all of the subsidiaries who are named and all of
13 the writing companies and everybody who you
14 mentioned in your report, if they were all as named
15 defendants, you would not have raised this concern;
16 is that fair?
17    A.    I don't know the answer to that
18 question because, again, it's a legal determination
19 related to who would be liable for the damages.
20 But assuming that all of those who are named
21 parties and could be named defendants and it was
22 found that each of them was liable for unauthorized
23 use, then, I may not have needed to include a
24 section like this.
25    Q.    Okay.  So you're -- and you're the one

Page 97

1 who raised the issue in the first instance, or you
2 and your team?
3    A.    Well, we raised the issue of
4 understanding the fact that there were two named
5 defendants and there were a number of other
6 entities that were un -- had unauthorized use of
7 the software.
8    Q.    Okay.  So, in response to that
9 concern, you then created this concept of a, quote,
10 single economic unit, unquote; is that fair?
11    A.    Yes, through our discussions with
12 counsel and realizing that this would be helpful
13 information to arm a trier of fact with, yes, we
14 determined that this should be included in the
15 report.
16    Q.    So did you have any concerns in doing
17 that that there was no prior precedent or legal or
18 scholarly basis for creating this concept of,
19 quote, single economic unit, unquote, or was that
20 not a concern?
21    A.    It was not a concern in that I am
22 providing information from an economic perspective
23 regarding the corporate structure of the
24 defendants.
25    Q.    Okay.  And just to be clear, you say

Page 98

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  from an economic perspective, you can't point me to
2  any economic publications or any economic journals
3  or any books by persons versed in economics that
4  adopt or espouse or address this concept of, quote,
5  single economic unit, unquote, correct?
6      A.   In those particular terms of a single
7  economic unit, I'm not aware of anything.  But the
8  concept of corporate structure is not one that's --
9  that economists and others have not addressed
10  before.
11     Q.   That who has not addressed before?
12     A.   Economists and others, accountants,
13  tax professionals.
14     Q.   You're saying they've addressed the
15  structure of companies before?
16     A.   And I discussed some of that.
17     Q.   All right.  So you go on to say that
18  there's four different criteria or bases for
19  determining whether there's a single economic unit;
20  is that right?
21     A.   Is there a particular spot in my
22  report you're pointing to?
23     Q.   Well, starting on page 10,
24  paragraph 30, there's a section of your report
25  entitled A Single Economic Unit, right?

Page 99

1      A.   That's correct.
2      Q.   And, then, you have underneath that
3  section of your report five different subsections
4  entitled a) Consolidation of the Financial
5  Statements, b) Parent and Subsidiary Relationships,
6  c) Pooling arrangements; d) Consolidated Income Tax
7  Returns, and e) Economic Benefits of Single
8  Economic Unit, right?
9      A.   That's correct.
10     Q.   So when I read that, I assumed that
11  those were the factors or criteria that you were
12  relying upon to determine whether all of these
13  entities could be considered a single economic
14  unit.  Am I correct?
15     A.   It's information that falls under each
16  of these four categories that provides support
17  of -- of the fact that this is a single economic
18  unit based upon the corporate structure, and the
19  fifth section is more of a conclusion related to
20  that information that there is a benefit that flows
21  to all these subsidiaries that fall under this
22  corporate structure.
23     Q.   How did you -- So they are the factors
24  or criteria that determine whether these entities
25  are a single economic unit, correct?

Page 100

1      A.   I wouldn't say I set out with
2  criteria.  I -- they may have become the factors,
3  but they're the information that after our
4  assessment supported that this was, in fact, a
5  single economic unit from a corporate structure
6  perspective.
7      Q.   So you're saying they're not criteria,
8  but they might become the factors, is that what
9  you're saying?
10     A.   Well, I think you -- the way your
11  question is asked it makes it seem as though there
12  were criteria that I started with a framework, and
13  what I did was I looked at the information
14  available and determined that this was the
15  supporting information based upon my review and
16  analysis of that information.
17     Q.   Okay.  So you created this concept of
18  a single economic unit out of whole cloth, and then
19  you determined different factors or criteria that
20  may assist in that determination as to whether
21  these entities are a single economic unit, correct?
22     A.   I'm not sure if it's fair to be
23  characterized that way.  I think there were certain
24  inputs to look into related to that single economic
25  unit methodology, and I summarize those here, which

Page 101

1  would be the fact that they have a consolidation of
2  their financial statements, from a tax perspective
3  they're doing consolidated tax filings, that they
4  enter into these pooling agreements where the
5  members are all of their subsidiaries that are all
6  related to this parent entity, and the fact that
7  there are relationships between the parents and the
8  subsidiaries in terms of being wholly owned or
9  majority owned subsidiaries.
10     Q.   Okay.  So you're comfortable calling
11  them inputs, at least, you don't want to call them
12  criteria or factors, but you're comfortable using
13  the word input or inputs, right?
14     A.   And I'm not uncomfortable with the
15  term criteria or factors.  I just want to say I
16  didn't start out with them as criteria, they
17  just -- they became the criteria that led me to the
18  conclusion.
19     Q.   Okay.  Are they criteria today?
20     A.   If you want to term them that, I'm
21  okay with that.
22     Q.   Okay.  That took us a long time to get
23  there.
24     A.   Sorry about that.
25     Q.   No, that's all right.

Page 102

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 24 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 pieces of information we learned through our review
2 of the documents.
3     Q.    So if two companies contract to help
4 each other, at what point do they become a single
5 economic unit in your mind?
6     A.    I guess it would relate to the -- the
7 structure of the corporation and their relationship.
8         In this situation, they're wholly
9 owned subsidiaries, pooling agreement and -- under
10 this construct are entities that are related under
11 one corporate structure between parent and
12 subsidiary and where they accumulate dollars and
13 allocate them based on proportion of their size in
14 that pool.
15         But I don't have information, like I
16 stated it could be bank accounts, to understand
17 that they all fall into one company.  Are they
18 sharing bank accounts, are they sharing the -- the
19 profits from those bank accounts or the revenues
20 from those bank accounts or the costs?
21     Q.    Do you know the answer to those
22 questions with regard to these companies?
23     A.    That information wasn't produced in
24 this proceeding.
25     Q.    Okay.  Then your fourth input or

Page 111

1     Q.    Yes.
2     A.    I do not have a lot of experience in
3 tax -- tax-related work.
4     Q.    So are you qualified to make
5 assumptions based on the tax rules?
6     A.    Again, this is a educational exercise
7 to provide information to the court and the trier
8 of fact to make a determination on this issue.
9     Q.    I understand that, but my question is
10 different.
11         Are you qualified to make assumptions
12 based on tax rules?
13     A.    I guess it would relate -- it would
14 have to depend upon the assumption and what you're --
15 what you mean by that.  Again, this is simply
16 information that I'm summarizing related to my
17 understanding of the company's structure and the
18 way that they file their taxes.
19     Q.    Are you qualified to provide an expert
20 opinion on whether a corporation's choice to file
21 in a consolidated manner is similar to the
22 accounting reporting requirements promulgated by
23 the FASB?
24     A.    I think, really, all that's stating is
25 that the company is filing its tax returns in a

Page 113

1 criteria, beginning on paragraph 47, is Consolidated
2 Income Tax Returns - Post Acquisition; is that
3 correct?
4     A.    That's correct.
5     Q.    And you say, you give the opinion
6 that, quote, The choice to file in a consolidated
7 manner is similar to the accounting reporting
8 requirements promulgated by FASB, which suggests
9 that a corporation and its legal entities are to be
10 viewed in singularity, even if the corporation
11 achieves its business objectives through multiple
12 entities, unquote; is that right?
13     A.    That's correct.
14     Q.    Now, you're not providing an expert
15 opinion on tax issues, right?
16     A.    Correct.
17     Q.    You're not an expert on tax issues?
18     A.    No, I'm not.
19     Q.    And you're not an expert on the
20 application of tax rules, right?
21     A.    That's correct.
22     Q.    What is your experience with regard to
23 tax issues?
24     A.    In regard to my professional
25 experience?

Page 112

1 consolidated manner, and, also, there are reporting
2 requirements as promulgated by the FASB related to
3 consolidated financial statements.
4     Q.    Right, and my question is different.
5         My question is, are you qualified to
6 provide an expert opinion on whether a corporation's
7 choice to file in a consolidated manner is similar
8 to the accounting reporting requirements
9 promulgated by the Financial Accounting Standard
10 Boards?
11     A.    I think that's more of an observation.
12 I'm not providing expert opinion on if they're
13 exactly the same, but that's my observation based
14 upon my review and analysis of the information.
15     Q.    I understand it's your observation.
16         My question is whether you are
17 qualified to provide an expert opinion on whether a
18 corporation's choice to file in a consolidated
19 manner is similar to the accounting reporting
20 requirements promulgated by the Financial
21 Accounting Standards Board?
22     A.    I don't think that's for me to
23 determine.  It's usually the court that makes a
24 determination on an expert's qualifications.
25     Q.    Well, do you think that you're

Page 114

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 115

1 qualified?

2     A.   I do not have expertise in -- in

3 tax-related manner -- matters.

4     Q.   Okay. So you would agree that you are

5 not qualified to provide an expert opinion on

6 whether a corporation's choice to file in a

7 consolidated manner is similar to the accounting

8 reporting requirements promulgated by the Financial

9 Accounting Standards Board?

10     A.   And I'll answer that the same way I

11 did before, which is it's not an opinion that they

12 are the same, it's an observation that based upon

13 my review that they are -- it is similar.

14     Q.   Again, and my question is different

15 than that, and I'd like an answer to it.

16     Do you agree that you are not

17 qualified to provide an expert opinion on whether a

18 corporation's choice to file in a consolidated

19 manner is similar to the accounting reporting

20 requirements promulgated by the FASB?

21     A.   I don't know if I'm qualified or not.

22 I would state that I'm not providing an opinion.

23 It's simply an observation that I include in my

24 report.

25     Q.   So your response is you don't know

Page 116

1 whether you're qualified or not?

2     A.   Correct.

3     Q.   You're certainly not stating that you

4 are qualified to provide such an opinion?

5     A.   That's correct.

6     Q.   So that would mean that you're not

7 qualified to provide such an opinion?

8     A.   I'm not sure if that's an appropriate

9 characterization, but I think the prior question is

10 more appropriate, that I -- I don't know if I'm

11 qualified.

12     Q.   Now, in your reply, paragraph 109,

13 that paragraph is entitled, quote, No Opinion

14 Regarding Writing Companies Subject to Damages,

15 unquote. So are you walking back from this whole

16 concept of a single economic unit?

17     A.   I don't think I'm -- I think walking

18 back isn't a fair characterization. I think I

19 stated what the -- what the -- the meaning of the

20 exercise was and what I set out to do, which was

21 provide education to the court or trier of fact to

22 make a determination.

23     Q.   So why did you feel the need to say

24 here, quote, No Opinion Regarding Writing Companies

25 Subject to Damages, unquote?

Page 117

1     A.   Because it's not for me to decide if

2 the companies -- this goes back to legal question

3 as to who is responsible for damages. This would

4 be for the trier of fact, this would for the jury,

5 for the judge to determine.

6     I'm simply providing information

7 regarding the fact that the company operates as a

8 single economic unit, and based upon that information

9 and other information, which the jury or judge

10 decides to utilize, will make a determination as to

11 which entities are subject to damages should

12 liability be found.

13     Q.   I thought your purpose in this entire

14 exercise that you engaged in in your expert report

15 as to whether all of these various entities are a

16 single economic unit was to support the idea that

17 all of these various units, including the writing

18 companies, are subject to damages?

19     A.   The purpose of the exercise was to

20 educate the Court as to what the corporate

21 structure looks like for the entities involved in

22 this proceeding, but I don't have a legal opinion

23 as to which ones are subject to damages.

24     Q.   So why -- why did you feel the need in

25 your reply report to state that, that you have,

Page 118

1 quote, No Opinion Regarding Writing Companies

2 Subject to Damages, unquote?

3     A.   I believe this was just a rebuttal

4 point back to Mr. Bakewell because, if I remember

5 correctly, he may have just mischaracterized what I

6 was rendering as my opinions.

7     Q.   All right. You agree that you did not

8 do any independent research to confirm whether or

9 how each application incorporates Blaze into its

10 overall structure?

11     A.   Other than review of information in

12 this proceeding that was submitted in interrogatory

13 responses or deposition testimony, other documents

14 provided, there was no additional analysis outside

15 of that.

16     Q.   Okay. Now, you reference in your

17 analysis a number of applications where you have

18 seen that Federal states that certain of those

19 applications do not use Blaze, correct?

20     A.   Is there a particular place you're

21 pointing me to in my report?

22     Q.   You're not aware of that generally? I

23 will go to your report. But you're not aware of

24 that generally?

25     A.   Could you repeat the question, please?

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 26 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1    Q.    Your analysis refers to a number of
2  applications that use Blaze, and Federal has
3  responded that a number of those applications do
4  not use Blaze.  You're aware of that generally,
5  right?
6    A.    I am aware that there has been
7  information that Federal -- or Federal has stated
8  that certain applications in my analysis do not use
9  Blaze.  However, I understand that in their
10  interrogatory responses there was information that
11  the company provided related to the revenues which
12  came from those applications and used Blaze Advisor.
13    Q.    Now, in paragraph 88 of your reply,
14  you say in the last sentence, quote, If Plaintiff
15  is unable to demonstrate that certain of the
16  applications infringe FICO's copyrights through the
17  use of the Blaze Advisor software, I may adjust my
18  analysis to the extent necessary, unquote.
19    A.    I see that.
20    Q.    So tell me, I mean, if it is determined
21  by a fact-finder that certain of the applications
22  that are contained in your analysis do not use
23  Blaze, I mean, you would adjust your analysis,
24  right, it's not that you may adjust your analysis
25  to the extent necessary, you would adjust it?

1    A.    If I was asked or required to do so, I
2  would adjust it, yes.
3    Q.    Even if you're not asked or required
4  to do it, if it's determined that your analysis is
5  based in part on applications that use Blaze but
6  it's determined that they do not use Blaze, you
7  would revise your analysis, right?
8    A.    Sure.
9    Q.    Okay.
10    A.    I mean, I also -- I may not need to
11  because it may happen through trial.  And so,
12  therefore, that's why I have schedules that allow a
13  trier of fact to pull out certain applications if
14  it's found that they're not found to be infringing.
15    Q.    Okay, okay.  Let's look at sections
16  101 to 108.
17    A.    Paragraph 101?
18    Q.    In your initial report.  Sorry about
19  that.
20    A.    Okay.
21    Q.    Thanks for asking the clarification.
22    A.    Okay.
23    Q.    And this describes, in part, your
24  opinions on the pricing for Blaze; is that right?
25    A.    Correct.

1    Q.    And you state, quote, the process by
2  which FICO prices Blaze Advisor has not changed
3  since November 2003, unquote?
4    A.    Correct.
5    Q.    Now, you've read Bill Waid's
6  deposition where he talks about a number of changes
7  that have occurred since 2003 that are not on that
8  pricing grid, right?
9    A.    I don't recall.  If there were
10  changes, they were not significant in terms of
11  changing the structure and the -- and the process
12  of the pricing.
13    Q.    So the 2006 agreement between FICO and
14  Federal was an enterprise agreement, right?
15    A.    It became an enterprise agreement I
16  believe through the second amendment of that
17  agreement.
18    Q.    So if the pricing structure has been
19  in place since 2003 and you relied upon it for your
20  calculation, why didn't you arrive at an enterprise
21  license as well?
22    A.    I think I stated this previously, but
23  the facts and circumstances demonstrate that that
24  wouldn't be an appropriate structure.  You have a
25  situation where two parties are -- entered into

1  negotiations to renegotiate the license after the
2  merger that transpired by the plaintiffs -- I mean,
3  sorry, by the defendants, and they were unable to
4  reach an agreement, and as a result you have two
5  parties that -- well, you have one party that's
6  un -- is using the soft -- software without
7  authorization and you have two parties that are
8  not -- are at -- at that point adversarial and not
9  looking to create a long-term relationship.  And,
10  effectively, the enterprise-wide license pricing in
11  that type of structure really lends itself to --
12  for FICO, two parties that they're going to have as
13  customers long term.
14    Q.    If you had used a perpetual license
15  rather than an application-based approach, what
16  would be the lost license fees in your analysis?
17    A.    I'd have to go back and recalculate my
18  analysis, with the caveat that I don't agree that
19  that's the appropriate structure.
20    Q.    Well, for example, let's look at the
21  domestic named application fees, Schedule 6.0.  If
22  you were determining lost license fees based on a
23  perpetual license, wouldn't the lost license fees
24  be depicted in the first column of Schedule 6.0,
25  totaling 7.9 million, approximately?

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1    A.    The license fees, that's correct.
2    Q.    Similarly, for the afore-named
3  application license fees, going to Schedule 7.0, if
4  you had determined the lost license fees based on a
5  perpetual license rather than an application-based
6  approach, the total damages would be, again, listed
7  in the first column and amount to approximately
8  $6 million; is that right?
9    A.    That's under the assumption that
10  that's the appropriate construct and that no other
11  license fees would be applicable.
12    Q.    But, otherwise, that would be the --
13  the place to look at in your analysis and the
14  number $6 million --
15    A.    For the --
16    Q.    -- would be --
17    A.    -- deployment and development seat
18  license fee.
19         The one thing I would note with these
20  schedules is when looking at it from an enterprise
21  license agreement perspective is these don't --
22  this analysis doesn't consider the long-term
23  relationship that FICO builds with its customers
24  and, therefore, doesn't include any assessment of
25  the professional fees that would go along with a

Page 123

1  discount was generally 40 percent, right?
2    A.    I don't know if the standard is
3  40 percent.  I remember seeing discounts up to
4  40 percent, and, as I stated, that's with the
5  expectation of professional service fees.
6         And that's different than the contract
7  we have here, where FICO had no expectation of
8  professional service fees because Federal or
9  plaintiff -- sorry, defendants had stated that they
10  were going to move forward without any sort of
11  input or use of those professional services going
12  forward for FICO.
13    Q.    So your -- your framework for
14  determining lost license fees is based on an
15  assumption that there should not be any discount;
16  is that right?
17    A.    That's correct, based upon a named
18  application license, and these facts and
19  circumstances.
20    Q.    And, in any event, you agree that
21  there is no discount reflected in your analysis
22  related to lost license fees, right?
23    A.    That's correct, and, also, no
24  professional service fees as well.
25    Q.    So if there was a -- if you had used a

Page 125

1  license like this, which I understand to be a
2  significant part of FICO's business.
3    Q.    Now, with regard to FICO's prior
4  software license agreements involving Blaze, what
5  is the range of discounts that they have provided
6  to their customers?
7    A.    I think it depends upon the agreement.
8    Q.    Well, that's why I'm asking what is
9  the range?  That is my question.
10    A.    I believe they have provided discounts
11  up to -- and, again, I don't recall specifically
12  the number, but I think it might be around
13  40 percent, again, with the caveat that the reason
14  for the discount that FICO provides is from the
15  perspective of building a long-term relationship
16  with customers and the expectation of professional
17  service fees that come along with that agreement.
18    Q.    And did you come across any license
19  fee between Chubb -- excuse me, between FICO and a
20  customer involving Blaze where a li -- where a
21  discount was not provided?
22    A.    I don't recall.
23    Q.    You don't recall one way or another?
24    A.    I don't.
25    Q.    But you'd agree that their standard

Page 124

1  perpetual license fee as the basis for your
2  analysis rather than the application fee and you
3  had provided a 40 percent discount, what would be
4  the total lost license fees?
5    A.    And just so I'm clear with your
6  question, a 40 percent discount just on the
7  deployment and development seat?
8    Q.    Yes.
9    A.    For domestic named applications, if
10  you looked at a perpetual license for deployment
11  and development seats, that totals 7.9 million, and
12  if you discounted it by 40 percent, it would
13  reduced by slightly more than $3 million.
14         If you did the same for foreign named
15  applications, the perpetual license, which is only
16  deployment and development seat license fees, is a
17  little more than 6 million.  If you had a 40 percent
18  discount, that would reduced by about 2.4 million.
19    Q.    What are the tangible and intangible
20  assets other than Blaze within the defendants'
21  companies that contribute to their overall revenues
22  and profits?
23    A.    As I sit here today, I can't provide a
24  full list.  There are likely a number of -- And
25  you're speaking of profits in total to the company,

Page 126

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019

Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 correct?

2    Q.    Overall revenues and profits?

3    A.    I'm sure there are a number of

4 components or factors that play into that.  I don't

5 have a laundry list sitting here today.

6    Q.    Well, can you tell me anything?

7    A.    It could be speed to market, it could

8 be effective pricing, it could be effective

9 management of risk, it could be human capital in

10 terms of having good employees and management, it

11 could be use of the appropriate technologies and

12 applications, it could be effective management of

13 the services it provides in terms of the types of

14 insurance lines that it offers versus others that

15 it's decided to not offer or stop providing.

16 That's a few that I can think of off the top of my

17 head.

18    Q.    Well, what else?

19    A.    I don't have a laundry list, as I

20 stated.  And, again, you're talking about the

21 entire company, and I don't have knowledge as to

22 the entirety of Chubb's offerings and specific

23 factors that would play into their -- driving their

24 profitability for other things, outside of what I

25 looked at in this case.

Page 127

1    Q.    So can you quantify how Blaze

2 contributes to the revenues and the net profits,

3 can you provide me with a number or a percentage?

4    A.    I know based on the law that's not my

5 burden.  The apportionment --

6    Q.    That's not my question.  I'm not

7 asking you what's your burden.

8    A.    Based upon --

9    Q.    I'd like an answer to my question.

10    A.    If I had the information that would

11 allow me to do so, I could provide some sort of

12 apportionment percentage.  I don't have information

13 to do so based upon what's been produced in this

14 case.

15        I know that there's a number of

16 applications, I think Mr. Bakewell talks about a

17 thousand or so that are used as part of their

18 binding and renewing policies.  I know Mr. McCarter

19 testified that he doesn't even know what those do.

20        But if I had information surrounding

21 all of the inputs that went into their business

22 operations related to binding policies and the

23 policies that use Blaze Advisor and had technical

24 expertise either from company personnel or industry

25 people to assist me, which is what I would

Page 128

1 typically do in a patent infringement damages case,

2 understanding that technology one could get to a

3 number.

4        But I will also add that Mr. Bakewell,

5 whose burden it is to do so, didn't provide any

6 opinion as to what the appropriate apportionment is.

7    Q.    Just to be clear, though, you've given

8 me all the reasons and excuses, but you do not have

9 an expert opinion as to any quantification of the --

10 the extent to which Blaze contributes to overall

11 revenues and overall net profits, correct?

12    A.    I do not have an opinion regarding

13 apportionment, that's correct.

14    Q.    Well, you not only don't have an

15 opinion, you don't have the ability to do that

16 based on the information you have, correct?

17    A.    And I would state again that it's the

18 defendants' burden, and one would think if it was

19 the burden of the defendants they would want to

20 produce information that would allow one to perform

21 such an analysis.

22    Q.    And my question wasn't on burden, my

23 question was on your ability to provide

24 quantification of the amount or the extent or the

25 dollar amount of the contribution of Blaze to

Page 129

1 overall revenues and net profits.  You don't have

2 an opinion and you have no ability to provide such

3 an opinion based on the information you have,

4 correct?

5    A.    The easiest way to say it is I was

6 handcuffed based upon the lack of information

7 available from defendants to perform such an

8 analysis.

9        MR. FLEMING:  Okay.  I'd like my

10 question read, would you, please?  And I'd like an

11 answer to it.

12        (Whereupon, the court reporter read

13 back the following question:  "And my question

14 wasn't on burden, my question was on your ability

15 to provide quantification of the amount or the

16 extent or the dollar amount of the contribution of

17 Blaze to overall revenues and net profits.  You

18 don't have an opinion and you have no ability to

19 provide such an opinion based on the information

20 you have, correct?")

21        THE WITNESS:  Correct.

22        MR. FLEMING:  I'll tell you what, it's

23 getting near to noon.  Do you want to break for

24 half an hour and then we'll keep going?  Is that

25 enough time or -- why don't we go off the record.

Page 130

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 29 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1    THE VIDEOGRAPHER:  Going off the
2 record.  The time is now 11:49 a.m.
3    (Break from 11:49 to 12:37.)
4    THE VIDEOGRAPHER:  We're back on the
5 record.  The time is now 12:37 p.m.
6 BY MR. FLEMING:
7    Q.    Good afternoon, Mr. Zoltowski.
8    A.    Good afternoon.
9    Q.    Before we broke, we were talking about
10 quantifying the contribution that Blaze makes to
11 overall revenues and net profits.  You stated that
12 you could do it, but you didn't have the
13 information.  Have you done such a calculation in
14 other copyright cases?
15    A.    I have performed apportionment
16 calculations prior to this case.  I don't recall
17 which copyright cases, but definitely in a patent
18 infringement damages situation.
19    Q.    What was the product there?
20    A.    Um, a lot of those cases where
21 apportionment becomes an issue are mobile phone
22 cases many times, where you have a feature or a
23 functionality that's one of many as part of a -- a
24 larger product, you know, many times thousands of
25 different features or functionalities that may sit

Page 131

1 on a specific chip, and the feature at issue
2 related to the patent that's being -- the alleged
3 infringement is only one of those thousand features.
4    Q.    Have you ever done an apportionment in
5 a copyright case?
6    A.    I believe I have.  I just can't recall
7 which case off the top of my head.
8        I don't recall if I've done any when
9 I've served as expert, but I know I have done them
10 before where I may have managed a case for a --
11 another expert.
12    Q.    And you stated earlier that you could
13 do it in this case.  How would you go about doing
14 it, what additional information do you need?
15    A.    As I stated previously, I would want
16 to learn more about the entire process related to
17 how the company, in this case the defendants, is
18 generating their revenues in terms of the -- all of
19 the different components of that, be it software
20 that's used, be it the inputs of manual labor,
21 human capital, what other parts of that process
22 exists.
23        And, then, as I also stated, I would
24 rely upon or speak with industry experts, either
25 individuals at the company or expert witnesses who

Page 132

1 could provide information regarding where the real
2 value lies in terms of each of the components and
3 inputs that go into the process and where that
4 connection to revenue is.
5    Q.    And there hasn't been any impediment
6 to you talking with industry experts, I take it?
7    A.    Uh, no, there has not.
8    Q.    Okay.  And what specific information
9 would you need other than what you've stated in
10 order to do that calculation?
11    A.    I think I stated generally what
12 information I would need.  Again, it would really
13 come down to getting a complete understanding of
14 the process for binding and renewing policies and
15 what drives revenue, and that, again, could include
16 information technology, which would be software
17 solutions, it could be human capital inputs, there
18 could be a number of different factors that fall
19 into that.
20    Q.    How many different factors would there
21 be, I mean, millions?
22    A.    I don't know, and that's part of the
23 issue.  What I do know from my experience of doing
24 these types of cases is it could be ten, it could
25 be a million.  What it really comes down to is what

Page 133

1 is the apportionment and the value of the specific
2 intellectual property at issue.  For example, you
3 could have one feature at issue on a mobile phone,
4 but that feature could be incredibly valuable even
5 though there might be thousands.
6    Q.    Uh-huh.  Have you ever attempted to
7 determine the profits attributable to one software
8 program used by some employees in a big
9 corporation?
10    A.    I don't recall.  But I have
11 experienced with apportionment, like I stated,
12 where there might be limited use of a particular
13 feature within a larger product.
14        (Reporter's Note:  Mr. Fleming
15 coughs.)
16        MR. FLEMING:  Excuse me.
17 BY MR. FLEMING:
18    Q.    You were an expert in a case entitled
19 Brooks Automation, Inc. versus PTB Sales, Inc.; is
20 that right?
21    A.    That's correct.
22    Q.    And do you recall what was your expert
23 opinion as to damages?
24    A.    I don't recall the specifics.  I think
25 it covered a lot of ground, because there were a

Page 134

CASE 0:16-cv-01054-DTS   Doc. 630-7   Filed 10/23/19   Page 30 of 31
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 number of allegations. I think there was trade
2 secret misappropriation, copyright infringement and
3 trademark infringement, and maybe a breach of
4 contract as well.
5     Q.    Do you recall what the case was about
6 generally?
7     A.    It had to do with cryogenic technology
8 in the semiconductor industry.
9     Q.    In that case, do you recall that you
10 opted to only measure statutory damages for
11 infringement because you didn't have sufficient
12 information?
13     A.    I don't recall, but I may have done
14 that.
15         MR. FLEMING:  Mark this as the next
16 exhibit.
17         THE COURT REPORTER:  That's Exhibit
18 460.
19         (Whereupon, Deposition Exhibit No. 460
20 was marked for identification, and a copy is
21 attached and hereby made a part of this deposition.)
22         THE WITNESS:  Thank you.
23 BY MR. FLEMING:
24     Q.    Is this the initial disclosure expert
25 report that you provided in the Brooks versus PTB

Page 135

1 case?
2     A.    This appears to be that report, with
3 the qualification that it does not include any
4 schedules.
5     Q.    In paragraph 34 on page 13, is that
6 where you provide your opinion relating to the
7 damages from copyright infringement?
8     A.    I'm sorry, what page did you say?
9     Q.    Page 13, paragraph 34?
10     A.    Uh, yes, that's correct.
11     Q.    And in this case did you determine to
12 only measure statutory damages for infringement
13 because you didn't have sufficient information?
14     A.    I believe in this case I actually
15 didn't have any information related to what
16 actually transpired with these upgrades of these
17 cryo pump software pump -- or cryo -- cryo pump
18 products, and they upgraded the software, and there
19 was no detail as to actually any revenue or any
20 other metrics related to quantification, and as a
21 result, I defaulted to a statutory damages
22 calculation.
23     Q.    Well, you didn't say here that there
24 was no information, what you say is that they
25 provided minimal information, right?

Page 136

1     A.    Correct.
2     Q.    So they provided some information?
3     A.    Yeah, that there were at least 70
4 times that they updated software, and I believe
5 they may have provided the customer names, but
6 there was no other information related to details
7 of the revenue related to those upgrades.
8     Q.    Could that be an appropriate measure
9 of damages here, statutory damages?
10     A.    I think that would be up to the trier
11 of fact in terms of if statutory damages would be
12 appropriate.
13     Q.    With regard to your expert opinion
14 relating to lost license fees, what expert opinions
15 do you provide other than what Mr. Waid provided
16 you with and the arithmetic you performed in order
17 to create the tables relating to lost license fees?
18     A.    I think we discussed this before
19 lunch. But I provided expertise related to
20 understanding what's the appropriate structure of
21 the license based upon the facts and circumstances
22 here and what is the appropriate pricing based upon
23 that structure, and Mr. Waid provided inputs in
24 terms of the quantification piece based upon FICO's
25 standard pricing for the named application

Page 137

1 licenses.
2     Q.    And what specifically in your report
3 did you provide expert opinions on other than those
4 inputs provided by Mr. Waid and the arithmetic in
5 the graphs?
6     A.    I think I just answered that question,
7 but it's a determination of the appropriate
8 structure of the license based upon the information
9 available and the facts and circumstances.
10     Q.    The appropriate structure of the
11 license meaning what?
12     A.    Oh, Mr. Bakewell doesn't agree that it
13 should be a named application license, so he has a
14 different opinion, that it should be based upon a
15 hypothetical negotiation I believe of an enterprise
16 license, although he didn't quantify any damages
17 from the affirmative perspective in his own opinion.
18         So I would say that that is his
19 expert -- he's providing his expertise and that
20 opinion based upon that expertise. I have my own
21 opinion, which is that's based upon a named
22 application license structure, and that's the
23 expertise I'm providing.
24     Q.    Anything other than that?
25     A.    No.

Page 138

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 139

1    Q.    The named application license
2  structure was a very structure that Mr. Waid had
3  already provided in his declaration prior to the
4  time you were retained as an expert, right?
5    A.    He had provided a quantification based
6  upon that type of license and that declaration,
7  that's correct.
8    Q.    And you're not providing expert
9  opinions as to software pricing structures,
10 correct?
11   A.    I'm providing expertise related to the
12 lost license fees based upon the pricing structure
13 I determined was appropriate.
14   Q.    So if Mr. Waid were to testify and
15 provide the information that he provided you and
16 utilized the graphs that you created based on the
17 information you provided, what additional
18 information would you have to provide beyond what
19 he would testify about?
20   A.    I am testifying to the structure of
21 the license. I would believe if you had a company
22 witness testifying as an expert witness related to
23 the structure of a license and the damages related
24 to that, it would likely create some bias, and
25 Mr. Waid I believe did a calculation of a named

Page 140

1  application license in his declaration.
2          I don't think there's an opinion as to
3  that's an appropriate structure per se. It simply
4  was a calculation if one were to look at it from
5  that perspective, and it was based upon information
6  at that time, which I think was February 2018.
7  And, therefore, his calculations based upon the
8  sizing matrix are not the same as the results of my
9  calculations because updated information was
10 provided in the meantime.
11   Q.    So are you suggesting that the role
12 that you play here or the expertise that you
13 provide is, basically, to act as a mouthpiece for
14 the opinions of Bill Waid?
15   A.    I don't believe that's what I said.
16   Q.    Okay. And you -- you're not providing
17 any expert opinion relazing -- relating to the
18 causal nexus between the use of Blaze and revenues
19 and profits, correct?
20   A.    There are others who are providing
21 that information or testimony related to causal
22 nexus and the connection to revenue. However, I
23 will state that based upon my review of information,
24 which includes a number of things, off the top of
25 my head, you know, Mr. Whitener's report and some

Page 141

1  of the documentation he cited, as well as I think
2  there was a RFI that was back in 2006 by the
3  defendants related to the entry into the mid-market
4  and -- I'm trying to remember what other
5  documentation I saw. I think there was a white
6  paper that FICO has related to the connection to
7  revenue from Blaze Advisor.
8          There are a number of pieces of
9  information that one could conclude there is a
10 reasonable connection. But, again, I'm not
11 offering those opinions.
12   Q.    Okay. So you're not providing an
13 expert opinion as to the causal nexus issue,
14 correct?
15   A.    Correct.
16   Q.    Okay. And you aren't providing any
17 software industry expertise here, correct?
18   A.    I'm not providing -- I'm not putting
19 myself out as an expert in the software industry by
20 due of expertise working on cases related to
21 software and software licenses.
22   Q.    And you agree that you didn't attempt
23 to independently verify the gross written premium
24 numbers, you just took them from the -- took the
25 numbers from the interrogatories?

Page 142

1    A.    I took them from signed and sworn, I
2  believe, verified interrogatory responses from the
3  defendants, correct.
4    Q.    And in response to the question, you
5  didn't attempt to independently verify those
6  numbers?
7    A.    Uh, no.
8    Q.    Okay. Got double negatives there.
9          You agree that you did not take any
10 steps independently to verify the gross written
11 premium numbers, correct?
12   A.    I did not perform any analysis to
13 reconcile them to any additional financial
14 information provided in terms of financial statements
15 or reported financials. I don't believe that was
16 possible based upon the way that the information
17 was produced.
18   Q.    You state in your reply report at
19 paragraph 4 that "except as reflected herein, my
20 prior opinions have not changed." Can you
21 summarize which of your opinions did change between
22 your first report and your reply report, if any?
23   A.    This report lays out my rebuttal
24 arguments in critique of Mr. Bakewell's opinions,
25 and nothing has changed in terms of my opinion that