# Exhibit 22
# (Unsealed)
# (Previously Filed Under Seal as Dkt. 412)

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, ) ) ) | |
| Plaintiff, ) ) | |
| v.                                                                      ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania Corporation, ) ) ) ) ) | |
| Defendant.                                                   ) | |

**EXPERT REPORT OF
W. CHRISTOPHER BAKEWELL
REGARDING DAMAGES**

**May 17, 2019**

Respectfully Submitted,

*[signature: WCBakewell]*

W. Christopher Bakewell

**EXHIBIT 22**

131. Mr. McCarter also told me that Federal could have implemented the following alternatives at or leading up to the time it was alleged of infringement:[185]

- *Manual Decisions*. I understand from Mr. McCarter that Federal could have manually looked up information in underwriting manuals to make the determinations.[186] Mr. McCarter explained that the manual process would not have been as efficient as Blaze Advisor, but it would have been an alternative to paying the overstated license fee calculated by Mr. Zoltowski.[187]

- *Hard Coding*. I understand from Mr. McCarter that Federal could have implemented what they did prior to using Blaze Advisor, which was hard coding rules into the applications.[188] According to Mr. McCarter, hardcoding would not have been as efficient as Blaze Advisor, but it would have been an alternative to paying the license fee calculated by Mr. Zoltowski.[189]

- *Other Products*. I understand from Mr. McCarter that Federal could have implemented an alternative rules-based software from one of FICO's competitors such as IBM, Oracle or CA Technology.[190] Mr. McCarter explained that these alternative products would have been commercially and technically acceptable at the time of the alleged infringement.[191] In early 2006, Federal was considering taking a license to IBM's ODM software because ACE already had the application.[192] According to Tamra Pawloski, Federal's Former Vice President of Vendor Management Hardware and Software, Federal "had multiple discussions with IBM."[193]

---

[185] I note that just because an alternative or substitute has not been implemented, it does not mean that option is not feasible or not acceptable. Licensees or alleged infringers do not simply switch to an existing alternative or develop new available alternatives each and every time they are accused of infringement. To do so any time there is disagreement about permissible use would be unreasonable and disruptive. The decision not to switch to an alternative is not, by itself, evidence that such a switch was not possible or would not have occurred.
[186] Interview of Mr. McCarter.
[187] Interview of Mr. McCarter.
[188] Interview of Mr. McCarter.
[189] Interview of Mr. McCarter.
[190] Interview of Mr. McCarter; Global Business Rules Management System (BRMS) Market Forecasts & Opportunities (2014-2024), TechSciResearch, p. 122.
[191] Interview of Mr. McCarter; Global Business Rules Management System (BRMS) Market Forecasts & Opportunities (2014-2024), TechSciResearch, p. 122.
[192] Deposition of Tamra Pawloski, January 18, 2019, p. 211; FED001150_0001; FED001151_0001-002.
[193] Deposition of Tamra Pawloski, January 18, 2019, p. 211; FED001150_0001; FED001151_0001-002.

financially and economically reasonable, too. It is disadvantageous and unreasonable to assume that companies would routinely subject themselves to a form of economic hold up, where it would have to go back and ask permission to extend licenses without any other options. [199]

136. Mr. Zoltowski disregarded these business realities. Instead, he calculated a separate license fee for each of the accused named applications. So instead of calculating one enterprise license fee (that included discounts), Mr. Zoltowski decided to calculate a separate license fee for each the ten U.S. and seven foreign accused applications (without a discount). I will explain in more detail below, Mr. Zoltowski's assumption in this regard is commercially unrealistic and results in inflated conclusions.

137. In this way, Mr. Zoltowski's calculations are not a function of the value of Blaze, or reflective of what a reasonable outcome of a negotiation would be. In terms of damages, this shows why Mr. Zoltowski's calculations are not actual damages that are "suffered… as a result of the infringement." [200] Mr. Zoltowski also did not justify his inherent assumption that Federal's merger increased the number of times Blaze Advisor was used and therefore would require Federal to license each application individually.

138. In short, Mr. Zoltowski did not cite to any evidence or documentation to support his theory, which amounts to a license fee based on named applications. Mr. Zoltowski disregarded Mr. Waid's declaration in this matter stating FICO has never entered into the type of named application license that Mr. Zoltowski is proposing. Mr. Waid stated the following in his declaration:[201]

> *To my knowledge, a FICO licensee has never entered into a license agreement for the use of Blaze Advisor® software on an application basis with fifteen separate application.*

---

[199] Oliver Hart and John Moore, "Incomplete Contracts and Renegotiation," Econometrica, July 1988.
[200] 17 U.S.C. §504(b).
[201] Declaration of William Waid In Support Of Fair Isaac Corporation's Opposition to Federal Insurance Company's Motion to Compel, p. 5.