**Exhibit 34**
**(Redacted)**
**(Previously Filed Under Seal as Dkt. 415)**

Brooks Hilliard - 6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
 2     _____

 3     FAIR ISAAC CORPORATION,        Court File No.
                                      16-cv-1054(WMS/DTS)
              PLAINTIFF,
 4
         VS.
 5
       FEDERAL INSURANCE COMPANY
 6     and ACE AMERICAN INSURANCE
       COMPANY,
 7
              DEFENDANTS.
 8     _____

 9

10

11

12     - - - - - - - - - - - - - - - - - - - - - - - - - -

13            VIDEOTAPED DEPOSITION OF

14               BROOKS HILLIARD

15     - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17

18

19

20

21

22

23

24

25     Taken June 19, 2019        By Brandi Bigalke, RPR
```

EXHIBIT
34

Brooks Hilliard - 6/19/2019

**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1  cases multiple licenses.
2      Also in the consulting environment
3  there were often multiple software licenses. If
4  there were multiple, and in most cases there
5  were, companies making proposals to my clients, I
6  in many cases reviewed the licenses of more than
7  just the desired or selected provider.
8      So while I say -- and perhaps 150
9  of those instances involved analyzing and
10  negotiating software licenses, in many of those
11  150 I analyzed multiple software licenses, and in
12  some of them I was involved in negotiation of
13  multiple software licenses.
14      Q.    In connection with your statement
15  about your professional involvement in analyzing,
16  drafting, and/or negotiating several hundred
17  software licenses, what types of software are you
18  referencing?
19      **A.    Business-oriented software.**
20      Q.    Such as what?
21      **A.    Many of them are what would be**
22  called enterprise software, which touches many
23  areas within a business from operations to
24  accounting to administrative. Many of them were
25  specialized software for particular business

*Page 33*

1  applications. Virtually all of them were
2  business related -- business software -- related
3  to business software rather than technical
4  software or software oriented toward say
5  controlling equipment or system software.
6  Although there was some of that.
7      Q.    With respect to your statement
8  about your professional involvement in analyzing,
9  drafting, and/or negotiating several hundred
10  software licenses, did any of those licenses
11  involve rules management software?
12      **A.    Yes.**
13      Q.    Could you identify those?
14      **A.    The one that comes to mind is an**
15  ongoing case that's covered by a protective order
16  that I can't talk about, but most of them involve
17  rules management relating to configuration. It
18  could be configured to order manufacturing, it
19  could be configuration relating to distribution
20  of products.
21      So there would be rules as to what
22  product can go with what product, or if you buy
23  this one you have to buy that one, and you can't
24  get that one because it doesn't work with it. So
25  most of them were configuration management rules.

*Page 34*

1  that I recall.
2      Q.    In the case that you referenced
3  involving protective order, who were you retained
4  by?
5      **A.    I was retained by a firm called**
6  AZA, Anaipakos something. This --
7      Q.    Is this -- go ahead.
8      **A.    They're very lengthy names. The**
9  firm goes by the name of AZA.
10      Q.    What does that stand for?
11      **A.    Anaipakos I believe is the name of**
12  the first individual. The second and third
13  individuals, one's last name begins with Z and
14  the next one begins with A.
15      Q.    And who -- what is the party on the
16  opposite side of that lawsuit?
17      **A.    Pardon me?**
18      Q.    Could you identify the party on the
19  other side of that lawsuit?
20      **A.    Ford Motor Company.**
21      Q.    Where is that lawsuit venued?
22      **A.    Detroit.**
23      Q.    Do you know whether it's state
24  court or federal court?
25      **A.    Federal.**

*Page 35*

1      Q.    Do you know who the judge is?
2      **A.    No.**
3      Q.    Who are the attorneys for AZA?
4      **A.    They've changed over a period of**
5  time. AZA is the law firm, not the litigant. I
6  was engaged by the law firm. And the one
7  constant is a Mr. Mitby. Steven Mitby,
8  M-I-T-B-Y.
9      Q.    Who does AZA represent in that
10  case?
11      **A.    A company called Versata,**
12  V-E-R-S-A-T-A.
13      Q.    What is the subject matter of that
14  lawsuit?
15      **A.    It's an intellectual property,**
16  trade secret -- well, there are a number of
17  issues. My issues were related to trade secret.
18      Q.    Does it involve software licenses?
19      **A.    Yes.**
20      Q.    Do you provide any -- have you
21  provided any opinions in that case relating to
22  software licenses?
23      **A.    I haven't provided any opinions in**
24  that case. I was a consulting expert.
25      Q.    So in that case did you prepare an

*Page 36*

Brooks Hilliard  -  6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 expert report?

2    **A.   No.**

3    Q.   In this case would you say that

4 analyzing comparable software licenses is

5 relevant to your task?

6    **A.   Would I say that analyzing software**

7 licenses is relevant, yes.

8    Q.   Would you say that analyzing

9 comparable software licenses is relevant to your

10 task?

11    **A.   In terms of knowledge of what**

12 comparable -- what is in comparable software

13 licenses, yes, very relevant.

14    Q.   How so?

15    **A.   Well, because in many cases my**

16 opinions deal with what is normal and customary

17 in software licenses for in -- for similar

18 specially purpose and general purpose business

19 software.

20    Q.   What experience do you have with

21 regard to the performance of obligations due

22 under a software license agreement?

23    MR. HINDERAKER:  Object to the

24 question as vague.

25    THE WITNESS:  I don't understand   Page 37

1 what you're asking me.

2 BY MR. FLEMING:

3    Q.   Have you provided -- have you

4 worked as an expert witness in any case involving

5 the question as to a party's obligations under a

6 software license agreement?

7    MR. HINDERAKER:  Same objection,

8 vagueness.

9    THE WITNESS:  In a general sense,

10 many of the cases involved what was in the

11 software license, as well as the actions of the

12 licensor and licensee.

13    As best I understand your question,

14 that's the most relevant answer I can give you.

15 BY MR. FLEMING:

16    Q.   And you're referencing cases in

17 which you've testified as an expert?

18    **A.   Yes.**

19    Q.   Okay. Can you identify those

20 cases?

21    MR. HINDERAKER:  I'm going to

22 object to the question to the extent it's asking

23 for disclosures that are beyond Rule 26.  And

24 Mr. Hilliard's disclosures and conformance with

25 Rule 26 regarding his prior experience over the   Page 38

1 last, I think it's four years that are required

2 by the rule are in your possession.

3    MR. FLEMING:  Go ahead.

4    THE WITNESS:  I'd be happy to

5 address the cases on page 37 of my report, which

6 are the ones within the past four years.

7    And could you ask the question

8 again, or could we read back the question so that

9 I'm answering it specifically.

10    MR. HINDERAKER:  Sure.

11    (Whereupon, the requested portion

12 was read back by the reporter.)

13    THE WITNESS:  Could you read the

14 prior question.  When you say "those cases," I --

15 cases relating --

16    (Clarification by the court

17 reporter.)

18    MR. FLEMING:  You have to go to the

19 question before that.

20    THE WITNESS:  The prior question, I

21 think.

22    (The requested portion was read

23 back by the court reporter.)

24    THE WITNESS:  I'm trying to

25 remember the details of the cases.  The   Page 39

1 Hodell-Natco dealt with SAP's -- SAP America's

2 involvement in performance of services under a --

3 there may have been an implementation contract

4 rather than a software license.  I don't know

5 that there were licensing issues, but there may

6 have been.

7    State Controller's Office versus

8 SAP Public Services was an implementation

9 contract.  I reviewed the software license, but I

10 don't believe that there were software licensing

11 issues there.

12    The Gish versus Meisenheimer did

13 not have any.

14    The QAD versus Ingersoll-Rand did

15 involve software licensing issues, although I

16 don't recall specifically off the top of my head

17 what they were.

18    And the Armour Capital Management

19 versus SS&C Technology involved, as I recall,

20 both software licensing and implementation

21 issues.

22 BY MR. FLEMING:

23    Q.   So do you recall any cases in which

24 you've testified as an expert witness relating to

25 a party's obligations under a software license   Page 40

**Page 13 (37 - 40)**

**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

1    A.   I would expect there to be some
2 negotiation, and that the negotiation to be based
3 on -- on the parameters that the licensor
4 normally uses for setting fees and discussions
5 between the licensor and licensee, which may or
6 may not address the usage.
7    Q.   So you would not expect a software
8 licenser in FICO's position in 2016 to request
9 some information about how the licensee was using
10 the software prior to demanding an increased fee,
11 correct?
12        MR. HINDERAKER:  Objection;
13 misstates the testimony.
14        THE WITNESS:  I'm saying I would
15 expect there to be some discussion.  I would
16 think that that would come up in the discussion.
17 The imperatives in your question, the demanding
18 and so forth, it wouldn't -- normally there's a
19 good business relationship, and it's not an
20 imperative and a demanding kind of situation as
21 you've described it.  And I would expect that to
22 come up, but I don't know necessarily that it
23 would always have to come up.
24 BY MR. FLEMING:
25    Q.   Are you saying that FICO was

1 entitled to an increased licensing fee whether or
2 not there was any change in the way Blaze was
3 being used as a result of the merger?
4    A.   I'm saying that the contract says
5 what it says with regard to that, and what it
6 says is normal and customary.
7    Q.   No, I'm asking whether you believe
8 that FICO was entitled to an increased licensing
9 fee whether or not there was any change in the
10 way Blaze was being used as a result of the
11 merger?
12    A.   I believe that would be that what
13 FICO did was normal and customary.  I believe
14 that the discussions over increased licensing
15 fees are normal and customary, and that the
16 contract says what it says, and it would be
17 normal and -- regarding the consent for
18 assignment and the way that FICO dealt with Chubb
19 in that regard was consistent with what the
20 contract said, and was normal and customary in
21 the industry.
22        I think I cited both Landy and
23 Classen in that regard, as well as my own
24 experience.
25    Q.   Mr. Hilliard, I know it's getting

1 late.  We've been going a long time today, but --
2        MR. HINDERAKER:  Almost seven
3 hours.
4 BY MR. FLEMING:
5    Q.   Continuing to say the contract says
6 what it says is not responsive to my question,
7 and I'd like an answer.
8        Is it your opinion that FICO was
9 entitled to an increased licensing fee whether or
10 not there was any change in the way Blaze was
11 being used as a result of the merger?
12    A.   I believe the contract says that
13 FICO was entitled to do that, and I feel that
14 FICO was entitled to rely on what the contract
15 said.
16    Q.   The contract says that they were
17 entitled to an increased licensing fee, is that
18 what you're saying?
19    A.   The contract says that there is --
20 that consent is required, that there is no
21 assignment without consent, and the normal way
22 that consent occurs in situations where one -- as
23 Landy and Classen agree, the normal way in
24 situations where there is an acquisition by a
25 much larger entity that increases in license fees

1 are normal and customary regardless of use.
2    Q.   On page 22 of your report you state
3 that as negotiations between FICO and Chubb
4 continued in 2016, FICO learned of several
5 installations of the Blaze Advisor software that
6 had previously been done outside of the United
7 States, right?
8    A.   Yes.
9    Q.   And you reviewed Dr. Kursh's report
10 relating to the documents he referred to in
11 connection with FICO's prior knowledge of foreign
12 use, right?
13    A.   I reviewed Dr. Kursh's report in
14 that regard, yes.
15    Q.   How can you claim that FICO just
16 learned of this foreign use in 2016?
17        That's not accurate, is it?
18    A.   It had learned of some prior to
19 2016.  There was use, but it didn't necessarily
20 learn of all of the installation until 2016,
21 which would have been the unlicensed use.  And I
22 think there was actually a specific new -- at
23 least one specific new incidence of unlicensed
24 installation or of installation outside the
25 United States that FICO was not aware of, at

Brooks Hilliard  -  6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  least one, that it didn't become aware of until
2  2016.
3          Access to the software without the
4  installation of the software outside the U.S.
5  would not necessarily have been contrary to
6  violation of the license.  And I don't know
7  whether it was 2016 or exactly when -- I don't
8  recall exactly when FICO became aware of
9  installations not permitted by the license, or
10  the date at which FICO became aware of disclosure
11  of the software through consultants that aren't
12  specifically named in Section 3.6 of the license
13  agreement.  I think at least one of those
14  instances occurred in 2016.
15      Q.   Throughout your report you use the
16  phrase "consistent with the normal customs and
17  practices of the commercial software industry."
18          How is that any different than the
19  phrase that Dr. Kursh uses which is
20  "commercially reasonable"?
21      A.   **It's very different.  The**
22  difference is that in my case it is based on my
23  experience backed up by learned treatises,
24  third-party sources that confirm my experience.
25  And it's evaluatable not only on my experience,

Page 233

1  but what the third-party sources say.
2          In Dr. Kursh's case, he refers
3  to -- he attempts to make a definition of what he
4  means by commercially unreasonable, and I think
5  he has three different factors.  His experience,
6  the customs and practices of Chubb, the customs
7  and practices of FICO, and I think one other.  He
8  doesn't say how they're combined, but he says
9  it's a combination of those three.
10          There's no way to evaluate what he
11  means by that because he's combined so many
12  different things.  Whereas I've been very
13  specific about what I mean by customs and
14  practices of the industry, and I've backed it up
15  with third parties.
16      Q.   Mr. Hilliard, I'd like to talk
17  about your opinions relating to discounts.
18      A.   Certainly.
19      Q.   On page 25 of your report you state
20  that FICO's discounting process is consistent
21  with the custom and practices of the commercial
22  software industry.
23      A.   Page?
24      Q.   25.
25      A.   25.  Yes.

Page 234

1      Q.   And you go on to state that the
2  last custom pricing process is exactly what FICO
3  did in developing the license fee quote it gave
4  to Federal in March of 2016 when it offered a
5  discounted fee level of ███████████s that
6  right?
7      A.   ███████**There were three**
8  different proposals that the most -- the one with
9  the greatest discount was ████████████
10      Q.   So a ████████████discount would be
11  consistent with industry norms; is that right?
12      A.   **Discounts vary, but it would -- for**
13  a discount for an expanded license with a major
14  client with potential worldwide use, it's
15  certainly within the range that would be normal
16  and customary.
17      Q.   On page 23 you summarize
18  Dr. Kursh's opinions on discounts, and you state
19  that Dr. Kursh asserts that the way that FICO
20  determined the license fees it quotes to
21  prospective and current customers is inconsistent
22  with software industry norms, and you go on to
23  state that based on your experience, Dr. Kursh is
24  wrong.
25          Can you summarize your experience

Page 235

1  with pricing software similar to Blaze Advisor?
2      A.   **Certainly.  Working as a consultant**
3  in over 200 engagements, the vast majority of
4  which were engagements where my clients acquired
5  business software, in some cases special purpose
6  industry oriented business software, in other
7  cases general purposes what's known as ERP
8  software, I was involved in seeing the pricing
9  and discounting that were offered to my clients.
10          And in my work -- and prior to that
11  when I had worked in computer companies, I was
12  involved in decisions on discounting -- now this
13  is some years ago because I've been working as a
14  consultant since 1980, but I was involved in
15  negotiating discounts with clients, so I'm
16  familiar from that experience.
17          And then in work as an expert
18  witness, many of the cases that I've been
19  involved in, the issues in the case related to
20  discounts that were given for business software
21  applications.  Some cases special purpose, some
22  cases general purpose.
23      Q.   Okay.  Mr. Hilliard, we've just got
24  a little bit of time left, but what is your
25  experience with pricing software similar to Blaze

Page 236

Brooks Hilliard  -  6/19/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  Advisor?  I think you've -- that's the question
2  I'd like an answer to.
3      A.    When I'm referring to similar to
4  Blaze Advisor, what I'm referring to is business
5  application software.  And in some cases that
6  would be special purpose business applications
7  such as Blaze Advisor.  In other cases it would
8  be general purpose business application software
9  such as, for instance, Oracle Financials or
10  PeopleSoft ERP software.  PeopleSoft now being a
11  part of Oracle.  Or Lawson software or others.
12  And I'm familiar -- and so all of those would be
13  business application software like Blaze Advisor.
14      Q.    Okay.
15      A.    And that's what I'm familiar with.
16      Q.    Would you agree that database
17  software is an example of system software, the
18  category of software that includes operating
19  systems which is entirely different from
20  application software like Blaze that perform
21  business functions?
22      A.    Yes.
23      Q.    Okay.  What are some other examples
24  of application software in the market today?
25      A.    Oracle Financials, SAP-1, Lawson's

Page 237

1  ARP software, SAP's R/3.  Boy, I mean, Microsoft
2  Dynamics.  I think there are four -- at least
3  three different Microsoft Dynamics' products.
4  There are software applications for different
5  kinds of professional businesses and so forth.
6          The ones I've given you are brand
7  name products that you might have heard of.
8      Q.    What is your understanding as to
9  who are the main competitors to Blaze software in
10  the marketplace?
11      A.    Yeah, I looked at the main
12  competitors that were listed in the Forester
13  report.  And as we sit here today, I'm not
14  recalling them off the top of my head.
15      Q.    On page 26 of your report you state
16  that commercial software pricing methods are very
17  fluid.
18          Are you saying it's impossible to
19  quantify the market rate for a license in this
20  situation?
21      A.    I don't understand your question.
22          What do you mean by the market rate
23  for a license?
24      Q.    What do you mean when you say that
25  commercial software pricing methods are very

Page 238

1  fluid?
2      A.    I mean that for different
3  business -- business software and different
4  software licensors, pricing can be very --
5  everything from very rigid as it would for
6  off-the-shelf consumer software or off-the-shelf
7  software that gets installed by businesses with
8  no implementation or customization, on up to very
9  variable by company and licensor ranging from
10  hundreds of dollars to millions of dollars with
11  discounts ranging from nothing to a substantial
12  portion of list price.
13          And you'd have to look at
14  individual -- individual software -- markets for
15  individual software applications, ERP
16  applications.  General purpose ERP applications
17  might be one thing, special purpose -- and by ERP
18  I mean general purpose business software.  The
19  term ERP means enterprise resource planning.  The
20  name doesn't connote what it actually is.  It's
21  a -- comes out historically.
22      Q.    So did you --
23      A.    So it just depends on the software.
24  But by very fluid I mean the amount of the
25  license varies by type of software, and the level

Page 239

1  of discounting varies both by type of software
2  and by market.
3      Q.    Did you attempt to determine the
4  fair market value of the Blaze software license
5  as of 2016 or presently?
6      A.    I have not attempted to do that,
7  no.
8      Q.    How would you go about doing that?
9      A.    The fair market value.  The fair
10  market value is what FICO sells it for to its
11  customers.  So you'd have to look at the way --
12  what price FICO has determined to sell its
13  software licenses at, and whether it's able to
14  sell substantial numbers of licenses at those
15  prices.
16      Q.    But you have not provided an
17  opinion as to the fair market value of the Blaze
18  license either as of 2016 or presently, correct?
19      A.    Correct.
20          MR. FLEMING:  All right.  That's
21  all I have.
22          MR. HINDERAKER:  Okay.  I guess I
23  have one question.
24          EXAMINATION
25  BY MR. HINDERAKER:

Page 240