**Exhibit 7**
**(Unsealed)**
**(Previously Filed Under Seal as Dkt. 434)**

CASE 0:16-cv-01054-DTS   Doc. 641-3   Filed 10/23/19   Page 2 of 15

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  10/24/2018

Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1              CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2             UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
 3
        ----------------------------x
 4
     FAIR ISAAC CORPORATION,
 5
                    Plaintiff,
 6           v.                        Court File No.
                                       16-cv-1054 (WMW/DTS)
 7
     FEDERAL INSURANCE COMPANY
 8   and ACE AMERICAN INSURANCE
     COMPANY,
 9
                    Defendants.
10
        ----------------------------x
11

12     ***CONFIDENTIAL - ATTORNEYS' EYES ONLY***

13     VIDEOTAPED DEPOSITION OF RUSSELL SCHREIBER

14               New York, New York

15            Wednesday, October 24, 2018

16                  8:52 a.m.

17

18

19

20

21
     Reported by:
22   LYNN VAN DEN HENDE
     CRR, RMR, RPR, CSR-NY, CSR-CA, CSR-IL
23   JOB NO: 39215

24

25
```

**EXHIBIT**
**7**

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2  Q.   And what was the working
3  relationship between you two?
4      A.   So Mike initially was a -- I don't
5  remember what the title was, but he was
6  basically a sales -- not a sales -- but a
7  customer service person.  I should -- I
8  should remember the title though.
9          But his job was to work with
10 clients in my sector and make sure that we
11 were delivering on the value that we said,
12 that we would take -- if there were support
13 problems that weren't getting answered from
14 the different product lines, he'd be kind of
15 the catchall guy to make sure that -- that
16 FICO didn't drop the ball.
17         Where maybe if they had a -- like
18 a newer product, if they had another product
19 and the product team wasn't being responsive
20 to support requests, they'd call -- you know,
21 the client might call Mike up.  And Mike
22 would help chase down internal, internal
23 stuff.
24         So he was initially a customer
25 support person.  And then --

Page 120

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2  Q.   And -- yeah, go ahead.
3      A.   And then over the years he was
4  eventually promoted to client partner.  And
5  he became responsible for a territory.
6      Q.   Do you recall when he became
7  client partner for Chubb?
8      A.   No.
9          But it would have been -- I do
10 not.  But '12, 2012 maybe, '14, like that.
11     Q.   And when he stepped into the role
12 of client partner at Chubb, he reported to
13 you, is that right?
14     A.   Ultimately, yes.
15         There was a person before Mike
16 though.  You have Ian Brodie in there, right?
17     Q.   Okay.
18     A.   I guess you don't.
19     Q.   Ian Brodie was the client partner
20 for Chubb?
21     A.   Right.  So when I got promoted to
22 take over the -- to be responsible for the
23 United States, Ian became the client partner
24 for Chubb.
25         And that was two-plus years or so.

Page 121

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2  Q.   Okay.  And so --
3      A.   And then after Ian left, then Mike
4  became client partner for Chubb.
5      Q.   And so whoever was acting as
6  client partner for Chubb, Ian and then Mike,
7  would have reported to you?
8      A.   That's correct.
9      Q.   And would you characterize that
10 working relationship as a close working
11 relationship?
12     A.   I don't know how I would -- it was
13 a good working relationship.
14         I don't know what "close" means.
15 I don't know you're looking for.
16     Q.   Did you interact with Mike when he
17 was client partner for Chubb every day about
18 Chubb, every week?
19     A.   No, no.  But we spoke weekly on
20 everything that he was responsible for.
21         And Chubb sometimes wouldn't be a
22 topic for maybe months on end.
23     Q.   Was Chubb one of the bigger
24 accounts that you and Mike had responsibility
25 for?

Page 122

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1
2      A.   No.
3          I don't know how you mean
4  "bigger."  So why don't you tell me what you
5  mean by bigger.
6      Q.   Okay.  Would you say it was in the
7  top 10 percent in terms of size of accounts?
8      A.   So again, what do you mean?  Size
9  by what measure?
10     Q.   The amount of revenue that the
11 relationship generated for FICO.
12     A.   No, no.
13     Q.   Okay.
14     A.   So Chubb had -- it was spiky.
15         So we had initial sales.  Then we
16 had some services.  Then we didn't do much
17 for a while.  Then we did a lot.
18         And then it was up then down over
19 time as the ebb and flow, their business
20 needs ebbed and flowed.
21     Q.   How would you compare the amount
22 of revenue that FICO generated from Chubb
23 over the ten-year period that FICO did
24 business with Chubb?
25     A.   Perfectly fine.

Page 123

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

2      Q.   Fine, middle of the road?
3      A.   I wouldn't put it -- I wouldn't
4  put it in a bucket. I just don't know.
5      Q.   Okay.
6      A.   The thing that was great about
7  Chubb was we had a great relationship. They
8  could count on us. If I need a reference, we
9  could count on them.
10         We had a great history together.
11     Q.   But they were not viewed by you or
12  anyone else at FICO as one of the bigger
13  clients?
14     A.   As a big revenue generator year
15  over year over year, no.
16         But certainly as a name brand and
17  a great client who we had a great track
18  record with.
19     Q.   Showing you what's been marked as
20  Exhibit 115.
21         (Exhibit 115, Email dated
22         11/14/2008, with attachment, Bates
23         FICO0002101 through FICO0002273, marked
24         for identification.)
25     A.   Okay.

Page 124

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

2      Q.   Take a look at that. And let me
3  know when you're ready.
4         (Document review.)
5      A.   Oh, John Finnegan, wow. I forgot
6  about these guys.
7         Okay. So this looks to me you're
8  trying to give me the license agreements that
9  we've already looked at in 110, plus an
10  annual report from '07?
11     Q.   Yes.
12     A.   Okay.
13     Q.   That's what I believe is included
14  in Exhibit 115.
15         MR. HINDERAKER: Are you okay?
16     A.   Okay. Yep.
17     Q.   Okay. And on the first page Mike
18  Sawyer states to you, with the subject line
19  "Chubb:"
20         "Russ - I've attached 4 PDFs. The
21  first three are the SLSA and subsequent
22  expansion amendments. The fourth is their
23  2007 annual report."
24     A.   Right.
25     Q.   Take a look at page 26 and 27 of

Page 125

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

2  the annual report.
3      A.   Okay.
4      Q.   Do you recall what this meeting
5  was being called about?
6      A.   I do not.
7      Q.   If you take a look at page 26 and
8  27 --
9      A.   Yep.
10     Q.   -- do you recall what it is that
11  he was finding significant in those pages?
12     A.   No.
13     Q.   Was the annual report something
14  that you had reviewed at times in the past?
15     A.   I would have. It's conceivable I
16  would have, sure.
17         Know your customer, right?
18     Q.   If you look at page 27, which is
19  one of the pages that he pointed you to --
20     A.   Yep.
21     Q.   -- you see there that the net
22  premiums written for 2005 was 12.2 billion,
23  correct?
24     A.   Right.
25     Q.   And is it your understanding that

Page 126

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

2  that is for essentially the Chubb groups
3  of -- the Chubb group of companies that are
4  subject to this annual report?
5      A.   I don't know. I'm on page 27. I
6  don't know.
7         Do you want me to read the annual
8  report and tell you what my interpretation
9  is?
10     Q.   Well, presumably you could do
11  that.
12     A.   I could. If you want me to, I'd
13  be --
14     Q.   And you've had experience with the
15  annual report in the past?
16     A.   Right.
17         But I don't know what this is
18  referring to without reading the annual
19  report.
20     Q.   Sure. I understand.
21         All right. So let's take a look
22  at the document that was previously marked as
23  Exhibit 73.
24     A.   73?
25     Q.   Uh-huh.

Page 127

---

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

**Page 132**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  global license."

2  Do you see that?

3  A.  I see that, yeah.

4  Q.  Okay.  So does this refresh your

5  recollection that in November of 2018 you

6  were asked to determine whether the Chubb ELA

7  was a global ELA?

8  A.  Oh, no, it does not.

9  Q.  Okay.

10  A.  But I could have been asked that

11  every year, every other year for five years.

12  This would have -- just one of the

13  many times I was asked that.

14  Q.  Okay.

15  A.  Okay.

16  Q.  Is it a fair assumption from what

17  we've looked at from Exhibits 115, 73, and

18  116 that are all in mid to late November

19  2008, fair to conclude from those that you

20  and your internal FICO team were doing an

21  analysis of whether the ELA was a global ELA?

22  A.  I want to say, yes.

23  The reason I can't -- I feel like

24  I can't say yes is I haven't seen a lawyer on

---

**Page 133**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  here, 'cause it would have went to a lawyer

2  for the ultimate answer, plus there's a

3  contract.

4  Q.  Okay.  But in terms of at least

5  the business discussion --

6  A.  Right.

7  Q.  -- is it fair to conclude from

8  these documents that you internally were

9  discussing with your business folks whether

10  the ELA was a global ELA?

11  A.  That would be fair.  That would be

12  a fair conclusion, yes.

13  Q.  Okay.  And in doing so you had

14  referenced the annual report, Chubb annual

15  report?

16  A.  Right.

17  Q.  And you received an email from

18  Larry Wachs, who was a part of your pursuit

19  team at the time of the deal, correct?

20  A.  Yeah, I wouldn't describe him that

21  way.  But, yes, he was on the -- he was on

22  the pursuit team.  He was not part of my

23  team.

24  So the Blaze guys were very

---

**Page 134**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  distinct from the sector guys.

2  Q.  Okay.  Well, Larry and Russ were

3  working --

4  A.  Were working together, right.

5  Q.  Yes.

6  And his position is the corporate

7  ELA was intended to include the global

8  license?

9  A.  That's Larry's position.

10  Q.  Okay.  And so at this point then

11  did you conclude that Chubb had in fact

12  purchased a global ELA for Blaze?

13  A.  I don't -- I don't know.

14  I would be surprised if I did.

15  But maybe I did and then found -- did the

16  rest of the research and found that was

17  wrong.  I don't know.

18  Q.  Okay.  So it's possible --

19  A.  But Larry believes it for sure.

20  Q.  Larry believed it?

21  A.  Russ would have to be convinced.

22  I don't believe it.

23  Q.  Okay.  It's possible though that

24  in November of 2008 after doing the analysis

---

**Page 135**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  that you did in November of 2008 with your

2  internal team that you concluded it was in

3  fact a global ELA?

4  MR. HINDERAKER:  Objection, asks

5  for speculation.

6  A.  So what does that mean?  Do I

7  answer the question?

8  MR. HINDERAKER:  Well, she said it

9  is possible that.  And I said I think

10  that's asking --

11  So you can -- you have to answer

12  the question.

13  THE WITNESS:  Oh.

14  MR. HINDERAKER:  I'm just raising

15  my objection to the question itself.

16  THE WITNESS:  So I don't have a

17  judge here to say objection overruled

18  and all that stuff?

19  MR. HINDERAKER:  No, there's no --

20  I've lodged my objection to the

21  form.

22  THE WITNESS:  So the question is

23  one more time?

24  BY MS. JANUS:

---

**Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018**
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  
2    Q.    You said you couldn't remember.
3    A.    Right.
4    Q.    And so my question -- my follow-up
5    question to you was it's possible then that
6    in November 2008 after going through an
7    internal analysis of the Chubb ELA you
8    concluded that it was in fact a global ELA?
9         MR. HINDERAKER:  And my objection
10       is lack of foundation, asks for
11       speculation.
12       A.    But I still answer the question
13   anyway.
14       MR. HINDERAKER:  Yes, the best you
15       can.
16       A.    Okay.  So it's -- I'm sorry, one
17   more time -- is it possible that I concluded
18   that it was a global ELA?
19            I'd state that all things are
20   possible.
21            Is it possible in the moment that
22   with Larry saying yeah, yeah, yeah, yeah,
23   yeah, yeah, I might have said, okay, maybe.
24            And then I would have done the
25   rest of the work to find out what I really

Page 136

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  
2    thought.
3            So it's possible in a moment, in a
4    flash I might have said, okay, maybe you're
5    right.
6    Q.    Okay.  Now, presumably these
7    conversations were taking place because Chubb
8    Europe wanted to use Blaze, right?
9    A.    Or -- that's one possible --
10   that's one possible reason.
11   Q.    Okay.  Or FICO --
12   A.    -- sell it to --
13            THE COURT REPORTER:  Excuse me,
14       excuse me.  You need to speak one at a
15       time.
16            So what was the question?
17   A.    Or that FICO Europe wanted to sell
18   Blaze to Chubb Europe, that's another
19   possibility for the reason for the
20   conversation, correct?
21   A.    Correct.
22   Q.    Do you recall what precipitated
23   the conversation?
24   A.    No.
25   Q.    In any event, do you recall that a

Page 137

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  
2    decision was made about what position FICO
3    would take with respect to whether the Chubb
4    Blaze ELA was global?
5    A.    Do I recall?  No.
6    Q.    As you sit here today, do you
7    believe that FICO made the decision to treat
8    the Chubb Blaze ELA as a global ELA?
9    A.    No, 'cause we'd have an
10   amendment -- we'd an Amendment Four that said
11   it's global.  And we don't have that.  Or
12   amendment whatever.
13   Q.    Do you believe that FICO
14   allowed -- knowingly allowed Chubb to use the
15   Blaze ELA outside of the United States?
16   A.    Knowingly allowed -- how do you
17   mean that?
18            Just -- so I'm wondering, you
19   know, before the fact or after the fact kind
20   of.  So do we knowingly say, go ahead and use
21   it?
22   Q.    Yeah.
23   A.    No.
24            We might have found out about
25   something and said, you know what, don't

Page 138

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  
2    break the relationship.  It's a good
3    customer.  It's a small use.  Let it go for a
4    while till it becomes important.
5    Q.    Okay.  So in your view --
6    A.    But that would have been -- we'd
7    not --
8    Q.    So in your view you don't believe
9    that Chubb ever said to -- I'm sorry, strike
10   that.
11            You don't believe that FICO ever
12   said to Chubb, go ahead and use it in Europe?
13            Is that part correct?
14   A.    That is correct.
15   Q.    But you think it's possible that
16   FICO knew that Chubb was using it in Europe
17   and made a decision to not take steps to stop
18   Chubb from using it in Europe?
19            MR. HINDERAKER:  I'll object to
20       the form of the question as asking for
21       speculation.
22       A.    I'm sorry, so I believed -- do I
23   believe that they -- I could have learned
24   that they were using it and said, don't rock
25   the boat, Chubb's a great customer, we love

Page 139

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2 their reference, it's a small use, it's not
3 material?  It's possible.
4        That would be something -- that
5 would be a decision I would have made, say
6 don't rock -- it's not material, if it was a
7 minor use for like a concept idea.  But,
8 yeah.
9    Q.   Okay.  And so in that case in your
10 mind you were knowingly allowing Chubb to use
11 the Blaze software outside of the scope of
12 the license?
13        MR. HINDERAKER:  Object to the
14 question to the extent it asks for a
15 legal conclusion.
16        Also misstates his prior
17 testimony.  You.
18        Can try to answer the question the
19 best you can.
20    A.   I'm sorry, give me the question
21 again.
22    Q.   In that case you were knowingly
23 allowing Chubb to use the Blaze software
24 outside of the scope of the license?
25        MR. HINDERAKER:  Same objections.

Page 140

1 CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2        Go ahead.
3    A.   I -- knowingly may have known.
4        I don't know that I know that I
5 knew that I know, you know.
6    Q.   It's possible -- you can't recall
7 whether you knew, but it's possible?
8    A.   It's possible --
9        MR. HINDERAKER:  Objection, asks
10 for speculation.  Go ahead.
11    A.   It's -- it's --
12        MR. HINDERAKER:  Anything is
13 possible.  Go ahead.
14    A.   Right.  It's certainly possible.
15        It's possible I knew that they had
16 some small use and didn't hold them to the
17 letter of the law for a moment.
18    Q.   Or the letter of the license?
19    A.   That's what I meant, yeah, letter
20 of license, yeah.  Or the spirit of the
21 license, quite frankly.
22        (Exhibit 117, Email dated
23 6/3/2009, Bates FICO0003146 through
24 FICO0003147, marked for identification.)
25    Q.   I'm showing you what's been marked

Page 141

1 CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2 as Exhibit 117.
3    A.   David Taylor.
4    Q.   After you've had a chance to look
5 at this, let me know.
6        (Document review.)
7    A.   Okay.
8    Q.   All right.  So if we start at the
9 first in time email, which is on the back --
10    A.   Okay.  First in time email.
11    Q.   That's from David Taylor to Ian
12 Brodie and you --
13    A.   Uh-huh.
14    Q.   -- and others?
15        Do you think Ian Brodie would have
16 been the client partner for Chubb at this
17 time?
18    A.   Yes.
19    Q.   Do you know where Ian Brodie is
20 now?
21    A.   He's running tattoo removal
22 parlors in Boston.
23        You don't get to say that often,
24 do you?  Actually as of two years ago.  So I
25 don't know where he is now.

Page 142

1 CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2    Q.   Okay.  And did you say he's
3 running them or --
4    A.   Right.
5    Q.   Like he actually works in --
6    A.   No, he owns -- he owns a string of
7 laser removals.  Apparently a very big
8 business.
9    Q.   Okay.  And in the Boston area?
10    A.   I believe so, yes.
11    Q.   Okay.  To your knowledge, he's not
12 in the industry anymore?
13    A.   That's right.
14    Q.   Okay.  And then David Taylor, who
15 is that?  Have we --
16    A.   David Taylor would have been an
17 alliance person.
18        Alliance is between -- ACN is
19 Accenture.
20    Q.   Okay.
21    A.   All right.  So we had business
22 relationships with Accenture where we would
23 help them, they would help us.
24        You know, it's an alliance.  It's
25 a teaming agreement.  So David Taylor and Bob

Page 143

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2 Berini.
3    Q.    What line of business is Accenture
4 in?
5    A.    Accenture is -- Accenture is in
6 the IT services and outsourcing business.
7         They're like an IBM, except they
8 don't do the hardware side, I guess, or --
9    Q.    And so when you say that you would
10 have an alliance or teaming agreement with
11 Accenture, what types of things would you be
12 teaming on?
13    A.    Teaming on?
14    Q.    Yeah.
15    A.    So -- so Accenture probably had
16 a -- has a multibillion dollar consulting
17 practice to the insurance industry.
18         So we would want them to
19 understand how our products work in the
20 insurance business and -- so that they would
21 include our technologies in -- in their
22 consulting work.
23    Q.    So Accenture would possibly be a
24 company that could assist a FICO client with
25 the client's use of --

Page 144

1 CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2         MR. HINDERAKER:  Objection, lack
3    of foundation as to somebody else's
4    intentions.
5    A.    But I answer it anyway, okay.
6         What does "illusory" mean?
7    Q.    Well, I guess I'm asking you the
8 question.  If you don't understand, that's
9 fine.  I can say it a different way.
10        But it sounds to me like what
11 Taylor is saying is, yeah, we've entered into
12 an agreement with Accenture for -- to pay
13 them 25 percent for deals at Chubb on Blaze
14 license sales, but we have an existing Blaze
15 ELA, so our fee exposure is null on Blaze.
16    A.    Right, so I would have said this
17 is a stupid paragraph.
18        I don't know what "illusory"
19 means, but the guy -- I don't know what he's
20 trying to tell me here.  This looks really
21 broken to me.
22    Q.    Isn't David Taylor saying, yeah,
23 we got an agreement with Accenture that says
24 Accenture is going to get 25 percent of
25 nothing?

Page 146

1 CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2    A.    That's right.
3    Q.    -- Blaze or FICO's other software?
4    A.    That's right.
5    Q.    Okay.  It looks like David
6 Taylor's email to you and others relates to
7 the Chubb teaming agreement with Accenture.
8         And in the second paragraph he
9 describes the terms of the agreement.
10        And he says:
11        "The agreement states we will pay
12 Accenture 25 percent for ICC or policy admin
13 driven deals at Chubb on Blaze license sales
14 (not including support and PS)."
15        Then he says in the bottom:
16        "My understanding is Chubb has an
17 existing Blaze ELA, so our opportunity (and
18 fee exposure to ACN) is null on Blaze, but we
19 want to incent them to sell the Blaze product
20 extensions listed above into Chubb."
21        So was Taylor saying that he was
22 entering into an illusory agreement with
23 Accenture with respect to the percent of
24 Blaze license sales Accenture would be
25 entitled to?

Page 145

1 CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2    A.    That's right.
3    Q.    Okay.
4    A.    That's how I read it as well.
5         Except for the products that he
6 says they get 15 percent on which they don't
7 own.  So I don't know why he would even --
8         But that could have been 25
9 percent for all clients who just happened to
10 say "Chubb" here.  I don't know -- you know
11 what, who --
12    Q.    Well, it's a Chubb team agreement.
13    A.    Who knows what he was saying.  It
14 doesn't make any sense.
15    Q.    And David was a FICO employee,
16 right?
17    A.    I believe that's right.  I don't
18 think he was a contractor.  I think he was a
19 FICO employee, yeah.
20    Q.    Was he trying to trick Accenture
21 by getting Accenture to do the deal for fees
22 they would never receive?
23        MR. HINDERAKER:  Objection, lack
24    of foundation.
25        That's somebody else's intentions.

Page 147

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

| | |
|---|---|
| CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber<br><br>2 making a decision to say it is -- it is a<br>3 license that's limited to the United States,<br>4 but it's not the right time to enforce that?<br>5     **A. No, but I could have.**<br>6     Q. Okay. You just don't recall?<br>7     **A. That's right.**<br>8     **But I wouldn't be -- I would**<br>9 **consider that I might have done that.**<br>10     Q. It's possible?<br>11     **A. Sure, yeah.**<br>12     Q. All right.<br>13     **A. I mean, Chubb was a very favored**<br>14 **client of mine.**<br>15     **They were my first customer. They**<br>16 **were a great reference. I liked them and**<br>17 **wanted them to be wildly successful.**<br>18     **So if there was a minor thing, I**<br>19 **might not have been -- I might not have**<br>20 **rubbed their noses in it one day.**<br>21     Q. Showing you what's been previously<br>22 marked as Deposition Exhibit 47.<br>23     Al, you can just ignore my<br>24 highlighting.<br>25     MR. HINDERAKER: I can probably<br>           Page 168 | CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber<br><br>2     **A. Right.**<br>3     Q. And Richard Hill is reaching out<br>4 to you about Chubb. And it says, "Chubb<br>5 (again)."<br>6     Does that refresh your<br>7 recollection that you had had opportunities<br>8 to deal with Chubb and Europe previous to<br>9 2012?<br>10     **A. Previous to this email maybe, but,**<br>11 **no.**<br>12     **So Richard would probably have**<br>13 **several conversations about Chubb.**<br>14     Q. Yeah.<br>15     **A. I just don't know if it was in**<br>16 **August of '12 or if it was in August of '11.**<br>17     **But Chubb, he's talking about**<br>18 **Chubb.**<br>19     Q. And one of the meeting planners<br>20 that we looked at from February of 2008<br>21 included Richard Hill, right?<br>22     **A. I don't know. Is that what it**<br>23 **said? I'll trust --**<br>24     Q. I think --<br>25     **A. It may have. I don't know.**<br>           Page 170 |
| CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber<br><br>2 find it.<br>3     MS. JANUS: Sure, that's fine.<br>4     THE WITNESS: POC, use, all<br>5 right --<br>6 BY MS. JANUS:<br>7     Q. Take a look at this exchange.<br>8     MR. HINDERAKER: Maybe I can't.<br>9     (Document review.)<br>10     **A. So here it says -- he's saying**<br>11 **they do have a global, but he's saying he**<br>12 **said they don't have a global. All right.**<br>13     (Document review.)<br>14     **A. Okay.**<br>15     Q. Take a look at the second page as<br>16 well.<br>17     (Document review.)<br>18     **A. Okay.**<br>19     Q. All right. Are you with me?<br>20     **A. I'm with you.**<br>21     Q. Okay. So in Exhibit 47 the<br>22 earliest email in time is on the second page,<br>23 and it's an email from Richard Hill to you?<br>24     **A. Right.**<br>25     Q. Dated August 14, 2012, right?<br>           Page 169 | CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber<br><br>2     Q. Deposition Exhibit 73 included<br>3 Richard Hill and said it was a call to<br>4 discuss the Chubb license agreement and plan<br>5 for Chubb Europe?<br>6     **A. Okay.**<br>7     Q. Okay. So presumably in November<br>8 of 2008 you had discussed with Richard Hill<br>9 the Chubb license and a plan for Chubb<br>10 Europe?<br>11     MR. HINDERAKER: Objection to<br>12 counsel giving testimony.<br>13     MS. JANUS: No, that's not a<br>14 proper objection.<br>15     I'm asking a question.<br>16     MR. HINDERAKER: You know that's<br>17 not a question.<br>18     Presumably you did X and Y is not<br>19 a question. That's a statement of<br>20 argument.<br>21     MS. JANUS: No, it's a proper<br>22 question.<br>23     I'm allowed to take my deposition,<br>24 Al.<br>25     MR. HINDERAKER: You can take it.<br>           Page 171 |

**Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018**
**Fair Isaac Corporation vs. Federal Insurance Company, et al.**

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2      I've lodged my objection.
3      MS. JANUS: Well, it's not a
4  proper objection.
5      Keep your objections to within the
6  rules, please.
7  BY MS. JANUS:
8      Q.   So presumably in November of 2008
9  you had discussed with Richard Hill the Chubb
10 license agreement and a plan for Chubb
11 Europe, is that a fair statement?
12     A.   Chubb license discussion -- yes,
13 that's what it says, exactly what it says,
14 yep.
15     Q.   Okay, all right.  And then in 2012
16 Richard Hill emails you --
17     A.   Four years later, yep.
18     Q.   -- and says, "Chubb U.K. have
19 started being interested in Blaze (again)"?
20     A.   Right.  Okay.
21     Q.   He talks about who the
22 relationship people are in the middle
23 paragraph, right, or who they used to be?
24     A.   Right.
25     Q.   And then in the third paragraph he

Page 172

1  CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2  says, "Let me know if anything has changed -
3  good or bad" --
4      Are you with me?
5      A.   Yep.
6      Q.   -- "and more importantly whether
7  we can actually sell anything new here as I
8  seem to remember their U.S. Blaze license
9  allowed them the software for free..."?
10     A.   Right.
11     Q.   Okay.  So Richard Hill is emailing
12 to you after that 2008 conversation about a
13 plan for Blaze in Europe --
14     A.   Right.
15     Q.   -- and saying, is there anything
16 we can sell in Europe because my recollection
17 is they get Blaze for free; is that a fair
18 characterization of his email?
19     A.   That's what Richard says in this
20 email, that's right.
21     Q.   Okay.  And your response is, "They
22 do have a Blaze ELA"?
23     A.   Uh-huh.
24     Q.   Right?
25     A.   I do say, "They have a Blaze ELA."

Page 173

1  CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2  Yes, I do.  Yes, I say that.
3      Q.   You do not say, no, no, no,
4  Richard, hold on here, you're wrong, go for
5  it, get a Blaze ELA negotiated for Chubb
6  Europe?
7      That is not your response, is it?
8      A.   Right, that is not my response.
9      Q.   So fair to say in 2012 you
10 understand that Chubb Europe is using Blaze
11 pursuant to the Chubb ELA, correct?
12     A.   Wrong.
13     Q.   What part of it is wrong?
14     A.   Well, they haven't started using
15 it because they said they were starting
16 interested in using it.
17     So that means they haven't used
18 it.
19     And I didn't say they have a
20 global ELA or they have a -- don't have a
21 global ELA.
22     I said, check with Mike Sawyer to
23 see what the lay of the land is.
24     Q.   You do say, "They have a Blaze
25 ELA."

Page 174

1  CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
2      And you do not say -- his specific
3  question to you is there anything to sell
4  here.
5      MR. HINDERAKER:  Objection,
6  argumentative, asked and answered.
7      A.   That's -- I asked -- I would say
8  the same thing I said.
9      Q.   And your answer was --
10     A.   That --
11     Q.   -- you didn't say there was a
12 Blaze --
13     A.   I didn't say there was or there
14 wasn't --
15     Q.   Okay, so you just didn't --
16     A.   -- I said you need to check --
17     THE COURT REPORTER:  Wait, wait,
18 wait, wait.
19     Okay, what's the question?
20     Q.   So you just didn't answer that
21 part of the question?
22     A.   I really didn't.  I did not.  I
23 said --
24     Q.   All right.  Let's look at the
25 first page.

Page 175

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018

Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  
2       A.    All right.
3       Q.    So the first page then, the bottom
4  of the page has an email from Mike Sawyer to
5  Richard Hill, with a copy to you?
6       A.    Yep.
7       Q.    And Mike says:
8            "I am the CP for Chubb.  They do
9  have a global ELA for Blaze and have an
10 automated underwriting application running in
11 the U.K. already."
12           You see that?
13      A.    Yeah, yeah, yeah.
14      Q.    Okay.  You're on that email?
15      A.    Yeah, yeah, I see it, yeah.
16      Q.    Okay.  So at that point why didn't
17 you say, whoa, whoa, whoa, guys, you got it
18 all wrong?
19      A.    Well, maybe I didn't read the
20 email.  Maybe I sent it to -- maybe I picked
21 up the phone and called him.
22           I don't know.
23      Q.    Wait a second.  They've already
24 got an automated underwriting application
25 running in the U.K., and you're telling them

Page 176

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  
2       Q.    Based on your prior testimony
3  today it seems to me that you would have, you
4  know --
5       A.    So it's conceivable this is when I
6  learned they had something running in the
7  U.K.
8       Q.    Okay.  So it's conceivable --
9       A.    That's conceivable that --
10      Q.    -- that you learned that they had
11 an automated underwriting application running
12 in the U.K. already in 2012, right?
13      A.    It's conceivable that I learned
14 that this day or whenever I got this email.
15 It could have been three weeks later,
16 whenever I got it.
17      Q.    And you chose not to respond to
18 prevent Chubb in Europe from using Blaze,
19 correct?
20      A.    I don't know.  It's conceivable.
21      Q.    You think you did respond by
22 preventing Chubb in Europe from using Blaze?
23           MR. HINDERAKER:  Objection,
24 argumentative, also asked and answered.
25           MS. JANUS:  It's not.

Page 178

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  
2  there's a global ELA for Blaze.
3           MR. HINDERAKER:  Objection.
4       A.    Where am I saying that?
5           MR. HINDERAKER:  That misstates
6  the testimony.
7       Q.    No, Mr. Sawyer is telling him they
8  have a global ELA for Blaze.
9           And you're on the email?
10      A.    Yes, I am.
11      Q.    Okay.  Do you think you did
12 anything in response to this email?
13      A.    I would have picked up the phone.
14      Q.    Okay.  Called -- called Mike
15 Sawyer?
16      A.    Uh-huh, or Richard or lawyers
17 or -- yeah.
18      Q.    And do you recall doing anything
19 in response to this email?
20      A.    I didn't recall the email until
21 you showed it to me.  So, no.
22      Q.    Okay.  Well, now that you've seen
23 it -- sometimes that refreshes peoples'
24 recollections.
25      A.    Uh-huh.

Page 177

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  
2           MR. HINDERAKER:  Yes, it has.
3           Go ahead.  My objection is there.
4           We can move on faster if I lodge
5  my objection.
6           He's going to answer your question
7  as best he can.
8           MS. JANUS:  Well, I'm okay with
9  proper objections, Al.  I'm okay with
10 proper objections.  It wasn't
11 argumentative.
12           I'm entitled to take my
13 deposition.
14           That you're not happy with it
15 doesn't mean you can issue improper
16 objections.
17           The rules are the rules.
18 BY MS. JANUS:
19      Q.    Please answer the question.
20      A.    Could you please state it again
21 without --
22      Q.    Yeah.  I said you did not take any
23 action in response to Exhibit 47 to prevent
24 Chubb in Europe from using Blaze, is that
25 correct?

Page 179

---

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  presumably you can make your expanded use?
2
3      MR. HINDERAKER:  Objection,
4  mischaracterizes the document.
5      Counsel says it's a sentence.
6  It's not.
7      Counsel's argumentative
8  interpretation of the document.
9      MS. JANUS:  Improper objections,
10  Al.
11      Go ahead.
12      MR. HINDERAKER:  It's improper to
13  be unfair to the witness and
14  mischaracterize the document by
15  redrafting it.
16      MS. JANUS:  I'm not being unfair.
17  I'm asking fair questions and
18  trying to create my record.
19      THE WITNESS:  So I think we just
20  read it very differently.  I do.
21      So to me, right now you've got a
22  change in ownership, which is a problem.
23      If we would have sat together well
24  in advance of the change of ownership
25  and said here's some use and I've got

Page 268

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  this much revenue going through it, you
2  told me what you were doing beforehand,
3  we could have managed our way through
4  it.
5      You could have said, oh, if you
6  want to pay no fee, we can license an
7  entity to do that.
8      But by not doing any of those
9  things, at that point, 'cause we had
10  no insight into what the plans were, at
11  that point -- and this could happen in
12  any company, right?
13      If you don't tell me what you're
14  doing, or whoever is at FICO that day,
15  what's going on, then you've just got to
16  lock it down until we either terminate
17  it or we renegotiate something.
18      That's what "expanded use" means
19  to me.
20  BY MS. JANUS:
21      Q.  You agree that there was an
22  obligation on the part of FICO to not
23  unreasonably withhold its consent to
24  transfer?

Page 269

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1      A.  That's right.  That's what it says
2  right here, right.
3
4      And I also agree -- like you said,
5  right.  But "unreasonable" would have
6  happened before the fact.
7      Q.  You said that Chubb had not
8  reached out to FICO.
9      What language in this provision
10  requires Chubb to reach out to FICO?
11      A.  I have this one -- I'll have to go
12  back to the whole document, if you want to go
13  through that.
14      But right here, by definition,
15  they had an obligation to tell us before the
16  deal closed.  By definition, right?
17      By definition in the event of a
18  change of control.
19      Well, what it was like -- January
20  1 there was a change of control event, so --
21      Q.  But do you see anything in -- I
22  understand you're not looking at the whole
23  agreement right now, but do you see anything
24  in this provision that we're looking at that
25  requires Chubb to reach out to FICO to obtain

Page 270

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1  consent versus FICO initiating the
2  conversation?
3
4      A.  Yeah.  So I view -- I view this as
5  an attempt to transfer the agreement without
6  our -- without first obtaining some written
7  consent.
8      That's how I view what happened,
9  the last bit.
10      Right here it says:
11      "Any attempt to assign or
12  transfer...without first obtaining...will be
13  void and of no force or effect," which means
14  you lost your license that day.
15      You had no license at that point
16  in my mind.
17      Q.  Now, FICO knew about the
18  transaction that was scheduled to take place
19  in January of 2016 back in July of 2015,
20  right?
21      A.  July 1st.
22      Q.  Showing you what's been marked
23  as --
24      A.  123.
25      Q.  -- Exhibit 123.

Page 271

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1
2      (Exhibit 123, Email chain, Bates
3    FICO0001698 through FICO0001701, marked
4    for identification.)
5      Q.   Take a look at this email
6  exchange, and let me know --
7      A.   123, there you go.
8      (Document review.)
9      A.   Okay.
10     Q.   So this is an email exchange
11 between you and Mike Sawyer --
12     A.   Yep.
13     Q.   -- in October of 2015, right?
14     A.   Yep.
15     Q.   The first portion of the email
16 is -- contains the email we were looking at
17 in 122.
18     A.   Uh-huh.
19     Q.   Your response to Mr. Sawyer's
20 email on October 7 is:
21     "The unreasonably withheld bit has
22 me a little concerned so it may come down to
23 a 'how did we size' the enterprise
24 discussion"?
25     A.   Yep.

Page 272

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1
2      Q.   So you had some concern about that
3  language we looked at, that such written
4  consent will not be unreasonably withheld?
5      A.   Uh-huh.
6      Q.   Yes?
7      A.   Yes. I say right here, yes, has
8  me concerned, yeah.
9      Q.   What?
10     A.   I say right here, "unreasonably
11 withheld...has me a little concerned," yes.
12     Q.   And that's because you understood
13 that FICO had an obligation to not
14 unreasonably withhold its consent, correct?
15     A.   Yeah, there were two things that
16 had me worried about this.
17     And, again, this is like in modern
18 days. So I kind of remember this one. It's
19 kind of nice.
20     There were two things.
21     One, that "unreasonably withheld"
22 is not a defined term.
23     So in a contract, if I have a term
24 like that, it's not defined, then I kind
25 of -- I get antsy.

Page 273

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1
2      So that would have been the first
3  thing.
4      The next bit was literally, you
5  know, how do we size it.
6      So we sized it on a $12 billion
7  deal. And now it got acquired by a $23
8  billion entity. So it's now up to a 35
9  billion company.
10     So the lack of a defined what is
11 "unreasonably withheld" would have caused me
12 to pause.
13     Q.   Okay, yep.
14     A.   But that would been it.
15     Q.   And, by the way -- so the deal --
16 the enterprise deal was sized on
17 $12.3 billion of --
18     A.   Sounds about right.
19     Q.   -- premium revenue, right?
20     Do you recall whether that
21 12.3 billion, in terms of sizing the original
22 deal, included Chubb's global revenues?
23     A.   I don't. I don't.
24     Q.   If it did, do you agree with me
25 that that counts as in favor of an

Page 274

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber
1
2  interpretation of the ELA as being a global
3  ELA?
4      MR. HINDERAKER:  Objection, asks
5      for a legal conclusion.
6      A.   I'm allowed to answer that, right?
7      Q.   Yes, you can answer that.
8      A.   Right, so I agree that there's
9  some things here that would lend one to think
10 there's a global, but at the end of the day
11 the agreements rule. And the agreements were
12 not a global.
13     Q.   And you're -- we're going to look
14 at the language of the agreement, but I take
15 it what you're referring to is some language
16 in the actual agreement?
17     A.   Right, in the Exhibits 110 -- 110
18 it was, right? It had the original agreement
19 and then Amendment One, Amendment Two, right.
20     Q.   Okay. All right. Then Mike
21 Sawyer responds to you and says, "I am not as
22 concerned about it."
23     He talks about this size in
24 revenue issue that you pointed out.
25     And he says, "Our pricing model is

Page 275

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY    -    10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

2 based on" -- is that gross written premium,
3 "GWP"?
4    A.   Yes, it is.
5    Q.   "So I would think that tripling
6 the size of GWP by acquisition should be
7 significant."
8        And then you respond, "Is the
9 license specifically tied to GWP?"
10       Does your question indicate that
11 you think the argument would be stronger to
12 increase the licensing revenues if the
13 license specifically tied to GWP?
14    A.   No.  I was just wondering is it in
15 the contract.  Does it say based on GWP, you
16 know.  It was a simple question.
17    Q.   What would the significance of
18 that have been to you?
19    A.   Then it would have been clear.  It
20 would have been clearly stated, the same way
21 the definition of "unreasonably withheld"
22 would be helpful if it was clearly stated.
23    Q.   Okay.  And so the fact that the
24 contract was not specifically tied to GWP
25 made that less clear for you?

Page 276

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

2    A.   It meant it just wasn't documented
3 in the -- so I -- one less piece of fact that
4 I had, one less -- one less fact I had in
5 writing.
6    Q.   What is -- at the bottom of the
7 first page of Exhibit 123 Sawyer says, "Do
8 you have any of the proposal information?"
9        Do you see that?
10    A.   I do.
11    Q.   Do you know what he's talking
12 about, what is "proposal information" in this
13 context?
14       MR. HINDERAKER:  I object to
15    testimony about Sawyer's intentions.
16    Q.   I'm not asking for his intention.
17       I'm just simply asking you as a
18 member of the same business whether you know
19 what would be referred to as "proposal
20 information" in connection with the beginning
21 of a license.
22       MR. HINDERAKER:  I understand that
23    to be a different question.
24    A.   So I believe, as I said in my
25 response, I could dig up the proposal, which

Page 277

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

2 has -- which determines how we priced --
3 there would have been information about how
4 we priced the original licenses, the May 6,
5 August 6, and December 2006.
6    Q.   June of '06?
7    A.   Did I say May?
8        Yeah, June, right.
9    Q.   And is that some of the
10 information we looked at earlier today?
11    A.   I have not seen it in our -- I
12 have not seen it here today.
13    Q.   Okay.  And so can you just
14 describe what that document would be like?
15       So that -- because I would like
16 to -- if I haven't -- if it hasn't been
17 produced in the lawsuit, I'd like for it to
18 be produced.  And I want to know how to
19 describe what it would look like.
20    A.   Right.  So if it hasn't been
21 produced, I suspect it doesn't longer exist.
22       But it would have a little
23 preamble.  It would describe the situation
24 that we're in, what problem are we solving,
25 the original CSI renewal project.

Page 278

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

2       It would been a PowerPoint.
3       There would actually be two
4 documents.
5       One would be the written proposal
6 in response to the RFP, which Chubb should
7 have that.
8       You know, FICO is not the best
9 knowledge management shop, because as of 2010
10 we've gone through several upgrades in
11 systems.
12       But there was a written proposal
13 in response the RFP -- RFI rather, RFI.
14       And then we have a sales deck
15 which we went out and I presented.  Larry
16 Wachs was with me.
17       And there would be a sales deck
18 that talked about how we priced it, what the
19 scope was.
20       So that would be the original
21 proposal.
22       And I'm sure I had it before I
23 left FICO.  But that was two laptops ago,
24 so -- maybe three laptops ago, right.
25       'Cause I -- when I left in '08, I

Page 279

Russell Schreiber - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   10/24/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 might have -- I left in '07, I might have
2 lost it on that laptop, 'cause I turned in
3 the laptop -- actually I had a hiatus, right,
4 yeah.
5     Q.  So would it be on though like a
6 server or --
7     A.  It's possible.  I don't know.
8        Like wherever they backed up my
9 server in 2006, right?
10     Q.  Okay.
11     A.  And I just don't know.
12        If they didn't give it to you,
13 then I'm sure they don't have it or it's
14 confidential, so --
15     Q.  Did we already talk about where
16 Larry Wachs is?
17     A.  We talked and I haven't -- I don't
18 know, yeah.
19     Q.  Okay.  But he was based in New
20 York as well?
21     A.  Right.
22     Q.  Okay.  Okay, and then Mike Sawyer
23 gets back to you finally and says, "I don't
24 see anything on gross written premium in the

Page 280

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1     A.  I don't.  But I know by December I
2 was really -- the alarm signals were -- were
3 blaring.
4        So it might have been December
5 before we actually made contact with
6 somebody.
7     Q.  And during this time -- you know,
8 we looked at October 2015, November 2015,
9 September 2015 -- it was business as usual
10 between Chubb and FICO?
11     A.  We weren't really doing anything
12 though.  We weren't --
13     Q.  You were doing quite a bit, I
14 think, weren't you?
15        You were doing Chubb app studio,
16 professional services scoping.
17        There have been voluminous emails
18 provided in the lawsuit relating to work that
19 FICO was doing with Chubb.
20     MR. HINDERAKER:  That's counsel's
21     representation.
22     A.  I don't remember us doing work
23 with FICO -- with Chubb the second half of
24 calendar year '15, or even actually at all in

Page 282

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 agreements," right?
2     A.  Right, right, which we saw
3 already, yes.
4     Q.  Do you recall then what happened
5 after this exchange in October of 2015?
6     A.  So I can tell you I was becoming
7 less and less comfortable that we had not
8 heard from Chubb about this.
9        Because I would have thought --
10 you know, before I was at FICO I was a -- I
11 was a consulting partner.  And we would --
12 these kind of situations, we make sure we
13 reach out to the vendors.  There's a whole
14 sourcing strategy.
15        I was really becoming
16 uncomfortable that no one had reached out to
17 us as one of the vendors that a contract
18 needed to be resolved, which should have been
19 on someone's list and worked through.
20        So at that point the fact that we
21 hadn't been contacted, I started pushing Mike
22 to contact them.
23     Q.  Okay.  Do you recall when that
24 was?

Page 281

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY - Schreiber

1 calendar year '15.
2        So we could have been doing little
3 bits, but we certainly were not having the
4 interactions we had three years before that.
5     Q.  Here's an example of some of the
6 things that were being talked about, Exhibit
7 124.
8        (Exhibit 124, Email dated October
9     7, 2015, Bates FICO0002507 through
10     FICO0002508, marked for identification.)
11        (Document review.)
12     A.  Okay.
13     Q.  Does that refresh your
14 recollection that there was activity
15 happening with Chubb during this time?
16     A.  This is something that -- one, it
17 was a sales pitch.  This is something that
18 was not acquired.
19        It was a sales pitch to Henry, who
20 was pretty far down in the food chain, to buy
21 a little piece of software, a very specific
22 and narrow use.  So this would be consistent.
23        And they didn't buy it.
24        So Henry asked for a price.  We

Page 283

---