**Exhibit 14**
**(Redacted)**
**(Previously Filed Under Seal as Dkt. 437)**

Appointment

| | |
|---|---|
| **From:** | Sawyer, Michael L (Mike) [/O=FAIRISAAC/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MIKESAWYER] |
| **Sent:** | 11/14/2008 2:06:30 PM |
| **To:** | Brodie, Ian B [ianbrodie@fairisaac.com]; Hill, Richard [RichardHill@fairisaac.com]; Schreiber, Russell (Russ) [RussSchreiber@fairisaac.com] |
| **Subject:** | Chubb License Discussion |
| **Location:** | Ready-Access phone number: GC; 7-digit access code: 6996772 |
| **Start:** | 11/17/2008 7:00:00 AM |
| **End:** | 11/17/2008 7:30:00 AM |
| **Show Time As:** | Tentative |

**Required Attendees:** Sawyer, Michael L (Mike); Brodie, Ian B; Hill, Richard; Schreiber, Russell (Russ)

When: Monday, November 17, 2008 8:00 AM-8:30 AM (GMT-05:00) Eastern Time (US & Canada).
Where: Ready-Access phone number: GC; 7-digit access code: 6996772

*~*~*~*~*~*~*~*~*~*

All -

Please join this call to discuss the Chubb license agreement and a plan for Chubb Europe.  Attached are the three SLSA contracts and the latest Chubb Annual report.



**EXHIBIT**
**14**

EXHIBIT 73
Sawyer
10-2-18 AR

Confidential - Attorneys' Eyes Only

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 1 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

# SOFTWARE LICENSE AND MAINTENANCE AGREEMENT
## Blaze Advisor

This Software License and Maintenance Agreement ("**Agreement**") is entered into as of June 30, 2006 ("**Effective Date**") between Fair Isaac Corporation ("**Fair Isaac**") and Chubb & Son, a division of Federal Insurance Company ("**Client**") and describes the terms and conditions under which Fair Isaac shall provide to Client the Blaze Advisor products and related maintenance services described below.

1.  **Definitions**

The following terms, as used in this Agreement with initial capital letters, in the singular or the plural, will have the meanings set forth below. Other terms may be defined in context within this Agreement:

"**CPU**" means a single core central processing unit. For multi-core central processing units, each core will count as one "CPU".

"**Documentation**" means the *Blaze Advisor User Guide* provided in either HTML or PDF format.

"**Fair Isaac Products**" means the Blaze Advisor products listed in Section 1 of Exhibit A. The Blaze Advisor Development product allows a developer to utilize design and testing tools and to run a non-production deployment environment for testing use only. The Blaze Advisor Deployment product consists of the Blaze Advisor Rule Server and Engine and allows the software to be run on a system handling production-level processing.

"**Seat**" means an identified individual user on a single personal computer or workstation.

"**Territory**", with respect to the installation and physical location of the Fair Isaac Products, means the United States of America.

2.  **License Grant**

2.1   License Grant to Fair Isaac Products. Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a perpetual (subject to the provisions of Article 9), non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes, subject to the additional limitations set forth below and/or listed in Exhibit A.

(a)   Seat/CPU License. If the "Scope/Quantity" of the license for any Fair Isaac Product is designated in Exhibit A as limited to a specified number of "Seats" or "CPUs", then Client's use of such Fair Isaac Product shall not exceed the number of Seats or CPUs, as applicable, that are set forth in Exhibit A for such Fair Isaac Product.

(b)   Named Application License. If the "Scope/Quantity" of the license for any Fair Isaac Product is designated in Exhibit A as "Named Application", then, subject to any "Seat" or "CPU" limitation that may also apply, Client may use such Fair Isaac Product only in connection with the particular Named Application of Client that is defined in Exhibit A. Under no circumstances may Client use such Fair Isaac Products on a stand-alone basis or in connection with any other application.

(c)   Enterprise-Wide License. If the "Scope/Quantity" of the license for any Fair Isaac Product is designated in Exhibit A as "Enterprise-Wide", then Client may use such Fair Isaac Product on an unlimited number of Seats or CPUs, as applicable; provided, however, that such use is for Client's use only and not for use by any of Client's affiliated, subsidiary, or parent companies.

*Fair Isaac Confidential*

FICO0002276

| Fair Isaac Software License and Maintenance Agreement -- Blaze Advisor | Page 2 of 16 |
| FI Contract Number: | | | FI LR# 30073 |

2.2     License to Documentation.  Subject to the terms, conditions, and limitations of this Agreement, Fair Isaac grants to Client a perpetual (subject to the provisions of Article 9) non-exclusive, non-transferable, limited license to use the Documentation during the Term for its internal business purposes, but only in accordance with Client's license grant of the applicable Fair Isaac Product.  Client shall not have the right to modify the Documentation, combine the Documentation with other works, or create derivative works from the Documentation without Fair Isaac's written permission.  In the event that Fair Isaac does give permission, such modifications, combinations, or derivatives which include the Documentation shall become Fair Isaac's intellectual property and be used only in support of Client's permitted use of the Fair Isaac Product.

2.3     Platforms/Options.  Client obtains the right to use only the version of the Fair Isaac Product for the specific supported platform(s) that are noted in Exhibit A (i.e., Java, COBOL or .NET). If no platform is noted in Exhibit A, Client has the right to use the Fair Isaac Product only for the supported platform(s) that is(are) initially delivered to Client.  If Client desires versions of the Fair Isaac Product for additional supported platforms, an additional fee applies. Unless specifically noted as being purchased in the Exhibit A. Client does not obtain any right to options or additional related products (e.g., Compiled Sequential, SmartForms) by virtue of its purchase of a license to the Fair Isaac Product.

3.     **Rights and Restrictions**

3.1     License Restrictions.  Client represents and warrants that it and its employees shall not: (i) use the Fair Isaac Products or Documentation for any purpose other than the internal business operations of Client or in any other manner that exceeds the scope of any license granted under this Agreement or that otherwise constitutes a breach of this Agreement; (ii) (other than in connection with rules) alter, change, modify, adapt, translate or make derivative works of the Fair Isaac Products; (iii) reverse engineer, decompile, disassemble, or otherwise attempt to reduce the object code of any Fair Isaac Products to human perceivable form or permit others to do so; (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products by, any third party or by any individuals other than the employees of Client; (v) assign, sublicense, lease, transfer or distribute the Fair Isaac Products, or operate any Fair Isaac Product for timesharing, rental, outsourcing, or service bureau operations (or otherwise for the benefit of any party other than Client), or train persons other than permitted users; (vi) disclose or publish performance benchmark results for any Fair Isaac Product without Fair Isaac's prior written consent; or (vii) (if applicable) use any provided third party software except as solely in conjunction with the Fair Isaac Product.

3.2     Reservation Of Rights Not Granted.  Fair Isaac reserves all rights not expressly granted to Client under this Agreement.  Without limiting the foregoing, Fair Isaac retains and reserves sole and exclusive worldwide right, title and interest in and to the Fair Isaac Products, Documentation, any custom code developed in whole or part by Fair Isaac (if applicable), and any other Fair Isaac software or materials, and in all patents, trademarks, copyrights, trade secrets, and all other intellectual property and proprietary rights therein, and any Fair Isaac know-how related thereto, subject to only the limited, non-exclusive, license rights granted herein.  Nothing in this Agreement shall limit in any way Fair Isaac's right to develop, use, license, create derivative works of, or otherwise exploit Fair Isaac intellectual property or to permit third parties to do so.

3.3     Permission for Back-Up Copy.  Client may reproduce the object code of the Fair Isaac Product and the Documentation for the purposes of exercising the license rights granted under this Agreement on a backup CPU/server in the event of a malfunction that renders the primary CPU/server inoperable. This license shall only be effective for the period of such inoperability or the expiration or termination of the primary license to the Fair Isaac Product, whichever first occurs.

*Fair Isaac Confidential*

Confidential

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 3 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

3.4 <u>Notice Reproduction</u>. To the extent Client is provided reproduction rights, Client must reproduce on each copy of the Fair Isaac Product and Documentation any copyright, patent, or trademark notice, and any other proprietary legends that were provided in the originals.

3.5 <u>Verification and Audit Rights</u>. On Fair Isaac's written request, Client shall provide to Fair Isaac a written certification executed by an authorized officer of Client that provides the following information: (i) verification that the Fair Isaac Products are being used in accordance with the provisions of this Agreement; (ii) list of the locations at which the Fair Isaac Products are or have been operated during the preceding twelve (12) month period; and (iii) the number of Seats, CPU's and/or applications accessing or utilizing the Fair Isaac Products (as applicable).

3.6 <u>Use by Third Party</u>. Fair Isaac acknowledges that Client's information technology infrastructure operations have been outsourced to ACS Commercial Solutions, Inc., and Fair Isaac hereby grants ACS, its affiliates, and their respective employees, agents, consultants and subcontractors (collectively "ACS") the right to use the Fair Isaac Products and Documentation on behalf of Client for the sole and exclusive purpose of fulfilling ACS's obligations to provide information technology services to Client provided that such use is otherwise subject to the terms and conditions of this Agreement and does not exceed the limitations on use and other restrictions set forth herein. Client shall be responsible for ensuring ACS's compliance with the terms and conditions of this Agreement and Client shall be liable to Fair Isaac for any breach of this Agreement by ACS. The rights granted to ACS herein shall not be extended to any other third party without the prior express written consent of Fair Isaac.

4. **Services**

4.1 <u>Maintenance Services</u>. Subject to the payment of the applicable Maintenance Fees described in Exhibit A, Fair Isaac shall provide Client with the Maintenance Services described in Exhibit B.

4.2 <u>Other Services</u>. From time to time, Fair Isaac may provide Client with professional services related to the Fair Isaac Product as mutually agreed between the parties. Such professional services shall be performed only upon the execution of a Statement of Work which references the Master Services Agreement, entered into by and between the parties on June 9, 2006.

5. **Warranties and Limitation of Liability**

5.1 <u>Conformity to Specifications</u>. Subject to Client's compliance with the terms and conditions of this Agreement, Fair Isaac warrants that the Fair Isaac Product will conform in all material respects to its Documentation for a period of ninety (90) days from the initial date of delivery. Fair Isaac will, at its own expense and as its sole obligation, and Client's exclusive remedy, for any breach of this warranty, correct any reproducible error in the Fair Isaac Product reported to Fair Isaac by Client in writing (along with all information available to Client that is relevant to verifying, diagnosing, or correcting the error) or replace the Fair Isaac Product during the warranty period.

5.2 <u>Warranty of Title</u>. Fair Isaac represents and warrants that it owns or has all of the necessary rights in respect to the Fair Isaac Products and Documentation and has the full power and authority to grant the rights and licenses granted to Client herein.

5.3 <u>Non-Interference Warranty</u>. Fair Isaac represents and warrants that the Fair Isaac Products and any medium on which such products are delivered will not contain, when delivered, any timer, clock, counter, expiry codes, viruses, worms, Trojan horses, backdoors or other codes or devices that are designed to prevent Client from using the Fair Isaac Products at any time in accordance with this

*Fair Isaac Confidential*

Confidential

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 4 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

Agreement. Notwithstanding the forgoing, Client acknowledges that the Fair Isaac Products may contain license controlling devices which require the input of a license key string upon installation. Failure to input the correct license key string upon installation (which shall be provided to Client upon delivery of the Fair Isaac Products) will cause the Fair Isaac Products to be inoperable until the correct license key string is inputted. No such license key string shall be deemed to be a breach of this warranty.

5.4     Year 2000 Warranty. Fair Isaac represents and warrants that the Fair Isaac Products shall be capable of storing, retrieving, interfacing and processing completely and accurately all data and information involving dates beyond December 31, 1999.

5.5     WARRANTY DISCLAIMER. Fair Isaac does not warrant that the Fair Isaac Products, Documentation or Maintenance Services will (i) meet Client's requirements, (ii) operate in combination with hardware, software, systems or data not expressly specified in writing by Fair Isaac, (iii) meet any performance level, resource utilization, response time, or system overhead requirements, or (iv) operate uninterrupted, free of errors, or without delay. Fair Isaac is not responsible for problems caused by: (a) use of the Fair Isaac Products outside the scope of this Agreement or the Documentation; (b) modification, alteration or changes to the Fair Isaac Products (or tangible copy thereof) not made by Fair Isaac; (c) changes in, or modifications to, the operating characteristics of the Client's system or any component thereof that is inconsistent with the requirements of the Documentation; (d) use of the Fair Isaac Products with hardware or software that is not represented in the Documentation as interoperable with the Fair Isaac Products; or (e) accident, physical, electrical or magnetic stress, unauthorized alterations, failure of electric power, environmental controls, or causes other than ordinary use. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS ARTICLE 5, FAIR ISAAC MAKES NO OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, UNDER THIS AGREEMENT AND HEREBY DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE. CLIENT IS SOLELY RESPONSIBLE FOR ITS USE OF ANY PRODUCTS, SERVICES, AND DELIVERABLES PROVIDED BY FAIR ISAAC UNDER THIS AGREEMENT AND FOR ANY LIABILITY ARISING OUT OF DATA OR CONTENT SUPPLIED BY CLIENT.

5.6     LIMITATION OF LIABILITY. EXCEPT FOR (i) A BREACH OF CONFIDENTIALITY BY EITHER PARTY, (ii) FAIR ISAAC'S INDEMNIFICATION OBLIGATIONS AS SET FORTH IN ARTICLE 6, OR (iii) CLIENT'S VIOLATION OF FAIR ISAAC'S INTELLECTUAL PROPERTY, (INCLUDING UNAUTHORIZED USE) IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER ANY THEORY OF RECOVERY (INCLUDING BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, TORT AND STRICT LIABILITY) FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, CONSEQUENTIAL (INCLUDING, BUT NOT LIMITED TO, LOSS OF INCOME, PROFIT OR SAVINGS) OR PUNITIVE DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY FAIR ISAAC PRODUCT OR SERVICE, EVEN IF THE PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE. WITHOUT LIMITING THE FOREGOING, AND EXCEPT IN THE CASE OF (a) A BREACH OF CONFIDENTIALITY BY EITHER PARTY, (b) FAIR ISAAC'S INDEMNIFICATION OBLIGATIONS SET FORTH IN ARTICLE 6, or (c) CLIENT'S VIOLATION OF FAIR ISAAC'S INTELLECTUAL PROPERTY (INCLUDING UNAUTHORIZED USE), EACH PARTY'S AGGREGATE LIABILITY IN CONNECTION WITH THIS AGREEMENT UNDER ANY AND ALL THEORIES OF RECOVERY (INCLUDING BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, TORT AND STRICT LIABILITY) SHALL BE LIMITED TO THE AMOUNT PAID BY CLIENT (EXCLUDING IMPLEMENTATION FEES AND REIMBURSED EXPENSES) FOR THE APPLICABLE FAIR ISAAC PRODUCT OR SERVICE DURING THE 12 MONTHS IMMEDIATELY PRECEDING THE DATE OF THE MOST RECENT CLAIM THAT GAVE RISE TO SUCH

*Fair Isaac Confidential*

Confidential

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 5 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

LIABILITY. FEES OWED BY CLIENT SHALL NOT BE SUBJECT TO THE LIMITATIONS SET FORTH IN THIS SECTION.

## 6. Indemnification

6.1     Intellectual Property Indemnification. Fair Isaac will defend at its own expense any action against Client, its directors, officers, employees, agents, successors, and assigns brought by a third party to the extent that the action is based upon a claim that the Fair Isaac Product or Documentation directly infringes any U.S. registered patent or U.S. registered copyright, or misappropriates any trade secret recognized as such under the Uniform Trade Secrets Act, and Fair Isaac will pay those costs (including reasonable attorneys' fees) and damages finally awarded against Client in any such action that are specifically attributable to such claim or those costs and damages agreed to in a monetary settlement of such action.

6.2     Conditions. Fair Isaac's indemnification obligations under this Article are conditioned upon: (a) Client notifying Fair Isaac promptly in writing of such action; (b) Client giving Fair Isaac sole control of the defense thereof and any related settlement negotiations; provided, however, Client may assign counsel of its own choosing, and at its own expense, to provide legal advice to Client in any action where Client is a named party; and furthermore, Fair Isaac shall not enter into any settlement agreement that will require Client to disclose the identities of its customers; (c) Client's compliance with the terms and conditions of this Agreement, including without limitation the license(s) granted by Fair Isaac; and (d) Client fully cooperating with Fair Isaac in such defense.

6.3     Fair Isaac's Options. If the Fair Isaac Product becomes, or in Fair Isaac's opinion is likely to become, the subject of an infringement or misappropriation claim, Fair Isaac may, at its option and expense, either: (a) procure for the Client the right to continue to exercise the Fair Isaac Product license; (b) replace or modify the Fair Isaac Product so that it becomes non-infringing; or (c) if neither option (a) or (b) is available, terminate Client's license for the Fair Isaac Product concerned.

6.4     Exclusions. Notwithstanding the foregoing, Fair Isaac will have no obligation with respect to any infringement or misappropriation claim based upon: (a) any violation of the terms of Client's license or any license restrictions, or for use of the Fair Isaac Product for any purpose not intended by Fair Isaac; (b) any combination or use of the Fair Isaac Product with other products, equipment, software, or data not supplied or approved in writing by Fair Isaac; (c) any modification of the Fair Isaac Product pursuant to specifications required by client or any modification made by any entity other than Fair Isaac; or (d) any claim of infringement or misappropriation that would have been avoided had Client upgraded to a new version or release of the Fair Isaac Product.

6.5     ENTIRE LIABILITY. THIS ARTICLE STATES FAIR ISAAC'S ENTIRE LIABILITY AND CLIENT'S SOLE AND EXCLUSIVE REMEDY FOR INFRINGEMENT AND ALL INFRINGEMENT AND MISAPPROPRIATION CLAIMS AND ACTIONS

## 7. Confidential Information

7.1     The exchange of confidential information hereunder shall be governed by the confidentiality provisions set forth in the Master Services Agreement dated June 9, 2006.

## 8. Payment Terms

*Fair Isaac Confidential*

Confidential

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 6 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

8.1    Invoices and Payment. Client shall pay the fees and charges set forth in Exhibit A. All fees, charges, and expenses invoiced under this Agreement will be due and payable by Client in United States Dollars within the greater of forty-five (45) days of the invoice date or thirty (30) days of Client's actual receipt of an invoice. If any payment is not received by Fair Isaac within the timeframes set forth above, Fair Isaac shall have the right to terminate the pertinent product license or service after giving Client written notice and thirty (30) days to cure. Client shall reimburse Fair Isaac for all costs related to any proceedings to collect any past-due amounts, including without limitation all attorneys' fees and expenses. Except as otherwise expressly provided in this Agreement, no refunds are available.

8.2    Taxes and other Charges. Client shall be solely responsible for, and shall pay or reimburse Fair Isaac for, all Taxes. "**Taxes**" means all present and future taxes, duties, import deposits, assessments, and other governmental charges (and any related penalties and interest), however designated, that are now or hereafter imposed by or under any governmental authority or agency that are: (i) associated with the performance by Fair Isaac of its obligations hereunder; (ii) associated with the payment of any amount by Client to Fair Isaac pursuant to this Agreement; (iii) based on the license or use of any Fair Isaac Product; or (iv) associated with the importation of any Fair Isaac Product into any country other than the United States, excepting only taxes imposed on Fair Isaac's net income by the United States and each state thereof (and their political subdivisions). To the extent Client is required to withhold income taxes on any payment made to Fair Isaac pursuant to applicable tax law, Client may withhold such tax to the extent such tax (a) does not exceed the appropriate withholding amount applicable under relevant tax treaties and (b) qualifies as a creditable foreign tax by the United States government. Client agrees to send the appropriate certified tax receipt to Fair Isaac promptly upon payment of such tax. If a certified tax receipt issued by the taxing authority evidencing such payment and suitable for Fair Isaac to obtain a tax credit in the United States is not received by Fair Isaac within thirty (30) days after the date of the invoice, Client will be responsible for paying the full invoice amount.

8.3    Mode of Payment. Client agrees to remit all payments due to Fair Isaac in accordance with the instructions provided in the invoice or other instructions provided by Fair Isaac.

9.    **Term**

9.1    Term. Unless earlier terminated, this Agreement and the license(s) granted hereunder shall commence upon the Effective Date and shall continue in full force in perpetuity, or, if applicable, for the duration of the applicable license term set forth in Exhibit A if such term is not perpetual ("**Term**").

9.2    Events of Termination. This Agreement may be terminated upon the occurrence of any of the following events:

(a)    Uncured Breach. Either party may terminate this Agreement for a breach by the other party of any of the material terms of this Agreement, or numerous breaches of duties or obligations hereunder that cumulatively constitute a material breach if the breaching party fails to cure the breach(es) within 30 days from receipt of written notice from the non-breaching party identifying the breach(es) and requiring them to be remedied.

(b)    Insolvency. Either party may terminate this Agreement if the other party ceases to conduct business in the ordinary course or is declared insolvent or bankrupt, or makes an assignment of substantially all of its assets for the benefit of creditors, or a receiver is appointed, or any proceeding is demanded by, for or against the other party under any provision of bankruptcy or insolvency legislation.

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 7 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

(c) <u>Violation of License or Confidentiality Obligations</u>. Fair Isaac may immediately terminate this Agreement, without a requirement for prior notice or a cure period, if Client violates any terms of the licenses granted in this Agreement. Either party may immediately terminate this Agreement by written notice to the other party if the other party materially breaches any of the provisions of this Agreement relating to the protection of Confidential Information or Intellectual Property.

9.3    <u>Effect of Termination</u>. Upon expiration or termination of this Agreement for any reason, all licenses granted hereunder shall terminate immediately, all support and maintenance obligations shall cease. Client shall immediately cease using all Fair Isaac Product(s) and related documentation (including all intellectual property arising from or related to the foregoing), shall remove all copies of the Fair Isaac Product(s) and related documentation from Client's computers and systems, and shall either (i) destroy all copies of the Fair Isaac Product(s), related documentation, and other Fair Isaac Confidential Information and intellectual property in Client's possession; or (ii) return to Fair Isaac all copies of the Fair Isaac Product(s), related documentation, and other Fair Isaac Confidential Information and intellectual property in Client's possession. Client shall provide to Fair Isaac a written certification signed by an authorized office of Client certifying that Client has complied with the foregoing. Upon termination of this Agreement, all fees and other charges provided for hereunder will become immediately due and payable to Fair Isaac, and Client shall immediately remit all unpaid fees to Fair Isaac.

9.4    <u>Survival</u>. Rights to payment and the following rights and obligations under this Agreement will survive any termination or expiration of this Agreement: Article 1 (Definitions), Section 3.1 (License Restrictions), Section 3.2 (Reservation of Rights Not Granted), Section 5.3 (Warranty Disclaimer), Section 5.4 (Limitation of Liability), Article 7 (Confidential Information), Section 9.3 (Effect of Termination), Section 9.4 (Survival), and Article 10 (Provisions of General Applicability).

10.    **Provisions of General Applicability**

10.1    <u>Relationship of the Parties</u>. Fair Isaac and Client are independent contractors and will have no power to bind the other party or to create any obligation or responsibility on behalf of the other party. This Agreement shall not be construed as creating any partnership, joint venture, agency, or any other form of legal association that would impose liability upon one party for the act or failure to act of the other party.

10.2    <u>Counterparts</u>. This Agreement may be executed in counterparts, which taken together shall constitute one single agreement between the parties.

10.3    <u>Section Headings</u>. The section and subsection headings used herein are for reference and convenience only, and will not enter into the interpretation hereof.

10.4    <u>No Waiver</u>. No delay or omission by either party to exercise any right or power with respect to any of the terms or conditions of this Agreement will impair any right or power or be construed to be a waiver thereof. A waiver by either party of any of the terms and conditions of this Agreement will not be construed to be a waiver of any other term or condition of this Agreement. No waiver of any rights of a party under this Agreement will be effective unless set forth in a writing signed by such party.

10.5    <u>Entire Agreement</u>. This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof, and supersedes all prior or contemporaneous proposals and all other oral or written understandings, representations, conditions, and other communications between the parties relating to such subject matter, as well as the terms of all existing or future purchase orders and acknowledgments. Each party represents and warrants to the other party that in

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 8 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

entering into this Agreement it has not relied on any representations, promises, or assurances from another party or any employee, officer, director, representative, attorney, or affiliate of another party not expressly contained in this Agreement. Any other terms or conditions or amendments shall not be incorporated herein or be binding upon any party unless expressly agreed to in a writing signed by authorized representatives of Client and Fair Isaac.

10.6    Construction; Severability. This Agreement will not be more strongly construed against either Party, regardless of who is more responsible for its preparation. If any provision of this Agreement is held to be unlawful or invalid under applicable law, then such provision will be ineffective only to the extent of such illegality or invalidity, without invalidating the remainder of such provision or any of the remaining provisions of this Agreement.

10.7    Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law or international law, including without limitation the 1980 United Nations Convention on Contracts for the International Sale of Goods, as revised.

10.8    No Assignment. Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof. In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld. Any attempt to assign or transfer all or any part of this Agreement without first obtaining such written consent will be void and of no force or effect. Notwithstanding the foregoing, Fair Isaac may perform any or all of its obligations through any subsidiary or affiliated company, and may assign this Agreement by merger, reorganization, consolidation, or sale of all or substantially all its assets.

10.9    Force Majeure. Notwithstanding anything to the contrary herein, neither party shall be deemed to be in default of any provision of this Agreement or be liable to the other or to any third party for any delay, error, failure in performance or interruption of performance due to any act of God, terrorism, war, insurrection, riot, boycott, strike, interruption of power service, interruption of communications service, labor or civil disturbance, act of any other person not under the control or direction of either party or other similar cause. The party impacted by the force majeure event shall give the other party reasonable written notification of any material or indefinite delay due to such causes.

10.10    Press Releases; Publicity. Except as provided for below, press releases and publicity related to this Agreement shall be handled in accordance with Article 18 of the Master Services Agreement. Notwithstanding the foregoing, Fair Isaac shall be allowed to disclose Client's name and/or the terms and conditions of this Agreement to the extent such disclosure is required by law or regulations of the Securities Exchange Commission. Client has agreed to participate in the following marketing activities:

(i)    Client will participate with Fair Isaac in the development of a case study for Fair Isaac's internal and external use; and

(ii)    Client will serve as a reference to other potential customers of the Fair Isaac Products. Such references shall be limited to five (5) references per year.

10.11    Notices. Any notices required to be given by one party to the other under the Agreement must be in writing, must reference the Fair Isaac Legal Request (LR) number set forth above, and must be sent to the recipient's address or facsimile number for notices set forth on the page of this Agreement titled

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 9 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

"Instructions and Contact Information." Such notices will be deemed given upon the earlier of (i) actual delivery, whether personally, by a recognized international overnight delivery carrier, or by facsimile (provided that the facsimile notice is promptly confirmed in writing using another method for giving notice provided in this section), or (ii) five business days after being mailed by certified or registered mail, first class, postage prepaid.. The date a notice sent by facsimile is deemed to have been given will be the date of actual receipt, but no faxed notice will be effective unless promptly confirmed in writing as set forth above. Either party may change its address or facsimile number for notices at any time by giving notice to the other party.

10.12   No Third Party Beneficiaries. Nothing in the Agreement is to be deemed to create any right or benefit in any person not a party to this Agreement.

IN WITNESS WHEREOF, Fair Isaac and Client have caused this Agreement to be signed in duplicate and delivered by their duly authorized representatives as of the Effective Date.

**FAIR ISAAC CORPORATION**                    **CLIENT – CHUBB & SON**

By: _____              By: _____

Name: Aaron Jaeger                          Name: MARK BERTHIACME

Title: Manager Financial Planning & Analysis   Title: SENIOR VICE PRESIDENT

Date Signed: 6 - 30 - 06                    Date Signed: 6/30/06

| Fair Isaac Use Only: | | Created: 2 June 2006 |
|---|---|---|
| Short Name: | Client #: | Acct. Exec.: |
| OE Order #: | System #: | Royal Blue #: |
| Sales Approval: | Notes: | |

**Please complete the information on the following page.**



*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 10 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

## INSTRUCTIONS AND CONTACT INFORMATION

*Instructions to Client:*

1. *Appropriate corporate officer should execute 2 copies of the document.*

2. *Complete all requested information below:*

**Addresses for Notices:**

| | **For Client:** | **For Fair Isaac:** |
|---|---|---|
| Address: | | Fair Isaac Corporation |
| | | Attn: Contracts Administrator |
| | | 3661 Valley Centre Drive |
| City/State: | | San Diego, CA 92130 |
| | | Reference FI LR # 30073 |
| Zip/Code: | | |
| | | Fax: 858-523-4450 |
| Country: | | |
| Attention : | | |
| Fax: | | |

*Compete Information below if different from above:*

| | Return executed contract to Client at: | Send Software to: | **Client's Billing Information:** |
|---|---|---|---|
| Address: | | | |
| City/State: | | | |
| Zip/Code: | | | |
| Attention : | | | |
| Phone: | | | |
| Fax (optional): | | | |
| Email (optional): | | | |

3. *Return 2 completed and executed copies to:*
   Fair Isaac Corporation
   Attn: Contracts Administration
   3661 Valley Centre Drive
   San Diego, CA 92130

   If time is of the essence, please fax to:
   858-523-4450

   Questions? Call 858-369-8259

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 11 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

## EXHIBIT A
## PRICING AND PAYMENT

### 1. BLAZE ADVISOR LICENSE AND SUPPORT AND MAINTENANCE FEES

| Product | Item # | Initial Term (Perpetual or No. of Years) | Scope/Quantity | Price | Total |
|---|---|---|---|---|---|
| Blaze Advisor Development Platform: JAVA and .Net | 280-DVLI-03 (Perpetual) | Perpetual | For use on up to 5 Seats to be used solely in conjunction with the Named Application | | |
| Blaze Advisor Deployment Platform: JAVA and .Net | 280-DPLI-03 (Perpetual) | Perpetual | Named Application | | |
| Documentation for Blaze Advisor: • User guide (available in HTML or PDF) | N/A | Perpetual | 1 set | | |
| Support and Maintenance Fee for Blaze Advisor Software: | 280-OOMN-08 | Initial Term: One year | 1 | | |
| TOTAL LICENSE AND FIRST YEAR SUPPORT AND MAINTENAN | | | | | |

a. **Definition of Named Application:** With respect to any license set forth above with a "Scope/Quantity" of "Named Application", Client's "Named Application" is defined as follows: The application currently known as the CSI Express application (which is Chubb's Specialty Insurance's underwriting and automated policy renewal application) and its supporting system applications, excluding claims, Point-of-Sale data capture, billing and marketing applications.

b. **Divisional Enterprise License Option:** For a period commencing on the Effective Date and ending on July 31, 2006. Client shall have the option to purchase a Divisional ELA license to the Fair Isaac Products for use within Client's Specialty Lines insurance division. Such license shall permit Client to use the Fair Isaac Blaze Advisor Development Product on up to ten (10) Seats and make unlimited internal use of the Fair Isaac Blaze Advisor Deployment Product, but only within Client's Specialty Lines insurance division. The license fee for such Divisional ELA shall be ███████ and Client shall be entitled to a credit of ███ of the license fees previously paid under this Agreement (i.e., the additional license fees due to exercise such option shall be ███████ The purchase of such Divisional ELA shall supersede and automatically terminate the licenses set forth in Section 1 above. The total annual maintenance for the Divisional ELA shall be calculated as ███ of the Divisional ELA license fee (i.e., the first year of maintenance following the exercise of such option shall be ███████ Client shall exercise the Divisional Enterprise License Option by notifying Fair Isaac in writing on or before July 31, 2006.

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 12 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

c.      **Enterprise License Credit:**  For a period of twelve (12) months after the Effective Date of this Agreement, if Client purchases an Enterprise License (apart from the Divisional Enterprise License in Section 1(b)) from Fair Isaac for the Fair Isaac Products, ███████████████ the above license fees paid under this Exhibit A will be applied toward such Enterprise License if the Enterprise License is purchased within such ██████████████ period ("Option 1").  After the expiration of Option 1, but within ████████████ of the Effective Date of this Agreement, if Client purchases an Enterprise License from Fair Isaac for the Fair Isaac Products ██████████████ of the above license fees paid under this Exhibit A will be applied toward such Enterprise License if the Enterprise License is purchased after the expiration of Option 1, but not later than ███████████ onths after the Effective Date.  The parties shall enter into an addendum to this Agreement to set forth the terms of any such Enterprise License.

## 2.      PAYMENT

      2.1      **License Fees.**  Client agrees to pay the license fees described above upon execution of this Agreement.

      2.2      **Maintenance Fees.**  Client agrees to pay the support and maintenance fees for the first year upon execution of this Agreement, and annually thereafter in advance while the maintenance term is in effect.  Client agrees that the maintenance fee set forth above covers only the licenses to the Fair Isaac Products set forth in this Agreement and does not cover any other licenses to the Fair Isaac Products granted to Client under any other agreement.  The total maintenance fee for the Fair Isaac Products for future years shall be calculated based on the total license fees paid by Client for the Fair Isaac Products under this Agreement and all other agreements.

**Unless Client signs this Agreement and returns it to Fair Isaac by June 30, 2006, prices and terms are subject to change.**

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 13 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

## EXHIBIT B
## FAIR ISAAC SOFTWARE SUPPORT AND MAINTENANCE POLICY

### 1. DEFINITIONS

"FIC" means Fair Isaac Corporation and its subsidiaries.

"Errors" means persistent malfunctions, inherent within the Software, that prevent the Software from operating according to its technical documentation.

For software to be installed at locations in North America, Asia, and South America, "Product Support Hours" (United States) are 6:00 a.m. to 5:00 p.m. Pacific Time, Monday through Friday, excluding holidays observed by FIC in the United States. Support services will be provided from the United States.

For software to be installed at locations in Europe, Middle East, and Africa, "Product Support Hours" (U.K.) are 8:30 a.m. to 5:00 p.m. UK Time, Monday through Friday, excluding holidays observed by FIC in the United States. Support services will be provided from the United States.

"Software" means the following software product(s) that are licensed by Client:

The Fair Isaac Products listed on Exhibit A.

### 2. SUPPORT AND MAINTENANCE SERVICES GENERALLY

2.1. Subject to payment of the appropriate Maintenance fees by Client, and compliance by Client with the terms of the applicable license agreement, FIC agrees to provide Client with support and maintenance services for the Software as set forth in this policy.

2.2. FIC provides support and maintenance services for licensed Software during both implementation and production use when operated on supported platforms installed on designated or approved equipment. Support is currently provided in the English language only.

2.3. Subject to Section 5.1.4, maintenance includes any standard Software versions and releases generally made available to FIC's clients that are current on Maintenance fees. Such versions and releases will be provided to Client pursuant to this policy on a when and if available basis.

### 3. TECHNICAL SUPPORT

3.1. FIC will make commercially reasonable efforts, during Product Support Hours, to address Client's questions about the Software, to resolve operating problems that are attributable to the Software, and to resolve verified, reproducible Errors in the Software.

3.2. Client agrees: (a) to set up primary and secondary liaisons who have been trained on the Software; (b) that all support requests will be centralized through the primary and secondary liaisons; (c) to submit support requests to FIC Product Support; (d) to comply with the attached guidelines for submitting support requests; (e) to use commercially reasonable efforts to diagnose and resolve problems in the operation of the Software prior to contacting FIC for support; and (f) to use commercially reasonable efforts to verify that reported problems are due to a malfunction of the Software, and not due to the operating system, hardware, data, interfaces, or improper use of the Software, prior to contacting FIC for support.

*Fair Isaac Confidential*

FICO0002288

06/30/2006 17:06 FAX 9089034216    CHUBB&SON                                    015/017

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 14 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

## 4. TERM; TERMINATION; REINSTATEMENT

4.1. FIC's support and maintenance obligations under this policy commence upon shipment of the Software and will continue for an initial term of one year. Maintenance fees will be invoiced on an annual basis in advance. For as long as FIC makes maintenance for the Software generally available to all of its customers, the support and maintenance service will automatically renew for consecutive one-year terms unless Client gives FIC 30 days' written notice, prior to the end of the current term, of its intent not to renew. Support and maintenance during renewal terms will be subject to the Support and Maintenance Policy in effect at the time of renewal. Maintenance fees applicable to renewal terms may be increased by FIC, but no such increase may exceed the lesser of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ means the Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for All Items, 1982-84=100, as published by the US Bureau of Labor Statistics.

4.2. FIC may terminate support and maintenance services under this policy upon 30 days' written notice if Client is in breach under this policy or any license agreement relating to the Software and does not cure the breach within such 30-day period. FIC will have no obligation to resume support and maintenance services following such a termination for cause.

4.3. FIC may, at its sole discretion, reinstate lapsed support and maintenance services, in accordance with its then-current policies, upon payment by Client of the applicable reinstatement fee.

## 5. EXCLUSIONS

5.1. Services outside the scope of this policy are subject to availability of resources and will be charged for separately at FIC's then-current rates for such services. The following services are outside the scope of this policy:

5.1.1. Support services provided outside of Product Support Hours.

5.1.2. Support service that becomes necessary due to failure of computer hardware, equipment or programs not provided by FIC; negligence of Client or any third party; operator error; improper use of hardware or software (including the Software); any problem or loss not solely attributable to the Software; problems stemming from Client not applying all required maintenance releases; or problems due to unauthorized modification or adaptation of the Software by Client.

5.1.3. Development, customization, coding, installation, integration, consulting and training.

5.1.4. Optional, separately-priced Software features that may, from time to time, be made available by FIC with new versions or releases of the Software.

5.2 Unless otherwise indicated in the applicable Order Form or license agreement, FIC has no obligation to provide support or maintenance services for other than (a) the current release of the Software and (b) one prior release of the Software, but only for a maximum of one year after release of a subsequent release.

*Fair Isaac Confidential*

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 15 of 16 |
|---|---|
| FI Contract Number: | FI LR# 30073 |

**6. SEVERITY LEVELS AND RESPONSE TIMES.** Upon Client's report of a problem with the Software, an FIC representative will acknowledge such report by issuing a confirmation to Client, either by phone or email, and FIC will assign a Severity Level to the problem based on the type of issue reported, according to the following schedule:

| Severity | Condition | Response Time/Action |
|---|---|---|
| 1 | **Production Down Emergency:** An Error in the production environment that inhibits all or substantially all of the Software from functioning in accordance with its documentation. A severity "one" problem is both severe and mission-critical. | Provide (a) a phone response within 1 hour during FIC's Product Support Hours and<br><br>(b) an action plan within 4 hours for the development of a patch or a bypass for the Error.<br><br>Following the development of the patch or bypass, FIC will notify the Client of inclusion of the patch or a solution in a revision of the Software.<br><br>Once identified and logged, FIC will provide all necessary services to resolve a Severity-One condition on a diligent-efforts priority basis seven days per week until that condition has been patched or bypassed. |
| 2 | **Production Impaired:** An Error in the production environment where major functionality of the Software is inhibited, but the Error does not materially disrupt the Client's business. | Provide (a) a written or phone response within 4 hours during FIC's Product Support Hours and<br><br>(b) an action plan within 2 business days for a bypass for the Error or<br><br>(c) an action plan within 5 business days for developing a patch for the Error.<br><br>Following the development of the patch or bypass, FIC will notify the Client of inclusion of the patch or a solution in a revision of the Software.<br><br>The Error will be worked on during Product Support Hours. |
| 3 | **Production Inhibited:** An Error in the production environment where a feature of the Software is inhibited, but the Error does not materially disrupt the Client's business. | Provide (a) a written or phone response within one business day and<br><br>(b) Consider for correction or inclusion in the next revision of the Software. |
| 4 | **General Assistance:** A "how to" question; an Error that is minor or cosmetic in nature; or an enhancement request to be considered for a future revision of the Software | Provide (a) a written or phone response within 2 business days and<br><br>(b) Consider for correction or inclusion in the next revision of the Software. |

*Fair Isaac Confidential*

Confidential                                    FICO0002290

| Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | | Page 16 of 16 |
|---|---|---|
| FI Contract Number: | | FI LR# 30073 |

### Fair Isaac Product Support
### Problem Submission Guidelines

We encourage clients to first consult the appropriate documentation for the product they are using (installation guides, reference manuals, user guides, product release notes, etc.). Release notes will typically include contents of the release, installation/license information, known limitations, product support, and compatibility information. Other reference materials should also be consulted as needed for related components such as database management systems, compilers, operating systems, etc. For Fair Isaac products with web-based self-service, visit the support web site to search for known questions, solutions and technical notes.

If you've completed this initial research and are still unable to resolve your problem, the next step is to contact Product Support. The following information is critical to resolving a problem:

- Your client ID (a 4-digit number communicated to you either by your Engagement Manager or during your first contact with Product Support) or license number (if applicable).
- Your phone number and email address
- The name and version of the Fair Isaac software to which the issue pertains. For incidents submitted via email, please be sure to include the **product name** on the subject line of the email.
- The name and version of the operating system and database.
- The environment in which the error is occurring (development, test or production).
- Both a general statement and a detailed description of the problem, including any relevant error messages.
- Frequency with which the condition occurs and at what intervals.
- Can the problem be replicated, and if so, the steps taken to recreate the problem.
- Any changes that may have been made to the environment (for example, maintenance work that may have been performed or any hardware/software changes made to the server, workstation, operating system, or data feed).
- Any changes to the Fair Isaac application, including new configuration or software upgrades.
- Copies of the Fair Isaac product log files, configuration files, and screen prints of errors.

### Troubleshooting Tips:

- Isolate the problem as precisely as possible using debugging facilities and error logs as appropriate, and try to find a consistent way to reproduce it.
- Whenever possible, modify a Fair Isaac provided example or test case to cause the same problem.
- If the problem is not consistently reproducible, check whether it may be related to insufficient memory, memory leaks, search paths, or files that may be missing from certain directories or the class path.
- Verify that the versions of the database, compilers, operating system, browser, drivers, etc. that are in use are certified and supported by Fair Isaac.
- Identify any other changes that may have occurred in your environment that may have an impact on the Fair Isaac solution (for example, database maintenance, service pack deployment, upgrade of a system component, operating system patches, etc.)
- Try to reproduce the problem on another platform or test system.
- If applicable, try to isolate various components of your solution to simplify the troubleshooting (for example, pull out a subset of rules or code from the bulk of your application). Support can assist you best if we get a small sample of your application to work with. If possible send us a small test case with instructions, so we can run the test case.

*Fair Isaac Confidential*

   FICO0002291

| Amendment One to Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 1 of 2 |
|---|---|
| FI Contract Number: | FI LR# 30274 |

## AMENDMENT ONE TO
## SOFTWARE LICENSE AND SERVICES AGREEMENT

This Amendment One (the "**Amendment**") is effective as of ~~July~~ August 1, 2006 (the "**Amendment Effective Date**") and amends the Software License and Services Agreement entered into on June 30, 2006 (the "**Agreement**") by and between Fair Isaac Corporation ("**Fair Isaac**") and Chubb and Sons a division of Federal Insurance Company ("**Client**").

WHEREAS, the Agreement provided for the licensing of certain Fair Isaac Products known as Blaze Advisor Development and Blaze Advisor Deployment; and

WHEREAS, under the Agreement, Client was given an option to expand the license granted in the Agreement to a Divisional Enterprise License; and

WHEREAS, Client wishes to exercise the Divisional Enterprise License option.

NOW THEREFORE, the parties agree to amend the Agreement as set forth below.

1.  As of the Amendment Effective Date, the table in Section 1 of Exhibit A to the Agreement shall be deleted in its entirety and replaced with the following:

| Product | Item # | Initial Term (Perpetual or No. of Years) | Scope/Quantity | Price | Total |
|---|---|---|---|---|---|
| Blaze Advisor Development  Platform: JAVA and .Net | 280-DVLI-03 (Perpetual) | Perpetual | For use on up to 10 Seats to be used solely by the Chubb Specialty Lines Division | | |
| Blaze Advisor Deployment  Platform: JAVA and .Net | 280-DPLI-03 (Perpetual) | Perpetual | For use solely by the Chubb Specialty Lines Division; no other limitations (i.e. Seat or Named Application limitations) apply | | |
| Documentation for Blaze Advisor:  • User guide (available in HTML or PDF) | N/A | Perpetual | 1 set | | |
| Support and Maintenance Fee for Blaze Advisor Software: | 280-OOMN-08 | Initial Term: One year | | | |
| TOTAL LICENSE AND FIRST YEAR SUPPORT AND MAINTEN | | | | | |

*If Client has paid any license and/or support and maintenance fees under the Agreement, those amounts received by Fair Isaac shall be deducted from the Total License and First Year Support and Maintenance Fees listed above.

FICO0002292

| Amendment One to Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 2 of 2 |
|---|---|
| FI Contract Number: | | FI LR# 30274 |

## 2. PAYMENT

**2.1   License Fees.**   Client agrees to pay the license fees described above (less any amounts already paid under the Agreement, as noted above) upon execution of this Amendment.

**2.2   Maintenance Fees.**   Client agrees to pay the support and maintenance fees for the first year (less any amounts already paid under the Agreement, as noted above) upon execution of this Amendment, and annually thereafter in advance while the maintenance term is in effect.   Client agrees that the maintenance fee set forth above covers only the licenses to the Fair Isaac Products set forth in this Amendment and does not cover any other licenses to the Fair Isaac Products granted to Client under any other agreement.   The total maintenance fee for the Fair Isaac Products for future years shall be calculated based on the total license fees paid by Client for the Fair Isaac Products under this Amendment and all other agreements.

## 3. MISCELLANEOUS.
Unless otherwise indicated, capitalized terms used in this Amendment have the meanings given them in the Agreement.   Except as expressly amended by this Amendment, all other provisions of the Agreement continue in full force and effect.   If there is a conflict between the Agreement and this Amendment, the terms of this Amendment control. This Amendment, together with the terms of the Agreement, constitute the full and entire understanding and agreement between the parties with regard to the subject matter hereof, and supersedes all prior or contemporaneous proposals and all other oral or written understandings, representations, conditions, and other communications between the parties relating to such subject matter, as well as the terms of all existing or future purchase orders and acknowledgements.

Fair Isaac and Client are signing this Amendment as of the Amendment Effective Date, notwithstanding the date of the parties' actual signatures.

**FAIR ISAAC CORPORATION**                **CLIENT – CHUBB & SON**

| | | | |
|---|---|---|---|
| By: | _Aaron Jaeger_ | By: | _Robert P. Cox_ |
| Name: | Aaron Jaeger  Manager  Financial Planning & Analysis | Name: | ROBERT P. COX |
| Title: | | Title: | EXECUTIVE VICE PRESIDENT |
| Date Signed: | 8-1-06 | Date Signed: | 7/21/06 |

**Unless Client signs this Amendment and returns it to Fair Isaac by July 31, 2006, prices and terms are subject to change.**

REVIEWED BY
Per
J. Boone
IQ
FAIR ISAAC LEGAL

Confidential                                                    FICO0002293

| Amendment Two to Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 1 of 3 |
|---|---|
| FI Contract Number: | FI LR# 33073 |

## AMENDMENT TWO TO
## SOFTWARE LICENSE AND SERVICES AGREEMENT

This Amendment Two (the "**Amendment Two**") is effective as of December 2̶8̶ 2006 (the "Amendment Two Effective Date") and amends the Software License and Services Agreement entered into on June 30, 2006, as amended on August 1, 2006 (collectively the "**Agreement**") by and between Fair Isaac Corporation ("**Fair Isaac**") and Chubb and Sons, a division of Federal Insurance Company ("**Client**").

WHEREAS, the Agreement provided for a Divisional Enterprise License for certain Fair Isaac Products known as Blaze Advisor Development and Blaze Advisor Deployment; and

WHEREAS, under the Agreement, Client was given an option to expand the license granted in the Agreement to an Enterprise-Wide License; and

WHEREAS, Client wishes to exercise the Enterprise-Wide License option.

NOW THEREFORE, the parties agree to amend the Agreement as set forth below.

1.      As of the Amendment Two Effective Date, the scope of the licenses granted to Client under the Agreement is amended as outlined herein.  All previous licenses granted to Client under the Agreement shall be terminated and superseded by the license granted herein.

| Product | Item # | Initial Term | Scope/Quantity | Price | Total |
|---|---|---|---|---|---|
| Blaze Advisor Development  Platform: JAVA and .Net | 280-DVLI-03 | Perpetual | Enterprise-Wide | | |
| Blaze Advisor Deployment  Platform: JAVA and .Net | 280-DPLI-03 | Perpetual | Enterprise-Wide | | |
| Documentation for Blaze Advisor:  • User guide (available in HTML or PDF) | N/A | Perpetual | 1 set | | |
| | | | To | | |
| | | | 100% Credit for license fees paid und | | |
| | | | Total | | |
| Support and Maintenance Fee for Blaze Advisor Software: | 280-OOMN-08 | Initial Term: One year | Set forth in Exhibit B to the Agreement | | |
| TOTAL LICENSE AND FIRST YEAR SUPPORT AND MAINT | | | | | |

*If Client has paid any support and maintenance fees under the Agreement, those amounts received by Fair Isaac and applicable to periods after the date of this Amendment Two shall be deducted from the first year support and maintenance fees listed above.  The Client's anniversary date for support and maintenance renewals shall be the Amendment Two Effective Date.

Confidential

| Amendment Two to Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | | Page 2 of 3 |
|---|---|---|
| FI Contract Number: | | FI LR# 33073 |

For purposes of this Amendment Two, the Enterprise-Wide License shall mean that Client and its Affiliates may use the Fair Isaac Product for their internal business purposes, with no limitation on the number of Seats or CPUs, subject to and in accordance with all of the provisions of the Agreement.  "Affiliates" shall mean any other entity directly or indirectly controlled by Client, where "control" means the ownership of more than 50% of the aggregate of all voting interests (representing the right to vote for the election of directors or other managing authority) in an entity. Such other entity is an Affiliate only during the period that such "control" exists.  Client shall at all times be responsible for its Affiliates' use of the Fair Isaac Products.

2.      PAYMENT

      2.1      **License Fees.** Client agrees to pay the license fees described above according to the following schedule:

            a)      ▇▇▇▇▇▇▇ all be invoiced upon execution of this Amendment Two and paid in accordance with the payment terms set forth in the Agreement;

            b)      ▇▇▇▇▇▇▇ hall be invoiced on October 15, 2007 and paid on or before November 30, 2007.

      2.2      **Maintenance Fees.** Client agrees to pay the support and maintenance fees for the first year (subject to the note above) upon execution of this Amendment Two, and annually thereafter in advance while the maintenance term is in effect.  Client agrees that the maintenance fee set forth above covers only the Blaze Advisor Enterprise-Wide license and does not cover any other licenses granted to Client under any other agreement.

3.      **MISCELLANEOUS.** Unless otherwise indicated, capitalized terms used in this Amendment Two have the meanings given them in the Agreement.  Except as expressly amended by this Amendment Two, the provisions of the Agreement continue in full force and effect.  If there is a conflict between the Agreement and this Amendment Two, the terms of this Amendment Two control.  This Amendment Two, together with the terms of the Agreement, constitute the full and entire understanding and agreement between the parties with regard to the subject matter hereof, and supersedes all prior or contemporaneous proposals and all other oral or written understandings, representations, conditions, and other communications between the parties relating to such subject matter, as well as the terms of all existing or future purchase orders and acknowledgements.

Fair Isaac and Client are signing this Amendment Two as of the Amendment Two Effective Date, notwithstanding the date of the parties' actual signatures.

**FAIR ISAAC CORPORATION**

By: _Aaron Jaeger_

Name: Aaron Jaeger
Manager
Financial Planning & Analysis

Title:

Date Signed: _12/28/06_

**CLIENT – CHUBB & SON, A DIVISION OF FEDERAL INSURANCE COMPANY**

By: _June E. Drewry_

Name: _June E. Drewry_

Title: _CIO_

Date Signed: _12/27/2006_

REVIEWED BY
Per
J. Boone
FAIR ISAAC LEGAL

| Amendment Two to Fair Isaac Software License and Maintenance Agreement – Blaze Advisor | Page 3 of 3 |
|---|---|
| FI Contract Number: | | | FI LR# 33073 |

**Unless Client signs this Amendment and returns it to Fair Isaac by December 28, 2006, prices and terms are subject to change.**

Confidential



# THE CHUBB CORPORATION

Annual Report 2007

*Service:*
*The Chubb Difference*

FICO0002297

# The Chubb Corporation



Chubb celebrated its 125th anniversary in 2007. In 1882, Thomas Caldecot Chubb and his son Percy opened a marine underwriting business in the seaport district of New York City. The Chubbs were adept at turning risk into success, often by helping policyholders prevent disasters before they occurred. By the turn of the century, Chubb had established strong relationships with the insurance agents and brokers who placed their clients' business with Chubb underwriters.

"Never compromise integrity," a Chubb principle, captures the spirit of our company. Each member of the Chubb organization seeks to satisfy customers by bringing quality, fairness and integrity to each transaction.

The Chubb Corporation was formed in 1967 and was listed on the New York Stock Exchange in 1984. Today, Chubb stands among the largest property and casualty insurers in the world. Chubb's 10,600 employees serve customers from offices in North America, South America, Europe and Asia (see page 8).

The principles of financial stability, product innovation and excellent service combined with the high caliber of our employees have been the mainstays of our organization for 125 years.

## Contents

1  Letter to Shareholders
8  Chubb Worldwide Locations
9  Service: The Chubb Difference
24  Employee Profiles
26  Corporate Directory
29  Form 10-K

**On the cover:** Chubb is proud to insure Salamander Farm, the Virginia home of Sheila C. Johnson and her husband, the Hon. William T. Newman, Jr. See pages 14–15.

Some of the statements in this report may be considered forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995. We caution investors that these forward-looking statements are not guarantees of future performance. Various risks and uncertainties may cause actual results to differ materially. These risks and uncertainties include those discussed in our 2007 Annual Report on Form 10-K (which forms a part of this document), in our Quarterly Reports on Form 10-Q and in the other filings we make with the Securities and Exchange Commission. Forward-looking statements speak only as of the date made, and we assume no obligation to update such forward-looking statements.

⤙ ⤚

Portions of this report discuss operating income and property and casualty investment income after tax, both of which are "non-GAAP financial measures" (as defined by the Securities and Exchange Commission). For additional information regarding these non-GAAP financial measures, please refer to the inside back cover of this report.

FICO0002298

# Letter to Shareholders



John D. Finnegan
Chairman, President and Chief Executive Officer

**Dear Fellow Shareholder:**

I am pleased to report that 2007 was the fifth consecutive year of record earnings for Chubb. In a slow-growth environment marked by intense competition for market share, all our strategic business units performed outstandingly well.

Net income grew to $2.8 billion from $2.5 billion in 2006, and net income per share increased to $7.01 from $5.98. Operating income,

### Net Income per Share



*2007 was the fifth consecutive year of record earnings for Chubb. In a slow-growth environment marked by intense competition for market share, all our strategic business units performed outstandingly well.*

which we define as net income excluding realized investment gains and losses, increased to $2.6 billion from $2.4 billion. Operating income per share grew 14% to a record $6.41 from $5.60.

Net written premiums in 2007 declined 1% to $11.9 billion, reflecting the impact of the transfer of our ongoing reinsurance assumed business to Harbor Point in December 2005. Premiums for the insurance business increased 1%; for the reinsurance assumed business, premiums declined 65%.

Underwriting income grew 11% to $2.1 billion. The combined loss and expense ratio for 2007 improved to 82.9% from 84.2% in 2006. The expense ratio was 30.1% in 2007 and 29.0% in 2006, reflecting growth in certain product lines outside the United States for which commission rates are high.

Catastrophe losses in 2007 accounted for 3.0 percentage points of the combined ratio, compared to 1.4 points in 2006. Excluding catastrophe losses, the combined ratio improved 2.9 percentage points in 2007 to an extraordinary 79.9% from 82.8% in 2006.

Property and casualty investment income pre-tax increased 9% to $1.6 billion, reflecting strong cash flow from both investments and underwriting; after taxes, it increased 9% to $1.3 billion.

Book value per share grew 14% in 2007. Over the past five years, book value per share has grown at a compound average annual rate of 14%.

**Combined Loss & Expense Ratio**
Percentage of premium dollars spent on claims and expenses



FICO0002300

  

*John J. Degnan, Vice Chairman and Chief Administrative Officer*

*Thomas F. Motamed, Vice Chairman and Chief Operating Officer*

*Michael O'Reilly, Vice Chairman and Chief Financial Officer*

**Total Return for Chubb Shareholders**

Although 2007 was not a particularly good year in the stock market, Chubb shareholders enjoyed a total return (stock appreciation plus reinvested dividends) of 5.5%, nearly identical with the return of the Standard & Poor's 500 Index and much better than the Standard & Poor's Property & Casualty Index, which had a *negative* 13.2% return in 2007.

For the five years ended December 31, 2007, Chubb's compound average annual total return was 18.4%, far better than the S&P 500 Index's 12.8% and nearly double the 9.5% total return of the S&P Property & Casualty Index. Chubb's market capitalization at the end of 2007 was still a modest 1.4 multiple of book value.

*For the five years ended December 31, 2007, Chubb's compound average annual total return was 18.4%, far better than the S&P 500 Index and nearly double the total return of the S&P Property & Casualty Index.*

3

*In an industry often regarded as fully commoditized, Chubb continues to rise above the competition with specialized coverages, loss-control expertise, outstanding claim service and highly selective underwriting criteria.*

**Operations Review**

**Chubb Personal Insurance** (CPI) net written premiums grew 5% to $3.7 billion. As a result of higher catastrophe losses in 2007, the combined ratio in 2007 was 84.8% compared to 81.7% in 2006. Excluding catastrophes, CPI's combined ratio was 78.5% in 2007, compared to 78.0% in 2006.

CPI specializes in insuring the homes, autos, yachts, jewelry, art, antiques, collectibles and other possessions of affluent customers in the United States, Canada, the United Kingdom, Australia and Brazil. CPI also offers personal excess liability insurance and group accident insurance.

**Chubb Commercial Insurance** (CCI) net written premiums declined 1% to $5.1 billion. The combined ratio was 85.8% in 2007, compared to 83.1% in 2006. Excluding catastrophe losses, the combined ratio was 83.2% in 2007, compared to 82.5% in 2006. Margin compression due largely to competitive pricing pressures was mitigated by improved loss experience.

CCI is a global provider of multiple peril, monoline casualty and property, excess liability and workers' compensation coverages, with special expertise in serving the local insurance needs of companies wherever in the world they do business. In an industry often regarded as fully commoditized, Chubb continues to rise above the competition

4

FICO0002302

with specialized coverages, loss-control expertise, outstanding claim service and highly selective underwriting criteria.

**Chubb Specialty Insurance** (CSI) net written premiums remained virtually unchanged at $2.9 billion — but the combined ratio improved to 77.4% from 87.5%. In our Professional Liability (PL) book, which includes, among others, directors & officers (D&O) and errors & omissions (E&O) insurance coverages, premiums declined 1%, and the combined ratio improved to 82.4% from 91.8% in 2006.

Our PL book of business was formerly dominated by Fortune 500 companies. Following heavy losses in 2000 through 2002, we shifted our emphasis to middle-market insureds and reduced our limits per insured. These and other underwriting decisions, together with a decline in class action litigation and favorable court decisions, have resulted in dramatically lower losses and improved profitability despite declining rates.

CSI also includes our Surety business, which had premium growth of 13% and a combined ratio of 35.4%.

**Returning Capital to Our Shareholders**

As part of our capital management program, we returned over $2.6 billion of excess capital to our shareholders in 2007: $451 million in dividends and $2.2 billion through share repurchases. In March 2007,

*We returned over $2.6 billion of excess capital to our shareholders in 2007. In March 2007, the Board raised the dividend by 16%, and in December, the Board approved a new share repurchase program.*



**Shareholders' Equity**
[$ in billions]

2003 — $8.5
2004 — $10.1
2005 — $12.4
2006 — $13.9
2007 — $14.4

5

FICO0002303

*Our portfolio has not had and does not have any direct exposure to either sub-prime mortgages or collateralized debt obligations.*

our Board of Directors raised the dividend by 16%, marking Chubb's 25th consecutive annual dividend increase. In December 2007, the Board approved a new 28-million-share repurchase program, which we expect to complete by the end of 2008, subject to market conditions.

**Managing Risk**

Dominating the headlines since mid-2007 has been the global credit crisis precipitated by the sub-prime mortgage meltdown. I am pleased to report that our investment portfolio has not had and does not have any direct exposure to either sub-prime mortgages or collateralized debt obligations. Regarding our tax-exempt bonds, 43% of our portfolio is insured. It's our view that even if the insurance ceased to exist, the underlying quality of the bonds is so strong that the aggregate mark-to-market impact on our financial condition would not be material. As for



Book Value and Market Value per Share

FICO0002304

our mortgage-backed securities, 98% of our portfolio was rated AAA at year end.

   We are in the business of assuming risk. However, expert investing and underwriting — knowing which risk (and how much of it) to assume — are fundamental to long-term success in the insurance business. Having just celebrated our 125th anniversary with a year of record earnings, we intend to pursue actions and behaviors that will enable us to prosper for another 125 years.

   My thanks to our customers, agents, brokers, employees and shareholders for your efforts and support all through the year.

*We are in the business of assuming risk. However, expert investing and underwriting — knowing which risk (and how much of it) to assume — are fundamental to long-term success in the insurance business.*

*John D. Finnegan*

John D. Finnegan
Chairman, President and Chief Executive Officer
February 21, 2008



**Total Return**

Value of $10,000 invested on December 31, 2002 in Chubb common stock,
S&P 500 Index and S&P Property & Casualty Index, including share price
appreciation and reinvested dividends. Past results are no guarantee of future returns.

7

FICO0002305

# Seamless Global Service



## UNITED STATES

Worldwide Headquarters:  Warren, NJ

**Mid-Atlantic**
Baltimore, MD
Chesapeake, VA
Florham Park, NJ
Harrisburg, PA
New York, NY
Philadelphia, PA
Pittsburgh, PA
Richmond, VA
Washington, DC
Whitehouse Station, NJ

**Northeast**
Albany, NY
Boston, MA
Long Island, NY
New Haven, CT
Portsmouth, NH
Rochester, NY
Simsbury, CT
Westchester, NY

**West**
Denver, CO
Los Angeles, CA
Newport Beach, CA
Phoenix, AZ
Pleasanton, CA
Portland, OR
Salt Lake City, UT
San Diego, CA
San Francisco, CA
Seattle, WA

**North**
Chicago, IL
Cincinnati, OH
Cleveland, OH
Columbus, OH
Des Moines, IA
Grand Rapids, MI
Indianapolis, IN
Itasca, IL
Kansas City, MO
Louisville, KY
Milwaukee, WI
Minneapolis, MN
St. Louis, MO
Troy, MI

**South**
Atlanta, GA
Austin, TX
Birmingham, AL
Charlotte, NC
Columbia, SC
Dallas, TX
Houston, TX
Jackson, MS
Maitland, FL
Nashville, TN
Raleigh, NC
San Antonio, TX
Sunrise, FL
Tampa, FL
Tulsa, OK

## CANADA

Calgary, AB
Montréal, PQ
Toronto, ON
Vancouver, BC

## BERMUDA

Hamilton

## LATIN AMERICA

**Argentina**
Buenos Aires

**Brazil**
Belo Horizonte
Brasília
Curitiba
Porto Alegre
Rio de Janeiro
São Paulo

**Chile**
Santiago

**Colombia**
Barranquilla
Bogotá
Cali
Medellín

**México**
Guadalajara
México City
Monterrey

## EUROPE

**Austria**
Vienna

**Belgium**
Brussels

**Denmark**
Copenhagen

**France**
Bordeaux
Lille
Lyon
Paris

**Germany**
Düsseldorf
Hamburg
Munich

**Ireland**
Dublin

**Italy**
Milan

**Netherlands**
Amsterdam

**Norway**
Oslo

**Spain**
Barcelona
Madrid

**Sweden**
Stockholm

**Switzerland**
Zurich

**United Kingdom**
Belfast
Birmingham
Glasgow
Leeds
London
Manchester
Reading

## ASIA/PACIFIC

**Australia**
Brisbane
Melbourne
Perth
Sydney

**China**
Beijing
Hong Kong
Shanghai

**Japan**
Tokyo

**Korea**
Seoul

**Singapore**

**Taiwan**
Taipei

**Thailand**
Bangkok

8

# Service:   The Chubb Difference



*Photo at left:  5 & 7 South William Street, circa 1897. In 1892, Percy Chubb and Charles Myers bought the land and building at 5 & 7 South William Street and moved the firm there. Here a group of employees stand in front of the old building, which served as Chubb's headquarters until 1901.*

Chubb's commitment to superior service, which has always been the essence of our reputation, continues to guide us in a world that has changed dramatically since the company opened its doors in 1882. Early on, we distinguished ourselves from competitors by providing principled claim handling and expert loss prevention advice. It was a focus that demonstrated our personal interest in the success and well-being of the individuals and businesses we insure, as well as our respect for the agents and brokers with whom we partner. Those core values continued to guide us as we built a worldwide branch network that not only allowed us to provide an increasingly sophisticated range of services, but also helped us remain a local company with strong ties to each of the communities in which we operate.

In a business as complex as property and casualty insurance, superior service is predicated on specialized expertise. Chubb's underwriting, claim and loss prevention specialists spend years developing deep knowledge and businesses relationships in their selected industry segments or areas of expertise. Our customers trust Chubb's specialists to understand and protect what they value — whether it's a personal art collection, a biotechnology laboratory, bank information systems or a winery vineyard.

> *Our customers trust Chubb's specialists to understand and protect what they value.*

We also recognize the need to balance our quest for increased speed and efficiency with our commitment to working closely with our producers and customers around the world. Because technology has the potential to distance companies from those they serve, we take great care to use it in ways that add value and dimension to our relationships. In addition to streamlining the routine services associated with the insurance transaction, technology has provided new opportunities for us to partner with our customers on loss prevention efforts, claim handling, financial management and service needs unique to their homes or businesses.

Of course the most meaningful measure of the service provided by any insurer is its ability and willingness to pay promptly and fairly in the event of a loss. Chubb's outstanding financial strength, which has consistently earned the highest rating from A.M. Best, assures our customers that our claim handling integrity is backed by more than 125 years of responsible financial management.

Insurance is fundamentally a promise, made tangible not only by fair dealing when a claim occurs, but also by the quality of the overall service relationship an insurer has with its customers. The pages that follow offer profiles of customers, agents and brokers who have experienced first-hand what service means to Chubb.

9

FICO0002307

# Chubb Service:  Global Capability, Prompt and Fair Claim Handling



*Photo at right:  Brian Holland, Group Insurance Director of Christie's, is photographed at a Christie's showroom in London.*

*Photo at left:  At Christie's in London are (from left) Erika Bloor, Chubb United Kingdom Manager for Risk Management; Graham Medcalf, Chubb United Kingdom Property Manager; and Tim Lloyd, Christie's Risk Manager.*

On paper, it appears like a perfect fit — two global corporations with impeccable reputations working together to help maintain and enhance those reputations.

Christie's, the venerable London-based auction house with operations in 43 countries, and Chubb, the highly rated insurance carrier with offices in 28 countries, first teamed up in 2004. Chubb provides Christie's property and casualty insurance on a global basis and is a participating insurer for other coverages, such as directors and officers liability.

But Christie's and Chubb are linked by more than just insurance policies. The two companies have formed a close bond by working together on a global basis to help identify and mitigate potential problems and ensure that Christie's has appropriate and sufficient insurance protection wherever it does business.

Chubb secures locally admitted insurance policies in many countries where Christie's has operations and also provides coverage on a non-admitted basis where necessary. These policies are combined under a controlled master policy to help close coverage gaps.

"Because Christie's is all over the world, we need to be flexible and creative," said Erika Bloor, who supervises risk-management accounts at Chubb United Kingdom. "Christie's has offices and showrooms in many countries, and, in some countries, there may be just one person working from home. The challenge is making sure Christie's is protected wherever it does business."

Claim handling also is critical for a multinational organization. Chubb helps keep Christie's risk management team informed by consolidating loss data from around the world and delivering them in a single quarterly report to the London headquarters. "Knowing what is happening in its overseas operations helps give Christie's risk managers peace of mind," Bloor said.

Tim Lloyd, Risk Manager for Christie's, said Chubb's global network was one of the deciding factors when it selected an insurer. "In addition, we were looking for a respected, financially sound carrier with a track record of dealing with claims promptly and fairly," Lloyd said. "Chubb has a reputation for working effectively with risk-managed businesses."

> "We were looking for a respected, financially sound carrier with a track record of dealing with claims promptly and fairly."

FICO0002308



11

FICO0002309

# Chubb Service:  Understanding the Insured's Business



*Photo at right:  Tumi's Mike Mardy, Chief Financial Officer (seated) and Peter Closs, Director of Corporate Finance, in a showroom at the company's South Plainfield, New Jersey headquarters.*

*Photo at left:  At the baggage repair center of Tumi's Vidalia, Georgia warehouse are (from left) Dexter Sturdivant, Chubb Property and Casualty Risk Engineer; Tina Weeks, Tumi's Human Resources Coordinator; Richard Lawrence, Vice President of Tumi's Georgia operations; and Barbara Lawrence, Manager of Tumi's After Sales Service.*

**A**s Chief Financial Officer for one of the leaders in luxury travel, business and lifestyle accessories, Tumi's Mike Mardy places a high premium on product quality, functionality and innovation — and he expects the same from Tumi's insurer.

Since 1975, New Jersey-based Tumi has relied on innovation in high-quality products to achieve success. Ranging from luggage, business cases and handbags to electronics, pens and watches, its award-winning products are designed to meet the evolving needs of consumers worldwide.

Tumi's relationship with Chubb began with the purchase of a single excess liability policy in 1999. Today, Chubb provides a uniquely tailored property and casualty insurance program, which Chubb un-

derwriters adapt to fit Tumi's changing needs. But the company's choice of Chubb extends beyond quality of coverage: "Chubb takes the time to understand our business and its exposures and then partners with us to implement effective loss prevention measures," explained Mardy.

While Tumi's operations include 75 stores in major cities throughout the world, Chubb's loss-control efforts are focused on Vidalia, Georgia, where 182 employees work at Tumi's 260,000-square-foot distribution, product repair and customer service facility. Chubb has worked with Tumi to reduce workplace injuries through ergonomic assessments, Occupational Safety and Health Administration employee training, a formal safety committee and loss control inspections.

"Since our first visit to Vidalia, it was evident that the local staff was eager to develop a more thorough program to address their exposures while caring for employees," said Chubb Property and Casualty Risk Engineer Dexter Sturdivant, who helped develop a baggage-repair workbench to reduce repetitive motion injuries.

Peter Closs, Tumi's Director of Corporate Finance, said that Chubb's loss mitigation efforts have helped improve Tumi's workers' compensation accident experience rate by a third, significantly reducing claim frequency and severity.

While Tumi values Chubb's product quality and risk management expertise, Mardy noted that claim handling is what sets Chubb apart. "When you insure a business or underwrite a casualty risk with Chubb, you can be assured there will be no hassle getting the claim resolved quickly and effectively to get you back in business."

> "...with Chubb, you can be assured there will be no hassle getting the claim resolved quickly and effectively to get you back in business."

12

FICO0002310



FICO0002311

# Chubb Service:  Technical Loss-Prevention Expertise



*Photo at right:  Sheila C. Johnson and the Honorable William T. Newman, Jr. in the living room of the main house at Salamander Farm.*

*Photo at left:  Matt Burgey, Chubb's Personal Lines Manager in Washington, D.C. (left), and Nick Bretz, Operations Director for the Johnson Family Office at Salamander Farm, outside one of the farm's stables with Dominique, one of Paige Johnson's show horses.*

S heila C. Johnson — a founder of Black Entertainment Television, President and Managing Partner of the Women's National Basketball Association's Washington Mystics, CEO of Salamander Hospitality, philanthropist, educator and entrepreneur — is above all a visionary. In 2002, Ms. Johnson pictured her 100-year-old stone farmhouse in the rolling hills of Virginia transformed into a Tuscan-style villa graced by gardens, ponds and fruit trees. Accustomed to making her dreams come true, she launched a three-year renovation project that quickly became a passion. Named "Salamander Farm," the property is now home to Ms. Johnson and her husband, Arlington, Virginia, Chief Judge William T. Newman, Jr.

> *"I'm a perfectionist who doesn't like leaving things to chance. I expect the same from my insurance company."*

In addition to doubling the size of the existing structure, the project included the addition of a tennis court, landscaped spaces to accommodate outdoor entertaining and the construction of an equestrian center for her daughter Paige. "The renovation of Salamander Farm was a masterful integration of architectural, landscape and interior design," said Matt Burgey, Chubb Personal Lines Manager in Washington, D.C. "It's a unique property that requires the type of custom loss-prevention services Chubb excels at providing."

During the renovation, Chubb Technical Specialist Rick Albers worked closely with Ms. Johnson's contractor and Nick Bretz, Operations Director for Ms. Johnson's Family Office at Salamander Farm, to design a state-of-the-art fire and security system that included installation of a 10,000-gallon water tank on the property. "By incorporating the tank in our fire-protection plan, we essentially installed our own hydrant — which could be critical in the event of a fire, given the size and location of the farm," said Bretz. "We have not only the piece of mind that comes from knowing we have done everything possible to safeguard Ms. Johnson's home, but the added benefit of a substantial premium credit in return for acting on Chubb's loss-prevention recommendations."

Chubb's emphasis on expertise and superior service made it the clear choice for Ms. Johnson, a customer since 1996. "I'm a perfectionist who doesn't like leaving things to chance," she said. "I expect the same from my insurance company."

14

FICO0002312



15

FICO0002313

# Chubb Service:  Customized Solutions for Unique Needs



*Photo at right:  At the entrance to Wilmar's Singapore headquarters are Shannonjeet Kaur, Shipping Manager (left), and Carol Wong Choy Lan, Operations and Documentations Manager.*

*Photo at left:  Valerie Lee, Wilmar Operations Executive (seated), uses the Chubb Certificate Issuance System on a computer station at Chubb's Singapore office with Jessie Siow, Chubb Senior Marine Underwriting Assistant.*

As a leading agribusiness group based in Singapore with facilities in 20 countries, Wilmar needs an insurer that has the insurance, IT and risk management capabilities to support its growing international operations.

Since 1991, Wilmar has become the largest global processor and merchandiser of palm and lauric oils, delivering products to more than 50 countries. While Chubb provides protection for Wilmar's directors and officers, our primary assignment is to support the transportation of Wilmar's cargo with coverage and loss-prevention solutions.

After learning in 2004 about Chubb's reputation as an ocean cargo specialist and leader in loss control,

> "Chubb's system saves our staff time by enabling the automatic issuance of certifications and development of customized reports."

Wilmar senior management chose Chubb to develop a cargo coverage program which was tailored to meet their unique exposures.

One of the biggest benefits to Wilmar's insurance process, explained Shipping Manager Shannonjeet Kaur, is the Chubb Certificate Issuance System (CCIS), which was specifically designed to meet Wilmar's needs. When Wilmar's products are purchased, the trades are often financed by banks, and certificates are necessary to demonstrate proof of insurance.

"Before CCIS, we had to manually issue and verify insurance certifications," said Kaur. "Chubb's system saves our staff time by enabling the automatic issuance of certifications and development of customized reports."

Chubb's loss control department is currently working to reduce Wilmar's marine transport exposures and also assessing Wilmar's vessel selection and chartering best practices, which will help streamline the worldwide distribution of the company's products.

Chubb continues to earn Wilmar's business with comprehensive coverages, first-class service and loss-control leadership.

16

FICO0002314



FICO0002315

# Chubb Service:  Broad Coverages, Loss Control



*Photo at right:  In the atrium of the Tastefully Simple headquarters in Alexandria, Minnesota, are Jill Blashack Strahan, Founder and Chief Executive Officer (left), and Joani Nielson, Founding Partner and Chief Operating Officer.*

*Photo at left:  Pictured among boxes of gourmet food in the Tastefully Simple Alexandria, Minnesota, warehouse are Jason Berger, Property and Casualty Risk Engineer in Chubb's Minneapolis branch (left), and Richard Miller, Chief Financial Officer, Tastefully Simple.*

**W**hen Minnesota-based Tastefully Simple began selling gourmet food through home taste-testing parties in 1995, its founder reported to work at a small shed with no running water and packed orders on a pool table. Today, the company's 340 employees work in a state-of-the-art 200,000 square-foot office/warehouse. According to Founder and Chief Executive Officer Jill Blashack Strahan, "Our amazing headquarters team and our 26,000 consultants have been critical in getting the company to the next level." She also noted that "vendors and service providers play an important role in helping us exceed expectations."

With this in mind, Tastefully Simple's Chief Financial Officer, Rick Miller, turned to Chubb in 2002 for property and casualty insurance protection, as well as critical loss control services. "Chubb has the ability and resources to help us as we build this business," noted Miller. "Its expertise in all areas of insurance — especially loss control — enables Chubb to bring solutions to the table that are in our best interest."

> "Its expertise in all areas of insurance — especially loss control — enables Chubb to bring solutions to the table that are in our best interest."

In 2007, Chubb continued to demonstrate how its loss control expertise could help protect Tastefully Simple employees. The addition of two warehouse conveyor lines resulted in increased forklift traffic and more chances for accidents. With the increase in business, employees had also begun to experience an increase in repetitive stress injuries. Chubb Loss Control worked with Tastefully Simple's risk manager to help develop and implement changes to forklift traffic patterns and to packaging and handling procedures.

"By providing all of Tastefully Simple's insurance coverages and loss-control services, we're able to offer true continuity of service," said Chubb's Krista Ksicinski, Commercial Insurance Specialty Senior Underwriter.

"Tastefully Simple has very high standards," noted Founding Partner and Chief Operating Officer Joani Nielson. "We want to work with the best of the best; that's how we're going to grow. Whether it's a food vendor or our insurance carrier, everyone we work with is an extension of our image. Chubb's commitment to offering quality products and service truly aligns with Tastefully Simple's culture and philosophy of doing business."

18



FICO0002317

# Chubb Service:  Listening to the Customer



*Photo at right:  Viewing farm equipment at the Iowa Power Farming Show in Des Moines are Amy Ventling, Chief Executive Officer, AGCO Finance, LLC, Duluth, Georgia (left), and Dennis J. Fedosa, Chief Executive Officer, Agricredit Acceptance, LLC, Johnston, Iowa.*

*Photo at left:  L. Pat Stoik, Vice President and Global Commercial Inland Marine Manager (left) visits Richard Mauk, Vice President and Branch Manager, at Chubb's Des Moines, Iowa, office.*

is market segmentation. More people are living in rural areas, and their needs are different from the large-scale commercial farmer. We need to have a comprehensive finance offering that is easily explained to our customers but that can be tailored to their individual needs."

In 2005, Agricredit Acceptance and AGCO Finance sought an insurance partner that fully understood their needs and had the flexibility to offer a product that would enhance each company's finance offering. Insurance is required for all financed or leased purchases of agricultural equipment. "Agricredit Acceptance and AGCO Finance needed a partner that could integrate the insurance offering into the finance quote process in a seamless manner," noted Pat Stoik, Vice President and Global Commercial Inland Marine Manager for Chubb. "We met their criteria."

Chubb provides property insurance protection for installment sales and leasing deals for agricultural equipment for Agricredit Acceptance and AGCO Finance customers. But what really impressed executives at the two companies was the development of a tailored automated process to transfer financial data between the company, its insurance agent, Holmes Murphy & Associates, and Chubb.

AGCO Finance Chief Executive Officer Amy Ventling said, "Chubb's willingness to listen and understand our needs has made this partnership a win for Agricredit Acceptance and AGCO Finance. The transition to Chubb was easy. Our experience with payment on losses has been very impressive, and our dealers and customers are quite satisfied with our program."

**W**ith roots that run deep in the agricultural community, Agricredit Acceptance, LLC, in Johnston, Iowa, and AGCO Finance, LLC, in Duluth, Georgia, provide financing options for the agriculture and food production industry. Agricredit Acceptance and AGCO Finance have a common parent company, De Lage Landen, a subsidiary of Rabobank Nederland, formed in the 1890's as a collection of small rural banks financing local farmers in the Netherlands.

Since Agricredit Acceptance opened its doors to the agribusiness community 50 years ago, many aspects of the industry have evolved. According to Agricredit Acceptance Chief Executive Officer Dennis J. Fedosa, "The greatest challenge for companies servicing this industry

> *"Chubb's willingness to listen and understand our needs has made this partnership a win for Agricredit and AGCO."*

FICO0002318



21

# Chubb Service:  Agency Education



*Photo at right:  Pictured behind a statue of Benjamin Franklin at the University of Pennsylvania in Philadelphia are (from left) William Pridgeon, Senior Vice President and Chief Financial Officer of Hylant Group, Toledo, Ohio; Jeffrey Perlman, Partner, Borden Perlman, Lawrenceville, New Jersey; and Susan Daley, Area President, Arthur J. Gallagher & Co., Aliso Viejo, California.*

*Photo at left: Pictured at the University of Pennsylvania in Philadelphia are (from left) Sandhya Karpe, Senior Director of Executive Programs at the Wharton School of the University of Pennsylvania; Elizabeth McDaid, Vice President, Agency Education Manager, Chubb; and Neil Doherty, Frederick H. Ecker Professor and Chairperson, Insurance and Risk Management at the Wharton School.*

*A*t Chubb, we understand that our reputation is only as good as that of the independent agents and brokers who sell our products. That's why Chubb places a high value on agency education and offers many opportunities for agents and brokers to advance their education in sales, management and leadership.

In 2001, Chubb partnered with the Wharton School of the University of Pennsylvania to offer a program to educate insurance agency executives. The partnership has grown steadily over the years, and today the Chubb/Wharton Recognized Insurance Leader Program offers a robust curriculum for agents and brokers throughout the year.

The curriculum is geared toward agency executives and begins with a five-day Executive Leadership Development Program. Among the many courses offered are growth through innovation, financial analysis, negotiating skills, and mergers and acquisitions.

"This is not about Chubb, and sometimes it's not even about insurance," said Elizabeth McDaid, Agency Education Manager for Chubb. "It's about making agency leaders more successful as business people."

Many agency executives return to further their education, and they can earn a Chubb/Wharton Certificate of Leadership Development and Recognized Insurance Leader designation by accumulating points through participation in the programs over a three-year period.

William Pridgeon, Senior Vice President and Chief Financial Officer of Hylant Group in Toledo, Ohio, participated in the Chubb/Wharton executive program in 2003 and completed three-day advanced leadership training on the Gettysburg battlefield in 2004. Pridgeon said the biggest benefit of the five-day introductory training was the ability to think strategically instead of tactically for a week. "I left with a list of things to start doing at work, but also a list of things to stop doing," he said.

Susan Daley, Area President, Arthur J. Gallagher & Co., Aliso Viejo, California, said the training helped her to find her "blind spots" and surround herself with people who can help make her more productive. "The Chubb/Wharton program was the single most beneficial adult learning experience I have ever had."

> "The Chubb/Wharton program was the single most beneficial adult learning experience I have ever had."

22



FICO0002321

# Employee Profiles

*Chubb's success depends on the performance of each employee. Meet six leaders whose accomplishments illustrate the many individual successes that have contributed to Chubb's extraordinary results in 2007.*





*I*n his role as Assistant Vice President and Commercial Underwriting Manager in Seoul, building the profitability and growth of Chubb in Korea is **Chang Tae Noh**'s primary goal. He also forges strategic alliances to maximize Chubb's business opportunities there.

"I've worked to develop Chubb's marine business in Korea through the country's growth in global exports and local market change," said Chang. "Using Chubb's underwriting expertise and global capability, we have been able to introduce product liability coverage to local manufacturers going global and technology



insurance to IT-related companies that currently make up a substantial portion of the Korean GDP."

In addition to expanding Chubb's ability to provide a diverse array of products in Korea, Chang's management talents have enabled Chubb's commercial operations in Korea to grow at a double-digit rate in 2007 while remaining profitable.

*S*tarting her career shortly after Chubb de Colombia first became a wholly owned Chubb subsidiary 18 years ago, **Claudia Vargas** has contributed to Chubb de Colombia's results from the very beginning. She now serves as Vice President and Commercial Underwriting Manager.

During the last five years, Claudia has helped guide Chubb's Colombian commercial operations to superior results — an average combined ratio of 62% and cumulative premium growth of 53%. Her contributions are not limited to financial results; she has also led Chubb de Colombia's diversity group since 2003.

"The respect the corporation gives to its employees through training, equal opportunity and recognition makes us a very committed group, oriented to the company's goals," said Claudia. "This is one of the reasons that Chubb de Colombia has been voted 'The Number One Property and Casualty Insurance Company in Colombia' by producers for five consecutive years."

*J*oining Chubb immediately after graduating from Western Michigan University, **Ken Stephens** has held nine positions of increasing responsibility during his 21-year career at Chubb. He has risen to Senior Vice President and Manager of Chubb's North Central United States specialty business, representing nearly a fifth of Chubb's specialty business worldwide.

When Ken began his current assignment, he was challenged to return the region's specialty business to profitability while shifting its underwriting focus in a marketplace of intense price competition. Since then, his region has surpassed the average annual profitability of Chubb's specialty business worldwide with a high customer-retention rate.

Ken credits his success to the many leaders he has worked for, and he seeks to pass on his knowledge and experience through his leadership of Chubb's Minority Development Council.

"I'm proud to work at a company that is sincere about its commitment to diversity," said Ken. "My belief is that the more diverse individuals progress to leadership, the more the corporation will benefit from a diversity of thought and leadership."

24

Although new to Chubb, **Denise Lewis** is no newcomer to the insurance industry. Currently Assistant Vice President and Human Resources Manager for Chubb's Atlanta and Birmingham offices, Denise has more than two decades of industry



experience in marketing and operations.

Since 2005, Denise has helped create a talent development initiative to increase employee leadership skills in the southern United States. Every year, her talent management team carefully selects high-potential employees to receive leadership education. After training, these individuals form teams and suggest ideas to develop new products and increase efficiency.

"This program has enabled participants to grow and develop dynamic leadership abilities, and their suggestions are enhancing Chubb's operations," said Denise. "I value the opportunity to contribute to talent development and add to Chubb's intellectual capital."

She has also worked to improve new-hire performance and retention while supporting the Atlanta branch's diversity and charitable activities.

Using her skills gleaned from four years as a broker and 11 as a personal lines underwriter, **Tara Parchment** knows how to balance the needs of brokers with Chubb's continued expense reduction initiatives.

As Assistant Vice President and Producer Development Manager for the United Kingdom and Ireland, Tara recently implemented a broker incentive program, based on the current model in the United States, whereby brokers who bring Chubb more profitable business receive higher incentives.

"By grouping our brokers based on performance, we can make sure that we're putting our limited resources where we get the best results," explained Tara.

The broker incentive program enabled Chubb to both significantly reduce expenses and show



brokers how to reach the next performance level. By training the sales team to deliver a consistent message about the financial reasons for incentive structure adjustments, Tara also helped to retain all 550 of the region's personal lines brokers — a tremendous accomplishment considering the local soft market, rate increases and competitor incentives.



Over the last two decades, Senior Vice President and International Chief Information Officer **Rick Gray** has spent more time abroad than in his native United States.

Previously on assignment in Singapore, Hong Kong and London, he cites his international experience as the key to his management success. As the International CIO, Rick ensures that, wherever possible, the 200 employees he manages integrate Chubb's international IT operations very closely with those in the United States.

"I view Chubb as a company that thinks globally but oftentimes has to act locally," explained Rick. "Although our primary focus is company-wide solutions, things do work differently in different marketplaces, and we need to be agile enough to adapt."

In his last position as Europe's CIO, Rick helped to outsource some of Chubb Europe's policy administration and finance activities to the Czech Republic and India. The project is expected to result in significant annual savings and enhanced operational efficiency.

25

FICO0002323

# The Chubb Corporation

## Officers

*Chairman, President and Chief Executive Officer*
John D. Finnegan

*Lead Director*
Joel J. Cohen

*Vice Chairman and Chief Operating Officer*
Thomas F. Motamed

*Vice Chairman and Chief Administrative Officer*
John J. Degnan

*Vice Chairman and Chief Financial Officer*
Michael O'Reilly

*Executive Vice Presidents*
Ned I. Gerstman
Marjorie D. Raines

*Executive Vice President and General Counsel*
Maureen A. Brundage

*Senior Vice Presidents*
Daniel J. Conway
Frederick W. Gaertner
Paul R. Geyer
Mark E. Greenberg
Andrew A. McElwee, Jr.
Glenn A. Montgomery
Henry B. Schram
Robert M. Witkoff

*Vice Presidents*
Stephen A. Fuller
Marc R. Hachey
Marylu Korkuch
Robert A. Marzocchi
Thomas J. Swartz, III
Steven M. Versaggi

*Vice President, Corporate Counsel and Secretary*
W. Andrew Macan

*Vice President and Treasurer*
Douglas A. Nordstrom

# Chubb & Son, a division of Federal Insurance Company

## Officers

*Chairman and Chief Executive Officer*
John D. Finnegan

*President and Chief Operating Officer*
Thomas F. Motamed

*Executive Vice Presidents*
Robert C. Cox
John J. Degnan
June E. Drewry
Sunita Holzer
Paul J. Krump
Andrew A. McElwee, Jr.
Harold L. Morrison, Jr.
Michael O'Reilly
Dino E. Robusto
Janice M. Tomlinson

*Executive Vice President and General Counsel*
Maureen A. Brundage

*Administrative Committee*
W. Brian Barnes
Maureen A. Brundage
Terrence W. Cavanaugh
Robert C. Cox
John J. Degnan
June E. Drewry
John D. Finnegan
Mark E. Greenberg
Sunita Holzer
Paul J. Krump
Andrew A. McElwee, Jr.
Harold L. Morrison
Thomas F. Motamed
Michael O'Reilly
Dino E. Robusto
Henry B. Schram
Janice M. Tomlinson

*Senior Vice Presidents*
Valerie A. Aguirre
James E. Altman
John C. Anderson
Joel D. Aronchick
William D. Aubigh
Gregory P. Barabas
Donald E. Barb
John A. Barrett
Mark L. Berthiaume
Jon C. Bidwell
Peter G. Boccher
Julia T. Boland
James F. Brosnan
Deborah L. Brunson
Alan C. Brown
R. Jeffery Brown
Timothy D. Buckley
Gerard M. Butler
John E. Casella
Michael J. Casella
Terrence W. Cavanaugh
Gardner R.G. Cunningham, Jr.
Robert E. Dabb
David S. Dalton
James A. Darling
Gary R. Delgreco
Christopher N. Di Sipio
Timothy R. Diveley
Kathleen M. Dubia
Mark D. Dugle
Alexis R. Durcan, Jr.

Mary M. Elliott
Kathleen S. Ellis
Timothy T. Ellis
Michele N. Fincher
Philip W. Fiscus
Thomas V. Fitzpatrick
Philip G. Folz
Paul W. Franklin
Anthony S. Galban
Thomas J. Ganter
Michael Garceau
James E. Gardiner
John C. Gibson, Jr.
Christopher J. Giles
John H. Gillespie
Baxter W. Graham
Jeffrey S. Grange
Rick A. Gray
Mark E. Greenberg
Donna M. Griffin
Charles S. Gunter
Marc R. Hachey
James R. Hamilton
Steven D. Hernandez
Jeffrey Hoffman
Kevin G. Hogan
Kim D. Hoorepe
Patricia A. Hurley
Gerald A. Ippolito
Hope Jarvis
Doris M. Johnson
Bettina E. Kelly
John J. Kennedy
James P. Knight
Mark P. Korsgaard
Eric T. Krantz
Uli Krull
John B. Kristiansen
Andrew N. LaGravenese
James V. Lalor
Kathleen S. Langner
Paul A. Larson
Kevin J. Leidwinger
Paul L. Lewis
Robert A. Lippert
Beverly J. Luehs
Amelia C. Lynch
Michael J. Maloney
Michael L. Marinaro
Kathleen D. Marvel
Robert A. Marzocchi
David P. Mc Keon
Michelle D. Middleton
Robert P. Midwood
John J. Mizzi
Ellen J. Moore
Frank Morelli
Lynn S. Neville
Frances D. O'Brien
Moses I. Ojeisekhoba
Michael W. O'Malley
Michael D. Opp
Rolando A. Orama
Daniel A. Pacicco
Nancy D. Pate-Nelson
Jane M. Peterson
Gary M. Petrosino
Steven R. Pozzi
Edward J. Radzinski
Barbara Ring
Christoph G. Ritterson
Eric M. Rivera
James C. Romanelli
Evan J. Rosenberg
Judith A. Sammarco

Timothy M. Shannahan
Richard I. Simon
Michael A. Sior
Kevin G. Smith
Gail W. Soja
Richard P. Soja
Jody E. Specht
Edward G. Spell
Scott R. Spencer
Kurt R. Stemmler
Kenneth J. Stephens
John M. Swords
Timothy J. Szerlong
Joel M. Tealer
Clifton E. Thomas
Bruce W. Thorne
Kathleen M. Tierney
Gary Trust
Peter J. Tucker
William P. Tully
William C. Turnbull, Jr.
Michele E. Twyman
Jeffrey A. Updyke
Susan M. Vella
Peter H. Vogt, II
Charles J. Walkonis
Susan C. Waltermire
Carole J. Weber
James L. West
Jeremy N.R. Winter

*Senior Vice President and Chief Accounting Officer*
Henry B. Schram

*Senior Vice President and Chief Actuary*
W. Brian Barnes

*Senior Vice Presidents and Actuaries*
James E. Biller
Linda M. Groh
Robert J. Hopper
Adrienne B. Kane
Michael E. McManus
Keith R. Spalding

*Senior Vice President and Deputy General Counsel*
Judith A. Heim

*Senior Vice Presidents and Associate General Counsels*
Matthew Campbell
Suzanne Johnston
Kirk J. Raslowsky
Linda F. Walker

*Senior Vice President and Treasurer*
Douglas A. Nordstrom

*Vice Presidents*
James R. Abercrombie
Jill A. Abere
Derek R. Adams
William M. Adams
Elizabeth A. Aguinaga
James D. Albertson
Brenda I. Alahas
George N. Allport
Angela W. Alper
Mary S. Aquino
Michael Arcuri

Ronald J. Arigo
Brendan Arnott
Dorothy M. Badger
Sybil Q. Bafford
Kirk O. Bailey
Gregory W. Bangs
Achilles L. Barbatsoulis
David A. Barclay
Frances M. Barfoot
Cynthia L. Barkman
Richard M. Barnett
William E. Barr, Jr.
David Bauman
John L. Bayley
Arthur J. Beaver
William R. Bell, III
Donna A. Belvedere
R. Kerry Besnia
David H. Bissell
Stanley V. Bloom
Julie Bond
Odette M. Bonvouloir
Charles A. Borda
Daniel J. Bosold
Dennis L. Bostedo, Jr.
Jeffrey M. Brown
Jeff H. Brundrett
John E. Bryer, III
John A. Burkhart, III
James D. Butchart
Sabine B. Cain
Walter K. Cain
Ronald Calvano
W. Michael Camfield
James M. Carson
John C. Cavanaugh
Michael A. Chang
Barnes L. Chatelain
Kenneth Chung
Richard A. Cicillo
Thomas C. Claasen
Laura D. Clark
Frank L. Claybrooks
Arthur W. Cohen
Richard N. Consoli
Judith A. Cook
Roberta Corbett
Brian B. Cottone
Edwin E. Creiter
Raymond L. Crisci, Jr.
William S. Crowley
Timothy E. Dadik
Christine A. Dart
Michael D. Daugherty
Mark W. Davis
Janet Decostro
David S. Deets
Carol A. Defrance
Michael C. DeMarco
Phillip C. Demmel
David Derwies Amelang
Joanne C. Diamond
Debra A. Dixen
James S. Dobson
Robert J. Donnelly
Brian J. Douglas
Wendy J. Dowd
Alfred C. Drowne
Keith M. Dunford
Leslie L. Edsall
Richard J. Edsall
Timothy G. Ehrhart
James P. Ekdahl
Robert C. Ellis, Jr.
Victoria S. Esposito

Heather S. Evans
Craig M. Farina
Timothy J. Farr
Thomas J. Fazio
Drew A. Feldman
Amy L. Feller
Karen E. Felderhm
Jeffrey B. Fischer
James A. Fiske
Brian J. Flynn
Peter A. Flynn
Patrick G. Fouche
Jill A. Francis
John B. Fuoss
Frederick W. Gaertner
Eileen L. Gallagher
Trevor S. Gandy
Wallace W. Gardner, Jr.
Donald M. Garvey, Jr.
Mark D. Gatliff
Irene T. Gaughan
Patrick Gerrity
Ned I. Gerstman
Ralph Giordano
Karen R. Gladden
Aaron Goldstein
Christine Gomes
Eugene B. Goodridge
Frank E. Gotchmitt
Anne S. Gouin
Perry S. Granof
Craig M. Grant
Joseph Gresia, Jr.
Patricia L. Hall
Nancy Halpin-Birkner
Robert A. Hamburger
Noel P. Hannon
Richard W. Haran
Patricia F. Harris
Richard A. Cillo
William R. Harrison
Gary L. Heard
Michael W. Heembrock
Lynne J. Heidelbach
Randolph L. Hein
Lorraine C. Heinen
Raymond Hendrickson
Frederick P. Hessenthaler
Steven M. Hill
Pamela D. Hoffman
Edward J. Howard
Michael S. Howey
Thomas B. Howland
Joaquin O. Hoyos
Anthony Iovine
Robert A. Iskols
Michael E. Jackson
Steven Jakubowski
Mark S. James
John M. Jeffrey
Colleen A. Jennings
Bradley M. Jones
Latrell Johnson
Kenneth C. Jones
Lisa M. Jones
John J. Juarez, Jr.
Celine L. Kacmarek
Arvind Kapoor
Dennis C. Kearns
James R. Keberris
David L. Keenan
Debra Ann Keiser
Robert G. Kelly
Timothy J. Kelly
Amy F. Kendall

Thomas R. Kerr
Elsbeth Kirkpatrick
Jeffrey Knieshaw
Cille Koch
Joseph M. Korkuch
Dieter W. Korte
Kathleen W. Koufacos
Joseph E. Kozlowski
Edgar Kroeze
Ralph La Canna
Kathleen V. Laprima
Anne La Fontaine
Barbara J. Langione
Terri L. Lathan
Mary M. Leahy
Amy M. Lenz
Kelly Lewis
Robert D. Lindberg
Frederick W. Lobdell
Mark A. Locke
Donna M. Lombardi
Matthew E. Lubin
John W. Luthringer
Edward J. Lynch
Terence P. Lynch
David E. Mack
Michael G. Mangini
Leona E. Mantie
Keith D. Marks
John C. Marques
Patricia S. Martz
Brian Mates
Eileen G. Mathews
Richard D. Mauk
Anthony McCuller
Elizabeth McDaid
Sandra K. Mc Dade
Frances K. Mc Guinn
Penny L. McGuire
Michelle McLaughlin
Joseph McLoughlin, Jr.
Neil W. McPherson
Denise B. Melick
Robert Meola
Allison W. Meta
Eileen G. Meyers
Ann M. Mintzer Conley
Joseph D. Miskell
Timothy L. Moehlenpah
Andrea M. Mollica
Gregory E. Monroe
Terry D. Montgomery
Michael K. Mooney
Paul N. Morrissette
Richard P. Munson
Patrick P. Murphy
Jeffery A. Neighbors
Ruth T. Nelson
Jennifer K. Newsom
Catherine J. Nielsen
David B. Norris, Jr.
Nancy A. O'Donnell
Stephen N. Oh
Kelly P. O'Leary
Thomas P. Olson
John A. O'Mara
Kathleen A. Orenczak
John S. Osabem
Mark C. Paccione
Catherine M. Padalino
Peter Palermo
Michael Palumbo
Christopher Parker
Louise T. Patregnani
Joanna B. Peiron
Audrey L. Petersen

FICO0002324

## Chubb & Son, a division of Federal Insurance Company (continued)

### Officers

Jeffrey Peterson
Irene D. Petillo
Donald W. Petrin
Michael S. Phillips
Mary Beth Pittinger
Robert J. Price
Ramona D. Pringle
Scott F. Pringle
Jennifer L. Proce
James H. Proferes
William J. Puleo
Danette Purkis
David L. Pych
Robert S. Rafferty
Marjorie D. Raines
Richard D. Reed
Robert Reedy
Walead A. Refai
Michael K. Reicher, II
James L. Rhyner
Merrily Riesebeck
Gary V. Rispoli

Nicholas Rizzi
Mark J. Robinson
Anne Rocco
Edward F. Rochford
Beatriz Rodriguez
Thomas J. Roessel
Jorge A. Rosas
June A. Rose
Victoria S. Rossetti
Jeffrey W. Ryan
Ruth M. Ryan
Carolyn M. Salapa
Barbara N. Sandelands
Franklin D. Sanders, Jr.
Robert F. Santoro
Eric D. Schall
Melissa P. Scheffler
Anthony C. Schiavone
Robert F. Schmid
Michael A. Schraer
Robert D. Schuck
Russell J. Schuren
Mark L. Schussel

Roma K. Seudat
Mary T. Sheridan
Leigh A. Sherman
Kristine A. Shields
Anthony W. Shine
Donald L. Siegrist, Jr.
Jason Skrant
Patricia S. Smith
Scott E. Smith
T. Clarke Smith, III
Richard E. Soleau
Veronica Somarriba
Victor J. Sordillo
Peter D. Stcer
Mario A. Stassi
Brian J. Steele
Victor C. Stewman
Lloyd J. Stoik
Michael C. Strakhov
Beth A. Strapp
Donat D. Straus
Robert K. Streeter
Jacquelyn C. Strobel

Patrick F. Sullivan
Scott B. Teller
James S. Thieringer
Jonathan Thomas
Charles E. Thompson
Eric W. Thompson
Peter J. Thompson
John J. Tomaine
Dionysia G. Toregas
Richard E. Towle
Joel S. Townsend
J. Tracy Tucker
John T. Tucker
Roy C. Tyson, III
Richard L. Ughetta
Paula C. Umreiko
Louise E. Vallee
Nivaldo Venturini
Bennett C. Verniero
Tracey A. Vispoli
John T. Volanski
Richard Vreeland
Kevin M. Waldron

Christine Wartella
Walter B. Washington
Maureen B. Waterbury
James L. Watson
Gregory Wells
Janece E. White
Patricia S. Whitehouse
David B. Williams
Grenes Eugene Williams
Owen E. Williams
Thomas R. Wing, Jr.
Suzanne L. Witt
Barbara A. Wittick
Bert Wolff, Jr.
Archyne S. Woodard
Gary C. Woodring
Steven Yacik
Jack S. Zacharias
John J. Zanzalari
Stephen J. Zappas
Ann H. Zaprazny
Cynthia Zegel
Dominick Zenzola

*Vice President and Secretary*
W. Andrew Macan

*Vice Presidents and Actuaries*
Peter V. Burchett
Joseph E. Freedman
Hye-Sook Kang
Kevin A. Kesby
Shu C. Lin
Kraig P. Peterson

*Vice President and Coverage Counsel*
Louis Nagy

*Vice Presidents and Associate Counsels*
Gail Arkin
James W. Gunson
James Sharkey

## Federal Insurance Company

### Officers

*Chief Executive Officer*
John D. Finnegan

*Chairman, President and Chief Operating Officer*
Thomas E. Motamed

*Senior Vice President and Chief Administrative Officer*
John J. Degnan

*Senior Vice President and Chief Financial Officer*
Michael O'Reilly

*Senior Vice President and General Counsel*
Maureen A. Brundage

*Senior Vice Presidents*
Brendon R. Allan
Stephen Blasina
Stanley V. Bloom
Paul Chapman
Michael Collins
Ian Cook
Andre Dallaire
Christopher J. Giles
Christopher Hamilton
Mark T. Lingafelter
Frederick W. Lobdell
Kevin O'Shiel
Gary C. Petrosino
Doreen Yip

*Vice Presidents*
James E. Altman
Paul Baldacchino
Kemsley Brennan
Roger C.P. Brookhouse
J. Airton Carvalho
Michael J. Casella
Terrence W. Cavanaugh
Jackie Chang
Bay Hon Chin
William C. Clarkson
Ann Marie Cook
Stephen De Gruchy
Mario Delrosso
Gregory D. Dodds
Jonathan Doherty

Matthew T. Doquile
Frederick W. Gaertner
Shasi Ganeadharan
Ned I. Gerstman
Paul R. Geyer
Andrew R. Gourley
Baxter W. Graham
Rick A. Gray
Jason Howard
Michael X. Howey
George X.Z. Huang
Karen A. Humphreys
James E. Kerns
Helen Koustas
Christopher R. Lees
Irene Liang
Amelia C. Lynch

Robert A. Marzocchi
Dermot McComiskey
David P. Mc Keon
Mark B. Mitchell
Glenn A. Montgomery
David B. Norris, Jr.
Rolando A. Orama
Steven J. Ord
Emma Osborne
Matthew Pasterfield
Marjorie D. Raines
Jorge A. Rosas
Francis Row
Adrienne Russell
Leo A. Schmidt
Henry B. Schram
John X. Stabelos

Jik C. Tay
Janice M. Tomlinson
Stephen D. Warren
Kyle Williams
Robert M. Witkoff
Esther Wong
Kiyoshi Yamamoto

*Vice President and Actuary*
W. Brian Barnes

*Vice President and Secretary*
W. Andrew Macan

*Vice President and Treasurer*
Douglas A. Nordstrom

## Chubb Insurance Company of Canada

### Officers

*Chairman*
Janice M. Tomlinson

*President and Chief Executive Officer*
Ellen J. Moore

*Senior Vice President and Chief Financial Officer*
Geoffrey D. Shields

*Senior Vice President, General Counsel and Secretary*
John F. Cairns

*Senior Vice Presidents*
Jean Bertrand
Nicole Brouillard
Giovanni Damiano
Paul N. Morrissette
James V. Newman

Andrew Steen
Susan Watts
David B. Williams

*Vice Presidents*
Barry Blackburn
LeeAnn Boyd

Dale Chow
Patricia Ewen
Paul Johnstone
Gaile Lewis
Mary Maloney
Jeffrey Marit
Christina Mcavella

Robert Murray
Michel Rousseau

*Vice President and Actuary*
Philip Jeffery

## Chubb Insurance Company of Europe, S.A.

### Officers

*President and Chief Executive Officer*
Christopher J. Giles

*Senior Vice Presidents*
Paul Chapman
Gardner R. Cunningham, Jr.
Thierry Daucourt
Johannes Etten
Carolyn Hamilton
Andrew McKee
Carlos Merino
Moses I. Ojeisekhoba

Jalil Rehman
Fred Shurbaji
Bernardus Van Der Vossen
Paul R. Van Pelt
Simon Wood

*Senior Vice President and Chief Financial Officer*
Kevin O'Shiel

*Senior Vice President and Actuary*
Colin Crouch

*Vice President, General Counsel and Secretary*
Ranald T. L. Munro

*Vice Presidents*
David Adams
Jan Auerbach
Ron Bakker
Hubert Belanger
Thierry Bourguignon
Bernhard Budde
Robert Cage
David Casement
Fiona Cox
Bijan Daftari

Guillaume Deal
Mark Edmondson
Halcyon Ellis
Richard Eveleigh
Andrew Francis
David Gibbs
Marta Gomez-Llorente
Brian Hardwick
Erik Hassel
Simon Hayter
Isabelle Hilaire
Monique Kooijman
Neil Lee-Amies
Philippe Leostic

Andreas Luberichs
Daniel Maurer
Jeremy Miles
Simon Mopey
Miguel Molina
Tom Newark
Rene Nieuwland
Stuart Payne
Bjorn Petersen
Hugh Pollington
Jonathan Poole
John Roome
Feliciano Ruiz
Vittorio Scala

Henrik Schwiening
Covington Shackleford
Alan Sheil
Veronica Somarriba
Chris Tait
Peter Thomas
Michael Thyssen
Lynn Twinn
Monique Van Der Linden
Sophie Van T'il Leedham
Brian Vosloh
Bernd Wiemann
Nigel Williams
Miles Wright

27

## The Chubb Corporation

**Directors**



Zoe Baird
*President*
The Markle Foundation



John D. Finnegan
*Chairman, President and Chief Executive Officer*
The Chubb Corporation



Jess Søderberg
*Retired Partner and Group CEO*
A.P. Moller-Maersk



Sheila P. Burke
*Research Faculty*
J.F. Kennedy School of Government,
Harvard University



Dr. Klaus J. Mangold
*Former Member of the Board*
Daimler AG



Daniel E. Somers
*Retired Vice Chairman*
Blaylock and Partners LP



James I. Cash, Ph.D.
*Professor Emeritus*
Harvard Business School



Martin G. McGuinn
*Retired Chairman and Chief Executive Officer*
Mellon Financial Corp.



Karen Hastie Williams
*Retired Partner*
Crowell & Moring LLP



Joel J. Cohen
*Lead Director*
The Chubb Corporation
*Chairman and Co-Chief Executive Officer*
Sagent Advisors Inc.



Sir David G. Scholey, CBE
*Senior Advisor*
UBS Investment Bank



Alfred W. Zollar
*General Manager*
Tivoli Software
IBM Corporation



Lawrence M. Small
*Former Secretary*
Smithsonian Institution

## Committees of the Board

**Audit Committee**
Joel J. Cohen (Chair)
Zoe Baird
Martin G. McGuinn
Daniel E. Somers
Alfred W. Zollar

**Organization & Compensation Committee**
Daniel E. Somers (Chair)
Sheila P. Burke
Martin G. McGuinn
Karen Hastie Williams
Alfred W. Zollar

**Executive Committee**
John D. Finnegan (Chair)
James I. Cash, Ph.D.
Joel J. Cohen
Daniel E. Somers

**Finance Committee**
John D. Finnegan (Chair)
Sheila P. Burke
Dr. Klaus J. Mangold
Sir David G. Scholey, CBE
Jess Søderberg

**Corporate Governance & Nominating Committee**
James I. Cash, Ph.D. (Chair)
Zoe Baird
Joel J. Cohen
Lawrence M. Small
Karen Hastie Williams

**Pension & Profit Sharing Committee**
Sheila P. Burke
Dr. Klaus J. Mangold
Sir David G. Scholey, CBE
Jess Søderberg

FICO0002326

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D. C. 20549

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM _____ TO_____

Commission File No. 1-8661

# The Chubb Corporation
*(Exact name of registrant as specified in its charter)*

| New Jersey | 13-2595722 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **15 Mountain View Road** **Warren, New Jersey** | **07059** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(908) 903-2000**
*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act:

| *(Title of each class)* | *(Name of each exchange on which registered)* |
|---|---|
| Common Stock, par value $1 per share | New York Stock Exchange |
| Series B Participating Cumulative Preferred Stock Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

None
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes [✔]  No [ ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.  Yes [ ]  No [✔]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes [✔]  No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer [✔]       Accelerated filer [ ]

Non-accelerated filer [ ]       Smaller reporting company [ ]
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes [ ]  No [✔]

The aggregate market value of common stock held by non-affiliates of the registrant was $21,242,705,472 as of June 30, 2007, computed on the basis of the closing sale price of the common stock on that date.

370,249,648
*Number of shares of common stock outstanding as of February 15, 2008*

### Documents Incorporated by Reference

Portions of the definitive Proxy Statement for the 2008 Annual Meeting of Shareholders are incorporated by reference in Part III of this Form 10-K.

## CONTENTS

| | ITEM | DESCRIPTION | PAGE |
|---|---|---|---|
| PART I | 1 | Business | 3 |
| | 1A | Risk Factors | 12 |
| | 1B | Unresolved Staff Comments | 17 |
| | 2 | Properties | 17 |
| | 3 | Legal Proceedings | 17 |
| | 4 | Submission of Matters to a Vote of Security Holders | 19 |
| PART II | 5 | Market for the Registrant's Common Stock and Related Stockholder Matters | 20 |
| | 6 | Selected Financial Data | 22 |
| | 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 23 |
| | 7A | Quantitative and Qualitative Disclosures About Market Risk | 61 |
| | 8 | Consolidated Financial Statements and Supplementary Data | 64 |
| | 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 64 |
| | 9A | Controls and Procedures | 64 |
| | 9B | Other Information | 65 |
| PART III | 10 | Directors and Executive Officers of the Registrant | 67 |
| | 11 | Executive Compensation | 67 |
| | 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 67 |
| | 13 | Certain Relationships and Related Transactions | 67 |
| | 14 | Principal Accountant Fees and Services | 67 |
| PART IV | 15 | Exhibits, Financial Statements and Schedules | 67 |
| | | Signatures | 68 |
| | | Index to Financial Statements and Financial Statement Schedules | F-1 |
| | | Exhibits Index | E-1 |

FICO0002328

PART I.

Item 1. *Business*

General

The Chubb Corporation (Chubb) was incorporated as a business corporation under the laws of the State of New Jersey in June 1967. Chubb and its subsidiaries are referred to collectively as the Corporation. Chubb is a holding company for a family of property and casualty insurance companies known informally as the Chubb Group of Insurance Companies (the P&C Group). Since 1882, the P&C Group has provided property and casualty insurance to businesses and individuals around the world. According to A.M. Best, the P&C Group is the 11th largest U.S. property and casualty insurance group based on 2006 net written premiums.

At December 31, 2007, the Corporation had total assets of $51 billion and shareholders' equity of $14 billion. Revenues, income before income tax and assets for each operating segment for the three years ended December 31, 2007 are included in Note (12) of the Notes to Consolidated Financial Statements. The Corporation employed approximately 10,600 persons worldwide on December 31, 2007.

The Corporation's principal executive offices are located at 15 Mountain View Road, Warren, New Jersey 07059, and our telephone number is (908) 903-2000.

The Corporation's internet address is www.chubb.com. The Corporation's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) of the Securities Exchange Act of 1934 are available free of charge on this website as soon as reasonably practicable after they have been electronically filed with or furnished to the Securities and Exchange Commission. Chubb's Corporate Governance Guidelines, charters of certain key committees of its Board of Directors, Restated Certificate of Incorporation, By-Laws, Code of Business Conduct and Code of Ethics for CEO and Senior Financial Officers are also available on the Corporation's website or by writing to the Corporation's Corporate Secretary.

Property and Casualty Insurance

The P&C Group is divided into three strategic business units. Chubb Commercial Insurance offers a full range of commercial insurance products, including coverage for multiple peril, casualty, workers' compensation and property and marine. Chubb Commercial Insurance is known for writing niche business, where our expertise can add value for our agents, brokers and policyholders. Chubb Specialty Insurance offers a wide variety of specialized professional liability products for privately and publicly owned companies, financial institutions, professional firms and healthcare organizations. Chubb Specialty Insurance also includes our surety business. Chubb Personal Insurance offers products for individuals with fine homes and possessions who require more coverage choices and higher limits than standard insurance policies.

In December 2005, the Corporation transferred its ongoing reinsurance assumed business to Harbor Point Limited. For a transition period of about two years, Harbor Point underwrote specific reinsurance business on the P&C Group's behalf. The P&C Group retained a portion of this business and ceded the balance to Harbor Point.

The P&C Group provides insurance coverages principally in the United States, Canada, Europe, Australia, and parts of Latin America and Asia. Revenues of the P&C Group by geographic area for the three years ended December 31, 2007 are included in Note (12) of the Notes to Consolidated Financial Statements.

The principal members of the P&C Group are Federal Insurance Company (Federal), Pacific Indemnity Company (Pacific Indemnity), Vigilant Insurance Company (Vigilant), Great Northern Insurance Company (Great Northern), Chubb Custom Insurance Company (Chubb Custom), Chubb National Insurance Company (Chubb National), Chubb Indemnity Insurance Company (Chubb Indemnity), Chubb Insurance Company of New Jersey (Chubb New Jersey), Texas Pacific Indemnity

FICO0002329

Company, Northwestern Pacific Indemnity Company, Executive Risk Indemnity Inc. (Executive Risk Indemnity) and Executive Risk Specialty Insurance Company (Executive Risk Specialty) in the United States, as well as Chubb Atlantic Indemnity Ltd. (a Bermuda company), Chubb Insurance Company of Canada, Chubb Insurance Company of Europe, S.A., Chubb Insurance Company of Australia Limited, Chubb Argentina de Seguros, S.A. and Chubb do Brasil Companhia de Seguros.

Federal is the manager of Vigilant, Pacific Indemnity, Great Northern, Chubb National, Chubb Indemnity, Chubb New Jersey, Executive Risk Indemnity and Executive Risk Specialty. Federal also provides certain services to other members of the P&C Group. Acting subject to the supervision and control of the boards of directors of the members of the P&C Group, Federal provides day to day executive management and operating personnel and makes available the economy and flexibility inherent in the common operation of a group of insurance companies.

*Premiums Written*

A summary of the P&C Group's premiums written during the past three years is shown in the following table:

| Year | Direct Premiums Written | Reinsurance Premiums Assumed (a) | Reinsurance Premiums Ceded (a) | Net Premiums Written |
|------|------|------|------|------|
| | | (in millions) | | |
| 2005 .......................... | $12,180 | $1,120 | $1,017 | $12,283 |
| 2006 .......................... | 12,224 | 954 | 1,204 | 11,974 |
| 2007 .......................... | 12,432 | 775 | 1,335 | 11,872 |

(a) Intercompany items eliminated.

The net premiums written during the last three years for major classes of the P&C Group's business are included in the Property and Casualty Insurance — Underwriting Results section of Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A).

One or more members of the P&C Group are licensed and transact business in each of the 50 states of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, Canada, Europe, Australia, and parts of Latin America and Asia.  In 2007, approximately 78% of the P&C Group's direct business was produced in the United States, where the P&C Group's businesses enjoy broad geographic distribution with a particularly strong market presence in the Northeast. The five states accounting for the largest amounts of direct premiums written were New York with 12%, California with 9%, Texas with 5%, New Jersey with 5% and Florida with 5%. No other state accounted for 5% of such premiums. Approximately 11% of the P&C Group's direct premiums written was produced in Europe and 5% was produced in Canada.

*Underwriting Results*

A frequently used industry measurement of property and casualty insurance underwriting results is the combined loss and expense ratio.  The P&C Group uses the combined loss and expense ratio calculated in accordance with statutory accounting principles applicable to property and casualty insurance companies. This ratio is the sum of the ratio of losses and loss expenses to premiums earned (loss ratio) plus the ratio of statutory underwriting expenses to premiums written (expense ratio) after reducing both premium amounts by dividends to policyholders.  When the combined ratio is under 100%, underwriting results are generally considered profitable; when the combined ratio is over 100%, underwriting results are generally considered unprofitable.  Investment income is not reflected in the combined ratio.  The profitability of property and casualty insurance companies depends on the results of both underwriting and investments operations.

4

FICO0002330

The combined loss and expense ratios during the last three years in total and for the major classes of the P&C Group's business are included in the Property and Casualty Insurance — Underwriting Operations section of MD&A.

Another frequently used measurement in the property and casualty insurance industry is the ratio of statutory net premiums written to policyholders' surplus. At December 31, 2007 and 2006, the ratio for the P&C Group was .91 and 1.05, respectively.

### Producing and Servicing of Business

The P&C Group does not utilize a significant in-house distribution model for its products. Instead, in the United States, the P&C Group offers products through approximately 5,000 independent insurance agencies and accepts business on a regular basis from approximately 500 insurance brokers. In most instances, these agencies and brokers also offer products of other companies that compete with the P&C Group. The P&C Group's branch and service offices assist these agencies and brokers in producing and servicing the P&C Group's business. In addition to the administrative offices in Warren and Whitehouse Station, New Jersey, the P&C Group has zone, branch and service offices throughout the United States.

The P&C Group offers products through approximately 3,000 insurance brokers outside the United States. Local branch offices of the P&C Group assist the brokers in producing and servicing the business. In conducting its foreign business, the P&C Group mitigates the risks relating to currency fluctuations by generally maintaining investments in those foreign currencies in which the P&C Group has loss reserves and other liabilities. The net asset or liability exposure to the various foreign currencies is regularly reviewed.

Business for the P&C Group is also produced through participation in certain underwriting pools and syndicates. Such pools and syndicates provide underwriting capacity for risks which an individual insurer cannot prudently underwrite because of the magnitude of the risk assumed or which can be more effectively handled by one organization due to the need for specialized loss control and other services.

### Reinsurance Ceded

In accordance with the normal practice of the insurance industry, the P&C Group cedes reinsurance to other insurance companies. Reinsurance is ceded to provide greater diversification of risk and to limit the P&C Group's maximum net loss arising from large risks or from catastrophic events.

A large portion of the P&C Group's ceded reinsurance is effected under contracts known as treaties under which all risks meeting prescribed criteria are automatically covered. Most of the P&C Group's treaty reinsurance arrangements consist of excess of loss and catastrophe contracts that protect against a specified part or all of certain types of losses over stipulated amounts arising from any one occurrence or event. In certain circumstances, reinsurance is also effected by negotiation on individual risks. The amount of each risk retained by the P&C Group is subject to maximum limits that vary by line of business and type of coverage. Retention limits are regularly reviewed and are revised periodically as the P&C Group's capacity to underwrite risks changes. For a discussion of the P&C Group's reinsurance program and the cost and availability of reinsurance, see the Property and Casualty Insurance — Underwriting Results section of MD&A.

Ceded reinsurance contracts do not relieve the P&C Group of the primary obligation to its policyholders. Thus, an exposure exists with respect to reinsurance recoverable to the extent that any reinsurer is unable to meet its obligations or disputes the liabilities assumed under the reinsurance contracts. The collectibility of reinsurance is subject to the solvency of the reinsurers, coverage interpretations and other factors. The P&C Group is selective in regard to its reinsurers, placing reinsurance with only those reinsurers that the P&C Group believes have strong balance sheets and superior underwriting ability. The P&C Group monitors the financial strength of its reinsurers on an ongoing basis.

FICO0002331

*Unpaid Losses and Loss Adjustment Expenses and Related Amounts Recoverable from Reinsurers*

Insurance companies are required to establish a liability in their accounts for the ultimate costs (including loss adjustment expenses) of claims that have been reported but not settled and of claims that have been incurred but not reported. Insurance companies are also required to report as assets the portion of such liability that will be recovered from reinsurers.

The process of establishing the liability for unpaid losses and loss adjustment expenses is complex and imprecise as it must take into consideration many variables that are subject to the outcome of future events. As a result, informed subjective estimates and judgments as to our ultimate exposure to losses are an integral component of our loss reserving process.

The anticipated effect of inflation is implicitly considered when estimating liabilities for unpaid losses and loss adjustment expenses. Estimates of the ultimate value of all unpaid losses are based in part on the development of paid losses, which reflect actual inflation. Inflation is also reflected in the case estimates established on reported open claims which, when combined with paid losses, form another basis to derive estimates of reserves for all unpaid losses. There is no precise method for subsequently evaluating the adequacy of the consideration given to inflation, since claim settlements are affected by many factors.

The P&C Group continues to emphasize early and accurate reserving, inventory management of claims and suits, and control of the dollar value of settlements. The number of outstanding claims at year-end 2007 was approximately 9% lower than the number at year-end 2006. The number of new arising claims during 2007 was 4% lower than in the prior year.

Additional information related to the P&C Group's estimates related to unpaid losses and loss adjustment expenses and the uncertainties in the estimation process is presented in the Property and Casualty Insurance — Loss Reserves section of MD&A.

The table on page 7 presents the subsequent development of the estimated year-end liability for unpaid losses and loss adjustment expenses, net of reinsurance recoverable, for the ten years prior to 2007. The Corporation acquired Executive Risk Inc. in 1999. The amounts in the table for the years 1997 and 1998 do not include Executive Risk's unpaid losses and loss adjustment expenses.

The top line of the table shows the estimated net liability for unpaid losses and loss adjustment expenses recorded at the balance sheet date for each of the indicated years. This liability represents the estimated amount of losses and loss adjustment expenses for claims arising in all years prior to the balance sheet date that were unpaid at the balance sheet date, including losses that had been incurred but not yet reported to the P&C Group.

The upper section of the table shows the reestimated amount of the previously recorded net liability based on experience as of the end of each succeeding year. The estimate is increased or decreased as more information becomes known about the frequency and severity of losses for each individual year. The increase or decrease is reflected in operating results of the period in which the estimate is changed. The "cumulative deficiency (redundancy)" as shown in the table represents the aggregate change in the reserve estimates from the original balance sheet dates through December 31, 2007. The amounts noted are cumulative in nature; that is, an increase in a loss estimate that is related to a prior period occurrence generates a deficiency in each intermediate year. For example, a deficiency recognized in 2007 relating to losses incurred prior to December 31, 1997 would be included in the cumulative deficiency amount for each year in the period 1997 through 2006. Yet, the deficiency would be reflected in operating results only in 2007. The effect of changes in estimates of the liabilities for losses occurring in prior years on income before income taxes in each of the past three years is shown in the reconciliation of the beginning and ending liability for unpaid losses and loss adjustment expenses in the Property and Casualty Insurance — Loss Reserves section of MD&A.

FICO0002332

## ANALYSIS OF LOSS AND LOSS ADJUSTMENT EXPENSE DEVELOPMENT

| Year Ended | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | |
| Net Liability for Unpaid Losses and Loss Adjustment Expenses | $8,564 | $9,050 | $9,749 | $10,051 | $11,010 | $12,642 | $14,521 | $16,809 | $18,713 | $19,699 | $20,316 |
| Net Liability Reestimated as of: | | | | | | | | | | | |
| One year later | 8,346 | 8,855 | 9,519 | 9,856 | 11,799 | 13,039 | 14,848 | 16,972 | 18,417 | 19,002 | |
| Two years later | 7,900 | 8,517 | 9,095 | 10,551 | 12,143 | 13,634 | 15,315 | 17,048 | 17,861 | | |
| Three years later | 7,565 | 8,058 | 9,653 | 10,762 | 12,642 | 14,407 | 15,667 | 16,725 | | | |
| Four years later | 7,145 | 8,527 | 9,740 | 11,150 | 13,246 | 14,842 | 15,584 | | | | |
| Five years later | 7,571 | 8,656 | 9,999 | 11,605 | 13,676 | 14,907 | | | | | |
| Six years later | 7,694 | 8,844 | 10,373 | 11,936 | 13,812 | | | | | | |
| Seven years later | 7,822 | 9,119 | 10,602 | 12,019 | | | | | | | |
| Eight years later | 8,061 | 9,324 | 10,702 | | | | | | | | |
| Nine years later | 8,247 | 9,434 | | | | | | | | | |
| Ten years later | 8,383 | | | | | | | | | | |
| Total Cumulative Net Deficiency (Redundancy) | (181) | 384 | 953 | 1,968 | 2,802 | 2,265 | 1,063 | (84) | (852) | (697) | |
| Cumulative Net Deficiency Related to Asbestos and Toxic Waste Claims (Included in Above Total) | 1,420 | 1,352 | 1,305 | 1,274 | 1,213 | 472 | 222 | 147 | 112 | 88 | |
| Cumulative Amount of Net Liability Paid as of: | | | | | | | | | | | |
| One year later | 1,798 | 2,520 | 2,483 | 2,794 | 3,085 | 3,399 | 3,342 | 4,031 | 3,948 | 3,873 | |
| Two years later | 3,444 | 3,708 | 4,079 | 4,669 | 5,354 | 5,671 | 6,095 | 6,594 | 6,586 | | |
| Three years later | 4,161 | 4,653 | 5,286 | 5,981 | 6,932 | 7,753 | 8,039 | 8,487 | | | |
| Four years later | 4,711 | 5,351 | 6,139 | 7,012 | 8,390 | 9,147 | 9,466 | | | | |
| Five years later | 5,133 | 5,894 | 6,829 | 7,894 | 9,378 | 10,250 | | | | | |
| Six years later | 5,481 | 6,326 | 7,382 | 8,635 | 10,126 | | | | | | |
| Seven years later | 5,807 | 6,680 | 7,926 | 9,159 | | | | | | | |
| Eight years later | 6,060 | 7,040 | 8,310 | | | | | | | | |
| Nine years later | 6,335 | 7,330 | | | | | | | | | |
| Ten years later | 6,599 | | | | | | | | | | |
| Gross Liability, End of Year | $9,772 | $10,357 | $11,435 | $11,904 | $15,515 | $16,713 | $17,948 | $20,292 | $22,482 | $22,293 | $22,623 |
| Reinsurance Recoverable, End of Year | 1,208 | 1,307 | 1,686 | 1,853 | 4,505 | 4,071 | 3,427 | 3,483 | 3,769 | 2,594 | 2,307 |
| Net Liability, End of Year | $8,564 | $9,050 | $9,749 | $10,051 | $11,010 | $12,642 | $14,521 | $16,809 | $18,713 | $19,699 | $20,316 |
| Reestimated Gross Liability | $9,507 | $11,050 | $13,117 | $14,828 | $19,243 | $19,688 | $19,318 | $20,119 | $21,410 | $21,565 | |
| Reestimated Reinsurance Recoverable | 1,424 | 1,616 | 2,415 | 2,809 | 5,431 | 4,781 | 3,734 | 3,394 | 3,549 | 2,563 | |
| Reestimated Net Liability | $8,383 | $9,434 | $10,702 | $12,019 | $13,812 | $14,907 | $15,584 | $16,725 | $17,861 | $19,002 | |
| Cumulative Gross Deficiency (Redundancy) | $ 35 | $ 693 | $ 1,682 | $ 2,924 | $ 3,728 | $ 2,975 | $ 1,370 | $ (173) | $(1,072) | $ (728) | |

The amounts for the years 1997 and 1998 do not include the unpaid losses and loss adjustment expenses of Executive Risk, which was acquired in 1999.

FICO0002333

The subsequent development of the net liability for unpaid losses and loss adjustment expenses as of year-ends 1997 through 2003 was adversely affected by substantial unfavorable development related to asbestos and toxic waste claims. The cumulative net deficiencies experienced related to asbestos and toxic waste claims were the result of: (1) an increase in the actual number of claims filed; (2) an increase in the estimated number of potential claims; (3) an increase in the severity of actual and potential claims; (4) an increasingly adverse litigation environment; and (5) an increase in litigation costs associated with such claims. For the years 1997 through 1999, the unfavorable development related to asbestos and toxic waste claims was offset in varying degrees by favorable loss experience in the professional liability classes, particularly directors and officers liability and fiduciary liability. For 2000, in addition to the unfavorable development related to asbestos and toxic waste claims, there was significant unfavorable development in the commercial casualty and workers' compensation classes. For the years 2001 through 2003, in addition to the unfavorable development related to asbestos and toxic waste claims, there was significant unfavorable development in the professional liability classes — principally directors and officers liability and errors and omissions liability, due in large part to adverse loss trends related to corporate failures and allegations of management misconduct and accounting irregularities — and the commercial casualty classes and, to a lesser extent, workers' compensation. For the years 2005 and 2006, there was significant favorable development, primarily in the professional liability classes due to favorable loss trends in recent years and in the homeowners and commercial property classes due to lower than expected emergence of losses.

Conditions and trends that have affected development of the liability for unpaid losses and loss adjustment expenses in the past will not necessarily recur in the future. Accordingly, it is not appropriate to extrapolate future redundancies or deficiencies based on the data in this table.

The middle section of the table on page 7 shows the cumulative amount paid with respect to the reestimated net liability as of the end of each succeeding year. For example, in the 1997 column, as of December 31, 2007 the P&C Group had paid $6,599 million of the currently estimated $8,383 million of net losses and loss adjustment expenses that were unpaid at the end of 1997; thus, an estimated $1,784 million of net losses incurred on or before December 31, 1997 remain unpaid as of December 31, 2007, approximately 53% of which relates to asbestos and toxic waste claims.

The lower section of the table on page 7 shows the gross liability, reinsurance recoverable and net liability recorded at the balance sheet date for each of the indicated years and the reestimation of these amounts as of December 31, 2007.

The liability for unpaid losses and loss adjustment expenses, net of reinsurance recoverable, reported in the accompanying consolidated financial statements prepared in accordance with generally accepted accounting principles (GAAP) comprises the liabilities of U.S. and foreign members of the P&C Group as follows:

|  | December 31 | |
|---|---|---|
|  | 2007 | 2006 |
|  | (in millions) | |
| U.S. subsidiaries ......................... | $16,597 | $16,492 |
| Foreign subsidiaries ..................... | 3,719 | 3,207 |
|  | $20,316 | $19,699 |

Members of the P&C Group are required to file annual statements with insurance regulatory authorities prepared on an accounting basis prescribed or permitted by such authorities (statutory basis). The difference between the liability for unpaid losses and loss expenses reported in the statutory basis financial statements of the U.S. members of the P&C Group and such liability reported on a GAAP basis in the consolidated financial statements is not significant.

FICO0002334

*Investments*

Investment decisions are centrally managed by investment professionals based on guidelines established by management and approved by the respective boards of directors for each company in the P&C Group.

Additional information about the Corporation's investment portfolio as well as its approach to managing risks is presented in the Invested Assets section of MD&A, the Investment Portfolio section of Quantitative and Qualitative Disclosures About Market Risk and Note (4) of the Notes to Consolidated Financial Statements.

The investment results of the P&C Group for each of the past three years are shown in the following table.

| Year | Average Invested Assets (a) | Investment Income (b) | Percent Earned | |
|---|---|---|---|---|
| | | | Before Tax | After Tax |
| | (in millions) | | | |
| 2005 ............................ | $30,570 | $1,315 | 4.30% | 3.45% |
| 2006 ............................ | 33,492 | 1,454 | 4.34 | 3.48 |
| 2007 ............................ | 36,406 | 1,590 | 4.37 | 3.50 |

(a) Average of amounts with fixed maturity securities at amortized cost, equity securities at market value and other invested assets, which include private equity limited partnerships, at the P&C Group's equity in the net assets of the partnerships.

(b) Investment income after deduction of investment expenses, but before applicable income tax.

## Competition

The property and casualty insurance industry is highly competitive both as to price and service. Members of the P&C Group compete not only with other stock companies but also with mutual companies, other underwriting organizations and alternative risk sharing mechanisms. Some competitors produce their business at a lower cost through the use of salaried personnel rather than independent agents and brokers. Rates are not uniform among insurers and vary according to the types of insurers, product coverage and methods of operation. The P&C Group competes for business not only on the basis of price, but also on the basis of financial strength, availability of coverage desired by customers and quality of service, including claim adjustment service. The P&C Group's products and services are generally designed to serve specific customer groups or needs and to offer a degree of customization that is of value to the insured. The P&C Group continues to work closely with its customers and to reinforce with them the stability, expertise and added value the P&C Group's products provide.

There are approximately 3,100 property and casualty insurance companies in the United States operating independently or in groups and no single company or group is dominant. However, the relatively large size and underwriting capacity of the P&C Group provide it opportunities not available to smaller companies.

## Regulation and Premium Rates

Chubb is a holding company with subsidiaries primarily engaged in the property and casualty insurance business and is therefore subject to regulation by certain states as an insurance holding company. All states have enacted legislation that regulates insurance holding company systems such as the Corporation. This legislation generally provides that each insurance company in the system is required to register with the department of insurance of its state of domicile and furnish information concerning the operations of companies within the holding company system that may materially affect the operations, management or financial condition of the insurers within the system. All transactions within a holding company system affecting insurers must be fair and equitable. Notice to the insurance commissioners is required prior to the consummation of transactions affecting the ownership or control of an insurer and of certain material transactions between an insurer and any person in its

FICO0002335

holding company system and, in addition, certain of such transactions cannot be consummated without the commissioners' prior approval.

Companies within the P&C Group are subject to regulation and supervision in the respective states in which they do business. In general, such regulation is designed to protect the interests of policyholders, and not necessarily the interests of insurers, their shareholders and other investors. The extent of such regulation varies but generally has its source in statutes that delegate regulatory, supervisory and administrative powers to a department of insurance. The regulation, supervision and administration relate, among other things, to: the standards of solvency that must be met and maintained; the licensing of insurers and their agents; restrictions on insurance policy terminations; unfair trade practices; the nature of and limitations on investments; premium rates; restrictions on the size of risks that may be insured under a single policy; deposits of securities for the benefit of policyholders; approval of policy forms; periodic examinations of the affairs of insurance companies; annual and other reports required to be filed on the financial condition of companies or for other purposes; limitations on dividends to policyholders and shareholders; and the adequacy of provisions for unearned premiums, unpaid losses and loss adjustment expenses, both reported and unreported, and other liabilities.

The extent of insurance regulation on business outside the United States varies significantly among the countries in which the P&C Group operates. Some countries have minimal regulatory requirements, while others regulate insurers extensively. Foreign insurers in many countries are subject to greater restrictions than domestic competitors. In certain countries, the P&C Group has incorporated insurance subsidiaries locally to improve its competitive position.

The National Association of Insurance Commissioners (NAIC) has a risk-based capital requirement for property and casualty insurance companies. The risk-based capital formula is used by state regulatory authorities to identify insurance companies that may be undercapitalized and that merit further regulatory attention. The formula prescribes a series of risk measurements to determine a minimum capital amount for an insurance company, based on the profile of the individual company. The ratio of a company's actual policyholders' surplus to its minimum capital requirement will determine whether any state regulatory action is required. At December 31, 2007, each member of the P&C Group had more than sufficient capital to meet the risk-based capital requirement. The NAIC periodically reviews the risk-based capital formula and changes to the formula could be considered in the future.

Regulatory requirements applying to premium rates vary from state to state, but generally provide that rates cannot be excessive, inadequate or unfairly discriminatory. In many states, these regulatory requirements can impact the P&C Group's ability to change rates, particularly with respect to personal lines products such as automobile and homeowners insurance, without prior regulatory approval. For example, in certain states there are measures that limit the use of catastrophe models or credit scoring as well as premium rate freezes or limitations on the ability to cancel or nonrenew certain policies, which can affect the P&C Group's ability to charge adequate rates.

Subject to legislative and regulatory requirements, the P&C Group's management determines the prices charged for its policies based on a variety of factors including loss and loss adjustment expense experience, inflation, anticipated changes in the legal environment, both judicial and legislative, and tax law and rate changes. Methods for arriving at prices vary by type of business, exposure assumed and size of risk. Underwriting profitability is affected by the accuracy of these assumptions, by the willingness of insurance regulators to approve changes in those rates that they control and by certain other matters, such as underwriting selectivity and expense control.

In all states, insurers authorized to transact certain classes of property and casualty insurance are required to become members of an insolvency fund. In the event of the insolvency of a licensed insurer writing a class of insurance covered by the fund in the state, companies in the P&C Group, together with the other fund members, are assessed in order to provide the funds necessary to pay certain claims against the insolvent insurer. Generally, fund assessments are proportionately based on the members' written premiums for the classes of insurance written by the insolvent insurer. In certain states, the P&C Group can recover a portion of these assessments through premium tax offsets and

10

FICO0002336

policyholder surcharges. In 2007, assessments of the members of the P&C Group amounted to $9 million. The amount of future assessments cannot be reasonably estimated.

Insurance regulation in certain states requires the companies in the P&C Group, together with other insurers operating in the state, to participate in assigned risk plans, reinsurance facilities and joint underwriting associations, which are mechanisms that generally provide applicants with various basic insurance coverages when they are not available in voluntary markets. Such mechanisms are most prevalent for automobile and workers' compensation insurance, but a majority of states also mandate that insurers, such as the P&C Group, participate in Fair Plans or Windstorm Plans, which offer basic property coverages to insureds where not otherwise available. Some states also require insurers to participate in facilities that provide homeowners, crime and other classes of insurance where periodic market constrictions may occur. Participation is based upon the amount of a company's voluntary written premiums in a particular state for the classes of insurance involved. These involuntary market plans generally are underpriced and produce unprofitable underwriting results.

In several states, insurers, including members of the P&C Group, participate in market assistance plans. Typically, a market assistance plan is voluntary, of limited duration and operates under the supervision of the insurance commissioner to provide assistance to applicants unable to obtain commercial and personal liability and property insurance. The assistance may range from identifying sources where coverage may be obtained to pooling of risks among the participating insurers. A few states require insurers, including members of the P&C Group, to purchase reinsurance from a mandatory reinsurance fund.

Although the federal government and its regulatory agencies generally do not directly regulate the business of insurance, federal initiatives often have an impact on the business in a variety of ways. Current and proposed federal measures that may significantly affect the P&C Group's business and the market as a whole include federal terrorism insurance, asbestos liability reform measures, tort reform, natural catastrophes, corporate governance, ergonomics, health care reform including the containment of medical costs, medical malpractice reform and patients' rights, privacy, e-commerce, international trade, federal regulation of insurance companies and the taxation of insurance companies.

Companies in the P&C Group are also affected by a variety of state and federal legislative and regulatory measures as well as by decisions of their courts that define and extend the risks and benefits for which insurance is provided. These include: redefinitions of risk exposure in areas such as water damage, including mold, flood and storm surge; products liability and commercial general liability; credit scoring; and extension and protection of employee benefits, including workers' compensation and disability benefits.

Pursuant to a December 2006 settlement agreement with the Attorneys General of New York, Connecticut and Illinois, the Corporation, among other things, agreed to no longer pay compensation to agents and brokers in the form of contingent commissions on all lines of its business. A number of other property and casualty insurance carriers and a number of insurance producers also have agreed with various regulatory agencies to no longer pay or accept, as applicable, contingent commissions in some or all lines of business. A small number of states have enacted compensation disclosure rules and it is possible that additional states may adopt such rules in the future.

Legislative and judicial developments pertaining to asbestos and toxic waste exposures are discussed in the Property and Casualty Insurance — Loss Reserves section of MD&A.

### Real Estate

The Corporation's wholly owned subsidiary, Bellemead Development Corporation (Bellemead), and its subsidiaries were involved in commercial development activities primarily in New Jersey and

FICO0002337

residential development activities primarily in central Florida. The real estate operations are in run-off. Additional information related to the Corporation's real estate operations is included in the Corporate and Other — Real Estate section of MD&A.

## Chubb Financial Solutions

Chubb Financial Solutions (CFS) provided customized financial products to corporate clients. CFS's business was primarily structured credit derivatives, principally as a counterparty in portfolio credit default swaps. CFS has been in run-off since April 2003. Since that date, CFS has terminated early or run-off nearly all of its contractual obligations within its financial products portfolio. Additional information related to CFS's operations is included in the Corporate and Other — Chubb Financial Solutions section of MD&A.

**Item 1A.** *Risk Factors*

The Corporation's business is subject to a number of risks, including those described below, that could have a material effect on the Corporation's results of operations, financial condition or liquidity and that could cause our operating results to vary significantly from period to period. References to "we," "us" and "our" appearing in this Form 10-K should be read to refer to the Corporation.

**If our property and casualty loss reserves are insufficient, our results could be adversely affected.**

The process of establishing loss reserves is complex and imprecise as it must take into consideration many variables that are subject to the outcome of future events. As a result, informed subjective estimates and judgments as to our ultimate exposure to losses are an integral component of our loss reserving process. Variations between our loss reserve estimates and the actual emergence of losses could be material and could have a material adverse effect on our results of operations and financial condition.

A further discussion of the risk factors related to our property and casualty loss reserves is presented in the Property and Casualty Insurance — Loss Reserves section of MD&A.

**The effects of emerging claim and coverage issues on our business are uncertain.**

As industry practices and legal, judicial, social, environmental and other conditions change, unexpected or unintended issues related to claims and coverage may emerge. These issues may adversely affect our business by either extending coverage beyond our underwriting intent or by increasing the number or size of claims. In some instances, these issues may not become apparent for some time after we have written the insurance policies that are affected by such issues. As a result, the full extent of liability under our insurance policies may not be known for many years after the policies are issued. Emerging claim and coverage issues could have a material adverse effect on our results of operations and financial condition.

**Catastrophe losses could materially and adversely affect our business.**

As a property and casualty insurance holding company, our insurance operations expose us to claims arising out of catastrophes. Catastrophes can be caused by various natural perils, including hurricanes and other windstorms, earthquakes, severe winter weather and brush fires. Catastrophes can also be man-made, such as a terrorist attack. The frequency and severity of catastrophes are inherently unpredictable. It is possible that both the frequency and severity of natural and man-made catastrophic events will increase.

The extent of losses from a catastrophe is a function of both the total amount of exposure under our insurance policies in the area affected by the event and the severity of the event. Most catastrophes are restricted to relatively small geographic areas; however, hurricanes and earthquakes may produce significant damage over larger areas, especially those that are heavily populated. Natural or man-made catastrophic events could cause claims under our insurance policies to be higher than we

FICO0002338

anticipated and could cause substantial volatility in our financial results for any fiscal quarter or year. Our ability to write new business could also be affected. We believe that increases in the value and geographic concentration of insured property and the effects of inflation could increase the severity of claims from catastrophic events in the future. In addition, states have from time to time passed legislation that has the effect of limiting the ability of insurers to manage catastrophe risk, such as legislation prohibiting insurers from withdrawing from catastrophe-exposed areas.

As a result of the foregoing, it is possible that the occurrence of any natural or man-made catastrophic event could have a material adverse effect on our business, results of operations, financial condition and liquidity. A further discussion of the risk factors related to catastrophes is presented in the Property and Casualty Insurance — Catastrophe Risk Management section of MD&A.

**The occurrence of certain catastrophic events could have a materially adverse effect on our systems and could impact our ability to conduct business effectively.**

Our computer, information technology and telecommunications systems, which we use to conduct our business, interface with and rely upon third-party systems. Systems failures or outages could compromise our ability to perform business functions in a timely manner, which could harm our ability to conduct business and hurt our relationships with our business partners and customers. In the event of a disaster such as a natural catastrophe, an industrial accident, a blackout, a computer virus, a terrorist attack or war, our systems may be inaccessible to our employees, customers or business partners for an extended period of time. Even if our employees or third party providers are able to report to work, they may be unable to perform their duties for an extended period of time if our computer, information technology or telecommunication systems are disabled or destroyed. Our systems could also be subject to physical and electronic break-ins, and subject to similar disruptions from unauthorized tampering. This may impede or interrupt our business operations, which could have a material adverse effect on our results of operations and financial condition.

**If we experience difficulties with outsourcing relationships, our ability to conduct our business might be negatively impacted.**

We outsource certain business and administrative functions to third parties. If we fail to develop and implement our outsourcing strategies or our third party providers fail to perform as anticipated, we may experience operational difficulties, increased costs and a loss of business that may have a material adverse effect on our results of operations and financial condition.

**The failure of the risk mitigation strategies we utilize could have a material adverse effect on our financial condition or results of operations.**

We utilize a number of strategies to mitigate our risk exposure, such as:

- engaging in vigorous underwriting;
- carefully evaluating terms and conditions of our policies;
- focusing on our risk aggregations by geographic zones, industry type, credit exposure and other bases; and
- ceding reinsurance.

However, there are inherent limitations in all of these tactics and no assurance can be given that an event or series of unanticipated events will not result in loss levels in excess of our probable maximum loss models, which could have a material adverse effect on our financial condition or results of operations.

FICO0002339

**Reinsurance coverage may not be available to us in the future at commercially reasonable rates or at all and we may not be able to collect all amounts due to us from reinsurers from whom we have purchased coverage.**

The availability and cost of reinsurance are subject to prevailing market conditions that are beyond our control. No assurances can be made that reinsurance will remain continuously available to us in amounts that we consider sufficient and at prices that we consider acceptable, which would cause us to increase the amount of risk we retain, reduce the amount of business we underwrite or look for alternatives to reinsurance. This, in turn, could have a material adverse effect on our financial condition or results of operations.

With respect to reinsurance coverages we have purchased, our ability to recover amounts due from reinsurers may be affected by the creditworthiness and willingness to pay of the reinsurers from whom we have purchased coverage. The inability or unwillingness of any of our reinsurers to meet their obligations to us could have a material adverse effect on our results of operations.

**Cyclicality of the property and casualty insurance industry may cause fluctuations in our results.**

The property and casualty insurance business historically has been cyclical, experiencing periods characterized by intense price competition, relatively low premium rates and less restrictive underwriting standards followed by periods of relatively low levels of competition, high premium rates and more selective underwriting standards. We expect this cyclicality to continue. The periods of intense price competition in the cycle could adversely affect our financial condition, profitability or cash flows.

A number of factors, including many that are volatile and unpredictable, can have a significant impact on cyclical trends in the property and casualty insurance industry and the industry's profitability. These factors include:

- an apparent trend of courts to grant increasingly larger awards for certain damages;
- catastrophic hurricanes, windstorms, earthquakes and other natural disasters, as well as the occurrence of man-made disasters (e.g., a terrorist attack);
- availability, price and terms of reinsurance;
- fluctuations in interest rates;
- changes in the investment environment that affect market prices of and income and returns on investments; and
- inflationary pressures that may tend to affect the size of losses experienced by insurance companies.

We cannot predict whether or when market conditions will improve, remain constant or deteriorate. Negative market conditions may impair our ability to write insurance at rates that we consider appropriate relative to the risk assumed. If we cannot write insurance at appropriate rates, our ability to transact business would be materially and adversely affected.

**Payment of obligations under surety bonds could adversely affect our future operating results.**

The surety business tends to be characterized by infrequent but potentially high severity losses. The majority of our surety obligations are intended to be performance-based guarantees. When losses occur, they may be mitigated, at times, by recovery rights to the customer's assets, contract payments, collateral and bankruptcy recoveries. We have substantial commercial and construction surety exposure for current and prior customers. In that regard, we have exposures related to surety bonds issued on behalf of companies that have experienced or may experience deterioration in creditworthiness. If the financial condition of these companies were adversely affected by the economy or otherwise, we may experience an increase in filed claims and may incur high severity losses, which could have a material adverse effect on our results of operations.

14

FICO0002340

**A downgrade in our credit ratings and financial strength ratings could adversely impact the competitive positions of our operating businesses.**

Credit ratings and financial strength ratings can be important factors in establishing our competitive position in the insurance markets. There can be no assurance that our ratings will continue for any given period of time or that they will not be changed. If our credit ratings were downgraded in the future, we could incur higher borrowing costs and may have more limited means to access capital. In addition, a downgrade in our financial strength ratings could adversely affect the competitive position of our insurance operations, including a possible reduction in demand for our products in certain markets.

**Our businesses are heavily regulated, and changes in regulation may reduce our profitability and limit our growth.**

Our insurance subsidiaries are subject to extensive regulation and supervision in the jurisdictions in which they conduct business. This regulation is generally designed to protect the interests of policyholders, and not necessarily the interests of insurers, their shareholders or other investors. The regulation relates to authorization for lines of business, capital and surplus requirements, investment limitations, underwriting limitations, transactions with affiliates, dividend limitations, changes in control, premium rates and a variety of other financial and nonfinancial components of an insurance company's business.

Virtually all states in which we operate require us, together with other insurers licensed to do business in that state, to bear a portion of the loss suffered by some insureds as the result of impaired or insolvent insurance companies. In addition, in various states, our insurance subsidiaries must participate in mandatory arrangements to provide various types of insurance coverage to individuals or other entities that otherwise are unable to purchase that coverage from private insurers. A few states require us to purchase reinsurance from a mandatory reinsurance fund. Such reinsurance funds can create a credit risk for insurers if not adequately funded by the state and, in some cases, the existence of a reinsurance fund could affect the prices charged for our policies. The effect of these and similar arrangements could reduce our profitability in any given period or limit our ability to grow our business.

In recent years, the state insurance regulatory framework has come under increased scrutiny, including scrutiny by federal officials, and some state legislatures have considered or enacted laws that may alter or increase state authority to regulate insurance companies and insurance holding companies. Further, the NAIC and state insurance regulators are continually reexamining existing laws and regulations, specifically focusing on modifications to statutory accounting principles, interpretations of existing laws and the development of new laws and regulations. Any proposed or future legislation or NAIC initiatives, if adopted, may be more restrictive on our ability to conduct business than current regulatory requirements or may result in higher costs.

**We cannot predict the outcome of the investigations into business practices in the property and casualty insurance industry or related legal proceedings, including any potential amounts that we may be required to pay.**

In recent years, Attorneys General and regulatory authorities of several states, the U.S. Securities and Exchange Commission, the U.S. Attorney for the Southern District of New York and certain non-U.S. regulatory authorities commenced investigations into certain business practices in the property and casualty insurance industry involving, among other things, (1) the payment of contingent commissions to brokers and agents and (2) loss mitigation and finite reinsurance arrangements. We have received, and may continue to receive, subpoenas and other information requests from Attorneys General or other regulatory agencies regarding similar issues.

15

In August 2007, the Attorney General of Ohio filed an action against us, as well as several other insurers and one broker, as a result of the Ohio Attorney General's business practices investigation. Although no other Attorney General or regulator has initiated an action against us and we have settled matters arising out of the investigations into business practices in the property and casualty insurance market by the Attorneys General of Connecticut, Illinois and New York, it is possible that such an action may be brought against us with respect to some or all of the issues that are the focus of the ongoing investigations. In addition, we have been named in legal proceedings brought by private plaintiffs arising out of these investigations. We cannot predict the ultimate outcome of these or any future investigations or legal proceedings, including any potential amounts that we may be required to pay in connection with them.

In addition, it is possible that one or more jurisdictions may adopt regulatory reforms as a result of these investigations. We cannot predict the impact of any such regulatory reforms on our ability to renew business or write new business.

**Intense competition for our products could harm our ability to maintain or increase our profitability and premium volume.**

The property and casualty insurance industry is highly competitive. We compete not only with other stock companies but also with mutual companies, other underwriting organizations and alternative risk sharing mechanisms. We compete for business not only on the basis of price, but also on the basis of financial strength, availability of coverage desired by customers and quality of service, including claim adjustment service. We may have difficulty in continuing to compete successfully on any of these bases in the future.

If competition limits our ability to write new business at adequate rates, our results of operations could be adversely affected.

**We are dependent on a distribution network comprised of independent insurance brokers and agents to distribute our products.**

We generally do not use salaried employees to promote or distribute our insurance products. Instead, we rely on a large number of independent insurance brokers and agents. Accordingly, our business is dependent on the willingness of these brokers and agents to recommend our products to their customers. Deterioration in relationships with our broker and agent distribution network could materially and adversely affect our ability to sell our products, which, in turn, could have a material adverse effect on our results of operations and financial condition.

**The inability of our insurance subsidiaries to pay dividends in sufficient amounts would harm our ability to meet our obligations and to pay future dividends.**

As a holding company, Chubb relies primarily on dividends from its insurance subsidiaries to meet its obligations for payment of interest and principal on outstanding debt obligations and to pay dividends to shareholders. The ability of our insurance subsidiaries to pay dividends in the future will depend on their statutory surplus, on earnings and on regulatory restrictions. We are subject to regulation by some states as an insurance holding company system. Such regulation generally provides that transactions between companies within the holding company system must be fair and equitable. Transfers of assets among affiliated companies, certain dividend payments from insurance subsidiaries and certain material transactions between companies within the system may be subject to prior notice to, or prior approval by, state regulatory authorities. The ability of our insurance subsidiaries to pay dividends is also restricted by regulations that set standards of solvency that must be met and maintained, that limit investments and that limit dividends to shareholders. These regulations may affect Chubb's insurance subsidiaries' ability to provide Chubb with dividends.

FICO0002342

**Our investments may suffer reduced returns or losses.**

The returns on our investment portfolio may be reduced or we may incur losses as a result of changes in general economic conditions, exchange rates, global capital market conditions and numerous other factors that are beyond our control. These factors may cause us to realize less than expected returns on invested assets, sell investments for a loss or write off or write down investments, any of which could have a material adverse effect on our results of operations or financial condition.

**Item 1B.**  *Unresolved Staff Comments*

None.

**Item 2.**  *Properties*

The executive offices of the Corporation are in Warren, New Jersey. The administrative offices of the P&C Group are located in Warren and Whitehouse Station, New Jersey. The P&C Group maintains zone, branch and service offices in major cities throughout the United States and also has offices in Canada, Europe, Australia, Latin America and Asia. Office facilities are leased with the exception of buildings in Whitehouse Station, New Jersey and Simsbury, Connecticut. Management considers its office facilities suitable and adequate for the current level of operations.

**Item 3.**  *Legal Proceedings*

As previously disclosed, beginning in December 2002, Chubb Indemnity was named in a series of actions commenced by various plaintiffs against Chubb Indemnity and other non-affiliated insurers in the District Courts in Nueces, Travis and Bexar Counties in Texas. The plaintiffs generally allege that Chubb Indemnity and the other defendants breached duties to asbestos product end-users and conspired to conceal risks associated with asbestos exposure. The plaintiffs seek to impose liability on insurers directly. The plaintiffs seek unspecified monetary damages and punitive damages. Pursuant to the asbestos reform bill passed by the Texas legislature in May 2005, these actions were transferred to the Texas state asbestos Multidistrict Litigation on December 1, 2005. Chubb Indemnity is vigorously defending all of these actions and has been successful in getting a number of them dismissed through summary judgment, special exceptions, or voluntary withdrawal by the plaintiff.

Beginning in June 2003, Chubb Indemnity was also named in a number of similar cases in Cuyahoga, Mahoning, and Trumbull Counties in Ohio. The allegations and the damages sought in the Ohio actions are substantially similar to those in the Texas actions. In May 2005, the Ohio Court of Appeals sustained the trial court's dismissal of a group of nine cases for failure to state a claim. Following the appellate court's decision, Chubb Indemnity and other non-affiliated insurers were dismissed from the remaining cases filed in Ohio, except for a single case which had been removed to federal court and transferred to the federal asbestos Multidistrict Litigation. There has been no activity in that case since its removal.

In December 2007, certain of Chubb's subsidiaries were named in an action filed in the Superior Court of Los Angeles County, California that contains allegations similar to those made in the Texas and Ohio actions. The subsidiaries are vigorously defending this action.

As previously disclosed, Chubb and certain of its subsidiaries have been involved in the investigations of certain business practices in the property and casualty insurance industry by various Attorneys General and other regulatory authorities of several states, the U.S. Securities and Exchange Commission, the U.S. Attorney for the Southern District of New York and certain non-U.S. regulatory authorities with respect to, among other things, (1) potential conflicts of interest and anti-competitive behavior arising from the payment of contingent commissions to brokers and agents and (2) loss mitigation and finite reinsurance arrangements. In connection with these investigations, Chubb and certain of its subsidiaries received subpoenas and other requests for information from various regulators. The Corporation has been cooperating fully with these investigations. In December 2006, the Corporation settled with the Attorneys General of New York, Connecticut and Illinois all issues arising out of their investigations. As described in more detail below, the Attorney General of Ohio in

17

FICO0002343

August 2007 filed an action against Chubb and certain of its subsidiaries, as well as several other insurers and one broker, as a result of the Ohio Attorney General's business practices investigation. Although no other Attorney General or regulator has initiated an action against the Corporation, it is possible that such an action may be brought against the Corporation with respect to some or all of the issues that are the focus of these ongoing investigations.

As previously disclosed, individual actions and purported class actions arising out of the investigations into the payment of contingent commissions to brokers and agents have been filed in a number of federal and state courts. On August 1, 2005, Chubb and certain of its subsidiaries were named in a putative class action entitled *In re Insurance Brokerage Antitrust Litigation* in the U.S. District Court for the District of New Jersey. This action, brought against several brokers and insurers on behalf of a class of persons who purchased insurance through the broker defendants, asserts claims under the Sherman Act and state law and the Racketeer Influenced and Corrupt Organizations Act (RICO) arising from the alleged unlawful use of contingent commission agreements.

Chubb and certain of its subsidiaries have also been named as defendants in two purported class actions relating to allegations of unlawful use of contingent commission arrangements that were originally filed in state court. The first was filed on February 16, 2005 in Seminole County, Florida. The second was filed on May 17, 2005 in Essex County, Massachusetts. Both cases were removed to federal court and then transferred by the Judicial Panel on Multidistrict Litigation to the U.S. District Court for the District of New Jersey for consolidation with the *In re Insurance Brokerage Antitrust Litigation*. Since being transferred to the District of New Jersey, the plaintiff in the former action has been inactive, and that action currently is stayed. The latter action has been voluntarily dismissed. On September 28, 2007, the U.S. District Court for the District of New Jersey dismissed the second amended complaint filed by the plaintiffs in *In re Insurance Brokerage Antitrust Litigation* in its entirety. In so doing, the court dismissed the plaintiffs' Sherman Act and RICO claims with prejudice for failure to state a claim, and it dismissed the plaintiffs' state law claims without prejudice because it declined to exercise supplemental jurisdiction over them. The plaintiffs have appealed the dismissal of their second amended complaint to the U.S. Court of Appeals for the Third Circuit, and that appeal is currently pending.

In December 2005, Chubb and certain of its subsidiaries were named in a putative class action similar to the *In re Insurance Brokerage Antitrust Litigation*. The action is pending in the U.S. District Court for the District of New Jersey and has been assigned to the judge who is presiding over the *In re Insurance Brokerage Antitrust Litigation*. The complaint has never been served in this matter. Separately, in April 2006, Chubb and one of its subsidiaries were named in an action similar to the *In re Insurance Brokerage Antitrust Litigation*. This action was filed in the U.S. District Court for the Northern District of Georgia and subsequently was transferred by the Judicial Panel on Multidistrict Litigation to the U.S. District for the District of New Jersey for consolidation with the *In re Insurance Brokerage Antitrust Litigation*. This action currently is stayed. On May 21, 2007, Chubb and one of its subsidiaries were named as defendants in another action similar to *In re Insurance Brokerage Antitrust Litigation*. This action was filed in the U.S. District Court for the District of New Jersey and consolidated with *In re Insurance Brokerage Antitrust Litigation*. This action currently is stayed.

On October 12, 2007, certain of Chubb's subsidiaries were named as defendants in an action similar to *In re Insurance Brokerage Antitrust Litigation*. This action was filed in the U.S. District Court for the Northern District of Georgia. This action has been identified to the Judicial Panel on Multidistrict Litigation as a potential "tag-along action" to *In re Insurance Brokerage Antitrust Litigation*. The Corporation currently anticipates that this action will be transferred by the Judicial Panel on Multidistrict Litigation to the U.S. District Court for the District of New Jersey and consolidated with *In re Insurance Brokerage Antitrust Litigation*.

On August 24, 2007, Chubb and certain of its subsidiaries were named as defendants in an action filed by the Ohio Attorney General against several insurers and one broker. This action alleges

18

FICO0002344

violations of Ohio's antitrust laws. On November 18, 2007, the Corporation filed a motion to dismiss the Attorney General's complaint which is still pending.

In these actions, the plaintiffs generally allege that the defendants unlawfully used contingent commission agreements and conspired to reduce competition in the insurance markets. The actions seek treble damages, injunctive and declaratory relief, and attorneys' fees. The Corporation believes it has substantial defenses to all of the aforementioned legal proceedings and intends to defend the actions vigorously. It is possible that the Corporation may become involved in additional litigation of this sort.

Information regarding certain litigation to which the P&C Group is a party is included in the Property and Casualty Insurance — Loss Reserves section of MD&A.

Chubb and its subsidiaries are also defendants in various lawsuits arising out of their businesses. It is the opinion of management that the final outcome of these matters will not materially affect the Corporation's results of operations or financial condition.

### Item 4.  *Submission of Matters to a Vote of Security Holders*

No matters were submitted to a vote of the shareholders during the quarter ended December 31, 2007.

### *Executive Officers of the Registrant*

| | Age (a) | Year of Election (b) |
|---|---|---|
| John D. Finnegan, Chairman, President and Chief Executive Officer . . . . . . . . . . . . . . . . . . | 59 | 2002 |
| Maureen A. Brundage, Executive Vice President and General Counsel . . . . . . . . . . . . . . . . | 51 | 2005 |
| Robert C. Cox, Executive Vice President of Chubb & Son, a division of Federal . . . . . . . . . | 50 | 2003 |
| John J. Degnan, Vice Chairman and Chief Administrative Officer . . . . . . . . . . . . . . . . . . . . . | 63 | 1994 |
| Paul J. Krump, Executive Vice President of Chubb & Son, a division of Federal . . . . . . . . | 48 | 2001 |
| Andrew A. McElwee, Jr., Executive Vice President of Chubb & Son, a division of Federal . . | 53 | 1997 |
| Thomas F. Motamed, Vice Chairman and Chief Operating Officer . . . . . . . . . . . . . . . . . . . . . | 59 | 1997 |
| Dino E. Robusto, Executive Vice President of Chubb & Son, a division of Federal . . . . . . | 49 | 2006 |
| Michael O'Reilly, Vice Chairman and Chief Financial Officer . . . . . . . . . . . . . . . . . . . . . . . . . | 64 | 1976 |
| Henry B. Schram, Senior Vice President and Chief Accounting Officer . . . . . . . . . . . . . . . . | 61 | 1985 |

(a)  Ages listed above are as of April 29, 2008.

(b)  Date indicates year first elected or designated as an executive officer.

All of the foregoing officers serve at the pleasure of the Board of Directors of the Corporation and have been employees of the Corporation for more than five years except for Ms. Brundage.

Before joining the Corporation in 2005, Ms. Brundage was a partner in the law firm of White & Case LLP, where she headed the securities practice in New York and co-chaired its global securities practice.

FICO0002345

PART II.

Item 5.  *Market for the Registrant's Common Stock and Related Stockholder Matters*

The common stock of Chubb is listed and principally traded on the New York Stock Exchange (NYSE) under the trading symbol "CB". The following are the high and low closing sale prices as reported on the NYSE Composite Tape and the quarterly dividends declared per share for each quarter of 2007 and 2006.

| | 2007 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Common stock prices | | | | |
| High | $53.34 | $55.91 | $54.63 | $55.52 |
| Low | 48.82 | 51.68 | 47.36 | 49.80 |
| Dividends declared | .29 | .29 | .29 | .29 |

| | 2006 | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Common stock prices | | | | |
| High | $49.45 | $52.55 | $52.55 | $54.65 |
| Low | 46.80 | 47.60 | 47.40 | 51.35 |
| Dividends declared | .25 | .25 | .25 | .25 |

At February 15, 2008, there were approximately 9,300 common shareholders of record.

The declaration and payment of future dividends to Chubb's shareholders will be at the discretion of Chubb's Board of Directors and will depend upon many factors, including the Corporation's operating results, financial condition and capital requirements, and the impact of regulatory constraints discussed in Note (19)(f) of the Notes to Consolidated Financial Statements.

The following table summarizes the stock repurchased by Chubb during each month in the quarter ended December 31, 2007.

| Period | Total Number of Shares Purchased(a) | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs(b) |
|---|---|---|---|---|
| October 2007 | 1,183,564 | $53.96 | 1,183,564 | 6,742,558 |
| November 2007 | 2,402,166 | 51.87 | 2,402,166 | 4,340,392 |
| December 2007 | 6,227,722 | 54.07 | 6,227,722 | 26,112,670 |
| Total | 9,813,452 | 53.52 | 9,813,452 | |

(a)  The stated amounts exclude 28,677 shares, 42,773 shares and 6,803 shares delivered to Chubb during the months of October 2007, November 2007 and December 2007, respectively, by employees of the Corporation to cover option exercise prices and withholding taxes in connection with the Corporation's stock-based compensation plans.

(b)  On December 7, 2006, the Board of Directors authorized the repurchase of up to 20,000,000 shares of common stock. On March 21, 2007, the Board of Directors authorized an increase of 20,000,000 shares to the authorization approved in December 2006. No shares remain under this share repurchase authorization. On December 13, 2007, the Board of Directors authorized the repurchase of up to 28,000,000 additional shares of common stock. The authorization has no expiration date.

FICO0002346

**Stock Performance Graph**

The following performance graph compares the performance of Chubb's common stock during the five-year period from December 31, 2002 through December 31, 2007 with the performance of the Standard & Poor's 500 Index and the Standard & Poor's Property & Casualty Insurance Index. The graph plots the changes in value of an initial $100 investment over the indicated time periods, assuming all dividends are reinvested.

**Cumulative Total Return**
**Based upon an initial investment of $100 on December 31, 2002**
**with dividends reinvested**



|  | December 31 | | | | | |
|---|---|---|---|---|---|---|
|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Chubb | $100 | $134 | $154 | $200 | $221 | $233 |
| S&P 500 | 100 | 129 | 143 | 150 | 173 | 183 |
| S&P 500 Property & Casualty Insurance | 100 | 126 | 140 | 161 | 181 | 156 |

Our filings with the Securities and Exchange Commission (SEC) may incorporate information by reference, including this Form 10-K. Unless we specifically state otherwise, the information under this heading "Stock Performance Graph" shall not be deemed to be "soliciting materials" and shall not be deemed to be "filed" with the SEC or incorporated by reference into any of our filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.

FICO0002347

Item 6.  *Selected Financial Data*

| | 2007 | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|---|
| | (in millions except for per share amounts) | | | | |
| **FOR THE YEAR** | | | | | |
| Revenues | | | | | |
| Property and Casualty Insurance | | | | | |
| Premiums Earned ................. | $11,946 | $11,958 | $12,176 | $11,636 | $10,183 |
| Investment Income ................ | 1,622 | 1,485 | 1,342 | 1,207 | 1,083 |
| Other Revenues ................... | 11 | — | — | — | — |
| Corporate and Other .............. | 154 | 315 | 181 | 116 | 44 |
| Realized Investment Gains .......... | 374 | 245 | 384 | 218 | 84 |
| Total Revenues .................. | $14,107 | $14,003 | $14,083 | $13,177 | $11,394 |
| **Income** | | | | | |
| Property and Casualty Insurance | | | | | |
| Underwriting Income (a) .......... | $ 2,116 | $ 1,905 | $  921(b) | $  846 | $  105 |
| Investment Income ................ | 1,590 | 1,454 | 1,315 | 1,184 | 1,058 |
| Other Income (Charges) ........... | 6 | 10 | (1) | (4) | (30) |
| Property and Casualty | | | | | |
| Insurance Income ................ | 3,712 | 3,369 | 2,235 | 2,026 | 1,133 |
| Corporate and Other .............. | (149) | (89) | (172) | (176) | (283) |
| Realized Investment Gains .......... | 374 | 245 | 384 | 218 | 84 |
| Income Before Income Tax .......... | 3,937 | 3,525 | 2,447 | 2,068 | 934 |
| Federal and Foreign Income Tax ...... | 1,130 | 997 | 621 | 520 | 125 |
| Net Income ....................... | $ 2,807 | $ 2,528 | $ 1,826 | $ 1,548 | $  809 |
| **Per Share** | | | | | |
| Net Income ....................... | $  7.01 | $  5.98 | $  4.47 | $  4.01 | $  2.23 |
| Dividends Declared on | | | | | |
| Common Stock ................... | 1.16 | 1.00 | .86 | .78 | .72 |
| **AT DECEMBER 31** | | | | | |
| Total Assets ....................... | $50,574 | $50,277 | $48,061 | $44,260 | $38,361 |
| Long Term Debt .................... | 3,460 | 2,466 | 2,467 | 2,814 | 2,814 |
| Total Shareholders' Equity ........... | 14,445 | 13,863 | 12,407 | 10,126 | 8,522 |
| Book Value Per Share ................ | 38.56 | 33.71 | 29.68 | 26.28 | 22.67 |

(a)  Underwriting income reflected net losses of $88 million ($57 million after-tax or $0.14 per share) in 2007, $24 million ($16 million after-tax or $0.04 per share) in 2006, $35 million ($23 million after-tax or $0.06 per share) in 2005, $75 million ($49 million after-tax or $0.13 per share) in 2004 and $250 million ($163 million after-tax or $0.45 per share) in 2003 related to asbestos and toxic waste claims.

(b)  Underwriting income in 2005 reflected net costs of $462 million ($300 million after-tax or $0.74 per share) related to Hurricane Katrina.

FICO0002348

Item 7.  *Management's Discussion and Analysis of Financial Condition and Results of Operations*

Management's Discussion and Analysis of Financial Condition and Results of Operations addresses the financial condition of the Corporation as of December 31, 2007 compared with December 31, 2006 and the results of operations for each of the three years in the period ended December 31, 2007. This discussion should be read in conjunction with the consolidated financial statements and related notes and the other information contained in this report.

### INDEX

|  | PAGE |
|---|---|
| Cautionary Statement Regarding Forward-Looking Information | 24 |
| Critical Accounting Estimates and Judgments | 26 |
| Overview | 26 |
| Property and Casualty Insurance | 27 |
|   Underwriting Operations | 28 |
|     Underwriting Results | 28 |
|       *Net Premiums Written* | 28 |
|       *Reinsurance Ceded* | 29 |
|       *Profitability* | 30 |
|     Review of Underwriting Results by Business Unit | 32 |
|       *Personal Insurance* | 32 |
|       *Commercial Insurance* | 33 |
|       *Specialty Insurance* | 35 |
|       *Reinsurance Assumed* | 36 |
|     Regulatory Developments | 36 |
|     Catastrophe Risk Management | 37 |
|       *Natural Catastrophes* | 37 |
|       *Terrorism Risk and Legislation* | 37 |
|     Loss Reserves | 39 |
|       *Estimates and Uncertainties* | 40 |
|       *Reserves Other than Those Relating to Asbestos and Toxic Waste Claims* | 41 |
|       *Reserves Relating to Asbestos and Toxic Waste Claims* | 45 |
|         *Asbestos Reserves* | 45 |
|         *Toxic Waste Reserves* | 48 |
|         *Reinsurance Recoverable* | 49 |
|       *Prior Year Loss Development* | 49 |
|   Investment Results | 53 |
|   Other Income and Charges | 53 |
| Corporate and Other | 53 |
|   Real Estate | 53 |
|   Chubb Financial Solutions | 54 |
| Realized Investment Gains and Losses | 54 |
| Income Taxes | 55 |
| Capital Resources and Liquidity | 56 |
|   Capital Resources | 56 |
|   Ratings | 57 |
|   Liquidity | 58 |
|   Contractual Obligations and Off-Balance Sheet Arrangements | 59 |
| Invested Assets | 60 |
| Change in Accounting Principles | 61 |

FICO0002349

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING INFORMATION

*Certain statements in this document are "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995 (PSLRA). These forward-looking statements are made pursuant to the safe harbor provisions of the PSLRA and include statements regarding our loss reserve and reinsurance recoverable estimates; the impact of future catastrophes on our results of operations, financial condition or liquidity; asbestos liability developments; the number and severity of surety-related claims; the impact of changes to our reinsurance program in 2006 and 2007 on our results of operations, financial condition or liquidity and the cost and availability of reinsurance in 2008; the adequacy of the rates at which we renewed and wrote new business; premium volume and competition in 2008; the impact of investigations into market practices in the property and casualty insurance industry and any resulting business reforms; changes to our producer compensation program; estimates with respect to our credit derivatives exposure; provisions for impairment of our real estate assets; the repurchase of common stock under our share repurchase program; our capital adequacy and funding of liquidity needs; and the overall effect of interest rate risk on us. Forward-looking statements are made based upon management's current expectations and beliefs concerning trends and future developments and their potential effects on us. These statements are not guarantees of future performance. Actual results may differ materially from those suggested by forward-looking statements as a result of risks and uncertainties, which include, among others, those discussed or identified from time to time in our public filings with the Securities and Exchange Commission and those associated with:*

- global political conditions and the occurrence of terrorist attacks, including any nuclear, biological, chemical or radiological events;

- the effects of the outbreak or escalation of war or hostilities;

- premium pricing and profitability or growth estimates overall or by lines of business or geographic area, and related expectations with respect to the timing and terms of any required regulatory approvals;

- adverse changes in loss cost trends;

- our ability to retain existing business;

- our expectations with respect to cash flow projections and investment income and with respect to other income;

- the adequacy of loss reserves, including:

  - our expectations relating to reinsurance recoverables;

  - the willingness of parties, including us, to settle disputes;

  - developments in judicial decisions or regulatory or legislative actions relating to coverage and liability, in particular, for asbestos, toxic waste and other mass tort claims;

  - development of new theories of liability;

  - our estimates relating to ultimate asbestos liabilities;

  - the impact from the bankruptcy protection sought by various asbestos producers and other related businesses; and

  - the effects of proposed asbestos liability legislation, including the impact of claims patterns arising from the possibility of legislation and those that may arise if legislation is not passed;

- the availability and cost of reinsurance coverage;

- the occurrence of significant weather-related or other natural or human-made disasters, particularly in locations where we have concentrations of risk;

FICO0002350

- the impact of economic factors on companies on whose behalf we have issued surety bonds, and in particular, on those companies that file for bankruptcy or otherwise experience deterioration in creditworthiness;

- the effects of disclosures by, and investigations of, companies relating to possible accounting irregularities, practices in the financial services industry, investment losses or other corporate governance issues, including:

  - claims and litigation arising out of stock option "backdating," "spring loading" and other option grant practices by public companies;

  - the effects on the capital markets and the markets for directors and officers and errors and omissions insurance;

  - claims and litigation arising out of actual or alleged accounting or other corporate malfeasance by other companies;

  - claims and litigation arising out of practices in the financial services industry; and

  - legislative or regulatory proposals or changes;

- the effects of changes in market practices in the U.S. property and casualty insurance industry, in particular contingent commissions and loss mitigation and finite reinsurance arrangements, arising from any legal or regulatory proceedings, related settlements and industry reform, including changes that have been announced and changes that may occur in the future;

- the impact of legislative and regulatory developments on our business, including those relating to terrorism and catastrophes;

- any downgrade in our claims-paying, financial strength or other credit ratings;

- the ability of our subsidiaries to pay us dividends;

- general economic and market conditions including:

  - changes in interest rates, market credit spreads and the performance of the financial markets;

  - uncertainty in the credit markets and its impact on specific types of investments as well as on the broader financial markets;

  - the effects of inflation;

  - changes in domestic and foreign laws, regulations and taxes;

  - changes in competition and pricing environments;

  - regional or general changes in asset valuations;

  - the inability to reinsure certain risks economically; and

  - changes in the litigation environment; and

- our ability to implement management's strategic plans and initiatives.

The Corporation assumes no obligation to update any forward-looking information set forth in this document, which speak as of the date hereof.

FICO0002351

## CRITICAL ACCOUNTING ESTIMATES AND JUDGMENTS

The consolidated financial statements include amounts based on informed estimates and judgments of management for transactions that are not yet complete. Such estimates and judgments affect the reported amounts in the financial statements. Those estimates and judgments that were most critical to the preparation of the financial statements involved the determination of loss reserves and the recoverability of related reinsurance recoverables. These estimates and judgments, which are discussed within the following analysis of our results of operations, require the use of assumptions about matters that are highly uncertain and therefore are subject to change as facts and circumstances develop. If different estimates and judgments had been applied, materially different amounts might have been reported in the financial statements.

## OVERVIEW

*The following highlights do not address all of the matters covered in the other sections of Management's Discussion and Analysis of Financial Condition and Results of Operations or contain all of the information that may be important to Chubb's shareholders or the investing public. This overview should be read in conjunction with the other sections of Management's Discussion and Analysis of Financial Condition and Results of Operations.*

- Net income was $2.8 billion in 2007 compared with $2.5 billion in 2006 and $1.8 billion in 2005. Net income in 2007 and 2006 benefited from substantially higher underwriting income in our property and casualty insurance business compared with 2005.

- Underwriting results were significantly more profitable in 2007 and 2006 compared with 2005. Our combined loss and expense ratio was 82.9% in 2007 compared with 84.2% in 2006 and 92.3% in 2005. The impact of catastrophes accounted for 3.0 percentage points of the combined ratio in 2007 compared with 1.4 percentage points in 2006 and 5.6 percentage points in 2005. The greater catastrophe impact in 2005 was due to costs of $462 million related to Hurricane Katrina, including estimated net losses of $403 million and net reinsurance reinstatement premium costs of $59 million.

- Total net premiums written decreased by 1% in 2007 and 3% in 2006. Net premiums written in our insurance business increased 1% in 2007 and 2% in 2006. The low growth in our insurance business in both years reflected our continued emphasis on underwriting discipline in an increasingly competitive market environment. In the reinsurance assumed business, net premiums written decreased 65% in 2007 and 57% in 2006, reflecting our sale of the ongoing business to Harbor Point Limited in December 2005.

- During 2007, we experienced overall favorable development of $697 million on loss reserves established as of the previous year end, due primarily to favorable loss trends in recent years in the professional liability classes, lower than expected emergence of losses in the homeowners and commercial property classes and better than expected reported loss activity in the run-off of our reinsurance assumed business. During 2006, we experienced overall favorable development of $296 million due primarily to lower than expected emergence of losses in the homeowners and commercial property classes. During 2005, we experienced overall unfavorable development of $163 million due to adverse development in the professional liability and commercial liability classes offset in part by favorable development in the homeowners and commercial property classes.

- Property and casualty investment income after tax increased by 9% in 2007 and 10% in 2006. The growth was due to an increase in invested assets over the period. For more information on this non-GAAP financial measure, see "Property and Casualty Insurance — Investment Results."

FICO0002352

A summary of our consolidated net income is as follows:

| | Years Ended December 31 | | |
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
| Property and casualty insurance | $3,712 | $3,369 | $2,235 |
| Corporate and other | (149) | (89) | (172) |
| Realized investment gains | 374 | 245 | 384 |
| Consolidated income before income tax | 3,937 | 3,525 | 2,447 |
| Federal and foreign income tax | 1,130 | 997 | 621 |
| Consolidated net income | $2,807 | $2,528 | $1,826 |

## PROPERTY AND CASUALTY INSURANCE

A summary of the results of operations of our property and casualty insurance business is as follows:

| | Years Ended December 31 | | |
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
| Underwriting | | | |
| Net premiums written | $11,872 | $11,974 | $12,283 |
| Decrease (increase) in unearned premiums | 74 | (16) | (107) |
| Premiums earned | 11,946 | 11,958 | 12,176 |
| Losses and loss expenses | 6,299 | 6,574 | 7,813 |
| Operating costs and expenses | 3,564 | 3,467 | 3,436 |
| Increase in deferred policy acquisition costs | (52) | (19) | (17) |
| Dividends to policyholders | 19 | 31 | 23 |
| Underwriting income | 2,116 | 1,905 | 921 |
| Investments | | | |
| Investment income before expenses | 1,622 | 1,485 | 1,342 |
| Investment expenses | 32 | 31 | 27 |
| Investment income | 1,590 | 1,454 | 1,315 |
| Other income (charges) | 6 | 10 | (1) |
| Property and casualty income before tax | $ 3,712 | $ 3,369 | $ 2,235 |
| Property and casualty investment income after tax | $ 1,273 | $ 1,166 | $ 1,056 |

Property and casualty income before tax in 2007 was higher than in 2006 which, in turn, was substantially higher than in 2005. Income in each year, but more so in 2007 and 2006, benefited from highly profitable underwriting results. Underwriting income in 2007 was higher than in 2006, particularly in our specialty insurance business unit. Underwriting income in 2006 was substantially higher than in 2005, due largely to significantly lower catastrophe losses, particularly in our commercial insurance business unit, as well as improvement in our specialty insurance business unit. Results in 2007 and 2006 also benefited from significant increases in investment income due to an increase in invested assets in both years.

FICO0002353

The profitability of our property and casualty insurance business depends on the results of both our underwriting and investment operations. We view these as two distinct operations since the underwriting functions are managed separately from the investment function. Accordingly, in assessing our performance, we evaluate underwriting results separately from investment results.

**Underwriting Operations**

**Underwriting Results**

We evaluate the underwriting results of our property and casualty insurance business in the aggregate and also for each of our separate business units.

*Net Premiums Written*

Net premiums written amounted to $11.9 billion in 2007, a decrease of 1% compared with 2006. Net premiums written in 2006 decreased 3% compared with 2005. In both years, a slight increase in premiums from our insurance business was more than offset by a substantial decline in premiums from our reinsurance assumed business.

Net premiums written by business unit were as follows:

| | Years Ended December 31 | | | | |
|---|---|---|---|---|---|
| | 2007 | % Increase (Decrease) 2007 vs. 2006 | 2006 | % Increase (Decrease) 2006 vs. 2005 | 2005 |
| | | | (dollars in millions) | | |
| Personal insurance ................. | $ 3,709 | 5% | $ 3,518 | 6% | $ 3,307 |
| Commercial insurance ............. | 5,083 | (1) | 5,125 | 2 | 5,030 |
| Specialty insurance ................ | 2,944 | — | 2,941 | (3) | 3,042 |
| Total insurance .................. | 11,736 | 1 | 11,584 | 2 | 11,379 |
| Reinsurance assumed .............. | 136 | (65) | 390 | (57) | 904 |
| Total .......................... | $11,872 | (1) | $11,974 | (3) | $12,283 |

Net premiums written from our insurance business grew 1% in 2007 and 2% in 2006. Premiums in 2005 were reduced by reinsurance reinstatement premium costs of $102 million related to Hurricane Katrina. Premiums in 2006 benefited from a $20 million reduction of previously accrued reinsurance reinstatement premium costs. Premiums in the United States, which represent about 75% of our insurance premiums, decreased 1% in 2007 and increased 1% in 2006. Insurance premiums outside the U.S. grew 10% in 2007 and 4% in 2006. In both years, such growth was 3% when measured in local currencies.

The slight overall growth in net written premiums in our insurance business in both 2007 and 2006 reflected our continued emphasis on underwriting discipline in an increasingly competitive market environment. Rates were under competitive pressure that varied by class of business and geographic area. In both years, we retained a high percentage of our existing customers and renewed these accounts at prices we believe to be appropriate relative to the exposure. In addition, while we continued to be selective, we found opportunities to write new business at acceptable rates; however, we saw fewer such opportunities as 2007 progressed. We expect the competitive market environment to continue in 2008. We expect that overall premiums in our insurance business will be flat to modestly down in 2008 compared with 2007, with a modest increase for personal insurance and modest decreases for both commercial insurance and specialty insurance.

Net reinsurance assumed premiums written decreased by 65% in 2007 and 57% in 2006. Premiums in 2005 included net reinstatement premium revenue of $43 million related to Hurricane Katrina. The significant premium decline reflects the sale of our ongoing reinsurance assumed business to Harbor Point Limited in December 2005, which is discussed below.

FICO0002354

*Reinsurance Ceded*

Our premiums written are net of amounts ceded to reinsurers who assume a portion of the risk under the insurance policies we write that are subject to the reinsurance.

As a result of the substantial losses incurred by reinsurers from the catastrophes in 2004 and 2005, the cost of property catastrophe reinsurance increased significantly in 2006 and there were capacity restrictions in the marketplace.

Although property catastrophe reinsurance rates increased in 2006, our overall ceded reinsurance premiums for our insurance business, excluding the impact of reinstatement premiums related to Hurricane Katrina, were only modestly higher than in 2005 due to modifications to certain of our reinsurance treaties. On our casualty clash treaty, our initial retention remained at $75 million. We reduced our reinsurance coverage at the top of the program by $50 million and increased our participation in the program. On our commercial property per risk treaty, we increased our retention from $15 million to $25 million. Our property catastrophe treaty for events in the United States was modified to increase our initial retention from $250 million to $350 million and to increase our participation in the program. At the same time, we increased the insurance coverage in the northeastern part of the country by $400 million. Our property catastrophe treaty for events outside the United States was modified to increase our initial retention from $50 million to $75 million.

Reinsurance rates generally remained steady in 2007, due in part to a relatively low level of catastrophes in 2006. However, capacity restrictions continued in some segments of the marketplace. Our overall reinsurance costs in 2007 were similar to those in 2006.

We did not renew our casualty clash treaty in 2007 as we believed the cost was not justified given the limited capacity and terms available. The treaty had provided coverage of approximately 55% of losses between $75 million and $150 million per insured event.

On our commercial property per risk treaty, we increased the reinsurance coverage at the top of the program by $100 million. This treaty now provides approximately $500 million of coverage per risk in excess of our $25 million retention.

The structure of our property catastrophe program for events in the United States was modified in 2007 but the overall coverage is similar to the previous program. The principal catastrophe treaty provides coverage of approximately 70% of losses (net of recoveries from other available reinsurance) between $350 million and $1.3 billion, with additional coverage of 55% of losses between $1.3 billion and $2.05 billion in the northeastern part of the country, where we have our greatest concentration of catastrophe exposure.

We also purchased in April 2007 fully collateralized four-year reinsurance coverage for homeowners-related losses sustained from qualifying hurricane loss events in the northeastern part of the United States. This reinsurance was purchased from East Lane Re Ltd., a Cayman Islands reinsurance company, which financed the provision of reinsurance through the issuance of $250 million in catastrophe bonds to investors under two separate bond tranches. This reinsurance provides coverage of approximately 30% of covered losses between $1.3 billion and $2.05 billion.

We purchased additional reinsurance from the Florida Hurricane Catastrophe Fund, which is a state-mandated fund designed to reimburse insurers for a portion of their residential catastrophic hurricane losses. Our participation in the Fund limits our initial retention in Florida for homeowners related losses to approximately $150 million.

Our property catastrophe treaty for events outside the United States was renewed in 2007 with no modification of its terms. The treaty provides coverage of approximately 90% of losses (net of recoveries from other available reinsurance) between $75 million and $275 million.

FICO0002355

Our property reinsurance treaties generally contain limitations on the losses that we can recover relating to acts of terrorism, depending on the geographic location where the act is committed and the class of business affected.

We do not expect the changes we made to our reinsurance program during 2006 and 2007 to have a material effect on the Corporation's results of operations, financial condition or liquidity.

Most of our ceded reinsurance arrangements consist of excess of loss and catastrophe contracts that protect against a specified part or all of certain types of losses over stipulated amounts arising from any one occurrence or event. Therefore, unless we incur losses that exceed our initial retention under these contracts, we do not receive any loss recoveries. As a result, in certain years, we cede premiums to other insurance companies and receive few, if any, loss recoveries. However, in a year in which there is a significant catastrophic event (such as Hurricane Katrina) or a series of large individual losses, we may receive substantial loss recoveries. The impact of ceded reinsurance on net premiums written and earned and on net losses and loss expenses incurred for the three years ended December 31, 2007 is presented in Note (11) of the Notes to Consolidated Financial Statements.

Our property reinsurance treaties expire on April 1, 2008. While we expect that reinsurance rates for property risks will decline somewhat in 2008, the final structure of our program and amount of coverage purchased will be determinants of our ceded reinsurance premium cost in 2008. We expect that the availability of reinsurance for certain coverages, such as terrorism, will continue to be very limited in 2008.

*Profitability*

The combined loss and expense ratio, expressed as a percentage, is the key measure of underwriting profitability traditionally used in the property and casualty insurance business. Management evaluates the performance of our underwriting operations and of each of our business units using, among other measures, the combined loss and expense ratio calculated in accordance with statutory accounting principles. It is the sum of the ratio of losses and loss expenses to premiums earned (loss ratio) plus the ratio of statutory underwriting expenses to premiums written (expense ratio) after reducing both premium amounts by dividends to policyholders. When the combined ratio is under 100%, underwriting results are generally considered profitable; when the combined ratio is over 100%, underwriting results are generally considered unprofitable.

Statutory accounting principles applicable to property and casualty insurance companies differ in certain respects from generally accepted accounting principles (GAAP). Under statutory accounting principles, policy acquisition and other underwriting expenses are recognized immediately, not at the time premiums are earned. Management uses underwriting results determined in accordance with GAAP, among other measures, to assess the overall performance of our underwriting operations. To convert statutory underwriting results to a GAAP basis, policy acquisition expenses are deferred and amortized over the period in which the related premiums are earned. Underwriting income determined in accordance with GAAP is defined as premiums earned less losses and loss expenses incurred and GAAP underwriting expenses incurred.

Underwriting results were significantly more profitable in 2007 and 2006 compared with 2005. The combined loss and expense ratio for our overall property and casualty business was as follows:

|  | Years Ended December 31 | | |
|  | 2007 | 2006 | 2005 |
| Loss ratio | 52.8% | 55.2% | 64.3% |
| Expense ratio | 30.1 | 29.0 | 28.0 |
| Combined loss and expense ratio | 82.9% | 84.2% | 92.3% |

FICO0002356

The loss ratio improved in 2006 and again in 2007, reflecting the favorable loss experience which we believe resulted from our disciplined underwriting in recent years as well as relatively mild loss trends in certain classes of business. The loss ratio in 2005 was adversely affected by higher catastrophe losses, primarily from Hurricane Katrina.

In 2007, net catastrophe losses incurred were $363 million, which represented 3.0 percentage points of the loss ratio. Net catastrophe losses incurred in 2006 were $173 million, which were offset in part by a $20 million reduction in previously accrued reinsurance reinstatement premium costs related to Hurricane Katrina. The net impact of catastrophes in 2006 accounted for 1.4 percentage points of the loss ratio. In 2005, we incurred $630 million of net catastrophe losses and $59 million in related net reinsurance reinstatement premium costs, which in the aggregate accounted for 5.6 percentage points of the loss ratio. The reinsurance reinstatement premium costs and a substantial portion of the catastrophe losses in 2005 related to Hurricane Katrina.

At the end of 2005, we estimated that our net losses from Hurricane Katrina were $403 million and our net reinsurance reinstatement premium costs related to the hurricane were $59 million. In our insurance business, estimated net losses were $335 million and reinstatement premium costs were $102 million, for an aggregate cost of $437 million. In our reinsurance assumed business, estimated net losses were $68 million and net reinstatement premium revenue was $43 million, for a net cost of $25 million. We estimated that our gross losses from Hurricane Katrina were about $1.2 billion. Almost all of the losses were from property exposure and business interruption claims. Our net losses of $403 million were significantly lower than the gross amount due to a property per risk treaty that limited our net loss per risk and our property catastrophe treaty.

During 2006, a large percentage of our claims from Hurricane Katrina were settled. As a result, there were many adjustments, both favorable and unfavorable, to our loss estimates for individual claims related to this event. These adjustments produced a reduction in our estimates for gross losses and reinsurance recoverable of $190 million and $175 million, respectively, as well as a $20 million reduction of previously accrued reinsurance reinstatement premium costs.

Other than the reinsurance recoverable related to Hurricane Katrina, we did not have any recoveries from our catastrophe reinsurance treaties during the three year period ended December 31, 2007 because there were no other individual catastrophes for which our losses exceeded our initial retention under the treaties.

Our expense ratio increased in both 2007 and 2006. The increase in 2007 was due primarily to higher commissions, largely the result of premium growth outside the United States in certain classes of business for which commission rates are high. The increase in 2006 was due to a decrease in net premiums written whereas compensation and other operating costs increased.

In lieu of paying contingent commissions, beginning in 2007, we implemented a new guaranteed supplemental compensation program for agents and brokers in the United States with whom we previously had contingent commission agreements. Under this arrangement, agents and brokers are paid a percentage of written premiums on eligible lines of business in a calendar year based upon their prior performance. The total guaranteed supplemental compensation payout for 2007 will be substantially the same as the contingent commission payout for 2006. However, the change in our commission arrangements created a difference in the timing of expense recognition, which resulted in a one-time benefit to income during the 2007 transition year. The impact of the change in 2007 was to increase deferred policy acquisition costs by approximately $70 million. The change had no effect on the expense ratio.

FICO0002357

Review of Underwriting Results by Business Unit

*Personal Insurance*

Net premiums written from personal insurance, which represented 31% of our premiums written in 2007, increased by 5% in 2007 and 6% in 2006. Net premiums written for the classes of business within the personal insurance segment were as follows:

| | Years Ended December 31 | | | | |
|---|---|---|---|---|---|
| | 2007 | % Increase 2007 vs. 2006 | 2006 | % Increase 2006 vs. 2005 | 2005 |
| | | | (dollars in millions) | | |
| Automobile | $ 621 | (7)% | $ 670 | 4% | $ 645 |
| Homeowners | 2,423 | 7 | 2,268 | 8 | 2,104 |
| Other | 665 | 15 | 580 | 4 | 558 |
| Total personal | $3,709 | 5 | $3,518 | 6 | $3,307 |

Personal automobile premiums in the U.S. decreased in 2007 and 2006 due to an increasingly competitive marketplace. The termination of a collector vehicle program also contributed to the decrease in 2007. The overall growth in personal automobile premiums in 2006 was due to selective initiatives outside the United States. The growth in our homeowners business in both years was due primarily to increased insurance-to-value. The in-force policy count for this class of business was relatively flat over the period. Homeowners premiums in 2005 were reduced by reinsurance reinstatement premium costs of $17 million related to Hurricane Katrina. Our other personal business includes insurance for excess liability, yacht and accident coverages. The substantial growth in this business in 2007 was due primarily to a significant increase in accident premiums, particularly outside the United States. Excess liability premiums also grew, due in part to a modest increase in rates.

Our personal insurance business produced highly profitable underwriting results in each of the last three years. The combined loss and expense ratios for the classes of business within the personal insurance segment were as follows:

| | Years Ended December 31 | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| Automobile | 89.8% | 90.4% | 95.3% |
| Homeowners | 80.2 | 74.6 | 81.2 |
| Other | 96.4 | 98.6 | 96.2 |
| Total personal | 84.8% | 81.7% | 86.6% |

Our personal automobile results were profitable in each of the past three years. Results in 2007 and 2006 were more profitable than in 2005 due to lower claim frequency and modest favorable prior year loss development.

Homeowners results were highly profitable in each of the last three years. Results in all three years reflected adequate pricing and a reduction in water damage losses primarily as a result of policy wording changes related to mold coverage and loss remediation measures that we have implemented over the past several years. Results in 2006 benefited from lower catastrophe losses. The impact of catastrophes accounted for 9.6 percentage points of the combined loss and expense ratio for this class in 2007 compared with 5.7 percentage points in 2006 and 9.8 percentage points in 2005.

Other personal business produced modestly profitable results in each of the past three years. Our accident business was highly profitable in all three years. Our yacht business was profitable in 2007 and 2006 compared with unprofitable results in 2005. Our excess liability business was unprofitable in each of the past three years, but more so in 2006, due to inadequate pricing and unfavorable prior year loss development.

FICO0002358

*Commercial Insurance*

Net premiums written from commercial insurance, which represented 43% of our premiums written in 2007, decreased by 1% in 2007 and increased by 2% in 2006. Net premiums written for the classes of business within the commercial insurance segment were as follows:

| | 2007 | % Increase (Decrease) 2007 vs. 2006 | 2006 | % Increase (Decrease) 2006 vs. 2005 | 2005 |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| Multiple peril ..................... | $1,252 | (3)% | $1,290 | —% | $1,286 |
| Casualty .......................... | 1,726 | — | 1,731 | (1) | 1,755 |
| Workers' compensation ............ | 890 | (1) | 901 | (3) | 930 |
| Property and marine .............. | 1,215 | 1 | 1,203 | 14 | 1,059 |
| Total commercial ................ | $5,083 | (1) | $5,125 | 2 | $5,030 |

Years Ended December 31

Growth in our commercial classes in 2007 and 2006 was constrained due to an increasingly competitive marketplace. In 2006, renewal rates were generally stable but were under competitive pressure in some classes of business, particularly non-catastrophe exposed property risks and certain casualty risks. During 2007, rates were down modestly. Certain classes of business and geographic areas, such as non-catastrophe exposed property risks and large company risks, experienced more competitive pressure than others. Rate pressure increased in the second half of the year across all classes of business, particularly for new business. Multiple peril and property and marine premiums in 2005 were reduced by reinsurance reinstatement premium costs of $19 million and $66 million, respectively, related to Hurricane Katrina. In 2006, property and marine premiums benefited from a $20 million reduction of previously accrued reinsurance reinstatement premium costs. Excluding the reinsurance reinstatement premiums, multiple peril premiums declined 1% and property and marine premiums grew 5% in 2006 compared with the prior year.

Retention levels of our existing customers remained steady over the last three years. New business volume was slightly higher in 2006 and again in 2007 compared with the respective prior years. The increase in 2006 came from business outside the U.S. The increase in 2007 was due to a few large accounts written in the first half of the year. New business volume in the second half of 2007 was down as it became more difficult to find new opportunities at acceptable rates.

We have continued to maintain our underwriting discipline in the more competitive market, renewing business and writing new business only where we believe we are securing acceptable rates and appropriate terms and conditions for the exposures.

Our commercial insurance business produced profitable underwriting results in each of the past three years, particularly in 2007 and 2006. Results in all three years benefited from better terms and conditions and disciplined risk selection in recent years as well as low non-catastrophe property losses. Results in 2005 were less profitable than in 2007 and 2006, largely due to substantially higher catastrophe losses, primarily from Hurricane Katrina. The impact of catastrophes accounted for 8.3 percentage points of the combined loss and expense ratio for our commercial insurance business in 2005 whereas such impact was 2.6 percentage points in 2007 and negligible in 2006.

FICO0002359

The combined loss and expense ratios for the classes of business within commercial insurance were as follows:

|  | Years Ended December 31 | | |
|  | 2007 | 2006 | 2005 |
| --- | --- | --- | --- |
| Multiple peril | 80.8% | 75.8% | 87.8% |
| Casualty | 94.6 | 96.8 | 96.1 |
| Workers' compensation | 77.6 | 80.4 | 84.8 |
| Property and marine | 84.3 | 72.5 | 98.8 |
| Total commercial | 85.8% | 83.1% | 92.4% |

Multiple peril results were highly profitable in each of the past three years. Results in 2005 were less profitable than in 2007 and 2006, largely due to higher catastrophe losses. The impact of catastrophes accounted for 1.7 percentage points of the combined loss and expense ratio for this class in 2007 compared with 2.9 percentage points in 2006 and 9.1 percentage points in 2005. The property component of this business benefited from low non-catastrophe losses in all three years. Results in the liability component were profitable in all three years, particularly in 2006.

Results for our casualty business were similarly profitable in each of the past three years. The automobile component of our casualty business deteriorated somewhat in 2007 but remained highly profitable. Results in the primary liability component were highly profitable in 2007 compared with marginally profitable results in 2006 and profitable results in 2005. Results in the excess liability component were profitable in 2007 compared with unprofitable results in 2006 and 2005. Excess liability results in 2007 benefited from favorable prior year loss development, whereas results in 2006 and 2005 were adversely affected by unfavorable loss development related to older accident years. Casualty results in 2007 were adversely affected by incurred losses related to asbestos and toxic waste claims. Our analysis of these exposures resulted in an increase in our estimate of the ultimate liabilities for a small number of our insureds. Such losses represented 5.3 percentage points of the combined loss and expense ratio for this class in 2007. The impact of such losses was not significant in 2006 or 2005.

Workers' compensation results were highly profitable in each of the past three years. Results were more profitable in each succeeding year due to favorable claim cost trends, resulting in part from the positive effect of reforms in California. Results in all three years benefited from our disciplined risk selection during the past several years.

Property and marine results were highly profitable in 2007 and 2006 compared with marginally profitable results in 2005. The less profitable results in 2005 were due to catastrophe losses, primarily from Hurricane Katrina. Catastrophes accounted for 8.2 percentage points of the combined loss and expense ratio in 2007 and 27.2 percentage points in 2005. The impact of catastrophes was negligible in 2006. Excluding the impact of catastrophes, the combined ratio was 76.1%, 73.4% and 71.6% in 2007, 2006 and 2005, respectively. Results in each year benefited from relatively few large non-catastrophe losses.

FICO0002360

*Specialty Insurance*

Net premiums written from specialty insurance, which represented 25% of our premiums written in 2007, were flat in 2007 and decreased by 3% in 2006 compared with the respective prior years. Net premiums written for the classes of business within the specialty insurance segment were as follows:

| | Years Ended December 31 | | | | |
| | 2007 | % Increase (Decrease) 2007 vs. 2006 | 2006 | % Increase (Decrease) 2006 vs. 2005 | 2005 |
| | | | (dollars in millions) | | |
| Professional liability .............. | $2,605 | (1)% | $2,641 | (6)% | $2,798 |
| Surety ........................... | 339 | 13 | 300 | 23 | 244 |
| Total specialty ................... | $2,944 | — | $2,941 | (3) | $3,042 |

The decline of premiums in 2007 and 2006 for the professional liability classes of business was due to the increasingly competitive pressure on rates, particularly in the directors and officers liability component, and our commitment to maintain underwriting discipline in this environment. The decline in premiums in 2006 was exacerbated by the sale of renewal rights, effective July 1, 2005, on our hospital medical malpractice and managed care errors and omissions business.

Renewal rates for the directors and officers liability class of business were down in 2006 and again in 2007. Rates for professional liability classes other than directors and officers liability, which were generally stable in 2006, trended downward in 2007. Retention levels remained strong over the last three years. New business volume declined in each of the past two years due to the increased competition in the marketplace. We continued to get what we believe are acceptable rates and appropriate terms and conditions on both new business and renewals. In line with our strategy in recent years of directing our focus to small and middle market publicly traded and privately held companies, the percentage of our book of business represented by large public companies has continued to decrease.

The growth in net premiums written for our surety business was substantial in both 2007 and 2006. About half of the growth in 2006 was due to the non-renewal of a high excess reinsurance treaty during 2005. Growth in 2007 was due primarily to a strong public sector construction economy. However, growth slowed as the year progressed due in part to a more competitive rate environment. We expect the increasingly competitive market to continue in 2008.

Our specialty insurance business produced profitable underwriting results in each of the last three years. Results were significantly more profitable in each succeeding year. The combined loss and expense ratios for the classes of business within specialty insurance were as follows:

| | Years Ended December 31 | | |
| | 2007 | 2006 | 2005 |
| Professional liability ............................................. | 82.4% | 91.8% | 99.8% |
| Surety ........................................................... | 35.4 | 44.2 | 62.9 |
| Total specialty .................................................. | 77.4% | 87.5% | 97.3% |

Results for our professional liability business improved substantially in 2006 and again in 2007, producing highly profitable results in 2007 compared with profitable results in 2006 and near breakeven results in 2005. The fidelity class was highly profitable in each of the past three years due to favorable loss experience. The results of the directors and officers liability, errors and omissions liability and fiduciary liability classes improved in 2006 and again in 2007. Results in 2007 and, to a much lesser extent, 2006 benefited from favorable prior year loss development due to the recognition of the increasingly favorable loss trends we have been experiencing in recent years. These trends were largely the result of a favorable business climate in recent years, lower policy limits and better terms

35

FICO0002361

and conditions. Conversely, results in 2005 were adversely affected by unfavorable loss development related to accident years prior to 2003. This adverse development was predominantly from claims relating to corporate failures and allegations of management misconduct and accounting irregularities. For more information on prior year loss development, see "Property and Casualty Insurance — Loss Reserves, *Prior Year Loss Development.*"

Our surety business produced highly profitable results in each of the past three years due to favorable loss experience. This business tends to be characterized by infrequent but potentially high severity losses. When losses occur, they are mitigated, at times, by recovery rights to the customer's assets, contract payments, collateral and bankruptcy recoveries.

The majority of our surety obligations are intended to be performance-based guarantees. We manage our exposure on an absolute basis and by specific bond type. We have substantial commercial and construction surety exposure for current and prior customers, including exposures related to surety bonds issued on behalf of companies that have experienced deterioration in creditworthiness since we issued bonds to them. We therefore may experience an increase in filed claims and may incur high severity losses. Such losses would be recognized if and when claims are filed and determined to be valid, and could have a material adverse effect on the Corporation's results of operations.

### Reinsurance Assumed

In December 2005, we completed a transaction involving a new Bermuda-based reinsurance company, Harbor Point Limited. As part of the transaction, we transferred our ongoing reinsurance assumed business and certain related assets, including renewal rights, to Harbor Point. Harbor Point generally did not assume our reinsurance liabilities relating to reinsurance contracts incepting prior to December 31, 2005. We retained those liabilities and the related assets.

For a transition period of about two years, Harbor Point underwrote specific reinsurance business on our behalf. We retained a portion of this business and ceded the balance to Harbor Point in return for a fronting commission. We receive additional payments based on the amount of business renewed by Harbor Point. These amounts are being recognized in income as earned.

Net premiums written from our reinsurance assumed business, which represented 1% of our premiums written in 2007, decreased by 65% in 2007 and 57% in 2006. The significant decrease in premiums in both years was expected in light of the sale of our ongoing reinsurance assumed business to Harbor Point. Premiums in 2005 included net reinsurance reinstatement premium revenue of $43 million related to Hurricane Katrina.

Reinsurance assumed results were profitable in each of the past three years, particularly in 2007 and 2006. While the volume of business declined substantially in each of the past two years, results in both years benefited from significant favorable prior year loss development. Results in 2005 were adversely affected by catastrophe losses related to Hurricane Katrina.

### Regulatory Developments

To promote and distribute our insurance products, we rely on independent brokers and agents. Accordingly, our business is dependent on the willingness of these brokers and agents to recommend our products to their customers. Prior to 2007, we had agreements in place with certain insurance agents and brokers under which, in addition to the standard commissions that we pay, we agreed to pay commissions that were contingent on the volume and/or the profitability of business placed with us.

We have been involved in the investigations of certain business practices in the property and casualty insurance industry by various Attorneys General and other regulatory authorities of several states, the U.S. Securities and Exchange Commission, the U.S. Attorney for the Southern District of New York and certain non-U.S. regulatory authorities with respect to, among other things, (1) potential conflicts of interest and anti-competitive behavior arising from the payment of contingent commissions to brokers and agents and (2) loss mitigation and finite reinsurance arrangements. In

FICO0002362

connection with these investigations, we received subpoenas and other requests for information from various regulators. We have been cooperating fully with these investigations.

In December 2006, we settled with the Attorneys General of New York, Connecticut and Illinois all issues arising out of their investigations. As part of this settlement, we agreed to implement certain business reforms, including discontinuing the payment of contingent commissions in the United States on all insurance lines beginning in 2007.

In August 2007, the Attorney General of Ohio filed an action against us, as well as several other insurers and one broker, as a result of the Ohio Attorney General's business practices investigation.

Although no other Attorney General or regulator has initiated an action against us, it is possible that such an action may be brought against us with respect to some or all of the issues that are the focus of the ongoing investigations described above.

Chubb and certain of its subsidiaries have been named in various legal proceedings brought by private plaintiffs arising out of these investigations. These legal proceedings and the litigation brought by the Ohio Attorney General referred to above are further described in Note (15) of the Notes to Consolidated Financial Statements.

We cannot predict at this time the ultimate outcome of the ongoing investigations and legal proceedings referred to above, including any potential amounts that we may be required to pay in connection with them. Nevertheless, management believes that it is likely that the outcome will not have a material adverse effect on the Corporation's results of operations or financial condition.

Catastrophe Risk Management

Our property and casualty subsidiaries have exposure to losses caused by natural perils such as hurricanes and other windstorms, earthquakes, severe winter weather and brush fires and from man-made catastrophic events such as terrorism. The frequency and severity of catastrophes are inherently unpredictable.

*Natural Catastrophes*

The extent of losses from a natural catastrophe is a function of both the total amount of insured exposure in an area affected by the event and the severity of the event. We regularly assess our concentration of risk exposures in catastrophe exposed areas globally and have strategies and underwriting standards to manage this exposure through individual risk selection, subject to regulatory constraints, and through the purchase of catastrophe reinsurance. We have invested in modeling technologies and a risk concentration management tool that allow us to monitor and control our accumulations of potential losses in catastrophe exposed areas in the United States, such as California and the gulf and east coasts, as well as in such areas in other countries. Actual results may differ materially from those suggested by the model. We also continue to actively explore and analyze credible scientific evidence, including the impact of global climate change, that may affect our ability to manage exposure under the insurance policies we issue.

Despite these efforts, the occurrence of one or more severe natural catastrophic events in heavily populated areas could have a material adverse effect on the Corporation's results of operations, financial condition or liquidity.

*Terrorism Risk and Legislation*

The September 11, 2001 attack changed the way the property and casualty insurance industry views catastrophic risk. That tragic event demonstrated that numerous classes of business we write are subject to terrorism related catastrophic risks in addition to the catastrophic risks related to natural occurrences. This, together with the limited availability of terrorism reinsurance, has required us to change how we identify and evaluate risk accumulations. We have licensed a terrorism model that

FICO0002363

provides loss estimates under numerous event scenarios. Also, the above noted risk concentration management tool enables us to identify locations and geographic areas that are exposed to risk accumulations. The information provided by the model and the tracking tool has resulted in our non-renewing some accounts and has restricted us from writing others. Actual results may differ materially from those suggested by the model.

The Terrorism Risk Insurance Act of 2002 (TRIA) established a temporary program under which the federal government will share the risk of loss arising from certain acts of foreign terrorism with the insurance industry. The program, which was applicable to most lines of commercial business, was scheduled to terminate on December 31, 2005. In December 2005, TRIA was extended through December 31, 2007. Certain lines of business previously subject to the provisions of TRIA, including commercial automobile, surety and professional liability insurance, other than directors and officers liability, were excluded from the program. In December 2007, TRIA was extended through December 31, 2014. The amended law eliminated the distinction between foreign and domestic acts of terrorism, now providing protection from all acts of terrorism. Otherwise, there were no significant changes to the key features of the program.

As a precondition to recovery under TRIA, insurance companies with direct commercial insurance exposure in the United States for TRIA lines of business are required to make insurance for covered acts of terrorism available under their policies. Each insurer has a separate deductible that it must meet in the event of an act of terrorism before federal assistance becomes available. The deductible is based on a percentage of direct U.S. earned premiums for the covered lines of business in the previous calendar year. For 2008, that deductible is 20% of direct premiums earned in 2007 for these lines of business. For losses above the deductible, the federal government will pay for 85% of covered losses, while the insurer retains 15%. There is a combined annual aggregate limit for the federal government and all insurers of $100 billion. If acts of terrorism result in covered losses exceeding the $100 billion annual limit, insurers are not liable for additional losses. While the provisions of TRIA will serve to mitigate our exposure in the event of a large-scale terrorist attack, our deductible is substantial, approximating $1 billion in 2008.

For certain classes of business, such as workers' compensation, terrorism insurance is mandatory. For those classes of business where it is not mandatory, policyholders may choose not to accept terrorism insurance, which would, subject to other statutory or regulatory restrictions, reduce our exposure.

We will continue to manage this type of catastrophic risk by monitoring terrorism risk aggregations. Nevertheless, given the unpredictability of the targets, frequency and severity of potential terrorist events as well as the very limited terrorism reinsurance coverage available in the market, the occurrence of any such events could have a material adverse effect on the Corporation's results of operations, financial condition or liquidity.

We also have exposure outside the United States to risk of loss from acts of terrorism. In some jurisdictions, we have access to government mechanisms that would mitigate our exposure.

FICO0002364

Loss Reserves

Unpaid losses and loss expenses, also referred to as loss reserves, are the largest liability of our property and casualty subsidiaries.

Our loss reserves include case estimates for claims that have been reported and estimates for claims that have been incurred but not reported at the balance sheet date as well as estimates of the expenses associated with processing and settling all reported and unreported claims, less estimates of anticipated salvage and subrogation recoveries. Estimates are based upon past loss experience modified for current trends as well as prevailing economic, legal and social conditions. Our loss reserves are not discounted to present value.

We regularly review our loss reserves using a variety of actuarial techniques. We update the reserve estimates as historical loss experience develops, additional claims are reported and/or settled and new information becomes available. Any changes in estimates are reflected in operating results in the period in which the estimates are changed.

Incurred but not reported (IBNR) reserves represent the difference between the estimated ultimate cost of all claims that have occurred and the reported losses and loss expenses. Reported losses include cumulative paid losses and loss expenses plus case reserves. The IBNR reserve includes a provision for claims that have occurred but have not yet been reported to us, some of which are not yet known to the insured, as well as a provision for future development on reported claims. A relatively large proportion of our net loss reserves, particularly for long tail liability classes, are reserves for IBNR losses. In fact, more than 65% of our aggregate net loss reserves at December 31, 2007 were for IBNR losses.

Our gross case and IBNR loss reserves and related reinsurance recoverable by class of business were as follows:

| December 31, 2007 | Gross Loss Reserves | | | Reinsurance Recoverable | Net Loss Reserves |
| | Case | IBNR | Total | | |
| | | | (in millions) | | |
| Personal insurance | | | | | |
| Automobile | $ 226 | $ 200 | $ 426 | $ 15 | $ 411 |
| Homeowners | 432 | 305 | 737 | 32 | 705 |
| Other | 452 | 526 | 978 | 230 | 748 |
| Total personal | 1,110 | 1,031 | 2,141 | 277 | 1,864 |
| Commercial insurance | | | | | |
| Multiple peril | 646 | 1,010 | 1,656 | 37 | 1,619 |
| Casualty | 1,640 | 4,302 | 5,942 | 402 | 5,540 |
| Workers' compensation | 842 | 1,323 | 2,165 | 255 | 1,910 |
| Property and marine | 814 | 395 | 1,209 | 532 | 677 |
| Total commercial | 3,942 | 7,030 | 10,972 | 1,226 | 9,746 |
| Specialty insurance | | | | | |
| Professional liability | 2,079 | 5,999 | 8,078 | 552 | 7,526 |
| Surety | 33 | 52 | 85 | 14 | 71 |
| Total specialty | 2,112 | 6,051 | 8,163 | 566 | 7,597 |
| Total insurance | 7,164 | 14,112 | 21,276 | 2,069 | 19,207 |
| Reinsurance assumed | 400 | 947 | 1,347 | 238 | 1,109 |
| Total | $7,564 | $15,059 | $22,623 | $2,307 | $20,316 |

FICO0002365

| December 31, 2006 | Gross Loss Reserves | | | Reinsurance Recoverable | Net Loss Reserves |
| | Case | IBNR | Total | | |
| | | | (in millions) | | |
| Personal insurance | | | | | |
| Automobile . . . . . . . . . . . . . . . . . . . . . . . . | $ 261 | $ 178 | $ 439 | $ 14 | $ 425 |
| Homeowners . . . . . . . . . . . . . . . . . . . . . . . . . . | 421 | 298 | 719 | 54 | 665 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 443 | 459 | 902 | 245 | 657 |
| Total personal . . . . . . . . . . . . . . . . . . . . . . | 1,125 | 935 | 2,060 | 313 | 1,747 |
| Commercial insurance | | | | | |
| Multiple peril . . . . . . . . . . . . . . . . . . . . . . . . . | 702 | 965 | 1,667 | 74 | 1,593 |
| Casualty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,668 | 3,922 | 5,590 | 377 | 5,213 |
| Workers' compensation . . . . . . . . . . . . . . . . . . | 827 | 1,223 | 2,050 | 310 | 1,740 |
| Property and marine . . . . . . . . . . . . . . . . . . . | 821 | 393 | 1,214 | 536 | 678 |
| Total commercial . . . . . . . . . . . . . . . . . . . . . | 4,018 | 6,503 | 10,521 | 1,297 | 9,224 |
| Specialty insurance | | | | | |
| Professional liability . . . . . . . . . . . . . . . . . . . . | 2,542 | 5,598 | 8,140 | 852 | 7,288 |
| Surety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | 56 | 78 | 19 | 59 |
| Total specialty . . . . . . . . . . . . . . . . . . . . . . | 2,564 | 5,654 | 8,218 | 871 | 7,347 |
| Total insurance . . . . . . . . . . . . . . . . . . . . . . | 7,707 | 13,092 | 20,799 | 2,481 | 18,318 |
| Reinsurance assumed . . . . . . . . . . . . . . . . . . . . . | 464 | 1,030 | 1,494 | 113 | 1,381 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $8,171 | $14,122 | $22,293 | $2,594 | $19,699 |

Loss reserves, net of reinsurance recoverable, increased by $617 million or 3% in 2007. Loss reserves related to our insurance business increased by $889 million, including approximately $290 million related to currency fluctuation due to the weakness of the U.S. dollar. Loss reserves related to our reinsurance assumed business, which is in runoff, decreased by $272 million.

Gross case reserves related to the professional liability classes decreased by $463 million in 2007 due to generally low reported loss activity as well as settlements related to previously existing case reserves. The $300 million decrease in reinsurance recoverable in the professional liability classes was due primarily to the discontinuation of the professional liability per risk treaty in 2005 and the settlement of claims related to years prior to 2005.

In establishing the loss reserves of our property and casualty subsidiaries, we consider facts currently known and the present state of the law and coverage litigation. Based on all information currently available, we believe that the aggregate loss reserves at December 31, 2007 were adequate to cover claims for losses that had occurred as of that date, including both those known to us and those yet to be reported. However, as described below, there are significant uncertainties inherent in the loss reserving process. It is therefore possible that management's estimate of the ultimate liability for losses that had occurred as of December 31, 2007 may change, which could have a material effect on the Corporation's results of operations and financial condition.

*Estimates and Uncertainties*

The process of establishing loss reserves is complex and imprecise as it must take into consideration many variables that are subject to the outcome of future events. As a result, informed subjective estimates and judgments as to our ultimate exposure to losses are an integral component of our loss reserving process.

FICO0002366

Due to the inherent complexity of the loss reserving process and the potential variability of the assumptions used, the actual emergence of losses could vary, perhaps substantially, from the estimate of losses included in our financial statements, particularly when settlements may not occur until well into the future. Our net loss reserves at December 31, 2007 were $20.3 billion. Therefore, a relatively small percentage change in the estimate of net loss reserves would have a material effect on the Corporation's results of operations.

*Reserves Other than Those Relating to Asbestos and Toxic Waste Claims.* Our loss reserves include amounts related to short tail and long tail classes of business. "Tail" refers to the time period between the occurrence of a loss and the settlement of the claim. The longer the time span between the incidence of a loss and the settlement of the claim, the more the ultimate settlement amount can vary.

Short tail classes consist principally of homeowners, commercial property and marine business. For these classes, claims are generally reported and settled shortly after the loss occurs and the claims relate to tangible property. Consequently, the estimation of loss reserves for these classes is less complex.

Most of our loss reserves relate to long tail liability classes of business. Long tail classes include directors and officers liability, errors and omissions liability and other professional liability coverages, commercial primary and excess liability, workers' compensation and other liability coverages. For many liability claims significant periods of time, ranging up to several years or more, may elapse between the occurrence of the loss, the reporting of the loss to us and the settlement of the claim. As a result, loss experience in the more recent accident years for the long tail liability classes has limited statistical credibility because a relatively small proportion of losses in these accident years are reported claims and an even smaller proportion are paid losses. An accident year is the calendar year in which a loss is incurred or, in the case of claims-made policies, the calendar year in which a loss is reported. Liability claims are also more susceptible to litigation and can be significantly affected by changing contract interpretations and the legal environment. Consequently, the estimation of loss reserves for these classes is more complex and typically subject to a higher degree of variability than for short tail classes.

Most of our reinsurance assumed business is long tail casualty reinsurance. Reserve estimates for this business are therefore subject to the variability caused by extended loss emergence periods. The estimation of loss reserves for this business is further complicated by delays between the time the claim is reported to the ceding insurer and when it is reported by the ceding insurer to us and by our dependence on the quality and consistency of the loss reporting by the ceding company.

Our actuaries perform a comprehensive annual review of loss reserves for each of the numerous classes of business we write prior to the determination of the year end carried reserves. The review process takes into consideration the variety of trends that impact the ultimate settlement of claims in each particular class of business. A similar, but somewhat less comprehensive, review is performed for the major classes of business prior to the determination of the June 30 carried reserves. Prior to the determination of the March 30 and September 30 carried reserves, our actuaries review the emergence of paid and reported losses relative to expectations and, as necessary, conduct reserve reviews for particular classes of business.

The loss reserve estimation process relies on the basic assumption that past experience, adjusted for the effects of current developments and likely trends, is an appropriate basis for predicting future outcomes. As part of that process, our actuaries use a variety of actuarial methods that analyze experience, trends and other relevant factors. The principal standard actuarial methods used by our actuaries in the loss reserve reviews include loss development factor methods, expected loss ratio methods, Bornhuetter-Ferguson methods and frequency/severity methods.

Loss development factor methods generally assume that the losses yet to emerge for an accident year are proportional to the paid or reported loss amount observed so far. Historical patterns of the

FICO0002367

development of paid and reported losses by accident year are applied to current paid and reported losses to generate estimated ultimate losses by accident year.

Expected loss ratio methods use loss ratios for prior accident years, adjusted to reflect our evaluation of recent loss trends, the current risk environment, changes in our book of business and changes in our pricing and underwriting, to determine the appropriate expected loss ratio for a given accident year. The expected loss ratio for each accident year is multiplied by the earned premiums for that year to calculate estimated ultimate losses.

Bornheutter-Ferguson methods are combinations of an expected loss ratio method and a loss development factor method, where the loss development factor method is given more weight as an accident year matures.

Frequency/severity methods first project ultimate claim counts (using one or more of the other methods described above) and then multiply those counts by an estimated average claim cost to calculate estimated ultimate losses. The average claim costs are often estimated by fitting historical severity data to an observed trend. Generally, these methods work best for high frequency, low severity classes of business.

In completing their loss reserve analysis, our actuaries are required to determine the most appropriate actuarial methods to employ for each class of business. Within each class, the business is further segregated by accident year and generally by jurisdiction. Each estimation method has its own pattern, parameter and/or judgmental dependencies, with no estimation method being better than the others in all situations. The relative strengths and weaknesses of the various estimation methods when applied to a particular class of business can also change over time, depending on the underlying circumstances. In many cases, multiple estimation methods will be valid for the particular facts and circumstances of the relevant class of business. The manner of application and the degree of reliance on a given method will vary by class of business, by accident year and by jurisdiction based on our actuaries' evaluation of the above dependencies and the potential volatility of the loss frequency and severity patterns. The estimation methods selected or given weight by our actuaries at a particular valuation date are those that are believed to produce the most reliable indication for the loss reserves being evaluated. These selections incorporate input from claims personnel, pricing actuaries and underwriting management on loss cost trends and other factors that could affect the reserve estimates.

For short tail classes, the emergence of paid and incurred losses generally exhibits a reasonably stable pattern of loss development from one accident year to the next. Thus, for these classes, the loss development factor method is generally relatively straightforward to apply and usually requires only modest extrapolation. For long tail classes, applying the loss development factor method often requires more judgment in selecting development factors as well as more significant extrapolation. For those long tail classes with high frequency and relatively low per-loss severity (e.g. workers' compensation), volatility will often be sufficiently modest for the loss development factor method to be given significant weight, except in the most recent accident years.

For certain long tail classes of business, however, anticipated loss experience is less predictable because of the small number of claims and erratic claim severity patterns. These classes include directors and officers liability, errors and omissions liability and commercial excess liability, among others. For these classes, the loss development factor methods may not produce a reliable estimate of ultimate losses in the most recent accident years since many claims either have not yet been reported to us or are only in the early stages of the settlement process. Therefore, the actuarial estimates for these accident years are based on less extrapolatory methods, such as expected loss ratio and Bornheutter-Ferguson methods. Over time, as a greater number of claims are reported and the statistical credibility of loss experience increases, loss development factor methods are given increasingly more weight.

Using all the available data, our actuaries select an indicated loss reserve amount for each class of business based on the various assumptions, projections and methods. The total indicated reserve

FICO0002368

amount determined by our actuaries is an aggregate of the indicated reserve amounts for the individual classes of business. The ultimate outcome is likely to fall within a range of potential outcomes around this indicated amount, but the indicated amount is not expected to be precisely the ultimate liability.

Senior management meets with our actuaries at the end of each quarter to review the results of the latest loss reserve analysis. Based on this review, management determines the carried reserve for each class of business. In making the determination, management considers numerous factors, such as changes in actuarial indications in the period, the maturity of the accident year, trends observed over the recent past and the level of volatility within a particular class of business. Such an assessment requires considerable judgment. It is often not possible to determine whether a change in the data represents credible actionable information or an anomaly. Even if a change is determined to be permanent, it is not always possible to determine the extent of the change until sometime later. As a result, there can be a time lag between the emergence of a change and a determination that the change should be reflected in the carried loss reserves. In general, changes are made more quickly to more mature accident years and less volatile classes of business.

Among the numerous factors that contribute to the inherent uncertainty in the process of establishing loss reserves are the following:

- changes in the inflation rate for goods and services related to covered damages such as medical care and home repair costs,

- changes in the judicial interpretation of policy provisions relating to the determination of coverage,

- changes in the general attitude of juries in the determination of liability and damages,

- legislative actions,

- changes in the medical condition of claimants,

- changes in our estimates of the number and/or severity of claims that have been incurred but not reported as of the date of the financial statements,

- changes in our book of business,

- changes in our underwriting standards, and

- changes in our claim handling procedures.

In addition, we must consider the uncertain effects of emerging or potential claims and coverage issues that arise as legal, judicial and social conditions change. These issues have had, and may continue to have, a negative effect on our loss reserves by either extending coverage beyond the original underwriting intent or by increasing the number or size of claims. Recent examples of such issues include the number of directors and officers liability and errors and omissions liability claims arising out of the ongoing credit crisis, the number of directors and officers liability claims arising out of stock option "backdating" practices by certain public companies, the number and size of directors and officers liability and errors and omissions liability claims arising out of investment banking practices and accounting and other corporate malfeasance, and exposure to claims asserted for bodily injury as a result of long-term exposure to harmful products or substances. As a result of issues such as these, the uncertainties inherent in estimating ultimate claim costs on the basis of past experience have grown, further complicating the already complex loss reserving process.

As part of our loss reserving analysis, we take into consideration the various factors that contribute to the uncertainty in the loss reserving process. Those factors that could materially affect our loss reserve estimates include loss development patterns and loss cost trends, rate and exposure level changes, the effects of changes in coverage and policy limits, business mix shifts, the effects of regulatory and legislative developments, the effects of changes in judicial interpretations, the effects of emerging claims and coverage issues and the effects of changes in claim

43

FICO0002369

handling practices. In making estimates of reserves, however, we do not necessarily make an explicit assumption for each of these factors. Moreover, all estimation methods do not utilize the same assumptions and typically no single method is determinative in the reserve analysis for a class of business. Consequently, changes in our loss reserve estimates generally are not the result of changes in any one assumption. Instead, the variability will be affected by the interplay of changes in numerous assumptions, many of which are implicit to the approaches used.

For each class of business, we regularly adjust the assumptions and actuarial methods used in the estimation of loss reserves in response to our actual loss experience as well as our judgments regarding changes in trends and/or emerging patterns. In those instances where we primarily utilize analyses of historical patterns of the development of paid and reported losses, this may be reflected, for example, in the selection of revised loss development factors. In those long tail classes of business that comprise a majority of our loss reserves and for which loss experience is less predictable due to potential changes in judicial interpretations, potential legislative actions and potential claims issues, this may be reflected in a judgmental change in our estimate of ultimate losses for particular accident years.

The future impact of the various factors that contribute to the uncertainty in the loss reserving process is extremely difficult to predict. There is potential for significant variation in the development of loss reserves, particularly for long tail classes of business. We do not derive statistical loss distributions or outcome confidence levels around our loss reserve estimate. Actuarial ranges of reasonable estimates are not a true reflection of the potential volatility between carried loss reserves and the ultimate settlement amount of losses incurred prior to the balance sheet date. This is due, among other reasons, to the fact that actuarial ranges are developed based on known events as of the valuation date whereas the ultimate disposition of losses is subject to the outcome of events and circumstances that were unknown as of the valuation date.

The following discussion includes disclosure of possible variation from current estimates of loss reserves due to a change in certain key assumptions for particular classes of business. These impacts are estimated individually, without consideration for any correlation among such assumptions or among lines of business. Therefore, it would be inappropriate to take the amounts and add them together in an attempt to estimate volatility for our loss reserves in total. We believe that the estimated variation in reserves detailed below is a reasonable estimate of the possible variation that may occur in the future. However, if such variation did occur, it would likely occur over a period of several years and therefore its impact on the Corporation's results of operations would be spread over the same period. It is important to note, however, that there is the potential for future variation greater than the amounts discussed below.

Two of the larger components of our loss reserves relate to the professional liability classes other than fidelity and to commercial excess liability. The respective reported loss development patterns are key assumptions in estimating loss reserves for these classes of business, both as applied directly to more mature accident years and as applied indirectly (e.g., via Bornheutter-Ferguson methods) to less mature accident years.

Reserves for the professional liability classes other than fidelity were $7.1 billion, net of reinsurance, at December 31, 2007. Based on a review of our loss experience, if the loss development factor for each accident year changed such that the cumulative loss development factor for the most recent accident year changed by 10%, we estimate that the net reserves for professional liability classes other than fidelity would change by approximately $700 million, in either direction. This degree of change in the reported loss development pattern is within the historical variation around the averages in our data.

Reserves for commercial excess liability (excluding asbestos and toxic waste claims) were $2.9 billion, net of reinsurance, at December 31, 2007. These reserves are included within commercial casualty. Based on a review of our loss experience, if the loss development factor for each accident year changed such that the cumulative loss development factor for the most recent accident year

FICO0002370

changed by 15%, we estimate that the net reserves for commercial excess liability would change by approximately $250 million, in either direction. This degree of change in the reported loss development pattern is within the historical variation around the averages in our data.

*Reserves Relating to Asbestos and Toxic Waste Claims.* The estimation of loss reserves relating to asbestos and toxic waste claims on insurance policies written many years ago is subject to greater uncertainty than other types of claims due to inconsistent court decisions as well as judicial interpretations and legislative actions that in some cases have tended to broaden coverage beyond the original intent of such policies and in others have expanded theories of liability. The insurance industry as a whole is engaged in extensive litigation over coverage and liability issues and is thus confronted with a continuing uncertainty in its efforts to quantify these exposures.

Reserves for asbestos and toxic waste claims cannot be estimated with traditional actuarial loss reserving techniques that rely on historical accident year loss development factors. Instead, we rely on an exposure-based analysis that involves a detailed review of individual policy terms and exposures. Because each policyholder presents different liability and coverage issues, we generally evaluate our exposure on a policyholder-by-policyholder basis, considering a variety of factors that are unique to each policyholder. Quantitative techniques have to be supplemented by subjective considerations including management's judgment.

We establish case reserves and expense reserves for costs of related litigation where sufficient information has been developed to indicate the involvement of a specific insurance policy. In addition, IBNR reserves are established to cover additional exposures on both known and unasserted claims.

We believe that the loss reserves carried at December 31, 2007 for asbestos and toxic waste claims were adequate. However, given the judicial decisions and legislative actions that have broadened the scope of coverage and expanded theories of liability in the past and the possibilities of similar interpretations in the future, it is possible that our estimate of loss reserves relating to these exposures may increase in future periods as new information becomes available and as claims develop.

*Asbestos Reserves.* Asbestos remains the most significant and difficult mass tort for the insurance industry in terms of claims volume and dollar exposure. Asbestos claims relate primarily to bodily injuries asserted by those who came in contact with asbestos or products containing asbestos. Tort theory affecting asbestos litigation has evolved over the years. Early court cases established the "continuous trigger" theory with respect to insurance coverage. Under this theory, insurance coverage is deemed to be triggered from the time a claimant is first exposed to asbestos until the manifestation of any disease. This interpretation of a policy trigger can involve insurance policies over many years and increases insurance companies' exposure to liability. Until recently, judicial interpretations and legislative actions attempted to maximize insurance availability from both a coverage and liability standpoint.

New asbestos claims and new exposures on existing claims have continued despite the fact that usage of asbestos has declined since the mid-1970's. Many claimants were exposed to multiple asbestos products over an extended period of time. As a result, claim filings typically name dozens of defendants. The plaintiffs' bar has solicited new claimants through extensive advertising and through asbestos medical screenings. A vast majority of asbestos bodily injury claims have been filed by claimants who do not show any signs of asbestos related disease. New asbestos cases are often filed in those jurisdictions with a reputation for judges and juries that are extremely sympathetic to plaintiffs.

Approximately 80 manufacturers and distributors of asbestos products have filed for bankruptcy protection as a result of asbestos-related liabilities. A bankruptcy sometimes involves an agreement to a plan between the debtor and its creditors, including current and future asbestos claimants. Although the debtor is negotiating in part with its insurers' money, insurers are generally given only limited opportunity to be heard. In addition to contributing to the overall number of claims, bankruptcy proceedings have also caused increased settlement demands against remaining solvent defendants.

FICO0002371

There have been some positive legislative and judicial developments in the asbestos environment over the past several years:

- Various challenges to mass screening claimants have been mounted, including a June 2005 U.S. District Court decision in Texas. Many believe that this decision is leading to higher medical evidentiary standards. For example, several asbestos injury settlement trusts suspended their acceptance of claims that were based on the diagnosis of physicians or screening companies named in the case, citing concerns about their reliability. Further investigations of the medical screening process for asbestos claims are underway.

- A number of states have implemented legislative and judicial reforms that focus the courts' resources on the claims of the most seriously injured. Those who allege serious injury and can present credible evidence of their injuries are receiving priority trial settings in the courts, while those who have not shown any credible disease manifestation are having their hearing dates delayed or are placed on an inactive docket, which preserves the right to pursue litigation in the future.

- A number of key jurisdictions have adopted venue reform that requires plaintiffs to have a connection to the jurisdiction in order to file a complaint.

- In recognition that many aspects of bankruptcy plans are unfair to certain classes of claimants and to the insurance industry, these plans are beginning to be closely scrutinized by the courts and rejected when appropriate.

Our most significant individual asbestos exposures involve products liability on the part of "traditional" defendants who were engaged in the manufacture, distribution or installation of asbestos products. We wrote excess liability and/or general liability coverages for these insureds. While these insureds are relatively few in number, their exposure has become substantial due to the increased volume of claims, the erosion of the underlying limits and the bankruptcies of target defendants.

Our other asbestos exposures involve products and non-products liability on the part of "peripheral" defendants, including a mix of manufacturers, distributors and installers of certain products that contain asbestos in small quantities and owners or operators of properties where asbestos was present. Generally, these insureds are named defendants on a regional rather than a nationwide basis. As the financial resources of traditional asbestos defendants have been depleted, plaintiffs are targeting these viable peripheral parties with greater frequency and, in many cases, for large awards.

Asbestos claims against the major manufacturers, distributors or installers of asbestos products were typically presented under the products liability section of primary general liability policies as well as under excess liability policies, both of which typically had aggregate limits that capped an insurer's exposure. In recent years, a number of asbestos claims by insureds are being presented as "non-products" claims, such as those by installers of asbestos products and by property owners or operators who allegedly had asbestos on their property, under the premises or operations section of primary general liability policies. Unlike products exposures, these non-products exposures typically had no aggregate limits on coverage, creating potentially greater exposure. Further, in an effort to seek additional insurance coverage, some insureds with installation activities who have substantially eroded their products coverage are presenting new asbestos claims as non-products operations claims or attempting to reclassify previously settled products claims as non-products claims to restore a portion of previously exhausted products aggregate limits. It is difficult to predict whether insureds will be successful in asserting claims under non-products coverage or whether insurers will be successful in asserting additional defenses. Accordingly, the ultimate cost to insurers of the claims for coverage not subject to aggregate limits is uncertain.

In establishing our asbestos reserves, we evaluate the exposure presented by each insured. As part of this evaluation, we consider a variety of factors including: the available insurance coverage; limits and deductibles; the jurisdictions involved; past settlement values of similar claims; the potential role of other insurance, particularly underlying coverage below our excess liability policies; potential

FICO0002372

bankruptcy impact; relevant judicial interpretations; and applicable coverage defenses, including asbestos exclusions.

We have assumed a continuing unfavorable legal environment with no benefit from any federal asbestos reform legislation. Various federal proposals to solve the ongoing asbestos litigation crisis have been considered by the U.S. Congress over the past few years, but none have yet been enacted. Thus, the prospect of federal asbestos reform legislation remains uncertain.

Our actuaries and claim personnel perform periodic analyses of our asbestos related exposures. The analyses during 2005 noted an increase in our estimate of the ultimate liabilities for two of our asbestos defendants. The analyses during 2006 noted positive developments, including several settlements, related to certain of our traditional asbestos defendants. At the same time, the analyses indicated that our exposure to loss from claims against our peripheral defendants was somewhat higher than previously expected. The analyses during 2007 noted an increase in our estimate of the ultimate liabilities related to certain of our traditional asbestos defendants. Based on these analyses, we increased our net asbestos loss reserves by $35 million in 2005, $18 million in 2006 and $75 million in 2007.

The following table presents a reconciliation of the beginning and ending loss reserves related to asbestos claims.

|  | Years Ended December 31 | | |
| --- | --- | --- | --- |
|  | 2007 | 2006 | 2005 |
|  | (in millions) | | |
| Gross loss reserves, beginning of year | $841 | $930 | $961 |
| Reinsurance recoverable, beginning of year | 52 | 50 | 55 |
| Net loss reserves, beginning of year | 789 | 880 | 906 |
| Net incurred losses | 75 | 18 | 35 |
| Net losses paid | 71 | 109 | 61 |
| Net loss reserves, end of year | 793 | 789 | 880 |
| Reinsurance recoverable, end of year | 45 | 52 | 50 |
| Gross loss reserves, end of year | $838 | $841 | $930 |

The following table presents the number of policyholders for whom we have open asbestos case reserves and the related net loss reserves at December 31, 2007 as well as the net losses paid during 2007 by component.

|  | Number of Policyholders | Net Loss Reserves | Net Losses Paid |
| --- | --- | --- | --- |
|  |  | (in millions) | |
| Traditional defendants | 26 | $220 | $26 |
| Peripheral defendants | 385 | 411 | 45 |
| Future claims from unknown policyholders |  | 162 | — |
|  |  | $793 | $71 |

Significant uncertainty remains as to our ultimate liability related to asbestos related claims. This uncertainty is due to several factors including:

- the long latency period between asbestos exposure and disease manifestation and the resulting potential for involvement of multiple policy periods for individual claims;

- plaintiffs' increased focus on peripheral defendants;

- the volume of claims by unimpaired plaintiffs and the extent to which they can be precluded from making claims;

FICO0002373

- the efforts by insureds to claim the right to non-products coverage not subject to aggregate limits;

- the number of insureds seeking bankruptcy protection as a result of asbestos-related liabilities;

- the ability of claimants to bring a claim in a state in which they have no residency or exposure;

- the impact of the exhaustion of primary limits and the resulting increase in claims on excess liability policies we have issued;

- inconsistent court decisions and diverging legal interpretations; and

- the possibility, however remote, of federal legislation that would address the asbestos problem.

These significant uncertainties are not likely to be resolved in the near future.

*Toxic Waste Reserves.*   Toxic waste claims relate primarily to pollution and related cleanup costs. Our insureds have two potential areas of exposure — hazardous waste dump sites and pollution at the insured site primarily from underground storage tanks and manufacturing processes.

The federal Comprehensive Environmental Response Compensation and Liability Act of 1980 (Superfund) has been interpreted to impose strict, retroactive and joint and several liability on potentially responsible parties (PRPs) for the cost of remediating hazardous waste sites. Most sites have multiple PRPs.

Most PRPs named to date are parties who have been generators, transporters, past or present landowners or past or present site operators. These PRPs had proper government authorization in many instances. However, relative fault has not been a factor in establishing liability. Insurance policies issued to PRPs were not intended to cover the clean-up costs of pollution and, in many cases, did not intend to cover the pollution itself. In more recent years, however, policies specifically excluded such exposures.

As the costs of environmental clean-up became substantial, PRPs and others increasingly filed claims with their insurance carriers. Litigation against insurers extends to issues of liability, coverage and other policy provisions.

There is substantial uncertainty involved in estimating our liabilities related to these claims. First, the liabilities of the claimants are extremely difficult to estimate. At any given waste site, the allocation of remediation costs among governmental authorities and the PRPs varies greatly depending on a variety of factors. Second, different courts have addressed liability and coverage issues regarding pollution claims and have reached inconsistent conclusions in their interpretation of several issues. These significant uncertainties are not likely to be resolved definitively in the near future.

Uncertainties also remain as to the Superfund law itself. Superfund's taxing authority expired on December 31, 1995 and has not been re-enacted. Federal legislation appears to be at a standstill. At this time, it is not possible to predict the direction that any reforms may take, when they may occur or the effect that any changes may have on the insurance industry.

Without federal movement on Superfund reform, the enforcement of Superfund liability has occasionally shifted to the states. States are being forced to reconsider state-level cleanup statutes and regulations. As individual states move forward, the potential for conflicting state regulation becomes greater. In a few states, we have seen cases brought against insureds or directly against insurance companies for environmental pollution and natural resources damages. To date, only a few natural resource claims have been filed and they are being vigorously defended. Significant uncertainty remains as to the cost of remediating the state sites. Because of the large number of state sites, such sites could prove even more costly in the aggregate than Superfund sites.

FICO0002374

In establishing our toxic waste reserves, we evaluate the exposure presented by each insured. As part of this evaluation, we consider a variety of factors including: the probable liability, available insurance coverage, past settlement values of similar claims, relevant judicial interpretations, applicable coverage defenses as well as facts that are unique to each insured.

Uncertainty remains as to our ultimate liability relating to toxic waste claims. However, toxic waste losses appear to be developing as expected due to relatively stable claim trends. In many cases, claims are being settled for less than initially anticipated due to more efficient site remediation efforts. In other cases, we have been successful at buying back our policies, thus removing the threat of additional losses in the future.

The following table presents a reconciliation of our beginning and ending loss reserves, net of reinsurance recoverable, related to toxic waste claims. The reinsurance recoverable related to these claims is minimal.

|  | Years Ended December 31 | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
|  | | (in millions) | |
| Reserves, beginning of year | $169 | $191 | $208 |
| Incurred losses | 13 | 6 | — |
| Losses paid | 28 | 28 | 17 |
| Reserves, end of year | $154 | $169 | $191 |

Of the net toxic waste loss reserves at December 31, 2007, $58 million was IBNR reserves.

*Reinsurance Recoverable.*   Reinsurance recoverable is the estimated amount recoverable from reinsurers related to the losses we have incurred. At December 31, 2007, reinsurance recoverable included $363 million recoverable with respect to paid losses and loss expenses, which is included in other assets, and $2.3 billion recoverable on unpaid losses and loss expenses.

Reinsurance recoverable on unpaid losses and loss expenses represents an estimate of the portion of our gross loss reserves that will be recovered from reinsurers. Such reinsurance recoverable is estimated as part of our loss reserving process using assumptions that are consistent with the assumptions used in estimating the gross loss reserves. Consequently, the estimation of reinsurance recoverable is subject to similar judgments and uncertainties as the estimation of gross loss reserves.

Ceded reinsurance contracts do not relieve our primary obligation to our policyholders. Consequently, an exposure exists with respect to reinsurance recoverable to the extent that any reinsurer is unable to meet its obligations or disputes the liabilities assumed under the reinsurance contracts. We are selective in regard to our reinsurers, placing reinsurance with only those reinsurers who we believe have strong balance sheets and superior underwriting ability, and we monitor the financial strength of our reinsurers on an ongoing basis. Nevertheless, in recent years, certain of our reinsurers have experienced financial difficulties or exited the reinsurance business. In addition, we may become involved in coverage disputes with our reinsurers. A provision for estimated uncollectible reinsurance is recorded based on periodic evaluations of balances due from reinsurers, the financial condition of the reinsurers, coverage disputes and other relevant factors.

*Prior Year Loss Development*

Because loss reserve estimates are subject to the outcome of future events, changes in estimates are unavoidable given that loss trends vary and time is required for changes in trends to be recognized and confirmed. Reserve changes that increase previous estimates of ultimate cost are referred to as unfavorable or adverse development or reserve strengthening. Reserve changes that decrease previous estimates of ultimate cost are referred to as favorable development or reserve releases.

FICO0002375

A reconciliation of our beginning and ending loss reserves, net of reinsurance, for the three years ended December 31, 2007 is as follows:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | (in millions) | |
| Net loss reserves, beginning of year | $19,699 | $18,713 | $16,809 |
| Net incurred losses and loss expenses related to | | | |
| Current year | 6,996 | 6,870 | 7,650 |
| Prior years | (697) | (296) | 163 |
| | 6,299 | 6,574 | 7,813 |
| Net payments for losses and loss expenses related to | | | |
| Current year | 1,809 | 1,640 | 1,878 |
| Prior years | 3,873 | 3,948 | 4,031 |
| | 5,682 | 5,588 | 5,909 |
| Net loss reserves, end of year | $20,316 | $19,699 | $18,713 |

During 2007, we experienced overall favorable prior year development of $697 million, which represented 3.5% of the net loss reserves as of December 31, 2006. This compares with favorable prior year development of $296 million during 2006, which represented 1.6% of the net loss reserves at December 31, 2005, and unfavorable prior year development of $163 million during 2005, which represented 1.0% of the net loss reserves at December 31, 2004. Such development was reflected in operating results in these respective years.

The following table presents the overall prior year loss development for the three years ended December 31, 2007 by accident year.

| Accident Year | Calendar Year (Favorable) Unfavorable Development | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| 2006 | $ (141) | | |
| 2005 | (233) | $ (372) | |
| 2004 | (240) | (276) | $ (304) |
| 2003 | (148) | (83) | (306) |
| 2002 | (71) | 5 | 169 |
| 2001 | 53 | 99 | 149 |
| 2000 | (17) | 102 | 81 |
| 1999 | (10) | 24 | 99 |
| 1998 | (26) | 19 | 36 |
| 1997 and prior | 136 | 186 | 239 |
| | $ (697) | $ (296) | $ 163 |

The net favorable development of $697 million in 2007 was due to various factors. The most significant factors were:

• We experienced favorable development of about $300 million in the professional liability classes other than fidelity, including about $100 million outside the U.S. A majority of this favorable development was in the 2003 through 2005 accident years. Reported loss activity related to these accident years was less than expected due to a favorable business climate, lower policy limits and better terms and conditions. While these accident years are somewhat immature, we concluded that

FICO0002376

there was sufficient evidence to modestly decrease the expected loss ratios for these accident years. The fact that our initial estimates for accident years 2003 and subsequent are developing favorably was recognized as one factor among several factors in the determination of loss reserves for the 2007 accident year for these classes. Other factors included the specific aspects of the current claim environment and the recent downward trend in prices.

- We experienced favorable development of about $180 million in the short tail homeowners and commercial property classes, primarily related to the 2006 and 2005 accident years. This favorable development arose from the lower than expected emergence of actual losses during 2007 relative to expectations used to establish our loss reserves at the end of 2006. The severity of late reported property claims that emerged during 2007 was lower than expected and case development, including salvage recoveries, on previously reported claims was better than expected. Because the incidence of property losses is subject to a considerable element of fortuity, reserve estimates for these classes are based on an analysis of past loss experience on average over a period of years. As a result, the favorable development in 2007 was recognized but had a relatively modest effect on our determination of carried property loss reserves at December 31, 2007.

- We experienced favorable development of about $135 million in the run-off of our reinsurance assumed business due primarily to better than expected reported loss activity from cedants.

- We experienced favorable development of about $40 million in the fidelity class and $30 million in the surety class due to lower than expected reported loss emergence, mainly related to more recent accident years. Loss reserve estimates at the end of 2006 in these classes included an expectation of more large late reported losses than actually occurred in 2007. However, since we would still expect such losses to occur in a typical year, factors that resulted in the favorable development in 2007 were given only modest weight in our determination of carried fidelity and surety loss reserves at December 31, 2007.

- We experienced favorable development of about $30 million in the personal automobile class. Case development during 2007 on previously reported claims was better than expected, reflecting improved case management. Also, the number of late reported claims was less than expected, reflecting a continuation of recent generally favorable frequency trends. Both of these factors were reflected in the determination of the carried loss reserves for this class at December 31, 2007.

- We experienced adverse development of about $20 million in the commercial liability classes. Adverse development in accident years prior to 1997, mostly the $88 million related to asbestos and toxic waste claims, was largely offset by favorable development in these classes in the more recent accident years. The asbestos and toxic waste loss activity primarily related to specific individual excess liability claims and did not change our overall assessment of recent trends. Therefore, this adverse development had little overall effect on our determination of carried loss reserves for these classes at December 31, 2007.

The net favorable development of $296 million in 2006 was also due to various factors. The most significant factors were:

- We experienced favorable development of about $190 million in the short tail homeowners and commercial property classes, primarily related to the 2005 accident year. This favorable development arose from the lower than expected emergence of actual losses during 2006 relative to expectations used to establish our loss reserves at the end of 2005. The severity of late reported property claims that emerged during 2006 was lower than expected and case development, including salvage recoveries, on previously reported claims was better than expected.

- We experienced favorable loss development of about $70 million in the fidelity class due to lower than expected reported loss emergence, mainly related to more recent accident years.

- We experienced favorable development of about $65 million in the run-off of our reinsurance assumed business due primarily to better than expected reported loss activity from cedants.

FICO0002377

- We experienced favorable development of about $45 million in the professional liability classes other than fidelity. Favorable development in the 2004 and 2005 accident years more than offset continued unfavorable development in accident years 2000 through 2002. Reported loss activity related to accident years 2004 and 2005 was less than expected due to a favorable business climate, lower policy limits and better terms and conditions. While these accident years are somewhat immature, we concluded that there was sufficient evidence to modestly decrease the expected loss ratios for these accident years. On the other hand, we continued to experience significant reported loss activity related to the 2000 through 2002 accident years, largely from claims related to corporate failures and allegations of management misconduct and accounting irregularities. As a result, we increased the expected loss ratios for these accident years.

- We experienced favorable development of about $25 million in the personal automobile class. Case development during 2006 on previously reported claims was better than expected, reflecting improved case management. Also, the number of late reported claims was less than expected, reflecting a continuation of recent generally favorable frequency trends.

- We experienced adverse development of about $100 million in the commercial liability classes, including $24 million related to asbestos and toxic waste claims. The adverse development was primarily due to reported loss activity in accident years prior to 1997 that was worse than expected, primarily related to specific individual excess liability and other liability claims.

The net unfavorable development of $163 million in 2005 was due to various factors. The most significant were:

- We experienced adverse development of about $200 million in the professional liability classes other than fidelity. The adverse development resulted from continued significant reported loss activity related to accident years 1998 through 2002, largely from claims related to corporate failures and allegations of management misconduct and accounting irregularities. As a result, we increased the expected loss ratios for these accident years. Offsetting this somewhat, reported loss activity related to accident years 2003 and 2004 was less than expected due to a favorable business climate, lower policy limits and better terms and conditions. While these accident years were somewhat immature, we concluded that there was sufficient evidence to modestly decrease the expected loss ratios for these accident years.

- We experienced adverse development of about $175 million in the commercial liability classes related to accident years prior to 1996, including $35 million related to asbestos claims. There was significant reported loss activity during 2005 related to these older accident years, primarily in the commercial excess liability class, which caused us to extend the expected loss emergence period.

- We experienced favorable development of about $160 million in the short tail homeowners and commercial property classes, primarily related to the 2004 accident year. The favorable development arose from the lower than expected emergence of late reported losses during 2005 relative to expectations used to establish our loss reserves at the end of 2004.

- We experienced favorable loss development of about $60 million in the fidelity class due to lower than expected reported loss emergence, mainly related to more recent accident years.

In Item 1 of this report, we present an analysis of our consolidated loss reserve development on a calendar year basis for each of the ten years prior to 2007. The variability in reserve development over the ten year period illustrates the uncertainty of the loss reserving process.

Our U.S. property and casualty subsidiaries are required to file annual statements with insurance regulatory authorities prepared on an accounting basis prescribed or permitted by such authorities. These annual statements include an analysis of loss reserves, referred to as Schedule P, that presents accident year loss development information by line of business for the nine years prior to 2007. It is our intention to post the Schedule P for our combined U.S. property and casualty subsidiaries on our website as soon as it becomes available.

FICO0002378

### Investment Results

Property and casualty investment income before taxes increased by 9% in 2007 compared with 2006 and by 11% in 2006 compared with 2005. Growth in both years was due to an increase in invested assets, which reflected substantial cash flow from operations over the period.

The effective tax rate on our investment income was 19.9% in 2007 compared with 18.8% in 2006 and 19.7% in 2005. While similar in these years, the effective tax rate does fluctuate as a result of our holding a different proportion of our investment portfolio in tax exempt securities during different periods.

On an after-tax basis, property and casualty investment income increased by 9% in 2007 and 10% in 2006. The after-tax annualized yield on the investment portfolio that supports our property and casualty insurance business was 3.50% in 2007 compared with 3.48% in 2006 and 3.45% in 2005. Management uses property and casualty investment income after-tax, a non-GAAP financial measure, to evaluate its investment performance because it reflects the impact of any change in the proportion of the investment portfolio invested in tax exempt securities and is therefore more meaningful for analysis purposes than investment income before income tax.

### Other Income and Charges

Other income and charges, which include miscellaneous income and expenses of the property and casualty subsidiaries, were not significant in the last three years.

## CORPORATE AND OTHER

Corporate and other comprises investment income earned on corporate invested assets, interest expense and other expenses not allocated to our operating subsidiaries, and the results of our real estate and other non-insurance subsidiaries, including Chubb Financial Solutions (CFS), which provided customized financial products to corporate clients and has been in run-off since April 2003.

Corporate and other produced a loss before taxes of $149 million in 2007 compared with losses of $89 million and $172 million in 2006 and 2005, respectively. The higher loss in 2007 compared with 2006 was due primarily to higher interest expense as a result of the issuance of $1.8 billion of new debt during the first half of 2007. The higher interest expense was only modestly offset by an increase in investment income as a substantial portion of the proceeds from the issuance of the debt was used to repurchase Chubb's common stock. The lower loss in 2006 compared with 2005 was primarily due to a significantly smaller loss in our real estate operation and higher investment income. The growth in investment income in 2006 was due to an increase in corporate invested assets, resulting from the issuance of Chubb's common stock upon the settlement of equity unit warrants and purchase contracts and under stock-based employee compensation plans.

### Real Estate

Real estate operations resulted in a loss before taxes of $6 million in 2007 compared with losses of $3 million in 2006 and $41 million in 2005. The large loss in 2005 was due to the recognition of a significant impairment loss. During 2005, we committed to a plan to sell a parcel of land in New Jersey that we had previously intended to hold and develop. The decision to sell the property was based on our assessment of the current real estate market and our concern about zoning issues. As a result of our decision to sell this property, we reassessed the recoverability of its carrying value. Based on our reassessment, we recognized an impairment loss of $48 million during the year to reduce the carrying value of the property to its estimated fair value.

Real estate revenues were $41 million in 2007, $202 million in 2006 and $115 million in 2005. The higher revenues in 2006 were due to the sale of one commercial property for approximately $110 million.

FICO0002379

At December 31, 2007, we owned approximately $120 million of land and $25 million of commercial properties and land parcels under lease. Management believes that it has made adequate provisions for impairment of real estate assets.

**Chubb Financial Solutions**

CFS's business was primarily structured credit derivatives, principally as a counterparty in portfolio credit default swap contracts. In April 2003, the Corporation announced its intention to exit CFS's business. Since that date, CFS has terminated early or run-off nearly all of its contractual obligations within its financial products portfolio.

The credit derivatives are carried in the financial statements at estimated fair value, which represents management's best estimate of the cost to exit the positions. Changes in fair value are recognized in income in the period of the change.

CFS's results were near breakeven in 2007 and 2006 compared with a loss before taxes of $9 million in 2005. The loss in 2005 related to the termination of a principal and interest guarantee contract.

CFS's aggregate exposure, or retained risk, from each of its remaining in-force financial products contracts is referred to as notional amount. Notional amounts are used to calculate the exchange of contractual cash flows and are not necessarily representative of the potential for gain or loss. The notional amounts are not recorded on the balance sheet.

CFS's remaining financial products contracts at December 31, 2007 included one credit default swap, a derivative contract linked to an equity market index that terminates in 2012 and a few other insignificant transactions. We estimate that the notional amount under the remaining contracts was about $400 million and the fair value of our future obligations was $7 million at December 31, 2007.

## REALIZED INVESTMENT GAINS AND LOSSES

Net investment gains realized were as follows:

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| Net realized gains (losses) | | | |
| Equity securities | $135 | $ 51 | $ 75 |
| Fixed maturities | 4 | (2) | (35) |
| Other invested assets | 344 | 209 | 162 |
| Transfer of reinsurance assumed business | — | — | 171 |
| Personal Lines Insurance Brokerage | — | — | 16 |
| | 483 | 258 | 389 |
| Other-than-temporary impairment losses | | | |
| Equity securities | 79 | 10 | 1 |
| Fixed maturities | 30 | 3 | 4 |
| | 109 | 13 | 5 |
| Realized investment gains before tax | $374 | $245 | $384 |
| Realized investment gains after tax | $243 | $161 | $248 |

The net realized gains on other invested assets represent the aggregate of distributions to us from the limited partnerships in which we have an interest and changes in our equity in the net assets of the partnerships based on valuations provided to us by the manager of each partnership. As a result of the timing of our receipt of valuation data from the investment managers, these investments are reported on a three month lag.

FICO0002380

In 2005, we transferred our ongoing reinsurance business and certain related assets to Harbor Point Limited. In exchange, we received from Harbor Point $200 million of 6% convertible notes and warrants to purchase common stock of Harbor Point. The notes and warrants represented in the aggregate on a fully diluted basis approximately 16% of the new company. The transaction resulted in a pre-tax gain of $204 million, of which $171 million was recognized as a realized investment gain in 2005. The remaining gain of $33 million was deferred and will be recognized based on the timing of the ultimate disposition of our economic interest in Harbor Point.

In 2005, we completed the sale of Personal Lines Insurance Brokerage, Inc. Based on the terms of the sale, we recognized a gain of $16 million.

Decisions to sell equity securities and fixed maturities are governed principally by considerations of investment opportunities and tax consequences. As a result, realized gains and losses on the sale of these investments may vary significantly from period to period. However, such gains and losses generally have little, if any, impact on shareholders' equity as all of these investments are carried at fair value, with the unrealized appreciation or depreciation reflected in comprehensive income.

A primary reason for the sale of fixed maturities in each of the last three years has been to improve our after-tax portfolio return without sacrificing quality where market opportunities have existed to do so. In addition, in the fourth quarter of 2005, to reduce our income tax liability, we engaged in a program to sell taxable and tax exempt fixed maturities to generate realized losses to offset a portion of the gain related to the Harbor Point transaction.

We regularly review those invested assets whose fair value is less than cost to determine if an other-than-temporary decline in value has occurred. In evaluating whether a decline in value of any investment is temporary or other than temporary, we consider various quantitative criteria and qualitative factors including the length of time and the extent to which the fair value has been less than the cost, the financial condition and near term prospects of the issuer, whether the issuer is current on contractually obligated interest and principal payments, our intent and ability to hold the investment for a period of time sufficient to allow us to recover our cost, general market conditions and industry or sector specific factors. If a decline in the fair value of an individual security is deemed to be other than temporary, the difference between cost and estimated fair value is charged to income as a realized investment loss. The fair value of the investment becomes its new cost basis. The decision to recognize a decline in the value of a security carried at fair value as other-than-temporary rather than temporary has no impact on shareholders' equity.

During 2007, our investments in several equity securities and one fixed maturity holding were deemed to be other-than-temporarily impaired. We determined that the equity securities were not likely to recover to our cost basis over a near-term period and we were not likely to collect all contractually obligated amounts due us under the terms of the fixed maturity investment.

Information related to investment securities in an unrealized loss position at December 31, 2007 and 2006 is included in Note (4)(b) of the Notes to Consolidated Financial Statements.

INCOME TAXES

As a result of progress toward the settlement of certain tax matters, we recognized a $10 million tax benefit in the third quarter of 2006.

In connection with the sale of a subsidiary a number of years ago, we agreed to indemnify the buyer for certain pre-closing tax liabilities. During the first quarter of 2005, we settled this obligation with the purchaser. Accordingly, we reduced our income tax liability, which resulted in the recognition of a benefit of $22 million.

FICO0002381

## CAPITAL RESOURCES AND LIQUIDITY

Capital resources and liquidity represent a company's overall financial strength and its ability to generate cash flows, borrow funds at competitive rates and raise new capital to meet operating and growth needs.

### Capital Resources

Capital resources provide protection for policyholders, furnish the financial strength to support the business of underwriting insurance risks and facilitate continued business growth. At December 31, 2007, the Corporation had shareholders' equity of $14.4 billion and total debt of $3.5 billion.

In February 2007, Executive Risk Capital Trust (Trust), wholly owned by Chubb Executive Risk Inc., a wholly owned subsidiary of Chubb, redeemed $125 million of its 8.675% capital securities using the funds it received from the repayment of debentures issued by Chubb Executive Risk to the Trust, which constituted the Trust's sole assets. The redemption price of the capital securities included a make-whole premium of $5 million in the aggregate.

In March 2007, Chubb issued $1.0 billion of unsecured junior subordinated capital securities. The capital securities will become due on April 15, 2037, the scheduled maturity date, but only to the extent that Chubb has received sufficient net proceeds from the sale of certain qualifying capital securities. Chubb must use its commercially reasonable efforts, subject to certain market disruption events, to sell enough qualifying capital securities to permit repayment of the capital securities on the scheduled maturity date or as soon thereafter as possible. Any remaining outstanding principal amount will be due on March 29, 2067, the final maturity date. The capital securities bear interest at a fixed rate of 6.375% through April 14, 2017. Thereafter, the capital securities will bear interest at a rate equal to the three-month LIBOR rate plus 2.25%. Subject to certain conditions, Chubb has the right to defer the payment of interest on the capital securities for a period not exceeding ten consecutive years. During any such period, interest will continue to accrue and Chubb generally may not declare or pay any dividends on or purchase any shares of its capital stock.

In connection with the issuance of the capital securities, Chubb entered into a replacement capital covenant in which it agreed that it will not repay, redeem or purchase the capital securities before March 29, 2047, unless, subject to certain limitations, it has received proceeds from the sale of replacement capital securities, as defined. Subject to the replacement capital covenant, the capital securities may be redeemed, in whole or in part, at any time on or after April 15, 2017 at a redemption price equal to the principal amount plus any accrued interest or prior to April 15, 2017 at a redemption price equal to the greater of (i) the principal amount or (ii) a make-whole amount, in each case plus any accrued interest.

In May 2007, Chubb issued $800 million of unsecured 6% senior notes due in 2037.

In 2002, Chubb issued $600 million of unsecured 4% senior notes due in 2007 and 24 million mandatorily exercisable warrants to purchase its common stock. The notes and warrants were issued together in the form of 7% equity units, each of which initially represented $25 principal amount of notes and one warrant. In August 2005, the notes were successfully remarketed as required by their terms. The interest rate on the notes was reset to 4.934%, effective August 16, 2005. Each warrant obligated the holder to purchase, on or before November 16, 2005, for a settlement price of $25, a variable number of shares of Chubb's common stock. The number of shares purchased was determined based on a formula that considered the market price of Chubb's common stock immediately prior to the time of settlement in relation to the $28.32 per share sale price of the common stock at the time the equity units were offered. Upon settlement of the warrants in November 2005, Chubb issued 17,366,234 shares of common stock and received proceeds of $600 million. In November 2007, the $600 million of notes were paid when due.

In December 2007, $75 million of 7⅛% notes issued by Chubb Executive Risk were paid when due.

FICO0002382

In 2003, Chubb issued $460 million of unsecured 2.25% senior notes due in 2008 and 18.4 million purchase contracts to purchase its common stock. The notes and purchase contracts were issued together in the form of 7% equity units, each of which initially represented $25 principal amount of notes and one purchase contract. In May 2006, the notes were successfully remarketed as required by their terms. The interest rate on the notes was reset to 5.472% from 2.25%, effective May 16, 2006. The remarketed notes mature on August 16, 2008. Each purchase contract obligated the holder to purchase, on or before August 16, 2006, for a settlement price of $25, a variable number of shares of Chubb's common stock. The number of shares purchased was determined based on a formula that considered the market price of Chubb's common stock immediately prior to the time of settlement in relation to the $29.75 per share sale price of the common stock at the time the equity units were offered. Upon settlement of the purchase contracts in August 2006, Chubb issued 12,883,527 shares of common stock and received proceeds of $460 million.

Chubb also has outstanding $225 million of 3.95% notes due in April 2008 as well as $400 million of 6% notes due in 2011, $275 million of 5.2% notes due in 2013, $100 million of 6.6% debentures due in 2018 and $200 million of 6.8% debentures due in 2031, all of which are unsecured.

Management regularly monitors the Corporation's capital resources. In connection with our long-term capital strategy, Chubb from time to time contributes capital to its property and casualty subsidiaries. In addition, in order to satisfy capital needs as a result of any rating agency capital adequacy or other future rating issues, or in the event we were to need additional capital to make strategic investments in light of market opportunities, we may take a variety of actions, which could include the issuance of additional debt and/or equity securities. We believe that our strong financial position and conservative debt level provide us with the flexibility and capacity to obtain funds externally through debt or equity financings on both a short term and long term basis.

In December 2005, the Board of Directors authorized the repurchase of up to 28,000,000 shares of Chubb's common stock. In December 2006, the Board of Directors authorized the repurchase of up to an additional 20,000,000 shares of common stock. In March 2007, the Board of Directors authorized an increase of 20,000,000 shares to the December 2006 authorization. In December 2007, the Board of Directors authorized the repurchase of up to an additional 28,000,000 shares of common stock.

In 2005, we repurchased 2,787,800 shares of Chubb's common stock in open market transactions at a cost of $135 million. In January 2006, we repurchased 5,100,000 shares under an accelerated stock buyback program at an initial price of $48.91 per share, for a total cost of $249 million. The program was completed in March 2006, at which time, under the terms of the agreement, we received a price adjustment based on the volume weighted average price of Chubb's common stock during the program period. The price adjustment could be settled, at our election, in Chubb's common stock or cash. We elected to have the counterparty deliver 125,562 additional shares in settlement of the price adjustment. During the remainder of 2006, we repurchased 20,140,700 shares in the open market. In the aggregate, in 2006, we repurchased 25,366,262 shares of Chubb's common stock at a cost of $1,257 million. In 2007, we repurchased 41,733,268 shares of Chubb's common stock in open market transactions at a cost of $2,184 million. As of December 31, 2007, 26,112,670 shares remained under the December 2007 share repurchase authorization, which has no expiration date. Based on our outlook for 2008, we expect to repurchase all of the shares remaining under the December 2007 authorization by the end of 2008, subject to market conditions.

Ratings

Chubb and its insurance subsidiaries are rated by major rating agencies. These ratings reflect the rating agency's opinion of our financial strength, operating performance, strategic position and ability to meet our obligations to policyholders.

FICO0002383

Credit ratings assess a company's ability to make timely payments of interest and principal on its debt. The following table summarizes the Corporation's credit ratings from the major independent rating organizations as of February 26, 2008.

|  | A.M. Best | Standard & Poor's | Moody's | Fitch |
|---|---|---|---|---|
| Senior unsecured debt . . . . . . . . . . . . . . . . . . . . | aa− | A | A2 | A+ |
| Junior subordinated capital securities . . . . . . . | a | BBB+ | A3 | A |
| Commercial paper . . . . . . . . . . . . . . . . . . . . . . . | AMB-1+ | A-1 | P-1 | F-1 |

Financial strength ratings assess an insurer's ability to meet its financial obligations to policyholders. The following table summarizes our property and casualty subsidiaries' financial strength ratings from the major independent rating organizations as of February 26, 2008.

|  | A.M. Best | Standard & Poor's | Moody's | Fitch |
|---|---|---|---|---|
| Financial strength . . . . . . . . . . . . . . . . . . . . . . . . | A++ | AA | Aa2 | AA |

Ratings are an important factor in establishing our competitive position in the insurance markets. There can be no assurance that our ratings will continue for any given period of time or that they will not be changed.

It is possible that one or more of the rating agencies may raise or lower our existing ratings in the future. If our credit ratings were downgraded, we might incur higher borrowing costs and might have more limited means to access capital. A downgrade in our financial strength ratings could adversely affect the competitive position of our insurance operations, including a possible reduction in demand for our products in certain markets.

Liquidity

Liquidity is a measure of a company's ability to generate sufficient cash flows to meet the short and long term cash requirements of its business operations.

The Corporation's liquidity requirements in the past have been met by funds from operations as well as the issuance of commercial paper and debt and equity securities. We expect that our liquidity requirements in the future will be met by these sources of funds or borrowings from our credit facility.

Our property and casualty operations provide liquidity in that premiums are generally received months or even years before losses are paid under the policies purchased by such premiums. Historically, cash receipts from operations, consisting of insurance premiums and investment income, have provided more than sufficient funds to pay losses, operating expenses and dividends to Chubb. After satisfying our cash requirements, excess cash flows are used to build the investment portfolio and thereby increase future investment income.

Our strong underwriting results continued to generate substantial new cash in 2007. New cash from operations available for investment by the property and casualty subsidiaries was approximately $1.6 billion in 2007 compared with $2.7 billion in 2006 and $3.4 billion in 2005. New cash available was lower in 2007 than in 2006 due to a $900 million increase in dividends paid by the property and casualty subsidiaries to Chubb and, to a lesser extent, higher income tax payments. New cash available was lower in 2006 than in 2005 due primarily to substantially higher income tax payments and lower premium receipts.

FICO0002384

Our property and casualty subsidiaries maintain substantial investments in highly liquid, short-term marketable securities. Accordingly, we do not anticipate selling long-term fixed maturity investments to meet any liquidity needs.

Chubb's liquidity requirements primarily include the payment of dividends to shareholders and interest and principal on debt obligations. The declaration and payment of future dividends to Chubb's shareholders will be at the discretion of Chubb's Board of Directors and will depend upon many factors, including our operating results, financial condition, capital requirements and any regulatory constraints.

As a holding company, Chubb's ability to continue to pay dividends to shareholders and to satisfy its debt obligations relies on the availability of liquid assets, which is dependent in large part on the dividend paying ability of its property and casualty subsidiaries. Our property and casualty subsidiaries are subject to laws and regulations in the jurisdictions in which they operate that restrict the amount of dividends they may pay without the prior approval of regulatory authorities. The restrictions are generally based on net income and on certain levels of policyholders' surplus as determined in accordance with statutory accounting practices. Dividends in excess of such thresholds are considered "extraordinary" and require prior regulatory approval. During 2007, 2006 and 2005, these subsidiaries paid to Chubb cash dividends of $1,550 million, $650 million and $520 million, respectively. In 2005, these subsidiaries also paid a dividend of $97 million in other assets. The maximum dividend distribution that may be made by the property and casualty subsidiaries to Chubb during 2008 without prior approval is approximately $2.4 billion.

Chubb has a revolving credit agreement with a group of banks that provides for up to $500 million of unsecured borrowings. There have been no borrowings under this agreement. Various interest rate options are available to Chubb, all of which are based on market interest rates. The agreement contains customary restrictive covenants including a covenant to maintain a minimum consolidated shareholders' equity, as adjusted. At December 31, 2007, Chubb was in compliance with all such covenants. The revolving credit facility is available for general corporate purposes and to support our commercial paper borrowing arrangement. The facility had a termination date of June 22, 2010. In October 2007, the agreement was amended to extend the termination date to October 19, 2012. The terms of the amended agreement allow Chubb to elect in 2008 and again in 2009 to extend the termination date of the agreement by an additional year. On the termination date of the agreement, any borrowings then outstanding become payable.

## Contractual Obligations and Off-Balance Sheet Arrangements

The following table provides our future payments due by period under contractual obligations as of December 31, 2007, aggregated by type of obligation.

| | 2008 | 2009 and 2010 | 2011 and 2012 | There-after | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Principal due under long term debt . . . . . . . | $ 685 | $ — | $ 400 | $ 2,375 | $ 3,460 |
| Interest payments on long term debt(a) . . . | 190 | 341 | 317 | 3,144 | 3,992 |
| Future minimum rental payments under operating leases . . . . . . . . . . . . . . . . . . . . . . | 89 | 146 | 114 | 181 | 530 |
| | 964 | 487 | 831 | 5,700 | 7,982 |
| Loss and loss expense reserves(b) . . . . . . . . | 4,977 | 7,013 | 4,072 | 6,561 | 22,623 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $5,941 | $7,500 | $4,903 | $12,261 | $30,605 |

(a) Junior subordinated capital securities of $1 billion bear interest at a fixed rate of 6.375% through April 14, 2017 and at a rate equal to the three-month LIBOR rate plus 2.25% thereafter. For purposes of the above table, interest after April 14, 2017 was calculated using the three-month

FICO0002385

LIBOR rate as of December 31, 2007. The table includes future interest payments through the scheduled maturity date, April 15, 2037. Interest payments for the period from the scheduled maturity date through the final maturity date, March 29, 2067, would increase the contractual obligation by $2.1 billion. It is our expectation that the capital securities will be redeemed at the end of the fixed interest rate period.

(b) There is typically no stated contractual commitment associated with property and casualty insurance loss reserves. The obligation to pay a claim arises only when a covered loss event occurs and a settlement is reached. The vast majority of our loss reserves relate to claims for which settlements have not yet been reached. Our loss reserves therefore represent estimates of future payments. These estimates are dependent on the outcome of claim settlements that will occur over many years. Accordingly, the payment of the loss reserves is not fixed as to either amount or timing. The estimate of the timing of future payments is based on our historical loss payment patterns. The ultimate amount and timing of loss payments will likely differ from our estimate and the differences could be material. We expect that these loss payments will be funded, in large part, by future cash receipts from operations.

The above table excludes certain commitments totaling $1.3 billion at December 31, 2007 to fund limited partnership investments. These capital commitments can be called by the partnerships from time to time during the commitment period (generally five years or less), if and when needed by the partnerships to fund working capital needs or the purchase of new investments. It is uncertain whether and, if so, when we will be required to fund these commitments. There is no predetermined payment schedule.

The Corporation does not have any off-balance sheet arrangements that are reasonably likely to have a material effect on the Corporation's financial condition, results of operations, liquidity or capital resources, other than as disclosed in Note (15) of the Notes to Consolidated Financial Statements.

## INVESTED ASSETS

The main objectives in managing our investment portfolios are to maximize after-tax investment income and total investment returns while minimizing credit risks in order to provide maximum support to the insurance underwriting operations. Investment strategies are developed based on many factors including underwriting results and our resulting tax position, regulatory requirements, fluctuations in interest rates and consideration of other market risks. Investment decisions are centrally managed by investment professionals based on guidelines established by management and approved by the boards of directors of Chubb and its respective operating companies.

Our investment portfolio is primarily comprised of high quality bonds, principally tax exempt, U.S. Treasury and government agency, mortgage-backed securities and corporate issues as well as foreign government and corporate bonds that support our international operations. The portfolio also includes equity securities, primarily publicly traded common stocks, and other invested assets, primarily private equity limited partnerships, all of which are held with the primary objective of capital appreciation.

Limited partnership investments by their nature are less liquid and involve more risk than other investments. We actively manage our risk through type of asset class and domestic and international diversification. At December 31, 2007, we had investments in about 80 separate partnerships. We review the performance of these investments on a quarterly basis and we obtain audited financial statements annually.

In our U.S. operations, during 2007, we invested new cash in tax exempt bonds and, to a lesser extent, taxable bonds, equity securities and limited partnerships. The taxable bonds we invested in were corporate bonds and mortgage-backed securities while we reduced our holdings of U.S. Treasury securities. In 2006, we invested new cash in tax-exempt bonds and, to a lesser extent, equity securities

FICO0002386

and limited partnerships, whereas we decreased our holdings of taxable bonds, principally U.S. Treasury securities. In 2005, we invested new cash primarily in tax-exempt bonds and taxable bonds. The taxable bonds we invested in were mortgage-backed securities and, to a lesser extent, corporate bonds. Our objective is to achieve the appropriate mix of taxable and tax exempt securities in our portfolio to balance both investment and tax strategies. At December 31, 2007, 66% of our U.S. fixed maturity portfolio was invested in tax exempt bonds compared with 65% at December 31, 2006 and 60% at December 31, 2005.

We classify those fixed maturity securities that may be sold prior to maturity to support our investment strategies, such as in response to changes in interest rates and the yield curve or to maximize after-tax returns, as available-for-sale. We classify those fixed maturities that we have the ability and intent to hold to maturity as held-to-maturity. Fixed maturities classified as available-for-sale are carried at market value while fixed maturities classified as held-to-maturity are carried at amortized cost. Only about 1% of the fixed maturity portfolio was classified as held-to-maturity at December 31, 2006 and 2005. During the fourth quarter of 2007, we transferred our remaining held-to-maturity securities to available-for-sale.

Changes in the general interest rate environment affect the returns available on new fixed maturity investments. While a rising interest rate environment enhances the returns available on new investments, it reduces the market value of existing fixed maturity investments and thus the availability of gains on disposition. A decline in interest rates reduces the returns available on new investments but increases the market value of existing investments, creating the opportunity for realized investment gains on disposition.

The unrealized appreciation before tax of investments carried at market value, which consists of fixed maturities classified as available-for-sale and equity securities, was $810 million, $603 million and $478 million at December 31, 2007, 2006 and 2005, respectively. Such unrealized appreciation is reflected in comprehensive income, net of applicable deferred income tax.

Changes in unrealized market appreciation or depreciation of fixed maturities were due primarily to fluctuations in interest rates.

## CHANGE IN ACCOUNTING PRINCIPLES

Effective December 31, 2006, we adopted Statement of Financial Accounting Standards (SFAS) No. 158, Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132(R). SFAS No. 158 requires an employer to recognize the overfunded or underfunded status of a defined benefit postretirement plan as an asset or liability in its balance sheet and to recognize changes in the funded status as a component of comprehensive income in the year in which the changes occur. Retrospective application is not permitted.

SFAS No. 158 required that any gains or losses and prior service cost that had not yet been included in net benefit costs at the end of the year in which the Statement was adopted be recognized as an adjustment of the ending balance of accumulated other comprehensive income, net of tax. The adoption of SFAS No. 158 reduced shareholders' equity at December 31, 2006 by $281 million. Adoption of the Statement did not have any effect on the Corporation's net income in 2006 and 2007 and will not in future years. The adoption of SFAS No. 158 is discussed further in Note (2)(a) of the Notes to Consolidated Financial Statements.

## Item 7A.  *Quantitative and Qualitative Disclosures About Market Risk*

Market risk represents the potential for loss due to adverse changes in the fair value of financial instruments. Our primary exposure to market risks relates to our investment portfolio, which is sensitive to changes in interest rates and, to a lesser extent, credit quality, prepayment, foreign currency exchange rates and equity prices. We also have exposure to market risks through our debt

FICO0002387

obligations. Analytical tools and monitoring systems are in place to assess each of these elements of market risk.

**Investment Portfolio**

Interest rate risk is the price sensitivity of a security that promises a fixed return to changes in interest rates. When market interest rates rise, the market value of our fixed income securities decreases. We view the potential changes in price of our fixed income investments within the overall context of asset and liability management. Our actuaries estimate the payout pattern of our liabilities, primarily our property and casualty loss reserves, to determine their duration, which is the present value of the weighted average payments expressed in years. We set duration targets for our fixed income investment portfolios after consideration of the estimated duration of these liabilities and other factors, which we believe mitigates the overall effect of interest rate risk for the Corporation.

The following table provides information about our fixed maturity investments, which are sensitive to changes in interest rates. The table presents cash flows of principal amounts and related weighted average interest rates by expected maturity dates at December 31, 2007 and 2006. The cash flows are based on the earlier of the call date or the maturity date or, for mortgage-backed securities, expected payment patterns. Actual cash flows could differ from the expected amounts.

| | | | | | | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | Estimated |
| | | | | | | There- | Amortized | Market |
| | 2008 | 2009 | 2010 | 2011 | 2012 | after | Cost | Value |
| | | | | | (in millions) | | | |
| Tax exempt . . . . . . . . . . . . . . . . . . . | $1,179 | $ 891 | $1,047 | $1,421 | $1,766 | $11,904 | $18,208 | $18,559 |
| Average interest rate . . . . . . . | 5.2% | 5.1% | 4.7% | 4.3% | 4.1% | 4.1% | | |
| Taxable — other than mortgage-backed securities . . . . . . . . . . . | 808 | 1,125 | 1,388 | 1,196 | 1,494 | 4,494 | 10,505 | 10,562 |
| Average interest rate . . . . . . . | 5.6% | 4.8% | 4.8% | 5.0% | 5.2% | 5.1% | | |
| Mortgage-backed securities . . . . . | 623 | 580 | 556 | 529 | 694 | 1,779 | 4,761 | 4,750 |
| Average interest rate . . . . . . . | 5.0% | 4.7% | 4.7% | 4.8% | 5.0% | 5.3% | | |
| Total . . . . . . . . . . . . . . . . . . . . | $2,610 | $2,596 | $2,991 | $3,146 | $3,954 | $18,177 | $33,474 | $33,871 |

At December 31, 2007

| | | | | | | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | Estimated |
| | | | | | | There- | Amortized | Market |
| | 2007 | 2008 | 2009 | 2010 | 2011 | after | Cost | Value |
| | | | | | (in millions) | | | |
| Tax exempt . . . . . . . . . . . . . . . . . . . | $ 915 | $ 868 | $1,007 | $1,094 | $1,492 | $12,073 | $17,449 | $17,755 |
| Average interest rate . . . . . . . | 5.3% | 5.2% | 5.0% | 4.7% | 4.3% | 4.1% | | |
| Taxable — other than mortgage-backed securities . . . . . . . . . . . | 757 | 1,151 | 1,834 | 1,278 | 1,053 | 3,831 | 9,904 | 9,879 |
| Average interest rate . . . . . . . | 5.6% | 4.8% | 4.5% | 4.8% | 5.1% | 5.0% | | |
| Mortgage-backed securities . . . . . | 473 | 675 | 583 | 550 | 523 | 1,602 | 4,406 | 4,339 |
| Average interest rate . . . . . . . | 4.5% | 5.2% | 4.7% | 4.7% | 4.8% | 5.1% | | |
| Total . . . . . . . . . . . . . . . . . . . . . | $2,145 | $2,694 | $3,424 | $2,922 | $3,068 | $17,506 | $31,759 | $31,973 |

At December 31, 2006

Credit risk is the potential loss resulting from adverse changes in the issuer's ability to repay the debt obligation. We have consistently invested in high quality marketable securities. Only about 1% of our bond portfolio is below investment grade. Our investment portfolio does not have any direct exposure to either sub-prime mortgages or collateralized debt obligations. Our tax exempt bonds mature on average in nine years, while our taxable bonds have an average maturity of five years.

FICO0002388

About 95% of our tax exempt bonds are rated AA or better by Moody's or Standard and Poor's with about 70% rated AAA. About 57% of the tax exempt bonds are uninsured and have an average credit rating of AA+. The remaining 43% are insured and are therefore rated AAA. Ongoing credit market related events have weakened the monoline bond insurers and raised concerns about the value of the credit insurance. The insured tax exempt bonds in our portfolio have been selected based on the quality of the underlying credit and not the value of the credit insurance enhancement. It is management's belief that even if the insurance provided by the monoline insurers ceased to exist, the aggregate mark-to-market impact on our tax exempt portfolio would not be material.

About 75% of the taxable bonds, other than mortgage-backed securities, in our portfolio are issued by the U.S. Treasury or U.S. government agencies or by foreign governments or are rated AA or better.

Mortgage-backed securities comprised 31% of our taxable bond portfolio at year-end 2007. About 98% of the mortgage-backed securities are rated AAA and the remaining 2% are all investment grade. Of the AAA rated securities, about 60% related to residential mortgages consisting of government agency pass-through securities, government agency collateralized mortgage obligations (CMOs) and AAA rated non-agency CMOs backed by government agency collateral or single family home mortgages. The majority of the CMOs are actively traded in liquid markets and market value information is readily available from broker/dealers. The other 40% of the AAA rated securities are call protected, commercial mortgage-backed securities.

Prepayment risk refers to the changes in prepayment patterns related to decreases and increases in interest rates that can either shorten or lengthen the expected timing of the principal repayments and thus the average life of a security, potentially reducing or increasing its effective yield. Such risk exists primarily within our portfolio of residential mortgage-backed securities. We monitor such risk regularly.

Foreign currency risk is the sensitivity to foreign exchange rate fluctuations of the market value and investment income related to foreign currency denominated financial instruments. The functional currency of our foreign operations is generally the currency of the local operating environment since business is primarily transacted in such local currency. We seek to mitigate the risks relating to currency fluctuations by generally maintaining investments in those foreign currencies in which our property and casualty subsidiaries have loss reserves and other liabilities, thereby limiting exchange rate risk to the net assets denominated in foreign currencies.

At December 31, 2007, the property and casualty subsidiaries held foreign currency denominated investments of $6.8 billion supporting their international operations. The principal currencies creating foreign exchange rate risk for the property and casualty subsidiaries are the Canadian dollar, the euro and the British pound sterling. The following table provides information about those fixed maturity investments that are denominated in these currencies. The table presents cash flows of principal amounts in U.S. dollar equivalents by expected maturity dates at December 31, 2007. Actual cash flows could differ from the expected amounts.

| | At December 31, 2007 | | | | | | | |
| | | | | | | | Total | |
| | 2008 | 2009 | 2010 | 2011 | 2012 | There-after | Amortized Cost | Estimated Market Value |
| | | | | | (in millions) | | | |
|---|---|---|---|---|---|---|---|---|
| Canadian dollar . . . . . . . . . . . . . | $163 | $227 | $246 | $261 | $231 | $718 | $1,846 | $1,873 |
| Euro . . . . . . . . . . . . . . . . . . . . . . . | 98 | 161 | 174 | 215 | 144 | 842 | 1,634 | 1,611 |
| British pound sterling . . . . . . . . | 129 | 114 | 274 | 117 | 191 | 673 | 1,498 | 1,502 |

FICO0002389

Equity price risk is the potential loss in market value of our equity securities resulting from adverse changes in stock prices. In general, equities have more year-to-year price variability than intermediate term high grade bonds. However, returns over longer time frames have been consistently higher. Our publicly traded equity securities are high quality, diversified across industries and readily marketable. A hypothetical decrease of 10% in the market price of each of the equity securities held at December 31, 2007 and 2006 would have resulted in a decrease of $232 million and $196 million, respectively, in the fair value of the equity securities portfolio.

All of the above risks are monitored on an ongoing basis. A combination of in-house systems and proprietary models and externally licensed software are used to analyze individual securities as well as each portfolio. These tools provide the portfolio managers with information to assist them in the evaluation of the market risks of the portfolio.

### Debt

We also have interest rate risk on our debt obligations. The following table presents expected cash flow of principal amounts and related weighted average interest rates by maturity date of our long term debt obligations at December 31, 2007.

| | At December 31, 2007 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | There-after | Total | Estimated Market Value |
| | | | | (in millions) | | | | |
| Expected cash flows of principal amounts ...................... | $685 | $— | $— | $400 | $— | $2,375 | $3,460 | $3,427 |
| Average interest rate ............. | 5.0% | — | — | 6.0% | — | 6.2% | | |

### Item 8.   *Consolidated Financial Statements and Supplementary Data*

Consolidated financial statements of the Corporation at December 31, 2007 and 2006 and for each of the three years in the period ended December 31, 2007 and the report thereon of our independent registered public accounting firm, and the Corporation's unaudited quarterly financial data for the two-year period ended December 31, 2007 are listed in Item 15(a) of this report.

### Item 9.   *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

None.

### Item 9A.   *Controls and Procedures*

As of December 31, 2007, an evaluation of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Securities Exchange Act of 1934) was performed under the supervision and with the participation of the Corporation's management, including Chubb's chief executive officer and chief financial officer. Based on that evaluation, the chief executive officer and chief financial officer concluded that the Corporation's disclosure controls and procedures were effective as of December 31, 2007.

During the three month period ended December 31, 2007, there were no changes in internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, the Corporation's internal control over financial reporting.

FICO0002390

**Management's Report on Internal Control over Financial Reporting**

Management of the Corporation is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) of the Securities Exchange Act of 1934. The Corporation's internal control over financial reporting was designed under the supervision of and with the participation of the Corporation's management, including Chubb's chief executive officer and chief financial officer, to provide reasonable assurance regarding the reliability of the Corporation's financial reporting and the preparation and fair presentation of published financial statements in accordance with U.S. generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect all misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Management conducted an assessment of the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2007. In making this assessment, management used the framework set forth in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has determined that, as of December 31, 2007, the Corporation's internal control over financial reporting is effective.

The Corporation's internal control over financial reporting as of December 31, 2007 has been audited by Ernst & Young LLP, the independent registered public accounting firm who also audited the Corporation's consolidated financial statements. Their attestation report on the Corporation's internal control over financial reporting is shown on page 66.

**Item 9B.   *Other Information***

None.

FICO0002391

**Report of Independent Registered Public Accounting Firm**

Ernst & Young LLP
5 Times Square
New York, New York 10036

*The Board of Directors and Shareholders*
*The Chubb Corporation*

We have audited The Chubb Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). The Chubb Corporation's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, The Chubb Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of The Chubb Corporation as of December 31, 2007 and 2006, and the related consolidated statements of income, shareholders' equity, cash flows and comprehensive income for each of the three years in the period ended December 31, 2007, and our report dated February 26, 2008 expressed an unqualified opinion thereon.

/s/   ERNST & YOUNG LLP

February 26, 2008

FICO0002392

## PART III.

**Item 10.**   *Directors and Executive Officers of the Registrant*

Information regarding Chubb's directors is incorporated by reference from Chubb's definitive Proxy Statement for the 2008 Annual Meeting of Shareholders under the caption "Our Board of Directors." Information regarding Chubb's executive officers is included in Part I of this report under the caption "Executive Officers of the Registrant." Information regarding Section 16 reporting compliance of Chubb's directors, executive officers and 10% beneficial owners is incorporated by reference from Chubb's definitive Proxy Statement for the 2008 Annual Meeting of Shareholders under the caption   "Section 16(a) Beneficial Ownership Reporting Compliance." Information regarding Chubb's Code of Ethics for CEO and Senior Financial Officers is included in Item 1 of this report under the caption "Business — General." Information regarding the Audit Committee of Chubb's Board of Directors and its Audit Committee financial experts is incorporated by reference from Chubb's definitive Proxy Statement for the 2008 Annual Meeting of Shareholders under the captions "Corporate Governance — Audit Committee" and "Committee Assignments."

**Item 11.**   *Executive Compensation*

Incorporated by reference from Chubb's definitive Proxy Statement for the 2008 Annual Meeting of Shareholders, under the captions "Corporate Governance — Directors' Compensation," "Compensation Discussion and Analysis" and "Executive Compensation."

**Item 12.**   *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

Incorporated by reference from Chubb's definitive Proxy Statement for the 2008 Annual Meeting of Shareholders, under the captions "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information."

**Item 13.**   *Certain Relationships and Related Transactions*

Incorporated by reference from Chubb's definitive Proxy Statement for the 2008 Annual Meeting of Shareholders, under the caption "Certain Transactions and Other Matters."

**Item 14.**   *Principal Accountant Fees and Services*

Incorporated by reference from Chubb's definitive Proxy Statement for the 2008 Annual Meeting of Shareholders, under the caption "Proposal 2: Ratification of Appointment of Independent Auditor."

## PART IV.

**Item 15.**   *Exhibits, Financial Statements and Schedules*

The financial statements and schedules listed in the accompanying index to financial statements and financial statement schedules are filed as part of this report.

The exhibits listed in the accompanying index to exhibits are filed as part of this report.

FICO0002393

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

THE CHUBB CORPORATION
(Registrant)

February 21, 2008

By      /s/    John D. Finnegan
    (John D. Finnegan Chairman, President and
    Chief Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/    John D. Finnegan<br>(John D. Finnegan) | Chairman, President, Chief Executive Officer and Director | February 21, 2008 |
| /s/    Zoë Baird<br>(Zoë Baird) | Director | February 21, 2008 |
| /s/    Sheila P. Burke<br>(Sheila P. Burke) | Director | February 21, 2008 |
| /s/    James I. Cash, Jr.<br>(James I. Cash, Jr.) | Director | February 21, 2008 |
| /s/    Joel J. Cohen<br>(Joel J. Cohen) | Director | February 21, 2008 |
| /s/    Klaus J. Mangold<br>(Klaus J. Mangold) | Director | February 21, 2008 |
| /s/    Martin G. McGuinn<br>(Martin G. McGuinn) | Director | February 21, 2008 |

FICO0002394

| Signature | Title | Date |
|---|---|---|
| /s/   David G. Scholey<br>(David G. Scholey) | Director | February 21, 2008 |
| /s/   Lawrence M. Small<br>(Lawrence M. Small) | Director | February 21, 2008 |
| /s/   Jess Søderberg<br>(Jess Søderberg) | Director | February 21, 2008 |
| /s/   Daniel E. Somers<br>(Daniel E. Somers) | Director | February 21, 2008 |
| /s/   Karen Hastie Williams<br>(Karen Hastie Williams) | Director | February 21, 2008 |
| /s/   Alfred W. Zollar<br>(Alfred W. Zollar) | Director | February 21, 2008 |
| /s/   Michael O'Reilly<br>(Michael O'Reilly) | Vice Chairman and<br>Chief Financial Officer | February 21, 2008 |
| /s/   Henry B. Schram<br>(Henry B. Schram) | Senior Vice President and<br>Chief Accounting Officer | February 21, 2008 |

69

FICO0002395

### THE CHUBB CORPORATION

### INDEX TO FINANCIAL STATEMENTS AND FINANCIAL STATEMENT SCHEDULES

#### (Item 15(a))

|  | Form 10-K Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Statements of Income for the Years Ended December 31, 2007, 2006 and 2005 | F-3 |
| Consolidated Balance Sheets at December 31, 2007 and 2006 | F-4 |
| Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2007, 2006 and 2005 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2007, 2006 and 2005 | F-6 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2007, 2006 and 2005 | F-7 |
| Notes to Consolidated Financial Statements | F-8 |
| Supplementary Information (unaudited) | |
|     Quarterly Financial Data | F-32 |
| Schedules: | |
|     I — Consolidated Summary of Investments — Other than Investments in Related Parties at December 31, 2007 | S-1 |
|     II — Condensed Financial Information of Registrant at December 31, 2007 and 2006 and for the Years Ended December 31, 2007, 2006 and 2005 | S-2 |
|     III — Consolidated Supplementary Insurance Information at and for the Years Ended December 31, 2007, 2006 and 2005 | S-5 |

All other schedules are omitted since the required information is not present or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the financial statements and notes thereto.

FICO0002396

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

**ERNST & YOUNG LLP**
5 Times Square
New York, New York 10036

*The Board of Directors and Shareholders*
*The Chubb Corporation*

We have audited the accompanying consolidated balance sheets of The Chubb Corporation as of December 31, 2007 and 2006, and the related consolidated statements of income, shareholders' equity, cash flows and comprehensive income for each of the three years in the period ended December 31, 2007. Our audits also included the financial statement schedules listed in the Index at Item 15(a). These financial statements and schedules are the responsibility of the Corporation's management. Our responsibility is to express an opinion on these financial statements and schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of The Chubb Corporation at December 31, 2007 and 2006, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedules, when considered in relation to the basic financial statements taken as a whole, present fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), The Chubb Corporation's internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 26, 2008 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

February 26, 2008

FICO0002397

**THE CHUBB CORPORATION**

Consolidated Statements of Income

| | In Millions, Except For Per Share Amounts Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| **Revenues** | | | |
| Premiums Earned | $11,946 | $11,958 | $12,176 |
| Investment Income | 1,738 | 1,580 | 1,408 |
| Other Revenues | 49 | 220 | 115 |
| Realized Investment Gains | 374 | 245 | 384 |
| TOTAL REVENUES | 14,107 | 14,003 | 14,083 |
| **Losses and Expenses** | | | |
| Losses and Loss Expenses | 6,299 | 6,574 | 7,813 |
| Amortization of Deferred Policy Acquisition Costs | 3,092 | 2,919 | 2,931 |
| Other Insurance Operating Costs and Expenses | 444 | 550 | 512 |
| Investment Expenses | 35 | 34 | 29 |
| Other Expenses | 48 | 207 | 161 |
| Corporate Expenses | 252 | 194 | 190 |
| TOTAL LOSSES AND EXPENSES | 10,170 | 10,478 | 11,636 |
| INCOME BEFORE FEDERAL AND FOREIGN INCOME TAX | 3,937 | 3,525 | 2,447 |
| Federal and Foreign Income Tax | 1,130 | 997 | 621 |
| NET INCOME | $ 2,807 | $ 2,528 | $ 1,826 |
| **Net Income Per Share** | | | |
| Basic | $ 7.13 | $ 6.13 | $ 4.61 |
| Diluted | 7.01 | 5.98 | 4.47 |

See accompanying notes.

FICO0002398

# THE CHUBB CORPORATION

## Consolidated Balance Sheets

|  | In Millions December 31 | |
|---|---|---|
|  | 2007 | 2006 |
| **Assets** | | |
| Invested Assets | | |
| Short Term Investments | $ 1,839 | $ 2,254 |
| Fixed Maturities | | |
| Held-to-Maturity — Tax Exempt (market $142 in 2006) | — | 135 |
| Available-for-Sale | | |
| Tax Exempt (cost $18,208 and $17,314) | 18,559 | 17,613 |
| Taxable (cost $15,266 and $14,310) | 15,312 | 14,218 |
| Equity Securities (cost $1,907 and $1,561) | 2,320 | 1,957 |
| Other Invested Assets | 2,051 | 1,516 |
| TOTAL INVESTED ASSETS | 40,081 | 37,693 |
| Cash | 49 | 38 |
| Securities Lending Collateral | 1,247 | 2,620 |
| Accrued Investment Income | 440 | 411 |
| Premiums Receivable | 2,227 | 2,314 |
| Reinsurance Recoverable on Unpaid Losses and Loss Expenses | 2,307 | 2,594 |
| Prepaid Reinsurance Premiums | 392 | 354 |
| Deferred Policy Acquisition Costs | 1,556 | 1,480 |
| Deferred Income Tax | 442 | 591 |
| Goodwill | 467 | 467 |
| Other Assets | 1,366 | 1,715 |
| TOTAL ASSETS | $50,574 | $50,277 |
| **Liabilities** | | |
| Unpaid Losses and Loss Expenses | $22,623 | $22,293 |
| Unearned Premiums | 6,599 | 6,546 |
| Securities Lending Payable | 1,247 | 2,620 |
| Long Term Debt | 3,460 | 2,466 |
| Dividend Payable to Shareholders | 110 | 104 |
| Accrued Expenses and Other Liabilities | 2,090 | 2,385 |
| TOTAL LIABILITIES | 36,129 | 36,414 |
| **Commitments and Contingent Liabilities (Note 9 and 15)** | | |
| **Shareholders' Equity** | | |
| Preferred Stock — Authorized 8,000,000 Shares; | | |
| $1 Par Value; Issued — None | — | — |
| Common Stock — Authorized 1,200,000,000 Shares; | | |
| $1 Par Value; Issued 374,649,923 and 411,276,940 Shares | 375 | 411 |
| Paid-In Surplus | 346 | 1,539 |
| Retained Earnings | 13,280 | 11,711 |
| Accumulated Other Comprehensive Income | 444 | 202 |
| TOTAL SHAREHOLDERS' EQUITY | 14,445 | 13,863 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $50,574 | $50,277 |

See accompanying notes.

F-4

FICO0002399

**THE CHUBB CORPORATION**

Consolidated Statements of Shareholders' Equity

In Millions
Years Ended December 31

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Preferred Stock** | | | |
| Balance, Beginning and End of Year | $  — | $  — | $  — |
| **Common Stock** | | | |
| Balance, Beginning of Year | 411 | 210 | 196 |
| Two-for-One Stock Split | | 210 | |
| Treasury Shares Cancelled | | (7) | |
| Repurchase of Shares | (42) | (21) | |
| Shares Issued Upon Settlement of Equity Unit Purchase Contracts and Warrants | — | 13 | 9 |
| Shares Issued Under Stock-Based Employee Compensation Plans | 6 | 6 | 5 |
| Balance, End of Year | 375 | 411 | 210 |
| **Paid-In Surplus** | | | |
| Balance, Beginning of Year | 1,539 | 2,364 | 1,319 |
| Two-for-One Stock Split | — | (210) | |
| Treasury Shares Cancelled | | (377) | |
| Repurchase of Shares | (1,361) | (987) | |
| Shares Issued Upon Settlement of Equity Unit Purchase Contracts and Warrants | — | 447 | 591 |
| Changes Related to Stock-Based Employee Compensation (includes tax benefit of $16, $46, and $84) | 168 | 302 | 454 |
| Balance, End of Year | 346 | 1,539 | 2,364 |
| **Retained Earnings** | | | |
| Balance, Beginning of Year | 11,711 | 9,600 | 8,119 |
| Net Income | 2,807 | 2,528 | 1,826 |
| Dividends Declared (per share $1.16, $1.00 and $.86) | (457) | (417) | (345) |
| Repurchase of Shares | (781) | — | — |
| Balance, End of Year | 13,280 | 11,711 | 9,600 |
| **Accumulated Other Comprehensive Income** | | | |
| Unrealized Appreciation of Investments | | | |
| Balance, Beginning of Year | 392 | 311 | 624 |
| Change During Year, Net of Tax | 134 | 81 | (313) |
| Balance, End of Year | 526 | 392 | 311 |
| Foreign Currency Translation Gains | | | |
| Balance, Beginning of Year | 91 | 57 | 79 |
| Change During Year, Net of Tax | 125 | 34 | (22) |
| Balance, End of Year | 216 | 91 | 57 |
| Postretirement Benefit Costs Not Yet Recognized in Net Income | | | |
| Balance, Beginning of Year | (281) | — | — |
| Change During Year, Net of Tax | (17) | — | — |
| Adjustment to Recognize Funded Status at December 31, 2006, Net of Tax | — | (281) | — |
| Balance, End of Year | (298) | (281) | — |
| Accumulated Other Comprehensive Income, End of Year | 444 | 202 | 368 |
| **Treasury Stock, at Cost** | | | |
| Balance, Beginning of Year | — | (135) | (211) |
| Repurchase of Shares | — | (249) | (135) |
| Cancellation of Shares | — | 384 | |
| Shares Issued Under Stock-Based Employee Compensation Plans | — | — | 211 |
| Balance, End of Year | — | — | (135) |
| TOTAL SHAREHOLDERS' EQUITY | $14,445 | $13,863 | $12,407 |

See accompanying notes.

FICO0002400

# THE CHUBB CORPORATION

Consolidated Statements of Cash Flows

|  | In Millions Years Ended December 31 | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| **Cash Flows from Operating Activities** |  |  |  |
| Net Income | $ 2,807 | $ 2,528 | $ 1,826 |
| Adjustments to Reconcile Net Income to Net Cash Provided by Operating Activities |  |  |  |
| Increase in Unpaid Losses and Loss Expenses, Net | 617 | 986 | 1,904 |
| Increase (Decrease) in Unearned Premiums, Net | (74) | 16 | 107 |
| Decrease (Increase) in Reinsurance Recoverable on Paid Losses | 258 | (225) | (51) |
| Amortization of Premiums and Discounts on Fixed Maturities | 233 | 233 | 217 |
| Depreciation | 69 | 81 | 91 |
| Realized Investment Gains | (374) | (245) | (384) |
| Other, Net | (345) | (32) | 46 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 3,191 | 3,342 | 3,756 |
| **Cash Flows from Investing Activities** |  |  |  |
| Proceeds from Fixed Maturities |  |  |  |
| Sales | 4,616 | 3,623 | 7,481 |
| Maturities, Calls and Redemptions | 1,790 | 1,579 | 1,683 |
| Proceeds from Sales of Equity Securities | 360 | 186 | 330 |
| Purchases of Fixed Maturities | (7,909) | (6,758) | (12,206) |
| Purchases of Equity Securities | (650) | (377) | (428) |
| Investments in Other Invested Assets, Net | (164) | (264) | (66) |
| Decrease (Increase) in Short Term Investments, Net | 455 | (355) | (591) |
| Increase (Decrease) in Net Payable from Security Transactions not Settled | (106) | 50 | (111) |
| Purchases of Property and Equipment, Net | (53) | (53) | (40) |
| Other, Net | 12 | — | 97 |
| NET CASH USED IN INVESTING ACTIVITIES | (1,649) | (2,369) | (3,851) |
| **Cash Flows from Financing Activities** |  |  |  |
| Proceeds from Issuance of Long Term Debt | 1,800 | — | — |
| Repayment of Long Term Debt | (800) | — | (301) |
| Decrease in Funds Held Under Deposit Contracts | (8) | (29) | (276) |
| Proceeds from Common Stock Issued Upon Settlement of Equity Unit Purchase Contracts and Warrants | — | 460 | 600 |
| Proceeds from Issuance of Common Stock Under Stock-Based Employee Compensation Plans | 130 | 229 | 531 |
| Repurchase of Shares | (2,185) | (1,228) | (135) |
| Dividends Paid to Shareholders | (451) | (403) | (330) |
| Other, Net | (17) | — | — |
| NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | (1,531) | (971) | 89 |
| Net Increase (Decrease) in Cash | 11 | 2 | (6) |
| Cash at Beginning of Year | 38 | 36 | 42 |
| CASH AT END OF YEAR | $ 49 | $ 38 | $ 36 |

See accompanying notes.

FICO0002401

## THE CHUBB CORPORATION

Consolidated Statements of Comprehensive Income

|  | In Millions Years Ended December 31 | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Net Income | $2,807 | $2,528 | $1,826 |
| Other Comprehensive Income (Loss), Net of Tax |  |  |  |
| Change in Unrealized Appreciation of Investments | 134 | 81 | (313) |
| Foreign Currency Translation Gains (Losses) | 125 | 34 | (22) |
| Change in Postretirement Benefit Costs Not Yet Recognized in Net Income | (17) | — | — |
|  | 242 | 115 | (335) |
| COMPREHENSIVE INCOME | $3,049 | $2,643 | $1,491 |

See accompanying notes.

FICO0002402

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### (1) Summary of Significant Accounting Policies

#### (a) Basis of Presentation

The Chubb Corporation (Chubb) is a holding company with subsidiaries principally engaged in the property and casualty insurance business. The property and casualty insurance subsidiaries (the P&C Group) underwrite most lines of property and casualty insurance in the United States, Canada, Europe, Australia and parts of Latin America and Asia. The geographic distribution of property and casualty business in the United States is broad with a particularly strong market presence in the Northeast.

The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles and include the accounts of Chubb and its subsidiaries (collectively, the Corporation). Significant intercompany transactions have been eliminated in consolidation.

The consolidated financial statements include amounts based on informed estimates and judgments of management for transactions that are not yet complete. Such estimates and judgments affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Certain amounts in the consolidated financial statements for prior years have been reclassified to conform with the 2007 presentation.

#### (b) Invested Assets

Short term investments, which have an original maturity of one year or less, are carried at amortized cost, which approximates market value.

Fixed maturities, which include bonds and redeemable preferred stocks, are purchased to support the investment strategies of the Corporation. These strategies are developed based on many factors including rate of return, maturity, credit risk, tax considerations and regulatory requirements. Fixed maturities that may be sold prior to maturity to support the investment strategies of the Corporation are classified as available-for-sale and carried at market value as of the balance sheet date. Those fixed maturities that the Corporation has the ability and positive intent to hold to maturity are classified as held-to-maturity and carried at amortized cost.

Premiums and discounts arising from the purchase of fixed maturities are amortized using the interest method over the estimated remaining term of the securities. For mortgage-backed securities, prepayment assumptions are reviewed periodically and revised as necessary.

Equity securities, which include common stocks and non-redeemable preferred stocks, are carried at market value as of the balance sheet date.

Unrealized appreciation or depreciation of equity securities and fixed maturities carried at market value is excluded from net income and credited or charged, net of applicable deferred income tax, directly to comprehensive income.

Other invested assets, which include private equity limited partnerships, are carried at the Corporation's equity in the net assets of the partnerships based on valuations provided by the manager of each partnership. As a result of the timing of the receipt of valuation data from the investment managers, these investments are reported on a three month lag. Changes in the Corporation's equity in the net assets of the partnerships are included in income as realized investment gains or losses.

Realized gains and losses on the sale of investments are determined on the basis of the cost of the specific investments sold and are credited or charged to income. When the market value of any investment is lower than its cost, an assessment is made to determine whether the decline is temporary or other-than-temporary. If the decline is deemed to be other-than-temporary, the investment is written down to market value and the amount of the writedown is charged to income as a realized investment loss. The market value of the investment becomes its new cost basis.

The Corporation engages in a securities lending program from which it generates investment income from the lending of certain of its invested assets to other institutions for short periods of time. The Corporation maintains effective control over securities loaned and therefore continues to report such securities as invested assets. The market value of the loaned securities was $1,510 million and $2,857 million at December 31, 2007 and 2006, respectively. Of these amounts, $1,274 million and $2,499 million, respectively, comprised available-for-sale fixed maturities and the balance comprised equity securities.

The Corporation's policy is to require initial collateral equal to at least 102% of the market value of the loaned securities. In those instances where cash collateral is obtained from the borrower, the collateral is invested by a lending agent in accordance with the Corporation's guidelines. The cash collateral is recognized as an asset with a corresponding liability for the obligation to return the collateral. In instances where non-cash collateral is obtained from the borrower, the Corporation does not recognize the receipt of the collateral held by the lending agent or the obligation to return the collateral as there exists no right to sell or repledge the collateral. The market value of the non-cash collateral held was $325 million and $346 million at December 31, 2007 and 2006, respectively. The Corporation retains a portion of the income earned from the cash collateral or receives a fee from the borrower. Under the terms of the securities lending program, the lending agent indemnifies the Corporation against borrower defaults.

FICO0002403

(c) *Premium Revenues and Related Expenses*

Insurance premiums are earned on a monthly pro rata basis over the terms of the policies and include estimates of audit premiums and premiums on retrospectively rated policies. Assumed reinsurance premiums are earned over the terms of the reinsurance contracts. Unearned premiums represent the portion of direct and assumed premiums written applicable to the unexpired terms of the insurance policies and reinsurance contracts in force.

Ceded reinsurance premiums are charged to income over the terms of the reinsurance contracts. Prepaid reinsurance premiums represent the portion of premiums ceded to reinsurers applicable to the unexpired terms of the reinsurance contracts in force.

Reinsurance reinstatement premiums are recognized in the same period as the loss event that gave rise to the reinstatement premiums.

Acquisition costs that vary with and are primarily related to the production of business are deferred and amortized over the period in which the related premiums are earned. Such costs include commissions, premium taxes and certain other underwriting and policy issuance costs. Commissions received related to reinsurance premiums ceded are considered in determining net acquisition costs eligible for deferral. Deferred policy acquisition costs are reviewed to determine whether they are recoverable from future income. If such costs are deemed to be unrecoverable, they are expensed. Anticipated investment income is considered in the determination of the recoverability of deferred policy acquisition costs.

(d) *Unpaid Losses and Loss Expenses*

Unpaid losses and loss expenses (also referred to as loss reserves) include the accumulation of individual case estimates for claims that have been reported and estimates of claims that have been incurred but not reported as well as estimates of the expenses associated with processing and settling all reported and unreported claims, less estimates of anticipated salvage and subrogation recoveries. Estimates are based upon past loss experience modified for current trends as well as prevailing economic, legal and social conditions. Loss reserves are not discounted to present value.

Loss reserves are regularly reviewed using a variety of actuarial techniques. Reserve estimates are updated as historical loss experience develops, additional claims are reported and/or settled and new information becomes available. Any changes in estimates are reflected in operating results in the period in which the estimates are changed.

Reinsurance recoverable on unpaid losses and loss expenses represents an estimate of the portion of gross loss reserves that will be recovered from reinsurers. Amounts recoverable from reinsurers are estimated using assumptions that are consistent with those used in estimating the gross losses associated with the reinsured

policies. A provision for estimated uncollectible reinsurance is recorded based on periodic evaluations of balances due from reinsurers, the financial condition of the reinsurers, coverage disputes and other relevant factors.

(e) *Financial Products*

Credit derivatives are carried at estimated fair value as of the balance sheet date. Changes in fair value are recognized in income in the period of the change and are included in other revenues.

Assets and liabilities related to the credit derivatives are included in other assets and other liabilities.

(f) *Goodwill*

Goodwill represents the excess of the cost of an acquired entity over the fair value of net assets acquired. Goodwill is tested for impairment at least annually.

(g) *Property and Equipment*

Property and equipment used in operations, including certain costs incurred to develop or obtain computer software for internal use, are capitalized and carried at cost less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful lives of the assets.

(h) *Real Estate*

Real estate properties are carried at cost less accumulated depreciation and any writedowns for impairment. Real estate properties are reviewed for impairment whenever events or circumstances indicate that the carrying value of such properties may not be recoverable. Measurement of such impairment is based on the fair value of the property.

(i) *Income Taxes*

Deferred income tax assets and liabilities are recognized for the expected future tax effects attributable to temporary differences between the financial reporting and tax bases of assets and liabilities, based on enacted tax rates and other provisions of tax law. The effect on deferred tax assets and liabilities of a change in tax laws or rates is recognized in income in the period in which such change is enacted. Deferred tax assets are reduced by a valuation allowance if it is more likely than not that all or some portion of the deferred tax assets will not be realized.

The Corporation does not consider the earnings of its foreign subsidiaries to be permanently reinvested. Accordingly, provision has been made for the expected U.S. federal income tax liabilities applicable to undistributed earnings of foreign subsidiaries.

(j) *Stock-Based Employee Compensation*

The fair value method of accounting is used for stock-based employee compensation plans. Under the fair value method, compensation cost is measured based on the fair value of the award at the grant date and recognized over the requisite service period.

FICO0002404

(k) *Foreign Exchange*

Assets and liabilities relating to foreign operations are translated into U.S. dollars using current exchange rates as of the balance sheet date. Revenues and expenses are translated into U.S. dollars using the average exchange rates during the year.

The functional currency of foreign operations is generally the currency of the local operating environment since business is primarily transacted in such local currency. Translation gains and losses, net of applicable income tax, are excluded from net income and are credited or charged directly to comprehensive income.

(l) *Cash Flow Information*

In the statement of cash flows, short term investments are not considered to be cash equivalents. The effect of changes in foreign exchange rates on cash balances was immaterial.

In 2005, the Corporation transferred its ongoing reinsurance assumed business and certain related assets to Harbor Point Limited (see Note (3)). In exchange, the Corporation received from Harbor Point $200 million of 6% convertible notes and warrants to purchase common stock of Harbor Point.

In 2005, a mortgage payable of $42 million was assumed by an unaffiliated joint venture in connection with the disposition of the Corporation's interest in a variable interest entity in which it was the primary beneficiary.

These noncash transactions have been excluded from the consolidated statement of cash flows.

(m) *Accounting Pronouncements Not Yet Adopted*

In September 2006, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards (SFAS) No. 157, Fair Value Measurements. SFAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. SFAS No. 157 applies whenever other accounting pronouncements require or permit assets or liabilities to be measured at fair value. The Statement does not expand the use of fair value to any new circumstances. SFAS No. 157 is effective for the Corporation for the year beginning January 1, 2008. The adoption of SFAS No. 157 is not expected to have a significant effect on the Corporation's financial position or results of operations.

(2) **Adoption of New Accounting Pronouncements**

(a) Effective December 31, 2006, the Corporation adopted SFAS No. 158, Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132(R). SFAS No. 158 requires an employer to recognize the overfunded or underfunded status of a defined benefit postretirement plan as an asset or liability in its balance sheet and to recognize changes in the funded status as a component of other comprehensive income in the years in which the changes occur. Retrospective application was not permitted.

SFAS No. 158 requires that any gains or losses and prior service cost that had not yet been included in net benefit costs as of the end of the year in which the Statement was adopted be recognized as an adjustment of the ending balance of accumulated other comprehensive income, net of tax. The effect on the Corporation's balance sheet at December 31, 2006 was an increase in other liabilities of $432 million, an increase in deferred income tax assets of $151 million and a decrease in accumulated other comprehensive income, a component of shareholders' equity, of $281 million. Adoption of the Statement did not have any effect on the Corporation's results of operations in 2006 and 2007 and will not in future years.

(b) Effective January 1, 2007, the Corporation adopted FASB Interpretation No. 48 (FIN 48), Accounting for Uncertainty in Income Taxes, an interpretation of SFAS No. 109. FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements. The Interpretation prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. The adoption of FIN 48 did not have a significant effect on the Corporation's financial position or results of operations.

(3) **Transfer of Ongoing Reinsurance Assumed Business**

In December 2005, the Corporation completed a transaction involving a new Bermuda-based reinsurance company, Harbor Point Limited.

As part of the transaction, the Corporation transferred its ongoing reinsurance assumed business and certain related assets, including renewal rights, to Harbor Point. In exchange, the Corporation received from Harbor Point $200 million of 6% convertible notes and warrants to purchase common stock of Harbor Point. The notes and warrants represented in the aggregate on a fully diluted basis approximately 16% of the new company.

Harbor Point generally did not assume the reinsurance liabilities relating to reinsurance contracts incepting prior to December 31, 2005. The P&C Group retained those liabilities and the related assets.

The transaction resulted in a pre-tax gain of $204 million, of which $171 million was recognized in 2005 and $33 million was deferred. The portion of the gain that was deferred was based on the Corporation's economic interest in Harbor Point.

For a transition period of about two years, Harbor Point underwrote specific reinsurance business on the P&C Group's behalf. The P&C Group retained a portion of this business and ceded the balance to Harbor Point in return for a fronting commission.

The P&C Group receives additional payments based on the amount of business renewed by Harbor Point. These amounts are being recognized in income as earned.

FICO0002405

**(4) Invested Assets and Related Income**

(a) The amortized cost and estimated market value of fixed maturities were as follows:

|  | December 31 | | | | | | | |
|  | 2007 | | | | 2006 | | | |
|  | Amortized Cost | Gross Unrealized Appreciation | Gross Unrealized Depreciation | Estimated Market Value | Amortized Cost | Gross Unrealized Appreciation | Gross Unrealized Depreciation | Estimated Market Value |
|---|---|---|---|---|---|---|---|---|
|  | (in millions) | | | | | | | |
| Held-to-maturity — Tax exempt | $ — | $ — | $ — | $ — | $ 135 | $ 7 | $ — | $ 142 |
| Available-for-sale | | | | | | | | |
| Tax exempt | 18,208 | 385 | 34 | 18,559 | 17,314 | 341 | 42 | 17,613 |
| Taxable | | | | | | | | |
| U.S. Government and government agency and authority obligations | 671 | 36 | 2 | 705 | 1,936 | 1 | 26 | 1,911 |
| Corporate bonds | 2,888 | 42 | 22 | 2,908 | 2,379 | 42 | 24 | 2,397 |
| Foreign bonds | 6,946 | 66 | 63 | 6,949 | 5,589 | 39 | 57 | 5,571 |
| Mortgage-backed securities | 4,761 | 31 | 42 | 4,750 | 4,406 | 21 | 88 | 4,339 |
|  | 15,266 | 175 | 129 | 15,312 | 14,310 | 103 | 195 | 14,218 |
| Total available-for-sale | 33,474 | 560 | 163 | 33,871 | 31,624 | 444 | 237 | 31,831 |
| Total fixed maturities | $33,474 | $560 | $163 | $33,871 | $31,759 | $451 | $237 | $31,973 |

During the fourth quarter of 2007, the Corporation transferred its remaining $86 million of held-to-maturity securities to available-for-sale. The unrealized appreciation was $6 million at the date of transfer.

The amortized cost and estimated market value of fixed maturities at December 31, 2007 by contractual maturity were as follows:

|  | Amortized Cost | Estimated Market Value |
|---|---|---|
|  | (in millions) | |
| Available-for-sale | | |
| Due in one year or less | $ 1,062 | $ 1,065 |
| Due after one year through five years | 8,206 | 8,301 |
| Due after five years through ten years | 11,862 | 12,071 |
| Due after ten years | 7,583 | 7,684 |
|  | 28,713 | 29,121 |
| Mortgage-backed securities | 4,761 | 4,750 |
|  | $33,474 | $33,871 |

Actual maturities could differ from contractual maturities because borrowers may have the right to call or prepay obligations.

(b) The components of unrealized appreciation or depreciation of investments carried at market value were as follows:

|  | December 31 | |
|  | 2007 | 2006 |
|---|---|---|
|  | (in millions) | |
| Equity securities | | |
| Gross unrealized appreciation | $490 | $417 |
| Gross unrealized depreciation | 77 | 21 |
|  | 413 | 396 |
| Fixed maturities | | |
| Gross unrealized appreciation | 560 | 444 |
| Gross unrealized depreciation | 163 | 237 |
|  | 397 | 207 |
|  | 810 | 603 |
| Deferred income tax liability | 284 | 211 |
|  | $526 | $392 |

FICO0002406

When the market value of any investment is lower than its cost, an assessment is made to determine whether the decline is temporary or other-than-temporary. The assessment is based on both quantitative criteria and qualitative information and considers a number of factors including, but not limited to, the length of time and the extent to which the market value has been less than the cost, the financial condition and near term prospects of the issuer, whether the issuer is current on contractually obligated interest and principal payments, the intent and ability of the Corporation to hold the investment for a period of time sufficient to allow for the recovery of cost, general market conditions and industry or sector specific factors. Based on a review of the securities in an unrealized loss position at December 31, 2007 and 2006, management believes that none of the declines in market value at those dates were other-than-temporary.

The following table summarizes, for all investment securities in an unrealized loss position at December 31, 2007, the aggregate market value and gross unrealized depreciation by investment category and length of time that individual securities have continuously been in an unrealized loss position.

| | Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|---|
| | Estimated Market Value | Gross Unrealized Depreciation | Estimated Market Value | Gross Unrealized Depreciation | Estimated Market Value | Gross Unrealized Depreciation |
| | (in millions) | | | | | |
| Fixed maturities – available-for-sale | | | | | | |
| Tax exempt . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,109 | $ 19 | $1,556 | $ 15 | $ 2,665 | $ 34 |
| Taxable | | | | | | |
| U.S. Government and government agency and authority obligations . . . . . | — | — | 66 | 2 | 66 | 2 |
| Corporate bonds . . . . . . . . . . . . . . . . . . . . | 262 | 8 | 610 | 14 | 872 | 22 |
| Foreign bonds . . . . . . . . . . . . . . . . . . . . . . . | 1,302 | 20 | 2,052 | 43 | 3,354 | 63 |
| Mortgage-backed securities . . . . . . . . . . . | 813 | 8 | 2,263 | 34 | 3,076 | 42 |
| | 2,377 | 36 | 4,991 | 93 | 7,368 | 129 |
| Total fixed maturities – available-for-sale . . | 3,486 | 55 | 6,547 | 108 | 10,033 | 163 |
| Equity securities . . . . . . . . . . . . . . . . . . . . . . | 373 | 52 | 81 | 25 | 454 | 77 |
| | $3,859 | $107 | $6,628 | $133 | $10,487 | $240 |

The total gross unrealized depreciation amount at December 31, 2007 comprised approximately 1,260 securities, of which 1,210 were fixed maturities. There were no securities with a market value of less than 80% of the security's amortized cost for the previous six continuous months. Of the fixed maturities in an unrealized loss position, substantially all were investment grade securities for which market values declined due to increases in interest rates from the date of purchase. Fixed maturity securities in an unrealized loss position for less than twelve months comprised approximately 550 securities, of which 95% were securities with a market value to amortized cost ratio at or greater than 90%. Fixed maturity securities in an unrealized loss position for twelve months or more comprised approximately 660 securities, of which 99% were securities with a market value to amortized cost ratio at or greater than 90%.

The following table summarizes, for all investment securities in an unrealized loss position at December 31, 2006, the aggregate market value and gross unrealized depreciation by investment category and length of time that individual securities have continuously been in an unrealized loss position.

| | Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|---|
| | Estimated Market Value | Gross Unrealized Depreciation | Estimated Market Value | Gross Unrealized Depreciation | Estimated Market Value | Gross Unrealized Depreciation |
| | (in millions) | | | | | |
| Fixed maturities – available-for-sale | | | | | | |
| Tax exempt . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,136 | $ 4 | $2,985 | $ 38 | $ 4,121 | $ 42 |
| Taxable | | | | | | |
| U.S. Government and government agency and authority obligations . . . . . . . . . . . . | 1,014 | 8 | 766 | 18 | 1,780 | 26 |
| Corporate bonds . . . . . . . . . . . . . . . . . . . . . . | 229 | 3 | 928 | 21 | 1,157 | 24 |
| Foreign bonds . . . . . . . . . . . . . . . . . . . . . . . . | 2,893 | 37 | 976 | 20 | 3,869 | 57 |
| Mortgage-backed securities . . . . . . . . . . . . . . | 584 | 4 | 2,763 | 84 | 3,347 | 88 |
| | 4,720 | 52 | 5,433 | 143 | 10,153 | 195 |
| Total fixed maturities – available-for-sale . . | 5,856 | 56 | 8,418 | 181 | 14,274 | 237 |
| Equity securities . . . . . . . . . . . . . . . . . . . . . . . . | 148 | 12 | 68 | 9 | 216 | 21 |
| | $6,004 | $68 | $8,486 | $190 | $14,490 | $258 |

FICO0002407

The change in unrealized appreciation of investments carried at market value was as follows:

| | Years Ended December 31 | | |
| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | (in millions) | | |
| Change in unrealized appreciation of equity securities . . . . . . . . . . . . . . . . . . . | $ 17 | $ 272 | $ (29) |
| Change in unrealized appreciation of fixed maturities . . . . . . . . . . . . . . . . . . . | 190 | (147) | (453) |
| | 207 | 125 | (482) |
| Deferred income tax (credit) . . . . . . . . . | 73 | 44 | (169) |
| | $134 | $ 81 | $(313) |

(c) The sources of net investment income were as follows:

| | Years Ended December 31 | | |
| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | (in millions) | | |
| Fixed maturities . . . . . . . . . . . . . . . . . . | $1,516 | $1,433 | $1,296 |
| Equity securities . . . . . . . . . . . . . . . . . . | 46 | 33 | 30 |
| Short term investments. . . . . . . . . . . . . | 119 | 74 | 53 |
| Other. . . . . . . . . . . . . . . . . . . . . . . . . . . | 57 | 40 | 29 |
| Gross investment income . . . . . . . . | 1,738 | 1,580 | 1,408 |
| Investment expenses . . . . . . . . . . . . . . | 35 | 34 | 29 |
| | $1,703 | $1,546 | $1,379 |

(d) Realized investment gains and losses were as follows:

| | Years Ended December 31 | | |
| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | (in millions) | | |
| Fixed maturities | | | |
| Gross realized gains . . . . . . . . . . . . . . . | $ 57 | $ 29 | $ 74 |
| Gross realized losses . . . . . . . . . . . . . . . | (53) | (31) | (109) |
| Other-than-temporary impairments . . . . . | (30) | (3) | (4) |
| | (26) | (5) | (39) |
| Equity securities | | | |
| Gross realized gains . . . . . . . . . . . . . . . | 136 | 60 | 84 |
| Gross realized losses . . . . . . . . . . . . . . . | (1) | (9) | (9) |
| Other-than-temporary impairments . . . . . | (79) | (10) | (1) |
| | 56 | 41 | 74 |
| Other invested assets . . . . . . . . . . . . . . . . . | 344 | 209 | 162 |
| Transfer of reinsurance business . . . . . . . . | — | — | 171 |
| Sale of Personal Lines Insurance Brokerage . . . . . . . . . . . . . . . . . . . . . . . | — | — | 16 |
| | $374 | $245 | $384 |

In December 2005, the Corporation transferred its ongoing reinsurance assumed business and certain related assets to Harbor Point Limited. This transaction is further described in Note (3).

In September 2005, the Corporation sold Personal Lines Insurance Brokerage, Inc., an insurance brokerage subsidiary.

## (5) Deferred Policy Acquisition Costs

Policy acquisition costs deferred and the related amortization charged against income were as follows:

| | Years Ended December 31 | | |
| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | (in millions) | | |
| Balance, beginning of year . . . . . . | $ 1,480 | $ 1,445 | $ 1,435 |
| Costs deferred during year | | | |
| Commissions and brokerage. . . | 1,713 | 1,534 | 1,636 |
| Premium taxes and assessments . . | 253 | 265 | 260 |
| Salaries and operating costs . . . . | 1,178 | 1,139 | 1,052 |
| | 3,144 | 2,938 | 2,948 |
| Increase (decrease) due to foreign exchange . . . . . . . . . . . . | 24 | 16 | (7) |
| Amortization during year . . . . . . . | (3,092) | (2,919) | (2,931) |
| Balance, end of year . . . . . . . . . . | $ 1,556 | $ 1,480 | $ 1,445 |

## (6) Real Estate

The carrying value of real estate assets, primarily land under development and unimproved land, included in other assets was $174 million and $201 million at December 31, 2007 and 2006, respectively. Impairment losses of $11 million and $66 million were recognized in 2006 and 2005, respectively, to write down the carrying value of certain properties to their estimated fair value. No impairment losses were recognized in 2007.

## (7) Property and Equipment

Property and equipment included in other assets were as follows:

| | December 31 | |
| | 2007 | 2006 |
|---|---|---|
| | (in millions) | |
| Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $839 | $814 |
| Accumulated depreciation . . . . . . . . . . . . . . . . . . . . . . . . . | 490 | 451 |
| | $349 | $363 |

Depreciation expense related to property and equipment was $69 million, $77 million and $85 million for 2007, 2006 and 2005, respectively.

FICO0002408

## (8) Debt and Credit Arrangements

(a) Long term debt consisted of the following:

| | December 31 | |
|---|---|---|
| | 2007 | 2006 |
| | (in millions) | |
| 4.934% notes due November 16, 2007 . . . . . . . | $ — | $ 600 |
| 7⅛% notes due December 15, 2007. . . . . . . . . | — | 75 |
| 3.95% notes due April 1, 2008 . . . . . . . . . . . . . | 225 | 225 |
| 5.472% notes due August 16, 2008 . . . . . . . . . | 460 | 460 |
| 6% notes due November 15, 2011 . . . . . . . . . . | 400 | 400 |
| 5.2% notes due April 1, 2013 . . . . . . . . . . . . . . | 275 | 275 |
| 6.6% debentures due August 15, 2018 . . . . . . . | 100 | 100 |
| 8.675% capital securities due February 1, 2027 . . | — | 125 |
| 6.8% debentures due November 15, 2031. . . . . | 200 | 200 |
| 6% notes due May 11, 2037 . . . . . . . . . . . . . . . | 800 | — |
| 6.375% capital securities due March 29, 2067 . . | 1,000 | — |
| | 3,460 | 2,460 |
| Fair value of interest rate swap . . . . . . . . . . . . . | — | 6 |
| | $3,460 | $2,466 |

In May 2007, Chubb issued $800 million of 6% senior notes due May 11, 2037.

In March 2007, Chubb issued $1.0 billion of unsecured junior subordinated capital securities. The capital securities will become due on April 15, 2037, the scheduled maturity date, but only to the extent that Chubb has received sufficient net proceeds from the sale of certain qualifying capital securities. Chubb must use its commercially reasonable efforts, subject to certain market disruption events, to sell enough qualifying capital securities to permit repayment of the capital securities on the scheduled maturity date or as soon thereafter as possible. Any remaining outstanding principal amount will be due on March 29, 2067, the final maturity date. The capital securities bear interest at a fixed rate of 6.375% through April 14, 2017. Thereafter, the capital securities will bear interest at a rate equal to the three-month LIBOR rate plus 2.25%. Subject to certain conditions, Chubb has the right to defer the payment of interest on the capital securities for a period not exceeding ten consecutive years. During any such period, interest will continue to accrue and Chubb generally may not declare or pay any dividends on or purchase any shares of its capital stock.

In connection with the issuance of the capital securities, Chubb entered into a replacement capital covenant in which it agreed that it will not repay, redeem, or purchase the capital securities before March 29, 2047, unless, subject to certain limitations, it has received proceeds from the sale of replacement capital securities, as defined. The replacement capital covenant is not intended for the benefit of holders of the capital securities and may not be enforced by them. The replacement capital covenant is for the benefit of holders of one or more designated series of Chubb's indebtedness, which will initially be its 6.8% debentures due November 15, 2031.

Subject to the replacement capital covenant, the capital securities may be redeemed, in whole or in part, at any time on or after April 15, 2017 at a redemption price equal to the principal amount plus any accrued interest or prior to April 15, 2017 at a redemption price equal to the greater of (i) the principal amount or (ii) a make-whole amount, in each case plus any accrued interest.

The 3.95% notes, the 5.472% notes, the 6% notes due in 2011, the 5.2% notes, the 6.6% debentures, the 6.8% debentures and the 6% notes due in 2037 are all unsecured obligations of Chubb. Chubb generally may redeem some or all of the notes and debentures prior to maturity in accordance with the terms of each debt instrument.

Executive Risk Capital Trust, wholly owned by Chubb Executive Risk Inc., which in turn is wholly owned by Chubb, had outstanding $125 million of 8.675% capital securities. The sole assets of the Trust were debentures issued by Chubb Executive Risk. The capital securities were subject to mandatory redemption in 2027 upon repayment of the debentures. The capital securities were also subject to mandatory redemption in certain other specified circumstances beginning in 2007. On February 1, 2007, the debentures were repaid and the Trust redeemed the capital securities at a price that included a make-whole premium of $5 million in the aggregate.

At December 31, 2006, Chubb was a party to a cancelable interest rate swap agreement with a notional amount of $125 million that replaced the fixed rate of the capital securities with the 3-month LIBOR rate plus 204 basis points. The swap agreement had a maturity date of February 1, 2027 and provided only for the exchange of interest on the notional amount. The fair value of the swap was included in other assets, offset by a corresponding increase to long term debt. On February 1, 2007, the interest rate swap was terminated.

The amounts of long term debt due annually during the five years subsequent to December 31, 2007 are as follows:

| Years Ending December 31 | |
|---|---|
| | (in millions) |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $685 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 400 |
| 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — |

(b) Interest costs of $206 million, $134 million and $135 million were incurred in 2007, 2006 and 2005, respectively. Interest paid was $191 million, $129 million and $138 million in 2007, 2006 and 2005, respectively.

FICO0002409

(c) Chubb has a revolving credit agreement with a group of banks that provides for up to $500 million of unsecured borrowings. There have been no borrowings under this agreement. Various interest rate options are available to Chubb, all of which are based on market interest rates. Chubb pays a fee to have this revolving credit facility available. The agreement contains customary restrictive covenants including a covenant to maintain a minimum consolidated shareholders' equity, as adjusted. At December 31, 2007, Chubb was in compliance with all such covenants. The revolving credit facility is available for general corporate purposes and to support Chubb's commercial paper borrowing arrangement. The facility had a termination date of June 22, 2010. In October 2007, the agreement was amended to extend the termination date to October 19, 2012. The terms of the amended agreement allow Chubb to elect in 2008 and again in 2009 to extend the termination date of the agreement by an additional year. On the termination date of the agreement, any borrowings then outstanding become payable.

## (9) Unpaid Losses and Loss Expenses

(a) The process of establishing loss reserves is complex and imprecise as it must take into consideration many variables that are subject to the outcome of future events. As a result, informed subjective estimates and judgments as to the P&C Group's ultimate exposure to losses are an integral component of the loss reserving process. The loss reserve estimation process relies on the basic assumption that past experience, adjusted for the effects of current developments and likely trends, is an appropriate basis for predicting future outcomes.

Most of the P&C Group's loss reserves relate to long tail liability classes of business. For many liability claims, significant periods of time, ranging up to several years or more, may elapse between the occurrence of the loss, the reporting of the loss and the settlement of the claim. The longer the time span between the incidence of a loss and the settlement of the claim, the more the ultimate settlement amount can vary.

There are numerous factors that contribute to the inherent uncertainty in the process of establishing loss reserves. Among these factors are changes in the inflation rate for goods and services related to covered damages such as medical care and home repair costs; changes in the judicial interpretation of policy provisions relating to the determination of coverage; changes in the general attitude of juries in the determination of liability and damages; legislative actions; changes in the medical condition of claimants; changes in the estimates of the number and/or severity of claims that have been incurred but not reported as of the date of the financial statements; and changes in the P&C Group's book of business, underwriting standards and/or claim handling procedures.

In addition, the uncertain effects of emerging or potential claims and coverage issues that arise as legal, judicial and social conditions change must be taken into consideration. These issues have had, and may continue to have, a negative effect on loss reserves by either extending coverage beyond the original underwriting intent or by increasing the number or size of claims. As a result of such issues, the uncertainties inherent in estimating ultimate claim costs on the basis of past experience have grown, further complicating the already complex loss reserving process.

Management believes that the aggregate loss reserves of the P&C Group at December 31, 2007 were adequate to cover claims for losses that had occurred as of that date, including both those known and those yet to be reported. In establishing such reserves, management considers facts currently known and the present state of the law and coverage litigation. However, given the significant uncertainties inherent in the loss reserving process, it is possible that management's estimate of the ultimate liability for losses that had occurred as of December 31, 2007 may change, which could have a material effect on the Corporation's results of operations and financial condition.

(b) A reconciliation of the beginning and ending liability for unpaid losses and loss expenses, net of reinsurance recoverable, and a reconciliation of the net liability to the corresponding liability on a gross basis is as follows:

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
|  | | (in millions) | |
| Gross liability, beginning of year ........ | $22,293 | $22,482 | $20,292 |
| Reinsurance recoverable, beginning of year ................. | 2,594 | 3,769 | 3,483 |
| Net liability, beginning of year ......... | 19,699 | 18,713 | 16,809 |
| Net incurred losses and loss expenses related to | | | |
| Current year .................... | 6,996 | 6,870 | 7,650 |
| Prior years .................... | (697) | (296) | 163 |
|  | 6,299 | 6,574 | 7,813 |
| Net payments for losses and loss expenses related to | | | |
| Current year .................... | 1,809 | 1,640 | 1,878 |
| Prior years .................... | 3,873 | 3,948 | 4,031 |
|  | 5,682 | 5,588 | 5,909 |
| Net liability, end of year ............. | 20,316 | 19,699 | 18,713 |
| Reinsurance recoverable, end of year..................... | 2,307 | 2,594 | 3,769 |
| Gross liability, end of year........... | $22,623 | $22,293 | $22,482 |

The gross liability for unpaid losses and loss expenses and reinsurance recoverable included $83 million and $40 million, respectively, at December 31, 2007, $178 million and $107 million, respectively, at December 31, 2006 and $967 million and $756 million, respectively, at December 31, 2005 related to Hurricane Katrina.

FICO0002410

Because loss reserve estimates are subject to the outcome of future events, changes in estimates are unavoidable given that loss trends vary and time is required for changes in trends to be recognized and confirmed. During 2007, the P&C Group experienced overall favorable development of $697 million on net unpaid losses and loss expenses established as of the previous year end. This compares with favorable prior year development of $296 million in 2006 and unfavorable prior year development of $163 million in 2005. Such development was reflected in operating results in these respective years.

The net favorable development of $697 million in 2007 was due to various factors. Favorable development of about $300 million was experienced in the professional liability classes other than fidelity, including about $100 million outside the United States. A majority of this favorable development was in the 2003 through 2005 accident years. Reported loss activity related to these accident years was less than expected due to a favorable business climate, lower policy limits and better terms and conditions. Favorable development of about $180 million was experienced in the short tail homeowners and commercial property classes, primarily related to the 2006 and 2005 accident years. This favorable development arose from the lower than expected emergence of actual losses during 2007 relative to expectations used to establish the loss reserves at the end of 2006. Favorable development of about $135 million was experienced in the run-off of the reinsurance assumed business due primarily to better than expected reported loss activity from cedants. Favorable development of about $40 million and $30 million was experienced in the fidelity class and the surety class, respectively, due to lower than expected reported loss emergence, mainly related to more recent accident years. Favorable development of about $30 million was experienced in the personal automobile class. Case development during 2007 on previously reported claims was better than expected and the number of late reported claims was less than expected. Unfavorable development of about $20 million was experienced in the commercial liability classes. Unfavorable development in accident years prior to 1997, mostly the $88 million related to asbestos and toxic waste claims, was largely offset by favorable development in these classes in the more recent accident years.

The net favorable development of $296 million in 2006 was also due to various factors. Favorable development of about $190 million was experienced in the short tail homeowners and commercial property classes, primarily related to the 2005 accident year. This favorable development arose from the lower than expected emergence of losses during 2006 relative to expectations used to establish loss reserves at the end of 2005. Favorable development of about $70 million was experienced in the fidelity class due to lower than expected reported loss emergence, mainly related to more recent accident years.

Favorable development of about $65 million was experienced in the run-off of the reinsurance assumed business due primarily to better than expected reported loss activity from cedants. Favorable development of about $45 million was experienced in the professional liability classes other than fidelity. Favorable development in the 2004 and 2005 accident years more than offset continued unfavorable development in the 2000 through 2002 accident years. Reported loss activity related to accident years 2004 and 2005 was less than expected due to a favorable business climate, lower policy limits and better terms and conditions. On the other hand, the P&C Group continued to experience significant reported loss activity related to the 2000 through 2002 accident years, largely from claims related to corporate failures and allegations of management misconduct and accounting irregularities. Favorable development of about $25 million was experienced in the personal automobile class. Case development during 2006 on previously reported claims was better than expected and the number of late reported claims was also less than expected. Unfavorable development of about $100 million was experienced in the commercial liability classes, including $24 million related to asbestos and toxic waste claims. Reported loss activity in accident years prior to 1997 was worse than expected, primarily related to specific individual excess liability and other liability claims.

The net unfavorable development of $163 million in 2005 was the result of various factors. Unfavorable development of about $200 million was experienced in the professional liability classes other than fidelity. Adverse development related to accident years 1998 through 2002, largely from claims related to corporate failures and allegations of management misconduct and accounting irregularities, was offset in part by favorable development related to accident years 2003 and 2004. Reported loss activity related to accident years 2003 and 2004 was less than expected due to a favorable business climate, lower policy limits and better terms and conditions. Unfavorable development of about $175 million was experienced in the commercial liability classes related to accident years prior to 1996, including $35 million related to asbestos claims. There was significant reported loss activity during 2005 related to these older accident years, primarily in the commercial excess liability class, which resulted in a lengthening of the expected loss emergence period. Favorable development of about $160 million was experienced in the short tail homeowners and commercial property classes, primarily related to the 2004 accident year. The favorable development arose from the lower than expected emergence of late reported losses during 2005 relative to expectations used to establish loss reserves at the end of 2004. Favorable development of about $60 million was experienced in the fidelity class due to lower than expected reported loss emergence, mainly related to more recent accident years.

FICO0002411

(c) The estimation of loss reserves relating to asbestos and toxic waste claims on insurance policies written many years ago is subject to greater uncertainty than other types of claims due to inconsistent court decisions as well as judicial interpretations and legislative actions that in some cases have tended to broaden coverage beyond the original intent of such policies and in others have expanded theories of liability. The insurance industry as a whole is engaged in extensive litigation over these coverage and liability issues and is thus confronted with a continuing uncertainty in its efforts to quantify these exposures.

Asbestos remains the most significant and difficult mass tort for the insurance industry in terms of claims volume and dollar exposure. Asbestos claims relate primarily to bodily injuries asserted by those who came in contact with asbestos or products containing asbestos. Tort theory affecting asbestos litigation has evolved over the years. Early court cases established the "continuous trigger" theory with respect to insurance coverage. Under this theory, insurance coverage is deemed to be triggered from the time a claimant is first exposed to asbestos until the manifestation of any disease. This interpretation of a policy trigger can involve insurance policies over many years and increases insurance companies' exposure to liability.

New asbestos claims and new exposures on existing claims have continued despite the fact that usage of asbestos has declined since the mid-1970's. Many claimants were exposed to multiple asbestos products over an extended period of time. As a result, claim filings typically name dozens of defendants. The plaintiffs' bar has solicited new claimants through extensive advertising and through asbestos medical screenings. A vast majority of asbestos bodily injury claims are filed by claimants who do not show any signs of asbestos related disease. New asbestos cases are often filed in those jurisdictions with a reputation for judges and juries that are extremely sympathetic to plaintiffs.

Approximately 80 manufacturers and distributors of asbestos products have filed for bankruptcy protection as a result of asbestos related liabilities. A bankruptcy sometimes involves an agreement to a plan between the debtor and its creditors, including current and future asbestos claimants. Although the debtor is negotiating in part with its insurers' money, insurers are generally given only limited opportunity to be heard. In addition to contributing to the overall number of claims, bankruptcy proceedings have also caused increased settlement demands against remaining solvent defendants.

There have been some positive legislative and judicial developments in the asbestos environment over the past several years. Various challenges to mass screening claimants have been mounted. Also, a number of states have implemented legislative and judicial reforms that focus the courts' resources on the claims of the most seriously injured. Those who allege serious injury and can present credible evidence of their injuries are receiving priority trial settings in the courts, while those who have not shown any credible disease manifestation are having their hearing dates delayed or are placed on an inactive docket, which preserves the right to pursue litigation in the future. Further, a number of key jurisdictions have adopted venue reform that requires plaintiffs to have a connection to the jurisdiction in order to file a complaint. Finally, in recognition that many aspects of bankruptcy plans are unfair to certain classes of claimants and to the insurance industry, these plans are beginning to be closely scrutinized by the courts and rejected when appropriate.

The P&C Group's most significant individual asbestos exposures involve products liability on the part of "traditional" defendants who were engaged in the manufacture, distribution or installation of asbestos products. The P&C Group wrote excess liability and/or general liability coverages for these insureds. While these insureds are relatively few in number, their exposure has become substantial due to the increased volume of claims, the erosion of the underlying limits and the bankruptcies of target defendants.

The P&C Group's other asbestos exposures involve products and non-products liability on the part of "peripheral" defendants, including a mix of manufacturers, distributors and installers of certain products that contain asbestos in small quantities and owners or operators of properties where asbestos was present. Generally, these insureds are named defendants on a regional rather than a nationwide basis. As the financial resources of traditional asbestos defendants have been depleted, plaintiffs are targeting these viable peripheral parties with greater frequency and, in many cases, for large awards.

Asbestos claims against the major manufacturers, distributors or installers of asbestos products were typically presented under the products liability section of primary general liability policies as well as under excess liability policies, both of which typically had aggregate limits that capped an insurer's exposure. In recent years, a number of asbestos claims by insureds are being presented as "non-products" claims, such as those by installers of asbestos products and by property owners or operators who allegedly had asbestos on their property, under the premises or operations section of primary general liability policies. Unlike products exposures, these non-products exposures typically had no aggregate limits on coverage, creating potentially greater exposure. Further, in an effort to seek additional insurance coverage, some insureds with installation activities who have substantially eroded their products coverage are presenting new asbestos claims as non-products operations claims or attempting to reclassify previously settled products claims as non-products claims to restore a portion of previously exhausted products aggregate limits. It is difficult to predict whether insureds will be successful in asserting claims under non-products coverage or whether insurers will be successful in asserting additional defenses. Accordingly, the ultimate cost to insurers of the claims for coverage not subject to aggregate limits is uncertain.

Various federal proposals to solve the ongoing asbestos litigation crisis have been considered by the U.S. Congress over the past few years, but none have yet been enacted. Thus, the prospect of federal asbestos reform legislation remains uncertain.

FICO0002412

In establishing asbestos reserves, the exposure presented by each insured is evaluated. As part of this evaluation, consideration is given to a variety of factors including the available insurance coverage; limits and deductibles; the jurisdictions involved; past settlement values of similar claims; the potential role of other insurance, particularly underlying coverage below excess liability policies; potential bankruptcy impact; relevant judicial interpretations; and applicable coverage defenses, including asbestos exclusions.

Significant uncertainty remains as to the ultimate liability of the P&C Group related to asbestos related claims. This uncertainty is due to several factors including the long latency period between asbestos exposure and disease manifestation and the resulting potential for involvement of multiple policy periods for individual claims; plaintiffs' increased focus on peripheral defendants; the volume of claims by unimpaired plaintiffs and the extent to which they can be precluded from making claims; the efforts by insureds to claim the right to non-products coverage not subject to aggregate limits; the number of insureds seeking bankruptcy protection as a result of asbestos related liabilities; the ability of claimants to bring a claim in a state in which they have no residency or exposure; the impact of the exhaustion of primary limits and the resulting increase in claims on excess liability policies that the P&C Group has issued; inconsistent court decisions and diverging legal interpretations; and the possibility, however remote, of federal legislation that would address the asbestos problem. These significant uncertainties are not likely to be resolved in the near future.

Toxic waste claims relate primarily to pollution and related cleanup costs. The P&C Group's insureds have two potential areas of exposure: hazardous waste dump sites and pollution at the insured site primarily from underground storage tanks and manufacturing processes.

The federal Comprehensive Environmental Response Compensation and Liability Act of 1980 (Superfund) has been interpreted to impose strict, retroactive and joint and several liability on potentially responsible parties (PRPs) for the cost of remediating hazardous waste sites. Most sites have multiple PRPs.

Most PRPs named to date are parties who have been generators, transporters, past or present landowners or past or present site operators. Insurance policies issued to PRPs were not intended to cover the clean-up costs of pollution and, in many cases, did not intend to cover the pollution itself. As the costs of environmental clean-up became substantial, PRPs and others increasingly filed claims with their insurance carriers. Litigation against insurers extends to issues of liability, coverage and other policy provisions.

There is substantial uncertainty involved in estimating the P&C Group's liabilities related to these claims. First, the liabilities of the claimants are extremely difficult to estimate. At any given waste site, the allocation of remediation costs among governmental authorities and the PRPs varies greatly depending on a variety of factors. Second, different courts have addressed liability and coverage issues regarding pollution claims and have reached inconsistent conclusions in their interpretation of several issues. These significant uncertainties are not likely to be resolved definitively in the near future.

Uncertainties also remain as to the Superfund law itself. Superfund's taxing authority expired on December 31, 1995 and has not been re-enacted. Federal legislation appears to be at a standstill. At this time, it is not possible to predict the direction that any reforms may take, when they may occur or the effect that any changes may have on the insurance industry.

Without federal movement on Superfund reform, the enforcement of Superfund liability has occasionally shifted to the states. States are being forced to reconsider state-level cleanup statutes and regulations. As individual states move forward, the potential for conflicting state regulation becomes greater. In a few states, cases have been brought against insureds or directly against insurance companies for environmental pollution and natural resources damages. To date, only a few natural resources claims have been filed and they are being vigorously defended. Significant uncertainty remains as to the cost of remediating the state sites. Because of the large number of state sites, such sites could prove even more costly in the aggregate than Superfund sites.

In establishing toxic waste reserves, the exposure presented by each insured is evaluated. As part of this evaluation, consideration is given to the probable liability, available insurance coverage, past settlement values of similar claims, relevant judicial interpretations, applicable coverage defenses as well as facts that are unique to each insured.

Management believes that the loss reserves carried at December 31, 2007 for asbestos and toxic waste claims were adequate. However, given the judicial decisions and legislative actions that have broadened the scope of coverage and expanded theories of liability in the past and the possibilities of similar interpretations in the future, it is possible that the estimate of loss reserves relating to these exposures may increase in future periods as new information becomes available and as claims develop.

FICO0002413

**(10)  Federal and Foreign Income Tax**

(a)  Income tax expense consisted of the following components:

| | Years Ended December 31 | | |
| | 2007 | 2006 | 2005 |
| --- | --- | --- | --- |
| | (in millions) | | |
| Current tax | | | |
| United States | $ 952 | $735 | $421 |
| Foreign | 168 | 154 | 116 |
| Deferred tax, principally United States | 10 | 108 | 84 |
| | $1,130 | $997 | $621 |

Federal and foreign income taxes paid were $1,140 million, $847 million and $409 million in 2007, 2006 and 2005, respectively.

(b)  The effective income tax rate is different than the statutory federal corporate tax rate. The reasons for the different effective tax rate were as follows:

| | Years Ended December 31 | | | | | |
| | 2007 | | 2006 | | 2005 | |
| | Amount | % of Pre-Tax Income | Amount | % of Pre-Tax Income | Amount | % of Pre-Tax Income |
| --- | --- | --- | --- | --- | --- | --- |
| | (in millions) | | | | | |
| Income before federal and foreign income tax | $3,937 | | $3,525 | | $2,447 | |
| Tax at statutory federal income tax rate | $1,378 | 35.0% | $1,234 | 35.0% | $ 856 | 35.0% |
| Tax exempt interest income | (232) | (5.9) | (215) | (6.1) | (195) | (8.0) |
| Other, net | (16) | (.4) | (22) | (.6) | (40) | (1.6) |
| Actual tax | $1,130 | 28.7% | $ 997 | 28.3% | $ 621 | 25.4% |

(c)  The tax effects of temporary differences that gave rise to deferred income tax assets and liabilities were as follows:

| | December 31 | |
| | 2007 | 2006 |
| --- | --- | --- |
| | (in millions) | |
| Deferred income tax assets | | |
| Unpaid losses and loss expenses | $ 729 | $ 690 |
| Unearned premiums | 357 | 363 |
| Foreign tax credits | 631 | 524 |
| Employee compensation | 175 | 167 |
| Postretirement benefits | 138 | 132 |
| Total | 2,030 | 1,876 |
| Deferred income tax liabilities | | |
| Deferred policy acquisition costs | 447 | 430 |
| Unremitted earnings of foreign subsidiaries | 630 | 487 |
| Unrealized appreciation of investments | 284 | 211 |
| Other, net | 227 | 157 |
| Total | 1,588 | 1,285 |
| Net deferred income tax asset | $ 442 | $ 591 |

Although realization of deferred income tax assets is not assured, management believes that it is more likely than not that the deferred tax assets will be realized. Accordingly, no valuation allowance was recorded at December 31, 2007 or 2006.

(d)  Chubb and its domestic subsidiaries file a consolidated federal income tax return with the U.S. Internal Revenue Service (IRS). The Corporation also files income tax returns with various state and foreign tax authorities. The U.S. income tax returns for years prior to 2004 are no longer subject to examination by the IRS. The examination of the U.S. income tax returns for 2004, 2005 and 2006 is expected to be completed in 2010. Management does not anticipate any assessments for tax years that remain subject to examination that would have a material effect on the Corporation's financial position or results of operations.

FICO0002414

## (11) Reinsurance

In the ordinary course of business, the P&C Group assumes and cedes reinsurance with other insurance companies. Reinsurance is ceded to provide greater diversification of risk and to limit the P&C Group's maximum net loss arising from large risks or catastrophic events.

A large portion of the P&C Group's ceded reinsurance is effected under contracts known as treaties under which all risks meeting prescribed criteria are automatically covered. Most of these arrangements consist of excess of loss and catastrophe contracts that protect against a specified part or all of certain types of losses over stipulated amounts arising from any one occurrence or event. In certain circumstances, reinsurance is also effected by negotiation on individual risks.

Ceded reinsurance contracts do not relieve the P&C Group of the primary obligation to its policyholders. Thus, an exposure exists with respect to reinsurance ceded to the extent that any reinsurer is unable or unwilling to meet its obligations assumed under the reinsurance contracts. The P&C Group monitors the financial strength of its reinsurers on an ongoing basis.

Premiums earned and insurance losses and loss expenses are reported net of reinsurance in the consolidated statements of income.

The effect of reinsurance on the premiums written and earned of the P&C Group was as follows:

|  | Years Ended December 31 | | |
|  | 2007 | 2006 | 2005 |
|  | (in millions) | | |
|---|---|---|---|
| Direct premiums written .......... | $12,432 | $12,224 | $12,180 |
| Reinsurance assumed ............. | 775 | 954 | 1,120 |
| Reinsurance ceded ............... | (1,335) | (1,204) | (1,017) |
| Net premiums written .......... | $11,872 | $11,974 | $12,283 |
| Direct premiums earned ......... | $12,457 | $12,084 | $12,111 |
| Reinsurance assumed ............. | 789 | 971 | 1,175 |
| Reinsurance ceded .............. | (1,300) | (1,097) | (1,110) |
| Net premiums earned........... | $11,946 | $11,958 | $12,176 |

The ceded reinsurance premiums written and earned included $386 million and $344 million, respectively, in 2007 and $283 million and $190 million, respectively, in 2006 that were ceded to Harbor Point.

Ceded losses and loss expenses, which reduce losses and loss expenses incurred, were $460 million, $86 million and $1,031 million in 2007, 2006 and 2005, respectively. The ceded losses and loss expenses in 2007 and 2006 included $183 million and $75 million, respectively, that were ceded to Harbor Point. The 2005 ceded amount included $775 million related to Hurricane Katrina and the 2006 amount reflected a $175 million reduction of ceded losses and loss expenses related to the hurricane.

## (12) Segments Information

The principal business of the Corporation is the sale of property and casualty insurance. The profitability of the property and casualty insurance business depends on the results of both underwriting operations and investments, which are viewed as two distinct operations. The underwriting operations are managed and evaluated separately from the investment function.

The P&C Group underwrites most lines of property and casualty insurance. Underwriting operations consist of four separate business units: personal insurance, commercial insurance, specialty insurance and reinsurance assumed. The personal segment targets the personal insurance market. The personal classes include automobile, homeowners and other personal coverages. The commercial segment includes those classes of business that are generally available in broad markets and are of a more commodity nature. Commercial classes include multiple peril, casualty, workers' compensation and property and marine. The specialty segment includes those classes of business that are available in more limited markets since they require specialized underwriting and claim settlement. Specialty classes include professional liability coverages and surety. The reinsurance assumed business is effectively in runoff following the sale, in December 2005, of the ongoing business to Harbor Point (see Note (3)).

Corporate and other includes investment income earned on corporate invested assets, corporate expenses and the Corporation's real estate and other non-insurance subsidiaries.

Performance of the property and casualty underwriting segments is measured based on statutory underwriting results. Statutory underwriting profit is arrived at by reducing premiums earned by losses and loss expenses incurred and statutory underwriting expenses incurred. Under statutory accounting principles applicable to property and casualty insurance companies, policy acquisition and other underwriting expenses are recognized immediately, not at the time premiums are earned.

Management uses underwriting results determined in accordance with generally accepted accounting principles (GAAP) to assess the overall performance of the underwriting operations. Underwriting income determined in accordance with GAAP is defined as premiums earned less losses and loss expenses incurred and GAAP underwriting expenses incurred. To convert statutory underwriting results to a GAAP basis, policy acquisition expenses are deferred and amortized over the period in which the related premiums are earned.

Investment income performance is measured based on investment income net of investment expenses, excluding realized investment gains and losses.

FICO0002415

Distinct investment portfolios are not maintained for each underwriting segment. Property and casualty invested assets are available for payment of losses and expenses for all classes of business. Therefore, such assets and the related investment income are not allocated to underwriting segments.

Revenues, income before income tax and assets of each operating segment were as follows:

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| Revenues | | | |
| Property and casualty insurance | | | |
| Premiums earned | | | |
| Personal insurance | $ 3,642 | $ 3,409 | $ 3,217 |
| Commercial insurance | 5,120 | 5,079 | 5,020 |
| Specialty insurance | 2,971 | 2,953 | 2,981 |
| Total insurance | 11,733 | 11,441 | 11,218 |
| Reinsurance assumed | 213 | 517 | 958 |
| | 11,946 | 11,958 | 12,176 |
| Investment income | 1,622 | 1,485 | 1,342 |
| Other revenues | 11 | — | — |
| Total property and casualty insurance | 13,579 | 13,443 | 13,518 |
| Corporate and other | 154 | 315 | 181 |
| Realized investment gains | 374 | 245 | 384 |
| Total revenues | $14,107 | $14,003 | $14,083 |
| Income (loss) before income tax | | | |
| Property and casualty insurance | | | |
| Underwriting | | | |
| Personal insurance | $    532 | $    590 | $    405 |
| Commercial insurance | 738 | 840 | 376 |
| Specialty insurance | 678 | 371 | 67 |
| Total insurance | 1,948 | 1,801 | 848 |
| Reinsurance assumed | 116 | 85 | 56 |
| | 2,064 | 1,886 | 904 |
| Increase in deferred policy acquisition costs | 52 | 19 | 17 |
| Underwriting income | 2,116 | 1,905 | 921 |
| Investment income | 1,590 | 1,454 | 1,315 |
| Other income (charges) | 6 | 10 | (1) |
| Total property and casualty insurance | 3,712 | 3,369 | 2,235 |
| Corporate and other loss | (149) | (89) | (172) |
| Realized investment gains | 374 | 245 | 384 |
| Total income before income tax | $ 3,937 | $ 3,525 | $ 2,447 |

| | December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| Assets | | | |
| Property and casualty insurance | $47,931 | $47,671 | $45,110 |
| Corporate and other | 2,785 | 2,811 | 3,054 |
| Adjustments and eliminations | (142) | (205) | (103) |
| Total assets | $50,574 | $50,277 | $48,061 |

The international business of the property and casualty insurance segment is conducted primarily through subsidiaries that operate solely outside of the United States. Their assets and liabilities are located principally in the countries where the insurance risks are written. International business is also written by branch offices of certain domestic subsidiaries.

Revenues of the P&C Group by geographic area were as follows:

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| Revenues | | | |
| United States | $10,624 | $10,807 | $11,013 |
| International | 2,955 | 2,636 | 2,505 |
| Total | $13,579 | $13,443 | $13,518 |

FICO0002416

**( 13 )  Stock-Based Employee Compensation Plans**

The Corporation has two stock-based employee compensation plans, the Long-Term Stock Incentive Plan and the Stock Purchase Plan. The compensation cost charged against income with respect to these plans was $87 million, $88 million and $65 million in 2007, 2006 and 2005, respectively. The total income tax benefit included in income with respect to these stock-based compensation arrangements was $31 million in 2007 and 2006 and $22 million in 2005.

As of December 31, 2007, there was $82 million of unrecognized compensation cost related to nonvested awards. That cost is expected to be charged against income over a weighted average period of 1.7 years.

(a)  The Long-Term Stock Incentive Plan provides for the granting of restricted stock units, restricted stock, performance shares, stock options, and other stock-based awards to key employees. The maximum number of shares of Chubb's common stock in respect to which stock-based awards may be granted under the Plan is 15,834,000 shares. At December 31, 2007, 9,575,399 shares were available for grant under the Plan.

*Restricted Stock Units, Restricted Stock and Performance Shares*

Restricted stock unit awards are payable in cash, in shares of Chubb's common stock, or in a combination of both. Restricted stock units are not considered to be outstanding shares of common stock, have no voting rights and are subject to forfeiture during the restriction period. Holders of restricted stock units may receive dividend equivalents. Restricted stock awards consist of shares of Chubb's common stock granted at no cost to the employees. Shares of restricted stock become outstanding when granted, receive dividends and have voting rights. The shares are subject to forfeiture and to restrictions that prevent their sale or transfer during the restriction period. Performance share awards are based on the achievement of performance goals over three year performance periods. Performance share awards are payable in cash, in shares of Chubb's common stock or in a combination of both.

An amount equal to the fair value at the date of grant of restricted stock unit awards, restricted stock awards and performance share awards is expensed over the vesting period. The weighted average fair value per share of the restricted stock units and restricted stock granted was $50.10, $47.54 and $39.67 in 2007, 2006 and 2005, respectively. The weighted average fair value per share of the performance shares granted was $52.99, $44.73 and $37.02 in 2007, 2006 and 2005, respectively.

Additional information with respect to restricted stock units and restricted stock and performance shares is as follows:

| | Restricted Stock Units and Restricted Stock | | Performance Shares* | |
| --- | --- | --- | --- | --- |
| | Number of Shares | Weighted Average Grant Date Fair Value | Number of Shares | Weighted Average Grant Date Fair Value |
| Nonvested, January 1, 2007 | 3,829,530 | $39.98 | 1,472,352 | $40.58 |
| Granted | 1,039,903 | 50.10 | 646,211 | 52.99 |
| Vested | (1,419,364) | 34.75 | (782,908)** | 37.02 |
| Forfeited | (143,376) | 44.07 | (26,626) | 45.76 |
| Nonvested, December 31, 2007 | 3,306,693 | 45.23 | 1,309,029 | 48.73 |

\*  The number of shares earned may range from 0% to 200% of the performance shares shown in the table above.

\*\*  The performance shares earned in 2007 were 136.6% of the vested shares shown in the table, or 1,069,452 shares.

The total fair value of restricted stock units and restricted stock that vested during 2007, 2006 and 2005 was $77 million, $34 million and $20 million, respectively. The total fair value of performance shares that vested during 2007 and 2006 was $58 million and $63 million, respectively. No performance shares were granted that would have vested during 2005.

*Stock Options*

Stock options are granted at exercise prices not less than the fair market value of Chubb's common stock on the date of grant. The terms and conditions upon which options become exercisable may vary among grants. Options expire no later than ten years from the date of grant.

An amount equal to the fair market value of stock options at the date of grant is expensed over the period that such options become exercisable. The weighted average fair value per stock option granted during 2007, 2006 and 2005 was $8.39, $7.65 and $7.56, respectively. The fair value of each stock option was estimated on the date of grant using the Black-Scholes option pricing model with the following weighted average assumptions.

| | 2007 | 2006 | 2005 |
| --- | --- | --- | --- |
| Risk-free interest rate | 4.4% | 4.8% | 4.0% |
| Expected volatility | 16.9% | 15.9% | 22.1% |
| Dividend yield | 2.2% | 2.0% | 2.0% |
| Expected average term (in years) | 4.3 | 3.4 | 3.5 |

FICO0002417

Additional information with respect to stock options is as follows:

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | | | (in years) | (in millions) |
| Outstanding, January 1, 2007 | 11,508,056 | $33.94 | | |
| Granted | 203,481 | 51.78 | | |
| Exercised | (3,592,569) | 34.85 | | |
| Forfeited | (11,037) | 29.91 | | |
| Outstanding, December 31, 2007 | 8,107,931 | 33.99 | 3.5 | $166 |
| Exercisable, December 31, 2007 | 7,883,973 | 33.63 | 3.3 | 165 |

The total intrinsic value of the stock options exercised during 2007, 2006 and 2005 was $66 million, $110 million and $229 million, respectively. The Corporation received cash of $115 million, $185 million and $528 million during 2007, 2006 and 2005, respectively, from the exercise of stock options. The tax benefit realized with respect to stock options exercised during 2007, 2006 and 2005 was $19 million, $40 million and $69 million, respectively.

(b) Under the Stock Purchase Plan, substantially all employees are eligible to receive rights to purchase shares of Chubb's common stock at a fixed price at the end of the offering period. The price is determined on the date the purchase rights are granted and the offering period cannot exceed 27 months. The number of shares an eligible employee may purchase is based on the employee's compensation. An amount equal to the fair market value of purchase rights at the date of grant is expensed over the offering period. No purchase rights have been granted since 2002.

## (14) Employee Benefits

(a) The Corporation has several non-contributory defined benefit pension plans covering substantially all employees. Prior to 2001, benefits were generally based on an employee's years of service and average compensation during the last five years of employment. Effective January 1, 2001, the Corporation changed the formula for providing pension benefits from the final average pay formula to a cash balance formula. Under the cash balance formula, a notional account is established for each employee, which is credited semi-annually with an amount equal to a percentage of eligible compensation based on age and years of service plus interest based on the account balance. Employees hired prior to 2001 will generally be eligible to receive vested benefits based on the higher of the final average pay or cash balance formulas.

The Corporation's funding policy is to contribute amounts that meet regulatory requirements plus additional amounts determined by management based on actuarial valuations, current market conditions and other factors. This may result in no contribution being made in a particular year.

The Corporation also provides certain other postretirement benefits, principally health care and life insurance, to retired employees and their beneficiaries and covered dependents. Substantially all employees hired before January 1, 1999 may become eligible for these benefits upon retirement if they meet minimum age and years of service requirements. Health care coverage is contributory. Retiree contributions vary based upon a retiree's age, type of coverage and years of service with the Corporation. Life insurance coverage is non-contributory.

The Corporation funds a portion of the health care benefits obligation where such funding can be accomplished on a tax effective basis. Benefits are paid as covered expenses are incurred.

The Corporation uses December 31 as the measurement date for its pension and other postretirement benefit plans.

The funded status of the pension and other postretirement benefit plans at December 31, 2007 and 2006 was as follows:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (in millions) | | | |
| Benefit obligation | $1,658 | $1,533 | $289 | $269 |
| Plan assets at fair value | 1,409 | 1,304 | 37 | 26 |
| Funded status at end of year, included in other liabilities | $ 249 | $ 229 | $252 | $243 |

FICO0002418

Net loss and prior service cost included in accumulated other comprehensive income that were not yet recognized as components of net benefit costs at December 31, 2007 and 2006 were as follows:

|  | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
|  | (in millions) | | | |
| Net loss | $ 383 | $ 357 | $ 33 | $ 31 |
| Prior service cost (benefit) | 44 | 47 | (2) | (3) |
|  | $ 427 | $ 404 | $ 31 | $ 28 |

The accumulated benefit obligation for the pension plans was $1,328 million and $1,224 million at December 31, 2007 and 2006, respectively. The accumulated benefit obligation is the present value of pension benefits earned as of the measurement date based on employee service and compensation prior to that date. It differs from the pension benefit obligation in the table on the previous page in that the accumulated benefit obligation includes no assumptions regarding future compensation levels.

The weighted average assumptions used to determine the benefit obligations were as follows:

|  | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
| Discount rate | 6.0% | 5.75% | 6.0% | 5.75% |
| Rate of compensation increase | 4.5 | 4.5 | — | — |

The Corporation made pension plan contributions of $93 million and $109 million during 2007 and 2006, respectively. The Corporation made other postretirement benefit plan contributions of $12 million and $2 million during 2007 and 2006, respectively.

The components of net pension and other postretirement benefit costs reflected in net income and other changes in plan assets and benefit obligations recognized in other comprehensive income for the years ended December 31, 2007, 2006 and 2005 were as follows:

|  | Pension Benefits | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|
|  | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
|  | (in millions) | | | | | |
| Costs reflected in net income |  |  |  |  |  |  |
| Service cost | $ 79 | $ 67 | $ 58 | $10 | $ 9 | $ 8 |
| Interest cost | 89 | 75 | 69 | 16 | 14 | 15 |
| Expected return on plan assets | (100) | (85) | (74) | (2) | (2) | (1) |
| Amortization of net loss and prior service cost | 32 | 34 | 20 | 1 | 1 | — |
|  | $ 100 | $ 91 | $ 73 | $25 | $22 | $22 |
| Changes in plan assets and benefit obligations recognized in other comprehensive income |  |  |  |  |  |  |
| Net loss | $ 54 |  |  | $ 4 |  |  |
| Prior service cost | 1 |  |  | — |  |  |
| Amortization of net loss and prior service cost | (32) |  |  | (1) |  |  |
|  | $ 23 |  |  | $ 3 |  |  |

The estimated aggregate net loss and prior service cost that will be amortized from accumulated other comprehensive income into net benefit costs during 2008 for the pension and other postretirement benefit plans is $27 million.

F-24

FICO0002419

The weighted average assumptions used to determine net pension and other postretirement benefit costs were as follows:

| | Pension Benefits | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2007 | 2006 | 2005 |
| Discount rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.75% | 5.75% | 6.25% | 5.75% | 5.75% | 6.25% |
| Rate of compensation increase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.5 | 4.5 | 4.5 | — | — | — |
| Expected long term rate of return on plan assets . . . . . . . . . . . . . . . . . . . . | 8.0 | 8.0 | 8.25 | 8.0 | 8.0 | 8.25 |

The weighted average health care cost trend rate assumptions used to measure the expected cost of medical benefits were as follows:

| | December 31 | |
|---|---|---|
| | 2007 | 2006 |
| Health care cost trend rate for next year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.75% | 9.5% |
| Rate to which the cost trend rate is assumed to decline (the ultimate trend rate) . . . . . . . . . . . . . . . . . . . . . . | 5.0 | 5.0 |
| Year that the rate reaches the ultimate trend rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2014 | 2014 |

The health care cost trend rate assumption has a significant effect on the amount of the accumulated other postretirement benefit obligation and the net other postretirement benefit cost reported. To illustrate, a one percent increase or decrease in the trend rate for each year would increase or decrease the accumulated other postretirement benefit obligation at December 31, 2007 by approximately $51 million and the aggregate of the service and interest cost components of net other postretirement benefit cost for the year ended December 31, 2007 by approximately $5 million.

The long term objective of the pension plan is to provide sufficient funding to cover expected benefit obligations, while assuming a prudent level of portfolio risk. Plan assets are invested in a diversified portfolio of predominately U.S. equity securities and fixed maturities. The Corporation seeks to obtain a rate of return that over time equals or exceeds the returns of the broad markets in which the plan assets are invested. The target allocation of plan assets is 55% to 65% invested in equity securities, with the remainder invested in fixed maturities. The portfolio is rebalanced periodically to remain within the target allocation range. The Corporation determined the expected long term rate of return assumption for each asset class based on an analysis of the historical returns and the expectations for future returns. The expected long-term rate of return for the portfolio is a weighted aggregation of the expected returns for each asset class.

The weighted average allocation of the pension plan assets was as follows:

| | December 31 | |
|---|---|---|
| | 2007 | 2006 |
| Equity securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 60% | 62% |
| Fixed maturities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 | 38 |
| | 100% | 100% |

The estimated benefits expected to be paid in each of the next five years and in the aggregate for the following five years are as follows:

| Years Ending December 31 | Pension Benefits | Other Postretirement Benefits |
|---|---|---|
| | (in millions) | |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 55 | $ 9 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 62 | 10 |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 67 | 11 |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72 | 12 |
| 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 78 | 13 |
| 2013-2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 541 | 88 |

(b) The Corporation has a defined contribution benefit plan, the Capital Accumulation Plan, in which substantially all employees are eligible to participate. Under this plan, the employer makes a matching contribution annually equal to 100% of each eligible employee's pre-tax elective contributions, up to 4% of the employee's eligible compensation. Contributions are invested at the election of the employee in Chubb's common stock or in various other investment funds. Employer contributions charged against income were $27 million in 2007 and $25 million in both 2006 and 2005.

FICO0002420

**(15) Commitments and Contingent Liabilities**

(a) Chubb and certain of its subsidiaries have been involved in the investigations of certain business practices in the property and casualty insurance industry by various Attorneys General and other regulatory authorities of several states, the U.S. Securities and Exchange Commission, the U.S. Attorney for the Southern District of New York and certain non-U.S. regulatory authorities with respect to, among other things, (1) potential conflicts of interest and anti-competitive behavior arising from the payment of contingent commissions to brokers and agents and (2) loss mitigation and finite reinsurance arrangements. In connection with these investigations, Chubb and certain of its subsidiaries received subpoenas and other requests for information from various regulators. The Corporation has been cooperating fully with these investigations. In December 2006, the Corporation settled with the Attorneys General of New York, Connecticut and Illinois all issues arising out of their investigations. As described in more detail below, the Attorney General of Ohio in August 2007 filed an action against Chubb and certain of its subsidiaries, as well as several other insurers and one broker, as a result of the Ohio Attorney General's business practices investigation. Although no other Attorney General or regulator has initiated an action against the Corporation, it is possible that such an action may be brought against the Corporation with respect to some or all of the issues that are the focus of these ongoing investigations.

Individual actions and purported class actions arising out of the investigations into the payment of contingent commissions to brokers and agents have been filed in a number of federal and state courts. On August 1, 2005, Chubb and certain of its subsidiaries were named in a putative class action entitled In re Insurance Brokerage Antitrust Litigation in the U.S. District Court for the District of New Jersey. This action, brought against several brokers and insurers on behalf of a class of persons who purchased insurance through the broker defendants, asserts claims under the Sherman Act and state law and the Racketeer Influenced and Corrupt Organizations Act (RICO) arising from the alleged unlawful use of contingent commission agreements. Chubb and certain of its subsidiaries have also been named as defendants in two purported class actions relating to allegations of unlawful use of contingent commission arrangements that were originally filed in state court. The first was filed on February 16, 2005 in Seminole County, Florida. The second was filed on May 17, 2005 in Essex County, Massachusetts. Both cases were removed to federal court and then transferred by the Judicial Panel on Multidistrict Litigation to the U.S. District Court for the District of New Jersey for consolidation with the In re Insurance Brokerage Antitrust Litigation. Since being transferred to the District of New Jersey, the plaintiff in

the former action has been inactive, and that action currently is stayed. The latter action has been voluntarily dismissed. On September 28, 2007, the U.S. District Court for the District of New Jersey dismissed the second amended complaint filed by the plaintiffs in In re Insurance Brokerage Antitrust Litigation in its entirety. In so doing, the court dismissed the plaintiffs' Sherman Act and RICO claims with prejudice for failure to state a claim, and it dismissed the plaintiffs' state law claims without prejudice because it declined to exercise supplemental jurisdiction over them. The plaintiffs have appealed the dismissal of their second amended complaint to the U.S. Court of Appeals for the Third Circuit, and that appeal is currently pending.

In December 2005, Chubb and certain of its subsidiaries were named in a putative class action similar to the In re Insurance Brokerage Antitrust Litigation. The action is pending in the U.S. District Court for the District of New Jersey and has been assigned to the judge who is presiding over the In re Insurance Brokerage Antitrust Litigation. The complaint has never been served in this matter. Separately, in April 2006, Chubb and one of its subsidiaries were named in an action similar to the In re Insurance Brokerage Antitrust Litigation. This action was filed in the U.S. District Court for the Northern District of Georgia and subsequently was transferred by the Judicial Panel on Multidistrict Litigation to the U.S. District Court for the District of New Jersey for consolidation with the In re Insurance Brokerage Antitrust Litigation. This action currently is stayed. On May 21, 2007, Chubb and one of its subsidiaries were named as defendants in another action similar to In re Insurance Brokerage Antitrust Litigation. This action was filed in the U.S. District Court for the District of New Jersey and consolidated with In re Insurance Brokerage Antitrust Litigation. This action currently is stayed.

On October 12, 2007, certain of Chubb's subsidiaries were named as defendants in an action similar to In re Insurance Brokerage Antitrust Litigation. This action was filed in the U.S. District Court for the Northern District of Georgia. This action has been identified to the Judicial Panel on Multidistrict Litigation as a potential "tag-along action" to In re Insurance Brokerage Antitrust Litigation. The Corporation currently anticipates that this action will be transferred by the Judicial Panel on Multidistrict Litigation to the U.S. District Court for the District of New Jersey and consolidated with In re Insurance Brokerage Antitrust Litigation.

On August 24, 2007, Chubb and certain of its subsidiaries were named as defendants in an action filed by the Ohio Attorney General against several insurers and one broker. This action alleges violations of Ohio's antitrust laws. On November 18, 2007, the Corporation filed a motion to dismiss the Attorney General's complaint which is still pending.

FICO0002421

In these actions, the plaintiffs generally allege that the defendants unlawfully used contingent commission agreements and conspired to reduce competition in the insurance markets. The actions seek treble damages, injunctive and declaratory relief, and attorneys' fees. The Corporation believes it has substantial defenses to all of the aforementioned legal proceedings and intends to defend the actions vigorously.

The Corporation cannot predict at this time the ultimate outcome of the aforementioned ongoing investigations and legal proceedings, including any potential amounts that the Corporation may be required to pay in connection with them. Nevertheless, management believes that it is likely that the outcome will not have a material adverse effect on the Corporation's results of operations or financial condition.

(b) Chubb Financial Solutions (CFS), a wholly owned subsidiary of Chubb, participated in derivative financial instruments, principally as a counterparty in portfolio credit default swaps. Chubb issued unconditional guarantees with respect to all obligations of CFS arising from these transactions. CFS has been in run-off since April 2003.

CFS's aggregate exposure, or retained risk, from its in-force financial products contracts is referred to as notional amount. Notional amounts are used to calculate the exchange of contractual cash flows and are not necessarily representative of the potential for gain or loss. Notional amounts are not recorded on the balance sheet.

Future obligations with respect to the financial products contracts are carried at estimated fair value at the balance sheet date and are included in other liabilities. The notional amount and fair value of future obligations under CFS's financial products contracts were as follows:

| | December 31 | | | |
|---|---|---|---|---|
| | Notional Amount | | Fair Value | |
| | 2007 | 2006 | 2007 | 2006 |
| | (in billions) | | (in millions) | |
| Credit default swaps | $.1 | $1.1 | $1 | $2 |
| Other | .3 | .3 | 6 | 6 |
| Total | $.4 | $1.4 | $7 | $8 |

(c) A property and casualty insurance subsidiary issued a reinsurance contract to an insurer that provides financial guarantees on debt obligations. At December 31, 2007, the aggregate principal commitments related to this contract for which the subsidiary was contingently liable amounted to approximately $350 million, net of reinsurance. These commitments expire by 2023.

(d) The Corporation occupies office facilities under lease agreements that expire at various dates through 2019; such leases are generally renewed or replaced by other leases. Most facility leases contain renewal options for increments ranging from two to ten years. The Corporation also leases data processing, office and transportation equipment. All leases are operating leases.

Rent expense was as follows:

| | Years Ended December 31 | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
| Office facilities | $81 | $89 | $ 87 |
| Equipment | 12 | 9 | 14 |
| | $93 | $98 | $101 |

At December 31, 2007, future minimum rental payments required under non-cancellable operating leases were as follows:

| Years Ending December 31 | (in millions) |
|---|---|
| 2008 | $ 89 |
| 2009 | 80 |
| 2010 | 66 |
| 2011 | 60 |
| 2012 | 54 |
| After 2012 | 181 |
| | $530 |

(e) The Corporation had certain commitments totaling $1.3 billion at December 31, 2007 to fund limited partnership investments. These capital commitments can be called by the partnerships during the commitment period (generally 5 years or less) to fund working capital needs or the purchase of new investments.

FICO0002422

## (16) Earnings Per Share

Basic earnings per common share is computed by dividing net income by the weighted average number of common shares outstanding during the year. The computation of diluted earnings per share reflects the potential dilutive effect, using the treasury stock method, of outstanding awards under stock-based employee compensation plans and of outstanding purchase contracts and mandatorily exercisable warrants to purchase Chubb's common stock.

The following table sets forth the computation of basic and diluted earnings per share:

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| | (in millions except for per share amounts) | | |
| Basic earnings per share: | | | |
| Net income .................................................................... | $2,807 | $2,528 | $1,826 |
| Weighted average number of common shares outstanding .......................... | 393.6 | 412.5 | 396.4 |
| Basic earnings per share ......................................................... | $ 7.13 | $ 6.13 | $ 4.61 |
| Diluted earnings per share: | | | |
| Net income .................................................................... | $2,807 | $2,528 | $1,826 |
| Weighted average number of common shares outstanding .......................... | 393.6 | 412.5 | 396.4 |
| Additional shares from assumed exercise of stock-based compensation awards .......... | 6.7 | 7.7 | 7.3 |
| Additional shares from assumed issuance of common stock upon settlement of purchase contracts and mandatorily exercisable warrants ................................. | — | 2.2 | 4.7 |
| Weighted average number of common shares and potential common shares assumed outstanding for computing diluted earnings per share .......................... | 400.3 | 422.4 | 408.4 |
| Diluted earnings per share ....................................................... | $ 7.01 | $ 5.98 | $ 4.47 |

## (17) Comprehensive Income

Comprehensive income is defined as all changes in shareholders' equity, except those arising from transactions with shareholders. Comprehensive income includes net income and other comprehensive income, which for the Corporation consists of changes in unrealized appreciation or depreciation of investments carried at market value, changes in foreign currency translation gains or losses and, beginning in 2007, changes in postretirement benefit costs not yet recognized in net income.

The components of other comprehensive income or loss were as follows:

| | Years Ended December 31 | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2007 | | | 2006 | | | 2005 | | |
| | Before Tax | Income Tax | Net | Before Tax | Income Tax | Net | Before Tax | Income Tax | Net |
| | (in millions) | | | | | | | | |
| Unrealized holding gains (losses) arising during the year ............................ | $237 | $ 83 | $154 | $161 | $55 | $106 | $(447) | $(157) | $(290) |
| Reclassification adjustment for realized gains included in net income ............. | 30 | 10 | 20 | 36 | 11 | 25 | 35 | 12 | 23 |
| Net unrealized gains (losses) recognized in other comprehensive income ................. | 207 | 73 | 134 | 125 | 44 | 81 | (482) | (169) | (313) |
| Foreign currency translation gains (losses) ......... | 193 | 68 | 125 | 52 | 18 | 34 | (35) | (13) | (22) |
| Change in postretirement benefit costs not yet recognized in net income ....................... | (26) | (9) | (17) | — | — | — | — | — | — |
| Total other comprehensive income (loss) ................................. | $374 | $132 | $242 | $177 | $62 | $115 | $(517) | $(182) | $(335) |

FICO0002423

**(18) Fair Values of Financial Instruments**

Fair values of financial instruments are determined using valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. Fair values are generally measured using quoted prices in active markets for identical assets or liabilities or other inputs, such as quoted prices for similar assets or liabilities, that are observable, either directly or indirectly. In those instances where observable inputs are not available, fair values are measured using unobservable inputs for the asset or liability. Unobservable inputs reflect the Corporation's own assumptions about the assumptions that market participants would use in pricing the asset or liability and are developed based on the best information available in the circumstances. Fair value estimates derived from unobservable inputs are significantly affected by the assumptions used, including the discount rates and the estimated amounts and timing of future cash flows. The derived fair value estimates cannot be substantiated by comparison to independent markets and are not necessarily indicative of the amounts that would be realized in a current market exchange. Certain financial instruments, particularly insurance contracts, are excluded from fair value disclosure requirements.

The methods and assumptions used to estimate the fair value of financial instruments are as follows:

(i) The carrying value of short term investments approximates fair value due to the short maturities of these investments.

(ii) Fair values of fixed maturities are generally obtained from independent pricing services. The pricing services utilize market quotations for fixed maturities that have quoted prices in active markets. For the fixed maturities that do not trade on a daily basis, the pricing services estimate fair values using proprietary pricing applications based on observable inputs in most instances. Fair values of fixed maturities are principally a function of current interest rates. Care should be used in evaluating the significance of these estimated market values, which can fluctuate based on such factors as interest rates, inflation, monetary policy and general economic conditions.

(iii) Fair values of equity securities are based on quoted market prices obtained from independent pricing services.

(iv) The fair value of the interest rate swap is based on a price quoted by a broker-dealer.

(v) Fair values of long term debt are obtained from independent pricing services or based on prices quoted by broker-dealers.

(vi) Fair values of credit derivatives are determined using internal valuation models that are similar to external valuation models.

The carrying values and fair values of financial instruments were as follows:

| | December 31 | | | |
| | 2007 | | 2006 | |
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
| | (in millions) | | | |
| Assets | | | | |
| Invested assets | | | | |
| Short term investments | $ 1,839 | $ 1,839 | $ 2,254 | $ 2,254 |
| Fixed maturities (Note 4) | | | | |
| Held-to-maturity | — | — | 135 | 142 |
| Available-for-sale | 33,871 | 33,871 | 31,831 | 31,831 |
| Equity securities | 2,320 | 2,320 | 1,957 | 1,957 |
| Interest rate swap | — | — | 6 | 6 |
| Liabilities | | | | |
| Long term debt (Note 8) | 3,460 | 3,427 | 2,460 | 2,504 |
| Credit derivatives (Note 15) | 7 | 7 | 8 | 8 |

FICO0002424

(19) Shareholders' Equity

(a) The authorized but unissued preferred shares may be issued in one or more series and the shares of each series shall have such rights as fixed by the Board of Directors.

(b) On February 8, 2006, the Board of Directors authorized the cancellation of all treasury shares, which were thereupon restored to the status of authorized but unissued common shares. The change had no effect on total shareholders' equity.

The activity of Chubb's common stock was as follows:

| | Years Ended December 31 | | |
| | 2007 | 2006 | 2005 |
| --- | --- | --- | --- |
| | (number of shares) | | |
| Common stock issued | | | |
| Balance, beginning of year | 411,276,940 | 420,864,596 | 391,607,648 |
| Treasury shares cancelled | — | (7,887,800) | — |
| Repurchase of shares | (41,733,268) | (20,266,262) | — |
| Shares issued upon settlement of equity unit purchase contracts and warrants | — | 12,883,527 | 17,366,234 |
| Share activity under stock-based employee compensation plans | 5,106,251 | 5,682,879 | 11,890,714 |
| Balance, end of year | 374,649,923 | 411,276,940 | 420,864,596 |
| Treasury stock | | | |
| Balance, beginning of year | — | 2,787,800 | 6,254,564 |
| Repurchase of shares | — | 5,100,000 | 2,787,800 |
| Cancellation of shares | — | (7,887,800) | — |
| Share activity under stock-based employee compensation plans | — | — | (6,254,564) |
| Balance, end of year | — | — | 2,787,800 |
| Common stock outstanding, end of year | 374,649,923 | 411,276,940 | 418,076,796 |

In November 2002, Chubb issued 24 million mandatorily exercisable warrants to purchase its common stock and $600 million of senior notes due in 2007. The warrants and notes were issued together in the form of equity units. Each warrant obligated the holder to purchase, and obligated Chubb to sell, on or before the settlement date of November 16, 2005, for a settlement price of $25, a variable number of newly issued shares of Chubb's common stock. The number of shares of Chubb's common stock purchased was determined based on a formula that considered the market price of the common stock immediately prior to the time of settlement in relation to the $28.32 per share sale price of the common stock at the time the equity units were offered. Upon settlement of the warrants, Chubb issued 17,366,234 shares of common stock and received proceeds of $600 million.

In June 2003, Chubb issued 18.4 million purchase contracts to purchase its common stock and $460 million of senior notes due in 2008. The purchase contracts and notes were issued together in the form of equity units. Each purchase contract obligated the holder to purchase, and obligated Chubb to sell, on or before the settlement date of August 16, 2006, for a settlement price of $25, a variable number of newly issued shares of Chubb's common stock. The number of shares of Chubb's common stock purchased was determined based on a formula that considered the market price of the common stock immediately prior to the time of settlement in relation to the $29.75 per share sale price of the common stock at the time the equity units were offered. Upon settlement of the purchase contracts, Chubb issued 12,883,527 shares of common stock and received proceeds of $460 million.

(c) As of December 31, 2007, 26,112,670 shares remained under the current share repurchase authorization that was approved by the Board of Directors in December 2007. The authorization has no expiration date.

(d) Chubb has a shareholders rights plan under which each shareholder has one-half of a right for each share of Chubb's common stock held. Each right entitles the holder to purchase from Chubb one one-thousandth of a share of Series B Participating Cumulative Preferred Stock at an exercise price of $240. The rights are attached to all outstanding shares of common stock and trade with the common stock until the rights become exercisable. The rights are subject to adjustment to prevent dilution of the interests represented by each right.

The rights will become exercisable and will detach from the common stock ten days after a person or group either acquires 20% or more of the outstanding shares of Chubb's common stock or announces a tender or exchange offer which, if consummated, would result in that person or group owning 20% or more of the outstanding shares of Chubb's common stock.

FICO0002425

In the event that any person or group acquires 20% or more of the outstanding shares of Chubb's common stock, each right will entitle the holder, other than such person or group, to purchase that number of shares of Chubb's common stock having a market value of two times the exercise price of the right. In the event that, following the acquisition of 20% or more of Chubb's outstanding common stock by a person or group, the Corporation is acquired in a merger or other business combination transaction or 50% or more of the Corporation's assets or earning power is sold, each right will entitle the holder to purchase common stock of the acquiring company having a value equal to two times the exercise price of the right. At any time after any person or group acquires 20% or more of Chubb's common stock, but before such person or group acquires 50% or more of such stock, Chubb may exchange all or part of the rights, other than the rights owned by such person or group, for shares of Chubb's common stock at an exchange ratio of one share of common stock per one-half of a right.

The rights do not have the right to vote or to receive dividends. The rights may be redeemed in whole, but not in part, at a price of $0.01 per right by Chubb at any time until the tenth day after the acquisition of 20% or more of Chubb's outstanding common stock by a person or group. The rights will expire at the close of business on March 12, 2009, unless previously exchanged or redeemed by Chubb.

(e) The property and casualty insurance subsidiaries are required to file annual statements with insurance regulatory authorities prepared on an accounting basis prescribed or permitted by such authorities (statutory basis). For such subsidiaries, statutory accounting practices differ in certain respects from GAAP.

A comparison of shareholders' equity on a GAAP basis and policyholders' surplus on a statutory basis is as follows:

| | December 31 | | | |
| --- | --- | --- | --- | --- |
| | 2007 | | 2006 | |
| | GAAP | Statutory | GAAP | Statutory |
| | (in millions) | | | |
| P&C Group | $15,490 | $12,998 | $13,868 | $11,357 |
| Corporate and other | (1,045) | | (5) | |
| | $14,445 | | $13,863 | |

A comparison of GAAP and statutory net income (loss) is as follows:

| | Years Ended December 31 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2007 | | 2006 | | 2005 | |
| | GAAP | Statutory | GAAP | Statutory | GAAP | Statutory |
| | (in millions) | | | | | |
| P&C Group | $2,992 | $2,859 | $2,637 | $2,575 | $1,963 | $1,897 |
| Corporate and other | (185) | | (109) | | (137) | |
| | $2,807 | | $2,528 | | $1,826 | |

(f) As a holding company, Chubb's ability to continue to pay dividends to shareholders and to satisfy its obligations, including the payment of interest and principal on debt obligations, relies on the availability of liquid assets, which is dependent in large part on the dividend paying ability of its property and casualty insurance subsidiaries. The Corporation's property and casualty insurance subsidiaries are subject to laws and regulations in the jurisdictions in which they operate that restrict the amount of dividends they may pay without the prior approval of regulatory authorities. The restrictions are generally based on net income and on certain levels of policyholders' surplus as determined in accordance with statutory accounting practices. Dividends in excess of such thresholds are considered "extraordinary" and require prior regulatory approval. During 2007, these subsidiaries paid dividends of $1.55 billion to Chubb.

The maximum dividend distribution that may be made by the property and casualty insurance subsidiaries to Chubb during 2008 without prior regulatory approval is approximately $2.4 billion.

FICO0002426

## QUARTERLY FINANCIAL DATA

Summarized unaudited quarterly financial data for 2007 and 2006 are shown below. In management's opinion, the interim financial data contain all adjustments, consisting of normal recurring items, necessary to present fairly the results of operations for the interim periods.

| | Three Months Ended | | | | | | | |
| | March 31 | | June 30 | | September 30 | | December 31 | |
| | 2007 | 2006 | 2007 | 2006 | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|---|---|---|---|
| | (in millions except for per share amounts) | | | | | | | |
| Revenues | $3,519 | $3,506 | $3,521 | $3,445 | $3,549 | $3,451 | $3,518 | $3,601 |
| Losses and expenses | 2,518 | 2,554 | 2,534 | 2,611 | 2,502 | 2,620 | 2,616 | 2,693 |
| Federal and foreign income tax | 291 | 280 | 278 | 236 | 309 | 227 | 252 | 254 |
| Net income | $ 710 | $ 672 | $ 709 | $ 598 | $ 738 | $ 604 | $ 650 | $ 654 |
| Basic earnings per share | $ 1.74 | $ 1.62 | $ 1.78 | $ 1.45 | $ 1.90 | $ 1.47 | $ 1.71 | $ 1.59 |
| Diluted earnings per share | $ 1.71 | $ 1.58 | $ 1.75 | $ 1.41 | $ 1.87 | $ 1.43 | $ 1.68 | $ 1.56 |
| Underwriting ratios | | | | | | | | |
| Losses to premiums earned | 53.0% | 53.8% | 53.1% | 56.7% | 51.8% | 56.9% | 53.3% | 53.2% |
| Expenses to premiums written | 30.4 | 29.1 | 29.6 | 28.5 | 29.8 | 28.6 | 30.5 | 29.9 |
| Combined | 83.4% | 82.9% | 82.7% | 85.2% | 81.6% | 85.5% | 83.8% | 83.1% |

FICO0002427

## THE CHUBB CORPORATION
## EXHIBITS INDEX
### (Item 15(a))

| Exhibit Number | Description |
|---|---|
| | — Articles of incorporation and by-laws |
| 3.1 | Restated Certificate of Incorporation incorporated by reference to Exhibit (3) of the registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 1996. |
| 3.2 | Certificate of Amendment to the Restated Certificate of Incorporation incorporated by reference to Exhibit (3) of the registrant's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 3.3 | Certificate of Correction of Certificate of Amendment to the Restated Certificate of Incorporation incorporated by reference to Exhibit (3) of the registrant's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 3.4 | Certificate of Amendment to the Restated Certificate of Incorporation incorporated by reference to Exhibit (3.1) of the registrant's Current Report on Form 8-K filed on April 18, 2006. |
| 3.5 | Certificate of Amendment to the Restated Certificate of Incorporation incorporated by reference to Exhibit (3.1) of the registrant's Current Report on Form 8-K filed on April 30, 2007. |
| 3.6 | By-Laws incorporated by reference to Exhibit (3.1) of the registrant's Current Report on Form 8-K filed on December 9, 2003. |
| | — Instruments defining the rights of security holders, including indentures |
| | The registrant is not filing any instruments evidencing any indebtedness since the total amount of securities authorized under any single instrument does not exceed 10% of the total assets of the registrant and its subsidiaries on a consolidated basis. Copies of such instruments will be furnished to the Securities and Exchange Commission upon request. |
| 4.1 | Rights Agreement dated as of March 12, 1999 between The Chubb Corporation and First Chicago Trust Company of New York, as Rights Agent incorporated by reference to Exhibit (99.1) of the registrant's Current Report on Form 8-K filed on March 30, 1999. |
| | — Material contracts |
| 10.1 | The Chubb Corporation Asset Managers Incentive Compensation Plan (2005) incorporated by reference to Exhibit (10) of the registrant's Annual Report on Form 10-K for the year ended December 31, 2004. |
| 10.2 | Corporate Aircraft Policy incorporated by reference to Exhibit (10.12) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |
| 10.3 | The Chubb Corporation Annual Incentive Plan (2006) incorporated by reference to Annex A of the registrant's definitive proxy statement for the Annual Meeting of Shareholders held on April 25, 2006. |
| 10.4 | The Chubb Corporation Long-Term Stock Incentive Plan (2004) incorporated by reference to Annex B of the registrant's definitive proxy statement for the Annual Meeting of Shareholders held on April 27, 2004. |
| 10.5 | The Chubb Corporation Long-Term Stock Incentive Plan (2000) incorporated by reference to Exhibit A of the registrant's definitive proxy statement for the Annual Meeting of Shareholders held on April 25, 2000. |
| 10.6 | The Chubb Corporation Long-Term Stock Incentive Plan (1996), as amended, incorporated by reference to Exhibit (10) of the registrant's Annual Report on Form 10-K for the year ended December 31, 1998. |

FICO0002428

| Exhibit Number | Description |
|---|---|
| 10.7 | The Chubb Corporation Long-Term Stock Incentive Plan for Non-Employee Directors (2004) incorporated by reference to Annex C of the registrant's definitive proxy statement for the Annual Meeting of Shareholders held on April 27, 2004. |
| 10.8 | The Chubb Corporation Stock Option Plan for Non-Employee Directors (2001) incorporated by reference to Exhibit C of the registrant's definitive proxy statement for the Annual Meeting of Shareholders held on April 24, 2001. |
| 10.9 | The Chubb Corporation Stock Option Plan for Non-Employee Directors (1996), as amended, incorporated by reference to Exhibit (10) of the registrant's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10.10 | The Chubb Corporation Stock Option Plan for Non-Employee Directors (1992), as amended, incorporated by reference to Exhibit (10) of the registrant's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10.11 | Non-Employee Director Special Stock Option Agreement, dated as of December 5, 2002, between The Chubb Corporation and Joel J. Cohen, incorporated by reference to Exhibit (10.1) of the registrant's Current Report on Form 8-K filed on December 9, 2002. |
| 10.12 | Non-Employee Director Special Stock Option Agreement, dated as of December 5, 2002, between The Chubb Corporation and Lawrence M. Small, incorporated by reference to Exhibit (10.3) of the registrant's Current Report on Form 8-K filed on December 9, 2002. |
| 10.13 | The Chubb Corporation Key Employee Deferred Compensation Plan (2005) incorporated by reference to Exhibit (10.9) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |
| 10.14 | Amendment to the registrant's Key Employee Deferred Compensation Plan (2005) incorporated by reference to Exhibit (10.1) of the registrant's Current Report on Form 8-K filed on September 12, 2005. |
| 10.15 | The Chubb Corporation Executive Deferred Compensation Plan incorporated by reference to Exhibit (10) of the registrant's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10.16 | The Chubb Corporation Deferred Compensation Plan for Directors, as amended, incorporated by reference to Exhibit (10.1) of the registrant's Current Report on Form 8-K filed on December 11, 2006. |
| 10.17 | The Chubb Corporation Estate Enhancement Program incorporated by reference to Exhibit (10) of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 1999. |
| 10.18 | The Chubb Corporation Estate Enhancement Program for Non-Employee Directors incorporated by reference to Exhibit (10) of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 1999. |
| 10.19 | Change in Control Employment Agreement, dated as of December 1, 2002, between The Chubb Corporation and John D. Finnegan, incorporated by reference to Exhibit (10) of the registrant's Current Report on Form 8-K filed on January 21, 2003. |
| 10.20 | Amendment, dated as of December 1, 2003, to Change in Control Employment Agreement, dated as of December 1, 2002, between The Chubb Corporation and John D. Finnegan, incorporated by reference to Exhibit (10.2) of the registrant's Current Report on Form 8-K filed on December 2, 2003. |
| 10.21 | Employment Agreement, dated as of December 1, 2002, between The Chubb Corporation and John D. Finnegan, incorporated by reference to Exhibit (10) of the registrant's Current Report on Form 8-K filed on January 21, 2003. |

FICO0002429

| Exhibit Number | Description |
|---|---|
| 10.22 | Amendment, dated as of December 1, 2003, to Employment Agreement, dated as of December 1, 2002, between The Chubb Corporation and John D. Finnegan, incorporated by reference to Exhibit (10.1) of the registrant's Current Report on Form 8-K filed on December 2, 2003. |
| 10.23 | Executive Severance Agreement, dated as of November 16, 1998, between The Chubb Corporation and Thomas F. Motamed, incorporated by reference to Exhibit (10) of the registrant's Annual Report on Form 10-K for the year ended December 31, 1998. |
| 10.24 | Executive Severance Agreement, dated as of June 30, 1997, between The Chubb Corporation and Michael O'Reilly, incorporated by reference to Exhibit (10) of the registrant's Annual Report on Form 10-K for the year ended December 31, 1997. |
| 10.25 | Executive Severance Agreement, dated as of December 8, 1995, between The Chubb Corporation and John J. Degnan, incorporated by reference to Exhibit (10) of the registrant's Annual Report on Form 10-K for the year ended December 31, 1995. |
| 10.26 | Form of 2006 Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Chief Executive Officer and Vice Chairmen) incorporated by reference to Exhibit (10.2) of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2006. |
| 10.27 | Form of 2006 Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.3) of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2006. |
| 10.28 | Form of 2006 Restricted Stock Unit Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Chief Executive Officer, Vice Chairmen, Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.4) of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2006. |
| 10.29 | Form of 2006 Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan for Non-Employee Directors (2004) incorporated by reference to Exhibit (10.5) of the registrant's Current Report on Form 8-K filed on March 8, 2006. |
| 10.30 | Form of 2006 Stock Unit Agreement under The Chubb Corporation Long-Term Stock Incentive Plan for Non-Employee Directors (2004) incorporated by reference to Exhibit (10.6) of the registrant's Current Report on Form 8-K filed on March 8, 2006. |
| 10.31 | Form of Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Chief Executive Officer and Vice Chairmen) incorporated by reference to Exhibit (10.3) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |
| 10.32 | Form of Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.4) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |
| 10.33 | Form of Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for recipients other than Chief Executive Officer, Vice Chairmen, Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.5) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |

FICO0002430

| Exhibit Number | Description |
|---|---|
| 10.34 | Form of Restricted Stock Unit Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) incorporated by reference to Exhibit (10.6) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |
| 10.35 | Amendment to the form of restricted stock unit award agreement for all eligible participants in The Chubb Stock Incentive Plan (2004) incorporated by reference to Exhibit (10.2) of the registrant's Current Report on Form 8-K filed on September 12, 2005. |
| 10.36 | Form of Non-Statutory Stock Option Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (three year vesting schedule) incorporated by reference to Exhibit (10.7) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |
| 10.37 | Form of Non-Statutory Stock Option Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (four year vesting schedule) incorporated by reference to Exhibit (10.8) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |
| 10.38 | Form of Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan for Non-Employee Directors (2004) incorporated by reference to Exhibit (10.10) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |
| 10.39 | Form of Stock Unit Agreement under The Chubb Corporation Long-Term Stock Incentive Plan for Non-Employee Directors (2004) incorporated by reference to Exhibit (10.11) of the registrant's Current Report on Form 8-K filed on March 9, 2005. |
| 10.40 | Schedule of 2007 Base Salaries for Named Executive Officers incorporated by reference to Exhibit (10.1) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.41 | Form of Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Chief Executive Officer, Vice Chairmen, Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.2) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.42 | Form of Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for recipients of performance share awards other than Chief Executive Officer, Vice Chairmen, Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.3) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.43 | Form of Amendment No. 1 to the form of 2006 Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Chief Executive Officer, Vice Chairmen, Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.4) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.44 | Form of Amendment No. 1 to the form of 2006 Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for 2006 performance share award recipients other than Chief Executive Officer, Vice Chairmen, Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.5) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |

E-4

| Exhibit Number | Description |
|---|---|
| 10.45 | Form of Amendment No. 1 to the form of 2005 Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Chief Executive Officer, Vice Chairmen, Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.6) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.46 | Form of Amendment No. 1 to the form of 2005 Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for 2005 performance share award recipients other than Chief Executive Officer, Vice Chairmen, Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.7) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.47 | Form of Restricted Stock Unit Agreement under the Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Chief Executive Officer and Vice Chairmen) incorporated by reference to Exhibit (10.8) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.48 | Form of Restricted Stock Unit Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.9) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.49 | Form of Restricted Stock Unit Agreement under The Chubb Corporation Long-Term Stock Incentive Plan (2004) (for recipients of restricted stock unit awards other than Chief Executive Officer, Vice Chairmen, Executive Vice Presidents and certain Senior Vice Presidents) incorporated by reference to Exhibit (10.10) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.50 | Form of Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan for Non-Employee Directors (2004) incorporated by reference to Exhibit (10.11) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.51 | Form of Amendment No. 1 to the form of 2006 Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan for Non-Employee Directors (2004) incorporated by reference to Exhibit (10.12) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.52 | Form of Amendment No. 1 to the form of 2005 Performance Share Award Agreement under The Chubb Corporation Long-Term Stock Incentive Plan for Non-Employee Directors (2004) incorporated by reference to Exhibit (10.13) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 10.53 | Form of Stock Unit Agreement under The Chubb Corporation Long-Term Stock Incentive Plan for Non-Employee Directors (2004) incorporated by reference to Exhibit (10.14) of the registrant's Current Report on Form 8-K filed on March 7, 2007. |
| 11.1 | Computation of earnings per share included in Note (16) of the Notes to Consolidated Financial Statements. |
| 12.1 | Computation of ratio of consolidated earnings to fixed charges filed herewith. |
| 21.1 | Subsidiaries of the registrant filed herewith. |

FICO0002432

| Exhibit Number | Description |
|---|---|
| 23.1 | Consent of Independent Registered Public Accounting Firm filed herewith. |
| | — Rule 13a-14(a)/15d-14(a) Certifications. |
| 31.1 | Certification by John D. Finnegan filed herewith. |
| 31.2 | Certification by Michael O'Reilly filed herewith. |
| | — Section 1350 Certifications. |
| 32.1 | Certification by John D. Finnegan filed herewith. |
| 32.2 | Certification by Michael O'Reilly filed herewith. |

FICO0002433

THE CHUBB CORPORATION

Schedule I

CONSOLIDATED SUMMARY OF INVESTMENTS — OTHER THAN INVESTMENTS IN RELATED PARTIES

(in millions)

December 31, 2007

| Type of Investment | Cost or Amortized Cost | Market Value | Amount at Which Shown in the Balance Sheet |
|---|---|---|---|
| Short term investments | $ 1,839 | $ 1,839 | $ 1,839 |
| **Fixed maturities** | | | |
| United States Government and government agencies and authorities | 3,151 | 3,165 | 3,165 |
| States, municipalities and political subdivisions | 18,247 | 18,595 | 18,595 |
| Foreign | 6,946 | 6,949 | 6,949 |
| Public utilities | 582 | 590 | 590 |
| All other corporate bonds | 4,548 | 4,572 | 4,572 |
| Total fixed maturities | 33,474 | 33,871 | 33,871 |
| **Equity securities** | | | |
| Common stocks | | | |
| Public utilities | 154 | 190 | 190 |
| Banks, trusts and insurance companies | 379 | 577 | 577 |
| Industrial, miscellaneous and other | 1,274 | 1,449 | 1,449 |
| Total common stocks | 1,807 | 2,216 | 2,216 |
| Non-redeemable preferred stocks | 100 | 104 | 104 |
| Total equity securities | 1,907 | 2,320 | 2,320 |
| Other invested assets | 2,051 | 2,051 | 2,051 |
| Total invested assets | $39,271 | $40,081 | $40,081 |

S-1

FICO0002434

## THE CHUBB CORPORATION

### Schedule II

CONDENSED FINANCIAL INFORMATION OF REGISTRANT
BALANCE SHEETS — PARENT COMPANY ONLY
(in millions)
December 31

| | 2007 | 2006 |
|---|---|---|
| **Assets** | | |
| Invested Assets | | |
| Short Term Investments | $  881 | $  748 |
| Taxable Fixed Maturities — Available-for-Sale (cost $1,027 and $1,134) | 1,022 | 1,113 |
| Equity Securities (cost $289 and $289) | 478 | 416 |
| TOTAL INVESTED ASSETS | 2,381 | 2,277 |
| Cash | — | 1 |
| Investment in Consolidated Subsidiaries | 15,633 | 13,848 |
| Net Receivable from Consolidated Subsidiaries | 15 | 19 |
| Other Assets | 168 | 243 |
| TOTAL ASSETS | $18,197 | $16,388 |
| **Liabilities** | | |
| Long Term Debt | $ 3,460 | $ 2,266 |
| Dividend Payable to Shareholders | 110 | 104 |
| Accrued Expenses and Other Liabilities | 182 | 155 |
| TOTAL LIABILITIES | 3,752 | 2,525 |
| **Shareholders' Equity** | | |
| Preferred Stock — Authorized 8,000,000 Shares; | | |
| $1 Par Value; Issued — None | — | — |
| Common Stock — Authorized 1,200,000,000 Shares; | | |
| $1 Par Value; Issued 374,649,923 and 411,276,940 Shares | 375 | 411 |
| Paid-In Surplus | 346 | 1,539 |
| Retained Earnings | 13,280 | 11,711 |
| Accumulated Other Comprehensive Income | 444 | 202 |
| TOTAL SHAREHOLDERS' EQUITY | 14,445 | 13,863 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $18,197 | $16,388 |

The condensed financial statements should be read in conjunction with the consolidated financial statements and notes thereto.

FICO0002435

# THE CHUBB CORPORATION

## Schedule II
(continued)

CONDENSED FINANCIAL INFORMATION OF REGISTRANT
STATEMENTS OF INCOME — PARENT COMPANY ONLY
(in millions)

### Years Ended December 31

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Revenues** |  |  |  |
| Investment Income | $  125 | $  111 | $   82 |
| Other Revenues | (5) | 17 | 3 |
| Realized Investment Gains (Losses) | (31) | — | 16 |
| TOTAL REVENUES | 89 | 128 | 101 |
| **Expenses** |  |  |  |
| Investment Expenses | 3 | 3 | 2 |
| Real Estate Impairment Loss | — | — | 48 |
| Corporate Expenses | 249 | 192 | 188 |
| TOTAL EXPENSES | 252 | 195 | 238 |
| Loss before Federal and Foreign Income Tax and Equity in Net Income of Consolidated Subsidiaries | (163) | (67) | (137) |
| Federal and Foreign Income Tax (Credit) | 7 | 16 | (48) |
| Loss before Equity in Net Income of Consolidated Subsidiaries | (170) | (83) | (89) |
| Equity in Net Income of Consolidated Subsidiaries | 2,977 | 2,611 | 1,915 |
| NET INCOME | $2,807 | $2,528 | $1,826 |

Chubb and its domestic subsidiaries file a consolidated federal income tax return. The federal income tax provision represents an allocation under the Corporation's tax allocation agreements.

The condensed financial statements should be read in conjunction with the consolidated financial statements and notes thereto.

FICO0002436

## THE CHUBB CORPORATION

### Schedule II

(continued)

CONDENSED FINANCIAL INFORMATION OF REGISTRANT
STATEMENTS OF CASH FLOWS — PARENT COMPANY ONLY
(in millions)

### Years Ended December 31

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| **Cash Flows from Operating Activities** | | | |
| Net Income | $ 2,807 | $ 2,528 | $ 1,826 |
| Adjustments to Reconcile Net Income to Net Cash Provided by Operating Activities | | | |
| Equity in Net Income of Consolidated Subsidiaries | (2,977) | (2,611) | (1,915) |
| Realized Investment Losses (Gains) | 31 | — | (16) |
| Other, Net | 15 | (7) | (23) |
| NET CASH USED IN OPERATING ACTIVITIES | (124) | (90) | (128) |
| **Cash Flows from Investing Activities** | | | |
| Proceeds from Fixed Maturities | | | |
| Sales | 49 | 121 | 548 |
| Maturities, Calls and Redemptions | 86 | 113 | 102 |
| Purchases of Fixed Maturities | (61) | (75) | (703) |
| Decrease (Increase) in Short Term Investments, Net | (133) | 168 | (730) |
| Capital Contributions to Consolidated Subsidiaries | (20) | (10) | (200) |
| Dividends Received from Consolidated Insurance Subsidiaries | 1,550 | 650 | 520 |
| Distributions Received from Consolidated Non-Insurance Subsidiaries | 40 | 17 | — |
| Other, Net | (65) | 49 | 225 |
| NET CASH PROVIDED BY (USED IN) INVESTING ACTIVITIES | 1,446 | 1,033 | (238) |
| **Cash Flows from Financing Activities** | | | |
| Proceeds from Issuance of Long Term Debt | 1,800 | — | — |
| Repayment of Long Term Debt | (600) | — | (300) |
| Proceeds from Common Stock Issued Upon Settlement of Equity Unit Purchase Contracts and Warrants | — | 460 | 600 |
| Proceeds from Issuance of Common Stock Under Stock-Based Employee Compensation Plans | 130 | 229 | 531 |
| Repurchase of Shares | (2,185) | (1,228) | (135) |
| Dividends Paid to Shareholders | (451) | (403) | (330) |
| Other, Net | (17) | — | — |
| NET CASH PROVIDED BY (USED IN) FINANCING ACTIVITIES | (1,323) | (942) | 366 |
| Net Increase (Decrease) in Cash | (1) | 1 | — |
| Cash at Beginning of Year | 1 | — | — |
| CASH AT END OF YEAR | $ — | $ 1 | $ — |

The condensed financial statements should be read in conjunction with the consolidated financial statements and notes thereto.

In 2007, Chubb forgave a receivable and related interest in the amount of $216 million in the aggregate due from a consolidated subsidiary. In 2005, consolidated subsidiaries paid noncash dividends in the amount of $196 million to Chubb. These transactions have been excluded from the statement of cash flows.

FICO0002437

# THE CHUBB CORPORATION

## Schedule III

### CONSOLIDATED SUPPLEMENTARY INSURANCE INFORMATION

(in millions)

| Segment | December 31 | | | Year Ended December 31 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Deferred Policy Acquisition Costs | Unpaid Losses | Unearned Premiums | Premiums Earned | Net Investment Income* | Insurance Losses | Amortization of Deferred Policy Acquisition Costs | Other Insurance Operating Costs and Expenses** | Premiums Written |
| **2007** | | | | | | | | | |
| Property and Casualty Insurance | | | | | | | | | |
| Personal | $ 509 | $ 2,141 | $1,932 | $ 3,642 | | $1,942 | $1,039 | $106 | $ 3,709 |
| Commercial | 637 | 10,972 | 2,718 | 5,120 | | 2,822 | 1,301 | 224 | 5,083 |
| Specialty | 374 | 8,163 | 1,718 | 2,971 | | 1,551 | 635 | 90 | 2,944 |
| Reinsurance Assumed | 36 | 1,347 | 201 | 213 | | (16) | 117 | 19 | 136 |
| Investments | | | | | $1,590 | | | | |
| | $1,556 | $22,623 | $6,569 | $11,946 | $1,590 | $6,299 | $3,092 | $439 | $11,872 |
| **2006** | | | | | | | | | |
| Property and Casualty Insurance | | | | | | | | | |
| Personal | $ 478 | $ 2,060 | $1,848 | $ 3,409 | | $1,735 | $ 911 | $145 | $ 3,518 |
| Commercial | 591 | 10,521 | 2,716 | 5,079 | | 2,726 | 1,215 | 290 | 5,125 |
| Specialty | 352 | 8,218 | 1,746 | 2,953 | | 1,865 | 602 | 104 | 2,941 |
| Reinsurance Assumed | 59 | 1,494 | 236 | 517 | | 248 | 191 | 21 | 390 |
| Investments | | | | | 1,454 | | | | |
| | $1,490 | $22,293 | $6,546 | $11,958 | $1,454 | $6,574 | $2,919 | $560 | $11,974 |
| **2005** | | | | | | | | | |
| Property and Casualty Insurance | | | | | | | | | |
| Personal | $ 445 | $ 2,059 | $1,739 | $ 3,217 | | $1,822 | $ 845 | $123 | $ 3,307 |
| Commercial | 576 | 10,803 | 2,615 | 5,020 | | 3,187 | 1,180 | 269 | 5,030 |
| Specialty | 337 | 8,082 | 1,744 | 2,981 | | 2,217 | 603 | 97 | 3,042 |
| Reinsurance Assumed | 87 | 1,538 | 272 | 958 | | 587 | 303 | 22 | 904 |
| Investments | | | | | 1,315 | | | | |
| | $1,445 | $22,482 | $6,361 | $12,176 | $1,315 | $7,813 | $2,531 | $511 | $12,283 |

* Property and casualty assets are available for payment of losses and expenses for all classes of business; therefore, such assets and the related investment income have not been allocated to the underwriting segments.

** Other insurance operating costs and expenses does not include other income and charges.

FICO0002438

EXHIBIT 12.1

## THE CHUBB CORPORATION

### COMPUTATION OF RATIO OF CONSOLIDATED EARNINGS TO FIXED CHARGES

| | Years Ended December 31 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2005 | 2004 | 2003 |
| | (in millions except for ratio amounts) | | | | |
| Income from continuing operations before provision for income taxes . . . . . . . . . . . . . . . . . . | $3,937 | $3,525 | $2,447 | $2,068 | $ 934 |
| Less: | | | | | |
| Income from equity investees . . . . . . . . . . . . . . . | 390 | 266 | 186 | 207 | 93 |
| Add: | | | | | |
| Interest expensed . . . . . . . . . . . . . . . . . . . . . . . . . . | 206 | 134 | 135 | 139 | 130 |
| Capitalized interest amortized or expensed . . . . | 12 | 32 | 15 | 14 | 9 |
| Portion of rents representative of the interest factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | 32 | 34 | 35 | 35 |
| Distributions from equity investees . . . . . . . . . . . | 151 | 72 | 138 | 101 | 17 |
| Income as adjusted . . . . . . . . . . . . . . . . . . . . . . . | $3,947 | $3,529 | $2,583 | $2,150 | $1,032 |
| Fixed charges: | | | | | |
| Interest expensed . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 206 | $ 134 | $ 135 | $ 139 | $ 130 |
| Portion of rents representative of the interest factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | 32 | 34 | 35 | 35 |
| Fixed charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 237 | $ 166 | $ 169 | $ 174 | $ 165 |
| Ratio of consolidated earnings to fixed charges . . . | 16.65 | 21.26 | 15.28 | 12.36 | 6.25 |

FICO0002439

Exhibit 21.1

### THE CHUBB CORPORATION

### SUBSIDIARIES OF THE REGISTRANT

Significant subsidiaries at December 31, 2007 of The Chubb Corporation, a New Jersey corporation, and their subsidiaries (indented), together with the percentages of ownership, are set forth below.

| Company | Place of Incorporation | Percentage of Securities Owned |
|---|---|---|
| Federal Insurance Company | Indiana | 100% |
| Vigilant Insurance Company | New York | 100 |
| Pacific Indemnity Company | Wisconsin | 100 |
| Northwestern Pacific Indemnity Company | Oregon | 100 |
| Texas Pacific Indemnity Company | Texas | 100 |
| Great Northern Insurance Company | Indiana | 100 |
| Chubb Insurance Company of New Jersey | New Jersey | 100 |
| Chubb Custom Insurance Company | Delaware | 100 |
| Chubb National Insurance Company | Indiana | 100 |
| Chubb Indemnity Insurance Company | New York | 100 |
| Executive Risk Indemnity Inc. | Delaware | 100 |
| Executive Risk Specialty Insurance Company | Connecticut | 100 |
| CC Canada Holdings Ltd. | Canada | 100 |
| Chubb Insurance Company of Canada | Canada | 100 |
| Chubb Insurance Investment Holdings Ltd. | United Kingdom | 100 |
| Chubb Insurance Company of Europe, S.A. | Belgium | 100 |
| Chubb Insurance Company of Australia Limited | Australia | 100 |
| Chubb Argentina de Seguros, S.A. | Argentina | 100 |
| Chubb Atlantic Indemnity Ltd. | Bermuda | 100 |
| DHC Corporation | Delaware | 100 |
| Chubb do Brasil Companhia de Seguros | Brazil | 99 |
| Bellemead Development Corporation | Delaware | 100 |
| Chubb Financial Solutions, Inc. | Delaware | 100 |
| Chubb Financial Solutions LLC | Delaware | 100 |

Certain other subsidiaries of Chubb and its consolidated subsidiaries have been omitted since, in the aggregate, they would not constitute a significant subsidiary.

Exhibit 23.1

### THE CHUBB CORPORATION

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the Registration Statements (Form S-3: No. 333-104310, No. 333-141561; Form S-8: No. 33-30020, No. 33-49230, No. 333-09273, No. 333-09275, No. 333-58157, No. 333-67347, No. 333-73073, No. 333-36530, No. 333-85462, No. 333-90140, No. 333-117120, No. 333-135011) of The Chubb Corporation and in the related Prospectuses of our reports dated February 26, 2008, with respect to the consolidated financial statements and schedules of The Chubb Corporation and internal control over financial reporting of The Chubb Corporation, included in this Annual Report (Form 10-K) for the year ended December 31, 2007.

/s/   ERNST & YOUNG LLP

New York, New York
February 26, 2008

Exhibit 31.1

## THE CHUBB CORPORATION

### CERTIFICATION

I, John D. Finnegan, certify that:

1.   I have reviewed this annual report on Form 10-K of The Chubb Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2008

/s/   John D. Finnegan

John D. Finnegan
Chairman, President and Chief Executive Officer

Exhibit 31.2

### THE CHUBB CORPORATION

### CERTIFICATION

I, Michael O'Reilly, certify that:

1.   I have reviewed this annual report on Form 10-K of The Chubb Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2008

/s/   Michael O'Reilly
Michael O'Reilly
Vice Chairman and Chief Financial Officer

Exhibit 32.1

## THE CHUBB CORPORATION

### CERTIFICATION OF PERIODIC REPORT

I, John D. Finnegan, Chairman, President and Chief Executive Officer of The Chubb Corporation (the "Corporation"), certify, pursuant to 18 U.S.C. Section 1350 adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) the Annual Report on Form 10-K of the Corporation for the annual period ended December 31, 2007 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

Dated: February 26, 2008

/s/   John D. Finnegan
John D. Finnegan
Chairman, President and Chief Executive Officer

Exhibit 32.2

**THE CHUBB CORPORATION**

**CERTIFICATION OF PERIODIC REPORT**

I, Michael O'Reilly, Vice Chairman and Chief Financial Officer of The Chubb Corporation (the "Corporation"), certify, pursuant to 18 U.S.C. Section 1350 adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) the Annual Report on Form 10-K of the Corporation for the annual period ended December 31, 2007 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Corporation.

Dated: February 26, 2008

/s/   Michael O'Reilly

Michael O'Reilly
Vice Chairman and Chief Financial Officer

## The Chubb Corporation

15 Mountain View Road
Warren, New Jersey 07059
Telephone (908) 903-2000
www.chubb.com

## Stock Listing

The common stock of the
Corporation is traded on the
New York Stock Exchange
under the symbol CB.

## Dividend Agent, Transfer Agent and Registrar

BNY Mellon
Shareholder Services
480 Washington Boulevard
Jersey City, New Jersey 07310
Telephone (877) 251-3569
www.bnymellon.com

## SEC and NYSE Certifications

Chubb has included as exhibits to
its Annual Report on Form 10-K
for the year ended December 31,
2007 filed with the Securities and
Exchange Commission certificates
of its Chief Executive Officer and
Chief Financial Officer certifying
the quality of Chubb's internal
controls over financial reporting
and disclosure controls. Chubb has
submitted to the New York Stock
Exchange (NYSE) a certificate of
its Chief Executive Officer
certifying that he is not aware
of any violation by Chubb of the
NYSE's corporate governance
listing standards.

**Explanation of Non-GAAP Financial Measures**

Operating income, a non-GAAP financial
measure, is net income excluding after-tax
realized investment gains and losses.
Management uses operating income,
among other measures, to evaluate its
performance because the realization of
investment gains and losses in any given
period is largely discretionary as to timing
and can fluctuate significantly, which could
distort the analysis of trends.

Property and casualty investment income
after income tax, a non-GAAP financial
measure, is property and casualty
investment income after giving effect to
applicable income tax. Management uses
property and casualty investment income
after income tax to evaluate its investment
performance because it reflects the impact
of any change in the proportion of the
property and casualty investment portfolio
invested in tax-exempt securities and is
therefore more meaningful for analysis
purposes than property and casualty
investment income before income tax.

**Photography** Randy Duchaine, Peter Vidor, Joseph Lynch, Carlos Villalon and Mark Leong.

FICO0002446



**THE CHUBB CORPORATION**
15 Mountain View Road
Warren, New Jersey 07059
Telephone (908) 903-2000
www.chubb.com

FICO0002447