# Exhibit 30
# (Unsealed)
# (Previously Filed Under Seal as Dkt. 438)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
TAMRA PAWLOSKI - 01/18/2019

```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF MINNESOTA

 3   -------------------------------------------x

 4   FAIR ISAAC CORPORATION, a Delaware
     corporation,
 5                  Plaintiff,

 6                       Case No.  16-cv-1054

 7              v.

 8   FEDERAL INSURANCE COMPANY, an
     Indiana corporation, and ACE
 9   AMERICAN INSURANCE COMPANY, a
     Pennsylvania corporation,
10                  Defendants.

11   -------------------------------------------x

12                  8:30 a.m.
                    January 18, 2019
13
                    767 Third Avenue
14                  New York, New York

15                  * CONFIDENTIAL *

16        DEPOSITION of TAMRA PAWLOSKI, a Plaintiff

17   in the above entitled matter, pursuant to Notice,

18   before Stephen J. Moore, a Registered Professional

19   Reporter, Certified Realtime Reporter and Notary

20   Public of the State of New York.

21

22   Job No. MP-204293
```

**EXHIBIT 30**

Page 230

 1    3:35 p.m. and we are going off the
 2    record.
 3           (At this point in the proceedings
 4    there was a recess, after which the
 5    deposition continued as follows:)
 6           THE VIDEOGRAPHER: This is the
 7    start of media labeled number 6. The
 8    time now is 3:43 p.m. and we are back on
 9    the record.
10    Q     So, you mentioned a few times
11    that after February or March of 2016 in the
12    negotiations with FICO that it went up the
13    chain to senior leadership.
14           Who were the people that you are
15    referring to in that senior leadership group?
16    A     Bill Harlam, Rob Hilgan, Kevin
17    Shirran and Andrew Hopp.
18    Q     Andrew Hopp is the general
19    counsel, is that correct?
20    A     That's correct.
21    Q     Bill Harlam was the CIO?
22    A     No, Bill was my boss, he was the

Page 231

 1    head of vendor management.
 2    Q     Who is Rob Hilgan?
 3    A     Rob Hilgan was Bill's boss.
 4    Q     What was his role?
 5    A     Operations.
 6    Q     Chief of operations?
 7    A     Yeah -- no, he wasn't the Chief
 8    Operating Officer, he just had IT operations.
 9    Q     And Kevin Shirran, who was that
10    and what was his role?
11    A     Officially our CIO, global CIO.
12    Q     Now, when we were looking at
13    Exhibit -- the very last exhibit with the CHear
14    report, we were talking about the Blaze Advisor
15    being approved for use in Evolution and Russ
16    Hodey was the IT application contact.
17           Do you recall that?
18    A     Yes.
19           I'm sorry, here we go.
20    Q     I wanted to cross-reference that
21    to other exhibits. You mentioned that it
22    probably related to the e-mails we had already

Page 232

 1    discussed relating to Australia with Russ
 2    Hodey.
 3           Were those the e-mails at
 4    Exhibits 268 and 269?
 5    A     No, they were the ones in an
 6    earlier, that we did -- hold on a second, I
 7    think it was Exhibit 244.
 8           And what is he asking? Not 244,
 9    I'm sorry. It was 241 and 243.
10    Q     So I note your -- in Exhibit 241
11    your response was that the license was not
12    worldwide, correct?
13    A     Yes, but then shortly after, as
14    stated, that was corrected.
15    Q     An it was corrected by Mark?
16    A     Berthume.
17           MS. KLIEBENSTEIN: All right. No
18    further questions.
19           MR. FLEMING: I have just a
20    couple of follow-up relating to Exhibit
21    260.
22

Page 233

 1    EXAMINATION BY
 2    MR. FLEMING:
 3
 4    Q     My question --
 5           MS. KLIEBENSTEIN: Hold on just a
 6    second. Let me see 260, please.
 7    Q     What knowledge do you have that
 8    FICO knew that Chubb deployed Blaze in the
 9    United Kingdom?
10    A     I worked on a statement of work
11    with -- where two of the consultants from FICO
12    were sent to the U.K. to install and to do an
13    assessment and then an installation of the FICO
14    product, Blaze product.
15    Q     And who prepared the statement
16    of work?
17    A     It was joint between the
18    business partner, myself and FICO.
19    Q     And who at FICO was working on
20    this?
21    A     I know it wasn't Mike Sawyer,
22    because he wasn't there at the time, I don't

Page 234

1 believe.
2          I don't recall who the -- one of
3 the salesmen.
4     Q    Is it Russ Schreiber?
5     A    Yes.
6     Q    Did you have any discussions
7 with Russ Schreiber as to whether use of Blaze
8 by Chubb in the United Kingdom was permissible
9 under the agreement?
10    A    No, because I wouldn't have
11 thought they would send consultants there if it
12 was not permissible.
13    Q    So if you just walk through the
14 process of why there was a statement of work
15 and how that was proposed, just the timeline.
16    A    So, what will happen is we will
17 get a request from the business asking us if --
18 to put together the SOW.
19         I would contact FICO to arrange
20 that, and it is practice at Chubb that the
21 business also contacts FICO to go over what
22 their requirements are so the two of them can

Page 235

1 agree.
2          I'm on some of those calls and
3 not on some of those calls.
4          Then what we do is we take what
5 has been agreed and put it into a statement of
6 work and ensure that statement of work is
7 correct, including what's going to be delivered
8 and the deliverables, and from there it gets
9 signed.
10    Q    And then what happens next?
11    A    Then the SOW goes to the
12 business partner for them to work on, so they
13 contact FICO and the consultants go to wherever
14 they need to go.
15    Q    And did you understand that two
16 FICO representatives went to London?
17    A    Yes, that was outlined in the
18 SOW.
19    Q    And what was your understanding
20 of what did they do in London?
21    A    They were the architects that
22 helped with the assessment, and then also we

Page 236

1 wanted to make sure that we were putting FICO
2 in correctly, so, the assessment and
3 installation.
4     Q    And what was your understanding
5 as to what they installed?
6     A    It was clear that was -- it was
7 the Blaze Advisor product.
8     Q    Where was it installed?
9     A    In the U.K. data center on, I
10 believe our mainframe in the U.K.
11    Q    At any point during that process
12 did anybody from FICO suggest that the use or
13 installation of Blaze in the United Kingdom was
14 outside the scope of the sales force license
15 agreement?
16    A    No.
17         MR. FLEMING:  Okay, I have no
18    further questions.
19
20 CONTINUED EXAMINATION BY
21 MS. KLIEBENSTEIN:
22

Page 237

1     Q    So the event you were just
2 talking about, when did this occur?
3     A    2011, yes, 2011 or 2012; I
4 believe it was 2011.
5     Q    Were you in the United
6 Kingdom --
7     A    No.
8     Q    -- when the work was being done?
9     A    No.
10    Q    So when you are talking about
11 the installation and the assessment, you
12 weren't personally there?
13    A    No, that was managed by the
14 business.
15    Q    And how did you come across that
16 knowledge?
17    A    In the statement of work that
18 was signed off by two -- by both companies as
19 to what was going to be delivered, and then
20 before payment, I validated that it happened.
21    Q    So these were tasks that were
22 outlined in the statement of work?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
TAMRA PAWLOSKI - 01/18/2019          Pages 238..241

Page 238

1  A   Correct.
2  Q   A written statement of work?
3  A   Yes.
4  Q   Do you know if that statement of
5  work has been produced in this lawsuit?
6  A   I don't know.
7      I know it wasn't one of the ones
8  that you have shown me.
9  Q   Did anyone from Chubb & Sons
10 check with legal to make sure that what was
11 going to happen -- well, was the SOW Chubb &
12 Sons' standard SOW?
13 A   It was.
14 Q   So it wouldn't have gone to
15 Chubb & Sons' legal?
16 A   That's correct.
17 Q   Do you know whether it went
18 through FICO's legal department?
19 A   I do not know.
20 Q   Do you know if Mr. Schreiber
21 checked with FICO legal?
22 A   I do not, no.

Page 239

1  Q   You mentioned briefly you don't
2  recall any discussions with respect to this
3  statement of work as to whether it was okay
4  under the agreement, correct?
5  A   Yeah, I don't recall.
6  Q   But there weren't -- you don't
7  recall discussions one way or the other,
8  whether this was or was not okay?
9  A   That's correct, I don't recall.
10 Q   And so what was your role with
11 respect to this statement of work?
12 A   I helped to draft it on to the
13 template and work it through the process that
14 we have outlined, that I have outlined a couple
15 of times already.
16     So, getting it through to
17 signature, making sure everybody was agreed
18 with what the business terms were in the SOW,
19 agree with the pricing, and got a final
20 signature approval for it.
21 Q   And what application -- what
22 software application did the statement of work

Page 240

1  involve?
2  A   This one was a CPI print
3  application.
4  Q   That's the name for it?
5  A   Yes, I believe that was -- I
6  knew it had to do something with print.
7  Q   Do you know one way or the other
8  whether Blaze Advisor was installed on servers
9  in the United Kingdom pursuant to this
10 statement of work?
11 A   Yes.
12     Yes, it was installed, because
13 they gave me validation when we were paying the
14 invoice.
15 Q   What was that validation?
16 A   That the deliverables outlined
17 in that SOW were completed.
18 Q   Who gave that you validation?
19 A   The project manager.
20 Q   And who is the project manager?
21 A   I don't remember.
22     MS. KLIEBENSTEIN: All right, I

Page 241

1  don't have any further questions.
2      MR. FLEMING: Nothing further.
3  We will read and sign.
4      THE VIDEOGRAPHER: The time is
5  3:58 p.m. and we are going off the
6  record.