# Exhibit 42
# (Unsealed)
# (Previously Filed Under Seal as Dkt. 440)

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY  -  6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
 2
     - - - - - - - - - - - - - - - - - - - - - - - - -
 3

     FAIR ISAAC CORPORATION,
 4
                   Plaintiff,
 5
          v.             Court File No. 16-cv-1054 (WMW/DTS)
 6

     FEDERAL INSURANCE COMPANY,
 7   an Indiana corporation, and ACE
     AMERICAN INSURANCE COMPANY,
 8   a Pennsylvania corporation,

 9                 Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - -

11                     VIDEO DEPOSITION

12         The following is the video deposition of

13   RANDOLPH BICKLEY WHITENER, taken before Jean F.

14   Soule, Notary Public, Registered Professional

15   Reporter, pursuant to Notice of Taking Deposition,

16   at the law office of Fredrikson & Byron, P.A.,

17   200 South Sixth Street, Suite 4000, Basswood

18   Conference Room, Minneapolis, Minnesota, commencing

19   at 8:56 a.m., Thursday, June 27, 2019.

20

21                     *    *    *

22

23

24                C O N F I D E N T I A L

25                ATTORNEYS' EYES ONLY
```

EXHIBIT 42

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 3 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  Q. This is your first time?
2  A. That is correct.
3  Q. Okay. Tell me, what did you do to
4  prepare for your deposition today?
5  A. At this point, I believe you are
6  asking me the types of research I did, I believe
7  you are asking me the types of documents I looked
8  at; is that correct?
9  Q. I'm asking you what you did to prepare
10 for your deposition today?
11 A. Aah.
12 Q. Yes.
13 A. A different question. Thank you. I
14 mounted a plane in the great State of Alabama, flew
15 to the great State of Minnesota, and I met with the
16 attorneys present.
17 Q. Okay.
18 A. I have also reviewed --
19    MR. HINDERAKER: You don't have to
20 reveal any communications or the work product of
21 meetings with lawyers since you came to Minnesota.
22 BY MS. JANUS:
23 Q. Okay. And continue with your answer?
24 A. Then I will -- that will suffice.
25 Q. Okay. And so you reviewed documents?

Page 7

1  A. Yes.
2  Q. Okay. Which documents did you review
3  to prepare for your deposition?
4  A. I reviewed the original report I
5  wrote, dated 4-19; I have reviewed the response to
6  the other expert witness's rebuttal of my report,
7  that's dated 5-31; and I reread the RFI published
8  by Chubb in February of 2006, I believe it was.
9  Q. Did you do anything else or review any
10 other materials to prepare for your deposition?
11    MR. HINDERAKER: And, again, my
12 direction not to disclose the communications and
13 the work that you did in Minnesota with lawyers.
14    THE WITNESS: As I reread my report,
15 if I saw a footnote -- you will recall my report is
16 highly footnoted -- and I wanted to refresh my
17 visual view of that document, I opened it up to
18 refresh my memory.
19 BY MS. JANUS:
20 Q. So you looked at some of the documents
21 that are cited in your footnotes?
22 A. That is correct.
23 Q. Okay. Anything else?
24 A. No.
25 Q. Did you speak with anyone other than

Page 8

1  the attorneys here to prepare for your deposition?
2  A. No. Unless you count the conversation
3  with my wife, which said, hey, would you pretty
4  please book me for a plane ticket to, or with the
5  associate at Merchant & Gould, whose name I do not
6  know, that made the hotel arrangements for me.
7  Q. Okay. What are your opinions in this
8  matter?
9  A. My opinions in this matter only relate
10 to the qualitative use of software in the property
11 casualty writing of insurance policies process, be
12 that writing new business or renewal, and how
13 software can help in the quote, bind, book, issue
14 process that I articulate in the reports.
15 Q. Okay. So that is what your opinion in
16 this matter relates to, correct?
17 A. That is what my professional opinion
18 in this matter relates to, and what my report and
19 the rebuttal speak to.
20 Q. Okay. And what is the opinion that
21 you provide in this litigation?
22 A. My opinion is that automated decision
23 software and business rules management systems do,
24 in fact, contribute to creation of revenue through
25 the three primary vehicles an insurance company

Page 9

1  uses to pursue growth, and those are speed, speed
2  comes in two flavors, there are -- then there is
3  ease of doing business, and then there is precision
4  of price.
5  Q. How does automated decision software
6  contribute to the creation of revenue, in your
7  opinion?
8  A. In my opinion, automated decisioning
9  improves speed in two ways. The first one is it
10 improves the speed of response, in terms of requests
11 for quotes or in terms of processing rules. The
12 second is it improves the ease of doing business by
13 requiring less effort on behalf of an agent and
14 broker and, thereby, on behalf of their customer,
15 the applicant or policyholder, and it provides
16 precision in pricing in that it makes sure that the
17 adequate accurate information is available to the
18 underwriting process and can provide, in fact, I
19 will call it statistical actuarial guidance into
20 what the needed adequate accurate premium is for
21 the risk.
22 Q. And that statistical guidance, how
23 does it provide statistical guidance?
24 A. It will look at the attributes of
25 the -- I will refer to it as the application, the

Page 10

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 4 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 prospective risk, and it will say -- it will go
2 through a statistical model, a set of algorithms
3 that come back and say for this set of risk
4 characteristics you need X amount of premium to
5 cover the cost of the raw materials, the
6 manufacturing cost, the administrative cost,
7 et cetera.
8     Q.   Now, is your opinion in this matter
9 generally about automated decision software?
10    A.   No.
11        MR. HINDERAKER: Objection to the
12 extent the question is vague.
13 BY MS. JANUS:
14    Q.   You can go ahead and answer.
15    A.   My decision is based on the value of
16 automated decision software and, then, Blaze as the
17 selected automated decision software tool.
18    Q.   Okay. You provided some testimony
19 about the speed, the ease of doing business, the
20 precision of price, right?
21    A.   Correct.
22    Q.   Do you have an opinion as to those
23 matters specifically in this case?
24    A.   Yes.
25    Q.   Okay. What is that?

Page 11

1    A.   As I stated before, automated decision
2 software improves all three of those aspects of the
3 quote, bind, book, issue process, and Federal chose
4 Blaze Advisor®, and Blaze Advisor contributed to
5 those three things on behalf of Federal.
6     Q.   Did you measure what contribution you
7 believe Blaze had to the three things you've
8 mentioned?
9     A.   I used the term attributes.
10    Q.   Attributes?
11    A.   And that was not within the scope of
12 my responsibilities.
13    Q.   What do you mean by that?
14    A.   What is not clear about it? My -- my
15 responsibilities, as are articulated, were to
16 provide a qualitative evaluation of decision -- the
17 automated decision software and, then, Blaze
18 Advisor as that chosen automated decision software.
19 I have never been asked to provide an assessment of
20 any quantitative numbers.
21    Q.   So when you say "qualitative
22 evaluation," explain for someone who is not in your
23 industry or has your background, what do you mean
24 by that?
25    A.   Does it make speed of transactional

Page 12

1 processing faster, does it make speed of bringing
2 new product to market faster, does it improve the
3 ability of the company in its underwriting process
4 to better define the, quote unquote, accurate and
5 precise price.
6     Q.   So you're talking about whether
7 automated decision software makes certain decisions
8 at an insurance company faster, correct?
9     A.   Not sure I understand the question.
10    Q.   You said that the quantitative
11 evaluation assesses whether the software makes the
12 speed of transactional processing faster?
13    A.   Agree.
14    Q.   Right? And whether it makes the speed
15 of --
16    A.   Agree.
17    Q.   -- new products faster?
18    A.   Agree.
19    Q.   Okay. But you have not measured
20 whether, in fact, the automated decision software
21 makes those functions faster, correct?
22    A.   That is correct. I will, however,
23 point to you that I have a significant amount of
24 gray hair and 41 years of experience, and I saw
25 this at other companies, other insurance companies

Page 13

1 for which I worked and -- no, I'll close there.
2     Q.   You also said that your qualitative
3 analysis is that automated decision software
4 improves the ability to define accurate --
5     A.   Ade -- adequate precise premium.
6     Q.   Adequate precise premium. But you did
7 not measure in this case whether Blaze Advisor
8 improved that ability to define accurate and
9 adequate price?
10    A.   I will reiterate my earlier statement.
11 I was not asked to provide any quantitative
12 analysis of any aspects of this case.
13    Q.   So the answer to my question is no?
14    A.   Correct.
15        (Whereupon, Deposition Exhibit No. 513
16 was marked for identification, and a copy is
17 attached and hereby made a part of this deposition.)
18 BY MS. JANUS:
19    Q.   Showing you what's been marked as
20 Deposition Exhibit 513, do you recognize
21 Exhibit 513?
22    A.   I recognize the front page and the
23 back page as the beginning and the ending of the
24 report I created.
25    Q.   Okay. Take a look at the document

Page 14

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 5 of 20

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  itself and let me know when you've satisfied
2  yourself that it's a copy of your initial report in
3  this matter.
4         (Reporter's Note: The witness is
5  reviewing Exhibit No. 513 for approximately two
6  minutes.)
7         THE WITNESS: [Witness coughing]
8  Pardon me.
9         (Reporter's Note: The witness
10 continues reviewing Exhibit No. 513 for
11 approximately five more minutes.)
12        THE WITNESS: Finished.
13 BY MS. JANUS:
14    Q.   Okay. Is that the expert report that
15 you initially submitted in this matter?
16    A.   I will agree that upon cursory review
17 this does appear to be an entirety. But, being the
18 precise underwriter that I have been for so many
19 years, until I laid your copy, your soft copy of
20 the document and my soft copy of the document and
21 ran a compare, I would not agree that it's exactly
22 the same.
23    Q.   Okay. My question for you is, is
24 Exhibit 513 a copy of the initial expert report you
25 submitted in this matter?

Page 15

1    A.   And my answer is it appears to be.
2    Q.   Excellent. All right. Do you have
3  any reason to think that Exhibit 513 is not a copy
4  of the initial expert report you submitted in this
5  matter?
6    A.   I am a witness for plaintiff, you are
7  counselor for the defense. That leaves a question.
8  I have no reasonable belief, based on my cursory
9  review of the document, that it is incorrect. But
10 I will not absolutely state that it is because I
11 haven't taken it through the due diligence process
12 I normally take things through.
13        MS. JANUS: Okay. Did you come,
14 Mr. Hinderaker, with a copy of Mr. Whitener's
15 expert report today?
16        MR. HINDERAKER: Sure.
17        MS. JANUS: Okay. Can we mark that
18 as --
19        MR. HINDERAKER: No, you can't mark --
20        MS. JANUS: -- Exhibit 514?
21        MR. HINDERAKER: No, you cannot mark
22 my working copy as Exhibit -- we can --
23        MS. JANUS: Would you -- I mean --
24        MR. HINDERAKER: We have no -- as he
25 just said, there's no -- there's no reason to think

Page 16

1  that it's not the expert report. If you're
2  representing to us that it is, and I assume that
3  you are, then let's proceed forward with 513.
4         MS. JANUS: Okay, sounds good.
5  BY MS. JANUS:
6    Q.   So we'll proceed forward with
7  Exhibit 513 being a copy of the initial expert
8  report you submitted in this matter, fair?
9    A.   Fair.
10   Q.   Okay. I'm going to hand you a copy of
11 Exhibit 514.
12        (Whereupon, Deposition Exhibit No. 514
13 was marked for identification, and a copy is
14 attached and hereby made a part of this deposition.)
15 BY MS. JANUS:
16   Q.   Do you recognize Exhibit 514?
17   A.   Again, I recognize the first page and
18 the last page as the pages of 514 that I submitted
19 to Merchant & Gould, I will be happy to review this
20 document in a similar fashion, if you would like.
21   Q.   Yes. I would like to know whether the
22 Exhibit 514 is a copy of the reply expert report
23 you submitted in this matter?
24        (Reporter's Note: The witness is
25 reviewing Exhibit No. 514 for approximately three

Page 17

1  minutes.)
2         THE WITNESS: Ready.
3  BY MS. JANUS:
4    Q.   Okay. Does Exhibit 514 appear to be a
5  copy of your reply expert report submitted in this
6  matter?
7    A.   It does appear to.
8    Q.   All right. Let's start with
9  Exhibit 513, which is your initial report. On
10 page 1, you state that you are being paid $200 an
11 hour for your work in this matter?
12   A.   That is correct.
13   Q.   And how much have you billed to date
14 for your work in this matter?
15   A.   On a rounded to thousands basis,
16 $167,000.
17   Q.   In Information Considered, you note
18 that you had a discussion with Bill Waid on
19 November 12th, 2018, correct?
20   A.   That is correct.
21   Q.   Is that the only discussion you had
22 with anyone other than the attorneys at
23 Merchant & Gould to form the conclusions that
24 you've reached in this matter?
25   A.   At the time of the writing of this

Page 18

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 6 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 23

1 demonstration that was specific to the insurance
2 industry, for instance?
3    A.   That is correct.
4    Q.   Okay. And he didn't give you a
5 demonstration that had anything to do with Federal's
6 use of Blaze?
7    A.   Also --
8    Q.   Correct?
9    A.   Also correct.
10    Q.   Blaze out of the box does not have any
11 rules in it, correct?
12    A.   That is correct, to the best of my
13 understanding. The art -- the artifacts don't give
14 me enough information to really know what Federal
15 and what Blaze had at the beginning.
16    Q.   Your understanding is that Blaze, as a
17 software tool, does not have any specific subject
18 matter, for instance?
19    A.   That is correct.
20    Q.   Correct? It does not import any
21 expertise in any industry, correct?
22    A.   I disagree with that.
23    Q.   Does it have any rules out of the box
24 relating to the insurance industry, for example?
25        MR. HINDERAKER: I'm going to -- my

Page 24

1 only objection is to the phrase "out of the box,"
2 which is vague and inaccurate.
3 BY MS. JANUS:
4    Q.   Do you know what I mean by out of the
5 box?
6    A.   I know what I believe out of the box
7 means. I have no idea what you mean.
8    Q.   Okay. What do you interpret out of
9 the box to mean?
10    A.   Let's -- let's go to a personal
11 computer example, because most people understand
12 that. You buy shrink-wrap software. Let's pretend
13 that it's Microsoft Office. You cut the shrink
14 wrap, take out the disk, you load the software, and
15 it has only the executable code in it, it contains
16 no data.
17        So, if that's the definition of out of
18 the box, I suspect, but do not know, that Federal
19 received a out-of-the-box version of Blaze Advisor.
20    Q.   And, essentially, what you've
21 described as when it first received or downloaded
22 Blaze Advisor from FICO, we'd characterize that as,
23 essentially, out of the box?
24    A.   Yes.
25    Q.   Okay. Going back to the demo, you've

Page 25

1 mentioned that he showed you how to concatenate
2 rules; is that right?
3    A.   Yes, concatenate.
4    Q.   Concatenate?
5    A.   Yeah.
6    Q.   And what do you mean by that?
7    A.   Well, in the world that I live in, in
8 the underwriting world, rarely do you make decisions
9 based on one single data element, you consider
10 multiple. So he showed me how to have the
11 individual rules interact with each other.
12        So the -- so if you have three rules,
13 the first rule could be based on an and statement,
14 so it's inclusive, but then the next two rules
15 could be based on an or statement, meaning it's one
16 or the other. That's what I mean.
17        Linked the rules might be a better
18 word than concatenate, but --
19    Q.   To link, did you say?
20    A.   Yes.
21    Q.   And he showed you how to create rules,
22 you said?
23    A.   Yes.
24    Q.   Okay. And how is that done, how is --
25 what is your understanding of how you create rules?

Page 26

1    A.   I -- I believe you are giving me way
2 too much credit for my memory from the demo. I'm
3 not sure I can describe that.
4        It's a -- it's -- it has the -- it has
5 the ability for you to say this is the name of a
6 rule, and the criteria for that rule it has to
7 be -- and I'm going to -- it has to be not sand and
8 gravel, trucking companies.
9    Q.   Okay. And speaking about Blaze
10 generally now, is it your understanding that the
11 rules that are put into Blaze come from the
12 business expertise of the entity that's using
13 Blaze?
14    A.   I'm not quite sure what you mean by
15 the phrase "put into."
16    Q.   Okay. Well, what would -- how would
17 you describe the rules in Blaze?
18    A.   As I -- as I articulate in the report,
19 there is -- there is -- it's a multistep process.
20 So there's creation of the rules, and based on the
21 artifacts, the rules were created by the -- the
22 definition of the rules. Okay. We will not write
23 sand and gravel trucks, as an example, was created
24 by Federal. But then there's the writing of the
25 rule into the software. Artifacts indicate that

CASE 0:16-cv-01054-DTS Doc. 646-8 Filed 10/23/19 Page 7 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 27**

that was a combined effort between both FICO and Federal. And then there's a third part of the process, which I articulate in the -- mostly in the -- in the reply report, which is, then there's execution of the rules.

Q. All right. So let's start with the creation of the rules, and you said that the definition of the rules comes from Federal?

A. Yes.

Q. Okay. So what the rules actually are, how they are defined as something that is coming from the expertise that Federal has as an insurance company, correct?

A. I would rephrase that to say the definition of the rules are decided upon and articulated by Federal.

Q. Okay. And you would agree, based on your lengthy history in the insurance industry, that the definition of the rules takes substantial expertise, correct?

A. Yes. In fact, may I go to -- may I go to the core competency argument? I --

Q. I'd like just an answer to my question in the first instance. I think I've got it.

A. Okay.

**Page 28**

Q. The definition of the rules comes from an insurance company's experience, correct?

A. That plays a role in it.

Q. It necessarily depends upon the experience and expertise of the people who work at the company, correct?

A. That's part of it.

Q. It depends upon the processes that are used by the company in writing insurance, correct?

A. I disagree with that.

Q. Why is that?

A. I interpret the word process to mean execution. Okay. Processes can be easily changed. Underwriting criteria, rules, are less easily changed. So -- so when you talk about the process, the process, to me, is just simply execution.

Q. And you've referenced already today your experience in underwriting?

A. That is correct.

Q. Would you consider yourself an underwriter, is that how you would describe yourself?

A. Can you time frame that for me? Is that a description of me today or a description of me when I worked for The Hartford or a description

**Page 29**

of me when I worked for one of the other insurance companies? Because I have many labels, and to say that I take one specifically, I think, would be erroneous on my part.

Q. Okay.

A. I do have underwriting experience, yes.

Q. How would you characterize the importance of underwriting to the insurance industry?

A. As I articulate in my report, underwriting is one of three items that I could use the term core competency for. In my report, I -- I refer to it as have to excel. Insurance companies have to excel at underwriting, and I articulate the underwriting process as the three steps, you acquire adequate accurate information, you draft a proposal including price that would be adequate for that risk exposure, and then you -- you work to reach an agreement on it or decide you can't get the adequate price based on the definition of the proposal and you walk away from it.

Q. And you mentioned just now that underwriting criteria are the rules, correct?

A. One of the interesting things about the insurance industry is our nomenclature. So, if

**Page 30**

you say the word endorsement to me, that can mean three or four different things. In underwriting, some companies refer to it as the underwriting rules, some companies refer to it as the underwriting guidelines, some companies refer to it as the underwriting criteria.

Q. Okay.

A. And, then, the department -- the regulators refer to the definition of the product as the rates, the rules and the forms.

Q. So the rules that, in this case, Federal developed, are the criteria that they use to underwrite, correct?

A. In my report, I describe that as defining the company's risk appetite. So when -- so a company --

Q. Well, first, how about -- my question was simply, you were talking about underwriting, the importance of underwriting to the insurance industry, correct?

A. Yes.

Q. And -- and what I want to know is the -- whether you agree that the rules Federal has developed in connection with its underwriting constitute the criteria, the underwriting criteria

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 8 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

overview.

Q. Okay. I take it in your work as an underwriter, your expertise, your personal expertise was important to the performance of your underwriting duties?

A. Yes.

Q. Your personal judgment was crucial in the performance of your underwriting duties, correct?

A. Yes.

Q. Would you say your expertise and judgment in underwriting were the most important aspects of your success as an underwriter?

A. No.

Q. What was?

A. I -- I do not undervalue the importance of that expertise. However, that is one part of a Rubik's Cube.

So my ability to have a high level of -- are you familiar with the phrase EQ, emotional quotient, and be able to interface with a very, very diverse agency plant and then a very, very diverse group of people inside of the agency plant in combination with various other departments, such as claims, loss control, marketing, and my peers in other underwriting departments, such as bond and

Page 47

commercial lines, was very important. That's one of the reasons I like the underwriting, because you actually have your hands in so much of the business.

Q. So you're -- you said emotional quotient?

A. Yes.

Q. And do you sometimes refer to that as emotional intelligence?

A. Some people do.

Q. Okay.

A. When I grew up, it was EQ. Now it's EI.

Q. Okay. And that --

A. But it's the same thing.

Q. Same thing, okay. And so your EQ or EI was crucial to your success as an underwriter?

A. Agreed.

Q. Okay. Did you use technology as an underwriter with The Hartford?

A. Define technology, please. A Monroe -- a Monroe JD-30 calculator is technology. I had a Monroe JD-30 calculator on my desk. Okay. Did I interface and type into the policy admin system? No.

Q. Okay. So The Hartford had a policy

Page 48

admin system?

A. Multiple admin policy systems.

Q. But you did not use the policy admin system as an underwriter?

A. This was 1977, that is correct.

Q. Did you as an underwriter define rules that were used by The Hartford to underwrite insurance?

A. At what point in time?

Q. Any point in time?

A. Yes.

Q. Okay. When did you do that?

A. That would have been when -- pardon me. That would have been when I was now back -- back up in home office, excuse me, and had come back to the underwriting department from the planning department.

Q. Do you have a rough time period on that?

A. Um, I believe I came back from the planning department in late nineteen eighty -- yes, '84, yeah, give or take a century.

Q. And we'll go through the experience that you've listed. But just in general terms, what was your role in creating rules that were used

Page 49

in the underwriting process?

A. We would have an annual review. So, at this point, I was in what was called the line of business. Today you would know it as the product department, and we would -- we would have an annual review using multiple data sources, actuarial data, profit and loss statements for our various products by jurisdiction, and that jurisdiction was down into the individual rating territory, and we would look and we would see if we wanted to modify our rules, add rules, subtract rules, change from 21 to 25, change from sand and gravel to U-Haul vans, kind of a thing.

Q. So you looked at the data that you had based on past performance, correct?

A. I'm not -- I'm not sure I understand the question.

Q. Well, you described --

A. As it relate -- as it relates to my time at The Hartford?

Q. Yes.

A. Okay. Now restate the question, please.

Q. Okay. So you -- you -- you were describing the process of creating rules when you

Page 50

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 9 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 51**

1 were at the Hartford?
2   A.   Yes.
3   Q.   And it sounds to me like you would
4 look at the data from past performance for a given
5 product; is that correct?
6   A.   As long as you put an "S" on the end
7 of it, that's correct, products.
8   Q.   Products.
9   A.   Yeah.
10  Q.   Okay. And -- and then you, based on
11 your expertise and experience as an underwriter,
12 would decide whether to change the rules that were
13 in place, keep them the same, add rules, et cetera?
14  A.   Yeah.
15  Q.   Okay.
16  A.   Yes.
17  Q.   And where did those rules reside when
18 you were at The Hartford?
19  A.   In keeping with Mr. McCarter's reply
20 or rebuttal of my report, they were hard coded in
21 Cobalt.
22  Q.   For someone who is not in the
23 industry, what does hard coded in Cobalt mean?
24  A.   Programmed in a language that
25 insurance companies would prefer not to use today

**Page 52**

1 in modern technology times. So Cobalt is a
2 proga -- programming language, and I -- I could not
3 go up to a computer with a technologist at any
4 insurance company and have them bring up on their
5 screen Cobalt programming language and decipher
6 what's going on. I don't -- I don't write or speak
7 Cobalt.
8   Q.   So you don't know exactly how Cobalt
9 works?
10  A.   That is correct. I know -- I know
11 what my responsibility was, was to define the new
12 rules that we wanted to implement, the existing
13 rules that we wanted to modify or any rules that we
14 wanted to take out of the production system and
15 write the business requirement for it, make sure
16 that the business requirement was testable -- that,
17 by the way, requires a conversation with the IT
18 folks -- and then rely on my IT compatriots to
19 implement the rule, test it and make sure it was
20 doing as prescribed.
21        I would have -- if the -- if the IT
22 people had any questions about the test results,
23 they would come see me, but I was not heavily
24 involved in the testing.
25  Q.   When you say "the business

**Page 53**

1 requirement," what do you mean?
2   A.   It is the responsibility of the
3 business unit to articulate what they want the
4 technology to do. That articulation is called a
5 business requirement.
6   Q.   So your role was really on the
7 substantive development of the rules?
8   A.   I don't understand the question,
9 substantive development of the rules.
10  Q.   The defining of the rules?
11  A.   It was not limited to that, but I did
12 do that, yes.
13  Q.   Okay. I take it you would agree that
14 there's a substantial amount of value to the
15 insurance company in defining the rules?
16  A.   I disagree with that statement in
17 isolation. There is a high value to an insurance
18 company in defining the rules and having the -- I'm
19 going to call it processes in place that make sure
20 the rules are executed. There's a difference
21 between defining the rules and executing the rules.
22  Q.   Okay. The defining of the rules comes
23 from the expertise of the underwriters and the
24 other business people at the insurance company,
25 correct?

**Page 54**

1   A.   Correct. Inside of the insurance
2 company's organizational construct where defining
3 the rules is their responsibility.
4   Q.   And if --
5   A.   That could be -- it could be product,
6 it could be underwriting, it depends.
7   Q.   You would agree with me that if the
8 rules are not defined properly, the insurance
9 company will not make money, correct?
10  A.   I will agree with you that if the
11 rules do not reflect accurately the company's risk
12 appetite and their definition of acquiring adequate
13 accurate premium, the result of that will be losing
14 money on those policies.
15  Q.   So, without good rules, an insurance
16 company cannot make money, correct?
17  A.   That is part of the scenario, correct.
18  Q.   Well, you'd agree with me, I take it,
19 as an experienced underwriter that it's the most
20 important part of the scenario, correct?
21  A.   Again, I don't agree with that,
22 because I believe you are not accounting for the
23 fact that after the rules are authored they have to
24 be executed, and one of our -- one of every
25 insurance company's processes is the consistent

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 10 of 20

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

weekly, monthly, quarterly, annually review of the quality of the decisions their underwriters are making. Not all underwriters are created equal.

In a best case scenario, I would agree with your statement. If every underwriter were an A-plus player, I would agree that.

Q. Okay. If --

A. Every underwriter is not an A-plus player.

Q. So people, differences in people can make a difference in whether the right rules are implemented in the right way, fair?

A. Fair.

Q. But without the right rules, without good rules developed by the insurance company, the insurance company is not going to make any money, correct?

A. I would say that without the right rules, using your nomenclature, the expected performance will be less than if you started the process with the right rules.

Q. I mean, we could easily play this out to say if an insurance company had a rule that consistently caused it to issue policies to businesses that had claims that far exceeded the

Page 55

premiums those businesses paid, that would not be a good rule, correct?

A. It would not be a good thing, and they, clearly, would not be good rules, singular or plural.

Q. The definition of those rules would cause the insurance company to lose money in that scenario that I described?

A. Allow me to reiterate. The performance would be less, depending upon the variability of acquiring the correct adequate accurate premium for the lost cause, it could be a small loss, it could be a large loss. It could be less profit depending upon in that range. Insurance is a numbers game.

Q. Would you agree that underwriting insurance policies is a complex process?

A. Is this a general question about insurance? Then I would say it is a complex business. I would say underwriting can be more complex based on the -- you've read my report, I describe market segments, based on the market segment. So, for instance, Federal's specialty unit, I would suspect, but don't know, that their underwriters have a higher level of expertise.

Page 56

Whereas, the folks that they have underwriting their main street commercial -- my phraseology, not theirs -- could potentially have a slightly less level of expertise. But I generally describe the insurance industry as a complex business.

Q. There's lots of judgment involved in the insurance industry?

A. There is judgment involved in every industry. There is judgment involved in the insurance industry and the underwriting process because it's pegged to acquire adequate accurate information and adequate premium for the loss cost. You remember the phrase loss cost? Okay. Loss cost, there can be some judgment involved in that.

I worked for the president of an insurance once -- company once who looked at me and said -- actually looked at one of my friends and said, I can have the most actuarially accurate policy -- or, I'm sorry, price point in the world and not sell a single policy. Okay.

So there -- depending upon the market segment, the product, the industry classification, there can be relatively more or relatively less -- I'm sorry, your term -- judgment in the process, and that judgment is reflected in both the field

Page 57

people interfacing with the agency plant and in the -- and I'm going to use the word product instead of underwriting, because that's -- tends to be a more common phraseology nowadays, those underwriting product people in the definition of the rates, rules and forms for the product. Remember, my experience definition of insurance product is rates, rules and forms.

Q. All right. Looking back at the report, you -- we talked about your experience underwriting, you also talk about financial management, correct?

A. That is correct.

Q. And --

A. A better phrase for that might be financial reporting.

Q. Financial reporting, okay.

And that experience did not include a expertise in technology, correct?

A. Correct.

Q. So --

A. Although I will -- I will quite frankly say that every number that hit my desk came from a -- from a technology system, but I accepted the data as it was and believed that the technology

Page 58

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 11 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 A. Said in isolation, that's a correct
2 statement. But, remember, I will -- I will always
3 be taking you back to the Rubik's Cube, it's not
4 just one thing.
5 Q. You said the quality the product is
6 another factor that determines whether a consumer
7 will purchase an insurance product, correct?
8 A. Correct.
9 Q. And we talked about the development of
10 insurance products previously, correct?
11 A. Yes.
12 Q. Those are developed using the expertise
13 of that insurance company, the individuals'
14 knowledge who work there and possibly in
15 consultation with insurance experts, correct?
16 A. Correct.
17 Q. And you also mentioned the value
18 received in connection with the quality of the
19 product, correct?
20 A. Correct.
21 Q. Essentially does the consumer believe
22 that they are paying a fair price for the product
23 they're purchasing?
24 A. There are approximately 328 million
25 humans in the United States. The number of
Page 71

1 businesses is not nearly that large, but it's
2 significant. Each of those will establish in their
3 own mind their definition of value.
4  So it's impossible to specifically
5 answer your question. As a general observation,
6 the value is defined by each customer, be it
7 commercial or personal, and it's a combination of
8 things.
9 Q. You mentioned the relationship with
10 the broker?
11 A. Or independent agent.
12 Q. And by that, do you mean the
13 consumer's relationship with the broker or the
14 independent agent?
15 A. I mean both. So you have three
16 parties, correct? So at the left end of the
17 spectrum you have the consumer, be it business or
18 be it personal. At the right end of the spectrum
19 you have the insurance company, and in the middle
20 you have the independent agent or broker. The
21 consumer will primarily focus on the relationship
22 with the independent agent or broker.
23  You will see articles published about
24 expert advice. So the consumer is looking at that
25 broker or independent agent as a provider of, quote
Page 72

1 unquote, expert advice. Okay. And, then, the
2 broker is looking at the company for the things I
3 have articulated earlier. The broker, in the
4 relationship with the consumer, will have an opinion
5 about who that broker wants to do business with.
6 Q. So personal relationships between the
7 consumer and the broker and the broker and the
8 insurance company affect decisions about whether to
9 purchase a particular product?
10 A. And affect differently across the
11 three market segments I've articulated.
12 Q. You've said, then, finally, remittance
13 processing?
14 A. Billing.
15 Q. Billing? Okay.
16 A. Well --
17 Q. And how --
18 A. The -- the great thing about
19 remittance processing it's an all-encompassing
20 term. Billing insinuates that it's the demand from
21 the insurance company going out to the consumer or
22 the customer. But when that money comes back in,
23 it's got to be placed in the right bucket. Okay.
24  So I refer to it as remittance
25 processing. It's that all-encompassing ask for
Page 73

1 money, get money, put it in the right place.
2 Q. Okay. And how does that in your mind,
3 how does that impact a consumer's decision to
4 purchase an insurance product?
5 A. There are two impacts here. So the
6 first one is, remember, zero times X is zero. So
7 the -- the independent agent -- an independent
8 agent's relationship with any insurance company can
9 be soured if, in fact, the remittance processing
10 process is inefficient or inaccurate.
11  The one thing from -- so I'm going to
12 speak to billing, and I'm going to speak to claims.
13 Okay. One thing an independent agent never wants
14 is for one of their customers to be billed
15 incorrectly, and one thing the insurance company
16 doesn't want is to pay too little or too less on an
17 occurrence. So the insurance company -- I
18 articulate this in my report. The insurance
19 company wants every penny that it's entitled to,
20 not one penny that it is not.
21  The policyholder, when you get to
22 remittance processing, you are playing with their
23 budget and their financial bank statements, and
24 they don't like errors. It's as simple as that.
25 Q. We've been talking about what goes
Page 74

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 12 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 75

1 into a consumer's decision to purchase a given
2 insurance product. I take it you'd agree with me
3 that if an insurance company uses Blaze in some
4 aspect of the process to underwrite an insurance
5 product for a particular customer, that the use of
6 Blaze in and of itself would not influence that
7 customer's decision to purchase the product, would
8 you agree with that?
9     A.   I agree that the direct consumer, be
10 **it a business or a family entity, personal lines,**
11 **does not see or care about any of the technologies**
12 **that an insurance company takes to -- I'm going to**
13 **use the word fulfill, fulfill its insurance**
14 **process, be it policy issuance, be it claims, be it**
15 **billing. The consumer is oblivious to that. I**
16 **probably would --**
17        MR. HINDERAKER: Go ahead, finish your
18 answer.
19        THE WITNESS: I probably would not
20 make the same statement for the broker.
21 BY MS. JANUS:
22     Q.   So the consumer that you referred to
23 does not care whether Federal uses Blaze in any of
24 its processes in connection with selling or
25 administering a given insurance policy, fair?

Page 76

1        MR. HINDERAKER: The question
2 misstates the answer, and I object for that reason.
3        THE WITNESS: May I answer?
4        MS. JANUS: Yes.
5        THE WITNESS: Or respond?
6        MR. HINDERAKER: Yes, you may.
7        THE WITNESS: Okay. Thank you. Just
8 asking for the rules.
9        The consumer cares that the value
10 proposition, a combination of coverages, exclusions
11 and price, meet their needs and their expectation.
12 Okay. The insurance company cares that the -- oh,
13 and, I'm sorry, I need to put speed in there. All
14 right. So -- so if you look at speed of response
15 and you look at adequacy of price in combination
16 with the proposed package, the consumer cares about
17 that. The broker --
18 BY MS. JANUS:
19     Q.   I'm sorry, let me just stick with my
20 question for a moment. I want to make sure I've
21 got an answer to my question.
22        I asked you whether you would agree
23 that the consumer does not care that Federal may
24 use Blaze as a part of its complex processes to
25 issue or underwrite a particular insurance product?

Page 77

1        MR. HINDERAKER: I'm going to object
2 to the argumentative nature of that. He was trying
3 to answer --
4        MS. JANUS: No, no, no, no, don't
5 coach him, don't coach him.
6        MR. HINDERAKER: I'm not.
7        MS. JANUS: Al, I'll stop you there.
8        MR. HINDERAKER: Fine.
9        MS. JANUS: Let's not get into that.
10 It was a fair question, it wasn't argumentative.
11       MR. HINDERAKER: And you --
12       MS. JANUS: I want an answer.
13       MR. HINDERAKER: I was just trying to
14 say, he was trying to answer that question. So let
15 him finish his answer, please.
16       MS. JANUS: Please don't raise your
17 voice with me.
18       MR. HINDERAKER: Oh, I wasn't --
19       MS. JANUS: And stop coaching the
20 witness. As soon as I get to a question you don't
21 like, you start coaching. Okay.
22       MR. HINDERAKER: I --
23       MS. JANUS: Let's stop it now. He's
24 your expert, he should be able to handle it.
25       MR. HINDERAKER: I like your --

Page 78

1        MS. JANUS: All right. I'm going to --
2        MR. HINDERAKER: I like -- I liked
3 your question.
4        MS. JANUS: I'm going to --
5        MR. HINDERAKER: And I'd like him to
6 have a chance to answer.
7 BY MS. JANUS:
8     Q.   I'm going to ask my question again,
9 and I'd like an answer to it, and I think -- I
10 think your previous answers pretty obviously
11 suggest this. I just want to make it clear on the
12 record, as I'm entitled to do, I'm entitled to
13 create the record.
14       You would agree with me, I take it,
15 based on your previous testimony, that a consumer
16 making a decision to purchase an insurance product
17 from Federal does not care whether or not Blaze was
18 used at any point in the process of selling or
19 underwriting that insurance product, correct?
20    A.   Correct.
21    Q.   You would agree with me that, in fact,
22 a consumer making a decision to purchase an
23 insurance product from Federal does not know that
24 Blaze was used at any point in the process in
25 selling or underwriting that product, correct?

CASE 0:16-cv-01054-DTS Doc. 646-8 Filed 10/23/19 Page 13 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 79**

1  A.  The consumer is oblivious to any of
2 the tools the insurance company uses to construct,
3 deliver and fulfill their products. They don't
4 want to know.
5  Q.  And there are many, many tools that an
6 insurance company uses to do that, correct?
7  A.  I've never seen an insurance company
8 have less than three. To say many, I can't speak
9 to that.
10  Q.  There are many technologies that an
11 insurance company -- let's talk about Federal.
12 Federal uses many, many technologies in conducting
13 its business, correct?
14  A.  Yes.
15  Q.  Blaze is one technology that Federal
16 uses, correct?
17  A.  Pardon me. That is correct.
18  Q.  Is it fair to say that to the extent
19 Blaze is used by Federal it's in the background,
20 correct?
21  A.  From whose perspective?
22  Q.  The consumer's.
23  A.  Correct.
24  Q.  It is a back office issue, correct?
25  A.  It is a back office issue that creates

**Page 80**

1 things about which the consumer greatly cares.
2  Q.  Unbeknownst, its use is unbeknownst to
3 the consumer, correct?
4  A.  The consumer is not concerned about
5 how those three things are created, they're just
6 concerned that those three things exist.
7  Q.  You would agree with me that Federal
8 does not market or sell Blaze, correct?
9  A.  Excuse me. Yes. I -- I would agree
10 that I have no indication that they do that or have
11 any interest in doing that.
12  Q.  You would agree with me that Blaze is
13 just one part of Federal's IT infrastructure,
14 correct?
15  A.  As I articulate in my reply to
16 Mr. McCarter's report, it is one of many
17 technologies. But my job was not to value the
18 size of -- not value -- to evaluate qualitatively
19 the size of Federal's technology footprint, but it
20 is one of many.
21  Q.  So you did not conduct an analysis of
22 how significant a part of Federal's IT infrastructure
23 Blaze is?
24  A.  Significant is an ambiguous word.
25 There are multiple ways to find that. One -- one

**Page 81**

1 can, in fact, be, as Mr. McCarter pointed out, the
2 raw arithmetical, it's one of -- and off the top of
3 my head I don't remember his number, let's say a
4 thousand, it's one of a thousand technologies.
5      That is irrelevant in my opinion. I'm
6 not measuring, I'm not evaluating, I'm not trying
7 to quantify the impact of the overall footprint of
8 a company. I'm evaluating the value -- the
9 qualitative value of a software in executing the
10 insurance process.
11  Q.  Let's go back to your background. We
12 talked about product development. You also list
13 product management?
14  A.  Yes.
15  Q.  What -- what does that refer to?
16  A.  Do you recall my description of the
17 insurance product as rates, rules and forms?
18      So, in product management, for a
19 specified jurisdiction for a period of time, a
20 defined period of time, and for the departments of
21 insurance that regulate the insurance industry, my
22 responsibility was management of -- I'll use the
23 management term, management of the definition of
24 the rates, rules and forms within my scope of
25 geographic regulatory and agent responsibilities.

**Page 82**

1  Q.  So the focus of product management is
2 not technology, correct?
3  A.  Uh, correct.
4  Q.  You also did general (field operations)
5 management?
6  A.  Also correct.
7  Q.  And is -- what is general (field
8 operations) management?
9  A.  General (field operations) management
10 is -- may -- may I couch this in terms of Federal?
11      MR. HINDERAKER:  Sure.
12      THE WITNESS:  Okay. Federal makes
13 reference to their underwriters who are out in the
14 field and the fact that they had three centers.
15 Okay. I was a manager of all of the service people
16 and all of the processors and about 90 percent of
17 the underwriting function inside of an office. So
18 we were the interface to the agent. We were the
19 ones where the new business applications arrived on
20 those people's desks.
21 BY MS. JANUS:
22  Q.  The focus of your general (field
23 operations) management was not technology, correct?
24  A.  I struggle to answer this one,
25 respectfully. I -- I -- I respectfully point out

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 14 of 20

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 consistency and greater agility as efficiencies?
2     MR. HINDERAKER: Objection, asked and
3 answered.
4     THE WITNESS: The document does state
5 that those things come from the efficiency of
6 automation.
7 BY MS. JANUS:
8  Q.  Is it fair to say that the -- in your
9 opinion, the value that Blaze provides to a company
10 is realized through efficiencies?
11  A.  Absolutely not.
12  Q.  Well, the values that you've
13 identified here you are referring to as efficiencies,
14 correct?
15  A.  Automation makes speed improve.
16 Improved speed increases the probability that you
17 will have opportunities to quote, that you will
18 convert quotes, and that you will then execute the
19 book -- the bind and the book and the issue part of
20 the process. Increased precision and consistency
21 insures, a) that you eliminate variability from the
22 decisions, the judgment in underwriters, and
23 increased precision improves the probability that
24 your adequate accurate premium is sellable in the
25 marketplace.

Page 131

1     Does automation help accomplish all of
2 those things? Yes, but the result -- that's a --
3 that's a -- that's a cause. I look at cause and
4 effect. That's a cause. The effect is higher
5 quote volume, more converted quotes, better price
6 point.
7  Q.  Through efficiencies?
8  A.  Through deployment of automation.
9  Q.  Which you've said here is an
10 efficiency, correct, in paragraph 29?
11     MR. HINDERAKER: Objection, takes
12 the -- takes the paragraph out of context.
13     THE WITNESS: Do I have that artifact
14 in front of me?
15 BY MS. JANUS:
16  Q.  Yes. It's Exhibit 516.
17  A.  Thank you. Ah, excellent. Thank you.
18  Q.  So if you look at the site that you
19 use in that for that sentence, which is in
20 paragraph 516270-0012, this is, again, the FICO
21 PowerPoint that -- slide that we've referred to
22 earlier, correct?
23  A.  270 is that is correct.
24  Q.  Okay. And this slide doesn't mention
25 the word efficiencies, correct?

Page 132

1  A.  I believe not. I can go back and
2 check very rapidly.
3  Q.  That's your word?
4  A.  I'm sorry?
5  Q.  That's your word, efficiencies?
6  A.  I chose to write that, yes.
7  Q.  Okay.
8  A.  Twelve.
9  Q.  All right. The next sentence of
10 paragraph 29 says the "Use of Blaze Advisor enables
11 an insurance company to increase the volume and
12 accuracy of transactions in an efficient manner,"
13 correct?
14  A.  It does.
15  Q.  Again, you're referring to the
16 efficiencies that you opine are gained from using
17 Blaze Advisor, correct?
18     MR. HINDERAKER: Objection,
19 misstatement.
20     THE WITNESS: In isolation, that
21 sentence does, in fact, reference efficiency.
22 Efficiency is one of the three components that I
23 articulate in my report.
24 BY MS. JANUS:
25  Q.  Efficiency is the -- in your opinion,

Page 133

1 the value that Blaze offers to Federal, correct?
2  A.  Incorrect.
3  Q.  But you believe it is one of the
4 aspects of value offered?
5  A.  I offer three values in my report.
6 One is to revenue, one is to cost of raw materials,
7 one is to expense. Efficiency does, in fact,
8 impact expense.
9  Q.  Okay.
10  A.  But that is one of three values I
11 articulate.
12  Q.  All right. So you -- In the next
13 sentence of paragraph 29 you state, "Blaze Advisor
14 contributes to the increase in volume and accuracy
15 of transactions, which in turn contributes to Chubb
16 revenue," correct?
17  A.  I do state that, yes.
18  Q.  All right. So that's the revenue
19 component of your conclusion?
20  A.  In isolation on that page, yes. In
21 isolation in that sentence, yes. That is the
22 beginning of my -- beginning is probably the wrong
23 word. That is a contribution to my argument that
24 Blaze Advisor improves the quote, bind, book, issue
25 process speed, which influences revenue.

Page 134

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 15 of 20

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 135**

1  Q.  Okay. And so let's talk about the
2  speed. So your first bullet point is "Increasing
3  speed of response to quote requests," correct?
4  A.  That is correct.
5  Q.  How did you conclude that Federal
6  increased the speed of response to quote requests?
7  A.  I did not conclude that Federal
8  increased that. I concluded that inside of the
9  approximately 1,000 insurance companies that
10 transact property casualty business, they are all
11 looking to do things faster, and it's widely
12 recognized that responding to quotes faster
13 increases quote conversion.
14 Q.  Okay. Do you know whether Blaze
15 increased the speed of response to quote requests
16 in Federal?
17 A.  I performed no quantitative analysis
18 in this process, no. I do not know.
19 Q.  The next bullet point is "Increasing"
20 the "speed of making renewal offers," correct?
21 A.  Correct.
22 Q.  How did you conclude -- or I'm -- Did
23 you conclude that Federal increased the speed of
24 making renewal offers because of its use of Blaze?
25 A.  I did no qualitative research or

**Page 136**

1  definition inside of my report.
2       MR. HINDERAKER: Did you mean
3  quantitative or qualitative?
4       THE WITNESS: I'm sorry. Quali --
5  quanti -- I didn't -- I did zero quantitative
6  research. I -- I didn't have any numbers.
7  BY MS. JANUS:
8  Q.  So you just don't know whether Federal
9  increased the speed of making renewal offers
10 because of its use of Blaze, correct?
11 A.  That is correct.
12 Q.  The next bullet is "Increasing" the
13 "speed at which new products can be introduced, due
14 to Blaze Advisor's agility," correct?
15 A.  Correct.
16 Q.  Same question. I take it you do not
17 know whether Federal increased the speed at which
18 new products were introduced due to Blaze Advisor,
19 correct?
20 A.  Correct, with the caveat of there is
21 one artifact, there is one point made in multiple
22 artifacts that they improved the speed of
23 implementing rules, either new rules or modifications
24 to existing rules, from three to six months to two
25 to three days.

**Page 137**

1  Q.  Okay. But you don't know whether
2  there was an actual increase in speed at Federal in
3  which new products were introduced to the market,
4  correct?
5  A.  Correct, within the caveat of the
6  artifacts do state -- and today, in this specific
7  instance, I'm thinking about the premium
8  modernization project, that they were able to
9  acquire a, I believe, $20 million book of business
10 through the acquisition process from Star Aviation,
11 and they needed Blaze Advisor execution of the
12 premium modernization product to be able to book
13 that premium.
14 Q.  Premium -- premium modernization
15 product?
16 A.  Yes. It's one of the non-policy admin
17 deployments of Blaze Advisor inside of defendant.
18 Q.  And this is a document that you cite
19 in support of your conclusion that there's
20 increasing speed?
21 A.  I can't speak to that. I -- I would
22 have to go back and check the documents.
23 Q.  Is it fair to say that you simply
24 don't know whether there was increased speed at
25 Federal in which new products were introduced due

**Page 138**

1  to Blaze Advisor?
2  A.  It is fair to say that I don't
3  remember the number of the artifacts. So I can't
4  tell you where the cit -- whether the citations are
5  related to that or something else.
6  Q.  So you just don't know?
7  A.  Correct.
8  Q.  The next bullet is "Increasing speed
9  at which product changes involving product and
10 underwriting rules can be implemented, due to Blaze
11 Advisor's agility," correct?
12 A.  Correct.
13 Q.  Is it true that you do not know
14 whether Federal increased the speed at which
15 product changes involving product underwriting
16 rules can be implemented due to Blaze Advisor's
17 agility?
18 A.  I made no quantitative analysis in any
19 of the deployments. There are artifacts that refer
20 to writing rules faster and implementing regulatory
21 changes in less time period.
22 Q.  But you do not know whether Federal
23 actually increased the speed at which product
24 changes involving product and underwriting rules
25 were implemented?

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 16 of 20

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 139**

A. Agree.

Q. The next bullet is "Increasing" the "speed to market by ensuring compliance with corporate and statutory reporting requirements," correct?

A. That is correct.

Q. Is it true that you do not know whether Federal increased its speed to market by ensuring compliance with corporate and statutory reporting requirements?

A. Yes.

Q. The next bullet is "Increasing the precision and accuracy of a quote, thereby increasing the" profitability of the quote offer will be --

A. Probability.

Q. I'm sorry. Thank you. "...the probability the quote offer will be accepted"?

A. Agree.

Q. And is it true that you do not know whether Federal increased the precision and accuracy of its quotes, thereby increasing the probability of the quote offer was accepted?

A. Yes.

Q. The next bullet is "Increasing the

**Page 140**

precision and adequacy of a renewal offer, thereby increasing the probability" that "the renewal...will be accepted," correct?

A. Correct.

Q. Is it true that you do not know whether Federal increased the precision and accurate -- adequacy of renewal offers, thereby increasing the probability the renewal offers would be accepted?

A. I prefer the statement I do not have any quantitative information that Federal did or did not increase the stated attributes.

Q. Okay.

A. So --

Q. But -- and so I guess --

A. So -- so I think the answer to your question is yes.

Q. Okay. You do not know?

A. I do not know.

Q. The next bullet in "Increasing the ease of use for agents and brokers," and then you list three ways in which the ease of use for agents and brokers is increased, correct?

A. I do.

Q. And is it correct to say that you do

**Page 141**

not know whether Federal increased the ease of use for agents and brokers by way of those three bullet points underneath?

A. You are correct.

MR. HINDERAKER: Are you done with this -- are you done with this line?

MS. JANUS: Sure.

MR. HINDERAKER: I mean, I don't want --

MS. JANUS: Yeah, no.

MR. HINDERAKER: I don't want to take a break if you're in the midst of --

MS. JANUS: A break is fine.

THE VIDEOGRAPHER: Going off the record. The time is 1:28 p.m.

(Break from 1:28 to 1:37.)

THE VIDEOGRAPHER: We're back on the record. The time is 1:37 p.m.

BY MS. JANUS:

Q. Moving on in your report to page 13.

A. I'm there.

(Whereupon, Deposition Exhibit No. 519 was marked for identification, and a copy is attached and hereby made a part of this deposition.)

BY MS. JANUS:

**Page 142**

Q. Showing you what's been marked as Exhibit 519, this is the document that you rely upon for your conclusions in paragraph 30 of the report, correct?

A. Yes.

Q. And this appears to be a draft of a request -- RFI, correct, request for information?

A. Yes, although Chubb & Sons mixes their nomenclature. They -- they refer to it both as an RFP, a request for proposal, and an RFI, request for information.

Q. Okay.

A. But the fundamental answer is yes.

Q. Okay. So this is the document that you've relied upon for your conclusion in paragraph 30, correct?

A. Correct.

Q. Do you know whether this is the final RFI?

A. I do not. I know that this is the artifact that I was provided.

Q. Fair to say that the statements in the RFI are forward-looking?

A. Fair to say that the statements in the RFI are forward-looking in that Chubb & Sons offer

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 17 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 143

of the RFI were looking to increase their functionality relative to the points in the RFI.

Q. It was an aspirational document?

A. I'm uncomfortable with the word aspirational. Is a we're going to make a decision, give me information so we can decide whether to include you in the decision analysis or not.

Q. The document is not specific to Blaze, correct?

A. That is correct, from the perspective of they would have sent this document to multiple -- pardon me, excuse me, multiple software providers requesting those software providers provide them information that they would take through a decision management process to say I -- I -- I want to talk to these people, that people. It's that kind of document. It's not specific to Blaze, it's specific to the decision about what software are we going to license.

Q. In paragraph 31 --

A. My document?

Q. Yes.

A. Okay.

Q. Of your report.

A. Thank you.

Page 144

Q. You -- the last sentence states, "Chubb needed automated decision management software that would allow Chubb to scale its business so it could take on...new revenue streams," correct?

A. Correct.

Q. And you cite to the deposition of Mr. Wachs, correct?

A. That is correct.

Q. And Mr. Wachs was a FICO employee, correct?

A. Correct.

Q. Mr. Wachs was employed at FICO through the end of 2008, correct?

A. I cannot speak to that.

Q. Okay. You don't recall his deposition testimony about the length of his employment at FICO?

A. No.

Q. And you also cite to the document we've marked as Exhibit 516, correct?

A. Six -- nineteen, sixteen, sixteen? I do.

Q. And, again, that is you cite to page 16 of Exhibit 516?

A. I'm sorry, page 16?

Page 145

Q. Correct.

A. Yes.

Q. Okay. And that's a FICO marketing PowerPoint slide, correct?

A. Correct.

Q. You do not cite to any facts to support the statements you make in paragraph 32 of your report, correct?

A. I'm sorry, your question is I do not cite to anything?

Q. Correct.

A. That is correct.

Q. The next section of your report is Chubb's Use of Blaze Advisor Contributes to Gross Written Premium, correct?

A. Section VII, correct.

Q. In forming any of the opinions you reached in this case, did you conduct a comparison between the functionalities of Blaze compared to other competing business rules management software?

A. In the preparing of my report, I provided a qualitative value of automated decisions. How Blaze fit into that, I did no quantitative research at all, and I did not look at any other potential decision management softwares.

Page 146

Q. Do you know whether there are competing decision management softwares that Federal could have used instead of Blaze that would provide the same functionality Blaze does?

A. I can say yes to that inside of the caveat that the RFI I'm sure went to more than FICO, because if it didn't there would have been no purpose for the RFI.

Q. Okay. Other than the RFI going to other software providers, do you have any knowledge of the functionality that any competing rules management softwares provide?

A. I cite to the Forrester Research industry analysts group's new wave of decision-making that articulates, I believe, but won't swear to, ten different providers of decision management software.

Q. So it's fair to say that Federal could use another decision management software to perform the functions that Blaze performs at this point?

A. I prefer to say that it is fair to say that any of the software providers of decision management software that responded to the RFI could, in fact, have won that request for proposal, request for information, but the fact remains FICO

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 18 of 20
Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1 doing business, and establishing the adequate
2 accurate price point. You can't call those in the
3 insurance process small, because the rate, the
4 quote, the bind, the book, and the issue processes
5 do not work unless that's done.
6    Q.   How have you attributed speed to Blaze
7 specifically within the complex application that is
8 CSI Express?
9    A.   If -- I have done no level of
10 quantitative work. So you're asking me to provide
11 you my thoughts on did it make it better by one
12 day, by two days, by three days? I can't provide
13 you that. That was out of the scope of my work.
14   Q.   I take it, then, you also don't know
15 whether Blaze specifically versus some other
16 technology within CSI Express contributes to the
17 speed that you've opined CSI Express delivers,
18 correct?
19   A.   If I took the architectural footprint,
20 which you've referenced several times, there are --
21 pardon me -- components of the architectural process
22 that contribute to that rate. A -- a system does
23 two times three much faster than a human being does
24 two times three and with an incredibly higher
25 accuracy rate. But you -- you -- you do not --

Page 151

1 it's a Rubik's Cube, as I said earlier. You don't
2 sit down and look at components of the software and
3 say this component makes this happen or that happen.
4 It performs a function.
5        The functions that Blaze Advisor
6 specifically -- I would say -- if I were talking
7 about any of the ten, whose names I don't know or
8 remember, decision management systems that Forester
9 Research included in their report, all of those are
10 designed to improve the quote, bind, book, issue
11 process, which is critical to the accumulation of
12 written premium. If you quote and don't convert --
13 and I don't know what these numbers are, but
14 Federal has a quote number coming in, I don't know
15 what that number is, Federal has a quote converted
16 to policy number, I don't know what that number is,
17 but there is a direct link between those three
18 items. You can talk to almost any insurance
19 executive, I quoted Mark Watson of Argo, a couple
20 of other people, about their view of the need to
21 make these kind of advancements in use of
22 technology to accelerate and execute the quote,
23 bind, book, issue process.
24   Q.   My question was, you did not do an
25 analysis to determine whether the speed that you

Page 152

1 attribute to CSI Express results from the fact that
2 Blaze Advisor is in CSI Express or from other
3 technologies and functionalities that are in CSI
4 Express, correct?
5    A.   That is correct. I have done no --
6    Q.   You've answered the question.
7    A.   -- quanti --
8    Q.   Go ahead.
9        MR. HINDERAKER: You may finish your
10 answer.
11       THE WITNESS: I have repeatedly said I
12 did zero quantification assessment of this situation.
13 BY MS. JANUS:
14   Q.   In fact, you do not know whether CSI
15 Express actually increased the speed of response to
16 requests for quote at Federal, correct?
17   A.   That is correct. That would require
18 data.
19   Q.   In your mind, would it be even
20 possible to measure the contribution that Blaze has
21 to the speed that you've discussed CSI Express
22 creating?
23   A.   Having had the privilege of giving
24 that question zero thought, I can't answer it.
25 That --

Page 153

1    Q.   So you --
2    A.   That --
3    Q.   -- just don't --
4    A.   That requires thought.
5    Q.   So you just don't know whether it
6 would be possible -- possible to measure that?
7        MR. HINDERAKER: Misstates --
8 objection, misstates the answer.
9 BY MS. JANUS:
10   Q.   Is that correct?
11   A.   I have zero data and I have not spent
12 one minute thinking about how I would do that.
13 I -- I live in a world where most things are
14 possible. The question is what does it take to get
15 it done.
16       (Whereupon, Deposition Exhibit No. 520
17 was marked for identification, and a copy is
18 attached and hereby made a part of this deposition.)
19 BY MS. JANUS:
20   Q.   Showing you what's been marked as
21 Exhibit 520, this is the CSI Express component view
22 that was contained in Mr. McCarter's report.
23   A.   Yes, from Mr. McCarter's report.
24   Q.   Do you agree with me based on this
25 component view that CSI Express is a complex

Page 154

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 19 of 20

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

1  application involving many technologies?
2      A.   Yes.
3      Q.   Do you know what all of the various
4  components that are depicted in this chart do in
5  CSI Express?
6      A.   All?
7      Q.   Yes.
8      A.   No.  Some of the -- some of their
9  acronyms, I don't even know what they mean.
10     Q.   Do you know what each of these
11 components contributes to what you have opined are
12 the benefits of CSI Express?
13     A.   I'm not sure I opined that C -- that
14 anything other than Blaze Advisor provided benefits
15 to CIS.  So as relates to this current state
16 exhibit, CI -- Blaze Advisor inside of CIS Express
17 contributes to the benefits I articulate, but I
18 can't speak to any of the other systems.
19          I can -- I can tell you generally
20 speaking in the insurance industry what an under
21 man -- underwriting manager workbench does, I can
22 tell you what product figuration does, but I can't
23 answer the specific question you're asking.
24     Q.   Turning back to your report, in
25 paragraph 36?

Page 155

1      A.   I'm there, I'm there.
2      Q.   You state that "CSI eXPRESS's use of
3  Blaze Advisor contributes to revenue by increasing
4  the speed of response to a request for a quote
5  and...speed of making renewal offers," correct?
6      A.   I do.
7      Q.   And we've discussed that you don't
8  actually know whether the speed of response was
9  increased, correct -- at Federal, I should say?
10     A.   I have no quantification.
11     Q.   You don't know whether the speed of
12 making renewal offers was increased, correct?
13     A.   I have no quantification.
14     Q.   How have you concluded that CSI
15 Express's use of Blaze Advisor contributes to
16 revenue?
17     A.   So I go back to my three original
18 points.  There -- insurance companies try to improve
19 their positions in getting more quotes, converting
20 more quotes, hanging on to more renewals through
21 three fundamental strategies: speed -- that's both
22 speed of response and speed to market -- ease of
23 doing business, and adequate accurate pricing.
24     Q.   Okay.  And so you're basing your
25 opinion that CSI Express's use of Blaze Advisor

Page 156

1  contributes to revenue on general goals of
2  insurance companies in the industry?
3      A.   Not exactly.  I am basing my opinion
4  on the fact that every insurance company that I've
5  ever talked with is focused on that quote, bind,
6  book, issue process for new business and for
7  renewals, and that Blaze Advisor contributes to
8  getting responses inside of the quote process faster,
9  contributes to getting accurate adequate premium
10 faster, it contributes to easing the burden on the
11 independent agent or broker, meaning ease of doing
12 business, and it contributes to the relative
13 adequacy and acc -- attaining the adequate and
14 accurate premium.
15     Q.   And -- but you did not actually
16 analyze whether it did contribute to those things
17 you've just listed at Federal, correct?
18     A.   I did no quantification, that is
19 correct.
20     Q.   Do you know whether Blaze Advisor
21 actually increased or decreased the revenues of
22 Federal?
23     A.   I have done no quantification.
24     Q.   I take it you don't know whether Blaze
25 Advisor actually contributed to an increase in

Page 157

1  revenue or profit at Federal, correct?
2      A.   That would require a quantification.
3  I have done no quantification, no.
4      Q.   You do not cite to any authority in
5  paragraph 36, correct?
6      A.   That is correct.
7      Q.   And --
8      A.   So -- so when I don't cite, you should
9  assume that I am relying on 41 years and a lot of
10 gray hair in this business.
11     Q.   So your opinion in paragraph 36 is
12 based upon your experience in the industry?
13     A.   And conversations at industry
14 conferences with other insurance executives, and
15 conversations at industry conferences with software
16 vendors.
17     Q.   Those are conversations you had in
18 connection with authoring your report?
19     A.   No.
20     Q.   Are those conversations you had about
21 Blaze Advisor?
22     A.   Conversations I had -- no.  I --
23 conversations I generally have making sure that I
24 keep my mind aware of what's going on in the
25 insurance industry.  I have not discussed Blaze

Page 158

CASE 0:16-cv-01054-DTS   Doc. 646-8   Filed 10/23/19   Page 20 of 20

Randolph Bickley Whitener - CONFIDENTIAL - ATTORNEYS' EYES ONLY   -   6/27/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

Page 159

1  Advisor with any other insurance or vendor personnel.
2      Q.    Are those conversations that you had
3  about Federal or Chubb?
4      A.    No.
5      Q.    Paragraph 37 -- oh, one other question.
6  In paragraph 36 you state, "CSI eXPRESS's use of
7  Blaze Advisor contributes to revenue," correct?
8      A.    I do.
9      Q.    Do you mean to say CSI Express
10 contributes to revenue?
11     A.    I do not.
12     Q.    How does CSI Express's use of Blaze
13 Advisor contribute to revenue?
14     A.    This goes back to the quote, bind,
15 book, issue process for a new business. Okay.
16 CSI Express uses Blaze Advisor to make decisions on
17 what are acceptable risk attributes as it respects
18 Federal's risk appetite. Blaze Advisor contributes
19 to the adequate -- the calculation of adequate
20 accurate premium, and Blaze Advisor where deployed
21 this way says, yes, we'll write this policy, no,
22 we'll write this policy, and sends the instructions
23 for a quote letter to go out. There is a direct
24 connection between Blaze Advisor's operation inside
25 of CSI Express and the quote, bind, book, issue

Page 160

1  process of a property casualty insurance company.
2      Q.    And you say that it uses Blaze Advisor
3  to make decisions, but those decisions are actually
4  made using the rules that the -- that the company,
5  Federal, has defined using its expertise, correct?
6      A.    I disagree with that statement. The
7  decisions -- in my mind, there's a difference
8  between the definition of the rule, transferring
9  that rule into the technology, and, then, the
10 execution of the rule.
11           So as long as an automated decision
12 system is executing that rule, which is Blaze
13 Advisor, you are accelerating the process, you are
14 requiring less effort on behalf of your underwriters
15 and your agents, and you are approaching the best
16 possible price point, the adequacy and accuracy of
17 premium for the defined risk characteristics.
18     Q.    But you're using the rules that the
19 business has generated through its expertise,
20 correct?
21     A.    I agree that the rules are authored by
22 the underwriting function of the company, they are
23 not necessarily executed by the underwriting
24 function of the company. In some instances inside
25 of Chubb their underwriting rules are, in fact,

Page 161

1  executed by their people, but in some instances
2  they are executed by an automated decision system,
3  in this case, Blaze Advisor.
4      Q.    You said that the effect is an
5  acceleration and less effort. Those are
6  efficiencies, you'd agree with me on that, right?
7      A.    I agree that less effort is an
8  efficiency, but I don't think efficiency and impact
9  to revenue are unrelated. In fact, I think they're
10 very related.
11     Q.    Paragraph 37, once again, you do not
12 cite to any authority for the conclusions you reach
13 in that paragraph, correct?
14     A.    That is correct.
15     Q.    Is that paragraph based solely on your
16 experience in the industry?
17     A.    And the conversations I have had with
18 other insurance executives and with software vendors
19 about their sales and marketing approach for the
20 industry.
21     Q.    When did you have those conversations?
22     A.    Pick a time across the last 20 years
23 and you can plug that date in.
24     Q.    Okay. So how is that different from
25 your experience in the insurance industry?

Page 162

1      A.    It's not.
2      Q.    Okay.
3      A.    But --
4      Q.    So those --
5      A.    But --
6      Q.    -- are conver -- sorry.
7      A.    But -- but the -- the statement my
8  experience in the insurance industry apply --
9  implies I am operating in isolation. I want the
10 record to show, no, I -- I talk -- I attend the
11 IA -- I have attended the ISA, I've attended the
12 ACORD. I'm dropping a lot of things you don't
13 understand. I'll be happy to explain them.
14           But there are gatherings of the
15 industry, and there are conversations that happen
16 between executives of insurance industry, and I
17 don't want that to be missed. I don't want the
18 record to think that I am relying solely on the --
19 the thought process of Bick Whitener. I'm talking
20 to other people, not specifically about Blaze
21 Advisor, not specifically about Federal, but about
22 the insurance industry and the execution of our
23 processes, including the quote, bind, book, issue
24 process.
25     Q.    And those conversations were not