## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>      Plaintiff,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY,<br>an Indiana corporation, and ACE<br>AMERICAN INSURANCE COMPANY, a<br>Pennsylvania corporation,<br><br>      Defendants. | Court File No.  16-cv-1054 (WMW/DTS)<br><br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

---

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS ............................................................................ I

INTRODUCTION ................................................................................... 1

BACKGROUND ..................................................................................... 3
    I.     THE PARTIES. ............................................................................ 3
          A.    Federal and ACE American. ......................................... 3
          B.    In January 2016, Federal's Parent Corporation Merged with ACE American. ....................................................... 3
          C.    FICO. ........................................................................... 4
    II.    FEDERAL'S PERPETUAL, GLOBAL, AND ENTERPRISE-WIDE LICENSE. ................................................................................. 5
          A.    The License Grant in the Original Agreement:  Allowing Global Use of Blaze. .................................................... 5
          B.    The Assignment Clause: Allowing a Merger Assignment in the Absence of Expanded Use. ........................................ 7
          C.    The License Grant in Amendment Two: Continuing to Allow Global Use. ................................................................. 8
    III.    FICO CONSENTED TO FEDERAL'S GLOBAL USE OF BLAZE. ......... 8
          A.    In 2008, FICO Confirmed That the License Agreement Allowed Global Use. .................................................... 8
          B.    FICO Repeatedly Stated that the License Allowed Global Use. .......................................................................... 10
          C.    Sawyer Questioned Whether The License Covered Global Use, But Was Instructed By FICO Not to Press the Issue with Federal. ..................................................................... 10
    IV.    IN JULY 2015, WHEN THE ACE MERGER WAS ANNOUNCED, FICO SCHEMED TO EXTRACT ADDITIONAL LICENSE FEES. ....... 11
    V.    IMMEDIATELY FOLLOWING THE MERGER, FICO ACCUSED FEDERAL OF BEING IN BREACH OF THE LICENSE AGREEMENT. ........................................................................ 12
    VI.    FOR THE FIRST TIME, FICO ASSERTED THAT FEDERAL'S USE OUTSIDE OF THE UNITED STATES WAS A BREACH OF THE AGREEMENT. ................................................................. 13
    VII.    FICO PURPORTS TO TERMINATE THE LICENSE AND FILES THIS LAWSUIT. ..................................................................... 14

LEGAL STANDARD .................................................................................................... 14

ARGUMENT.................................................................................................................... 15

    I.     FEDERAL DID NOT BREACH THE LICENSE AGREEMENT
          BY USING BLAZE OUTSIDE OF THE UNITED STATES................... 15

        A.    The License Allows Federal to Use Blaze Globally (No
              Breach of § 3.1)............................................................................ 15

             1.    The Plain Language of the License Agreement Allows
                    Global Use......................................................................... 15

             2.    The Undisputed Evidence of the Parties' Negotiations
                    and Conduct Shows Global Use was Allowed...................... 17

        B.    FICO's Conduct Unequivocally Waived Any Claim that the
              License Agreement Forbade Global Use. ....................................... 18

    II.    FICO'S COPYRIGHT CLAIM BASED ON FEDERAL'S USE OF
          BLAZE OUTSIDE OF THE UNITED STATES ALSO FAILS............... 19

        A.    As a Matter of Law, FICO Cannot Assert a Copyright
              Infringement Claim Based on Use Outside the United States. ........ 19

        B.    The License Authorized Federal's Foreign Affiliates to Use
              Blaze............................................................................................ 20

        C.    FICO Authorized Federal to Use Blaze Globally and Has
              Waived Any Argument to the Contrary. ......................................... 20

    III.    FICO'S CONTRACT CLAIM BASED ON FEDERAL'S POST-
          MERGER USE FAILS................................................................................ 21

        A.    Federal Was Not Required to Obtain FICO's Consent as a
              Result of the Merger (No Breach of § 10.8). ................................. 21

             1.    Section 10.8 does not apply because there was no
                    expanded use at the time of the merger................................. 21

             2.    Section 10.8 does not apply because there was no
                    "change of control" within the meaning of § 10.8.............. 22

         B.    FICO's claim for breach of § 10.8 fails because FICO was
              prohibited from unreasonably withholding consent.......................... 23

    IV.    FICO'S CLAIM FOR COPYRIGHT INFRINGEMENT BASED
          ON FEDERAL'S POST-MERGER USE FAILS AS A MATTER
          OF LAW.................................................................................................... 24

         A.    Section 10.8 Does Not Give Rise to a Copyright Claim................. 24

        B.    FICO had no valid basis to terminate the License under §
              10.8, which means Federal's continued use cannot give rise to
              an infringement claim.................................................................... 26

    V.    FICO'S CLAIMS FAIL BECAUSE ITS DAMAGES CLAIMS
          ARE SPECULATIVE. ............................................................................... 26

    VI.    FICO'S DAMAGES ARE LIMITED BY CONTRACT ........................... 28

VII.    FICO'S CLAIM FOR DISGORGEMENT OF PROFITS UNDER
        THE COPYRIGHT ACT MUST BE DISMISSED AS
        SPECULATIVE AND UNPROVED............................................. 28
        A.    Standard for Disgorgement of Indirect Profits................................. 29
        B.    The Undisputed Facts Relevant to FICO's Disgorgement
              Claim Show that No Profits of Federal are Attributable to
              Blaze. ............................................................................ 31
              1.    Blaze plays a minor role in Federal's business. .................. 31
              2.    Blaze does not generate profits, it is simply a software
                    component that implements business rules created by
                    *Federal's* employees and operations..................................... 33
              3.    FICO's own causation expert has admitted that he does
                    not know whether Blaze actually caused *any* profits for
                    Federal..................................................................... 34
              4.    FICO cannot recover profits from parties it has not
                    named in this lawsuit........................................................ 34
VIII.   FICO'S CLAIMS AGAINST ACE AMERICAN FAIL. ......................... 35
IX.     FEDERAL IS ENTITLED TO SUMMARY JUDGMENT ON ITS
        COUNTERCLAIM FOR BREACH OF CONTRACT BECAUSE
        FICO MANUFACTURED ITS CLAIMS. ................................... 35

CONCLUSION ............................................................................. 36

## INTRODUCTION

In 2006, Federal Insurance Company ("Federal"), a property and casualty insurer, entered into a software license agreement with Fair Isaac Corporation ("FICO"). The License Agreement allowed Federal to use FICO's software product called Blaze Advisor ("Blaze"), globally and perpetually. For many years, the parties dealt with one another under the License Agreement with no problems at all. In the summer of 2015, however, it was announced that ACE Limited, the ultimate and indirect parent of several competing insurers, intended to acquire The Chubb Corporation, the parent of Federal. At that point, FICO decided to use the upcoming merger to squeeze Federal for additional payments on the pretext that the transaction was somehow tantamount to a breach of the agreement. To that end, FICO demanded that Federal pay it more than $5 million. Federal rejected this demand, as it was completely unwarranted. The ACE-Chubb merger closed in January 2016, and FICO filed this lawsuit on April 21, 2016.

FICO's first principal contention is that Federal breached Section 3.1 of the License Agreement, which FICO argues prohibits any use of Blaze outside the United States. Federal has indeed used the software outside of the United States, but FICO's claim fails because (a) the plain language of the License Agreement does not restrict use to the United States, (b) FICO's own executives have repeatedly acknowledged that such use is permitted, and (c) FICO has clearly waived any such claim by agreeing to and assisting in use of Blaze overseas. FICO asserts this claim as both a contractual breach and a violation of copyright.

FICO's second contention is that the ACE-Chubb merger operated as an assignment under Section 10.8 of the License Agreement.  FICO asserts that the License Agreement gives it discretion to consent to or reject that assignment, and argues that it did not consent.  FICO contends, therefore, that Federal's continued use of Blaze is a breach of the License Agreement and a copyright violation.  This claim fails because (a) the plain language of Section 10.8 does not require consent to an assignment in the context of a merger, so long as no expanded use occurs, (b) the section does not apply because Federal itself did not merge, and (c) FICO was forbidden by Section 10.8 from unreasonably withholding its consent to the assignment.   FICO asserts this claim, too, as both a contract breach and a violation of copyright.  The copyright portion of this claim fails for the additional reason that this alleged breach of a contractual covenant does not give rise to copyright liability.

All of FICO's claims fail because its damages are speculative.  In addition, to the extent any of FICO's claims survive summary judgment, FICO's damages claims must be significantly limited as a matter of law.  Because FICO's copyright claims fail as a matter of law, its claim for contract damages is subject to the damages limitation clause in the License Agreement.  Moreover, FICO's claim for disgorgement in connection with its copyright claims must be dismissed.

Finally, for the same reasons that FICO's claims fail, Federal is entitled to summary judgment on its counterclaim for breach of contract.

For all of these reasons, and the other reasons discussed below, Defendants are entitled to summary judgment as a matter of law, FICO's claims should be dismissed with prejudice, and judgment should be entered in favor of Federal on its counterclaim.

## BACKGROUND

I.    THE PARTIES.

A.    Federal and ACE American.

Federal Insurance Company and ACE American Insurance Company are separate companies that issue property and casualty insurance policies to their customers. (Declaration of Terrence J. Fleming at Ex. 1.)  Such companies select the risks they wish to insure, determine the terms and conditions upon which they will offer such insurance (a process called underwriting), and handle the claims that result from the insurance policies they sell. (*Id.*, Ex. 2, ¶¶ 47-48.)  To sell and service insurance policies to a wide variety of individual and corporate customers who have highly diverse needs for insurance, companies such as Federal and ACE conduct a complex business involving among other things marketing insurance policies, analyzing the risks presented by potential and existing insureds, developing and maintaining relationships with insurance brokers and agents, staying in regulatory compliance, and performing other functions. (Declaration of John P. Taylor, ¶ 10.)

B.    In January 2016, Federal's Parent Corporation Entered Into a Merger.

Prior to January 2016, Federal and ACE American were unrelated entities in separate corporate families. (*Id.*, ¶ 2.)  Federal was a subsidiary of The Chubb Corporation, a holding company. (*Id.*, ¶ 3.)  Federal had its own subsidiary companies

3

that also issued insurance policies.  (*Id.*, ¶ 4.)  Federal, its subsidiaries, and other related companies, formed a group of insurance entities known at the time as "Chubb."  (*Id.*, ¶ 3.)  ACE American was then an indirect subsidiary of ACE Limited, part of a different group of insurance entities known in the industry as "ACE."  (*Id.*)

On January 15, 2016, the two corporate families merged when ACE Limited acquired the Chubb companies.  (*Id.*, ¶ 6.)  ACE INA Holdings Inc., a subsidiary of ACE Limited, merged with The Chubb Corporation, and the surviving entity was renamed Chubb INA Holdings Inc.  (*Id.*, ¶¶ 6-7.)  Defendants Federal and ACE American did not merge—they remained separate entities, now in the same family of insurance companies.  (*Id.*, ¶ 8.)

### C.    FICO.

FICO sells a business rules management software program called Blaze.  Blaze is just one of many business rules management systems ("BRMS") available on the market today.  (Fleming Decl., Ex. 2, ¶ 80.)  A BRMS executes rules that are drafted by the user of the system (in this case, Federal) for accomplishing its own internal automatic processes.  (*Id.* ¶ 70.)  These are called "business rules."  (*Id.*)  A BRMS is simply the system through which a system user executes its own rules in running its business.  (*Id.*, ¶¶ 70-72.)  Here, Blaze executed certain specific business rules governing a few of Federal's internal automated processes.  (Declaration of Ramesh Pandey, ¶ 2.)  These internal processes are called "applications."[1]  (*Id.*)

---

[1] The number of internal processes or applications that Blaze is used in does not result in an increase in burden to FICO.

II.    **FEDERAL'S PERPETUAL, GLOBAL, AND ENTERPRISE-WIDE LICENSE.**

On June 30, 2006, FICO and Federal entered into a License Agreement for the use of Blaze.[2]  (Fleming Decl., Ex. 3.)  The Original Agreement limited use of Blaze to one application.  (*Id.*, at FICO0000218.)  The parties expanded the Original Agreement by executing Amendment One on August 1, 2006 and Amendment Two on December 28, 2006.[3]  (*Id.*, Exs. 4-5.)  Amendment One allowed Federal to go beyond the single application and use Blaze in multiple applications, but confined the license to one of Federal's business units.  (*Id.*, Ex. 4.)  Amendment Two expanded the license to apply to unlimited applications and business units and to cover the entire enterprise.[4]  (*Id.*, Ex. 5.)  The key terms relevant to this case include the following:

   A.    **The License Grant in the Original Agreement:  Allowing Global Use of Blaze.**

The License Agreement does not contain any geographic restriction on the use of Blaze.  The "License Grant" clause determines the scope of the license granted to Federal.  (*Id.*, Ex. 3, § 2.)  The License Grant does not contain *any* geographic limitation on Federal's use of Blaze, stating:

---

[2] FICO understood that Federal executed the License and was its "client" under the License. (*See, e.g.*, Dkt. No. 33, Stipulation dated January 31, 2017, at ¶ 1 (stipulating that "[t]he proper defendant in this lawsuit is Federal Insurance Company, an Indiana corporation[.]").

[3] The License Agreement is governed by New York law.  (Fleming Decl., Ex. 3, § 10.7.)

[4] The terms "License Agreement" or "License" refer to an original license agreement, executed in June 2006 (the "Original Agreement"), along with two amendments executed later that year on August 1, 2006 ("Amendment One") and December 28, 2006 ("Amendment Two").

> License Grant to Fair Isaac Products.  Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a perpetual (subject to the provisions of Article 9), non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes . . . .

(*Id.*, § 2.1(a).)

In fact, the territorial restriction was *specifically negotiated out* of the Original Agreement.  In 2006, Federal's operations were global (as they are today), and it was a priority for Federal that the License Agreement allow global use.  (*Id.*, Ex. 6 ("they were adamant about keeping Global on the table"); *see also* Ex. 7 at 173:19-174:8.)  On June 6, 2006, a FICO attorney sent Federal FICO's "standard Blaze Software License and Maintenance Agreement for [Federal's] review."  (*Id.*, Ex. 8.)  The standard agreement contained a definition of "Territory" (the "United States") and used that term in the license grant clause:

> Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes, *but only within the Territory* . . . .

(*Id.* at FICO0000176 (emphasis added).)  On June 27, 2006 FICO sent an edited version of the agreement to Federal "incorporating the changes [Federal] requested," and *removing* the reference to "Territory" in the License Grant:

> 2.1    License Grant to Fair Isaac Products.    Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a **perpetual (subject to the provisions of Article 9)**, non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes, ~~but only within the Territory~~ . . . .

(*Id.*, Ex. 9 at FICO0000132_0001.)  Thus, the parties intentionally omitted any territorial restriction in the license grant.  The definition of "Territory" was edited to say "with respect to the installation and physical location of the Fair Isaac Products, means the United States of America," but the term is not used in the Agreement.  (*Id.*)

### B.    The Assignment Clause: Allowing a Merger Assignment in the Absence of Expanded Use.

The issue of assignment is addressed in § 10.8 of the License Agreement, which states:

> <u>No Assignment</u>.  Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof.  In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization, or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld.  Any attempt to assign or transfer all or any part of this Agreement without first obtaining such written consent will be void and of no force or effect.

(*Id.,* Ex. 3.)  The first sentence of this section governs if Federal were to assign its License Agreement to an unrelated company (an "outside assignment").  In that situation, § 10.8 provides that written consent from FICO is required.  The second sentence of § 10.8 applies to mergers.  In that context, the license is technically "assigned" to a new entity (a "merger assignment"), but the entity receiving the assignment is not unrelated – it has merged with the existing client.  In that situation, FICO only can object if the use of Blaze expands, and cannot unreasonably withhold its consent.

### C.   The License Grant in Amendment Two: Continuing to Allow Global Use.

Amendment Two eliminated the single business unit restriction and allowed Federal to use Blaze on an enterprise-wide basis.   Amendment Two "terminated and superseded . . . [a]ll previous licenses granted to Client under the Agreement" and states:

> [T]he Enterprise-Wide License shall mean that Client and its Affiliates may use the Fair Isaac Product for their internal business purposes, with no limitation on the number of Seats or CPUs, subject to and in accordance with all of the provisions of the [Original] Agreement.

(*Id.*, Ex. 5 at FICO0000227.)   Importantly, Amendment Two did *not* limit the license to the United States, but instead continued to allow use throughout the world, now on an enterprise-wide basis.

## III.   FICO CONSENTED TO FEDERAL'S GLOBAL USE OF BLAZE.

### A.   In 2008, FICO Confirmed That the License Agreement Allowed Global Use.

Beginning in 2006, Federal used Blaze.[5]   The parties worked cooperatively for years.   FICO knew how Federal was used Blaze and often assisted Federal in doing so. (*Id.*, Ex. 10 at 194:20-21; Ex. 11 at 140:6-142:16.)   FICO even cited to Federal's global use of Blaze in its marketing to other insurance companies.   (*Id.*, Ex. 12 at FED006784_0004.)

---

[5] FICO does not allege that Federal's domestic use of Blaze pre-merger violated the License Agreement.   Thus, facts relating to such use are not addressed in detail here. Certain facts relating to the relative unimportance of Blaze to Federal's overall business are relevant to FICO's baseless claim for disgorgement of profits, however, and are cited in Argument Section VII.

In 2008 Federal wanted to use Blaze in Europe, in an application associated with underwriting policies issued there. (*Id.*, Ex. 13 at FICO0003278.)  In November 2008, FICO employees reviewed the License and the parties' prior negotiations to determine whether the License covered global use. (*Id.*, Ex. 6; Ex. 14.)  On November 17, 2008, the FICO employees in charge of the Federal account (Russ Schreiber and Michael Sawyer) met with FICO's Client Services Partner in Europe (Richard Hill). (*Id.*, Ex. 13.)  The meeting was to discuss "a plan for Chubb Europe" and determine whether Federal's License allowed global use of Blaze. (*Id.*, Exs. 6, 13.)

Significantly, FICO's executives consulted with FICO's key in-house counsel, Thomas Carretta, about the scope of the License. (*Id.*, Ex. 15 at Entries 656 and 662.)  At least two emails were exchanged by Hill and Carretta at this time: on November 12, 2008, Hill emailed attorney Carretta about the License Agreement, and on November 25, 2008, attorney Carretta emailed Hill and Schreiber about the License Agreement. (*Id.*)

On November 26, 2008, after reviewing the License Agreement and consulting with in-house counsel, FICO concluded the License was a "Global license." (*Id.*, Ex. 6.)  Lawrence Wachs, one of the FICO employees responsible for negotiating the License Agreement in 2006, wrote to Schreiber:

> In reviewing my notes and some archived e-mails it's apparent to me that the corporate ELA that was negotiated with Phil Folz and June Drewey *intended to include the Global license*.

(*Id.* (emphasis added).)  Thus, FICO clearly understood and acknowledged that the license was global in geographic scope.

### B.      FICO Repeatedly Stated that the License Allowed Global Use.

After consulting with in-house counsel Carretta in November 2008, *all* of FICO's internal and external communications about the territorial scope of the License Agreement acknowledge that it allowed use around the world:

- In August 2012, Hill emailed Schreiber confirming that the License allowed global use. (*Id.*, Ex. 13 at FICO0003279 ("I seem to remember their US blaze license allowed them the software for free.").)

- In August 2012, Sawyer responded to Hill confirming Federal had a global, enterprise-wide license and that Federal was already using Blaze in the UK. (*Id.* at FICO0003278 ("They do have a Global ELA [enterprise license agreement] for Blaze and have an automated UW Application running in the UK already.").)

- In August 2013, Hill emailed another FICO employee about selling new products to Federal and wrote "[t]o set expectations, they already have a Blaze global ELA." (*Id.*, Ex. 16, Dep. Ex. 48.)

- On March 26, 2015, Schreiber wrote that "Chubb has global ela for blaze." (*Id.*, Ex. 17, Dep. Ex. 57.)

- In April 2015, FICO wrote to Federal that "[n]o additional license(s) are needed as it is covered within the overall global Blaze ELA."  (*Id.*, Ex. 18.)

In addition, it is undisputed that FICO knew that Federal used Blaze outside of the United States. (*See, e.g.,* Ex. 10 at 51:1-7 ("So with respect to Chubb Europe, Henry [Mirolyuz of Chubb] was very open about the use of the software to support Europe . . . .").)

### C.      Sawyer Questioned Whether The License Covered Global Use, But Was Instructed By FICO Not to Press the Issue with Federal.

During his deposition, Sawyer testified that he asked Schreiber (his boss) whether the License Agreement allowed use of Blaze only within the United States. (*Id.*, at 42:20-43:6.)   Schreiber instructed Sawyer to allow Federal to continue to use Blaze

outside the United States, even if Sawyer believed it was outside the scope of the License Agreement, because "the time was not right" to raise the issue with Federal.  (*Id.* at 43:9-13.)

According to Schreiber, he likely made the decision not to "rock the boat" because Federal was a "good client" and the companies had a "great history together."  (*Id.*, Ex. 7 at 124:6-18, 138:24-139:4, 139:23-140:1.)   Schreiber admitted that it was "certainly possible" that he made the decision not to "hold [Federal] to the letter of the . . . license." (*Id.* at 141:14-21.)

## IV.    IN JULY 2015, WHEN THE ACE MERGER WAS ANNOUNCED, FICO SCHEMED TO EXTRACT ADDITIONAL LICENSE FEES.

On July 1 2015, the ACE acquisition of Chubb was publically announced.  That same day, Schreiber and Sawyer began discussing a strategy to assert that this was a "license transfer" – or assignment – and that it presented an opportunity to leverage the deal to FICO's benefit and seek additional license fees.  (*Id.*, Ex. 19.)  FICO employees discussed this issue repeatedly after July 2015.  (*Id.*, Exs. 19-21.)  In November 2015, Schreiber, Sawyer, and Bill Waid, a Vice President at FICO, held an internal meeting to discuss FICO's strategy for obtaining "licensing expansion fees" due to the planned merger.  (*Id.*, Ex. 20.)

Schreiber and Sawyer, however, knew that License Agreement did not allow their contemplated actions.  In an October 2015 email to Sawyer, Schreiber wrote "[t]he unreasonably withheld bit has me a little concerned," referring to the language of § 10.8. (*Id.*, Ex. 21 at FICO0001700.)   They acknowledged that nothing in the License

Agreement allowed FICO to demand more licensing fees based on the new parent company's greater insurance premiums. (*Id.* at FICO0001698 (Sawyer acknowledged that the License Agreement did not allow them to charge more, stating "I don't see anything on GWP[6] in the agreements"); *see also id.*, Ex. 7 at 273:1-277:5 ("So the lack of a defined what is 'unreasonably withheld' would have caused me to pause."; FICO's ability to increase the price "wasn't documented . . . one less fact I had in writing.").)

## V.     IMMEDIATELY FOLLOWING THE MERGER, FICO ACCUSED FEDERAL OF BEING IN BREACH OF THE LICENSE AGREEMENT.

Despite discussing the assignment issue internally since July 2015, FICO did not raise it with Federal until just prior to the merger, hiding its intent to withhold approval unless Federal paid millions more in license fees from its long term customer. (*Id.*, Ex. 20 at FICO0000976; Ex. 22.)  On January 27, 2016, twelve days after the closing of the merger transaction, FICO's in-house counsel Carretta sent Federal a demand letter stating the position FICO had internally decided upon in July 2015, that the merger was an assignment in violation of § 10.8. (*Id.*, Ex. 23.)   FICO knew that a client like Federal could not immediately stop using Blaze upon FICO's demand, and thus this timing provided maximum leverage. (Pandey Decl., ¶ 2.)

FICO never sought to determine whether the merger would actually result in an "expanded use" of Blaze.  In fact, at the time it withheld consent FICO was unaware of any expanded use. (Fleming Decl., Ex. 10 at 130:13-16; 133:18-134:8.)  Moreover,

---

[6] GWP means "gross written premium."  Sawyer's point was that the License Agreement did not facially allow FICO to demand additional license fees solely on a theory that their client's gross written premiums might expand.

during negotiations following the merger, FICO had no evidence that would indicate Federal expanded its use following the merger, and Federal offered to *limit* its use of Blaze going forward in a good faith effort to resolve FICO's threats.  (*Id.* at 135:4-6; *see also id*, Ex. 24 ("All usage now and going forward does not and will not change from that permitted under the current license agreement and all usage remains with the same named applications.").)  FICO rejected Federal's offer in less than 24 hours with no explanation. (*Id.*, Ex. 25.)  The reason for this was simple: FICO never treated sentence two of Section 10.8 as though it had any effect whatsoever. FICO's employee Bill Waid, who was instrumental in Blaze pricing and negotiations, later testified that, according to FICO, the merger *was* the expanded use.  (*Id.*, Ex. 26 at 240:15-20.)

After the merger, Federal's use of Blaze remained confined to the same Federal applications where it was used prior to the merger.  (Pandey Decl., ¶¶ 5-6.)  No additional applications were ever added as a result of the merger. (*Id.*)  Indeed, after the merger Federal *retired* two applications which used Blaze in the United Kingdom.  (*Id.*)

## VI.  FOR THE FIRST TIME, FICO ASSERTED THAT FEDERAL'S USE OUTSIDE OF THE UNITED STATES WAS A BREACH OF THE AGREEMENT.

During the parties' negotiations regarding the purported assignment due to the merger, FICO also asserted—for the very first time—that Federal had breached § 3.1 of the License Agreement by using Blaze outside of the United States.  (*Id.*, Ex. 27.) Shockingly, in March 2016, despite having been *personally* consulted on European use in 2008, FICO in-house counsel Carretta even took the position that FICO had been previously unaware of any "use of the Software outside of the United States."  (*Id.*, Ex.

28.)   His assertion was directly contrary to the undisputed facts regarding FICO's knowledge of and consent to Federal's global use.

## VII.   FICO PURPORTS TO TERMINATE THE LICENSE AND FILES THIS LAWSUIT.

On February 17, 2016, in response to the FICO demand letter, Federal denied that it was in breach under either § 3.1 or § 10.8 and asserted that FICO was not entitled to any additional license fees for Blaze.  (*Id.*, Ex. 29.)  On March 30, 2016, FICO's in-house counsel Carretta sent Federal another letter purporting to terminate the License "effective on March 31, 2016 at 5 p.m."  (*Id.*, Ex. 28.)  On April 21, 2016, FICO filed this lawsuit.

## <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that the Court shall grant summary judgment when the "materials in the record . . . show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material if it "might affect the outcome of the suit," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for" either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is also appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[S]tatements of counsel are not evidence and do not create issues of fact."  *Exeter Bancorporation, Inc. v. Kemper Sec. Grp., Inc.*, 58 F.3d 1306, 1312 n.5 (8th Cir. 1995) (internal quotation omitted).  "Legal opinions do not qualify as facts for purposes of

14

summary judgment, and courts may disregard such opinions." *Cable v. FedEx Freight, Inc.*, 2014 WL 6810816, at *10 (M.D.N.C. Dec. 2, 2014).

## ARGUMENT

## I.  FEDERAL DID NOT BREACH THE LICENSE AGREEMENT BY USING BLAZE OUTSIDE OF THE UNITED STATES.

### A.  The License Allows Federal to Use Blaze Globally (No Breach of § 3.1).

FICO asserts that the License Agreement allowed use of Blaze only in the United States.  FICO's argument rests on the definition of the term "Territory" in the License Agreement.  Pursuant to the plain language of the License Agreement and the conduct of FICO during the operation of the License Agreement, FICO's claim should be dismissed as a matter of law.

### 1.  The Plain Language of the License Agreement Allows Global Use.

The License Agreement does not contain a restriction on the territory in which the software may be used.  The License Grant in the Original Agreement allowed use without geographical restriction as follows:

> Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a perpetual (subject to the provisions of Article 9), non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes . . . .

(Fleming Decl., Ex. 3, § 2.)  The License Grant in the Second Amendment, similarly had no such restriction:

> [T]he Enterprise-Wide License shall mean that Client and its Affiliates may use the Fair Isaac Product for their internal business purposes, with no limitation on the number of Seats or CPUs, subject to and in accordance with all of the provisions of the Agreement.

15

(*Id.*, Ex. 5.)

The definition of "Territory" in the Original License Agreement does not change this result.  (*Id.*, Ex. 3, § 1.)  The term is not used *anywhere* in the License Agreement. Rather, it is a stand-alone definition that was never incorporated into or otherwise used in the substantive areas of the agreement.  The Original License makes clear that the defined "terms" are only referenced "as *used* in this Agreement with initial capital letters."  (*Id.*, Ex. 3, § 1.) (emphasis added)  As such, the definition of the term "Territory," taken alone, does not create any binding contractual covenants.  *See, e.g.*, *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 766 (N.D. Ill. 2019) (contractual recitals "not binding on the parties or an effective part of their agreement unless referred to in the operative portion of [the] agreement."). *Trunzo v. Allstate Ins. Co.*, No. CV-04-1789, 2006 WL 2773468, at *6 (W.D. Pa. Sept. 25, 2006) (granting summary judgment where defined term was not used in disputed portion of contract because "[t]he term . . . appears nowhere in the specific contractual language at issue in this case"); *Weber v. GE Grp. Life Assur. Co.*, No. 05-CV-165-JHP-SAJ, 2007 WL 764288, at *6 (N.D. Okla. Mar. 9, 2007), aff'd, 541 F.3d 1002 (10th Cir. 2008) ("The 'Definitions' section of the [contract], standing alone, does not add to or subtract from the rights and obligations under the [contract]. It is only when a defined term is used in a substantive part of the [contract] that the definition has any relevance.").

### 2. The Undisputed Evidence of the Parties' Conduct Shows Global Use was Allowed.

FICO and Federal specifically negotiated to *remove* the reference to "Territory" in the License Grant Section. (Fleming Decl., Exs. 6-9.) Moreover, the conduct of FICO shows that FICO interpreted the License Agreement to allow global use. (*Id.*, Exs. 6, 12-18.) All of FICO's communications regarding the scope of the License Agreement state that it is "global," and acknowledge that Federal was using Blaze outside of the United States. (*Id.*) The FICO employee who negotiated the deal reviewed his notes and concluded that the parties' agreement was global. (*Id.*, Ex. 6.) At all times when FICO could have made additional money by concluding that the License Agreement disallowed foreign use, FICO concluded the opposite. (*Id.*, Exs. 6, 12-18.) Even FICO's counsel Carretta reviewed the License Agreement and concluded that foreign use was allowed. (*Id.*, Ex. 15.) Not only did FICO hold that view, but FICO *acted on it* as well. FICO did not charge Federal any extra fees and FICO employees in London had meetings with Federal employees in London, and assisted in deploying Blaze technology there. (*Id.*, Exs. 13, 16-18; Ex. 30 at 233:7-14; 240:7-17; Ex. 31 at FED007129_0055 ("FICO faced challenges at Chubb in the UK…")

In sum, all of the evidence supports the plain language of the License Agreement, and FICO's claims based upon Federal's use of the software outside of the United States should be dismissed.

**B.    FICO's Conduct Unequivocally Waived Any Claim that the License Agreement Forbade Global Use.**

FICO's claim also fails because FICO's own actions and statements demonstrate that FICO waived any geographical restriction.  Waiver is a defense to breach of contract claims.  Under New York law, "[i]t is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach."   *Nat'l Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 675 (S.D.N.Y.1991), *aff'd sub nom Yaeger v. Nat'l Westminster,* 961 F.2d 1 (2d Cir.1992).

Here, not only did FICO's knowledge, support, and acquiescence in Federal's foreign use constitute a waiver, but FICO actually considered whether to enforce what it believed may have been a territorial restriction against Federal and decided *not* to do so. The undisputed facts show:

- FICO took affirmative steps to help FICO install Blaze outside of the United States and was aware of the use of Blaze outside of the United States. (Fleming Decl., Ex. 30 at 233:7-14; 240:7-17; Ex. 31 at FED007129_0055.)

- Correspondence confirms that FICO was aware Federal was using *and running* Blaze in the United Kingdom. (*Id.*, Ex. 13 ("They [Federal] do have a Global ELA for Blaze and have automated UW Application running in the UK already.").)

- Correspondence by key FICO employees acknowledges that the License Agreement is global.  (*Id.*, Exs. 6, 12-18.)

- Sawyer and Schreiber testified that they discussed whether to enforce a prohibition on outside United States use, and decided *not* to do so.  (*Id.*, Ex. 7 at 139:15-141:21; Ex. 10 at 42:20-43:13.)   Rather, they decided to *allow* Federal to use the software outside the United States.  FICO benefited from this decision.  It kept its "great" client happy, a client FICO liked to use as an example of a successful user.  (*Id.*, Ex. 7 at 124:6-18; Ex. 10 at 43:9-13.)

18

In sum, even if the License Agreement was ambiguous on the issue of geographical scope (and it is not), FICO has waived any right to impose any such restriction through years of knowledge, acquiescence, and active participation in Federal's use of Blaze at its foreign affiliates.

## II.   FICO'S COPYRIGHT CLAIM BASED ON FEDERAL'S USE OF BLAZE OUTSIDE OF THE UNITED STATES ALSO FAILS.

To establish a claim for copyright infringement, plaintiff has the burden of demonstrating (1) ownership of a valid copyright and (2) that the defendant has, without authorization, copied, displayed, or distributed protected elements of the copyrighted work. *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 (8th Cir. 2004).  FICO's claim that Federal violated FICO's copyrights by using Blaze outside of the United States fails as a matter of law.

### A.   As a Matter of Law, FICO Cannot Assert a Copyright Infringement Claim Based on Use Outside the United States.

As a threshold matter, FICO's copyright infringement claims stemming from use by Federal's foreign affiliates must fail based on the territorial limitations of the Copyright Act.  The Eighth Circuit has held that "United States copyright law has no extraterritorial effect." *Iverson v. Grant*, 133 F.3d 922 (8th Cir. 1998).  Thus, a plaintiff cannot maintain a copyright infringement claim that is based on a party's use of a copyrighted work outside of the United States. *Id.*; *see also, e.g.*, *Subafilms, Ltd. v. MGM-Pathe Commc'ns*, 24 F.3d 1088, 1089 (9th Cir. 1994) ("when the assertedly infringing conduct consists solely of the authorization within the territorial boundaries of the United States of acts that occur entirely abroad . . . such allegations do not state a

claim for relief under the copyright laws of the United States"); *Datacarrier S.A. v. WOCCU Servs. Grp.*, 221 F. Supp. 3d 1078, 1085 (W.D. Wis. 2016) (dismissing infringement claims where defendant authorized foreign affiliates in South America to use plaintiff's software).

### B.   The License Authorized Federal's Foreign Affiliates to Use Blaze.

As described above, the License authorized Federal to use Blaze globally. Therefore, any use by Federal's foreign affiliates cannot form the basis for copyright infringement claims. *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 749 (E.D. Mich. 1998) ("Since the City possessed a license to use [the software], Plaintiff cannot prevail on its claim of infringement."); *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) ("A license is a defense to a claim of copyright infringement.").

### C.   FICO Authorized Federal to Use Blaze Globally and Has Waived Any Argument to the Contrary.

In the alternative, FICO's waiver conduct requires dismissal of its copyright claim. Courts have held that a party who provides *de facto* authorization to another party to use a copyrighted work cannot later change its mind and sue for infringement.  *See, e.g.*, *Gillani Consulting Inc. v. Daewoo Heavy Indus. Am. Corp.*, 300 F. App'x 466, 467 (9th Cir. 2008) (waiver); *Rouse v. Walter & Assocs., L.L.C.*, 513 F. Supp. 2d 1041, 1069 (S.D. Iowa 2007) (estoppel); *Keane Dealer Servs., Inc. v.*, 968 F. Supp. at 947 (S.D.N.Y. 1997) (implied license).  As set forth above in § I.B, this is exactly what happened here.  Based on the same equitable principles that underlie the contractual defense of waiver, FICO has waived or is estopped from asserting any copyright violation.

### III.   FICO'S CONTRACT CLAIM BASED ON FEDERAL'S POST-MERGER USE FAILS.

#### A.   Federal Was Not Required to Obtain FICO's Consent as a Result of the Merger (No Breach of § 10.8).

Federal did not breach § 10.8 of the License because (a) consent was not required for an assignment-by-merger in the absence of expanded use, and (b) there was no "change of control" as required by § 10.8.

##### 1.   Section 10.8 does not apply because there was no expanded use at the time of the merger.

By its plain terms, § 10.8 only required Federal to obtain FICO's written consent if a merger caused Federal to "expand" its use of Blaze.  Section 10.8, in relevant part, states:

> **[1]** Neither party shall, without *the prior written consent* of the other party, assign or transfer this Agreement, or any part thereof.  **[2]** In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization, or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides *such written consent*, which will not be unreasonably withheld.

(Fleming Decl., Ex. 3 (numbering and emphasis added).)

The meaning of this paragraph is clear from the structure of the text. The first sentence applies to an assignment to an unrelated entity, and forbids any such assignment in the absence of FICO's approval.  Such a restriction makes sense, as FICO would not expect to be dealing with a new customer under a license it had sold to a completely different entity.

21

The second sentence applies only to assignments to an entity that is now different due to an organizational change such as merger, acquisition, or reorganization.  Since the assignee is *related* to the client, FICO's rights to object are also diminished.  Under sentence two, the consent referenced in sentence one (called "such consent") is handled differently and is more constrained.  Such consent is required only if there is "expanded use," and in that event it "will not be unreasonably withheld."  Thus, when an assignment falls within the scope of sentence two, only one written consent is required, namely written consent to "expanded use of the Fair Isaac Products as a result of any such event." (*Id.*)  Because Federal agreed that use would not be expanded, but would simply continue as it had under the License Agreement, Federal was allowed to continue using the software under the License Agreement.  (*Id.*, Ex. 24.)

> ### 2.      Section 10.8 does not apply because there was no "change of control" within the meaning of § 10.8.

Moreover, § 10.8 only applies to the 2016 transaction "in the event of a change of control of" Federal.  (*Id.*, Ex. 3.)  However, it was Federal's parent corporation that changed ownership, not Federal itself.  (Taylor Decl., ¶ 6.)  It is black letter law "that a parent is considered a legally separate entity from its subsidiary." *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014).  Accordingly, § 10.8 of the License Agreement is not triggered by the 2016 transaction, and FICO's claim should be dismissed for this independent reason.[7]

---

[7] As noted above, "Chubb & Son, Inc." was the named Defendant at the time of the Motion to Dismiss, and the Motion accepted all pleaded facts as true.  The Court's Order regarding Federal's Motion to Dismiss left the issue of whether there was a change of

**B.  FICO's Claim for Breach of § 10.8 Fails Because FICO was Prohibited from Unreasonably Withholding Consent.**

The § 10.8 claim should be dismissed because there is no evidence that FICO has ever had, let alone articulated, a reasonable basis for withholding consent.  Section 10.8 requires FICO not to unreasonably withhold consent.  In such circumstances, Federal's continued use of Blaze in the absence of consent does not constitute a material breach of contract.  *See Hess Energy, Inc. v. Lightning Oil Co.*, 276 F.3d 646, 650 (4th Cir. 2002).

In *Hess*, the defendant alleged that the plaintiff had materially breached a no-assignment clause when the plaintiff underwent a merger.  *Id.* at 647-48.  The court rejected this argument and did not allow the defendant to terminate the agreement because that contract provided that consent could "not be unreasonably withheld."  *Id.* at 648.  The court reasoned that "[t]his contractual test of materiality therefore rests on the assignment's reasonableness . . . where there is no legitimate reason to withhold consent, skipping the step of asking for consent does not constitute a material breach."  *Id.* at 650.

The only thing FICO ever asked Federal for in the post-merger negotiations was additional fees.  This is important, as the evidence shows that FICO knew that the License Agreement did not textually allow it to seek such fees.  (Fleming Decl., Ex. 7 at 273:1-277:5; Ex. 21.)  Even if FICO were to now claim that it had a reasonable basis to withhold consent, such as Federal's unwillingness to pay all the extra license fees that FICO demanded, this claim must fail.  FICO's desire to collect additional fees is not a

---

control open.  (Dkt. No. 28 at 7-8 ("on the existing record, the Court cannot conclude that [Federal's] alternative interpretation of this aspect of Section 10.8 of the License is unreasonable.").)

valid reason to withhold consent under the New York law which the contract selects as controlling. *Silver v. Rochester Sav. Bank*, 73 A.D.2d 81, 86 (N.Y. App. Div. 1980) (holding that a party "may not condition an approval on an increase" in fees where the parties "expressly agreed that [defendant] would not unreasonably withhold its consent").

## IV.   FICO'S CLAIM FOR COPYRIGHT INFRINGEMENT BASED ON FEDERAL'S POST-MERGER USE FAILS AS A MATTER OF LAW.

FICO asserts that Federal's post-merger use of Blaze constitutes copyright infringement. As with its claim based upon its global use, FICO's copyright claim based on post-merger use fails as a matter of law.

### A.   Section 10.8 Does Not Give Rise to a Copyright Claim.

It is black letter law that "[b]efore [a] plaintiff can gain the benefits of copyright enforcement, it must definitively establish that the rights it claims were violated are copyright, not contractual rights." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121-22 (9th Cir. 1999). Whether an alleged breach of contract can give rise to a copyright claim thus "turns—and fails—on the distinction in contract between a condition and a covenant." *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). Where the contract term at issue is merely a contractual covenant, as opposed to a condition, a licensor only has a claim for breach of contract. *Id.* at 236-37; *see also Russian Entm't Wholesale, Inc. v. Close-Up Int'l, Inc.*, 767 F. Supp. 2d 392, 408 (E.D.N.Y. 2011), *aff'd*, 482 F. App'x 602 (2d Cir. 2012); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 122 (S.D.N.Y. 2015). Additionally, if there is any doubt as to whether a term is a condition or a covenant, New York law (which applies here) "respects a presumption that

terms of a contract are covenants rather than conditions." *Graham*, 144 F.3d at 237. Thus, courts regularly reject copyright claims where they are found to rest on terms in a license agreement that are even arguably covenants. *See, e.g., id.; Spinelli*, 96 F. Supp. 3d at 122; *Russian Ent'mt Wholesale, Inc.*, 767 F. Supp. 2d at 408; *Actuate Corp. v. Fid. Nat'l Info. Servs., Inc.*, 2014 WL 4182093, at *3 (N.D. Cal. Aug. 22, 2014) (dismissing infringement claim where "the gravamen of [plaintiff]'s direct infringement claim is for unpaid use and distribution of the Software, which are not cognizable as copyright infringement").

Section 10.8 cannot support a copyright infringement claim because it is a contractual covenant under New York law, which gives rise only to a claim for breach of contract. The court recognized as much in *Netbula, LLC v. Storage Tech. Corporation*, which involved a similar assignment provision in a software license agreement. 2008 WL 228036, *8 (N.D. Cal. 2008). In *Netbula* the plaintiff alleged a copyright infringement claim against a software licensee following a merger. Id. at *8. The district court rejected this claim and granted summary judgment to the defendant, recognizing that under the principles described above an assignment clause "does not limit the scope of the license and is instead an independent contractual covenant." *Id.* at *9. The relevant facts are indistinguishable between this case and *Netbula*. Therefore, Federal is entitled to summary judgment on FICO's § 10.8 copyright claims.

**B.    FICO had No Valid Basis to Terminate the License Under § 10.8, Which Means Federal's Continued Use Cannot Give Rise to an Infringement Claim.**

As noted above, FICO did not violate § 10.8 in connection with the merger, meaning FICO had no basis whatsoever to terminate Federal's license to use Blaze. Because a license is a complete defense to an infringement claim, FICO's claim fails for this reason alone. *Keane Dealer Servs., Inc.*, 968 F. Supp. at 947.

**V.    FICO'S CLAIMS FAIL BECAUSE ITS DAMAGES CLAIMS ARE SPECULATIVE.**

Non-speculative evidence of damages is an essential element of FICO's breach of contract and infringement claims. *See, e.g.*, *Document Sec. Sys., Inc. v. Coupons.com, Inc.*, 55 F. Supp. 3d 485, 497 (W.D.N.Y. 2014); *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016). FICO is seeking "lost license fees" as a measure of its damages. (Fleming Decl., Ex. 32 at 39.) FICO has the burden of establishing the "fair market value" of a Blaze license to proceed to trial on a claim for lost license fees, and FICO has failed to do so here. *Nucor Corp. v. Tennessee Forging Steel Serv., Inc.*, 513 F.2d 151, 153 n.3 (8th Cir. 1975) (copyright); *Document Sec. Sys., Inc.*, 55 F. Supp. 3d at 497 (breach of contract).

FICO's purported "evidence" in support of its claim for lost license fees is too speculative to survive summary judgment. FICO has not presented *any* evidence of "fair market value," as it must to assert a valid claim. Rather, FICO has relied entirely on testimony from Waid. (Fleming Decl., Ex. 32 at 40 ("For my calculations, I relied upon William Waid…"), *see also id.* at Schedules 6.0, 6.1, 7.0, 7.1 (citing Waid extensively in

"Notes/Sources"); *see also, generally* Mtn. to Exclude Zoltowski at 7-23.)  Unsupported testimony from an employee is insufficient to establish the market rate for lost license fees as a matter of law. *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4366990, at *11, *43 (S.D. Tex. Oct. 27, 2010) (granting summary judgment to defendant where plaintiff relied on biased affiant as evidence of lost license fees).

Moreover, Waid's testimony is entirely contradicted by the evidence in this case. Waid calculates FICO's damages based on separate licenses for each of Federal's applications and uses an annual fee, in contrast to the enterprise-wide, perpetual license that Federal originally purchased and that FICO generally sells to companies of Federal's size. (Dkt. No. 77, Declaration of William Waid, at ¶ 9; Fleming Decl., Ex. 33 at

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████   While FICO claims it is "incapable" of calculating an enterprise-wide license fee here, this admission only further illustrates that its damages claims are speculative and must be dismissed. (Fleming Dec., Ex. 41 at 3); *Document Sec. Sys., Inc.*, 55 F. Supp. 3d at 497 ("Plaintiff reiterated that . . . each client was

unique. Therefore, even viewing the disputed facts in the light most-favorable to Plaintiff, any attempt by Plaintiff to establish [damages] here would be unduly speculative.").

## VI.   FICO'S DAMAGES ARE LIMITED BY CONTRACT

The License Agreement contains a "limitation of liability" clause, that precludes FICO from obtaining "indirect, incidental, special, exemplary, consequential (including, but not limited to, loss of income, profit or savings) or punitive damages," and limits recovery to "the amount paid by client (excluding implementation fees and reimbursed expenses) of the applicable Fair Isaac product or service during the 12 months immediately preceding the date of the most recent claim that gave rise to such liability . . . ." (Fleming Decl., Ex. 3 at § 5.6.) FICO's claimed damages in this lawsuit are consequential under New York law and, thus, barred. *See, e.g., PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 371 (S.D.N.Y. 2014).

While the limitation of liability clause contains an exception for the "violation of Fair Isaac's intellectual property, (including unauthorized use)," as set forth above, FICO's copyright claims fail as a matter of law. Moreover, the clause explicitly applies to breach of contract claims. Accordingly, FICO's claim for contract damages is limited by the damages limitation clause.

## VII.   FICO'S CLAIM FOR DISGORGEMENT OF PROFITS UNDER THE COPYRIGHT ACT MUST BE DISMISSED AS SPECULATIVE AND UNPROVED.

In conjunction with its Copyright Act claim, FICO seeks the remedy of "disgorgement" of indirect profits that Federal allegedly made as a result of the purported

infringement.  It is settled law that indirect profit "disgorgement" is rarely awarded.  *Int'l*

*Bus. Machines Corp. v. BGC Partners, Inc.*, 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25,

2013) ("*IBM*").  Moreover, there is no basis in this case for such an award.

### A.      Standard for Disgorgement of Indirect Profits.

To assert a claim for disgorgement damages under the Copyright Act, FICO

carries the burden of proving by non-speculative evidence that Blaze *caused* Federal's

profits.  *Tri-Mktg., Inc. v. Mainstream Mktg. Servs., Inc.*, No. CIV.09-13(DWF/RLE),

2010 WL 1924456, at *4 n.4 (D. Minn. May 12, 2010).  This causation requirement is

rooted in the Copyright Act, 17 U.S.C. § 504(b), which provides that copyright owners

are only entitled to "profits of the infringer that are attributable to the infringement."

Courts have recognized that § 504(b) has spawned two types of profit disgorgement

claims: indirect and direct.  *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002).

*Direct* profit disgorgement claims arise when a defendant has sold the infringing

product itself.  *Id.*  For example, where a party has sold an item which violates copyright,

such as a pirated movie, it is proper for the copyright holder to recover the profits from

that sale.  In the present case, FICO makes no claim for direct disgorgement damages.

*Indirect* profit disgorgement claims seek to disgorge "revenue that has a more

attenuated nexus to the infringement."  *Id.*  Disgorgement on an indirect profits claim is

"extremely rare" and requires that a party present "detailed evidence linking gross

revenues to the infringement."  *DaimlerChrysler Services v. Summit National, Inc.*, No.

02-71871, 2006 WL 208787 (E.D. Mich. Jan. 26, 2006); *IBM*, 2013 WL 1775437 at *4

n.4.  The Southern District of New York, for example, has noted that indirect profit

claims are "highly speculative [in] nature" and should be allowed to proceed to trial only in "extremely rare" circumstances. *IBM*, 2013 WL 1775437 at *3.

As discussed below, courts in other software cases have rejected attempts to recover indirect disgorgement damages that are far less tenuous than the claim being made by FICO here.

Here, FICO is seeking to disgorge *indirect* profits allegedly caused by Federal's use of Blaze as a component within a few of its many proprietary software applications. The Eighth Circuit has *never* endorsed a disgorgement claim based upon a defendant's use of software and courts in other Circuits have routinely rejected such claims as a matter of law. *See, e.g., IBM*, 2013 WL 1775437 at *3.  In *IBM*, the plaintiff's arguments were nearly identical to FICO's, in that the plaintiff claimed that it was entitled to profits from the use of a "back-office" software program called Informix. *Id.* at *3.  The court rejected IBM's claims because it "failed to proffer sufficient evidence of a 'causal link' between the infringement and the revenues." *Id.* at *4.  The court reasoned as follows:

> BGC did not market or sell the Informix software to its customers and there is no evidence that its customers care what software system it used.  While BGC may have profited from using Informix indirectly in that it enabled BGC to operate more efficiently, courts often deny recovery if the profits are only remotely or speculatively attributable to the infringement.  IBM points to nothing more than BCG's repeated statement that Informix software is 'integral' to its operations and that the sudden removal or failure of the Informix software would have devastating consequences to BCG's operational efficiency. But simply saying that copyrighted material 'may have played an 'important,' 'significant' or 'meaningful' role' is insufficient, particularly where, as part of BGC's information technology infrastructure, it comprises only a portion of what enabled BGC to conduct its business profitably. . . . In the absence of concrete evidence regarding the myriad factors that could influence BCG's customers' decisions to

engage BGC's services, IBM's indirect profits argument is overly speculative.

*Id.* at *4-5.

Courts have consistently rejected other similar attempts in cases involving copyright infringement claims and software.  In *Complex Systems, Inc. v. ABN Ambro Bank N.V.* the court found that the plaintiff could not demonstrate a causal nexus even where "it would take years and tens of millions of dollars to bring an alternative system online."  No. 08 CIV. 7497 KBF, 2013 WL 5970065, *8 (S.D.N.Y. Nov. 8, 2013).  The court emphasized that "[u]se is, of course, not necessarily evidence of causation" and excluded profits evidence even for transactions that "'flow[ed] through' the software." *Id.* at *11.  The court rejected a plaintiff's attempt to disgorge profits based on a defendant's use of infringing software in *DaimlerChrysler Services* even though Chrysler admitted that the software was "so critical to its business that without [it] (or some suitable substitute), it would have had to shut down."  2006 WL 208787 at *1.

### B.    The Undisputed Facts Relevant to FICO's Disgorgement Claim Show that No Profits of Federal are Attributable to Blaze.

#### 1.    Blaze plays a minor role in Federal's business.

The precedents cited above are on all fours with the present case, and compel the conclusion that FICO has no claim for indirect disgorgement.  These precedents are especially germane where, as here, the software at issue plays an even more limited role in the business at issue.  Blaze is an exceedingly minor piece of the business operations at Federal and ACE American.  (Pandey Decl., ¶ 4.)  For example, Blaze is one of approximately twenty third-party technologies that make up just one of Federal's

proprietary applications called CSI eXPRESS.  (*Id.*)  CSI eXPRESS, in turn, is just one of approximately 1,500 software application that Federal uses.  (*Id.*)  Of these 1,500 applications, approximately ten have utilized Blaze at any time since Federal purchased the License.  (*Id.*)  Thus, Blaze's use within CSI eXPRESS, expressed as a percentage of all of Federal's technologies, is 0.06% of Federal's technologies.  (Fleming Decl., Ex. 2 at ¶ 90.)

These key facts do not even begin to account for the importance of non-technological, human activity within Federal's business.   For instance, with respect to rate development, it is Federal's human actuaries who determine the overall target price for insurance products and premium revenue rates, as limited by state law and other matters – not Blaze.  (*Id.*, ¶¶ 44-45, 61; *see also* Taylor Decl., ¶ 12.)  Blaze does not (and cannot) be used in these rate development activities without human expertise and intelligence.  (Fleming Decl., Ex. 2, ¶¶ 51, 61.)   Similarly, it is Federal's human underwriters who determine whether and on what terms to write policies and undertake risks, which decisions are not dictated by any technology.  (*Id.*, ¶¶ 44, 47; *see also* Taylor Decl., ¶ 13.)  Federal's team of highly-skilled insurance product managers, not Blaze, establish the coverages for the policy and the underwriting business rules by which various policies would be sold.  (Fleming Decl., Ex. 2, ¶ 61; *see also* Taylor Decl., ¶ 14.)

Overall, Federal performs and completes thousands of business activities to sell and service insurance policies, and Blaze plays a very small role in this business-processing ecosystem.  (Fleming Decl., Ex. 2, ¶¶ 59, 74.)  Each activity potentially has business rules and decisions, yet only a fraction of Federal's business rules and decisions

were ever loaded into Blaze.  (*Id.*, ¶ 69.)  Taking it a step further, the small fraction of business rules and decisions that were loaded into Blaze were developed by Federal's employees, i.e. the skilled actuaries, product managers, underwriters, compliance managers, etc., who created and developed the business rules and decisions based on their insurance industry expertise.  (*Id.*, ¶¶ 44, 52, 58.)  The Court need look no further than these facts to see that FICO's claimed connection between Federal's profits and Federal's use of Blaze amounts to pure speculation.

> **2.    Blaze does not generate profits; it is simply a software component that implements business rules created by *Federal's* employees and operations.**

Business rules are a company's business logic derived from the company's employees using their industry expertise.  Federal developed its business logic over decades of successful operations as an insurance company.  Federal's accumulated expertise in the insurance industry is the basis for its human-designed business rules. (Fleming Decl., Ex. 11 at 54:5-25.)

A BRMS like Blaze is merely the software into which a customer's business rules are loaded.  (*Id.*, Ex. 2, ¶ 70.)  Blaze cannot be used "out of the box," or as it is purchased.  (*Id.*, Ex. 11 at 11:13-19.)  Blaze is not tailored in any way to the insurance industry or any particular insurer.  (*Id.*, Ex. 2, ¶ 72.)  Rather, to be used, Blaze must be populated with Federal's business rules.  The rules used in Blaze come from Federal. (*Id.*, Ex. 11 at 24:17-23.)   In other words, Blaze is analogous to a blank Excel spreadsheet.  (*Id.*, Ex. 2, ¶ 26.)  FICO's proposed expert, Whitener, agrees that the business rules are generated by Federal, based upon Federal's expertise.  (*Id.*, Ex. 42 at

27:14-22; 53:22-54:1 (Q: "The defining of the rules comes from the expertise of the underwriters and the other business people at the insurance company, correct?"   A: "Correct.").)  In these circumstances, it is clear that *Federal's* work generates any profits it made.  FICO therefore cannot satisfy its burden of proving causation based on this set of undisputed facts.

> ### 3.  FICO's own causation expert has admitted that he does not know whether Blaze actually caused *any* profits for Federal.

As stated above, FICO has the burden of presenting detailed evidence showing that Blaze in fact caused a portion of Federal's profits.  *Complex Sys., Inc.*, 2013 WL 5970065, at *5.   This is an essential element of FICO's claim for disgorgement. However, FICO has no evidence of this nature.  In fact, FICO's own proposed expert agrees that he *does not know whether Blaze actually caused **any** profits*. (Fleming Decl., Ex. 42 at 13:19-14:1, 135:14-141:4, 154:11-15, 157:24-158:3.)  Moreover, just as in *IBM* and *Complex Systems*, Whitener admitted that Federal's own customers "do[] not see or care about any of the technologies that an insurance company takes to . . . fulfill its insurance process."   (*Id.* at 75:2-78:20.)   Whitener has thus done nothing to rebut Federal's expert, who correctly points out that it is impossible to tie profits to such a "small technology of a very large company ecosystem of people, process, and technology." (*Id.*, Ex. 2 at ¶¶ 21-31.)

> ### 4.  FICO cannot recover profits from parties it has not named in this lawsuit.

Even if FICO had presented any evidence of causation (it has not), it would still be barred from recovering profits on approximately $29.5 billion of the $30.9 billion in

gross revenue it has put forth because these revenues come from entities that are not named as parties in this litigation.  (*Id.*, Ex. 32, Zoltowski Rep. at Schedules 8.0, 9.0., 12.0.)  Zoltowski's testimony makes clear that he came up with this "single economic unit" theory only after discussions with counsel.  (Fleming Decl., Ex. 43 at 97:2-24.)

It is basic law that due process does not allow recovery from non-parties to a lawsuit.  *North Atlantic Distribution Inc. v. Teamsters Local Union No. 430*, 497 F. Supp.2d 315 (D. R.I. 2007).  Moreover, under the Copyright Act "[i]nsofar as there is liability for illegal profit, the liability is several; one defendant is not liable for the profit made by another."  *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir. 1981) (collecting cases); *see also Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 517 (4th Cir. 2002) ("each defendant is only liable to the copyright plaintiff to the extent of its own profits derived from the infringing activity").  Accordingly, FICO's unsupported attempt to recover from nonparties must be rejected.

## VIII.  FICO'S CLAIMS AGAINST ACE AMERICAN FAIL.

FICO has also asserted copyright claims against ACE American.  (Dkt. No. 132, Second Amd. Cmplt., ¶¶ 61-68.)  FICO's claims against ACE American fail for the same reasons that its claims against Federal fail.  Therefore, ACE American is entitled to summary judgment dismissing FICO's claims against it.

## IX.   FEDERAL IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM FOR BREACH OF CONTRACT BECAUSE FICO MANUFACTURED ITS CLAIMS.

Federal's breach of contract counterclaim is straightforward.  FICO did not have a legitimate reason to terminate the License, and therefore its purported termination is a

breach.    Section 9 enumerates the specific circumstances under which FICO may terminate the License, none of which were satisfied here.    FICO claims that § 9.2(a) authorized it to terminate the agreement based on Federal's failure to obtain consent following the merger.    (Dkt. No. 132, ¶ 19.)    However, § 9.2(a) only authorizes termination based on a "material" breach of the agreement and, as explained above in Section III, Federal's failure to obtain consent does not constitute breach, let alone material breach.    (Fleming Decl., Ex. 3.)    FICO also claims that § 9.2(c), which authorizes termination if Federal "violates any terms of [its] licenses," justified termination based on the Blaze usage by Federal's foreign affiliates.    (Dkt. No. 132, ¶ 28.)    As explained above in Section I though, there is no territorial restriction on Federal's license to use Blaze.    Thus, FICO's termination of the License in violation of § 9 is a breach of the License.    FICO's breach has caused damage to Federal in the form of the costs Federal has incurred and will incur to replace Blaze in its applications.    (Pandey Decl., ¶ 8.)    Accordingly, summary judgment should be granted on Federal's counterclaim.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request the Court grant their motion for summary judgment.

Dated:  July 26, 2019

s/ Terrence J. Fleming
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000

*Attorneys for Defendants*