# Exhibit 1
# (Redacted)
# (Previously Filed Under Seal as Dkt. 487)

```
 1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
     - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 3
     FAIR ISAAC CORPORATION,
 4
                   Plaintiff,
 5
         v.              Court File No. 16-cv-1054 (WMW/DTS)
 6
     FEDERAL INSURANCE COMPANY,
 7   an Indiana corporation, and ACE
     AMERICAN INSURANCE COMPANY,
 8   a Pennsylvania corporation,

 9                 Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11                      VIDEO DEPOSITION

12          The following is the video deposition of

13   RANDOLPH BICKLEY WHITENER, taken before Jean F.

14   Soule, Notary Public, Registered Professional

15   Reporter, pursuant to Notice of Taking Deposition,

16   at the law office of Fredrikson & Byron, P.A.,

17   200 South Sixth Street, Suite 4000, Basswood

18   Conference Room, Minneapolis, Minnesota, commencing

19   at 8:56 a.m., Thursday, June 27, 2019.

20

21                      *    *    *

22

23
                                                    EXHIBIT
24              C O N F I D E N T I A L
                                                       1
25              ATTORNEYS' EYES ONLY
```

```
 1   APPEARANCES:

 2
         On Behalf of the Plaintiff:
 3
             Allen W. Hinderaker, Esquire
 4           MERCHANT & GOULD, P.C.
             3200 IDS Center
 5           80 South Eighth Street
             Minneapolis, Minnesota 55402-2215
 6           Phone:  (612) 332-5300
             e-mail:  ahinderaker@merchantgould.com
 7

 8       On Behalf of the Defendants:

 9           Leah C. Janus, Esquire
             Christian V. Hokans, Esquire
10           FREDRIKSON & BYRON, P.A.
             200 South Sixth Street
11           Suite 4000
             Minneapolis, Minneosta 55402-1425
12           Phone:  (612) 492-7000
             e-mail:  ljanus@fredlaw.com
13                    chokans@fredlaw.com

14
         Also Present:  James Woodward, Esquire
15                      Vice President, Legal
                        Fair Isaac Corporation
16

17
         The Videographer:  Mr. Scott Breckheimer
18

19

20

21

22

23

24

25
```

**Advisor, and if the rule is you can't do this if the person is age 21 and under and you want to change that to 25 and under, you highlight the 1, and you press the delete key, you type in 5, and then you save it.**

THE WITNESS: Thank you, Allen.

MR. HINDERAKER: You're welcome.

BY MS. JANUS:

Q. Did the presentation yesterday or the demo yesterday refer in any way to Federal?

A. No.

Q. Did Thiago discuss Federal's use of Blaze?

A. No.

Q. Do you know whether Thiago had any knowledge of Federal's use of Blaze?

A. No.

Q. Did you discuss the deposition today with Thiago?

A. No.

THE WITNESS: Excuse me. My sinuses are not particularly fond of Minnesota, the great State of Minnesota.

MS. JANUS: We've been going about an hour. If you want to take a quick break?

Page 39

THE WITNESS: I think I can go like ten more minutes.

MS. JANUS: Okay.

THE WITNESS: But I am going to need a break shortly.

MS. JANUS: All right. Well, why don't we just break now and then --

THE WITNESS: That's fine.

MS. JANUS: -- we can reconvene.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Going off the record. The time is 10:00 a.m.

(Break from 10:00 to 10:08.)

THE VIDEOGRAPHER: We're back on the record. The time is 10:08 a.m.

BY MS. JANUS:

Q. You have referred to artifacts several times this morning. What do you mean by that?

A. **I mean the case documents that I have been provided for reading, review and use. Artifacts is a -- is a insurance industry technological term. All business requirements, for instance, are referred to as artifacts.**

Q. Other than the demo that you received from Thiago, have you had any other conversations

Page 40

with anyone in preparing your reports?

MR. HINDERAKER: Again, exclusive of lawyers.

THE WITNESS: Well, then, my response is exclusive of attorneys, no.

BY MS. JANUS:

Q. Okay. And the demonstration you had yesterday with Thiago was the first time that you had talked with anyone at FICO other than Bill Waid, correct?

A. Yes, that is correct.

Q. You refer to the conversation you had with Bill Waid on November 12th, 2018, in your report. Was that a conversation over the phone?

A. Yes.

Q. How long did it last?

A. Oh, I'm sorry, I couldn't guess. If **you want me to pull a number out of the air, I'd say 45 minutes. It was -- it was longer than 15 minutes and it was less than two hours, 45 minutes.**

Q. And did you only have one conversation with Mr. Waid?

A. **That is correct.**

Q. What did you discuss with Mr. Waid

Page 41

during the conversation?

MR. HINDERAKER: I believe there were lawyers involved --

THE WITNESS: That is correct.

MR. HINDERAKER: -- in that conversation. So we'll maintain a work product and a privilege objection. I don't have any quarrel with you asking about whether any of that conversation bears on the opinions that are reported. But the conversation per se with the lawyers involved and the work product, I -- I instruct you not to disclose that.

BY MS. JANUS:

Q. Did your conversation with Bill Waid inform any of the opinions that you have in this matter?

A. No.

Q. Why did you list it under information considered in your report on page 1?

A. **Because I felt that not to list it would be erroneous on my part, because I, in fact, talked with him.**

Q. Okay. And your testimony is that none of the information that you obtained during your conversation with Mr. Waid has any bearing at all

Page 42

```
 1  on your opinions in this matter?
 2      A.   Correct.
 3      Q.   What topics did you discuss with
 4  Mr. Waid during the call in November 12th?
 5           MR. HINDERAKER: I object to that as
 6  work product and attorney-client privilege.
 7  BY MS. JANUS:
 8      Q.   Are you --
 9           MR. HINDERAKER: And I instruct you
10  not to answer.
11  BY MS. JANUS:
12      Q.   Are you following that instruction?
13      A.   I am.
14      Q.   What questions did you ask Mr. Waid
15  during your conversation on November 12th, 2018?
16           MR. HINDERAKER: I have the same
17  objections, and I instruct you not to answer.
18           THE WITNESS: I follow the advice of
19  counsel for plaintiff.
20  BY MS. JANUS:
21      Q.   What answers did Mr. Waid give to the
22  questions that you asked him on November 12th, 2018?
23           MR. HINDERAKER: I have the same
24  objections, and I instruct the witness not to
25  answer.
                                          Page 43
```

```
 1           THE WITNESS: I comply with plaintiff
 2  counsel's request.
 3  BY MS. JANUS:
 4      Q.   Did -- Who was present on the phone
 5  call with Mr. Waid on November 12th, 2018?
 6      A.   There were four people involved in the
 7  phone call, myself, Mr. Waid and two lawyers.
 8           THE WITNESS: The lawyers names?
 9           MR. HINDERAKER: If she wants to know,
10  that's fine.
11           THE WITNESS: Mr. Woodward and
12  Missus -- if I wouldn't --
13           MR. HINDERAKER: Kliebenstein.
14           THE WITNESS: Yeah, Mrs. Kliebenstein.
15  I always -- I don't get -- I don't have a problem
16  with the Stein, it's the Klee (phonetic), because
17  I'm prone to turn her into a Kly (phonetic). I'm
18  sorry, continue, please.
19  BY MS. JANUS:
20      Q.   All right. Let's talk about your
21  education and experience, which begins on page 2 of
22  your report.
23      A.   I'm there.
24      Q.   Okay. You write that you "have worked
25  in many parts of the insurance industry, including
                                          Page 44
```

```
 1  underwriting, financial management, planning,
 2  product development, project management, general
 3  (field operations) management, and business
 4  management of technology," correct?
 5      A.   That is correct.
 6      Q.   And so would you say it's a fair
 7  characterization that most of your experience in
 8  the insurance industry does not directly relate to
 9  technology?
10      A.   No.
11      Q.   Only one of the categories of
12  experience that you list -- and having worked in
13  many parts of the insurance industry -- includes
14  any direct connection to technology, correct?
15      A.   I agree with that statement.
16      Q.   Okay. And that's the last one that
17  you list, the business management of technology,
18  correct?
19      A.   Correct.
20      Q.   You say you've had experience
21  underwriting, correct?
22      A.   Correct.
23      Q.   And as -- when you say experience
24  underwriting, describe what type of experience,
25  just in general terms, you're referring to?
                                          Page 45
```

```
 1      A.   As an underwriter -- I was an
 2  underwriter twice, in Hartford, Connecticut, and
 3  in -- the second time in Washington, D.C. My
 4  general responsibilities will be similar to --
 5  which you will hear almost any underwriter describe,
 6  I was responsible for interfacing with and selling
 7  The Hartford to independent agents in a -- a
 8  specific defined territory. I was responsible for
 9  underwriting for that group of agents, every new
10  business application that came in that they
11  submitted. I was responsible for reviewing and
12  underwriting any changes to policies that were
13  submitted by those agents that required
14  underwriting attention. I was responsible for
15  reviewing renewals that were come -- policies that
16  were coming up for renewal to determine whether we
17  wanted to make any modifications or we were just
18  going to allow the renewal to continue as is. I
19  was responsible for underwriting what The Hartford
20  called risk alerts. So if the claims department
21  flagged a specific claim as needing scrutiny and
22  that claim was for a policy submitted by one of the
23  agents for which I was responsible, I would review
24  that policy almost immediately after the claims
25  occurrence had taken place. That's a 50,000 foot
                                          Page 46
```

**Page 47**

1 overview.
2   Q.   Okay. I take it in your work as an
3 underwriter, your expertise, your personal
4 expertise was important to the performance of your
5 underwriting duties?
6   A.   Yes.
7   Q.   Your personal judgment was crucial in
8 the performance of your underwriting duties, correct?
9   A.   Yes.
10  Q.   Would you say your expertise and
11 judgment in underwriting were the most important
12 aspects of your success as an underwriter?
13  A.   No.
14  Q.   What was?
15  A.   I -- I do not undervalue the
16 importance of that expertise. However, that is one
17 part of a Rubik's Cube.
18       So my ability to have a high level
19 of -- are you familiar with the phrase EQ, emotional
20 quotient, and be able to interface with a very,
21 very diverse agency plant and then a very, very
22 diverse group of people inside of the agency plant
23 in combination with various other departments, such
24 as claims, loss control, marketing, and my peers in
25 other underwriting departments, such as bond and

**Page 48**

1 commercial lines, was very important. That's one
2 of the reasons I like the underwriting, because you
3 actually have your hands in so much of the business.
4   Q.   So you're -- you said emotional
5 quotient?
6   A.   Yes.
7   Q.   And do you sometimes refer to that as
8 emotional intelligence?
9   A.   Some people do.
10  Q.   Okay.
11  A.   When I grew up, it was EQ. Now it's
12 EI.
13  Q.   Okay. And that --
14  A.   But it's the same thing.
15  Q.   Same thing, okay. And so your EQ or
16 EI was crucial to your success as an underwriter?
17  A.   Agreed.
18  Q.   Okay. Did you use technology as an
19 underwriter with The Hartford?
20  A.   Define technology, please. A
21 Monroe -- a Monroe JD-30 calculator is technology.
22 I had a Monroe JD-30 calculator on my desk. Okay.
23 Did I interface and type into the policy admin
24 system? No.
25  Q.   Okay. So The Hartford had a policy

**Page 49**

1 admin system?
2   A.   Multiple admin policy systems.
3   Q.   But you did not use the policy admin
4 system as an underwriter?
5   A.   This was 1977, that is correct.
6   Q.   Did you as an underwriter define rules
7 that were used by The Hartford to underwrite
8 insurance?
9   A.   At what point in time?
10  Q.   Any point in time?
11  A.   Yes.
12  Q.   Okay. When did you do that?
13  A.   That would have been when -- pardon
14 me. That would have been when I was now back --
15 back up in home office, excuse me, and had come
16 back to the underwriting department from the
17 planning department.
18  Q.   Do you have a rough time period on
19 that?
20  A.   Um, I believe I came back from the
21 planning department in late nineteen eighty -- yes,
22 '84, yeah, give or take a century.
23  Q.   And we'll go through the experience
24 that you've listed. But just in general terms,
25 what was your role in creating rules that were used

**Page 50**

1 in the underwriting process?
2   A.   We would have an annual review. So,
3 at this point, I was in what was called the line of
4 business. Today you would know it as the product
5 department, and we would -- we would have an annual
6 review using multiple data sources, actuarial data,
7 profit and loss statements for our various products
8 by jurisdiction, and that jurisdiction was down
9 into the individual rating territory, and we would
10 look and we would see if we wanted to modify our
11 rules, add rules, subtract rules, change from 21 to
12 25, change from sand and gravel to U-Haul vans,
13 kind of a thing.
14  Q.   So you looked at the data that you had
15 based on past performance, correct?
16  A.   I'm not -- I'm not sure I understand
17 the question.
18  Q.   Well, you described --
19  A.   As it relate -- as it relates to my
20 time at The Hartford?
21  Q.   Yes.
22  A.   Okay. Now restate the question,
23 please.
24  Q.   Okay. So you -- you -- you were
25 describing the process of creating rules when you

Page 51

1 were at the Hartford?
2   A.   Yes.
3   Q.   And it sounds to me like you would
4 look at the data from past performance for a given
5 product; is that correct?
6   A.   As long as you put an "S" on the end
7 of it, that's correct, products.
8   Q.   Products.
9   A.   Yeah.
10  Q.   Okay. And -- and then you, based on
11 your expertise and experience as an underwriter,
12 would decide whether to change the rules that were
13 in place, keep them the same, add rules, et cetera?
14  A.   Yeah.
15  Q.   Okay.
16  A.   Yes.
17  Q.   And where did those rules reside when
18 you were at The Hartford?
19  A.   In keeping with Mr. McCarter's reply
20 or rebuttal of my report, they were hard coded in
21 Cobalt.
22  Q.   For someone who is not in the
23 industry, what does hard coded in Cobalt mean?
24  A.   Programmed in a language that
25 insurance companies would prefer not to use today

Page 52

1 in modern technology times. So Cobalt is a
2 proga -- programming language, and I -- I could not
3 go up to a computer with a technologist at any
4 insurance company and have them bring up on their
5 screen Cobalt programming language and decipher
6 what's going on. I don't -- I don't write or speak
7 Cobalt.
8   Q.   So you don't know exactly how Cobalt
9 works?
10  A.   That is correct. I know -- I know
11 what my responsibility was, was to define the new
12 rules that we wanted to implement, the existing
13 rules that we wanted to modify or any rules that we
14 wanted to take out of the production system and
15 write the business requirement for it, make sure
16 that the business requirement was testable -- that,
17 by the way, requires a conversation with the IT
18 folks -- and then rely on my IT compatriots to
19 implement the rule, test it and make sure it was
20 doing as prescribed.
21       I would have -- if the -- if the IT
22 people had any questions about the test results,
23 they would come see me, but I was not heavily
24 involved in the testing.
25  Q.   When you say "the business

Page 53

1 requirement," what do you mean?
2   A.   It is the responsibility of the
3 business unit to articulate what they want the
4 technology to do. That articulation is called a
5 business requirement.
6   Q.   So your role was really on the
7 substantive development of the rules?
8   A.   I don't understand the question,
9 substantive development of the rules.
10  Q.   The defining of the rules?
11  A.   It was not limited to that, but I did
12 do that, yes.
13  Q.   Okay. I take it you would agree that
14 there's a substantial amount of value to the
15 insurance company in defining the rules?
16  A.   I disagree with that statement in
17 isolation. There is a high value to an insurance
18 company in defining the rules and having the -- I'm
19 going to call it processes in place that make sure
20 the rules are executed. There's a difference
21 between defining the rules and executing the rules.
22  Q.   Okay. The defining of the rules comes
23 from the expertise of the underwriters and the
24 other business people at the insurance company,
25 correct?

Page 54

1   A.   Correct. Inside of the insurance
2 company's organizational construct where defining
3 the rules is their responsibility.
4   Q.   And if --
5   A.   That could be -- it could be product,
6 it could be underwriting, it depends.
7   Q.   You would agree with me that if the
8 rules are not defined properly, the insurance
9 company will not make money, correct?
10  A.   I will agree with you that if the
11 rules do not reflect accurately the company's risk
12 appetite and their definition of acquiring adequate
13 accurate premium, the result of that will be losing
14 money on those policies.
15  Q.   So, without good rules, an insurance
16 company cannot make money, correct?
17  A.   That is part of the scenario, correct.
18  Q.   Well, you'd agree with me, I take it,
19 as an experienced underwriter that it's the most
20 important part of the scenario, correct?
21  A.   Again, I don't agree with that,
22 because I believe you are not accounting for the
23 fact that after the rules are authored they have to
24 be executed, and one of our -- one of every
25 insurance company's processes is the consistent

**Page 55**

weekly, monthly, quarterly, annually review of the quality of the decisions their underwriters are making. Not all underwriters are created equal.

    In a best case scenario, I would agree with your statement. If every underwriter were an A-plus player, I would agree that.

Q. Okay. If --

A. Every underwriter is not an A-plus player.

Q. So people, differences in people can make a difference in whether the right rules are implemented in the right way, fair?

A. Fair.

Q. But without the right rules, without good rules developed by the insurance company, the insurance company is not going to make any money, correct?

A. I would say that without the right rules, using your nomenclature, the expected performance will be less than if you started the process with the right rules.

Q. I mean, we could easily play this out to say if an insurance company had a rule that consistently caused it to issue policies to businesses that had claims that far exceeded the

**Page 56**

premiums those businesses paid, that would not be a good rule, correct?

A. It would not be a good thing, and they, clearly, would not be good rules, singular or plural.

Q. The definition of those rules would cause the insurance company to lose money in that scenario that I described?

A. Allow me to reiterate. The performance would be less, depending upon the variability of acquiring the correct adequate accurate premium for the lost cause, it could be a small loss, it could be a large loss. It could be less profit depending upon in that range. Insurance is a numbers game.

Q. Would you agree that underwriting insurance policies is a complex process?

A. Is this a general question about insurance? Then I would say it is a complex business. I would say underwriting can be more complex based on the -- you've read my report, I describe market segments, based on the market segment. So, for instance, Federal's specialty unit, I would suspect, but don't know, that their underwriters have a higher level of expertise.

**Page 57**

Whereas, the folks that they have underwriting their main street commercial -- my phraseology, not theirs -- could potentially have a slightly less level of expertise. But I generally describe the insurance industry as a complex business.

Q. There's lots of judgment involved in the insurance industry?

A. There is judgment involved in every industry. There is judgment involved in the insurance industry and the underwriting process because it's pegged to acquire adequate accurate information and adequate premium for the loss cost. You remember the phrase loss cost? Okay. Loss cost, there can be some judgment involved in that.

    I worked for the president of an insurance once -- company once who looked at me and said -- actually looked at one of my friends and said, I can have the most actuarially accurate policy -- or, I'm sorry, price point in the world and not sell a single policy. Okay.

    So there -- depending upon the market segment, the product, the industry classification, there can be relatively more or relatively less -- I'm sorry, your term -- judgment in the process, and that judgment is reflected in both the field

**Page 58**

people interfacing with the agency plant and in the -- and I'm going to use the word product instead of underwriting, because that's -- tends to be a more common phraseology nowadays, those underwriting product people in the definition of the rates, rules and forms for the product. Remember, my experience definition of insurance product is rates, rules and forms.

Q. All right. Looking back at the report, you -- we talked about your experience underwriting, you also talk about financial management, correct?

A. That is correct.

Q. And --

A. A better phrase for that might be financial reporting.

Q. Financial reporting, okay.

    And that experience did not include a expertise in technology, correct?

A. Correct.

Q. So --

A. Although I will -- I will quite frankly say that every number that hit my desk came from a -- from a technology system, but I accepted the data as it was and believed that the technology

**Page 71**

1  A. Said in isolation, that's a correct
2  statement. But, remember, I will -- I will always
3  be taking you back to the Rubik's Cube, it's not
4  just one thing.
5  Q. You said the quality the product is
6  another factor that determines whether a consumer
7  will purchase an insurance product, correct?
8  A. Correct.
9  Q. And we talked about the development of
10 insurance products previously, correct?
11 A. Yes.
12 Q. Those are developed using the expertise
13 of that insurance company, the individuals'
14 knowledge who work there and possibly in
15 consultation with insurance experts, correct?
16 A. Correct.
17 Q. And you also mentioned the value
18 received in connection with the quality of the
19 product, correct?
20 A. Correct.
21 Q. Essentially does the consumer believe
22 that they are paying a fair price for the product
23 they're purchasing?
24 A. There are approximately 328 million
25 humans in the United States. The number of

**Page 72**

1  businesses is not nearly that large, but it's
2  significant. Each of those will establish in their
3  own mind their definition of value.
4     So it's impossible to specifically
5  answer your question. As a general observation,
6  the value is defined by each customer, be it
7  commercial or personal, and it's a combination of
8  things.
9  Q. You mentioned the relationship with
10 the broker?
11 A. Or independent agent.
12 Q. And by that, do you mean the
13 consumer's relationship with the broker or the
14 independent agent?
15 A. I mean both. So you have three
16 parties, correct? So at the left end of the
17 spectrum you have the consumer, be it business or
18 be it personal. At the right end of the spectrum
19 you have the insurance company, and in the middle
20 you have the independent agent or broker. The
21 consumer will primarily focus on the relationship
22 with the independent agent or broker.
23    You will see articles published about
24 expert advice. So the consumer is looking at that
25 broker or independent agent as a provider of, quote

**Page 73**

1  unquote, expert advice. Okay. And, then, the
2  broker is looking at the company for the things I
3  have articulated earlier. The broker, in the
4  relationship with the consumer, will have an opinion
5  about who that broker wants to do business with.
6  Q. So personal relationships between the
7  consumer and the broker and the broker and the
8  insurance company affect decisions about whether to
9  purchase a particular product?
10 A. And affect differently across the
11 three market segments I've articulated.
12 Q. You've said, then, finally, remittance
13 processing?
14 A. Billing.
15 Q. Billing? Okay.
16 A. Well --
17 Q. And how --
18 A. The -- the great thing about
19 remittance processing it's an all-encompassing
20 term. Billing insinuates that it's the demand from
21 the insurance company going out to the consumer or
22 the customer. But when that money comes back in,
23 it's got to be placed in the right bucket. Okay.
24    So I refer to it as remittance
25 processing. It's that all-encompassing ask for

**Page 74**

1  money, get money, put it in the right place.
2  Q. Okay. And how does that in your mind,
3  how does that impact a consumer's decision to
4  purchase an insurance product?
5  A. There are two impacts here. So the
6  first one is, remember, zero times X is zero. So
7  the -- the independent agent -- an independent
8  agent's relationship with any insurance company can
9  be soured if, in fact, the remittance processing
10 process is inefficient or inaccurate.
11    The one thing from -- so I'm going to
12 speak to billing, and I'm going to speak to claims.
13 Okay. One thing an independent agent never wants
14 is for one of their customers to be billed
15 incorrectly, and one thing the insurance company
16 doesn't want is to pay too little or too less on an
17 occurrence. So the insurance company -- I
18 articulate this in my report. The insurance
19 company wants every penny that it's entitled to,
20 not one penny that it is not.
21    The policyholder, when you get to
22 remittance processing, you are playing with their
23 budget and their financial bank statements, and
24 they don't like errors. It's as simple as that.
25 Q. We've been talking about what goes

**Page 75**

1 into a consumer's decision to purchase a given
2 insurance product. I take it you'd agree with me
3 that if an insurance company uses Blaze in some
4 aspect of the process to underwrite an insurance
5 product for a particular customer, that the use of
6 Blaze in and of itself would not influence that
7 customer's decision to purchase the product, would
8 you agree with that?
9     A.   I agree that the direct consumer, be
10 it a business or a family entity, personal lines,
11 does not see or care about any of the technologies
12 that an insurance company takes to -- I'm going to
13 use the word fulfill, fulfill its insurance
14 process, be it policy issuance, be it claims, be it
15 billing. The consumer is oblivious to that. I
16 probably would --
17           MR. HINDERAKER: Go ahead, finish your
18 answer.
19           THE WITNESS: I probably would not
20 make the same statement for the broker.
21 BY MS. JANUS:
22     Q.   So the consumer that you referred to
23 does not care whether Federal uses Blaze in any of
24 its processes in connection with selling or
25 administering a given insurance policy, fair?

**Page 76**

1           MR. HINDERAKER: The question
2 misstates the answer, and I object for that reason.
3           THE WITNESS: May I answer?
4           MS. JANUS: Yes.
5           THE WITNESS: Or respond?
6           MR. HINDERAKER: Yes, you may.
7           THE WITNESS: Okay. Thank you. Just
8 asking for the rules.
9           The consumer cares that the value
10 proposition, a combination of coverages, exclusions
11 and price, meet their needs and their expectation.
12 Okay. The insurance company cares that the -- oh,
13 and, I'm sorry, I need to put speed in there. All
14 right. So -- so if you look at speed of response
15 and you look at adequacy of price in combination
16 with the proposed package, the consumer cares about
17 that. The broker --
18 BY MS. JANUS:
19     Q.   I'm sorry, let me just stick with my
20 question for a moment. I want to make sure I've
21 got an answer to my question.
22          I asked you whether you would agree
23 that the consumer does not care that Federal may
24 use Blaze as a part of its complex processes to
25 issue or underwrite a particular insurance product?

**Page 77**

1           MR. HINDERAKER: I'm going to object
2 to the argumentative nature of that. He was trying
3 to answer --
4           MS. JANUS: No, no, no, no, don't
5 coach him, don't coach him.
6           MR. HINDERAKER: I'm not.
7           MS. JANUS: Al, I'll stop you there.
8           MR. HINDERAKER: Fine.
9           MS. JANUS: Let's not get into that.
10 It was a fair question, it wasn't argumentative.
11          MR. HINDERAKER: And you --
12          MS. JANUS: I want an answer.
13          MR. HINDERAKER: I was just trying to
14 say, he was trying to answer that question. So let
15 him finish his answer, please.
16          MS. JANUS: Please don't raise your
17 voice with me.
18          MR. HINDERAKER: Oh, I wasn't --
19          MS. JANUS: And stop coaching the
20 witness. As soon as I get to a question you don't
21 like, you start coaching. Okay.
22          MR. HINDERAKER: I --
23          MS. JANUS: Let's stop it now. He's
24 your expert, he should be able to handle it.
25          MR. HINDERAKER: I like your --

**Page 78**

1           MS. JANUS: All right. I'm going to --
2           MR. HINDERAKER: I like -- I liked
3 your question.
4           MS. JANUS: I'm going to --
5           MR. HINDERAKER: And I'd like him to
6 have a chance to answer.
7 BY MS. JANUS:
8     Q.   I'm going to ask my question again,
9 and I'd like an answer to it, and I think -- I
10 think your previous answers pretty obviously
11 suggest this. I just want to make it clear on the
12 record, as I'm entitled to do, I'm entitled to
13 create the record.
14          You would agree with me, I take it,
15 based on your previous testimony, that a consumer
16 making a decision to purchase an insurance product
17 from Federal does not care whether or not Blaze was
18 used at any point in the process of selling or
19 underwriting that insurance product, correct?
20    A.   Correct.
21    Q.   You would agree with me that, in fact,
22 a consumer making a decision to purchase an
23 insurance product from Federal does not know that
24 Blaze was used at any point in the process in
25 selling or underwriting that product, correct?

### Page 87

product owned by what today is known as LexisNexis. It was first created by Equifax's insurance services division, which later morphed into a freestanding company called ChoicePoint, which was later purchased by LexisNexis. CLUE is a database of multiple lines of businesses today occurrences from a claims standpoint.

The Hartford was one of the first ten companies to participate in CLUE. We were -- we were a -- an original supplier, if you will. One of the -- one of the things that we did was once a month we cut a tape of all of our current claims activities for the identified market segment products and shipped it to Equifax. Equifax had that coming in from a number of companies, and they consolidated it all into a database, and if you provided to the database you could, whenever you wanted to, make a call into the database to find out if Bick Whitener had a claim in the -- that was in the database, comprehensive loss underwriting exchange.

Q. Then you went to Equifax, correct?
A. Yeah. They kind of liked the work I did on behalf of The Hartford and -- and CLUE.
Q. And you worked to -- would you say as

### Page 88

a sales representative for Equifax products?
A. I would absolutely not say that. Thank you.
Q. Okay.
A. I was the assistant vice president of their property information products for the -- that -- that they sold for the underwriting process. So I had zero sales responsibilities except that -- I spoke insurance. So if we had a sales rep that really felt like he needed to take someone -- or he or she needed to take someone with them who spoke insurance, I would get a phone call and would be released to go accompany the person.
Q. You then went to Prudential?
A. That is correct.
Q. Okay. And you were the director of information services -- systems? I'm sorry.
A. Yes, systems.
Q. Okay. Did Prudential use a rules management software?
A. No. Again, they didn't exist at that period of time. So Prudential was operating in that -- in a that hard-coding-of-the-rules environment.
Allow me to point out that Prudential

### Page 89

brought me there because they wanted to mi -- they wanted to migrate their policy admin, billing and claims systems into a fresher technology, and they wanted my expertise in that. That's why they brought me there.
Q. Then you went to a midsize personal auto insurance company, correct?
A. That is incorrect.
Q. Oh, after a sabbatical?
A. Yes.
Q. Okay.
A. I was the chief vampire for the State of Alabama for the American Red Cross. Anybody that asked you to give blood or took blood from you reported to me.
Q. At the midsize personal auto insurance company, you were the product manager, correct?
A. I held three different positions for that company, all three of which were in the product department.
Q. Did that company use a rules management software?
A. No. Again, they were in alternative number two, hard coded into Cobalt.
Q. Then you went to --

### Page 90

THE WITNESS: Allen? I'm sorry.
MR. HINDERAKER: Sure, be happy to.
THE WITNESS: Thank you.
(Reporter's Note: Mr. Hinderaker gets the witness another glass of water.)
BY MS. JANUS:
Q. -- a business process outsourcer in Montana?
A. That is correct. Wait. Yes, that is correct.
Q. And did that entity use a rules management system?
A. It did not.
Q. In 2004, you became the director of project management for a midsize P&C insurance carrier, correct?
A. That is correct.
Q. Which company was that?
A. It's a small -- well, it's a midsize insurance company called American Reliable. Today they are owned by Globe Indemnity. Globe Indemnity purchased them approximately 18 months ago.
Q. Did that company have a rules management software?
A. No. In fact, that company brought me

**Page 91**

1  there because they wanted to transition software,
2  and one of the decision criteria that we put
3  together was the ability to get out of the hard
4  coding of rules to software that we ultimately
5  selected allowed us to do that.
6      Q.   And what software was that?
7      A.   Duck Creek.
8      Q.   Duck Creek is a software that insurance
9  companies use for rules management, correct?
10     A.   Duck Creek is a software that allows
11 rules to be built inside of policy admin or billing
12 or claims, and its interfaces are set up so that
13 the consumer -- I'm sorry, the business people, be
14 it product managers or corporate underwriting, can,
15 in fact, modify the rules.
16          You'll enjoy my story about the
17 selection process.
18          MR. HINDERAKER:  Wait for a question.
19 BY MS. JANUS:
20     Q.   Did you consider Blaze in the process
21 of selecting software while you were at that
22 company?
23     A.   To the best of my knowledge, Blaze did
24 not exist.  So, no.  To the best of my knowledge at
25 that time.

**Page 92**

1      Q.   When did you select software for the
2  company?
3      A.   Two thousand -- You told me I arrived
4  there in 2004?
5      Q.   It looks like it from your --
6      A.   Yeah.
7      Q.   -- report.
8      A.   If that's -- if that's -- if that's
9  what it says, 2004.  It took us less than a year to
10 make the decision on the selection of software.
11     Q.   Then you became the general manager of
12 a Midwest division of a midsize P&C personal auto
13 insurance company?
14     A.   That is correct.
15     Q.   Which company was that?
16     A.   The company in those days was known as
17 Unitrin Specialty, and actually Unitrin, Unitrin
18 Specialty was a strategic business unit within
19 Unitrin.  Today you will know them as Kemper.
20     Q.   Did that company use a business rules
21 management software?
22     A.   Not to my -- not to my knowledge.
23     Q.   You did not have occasion to work with
24 a rules management software while you were there?
25     A.   That is correct.

**Page 93**

1      Q.   That was not a part of your job
2  responsibility?
3      A.   That is correct.
4      Q.   And, then, you were -- How long were
5  you with that company?
6      A.   Memory test, huh?  Um, three-and-a-half
7  years.
8      Q.   Because the next entrance you -- or
9  the next item you have is in 2009.  You went to
10 work for a small technology services company that
11 sold implementation services of vendor policy
12 administration systems to P&C insurance companies?
13     A.   Correct.
14     Q.   Which company was that?
15     A.   Its name was Discoverture Solutions.
16 It is now Mindtree.
17     Q.   What does that mean, sold
18 implementation services of vendor policy
19 administration systems?
20     A.   The vendor landscape in policy
21 administration systems in those days had
22 approximately 65 different vendors that offered a
23 policy administration system.  This company
24 specialized in providing professional services in
25 much the way -- much the same way that FICO

**Page 94**

1  provides professional services to Federal, and they
2  would go in and they would help with the actual
3  implementation of the licensed software.
4      Q.   For policy administration systems?
5      A.   Primarily.  It could be other things.
6  It could be billing, it could be -- it could be
7  claims.  We even -- we even dabbled in management
8  reporting, but we only did -- we didn't market
9  that.  If somebody requested us to help with that,
10 we would.
11     Q.   Does that -- did that position in 2009
12 have anything to do with rules management software?
13     A.   It had -- I'm going to say no.
14     Q.   And you were there until 2014; is that
15 correct?
16     A.   That is correct.  No, 2013.
17     Q.   Okay.  What did you do between 2013
18 and 2014?
19     A.   Prepared to move to beautiful scenic
20 Huntsville in the great State of Alabama.  We had
21 aging parent issues.
22     Q.   Let's talk about Federal's use of
23 Blaze.  We've talked about at various times this
24 morning policy administration systems.  In general
25 terms, what is a policy administration system?

**Page 95**

1 A. A policy administration system is the
2 system that executes an insurance company's quote,
3 bind, book, issue process for multiple transactions.
4 In addition, it executes the termination process
5 for policies that an insurance company may have
6 already sold. It is the -- it is the core database
7 of characteristics. I'm 64 years old, that's an
8 insure -- that's an insurance characteristic. I
9 have gray hair, that's not an insurance
10 characteristic.
11 So it -- it was the -- it was the
12 prelim -- it is the preliminary database as it
13 relates to that quote, bind, book, issue terminate
14 and -- change-and-terminate process, it's the
15 engine. Oh, pardon me.
16 Q. Federal, I take it, has policy
17 administration systems?
18 A. Multiple.
19 Q. Are any of those policy administration
20 systems at issue in this case?
21 A. Yes. Well, the use of Blaze Advisor
22 as the rules management system or the automated
23 decision system as used by several of those policy
24 administration systems is part of this case or
25 is -- is relevant to this case.

**Page 96**

1 Q. Which systems are those?
2 A. Memory test. All right. So may I go
3 to my report?
4 Q. Sure.
5 A. All right. CSI Express is used by the
6 Chubb Specialty Insurance small business unit -- or
7 strategic business unit. Excuse me.
8 Q. Which paragraph of your report are you
9 looking at?
10 A. I am looking at multiple paragraphs,
11 but let's start on page 7, section V, paragraph 28.
12 Q. Okay.
13 A. Shall I continue?
14 Q. So CSI Express is a policy --
15 A. Administration system.
16 Q. Administration system. And CSI
17 Express was developed by Federal, correct?
18 A. I cannot answer that question. I
19 don't know. I mean, I didn't do a history of
20 Federal's deployment of technology. I will say
21 this, I expect so, but I cannot definitively
22 confirm or deny that.
23 Q. Okay. And CSI Express was in use at
24 Federal prior to Federal's use of Blaze, correct?
25 A. The artifacts indicate that that is

**Page 97**

1 the case, yes.
2 Q. Blaze is used in CSI Express, correct?
3 A. The artifacts indicate that that is
4 the case, yes.
5 Q. It is one small part of CSI Express,
6 correct?
7 A. CSI Express uses multiple technologies.
8 It is a component of that. The relative size or
9 significance of it depends on your denominator. So
10 I can't respond to that.
11 Q. Okay. So you don't know how
12 significant of a component Blaze is within CSI
13 Express?
14 A. Significance of component cannot be
15 assessed until you tell me what the denominator is.
16 Are you measuring it as one against X numbers of
17 technologies, are you measuring it against the
18 relative functional value that each of the
19 individual components contributes to the quote,
20 bind, book, issue process? I don't know what your
21 denominator is.
22 Q. Well, how would you -- did you -- did
23 you measure -- let me ask it this way. Did you
24 measure the relative significance of Blaze in CSI
25 Express as compared to the other technologies that

**Page 98**

1 are used in CSI Express?
2 A. I submit to you that my entire report
3 is an evaluation of the functional value of Blaze
4 Advisor inside of multiple of the Federal policy
5 administration systems.
6 Q. And we're talking about CSI Express
7 first.
8 A. Okay.
9 Q. My question for you is, did you do any
10 measurement or analysis of how significant a part
11 of CSI Express Blaze is?
12 MR. HINDERAKER: I'd like to object to
13 the question as multiple in form, one is
14 significance, the other is analysis. Which are you
15 asking?
16 MS. JANUS: I think you mean
17 measurement or analysis.
18 BY MS. JANUS:
19 Q. So let's start with measurement?
20 A. I did not quantitatively measure in
21 terms of this report. My responsibility was
22 qualitative and functional.
23 Q. So are you able to opine as to the
24 specific value that comes from CSI Express that is
25 attributable to Blaze?

**Page 99**

1  A.  I'm able to opine the functional value
2  attributable to Blaze as it relates to the execution
3  of business rules inside of the policy administration
4  system which is using the software.
5  Q.  What is that?
6  A.  In this case we're discussing CSI
7  Express.
8  Q.  Right. But you're saying you're able
9  to opine on the functional value?
10  A.  Yes.
11  Q.  Okay.
12  A.  Oh, good.
13  Q.  And what do you --
14  A.  Good. I'm sorry. Now I understand
15  your question. Okay.
16      So let's go back to my three things
17  that are important: speed, ease of doing business,
18  and accuracy and adequacy of the price. Blaze
19  functionally makes all of those better. It improves
20  the speed of response for the independent broker.
21  It makes the job of the independent broker easier,
22  which translates then into the ease that the
23  applicant or customer experiences, and it is
24  contributing to the adequacy of the price for the
25  proposed coverage package.

**Page 100**

1  Q.  Are those all functions that CSI
2  Express performs or Blaze specifically?
3  A.  Both.
4  Q.  Have you done an analysis of what
5  amount of improvement to speed, ease of doing
6  business, adequacy of price is attributable to
7  Blaze --
8  A.  That --
9  Q.  -- as opposed to CSI Express?
10  A.  That was outside of the scope of my
11  responsibilities.
12  Q.  So you can't opine as to what
13  improvements, if any, in terms of speed, ease of
14  doing business or adequacy of price are specifically
15  attributable to Blaze, correct?
16  A.  Quantitatively, no. Qualitatively,
17  yes, the things I've already articulated.
18  Q.  The things you've articulated, though,
19  relate to the functioning of CSI Express generally,
20  correct?
21  A.  They relate to the -- to all of the
22  tools and mechanisms used by the owner of the
23  software, Federal, to execute their quote, bind,
24  book, issue, modify, terminate processes.
25  Q.  And here we're talking about CSI

**Page 101**

1  Express?
2  A.  Here specifically we're discussing CSI
3  Express, yes.
4  Q.  And as we've established, Blaze is one
5  small part of CSI Express?
6  A.  As long as you and I agree that your
7  measurement is footprint, yes. If you and I are
8  discussing functional value, no. You choose. Not
9  meaning to be disrespectful, it's got to be one or
10  the other.
11  Q.  Do you know what the other components
12  of CSI Express are?
13  A.  There are artifacts that articulate
14  the various and sundry components. I assure you I
15  spent less than one second reviewing those.
16  Q.  How can you have an opinion as to
17  Blaze's contribution to speed, ease of doing
18  business or adequacy of price if you do not know
19  what the other components of the complex application
20  it resides in -- namely, CSI Express -- are?
21  A.  CSI Express is a policy administration
22  system. It quotes. But going to inside of CSI
23  Express, specifically Decision Point as -- just as
24  one example, CSI Express Decision Point won't quote
25  if it doesn't meet the definition of the rules, the

**Page 102**

1  risk attribute.
2      That's why insurance companies have
3  rules, to frame for their distribution system -- in
4  this case independent agents and brokers -- the
5  definition of their risk appetite. I've been working
6  with underwriting insurance rules and the use of
7  technology to make those processes better for the
8  brokers and agents for a really long time.
9  Q.  You have never worked with a policy
10  administration that utilizes a rules management
11  software, correct?
12  A.  Correct.
13  Q.  The value that you've articulated as
14  speed, ease of doing business, and adequacy of
15  price, would you characterize those as efficiencies?
16  A.  No. Again, it's Rubik's Cube.
17  There's written premium impact, there's loss cost
18  impact, and there is expense impact across the use
19  of a system like this.
20  Q.  Can you quantify --
21  A.  I was never asked to quantify anything.
22  Q.  So you cannot quantify any contribution
23  that Blaze has on any of the factors you just listed?
24  A.  That is correct. I was not asked to
25  quantify anything. It's out of the scope of my

Page 103

1 agreement and arrangement.
2      MS. JANUS:  All right.  Let's take a
3 short break.
4      THE WITNESS:  Sure.  My blad --
5      THE VIDEOGRAPHER:  Going off the
6 record.  The time is 11:39 a.m.
7      (Break from 11:39 to 12:30.)
8      THE VIDEOGRAPHER:  We're back on the
9 record.  The time is 12:30 p.m.
10      THE WITNESS:  [Witness coughing] Pardon
11 me.
12 BY MS. JANUS:
13   Q.   All right.  Mr. Whitener (phonetic
14 Wit-ner), you understand you're still under oath?
15   A.   I do.
16        Would you please use Whitener
17 (phonetic White-ner)?
18   Q.   Oh, sure.
19   A.   You'll get a better response from --
20   Q.   My apologies.
21   A.   No, no, no worries.  I can't tell you
22 how many times I've made that statement in the years.
23   Q.   If you could turn to your report,
24 let's start on page 4 of Exhibit 513.  And this
25 section of the report is entitled FICO's Blaze

Page 104

1 Advisor® Decision Management Software, correct?
2   A.   Yeah, section IV.
3   Q.   How would you characterize the facts
4 and data that you relied upon in forming the
5 conclusions you've reached in section IV of your
6 report?
7   A.   I would characterize them as my
8 fundamental belief based on noted artifacts, based
9 on a functional analysis of the software that shows
10 that Blaze Advisor contributes to the automate --
11 automated decisioning of Federal's business units,
12 wherein it is deployed, it's not deployed in all
13 the business units, and that Blaze Advisor is
14 highly regarded by the industry analyst community,
15 and I note that through the quoting of a Forrester
16 group, Research group's document, where they
17 analyzed the functionality and the future vision of
18 various and sundry decision management systems.
19   Q.   And you mentioned a functional
20 analysis of the software.  Are you referring to
21 Chubb's software -- Federal's software, I should
22 say?
23   A.   No.  In this section I am referring to
24 the Blaze Advisor decision software.
25   Q.   And that is a software that you have

Page 105

1 never used, correct?
2   A.   That is correct.
3   Q.   And that's a software that you had
4 never seen demonstrated until yesterday, correct?
5   A.   Also correct.
6        (Whereupon, Deposition Exhibit No. 515
7 was marked for identification, and a copy is
8 attached and hereby made a part of this deposition.)
9 BY MS. JANUS:
10   Q.   Showing you what's been marked as
11 Exhibit 515 --
12        MR. HINDERAKER:  Thank you.
13 BY MS. JANUS:
14   Q.   -- this is the document that you
15 reference in footnote 1 of your report?
16   A.   May -- may I have a moment, please?
17   Q.   Oh, sure.
18   A.   Thank you, thank you.  Ah,
19 double-sided.
20   Q.   And, Mr. Whitener, the question before
21 you is, could you confirm that this is the document
22 that you've cited in footnote 1 of your report?
23 And that's on page 4 of your report.
24   A.   Coming.  It is.
25   Q.   Okay.  And --

Page 106

1   A.   Well, let me rephrase that.  This --
2 this is -- this footnote does, in fact, relate to
3 the quote -- to a quote that is documented here.
4 There are multiple artifacts that this quote is in.
5 This is the one I choose for -- choose to use for
6 the footnote in the report.
7   Q.   Sure.  Okay.  As authority for the
8 point you're making in paragraph 21, correct?
9   A.   Yes.
10   Q.   Okay.  And Exhibit 515 is a FICO
11 document, correct?
12   A.   Interestingly, its front name on the
13 document is Henry Mirolyuz, a Chubb employee.  The
14 presentation is a FICO™ Forum:  Decision Management
15 Tools User Group, and both companies' logos are on
16 the document.  To the extent that each of those
17 entities contributed to this, I cannot speak.
18   Q.   Okay.  So you don't know who as
19 between FICO and Federal authored what in this
20 document, correct?
21   A.   That is correct.
22   Q.   Take a look at the page marked 57211?
23   A.   I'm there.
24   Q.   This has a list of Lessons Learned,
25 correct?

**Page 151**

1  doing business, and establishing the adequate
2  accurate price point.  You can't call those in the
3  insurance process small, because the rate, the
4  quote, the bind, the book, and the issue processes
5  do not work unless that's done.
6      Q.  How have you attributed speed to Blaze
7  specifically within the complex application that is
8  CSI Express?
9      A.  If -- I have done no level of
10 quantitative work.  So you're asking me to provide
11 you my thoughts on did it make it better by one
12 day, by two days, by three days?  I can't provide
13 you that.  That was out of the scope of my work.
14     Q.  I take it, then, you also don't know
15 whether Blaze specifically versus some other
16 technology within CSI Express contributes to the
17 speed that you've opined CSI Express delivers,
18 correct?
19     A.  If I took the architectural footprint,
20 which you've referenced several times, there are --
21 pardon me -- components of the architectural process
22 that contribute to that rate.  A -- a system does
23 two times three much faster than a human being does
24 two times three and with an incredibly higher
25 accuracy rate.  But you -- you -- you do not --

**Page 152**

1  it's a Rubik's Cube, as I said earlier.  You don't
2  sit down and look at components of the software and
3  say this component makes this happen or that happen.
4  It performs a function.
5          The functions that Blaze Advisor
6  specifically -- I would say -- if I were talking
7  about any of the ten, whose names I don't know or
8  remember, decision management systems that Forester
9  Research included in their report, all of those are
10 designed to improve the quote, bind, book, issue
11 process, which is critical to the accumulation of
12 written premium.  If you quote and don't convert --
13 and I don't know what these numbers are, but
14 Federal has a quote number coming in, I don't know
15 what that number is, Federal has a quote converted
16 to policy number, I don't know what that number is,
17 but there is a direct link between those three
18 items.  You can talk to almost any insurance
19 executive, I quoted Mark Watson of Argo, a couple
20 of other people, about their view of the need to
21 make these kind of advancements in use of
22 technology to accelerate and execute the quote,
23 bind, book, issue process.
24     Q.  My question was, you did not do an
25 analysis to determine whether the speed that you

**Page 153**

1  attribute to CSI Express results from the fact that
2  Blaze Advisor is in CSI Express or from other
3  technologies and functionalities that are in CSI
4  Express, correct?
5      A.  That is correct.  I have done no --
6      Q.  You've answered the question.
7      A.  -- quanti --
8      Q.  Go ahead.
9          MR. HINDERAKER:  You may finish your
10 answer.
11         THE WITNESS:  I have repeatedly said I
12 did zero quantification assessment of this situation.
13 BY MS. JANUS:
14     Q.  In fact, you do not know whether CSI
15 Express actually increased the speed of response to
16 requests for quote at Federal, correct?
17     A.  That is correct.  That would require
18 data.
19     Q.  In your mind, would it be even
20 possible to measure the contribution that Blaze has
21 to the speed that you've discussed CSI Express
22 creating?
23     A.  Having had the privilege of giving
24 that question zero thought, I can't answer it.
25 That --

**Page 154**

1      Q.  So you --
2      A.  That --
3      Q.  -- just don't --
4      A.  That requires thought.
5      Q.  So you just don't know whether it
6  would be possible -- possible to measure that?
7          MR. HINDERAKER:  Misstates --
8  objection, misstates the answer.
9  BY MS. JANUS:
10     Q.  Is that correct?
11     A.  I have zero data and I have not spent
12 one minute thinking about how I would do that.
13 I -- I live in a world where most things are
14 possible.  The question is what does it take to get
15 it done.
16         (Whereupon, Deposition Exhibit No. 520
17 was marked for identification, and a copy is
18 attached and hereby made a part of this deposition.)
19 BY MS. JANUS:
20     Q.  Showing you what's been marked as
21 Exhibit 520, this is the CSI Express component view
22 that was contained in Mr. McCarter's report.
23     A.  Yes, from Mr. McCarter's report.
24     Q.  Do you agree with me based on this
25 component view that CSI Express is a complex

**Page 155**

1 application involving many technologies?
2  A. Yes.
3  Q. Do you know what all of the various
4 components that are depicted in this chart do in
5 CSI Express?
6  A. All?
7  Q. Yes.
8  A. No. Some of the -- some of their
9 acronyms, I don't even know what they mean.
10  Q. Do you know what each of these
11 components contributes to what you have opined are
12 the benefits of CSI Express?
13  A. I'm not sure I opined that C -- that
14 anything other than Blaze Advisor provided benefits
15 to CIS. So as relates to this current state
16 exhibit, CI -- Blaze Advisor inside of CIS Express
17 contributes to the benefits I articulate, but I
18 can't speak to any of the other systems.
19     I can -- I can tell you generally
20 speaking in the insurance industry what an under
21 man -- underwriting manager workbench does, I can
22 tell you what product figuration does, but I can't
23 answer the specific question you're asking.
24  Q. Turning back to your report, in
25 paragraph 36?

**Page 156**

1  A. I'm there, I'm there.
2  Q. You state that "CSI eXPRESS's use of
3 Blaze Advisor contributes to revenue by increasing
4 the speed of response to a request for a quote
5 and...speed of making renewal offers," correct?
6  A. I do.
7  Q. And we've discussed that you don't
8 actually know whether the speed of response was
9 increased, correct -- at Federal, I should say?
10  A. I have no quantification.
11  Q. You don't know whether the speed of
12 making renewal offers was increased, correct?
13  A. I have no quantification.
14  Q. How have you concluded that CSI
15 Express's use of Blaze Advisor contributes to
16 revenue?
17  A. So I go back to my three original
18 points. There -- insurance companies try to improve
19 their positions in getting more quotes, converting
20 more quotes, hanging on to more renewals through
21 three fundamental strategies: speed -- that's both
22 speed of response and speed to market -- ease of
23 doing business, and adequate accurate pricing.
24  Q. Okay. And so you're basing your
25 opinion that CSI Express's use of Blaze Advisor

**Page 157**

1 contributes to revenue on general goals of
2 insurance companies in the industry?
3  A. Not exactly. I am basing my opinion
4 on the fact that every insurance company that I've
5 ever talked with is focused on that quote, bind,
6 book, issue process for new business and for
7 renewals, and that Blaze Advisor contributes to
8 getting responses inside of the quote process faster,
9 contributes to getting accurate adequate premium
10 faster, it contributes to easing the burden on the
11 independent agent or broker, meaning ease of doing
12 business, and it contributes to the relative
13 adequacy and acc -- attaining the adequate and
14 accurate premium.
15  Q. And -- but you did not actually
16 analyze whether it did contribute to those things
17 you've just listed at Federal, correct?
18  A. I did no quantification, that is
19 correct.
20  Q. Do you know whether Blaze Advisor
21 actually increased or decreased the revenues of
22 Federal?
23  A. I have done no quantification.
24  Q. I take it you don't know whether Blaze
25 Advisor actually contributed to an increase in

**Page 158**

1 revenue or profit at Federal, correct?
2  A. That would require a quantification.
3 I have done no quantification, no.
4  Q. You do not cite to any authority in
5 paragraph 36, correct?
6  A. That is correct.
7  Q. And --
8  A. So -- so when I don't cite, you should
9 assume that I am relying on 41 years and a lot of
10 gray hair in this business.
11  Q. So your opinion in paragraph 36 is
12 based upon your experience in the industry?
13  A. And conversations at industry
14 conferences with other insurance executives, and
15 conversations at industry conferences with software
16 vendors.
17  Q. Those are conversations you had in
18 connection with authoring your report?
19  A. No.
20  Q. Are those conversations you had about
21 Blaze Advisor?
22  A. Conversations I had -- no. I --
23 conversations I generally have making sure that I
24 keep my mind aware of what's going on in the
25 insurance industry. I have not discussed Blaze

**Page 223**

1  Q.  It's not the applications, it's
2  particular softwares within the applications, is
3  that what you're saying?
4  A.  It is particular software within the
5  overall application.  That is what I am saying.
6  Q.  And including software other than
7  Blaze, correct?
8  A.  Oh, absolutely correct.
9  Q.  And you would agree that it's the
10 actuaries at Chubb that actually establish the
11 premiums, correct?
12 A.  No.  Okay.  It is the actuaries at
13 Chubb that establish the price for various
14 combinations of risk attributes.  That then transfers
15 to an underwriting function.
16     That underwriting function --
17 especially -- especially in -- in commercial lines,
18 that underwriting function takes the actuarial --
19 and I'm going to use a term here, indication, a
20 projected needed price point, and it is the
21 underwriter's job to work with that.  They may
22 modify it, they may not, they may accept it.  But
23 the actuary's job is to take data from the past in
24 terms of the risk attributes and tell the
25 underwriters based on what's happened in the past

**Page 224**

1  here's where you need to be from a price point.
2  Q.  Okay.  So the actuaries make the
3  suggestion about the correct price point, correct?
4  A.  Yes.
5  Q.  And then -- and those are -- those are
6  people, actuaries are people, correct?
7  A.  I would go beyond that.  They are
8  using systems to -- to do that.
9  Q.  But an actuary is a job that a person
10 performs, correct?
11 A.  Yes.
12 Q.  Okay.  And -- and, then, the
13 underwriters, the individuals who perform
14 underwriting at Federal then consider the
15 recommendation made by the actuary, correct?
16 That's your testimony?
17 A.  The actuary -- I'm sorry.  The
18 underwriters use that as a data point, not the only
19 data point but as a data point, yes.
20 Q.  And they make the ultimate decision at
21 Federal about what price to sell the policy at,
22 correct?
23 A.  You can't make that statement with
24 DecisionPoint, because there are no underwriters
25 involved in DecisionPoint.  DecisionPoint is

**Page 225**

1  relying on Profitability Indicator and some other
2  things to establish the price point, offer it to
3  the agent, and if the agent closes the business,
4  then to start the bind and execute process.
5     So, if a market segment product line
6  is not using a -- an automated decision system, I
7  would agree with the statement.  But if the -- if
8  the market segment product line is using a deci --
9  an automated decision software, then I would
10 disagree with the statement.
11 Q.  Take a look back at your reply report,
12 which is Exhibit 514?
13 A.  I have it.
14 Q.  And in paragraph 6 you state --
15 A.  I'm there.
16 Q.  -- at the -- right before the bullet
17 points you state, "Chubb & Sons sought to," and
18 then you list four bullet points, correct?
19 A.  Correct.
20 Q.  And you do not know whether Blaze
21 Advisor contributed to Chubb & Sons' ability to do
22 the things that are listed in the bullet points,
23 correct?
24 A.  I have performed no quantitative
25 analysis, no.

**Page 226**

1  Q.  You then state right after that,
2  "All" of "these benefits allowed Federal to grow in
3  the small commercial and mid-market commercial
4  sub-segments," correct?
5  A.  Correct.
6  Q.  I take it you don't know whether that
7  statement is, in fact, true, correct?
8  A.  I have performed no quantifi --
9  quant -- quantify benefit analysis.  So, no, I do
10 not.
11 Q.  Okay.  And you don't cite to any
12 authority for that statement, correct?
13 A.  I believe that is correct.
14 Q.  The next sentence states, "Reducing
15 time to market for new products increased gross
16 written premium generated by those new products."
17 Same question, you don't know whether that is, in
18 fact, true with respect to Federal, correct?
19 A.  That is a reference to the acquisition
20 of the _____ book of business.  So while I
21 have not talked with anyone at Federal, Chubb, ACE
22 Limited about the acquisition of that book of
23 business, artifacts indicate that it was, in fact,
24 acquired.
25 Q.  You don't know whether Blaze Advisor

**Page 227**

1 actually contributed to the reducing time to market
2 for new products increasing gross written premium
3 generated by those new products, correct?
4 　A.　I know that the Premium Booking
5 Modernization project was required in order to
6 acquire that ▇▇▇▇▇ book of business. So,
7 no.
8 　Q.　And is that all you base that
9 statement on?
10 　A.　That is the tangible example I can
11 give you from artifacts where that was demonstrated.
12 　Q.　Other than that --
13 　　MR. HINDERAKER: Excuse me.
14 BY MS. JANUS:
15 　Q.　-- example that you gave, you don't
16 know whether the statement is true with respect to
17 anything else at Federal, correct?
18 　A.　Correct. I have performed no
19 quantifiable -- I'm sorry, quantification analysis.
20 　Q.　In footnote 8 on page 3, you discuss
21 artificial intelligence and robotics, correct?
22 　A.　I quote Chubb associates, Chubb
23 Limited associates in terms of their talking about
24 technology.
25 　Q.　And you would agree that Federal is

**Page 228**

1 not using Blaze for any artificial intelligence or
2 robotics capabilities, correct?
3 　A.　Inside the insurance industry, the --
4 the term artificial intelligence has so many
5 meanings that I hesitate to respond affirmative on
6 that. I have been in -- in conversations with
7 people that considered decision management software
8 to be an artificial intelligence.
9 　Q.　Okay. So they're using Blaze, which
10 is decision management or rules management software,
11 correct?
12 　A.　Correct.
13 　Q.　Other than the rules management aspect
14 of Blaze, are you aware of any other robotics or
15 artificial intelligence --
16 　A.　I -- I --
17 　Q.　-- that --
18 　A.　I would take robotics off the table.
19 I've been with people that would call Profitability
20 Indicator, DecisionPoint artificial intelligence.
21 Automated rule processing, I've been with people
22 that would call that artifical intelligence. I
23 can't -- I can't speak to the Chubb Limited CEO,
24 Mr. Greenberg's use of that phrase artificial
25 intelligence in terms of what his intent was there.

**Page 229**

1 　Q.　Sure. You don't know whether he
2 was -- put it this way, he did not refer to Blaze?
3 　A.　That is correct.
4 　Q.　Okay. And do you consider Blaze to be
5 artificial intelligence?
6 　A.　Actually, yes.
7 　Q.　Blaze as implemented at Federal?
8 　A.　On certain market segments, product
9 lines, yes.
10 　Q.　Which market segments and product
11 lines?
12 　A.　Let's go with CSI Express automated
13 renewal processing, CSI Express DecisionPoint, CSI
14 Express Profitability Indicator. Those are all
15 uses of the system relying on what I would call
16 artificial intelligence. If you come down to the
17 commercial -- Chubb Commercial Insurance, CCI,
18 Profitabilities Indicator there would be my
19 definition of artificial intelligence.
20 　Q.　And what is your definition of
21 artificial intelligence?
22 　A.　Artificial intelligence is the use of
23 and deployment of technology to execute certain
24 functions so that you don't have to rely on human
25 capital to do so.

**Page 230**

1 　Q.　Do you know whether FICO defines
2 Blaze --
3 　A.　No. I'm sorry, I'm sorry, to
4 interrupt. Go ahead.
5 　Q.　Blaze as used by Federal as artificial
6 intelligence?
7 　A.　No.
8 　Q.　They do not define it that way?
9 　A.　I do not know.
10 　Q.　You do not know. On page 9 of your
11 reply report --
12 　A.　Patience, Counselor. I'm there.
13 　Q.　Just above paragraph 20 you state that
14 "Blaze Advisor software...executed, at one point,
15 just over thirty-five thousand rules." Do you see
16 that?
17 　A.　I do.
18 　Q.　And you understand that Blaze Advisor
19 software does not process all of the rules used by
20 Federal, correct?
21 　A.　Yes.
22 　Q.　And would it be safe to say that
23 Federal uses hundreds of thousands of rules at any
24 given time to conduct its business?
25 　A.　I can't speak to that.

**Page 231**

1  Q.  You just --
2  A.  That would --
3  Q.  -- don't know?
4  A.  That would be pure unadulterated
5  speculation on my part.
6  Q.  Okay. Do you think that it's
7  reasonable, given the size of Federal and its
8  business, to assume that Federal has hundreds and
9  thousands of rules that it uses to conduct its
10 business?
11     MR. HINDERAKER: Objection, lack of
12 foundation, asks for speculation. You can answer
13 the --
14     THE WITNESS: I -- I --
15     MR. HINDERAKER: -- question, if you
16 can.
17     THE WITNESS: I -- and any answer,
18 Counselor, that I gave you would be pure
19 unadulterated speculation on my part.
20 BY MS. JANUS:
21  Q.  You just don't know?
22  A.  I just don't know.
23  Q.  In paragraph 10 of your reply report,
24 you discuss the Chubb Limited Annual Report. It's
25 on page 5.

**Page 232**

1  A.  Oh, I'm sorry, I went to page 10. I
2  apologize. Yes.
3  Q.  And in that report technology is
4  generally referred to, correct?
5  A.  In this specific reference, yes.
6  Q.  There is no specific reference to
7  Blaze, correct?
8  A.  Correct.
9  Q.  And we've discussed the fact that
10 Blaze is one of hundreds or thousands of technologies
11 that Federal uses to conduct its business, correct?
12     MR. HINDERAKER: Objection, asked and
13 answered.
14     THE WITNESS: I take objection to the
15 phrase hundreds and thousands. We have agreed that
16 Blaze Advisor is not the only software inside of
17 the footprint of the technology that is contributing
18 to the quote, bind, book, issue underwriting
19 process. We've agreed with that, yes.
20 BY MS. JANUS:
21  Q.  And would you also agree, based on
22 your knowledge of the insurance industry and of
23 Federal, that Blaze is one of only -- I'm sorry,
24 strike that.
25     Would you also agree, based on your

**Page 233**

1  knowledge of the insurance industry and Federal,
2  that Blaze is one of at least hundreds, if not
3  thousands, of other technologies generally that
4  Federal uses to conduct its business?
5     MR. HINDERAKER: Objection, asked and
6  answered.
7     THE WITNESS: I -- I -- I -- I object
8  to hundreds. The artifacts that I've looked at
9  don't take me to a position where I -- where I look
10 and say, yeah, holy cow, there's, you know, X number,
11 other than Mr. McCarter's report.
12     Mr. McCarter's report, I believe,
13 relies on some of the artifacts I have access to.
14 I did not count the number of technologies deployed.
15 BY MS. JANUS:
16  Q.  Well, in your experience in the
17 industry, would it surprise you if it's hundreds or
18 thousands of other technologies deployed at a
19 company the size of Federal?
20  A.  Based on my experience in the
21 insurance industry, it would not surprise me if the
22 count of individual technology applications was
23 extremely high. Federal, Chubb & Sons, ACE Limited
24 is operating in three marketplaces. They are
25 operating with literally in excess of a hundred

**Page 234**

1  products, and that's just in the commercial -- I'm
2  sorry, Chubb Specialty Insurance small business --
3  or, I'm sorry, strategic business unit.
4     I'm comfortable saying it's a lot.
5  I'm uncomfortable saying how many.
6  Q.  Sure. And just -- specifically, you
7  reference McCarter's report. In his report he
8  estimates that it is 1,545 technologies that are
9  used to build and implement Federal's business
10 applications.
11     Do you have a reason to disagree with
12 that estimate one way or another?
13  A.  No. I have a -- I have a position of
14 that's an interesting statistic. It's not relative
15 to my analysis, which I believe I say in my reply
16 report.
17  Q.  Your conclusion that Blaze Advisor
18 contributes to Federal's revenue could be extended
19 to, basically, any other technology that Federal
20 uses, correct?
21  A.  No.
22  Q.  Could you extend your conclusion to
23 Microsoft Word?
24  A.  Because my conclusion is based on a
25 specific direct-written-premium-generating process,