# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

FAIR ISAAC CORPORATION,

      Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY, a
Pennsylvania corporation,

      Defendants.

Court File No.  16-cv-1054 (WMW/DTS)

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION TO
EXCLUDE TESTIMONY OF W.
CHRISTOPHER BAKEWELL**

---

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

    I.    BAKEWELL IS FEDERAL'S DAMAGES EXPERT RETAINED
        TO RESPOND TO FICO'S DAMAGES EXPERT NEIL
        ZOLTOWSKI'S ANALYSIS. ............................................................. 3

    II.    ZOLTOWSKI'S DAMAGES ANALYSIS IS FLAWED. ......................... 3

        A.    Zoltowski Did Not Conduct Any Fair Market Value Analysis. ........ 3

        B.    Zoltowski Conducted No Analysis on FICO's Disgorgement
             of Profits Claim. ................................................................... 5

    III.    BAKEWELL'S RESPONSE TO ZOLTOWSKI'S DAMAGES
        ANALYSIS. .............................................................................. 6

        A.    Bakewell Opines on Zoltowski's Failure to Consider the Fair
             Market Value of Blaze. ......................................................... 6

        B.    Bakewell's Response to Zoltowski's Disgorgement of Profits
             Opinion. ............................................................................ 7

             1.    Bakewell's opinions regarding the revenue stream
                 Zoltowski identifies. ................................................... 7

             2.    Bakewell's opinions regarding the lack of a causal
                 nexus. ...................................................................... 9

LEGAL STANDARD ............................................................................................. 10

ARGUMENT ......................................................................................................... 11

    I.    BAKEWELL'S OPINIONS REGARDING ZOLTOWSKI'S LOST
        LICENSE FEE CALCULATION ARE RELEVANT AND
        ADMISSIBLE. .......................................................................... 11

        A.    The Proper Legal Standard, which Bakewell Applies and
             FICO's Expert Ignores, is an Objective Determination of the
             Fair Market Value of the License. .......................................... 11

i

1.     Bakewell applies the proper legal standard............................ 12

2.     FICO and Zoltowski ignore the proper legal standard.......... 14

B.     Bakewell's Opinions are Relevant to a Determination of the
       Fair Market Value of Blaze. ............................................................ 15

1.     Bakewell's opinion that the proper measure of license
       fees is an enterprise wide license is supported by
       FICO's own practice in licensing Blaze. ............................. 15

2.     Bakewell's opinion regarding discounting is supported
       by FICO's own standard discount policies. .......................... 18

3.     Bakewell's analysis of other, similar license
       agreements is relevant and admissible. ................................ 20

4.     Bakewell's analysis of FICO's negotiations with other
       licensees is relevant and admissible..................................... 22

C.     Bakewell's Analysis of the Market Value of Products Similar
       to Blaze, which FICO's Expert Failed to Consider, is
       Relevant to the Fair Market Value of Blaze.................................... 22

D.     Bakewell's Application Number and Sizing Assumptions are
       Based on the *Admissible* Testimony of Dr. Kursh and the
       *Admissible* Record Evidence........................................................... 24

II.     BAKEWELL'S OPINIONS REGARDING FICO'S
        DISGORGEMENT OF PROFITS CLAIM ARE RELEVANT AND
        ADMISSIBLE. ........................................................................................... 25

A.     FICO and Its Experts Continue to Ignore the Proper Legal
       Standard under 17 U.S.C. § 504(b). ............................................... 25

1.     It is FICO's burden to establish a causal nexus. .................. 25

2.     It is FICO's burden to identify the appropriate revenue
       stream. ................................................................................... 27

B.     Bakewell Applies the Proper Legal Standard under 17 U.S.C.
       § 504(b). .......................................................................................... 28

1.     Bakewell's opinions regarding Zoltowski's failure to
       conduct any analysis to identify the appropriate
       revenue stream are admissible. ............................................ 28

2.    Bakewell's opinions regarding Zoltowski's failure to conduct any analysis to establish a casual nexus between the alleged infringement and Federal's profits are admissible. .................................................................. 30

C.    Bakewell's Apportionment Analysis is Reliable and Admissible. ................................................................................ 30

1.    Deductible expenses. ........................................................... 31

2.    Factors other than the copyrighted work. ............................ 32

CONCLUSION ................................................................................................ 33

## INTRODUCTION

W. Christopher Bakewell is Defendants Federal Insurance Company and ACE American Insurance Company's ("Federal") damages expert. Bakewell was retained to respond to FICO's damages expert—Neil Zoltowski—who Federal has moved to exclude. In its motion, FICO seeks to exclude Bakewell's opinions critiquing Zoltowski's analysis related to FICO's actual damages (its lost license fees) and its disgorgement of profits claim. The Court should reject FICO's motion.

*First*, the Court should reject FICO's attempt to exclude Bakewell's analysis of FICO's lost license fees which demonstrates FICO's lost license fee calculation is a litigation tool designed to inflate the damages figure and ignore the fair market value of Blaze or consideration of what license fees FICO actually charges. Zoltowski calculated lost license fees of *$37 million*. He did so by creating a "per application" license the type of which FICO admits it has never sold. Zoltowski's artificial $37 million figure ███

████████████████████████████████████████████

███████████████████████████████ FICO's expert ignored the proper legal standard for determining FICO's actual damages which is to calculate the fair market value for a license covering the alleged unlicensed use.

Bakewell, on the other hand, conducted a sound analysis rooted in data that analyzed the fair market value of Blaze; it shows that Zoltowski's lost license fee calculation is significantly inflated. Bakewell analyzed Federal and FICO's negotiations, approximately 88 license agreements with other licensees of Blaze, FICO's negotiations with other licensees, FICO's standardized discounting policy, FICO's pricing policies,

1

and the cost of competing products.  Zoltowski failed to consider any of this information. Bakewell's analysis applies the proper legal standard (a fair market value analysis) and is reliable.  The opinions should be admitted.

*Second*, the Court should reject FICO's attempt to exclude Bakewell's critiques of Zoltowski's opinions on FICO's claim for disgorgement of profits.   FICO, via Zoltowski's opinions, seeks to disgorge profits from a *$30.9 billion revenue stream*.  To do so, FICO carries the burden of identifying the legally relevant revenue stream and demonstrating a causal nexus between the use of Blaze and Federal's profits.  This is a burden FICO has not, and cannot, meet.

With respect to FICO's disgorgement claim, Zoltowski's report consists of 5 paragraphs tacked onto the report's last page.  In those paragraphs, Zoltowski performs simple arithmetic to identify what he claims is the legally relevant revenue stream.  He adds together figures Federal provided in response to FICO's Interrogatories 16-20.  As Bakewell points out, Zoltowski does not provide any opinion regarding why this figure represents the appropriate revenue stream.  In response, Bakewell analyzes Zoltowski's $30.9 billion figure and concludes that it is significantly inflated—by roughly 92%. Zoltowski also provides no analysis to support his conclusion that Blaze contributed to Federal's profits.   In response to that, Bakewell provides detailed analysis of the numerous factors that contribute to Federal's revenue generation.  Bakewell's opinions on these points should be admitted.

2

## BACKGROUND

I.   **BAKEWELL IS FEDERAL'S DAMAGES EXPERT RETAINED TO RESPOND TO FICO'S DAMAGES EXPERT NEIL ZOLTOWSKI'S ANALYSIS.**

Bakewell was retained by Federal to review and respond to the April 19, 2019 expert report of Neil Zoltowski.  (Bakewell Rep., 2.)[1]  Zoltowski is FICO's damages expert.  (*See* Zoltowski's Rep.)[2]  Zoltowski purports "to assess and quantify the economic damages sustained by FICO and the economic benefits received by [Defendants] assuming Defendants are found liable."  (*Id.* at 2.)  In doing so, Zoltowski calculates what he claims are FICO's lost license fees as well as opining on FICO's disgorgement of profits claim.  Zoltowski's analysis and Bakewell's responses are outlined below.

II.  **ZOLTOWSKI'S DAMAGES ANALYSIS IS FLAWED.**

A.   **Zoltowski Did Not Conduct Any Fair Market Value Analysis.**

The actual damages FICO seeks to recover under its breach of contract and copyright infringement claim are the license fees associated with any unlicensed use of Blaze by Federal.  Zoltowski's report purports to calculate those fees.  Zoltowski calculates that FICO is entitled to either $37,362,272 under a breach of contract theory or $34,069,940 under a copyright infringement theory.  (Zoltowski Rep., 38.)

---

[1]  Bakewell's report was submitted in connection with FICO's Motion to Exclude Testimony of C. Bakewell.  The report is Exhibit 1 to the Declaration of Heather J. Kliebenstein, dated July 26, 2019.  (*See* Dkt. 423-424.)  Bakewell's report is cited in this memorandum as "Bakewell Rep."

[2]  Zoltowski's report was submitted in connection with Federal's Motion to Exclude Expert Report and Testimony of Neil J. Zotowski.  The report is Exhibit 1 to the Declaration of Terrence J. Fleming dated July 26, 2019.  (*See* Dkt. 407-408.)  Zoltowski's report is cited in this memorandum as "Zoltowski Rep."

Zoltowski's analysis has substantial flaws that result in an inflated damages figure.[3]  Although Zoltowski's report states that "there are typically three approaches to valuation: the market approach, the cost approach, and the income approach" he failed to consider them in his analysis.  (*Id.* at 13.)  Instead, to arrive at these figures Zoltowski applied "FICO's annual named-application deployment and development seat license fees for the period each Blaze Advisor application is used without FICO's licensed consent."  (*Id.* at 39.)  FICO admits that it has never in its history sold a "per application" license of this type:

> To my knowledge, a FICO licensee has never entered into a license agreement for the use of Blaze Advisor® software on an application basis with fifteen separate applications.

(*See* Dkt. No. 77, Sealed Declaration of William Waid ("Waid Decl."), ¶ 11.)

Zoltowski's motivation for calculating FICO's lost license fees on a "per application" basis is obvious—it substantially increases the damages figure.  Indeed, the lost license fees Zoltowski calculated are approximately █ times higher than the price Federal originally paid FICO for its perpetual, enterprise-wide license to use Blaze in 2006.  (Dkt. 407, Exs. 4, 10-11) ██████████████████████ Zoltowski's calculation is also ████████████████████████████████████

████████████████████████████████████████████████

---

[3] The issues with Zoltowski's analysis are outlined in detail in Federal's Memorandum in Support of Motion to Exclude Testimony of N. Zoltowski, filed July 26, 2019.  (*See* Dkt. No. 406.)

████████████████████████████ Zoltowski, as Bakewell highlights,

ignores how FICO actually sold licenses to Federal and other licensees.

**B.    Zoltowski Conducted No Analysis on FICO's Disgorgement of Profits Claim.**

Zoltowski's disgorgement opinions are flawed because he failed to conduct any

analysis.   Zoltowski's disgorgement of profits opinion—that is intended to support

FICO's efforts to disgorge profits from *$30.9 billion* in revenue— is found in the last two

pages of his report and span just 5 paragraphs.  (Zoltowski Rep., ¶¶ 122-126.)  Zoltowski

relies exclusively on Federal's Answers to Interrogatories 16-20 and a conversation he

had with FICO's causation expert Bick Whitener.   From this, Zoltowski provides the

following opinion:

> Defendants' use of Blaze Advisor contributes to the generation of gross written premiums.  Consequently, FICO may be entitled to disgorge Defendants' profits from written premiums generated using Blaze Advisor.

(*Id.* at 42-43.)

Zoltowski conducted no analysis to determine whether Blaze "contributed to the

generation of gross written premiums."  He relies exclusively on Mr. Whitener for that

opinion.[4]  Zoltowski also did not conduct any analysis to determine the proper revenue

stream.  Instead, Zoltowski's identification of the relevant revenue stream simply restates

numbers Federal provided in its Answers to Interrogatories 16-20.  FICO claims, based

---

[4] Whitener admits that although he is designated as FICO's causation expert responsible for carrying FICO's burden to establish a causal nexus between Federal's use of Blaze and its profits he has not conducted any causation analysis.  On this basis, among others, Federal has moved to exclude Whitener.  (*See* Dkt. No. 380.)

on Zoltowski's opinions, that it is entitled to disgorge profits from a $30.9 billion revenue
stream.

## III.   BAKEWELL'S RESPONSE TO ZOLTOWSKI'S DAMAGES ANALYSIS.

### A.   Bakewell Opines on Zoltowski's Failure to Consider the Fair Market Value of Blaze.

In his response, Bakewell demonstrates the flaws in Zoltowski's analysis by doing
what Zoltowski failed to do—analyze the fair market value of Blaze.  Bakewell responds
with the following objective evidence which demonstrate how Zoltowski's calculation of
$37 million in lost license fees does not represent the fair market value for Blaze:

- *Zoltowski Did Not Calculate an Enterprise License* – Zoltowski ignored FICO's sales practices with other licensees of Blaze and the terms of Federal's license—which was an enterprise license—and instead calculated a "per application" license that greatly inflates the damages figure. (Bakewell Rep., ¶¶ 135-141.)  FICO admits it has never sold this type of license.  (Waid Decl., ¶ 11.)

- *Zoltowski Ignored FICO's Standardized Discounting Policy* – FICO has a standardized discount policy that requires a discount of ▮▮ here and has historically offered licensees of Blaze discounts ranging from ▮▮▮▮ ▮▮ (Bakewell Rep., ¶¶ 142-149.)

- *Zoltowski Relies Entirely on the Unreliable Opinions of FICO's Employee William Waid for His Sizing Calculations* – Zoltowski's application sizing is flawed because it relies on the flawed methodology of FICO's employee, Mr. Waid.  (*Id.*, ¶¶ 152-156.)

- *Zoltowski Ignores Federal and FICO's Negotiations* – in March 2016, FICO proposed three different licensing options to Federal that ranged from ▮▮▮▮▮▮▮▮; Zoltowski ignores these and other negotiations FICO and Federal had.  (*Id.*, ¶ 20.)

- *Zoltowski Ignores Negotiations with Other Licensees* – Bakewell analyzes FICO's negotiations with other licensees who underwent a merger or acquisition and the resolution in those cases.  (*Id.*, ¶¶ 72-102.)

- ***Zoltowski Ignores Non-Infringing Alternatives or Products that Compete with Blaze*** – Zoltowski failed to consider the fees associated with products that compete with Blaze of which there are many. (*Id.*, ¶¶ 121-134.)

- ***Zoltowski Ignores Comparable License Agreements*** – Bakewell reviewed and analyzed approximately 88 license agreements with other licensees that show Zoltowski's figure is significantly inflated. (*Id.*, Ex. 12.0 (Schedule of License Agreements).)

Based on the above, Bakewell concludes that Zoltowski did not conduct an appropriate fair market value analysis.

## B. Bakewell's Response to Zoltowski's Disgorgement of Profits Opinion.

In his report, Bakewell responds to Zoltowski's opinions related to FICO's claim for disgorgement of profits. (Bakewell Rep., ¶¶ 157-205.) Bakewell's critique of Zoltowski's disgorgement opinions relate to (1) Zoltowski's failure to conduct any analysis regarding the appropriate revenue stream, and (2) Zoltowski's failure to establish any causal nexus between the revenue stream he identifies and the alleged infringing use.

### 1. Bakewell's opinions regarding the revenue stream Zoltowski identifies.

Bakewell critiques the revenue stream Zoltowski identifies, noting that Zoltowski merely tallies figures Federal provided in response to Interrogatories 16-20:

> Mr. Zoltowski relies on Federal's disclosure of gross written premiums "of each company from all insurance policies in connection with which Blaze Advisor was used." Mr. Zoltowski's calculation comprises a simple arrogation of Federal's total gross written premiums (revenue).

(Bakewell Rep., ¶ 160.) Interrogatories 16-20 requested identification of the gross written premium "from all insurance policies in connection with which the Software [Blaze] was used." (Dkt. 407 & 412, Exs. 13-17.) In other words, FICO asked Federal to

identify each instance in which an insurance policy went through an application that used Blaze. (*Id.*) Bakewell provides that reliance on this data is an inappropriate starting point for a number of reasons including the following:

- The data includes gross written premiums from applications that do not use Blaze including CIS Claims, Cornerstone, ADAPT (U.K.), Evolution (Australia), Exari (U.K.) and Broker Site (Canda). (Bakewell Rep., ¶ 175.)

- The data overstates Federal's gross written premiums due to erroneous assumptions. (*Id.* at ¶¶ 177-184.) Zoltowski's analysis assumes gross written premiums for each company and for each Blaze application are mutually exclusive, which is incorrect. (*Id.* at ¶ 177.) Bakewell explains this erroneous assumption leads Zoltowski to rely on figures that are significantly inflated. For example, Bakewell demonstrates that the figures Zoltowski relies on for the years 2013 to 2018 are inflated by 22% to 71%. (*Id.* at ¶ 180.) He also demonstrates that figures Zoltowski relies on related to use associated with Federal's CUW application for the years 2016 to 2018 are inflated by 98% to 238%. (*Id.* at ¶ 183.)

- Zoltowski fails to deduct any of Federal's costs, which additionally inflates the figure. (*Id.* at ¶¶ 185-205.)

Bakewell adjusts Zoltowski's erroneous gross written premium figure and then (1) deducts reinsurance costs, (2) adjusts net written premiums to reflect the amount of earned premiums, (3) deducts losses and LAE expenses incurred by Federal associated with the earned premiums, (4) deducts commissions expenses, and (5) deducts general and administrative expenses and taxes, licenses and fees incurred by Federal. (*Id.* at ¶¶ 185-205.) After conducting the above analysis, Bakewell provides a comparison of his calculations with those of Zoltowski:

**Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual**
*(in US$ millions)*

|  | Mr. Zoltowski's Estimate | Federal Actual |
|---|---|---|
| **Gross Written Premiums** | $  30,876 | $  16,189 |
| Net Written Premiums |  | $  14,688 |
| **Net Earned Premiums** |  | $  15,364 |
| Less: Losses |  | $  (8,560) |
| *Loss Ratio* |  | *56%* |
| Less: Expenses (incl. commissions, G&A, taxes, dividends & other expenses) | *Was not estimated by Mr. Zoltowski* | $  (4,348) |
| *Expense Ratio* |  | *28%* |
| **Underwriting Profit** |  | $  2,456 |
| *% of Net Earned Premiums* |  | *16%* |
| *Combined Loss Ratio* |  | *84%* |

Zoltowski, as Bakewell points out, provided no analysis regarding the data he used to calculate the $30.9 billion identified above. Zoltowski also failed to provide any opinion or analysis as to why this revenue stream is financially or economically relevant.

### 2. Bakewell's opinions regarding the lack of a causal nexus.

Finally, Bakewell critiques Zoltowski for failing to conduct any real "financial or economic analysis" that would establish a causal connection between the revenue stream Zoltowski identified and Federal's use of Blaze. For example, Bakewell analyzes FICO's income and revenue in comparison to the $30.9 billion revenue stream Zoltowski identifies (which is 70 times greater than FICO's net income). (*Id.* at ¶ 165.) Bakewell also analyzes the numerous factors that contribute to Federal's gross written premiums, none of which are taken into account by Zoltowski. (*Id.* at ¶ 167-174.)

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "The main purpose of *Daubert* exclusion is to prevent juries from being swayed by dubious scientific testimony."  *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011).  When making the reliability and relevancy determinations, a district court may consider: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993).  "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands."  *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).  "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant."  *Id.*; *see also Daubert*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one.").

Rebuttal expert testimony is that which "is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B)." See Fed. R. Civ. P. 26(a)(2)(C) (emphasis added).  "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681 KBF, 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015).  As such, "[t]here is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." *Id.*  Additionally, expert testimony using a different technique or discussing a different issue is proper rebuttal, where that opinion "expose[s] a potential flaw in [affirmative expert's] method" or otherwise refutes the subject matter of the affirmative expert's analysis." *Garcia v. Union Labor Life Ins. Co.*, No. CV 04-0721-WJR (RNBx), 2004 WL 5644436, at *2 (C.D. Cal. Nov. 24, 2004).

## <u>ARGUMENT</u>

I.    **BAKEWELL'S OPINIONS REGARDING ZOLTOWSKI'S LOST LICENSE FEE CALCULATION ARE RELEVANT AND ADMISSIBLE.**

A.    **The Proper Legal Standard, which Bakewell Applies and FICO's Expert Ignores, is an Objective Determination of the Fair Market Value of the License.**

FICO clings to a single word used in Bakewell's report—"intrinsic value"—to argue that Bakewell applied the wrong legal standard.  (Dkt. 421 at 7.)[5]  In fact, it is FICO's expert, Zoltowski, who has ignored the appropriate legal standard for

---

[5] FICO's Memorandum in Support of Its Motion to Exclude Testimony of C. Bakewell, filed July 26, 2019 can be found at Docket entry 421.  For ease of reference it is cited in this memorandum as "Dkt. 421."

determining FICO's actual damages.  Zoltowski conducted no fair market value analysis of Blaze—he did not consider FICO's agreements with other licensees, FICO's standardized discounting policy, or products that compete with Blaze.

In contrast, by opining on the "intrinsic value" of Blaze, Bakewell is referring to the product's market value as determined through objective evidence, such as comparable license agreements with other licensees and competing products.  (Bakewell's Rep., ¶ 88) (referring to the "intrinsic or market value" of Blaze).   As outlined below, the determination of the fair market value of Blaze is the appropriate legal standard for calculating FICO's lost license fees.[6]

### 1.      Bakewell applies the proper legal standard.

It is well established that the appropriate measure of damages is the "fair market value" of a license covering the alleged unlicensed use.  *Nucor Corp. v. Tennessee Forging Steel Serv., Inc.*, 513 F.2d 151, 153 n.3 (8th Cir. 1975); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001); *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016). "The fair market value of a copyrighted work is derived from an objective, not a subjective, inquiry."  *On Davis*, 246 F.3d at 166.   Calculating the fair market value requires determining "the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use."  *Id.* at 167.

---

[6] FICO's actual damages on its breach of contract and copyright infringement claim are the same and are, therefore, analyzed together in this memorandum.   FICO does not dispute this fact.  (Dkt. 421 at 19) (arguing "FICO's claim for actual damages under 17 U.S.C.  § 504(b) is consistent with its breach of contract damages.   Mr. Bakewell's opinions regarding FICO's claim for actual damages… should be excluded for the same reasons, and in the same ways, as Mr. Bakewell's opinions regarding FICO's breach of contract damages.").

To do so, courts consider various types of evidence.  One of the most important pieces of evidence are "benchmark licenses" that authorize similar uses to the ones made by the defendant.  *See, e.g., Recursion Software, Inc. v. Double-Take Software, Inc.*, No. 4:10-CV-403, 2012 WL 1576252, at *6 (E.D. Tex. May 4, 2012) quoting *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4366990, at *11 (S.D. Tex. Oct. 27, 2010); *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 331 (S.D.N.Y. 2003) (collecting cases).  Courts also consider the fees and license types that a plaintiff has offered the defendant in the past. This inquiry also includes the application of a copyright owner's "standard discounting policy" if one exists. *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 981 (4th Cir. 1990) (vacating damages award where "under [plaintiff]'s standard discounting policy, the fifth, sixth, and seventh licenses each would have cost 25 percent of $35,000").  Past settlement offers that a copyright owner has made to other parties it accused of infringement are also a relevant measure of value.  *Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*, No. 10 CIV. 128(PAC), 2013 WL 1775437, at *10 (S.D.N.Y. Apr. 25, 2013).

FICO argues "the remedy for breach of contract is not the amount the breaching party is willing to pay."  (Dkt. 421 at 8.)  However, neither is the remedy what the licensor says it would have charged. *See, e.g., On Davis*, 246 F.3d at 166 ("The question is not what the owner would have charged, but rather what is the fair market value."); *DaimlerChrysler Servs. v. Summit Nat'l*, No. 02071871, 2006 WL 208787, at *2 (E.D. Mich. Jan. 26, 2006) ("The Court holds that [plaintiff] may not rely on its own subjective estimate as to the price it would have charged [defendant] given [defendant's]

13

predicament."); *Bell*, 827 F.3d at 709 ("[Plaintiff]'s subjective belief as to the fair market value… is not enough to prove damages").   Bakewell is not opining on what Federal is "willing to pay."  He's analyzing objective evidence—FICO's pricing policies, its license agreements with other licensees, and the cost of competing products—to determine the fair market value of Blaze.  In doing so, Bakewell applies the proper legal standard for calculating damages here.

### 2.    FICO and Zoltowski ignore the proper legal standard.

FICO and Zoltowski ignore the applicable legal standard for calculating lost license fees.  None of the cases FICO cites concern the calculation of lost license fees. *See Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York*, 886 N.E.2d 127, 128 (N.Y. 2008) (calculation of damages under commercial property insurance contract); *Holland Loader Co. v. FlSmidth A/S*, 313 F. Supp. 3d 447, 480 (S.D.N.Y. 2018) (calculation of lost profits associated with new product); *J&H Holding Co. v. Kloss*, No. 12 CV 5738 (NGG)(RML), 2013 U.S. Dist. LEXIS 162473 (E.D.N.Y. Nov. 13, 2013) (calculation of damages under consulting agreement for consultant to conduct environmental impact study).  Instead, FICO cites to general New York law regarding damages in a breach of contract case stating that it is "entitled to expectation damages, *i.e.*, the loss in value to the plaintiff resulting from the defendant's breach."  (Dkt. 421 at 7.)  Any "loss in value" to FICO for the unlicensed use of Blaze, however, is the fair market value of a license covering the unlicensed use.  Therefore, Zoltowski has not properly calculated FICO's expectation damages.

14

Indeed, FICO cannot claim to "expect" a license of the type Zoltwoski calculates when it admits that it has never in its history sold a "per application" license of the type Zoltowski calculates.  (Waid Decl., ¶ 11.)  FICO also cannot claim to "expect" *$37 million* in lost license fees when that figure represents a ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

**B.      Bakewell's Opinions are Relevant to a Determination of the Fair Market Value of Blaze.**

**1.      Bakewell's opinion that the proper measure of license fees is an enterprise wide license is supported by FICO's own practice in licensing Blaze.**

Bakewell's opinion that the parties would have negotiated an enterprise license, as opposed to the "per application" license Zoltowski proposes, is relevant and admissible. In support of his opinion that an enterprise license is appropriate Bakewell relies on the following:

- In 2006, Federal purchased an enterprise license not a "per application" license like the one Zoltowski proposes.  (Bakewell Rep., ¶ 54-57.)

- In 2016, during negotiations following the merger FICO proposed an enterprise license, not a "per application" license like the one Zoltowski proposes.  (*Id.* at ¶ 59.)

- Other licensees purchase enterprise licenses, not the "per application" license Zoltowski proposes.  (*See, e.g.*, *Id.* at ¶ 89 ("FICO and ███ did not discuss a named application type license and instead discussed an enterprise license that included discounts.)).  Indeed, FICO has never sold the type of license its damages expert has manufactured.  (Waid Decl., ¶ 11.)

15

FICO argues that Bakewell's opinion is inadmissible because he relies on Federal's industry expert Dr. Kursh in coming to his conclusion. (Dkt. 421 at 10.) Dr. Kursh opines that "ELA [Enterprise License Agreements] are common in the software industry" and provides the reasons that companies use ELAs as opposed to licensing per application as Zoltowski proposes. (Kursh Rep., 40.)[7] FICO's argument should be rejected for at least three reasons.

*First*, FICO overstates its position. FICO represents that Bakewell's opinion is based *solely* on Dr. Kursh. (Dkt. 421 at 10) ("Mr. Bakewell's opinion that the parties would have negotiated an enterprise license is based entirely on Dr. Kursh."). That is incorrect. As outlined above Bakewell relies on, among other things, FICO and Federal's negotiations in 2006 and 2016 as well as FICO's licenses and negotiations with other licensees, which includes his review and analysis of 88 licenses, 7 settlement agreements and various communications. (Bakewell Rep., ¶¶ 54-57, 59, 89, Ex. 12.0.)[8]

*Second*, the objective evidence also supports Bakewell's opinion that a "per application" license never would have been used. FICO's own pricing policies and practices demonstrate that an enterprise license is the appropriate measure and Zoltowski's "per application" license has never been sold. FICO's pricing guide, for

---

[7] Kursh's report was submitted in connection with FICO's Motion to Exclude Testimony of S. Kursh. The report is Exhibit 1 to the Declaration of Heather J. Kliebenstein, dated July 26, 2019. (*See* Dkt. 373.) Kursh's report is cited in this memorandum as "Kursh Rep."

[8] In his deposition, Zoltowski agreed that a valuation expert must consider transactions comparable to the subject of the valuation because they provide evidence of value. (Dkt. 407 & 412, Zoltowski Tr., at 186:4-18.)

example, specifies that an enterprise license is the type FICO used most often to sell Blaze.  (Dkt. 407, Ex. 5, FICO Global Price List at FICO0057392 ███████



███████ This evidence shows that FICO's pre-litigation negotiations are much closer to Bakewell's own calculations.  Additionally, FICO never sold a per application license to Federal and, in fact, it has never sold this type of license to *anyone*.  (Waid Decl., ¶ 11.) Indeed, this fact is clear given that Zoltowski's calculated lost license fees are roughly ███ ███ the amount Federal paid for its enterprise license in 2006.  (Dkt. 431, Ex. 4 & 10-11 (Federal paid ████████ for its license).).  Zoltowski's calculation is also ███████

*Third*, Bakewell's reliance on Dr. Kursh is appropriate.  Dr. Kursh's opinions on this point are reliable and admissible.  (*See* Federal's Mem. in Opp. to FICO's Mot. to Exclude Testimony of Dr. Kursh, at 23-27.)   An expert is entitled to rely upon the opinions of another expert.  *In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *23 (S.D.N.Y. July 28, 2017) (finding admissible the portions of the expert's report that relied upon the findings of other experts to reach his own conclusions where he did so to support his own analysis and conclusions based on his own expertise); *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461, 474 (D. Mass. 2017) (allowing damages expert's testimony that used assumptions based on information provided by separate

expert).  Indeed, this principle applies even where the other expert's opinions or analyses are deemed inadmissible.  *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) ("One expert is permitted to rely on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert in the case—even if those facts, opinions, and data are otherwise inadmissible.").  For his part, Zoltowski relied on interviews with FICO's employee, William Waid, in reaching his conclusions.  Bakewell may rely on Kursh's opinions.

### 2.   Bakewell's opinion regarding discounting is supported by FICO's own standard discount policies.

Bakewell opines that Zoltowski's analysis is flawed because it fails to apply any discounts when discounts are standardized at FICO and are commonplace in the software industry.  (Bakewell Rep., ¶¶ 142-149.)  FICO claims Bakewell's opinions on discounts are inadmissible because they are irrelevant and rely on opinions from Dr. Kursh. FICO's arguments fail.

Bakewell's opinions regarding discounting are relevant.  Here, the proper measure of damages is the fair market value of the lost license fees.  *Nucor Corp.*, 513 F.2d at 153 n.3; *On Davis*, 246 F.3d 152 at 172; *Bell*, 827 F.3d at 709.   As Bakewell points out, Zoltowski failed to take into account standardized discounting that is provided to all licensees.  Whether a company applies standardized discounting, like FICO does, is relevant to determining the market value of the license.  Indeed, damages awards have been vacated when they fail to take into account standardized discounting policies like the one for FICO's Blaze software.  *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 981

(4th Cir. 1990) (vacating damages award where "under [plaintiff]'s standard discounting policy, the fifth, sixth, and seventh licenses each would have cost 25 percent of $35,000.").

FICO claims its standardized discounting does not apply because Federal is in breach. (Dkt. 421 at 13) ("A discount would not apply in this case [because] Federal is in breach."). In *Lasercomb*, a copyright owner made the same argument, which argument was rejected by the Fourth Circuit. *Lasercomb*, 911 F.2d at 981. The copyright owner argued its "standard discounting policy" did not apply due to the software licensee's "wrongful actions." *Id.* The court rejected the argument concluding that the district court erred in failing to take into account the licensor's "standard discounting policy" when calculating actual damages:

> Lasercomb contends that "it would be a perversion of justice to allow" appellants the benefit of the "discount," given their intentional infringement and fraudulent actions. Appellants' wrongful actions, however, have bearing on the actual damages only if those actions induced Lasercomb to lower its price to $2,000; otherwise, the wrongful actions are relevant only to assessment of punitive damages… Defendants submitted evidence that, under Lasercomb's standard discounting policy, the fifth, sixth, and seventh licenses each would have cost 25 percent of $35,000. We therefore vacate the judgment for $105,000[.]

*Id.* Similarly, here, FICO's allegation that Federal is in breach does not mean its standardized discounting policy does not apply. Like in *Lasercomb*, FICO's discounting applies to its claim for actual damages.

FICO again criticizes Bakewell for relying on Dr. Kursh. Again, FICO overstates it position. (Dkt. 421 at 10) (arguing "Mr. Bakewell's discount-related opinions are also

based entirely on Dr. Kursh.")  FICO is wrong.  For example, Bakewell relies on FICO's 2003 global price list, which "show FICO's ███████████████████████ ███████████████  (Bakewell Rep., ¶ 144.)  He also relies on the parties' 2016 negotiations in which FICO offered a discount of ████████  (*Id.* at ¶ 144.)  He examines negotiations with other licensees such as Oracle who was offered a 45 percent discount. (*Id.* at ¶ 145.)  Finally, he relies on FICO employee testimony that ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████  (*Id.* at ¶ 146.)  Bakewell's opinions are supported by much more than Dr. Kursh and FICO's position that Bakewell's discount opinions "rise or fall with Dr. Kursh" is simply not true.  In any event, as outlined above, Bakewell can rely on Dr. Kursh's opinions.  *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *23 (expert entitled to rely on opinions of other experts); *Iconics, Inc.*, 266 F. Supp. 3d at 474 (D. Mass. 2017) (same); *U.S. Bank Nat. Ass'n*, 112 F. Supp. 3d at 131 (same).  Moreover, this is not an issue of admissibility, but goes to the weight of the evidence.  If FICO disagrees with Bakewell's consideration of this evidence, it may cross-examine him at trial.

### 3.    Bakewell's analysis of other, similar license agreements is relevant and admissible.

Bakewell critiques Zoltowski's analysis by reviewing approximately 88 license agreements for the use of Blaze that FICO entered into with other licensees.  Bakewell's opinions regarding other comparable licenses are relevant and, contrary to FICO's arguments, will assist the trier of fact.  Indeed, one of the most important factors for

determining fair market value is consideration of comparable license agreements. *See, e.g.*, *Recursion Software, Inc. v. Double-Take Software, Inc.*, No. 4:10-CV-403, 2012 WL 1576252, at *6 (E.D. Tex. May 4, 2012); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4366990, at *11 (S.D. Tex. Oct. 27, 2010); *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F.Supp.2d 325, 331 (S.D.N.Y. 2003) (collecting cases).

FICO, without analyzing a single license agreement that Bakewell relies upon, states that the license agreements are not comparable. Bakewell reviewed and relied upon 88 license agreements. (Bakewell Rep., Ex. 12.0.) FICO cannot claim with any credibility that *none* of FICO's license agreements with other licensees are comparable. Further, Bakewell analyzed the ███████████ license agreements in detail. The license agreements are comparable. ████████████ panies each of which entered into an enterprise-wide license similar to the one Federal purchased. Finally, FICO's argument on this point fails because the degree to which the license agreements Bakewell relies on are comparable to Federal's license goes to the weight of the evidence, not its admissibility. *Primrose Operating Co.*, 382 F.3d at 562 ("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. It is the role of the adversarial system, not the court, to highlight weak evidence."). The Court should reject FICO's attempt to prevent Federal from putting on evidence of FICO's license agreements with other licensees, which demonstrate Zoltowski's damages figure is significantly inflated.

### 4.    Bakewell's analysis of FICO's negotiations with other licensees is relevant and admissible.

Bakewell relies on negotiations with ████████████, each of whom were offered enterprise wide licenses and discounts, to "illustrate FICO's negotiating practices with licensees of Blaze Advisor that were involved in a merger or acquisition." (Bakewell Rep., ¶ 50.) Bakewell's opinions regarding FICO's negotiations with other licensees, ████████████, who similarly underwent a merger event, are relevant to rebutting Zoltowski's failure to consider the effect of an enterprise license or discounting.

████████████, like Federal, underwent a merger or acquisition after which time FICO accused them of violating their license's no assignment clause. FICO, without any citation to case law, argues these negotiations are legally irrelevant. The negotiations are relevant because, contrary to FICO's position, negotiations with third parties are considered when calculating lost license fees. *Int'l Bus. Machs. Corp. v. BGC partners, Inc.*, No. 10 CIV. 128(PAC), 2013 WL 1775437, at *10 (S.D.N.Y. Apr. 25, 2013) ("*IBM*") (past settlement offers that a copyright owner has made to other parties it accused of infringement are relevant measure of value).

### C.    Bakewell's Analysis of the Market Value of Products Similar to Blaze, which FICO's Expert Failed to Consider, is Relevant to the Fair Market Value of Blaze.

Zoltowski did not conduct any analysis regarding the market prices for products that are comparable to Blaze. (Bakewell Rep., ¶¶ 122-134.) Bakewell provides that Zoltowski's failure to consider the value of products similar to Blaze is a failure to conduct a fair market value analysis. It assumes, in Bakewell's words, that "FICO would

have negotiated a license with Federal at whatever value FICO requested… [and] does not consider that there is a competitive market with substitute products that are available[.]" (*Id.* at ¶ 134.)

The opinion is legally relevant.  As outlined above, the standard for calculating FICO's actual damages is the determination of the fair market value of Blaze.  *On Davis*, 246 F.3d at 167 (lost license fees calculated based on fair market value of license which is "the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use.").   The market value of similar substitute products for Blaze is necessary to determine what "a willing buyer and a willing seller would have agreed for the use."

It is no surprise that FICO vehemently objects to the introduction of evidence related to the value of products similar to Blaze.  The evidence of competing products demonstrates Zoltowski's damages figure is significantly inflated.  Indeed, the opinion



With respect to these opinions, FICO criticizes Bakewell for relying on opinions from Federal's industry expert William McCarter.  In addition to interviewing McCarter,

Bakewell interviewed a number of Federal employees familiar with Blaze and performed independent research and analysis about the availability of non-infringing alternatives. Nonetheless, McCarter's opinions, as outlined in Federal's Memorandum in Opposition to FICO's Motion to Exclude Testimony of William McCarter, are relevant, reliable and admissible.  (Federal's Memo. in Opp. to FICO's Motion to Exclude Testimony of W. McCarter, at 25-26.)   As with Dr. Kursh's opinions, Bakewell is entitled to rely on McCarter's opinions as well.  *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *23 (expert entitled to rely on opinions of other experts); *Iconics, Inc.*, 266 F. Supp. 3d at 474 (D. Mass. 2017) (same); *U.S. Bank Nat. Ass'n*, 112 F. Supp. 3d at 131 (same).

> **D.    Bakewell's Application Number and Sizing Assumptions are Based on the *Admissible* Testimony of Dr. Kursh and the *Admissible* Record Evidence.**

Bakewell relied on Federal's software expert Dr. Kursh for certain opinions that require knowledge of the software industry.  Specifically, Bakewell relied on Dr. Kursh's opinions related to sizing of the use of Blaze in Federal applications and assumptions regarding the Federal applications that use Blaze.  FICO claims Bakewell's reliance on Dr. Kursh for these points renders Bakewell's opinions inadmissible.

Dr. Kursh's opinions related to sizing and the numbers of applications that use Blaze, as outlined in Federal's Memorandum in Opposition to FICO's Motion to Exclude Testimony of Dr. Kursh, are relevant, reliable and admissible.  (Federal's Memo. in Opp. to FICO's Motion to Exclude Testimony of Dr. Kursh, at 22-23.)  Bakewell is entitled to rely on these opinions.  *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *23 (expert

entitled to rely on opinions of other experts); *Iconics, Inc.*, 266 F. Supp. 3d at 474 (D.

Mass. 2017) (same); *U.S. Bank Nat. Ass'n*, 112 F. Supp. 3d at 131 (same).

## II.   BAKEWELL'S OPINIONS REGARDING FICO'S DISGORGEMENT OF PROFITS CLAIM ARE RELEVANT AND ADMISSIBLE.

### A.   FICO and Its Experts Continue to Ignore the Proper Legal Standard under 17 U.S.C. § 504(b).

FICO claims that Bakewell applies the wrong burdens of proof for disgorgement

of profits under the Copyright Act.  (Dkt. 421 at 19.)  In fact it is FICO, along with its

damages expert Zoltowski and causation expert Whitener, who have ignored the legal

standard for recovery of profits.  The Copyright Act, as outlined below, requires FICO

establish a causal nexus between the defendant's profits and the alleged infringement and

identify the appropriate revenue stream.  *Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d

323, 330 (S.D.N.Y. 2008) ("[t]he language of [§ 504(b)] makes clear that only those

profits 'attributable to the infringement' are recoverable" therefore "in order to recover

Defendants' profits, Plaintiff is required to establish a 'causal link' between

[Defendant]'s profits and the infringement.").  As Bakewell demonstrates, Zoltowski has

done neither.

#### 1.   It is FICO's burden to establish a causal nexus.

The Copyright Act only allows recovery of profits that are "attributable" to one of

the infringing activities set forth in § 106 of the Act.  "[P]unitive damages are not

available under the Copyright Act," and thus "[t]he language of [§ 504(b)] makes clear

that only those profits 'attributable to the infringement' are recoverable."  *Granger v. Gill*

*Abstract Corp.*, 566 F. Supp. 2d 323, 330 (S.D.N.Y. 2008); H. Rep., p. 161.  Therefore,

"in order to recover Defendants' profits, Plaintiff is required to establish a 'causal link' between [Defendant]'s profits and the infringement." *Granger*, 566 F. Supp. 2d at 332 quoting *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001).

Plaintiffs face a higher burden when it comes to this causation requirement in "indirect profits" cases like this one, where a claim for profits relies on "revenue that has a more attenuated nexus to the infringement." *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). "'Because of the at-best highly speculative nature of all indirect profits claims' . . . the decision to 'send such claims to a jury should be extremely rare.'" *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10 CIV. 128 PAC, 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25, 2013) quoting William F. Patry, *Patry on Copyright*, § 22:131 (2010).

FICO has mischaracterized its burdens under the Copyright Act by ignoring its burden to prove causation. FICO selectively quotes § 504(b) and claims that the Act "only" requires it to present proof of Federal's "gross revenues" before the burden shifts to Federal to apportion away "the elements of profit attributable to factors other than the copyrighted work." (Dkt. No. 421 at 20.) The Act does provide a burden-shifting framework, but in order to reach this point FICO must first satisfy the causation requirements described above. *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 751 (D. Md. 2003) ("The court must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and the subsequent indirect profits."). Accordingly, it is FICO's burden "to formulate the initial evidence of

gross revenue duly apportioned to relate to the infringement." 4 NIMMER ON COPYRIGHT § 14.03[B], 14-44.

### 2.    It is FICO's burden to identify the appropriate revenue stream.

The Copyright Act provides a burden-shifting framework, but before reaching this point FICO must first satisfy the causation requirements described above. *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 751 (D. Md. 2003) ("The court "must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and the subsequent indirect profits."). To satisfy this initial requirement it is FICO's burden "to formulate the initial evidence of gross revenue duly apportioned to relate to the infringement." 4 NIMMER ON COPYRIGHT § 14.03[B], 14-44; *see also On Davis*, 246 F.3d at 160 ("the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelated revenues"); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004) ("[A] copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement.").

In cases like this one where "profits cannot be traced only to the infringing work but rather to a complex income stream, courts have required that plaintiff introduce detailed evidence linking gross revenues to the infringement." *DaimlerChrysler Servs. v. Summit Nat.*, No. 02-71871, 2006 WL 208787, at *4 (E.D. Mich. Jan. 26, 2006) (internal quotations omitted). Presenting such "detailed evidence" necessarily entails selecting

27

"the appropriate revenue streams to include." *Complex Systems, Inc. v. ABN Ambro Bank N.V.*, No. 08 CIV. 7497 KBF, 2013 WL 5970065, at *7 (S.D.N.Y. Nov. 8, 2013).

*Complex Systems* provides a particularly relevant illustration of FICO's burdens in selecting the proper gross revenue stream. 2013 WL 5970065 at *7. Similar to here, the plaintiff in *Complex Systems* attempted to disgorge profits based on the defendant's allegedly unlicensed use of a "back-office" software program called BankTrade. *Id.* at *4. The plaintiff's expert "proffered reasonable estimates of revenues somehow connected to or touching BankTrade" but then merely "assume[d] a causal nexus." *Id.* at *8. The court rejected this theory of recovery, reasoning that under the Copyright Act "profits must be *attributable* to BankTrade, not just touch the application in some way." *Id.* Thus, the expert's testimony was "missing [] the necessary *causation* component." *Id.*

### B. Bakewell Applies the Proper Legal Standard under 17 U.S.C. § 504(b).

Bakewell correctly applies the legal standards outlined above. Bakewell reliably opines on (1) Zoltowski's failure to conduct *any* analysis to identify the appropriate revenue stream opting instead to perform simple arithmetic on Federal's Answers to Interrogatories 16-20, and (2) Zoltowski's failure to establish a causal nexus between the alleged infringement and Federal's profits.

### 1. Bakewell's opinions regarding Zoltowski's failure to conduct any analysis to identify the appropriate revenue stream are admissible.

Bakewell's opinions provide reliable critiques of Zoltowski's disgorgement opinions because they demonstrate that Zoltowski has failed to present any evidence to

show that FICO's disgorgement claim is based on the appropriate revenue stream.  It is FICO's burden to present "detailed evidence" of "the appropriate revenue streams" for disgorgement.  *Complex Systems*, 2013 WL 5970065, at *7.  Here, as Bakewell points out, Zoltowski has failed to conduct any analysis regarding the revenue stream he identifies.  Bakewell opines that Zoltowski's identification of $30.9 billion resulted from simple arithmetic—Zoltowski added up figures identified in response to FICO's Interrogatories 16-20.  (Bakewell Rep., ¶ 177.)  Bakewell goes on to point out the flaws in Zoltowski's reliance on this figure and demonstrate how Zoltowski's calculation is inflated.

FICO complains that, in doing so, Bakewell relies on sources outside of Federal's Answers to Interrogatories 16-20.  (Dkt. 421 at 23.)  That is not a basis for exclusion. The fact that Bakewell relied on *more sources* instead of simply relying on four interrogatory answers proves *greater reliability*.  Indeed, Bakewell's reliance on other sources demonstrates the flaws in Zoltowski's singular reliance on answers to interrogatories.

Further, FICO's argument that the financial data is somehow less reliable because it was "prepared for this litigation" is not an issue of admissibility; that issue goes to the weight of the evidence.  *Primrose Operating Co.*, 382 F.3d at 562 ("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.  It is the role of the adversarial system, not the court, to highlight weak evidence.").

2.  **Bakewell's opinions regarding Zoltowski's failure to conduct any analysis to establish a casual nexus between the alleged infringement and Federal's profits are admissible.**

FICO claims that Bakewell's opinions regarding the "connection between the revenue stream and the infringement is conclusory." (Dkt. 421 at 25.) FICO's position is ironic given that proof of causal nexus is FICO's burden, not Federal's, and Zoltowski (FICO's expert) provided as follows—*and nothing further*— related to causal nexus:

> I understand that these Blaze Advisor applications have contributed to the generation of billions of dollars in premiums.

(Bakewell Rep., ¶ 122.) Further, although Zoltowski purports to rely on Whitener— FICO's causation expert—Whitener admits he has provided no causation analysis. (*See* Dkt. 380 at 4-5.)

In any event, Bakewell's opinions related to causal nexus are not conclusory and should be admitted. Bakewell opines on the relative value of Blaze to Federal and the role Blaze plays in Federal's overall claims process. (Bakewell Rep., ¶¶ 163-166.) Bakewell opines on the numerous factors that contribute to Federal's gross written premiums. (*Id.* at ¶¶ 167-174.) The opinions are not "conclusory"; they are admissible.

C.  **Bakewell's Apportionment Analysis is Reliable and Admissible.**

As noted above, § 504(b) "makes clear that only those profits 'attributable to the infringement' are recoverable." H. Rep. No. 94-1476, at 161. Thus, "where some of the defendant's profits result from the infringement and other profits are caused by different factors, it will be necessary for the court to make an apportionment." *Id.* Section 504(b) sets forth the manner in which this apportionment takes place by requiring that any award

of profits be reduced by "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*

### 1. Deductible expenses.

FICO seeks to impose a much stricter burden than the Copyright Act requires when it comes to determining which expenses are properly deductible from the gross revenue stream that FICO has selected. FICO cites to *Hamil America Inc. v. GFI* for the two-part test related to determining whether expenses are properly deductible under the Act. *Hamil America Inc. v. GFI*, 193 F.3d 92, 104 (2d Cir. 1999). First, "the infringer's profits are calculated as the gross sales of infringing goods minus the costs that the infringer proves are attributable to the production and sale of those goods." *Id.* at 104. The second step is to arrive at a fair, accurate, and practical method of allocating the implicated overhead to the infringement." *Id.* at 107.

In *Hamil* the court was careful to note that "a court need not scrutinize for inclusion or exclusion particular items within the overhead." *Id.* at 105. In determining which expenses to deduct under the first part of the test, "the court should limit its inquiry to the sufficiency of the nexus between the expense category and production of the infringing product." *Id.* For the second part of the test, the court's reasoning makes clear that attacks on a defendant's formulation of deductible expenses are not bars to admissibility because "[t]he reasonableness of the proffered overhead allocation formula is a question of fact in all cases." *Id.* In fact, after applying this test in *Hamil* the Second Circuit reversed the district court's decision because it was too strict in refusing to allow deductions for things like "country club dues" related to producing an infringing dress

pattern. *Id.* The court reasoned that "if 'entertainment expenses' is a category of overhead implicated in the line of business that produced or sold the infringing product, then country club dues included within that category should not be singled out for exclusion." *Id.*

Restating the test from *Hamil* only demonstrates that Bakewell's testimony regarding deductible expenses—which include, for example, reinsurance costs, losses and LAE expenses, commission expenses, and administrative expenses, taxes, licenses and fees—is admissible because any weaknesses in this part of his analysis are the result of FICO's attenuated theory of recovery. The product that FICO's theory has put at issue is insurance policies, not dresses, and the alleged infringement is not the product itself.

### 2.     Factors other than the copyrighted work.

Federal is also entitled to deduct any hypothetical profit recovery by "the elements of profit attributable to factors other than the copyrighted work," i.e. the elements of Federal's insurance premium profits attributable to factors other than Blaze. 17 U.S.C. § 504(b). "The defendant thus may retain the return on investment shown to be attributable to its own enterprise, as distinct from the value created by the infringed work." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 677–78 (2014). Numerous courts have recognized in cases like this one where parties present overly speculative claims for indirect profits that parties are justified in correctly opining that they are incapable of apportioning profits between the alleged infringement and the "complex, variable, independent" factors that "intervene between the copying and any subsequent gain." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 752 (D. Md. 2003). By

doing no more than opining that "the large majority, if not all" of Federal's profits are attributable to other facts than Blaze Bakewell has simply stated the facts as best he could given FICO's attenuated claim.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request the Court deny Plaintiff's Motion to Exclude Testimony of Christopher Bakewell.

Dated:  August 26, 2019

s/ Terrence J. Fleming
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Christian V. Hokans (#0400377)
chokans@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000

*Attorneys for Defendants*

67578685 v3

33