## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION,

        Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY, a
Pennsylvania corporation,

        Defendants.

Court File No.  16-cv-1054 (WMW/DTS)

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION TO
EXCLUDE TESTIMONY OF DR.
STEVEN KURSH**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    I.    KURSH IS HIGHLY QUALIFIED TO OPINE ON INDUSTRY
        CUSTOMS WHEN IT COMES TO SOFTWARE LICENSING. .............. 2

    II.    KURSH'S ROLE IN THIS LAWSUIT. ................................................. 3

LEGAL STANDARD ......................................................................................... 5

ARGUMENT........................................................................................................ 6

    I.    KURSH'S OPINIONS REGARDING THE TERRITORIAL
        SCOPE OF THE LICENSE AGREEMENT ARE ADMISSIBLE. ............ 6

        A.    Kursh Does Not Provide a Legal Interpretation of the
               Territory Definition. ........................................................................ 7

            1.    Kursh does not interpret the term "Territory."...................... 8

            2.    FICO's own expert, Brooks Hilliard, opines regarding
                   the meaning of "Territory."................................................... 9

            3.    Interpretation of the geographic scope of a license
                   requires industry knowledge and Kursh's opinions will
                   assist the Court and the trier of fact to interpret the
                   scope of the License. ............................................................ 10

        B.    Kursh's Opinions on the Commercial Reasonableness of
               FICO's Conduct in Terminating the License are Relevant and
               Admissible........................................................................................ 11

            1.    FICO misrepresents the law on an expert's ability to
                   testify regarding a party's commercial reasonableness. ....... 12

            2.    Kursh's selection of facts goes to the weight, not the
                   admissibility, of his testimony. ............................................ 15

        C.    Kursh's Restatement of Facts Does Not Render His Opinions
               Inadmissible. .................................................................................... 15

i

II.    KURSH'S OPINIONS REGARDING FICO'S TREATMENT OF THE LICENSE AGREEMENT'S ASSIGNMENT CLAUSE ARE ADMISSIBLE. .................................................................................. 16

    A.    Kursh Does Not Provide a Legal Interpretation of the No Assignment Clause. ..................................................... 17

        1.    Kursh does not interpret the No Assignment Clause. ........... 17

        2.    FICO's own expert, Brooks Hilliard, opines regarding the No Assignment Clause. ................................... 17

        3.    Interpretation of the No Assignment Clause requires industry knowledge and Kursh's opinions will assist the Court and the trier of fact. ................................ 18

    B.    Kursh's Opinions on the Commercial Reasonableness of FICO's Conduct in Withholding Consent are Relevant and Admissible. .................................................... 18

        1.    FICO misrepresents the law on an expert's ability to testify regarding a party's commercial reasonableness. ....... 19

        2.    Kursh's selection of facts goes to the weight, not the admissibility, of his testimony. ............................. 19

    C.    Kursh's Restatement of Facts Does Not Render His Opinions Inadmissible. ................................................... 20

III.   KURSH'S OPINIONS RELATED TO FICO'S DAMAGES CLAIMS ARE ADMISSIBLE. .................................................. 20

    A.    The Jury Will Benefit from an Expert's Analysis of Which Applications are Integrated with Blaze. ........................... 20

    B.    Kursh's Application Sizing Opinion is Admissible, FICO Admits its Sizing is Based on Multiple Factors. .................. 22

    C.    Kursh's Enterprise License and Discount Opinions are Supported by the Law and are Factually Correct. ............... 23

        1.    Kursh applied the correct legal standard, which requires calculation of the fair market value of a license covering the alleged unlicensed use. ................. 24

2.    Kursh's opinions are supported by the objective evidence................................................................................26

D.    Kursh's Audit Opinion is Admissible to Show that FICO Failed to Mitigate Its Damages. .......................................................27

CONCLUSION ...........................................................................................29

## INTRODUCTION

Doctor Steven Kursh is Defendants Federal Insurance Company and ACE American Insurance Company's ("Federal") software licensing expert.  Kursh was retained to opine regarding the commercial reasonableness of FICO's conduct in response to the Chubb-ACE merger based on the terms of the License, the parties' customs and practices, and the customs and practices in the software industry generally. Kursh intends to opine that FICO's conduct in withholding consent to the Chubb-ACE merger without any evidence of a change in use and demanding additional license fees was, based on industry customs and practices, commercially unreasonable.

FICO does not challenge Kursh's qualifications.  Instead FICO argues that experts cannot opine on the commercial reasonableness of a party's conduct and that Kursh's opinions amount to improper legal conclusions.  FICO's arguments lack merit.  It is well established, and FICO's own case law demonstrates, that an expert may opine on the commercial reasonableness of a party's conduct.  Further, Kursh's opinions are not legal conclusions—they inform the Court and the trier of fact of important industry customs and practices that will assist the Court and trier of fact when interpreting the License and determining whether FICO's conduct was reasonable.  The Court, therefore, should deny FICO's motion and admit Kursh's opinions in their entirety.

# BACKGROUND

## I.  KURSH IS HIGHLY QUALIFIED TO OPINE ON INDUSTRY CUSTOMS WHEN IT COMES TO SOFTWARE LICENSING.

Kursh has over 30 years of professional and academic experience with computer software and customs and practices regarding licensing in the software industry.  (Kursh Rep., ¶¶ 5-6.)[1]  He has been certified as a Certified Software Development Professional (CDSP) by the Institute of Electrical and Electronics Engineers Computer Society.  (*Id.*, ¶ 24.)  The Licensing Executives Society of the United States and Canada has also certified him as a Certified Licensing Professional (CLP).  (*Id.*, ¶ 26.)  These certifications required thousands of hours of professional work involving software and "demonstrated experience and knowledge about . . . licensing and commercialization of intellectual property through involvement in negotiations, marketing, valuation, [and] intellectual property rights."  (*Id.*, ¶¶ 24-27.)  Kursh has utilized his qualifications in teaching courses related to technology and business at various universities.  (*Id.*, ¶¶ 1-3.)

In addition to his impressive academic credentials, Kursh also has extensive experience with software and software licensing from the business world.  He founded and served as the President of an enterprise software company.  (*Id.*, ¶ 5.)  Through roles like this one, Kursh has "been involved with negotiating, signing, and executing hundreds of contacts covering software and e-commerce licenses, joint development of products, marketing, distribution and sales, mergers and acquisitions, partnerships and other

---

[1] Kursh's report was submitted in connection with FICO's Motion to Exclude Testimony of S. Kursh.  The report is Exhibit 1 to the Declaration of Heather J. Kliebenstein, dated July 26, 2019.  (*See* Dkt. 373-374.)  Kursh's report is cited in this memorandum as "Kursh Rep."

issues." (*Id.*, ¶ 6.)  As a consultant Kursh has been engaged on behalf of numerous major corporate clients including Samsung, Toyota, Home Depot, Bank of America, and more. (*Id.*, ¶ 40.)  Kursh is thus uniquely qualified to provide opinions on whether a software licensor's conduct toward another party would be considered reasonable within the commercial software industry.

## II.   KURSH'S ROLE IN THIS LAWSUIT.

The opinions Kursh provides in his expert report are based on his "review of the evidence in this matter, publicly-available documents, and other information, as well as [his] knowledge, skills, experience, training, and education." (*Id.*, ¶ 13.)  Indeed, the first 65 paragraphs of Kursh's report provide an extensive foundation for his opinions by outlining his qualifications and experiences.  Kursh thus has a reliable basis to provide opinions related to the parties' various claims and defenses in this lawsuit.

Kursh's central conclusion after reviewing the evidence is that FICO's conduct following the 2016 ACE-Chubb merger was not commercially reasonable "given industry customs and practices in software licensing." (*Id.*, ¶ 45.)  This opinion and Kursh's various other related opinions are relevant to a number of the Parties' claims and defenses.

First, in the event that the Court finds the territory or assignment provisions in the License Agreement to be ambiguous, Kursh's opinions related to commercial reasonableness, found in paragraphs 45, 69-98, and 105 of his report, will enable Federal to provide the jury with an industry understanding of these terms.  For example, Kursh will testify that in the software industry parties normally identify territorial restrictions

3

and other restrictions on use in the license grant clause of their agreement.  (Kursh Rep., ¶¶ 72-80.)

Second, Kursh's opinions are relevant to Federal's counterclaim for breach of the implied covenant of good faith and fair dealing.  The court in *First Nationwide Bank v. Florida Software Servs., Inc.*, 770 F. Supp. 1537 (M.D. Fla. 1991), found a breach of this implied duty in directly analogous circumstances where a software licensor tried to leverage an acquisition to demand additional licensing fees.  *Id.* at 1543-44.  Kursh's opinions show that the same thing occurred here when FICO attempted to leverage the ACE-Chubb merger to make unwarranted demands for additional licensing fees.  Kursh will testify that FICO's demands following the merger were not consistent with good faith dealing in this industry "given how Blaze was integrated into Federal's operations." (Kursh Rep., ¶ 95.)  FICO had significant leverage, as Kursh explains, because Federal would have had to "acquire software to replace Blaze and do technical work that includes migrating their configuration . . . and integrating it with their application[s]" and "then test, document, and rollout the updated application[s]" across the entirety of Federal's enterprise. (*Id.*, ¶ 90.)

Third, Kursh's opinions in Paragraphs ¶¶ 99-136 are relevant to show that FICO's damages claims are inflated because they do not reflect ordinary pricing practices for commercial software.  In order to recover the lost license fee damages that FICO is seeking, it has the burden of proving that its damages figures represent the "fair market value" for a Blaze license agreement.  *See, e.g.*, *Nucor Corp. v. Tennessee Forging Steel Serv., Inc.*, 513 F.2d 151, 153 n.3 (8th Cir. 1975); *On Davis v. The Gap, Inc.*, 246 F.3d

152, 166 (2d Cir. 2001); *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016); *Dash v. Mayweather*, 731 F.3d 303, 312-14 (4th Cir. 2013).   Kursh's opinions demonstrate that FICO has indisputably failed to meet this burden by, for example, pointing out that FICO's damages calculations include Federal applications that do not integrate Blaze. (Kursh Rep., ¶¶ 101-05.)  He will also support this conclusion by testifying that FICO's damages model employs an unrealistic license structure, "oversizes" Federal's applications (which increases the alleged damages), and does not include industry standard discounts.  (*Id.*, ¶¶ 101-36.)

Finally, Kursh's opinions on FICO's failure to exercise its audit rights under the License are relevant to FICO's duty to mitigate its damages.  (*Id.*, ¶¶ 137-40.)  Under New York law, FICO had a duty to mitigate its damages from any breach of the License Agreement.  *See U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440–41 (S.D.N.Y. 2010).  Kursh's opinions on audits will help the jury understand how FICO failed in this duty because "industry norms dictate that [FICO] would have exercised this audit right" if it had genuine concerns about uses exceeding the scope of the License Agreement.  (*Id.*, ¶ 140.)

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the

testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The main purpose of *Daubert* exclusion is to prevent juries from being swayed by dubious scientific testimony." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). When making the reliability and relevancy determinations, a district court may consider: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Id.*; *see also Daubert*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one.").

## ARGUMENT

I. **KURSH'S OPINIONS REGARDING THE TERRITORIAL SCOPE OF THE LICENSE AGREEMENT ARE ADMISSIBLE.**

FICO seeks to exclude Paragraphs 70-89 of Kursh's report. In those paragraphs, Kursh opines on the commercial reasonableness of FICO's termination of the License

based on FICO's position that the unincorporated "Territory" definition in Federal's global, enterprise-wide license limits use of Blaze to the United States.

Kursh analyzes the License's scope to determine if it contains any limitations with respect to the use of Blaze.  (Kursh Rep., ¶¶ 71-75, 77-80.)  To do so, Kursh relies on industry customs and practices and his extensive experience negotiating licenses to determine the License's scope.  Kursh additionally analyzes the parties' course of conduct in making use of Blaze after the License was executed to determine if the parties treated the License as containing any territorial restrictions.  (*Id.*, ¶¶ 76, 81-89.)  Kursh concludes that the License does not contain any territorial restriction and that the parties never treated the License as containing any such limitation.

FICO claims these opinions are inadmissible because Kursh improperly provides a legal interpretation of the License's terms and his testimony regarding the commercial reasonableness of FICO's conduct is impermissible.  Each of FICO's arguments fails.

### A.   Kursh Does Not Provide a Legal Interpretation of the Territory Definition.

Kursh intends to testify that—based on industry customs and practices—the License does not contain any territorial restriction.  The rationale for his opinion includes the following:

- If the parties had intended to limit the territorial scope of the License it is the industry custom and practice that they do so in the license grant clause, which was not done here.  (Kursh Rep., at ¶ 75.)

- Other license agreements executed between FICO and its licensees demonstrate that when FICO intended to limit the territorial scope of a license it did so in the license grant clause, as is consistent with industry customs and practices.  (*Id.* at ¶ 74.)

7

- Based on industry customs and practices a party would not expect an unincorporated definition to limit the scope of the license. (*Id.* at ¶¶ 77-79.)

- The type of license Federal purchased—"an enterprise-wide license, without any applicable limitations"—does not contain territorial restrictions. (*Id.* at ¶ 71.)

FICO seeks to exclude these opinions arguing they are an improper legal interpretation of the License.

### 1.   Kursh does not interpret the term "Territory."

None of the paragraphs FICO seeks to exclude on the basis of this argument (Paragraphs 71, 72, 75, 77-79, 89) contain an interpretation of the meaning of the term "Territory."   Instead, in these paragraphs Kursh opines that it is industry custom and practice for any geographic or territorial restriction to be contained in the license grant section of a software license, which was not done here:

> It is my opinion, that if the intent of the parties was to limit the territory to a specific area, then I would have expected FICO to follow industry customs and practices by calling out the limitation within the license grant clause. FICO, however, did not do so.

(Kursh Rep., at ¶ 75.)   He additionally opines that FICO's practice with other licensees was consistent with industry customs and practices in that, when FICO intended a license to include a territorial restriction, that restriction was set forth in the license grant clause. (*Id.* at ¶ 74.)   Additionally, during the life of the license FICO treated the license as a global, enterprise-wide license without any territorial restrictions. (*Id.* at ¶ 76.)   As such, Kursh concludes the license contains no territorial restrictions. (*Id.* at ¶ 71.)   In these paragraphs Kursh does not, as FICO argues, interpret the term "Territory."   On this basis alone, FICO's motion should be denied with respect to paragraphs 70-89.

##### 2.     FICO's own expert, Brooks Hilliard, opines regarding the meaning of "Territory."

FICO's argument ignores that its own expert, Brooks Hilliard, intends to offer opinion testimony as to the meaning and the interpretation of the term "Territory."  As stated in his report:

> The license grant is limited by *Territory*...
>
> Dr. Kursh's first opinion is further flawed because there is a ***territory*** restriction in the Blaze Advisor License Agreement based on the Definitions in Section 1 and the License Grant in Section 2.1. Section 2.1 begins with: "Subject to the terms, conditions and limitations of this Agreement …". This phrase is a direct reference to Section 1 Definitions, immediately above, which begins by stating "The following terms, as used in this Agreement … will have the meanings set forth below." ***The final defined term in Section 1 is "Territory",*** which states:
>
> > "**Territory**", with respect to the installation and physical location of [Blaze Advisor], means the United States of America.
>
> It should not have been a surprise to Chubb & Son in 2016 that the Section 1 ***Territory*** restriction applied to the Section 2 license grant . . . .

(Hilliard Rep., at 9 (emphasis in original).)[2]  To the extent Hilliard is permitted to testify regarding the meaning of the term "Territory" Kursh is entitled to provide his opinions and interpretations of the same clause.  *U.S. v. Luschen*, 614 F.2d 1164, 1170 (8th Cir. 1980) (holding expert testimony "served the permissible rebuttal function of counteracting testimony of appellant's expert witness").

---

[2] Hilliard's report was submitted in connection with Federal's Motion to Exclude Expert Report and Testimony of B. Hilliard.  The report is Exhibit 1 to the Declaration of Terrence J. Fleming, dated July 26, 2019.  (*See* Dkt. 389-390.)  Hilliard's report is cited in this memorandum as "Hilliard Rep."

3.     **Interpretation of the geographic scope of a license requires industry knowledge and Kursh's opinions will assist the Court and the trier of fact to interpret the scope of the License.**

The interpretation of license scope requires industry expertise.  FICO agrees that an expert may opine on the industry meaning of a term of art or explain an ambiguous term.  (Dkt. 371 at 11)[3] ("An expert may opine on the industry meaning of a term of art or explain an ambiguous term.")  That is precisely what Kursh is doing here.  He's interpreting the License's scope—a task that requires industry expertise—to aid the Court and the trier of fact in determining whether the License contained any territorial restriction.

FICO claims the entirety of Kursh's analysis of the License should be excluded because during his deposition Kursh agreed "Territory" is not a term of art.  (Dkt. 371 at 11.)  Again, Kursh is not telling the Court or the jury what the term "Territory" means.  He's analyzing the scope of the License relative to industry customs and practices.  During his deposition, Kursh explained in depth how geographic restrictions are common in the industry, are one of many metrics that are used by licensors, that those restrictions are generally contained in the license grant section of a license, and that the restrictions contain terms of art—such as use and installation (which are contained in the "Territory" definition)—that are specific to the software industry.  (Kursh Tr. at 129:3-130:12; 131:5-

---

[3] FICO's Memorandum in Support of Its Motion to Exclude Testimony of S. Kursh, filed July 26, 2019 can be found at Docket entry 371.  For ease of reference it is cited in this memorandum as "Dkt. 371."

131:14.)[4]  Interpretation of the geographic scope of a license, as Kursh explained, is informed by industry expertise.  Additionally, in his deposition Kursh provided several independent, third-party sources supporting his opinions regarding the importance of FICO's "calling out the territory issue" in the license grant clause if FICO chose to include this metric.  (*Id.* 136:17-137:17.)

FICO also does not cite any case law supporting its position that even if Kursh had interpreted the term "Territory" that would be a basis for exclusion.  In fact, courts allow experts to opine on terms that are far less industry-specific than the geographic scope of a license.  For example, in *Nucor Corp. v. Nebraska Public Power District*, 891 F.2d 1343 (8th Cir. 1989), the appellant asserted the district court erred when it allowed experts to opine regarding terms of art and industry standards.  *Id.* at 1350.  The terms of art at issue there were the terms "fair," "reasonable," and "non-discriminatory."  *Id.*  The Eighth Circuit affirmed the district court admission of this testimony stating "Courts have frequently recognized the value of expert testimony defining terms of a technical nature and testifying as to whether such terms have acquired a well-recognized meaning in the business or industry."  *Id.*  The same reasoning applies here.

**B.     Kursh's Opinions on the Commercial Reasonableness of FICO's Conduct in Terminating the License are Relevant and Admissible.**

Kursh also intends to testify regarding whether FICO's termination of the License in response to Federal's merger was commercially reasonable based on industry customs

---

[4] Kursh's deposition transcript was submitted in connection with FICO's Motion to Exclude Expert Testimony of S. Kursh.  The transcript is Exhibit 2 to the Declaration of Heather J. Kliebenstein, dated July 26, 2019.  (*See* Dkt. 373-374.)  Kursh's transcript is cited in this memorandum as "Kursh Tr."

and practices.  (Kursh Rep., ¶¶ 71, 81-89.)  Kursh has analyzed the relationship of the parties throughout the life of the License from which he concludes that FICO did not begin referring to any territorial restrictions in the License until after it learned about the merger.  (*Id.* at ¶ 81.)  Kursh opines that for FICO to take a contrary position—i.e., that the License contains territorial restrictions—for the first time during merger negotiations is "not commercially reasonable or consistent with good faith conduct in the industry." (*Id.* at ¶ 88.)

FICO argues the opinions are inadmissible because (1) experts are not allowed to opine on the reasonableness of a party's conduct, and (2) Kursh's selection of facts renders his opinion inadmissible.  In fact, the law—and FICO's own cases—establish that it is common practice for experts to opine on the reasonableness of a party's conduct. Additionally, Kursh's selection of facts is not a basis for exclusion—FICO's argument goes to the weight, not the admissibility of Kursh's testimony.

### 1. FICO misrepresents the law on an expert's ability to testify regarding a party's commercial reasonableness.

FICO first claims that Kursh is not entitled to opine on FICO's commercial reasonableness.  (Dkt. 371 at 13-14.)  FICO misrepresents the law.  FICO claims that "[a]n expert may not testify about commercial reasonableness of the parties' conduct" citing to *Crawford Supply Grp. Inc. v. Bank of Am. N.A.*, 2011 WL 4840965 (N.D. Ill. Oct. 12, 2011).  (Dkt. 371 at 13.)  *Crawford* contained no such holding and, in fact, held testimony regarding a party's commercial reasonableness is relevant and admissible:

> The court is satisfied, further, that Bagnoli's testimony concerning the commercial reasonableness of banking practices is relevant . . . .  The

> reasonableness of a party's conduct is a common subject of expert
> testimony, however. *See, e.g., Metavante Corp. v. Emigrant Sav. Bank*, 619
> F.3d 748, 761-762 (7th Cir. 2010) (expert testified as to whether an online
> banking service provider performed its contract in a "commercially
> reasonable" manner); *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F.
> Supp. 2d 768, 773 (N.D. Ill. 2009) (security expert testified as to
> reasonableness of a company's information protection measures).

*Id.* at *2. FICO further claims "[a]n expert may only discuss commercial reasonableness

and industry standard; the conclusions to be reached are the provenance of the court and

jury." (Dkt. 371 at 13.) Again, FICO's own case law proves the opposite:

> The Bank contends that Bagnoli's testimony "constitutes a legal
> conclusion" . . . ostensibly because Bagnoli opines on the commercial
> reasonableness of the Bank's conduct, and that therefore his opinion would
> not assist a trier of fact. The reasonableness of a party's conduct is a
> common subject of expert testimony, however. Indeed, even in *Richman*,
> cited by the Bank, the court concluded that an expert's "opinion that the
> defendants used reasonable force is not ... an impermissible legal
> conclusion." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 949 (N.D. Ill.
> 2006). With explanation, testimony regarding the reasonableness or
> unreasonableness of particular conduct will assist the jury in understanding
> the evidence and determining facts in issue, and will not simply tell the jury
> what result to reach.

*Id.* at *2. Similarly, in *Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, 2017 WL 3592775 (N.D.

Ill. Aug. 21, 2017), which is also cited by FICO, the court permitted the expert to testify

regarding whether a party's conduct was commercially reasonable and rejected plaintiff's

argument that this type of opinion amounts to an improper legal conclusion. The court

reasoned:

> Contract meaning is typically a question of law, but "what is commercially
> reasonable" under the circumstances of this case is a question of fact . . . .
> With full explanation by the expert and proper instruction by the Court,
> "testimony regarding the reasonableness or unreasonableness of particular
> conduct will assist the jury in understanding the evidence and determining

13

facts in issue, and will not simply tell the jury what result to reach." Elorac's motion is denied on this ground.

*Id.* at *17.

The other cases upon which FICO relies are inapposite. *See Sanny v. Trek Bicycle Corp.*, 2013 WL 1912467 (D. Minn. May 8, 2013). In *Sanny*, the expert provided an opinion that Trek's bicycle design was "unreasonably dangerous" in a products liability case without conducting any tests of the bicycle's design; the expert was not opining on the commercial reasonableness of a party's conduct. *Id.* at *16. In the case FICO cites involving Kursh the court *admitted* Kursh's testimony regarding industry customs and practices *and* his interpretation of the license agreement at issue:

> Dr. Steven Kursh opined that the term CPU in a software license agreement should have been understood to mean a single core processor as early as 2003. Aon claims that Dr. Kursh is not qualified to offer expert testimony about computer development and licensing because he does not have a degree in computer science or law. This order disagrees. Dr. Kursh is qualified to discuss, generally, the development of computer processors. He is also qualified to testify about how the term CPU would have been understood in the context of software license agreements . . . . Dr. Kursh is [also] qualified to testify about industry custom[.]

*Actuate Corp. v. Aon Corp.*, 2012 WL 2285187, *3-4 (N.D. Cal. June 18, 2012). FICO's case law does not demonstrate, as it argues, that "[a]n expert may not testify about commercial reasonableness of the parties' conduct." (Dkt. 371 at 13.) Its own case law shows just the opposite—that "[t]he reasonableness of a party's conduct is a common subject of expert testimony." *Crawford*, 2011 WL 4840965, at *2.

### 2. Kursh's selection of facts goes to the weight, not the admissibility, of his testimony.

FICO additionally complains that, from its point of view, Kursh presents a "selected factual narrative." (Dkt. 371 at 13.) Kursh's selection of facts goes to the weight rather than the admissibility of his testimony. *Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 955 (8th Cir. 2000); *David E. Watson, P.C. v. U.S.*, 668 F.3d 1008, 1014 (8th Cir. 2012) ("Generally, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."). FICO's complaint regarding Kursh's selection of facts is not a basis for exclusion.

### C. Kursh's Restatement of Facts Does Not Render His Opinions Inadmissible.

FICO seeks to exclude Paragraphs 73-74, 76 and 77-86 of Kursh's report because they summarize the factual record. Of course, to provide an opinion an expert is required to summarize, rely, and comment upon the factual record. Contrary to FICO's arguments, experts are allowed to summarize and comment upon the factual record and doing so does not render the expert's opinions inadmissible.

Expert testimony is admissible where it "summarizes" facts in a manner that streamlines the presentation of those facts or data to the jury, saving the jury time and avoiding unnecessary confusion. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016); *see also*, *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 536 (E.D.N.Y. 2012); *Iacobelli Constr., Inc. v. Cnty. Of Monroe*, 32 F.3d 19, 25 (2d Cir.

15

1994) ("Given the inherently voluminous and highly technical nature of the data in such cases, the parties in a []contract dispute usually must retain experts to summarize and interpret that data.").   Furthermore, an expert can permissibly offer commentary on documents in evidence if the expert's testimony relates to the "context in which [documents] were created, defining any complex or specialized terminology, or drawing inference that would not be apparent without the benefit of experience or specialized knowledge."  *In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *see also TCBY Sys., Inc. v. RSP Co., Inc.*, 33 F.3d 925, 929 (8th Cir. 1994) (allowing expert testimony that, based on "custom and practice observed by franchisors in the fast food franchise industry," plaintiff's conduct was not adequate). Kursh's comments and summaries of the factual record he deems relevant to his opinions are helpful to the Court and the trier of fact and are not a basis for exclusion.  FICO's attempt to exclude these paragraphs is without merit.

## II.   KURSH'S OPINIONS REGARDING FICO'S TREATMENT OF THE LICENSE AGREEMENT'S ASSIGNMENT CLAUSE ARE ADMISSIBLE.

FICO seeks to exclude Paragraphs 90-98 of Kursh's report.  In those paragraphs, Kursh opines on the commercial reasonableness of FICO's termination of the License based on its application of Paragraph 10.8—the No Assignment Clause.  Kursh concludes that it was commercially unreasonable for FICO to withhold consent based on industry customs and practices, FICO's admission that it had no evidence of expanded use, and the inability of Federal to immediately remove Blaze software across the entirety of its enterprise (which is what FICO demanded).

FICO's arguments for exclusion of Kursh's analysis of the No Assignment Clause mirror its arguments to exclude Kursh's analysis of the scope of the License.   Those arguments are addressed in Section I *supra*.   FICO again argues (1) Kursh's opinions amount to an improper legal interpretation of the No Assignment Clause, and (2) Kursh is not allowed to testify regarding the commercial reasonableness of FICO's conduct.   Each argument fails for the same reasons FICO's arguments failed with respect to Kursh's analysis of the scope of the License.

**A.     Kursh Does Not Provide a Legal Interpretation of the No Assignment Clause.**

**1.     Kursh does not interpret the No Assignment Clause.**

None of the paragraphs FICO seeks to exclude on the basis of this argument (Paragraphs 90-98) contain an interpretation of the meaning of the No Assignment clause.   Instead, in these paragraphs Kursh opines that FICO's *use* of the No Assignment Clause was unreasonable because (1) FICO's demand that Federal immediately cease use of Blaze would have been impossible to comply with, and (2) FICO had no evidence of expanded use, which is the only use that is prohibited by the No Assignment Clause.   In these paragraphs Kursh does not, as FICO argues, provide a legal interpretation of the No Assignment Clause.

**2.     FICO's own expert, Brooks Hilliard, opines regarding the No Assignment Clause.**

As with the definition of "Territory," Hilliard intends to offer testimony as to the meaning of the No Assignment Clause.   (Hilliard Rep., at 13-14.)   To the extent Hilliard is permitted to testify regarding the meaning of the No Assignment Clause Kursh is

entitled to provide his opinions and interpretations of the same clause. *Luschen*, 614 F.2d at 1170 (holding expert testimony "served the permissible rebuttal function of counteracting testimony of appellant's expert witness").

> **3.    Interpretation of the No Assignment Clause requires industry knowledge and Kursh's opinions will assist the Court and the trier of fact.**

As in Section I(A)(3) above, Kursh  may opine on the industry meaning of terms of art or to explain ambiguous terms, such as, "acquisition," "assignment," "change of control," and "expanded use." *Nucor Corp.,* 891 F.2d at 1350 (allowing testimony regarding meaning of terms "fair," "reasonable," and "non-discriminatory" noting "[c]ourts have frequently recognized the value of expert testimony defining terms of a technical nature and testifying as to whether such terms have acquired a well-recognized meaning in the business or industry.").  Kursh's opinions regarding industry customs and practices in applying the terms of a no assignment clause will assist the Court and the trier of fact in determining whether FICO's conduct in withholding consent violated the License.

> **B.    Kursh's Opinions on the Commercial Reasonableness of FICO's Conduct in Withholding Consent are Relevant and Admissible.**

Kursh also intends to testify regarding whether FICO's termination of the License in response to Federal's merger was commercially reasonable based on industry customs and practices.  (Kursh Rep., at ¶¶ 71, 81-89.)  Kursh has analyzed the relationship of the parties throughout the life of the License from which he concludes that FICO did not begin referring to any territorial restrictions in the License until after it learned about the

merger. (*Id.* at ¶ 81.)  Kursh opines that for FICO to take a contrary position—i.e., that the License contains territorial restrictions—for the first time during merger negotiations is "not commercially reasonable or consistent with good faith conduct in the industry." (*Id.* at ¶ 88.)

FICO argues the opinions are inadmissible because (1) experts are not allowed to opine on the reasonableness of a party's conduct, and (2) Kursh's selection of facts renders his opinion inadmissible.  In fact, the law—and FICO's own cases—establish that it is common practice for experts to opine on the reasonableness of a party's conduct. Additionally, Kursh's selection of facts is not a basis for exclusion—FICO's argument goes to the weight, not the admissibility of Kursh's testimony.

### 1.   FICO misrepresents the law on an expert's ability to testify regarding a party's commercial reasonableness.

FICO again argues that Kursh may not testify regarding the commercial reasonableness of FICO's conduct.  (Dkt. 371 at 22.)   Again, FICO is wrong.   The argument fails for the reasons set forth in Section I(B)(1) *supra*.  It is well established— as FICO's own case law demonstrates—that an expert may testify regarding the commercial reasonableness of a party's conduct.  *Crawford*, 2011 WL 4840965, at \*2; *Elorac*, 2017 WL 3592775, at \*17.

### 2.   Kursh's selection of facts goes to the weight, not the admissibility, of his testimony.

FICO again argues that because Kursh presents a "selected case narrative" his opinions in Paragraphs 90-98 must be excluded.  (Dkt. 371 at 22.)  The argument fails for the reasons set forth in Section I(B)(2) *supra*; namely, Kursh's selection of facts goes to

the weight rather than the admissibility of his testimony.  *Sphere Drake*, 226 F.3d at 955;

*David E. Watson*, 668 F.3d at 1014.

> **C.    Kursh's Restatement of Facts Does Not Render His Opinions Inadmissible.**

FICO seeks to exclude Paragraphs 92-93, 95-98 of Kursh's report because they

summarize the factual record.  (Dkt. 371 at 24.)  The arguments fail for the reasons set

forth in Section I(C) *supra*; namely, experts are allowed to summarize and comment upon

the factual record and doing so does not render the expert's opinions inadmissible.

## III.   KURSH'S OPINIONS RELATED TO FICO'S DAMAGES CLAIMS ARE ADMISSIBLE.

Kursh's opinions in paragraphs 99-136 highlighting the faulty assumptions behind

FICO's damages figures are reliable and admissible because they help demonstrate the

ways in which FICO has artificially inflated its damages figures.  FICO's arguments that

these opinions are mere *ipse dixit*, "factually wrong" or rely on the wrong legal standard

are incorrect.

> **A.    The Jury Will Benefit from an Expert's Analysis of Which Applications are Integrated with Blaze.**

Kursh's opinions in paragraphs 102-105 will aid the trier of fact in understanding

one of the faulty assumptions underlying FICO's damages figures.  In this case FICO is

seeking as damages "license fees it lost from the unauthorized use of Blaze Advisor."

(Dkt. 371 at 24.)  As noted above, in order to recover these damage FICO has the burden

of demonstrating that its proposed damages figures approximate the "fair market value"

for a license covering Federal's use of Blaze.  *See, e.g.*, *On Davis*, 246 F.3d at 172; *Bell*,

827 F.3d at 709; *Dash*, 731 F.3d at 312-14.[5]   Kursh's proposed testimony that an enterprise like Federal would not pay license fees based on applications that do not use the licensed software are useful in making this market value determination.

First, Kursh's testimony regarding which applications should and should not be included in a license fee calculation have a sufficient factual basis.  FICO's only basis for arguing that Kursh does not have a reliable basis for this opinion is the inaccurate statement that Federal's Rule 30(b)(6) deponent does not have "independent knowledge of applications using Blaze Advisor."  (Dkt. 371 at 25.)  To the extent FICO is arguing that the way in which Mr. Harkin obtained his knowledge about Federal's application was not "independent" enough, this is an argument that only goes to the weight of Kursh's testimony and not the admissibility.  *See David E. Watson,* 668 F.3d at 1014 ("Generally, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (internal quotations omitted).

Second, Kursh's technical expertise will aid the trier of fact in understanding the evidence should FICO come up with any evidence to support its argument that the applications listed in Kursh's report do use Blaze.  Whether a specific application is

---

[5] These cases deal with damages under the Copyright Act.  FICO has stated that its "claim for actual damages under [the Copyright Act] is consistent with its breach of contract damages."  (Dkt. No. 421 at 19)  Accordingly, changing the legal theory from infringement to breach of contract does not alter FICO's burden.  In any case, it is well recognized that FICO cannot recover speculative damages for breach either.  *See, e.g.*, *Document Sec. Sys., Inc. v. Coupons.com, Inc.*, 55 F. Supp. 3d 485, 497 (W.D.N.Y. 2014).

integrated with Blaze Advisor is a technical question.  For example, it is reasonable to expect that a jury will require additional assistance to understand that the Cornerstone application did not use Blaze because it is a "mainframe" application.  (Kursh Rep., ¶ 104.) Kursh has extensive experience with the technical aspects of software coding and "integration services" which will provide him with ample basis to provide this understanding and to rebut FICO's testimony should it try to convince the jury that these applications use Blaze advisor.  (Kursh Tr. 13:13-14:9; Kursh Rep., ¶¶ 32-33.)  For these reasons, Kursh's testimony on which Federal applications should be included in FICO's damages calculation should be admitted.

**B.    Kursh's Application Sizing Opinion is Admissible, FICO Admits its Sizing is Based on Multiple Factors.**

FICO spends several pages of its memorandum arguing that Kursh's "sizing" opinion is inadmissible, but FICO's emphasis on this issue is misleading.  As Kursh testified in his deposition, sizing "doesn't matter to my overall opinion."  (Kursh Tr. at 185:4-10.)   That overall opinion is that FICO's damages model contains "false assumptions and errors."  (Kursh Rep., ¶ 100.)  As FICO notes, its model "seeks a separate license fee for each of the 17 Federal software applications that used Blaze Advisor."  (Dkt. 371 at 25.)  The Court should not allow it to do so because, as Kursh points out, the proper licensing structure for approximating market value in this case is an enterprise-wide license for Blaze.  (*See also* Dkt. No. 406, Mem. in Support of Defs.' Mtn. to Exclude Zoltowski at 18.)  However, even in a scenario where Kursh's sizing

opinion does become relevant to the issues in dispute at trial, this opinion is sufficiently reliable to be admitted.

FICO makes much of the fact that the number of transactions currently being processed by Federal's applications does not appear to support Kursh's sizing.  In doing so, FICO ignores the other factors utilized in determining sizing and the remainder of Kursh's analysis.   Additionally, Kursh explained that Waid's sizing determination on which Zoltowski entirely relies with respect to sizing is not reliable and cannot be replicated.  (Kursh. Tr. 169:9-172:23.)  Further, FICO's argument regarding the number of transactions goes to the weight of Kursh's testimony, not its admissibility.  Kursh's opinion is only inadmissible if it is "fundamentally unsupported."  *David E. Watson, P.C.*, 668 F.3d at 1015.

### C.   Kursh's Enterprise License and Discount Opinions are Supported by the Law and are Factually Correct.

FICO seeks to exclude Kursh's opinions which respond to FICO's damages expert's calculation of FICO's lost license fees.  (Dkt. 371 at 30.)   FICO claims Kursh failed to apply the appropriate legal standard and that his opinions are not supported by the record evidence.

Kursh intends to opine that FICO's damages expert, Neil Zoltowski's lost license fee calculation is significantly inflated because (1) the calculation incorrectly assumes Federal would purchase a "per application" license—a license the type of which FICO has never sold—as opposed to an enterprise license; and (2) the calculation ignores FICO's own standardized discounting policy and the industry custom and practice of

discounting.  (Kursh Rep., ¶¶ 125-36.)  The opinions should be admitted—Kursh applies the correct legal standard for calculation of lost license fees and his opinions are supported by the objective evidence.

> **1.    Kursh applied the correct legal standard, which requires calculation of the fair market value of a license covering the alleged unlicensed use.**

Kursh's opinions are supported by the law, which requires a calculation of the fair market value of a Blaze license covering the alleged unlicensed use.  It is well established that the appropriate measure of damages is the "fair market value" of a license covering the alleged unlicensed use.  *Nucor Corp.*, 513 F.2d at 153 n.3; *On Davis,* 246 F.3d at 172; *Bell,* 827 F.3d at 709.   "The fair market value of a copyrighted work is derived from an objective, not a subjective, inquiry."  *Dash v. Mayweather*, 731 F.3d 303, 312 (4th Cir. 2013).  Calculating the fair market value requires determining "the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use."  *On Davis*, 246 F.3d at 167.

To do so, courts consider various types of evidence.  One of the most important pieces of evidence are "benchmark licenses" that authorize similar uses to the ones made by the defendant.  *See, e.g., Recursion Software, Inc. v. Double-Take Software, Inc.*, No. 4:10-CV-403, 2012 WL 1576252, at *6 (E.D. Tex. May 4, 2012) (quoting *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4366990, at *11 (S.D. Tex. Oct. 27, 2010)); *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 331 (S.D.N.Y. 2003) (collecting cases).  Courts also consider the fees and license types that a plaintiff has offered the defendant in the past. This inquiry also includes the

application of a copyright owner's "standard discounting policy" if one exists. *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 981 (4th Cir. 1990) (vacating damages award where "under [plaintiff]'s standard discounting policy, the fifth, sixth, and seventh licenses each would have cost 25 percent of $35,000"). Past settlement offers that a copyright owner has made to other parties it accused of infringement are also a relevant measure of value. *Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*, No. 10 CIV. 128(PAC), 2013 WL 1775437, at *10 (S.D.N.Y. Apr. 25, 2013).

FICO ignores this well-established law citing instead to New York law regarding the calculation of damages in inapposite scenarios. None of the cases FICO cites concern the calculation of lost license fees. *See Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York*, 886 N.E.2d 127, 128 (N.Y. 2008) (calculation of damages under commercial property insurance contract); *Holland Loader Co. v. FlSmidth A/S*, 313 F. Supp. 3d 447, 480 (S.D.N.Y. 2018) (calculation of lost profits associated with new product); *J&H Holding Co. v. Kloss*, No. 12 CV 5738 (NGG)(RML), 2013 U.S. Dist. LEXIS 162473 (E.D.N.Y. Nov. 13, 2013) (calculation of damages under consulting agreement for consultant to conduct environmental impact study). Instead, FICO cites to general New York law regarding damages in a breach of contract case stating that it is "entitled to expectation damages, *i.e.*, the loss in value to the plaintiff resulting from the defendant's breach." (Dkt. 371 at 31.) Any "loss in value" to FICO for the unlicensed use of Blaze, however, is the fair market value of a license covering the unlicensed use.

FICO criticizes Kursh for coming to his conclusion by considering what parties to "an arm's length transaction of a willing buyer/seller" would do. (Dkt. 371 at 31.)

FICO's criticism of Kursh demonstrates that FICO does not understand the applicable legal standard.   Considering what a willing buyer and willing seller would pay is precisely the correct legal standard to apply when calculating lost license fees.  *On Davis,* 246 F.3d at 167  (lost license fees calculated based on fair market value of license which is "the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use.").

### 2.    Kursh's opinions are supported by the objective evidence.

The objective evidence also supports Kursh's opinion that FICO's lost license fees must be calculated based upon an enterprise license and taking into account FICO's standardized discounting policies as well as the industry custom and practice of discounting.

FICO's own pricing policies and practices demonstrate that an enterprise license is the appropriate measure and Zoltowski's "per application" license has never been sold. FICO's pricing guide, for example, specifies that an enterprise license is the type FICO used most often to sell Blaze. ███████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████   Additionally, FICO never sold a per application license to Federal and, in fact, it has never sold this type of license to *anyone*.  (Waid Decl., ¶ 11.) Indeed, this fact is clear given that Zoltowski's calculated lost license fees are roughly ███ ███ the amount Federal paid for its enterprise license in 2006.  (Dkt. 431, Ex. 4 & 10-11 (Federal paid ████████ for its license).)  Zoltowski's calculation is also ████████

times higher than other enterprise-wide licenses FICO has sold. ██████████

████████████████████████████████████████████████████████████

███████████████

Further, it is undisputed that FICO has a standardized discounting policy. Determining what a willing buyer and willing seller would pay requires consideration of standard discounting policies. *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 981 (4th Cir. 1990) (vacating damages award where "under [plaintiff]'s standard discounting policy, the fifth, sixth, and seventh licenses each would have cost 25 percent of $35,000."). Additionally, as Kursh will opine, discounting is an industry custom and practice. (Kursh Rep., ¶¶ 134-36.) On these points, Kursh provided thorough and detailed responses, including references to FICO's licenses with other companies where extensive discounts were provided. (Kursh Tr. at 64:15-74:14.) These opinions are relevant to calculation of FICO's purported lost license fees.

> **D.    Kursh's Audit Opinion is Admissible to Show that FICO Failed to Mitigate Its Damages.**

Kursh will opine on the commercial reasonableness of FICO's actions in failing to exercise its audit rights at any time during the life of the License and, especially, at the time of the Chubb-ACE merger. (Kursh Rep., ¶¶ 137-40.) These opinions are relevant and admissible.

The opinions are relevant to FICO's duty to mitigate damages. FICO was required to act reasonably to mitigate the harm caused by Federal's alleged "breach of contract." *U.S. Bank Nat'l Ass'n*, 696 F. Supp. 2d at 440–41 ("In a breach of contract action, a

plaintiff ordinarily has a duty to mitigate the damages that he incurs.  If the plaintiff fails to mitigate his damages, the defendant cannot be charged with them.");  *see also Occidental Fire & Casualty Company of North Carolina v. Interstate Risk Placement, Inc.*, 329 F. Supp. 3d 711, 717 (D. Minn. 2013).  The general law on mitigation is that the wronged party must use "reasonable, practical care and diligence" to mitigate its damages.  *U.S. Bank Nat'l Ass'n*, 696 F. Supp. 2d at 440.

When FICO became aware of the merger, it chose not to utilize its "Verification and Audit Rights" in the Agreement.  That provision provides:

> On Fair Isaac's written request, Client shall provide to Fair Isaac a written certification executed by an authorized officer of Client that provides the following information: i) verification that the Fair Isaac Products are being used in accordance with the provisions of this Agreement; ii) list of the locations at which the Fair Isaac Products are or have been operated during the preceding twelve (12) month period; and (iii) the number of Seats, CPU's and/or applications accessing or utilizing the Fair Isaac Products (as applicable).

(Kursh Rep., ¶ 137.)

Kursh's opinions do not, as FICO argues, usurp the role of the jury.  The opinions relating to FICO's audit rights provide the jury with information regarding what FICO could have done in response to the merger: "FICO could have invoked this audit right . . . but chose not to and, instead pursued litigation," "FICO's justification about expanded use . . . would have been addressed" through exercise of audit rights and "FICO could have used this [audit] clause to determine the geographical locations where Federal was using Blaze at any point during the relationship[.]" (Kursh Rep., ¶¶ 138-40.)  The opinions *inform*; they do not make decisions for the Court or the jury.  Indeed, Kursh's

only conclusion in these paragraphs is that, based on his experience and specialized knowledge, a party failing to exercise its audit rights in support of their allegations is not commercially reasonable; and further, could evidence improper leverage to collect unjustified fees.   (*Id.*, ¶ 140.)   These opinions are neither legal conclusions, nor impermissible conclusions as to the parties' actions.  The opinions should be admitted.

## <u>CONCLUSION</u>

For all the above reasons, FICO's motion should be denied, and Kursh's testimony should be admitted.

Dated:  August 26, 2019

s/ Terrence J. Fleming
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Christian V. Hokans (#0400377)
chokans@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000

*Attorneys for Defendants*

67635102 v4

29