# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

FAIR ISAAC CORPORATION,

       Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY, a
Pennsylvania corporation,

       Defendants.

Court File No.  16-cv-1054 (WMW/DTS)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF FEDERAL'S LIABILITY FOR BREACH OF CONTRACT**

---

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................. I

INTRODUCTION ........................................................................................................ 1

COUNTER-STATEMENT OF FACTS ......................................................................... 2

    I.     THE PARTIES. ............................................................................... 2

          A.     Federal Insurance Company. .................................................... 2

          B.     Chubb & Son, a Division of Federal Insurance Company. ........... 3

          C.     FICO. ................................................................................. 3

    II.    NEGOTIATION OF THE LICENSE AGREEMENT. ................................ 4

          A.     Negotiation of the Initial License. ............................................ 4

          B.     Negotiation of Amendment Two. ............................................. 5

          C.     Pricing of the License. ........................................................... 8

    III.   CHUBB USES BLAZE WITHIN AND OUTSIDE THE UNITED STATES, WITH FICO'S FULL KNOWLEDGE, AGREEMENT, AND COOPERATION. ................................................................. 8

    IV.   THE ANNOUNCEMENT OF THE ACE-CHUBB MERGER. ................ 12

    V.    THE MERGER CLOSES, AND FICO MOVES TO EXTRACT FEES. ....................................................................................... 13

    VI.   USE OF BLAZE POST-MERGER. ................................................ 15

ARGUMENT .......................................................................................................... 15

    I.     FEDERAL'S GLOBAL USE AND INSTALLATION IS ALLOWED UNDER THE LICENSE AGREEMENT. ............................. 15

          A.     FICO's Argument That "Territory" Forbids Foreign Installation Violates Interpretive Rules and Is Inconsistent with the Facts. .................................................................... 16

               1.     The License Agreement Does Not Restrict Installation. ...... 16

               2.     The Conduct of the Parties Confirms the License Does Not Restrict Installation. ................................................ 18

          B.     FICO's Interpretation that only Employees of an Unincorporated Division May use Blaze is Contrary to Law. ......... 20

               1.     Under the Law, the License Agreement by its Plain Language Names Federal as the Client. ............................ 20

   2. Interpreting Client as Chubb & Son Leads to Absurd Results. .................................................................. 21

  C. FICO Waived its Claimed Restrictions. ........................................... 23

   1. The License Agreement does not Preclude Waiver. ............. 23

   2. FICO's Conduct Waived Its Claimed Restrictions. .............. 25

    (a) FICO Consistently Interpreted the License Agreement as Allowing Global Use and Installation. ................................................................ 25

    (b) FICO was Aware of and Supported Federal's use of Blaze Globally. ............................................. 26

    (c) In 2015, FICO Chose not to "hold [Federal] to the letter of the… license." ....................... 27

   3. FICO's Employees had Authority to Waive. ....................... 28

  D. FICO is Estopped from Asserting the Restrictions. ....................... 30

   1. FICO's Conduct Meets the Standard of Estoppel. ............... 31

   2. The Integration Clause does not Foreclose the Estoppel Defense. .................................................................. 32

  E. The Statute of Limitations Bars any Claim Based on Conduct Occurring Prior to April 21, 2010. ................................................... 33

  F. FICO's Assertion that Federal Waived a "Course of Dealing" Defense is Without Merit. ................................................................. 33

II. INCIDENTAL WORK PERFORMED BY TECHNOLOGY CONSULTANTS CANNOT SUPPORT FICO'S BREACH OF CONTRACT CLAIM. ............................................................................. 34

  A. FICO's Account of Work Performed by AppCentrica and DWS is Vastly Overstated. ............................................................. 34

  B. Any Incidental use or Access by Consultants is not a Breach of Contract. ..................................................................................... 36

III. FEDERAL DID NOT NEED FICO'S CONSENT UNDER PARAGRAPH 10.8. ...................................................................................... 38

  A. FICO's Interpretation is Inconsistent with the Language of § 10.8. .................................................................................................. 38

  B. FICO's Own Witness has Rejected any Requirement of Two Approvals and Such a Requirement is Inconsistent with FICO's Behavior. ............................................................................. 40

ii

C.      FICO Ignores the Requirement that Consent Must not be
        Unreasonably Withheld.................................................................... 41

D.      No Change of Control. .................................................................... 42

IV.    FEDERAL MAY MAINTAIN A BREACH OF CONTRACT AND
       A BREACH OF GOOD FAITH AND FAIR DEALING CLAIM
       SIMULTANEOUSLY................................................................................. 42

CONCLUSION ............................................................................................. 44

## INTRODUCTION

FICO has moved for summary judgment on its breach of contract claims only, and only on liability.  In support of its motion, FICO makes three arguments.  All three are without merit.

First, FICO argues that Federal breached the License Agreement by installing Blaze in Europe, because Blaze could be <u>used</u>, but not <u>installed</u>, outside of the United States.  This argument fails because (a) the plain language of the License Agreement does not impose territorial restrictions on installation of Blaze, (b) FICO's long-term conduct is inconsistent with such a restriction, (c) FICO is estopped from asserting the claim, and (d) the claim is time barred.

Second, FICO argues that Federal's use of the software outside of the United States was not allowed because the people who used the software there were not employees of the "Client" Chubb & Son, a division of Federal, as the license required.  This argument fails because the "Client" was not Chubb & Son, the unincorporated division, but Federal.  Any interpretation to the contrary (a) would lead to an entirely illusory License Agreement, (b) is contradicted by the conduct of FICO throughout the term of the License Agreement, (c) is not supported by the law, and (d) is time barred.

Third, FICO argues that Federal was required to obtain its consent to continue using Blaze after ACE merged with Chubb.  This argument fails because (a) it is inconsistent with the plain language of the License Agreement, which only requires consent if Federal's use of Blaze "expanded," (b) Federal's use did not "expand," and (c)

even if Federal's use "expanded," FICO cannot articulate any basis, let alone a reasonable one, for withholding consent.

Throughout this case, FICO has made arguments that bear no resemblance to the transaction described in the License Agreement or to how FICO acted in the real world. This continues in its Motion for Summary Judgment. To accept FICO's contentions would be to ignore the language of the License Agreement, to disregard FICO's conduct during its 10 years of performance under the License, and to ignore the words and actions of FICO's own senior leaders and legal counsel. Federal respectfully requests that FICO's motion for summary judgment is denied and Defendants' motion for summary judgment is granted.

## COUNTER-STATEMENT OF FACTS

### I.   THE PARTIES.

#### A.   Federal Insurance Company.

Federal Insurance Company ("Federal") issues property and casualty insurance policies to its customers. (Terrence J. Fleming Declaration, Ex. 1 at 3.) In 2006, Federal was a part of a family of insurance companies generally known to the market as "Chubb" (references below to the general family of insurers will be to "Chubb"). (*Id.*) Federal was the primary subsidiary in the family of entities, and it employed the vast majority of its workforce in the United States. (Pamela Lopata Declaration, ¶ 6.) Federal also had subsidiaries both inside and outside of the United States, including Chubb Insurance Company of Canada, Chubb Insurance Company of Europe SE, and Chubb Insurance Company of Australia, Ltd. (*Id.*, ¶ 2.)

**B.     Chubb & Son, a Division of Federal Insurance Company.**

Chubb & Son, a division of Federal Insurance Company ("Chubb and Son") was not a legal entity.  (Lopata Decl., ¶ 4.)  Rather, it was at all times an unincorporated division of Federal.  (Dkt. 398 at 16.)  Chubb & Son did not have employees, write insurance policies, or otherwise operate as an insurance company.  (Lopata Decl., ¶¶ 4, 7.)  Chubb & Son's primary function as a division of Federal was to enter into commercial contracts on behalf of Federal.  (*Id.*, ¶ 9.)  Work done under contracts executed by Chubb & Son was performed by Federal employees as necessary.  (*Id.*, ¶ 6.)  The default practice was for Federal to sign these contracts as "Chubb & Son, a division of Federal Insurance Company" or something similar.  (*Id.*)  This practice facilitated the desire of many vendors to do business with a "Chubb" entity.  (*Id.*)  However, Federal was, in fact, the legal entity entering into these agreements and assumed all of the obligations and liabilities in connection with such contracts.  (*Id.*)

**C.     FICO.**

FICO sells a business rules management software program called Blaze Advisor ("Blaze").  Blaze is just one of many business rules management systems ("BRMS") available on the market today.  (Dkt. 432, Ex. 2 at ¶ 80.)  Businesses of many different kinds, both within and outside the insurance industry, use Blaze as a component in their software applications for the function of automating some decisions that involve "rules," or logical statements of what to do under a given set of circumstances.  (*Id.*, ¶ 70.)

3

## II.      NEGOTIATION OF THE LICENSE AGREEMENT.

### A.      Negotiation of the Initial License.

In 2006, FICO urged Chubb to use its BRMS software Blaze, and pursued a license agreement with Chubb.  (Fleming Decl., Ex. 2 at FICO0005496-5497; Ex. 3 at FICO0005639-5641; Ex. 4.)   Federal followed its default practice and executed the License Agreement with FICO as "Chubb & Son, a division of Federal Insurance Company."  (Dkt. 433, Ex. 3.)  FICO pursued its goal of partnering with Chubb without any regard for which entity actually executed the License Agreement.  The key FICO employee involved in negotiating the License Agreement, Lawrence Wachs, testified that he "did not place any significance" on the "client" description in the agreements he was negotiating with Federal in 2006.  (Fleming Decl., Ex. 5 at 88:5-7; *see also* 89:22-24; 88:21-25 ("it would not interest me what the client's requested legal definition of their company [was], the contracting party").  The in-house FICO attorney who drafted the License Agreement testified that she did not view the signing entity as significant either. She understood that a division "is not a legal entity," and that "there are instances where divisions of companies enter into agreements for—I don't know what purpose, their own budgeting purposes or whatever purpose." (*Id.*, Ex. 6 at 111:25-112:19.)

While negotiating the Original License Agreement the Parties mutually agreed to remove any Territory restriction from the language that determined the scope of Federal's license to use Blaze. (Dkt. 433, Ex. 3 at § 2.1.)  FICO's in-house attorney Jandeen Boone sent Federal a copy of the "standard Blaze Software License and Maintenance

Agreement." (Dkt. 435, Ex. 8.) This document contained a territorial restriction in its

License Grant provision:

> Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes, *but only within the Territory* . . . .

(*Id.* at FICO0000176 (emphasis added).) Boone *removed* the reference to this term from

the License Grant:

> 2.1   <u>License Grant to Fair Isaac Products</u>.   Subject to the terms, conditions and limitations of this Agreement, Fair Isaac hereby grants to Client a **perpetual (subject to the provisions of Article 9)**, non-exclusive, non-transferable, limited license to use the Fair Isaac Products during the Term for its internal business purposes, ~~but only within the Territory~~ . . . .

(Dkt. 436, Ex. 9 at FICO0000132_0001.) A definition of the omitted Territory term was

left in the Original Agreement, modified to state "with respect to the installation and

physical location of the Fair Isaac Products, means the United States of America." (Dkt.

433, Ex. 3.) However, the term "Territory" was never added back to the body of the

Agreement.

## B.   Negotiation of Amendment Two.

At the start of negotiations in 2006 FICO wanted a broader agreement, but all

Chubb would buy was a license to use Blaze for one application for ▮▮▮▮▮ (*Id.* at

FICO0000218; Fleming Decl., Ex. 7.) Just over a month later FICO sold Chubb an

upgrade to a "Divisional License" for ▮▮▮▮▮ allowing Chubb to use Blaze within the

---

[1] In prior briefing the Parties stated that the license fees paid under the License Agreement totaled ▮▮▮▮▮ This price failed to deduct ▮▮▮▮▮ that FICO credited

"Chubb Specialty Lines Division" with "no other limitations (i.e. Seat or Named Application limitations)." (Dkt. 434, Ex. 4.) The parties continued discussing an enterprise-wide upgrade throughout this period, however, and Federal was clear that it needed the upgrade to allow "international" use. (Fleming Decl., Ex. 8 at FICO0001897.)

On December 28, 2006, the Parties executed the final upgrade to the License Agreement, Amendment Two, for ▮▮▮▮▮ (Dkt. 434 at Ex. 5.) The negotiation communications make clear that the License Agreement does not contain territorial limitations. FICO's pre-sales report from December 1, 2006 noted that discussions were about a "Global ela [enterprise license agreement] (Blaze Advisor)." (Fleming Decl., Ex. 3 at FICO0005639.) A December 12, 2006 email from Wachs to Waid, Schreiber, and others at FICO notes that FICO had dropped its price to ▮▮▮▮▮ for a "Global ELA." (*Id.*, Ex. 9 at FICO0001804.)

During these negotiations for Amendment Two, Federal specifically asked FICO whether the enterprise-wide license would include "any restrictions in using or redistributing the licenses across SBUs[2] and other IT areas . . . [s]aid another way do we get licensing rights to 30 and 45 licenses respectively to distribute as we see fit anywhere

---

to Federal under Amendment One. (*See* Dkt. 434, Ex. 4.) Thus, the license fees that Federal paid for Blaze in 2006 actually totaled ▮▮▮▮▮

[2] SBUs refers to Strategic Business Units, which were other unincorporated subdivisions within Chubb that functioned like departments in other corporations and serviced different categories of insurance consumers. (Lopata Decl., ¶¶ 11-12.)

at CHUBB?"  (Philip G. Folz Declaration, ¶ 12, and Ex. A.)  FICO replied, "[t]here are

no usage or redistribution restrictions within Chubb."  (*Id.*)

The License Grant in Amendment Two "supersedes" the grant in the Original

Agreement and reads:

> For purposes of this Amendment Two, the Enterprise-Wide License shall
> mean that Client and its Affiliates may use the Fair Isaac Product for their
> internal business purposes….

(Dkt. 434 at Ex. 5.)  The expansion to include Federal's "Affiliates" was an intentional

deviation from FICO's standard enterprise-wide license found in the Original License

Agreement, which excluded from use any "affiliated, subsidiary, or parent companies."

(Dkt. 433 at Ex. 3 at § 2.1(c).)

Phil Folz, who was a Senior Vice President for Federal at the time, negotiated

Amendment Two with FICO.  Folz understood that "the right to install and use the

software globally was a foundational aspect of the license."  (Folz Decl., ¶ 15.)  Folz

recalls describing to FICO "how we wanted to use the software if we entered into the

license," a description that included "global deployment."  (*Id.*, ¶ 14.)  Immediately after

Amendment Two was finalized, Folz allocated a portion of the cost of the Blaze License

to Federal's affiliates outside the United States, reflecting Federal's understanding that

the License Agreement provided global rights.  (*Id.*, ¶ 18 and Ex. C.)  Federal's post-sale

"Contract Notes" reflect an understanding that "Amend[ment] 2 upgrades CSI divisional

License to a worldwide enterprise license."  (Fleming Decl., Ex. 10 at

FED000043_0004.)

### C.    Pricing of the License.

The License Agreement was priced using the Gross Written Premium generated by the entire Chubb family of insurance companies.  (Fleming Decl., Ex. 11.)  █████

████████████████████████████████████████████████████████

████████████████████  (Dkt. 398 at 21.)

FICO's internal emails from 2006 make clear that it never attempted to isolate the revenues of the Chubb & Son division of Federal from the rest of Chubb when determining what price to quote Federal for the enterprise-wide global license.  (Fleming Decl., Ex. 11; *see also* Ex. 6 at 75:14-18.)  Rather, FICO's pricing was based upon the entire Chubb family of companies.

## III.   CHUBB USES BLAZE WITHIN AND OUTSIDE THE UNITED STATES, WITH FICO'S FULL KNOWLEDGE, AGREEMENT, AND COOPERATION.

In 2006, Federal initially used Blaze as a component in just one application for underwriting and policy renewals.  (Dkt. 433, Ex. 3 at FICO0000218.)  After purchasing the enterprise-wide license, Federal employed Blaze in other applications throughout its enterprise.  (Dkt. 424, ¶¶ 150-151.)

In 2008, the issue of Chubb's use of Blaze internationally arose.  On November 14, 2008, FICO's "client partner" in charge of the Federal relationship, Michael Sawyer, set up a conference call with several FICO employees in the U.S. and London "to discuss the Chubb license agreement and a plan for Chubb Europe."  (Dkt. 437, Ex. 14.)  Prior to this meeting with FICO's European employees, Sawyer sent Schreiber the License Agreement, both Amendments, and a copy of The Chubb Corporation's 2007 Annual

8

Report with a note to "[t]ake a look at page 26 & 27."  (Fleming Decl., Ex. 12 at FICO0002101.)  These pages of the Report listed the officers for Federal as well as two of its foreign affiliates in Canada.  (*Id.* at FICO0002150-2151.)

Wachs, who was one of the leads in negotiating the license, was then asked whether the final license was global.  Wachs responded on November 24, 2008, stating:

> In reviewing my notes and some archived e-mails it's apparent to me that the corporate ELA that was negotiated with Phil Folz and June Drewey *intended to include the Global license*.

(Dkt. 434, Ex. 6.)  In addition, prior to the meeting to discuss "a plan for Chubb Europe," at least two emails were exchanged between Richard Hill, a FICO employee in Europe, and Thomas Carretta, FICO's in-house counsel.  (Dkt. 437, Ex. 15 at Entries 656 and 662.)  On November 12, 2008, Hill emailed Carretta about the License Agreement, and on November 25, 2008, Carretta emailed Hill and Schreiber on the same subject.  (*Id.*)  Thus, Carretta must have reviewed whether the license was global and advised that it was.  FICO thereafter took the position that Federal already had a global license and did not attempt to sell Federal, or its European affiliates, any additional licenses for Blaze.

After reaffirming its position that the License Agreement allowed global use and installation in November 2008, *all* of FICO's internal and external communications about the territorial scope of the Agreement acknowledge that it allowed use around the world:

- In August 2012, Hill emailed Schreiber confirming that the License allowed global use.  (Dkt. 436, Ex. 13 at FICO0003279 ("I seem to remember their US blaze license allowed them the software for free.").)

- In August 2012, Sawyer responded to Hill confirming Federal had a global, enterprise-wide license and that Federal was already using Blaze in the UK.  (*Id.* at

FICO0003278 ("They do have a Global ELA [enterprise license agreement] for Blaze and have an automated UW Application running in the UK already.").)

- In August 2013, Hill emailed another FICO employee about selling new products to Federal and wrote "[t]o set expectations, they already have a Blaze global ELA." (Dkt. 437, Ex. 16.)

- On March 26, 2015, Schreiber wrote that "Chubb has global ela for blaze." (*Id.*, Ex. 17 at FICO0001770.)

- In April 2015, FICO wrote to Federal that "[n]o additional license(s) are needed as it is covered within the overall global Blaze ELA." (*Id.*, Ex. 18.)

In addition, it is undisputed that FICO knew that Federal used and installed Blaze outside of the United States. (*See, e.g.,* Dkt. 436, Ex. 10 at 51:1-7 ("[W]ith respect to Chubb Europe, Henry [Mirolyuz of Chubb] was very open about the use of the software to support Europe . . . .").) On December 1, 2015, Sawyer forwarded another FICO employee a copy of a FICO presentation entitled "Chubb Blaze applications," which included a description of "Chubb International" applications using Blaze on its very first slide. (Fleming Decl., Ex. 13 at FICO0005452.) This presentation parallels an earlier joint marketing presentation involving both FICO and Chubb that explicitly referenced Chubb's activities outside of the United States. (Dkt. 436, Ex. 12 at FED006784_0003-0004.)

FICO assisted Federal in installing Blaze in Europe. Ewen Setti, the main developer who worked with Blaze at Chubb Insurance Company of Europe, communicated directly with FICO and set up a series of workshops with FICO regarding Blaze. (David Gibbs Declaration, ¶ 3; Ewen Setti Declaration, ¶ 2.) During these workshops, it was understood that Chubb Europe had a global license to install and use

10

Blaze, and FICO did not suggest otherwise. (*Id*.) FICO even sent Chubb Europe the Blaze installation files and helped it install Blaze. (Gibbs Decl., ¶ 4; Declaration of Patrick Sullivan, ¶¶ 6-7.) FICO also assisted Chubb Europe during the testing phase in the development environment. (*Id*., ¶ 5.) Coincidentally, Chubb Europe was in the same building as FICO, so whenever Chubb Europe needed help with Blaze, it contacted FICO directly. (*Id*., ¶ 4; Setti Decl., ¶ 3.) There was no discussion or negotiation with FICO regarding the scope of the Blaze license or payment for the license because it was understood by Chubb Europe and FICO that the license to install and use Blaze was global. (Gibbs Decl., ¶ 6; Setti Decl., ¶ 4.)

Federal's former Vice President of Software Compliance testified that Federal hired FICO to assist with the implementation of Blaze in Europe. (Fleming Decl., Ex. 14 at 184:1-17; *see also id.* at 233:7-14, 240:7-17.) A white paper that FICO prepared in 2011 corroborates this account by noting that "FICO faced challenges at Chubb in the UK." (Dkt. 439, Ex. 31 at FED007129_0055.)

In sum, every FICO employee that came into contact with the License Agreement prior to the 2016 ACE-Chubb merger knew that it did not contain any territorial restrictions. FICO not only <u>knew</u> Blaze was installed in Europe, it <u>helped install it</u>.[3]

---

[3] Federal has submitted the Declarations of five employees and former employees who worked closely with Blaze and FICO. (Declarations of Philip Folz, Patrick Sullivan, David Gibbs, Ewen Setti, and Zorica Todorovic.) Four of these declarants state that they believed, based upon the License Agreement or FICO's conduct that the License Agreement was global. (Folz Decl., ¶¶ 14-18; Sullivan Decl., ¶¶ 6, 8; Gibbs Decl., ¶¶ 4-6; Setti Decl., ¶¶ 2-4.)

## IV.   THE ANNOUNCEMENT OF THE ACE-CHUBB MERGER.

ACE's intention to acquire Federal's parent, The Chubb Corporation, was publically announced on July 1, 2015.  Schreiber and Sawyer began discussing a strategy to assert that this was a "license transfer," or assignment, and leveraging the deal to demand additional Blaze license fees.  (Dkt. 437 at Ex. 19.)  FICO employees discussed this issue repeatedly after July 2015.  (Dkt. 437-38 at Exs. 19-21.)  In November 2015, Schreiber, Sawyer, and Waid held an internal meeting to discuss FICO's strategy for obtaining "licensing expansion fees" due to the planned merger.  (Dkt. 437 at Ex. 20.)

Schreiber and Sawyer, however, knew that the License Agreement did not allow them to leverage Federal for more fees.  In an October 2015 email to Sawyer, Schreiber wrote that he was concerned FICO would have no reasonable basis to withhold its consent, even if Federal refused to pay more.  (Dkt. 438 at Ex. 21 at FICO0001700.) They acknowledged that nothing in the License Agreement allowed FICO to demand more licensing fees based on the new parent company's greater insurance premiums.  (*Id.* at FICO0001698 (Sawyer acknowledged that the License Agreement did not allow them to charge more, stating "I don't see anything on GWP[4] in the agreements"); *see also id.*, Dkt. 434, Ex. 7 at 273:1-277:5 (Schreiber stating that: "the lack of a defined what is 'unreasonably withheld' would have caused me to pause."; FICO's ability to increase the price "wasn't documented . . . one less fact I had in writing.").)

---

[4] GWP means "gross written premium."  Sawyer's point was that the License Agreement did not facially allow FICO to demand additional license fees solely on a theory that its client's gross written premiums might expand.

## V.      THE MERGER CLOSES, AND FICO MOVES TO EXTRACT FEES.

The ACE-Chubb merger closed on January 15, 2016, when ACE INA Holdings Inc., owned by ACE Limited, merged with The Chubb Corporation, Federal's parent, and the surviving entity was renamed Chubb INA Holdings Inc.  (Dkt. 442, ¶¶ 6-7.)  Despite Federal and FICO's long working relationship and despite the lack of contractual support for any right to demand additional fees, Sawyer, Schreiber, and other FICO employees launched their plan to extract additional fees from Federal.

Even though FICO had been discussing the matter internally for months, the only contact that FICO attempted to make with Federal prior to merger was to leave a voicemail for one Federal employee just before the year-end holidays, following up with an email in early January a week before the merger closed.  (Dkt. 438 at Ex. 22.)  The first substantive communication about the merger was a demand letter from FICO.  (Dkt. 438 at Ex. 23.)  On January 27, 2016, twelve days after the closing of the merger transaction, FICO's in-house counsel Carretta sent Federal a demand letter stating the position that FICO had decided upon in July 2015, specifically, that the merger somehow breached the License Agreement.  (*Id.*)  By this point, FICO knew that Federal was in a weaker negotiating position than in July 2015, because it takes months to transition to new business rules management software.  (Dkt. 433, Ex. 3 at § 9.2(a); Dkt. 374, ¶¶ 90-91, 95.)

In these post-merger negotiations, FICO never sought to determine whether the merger would actually result in an "expanded use" of Blaze as required by § 10.8 of the License Agreement.  In fact, at the time it withheld consent FICO was unaware of any

13

expanded use.  (Dkt. 436, Ex. 10 at 135:4-7.)  Moreover, during negotiations following the merger, FICO had no evidence that would indicate Federal had expanded or would expand its use following the merger, and Federal actually offered to *limit* its use of Blaze going forward in a good faith effort to resolve FICO's threats.  (*Id.*; *see also* Dkt. 438, Ex. 24 (Federal offering that "[a]ll usage now and going forward does not and will not change from that permitted under the current license agreement and all usage remains with the same named applications.").)  FICO rejected Federal's offer to limit Blaze use in less than 24 hours with no explanation.  (Dkt. 438, Ex. 25.)  FICO's employee Bill Waid, who was instrumental in Blaze pricing and negotiations, later explained why: according to FICO, the merger alone *was* the expanded use, which is why the actual post-merger use of Blaze was unimportant to FICO.  (Dkt. 438, Ex. 26 at 240:15-20.)

During these negotiations, FICO also sought to gain additional leverage by asserting that Federal breached the License Agreement by using Blaze outside the United States.  Sawyer, Carretta, and others misrepresented to Federal's representatives that they had just learned about Federal's use of Blaze outside the United States.  (Fleming Decl., Exs. 15-18.)  Of course, this was a complete fabrication, as Sawyer, Carretta, and others at FICO had known about this use for years and had even participated in that use with Federal and its affiliates on multiple occasions.  (*See* § III *supra*.)  In an about-face, during pre-suit negotiations with Federal, Sawyer "instructed" several FICO employees in its international offices that "[i]f your Chubb counterparts ask about their license rights, please just let them know you believe their rights were limited to use in the United States."  (Fleming Decl., Ex. 19.)

## VI.    USE OF BLAZE POST-MERGER.

After the merger, Federal's use of Blaze remained confined to the same Federal applications where it was used prior to the merger.  (Dkt. 441, ¶¶ 5-6.)  No additional applications were ever added.  (*Id.*)   Indeed, after the merger Federal *retired* two applications which used Blaze in the United Kingdom.  (*Id.*)  The overall use of the Blaze-integrated applications, in terms of gross value of insurance premiums that these applications are used in connection with, has also decreased since the merger.  (*See* Dkt. 408 at Schedules 10.1 and 11.1 ("Total" rows showing decreases in both foreign and domestic premium numbers from 2017 to 2018).)

## ARGUMENT

## I.    FEDERAL'S GLOBAL USE AND INSTALLATION IS ALLOWED UNDER THE LICENSE AGREEMENT.

FICO's argument regarding foreign deployment of Blaze is twofold.  First, FICO argues that foreign use of Blaze is allowed, but foreign installation is not.  According to this argument, which is based on the definition of the term "Territory," foreign use is permitted if such use accesses software that is installed on servers in the United States, thousands of miles away.

Second, FICO argues that the "employee clause" in § 3.1 invalidates any foreign use because (1) Chubb & Son, an unincorporated division of Federal was the "Client" under the License Agreement, (2) only employees of the "Client" can use Blaze, and (3) Chubb & Son does not have any foreign employees or affiliates.

As explained below, each of FICO's positions fail as a matter of law.

### A.      FICO's Argument That "Territory" Forbids Foreign Installation Violates Interpretive Rules and Is Inconsistent with the Facts.

FICO asserts that the License Agreement allowed the use of Blaze outside of the United States, but not its installation.  FICO's argument must be rejected because (1) it is based entirely on a defined term that is not used in the body of the License Agreement and (2) it is inconsistent with the undisputed material facts.

### 1.      The License Agreement Does Not Restrict Installation.

The License Agreement does not contain any restriction on the locations in which Blaze may be used or installed. The License Grant in the Original Agreement does not mention any such restriction, and neither does the License Grant in the Second Amendment.  (Dkt. 433, Ex. 3 at § 2.1; Dkt. 434, Ex. 5.)

FICO creates a restriction from the vestigial definition of "Territory," but this is wrong.  (Dkt. 433, Ex. 3 at § 1.)  As explained above, that defined term is not used anywhere and was never incorporated into the substantive areas of the License Agreement.  The Original License clearly states in the definitions section that the defined "terms" only have meaning "as <u>used</u> in this Agreement with initial capital letters." (*Id.*) (emphasis added). The term "Territory" is not used in the Agreement.[5]  Thus, under the clear language of the License Agreement, "Territory" does not create a restriction on installation.

---

[5] FICO apparently claims that the recitation of the defined terms in the "Definitions" section is that term being "used" in the License Agreement.  This argument is circular.  If a defined term was considered "used" merely by being defined, then there would be no need for the Definitions section to express that such terms only have meaning when "used."

16

It is well-established that the mere definition of a term does not create any binding contractual covenants. *See, e.g.*, *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 766 (N.D. Ill. 2019) (contractual recitals are "not binding on the parties or an effective part of their agreement unless referred to in the operative portion of [the] agreement.") (citation omitted); *Trunzo v. Allstate Ins. Co.*, No. CV-04-1789, 2006 WL 2773468, at *6 (W.D. Pa. Sept. 25, 2006) (granting summary judgment where defined term was not used in disputed portion of contract because "[t]he term . . . appears nowhere in the specific contractual language at issue in this case"); *Weber v. GE Grp. Life Assur. Co.*, No. 05-CV-165-JHP-SAJ, 2007 WL 764288, at *6 (N.D. Okla. Mar. 9, 2007), *aff'd*, 541 F.3d 1002 (10th Cir. 2008) ("The 'Definitions' section of the [contract], standing alone, does not add to or subtract from the rights and obligations under the [contract]. It is only when a defined term is used in a substantive part of the [contract] that the definition has any relevance.").

This conclusion is bolstered by other provisions of the License Agreement.  For instance, the License Agreement gives FICO audit rights, but not to audit installation location.  Rather, FICO only contracted for the right to audit how and where Federal "used" and "operated" Blaze.  (*Id.*, § 3.)  In addition, the License Restrictions provision of the Agreement that FICO relies upon does not restrict installation.  Rather, it relates to "use" of Blaze.  (Dkt. 433, Ex. 3 at § 3.1.)

The only other provision of the Agreement that deals at all with installation is in Exhibit B to the License Agreement, relating to software support.  (Dkt. 433, Ex. 3 at FICO0000220.)  Exhibit B explicitly contemplates that the software will be installed in

17

locations outside of the United States, defining and using the term "Product Support Hours" for "software to be installed at locations in North America, Asia, and South American" and for "software to be installed at locations in Europe, Middle East, and Africa." (*Id.*)

### 2. The Conduct of the Parties Confirms the License Does Not Restrict Installation.

The conduct of the parties supports the conclusion that the license was global and that foreign installation was not prohibited. FICO and Federal specifically negotiated to <u>remove</u> the reference to "Territory" from the body of the Agreement, namely the License Grant Section. (*See* Background § II.A.) However, FICO now claims, for the first time, that during negotiations it intended to add an installation restriction back by adding the term "installation" to the Territory definition.[6]

This supposed intention is belied by every statement FICO made, and every action it took, both before and after it executed its leverage play for more fees. The undisputed evidence indicates FICO was never concerned with where Blaze was <u>installed</u>; it only ever considered where it was <u>used</u>. FICO repeatedly referred to the License Agreement as "global," without mentioning any domestic installation restriction. (*See* Background § II.A *supra*.) In 2008, the issue arose of whether Chubb was allowed to deploy Blaze in Europe. (Dkt. 434, Ex. 6.) Concluding "no" could have entitled FICO to seek a new agreement and more licensing fees. (Fleming Decl., Ex. 20.) In this circumstance, where FICO would have been expected to assert the installation restriction, FICO allowed the

---

[6] Adding language to an unused term did not impact the License Agreement as per § I.A.1 above.

installation and use in Europe.  The FICO employee who negotiated the deal reviewed his notes and concluded that the parties' agreement was global. (Dkt. 434, Ex. 6.)  Even FICO's in-house counsel Carretta reviewed the License Agreement and concluded that foreign use was allowed, raising no installation restrictions. (Dkt. 437, Ex. 15.)  FICO employees in London had meetings with Federal employees in London. (Gibbs Decl., ¶ 3; Setti Decl., ¶ 2.)  A FICO executive later confirmed his knowledge that Federal had Blaze "running in the U.K."  (Dkt. 436, Ex. 13 at FICO0003278.)

Not only did FICO not object to these foreign installations, FICO actually assisted Federal in installing Blaze in Europe.  (*Supra* Background § III.)  FICO never distinguished between use and installation with Federal. (Sully Decl. ¶ 3; Folz Decl., ¶¶ 11-12, 14-17.) In fact, Carretta testified that restrictions on installation and use were essentially the same thing.  (Dkt. 460-8 at 103:22-24.)

FICO's conduct after the merger confirms that its focus was on use.  In January 2016, Sawyer asserted that Chubb's license was limited to "use in the territory of the US.," saying nothing about installation.  (Dkt. 460-2 (emphasis added).)  Later, Carretta wrote that "FICO had become aware of a further material breach due to the use of the Software outside the United States."  (Dkt. 460-4 (emphasis added).)

Under the language of the License Agreement, it is clear there is no such restriction.   The parties' actions make this even clearer. Chubb never intended an installation restriction and neither did FICO.  *See, e.g.*, *Compagnie Financiere de Cic et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith*, 232 F.3d 153, 158 (2d Cir. 2000) ("the court may resolve ambiguity in contractual language as a matter of law if

the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary" (internal citation omitted)); *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997) (similar).

    **B.**    **FICO's Interpretation that only Employees of an Unincorporated Division May use Blaze is Contrary to Law.**

FICO also contends that the "employee clause" in Section 3.1 prohibits the use of Blaze by any employees except those of the "Client," and that "Client" means only Chubb & Son, the unincorporated division of Federal.   Thus, FICO concludes any use of Blaze by foreign employees of foreign Chubb entities which are not Chubb & Son violates the License Agreement.  This argument fails.  First, according to well-established law and the plain language of the Agreement, the "Client" is not Chubb & Son; it is Federal.   Second, interpreting the Client to be Chubb & Son would render the license useless.  Since Federal is the client, employees of all of Federal's foreign subsidiaries may use Blaze, and there is no breach.

    **1.**    **Under the Law, the License Agreement by its Plain Language Names Federal as the Client.**

The License Agreement defines "Client" as "Chubb & Son, a division of Federal Insurance Company."  (Dkt. 433, Ex. 3.)  Chubb & Son was not a legal entity.  (Lopata Decl., ¶ 4.)  It was an unincorporated division of Federal Insurance Company.  (*Id.*)  The only legal entity mentioned in the definition of "Client," is Federal Insurance Company. (Dkt. 433, Ex. 3.)

When a contract is signed that way, well-established case law holds that the <u>legal entity</u>, not the <u>unincorporated division</u>, is the contracting party.  *Affymax, Inc. v. Johnson*

& *Johnson*, 420 F. Supp. 2d 876, 879 (N.D. Ill. 2006) ("An unincorporated division . . . has no legal existence apart from its parent corporation"); G*en. Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 525 (Fed.Cl.2000) ("The fact that 'Electric Boat Division' is appended to the designation 'General Dynamics Corporation' is legally inconsequential because an unincorporated division does not have a legal status independent of the corporation. 'A division of a corporation is not a separate entity but is the corporation itself.'" (citation omitted)); *Judson Pacific–Murphy Corp. v. Durkee*, 301 P.2d 97, 102 (Cal. Ct. App. 1956) (holding that corporation—not the unincorporated division named on the contract—held contracting license and thus any performance undertaken by its division was licensed as the two were part of the same legal entity).

Thus under the plain language of the License Agreement, Federal Insurance Company is the "Client." As a result, there is no violation of the "employee clause" and this aspect of FICO's breach of contract claim fails.

### 2.      Interpreting Client as Chubb & Son Leads to Absurd Results.

FICO's interpretation of "Client" must also be rejected because it would lead to absurd results. It is well-established law that a contract should not be interpreted to lead to an absurd or commercially unreasonable result. *Greenwhich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'" (citation omitted)). Moreover, an interpretation that renders clauses of the contract meaningless must be avoided. *Ajdler v. Province of Mendoza*, 890 F.3d 95, 100 (2d Cir. 2018) ("[A] contract must be construed

so as to give full meaning and effect to all of its provisions and an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." (citations and quotations omitted)).

First, and most fundamentally, FICO asserts that § 3.1 restricts use of Blaze to the Client's employees.  But Chubb & Son has no employees.  (Lopata Decl., ¶ 4.)  FICO's interpretation, therefore, leads to an absurd result, which is that no person could <u>ever</u> make use of Blaze under the License Agreement.  (Lopata Decl., ¶ 10.)  This simply cannot be the correct interpretation of the License Agreement, for which Federal paid ███████

Second, in December of 2006, FICO and Chubb expanded the License Agreement to be enterprise-wide.  (Dkt. 434, Ex. 5.)  Whereas the Original License restricted use of Blaze to just the "Client," in December 2016, the parties signed Amendment Two which expanded  the parties entitled to use Blaze to "Client <u>and Affiliates</u>."  (*Id.*) (emphasis added)  Affiliates were defined as those entities of which the "Client" owned more than fifty percent (50%). (*Id.*)

Chubb & Son had no affiliates.  By contrast, Federal Insurance Company had multiple affiliates, including foreign entities.  It thus leads to an absurd result to interpret the addition of the "Affiliates" clause as meaningless, as FICO does.  *Diamond Castle Partners IV PRC v. IAC/InterActivecorp*, 918 N.Y.S. 2d 73, 75 (N.Y. App. Div. 2011) (refusing to adopt contract interpretation that would render "affiliates" clause meaningless).  Under FICO's argument, the parties entered into Amendment Two for no purpose, since it did not expand the license to other users, and the scope of the License

Agreement remained the same, with only Chubb & Son entitled to use.  FICO concedes the illogical implications of its argument.  (Dkt. 398 at 16 ("It is impossible to give the affiliate language of Amendment Two meaning, because Amendment Two is with Chubb & Son, an unincorporated division").)  Because FICO's interpretation would render the Affiliates Clause meaningless, it violates well-established law.[7]

Moreover, FICO priced the enterprise-wide license based upon the revenue of the entire Chubb family of insurance companies—not based upon a discrete division, or revenue generated only within the United States.  (*Supra* Background § II.C.)

## C.  FICO Waived its Claimed Restrictions.

Even if FICO's interpretations regarding foreign restriction are correct, its claims still fail due to waiver.

### 1.  The License Agreement does not Preclude Waiver.

As a threshold matter, § 10.4 of the License, which is a generic no waiver provision, does not foreclose a waiver defense under New York law, despite FICO's argument to the contrary.  New York law is clear that parties may waive contractual

---

[7] FICO's interpretation renders other provisions meaningless as well.  For example, § 3.1 provides certain representations and warranties from the "Client's employees."  (Dkt. 433, Ex. 3 at FICO0000209.)  Chubb & Son has no employees.  (Lopata Decl., ¶ 4.) Section 3.6 recognizes that "Client's information technology infrastructure operations have been outsourced to ACS Commercial Solutions, Inc." and grants ACS Commercial Solutions the right to use Blaze.  (*Id.*)  Federal, not Chubb & Son, outsourced its information technology infrastructure to ACS Commercial Solutions.  Section 6.1 provides that FICO will indemnify Client's "directors, officers, employees, agents, successors, and assigns[.]"  (*Id.* at FICO0000212.)  Chubb & Son has no directors, employees, agents, successors or assigns.  (Lopata Decl., ¶ 4.)  Section 8.2 relates to the Client's treatment of taxes associated with the License.  (*Id.* at FICO0000212.)  Chubb & Son pays no taxes.

provisions through their course of conduct, even when a no waiver provision requires any waiver be in writing. *Five Star Development Resort Communities, LLC v. iStar RC Paradise Valley LLC*, No. 09 Civ. 208 (LTS), 2010 WL 1005169, at *4 n.3 (S.D.N.Y. Mar. 18, 2010) (Under New York law "parties can waive no-waiver provisions through their course of conduct."); *see also Alarm Monitoring Corp. v. D'Agostino Supermarkets, Inc.*, 875 N.Y.S.2d 818, at *7 (N.Y. Sup. Ct. 2008) (stating that an intent to waive a contractual right may be inferred despite a "no waiver" clause, and denying motions for summary judgment on the issue of whether plaintiff had waived any contractual rights to timely payment); *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989) (finding waiver and noting "[w]hile the Contract contains a no-waiver provision in paragraph G.2, New York law allows the parties to waive such a no waiver provision by a subsequent course of conduct").

*MVP Health Plan, Inc. v. Optuminsight, Inc.*, cited by FICO, does not hold otherwise.   Rather, it establishes that the presence of a no waiver clause does not foreclose Federal's waiver claim:

> Parties can waive contractual provisions and can even waive no-waiver provisions through their course of conduct… In New York the doctrine is well established that, even where a contract provides that there shall be no waiver or amendment not evidenced by a writing, the prohibition of oral waiver, may itself be waived.

No. 1:13-cv-1578 (BKS-CFH), 2016 WL 6638190, at *9 (N.D.N.Y. Sept. 30, 2016) (applying New York law).[8]   Contrary to FICO's argument, § 10.4 does not prohibit Federal's waiver defense.

### 2.   FICO's Conduct Waived Its Claimed Restrictions.

Waiver is a defense to breach of contract.   Under New York law, "[i]t is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract[9], such continuing performance constitutes waiver of the breach."   *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991), *aff'd sub nom Yaeger v. Nat'l Westminster*, 961 F.2d 1 (2d Cir. 1992).   Here, FICO interpreted the License Agreement as allowing global installation and use, knew of, supported, and acquiesced in Federal's foreign installation and use, and never raised any claimed restrictions, either internally or to Federal.

### (a)   FICO Consistently Interpreted the License Agreement as Allowing Global Use and Installation.

Throughout its decade-long relationship with Federal, FICO consistently interpreted the License as allowing Federal to deploy Blaze globally.   FICO never raised

---

[8] Courts in other jurisdictions agree.  *See, e.g.*, *Bernsen v. Innovative Legal Mktg., LLC*, 885 F. Supp. 2d 830, 833 (E.D. Va. 2012) (recognizing that contractual rights under a no waiver clause are subject to waiver); *Ada Liss Grp. (2003) Ltd. v. Sara Lee Corp.*, No. 1:06-cv-610, 2013 WL 4735387, at *20 (M.D.N.C. Sept. 3, 2013) (finding that defendants had waived agreement's no waiver clause through their conduct).

[9] FICO accepted millions of dollars in maintenance and other fees from Federal subsequent to the 2008 discussions about the territorial scope of the License Agreement. (Fleming Decl., Ex. 31; Ex. 32 at 140:6-141:3.)

any installation restriction or claimed employees in foreign countries could not use Blaze, even when doing so would have generated additional revenue for FICO.

In 2008, in response to Federal's desire to make use of Blaze in Europe, FICO employees reviewed the License and the parties' negotiations.  (*See* Background § III *supra*.)  Schreiber and Sawyer, who were in charge of the Federal account, met with Hill to determine whether Federal's License allowed global deployment of Blaze.  (Dkt. 434, Ex. 6; Dkt. 436, Ex. 13.)

After reviewing the License and consulting with in-house counsel, FICO concluded that the License was global:

> In reviewing my notes and some archived e-mails it's apparent to me that the corporate ELA that was negotiated with Phil Folz and June Drewey *intended to include the Global license*.

(Dkt. 434, Ex. 6 (emphasis added).)

Thereafter, *all* of FICO's internal and external communications about the territorial scope of the License acknowledge it is global, and do not raise either of the restrictions for which FICO now argues.  (*See* Background § III *supra*.)  FICO actually assisted Federal in installing Blaze in Europe.  (*Id.*)  FICO could have sold Federal an additional license to recognize additional revenue.  (Fleming Decl., Ex. 20 ("It could present opportunities to sell additional software/upgrade (depending on what is included on their Blaze ELA [enterprise license agreement]").)  FICO did not do so.

> **(b)     FICO was Aware of and Supported Federal's use of Blaze Globally.**

It is undisputed that FICO knew Federal deployed Blaze outside of the United States. FICO employees admitted Federal employees were "very open" about use of Blaze globally. (*See, e.g.*, Dkt. 436, Ex. 10 at 51:1-7 ("So with respect to Chubb Europe, Henry [Mirolyuz of Chubb] was very open about the use of the software to support Europe"), *see also* 45:10-13.) In addition, FICO helped Federal install Blaze outside of the United States. (*See* Background § III *supra*.)

> **(c)    In 2015, FICO Chose not to "hold [Federal] to the letter of the… license."**

Years after Federal began using Blaze, Sawyer asked Schreiber (his boss) whether the License allowed use of Blaze only within the United States. (Dkt. 436, Ex. 10 at 42:20-43:6.) Schreiber instructed Sawyer to allow Federal to continue to use Blaze outside of the United States, even if Sawyer believed it was outside of the scope of the License because "the time was not right" to raise the issue with Federal. (*Id.* at 43:9-13.) According to Schreiber, he made the decision not to "rock the boat" because Federal was a "good client" and the companies had a "great history together." (Dkt. 434, Ex. 7 at 124:6-18, 138:24-139:4, 139:23-140:1.) Schreiber admitted that it was "certainly possible" that he made the decision not to "hold [Federal] to the letter of the… license." (*Id.* at 141:14-21.) Thus, the only time a territorial restriction was raised internally at FICO, FICO employees in charge of managing the Federal-FICO relationship chose not to "hold [Federal] to the letter of the… license" and instead allowed Federal to continue using the software globally.

### 3.    FICO's Employees had Authority to Waive.

FICO claims its employees' consistent and unequivocal interpretation of the License as allowing global use does not matter because Schreiber and Sawyer did not have the authority to waive a contractual provision.  FICO is wrong because Schreiber and Sawyer had actual and apparent authority to waive.

An employee has the ability to bind the employer through his actions if the employee has actual or apparent authority to do so.  *Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 327-28 (2d Cir. 2010).  An employee has actual authority where the principal granted the employee the power to do a particular act on the principal's behalf.  *Id.* at 327; *see also Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 260 (S.D.N.Y. 2002) ("Actual authority exists when an agent has the power 'to do an act or to conduct a transaction on account of the principal . . . because of the principal's manifestation to him.'").  An employee has the apparent authority where the employer, through words or conduct reasonably interpreted by a third party, causes the third party to believe that the employer consented to the act done on its behalf.  *Bd. of Educ. of Plainedge Union Free Sch. Dist. v. Conn. Gen. Life Ins. Co.*, 309 F. Supp. 2d 416, 420 (E.D.N.Y. 2004).  "These representations . . . need not be made through actual contact between the principal and third party." *Trina Solar US, Inc. v. JRC-Servs. LLC*, 229 F. Supp. 3d 176, 187 (S.D.N.Y. 2017) (citation omitted).  A principal may be estopped from denying apparent authority of an agent or employee where it remains silent in the face of an opportunity to speak to the contrary and when the employer knew

or ought to have known that the silence would be relied upon. *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 163 (S.D.N.Y. 2007).

Schreiber and Sawyer had actual authority to waive because FICO granted them authority to negotiate the License with Federal and to manage the day-to-day business relationship with Federal. As Sawyer explained, he and the other "client partners" at FICO "were the authoritative figures on the relationship with Chubb." (Fleming Decl., Ex. 21 at 36:-37:3.) Sawyer was clear that "[w]hen you are the client partner for an account at FICO, it is your responsibility to understand the contracts associated with your assigned accounts." (*Id.* at 54:22-55:1; *see also id.*, Ex. 22 at 17:5-23, 20:3-21:19 ("I would certainly want to read the scope of the license, yeah".).) Indeed, when questions arose regarding the scope of the License, FICO employees consulted Schreiber and Sawyer because they were the client partners in charge of the business relationship. (*Id.*, Ex. 23.) FICO issued a formal offer to Federal in which the scope of the Blaze License was represented to be global, based upon consultations with Sawyer and Schreiber. (*Id.*, Exs. 24-25.) Sawyer even instructed other FICO employees to change their interpretation of the License Agreement to support FICO's position in the 2016 post-merger negotiations. (*Id.*, Ex. 19.)

Schreiber and Sawyer actually held higher positions at FICO than the FICO attorney who signed the License Agreement. Boone, the FICO attorney who signed the License Agreement, testified that the scope and particulars of the License Agreement were dictated by the business client, Wachs. (*Id.*, Ex. 6 at 19:5-21:8.) Schreiber testified

that he and Wachs were "partners" in the pursuit of Federal as a client, and that Wachs's position at FICO was below Schreiber and Sawyer.  (*Id.*, Ex. 22 at 189-191.)

In addition, and at a minimum, Schreiber and Sawyer had apparent authority because FICO held Schreiber and Sawyer out as the individuals responsible for managing the Federal-FICO relationship.  (*Id.* Ex. 21 at 36:-37:3, 54:22-55:1; Ex. 22 at 17:5-23, 20:3-21:19); *see, e.g.*, *Hidden Brook Air, Inc.*, 241 F. Supp. 2d at 264 (finding that agent had apparent authority as a matter of law where principal entity directed third party to deal with agent in transaction); *In Bd. of Educ. of Plainedge Union Free Sch. Dist.*, 309 F. Supp. 2d at 420 (employee had apparent authority to bind employer due to job title and third party's reasonable belief that employee had such authority).

While summary judgment in Federal's favor is appropriate on this issue, if the Court does not grant summary judgment in Federal's favor, the issue must be tried.  *See, e.g.*, *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 289 (2d Cir. 2003) ("'The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment.'" (citation omitted)).   Therefore, FICO's request for summary judgment on this point must be denied.

### D.    FICO is Estopped from Asserting the Restrictions.

FICO is also equitably estopped from asserting the territorial and employee restrictions because during the course of their decade-long relationship the parties treated the License as containing no such restrictions.   Even if the Court accepts FICO's interpretation of the License, it would be inequitable to allow FICO to enforce those

restrictions when it knew of, supported and acquiesced to Federal's global use and installation.

### 1.    FICO's Conduct Meets the Standard of Estoppel.

Equitable estoppel denies a litigant "the right to plead or prove an otherwise important fact because of something [it] has done or omitted to do." *DeCarlo v. Archie Comic Pubs., Inc.*, 127 F. Supp.2d 497, 509 (S.D.N.Y. 2001).[10]   The doctrine applies to claims for breach of contract.  *Id.*  Equitable estoppel requires proof that (1) plaintiff had knowledge of defendant's conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment. *Id.*  Whether equitable estoppel applies in a given case is a question of fact that is not generally appropriately resolved on summary judgment.  *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).

The elements of equitable estoppel are satisfied here.  It is undisputed that FICO had knowledge of Federal's foreign use and assisted with Federal's deployment of Blaze outside of the United States.  (*See* Background § III *supra*.)  This conduct gave Federal a right to believe that use by foreign employees and foreign installation was permitted by the License.  *Sterling v. Interlake Indus. Inc.*, 154 F.R.D. 579, 585 (E.D.N.Y. 1994) ("There does not have to be an actual attempt to mislead.  It is sufficient that the party

---

[10] Equitable estoppel additionally applies to claims for copyright infringement, although FICO has not moved for summary judgment on its copyright infringement claim. *DeCarlo*, 127 F. Supp.2d at 511.

being estopped knew or had reason to believe that their acts or inaction might prejudice the party asserting estoppel."); *DeCarlo*, 127 F.Supp.2d at 510 (equitable estoppel barred claim because "[u]ntil filing this suit, plaintiff admits that he had never so much as voiced his discontent to [defendant] about its use of the [copyrighted material] . . . or the alleged contractual obligations of [defendant] which he now asserts.").

From 2006 to 2016 FICO was silent regarding the restrictions it now seeks to impose, and all of its own communications show that FICO believed the License allowed global installation and use by foreign employees.  Under these circumstances, Federal had a right to believe its use and installation was allowed.  It relied on that belief FICO engendered and installed and used Blaze overseas.  This Court should estop FICO from asserting otherwise.

### 2.      The Integration Clause does not Foreclose the Estoppel Defense.

FICO argues that estoppel is barred by the License's integration clause.  None of the cases FICO cites stand for the proposition.  To the contrary, in New York, an integration clause may be overcome by equitable estoppel where the party relies to its detriment on the modification.  *See, e.g.*, *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 344 (1977) ("Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification"); *Christian Dior-New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 39 (2d Cir. 1986) (affirming denial of summary judgment and allowing party to proceed to trial on estoppel defense where contract contained integration clause requiring modifications to be in writing).  Because Federal relied to its

detriment on FICO's conduct allowing installation and use outside of the United States by installing and using Blaze within its systems outside of the United States, the integration clause does not foreclose the estoppel defense.

**E.     The Statute of Limitations Bars any Claim Based on Conduct Occurring Prior to April 21, 2010.**

FICO filed its initial Complaint on April 21, 2016.  (Dkt. 1.)  New York law provides a six year limitations period for breach of contract actions.  Therefore, to the extent FICO's claims accrued prior to April 21, 2010, they are time barred.

FICO's claim that installation in Europe was a breach of the License Agreement is barred because it is based upon an alleged installation that took place in 2009.  (Dkt. 398 at 8.)  FICO may try to argue that the claim is not time barred based on a "continuing accrual" theory.  *City of New York v. FedEx Ground Package Sys., Inc.*, 351 F. Supp. 3d 456, 477 (S.D.N.Y. 2018).  This argument fails because acts of installation are discrete acts.  *Id.* ("Where a plaintiff's claim is based on a series of discrete acts that are in and of themselves unlawful, such acts 'are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" (citation omitted)).  Accordingly, FICO's breach of contract claims against Federal based upon installation in Europe are barred.

**F.     FICO's Assertion that Federal Waived a "Course of Dealing" Defense is Without Merit.**

FICO asserts that any "course of dealing" defense has been waived by Federal.  In doing so, FICO does not cite a single case establishing that "course of dealing" is an affirmative defense that must be raised in the pleadings.  Moreover, the parties' course of dealing is related, among other things, to Federal's asserted defenses of waiver and

estoppel.  The court may therefore consider the parties' course of dealing. *See Teamsters & Empl'rs Welfare Tr. of Ill. v. Gorman Bros. Ready Mix*, 139 F. Supp. 2d 976, 981 n.10 (C.D. Ill. 2001), *rev'd on other grounds*, 283 F.3d 877 (7th Cir. 2002) ("[T]he Court will not consider course of dealing as a separate affirmative defense; it will, however, consider it to the extent it is applicable and overlaps with Gorman Brothers' other asserted affirmative defenses.").

## II.   INCIDENTAL WORK PERFORMED BY TECHNOLOGY CONSULTANTS CANNOT SUPPORT FICO'S BREACH OF CONTRACT CLAIM.

FICO is not entitled to summary judgment based on the use of Blaze by third party consultants for several reasons.

### A.   FICO's Account of Work Performed by AppCentrica and DWS is Vastly Overstated.

FICO alleges that consultants DWS and AppCentrica used Blaze in violation of the License Agreement.  The undisputed evidence only shows use of Blaze by a single AppCentrica employee. (Zorica Todorovic Declaration, ¶ 4.)  This individual used Blaze as a component within another component that Chubb Canada was incorporating into its Evolution application.  (*Id.*)

Moreover, just as FICO knew about Federal's other uses of Blaze outside of the United States, it also knew about AppCentrica's work with Chubb Canada.  In August 2013, Henry Mirolyuz of Federal contacted Sawyer to set up a meeting regarding another Blaze-related FICO product for Chubb Canada.  (Fleming Decl., Ex 26.)  An AppCentrica employee was included in the communication with Sawyer, and was

specifically invited to attend the meeting.  (*Id.*, Exs. 26-29.)  Sawyer did not object or otherwise comment about AppCentrica's involvement.

The undisputed evidence does not show use by DWS in violation of the License Agreement as FICO claims.  Rather, Chubb Canada gave employees from Chubb Australia and DWS Group a Blaze demonstration when Chubb Australia was considering duplicating Evolution, a Canadian application that used Blaze.  (Todorovic Decl., ¶¶ 5-6.) A DWS employee working with Chubb Australia later contacted FICO's technical support group with questions about Blaze.  (Fleming Decl., Ex. 19 at FICO0000720-721.) FICO's internal emails from this contact suggest that the DWS employee was using a "trial license," which "can be had from the FICO web site as part of [an] evaluation programme."  (*Id.* at FICO0000718)  Sawyer later instructed his colleagues in the support group to "continue to be responsive to DWS" and one of them replied to him that the group would "make the BA [Blaze Advisor] 7.1 installer available to DWS."  (*Id.*, Ex. 23.)  Ultimately, Chubb Australia decided <u>not</u> to use Blaze in its version of the Evolution application and used IBM's decision management software instead.  (Fleming Decl., Ex. 30 at 3-4; Todorovic Decl., ¶ 6.)

The evidence FICO cites in support of its Motion does not contradict this account. (Dkt. 398 at 9, 17-18.)  Federal's interrogatory responses do not state that AppCentrica and DWS "used and accessed Blaze" as FICO claims.  (*See* Dkt. 401-19.)  The 18 page contract between Chubb Canada and AppCentrica that FICO cites contains a single, passing mention of Blaze.  (Dkt. 401-22.)  FICO also cites a number of emails that do not confirm any further uses by consultants.  Indeed, one of these emails states that Chubb

Canada would "not . . . . continuously provide code and solutions," which, if anything, corroborates the fact that it did not allow third party access and that Blaze remained installed in the United States during these engagements.  (Dkt. 401-23 at FED011040.)

### B.    Any Incidental use or Access by Consultants is not a Breach of Contract.

Federal has licensed Blaze for 13 years.  Minimal use by one AppCentrica consultant during one project is not a breach of the License Agreement.  *BDCM Fund Adviser, L.L.C. v. Zenni*, 962 N.Y.S.2d 11, 14 (N.Y. App. Div. 2013) (affirming grant of summary judgment on breach of contract claim stating "de minimis failure to comply with the [contract] is insufficient to support a cause of action[.]").  Courts addressing circumstances like these hold that licensees may hire consultants to assist with technical work where the licensee was authorized to do such work itself.  *See, e.g.*, *Hogan Sys., Inc. v. Cybersource Intern., Inc.*, No. 3:96-CV-2083-H, 1997 WL 311526, at *4 (N.D. Tex. June 2, 1997); *Womack+Hamilton Architects, L.L.C. v. Metric Holdings Ltd. P'ship*, 102 F. App'x 374, 382–83 (5th Cir. 2004); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1315 (Fed. Cir. 2005).

There is no breach and certainly no material breach to justify rescission of the License Agreement.  *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp.3d 372, 379-80 (S.D.N.Y. 2014) ("'A breach is material if it go[es] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract.'") (citation omitted).  Whether a breach is material is "a question of fact and should be decided as a matter of law only where the inferences are certain."  *Orlander v.*

36

*Staples, Inc.*. 802 F.3d 289, 298 (2d Cir. 2015).  Here, the "inferences" drawn from this evidence are far from "certain" and, as such, the issue of breach cannot be determined as a matter of law.  *Id.*

Further, FICO has not and cannot provide evidence of damages related to incidental access by these consultants.  "Damages are an essential element of a breach of contract cause of action."  *Inter-Cmty. Mem'l Hosp. of Newfane, Inc. v. Hamilton Wharton Grp., Inc.*, 941 N.Y.S.2d 360, 364 (N.Y. App. Div. 2012).  Where a party fails to present evidence that it suffered damage as a result of breach, its claim for breach of contract may be dismissed as a matter of law.  *See, e.g.*, *Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*, 919 N.Y.S.2d 151, 152 (2011); *BDCM Fund Adviser, L.L.C.*, 962 N.Y.S.2d at 14.

Finally, even if Blaze access by DWS and AppCentrica satisfies a few of the elements for a breach of contract claim, here too, FICO has waived, or is estopped from asserting, any such claim.  It is undisputed that Sawyer and other FICO employees knew about DWS and AppCentrica's work with Blaze.  (Fleming Decl., Exs. 19, 23, 26-27.) Sawyer did not object to this access when he found out about it.  (Id., Ex. 23 at FICO0000619.)  To the contrary, he gave a sales presentation to employees of Federal's foreign affiliates and AppCentrica.  (*Id.*, Ex. 26-29.)  He even allowed his colleagues to provide Blaze files to DWS.  (*Id.*, Ex. 23.)  This conduct forecloses FICO's breach claim based on the work of these consultants for the same reasons its similar conduct forecloses FICO's claims based on wider use outside of the United States.

## III.   FEDERAL DID NOT NEED FICO'S CONSENT UNDER PARAGRAPH 10.8.

FICO's claim that Federal violated the prohibition on assignments found in § 10.8 of the License Agreement fails because Federal was not required to obtain FICO's consent as a result of the Chubb-ACE merger.

### A.   FICO's Interpretation is Inconsistent with the Language of § 10.8.

FICO argues that the language of § 10.8 required FICO's consent for continued Blaze use after any merger.  In fact, FICO's interpretation is on its face <u>inconsistent</u> with the section's plain language.

FICO and Federal agree that the first sentence, stating that "[n]either party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof," applies if Federal were to try to assign the license to an unrelated third party.  (Dkt. 398 at 19.)

FICO and Federal also agree that the second sentence applies to a merger situation.  What FICO and Federal disagree upon is how the second sentence operates and what it requires when a merger occurs.

There are two clauses of sentence two.  The first reads: "In the event of a change of control of Client … such event shall be deemed to be an assignment subject to this section…"  (Dkt. 433, Ex. 3.)  The second reads "Client shall make no expanded use of [Blaze] as a result of any such event unless and until Fair Isaac provides such written consent."  (*Id.*)  The two clauses are connected by an "and."  Both clauses must operate.

FICO contends that the <u>only</u> way to make both clauses of sentence two operate, and thus the <u>only</u> way to give meaning to the conjunctive "and," is if there are <u>two</u> consents required.  According to FICO, clause one of sentence two invokes sentence one, and requires FICO's consent to the merger regardless of use.  FICO's argument necessarily implies that clause two of sentence two then operates to require <u>another</u> consent if use expands.

FICO is wrong for two reasons.  First, clause one of sentence two does not refer to sentence one.  It does not state, for instance that "[i]n the event of a change of control of Client … such event shall be deemed to be an assignment subject to sentence one."  In fact, it says "[i]n the event of a change of control of Client … such event shall be deemed to be an assignment subject to <u>this section</u>…"  Thus, clause one of sentence two simply says that, in the event of a merger, clause two of sentence two also applies.

Second, two consents are <u>not</u> required to give meaning to both clauses of sentence two and to the conjunctive connecting them.  The first clause of sentence two states that a merger is subject to § 10.8.  By applying clause two of sentence two, clause one has meaning and effect.

Clause two of sentence two then outlines what happens when § 10.8 applies to a deemed assignment.  Clause two says that without "such consent," Federal cannot make expanded use of Blaze.  "Such" refers to a consent <u>already mentioned</u> in the section. The only consent mentioned in the section is the consent in sentence one.  <u>Clause two of</u> <u>sentence two thus says that without the consent for assignment in sentence one, Federal</u> <u>cannot expand use.  The obvious implication is that without that consent Federal *can* still</u>

make the *same* or *less* use.  Moreover, clause two adds the restriction on FICO that its consent may not be "unreasonably withheld."  (Dkt. 433, Ex. 3.)

This interpretation makes perfect sense. If Federal were to try to assign to an unrelated third-party, FICO may be able to refuse in its discretion.  But when Federal's "assignment" is a deemed assignment due to a merger, FICO's discretion to withhold consent is constrained to situations in which use is expanded, and its consent must not be unreasonably withheld.

FICO's reading, that sentence two requires two consents, reads the word "such" out of existence, breaking the "cardinal rule of contract construction that no portion of a contract should be meaningless."  *Diamond Castle Partners IV PRC*, 918 N.Y.S. 2d at 75.  Federal's interpretation by contrast, gives meaning to all words in the section; sentence one, both clauses of sentence two, the "and" conjunction, and the word "such."

### B.    FICO's Own Witness has Rejected any Requirement of Two Approvals and Such a Requirement is Inconsistent with FICO's Behavior.

FICO's interpretation also conflicts with the testimony of its key Blaze sales executive, Bill Waid.  Waid admitted that FICO never asked about expanded use, because for FICO there is no difference between expanded use and the merger itself.  Per Waid, a merger always results in expanded use.  He stated:

> My answer stands that the merger or acquisition event actually constituted the trigger request itself.  That is in itself an expanded use.  No one specifically asked for expanded use, because it's a merger and acquisition event that triggered it.

(Dkt. 438, Ex. 26 at 240:15-20.)  If Waid was correct that a merger <u>always</u> results in expanded use, then FICO's proffered requirement of two consents – one for the merger deemed assignment and one for the expanded use – cannot be correct.

Waid was also unable to provide any examples where FICO negotiated a consent for expanded use separately from a consent for an assignment. (*Id.* at 241:9.)  Like so many aspects of this case, the "two consent" theory is a post hoc argument, invented for this case, and completely at odds with FICO's conduct.

### C.   FICO Ignores the Requirement that Consent Must not be Unreasonably Withheld.

Even if FICO's interpretation of § 10.8 were plausible (which it is not), it has failed to provide any justification for withholding consent that satisfies the express reasonableness requirement.   Section 10.8 states that FICO's consent "will not be unreasonably withheld."  As noted above, FICO's proffered explanations for withholding consent are illogical because the entity it had contracted with, Federal, remained unchanged following the merger of its parent into another entity.  FICO has failed to provide any evidence that <u>Federal's</u> revenue footprint increased so as to justify additional fees under the formula that FICO claims to use to price enterprise agreements.  (Dkt. 398 at 21.)  It is not surprising that FICO has no justification for withholding its reasonable consent, FICO is simply seeking additional fees, which is not a reasonable basis for withholding consent to an assignment under New York law.  *Silver v. Rochester Sav. Bank*, 424 N.Y.S.2d 945, 948 (N.Y. App. Div. 1980).

### D. No Change of Control.

Section 10.8 by its terms only applies when there is "a change of control of Client." To the extent FICO's position that Chubb & Son was the "Client" is accepted, § 10.8 cannot apply, as Chubb & Son is not a legal entity. Moreover, it is undisputed that Chubb & Son did not acquire any entity, nor was it acquired by any entity. Before and after the ACE-Chubb merger, Chubb & Son remained a division of the same entity, Federal.

Even if the Court agrees that Federal is the "Client," § 10.8 should not apply because Federal did not enter into a "change of control" transaction such as a merger or acquisition. Rather, the merger occurred at a level removed from Federal—the parent corporation of Federal changed from The Chubb Corporation (a holding company) to Chubb INA Holdings (a holding company). (Dkt. 442, ¶¶ 6-7.) Federal itself remained the same following the merger. Thus there was no change to the identity of FICO's "Client."

## IV. FEDERAL MAY MAINTAIN A BREACH OF CONTRACT AND A BREACH OF GOOD FAITH AND FAIR DEALING CLAIM SIMULTANEOUSLY.

FICO claims that a party "who asserts breach of contract is foreclosed from further asserting breach of implied duties." (Dkt. 398 at 34.) FICO is wrong. Under New York law, parties may pursue breach of good faith and fair dealing claims so long as the claim is "based on allegations different than those underlying the accompanying breach of contract claim." *Sauer v. Xerox Corp.*, 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000) (citation omitted). Courts therefore allow parties to simultaneously pursue both claims.

*See, e.g.*, *Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 195 (E.D.N.Y. 2014) (allowing both breach of contract and breach of implied duty of good faith and fair dealing claims to proceed); *Tiffany Tower Condo., LLC v. Ins. Co. of Greater N.Y.*, 84 N.Y.S.3d 167, 170 (N.Y. App. Div. 2018) (same).

The facts supporting each of Federal's claims are distinct. Federal's breach of contract claim alleges that the License Agreement is a "perpetual, fully-paid, enterprise-wide license" to use Blaze which can only be terminated if one of the events set forth in § 9.2 occurs. (Dkt. 137, ¶¶ 17-18.) No such event has occurred. FICO breached the License Agreement by terminating the License Agreement without justification and in violation of Paragraph 9.2. (*Id.* at ¶¶ 19, 21.) Federal's breach of the implied covenant of good faith and fair dealing claim, on the other hand, asserts FICO's arbitrary and irrational decision to withhold consent in a bad faith effort to exact additional, unearned license fees from Federal. (*Id.* at ¶¶ 24-26.)

Moreover, "[o]n a summary judgment motion where the contract meaning is yet to be determined, a party can continue in both a claim for breach of contract and one for breach of the covenant of good faith and fair dealing." *Fantozzi v. Axsys Techs., Inc.*, No. 07 CIV. 02667 (LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008) (citation omitted); *see also Sandler v. Montefiore Health Sys., Inc.*, No. 16-CV-2258 (JPO), 2018 WL 4636835, at *16 (S.D.N.Y. Sept. 27, 2018) (allowing both breach of contract and breach of good faith and fair dealing claims when "there [was] a dispute over the scope of contract"). Here, there is a dispute over the scope of the License Agreement. Thus, Federal's breach of good faith and fair dealing claim should not be dismissed.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request the Court deny Plaintiff's Motion for Summary Judgment of Federal's Liability for Breach of Contract, and grant Defendants' Motion for Summary Judgment dismissing FICO's claims.


Dated:  August 26, 2019

s/ Terrence J. Fleming
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000

*Attorneys for Defendants*

67801426 v7

44