# Exhibit 5
# (Redacted)
# (Previously Filed Under Seal as Dkt. 510-3)

CASE 0:16-cv-01054-DTS   Doc. 657-3   Filed 10/23/19   Page 2 of 7
Lawrence Wachs  -  2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

```
 1

 2   UNITED STATES DISTRICT COURT
     DISTRICT OF MINNESOTA
 3   ------------------------------------X
     FAIR ISAAC CORPORATION,
 4
                              PLAINTIFF,
 5

 6         -against-        Case No.:
                            16-cv-1054
 7

 8   FEDERAL INSURANCE COMPANY and
     ACE AMERICAN INSURANCE COMPANY,
 9
                              DEFENDANTS.
10   ------------------------------------X

11

12              DATE:  February 26, 2019

13              TIME:  10:06 A.M.

14

15

16         DEPOSITION of a Non-Party

17   Witness, LAWRENCE WACHS, taken by the

18   respective parties, pursuant to a

19   Subpoena and to the Federal Rules of

20   Civil Procedure, held at the offices of

21   Merchant & Gould, P.C., 767 3rd Avenue,

22   23rd Floor, New York, New York 10017,

23   before Jennifer Schwartz, a Notary

24   Public of the State of New York.

25
```

EXHIBIT 5

CASE 0:16-cv-01054-DTS   Doc. 657-3   Filed 10/23/19   Page 3 of 7
Lawrence Wachs   -   2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 72**

Waid said in his previous e-mail that application description was missing, I'm responding to Bill Waid's question directly, trying to describe the application requirement and how that will be -- how our product will be used in that division, and to the purpose of getting a pricing decision from Bill Waid.

Q. So in connection with describing how the product would be used in the division, you state the division's revenue is 3.5 billion with 1,000 employees, correct, in the middle of the first paragraph?

A. Correct.

Q. Specialty insurance, is that the division you're talking about?

A. That's correct.

Q. Okay. "It's characterized by a small number of high value policies with high risk profile." And then do you recall that Bill Waid approved that pricing?

**Page 73**

A. I don't have a recollection of that.

MS. JANUS: Do you know what number we're on?

MR. HINDERAKER: Yes, but I have to look it up. Give me one minute and I -- actually -- the last exhibit was 330, according to my notes, so you'd be on 331.

MS. JANUS: Okay.

(Whereupon, e-mail was marked as Defendants' Exhibit 331 for identification as of this date by the Reporter.)

Q. Okay. Handing you a document that's been marked as Exhibit 331, this appears to be Bill Waid's response to you on February 22nd, 2006, do you see that?

A. I do.

Q. And he notes "approved, but in the future I need more lead time," correct?

A. Correct.

**Page 74**

Q. So Bill Waid approved the pricing you suggested for the application you were discussing?

A. Exactly.

(Whereupon, e-mail was marked as Defendants' Exhibit 332 for identification as of this date by the Reporter.)

Q. Handing you what has been marked as deposition Exhibit 332. This is an e-mail from John Haines to Bill Waid, subject, "pricing approval for Chubb ELA," correct?

A. Yes.

Q. And "ELA" stands for what?

A. Enterprise license agreement.

Q. So in the April 2006 time period, was FICO discussing the terms of an ELA with Chubb?

A. Correct.

Q. And you were involved in those discussions?

A. I wasn't CCed on this e-mail, carbon copied, so I don't know that I

**Page 75**

saw this specifically but I was involved in the conversations here.

Q. In the second paragraph of the e-mail, John Haines says, "Chubb group of insurance companies signed 12.3 billion in policies in 2005," correct?

A. Correct.

Q. Then he goes on, "and based on [REDACTED] pricing in the attached," correct?

A. Correct.

Q. So he's using the revenue information for the Chubb group of insurance companies in pricing the ELA, correct?

A. It appears that way.

[REDACTED]

A. It's a request by John to have variation pricing and it could be based upon -- and I don't know the answer --

CASE 0:16-cv-01054-DTS   Doc. 657-3   Filed 10/23/19   Page 4 of 7
Lawrence Wachs  -  2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

but the -- subjectively it would be either because of the nature of the business relationship with Chubb, the time of year, his commission quota, or whatever else that he's going to reduce that [REDACTED]

Q. The attachment to the e-mail is a three-page chart, and you can -- if you take the clip off, you can actually spread it out, it's a little easier to read. So you see towards the top of the page you're listed as the account executive, correct?
A. That's right.
Q. And then Russ Schreiber, consistent with your previous testimony, is listed as the client partner?

Page 76

A. Correct.
Q. And then Dale Zwizinski is the person you've mentioned a couple of times as the technical person involved?
A. Correct.
Q. It says, "Note, the following enterprise license quotation is included at this time for budgetary purposes." Do you know what that means?
A. That it wasn't a final quotation, it was just for estimation purposes.
Q. So this was an internal number that was being generated for purposes of FICO's budget?
A. Well, no, because it was sent to Jim -- James Black --
Q. Okay.
A. -- so I would tell him that he was looking -- without specificity, he was looking for a range of what this enterprise license could look like, what the dollars could be, and that's

Page 77

what we did here. We used the typical pricing model formula, what would be included in the enterprise license, and it was our -- it was our expectation that this would beget a conversation to fine tune the license points here, and even at that point to negotiate a higher or lower enterprise license quotation based upon what they -- what they really think they need and what they would achieve.
Q. After that statement, it says, "The final quotation is contingent upon a number of factors, including," and then it lists six bullet points?
A. All of those -- was that the end of your question?
Q. Yes.
A. All of those bullet points relate to the value of the software, that would be -- that they would license.
Q. The third bullet point is "rate of technology adaption, e.g.

Page 78

20 applications within five years or in 20 years," do you see that?
A. Yes.
Q. And what is -- what does that relate to?
A. It could be the best product in the world but if the business units don't choose to adopt it and to fund the development effort, then the value for the client would be reduced because the product is not being adopted at an assumed rate.
Q. So the rate of adoption may have an impact on the final price?
A. Sure.
Q. Or projected rate of adoption?
A. It's -- it's what we would use to project its impact to the organization and you can see in the final paragraph there we wanted to discover the answers to these questions so that we can fine tune our enterprise license quotation.
Q. And Ash Winshah was someone at

Page 79

CASE 0:16-cv-01054-DTS   Doc. 657-3   Filed 10/23/19   Page 5 of 7

Lawrence Wachs   -   2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 84**

the Blaze software, is that a fair statement?

A. Yes. Again, as a master services agreement, typically it's only a vehicle that exists between the organizations upon which specific work orders are attached that describe the work effort and the price for that work effort, so the master services agreement is something that Chubb wanted to have executed -- I believe even before the product license agreement -- to make sure that we were compatible.

Q. What do you mean by that?

A. Compatible meaning that we would accept their terms for an MSA and that we didn't have any untoward terms that they couldn't live with.

Q. This agreement was related to the software license agreement?

A. It would only be related to the software license agreement in that it would be that product, that license

**Page 85**

product that we would be talking about here.

Q. In the master services agreement?

A. That's right.

Q. Sure. Okay. Take a look at the master services agreement that's attached to the e-mail -- and actually, before I get there, you mentioned additional agreements that would be entered into relating to work that would be performed by FICO, are those referred to as statements of work or SOWs?

A. The statement of work would drive the work order --

Q. Okay.

A. -- yes, and the pricing.

Q. And -- so just describe to me sort of what documents or agreements are associated with all these things at FICO?

A. Once -- in order to bid and tell the client how much it would cost to

**Page 86**

build out the appropriate software, you would have to sit with the client and create a statement of -- a scope of work which is the limits, and it enables the professional services organization to estimate with precision the number of people hours that would be required to build the application suitable to purpose, and so there would be an initial discovery session with the client and that would be a deliverable document, a discovery document, and then that would drive a statement of work and the pricing for the statement of work, and those would become attachments to the master service agreement.

Q. And then is there a separate work order?

A. I don't know the mechanics in this particular case, typically there would be a work order as an exhibit to every -- addendum to each of the -- to the master services agreement.

**Page 87**

Q. Okay. All right. So in the e-mail marked as 305, Ms. Boone says she's attaching the updated version of the master services agreement and the standard Blaze software license and maintenance agreement.

A. Yes.

Q. Do you see that in her e-mail?

A. Yes.

Q. Okay. And then if you look at the master services agreement, which is the first document she attaches, on the first page, under the heading "definitions" --

A. Yes.

Q. -- do you see that Chubb is defined as "Chubb & Son, a division of federal insurance company for itself and as servicer for the Chubb corporations and its noninsurance company subsidiaries or as manager of its insurance company subsidiaries," do you see that?

A. Yes, I do.

CASE 0:16-cv-01054-DTS   Doc. 657-3   Filed 10/23/19   Page 6 of 7
Lawrence Wachs   -   2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 88**

Q. And did you place any significance on that definition of Chubb in the master services agreement?

A. I did not place any significance on it, I assumed that was the requested definition for the client.

Q. From your perspective, you were entering into a license -- FICO was entering into a license agreement with the Chubb group of entities, is that a fair statement?

MR. HINDERAKER: Objection, misstates the testimony.

A. I believe that the client definition as contained in this paragraph was what we were entering into. Again, typically -- again, our pricing model is based upon the scope, which is based upon the -- which drives the pricing model. I would not typically get it -- it would not interest me what the client's requested legal definition of their company, the contracting party, other than the

**Page 89**

pricing which we talked about.

Q. The second document attached to the e-mail marked as Exhibit 305 is what Ms. Boone referred to as FICO's standard Blaze software license and maintenance agreement, do you see that?

A. Yes.

Q. Okay. And this document in the first paragraph states that it's between Fair Isaac Corporation and Chubb & Son, a division of Federal Insurance Company?

A. Yes.

Q. Did you understand that the same entity was entering into both the software license and maintenance agreement and the master services agreement?

A. I would have no reason to think anything but that.

Q. And, again, that precise entity was not significant to you?

A. Not at all.

Q. Take a look at paragraph 2.1 of

**Page 90**

the standard software license and maintenance agreement.

A. Yes.

Q. The title of that paragraph is license grant to Fair Isaac products?

A. Yes.

Q. And starting in the second line it states, "Fair Isaac hereby grants to client a nonexclusive, non-transferrable, limited license to use the Fair Isaac products during the term for its internal business purposes, but only within the territory, and subject to the additional limitations set forth below, et cetera."

A. Correct.

Q. And based on your experience at FICO, is the phrase "but only within the territory" commonly in the license grant paragraph of license agreements for Blaze?

MR. HINDERAKER: A couple of objections. One, lack of

**Page 91**

foundation; two, to the extent it asked for a legal conclusion outside of the expertise or knowledge of Mr. Wachs.

Q. Go ahead.

A. Not withstanding the objection, I would always expect to have a territory definition within a license agreement.

Q. And you would expect to have that referenced to the territory in the license grant section as it is in this standard form?

MR. HINDERAKER: Same objections.

A. Yes.

Q. Paragraph 10.8 of the standard form license agreement relates to -- or is titled "no assignment", do you see that?

A. I do.

Q. Are you familiar with that paragraph in the standard FICO license agreement?

CASE 0:16-cv-01054-DTS   Doc. 657-3   Filed 10/23/19   Page 7 of 7
Lawrence Wachs - 2/26/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

## Page 92

2  A. I am not specifically familiar
3  with it but it is typical that a
4  no-assignment clause would be contained
5  within a software licensing agreement.
6  Q. Did you have any role in
7  negotiating the no assignment paragraph
8  in the Chubb-FICO license agreement?
9  A. No. No role.
10 Q. Have you ever been called upon
11 to interpret the Chubb-FICO
12 no-assignment provision in the license
13 agreement?
14 A. No.
15 Q. As you sit here today, unless I
16 asked you to read that paragraph in the
17 final agreement, do you have any idea
18 what the parties agreed to?
19 A. No, I don't.
20 Q. In connection with the no
21 assignment paragraph?
22 A. No.
23 Q. During your time at FICO, did
24 you have occasion to deal with clients
25 who merged with other entities and

## Page 93

2  engaged with FICO relating to what that
3  merger meant in the context of their
4  license agreement?
5  A. Not during my tenure at FICO.
6  Q. Do you have any understanding,
7  based on your time at FICO, as to how
8  FICO deals with those types of
9  situations?
10 A. Not at all.
11 Q. Showing you what has been marked
12 as deposition Exhibit 308. This is an
13 e-mail from Jandeen Boone to Jim Black
14 and there's a copy to you and others at
15 FICO, correct?
16 A. Correct.
17 Q. So is Ms. Boone keeping you in
18 the loop, so to speak, on the contract
19 progression with Chubb?
20 A. Yes.
21 Q. And that's because you were the
22 point person from a business
23 perspective on the Chubb account at
24 this time?
25 A. Yes.

## Page 94

2  Q. She says, "Attached is the final
3  version of the MSA," does that mean
4  that you would have signed off on this
5  version of the MSA prior to her sending
6  it?
7  A. It's not a formal sign off but
8  yes, I was aware of the progress and
9  that this was going out, certainly.
10 Q. I'm handing you what's been
11 marked as deposition exhibit -- oh, no,
12 actually, can I have that back? Sorry,
13 you can keep yours. I'm handing you
14 what's been marked as a -- a document
15 that was previously marked as
16 deposition Exhibit 108. This is an
17 e-mail from John Haines to Bill Waid
18 with a copy to you and the subject is
19 "Chubb question", correct?
20 A. That's correct.
21 Q. Is this one of the documents you
22 reviewed in connection with your
23 deposition preparation?
24 A. I believe so.
25 Q. It's dated June 16th, 2006, so

## Page 95

2  it's around the time that the parties
3  have been negotiating the master
4  services agreement and the standard
5  form license was provided to Chubb at
6  this time, correct?
7  A. Right -- yes.
8  Q. And John Haines says, "Bill,
9  Chubb is inquiring again about an
10 enterprise price but they want to know
11 if this would include international. I
12 have attached the quote for your review
13 but I think that if they wanted to do
14 an ELA, then for this price we could
15 grant them global rights. They may
16 need more Dev seats beyond the ten, so
17 maybe we bump it up to a 30-pack." Did
18 I read that correctly?
19 A. You did.
20 Q. Do you recall at this time that
21 Chubb was asking about the enterprise
22 price and whether it would include
23 international?
24 A. Yes.
25 Q. Is this the conversation that