## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION,

    Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY,
a Pennsylvania corporation,

    Defendants.

Court File No. 16-cv-1054 (WMW/DTS)

**DECLARATION OF PHILIP G. FOLZ**

I, Philip G. Folz, declare as follows:

1. I was an employee of Federal Insurance Company ("Chubb") from January 1990 to March 2018. During that time, my positions were in the Information Technology Department, as Controller of Information Technology, and finally as a senior leader in the Information Technology Department.

2. In December of 2006, I was the Controller of Information Technology. As the Controller of Information Technology, I was responsible for the North American Information Technology budget. In connection with that, I was responsible for allocating North American technology spend globally in situations where Chubb's overseas entities would be using technology procured through the North American budget.

3. I was involved in the direct negotiations with Fair Isaac Corporation ("FICO") regarding the Blaze License Agreement in 2006.

4. My involvement in the negotiations began in mid-fourth quarter of 2006. My role in the negotiations was to assess options being presented by FICO in terms of the value to Chubb and the budget available. My goal was to obtain the best offer possible from FICO and present it to Chubb management.

5. When I became involved in the negotiations in late-2006, it was apparent that FICO was very motivated to finalize the enterprise-wide deal prior to year-end. I specifically recall discussing this issue with individuals from FICO, and FICO saying something to the effect that "everything goes away after December 31, 2006." FICO wanted to book the revenue from the enterprise-wide deal in 2006.

6. Because FICO was motivated to close the enterprise-wide deal in 2006, I believe that Chubb was able to obtain more favorable pricing and a broader scope of the license.

7. FICO also appeared motivated to do the deal because Chubb was a big and important name in the insurance space at the time. FICO's statements at the time about the importance of Chubb made this clear. In addition, it was clear from FICO's statements that FICO intended to do business with the Chubb family of insurance companies by entering into an enterprise-wide license. There was no indication by FICO that it intended to do business with an unincorporated division of Federal that did not have employees, nor did FICO express any preference regarding which Chubb entity signed the license agreement—it was not a topic of discussion.

8. The license agreement was structured in three parts because that is the way Chubb approached software licenses during that time. The first part of the license was

for one application—CSI Express—so that Chubb could assess how the software worked without too much commitment. The next step was to extend the license to the entire Strategic Business Unit ("SBU") known as Chubb Specialty Insurance so that it could be used in other applications within the SBU. The final step was to pursue the enterprise-wide license so that the software could be used throughout the Chubb organization—both in the United States and globally.

9. In November/December 2006, Chubb was considering whether to purchase the enterprise-wide license through Amendment Two. The pricing, structure, and scope of the enterprise-wide license were being considered and negotiated during this time.

10. It was my role to assess the value of the license to Chubb, given the scope and the price. My primary areas of concern were (1) understanding the pricing structure and obtaining the best price possible, (2) understanding whether there would be any restrictions on Chubb's ability to install and use the software across Strategic Business Units across, regions, and within any of the companies generally in the Chubb family, and (3) understanding the extent of the ongoing maintenance costs associated with the license.

11. The reason that it was of primary importance that there were no restrictions on installation or use across business units and companies was software companies at times review contracts for holes and ways to charge more. I had previous experience with software companies auditing Chubb's use, and looking for ways in which the language in the agreements allowed the company to obtain additional revenue. Therefore, I approached this negotiation with a focus on the fact that there would be no

restrictions within the Chubb companies on the installation or use of the software, whether inside the United States or outside of the United States. Chubb was willing to pay a large one-time fee for this unlimited deployment, and maintenance fees over time.

12.   In early-December 2006, I sent a list of questions regarding the enterprise-wide license to Jim Black, Chubb's contract manager who was communicating on contract issues with FICO. That email exchange is attached hereto as <u>Exhibit A</u>. I sent this email before we had received the best and final offer from FICO for unrestricted "seats" to use Blaze enterprise-wide. However, there were two enterprise-wide offers on the table. With respect to those two options, due to my previous experience, I asked whether there were "any restrictions" on how we use the license, and whether we would have rights "to distribute as we see fit anywhere at CHUBB?" The response from FICO was that "there are no usage or redistribution restrictions within Chubb . . . ."

13.   In mid-December 2006, I met with FICO to discuss FICO's best and final offer. I believe the meeting was by telephone. We reviewed FICO's best offer during that call. I reported to the IT leadership after that meeting in the email attached hereto as <u>Exhibit B</u>. FICO was very interested in publicizing Chubb's use of Blaze and, therefore, asked us to agree to FICO issuing a press release, and presenting at one of FICO's client forums.

14.   We outlined to FICO what our enterprise architecture plans were, and how we wanted to use the software if we entered into the license. The description of Chubb's planned use of the software included global deployment.

15. My recollection is that the right to install and use the software globally was a foundational aspect of the license and it was the subject of discussion at our December meeting with FICO. While I cannot remember the specifics of the conversation, I came away from the meeting fully understanding that we would have an agreement to install and use the software globally.

16. As I note in my email (Exhibit B), during the telephone conference with FICO, FICO dropped their price for the license from ▮▮▮▮▮▮▮▮▮▮▮▮ There was no discussion or suggestion by FICO that this drop in price resulted in a more restricted license, or that the drop in price meant that the license would not convey global rights to install and use Blaze. The drop in price was due to FICO's motivation to get the deal done with Chubb, and to do so by year-end. It was clear during that telephone conference that the parties agreed this was a global enterprise-wide license that allowed the Chubb family of entities to install and use the software.

17. The enterprise-wide deal was consistent with the strategy that Chubb was formulating at the time around enterprise assets. This strategy involved unifying similar information technology capabilities across the Chubb enterprise. The strategy included Chubb's global entities.

18. This is consistent with how I allocated costs internally within the Chubb group of entities. Beginning in "year one" of the license (2007), I allocated costs to the Chubb entities outside of the United States ("OUS"), in part to encourage those entities to use Blaze. An example of the breakdown of this cost allocation is shown in Exhibit C,

which shows that 24 percent of the cost of the license was allocated to Chubb OUS entities.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: 8/22/2019

s/ Philip G. Folz

# EXHIBIT A

*Filed Under Seal*

Message



**From:** Wachs, Lawrence C (Larry)
**Sent:** Friday, December 01, 2006 4:55 PM
**To:** jwblack@chubb.com
**Cc:** Schreiber, Russell (Russ)
**Subject:** RE: Fair Isaac Proposal

Jim

See our responses to the questions raised by Phil. They are noted in blue text. Should you need further clarification or wish discuss these further, please don't hesitate to call.

Regards

Larry
917-968-5959



Could you respond to the questions below.

Jim

1. Refresh my memory on the three current proposals. Eg number of licenses, platforms, restrictions, etc

The current offer contemplate a December month-end execution. All options are exclusive of maintenance at 15% per annum.

Option 1 for ▮▮▮▮ is for Blaze Advisor ELA for JAVA and .Net platforms exclusively. It includes 30 development seats. This represents the entire license arrangement. We do not charge for end-users usage nor for the number of

***Document de-designated to CONFIDENTIAL on March 5, 2019***

**EXHIBIT A**

Confidential - Attorneys' Eyes Only

FICO0001799

business owners who maintain the rules via our Rules Maintenance Application. This represents a discount from the previously negotiated price of ▇.

Option 2 for ▇ reduces the ELA by ▇ providing Chubb purchases either our Cobol or SmartForms option for an additional fee of ▇. It includes 45 development seats. This represents a discount from our previously negotiated price of ▇.

Option 3 for $▇ reduces the ELA by a total ▇ providing Chubb purchases both our Cobol and SmartForms option for an additional fee of ▇. Selection of Option 3 includes unlimited development seats. This represents a discount from our previously negotiated price of ▇.

2. For options 1 and 2 are there any restrictions in using or redistributing the licenses across SBUs and other IT areas. Said another way do we get licensing rights to 30 and 45 licenses respectively to distribute as we see fit anywhere at CHUBB?

There are no usage or redistribution restrictions within Chubb in any of the options within the seat limitations of options 1 and 2.

3. For all 3 options I would like more info on the composition of the offer and can the offer be disaggregated. Eg if we didn't want either the SmartForms or Cobol option could we eliminate. Would this change the discount structure.

We would be happy to discuss this if there are further questions after reading our response to question 1. Essentially the discounts become steeper as the purchase commitment increases.

4. What are the associated maintenance costs? When do they begin? Since we would be acquiring licenses that we would not put in service for some time and considering the significant upfront payment, would FA allow for a sliding scale on maintenance so that maintenance costs commence when we start using the licenses?

Our standard policy is that the responsibility for the payment of the maintenance fee begins at the time of license acquisition. The maintenance costs have been negotiated down to ▇ by Chubb. An alternative schedule of maintenance payments had not been contemplated.

This represents a discount from our standard list for maintenance of ▇.

5. Do we have to worry about runtime licenses for the end users. Eg rules changes and updates will be made via an interface and by business folks instead of developers. I would imagine there would be a lot of these instances. Are the business folks subject to the developer license?

There is no runtime license concept within our pricing model. Business users work with the Rules Maintenance Application and we do not in any way charge for or limit their utilization. Our fees relate to the number of developers working in the IDE environment, the production server deployment license and annual maintenance.

***Document de-designated to CONFIDENTIAL on March 5, 2019***

6. Are there any other costs that need to be considered? Eg implementation, training, etc? Has FA baked this into the offers?

Other than the deployment ELA, developer seats and maintenance Chubb would normally incur fees for training and Professional Services as needed on a project by project basis. We would be happy to work with Chubb to develop a formal schedule of services and training that would serve to simplify the process in future projects and afford price protection for a period of time.

Phil

Larry Wachs
Account Executive
Fair Isaac Corporation/EDM Technology Group
516-791-5139 – H.O. Tel.
917-968-5959 – Mobile



*It's just a smarter way to do business.*

&lt;HRsize=2 width="100%" align=center tabindex=-1&gt;

**From:** jwblack@chubb.com [mailto:jwblack@chubb.com]
**Sent:** Friday, December 01, 2006 1:16 PM
**To:** Wachs, Lawrence C (Larry)
**Subject:** Fw: Fair Isaac Proposal

Larry,

Could you respond to the questions below.

Jim

1. Refresh my memory on the three current proposals. Eg number of licenses, platforms, restrictions, etc

2. For options 1 and 2 are there any restrictions in using or redistributing the licenses across SBUs and other IT areas. Said another way do we get licensing rights to 30 and 45 licenses respectively to distribute as we see fit anywhere at CHUBB?

3. For all 3 options I would like more info on the composition of the offer and can the offer be disaggregated. Eg if we didn't want either the smartforms or cobol option could we eliminate. Would this change the discount structure.

***Document de-designated to CONFIDENTIAL on March 5, 2019***

Confidential - Attorneys' Eyes Only

FICO0001801

4. What are the associated maintenance costs? When do they begin? Since we would be acquiring licenses that we would not put in service for some time and considering the significant upfront payment, would FA allow for a sliding scale on maintnence so that maintnenance costs commence when we start using the licenses?

5. Do we have to worry about runtime licenses for the end users. Eg rules changes and updates will be made via an interface and by business folks instead of developers. I would imagine there would be a lot of these instances. Are the business folks subject to the developer license?

6. Are there any other costs that need to be considered? Eg implementaion, training,etc? Has FA baked this into the offers?

Phil

***Document de-designated to CONFIDENTIAL on March 5, 2019***

Confidential - Attorneys' Eyes Only

FICO0001802

# EXHIBIT B

*Filed Under Seal*

| From: | CN=Mark L Berthiaume/O=ChubbMail |
|---|---|
| Sent: | Thursday, December 21, 2006 8:09 AM |
| To: | CN=Mario A Stassi/O=ChubbMail@ChubbMail; CN=Owen E Williams/O=ChubbMail@ChubbMail; CN=Dolores O Sutton/O=ChubbMail@ChubbMail; CN=Eric W Thompson/O=ChubbMail@ChubbMail; CN=Kristen A San Giacomo/O=ChubbMail@ChubbMail; CN=Patrick F Sullivan/O=ChubbMail@ChubbMail; CN=Jeffrey A Dehner/O=ChubbMail@ChubbMail; CN=Leslie Laiuppa/O=ChubbMail@ChubbMail; CN=Maria M D'addario/O=ChubbMail@ChubbMail; CN=Thea K Pastore/O=ChubbMail@ChubbMail; CN=Kristin M Stone-Baran/O=ChubbMail@ChubbMail; CN=Laura J Suske/O=ChubbMail@ChubbMail |
| Cc: | AndersoJ@chubb.com; rcox@chubb.com |
| Subject: | Fw: Fair Isaac - Enterprise License |

Management Team,
The Sr IT Leadership Team endorsed Blaze as an enterprise asset yesterday and we will be signing the deal tomorrow. No change for CSI, the enterprise deal is incremental to our deal but essentially the same pricing and maintenance....we got a good deal as first in...
Mark

----- Forwarded by Mark L Berthiaume/ChubbMail on 12/21/2006 09:04 AM -----

Philip G Folz/ChubbMail
12/19/2006 09:49 AM

To
Drewry Direct Reports
cc

Subject
Fw: Fair Isaac - Enterprise License




I apologize for not getting this to you. I thought i sent it to the direct reports but only sent it to June. This email summarizes the discussion we had with Fair Isaac last Friday.

Phil
----- Forwarded by Philip G Folz/ChubbMail on 12/19/2006 09:46 AM -----

Philip G Folz/ChubbMail
12/15/2006 03:07 PM

To
drewry, June Drewry
cc

**EXHIBIT B**

Confidential - Attorneys' Eyes Only

FED007629_0001

pgerrity@chubb.com, jwblack@chubb.com, Patrick F Sullivan/ChubbMail@ChubbMail
Subject
Fair Isaac - Enterprise License

Today, Julia, Jim Black and I had a conference call with the folks from Fair Isaac and received their best and final pricing offer for an Enterprise deal. Here are the key points:

1) Acquire license rights for Unlimited seat for the Java and .Net platforms
One Time License Cost: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Annual Maintenance Cost: ▓▓▓▓▓▓ (Represents ▓▓ of the license fee and is payable starting in Yr. 1)

2) License Fee payment Schedule: 40% upon execution, 30% June of '07 and 30% Sept '07. We may be able to get them to move the last two payments totalling 60% to November of 2007 but they do not offer extended payment options on license fees past one year. The above costs would be in addition to the annual maintenance costs of ▓▓▓▓▓ for our current CSI deal.

3) They've also asked that we allow them to issue a press release once we execute the deal. I told them that we do not typically do this but would inquire with Corp Communications if we were going to do the deal. Finally, they've asked that we speak at a future client forum. (*I think this would be a good opprtunity for Barb).

Although funding and support structure remain open issues, I thought you'd appreciate having this information sooner rather than later. Fair Isaac wants a quick response to this proposal as their offer is valid until 12/31/06. Any initial thoughts are welcome, however, I recommend we discuss as a group at our next leadership team meeting on Wed 12/20.

Phil

Confidential - Attorneys' Eyes Only
FED007629_0002

# EXHIBIT C

*Filed Under Seal*

# Enterprise Asset
# Blaze Maintenance Expense
# Allocations
### March 11, 2009

**EXHIBIT C**

Confidential - Attorneys' Eyes Only

1

FED007759_0001

## Fair Isaac – Blaze Enterprise Asset Discussion

### Deal History

- CSI First Adopter (6/06)
  - ▇▇▇ One Time
  - ▇▇▇ Annual Maint.
- 10 Developer licenses, unlimited use within CSI on Java and .Net platforms
- Option to covert to Enterprise License by June 2007.
- Late 2006 CCI pursuing Acquisition
- December 2006 acquired Enterprise license for ▇▇▇ one time and ▇▇ on going (subject to annual price increase. Can deploy unlimited number of developer licenses on Java and .net platforms across enterprise

### Maintenance Expense Allocation

All areas polled by GSS to assess level of interest over 3 year time frame.

Enterprise Asset discussion and acquisition of "adoption options"

SLT reviewed and agreed upon the following allocation

| Area  | # Lic. | %   |
|-------|--------|-----|
| CCI   | 10     | 20  |
| CSI   | 10     | 20  |
| CPI   | 7      | 13  |
| FIT   | 4      | 8   |
| OSD   | 8      | 15  |
| OUS   | 12     | 24  |
| Total | 51     | 100 |

Estimated Blaze Maintenance Allocation for 2009

| Estimated Maintenance for Dec 2009 - Dec 2010: | |
|---|---|
| Tax | |
| **Estimated Total Maintenance** | |
| Department | |
| CCI | |
| CSI | |
| CPI | |
| FIT | |
| OSD | |
| OUS | |
| Total | |

Invoice payable November of 2009

Expenses will hit each department controllable in the Nov/Dec time frame.

Confidential - Attorneys' Eyes Only