# EXHIBIT 13
# (Redacted)

**(Previously Filed Under Seal as DI 503-10)**

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS  Doc. 666  Filed 10/30/19  Page 2 of 10

```
               UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

FAIR ISAAC CORPORATION,

                Plaintiff,

     v.              Court File No. 16-cv-1054 (WMW/DTS)

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY,
a Pennsylvania corporation,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

                   VIDEO DEPOSITION

        The following is the Rule 30(b)(6) video

deposition of Fair Isaac Corporation, given by

M WILLIAM PAUL WAID, taken before Jean F. Soule,

Notary Public, Registered Professional Reporter,

pursuant to Notice of Taking Deposition, at the law

office of Fredrikson & Byron, P.A., 200 South Sixth

Street, Suite 4000, Basswood Conference Room,

Minneapolis, Minnesota, commencing at 9:03 a.m.,

Wednesday, January 16, 2019.


                       *   *   *


               C O N F I D E N T I A L

                  ATTORNEYS' EYES ONLY
```

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS  Doc. 666  Filed 10/30/19  Page 3 of 10

```
 1    APPEARANCES:

 2

 3
         On Behalf of the Plaintiff:
 4
             Allen W. Hinderaker, Esquire
 5           Joe Dubis, Ph.D., Esquire
             MERCHANT & GOULD, P.C.
 6           3200 IDS Center
             80 South Eighth Street
 7           Minneapolis, Minnesota 55402-2215
             Phone:  (612) 332-5300
 8           e-mail:  ahinderaker@merchantgould.com
                      jdubis@merchantgould.com
 9

10       On Behalf of the Defendants:

11           Terrence J. Fleming, Esquire
             Leah C. Janus, Esquire
12           FREDRIKSON & BYRON, P.A.
             200 South Sixth Street
13           Suite 4000
             Minneapolis, Minneosta 55402-1425
14           Phone:  (612) 492-7000
             e-mail:  tfleming@fredlaw.com
15                    ljanus@fredlaw.com

16

17       Also Present:   James Woodward, Esquire
                         Vice President, Legal
18                       Fair Isaac Corporation

19

20       The Videographer:  Mr. Scott Breckheimer

21

22

23

24

25
```

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
CASE 0:16-cv-01054-DTS  Doc. 666  Filed 10/30/19  Page 4 of 10
Fair Isaac Corporation vs. Federal Insurance Company, et al.

## Page 3

1  PROCEEDINGS
2  Whereupon, the 30(b)(6) video deposition of
3  Fair Isaac Corporation, given by M WILLIAM PAUL WAID,
4  was commenced at 9:03 a.m. as follows:
5  * * *
6  THE VIDEOGRAPHER: This is the
7  videographer speaking, Scott Breckheimer, with Depo
8  International. Today is January 16th in the year
9  2018 -- sorry, '19. The time is 9:03 a.m. We are
10  at 200 South Sixth Street, Suite 4000, Minneapolis,
11  Minnesota 55402 to take the video deposition of
12  Bill Waid in the matter of Fair Isaac Corporation
13  versus Federal Insurance Company, et al.
14  Will Counsel please introduce
15  themselves for the record?
16  MR. HINDERAKER: For the Plaintiff,
17  Allen Hinderaker from Merchant & Gould, and Joe
18  Dubis from Merchant & Gould, as well as James
19  Woodward, Vice President, Deputy General Counsel of
20  the Plaintiff FICO.
21  MR. FLEMING: Terry Fleming and Leah
22  Janus of the Fredrikson law firm representing
23  Defendants.
24  THE VIDEOGRAPHER: Will the court
25  reporter please administer the oath?

## Page 4

1  (Reporter's Note: The oath was
2  administered by the court reporter.)
3  MR. WAID: I do.
4  THE VIDEOGRAPHER: You may begin.
5  * * *
6  M WILLIAM PAUL WAID,
7  after having been first duly sworn,
8  deposes and says under oath as follows:
9  ***
10  EXAMINATION
11  BY MR. FLEMING:
12  Q. Good morning, Mr. Waid.
13  A. **Good morning.**
14  Q. Could you state your full name and
15  your work address?
16  A. **My full name is M William Paul Waid,**
17  **and I actually work out of a home office, which is**
18  **216 Nottingham Drive, Spring City, Pennsylvania**
19  **19475.**
20  Q. Have you had your deposition taken
21  before?
22  A. **No.**
23  Q. Do you understand that you're under
24  oath?
25  A. **Yes, sir.**

## Page 5

1  (Whereupon, Deposition Exhibit No. 220
2  was marked for identification, and a copy is
3  attached and hereby made a part of this deposition.)
4  BY MR. FLEMING:
5  Q. Showing you what's been marked as
6  Exhibit 220, this is Defendant's notice of the
7  30(b)(6) deposition of the Plaintiff.
8  Have you seen this document before,
9  Mr. Waid?
10  A. **I have not.**
11  Q. Have you been designated by FICO to
12  address certain topics which are stated in this
13  notice?
14  A. **I have been designated to address**
15  **certain topics, yes.**
16  Q. Could you identify those topics that
17  you've been designated to testify about?
18  MR. HINDERAKER: Counsel, he's been
19  designated to testify about topic 1, as I described
20  in my e-mail to you of the 15th, as well as topic 2,
21  as I described in my e-mail of the -- same e-mail
22  of the 15th. We have -- he's here and we have for
23  you identification on topic 8, identification of
24  individuals involved in -- FICO individuals
25  involved in the decision to terminate, and he has

## Page 6

1  been designated on topics 17 with respect to
2  pricing and 18 with respect to criteria for
3  pricing, as I detailed in the e-mail of the 15th.
4  BY MR. FLEMING:
5  Q. So have you read the topics that
6  Mr. Hinderaker just identified?
7  A. **I have not read this document, no**
8  (indicating).
9  Q. Okay. What have you done to prepare
10  for your Rule 30(b)(6) deposition?
11  MR. HINDERAKER: Would you be more
12  specific regarding which topics?
13  MR. FLEMING: I would like an answer
14  to that question.
15  BY MR. FLEMING:
16  Q. What have you done to prepare for your
17  Rule 30(b)(6) deposition?
18  A. **I've had a conversation with**
19  **Mr. Woodward and Mr. Hinderaker, in which they've**
20  **informed me about the topics that I am to testify**
21  **to.**
22  Q. Other than speaking with Mr. Woodward
23  and Mr. Hinderaker, have you done anything else to
24  prepare for your testimony on the topics that FICO
25  has designated you to testify about?

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS   Doc. 666   Filed 10/30/19   Page 5 of 10

**Page 35**

1  Q.  Did you understand that this was
2  information that Larry Wachs had obtained
3  independently from public sources or was it coming
4  from the organization that was negotiating the
5  software license agreement?
6  A.  I don't know where Larry got this
7  information.
8  Q.  So when he says in his e-mail that the
9  RFI provided little ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ and then talks about the revenue and the
12 employees, you didn't understand there was any
13 connection between his reference to the RFI and,
14 then, the information that he provided relating to
15 the revenues and the employees; is that fair?
16  A.  No.  As I previously stated, I read
17 this e-mail and took away that their Specialty
18 Insurance was about a $3.5 billion business.  In
19 the context he doesn't have any other information,
20 it's the only source of scale I have on the
21 opportunity.
22  Q.  All right.  Showing you what's
23 previously marked as Exhibit 106, do you agree this
24 is an e-mail from you to John Haines, dated
25 February 22nd, 2006?

**Page 36**

1  A.  That's what it says.
2  Q.  Do you recall sending this e-mail?
3  A.  No.
4  Q.  And do you see that the first e-mail
5  in this chain is an e-mail from Larry Wachs to John
6  Haines in which Russ Schreiber is copied?
7  A.  Russ Schreiber is copied.
8  Q.  Why -- If Russ Schreiber was not
9  involved in the communications with Federal
10 regarding 2006 agreement, why is he being copied on
11 these e-mails relating to the early discussions?
12  A.  Russ Schreiber was and -- our
13 insurance expert and responsible for that part of
14 the business at FICO.
15  Q.  Okay.  Well, was he involved in the
16 communications with Federal regarding the 2006
17 agreement?
18  A.  As previously stated, he was not
19 involved in the direct communications for the
20 contract.
21  Q.  Can you turn on the second page, this
22 is the text of the e-mail from Larry Wachs where it
23 says, it says, John, I've brought down the
24 enterprise (Divisional) license to ▮▮▮▮▮ based
25 upon the Division's sales of $3.5" million

**Page 37**

1  "(confirmed in their annual report)."  And he goes
2  on to say this qualifies as a small application at
3  ▮▮▮▮▮  Do you know what he meant when he says,
4  "I've brought down the enterprise (Divisional)
5  license to ▮▮▮▮▮ based on the sales of
6  $3.5 billion"?
7  A.  I don't know what he meant.  It looks
8  like he was working with John to come up with a
9  proposal.
10  Q.  Is it your understanding that the
11 proposal at that time was based simply on the
12 revenues generated from that line of business that
13 would use the application?
14  A.  Well, first of all, it's referring to
15 a divisional license here, not an enterprise license,
16 which there's a distinction thereof.  But, secondly,
17 Larry wasn't involved in pricing enterprise
18 agreements, as I previously stated, I was.  So they
19 come to me.
20  Q.  Okay.  What is the difference between
21 enterprise and divisional licenses?
22  A.  Divisional licenses are usually to
23 cover a small business function within the scope
24 of, say, a line of business, like specialty
25 insurance.  It doesn't have far-reaching license

**Page 38**

1  scope that an enterprise agreement would have.
2  Q.  And how is the pricing for a
3  divisional license done in comparison with how the
4  pricing for an enterprise license is conducted?
5  A.  The way we actually do enterprise
6  pricing is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮, and, then, within that we carve out
10 smaller subsets of licenses, like a divisional
11 license in this case, based on ▮▮▮▮▮▮▮▮▮▮
12  Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
23  A.  I can't care to speculate what Larry
24 was thinking in his e-mail here.  He's -- he's
25 making a proposal.  This ultimately have to come to

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS   Doc. 666   Filed 10/30/19   Page 6 of 10

**Page 39**

1  me for approval.
2     Q.   Okay.
3     A.   Larry is not involved in pricing these
4  things.
5     Q.   And you don't know how he would have
6  arrived at a proposal based on the revenues?
7     A.   Larry is not qualified to do the
8  pricing.  So I'm not sure how he would have arrived
9  at or what his thinking was.
10     Q.   Okay.  So when he says the division
11  sales of $3.5 billion confirmed on their annual
12  report, did you understand that to mean he had
13  confirmed that the Chubb Specialty line of business
14  had generated $3.5 billion in revenues and that was
15  confirmed in a 10-K?
16     A.   I have no idea what he confirmed or
17  didn't confirm or how he confirmed that.  I don't
18  know.
19     Q.   Okay.  When he says that the license
20  pertains only to a CSI Policy Renewal application
21  and that qualifies it as a small application at
22  [redacted] what is your understanding as to what he
23  meant by that?
24     A.   So we have a -- a sizing grid for the
25  use of Blaze Advisor.  There's nine factors that go

**Page 40**

1  into that sizing grid, and when you come out of
2  that, you end up in a classification of small,
3  medium, large or very large, and, then, the pricing
4  for a named application is tied to that sizing
5  segment.
6     So I'm not sure why he came up with
7  the small, but that's what he's stating here, is
8  that he thinks it's a small.
9     Q.   So, in the [redacted], what -- what is
10  that number as it's tied to -- when he says I've
11  qualified the license and it qualifies as a small
12  application at [redacted], if it is a small
13  application -- well, first of all, how is it
14  determined which -- on that grid whether a license
15  would be small, medium, large or very large?
16     A.   There's nine criteria in that grid.
17     Q.   Okay.  And that nine criteria are used
18  in determining whether it's small, medium, large or
19  very large?
20     A.   That's correct.
21     Q.   Okay.  On the first page, where it
22  says an e-mail from John Haines to you on
23  February 21st, he says, "Just need approval.  This
24  is standard pricing."  What was your understanding
25  as to what was meant by that?

**Page 41**

1     A.   I don't know what he meant.  The
2  pricing grid and the associated pricing is standard
3  documented.  He probably is referring to the
4  standard documentation on the enterprise, but I
5  don't know what he meant by this is standard.  He
6  knows that I approve and work out all enterprise
7  pricing.
8     Q.   And when you say at the top of the
9  page, the first e-mail on the page, that you "did
10  not see the application description in the quote --
11  just a reference to the RFI," what is the quote
12  that you're referencing?
13     A.   I -- I don't know.  There's nothing on
14  this e-mail, but generally we use a quoting
15  mechanism for pricing, but there's nothing on this
16  e-mail.
17     MR. FLEMING:  Will you mark this as
18  Exhibit 222?
19     THE COURT REPORTER:  223.
20     MR. FLEMING:  223.
21  BY MR. FLEMING:
22     Q.   Showing you what's been marked as
23  Exhibit 223, I'll represent to you that we tracked
24  down the attachment to the first e-mail or the
25  e-mail at the bottom of Exhibit 106, where it says

**Page 42**

1  "Quote Chubb licensing.xls."  Can you identify this
2  document?
3     A.   No.  I don't have it.
4     MR. HINDERAKER:  I believe the
5  document is two pages?  Need a clip?
6     THE WITNESS:  Thank you.
7     (Reporter's Note:  Mr. Woodward is
8  speaking to Mr. Hinderaker out of the hearing of
9  the reporter.)
10     MR. HINDERAKER:  I didn't hear what
11  you said.
12     (Reporter's Note:  Mr. Woodward is
13  speaking to Mr. Hinderaker out of the hearing of
14  the reporter.)
15     MR. HINDERAKER:  I don't think so,
16  either, yeah, yeah, yeah.
17     While -- while the witness is
18  reviewing the document and in light of Counsel's
19  representation, I'll just note that the e-mail to
20  which Counsel referred to regarding the attachment
21  is February 21, 2006, and the document that's said
22  to be an attachment is April 4, 2006.
23     THE WITNESS:  It appears to be a quote
24  to a James Black at Chubb & Sons, CSI Division,
25  Vendor Management Department, from Larry Wachs.

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS  Doc. 666  Filed 10/30/19  Page 7 of 10

**Page 99**

1  then. It has not -- it has never changed, and the
2  ▇
3  ▇
4  ▇ .
6  I don't have the document in front of
7  me, I can't recall how many tiers there are. I
8  want to say there's ▇ but I'm not sure.
9  Q. So could you describe this table that
10 you were talking about in more detail? Is it a
11 single document, how many pages is the document?
12 A. I -- I can't answer that question. I
13 don't know that off the top of my head.
14 Q. Okay. It's not a -- it's not an
15 electronic document where you put in numbers or an
16 Excel spreadsheet type thing, rather, it is a
17 document that simply has tables on it and a series
18 ▇
19 ▇ y?
20 A. So, to be perfectly clear, there is a
21 pricing document from 2003 that is the foundation
22 of our Blaze Advisor pricing. It has not changed.
23 That pricing has been consistently used since then.
24 We do have, as part of our sales force
25 automation capabilities, a quoting system built

**Page 100**

1  into salesforce.com. That quoting system
2  information comes in from our selling reps and it
3  determines the price, but it uses the pricing from
4  that 2003 document. And, as I stated earlier,
5  enterprise-wide pricing has to come through me. So
6  it's not part of that quoting system.
7  Q. And you didn't use a quoting system in
8  arriving at the -- in arriving at the license fee
9  for the Blaze Software license agreement with
10 Chubb, correct?
11 A. You need to be more specific.
12 Q. Okay. You've talked about a document
13 which is part of the standard pricing since 2003
14 that has tables and a series of tiers, and now
15 you've also discussed a quoting system that can be
16 used to quote prices. And my question is, when
17 you -- you were the person who priced the
18 enterprise license agreement for Blaze with regard
19 to the 2006 license agreements, correct?
20 A. Yes, that's correct.
21 Q. Okay. And my question is, did you use
22 this quoting system in coming to or in doing any of
23 the calculations or in otherwise arriving at the
24 numbers used for the license fees?
25 A. No, I did not.

**Page 101**

1  Q. Okay. Now, do you use a sizing
2  questionnaire in determining the appropriate price
3  for the Blaze Software and license agreement?
4  A. What kind of licenses?
5  Q. An enterprise license agreement.
6  A. No, we do not.
7  Q. Is it only used in connection with a
8  Cloud system?
9  ▇
10 ▇
11 ▇
12 ▇
13 ▇
14 ▇
15 ▇
16 ▇
17 ▇
18 ▇
19 Q. Uh-huh. And you say that the global
20 price you arrived at or the price for the global
21 license would have been ▇ ?
22 A. I'm just echoing back to you what's in
23 the documentation that you shared with me. I have
24 no recollection of how it was priced. I only have
25 the information you've offered me.

**Page 102**

1  Q. Okay.
2  A. And I can only share with you, which I
3  already have, the process we follow.
4  Q. Let me show you what's previously been
5  marked as Exhibit 113. Is this an e-mail from
6  Larry Wachs to Mark Layden that you were copied on
7  dated December 12th, 2006?
8  (Reporter's Note: An unidentified man
9  opens the door and Mr. Fleming goes to the door and
10 talks to the man, and then the man leaves the room.)
11 THE WITNESS: I've -- I've reviewed
12 the document.
13 BY MR. FLEMING:
14 Q. My question is whether this is an
15 e-mail from Larry Wachs to Mark Layden that you
16 were copied on, dated December 12th, 2006?
17 A. It is.
18 Q. And does Mr. Wachs summarize the
19 progress of the negotiations with Chubb relating to
20 the Blaze Software license agreement?
21 A. I would say that this e-mail lays out
22 that Chubb is asking for a price at ▇ ,
23 incremental, and we were at ▇ , and he changed
24 some terms here to get to a ▇ number.
25 It doesn't say what the scope of that

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 1/16/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 666 Filed 10/30/19 Page 8 of 10

**Page 103**

1 license is. He does offer rationale for his
2 thinking here, but, again, Larry Wachs doesn't do
3 enterprise pricing.
4    Q.   If you look at the bottom of the page
5 where it says Pricing Rationale, and it says,
6 "Following is a breakdown of premium revenue...by
7 business unit at Chubb," and it identifies specialty,
8 commercial, personal, and, then, on the next page
9 global?
10      MR. HINDERAKER: Other, global, slash,
11 other.
12 BY MR. FLEMING:
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?
16    A.   No. That is not what I said. I said
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and then we
18 scope to the specific license. And I'll reiterate
19 here, Larry Wachs is providing his point of view.
20    Q.   On page 2, what did you understand
21 when Mr. Wachs says, quote, Again we're at
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮?
23    A.   Plus ▮▮ for unlimited seats, which is
24 ▮▮▮▮▮▮ which, as I've explained before, the
25 drop goes down to ▮▮ which is consistent with the

**Page 104**

1 way that we would price to a U.S. only license.
2    Q.   But what does he mean when he says
3 ▮▮▮▮▮▮▮▮▮▮▮▮▮?
4      MR. HINDERAKER: Objection, lack of
5 foundation to his intentions.
6 BY MR. FLEMING:
7    Q.   What did you understand that he meant?
8    A.   I -- I -- I don't know what he meant.
9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11    Q.   So going back to this, the standard
12 pricing you use, what is the -- how do you refer to
13 that document internally?
14    A.   It's the Global Blaze Advisor Price
15 List from 2003.
16    Q.   And who authored that document?
17    A.   I think a guy by the name of Jeff
18 Kilbreth actually was the original author.
19    Q.   Is there any -- does it go by any
20 other -- is it referred to by any other name other
21 than Global Blaze Advisor Price List for 2003?
22    A.   Nope. That's what we've been using
23 since 2003.
24    Q.   Okay. And you don't change it every
25 year for inflation or for any other reason?

**Page 105**

1    A.   No, sir.
2      MR. FLEMING: Can you mark this as the
3 next exhibit?
4      THE COURT REPORTER: Exhibit 229.
5      (Whereupon, Deposition Exhibit No. 229
6 was marked for identification, and a copy is
7 attached and hereby made a part of this deposition.)
8 BY MR. FLEMING:
9    Q.   I'm showing you -- I'm sorry.
10      MR. HINDERAKER: What is it?
11      MR. FLEMING: Here you go.
12      MR. HINDERAKER: Do you want your tabs,
13 do you want this stuff?
14      MR. FLEMING: Let me see here, sorry
15 about that.
16      MR. HINDERAKER: First Supplemental
17 Answers, First Supplement -- I think these are all
18 the same, First Supplemental Answers.
19      MR. FLEMING: Oh, I see.
20      MR. HINDERAKER: First Supple --
21      MR. FLEMING: Why don't I take them
22 back, and I've got three copies of each, I'll put
23 them all on top of each other.
24      MR. HINDERAKER: What would you like?
25      MR. FLEMING: Can I have that back?

**Page 106**

1 Can you mark this as 229?
2      MR. HINDERAKER: All three, they're
3 all three 229?
4      MR. FLEMING: Yes.
5      (Whereupon, Deposition Exhibit No. 229
6 was re-marked for identification, and a copy is
7 attached and hereby made a part of this deposition.)
8 BY MR. FLEMING:
9    Q.   I am showing you what I've marked as
10 Exhibit 229, which are FICO's Answers to Defendant's
11 Interrogatories 6 through 9, and I'll ask you to
12 turn to the third document, which is entitled
13 Second Supplemental Answers to Defendant's
14 Interrogatories 6 through 9. If you could turn to
15 page 5? Do you see the second paragraph where it
16 says, quote, The FICO lost license fee for the
17 applications identified in the supplemental
18 response to interrogatory No. 4 (that FICO
19 understands to be used by Chubb & Son, a division
20 of Federal) is approximately $4,671,000 per year,"
21 and it goes on to say, "FICO claims damages for
22 that annual fee from March 31, 2016, to the date an
23 injunction is issued against Federal's continued
24 unlicensed use of the software." Have I read that
25 correctly?

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY 1/16/2019
CASE 0:16-cv-01054-DTS Doc. 666 Filed 10/30/19 Page 9 of 10
Fair Isaac Corporation vs. Federal Insurance Company, et al.

## Page 151

1  I'm sorry, I don't remember the CIO's name.
2  Q.   Did that meeting occur?
3  A.   That phone call did occur.
4  Q.   Were you present or in the room or --
5  A.   I was not.
6  Q.   Did you hear what happened in that
7  subsequent phone call?
8  A.   I simply got an update from Will
9  Lansing that the call did not go well.
10 Q.   Any other detail?
11 A.   No, I -- and I don't have any other
12 detail.
13      MR. HINDERAKER:  Do you think we're
14 soon done or should we take another break?
15      MR. FLEMING:  Why don't we take a
16 five-minute break.  We're getting there.
17      MR. HINDERAKER:  And then we're soon
18 done?
19      THE VIDEOGRAPHER:  Going off the
20 record.  The time is 3:29 p.m.
21      (Break from 3:29 to 3:40.)
22      THE VIDEOGRAPHER:  We're back on the
23 record.  The time is 3:40 p.m.
24 BY MR. FLEMING:
25 Q.   Mr. Waid, what is the rationale for

## Page 152

1  demanding more fees when a company with whom FICO
2  has a contractual relationship involving Blaze
3  Software undergoes a change in control or a merger?
4  A.   As I previously pointed out to you,
5  ███████████████████████████████████████████
6  ██████████████████████████████ and so
7  when there's a change of control or an acquisition,
8  the foundation of that license scope and subsequent
9  price becomes challenged against the principles on
10 which it was set in the first place.
11 Q.   Any other reason or rationale?
12 A.   Yes.  The enterprise agreement
13 provides for the use of Blaze Advisor in sort of an
14 ███████████████████████████████████████████
15 ███████████████████████████████████████████
16 ████████████████ The measure of that value
17 to an organization, which is outlined in several of
18 these quotes as well, is a function of many things,
19 but ██████████████████.
20      So when a company goes through an
21 acquisition event, there's going to be naturally
22 synergies from that acquisition, otherwise why
23 acquire, and that challenges the foundation of the
24 value statement of our enterprise agreement.  So at
25 the very core we put in this clause to say when you

## Page 153

1  have an acquisition event, there needs to be consent
2  and agreement around the scope of that license and
3  the fees associated with it.
4  Q.   Any other reasons?
5  A.   No.  That's the primary reason.
6  Q.   From FICO's perspective, in the event
7  of a merger, does it matter whether there is
8  increased use of Blaze post-merger?
9  A.   It's a question that frequently comes
10 up in the negotiations of contracts.  But increased
11 use means what?
12      You have a large organization, you
13 ███████████████████████████████████████████
14 ███████████████████████████████████████████
15 ███████████████████████████████████ The
16 foundational principles by which we licensed the
17 software have changed.  Here again, if you have an
18 acquisition event, why would you do that if there's
19 not business synergies?
20      Since there's no other controls in the
21 software █████████████████████████, it's
22 critically important that this clause is in there
23 to protect our IP and the value of our software.
24 Q.   And my question is really a different
25 one.  Does FICO care in connection with a merger

## Page 154

1  under the circumstances that we've been discussing
2  whether there is increased use post-merger?
3       MR. HINDERAKER:  Object to --
4       MR. FLEMING:  Let me put it
5  differently, and then you can state your objection
6  now if you want.
7       MR. HINDERAKER:  I'll ask -- I'll wait
8  for the question you're putting.
9       MR. FLEMING:  Okay.
10 BY MR. FLEMING:
11 Q.   What -- Does FICO attempt to determine
12 in the circumstances where there's been a merger
13 whether there is increased use of Blaze post-merger?
14 A.   I'm going to ask you what does
15 increased use mean?
16 Q.   What do you -- what would your
17 understanding of increased use be, what's ambiguous
18 about that?
19 A.   Huh.  If two entities merge where
20 there's an acquisition to gain business synergies,
21 by what definition do you define increased use if
22 not for the fact that you now have ████████
23 ███████████████████████████████████████████
24 than the one contemplated in the agreement in the
25 first place?  So you tell me what is actually --

M William Paul Waid - CONFIDENTIAL - ATTORNEYS' EYES ONLY 1/16/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 666 Filed 10/30/19 Page 10 of 10

**Page 155**

1 constitutes increased use if not that.
2    Q.   Well, what if, in fact, post-merger
3 the actual use of applications utilizing Blaze has
4 not increased by any metric?
5        MR. HINDERAKER:  Objection, lack of --
6 well, I'm sorry.
7        THE WITNESS:  Yeah, how do you --
8 foundationally how do you -- how can you make that
9 statement?  You -- you have an acquisition event,
10 that new organization is bigger than what you had
11 before.  There's going to be pull-through business,
12 there's going to be incremental business.
13 Otherwise, why did you acquire them in the first
14 place?  So how can you substantiate that there's no
15 increased use?
16 BY MR. FLEMING:
17    Q.   Apart from the ability to substantiate
18 it, is it FICO's position that it does not matter
19 one way or the other or is it FICO's position that
20 if there is a merger there must be increased use?
21    A.   No.  Our position is is that if there
22 is an acquisition event, there is no assignment
23 unless we consent, and the basis of our pricing,
24 the value of our software must be revisited.
25 That's our position, and it's pretty simple and

**Page 156**

1 clear.  We valued our software and ▌▌▌▌▌▌▌▌
▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
▌▌▌▌▌▌▌, that has changed.
4        MR. FLEMING:  Can you mark this as the
5 next?
6        THE COURT REPORTER:  It's 232.
7        (Whereupon, Deposition Exhibit No. 232
8 was marked for identification, and a copy is
9 attached and hereby made a part of this deposition.)
10 BY MR. FLEMING:
11    Q.   Showing you what's marked as
12 Exhibit 232, is this an e-mail from Mike Sawyer to
13 Tamra Pawloski, dated March 6th, 2016, that you
14 were copied on?
15    A.   March 6th, 2016, from Mike Sawyer to
16 Tamra, I was copied, yes.
17    Q.   So do you recall -- Other than what
18 you've testified already, do you recall any -- the
19 substance of any oral communications you had with
20 Tamra concerning the negotiations of this agreement?
21    A.   Nothing -- nothing specific.  Is -- is
22 there something special you're asking?
23    Q.   Well, what were the topics covered in
24 these oral conversations?  I mean, do you recall
25 anything about them?

**Page 157**

1    A.   Yeah.  We reviewed the proposals.
2    Q.   Okay.  Were they just information
3 gathering?
4    A.   We characterize that most of these
5 conversations were to understand how the proposal
6 worked, what the foundation of it was, what the
7 numbers were, and how the calculations actually
8 occurred, and what specifically was being asked,
9 and to explore a path forward to resolve an
10 amendment.
11        MR. FLEMING:  Mark this the next
12 exhibit.
13        THE COURT REPORTER:  233.
14        (Whereupon, Deposition Exhibit No. 233
15 was marked for identification, and a copy is
16 attached and hereby made a part of this deposition.)
17 BY MR. FLEMING:
18    Q.   At the top is an e-mail from Wayne
19 Huyard to Russ Schreiber and others, including you,
20 dated March 18th, 2016?
21    A.   Okay.
22    Q.   What was -- is this an e-mail at the
23 top from Wayne Hoard -- Huard -- Huyard to Russ
24 Schreiber and you and others, dated March 18th,
25 2016?

**Page 158**

1    A.   It is, yes.
2    Q.   What was Wayne Huyard's role in these
3 negotiations?
4    A.   I think prior to this e-mail I don't
5 think he was involved.
6    Q.   You think he was not involved?
7    A.   To my recollection, no, I -- he was
8 not involved.
9        MR. FLEMING:  Mark this as the next
10 exhibit.
11        THE COURT REPORTER:  234.
12        (Whereupon, Deposition Exhibit No. 234
13 was marked for identification, and a copy is
14 attached and hereby made a part of this deposition.)
15 BY MR. FLEMING:
16    Q.   In the middle of the first page, is
17 that an e-mail from you to Tamra Pawloski dated
18 March 23rd, 2016?
19    A.   It is.
20    Q.   And what is it that you're referencing
21 in the second paragraph about the evaluation of
22 Blaze in an oversea country?
23    A.   I had been informed that someone in
24 our support group got a support call from actually
25 I think a third-party organization operating on