# Exhibit 19
# (Previously Filed Under Seal as Dkt. 317-3)

```
                    1

 1    UNITED STATES DISTRICT COURT
         DISTRICT OF MINNESOTA
 2
      -------------------------------------------------
 3                              )
      Fair Isaac Corporation,   ) File No. 16-CV-1054
 4                              )   (WMW/DTS)
          Plaintiff,            )
 5                              )
      vs.                       ) Minneapolis, Minnesota
 6                              ) June 4, 2019
      Federal Insurance Company )
 7    and ACE American Insurance) DIGITAL RECORDING
      Company,                  )
 8                              )
          Defendants.           )
 9                              )
      -------------------------------------------------
10
            BEFORE THE HONORABLE DAVID T. SCHULTZ
11       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12              (TELEPHONE CONFERENCE)

13    APPEARANCES
      For the Plaintiff:    Merchant & Gould, PC
14    (Via Telephone)       HEATHER J. KLIEBENSTEIN, ESQ.
                            JOSEPH DUBIS, ESQ.
15                          Suite 3200
                            80 South Eighth Street
16                          Minneapolis, Minnesota 55402

17    For the Defendants:   Fredrikson & Byron
      (Via Telephone)       TERRENCE J. FLEMING, ESQ.
18                          CHRISTOPHER D. PHAM, ESQ.
                            LEAH C. JANUS, ESQ.
19                          Suite 4000
                            200 South Sixth Street
20                          Minneapolis, Minnesota 55402

21    Transcriber:          LORI A. SIMPSON, RMR-CRR
                            Suite 146
22                          316 North Robert Street
                            St. Paul, Minnesota 55101
23

24
      Proceedings recorded by digital recording; transcript
25    produced by computer.
                                2
```

```
 1              PROCEEDINGS

 2              IN OPEN COURT

 3         THE COURT: All right. We are on the record in

 4    the matter of Fair Isaac Corporation vs. Federal Insurance

 5    Company, Civil No. 16-1054.

 6         Counsel for FICO, if you would note your

 7    appearances for the record, please.

 8         MS. KLIEBENSTEIN: Yes, Your Honor. Heather

 9    Kliebenstein and Joe Dubis of Merchant & Gould.

10         THE COURT: Good morning.

11         And for the defendant?

12         MR. FLEMING: Your Honor, Terry Fleming, Leah

13    Janus, and Chris Pham of the Fredrikson law firm

14    representing defendant.

15         THE COURT: All right. We have a number of things

16    that I want to accomplish today. First, I will give you my

17    ruling on the privilege log entries. Second, I will give

18    you my ruling on the documents requested to be produced by

19    FICO regarding negotiations over prices. Third, we have to

20    look at the business rules issue. And fourth, the

21    dissemination of the expert report. So that's what was on

22    my agenda.

23         Turning first to the privilege log entries, I have

24    reviewed privilege log entry number 656, 662, and 665 from

25    FICO's privilege log and all three of the e-mail strings --
                                3
```

```
 1    they are all three e-mail strings. All three of them are,

 2    in fact, privileged and I'll give you a little bit of my

 3    rationale for that.

 4         First of all, they're different e-mail chains, but

 5    they spring from a common source and then privilege log

 6    entry 662 and 665 then branch off and have unique

 7    information or communications, but all three of them request

 8    or provide legal advice. You are entitled to know that the

 9    legal advice concerns the interpretation of the software

10    license agreement.

11         There is -- as is always the case almost, there

12    are minor portions of the communications that are perhaps

13    not strictly speaking privileged, but they are so interwoven

14    with the privileged communications as to be incapable of

15    meaningful redaction.

16         To the extent that any of the communication

17    reflects business advice as opposed to legal advice, I have

18    reviewed that question carefully and the legal advice

19    portion clearly predominates over the business advice

20    portion, to the extent there is any. And if one were to

21    attempt to extract the business advice portion, it would be

22    impossible to do that without revealing the content of the

23    legal advice.

24         So those three documents, entries number 656, 662,

25    and 665, are privileged and will not be produced. Let me
                                4
```

```
 1    pause there and ask if anyone has questions regarding that.

 2         MS. KLIEBENSTEIN: No questions from the

 3    plaintiff, Your Honor.

 4         THE COURT: Any --

 5         MR. FLEMING: Your Honor, this is Terry Fleming.

 6    One of the issues was the description of the entries and

 7    you've stated that they concern the interpretation of the

 8    software license agreement. Is it possible to have a more

 9    expansive description, such as in connection with --

10    concerning the interpretation of the SLA reuse outside of

11    the United States?

12         THE COURT: I don't believe that would be either

13    necessary or appropriate. So I am going to say no on that,
```

EXHIBIT 19

14 but by all means you are more than welcome to appeal that
15 issue to Judge Wright.
16     Okay. Moving on to the letter from
17 Ms. Kliebenstein dated May 24, 2019 regarding the production
18 of documents relating to what they've described in their
19 letter as Query Number 1 and Query Number 2. Let me ask
20 first if, Mr. Fleming, you wish to be heard on anything
21 relating to that issue.
22     MR. FLEMING: Just very briefly, Your Honor. The
23 only comment that we have in response to that letter relates
24 to the project that Federal had to undertake to respond to
25 FICO's Requests 55 through 70, which similarly required an

5

1 extensive document review project, well over a hundred hours
2 and costing Federal in excess of $40,000 in fees to
3 undertake that project. That, nonetheless, had to do
4 with -- was required by the Court's order. To the extent --
5     THE COURT: Mr. Pham [sic], if I might interrupt
6 you for a second. I'm sorry. You were very, very faint and
7 I'm really struggling to hear you. So if you could either
8 get closer to the speakerphone or pick up the phone or
9 whatever, but go again. I'm sorry.
10     MR. FLEMING: No problem, Your Honor. Just wanted
11 to make the comment that Federal had to undertake a project
12 relating to FICO's Requests 55 through 70 in which well over
13 a hundred hours of time was spent reviewing documents at the
14 cost to Federal of -- in excess of $40,000. In any event,
15 Federal complied with the Court's order and conducted the
16 review project. So to the extent FICO is making the
17 argument that, you know, it's going to be costly for them to
18 conduct a review project, you know, Federal has already had
19 to do so.
20     THE COURT: Okay. Ms. Kliebenstein, briefly do
21 you wish to be heard on this topic beyond the content of
22 your letter?
23     MS. KLIEBENSTEIN: I think our main focus is the
24 cost-benefit analysis with regards to this specific order
25 from the Court and essentially for the Court to decide what

6

1 is enough, what is enough collection and review to satisfy
2 the Court's order. I think both parties have spent
3 significant amounts of money on document review and
4 production going both ways.
5     So I didn't hear -- what I didn't hear from
6 Federal was a need to get the more robust, more costly
7 Query 2 search results. It sounds like the Query 1 would
8 satisfy what they're looking for.
9     THE COURT: All right. Anything further, Federal?
10     MR. FLEMING: No, Your Honor.
11     THE COURT: All right. I am going to set this one
12 aside for a minute. I want to turn to the other ones. I'm
13 still thinking through that particular issue. So we will
14 return to that.
15     Let's talk about the extraction of the business
16 rules and what's involved there. Let me start by giving the
17 parties what I remember of the first order for production of
18 documents that I think bears on this to some degree.
19     As I recall, we had a motion early on in which
20 Federal resisted on the grounds that overhead or things of
21 that nature were not discoverable because they don't relate
22 to direct loss or direct profits to be disgorged. I know
23 that that's a very imprecise way of phrasing it, but we had
24 that issue. I ordered the discovery of it. I think it
25 was -- in my view, the case law was very clear that it was

7

1 discoverable.
2     Now, this issue about extraction of the business
3 rules, as I understand FICO's position, they are essentially
4 arguing that they need the business rules in their entirety
5 to be extracted and produced because that will permit their
6 experts to determine how much of the profit is attributable
7 to the use of the software allegedly in violation of the
8 licensing agreement and as an infringement.
9     So far am I -- on a very high level, am I
10 summarizing this correctly, Ms. Kliebenstein?
11     MS. KLIEBENSTEIN: I think so. The way that I
12 would characterize it is Federal has stated throughout this
13 case and expert reports that it owns the rules. The rules
14 themselves are what make the decision and Blaze Advisor is
15 just, you know, a glorified Excel spreadsheet.
16     And so that's why we asked for the rules in the
17 first place. If we're going to get into the value of the
18 rules and what they drive in this case, then we should be
19 able to see the rules.
20     It's connected -- there is a revenue connection
21 there. It has to deal with the disgorgement, you're exactly
22 right, Your Honor, both on the connection to revenue side
23 and then what profits are attributable or not attributable
24 to infringement.
25     THE COURT: Okay. Mr. Pham or Mr. Fleming or

8

1 Ms. Janus.

2   MR. FLEMING: Thank you, Your Honor.
3   [Indiscernible.] We haven't -- what we're having difficulty
4   understanding, Your Honor, is how doing the rules themselves
5   will allow FICO to demonstrate, you know, how Blaze
6   contributes to the profits. Throughout FICO's expert's
7   opening report, it's clear that the expert understands how
8   Blaze is being used, how he foresees the benefits to be from
9   the use of Blaze, but there is no, you know, in-depth
10  discussion of how the rules themselves will help with that
11  process.
12      THE COURT: Okay. I have to confess,
13  Ms. Kliebenstein, I'm a little uncertain as to why knowing
14  the content of the rules themselves is truly necessary for
15  connecting the alleged infringement to the revenues. I'm
16  struggling to see it, so maybe you should address that.
17      MS. KLIEBENSTEIN: Sure, Your Honor. I think
18  this -- as you said at the outset, this is another situation
19  where Federal is saying we're certain it's not relevant, so
20  don't worry about it.
21      The rules get loaded into Blaze Advisor and what
22  we think we can see when it's in its native environment is
23  not just the rules, like are you a man or a woman, are you
24  older than 65 or younger than 65, but how they interplay
25  within Blaze Advisor. And that's an important piece in this

9

1   case. What does Blaze Advisor do when the rules are put
2   into Blaze Advisor? What value does Blaze Advisor add? Is
3   it more than a glorified Excel spreadsheet?
4       And we can't fully evaluate that question until we
5   have Federal's rules and put them into Blaze Advisor, and
6   that's exactly what we've asked for in our most recent
7   letter to the Court. We described a way that Federal can
8   provide us with the rules that we can then put into a native
9   environment here at Merchant & Gould and see how the whole
10  thing works.
11      FICO doesn't keep content -- FICO doesn't keep its
12  clients' rules internally for a number of different reasons,
13  one of which is confidentiality, setting aside the fact that
14  FICO and Federal spent $6.6 million in professional services
15  work together to not just develop the rules, but to get them
16  into a format and package them so that when they are put
17  into Blaze Advisor, that they'll work the right way.
18      So all this goes to the core question of what are
19  these rules doing and what is the value to Federal at the
20  end of the day, and we need these rules and to see them in
21  that native environment in order to test the reliability of
22  expert reports.
23      THE COURT: All right. Here's the way it sounds
24  to me. It's -- first of all, I take at face value what the
25  Federal party is saying regarding the process, what it would

10

1   take to extract the rules as they perceive that to be, that
2   it would be prohibitively expensive and take too long,
3   although, honestly, I'm a little skeptical that it would
4   actually take 260 weeks' worth of time, but more to the
5   point --
6       MS. KLIEBENSTEIN: Your Honor, if I could
7   interrupt? And I apologize for interrupting. We're not
8   asking for that Option 2.
9       THE COURT: Yeah, I understand that. I'll get to
10  that.
11      More to the point, it seems to me that what FICO
12  was trying to demonstrate is that by having Blaze Advisor,
13  two things happen:
14      One, the process of making these underwriting
15  judgments is made far quicker than if it were done by a
16  human or by hand or however they would do it without the
17  software.
18      Number two, that having the software means that
19  they make -- they, Federal, make better, in terms of the
20  quality, risk assessments, thereby saving themselves money
21  by charging more appropriate premiums or declining to write
22  certain policies or the like.
23      And that -- honestly, my reaction is that that is,
24  so far as I've described it, that is rather unexceptional or
25  unobjectionable, that that, in fact, is, you know, obvious.

11

1   The harder question is how to quantify that and, honestly,
2   I'm not persuaded that having the substance of the rules
3   themselves really provides any greater reliability in terms
4   of the quantification.
5       That said, I do understand that you're asking for
6   an option which I believe Federal has said is really not
7   cost or time prohibitive and I'm trying to find the
8   reference to it, but essentially -- let me find the portion
9   here.
10      (Pause)
11      THE COURT: Yeah, Federal reproducing repository
12  files and business object model files (JAE (JAVA Archive)
13  files). Now, I understand that Federal's response to that
14  is that's potentially inaccurate and the only way we can
15  verify that those are the rules is by undertaking

16  considerable expense, et cetera, et cetera.
17      So all of that is my long-winded way of saying as
18  a discovery matter I will order Federal to produce or
19  extract, as FICO has described it, the repository files and
20  business object model files. And as I understand it, that
21  is between five and ten thousand dollars' worth of expense.
22      Having said that, however, I think it is a risky
23  or at least uncertain proposition on FICO's part that it
24  would be able to rely on those or use those effectively or
25  introduce them because Federal is going to say it's not

                                12

1   verified, it's not certain. That, it strikes me, is an
2   evidentiary fight and so I am -- I don't know what Judge
3   Wright will do with that fight, but it is a fight for a
4   later day.
5       So Federal will be ordered to extract those files.
6   I will put that into a minute order so that you'll have this
7   on the docket as well. But I'm not ordering them to do what
8   Federal describes as a very time-intensive, exceedingly
9   costly undertaking. All that, as I said, is with risk to
10  both sides when it comes to an evidentiary threshold.
11      All right. Let me turn to the fourth thing on the
12  agenda, which is the access to the expert reports. I've
13  read the letters, but I would find it beneficial to have a
14  little bit more fulsome argument on this point.
15      I am not clear in my mind why Federal needs to
16  have these reports shared as widely as they want them
17  shared. So let's start there. At the same time I will tell
18  you honestly I'm not so sure why Fair Isaac is as concerned
19  with the dissemination of the information there as they
20  appear to be.
21      So I would like to hear from both of you. Start
22  with Federal about [indiscernible].
23      MR. FLEMING: Well, Your Honor, we've been going
24  through this process on our side of wanting to discuss in
25  detail the experts' reports and primarily Mr. Zoltowski's

                                13

1   report and especially relating to the lost license fee
2   issues, and the inability to share that has really impeded
3   our ability to talk with key executives.
4       We are dealing with in-house counsel, who has been
5   organizing these meetings and contacts us. The difficulty
6   is as the process moves up through these various levels of
7   authority, there are more and more people brought in and
8   just as a practical matter it has been difficult for him to
9   have fulsome discussions and to respond to questions by, you

10  know, very knowledgeable people in a lot of different areas.
11      We've tried -- they initially allowed us to have
12  one in-house counsel other than Kevin Murphy read the
13  experts' reports and then we talked about having a number of
14  other people.
15      And I've proposed most recently that so long as
16  any of those people sign the Exhibit B to the protective
17  order, which is a written assurance, that would provide all
18  necessary information and adequate protection to FICO.
19      But it really has impeded the ability to have
20  settlement discussions to the extent that I've requested.
21  And I understand FICO has agreed that we will not -- we will
22  stipulate to an extension on the time for the meet and
23  confer, which right now is June 5th, so that we can have
24  that any time prior to June 12th, simply because we are not
25  in a position to do that right now because they haven't been

                                14

1   able to have the discussion.
2       I mean, it's -- you know, the number of people
3   involved at various times and they keep having to bring in
4   then business lines and various, you know, upper echelon
5   people. It's not a static process on our end and it's a
6   very large corporation and they're asking for, you know,
7   extremely large sums of money, which has been changing over
8   time, and we haven't been able to keep the key executives
9   updated.
10      It wasn't until like last Tuesday that they were
11  able to provide the $37 million number they're now seeking
12  in lost license fees. And of course the people, the
13  executives who hear that want to get the backup and the data
14  and to challenge it so we can see -- they can understand
15  exactly, you know, what the issues are and what the risks
16  are.
17      So that's it in a nutshell, Your Honor.
18      THE COURT: Okay. Ms. Kliebenstein, let me ask
19  you a couple of factual questions. One, what is the amount
20  of damages, total amount of damages that are articulated in
21  your experts' various reports? I don't want duplicative
22  damages, but if it's [indiscernible] if you calculate it
23  this way it's 20 million and if you calculate it that way
24  it's 50 million, that's what I would like to know. Start
25  there, if you would.

                                15

1       MS. KLIEBENSTEIN: I will do my best. I was not
2   expecting that specific question. I think the lost license
3   fees for domestic and foreign are in the 37 million range in

4  our opening report and then our opening expert identified
5  the gross written premium dollars that are subject to
6  disgorgement, which was 30 billion.
7      MR. DUBIS: [Indiscernible.]
8      MS. KLIEBENSTEIN: Around 30 billion. I could be
9  off on that.
10     THE COURT: 3-0 billion with a "b"?
11     MS. KLIEBENSTEIN: Yeah. Those are the amounts of
12 premiums that went through the software and then --
13     THE COURT: And then it would be Federal's job to
14 cut that number down to profit, correct?
15     MS. KLIEBENSTEIN: Yes. And that number --
16     MR. DUBIS: 2.5.
17     MS. KLIEBENSTEIN: -- is 2.5 billion, I think is
18 what their expert put out there.
19     THE COURT: And forgive me and bear with me, but
20 are those numbers -- those are all alternative measures of
21 damage, 37 million versus 2.5 billion, correct?
22     MS. KLIEBENSTEIN: No. One is for breach of
23 contract and the other is for copyright disgorgement.
24     THE COURT: Okay. That's right.
25     Okay. So in light of all of that, what's the
                                16

25 mutual exchange.
                                17

1      I originally proposed five people because I could
2  not understand why five people from IT and two people from
3  procurement needed AEO access in this case.
4      What's reflected in that $37 million figure and
5  all of the underlying statements in our damages report is
6  our pricing methodology and how FICO goes about pricing its
7  software, which is not something that they disclose
8  willingly and often. It's AEO information.
9      I just cannot see and I have asked for an
10 explanation why does -- somebody from IT, somebody who is
11 developing applications, or people from procurement who are
12 negotiating contracts with vendors, what role do they have
13 in the settlement process such that they need to see this
14 information? I didn't get a response to that. So our next
15 proposal was: All right. Just, you know, for these five
16 people, tell us who they are and have them undertake the
17 mutual written assurance.
18     Any other instances in this case where we have
19 allowed additional people to view AEO information, we've
20 always exchanged names. We've understood who it is. And if
21 we have those names, we can understand -- we can assess

1  concern -- I will grant you that asking for 14 people is a
2  lot of people. On the other hand, that's a lot of money.
3      MS. KLIEBENSTEIN: Right.
4      THE COURT: Even if it's just 37 million and
5  you're hoping that it's a fruitful discussion, what's the
6  danger in letting -- for example, in your letter you say
7  they want five senior IT management people to review this
8  stuff. Why is that concerning in light of the fact they'll
9  sign the undertaking?
10     MS. KLIEBENSTEIN: Here's how I frame the issue.
11 We've offered and we're happy to do a reciprocal exchange,
12 so a number of people on FICO's end get to see the expert
13 reports -- unredacted versions of the expert reports as well
14 in order to prepare for the settlement conference.
15     So on Federal's end, they obviously care about the
16 financial figures. On our end, it would be fruitful and
17 helpful for our executives to review the expert reports to
18 understand the usage case, what's been going on at Federal
19 regarding the usage, and also the copyright disgorgement
20 case.
21     So the 37 million number can't go to Federal's
22 executives currently, but the disgorgement figures can
23 because those are based on Federal's dollars. The opposite
24 is true for FICO. So that's why I originally proposed a

22 whether they are at the proper level in IT, whether they're
23 at the proper level in procurement management and legal or
24 are they at a lower level and they're just trying to get
25 more witnesses access to our information so that they can
                                18

1  rebut the case instead of preparing for the settlement
2  conference.
3      So that was our concern on the 14 people and why
4  we originally proposed an exchange of five. It's always
5  been with the offer of if you need more people, tell me
6  exactly why and what role they have in this case or give me
7  their name and we're happy to re-assess it.
8      So two things. We want to know who so that we can
9  assess the why and we want it to be a mutual exchange on
10 both sides, and we're happy to provide names and written
11 assurances on our side.
12     THE COURT: Is it your view that it has to be the
13 same number of recipients on each side of the V?
14     MS. KLIEBENSTEIN: You know, reciprocality is
15 obviously important to my client as long as -- I do
16 understand that Chubb is a global organization and there may
17 be a number of people -- there may be more people that they
18 need to show it to than we do, but at some point it's got to

19  have an end, right? So maybe it's 10, maybe it's 14, but we
20  need names and we need a limit on it. It can't just keep
21  going and going and going so long as people execute the
22  written assurance. If that's the case, then the designation
23  of AEO has no meaning --
24      THE COURT: Right.
25      MS. KLIEBENSTEIN: -- if anybody within the
                            19

1   company can see AEO information by simply signing a written
2   assurance.
3       THE COURT: Okay.
4       MR. FLEMING: Well, if I may respond?
5       THE COURT: Go ahead, Mr. Fleming.
6       MR. FLEMING: FICO is not in a position to say
7   whether certain individuals have certain roles or
8   responsibility or, you know, the gravitas or have the
9   ability within Chubb to make decisions. They can't tell
10  that by giving them the name or even necessarily the titles.
11  This is an extremely large sum of money and as a result they
12  are bringing in people from across different divisions and a
13  lot of different areas.
14      But, I mean, this is a limited time frame. I
15  mean, we're talking about just having the ability to engage
16  in settlement discussions. FICO isn't claiming that in any
17  manner, that they aren't able to engage in settlement
18  discussions. That's the only use we have. We don't have
19  any other use. We just want to be able to provide numbers
20  and to make an assessment of risk, and they are impeding our
21  ability to do that. We can't do it right now. We're not in
22  a position to comply with the court orders because they
23  won't allow access to these large numbers.
24      And with regard to -- I mean, reciprocality only
25  matters if there's a purpose in it. If they don't have any
                            20

1   problem in engaging in settlement discussions, and we
2   haven't heard anything about that, then why does it need to
3   be reciprocal?
4       And there is a difference in the positions of the
5   parties. Unlike Federal, FICO is serving Chubb's
6   competitors. And especially with regards to the rules, they
7   could create solutions to competitors without ever revealing
8   anything, that we would have no way of knowing about it. It
9   increases their ability to compete -- it increases the
10  ability of competitors to compete with Federal. I mean,
11  we've got a legitimate issue as to why we don't want FICO to
12  have this information. It isn't the same on their side.

13      THE COURT: Okay. In general I agree with
14  everything you've said, Mr. Fleming. Let me ask you,
15  though, are you -- do you have an objection -- two
16  questions. One, do you have an objection to identifying the
17  people with whom you wish to share the information so that
18  for some reason if FICO says, you know, we object to
19  so-and-so, then we can at least have a process for resolving
20  that objection? Do you -- so question number one. Do you
21  have an objection to sharing the names?
22      MR. FLEMING: Well, if they sign the written
23  assurance, we would have to provide the names.
24      THE COURT: Right.
25      MR. FLEMING: It's just a question of speed and
                            21

1   process.
2       THE COURT: Right.
3       MR. FLEMING: We give the name. I'm not saying
4   that FICO doesn't get back as soon as they can, but they
5   don't get back -- they can't give immediate responses. And
6   then if there was -- I mean, I can't --
7       THE COURT: Right.
8       MR. FLEMING: -- imagine just in this scenario why
9   they would be not allowing somebody who is a key executive
10  who is involved in the settlement process to have access,
11  but then we have to go through another process of discussing
12  with the Court that person and it's just -- you know, more
13  days go by --
14      THE COURT: Right.
15      MR. FLEMING: -- and we're not able to have the
16  discussions we need to have to comply with the court order.
17      THE COURT: Let me ask you the second question,
18  then. Are any of these -- and I recognize the sensitivity
19  of this question. Are any of the people with whom you would
20  be inclined or feel the need to share this information with
21  likely to be on Federal's witness list?
22      MR. FLEMING: I mean, there are a couple people.
23  The person who is going to be present at the settlement
24  conference, a Mr. Ghislanzoni, the same person -- who is
25  also the same person who was at the previous settlement
                            22

1   conference, he's the head IP architect.
2       THE COURT: Right.
3       MR. FLEMING: There isn't anybody else who comes
4   to mind and I've seen the list and I didn't recognize any of
5   them as a witness, but I wasn't looking at it for that
6   purpose either. I could --

```
 7        THE COURT: Well, yeah, I -- you know, there was
 8   one thing that FICO articulated that I can understand why
 9   that would be potentially concerning.
10        Here's what I think we should do on this. You
11   know, first of all, a couple comments. I have to believe --
12   I have no way of knowing otherwise. I have to simply
13   believe that both parties are acting in good faith with
14   respect to the settlement conference. And whatever Federal
15   or Chubb's process is, really they are the only ones who can
16   judge whether or not John Smith executive needs the
17   information. And so I have to take both sides at their word
18   on this. And if it comes to light somehow later that this
19   appears to have been done in bad faith, we'll deal with it
20   then.
21        But in the meantime here's what I'm going to
22   order. I will give each side, for the purpose of preparing
23   for the settlement conference, up to 15 names. You're both
24   on your honor. You will shoot each other these names by the
25   close of business today. If one side objects to -- and with
                                    23

 1   titles. So John Smith, head of global IT or whatever.
 2   Shoot the name and the title to opposing counsel by the
 3   close of business today. By the close of business tomorrow
 4   if either of you object to anyone on the other's list,
 5   notify them of the objection by the close of business
 6   tomorrow. And then -- so today is Tuesday. Tomorrow is
 7   Wednesday. On Thursday I will resolve any objections if
 8   there are any, and we'll have to set that up if there are
 9   some. So that's how we'll deal with that.
10        I will tell you this. I am assuming and ordering
11   that all parties provide information under the assurance
12   that it will only be used for proper purposes. This isn't a
13   game of gotcha. This isn't a game that everybody is going
14   to skirt the rules.
15        I understand this is highly competitive, sensitive
16   information, but with the kind of dollars we're talking
17   about, we can't go in hamstringing either party from being
18   able to effectively prepare for and participate in the
19   settlement conference.
20        So that's what we're going to do on that one. Let
21   me pause there and see if there's any questions on that.
22        MR. FLEMING: Your Honor, so on Federal's side, so
23   what happens if three other people need to be involved in
24   the settlement discussions? For whatever reason we didn't
25   collect everybody that needed to be included and we need
                                    24

 1   additional names. What would be the process at that point?
 2        THE COURT: You'll have to come back to court, and
 3   we'll move very quickly.
 4        MR. FLEMING: Okay.
 5        THE COURT: Okay. All right. So going back to
 6   the last issue, the one that I put aside for a moment. Query
 7   Number 1 and Query Number 2 regarding the negotiations over
 8   the licensing fees, for the time being I am going to order
 9   only that FICO produce the documents responsive to Query
10   Number 1.
11        If I for some reason think this should change or
12   if this issue arises again -- let me ask you this question,
13   Ms. Kliebenstein. If -- let's just assume for a second that
14   you're ordered to produce documents in response to Query 1
15   and then a month down the line I decide that was a foolish
16   decision and I should have said Query Number 2. Have I
17   introduced added complexity or expense by doing it in stages
18   like this?
19        MS. KLIEBENSTEIN: No, Your Honor.
20        THE COURT: Okay. So for the time being and with
21   no assurance that anything is going to change on this, FICO
22   will produce the documents responsive to Query 1. Okay?
23        MS. KLIEBENSTEIN: Understood.
24        THE COURT: Okay. While I have everybody on the
25   line, is there anything else we need to deal with, anything
                                    25

 1   that's not clear?
 2        MS. KLIEBENSTEIN: Not from the plaintiff's
 3   perspective.
 4        THE COURT: Okay.
 5        MR. FLEMING: I --
 6        THE COURT: Go ahead, Mr. Fleming.
 7        MR. FLEMING: I have two things. First of all, I
 8   spoke with Al Hinderaker yesterday about this issue of
 9   stipulating that we can extend the time to meet and
10   confer on settlement. Rather it being as it is now ordered
11   by June 5th, that we have it as long as it's prior to
12   June 12th, if that is acceptable with the Court.
13        THE COURT: That is fine with me.
14        MR. FLEMING: [Indiscernible.] Regarding
15   production of documents, is there a timeline for that
16   Query 1 production?
17        THE COURT: Ms. Kliebenstein, how much time does
18   FICO need to do that?
19        MS. KLIEBENSTEIN: Oh.
20        THE COURT: Yeah.
```

21   MS. KLIEBENSTEIN: You know, I want to say two to
22   three weeks. My only reservation is that our Query 1, we
23   didn't pull attachments at that time, so that number could
24   easily expand to ten to fifteen thousand documents, which
25   would -- two to three weeks would be aggressive. So I will

26

1   get it pulled and get it put into our review database and
2   then I will follow up with Mr. Pham.
3       THE COURT: Okay. If -- certainly involve me if
4   need be. My order, just so that we have an order, will be
5   produce them by close of business two weeks from Friday. So
6   that would be June 20th. If it turns out that that is not
7   feasible, then either you and Mr. Pham can work that out or
8   come back to court and we'll address it then.
9       MS. KLIEBENSTEIN: The 21st or the 20th?
10      THE COURT: Whatever the Friday is. Is Friday the
11  21st? I thought it was the 20th, but I'm --
12      MR. FLEMING: The 21st.
13      THE COURT: It's the 21st, isn't it?
14      MS. KLIEBENSTEIN: Understood, Your Honor.
15      THE COURT: Okay. All right. Well, thank you,
16  everyone. And if anyone chooses to appeal any portion of
17  this, you'll have to order a transcript and it's obviously

15
16
17
18
19
20
21
22
23
24
25

18  audio recorded at this point, so that process takes a little
19  while as well. So just factor that into your timing. Okay?
20      MS. KLIEBENSTEIN: Thank you, Your Honor.
21      THE COURT: All right.
22      MR. FLEMING: Thank you, Your Honor.
23      THE COURT: We're in recess. Thank you all.
24      MR. FLEMING: All right.
25      (Court adjourned)

1
2
3       I, Lori A. Simpson, certify that the foregoing is a
4   correct transcript to the best of my ability from the
5   official digital recording in the above-entitled matter.
6
7           Certified by: s/ Lori A. Simpson
8                         Lori A. Simpson, RMR-CRR
9
10
11
12
13
14