**EXHIBIT 6**
**(Public)**
**(Previously File Under Seal as Dkt. 334)**

CASE 0:16-cv-01054-DTS Doc. 696 Filed 01/27/20 Page 2 of 3
Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/14/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.



```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
 2
        - - - - - - - - - - - - - - - - - - - - - - - -
 3
      FAIR ISAAC CORPORATION,
 4
                    Plaintiff,
 5
            v.          Court File No. 16-cv-1054 (WMW/DTS)
 6
      FEDERAL INSURANCE COMPANY,
 7    an Indiana corporation, and ACE
      AMERICAN INSURANCE COMPANY,
 8    a Pennsylvania corporation,

 9                  Defendants.

10      - - - - - - - - - - - - - - - - - - - - - - - -

11                    VIDEO DEPOSITION

12          The following is the video deposition of

13    NEIL J. ZOLTOWSKI, taken before Jean F. Soule,

14    Notary Public, Registered Professional Reporter,

15    pursuant to Notice of Taking Deposition, at the law

16    office of Fredrikson & Byron, P.A., 200 South Sixth

17    Street, Suite 4000, Mille Lacs Conference Room,

18    Minneapolis, Minnesota, commencing at 8:09 a.m.,

19    Friday, June 14, 2019.

20

21                    *       *       *

22

23              C O N F I D E N T I A L

24            ATTORNEYS' EYES ONLY

25
```

EXHIBIT
6

CASE 0:16-cv-01054-DTS  Doc. 696  Filed 01/27/20  Page 3 of 13

Neil J. Zoltowski - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 6/13/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.

**Page 67**

1 record. The time is now 10:06 a.m.
2 BY MR. FLEMING:
3    Q.    Mr. Zoltowski, what is your
4 understanding about what the Blaze Software does
5 for each one of the fifteen applications at issue?
6    A.    I outline that in my report on
7 pages 25 through 36.
8    Q.    What is your understanding as to who
9 created the rules that are used within the Blaze
10 Advisor software system at Federal?
11    A.    My understanding is that when it comes
12 to the rules creation that an end client, such as
13 Federal, would come up with the rules, but FICO
14 would perform the implementation based upon standards
15 of work or at the front end of the implementation
16 of the product.
17    Q.    And what do you mean by the
18 implementation?
19    A.    The deployment of the software.
20    Q.    It's your understanding that FICO had
21 no involvement in the creation of the rules
22 themselves, though, correct?
23    A.    I believe that FICO is part of the
24 process of getting those rules to appropriately run
25 within the system, and they have expertise in their

**Page 68**

1 experience of working with those rules. But I
2 believe the client, like Federal, would come up with
3 the -- how they wanted the rule to be structured
4 for use within the software.
5    Q.    And the creation of the rule itself,
6 correct?
7    A.    Determining how it wants the software
8 to perform would be Federal coming up with the
9 rule. I think the -- the software itself and
10 the -- actually getting the rules into the software
11 is what's really important to make sure that it's
12 using -- or employing and -- employing those rules
13 effectively to get the appropriate results based
14 upon those rules.
15    Q.    So who wrote the pages 25 to 33?
16    A.    It would be I and my team under my
17 direction.
18    Q.    I mean, can you explain to me what
19 Blaze Software does with respect to Decision Point?
20 Do you have to go to the page and read it or do you
21 happen to know that?
22    A.    There are 15 applications here. I
23 don't know what each of them are off the top of my
24 head.
25    Q.    Okay.

**Page 69**

1    A.    I didn't memorize all of this related
2 to how the applications or Blaze is used within
3 each of these 15 applications.
4    Q.    Did you do any independent analysis to
5 determine the reasonableness or reliability of
6 FICO's assumption that Federal's gross premiums
7 were derived from the use of Blaze in each of these
8 applications?
9    A.    Could you repeat that question?
10    Q.    What independent analysis did you do
11 to determine the reasonableness or reliability of
12 FICO's assumption that Federal's gross premiums
13 were derived from the use of Blaze in each of these
14 applications?
15    MS. KLIEBENSTEIN: Object to form.
16    THE WITNESS: I'm going to try to
17 answer your question, but I don't believe it was a
18 FICO assumption. I believe that there was
19 information on the record that was provided by the
20 defendants related to the amount of revenue in
21 terms -- or the gross written premiums that ran
22 through each of these applications, which was
23 provided in interrogatory responses.
24 BY MR. FLEMING:
25    Q.    So did you do any independent

**Page 70**

1 analysis?
2    A.    To test if the -- if the defendants
3 were -- amounts the defendants provided related to
4 each of those was correct, is that your question?
5    Q.    Whether they were derived from the use
6 of Blaze in each of the applications?
7    A.    My understanding, and based upon
8 Mr. Whitener's opinion as well as my review of the
9 information he provided in his report and my review
10 of the other information, is that there is a
11 connection between the use of Blaze Advisor
12 software by the defendants and revenue.
13    Q.    Now, you state that you're not
14 providing any opinion relating to liability, correct?
15    A.    That's correct.
16    Q.    And are you also not providing any
17 opinion as to what would be a commercially
18 reasonable software price?
19    A.    I'm providing an opinion as to the
20 appropriate damages in the form of lost license
21 fees.
22    Q.    And my question was different than
23 that.
24    Would you agree that you are not
25 providing an opinion as to what would be a