**EXHIBIT 9**
**(Public)**
**(Previously File Under Seal as Dkt. 334)**

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                   DISTRICT OF MINNESOTA
 3
 4      CASE NUMBER: 16-cv-1054 (WMW/DTS)
 5      ----------------------------------------------
 6      Fair Isaac Corporation, a Delaware corporation,
 7         Plaintiff,
 8      versus
 9      Federal Insurance Company, and Indiana
        corporation, and ACE American Insurance Company, a
10      Pennsylvania corporation,
11         Defendants.
        ----------------------------------------------
12
13
14            VIDEOTAPED DEPOSITION OF EXPERT WITNESS
15
16                        BILLY McCARTER
17
18
19
20
21
22
23
24
25      TAKEN:  5 June 2019          BY:  Jackie McKone
```

**EXHIBIT 9**

Page 70

1  A.  He did -- as I recall, he didn't have specific
2      knowledge about the technologies that are in the
3      application. It was more around the business use
4      of the applications that he was -- was talking to
5      him. So -- he was speaking to.
6  Q.  And for the business, you said the applications.
7      What do you mean by that?
8  A.  How they use CSI Express, DecisionPoint, et
9      cetera. Automated renewal.
10 Q.  And what did he tell you?
11 A.  Not much more than what was in the case documents
12     to be honest. These were folks that -- that
13     weren't -- weren't mostly aware Blaze was even
14     involved in their applications and how they were
15     being used. It was more about the business
16     functionality that those systems provided.
17 Q.  And then Alissa Theberge?
18 A.  Let's see who Alissa was, see what her role was.
19     Most of these happened on -- on scheduled calls
20     with the same people.
21 Q.  How many times --
22 A.  She was an -- she was an underwriter, and talked
23     about the -- as I recall, we -- we talked about
24     the use of CSI Express, and under -- for
25     underwriting.

Page 71

1  Q.  And what did she tell you?
2  A.  Basically about how they use it, and again, most
3      of the -- I don't recall her -- she specifically
4      said it, but they weren't even aware of Blaze
5      Advisor other than this case where they were
6      instructed this is why they are meeting with an
7      expert to discuss it.
8  Q.  Did you talk with Miss Theberge about the features
9      within CSI Express enabled by Blaze Advisor?
10 A.  They didn't know anything about Blaze, Blaze
11     Advisor. So no. I did not.
12     I asked them about the functionality of the
13     application and what it was used for, and from
14     that is where they -- one of them said, "We didn't
15     even know Blaze was involved until we got called
16     to this meeting."
17 Q.  So within CSI Express, Blaze Advisor provides
18     functionality relating to underwriting decision;
19     is that right?
20 A.  It provides a rules service related to
21     underwriting decisions.
22 Q.  And did you ask Ms. Theberge about that specific
23     functionality within CSI Express?
24 A.  I asked all of these folks if they were aware of
25     Blaze and what it provided, and the answer was no.

Page 72

1  Q.  Okay, but you knew what Blaze provided within that
2      application?
3  A.  Correct.
4  Q.  And the function that it provided?
5  A.  Yes.
6  Q.  And did you ask her about that function and what
7      her opinion was of that function?
8  A.  She said that that's all handled by the IT group
9      on the rules. If they need a change to the
10     business rules that need to be made, they submit a
11     request to IT.
12     Very similar to if it was embedded into an
13     application, which somewhat negates the benefit of
14     the externalization of the rules. They didn't put
15     it in the hands of the business users. It was
16     still the IT folks that maintain the business
17     rules.
18 Q.  Got it, but you didn't ask her about any of the
19     specific functions that Blaze Advisor provides
20     within CSI Express?
21 A.  She wasn't aware of Blaze so she couldn't answer
22     that question. I -- I didn't -- I asked her about
23     underwriting. I didn't ask her about Blaze, or
24     whatever the business processes were.
25 Q.  Understood. My question is a little bit

Page 73

1      different. It's about the functionality within
2      CSI Express --
3  A.  Um-hm.
4  Q.  -- that Blaze provides.
5  A.  Um-hm.
6  Q.  And Ms. Theberge is an underwriter; correct?
7  A.  Um-hm.
8  Q.  So she would be a person that was interacting with
9      CSI Express?
10 A.  She's using the functionality that is -- the user
11     interface gives her, and it doesn't say this is
12     Blaze or a rule issue. It's all handled behind
13     the scenes.
14 Q.  Right, but you would agree that Blaze is enabling
15     certain functionality within CSI Express?
16 A.  It's -- it's supporting the underlying process.
17     Yes.
18 Q.  And you did not ask her any questions about the
19     benefits of that functionality; right?
20 A.  The benefits of an underwriting application versus
21     the benefits of Blaze is two different things.
22 Q.  Understood. Did you ask her --
23 A.  I asked her about the application, you know, of
24     the CSI Express application functionality, and
25     it's -- it's basically a -- a policy

Page 74

1  administration system with all the functionality
2  to underwrite a insurance policy. I mean -- and
3  there's functionality that sits behind the scenes,
4  not just Blaze, many other components that sit
5  behind the scenes that are utilized that are not
6  even visible to most of these people.
7  Q. So you asked her what it does?
8  A. It's an underwriting application. Yeah.
9  Q. Not --
10 A. Or policy avenue.
11 Q. Not what she perceived to be the benefits?
12 A. Yeah. She -- no. I did not ask her about the
13    benefits to her. What we talked about the
14    benefits was really Ellen and Helen who basically
15    said they could do some of this work -- once they
16    found out Blaze was there, they said it's really a
17    check the box application, and we don't -- we
18    could have done this in Excel.
19 Q. That's for the TAPS application?
20 A. TAPS. I think TAPS was the one. Yeah. I'd have
21    to go back and look.
22 Q. TAPS was the one. Okay, but aside from Ms. Garnes
23    and Ms. Mencke, you did not ask any of the other
24    individuals on this list about the benefits of the
25    functionality of any of the applications that are

Page 75

1  at issue in this case?
2  A. It's not the applications that are -- it's Blaze
3     that I was interested in researching, not the
4     functionality that's provided by Federal's own
5     applications. I mean ...
6  Q. Right. I was starting broad and then going to go
7     a little bit deeper. So your answer to that
8     questions on the applications is no?
9  A. No.
10 Q. And then moving down to the features, within those
11    applications that are enabled by Blaze, you did
12    not ask any of these individuals in Paragraph 16
13    what the benefits were from those features
14    separate from the functionality?
15 A. I -- I did not ask them the benefits of those
16    features from a Blaze perspective because they
17    told me up front they didn't even know what Blaze
18    was.
19 Q. So Miss Santucci. How many times did you speak
20    with Ms. Santucci?
21 A. I think that she was on one phone calls, and these
22    were always group calls with multiple people.
23 Q. And -- and what did you ask Ms. Santucci?
24 A. I just -- the same discussion around CSI Express,
25    CUW to just clarify what I was reading within

Page 76

1  various case documents, depositions, et al., and
2  it was clarification basically.
3  Q. Did she -- did she chime in and provide you with
4     any -- any information in those group calls?
5  A. She clarified, for example, in CUW, the inventory
6     management, the role of that functionality within
7     inventory management, but I don't know if it was
8     Jennifer or one of the others that said it. I
9     don't have my notes, but basically they clarified
10    the functionality of certain activities that used
11    Blaze, but they didn't know it used Blaze at the
12    end of the discussion.
13 Q. So Miss Santucci clarified the functionality of
14    certain activities within the inventory management
15    part of CUW that used Blaze?
16 A. Yeah. I think that was correct, and I think it
17    was her. I'd -- I'd have to go check my notes,
18    but all these folks were on the same calls
19    together, not all of them at the same time
20    obviously, but -- but the operations folks, the
21    underwriting folks that are on this list all were
22    on the same calls together. So just had to
23    clarify who -- who gave me the response.
24 Q. So Ms. Santucci knew of functions of certain
25    activities that use Blaze even though she didn't

Page 77

1  know it was Blaze Advisor behind the scenes?
2  A. Yes. Yeah.
3  Q. Anything else that you discussed with Ms.
4     Santucci?
5  A. Not that I recall.
6  Q. Moving on to Mr. Pandey, what did you speak with
7     him about?
8  A. The overall information technology architecture, a
9     number of systems, number of applications where
10    Blaze was used.
11       He was the IT side, and I -- I had more --
12    he was aware of Blaze, and where it was being
13    used, and how it was being used within a number of
14    different applications. So he helped clarify what
15    I was reading in a lot of documents that were
16    produced by Mirolyuz and others.
17 Q. And what about Mr. Folz; what did you speak with
18    him about?
19 A. About the original justification for acquiring
20    Blaze. He was the controller back at the time.
21    He's no longer with the company.
22 Q. And what role did Mr. Folz have in that -- back in
23    2006; right?
24 A. Um-hm.
25 Q. What role did he have in that process to acquire a

Page 178

1 Q. You're specifically referring to TAPS; correct?
2 A. I am. I am.
3 Q. Do you know how many -- and TAPS stands for what
4    again?
5 A. Texas Accident Prevention. It's a workers' comp
6    compliance requirement for the state of Texas.
7 Q. And so some insurance applications need to comply
8    with TAPS in Texas; correct?
9 A. Correct.
10 Q. Do you know how many insurance policies that
11    affects every year?
12 A. No I do not.
13 Q. Did you ask anybody?
14 A. It doesn't matter whether it's one or many, but
15    no, I did not.
16 Q. So why do you say that the -- is it your opinion
17    that the features, functionality provided by Blaze
18    within the TAPS application could be done with an
19    Excel spreadsheet; correct?
20 A. That's what I was told. Yes.
21 Q. That's what you were told by whom?
22 A. Helen and Ellen.
23 Q. And did you do anything to independently verify
24    that that statement was true?
25 A. I looked at the descriptions of all the use of

Page 179

1    TAPS within the depositions and documents that I
2    had, and it would confirm that it's a disclosure
3    type of check the box function that we disclose
4    properly as part of the process. So that's my
5    only verification.
6 Q. And how would you use an Excel spreadsheet instead
7    of Blaze to accomplish the same functionality?
8 A. I have an individual pull up the spreadsheet, go
9    through the list of applications, and see if it
10    complied.
11 Q. But you don't know how many applications that
12    individual would have to look through?
13 A. And according to Ellen, it's a low volume
14    business. So I didn't ask how many policies. Low
15    volume usually means low, not many, and they said
16    that Blaze was used because it was there. It --
17    you know, it wasn't -- not Helen and Ellen didn't
18    say that because they didn't know Blaze existed.
19    Ramesh Pandey basically said they could have
20    easily used Excel as well.
21 Q. Do you know how many people would need to be
22    employed to undertake the same tasks as Blaze
23    Advisor with respect to the TAPS application to
24    perform the same functions using Excel
25    spreadsheet?

Page 180

1 A. I don't recall the exact number, but they said a
2    small number of people could have done this.
3 Q. How many is a small number of people?
4 A. I don't know. I didn't ask.
5 Q. Over how many years? Do you know?
6 A. No.
7 Q. You don't know how many policies it involved;
8    correct?
9 A. Other than it was a low volume business. Workers'
10    comp in Texas is poor -- is probably a very low
11    volume business.
12 Q. Chubb is one of the largest insurance companies in
13    the world; correct?
14 A. Um-hm.
15 Q. They are one of the largest suppliers of business
16    insurance in the United States; correct?
17 A. Right.
18 Q. So a low volume of business to Chubb could be --
19    strike that. So you don't have an opinion one way
20    or the other as to the cost or expense Chubb would
21    have incurred to use an Excel spreadsheet instead
22    of Blaze Advisor in the TAPS application --
23 A. I do not.
24 Q. And you don't -- you have not undertaken an
25    analysis to determine whether the use of a

Page 181

1    spreadsheet in the TAPS application instead of
2    Blaze Advisor would yield the same results;
3    correct?
4 A. I -- I'm going by the word, the folks I spoke
5    with, that they could use it that way.
6 Q. Do you know what percent of Federal's business
7    rules were ever implemented into Blaze Advisor?
8 A. I couldn't get a count. So no I do not.
9 Q. What was your methodology then to determine in
10    Paragraph 69 to make the statement, "Only a
11    fraction of Federal's business rules and decisions
12    were ever loaded into Blaze Advisor," -- "Blaze to
13    assist Federal."?
14 A. There's hundreds of thousands of rules that are
15    executed on a daily basis as part of this business
16    activity model, and if you look at the numbers of
17    rules that are loaded -- that are on that Fed
18    17914, it's a small amount compared to the total
19    rules that are being made on a daily basis.
20 Q. Do you know how many -- how many rules decisions
21    are being made at Federal on a daily basis?
22 A. I do not.
23 Q. Did you ask anyone?
24 A. I asked for total rules relative to plays, but I
25    didn't ask them for the total rules across all of