# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-1973 |
| v. | ) | |
| | ) | |
| HYTERA COMMUNICATIONS CORP. | ) | |
| LTD., et al., | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

## ORDER

Defendants' motion to preclude Motorola from relying on extraterritorial damages [758] is granted in part and denied in part.

## STATEMENT

On Monday, December 2, 2019, more than two years after this case was initially filed, Hytera Communications Corporation Ltd., Hytera America, Inc., and Hytera Communications America (West), Inc. (collectively, "Defendants,") filed a motion "to preclude Motorola from relying on extraterritorial damages." Dkt. 758. The motion was filed shortly after midnight, only hours before the thirteenth day of the ongoing jury trial. On that same day, Motorola Solutions, Inc. and Motorola Solutions Malaysia Sdn. Bhd. (collectively, "Plaintiffs") intended to call an expert to testify on damages, including extraterritorial damages. The Court, after a brief colloquy with defense counsel, exercised its discretion to provisionally allow testimony regarding extraterritorial damages, subject to the understanding that after the Court analyzed the motion and issued a ruling the jury would be instructed as to what damages it could properly consider or a limiting instruction if the Court ruled in Defendants' favor.

For the following reasons, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND

By way of brief background, Plaintiffs have brought three claims against Defendants: trade secret misappropriation under the recently enacted Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836(b), 1839 *et seq.*, trade secret misappropriation under the Illinois Trade Secret Act, 765 ILCS 1065 *et seq.*, and copyright infringement under the Copyright Act, 17 U.S.C. §§ 106, 501 *et seq.*  In essence, Plaintiffs allege that Defendants hired three engineers away from Plaintiffs' Malaysian office, that those engineers stole and brought with them thousands of Plaintiffs' technical, confidential documents, and that Defendants used those documents, which contained trade secrets and lines of source code, to develop a state-of-the-art digital radio that is functionally indistinguishable from Plaintiffs' radios.  Defendants then sold those radios all around the world, including in the United States.

Put simplistically, Defendants argue that none of these three statutes have extraterritorial effect and all damages should be limited only to domestic applications of the respective statutes. Plaintiffs respond by arguing that Defendants have waived this challenge, and even if they have not, the statutes should reach extraterritorially in this case—either because the statutes apply extraterritorially or because the conduct being regulated by the statutes was domestic in this case and thus this case represents a proper domestic application of the statutes, which in turn allows Plaintiffs also to recover for damages extraterritorially.

This issue of what the statutes authorize, in the Court's view, is not a defense and has not been waived by Defendants.  The Court exercises its discretion to reach the merits of the motion rather than to hold that this important issue has been waived.  No prejudice will accrue to Plaintiffs and an instruction on what damages may properly be considered will not destroy Plaintiffs' credibility with the jury.  The Court thus turns to each statute in turn.

2

## II. ANALYSIS

### A. The Federal Claims under the Defend Trade Secrets Act and the Copyright Act

#### 1. The Extraterritoriality Analysis, Generally

The Supreme Court has promulgated a two-step framework for analyzing extraterritoriality issues,[1] discussed in depth below. At the first step, a court asks whether the presumption against extraterritoriality "has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101, 195 L. Ed. 2d 476 (2016). If no clear, affirmative indication exists, the statute is not extraterritorial and the court proceeds to a second step, in which it determines whether the case involves "a domestic application of the statute." Id. This determination is made by determining the statute's focus. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id.

#### a. The Presumption Against Extraterritoriality

The first step of the extraterritoriality analysis deals with the presumption against extraterritoriality. The baseline principles underlying this canon of statutory construction are well developed by the Supreme Court. To begin, it is a "basic premise" of our legal system that, in general, United States law "governs domestically but does not rule the world." RJR Nabisco, Inc., 136 S. Ct. at 2101 (citing Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 454, 127 S. Ct. 1746,

---

[1] See Morrison v. National Australia Bank Ltd., 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed.2d 535 (2010) and Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 133 S. Ct. 1659, 185 L. Ed. 2d 671 (2013).

167 L. Ed.2d 737 (2007)) (internal quotations omitted). This principle is expressed as the "presumption against extraterritoriality," which governs a court's interpretation of whether a statute reaches beyond the United States. <u>Id.</u> Specifically, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." <u>Id.</u> (citing <u>Morrison v. National Australia Bank Ltd.</u>, 561 U.S. 247, 255, 130 S. Ct. 2869, 177 L. Ed.2d 535 (2010)). This presumption rests on the "commonsense notion that Congress generally legislates with domestic concerns in mind. . . . And it prevents unintended clashes between our laws and those of other nations which could result in international discord." <u>WesternGeco LLC v. ION Geophysical Corp.</u>, 138 S. Ct. 2129, 2136, 201 L. Ed. 2d 584 (2018) (internal citations and quotations omitted).

As to this first step of the extraterritorial analysis, <u>RJR Nabisco</u> cautions that "[t]he question is not whether we think Congress would have wanted a statute to apply to foreign conduct if it had thought of the situation before the court, but whether Congress has affirmatively and unmistakably instructed that the statute will do so." <u>Id.</u> (internal quotations omitted). When interpreting a statute, a court thus looks for a "clear indication" of extraterritorial application; if none is found, the statute applies only domestically, and the analysis shifts to the second step. <u>See</u> <u>Morrison</u>, 561 U.S. at 255.

In determining whether a "clear indication" exists, courts use traditional tools of statutory interpretation. Specifically, courts analyze the plain language of the statute and the statutory provisions at issue, <u>e.g.</u> <u>Morrison</u>, 561 U.S. at 261, the surrounding context, <u>Morrison</u>, 561 U.S. at 265 ("[a]ssuredly context can be consulted as well[]"), and, relatedly, how that plain language interacts with the general statutory structure, <u>RJR Nabisco</u>, 136 S. Ct. 2101-03 (holding that, because certain predicate acts incorporated by reference into the RICO statute criminalized

4

conduct occurring abroad, the criminal RICO provisions based on those violations had extraterritorial reach as well). The Supreme Court has cautioned, however, that the presumption against extraterritoriality is not a "clear statement rule" if "by that it is meant a requirement that a statute say 'this law applies abroad.'" Id.

In the wake of RJR Nabisco, it is clear that just because a federal statute establishes extraterritorial reach in a criminal context, a private right of action based on similar acts does not necessarily also have extraterritorial reach. In RJR Nabisco, the Court found that although certain criminal RICO actions could be applied extraterritorially (where the underlying predicate acts clearly incorporated extraterritorial-reaching crimes), the private right of action did not extend extraterritorially, even when based on the same predicates. This holding was based on what the Court held to be limiting language in the provision creating the private right of action, bolstered by the idea that:

> The creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion. Sosa v. Alvarez–Machain, 542 U.S. 692, 727, 124 S. Ct. 2739, 159 L. Ed.2d 718 (2004). It is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries. Something more is needed[.]

RJR Nabisco, 136 S. Ct. at 2108 (internal quotation omitted); see also id. ("The statute's reference to injury to 'business or property' also does not indicate extraterritorial application. If anything, by cabining RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries—Congress signaled that the civil remedy is not coextensive with § 1962's substantive prohibitions.").

Thus, the language of the statute is key in determining whether the presumption against extraterritoriality has been rebutted.

5

b. The Focus of the Statute

Absent the clear indication discussed above, a party may in certain circumstances still recover damages from outside of the United States if "the conduct relevant to the statute's focus occurred in the United States[.]" WesternGeco, 138 S. Ct. at 2137 (citing RJR Nabisco, 136 S. Ct. at 2101). This is the case "even if other conduct occurred abroad." Id. WesternGeco dealt specifically with the private right of action for infringement contained in the Patent Act, 35 U.S.C. § 281. Id. In analyzing the statute, the Court opted to forego the first step of the extraterritorial analysis and instead contained its examination to the second step dealing with the focus of the statute.

WesternGeco advises that the "focus" of a statute is the "object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." Id. (citations and internal quotations omitted). "When determining the focus of a statute, we do not analyze the provision at issue in a vacuum. . . . If the statutory provision at issue works in tandem with other provisions, it must be assessed in concert with those other provisions. Otherwise, it would be impossible to accurately determine whether the application of the statute in the case is a 'domestic application.'" Id. (citation omitted).

Discerning the focus of a statute involves an interpretation of what the legislature was concerned with when it enacted the law. See Morrison, 561 U.S. at 266 (Section 10(b) of the Securities Exchange Act "focus[e]d . . . upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.' 15 U.S.C. § 78j(b).."). The Court came to this conclusion by analyzing what the statute sought to regulate and the parties it sought to protect, as divined from the language of the

6

statute itself.  See also Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 126, 133 S. Ct. 1659,

1670, 185 L. Ed. 2d 671 (2013) ("We also reiterated that a cause of action falls outside the scope

of the presumption—and thus is not barred by the presumption—only if the event or relationship

that was 'the "focus" of congressional concern' under the relevant statute takes place within the

United States.")

      With the structure of this analysis and these background principles in mind, this opinion

will now turn to a discussion of the two relevant federal statutes.

2. The Defend Trade Secrets Act of 2016

               a.   The   DTSA   Overcomes   the   Presumption   Against
Extraterritoriality

      The Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 et seq. ("DTSA") became

effective in May 2016.  The statute amended sections of the previously enacted Economic

Espionage Act of 1996, Pub. L. 104-294 ("EEA").  The EEA had criminalized the theft of trade

secrets in certain contexts.  The DTSA, again, which amended the EEA, created a private right of

action, codified in 18 U.S.C. § 1836(b), and included other amendments to the EEA including,

among others, the addition of a definition of the term "misappropriation" which mirrors that within

the Uniform Trade Secrets Act.  18 U.S.C. § 1839; see Pub. L. 114-153, § 2(a), (d)(1), May 11,

2016.

      In certain contexts, the fact that Congress has amended a statute sheds light on how the

statute is to be interpreted.  E.g., Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 174-75, 129 S. Ct.

2343, 2349, 174 L. Ed. 2d 119 (2009) ("We cannot ignore Congress' decision to amend Title VII's

relevant provisions but not make similar changes to the ADEA. When Congress amends one

statutory provision but not another, it is presumed to have acted intentionally."); Firstar Bank, N.A.

v. Faul, 253 F.3d 982, 988 (7th Cir. 2001) ("[A] statute's longstanding meaning forms the

7

background against which Congress legislates when it amends the law. The courts presume that Congress will use clear language if it intends to alter an established understanding about what a law means; if Congress fails to do so, courts presume that the new statute has the same effect as the older version."); McClure v. United States, 95 F.2d 744, 750 (9th Cir. 1938), aff'd, 305 U.S. 472, 59 S. Ct. 335, 83 L. Ed. 296 (1939) ("In Conrad v. Nall, 24 Mich. 275, a section in the chapter of the Code was amended, and it was held that it was not intended to operate independently of the other provisions of the chapter, but that the whole chapter, is its present form, must be read as one act.").

On this issue, because Congress was not acting to change an existing interpretation of the EEA, but rather was creating a private right of action in the statutory chapter, the chapter amended through the DTSA should be read as a cohesive whole. In other words, Congress was not reacting to an interpretation of the EEA that it disagreed with and amending to clarify its intent on a provision. Rather, Congress was introducing a new right. This suggests to the Court that the entire chapter is to be read as intertwined, and the pronouncements cited above relating to the interpretation of non-amended provisions do not carry weight in this circumstance. Chapter 90 of the U.S. Code is made up of 18 U.S.C. §§ 1831-1839. The proper context in considering the relevant DTSA provisions is thus within Chapter 90 of the U.S. Code, not simply by reference to the provisions included in the text of the DTSA itself.

With the above in mind, a court's interpretation of a statute must begin with the plain language of the statute. Middleton v. City of Chicago, 578 F.3d 655, 658 (7th Cir. 2009) ("After all, when interpreting a statute, we must begin with its text and assume that the ordinary meaning of that language accurately expresses the legislative purpose.") (citation and internal quotations

omitted).  Turning then, to the statute at issue, the private right of action is codified in Section

1836 and is written as follows:

> (b) Private civil actions.--
> (1) In general.--An owner of a trade secret that is misappropriated
> may bring a civil action under this subsection if the trade secret is
> related to a product or service used in, or intended for use in,
> interstate or foreign commerce.

18 U.S.C.A. § 1836(b).  Misappropriation, as relevant, is defined within the statute as follows:

> (5) the term "misappropriation" means--
>> (A) acquisition of a trade secret of another by a
>> person who knows or has reason to know that the
>> trade secret was acquired by improper means; or
>> (B) disclosure or use of a trade secret of another
>> without express or implied consent by a person who-
>>> (i) used improper means to acquire
>>> knowledge of the trade secret;
>>> (ii) at the time of disclosure or use, knew or
>>> had reason to know that the knowledge of the
>>> trade secret was--
>>>> (I) derived from or through a person
>>>> who had used improper means to
>>>> acquire the trade secret;
>>>> (II) acquired under circumstances
>>>> giving rise to a duty to maintain the
>>>> secrecy of the trade secret or limit the
>>>> use of the trade secret; or
>>>> (III) derived from or through a person
>>>> who owed a duty to the person
>>>> seeking relief to maintain the secrecy
>>>> of the trade secret or limit the use of
>>>> the trade secret; . . .

18 U.S.C.A. § 1839(5).  As an initial matter, Section 1836 does not contain any explicit reference

to extraterritorial conduct or application.  Nor does the defined term "misappropriation."  This

does not end the inquiry, however, as the statute as a whole must be consulted in determining the

proper interpretation of these specific provisions.

The interpretation of Section 1837 is the cornerstone for the extraterritorial analysis of the

DTSA.  Section 1837 provides:

> This chapter also applies to conduct occurring outside the United
> States if—
>
>> (1) the offender is a natural person who is a citizen
>> or permanent resident alien of the United States, or
>> an organization organized under the laws of the
>> United States or a State or political subdivision
>> thereof; or
>>
>> (2) an act in furtherance of the offense was
>> committed in the United States.

18 U.S.C.A. § 1837.  Section 1837 does provide a clear indication that the presumption against

extraterritoriality has been rebutted.  The question, however, is whether Section 1837 limits that

rebuttal only to criminal matters—in other words, whether Section 1837 also creates an

extraterritorial application of the private right of action codified in Section 1836.

This is not an easy question, particularly in the wake of RJR Nabisco's holding with respect

to the distinction between extraterritorial criminal application and private application of the RICO

statute.  Neither the parties nor the Court have identified directly controlling precedent on this

issue, which appears never to have been directly addressed by the Seventh Circuit or any others.

Some district courts have assumed that Section 1836's private right of action can apply

extraterritorially when reciting what conduct the DTSA regulates.  These opinions do not provide

any detailed analysis of the reason for assuming that Section 1837 applies to a private right of

action.  See Luminati Networks Ltd. v. BIScience Inc., No. 2:18-CV-00483-JRG, 2019 WL

2084426, at *9-10 (E.D. Tex. May 13, 2019) ("The DTSA 'applies to conduct occurring outside

the United States if . . . an act in furtherance of the offense was committed in the United

States.' 18 U.S.C. § 1837(2)."); Austar Int'l Ltd. v. AustarPharma LLC, No. CV198356KMMAH,

10

2019 WL 6339848, at *11 (D.N.J. Nov. 27, 2019) (same); ProV Int'l Inc. v. Lucca, No. 8:19-CV-978-T-23AAS, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019) (same); MACOM Tech. Sols. Inc. v. Litrinium, Inc., No. SACV19220JVSJDEX, 2019 WL 4282906, at *4 (C.D. Cal. June 3, 2019) (same); Vendavo, Inc. v. Price f(x) AG, No. 17-CV-06930-RS, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018) (same); Micron Tech., Inc. v. United Microelectronics Corp., No. 17-CV-06932-MMC, 2019 WL 1959487, at *8 (N.D. Cal. May 2, 2019) ("Micron has a substantial interest in trying the case in the United States, as federal law provides for jurisdiction over misappropriation occurring outside the United States, see 18 U.S.C. § 1837[.]").

The Court has identified no court that has held that the DTSA does not apply extraterritorially to private rights of action.  It would be ill-advised to simply join the chorus of district courts that have held, without discussion, that the private right of action applies extraterritorially.  The Court will thus turn to a discussion first of Section 1837 and to the notes that Congress included in the piece of legislation passed as the DTSA.

The biggest indicator that Congress did intend for the private right of action of the DTSA to apply extraterritorially is the fact that Section 1837 refers broadly to "this chapter," which includes within it Section 1836.  18 U.S.C. § 1837 ("*This chapter* also applies to conduct occurring outside the United States if . . .") (emphasis added).  From this language, which Congress did not amend when it amended the chapter, the Court could draw the inference that Congress intended Section 1837 to apply to Section 1836.

Moreover, the actual law passed by Congress, Pub. L. 114-253, includes numerous references to extraterritorial conduct that were absent in the previous versions of the statute.  For example, Pub. L. 114-153 states:

11

> It is the sense of Congress that—
> (1) trade secret theft occurs in the United States and around the world;
> (2) trade secret theft, wherever it occurs, harms the companies that own the trade secrets and the employees of the companies;
> (3) chapter 90 of title 18, United States Code (commonly known as the "Economic Espionage Act of 1996"), applies broadly to protect trade secrets from theft; and
> (4) it is important when seizing information to balance the need to prevent or remedy misappropriation with the need to avoid interrupting the—
>> (A) business of third parties; and
>> (B) legitimate interests of the party accused of wrongdoing.

Pub. L. 114-153, § 5. Additionally, Pub. L. 114-153, § 4(b) contains new reporting requirements

for the Attorney General, absent in either the original EEA or in an earlier amendment in 2012,

requiring the Attorney General prepare reports on a biannual basis about, *inter alia*:

> (1) The scope and breadth of the theft of the trade secrets of United States companies occurring outside of the United States.
> (2) The extent to which theft of trade secrets occurring outside of the United States is sponsored by foreign governments, foreign instrumentalities, or foreign agents.
> (3) The threat posed by theft of trade secrets occurring outside of the United States.
> (4) The ability and limitations of trade secret owners to prevent the misappropriation of trade secrets outside of the United States, to enforce any judgment against foreign entities for theft of trade secrets, and to prevent imports based on theft of trade secrets overseas.

Pub. L. 114-153, § 4(b); compare with Pub. L. 104-294, Title I and Pub. L. 112–269. Taken

together, it is clear that Congress was concerned with actions taking place outside of the United

States in relation to the misappropriation of U.S. trade secrets when it passed the DTSA. And,

again, Section 1837 applies by its terms to the "chapter" to which the private right of action was

added.

On the other hand, RJR Nabisco drew a line between criminal extraterritorial application

and private extraterritorial application. There, the Supreme Court found that limiting language as

12

to what damages were available civilly (that is, only damages to business or property) distinguished the civil reach of RICO from the criminal reach, which the Court held did apply extraterritorially in certain criminal circumstances.

Here, there does not appear to be such limiting language in Section 1836, which broadly creates a private right of action. See 18 U.S.C 1836(b) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.").

Section 1837, however, could be viewed as containing such limiting language. Specifically, Section 1837 provides for extraterritorial application based on qualities related to the "offender" or the "offense." Broadly, and in everyday usage, an "offender" could simply mean one who has taken unlawful action and would include a suable entity such as a corporation. Sometimes in legal terminology, however, an "offender" falls more squarely within the realm of criminal law. Black's Law Dictionary, for example, defines offender as:

> offender (15c) *Criminal law.* Someone who has committed a crime; esp., one who has been convicted of a crime.

OFFENDER, Black's Law Dictionary (11th ed. 2019). No parallel definition within a civil context is included in Black's Law Dictionary. Similarly, the word "offense" has some criminal connotation noted:

> offense (ə-fents) (14c) 1. A violation of the law; a crime, often a minor one. — Also termed *criminal offense.* See crime. Cf. misbehavior.
> > "The terms 'crime,' 'offense,' and 'criminal offense' are all said to be synonymous, and ordinarily used interchangeably. 'Offense' may comprehend every crime and misdemeanor, or may be used in a specific sense as synonymous with 'felony' or with 'misdemeanor,' as the case may be, or as signifying a crime of lesser grade, or an act not indictable, but punishable summarily or by the forfeiture of a penalty." 22 C.J.S. *Criminal Law* § 3, at 4 (1989).

13

OFFENSE, Black's Law Dictionary (11th ed. 2019).  Additionally, one could argue it is unclear

whether Congress intended the interpretation of Section 1837 to remain consistent with its

interpretation prior to the 2016 amendment, when Congress decided not to amend Section 1837.

See Firstar Bank, N.A. v. Faul, 253 F.3d 982, 988 (7th Cir. 2001) ("a statute's longstanding

meaning forms the background against which Congress legislates when it amends the law. The

courts presume that Congress will use clear language if it intends to alter an established

understanding about what a law means; if Congress fails to do so, courts presume that the new

statute has the same effect as the older version.").  On the other hand, Congress also did not amend

the introductory language of Section 1837, which states that Section 1837 applies to "this

chapter"—a chapter which now includes Section 1836's private cause of action.  See McClure v.

United States, 95 F.2d 744, 750 (9th Cir. 1938), aff'd, 305 U.S. 472, 59 S. Ct. 335, 83 L. Ed. 296

(1939).

     With the above in mind, then, the Court returns to the principle question of

extraterritoriality, whether Congress has given a clear indication that it intended extraterritorial

application of the private cause of action of Section 1836.  The clearest precedent on this issue

appears to be RJR Nabisco.  As referenced throughout the above, RJR Nabisco distinguished

between the extraterritorial reach of the criminal provisions of RICO and the extraterritorial reach

of the private right of action.  RJR Nabisco, 136 S. Ct. at 2108.  In addition to relying on the private

right of action's limiting language with respect to damages, the Supreme Court additionally

outlined concerns with extending a private right of action extraterritorially.  Specifically, RJR

Nabisco instructed:

          Allowing recovery for foreign injuries in a civil RICO action,
          including treble damages, presents the . . . danger of international
          friction. . . . This is not to say that friction would necessarily result

14

> in every case, or that Congress would violate international law by permitting such suits. It is to say only that there is a potential for international controversy that militates against recognizing foreign-injury claims without clear direction from Congress. Although "a risk of conflict between the American statute and a foreign law" is not a prerequisite for applying the presumption against extraterritoriality, Morrison, 561 U.S., at 255, 130 S. Ct. 2869 where such a risk is evident, the need to enforce the presumption is at its apex.

RJR Nabisco, 136 S. Ct. at 2107; see also id. at 2106 ("The creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion. Sosa v. Alvarez–Machain, 542 U.S. 692, 727, 124 S. Ct. 2739, 159 L. Ed.2d 718 (2004). Thus, as we have observed in other contexts, providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct. See, e.g., Kiobel, 133 S. Ct., at 1665 (Each of th[e] decisions involved in defining a cause of action based on conduct within the territory of another sovereign carries with it significant foreign policy implications.") (internal quotations omitted). The Court takes very seriously RJR Nabisco's directive that "the need to enforce the presumption is at its apex" where a risk of conflict between laws is evident. This case, and certainly the DTSA, may implicate such risks.

Considering all of the above, the Court holds that although Section 1837 contains what might be construed as limiting language, the clear indication of Congress in amended Chapter 90 of Title 18 of the U.S. Code was to extend the extraterritorial provisions of Section 1837 to Section 1836, meaning Section 1836 may have extraterritorial reach subject to the restrictions in Section 1837. First, although Black's Law Dictionary attaches a criminal connotation to the words "offenders" and an "offense," these words should be construed more broadly than simply to the

criminal context in light of the other language of the DTSA. Moreover, an "offense," even in the Black's Law Dictionary definition, is a "violation of the law." This encompasses a violation of a civil statute. Moreover, in practical terms, "offense" is commonly used to refer to unlawful actions that are not criminal. E.g. Sabreliner Corp. v. Int'l Bhd. of Teamsters, Local No. 600, No. 1:08CV151 SNLJ, 2009 WL 1383278, at *3 (E.D. Mo. May 14, 2009) (discussing non-criminal "offenses" within an employment policy). This broader reading of "offense" is bolstered by the other legislative statements in Pub. L. 114-153, which reference extraterritorial conduct and the need for the DTSA to address trade secret theft "wherever it occurs." Pub. L. 153.

Moreover, concerns that animated the RJR Nabisco's distinction between criminal and private action are more muted in a case involving the DTSA because Section 1837 does require a nexus to the United States before the DTSA applies extraterritoriality. The RICO private right of action, on the other hand, could have theoretically applied to solely extraterritorial conduct where the predicate acts dealt with solely extraterritorial conduct. RJR Nabisco, 136 S. Ct. at 2101 ("At least one predicate—the prohibition against 'kill[ing] a national of the United States, while such national is outside the United States'—applies only to conduct occurring outside the United States. § 2332(a).").

Additionally, unlike in the RICO statute, which the Supreme Court read to be criminally extraterritorial only through principles related to the incorporation by reference of the extraterritorial predicate acts, the DTSA includes an explicit reference within the Act to its extraterritorial application. Compare with id. at 2103 ("Th[e] unique structure makes RICO the rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality."). As RJR Nabisco instructed, "[i]t is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries.

Something more is needed[.]"   RJR Nabisco, 136 S. Ct. at 2108.   Here, "something more" is present in the plain language of the statute because of the plain language of Section 1837—a reading which is bolstered by the broad pronouncements of Congress of the need to protect against trade secret theft wherever it occurs.

Thus, for the reasons discussed above, the Court holds that the DTSA may apply extraterritorially in a private cause of action if either of the requirements of Section 1837 are met.

> b. Extraterritorial Application Is Proper in this Case under Section 1837

Holding that the statute may apply extraterritorially does not end the analysis.   The next question is whether this case may meet the requirement of Section 1837.   Returning, then, to the language of Section 1837, the provision states:

> This chapter also applies to conduct occurring outside the United States if-
>
>> (1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or
>>
>> (2) an act in furtherance of the offense was committed in the United States.

18 U.S.C. § 1837.  The parties have not directly addressed this point.  The Court holds, however, that Plaintiffs have presented evidence sufficient to support a finding that an act in furtherance of the offense has been committed in the United States.

The offense, in the context of the DTSA private cause of action, is the misappropriation of a trade secret.  This is clear through the plain language of the statute.  See 18 U.S.C. § 1836(b).  In briefing this motion, the parties have focused on the "acquisition" of the trade secrets as the relevant misappropriation.   However, misappropriation, by its terms, is not limited to the

acquisition of the secret.  As courts have recognized, misappropriation can occur through any of three actions: (1) acquisition, (2) disclosure, or (3) use.  E.g. Zaccari v. Apprio, Inc., 390 F. Supp. 3d 103, 112–13 (D.D.C. 2019) (the DTSA permits plaintiffs to bring private causes of action if they 'own[] a trade secret that is misappropriated.' 18 U.S.C. § 1836(b)(1). Misappropriated means either '(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person' who meets one of several conditions. 18 U.S.C. § 1839(5)(A)–(B). As some courts have put it, the DTSA thus authorizes suits alleging three theories of trade secret misappropriation: (1) acquisition, (2) disclosure, and (3) use. See, e.g., AUA Private Equity Partners, LLC v. Soto, Civil No. 1:17-8035-GHW, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018); Camick v. Holladay, 758 F. App'x 640, 645 (10th Cir. 2018).").

Plaintiffs have argued that the acquisition of the trade secrets took place in the United States because, *inter alia*, the information was stored on servers that are housed in the United States and were accessible from its headquarters in Illinois.  The Court need not reach the merits of this argument in this context, however, because it is clear from the record that even if this constitutes acquisition within the United States, any acquisition took place before the effective date of the DTSA.

Specifically, the "effective date" provision in the DTSA states:

> The amendments made by this section shall apply with respect to any misappropriation of a trade secret (as defined in section 1839 of title 18, United States Code, as amended by this section) for which any act occurs on or after the date of the enactment of this Act.

Pub. L.114-153, May 11, 2016 (18 U.S.C. § 1833 Note).  From the undisputed evidence presented during the trial, it is clear that any improper acquisition of the alleged trade secrets occurred before the effective date of the DTSA.

18

However, as noted above, misappropriation can also be premised on a theory of "disclosure" or "use." 18 U.S.C.A. § 1839(5). "Use" is not defined in the DTSA, but has been interpreted by other courts applying similarly-defined state law. The Fifth Circuit, for example, has analyzed what constitutes "use" for purposes of Texas trade secret law, which contains an element of "use." Gen. Universal Sys., Inc. v. HAL, Inc., 500 F.3d 444, 450 (5th Cir. 2007). There, the court pointed to the definition of "use" in the Restatement (Third) of Unfair Competition, which reads:

> As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret (see § 42, Comment f) all constitute "use."

Restatement (Third) of Unfair Competition § 40, cmt. c (1995). The Seventh Circuit has not explicitly adopted this this definition of "use," but has cited to this section of the Restatement approvingly. Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V., 391 F.3d 871, 878 (7th Cir. 2004). One other court in this district has considered the definition of "use" when interpreting the ITSA, which has an identical definition of "misappropriation" as the DTSA. Cognis Corp. v. CHEMCENTRAL Corp., 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006). There, the court wrote:

> The Seventh Circuit and the Illinois state courts also do not define what it means to "use" a trade secret . . . However, Illinois courts have noted that:
>
> > . . . The idea of "use" as embodied in this language indicates that the third party's actions have to be improper and damage the owner of the secret to some extent. This suggests that "use" is a very broad concept. Such a construction is consistent with the Restatement (Third) of Unfair

Competition, which is often relied on by the Seventh Circuit in analyzing trade secret claims. See, for example, Learning Curve Toys, Inc. v. PlayWood Toys, Inc., 342 F.3d 714, 728 (7th Cir. 2003) (relying on the Restatement (Third) of Unfair Competition and the Uniform Trade Secret Act to determine the criteria for trade secret protection); Salton, 391 F.3d at 878 (relying on the same to determine the scope of legal protection of trade secrets); see also Peaceable Planet, Inc. v. TY, Inc., 362 F.3d 986, 989 (7th Cir. 2004). The Restatement states:

> There are no technical limitations on the nature of the conduct that constitutes "use" of a trade secret . . . As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute "use." The nature of the unauthorized use, however, is relevant in determining appropriate relief. [Restatement (Third) of Unfair Competition, § 40 cmt. c (1995)].

The Court agrees that "use" should be interpreted consistently with the above.  For example, "marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute use." Id.

The question under Section 1837, then, becomes whether "an act in furtherance" of the "use" of the alleged trade secrets has occurred in the United States.  The statute does not define what constitutes "an act in furtherance of the offense."  In Luminati, 2019 WL 2084426, at *9, a Texas district court case analyzing Section 1837 wrote, "this language is not foreign to the common law but is regularly used in the area of federal conspiracy law." Id. (citing Yates v. United States, 354 U.S. 298, 334 (1957) ("[T]he overt act must be found . . . to have been in furtherance of a

conspiracy...."); Findlay v. McAllister, 113 U.S. 104, 114 (1885) ("[T]o sustain the action it must be shown not only that there was a conspiracy, but that there were tortious acts in furtherance of it....").

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts . . . the meaning its use will convey to the judicial mind unless otherwise instructed." Morissette v. United States, 342 U.S. 246, 263 (1952). As a result, as did the Luminati court, this Court looks to the established common law meaning of "in furtherance of" when interpreting the extraterritoriality provision of the DTSA. 18 U.S.C. § 1837(2). In this respect, the Court agrees with Luminati's analysis on this point:

> Applied to the DTSA, Yates makes clear that the act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must "manifest that the [offense] is at work" and is not simply "a project in the minds of the" offenders or a "fully completed operation." [Yates, 354 U.S. at 334.] Put another way, an act that occurs before the operation is underway or after it is fully completed is not an act "in furtherance of" the offense.

2019 WL 2084426, at *10. Thus, if Plaintiffs have shown that Defendants have taken actions that "manifest that the offense is at work"—the offense being the misappropriation—then Section 1837 has been satisfied and the chapter also applies to acts occurring outside the United States.

Plaintiffs have introduced evidence in this case sufficient to support a finding that "use" of the alleged trade secrets has occurred domestically. Specifically, it has been undisputed throughout trial that Defendants have advertised, promoted, and marketed products embodying the allegedly stolen trade secrets domestically at numerous trade shows. This constitutes "use." See Gen. Universal Sys., Inc. v. HAL, Inc., 500 F.3d 444, 450 (5th Cir. 2007) (relying on the

Restatement (Third) of Unfair Competition, § 40 cmt. c (1995)); <u>Cognis Corp. v.</u>
<u>CHEMCENTRAL Corp.</u>, 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006) (same).

An additional point must be discussed now in the interest of completeness. The fact that
the "use" in this case started before the DTSA was enacted is not a barrier for Plaintiffs. Nothing
suggests that the DTSA forecloses a use-based theory simply because the trade secret being used
was acquired or used before the DTSA's enactment. In this regard, the Court agrees with two
other district courts that have noted that Congress omitted from the DTSA language included in
Section 11 of the Uniform Trade Secret Act. That UTSA language states, "[w]ith respect to a
continuing misappropriation that began prior to the effective date, the [Act] also does not apply to
the continuing misappropriation that occurs after the effective date.'" <u>Cave Consulting Grp., Inc.</u>
<u>v. Truven Health Analytics Inc.</u>, No. 15-CV-02177-SI, 2017 WL 1436044, at *4 (N.D. Cal. Apr.
24, 2017); <u>Adams Arms, LLC v. Unified Weapon Sys., Inc.</u>, 16-1503, 2016 WL 5391394, at *6
(M.D. Fla. Sept. 27, 2016) (quoting Unif. Trade Secrets Act, § 11).

The omission of this language suggests that the DTSA applies to a "use"- based private
cause of action even if the acquisition occurred before effective date of the statute or if the use
began before the effective date. Indeed, the plain language of the "effective date" provision of
Pub. L. 114-153 further supports this interpretation. Pub. L.114-153, May 11, 2016 (18 U.S.C. §
1833 Note) ("The amendments made by this section shall apply with respect to any
misappropriation of a trade secret . . . for which any act occurs on or after the date of the enactment
of this Act."). This broad language, coupled with the omission of the provision in the Uniform
Trade Secret Act limiting such recovery, support the position that "use" in this case occurring after
effective date serve as a proper basis for this action.

Finally, although Plaintiffs have briefly argued that they are entitled to research and development costs stretching back into the past prior to the effective date of the DTSA, Plaintiffs have failed to sufficiently support or explain this position. However, unjust enrichment may be recovered after the law came into effect if Plaintiffs can show such unjust enrichment. 18 U.S.C. § 1836(b)(3)(B)(II).

In summation, the Court holds that the DTSA may apply extraterritorially in this case because the requirement of Section 1837(b)(2) has been met. Plaintiffs thus may argue for extraterritorial damages resulting from the misappropriation, but only those damages that occurred after the effective date of the statute—May 11, 2016.

> c. Alternatively, This Case Nonetheless Consists of a Permissible Domestic Application of the DTSA.

Even if the DTSA private right of action did not have extraterritorial reach, this case would still present a proper domestic application of the statute. As stated above, if no clear, affirmative indication exists, the statute is not extraterritorial and the court proceeds to a second step of the extraterritoriality analysis, in which it determines whether the case involves "a domestic application of the statute." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101, 195 L. Ed. 2d 476 (2016). This determination is made first by finding the statute's focus. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id.

The parties argue from the basic premise that focus of the DTSA is on "misappropriation." See Dkt. 774 at 10; Dkt. 806 at 13-14. "When determining the focus of a statute, we do not analyze the provision at issue in a vacuum." WesternGeco, 138 S. Ct. at 2137. "If the statutory provision

23

at issue works in tandem with other provisions, it must be assessed in concert with those other provisions. Otherwise, it would be impossible to accurately determine whether the application of the statute in the case is a 'domestic application.'" Id.

WesternGeco advises that the "focus" of a statute is the "object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." Id. (citations and internal quotations omitted). Discerning the focus of a statute involves an interpretation of what the legislature was concerned with when it enacted the law. See Morrison, 561 U.S. at 266. This is divined from the language of the statute itself. See Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 126, 133 S. Ct. 1659, 1670, 185 L. Ed. 2d 671 (2013) ("We also reiterated that a cause of action falls outside the scope of the presumption—and thus is not barred by the presumption—only if the event or relationship that was 'the "focus" of congressional concern' under the relevant statute takes place within the United States.").

With respect to the DTSA, the Court finds that the focus of the statute is on the misappropriation of a trade secret. Specifically, Section 1836, as discussed at length above, fashions the private right of action around misappropriation and provides a civil remedy for the owner of that trade secret. 18 U.S.C. § 1836 ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."). Additionally, both the "owner" and what constitutes "misappropriation" are defined in Section 1839. Indeed, the title of the chapter of the U.S. Code in which the DTSA was implemented is entitled "Protection of Trade Secrets" and the language in Pub. 114-153 further supports the conclusion that the statute is focused on misappropriation.

Thus, the focus of the DTSA is on creating a remedy for a trade secret's owner for misappropriation, and misappropriation can take place through "use." Therefore, "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad[.]" RJR Nabisco, 136 S. Ct. at 2101. In other words, if the relevant misappropriation of the alleged trade secrets occurred domestically, then this case involves a permissible domestic application of the statute.

In the present case, Plaintiffs have provided evidence that "use" of the alleged trade secrets has occurred domestically. The tricky issue, however, is what damages would be proper under a use-based theory under this second step of the extraterritorial analysis. Because the Court has found that the statute applies extraterritorially, however, it is unnecessary to attempt to discern what damages in this alternative context would be proper.

### 3. The Copyright Act

The parties have provided considerably less argument with respect to damages under the Copyright Act, 17 U.S.C. §§ 106, 501 *et seq.* Dkt. 774 at 11-12 (Plaintiffs' argument); Dkt. 758 at 2 & Dkt. 806 at 14-15 (Defendants' argument). Defendants have pointed to clear pronouncements from the Supreme Court indicating that the Copyright Act has no extraterritorial application. Impression Products, Inc. v. Lexmark International, Inc., 137 S. Ct. 1523, 1528, (2017) ("The territorial limit on patent rights is no basis for distinguishing copyright protections; those do not have extraterritorial effect either."); id. at 1536-37 ("The territorial limit on patent rights is, however, no basis for distinguishing copyright protections; those protections 'do not have any extraterritorial operation' either. 5 M. Nimmer & D. Nimmer, Copyright § 17.02, p. 17–26 (2017).")

Plaintiffs agree that the Copyright Act does not have extraterritorial application but argue this lack of extraterritoriality does not foreclose recovering foreign profits. Dkt. 774 at 11. To support this claim, Plaintiffs cite to Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 307 (4th Cir. 2012) ("Shandong"). In Shandong, the Fourth Circuit outlined "the predicate-act" doctrine. Id. In essence, the doctrine states that "[o]nce a plaintiff demonstrates a domestic violation of the Copyright Act, . . . it may collect damages from foreign violations that are directly linked to the U.S. infringement." Id. The Fourth Circuit noted that the Second Circuit, Ninth Circuit, Sixth Circuit, and the Federal Circuit have adopted this doctrine. Id. (citing Update Art, Inc. v. Modiin Pub., Ltd., 843 F.2d 67, 73 (2d Cir. 1988); Los Angeles News Serv. v. Reuters Television Int'l, Ltd., 149 F.3d 987, 992 (9th Cir. 1998), as amended on denial of reh'g and reh'g en banc (Aug. 25, 1998); Liberty Toy Co. v. Fred Silber Co., 149 F.3d 1183 (6th Cir. 1998) (unpublished); Litecubes, LLC v. N. Light Prod., Inc., 523 F.3d 1353, 1370 (Fed. Cir. 2008).

The thrust of this doctrine is that if an infringing act occurred within the United States, then the plaintiff may recover for foreign violations that are directly linked to the domestic infringement. Although not explicitly adopted by the Seventh Circuit, the Court agrees with the analysis by these five other Circuit Courts. Although Defendants argue that modern extraterritorial jurisprudence displaces the predicate-act doctrine, the Court disagrees, and the predicate-act doctrine holds similarities to the Supreme Court's recent analysis in WesternGeco. WesternGeco, 138 S. Ct. at 2137.

Thus, the Court holds that Plaintiffs are entitled to recover damages flowing from exploitation abroad of the domestic acts of infringement committed by Defendants. Given the undeveloped nature of the arguments on this point, the Court will not throw itself into the bramblebush and analyze whether Defendants have shown that no such act has occurred. The

burden is on the movant to make its point in this regard and Defendants' roughly three paragraphs of argument have not met this burden.

## B. Misappropriation under the Illinois Trade Secret Act

This opinion now turns to Plaintiffs' claim under Illinois Trade Secret Act, 765 ILCS 1065/1 *et seq.* ("ITSA"). As an initial matter, principles surrounding the interpretation of whether an Illinois statute applies extraterritorially are similar to those in the federal context. "Our past decisions have established the rule that when a statute . . . is silent as to extraterritorial effect, there is a presumption that it has none." Graham v. Gen. U.S. Grant Post No. 2665, V. F. W., 43 Ill. 2d 1, 6, 248 N.E.2d 657, 660 (1969). An Illinois statute "should not be given extraterritorial effect [if] it does not clearly appear therefrom that such was the intention of the legislature." Butler v. Wittland, 18 Ill. App. 2d 578, 583, 153 N.E.2d 106, 109 (Ill. App. Ct. 1958).

With respect to the ITSA, the Court has located no controlling precedent as to the statute's extraterritorial application. Aside from one provision within the ITSA, the statute is silent as to geographic reach. That one provision, Section 1065/8(b)(1), reads as follows:

> (b) This Act does not affect:
> > (1) contractual remedies, whether or not based upon misappropriation of a trade secret, provided however, that a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty[.]

765 Ill. Comp. Stat. Ann. 1065/8. Plaintiffs argue that this provision indicates extraterritorial reach for the ITSA. At least one case from the Northern District of Illinois supports this reading. In Miller UK Ltd. v. Caterpillar Inc., a court considered the extraterritorial reach of the ITSA:

> Avery invoked the general rule of statutory construction under Illinois law that denies extraterritorial effect to a statute unless its language appears to provide for such application. 835 N.E.2d at 852. Avery interpreted the Illinois Consumer Fraud Act, 815 ILCS 505,

and its construction of the intended scope of that statute found
significance in a provision that defined its coverage to include "any
trade or commerce directly or indirectly affecting the people of this
State." 835 N.E.2d at 850 (citing 815 ILCS 505/1(f)). ITSA contains
no similar language and Caterpillar cites no precedent construing it
to have any geographic limitation. In contrast to the consumer fraud
statute at issue in Avery, ITSA's "Legislative intent" provision
states that "a contractual or other duty to maintain secrecy or limit
use of a trade secret shall not be deemed to be void or unenforceable
solely for lack of durational or geographical limitation on the duty."
765 ILCS 1065/8(b)(1). It is thus apparent that ITSA not only lacks
a geographic limitation, it authorizes broad geographic application
for purposes of trade secret protection that would be invalid in other
contexts. Caterpillar's duty to avoid misappropriation of Miller's
trade secrets cannot be considered unenforceable merely because
some of its employees and Miller were located beyond the borders
of Illinois.

Miller UK Ltd. v. Caterpillar Inc., No. 10-CV-03770, 2017 WL 1196963, at *7 (N.D. Ill. Mar. 31,

2017). In coming to the conclusion that "[i]t is thus apparent that ITSA not only lacks a geographic

limitation, it authorizes broad geographic application for purposes of trade secret protection that

would be invalid in other contexts[,]" id., it appears to this Court that the Miller court drew an

inference that the lack of limiting language supported the extraterritorial application of the statute.

The question is not whether the ITSA contains language limiting the statute to Illinois, but whether

extraterritoriality "clearly appear[s]" within the text of the statute.  Butler, 18 Ill. App. 2d at 583.

As to that question, the Miller court found Section 1065/8 to contain such a clear indication.

This Court disagrees.  By its terms, Section 1065/8 clarifies that a duty to maintain secrecy, such

as that in a restrictive covenant, should not be invalidated because of the lack of "lack of durational

or geographical limitation on the duty[.]"  The fact that Section 1065/8 twice references contractual

duties supports this reading.  Moreover, as Defendants point out, Dkt. 806 at 9, the Miller reading

would create internal conflict within the statute because Section 765 ILCS 1065/7 expressly does

set a durational limit for bringing actions under the statute.  See 765 ILCS 1065/7 ("An action for

28

misappropriation must be brought within 5 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this Act, a continuing misappropriation constitutes a single claim.").

If Section 1065/8 was read broadly to remove durational and geographic limits on ITSA claims, one of the "durational" provisions would be rendered superfluous. "A fundamental principle of statutory construction is to view all provisions of a statutory enactment as a whole. Accordingly, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." DeLuna v. Burciaga, 223 Ill. 2d 49, 60, 857 N.E.2d 229, 236 (2006). Moreover, courts should not adopt strained readings that render one aspect of a statute superfluous. Panarese v. Hosty, 104 Ill. App. 3d 627, 628–29, 432 N.E.2d 1333, 1335 (1982) ("It is a general rule of construction that where a statute can be reasonably interpreted so as to give effect to all its provisions, a court will not adopt a strained reading which renders one part superfluous. Jarecki v. G. D. Searle & Co., 367 U.S. 303, 81 S. Ct. 1579, 6 L. Ed.2d 859 (1961))".

Finally, this reading of Section 1065/8 is consistent with the Seventh Circuit's application of Section 1065/8 in PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1272 n.10 (7th Cir. 1995). There, the court, citing to Section 1065/8(b)(1), wrote that "[t]he confidentiality agreement is also not invalid for want of a time limitation." Id.; see also Coady v. Harpo, Inc., 308 Ill. App. 3d 153, 161, 719 N.E.2d 244, 250 (1999) ("The reasonableness of some types of restrictive covenants, such as nonsolicitation agreements, also is evaluated by the time limitation and geographical scope stated in the covenant. . . . However, a confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved.") (citations omitted).

In sum, the Court agrees with Defendants that the statutory language contained in Section 1065/8(b)(1) does not clearly express an intent by the legislature for extraterritorial reach of the ITSA. The clearer reading of the provision is that the legislature was concerned with courts' analysis of the reasonableness of restrictive covenants and sought to clarify that duties arising from such covenants should not be held to be unenforceable due to a lack of a geographic or temporal limitation. Thus, the Court holds that the ITSA does not have extraterritorial reach.

IT IS SO ORDERED.

ENTER:

_____

CHARLES RONALD NORGLE, Judge
United States District Court

DATE:  January 31, 2020

30