UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Fair Isaac Corporation,

Case No. 16-cv-1054 (WMW/DTS)

Plaintiff,

**ORDER**

v.

Federal Insurance Company and ACE
American Insurance Company,

Defendants.

Plaintiff Fair Isaac Corporation (FICO) and Defendants Federal Insurance Company (Federal) and ACE American Insurance Company (ACE American) (collectively, Defendants) cross-move to exclude expert testimony and for summary judgment. (Dkts. 360, 369, 378, 386, 396, 404, 419, 428.) FICO also moves to strike aspects of Defendants' summary judgment filings. (Dkt. 551.) For the reasons addressed below, the parties' motions to exclude expert testimony are granted in part and denied in part, FICO's motion to strike and motion for summary judgment are denied, and Defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

FICO designs and develops predictive-analytics and decision-management software. One of FICO's decision-management software tools is the FICO® Blaze Advisor® business rules management system (Blaze Advisor), which is used to design, develop, execute, and maintain rules-based business applications. FICO maintains federal copyright registrations for multiple versions of Blaze Advisor.

Chubb & Son, an unincorporated division of Federal, is an insurance manager for multiple insurance companies and offers information technology services. ACE American, a sister company to Federal, provides insurance-related services to insurance company subsidiaries of Federal. On June 30, 2006, FICO and Chubb & Son entered into a software license and maintenance agreement (License Agreement). The parties subsequently amended the License Agreement twice—first on August 1, 2006, and again on December 28, 2006. As amended, the License Agreement provides Chubb & Son a perpetual license to use Blaze Advisor enterprise-wide.

Before January 15, 2016, Federal's parent corporation was Chubb Corporation. On January 15, 2016, Chubb Corporation merged with—and Federal became a subsidiary of—ACE INA Holdings, Inc. On January 27, 2016, FICO sent Federal written notice that FICO believed Federal had breached Section 10.8 of the License Agreement, which governs assignments or transfers of the License Agreement. Thereafter, based on Federal's alleged refusal to cure the purported breach, FICO sent Federal written notice that FICO would terminate the License Agreement effective March 31, 2016.

On April 21, 2016, FICO commenced this lawsuit alleging breach of the License Agreement and copyright infringement. FICO filed a second amended complaint on September 11, 2018, which is the operative complaint in this case. Count I alleges that Federal breached Sections 3.1, 10.8, and 9.3 of the License Agreement. Count II alleges that Federal infringed FICO's copyright interests by reproducing and distributing FICO products to third parties without authorization. Count III alleges that Federal infringed FICO's copyright interests by continuing to use Blaze Advisor and related FICO products

after FICO terminated the License Agreement. Count IV alleges that both Federal and ACE American infringed FICO's copyright interests as a result of ACE American's unlicensed use and reproduction of Blaze Advisor and related FICO products.

Defendants assert two counterclaims against FICO. First, Defendants allege that FICO breached the License Agreement by purporting to terminate it without the right to do so. Second, Defendants allege that FICO breached an implied covenant of good faith and fair dealing by refusing to consent to Federal's continued use of Blaze Advisor and related FICO products after the merger. Currently pending before the Court are the parties' six cross motions to exclude expert testimony and two cross motions for summary judgment. FICO also moves to strike portions of Defendants' summary judgment briefing and a declaration that Defendants filed in opposition to FICO's motion for summary judgment.

## ANALYSIS

### I.    Cross Motions to Exclude Expert Testimony

The admissibility of expert testimony is an issue of law for the district court to decide and is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  *Id.*

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admissibility over exclusion.  *Id.* (internal quotation marks omitted).  Determinations as to the admissibility of expert testimony are within the district court's discretion.  *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997).

A district court must ensure that testimony admitted under Rule 702 "is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589.  When making this reliability determination, district courts may evaluate whether the expert's method has been tested or subjected to peer review and publication, the method's known or potential rate of error, and the method's general acceptance.  *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94).  These factors are not exhaustive, and a court must evaluate the reliability of expert testimony based on the

facts of the case. *Id.* A district court also may consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (internal quotation marks omitted). When weighing these factors, the district court must function as a gatekeeper to separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006), such that it is "so fundamentally unsupported that it can offer no assistance to the jury," *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (internal quotation marks omitted). But disputes about the factual basis of an expert's testimony ordinarily are issues of credibility—not admissibility—of the expert's testimony. *Sappington*, 512 F.3d at 450; *see also Minn. Supply Co.*, 472 F.3d at 544. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

A.     **FICO's Motions to Exclude Expert Testimony**

FICO moves to exclude the opinions and testimony of Defendants' industry expert William McCarter, Defendants' licensing expert Dr. Steven Kursh, and Defendants'

damages expert W. Christopher Bakewell. FICO does not challenge these witnesses' qualifications. Instead, FICO challenges the relevance and reliability of the opinions of these witnesses on several grounds. The Court addresses each expert witness in turn.

### 1. McCarter

FICO first moves to exclude the opinions and testimony of Defendants' industry expert, McCarter. Defendants intend to offer McCarter to opine about Defendants' use of Blaze Advisor and the extent to which Defendants' revenue and profits are attributable to their use of Blaze Advisor. FICO challenges McCarter's opinions as to disgorgement and market alternatives to Blaze Advisor. In doing so, FICO argues that McCarter's opinions lack a sufficient case-specific factual basis, lack a methodology of analysis, and rely on incorrect legal standards.

#### a. McCarter's Opinions as to Disgorgement

According to FICO, aspects of McCarter's disgorgement opinions lack a case-specific factual basis and methodology of analysis; instead, FICO contends, these opinions rely solely on McCarter's "experience."

A witness may be qualified as an expert based on the witness's knowledge, skill, experience, training, or education. Fed. R. Evid. 702; *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012). "[A]n expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *accord Shuck v. CNH Am., LLC*, 498 F.3d 868, 875 (8th Cir. 2007) (recognizing that "observations coupled with expertise generally may form the basis of an admissible expert opinion"). With respect to causation experts, such

testimony may be reliable and admissible when the expert "observed the relevant evidence, applied [the expert's] specialized knowledge, and systematically included or excluded possible theories of causation." *Russell v. Whirlpool Corp.*, 702 F.3d 450, 457 (8th Cir. 2012) (quoting *Shuck*, 498 F.3d at 875). Expert testimony may be excluded, however, when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

FICO argues that McCarter's opinions about Defendants' "core competencies," the "business rules" Defendants use with Blaze Advisor, customer purchasing preferences, and the qualitative and quantitative use of Blaze Advisor all lack case-specific factual bases. Defendants counter that McCarter based these opinions on his observations of Defendants' business practices and Defendants' particularized use of Blaze Advisor, together with McCarter's industry experience. And these opinions are relevant, Defendants argue, to rebut FICO's evidence that the disgorgement profits FICO seeks are "attributable" to Defendants' use of Blaze Advisor.

A copyright owner is entitled to recover "any profits of [an] infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). To prove such damages, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* In doing so, the copyright owner has the initial burden to demonstrate a nexus between the infringement and the infringer's profits. *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003). After

that nexus is established, the burden then shifts to the infringer to prove what portion of those profits should be allocated to factors unrelated to the infringing use. *Id.* (explaining that a plaintiff's initial burden to prove "attribution" requires proof that the infringing use "contributed to" the relevant gross revenues, after which the burden shifts to the defendant to apportion those profits between various factors that contributed to those profits). Here, McCarter's disgorgement opinions pertain to the extent to which Defendants' use of Blaze Advisor contributes to Defendants' revenue and profits, if at all. This evidence is relevant to each party's burden of proof with respect to disgorgement. *See id.*

FICO contends, however, that McCarter relies on nothing more than his "experience" and his opinions are not tethered to any case-specific facts. McCarter's report reflects that he interviewed 11 of Defendants' current and former employees, reviewed and analyzed deposition testimony and exhibits, reviewed other documents produced by both parties in discovery, reviewed outside resources, and drew on McCarter's years of experience working in the insurance industry. In short, the record shows that McCarter observed the relevant evidence of Defendants' business operations and means of using Blaze Advisor, applied his specialized industry knowledge to those observations, and reached conclusions about the causal connection between Defendants' profits and Defendants' use of Blaze Advisor relative to other factors.

On this record, any analytical gap between the evidence and McCarter's opinions is not so great as to require exclusion. Because FICO's disagreements with McCarter's

disgorgement opinions pertain to the weight and credibility of the opinions, not their admissibility, exclusion of these opinions is unwarranted.

### b.     McCarter's Opinions as to Alternatives to Blaze Advisor

FICO also seeks to exclude McCarter's opinions about alternatives to Blaze Advisor that are available on the market. According to FICO, these opinions improperly apply the patent-law concept of non-infringing alternatives to FICO's claim for disgorgement damages. Defendants respond that McCarter's opinions about market alternatives are relevant and admissible with respect to FICO's claims for both actual damages and disgorgement of Defendants' profits.

A "copyright owner is entitled to recover the actual damages suffered by [the owner] as a result of the infringement." 17 U.S.C. § 504(b). "Actual damages are usually determined by the loss in the fair market value of the copyright," and it "is not improper for a jury to consider either a hypothetical lost license fee or the value of the infringing use to the infringer to determine actual damages." *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016) (internal quotation marks omitted); *accord On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001); *cf. Nucor Corp. v. Tenn. Forging Steel Serv., Inc.*, 513 F.2d 151, 153 (8th Cir. 1975) (holding that infringers of common law copyright were liable for fair market value of copyrighted work). This amount is determined based on a "hypothetical negotiation" that reflects "the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use" of the copyrighted work. *On Davis*, 246 F.3d at 167. The existence of market alternatives to Blaze Advisor could

impact such a hypothetical negotiation.[1]  Therefore, McCarter's opinions about market alternatives to Blaze Advisor are relevant.[2]

FICO also contends that McCarter's opinions about market alternatives are not supported by a methodology or case-specific facts.  But FICO's argument is based on the premise that any purported alternatives must be "acceptable" or "exchangeable" with Blaze Advisor.  As FICO acknowledges, that standard applies in the patent-law context, which is not the context in which McCarter's opinions about market alternatives are being offered.  FICO has identified no legal authority to suggest that a market alternative must, as a matter of law, be "acceptable" or "exchangeable" with Blaze Advisor to be relevant to a hypothetical negotiation for copyright license fees.  Because FICO's disagreements with McCarter's opinions about market alternatives pertain to the weight and credibility of the opinions, not their admissibility, exclusion of these opinions is unwarranted.

---

[1]     FICO argues that McCarter cannot opine on matters outside the scope of his report, which does not expressly address actual damages.  But Defendants contend only that McCarter's opinions are *relevant* to actual damages, not that he will directly *opine* about actual damages.  Instead, McCarter will opine about market alternatives—a subject that *is* within the scope of his report.  That such opinions also may be relevant to other legal issues does not render the opinions inadmissible.  Nothing in the Federal Rules of Civil Procedure requires an expert report to precisely link the expert's opinions to specific legal issues.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii) (requiring an expert report to include "a complete statement of all opinions the witness will express and the basis and reasons for them" as well as "the facts or data considered by the witness in forming them").

[2]     Defendants also contend that McCarter's opinions as to market alternatives are relevant to the issue of disgorgement.  The Court need not address this argument because these opinions clearly are relevant to actual damages and, therefore, exclusion of the opinions on relevance grounds is unwarranted.

In summary, because FICO's challenges to the admissibility of McCarter's opinions lack merit, FICO's motion to exclude McCarter's opinions and testimony is denied.

## 2. Dr. Kursh

FICO also moves to exclude the opinions and testimony of Defendants' licensing expert, Dr. Kursh. Defendants intend to offer Dr. Kursh to opine about the commercial reasonableness of FICO's conduct, the parties' customs and practices, and the customs and practices in the software industry generally. FICO argues that Dr. Kursh's opinions are based on substantive contract interpretation, which is an issue of law for the Court to decide, and that his opinions either are based on insufficient facts or merely summarize the factual record and, therefore, would not be helpful to a jury.

### a. Dr. Kursh's Opinions at to Commercial Reasonableness

Dr. Kursh opines about the commercial reasonableness of FICO's decision to terminate the parties' License Agreement. According to FICO, these opinions are inadmissible for two reasons: first, because these opinions improperly usurp the role of the Court by interpreting contract language; and second, because these opinions will not assist a jury as they merely summarize facts rather than analyze those facts based on industry standards or customs.

Under New York law, unambiguous contract language is interpreted by the court as a matter of law.[3] *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). "As a general rule, questions of law are the subject of the court's instructions and

---

[3] The parties' License Agreement is governed by New York law.

not the subject of expert testimony." *United States v. Klaphake*, 64 F.3d 435, 438 (8th Cir. 1995) (internal quotation marks omitted); *accord S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not admissible."). However, "[c]ourts have frequently recognized the value of expert testimony defining terms of a technical nature and testifying as to whether such terms have acquired a well-recognized meaning in the business or industry." *Nucor Corp. v. Neb. Pub. Power Dist.*, 891 F.2d 1343, 1350 (8th Cir. 1989). Therefore, a court may permit an expert to testify about industry practices or standards and the meaning of ambiguous contract language that includes terms of art. *Id.*; *see also Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 98 (2d Cir. 2019) (unless a contract includes "terms of art," expert testimony as to the meaning of contractual provisions is irrelevant and inadmissible). Expert testimony also must be helpful to a jury. *See* Fed. R. Evid. 702. "Expert testimony is helpful to a jury if it concerns matters beyond the knowledge of average individuals; however, it cannot supplant the jury's role in evaluating the evidence." *United States v. Shedlock*, 62 F.3d 214, 219 (8th Cir. 1995).

FICO first argues that Dr. Kursh improperly opines about the geographic scope governed by Paragraph 2.1 of the License Agreement. According to Dr. Kursh, it is the "industry custom and practice" to limit territorial scope in the license grant clause, which was not done here; and he concludes, therefore, that the parties' License Agreement does not contain territorial restrictions. Although Dr. Kursh invokes the phrase "industry custom and practice," his opinions on this issue do not purport to explain a term of art or concept that has a specialized meaning in the industry. Rather, he opines about contract

drafting and the effect of the omission of a contractual term. Defendants do not argue, and Dr. Kursh does not opine, that Paragraph 2.1 of the License Agreement is ambiguous. And even if it were ambiguous, neither Defendants nor Dr. Kursh suggest that the ambiguity involves terms of art or unique industry practices that Dr. Kursh must explain to a jury based on his specialized knowledge or experience. Instead, Dr. Kursh purports to interpret contract language and tell the jury what conclusions to reach as to the contract's geographic scope, FICO's intent, and the reasonableness of FICO's interpretation of the contract's geographic scope. Defendants do not establish how any of these determinations require specialized industry knowledge. These opinions improperly address legal issues and would not be helpful to a jury because they do not involve "matters beyond the knowledge of average individuals." *Shedlock*, 62 F.3d at 219. Thus, exclusion of Dr. Kursh's opinions about the geographic scope of the License Agreement is warranted.

FICO also argues that Dr. Kursh improperly opines about the "no assignment" clause in Paragraph 10.8 of the License Agreement. According to Dr. Kursh, consent for an assignment is required under Paragraph 10.8 of the License Agreement only if there is an "expanded use" of Blaze Advisor and that FICO acted unreasonably by terminating the License Agreement either because no "expanded use" occurred or because withholding consent was unreasonable. Dr. Kursh's opinions on this issue do not purport to resolve an ambiguity or explain a term of art or concept that has a specialized meaning in the industry. Instead, Dr. Kursh purports to interpret the "no assignment" clause and tell the jury what conclusions to reach as to the reasonableness of FICO's interpretation

of the "no assignment" clause. Defendants do not establish how any of these determinations require specialized industry knowledge. These opinions improperly address legal issues and would not be helpful to a jury because they do not involve "matters beyond the knowledge of average individuals." *Id.* Thus, exclusion of Dr. Kursh's opinions about the "no assignment" clause of the License Agreement also is warranted.

For these reasons, the opinions reflected in Paragraphs 69–98 of Dr. Kursh's report, which address the geographic scope and "no assignment" clause of the License Agreement, are excluded.

### b. Dr. Kursh's Opinions as to Breach-of-Contract Damages

FICO also argues that Dr. Kursh's opinions that pertain to FICO's breach-of-contract damages should be excluded because they lack factual support and would not be helpful to a jury. In addition, FICO asserts that some of these opinions are based on the incorrect legal standard.

FICO first challenges the factual basis underlying Dr. Kursh's opinions about which of Defendants' applications use Blaze Advisor, the relative size of those applications, and the proper licensing structure and discounting to apply when approximating the market value of Blaze Advisor. Dr. Kursh opines that FICO's damages calculation is too high because FICO overstates or fails to account for these facts and figures. In support of these opinions, Dr. Kursh relies on deposition testimony, documentary evidence, and his own industry knowledge, including his experience with software development and licensing. FICO's disagreements with the factual bases of

these opinions pertain to the weight and credibility of the opinions, not their admissibility. These arguments are unavailing.[4]

FICO also challenges Dr. Kursh's opinion about the reasonableness of FICO's decision not to exercise its audit rights under the License Agreement. Defendants counter that this opinion is relevant to show that FICO failed to mitigate its damages. "As with other affirmative defenses, failure to plead mitigation of damages as an affirmative defense results in a waiver of that defense and its exclusion from the case." *Sayre v. Musicland Grp., Inc.*, 850 F.2d 350, 354 (8th Cir. 1988). But Defendants did not plead mitigation of damages in their answer. Because this defense has been waived, Dr. Kursh's opinions that pertain to this defense are inadmissible.

In summary, FICO's motion to exclude Dr. Kursh's testimony is granted in part. Dr. Kursh's opinions reflected in Paragraphs 69–98 and 137–40 of his report, which address the geographic scope and the "no assignment" clause of the License Agreement and Defendants' mitigation-of-damages defense, are excluded. In all other respects, FICO's motion to exclude Dr. Kursh's opinions and testimony is denied.

### 3. Bakewell

FICO also moves to exclude the opinions and testimony of Defendants' damages expert, Bakewell. Defendants intend to offer Bakewell's testimony to rebut FICO's damages expert's opinions about the actual damages and disgorgement of profits to

---

[4]    In addition, FICO challenges the legal standard underlying Dr. Kursh's opinions about the hypothetical lost license fees Defendants would have paid for Blaze Advisor. As addressed in Part I.A.3.a. of this Order, FICO misstates the legal standard governing the calculation of actual damages in this case. Therefore, this argument also is unavailing.

which FICO claims it is entitled. FICO argues that Bakewell's opinions rely on incorrect legal standards, irrelevant or unsupported facts, and inadmissible testimony from Defendants' other expert witnesses.

### a. Bakewell's Opinions as to Actual Damages

FICO first contends that Bakewell's opinions about FICO's claims for actual damages, in the form of lost license fees, are inadmissible because they are premised on an incorrect legal standard and improper factual support.

As addressed in Part I.A.1.b. of this Order, a reliable methodology for determining FICO's actual damages—the fair market value of Blaze Advisor—is to calculate a hypothetical lost license fee based on "the reasonable license fee on which a willing buyer and a willing seller would have agreed." *On Davis*, 246 F.3d at 167; *accord Bell*, 827 F.3d at 709. Because awarding a copyright owner a hypothetical lost license fee "can risk abuse," courts have required that "the amount of damages may not be based on undue speculation." *On Davis*, 246 F.3d at 166; *accord Bell*, 827 F.3d at 709. But although "finding the fair market value of a reasonable license fee may involve some uncertainty," that fact is not a sufficient reason to reject this method as an "eligible measure of actual damages." *On Davis*, 246 F.3d at 166. Determining the fair market value of a copyrighted work is "an objective, not a subjective, inquiry." *Dash v. Mayweather*, 731 F.3d 303, 312 (4th Cir. 2013) (citing *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002)). As such, the copyright owner's subjective beliefs or objections to an alleged infringer's conduct are irrelevant to this inquiry. *Id.*; *see also On Davis*, 246

F.3d at 166 ("The question is not what the owner would have charged, but rather what is the fair market value.").

FICO also seeks damages for breach of the parties' License Agreement. Under New York law, a successful plaintiff in a breach-of-contract action is entitled to expectation damages. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003). Expectation damages "put the plaintiff in the same economic position [the plaintiff] would have occupied had the breaching party performed the contract." *Id.*; *accord Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008) (explaining that a "nonbreaching party may recover general damages which are the natural and probable consequence of the breach" (internal quotation marks omitted)). When "a breach of contract causes a plaintiff to lose an income-producing asset and that asset has a determinable market value, a plaintiff may seek to recover that value." *Safka Holdings LLC v. iPlay, Inc.*, 42 F. Supp. 3d 488, 493 (S.D.N.Y. 2013) (internal quotation marks omitted). When evaluating the hypothetical market value of an asset, such as a license to use intellectual property, a factfinder may consider relevant evidence including "expert testimony, prior sales history, and evidence of sales of comparable assets" so as to "determine the fair market value at which the property would change hands between a willing buyer and a willing seller." *Id.* (internal quotation marks omitted).

As a rebuttal expert witness, Bakewell criticizes the opinions of FICO's damages expert that pertain to hypothetical lost license fees. In doing so, Bakewell relies on evidence that, in his opinion, would support a lower hypothetical lost license fee. In particular, Bakewell opines that FICO's damages expert ignores FICO's prior

17

negotiations with Defendants and FICO's sales practices with other licensees of Blaze Advisor, including other licensees who underwent a merger or acquisition as Defendant did here. Bakewell also asserts that FICO's damages expert does not account for FICO's standardized discount policy, fails to consider available alternatives to Blaze Advisor on the market, and relies on a flawed methodology with respect to "application sizing." Based on these factors, Bakewell concludes that the hypothetical lost license fees in this case should be lower than the amount advocated by FICO's damages expert, which exceeds $34 million.

In seeking to exclude these opinions, FICO first argues that Bakewell applied the incorrect legal standard because he attempts to measure the "intrinsic value" of Blaze Advisor. According to FICO, the correct measure of actual damages is FICO's "expectation damages," which should be based solely on "FICO's standard Blaze Advisor application fee" viewed "from the perspective of FICO's loss." But "[t]he question is not what the owner would have charged, but rather what is the fair market value." *On Davis*, 246 F.3d at 166; *accord Safka Holdings*, 42 F. Supp. 3d at 493 (proper measure of damages for breach of contract involving income-producing asset is "market value" of that asset). FICO's argument suggests that FICO's actual damages should be based solely on what FICO subjectively would have charged, which is contrary to the legal standard for actual damages under both copyright and contract law. An asset's fair market value is the proper measure of actual damages for both copyright infringement and breach of contract, and Bakewell's opinions as to the "intrinsic value" of Blaze Advisor are consistent with this governing law. Bakewell addresses the market value of

Blaze Advisor—in other words, the value that a willing buyer and willing seller would assign to Blaze Advisor—not merely what FICO subjectively would have charged or what Defendants subjectively would have paid. FICO's arguments to the contrary are unavailing.

FICO also challenges the factual bases underlying Bakewell's actual damages opinions. FICO contends that Bakewell improperly relies on the following evidence in support of his opinions: alleged discounts FICO would have applied to a license fee, the inadmissible testimony of Defendants' licensing expert, selective "[c]herry-pick[ed]" record evidence that is favorable to Defendants, evidence of FICO's licensing negotiations with other entities, the existence of non-infringing alternatives to Blaze Advisor, and the extent to which Defendants' applications use Blaze Advisor.

Significantly, an "expert is permitted to rely on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert in the case—even if those facts, opinions, and data are otherwise inadmissible." *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015); *accord* Fed. R. Evid. 703. And challenges to the factual basis of an expert's testimony ordinarily are issues of credibility—not admissibility—of the expert's testimony. *Sappington*, 512 F.3d at 450; *see also Minn. Supply Co.*, 472 F.3d at 544. FICO's challenges to the factual bases of Bakewell's actual damages opinions largely rely on FICO's mischaracterization of the legal standard and are unavailing for the reasons addressed above. Contrary to FICO's arguments, the evidence on which Bakewell relies is relevant to an evaluation of the fair market value of Blaze Advisor

because it is material to ascertaining the hypothetical license fee to which a willing buyer and a willing seller would have agreed. FICO's disagreements with Bakewell's analysis pertain to the weight and credibility of Bakewell's opinions, not their admissibility.

For these reasons, exclusion of Bakewell's testimony as to actual damages is unwarranted.

### b. Bakewell's Opinions as to Disgorgement Damages

FICO next contends that Bakewell's opinions as to FICO's claim for disgorgement damages are inadmissible because they are premised on an incorrect legal standard and improper factual support.

In addition to actual damages, a copyright owner is entitled to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). As addressed in Part I.A.1.a. of this Order, to seek disgorgement of an infringer's profits, the copyright owner has the initial burden to demonstrate a nexus between the infringement and the infringer's profits. *Andreas*, 336 F.3d at 796. After that nexus is established, the burden then shifts to the infringer to prove what portion of those profits should be allocated to factors unrelated to the infringing use. *Id.*

FICO first argues that Bakewell's opinions misallocate the applicable burden of proof. "[T]he burden of establishing that profits are *attributable* to the infringed work often gets confused with the burden of *apportioning* profits between various factors contributing to the profits." *Id.* (emphasis added). The burden to prove attribution is on the plaintiff, whereas the burden to prove apportionment is on the defendant. *Id.* The

plaintiff's initial burden to prove attribution requires proof that the infringing use, at least in part, "contributed to" the relevant gross revenues. *Id.* A plaintiff cannot meet this burden "by showing gross revenues from everything defendant sold," but instead must show gross revenues from the sale of products or services that have a nexus to the infringing use. *Id.*; *accord Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004) (observing that "a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement"); *On Davis*, 246 F.3d at 160 (observing that "the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelated revenues"). Only after the plaintiff has established this nexus does the burden shift to the defendant to apportion those profits between various factors that contributed to those profits. *Andreas*, 336 F.3d at 796.

Bakewell criticizes FICO's damages expert for failing to calculate Defendants' revenues attributable to Blaze Advisor and opines that FICO's disgorgement calculation is inflated because it includes revenues that have no connection to Defendants' allegedly infringing use of Blaze Advisor. In some respects, Bakewell's opinions are directed at the "nexus" requirement that FICO must prove. For instance, he opines that FICO's damages expert "simply aggregate[s] Federal's gross written premiums (*i.e.*, revenue)" for business units or segments that may have used Blaze Advisor applications but "did not perform any meaningful financial or economic analysis of these revenues." Bakewell also opines that FICO's damages expert used "gross written premiums associated with a number of applications that do not use Blaze Advisor." These opinions are consistent

with the applicable legal standard and burden of proof. Thus, to the extent that Bakewell's disgorgement opinions pertain to alleged failures by FICO's damages expert to establish a nexus between an infringing use and a particular revenue stream, such that the infringing use "contributed to" that revenue stream, exclusion of those opinions is unwarranted.

In other respects, however, Bakewell's opinions improperly suggest that FICO's damages expert *also* should have allocated Defendants' profits between various factors that contributed to those profits, such as "the know-how of [Defendants'] workforce, management abilities, brand recognition, existing customer relationships, pricing, and service quality." Defendants, not FICO, bear the burden to prove these apportionment factors, and any suggestion to the contrary mischaracterizes the law. Thus, to the extent that Bakewell's disgorgement opinions suggest that FICO's damages expert should have apportioned Defendants' profits between various factors, those opinions are improper and inadmissible in evidence.[5]

In summary, FICO's motion to exclude Bakewell's testimony is granted in part as to Bakewell's disgorgement opinions that improperly suggest that it is FICO's burden to

---

[5]    FICO also challenges Bakewell's allegedly inconsistent and selective reliance on evidence as well as his reliance on allegedly inadmissible evidence. But an expert may rely on inadmissible evidence. *See* Fed. R. Evid. 703. Moreover, FICO's challenges to the factual bases underlying Bakewell's disgorgement opinions pertain to the weight and credibility of Bakewell's opinions, not the admissibility of those opinions. As such, vigorous cross-examination and contrary evidence are the appropriate means by which FICO may challenge this evidence.

apportion profits. FICO's motion to exclude Bakewell's testimony is denied in all other respects.

## B. Defendants' Motions to Exclude Expert Testimony

Defendants move to exclude the opinions and testimony of FICO's industry expert R. Bickley Whitener, FICO's rebuttal licensing expert Brooks Hilliard, and FICO's damages expert Neil Zoltowski. The Court addresses each expert witness in turn.

### 1. Whitener

Defendants first move to exclude the opinions and testimony of FICO's industry expert, Whitener. FICO intends to offer Whitener to show that Defendants' use of Blaze Advisor was "connected to" and "contributed to" Defendants' gross revenue for the sale of insurance. Defendants do not challenge Whitener's qualifications.[6] Instead, Defendants challenge the relevance and reliability of his opinions. In particular, Defendants argue that Whitener's opinions rely on an incorrect legal standard and unreliable methodology.

#### a. Legal Standard Underlying Whitener's Opinions

Defendants contend that Whitener's disgorgement opinions are inadmissible because they are premised on an incorrect legal standard, namely a "connection" or "contribution" requirement instead of a "but for" requirement. As addressed above, when

---

[6] Defendants address Whitener's qualifications for the first time in their reply memorandum. Because this challenge has not been properly raised, the Court will not address it at this time. *See* LR 7.1(c)(3)(B) ("A reply memorandum must not raise new grounds for relief . . . ."); *Cannon Techs., Inc. v. Sensus Metering Sys., Inc.*, 734 F. Supp. 2d 753, 769 n.19 (D. Minn. 2010) (declining to address an argument raised only in a reply brief).

seeking disgorgement of a copyright infringer's profits, a plaintiff must prove the infringer's gross revenues that are attributable to the infringed work. *Andreas*, 336 F.3d at 796. Proving attribution requires proof that the infringing use, at least in part, "contributed to" the relevant gross revenues. *Id.* Whitener's opinions that Blaze Advisor "contributed to" Defendants' revenues are consistent with this legal standard and are not inadmissible on this basis. Exclusion of these opinions is, therefore, unwarranted.[7]

### b. Whitener's Methodology

Defendants next challenge Whitener's methodology. Defendants maintain that Whitener's opinions are based solely on his experience rather than a reliable methodology. FICO counters that Whitener employs a reliable methodology in which he analyzes how insurance companies sell insurance, what factors impact the sale of insurance, and how Defendants use Blaze Advisor as it pertains to those factors.

A witness may be qualified as an expert based on the witness's knowledge, skill, experience, training, or education. Fed. R. Evid. 702; *Watson*, 668 F.3d at 1014. Under certain circumstances, "observations coupled with expertise generally may form the basis of an admissible expert opinion." *Shuck*, 498 F.3d at 875; *Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Expert testimony may be excluded,

---

[7] This case involves indirect profits as opposed to direct profits because Defendants did not sell Blaze Advisor but instead allegedly profited from Blaze Advisor *indirectly* by using the software to sell other products or services. The same legal standard applies in the context of both direct profits and indirect profits, however. *Id.* Defendants' contention that courts apply a "heightened standard" in indirect profits cases is incorrect.

however, when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec.*, 522 U.S. at 146.

Based on his experience in the insurance industry, Whitener identifies three primary factors that contribute to the generation of revenue for insurance companies such as Defendants: speed in response to demand, ease of doing business, and product pricing. He explains how each factor contributes to revenue generation, and he analyzes how technology is used to achieve and improve each factor. Throughout his analysis, Whitener indicates that he relies on industry publications and his extensive industry experience relevant to each factor. Whitener also considers and rejects the alternatives to Blaze Advisor that Defendants' experts propose. In short, Whitener's opinions are based on his observations, specialized experience, and analysis. *See Shuck*, 498 F.3d at 875. Defendants have not identified any analytical gap between Whitener's opinions and the facts and data on which he relies that warrants excluding his opinions.[8]

In summary, because Defendants' challenges to the legal standard and methodology underlying Whitener's opinions lack merit, Defendants' motion to exclude Whitener's opinions and testimony is denied.

---

[8]  Defendants' criticisms of Whitener's methodology—for example, that he should have run speed testing on Blaze Advisor or engaged in some quantitative analysis—are more appropriately addressed at trial rather than on a motion to exclude expert testimony. *See Shuck*, 498 F.3d at 875 (rejecting the argument that experts must be excluded when they do not test the product at issue or exemplar products); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 2.       Hilliard

Defendants also move to exclude the opinions and testimony of FICO's licensing expert, Hilliard.  FICO intends to offer Hilliard's opinions to rebut the opinions of Defendants' licensing expert, Dr. Kursh, and industry expert, McCarter.[9]  Defendants challenge five categories of Hilliard's opinions, which the Court addresses below.

### a.       Industry Customs and Practices as to Licensing Limitations

Hilliard opines that FICO applied the licensing limitations in the parties' License Agreement consistently with the customs and practices of the commercial software industry.  Defendants contend that such testimony would improperly interpret the terms of the License Agreement.

As addressed above, unambiguous contract language is interpreted by the court as a matter of law, *Metro. Life Ins.*, 906 F.2d at 889, and expert testimony on legal matters is inadmissible, *S. Pine Helicopters*, 320 F.3d at 841.  A court may permit an expert to testify about industry practices or standards and the meaning of ambiguous contract language that includes terms of art.  *Nucor Corp.*, 891 F.2d at 1350.  But unless the contract includes terms of art, expert testimony as to the meaning of contractual terms generally is irrelevant and inadmissible.  *Richards*, 915 F.3d at 98.

Hilliard's opinions about FICO's application of license limitations are based on his interpretation of several terms of the License Agreement.  Hilliard purports to use his "professional experience [in] reviewing hundreds of software license agreements," and

---

[9]       The parties agree that Hilliard's opinions should be limited to rebuttal testimony and be admitted only in response to Dr. Kursh's and McCarter's testimony.

opines as to how FICO applied those terms during the parties' course of conduct. Hilliard opines that certain "license terms . . . are not in conflict because FICO and Chubb & Son specifically negotiated the territory restriction before signing the License Agreement" and that "the fact that FICO did not take action immediately would not have waived FICO's right to act on that knowledge at a later time because the License Agreement includes a 'No Waiver' provision." These opinions pertain to the terms of the License Agreement and are based on Hilliard's interpretation of these terms. But FICO does not contend that these aspects of the License Agreement are ambiguous or include any term of art. Hilliard's opinions as to the meaning of the License Agreement are irrelevant and inadmissible. *See id.* Accordingly, exclusion of Hilliard's testimony as to these opinions is warranted.

### b. Continued Use Reasonably Conditioned on Price Increase

Hilliard next opines that FICO acted reasonably when it conditioned Defendants' continued use of Blaze Advisor on an increase in the license price. Defendants contend that this opinion is not based on reliable facts and methodology because "Hilliard merely presents a biased, selective timeline of the negotiations" between the parties. This objection pertains to the factual basis of Hilliard's opinion. Because disputes as to the factual basis of an expert's testimony implicate the credibility of expert testimony rather than its admissibility, *Sappington*, 512 F.3d at 450, exclusion of Hilliard's testimony as to this opinion is not warranted.

### c. Pricing and Discount Practices

Hilliard also criticizes the opinions of Defendants' licensing expert, Dr. Kursh. According to Hilliard, Dr. Kursh's opinions about FICO's pricing and discount practices are flawed and are not consistent with industry standards. Defendants contend that Hilliard's opinions about pricing and discount practices are inadmissible.

The function of a rebuttal expert is to "explain, repel, counteract or disprove" the testimony of the opposing expert witness. *United States v. Luschen*, 614 F.2d 1164, 1170 (8th Cir. 1980). According to Defendants, Hilliard's opinion is "not responsive to and in fact support[s] Kursh's opinion." As a matter of logic, Hilliard's opinions cannot both support *and* fail to respond to Dr. Kursh's opinions. Defendants' position is internally inconsistent and does not warrant exclusion of Hilliard's testimony as to this subject matter. Defendants also argue that Hilliard's opinions about FICO's pricing and discount practices are irrelevant because they have no connection to the basis of FICO's damages calculations. But Hilliard is not offering an affirmative damages opinion. Instead, he is rebutting the opinions of Defendants' expert by applying his industry knowledge and experience to identify purported flaws in Dr. Kursh's criticisms of FICO's damages expert. The fact that Hilliard's rebuttal opinions are not directly connected to the basis of FICO's damages calculations does not warrant excluding Hilliard's testimony. Moreover, to the extent that Defendants challenge the weight and credibility that Hilliard's criticisms of Dr. Kursh should be afforded, the admissibility of Hilliard's testimony is not implicated. *See Sappington*, 512 F.3d at 450.

Therefore, exclusion of Hilliard's testimony as to these opinions is unwarranted.

### d. Vagueness in Dr. Kursh's Expert Report

Hilliard next criticizes aspects of Dr. Kursh's report as "so vague and undefined that judgments based on them are not supportable." Defendants argue that this part of Hilliard's opinion invades the province of the Court.

Whether expert testimony is sufficiently specific to support a judgment or assist the trier of fact is for a court to decide. *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 329 (D.C. Cir. 1988). Moreover, expert testimony must be helpful to the jury. *See* Fed. R. Evid. 702. Hilliard's opinions about the alleged vagueness of Dr. Kursh's report are not appropriate rebuttal opinions because they invade the Court's province to determine the admissibility of Dr. Kursh's opinions and the jury's province to evaluate the weight and credibility of Dr. Kursh's opinions. *See, e.g.*, *Honeywell Int'l, Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 1010–11 (D. Minn. 2014) (excluding expert testimony that invaded the province of the district court and the jury). A jury is capable, without the aid of Hilliard's industry knowledge or expertise, to evaluate whether Dr. Kursh's opinions are too vague to be credible.

As such, exclusion of Hilliard's testimony as to these opinions is warranted.

### e. Blaze Advisor's Contribution to Revenue

Finally, Hilliard opines that "Blaze Advisor provided critical capability, contributing to Federal's revenue." Defendants move to exclude this testimony on the ground that, like Whitener's testimony, Hilliard's opinion is premised on an incorrect legal standard and unreliable methodology. For the same reasons that the Court denies

Defendants' motion to exclude Whitener's testimony, exclusion of Hilliard's testimony as to this opinion is unwarranted.

In summary, Defendants' motion to exclude Hilliard's opinions and testimony is granted in part and denied in part. Hilliard's testimony is excluded to the extent that he opines about the licensing limitations in the parties' License Agreement and whether certain terms used in Dr. Kursh's report are vague or undefined. Defendants' motion is denied in all other respects.

### 3. Zoltowski

Defendants also move to exclude the opinions and testimony of FICO's damages expert, Zoltowski. FICO intends to offer Zoltowski's opinions about the measure of FICO's actual damages and Federal's profits subject to disgorgement. While Defendants do not challenge Zoltowski's qualifications, Defendants challenge the relevance and reliability of his opinions. Defendants argue that Zoltowski's opinions lack both a reliable factual basis and a reliable method of analysis.

### a. Zoltowski's Opinions as to FICO's Actual Damages

As to FICO's actual damages, Zoltowski opines that FICO's application-based pricing structure, in which a license is priced based on the number of applications the licensee wishes to enable with Blaze Advisor, "is the appropriate measure of loss to FICO because [this pricing structure] reflects the value of its software." Defendants disagree, arguing that this testimony relies on the incorrect legal standard for calculating actual damages.

FICO is entitled to seek actual damages for both its copyright-infringement claim and its breach-of-contract claim. As addressed in Part I.A.1.b. of this Order, a reliable methodology for determining FICO's actual damages—the fair market value of Blaze Advisor—is to calculate a hypothetical lost license fee based on "the reasonable license fee on which a willing buyer and a willing seller would have agreed." *On Davis*, 246 F.3d at 167; *accord Bell*, 827 F.3d at 709; *Safka Holdings*, 42 F. Supp. 3d at 493. This methodology is an objective, as opposed to a subjective, inquiry. *Dash*, 731 F.3d at 312. The copyright owner's subjective beliefs or objections to an alleged infringer's conduct are irrelevant to this inquiry. *Id.*; *see also On Davis*, 246 F.3d at 166.

Zoltowski purports to opine about the fair market value of Blaze Advisor using an accepted methodology. But an expert also must "*reliably appl[y]* the principles and methods to the facts of the case" using "sufficient facts or data." Fed. R. Evid. 702(b), (d) (emphasis added). Zoltowski's opinions as to FICO's actual damages do not consider what a willing buyer and a willing seller would have contemplated. Instead, his opinions focus primarily on what FICO would have charged Defendants had FICO known that Defendants were bound to the license for the relevant three-year period, with no prospect of any future business dealing between the parties afterwards. According to FICO, its "standard annual application-fee pricing for the period of unauthorized use is the measure of [FICO's] loss; not the purported value to Federal." But this measure does not accurately reflect the legal standard for calculating actual damages in this case, which is an objective standard as opposed to what FICO subjectively would have charged. Although some of the facts underlying Zoltowski's opinion may be relevant to the

calculation of a hypothetical lost license fee, Zoltowski's selective application of those facts to his calculation leads to a subjective and unreliable result that is inconsistent with the applicable legal standard.

Because Zoltowski's opinions as to actual damages are unreliable and would not be helpful to a jury, these opinions are excluded.

### b.    Zoltowski's Opinions as to Disgorgement

With respect to the disgorgement of Defendants' profits, Zoltowski opines that "FICO may be entitled to disgorge Defendants' profits from written premiums generated using Blaze Advisor."  Defendants object to this testimony on the ground that it improperly imposes liability on entities that are not parties to this lawsuit.  According to Defendants, FICO may not recover profits that were earned by non-parties.

A successful plaintiff may recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."  17 U.S.C. § 504(b).  Regardless of whether the disputed profits were earned in part by non-parties, the relevant issue is whether any such profits may fairly be considered profits of the infringer subject to FICO's disgorgement claim.  *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 404 (1940) (observing that the Copyright Act requires "a rational separation of the net profits so that neither party may have what rightfully belongs to the other" (internal quotation marks omitted)); *Dash*, 731 F.3d at 311 (observing that the Copyright Act "aims . . . to strip the infringer of the profits generated from infringement").  Defendants' position—namely, that FICO may recover only profits

*earned by* the infringer—is contrary to the express terms of the statute and not supported by the case law on which Defendants rely.

FICO has the burden of proving only "the infringer's gross revenue." 17 U.S.C. § 504(b). FICO may satisfy its burden of proof by introducing testimony from both fact and expert witnesses. *See Sheldon*, 309 U.S. at 404–05 (holding that the proper calculation of profits in copyright-infringement cases "may be attained through the testimony of experts and persons informed by observation and experience" (internal quotation marks omitted)). Although it may be true that FICO cannot seek to disgorge the profits of non-parties that are not before the Court, the law does not preclude FICO from seeking to disgorge certain profits that, although *earned* by non-parties, may nonetheless belong to Defendants. *See* 17 U.S.C. § 504(b); *cf. Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 517 (4th Cir. 2002) (recognizing that defendants may be jointly liable for profits "collectively derived from the acts of copyright infringement"). Defendants' argument that FICO may not recover profits earned by non-parties is unavailing.

Defendants also argue that Zoltowski's opinions regarding Defendants' profits are not based on relevant experience because "he is not an accounting, tax, or insurance expert." But Zoltowski's opinions pertain to the "corporate structure" and "economic relationships" of the corporate entities at issue. And his experience as a financial and economic consultant qualifies him to opine on such matters. *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 209 (M.D. Pa. 2012) (allowing an expert with expertise in the field of economics to opine on the nature of, and ramifications

flowing from, the economic structure of the market). Defendants provide no legal authority that requires an expert to be an "accounting, tax, or insurance expert" in order to opine on the corporate structure and economic relationships of corporate entities. Accordingly, exclusion of Zoltowski's disgorgement opinions is not warranted.[10]

In summary, Defendants' motion to exclude Zoltowski's testimony is granted in part and denied in part. Zoltowski's opinions as to FICO's actual damages are excluded, but his disgorgement opinions are not.

## II.     FICO's Motion to Strike

FICO moves to strike the declaration of Patrick Sullivan, which Defendants filed in opposition to FICO's motion for summary judgment.[11] FICO argues that Defendants never disclosed Sullivan as an individual likely to have discoverable information, an omission that violates Rule 26, Fed. R. Civ. P., and that the declaration should be stricken as a discovery sanction under Rule 37, Fed. R. Civ. P.

A party must provide to the opposing party "the name . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). The parties have a responsibility to supplement their disclosures. Fed. R. Civ. P. 26(e). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed

---

[10]     Defendants also object to Zoltowski's disgorgement opinions on the ground that these opinions rely on Whitener's inadmissible opinions. Because Whitener's opinions are not inadmissible, as addressed above, this argument also is unavailing.

[11]     FICO also moves to strike the portion of Defendants' opposition brief that asserts a statute-of-limitations defense. This aspect of FICO's motion to strike is denied for the reasons addressed in Part III.B.1. of this Order.

to use that information or witness to supply evidence on a motion, at a hearing, or at a trial . . . ." Fed. R. Civ. P. 37(c)(1). But Rule 37 does not provide for mandatory sanctions, and the district court may find that a party's failure to include a witness in that party's initial Rule 26(a)(1) disclosures was either substantially justified or harmless. *Tomlinson v. J.B. Hunt Transp., Inc.*, 989 F. Supp. 2d 766, 776 (D. Minn. 2013).

Defendants contend that they were not required to supplement their disclosures to include Sullivan because FICO already knew that Sullivan had discoverable information. Indeed, FICO concedes that it knew of Sullivan from documents produced in discovery and because Sullivan was included in a response to one of FICO's interrogatories. "There is no requirement to supplement if the information was otherwise made known to the opposing party during the discovery process." *Id*. (denying motion to strike testimony in similar circumstances). Moreover, it is clear from the record that any failure to disclose Sullivan was harmless.

For these reasons, FICO's motion to strike is denied.

### III.    Cross-Motions for Summary Judgment

Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014). A genuine dispute as to a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258

(1986). To defeat a motion for summary judgment, the opposing party must cite with particularity those aspects of the record that support any assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1)(A); *accord Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

FICO moves for summary judgment on Count I of the second amended complaint, which is FICO's breach-of-contract claim. FICO also seeks summary judgment on Defendants' affirmative defenses along with dismissal of Defendants' counterclaims. Defendants move for summary judgment on the four counts of FICO's second amended complaint and on Defendants' counterclaim for breach-of-contract. Each claim is addressed in turn.

## A.    FICO's Breach-of-Contract Claim (Count I)

The parties cross-move for summary judgment on Count I of the second amended complaint, which alleges that Federal breached Sections 3.1, 10.8, and 9.3 of the parties' License Agreement. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). Interpretation of a contract's terms is a matter of law for the district court to decide. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998) (applying New York law). Such interpretation includes a determination as to whether the terms of the contract are ambiguous. *Id.* An ambiguity exists if the terms of the contract "suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of

the entire . . . agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (internal quotation marks omitted). Only if the contract's "language *and* the inferences to be drawn from it are unambiguous may a district court construe a contract as a matter of law and grant summary judgment." *Id.* (internal quotation marks omitted). But "in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent." *Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir. 1994). The Court addresses, in turn, each allegedly breached section of the License Agreement.

### 1.      Breach of Section 3.1

FICO and Federal each seek summary judgment on FICO's claim that Federal breached Section 3.1 of the License Agreement. Section 3.1 of the License Agreement governs "License Restrictions" and provides, in relevant part:

> [Chubb & Son] represents and warrants that it and its employees shall not:  (i) use the Fair Isaac Products or Documentation for any purpose other than the internal business operations of [Chubb & Son] or in any other manner that exceeds the scope of any license granted under this Agreement or that otherwise constitutes a breach of this Agreement; . . . (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products by, any third party or by any individuals other than the employees of [Chubb & Son]; (v) assign, sublicense, lease, transfer or distribute the Fair Isaac Products . . . .

According to FICO, Federal breached Section 3.1 in two ways: first, by installing and maintaining Blaze Advisor outside of the United States; and second, by permitting third parties to use and access Blaze Advisor. Federal counters that the License Agreement

does not include a geographic restriction, that permitting Federal's subsidiaries to use and access Blaze Advisor does not qualify as impermissible third-party use or access, and that any third-party access by consultants is both too minimal and too fact-dependent to warrant summary judgment. The Court addresses each argument.

### a.  Geographical Restriction

It is undisputed that Federal installed Blaze Advisor outside the United States. But the parties disagree about whether such conduct is a breach of Section 3.1 of the License Agreement.

Section 3.1 of the License Agreement does not expressly refer to a geographic restriction. Instead, this provision generically prohibits "exceed[ing] the scope of [the] license" or using Blaze Advisor in a manner that "otherwise constitutes a breach" of the License Agreement. According to FICO, however, implicit in the License Agreement is a geographic restriction that limits the installation and physical location of Blaze Advisor to the United States. The parties' dispute turns on the meaning and significance of the term "Territory" in Section 1 of the License Agreement, the "Definitions" section, which provides in relevant part:

> The following terms, as used in this Agreement with initial capital letters, in the singular or the plural, will have the meanings set forth below. Other terms may be defined in context within this Agreement:
>
> . . .
>
> **"Territory"**, with respect to the installation and physical location of the Fair Isaac Products, means the United States of America.

The term "Territory" does not appear in any other part of the License Agreement. FICO argues that the meaning of "Territory" in the License Agreement is clear and unambiguous, limiting the installation and physical location of Blaze Advisor to the United States. Defendants counter that the License Agreement does not contain an installation restriction because the term "Territory" appears only in the definition section of the License Agreement, not in its substantive provisions.

According to Federal, the definitions section of the License Agreement is a non-substantive introductory "recital." Under New York law, recitals or analogous introductory clauses of a contract "can be used to clarify the meaning of an ambiguous contract" but "cannot be used to modify or create substantive rights not found in the contract's operative clauses." *Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 826 (S.D.N.Y. 2016) (internal quotation marks omitted); *accord Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (holding that an introductory clause to a contract that "is analogous . . . to a contract's 'whereas' clauses" does not create any contractual rights that are not included in the operative clauses of the contract). It is long-established under New York law that when "the recital in an agreement is so inconsistent with the covenant or promise that they cannot be harmonized, the latter, if unambiguous, must prevail, because it is the most important." *Williams v. Barkley*, 58 N.E. 765, 767 (N.Y. 1900).

A contract's definitions section is not, per se, a recital. *See United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (observing that "contracts may, and frequently do, include recitals of *the purposes and motives* of the contracting parties" (emphasis

added)); Black's Law Dictionary 1462 (11th ed. 2019) (defining "recital" as a "preliminary statement in a contract . . . explaining the reasons for entering into it or the background of the transaction, or showing the existence of particular facts"). But courts in New York and elsewhere have recognized that a contract's introductory definitions section, like a recital, is *not* an operative part of the contract but instead may only clarify the meaning of the operative parts of the contract. *See, e.g.*, *O'Rourke v. N. Cal. Elec. Workers Pension Plan*, 934 F.3d 993, 1001 (9th Cir. 2019) ("Definitions sections in contracts . . . explain what other obligations mean, rather than creating additional obligations themselves."); *Edart Leasing Co., LLC v. Ryder Truck Rental, Inc.*, No. 14-cv-7751, 2015 WL 4524313, at *4 (S.D.N.Y July 6, 2015) (declining to "import an obligation" into a contract based on a "term that appears not in the body of the contract, but in the definitions section"); *Weber v. GE Grp. Life Assurance Co.*, No. 05-CV-165, 2007 WL 764288, at *6 (N.D. Okla. Mar. 9, 2007) (same). Indeed, recitals sometimes define contractual terms. *See, e.g.*, *Chock Full O'Nuts Corp v. Tetley, Inc.*, 152 F.3d 202, 203–05 (2d Cir. 1998). And, conversely, definitions sections typically convey the meaning of terms as opposed to establishing the rights and obligations of the contracting parties. *See, e.g.*, *O'Rourke*, 934 F.3d at 1001.

Here, Section 1 of the License Agreement is an introductory section, akin to a recital. Section 1 defines certain terms "as *used* in" the License Agreement. (Emphasis added.) But the term "Territory" is not *used* in any other part of the License Agreement. Merely defining a term does not reflect an intent to impose a restriction on the scope of the license. Even if Section 1 were an operative part of the License Agreement, the plain

language of that section reflects only what Territory "*means*," not what effect it has on the license or other operative sections of the License Agreement.[12] (Emphasis added.) Moreover, the operative sections of the License Agreement do not suggest the existence of a geographic restriction. For example, Section 2.1 of the License Agreement, titled "License Grant to Fair Isaac products," governs the scope of the license and includes no express or implicit reference to the term "Territory" or any other geographical restriction. Nor does Section 3.1 of the License Agreement, which is titled "License Restrictions."

Because the License Agreement unambiguously lacks a geographic restriction on the installation or physical location of Blaze Advisor, FICO's motion for summary judgment on this ground is denied, and Federal's motion for summary judgment on this ground is granted.[13]

### b.    Third-Party Use and Access

FICO also argues that it is entitled to summary judgment on its claim that Federal breached Section 3.1 of the License Agreement by permitting third parties—namely, Federal's employees and affiliated entities and two outside consultants—to use and access Blaze Advisor.

---

[12]    The Court is mindful that "a contract must be construed so as to give full meaning and effect to all of its provisions," and an interpretation that "has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided *if possible*." *Ajdler v. Province of Mendoza*, 890 F.3d 95, 100 (2d Cir. 2018) (emphasis added). For the reasons addressed herein, FICO has not demonstrated that ascribing "Territory" the meaning FICO advocates is reasonably possible.

[13]    In light of this conclusion, the Court need not address the parties' arguments as to Federal's estoppel and waiver defenses, which pertain only to the License Agreement's purported (but nonexistent) geographic restriction.

The License Agreement was executed between FICO and Chubb & Son, an unincorporated division of Federal. Under Section 3.1 of the License Agreement, "[Chubb & Son] represents and warrants that it and its employees shall not . . . disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products by, any third party or by any individuals other than the employees of [Chubb & Son]." According to FICO, unauthorized third parties include other subsidiaries of Federal. Defendants counter that, because Chubb & Son is not a legal entity, the License Agreement effectively was executed between FICO and Federal. And Defendants contend that, because the December 2006 amendment to the License Agreement expanded the Blaze Advisor license to be "enterprise-wide"—namely, to include Chubb & Son and its affiliates—the parties intended the enterprise-wide license to include *Federal's* affiliates given that Chubb & Son has no affiliates.

The December 2006 amendment to the License Agreement provides an enterprise-wide expansion of the license as follows:

> Client and its Affiliates may use the Fair Isaac Product for their internal business purposes, . . . subject to and in accordance with all of the provisions of the Agreement. "Affiliates" shall mean any other entity directly or indirectly controlled by Client, where "control" means the ownership of more than 50% of the aggregate of all voting interests . . . in an entity.

The parties' dispute turns on whether the phrase "Client and its Affiliates" in the December 2006 amendment includes Federal and its affiliates.

The License Agreement defines "Client" as "Chubb & Son, a division of Federal Insurance Company." It is undisputed that Chubb & Son is not a legal entity because it is

unincorporated.  Under New York law, an unincorporated division or association is not a legal entity and does not have the capacity to be sued.  *See La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 95 (2d Cir. 2014).  In various contexts, courts in New York and elsewhere have recognized that "an unincorporated division . . . has no separate legal existence apart from its parent corporation."  *Affymax, Inc. v. Johnson & Johnson*, 420 F. Supp. 2d 876, 879 (N.D. Ill. 2006); *accord W. Beef, Inc. v. Compton Inv. Co.*, 611 F.2d 587, 591 (5th Cir. 1980) (citing *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978)); *cf. Greenbaum v. Svenska Handlesbanken*, 26 F. Supp. 2d 649, 654 (S.D.N.Y. 1998) (concluding that a branch bank is not a separate legal entity from its parent company "in the same way that an unincorporated division of a corporation cannot be sued or indicted").  The parties do not cite, and the Court's research has not identified, any legal authority addressing whether—under New York law—an unincorporated subdivision may *enter a contract* independently from its parent corporation.  But it would make little sense if a non-legal entity could enter a contract yet never be sued on that contract should a dispute arise.[14]

Moreover, "the objective of contract interpretation is to give effect to the expressed intention of the parties," and "an interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a

---

[14]    The absurdity of such a result is not hypothetical, it is demonstrated by this case. Chubb & Son originally was named as a defendant in this action.  But the parties agreed that the correct defendants were Federal and ACE American because Chubb & Son is not a legal entity and does not have the capacity to be sued.  As such, FICO is suing Federal for breaching the License Agreement, yet argues that Federal is *not* a party to the License Agreement.  FICO cannot have it both ways.

part unreasonable or of no effect." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) (applying New York law); *accord Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010) (recognizing that "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties"). Here, the record includes evidence—albeit disputed evidence—that Chubb & Son has no employees and no affiliates. By contrast, Federal has employees and multiple affiliates. Under FICO's interpretation, multiple aspects of the License Agreement, including the entire December 2006 amendment, would be rendered unreasonable or ineffectual. Such an interpretation is not preferred. *See Rothenberg*, 755 F.2d at 1019; *Diamond Castle Partners IV PRC, L.P. v. IAC/InterActiveCorp*, 918 N.Y.S.2d 73, 74–75 (N.Y. App. Div. 2011) (refusing to adopt contract interpretation that would render "affiliates" clause meaningless). At best, FICO has established that the scope of the phrase "Client and its Affiliates" in the December 2006 amendment is ambiguous and depends on disputed material facts, which forecloses summary judgment in FICO's favor.[15]

FICO also contends that Federal breached Section 3.1 by permitting two third-party consultants, DWS and AppCentrica, to use and access Blaze Advisor. But Federal presents evidence that DWS did *not* use or access Blaze Advisor, and that AppCentrica's use of Blaze Advisor was not a material breach because it was de minimis, isolated, and performed with FICO's knowledge. A breach of contract "is material if it [goes] to the

---

[15] Because Federal did not affirmatively move for summary judgment as to this issue, the Court declines to address whether Federal would be entitled to summary judgment in its favor as to this issue.

root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract." *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379–80 (S.D.N.Y. 2014) (internal quotation marks omitted). Whether the breach of a contract is material is "a question of fact and should be decided as a matter of law only where the inferences are certain." *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015). Here, whether the alleged use of Blaze Advisor by DWS and AppCentrica was a material breach of the License Agreement involves disputes of material fact that preclude summary judgment.

In summary, because disputes of material fact exist, FICO is not entitled to summary judgment as to its claim for breach of Section 3.1 of the License Agreement based on alleged third-party use of Blaze Advisor.

### 2.  Breach of Section 10.8

Both FICO and Federal seek summary judgment on FICO's claim that Federal breached Section 10.8 of the License Agreement. Section 10.8 is a "No Assignment" clause that provides, in relevant part:

> Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof. In the event of a change of control of [Chubb & Son], or if [Chubb & Son] is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and [Chubb & Son] shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld. Any attempt to assign or transfer all or any part of this Agreement

> without first obtaining such written consent will be void and
> of no force or effect.

FICO argues that Federal violated Section 10.8 after the Chubb Corporation merger by continuing and expanding its use of Blaze Advisor without first obtaining FICO's written consent. Federal disputes any violation, arguing that Section 10.8 requires FICO's written consent in the event of a change of control or merger *only* if Federal expands its use of Blaze Advisor thereafter. According to Federal, no expanded use of Blaze Advisor occurred after the Chubb Corporation merger.

Section 10.8 contains three sentences. Under the plain language of the first sentence, Federal was not permitted to "assign or transfer" the License Agreement without the prior written consent of FICO. And any attempt to do so without FICO's written consent would be "void and of no force or effect" under the plain language of the third sentence of Section 10.8. Because there is no material dispute as to the meaning of either the first or the third sentence of Section 10.8, the Court's analysis focuses on the second sentence of Section 10.8.

The second sentence of Section 10.8 comprises two clauses, connected by the conjunction "and." The first clause provides, in relevant part, that "[i]n the event of a change of control of [Chubb & Son], or if [Chubb & Son] is merged with . . . another entity, *each such event shall be deemed to be an assignment subject to this section*." (Emphasis added.) The parties agree that Chubb Corporation's merger is "deemed to be an assignment" under this clause—an event the parties refer to as a "deemed assignment," in contrast with an *actual* assignment. But the parties disagree about the

significance of a deemed assignment—specifically, what it means for a deemed assignment to be "subject to this section." According to FICO, because "subject to this section" means subject to *all* of Section 10.8, including its first sentence, written consent is required prior to any deemed assignment. This is a reasonable interpretation of Section 10.8. The plain language "deemed to be an *assignment* subject to this *section*," (emphasis added), indicates that a deemed assignment is subject to the same written-notice requirements as any other assignment of the License Agreement pursuant to Section 10.8. Under FICO's interpretation, Federal was required either to obtain FICO's consent to the Chubb Corporation merger or else to stop using Blaze Advisor after the merger.

Federal advances an alternative interpretation. According to Federal, the second sentence of Section 10.8 is intended to address obligations triggered by a *deemed* assignment of the License Agreement that are distinct from obligations triggered by an *actual* assignment of the License Agreement. These distinct obligations that are unique to deemed assignments, Federal contends, are reflected in the second clause of the second sentence of Section 10.8, which provides that "[Chubb & Son] shall make *no expanded use* of the Fair Isaac Products as a result of *any such event* unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld."[16] (Emphasis added.) The plain language of this clause reflects that after a deemed assignment occurs—such as Chubb Corporation's merger—Federal is prohibited from making

---

[16] The phrase "any such event" in this clause refers to an event that is a deemed assignment.

"expanded use" of Blaze Advisor without first obtaining FICO's written consent. Under Federal's interpretation of Section 10.8, *any* continued use of Blaze Advisor following an *actual* assignment of the License Agreement requires written consent; but after a *deemed* assignment, only *expanded* use of Blaze Advisor requires written consent. Federal's interpretation of Section 10.8 is reasonable. Section 10.8 plainly differentiates between an actual assignment and a "deemed" assignment and imposes distinct restrictions on the latter. Restricting "expanded" use of Blaze Advisor following a deemed assignment reasonably suggests that *non*-expanded use following a deemed assignment is permissible.[17]

When evaluating two reasonable contract interpretations, a court "need not determine which is the more likely interpretation." *Mellon Bank*, 31 F.3d at 115 (internal quotation marks omitted). Instead, even if one or both interpretations might be flawed in some way, a court need only decide whether each interpretation "is sufficiently reasonable to render the clause ambiguous." *Id.* (internal quotation marks omitted). Generally, "when a contract is ambiguous, its interpretation becomes a question of fact and summary judgment is inappropriate." *Id.* at 116. But "in order for the parties' intent

---

[17] The phrases "written consent" and "such written consent" appear three times in Section 10.8. According to FICO, this demonstrates that the "written consent" required for deemed assignments is the same as the written consent required for actual assignments. But the fact that "written consent" is repeated throughout Section 10.8 does not mean that the event *triggering* the written-consent requirement necessarily remains constant throughout Section 10.8. FICO insists that Section 10.8 does *not* require "two consents"—one written consent to authorize use of Blaze Advisor after a deemed assignment, and a second written consent to authorize *expanded* use of Blaze Advisor after a deemed assignment. But requiring two consents would be the effect of FICO's interpretation, or else the "expanded use" language in Section 10.8 would be meaningless.

to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent." *Id.* Such extrinsic evidence exists here. The parties present evidence that includes the method used to price the license, the commercial purpose underlying Section 10.8, the testimony and emails of FICO employees reflecting their understanding of the scope of Section 10.8, and the testimony of FICO's attorney who drafted the License Agreement. The parties vigorously dispute the meaning and significance of this evidence. Moreover, if Federal's interpretation were accepted, material fact disputes exist as to whether Federal expanded its use of Blaze Advisor after the Chubb Corporation merger.

In summary, Section 10.8 of the License Agreement is ambiguous, and genuine disputes of material fact preclude resolving this ambiguity as a matter of law. Accordingly, both FICO's and Federal's motions for summary judgment as to Federal's alleged breach of Section 10.8 of the License Agreement are denied.

### 3. Breach of Section 9.3

FICO argues that it is entitled to summary judgment on its claim that Federal breached Section 9.3 of the License Agreement by continuing to use Blaze Advisor after FICO terminated the License Agreement.

Section 9.3 of the License Agreement provides, in relevant part, that upon "termination of this Agreement for any reason, all licenses granted hereunder shall terminate immediately, . . . [and] Client shall immediately cease using all Fair Isaac Product(s)." FICO contends that, because Federal breached Section 3.1 and Section 10.8 of the License Agreement, FICO properly terminated the License Agreement on March

30, 2016. FICO maintains that Federal's continued use of Blaze Advisor thereafter is a breach of Section 9.3. FICO's argument is contingent upon a finding that Federal breached Section 3.1 or Section 10.8 prior to March 30, 2016. But no such finding can be made as a matter of law for the reasons that have been addressed. As such, FICO is not entitled to summary judgment on this basis.

FICO's motion for summary judgment as to Federal's alleged breach of Section 9.3 of the License Agreement is denied.

### B.    FICO's Copyright Claims (Counts II, III, and IV)

Defendants move for summary judgment on FICO's copyright-infringement claims. To prevail on a copyright-infringement claim, FICO must prove that it owns a valid copyright and Defendants, without authorization, reproduced or distributed the copyrighted work. *See Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 830 (8th Cir. 1992). If FICO prevails, it is entitled to recover actual damages and disgorgement of Defendants' profits attributable to the infringement. 17 U.S.C. § 504(b).

Federal moves for summary judgment on Counts II and III of the second amended complaint, which allege that Federal infringed FICO's copyright interests both before and after FICO's purported termination of the License Agreement. In addition, both Federal and ACE American move for summary judgment on Count IV of the second amended complaint, which alleges that Federal and ACE American infringed FICO's copyright interests by means of ACE American's unlicensed use and reproduction of Blaze Advisor and related FICO products. Defendants also seek to limit FICO's damages arising from FICO's copyright claims. Each of Defendants' arguments is addressed in turn.

### 1. Reproduction and Distribution (Count II)

Count II of the second amended complaint is based on Federal's alleged reproduction and distribution of Blaze Advisor to third parties. Federal argues that it had authorization to distribute Blaze Advisor to its foreign affiliates. As addressed in Part III.A.1.b. of this Order, the scope of the phrase "Client and its Affiliates" in the December 2006 amendment to the License Agreement is ambiguous and depends on disputed material facts. Moreover, disputes of fact remain as to whether Federal distributed Blaze Advisor to third-party consultants without authorization. Because there are disputed facts as to Federal's authorization to distribute Blaze Advisor to its affiliates and consultants, Federal is not entitled to summary judgment on this basis.

Federal also argues that Count II fails as a matter of law because all of the affiliates and consultants to which Blaze Advisor was distributed were outside the United States. "As a general matter, the Copyright Act is considered to have no extraterritorial reach" beyond the United States. *Tire Eng'g & Distrb., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 306 (4th Cir. 2012); *accord Iverson v. Grant*, 133 F.3d 922 (8th Cir. 1998) (table opinion). When allegedly infringing conduct is based on "acts that occur entirely abroad . . . such allegations do not state a claim for relief under the copyright laws of the United States." *Subafilms, Ltd. v. MGM-Pathe Commc'ns*, 24 F.3d 1088, 1089 (9th Cir. 1994). It is undisputed that all the alleged third parties to which Federal distributed Blaze Advisor reside outside the United States.

FICO contends that, because Federal's predicate act of unauthorized *distribution* originated in the United States, the fact that the unauthorized installation and use of Blaze

Advisor occurred outside the United States does not shield Federal from liability. Some courts have recognized an exception to the extraterritorial limits of the Copyright Act, holding that " 'when the type of infringement permits further reproduction abroad,' a plaintiff may collect damages flowing from foreign conduct." *Tire Eng'g*, 682 F.3d at 306 (quoting *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988)). Under this "predicate act" doctrine, "if the defendant has committed a domestic act of copyright infringement, and that act has enabled further acts of infringement abroad, then the plaintiff may recover damages for the foreign conduct." *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 117 (D.D.C. 2018) (citing *Tire Eng'g*, 682 F.3d at 306–07). FICO has not cited, and this Court's research has not identified, any Eighth Circuit decision adopting the predicate-act doctrine.

Even if the predicate-act doctrine were applied here, the parties nonetheless dispute whether a predicate act of infringement in the United States occurred within the three-year statute-of-limitations period.[18] Because Defendants amended their answer to include a statute-of-limitations defense *after* the dispositive-motion deadline, the record was not adequately developed as to this issue. Consequently, FICO requests permission to file a supplemental motion for summary judgment on this issue. Because this issue remains inadequately presented to the Court, both parties are granted an opportunity to

---

[18]    The predicate-act doctrine requires, as the name suggests, a predicate act of infringement that occurred in the United States. In responding to Federal's motion for summary judgment, FICO identifies two predicate acts of allegedly unauthorized distribution: one that occurred in 2009, and another that occurred in 2010. According to Federal, because these acts occurred outside the statute-of-limitations period, they cannot establish the requisite predicate act.

file supplemental motions for summary judgment *strictly limited* to the issue of Defendants' statute-of-limitations defense and the related issue of the predicate-act doctrine.[19] On the current record, however, Federal's motion for summary judgment on Count II of the second amended complaint is denied for the reasons addressed above.

### 2. Continued Use After Purported Termination of the License Agreement (Count III)

Count III of the second amended complaint is based on Federal's continued use of Blaze Advisor after FICO purported to terminate the License Agreement in March 2016. Federal contends that FICO had no valid basis to terminate the License Agreement. But, as addressed herein, disputes of material fact preclude summary judgment as to whether the License Agreement was either breached or properly terminated. For this reason, Federal's motion for summary judgment on Count III of the second amended complaint is denied.

### 3. ACE American's Use of Blaze Advisor (Count IV)

Count IV of the second amended complaint alleges that both Federal and ACE American infringed FICO's copyright interests by means of ACE American's unlicensed use and reproduction of Blaze Advisor. Without offering any independent analysis as to Count IV, Defendants argue that they are entitled to summary judgment on Count IV "for the same reasons" that Federal is entitled to summary judgment on Counts II and III. As

---

[19] After the hearing on the parties' pending motions, the parties continued to file—without the Court's permission—letters that amount to informal supplemental briefs addressing this issue. The Court has no obligation to sift through the lengthy docket in this case to entertain piecemeal written arguments. The Court, therefore, declines to consider the parties' letter briefs addressing this issue.

Federal is not entitled to summary judgment on Counts II and III for the reasons addressed herein, Defendants' motion for summary judgment on Count IV of the second amended complaint is denied.

### 4. Copyright Damages

Defendants argue that the actual damages and disgorgement amounts FICO seeks are speculative. And, Defendants assert, FICO's damages, if any, are limited by the limitation of liability clause in the License Agreement. The Court addresses each argument in turn.

### a. Actual Damages

Defendants first contend that the amount of actual damages FICO seeks is too speculative to survive summary judgment.

As addressed in Part I.A.1.b. of this Order, FICO is entitled to seek actual damages for both its copyright-infringement claim and its breach-of-contract claim. The determination of FICO's actual damages for both claims is based on the fair market value of Blaze Advisor, which is calculated as "the reasonable license fee on which a willing buyer and a willing seller would have agreed." *On Davis*, 246 F.3d at 167; *accord Bell*, 827 F.3d at 709; *Safka Holdings*, 42 F. Supp. 3d at 493. This is an objective, not a subjective, inquiry. *Dash*, 731 F.3d at 312. The copyright owner's subjective beliefs or objections to an alleged infringer's conduct are irrelevant to this analysis. *Id.*; *see On Davis*, 246 F.3d at 166.

Because awarding a copyright owner a hypothetical lost license fee "can risk abuse," courts require that "the amount of damages may not be based on undue

speculation." *On Davis*, 246 F.3d at 166; *accord Bell*, 827 F.3d at 709. But under New York law, the rule that prohibits a plaintiff from recovering "uncertain and speculative damages" applies only when "the fact of damages is uncertain, not [when] the amount is uncertain." *Toporoff Eng'rs, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105, 109 (2d Cir. 2004). Here, as addressed above, the Court excludes as unreliable the actual damages opinions of FICO's damages expert, Zoltowski, because Zoltowski's selective application of the underlying facts leads to a subjective and skewed result that is inconsistent with the applicable legal standard. But there remains relevant evidence *underlying* those opinions that has *not* been excluded. This includes evidence of FICO's standard pricing methodology that, together with evidence of Defendants' use of Blaze Advisor, creates a genuine dispute of material fact as to actual damages. *See, e.g.*, *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 331–32 (S.D.N.Y. 2003) (excluding as unreliable plaintiffs' damages expert's actual damages opinion and testimony, but declining to strike plaintiffs' claim for actual damages because the possibility existed that "a reasonable jury could, without engaging in undue speculation, ascertain a fair market value" for the copyrighted work based on other evidence in the record).

For these reasons, summary judgment on FICO's claim for actual damages is unwarranted.

### b.     Disgorgement

Defendants also argue that the amount of disgorged profits that FICO seeks is too speculative to survive summary judgment.

As addressed in Part I.A.1.a. of this Order, a copyright owner may recover "profits of the infringer that are attributable to the infringement."  17 U.S.C. § 504(b).  To obtain disgorgement of Defendants' profits, FICO must prove Defendants' gross revenue attributable to Defendants' use of Blaze Advisor.  *Andreas*, 336 F.3d at 796.  The burden then shifts to Defendants to prove what portion of those profits should be allocated to factors unrelated to the infringing use of Blaze Advisor.  *Id.*  (explaining that a plaintiff's initial burden to prove "attribution" requires proof that the infringing use "contributed to" the relevant gross revenues, after which the burden shifts to the defendant to apportion those profits between various factors that contributed to those profits).

FICO alleges indirect infringement.  Defendants argue that calculating profit disgorgement in cases involving indirect infringement is inherently speculative and, therefore, such awards are extremely rare.  In an indirect infringement case, "profits 'attributable' to the infringement are more difficult to quantify."  *Id.*  "But that difficulty does not change the burden of proof established by the statute."  *Id.*  "Congress did not distinguish between direct and indirect profits cases in allocating the burden of proof between establishing *the fact* that an infringement contributed to a defendant's profits and *the extent* to which the infringement contributed to the profits."  *Id.* at 799.  Contrary to Defendants' arguments, FICO's burden is not heightened or otherwise altered by the fact that this case involves alleged indirect infringement.

FICO's initial burden to prove attribution requires proof that the infringing use, at least in part, "contributed to" the relevant gross revenues.  *Id.* at 796.  FICO cannot meet this burden by proving gross revenues from everything Defendants sold, but instead must

prove gross revenues from the sale of products or services that have a nexus to the infringing use. *Id.*; *accord Polar Bear Prods.*, 384 F.3d at 711 (observing that "a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement"); *On Davis*, 246 F.3d at 160 (observing that "the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelated revenues"). Here, FICO presents evidence of gross revenue from the sale of insurance in connection with which Blaze Advisor was used. This evidence is not "undifferentiated," as it is tied to Defendants' use of Blaze Advisor. FICO also presents evidence about how Blaze Advisor contributed to Defendants' gross revenue from the sale of insurance. This evidence is sufficient to demonstrate a genuine dispute of material fact as to disgorgement of profits and, therefore, preclude summary judgment on this issue.[20]

For these reasons, summary judgment on FICO's claim for disgorgement of profits is not warranted.

---

[20] Defendants also contend that FICO cannot recover disgorgement profits because FICO is attempting to disgorge the profits of entities that are not parties to this lawsuit. But the Copyright Act entitles a successful plaintiff to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Regardless of whether the disputed profits were *earned* in part by nonparties, the question remains as to whether any such profits may fairly be considered "profits of the infringer" subject to FICO's disgorgement claim. *See id.*; *cf. Nelson-Salabes*, 284 F.3d at 517 (recognizing that defendants may be jointly liable for profits "collectively derived from the acts of copyright infringement"). Defendants' argument is, therefore, unavailing.

### c. Limitation of Liability Clause

Defendants also argue that FICO's damages are limited by the limitation of liability clause in Section 5.6 of the License Agreement. But Section 5.6 includes express exceptions for violations of FICO's intellectual property rights and unauthorized use, which are the basis for FICO's breach-of-contract and copyright-infringement claims. As such, Defendants' motion for summary judgment on this basis is unavailing.

### C. Defendants' Counterclaims

Defendants assert counterclaims against FICO for breach of contract and breach of an implied covenant of good faith and fair dealing. FICO summarily argues that both counterclaims "must be dismissed for all the reasons FICO is entitled to summary judgment." Because FICO is *not* entitled to summary judgment as to any of its claims, it also is not entitled to summary judgment as to Defendants' counterclaims on this basis.

FICO also contends that Defendants cannot pursue claims for both breach of contract and breach of implied duties because those claims are redundant. "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, *based upon the same facts*, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) (emphasis added); *accord Geler v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991). Here, Defendants' two counterclaims are *not* based on the same facts. Federal's first counterclaim alleges that FICO terminated the License Agreement without justification, in breach of Section 9.2 of the License Agreement. Federal's second counterclaim alleges that FICO "arbitrarily and irrationally" withheld consent to

Federal's continued use of Blaze Advisor after the Chubb Corporation merger "with the goal of extracting additional, unearned license fees." Because Defendants' two counterclaims are not based on the same facts, FICO's argument fails.

Defendants also move for summary judgment on their breach-of-contract counterclaim, arguing that FICO lacked a legitimate basis to terminate the License Agreement and, therefore, FICO's purported termination of the License Agreement is itself a breach. FICO contends that it was justified in terminating the License Agreement because Federal breached Sections 3.1 and 10.8 of the License Agreement. But, as addressed above, disputes of material fact remain as to whether Federal breached either Section 3.1 or Section 10.8 of the License Agreement.

Accordingly, FICO's and Defendants' motions for summary judgment as to Defendants' counterclaims are denied.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1.      Plaintiff's motion to exclude the opinions and testimony of William McCarter, (Dkt. 360), is **DENIED**.

2.      Plaintiff's motion to exclude the opinions and testimony of Dr. Steven Kursh, (Dkt. 369), is **GRANTED IN PART AND DENIED IN PART** as addressed in Part I.A.2. of this Order.

3.    Plaintiff's motion to exclude the opinions and testimony of W. Christopher Bakewell, (Dkt. 419), is **GRANTED IN PART AND DENIED IN PART** as addressed in Part I.A.3. of this Order.

4.    Defendants' motion to exclude the opinions and testimony of R. Bickley Whitener, (Dkt. 378), is **DENIED**.

5.    Defendants' motion to exclude the opinions and testimony of Brooks Hilliard, (Dkt. 386), is **GRANTED IN PART AND DENIED IN PART** as addressed in Part I.B.2. of this Order.

6.    Defendants' motion to exclude the opinions and testimony of Neil Zoltowski, (Dkt. 404), is **GRANTED IN PART AND DENIED IN PART** as addressed in Part I.B.3. of this Order.

7.    Plaintiff's motion to strike, (Dkt. 551), is **DENIED**.

8.    Plaintiff's motion for summary judgment, (Dkt. 396), is **DENIED**.

9.    Defendants' motion for summary judgment, (Dkt. 428), is **GRANTED IN PART** as addressed in Part III.A.1.a. of this Order and **DENIED IN PART** in all other respects.

10.   Plaintiff's request for permission to file a supplemental motion for summary judgment, (Dkt. 686), is **GRANTED** as follows:

      a.    Each party may file a supplemental motion for summary judgment, strictly limited to the issue of Defendants' statute-of-limitations defense and the related issue of the predicate-act doctrine, no later than 30 days after the date of this Order.

      b.      The parties' motions shall comply with all dispositive-motion requirements of Local Rule 7.1(c), including word-count limits and deadlines.

      c.      The supplemental motions for summary judgment will be taken under advisement on the written submissions after briefing is complete.


Dated: March 23, 2020                        s/Wilhelmina M. Wright
                                             Wilhelmina M. Wright
                                             United States District Judge