# EXHIBIT 10

Page 1

1           UNITED STATES DISTRICT COURT
2               DISTRICT OF MINNESOTA
3
4     CASE NUMBER:  16-cv-1054 (WMW/DTS)
5     ----------------------------------------------
6     Fair Isaac Corporation, a Delaware corporation,
7        Plaintiff,
8     versus
9     Federal Insurance Company, an Indiana corporation,
      and ACE American Insurance Company, a Pennsylvania
10    corporation,
11       Defendants.
      ----------------------------------------------
12
13
14         VIDEOTAPED DEPOSITION OF EXPERT WITNESS
15
16                     CHRIS BAKEWELL
17
18
19
20
21
22
23
24
25     TAKEN:  28 June 2019         BY:  Jackie McKone

|  | Page 98 |  | Page 100 |
|---|---|---|---|
| 1 | every single instance and see whether or not it | 1 Q. | Do you have any specific examples of any of gross |
| 2 | did or had to according to the business process | 2 | written premiums listed on Interrogatory Number 17 |
| 3 | the flow charts, and my recollection is is that | 3 | that run through the applications listed but do |
| 4 | those flow charts are relatively complicated, and | 4 | not touch Blaze Advisor? |
| 5 | if you trace them through, sort of like you trace | 5 A. | I don't know that I can give you an example. I'd |
| 6 | through a -- in -- in, like, a maze, sometimes you | 6 | have to talk to a business person. |
| 7 | may hit Blaze Advisor, and sometimes you may not, | 7 Q. | And there were other similar -- there were other |
| 8 | and my understanding from the people who pulled | 8 | interrogatory responses, this one is in the US, |
| 9 | this information together is that it wouldn't | 9 | there's others for the Canada, Australia, and the |
| 10 | really be possible to go through and trace through | 10 | EU, UK. Do you understand that as well? |
| 11 | every single written policy that went through the | 11 A. | Yes. |
| 12 | business process that I'm discussing, and so the | 12 Q. | And is your critique of those interrogatory |
| 13 | assumption was made that they'll -- they included | 13 | responses the same? |
| 14 | instances that could in concept touch Blaze | 14 A. | I'm not critiquing the interrogatory responses, |
| 15 | Advisor but don't necessarily do it. | 15 | and I want to say something here for the record |
| 16 | So they wanted to be -- when they pulled | 16 | that I think that what Mr. Zoltowski is saying and |
| 17 | this information, Federal wanted to be responsive, | 17 | accusing Federal of, frankly, he should retract, |
| 18 | and to the extent it produced information be | 18 | and to the extent he's accusing me of doing |
| 19 | overinclusive as opposed to under-inclusive. | 19 | something, he should retract those statements. He |
| 20 Q. | So if I'm understanding you right, there could be | 20 | should go back and look at what he wrote and -- |
| 21 | a policy that goes through DecisionPoint, for | 21 | and consider the allegations he's making. They |
| 22 | example, the application, and it goes through a | 22 | are very serious. |
| 23 | part of DecisionPoint that doesn't touch Blaze | 23 | I think that what's happening here is that |
| 24 | Advisor? | 24 | a company, Federal, is trying to be responsive to |
| 25 A. | I'd have to look at DecisionPoint and the process, | 25 | requests for information that doesn't exist, and |

|  | Page 99 |  | Page 101 |
|---|---|---|---|
| 1 | the flow chart that I talked about and try to | 1 | it should be considered in that context, and so to |
| 2 | figure that out on my own and see if I could. | 2 | try to accuse me, and I don't know if you did this |
| 3 | I would -- I think a more efficient way to | 3 | on purpose or not with your last question of doing |
| 4 | get an answer to that question is go directly to | 4 | something wrong or misleading, I -- I take |
| 5 | somebody from the company. | 5 | exception to. |
| 6 | So without saying that that -- if we're | 6 Q. | No. I'm just trying to understand your position |
| 7 | using that as a -- as an example, as opposed to | 7 | as to why the interrogatory responses are not -- |
| 8 | something that's, like, absolutely true, I'd use | 8 | shouldn't be the starting point for gross written |
| 9 | that as an example to describe the type of | 9 | premium. |
| 10 | critical thinking that you'd have to go through in | 10 A. | They can be the starting point, but they need to |
| 11 | understanding the data and how it was compiled. | 11 | be considered in their context. They shouldn't be |
| 12 Q. | So taking Interrogatory Number 17, this response | 12 | taken out of context or be considered myopically. |
| 13 | in particular, you believe the data is | 13 | There's a whole back and forth and there's context |
| 14 | overinclusive; is that right? | 14 | for this interrogatory and the response. There |
| 15 A. | Sort of. In the way that's described, I think | 15 | is. It's lengthy. |
| 16 | it's -- it's clear that that's how it was | 16 Q. | I know it well. |
| 17 | compiled. So in one way, it's not. In one way, | 17 A. | It's lengthy. |
| 18 | it's responsive directly and therefore not | 18 Q. | Mr. Fleming and I lived that for a year. So I'm |
| 19 | overinclusive because it's described, the | 19 | trying to do this efficiently without going |
| 20 | assumptions are described, but when it gets down | 20 | through each of the interrogatories, but we can do |
| 21 | to trying to use it for the things that Mr. | 21 | that if you would like. |
| 22 | Zoltowski tried to use it for, yes, it's | 22 | So we've got Interrogatories 18, 19, and 20 |
| 23 | overinclusive. | 23 | that ask for the same information but for |
| 24 | That's the issue that I describe in detail | 24 | different geographies. You're aware of that; |
| 25 | in my report. | 25 | correct? |

Page 102
1  A.  Yes.
2  Q.  And your opinions regarding the data that's
3      reported in Interrogatory Number 17 are those
4      opinions the same for the data reported in 18, 19,
5      and 20?
6  A.  Are the -- I didn't hear the word you said, the
7      issues?
8  Q.  Your opinions relating to the data.
9  A.  Well, I don't know that they are actually
10     opinions.  I'm trying to ground this in facts, and
11     I think that those facts that you and I just
12     discussed apply to these interrogatory responses
13     in context.  Those aren't my opinions.
14         MS. KLIEBENSTEIN:  Terry, I'm going to give
15     you this one.
16         (Whereupon material was marked for
17     identification as Exhibit 524.)
18         MS. KLIEBENSTEIN:  I'm going to mark
19     Exhibit 525 -- 524.
20         MR. FLEMING:  I'm wondering --
21         MS. KLIEBENSTEIN:  I have a paper bit too.
22         MR. FLEMING:  What are you going to have
23     Mr. Bakewell use?
24         MS. KLIEBENSTEIN:  I wanted him -- I was
25     wondering if he could just look at your screen to

Page 103
1   authenticate what it is, and then we can go to the
2   paper to discuss.
3       MR. FLEMING:  Okay.
4       MS. KLIEBENSTEIN:  That's all.
5       (Whereupon material was marked for
6   identification as Exhibit 525.)
7       BY MS. KLIEBENSTEIN:
8  Q.  Mr. Bakewell, your counsel has a native text file
9       on a thumb drive on his computer, and I'm handing
10      you what I've now marked as Exhibit 525, which is
11      a snip of the -- the first screen viewable --
12      viewable page of that text file, if you will, and
13      I want to confirm what we're looking at.  I see in
14      your report there's a reference to a file called
15      CUW/Blaze IM Extract?
16 A.  Which page are you referring to?  By the way, he's
17      not my counsel.  Just so you know.
18 Q.  Fair -- fair enough.
19 A.  Which page are you referring to.
20 Q.  Blaze IM Extract is Exhibit 6 on the third page.
21 A.  Okay.
22 Q.  At the top.  I was provided --
23 A.  Oh.  I see.  Got it.  Blaze IM Extract-Final.
24      This is what I was referring to earlier is that --
25      you're saying it's that file.

Page 104
1  Q.  Yes, and I want you to confirm looking on Mr.
2      Fleming's laptop whether the text file in Exhibit
3      525 -- actually the text file in Exhibit 524 is
4      that file Blaze IM extract-final.
5         MS. KLIEBENSTEIN:  Do you have it up Terry?
6         MR. FLEMING:  Do not.  You know what?  I
7      don't want to use up all your time.  You can find
8      it quicker than I can.
9         MS. KLIEBENSTEIN:  Are you on the thumb
10     drive?
11        MR. FLEMING:  I can't ...
12        THE WITNESS:  Sometimes your computer
13     doesn't work, it happens with mine, it doesn't
14     recognize when you put a thumb drive in there,
15     can't figure out what's going on.
16        MR. FLEMING:  Do you want us to use --
17        BY MS. KLIEBENSTEIN:
18 Q.  Mr. Bakewell, let's turn to Exhibit 525.
19 A.  Okay.
20 Q.  And I'll represent to you what we're looking at is
21     the first viewable screenshot of what is in that
22     text file, and does this look like the first
23     viewable screen from the file titled Blaze IM
24     Extract Final?
25 A.  I don't know if it's the first viewable screen,

Page 105
1   but it looks familiar, and I'll accept your
2   representation if we're looking at the right
3   document.  We can do that.
4  Q.  I think I am.  We got this with a Bates number.
5      It was identified as something different in your
6      report so that's what we're trying to sort out.
7      Maybe Terry can help.
8  A.  We try.
9         MR. FLEMING:  I can't help by looking at it
10     on my computer.
11        BY MS. KLIEBENSTEIN:
12 Q.  Let's go through each of the columns.  They don't
13     have headers so we're struggling with how to
14     interpret the data.
15        Can you identify for me what information is
16     contained in each of the columns?
17 A.  I can.  I think there's a policy number on the
18     left, and then there's two more columns that have
19     the applicable dates, the beginning -- well, these
20     seem to be the same date.  I think that's -- well,
21     some of them have different dates.  I need to
22     check and see.  The next one I think is the
23     company that wrote the policy.  The next one is
24     the type in general, and then there's a
25     subcategory, and then there's an amount.

27 (Pages 102 - 105)

Page 106
1  Q.  Do you recall what the -- did you ask Federal to
2      prepare this data set?
3  A.  I think I see it as a request that we've both made
4      frankly.
5  Q.  Why?
6  A.  Because Federal is trying to respond to your
7      interrogatories, and then I said, hey, we need to
8      do some more analysis of this if I understand this
9      data correctly, and so we got the native file.
10 Q.  And what does this file represent?  What type of
11     information is in the file?
12 A.  It's the underlying data behind the response to
13     the interrogatory.  I think.
14 Q.  And how did you use this data in preparing your
15     report?
16 A.  To try to eliminate the double counting issue that
17     I described in my report.
18 Q.  And walk me through the steps that you did -- walk
19     me through the steps that you took with respect to
20     this data in Exhibit 525.  What did you do to
21     eliminate the double counting as you see it?
22 A.  We used Excel and did sorts.
23 Q.  Sorted for what?
24 A.  Multiple -- same policy number.
25 Q.  So you sorted for -- you said multiple, same

Page 107
1      policy number.  You sorted for the multiple same
2      policy number?
3  A.  Maybe I said that, but I didn't mean to say it
4      exactly like that.  There's instances -- there's
5      multiple instances where the same policy number
6      would exist in a row.  So we sorted by policy
7      number and identified instances where there's the
8      same policy number and where the amount would have
9      been included under the categories identified in
10     Mr. Zoltowski's report more than once and
11     corrected it so that it only -- well, corrected
12     isn't the right word, studied it so that we only
13     counted that same policy once to arrive at the
14     correct result.  Unlike Mr. Zoltowski.  So the
15     correction is to what Mr. Zoltowski did.
16 Q.  And Mr. Zoltowski did not have access to the data
17     in Exhibit 524; correct?
18 A.  I don't think that's true.
19 Q.  I'll represent to you that Exhibit 524 was not
20     produced during discovery.
21 A.  He could have asked for it.  My experience is that
22     that would be a -- a customary thing to ask for
23     and to study.  It doesn't -- that's neither here
24     nor there from my perspective.  I'm not faulting
25     Mr. Zoltowski for doing that, but he did have a

Page 108
1      reply report where he didn't endeavor to use this
2      data at all, and so I don't think it's factually
3      correct for you to say he didn't have access to
4      this information because he issued a report, his
5      reply report where he clearly had access to this.
6  Q.  Do you know how Federal queried their system to
7      identify the policies identified in this data set?
8  A.  I did at one point in time.  I asked about that.
9  Q.  And do you know what criteria Federal used to
10     identify the relevant records?
11 A.  I think it asked if the criteria used are
12     consistent with the interrogatory requests.
13 Q.  And do you know what policies Federal included in
14     this data set?
15 A.  All of the ones that it described in the
16     interrogatory as having the relationship to Blaze
17     Advisor that's described in the interrogatory and
18     the response.
19 Q.  So the text file in Exhibit 524 is the underlying
20     data or is the underlying policy information for
21     the data shown in Interrogatory Number 17?
22 A.  That's my understanding.  It comes from the same
23     system of record.
24 Q.  So looking at -- looking at Exhibit 525 and 524,
25     how do I know which policies went through

Page 109
1      DecisionPoint, CSI Express, CUW, the applications
2      that are listed in Interrogatory Number 17?
3  A.  I think based upon what I see here in 525 and the
4      interrogatory response there -- there is some
5      assumptions that were made regarding which of
6      these descriptions went into which category.
7  Q.  When you say some assumptions were made regarding
8      which of these descriptions went into which
9      category, which descriptions and which category
10     are you referring to?
11 A.  The descriptions in Bakewell 525 and the
12     categories provided in the interrogatory response
13     and -- done.  Period.  I wouldn't say and.
14 Q.  And what were those assumptions?
15 A.  I'm just looking to see if we actually need to
16     make those assumptions from the gross written
17     premium information.  I think we're just
18     eliminating the multiple instances of the same
19     policy occurring and eliminating double counting
20     in that way, and then we check it against business
21     segment income statements, as I describe in
22     Section 4.3.
23         So I can go back and double check and see
24     if we have further information that might be
25     helpful to -- if Mr. Zoltowski has an interest in

Page 110

1  analyzing this data, I would be happy to do that,
2  but I'd have to discuss that with -- I mean, that
3  relates to whatever the discussions you've been
4  having with Mr. Fleming. I think you have all the
5  information that we do.
6  Q. But you agree that we don't have the know-how on
7     our end to figure out how to reconcile the text
8     file with the interrogatory responses; correct?
9  A. I can't agree with that.
10 Q. Well, sitting here today, you're having a hard
11    time explaining how I could replicate your
12    results; correct?
13 A. No.
14 Q. So then can you walk me through how I could use
15    Exhibits 5 -- Exhibit 524 and Interrogatory Number
16    17 to address the double counting issue that you
17    see?
18 A. I would do just what I said and sort that data by
19    policy number and figure out where the same policy
20    occurs more than once, and I was trying to be
21    helpful to you by describing other things that --
22    comparisons that you might do.
23 Q. So I could sort --
24 A. But I said very clearly in my answer, and if
25    that's how you want this to proceed, I'd be happy

Page 111

1  to go that way. If you're going to characterize
2  me being helpful as struggling, then I'll stop
3  trying to be helpful, and I'll just give you
4  specific answers to your questions.
5  Q. So I can sort the data -- Step 1 is to sort the
6     data to figure out where there's duplicative
7     policy numbers; right?
8  A. Correct.
9  Q. But then the link that I'm struggling with is how
10    do I know which policy went through the different
11    applications?
12 A. I would categorize -- I would do another sort by
13    the description, the categories, the following
14    three categories with verbal, with text, and I
15    would compare those to the business process
16    records that you also have copies of to map those
17    against what you've accused. I mean, this is your
18    lawsuit you're making the accusations of using
19    Blaze Advisor.
20      So I would sort this -- here is what I
21    would do, if you want to answer the question that
22    you just posited, I'll give you even more detail.
23    I would sort this by column, and let's -- let's
24    seem that each of these columns follows what Excel
25    has with Column A, B, C, D, et cetera. I would

Page 112

1  sort first by Column A, and then I would sort by
2  Column D, and Column E, and Column F, and I would
3  make subtotals for each of those, and where
4  there's policy numbers that appear more than once,
5  I would look to eliminate the policy that appears
6  more than once and compare those to the totals
7  that I have, and then where I've categorized it by
8  entity, according to this sort that I've just
9  done, as well as -- that's Column D and Column E
10 and F, I would match those sorts up against what
11 you've accused in this case and the application
12 that uses Blaze Advisor, and those are your
13 accusations. So that's how I would do that.
14      Pretty straightforward. Surprised Mr.
15 Zoltowski didn't do it. Instead, he made
16 accusations that I think he should retract.
17 Q. Let's move to Paragraph 82, and then we can take a
18    break for lunch.
19 A. Okay. Page 82 or Paragraph 82? I forgot.
20 Q. Paragraph, but it might be the wrong -- maybe it's
21    182.
22      MR. FLEMING: Which one?
23      THE WITNESS: That's what we're tying to
24 figure out.
25      MS. KLIEBENSTEIN: 182.

Page 113

1  BY MS. KLIEBENSTEIN:
2  Q. Going to Paragraph 184, there's a statement again,
3     "The CUW gross written premium data relied on by
4     Mr. Zoltowski included policies and associated
5     gross written premiums that were captured multiple
6     times in the data for other applications such as
7     CSI Express and Premium Bookings." Your source
8     there is an interview with Mr. McCarthy?
9  A. Correct.
10 Q. And he's the industry expert?
11 A. The industry expert? I don't think so. Let me
12    see.
13 Q. Who is Mr. McCarthy?
14 A. Chase McCarthy is the information technology lead.
15    He's an employee.
16 Q. And how many conversations did you have with Mr.
17    McCarthy?
18 A. One.
19 Q. And what is -- I know his job title. What is his
20    role? What does he do at Federal?
21 A. I think he works in the information technology
22    group.
23 Q. And did he pull this -- this data?
24 A. I don't know if he pulled it, but he was familiar
25    with it, and he was prepared to answer these

29 (Pages 110 - 113)

www.veritext.com    Paradigm, A Veritext Company    888-391-3376

Page 114

1  questions.
2  Q. What did you talk with Mr. McCarthy about?
3  A. How he pulled the information, or Federal pulled
4     the information.
5  Q. Anything else?
6  A. I think anywhere I cite to him in my report that's
7     what I would have spoken with him about. So I
8     don't see anything else. I think that I asked him
9     about the -- the data and whether it included
10    policies that were captured multiple times, like I
11    discussed, and he confirmed that it did because of
12    the reasons that we discussed earlier, the
13    interrogatory and the response, and the challenges
14    that Federal had in responding because the
15    interrogatory doesn't match what it does in the
16    ordinary course of business.
17       MS. KLIEBENSTEIN: All right. We can take
18    a break for lunch.
19       THE WITNESS: All right. Thank you.
20       THE VIDEOGRAPHER: We are going off the
21    report. The time now is 12:51 p.m.
22       (Whereupon a lunch break was taken from
23    12:51 p.m. to 1:41 p.m.)
24       THE VIDEOGRAPHER: We are back on the
25    record. This marks the beginning of Media 4 in

Page 115

1     the deposition of Chris Bakewell. The time now is
2     1:42 p.m.
3        BY MS. KLIEBENSTEIN:
4  Q. Mr. Bakewell, can you turn to Exhibit 5 of your
5     report.
6  A. Sure.
7  Q. Can you explain to me at a 10,000 foot level what
8     data -- what calculations are shown in Exhibit 5?
9  A. So in Exhibit 5, we're using, or I'm using the
10    actual numbers versus what Mr. Zoltowski used to
11    eliminate the double counting issue that we
12    discussed earlier, and that's detailed in Exhibit
13    6. We were going through Exhibit 6 earlier.
14 Q. Okay. So the --
15 A. Go ahead.
16 Q. No. Go ahead.
17 A. I was going to volunteer something that related to
18    a question you asked me earlier that I promised to
19    get you something during lunch.
20 Q. Sure.
21 A. You want to do that now?
22 Q. Yeah.
23 A. So you were asking about Paragraph 180.
24 Q. Yes. The citation for that.
25 A. There's a table underneath there, and the -- the

Page 116

1     sources are generally from Exhibit 8, but I think
2     it would be helpful if I gave you a work paper as
3     well to show where the sources came from, and so I
4     spoke with Mr. Fleming and we agreed that I'll
5     give that to him, and then he will give that to
6     you.
7  Q. Okay.
8  A. I don't know, in the next couple of days or
9     whatever.
10 Q. So the support is Exhibit 8?
11 A. Generally speaking, but the specific numbers you
12    have to do a couple of things to them, and we have
13    a work paper that describes that.
14 Q. Okay.
15 A. It should make it totally clear.
16 Q. So going back to Exhibit 5.
17 A. Okay.
18 Q. Exhibit 5, the gross written premium figures take
19    care of that double counting issue that you
20    raised; correct?
21 A. Correct.
22 Q. And then I see a number at the bottom of the first
23    page, about 2.456 billion, and what does that
24    number reflect?
25 A. That's the profit, the underwriting profit

Page 117

1     assuming a 16 percent profit margin.
2  Q. Assuming a 16 percent profit margin, or is the
3     result a 16 percent profit margin?
4  A. Either way.
5  Q. Essentially the -- what figures did you add and
6     subtract to get the 2.456?
7  A. I think it's the -- if you take 16 percent of
8     14.14 -- oh. Well, there are specific numbers for
9     -- so 16 percent of 16.1 million equals 2.45
10    million -- 2.45 billion and 16.2 billion on the
11    top line.
12 Q. And where did the 16 percent come from?
13 A. That comes from the 8 series of exhibits. So
14    Exhibit A, where it says percent net earned
15    premiums in 2018, that's 16 percent and the loss
16    ratio of 18.4 percent.
17 Q. So here is what I'm trying to clarify. These
18    percentages came from other calculations that you
19    did, not from, like, an industry publication or
20    anything like that?
21 A. That's not exactly right, but I -- I considered
22    industry data in -- in providing those estimates,
23    but there's other calculations that I did. So
24    you're right in part, but there's a part of my
25    report where I discuss some comparisons to the

30 (Pages 114 - 117)