**EXHIBIT 11
FILED UNDER SEAL**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2               DISTRICT OF MINNESOTA
 3  _____
 4  FAIR ISAAC CORPORATION, a    )
    Delaware corporation,        )
 5                               )
            Plaintiff,           )
 6                               )
    vs.                          )     Case No.:
 7                               ) 16-CV-1054 (WMW/DTS)
    FEDERAL INSURANCE COMPANY,   )
 8  an Indiana corporation, and  )
    ACE AMERICAN INSURANCE       )
 9  COMPANY, a Pennsylvania      )
    corporation,                 )
10                               )
            Defendants.          )
11  _____
12              HIGHLY CONFIDENTIAL
13              ATTORNEYS' EYES ONLY
14            VIDEOTAPED DEPOSITION OF
15                 CHASE McCARTHY
16
17  DATE:      04/23/2020
18  TIME:      9:30 a.m.
19  PLACE:     18 Charlotte Drive
20             Bridgewater, New Jersey 08807
21
22
23  REPORTED BY:  Merilee Johnson, RDR, CRR, CRC, RSA
24                (via videoconference)
25  JOB NO.:      MW4024408
```

Page 58

1  A. That's what it was. It was used by ACE
2  agents.
3  Q. Do you know, was this project accomplished?
4  A. I believe it was.
5  Q. If you'll go to the folder titled "!!Marked
6  Exhibits," I've placed into that folder an exhibit
7  titled Pandey 283. If you could open that up.
8      MR. FLEMING: Where did you say that
9  was, Heather?
10     MS. KLIEBENSTEIN: I put it in the
11 Marked Exhibits folder.
12     MR. FLEMING: Okay.
13 A. (Reviewing document.) Okay.
14 Q. Mr. McCarthy, have you seen this email and
15 its attachment before?
16 A. I don't recall seeing this.
17 Q. You're listed on this email chain, correct?
18 A. (Reviewing document.)
19 Q. Actually, I don't think you are.
20 A. I don't see my name.
21     MR. FLEMING: I thought I had gone
22 blind.
23 Q. Mr. McCarthy, are you familiar with the
24 business requirements document that's attached to
25 this email for the project name titled "CUW-IM

Page 59

1  Support for ACE Processing"?
2  A. No.
3  Q. Did you have any involvement in that
4  project?
5  A. Not that I recall. No.
6  Q. For the CUW application, is that
7  application used by underwriters or agents?
8  A. It's -- CUW is a broad application. I
9  wouldn't be able to answer that definitively.
10 Q. Do you know if underwriters use the CUW
11 application?
12 A. Yes.
13 Q. And who were the underwriters employed by?
14 A. Chubb underwriters are employed by Chubb.
15 Q. Do you know if any legacy ACE underwriters
16 used the CUW application?
17 A. Could you be more specific with your
18 question?
19 Q. The CUW application existed before the
20 merger, correct?
21 A. Yes.
22 Q. And before the merger, legacy Chubb
23 underwriters, only, used the application, correct?
24 A. I'm not sure they're the only people that
25 used it.

Page 60

1  Q. My question is: After the merger, were
2  legacy ACE underwriters given access to the CUW
3  application?
4  A. I wouldn't know if they were given access.
5  Q. Maybe I asked that question wrong. I don't
6  mean access to the underlying application, I mean
7  the portal that the underwriters used.
8      Do you know if legacy underwriters used the
9  CUW portal after the merger?
10 A. You're using the term "portal," and that
11 doesn't -- I don't understand the way that you're
12 asking the question.
13 Q. I'll ask it a different way.
14     When underwriters use the CUW application,
15 what do they interface with?
16 A. There's a CUW interface that they would
17 access.
18 Q. After the merger, were legacy ACE
19 underwriters allowed to use the CUW interface?
20 A. I do not know. I do not know.
21     MR. FLEMING: Heather, when you're done
22 with this question, could we take a lunch break
23 when you're done with this document, I guess?
24     MS. KLIEBENSTEIN: Yeah. I think I'm
25 done with that. I think we can take a lunch break.

Page 61

1      THE VIDEOGRAPHER: We're going off the
2  record. The time is 11:58.
3      (A break was taken at 11:58 a.m.)
4      THE VIDEOGRAPHER: We are back on the
5  record. This is the start to Media No. 3. The
6  time is 1:04.
7  BY MS. KLIEBENSTEIN:
8  Q. Mr. McCarthy, in connection with this case,
9  have you assisted in pulling any gross written
10 premium figures?
11 A. Yes.
12 Q. From what applications?
13 A. From IRMA, TAPS, and for CUW-IM.
14 Q. I've moved into the Marked Exhibits a
15 document titled Phillips 566. Let me know when you
16 have that open.
17 A. I have it open. I'm just looking at it
18 quickly.
19 Q. Sure. Take your time. And I'm going to be
20 turning to page -- the bottom of page 5, top of
21 page 6.
22 A. (Reviewing document.) Okay.
23 Q. And looking at the bottom of page 5, top of
24 page 6, the data that's on those pages, is that the
25 data that you helped to pull for the CUW-IM

16 (Pages 58 - 61)

Page 62

1 application?
2  A.  Yes.
3  Q.  Can you explain for me what information is
4 reflected in each column at the top of page 6.
5  A.  Yeah.  So we were asked to produce a report
6 by year and then by writing company.  And then for
7 each writing company, show the policy count and the
8 written premium for that writing company by year.
9  Q.  And are those policy counts and written
10 premiums in connection with which Blaze Advisor
11 software was used?
12  A.  Not necessarily.
13  Q.  If I look in the paragraph at the bottom of
14 page 5, it says, "For the Chubb Commercial
15 Insurance (CCI) business unit for the years
16 identified below (post-merger), the following
17 applications use Blaze Advisor software:  CUW-IM,
18 TAPS, and IRMA.  The approximate gross written
19 premiums, policy counts, and identification of the
20 insurance writing companies that issued insurance
21 policies that used these applications, in
22 connection with which Blaze Advisor software was
23 used, is provided in the charts below for the years
24 requested."
25     So to confirm, the data that begins on the

Page 63

1 top of page 6, does that include policies and
2 written premiums that did not touch Blaze Advisor
3 software?
4  A.  Possibly.
5  Q.  How do I know which policies did or did not
6 touch Blaze Advisor software?
7  A.  For this extract, the premium in 2016 does
8 not necessarily reflect premium that had any
9 association with a business rule.
10  Q.  What about for 2017?
11  A.  With greater confidence, 2017 and
12 thereafter, it's more likely that the premium is
13 associated with a business rule.
14  Q.  And why is the data from 2016 different?
15  A.  The way the request came in, as I recall,
16 if any transaction occurred and it went to CUW-IM,
17 we were to identify the premium associated with
18 that policy.
19  Q.  Okay.  That still doesn't explain to me why
20 the data for 2016 is less likely to have touched a
21 business rule than the data from 2017 and beyond.
22     Can you answer that question?
23  A.  I didn't -- if you could ask it as a
24 question, because that wasn't a question.
25  Q.  Why is the -- why is it more likely that

Page 64

1 the data, the policy counts and written premiums,
2 from 2017 and beyond more likely touched a business
3 rule in Blaze Advisor than the data from 2016?
4  A.  In 2016, it's possible that a transaction
5 associated with a policy had a business rule
6 associated with it, but that transaction did not
7 necessarily reflect the actual premium booking
8 processing.
9  Q.  And why not -- why did that transaction not
10 necessarily reflect the actual premium booking
11 processing?
12  A.  Because it may have been a subsequent
13 transaction.
14  Q.  But that's not the case for the 2017 and
15 beyond data; is that right?
16  A.  It's much less likely that would be the
17 case for 2017 and thereafter, yes.
18  Q.  And what I want to know is, what's
19 different?  What's different about the system,
20 2016, compared to 2017, that creates that result?
21  A.  A transaction that took place in 2016 could
22 have been for a policy that was still in force but
23 that was booked in 2015.
24  Q.  How did you go about gathering the data
25 that's reflected under the heading for "CUW-IM" in

Page 65

1 this exhibit?
2  A.  That's a very complicated question to
3 answer.
4  Q.  What were the steps you took to retrieve
5 the data that's under this heading?
6  A.  So we used client data and a policy ID, and
7 we associated that with premium data according to
8 this criteria:  year and written company.
9  Q.  What type of client data?
10  A.  Client data that is part of CUW.
11  Q.  And how did you go about isolating policies
12 that touched CUW-IM?
13  A.  We pulled the data from a database.
14  Q.  What database?
15  A.  Database associated with inventory
16 management and CUW.
17  Q.  And there's a footnote at the bottom of
18 this exhibit on page 6, and it says, "We understand
19 that this financial information includes policies
20 that were brought in under a system that includes
21 policies that are renewed using Blaze, but
22 automatically at the same time includes the prior
23 transaction involving the same policy regardless
24 whether it uses Blaze."
25  A.  Right.

17 (Pages 62 - 65)

Page 66
1  Q. Do you understand what that sentence means?
2  A. Yeah. That's what I was referring to
3  earlier.
4  Q. So I'm not clear as to what that sentence
5  means. Could you give me -- could you give me an
6  example of this problem that's illustrated in
7  footnote 1?
8  A. Yeah. So if a policy was booked but then a
9  subsequent transaction required a business rule, we
10  would have captured the premium from that original
11  policy when we pulled up this report, because of
12  that subsequent transaction that had business rules
13  associated with it.
14  Q. And isolating on the phrase "subsequent
15  transaction," what is a subsequent transaction?
16  Can you give me examples?
17  A. Could be a zero dollar endorsement of some
18  coverage that Chubb offers but we process that
19  transaction as an endorsement.
20  Q. Any other examples come to mind?
21  A. A cancellation. Could be a number of
22  different things.
23  Q. Any other examples come to mind?
24  A. I mean, I'm going to give you generic
25  examples, but those are the types of things, you

Page 67
1  know, that would be described as transactions.
2  Q. So we've got a zero dollar endorsement and
3  a cancellation. Are there any other general types
4  of subsequent transactions you can think of?
5  A. A reinstatement of the policy.
6  Q. Anything else?
7  A. I mean, there are a number of different
8  types of transactions.
9  Q. I understand --
10  A. But those -- yeah.
11  Q. I understand that --
12  A. So it --
13     MR. FLEMING: Wait, wait. Okay. So
14  the pending question now is . . .
15  Q. Do you have any more examples?
16  A. I'm probably not the best person to provide
17  additional examples of transactions.
18  Q. So no additional examples come to mind?
19  A. Not at this time.
20  Q. Can I tell -- from looking at this data on
21  page 6 of Exhibit 566, can I tell what policies --
22  what policies were booked without use of Blaze
23  Advisor and then a subsequent transaction required
24  a business rule from Blaze Advisor?
25  A. Sorry. Just repeat the question again,

Page 68
1  just to make sure I'm understanding you.
2  Q. Can I tell from looking at the data on
3  page 6 of 566 what policies were booked without use
4  of Blaze Advisor and then a subsequent transaction
5  in CUW-IM required use of a business rule from
6  Blaze Advisor?
7  A. Can you tell? No. From the report you
8  can't tell -- you can't discern that.
9  Q. I see Chubb Insurance Company of Canada
10  listed as a writing company on page 6 of
11  Exhibit 566. Does that refresh your recollection
12  as to whether CUW-IM was used in Canada?
13  A. It doesn't refresh my memory. No.
14  Q. And then moving down to the bottom of
15  page 7. Is this the data that you pulled for the
16  TAPS application?
17  A. Yes.
18  Q. And the policies and the gross written
19  premiums reflected, those each touched Blaze
20  Advisor; is that right?
21  A. In this case, I believe so.
22  Q. Moving back to CUW, that application is
23  used by, in part -- well, sorry, let me ask that a
24  different way.
25     Is the CUW application used by agents or

Page 69
1  underwriters or both?
2     MR. FLEMING: Objection. That's been
3  asked and answered.
4     MS. KLIEBENSTEIN: Yeah. I just can't
5  recall the answer.
6  A. Oh, okay. I can't recall -- I can't recall
7  if it's used by agents. It is used by
8  underwriters. I believe that was my answer before.
9  Q. And what about the TAPS application, is
10  that used by agents or underwriters or somebody
11  else?
12  A. I believe it's an internal application.
13  I'm not sure, but I believe that's correct.
14  Q. And underwriters -- the underwriters using
15  the CUW-IM, the CUW application, are the
16  underwriters employed by the writing companies
17  listed on pages 6 and 7 of Exhibit 566?
18     MR. FLEMING: Objection. Lack of
19  foundation.
20  A. I would not know about that.
21  Q. Moving to the IRMA data on page 8, is this
22  the data that you pulled for this lawsuit in
23  connection with the IRMA application?
24  A. Yes.
25  Q. And does this reflect the policies and

Page 70

1  written premiums that touch Blaze Advisor in the
2  IRMA application?
3     A.  Yes.
4     Q.  Are you familiar with the Evolution
5  application in Canada?
6     A.  I'm not familiar with it.  Could you ask
7  that differently?
8     Q.  I don't -- was there something unclear
9  about the question?
10    A.  "Familiar."  I've heard the name.
11    Q.  Does the Evolution application fall under
12 your umbrella of job responsibilities?
13    A.  No, they do not.
14    Q.  I've moved into the Marked Exhibit folder
15 an exhibit entitled Harkin 407.  Are you familiar
16 with this exhibit?
17    A.  Sorry.  It's still loading.
18    Q.  Oh.  And I'd like to focus on the Answer to
19 Interrogatory No. 16 in this Exhibit 407.
20    A.  Just one second.  It's having difficulty
21 loading.  Which page are you on?
22    Q.  Going to start on page 6.
23    A.  Okay.  Okay.  Yeah, okay.
24    Q.  And so starting on page 6 through 8,
25 there's policy counts and gross written premium

Page 71

1  figures for the CUW-IM application from years 2008
2  through 2012.  And I'm wondering, did you pull that
3  information?
4     A.  No, I didn't.
5     Q.  Do you know who did?
6     A.  Yes.
7     Q.  Who?
8     A.  That's an engineer that works in my group.
9     Q.  And what was that engineer's name?
10    A.  Peter Muller.
11    Q.  Was he working at your request?
12    A.  Yes.
13    Q.  Do you know how he pulled this data?  What
14 steps did he take?
15    A.  So the request -- the way the request was
16 made, we pulled policies and associated them with
17 the writing company by year, and their written
18 premium from two different sources.
19    Q.  And what are those two different sources?
20    A.  One would have been from a database from
21 CUW.  And for some of the policies, we would have
22 pulled premium from Genius, which is a different
23 system.
24    Q.  Now, I notice the data associated with
25 CUW-IM in this response does not have the same

Page 72

1  footnote that we saw in Exhibit 566.
2        Do you know why that is?
3     A.  No.
4     Q.  Do the policy counts --
5     A.  Sorry.  Sorry.  I'm thinking about your
6  question more.
7        Yeah, sorry.  I'll stay with my answer.
8  I'm not sure why there's not a footnote there.
9     Q.  Should it have the same footnote?
10    A.  I'm thinking about it.  Probably the answer
11 to that is yes.
12    Q.  And why do you say that?
13    A.  It would be the same scenario as the
14 previous data that we collected.
15    Q.  Is there a way for me to identify which
16 gross written premiums are from a policy that was
17 booked that did not touch Blaze Advisor, but yet
18 were involved in a subsequent transaction that did
19 touch Blaze Advisor?
20    A.  Is there a way?  Technically, I would think
21 that there is a way to do it, yes.
22    Q.  But looking at this interrogatory answer, I
23 cannot do that, correct?
24    A.  Not based on that information as it is.
25    Q.  Can you explain for me the technical way to

Page 73

1  sort out those different buckets?
2     A.  I am not a data analyst, so I wouldn't feel
3  comfortable answering that question.
4     Q.  Moving on to page 8 of Exhibit 407.  Did
5  you collect the data for the IRMA application
6  that's in this exhibit?
7     A.  No, I did not.
8     Q.  Did someone at your direction?
9     A.  Yes.
10    Q.  Who did that?
11    A.  An engineer that works on my team.
12    Q.  And the same name as before?
13    A.  Pete -- Peter Muller.  Yes.
14    Q.  And do you know, how did he go about
15 retrieving this data?  What steps did he take?
16    A.  For IRMA?
17    Q.  Yes.
18    A.  There's a database associated directly with
19 the application, and he pulled that data from the
20 production maintenance.
21    Q.  And the written premium dollars and the
22 policy counts, each touched Blaze Advisor in the
23 IRMA application?
24    A.  That was the basis for creating the report.
25    Q.  Chubb's damages expert stated in his report

Page 74

1  that the CUW gross written premium data that we
2  just looked at captured -- included policies that
3  were captured multiple times in the data for other
4  applications, such as CSI Express and Premium
5  Bookings.
6      Do you agree with that statement?
7   A.  I don't know who the damage expert is.  At
8  least I don't recall.  But I would say that
9  that's -- I'm sorry.  For which applications were
10 you talking about just now?
11  Q.  I'll read it for -- I'll read the statement
12 for you again.
13  A.  Okay.
14  Q.  This is what the -- this is what Chubb's
15 damages expert wrote in his report.  He wrote, "The
16 CUW gross written premium data relied upon included
17 policies that were captured multiple times in the
18 data for other applications such as CSI Express and
19 Premium Bookings."
20      And my question is:  Do you agree with that
21 statement?
22  A.  I can answer that yes and no.
23  Q.  Why do you answer that question yes?
24  A.  Well, because for some applications we
25 know, or we believe, that the premium and the

Page 75

1  reports would also appear in the CUW-IM.
2   Q.  So, for example, are you saying that in the
3  CSI Express application, the premium and -- the
4  premiums are showing up in both the CSI Express and
5  the CUW-IM reports?
6   A.  No.  No.
7   Q.  How did I get that wrong?
8   A.  Not in that case.
9   Q.  So how did I get that wrong?
10  A.  I'm not sure when that information was
11 captured.
12  Q.  When what information was captured?
13  A.  What you just told me, that the CSI Express
14 premium was double counting the premiums for
15 CUW-IM.
16  Q.  So this concern of capturing data multiple
17 times in different application reports, is that the
18 same concern or a different concern than what we
19 saw in footnote 1?
20  A.  That's -- I think that's separate.  That's
21 a separate issue.
22  Q.  It's a separate issue.
23      So going back up to your yes and no answer,
24 I'll repeat the question again so that you can have
25 it fresh in your mind.

Page 76

1      My question was:  Did you agree with this
2  statement, where Chubb's damages expert wrote, "The
3  CUW gross written premium data relied upon included
4  policies that were captured multiple times in the
5  data for other applications such as CSI Express and
6  Premium Bookings"?
7      Earlier you answered yes and no to that
8  question, and I want to know why you answered no,
9  in part.
10  A.  No, in the sense that it was my
11 understanding that CSI Express was using Inventory
12 Management, and recently I learned that it was not
13 using CSI Express for its assignment of -- or for
14 its business rules.
15     So in CSI Express, the answer would be no.
16  Q.  So there was a use of the word "it" in your
17 answer that confuses me.  So are you saying that
18 CSI Express does not use CUW-IM for its assignment
19 of business rules?
20  A.  That's correct.
21  Q.  And did it at one time -- did CSI Express
22 at one time use the CUW-IM application for
23 assignment of business rules?
24  A.  Not to my knowledge right now.
25  Q.  So I moved to the Marked Exhibits folder an

Page 77

1  exhibit titled Bakewell 525.
2   A.  Okay.
3   Q.  Let me know when you've had it open and
4  you're ready for questions.  And you can -- there's
5  a zoom feature to look closer at the document.
6      So this was produced to us titled "Blaze IM
7  Extract Final."  This is simply one page of
8  possibly a 10,000-page text file.
9   A.  Mm-hmm.
10  Q.  Are you familiar with this -- the data in
11 this file?
12  A.  No, I'm not.
13  Q.  Chubb's damages expert characterized this
14 document as the gross written premium data that
15 removes policies that ran through both CUW and
16 another application, specifically CSI Express and
17 Premium Booking.
18      Does that help refresh your recollection?
19  A.  No.
20  Q.  Were you asked -- after you pulled the data
21 that was reflected in the interrogatory responses
22 that we just looked at, were you asked to revise
23 and repull the data on policies and gross written
24 premiums for the CUW-IM application?
25  A.  (No response.)

20 (Pages 74 - 77)

Page 78

1  Q. Mr. McCarthy, did you hear my question?
2     MS. KLIEBENSTEIN: Can anybody hear me?
3  Terry, can you hear me?
4     MR. FLEMING: I can hear you.
5     MR. YOUNG: I can hear you.
6     MS. KLIEBENSTEIN: Can Chase hear me?
7  No? I'm confused. Mr. McCarthy?
8     (Technical interruption.)
9     THE VIDEOGRAPHER: We're going off the
10 record. The time now is 1:50.
11    (A break was taken at 1:50 p.m.)
12    THE VIDEOGRAPHER: We are back on the
13 record. The time now is 1:51.
14 BY MS. KLIEBENSTEIN:
15 Q. All right. My last question, Mr. McCarthy,
16 was: After you pulled the data reflected in the
17 interrogatory responses we just looked at, were you
18 reasked -- were you asked to revise and repull that
19 data for policies and gross written premium for the
20 CUW-IM application?
21 A. Yes.
22 Q. And do you know one way or the other
23 whether that data that you repulled is shown in
24 Bakewell Exhibit 525?
25 A. I'm trying to recall this, because I think

Page 79

1  that there were two reports and I'm just not sure
2  which one of those would be in this exhibit that
3  you're talking about right now.
4     The Bakewell 5 -- oh, no, the Bakewell 525,
5  is that the one that you're talking about right
6  now?
7  Q. Yes. And it -- when it was produced to us,
8  it was entitled "Blaze IM Extract Final."
9  A. Okay. I'm not familiar with this document.
10 Q. It was produced to us as a very large text
11 file.
12 A. No.
13 Q. Does that refresh your recollection?
14 A. No. I don't recall this document.
15 Q. Do you recall speaking with Chubb's damages
16 expert who's working on this case?
17 A. I may have -- through your prompting and by
18 the question, I think I may have had a
19 conversation. I just -- it's not a clear memory.
20 But I can imagine I would have spoken with someone
21 like that.
22 Q. Do you recall any parts of that
23 conversation?
24    MR. FLEMING: Well, just one minute.
25 To the extent that --

Page 80

1     THE WITNESS: Well --
2     MR. FLEMING: Just one second, Chase.
3  Do you hear me?
4     THE WITNESS: Yeah, yeah, I hear you.
5     MR. FLEMING: Okay. To the extent that
6  communication was with Chris Bakewell and counsel,
7  I will direct you not to answer on the grounds of
8  attorney-client work product privilege.
9     MS. KLIEBENSTEIN: Well, the trouble
10 with that is Mr. Bakewell cites conversations with
11 Mr. McCarthy as support that he's relied on, and
12 that can't be shielded from discovery.
13    MR. FLEMING: Yeah, that's fair enough.
14 Didn't Chase already answer the question? I don't
15 have the text up here that I'm going to stream.
16    Merilee, would you mind stating -- reading
17 the answer that Mr. McCarthy gave.
18    (The preceding portion was read back as
19    follows:
20    "QUESTION: Do you recall speaking with
21    Chubb's damages expert who's working on
22    this case?
23    ANSWER: I may have -- through your
24    prompting and by the question, I think I
25    may have had a conversation. I just --

Page 81

1     it's not a clear memory. But I can imagine
2     I would have spoken with someone like
3     that.")
4  MS. KLIEBENSTEIN:
5  Q. And then my follow-up was: Do you recall
6  any parts of that conversation?
7  A. No. Not really, no.
8  Q. Mr. McCarthy, I've marked and introduced
9  Exhibit 574. Do you recall receiving an email in
10 April of 2016 from Ramesh Pandey titled "Forward -
11 FICO Notice of Termination Chubb Blaze"?
12 A. I don't recall that email.
13 Q. Do you know why you would have received
14 FICO's notice of termination of the Blaze license
15 in 2016?
16    MR. FLEMING: I'll object. Lack of
17 foundation.
18 A. I would say it probably had to do with work
19 that we were doing with Specialty Insurance.
20 Q. And what work was that?
21 A. We were working on CSI Express.
22 Q. What work were you doing on CSI Express?
23 A. We were looking to move it over to a legacy
24 ACE platform for the business.
25 Q. And was CSI Express ultimately moved over

21 (Pages 78 - 81)

Page 82

1  to a legacy ACE platform?
2      A.   I'm not the best person to answer that
3  because I moved off of that project shortly
4  after -- around that date.
5      Q.   Who would know the answer to that question?
6      A.   Ramesh.  Ramesh Pandey would probably know
7  the answer.
8      Q.   And why was -- why was -- why were you part
9  of a group -- strike that.
10          Why was the company trying to move CSI
11 Express to a legacy ACE platform?
12     A.   Because it had been selected as our target
13 platform for that business unit under the new
14 Chubb.
15     Q.   And why did you move off of that project?
16     A.   At that time I took on a new role under
17 Mike Butler as the chief architect for PRS.
18     Q.   And PRS stands for what again?
19     A.   Personal risk services.
20     Q.   Back in 2016 when you were working with
21 CSI Express, do you know, did CSI Express interface
22 with the CUW application at all?
23     A.   So I would not have been able to answer
24 that question at that time.  I wasn't aware.
25     Q.   Can you answer that question today?

Page 83

1      A.   Yeah.
2      Q.   And what's the answer today?
3      A.   So CSI Express does not interface with
4  CUW-Inventory Management for assignment.
5      Q.   Has CSI Express ever interfaced with
6  CUW-IM?
7      A.   I'm not the best person to answer that.
8      Q.   So you don't know, one way or the other?
9      A.   Not definitively.
10     Q.   Does CSI Express interface with CUW?
11     A.   Yes.
12     Q.   If I wanted to find out the answer to the
13 question whether CSI Express has ever interfaced
14 with CUW-IM, who would I ask?
15     A.   Someone under the -- probably the best
16 person would be someone in the architecture group
17 that was assigned to that area.  And Ramesh Pandey,
18 for example, would be such a person.
19     Q.   What about Henry Mirolyuz?
20     A.   I don't know if he could answer that
21 question or not.
22          MR. FLEMING:  Heather, we've been going
23 about an hour.  Can we take a short break?
24          MS. KLIEBENSTEIN:  Yeah.
25          THE VIDEOGRAPHER:  We are going off the

Page 84

1  record.  The time now is 2:04.
2          (A break was taken at 2:04 p.m.)
3          THE VIDEOGRAPHER:  We are back on the
4  record.  This is the start to Media No. 4.  The
5  time is 2:19 p.m.
6  BY MS. KLIEBENSTEIN:
7      Q.   Mr. McCarthy, can you go in the Marked
8  Exhibits folder and pull up Exhibit 176?
9      A.   Sure.  (Reviewing document.)
10     Q.   So in this exhibit there's a two-page
11 email, along with an attachment behind it.
12     A.   Okay.
13     Q.   Do you recall receiving this email?
14     A.   I'm just having a look at it just now.
15 (Reviewing document.)  Okay.
16          MR. FLEMING:  Wait.  I don't know if
17 there's a pending question or not.
18     Q.   Yes.  It was:  Do you recall receiving this
19 email?
20     A.   Right.  I'm just looking.  I'm trying to
21 recall -- Duff & Phelps rings a bell.  I can't
22 remember exactly in what context this email was
23 sent.  So I don't have clear recollection of the
24 email.
25     Q.   The attachment is entitled "ACE Chubb

Page 85

1  Valuation_December 2015."  Did you have any role in
2  creating the attachment?
3      A.   Based on the content -- I mean, I can -- I
4  don't recall having direct input on this document.
5      Q.   Do you know what this document is?
6      A.   If you do and you described it to me, I
7  might be able to recall.
8      Q.   In the upper left-hand corner, I see the
9  phrase "Business Application Inventory and
10 Assessment."  Does that refresh your recollection?
11     A.   I see that.  I can't tell you definitively
12 what this document is for.
13     Q.   Can you move to the second page of the
14 attachment.  At the top, there's a row with the
15 product name CUW.
16          Do you see that?
17     A.   On the second page?
18     Q.   Correct.  It's page 5 of the entire
19 document; page 2 of the attachment.
20     A.   All right.  Yes, I see it.  Yes.
21     Q.   And product name CUW, the description of
22 use states, "The Commercial Underwriting
23 Workstation provides an electronic environment to
24 support and enhance the commercial underwriting
25 business process.  It provides quick access to key

22 (Pages 82 - 85)