UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>FEDERAL INSURANCE COMPANY,<br>an Indiana corporation, and ACE<br>AMERICAN INSURANCE COMPANY,<br>a Pennsylvania corporation,<br><br>　　　　Defendants. | Court File No. 16-cv-1054<br>(WMW/DTS)<br><br>**DECLARATION OF**<br>**C. CHASE MCCARTHY** |

I, C. Chase McCarthy, declare as follows:

1.　I am the IT Lead, North America Commercial Middle Market. I helped respond to FICO's Interrogatory No. 17 on behalf of Federal Insurance Company and ACE American Insurance Company (collectively, "Federal") as it relates to the Commercial Underwriting Workstation – Inventory Management ("CUW-IM") application.

2.　I was responsible for gathering the policy count and gross written premium numbers associated with the CUW-IM application, which process began in or around January 2019. To accomplish this task, I was assisted by my colleague Peter Muller, who at the time reported into my organization. He currently holds the role of Technology Manager, Field Operations, Shared Services. Gathering this data was a complicated undertaking that involved significant hours and processing time.

3.　The systems that use Blaze, including the CUW-IM application, are not capable of providing simple policy counts and associated premium numbers in response to

1

FICO's interrogatory. Instead, pulling a single transaction that was processed through the CUW-IM application may result in pulling premiums from many other years. This results in inflated numbers unless the non-relevant premiums associated with the other years can be removed. In gathering this data, for example, we noticed scenarios in which a single transaction counted gross written premium going back many years sometimes a decade or longer. If not removed, these non-relevant premiums result in inflated numbers.

4. To respond to the interrogatory, Mr. Muller and I collected and provided gross written premiums and policy counts for all writing companies that used the CUW-IM application. This process included gathering historical data for the gross written premiums and policy counts associated with 24 writing companies for North America for the years 2016, 2017 and 2018.

5. As we worked with legal counsel to identify Legacy ACE premium and Legacy Chubb premium along with filtering data to not potentially duplicate premium coming from other systems using Blaze that also used CUW-IM, we began to build complex filters into the data queries. The complexity of the queries grew and in February of 2019, Peter Muller and myself conducted what is called a mainframe extract in order to provide the raw data for the Legacy Chubb data to an outside expert working with legal counsel who was better prepared to deal with the data analysis required. The mainframe extract pulled historical data from CUW-IM associated with the Legacy Chubb writing companies for the years 2016, 2017 and 2018. The mainframe extraction took significant time to complete and resulted in over a 10,000-page report.

6. The mainframe extract resulted in the reported financial information having inflated numbers. This is so because the method in which the data was pulled included policies that were brought in under a system that includes policies that are renewed using Blaze, but automatically at the same time includes the prior transaction involving the same policy regardless of whether it uses Blaze. This is the issue I explained above in Paragraph 3 that results in the system providing non-relevant premium information. I understand we informed FICO of this issue when we responded to the interrogatory.

7. It is my understanding that Mr. Bakewell and his team refined the gross written premiums for CUW-IM and included the refined figures in his expert report using the data my team and I provided. However, I did not personally refine the data for the gross written premiums for 2016, 2017 and 2018. I did gather and provide the data underlying these calculations. The refined CUW-IM figures in Mr. Bakewell's expert report were included in the Ninth Supplemental Answer to Interrogatory No. 17 for 2016, 2017, and 2018.

8. In or around May 2020, we began the process of calculating the 2019 premium and policy count numbers. Mr. Muller was the senior engineer that worked on this project with assistance from his team of engineers. The project presented significant difficulties which are more fully explained in the Declaration of Peter Muller dated November 11, 2020.

9. On or about September 28, 2020, I executed the Ninth Supplemental Answer to Interrogatory No. 17, which included the refined gross written premiums for CUW-IM

for 2019. The delay was further aggravated by finding a notary public where I was living during the COVID-19 pandemic.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: November 11, 2020           s/ C. Chase McCarthy

                                                                                   C. Chase McCarthy