# EXHIBIT D
# FILED UNDER SEAL

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CASE NUMBER: 16-cv-1054 (WMW/DTS)

-------------------------------------------------

Fair Isaac Corporation, a Delaware corporation,

  Plaintiff,

versus

Federal Insurance Company, an Indiana corporation, and ACE American Insurance Company, a Pennsylvania corporation,

  Defendants.

-------------------------------------------------

VIDEOTAPED DEPOSITION OF EXPERT WITNESS

CHRIS BAKEWELL

EXHIBIT D

TAKEN: 28 June 2019          BY: Jackie McKone

Page 94

1   that is identified in the -- from the context of
2   this.
3       So I think this all can be traced to the
4   same source, but there's additional analysis that
5   needs to be done to this information. So I think
6   the answer is kind of a yes and no.
7  Q. Looking at Exhibit 6, Exhibit 6 in your report.
8  A. Okay.
9  Q. I see a total of 14 billion under the select gross
10  written premiums. Do you see that as well?
11 A. No. Where are you?
12 Q. At the top of Exhibit 6.
13 A. I see that number.
14 Q. And from what document did that number come from?
15 A. Blaze IM --
16     (Whereupon the reporter asked the witness
17  to repeat the answer.)
18     THE WITNESS: It's a document called Blaze
19  IM Abstract-Final. It's not a document -- well, I
20  guess it's a document. Sort of. It's a file.
21  BY MS. KLIEBENSTEIN:
22 Q. So that number did not come from the response to
23  Interrogatory Number 17?
24 A. Yes and no. It came from the same source, but
25  there's additional -- this is overinclusive by

Page 95

1   definition, and the objections and the context of
2   this I think it makes it clear that it's
3   overinclusive. Mr. Zoltowski should have
4   understood that.
5  Q. In what way is the response to Interrogatory
6   Number 17 overinclusive?
7  A. Because it includes what Federal is trying to do
8   is respond specifically to this question in I
9   think maybe an overinclusive way. So it's at
10  least -- it doesn't want to be accused of making
11  judgments or reducing the number arbitrarily, and
12  so what Federal is saying in this answer is that,
13  look, we don't keep information about Blaze
14  Advisor having gross written premiums because
15  Blaze Advisor doesn't generate gross written
16  premiums, but what we're going to do is give you
17  the information of companies that used Blaze
18  Advisor, and what can happen here is that -- and
19  it does happen here and why you need to go to the
20  -- to the underlying document that I described is
21  that the same policy could be written, and it
22  could be counted multiple times using the way the
23  data is produced. That's my understanding.
24 Q. Separate from the multiple counting issue, is it
25  your position that the response to Interrogatory

Page 96

1   Number 17 includes policies and do not touch Blaze
2   Advisor in any way?
3  A. I think that that's a possibility what -- driven
4   by the difficulty of answering this question where
5   Blaze Advisor doesn't generate revenue and there's
6   not revenues kept that are attributable to Blaze
7   Advisor. So what Federal tried to do is -- is
8   provide information that is -- if it's going to
9   err in its estimates err on the side of being
10  overinclusive, and so it seems to me that there's
11  going to be instances that fit the description you
12  just provided by definition of the way that it
13  responded.
14 Q. Do you know for a fact that there are policies
15  included in the response to Interrogatory 17 that
16  do not touch Blaze Advisor in any way?
17 A. In any way at all?
18 Q. Correct.
19 A. Depends how you define that.
20 Q. Let's take CSI Express. Let me ask it a different
21  way. The interrogatory responses only list policy
22  counts for policies that run through applications
23  that contain Blaze Advisor; correct?
24 A. Where is that?
25 Q. Well, the table at the top on Page 11 is

Page 97

1   DecisionPoint; right?
2  A. Yes.
3  Q. And that's an application that contains Blaze
4   Advisor; correct?
5  A. Yes.
6  Q. CSI Express is right below that along with ARP and
7   profitability indicator; correct?
8  A. Yes.
9  Q. And those use Blaze Advisor; correct?
10 A. As part of that. They have Blaze Advisor in them.
11 Q. Yes. I'll agree with that. So those policies
12  that run through DecisionPoint and CSI Express I
13  will call those policies as touching Blaze
14  Advisor.
15 A. I wouldn't.
16 Q. Why not?
17 A. Because they don't necessarily touch it. You have
18  to look at the business flow and the business
19  process and see whether they actually do it, and
20  the business process there's some ORG charts or
21  business process charts that show how it's
22  relatively complicated, and there may be instances
23  where you could write a policy where you don't use
24  Blaze Advisor, at least in concept.
25     You'd have to go through and trace through

Page 98

1  every single instance and see whether or not it
2  did or had to according to the business process
3  the flow charts, and my recollection is is that
4  those flow charts are relatively complicated, and
5  if you trace them through, sort of like you trace
6  through a -- in -- in, like, a maze, sometimes you
7  may hit Blaze Advisor, and sometimes you may not,
8  and my understanding from the people who pulled
9  this information together is that it wouldn't
10 really be possible to go through and trace through
11 every single written policy that went through the
12 business process that I'm discussing, and so the
13 assumption was made that they'll -- they included
14 instances that could in concept touch Blaze
15 Advisor but don't necessarily do it.
16      So they wanted to be -- when they pulled
17 this information, Federal wanted to be responsive,
18 and to the extent it produced information be
19 overinclusive as opposed to under-inclusive.
20 Q. So if I'm understanding you right, there could be
21 a policy that goes through DecisionPoint, for
22 example, the application, and it goes through a
23 part of DecisionPoint that doesn't touch Blaze
24 Advisor?
25 A. I'd have to look at DecisionPoint and the process,

Page 99

1  the flow chart that I talked about and try to
2  figure that out on my own and see if I could.
3      I would -- I think a more efficient way to
4  get an answer to that question is go directly to
5  somebody from the company.
6      So without saying that that -- if we're
7  using that as a -- as an example, as opposed to
8  something that's, like, absolutely true, I'd use
9  that as an example to describe the type of
10 critical thinking that you'd have to go through in
11 understanding the data and how it was compiled.
12 Q. So taking Interrogatory Number 17, this response
13 in particular, you believe the data is
14 overinclusive; is that right?
15 A. Sort of. In the way that's described, I think
16 it's -- it's clear that that's how it was
17 compiled. So in one way, it's not. In one way,
18 it's responsive directly and therefore not
19 overinclusive because it's described, the
20 assumptions are described, but when it gets down
21 to trying to use it for the things that Mr.
22 Zoltowski tried to use it for, yes, it's
23 overinclusive.
24      That's the issue that I describe in detail
25 in my report.

Page 100

1  Q. Do you have any specific examples of any of gross
2  written premiums listed on Interrogatory Number 17
3  that run through the applications listed but do
4  not touch Blaze Advisor?
5  A. I don't know that I can give you an example. I'd
6  have to talk to a business person.
7  Q. And there were other similar -- there were other
8  interrogatory responses, this one is in the US,
9  there's others for the Canada, Australia, and the
10 EU, UK. Do you understand that as well?
11 A. Yes.
12 Q. And is your critique of those interrogatory
13 responses the same?
14 A. I'm not critiquing the interrogatory responses,
15 and I want to say something here for the record
16 that I think that what Mr. Zoltowski is saying and
17 accusing Federal of, frankly, he should retract,
18 and to the extent he's accusing me of doing
19 something, he should retract those statements. He
20 should go back and look at what he wrote and --
21 and consider the allegations he's making. They
22 are very serious.
23      I think that what's happening here is that
24 a company, Federal, is trying to be responsive to
25 requests for information that doesn't exist, and

Page 101

1  it should be considered in that context, and so to
2  try to accuse me, and I don't know if you did this
3  on purpose or not with your last question of doing
4  something wrong or misleading, I -- I take
5  exception to.
6  Q. No. I'm just trying to understand your position
7  as to why the interrogatory responses are not --
8  shouldn't be the starting point for gross written
9  premium.
10 A. They can be the starting point, but they need to
11 be considered in their context. They shouldn't be
12 taken out of context or be considered myopically.
13 There's a whole back and forth and there's context
14 for this interrogatory and the response. There
15 is. It's lengthy.
16 Q. I know it well.
17 A. It's lengthy.
18 Q. Mr. Fleming and I lived that for a year. So I'm
19 trying to do this efficiently without going
20 through each of the interrogatories, but we can do
21 that if you would like.
22      So we've got Interrogatories 18, 19, and 20
23 that ask for the same information but for
24 different geographies. You're aware of that;
25 correct?

Page 102

1  A.  Yes.
2  Q.  And your opinions regarding the data that's
3      reported in Interrogatory Number 17 are those
4      opinions the same for the data reported in 18, 19,
5      and 20?
6  A.  Are the -- I didn't hear the word you said, the
7      issues?
8  Q.  Your opinions relating to the data.
9  A.  Well, I don't know that they are actually
10     opinions.  I'm trying to ground this in facts, and
11     I think that those facts that you and I just
12     discussed apply to these interrogatory responses
13     in context.  Those aren't my opinions.
14         MS. KLIEBENSTEIN:  Terry, I'm going to give
15     you this one.
16         (Whereupon material was marked for
17     identification as Exhibit 524.)
18         MS. KLIEBENSTEIN:  I'm going to mark
19     Exhibit 525 -- 524.
20         MR. FLEMING:  I'm wondering --
21         MS. KLIEBENSTEIN:  I have a paper bit too.
22         MR. FLEMING:  What are you going to have
23     Mr. Bakewell use?
24         MS. KLIEBENSTEIN:  I wanted him -- I was
25     wondering if he could just look at your screen to

Page 103

1   authenticate what it is, and then we can go to the
2   paper to discuss.
3       MR. FLEMING:  Okay.
4       MS. KLIEBENSTEIN:  That's all.
5       (Whereupon material was marked for
6   identification as Exhibit 525.)
7       BY MS. KLIEBENSTEIN:
8  Q.  Mr. Bakewell, your counsel has a native text file
9      on a thumb drive on his computer, and I'm handing
10     you what I've now marked as Exhibit 525, which is
11     a snip of the -- the first screen viewable --
12     viewable page of that text file, if you will, and
13     I want to confirm what we're looking at.  I see in
14     your report there's a reference to a file called
15     CUW/Blaze IM Extract?
16 A.  Which page are you referring to?  By the way, he's
17     not my counsel.  Just so you know.
18 Q.  Fair -- fair enough.
19 A.  Which page are you referring to.
20 Q.  Blaze IM Extract is Exhibit 6 on the third page.
21 A.  Okay.
22 Q.  At the top.  I was provided --
23 A.  Oh.  I see.  Got it.  Blaze IM Extract-Final.
24     This is what I was referring to earlier is that --
25     you're saying it's that file.

Page 104

1  Q.  Yes, and I want you to confirm looking on Mr.
2      Fleming's laptop whether the text file in Exhibit
3      525 -- actually the text file in Exhibit 524 is
4      that file Blaze IM extract-final.
5          MS. KLIEBENSTEIN:  Do you have it up Terry?
6          MR. FLEMING:  Do not.  You know what?  I
7      don't want to use up all your time.  You can find
8      it quicker than I can.
9          MS. KLIEBENSTEIN:  Are you on the thumb
10     drive?
11         MR. FLEMING:  I can't ...
12         THE WITNESS:  Sometimes your computer
13     doesn't work, it happens with mine, it doesn't
14     recognize when you put a thumb drive in there,
15     can't figure out what's going on.
16         MR. FLEMING:  Do you want us to use --
17         BY MS. KLIEBENSTEIN:
18 Q.  Mr. Bakewell, let's turn to Exhibit 525.
19 A.  Okay.
20 Q.  And I'll represent to you what we're looking at is
21     the first viewable screenshot of what is in that
22     text file, and does this look like the first
23     viewable screen from the file titled Blaze IM
24     Extract Final?
25 A.  I don't know if it's the first viewable screen,

Page 105

1   but it looks familiar, and I'll accept your
2   representation if we're looking at the right
3   document.  We can do that.
4  Q.  I think I am.  We got this with a Bates number.
5      It was identified as something different in your
6      report so that's what we're trying to sort out.
7      Maybe Terry can help.
8  A.  We try.
9          MR. FLEMING:  I can't help by looking at it
10     on my computer.
11         BY MS. KLIEBENSTEIN:
12 Q.  Let's go through each of the columns.  They don't
13     have headers so we're struggling with how to
14     interpret the data.
15         Can you identify for me what information is
16     contained in each of the columns?
17 A.  I can.  I think there's a policy number on the
18     left, and then there's two more columns that have
19     the applicable dates, the beginning -- well, these
20     seem to be the same date.  I think that's -- well,
21     some of them have different dates.  I need to
22     check and see.  The next one I think is the
23     company that wrote the policy.  The next one is
24     the type in general, and then there's a
25     subcategory, and then there's an amount.

| Page 106 | Page 108 |
|---|---|
| 1 Q. Do you recall what the -- did you ask Federal to | 1   reply report where he didn't endeavor to use this |
| 2    prepare this data set? | 2   data at all, and so I don't think it's factually |
| 3 A. I think I see it as a request that we've both made | 3   correct for you to say he didn't have access to |
| 4    frankly. | 4   this information because he issued a report, his |
| 5 Q. Why? | 5   reply report where he clearly had access to this. |
| 6 A. Because Federal is trying to respond to your | 6 Q. Do you know how Federal queried their system to |
| 7    interrogatories, and then I said, hey, we need to | 7   identify the policies identified in this data set? |
| 8    do some more analysis of this if I understand this | 8 A. I did at one point in time. I asked about that. |
| 9    data correctly, and so we got the native file. | 9 Q. And do you know what criteria Federal used to |
| 10 Q. And what does this file represent?  What type of | 10  identify the relevant records? |
| 11   information is in the file? | 11 A. I think it asked if the criteria used are |
| 12 A. It's the underlying data behind the response to | 12  consistent with the interrogatory requests. |
| 13   the interrogatory.  I think. | 13 Q. And do you know what policies Federal included in |
| 14 Q. And how did you use this data in preparing your | 14  this data set? |
| 15   report? | 15 A. All of the ones that it described in the |
| 16 A. To try to eliminate the double counting issue that | 16  interrogatory as having the relationship to Blaze |
| 17   I described in my report. | 17  Advisor that's described in the interrogatory and |
| 18 Q. And walk me through the steps that you did -- walk | 18  the response. |
| 19   me through the steps that you took with respect to | 19 Q. So the text file in Exhibit 524 is the underlying |
| 20   this data in Exhibit 525.  What did you do to | 20  data or is the underlying policy information for |
| 21   eliminate the double counting as you see it? | 21  the data shown in Interrogatory Number 17? |
| 22 A. We used Excel and did sorts. | 22 A. That's my understanding.  It comes from the same |
| 23 Q. Sorted for what? | 23  system of record. |
| 24 A. Multiple -- same policy number. | 24 Q. So looking at -- looking at Exhibit 525 and 524, |
| 25 Q. So you sorted for -- you said multiple, same | 25  how do I know which policies went through |
| Page 107 | Page 109 |
| 1    policy number.  You sorted for the multiple same | 1   DecisionPoint, CSI Express, CUW, the applications |
| 2    policy number? | 2   that are listed in Interrogatory Number 17? |
| 3 A. Maybe I said that, but I didn't mean to say it | 3 A. I think based upon what I see here in 525 and the |
| 4    exactly like that.  There's instances -- there's | 4   interrogatory response there -- there is some |
| 5    multiple instances where the same policy number | 5   assumptions that were made regarding which of |
| 6    would exist in a row.  So we sorted by policy | 6   these descriptions went into which category. |
| 7    number and identified instances where there's the | 7 Q. When you say some assumptions were made regarding |
| 8    same policy number and where the amount would have | 8   which of these descriptions went into which |
| 9    been included under the categories identified in | 9   category, which descriptions and which category |
| 10   Mr. Zoltowski's report more than once and | 10  are you referring to? |
| 11   corrected it so that it only -- well, corrected | 11 A. The descriptions in Bakewell 525 and the |
| 12   isn't the right word, studied it so that we only | 12  categories provided in the interrogatory response |
| 13   counted that same policy once to arrive at the | 13  and -- done.  Period.  I wouldn't say and. |
| 14   correct result.  Unlike Mr. Zoltowski.  So the | 14 Q. And what were those assumptions? |
| 15   correction is to what Mr. Zoltowski did. | 15 A. I'm just looking to see if we actually need to |
| 16 Q. And Mr. Zoltowski did not have access to the data | 16  make those assumptions from the gross written |
| 17   in Exhibit 524; correct? | 17  premium information.  I think we're just |
| 18 A. I don't think that's true. | 18  eliminating the multiple instances of the same |
| 19 Q. I'll represent to you that Exhibit 524 was not | 19  policy occurring and eliminating double counting |
| 20   produced during discovery. | 20  in that way, and then we check it against business |
| 21 A. He could have asked for it.  My experience is that | 21  segment income statements, as I describe in |
| 22   that would be a -- a customary thing to ask for | 22  Section 4.3. |
| 23   and to study.  It doesn't -- that's neither here | 23         So I can go back and double check and see |
| 24   nor there from my perspective.  I'm not faulting | 24  if we have further information that might be |
| 25   Mr. Zoltowski for doing that, but he did have a | 25  helpful to -- if Mr. Zoltowski has an interest in |

Page 110

1   analyzing this data, I would be happy to do that,
2   but I'd have to discuss that with -- I mean, that
3   relates to whatever the discussions you've been
4   having with Mr. Fleming. I think you have all the
5   information that we do.
6 Q. But you agree that we don't have the know-how on
7   our end to figure out how to reconcile the text
8   file with the interrogatory responses; correct?
9 A. I can't agree with that.
10 Q. Well, sitting here today, you're having a hard
11   time explaining how I could replicate your
12   results; correct?
13 A. No.
14 Q. So then can you walk me through how I could use
15   Exhibits 5 -- Exhibit 524 and Interrogatory Number
16   17 to address the double counting issue that you
17   see?
18 A. I would do just what I said and sort that data by
19   policy number and figure out where the same policy
20   occurs more than once, and I was trying to be
21   helpful to you by describing other things that --
22   comparisons that you might do.
23 Q. So I could sort --
24 A. But I said very clearly in my answer, and if
25   that's how you want this to proceed, I'd be happy

Page 111

1   to go that way. If you're going to characterize
2   me being helpful as struggling, then I'll stop
3   trying to be helpful, and I'll just give you
4   specific answers to your questions.
5 Q. So I can sort the data -- Step 1 is to sort the
6   data to figure out where there's duplicative
7   policy numbers; right?
8 A. Correct.
9 Q. But then the link that I'm struggling with is how
10   do I know which policy went through the different
11   applications?
12 A. I would categorize -- I would do another sort by
13   the description, the categories, the following
14   three categories with verbal, with text, and I
15   would compare those to the business process
16   records that you also have copies of to map those
17   against what you've accused. I mean, this is your
18   lawsuit you're making the accusations of using
19   Blaze Advisor.
20      So I would sort this -- here is what I
21   would do, if you want to answer the question that
22   you just posited, I'll give you even more detail.
23   I would sort this by column, and let's -- let's
24   seem that each of these columns follows what Excel
25   has with Column A, B, C, D, et cetera. I would

Page 112

1   sort first by Column A, and then I would sort by
2   Column D, and Column E, and Column F, and I would
3   make subtotals for each of those, and where
4   there's policy numbers that appear more than once,
5   I would look to eliminate the policy that appears
6   more than once and compare those to the totals
7   that I have, and then where I've categorized it by
8   entity, according to this sort that I've just
9   done, as well as -- that's Column D and Column E
10   and F, I would match those sorts up against what
11   you've accused in this case and the application
12   that uses Blaze Advisor, and those are your
13   accusations. So that's how I would do that.
14      Pretty straightforward. Surprised Mr.
15   Zoltowski didn't do it. Instead, he made
16   accusations that I think he should retract.
17 Q. Let's move to Paragraph 82, and then we can take a
18   break for lunch.
19 A. Okay. Page 82 or Paragraph 82? I forgot.
20 Q. Paragraph, but it might be the wrong -- maybe it's
21   182.
22      MR. FLEMING: Which one?
23      THE WITNESS: That's what we're tying to
24   figure out.
25      MS. KLIEBENSTEIN: 182.

Page 113

1 BY MS. KLIEBENSTEIN:
2 Q. Going to Paragraph 184, there's a statement again,
3   "The CUW gross written premium data relied on by
4   Mr. Zoltowski included policies and associated
5   gross written premiums that were captured multiple
6   times in the data for other applications such as
7   CSI Express and Premium Bookings." Your source
8   there is an interview with Mr. McCarthy?
9 A. Correct.
10 Q. And he's the industry expert?
11 A. The industry expert? I don't think so. Let me
12   see.
13 Q. Who is Mr. McCarthy?
14 A. Chase McCarthy is the information technology lead.
15   He's an employee.
16 Q. And how many conversations did you have with Mr.
17   McCarthy?
18 A. One.
19 Q. And what is -- I know his job title. What is his
20   role? What does he do at Federal?
21 A. I think he works in the information technology
22   group.
23 Q. And did he pull this -- this data?
24 A. I don't know if he pulled it, but he was familiar
25   with it, and he was prepared to answer these

Page 114

1  questions.
2  Q.  What did you talk with Mr. McCarthy about?
3  A.  How he pulled the information, or Federal pulled
4      the information.
5  Q.  Anything else?
6  A.  I think anywhere I cite to him in my report that's
7      what I would have spoken with him about.  So I
8      don't see anything else.  I think that I asked him
9      about the -- the data and whether it included
10     policies that were captured multiple times, like I
11     discussed, and he confirmed that it did because of
12     the reasons that we discussed earlier, the
13     interrogatory and the response, and the challenges
14     that Federal had in responding because the
15     interrogatory doesn't match what it does in the
16     ordinary course of business.
17         MS. KLIEBENSTEIN:  All right.  We can take
18     a break for lunch.
19         THE WITNESS:  All right.  Thank you.
20         THE VIDEOGRAPHER:  We are going off the
21     report.  The time now is 12:51 p.m.
22         (Whereupon a lunch break was taken from
23     12:51 p.m. to 1:41 p.m.)
24         THE VIDEOGRAPHER:  We are back on the
25     record.  This marks the beginning of Media 4 in

Page 115

1      the deposition of Chris Bakewell.  The time now is
2      1:42 p.m.
3      BY MS. KLIEBENSTEIN:
4  Q.  Mr. Bakewell, can you turn to Exhibit 5 of your
5      report.
6  A.  Sure.
7  Q.  Can you explain to me at a 10,000 foot level what
8      data -- what calculations are shown in Exhibit 5?
9  A.  So in Exhibit 5, we're using, or I'm using the
10     actual numbers versus what Mr. Zoltowski used to
11     eliminate the double counting issue that we
12     discussed earlier, and that's detailed in Exhibit
13     6.  We were going through Exhibit 6 earlier.
14 Q.  Okay.  So the --
15 A.  Go ahead.
16 Q.  No.  Go ahead.
17 A.  I was going to volunteer something that related to
18     a question you asked me earlier that I promised to
19     get you something during lunch.
20 Q.  Sure.
21 A.  You want to do that now?
22 Q.  Yeah.
23 A.  So you were asking about Paragraph 180.
24 Q.  Yes.  The citation for that.
25 A.  There's a table underneath there, and the -- the

Page 116

1      sources are generally from Exhibit 8, but I think
2      it would be helpful if I gave you a work paper as
3      well to show where the sources came from, and so I
4      spoke with Mr. Fleming and we agreed that I'll
5      give that to him, and then he will give that to
6      you.
7  Q.  Okay.
8  A.  I don't know, in the next couple of days or
9      whatever.
10 Q.  So the support is Exhibit 8?
11 A.  Generally speaking, but the specific numbers you
12     have to do a couple of things to them, and we have
13     a work paper that describes that.
14 Q.  Okay.
15 A.  It should make it totally clear.
16 Q.  So going back to Exhibit 5.
17 A.  Okay.
18 Q.  Exhibit 5, the gross written premium figures take
19     care of that double counting issue that you
20     raised; correct?
21 A.  Correct.
22 Q.  And then I see a number at the bottom of the first
23     page, about 2.456 billion, and what does that
24     number reflect?
25 A.  That's the profit, the underwriting profit

Page 117

1      assuming a 16 percent profit margin.
2  Q.  Assuming a 16 percent profit margin, or is the
3      result a 16 percent profit margin?
4  A.  Either way.
5  Q.  Essentially the -- what figures did you add and
6      subtract to get the 2.456?
7  A.  I think it's the -- if you take 16 percent of
8      14.14 -- oh.  Well, there are specific numbers for
9      -- so 16 percent of 16.1 million equals 2.45
10     million -- 2.45 billion and 16.2 billion on the
11     top line.
12 Q.  And where did the 16 percent come from?
13 A.  That comes from the 8 series of exhibits.  So
14     Exhibit A, where it says percent net earned
15     premiums in 2018, that's 16 percent and the loss
16     ratio of 18.4 percent.
17 Q.  So here is what I'm trying to clarify.  These
18     percentages came from other calculations that you
19     did, not from, like, an industry publication or
20     anything like that?
21 A.  That's not exactly right, but I -- I considered
22     industry data in -- in providing those estimates,
23     but there's other calculations that I did.  So
24     you're right in part, but there's a part of my
25     report where I discuss some comparisons to the

30 (Pages 114 - 117)