**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Fair Isaac Corporation,
     Plaintiff,

v.

Federal Insurance Company and
ACE American Insurance Company,
     Defendants.

Case No. 16-cv-1054 (WMW/DTS)

**ORDER**

---

Plaintiff FICO seeks sanctions against Defendants Federal Insurance Company and ACE American Insurance Company (collectively "Federal") under Rule 37 alleging untimely supplementation of discovery in violation of Rule 26(c). Docket No. 815. Specifically, this motion concerns only a limited aspect of Federal's Ninth Supplemental Answer to Interrogatory No. 17, which was served in September 2020, long after the close of fact discovery. FICO seeks alternative relief in its motion—either strike the offending portion of the Ninth Supplemental Answer to Interrogatory No. 17, or order additional discovery (at Federal's expense) regarding the particular data that is the subject of the motion. As detailed below, the Court will deny the request to strike the supplemental answer but will order additional fact discovery on the terms described herein.

## FACTS

This is a copyright infringement action involving Federal's allegedly infringing use of FICO's business rules management software, Blaze Advisor, which Federal used in its insurance underwriting process. FICO seeks, among other remedies, disgorgement of profits generated through the allegedly infringing use of the software. In discovery FICO

requested information regarding the gross written premiums for all policies written by Federal from 2016 on, wherein the underwriting process for that policy in any way involved the use of Blaze Advisor. FICO's Interrogatory No. 17, which requested this information, was served on December 29, 2017. Kliebenstein Decl. Ex. 1, Docket No. 819-1. At that time Federal Insurance Company was the sole named defendant; American Insurance Company (ACE) was added as a defendant in September 2018. *See* Second Am. Compl., Docket No. 132.

> Interrogatory No. 17 requests:
>
> For all insurance policies in connection with which the Blaze Advisor software was used, [state] the gross written premium of Federal and the gross written premium of each related company, including the specific identification of each related company, for each quarter from March 30, 2016 to date. For clarity, this Interrogatory is not seeking investment income, other income, or capital and surplus accounts.

Docket No. 819-1.

Because Federal used Blaze Advisor in specific underwriting applications, FICO diligently sought to ensure that Federal's answer to Interrogatory No. 17 included all applications that "touched" Blaze Advisor during the underwriting process. *See* FICO Motion to Compel (Jan. 29, 2018), Docket No. 58; Mem. in Support of Motion, at 9 n.1, Docket No. 60; DTS Order (Feb. 16, 2018) (granting motion in relevant part), Docket No. 96; WMW Order (Apr. 24, 2018) (aff'ing Feb. 16, 2018 Order), Docket No. 108.

During the tenure of this litigation Federal has supplemented its answer to Interrogatory No. 17 nine times. FICO's present sanctions motion concerns that portion of Federal's Ninth Supplemental Answer that pertains to the Commercial Underwriting

Workstation (CUW)[1] application. All references in this order to "gross written premiums" information produced in discovery refer exclusively to the CUW application. Federal first provided gross written premiums related to the CUW application in its Fourth Supplemental Answer to Interrogatory No. 17, served on February 28, 2019. Fourth Supp. at 11-13, Kliebenstein Decl. Ex. 4, Docket No. 819-4; Pl. Br. 3, Docket No. 817.

The CUW gross written premium amount Federal provided initially was overstated in two distinct ways—by inflation and by duplication. Due to the way Federal maintains its data, the gross written premium information produced for a particular policy included all premiums for that policy for all years it was written. To illustrate, if a policy was originally written in 2000 but renewed every year thereafter through 2016 (the first year of alleged infringement) the gross written premium information for that policy as initially produced by Federal included not only the premium generated for the 2016 renewal, but all premiums generated from 2000 through 2016. This number is ***inflated*** as it includes gross written premium dollars that did not result from any alleged infringement of FICO's copyright.

Duplication is a different issue. It is not uncommon that a Federal insurance policy would involve more than one application in Federal's system. If, during the underwriting process, a policy was processed by multiple applications, all of which used (or, in FICO's words, "touched") Blaze Advisor, the gross written premiums as initially produced would be included in the data produced for more than one application. This is ***duplication***; the premium dollars associated with a given policy might be double-, triple-, or even quadruple-counted. Thus, to produce accurate gross written premium information

---

[1] The CUW application, an inventory management tool, is also called CUW-IM, which stands for Commercial Underwriting Workstation — Inventory Management. *See* McCarthy Decl. ¶ 1, Docket No. 829.

requested by FICO, Federal needed to both "un-inflate" and "de-duplicate" the gross written premiums generated by Federal's system.

In its Fourth Supplemental Answer to Interrogatory No. 17 (the answer that first produced information regarding the CUW application) Federal included the following footnote explaining that the amounts are "inflated numbers":

> We understand that this financial information includes policies that were brought in under a system that includes policies that are renewed using Blaze, but automatically at the same time includes the prior transaction involving the same policy regardless whether it uses Blaze. **We are seeking a way to not include the prior policy since it results in the financial information having inflated numbers.**

Fourth Supp. at 11 n.1 (emphasis supplied), Docket No. 819-4. Federal included the same footnote in its Fifth (Mar. 2, 2019) and Sixth (Mar. 21, 2019) Supplemental Answers regarding CUW gross written premiums. Kliebenstein Decl. ¶¶ 8-9 & Exs. 5 & 6, Docket Nos. 819, 819-5 to 819-6. None of these iterations contained any footnote explicitly identifying the duplication issue or describing a process to de-duplicate the numbers. Discovery closed on March 22, 2019, after the Sixth Amendment. Sixth Am. Pretrial Sched. Order at 1, Docket No. 205.

On May 17, 2019 Federal served the report of its damages expert, Christopher Bakewell, in which he reported de-duplicated and un-inflated gross written premium numbers for the years 2016 through 2018 for the CUW application. *See* Bakewell Rpt. ¶¶ 177-84, Docket No. 831-3. Bakewell's report states that these revised CUW gross written premiums removed the duplication, citing to a 10,000-page text file "Blaze IM Extract-Final," but did not otherwise distinguish between duplication and inflation. At the hearing on this motion Federal clarified that the Bakewell report in fact disclosed CUW gross written premiums that were accurate—un-inflated and de-duplicated—for the years 2016-

4

2018. The extract file contains historical data associated with legacy Chubb writing companies for 2016, 2017, and 2018, but did not include data for legacy ACE writing companies. *See id.* Ex. 9.0, Docket No. 831-3 at 7; McCarthy Decl. ¶ 5, Docket No. 829. Bakewell reported the gross written premiums for the CUW application as follows:

| 2016 | 2017 | 2018 | Total |
|------|------|------|-------|
| $3,818,649,134 | $2,526,106,134 | $2,148,920,154 | $8,493,675,422 |

Bakewell's report states (as does Ex. 9.0 to the report) that the underlying data regarding CUW gross written premiums was prepared by Federal, not by Bakewell. Paragraph 182 states, in part:

> Federal also prepared the revised gross written premiums for CUW (a domestic application), an inventory management tool that is often used in conjunction with other applications when writing a single insurance policy. [footnote 258: "File titled: 'Blaze IM Extract-Final'."] In this revised data, removed are any policies which ran through both CUW and another application . . . . **Using this revised CUW data effectively removes the duplication of certain gross written premiums** in the CUW data used by Mr. Zoltowski. For example, in Mr. Zoltowski's analysis, the premiums associated with any single policy which touched each of CUW, CSI eXPRESS and Premium Booking would be counted three times in the total gross written premiums.

Bakewell Rpt. ¶ 182 (emphasis suppled), Docket No. 831-3. Nothing in Bakewell's report clarifies the distinction between inflated premium numbers and duplicative premium numbers.

Federal served its Seventh Supplemental Answer to Interrogatory No. 17 on July 16, 2019. The Seventh Supplement did not change any information relative to the CUW gross written premiums and included the same footnote about inflated CUW numbers. Kliebenstein Decl. ¶ 10 & Ex. 7, Docket Nos. 819, 819-7. Federal did not update its

interrogatory answers to reflect the revised CUW premium amounts for 2016, 2017, and 2018 that had been provided in the Bakewell report.

FICO deposed Bakewell on June 29, 2019. Kliebenstein Decl. ¶ 13 & Ex. 10, Docket Nos. 819, 819-10. FICO inquired about the duplication issue, and Bakewell testified the best source of information would be someone from Federal who prepared the extract file. *See, e.g.,* Bakewell Depo. Tr. 98-100, 103-04, Kliebenstein Decl. Ex. 10, Docket No. 819-10. Following that deposition on July 26, 2019, FICO moved to exclude portions of Bakewell's expert report, including Bakewell's opinions regarding the CUW gross written premium amounts. *See* FICO's Motion to Exclude Testimony of W. Christopher Bakewell, Docket No. 419. District Judge Wright denied FICO's motion on this point. *See* Order at 21-23 & n.5 ("FICO's challenges to the factual bases underlying Bakewell's disgorgement opinions pertain to the weight and credibility of Bakewell's opinions, not the admissibility of those opinions."), Docket No. 731.

On April 23, 2020, FICO deposed Chase McCarthy, a Federal employee, who had provided Bakewell the revised CUW data in the Blaze IM Extract-Final file[2] and had signed the Verification of Federal's various supplemental answers to Interrogatory No. 17. Kliebenstein Decl. ¶¶ 14-18 & Ex. 11, Docket Nos. 819, 820. McCarthy testified he was not familiar with the data in the Blaze IM Extract-Final file; did not recall the file; and, though he may have had a conversation with Bakewell, did not recall any parts of it.

---

[2] Bakewell Rpt. ¶ 184 & n.260, n.261, Docket No. 831-3. FICO has now asserted it never received the Blaze IM Extract-Final data file but Federal has unequivocally represented that the extract file was produced to FICO with the Bakewell report. *See* Def. Br. 9 n.6, Docket No. 828.

McCarthy Depo. Tr. 77-81, Docket N. 820. FICO did not move to compel further deposition testimony from Federal as to the Blaze extract file.

On June 15, 2020, Federal served its Eighth Supplemental Answer to Interrogatory No. 17 in which it provided CUW gross written premium numbers for 2019 but did not otherwise change any information regarding CUW gross written premiums for the years 2016-2018. Docket No. 819-8. The premiums for calendar year 2019 had not been available at the time of Bakewell's report in May 2019. The Eighth Supplemental Answer included the same footnote indicating the gross written premiums were inflated. *See* Eighth Supp. at 6 n.1, Docket No. 819-8. FICO did not and does not object to any aspect of Federal's Eighth Supplemental Answer to Interrogatory No. 17.

On September 28, 2020, Federal served its Ninth Supplemental Answer to Interrogatory No. 17. Fleming Decl. Ex. A, Docket No. 831-1. The Ninth Supplemental Answer did several things. First, it updated the CUW gross premiums for 2016-2018 to reflect the revised numbers previously disclosed in Bakewell's report. Federal did this in order to have "one clean final answer" to Interrogatory No. 17. The Ninth Supplemental Answer also included legacy ACE premiums that had been omitted from Bakewell's report.[3] Finally, it provided revised premium information for 2019 (that is, it "de-flated" the 2019 numbers Federal had produced in the Eighth Supplement). In short, the Ninth Supplement decreased the 2019 gross written premiums but increased the 2016-2018 gross written premiums (over Bakewell) by inclusion of the 2016-2018 premiums for the

---

[3] The ACE legacy premiums were first included in Federal's Sixth Supplement but no explanation is offered as to why they were omitted from Bakewell's report.

legacy ACE companies. The net effect of these refinements was to decrease the total CUW gross written premiums by approximately $1.5 billion (or, 10.7%).

| Year | Bakewell Report | Ninth Supplement |
|---|---|---|
| 2016 | $3,818,649,134 | $4,178,036,656 |
| 2017 | $2,526,106,134 | $3,521,674,450 |
| 2018 | $2,148,920,154 | $2,955,939,340 |
| Total | $8,493,675,422 | $10,655,650,446 |
| | | |
| | Eighth Supplement | Ninth Supplement |
| 2019 | $7,672,769,437 | $3,778,743,383 |
| | | |
| | | |
| Grand Total | $16,166,444,859 | $14,434,393,829 |

On October 28, 2020 FICO moved for Sanctions for Untimely Supplementation of Interrogatory Answer No. 17. Docket No. 815. FICO asks the Court to strike Federal's Ninth Supplemental Answer to Interrogatory No. 17 with respect to CUW premiums or, alternatively, to order Federal to produce McCarthy for a second deposition "to explain methodology differences between the Ninth Supplemental Answer and the prior answers" or, if he is unable to do so, an additional Rule 30(b)(6) deposition of Federal. Pl. Br. 2, Docket No. 817. FICO also seeks attorney's fees and costs incurred in bringing this sanctions motion and taking any depositions that the Court may order. *Id.* at 2, 17.

## ANALYSIS

### I.  The Duty to Supplement Discovery

Federal Rule of Civil Procedure 26(e)(1) requires a party to timely supplement an interrogatory answer "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). "[T]imeliness under Rule 26(e)(1)(A) is measured from 'the date when the facts are discovered, not some nebulous date when counsel first realized that there was some significance to them.'" *Longlois v. Stratasys, Inc.*, 88 F.Supp.3d 1058, 1077 (D. Minn. 2015) (quoting *Havenfield Corp. v. H & R Block, Inc.*, 509 F.2d 1263, 1272 (8th Cir. 1975)).

Thus, Rule 26(e) does not give a party the *right* to supplement prior discovery answers, it imposes on them the *duty* to do so, which duty arises whenever the information produced is found to be incomplete or inaccurate in some material respect. Fed. R. Civ. P. 26(e)(1)(A). The duty to supplement also requires that the supplementation be made in "timely" fashion. *Id.* In the context of the rule, however, timeliness is not measured by a particular date or event; rather, timeliness means without undue delay upon discovering the information that is to be provided. *See Longlois*, 88 F.Supp.3d at 1077. The duty to supplement continues past the discovery deadline and up to the time of trial. *See Phil Crowley Steel Corp. v. Macomber, Inc.,* 601 F.2d 342, 343, 345 (8th Cir. 1979) (original erroneous formula inflated the damages amount; revised damages formula and computation provided to opposing party four days before trial and supplemental interrogatory answer filed on second day of trial); *Silvagni v. Wal-Mart*

*Stores, Inc.,* 320 F.R.D. 237, 241 (D. Nev. 2017) ("To the extent it becomes clear based on new circumstances that the damages computation is incorrect or incomplete, the plaintiff has a duty to supplement the initial damages computation. There is no bright line rule that such supplementation is improper if made after the expert disclosure deadline or even after the close of discovery.") Even supplemental information provided during trial may be timely and not excluded. *See Phil Crowley Steel,* 601 F.2d at 343.[4] Conversely, even a supplementation prior to the close of discovery may be untimely where the producing party withheld information only to produce it at a time calculated to gain a tactical advantage. *See* 8A Federal Practice & Procedure (Wright & Miller) § 2049.1 (3d ed.) (Rule 26(e) is "not an invitation to hold back material items and disclose them at the last moment")*; see also Longlois*, 88 F.Supp.3d at 1077 (supplemental answers served during the discovery period were nonetheless untimely because they did not allow time for deposition on the contents of the supplementation); *Steady State Imaging, LLC v. General Electric Co.,* No. 17-1048, 2018 WL 2047578, at *9 (D. Minn. May 2, 2018) (plaintiff's "close-of-discovery supplementation" was "not 'timely' for purposes of Rule 26(e)(1)" because the information was essential to defendant's understanding of the reason it was sued; plaintiff "viewed focusing on its litigation priorities as more important than actually identifying the [factual information] that formed the very basis of two of [its] claims").

Some information by its very nature cannot be produced during the discovery period. For example, in patent and trademark infringement litigation it is well understood

---

[4] One may argue that *Phil Crowley Steel* reflects the particular circumstances of that case, but the same is true of every case involving a determination of whether supplementation is timely. That is the point.

that information regarding sales of allegedly infringing products may necessarily require supplementation up to the eve of trial. Seasoned litigation counsel know and expect this to be the case, often agreeing in advance to a regular schedule of supplementation on a periodic basis. Other supplementation may not be anticipated but is no less timely if it could not have been produced earlier. In contrast, when historical information requires manipulation of raw data the timeliness of supplementation will depend on the diligence with which the data manipulation is pursued. To illustrate, if the allegedly infringing activity ceases before suit is filed, the amount of infringing sales is a matter of history and does not evolve up to the time of trial. In such a case, when a party knows that historical data must be processed before it is produced and is given a deadline for that production but fails to act with reasonable diligence, the supplementation may be deemed untimely.

If a party fails to supplement information as required by Rule 26(e)(1), "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court . . . may order payment of the reasonable expenses, including attorney's fees, caused by the failure . . . ." Fed. R. Civ. P. 37(c)(1).

### A.    CUW Gross Written Premiums for 2019

Federal first provided the CUW gross written premiums for calendar year 2019 in June 2020 in its Eighth Supplemental Answer. Federal's Eighth Supplemental Answer advised FICO these numbers were inflated but that uninflated numbers would be provided. FICO did not object to or seek to strike this supplementation. (And why would it? After all, the Eighth Supplementation *increased* FICO's damage claim). Three months later in September 2020 Federal provided the uninflated 2019 gross written premiums in

11

its Ninth Supplemental Answer. FICO seeks to strike this Ninth Supplement as untimely and therefore a violation of Rule 26(e).

Production of the gross written premiums for 2019 falls into the category of ongoing infringement that is necessarily subject to supplementation. In this case discovery closed in May 2019. Thus, the gross premium information for 2019 could not possibly be produced before the close of discovery. Moreover, Federal employees describe a complicated and time-consuming process for identifying and gathering the policy counts and gross written premium information responsive to Interrogatory No. 17 because the company's systems cause duplication and inflation of the numbers. *See* McCarthy Decl. and Muller Decl., Docket Nos. 829, 830. Federal provided the information initially in June 2020 in its Eighth Supplemental Answer, to which FICO makes no objection. Three months later, in September 2020, Federal supplemented its answer to produce the uninflated gross written premiums for 2019. This Ninth Supplementation lowered the 2019 gross written premium amount and, predicably, FICO objects.

There is no basis in the record before the Court to establish that the three additional months it took Federal (June-September) to produce final accurate 2019 premium amounts was due to its lack of diligence or indicates an intent to sandbag FICO. To the contrary, throughout the discovery process Federal repeatedly advised FICO that the initial CUW premium numbers were inflated and that it was working on a process to deflate those numbers. It had previously done so regarding the earlier years as reflected in the Bakewell report. In short, Federal had an ongoing duty to supplement its answer regarding the 2019 premiums and there is nothing in this record to demonstrate that the

Ninth Supplemental Answer regarding the 2019 CUW gross written premiums was untimely.

Even if FICO had established a violation of Rule 26(e) with regard to the 2019 CUW gross written premiums, exclusion of the revised information would be an inappropriate remedy. The inflated 2019 premiums do not provide accurate information responsive to Interrogatory No. 17. FICO's disgorgement claim seeks to recover profits resulting from alleged infringement. FICO does not seek to recover profits that are overstated because they include premiums from non-infringing activities or premiums that have already been counted in other applications.

This Court has repeatedly expressed its reluctance to force a litigant to admit at trial facts it knows to be false. Trials should be a search for the truth, not an exercise in tactical advantage resulting from the presentation of knowingly false evidence. *See Phil Crowley Steel,* 601 F.2d at 345 (defense counsel did not object to plaintiff's revised damages formula and computation, provided four days before trial, until after witness testified and was cross-examined; "[defense] counsel candidly acknowledged that he preferred [plaintiff's original] higher damage estimate to [plaintiff's revised] lower one because [defendant's] expert could cast greater doubt on the former than he could on the latter."); *ELCA Enterprises, Inc. v. Sisco Equipment Rental & Sales, Inc.,* 53 F.3d 186, 190 (8th Cir. 1995) ("For litigation to function efficiently, parties must provide clear and accurate responses to discovery requests."); *U.S. Salt, Inc. v. Broken Arrow, Inc.*, No. 07-1988, 2008 WL 2277602 (D. Minn. May 30, 2008) at *4 (the purpose of discovery is to make trial less a game and more a "fair contest with the basic issues and facts disclosed to the fullest practicable extent"). Rule 37 seems to embody precisely this sentiment when

it provides that a court—even when confronting an *untimely* supplementation that favors the supplementing party—may craft an appropriate alternative sanction in lieu of excluding accurate information but admitting inaccurate information. Fed. R. Civ. P. 37(c); *Silvagni,* 320 F.R.D. at 242 ("[e]xclusion sanctions are not a foregone conclusion" under Rule 37(c) even if substantial justification or harmlessness have not been established). But in this case there is no evidence that Federal's supplemental production of accurate 2019 CUW gross written premiums was untimely or tactical (after all, it repeatedly advised FICO of its intent to provide revised, accurate premium information; in these circumstances it is FICO, not Federal, who seeks an inappropriate tactical advantage).

### B.    CUW Gross Written Premiums for 2016, 2017, and 2018

FICO's objection to Federal's Ninth Supplement for the period 2016-2018 is downright puzzling. In the Ninth Supplement for 2016-2018, CUW gross written premiums for the Chubb legacy policies are identical to the numbers included in Bakewell's report:

| Year | Bakewell Report Ex. 9.0 (May 17, 2019) | Ninth Supplement (Sept. 28, 2020) |
|------|------|------|
| 2016 | $3,818,649,134 | $3,818,649,134 |
| | | |
| 2017 | $2,526,106,134 | $2,526,106,134 |
| | | |
| 2018 | $2,148,920,154 | $2,148,920,154 |

True, the Ninth Supplementation of these premiums reflects a lower dollar amount than Fourth through Eighth Supplementations, but the reason for this is clear. Federal always intended to provide revised accurate numbers for these years and it did so in its May 2019 Bakewell report, but did not immediately include those revisions in its Seventh

14

or Eighth Supplementation.[5] It did include these revisions in its Ninth Supplementation in order to have one clean final Interrogatory Answer that gathered in one place all previously produced information. As noted, FICO did not object to Federal's Fourth through Eighth Supplemental Answers. It did move to exclude Bakewell's report, but lost that motion. Federal's inclusion of the revised 2016-2018 CUW gross written premiums for legacy Chubb policies does not violate Rule 26(e). Quite simply this information was "otherwise made known" to FICO in Federal's timely produced Bakewell report. It had no duty to supplement its answer to Interrogatory No. 17 to reflect this information but did so as a matter of clarity and convenience. Such conduct does not violate Rule 26(e).

### C.    2016 – 2018 Legacy ACE Premiums

In its Ninth Supplemental Answer to Interrogatory No. 17 Federal also included 2016-2018 CUW gross written premiums for policies written by legacy ACE companies. For reasons that have not been explained to this Court those numbers were not included in Bakewell's report.[6] The inclusion of these premiums in Federal's Ninth Supplemental Answer has the effect of increasing the 2016-2018 CUW gross written premiums by approximately $2.3 billion over the Bakewell report, hardly a circumstance that prejudices FICO. FICO nonetheless objects because the numbers are new, poorly explained and are presented on the "eve of trial," leaving FICO ill-prepared to rebut them at trial.

---

[5] Federal did include overstated 2016-2018 numbers for legacy Chubb companies in its Fourth, Fifth, and Sixth Supplementations that preceded Bakewell's report and that advised FICO it was producing revised numbers. *See* Docket Nos. 819-4, 819-5, 819-6. FICO did not object to these Supplemental Answers and the revisions were provided in Bakewell's report.

[6] The overstated numbers for legacy ACE companies were, however, included in Federal's Fourth, Fifth, and Sixth Supplemental Answers which were served before Bakewell's report was issued. *See* Docket Nos. 819-4, 819-5, 819-6.

There is nothing in the record before this Court to establish that the supplementation of these numbers is untimely. As indicated, it is difficult to see how the exclusion of these premiums—which augments FICO's damage claim—serves FICO's interests. More to the point, neither party has provided the Court any information regarding the circumstances of why that information was not previously provided. FICO has the burden of proving the supplementation is untimely and has not done so. Moreover, though FICO asserts the 2016-2018 CUW premium amounts in the Ninth Supplement are new "last-minute" numbers provided on the "eve of trial," Pl. Br. 1-2, 10, Docket No. 817, no trial date has been set. Though the Court contacted the parties on October 8, 2020 to inquire about the likely duration of a jury trial, no trial date is set and civil jury trials in this District have been delayed due to the COVID-19 pandemic. There is no indication that trial is imminent.

Finally, if the Ninth Supplemental numbers regarding CUW were excluded in their entirety, as FICO seeks, it is unclear which numbers the parties should then properly default to. FICO complains that the Ninth Supplement's CUW premium amounts for 2016-2018 do not match the Bakewell report. *See id.* at 9. But the Ninth Supplement's premium amounts ─ which FICO wants to *exclude* ─ are over $2 billion *higher, i.e.,* more favorable to FICO, than the amounts in the Bakewell report. *See id.* This is because the Bakewell report does not include the premium amounts for the legacy ACE companies, while the Ninth Supplement does.

On the other hand, the Eighth Supplement from June 2020 does not have the revised CUW numbers for either 2019 (because Federal had not finished revising them) or the 2016-2018 time period (because the revised numbers were previously provided in

the May 2019 Bakewell report Ex. 9.0 (for all writing companies except the legacy ACE companies), and Federal did not separately supplement its interrogatory answers with the revised numbers that appear in the Bakewell report). It would make no sense to use the Eighth Supplement's numbers as a basis for disgorgement damages calculations, given that Federal consistently advised, beginning with its Fourth Supplement in February 2019, that the CUW numbers were inflated due to the way Federal's system operates. FICO is entitled to cross-examine Bakewell about the CUW data, methodology, and opinions in his report. Moreover, it is District Judge Wright, not a jury, that will decide the disgorgement issues. She has already ruled that FICO's challenges to the factual bases underlying Bakewell's disgorgement opinions go to weight and credibility, not admissibility.

In any event one thing is clear. Exclusion of the Ninth Supplemental Answer to Interrogatory No. 17 would result in the exclusion of accurate information (*i.e.* un-inflated and de-duplicated) CUW premiums and admission of inaccurate information. As indicated, even if this Court found a violation of Rule 26(e), FICO's remedy would lie elsewhere.

### D.  Summary

Federal's Ninth Supplemental Answer to Interrogatory No. 17 is neither improper nor untimely. To the extent Federal's Ninth Supplemental Answer reflects its process of correcting inflated numbers, there is nothing before this Court to demonstrate that this process was intentionally or even negligently delayed or that the supplementation based on that process was otherwise untimely. To the extent Federal's Ninth Supplemental Answer includes premiums for ACE legacy policies, there is likewise nothing in the record

17

before this Court to establish this supplementation is untimely. FICO has failed to establish that Federal violated its duty to supplement under Rule 26(e). Accordingly, this Court will issue no sanctions under Rule 37(c)(1).

## II.    Further Discovery

Though the Court finds no violation of Rule 26(e), the specific facts and circumstances of this case establish that additional discovery is appropriate on the terms set forth below.

FICO has argued confusion regarding the CUW data on gross written premiums because the explanation of the "inflation" issue given in the discovery footnote differed from the "duplication" issue described in the Bakewell report.[7] It does appear there is overlap or imprecision in the terminology regarding why the gross written premium numbers are overstated. For example, FICO's brief quotes the footnote about "inflated numbers" but describes it as a "duplication" issue. *See* Pl. Br. 4 ("In a footnote, Defendants' response suggested some duplication existed in the gross written premium reported for the CUW application," citing footnote 1 in Fourth Supp.), Docket No. 817. But the salient point is that FICO was on notice of Federal's assertion that the CUW premium amounts in its interrogatory answers were overstated and would be refined. FICO never objected to that reservation. *See Silvagni,* 320 F.R.D. at 243 n.7 ("courts are generally unimpressed by tenuous assertions of prejudice when any harm could have been minimized through the movant's prompt action in either obtaining a stipulation with

---

[7] As discussed above, "inflation" occurs when the system captures a single policy's premiums for too many years, *i.e.*, years outside the relevant damages time period for this lawsuit. "Duplication" occurs when a policy touches two or more applications (*i.e.,* CUW and one or more other applications) and is thereby double-counted (or triple-counted, etc.).

opposing counsel or moving the Court for relief"). How and why that happened, and how the numbers were to be revised, are topics that FICO explored in depositions.

Unfortunately, in those depositions Bakewell and McCarthy did not provide meaningful explanations regarding the methodology used to reach the CUW premium numbers (who did what and how), especially as compared to the information in the November 2020 declarations of McCarthy and Peter Muller submitted in opposition to FICO's present sanctions motion. While this issue has nothing to do with the "timeliness" of Federal's Ninth Supplement, and any dissatisfaction with their testimony could have been raised in a motion to compel more responsive testimony, it would be unfair to compel FICO to proceed to trial with an incomplete or inadequate understanding of Federal's CUW gross premium information.

Accordingly, the Court will order Federal to make McCarthy available for deposition, at FICO's expense, on the following subjects: (1) the methodology for revising the 2019 gross premiums, as reflected in the Ninth Supplemental Answer; (2) questions previously asked of McCarthy but not answered regarding the Extract file; (3) how and why legacy ACE premiums were not included in the Bakewell report; and (4) how, when and by whom the legacy ACE premiums were revised and included in the Ninth Supplement. After the deposition, FICO may request the Court to reconsider its order denying its request for attorneys' fees.

In this context, one final observation is in order. This motion is at least the seventh request by FICO that the Court sanction Federal for alleged violations of the discovery

rules.[8] This litigation is quite large. FICO claims damages in excess of $30 billion. No doubt emotions have run high, both among the parties and between and among counsel. This in turn has caused both sides to view the other with distrust and to perceive in the other's conduct ill motive. It is human nature to understand our own conduct in light of our known motivation but to judge others' conduct by imputing ill motive.

The rules of civil procedure set the standards by which the parties and their counsel must conduct the litigation. They exist to ensure the speedy, just, and inexpensive determination of civil actions. Fed. R. Civ. P. 1; *Tenbarge v. Ames Taping Tool Systems, Inc.*, 190 F.3d 862, 865 (8th Cir. 1999) ("The purpose of our modern discovery procedure is to narrow the issues, *to eliminate surprise,* and to achieve substantial justice." (internal citation omitted)). The rules must be and will be enforced. This Court has not hesitated to sanction—sometimes quite severely—violations of the rules. It will continue to do so.

But the rules are not an open invitation for counsel to "litigate the litigation." This case has been plagued by the parties' mutual distrust and recrimination and by submission to the temptation to engage in needless, unproductive, and destructive litigation of the litigation. FICO has too often moved for sanctions for perceived discovery abuses. For its part, Federal has at times exhibited a lack of diligence in discovery that has bordered on—and on some occasions transgressed into—sanctionable disregard for the rules. *See Silvagni,* 320 F.R.D. at 243 (focus should be on working out agreements

---

[8] *See, e.g.*, Docket No. 149 at 43 (Nov. 13, 2018) (seeking monetary and multiple evidentiary sanctions including exclusion of evidence); Docket No. 184 at 1 (Jan. 28, 2019) (seeking evidentiary sanctions); Docket Nos. 224, 226 (Apr. 5, 2019) (seeking to exclude witnesses and evidence); Docket No. 353 at 2, 12-13 (July 19, 2019) (seeking monetary sanctions); Docket No. 553 at 2-4 (Sept. 9, 2019) (seeking exclusion of declaration); Docket Nos. 716, 718 (Feb. 25, 2020) (seeking monetary and evidentiary sanctions for alleged spoliation of evidence).

to reasonably permit the opposing party to respond to newly disclosed evidence "rather than automatically resorting to motions for exclusion sanctions"; "An overly strict application of Rule 37(c)'s exclusion provision would incentivize" parties to "instead focus their efforts on laying the groundwork for a later motion to exclude.").

Therefore, the Court issues two cautions to the parties. First, should FICO decide to avail itself of the opportunity to revisit its request for an award of fees, it should do so only if substantially justified by the testimony it is allowed to take. Second, this case is near its conclusion. Fact and expert discovery are concluded. Dispositive motions have been heard and ruled upon. This Court does not expect to be the recipient of new motions for sanctions. The parties are cautioned that in the event such motions are filed, the Court will be inclined to award attorneys' fees to the prevailing party.

## ORDER

The Court, being duly advised in the premises, upon all of the files, records and proceedings herein, now makes and enters the following Order.

**IT IS HEREBY ORDERED:**

1.      Plaintiff FICO's Motion for Sanctions for Untimely Supplementation of Interrogatory Answer [Docket No. 815] is DENIED.

2.      FICO may, at FICO's expense, depose Chase McCarthy on the topics specifically identified in this order.

Dated: January 20, 2021                     __s/David T. Schultz_____
                                                         DAVID T. SCHULTZ
                                                         U.S. Magistrate Judge