```
 1

 2                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 3
      --------------------------------------------------------
 4                                  )
      Fair Isaac Corporation, a     )  File No. 16-cv-1054
 5    Delaware Corporation,         )          (WMW-DTS)
                                    )
 6            Plaintiff,            )
                                    )  Minneapolis, Minnesota
 7    vs.                           )  January 11, 2022
                                    )  1:00 p.m.
 8    Federal Insurance Company, an )
      Indiana Corporation; and ACE  )
 9    American Insurance Company, a  )
      Pennsylvania Corporation,     )
10                                  )
              Defendants.           )
11    --------------------------------------------------------

12            BEFORE THE HONORABLE DAVID T. SCHULTZ
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
13
14                       (MOTION HEARING)

      APPEARANCES
15    For the Plaintiff:          Merchant & Gould PC
                                  ALLEN W. HINDERAKER, ESQ.
16                                80 South 8th Street
                                  Suite 3200
17                                Minneapolis, Minnesota 55402

18    For the Defendants:         Fredrikson & Byron
                                  TERRANCE J. FLEMING, ESQ.
19                                CHRISTIAN HOKANS, ESQ.
                                  LEAH JANUS, ESQ.
20                                200 South 6th Street
                                  Suite 4000
21                                Minneapolis, Minnesota 55402

22    Court Reporter:             ERIN D. DROST, RMR-CRR
                                  Suite 146
23                                316 North Robert Street
                                  St. Paul, Minnesota 55101
24
          Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  Okay.  Good afternoon, everyone.
We're on the record in the matter of FICO v. Federal, Civil
Number 16-1054.

Counsel for FICO, if you will note your
appearances for the record, please.

MR. HINDERAKER:  Your Honor, Allen Hinderaker from
Merchant Gould, and with me is the vice president and
associate general counsel of FICO, James Woodward.

THE COURT:  James, I didn't catch the last name.
I'm sorry.

MR. WOODWARD:  Woodward.

THE COURT:  Thank you.

All right.  Counsel for Federal, if you'll note
your appearances, please.

MR. FLEMING:  Good afternoon, Your Honor.
Terrance Fleming, Leah Janus, and Christian Hokans of the
Fredrikson firm representing the defendants.

THE COURT:  Very well.  Good afternoon to all of
you.

So just a couple of housekeeping things.  What I
would ask you to do, first of all, speak from the podium,
okay?  You can remove your mask to speak from the podium,

1    but we have lost our rolling Plexiglass due to a trial in

2    St. Paul which puts a bunch of judges over here in

3    Minneapolis, which takes my Plexiglass out of the courtroom

4    such as it is.  If one counsel is up here addressing the

5    Court, just I would prefer that you then move to the other

6    side of your own Plexiglass, okay?  Probably unnecessary,

7    but we should be as safe as we can be.  Okay?

8              Okay.  With that, Mr. Fleming, it is your motion.

9    Come on up.

10             MR. HINDERAKER:  I should go over here?

11             THE COURT:  Thank you.

12             MR. HINDERAKER:  Can I go here, Your Honor?

13             THE COURT:  Yeah, that's fine by me.  I just want

14   to make sure that we're appropriately distanced.

15             MR. HOKANS:  Your Honor, is it all right if I sit

16   here?

17             THE COURT:  Yes.  Just do me one other favor,

18   either when you return to counsel table or as you leave the

19   podium, use the hand sanitizer as well, okay?

20             MR. FLEMING:  Yes.

21             THE COURT:  Okay.  Go ahead, Mr. Fleming.  I have

22   read everything.  I think I have some questions for you, but

23   why don't you go ahead.

24             MR. FLEMING:  Thank you, Your Honor.  We are

25   moving today to amend the scheduling order to allow us to

1      file a nondispositive motion to preclude FICO from using Luc

2      Marce as a witness and also to exclude the charts that he

3      has prepared.  And we're also asking to make a motion for

4      summary judgment to dismiss FICO's remaining copyright

5      claim.

6              This arises out of a deposition that we took in

7      November, 2021, just a couple months ago, of Luc Marce.  And

8      you've read the papers.  I won't talk about how he happened

9      to be there on that day.  But the evening before the

10     deposition, we received Exhibit 15, which is a chart,

11     without any description or anything and there was no

12     explanation from counsel as to what it was.  And then the

13     following morning, two hours before the deposition, we got a

14     revised chart, same thing, just a -- the chart with numbers

15     and different terms all over it.

16             And we took Mr. Marce's deposition, and it was

17     quite apparent to me the subject matter was he talked about

18     his background as a software engineer at FICO for many

19     years.  And he said that he was asked back in November of

20     2021 to prepare the chart that was provided hours before the

21     deposition by counsel.  And the purpose of that was he ran

22     it through a -- he was told to utilize the software source

23     code analysis, a program, that analyzes, you know, 10

24     million lines of the source code for a prior version of

25     Blaze and to compare it with this Version 7.1.

1          And he went on to testify that there was

2     similarity between the two versions of like 95 percent, but

3     over 100,000 lines were not included.  And he said that he

4     did simply a quantitative analysis.  Certainly, it wasn't

5     what you would call a qualitative or substantive to compare

6     the two versions.  It was --

7          THE COURT:  Let me interrupt you for a second.

8     I'm looking at Exhibit 14 to the materials you submitted,

9     which I think is the same as what's marked in the materials

10    you submitted as Exhibit 16, except that Exhibit 16 is

11    oriented the wrong way.  But I think they are substantially

12    similar.

13         Setting aside the question of the chart, okay,

14    this is -- I mean, you would agree that the information in

15    the chart is factual data; right?  I mean, we've got -- so,

16    for example, looking at Reference Version 7.0, next line is

17    Version 7.1, and basically it says, you know, so many lines

18    of code were added, so many were deleted.  The common -- the

19    overlapping code is approximately 98 percent.  That's all

20    factual data; right?

21         MR. FLEMING:  Right, obtained from using a program

22    that compared the two.  It is data.  And it is data that

23    shows how many lines are in common, how many were added, how

24    many were deleted.

25         THE COURT:  Okay.  Keep going.

1            MR. FLEMING:  So it was clear to me that this was

2       classic expert testimony.  If there had been a determination

3       by FICO at the outset of this case to identify Mr. Marce as

4       an expert, it would have been no different.  It would have

5       the same background.  He would have provided the same

6       analysis of the quantitative similarity of the two.  He also

7       would have provided a report, and he would have provided us

8       with an opportunity to have our own rebuttal expert if we so

9       determined.  But it is not lay testimony by any means.  It

10      isn't something that he does in the regular course of his

11      business as a software engineer at FICO.  Rather, he was

12      directed by counsel to conduct this analysis using this

13      program.

14            So, I mean, he was conducting a test that he

15      doesn't do in the ordinary course of his business for the

16      purpose of providing this information at trial.

17            THE COURT:  How is this not -- hang on one second.

18      How is this not -- if you were going to -- let's say you're

19      ready for trial, you're exchanging exhibits, and FICO prints

20      off and numbers the software code for each of the referenced

21      versions as, boom, we're putting these in as exhibits.  So

22      far so good.  And then they say, this chart, Exhibit -- I'm

23      referring to what's marked as Exhibit 14 and Exhibit 609,

24      which is a depo exhibit number -- this chart, Exhibit 14 or

25      609, is just a Rule 1006 summary of voluminous documents.

1    How is that not the case?

2          MR. FLEMING:  Well, they, of course, have not made

3    that argument.  And also they wouldn't be able to present

4    the code itself since they didn't identify it in either

5    their initial disclosures or in response to our discovery

6    requests.  So, I mean, those parts of that hypothetical

7    should not happen in our view.  But even -- I don't believe

8    a layperson would be able to -- I mean, if he had done this

9    all manually, instead of used a software program, I don't

10   believe a layperson would have been able to prepare this

11   summary.  It -- I mean, it relates to the lines of code,

12   what's been added or deleted.  As he's -- as Mr. Marce

13   testified himself, a layperson would not be able to do this.

14   A layperson would not be able to understand this.  And it

15   was only because he'd been a software engineer for 20-plus

16   years that he had the foundation to explain what it is that

17   he did, the process that was followed, and what this machine

18   did.

19          But it is -- I mean, it's not like a layperson who

20   happened to be at the scene of an accident and a car -- like

21   an employee who happened to be at a car accident which is

22   the subject of a lawsuit and that person testifies about

23   what he saw.  This is something that he was asked to do by

24   counsel, would not -- he's never done it before, hasn't done

25   it since, and he had to use this software program to obtain

1    the data.  It's not ordinary course layperson's observations

2    of things.  Rather, it's something that he needed to engage

3    the services of this program in order to provide the

4    information and for him to give verification that it's

5    reliable and how that machine works and how it gathers the

6    information.  But --

7            THE COURT:  Is -- let me try it a different way

8    then.  He's -- Mr. Marce testified in his deposition, in

9    essence, I'm familiar with -- and by all means, tell me if

10   any of these details are wrong.  I'm not going to be that

11   detailed -- but I'm familiar with all these versions.  I

12   know the way we go from Version 7 to Version 7.1, and I know

13   how we go from Version 6 point anything to Version 7 point

14   anything.  One is built on top of the other.  We use most of

15   the lines of code from the prior version in the next

16   version.  How is this chart then rule -- or Exhibit 14,

17   Exhibit 609, in depos, how is that not just an illustration

18   of that factual testimony?

19           MR. FLEMING:  Well, because the factual testimony

20   that you just reviewed is just generally how a software

21   company would create various versions of a particular

22   software.  This is a -- a quantitative analysis that it was

23   necessary to use, you know, a software computer program to

24   provide this data.

25           THE COURT:  This -- but here's -- here's where I'm

1    struggling with this.  If Mr. Marce gets on the witness

2    stand and says -- let's say he memorizes these numbers and

3    he says, 98 percent of the code that exists in Version 7.0

4    is used in Version 7.1, that's a fact.  You can -- you get

5    to ask him, Well, do you know which lines of code, how do

6    you know it functions the same, all of that stuff.  But why

7    isn't that just a fact that he can testify to?  And then if

8    you want to talk about the computer program, isn't that

9    just -- the computer program itself isn't expert testimony,

10   isn't opinion testimony.  If they want to rely on the

11   computer program, they are going to have to demonstrate some

12   foundation for it.  Why isn't that just ordinary fact

13   testimony that, you know, maybe you did have discovery on it

14   and maybe you didn't?  Maybe you should have or maybe,

15   whatever, but I'm not there with you on the expert

16   testimony.

17            MR. FLEMING:  Yeah, well, Your Honor, I would

18   simply reiterate there is a difference between the -- the

19   extrinsic, which is all he's going to be providing testimony

20   on, and the intrinsic, which he unabashedly says he's not

21   able or at least he currently hadn't been able to conduct

22   any such analysis, wasn't asked to do it.  So we're just

23   talking about the quantitative analysis.  But I believe that

24   that analysis itself is not layperson testimony.  You need a

25   sufficient background in software engineering in order to do

1    that analysis in order to explain -- not only to do the

2    analysis, but to understand how that machine works and

3    exactly what it's doing.

4         I mean, they say that it's a fact that, you know,

5    it is that percentage as a -- I mean, the issue is literally

6    he was doing an analysis of tens of millions of lines of

7    source code, and he doesn't have personal knowledge of any

8    of that.  He doesn't have personal knowledge of the

9    similarity between the two.  He knows, in general, they use

10   a lot of the similar source code when they go to version for

11   version, but it was only with this machine, which attempts

12   to provide, you know, the information about how many lines

13   were added, how many were deleted, that he would be able to

14   testify.  A layperson wouldn't be able to come in and say --

15   wouldn't be able to run the machine in the first instance,

16   couldn't tell, without a background in software engineering,

17   how the machine was obtained, what exactly it does, why we

18   have comfort in the veracity of the machine.  I mean, it is

19   the type of information that typically an expert would

20   provide.

21             THE COURT:  Hang on a second.

22             Okay.  Keep going, Mr. Fleming.

23             MR. FLEMING:  So, I mean, there's -- that is our

24   argument as to why he is an expert.  He's a software

25   engineer.  He was relying upon his expertise.  He testified

1    himself that he would -- a layperson would not understand

2    the chart, would not be able to create the chart himself.

3    He also doesn't do it in the regular course of his business.

4    As I said, he was directed to do this for the first time, so

5    it's clearly something that was done in anticipation of

6    trial as opposed to something in the regular course of

7    things.

8            And, you know, the lateness in providing all of

9    this is a subject of concern also.  They had the chart back

10   in November 2020, they didn't provide it until a year later,

11   hours before the deposition.  So, I mean, I -- it's our

12   position that because he is testifying about a matter where

13   he needs technical expertise to provide the information, he

14   was asked to do this for the purposes of this litigation, he

15   doesn't do this in the regular course of his business.  He's

16   never used the machine before, he is an expert, and he

17   should have been so identified in a timely fashion and

18   allowing us an opportunity to respond with an expert.

19           THE COURT:  Is -- well, all right.  So I tend to

20   agree with you in -- that implicit in your argument, I

21   think, implicit in both sides' argument is that the issue is

22   going to come down to whether or not this is expert

23   testimony or not.  Right?

24           MR. FLEMING:  Yes.

25           THE COURT:  And I'm not hearing you say -- let's

1    assume for a second that it's fact testimony.  I'm not

2    hearing anyone say you requested the software code in

3    discovery or that you asked questions, for example, of any

4    witness, to the extent they are in the initial disclosures

5    whose testimony or knowledge is described as knowledge of

6    the extent of preexisting material in later versions of the

7    Blaze Advisor software, I'm not hearing that those questions

8    were asked in any other deposition.  Is that -- am I right

9    in all of that?

10             MR. FLEMING:  Yes.

11             THE COURT:  Okay.  Have you -- I don't recall

12   seeing any cases frankly cited by either side that were

13   terribly illuminating on this question of whether this is

14   really expert testimony or not.  I mean, the general

15   principles are the general principles, but have you cited

16   any cases that you think are particularly analogous to this

17   circumstance?

18             MR. FLEMING:  I don't believe so.  In this

19   context, though, in reviewing the cases about substantial

20   similarity, it did appear to me that generally there were

21   experts on both sides of the issue, but there wasn't a

22   discussion about their need or the lack of need for that.

23             THE COURT:  Okay.  So the part of this -- well,

24   the other part of this is if it's not -- well, are you

25   arguing that the overlap -- the percentage, for example, of

1    overlap between Version 7.0 and 7.1, that Mr. Marce says

2    that percentage is blank, that that statement is an opinion?

3              MR. FLEMING:  Yes.

4              THE COURT:  Okay.  Okay.  Anything else I should

5    be aware of before I hear from them?

6              MR. FLEMING:  Yes, this issue about the production

7    of the source code.  We had a -- you know, the initial

8    disclosures use the words "documents sufficient to show

9    FICO's ownership of its federal copyrights."  And, you know,

10   their response is, Well, that is the same as saying the

11   source code, but it's not.  It's saying "ownership of."  Any

12   more than if they said -- it was a different case and they

13   said ownership of a car or a dog or a book, ownership is

14   title, and words mean something.  Those are the words they

15   used.  They didn't use the word "source code."  And we asked

16   questions in interrogatories, in the document requests about

17   identifying each work, and also broader, all documents not

18   otherwise requested that refer or relate to the claims and

19   defenses in this lawsuit.  Now -- and, again, the source

20   code wasn't referenced or produced.

21              There's a difference between litigating and trying

22   a case.  I can't think of a single case that I've tried

23   where I attempted to use documents that hadn't been provided

24   in the initial disclosures or discovery.  I mean, that's

25   what you do is you make sure those are provided.  And

1   there's a reason for it, because Rule 37 says very clearly

2   if you fail to produce the documents in the initial

3   disclosures, you can't use them at trial.  And that is the

4   situation we're in.  They did not identify or produce it in

5   their initial disclosures in response to discovery requests

6   or otherwise.  And now they are going to, at trial, attempt

7   to use this evidence that has not been produced.  I mean,

8   that is -- that is contrary to the way cases are tried.  And

9   that is the very reason for the rules, for Rules 26 and 37.

10          THE COURT:  That's not really the motion that's in

11   front of me, but, that aside, isn't -- first of all, setting

12   aside the initial disclosure issue for a second, did you

13   request the -- the code in discovery?  I recall -- I recall

14   having some discussion early on in this case about code, and

15   I remember that being a bit of a lightning rod, but was that

16   requested in discovery?

17          MR. FLEMING:  It was not -- well, it was

18   requested -- those words were not used in the discovery

19   requests, but they would have been required to be produced

20   in the initial -- identified or produced in the initial

21   disclosures because they are -- you know, directly relate

22   to, you know, support for the claims that they are

23   providing.  And we had broader interrogatories asking them

24   to identify each work you contend that Federal used beyond

25   the scope granted and describe the basis for your

1    contention, all documents relied on in preparing those

2    responses, and then all documents not otherwise requested

3    that refer or relate to the claims and defenses in the

4    lawsuit.

5          THE COURT:  I think -- I'm sure Mr. Hinderaker

6    will have plenty to say on this topic.  But I think the

7    title, if you will, of the vehicle -- here the vehicle is

8    the software -- the title is the registration; right?  This

9    is how I prove that I own it.  The code itself -- well, the

10   code itself -- is the code itself the protected work?  Is

11   that your point?

12         MR. FLEMING:  Yeah, it's not the certificate.

13         THE COURT:  Right.

14         MR. FLEMING:  That is the only thing referenced in

15   the initial disclosures.  And, Your Honor, it is -- before

16   you just for this reason, we're asking for the ability both

17   to make a motion to preclude Mr. Marce but also to bring a

18   summary judgment motion on the copyright claim.

19         THE COURT:  Well, I think that the problem with

20   that -- and I really want to hear from Mr. Hinderaker --

21         MR. FLEMING:  Yeah.

22         THE COURT:  But the problem, at least as I

23   understand it, is you want to bring a motion for summary

24   judgment on a theory that they are not advancing.  Their

25   theory is Federal directly copied our registered works by

1    use of Version 7.1, and, for that, the question of

2    substantially similar doesn't matter.  For that, the

3    question is was 7.1 derivative of 7.0, which was asserted as

4    an infringed basis, and was 7.2 substantially derived from

5    7.1.  And so the summary judgment motion, at least as I

6    understand it that you want to bring, you could bring that

7    argument, and Mr. Hinderaker is going to stand up in front

8    of Judge Wright and say, We agree.  It's not -- we're not

9    asserting that it's substantially similar.  We're saying it

10   was directly copied.  So what do you say about that?

11           MR. FLEMING:  Well, that is different than what

12   they've represented to Judge Wright in the summary judgment

13   argument, because when we raised this issue about Blaze 7.1

14   being the only software that they are now relying upon, we

15   raised the point that it was unregistered, and their

16   response was, we're relying upon the unregistered Blaze 7.1

17   based on significant similarity.  They use that very phrase

18   repeatedly.  I mean, that was their argument as to why they

19   could use 7.1.  So, I mean, they can say now that they are

20   not relying upon it.  They told the Court they were relying

21   on it.  And even under the direct evidence of copying

22   doctrine -- or the derivative works doctrine, that is a

23   substantial similarity test.  They still have to show that

24   what was copied was substantially similar.

25           THE COURT:  They describe that as not substantial

1    similarity, and maybe it's a distinction without a

2    difference.  They describe it as substantial overlap,

3    similar -- at least as I understand it.  And maybe it's that

4    we're adopting, frankly, words that don't really fit in

5    the -- in the software area, but substantial similarity gets

6    at the notion of the sort of overall impression of the work

7    so that, you know, if you are looking at two paintings, it's

8    an assessment of its qualitative sort of conveyance.  And

9    they are saying, no, for derivative works, all it is is how

10   much of this work is found in the derivative work.  And when

11   we're talking about software code, their position, at least,

12   is, you know, if you have ten lines of code and nine lines

13   are used, we can put in evidence that nine lines are used

14   and the jury can decide whether that is a substantial bit of

15   the work that's used in the derivative work.

16             MR. FLEMING:  Right.  Right, Your Honor.  And

17   that's what they are saying now.  They had been arguing a

18   different analysis was applicable.  And they submitted a

19   brief.  We haven't had a chance, of course, to respond to

20   that.  But I don't believe the tests aren't similar.  I

21   think the tests are similar.  I think they still have to

22   show substantial or significant similarity between the two.

23   So they'd have to produce the source code of each in order

24   to do that, and they have failed to do so.

25             THE COURT:  Until now.  Actually, they probably

1    still haven't produced the actual source code.

2               MR. FLEMING:  They have not produced.

3               THE COURT:  Okay.  Okay.  Thank you, Mr. Fleming.

4               MR. FLEMING:  All right.  Thank you.

5               THE COURT:  Use the hand sanitizer before you

6    leave.  Come on over to the other side.  Thank you.

7               Mr. Hinderaker, before you begin, let me start

8    with what I think are the easy issues.  FICO is not going to

9    elicit testimony from Mr. Marce that says Version 7.1 is

10   substantially similar to Version 7.0 or 7.2.  Am I correct

11   in that assumption?

12              MR. HINDERAKER:  You are correct, Your Honor.  We

13   expect the judge to instruct the jury on the test, and we

14   expect Mr. Marce to provide the jury with facts.

15              THE COURT:  And the facts that he -- you would

16   have him provide are, this has this many lines, 7.1 has this

17   many lines, X number of lines were deleted, X number were

18   added, and here is the percentage of overlap?

19              MR. HINDERAKER:  Can I -- I think I need to -- I

20   know why you are saying it that way, and I'm not saying that

21   you are wrong saying it that way, but that's not the way I

22   would -- that's not my expression of it.

23              THE COURT:  Okay.

24              MR. HINDERAKER:  My expression of it is that I

25   need my glasses.  But Mr. Marce will first testify, as the

1   deposition detailed, about how FICO develops or writes one

2   version of Blaze Advisor over the other.  So as you

3   summarized earlier, they are written on top of each other.

4   The changes are very small, typically, and so forth.  So he

5   will -- he will testify that -- he will testify to that.

6   Under the instructions of the Court, under the definition of

7   a derivative work from the Copyright Act, Section 101, a

8   derivative work is something that is based on the prior

9   preexisting work.

10              So then when we get to the quantification --

11              THE COURT:  And the language in the Copyright Act

12   is based on.

13              MR. HINDERAKER:  The language of the Copyright Act

14   is based on.

15              THE COURT:  So the word "substantial," if one

16   really wanted to get technical about this, never has to come

17   out of Marce's mouth?

18              MR. HINDERAKER:  It never will.  It doesn't have

19   to be.  And I think, appropriate to this point, if I or any

20   counsel for FICO was to ask Mr. Marce a question that

21   implicated Rule 702, 703, or 705, counsel for the defendant

22   should object, and the judge should make a ruling.

23              The chart, the table, was given to counsel as a

24   courtesy to demonstrate how Mr. Marce -- what Mr. Marce --

25   what Mr. Marce did.  And so where my expression differs from

1    yours, Your Honor, is that if -- one, in the context of my

2    claim, depending on the registered Version 7.0, I will have

3    Mr. Marce do the work to tell the jury that version --

4    unregistered Version 7.1 has X lines of code of 7.  Now,

5    that information is on the chart here.  You have to do the

6    math yourself.  You take the code of 7, you look at how

7    much -- how many lines of code were deleted in 7.1, you

8    subtract that from the lines of code of 7, and then you have

9    the lines of Code 7 that are in 7.1.  You would do a similar

10   analysis if my -- when my copyright claim is based upon

11   registered Version 7.2, I'd look at all of the lines of code

12   of 7.1 that are in 7.2.

13           Now, counsel was asked whether that's an opinion

14   when you asked the question, Your Honor, about a percentage.

15   It's not an opinion.  It's simple math.  If I have two lines

16   of code and the registered version has four, the math is

17   that the unregistered version has half of the code of the

18   registered.  So it's not an opinion.  It's math.

19           THE COURT:  What -- imagine you're in Federal's

20   shoes and you are looking at these numbers, and -- well,

21   that's -- I'm not going to ask you that question.  Here's

22   the point, what's the factual refutation of this

23   information?  In other words, you know, there's a quality to

24   the argument they are making, that is, this has been sprung

25   on us.  We were unprepared for it.  And I'm asking what's --

1   if it were never sprung -- I'm not saying it was or it

2   wasn't, but if it were never sprung and somebody had three

3   years to develop a response to that, is there a response to

4   the factual information?

5               MR. HINDERAKER:  If Mr. Marce was inaccurate.

6               THE COURT:  Okay.  Okay.

7               MR. HINDERAKER:  So the -- there were -- there

8   were a few what I'll call errors of fact, misstatements, if

9   you will, and I have to leave the Court to looking at our

10  references to the transcript to test what I'm going to say.

11  But the source code or software control system that

12  Mr. Marce used is a standard business repository of FICO.

13  It wasn't done -- it wasn't created for the purpose of this.

14  It's where the source code for the various versions of Blaze

15  Advisor reside at FICO.  Mr. Marce created for himself a

16  tool that, if you will, I think he called it a script,

17  whereby, he could have the computer -- a computer do the

18  comparison of lines of code.  And that is the extent which

19  that is -- and Mr. Marce was able to do that because he

20  knows how.

21          Counsel was suggesting that these lines of code

22  have something to do with similarity, and he used those

23  words.  They do not.  Mr. Marce, when he identified what

24  lines of code were in common, he identified the lines of

25  code that are identical, exact, same line.  When he

1    identified or -- the lines of code that were added, he just

2    identified every line of code that was either added or an

3    existing line of code that was moved to someplace else in

4    the program.  That was added.  And when he identified lines

5    of code that were deleted, they had exactly what he says,

6    they are deleted.  So there's no similarity analysis in his

7    work in any event, and to suggest that any of this has

8    anything to do with similarity is wrong.

9         Now, let me -- I was going to talk -- let me say a

10   few more things about Mr. Marce and then segue into that.  I

11   have the impression from counsel that for Mr. Marce to

12   testify as a, quote, fact witness, he must not have the

13   qualifications to have the firsthand knowledge and the

14   personal experience to testify to these facts.  I mean, the

15   argument that a person with expertise and because of that

16   expertise has the personal knowledge of facts, and the

17   personal experience working with these facts, because such a

18   person is the only kind of person who can testify factually.

19   But the plaintiff's argument boils down to the

20   proposition -- or the defendants' argument boils down to the

21   proposition because he is -- has expertise in software,

22   somehow he's an expert.  And as the cases that we cited

23   detail, Your Honor, this issue of a fact witness being

24   presented as an expert or challenged as an expert has

25   happened before, and the Courts have said, Is this factual

1    testimony based upon his personal firsthand knowledge?  Is

2    his factual testimony based upon his personal experience?

3    The fact that he has qualifications to have that knowledge

4    and have that experience does not make him into an expert.

5              THE COURT:  So let me illustrate what I think

6    you're saying, and you tell me if this captures it.  Have

7    you seen the movie "Don't Look Up"?

8              MR. HINDERAKER:  Not yet.

9              THE COURT:  Okay.  It doesn't matter.  There --

10   essentially imagine you have a lawsuit in which an

11   astrophysicist's calculations matter, and the calculation is

12   there's a comet, I see the comet.  I run the math.  I

13   calculate this is the path, or I calculate, you know, these

14   things.  Your point is, I can't do that calculation.  Only

15   an astrophysicist can do that calculation, but that he has

16   the knowledge to do the calculation doesn't turn the

17   calculation into expert testimony.

18             MR. HINDERAKER:  Exactly so.

19             THE COURT:  Where it becomes expert testimony is

20   if he or she says, and it's going -- in my opinion, it's

21   going to hit the Earth?

22             MR. HINDERAKER:  Exactly so.  And the person isn't

23   saying, It's my opinion that this is what's going -- it's my

24   opinion of the trajectory.  The person is saying, That's the

25   math.

1          THE COURT:  Right.  Okay.  What about this issue

2     that this was in some measure sprung on the defendants?  I

3     have seen the initial disclosures and the description of,

4     first, Chen, and then I think it's Jorge, and then it's

5     Mr. Marce's testimony that says the -- well, let me just

6     find it.  Hang on.  The description is -- and of course I

7     pull up the wrong one.

8          MR. HINDERAKER:  It's knowledge of the extent of

9     preexisting material in later versions of Blaze Advisor

10    software.

11         THE COURT:  Right.  Right.  That was clearly

12    disclosed.

13         MR. HINDERAKER:  June of 2017.

14         THE COURT:  Right.  What about the argument that

15    if you were going to go this route with this theory, which

16    is to say 7.1 is the derivative work of 7.0 and 7.2 is the

17    derivative work of 7.1, you were required to disclose the

18    source code so that they could address that?

19         MR. HINDERAKER:  Well, I have two -- two responses

20    to that.  I don't accept the proposition that we did not

21    identify the source code.  We -- you -- there was an analogy

22    of a car, well, that has a title.  There was an analogy of

23    something else that had a title.  Let's use the analogy of a

24    baseball.  I want to show to you my ownership of the

25    baseball.  How might I do that?  I might show you that I

1     possess it.  Our initial disclosures doesn't say ownership

2     of registrations.  It says, ownership of copyrights.

3     Copyrights do not exist in thin air.  Copyrights are an

4     expression, and, in here, we're talking about source code,

5     the instructions to a computer.

6          THE COURT:  Reduced to a tangible medium.

7          MR. HINDERAKER:  Fixed in a tangible medium of

8     expression.  And we talked about -- and we said, we want the

9     documents sufficient to show our ownership of copyrights.

10    It is the expression fixed in a tangible medium.  It is the

11    source code.  We're not limiting it to registered

12    copyrights.  We're not limiting it to proof of the

13    registration itself.  We're saying, this case is based on

14    the instructions to a computer which are copyrights when

15    they are fixed in a tangible medium of expression.

16          And I want to suggest, Your Honor, that -- and I'm

17    looking at Footnote 8 of the defendants' brief at page 24,

18    where, in this case, they are talking about substantial --

19    or the substantial similarity argument, which I'll get to.

20    But I find this to be quite telling, when they are -- they

21    have already argued about the initial disclosure, quote, A

22    computer's program is literal elements, i.e., its source

23    code and object code, comprise the protected content of the

24    asserted work [sic].  That is the thing itself.  Documents

25    of FICO sufficient to show the ownership requires

1    presentation of the thing itself.  And we've cited in the

2    brief -- I'm saying it now -- the initial disclosure on

3    documents does not say source code.  It says, federal

4    copyrights.  And the only kind of copyrights there are is

5    federal.  And it doesn't say title documents.  So we did

6    disclose that.

7         But the initial disclosures need to be read, I

8    think, in total.  And less than three months later, the

9    subject matter for Mr. Chen has expanded to be the extent of

10   preexisting material in later versions of Blaze Advisor

11   software.  To suggest that the software itself, the source

12   code itself, is not a fundamental part of the case, ignores

13   Mr. Chen's testimony.  FICO was telling the plaintiff from

14   2017, June 6, this is one of the elements of our proof of

15   our case.

16        THE COURT:  Is -- so -- okay.  They argue -- or

17   they say in response to that, then you were required to

18   produce those.

19        MR. HINDERAKER:  And there is no -- there is

20   absolutely no support for that.  The initial disclosures

21   identify location and types of documents, and the next step

22   was for the defendants to request to come to the location

23   and inspect the documents or to request, by request for

24   documents, the source code.  That is -- you know, the

25   commentary to the initial disclosure rule says it's a way of

1    getting everybody on the same page as to what there is, and

2    then the discovery rules are the way in which that

3    information is produced to the other side.  I mean, I'm old

4    enough to have gone to warehouses where the documents were

5    located and that was how the other side produced their

6    documents.  More modern is that the one side actually gives

7    the documents to the other, but in either event, it's the

8    next step that defendants -- defendants never took.

9              THE COURT:  Rule 26(a)(1)(A)(ii) says you must

10   produce a copy or a description by category and location.

11             MR. HINDERAKER:  And we gave a description by

12   category and location.

13             THE COURT:  Did the Court's Rule 16 -- I can't

14   imagine that it did knowing what our Rule 16 orders look

15   like.  I don't believe -- I couldn't have been on the

16   initial one.  I wasn't a Magistrate Judge.  But did it

17   require production of the actual documents or simply say

18   initial disclosures?

19             MR. HINDERAKER:  Just initial disclosures.

20             THE COURT:  Okay.  And the category where the

21   software code -- the source code fits is ownership.  Or what

22   is -- what's the category that you think that the source

23   code fits in?

24             MR. HINDERAKER:  The documents necessary to show

25   ownership is the source code in FICO's possession.

 1              THE COURT:  Okay.

 2              MR. HINDERAKER:  And -- and the other notion -- a

 3      related notion is the proposition that the defendants could

 4      not have understood that the source code is a fundamental

 5      part of the case, and they didn't know enough to ask for it.

 6      Well, there's nothing unfair about what was disclosed to

 7      them, and reading Mr. Chen's disclosure, I think, I'm

 8      suggesting eliminates even the argument of any notion that

 9      the source code -- any surprise that they might have that

10      the source code is not -- is not part of this case.  Of

11      course it's part of this case.

12              THE COURT:  Did we have -- was there a request for

13      production of the source code?

14              MR. HINDERAKER:  No.

15              THE COURT:  Did we have -- do I have -- I know I

16      have a vague recollection of having discussed the topic

17      generally, but did we discuss the topic generally during the

18      course of our many, many motions in this case?

19              MR. HINDERAKER:  I really hate to show my age and

20      say I don't remember, but I don't remember.

21              THE COURT:  Okay.

22              MR. HINDERAKER:  If I might -- if I might turn to

23      another -- another argument that the defendants made.  With

24      the Court's indulgence, at the end of my comments, I'd like

25      to say more about this, but this is -- but at this point

1   now, there's this theme that, well, FICO is changing its

2   story, and, gosh, they are going to try to prove up

3   infringement based upon derivative works?  They said before,

4   at Docket 795, page 5, 7.1 is substantially similar to the

5   registered versions of Blaze Advisor.  And it is.  And we

6   will prove it.  And, as I mentioned, the definition of a

7   derivative work is one work, quote, based on one or more

8   preexisting works.  How are we going to show that?  We're

9   going to show that they are substantially similar.

10                  THE COURT:  Well --

11                  MR. HINDERAKER:  I'm sorry.  Go ahead.

12                  THE COURT:  The problem with that particular

13   phrase, I think, is that it's a buzz phrase; right?  You

14   know, you're going to show that it's based on, and the

15   argument is going to be, look at the extent of the overlap.

16                  MR. HINDERAKER:  I was going to add to this,

17   Your Honor.

18                  THE COURT:  Okay.

19                  MR. HINDERAKER:  In the case law, the case law

20   that we rely upon for direct copying, the case law uses the

21   phrasing "a substantial amount of material from registered

22   version to unregistered use."  I believe that when

23   defendants saw the phrase "substantial similarity," they

24   applied it to the wrong legal test.  Proof of substantial

25   similarity is our way that we can prove one work is

1    derivative from the other.  The material is substantially

2    identical.  That's our derivative proof.

3           They look at the word "substantial similarity" and

4    they say, oh, there's this other case law, not direct

5    copying case law, but this other case law where you have to

6    prove access for circumstantial and substantial similarity.

7    Well, they took a phrase and applied it to the wrong law.

8    But that's not -- that's on them.  What we said was we have

9    to prove substantial similarity to the registered versions.

10   And let me also point out this, substantial similarity to

11   the registered versions, that's the proposition of direct

12   copying and proof on derivative -- infringement based upon

13   derivative works.  We didn't say substantial similarity

14   between --

15           THE COURT:  The defendants' work and ours.

16           MR. HINDERAKER:  Right.

17           THE COURT:  Because the defendants don't have any

18   work.

19           MR. HINDERAKER:  They really don't.  They don't,

20   which is what the case law they rely on presumes, but they

21   don't.

22           THE COURT:  Is -- do you have your -- I think the

23   second amended complaint is the operative complaint in this

24   case; correct?

25           MR. HINDERAKER:  That is correct.

1        THE COURT:  And I don't remember exactly where it

2    appears in the materials submitted.  Do you happen to know

3    that offhand?  Is it in yours or theirs or both?

4        MR. HINDERAKER:  I know that in our written

5    materials, we speak to the second amended complaint because

6    that's how ACE American becomes a defendant in the lawsuit.

7    Whether --

8        THE COURT:  Yeah, I don't see any.

9        MR. HINDERAKER:  -- it's an exhibit, I --

10       THE COURT:  Do you know?  Excuse me a second,

11   Mr. Hinderaker.

12       MR. HOKANS:  Your Honor, it's Docket 132.

13       THE COURT:  But it's not included in the materials

14   that are supporting this motion?

15       MR. HOKANS:  No.  It's not an exhibit.

16       THE COURT:  Okay.  All right.  Thank you.  Hang

17   on.

18       All right.  Keep going, Mr. Hinderaker.  The point

19   I was going to ask, and obviously I'm going to satisfy

20   myself on this, but your infringement allegations in the

21   second amended complaint allege what?  Direct infringement?

22   Infringement of a derivative work?  What does it allege?

23       MR. HINDERAKER:  That the -- it's more general

24   than that.  It alleges --

25       THE COURT:  They infringed.

1           MR. HINDERAKER:  It alleges that the unauthorized

2     use of Blaze Advisor infringes registered copyrights.

3           THE COURT:  Okay.  Thank you.

4           MR. HINDERAKER:  And it's worth -- I think it's

5     worth me noting, Your Honor, at the time of these pleadings,

6     the pregnant question of what version of Blaze Advisor was

7     being used during this period of unauthorization wasn't

8     something that we had.  That was in their documents.  And so

9     we had to take on -- we undertook discovery to find that

10    out.  And any -- there's somewhere in the defendants' brief

11    where it was to the effect saying to the effect, FICO

12    finally disclosed that its Version 7.1, that's the basis of

13    unauthorized use.  It's as if FICO's counsel should call up

14    defendants' counsel from time to time and let them know how

15    we're thinking.

16          The complaint lets out the -- states the

17    registered versions.  They can look at their own documents

18    to see what they were doing with Blaze Advisor during the

19    infringement period.  Their own documents tell them it's

20    Version 7.1.  Look at our complaint again, is Version 7.1

21    there?  No, it's not.  7.1 is unregistered.  Check the

22    copyright office.  Maybe we made a -- 7.1 is unregistered.

23    They knew that or could have known that as soon as they got

24    the complaint and asked their clients to look at their

25    records.  And the records we attached in the filing are

1    called Chubb Enterprise Application Registry.  Big long

2    document, big Excel spreadsheet, pain in the neck to read.

3    And they record what technology they are using on their

4    applications.  And you go to the applications that I care

5    about that use Blaze Advisor, and it's Version 7.1.  They

6    knew that.

7           I'm going to -- now, relatedly to the -- well, I

8    want to -- if I might go back to the beginning of this just

9    briefly.  I'd like to just talk about diligence as a subject

10   matter.  So if -- if Version 7.1 -- the fact that 7.1 is

11   unregistered, is, quote, our fatal defect, as I just said,

12   they should have known that moments after they got the

13   complaint.  That fatal -- fatal defect has been in the

14   lawsuit since the second amended complaint.  It's been in

15   the lawsuit since the original complaint for that matter.

16          Why didn't the defendants ever ask for the source

17   code?  Was it irrelevant to them because the fatal defect

18   was 7.1 isn't registered?  Why didn't they inquire of Chen

19   about preexisting material?  Irrelevant because without 7.1

20   registered, there's no copyright infringement claim?  I

21   don't know.  But they never did.  And they knew about 7.1

22   being unregistered back in the day of the pleadings

23   themselves, and here we are bringing this -- wanting to

24   bring that summary judgment motion -- that summary judgment

25   motion today.

1          THE COURT:  You -- I guess the other way of

2     putting it is if 7.1 is not registered and that's a fatal

3     defect, that could have been brought as part of the original

4     summary judgment motion?

5          MR. HINDERAKER:  It could have been brought as a

6     motion to dismiss.  If -- if the testimony of Marce about

7     preexisting material in later versions of Blaze Advisor is

8     expert testimony because you have to have qualifications to

9     be able to figure that out, that could have been brought

10    June -- right after June 6, 2017.  There wasn't -- and, yet,

11    here we are doing -- doing that now.

12          There was a statement that there was discovery

13    against a source code, and that's Interrogatory 3.  It

14    was -- it asks, identify -- and then works was defined to be

15    registered works -- identify registered works that you

16    contend are used, and we did.  And they were all paragraphed

17    out in the complaint.

18          THE COURT:  What identified works were -- or what

19    registered works were identified?

20          MR. HINDERAKER:  All of the registered works of

21    Blaze Advisor, which aren't all versions, but all the

22    registered works of Blaze Advisor are identified.

23          THE COURT:  Okay.

24          MR. HINDERAKER:  There is a -- just as background,

25    I mean, there's a copyright circular I could provide the

1   Court if there was any interest, but the standard way that

2   the copyright office suggests that software companies

3   register is that they don't register every change, every

4   modification.  There would just be too much.  From time to

5   time, you register, and that's what FICO did.

6        THE COURT:  Let me interrupt you again.  First of

7   all, bear with me.  I have got to plug in my iPad or I'm

8   going to lose it, which requires that I do the undignified,

9   I think.

10        So my question, Mr. Hinderaker, relates to -- hang

11  on.  So you write in your memorandum at page 27, A plaintiff

12  may use an underlying registered work to pursue an

13  infringement claim against unauthorized use of an

14  unregistered derivative work, citing *Nimmer*, and, more

15  importantly, citing the case *Montgomery v. Noga* at 168 F.3d

16  out of the Eleventh Circuit in 1999.  Is this an unusual or

17  somehow rarefied proposition, and are there cases in the

18  Eighth Circuit that deal with this question, because nobody

19  has cited any?

20        MR. HINDERAKER:  Um, the answer to your first

21  question is, no, it's not unusual.  I don't -- I don't

22  pretend to have a copyright -- it's not the first time I've

23  had to deal with these issues in my practice.  And I want

24  to -- you point to -- right.  And the cases that -- we cited

25  the cases that we thought were applicable on the fact

1    pattern.

2              In terms of your second question about the Eighth

3    Circuit, off the top of my head, I'm not aware of it.  The

4    Eighth Circuit isn't a robust venue of copyright

5    infringement claims, so not having one isn't a surprise.

6    But I'm also -- I'm also not aware of any decision that

7    rejects either -- either the doctrine that an unregistered

8    work can infringe an earlier registered one or the other

9    doctrine, the effective registration doctrine, that an

10   unregistered work can infringe a later registered version.

11   Those are all standard copyright cases.

12             THE COURT:  Okay.  And for that, I think you cite

13   that proposition, the effective registration doctrine, you

14   cite *Big Daddy Games, LLC*, out of the Western District of

15   Wisconsin?

16             MR. HINDERAKER:  Yes.

17             THE COURT:  As well as I think some from the

18   District of Nevada?

19             MR. HINDERAKER:  Right.

20             THE COURT:  Kansas.

21             MR. HINDERAKER:  Right.  Right.  And then it's not

22   the same issue.  I'm not saying that.  But, relatedly,

23   there's quite a few cases that we cite where the Court is

24   saying, when the evidence -- when the proof is of direct

25   copying, the substantial similarity test of the two

1       states -- two-step test is irrelevant.

2              And if I could also add this, sort of on the

3       common sense of it, is kind of what -- so if I have a

4       Registered Work 7, and I need to have a registered work for

5       a copyright infringement claim, and I want to prove that

6       Registered Work 7 is being copied, and I present the fact

7       that Unregistered 7.1, when it's used, is copying -- is

8       copying, identical code is copying, 98 percent of the code

9       is 7 --

10             THE COURT:  And you own it.

11             MR. HINDERAKER:  -- and I own it, I have proven --

12             THE COURT:  It's a standing question.

13             MR. HINDERAKER:  -- I have proven the copying, the

14      direct copying of my 7.  Similarly, on the other way, the

15      effective registration doctrine, I prove that my 7.2 has a

16      lot, substantial, huge parts of 7.1.  When 7.1 is used

17      unauthorized without authority, it's copying 7.2.  Identical

18      quote.  So, factually, it works, and those are the ways that

19      the cases have addressed them and the way *Nimmer* has

20      addressed them.

21             THE COURT:  Okay.  Thank you, Mr. Hinderaker.  I

22      don't have any other questions.  Is there anything else you

23      need to point out to me?

24             MR. HINDERAKER:  Oh, I just have a -- I have a

25      burr under my saddle about the notion that FICO in any way

1       changes its tune, and I have more to say about that because

2       of what defendants put in their brief.  But when I get done

3       saying it, it doesn't make any bit of difference.  It just

4       gets it off my chest.  So having said that, I'll let it stay

5       on my chest.

6                   THE COURT:  Okay.

7                   MR. HINDERAKER:  Thank you, Your Honor.

8                   THE COURT:  Thank you.

9                   Mr. Fleming, I'll give you the last word or words.

10                  MR. FLEMING:  Your Honor, with regard to a claim

11      of an infringement of a derivative work, there is a case,

12      which we didn't cite, which says that the test is whether

13      they are substantially similar.  They aren't different

14      tests.  And that case is *Well-Made Toy Manufacturing*, Second

15      Circuit decision, 354 F.3d 112 (2010).

16                  With regard to this issue about disclosure of the

17      code and why it is that we didn't ask for that specifically,

18      so they have said repeatedly throughout this case that they

19      were relying on registered versions of the code.  They made

20      that argument before Judge Wright during the first summary

21      judgment hearings.  After the close of discovery, in 2019,

22      they said they were relying on Version 6.7 and 6.9.  It

23      wasn't until after the Court ruled, and during the

24      supplementary briefing in May of 2020, that for the first

25      time they say, Well, no, what we're actually relying on is

1      Version 7.1.

2              So prior to that, prior to that, there was no

3      reason why we would be taking the deposition of Mr. Chen who

4      became Mr. Fernando who became Mr. Marce, because

5      substantial similarity between the unregistered version and

6      the other versions had no bearing on the case as long as

7      they were relying on registered versions.

8              THE COURT:  When you say "relying on," what are

9      you referring to?  Are you referring to their argument

10     before the Court or what are you pointing to for me?

11             MR. FLEMING:  Their summary judgment brief.

12             THE COURT:  Okay.

13             MR. FLEMING:  We reference the exact page in

14     our -- in our memo.  But they had consistently taken that

15     position, and it was not until May of 2020.  And so we

16     raised the issue with the Court about the fact that they

17     were relying -- you know, for the first time, they are

18     telling us they are relying upon an unregistered work, and

19     we -- we made the argument in our briefs.  They responded

20     that the test is substantial similarity and they are going

21     to have proof of that at trial.  And Judge Wright issued her

22     order in -- Judge Wright issued her order in March of 2021

23     then, and she didn't address the arguments going back and

24     forth about 7.1 being unregistered.  And they didn't have

25     the jurisdictional prerequisite.

1              So that is the timing of things, is they are

2      telling one story.  They are telling us that that's what

3      we're relying on, and it's not until very late that they

4      change their theory and say, No, we're just relying upon

5      7.1.  We immediately brought it to the Court's attention.

6      She didn't address it.  In part, because she had been clear

7      with us that she was focusing on the supplementary memo on

8      some particular issues and did not sway from that,

9      understandably.  But the issue had been raised.  And then as

10     soon as we had the opportunity to take Mr. Marce's

11     deposition and learn that they were going to be using this

12     theory, we brought these motions.

13              Further, with regard to the disclosure of the

14     code, there's a representation that there was some

15     representation as to the location of the documents or the

16     location of the source, but they never gave the location of

17     the source code.  The only thing they said was ownership of

18     the works.  I mean, they didn't -- they didn't say the works

19     themselves.  They said ownership, which is a -- you know,

20     words are important.  They referenced that, and they never

21     had some other reference.  They never updated their initial

22     disclosures.  They never provided in discovery the source

23     code.  And they should be precluded from using it at trial

24     given that failure.

25              And it's not a matter of -- you know, they say

1    we're playing gotcha.  We're not playing gotcha.  There are

2    requirements about what documents and what exhibits you can

3    use at trial, and they are limited to what is identified or

4    produced in the initial disclosures and what is identified

5    or produced in discovery, and this wasn't done with regard

6    to those documents.

7         Let's see.  All right.  Just one final thing with

8    regard to Mr. Marce.  The fact that there are some

9    calculations in the analysis doesn't make it become simply a

10   layperson's testimony.  His analysis is the expert analysis.

11   He -- he didn't do something that he does in the regular

12   course of business.  Rather, he had to write an original

13   script to use with a source code repository and then arrange

14   it all in categories using his expertise.  The Exhibit 14,

15   that whole analysis is the expertise utilized by a software

16   engineer.  It is not simply something that he saw in the

17   regular course of his job.  He had to create it.  And it

18   does -- you know, it implicitly provides an opinion as to,

19   you know, which of the lines are included in the current

20   version, which have been added, which have been deleted.

21   That's expert testimony.

22        Finally, with regard to the so-called effective

23   registration doctrine, all of the cases cited in reference

24   to that predate the 2019 Supreme Court decision *Fourth*

25   *Estate*, which established unequivocally that the issuance of

```
 1    a registration certificate by the copyright office is a

 2    prerequisite to suit, so it changed the law.

 3               All right.  Okay.  Your Honor, that's all I have.

 4    Thank you.

 5               THE COURT:  Hang on.  Hang on.  Mr. Fleming, if

 6    you would come back up for one quick question.  I'd like you

 7    to point out to me in your memorandum where -- I just want

 8    to review it again -- you reference the summary judgment

 9    briefing or the statement at summary judgment before Judge

10    Wright.

11               MR. HINDERAKER:  Your Honor, page 10.

12               THE COURT:  Of theirs?

13               MR. HINDERAKER:  (Nods head.)

14               THE COURT:  Thank you.

15               MR. FLEMING:  In page 4 of our brief, we cite, In

16    briefing on these motions, FICO represented it was relying

17    on other registered versions of Blaze, including Version

18    6.7, to support its claims, Docket 398 at 8, 31.  They also

19    responded similarly in their interrogatory responses

20    relating to foreign use.  Page 3 of our brief.

21               THE COURT:  So to my reading, and I'm looking at

22    page 4 of your brief, and I'll go back and look at the

23    underlying dockets, but you state, In its briefing on these

24    motions, FICO represented that it was relying on other

25    registered versions of Blaze, including Version 6.7, to
```

1    support its claims.  Then you have the supplemental

2    cross-motions for summary judgment.  And in that briefing,

3    FICO says, as you've represented it, it's defendants'

4    reproduction and distribution of Blaze Version 7.1 that is

5    the only act on which the infringement claim is based.

6    Sounds to me like there just -- one sounds like a subset of

7    the other.  The later statement sounds like a subset of a

8    broader statement, perhaps done in response to these

9    questions about the statute of limitations and the predicate

10   act doctrine, but tell me if that's wrong.

11            MR. FLEMING:  Well, I think it was stated because

12   they understood that their other claims based on the

13   registered versions were time barred, so they said we're

14   just going to rely on 7.1.

15            THE COURT:  Was -- the other versions, did that

16   include 7.2, because that wouldn't have been time barred?

17   And there's a difference, I guess -- I'm sure I'll hear this

18   from Mr. Hinderaker, but I think there's a difference

19   between saying we're only alleging that your use of a

20   specific version is the active infringement.  There's a

21   difference between saying that and saying that it's

22   infringement because it is derivative of other versions that

23   are registered.  Right?

24            MR. FLEMING:  I believe so.

25            THE COURT:  Okay.  But if -- I think to FICO's

1   point, if you are hearing this for the first time, that they

2   are relying on a single version or the use of a single

3   version, 7.1, if you are hearing that on April 22nd of 2020,

4   why -- and if you think that's a fatal defect, why are we

5   here in January of 2022?

6           MR. FLEMING:  Well, for this reason, it was

7   asserted for the first time, we responded, but the issue was

8   then pending before Judge Wright, and she issued an order

9   then on March 23rd, 2021, and she didn't address this issue

10  of the use of an unregistered work as the basis for the

11  lawsuit.  And it was just two months after that that we had

12  the discussion with FICO about taking the deposition of

13  Mr. Marce, and then we were trying for months to schedule

14  his deposition.  We weren't able to schedule it until

15  November.  It wasn't until we took his deposition in

16  November 2021 when they provided the -- the documents, the

17  graphs, and we took his deposition.  And we -- as soon as we

18  took his deposition, we noticed this motion.

19          THE COURT:  Okay.  Understood.  Okay.  Thank you,

20  Mr. Fleming.

21          Mr. Hinderaker, I can tell that you have something

22  that you are dying to say.

23          MR. HINDERAKER:  I am.  Because Mr. Fleming

24  opening up that issue, I believe, gives me the opportunity

25  to scratch the itch that's been bothering me for quite a

1      while.

2                  THE COURT:  Scratch away.

3                  MR. HINDERAKER:  All right.  I just heard -- I

4      just -- if I misheard it, but I think I just heard the

5      statement, registered versions being time barred.  The

6      statute of limitations doesn't run from the date you

7      register a copyright.  Statute of limitations begins to run

8      when infringement begins.

9                  THE COURT:  Right.  From their use.

10                 MR. HINDERAKER:  From the use.  I think I just

11     heard the statement that we're relying upon an unregistered

12     work as a basis of our lawsuit.  And Mr. Fleming referenced

13     a case that changed the law.  Well, as we said in our brief,

14     the statute has always required registration as a standing

15     or a subject matter jurisdictional matter and so that's why

16     we have it in the complaint.  So that argument, in my

17     judgment, doesn't work.

18                 But now let me, if I might, scratch that itch.  At

19     the summary judgment stage, FICO's limited its summary

20     judgment to contract claims.  In our view, there were

21     disputes of fact regarding copyright claims, and we did not

22     raise any copyright issues in our summary judgment briefing.

23                 One of the violations of the license agreement was

24     the distribution of Blaze Advisor to foreign insurance

25     companies, our allegation.  And in the detailing out of our

1     grounds, we identified occasions, early occasions when Blaze

2     Advisor Version 6.7 or whatever they were, earlier versions,

3     were take -- were distributed by Chubb U.S. to foreign

4     insurance companies.  That is a violation of the license

5     agreement.

6            Federal sees those facts and moves -- has not

7     asserted a statute of limitations defense.  Federal sees

8     those facts and moves the Court for an opportunity to amend

9     its answer to assert the statute of limitations defense, and

10    it does.  Now FICO is faced with -- now, the motion that

11    Judge Wright ruled upon was the motion directed at Count 2,

12    not 3, just 2, not 1, just 2, copyright infringement claim

13    directing it at Count 2 for statute of limitations.

14           Just as -- so while the unauthorized distribution

15    of Blaze Advisor to foreign insurance companies violated the

16    license agreement, one of the exclusive rights of copyright

17    under Section 106 is the exclusive right to distribute.  So

18    Count 2 was based upon the proposition that the distribution

19    of Blaze Advisor to foreign insurance companies violated

20    106(3).  Now, why did we do that?  We did that because

21    there's a document called the predicate act doctrine that

22    says, if you have a U.S.-based infringement -- Copyright Act

23    only acting within the U.S. -- then that U.S.-based

24    infringement can capture profits of a foreign user.  So

25    Judge Wright said, I'm going to let you have a motion.  It

1       is limited to statute of limitations and the predicate act

2       doctrine.

3               So when we are faced with that motion, we're

4       looking at, well, what did they do within the three years of

5       the copyright statute of limitations?  The six years of the

6       contract that we had for the contract claim, you know,

7       that's twice as long.  We've got to be half as short.  So we

8       looked at the distributions of 7.1, and they were within the

9       timeframe of the three years of the Copyright Act.

10              So Judge Wright in -- I don't think Judge Wright

11      appreciated that when we brought our summary judgment

12      motion, we were limited to the -- we limited ourselves to

13      the contract claim.  But in her statute of limitations

14      ruling, she recognized that those early distributions, those

15      early violations of the contract were outside of the

16      copyright statute of limitations.  Can't rely on that.

17              She then looked at the distributions of 7.1, which

18      we were relying upon for the 106(3) claim of copyright, and

19      she said that's in the statute of limitations.

20              So that brought her then to consider the predicate

21      act doctrine.  And what we have -- our facts are, from

22      our -- I think -- I don't know if there's a dispute, but the

23      facts are, Blaze Advisor is loaded onto a server in the U.S.

24      of Chubb.  And then from that server, Blaze Advisor goes

25      across the Internet and all in the packets and is

1    reassembled into Blaze Advisor software on, let's call it, a

2    UK server.  And what we said to her, and I'll say now, is we

3    looked at that and said the predicate act is in the United

4    States of uploading and distributing -- distributing for the

5    purpose of getting it outside the United States.  And Judge

6    Wright said, Well, the predicate act doctrine is a predicate

7    act.  The predicate act doctrine is not a predicate purpose.

8    And so our argument that it was unauthorized because it was

9    for an improper purpose, she did not agree with.

10            Now, I'll get the circuits mixed up, but there's

11   like the Second Circuit had cases that favored us.  The

12   Ninth Circuit had cases that did not favor us or the other

13   way around.  But that was a dispute.  So -- so then

14   defendants' briefs say, following all of this, it remained

15   unclear how FICO intended to prove that the source code for

16   Blaze Advisor 7.1 is substantially similar to the code of a

17   registered version of the software.

18            THE COURT:  What are you quoting?

19            MR. HINDERAKER:  Page 10 of the defendants'

20   memorandum.  Following the Court's order -- they are

21   referring to the statute of limitations -- it remained

22   unclear how FICO intended to prove that the source code for

23   Blaze Advisor 7.1 is substantially similar to the code of a

24   registered version of the software.

25            Well, my first point is that it's a complete non

1     sequitur.  The statute of limitations motion was directed to

2     when did the distributions occur and were those

3     distributions a predicate act.

4              THE COURT:  Hang on, Mr. Hinderaker.  Are you

5     talking about page 10 of your brief?

6              MR. HINDERAKER:  No.  I was talking about

7     defendants' -- the defendants' statement at page 10.

8              THE COURT:  Okay.

9              MR. HINDERAKER:  That's what my notes say.  It's

10    on page 10.  It's page 6 on their -- paginated page 10 of

11    the court filing.

12             THE COURT:  I see, okay.

13             MR. HINDERAKER:  Underneath the quote, Following

14    the Court's order.

15             THE COURT:  Got it.  Okay.

16             MR. HINDERAKER:  And so the claims of Count 2 --

17    yeah, the claims of Count 2 are distribution, 106(3).

18    Distribution claims have nothing to do with reproduction,

19    copying.  Reproduction, copying is 106(1).  So there was a

20    motion to Judge Wright, dealt with Count 2, and dealt with

21    Section 106(3), distribution, and the statute of

22    limitations.  Nothing that dealt with Count 3, nothing that

23    dealt with copying or reproduction.

24             And, you know, just as a footnote to all of this,

25    when FICO has been accounting for the gross written premium

1    of the lost profits of the foreign insurance companies, from

2    the first iteration of that report, the -- we only claim

3    three years of gross written premiums, so there was never a

4    notion of trying to get outside of the statute of

5    limitations.  So that's FICO's procedural history of this

6    so-called they didn't tell us what we should know story.

7         THE COURT:  All right.  Tell you what we're going

8    to do.  It's 20 minutes to 3:00.  Who knew?  We're going to

9    take a break until -- let's give Erin until 3:00, and then

10   I'm going to come back and I'm going to rule here today

11   because I think the parties need a ruling here today.  So

12   make yourselves comfortable, stay socially distanced and

13   masked, and we'll be back on the record at 3:00 on the

14   Court's clock.  Thank you.  We're in recess.

15        (Recess taken at 2:39 p.m.)

16                      *    *    *    *    *

17        (2:57 p.m.)

18                        **IN OPEN COURT**

19

20        THE COURT:  All right.  We're back on the record

21   in the matter of FICO v. Federal, Civil Number 16-1054.

22        I am going to announce my ruling on Docket Number

23   851, which is a motion by Federal to amend the scheduling

24   order such that Federal could then bring a motion to exclude

25   the testimony of the witness Luc Marce and move for summary

1     judgment as a result of that exclusion.

2              I'll have to -- I'll try and make it clear what

3     I'm doing and why.  I will permit questions after I get

4     through it, but the argument is over.

5              I'm going to deny the motion.  I find there is not

6     good cause to amend the scheduling order.  And I'm going to

7     try and explain the reasons for my ruling and the various

8     steps in the analysis.  I'm doing it this way rather than

9     get a written ruling out because you have a trial date in

10    April, and, just candidly, doing it any other way is going

11    to be disruptive to the trial schedule.

12             My analysis is going to focus on diligence,

13    obviously, prejudice, and what I'll call futility.  So

14    starting with the question of diligence, often that element

15    is looked at as how quickly after the basis for the motion

16    does the moving party move to amend the scheduling order?

17    And as to that aspect of diligence, I find that Federal has

18    been reasonably diligent in filing the motion to amend the

19    scheduling order.  For reasons that are not made known to

20    the Court, but I assume are the scheduling of counsels' and

21    witness's convenience, the deposition of Mr. Marce did not

22    occur until November of 2021.  The motion was filed

23    reasonably promptly thereafter.  And the deposition itself

24    occurred within a reasonable timeframe of the substitution

25    of the witness identity, Mr. Marce from Mr. Jorge, I

1      believe.

2              If -- let me say also if I concluded that FICO

3      were, in fact, trying to sneak a new expert into the case

4      despite its initial disclosures and amendments to those

5      disclosures, this motion would be timely inappropriate and,

6      frankly, I would grant it.  But has -- so that's what I'm

7      saying as to diligence, but I don't find that diligence is

8      the heart of the matter.  I think the heart of the matter

9      really goes to the question of whether Mr. Marce is

10     presenting expert testimony.  And as I indicated, if he

11     were, that testimony is clearly late disclosed and would be

12     excludable.  However, I don't find that this is expert

13     testimony.  And I think it becomes -- it comes down to this,

14     Mr. Marce is testifying as to the lines of code that are

15     common to both Versions 7.0, 7.1, and 7.2 of the Blaze

16     Advisor software.  Those, in this Court's view, are factual

17     issues.

18             Now, the -- Federal argues that this is based on

19     an analysis, and by virtue of being an analysis, it is per

20     se expert testimony.  I'm not persuaded by that for a couple

21     of reasons.  First of all, there is the general proposition

22     that an expert -- or that someone with expertise is not

23     necessarily precluded from testifying as a lay witness just

24     because they have expertise.  More importantly, I think the

25     idea that utilizing a computer program to essentially do the

1    calculations that would be extremely time-consuming and

2    laborious, which is what has happened here, doesn't convert

3    the factual comparison into an expert analysis.  I think

4    the -- probably the best analogy is I could do, you know,

5    fairly straightforward, but, nonetheless, lengthy

6    mathematical computations using long division or what have

7    you, or I could use a calculator.  And the use of the

8    calculator doesn't turn a factual matter into an expert

9    matter.

10            The question then comes -- comes back to whether

11   Mr. Marce is going to testify or what he can testify to.  As

12   I understand it, Mr. Marce will testify to the general

13   process by which one version of Blaze Advisor software is

14   created from the prior version, and he intends to testify as

15   to the -- the figures that have been presented to this Court

16   in the form of Exhibit 14 and Deposition Exhibit 619, I

17   believe it is.  That testimony is fact testimony, or

18   testimony by a fact witness.  I do not think that Mr. Marce

19   can testify to the conclusion that Blaze Advisor Version 7.1

20   is substantially similar to 7.0 or 7.2.  That would, I

21   think, stray into the province of an expert opinion.  But

22   that -- and really it will stray into the province of the

23   jury which has to decide whether it's substantially similar

24   or based upon the other versions.

25            Whether or not the document itself is admissible

1   at trial is not for me to say.  Judge Wright can decide

2   whether that document is a Rule 1006 chart.  She can decide

3   whether it was appropriately disclosed during discovery.

4   She can decide whether, for one reason or another, it is to

5   be excluded.  That is up to her obviously, but I don't

6   believe that she would find that the testimony of Mr. Marce

7   would be excludable as expert testimony.  And if Mr. Marce's

8   testimony on these factual matters is not to be excluded,

9   there would be, at least as I understand it, no reason to --

10  or no basis for a summary judgment motion.

11          There's also, well, two other pieces of rationale

12  here.  First of all, the case law, to my reading, allows the

13  plaintiff to say that the unauthorized copying of Version

14  7.1, the direct copying of Version 7.1, can be an

15  infringement of the two registered versions that are

16  proffered here, 7.0 and 7.2.  So those issues are

17  appropriately presented to a jury at trial, and I don't have

18  any basis to say that somehow the Court could find that the

19  copying of Version 7.1 cannot be actionable because 7.1

20  itself is not registered.

21          A lot of the issue in this motion has been whether

22  or not -- and, again, I'm just paraphrasing here -- but

23  whether or not FICO has been aboveboard or compliant with

24  its obligations under Rule 26 and its discovery obligations.

25  I find that the initial disclosures describing the testimony

1      of Mr. Chen, that he would testify to the extent of -- I

2      don't have the actual language right in front of me, but the

3      extent by which one version of the software is the same as

4      another version of the software, discloses, in fact, the

5      subject matter of Mr. Marce's testimony.  And that was

6      disclosed within three months, I believe, of the case

7      beginning.  It was repeated throughout the initial

8      disclosures when the initial disclosures were updated to

9      change from Mr. Chen to Mr. Jorge.  And then from Mr. Jorge

10     to Mr. Marce, those disclosures were reiterated.  And FICO

11     did agree to a late deposition of Mr. Marce upon

12     substitution of his identity in the initial disclosures for

13     that of the prior identified witness.

14             So I find that all of that has been disclosed.

15     Now, as to the issue of whether the source code was

16     identified as a source of -- or a document at issue in the

17     case, I find two things.  First of all, it seems to this

18     Court self-evident that source code would be a document at

19     issue in the case as it were, but, beyond that,

20     Rule 26(a)(1)(A)(ii) merely requires the disclosure of

21     category of documents and where they are located.  And

22     looking at FICO's disclosure, it first identified, it said,

23     here are the following categories of documents, and we'll

24     just tell you that they are in the possession, custody, or

25     control of its attorneys or of FICO itself.  And then it

1    lists documents sufficient to show FICO's ownership of its

2    federal copyrights in multiple versions of its FICO Blaze

3    Advisor business rules management software.  Certainly, to

4    the lay reader, that may not trigger a subjective awareness

5    of source code, but to lawyers engaged in copyright

6    litigation, that category would, it seems to the Court,

7    naturally include source code.  It might also, frankly, be

8    said to reside within the description, documents sufficient

9    to show Chubb & Sons' continued use of FICO Blaze Advisor

10   software following the termination of the agreement.  But,

11   regardless, I find that these facts have been adequately

12   disclosed in the initial disclosures, and I am not aware of

13   any manner in which this information was requested in

14   discovery and kept from being discovered.

15          So, with that, the motion is denied.  You're going

16   to trial April 6th of 2022.  You, of course, have the right

17   to appeal this ruling to Judge Wright.  If you do, you'll

18   have to order the transcript because not only have I tried

19   to summarize my rationale, there is an awful lot in the

20   transcript upon which the Court has been informed and has

21   based its ruling.

22          With that, any questions for your side,

23   Mr. Fleming?

24          MR. FLEMING:  Your Honor, not about your order.

25   When you are done discussing that, I would like to follow up

1    about information about the trial if there is any.

2                THE COURT:  Okay.  Hang on one second.

3                Anything, Mr. Hinderaker, about the order?

4                MR. HINDERAKER:  No, Your Honor.

5                THE COURT:  Okay.  I'll just tell you both, I find

6    it really difficult to hear well through the masks, so go

7    ahead and take it off, Mr. Fleming, and you can just sit at

8    counsel table.  Make sure your mic is open.  And do you

9    think this needs to be -- or should be on the record?

10               MR. FLEMING:  I don't.

11               MR. HINDERAKER:  No, I don't either.

12               THE COURT:  Okay.  We can go off the record.

13               Okay.  Thank you.

14          (Discussion off the record)

15          (Court adjourned at 3:15 p.m.)

16                            *     *     *

17

18

19          I, Erin D. Drost, certify that the foregoing is a

20    correct transcript from the record of proceedings in the

21    above-entitled matter to the best of my ability.

22

23               Certified by:   *s/ Erin D. Drost*

24                               Erin D. Drost, RMR-CRR

25