**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | Court File No.  16-cv-1054 (WMW/DTS) |
| Plaintiff, | |
| v. | ***REDACTED*** |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | **DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO BIFURCATE** |
| Defendants. | |

## INTRODUCTION

Defendants Federal Insurance Company and ACE American Insurance Company (collectively, "Federal") submit this memorandum of law in support of their motion to bifurcate Plaintiff Fair Isaac Corporation's ("FICO") claim for disgorgement of profits— which will be decided by the Court—from other issues to be decided by the jury, including liability and actual damages.

This Court previously held that FICO is not entitled to a jury trial on its claim for disgorgement of profits under the Copyright Act.  (*See* Dkt. 588 & 811.)  The Court conducted a thorough analysis of relevant case law and statutory history and determined that the disgorgement of profits claim is an equitable claim that is decided by the Court, not the jury.  The Court also stated that "FICO has not asserted that Federal's profits represent actual damages it has suffered," that Federal's profits are not "a proxy for [actual damages]," and that "the staggering amount of profits FICO seeks to disgorge

vastly outstrips its claim for actual damages" and that this "disparity itself demonstrates that disgorgement of Federal's profits is unrelated to any actual damages FICO suffered." (Dkt. 588 at 13.)

There is thus no reason to allow evidence or argument on the issue of disgorgement to be presented to the jury. Because the jury will have no role in resolving the question of disgorgement, placing evidence of disgorgement before the jury would serve only to anchor the jury to a totally specious dollar figure and would be highly prejudicial to Federal. For one thing, FICO's egregious assertion that it is entitled to *billions* in disgorgement—orders of magnitude greater than any plausible award of compensatory damages—would itself severely prejudice Federal simply by subjecting the jury to such outlandish numbers and theories, thus implying to the jury that Federal profited to the tune of billions of dollars through its use of FICO's Blaze software. And even setting aside the sky-high numbers at issue and the suggestion of Federal's improper profits, courts routinely hold that needlessly presenting the jury with complex damages calculations and theories should be avoided in favor of bifurcation.

Finally, bifurcation will serve judicial economy. There is no substantial overlap between FICO's disgorgement claim and the remainder of its case, so no efficiencies will be gained by trying disgorgement together with liability and damages. And if Federal prevails on liability on the copyright issue (which it likely will), Federal's disgorgement claim fails automatically, so there would be no need for a second phase. Courts routinely order bifurcation in similar circumstances.

Therefore, Federal moves, consistent with the Court's prior rulings, to bifurcate the trial into two separate proceedings: (1) liability and actual damages, presented to the jury, and (2) if Defendants are found liable by the jury for copyright infringement, a separate proceeding to the Court on disgorgement of profits.

## BACKGROUND

### I.    FICO'S DISGORGEMENT THEORY.

FICO brings contract and copyright claims against Federal for Federal's allegedly unauthorized use of FICO's Blaze software, and principally seeks actual damages for those violations.   But FICO also separately seeks the remedy of "disgorgement" of indirect profits that Federal allegedly made as a result of purported copyright infringement.[1]

FICO admits that it cannot obtain disgorgement of direct profits, because Federal did not sell the infringing product.  Instead, FICO seeks *indirect* profits—profits of the alleged infringer that are not directly connected to any alleged infringement.  FICO seeks to disgorge indirect profits allegedly caused by Federal's use of Blaze as a component within a few of its many proprietary software applications.[2]  Specifically, FICO seeks to

---

[1] FICO's damages expert, Neil Zoltowski, submitted a report dated April 19, 2019, a supplemental report dated August 14, 2020, and a second supplemental report dated May 13, 2021, which outline the revenue figures from which FICO seeks disgorgement.  (*See* Fleming Decl. ¶¶ 2-4, Ex. A ("Zoltowski Rep."), Ex. B ("Zoltowski Supp. Rep."), Ex. C ("Zoltowski 2nd Supp. Rep.").)

[2] Blaze is not standalone software like Microsoft Word or QuickBooks that may be independently used by Federal employees.   Instead, it is a component of other applications, the same way fonts are a component in Microsoft Word, or a calculator is a component in QuickBooks.  Federal used Blaze as a component in just 10 of its more than 1,500 internal applications to conduct its business.  (Fleming Decl. ¶ 5, Ex. D,

disgorge profits from more than $35 billion in Federal's revenue: FICO generates this figure by simply adding up all of the gross written premium from all policies that passed through any of the applications that used Blaze from March 31, 2016 through May 2020 (for domestic revenue), and from September 6, 2013 through October 2019 (for international revenue). (Zoltowski 2nd Supp. Rep., pp. 5-6.)

FICO's theory of damages is completely unsupported. Indeed, FICO's damages expert, Neil Zoltowski, conducted no analysis of Federal's profits that shows any nexus between those profits and Federal's use of Blaze. (*See* Zoltowski Rep., Zoltowski Supp. Rep. & Zoltowski 2nd Supp. Rep.) Instead, Zoltowski states, without support or analysis, that "use of Blaze Advisor contributes to the generation of gross written premiums." (Zoltowski Rep. ¶ 124.) From there, Zoltowski merely adds together total gross written premiums as reported by Federal[3] for premiums processed through applications that touched Blaze. (*Id. See also* Zoltowski Supp. Rep., ¶ 10; Zoltowski 2nd Supp. Rep., ¶¶ 12, 15-16 & 18.) Specifically, Zoltowski's "computations of Federal and ACE

---

("McCarter Rep.") ¶ 88.) The applications that did use Blaze varied in their functions— some, for example, kept track of compliance with state regulations, others monitored workflow, and others provided underwriting guidance. (McCarter Rep. ¶ 94.) In each instance, Blaze represented one component of many that made up the overall application. For example, Blaze represented 1 of 20 third-party technologies, in addition to internally developed technologies, used by the application CSI Express. (McCarter Rep. ¶ 97-98.)

[3] In Federal's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 16 and Sixth Supplemental Answer to Plaintiff's Interrogatory No. 17, Federal reported the revenues associated with premiums that touched applications containing Blaze. Zoltowski merely summed all the revenues reported by Federal without regard to which entity earned those revenues, including adding revenues associated with entities that are not party to this lawsuit. (Zoltowski Report, Schedule 8.0 and 9.0.) Furthermore, Zoltowski provides no differentiation of whether Blaze was used in connection with any of the policies generated by these entities. (Zoltowski Rep. ¶¶ 124-26.)

American's gross written premiums are limited to only those *reported by Defendants* as involving domestic [and] . . . foreign applications." (Zoltowski Rep., ¶ 124) (emphasis added). Essentially, Zoltowski added together the domestic gross written premiums and foreign gross written premiums without any analysis as to which portion, if any, of the gross written premiums reported by Federal had anything to do with Blaze Advisor.[4] (*See* Zoltowski 2nd Supp. Rep., pp. 5-6.)

That analysis is utterly specious. Blaze was an exceedingly minor piece of Federal's business operations. (Fleming Decl. ¶ 6, Ex. E ¶ 4.) For example, Blaze was one of approximately twenty third-party technologies that make up just one of Federal's proprietary applications, CSI Express, that used Blaze. (*Id.*) CSI Express, in turn, is just one of approximately 1,500 software applications that Federal uses as part of its business. (*Id.*) Of these 1,500 applications, approximately ten have utilized Blaze at any time since Federal purchased the License. (*Id.*)

Indeed, FICO cannot show that *any* of Federal's profits are attributable to the use of Blaze. FICO's damages expert, Zoltowski, makes no attempt to connect Federal's use of Blaze to its revenue. (*See* Zoltowski Rep. ¶ 122.) Nor does FICO's other expert, Randolph Whitener, know whether Blaze actually caused any of Federal's profits.

---

[4] Similarly, Zoltowski opined that FICO had suffered $37.4 million in lost license and support and maintenance fees without regard to the applicable legal standard. (Zoltowski Rep. ¶ 117.) The Court excluded Zoltowski's opinion as to FICO's actual damages as unreliable because Zoltowski applied an incorrect legal standard in forming his opinion. (Dkt. 731 at 31-32 ("Although some of the facts underlying Zoltowski's opinion may be relevant to the calculation of a hypothetical lost license fee, Zoltowski's selective application of those facts to his calculation leads to a subjective and unreliable result that is inconsistent with the applicable legal standard.").)

(Fleming Decl. ¶ 7, Ex. F ("Whitener Dep.") at 13:19-14:1, 135:14-141:4, 154:11-15,

157:24-158:3.)   Moreover, Whitener admits that Federal's own customers ████████

██████████████████████████████████████████████████████████████████████████████

███████████████████   (*Id.* at 75:2-78:20.)   Federal's industry expert, William McCarter, in

contrast, correctly concludes that it is impossible to tie profits to such a "small

technology of a very large company ecosystem of people, process, and technology."[5]

(McCarter Rep. ¶¶ 21-31.)

## II.   THE COURT DETERMINED FICO HAS NO RIGHT TO A JURY TRIAL ON ITS DISGORGMENT CLAIM.

On July 10, 2019, Federal filed a motion to strike FICO's jury demand on its claim

for profit disgorgement.   (*See* Dkt. 331.)   Federal argued that an award of profits under

§ 504(b), as an equitable remedy, was not for a jury to determine.   (Dkt. 331 at 5-10.)

Moreover, Federal expressed concern that FICO's intention to present multi-billion dollar

figures to the jury, and then leave it to isolate only those profits that are "attributable" to

---

[5] Courts have similarly concluded that use of a software component as one element of a complex business environment cannot support a disgorgement claim. *Complex Systems, Inc. v. ABN Ambro Bank N.V.*, No. 08 Civ. 7497 (KBF), 2013 WL 5970065, *11 (S.D.N.Y. Nov. 8, 2013) (holding that "[u]se is, of course, not necessarily evidence of *causation*" and excluding profits evidence even for transactions that "'flow[ed] through' the software."); *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25, 2013) ("While [defendant] may have profited from using Informix indirectly in that it enabled [it] to operate more efficiently, courts often deny recovery if the profits are only remotely or speculatively attributable to the infringement. . . . [S]imply saying that copyrighted material may have played an 'important,' 'significant' or 'meaningful' role is insufficient, particularly where, as part of [defendant's] information technology infrastructure, it comprises only a portion of what enabled [defendant] to conduct its business profitably." (internal quotation marks omitted)).

use of Blaze was an impossible task and one that would undoubtedly confuse the issues and significantly prejudice Federal.  (Dkt. 331 at 2.)

On October 9, 2019, the Court issued a 25-page Memorandum Opinion and Order granting Federal's motion and concluding that FICO had no right to a jury trial on its disgorgement claim.  (Dkt. 588 & 811.)  The Court conducted a thorough analysis of statutory text and legislative history, and held that the Copyright Act does not provide for a statutory right to a jury trial.  (Dkt. 588 at 8-10.)  The Court then concluded that the Seventh Amendment does not provide a right to a jury trial for FICO's disgorgement claim because disgorgement is an equitable remedy.  (*Id.* at 18.)  In analyzing the issue, the Court noted that FICO's disgorgement claim is unrelated to any actual damages claimed by FICO and that the "staggering amount of profits FICO seeks" in comparison to its actual damages claim makes clear that Federal's profits are "unrelated to any actual damages FICO suffered":

> FICO has not asserted that Federal's profits represent actual damages it has suffered.  Therefore, the profits it seeks to disgorge are not actual damages, nor a proxy for them.  Moreover, the staggering amount of profits FICO seeks to disgorge vastly outstrips its claim for actual damages.  FICO's claim for disgorgement is at least $2.5 billion – and potentially as high as $31 billion – whereas its claim for actual damages is a "mere" $34 million.[6]  This disparity itself

---

[6] FICO's $37 million figure was excluded by Judge Wright as unreliable and inconsistent with the applicable legal standard.  (Dkt. 731 at 32.)  There, Zoltowski offered the opinion that FICO's actual damages—in the form of lost license fees—was $37.4 million. (Zoltowski Rep. ¶ 117.)  To arrive at this figure, however, Zoltowski implemented a subjective measure of what FICO would have charged for a license for the alleged infringing use of Blaze.  (Dkt. 731 at 31.)  The Court disagreed with this methodology because the correct legal standard was not what FICO would have subjectively charged,

> demonstrates that disgorgement of Federal's profits is unrelated to any actual damages FICO suffered.

(Dkt. 588 at 13.)  On June 24, 2020, the District Court affirmed this Court's decision. (Dkt. 811 at 12.)

Because the issues of actual damages and disgorgement are unrelated, there will not be significant overlap in the presentation of evidence.  Federal intends to call its damages expert, Chris Bakewell, and its industry expert William McCarter on FICO's disgorgement claim.  Federal further anticipates that FICO will call its damages expert, Neil Zoltowski, and its causation expert Bick Whitener on this issue.  Federal also intends to call certain current and former employees who will testify regarding the integration of Blaze into 10 applications and how those applications were used in the operations of Federal's business.  However, this testimony does not relate to or concern the issues of liability or actual damages that will be determined by the jury.  Federal estimates that the presentation of evidence on FICO's disgorgement claim will take approximately one week.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues."  "District courts possess broad discretion to bifurcate issues for purposes of trial."  *O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1201 (8th Cir. 1990).  "In exercising discretion, district courts should consider the preservation of constitutional

---

but "the reasonable license fee on which a willing buyer and willing seller would have agreed." (*Id.*)

rights, clarity, judicial economy, the likelihood of inconsistent results and possibilities for confusion." *Id.* Where the issues in a case are clearly separable, bifurcation is appropriate. *Id.*

## ARGUMENT

The Court has already determined that FICO does not have a right to a jury trial on its disgorgement claim. (*See* Dkt. 588 & 811.) Consistent with that opinion, the Court should order that the disgorgement claim be tried to the Court separately from those to be determined by the jury—liability and actual damages. Doing so will avoid the significant prejudice that Federal will suffer if FICO is allowed to parade multi-billion-dollar gross revenue figures before a jury based on its highly attenuated theory that Defendants profits are somehow connected to its use of Blaze. Furthermore, separating the trial of these issues will avoid juror confusion and serve the interests of convenience and judicial economy.

## I. BIFURCATION IS CONSISTENT WITH THE COURT'S PRIOR ORDERS CONCLUDING THAT THE COURT, NOT THE JURY, WILL DECIDE ANY DISGORGEMENT CLAIM.

The Court should bifurcate disgorgement because doing so is consistent with the Court's prior orders. As outlined above, pursuant to the Court's prior orders, the Court, not the jury, will decide any issues related to disgorgement. (Dkt. 588 & 811.) The Court previously held that FICO did not have a constitutional right to trial by jury on its disgorgement claim because it is an equitable claim. (*Id.*) Federal seeks to bifurcate trial into two phases (1) where issues of liability and actual damages are presented to a jury; and (2) where the issue of disgorgement is presented to the Court. Bifurcation of trial

9

into two phases where claims triable by a jury will be presented to a jury, and equitable claims will only be presented to the Court is consistent with this Court's prior orders determining that disgorgement is an equitable remedy to be determined by the Court.

## II.     FEDERAL WILL SUFFER SIGNIFICANT PREJUDICE IF THE DISGORGEMENT CLAIM IS NOT BIFURCATED.

The Court should also bifurcate FICO's disgorgement claim from the remainder of the trial because trying these issues together would cause Federal substantial prejudice. Bifurcation is appropriate when declining to do so would prejudice either party. *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.,* 2001 WL 228427, at *5 (D. Minn. Feb. 27, 2001), *aff'd*, 401 F.3d 901 (8th Cir. 2005). Bifurcation is appropriate in this case because Federal will be unfairly prejudiced if the issue of disgorgement is presented to the jury, whereas FICO will suffer no prejudice as a result of bifurcation.

### A.     Federal Will Be Unfairly Prejudiced If the Issue of Disgorgement Is Presented to the Jury.

If FICO is allowed to present its disgorgement claim to the jury, Federal will suffer incurable prejudice. The interjection of unsupported, multi-billion-dollar figures to the jury—where actual damages in the form of lost license fees are realistically between $750,000 and $2.5 million—will significantly skew the evidence and presentation on damages. FICO's disgorgement theory inappropriately implies without support that Federal wrongfully pocketed billions of dollars that rightfully belong to FICO. It would be one thing if disgorgement were a question for the jury—in that case, presenting the jury with this sort of prejudicial evidence and argument might be necessary. But when, as here, the evidence and argument concerning FICO's disgorgement claim are irrelevant

to any issue the jury will be asked to decide, there is no basis whatever for allowing FICO to present the jury with evidence posing such an obvious risk of prejudice to Federal.

> ### 1.      The interjection of unsupported, multi-billion-dollar figures to the jury will prejudice Federal.

Because FICO's disgorgement claim will not be decided by the jury, there is no purpose to presenting to them multi-billion-dollar figures other than to unfairly prejudice Federal. The Federal Circuit's decision in *Uniloc USA, Inc. v. Microsoft Corp.* is instructive. There, one of the issues presented to the jury was the reasonable royalty for "a very small component of a much larger software program." *Uniloc*, 632 F.3d 1292, 1320 (Fed. Cir. 2011). The plaintiff's damages expert (whose opinions were later excluded on appeal) used a questionable method of calculating this royalty that involved presenting gross revenue figures of $19 billion to the jury. *Id.* at 1311. The Federal Circuit affirmed the trial court's decision to vacate the damages award after trial based on the prejudice caused by this tactic, and its reasoning is particularly relevant here:

> [t]he $19 billion cat was never put back into the bag even by Microsoft's cross-examination of Mr. Gemini and re-direct of Mr. Napper, and in spite of a final instruction that the jury may not award damages based on Microsoft's entire revenue from all the accused products in the case. This is unsurprising. The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.

*Id.* at 1320 (citation omitted).[7]

---

[7] This reasoning is consistent with other opinions that conclude that defendants are prejudiced by the presentation of high damages figures. *Marvin Lumber & Cedar Co.*, 2001 WL 228427, at *5 ("The extent of the damages based upon the assertions of the

Like in *Uniloc*, if FICO is allowed to present its disgorgement claim to the jury there will be no way to put the multi-billion-dollar cat back into the bag. This is especially so because, as this Court has previously noted, FICO's actual damages in this case come nowhere near the profits it seeks. (*See* Dkt. 588 at 13 (FICO's profits claim "vastly outstrips its claim for actual damages").)[8]   Indeed, FICO's expert's actual damages calculation of $37.4 million was excluded as unreliable and not representative of the fair market value to use Blaze. The fair market value of a license to use Blaze is, at most, a low million-dollar figure. For example, Federal's enterprise-wide license cost

████████████████████████████████████████████

██████ . In other words, even if the jury were to ultimately reward FICO with its actual damages, it will be considering figures less than $2.5 million. The disgorgement FICO seeks, in comparison, is ***81 times*** the most generous estimate of FICO's damages from lost license fees; ***813 times*** the license fee FICO demanded from Federal post-merger; and ***2,102 times*** the fee that Federal actually paid for an enterprise-wide license. Introducing such starkly incongruent numbers will unfairly prejudice Federal.

Under these circumstances, the interjection of multi-billion-dollar figures that are not supported and bear no relation to any loss by FICO is prejudicial to Federal.

---

Plaintiffs is potentially enormous, and this alone creates potential for great prejudice against the Defendant… Thus, the Court finds that bifurcation is an appropriate means to avoid unfair prejudice."); *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2011 WL 13234787, at *2 (E.D.N.C. Oct. 31, 2011) (bifurcating trial and stating that evidence regarding defendant's "revenues or net worth[] creates a significant risk of unfair prejudice").

[8] There is also no reason that the jury needs to hear evidence related to the disgorgement claim because, as this Court has found, "disgorgement of Federal's profits is unrelated to any actual damages FICO suffered[.]"  (Dkt. 588 at 13.)

### 2.     FICO's disgorgement theory improperly implies that Federal profited billions from its use of Blaze without evidence or support.

FICO's presentation of evidence and argument concerning its disgorgement of profits claim will also prejudice Defendants because FICO's theory is speculative and unsupported.  FICO asserts without support that it is entitled to billions of dollars in lost profits.  Presenting this theory to the jury is unfairly prejudicial to Federal because it will mislead the jury into believing that Federal earned billions of dollars from the use of a minor software component.  FICO cannot show that the revenue figure it intends to present is attributable to the alleged infringement.  *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003) ("[T]he plaintiff has the 'burden' to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur." (*quoting Mackie v. Rieser*, 296 F.3d 909, 915 (9th Cir. 2002))); *Complex Systems, Inc. v. ABN Ambro Bank N.V.*, No. 08 Civ. 7497 (KBF) 2013 WL 5970065, *3 (S.D.N.Y. Nov. 8, 2013) ("A copyright owner bears the initial burden of demonstrating a causal nexus between the infringement and the appropriate gross revenues."); *Int'l Bus. Machines Corp. v. BGC Partners*, Inc., No. 10 Civ. 128 (PAC), 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25, 2013) ("IBM seeks recovery of all of BGC's profits, but first it must present proof of BGC's gross revenue reasonably related to the infringement, excluding unrelated revenues." (citation omitted)).

FICO's experts fail to address this issue entirely.  FICO's damages expert provides no analysis on this point.  (Zoltowski Rep. ¶ 122.)  Furthermore, FICO's causation expert admits that he cannot say, one way or the other, whether use of Blaze caused *any* of

Federal's profits; let alone provide an opinion as to the amount.  (Whitener Dep. 100:12-17, 150:16-151:13, 152:24-153:5, 216:11-15, 236:4-237:18 ██████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████.) Allowing

FICO to present such an astronomical and irrelevant number to the jury will unfairly

prejudice Federal because it will color the jury's perception of Federal's liability and

improperly imply, without support, that Federal has profited from its use of Blaze.  *See*

*Silicon Knights*, 2011 WL 13234787 at *2.

### B.   FICO Will Not Be Prejudiced by Bifurcation.

The Court should also bifurcate these issues because FICO will not be prejudiced

if these issues are tried separately.  Courts have routinely recognized that, in intellectual

property cases, there is little overlap between issues of liability and damages.  *See Oracle*

*Am., Inc. v. Google Inc.*, 2016 WL 5393938, at *15 (N.D. Cal. Sept. 27, 2016) ("Again,

unlike Oracle's lost profits segment, the apportionment/disgorgement problems had

virtually no relevance to market harm and fair use."), *rev'd on other grounds*, 886 F.3d

1179 (9th Cir. 2018).  FICO will not be prejudiced by bifurcation because there will be

little, if any, overlap between the first and second phases of the trial.  As discussed in

Section III, *infra*, the evidence presented at a separate disgorgement trial will primarily

consist of testimony and analysis from the parties' expert witnesses that overlap little

with any testimony those witnesses may give at the liability and actual damages phase.

*See* Section III, *infra*.

FICO will also not be prejudiced by any potential delay caused by bifurcating the trial because Federal is prepared to present these issues to the Court immediately after the first phase of the trial.  Thus, there is no prejudice to FICO.

## III.    BIFURCATION WILL REDUCE THE RISK OF CONFUSING THE JURY.

The complexity of the disgorgement claim also creates a significant risk of juror confusion—especially because it is not a claim the jury will decide.  Courts have held that presenting evidence of damages during the liability phase of trial can cause jury confusion.  *See Alfwear, Inc. v. Icon Health & Fitness, Inc.*, No. 2:17-CV-00476-EJF, 2018 WL 6592728, at *1 (D. Utah Dec. 14, 2018) ("The Court finds that damages evidence could distract and confuse the jury in this case."); *Marchionda v. John Q. Hammons Hotels Mgmt., LLC*, No. 4:15-CV-00479-JEG, 2018 WL 8458879, at *1 (S.D. Iowa Dec. 31, 2018) (bifurcating trial and noting that "emphasis on [evidence of Defendants' financial condition] during the liability phase could contribute to both prejudice and jury confusion").  The risk of jury confusion is especially high where, as here, the evidence of damages is highly complex.  In *Medtronic Xomed, Inc. v. Gyrus ENT LLC*, for example, the court held that it would try liability and damages in separate phases because "the issues in this case as to liability and damages are sufficiently complex and so distinct that one trial on all issues could well perplex the jury . . . [and] [t]o include at the same time proof of the damages issues could risk needless juror confusion."  440 F. Supp. 2d 1333, 1337 (M.D. Fla. 2006) (citation omitted).

Here, the disgorgement claim will require FICO to prove (1) Federal's revenues and (2) a causal nexus between Federal's revenues and the alleged infringing activity.  17

U.S.C. § 504(b).   Then, once FICO has satisfied its burden, Federal may prove "its deductible expenses and the elements of profit attributable to factors other than the copyright work." *Id.*   This will necessarily involve highly complex and technical evidence that risks confusing the jury if presented alongside evidence of liability.   In *Oracle*, the court noted that disgorgement "presented extraordinary complexity" because

> the jury would have had to further apportion between the accused lines of code versus the unaccused lines of code within Android. The infringing part of Android constituted only a small fraction of one percent of Android. Oracle conceded this but contended that this sliver held the key to the success of Android.

*Oracle*, 2016 WL 5393938, at *15.   Like in *Oracle*, Blaze constituted only a small fraction of one percent of all applications and technologies employed by Federal.   The Court would have to isolate profits attributable to Blaze from other profits.   Presenting this evidence to a jury will be needlessly confusing.

Furthermore, the actual evidence of revenues and deductible expenses are highly complicated.   FICO claims revenues from all gross written premiums that ever touched any application that used Blaze, including revenues of non-parties.   (Zoltowski Supp. Rep., Schedule 3.0.)   FICO will therefore need to present evidence of revenues for each specific application that used Blaze during specific time periods, prove a causal nexus between the use of Blaze and those revenues, and show those revenues are attributable to Federal because some of the revenue that FICO now claims was earned by non-parties. (*See* Dkt. 731 at 33 ("Although it may be true that FICO cannot seek to disgorge the profits on non-parties that are not before the Court, the law does not preclude FICO from

seeking to disgorge certain profits that, although *earned* by non-parties, may nonetheless belong to Defendants.").)

Federal will then need to present equally complicated evidence as to deductible expenses from revenues. This includes expenses related to insurance claims and losses and loss adjustment expenses incurred; commissions or acquisitions fees paid to insurance brokers and agents; salaries and benefits of employees; information technology costs; general office costs; taxes; licensing and other fees; and dividends paid to certain policy holders. (Fleming Decl. ¶ 8, Ex. G ("Bakewell Rep.") ¶ 192.) This is a complicated process requiring sophisticated expert analysis and detailed presentation. (*See* Bakewell Rep. ¶¶ 192-205.) All of these issues risk significant juror confusion.

Finally, that the Court will decide the disgorgement claim further heightens the risk of juror confusion—and makes it wholly unnecessary. Jurors will inevitably be confused if presented with voluminous technical evidence that they need not actually consider. Moreover, because the jury will not decide the disgorgement claim, there is nothing to be gained from subjecting them to the evidence underlying it.

## IV.   BIFURCATION WILL PROMOTE CONVENIENCE AND JUDICIAL ECONOMY.

Bifurcation also furthers the interests of convenience and promotes judicial economy. "Central to the concept of convenience is whether the triable issues involve evidentiary overlap, that would require the testimony of the same witnesses, and related repetitions of proof." *See Intermedics, Inc. v. Cardiac Pacemakers, Inc.*, No. CIV 4-95-716, 1998 WL 35253490, at *15 (D. Minn. Feb. 17, 1998), *report and recommendation*

*adopted as modified*, No. CIV 04-95-716 (JRT/RLE), 1998 WL 35253492 (D. Minn. Mar. 31, 1998). When there is minimal or nonexistent overlap bifurcation is appropriate. *See id.*

Here, bifurcation is convenient because there is minimal to no overlap between the evidence relevant to issues decided by the jury (liability and actual damages) and those decided by the Court (disgorgement). *See Alfwear, Inc.*, 2018 WL 6592728, at *1 (noting that courts may "bifurcate liability and damages phases at trial where proof of damages does not form an element of the claim and/or where proof of damages goes beyond traditional actual damages"); *Swofford v. B & W, Inc.*, 336 F.2d 406, 415 (5th Cir. 1964) ("[W]e cannot think of an instance in a patent action where the damage issue is so interwoven with the other issues that it cannot be submitted to the jury independently of the others.").

Bifurcation will further the interest of judicial economy in this case because the issues of liability and profit disgorgement are entirely separable, and, if the jury finds that Federal did not infringe FICO's copyright, a trial on profit disgorgement will be unnecessary.  When issues in a case are clearly separable, it follows that bifurcation promotes judicial efficiency. *See Marvin Lumber & Cedar Co.*, 2001 WL 228427, at *5. Furthermore, bifurcation advances judicial economy if it "saves considerable time and unnecessary expense and preparation and eliminate[s] the need for a future trial if one of the parties is successful." *Soo Line R.R. Co. v. Werner Enterprises*, No. CIV. 12-1089, 2014 WL 4449642, at *1 (D. Minn. Sept. 10, 2014) (internal quotation marks and citation omitted); *see also Smith-Walker v. Zielinski*, No. IP 01-0343-C-T/K, 2003 WL 21254221,

at \*4 (S.D. Ind. Apr. 29, 2003) ("If the jury in the first [phase] finds in the Defendants' favor, then there would be no trial on damages, and no time whatsoever would be used in presenting evidence, argument and instructions on issues regarding damages. In the end, this would promote economy.").

*Kars 4 Kids, Inc. v. America Can!* explains how trying liability and damages separately promotes efficiency. In *Kars 4 Kids*, the Court held that bifurcation of the disgorgement claim was appropriate because significant time spent presenting evidence of profits "could possibly serve no purpose" if the jury determined defendants were not liable:

> Though America Can! argues that this Court should empanel the jury as an advisory jury on damages, the Court declines to do so, and instead determines that trying disgorgement and liability separately conserves judicial resources. Depending on how the jury determines liability, the Court may not need to determine disgorgement of Kars 4 Kids' profits, and any time spent presenting that evidence could possibly serve no purpose. The Court also determines that trying disgorgement separately will enhance jury comprehension of the issues to be presented in the case, as the jury will not be presented with evidence that is not relevant to any issue it will need to decide.

*Kars 4 Kids*, No. 14-cv-7770 (PGS), 2019 WL 2078670, at \*2 (D.N.J. May 10, 2019); *see also Chicago Mercantile Exch. Inc. v. Ice Clear US, Inc.*, No 18 C 1376, 2020 WL 5370625, at \*2 (N.D. Ill. Aug. 10, 2020) (concluding no right to jury trial on disgorgement and reasoning there was "no viable reason" to empanel an advisory jury on the issue of disgorgement).

19

The same reasoning applies here.  If the jury finds that Defendants are not liable for copyright infringement—which is likely given Defendants purchased an enterprise-wide license for the use of Blaze—then the Court will not even need to conduct a disgorgement proceeding, avoiding approximately one week of presentation of evidence. This is a well-established reason for bifurcation.  *See Alfwear*, 2018 WL 6592728, at *1 (ordering bifurcation of trial into separate phases for liability and damages in trademark infringement case, noting that bifurcation would "increase efficiency to the extent the second phase proves unnecessary"); *Fahmy v. Jay Z*, No. 07-cv-05715-CAS, 2015 WL 5680299, at *24 (C.D. Cal. Sept. 24, 2015) (ordering bifurcation of trial into separate phases for liability and damages in copyright infringement case because "the liability portion of the trial may obviate the need for a trial on damages"); *Naxon Telesign Corp. v. GTE Info. Sys., Inc.*, 89 F.R.D. 333, 341 n.10 (N.D. Ill. 1980) (ordering bifurcation of trial into separate phases for liability and damages in patent infringement case, noting that "a jury verdict for defendant as to liability ends the case without the expenditure of time by the Court, the jury and counsel on proof of damages"); *Beeck v. Aquaslide 'N' Dive Corp.*, 562 F.2d 537, 542 (8th Cir. 1977) (affirming bifurcation of trial into two phases because first phase, if resolved in defendant's favor, would obviate need for second phase).  For this additional reason bifurcation is appropriate.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should exercise its discretion under Federal Rule of Civil Procedure 42(b) to conduct a phased trial, with the jury's determination of

liability and actual damages being tried first, and, if necessary, a second phased trial to the Court only on FICO's claim for disgorgement of profits.

Dated:  November 29, 2022

*s/ Terrence J. Fleming*

Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Ryan C. Young (#0397751)
ryoung@fredlaw.com
Panhia Vang (#399444)
pvang@fredlaw.com

**Fredrikson & Byron, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

Leah Godesky (Admitted Pro Hac Vice)

**O'Melveny & Myers LLP**
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
lgodesky@omm.com

***Attorneys for Federal Insurance Company and ACE American Insurance Company***