# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054 (DTS) |
| Plaintiff, | ) ) | **Jury Trial Demanded** |
| v. | ) ) | **REDACTED VERSION** |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO BIFURCATE

## <u>TABLE OF CONTENTS</u>

I.    Introduction ................................................................................................ 1

II.   Bifurcation is an extreme remedy, and Defendants bear a heavy burden to establish that bifurcation is warranted. ...................................................... 6

III.  Defendants' Motion should be denied. ...................................................... 7

    A.  The jury will learn facts relevant to liability and damages through expert and fact witnesses. .............................................................. 7

        (1)  In assessing the fair market value of Blaze Advisor, the jury will receive evidence of Defendants' annual revenue and the revenue generated from use of Blaze Advisor. ............................... 10

        (2)  In assessing the fair market value of Blaze Advisor, the jury will receive additional evidence of the value and importance of Blaze Advisor to Defendants and their sale of insurance. ........... 13

    B.  The evidence relevant to disgorgement is the same evidence relevant to compensatory damages. ......................................................... 17

        (1)  There is significant evidentiary overlap. ........................................ 17

        (2)  Defendants' arguments and case law are unavailing and do not support their position. ............................................................... 20

    C.  Bifurcation does not promote convenience or judicial economy. ............... 22

    D.  Defendants will not suffer undue prejudice if the case is not bifurcated. ..................................................................................... 24

        (1)  The evidentiary overlap defeats Defendants' claim of alleged prejudice. ....................................................................................... 24

        (2)  Defendants' attempts to characterize FICO's claims as unsupported fail. ............................................................................. 25

        (3)  The jury will understand the scope of this case and the size of the parties. ...................................................................................... 27

        (4)  FICO will be prejudiced by bifurcation. ........................................ 28

    E.  Bifurcation is not necessary to prevent or reduce the risk of juror confusion. ....................................................................................... 29

IV.    Conclusion ................................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADT Sec. Servs. v. Swenson*,
  No. 07-2983, 2011 U.S. Dist. LEXIS 107482 (D. Minn. Sept. 21, 2011)...................22

*Andreas v. Volkswagen of Am., Inc.*,
  336 F.3d 789 (8th Cir. 2003) ........................................................................... 3, 26, 30

*Benjamin v. United Merchs. & Mfrs., Inc.*,
  873 F.2d 41 (2d Cir. 1989)...................................................................................... 29

*Campanella v. N. Props. Grp., LLC*,
  No. 19-cv-171, 2019 U.S. Dist. LEXIS 230229
  (D. Minn. Dec. 19, 2019)..................................................................................... 6, 17

*Cisco Sys. Inc. v. Arista Networks Inc.*,
  Case No. 14-cv-5344, Dkt. No. 661 (N.D. Cal. Nov. 16, 2016).................................21

*Collins v. Depositors Ins. Co.*,
  No. 12-cv-3133, 2014 U.S. Dist. LEXIS 196375
  (D. Minn. Aug. 21, 2014) .................................................................................*passim*

*Dash v. Mayweather*,
  731 F.3d 303 (4th Cir. 2013) ................................................................................. 26

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994).................................................................................. 30

*Dayva Int'l v. Award Prods. Corp.*,
  97-1397, 1998 U.S. App. LEXIS 4386 (Fed. Cir. Mar. 11, 1998) ............................ 30

*DocMagic, Inc. v. Ellie Mae, Inc.*,
  745 F. Supp. 2d 1119 (N.D. Cal. 2010) ................................................................. 24

*Fahmy v. Jay-Z*,
  No. 2:07-cv-05715-CAS(PJWx), 2015 U.S. Dist. LEXIS 139298
  (C.D. Cal. Oct. 9, 2015) ....................................................................................... 21

*Falzon v. Johnson*,
  No. 12 CV 674 (CLP), 2016 U.S. Dist. LEXIS 200687
  (E.D.N.Y. Oct. 24, 2016) ...................................................................................... 29

iii

*Gaylord v. United States*,
   777 F.3d 1363 (Fed. Cir. 2015) ..................................................................... 2

*INS v. Pangilinan*,
   486 U.S. 875 (1988) ....................................................................................... 5

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
   274 F.3d 1371 (Fed. Cir. 2001) ............................................................... 2, 17

*Kelley v. BMO Harris Bank N.A.*,
   No. 19-cv-1756 (WMW), 2022 U.S. Dist. LEXIS 176891
   (D. Minn. Sep. 29, 2022) ........................................................................ 27, 28

*In re Landbank Equity Corp.*,
   973 F.2d 265 (4th Cir. 1992) .......................................................................... 5

*MAI Sys. Corp. v. Peak Comput., Inc.*,
   991 F.2d 511 (9th Cir. 1993) ......................................................................... 23

*Maranatha Assocs. v. Titan Grp.*,
   202 A.D.2d 846 (N.Y. App. Div. 1994) ......................................................... 8

*Marvel v. United States*,
   719 F.2d 1507 (10th Cir. 1983) .................................................................... 21

*Medtronic, Inc. v. Boston Scientific Corp.*,
   No. 99-1035, 2002 U.S. Dist. LEXIS 28355 (D. Minn. Aug. 8, 2002) ...... 10

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
   284 F.3d 505 (4th Cir. 2002) ........................................................................ 13

*Navarro v. P&G Co.*,
   529 F. Supp. 3d 742 (S.D. Ohio 2021) ....................................... 19, 20, 21, 22

*NLRB v. RELCO Locomotives, Inc.*,
   734 F.3d 764 (8th Cir. 2013) ........................................................................ 26

*On Davis v. Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001) .......................................................................... 11

*Ossman v. Diana Corp.*,
   825 F. Supp. 870 (D. Minn. 1993) ................................................................ 26

*Pinn, Inc. v. Apple, Inc.*,
   No. 8:19-CV-01805-DOC-(JDEx), 2021 U.S. Dist. LEXIS 200942
   (C.D. Cal. Mar. 9, 2021) ............................................................. 2, 3, 11, 17

*Prichard v. Royal Ins. Serv. Corp.*,
  Civil Action No. 86-2436-S, 1988 U.S. Dist. LEXIS 8023
  (D. Kan. July 18, 1988) ................................................................................ 21

*Probatter Sports, LLC v. Sports Tutor, Inc.*,
  586 F. Supp. 3d 80 (D. Conn. 2022) ............................................................... 2

*Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*,
  338 F. App'x 329 (4th Cir. 2009) .................................................................. 23

*In re RFC & ResCap Liquidating Tr. Litig.*,
  No. 13-cv-3451 (SRN/HB), 2019 U.S. Dist. LEXIS 93360
  (D. Minn. June 3, 2019) ............................................................................ 6, 17

*Sobolik v. Briggs & Stratton Power Prods. Grp., LLC*,
  No. 09-1785, 2011 U.S. Dist. LEXIS 128905 (D. Minn. Nov. 7, 2011) ............. 22, 28

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*,
  689 F.3d 29 (1st Cir. 2012) .......................................................................... 23

*State v. Bowman*,
  144 Ohio App. 3d 179 (Ohio 2001) ............................................................... 26

*State v. Tia*,
  No. 94-2440-CR, 1995 Wisc. App. LEXIS 985
  (Wisc. Ct. App. Aug. 16, 1995) .................................................................... 26

*Tran v. Farmers Grp., Inc.*,
  104 Cal. App. 4th 1202 (Cal. Ct. App. 2002) ................................................. 12

*U.S. v. Mast*,
  999 F.3d 1107 (8th Cir. 2021) ...................................................................... 10

*United States v. Beaudet*,
  No. 03-1132, 2004 U.S. Dist. LEXIS 13952 (D. Minn. July 19, 2004) ............. 6, 30

*United States v. Mosquera*,
  No. 8:14-cr-379-T-36TGW, 2015 U.S. Dist. LEXIS 177631
  (M.D. Fla. Apr. 9, 2015) ............................................................................... 29

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ....................................................................................... 5

*Weimer v. Int'l Flavors & Fragrances, Inc.*,
  No. C05-4138-MWB, 2007 U.S. Dist. LEXIS 48669

(N.D. Iowa July 3, 2007) .................................................................................. 28

**Statutes**

17 U.S.C. § 106 .............................................................................................. 23

17 U.S.C. § 504 ...................................................................................... *passim*

**Other Authorities**

Federal Rule of Civil Procedure 39 ............................................................. 1, 20

Federal Rule of Civil Procedure 42 ..................................................... 1, 5, 6, 17

# I.     Introduction

Defendants Federal Insurance Company's ("Federal") and ACE American Insurance Company's ("ACE American") (collectively, "Defendants") motion to bifurcate liability and compensatory damages from disgorgement should be denied. Defendants' motion is based on a non sequitur—that the Court should bifurcate because it held Plaintiff Fair Isaac Corporation's ("FICO") claim for disgorgement under 17 U.S.C. § 504(b) is equitable in nature. Federal Rule of Civil Procedure 42 permits a separate trial on "separate issues" "[f]or convenience, to avoid prejudice, or to expedite and economize." None of those grounds are met here. The same evidence that proves FICO's compensatory damages for the unauthorized use of Blaze Advisor also proves FICO's right to disgorgement under Section 504(b) and the amount to be disgorged. This evidentiary overlap defeats any arguments of prejudice. The jury will hear the <u>same</u> evidence regardless. Bifurcation is the exception, not the rule, and, here, will do nothing but create inefficiencies. Because the jury will hear the same evidence, the Court was correct to exercise its discretion under Federal Rule of Civil Procedure 39(c) to empanel an advisory jury on that issue.

FICO is entitled to compensatory damages resulting from Federal's breach of contract, Federal's copyright infringement, and ACE American's copyright infringement. Under the Copyright Act these damages are called "actual damages." Actual damages, like the contract damages from Federal's breach, are determined by proof of the fair market value of the unauthorized use of Blaze Advisor. That fair market value is based on

1

a hypothetical negotiation between FICO and the unauthorized user. (Dkt. No. 731 at 9-10, 16-18.)

Factors to be considered in a hypothetical negotiation to determine fair market value include, among other things:

- The business purpose of the unauthorized use[1] - the evidence will show the business purpose was to sell insurance.

- The criticality of the business purpose served by the unauthorized use[2] - the evidence will show the unauthorized use of Blaze Advisor was critical to selling insurance.

- The connection between the unauthorized use and the generation of revenue from selling insurance[3] - the evidence will show the intimate connection between the two.

- The amount of revenue generated because of the unauthorized use[4] - an unauthorized use connected to a large amount of revenue has a greater fair

---

[1] *See Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015) ("The hypothetical-negotiation determination must be tied to the particular work at issue and its marketplace value—much as, in patent law, the determination must be tied to the particular patented technology and its footprint in the market."). (*See also*, Dkt. No. 731 at 18 (explaining the intrinsic value of Blaze Advisor is relevant to a hypothetical negotiation).)

[2] *See Gaylord*, 777 F.3d at 1368.

[3] *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) (explaining that "an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation" but "does not require that estimates of sales revenues, as referenced in a hypothetical negotiation at the time infringement began, must later bear a close relation to actual sales revenue"); *Probatter Sports, LLC v. Sports Tutor, Inc.*, 586 F. Supp. 3d 80 (D. Conn. 2022) (citing *Interactive Pictures*, 274 F.3d at 1384) ("In applying this principal, the court affirmed a jury verdict based on projected future sales versus actual future sales where, at the time of the hypothetical negotiation, there was evidence, or elements of value, supporting the projected future sales.").

[4] *Pinn, Inc. v. Apple, Inc.*, No. 8:19-CV-01805-DOC-(JDEx), 2021 U.S. Dist. LEXIS 200942, at *122 (C.D. Cal. Mar. 9, 2021) ("*Pre*-hypothetical-negotiation revenue and profits are thus relevant to the hypothetical negotiation circumstances, and *post*-hypothetical-negotiation revenue and profits are also relevant") (emphasis in original).

market value than an unauthorized use connected to a small amount of revenue. The evidence will show Defendants' unauthorized use generated a substantial amount of revenue.

Indeed, the determination of fair market value to award compensatory damages considers all business benefits and value derived from the unauthorized use of Blaze Advisor in connection with selling insurance.[5]

This same evidence proves FICO's right to disgorgement under Section 504(b). In the words of Judge Wright, "[t]o prove such damages, 'the copyright owner is required to present proof only of the infringer's gross revenue . . . .'" (Dkt. 731 at 7.) This proof includes evidence of "attribution," meaning proof that "the infringing use, at least in part, 'contributed to' the relevant gross revenue." (*Id.* at 7, 21.) FICO is presumptively entitled to all gross revenue attributable to the infringement. *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003) (When the copyright owner meets its burden to prove gross revenue connected to infringement, "a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement arises."). Defendants have the burden to rebut that presumption with proof of "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). (*See also*, Dkt. No. 731 at 7-8 (explaining the same).) Proof of profits from the infringement depends on Defendants meeting their two burdens of proof.

The gross written premium connected to the unauthorized use of Blaze Advisor is evidence relevant to fair market value and is relevant to prove the amount of revenue

---

[5] *Pinn, Inc.*, 2021 U.S. Dist. LEXIS 200942, at *122. (Dkt. No. 731 at 18 (explaining the intrinsic value of Blaze Advisor is relevant to a hypothetical negotiation).)

attributable to infringement under Section 504(b). The critical business purpose of the unauthorized use of Blaze Advisor to sell insurance is relevant to fair market value and is relevant to prove the infringement contributed, at least in part, to the revenue generated by use of Blaze Advisor. This evidence, as well as other evidence relevant to both fair market value and disgorgement, will be introduced through the same documents and witnesses. Defendants ignore this reality.

Instead, Defendants rehash their prior summary judgment and Daubert arguments and contend FICO's damages claims are speculative. These arguments were rejected by Judge Wright. (Dkt. No. 731 at 23-25, 32-34, 55-57; *see also*, *id.* at 7-8, 20-21 (explaining burdens associated with Section 504(b).) Defendants refuse to acknowledge the shifting burdens of proof under Section 504(b). FICO's proof is far from speculative or baseless. Again, in the words of Judge Wright:

> Here, FICO presents evidence of gross revenue from the sale of insurance in connection with which Blaze Advisor was used. The evidence is not "undifferentiated" as it is tied to Defendants' use of Blaze Advisor. FICO presents evidence about how Blaze Advisor contributed to Defendants' gross revenue from the sale of insurance. This evidence is sufficient to demonstrate a genuine dispute of material fact as to disgorgement of profits and, therefore, preclude summary judgment on this issue.

(*Id.* at 57 (rejecting Defendants' contention that FICO's claim for disgorgement was speculative).)

Defendants are part of the largest property and casualty insurance company in the world. (Declaration of Michael A. Erbele Ex. 1.)[6] Defendants generated billions of

---

[6] Unless otherwise noted, all exhibits are to the Declaration of Michael A. Erbele filed concurrently herewith.

dollars of gross revenue from the unauthorized use of Blaze Advisor over, approximately, four years. That is a fact, and it is directly relevant to fair market value and to disgorgement. Relevant evidence is not unfairly prejudicial because the complaining party wishes it were otherwise.

Defendants' desire for bifurcation suggests they hope to overcome their failures to prove deductible expenses and to prove the extent their profit is attributable to factors other than infringement, as required by Section 504(b), because the award of disgorgement is equitable. This hope is misplaced. "[C]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *INS v. Pangilinan*, 486 U.S. 875, 883, (1988); *see also, United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) ("Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute."). The Court's equitable discretion is limited to whether the amount to be disgorged shocks the conscience or is "manifestly unjust." *See In re Landbank Equity Corp.*, 973 F.2d 265, 271-72 (4th Cir. 1992) (Damages may only be reduced through the principles of equity "in those extraordinary cases in which a manifest injustice would result if established legal principles were to be applied.").

When the Rule 42 factors are forthrightly considered, it is clear Defendants' motion should be denied. The jury will be fully advised regarding all the business benefits and the financial value of those benefits from the unauthorized use of Blaze Advisor so it can determine fair market value and award compensatory damages. That same evidence is the basis for a disgorgement award. There is no reason to bifurcate.

## II.     Bifurcation is an extreme remedy, and Defendants bear a heavy burden to establish that bifurcation is warranted.

Rule 42(b) governs the bifurcation of trials:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

Fed. R. Civ. P. 42(b). Bifurcation is an extreme remedy, and Defendants bear a "'heavy burden' to prove that separate trials meet the objectives of Rule 42(b)." *In re RFC & ResCap Liquidating Tr. Litig.*, No. 13-cv-3451 (SRN/HB), 2019 U.S. Dist. LEXIS 93360, at *26 (D. Minn. June 3, 2019); *see also, Campanella v. N. Props. Grp., LLC*, No. 19-cv-171 (JNE/LIB), 2019 U.S. Dist. LEXIS 230229, at *9 (D. Minn. Dec. 19, 2019); *Collins v. Depositors Ins. Co.*, No. 12-cv-3133, 2014 U.S. Dist. LEXIS 196375, at *3 (D. Minn. Aug. 21, 2014). "Bifurcation is the exception, not the rule." *In re RFC & ResCap Liquidating Tr. Litig.*, 2019 U.S. Dist. LEXIS 93360, at *27.

In assessing whether bifurcation is appropriate, courts consider whether bifurcation would promote convenience, judicial economy, and the avoidance of prejudice. Fed. R. Civ. P. 42(b); *In re RFC & ResCap Liquidating Tr. Litig.*, 2019 U.S. Dist. LEXIS 93360, at *27; *see also*, *e.g.*, *Collins*, 2014 U.S. Dist. LEXIS 196375, at *3 (Court may weigh factors such as "the preservation of constitutional rights, clarity, judicial economy, the likelihood of inconsistent results and possibilities of confusion.") Further, bifurcation is not appropriate when jury instructions can address concerns raised by the movant. *United States v. Beaudet*, No. 03-1132 (JRT/JSM), 2004 U.S. Dist. LEXIS 13952, at *4 (D. Minn. July 19, 2004).

None of the relevant factors support bifurcation. Defendants cannot meet their heavy burden.

## III.   Defendants' Motion should be denied.

### A.   <u>The jury will learn facts relevant to liability and damages through expert and fact witnesses.</u>

FICO asserts claims of breach of contract and copyright infringement against Federal and a claim of copyright infringement against ACE American. All claims stem from the unauthorized use of FICO's Blaze Advisor software. Blaze Advisor automates human decision making, and, in the context of insurance, significantly and directly contributes to selling insurance.

Chubb & Son, a division of Federal and part of the Chubb Corporation's $12 billion group of insurance companies, recognized the value of automating the decisioning process connected to selling insurance, and, in February of 2006, issued a Request for Information ("RFI") to FICO to learn about Blaze Advisor. (Ex. 2.) As the RFI states, the division Chubb & Son was a manager of insurance company subsidiaries of the Chubb Corporation. (*Id.* at FICO0057280.) The RFI was issued because a "key strategic initiative" of the Chubb Corporation was to increase revenue by selling more insurance to small and mid-market customers, most specifically with respect to the sale of Specialty insurance products. (*Id.* at FICO0057264.) Expansion into this market was "viewed as a good opportunity as it is understood that 85% of the identified and targeted customer set does not currently buy Chubb products." (*Id.*; *see also*, Ex. 3 at 184:23-187:3, 190:6-191:20.) Chubb & Son understood that automated decisioning was necessary to sell

insurance in the mid-market because of its higher volume of transactions. That also freed the time of its underwriters to focus on higher value selling opportunities. Chubb & Son knew automated decisioning with Blaze Advisor was necessary to break into a profitable and previously untapped market segment.

Chubb & Son (the Client) entered into a limited Software License and Maintenance Agreement to use Blaze Advisor in 2006 (the "Agreement"). (Ex. 4.)[7] Blaze Advisor automates specific business goals and outcomes of the Client, using the Client's business logic and rules of decision. (Ex. 3 at 196:19-198:21.) Blaze Advisor applications were used in connection with selling insurance issued in the names of at least 13 subsidiary insurance companies of the Chubb Corporation managed by Chubb & Son. The parties enjoyed a productive relationship for a decade.

In January 2016 the Chubb Corporation ceased to exist when it was acquired by a much larger insurance company, ACE Limited.[8] That acquisition was the largest merger in insurance history, creating an insurance group of companies with annual revenues of over $30 billion. (Ex. 1 at FICO0056561, FICO0056577.) The acquisition by ACE Limited was deemed an assignment under Paragraph 10.8 of the Agreement. (Dkt. No. 731 at 46.) That assignment triggered the obligation to get FICO's prior written consent to continue using Blaze Advisor. (Ex. 4 at §10.8.)

---

[7] Federal is a Defendant because it is responsible for the actions of its division, Chubb & Son. *Maranatha Assocs. v. Titan Grp.*, 202 A.D.2d 846, 847 (N.Y. App. Div. 1994).
[8] ACE Limited thereafter changed its name to Chubb Limited.

FICO's prior consent was not requested. FICO gave notice of breach on January 27, 2016. (Ex. 5.) FICO extended the 30-day cure period to 60-days, but the efforts to cure failed. FICO terminated the Agreement effective March 31, 2016. Federal had breached Paragraph 10.8 and two provisions of Paragraph 3.1, entitled "License Restrictions." Despite termination, and the requirements of Paragraph 9.3 that all use of Blaze Advisor cease, Federal continued using Blaze Advisor.

FICO seeks compensatory damages of lost license fees against Federal for breach of the Agreement. The unauthorized use of Blaze Advisor by Federal after termination of the Agreement was also copyright infringement. Under the Copyright Act the compensatory damages for the unauthorized use of Blaze Advisor are termed "actual damages." These "actual damages" are the lost license fees. Contract damages and actual damages for copyright infringement are, in both cases, the fair market value for the unauthorized use of Blaze Advisor. (Dkt. No. 731 at 18.) FICO also seeks disgorgement under 17 U.S.C. § 504(b).

 From January 2017 to approximately the first quarter of 2020, ACE American was a naked, unlicensed infringer of Blaze Advisor. It was not a party to, and had no rights under, the Agreement. FICO

seeks, in addition to disgorgement, an award of actual damages from ACE American in the form of lost license fees for the unauthorized use of Blaze Advisor.

In total, FICO seeks compensatory damages of $47 million in lost license fees for Federal's breach of the Agreement and Defendants' infringement of FICO copyrights by the unauthorized use of Blaze Advisor. (Ex. 7.)

> **(1)     In assessing the fair market value of Blaze Advisor, the jury will receive evidence of Defendants' annual revenue and the revenue generated from use of Blaze Advisor.**

The fair market value of the unauthorized use of Blaze Advisor is determined by a hypothetical negotiation between FICO, on the one hand, and the unauthorized user, on the other hand, at the time of the unauthorized use. (Dkt. 731 at 16-18, 26.) To establish the fair market value of Blaze Advisor, FICO will offer testimony from both fact and expert witnesses. For example, FICO's Chief Product & Technology Officer, Mr. William Waid, has personally been involved in hundreds of Blaze Advisor licensing negotiations.[9] ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ (Ex. 8 at 90:1-14, 94:8-95:11.) Mr. Waid will explain that

███████████████████████████████████ In addition to total revenue, FICO considers ███

---

[9] A fact witness with expertise in a particular area may testify to his or her experience and understanding. Doing so does not transform that fact witness into an expert witness. *U.S. v. Mast*, 999 F.3d 1107, 1112 (8th Cir. 2021) (permitting witness with professional training and experience regarding easement maps to testify to the process of creating those maps); *Medtronic, Inc. v. Boston Sci. Corp.*, No. 99-1035 (RHK/FLN), 2002 U.S. Dist. LEXIS 28355, *70-75 (D. Minn. Aug. 8, 2002) (Rule 701 distinguishes between expert and lay testimony, not expert and lay witnesses).



(Ex. 8 at 39:19-40:20; Ex. 9; *see also*, Dkt. No. 77 at ¶¶ 5-6.)

FICO's former employee, Mr. Lawrence Wachs, will likewise testify

(Ex. 3 at 38:14-40:5; *see also*, *id.* at 74:10-75:18

)

FICO's licensing practices and standards were established and accepted by the market well before Federal breached the Agreement and Defendants infringed FICO's copyrights. Evidence of the annual revenue of the organization of which the Client is a part will be introduced as part of the hypothetical negotiation analysis. *On Davis v. Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001) ("established rates that are regularly paid by licensees" used to calculate fair market value); *Pinn, Inc.*, 2021 U.S. Dist. LEXIS 200942, at *122 ("*Pre*-hypothetical-negotiation revenue and profits are thus relevant to the hypothetical negotiation circumstances, and *post*-hypothetical-negotiation revenue and profits are also relevant") (emphasis in original).

To establish fair market value, namely the extent and business import of Defendants' use of Blaze Advisor, the jury will also learn of Defendants' total revenue generated from use of Blaze Advisor applications during the period of unauthorized use. That amount comes directly from Defendants' answers to FICO's interrogatories, which

11

identify the total revenue from use of Blaze Advisor as ranging from approximately $21 billion to $35 billion during the period of unauthorized use. (Ex. 10 (Eighth Supp. Response to No. 17); Ex. 11 (Ninth Supp. Response to No. 17).)[10] FICO's damage expert Mr. Neil Zoltowski will summarize that information for the jury in a manner that is easily understood. (Ex. 12; Ex. 13.)[11]

Mr. Zoltowski will also testify that the fact the unauthorized use was connected to the issuance of insurance in the names of all the subsidiary insurance companies managed by Chubb & Son and then by ACE American must be considered in the hypothetical negotiation to determine fair market value. These groups of insurance companies operated as a single enterprise. *Tran v. Farmers Grp., Inc.*, 104 Cal. App. 4th 1202, 1218-20 (Cal. Ct. App. 2002) ("unitary nature of the Farmers Group insurance business"; "unified insurance business"). (Ex. 14 at ¶¶ 30-50.) Mr. Zoltowski will explain that the intrinsic value of Blaze Advisor to determine fair market value must be judged considering the economic realities of its use. (Ex. 14 at ¶¶30-50.) This same evidence is relevant to the amount of gross revenue generated from the infringing use of Blaze Advisor to prove FICO's entitlement to disgorgement. (Dkt. No. 731 at 32-33, 57 (citing,

---

[10] Both Defendants' Eighth and Ninth Supplemental Responses to Interrogatory No. 17 were verified by Defendants. When questioned regarding why the verified responses were different, Defendants could not satisfactorily explain the basis for the reduction in revenue from approximately $35 billion to $21 billion.

[11] The Court excluded the ultimate conclusions offered by Mr. Zoltowski but ruled that relevant evidence underlying those conclusions is not excluded. (Dkt. No. 731 at 55.) Mr. Zoltowski may testify to relevant facts speaking to fair market value, and the jury will determine the fair market value from the factual evidence presented through Mr. Zoltowski and the parties' other fact and expert witnesses.

among others, *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 517 (4th

Cir. 2002)).)

> **(2)    In assessing the fair market value of Blaze Advisor, the jury will receive additional evidence of the value and importance of Blaze Advisor to Defendants and their sale of insurance.**

FICO witnesses will also offer additional testimony regarding the business value

realized by the unauthorized use of Blaze Advisor. (Dkt. 731 at 18 (finding consideration

of the "intrinsic value" of Blaze Advisor is relevant to the determination of Blaze

Advisor's fair market value).) Among others, FICO's expert on the insurance industry

and the role of decision management software in selling insurance, Mr. Bickley

Whitener, will testify regarding how Blaze Advisor contributes to the generation of

revenue in the sale of insurance. Indeed, he will testify that insurance cannot be sold

without the systems Defendants automated using Blaze Advisor. (Ex. 15 at ¶ 21,

Appendix 3.)  His testimony will establish that Blaze Advisor contributed to the

generation of revenue in the sale of insurance by, among other things:

- Increasing the speed of response to quote requests from customers, thereby enhancing the likelihood of acceptance by new customers;

- Increasing the speed of making renewal offers to existing customers, thereby enhancing the likelihood of acceptance by existing customers;

- Increasing the speed at which new products can be introduced to the market, thereby generating new revenue sooner rather than later;

- Increasing the speed at which product changes involving product and underwriting rules can be implemented, again generating new revenue sooner rather than later;

- Increasing the speed to market by ensuring compliance with corporate and statutory reporting requirements;

- Increasing the precision and adequacy of a quote to new customers (thereby being competitive) to increase the probability the quote will be accepted;

- Increasing the precision and adequacy of a renewal offer (thereby being competitive) to increase the probability the renewal offer will be accepted;

- Increasing the ease of use for agents and brokers, increasing the likelihood they will direct customers to Defendants; and

- Enabling scale, handling a much larger volume of transactions without increasing the underwriting staff.

(*Id.* at ¶¶ 23-25, 29.) Defendants' own documents confirm the business value of Blaze Advisor applications in selling insurance:



(Ex. 16 at FED000270_0012; *see also*, *e.g.*, Ex. 17 at FED000275_0005 (identifying reasons to adopt Blaze Advisor, including reduction of time and cost and improved consistency).) Mr. Wachs will similarly testify regarding the business benefits realized from Blaze Advisor by Defendants. (Ex. 3 at 25:22-28:20, 184:23-189:15, 198:22-199:13, 199:18-200:5, 202:14-203:4.)

Mr. Sean Basemen, a fact witness, will testify regarding the role and import of Blaze Advisor in selling insurance, namely that it is the brain or central nervous system

14

of the applications deployed in connection with selling insurance. (Ex. 18 at 77:23-78:11.) He will testify to various factors relevant to determining the business value of Blaze Advisor (the so-called "intrinsic value" of the hypothetical negotiation) including (1) whether Blaze Advisor is deployed in connection with revenue generating events; (2) the amount of revenue connected to the use of Blaze Advisor; (3) the number of decisions that are automated and the number of transactions (here insurance policies sold) that "touch" Blaze Advisor; and (4) whether Blaze Advisor automates core business goals. (*Id.* at 98:22-99:15, 101:3-12.) The testimony of Messrs. Whitener, Wachs, and Baseman is relevant both to fair market value for compensatory damages and FICO's burden of proof under Section 504(b) that the infringing use of Blaze Advisor contributed, at least in part, to the generation of gross written premium from the sale of insurance.

Henry Mirolyuz, a former employee of Defendants, will similarly testify to the value realized by using Blaze Advisor. He will testify that Blaze Advisor made it possible to implement changes to respond to changing market conditions and changing regulatory requirements quicker than what was previously possible. (Ex. 19 at 89:25-91:24.) Blaze Advisor also made it possible to provide customers real time quotes. (*Id.* at 105:10-106:5.) Mr. Mirolyuz will further testify that Blaze Advisor helped Defendants meet their goal of increasing the percentage of automated renewal submissions, which created more time for underwriters to develop and produce additional business. (*Id.* at 96:4-15.)

Mr. Mirolyuz's testimony will also explain several of the Blaze Advisor applications and their purpose connected to selling insurance. For example, Mr. Mirolyuz will testify that a Policy Administration System is a system that allows the company to

15

provide insurance to customers, i.e., an application that allows the company to book, bind, and issue insurance policies. (*Id.* at 23:14-18, 24:7-13; Ex. 20 at 48:14-18.) Most Blaze Advisor applications used by Defendants are Policy Administration Systems. (Ex. 21.) The other Blaze Advisor applications are Compliance Systems and Utilities Systems. (*Id.*) Insurance cannot be sold without these systems, and Defendants chose to automate them using Blaze Advisor.

Mr. Mirolyuz's testimony directly relates to the intrinsic value of Blaze Advisor as used by Defendants—the business use and the importance of that use. The evidence relates to the fair market value of Blaze Advisor. The same evidence is relevant to FICO's burden of proving the infringing use of Blaze Advisor contributed, at least in part, to the generation of gross written premium from the sale of insurance.

Defendants intend to offer testimony of their experts in connection with both compensatory damages and disgorgement. For instance, Mr. Chris Bakewell asserts that FICO's compensatory damages claim is inflated because it fails to consider available alternatives to business rules management systems. (Dkt. No. 494 at 11, 22-23.) And Defendants' other expert, Mr. Billy McCarter, will also testify as to alleged alternatives. In other motions, Defendants have acknowledged an evidentiary overlap; the same testimony is relevant to both compensatory damages and to their burdens of proof under Section 504(b). (Dkt. No. 485 at 25-27.)

16

**B.**     **The evidence relevant to disgorgement is the same evidence relevant to compensatory damages.**

Separate trials under Rule 42 are not appropriate when the issues to be tried are not substantially different from one another and involve significant evidentiary overlap. Here, the issues and evidence relevant to disgorgement are not substantially different from the issues and evidence relevant to a hypothetical negotiation which the jury will hear as part of the compensatory damages proof. Defendants cannot meet their high burden to justify altering the status quo and bifurcating trial. *Campanella*, 2019 U.S. Dist. LEXIS 230229, at *9; *In re RFC & ResCap Liquidating Tr. Litig.*, 2019 U.S. Dist. LEXIS 93360, at *26; *Collins*, 2014 U.S. Dist. LEXIS 196375, at *3.

**(1)     There is significant evidentiary overlap.**

First and foremost, case law and witness testimony confirm that the generation of revenue by selling insurance using Blaze Advisor, including Defendants' operation as a single enterprise, is relevant to the hypothetical negotiation. *Pinn, Inc.*, 2021 U.S. Dist. LEXIS 200942, at *122 ("*Pre*-hypothetical-negotiation revenue and profits are thus relevant to the hypothetical negotiation circumstances, and *post*-hypothetical-negotiation revenue and profits are also relevant") (emphasis in original); *see also*, *Interactive Pictures*, 274 F.3d at 1385 (explaining that "an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation" but "does not require that estimates of sales revenues, as referenced in a hypothetical negotiation at the time infringement began, must later bear a close relation to actual sales revenue"). It speaks directly to the intrinsic value provided to Defendants by

17

Blaze Advisor. This same evidence of the amount of revenue generated from the use of Blaze Advisor is the revenue that FICO seeks to disgorge under Section 504(b).

The testimony of Messrs. Whitener, Wachs, Baseman, and Mirolyuz (among others) and Defendants' own documents directed to the value of Blaze Advisor are also relevant to both compensatory damages and disgorgement. (*E.g.*, Ex. 2; Ex. 22 at FED000252_0010; Ex. 23 FED000243_0004.) Further, the evidence that rebuts Defendants' contentions, repeated in their current motion, that Blaze Advisor was only used by Defendants to a limited extent and was "only a small fraction of one percent of all applications and technologies employed by Federal" (Dkt. No. 900 at 6, 11, 16) is relevant to both compensatory damages and disgorgement.

Defendants' prior briefing admits the testimony offered by at least Messrs. Bakewell and McCarter will be offered in connection with FICO's compensatory damages claim and disgorgement claim. Defendants' opposition to FICO's Daubert motion against Mr. McCarter argued that his opinions as to available alternatives were relevant to both compensatory damages and disgorgement. (Dkt. No. 485 at 25-28.)[12] Defendants' opposition to FICO's motion to exclude Mr. Bakewell also makes clear that Defendants intend to offer Mr. Bakewell's testimony in connection with both compensatory damages and disgorgement. (*See generally*, Dkt. No. 494.) The position

---

[12] To be clear, FICO disagrees that alleged alternatives are relevant to disgorgement under Section 504(b). FICO, however, makes this point to illustrate that, in other contexts and when it suits Defendants' needs, Defendants have admitted the overlapping nature of the compensatory damages and disgorgement claims.

taken by Defendants in opposition to FICO's Daubert motions directly contradicts
Defendants' current position.

Defendants also admit in this motion that, to defend against disgorgement, they
intend to call current and former employees to testify regarding the integration of Blaze
Advisor into 10 applications and how those applications were used in the operation of
Federal's business. (Dkt. No. 900 at 8.) Their contention that "this testimony does not
relate to or concern the issues of liability or actual damages . . . ." is glaringly wrong.
(*Id.*) How Blaze Advisor is used in Defendants' business operations is directly relevant to
the hypothetical negotiation to determine fair market value which, among other things,
considers the extent of use and the criticality of the use of Blaze Advisor to Defendants'
operations.

The specific facts of this case, in which the same evidence is relevant to
compensatory damages and disgorgement, do not warrant bifurcation. A recent decision,
addressing the exact question now facing the Court, supports this conclusion. There, like
here, Defendant moved to bifurcate disgorgement from liability and compensatory
damages, citing potential prejudice associated with the jury hearing evidence of "millions
of dollars in revenue." *Navarro v. P&G Co.*, 529 F. Supp. 3d 742, 745, 756 (S.D. Ohio
2021) (emphasis removed). While the Court agreed Plaintiff's claim for disgorgement
was equitable, it denied defendant's motion to bifurcate, finding that the evidence
relevant to calculating compensatory damages would also be relevant to disgorgement.
*Id.* at 756. The *Navarro* Court explained that both anticipated and actual profits from use
of the intellectual property are relevant to the hypothetical negotiation and that evidence

19

of revenue was also likely to be introduced as part of the hypothetical negotiation. *Id.* at

755-56. Because the same evidence and dollar amounts would be introduced as part of

both the compensatory damages proof and the disgorgement proof, the Court held that

"any purported efficiency gains, or potential for avoiding jury confusion or prejudice,

from bifurcation are largely illusory" and "do not warrant the requested remedy." *Id.* at

756. The same is true here.

> **(2)     Defendants' arguments and case law are unavailing and do not support their position.**

Defendants contend that because Defendants' profits are not a proxy for

compensatory damages, it is appropriate to bifurcate. Defendants' argument misses the

point. Yes, Defendants' profits are not a proxy for compensatory damages; that is why

FICO is permitted to seek both compensatory damages and disgorgement. But the real

question is what evidence will be used to prove compensatory damages and

disgorgement; here, the answer is the same evidence. *Collins*, 2014 U.S. Dist. LEXIS

196375, at *3-4 (explaining that even where claims have different elements, certain

evidence is relevant to both claims).

Defendants also contend that because the claim for disgorgement is equitable,

bifurcation is necessarily appropriate. This is a non sequitur, and the *Navarro* Court

expressly rejected the very same argument Defendants now make. *Navarro*, 529 F. Supp.

3d at 756. There is no reason to bifurcate if the jury will hear the same evidence as part of

the compensatory damages case. And, for this reason, the Court's exercise of its authority

under Rule 39 to empanel an advisory jury on the issue of disgorgement makes sense.

(*See* Court's Draft Special Verdict Form.)[13] The jury will hear evidence relevant to both

compensatory damages and disgorgement and can provide an advisory decision on

disgorgement. An advisory opinion will aid the Court in making its own equitable

decision. *Navarro*, 529 F. Supp. 3d at 756 (citing cases in which courts used advisory

juries on the issue of disgorgement in copyright actions).[14] Further, in the event of an

appeal and a decision by the Eighth Circuit that a claim for disgorgement is not equitable,

the advisory decision of the jury will avoid a second trial. *Navarro*, 529 F. Supp. 3d at

756.

Finally, the cases cited by Defendants do not support bifurcation. (Dkt. No. 900 at

15-20.) Those cases fall into two groups: (1) cases bifurcating liability from damages and

---

[13] The Court provided the Parties with a draft Special Verdict Form that it had prepared at the Parties' November 8, 2022 Pretrial Conference.

[14] Several other courts have empaneled advisory juries on the issue of disgorgement of profits. *E.g.*, *Cisco Sys. Inc. v. Arista Networks Inc.*, Case No. 14-cv-5344, Dkt. No. 661 at 12-13 n.2 (N.D. Cal. Nov. 16, 2016) (citing cases) (attached hereto as Ex. 24); *Fahmy v. Jay-Z*, No. 2:07-cv-05715-CAS(PJWx), 2015 U.S. Dist. LEXIS 139298, at *4 (C.D. Cal. Oct. 9, 2015). The Court is correct to do the same here. Doing so will not prejudice Defendants because (1) the jury will already be hearing much of the same evidence, including Defendants' revenue from use of Blaze Advisor, and (2) if the Court disagrees with the jury's advisory opinion, the Court remains free to reject that advisory opinion. *Marvel v. United States*, 719 F.2d 1507, 1515 n.12 (10th Cir. 1983) ("Although an advisory jury was employed in this instance, the findings of such a jury are, of course, merely advisory; the trial court must, as it did in this instance, make its own findings and review on appeal is of the findings of the court as if there had been no verdict from an advisory jury.") (internal quotations omitted); *Prichard v. Royal Ins. Serv. Corp.*, Civil Action No. 86-2436-S, 1988 U.S. Dist. LEXIS 8023, at *3 (D. Kan. July 18, 1988) ("However, despite the court's inclination to empanel an advisory jury on the Title VII claim, this court will be the ultimate trier of fact on that claim. Any prejudice which might overcome the jury during its evaluation of the Title VII claim can easily be remedied by this court.").

(2) cases bifurcating liability and damages from punitive damages. Such cases are inapposite; they simply do not address the facts of this case. Defendants do not seek to bifurcate liability from damages, nor do they seek to separate liability and damages from other alleged bad acts. Instead, Defendants seek to bifurcate two types of damages that will be proved and defended against using the same underlying facts. Defendants cite no cases addressing the facts at hand, and the *Navarro* Court, directly addressing the issue at hand, found significant evidentiary overlap and denied the motion for bifurcation.

### C.   Bifurcation does not promote convenience or judicial economy.

As Defendants acknowledge "[c]entral to the concept of convenience is whether the triable issues involve evidentiary overlap, that would require the testimony of the same witnesses, and related repetitions of proof." (Dkt. No. 900 at 17 (citing *Intermedics, Inc. v. Cardiac Pacemakers, Inc.*)); *see also*, *e.g.*, *Collins*, 2014 U.S. Dist. LEXIS 196375, at *3-4 ("Bifurcation furthers convenience only when the separable claims are 'substantially different'"); *ADT Sec. Servs. v. Swenson*, No. 07-2983, 2011 U.S. Dist. LEXIS 107482, at *21 (D. Minn. Sept. 21, 2011) (citing cases). As described above, bifurcation would result in the parties presenting the same evidence twice—the same documents will be introduced, and the same witnesses will offer repetitious testimony. (*See*, *supra*, Section III(A)-(B).) This does not promote convenience or judicial economy. *ADT Sec. Servs.*, 2011 U.S. Dist. LEXIS 107482, at *14-17 (finding it would be inconvenient and judicial economy would not be served where claims were not clearly separable and explaining that, because the claims overlap, bifurcation would cause the parties to present the same evidence twice in separate trials); *Sobolik v. Briggs & Stratton*

*Power Prods. Grp., LLC*, No. 09-1785, 2011 U.S. Dist. LEXIS 128905, at *3 (D. Minn. Nov. 7, 2011) (judicial economy not promoted where the same witnesses would have to testify in the two trials and where the jury would hear repetitious testimony); *Collins*, 2014 U.S. Dist. LEXIS 196375, at *3 (same).

Instead, bifurcation creates unnecessary inefficiencies and challenges to both the parties and Court. Inevitably, should disgorgement be bifurcated, the parties will challenge evidence related to compensatory damages as only related to disgorgement and seek its exclusion from the jury. Numerous disputes prior to and during trial are likely to occur regarding the relevance of documents and testimony, resulting in a waste of the parties', jury's, and Court's time.

Defendants' only other argument in support of alleged convenience and judicial economy assumes they will win the liability portion of the case, rendering a trial on disgorgement unnecessary. (Dkt. No. 900 at 18-20.) This assumption is misplaced, and now is not the time for FICO to summarize its case more fully. But, of significance now is that Defendants' assertion of no liability fails to distinguish between Federal and ACE American (indeed, Defendants use "Federal" to collectively refer to both parties). Federal must prevail against all of FICO's breach of contract claims to avoid contractual and copyright liability. ACE American had no rights under the Agreement: it was an unlicensed, naked, infringer. The unauthorized use of software is copyright infringement in violation of 17 U.S.C. §106(1). *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 518-19 (9th Cir. 1993); *see also*, *Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012); *Quantum Sys. Integrators, Inc. v. Sprint Nextel*

23

*Corp.*, 338 F. App'x 329, 336-37 (4th Cir. 2009); *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1148 (N.D. Cal. 2010).

Additionally, the cases cited by Defendants are not analogous to the facts at hand. *Soo Line R.R. Co.*, *Smith-Walker*, and *Kars 4 Kids* involve scenarios in which liability was bifurcated from damages, such that a finding of no liability would eliminate the need for any damages evidence. (*See* Dkt. No. 900 at 18-19.)[15] That is not the case here. Defendants seek bifurcation of two types of damages such that the jury will hear damages evidence regardless of a finding of no liability. And, in fact, the jury will hear the same evidence that it would hear for proof of disgorgement that it will hear for proof of compensatory damages. Bifurcation simply does not promote convenience or judicial economy.

**D.    Defendants will not suffer undue prejudice if the case is not bifurcated.**

**(1)    The evidentiary overlap defeats Defendants' claim of alleged prejudice.**

Defendants claim they will be prejudiced if FICO is allowed to introduce a multi-billion-dollar figure to the jury. (*Id.* at 10.) The problem with Defendants' argument is that $21 billion to $35 billion in revenue is what Defendants realized from the unauthorized use of Blaze Advisor. The business value derived from that unauthorized use—both the amount ($21 billion to $35 billion) and the fact the revenue was realized from Defendants' core business of selling insurance—is relevant to the fair market value

---

[15] Defendants also cite *Chicago Mercantile Exch. Inc.* (Dkt. No. 900 at 19), but that case did not address bifurcation.

for the unauthorized use, facts for the jury to consider. Bifurcation will not cure the "prejudice" Defendants assert.

### (2) Defendants' attempts to characterize FICO's claims as unsupported fail.

Defendants attempt to analogize this case with *Uniloc*, characterizing FICO's claim for disgorgement as "not supported" and pointing out the disparity between the amount FICO seeks in compensatory damages as compared to disgorgement. (Dkt. No. 900 at 12; *see also*, *id.* at 13-14 (describing FICO's disgorgement claim as speculative).) *Uniloc* is inapposite. It stands for the unremarkable position that introducing irrelevant evidence merely to inflate a damages number is improper.

FICO does not seek to introduce irrelevant evidence. Defendants' revenue from the use of Blaze Advisor is directly relevant to both compensatory damages and disgorgement. (*See*, *supra*, Section III(A)-(B).)

Separately, Defendants' contentions regarding the alleged "speculative" nature of FICO's disgorgement claim mischaracterize the law and are contradicted by the Court's summary judgment ruling, holding that FICO's disgorgement claim is not speculative and is sufficiently supported. (Dkt. No. 731 at 55-57 ("[FICO's] evidence is not 'undifferentiated' as it is tied to Defendants' use of Blaze Advisor. FICO presents evidence about how Blaze Advisor contributed to Defendants' gross revenue from the sale of insurance.").) Despite Defendants' contention to the contrary (Dkt. No. 900 at 13-14), FICO is not required to prove Defendants' profits from infringement. FICO need only prove the gross revenue attributable to Defendants' infringement. (Dkt. No. 731 at

7-8, 20-21, 55-57.) This burden applies to indirect profits cases, as here. (*Id.* at 24 n.7, 56 ("Contrary to Defendants' arguments, FICO's burden is not heightened or otherwise altered by the fact that this case involves alleged indirect infringement.").)

It is Defendants' burden to derive profit from proof of deductible expenses and apportionment; if they fail to do so, FICO is entitled to Defendants' gross revenue from the unauthorized use of Blaze Advisor. *Andreas*, 336 F.3d at 796. This balance reflects the purpose of Section 504(b), which is to strip the infringer of the benefits from infringement. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (The Copyright Act "aims . . . to strip the infringer of the profits generated from infringement.").

Defendants' quarrel is with the facts of the case, their own strategic choices, and the shifting burdens of proof of Section 504(b). Unfavorable facts and poor strategic decisions do not render those facts unfairly prejudicial. *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 796 (8th Cir. 2013) ("The fact that RELCO initially decided not to pursue this argument . . . is a strategic decision whose consequences it must accept."); *Ossman v. Diana Corp.*, 825 F. Supp. 870, 879 (D. Minn. 1993) ("In all, the court finds no unfairness in forcing the defendants to abide by consequences they knew might arise out of their prior tactical decisions."); *see also*, *State v. Bowman*, 144 Ohio App. 3d 179, 185, 759 N.E.2d 856, 861 (Ohio 2001) ("Unfavorable evidence is not equivalent to unfairly prejudicial evidence. . . The evidence must cause *unfair* prejudice, for if the term 'unfair prejudice' simply meant prejudicial or unfavorable, anything adverse to a litigant's case would be excluded under Evid. R. 403.") (emphasis in original); *State v.*

*Tia*, No. 94-2440-CR, 1995 Wisc. App. LEXIS 985, at \*7 (Wisc. Ct. App. Aug. 16, 1995) ("Unfair prejudice cannot be equated with unfavorable evidence.").

> **(3)    The jury will understand the scope of this case and the size of the parties.**

Defendants' allegations of prejudice also underestimate the intelligence and common sense of the jury. Evidence relevant to liability for breach of Paragraph 10.8 includes the fact the Agreement was entered into when the Client was part of a $12 billion group of insurance companies. Because of the assignment event, the Client became part of a $30 billion group of insurance companies. That proof bears directly on the commercial purpose of Paragraph 10.8. The jury will also learn the assignment event was "the largest merger in insurance history . . . transforming ourselves [Chubb Limited] into the highest quality and largest publicly traded property and casualty insurer in the world." (Ex. 1 at FICO0056561.) And the jury will hear that, after the assignment event, Blaze Advisor was used in connection with selling insurance by twice as many subsidiary insurance companies than before. These facts are directly relevant to establishing breach of Section 10.8 of the License Agreement. The evidence also belies Defendants' contention the use of Blaze Advisor did not expand. From this evidence and more, the jury will understand that this lawsuit involves an extremely large company, and it will recognize and expect that a company of Defendants' size will have large revenue.

*Kelley v. BMO Harris Bank N.A.* is instructive. There, BMO Harris argued that it would be prejudiced if punitive damages were not bifurcated from liability and compensatory damages issues because "evidence of BMO's financial condition, net

worth, or income' might influence the jury when assessing BMO Harris's liability or the amount of compensatory damages." *Kelley v. BMO Harris Bank N.A.*, No. 19-cv-1756 (WMW), 2022 U.S. Dist. LEXIS 176891, at *71-72 (D. Minn. Sep. 29, 2022). The Court disagreed and denied BMO's Harris's motion to bifurcate, explaining that:

> [i]t is unlikely that jurors will be surprised to learn the financial condition, net worth or income of a large bank in a case such as this one. And evidence relevant to liability and compensatory damages likely will directly or indirectly suggest the nature of BMO Harris's financial condition. Indeed, evidence relevant to liability and compensatory damages will demonstrate the nature and scope of the banking industry in general and BMO Harris's business in particular.

*Id.* (further noting that BMO Harris's prejudice argument was based on speculation); *see also*, *e.g.*, *Sobolik*, 2011 U.S. Dist. LEXIS 128905, at *3-4 (finding no undue prejudice, rejecting argument that jury's sympathy will be elicited by damages evidence, and explaining jurors look objectively at the evidence). The *Kelly* Court's logic is equally applicable here, and there is no reason to believe the jury will not be objective and follow the Court's instructions. *Sobolik*, 2011 U.S. Dist. LEXIS 128905, at *3-4; *Weimer v. Int'l Flavors & Fragrances, Inc.*, No. C05-4138-MWB, 2007 U.S. Dist. LEXIS 48669, at *7 (N.D. Iowa July 3, 2007) (rejecting argument that Defendant would be prejudiced by the jury learning of its financial status and explaining the trial system is premised on the jury following instructions).

### (4)    FICO will be prejudiced by bifurcation.

Defendants will not be prejudiced if the trial is not bifurcated and an advisory jury is empaneled on the issue of disgorgement. Bifurcation will, however, prejudice FICO. Bifurcation would require FICO to bring back numerous witnesses, both fact and expert,

and would require FICO re-prepare those witnesses. It would require FICO to re-cross Defendants' witnesses, covering ground that was already addressed in establishing liability and compensatory damages. Defendants estimate that a separate trial on disgorgement would take a week to complete. This is additional time that the parties and Court would unnecessarily be spending, wasting the resources of both.

### E.    Bifurcation is not necessary to prevent or reduce the risk of juror confusion.

Defendants assert the complexity of the disgorgement claim will confuse the jury. (Dkt. No. 900 at 15-17.) This case is no more complex than many other cases that are routinely and successfully tried to juries. *Benjamin v. United Merchs. & Mfrs., Inc.*, 873 F.2d 41, 44 (2d Cir. 1989) (finding that a question of fact underlying damages "present[ed] a question of fact that is not always easy to resolve, but is no more complex than many issues juries are routinely called upon to decide"); *Falzon v. Johnson*, No. 12 CV 674 (CLP), 2016 U.S. Dist. LEXIS 200687, at *14-17 (E.D.N.Y. Oct. 24, 2016) (rejecting Defendant's argument that the issues were too complex for the jury and refusing to bifurcate); *United States v. Mosquera*, No. 8:14-cr-379-T-36TGW, 2015 U.S. Dist. LEXIS 177631, at *11 (M.D. Fla. Apr. 9, 2015) ("[J]uries are regularly presented with complex, conflicting, and persuasive evidence and trusted to weigh all evidence presented appropriately before reaching a verdict. The Court will not presume that the jury is incapable of evaluating evidence appropriately without some evidence to support that claim."). And the disgorgement case is no more complex than the compensatory

damages case, which requires the jury to determine the fair market value of the unauthorized use.

Defendants attempt to paint the determination of disgorgement as requiring a Ph.D. in mathematics. Not so. FICO's proof of Defendants' revenue attributable to infringement is simple: Defendants admitted in their interrogatory answers to the amount of revenue they generated from insurance sold using Blaze Advisor (Ex. 10 (Eighth Supp. Response to No. 17); Ex. 11 (Ninth Supp. Response to No. 17).) FICO's damages expert will summarize that information in an easy-to-read format for the jury. (*E.g.*, Ex. 12; Ex. 13.) FICO is presumptively entitled to recover all this revenue. *See Andreas*, 336 F.3d at 796 (When the copyright owner meets its burden to prove gross revenue connected to infringement, "a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement arises."); *see also*, *Dayva Int'l v. Award Prods. Corp.*, 97-1397, 1998 U.S. App. LEXIS 4386, at *8 (Fed. Cir. Mar. 11, 1998) (citing *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1173 (1st Cir. 1994)).

The jury instructions will make the proof required to award compensatory damages and disgorgement clear, and the special verdict form will likewise ensure the jury understands these are two different types of awards. *Collins*, 2014 U.S. Dist. LEXIS 196375, at *5 (a court can fashion jury instructions and a special verdict form to ward against jury confusion); *Beaudet*, 2004 U.S. Dist. LEXIS 13952, at *4-5. There is no likely jury confusion.

**IV.     Conclusion**

None of the relevant factors support the extreme remedy of bifurcation. Rather, those factors show that bifurcation would be improper given the substantial evidentiary overlap. The jury will hear the same evidence in connection with proof of compensatory damages and disgorgement. This renders Defendants' claims of prejudice meritless. Bifurcation would merely waste the time and resources of the parties, the jury, and the Court. Trying this case in a single trial, with an advisory jury opinion on disgorgement, is more efficient, aids the Court in its own equitable determination, and ensures no need for a second trial following appeal. There is no reason to employ the extreme remedy of bifurcation. Defendants' motion should be denied.

Dated: December 6, 2022

MERCHANT & GOULD P.C.

/s/ Heather Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
Gabrielle L. Kiefer, MN Bar # 0402364
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
Tel: (612) 332-5300
Fax: (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com
gkiefer@merchantgould.com

*Attorneys for Plaintiff Fair Isaac Corporation*