**EXHIBIT 24**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CISCO SYSTEMS INC,

          Cisco,

    v.

ARISTA NETWORKS, INC.,

          Arista.

Case No.  14-cv-05344-BLF

**ORDER ON DAUBERT MOTIONS**

[Re:  ECF 423, 427, 428, 429, 430, 440]

Before the Court are the parties' motions to exclude certain opinions of each party's experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The Court heard argument on September 9, 2016.  For the reasons stated on the record and set forth below, Plaintiff Cisco Systems Inc.'s ("Cisco") motions are GRANTED IN PART and DENIED IN PART and Defendant Arista Networks, Inc.'s ("Arista") motions are GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

Cisco and Arista are competitors who make and sell Ethernet switches, which connect multiple devices within a local area network and can direct traffic on the network.  Cisco developed an "Internetwork Operating System" ("IOS") that allowed engineers to configure and manage Cisco servers, routers, and switches, and has multiple copyrights on its IOS.  Arista also sells networking equipment using an "Extensible Operating System" ("EOS").  Cisco claims Arista's products violate its copyrights and infringe one of its patents.

## II.  LEGAL STANDARD

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993). In *Kumho Tire Co., Ltd. v. Carmichael*, the Supreme Court clarified that the "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to all expert testimony. 526 U.S. 137, 147 (1999). The Supreme Court also made clear that the reliability inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153; *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).

"*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) *aff'd*, 131 S. Ct. 2238 (2011). So long as an expert's methodology is sound and his opinions satisfy the requirements of Rule 702, underlying factual disputes and how much weight to accord the expert's opinion are questions for the jury. *Micro Chem.*, 317 F.3d at 1392; *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

## III. DISCUSSION

### A. Dr. John Black

Cisco moves to exclude Dr. Black's opinions on grounds of qualification, reliability, and irrelevance. Cisco's challenges are separately addressed below.

#### i. Dr. Black's Opinions Regarding "*De Facto* Industry Standards"

Cisco contends that Dr. Black's *de facto* industry standard cannot be independently tested and his opinions were manufactured for this litigation. Black Mot. 5-8, ECF 427. Cisco further claims that Dr. Black's opinion is flawed because he relied on Cisco's characterizations and failed to survey the industry. *Id.* Cisco also argues that Dr. Black is not qualified to opine on industry standards because he is not a member of any "important" industry standard organization, has not

2

1    authored a paper on industry standards, and has not held himself out as an expert in the creation of

2    industry standards.  Black Mot. 3-4; Black Reply 1-3, ECF 499.  Lastly, Cisco claims that Dr.

3    Black's opinion on *de facto* industry standard is not relevant.  Black Mot. 8-9.

4         According to Arista, Dr. Black's experience in the networking industry and particularly

5    with command line interfaces ("CLIs"), as well as his participation with the National Institute of

6    Standards and Technology, makes him more than qualified to opine on *de facto* industry

7    standards.  Black Opp. 3-5, ECF 463.  Arista claims that Dr. Black has extensively analyzed

8    documentation from "all the 'major players'" in the industry to look for common CLI features, and

9    even Cisco's own expert admitted that there was no reason to question Dr. Black's analysis.  *Id.* at

10   6-7.  Finally, Arista argues that while the nature of Dr. Black's methodology is not the type that

11   invites peer-reviewed scholarship, evidence exists to support his opinion that the networking

12   industry has adopted a *de facto* industry standard CLI.  *Id.* at 9.

13        The Court is satisfied that Dr. Black is sufficiently qualified to render the opinions offered.

14   The Court's concern is the reliability of those opinions.  Dr. Black defines a "*de facto* standard" as

15   that which "has become widely used over time, and not because the standard was developed and

16   approved by a standards-setting body" and which is created "simply by the weight of their

17   presence, adoption, and acceptance by vendors and customers in an industry."  Black Mot. Ex. 1

18   ("Black Opening Rpt.") ¶¶ 82-83.  The parties do not dispute that this definition is consistent with

19   the glossary definition of The Institute of Electrical and Electronics Engineers.  Hr'g Tr. 15:23-

20   16:3; 24:18-25, ECF 516.  Dr. Black cited to the QWERTY keyboard and the "AT" command set

21   for modems as examples of *de facto* standards.  Black Opening Rpt. ¶¶ 84-85.  He then concluded

22   that the *de facto* industry standard CLI he reviewed in his report is "widely used by multiple

23   vendors in the networking industry, and has been widely used for a long period of time" because

24   "a significant number of vendors support the same command modes, prompts, hierarchies, and

25   commands disputed in this litigation, and many have supported those CLI features for over a

26   decade."  *Id.* ¶ 90.

27        While the evidence of widespread use of Cisco CLI throughout the industry is relevant to

28   this case, such as on the issues of fair use and estoppel, Dr. Black's conclusion that Cisco CLI is a

*de facto* industry standard gives the Court pause. *Wall Data Inc. v. Los Angeles Cty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006) (noting that fair use "is appropriate where a 'reasonable copyright owner' would have consented to the use, i.e., where the 'custom or public policy' at the time would have defined the use as reasonable"). The problem is that Dr. Black has failed to identify a quantitative methodology that supports the conclusion that Cisco CLI is a *de facto* industry standard. Instead, he relies on his experience and knowledge to opine that use by other vendors of Cisco CLI has become sufficiently widespread to have crossed the line to become a *de facto* industry standard. In fact, Dr. Black admitted that there is no number to define what is "widely used" or "widespread adoption" and refused to provide a percentage or threshold for when the use "becomes common, well known, or widely adopted." Black Mot. Ex. 4 ("Black Dep.") 138:25-139-9; 171:8-173:5. Further, Dr. Black acknowledged that a "gray area" exists for commands that are less widely used but refused to provide any concrete description as to where the gray area begins or ends. *Id.* at 256:19-258:11.

Accordingly, Dr. Black's opinion is offered without any objective criterion on measurements. A bright line demarcation may not be necessary in this case, but without some definitive parameters, the proffered "test" of when and how Cisco CLI becomes the *de facto* industry standard appears to be wholly subjective and ambiguous, and in fact, nothing more than an opinion based on "I know it when I see it" rationale. Furthermore, both parties acknowledged at the hearing that they were unaware of any cases where an expert opinion regarding *de facto* industry standard had been used to address the issues presented in this case.

Cisco did not dispute at the hearing that Dr. Black should be permitted to opine on the underlying facts and analysis, such as the features and vendors he had reviewed and whether certain usage is common or frequent. Hr'g Tr. 17:9-22. It thus appears that Cisco's challenge relates to the label of "*de facto* industry standard," and not to the underlying evidence of industry use of Cisco CLI. The Court agrees that the label itself pronounced by an expert carries the potential of great prejudice where the opinion is not based on a sound methodology. Accordingly, the Court GRANTS the motion IN PART to exclude Dr. Black's opinion relating to whether Cisco CLI is a *de facto* industry standard. To the extent the motion also challenges Dr. Black's

4

underlying facts and analysis, the Court DENIES the motion IN PART.

### ii. Dr. Black's Opinions Regarding Corporate Intent and the Subjective Beliefs of Others

Cisco further challenges Dr. Black's statements relating to "industry standard CLI," "fair use," etc., on the grounds that they are not based on his expertise, but rather, are conclusions about third-party beliefs and corporate intent. Black Mot. 9-10. In response, Arista asserts that Dr. Black is not opining on corporate intent but on industry use of CLI over time. Black Opp. 10.

At the hearing, the parties conceded that their experts must not speculate about state of mind and corporate intent, or vouch for opinions of others. Hr'g Tr. 55:3-6. An expert is also prohibited from acting as a mere conduit for statements of others. *E.g.*, *Williams v. Illinois*, 132 S. Ct. 2221, 2241 (2012) (holding that an expert may not act as "mere conduits for hearsay"). To the extent Dr. Black opined on corporate intent and subjective beliefs of others, this motion is GRANTED. However, the Court is not persuaded at this time that Arista is offering Dr. Black for his opinion on corporate intent or beliefs of others. Rather, Dr. Black merely considered evidence to determine whether Cisco CLI has become common in the industry. As such, the Court DENIES the motion to the extent Cisco seeks to exclude Dr. Black's opinions on the common or frequent use of CLI by others in the industry.

### B. Mr. William M. Seifert

Cisco moves to exclude Mr. Seifert's opinions on "*de facto* industry standard" and "market effects." The Court addresses Cisco's challenges separately below.

### i. Mr. Seifert's "*De Facto* Industry Standard" Opinions

Cisco challenges Mr. Seifert's opinions on "*de facto* industry standard" because he lacks experience with any industry standard-setting organization, and discloses no research or publications on the topic. Seifert Mot. 1-9, ECF 430. In addition, Cisco contends that Mr. Seifert formed his opinion on third-party usage of Cisco CLI based on charts not prepared by him. *Id.* at 3; Seifert Reply 2, ECF 501. Cisco further argues that Mr. Seifert's opinions regarding *de facto* standard are unreliable as the opinions have neither been tested nor accepted. Seifert Mot. 3-4. Cisco claims that Mr. Seifert invented his definition and four-part test for this litigation.

United States District Court
Northern District of California

1   According to Cisco, Mr. Seifert also failed to reliably apply his method and definition of "industry

2   standard" to this case, did not know the version of Cisco CLI he was reviewing, and could not

3   identify when Cisco CLI became an industry standard. *Id.* at 5-6. Finally, Cisco seeks to exclude

4   Mr. Seifert's opinion on grounds of relevance. *Id.* at 6-7.

5         Arista argues that Mr. Seifert is qualified because of his experience as an engineer and later

6   as a business man, having worked in the local-area-networking industry since 1981. Seifert Opp.

7   1-3, ECF 471. As to whether Mr. Seifert's opinion has been tested and reliably applied, Arista

8   contends that Mr. Seifert can properly rely on another expert's opinion and third party's

9   information on Cisco CLI, as well as his own experience and knowledge. *Id.* at 3-9. Arista

10  disagrees with Cisco's various assertions pointing to Mr. Seifert's lack of knowledge with respect

11  to the version of Cisco CLI under review and timing of the CLI development. *Id.* at 7-8.

12  Moreover, Arista counters that Mr. Seifert's testimony is not of the type that should be subject to

13  an exacting inquiry based on peer reviews or error rates, but is more properly evaluated on his

14  experience and training. *Id.* at 5-6 (citing *Hangarter v. Provident Life & Accident Ins. Co.*, 373

15  F.3d 998, 1018 (9th Cir. 2004)). Lastly, Arista claims that Mr. Seifert's testimony is relevant to

16  several issues, including fair use and estoppel. Seifert Opp. 8.

17        The Court is satisfied that Mr. Seifert is qualified to render expert opinions on this topic.

18  However, similar to Dr. Black's opinion on *de facto* industry standard, no reliable methodology

19  supports Mr. Seifert's opinion, either. Mr. Seifert defines a "*de facto* standard" as one that

20  "typically emerges over time owing to its widespread adoption by users," Seifert Mot. Ex. 5

21  ("Seifert Opening Rpt.") ¶ 38, and created a four-factor test to determine the characteristics of a

22  "*de facto* standard." Seifert Mot. Ex. 6 ("Seifert Dep.") 25:21-22. The four factors are (1) market

23  size; (2) number of market participants; (3) scarce human resources available to deploy the

24  equipment; and (4) complexity of the system. *Id.* at 28:2-37:20. Not only has this four-factor test

25  never been adopted by anyone before this litigation, *id.* at 26:12-27:4, but Mr. Seifert also did not

26  provide any objective parameters or reliable method by which one could apply his test. In

27  describing this four-factor test, Mr. Seifert admitted that "market size" involves a subjective test,

28  and "number of market participants," "scarce human resources," and "complexity of the system"

1    all involve either a subjective test or business judgment.  *Id.* at 28:7-18 ("[determining the

2    sufficiency size of the market] requires a simple subjective test, business judgment"); *id.* at 28:20-

3    29:6 ("this is [sic] largely subjective thresholds in terms of market participants); *id.* at 35:23-37:7

4    (stating that complexity is in the eye of the customer or the collective perspective of an

5    organization).  For example, when asked how many customers have to ask for help for the element

6    of "scarcity" to be satisfied, Mr. Seifert testified in his deposition that it is a business judgment as

7    to whether there is enough human capital available to respond to customer needs.  *Id.* at 30:25-

8    31:10; 34:2-35:9 ("business judgment . . . opportunity costs . . . go into making a determination").

9          Accordingly, Mr. Seifert did not use an objective measure to determine what qualifies as a

10   *de facto* industry standard.  His four-factor test of *de facto* industry standard also appears to have

11   emerged for the first time in this litigation, as there is no evidence of its application or adoption in

12   the industry or use by him prior to this suit.  As raised by Arista, the Court acknowledges that

13   reliability of an expert opinion can turn more on knowledge and experience rather than on

14   methodology, depending on the nature of the opinion.  Seifert Opp. 8; *Hangarter*, 373 F.3d at

15   1017 (citing *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000)).  However, the expert

16   testimony at issue in *Hangarter* related to whether an insurance company's letter was misleading,

17   deceptive, and below industry standard.  373 F.3d at 1010.  Thus, the opinion in *Hangarter* was

18   not contingent upon a particular methodology or technical framework.  *Id.* at 1018.  In contrast,

19   Mr. Seifert's opinion on *de facto* industry standard is technical and should rest on some scientific

20   foundations, or at least some measure of objective, verifiable principles rather than the subjective

21   guesstimates used by Mr. Seifert.  *See id.* (noting that the expert's testimony on the insurance

22   company's correspondence is not scientific or technical testimony).

23         Further, although an expert may rely on opinions of another expert in some circumstances,

24   Mr. Seifert's recitation of factual events and reliance on charts prepared by Dr. Black cannot

25   substitute for "reliable principles and methods" required in determining a *de facto* industry

26   standard.  For Mr. Seifert to merely parrot Dr. Black's opinion would also be cumulative and

27   improper under Fed. R. Evid. 702 when Mr. Seifert has not applied a proper methodology.  For the

28   reasons stated herein, the Court GRANTS Cisco's motion to exclude Mr. Seifert's "*de facto*

7

industry standard" opinions.

### ii. Mr. Seifert's "Market Effect" Opinions

Cisco moves to exclude Mr. Seifert's opinions on "market effect" on grounds that Mr. Seifert merely summarized sources from third parties without applying any expertise. Seifert Mot. 7-9; Seifert Reply 5. Arista counters that Mr. Seifert analyzed evidence, such as a publication from "Network World." Seifert Opp. 9-10.

In determining whether Cisco has suffered market harm, Mr. Seifert relied on a number of documents, but failed to apply his expertise or experience in his review. He relied on an online publication by "Network World, Inc." from 2010 that purportedly conducted "grueling" performance tests of Cisco and Arista's products. Seifert Opening Rpt. ¶¶ 94-96. Mr. Seifert then described Arista's market segments using Arista's 30(b)(6) deposition, the deposition of an Arista customer, related deposition exhibits, and the parties' presentation materials. *Id.* ¶¶ 97-102. Mr. Seifert then concluded that Arista's customers chose Arista for reasons other than the Cisco-like CLI. *Id.* ¶¶ 103-04. In effect, Mr. Seifert's opinions amount to nothing more than his summary of the depositions or the documents without applying any "reliable principles and methods." Nor did he apply his personal experience and knowledge to add any substantive analysis to the mere recitation of third-party testimony and documents.

In contrast, Mr. Seifert's opinion on the market share data published by Crehan Research Inc. can be proper expert testimony. *Id.* ¶¶ 106-09. Crehan's chart shows the market share of the major players in the data center Ethernet switching market over time. *Id.* ¶ 108. The Court finds that Mr. Seifert's interpretation of this chart is derived at least in part from his personal knowledge and business experience and can be helpful to a trier of fact. The Court therefore DENIES the motion as to Mr. Seifert's opinion on Crehan's chart, *id.* ¶¶ 106-09, but GRANTS the motion as to rest of his opinions on "market effect."

### C. Dr. Douglas W. Clark

Cisco seeks to preclude Dr. Clark from testifying on the invalidity of the asserted '526 patent claims because he fails to conform his opinions to the Court's claim constructions. Clark Mot. 2-5, ECF 428. Cisco also objects to Dr. Clark's opinions to the extent they are conditioned

on Cisco's infringement allegations, the so-called "caveated invalidation theory." Clark Reply 3-4, ECF 496. In response, Arista states that Dr. Clark's opinion on invalidity is consistent with constructions proffered by both parties prior to the Court's constructions. Clark Opp. 2-4, ECF 465. Only for two terms – "management programs" and "command action value" – did the Court not adopt the proposal by one of the parties. *Id.* Further, Arista clarifies that Dr. Clark had an invalidity opinion based on Cisco's interpretation of a claim limitation. *Id.* at 6.

The Court recognizes that Dr. Clark was required to provide his report prior to receiving the Court's claim construction order. Thus, it was impossible for him to apply as yet undetermined claim constructions. By the time of his deposition, the Court had issued its order, but Dr. Clark did not offer opinions entirely based on those constructions. Recognizing that Dr. Clark's report provides many opinions based on the Court's ultimate determinations of proper constructions of claim terms, and not knowing precisely which opinions Arista will elicit at trial, the Court will defer ruling on this motion until Dr. Black testifies at trial. However, the following guidance is provided.

The Court will allow Dr. Clark to opine on matters in his reports and in his deposition, as long as the opinions are consistent with the Court's claim constructions. In an event where Dr. Clark testifies beyond his reports and his deposition or offers an opinion that conflicts with the Court's constructions, Cisco may renew its objection at trial. Further, Dr. Black's "caveated invalidation theory" is properly offered to refute what Arista believes will be Cisco's infringement evidence. Accordingly, Dr. Black's invalidity opinions will not excluded on the ground that it is based on Cisco's infringement theories.

### D. Dr. Kevin C. Almeroth

Arista challenges Dr. Almeroth's opinions on copying of parser source code, of "help descriptions" source code, of Cisco CLI's "look and feel," and of user documentations, as well as his opinions on corporate intent, third-party beliefs, and improper vouching. The Court addresses these challenges below.

#### i. Dr. Almeroth's Opinion that Arista Copied Cisco's Source Code

Arista moves to exclude for lack of methodology Dr. Almeroth's opinion that Arista

United States District Court
Northern District of California

copied Cisco's source code for the parser and for the "help descriptions." Almeroth Mot. 3-7, ECF 440; Almeroth Reply 2-4, ECF 495. In its opposition, Cisco counters that the method by which Dr. Almeroth analyzed the parsers is rooted in his experience. Almeroth Opp. 2-3, ECF 477. Dr. Almeroth also cited to Arista's source code to support his opinion. *Id.* at 3-4. Accordingly, Cisco argues that his opinion, as well as the use of the term "non-standard" when describing the parser's functionality, is proper. *Id.* at 1-5. In a similar vein, Cisco asserts that Dr. Almeroth properly concluded that there is evidence of copying of "help descriptions" texts as displayed to the user, and embedded in source code. *Id.* at 6-7.

Dr. Almeroth opined that Arista copied Cisco's parser source code because he observed "non-standard behavior" in both Arista's EOS CLI parser and Cisco's programs. Almeroth Mot. Ex. 1 ("Almeroth Opening Rpt.") ¶¶ 81-87. However, Dr. Almeroth failed to identify the "non-standard behavior" or the method by which he observed the "non-standard behavior." Almeroth Mot. Ex. 3 ("Almeroth Dep.") 279:9-280:11. At the hearing, Cisco represented to the Court that Dr. Almeroth's opinion on parser source code goes to the patent infringement claim and not the copyright claim. Hr'g Tr. 45:9-21. Cisco also clarified that it is alleging copying of the "help descriptions" output on screen, but not the underlying source code. *Id.* at 45:22-46:5.

The Court requested the parties to submit supplemental briefing on whether the parser source code opinion of Dr. Almeroth was adequately disclosed under Fed. R. Civ. P. 26 with respect to the asserted '526 patent. In its supplemental briefing, however, Cisco stipulated that "it will not present at trial Dr. Almeroth's opinions relating to the non-standard similarities in the CLI parser source code between Cisco and Arista products . . . for any purpose." ECF 529. Based on Cisco's stipulation and representation at the hearing, the Court finds that Cisco concedes that the parser source code opinion of Dr. Almeroth that Arista is challenging here should be excluded.[1] Accordingly, the Court GRANTS Arista's motion to exclude Dr. Almeroth's opinions on parser

---

[1] The parties' supplemental briefs appear to insinuate that the exclusion of Dr. Almeroth's parser source code opinion is somehow related to the exclusion of opinions on *de facto* industry standard of Dr. Black and Mr. Seifert. The Court finds no such relationship between the two, and its ruling on Almeroth's opinions on parser source code copying is independent of its rulings with respect to the opinions of Dr. Black and Mr. Seifert.

United States District Court
Northern District of California

source code copying. Further, because Cisco represented that it is not alleging source code copying of the "help descriptions," the motion to exclude opinions on source code copying of the "help descriptions" is also GRANTED. Almeroth Opp. 6; Hr'g Tr. 45:24-46:5.

### ii. Dr. Almeroth's Opinion that Arista Copied the "Look and Feel" of the Cisco CLI

Arista moves to exclude Dr. Almeroth's opinion that Arista copied the "look and feel" of Cisco CLI without identifying any features constituting the "look and feel" of Cisco CLI or a methodology. Almeroth Mot. 7. To the extent any features, such as modes, prompts, and hierarchies, are identified, Arista asks the Court to limit Dr. Almeroth's opinion to the specifically asserted elements. Almeroth Reply 4-5.

Cisco explained in its opposition that the features constituting the "look and feel" of Cisco CLI consist of those identified in Dr. Almeroth's report – command expressions, command outputs, hierarchies, modes, prompts, and help descriptions screens. Almeroth Opp. 7-8. In its reply and at the hearing, Arista represented that it would not challenge Dr. Almeroth's opinion if it is restricted to those identified features. Almeroth Reply 4-5; Hr'g Tr. 53:3-9. Based on the parties' concessions, the Court DENIES the motion IN PART to allow Dr. Almeroth to opine on the "look and feel" of Cisco CLI based on the following features – command expressions, command outputs, hierarchies, modes, prompts, and help descriptions screens; and GRANTS the motion IN PART to preclude any "look and feel" opinion based on other features.

### iii. Dr. Almeroth's Opinions that Speculate about State of Mind or Merely Summarize Evidence and Provide Attorney Argument, and Dr. Almeroth's Improper "Vouching" Opinions

Arista challenges Dr. Almeroth's opinion on Arista's state of mind as it is based on third-party sources without applying his expertise. Almeroth Mot. 8-9. Additionally, Arista objects to Dr. Almeroth's vouching for Cisco's version of disputed facts. *Id.* at 9-10. In response, Cisco agrees that Dr. Almeroth should not be allowed to opine on subjective intent or to "vouch" for fact witnesses, but instead, should be permitted to rely on deposition testimony or other evidence to support his opinions. Almeroth Opp. 8-9.

As noted above, the parties conceded that their experts must not speculate about state of

United States District Court
Northern District of California

11

1    mind or vouch for opinions of others.  To the extent Dr. Almeroth opined on state of mind,

2    attorney argument, or vouched for opinions of others, this motion is GRANTED.

### iv.    Dr. Almeroth's Opinion that Arista Copied Cisco's User Documentation

4        Arista challenges Dr. Almeroth's opinion on similarities between Cisco and Arista's user

5    documentation on the grounds that it requires no expertise.  Almeroth Mot. 10; Almeroth Reply 5.

6    In opposition, Cisco states that Dr. Almeroth, with his experience in plagiarism and plagiarism

7    detection, has analyzed the documentation in a way that a layperson could not.  Almeroth Opp. 10.

8        Because of the sheer volume of documents at issue, the Court finds that Dr. Almeroth

9    could help a trier of fact understand the evidence based on his technical expertise and his

10   knowledge from having reviewed the documents.  Even if a layperson could have done the

11   comparison, requiring the jury to do the comparison themselves without the guidance of expert

12   testimony would be overly burdensome.  Accordingly, the Court DENIES Arista's motion on this

13   issue.

### E.    Ms. Cate M. Elsten

15       Cisco advances several challenges to the damages opinions offered by Arista's expert, Ms.

16   Cate Elsten, in large part directed toward her various methods of apportioning damages to account

17   only for the infringing features.  The Court addresses them below.

### i.    Ms. Elsten's Disgorgement of Profits[2] Opinion

---

[2] The parties submitted supplemental briefs on whether a copyright owner has a right to a jury trial on disgorgement of profits claims.  The Supreme Court in *Feltner v. Columbia Pictures Television, Inc.* held that a copyright owner has a right to a jury trial on all issues pertinent to an award of statutory damages under 17 U.S.C. section 504(c).  523 U.S. 340, 355 (1998).  Here, the expert opinions being challenged by the parties relate to disgorgement of profits under section 504(b), which was not before the *Feltner* court and thus was not analyzed.  *Id.* at 343-44.  However, *Feltner* did reference section 504(b) in passing, noting that "awards of actual damages and profits, see § 504(b), [] generally are thought to constitute legal relief."  *Id.* at 346.  More recently in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, the Supreme Court was faced with the issue of whether laches bars copyright claims for damages brought within the three-year limitation period.  134 S. Ct. 1962, 1973 (2014).  The right to trial by jury was not before the *Petrella* court but in a footnote, the Supreme Court stated that "[l]ike other restitutional remedies, recovery of profits 'is not easily characterized as legal or equitable,' for it is an 'amalgamation of rights and remedies drawn from both systems.'"  *Id.* at 1967 n.1.  The *Petrella* court then noted that "[g]iven the 'protean character' of the profits-recovery remedy, we regard as appropriate its treatment as 'equitable' in this case."  *Id.*  It is unclear whether the *Petrella* court's conclusion that the remedy is equitable is limited to the case before it or is a rule generally applicable to copyright infringement profits.  Based on these two Supreme Court opinions, while *Feltner* suggests that a

United States District Court
Northern District of California

Cisco first argues that Ms. Elsten's disgorgement of profits opinion should be stricken because it is inconsistent with controlling legal standards. Elsten Mot. 2-3, ECF 429. Specifically, Cisco takes issue with Ms. Elsten's assertion that "to recover any profits, 'the plaintiff must establish the existence of a causal nexus between the infringement and the gross revenue.'" *Id.* at 2 (citing Elsten Mot. Ex. 8 ("Elsten Rebuttal Rpt.") 74). Cisco argues that contrary to Ms. Elsten's assertion, "causal nexus" should only be required for indirect profits, which Cisco is not seeking in this case. Elsten Mot. 2-3; Elsten Reply 2-3, ECF 500 (citing *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 710-11 (9th Cir. 2004)). Cisco contends that it has already satisfied its burden on direct profits by having its expert calculate Arista's gross revenues from sales of infringing switches, and the burden shifts to Arista from there. Elsten Mot. 3 (citing 17 U.S.C. § 504(b)). Even if "causal nexus" were required, Cisco claims that Ms. Elsten applied an overly stringent "causal nexus" standard because a plaintiff is not required to show that the infringement drove customer demand. Elsten Mot. 3 (citing *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-3428, 2013 WL 831528, at *6 (N.D. Cal. Jan. 10, 2013) (noting that the requirement to show that the infringing code drove consumer demand is not the plaintiff's burden in a copyright case)).

Arista disputes that Ms. Elsten relied on the incorrect legal standard. Elsten Opp. 1-3, ECF

---

copyright owner has a right to a jury trial for disgorgement of profits, *Petrella* suggests otherwise. However, neither provides unequivocal guidance on this point. *See also* 3-12 Nimmer on Copyright § 12.06 [B] (2015) ("[a] question arises whether other cases could reasonably treat plaintiff's attempt to recover defendant's profits on the legal side of the line. No standards emerge from the face of the [*Petrella*] opinion itself"); 5-14 Nimmer on Copyright § 14.03[E] ("it has been stated that, in a copyright infringement action, there is a right to a jury trial on the issue of defendant's profits. . . [p]articularly after *Feltner v. Columbia Pictures Television*, Inc. . . ."). District courts faced with the issue of whether a copyright plaintiff has a right to a jury trial on the disgorgement of profits claim have submitted the claim to the jury or at least decided to seek an advisory opinion from the jury. *E.g.*, *Oracle Am., Inc. v. Google Inc.*, No. 3:10-cv-03561-WHA (N.D.Cal. May 3, 2016) ("The disgorgement issue will remain with the jury for decision and post-verdict, the Court will rule on the *Petrella* issue and at the very least treat the disgorgement verdict as advisory, if not conclusive"); *Fahmy v. Jay-Z*, No. 2:07-cv-05715-CAS (C.D. Cal. Oct. 9, 2015) (finding "ambiguity" regarding the issue, and deciding to "have the issue of plaintiff's recovery of profits presented to the jury" and to "treat the jury's verdict on this issue as advisory"). In light of how other courts have approached the unsettled issue of the right to trial by jury on disgorgement of profits claim, this Court will submit the disgorgement of profits claim to the jury and treat the disgorgement verdict as advisory, if not conclusive. The *Petrella* issue may be addressed by the parties post-verdict, if necessary.

468. Citing to *Polar Bear* and other cases, Arista asserts that a copyright owner bears the burden to establish causal nexus before the burden shifts to the defendant for apportionment. *Id.* at 2-3 (citing *Polar Bear Prods.*, 384 F.3d at 711 n.7). Regardless of the legal standard, Arista claims that Ms. Elsten still used Cisco's gross revenue figure as the baseline, and as such, her opinions do not hinge on the supposed failure to establish causal nexus. Elsten Opp. 2 (citing Elsten Rebuttal 75-77).

As a preliminary matter, the Court addresses the legal standard with respect to a plaintiff's burden in disgorgement of profits before the burden shifts to the defendant for apportionment and deductible expenses. Section 504(b) of the 1976 Copyright Act provides two distinct remedies for copyright infringement — the copyright owner's actual damages and disgorgement of the infringer's profits attributable to the infringement, as follows:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.

17 U.S.C. § 504(b).

Section 504(b) contemplates a two-step burden-shifting analysis for determining the infringer's profits:

> In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work. *Id.*

*See also Oracle Am., Inc. v. Google Inc.*, No. 10-03561, 2016 WL 2342365, at *4 (N.D. Cal. May 3, 2016) (noting that "it is [defendant's] burden to provide a method of apportionment, so [plaintiff] need not offer [the expert's] apportionment opinion at all.").

The Ninth Circuit has not directly ruled on the standard of proof applicable to a claim for loss of direct profits but has addressed the "causal nexus" standard in the context of indirect profits in *Polar Bear*, a case both parties relied upon. Specifically, the Ninth Circuit held that to recover indirect profits in a copyright infringement case, a plaintiff is required to show a "causal nexus" between the infringement and the gross revenue. *Polar Bear Prods.*, 384 F.3d at 710-11. The plaintiff in *Polar Bear* sought profits from Timex's retail sales of wrist watches based on unauthorized uses of plaintiff's film at promotional events. *Id.* at 703-04, 712. The court found

14

that the causal nexus between retail sales and copyright infringement was not sufficiently

supported by evidence because the film was only used at promotional events and the retail

purchasers were not exposed to the plaintiff's film.  *Id.* at 714-15.

Because the plaintiff in *Polar Bear* did not seek to recover profits based on sale of the film

but only from the watch sales, only indirect profits were relevant to the case.  Nevertheless, the

Ninth Circuit noted that § 504(b) on its face "does not differentiate between 'direct profits' – those

that are generated by selling an infringing product – and 'indirect profits' – revenue that has a

more attenuated nexus to the infringement."  *Id.* at 710 (citing *Mackie v. Rieser*, 296 F.3d 909, 914

(9th Cir. 2002)).  Further, in holding that "a copyright holder must establish the existence of a

causal link before indirect profits damages can be recovered," the Ninth Circuit clarified in a

footnote that it is "not [suggesting] that a showing of causation is required only for claims of

indirect profits but that causation in indirect profit claims is often more attenuated than claims for

actual damages or direct profits."  *Polar Bear Prods.*, 384 F.3d at 711 n.7.  *See also Mackie*, 296

F.3d at 914 (noting that "indirect profits" have a more attenuated nexus to the infringement than

those generated by selling an infringing production).

Other courts confronted with the issue of "causal nexus" in copyright cases have held

plaintiffs to the initial burden of establishing "causal nexus" regardless of whether profits are

direct or indirect.  In *Taylor v. Meirick*, the Seventh Circuit held that a plaintiff seeking direct

profits must make out a prima facie case by showing that the proffered gross revenue is from the

sale of the infringing product.  712 F.2d 1112, 1122 (7th Cir. 1983).  The plaintiff in *Taylor*,

seeking disgorgement of profits from defendant's unauthorized use of his maps, offered up the

defendant's gross revenue from sales of everything the defendant sold, including "pH meters,"

which was not related to the plaintiff's maps in any way.  *Id.*  The court thus rejected the

plaintiff's estimate of the defendant's revenue for failing to meet his burden.  *Id.*  In *On Davis v.*

*The Gap, Inc.*, although the facts of that case concerned indirect profits, the Second Circuit

provided the following example illustrating the causal nexus requirement a plaintiff must meet for

direct profits.  246 F.3d 152, 160 (2d Cir. 2001).  "If a publisher published an anthology of poetry

which contained a poem covered by the plaintiff's copyright," the plaintiff cannot discharge the

15

statutory burden by "submitting the publisher's gross revenue resulting from its publication [of books that do not include the poem]." *Id.* Rather, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. *Id.*; *see also Garcia v. Coleman*, No. 07-2279, 2009 WL 799393, at *3 (N.D. Cal. Mar. 24, 2009) (in a case where the plaintiff sought profits from wine sales, where the wine bottle labels contained plaintiff's artwork, holding that "there must be a causal nexus regardless of which kind of profits is being sought" and finding that the plaintiff has met its causal nexus requirement because "the infringement at least partially caused the profits that the infringer generated as a result of the infringement"); *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003) (holding that the "nexus requirement exists in both direct and indirect profits cases" and that "in an indirect profits case the profits 'attributable' to the infringement are more difficult to quantify[] [b]ut that difficulty does not change the burden of proof established by the statute").

At the hearing, Cisco claimed that it is only seeking direct profits based on infringing products, and as such, it has already met the burden required by Section 504(b). Hr'g Tr. 60:7-10. In response, Arista argued to the Court that Cisco exaggerated the role of the "causal nexus" requirement in Ms. Elsten's opinions. Arista further claimed that because Ms. Elsten still used the number Cisco's expert proffered as the royalty base in her calculations, the "causal nexus" legal standard cited by Ms. Elsten played no role in her opinions. *Id.* at 73:8-19. Importantly, Arista also acknowledged to the Court that for establishing a royalty base, Cisco could satisfy its initial burden by showing that the direct profits are derived from the infringing products. *Id.* at 74:1-5.

Consistent with the weight of authority above, the Court finds that Cisco has an initial burden to prove "causal nexus" between the profits it seeks and the copyright infringement, regardless of whether the profits are direct or indirect. *E.g.*, *Garcia*, 2009 WL 799393, at *2 ("there must be a causal nexus regardless of which kind of profits is being sought"). Assuming that Cisco is seeking only direct profits, Cisco must at least show that the profits it seeks to recover derive directly from infringing products. As such, its burden of proof remains, albeit the bar it must meet is lower than that for indirect profits. This is because, as set forth in *Polar Bear* and other cases, indirect profits have a more attenuated nexus than direct profits. *E.g.*, *Fahmy v.*

United States District Court
Northern District of California

United States District Court
Northern District of California

*Jay-Z*, 835 F. Supp. 2d 783, 793 (C.D. Cal. 2011) (noting that plaintiff in indirect profits case bears "a greater burden than the plaintiff carries in a direct profits case"); *Brocade*, 2013 WL 831528, at *6 (noting that the requirement of seeking direct profits in a copyright case is not as stringent as that required in a patent case where a patent owner needs to demonstrate that the infringement drove customer sales).

Turning to Ms. Elsten's opinions at issue here, Ms. Elsten recited the "causal nexus" requirement as follows: "To recover any profits, . . . the plaintiff must establish the existence of a causal nexus between the infringement and the gross revenue. . . . If the plaintiff fails to establish a nexus, disgorgement is not allowed."  Elsten Rebuttal Rpt. 74.  The Court does not find this causal nexus requirement as stated by Ms. Elsten improper as it is consistent with *Polar Bear* and cases discussed above.

Given that Ms. Elsten did not state an incorrect standard, the next question is whether Ms. Elsten imposed an overly stringent causal nexus standard on Cisco's initial burden under section 504(b).  In sections of her report cited by the parties, Ms. Elsten criticized Cisco's damages expert, Dr. Chevalier, for her conclusion that "Arista's revenues earned on the *sale of its switches are reasonably related to its infringement* of Cisco's copyrighted works."  *Id.* (emphasis in original).  Specifically, Ms. Elsten questioned Dr. Chevalier's reliance on deposition testimony to reach that conclusion.  *Id.* at 74-75.  Ms. Elsten further asserted that "the available evidence does not support a contention that Arista made switch sales to any particular customer due to its use of the copyrights-at-issue."  *Id.* at 75.  Ms. Elsten next proceeded to discuss evidence allegedly showing that not all of Arista's switch revenue should be attributed to the EOS CLI.  *E.g.*, *id.* at 75 ("I have identified three [customers] that do not use the EOS CLI"); *id.* at 76 ("I have identified six 'cloud titan' Arista customers (excluding Facebook as previously discussed) who only use the EOS CLI for limited tasks such as some troubleshooting.").

The Court finds that these discussions in Ms. Elsten's report highlight the need for apportionment, so as to properly determine amount of profits "that are attributable to the infringement."  As such, these opinions support her apportionment analysis and are not related to the "causal nexus" requirement.  Nowhere in her opinions did Ms. Elsten opine on Cisco's

supposed failure to apportion or to show that the Cisco-like CLI drove customer demand, either. Because Ms. Elsten's criticisms directed to Dr. Chevalier's opinions aim to bolster and explain the need for apportionment, the Court does not find that Ms. Elsten applied an overly stringent "causal nexus" standard to Dr. Chevalier's opinions.

Most importantly, by accepting Arista's total switch revenue as the baseline, Ms. Elsten's apportionment analysis had assumed that Cisco met its prima facie causal nexus requirement. For example, Ms. Elsten acknowledged the total switch revenue offered by Dr. Chevalier. Elsten Rebuttal Rpt. 16. She also took Dr. Chevalier's number as a starting point for her apportionment and "assumed that the trier of fact will find a basis for considering at least some sales and related profits as appropriate bases for disgorgement in this case." *Compare id.* at 75, 78 (Table 7); Chevalier Mot. Ex. A ("Chevalier Opening Rpt.") (Ex. 10). She also correctly stated that "once the plaintiff has met the burden of establishing the alleged infringer's gross revenue and a non-speculative relationship between the revenue and the infringement, the burden shifts to the defendant to prove 1) deductible expenses, and 2) the elements of profit attributable to factors other than the copyrighted work (i.e., apportionment)." Elsten Rebuttal Rpt. 77. Accordingly, the Court does not find that Ms. Elsten opinions required Cisco to meet an overly stringent standard with respect to the causal nexus requirement. The Court thus DENIES the motion challenging Ms. Elsten's disgorgement of profits opinions.

### ii. Ms. Elsten's Apportionment Opinions based on a Cisco Presentation and Ms. Elsten's Alternative Apportionment Data Points

Cisco further moves to exclude Ms. Elsten's apportionment opinion on the following two grounds. First, Cisco challenges Ms. Elsten's apportionment opinion that

alternative percentages Ms. Elsten calculated from counting source code or from analyzing other "cherry-picked Arista documents" because the percentages are similarly arbitrary. Elsten Mot. 5-7.

In response, Arista points out that Ms. Elsten relied on more than that presentation to arrive at the ███ apportionment. Elsten Opp. 6-9. Ms. Elsten's analysis included the frequency of CLI requirements in the requests for proposal and the amount of source code associated with the CLI. *Id.* For example, she also divided customers into two groups – customers who rarely use CLI and other customers. *Id.* at 6; Elsten Rebuttal Rpt. 80, 89-90. She then conservatively assigned ███ as the relative value of the CLI to the first group of customers. Elsten Opp. 7; Elsten Rebuttal Rpt. 80, 93 (Table 14). For the latter group, she weighed the relative values of the hardware and software features of Arista products and considered other features and customer usage to arrive at her apportionment numbers. *Id.* at 80-92. After all the analyses, Ms. Elsten obtained a range of numbers but ultimately chose ███ because it is the highest number out of the range. Elsten Opp. at 8. Arista further suggests that Cisco is merely attacking the weight of the evidence but not the reliability. *Id.* at 5.

After reviewing Ms. Elsten's rebuttal opinions and the totality of evidence she has analyzed, the Court is not persuaded that these apportionment opinions should be excluded. After identifying Arista's revenues and deductible expenses, Ms. Elsten proceeded to apportion the profits to the Cisco-like CLI. Elsten Rebuttal Rpt. 80-93. She considered price lists of hardware that is not bundled with Arista's EOS. *Id.* at 80-81. She also calculated the proportion of research and development expenditures in software and hardware. *Id.* at 81-82. To determine the value of the Arista EOS attributed to the Cisco-like CLI, Ms. Elsten also analyzed marketing presentations, feature list, diagrams, and customers' requests for proposals. *Id.* at 83-90 (Elsten Rebuttal Ex. 2.18). She further took into account the amount of Cisco-like CLI out of the total commands in Arista's EOS based on the opinions of Dr. Black and Dr. Almeroth. *Id.* at 90-92. Out of all these materials, Ms. Elsten obtained the highest apportionment percentage – ███ ███

Although Ms. Elsten might have assigned equal value to the listed product features identified in that one presentation to arrive at ▮▮▮, the Court does not determine the reliability of an equal-value assignment in a vacuum. Rather, when considering the other analyses performed by Ms. Elsten, including the requests for proposals, the amount of source code associated with the CLI as percentage of all source code, and the frequency of the CLI as a promoted feature, the Court finds that Ms. Elsten's opinion meets the "reasonable approximation" requirement. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 404 (1940) (holding that mathematical exactness was not possible in determining recoverable profits under the Copyright Act). Further, ▮▮▮ was the highest number out of the range in Ms. Elsten's report, which she selected out of a proper recognition to err in favor of Cisco. *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1549 (9th Cir. 1989) (holding that "[i]n performing the apportionment, the benefit of the doubt must always be given to the plaintiff"). Similarly, Ms. Elsten's alternative apportionment opinions based on counting source code or other documents also meet the "reasonable approximation" requirement in light of the totality of evidence she has analyzed. Rather than exclude these opinions, the Court finds that Cisco's opportunity to cross-examine Ms. Elsten and offer rebuttal evidence is more appropriate. The Court thus DENIES Cisco's motion to exclude Ms. Elsten's apportionment opinions on both grounds.

### iii. Ms. Elsten's Opinions Regarding Non-Infringing Alternatives, "*De Facto* "Industry Standard," Corporate Intent, and the Subjective Beliefs of Others

Cisco also challenges Ms. Elsten's following three opinions– the opinion on non-infringing alternatives, the opinion on "*de facto* industry standard," and the opinion on corporate intent and the subjective beliefs of others. Cisco moves to preclude Ms. Elsten from testifying on non-infringing alternatives on the basis of prejudice. Elsten Mot. 8. It argues that non-infringing alternatives are irrelevant and cannot rebut causal nexus. *Id.* (citing *Oracle Am., Inc. v. Google Inc.*, No. 10-03561, 2016 WL 1743154, at *4 (N.D. Cal. May 2, 2016)). Additionally, Cisco challenges Ms. Elsten's qualification and methodology in relation to her opinions on industry standards, corporate intent, and subjective beliefs of others. Elsten Mot. 8-10.

Arista states that Cisco mischaracterizes Ms. Elsten's opinion in that Ms. Elsten did not

opine on non-infringing alternatives as counterfactual scenarios but noted the alternatives to acknowledge that some customers may not require the accused CLI features. Elsten Opp. 9. Arista also counters that Ms. Elsten neither opined on industry standards nor beliefs of others but merely considered the opinions of Dr. Black and Mr. Seifert and other documentary evidence that implicate fair use and lost profits. *Id.* at 10.

With respect to Ms. Elsten's opinion on non-infringing alternatives, the Court agrees that non-infringing alternatives should neither be used to rebut causal nexus nor profits rightly attributed to the copyrighted work. The court in *Oracle* excluded an opinion where an expert relied on non-infringing alternatives to rebut causal nexus and to support an opinion that the infringer's profits should not be attributed to the copyrighted work. 2016 WL 1743154, at *4. However, that is not the case here and the Court disagrees with Cisco's characterization of Ms. Elsten's opinion. In reviewing the relevant section in Ms. Elsten's Rebuttal Report, the Court finds that Ms. Elsten is not opining that Cisco would lose the right to disgorgement if there is a non-infringing alternative. Ms. Elsten merely noted that there is little to no evidence showing that Arista's customers requested Cisco's copyrighted CLI. Elsten Rebuttal 75 ("there is little or no evidence that even where having a 'familiar,' 'industry standard,' 'Cisco-like,' etc. CLI was preferable for the client that this implicates the copyrights-at-issue, as opposed to elements shared with a number of non-accused companies promoting the same type of CLI"). The Court does not find this opinion improper and DENIES Cisco's motion on this ground.

As to Ms. Elsten's supposed opinion on *de facto* industry standards, the Court recognizes that Ms. Elsten considered certain opinions of Dr. Black and Mr. Seifert, but did not provide a technical opinion on *de facto* industry standards herself. Nevertheless, because the Court has excluded certain opinions of Dr. Black and Dr. Seifert on "*de facto* industry standard" as set forth above, Ms. Elsten is precluded from testifying or referring to the "*de facto* industry standard." However, Ms. Elsten may testify to her underlying opinion to the extent it does not hinge on the "*de facto* industry standard."

Finally, for the same reasons the Court GRANTS the motions to exclude Dr. Black and Dr. Almeroth's opinions on corporate intent and subjective beliefs of others, the Court GRANTS the

United States District Court
Northern District of California

1    motion to the extent Ms. Elsten opined on beliefs of others or on corporate intent.

2        **F.    Dr. Judith A. Chevalier**

3        Arista raises two challenges to Dr. Judith Chevalier's damages opinion targeted at her "no

4    apportionment" approach and her reliance on statements of Arista witnesses to construct a lost

5    profits scenario.  The Court addresses each in turn.

6        **i.    Dr. Chevalier's "No Apportionment" Disgorgement Claim**

7        Arista seeks to exclude the "no apportionment" approach because it supposedly violates

8    Ninth Circuit law.  Chevalier Mot. 3-5, ECF 423.  Arista asserts that Dr. Chevalier is required to

9    apportion where the value of the accused product is attributable to elements other than those

10   accused of infringement.  *Id.* (citing *Polar Bear Prods.*, 384 F.3d at 708; *Cream Records, Inc. v.*

11   *Jos. Schlitz Brewing Co.,* 754 F.2d 826, 828-29 (9th Cir. 1985); *Oracle*, 2016 WL 2342365, at

12   *7); Chevalier Reply 2-3, ECF 492.  Cisco argues to the contrary, and asserts that the copyright

13   owner is required to present only the infringer's gross revenue and infringer bears the burden to

14   "prove deductible expenses and elements of profits attributable to factors other than the

15   copyrighted work."  Chevalier Opp. 2-5, ECF 478 (citing 17 U.S.C. § 504(b); *Oracle*, 2016 WL

16   2342365, at *7).

17       Dr. Chevalier's "no apportionment" opinions are essentially a rejection of Arista's expert,

18   Ms. Elsten's apportionment opinions.  Specifically, Dr. Chevalier opined "that Ms. Elsten has not

19   presented a sufficiently reliable analysis to provide a reasonable approximation of the portion of

20   Arista's profits attributable to its use of Cisco's copyrighted works.  As such, I have calculated

21   Arista's profits from its infringement without applying Ms. Elsten's apportionment factors."

22   Chevalier Mot. Ex. E ("Chevalier Surrebuttal Rpt.") ¶ 57.  Although Dr. Chevalier might have

23   admitted in her deposition that features other than the Cisco-like CLI contributed value to Arista's

24   switches, Chevalier Mot. Ex. B ("Chevalier Dep.") 217:9-219:13, she also stated that "[her] task is

25   not to apportion the value of the CLI for those different customers."  *Id.* at 166:20-167:2; 209:24-

26   210:9.

27       The Court recognizes that recoverable profits must be "attributable to the infringement"

28   and that a copyright owner is not entitled to recover all of the profits where not all of the profits

22

are attributable to the infringing material. *Polar Bear*, 384 F.3d at 708; *Cream Records*, 754 F.2d at 828-29. However, the statute does not require Cisco to perform apportionment, 17 U.S.C. § 504(b), and the Ninth Circuit does not hold anything to the contrary. Specifically, the Ninth Circuit places the burden on the court, not the plaintiff, to make some apportionment where "the infringer fails to establish with certainty the portion attributable to the non-infringing elements." *Cream Records*, 754 F.2d at 828-29. Arista's reliance on *Oracle Am., Inc. v. Google Inc.* is unavailing. 2016 WL 2342365, at *7. The court in *Oracle* unequivocally states that "[i]t is [infringer]'s burden to apportion the disgorgement figure advanced by [the plaintiff]." *Id.* The court only excluded the expert's opinion because the expert actually "[engaged] in the exercise of apportionment" and disregarded any contribution of critical non-infringing elements in his methodology. *Id.* In contrast, Dr. Chevalier did not engage in the exercise of apportionment. Instead, Dr. Chevalier found Arista's apportionment analysis not sufficiently reliable and thus did not take into account any apportionment factors offered by Arista. Chevalier Opp. 2.

In sum, the Court concludes that Dr. Chevalier's rebuttal opinions regarding "no apportionment" do not violate governing law, because Arista, and not Cisco, bears the burden of proving apportionment. As such, Arista's motion to exclude Dr. Chevalier's "no apportionment" opinions is DENIED.

### ii. Dr. Chevalier's Lost-Profits "Scenario 3"

Arista challenges one of the three scenarios offered by Dr. Chevalier – "Scenario 3" – where she assumed all the "thousands of customers" would have bought from Cisco but for Arista's alleged infringement. Chevalier Mot. 5-6; Chevalier Opening Rpt. ¶ 78. According to Arista, Dr. Chevalier relied not on her expertise but on out-of-context excerpts of deposition testimony and a blog post to construct "Scenario 3." Chevalier Mot. 6-7. Arista further asserts that, in effect, Dr. Chevalier rehashes that testimony as expert testimony. Chevalier Reply 4-5 (citing *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (stating that "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (noting that the history of Rezulin is more properly presented through

United States District Court
Northern District of California

1  percipient witnesses and documentary evidence)).

2      Cisco counters that Dr. Chevalier relied on her expertise in constructing "Scenario 3" and

3  properly considered sales numbers, third-party research, and deposition testimony in her opinions.

4  Chevalier Opp. 6-7. Cisco claims that a market-share analysis for lost profits relies on a but-for

5  market share percentage and does not need to name customers to be reliable. *Id.* at 7. Moreover,

6  Cisco contends that Arista's objections go to the weight of the testimony which can be addressed

7  by cross-examination. *Id.* at 8.

8      In her report, Dr. Chevalier found that certain deposition testimony "suggests that

9  substantially all of Arista's sales would be candidates for lost profits." Chevalier Opening Rpt. ¶

10  65; ¶ 78 n.171. She then stated that "[her] calculations include all sales of Arista switches to these

11  customers in this period. This is supported by evidence that Arista's infringing CLI was necessary

12  to get its 'foot in the door' with a customer." *Id.* ¶ 69. Based also on deposition testimony, she

13  then deducted 20% from the total profits to account for customers who purportedly did not use the

14  Cisco-like CLI. *Id.* ¶ 78 (Ex. 10). Finally, Dr. Chevalier adjusted the amount for Cisco's market

15  share. *Id.* (Ex. 10).

16      Because the market share approach as set forth in "Scenario 3" is not contrary to law, the

17  Court finds the alleged flaws in Dr. Chevalier's underlying assumption more suited for cross-

18  examination. Drawing analogy from lost profit analysis in patent cases, a rights owner needs to

19  prove "causation in fact," establishing that "but for" the infringement, he would have made

20  additional profits. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989).

21  For example, "[in a] two-supplier market, it is reasonable to assume, provided the patent owner

22  has the manufacturing and marketing capabilities, that it would have made the infringer's sales."

23  *Id.* at 1578. *See also Sheldon*, 309 U.S. at 402 (finding patent infringement cases instructive in

24  apportionment of profits in copyright cases).

25      Given that the market-share approach is an accepted methodology, Dr. Chevalier's

26  methodology is not improper. Moreover, the assumptions she made before proceeding with her

27  market share analysis – one of which is that Arista would have sold to "[v]ery few customers"

28  without its Cisco-like CLI – is not without some support. Chevalier Mot. 6; Chevalier Mot. Ex. C

("Sadana Dep.") 108:17-21. If the supporting evidence is weak or if Dr. Chevalier's inference is erroneous, Arista is free to cross-examine her. *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003) ("Once the patentee establishes the reasonableness of this inference, the burden shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits.").

The Court is also not persuaded that Dr. Chevalier's opinion on "Scenario 3" is solely for the purpose of presenting a factual narrative, like the precluded expert opinions in *Highland Capital* and *Rezulin*. The expert in *Highland Capital* was to opine on whether the conduct of certain individuals constituted a criminal violation of securities law. 379 F. Supp. 2d at 465, 469. The expert provided a narrative solely to marshal facts in support of the plaintiff's theories without applying any of his expertise. *Id.* at 469. Similarly, the court in *Rezulin* excluded an expert's opinion relating to the regulatory events of a drug in a product liability case because the expert was merely acting as a "historian" of facts better presented through percipient witnesses and documentary evidence. *Rezulin*, 309 F. Supp. 2d at 551. Unlike those experts, Dr. Chevalier is not recounting historical events or narrating facts, but has applied her expertise in a market share analysis based on assumptions she made from certain deposition testimony. Accordingly, Arista's motion to exclude Dr. Chevalier's "Scenario 3" is DENIED.

## IV.  ORDER

For the foregoing reasons, Cisco and Arista's *Daubert* motions are both GRANTED in PART and DENIED IN PART.

1.  Cisco's motions to exclude expert testimony are GRANTED with respect to:

    a.  Dr. Black's opinions on *de facto* industry standard, except to his underlying analysis;

    b.  Dr. Seifert's opinions on *de facto* industry standard;

    c.  Dr. Seifert's opinions on "market effects," except to his opinions on the chart published by Crehan Research Inc.

    d.  Opinions of Dr. Black and Ms. Elsten on third-party beliefs and corporate

1    intent.

2    2.    The Court defers Cisco's motion as to Dr. Clark's opinions.

3    3.    Cisco's motions are DENIED as to the remainder.

4    4.    Arista's motions to exclude expert testimony are GRANTED with respect to:

5        a.  Dr. Almeroth's opinions on source code copying of the parser and source code

6            copying relating to "help descriptions;"

7        b.  Dr. Almeroth's opinions on the CLI "look and feel" based on features that are

8            not command expressions, command outputs, hierarchies, modes, prompts, or

9            help descriptions screens; and

10       c.  Opinions of Dr. Almeroth on third-party beliefs and corporate intents.

11   5.    Arista's motions are DENIED as to the remainder.

Dated: October 11, 2016

BETH LABSON FREEMAN
United States District Judge