# EXHIBIT 1



# Expert Report of Brooks L. Hilliard CMC® CCP

## Business Automation Associates, Inc.
## Phoenix, Arizona

In the matter of:

## Fair Isaac Corporation

v.

## Federal Insurance Company and Ace American Insurance Company

### Case No. 16-CV-1054 (WMW/DTS)

United States District Court
District of Minnesota

### CONFIDENTIAL – ATTORNEY'S EYES ONLY

May 31, 2019

Business Automation Associates, Inc.
11811 North Tatum Boulevard; Suite 3031; Phoenix, Arizona  85028-1632
Office: (602) 264-9263     On the web: http://www.ComputerExpertWitness.com     FAX: (602) 532-7244



## I. INTRODUCTION

This report contains a true and accurate statement of my opinions, including explanations of the factors that support them, reached based on my personal analysis of the evidence in Fair Isaac Corporation ("FICO") v. Federal Insurance Company ("Federal") and Ace American Insurance Company ("Ace American"), a litigation relating to the licensing of FICO's Blaze Advisor software ("Blaze Advisor") by Chubb & Son ("Chubb & Son"), a division of Federal. I affirm I am independent of the parties to this matter and their legal advisors.

I was engaged by Merchant & Gould PC on behalf of FICO, and asked to review and respond to the reports prepared by Federal/Ace American's experts, Dr. Steven Kursh and Mr. William McCarter, both dated May 17, 2019 (the "Kursh Report" and the "McCarter Report").

If called to testify, I anticipate that my testimony will concern the matters addressed in this report. I note that the Kursh Report states, if this matter goes to trial, Dr. Kursh plans to use one or more exhibits or computerized presentations summarizing or supporting the opinions made in his report. He explained that any computerized presentation may include materials taken directly from his report, and that he may also use the materials on which he relied in generating his report and other materials related to this matter as exhibits at trial. I will likely use similar materials if this case proceeds to trial.

I plan to consider any additional information that may become available in this proceeding following the submission of this report and will modify or supplement my analysis and opinions accordingly.

This report is organized into eight parts: (1) A review of my expertise and qualifications, (2) A statement of my opinions, (3) The methods I used to reach my opinions, (4) A detailed explanation of the support for each opinion, (5) Publications, (6) Prior Testimony, (7) Compensation, and (8) Concluding notes.

## II. CONSULTING BACKGROUND

In my consulting practice over the past 37 years, my firm, Business Automation,

Some opinions expressed in Federal's experts' reports either (a) include the expert's interpretation of the meaning of various provisions of the 2006 Software License and Maintenance Agreement ("License Agreement") at issue in this case, or (b) rely on an implicit assumption the expert report makes regarding how a particular license provision should be interpreted.  It is my understanding that contractual interpretation is normally a legal matter rather than an Information Technology or business matter.  The explanations of my opinions in this report focus on business and industry factors that can assist the Court or the finder of fact to understand any terms of art and/or the business context that licensors and licensees would normally use to determine what rights, obligations and/or restrictions are embodied by the provisions of the License Agreement.

### IV.  SUMMARY OF OPINIONS

*Opinion #1:  The licensing limitations in the License Agreement are comparable to limitations customarily found in the license agreements of other commercial software providers.  FICO applied these limitations in a manner that is consistent with the normal customs and practices of the commercial software industry.*

*Opinion #2:  FICO had good and sufficient reasons, consistent with the normal customs and practices of the commercial software industry, for conditioning its consent to the continued use of its Blaze Advisor software on Federal's willingness to accept a negotiated increase in the license price.*

*Opinion #3:  Dr. Kursh's contention that FICO's pricing and discounting practices are inconsistent with the customs and practices of the commercial software industry is unsupported and incorrect.*

*Opinion #4:  The terms "commercially reasonable" and "commercially unreasonable" used throughout the Kursh Report are so vague and undefined that judgments based on them are not supportable.*

*Opinion #5:  Mr. McCarter fails to support his contention that Blaze Advisor has minimal value to Federal because it is "industry agnostic", easily replaceable and only one of many technologies that*

> ***Federal employs to operate its insurance business. The evidence shows that FICO's Blaze Advisor provided critical capability, contributing to Federal's revenue that Chubb & Son had not developed internally.***

## V.  BASIS FOR OPINIONS

In addition, because I have been professionally involved in analyzing, drafting and/or negotiating several hundred software licenses in my consulting and expert witness engagements, the explanation of my opinions below also addresses whether particular license provisions, and the wording used to express them, are common and consistent with the provisions customarily found in licenses for other comparable business software.

The paragraphs that follow address each of my opinions stated above and explain the support for each of them.  In the instances where this support relies on the contract interpretation and/or contract enforceability issues described above, I have referenced them in the text.

*Opinion #1:  **The licensing limitations in the License Agreement are comparable to limitations customarily found in the license agreements of other commercial software providers.  FICO applied these limitations in a manner that is consistent with the normal customs and practices of the commercial software industry.***

There are three areas where Dr. Kursh criticizes FICO's actions relating to the terms and conditions of the License Agreement:

1. **License Scope**:  Dr. Kursh's initial opinion states that it was commercially unreasonable for FICO to claim Federal breached the License Agreement by installing the Blaze Advisor software outside the United States.  Dr. Kursh's opinion states that FICO's resulting demand that Federal pay higher license fees to cure that breach was also commercially unreasonable, relying on a nonstandard interpretation of the License Agreement, specifically his assertion that Section 2 of the License Agreement allows Federal to install

> ***Blaze Advisor provided critical capability, contributing to Federal's revenue that Chubb & Son had not developed internally.***

The McCarter Report uses several explanations to try to minimize Blaze Advisor's value to Federal, but his own reasons undercut his conclusions. I disagree with these opinions for the following reasons.

Mr. McCarter acknowledges there are ten software applications that deploy Blaze Advisor, and "leverage" its functionality.[81] This total of ten applications understates Federal's own application count of 15. These 15 applications were disclosed in a report attached to an e-mail sent to FICO by Ms. T. Pawloski, Federal's VP of Software Compliance and Optimization, Global Vendor Services Organization on February 25, 2016. McCarter does not explain this discrepancy).[82]

### A. Blaze Advisor is integrated into "core" Federal applications

Mr. McCarter contends that Blaze Advisor is not a core technology:[83]

> Federal has only automated a small amount of the business rules and decisions that take place every day to conduct business. Blaze plays a small role in the business processing ecosystem at Federal.

However, the McCarter Report notes that Blaze Advisor is "integrated with core insurance applications that have … insurance functionality [needed] for selling and servicing insurance policies."[84] The phrase "integrated with core … applications" has special meaning to information technology professionals due to its use of the business computing terms of art, "integrated" and "core":

- "Integrated" normally means that a component application (Blaze Advisor in this case) is linked into a host application (here, an insurance application) in in a way that, *in the ideal*, would allow information to pass between them as if they were a single unified application. Depending on how "seamless" (*i.e.*, how close to the ideal) the integration is, this typically means that removal or

---

[81] McCarter Report, paragraph 85 on pages 24.

[82] FICO00001358–1359.

[83] McCarter Report, *op. cit.*, paragraph 74 on page 9.

[84] *Id.*, paragraph 91 on page 24.

- replacement of an integrated component is likely to be difficult, time consuming and to risk endangering the operation of the host application.
- "Core application" normally means that the functions that the application performs are critical to the business because they perform irreplaceable business functions that could cause significant business problems if they failed.

When application developers design and build a new "core" application it would be the normal custom and practice of the commercial software industry to avoid integrating externally developed components (like Blaze Advisor) whenever possible to avoid introducing externally uncontrolled risk factors that could affect the "core" application functionality. The fact that Chubb & Son chose to integrate Blaze Advisor into several of its core insurance applications is evidence that, contrary to McCarter's assertions, it has significant business value.

### B. Whether Blaze Advisor is "industry agnostic" does not determine how much value it contributes to Federal's business

Mr. McCarter contends that Blaze Advisor has little value to Federal because it is "industry agnostic". For example, the McCarter Report states:

- Blaze Advisor is "industry agnostic",[85] meaning its inherent capabilities are potentially usable in multiple industries and are not specifically focused to optimize its operation for any one industry.
- As delivered, Blaze Advisor[86] (a) includes no insurance-specific rules or capabilities that operate on their own, (b) cannot leverage FICO's insurance expertise because FICO is not in the insurance industry, and (c) requires a substantial implementation effort by knowledgeable Chubb & Son personnel (with significant and costly assistance from FICO) to know what rules to put into it, how to put those rules in, and how to test the rules to make sure they function properly. In addition, Blaze Advisor requires licensees like Chubb & Son to spend significant time and effort entering the rules and testing their operation.

---

[85] McCarter Report, paragraphs 26, 70 and 157 on pages 9, 20 and 42.

[86] *Id.*, paragraphs 21–22, 24, 26, 71–75 and 91 on pages 8, 8-9, 9, 20-21 and 24.

**Business Automation Associates, Inc.**
11811 North Tatum Boulevard; Suite 3031-113; Phoenix, Arizona  85028-1632
Office: (602) 264-9263      On the web: http://www.ComputerExpertWitness.com      FAX: (602) 532-7244

issues discussed in this report. I therefore reserve the right to supplement or update this report, and the opinions and the bases for them stated herein (as well as, potentially, adding new opinions if appropriate), if such further information becomes available.

CMC

Certified Computing Professional

Brooks Hilliard is one of fewer that 15 consultants in the world to have achieved both the Certified Management Consultant (CMC) and Certified Computing Professional (CCP) designations, the only internationally recognized certifications in each field.

To achieve this distinction, Mr. Hilliard has undergone peer reviews, client audits, competency tests and oral interviews; he has complied with continuing education requirements and has pledged to uphold the Codes of Ethics for both organizations.

Signed:

Brooks L. Hilliard CMC® CCP
President
Business Automation Associates, Inc.