# EXHIBIT 1 - REDACTED

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS   Doc. 983-1   Filed 01/13/23   Page 2 of 19

```
 1                  UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MINNESOTA

 3
     -----------------------------------------------------------
 4   FAIR ISAAC CORPORATION, )
                             )
 5            Plaintiff(s),)
                             )
 6       vs.                 ) File No. 16-cv-1054(WME/DTS)
                             )
 7   FEDERAL INSURANCE       )
     COMPANY,                )
 8   and ACE AMERICAN        )
     INSURANCE COMPANY,      )
 9                           )
              Defendant(s).)
10   -----------------------------------------------------------

11

12

13                           CONFIDENTIAL

14                       ATTORNEYS' EYES ONLY

15

16                            DEPOSITION

17        The following is the videotaped deposition of

18   THOMAS CARRETTA, taken before Julie A. Brooks, Notary

19   Public, Registered Professional Reporter, pursuant to

20   Notice of Taking Deposition, at Fredrikson & Byron,

21   4000 US Bank Plaza, 200 South Sixth Street,

22   Minneapolis, Minnesota, commencing at 9:09 a.m.,

23   Tuesday, October 9, 2018.

24

25
```

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 983-1   Filed 01/13/23   Page 3 of 19

## Page 29

1  Q. How do you spell his last name?
2  A. H-u-y-a-r-d.
3  Q. Okay. What about fo ks that might be
4  closer to the relationship than the EVP of sales?
5  A. It changes. So today, you would have a
6  person that's generally responsible for insurance, and
7  they may be a vice president or senior director. It
8  kind of depends. But I haven't dealt in that
9  particular market, because I work primarily with banks.
10 So somebody on my team would be more familiar with who
11 runs that. I, actually, don't remember who is in
12 charge of that segment right now.
13  Q. Let's talk specifically about Chubb.
14 When was your first involvement with anything relating
15 to the Chubb relationship with FICO?
16  MS. KLIEBENSTEIN: Objection. Vague as
17 to "Chubb." Which corporate entity are you referring
18 to?
19 BY MS. JANUS:
20  Q. Do you have -- I mean, I guess, I'd just
21 like to know the answer to that question, unless it is
22 confusing to you.
23  A. Chubb is a big entity that went through
24 a merger, so I don't know who Chubb is. The people
25 that I'm familiar with are Chubb & Son, and that's --

## Page 30

1  that's who our client is, a division of Federal.
2  Q. And you would refer to them as -- FICO
3  referred to them as Chubb, correct?
4  MS. KLIEBENSTEIN: Objection. Calls for
5  speculation. He's here on his individual capacity, not
6  to testify for FICO.
7  THE WITNESS: I don't know what they
8  call them.
9  BY MS. JANUS:
10  Q. How did you refer to them when you were
11 dealing with issues relating to Chubb within FICO?
12  MS. KLIEBENSTEIN: Objection.
13 Foundation.
14  MS. JANUS: There's no foundation
15 objection there.
16 BY MS. JANUS:
17  Q. But go ahead.
18  A. I didn't deal with Chubb & Son in the
19 past. I mean, I didn't work on that agreement. But
20 I'm familiar with them, from later involvement, as
21 Chubb & Son.
22  Q. Okay. So back to my question. What was
23 your first involvement in any way with FICO's
24 relationship with Chubb?
25  MS. KLIEBENSTEIN: Just so the record is

## Page 31

1  clear, when we say "Chubb," are we referring to Chubb &
2  Son?
3  BY MS. JANUS:
4  Q. I'm asking the question, so if there's
5  confusion about it, explain to me what your confusion
6  is. Is there some ambiguity about -- about whether you
7  dealt with Chubb at different times based on which
8  legal entity it was?
9  A. Yes.
10  Q. Okay. So explain that to me.
11  A. So our license agreement was with Chubb
12 & Son, and that's part of -- it is a division of
13 Federal Insurance.
14  And at a later time, I became aware that
15 there was a Chubb Limited, a Chubb Corporation,
16 multiple entities under the umbrella of the
17 organization that was the Chubb company, for lack of a
18 better word, which is the mothership, if you will. I
19 became aware of that because of the merger agreement.
20  So there's a great deal of confusion
21 because of the commonality of using "Chubb" as a
22 shortcut name for the companies, but there's multiple
23 companies.
24  Q. How does that change the answer to my
25 question? I don't understand how that creates

## Page 32

1  confusion in terms of my question, which is, when is
2  the first time you dealt with Chubb and its
3  relationship with FICO?
4  A. It would have been in connection with
5  Chubb & Son, in a review of that license agreement.
6  Q. And when did that take place?
7  A. It would have been after the salesperson
8  and his boss came to me and said, we've been advised
9  that they're going to be undergoing a merger. There
10 was an announcement, and then they followed up on it.
11  Q. Do you recall the names of the FICO
12 employees you were dealing with?
13  A. Yes.
14  Q. Who were they?
15  A. Mike Sawyer and Russ Schreiber.
16  Q. So Mike Sawyer and Russ Schreiber
17 approached you relating to a merger that was to take
18 place that involved Chubb?
19  A. Yes.
20  Q. Do you recall when that occurred?
21  A. It was after the parent corporation of
22 Chubb & Son announced that they were merging with a
23 Swiss company.
24  Q. Do you recall when that was?
25  A. It was in 2015 sometime, I believe.

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.

CASE 0:16-cv-01054-DTS   Doc. 983-1   Filed 01/13/23   Page 4 of 19

**Page 33**

1  Q. Okay. I take it, you don't recall a
2  date; is that --
3  A. Not particularly, no.
4  Q. Do you recall a month?
5  A. I think it was August.
6  Q. So --
7  A. But it may have been later.
8  Q. Understood. But just so we can sort of
9  start to put a timeline together. So -- and some of
10 this may become clear when we get your privilege log,
11 to the extent you emailed about it. But we don't have
12 that at this point.
13    So you are thinking, August of 2015, you
14 were approached by Mike Sawyer and Russ Schre ber about
15 the issue of the Chubb and ACE merger?
16 A. Yes.
17 Q. And do you recall whether that was a
18 phone call or a meeting or an email or all of the
19 above?
20 A. No. I'm pretty sure it was a phone
21 call.
22 Q. A phone call. Was that your first
23 interaction in any substantive way with FICO's license
24 of software to Chubb?
25 A. Yes.

**Page 34**

1  Q. You were not involved in the original
2  negotiation of the license agreement in June of 2006?
3  A. No.
4  Q. Do you know who handled that
5  negotiation?
6  A. I recall it was Jandeen Boone.
7  Q. Was she someone you supervised?
8  A. Not directly.
9  Q. What do you mean by that?
10 A. We have an org chart, like most
11 companies, where I manage X, and then they managed Y.
12 Q. Oh, I see. So she was one --
13 A. Layer down.
14 Q. One layer down?
15 A. Yeah.
16 Q. And would you have reviewed the license
17 in connection with her negotiation of it back in
18 2006?
19 A. No.
20 Q. Is she still employed at FICO?
21 A. No.
22 Q. Do you know where she is employed?
23 A. I think, Ecolab.
24 Q. Locally?
25 A. I think so.

**Page 35**

1  Q. And in some sort of counsel role?
2  A. She's a lawyer, so I assume that's the
3  case. I don't know what she does over there.
4  Q. When did she leave FICO?
5  A. I don't know. It was quite a number of
6  years ago.
7  Q. Prior to August of 2015, do you know
8  whether legal was consulted in any way relating to the
9  Chubb license agreement?
10 A. No, I'm not aware of anything.
11 Q. Would you know if legal had been
12 consulted?
13 A. Not necessarily, because I don't review
14 every LR. We have, literally, hundreds of those per
15 quarter.
16 Q. And the LRs are the requests for --
17 A. Legal requests.
18 Q. Legal requests. Do you keep records of
19 legal requests that come in?
20 A. Yes.
21 Q. And are those searchable?
22 A. I think it is a matter of timing. So as
23 I mentioned, it was a manual process back in that time
24 frame of 2006, so I don't believe they're searchable
25 that way. Today, they're in a system, so they are

**Page 36**

1  searchable.
2     But we do keep track of all of our
3  contracts using that legal request number. So manual
4  system, then a contract repository, which is
5  identifying contracts by legal request number, and then
6  a processing system, which is the one where we talked
7  about they get the legal request ask and then they
8  process it and it ends up getting signed and going
9  through contract administration.
10 Q. So if you wanted to determine whether
11 there had been any requests for legal review or legal
12 requests, I should say, relating to the Chubb license,
13 how would you search for that?
14 A. The way I would search for it is I would
15 go into the contract repository and enter in the legal
16 request number.
17 Q. But what if you didn't know if there was
18 a legal request number?
19 A. Then I wouldn't be able to search for it
20 that way.
21 Q. So my question for you is: If I don't
22 know if there's been a legal request relating to the
23 Chubb license and I want to find out, five years ago,
24 did someone make a legal request for an analysis of the
25 scope of this license, how would I search for whether

Thomas Carretta — CONFIDENTIAL — ATTORNEYS' EYES ONLY — 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 983-1   Filed 01/13/23   Page 5 of 19

### Page 45

1  agreement.
2  Q. How did Chubb & Son violate the license
3  agreement?
4  MS. KLIEBENSTEIN: That's a tricky
5  question. I'll put an objection on attorney-client
6  work product.
7  If you think you can answer that, go
8  ahead, without violating those privileges.
9  THE WITNESS: ACE bought the Chubb
10 Corporation, or whatever the mothership of all Chubbs
11 are, and that transaction implicated the contract.
12 BY MS. JANUS:
13 Q. What specifically are you referring to
14 by "implicated the contract"?
15 A. It was a change of entity.
16 Q. How did it implicate the contract?
17 A. We licensed Chubb & Son.
18 Q. Yeah.
19 A. The company was purchased by another
20 entity as part of an overall merger. And there's
21 clauses in the agreement, throughout the agreement,
22 that provide for FICO's protection that, we believe --
23 or I believe were being violated.
24 Q. Okay. Anything else?
25 A. That's what's stated in the Complaint.

### Page 46

1  Q. I'm just asking for your understanding
2  of how Chubb violated the license agreement. You said
3  that the acquisition by ACE --
4  A. Right.
5  MS. KLIEBENSTEIN: Objection. Wait for
6  a question.
7  BY MS. JANUS:
8  Q. That was a question. Is there anything
9  other than the acquisition of ACE?
10 A. At the time that I was involved, I was
11 aware of the merger implicating the contract.
12 Q. Okay. Any other violations of the
13 license agreement that you're aware of?
14 MS. KLIEBENSTEIN: Objection. Asked and
15 answered.
16 THE WITNESS: Those that are stated in
17 the Complaint.
18 BY MS. JANUS:
19 Q. Okay. But I'm asking --
20 A. I read the Complaint and agree with
21 it.
22 Q. What's that?
23 A. I read the Complaint and agree with
24 it.
25 Q. Right. And I'm asking for your

### Page 47

1  testimony. So tell me what the violations of the
2  license agreement are.
3  MS. KLIEBENSTEIN: Objection. Asked and
4  answered.
5  THE WITNESS: We became aware that --
6  through fact discovery, that there were other issues
7  that had come up that we were unaware of, at least I
8  was unaware of.
9  BY MS. JANUS:
10 Q. What were those?
11 A. That the software was being used outside
12 the scope of the license.
13 Q. In what way?
14 A. The agreement has multiple terms and
15 conditions, and so there were various elements that
16 violated the agreement, as far as I was concerned.
17 Q. How was the software being used outside
18 the scope of the license?
19 MS. KLIEBENSTEIN: Vague as to scope.
20 THE WITNESS: So the entire agreement is
21 the entire agreement, and it says you can do this or
22 you can't do that. And there were elements that
23 appeared to me, facially, that Chubb & Son was doing
24 things with the software that they weren't supposed to
25 be doing.

### Page 48

1  BY MS. JANUS:
2  Q. I'm asking -- go ahead. Sorry. I
3  didn't mean to cut you off.
4  A. So I became aware that they were making
5  inquiries for use of the software from outside of the
6  United States, and that led to more inquiries.
7  Q. Okay.
8  A. And I concluded that they had installed
9  the software outside of the United States. They were
10 definitely using it outside of the United States.
11 That's just one aspect of it.
12 The other is the assignment clause that
13 we talked about and other licensing terms within the
14 agreement that constrained what Chubb & Son could do.
15 Q. So they installed the license and were
16 using it outside of the United States. That was a
17 violation of the license agreement, in your view?
18 A. Yes.
19 Q. Okay. The ACE transaction was a
20 violation of the license agreement?
21 A. You are going to have to reask that.
22 ACE alone buying the Chubb conglomerate is not a
23 violation in and of itself.
24 Q. Okay.
25 A. The violation was that the agreement had

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 983-1   Filed 01/13/23   Page 6 of 19

## Page 49

1  had constrictions against what they could do with the
2  software in the event of a merger.
3      Q.  Okay.  So what was the violation?
4      A.  That they continued to use the software
5  without our consent, as one example.
6      Q.  Okay.  So could they have merged with
7  ACE and continued to use the software as they had been
8  using it without any change without FICO's consent?
9      MS. KLIEBENSTEIN:  Objection.  Calls for
10 speculation.
11     THE WITNESS:  The contract says what the
12 contract says.  In the event of a merger, you have to
13 get our consent.
14 BY MS. JANUS:
15     Q.  Okay.  So any situation involving a
16 merger, your view is the contract requires FICO's
17 consent?
18     MS. KLIEBENSTEIN:  Objection.  Vague,
19 calls for speculation.
20     THE WITNESS:  Are you talking about any
21 circumstance, or are you talking Chubb & Son?
22 BY MS. JANUS:
23     Q.  Chubb & Son.
24     A.  For Chubb & Son --
25     MS. KLIEBENSTEIN:  Same objection.

## Page 50

1      THE WITNESS:  It says, in the event of a
2  merger, it is a deemed assignment, and you need our
3  consent.
4  BY MS. JANUS:
5      Q.  We'll look at the license.  But I'm just
6  trying to understand what you believe the violations of
7  the license were, as the person who was dealing with
8  this issue at the time.
9      Okay.  So you identified the continued
10 use of software without FICO's consent in light of the
11 ACE transaction as a violation.  Just trying to get
12 them straight here.  Correct?
13     A.  There was a public merger.
14     Q.  Yes.
15     A.  It implicated the contract.  The
16 contract has a clause, an anti-assignment clause.  And,
17 as a result, we went through the process of, you know,
18 notifying Chubb & Son that there was a problem, that
19 they needed our consent.
20     Q.  Then you identified the fact that the
21 software was installed and used outside of the United
22 States as a violation, correct?
23     A.  Found that out after the fact, yes.
24     Q.  You found it out after the fact?
25     A.  I can't say I directly did.

## Page 51

1      Q.  Okay.  And when you say "after the
2  fact," what fact are you referring to?
3      A.  Well, because there was a very obvious
4  self-evidencing event, this public merger, that
5  triggered a thought process of, well, okay, what
6  else -- what exactly has Chubb & Son been up to?  What
7  can we find out?
8      So I made inquiries of the counsel at
9  the Chubb conglomerate to say, we're aware of this, we
10 need to talk.
11     And then it was brought to my attention
12 that there were inquiries in our maintenance system,
13 tickets logged --
14     Q.  Okay.
15     A.  -- from outside the United States, from
16 entities that we weren't aware of.
17     Q.  And when you say "we," who are you
18 referring to?
19     A.  FICO.
20     Q.  Okay.  Did you come to learn that, in
21 fact, FICO was aware of Chubb's use of the software
22 outside of the United States?
23     MS. KLIEBENSTEIN:  Objection.  Vague as
24 to time and work product.
25     THE WITNESS:  I became aware that they

## Page 52

1  had made maintenance inquiries from outside the United
2  States.
3  BY MS. JANUS:
4      Q.  And you said, we weren't aware of that.
5      And I said, who is we?
6      And you said, FICO.
7      A.  I should -- that's right.  Because those
8  systems are automated, so anybody can log a ticket.
9  And, you know, there's thousands of employees at FICO.
10     So I didn't see that myself, but I
11 became aware of it because the organization,
12 maintenance organization, told me, oh, yes, there's
13 inquiries, here they are.
14     Q.  All right.  Any other violations of the
15 license agreement?
16     A.  Well, like I said, the entire agreement
17 is a bundle of rights and obligations, one related to
18 the other.  So having that merger and anti-assignment
19 clause implicates other clauses within the agreement,
20 as well.
21     So in my view, there were multiple
22 violations of that agreement, based upon the activities
23 that I understood Chubb & Son had undertaken, both
24 because Chubb told us that and because of what we
25 learned.

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 983-1 Filed 01/13/23 Page 7 of 19

**Page 57**

is attached to here as this exhibit.

And then the third document is Amendment Two to that same software license agreement, services agreement.

Q. Okay. And generally, the Software License and Maintenance Agreement was entered into first, correct, in June of 2006?

A. Right. June 30, 2006, is the date of the Software License and Maintenance Agreement.

Q. Okay. And then Amendment One followed in August of 2006?

A. This one is dated August 1st, 2006.

Q. Then Amendment --

A. Amendment One, excuse me.

Q. Amendment Two followed in December of 2006, correct?

A. It is dated December 28th, 2006.

Q. Again, you weren't involved in actually negotiating or drafting these documents?

A. No, I wasn't.

Q. One of your colleagues at the time was?

A. That is correct.

Q. You mentioned that you learned, at some point, that software was being used outside of the

**Page 58**

scope of the license; is that correct?

A. Yes.

Q. Point us to what in the contract you are relying on for that position.

A. Is the question about when I thought about it, or is the question what I think is violated? I don't understand the question.

Q. What you think is violated.

A. Okay. So the Software License and Maintenance Agreement and the two amendments are one understanding of the parties. And as I've said before, all of these terms and conditions work in tandem with each other so that there are clauses that talk about license restrictions, deemed assignments, confidential information, and so on.

And I believe that they violated the agreement because of the activities that they undertook at Chubb & Son and that I can look to this agreement and say, well, one of the elements of it is the territory is the installation and physical location of the software.

My understanding is it is not located -- Chubb & Son has been using it outside the United States, as well as inside the United States.

Q. So let's start with that.

**Page 59**

A. Okay.

Q. And then we can continue on with other aspects that you'd like to -- that you'd like to point out.

MS. KLIEBENSTEIN: Were you done with your answer?

THE WITNESS: I am done.

BY MS. JANUS:

Q. So you referenced the territory, correct?

A. Yes.

Q. Okay. And that is on the first page, page 1 of 16, of the Software License and Maintenance Agreement. How is it that -- so how is it that you read the territory to prohibit use of the software outside of the United States?

A. Because Article 2 says, Subject to the terms, conditions, and limitations of the Agreement, Fair Isaac grants. One of the terms is the "Territory," which it specifically says, "Territory" means with respect to the installation and physical location of the Fair Isaac products.

Q. It means the United States of America?

A. It means the United States of America.

Q. You are looking at paragraph 2.1 to

**Page 60**

determine what the scope of the grant is for use, correct?

A. In part.

Q. And that's -- the license grant to Fair Isaac products, that's a very typical term in FICO's software license agreements, correct?

MS. KLIEBENSTEIN: Objection. Speculation.

THE WITNESS: I don't know what the question is. Are you saying there's a license grant, typically, in our license agreements?

BY MS. JANUS:

Q. Correct, that is my question.

A. There are typical license grants in license agreements.

Q. Pretty key term of a license agreement, right?

A. It is one of the terms.

Q. Yes. And it is the granting language of the license, correct?

A. Not exclusively.

Q. Okay. But it is one place that you look to to see what license is being granted in this agreement, correct?

A. Right, it is one of the components of

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 983-1   Filed 01/13/23   Page 8 of 19

**Page 61**

1  the entire agreement; that is right.
2     Q. Yeah. So 2.1 is that license grant in
3  the Chubb Software License and Maintenance Agreement,
4  correct?
5     A. It is captioned the "License Grant," but
6  as I indicated, there's a lot of other terms that
7  constrain or allow a client to do certain things in
8  this agreement.
9     Q. Okay. So let's stick with 2.1 at first.
10 That's the first one you pointed to.
11    A. Sure.
12    Q. You said, well, territory is in the
13 definition section, and it says "with respect to the
14 installation and physical location of the Fair Isaac
15 Products, means the United States of America."
16       And then you said, yes, and paragraph
17 2.1 says, "Subject to the terms, conditions and
18 limitations of this Agreement, Fair Isaac hereby grants
19 to Client a perpetual (subject to the provisions of
20 Article 9), non-exclusive, non-transferable, limited
21 license to use the Fair Isaac products during the Term
22 for its internal business purposes, subject to the
23 additional limitations set forth below and/or listed in
24 Exhibit A," correct?
25       MS. KLIEBENSTEIN: Objection.

**Page 62**

1  Mischaracterizes the testimony.
2        THE WITNESS: I mean, you read the
3  clause.
4  BY MS. JANUS:
5     Q. Okay. But I just want to make sure,
6  because of that objection. I didn't understand the
7  objection. But I said, what are you looking at when
8  you tell me that use outside of the United States is in
9  violation of the agreement?
10       And you said you are looking at
11 territory, the definition of "Territory," and then you
12 are looking at that language in 2.1 that said "subject
13 to the terms, conditions and limitations of this
14 Agreement," et cetera.
15       MS. KLIEBENSTEIN: Objection. Asked and
16 answered.
17       THE WITNESS: That's part of what I look
18 at.
19 BY MS. JANUS:
20    Q. Okay. What else do you look at?
21    A. The balance of the agreement.
22    Q. What other provisions of the agreement
23 do you look at?
24    A. So for instance, the license
25 restrictions clause, 3.1, and the reservations of

**Page 63**

1  rights clause, as two more examples.
2     Q. Okay. License restrictions. What in
3  the license restrictions clause limits Chubb's use of
4  the software to the United States?
5     A. Well, it says that the client, which is
6  Chubb & Son, reps and warrants that it and its
7  employees shall not use the Fair Isaac products or
8  documentation for any other internal business ops or in
9  any other manner that exceeds the scope of the license
10 granted.
11       So by defining the territory, you've
12 invoked that clause, (i), 3.1, as an example.
13    Q. So the language "that exceeds the scope
14 of any license granted"?
15    A. Yes, that whole section that I just
16 read.
17    Q. Okay.
18    A. Paraphrased.
19    Q. Anything else in 3.1?
20    A. (IV) disclose the Fair Isaac Products to
21 permit the use or access by any third party or any
22 other individuals, other than employees of Chubb &
23 Son.
24    Q. And that, in your view, prohibits use
25 out of the United States?

**Page 64**

1     A. It works in tandem with it. So this is
2  an absolute prescription that you don't permit anybody
3  other than Chubb & Son's employees to use it.
4        So I don't know where Chubb & Son's employees
5  are. But in tandem with the territorial limitation, it
6  would be only those employees in the United States,
7  would be my view. It, certainly, wouldn't include
8  third parties outside --
9     Q. Sure.
10    A. -- whether they're in the States or
11 not.
12    Q. I'm asking about the use outside of the
13 United States right now.
14    A. Okay. Yeah, no third parties or other
15 individuals, other than employees of client, can use it
16 outside of the United States. They can't use it at
17 all.
18    Q. That's not what this says, though?
19    A. It says what it says.
20    Q. This just says -- right. I'm asking
21 you, as legal counsel for FICO, what provisions of this
22 agreement you look to when you say that use outside of
23 the United States was a violation of this agreement.
24    A. Well, I've already answered, first,
25 generally, that the entire agreement must be looked at

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 983-1   Filed 01/13/23   Page 9 of 19

### Page 109

    A.  I'm sure I can find other reasons for
it, such as 3.6, where it says no use by third parties,
except this particular group that was providing some
sort of support to Chubb & Son.
    Q.  But assuming that we're not talking
about third parties in -- outside the United States.
So I'm asking about use outside the United States that
is not use by a third party.
    A.  So Chubb & Son, like I said, is a line
of business, right.  It is not a legal entity.  So by
definition, then, it can only be used by Chubb & Son
for that line of business.  And where that line of
business is was, as I understand it, in the United
States.  So that's a further implication it wouldn't be
used outside the United States, notwithstanding the
fact it says territory.
    Q.  Where are you -- what are you basing
that testimony on?
    A.  The review of that merger agreement.
    Q.  Okay.  Anything else?
    A.  The fact that the agreement says a Chubb
& Son, a division of.
    Q.  Of Federal?
    A.  Of Federal Insurance Company.
    Q.  Okay.  Anything else?

### Page 110

    A.  Federal Insurance Company is an American
company.
    Q.  Does Federal Insurance Company have
affiliates outside of the United States?
    A.  That's -- that's a different question
than you asked earlier.  You asked if the line of
business has affiliates.
    Q.  I asked the question this time.
    A.  Okay.  I don't know who are all the
affiliates of Federal Insurance Company.
    Q.  Do you know whether Federal Insurance
Company had affiliates outside of the United States?
    A.  I don't recall.
    Q.  Okay.  All right.  Anything else
relating to territory?
    A.  Yeah.  You had mentioned that Chubb &
Son had affiliate rights under one of the amendments.
My view is that a non-entity can't have a legal
affiliate under the definitions.
    Q.  So that was a meaningless provision of
the agreement?
    A.  It was a very meaningful provision.
    Q.  In what way?
    A.  That whoever on the Chubb side decided
to think that it was differently (sic).  They thought

### Page 111

it was important.  It didn't impact us.
    Q.  What?  I didn't understand your answer.
What?
    A.  I had said Chubb & Son is a division.
It is a line of business.  It is not a legal entity.
    Q.  That's your testimony.  Yep, I
understand that.  And you have determined that based on
a review of public filings, supposedly.
    A.  And the fact that the contract says
that.
    Q.  Okay.
    A.  And having affiliates in there as
another entity might seem important to Chubb & Son.
From my perspective, there's no legal right to have an
affiliate, because of the definition of the affiliates.
That's what it says in the agreement.
    Q.  Okay.  Well, let's go there.  You're
looking at Amendment Two to the Software License and
Services Agreement, correct?
    A.  Yeah.  This is the one where they
elected to -- it is dated December 28th, 2006.
    Q.  Okay.  And what were you going to say?
Who elected to what?
    A.  Chubb & Son, division of Federal
Insurance Company.

### Page 112

    Q.  Elected to what?
    A.  Exercise this amendment, sign an
amendment.
    Q.  And what is the purpose of this
amendment?
    A.  They wanted to extend or expand the
license grant to an enterprisewide license, which is
defined.
    Q.  Okay.  What is the definition of
enterprisewide?
    A.  So it looks like I have to go back
earlier to find that definition.  I believe, it is on
page 1 of the original license agreement, June 30th, it
says an enterprisewide license.  Definition, if you
will, says, "If the 'Scope/Quantity' of the license for
any Fair Isaac Product is designated in Exhibit A as
'Enterprise-wide,' then Client may use such Fair Isaac
Product on an unlimited number of Seats or CPUs, as
applicable, providing, however, that such use is for
Client's use only and not for use by any of Client's
affiliated, subsidiary, or parent companies."
    Q.  What are CPUs?
    A.  Central processing units.
    Q.  So sort of, would we think of that like
a server, where people can access the software but not

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 983-1 Filed 01/13/23 Page 10 of 19

**Page 129**

1 don't know why Chubb decided that they wanted to
2 negotiate for that.
3 BY MS. JANUS:
4     Q. Did you -- do you think anyone at FICO
5 said to Chubb during the negotiation of the deal, well,
6 you're expanding the definition of affiliates, but
7 since you don't have any affiliates, in our view, that
8 isn't going to mean anything, you are not going to be
9 able to expand the use in any way through that
10 definition?
11     MS. KLIEBENSTEIN: Objection.
12 Foundation, speculation, hearsay.
13     THE WITNESS: I don't have any personal
14 knowledge of that.
15     MS. KLIEBENSTEIN: Counsel, when would
16 be a good time to break for lunch?
17     MS. JANUS: I'm okay to break now.
18     THE VIDEOGRAPHER: Going off the record.
19 The time is 12:10 p.m.
20     (Lunch recess.)
21     THE VIDEOGRAPHER: We're back on the
22 record. The time is 1:14 p.m.
23 BY MS. JANUS:
24     Q. Okay. Mr. Carretta, we're back from a
25 break. You understand you are still under oath?

**Page 130**

1     A. I do.
2     Q. Okay. Did you review any documents
3 during the break?
4     A. No.
5     Q. Turning back to the Chubb software
6 license agreement, which is a part of Deposition
7 Exhibit 80, let's turn to the issue of the merger with
8 ACE. You mentioned that one of the violations that you
9 believe exists with respect to the agreement was the
10 continued use of the software after that transaction,
11 correct?
12     A. Yes. I became aware of that and was
13 aware of the clause in the agreement.
14     Q. Okay. Let's turn to the clause you are
15 referring to. Which clause is it?
16     A. It is in both the Section 3 and in
17 Section 10, 10.8.
18     Q. So in Section 3, is it 3.1?
19     A. It is in 3.1, yes.
20     Q. Okay. And that is "Client represents
21 and warrants that it and its employees shall not," and
22 then (v)?
23     A. Yes. That's one part of it, yes.
24     Q. Okay. And so that says, shall not
25 "assign, sublicense, lease, transfer or distribute the

**Page 131**

1 Fair Isaac Products." Okay. And so what is your
2 understanding of what that provision means?
3     A. Section 3.1, (v), says that this offer
4 can't be -- the client warrants and represents that it
5 and its employees will not "assign, sublicense, lease,
6 transfer or distribute the Fair Isaac Products, or
7 operate any Fair Isaac Product for timesharing, rental,
8 outsourcing, or service bureau operations (or otherwise
9 for the benefit of any party other than Client), or
10 train persons other than permitted users."
11     Q. Okay. And then you also mentioned the
12 Section 10.8?
13     A. Yes.
14     Q. And this section is entitled "No
15 Assignment." Is this the section that you believe
16 applies to the use of the software after the merger of
17 ACE and Chubb?
18     MS. KLIEBENSTEIN: Objection. Vague.
19     THE WITNESS: This clause is operative
20 during the entire relationship.
21 BY MS. JANUS:
22     Q. Okay. Does it essentially apply to how
23 the software may or may not be used in connection with
24 the merger of Chubb and ACE?
25     A. I'm not sure what you mean by use. This

**Page 132**

1 is a prohibition without our consent of assignment.
2     Q. Okay. So let's go through this section.
3 It is titled "No Assignment." The first sentence
4 states, "Neither party shall, without the prior written
5 consent of the other party, assign or transfer this
6 Agreement or any part thereof," correct?
7     A. You read that sentence correctly, yes.
8     Q. So it appears, to me, that that first
9 sentence just applies to any sort of assignment or
10 transfer of the agreement; is that fair?
11     A. Well, yeah, it says "assign or
12 transfer."
13     Q. Right. It is not limited in terms of
14 what type of assignment or transfer it applies to,
15 correct?
16     A. I'm not sure I understand what you mean
17 by assign or transfer, what type. It just --
18     Q. You don't know what I mean?
19     A. No, I don't. I don't understand the
20 question.
21     Q. Is there a limitation in the first
22 sentence as to what type of assignment or transfer that
23 first sentence applies to?
24     A. Yeah. It says, "Neither party shall,
25 without the prior written consent of the other party,

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 983-1 Filed 01/13/23 Page 11 of 19

**Page 133**

1 assign or transfer this Agreement, or any part
2 thereof."
3     Q. The second sentence then says, "In the
4 event of a change of control of Client, or if Client is
5 merged with, acquired by, or acquires another entity,
6 or undergoes a reorganization or otherwise acquires the
7 right to process the business of another entity, each
8 such event shall be deemed to be an assignment subject
9 to the section, and Client shall make no expanded use
10 of the Fair Isaac Products as a result of any such
11 event, unless and until Fair Isaac provides such
12 written consent, which will not be unreasonably
13 withheld."
14     Did I read that correctly?
15     A. Yes, you read that correctly.
16     Q. So the second sentence applies
17 specifically to a situation involving a change of
18 control or merger, correct?
19     A. Or acquisition or other reorganization
20 or other rights to process the business of a third
21 party. There's multiple elements to this, to these
22 events, multiple elements here.
23     Q. But this second sentence applies
24 specifically to those change of control or
25 reorganization or merger events, correct?

**Page 134**

1     A. It says, in the event of a change of
2 control or if client engages in any of these others, it
3 shall be deemed an assignment, subject to this
4 section.
5     Q. Okay. So this second sentence is
6 addressing specifically that situation in which there
7 is a change of control or merger or one of these other
8 events. But for our purposes, we're talking really
9 about a change of control or merger, correct?
10     MS. KLIEBENSTEIN: Objection. Vague as
11 to purposes and mischaracterizes the document.
12     THE WITNESS: My answer would be it
13 could be any of these, because it can often be
14 characterized as one or the other.
15 BY MS. JANUS:
16     Q. Sure. This sentence applies
17 specifically to -- how would you characterize these,
18 the change of control, merged with, acquired by,
19 acquires another entity, or undergoes a reorganization
20 or otherwise acquires the right to process the business
21 of another entity? How would you characterize those
22 events in general terms, just so that we can refer to
23 them easily?
24     A. They're all a change in the business.
25 That's what I would call it. They're different types

**Page 135**

1 of events that could impact the business.
2     Q. Okay. So this second sentence applies
3 specifically to how to handle an assignment situation
4 where there's a change in the business event that's
5 enumerated there, correct?
6     MS. KLIEBENSTEIN: Objection.
7 Mischaracterizes the testimony and the document.
8     MS. JANUS: I wasn't characterizing any
9 testimony.
10     MS. KLIEBENSTEIN: Then mischaracterizes
11 the document.
12     THE WITNESS: So I think the way I would
13 answer this is that any of these events, each one of
14 them individually or if there's more than one, is
15 deemed to be an assignment, meaning the parties reached
16 an agreement that it is subject to this section.
17 BY MS. JANUS:
18     Q. Right. And so what I'm trying to get at
19 is that's what this second sentence is -- so the first
20 sentence is just ta king generally what either party --
21 that neither party can, without prior written consent,
22 assign or transfer the agreement.
23     The second sentence is a little more
24 specific, right? It is dealing specifically with what
25 takes place when you have one of these business changes

**Page 136**

1 that's enumerated in the second sentence. Is that
2 fair?
3     A. No.
4     MS. KLIEBENSTEIN: Objection.
5 Mischaracterizes the document.
6     THE WITNESS: No. I think what it is
7 saying is --
8     MS. JANUS: You know what, I'm sorry,
9 for one moment. I'm just asking the question, so
10 that's not a proper objection. I need to be able to
11 ask my question. I'm not characterizing the document.
12 All right. I'm asking in-house counsel for FICO, whose
13 job it is to analyze license agreements about a
14 provision in a license agreement.
15     Go ahead and answer.
16     MS. KLIEBENSTEIN: Right. But you are
17 not --
18     MS. JANUS: I'm asking a question.
19     MS. KLIEBENSTEIN: You are
20 characterizing.
21     MS. JANUS: What you are doing is
22 coaching your witness and coaching your witness by
23 alerting him that you don't like my question. It is
24 not a proper use of objections. Your objection is
25 improper. So please stop making those types of

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS  Doc. 983-1  Filed 01/13/23  Page 12 of 19

**Page 137**

1 objections. I'm entitled to ask my questions, and my
2 questions are fair.
3          MS. KLIEBENSTEIN: I disagree with that.
4 I think, when you are at trial and when you are in a
5 deposition, you have to fairly and accurately
6 characterize the document. Otherwise, the question --
7 the question isn't a fair question.
8          MS. JANUS: It is a fair question. I'm
9 asking the questions.
10          Go ahead.
11          THE WITNESS: Could you read back the
12 question, please?
13          (Record read as follows:
14          "Question: Right. And so what I'm
15     trying to get at is that's what this second
16     sentence is -- so the first sentence is just
17     talking generally what either party -- that
18     neither party can, without prior written
19     consent, assign or transfer the agreement.
20          The second sentence is a little
21     more specific, right? It is dealing
22     specifically with what takes place when you
23     have one of these business changes that's
24     enumerated in the second sentence. Is that
25     fair?")

**Page 138**

1          THE WITNESS: No, that's not fair.
2 BY MS. JANUS:
3      Q. Okay. Explain to me why not.
4      A. The first sentence is a prohibition thou
5 shall not do. The second sentence is, if any of these
6 events was to occur, it will be deemed an assignment;
7 and therefore, thou shall not do without consent.
8      Q. Okay. But what thou shall not do, as
9 you say, is in the second -- or the third clause of the
10 second sentence, right? "And Client shall make no
11 expanded use of the Fair Isaac Products as a result of
12 any such event unless and until Fair Isaac provides
13 such written consent, which will not be unreasonably
14 withheld."
15      A. Is there a question?
16      Q. Yeah. That was my question.
17      A. I don't think that was a question. You
18 want to rephrase it for me, please? I didn't get asked
19 a question by you.
20      Q. The -- you said that the second sentence
21 is -- in one of these situations it is an assignment
22 and thou shall not do.
23          What I'm saying is, okay, but is it,
24 then, the thou shall not do is in that last or third
25 clause of the second sentence, which says, "and client

**Page 139**

1 shall make no expanded use of the Fair Isaac Products
2 as a result of any such event unless and until Fair
3 Isaac provides such written consent, which will not
4 unreasonably be withheld"?
5      A. So I said the thou shall not do. The
6 proper reading of this sentence is there is an
7 assignment; therefore, you cannot do that without our
8 consent. And in the interim, before you have our
9 consent and we take some other action, whether a
10 negotiated response or not, you shall not make expanded
11 use. They're two separate covenants.
12      Q. Okay.
13      A. Because it goes on to say, any attempt
14 to assign or transfer without written consent is
15 void.
16      Q. Okay. So based on your reading of 10.8,
17 in the event of a change of control or a merger, is it
18 your view that consent from FICO is necessary
19 regardless of whether use is expanded?
20      A. Yes.
21      Q. Okay.
22      A. You must have consent.
23      Q. Okay. And so any merger, regardless of
24 the type or the size or the nature of the transaction,
25 requires consent from FICO to transfer the license or

**Page 140**

1 to continue to use the license, I should say?
2          MS. KLIEBENSTEIN: I'm going to object
3 to that as calling for speculation.
4 BY MS. JANUS:
5      Q. Go ahead.
6      A. My view is that each party is prohibited
7 from making assignment or transfer without prior
8 written consent. Therefore, if you do engage in one of
9 the enumerated list of items in here, then you are in
10 violation of the license, because you failed to get the
11 consent or written consent.
12          Separately, it then says and client
13 shall not make expanded use of the products as a result
14 of any such event unless and until Fair Isaac provides
15 such written consent, which will not be unreasonably
16 withheld.
17          So both here and in the prior section I
18 referenced, there can't be a transfer or assignment, a
19 legal transfer or assignment, without the prior written
20 consent. There just can't be, because that's what the
21 parties said here.
22      Q. So how is it, then, that the second
23 sentence specifically makes reference to "expanded use
24 of the Fair Isaac Products as a result of any such
25 event unless and until Fair Isaac provides such written

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 983-1 Filed 01/13/23 Page 13 of 19

## Page 141

consent, which will not be unreasonably withheld," and the first sentence does not relate in any way to expanded use, correct?

A. The first sentence is an absolute prohibition. So when you step on the land mine, you step on the land mine.

But the second one is, a lot of clients in that situation may say, wait a minute, I don't want to follow these rules, and they go off and do something. So we add this additional covenant that says you won't make expanded use of it.

Q. Okay.

A. That's because of the right to cure.

Q. Okay. So is it a fair reading of this section, Section 10.8, that in the event of a merger or change of control, so long as there's no expanded use, then consent is not required?

A. No, that's completely wrong.

Q. No. Okay.

A. You've ignored the first sentence. You've ignored the first part of the second sentence. You've ignored the third section, and you've ignored 3.1. That is a completely wrong reading.

Q. What is the point of having the expanded use language in the second sentence if the first

## Page 142

sentence is an outright prohibition of transfer without written consent?

A. Because the parties had also agreed that a violation of the license provides that Fair Isaac, or the party that's not in violation, has the right to terminate. In the interim, you want to preserve the status quo.

Q. What were you looking at there?

A. Section 9.2.

Q. Okay. Which subdivision?

A. Both (a) and (c).

Q. And what does that have to do with the expanded use provision?

A. Well, again, you have to first look at the prohibition against an assignment or transfer. And then secondarily, when you provide notice to a client that you're in violation of the license agreement, you want to preserve the status quo. So don't make additional use of it or expanded use of it. It is a separate covenant.

Q. Where is that, what you are talking about?

A. Where is what?

Q. What you just said. We're talking about a contract. What are you referring to?

## Page 143

A. I'm referring to Section 10.8.

Q. Oh, I thought you were talking about Section 9.2, (a) and (c).

A. 9.2 is termination and rights of the parties relative to the event of a termination.

Q. What does that have to do with 10.8?

A. Not obtaining consent is a terminable right. It's a breach of the agreement.

Q. Okay.

A. So by the time that you discover the breach and then give notice of what your intent is, there's a period where the client may still be misunderstanding what's going on. Therefore, you don't want them to make any expanded use of it. In other words, they have to preserve the status quo. If they choose not to preserve it, that's an independent breach.

Q. Where is that in the language of 10.8?

A. I'll say it again. "Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement or any part thereof."

The second sentence says, "In the event" --

Q. No. You don't need to read the second

## Page 144

sentence. But I'm asking you, where is it that -- you just testified about --

A. I'm not going to answer this question. I want to finish my first answer. I'd appreciate if you don't interrupt me.

Q. Okay.

A. So I said, then the second sentence says, in the event of any of these enumerated, it is deemed to be an assignment subject to this section, meaning that you have to get consent. Until then, you'll make no expanded use of the products.

Q. Until when?

A. Until you obtain consent. It says, "until Fair Isaac provides such written consent."

Q. "Which will not be unreasonably withheld."

A. Right.

Q. So you can use the product after the merger until you get -- your reading of the second sentence is, okay, if you have a merger or change in control, you can use the product without consent --

A. That is not what I said.

Q. -- so long as --

A. I'm sorry. I interrupted you. Please go ahead.

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 983-1 Filed 01/13/23 Page 14 of 19

## Page 145

1  Q. -- as long as you don't make expanded
2  use of it, and then you can make expanded use of it,
3  when you get consent, which will not be unreasonably
4  withheld?
5      A. That's not what I said.
6      Q. Okay. So my question is: If the first
7  sentence just covers it, if the first sentence, as you
8  said, that's the absolute prohibition on assignment
9  without consent, then why does the second sentence
10 which relates specifically to these change-in-business
11 events refer to making no expanded use of the
12 products?
13     A. Because once that breach occurs because
14 you fail to get the consent -- so you violated the
15 license agreement. You then have to look at the
16 termination rights. And during the period between the
17 time that the non-violating party is looking at that,
18 the violating party should not make expanded use of the
19 product.
20     Q. But that's not --
21     A. Because what happens is we're not in the
22 business of shutting off the faucet. We're in the
23 business of looking for the right answer. If you're a
24 real bad actor, we'll set off the faucet and just send
25 you a termination notice.

## Page 146

1  But there are clients that still would
2  like to continue it. It is a violation if you make any
3  expanded use. It is an additional violation.
4      Q. But that's not what -- I mean, there's
5  nothing in 10.8 that says what you are saying it means.
6  10.8 doesn't say, in the event of a change of control
7  or merger, if that takes place prior to obtaining
8  written consent, you'll have an opportunity to cure so
9  long as you don't make expanded use of the product.
10     A. It says, "and client shall make no
11 expanded use of the Fair Isaac Products as a result of
12 any such event unless and until Fair Isaac provides
13 such written consent."
14     Q. "Which will not be unreasonably
15 withheld."
16     A. "Which will not be unreasonably
17 withheld."
18     Q. You keep leaving that part out. Is
19 there a reason for that?
20     A. Yeah.
21     Q. Why?
22     A. My recollection is the Fair Isaac
23 business people went to Chubb ahead of this and said,
24 look, Chubb & Son, we see this coming. Have you paid
25 attention to it? We need to discuss this. And they

## Page 147

1  ignored them, and then Chubb & Son never asked for
2  consent. So you can't really withhold any consent if
3  there's no ask.
4      Q. Okay. And we'll get into that more
5  later, because I'd like to know what the basis of your
6  understanding is.
7          But isn't it possible to read this
8  language to mean that, in the event there is a change
9  of control or merger or one of these other business
10 events, that consent is not required unless you make an
11 expanded use?
12     A. That's an impossible, tortured reading,
13 because you don't read the balance of the agreement,
14 which says you have to get the consent.
15     Q. Do you -- does Chubb (sic) require
16 consent for every transfer that takes place due to a
17 merger?
18          MS. KLIEBENSTEIN: Objection.
19 Speculation, beyond the scope of this witness. He's
20 not here as a 30(b)(6) witness.
21          THE WITNESS: I don't know about Chubb.
22 I know about Chubb & Son.
23 BY MS. JANUS:
24     Q. I'm sorry. Did I say "Chubb"?
25     A. Yes, you did.

## Page 148

1      Q. Oh, I'm sorry. Does FICO, in FICO's
2  license agreements, require written consent in the
3  event of mergers?
4          MS. KLIEBENSTEIN: Same objection.
5          THE WITNESS: As I've indicated before,
6  there are multiple, multiple agreements that FICO does
7  on transactions. And so our preference is to have a
8  no-assignment clause. It has been negotiated away from
9  time to time or modified from time to time. This is
10 the one that was settled between the parties.
11 BY MS. JANUS:
12     Q. In your experience, have you dealt with
13 other merger assignment issues before?
14     A. In what context?
15     Q. In this context, in your role at FICO
16 where you've had a client with some sort of business
17 change, you know, have an assignment issue.
18     A. I can't recall a specific one right
19 now.
20     Q. Okay. So this is the only one you can
21 recall dealing with right now?
22     A. This one was put in front of me. I
23 mean, I'd have to think about it a little bit to see if
24 I can remember some of the others. But I know from
25 agreements that I've worked on that I have a clause

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 983-1 Filed 01/13/23 Page 15 of 19

1 like this.
2    Q. Right. So my question is: Have you
3 dealt with any situation which you've been faced with
4 whether or not to consent to an assignment in the event
5 of a merger?
6    **A. I'm trying to think. I just can't**
7 **recall.**
8    Q. Okay. Does FICO have a practice of
9 requiring increased license fees in the event of a
10 merger?
11    MS. KLIEBENSTEIN: Objection.
12 Foundation.
13    THE WITNESS: I don't know what you mean
14 by "practice." FICO has a preference to decide who it
15 does business with. It is our IP. We decide who to do
16 business with. We price and build everything into that
17 concept of what's our arrangement going to be. So I
18 can look at this instance, and I say, this is what the
19 parties agreed.
20    And I don't know about your practice
21 idea. But we get the right -- we have the absolute
22 right to control who we license to, who we choose to do
23 business with. That's why that provision is in there.
24 BY MS. JANUS:
25    Q. Well, has -- what I mean is that -- does

Page 149

1 FICO generally, when it is faced with a client who has
2 gone through a business change, used that as an
3 opportunity to increase the license fees it is going to
4 charge?
5    MS. KLIEBENSTEIN: Objection.
6 Foundation.
7    THE WITNESS: I think I've previously
8 testified that I don't recall any other deals like
9 that, so I can't answer your question.
10 BY MS. JANUS:
11    Q. Does ACE have a license for Blaze?
12    **A. I recall that -- some group named ACE.**
13 **I don't know which entity within that large group, but**
14 **that they had purchased some type of license, yes, from**
15 **FICO.**
16    Q. Do you know what the status of that
17 license is?
18    **A. No.**
19    Q. Would you agree, though, that if --
20 well, first, let me ask you this. We talked about the
21 enterprisewide license that Chubb entered into ▓▓▓▓▓
22 ▓▓▓▓ in December of 2006. How would you measure
23 expanded use under that enterprisewide license?
24    MS. KLIEBENSTEIN: Objection.
25 Mischaracterizes his testimony.

Page 150

1    THE WITNESS: I mean, I think, number
2 one, you are calling for some of my work product.
3    Number two, I think it says what it
4 says.
5 BY MS. JANUS:
6    Q. I don't understand the answer.
7    **A. The answer says obtain consent before**
8 **you make any expanded use.**
9    Q. Yeah. So I'm asking you, how would you
10 measure expanded use under enterprisewide, unlimited
11 seat, no limit as to application license?
12    MS. KLIEBENSTEIN: Objection on
13 privilege grounds. If you think answering will reveal
14 your work product, please don't.
15    THE WITNESS: Let me answer the part I
16 think I can answer for you. Because you don't even
17 have the right to get to that question until you get
18 consent.
19 BY MS. JANUS:
20    Q. So you need to obtain consent --
21    **A. First.**
22    Q. -- for the merger first?
23    **A. No, not for the merger. The merger is a**
24 **decision between separate business entities. When you**
25 **engage in that event and that event occurs, it is**

Page 151

1 **deemed an assignment, and it requires consent.**
2    Q. Okay.
3    **A. It is at that point.**
4    Q. Okay. That's regardless of whether
5 there's expanded use?
6    **A. That's correct.**
7    Q. Okay. And is that consent not to be
8 unreasonably withheld?
9    **A. That's what it says.**
10    Q. Okay. So FICO has an obligation to not
11 unreasonably withhold its consent to that initial
12 transfer, fair?
13    **A. On the condition that we're actually**
14 **requested. So you don't volunteer consent when you**
15 **don't know the understanding of the event.**
16    Q. Okay.
17    **A. So it is on the client, who has to come**
18 **to us and ask for consent, and then it triggers not to**
19 **be unreasonably withheld.**
20    Q. And if there's no expanded use of the
21 license, what would be the grounds for not
22 consenting?
23    MS. KLIEBENSTEIN: Objection. Calls for
24 speculation.
25    THE WITNESS: The grounds are plain and

Page 152

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 983-1 Filed 01/13/23 Page 16 of 19

**Page 153**

1 simple. It is in the first sentence. You must get
2 consent first.
3 BY MS. JANUS:
4  Q. No, no, no. I know. But you are
5 saying, okay, so we need consent, and FICO has agreed
6 not to unreasonably withhold it. In terms of an
7 analysis of when it is reasonable to withhold the
8 consent, is the primary factor in that whether there's
9 expanded use?
10  MS. KLIEBENSTEIN: I'm going to object
11 to that on privilege grounds, work product, and
12 attorney-client -- well, not work product.
13  If you think you can answer that without
14 revealing any work product, feel free to do so.
15  THE WITNESS: So my answer is: When you
16 enter into a license agreement, you take into
17 consideration a lot of factors. When an event like
18 this occurs, you take into consideration a lot of
19 factors, most of which we don't know about.
20 BY MS. JANUS:
21  Q. Okay. Most of which you, as a legal --
22 you are saying, most of which who doesn't know about?
23  A. It is a private transaction, so it is
24 only what is publicly available that you can see. So
25 there might be a hundred reasons why you want to do

**Page 154**

1 this. If we don't know about them, we don't know if it
2 is reasonable or unreasonable. But not asking or not
3 telling us is a precondition. You must ask. It is a
4 separate covenant.
5  Q. And what -- let's ta k about -- all
6 right. So you found out about the -- did you find out
7 about the ACE-Chubb transaction that was proposed
8 during that conversation with Russ and Bill in August
9 of 2015, roundabout there?
10  A. No. I didn't talk to Bill Waid at that
11 point.
12  Q. Oh, Russ and -- what?
13  A. I didn't talk to --
14  Q. Russ and Mike.
15  A. They, meaning Russ Schreiber and Mike
16 Sawyer -- my recollection is they called me and said,
17 Tom, there is a transaction with -- the whole of the
18 Chubb organization is being purchased, because there
19 was some sort of public announcement.
20  Q. Okay. And that's the first you learned
21 about it?
22  A. Yes.
23  Q. Okay. And then as you understand it,
24 with respect to the interactions between FICO and
25 Chubb, what happened next in terms of communications

**Page 155**

1 with Chubb on that issue?
2  A. My recollection is that Mike and/or Russ
3 Schreiber, Mike Sawyer and/or Russ Schreiber, reached
4 back to the Chubb organization, contacts that they had
5 at Chubb & Son. They said, we understand there's a
6 transaction. We need to review our arrangement with
7 you to look for any impact.
8  Q. Do you know when that occurred?
9  A. Not with specificity.
10  Q. Not with specificity?
11  A. No.
12  Q. Do you know whether it occurred in late
13 December?
14  A. I don't recall exactly.
15  Q. Okay. But it is possible that's when it
16 occurred?
17  A. I don't recall.
18  Q. Okay. And after that occurred, your
19 understanding is that Mike and/or Russ reached out to
20 Chubb. What happened next, as far as you are aware, in
21 terms of interactions between FICO and Chubb on this
22 topic?
23  A. My recollection is that Mike Sawyer
24 and/or Russ Schreiber reached out to their business
25 contacts at Chubb & Son and said, you know, we want you

**Page 156**

1 to be aware of our agreement and your transaction and
2 we should assess the impact of that.
3  Q. Right. And what happened next, as far
4 as you are aware, after that?
5  A. My understanding is they ignored Mike
6 Sawyer and Russ Schreiber --
7  Q. Okay.
8  A. -- and never responded.
9  Q. All right. Then what occurred after
10 that?
11  A. The transaction closed between ACE and
12 the Chubb entity.
13  Q. Do you recall when that was?
14  A. Well, it was signed sometime in July
15 2015. Then it had a close date of around January 14th
16 of '16, if I remember, something like that.
17  Q. Okay. All right. So the transaction
18 closed. Then what happened?
19  A. Based upon what I had learned, I sent a
20 letter out to the Chubb & Son folks following those
21 provisions.
22  (Exhibit 90 marked.)
23 BY MS. JANUS:
24  Q. I'm showing you what's been marked as
25 Exhibit 90. Is this the letter that you were referring

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 983-1 Filed 01/13/23 Page 17 of 19

**Page 157**

1  to?
2  A. Yes.
3  Q. Okay. And you say, in the second
4  paragraph, "FICO became aware of the pending
5  acquisition of The Chubb Corporation by ACE Limited
6  late last year." Do you see that?
7  A. Yes. I see that sentence in the second
8  full paragraph, yes.
9  Q. And in fact, folks at FICO knew about
10 the acquisition as soon as it was announced in July of
11 2015, correct?
12 A. I don't -- I don't know that specific
13 dating. They became aware of the merger at some point,
14 because they have business contacts and they talk.
15 Q. Right. But you say "late last year,"
16 and I'm wondering why you say late last year?
17 A. Because Mike Sawyer and/or Russ
18 Schreiber had talked to them, so I'm assuming late last
19 year is when they talked to them.
20 Q. Oh, well, you were saying "became aware
21 of," not that they had talked to them late last year.
22 A. I said "FICO became aware," "FICO"
23 meaning Mike Sawyer and/or Russ Schreiber became aware
24 of that acquisition late last year.
25 Q. Late last year.

**Page 158**

1  A. Which would have been late 2015.
2  Q. So my question was: Are you now aware
3  that actually FICO was aware of the transaction when it
4  was announced in July of 2015?
5  A. No, I don't know --
6  Q. Okay.
7  A. -- if they became -- if anybody became
8  aware of it when they announced it.
9  Q. The third sentence in that paragraph
10 states, "As you may be aware, FICO advised our business
11 contact at Chubb & Son prior to the recent closing of
12 the merger that FICO's consent is required under the
13 applicable provision of the license agreement in order
14 to transfer the license from Chubb to Chubb Limited."
15 Do you see that?
16 A. I do.
17 Q. Who are the people involved in that
18 communication?
19 A. It would have been either Mike Sawyer
20 and/or Russ Schreiber.
21 Q. And who are the people at Chubb?
22 A. I don't remember.
23 Q. Was it by phone or in writing?
24 A. I don't recall.
25 Q. Were you a part of that communication?

**Page 159**

1  A. No, I was not.
2  Q. You don't know when it occurred?
3  A. I know it occurred prior to January
4  27th, 2016.
5  Q. Other than that, you don't know?
6  A. No.
7  Q. And then you say, in the next paragraph,
8  "I am writing now to again confirm that the Agreement
9  may not be transferred and assigned without FICO's
10 consent, and that FICO has not and does not consent to
11 such transfer and assignment," right?
12 A. Yes, that's what the sentence says.
13 Q. Why did FICO not consent to the transfer
14 and assignment?
15 A. Number one, we were never asked. And
16 number two, the agreement specifically provides that
17 you cannot do that without asking for our consent. It
18 calls for prior written consent.
19 Q. So both number one and number two are
20 that you were never asked?
21 A. No. Number one is they never asked.
22 Number two is, even if they did ask, we don't have to
23 provide consent. We only have to look at it in the
24 context of Section 10.8. But you never get there,
25 because they never asked.

**Page 160**

1  Q. Okay. Number two is, even if they had
2  asked, you wouldn't consent?
3  A. We wouldn't consent without
4  understanding the context of what's going on. We don't
5  have to consent.
6  Q. Although, you agreed you wouldn't
7  unreasonably withhold your consent, correct?
8  A. Right.
9  Q. And you do have a duty of good faith and
10 fair dealing in your license agreements, correct?
11 A. Under New York law, yes, you do, as does
12 Chubb & Son.
13 Q. So is it fair to say, at this point, you
14 needed more understanding of the context?
15 A. Well, since Chubb did not respond to any
16 of the inquiries that Russ Schreiber or Mike Sawyer
17 made --
18 Q. There were more than one?
19 A. I don't know.
20 Q. Okay.
21 A. I've already testified I don't recall.
22 Q. Well, I just don't want to create an
23 inaccurate record. So my question for you was: Is
24 it -- I asked you why it is that you said that FICO
25 does not consent to such transfer and assignment. You

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY — 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 983-1 Filed 01/13/23 Page 18 of 19

1 provide consent for the transfer of the license in this
2 case -- strike that.
3     Do you believe that FICO's refusal to
4 provide consent for the transfer of the license in this
5 situation was reasonable?
6     A. My view is that the contract called for
7 what the contract called. And since they never asked
8 for consent, you never get to that question. Chubb has
9 the responsibility to understand its own agreements.
10 For something as important as this is for their
11 business, you would think they would have paid
12 attention. Instead, being forewarned, according to
13 information you've provided, by Russ Schreiber and Mike
14 Sawyer, they chose to ignore it.
15     Q. So your view is that FICO did not
16 withhold its consent to transfer?
17     A. It never got to that question, because
18 they were never asked.
19     Q. Okay. So your position is that, because
20 there was never an email or a letter stating please
21 consent to this transfer, FICO was not required to do
22 an analysis of whether it would consent to the
23 transfer?
24     MS. KLIEBENSTEIN: Objection.
25 Speculation.

Page 221

1     THE WITNESS: The facts that I'm aware
2 of are that Mike Sawyer and/or Russ Schreiber went to
3 Chubb before the transaction closed, because it was
4 spread over a long period of time, at some point before
5 January 27th and after some point in mid 2015. And
6 despite that information being conveyed to Chubb & Son,
7 they chose to take no action. So the burden is on
8 Chubb to decide what it wants to do. Chubb decided to
9 do nothing.
10 BY MS. JANUS:
11     Q. What about the exchange between the
12 parties that we've gone over? Do you take the position
13 that Chubb's engagement in those conversations relating
14 to a business resolution was not, in effect, a request
15 for consent under certain terms?
16     MS. KLIEBENSTEIN: I'm going to object
17 to that on work product.
18     THE WITNESS: I agree with the work
19 product.
20     But the request came after the event
21 closed. Therefore, they were asking for something
22 entirely different, the right to use the software.
23 BY MS. JANUS:
24     Q. So if they were going to ask for
25 consent, it needed to be prior to the transaction

Page 222

1 closing?
2     A. That's what that says.
3     Q. By "that," you mean --
4     A. The agreements.
5     Q. And that's the provision 10.8 in the
6 agreement that you are referring to?
7     A. 10.8 and the other points that I've
8 pointed out to you.
9     Q. So your position is that, under an
10 interpretation of the Chubb agreement, Chubb needed to
11 seek consent prior to the transaction closing?
12     A. I believe a plain reading says that they
13 needed to ask for consent prior to -- prior to the
14 event. Because after the event, it clearly says it is
15 null and void, any assignment.
16     Q. The agreement specifically states,
17 however, that in the event of a merger, it's expanded
18 use that Chubb needs to seek written consent for?
19     A. No. You are misreading that again. It
20 says, very plainly, they must ask for prior written
21 consent --
22     Q. Okay.
23     A. -- upon an event. Otherwise, it is null
24 and void. I can go through that again if you want.
25     Q. And so once that -- under your reading

Page 223

1 of the contract, once the transaction closes, can they
2 still seek consent to transfer the license?
3     A. They can seek to work out a business
4 resolution to affect a cure, but they have hit the
5 tripwire. You've pointed out there's a tripwire. You
6 need to pay attention to this. Talk to us. They chose
7 not to talk to us. And, of course, they closed the
8 transaction.
9     It was a multibillion-dollar
10 transaction. I'm sure they were busy with lots of
11 things. But for whatever reason, they decided not to
12 do it, and they just kept using the software.
13     They had to have asked for consent. It
14 is plain and simple in Section 3.1, as edited by
15 10.8.
16     Q. So your view is, under the contract,
17 once they missed that trigger of asking prior to the
18 transaction closing, they're out of luck? They can't
19 get consent at that point?
20     A. Not to affect the terms of the
21 agreement. They were then in breach and were told
22 that. So then they could achieve a work-out
23 solution.
24     Q. What about -- I thought your
25 interpretation of the expanded-use provision of the

Page 224

Thomas Carretta - CONFIDENTIAL - ATTORNEYS' EYES ONLY - 10/9/2018
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS  Doc. 983-1  Filed 01/13/23  Page 19 of 19

assignment clause was that that was specifically designed to deal with a situation in which there was a merger or a business event and consent wasn't obtained prior to that merger taking place?

A. That's exactly the opposite of what I said. I said -- I'm sorry. I'll answer the question, because you've asked it so many times. I'll try to make it very clear. The contract says ask for prior written consent. Okay. They chose not to do that.

The contract, secondarily says, in another covenant, make no expanded use.

The contract says FICO then has a right to follow a termination process. We sent a notice of breach. During that period is when they have to make no expanded use, between the time of the notice and the time of the decision of what FICO wants to do.

Q. Right. And then it says, unless and until they receive consent, which shall not be unreasonably withheld. So that, under your reading of the contract, which I disagree with -- but under your reading of the contract, that would mean that it's -- the consent process is still in play even if they did not obtain consent prior to the merger?

MS. KLIEBENSTEIN: Mischaracterize the testimony.

Page 225

MS. JANUS: I'm not characterizing testimony.

THE WITNESS: Yes, you are. I gave you my answer. That if you read 10.8 in a reasonable, simple fashion, it simply says, neither party, without the prior written consent of the other party, shall assign or transfer this agreement or any part thereof. Okay.

In the event of a change of control, through the elements listed there, and I'll paraphrase, each such event shall be deemed an assignment. There's no dispute that there was a change of control, a reorganization. His own letters say that, Andrew's. And -- comma, and make no expanded use as a result of such event and unless and until we provide written consent.

But you had to have asked for the consent to begin with. You missed that opportunity to do it. Purposeful or not, I don't know.

Then you fell into the gap between the notice of the breach, and you were told not to use expanded use. Don't make more use of it until we decide what we are going to do. That's how I interpret it.

BY MS. JANUS:

Page 226

Q. But because we had -- your reading of the provision is because we hadn't -- Chubb hadn't asked prior to the transaction. Once the transaction occurred, they couldn't ask for consent?

A. They terminated their right to ask for consent.

Q. Because the --

A. The transfer is null and void. It was an assignment deemed to be an assignment. It is a null and void assignment, according to the language. There's no assignment.

Q. So once the transfer takes place, under your reading of the contract, if Chubb has not asked for consent, they are out of luck? They cannot ask for consent after that point in time; is that --

MS. KLIEBENSTEIN: Asked and answered.

THE WITNESS: Yeah, they can ask for consent any time they want. My point is that, for purposes of the assignment clause, they violated the agreement the minute that they tried to make -- that that event occurred. And then they allowed or transferred, or however you want to phrase it, assigned the license to a new party. That was mistake number one.

BY MS. JANUS:

Page 227

Q. Okay. But they could still ask for consent after that --

A. They could ask --

Q. -- after that transaction --

A. -- to cure.

Q. -- took place?

A. They could ask for the right to cure that default, which might entail consent, or it might entail a new deal.

MS. JANUS: Let's take a break.

THE VIDEOGRAPHER: Going off the record. The time is 3:47.

(Recess.)

THE VIDEOGRAPHER: We're back on the record. The time is 3:55 p.m.

BY MS. JANUS:

Q. Does FICO maintain standard Blaze software license agreements in its agreement repository?

A. The repository is for executed agreements. And we have a template library that provides frameworks. Each Blaze license is not standard. It depends on what the client wants to buy.

Q. And for Blaze Advisor in the template

Page 228