## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054 (DTS) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S TRIAL MEMORANDUM

## TABLE OF CONTENTS

I.    Introduction ................................................................................................. 1

II.   Statement of the Case and FICO's Claims ................................................ 2

    A.    FICO and Blaze Advisor ................................................................. 2

    B.    The Chubb Corporation, Federal Insurance Company, and its division Chubb & Son ..................................................................... 3

    C.    2006 Software License and Maintenance Agreement ................... 3

    D.    ACE Limited, ACE American Insurance Company, and the acquisition of The Chubb Corporation .......................................... 4

    E.    FICO's claims against Federal for breach of contract and copyright infringement ................................................................... 5

    F.    FICO's claims against ACE American for copyright infringement.............. 7

III.   FICO's Proof of Breach of Contract ......................................................... 7

    A.    Breach of Paragraph 10.8 ............................................................... 7

    B.    Breach of Paragraph 3.1(iv) – Third Party Consultants .............. 10

        (1)   Federal disclosed Blaze Advisor to third party consultants. ............ 10

        (2)   Federal's breach permitted termination. ........................... 10

    C.    Breach of Paragraph 3.1(iv) – Foreign Insurance Companies .................. 11

        (1)   The plain language of the License Agreement unambiguously defines the terms "Client" and "Affiliates." .................................... 12

        (2)   Unambiguous contracts cannot be re-written. .................. 13

    D.    Breach of Paragraph 9.3 ............................................................... 15

    E.    Defendants' counterclaims fail...................................................... 16

        (1)   FICO did not breach the License Agreement................... 16

        (2)   FICO did not breach the covenant of good faith and fair dealing. .......................................................................... 17

IV.    Lost License Fee Damages Against Federal ................................................... 18

    A.    Legal standards ................................................................................ 18

        (1)    The fair market value of Blaze Advisor is determined by a hypothetical negotiation. ................................................... 19

        (2)    Objective factors inform the hypothetical negotiation. .................... 19

    B.    FICO's witnesses will testify to facts relating to lost license fee damages. .......................................................................... 20

V.    FICO's Proof of Copyright Infringement ................................................... 22

    A.    The Unauthorized Use of Blaze Advisor by Federal and ACE American Infringed FICO Copyrights. ......................................... 22

    B.    Federal and ACE American's unauthorized reproduction of Blaze Advisor infringed FICO's registered copyrights. ........................................ 22

        (1)    FICO will prove infringement through evidence of direct copying. ................................................................... 24

        (2)    Defendants' copyright infringement was willful. ........................... 24

VI.    Actual Damages for Copyright Infringement ............................................. 25

VII.    Disgorgement Under the Copyright Act ................................................... 25

    A.    An equitable disgorgement award must follow the statutory requirements of Section 504(b). .......................................... 26

    B.    Shifting burdens of proof under Section 504(b). ......................................... 26

    C.    FICO's proof of Defendants' gross revenue ............................................. 28

        (1)    Defendants' interrogatory answers admit the amount of gross written premium connected to the use of Blaze Advisor. ............... 28

        (2)    FICO is entitled to recover gross written premiums from Defendants' single enterprise. ........................................ 29

        (3)    Blaze Advisor applications contributed to the generation of gross written premium. ......................................... 30

        (4)    Vicarious liability ................................................... 31

VIII.  Defendants bear the burden to rebut FICO's presumptive entitlement to all infringing revenue. ...................................................................................... 32

    A.    Legal standard ........................................................................... 32

    B.    Defendants fail to meet their burden to prove deductible expenses ........... 33

    C.    Defendants chose to present no evidence of apportionment; in equity they must bear the consequences of that strategic choice. .......................... 35

    D.    In equity, Defendants' bear the consequences of their choices. ................. 36

IX.    FICO is entitled to recover prejudgment interest and attorneys' fees.................... 37

    A.    FICO is entitled to recover prejudgment interest for its breach of contract damages. ..................................................................... 37

    B.    FICO is entitled to recover prejudgment interest for its actual damages and disgorgement damages in connection with its copyright claims.................................................................................... 37

    C.    FICO is entitled to recover attorneys' fees due to Defendants' willful infringement. ............................................................................ 38

X.    Conclusion ............................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360Heros, Inc. v. GoPro, Inc.*,
   No. 17-cv-1302, 2022 U.S. Dist. LEXIS 96453 (D. Del. May 31, 2022) .................. 20

*Adventure Creative Grp., Inc. v. CVSL, Inc.*,
   412 F. Supp. 3d 1065 (D. Minn. 2019) ........................................................................ 24

*Agred Found. v. U.S. Army Corps of Eng'rs*,
   3 F.4th 1069 (8th Cir. 2021) ....................................................................................... 16

*Allied Sys., Ltd. v. Teamsters Auto. Transp. Chauffeurs, Demonstrators &
   Helpers, Local 604*,
   304 F.3d 785 (8th Cir. 2002) ....................................................................................... 21

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,
   610 F. Supp. 2d 998 (D. Minn. 2009) .......................................................................... 30

*Andreas v. Volkswagen of Am., Inc.*,
   336 F.3d 789 (8th Cir. 2003) ........................................................................... 27, 32, 34

*Astoria Bedding v. Northside P'ship.*,
   657 N.Y.S.2d 796 (App. Div. 3rd Dept. 1997) ............................................................ 17

*Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*,
   856 N.Y.S.2d 505 (2008) .............................................................................................. 18

*Big Daddy Games, LLC v. Reel Spin Studios, LLC*,
   No. 12-cv-449, 2013 US. Dist. LEXIS 200235 (W.D. Wis. April 10,
   2013) .............................................................................................................................. 23

*BLT Steak, LLC v. 57th St. Dorchester, Inc.*,
   940 N.Y.S.2d 603 (App. Div. 1st Dept. 2012) ............................................................. 18

*Brown v. Bldg. Engines, Inc.*,
   No. 1:21-cv-10893, 2022 U.S. Dist. LEXIS 71112 (S.D.N.Y. Apr. 15,
   2022) .............................................................................................................................. 13

*Brushton-Moira Cent. School Dist. v. Thomas Assocs.*,
   669 N.Y.S.2d 520 (1998) .............................................................................................. 37

*BSC Assocs. v. Leidos, Inc.*,
    91 F. Supp. 3d 319 (N.D.N.Y. 2015) ................................................................ 16, 17

*Central Point Software, Inc. v. Nugent*,
    903 F. Supp. 1057 (E.D. Tex. 1995) ................................................................ 23

*Citibank, N.A. v. Barclays Bank, PLC*,
    28 F. Supp. 3d 174 (S.D.N.Y. 2013) ................................................................ 37

*Comput. Assocs. Int'l v. Altai, Inc.*,
    982 F.2d 693 (2d Cir. 1991) ................................................................ 24

*Congel v. Malfitano*,
    76 N.Y.S.3d 873 (2018) ................................................................ 17

*Dash v. Mayweather*,
    731 F.3d 303 (4th Cir. 2013) ................................................................ 27

*Design Ideas, Ltd. v. Things Remembered, Inc.*,
    No. 07-cv-3077, 2009 U.S. Dist. LEXIS 38374 (C.D. Ill. May 6, 2009) .................... 36

*Duluth Lighthouse of the Blind v. C.G. Bretting Mfg. Co.*,
    199 F.R.D. 320 (D. Minn. 2000) ................................................................ 21

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ................................................................ 22

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*,
    No. 06-cv-0085, 2010 U.S. Dist. LEXIS 144425 (S.D.N.Y. Aug. 9,
    2010) ................................................................ 33, 34

*FHC Equities, L.L.C. v. MBL Life Assurance Corp.*,
    188 F.3d 678 (6th Cir. 1999) ................................................................ 36

*Fiore v. Fiore*,
    415 N.Y.S.2d 826 (1979) ................................................................ 13

*Fourth Estate Pub. Ben. Corp. v. Wall-Street.com, LLC*,
    139 S. Ct. 881 (2019) ................................................................ 22

*Frank Music Corp. v. MGM, Inc.*,
    772 F.2d 505 (9th Cir. 1985) ................................................................ 35

*Gaste v. Kaiserman*,
    863 F.2d 1061 (2d Cir. 1988) ................................................................ 34

*Gaylord v. United States*,
 777 F.3d 1363 (Fed. Cir. 2015) ........................................................... 19, 20

*Gorman v. Fowkes*,
 949 N.Y.S.2d 96 (App. Div. 2d Dept. 2012) ............................................. 17

*Gusmao v. GMT Grp., Inc.*,
 No. 06-cv-5113, 2008 U.S. Dist. LEXIS 58462 (S.D.N.Y. Aug. 1, 2008) ............... 19

*Hamil Am., Inc. v. GFI, Inc.*,
 193 F.3d 92 (2d Cir. 1999) ............................................................ 33, 34

*Hoag v. Chancellor, Inc.*,
 677 N.Y.S.2d 531 (App. Div. 1st Dept. 1998) .......................................... 17

*Honeywell Int'l Inc. v. ICM Controls Corp.*,
 No. 11-cv-569, 2017 U.S. Dist. LEXIS 11692 (D. Minn. Jan. 26, 2017) ............... 27

*I-Sys., Inc. v. Softwares, Inc.*,
 No. 02-cv-1951, 2005 U.S. Dist. LEXIS 47592 (D. Minn. Mar. 7, 2005) .............. 38

*In Design v. Lauren Knitwear Corp.*,
 782 F. Supp. 824 (S.D.N.Y. 1991) ...................................................... 34

*In Touch Concepts v. Cellco P'ship*,
 949 F. Supp. 2d 447 (S.D.N.Y. 2013) ................................................... 11

*Infogroup, Inc. v. DatabaseLLC*,
 956 F.3d 1063 (8th Cir. 2020) ..................................................... 24, 32

*INS v. Pangilinan*,
 486 U.S. 875 (1988) ................................................................... 26

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
 98 F. Supp. 2d 498 (S.D.N.Y. 2000) .................................................... 12

*Kleier Advert. v. John Deery Motors*,
 834 F. Supp. 311 (N.D. Iowa 1993) ..................................................... 38

*Koh-I-Noor Inc. v. Ikon Photographic Corp.*,
 92 Civ. 8584 (KTD), 1993 U.S. Dist. LEXIS 18193 (S.D.N.Y. Dec. 22,
 1993) ............................................................................. 16, 17

*In re Landbank Equity Corp.*,
 973 F.2d 265 (4th Cir. 1992) .......................................................... 26

*M2M Sols. LLC v. Enfora, Inc.*,
　　167 F. Supp. 3d 665 (D. Del. 2016) ............................................................. 20

*M2M Sols. LLC v. Motorola Sols., Inc.*,
　　No. 12-cv-33, 2016 U.S. Dist. LEXIS 22944 (D. Del. Feb. 25, 2016) ......................... 20

*Mackie v. Rieser*,
　　296 F.3d 909 (9th Cir. 2002) ..................................................................... 19

*MAI Sys. Corp. v. Peak Comput., Inc.*,
　　991 F.2d 511 (9th Cir. 1993) ..................................................................... 22

*Manning v. Gold Belt Falcon, LLC*,
　　No. 08-cv-3427, 2011 U.S. Dist. LEXIS 134241 (D.N.J. Nov. 17, 2011) ................. 37

*Maranatha Assocs. v. Titan Grp.*,
　　609 N.Y.S.2d 368 (App. Div. 3rd Dept. 1994) ........................................... 13, 14

*Medtronic, Inc. v. Bos. Sci. Corp.*,
　　No. 99-cv-1035, 2002 U.S. Dist. LEXIS 28355 (D. Minn. Aug. 8, 2002) ................. 21

*Missouri v. Biden*,
　　52 F.4th 362 (8th Cir. 2022) ..................................................................... 16

*Montgomery v. Noga*,
　　168 F.3d 1282 (11th Cir. 1999) ................................................................. 23

*NLRB v. RELCO Locomotives, Inc.*,
　　734 F.3d 764 (8th Cir. 2013) ..................................................................... 36

*On Davis v. Gap, Inc.*,
　　246 F.3d 152 (2d Cir. 2001) ................................................................. 19, 20

*Ossman v. Diana Corp.*,
　　825 F. Supp. 870 (D. Minn. 1993) ............................................................... 36

*Peter J. Solomon Co., L.P. v. ADC Prods. (UK)*,
　　No. 14CV4086-LTS, 2016 U.S. Dist. LEXIS 42537 (S.D.N.Y. Mar. 30,
　　2016) ............................................................................................... 11

*Philpot v. Music Times LLC*,
　　No. 16-cv-1277, 2017 U.S. Dist. LEXIS 48454 (S.D.N.Y. Mar. 29,
　　2017) ............................................................................................... 24

*Pinkham v. Camex, Inc.*,
　　84 F.3d 292 (8th Cir. 1996) ..................................................................... 38

*Quantum Chem. Corp. v. Reliance Grp.*,
    580 N.Y.S.2d 275 (App. Div. 1st Dept. 1992) ............................................. 13

*Raimondi v. Olenicoff*,
    No. 12-cv-2094, 2015 U.S. Dist. LEXIS 174961 (C.D. Cal. July 7,
    2015) ............................................................................................................. 20

*Ran First Assocs. v. 363 E. 76th St. Corp.*,
    747 N.Y.S.2d 13 (App. Div. 1st Dept. 2002) ............................................... 13

*RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*,
    845 F.2d 773 (8th Cir. 1988) ................................................................. 31, 39

*Reno v. Bossier Par. Sch. Bd.*,
    520 U.S. 471 (1997) ...................................................................................... 26

*Royal Indus. v. Kraft Foods*,
    926 F. Supp. 407 (S.D.N.Y. 1996) ................................................................ 13

*Safka Holdings LLC v. iPlay, Inc.*,
    42 F. Supp. 3d 488 (S.D.N.Y. 2013) ............................................................ 19

*Saxon v. Blann*,
    968 F.2d 676 (8th Cir. 1992) ........................................................................ 35

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) .......................................................................... 19

*Sharkey v. Zimmer USA, Inc.*,
    No. 20-cv-8258, 2021 U.S. Dist. LEXIS 149120 (S.D.N.Y. Aug. 9,
    2021) ............................................................................................................. 17

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012) .......................................................................... 22

*Southland Corp. v. Froelich*,
    41 F. Supp. 2d 227 (E.D.N.Y. 1999) ............................................................ 11

*Spodek v. Park Prop. Dev. Assoc.*,
    733 N.Y.S.2d 674 (2001) ............................................................................. 37

*Stroh Container Co. v. Delphi Indus., Inc.*,
    783 F.2d 743 (8th Cir. 1986) ........................................................................ 37

*Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC*,
    377 F. App'x 303 (4th Cir. 2010) ................................................................. 34

*Titlecraft, Inc. v. NFL*,
  No. 10-cv-758, 2010 U.S. Dist. LEXIS 134367 (D. Minn. Dec. 20,
  2010) .................................................................................................. 24

*Tran v. Farmers Grp., Inc.*,
  128 Cal. Rptr. 2d 728 (Ct. App. 2002) ......................................... 30

*United States v. Mast*,
  999 F.3d 1107 (8th Cir. 2021) ...................................................... 21

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ...................................................................... 26

*Universal Furniture Int'l, Inc. v. Collezione Europa, USA, Inc.*,
  599 F. Supp. 2d (M.D.N.C. 2009) ................................................. 33

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
  No. 06-cv-2662, 2011 U.S. Dist. LEXIS 112846 (D. Md. Sep. 30, 2011)............ 33, 38

*William A. Graham Co. v. Haughey*,
  646 F.3d 138 (3d Cir. 2011).................................................... 27, 38

*William A. Graham Co. v. Haughey*,
  No. 05-cv-612, 2010 U.S. Dist. LEXIS 47035 (E.D. Pa. May 12, 2010).................. 38

**Statutes**

17 U.S.C. § 106 .......................................................................... 6, 7, 22

17 U.S.C. § 410 ................................................................................ 23

17 U.S.C. § 504 ....................................................................... *passim*

17 U.S.C. § 505 ................................................................................ 38

Copyright Act of 1976, 17 U.S.C. §§ 101-1332 (2012)........................ 27, 38, 39

**Other Authorities**

2 Nimmer on Copyright § 7.16 (2021) .............................................. 23

4 Nimmer on Copyright § 14.03 (2021)............................................. 27

4 Nimmer on Copyright § 14.10 (2021)............................................. 39

Fed. R. Civ. P. 30(b)(6) ................................................................... 11

Fed. R. Evid. 701 ................................................................................................... 21

H.R. Rep. No. 94-1476 (1976) ............................................................................. 27

N.Y. CPLR § 5001 ................................................................................................ 37

N.Y. CPLR § 5004 ................................................................................................ 37

## I.     Introduction

This case is about the unauthorized use of FICO's Blaze Advisor software, a Business Rules Management System, previously licensed to Chubb & Son, a division of Federal. Chubb & Son breached the parties' License Agreement by, among other things, not seeking FICO's prior consent to the continued use of Blaze Advisor after an event deemed to be an assignment. The assignment event was the acquisition of Federal and its division Chubb & Son by a subsidiary of ACE Limited. The cure negotiations were unsuccessful. FICO's consent to the use of Blaze Advisor in the new post-acquisition enterprise was not received, and the License Agreement was terminated.

The License Agreement restricted the use of Blaze Advisor to employees of the Client, Chubb & Son, and forbade any use or access by third parties. It was discovered that these restrictions were breached before termination, because three foreign insurance companies and two third-party consultants were permitted access to and use of Blaze Advisor. Use by the foreign insurance companies before termination was unauthorized. Their continued use of Blaze Advisor, and Chubb & Son's continued use after termination, was also unauthorized. Thereafter, without any claim of right, ACE American assumed the role of Chubb & Son and continued the unauthorized use of Blaze Advisor. FICO seeks recovery of lost license fees and disgorgement of all gross revenue attributable to Defendants' copyright infringement.

## II.      Statement of the Case and FICO's Claims

This action is against Defendant Federal Insurance Company ("Federal") for breach of contract and copyright infringement, and against Defendant ACE American Insurance Company ("ACE American") for copyright infringement.

### A.      FICO and Blaze Advisor

FICO is a world leader in the design and development of business rules management system software. One of FICO's products is Blaze Advisor. Blaze Advisor software is protected by copyright, and FICO maintains federal copyright registrations related to it.

Blaze Advisor manages business rules and automates human decisioning in real time based upon a company's business logic and rules. Blaze Advisor is used to design, develop, execute, and maintain rules-based business applications; here, business applications used in connection with selling insurance.

Blaze Advisor applications directly contribute to the sale of insurance in important ways, including: _speed_ of response to customers and potential customers, _precision_ in pricing, _consistency_ in underwriting decision making, _agility_ to bring new products to market faster and to respond faster to changing market conditions and regulations, _scale_ to enable high-volume decisioning, improved _compliance_ with company and regulatory requirements, and an improved experience for agents and brokers, an _ease of doing business_, enhancing the referral of insurance customers.

2

**B.  The Chubb Corporation, Federal Insurance Company, and its division Chubb & Son**

The Chubb Corporation was the global parent of a group of insurance companies that operated together as a $12+ billion enterprise. Federal was the principal property and casualty insurance company subsidiary of the Chubb Corporation. Chubb & Son, a division of Federal, was the manager of insurance company subsidiaries of Federal and the Chubb Corporation. Chubb & Son managed all the underwriting activities and administrative duties of other insurance company subsidiaries, and took all necessary actions on their behalf, so that insurance policies could be sold in their names.

**C.  2006 Software License and Maintenance Agreement**

The dispute against Federal arises from breach of a 2006 Software License and Maintenance Agreement (the "License Agreement") between FICO and Chubb & Son, the division. Federal is a defendant because it is responsible for the actions of its division Chubb & Son.

In February 2006, Chubb & Son issued a Request for Information ("RFI") to FICO to learn about Blaze Advisor. As the RFI said, a "key strategic initiative" of the Chubb Corporation was to increase revenue by selling more insurance to small and mid-market customers, most specifically with respect to the sale of Specialty insurance products. Specialty insurance products are non-property and casualty insurance products sold to businesses, including directors' and officers' insurance, errors and omissions insurance, and malpractice insurance.

At the time, the Chubb Corporation's Specialty insurance products were sold to a small number of large accounts. Expanding sales to customers in the small and mid-markets, in the words of the RFI, was "viewed as a good opportunity as it is understood that 85% of the identified and targeted customer set does not currently buy Chubb products."

Chubb & Son understood that by automating human decisioning with Blaze Advisor it could process the higher volume of transactions required to succeed in the small and mid-markets, without increasing staff, and could also free up its underwriters' time to focus on higher value selling opportunities.

FICO and Chubb & Son entered into the License Agreement in 2006. "Client" is a defined term and means "Chubb & Son, a division of Federal Insurance Company." The License Agreement and its subsequent amendments, Amendment One and Amendment Two, granted Chubb & Son a perpetual, non-exclusive, non-transferable, limited enterprise license to use Blaze Advisor for internal business purposes only and only by Chubb & Son employees.

### D.    ACE Limited, ACE American Insurance Company, and the acquisition of The Chubb Corporation

In January 2016, Federal's parent company, the Chubb Corporation was acquired by another insurance company, ACE Limited. As a result of the acquisition, Federal and its division Chubb & Son were also acquired and underwent a change of control. Before the acquisition, Federal and its division Chubb & Son were wholly owned by the Chubb Corporation. After the acquisition, Federal and its division Chubb & Son were wholly

owned by ACE INA Holdings, Inc., itself a wholly owned subsidiary of ACE Limited.

Defendant ACE American was also a subsidiary of ACE Limited. After the acquisition,

ACE Limited changed its name to Chubb Limited. Federal and ACE American became

sister companies within the group of insurance companies known as Chubb Limited.

The Chubb Limited group of insurance companies operated together as a $30+

billion enterprise. In the words of Chubb Limited's 2016 letter to shareholders: "We

completed the largest merger in insurance history … transforming ourselves into the

highest quality and largest publicly traded property and casualty insurer in the world."

### E.    FICO's claims against Federal for breach of contract and copyright infringement

The lawsuit seeks contract damages arising from breach of three paragraphs of the

License Agreement.

First, Paragraph 10.8, entitled "No Assignment," was breached. The acquisition

and change of control of Federal and its division Chubb & Son was an event that

Paragraph 10.8 defines to be an assignment. FICO's prior written consent was required

for use of Blaze Advisor after the assignment event. Chubb & Son did not seek that

consent before the event of assignment as the License Agreement required.

Second, Paragraph 3.1(iv), entitled "License Restrictions," was breached. Chubb

& Son represented and warranted that no third party would have access to or use of Blaze

Advisor without FICO's consent, and that Blaze Advisor would only be used by its

employees. Chubb & Son breached Paragraph 3.1(iv) in two ways: (1) by permitting

third-party consultants to access and use Blaze Advisor without FICO's consent, and

(2) by permitting employees of foreign insurance companies to access and use Blaze Advisor.

FICO gave written notice that the License Agreement was terminated for breach, the effective date being March 31, 2016. The notice of termination further demanded that all use of Blaze Advisor cease.

Third, Paragraph 9.3, entitled "Effect of Termination," was breached. Federal, through its division Chubb & Son, continued to use Blaze Advisor after the License Agreement terminated. The unauthorized use by the foreign insurance companies also continued.

Federal's unauthorized continued use of Blaze Advisor was also copyright infringement in violation of FICO's exclusive right of reproduction under 17 U.S.C. § 106(1). Blaze Advisor applications were used to sell insurance in the name of Federal, Federal's subsidiaries, and insurance companies in pooling arrangements[1] led by Federal, which together made up the Federal single enterprise.

Federal's infringement was willful. Its unauthorized use was with full knowledge of FICO's rights, or at the very least, in reckless disregard of those rights.

---

[1] Pooling arrangements are agreements whereby companies share premiums, losses, and expenses and identify the pool leader as the head. Pooling arrangements also allow for shared services—staffed and managed by the pool leader but paid for by the pool members. Insurance policies, regardless of the name on the policy's declaration page, are managed, serviced, and insured by the pool's lead.

### F.    FICO's claims against ACE American for copyright infringement

Without FICO's knowledge, on January 1, 2017, ACE American took over Chubb & Son's role as the manager of other insurance companies. As of that date, the employees of Federal and its division Chubb & Son became employees of ACE American. ACE American continued the unauthorized use of Blaze Advisor in connection with selling insurance. Blaze Advisor applications were used to sell insurance in the name of ACE American, ACE American's subsidiaries, and insurance companies in pooling arrangements led by ACE American, which together made up the ACE American single enterprise.

ACE American used Blaze Advisor without any grant of rights from FICO: it was an unlicensed, naked, user. ACE American is not a party to the License Agreement and has no rights under the License Agreement. ACE American's unlicensed use of Blaze Advisor is copyright infringement in violation of FICO's exclusive right of reproduction under 17 U.S.C. § 106(1). ACE American was a willful infringer. It used Blaze Advisor to sell insurance with full knowledge of FICO's rights, or at the very least, in reckless disregard of those rights.

## III.   FICO's Proof of Breach of Contract

### A.    Breach of Paragraph 10.8

Paragraph 10.8 of the License Agreement states in pertinent part:

No Assignment. Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof. In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an

assignment subject to this section, and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld. Any attempt to assign or transfer all or any part of this Agreement without first obtaining such written consent will be void and of no force or effect.

The Court determined that under the first sentence of Paragraph 10.8, Chubb & Son could not "assign or transfer" the License Agreement without the prior written consent of FICO. (Dkt. 731 at 46.) The Court determined as a matter of law that any attempt to "assign or transfer" without FICO's prior written consent would be "void and of no force or effect" under the third sentence of Paragraph 10.8. (*Id.*)

The Court also determined that the January 2016 acquisition and change of control of Federal and its division Chubb & Son was an event "deemed to be an assignment" under Paragraph 10.8. (*Id.* at 46-47.) Before the assignment, Blaze Advisor was used in the $12+ billion Chubb Corporation enterprise. After the assignment, Blaze Advisor was used in the $30+ billion Chubb Limited enterprise. It is undisputed that FICO's prior written consent was not requested before the assignment.

The dispute centers on the meaning of the following language of Paragraph 10.8: "and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent[.]" The Court ruled that (1) the meaning of the phrase is for the jury to resolve and (2) the jury must also determine whether use of Blaze Advisor in fact expanded after the assignment. (*Id.* at 49.)

FICO contends the phrase "and shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written

consent" means that during negotiations to cure the breach the use of Blaze Advisor must be no different than it was before the assignment; the status quo must be maintained. If the negotiations succeed there is a new agreement. If the negotiations fail, the License Agreement will be terminated.

Defendants re-write the term to say, "**except that** [deleting "and"] FICO's consent shall not be required if Client does not expand use of the Fair Isaac Products as a result of any such event." Defendants further contend the use of Blaze Advisor did not in fact expand after the assignment event. (Dkt. 445 at 13; Dkt. 507 at 14-15.)

During the cure negotiations FICO received a Commercial Proposal, dated February 25, 2016, stating: "Under the above proposal, Chubb shall have the right _to change the applications_ utilizing the Blaze Advisor software _at any time in its sole discretion_ without FICO's consent so long as the named applications do not exceed an amount of fifteen (15)." The so-called limitation to up to 15 applications was meaningless. Any number of applications could be wrapped together under a single name. Moreover, the Commercial Proposal was clear: after the assignment event the right to change any application at any time in any way was reserved.

The cure negotiations concluded on March 30, 2016, with notice of termination of the License Agreement effective March 31, 2016. In addition to the proper reading of Paragraph 10.8, the evidence will show the use of Blaze Advisor in fact expanded after the assignment event. Blaze Advisor was used in connection with selling insurance in the names of twice as many insurance companies after the assignment event as before (27 companies versus 13 companies).

### B.    Breach of Paragraph 3.1(iv) – Third Party Consultants

#### (1)    Federal disclosed Blaze Advisor to third party consultants.

Paragraph 3.1(iv) prohibited disclosure of Blaze Advisor to third parties:

> License Restrictions. Client represents and warrants that it and its employees shall not … (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products, by any third party ….

The Court determined that Paragraph 3.1(iv) prohibited Federal from making Blaze Advisor available to unlicensed third-party consultants without FICO's consent. (Dkt. 731 at 42.) Federal admits it permitted the third-party consultants AppCentrica and DWS Group to access and use Blaze Advisor. (*See* Ex. A.[2])

AppCentrica is an IT vendor that provided services to Chubb Insurance of Canada to develop Evolution, a Blaze Advisor application. AppCentrica's work continued into 2015-2016, expanding to include design and development of the Evolution application for Chubb Insurance of Australia. DWS Group worked with Chubb Insurance of Australia and AppCentrica to design and develop Evolution for Australia. AppCentrica and DWS Group accessed and used Blaze Advisor without FICO's consent. Defendants concede breach of Paragraph 3.1(iv) but contend the breach was not material. (Dkt. 731 at 44-45.)

#### (2)    Federal's breach permitted termination.

Paragraph 9.2(c) of the License Agreement permitted FICO to immediately terminate the License Agreement for violation of any term of the license grant, regardless

---

[2] Unless otherwise noted, all cited Exhibits are to the Declaration of Michael Erbele filed concurrently herewith.

of materiality. The unauthorized use and access by third-party consultants violated the license restriction of Paragraph 3.1(iv); it violated the license grant. Termination for breach of the license grant is not limited by materiality. *Peter J. Solomon Co., L.P. v. ADC Prods. (UK)*, No. 14CV4086-LTS, 2016 U.S. Dist. LEXIS 42537, at *12 (S.D.N.Y. Mar. 30, 2016); *In Touch Concepts v. Cellco P'ship*, 949 F. Supp. 2d 447, 468 (S.D.N.Y. 2013); *Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 246 (E.D.N.Y. 1999).

When all the evidence is considered, no reasonable jury can find this admitted breach of Paragraph 3.1(iv) did not permit termination under applicable law.

### C.     Breach of Paragraph 3.1(iv) – Foreign Insurance Companies

The License Agreement also restricted the access and use of Blaze Advisor only to employees of Chubb & Son. Paragraph 3.1 states in pertinent part:

> License Restrictions. Client represents and warrants that it and its employees shall not … (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products … by any individuals other than employees of Client ….

Defendants admit foreign insurance company employees were permitted to access and use Blaze Advisor applications in connection with selling insurance. Chubb Insurance Company of Europe SE, Chubb Insurance Company of Canada, and Chubb Insurance Company of Australia Limited "made use of Blaze Advisor." (Ex. B at 4-6 (RFA Nos. 20-28).) Defendants' Rule 30(b)(6) deponent, John Taylor, conceded that neither Federal nor its division Chubb & Son have employees outside the United States.

### (1)    The plain language of the License Agreement unambiguously defines the terms "Client" and "Affiliates."

Defendants contend Federal should be considered the "Client," rather than its division Chubb & Son as the License Agreement states. (Dkt. 751 at 11-12.) Each of the foreign insurance companies that used Blaze Advisor were wholly owned subsidiaries of Federal. Were Federal "the Client," then these foreign insurance companies were "Affiliates," as defined in Amendment Two. Under that re-writing, access to and use of Blaze Advisor by the employees of those foreign insurance companies was permitted before the License Agreement terminated.

The Court ruled as a matter of law that the License Agreement defines the "Client" as "Chubb and Son, a division of Federal Insurance Company." (Dkt. 731 at 42.) The parties agree that Chubb & Son has no "Affiliates" as defined in Amendment Two. (Dkt. 731 at 42-44; Ex. C at 38:1-17.)

The definition of "Affiliates" is also clear and unambiguous: "'Affiliates' shall mean any other entity directly or indirectly controlled by Client, where 'control' means the ownership of more than 50% of the aggregate of all voting interests … in an entity." The "Affiliates" definition can only be read one way; it is not ambiguous.

New York law governs the License Agreement. When contractual language may only be read one way, it is not ambiguous. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 98 F. Supp. 2d 498, 506 (S.D.N.Y. 2000) ("[T]hat extrinsic evidence may be used to create ambiguity in clear contractual language, is unsupported, and contradicts the

New York rule."); *Quantum Chem. Corp. v. Reliance Grp.*, 580 N.Y.S.2d 275, 276 (App. Div. 1st Dept. 1992).

### (2)   Unambiguous contracts cannot be re-written.

Despite the clear and unambiguous definition of "Client" in the License Agreement and "Affiliates" in Amendment Two, Judge Wright ruled the phrase "Client and its Affiliates" was ambiguous, presenting a question for the jury. (Dkt. 731 at 44.) Respectfully, this ruling is incorrect.

Under New York law unambiguous contracts cannot be re-written even when it means a term is superfluous. *Fiore v. Fiore*, 415 N.Y.S.2d 826, 826 (1979) ("The question, however, is not whether the agreement is imperfect but whether it is ambiguous. The courts may not rewrite a term of a contract by 'interpretation' when it is clear and unambiguous on its face."); *see also Brown v. Bldg. Engines, Inc.*, No. 1:21-cv-10893, 2022 U.S. Dist. LEXIS 71112, at *18 (S.D.N.Y. Apr. 15, 2022); *Ran First Assocs. v. 363 E. 76th St. Corp.*, 747 N.Y.S.2d 13, 15 (App. Div. 1st Dept. 2002).

Judge Wright's ruling that "Client and its Affiliates" is ambiguous was based on the legal misunderstanding that an unincorporated division cannot contract in its own name. (Dkt. 731 at 43-44.) Under New York law, an unincorporated division, such as Chubb & Son, *may* enter contracts in its own name. *Maranatha Assocs. v. Titan Grp.*, 609 N.Y.S.2d 368, 369 (App. Div. 3rd Dept. 1994); *see also Royal Indus. v. Kraft Foods*, 926 F. Supp. 407, 416 (S.D.N.Y. 1996) (acknowledging potential to contract with an unincorporated division under New York law).

In *Maranatha*, the defendant made the same argument Defendants now make, namely that an unincorporated division cannot enter into contracts in its own name. 609 N.Y.S.2d at 369 ("The fundamental premise underlying third-party defendants' motion … is that third-party plaintiff, having no legal existence independent of Hanover Companies Incorporated … cannot enter into contracts or bring legal action."). The New York court rejected the argument. It held that the unincorporated division could enter contracts and sue in its own name, should the counterparty breach. *Id.* When the breach of contract was by the unincorporated division, on the other hand, the proper party to sue for breach is the corporate entity. *Id.* ("In the case of a breach, [the third-party defendant] would have been free to sue third-party plaintiff *through the legal entity of the corporation*.") (emphasis added). The corporate entity, here Federal, is responsible for the actions of its division. *See id.*

The evidence will show the division Chubb & Son made contracts in its own name, including management and service agreements between itself and various direct and indirect insurance company subsidiaries of Federal. In this case, as the Court has ruled, the Client of the License Agreement is Chubb & Son, the division. (Dkt. 731 at 42-43.) Because the division is the party in breach, the proper defendant is Federal.

*Maranatha et al.* shows the concern raised in Footnote 14 of the Court's Summary Judgment Order is misplaced. (Dkt. 731 at 43 n.14 ("FICO is suing Federal for breaching the License Agreement, yet argues that Federal is *not* a party to the License Agreement.").) FICO's suit against Federal as the party responsible for the actions of its division conforms to New York law. With respect, the footnote asks the wrong question.

14

The correct question is: May an unincorporated division make contracts in its own name under New York law? It can. A different question is whether the corporation of which the division is a part is responsible for the division's breach of contract. It is. FICO is not trying to "have it both ways." (*Id.*) FICO seeks to have the contract read and applied as it was written.

The Court's ambiguity finding was also premised on a factual misunderstanding. Judge Wright stated that Amendment Two is rendered ineffectual unless Federal is considered the client. (*Id.* at 44.) Respectfully, the Court was wrong. Chubb & Son first licensed the right to use Blaze Advisor on a single named application. Amendment One expanded the scope of rights to any number of applications so long as the use was limited to specialty insurance. Amendment Two expanded the scope of rights to Chubb & Son's use of Blaze Advisor to all insurance products of the enterprise of which Chubb & Son was a part (commercial, specialty, personal, etc.). This expanded scope was granted to the division Chubb & Son, the Client, for use by its employees only for Chubb & Son's internal business purposes.

The term "Client and its Affiliates" has no application to the facts of this case. After hearing all the evidence no reasonable jury can find that Federal is included within the meaning of "Client and its Affiliates" under applicable law.

## D.     Breach of Paragraph 9.3

Paragraph 9.3 details the consequences of termination:

Effect of Termination. Upon … termination of this Agreement for any reason, all licenses granted hereunder shall terminate immediately, all support and

maintenance obligations shall cease, Client shall immediately cease using all Fair Isaac Product(s) and related documentation.

Following the failed efforts to cure the breach, FICO terminated the License Agreement by letter dated March 30, 2016, with termination effective the next day, March 31, 2016. (Ex. D.) Federal admits that it and its division Chubb & Son did not cease using Blaze Advisor. (Dkt. 137 at ¶ 18.)

     **E.**    <u>**Defendants' counterclaims fail.**</u>

     **(1)**    **FICO did not breach the License Agreement.**

Defendants' counterclaim for breach of contract fails. Neither Federal nor ACE American were parties to the License Agreement. Defendants have no standing to assert a claim for breach of contract. *BSC Assocs. v. Leidos, Inc.*, 91 F. Supp. 3d 319, 323 (N.D.N.Y. 2015); *Koh-I-Noor Inc. v. Ikon Photographic Corp.*, 92 Civ. 8584 (KTD), 1993 U.S. Dist. LEXIS 18193, at *3-4 (S.D.N.Y. Dec. 22, 1993). At the conclusion of all the evidence, the counterclaim should be dismissed for lack of subject matter jurisdiction. *Missouri v. Biden*, 52 F.4th 362, 371 (8th Cir. 2022); *Agred Found. v. U.S. Army Corps of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021).

The counterclaim also fails for lack of proof. The evidence will show that FICO rightfully terminated the License Agreement. If the jury finds that FICO proved breach of any one of the paragraphs of the License Agreement, Defendants' counterclaim fails.

The counterclaim also fails because Defendants have not suffered damages. When asked to disclose the factual basis for its contention it had been damaged, Federal stated that FICO's alleged breach caused Federal to incur attorneys' fees and costs defending

16

this lawsuit. (Ex. E at 14.) New York law is clear. Attorneys' fees are not adequate damages to support a breach of contract claim. *Congel v. Malfitano*, 76 N.Y.S.3d 873, 883-84 (2018); *Gorman v. Fowkes*, 949 N.Y.S.2d 96, 98 (App. Div. 2d Dept. 2012).

> **(2)    FICO did not breach the covenant of good faith and fair dealing.**

Defendants' counterclaim for breach of the covenant of good faith and fair dealing also fails. Defendants have no standing to assert the counterclaim because they were not parties to the License Agreement. *BSC Assocs.*, 91 F. Supp. 3d at 323; *Koh-I-Noor Inc.*, 1993 U.S. Dist. LEXIS 18193, at *3-4.

The counterclaim also fails for lack of proof. Defendants contend FICO breached the covenant of good faith and fair dealing because it enforced Paragraph 10.8 without knowledge of whether Federal in fact expanded its use of Blaze Advisor. (*See* Dkt. 731 at 58-59.) To succeed, Defendants must prove that FICO's enforcement of Paragraph 10.8 was objectively unreasonable when judged in the light of the commercial purpose of Paragraph 10.8. *Sharkey v. Zimmer USA, Inc.*, No. 20-cv-8258, 2021 U.S. Dist. LEXIS 149120, at *15 (S.D.N.Y. Aug. 9, 2021). Subjective factors such as the parties' intent or motivations are not relevant. *Hoag v. Chancellor, Inc.*, 677 N.Y.S.2d 531, 535 (App. Div. 1st Dept. 1998); *Astoria Bedding v. Northside P'ship.*, 657 N.Y.S.2d 796, 797 (App. Div. 3rd Dept. 1997).

The evidence will show Defendants' contention is belied by the fact Federal itself informed FICO regarding the scope of its intended use of Blaze Advisor after the assignment event. The Commercial Proposal, dated February 25, 2016, confirmed Blaze Advisor would be used after the assignment event however Defendants wished it to be

used. And, in fact, the use of Blaze Advisor expanded. The evidence will show that

FICO's enforcement of Paragraph 10.8 was reasonable.

This counterclaim also fails because the "American rule" precludes the recovery

of attorneys' fees for a breach of the covenant of good faith and fair dealing under New

York law. *See BLT Steak, LLC v. 57th St. Dorchester, Inc.*, 940 N.Y.S.2d 603, 605 (App.

Div. 1st Dept. 2012).

## IV.    Lost License Fee Damages Against Federal

FICO seeks lost license fees from Federal to fully compensate it for the

unauthorized use of Blaze Advisor by foreign insurance companies. Some of these

unauthorized uses began as early as 2007. FICO's claim for recovery of these damages is

limited by the six-year period of the statute of limitations for contracts under New York

law. The unauthorized use by foreign insurance companies continued after termination,

for which Federal is also liable. Federal's own unauthorized use of Blaze Advisor

continued after termination of the License Agreement in 10 applications until December

31, 2016, the date ACE American began its unauthorized use of Blaze Advisor.[3]

### A.    <u>Legal standards</u>

FICO is entitled to full compensation for the loss that is the natural and probable

consequence of the breach. *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 856

N.Y.S.2d 505, 508 (2008). Full compensation is measured by the fair market value of the

---

[3] FICO is also entitled to recover lost license fees from ACE American to fully compensate it for ACE American's unauthorized use of Blaze Advisor. As discussed *infra* at Section VI, these lost license fees take the form of actual damages resulting from ACE American's copyright infringement.

unauthorized use of Blaze Advisor. *On Davis v. Gap, Inc.*, 246 F.3d 152, 166 (2d Cir.

2001); *Safka Holdings LLC v. iPlay, Inc.*, 42 F. Supp. 3d 488, 493 (S.D.N.Y. 2013);

*Gusmao v. GMT Grp., Inc.*, No. 06-cv-5113, 2008 U.S. Dist. LEXIS 58462, at *36-38

(S.D.N.Y. Aug. 1, 2008); *see also Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002).

### (1)    The fair market value of Blaze Advisor is determined by a hypothetical negotiation.

The fair market value of the unauthorized use of Blaze Advisor is determined by a

hypothetical negotiation between FICO, on the one hand, and the unauthorized user of

Blaze Advisor, on the other hand. (Dkt. 731 at 9-10, 16-18.) The hypothetically

negotiated fair market value is the license fee that FICO as a willing licensor and the

unauthorized user as a willing licensee would have agreed upon under the circumstances.

*On Davis*, 246 F.3d at 166; *Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000);

*Mackie*, 296 F.3d at 917. The hypothetical negotiation takes place at the time of the

unauthorized use of Blaze Advisor. *On Davis*, 246 F.3d at 166-67; *Gaylord v. United

States*, 777 F.3d 1363, 1367-68 (Fed. Cir. 2015).

### (2)    Objective factors inform the hypothetical negotiation.

The jury's consideration of a hypothetically negotiated fair market value is based

on objective factors. Fair market value is not based on the subjective wishes of either

party. *On Davis*, 246 F.3d at 166; *Safka*, 42 F. Supp. 3d at 493. FICO's proposed jury

instructions detail the objective factors relevant to the hypothetical negotiation.

To the extent third party license agreements are considered in the hypothetical

negotiation, such agreements must be economically comparable to the circumstances of

the hypothetical negotiation. *Gaylord*, 777 F.3d at 1368 ("[T]he use of past licenses as evidence must always take account of economically relevant differences between the circumstances of those licenses and the circumstances of the matter in litigation."); *Raimondi v. Olenicoff*, No. 12-cv-2094, 2015 U.S. Dist. LEXIS 174961, at *6 (C.D. Cal. July 7, 2015). Other agreements that are not comparable are inadmissible.

Defendants bear the burden of proving that any other agreements it may seek to introduce are economically comparable. *See M2M Sols. LLC v. Motorola Sols., Inc.*, No. 12-cv-33, 2016 U.S. Dist. LEXIS 22944, at *26-27 (D. Del. Feb. 25, 2016) ("Defendant must show that the prior licenses … are actually comparable to the license that the parties would have negotiated … before introducing this evidence to the jury."); *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 678 (D. Del. 2016). No testimony about other agreements is admissible until Defendants meet this burden. *See 360Heros, Inc. v. GoPro, Inc.*, No. 17-cv-1302, 2022 U.S. Dist. LEXIS 96453, at *29-30 (D. Del. May 31, 2022).

The hypothetical negotiation is under the circumstances at the time of unauthorized use. The total award is for the actual period of unauthorized use of Blaze Advisor. *On Davis*, 246 F.3d at 166. Defendants' assumption that the lost fees should be priced based on a perpetual enterprise license is wrong. It is counterfactual.

**B.** **FICO's witnesses will testify to facts relating to lost license fee damages.**

The testimony of various FICO witnesses will address the business value of automating human decision making; the functions Blaze Advisor performs in various

contexts, particularly relating to the business value in connection with selling insurance; and the importance of the use of Blaze Advisor in connection with generating revenue. It is proper for fact witnesses to testify regarding facts within their personal knowledge, even if those facts are of a technical nature. *Allied Sys., Ltd. v. Teamsters Auto. Transp. Chauffeurs, Demonstrators & Helpers, Local 604*, 304 F.3d 785, 792 (8th Cir. 2002); *Duluth Lighthouse of the Blind v. C.G. Bretting Mfg. Co.*, 199 F.R.D. 320, 325-26 (D. Minn. 2000). A fact witness can be a person with expertise. *United States v. Mast*, 999 F.3d 1107, 1112 (8th Cir. 2021); *Medtronic, Inc. v. Bos. Sci. Corp.*, No. 99-cv-1035, 2002 U.S. Dist. LEXIS 28355, at \*74-75 (D. Minn. Aug. 8, 2002) (explaining that Rule 701 distinguishes between expert and lay testimony, not expert and lay witnesses).

Defendants contend that FICO's damages expert may not testify to FICO's lost license fee damages. It is true the Court excluded Mr. Zoltowski's ultimate opinion regarding the amount of FICO's actual damages. (Dkt. 731 at 55.) It is also true the Court expressly ruled that the facts underlying Mr. Zoltowski's damages opinion are properly considered. (*Id.* ("But there remains relevant evidence *underlying* those opinions that has *not* been excluded." (emphasis in original)).) Mr. Zoltowski will testify, among other things, to the business benefits of Blaze Advisor measured by the amount of annual revenue generated in connection with the unauthorized use of Blaze Advisor, the percentage that revenue represents to the total annual revenue of the Chubb Limited enterprise, and the use of Blaze Advisor in the single enterprises led by Federal and ACE American that benefited many other insurance companies. The Court ruled that

consideration of Defendants' business use of Blaze Advisor is relevant to the determination of Blaze Advisor's fair market value. (*Id.* at 18.)

## V.     FICO's Proof of Copyright Infringement

### A.     The Unauthorized Use of Blaze Advisor by Federal and ACE American Infringed FICO Copyrights

Federal's unauthorized use of Blaze Advisor after termination of the License Agreement, and ACE American's later unauthorized use infringed FICO's exclusive reproduction right under the Copyright Act, 17 U.S.C. § 106(1).

Defendants' unauthorized use of Blaze Advisor required the reproduction (copying) of Blaze Advisor into the random-access memory (RAM) of each server or computer hosting the Blaze Advisor application. Each time a Blaze Advisor application was used in connection with selling insurance, Blaze Advisor was copied without authorization. Unauthorized reproduction is copyright infringement in violation of 17 U.S.C. § 106(1). *Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012); *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 518 (9th Cir. 1993).

### B.     Federal and ACE American's unauthorized reproduction of Blaze Advisor infringed FICO's registered copyrights.

To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of a work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Registration of copyright is a jurisdictional prerequisite. *See Fourth Estate Pub. Ben. Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 891 (2019). FICO's registered ownership of Blaze Advisor includes

Version 7.0, Registration No. TX 7-504-713, and Version 7.2, Registration No. TX 7-776-962. These registered works, and all underlying preexisting versions, were authored by FICO employees or employees of FICO's predecessors in interest. (Dkt. 1-1 at 29, 31.) The registration certificates list FICO as the author. The presumption of validity that arises from registration is not challenged. 17 U.S.C. § 410(c). These copyright registrations are valid, and FICO is the owner.

The unauthorized reproduction of a derivative work, here Version 7.1,[4] is infringement of the underlying registered work, here Version 7.0. *Montgomery v. Noga*, 168 F.3d 1282, 1292-93 (11th Cir. 1999); 2 Nimmer on Copyright § 7.16[B][5] (2021). Proof that Version 7.1 is derivative of Version 7.0 includes showing the later work contains "a substantial amount of material from the copyrighted work." *Central Point Software, Inc. v. Nugent*, 903 F. Supp. 1057, 1060 (E.D. Tex. 1995).

The unauthorized reproduction of Version 7.1 also infringed registered Version 7.2 under the "Effective Registration Doctrine." Proof under that doctrine includes showing the later registered version was derived from the earlier one. *See Big Daddy Games, LLC v. Reel Spin Studios, LLC*, No. 12-cv-449, 2013 US. Dist. LEXIS 200235, *45-47 (W.D. Wis. April 10, 2013). The evidence will show that registered Version 7.2 is derivative of Version 7.1.

---

[4] Defendants' business records identify Blaze Advisor Version 7.1 as the version used from March 31, 2016, to the date all use ceased. Defendants may contend their unauthorized use was also of Version 7.1.1 or Version 7.1.2. Any use of those versions also infringed FICO registered copyrights.

### (1)     FICO will prove infringement through evidence of direct copying.

FICO will prove Federal's infringement with evidence of direct copying. *Comput. Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 701 (2d Cir. 1991); *see also Infogroup, Inc. v. DatabaseLLC*, 956 F.3d 1063, 1066 (8th Cir. 2020); *Titlecraft, Inc. v. NFL*, No. 10-cv-758, 2010 U.S. Dist. LEXIS 134367, at *5 (D. Minn. Dec. 20, 2010).

Defendants' unauthorized use of Version 7.1 resulted in the direct copying of substantial amounts of registered Version 7.0 from which it was derived. The same unauthorized use resulted in the direct copying of substantial amounts of registered Version 7.2, the latter being derived from the former.

### (2)     Defendants' copyright infringement was willful.

Federal's infringement is willful. Federal knowingly chose to use Blaze Advisor after termination of the License Agreement. *Adventure Creative Grp., Inc. v. CVSL, Inc.*, 412 F. Supp. 3d 1065, 1073 (D. Minn. 2019); *Philpot v. Music Times LLC*, No. 16-cv-1277, 2017 U.S. Dist. LEXIS 48454, at *16 (S.D.N.Y. Mar. 29, 2017) ("Courts will infer willful infringement from the fact that a defendant engages in infringing activity after receiving warning that the activity constitutes infringement.").

Federal knew of FICO's copyrights in Blaze Advisor through at least the post-assignment correspondence to cure the breach of Paragraph 10.8. FICO reasserted those rights in its notice of termination letter: use of Blaze Advisor without FICO's consent "constitutes Chubb and Chubb Ltd. as intentional infringers under applicable copyright

and patent laws, in addition to being a breach of the Agreement." (Ex. F.) Federal admits it continued to use Blaze Advisor after the License Agreement terminated.

ACE American's infringement was also willful. ACE American knowingly chose to use Blaze Advisor without a license or any claim of rights.

## VI.   Actual Damages for Copyright Infringement

FICO is entitled to recover actual damages for Defendants' copyright infringement. FICO's actual damages for Federal's infringing use are coextensive with its lost license fee damages from March 31, 2016, to December 31, 2016. FICO's actual damages for ACE American's infringing use are the fair market value for the use of Blaze Advisor to the full extent of ACE American's infringing use. Fair market value is determined through a hypothetical negotiation in the same manner as discussed above.

## VII.   Disgorgement Under the Copyright Act

FICO is entitled to disgorgement of Defendants' gross written premium from the sale of insurance that is attributable to the infringement. *See* 17 U.S.C. § 504(b). The gross written premium to be disgorged from Federal is $4,790,757,769. That is the gross written premium connected to the use of Blaze Advisor from March 31, 2016, to January 1, 2017, the date ACE American assumed the role of Chubb & Son.

The total gross written premium to be disgorged from ACE American is $16,566,003,197. That is the gross written premium connected to the use of Blaze Advisor from January 1, 2017, to the date ACE American's infringing use ceased. The total gross written premium subject to disgorgement is $21,356,760,966.

A.     <u>An equitable disgorgement award must follow the statutory requirements of Section 504(b).</u>

The Court ruled that a disgorgement award is an equitable decision. (Dkt. 811 at 2.) An equitable disgorgement award under Section 504(b) must apply the statutory burdens of proof. Equitable adjustments are only appropriate to avoid manifest injustice. As the Supreme Court explained:

> [A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation …. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is … for the courts to enforce them when enforcement is sought. *<u>Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute</u>*.

*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (emphasis added); *see also Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 485 (1997) ("[C]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.") (quotations omitted); *INS v. Pangilinan*, 486 U.S. 875, 883 (1988).

The amount to be disgorged cannot be divorced from the statutory methodology and burdens Congress set forth in Section 504(b). Damages may only be reduced through the principles of equity "in those extraordinary cases in which a manifest injustice would result if established legal principles were to be applied." *In re Landbank Equity Corp.*, 973 F.2d 265, 271 (4th Cir. 1992).

B.     <u>Shifting burdens of proof under Section 504(b)</u>

Section 504(b) provides:

<u>Actual Damages and Profits</u>. The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue ….

17 U.S.C. § 504(b).

FICO's burden includes proof of the amount of gross revenue connected or related to infringement. *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 799 (8th Cir. 2003) ("[T]he copyright holder must first establish some connection or relationship between the infringement and the profits he seeks."); *Honeywell Int'l Inc. v. ICM Controls Corp.*, No. 11-cv-569, 2017 U.S. Dist. LEXIS 11692, at *12, 15-16 (D. Minn. Jan. 26, 2017). FICO must also show that "the infringing use, at least in part, 'contributed to' the relevant gross revenues." (Dkt. 731 at 20-21.)

The purposes of Section 504(b) are clear: to take away the incentive to infringe and to prevent the infringer from unfairly benefitting from the infringement. "Damages are awarded to compensate the copyright owner for losses from the infringement, and profits are awarded to prevent the infringer from unfairly benefiting from a wrongful act." *William A. Graham Co. v. Haughey*, 646 F.3d 138, 144 (3d Cir. 2011) (quoting H.R. Rep. No. 94-1476, at 161 (1976)); 4 Nimmer on Copyright § 14.03 (2021). The Copyright Act "aims … to strip the infringer of the profits generated from infringement." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

C.      **FICO's proof of Defendants' gross revenue**

      (1)      **Defendants' interrogatory answers admit the amount of gross written premium connected to the use of Blaze Advisor.**

The Court found that "FICO presents evidence of gross revenue from the sale of insurance in connection with which Blaze Advisor was used." (Dkt. 731 at 57.) "This evidence is not 'undifferentiated,' as it is tied to Defendants' use of Blaze Advisor." (*Id.*)

Defendants admit the amount of gross written premium from the domestic sale of insurance connected to the use of Blaze Advisor in their answers to interrogatories. In their Ninth Supplemental Answer to Interrogatory 17, they concede that $21,202,380,943 in gross written premium was connected to the use of Blaze Advisor. (Ex. G at Schedule 8.0.)

Defendants also admit to their continued use in the United States of the Blaze Advisor application called Evolution in connection with the sale of insurance in Canada. There is no dispute the Evolution application was hosted on servers in Raleigh, North Carolina. Defendants concede that $154,380,023 of gross written premium was connected to the United States use of Blaze Advisor in connection with the sale of insurance in Canada. (*Id.* at Schedule 9.0B.) This revenue is also subject to disgorgement.

The total gross written premium connected to the domestic infringement of Blaze Advisor (from March 31, 2016, to the date use ceased) is $21,356,760,966. (*Id.* at Schedules 8.0, 9.0B.)

### (2)    FICO is entitled to recover gross written premiums from Defendants' single enterprise.

FICO's proof of the total gross written premium connected to the infringing use of Blaze Advisor includes, in addition to the gross written premium of Federal and ACE American, the gross written premium from the sale of insurance of all writing companies who sold insurance using Blaze Advisor applications.[5] These other writing companies were part of the Federal and ACE American single enterprises.

In the words of the Court: "Regardless of whether the disputed profits were earned in part by nonparties, the relevant issue is whether any such profits may fairly be considered profits of the infringer subject to FICO's disgorgement claim." (Dkt. 731 at 32.) The Court ruled, "the law does not preclude FICO from seeking to disgorge certain profits that, although *earned* by non-parties, may nonetheless belong to Defendants." (*Id.* at 33 (emphasis in original).)

FICO's proof includes the total gross written premium from insurance sold in Federal's name as well as all gross written premium from insurance sold in the name of Federal's wholly owned subsidiaries and in the name of members of the insurance pool led by Federal. FICO's proof also includes the total gross written premium from insurance sold in ACE American's name as well as all gross written premium from insurance sold in the name of ACE American's wholly owned subsidiaries and in the name of members of the insurance pool led by ACE American. Federal, ACE American,

---

[5] "Writing company" references the various individually named insurance companies that sold insurance in connection with the use of Blaze Advisor.

their wholly owned subsidiaries, and the insurance companies in the pools they led were a single enterprise. FICO is entitled to disgorgement of the gross written premium from the Federal and ACE American single enterprises.

Federal and ACE American led single enterprises because all the writing companies had a common purpose: to sell insurance. All the writing companies were under common control or had agreed to share their revenue and expenses. All the writing companies sold insurance in connection with the unauthorized use of Blaze Advisor. All the writing companies filed consolidated tax returns combining the financial operations of each entity. *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 610 F. Supp. 2d 998, 1019-20 (D. Minn. 2009); *Tran v. Farmers Grp., Inc.*, 128 Cal. Rptr. 2d 728, 730, 740-41 (Ct. App. 2002) (permitting recovery of damages from insurance companies acting as a single enterprise). The jury may conclude from the evidence that the infringing use of Blaze Advisor was used in connection with selling insurance by single enterprises.

> **(3)     Blaze Advisor applications contributed to the generation of gross written premium.**

The evidence, including the testimony of FICO's fact witnesses, will prove the ways in which automated decisioning with Blaze Advisor contributed to the sale of insurance. FICO's insurance industry expert Mr. Whitener will also testify that Blaze Advisor applications contributed to the generation of gross written premium. Mr. Whitener will testify that Blaze Advisor provided seven key benefits that directly contributed to the Defendants' sale of insurance: speed of response, precision in pricing, consistency in underwriting decision making, agility in bringing new products to market

faster and in responding faster to changing market conditions and regulations, scale to enable high-volume decisioning, improved compliance with company and regulatory requirements, and an improved experience for agents and brokers, enhancing the referral of insurance customers.

Proof will also include Defendants' admissions, which confirm that Blaze Advisor contributed to the Defendants' sale of insurance. Henry Mirolyuz, a Senior Systems Architect at Chubb in 2016, will testify Blaze Advisor permitted Defendants to bring products to market faster, increase the percentage of renewals, and better respond to changing market conditions.

### (4)  Vicarious liability

ACE American is vicariously liable for Federal's infringing use of Blaze Advisor on its behalf. *See RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*, 845 F.2d 773, 781 (8th Cir. 1988). The evidence includes a reciprocal Service Agreement between Federal and ACE American, effective March 14, 2016. This Service Agreement establishes ACE American's right to supervise Federal's infringing activity performed on ACE American's behalf between March 14, 2016, and December 31, 2016. The evidence shows that ACE American benefitted financially from Federal's infringement.

Federal is likewise vicariously liable for ACE American's infringing use of Blaze Advisor on its behalf. The evidence includes the same reciprocal Service Agreement between Federal and ACE American, effective March 14, 2016, and Amendment 1 to the Service Agreement, effective February 22, 2018. This Service Agreement and Amendment 1 establishes ACE American's direct infringement on Federal's behalf and

that Federal had the right to supervise ACE American's infringing activity performed on Federal's behalf after January 1, 2017. The evidence shows that Federal benefitted financially from ACE American's infringement.

## VIII.   Defendants bear the burden to rebut FICO's presumptive entitlement to all infringing revenue.

### A.     <u>Legal standard</u>

Section 504(b) presumes the copyright owner is entitled to recover *all* revenue (here all gross written premium) attributable to the infringement. *Andreas*, 336 F.3d at 796 (explaining that when the copyright owner meets its burden to prove gross revenue connected to infringement, "a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement arises"). The burden rests with Defendants to rebut that presumption. *Infogroup*, 956 F.3d at 1067-68 (affirming award of infringer's gross revenue under Section 504(b) where the infringer "did not present *any* evidence that its gross revenue resulted from factors unrelated to infringement") (emphasis in original).

Defendants bear the burden to prove both deductible expenses *and* the extent to which Defendants' resulting profits are not attributable to the infringement. (Dkt. 731 at 20 ("The burden to prove attribution is on the plaintiff, whereas the burden to prove apportionment is on the defendant.").) Due to the shifting statutory burdens of Section 504(b), if Defendants meet their two burdens of proof, the result is the profits derived "but-for" the infringement.

**B.**     **Defendants fail to meet their burden to prove deductible expenses.**

Deductible expenses take two forms: direct and general. Direct expenses are expenses that are, by their nature, related to the selling of insurance. To deduct expenses as "direct expenses," Defendants must show the expense is directly linked to an insurance policy sold in connection with the use of Blaze Advisor. *See Hamil Am., Inc. v. GFI, Inc.*, 193 F.3d 92, 107 (2d Cir. 1999).

Should Defendants seek to prove the amount of deductible direct expenses by deriving the percentage that all direct expenses are to all gross written premium and apply that percentage to the infringing gross written premium, Defendants must prove the allocation is reasonable. Without proof of the comparability of all direct expenses to those linked to insurance sold in connection with the use of Blaze Advisor, the burden cannot be met. *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, No. 06-cv-0085, 2010 U.S. Dist. LEXIS 144425, at *30 (S.D.N.Y. Aug. 9, 2010) (denying deduction for credit card fees, a direct expense, because there was no proof of comparability).

General expenses are administrative expenses related to the operation of the business, and not directly tied to the sale of an insurance policy. To deduct general expenses, Defendants must prove two things.

First, Defendants must prove that the general expense is connected to and contributed to the sale of insurance using Blaze Advisor. *Victor Stanley, Inc. v. Creative Pipe, Inc.*, No. 06-cv-2662, 2011 U.S. Dist. LEXIS 112846, at *18-21 (D. Md. Sep. 30, 2011); *Universal Furniture Int'l, Inc. v. Collezione Europa, USA, Inc.*, 599 F. Supp. 2d at

33

660-61 (M.D.N.C. 2009); *In Design v. Lauren Knitwear Corp.*, 782 F. Supp. 824, 832-33 (S.D.N.Y. 1991). In other words, they must prove a "sufficient nexus between each expense claimed and the sales of the unlawful goods." *Hamil*, 193 F.3d at 106 (emphasis and quotations omitted).

Second, Defendants must prove that any method of allocation that compares all general expenses connected to selling insurance to the insurance sold in connection with the use of Blaze Advisor is a fair and accurate one. *Id.* at 105; *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC*, 377 F. App'x 303, 310 (4th Cir. 2010). Absent proof of comparability, a percentage-based allocation of expenses is unreasonable. *Gaste v. Kaiserman*, 863 F.2d 1061, 1071 (2d Cir. 1988) (rejecting a 90 percent deduction of expenses to an infringing song that represented 90 percent of the infringer's sales); *Fendi*, 2010 U.S. Dist. LEXIS 144425, at *30; *In Design*, 782 F. Supp. at 835 (rejecting deduction of expenses based on pro rata percentage of revenues).

This is Defendants' burden. Any uncertainty because of Defendants' inadequate record-keeping is resolved in favor of FICO. *Andreas*, 336 F.3d at 795 ("Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff. If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits.") (quotations omitted).

The evidence will show that Defendants chose to produce litigation-generated financial reports with incomplete financial data. Defendants chose to ignore proof of a nexus between expenses and revenue, and to further ignore proof of a nexus to the revenue generated from infringement. Defendants chose to rely on assumptions rather

than factual analysis in their treatment of expenses. Defendants also failed to produce financial information regarding ACE American and its writing companies. Defendants' damages expert, Mr. Bakewell, assumed that the expenses of ACE American and its writing companies were in the same proportions as legacy Chubb expenses. He has no evidence to support that assumption. Defendants will fail to carry their burden to prove deductible expenses under Section 504(b).

When infringement is willful, the defendant cannot deduct general expenses. *Saxon v. Blann*, 968 F.2d 676, 681 (8th Cir. 1992) ("Overhead may not be deducted from gross revenues to arrive at profits when an infringement was deliberate or willful."); *Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 515 (9th Cir. 1985). The evidence will show that Federal and ACE American were willful infringers.

### C.  **Defendants chose to present no evidence of apportionment; in equity they must bear the consequences of that strategic choice.**

Defendants also carry the burden to apportion the revenue generated in connection with the infringing use of Blaze Advisor from all other factors contributing to revenue generation. *See* 17 U.S.C. § 504(b). Defendants made the strategic choice to present no evidence of the extent the infringing revenue is attributable to factors other than infringement.

Defendants have no evidence of deductible expenses that match the infringing gross written premium. Defendants also present no evidence quantifying the extent to which other factors contributed to the infringing gross written premium. Defendants merely contend the infringing gross written premium is attributable to other factors. Mr.

Bakewell opines: "the large majority, if not all" of Federal's profits are attributable to factors other than Federal's infringement. (Ex. H at ¶ 170.) Defendants' insurance industry expert, Mr. McCarter, also offers only his *ipse dixit* statements to the same effect.

Mr. Bakewell did not analyze the extent to which profits were attributable to factors other than infringement because he was not engaged to do so. Mr. Bakewell concedes he could "get out the toolbox" and perform these calculations for apportionment. (Ex. I at 53:10-63:15.) But he did not. Similarly, Mr. McCarter made no analysis of the case-specific facts regarding apportionment.

Under Section 504(b), an expert must provide more than unquantified observations regarding profit apportionment. The expert must provide the "correct percentage of total revenues or profits that would be attributable to" other factors. *Design Ideas, Ltd. v. Things Remembered, Inc.*, No. 07-cv-3077, 2009 U.S. Dist. LEXIS 38374, at *13-14 (C.D. Ill. May 6, 2009) (explaining that an expert witness's apportionment opinion must provide mathematical apportionment).

### D.    In equity, Defendants' bear the consequences of their choices.

Defendants here chose to present no evidence directed to their burden to prove apportionment. Defendants chose to offer no evidence to quantify the extent their infringing revenue was attributable to factors other than infringement. In equity, Defendants must bear the consequences of their strategic decisions. *See NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 796 (8th Cir. 2013); *Ossman v. Diana Corp.*, 825 F. Supp. 870, 879 (D. Minn. 1993); *see also FHC Equities, L.L.C. v. MBL Life Assurance*

*Corp.*, 188 F.3d 678, 687 (6th Cir. 1999); *Manning v. Gold Belt Falcon, LLC*, No. 08-cv-3427, 2011 U.S. Dist. LEXIS 134241, at *7 (D.N.J. Nov. 17, 2011) ("The Court will not utilize equitable principles to undo the results of Plaintiff's tactical decisions.").

## IX.    FICO is entitled to recover prejudgment interest and attorneys' fees.

### A.    FICO is entitled to recover prejudgment interest for its breach of contract damages.

FICO will move post-trial for an award of prejudgment interest on its breach of contract damages. New York law provides that prejudgment interest "shall be recovered" by a prevailing plaintiff in a breach of contract action. N.Y. CPLR § 5001(a). The recovery of prejudgment interest is mandatory, not discretionary. *See Spodek v. Park Prop. Dev. Assoc.*, 733 N.Y.S.2d 674, 676 (2001); *Brushton-Moira Cent. School Dist. v. Thomas Assocs.*, 669 N.Y.S.2d 520, 522-23 (1998). The interest is to be computed from the date the damages in question were incurred. N.Y. CPLR § 5001(b). The statutory rate is 9% per annum, calculated on a simple basis. N.Y. CPLR § 5004. New York's 9% prejudgment interest rate is compensatory. *See Citibank, N.A. v. Barclays Bank, PLC*, 28 F. Supp. 3d 174, 184 (S.D.N.Y. 2013).

### B.    FICO is entitled to recover prejudgment interest for its actual damages and disgorgement damages in connection with its copyright claims.

FICO will also move post-trial for an award of prejudgment interest for its actual damages, beginning on the date the infringement began. "[P]rejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable." *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986). District courts in the Eighth Circuit award prejudgment interest for actual

copyright damages. *I-Sys., Inc. v. Softwares, Inc.*, No. 02-cv-1951, 2005 U.S. Dist. LEXIS 47592, at *46 (D. Minn. Mar. 7, 2005); *Kleier Advert. v. John Deery Motors*, 834 F. Supp. 311, 314 (N.D. Iowa 1993).

The Copyright Act does not specify a method of calculation, but courts have approved the use of the one-year constant maturity Treasury yield compounded annually. *William A. Graham Co. v. Haughey*, No. 05-cv-612, 2010 U.S. Dist. LEXIS 47035, at *12-15 (E.D. Pa. May 12, 2010), *aff'd*, 646 F.3d 138 (3d Cir. 2011).

FICO will also move for prejudgment interest on its disgorgement damages. Courts have awarded prejudgment interest for disgorgement damages in indirect profits cases to deter willful infringement and to prevent the infringer from being unjustly enriched from acts of willful infringement. *Victor Stanley*, 2011 U.S. Dist. LEXIS 112846, at *21-22, *aff'd*, 499 F. App'x 971 (Fed. Cir. 2013); *William A. Graham*, 2010 U.S. Dist. LEXIS 47035, at *10 ("[W]e reiterate that an award of prejudgment interest is appropriate here [*e.g.*, for disgorged indirect profits].").

**C.     FICO is entitled to recover attorneys' fees due to Defendants' willful infringement.**

The Court may award attorneys' fees to a prevailing party in a copyright infringement action. *See* 17 U.S.C. § 505. Factors that courts may consider in awarding attorney's fees include "frivolousness, motivation, objective reasonableness … and the need in particular circumstances to advance considerations of compensation and deterrence." *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294 (8th Cir. 1996). "One of the most common circumstances warranting an award of attorney's fees is deliberate

infringement." 4 Nimmer on Copyright § 14.10 (2021). While willful infringement is not a prerequisite to the recovery of attorneys' fees under the Copyright Act, *see RCA/Ariola Int'l*, 845 F.2d at 780, it is one consideration. Here, Defendants are willful infringers.

## X.  Conclusion

Federal, through its division Chubb & Son, breached the License Agreement. It willfully infringed FICO's copyrights after the License Agreement terminated, and ACE American willfully infringed those copyrights thereafter. FICO seeks an award of its lost license fees and disgorgement of all infringing revenue.

MERCHANT & GOULD P.C.

DATE: January 25, 2023

/s/ Heather Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Paige S. Stradley, MN Bar #393432
Michael A. Erbele, MN Bar # 393635
Joseph Dubis, MN Bar # 0398344
Gabrielle L. Kiefer, MN Bar # 0402364
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN  55402
Tel:  (612) 332-5300
Fax:  (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
pstradley@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com
gkiefer@merchantgould.com

*Attorneys for Plaintiff Fair Isaac Corporation*