UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| FAIR ISAAC CORPORATION, | Court File No. 16-cv-1054 (DTS) |
| Plaintiff, | |
| v. | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | *REDACTED*<br>DEFENDANTS' TRIAL BRIEF |
| Defendants. | |

---

# INTRODUCTION

Defendants Federal Insurance Company and ACE American Insurance Company submit this trial brief pursuant to the Court's Trial Notice and Final Pretrial Order.

## STATEMENT OF FACTS TO BE PROVED AT TRIAL

Defendants intend to prove the following facts at trial. The following is not an exhaustive list of every fact Defendants will prove at trial.

### A. The parties.

Plaintiff Fair Isaac Corporation ("FICO") is a software company. One of its products is Blaze Advisor, a business-rules management program. Business-rules management programs execute rules drafted by the program's user to assist in accomplishing some internal business processes. Blaze Advisor is one of many business rules management programs that have been on the market since the mid-2000s.

Defendants Federal Insurance Company ("Federal") and ACE American Insurance Company ("ACE") are separate companies that issue property and casualty insurance. They

identify and underwrite risks they wish to insure, issue policies, and handle insurance claims arising under those policies.

Prior to January 2016, ACE was an indirect subsidiary of ACE Limited.

Before January 2016, Federal and ACE were unrelated entities in separate corporate families. Federal was a subsidiary of the Chubb Corporation. Federal was the principal insurance company in the Chubb group of companies, which were known collectively as "Chubb." Chubb wrote insurance through more than a dozen different insurance companies in the United States and other countries. Before January 2016, all but two of those insurance companies were subsidiaries of Federal.

On January 15, 2016, ACE Limited acquired the Chubb Corporation, resulting in the merger of the Chubb and ACE groups of companies. After the merger, the ultimate parent, ACE Limited—recognizing the value of the "Chubb" name—changed its name to Chubb Limited. The merged groups of companies now operate under the "Chubb" brand.

**B.     Federal purchased a perpetual, enterprise-wide license to use Blaze Advisor.**

In June 2006, Federal, through its Chubb & Son division, purchased from FICO a perpetual license to use Blaze Advisor as part of an existing policy-administration computer application called CSI Express. It paid ▒▒▒▒▒▒ for this license, and the original license agreement included terms allowing Federal to expand the scope of the license in the future.

In August 2006, Federal exercised one of the expansion options—the Divisional Enterprise License Option—and the parties executed Amendment One, which permitted the unlimited use of Blaze Advisor within the Chubb Specialty Lines Division. The fee for the divisional license was ▒▒▒▒▒▒. Federal was credited for its ▒▒▒▒▒▒ payment for the initial license and thus paid an additional ▒▒▒▒▒▒ for Amendment One.

2

In December 2006, Federal exercised the second option, and the parties executed Amendment Two, which expanded the scope of the license to an enterprise-wide, perpetual license, the broadest license available. The total fee for the enterprise-wide license was ███████████████████████████ fee for the divisional license. Federal was credited the ██████ in prior license fee payments and thus paid an additional ██████ for Amendment Two (the complete license agreement, including Amendments One and Two is referred to herein as the "License Agreement").

The License Agreement provided that the "Client and its Affiliates" were permitted to use Blaze Advisor. The evidence will show that the parties intended, and at all times prior to January 2016, treated, the License Agreement as allowing use of Blaze Advisor by Federal and its Affiliates—and not by only the Chubb & Son division and its (non-existent) Affiliates, as FICO now contends. Indeed, both parties understood that, because Chubb & Son was an unincorporated division with no affiliates, expansion of the license to an enterprise-wide scope—for which Federal paid an additional ██████—would otherwise be meaningless.

Section 10.8 of the License Agreement generally provided that the parties cannot assign their rights under the Agreement without the other party's written consent. But that provision also sets forth a special rule for changes of control, *e.g.*, reorganizations, acquisitions, and mergers—such changes of control are "deemed" to be assignments under the Agreement, and FICO's written consent is required only in those circumstances for "expanded use" of Blaze Advisor. Section 10.8 also prohibits FICO from unreasonably withholding its consent to such "deemed" assignments.

Under Section 9.2 of the License Agreement, the parties reserved the right to terminate the License Agreement, but only in certain limited circumstances, including in the event of an uncured,

material breach. Section 9.3 of the License Agreement barred further use of Blaze Advisor in the event the License Agreement was validly terminated.

C.  **Federal and its international affiliates used Blaze Advisor without incident for a decade.**

For almost a decade after entering into the License Agreement, Federal used Blaze Advisor without incident. During this period, Federal paid FICO millions of dollars in Blaze Advisor maintenance and service fees (in addition to the initial ▮▮▮▮▮▮ license fee). Some of Federal's foreign affiliates in Canada, Europe, and Australia also used Blaze Advisor during this time. FICO knew of this usage and did not object to it. In fact, FICO encouraged this use by assisting Federal's foreign affiliates in installing Blaze Advisor. FICO's internal communications confirm its knowledge of this use. For instance, in 2008, when Federal's European affiliate sought to use Blaze Advisor, internal communications show that FICO staff understood the License Agreement to permit such usage. Other communications within FICO in the following years make clear that FICO understood that the License Agreement permitted Federal's foreign affiliates to use Blaze Advisor.

D.  **FICO used ACE's acquisition of Chubb as a pretext to seek higher license fees from Chubb.**

On July 1, 2015, ACE Limited's acquisition of the Chubb Corporation was announced. That same day, FICO began discussing a strategy to assert that any use of Blaze Advisor after this acquisition would violate the License Agreement. Over the following months, FICO employees strategized over how they could use the impending merger to extract additional fees from Federal, even though Federal already had a perpetual, enterprise-wide license. Internal communications among these employees make clear that FICO understood at the time that Federal's license permitted the continued use of Blaze Advisor after a change in corporate control and that FICO

would not be entitled to additional fees merely because the revenue of the reorganized client would be larger than it was before.

Despite learning about the merger in July 2015, FICO did not approach Federal to discuss the License Agreement until year-end 2015. Instead, FICO used this time to try to sell other products to Federal, without any mention of the merger or its alleged impact on the License Agreement. These efforts to sell additional products to Federal prior to the close of the merger were unsuccessful.

Then, around the time ACE's acquisition of Chubb closed in January 2016, FICO informed Federal of its view that Federal was in breach of the License Agreement. FICO timed this announcement to increase its leverage over Federal, knowing that a client like Federal could not immediately stop using Blaze Advisor. During the business negotiations that ensued, Federal demonstrated that it had not expanded its use of Blaze Advisor and, accordingly, that FICO had no legal basis to seek additional license fees. In fact, it would have been impossible for use to expand during this time, with the technological integration of two large insurance companies projected to take years. In response to FICO's claims, Federal even offered to further *limit* its use of Blaze Advisor. FICO rejected this offer, having asserted that *any* use of Blaze Advisor by Federal after the merger violated the License Agreement. After the merger, Blaze Advisor remained confined to the same Federal applications with which it had been used before the merger. By April 2020, Blaze Advisor was removed from all of Federal's computer applications with no negative impact on Federal's business.

In early 2016, FICO also asserted—for the first time—that Federal had breached the License Agreement by permitting its foreign affiliates to use Blaze Advisor. FICO leveled this accusation even though, for many years, its employees had known of Federal affiliates' use of

Blaze Advisor and had understood the License Agreement to permit such use. And, in an effort to pile-on—despite evidence to the contrary—FICO also alleged that two third-party consultants improperly used Blaze Advisor. The evidence will show that one of the consultants never used Blaze and FICO knew of and approved of the limited use by the other. Neither constituted a breach of the License Agreement.

**E.     FICO improperly purported to terminate the License Agreement.**

On March 30, 2016, FICO announced its intention to terminate the License Agreement, effective the following day. FICO filed this lawsuit less than a month later, on April 21, 2016.

## CLAIMS AND DEFENSES

**I.     Breach of Contract**

    **A.     Defendants did not breach the License Agreement**

        **1.     Entity issue**

FICO argues that Federal breached the License Agreement by permitting use of Blaze Advisor by its employees and affiliates and by third-party consultants. That is incorrect. First, under the License Agreement, Federal's affiliates had the right to use Blaze Advisor. Second, to the extent third-party consultants for Federal's affiliates used Blaze, that use was condoned by FICO and, in any event, immaterial.

            **a)     Federal's foreign affiliates**

Amendment Two expressly permits use of Blaze Advisor by the "Client and its Affiliates[.]" FICO argues that the Client was the Chubb & Son division of Federal, not Federal itself, and hence that the use of Blaze Advisor by <u>Federal's</u> affiliates violated the License Agreement. That is incorrect.

Federal is the counterparty to the License Agreement. The Agreement's plain text shows that Chubb & Son executed the agreement on behalf of Federal. Chubb & Son, as an unincorporated division of Federal, is not a legal entity under New York law. It cannot be sued. Therefore, as the Court observed at summary judgment, it would make little sense to hold that the Chubb & Son division had the power to enter into a contract. Indeed, the parties stipulated that Federal, not the Chubb & Son division, was the proper defendant in this matter.

The evidence will show that the parties understood Federal to be the "Client" at the time the License Agreement was originally executed and amended. The license fee due under the License Agreement was not calculated based on the revenue of the Chubb & Son division, but rather the Chubb Corporation as a whole. Federal had a custom and practice of entering into contracts under the Chubb & Son name that spanned thousands of contracts. This practice derived, in part, from its counterparties'—including FICO's—desire to do business with the more well-known "Chubb" name. Indeed, FICO negotiated for the right to publicize that it did business with "Chubb."

The Master Services Agreement, negotiated contemporaneously with the License Agreement, specified that the counterparty was "Chubb & Son, a division of Federal Insurance Company, for itself and as servicer of the Chubb Corporation and its non-insurance company subsidiaries." Federal's original Request for Information, the very first communication between the parties in February 2006, used the same language. This language shows that the parties' mutual understanding and agreement that Chubb & Son was acting on behalf of Federal and its affiliates throughout the Chubb Corporation. Consequently, when the parties executed Amendment Two, the parties intended that Federal and its affiliates were permitted to use Blaze Advisor. Notably,

7

Federal allocated the cost of the License Agreement across six different areas of Chubb, not just the Chubb & Son division.

In addition, Amendment Two to the License Agreement expanded the use of Blaze Advisor to the Client's affiliates. The Chubb & Son division, as an unincorporated entity, has no affiliates. Therefore, if Chubb & Son were the client, Amendment Two would be rendered a nullity, and Federal would have paid the additional ▮▮▮▮▮ fee for nothing.

Moreover, FICO acquiesced in and ratified the use of Blaze Advisor by Federal's affiliates. Employees at Federal subsidiaries in Europe, Australia, and Canada used Blaze Advisor. Federal never hid this fact from FICO. To the contrary, FICO employees actively worked to help employees of Chubb Europe and Chubb Canada use Blaze. Internal communications among FICO employees show they understood that the License Agreement extended to Federal's global affiliates.

Because the License Agreement's Client was Federal, not the Chubb & Son division, Federal did not breach the License Agreement by permitting its foreign affiliates to use Blaze Advisor.

### b) Third-party consultants

FICO claims that third-party consultants of Federal affiliates—AppCentrica and DWS Group—had access to or used Blaze Advisor in violation of Section 3.1 of the License Agreement, which limits use of Blaze to the Client's employees. Federal did not breach Section 3.1.

FICO cannot carry its burden of proving that any DWS Group employee had access to or used Blaze Advisor. The evidence will show only that (i) employees from Federal's Canadian affiliate delivered a demonstration of Blaze Advisor to Federal's Australian affiliate and DWS Group employees—a demonstration of which FICO was aware, and (ii) a DWS Group employee

working with Federal's Australian affiliate later contacted FICO with questions about Blaze Advisor.

One AppCentrica employee used Blaze Advisor in 2013. But FICO knew about AppCentrica's incidental use of Blaze Advisor and did not object to it. It therefore acquiesced in that usage. To the extent that AppCentrica's usage of Blaze Advisor constituted a breach of the License Agreement, it was not a material breach that would justify FICO's termination of the License Agreement under Section 9.2.

### 2. Section 10.8

FICO argues that Federal breached Section 10.8 of the License Agreement by failing to obtain prior written consent for the continued use of Blaze Advisor after ACE acquired Chubb. Defendants will prove that is also incorrect.

Section 10.8 only required Federal to seek FICO's consent to continued use of Blaze Advisor after the acquisition in the event Federal made "expanded use" of Blaze Advisor. The text of the License Agreement provides that when a "deemed assignment" in the case of a corporate reorganization, acquisition or merger, Federal was only required to obtain consent to any "expanded use" of Blaze Advisor. FICO's contrary interpretation of the language of Section 10.8 would essentially read the "expanded use" rule out of the License Agreement.

Bolstering Federal's interpretation, the expanded-use rule does not appear in other, comparable agreements between FICO and other licensees. In those agreements, *any* use of Blaze Advisor after a corporate change in control, reorganization, or acquisition requires FICO's consent. The text of these other agreements shows that FICO understood how to negotiate for an assignment clause that would have the meaning FICO ascribes to Section 10.8 in this litigation. It did not do so here.

9

There was, moreover, no expanded use of Blaze Advisor after the acquisition. In other agreements, FICO negotiated for terms expressly tying expanded use to the revenue of the reorganized or acquired licensee. The License Agreement, however, does not define "use" by reference to gross written premiums or any other revenue-based metric. FICO thus asks the jury to amend Section 10.8 to include such language. But Federal will demonstrate that Section 10.8 allocated the risk of a revenue change associated with a change in the Client's control to both parties: if Federal got bigger through reorganization or merger, it would pay the same; but if it got smaller, it would also pay the same. The License Agreement likewise does not define "use" by reference to the number of seats using Blaze Advisor. Federal, through Amendment Two, purchased an unlimited-seat license. Looking at the number of applications that Blaze was deployed in is accordingly the only measure of expanded use that makes sense. And the number of applications using Blaze Advisor never expanded.

### 3. Section 9.3

FICO contends that Federal breached Section 9.3 of the License Agreement, which bars a licensee from further use of Blaze Advisor in the event the License Agreement is validly terminated. FICO, however, lacked cause to terminate the License Agreement under Section 9.2. Consequently, its termination was invalid. Federal's continued use of Blaze Advisor after March 31, 2016, therefore, did not violate Section 9.3

### 4. Excuse

FICO materially breached the License Agreement by terminating it without cause under Section 9.2. That breach excused any subsequent breach by Federal.

### B. FICO breached the License Agreement

#### 1. Improper termination

FICO breached the License Agreement by improperly terminating it. FICO could only terminate the License Agreement in the event Federal breached "any of the material terms of this Agreement[.]" Federal will prove that it did not breach the License Agreement in any material respect. Consequently, FICO's purported termination violated the License Agreement.

#### 2. Covenant of good faith and fair dealing

In several respects, FICO breached the covenant of good faith and fair dealing that the law incorporates into all contracts. The covenant of good faith and fair dealing bars either party to a contract from attempting to deprive the other party of the benefit of its bargain or from frustrating the purposes of the contract.

First, FICO unreasonably withheld consent under Section 10.8 to Federal's continued use of Blaze Advisor.

Second, FICO rushed to terminate the License Agreement without a good faith basis to do so. Under industry custom, there is a grace period between the close of a corporate acquisition and the time at which the acquisition's impact on contracts is assessed. FICO's own witnesses agree. Nevertheless, FICO rushed to declare Federal in breach and terminate the License Agreement over the course of only a few months, even though Federal promptly informed FICO that there was no expanded use of Blaze Advisor and pledged to work with FICO to understand the effect of the acquisition on the parties' dealings. For instance, Federal proposed to downgrade from an enterprise-wide license to a seat- and application-limited license for no additional license fee. And it again made clear that Federal would limit its use to the exact seats and applications with which it had always used Blaze Advisor—*i.e.*, that its use would not expand. FICO rejected

that offer. Fearing that the new Chubb might not prove as lucrative a client as Federal had been, FICO moved quickly to extract as large a fee as possible from Federal. And when these efforts failed, FICO rushed to terminate the agreement based on dubious breach allegations and sued Federal.

Third, FICO purported to identify a nonexistent territorial restriction into the License Agreement in an attempt to pressure Federal to come to terms. Shortly after the ACE-Chubb acquisition, FICO claimed that the License Agreement limited Federal's use of Blaze Advisor to the United States. FICO employees, however, knew that the License Agreement contained no such restriction. Internal emails show FICO executives' understanding that the License Agreement was global in scope. Indeed, FICO was aware of and communicating with Federal's global affiliates using Blaze Advisor. And, indeed, the Court determined on summary judgment that this claim lacked any merit.

In these three ways, FICO violated the covenant of good faith and fair dealing.

## II. Copyright Infringement

### A. Federal did not infringe FICO's copyright

FICO alleges that Federal's use of Blaze Advisor between March 2016—when FICO purported to terminate the License Agreement, and December 31, 2016—was unauthorized, and hence copyright infringement. This period of usage was not copyright infringement because Federal possessed a valid, enterprise-wide, perpetual license to use Blaze Advisor—the License Agreement. Because Federal did not breach the License Agreement in any respect, FICO's purported termination was unjustified under Section 9.2 of the License Agreement and therefore invalid. Indeed, FICO bargained for a perpetual license to use Blaze Advisor. It did so in part to

12

avoid exactly this situation: a counterparty announcing with one day's notice that an agreement is terminated.

### B. ACE American and Federal did not infringe FICO's copyright

FICO claims that starting on January 1, 2017, when Federal employees became employees of ACE, any further use of Blaze Advisor was copyright infringement attributable to both Federal and ACE American. Federal and ACE did not infringe FICO's copyright.

Federal did not infringe FICO's copyright because at all times it has had a valid license to use Blaze Advisor.

As to ACE American, FICO offers two theories of copyright infringement. First, it contends that, because as of January 1, 2017, all employees of Federal were nominally employees of ACE, ACE was using Blaze Advisor without a license and thereby infringing FICO's copyright. Second, it contends that certain insurance policies issued by ACE and its affiliates were processed in one of the applications built by Federal that included Blaze Advisor, amounting to unauthorized use of Blaze Advisor by ACE. Both theories fail.

Before and after the merger, Blaze Advisor was used by the same employees and applications. FICO's theory would mean that the mere act of continuing business as usual—even as Defendants worked to transition away from Blaze Advisor following FICO's improper termination—is copyright infringement. This theory—among other problems—goes directly against Section 10.8 of the License Agreement, which permitted Federal to keep using Blaze Advisor after an acquisition so long as it did not expand its usage. As to ACE, FICO cannot prove any improper use of the software license. Nor, in any event, would any ACE use of Blaze have been improper given that under Section 10.8, when ACE acquired Chubb, a "deemed assignment" occurred and ACE stepped into Federal's shoes under the contract so long as use of Blaze Advisor

13

did not expand beyond the applications in which it was previously used. Consequently, both Defendants had a valid license to use Blaze Advisor during the whole time period in which FICO claims copyright infringement.

### III. Damages

Should Defendants be found liable, the evidence will show that FICO's damages request is grossly inflated and not supported by the facts or the law.

#### A. Actual damages

The measure of actual damages in this case—for both FICO's contract and copyright claims—is the license fee that FICO purportedly lost as a result of Defendants' alleged unauthorized use of Blaze Advisor. Lost license fees are determined by calculating the fair market value of a license to use Blaze Advisor—the price at which a willing seller and a willing buyer would agree.

FICO claims that its actual damages are approximately $47 million. This figure is baseless, for several reasons. First, Federal purchased a global, perpetual, enterprise-wide Blaze Advisor license in 2006 for ██████. Second, other companies purchased or were offered comparable perpetual, enterprise-wide Blaze Advisor licenses for similar amounts—in all events, far, far less than $47 million. Many of these companies' revenues far exceeded Chubb's. Third, FICO's $47 million damages calculation was computed using a methodology that the Court has determined is subjective, unreliable, and inconsistent with the legal standard for determining actual damages:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

14

███████████, as Federal did. FICO's employees admit that ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

The $47 million figure likewise does not account for ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

In fact, in 2006, ████████████████████████████████

Additionally, the $47 million calculation includes charges for Federal applications that never incorporated Blaze Advisor: CIS Claims, Cornerstone, Broker Site, Evolution, and Exari.

**B.       Disgorgement of profits**

FICO also contends that it is entitled to disgorge Defendants' profits attributable to their alleged copyright infringement. Even if infringement is found, FICO is entitled to none of Defendants' profits. There is not a sufficient causal nexus between the use of Blaze Advisor and any portion of Defendants' profits.

First, expenses—losses, operating expenses, taxes, and fees—must be deducted. Second, and more importantly, Defendants' alleged copyright infringement did not contribute to their revenues. Blaze Advisor was used in at most 15 applications—out of approximately 1,500 applications that Defendants use in their insurance business. Blaze Advisor did not provide the business rules Defendants used: Federal employees crafted all the rules that were subsequently deployed in the applications that used Blaze Advisor. And Blaze Advisor was far from the only way to program rules into a computer application: Defendants could—and did—use other programs and hard-coding. Indeed, nearly all of these applications ran business rules, but in most

of them, those rules were hard-coded by Defendants' employees and business rules software was not used.

Defendants will demonstrate the factors that contributed to its revenues: finding and retaining customers, providing excellent customer service and claim handling, monitoring state and federal regulatory requirements, and developing a reputation as a reliable insurer. The evidence will show that Blaze Advisor was an insignificant part of this process. It could be, and was, replaced with other programs or with no program at all. Customers did not know about Blaze Advisor and did not give Defendants their business because of it. Indeed, Defendants' expert will testify, based on his extensive knowledge of Blaze Advisor and rules-management software, that Defendants' revenues are not attributable to Blaze Advisor. For his part, FICO's expert has stated that he cannot testify as to whether Blaze Advisor contributed to Federal or ACE's revenues in any way.

## UNRESOLVED ISSUES

The parties will separately file a statement of uncontested facts. All other facts and issues in this case are unresolved.

## CONCLUSION

The Court should enter judgment for Defendants on all of FICO's claims and all of Defendants' counterclaims.

Dated:  January 25, 2023

*/s/ Terrence J. Fleming*
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Ryan C. Young (#0397751)
ryoung@fredlaw.com
Panhia Vang (#399444)
pvang@fredlaw.com

**Fredrikson & Byron, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

Leah Godesky (Admitted Pro Hac Vice)
Anton Metlitsky (Admitted Pro Hac Vice)
Daryn Rush (Admitted Pro Hac Vice)
Roxana Guidero (Admitted Pro Hac Vice)

**O'Melveny & Myers LLP**
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
lgodesky@omm.com
ametlitsky@omm.com
drush@omm.com
rguidero@omm.com

***Attorneys for Federal Insurance Company and ACE American Insurance Company***