# EXHIBIT 1

*Declaration of Leah Godesky*



# Expert Report of Brooks L. Hilliard  CMC® CCP

**Business Automation Associates, Inc.**
**Phoenix, Arizona**

In the matter of:

**Fair Isaac Corporation**

v.

**Federal Insurance Company and Ace American Insurance Company**

Case No. 16-CV-1054 (WMW/DTS)

United States District Court
District of Minnesota

**CONFIDENTIAL – ATTORNEY'S EYES ONLY**

May 31, 2019

has consulted for more than 200 companies, governmental agencies and not-for-profit organizations.  My work has included the selection, implementation and ongoing support of business information technology applications, including both hardware and software for data and voice communication.  As a part of these consulting engagements, my clients have licensed and purchased (or were considering the license or purchase of) various types of general purpose and special purpose business software, including applications used in the financial industry.

Over the past 35 years, I have been engaged as an expert witness / consultant in more than 120 legal disputes.  These matters include (a) the implementation and performance of various business software applications, and (b) intellectual property disputes between computer software and/or systems suppliers.  Although most engagements have been settled out of court, I have given testimony numerous times in depositions, trials, hearings and arbitrations.

I am one of fewer than fifteen professionals in the world to be both a Certified Management Consultant™ (see Exhibit #1) and a Certified Computing Professional (see Exhibit #2).  My educational background includes a Master of Business Administration (MBA) degree from Harvard Business School and a Bachelor of Science degree in Mechanical Engineering with Deans' List academic honors from the Massachusetts Institute of Technology.  In addition, I have lectured on computer systems and programming for the Arizona State University School of Business and the American Management Association.  Prior to founding Business Automation Associates in 1980, I held both line and staff positions for several major computer companies where I had responsibilities in the areas of designing, developing, marketing and supporting a wide variety of computer products used in both business and government applications.  A copy of my professional biography is attached (see Exhibit #3).

In addition to my full-time consulting activities, I have served as a member of the Arizona State Bar Technology Task Force, written a book on computer selection (published by Dow Jones), published my own hard copy and electronic computer newsletters, provided commentary on computer issues for the nationally-syndicated MARKETPLACE news program on Public Radio International, conducted seminars, spoken professionally on various computer issues and been active in several civic organizations.  I am a past Board of Directors member for the Institute of Management Consultants USA, the Arizona Harvard Business School Alumni Association, the Arizona Chapter of the National Conference of Christians and

Expert Report of Brooks Hilliard, dated 5/31/2019, page 5

Some opinions expressed in Federal's experts' reports either (a) include the expert's interpretation of the meaning of various provisions of the 2006 Software License and Maintenance Agreement ("License Agreement") at issue in this case, or (b) rely on an implicit assumption the expert report makes regarding how a particular license provision should be interpreted. It is my understanding that contractual interpretation is normally a legal matter rather than an Information Technology or business matter. The explanations of my opinions in this report focus on business and industry factors that can assist the Court or the finder of fact to understand any terms of art and/or the business context that licensors and licensees would normally use to determine what rights, obligations and/or restrictions are embodied by the provisions of the License Agreement.

### IV.  SUMMARY OF OPINIONS

*Opinion #1:  The licensing limitations in the License Agreement are comparable to limitations customarily found in the license agreements of other commercial software providers.  FICO applied these limitations in a manner that is consistent with the normal customs and practices of the commercial software industry.*

*Opinion #2:  FICO had good and sufficient reasons, consistent with the normal customs and practices of the commercial software industry, for conditioning its consent to the continued use of its Blaze Advisor software on Federal's willingness to accept a negotiated increase in the license price.*

*Opinion #3:  Dr. Kursh's contention that FICO's pricing and discounting practices are inconsistent with the customs and practices of the commercial software industry is unsupported and incorrect.*

*Opinion #4:  The terms "commercially reasonable" and "commercially unreasonable" used throughout the Kursh Report are so vague and undefined that judgments based on them are not supportable.*

*Opinion #5:   Mr. McCarter fails to support his contention that Blaze Advisor has minimal value to Federal because it is "industry agnostic", easily replaceable and only one of many technologies that*

Expert Report of Brooks Hilliard, dated 5/31/2019, page 6

> *Federal employs to operate its insurance business. The evidence shows that FICO's Blaze Advisor provided critical capability, contributing to Federal's revenue that Chubb & Son had not developed internally.*

## V.  BASIS FOR OPINIONS

In addition, because I have been professionally involved in analyzing, drafting and/or negotiating several hundred software licenses in my consulting and expert witness engagements, the explanation of my opinions below also addresses whether particular license provisions, and the wording used to express them, are common and consistent with the provisions customarily found in licenses for other comparable business software.

The paragraphs that follow address each of my opinions stated above and explain the support for each of them.  In the instances where this support relies on the contract interpretation and/or contract enforceability issues described above, I have referenced them in the text.

*Opinion #1:  The licensing limitations in the License Agreement are comparable to limitations customarily found in the license agreements of other commercial software providers.  FICO applied these limitations in a manner that is consistent with the normal customs and practices of the commercial software industry.*

There are three areas where Dr. Kursh criticizes FICO's actions relating to the terms and conditions of the License Agreement:

1. **License Scope**:  Dr. Kursh's initial opinion states that it was commercially unreasonable for FICO to claim Federal breached the License Agreement by installing the Blaze Advisor software outside the United States.  Dr. Kursh's opinion states that FICO's resulting demand that Federal pay higher license fees to cure that breach was also commercially unreasonable, relying on a nonstandard interpretation of the License Agreement, specifically his assertion that Section 2 of the License Agreement allows Federal to install

Expert Report of Brooks Hilliard, dated 5/31/2019, page 31

---

> ***Blaze Advisor provided critical capability, contributing to Federal's revenue that Chubb & Son had not developed internally.***

The McCarter Report uses several explanations to try to minimize Blaze Advisor's value to Federal, but his own reasons undercut his conclusions. I disagree with these opinions for the following reasons.

Mr. McCarter acknowledges there are ten software applications that deploy Blaze Advisor, and "leverage" its functionality.[81] This total of ten applications understates Federal's own application count of 15. These 15 applications were disclosed in a report attached to an e-mail sent to FICO by Ms. T. Pawloski, Federal's VP of Software Compliance and Optimization, Global Vendor Services Organization on February 25, 2016. McCarter does not explain this discrepancy).[82]

### A. Blaze Advisor is integrated into "core" Federal applications

Mr. McCarter contends that Blaze Advisor is not a core technology:[83]

> Federal has only automated a small amount of the business rules and decisions that take place every day to conduct business. Blaze plays a small role in the business processing ecosystem at Federal.

However, the McCarter Report notes that Blaze Advisor is "integrated with core insurance applications that have … insurance functionality [needed] for selling and servicing insurance policies."[84] The phrase "integrated with core … applications" has special meaning to information technology professionals due to its use of the business computing terms of art, "integrated" and "core":

- "Integrated" normally means that a component application (Blaze Advisor in this case) is linked into a host application (here, an insurance application) in in a way that, *in the ideal*, would allow information to pass between them as if they were a single unified application. Depending on how "seamless" (*i.e.*, how close to the ideal) the integration is, this typically means that removal or

---

[81] McCarter Report, paragraph 85 on pages 24.

[82] FICO00001358–1359.

[83] McCarter Report, *op. cit.*, paragraph 74 on page 9.

[84] *Id.*, paragraph 91 on page 24.