# EXHIBIT 1

*Declaration of Leah Godesky*

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 16-cv-1054 (WMW/DTS) |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania Corporation, | ) ) ) ) ) ) |
| Defendant. | ) |

**EXPERT REPORT OF
W. CHRISTOPHER BAKEWELL
REGARDING DAMAGES**

**May 17, 2019**

Respectfully Submitted,

*[signature: WCBakewell]*

W. Christopher Bakewell

entities into one for the purposes of a damages assessment. It is my understanding that FICO is only entitled to profits from the actual named defendants themselves, and Mr. Zoltowski has provided no financial basis for doing otherwise. Here again, from a financial perspective, Mr. Zoltowski's claims are not to the evidence and would result in a windfall to FICO.

169. In his calculations, Mr. Zoltowski just aggregates *all* gross written premiums. Mr. Zoltowski appears to acknowledge that Blaze Advisor is one component that may *contribute* to the generation of gross written premiums;[252] however, he demonstrates no real attempt to use any type of reliable method to tie Federal's profits or revenue to the use of Blaze Advisor.

170. Federal operates one of the world's largest international P&C insurance companies with operating roots dating back to 1792.[253] As I discussed in **Section 3**, the evidence indicates that the large majority, if not all, of Federal's gross written premiums are attributable to factors unrelated to the use of Blaze Advisor applications and that fall outside the scope of any allegedly unlawful conduct in this matter. And Mr. Zoltowski has not shown otherwise. These factors include (but are not necessarily limited to), the know-how of its workforce, management abilities, brand recognition, existing customer relationships, pricing, and service quality, all of which are key drivers of Federal's gross written premiums.[254]

171. Gross written premiums attributable to these other considerations should not be included in any estimate of Federal's profits if they are claimed to somehow be attributable to the alleged wrongdoing, or else there is a windfall to FICO. In other words, FICO did not develop or take the requisite business risks or make the investments to develop the intangibles that I discussed above, and certainly Mr. Zoltowski has not shown this. FICO should not benefit from economic activities associated with these other intangibles.

---

[252] Zoltowski Report, p. 42.
[253] Chubb website: Our History. (accessed https://www.chubb.com/us-en/about-chubb/who-we-are.aspx)
[254] Chubb Limited Form 10-K, for the year ended December 31, 2017, p. 3; Chubb Ltd., Argus Analyst Report, February 26, 2019, p.1.

172. The P&C insurance industry is mature, and "the majority of P&C sales are associated with existing customers, so policy renewals dominate premiums for industry operators."[255] Industry sales are largely driven by strong recurring revenue and pre-existing customer relationships. Mr. Zoltowski did not factor these considerations. Mr. Zoltowski did not address the economic realities of the P&C insurance industry; he also did not recognize that existing customer relationships and the recurring nature of Federal's gross written premiums as being the primary driver of revenues, as opposed to any alleged wrongdoings.

173. This is all problematic because Mr. Zoltowski simply took Federal's total gross written premiums from business lines/segments which may have used Blaze Advisor, regardless of whether those gross written premiums were attributable to any alleged infringement. Mr. Zoltowski did not employ any financial or economic methodology to demonstrate a connection between these revenue numbers and Federal's use of Blaze Advisor, other than basic addition that requires little, if any, of his financial and valuation expertise.

174. In short, Mr. Zoltowski has not identified or accounted for those gross written premiums that are unrelated to the allegations in this case, or are driven by considerations that are separate and apart from any alleged wrongdoings. He has not identified any incremental financial benefits (*e.g.* incremental gross written premiums) realized by Federal on account of the alleged infringement.

*Mr. Zoltowski Includes Gross Written Premiums From Applications That Did Not Use Blaze Advisor*

175. Mr. Zoltowski's calculation of Federal's gross written premiums is overstated as it includes gross written premiums associated with a number of applications that do not use Blaze Advisor. I discussed in **Section 4.2** that the following applications do not use Blaze Advisor: CIS Claims, Cornerstone, ADAPT (U.K.), Evolution (Australia), Exari (U.K) and Broker Site (Canada).[256]

---

[255] IBISWorld Industry Report 52412 Property, Casualty and Direct Insurance in the US, December 2018, p. 7.
[256] Mr. Zoltowski assumes that gross written premiums processed through Broker Site are already included in

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

176. As a result of his inclusion of non-Blaze Advisor related applications, Mr. Zoltowski's calculation (setting aside the issues of nexus discussed above) overstates Federal's total gross written premiums by approximately $1.0 billion (or three percent) (*see* **Exhibit 5**).

*Mr. Zoltowski's Calculation Methodology Is Flawed and Overstates Federal's Gross Written Premiums*

177. In calculating Federal's gross written premiums related to the alleged infringement, Mr. Zoltowski simply aggregates the disclosed "gross written premiums of each company from all insurance policies in connection with which Blaze Advisor was used."[257] Put simply, Mr. Zoltowski just adds up all gross written premiums for each company and for each Blaze Advisor application. He does no substantive analysis of causation "attributable to" the alleged infringement, nor does he meaningfully analyze the financial attributes of the amounts that he tallied.

178. To the extent Mr. Zoltowski has a methodology, it implicitly assumes that the gross written premiums reported for each company and Blaze Advisor application are mutually exclusive and distinct. As the evidence shows, and as I will explain in more detail below, Mr. Zoltowski's inherent assumption is incorrect. As a result, Mr. Zoltowski's methodology is fundamentally flawed and results in an inflated gross written premium amount.

179. I understand that a single insurance policy (and by extension the associated gross written premium) may feed through more than one Blaze Advisor application. The data which Mr. Zoltowski has relied upon captures all of the policies (and associated gross written premiums) which ran through each of the applications, regardless of whether a policy had already been accounted for under another application. For example, if a single policy with $100 of gross

---

the database of gross written premiums that pass through Evolution. Zoltowski Report, Schedule 8.0 and 9.0. Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 19, March 2, 2019, p. 3; Deposition of Kevin Harkin, March 25, 2019, pp. 206-207.
[257] Zoltowski Report, p. 42.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

written premiums ran through both the CUW and CSI eXPRESS applications, its associated gross written premiums would appear twice in Mr. Zoltowski's analysis, and he would conclude that Blaze Advisor contributed $200 of gross written premiums. As a result, by simply aggregating the gross written premiums, Mr. Zoltowski may double or triple (or more) count certain gross written premiums, leading to an inflated and inaccurate total gross written premium amount.

180. One way that the magnitude of the overstatement contained in Mr. Zoltowski's calculations can be illustrated is by comparing Mr. Zoltowski's figures to the total (actual) gross written premiums reported on Federal's business segments and lines of business financial statements over the same time period:

**Comparison of Gross Written Premiums Between Federal's Business Segment/Line of Business Financials and Mr. Zoltowski**

*(in US$ millions)*

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Business Segment/Line of Busines Financials [1] | $ 167 | $ 223 | $ 332 | $ 7,016 | $ 6,910 | $ 6,353 |
| Mr. Zoltowski | $ 203 | $ 283 | $ 569 | $ 10,775 | $ 11,542 | $ 8,992 |
| *% Greater than Business Segment/Line of Business Financials* | 22% | 27% | 71% | 54% | 67% | 42% |

**Note:**
[1] The UK financials were only for the years 2016 to 2018. The 2013 to 2015 figures reflect the Europe gross written premiums from Mr. Zoltowski's analysis for illustrative purposes.

181. As this shows, Mr. Zoltowski's calculated gross written premiums exceed Federal's *total* reported gross written premiums in Federal's business segments and lines of business profit and loss statements over the same period(s), a conclusion that is not justifiable or reasonable. The profit and loss statements for the business segments and lines of business include all of the gross written premiums earned by the company, including policies connected to Blaze Advisor, as well as policies that did not use Blaze Advisor. By definition, the gross written premiums reported in the business segments and line of business profit and loss statements should be greater than the gross written premiums relied upon by Mr. Zoltowski. But they

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

are not.  And nowhere in his report does Mr. Zoltowski perform any such tests of reasonableness.

182. Federal also prepared the revised gross written premiums for CUW (a domestic application), an inventory management tool that is often used in conjunction with other applications when writing a single insurance policy.[258]  In this revised data, removed are any policies which ran through both CUW and another application, specifically CSI eXPRESS or Premium Booking and the resulting data shows policies that only ran through the CUW application.  The policies (and associated gross written premiums) which ran through both CUW and CSI eXPRESS or Premium Booking would have also been captured in the gross written premiums data relied upon by Mr. Zoltowski for CSI eXPRESS or Premium Booking applications (as discussed in the example above).  Using this revised CUW data effectively removes the duplication of certain gross written premiums in the CUW data used by Mr. Zoltowski.  For example, in Mr. Zoltowski's analysis, the premiums associated with any single policy which touched each of CUW, CSI eXPRESS and Premium Booking would be counted three times in the total gross written premiums.

183. When comparing this revised data to the data used by Mr. Zoltowski, the overstatement of gross written premiums is further illustrated:[259]

**Comparison of the Gross Written Premiums for the CUW Application Between Federal's Revised CUW Data and the Data Used by Mr. Zoltowski**
*(in US$ millions)*

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| Revised CUW Data | $ 3,819 | $ 2,526 | $ 2,149 |
| Mr. Zoltowski | $ 7,579 | $ 8,533 | $ 6,201 |
| *% Greater than the Revised CUW Data* | *98%* | *238%* | *189%* |

---

[258] File titled: "Blaze IM Extract-Final".
[259] I understand that the premiums from IRMA and TAPS would likely already be included in CUW premiums so the domestic premium are likely still overstated.

Page 56

184. The above table shows that the CUW gross written premiums relied upon by Mr. Zoltowski, are greater than the gross written premiums per the revised data prepared by Federal. Again, the CUW gross written premium data relied upon by Mr. Zoltowski included policies (and associated gross written premiums) that were captured multiple times in the data for other applications such as CSI eXPRESS and Premium Bookings.[260] I understand that the revised CUW data eliminates any policies that also ran through CSI eXPRESS and Premium Bookings.[261] This prevents double counting when the totals for each application are added together.

*Mr. Zoltowski Does Not Deduct Any of Federal's Costs That Were Incurred To Earn the Gross Written Premiums*

185. Mr. Zoltowski states that it is his understanding that "the copyright owner is required to present proof of only the infringer's gross revenue."[262] According to Mr. Zoltowski, "as a result, the damages presented related to copyright infringement damages reflect the dollar amounts associated with the gross written premiums through Federal's allegedly infringing use of Blaze Advisor."[263] On only this basis, Mr. Zoltowski calculates his estimate of total gross revenue as represented by gross written premiums only.

186. However, Mr. Zoltowski performed no analysis to determine if any of the revenues he captured had any link (*i.e*., nexus) to the allegations of this case, or to the value provided by the accused software. I explained at length above why this is problematic. Moreover, compounding his error of having a lack of nexus, Mr. Zoltowski provided no consideration of the costs and expenses that are necessary for Federal to earn such revenue.

187. Instead of engaging in financial analysis, or investigating issues that relate to value (as he claimed he did), Mr. Zoltowski's simply aggregated Federal's gross written premium (*i.e.,*

---

[260] Interview of Mr. McCarthy.
[261] Interview of Mr. McCarthy.
[262] Zoltowski Report, p. 43.
[263] Zoltowski Report, p. 43.

Page 57

gross revenue). Mr. Zoltowski did not perform any meaningful financial or economic analysis of these revenues. Exacerbating this issue, he made no attempt to identify the costs Federal incurred to earn such revenue, or the corresponding profit generated from such revenue. Without studying the economic attributes of what it took to generate the revenues that he identified as relevant, including their requisite costs, Mr. Zoltowski's work is incomplete, and does not provide any relevant measure of value, at least from a financial perspective.[264]

188. Federal does not track or report financial information by software application in the normal course of business.[265] I understand that Federal is unable to generate financial reports that report profit and loss information for insurance products that use Blaze Advisor.[266] This is not unusual at all, because these products are just one of many products and intangibles that are used to run the business. The lack of such information only helps illustrate why putting a revenue number in place like Mr. Zoltowski has, without further analysis, is not a meaningful measure of financial value.

189. However, for purposes of this dispute, Federal prepared profit and loss statements for each of the relevant business segments and lines of business that may have used the Blaze Advisor application.[267] These profit and loss statements reflect an overinclusive (*i.e.,* conservative) approximation of profit and loss for Blaze Advisor related lines of business.[268]

190. I summarize the business segments and lines of business for which Federal prepared a profit and loss statement (*see* **Exhibit 11**).[269] The information contained in the business segment

---

[264] Of course, there are significant costs required to support Federal's gross written premiums. Mr. Zoltowski made no effort to account for these. In addition to the issue of nexus, by not considering costs and expenses, Mr. Zoltowski does not utilize his financial and valuation expert skillset which shows that he has not studied the economic attributes of the revenues that he erroneously identifies as relevant.
[265] Deposition of Kevin Harkin, March 25, 2019, p. 123-124.
[266] Deposition of Kevin Harkin, March 25, 2019, p. 123-124.
[267] Deposition of Kevin Harkin, March 25, 2019, p. 124.
[268] Deposition of Kevin Harkin, March 25, 2019, p. 119, 123-124.
[269] Deposition of Kevin Harkin, March 25, 2019, p. 126-141.

Page 58

and line of business profit and loss statements is pulled from various sources. The process involved in pulling the data varies by line of business and geography, as described below:

- *Chubb Specialty Insurance ("CSI")*. 2016 data was pulled from the legacy general ledger by line of business. The data was then filtered to include only the US and Canada business.[270] 2017 and 2018 was pulled from the general ledger based on unique identifiers for each line of business.[271]

- *Chubb Commercial Insurance ("CCI")*. Federal used the same process as for CSI.

- *Chubb Canada Personal Lines*. The data was gathered from the legacy general ledger system using the unique identifiers for the selected personal lines of business in Canada.[272]

- *Australia ADAPT*. The data represents a pro-forma analysis prepared by Federal to estimate the underwriting income from 2007 to 2019 for accident and health insurance policies that processed through the ADAPT application and used Blaze Advisor.[273] The information used to prepare the pro-forma analysis was pulled from the Prism system, a policy registration system.[274]

- *Chubb European Group*. Financial data represents an attempt by Chubb European Group's CFO (Paul Johnston) to estimate the profit and loss of the European business that ran through the EZER and/or ADAPT applications.[275] The approximation was prepared specifically for purposes of this litigation. The data is sourced from the legacy general ledger similar to CSI and CCI but filtered for Europe.[276]

191. The line of business profit and loss statements report the profitability of each line of business for the relevant time period. The profit and loss statements report both "gross" and "net" amounts. Gross amounts reflect total amounts before deductions for amounts ceded to

---

[270] Deposition of Kevin Harkin, March 25, 2019, p. 119-120.
[271] Deposition of Kevin Harkin, March 25, 2019, p. 122-123.
[272] Deposition of Kevin Harkin, March 25, 2019, p. 210-211.
[273] Deposition of Kevin Harkin, March 25, 2019, p. 194.
[274] Deposition of Kevin Harkin, March 25, 2019, p. 188 and 194.
[275] Deposition of Kevin Harkin, March 25, 2019, p. 164.
[276] Deposition of Kevin Harkin, March 25, 2019, p. 167.

reinsurers.[277] Net amounts are reported after deducting reinsurance costs.[278] The originating insurer's risk exposure and profitability is based on the net amount after deducting reinsurance, as the net amount reflects the revenue and cost retained by the originating insurer. Federal's underwriting gain/loss reflects Federal's reported profit from its insurance underwriting activities after consideration of all costs incurred to generate such underwriting income.[279]

192. The line of business profit and loss statements identify the following revenue and expense items:

**Summary Of the Types Of Revenue And Costs
Included In the Profit And Loss Statements**

| Line Item | Account Classification | Description |
|---|---|---|
| Written Premium | Revenue | The total revenue expected to be received from the sale of an insurance policy over the term of the policy. Reflects the price paid by the customer on a cash basis.[280] |
| Earned Premium | Revenue | The amount of insurance premium reported as earned for accounting purposes based on U.S. GAAP principles and accrual-based accounting.[281] Customers typically pay premiums in advance, however for accounting purposes the premium is earned over the term of the insurance coverage. |
| Losses & LAE (Loss Adjustment Expenses) Incurred | Expense | The cost of insurance claims/losses and costs associated with claims handling (*e.g.*, legal fees).[282] |
| Commissions/Acquisition Costs | Expense | Policy level selling commissions and costs paid to insurance brokers and agents.[283] Reflects a direct cost of sales of an insurance policy. |

---

[277] Deposition of Kevin Harkin, March 25, 2019, p. 136.
[278] Deposition of Kevin Harkin, March 25, 2019, p. 136. Reinsurance is a common insurance industry practice whereby an originating insurance company transfers a portion of its risk exposure to another insurer through a reinsurance agreement. Investopedia (accessed https://www.investopedia.com/terms/r/reinsurance.asp).
[279] Interview of Mr. Harkin.
[280] Deposition of Kevin Harkin, March 25, 2019, p. 129.
[281] Deposition of Kevin Harkin, March 25, 2019, p. 129.
[282] Deposition of Kevin Harkin, March 25, 2019, p. 130.
[283] Deposition of Kevin Harkin, March 25, 2019, p. 132.

CONFIDENTIAL
ATTORNEY'S EYES ONLY

| Line Item | Account Classification | Description |
| --- | --- | --- |
| G&A (Administrative) and TLF (Taxes, Licenses and Fees) | Expense | General and administrative expenses (*e.g.*, administrative salaries and benefits, IT costs, general office costs).[284] TLF expenses include state premium taxes, licensing fees and other fees.[285] |
| Expenses Incurred | Expense | Equal to the sum of commissions/acquisition costs, G&A and TLF expenses. |
| Dividends Incurred | Expense | Policy holder dividends which are specific to a small number of lines of business (*e.g*.,. surety).[286] |
| Underwriting Gain/Loss | Profit | The profitability of an insurance company's underwriting operations. Calculated as earned premium less losses & LAE expenses and expenses incurred.[287] |
| Combined Ratio | Ratio | A summary financial ratio of an insurance company's underwriting profitability. Calculated as losses and LAE expenses plus expenses and dividends incurred divided by earned premiums. |

193. I understand that in calculating profits, Federal is entitled to deduct the costs it incurs to generate revenue. With this understanding, I performed additional analyses of these costs. Setting aside the issue of nexus discussed above, I calculated Federal's profits following several steps, as I discuss below.

194. *First*, I calculated Federal's gross written premiums (gross revenue) associated with applications that used Blaze Advisor. I adjusted Mr. Zoltowski's analysis to exclude those applications discussed in **Section 4.2** that do not use Blaze Advisor (see above) and to exclude duplicative gross written premiums that were included in Mr. Zoltowski's analysis.

195. *Second*, I deducted Federal's reinsurance costs to determine Federal's net written premium, being the amount of premium retained by Federal. Based on the evidence produced in this matter, including my discussions with Mr. Harkin, reinsurance costs are variable costs that are directly related to the sale of insurance policies. Therefore, these costs are an appropriate

---

[284] Deposition of Kevin Harkin, March 25, 2019, p. 134.
[285] Deposition of Kevin Harkin, March 25, 2019, p. 57-58, 134.
[286] Deposition of Kevin Harkin, March 25, 2019, p. 144.
[287] Deposition of Kevin Harkin, March 25, 2019, p. 135.

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

deduction in arriving at Federal's profits. I estimated Federal's reinsurance costs based on Federal's actual reinsurance costs as reported in the profit and loss statements for the relevant business segments and lines of business.

196. *Third*, I adjusted the net written premiums to reflect the amount of earned premiums. The difference between written premium and earned premium is principally timing related and related to differences between cash (written) and accrual (earned) based accounting. I adjusted the net written premiums to earned premiums based on the actual relationship between net written premiums and earned premiums as reflected in Federal's profit and loss statements for the relevant business segments and lines of business.

197. *Fourth*, I deducted losses and LAE expenses incurred by Federal associated with the earned premiums. Losses and LAE expenses are direct variable costs that directly relate to the earned insurance premiums. Losses and LAE expenses reflect the direct cost of claims associated with the earned insurance premiums and are therefore an appropriate deduction. I estimated the losses and LAE expenses based on Federal's actual loss ratio as reported in the profit and loss statements for the relevant business segments and lines of business. The loss ratio is a standard industry measure of losses as a percentage of earned premiums. I adopted the following loss ratios (*see* also **Exhibits 8.0, 8.1, 8.2, 8.3** and **8.4**):

**Comparison of the Loss Ratios Between Business Segment/Line of Business Financials and Comparable Public Companies**

|  | For the Years Ending December 31, | | |
|---|---|---|---|
|  | 2016 | 2017 | 2018 |
| **Business Segment/Line of Business Financials** | 53% | 58% | 56% |
| **Comparable Public Companies [1]** | | | |
| Low | 58% | 63% | 62% |
| **Median** | **61%** | **66%** | **64%** |
| High | 85% | 83% | 76% |
| **Average** | **66%** | **69%** | **66%** |

**Note:**
[1] Includes Chubb Limited; The Travelers Companies, Inc.; The Hanover Insurance Group, Inc.; American International Group, Inc.; and W.R. Berkley Corporation

CONFIDENTIAL
ATTORNEY'S EYES ONLY

198. As summarized in the above table, Federal's actual loss ratio is generally consistent, albeit lower, than the observed range in industry benchmark loss ratios and the loss ratios of comparable public companies. Adopting Federal's actual loss ratio is conservative, meaning that if I adopted the higher loss ratios observed in industry benchmarks and comparable public companies, the losses would be higher and the underwriting profit would be smaller.

199. *Fifth,* I deducted commissions expenses incurred by Federal. Commissions expenses comprise the direct selling costs of the insurance policies and are therefore appropriately deducted as a direct variable cost. I estimated Federal's commissions expenses attributable to the subject earned premiums based on Federal's actual reported commissions expenses as a percentage of earned premiums as reported in the profit and loss statements for the relevant business segments and lines of business.

200. *Sixth*, I deducted general and administrative expenses and taxes, licenses and fees incurred. These expenses represent expenses that are necessary for the operation of Federal's business and sale of insurance policies. General and administrative expenses include underwriter salaries and benefits, professional fees and advertising and marketing costs among other expenses. These costs are necessary to operate Federal's business and sell insurance policies (gross written premium). Taxes, licenses and fees are similarly necessary costs of operating as an insurance company. I understand that these costs cannot be attributed to specific insurance policies, but are allocated to the lines of business.[288]

201. I estimated Federal's general and administrative expenses and taxes, licenses and fees incurred based on Federal's actual reported expenses as a percentage of earned premiums as reported in the profit and loss statements for the relevant business segments and lines of business as follows (*see* also **Exhibits 8.0, 8.1, 8.2, 8.3** and **8.4**):

---

[288] Deposition of Kevin Harkin, March 25, 2019, p. 56-58.

**Comparison of the Expense Ratios Between Business Segment/Line of Business Financials and Comparable Public Companies**

|  | For the Years Ending December 31, | | |
|---|---|---|---|
|  | **2016** | **2017** | **2018** |
| **Business Segment/Line of Business Financials** | 27% | 29% | 28% |
| **Comparable Public Companies [1]** | | | |
| Low | 30% | 29% | 29% |
| **Median** | **33%** | **33%** | **32%** |
| High | 34% | 34% | 36% |
| **Average** | **32%** | **32%** | **32%** |

**Note:**
[1] Includes Chubb Limited; The Travelers Companies, Inc.; The Hanover Insurance Group, Inc.; American International Group, Inc.; and W.R. Berkley Corporation

202. As summarized in the foregoing table, Federal's actual expense ratio is generally consistent, albeit on the low end, of the observed range in industry benchmark expense ratios and the expense ratios of comparable public companies.[289]

203. The following table summarizes Federal's underwriting profits from estimated gross written premiums that processed through Blaze Advisor applications and compares them to Mr. Zoltowski's estimate (*see* also **Exhibit 5**):

---

[289] Again, adopting Federal's actual expense ratio is conservative, meaning that I were to adopt the higher expense ratios observed in industry benchmarks and comparable public companies, the expenses would be higher and the underwriting profit would be smaller.

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

**Comparison of the Profit and Loss Statements for Gross Written Premiums Processed Through the Blaze Advisor Applications Between Mr. Zoltowski and Federal Actual**
*(in US$ millions)*

|  | Mr. Zoltowski's Estimate | Federal Actual |
|---|---|---|
| **Gross Written Premiums** | $ 30,876 | $ 16,189 |
| Net Written Premiums | | $ 14,688 |
| **Net Earned Premiums** | | $ 15,364 |
| Less: Losses | Was not estimated by Mr. Zoltowski | $ (8,560) |
| *Loss Ratio* | | 56% |
| Less: Expenses (incl. commissions, G&A, taxes, dividends & other expenses) | | $ (4,348) |
| *Expense Ratio* | | 28% |
| **Underwriting Profit** | | $ 2,456 |
| *% of Net Earned Premiums* | | 16% |
| *Combined Loss Ratio* | | 84% |

204. Federal's underwriting profit calculations show a combined ratio of 84%. This combined ratio is consistent with industry benchmarks and comparable public companies (*see* **Exhibit 10**).

205. To recap, and absent establishing an economic nexus or causal link between any profits Federal received and the alleged infringement, a calculation of Federal's profits is inappropriate in these circumstances. As I discussed above, from a financial perspective my analysis is overinclusive relative to the claims in this case. By this I mean that it does not isolate gross written premiums and associated profits (if any) attributable to the alleged infringement, as opposed to other factors unrelated to any alleged infringement.

### *4.4   Summary*

206. As I discussed at length above, Mr. Zoltowski's calculations are not tied to the allegations in this case. Both his "lost license fees" calculations and his "disgorgement" calculations lack