**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| FAIR ISAAC CORPORATION, | Court File No.  16-cv-1054 (DTS) |
| Plaintiff, | |
| v. | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 5** |
| Defendants. | |

---

Defendants Federal Insurance Company and ACE American Insurance Company submit this memorandum of law in opposition to Fair Isaac Corporation's ("FICO") Motion *in Limine* No. 5.

The Federal Rules of Civil Procedure require a party to disclose the topics on which its witnesses will testify—through initial Rule 26 disclosures or otherwise. Defendants have done just that. Every topic associated with each witness on Defendants' witness list has been disclosed, either through initial disclosures, deposition testimony, answers to interrogatories, or summary-judgment declarations. FICO's purpose in filing this Motion in Limine is clear: it knows the testimony that Defendants' witnesses will offer is fatal to its case, so it is seeking to have substantial portions of that testimony barred on the desperate pretext that it was not properly disclosed. But this litigation has gone on nearly seven years and the parties have taken voluminous discovery—encompassing 39 depositions and more than 27,000 documents. There is nothing about the topics identified

in Defendants' witness list that is a surprise to FICO, and FICO's bad-faith attempt to preclude Defendants from putting on a case to refute its baseless claims should be rejected.

## I. WITNESSES MAY TESTIFY ON ANY TOPIC DISCLOSED DURING LITIGATION

At trial, a witness may testify regarding any topic as to which the witness was disclosed as knowledgeable—either in initial disclosures or subsequently in litigation. Under Rule 26, a party must disclose at the outset of the case "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses[.]" Fed. R. Civ. P. 26(a)(1)(A)(i). But a party need not supplement that disclosure if new information—such as a new testimony topic—has "otherwise been made known to the other parties during the discovery process or in writing[.]" *Id.* 26(e)(1)(A); *accord* Dkt. 731 at 34-35 ("There is no requirement to supplement if the information was otherwise made known to the opposing party during the discovery process." (quoting *Tomlinson v. J.B. Hunt Transp., Inc.*, 989 F. Supp. 2d 766, 776 (D. Minn. 2013)). And even if "a party fails to comply with the disclosure requirements" of Rule 26, undisclosed testimony topics may not be excluded at trial if the failure to disclose "was substantially justified or is harmless." *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018) (quoting Fed. R. Civ. P. 37(c)(1)). An omission in initial disclosures is harmless if the other party had "notice" of the information because, for instance, a witness testified to the subject matter "during his [or her] deposition[,]" *Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879, 889 (8th Cir. 2006), or it was disclosed in an "interrogatory response[,]" *Tomlinson*, 989 F. Supp. 2d at

776; Dkt. 731 at 34-35 (court finding in other context that FICO knew witness had discoverable information "from documents produced in discovery" and because he "was included in a response to one of FICO's interrogatories"). Consequently, Defendants' witnesses may testify to any topic identified in Defendants' initial disclosures or otherwise made known to FICO in litigation.

## II.  EACH OF THE TESTIMONY TOPICS TO WHICH FICO OBJECTS HAS BEEN DISCLOSED

### A.  FICO largely declined to take fact-witness depositions despite every opportunity to do so.

FICO's self-described "litigation strategy" was to obtain discovery almost exclusively "through use of 30(b)(6) depositions[.]" Godesky Decl. Ex. 1 ("May 2019 Hr'g Tr."), at 8. FICO served Rule 30(b)(6) notices on dozens of topics—seeking binding corporate testimony on subjects such as Defendants' corporate structure, *id.* Ex. 2 ("First Rule 30(b)(6) Notice), at 1-4, the Chubb & Son division, *id.* at 3-4, the use of Blaze Advisor, *id.* Ex. 3 ("Second Rule 30(b)(6) Notice"), at 1-2, Blaze Advisor's role in Defendants' business, *id.* at 3-4, the calculation of Defendants' revenue and profit, *id.* Ex. 4 ("Third Rule 30(b)(6) Notice"), at 1-5. Accordingly, FICO expressly "decided not to depose" most of Defendants' disclosed witnesses, *see* May 2019 Hr'g Tr. 8, even though it had ample notice of the topics on which they would testify.

### B.  Claudio Ghislanzoni

FICO objects to Chubb Chief Enterprise Architect Claudio Ghislanzoni testifying about "software-license agreements[.]" Dkt. 964 at 4. At his deposition, however, Ghislanzoni discussed software-licensing agreements. *See* Godesky Decl. Ex. 5, at 31 (Q:

3

"Does Chubb have a license to the Drools software?"  Q: "[D]o you know what the price is of that software tool?"  Q: "Do you know what type of license Chubb has to Drools?  Say, for example, enterprise- or application-based?"); *id.* 33-34, 45 (discussing considerations involved in choosing which software to license).  Material disclosed in discovery also shows that Ghislanzoni was involved in analyzing software-licensing agreements.  *Id.* Ex. 6 (D-0166) (email from Ramesh Pandey to Ghislanzoni laying out different license pricing models for the ODM rules engine).  FICO was thus on notice that this was a topic as to which Ghislanzoni might testify.

    **C.**    **David Gibbs**

FICO objects to David Gibbs testifying about "software license agreements" and "the scope and terms of the Enterprise License Agreement and/or other related agreements[.]"  Dkt. 964 at 4.  Gibbs, however, was disclosed as knowledgeable "regarding Federal's use of Blaze Advisor in the United Kingdom."  Dkt. 965 Ex. 1 at 2.  A dispute in this case is whether the License Agreement authorized use of Blaze Advisor by Federal's foreign affiliates.  Consequently, testimony about such usage will necessarily contain information about the scope of permissible Blaze Advisor use under the License Agreement and other related agreements.

Moreover, numerous communications produced by Defendants showed that Gibbs was involved in conversations, and therefore had knowledge, about the terms of the License Agreement.  *See, e.g.*, Godesky Decl. Ex. 7 (D-0120) (email copying Gibbs stating that "[n]o additional Blaze license[s] are needed as [UK use] is covered within the overall global Blaze ELA"); *Id.* Ex. 8 (D-0061) (email copying Gibbs stating "[T]he blaze license

4

is global for both java and .net"); *Id.* Ex. 9 (D-0115) (email copying Gibbs to FICO employee asking, "[W]ould you please be able to chase down whether we have Decision Simulator as part of our license agreement"); *Id.* Ex. 10 (D-0087); *Id.* Ex. 11 (D-0113).

Gibbs also testified regarding these topics in a declaration submitted with Federal's summary-judgment motion.  Dkt. 515.  He explained that "it was understood that Chubb Europe had a global license to install and use Blaze, and FICO did not suggest otherwise, nor did FICO attempt to charge us additional license fees[.]"  *Id.* at 2  He added, "There was no discussion or negotiation with FICO regarding the scope of the Blaze license or payment for the license because it was understood by Chubb Europe and FICO that the license to install and use Blaze was global."  *Id.*  FICO did not object to Gibbs's testimony at the time his declaration was filed (even as it unsuccessfully moved to strike a *different* witness's summary-judgment declaration on insufficient-disclosure grounds, Dkt. 731 at 34-35).  It has thus known for almost three-and-a-half years that Gibbs was knowledgeable about the scope and terms of the License Agreement.

**D.     Kevin Harkin**

FICO objects to Harkin testifying about "the factors that contribute to revenue generation and profit, and use of Blaze."  Dkt. 964 at 4-5.  That objection is puzzling because Defendants initially disclosed Harkin as knowledgeable "regarding the company's financial operations[,]" suggesting considerable knowledge about its revenue and profits— a topic that necessarily also includes any revenue generation or profit from policies that interacted with computer applications including the Blaze software. Dkt. 965 Ex. 1 at 3.  Indeed, in the Rule 30(b)(6) notice for Harkin's deposition, FICO specifically requested

5

testimony on "the steps undertaken and the methods used to report gross and net revenue and gross and net profit derived from products for which Blaze Advisor software was used." Third Rule 30(b)(6) Notice. Moreover, at deposition, Harkin discussed Federal's losses and expenses—which bear on profit. *See* Godesky Decl. Ex. 12, at 59-62, 135-38.

### E.     Pamela Lopata

FICO objects to Pamela Lopata testifying about "Defendants' corporate structure, and the Chubb & Son division." Dkt. 964 at 5. That objection is as meritless as the others recounted above. First, Defendants disclosed Lopata as knowledgeable about "the parties' agreement[.]" Godesky Decl. Ex. 13 ("Federal's Supp. 1st Set of Interr. Ans.") at 2. Because she may testify broadly about the terms of the License Agreement—which necessarily includes the identity and nature of the signatory, "Chubb & Son, a division of Federal Insurance Company"—she may discuss how Defendants' corporate structure relates to and explains the nature of the Chubb & Son division. As the history of this case makes plain, a grasp of Chubb's corporate structure is essential to properly understanding the terms of the License Agreement.

Second, Lopata was also initially disclosed during discovery as knowledgeable about "communications between the parties[,]" Dkt. 965 Ex. 1 at 2, and subsequently about "their course of dealing[,]" Federal's Supp. 1st Set of Interr. Ans. at 2. These topics also encompass knowledge of Defendants' corporate structure. For instance, much of the 2016 communications between the parties concerned the identity of the "Client" under the License Agreement and whether Chubb's use of Blaze had expanded by virtue of the ACE acquisition—a topic necessarily encompassing information about the Chubb & Son

division and Defendants' corporate structure both before and after the acquisition. *See, e.g.*, Dkt. 775 Ex. 14 (sent on behalf of "Chubb," and referring to "Chubb & Son, a division of Federal Insurance Company" as the client of a proposed renegotiated licensing agreement); Dkt. 775 Ex. 15 (concerning the "Chubb business contract" and identifying "Chubb Limited, through its division Chubb & Son" as the client in a counterproposal). Consequently, in testifying about the parties' course of dealing, Lopata will be required to discuss Defendants' corporate structure and the Chubb & Son division.

Finally, Lopata has already offered testimony concerning Defendants' corporate structure and the Chubb & Son division in a summary-judgment declaration. Dkt. 513 at 1-2 (describing Chubb's and Federal's subsidiaries and Federal's role in Chubb's corporate structure); *id.* at 2 (describing the Chubb & Son division's role within Federal and its legal status). Again, FICO did not object to Lopata's testimony at the time her declaration was filed. FICO has thus long been on notice that Lopata was knowledgeable about "the Defendants' corporate structure, and the Chubb & Son division."

It is likewise puzzling that FICO objects to testimony on Defendants' corporate structure because its Rule 30(b)(6) deposition notices identify numerous topics related to Defendants' corporate structure and the Chubb & Son division. *See* First Rule 30(b)(6) Notice (seeking testimony on, among other topics, Federal's subsidiaries, entities it controls, and the business and corporate structure of the Chubb & Son division). It has long known that these topics would be the subject of trial testimony and has sought binding corporate testimony on them—its eyes-wide-open choice to *not* also seek percipient-witness testimony from Lopata is not a valid basis for a preclusion order. May 2019 Hr'g

7

Tr. 8 ("We did not depose Ms. Pamela Lopata. . . . [W]e deemed her testimony to be entirely duplicative[.]")

### F.     Ramesh Pandey

FICO objects to Ramesh Pandey testifying on "software-license agreements" and the "replacement of Blaze." Dkt. 964 at 5. FICO has long known that Pandey was involved in—and has knowledge of—Federal's replacement of Blaze. First, Defendants initially disclosed this knowledge, explaining that Pandey knew about "Federal's use of the licensed software[.]" Dkt. 965 Ex. 1 at 2. That disclosure covers testimony about Federal's replacement of Blaze Advisor—knowledge about the "use" of Blaze Advisor necessarily encompasses the diminution and end of that use.

Second, in an interrogatory response, Defendants identified Pandey as a witness knowledgeable about the contention that Federal did not expand its use of Blaze Advisor following the acquisition, a proposition that plainly relates to Federal's eventual transition away from Blaze Advisor. Federal's Supp. 1st Set of Interr. Ans. at 10.

Third, in one of the *three* depositions FICO took of Pandey, he testified about the replacement of applications using Blaze Advisor. Godesky Decl. Ex. 14 at 211 (Q: "CSI Express is still being used is it not[?]"  A: "But it's being replaced now."); *id.* at 212 (Q: "When do you project it will be completed, that transition?"  A: "If we get the funding that we are getting now, I'll say 18 to 24 month[s].").

Fourth, material produced in discovery shows that Pandey led a "Business Rule Engine Rationalization" presentation at which he discussed "[m]igration from Blaze to ODM," the business-rule software program to which Chubb transitioned. *Id.* Ex. 15 (D-

8

0134). And Pandey was part of numerous email exchanges produced in discovery discussing the transition away from Blaze Advisor. *See, e.g.*, *id*. Ex. 16 (FED000690_0001) ("Hi Ramesh, Who in your team is working on the ODM vs Blaze Rules Engine comparative assessment?"); *id.* Ex. 17 (FED000700_0001) (Pandey: "Please follow this template while doing the product compare[.]"); *id.* Ex. 18 (FED001118_0001) (discussing "blaze vs IBM ODM").

Fifth, other witnesses testified in their depositions about Pandey's involvement in and knowledge of the replacement of Blaze Advisor. Tamra Pawloski described a meeting in which Pandey "did a whole big presentation on the white board" regarding "the future between Blaze Advisor and Chubb[.]" *Id*. Ex. 19 at 155-56. And William McCarter relied on Pandey's view of alternatives to Blaze Advisor as a basis for his expert opinion that Blaze Advisor did not contribute to Defendants' revenue. *Id*. Ex. 20 at 178-79.

FICO has also been on notice that Pandey's testimony may concern software-license agreements. Defendants disclosed Pandey as knowledgeable about "the business reasons for using the Blaze Advisor software." Federal's Supp. 1st Set of Interr. Ans. at 7. Testimony on that subject would naturally encompass discussion of the reasons to license Blaze Advisor and the appropriate content of such a license.

### G. Michael Schraer

FICO objects to Michael Schraer testifying on "the factors that contribute to revenue generation and profit." Dkt. 964 at 5. Defendants, however, disclosed Schraer as having "knowledge regarding the applications that used Blaze Advisor in the Chubb Specialty Insurance (CSI) unit (premerger) and the Financial Lines Unit (post-merger)[.]" Dkt. 965

Ex. 1 at 5. Testimony about applications using Blaze Advisor necessarily relates to the role Blaze Advisor played in Defendants' business—and thus "the factors that contribute to revenue generation and profit."

That connection was clear at Schraer's deposition. There, he testified extensively to the factors that drive revenue generation and profit. *See, e.g.*, Godesky Decl. Ex. 21 at 14 ("[I]t's a very relationship-driven business and, really, in this industry, your relationships with people really do matter and make a difference."); *id.* at 17 ("How we [make an underwriting profit], as I said, is an incredibly complex mix of all kinds of activities."); *id.* at 62-65 (discussion as to whether "precision, consistency, agility, speed, and cost . . . drive[] business at Chubb"); *id.* at 77 ("[T]here's a whole multitude of factors throughout the whole process that would impact the ultimate outcome."). FICO has long been on notice that Schraer would offer such testimony at trial.

### H.   Alissa Theberge

FICO objects to Alissa Theberge testifying on "the use of Blaze, Defendants' business sales," and "the factors that contribute to revenue generation and profit." Dkt. 964 at 5. All these topics were covered by Defendants' initial disclosure that Theberge is knowledgeable about "the underwriting service center which underwrites certain risks." Dkt. 956 Ex. 1 at 5. Knowledge of the underwriting process encompasses testimony about the role Blaze Advisor (and myriad other factors) played in underwriting—that is, testimony about "the use of Blaze" and "the factors that contribute to revenue generation

and profit." And because underwriting is a crucial part of the insurance business, Theberge may testify about "Defendants' business sales[.]"

Moreover, other discovery put FICO on ample notice that Theberge is knowledgeable about these topics. In her deposition, for example, Theberge testified about her use of apps employing Blaze Advisor, *id.* Ex. 22 at 26-28, the role of the underwriting process in crafting insurance policies, *id. passim*, and the connection—or lack thereof—between apps using Blaze Advisor and the efficiency of the underwriting process, *id.* 28-30 (Q: "Were any of those tasks accomplished faster because of the use of CSI Express?" A: "I don't think so.").

## **CONCLUSION**

The Court should deny FICO's Motion *in Limine* No. 5.

Dated:  January 27, 2023                                *s/ Terrence J. Fleming*

_____
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Ryan C. Young (#0397751)
ryoung@fredlaw.com
Panhia Vang (#399444)
pvang@fredlaw.com

**Fredrikson & Byron, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

Leah Godesky (Admitted Pro Hac Vice)
lgodesky@omm.com
Anton Metlitsky (Admitted Pro Hac Vice)
ametlitsky@omm.com
Daryn Rush (Admitted Pro Hac Vice)
drush@omm.com
Roxana Guidero (Admitted Pro Hac Vice)
rguidero@omm.com

**O'Melveny & Myers LLP**
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000

***Attorneys for Federal Insurance Company and ACE American Insurance Company***