1          UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                     )
     Fair Isaac Corporation,         )  File No. 16-cv-1054(DTS)
4    a Delaware Corporation,         )
                                     )
5             Plaintiff,             )
                                     )
6    v.                              )
                                     )
7    Federal Insurance Company,      )  Courtroom 14W
     an Indiana corporation,         )  Minneapolis, Minnesota
8    and ACE American Insurance      )  Friday, February 3, 2023
     Company, a Pennsylvania         )  3:00 p.m.
9    Corporation,                    )
                                     )
10            Defendants.            )
                                     )
11   ------------------------------------------------------------

12

13

14          BEFORE THE HONORABLE DAVID T. SCHULTZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16             **(FINAL PRETRIAL CONFERENCE)**

17

18

19

20

21

22
          Proceedings recorded by mechanical stenography;
23   transcript produced by computer.

24                    *   *   *

25

                 RENEE A. ROGGE, RMR-CRR
                      (612)664-5107

```
 1       APPEARANCES:

 2         For Plaintiff:          MERCHANT & GOULD P.C.
                                   BY:  ALLEN W. HINDERAKER
 3                                      HEATHER J. KLIEBENSTEIN
                                        PAIGE S. STRADLEY
 4                                      MICHAEL A. ERBELE
                                        JOSEPH W. DUBIS
 5                                      GABRIELLE L. KIEFER
                                   150 South Fifth Street, #2200
 6                                 Minneapolis, Minnesota 55402

 7         For Defendants:         FREDRIKSON & BYRON
                                   BY:  TERRENCE J. FLEMING
 8                                      LEAH C. JANUS
                                        CHRISTOPHER D. PHAM
 9                                      RYAN C. YOUNG
                                        PANHIA VANG
10                                 200 South Sixth Street, #4000
                                   Minneapolis, Minnesota 55402
11
                                   O'MELVENY & MYERS LLP
12                                 BY:  LEAH GODESKY
                                        ANTON METLITSKY
13                                      DARYN E. RUSH
                                        ROXANA GUIDERO
14                                 Times Square Tower
                                   7 Times Square
15                                 New York, New York 10036

16         Court Reporter:         RENEE A. ROGGE, RMR-CRR
                                   United States District Courthouse
17                                 300 South Fourth Street, Box 1005
                                   Minneapolis, Minnesota 55415
18
19                                      *   *   *
20
21
22
23
24
25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3          THE COURT:  We're on the record in the matter of

4    Fair Isaac Corporation versus Federal, et al., Civil

5    Number 16-1054.

6          Counsel for FICO, if you will note all of your

7    appearances, please.

8          MR. HINDERAKER:  Your Honor, Allen Hinderaker from

9    Merchant & Gould.  And with me from Merchant & Gould is

10   Heather Kliebenstein, Paige Stradley, Michael Erbele and Joe

11   Dubis.  And at the end of the table I'm at, Jim Woodward,

12   Vice President/Deputy General Counsel of FICO.

13         THE COURT:  All right.  Good afternoon to all of

14   you.

15         Counsel for the defendants, if you will note your

16   appearances, please.

17         MR. FLEMING:  Good afternoon, Your Honor.  Leah

18   Godesky, Anton Metlitsky and Roxana Guidero of the O'Melveny

19   firm.  And along with me from the Fredrikson law firm, Leah

20   Janus and Ryan Young.  And I'm Terry Fleming.

21         THE COURT:  All right.  Good afternoon to all of

22   you.

23         So I'll give you a general idea of what I had

24   planned for the afternoon.  First of all, thanks for

25   accommodating my change in the schedule.  It became apparent

1    to me that we needed more than an hour for this.  So I had

2    to move it to this afternoon.  I'm planning that we'll be

3    done by 5:00, but some of that's in your hands.

4         My plan for this is to spend the next hour dealing

5    with the motions in limine, if it takes that long.  I don't

6    know that it necessarily has to, but I'll give you each, you

7    know, that half an hour to make your case about each and

8    every one of the motions that you want to.

9         I will tell you I will rule on them from the

10   bench.  We'll follow that up with a brief written order on

11   the motions.  I have largely made up my mind about them, but

12   that doesn't mean my mind is closed.  So if you persuade me

13   otherwise, we'll certainly take it under advisement and rule

14   at a later date, but my hope is to get that all done here.

15        Second, I've got a whole list of things about how

16   we deal with the trial, the process and procedures and some

17   things that I want of all of you, and we'll go through that.

18   And, of course, anything that you want to raise that I

19   don't, by all means, we'll deal with that as well.  Okay?

20        All right.  Why don't we -- I'm still waiting for

21   the other stuff that I want, but we can go ahead with the

22   motions while we're waiting.  Why don't we start --

23        Mr. Hinderaker, we'll take them in order, 1

24   through 6, as you see fit or whoever is arguing them.

25        MR. HINDERAKER:  Okay.  But you would like them in

1    that order?

2                    THE COURT:  I would, actually.

3                    Go ahead, Mr. Dubis.

4                    MR. DUBIS:  Thank you, Your Honor.  I'll be brief

5    with this one.

6                    So Brooks Hilliard is a retained expert who will

7    rebut the opinions of defendants' experts Kursh and

8    McCarter.  Now, defendants want to cross-examine

9    Mr. Hilliard regarding a fee dispute with another client

10   where that client filed counterclaims of fraud.  Allowing

11   such questioning will result in a collateral sideshow at the

12   end of this trial.  Again, Mr. Hilliard is a rebuttal expert

13   that will go after -- yes, Your Honor.

14                   THE COURT:  Okay.  Yeah, that clarifies a question

15   or a problem that I had, which was I didn't see him on the

16   witness list.  Your plan is he'll be called in the rebuttal

17   case; is that right?

18                   MR. DUBIS:  That is correct, Your Honor.

19                   THE COURT:  Okay.  All right.  Keep going.

20                   MR. DUBIS:  And so it will result in a collateral

21   sideshow right at the end of this already long trial.  And

22   testing these untested allegations will result in a mini

23   trial, which will be confusing, prejudicial and a great

24   waste of time and should be blocked under Rule 403.

25                   Two points I want to make quickly from defendants'

1    briefing.  First, they say that the court has already

2    rejected FICO's relevance objection.  That's not true.  In

3    the court's order, it was very explicit that admissibility

4    at trial is not the standard for discovery.

5              And then, lastly, defendants make the point that,

6    you know, this won't be a huge waste of time.  While they

7    may be able to ask their questions quickly, FICO's job to

8    then rebut it and rehabilitate Mr. Hilliard will take

9    sufficient amount of time and create quite a sideshow.

10             So if Your Honor has any questions, I'm happy

11   to --

12             THE COURT:  No, I don't have any questions about

13   this one.  So why don't we go ahead and let them argue what

14   they want to and we'll go from there.

15             MR. FLEMING:  Good afternoon, Your Honor.

16             THE COURT:  Good afternoon, Mr. Fleming.

17             MR. FLEMING:  Terry Fleming on behalf of the

18   defendants.

19             Brooks Hilliard will testify in rebuttal, and he

20   will rely on his experience with business technology

21   applications and will testify about the customs and practice

22   of the commercial software industry and whether Blaze

23   contributed to Federal's revenues.

24             Now, we intend to attack Mr. Hilliard's

25   credibility.  We're not attacking his qualifications as an

1    expert, but, rather, his truth-telling capability.  It's

2    fairly straightforward.

3            He was involved in a lawsuit that he initially

4    refused to talk about until this court ordered him to.  And

5    he brought a lawsuit relating to a prior expert witness

6    matter, because they didn't pay his fees; and they brought a

7    counterclaim, and that counterclaim alleged fraud.  It

8    alleged fraud with regard to his capabilities as an expert.

9    It alleged fraud with regard to over-billing.  These are

10   very serious allegations.  And is it prejudicial?  Of

11   course, it is.  Is it unfairly prejudicial?  No.  No, it's

12   not unfairly prejudicial.  These are very unusual

13   circumstances.  And the jury ought to be able to hear that

14   the witness who is opining on these software capabilities is

15   somebody who a prior client has said that he misrepresented

16   his capabilities in that regard and, further, that he

17   committed fraud in submitting bills for time that he did not

18   actually spend.

19           We've referenced a couple cases that courts have

20   said, well, the fact that they're mere allegations and

21   haven't been proven yet are not a barrier to inquiring about

22   this.  Will there be a mini trial on this?  Will it be

23   wasteful of time?  Will the jury be confused?  No.  The jury

24   will understand that they're allegations.

25           We're not planning on spending half an hour on it,

1    but we are going to -- we anticipate asking him questions

2    about his prior stint as an expert witness.  These are

3    serious allegations that were made, and it goes directly to

4    his credibility.

5              I will stop there, Your Honor.

6              THE COURT:  Okay.  Go ahead and be seated.

7              Let me ask, counsel, Do you want me to tell you as

8    we go through the motions my rulings or do you want to wait?

9    Do you want to hear them now?

10             MR. HINDERAKER:  We can hear them now, Your Honor.

11             THE COURT:  All right.  This motion I'm going to

12   grant in part and deny in part for the following reasons:

13             The specific information I think is proper for the

14   limited purpose that Mr. Fleming has identified, that is,

15   only to the extent to test the witness's credibility and

16   truthfulness.  So I do find it's admissible under 608.

17   But -- and I don't think it will be unfairly prejudicial,

18   lead to a sideshow, confuse the jury or be irrelevant.  And

19   the cases, frankly, cited by both parties aren't terribly

20   factually, you know, on point, which is not terribly

21   surprising, but they don't, they don't really give me much.

22             There are going to be some limits on this.  Number

23   one, there's going to be no documents from that dispute

24   entered into evidence.

25             Number two, it's cross-examination only, unless,

1  of course, the plaintiff decides to bring it up first on

2  direct, but it's, you know -- and I'm not telling you how to

3  try your case, but it's in the form of, Isn't it true that

4  you had a client allege these things.

5       Now, having done that, Mr. Hilliard gets to

6  explain the context.  Sure, the client made that allegation;

7  it was after I sued them to collect my fees; you know, we

8  settled the matter to my satisfaction.  He can't testify to

9  the other side's satisfaction.  So all of that is fair

10  response to the question, in my view.  And I'm not saying

11  those are the only questions in how you do it, but those are

12  the limits of what you can do.

13       My own personal opinion, for what it's worth,

14  which is probably very little, is I think it's going to end

15  up being a big "so what."  I don't think the jury's going to

16  care.  And, you know, it could even back fire.  If he gets

17  to explain the circumstances, they may well conclude, well,

18  this is just an unfair accusation by a former client who was

19  sued.  But it's relevant, it's admissible along the lines

20  that I've discussed.  Okay?

21       All right.  No. 2.

22       MS. STRADLEY:  Thank you, Your Honor.

23       For Motion in Limine No. 2, the reason that

24  defendants are alleging the summary judgment order is

25  relevant is to their breach of the covenant of good faith

 1    and fair dealing.  And the big concern here is that this is

 2    the first time we've heard this theory.

 3            And we largely address this in our Motion in

 4    Limine No. 6.  So they are sort of interwoven.  And I'm

 5    happy to answer questions for both if they come up in this

 6    one.

 7            But as we explained in Motion in Limine No. 6,

 8    this briefing was the first time we've heard this new

 9    theory.  If you look at what their answer pleads, the

10    discovery, even their own summary judgment briefing

11    explanation of their breach of good faith and fair dealing,

12    it all relates to our refusal to give consent.  And nothing

13    suggests that they're pursuing this breach of good faith and

14    fair dealing based on our alleged pursuit of a meritless

15    geographic or territorial limitation.  And so it's very

16    prejudicial at this late stage for us to be addressing this

17    new theory.  And so that's our first big concern.

18            And then, of course, the other is that

19    introduction of a summary judgment order is likely to be

20    prejudicial and confusing to the jury, unduly influenced by

21    the court's finding on this matter.  So we don't think that

22    this new theory should be introduced in the first instance;

23    but certainly if it is, the jury shouldn't be given a court

24    order that's going to unduly influence their decision.

25            THE COURT:  Are you, because the issues overlap,

1  are you also going to be arguing Motion in Limine No. 6 --

2            MS. STRADLEY:  I am.

3            THE COURT:  -- to exclude the complaints?  Why

4  don't you go ahead with that one as well.

5            MS. STRADLEY:  Okay.

6            THE COURT:  But I want to make sure about one

7  thing.

8            MS. STRADLEY:  Sure.  And if you have a question,

9  I'm happy to just --

10           THE COURT:  Well, this relates to both of them.

11           Your assertion is that their allegation of the

12  breach of covenant of good faith and fair dealing is that

13  it's only related to failure to give consent.  Is there

14  anything that you're aware of in any of the pleadings or

15  interrogatory answers or in the depositions that suggests it

16  was somehow related to the assertion of, you know, a

17  territorial limitation in the license agreement?

18           MS. STRADLEY:  No, not that I'm aware of.  And our

19  brief does acknowledge that we certainly knew the

20  disputed -- that provision and its applicability, but we did

21  not understand that the breach of good faith and fair

22  dealing claim was stemming from our pursuit of that breach

23  and continued pursuit for four years during the litigation.

24           THE COURT:  Okay.  And one last thing.  Are you of

25  a mind that the issue that during the process of negotiating

1     the potential for a new license agreement FICO took the

2     position that there was a territorial limitation, is that

3     fact in your view excludable as well?  Because I'm not so

4     sure it is in that context.

5          MS. STRADLEY:  Could you just repeat the question

6     one more time to make sure I'm understanding it?

7          THE COURT:  Sure.  During the process where the

8     parties were negotiating whether or not to amend the license

9     agreement after FICO said it's been breached, among other

10    things, FICO insisted that there was a geographical

11    limitation.  Is the fact that they took that position during

12    the negotiations itself in your view excludable?

13         MS. STRADLEY:  I do think it's excludable only

14    because there's no real relevance to that point.  Now that

15    the claim for breach based on a territorial restriction has

16    been dismissed, there's really no need for that to come into

17    evidence because it serves no purpose.  It's not relevant to

18    our claim of breach anymore, and it's not relevant to the

19    breach of covenant of good faith and fair dealing.

20         THE COURT:  Okay.  Very well.

21         Do you want to add anything about the answer,

22    Motion in Limine No. 6, or the complaints, rather?

23         MS. STRADLEY:  Oh, yes, just that if you do look

24    at the complaints -- even, again, we don't think the new

25    theory should come in; but if you look at the complaints

1     themselves, they do not actually allege that there's a

2     violation of the territorial restriction.  And I think

3     defendants' brief cites to paragraphs 25 through 30; and if

4     you actually look at them, there simply is no reference.  So

5     it wouldn't make sense to introduce them for that separate

6     reason as well.

7               THE COURT:  Okay.  Thank you.

8               All right.  Federal.

9               MS. GODESKY:  Thank you, Your Honor.

10              THE COURT:  Let me begin by asking you a question.

11              MS. GODESKY:  Sure.

12              THE COURT:  I have never in 30-some years of

13     practice ever seen a court order admitted into evidence.

14     Have you?

15              MS. GODESKY:  I haven't, but I think we cite cases

16     in our brief where they have been admitted.  Right?  They

17     are not admitted for the fact that, you know, the

18     allegations in the complaint are true, of course, but for

19     the fact that the allegations were made.  Right?  That might

20     be relevant in a malicious prosecution case, for example.

21     And you could see the summary judgment ruling be relevant,

22     you know, not for the truth of the matter asserted, but for

23     the fact that the court made a particular finding at a

24     particular point in time.

25              THE COURT:  If the question of, if the question of

1   whether there were a geographical limitation in the license

2   agreement were a fact at issue in the lawsuit, then

3   certainly -- and we can get to some of this -- Federal can

4   say, no, there is no geographical limitation, as a matter of

5   fact.  And if FICO were to dispute that, you could, of

6   course, say that the court found that.  But I don't see, I

7   don't see that fact in dispute anymore in this case.  I

8   understand your argument is it relates to good faith and

9   fair dealing, but I'm not sure it ties to your allegation of

10  good faith and fair dealing.

11          MS. GODESKY:  But, Your Honor, it also is squarely

12  relevant to our breach of contract counterclaim.  Right?

13  And that's in the supplemental briefing on the pleadings,

14  right, Motion No. 6, because the counterclaim on the breach

15  of contract is that FICO terminated this contract without

16  any basis to do so and they terminated it citing two

17  reasons.  Right?  You're using the software outside the

18  United States territory, and there's been a breach of

19  Section 10.8.

20          So the fact that -- you know, the jury's going to

21  be asked to decide, you know, Did they terminate this with a

22  basis or not.  And so we need to be able to present to the

23  jury that one of the two reasons you're going to see in the

24  letters, in the correspondence, in the back and forth,

25  consistent with defendants' position in this case, was

1    adjudicated by the court and found to be without any basis.

2             And we list in our papers, Your Honor, really the

3    three facts that we're trying to elicit and we want to put

4    into evidence either through the summary judgment order or

5    through the pleadings or from an instruction from the court.

6    We proposed to FICO that they be uncontested facts that

7    would just be read to the jury.  They didn't like that idea,

8    because we were trying to address their concern about all of

9    the extraneous information in these documents and the

10   legalese.  Right?  They didn't want to go the uncontested

11   fact route.

12            But if you look at pages 4 and 5 of our opposition

13   brief, there's three bullet points that lay out the facts

14   that we think are squarely relevant to our counterclaims and

15   the jury has a right to know and to understand.  Right?

16   FICO --

17            THE COURT:  But hang on a second, though.  On

18   pages 4 and 5 you -- the facts you want to establish are

19   that FICO pursued that claim in the litigation.

20            MS. GODESKY:  Yes.

21            THE COURT:  And, you know, for lack of a more

22   polite way of saying it, So what.  They pursued it in the

23   litigation; you guys won; that issue is out.  Whether they

24   were in bad faith or not bad faith, maybe that's an issue to

25   be taken up after a verdict.  But how does it relate to this

1    trial?

2              MS. GODESKY:  I don't think it's "so what" at all,

3    right, because they're going to be saying, We had a basis to

4    terminate this license agreement, this license agreement

5    that you paid a lot of money for and was supposed to last

6    forever, we had a basis to terminate it, we gave you two

7    reasons.  And we need to be able to show the jury one of

8    those reasons they filed a lawsuit over, they made us

9    litigate for five years, we incurred costs.  Right?  This

10   was done in bad faith and without basis.

11             THE COURT:  And so your point is that fact or

12   those set of facts are admissible to show that it's also

13   likely that their other basis is without basis in fact or

14   law.  Is that it?  Because, I mean, now -- the only thing

15   they can say now in this trial is, We terminated the

16   license, and we had a basis to terminate it, and our basis

17   for terminating it is basically -- tell me if I'm wrong --

18   the merger, right, or the acquisition.

19             MS. GODESKY:  Right.

20             THE COURT:  And you didn't get consent, and you

21   didn't seek approval, and we were within our rights to

22   terminate.  That's the only thing they can argue at trial as

23   to their basis for termination.

24             MS. GODESKY:  I agree with that, but I think it's

25   going to be very confusing to the jury to be seeing letters

1    and correspondence in that period that also talk about this

2    purported territorial restriction.  And so the jury needs to

3    understand that this was found to be without basis.  And

4    that's relevant to show, number one, we are correct, they

5    terminated this contract without basis; they gave us two

6    reasons and one has been dismissed.

7         And then it's also relevant to the good faith and

8    fair dealing claim because we're saying that they -- the

9    evidence will show that they refused to give consent,

10   because they wanted to extract more fees and they did so by

11   cooking up this excuse that we were using the software

12   inappropriately in Europe, even though the documents show

13   that they knew that all along.  That was in bad faith.

14        And so, you know, it's a combination of things,

15   right, but I also think there is a real jury confusion point

16   here if we have all of these letters where they're accusing

17   us of breaching by using outside the U.S. territory if there

18   isn't some resolution, some answer given to the jury as to

19   what happened to that allegation.

20        THE COURT:  All right.  So on the jury confusion

21   point, I can clear that up.  Okay?  To the extent that those

22   documents are relevant and admitted, and I, frankly, assume

23   they will be, and they relate to this question about

24   territorial restriction, having the court instruct the jury

25   that you may see that in some of the documents, it was a

1    basis for some of FICO's allegations, but the court has

2    determined that that was not -- that was not a legal basis

3    for termination of the agreement.  I mean, to the extent

4    that confusion is really a problem, it could be handled that

5    way.

6         But now you've said the other thing is that the

7    refusal to give consent was in bad faith and it was done to

8    extract more of a license fee; and in order to do that, they

9    had to have reasons why you were in breach, and this is one

10   of the arguments they made.

11        MS. GODESKY:  In our view, in bad faith, because,

12   as we show the jury, document after document shows that at

13   the time they knew and in fact often facilitated use of

14   software that included Blaze outside the United States.

15        THE COURT:  But all of that even, all of that,

16   even assuming that's fair game, the fact that they pursued

17   this claim in litigation doesn't relate to that.  You know,

18   I can see -- I can understand why you're saying that the

19   conduct during the license termination negotiations may --

20   that may be relevant to that; but the fact that it was

21   pursued in this litigation, I don't see it.

22        MS. GODESKY:  It goes to damages, Your Honor.

23   Right?  There's interrogatory responses where we've

24   identified the fact that we had to incur costs and fees

25   litigating this case as some of the harm.

1          THE COURT:  Well, those are not items of damage

2     that you have asserted in the lawsuit, right?  I mean, those

3     are items of damage or they are appropriate for the court to

4     consider after the verdict, right?

5          MS. GODESKY:  They have been asserted in

6     interrogatory responses.  Right?  When the question is

7     asked, What damage have you incurred from these, you know,

8     your counterclaims, we've identified costs and fees of

9     litigation.

10          THE COURT:  But by that logic, any party would get

11     to say costs and fees in litigation are part of my damages,

12     and that's contrary to the American rule.

13          MS. GODESKY:  I think, though, Your Honor, in this

14     context, and we can -- we can certainly present the court

15     with law around this, that the fact that you're incurring

16     the fees can be sufficient to show the harm, show the

17     damages for the element of the breach of contract claim.

18     And then it almost becomes nominal damages at that point, as

19     far as what the jury could award.

20          THE COURT:  But now talk about confusing the jury.

21     Right?  I mean, you can't make that argument -- well, maybe

22     you can, but the jury is not going to determine your fees as

23     an element of damages.

24          MS. GODESKY:  No, no.  We agree with that.  We

25     agree with that.  Absolutely.  But I'm just -- Your Honor's

1    question was, How is the fact of litigation relevant to the

2    bad faith claim, you know, and that's why.  Right?  I mean,

3    we litigated a claim that was found to be without basis.

4    They gave us one of two reasons, one of which we had to

5    spend five, six years litigating.

6         THE COURT:  But the bad faith claim is temporally

7    limited to the conduct pre-litigation.  And so the fact that

8    they continued what you would say is bad faith conduct in

9    the litigation, I don't think fairly supports the claim that

10   their pre-litigation conduct was in bad faith; or if it

11   does, it's going to be really confusing to a jury.

12        MS. GODESKY:  I think our primary concern, Your

13   Honor, is that -- and if the court can address it with the

14   instruction or something along the lines of the instruction

15   or facts that you could give the jury about the territorial

16   restriction, that would go a long way to addressing our

17   concerns, because I think undoubtedly both parties have on

18   their exhibit list, right, the letters back and forth about,

19   You breached Section 10.8 and you breached the territorial

20   restriction.  And so we need to give the jury an answer as

21   to what happened there.

22        THE COURT:  Well, and the jury -- I guess I would

23   rephrase your point a slightly different way to be that you

24   certainly can't have the jury finding you breached the

25   contract on the basis of the territorial exclusion.  That

1    much is clear.  And to the extent that it's in the

2    documents, they need to know that can't be a basis for their

3    verdict.

4              MS. GODESKY:  Yes.

5              THE COURT:  I'll think about that one.

6              MS. GODESKY:  Okay.

7              THE COURT:  Okay.  Anything else?

8              MS. GODESKY:  No, not on this one.  Thank you.

9              THE COURT:  Okay.  Well, I was including also the

10   complaint.

11             MS. GODESKY:  I understand.

12             THE COURT:  Okay.

13             MS. GODESKY:  The complaint and the summary

14   judgment decision are really for those three facts that we

15   were just discussing.

16             THE COURT:  Okay.  So here's my order on Motion in

17   Limine No. 2 by FICO and Motion in Limine No. 6.  Hang on.

18             On No. 2, the motion is granted.  I think the

19   order of the court is not admissible.  Certainly, the

20   document itself is not going to be admitted.  And describing

21   the court's order in some fashion to the jury is not

22   permitable.

23             I think in some measure you can state, but I want

24   to -- we can hear further concerns about this, if need be,

25   but let's assume you were in the process of delivering your

1   opening statement.  I think it's fair to say, as a matter of

2   fact, there's no territorial limitation in the contract.

3   I'm not sure at this point that it's -- that that's relevant

4   to anything.

5          I understand your point about the bad faith during

6   the negotiations, and I'll think further about that, but --

7          And FICO couldn't certainly say during the trial,

8   Oh, yeah, there's a geographical limitation.  They can't say

9   that.  And if for some reason they or a witness were to say,

10  We genuinely believe there was a geographical limitation,

11  then the form of the question I think that's fair is, Are

12  you aware that the court held there is unambiguously no

13  geographical limitation.  But I -- before trial I will let

14  you know whether you can even get into that fact, if you are

15  following me.  Okay?

16         On Motion in Limine No. 6, that is also granted.

17  I want to make a couple of other points about that one, not

18  that they're necessarily critical to the ruling, but that

19  motion is granted.

20         Pleadings themselves are not admissible to prove

21  the facts alleged in the pleadings, but they are admissible

22  to prove the fact that a party made that allegation.  And

23  the question then would be, Is the fact that FICO made the

24  allegation in the litigation relevant to an issue in this

25  case?  And I don't think it is.

1            The fact that FICO alleged in its pleadings that

2     the license agreement had a territorial exclusion doesn't

3     relate to the claim in the case.  And primarily because of

4     the temporal limitation, your bad faith claim is temporally

5     directed toward the period of negotiation pre-litigation.

6     So -- and as I've indicated, the fact a bad faith

7     litigation, if it's a fact, is something to be taken up, if

8     at all, at a later date.

9            So that's the rulings on No. 2 and No. 6.  Given

10    what I've said, does anybody have any questions about that

11    at this point?

12           Mr. Hinderaker, your side, anybody have a question

13    about it?

14           MR. HINDERAKER:  Your Honor, I think we're fine.

15    Thank you.

16           THE COURT:  Okay.  Ms. Godesky?

17           MS. GODESKY:  No, Your Honor.  Thank you.

18           THE COURT:  Okay.  Let's go to Motion in Limine by

19    FICO No. 3.  This relates to the license agreement that FICO

20    had with ACE from 2006, right?

21           MS. KLIEBENSTEIN:  Correct, Your Honor.

22           THE COURT:  Okay.

23           MS. KLIEBENSTEIN:  So we initially moved to

24    exclude that piece of evidence from the case, thinking that

25    the defendants were going to use it for some sort of

24

1    defense.  Their opposition brief cleared up that issue, but

2    it brought up another problem.

3         So the argument before me, Ms. Stradley mentioned

4    this is the first we've seen of a particular theme.  And you

5    also heard mention of the phrase "cooking up" as a motive.

6    The opposition brief that was filed by defendants goes one

7    step further and makes additional motive allegations that

8    relate to that 2006 ACE American license agreement.

9         As we've articulated in our moving papers, it was

10   a very limited license for use of Blaze Advisor in

11   connection with one named application that excludes routing.

12   It's very different from how Chubb & Son used Blaze Advisor.

13        We see in the opposition brief that defendants

14   want to use that agreement and somehow elicit testimony

15   relating to it that's going to show FICO had a motive.  They

16   knew that because of this 2006 arrangement that ACE maybe

17   didn't like the software or wasn't going to use the software

18   post-merger, and so we had to cook up an excuse to get more

19   license fees.

20        The problem with that motive is twofold.  Number

21   one, Your Honor, you're intimately familiar with how many

22   years we've been in litigation, how many documents have been

23   produced, dozens of depositions, hundreds of thousands of

24   emails, possibly.  Not a one of them hints to that motive.

25   None are cited in their opposition brief.  We know of none

1    that relates to those three particular reasons that they've

2    outlined in their opposition brief that go to that motive.

3              So what to do with that?  What are we really

4    concerned about?  I'm concerned about an opening statement

5    that lacks good faith that certain allegations in the

6    opening statement are going to be proven with facts down the

7    road.  I'm concerned that we're going to hear about motives

8    that are completely pulled out of thin air that are a smoke

9    screen.  That's not the way that lawsuits are supposed to be

10   tried.

11             There's one other, one other factor that's

12   mentioned in the defendants' brief that is also a red

13   herring.  They want to use this agreement to show that

14   market and in-house alternatives existed.  That's number

15   three.  However, the experts in this case have articulated

16   what they think are the alternatives and in-house methods.

17   Not a one of them mentioned, Oh, yeah, ACE used this back in

18   2006 and here's what they thought about it.

19             THE COURT:  Isn't -- well, I don't want to get

20   sidetracked, but isn't the -- I mean, an ACE witness could

21   certainly testify that, yeah, there's alternatives to Blaze,

22   we did certain things in-house.  Right?  I mean, they --

23   that's not this motion, but they could testify to that or

24   Federal could testify to that.  Right?

25             MS. KLIEBENSTEIN:  Well --

1          THE COURT:  As a matter of fact, that they're

2     aware that there are alternatives.

3          MS. KLIEBENSTEIN:  Correct.  We don't dispute that

4     they're allowed to argue there are alternatives.  And

5     there's been much ink spilled in this case about what those

6     alternatives are, and not a one of them has been ACE's use

7     of Blaze Advisor in 2006.

8          THE COURT:  Here's one -- well, keep going, if

9     there's anything else you think I should know.  I share

10    some, but not necessarily all of your concerns.  So anything

11    else you want to argue?

12         MS. KLIEBENSTEIN:  No, Your Honor.  Well, yes.

13         Whether evidence or argument or statements come in

14    or out of a trial, you know, it's this balancing act between

15    the probative relevance, right, and the risk of prejudice

16    and confusion.  And so the slight possibility that maybe,

17    maybe defendants could make hay with with these four

18    motives, it is outweighed significantly by the prejudice and

19    confusion risked at this case.  Again, I can't stress it

20    enough, dozens of depositions, countless expert reports,

21    hundreds of thousands of documents and emails and not a one

22    of them hint at the motives that they listed in their

23    opposition brief.  The defendants shouldn't get a free pass

24    to explore this at this time.

25         THE COURT:  And here's where you and I might part

1    ways.  That seems like a fact in your favor, right?  So to

2    the extent that they have this agreement in evidence and

3    suggest that this was, you know, explains the motive of FICO

4    to jack up the fees seems like a really nice opportunity for

5    you to say, That's really interesting, given all the emails

6    you've seen, all the testimony you've heard, all of that,

7    there's not one shred of evidence for that.

8              So what they want to use it for, the agreement

9    itself, the agreement is the agreement.  They want to use it

10   in argument and maybe in cross-examination, which I predict

11   will go nowhere, but they want to use it in argument to say,

12   This is, you know, one of FICO's concerns, they could see

13   this coming, and that's why they did what they did.  And the

14   response to that is, Funny how that huge concern never

15   showed up an email.

16             MS. KLIEBENSTEIN:  You are right, Your Honor.  We

17   have that escape route planned as well.

18             THE COURT:  Yeah.

19             MS. KLIEBENSTEIN:  However, juries -- these types

20   of conversations are not familiar to juries.  It's unknown

21   how they react and respond to contracts, which carry a bit

22   more seriousness than -- particularly to a juror than they

23   would to lawyers that deal with them all the time.  So

24   that's the main concern, is misunderstanding fundamentally

25   that 2006 relationship with ACE American, and then the

1    misuse of it that will come along the way.

2             THE COURT:  Okay.  Very well.

3             MS. KLIEBENSTEIN:  Thank you.

4             THE COURT:  Thank you.

5             MS. GUIDERO:  Good afternoon, Your Honor.  Roxana

6    Guidero on behalf of the defendants.

7             THE COURT:  Thank you, Ms. Guidero.

8             MS. GUIDERO:  First, Your Honor, I want to clarify

9    something.  This has come up previously in the case, in the

10   depositions of FICO's own witnesses talking about the period

11   in late 2015 to early 2016 when FICO was evaluating what to

12   do about the license negotiations.  Their own witnesses have

13   testified in depositions that they had in their mind that

14   ACE was a particularly small customer for FICO; and they

15   were worried that when ACE was going to take over the new

16   corporation, they would have no use for Blaze because they

17   knew the history, that it was a really limited relationship.

18   And that's why they were talking internally at that time

19   about what they were going to do about the Chubb license

20   agreement and how they were going to handle it, in order to

21   ensure that their license fees weren't going to be cut off.

22   Right?  That's been in testimony for years.  They've been

23   aware of it, and we should be allowed to probe that with the

24   witnesses.

25            THE COURT:  Who testified to that?

1          MS. GUIDERO:  Mike Sawyer and Russ Schreiber, Your

2     Honor --

3          THE COURT:  Okay.

4          MS. GUIDERO:  -- who were the two sales people at

5     FICO in charge of the client relationship.

6          THE COURT:  Okay.

7          MS. GUIDERO:  Furthermore, Your Honor, we have

8     witnesses from our side, like Mr. Claudio Ghislanzoni who

9     was the Chubb architect of software development post-merger

10    and he was the legacy ACE person pre-merger.

11         And a key issue in this case is, What did Chubb

12    and ACE do during the transition period.  Right?  Did ACE

13    all of a sudden start using Blaze in their software

14    applications?  Did they even have a need for it?  Did they

15    have an intention to use it?

16         And Mr. Ghislanzoni is going to talk about what

17    ACE did pre-merger, right, the fact that they had a very

18    limited use of Blaze.  The software agreement is relevant to

19    that.  And the jury should be able to see the agreement and

20    understand that this use was limited and perhaps take from

21    that that ACE had no intention to expand its use

22    post-merger, that it had no need to add Blaze to its

23    applications because it had already been familiar with Blaze

24    for a number of years and made a determination that there

25    was no need to expand its use.  Right?  Those are just a

1      couple of the reasons why it can be used.

2              It can also be used to show that ACE was

3      conducting its business for many years using Blaze in one

4      very limited component of their business and they did just

5      fine.  And that tends to disprove FICO's claims that Blaze

6      is a critically important program.  Right?  And because we

7      have an advisory finding on disgorgement and copyright in

8      this case, an issue for the jury will be how much value does

9      Blaze bring to the table.  And so to see that a big

10     corporation like ACE American was able to run its operations

11     with Blaze in just one very, very limited portion of their

12     agreement or their general tech infrastructure, that is

13     relevant to the case.

14              As to the arguments about confusing the jury, I

15     think there's absolutely no risk of confusion here, right,

16     both because defendants are not planning to argue that this

17     agreement covers more than it does.  Right?  We're not going

18     to say that it isn't limited.  It is limited.  That's

19     precisely the point.  There will be witnesses like

20     Mr. Ghislanzoni that will be able to testify about exactly

21     what ACE's use of Blaze pre-merger was, and FICO is free to

22     ask Mr. Ghislanzoni any questions they want to show just how

23     limited that use was.

24              And moreover, Your Honor, we have -- FICO and

25     defendants both have on our exhibit lists a number of other

1    agreements with other companies, which I think just is an

2    implied admission that jurors are able to parse through

3    these agreements and understand that this is not the

4    operative agreement that is allegedly breached in this case.

5    Right?  It's a separate agreement.  But the jurors will be

6    able to clearly understand that, especially given that

7    defendants are not going to argue anything to the contrary.

8              THE COURT:  Well, and defendants are not going to

9    argue that somehow this agreement defines, you know, the

10   actual damages or anything like that.

11             MS. GUIDERO:  Exactly.  Yes.  We're not planning

12   to do that.  It clearly covers what it covers, and that is a

13   very limited use for one application that ACE had

14   pre-merger.  Right?  We're not going to argue that it covers

15   anything beyond that or that it -- it explains what the

16   damages in this case are.  Right?  It just goes to the jury

17   understanding all of these different discrete facts.  Right?

18   What could the value of Blaze be if a big company like ACE

19   American could do its business without really using it very

20   much?  Right?  What was FICO thinking at the time knowing

21   that ACE American was such a small customer?  Right?  Could

22   that have played into their motivations?

23             And I think the jury should be able to consider

24   this as one piece of evidence in making that determination.

25   And FICO is free to argue in their summations, in their

1  cross-examinations, anything to the contrary, right, that it

2  shouldn't be -- it shouldn't be considered for the jury, but

3  that doesn't mean the jury shouldn't be able to see the

4  agreement itself and make that decision for themselves.

5          THE COURT:  Okay.  Thank you.

6          Ms. Kliebenstein, I'll give you a final word, if

7  you want, on this one.

8          MS. KLIEBENSTEIN:  Thank you, Your Honor.

9          Opposing counsel and I have different viewpoints

10  on the alleged facts.  I'll note, again, that none of them

11  are cited in the response brief.

12          One path through this could be to give clear

13  guidelines in the opening statement in the way that the 2006

14  agreement is referenced and dealt with during the trial.

15          THE COURT:  Understood.  Without intending this to

16  come across the way it might, I did not see any of that

17  testimony referenced in your response.  And so I don't have

18  the opportunity to really decide whether you're overstating

19  it or accurately stating it.

20          I'm going to reserve ruling on this one for a

21  little bit; but certainly if it's admitted, there will be

22  some very clear guidance on what it can and cannot be argued

23  to show.

24          MS. KLIEBENSTEIN:  Thank you.

25          THE COURT:  Okay?  All right.

1          MS. GUIDERO:  Your Honor, would it be helpful --

2          THE COURT:  Come on up.

3          MS. GUIDERO:  Would it be helpful for the court,

4     Your Honor, if we submit a supplement with that deposition

5     testimony?  Would you like to see that or --

6          THE COURT:  If you would just submit the testimony

7     without argument, without anything other than, Here's the

8     testimony.  Okay?

9          MS. GUIDERO:  Okay.  Perfect.  Happy to.  Thank

10    you.

11         THE COURT:  Okay.  Thank you.

12         All right.  I've got to take a quick break

13    because -- oh, hang on.

14         After sending you down there, I found part of it.

15    All right.

16         Never mind.  Let's keep going.  Motion in Limine

17    No. 4.

18         MR. HINDERAKER:  Your Honor, No. 4.  The briefing

19    has been helpful in clarifying the respective positions of

20    the parties; and it seems to me that we are in violent

21    agreement, both sides, that decisions should not be made on

22    the basis of speculation.  And FICO has no quarrel with the

23    proposition that a reasonable approximation is not

24    speculation, and it has no quarrel that there should be

25    evidence that -- well, we're in violent agreement that

1    decisions should not be made on the basis of speculation.

2         The argument is made that this is a collateral

3    attack on the *Daubert* motion, and I respectfully suggest

4    that it is not.  The issue isn't whether the experts are

5    qualified.  The issue isn't whether the experts have

6    fact-specific knowledge to this case in which to opine.  The

7    issue is what is the issue -- what is the decision that's

8    being presented to the jury, and is the jury being given

9    evidence upon which that -- on which to make that decision

10   on a nonspeculative basis.

11        The court is familiar with the fact that FICO

12   carries the burden to prove that the use of Blaze Advisor

13   made a contribution in some part, some contribution, to the

14   revenue.  It's useful to see in the opposition papers that

15   their position is Blaze Advisor made zero contribution.

16        My view to the court is that is an attack or a

17   challenge, and they have every right to do so, to FICO's

18   sustaining or not its burden of proof.  And the jury can

19   decide, Did Blaze Advisor contribute in some degree to the

20   revenue?  Yes or no.  If the answer is no, the defendants'

21   evidence will have had an effect.

22        Getting back to the agreement that evidence should

23   not be -- decisions should not be based on speculation, if

24   defendants are to argue or were permitted to argue to the

25   jury, Well, if you find that Blaze Advisor made some

1    contribution to revenue, then you have to decide to what

2    extent did it do so.  And that's the point where the

3    evidence that they offer is pure speculation, because none

4    of the witnesses try to in any rational way separate out the

5    contribution of Blaze Advisor from the contribution of

6    everything else that the business does.

7         You know, they cite the *Sheldon* case.  That case

8    required -- and in that case the expert testified -- the

9    experts testified to the extent that other factors

10   contributed to the revenue.  They cite the *Frank Music* case.

11   The Court of Appeals in that case said there must be, to the

12   district court, there must be a reasonable nonspeculative

13   formula or basis for making a decision.

14        And, again, we have no quarrel with the fact that

15   a decision on apportionment, what extent did other factors

16   contribute to the generation of revenue, must be based upon

17   nonspeculative evidence.

18        The only evidence that they do have is speculative

19   because none of the witnesses try to show the extent that,

20   none of the witnesses try to show a reasonable approximation

21   between the two, Blaze Advisor and anything else.  So they

22   just leave it to the jury and ultimately to the court, What

23   do you feel -- what do you feel it's like?  What do you feel

24   should be the answer?  Let's make a guess.  What's a good

25   guess?  But that's not the way evidence should go in.

1          So I don't have any quarrel with the evidence so

2     long as the court is giving the guidance and we're all under

3     instructions that the issue that the evidence is coming in

4     on is did Blaze Advisor contribute to the generation of

5     revenue in any small part.  Yes or no.  If the answer is no,

6     apportionment isn't at issue.  If the answer is yes,

7     apportionment is at issue, and they do not have any evidence

8     that's not speculation.

9          So in that regard, Your Honor, the motion as I'm

10    framing it here in the argument is a little different than

11    how we presented it, because it's now clear that these

12    witnesses are not going to pretend that they know the extent

13    to which these other factors contributed to the revenue,

14    other than to say a hundred percent.

15         THE COURT:  I had perhaps misperceived your motion

16    somewhat.  I was under the impression that what you were

17    most concerned about -- I think it's McCarter, maybe not.

18         MR. HINDERAKER:  No.  He's their expert.

19         THE COURT:  Right.  Who says -- or maybe it was

20    Bakewell, one of the two, who says, What Zoltowski didn't do

21    is he didn't deduct costs and expenses and he didn't do this

22    and he didn't do that.  And I understand how that's out and

23    why that's out.  But that your motion was they don't get to

24    testify to our general overhead and they don't get to

25    testify to the expenses incurred in generating the revenue,

1    but that's not how I understand your motion now.  Now I

2    understand it more clearly to be, whoever it is -- not

3    Zoltowski.  Who is it that's going to --

4              MR. HINDERAKER:  On our side or their side?

5              THE COURT:  On your side.  Is it Zoltowski that's

6    going to say contributed to it?

7              MR. HINDERAKER:  No.  That's the fellow by the

8    name of Bick Whitener.

9              THE COURT:  Bick Whitener.  That's it.  So he's

10   going to say it contributed to the production of revenue.

11   They want to say, Well, not very much, if at all, because of

12   this, this and this.  And then --

13             MR. HINDERAKER:  I view the defendants' burden of

14   proof to have two elements to it.

15             THE COURT:  Right.

16             MR. HINDERAKER:  One of them is to take the gross

17   revenue -- take the revenue amount attributable to the

18   infringement and reduce that amount by proper expenses --

19             THE COURT:  Right.

20             MR. HINDERAKER:  -- that also were connected to

21   that revenue.

22             THE COURT:  Right.

23             MR. HINDERAKER:  So the expense deduction.  We're

24   not talking about that.

25             THE COURT:  Right.  You're talking about the

1    attribution, the percentage of attribution.

2           MR. HINDERAKER:  After you get to that number,

3    then what percentage of that number, what extent of that

4    number is other factors and what extent is Blaze Advisor.

5    And their expert Bakewell, he's the one who said, Well,

6    maybe a little bit, probably not, or something to that

7    effect.  And he's the one who said, I wasn't asked to figure

8    out the extent that that was true and I don't know.  And

9    then McCarter is their other industry expert, and he simply

10   says, Well, it's a hundred percent the business acumen of

11   the companies and zero percent the technology.

12          And as I'm suggesting, when the issue is framed so

13   that we know that this evidence is being put in to challenge

14   FICO's burden to prove Blaze Advisor made a contribution,

15   and we're in a game -- we're in a situation where it is

16   either, you know, really all or nothing, FICO made a

17   contribution and there is no nonspeculative evidence of

18   apportionment, fine.

19          THE COURT:  Isn't this -- hang on.  Let me pull it

20   here.  So as you might imagine, I have read Judge Wright's

21   order and reread Judge Wright's order and re-reread

22   Judge Wright's order.  My reaction was that this is exactly

23   what Judge Wright already looked at and denied exclusion of

24   Bakewell or McCarter's -- whose ever it was that opined on

25   apportionment, that despite your argument that, Well, you

1    didn't quantify it, et cetera et cetera.

2          So what's -- what's different here?

3          MR. HINDERAKER:  So Judge Wright made her order,

4    and she said we can cross-examine them vigorously and that's

5    the appropriate remedy in this context.

6          And what's different here is we are now at trial

7    with the jury and trying to control the evidence so that

8    nonspeculative -- so that a jury is presented for decision

9    something that it can decide without using -- without

10   speculating.  And the jury can decide whether Blaze Advisor

11   contributed to revenue as against the testimony of Bakewell

12   and McCarter and that would not be speculative, because they

13   aren't trying to apportion the percentages or the extent

14   that the other factors contributed other than to say a

15   hundred percent.

16         But if the issue to the jury is, Well, Blaze

17   Advisor made a contribution against all of this revenue and

18   all of this profit, to what extent is that profit

19   attributable to factors other than Blaze Advisor.  That

20   requires some apportionment.  That requires some reasonable

21   approximation.  That requires some rational formula that's

22   based upon something, and none of the witnesses have that.

23   So, Your Honor, you're facing a different issue than what

24   Judge Wright faced.

25         THE COURT:  So Bakewell can offer his opinions as

1     to attribution -- this is your argument -- he can offer

2     those opinions as to attribution, but they don't get to

3     argue that you should only attribute 10 percent to Blaze or

4     15 percent, because he doesn't say it, and doing so

5     quantifying it would be speculative.

6            MR. HINDERAKER:  And I think -- I think their fair

7     argument is that based upon all the evidence that we're

8     offering, Blaze Advisor doesn't contribute to the revenue at

9     all.  That's the fair argument on this evidence.  But if

10    it goes -- that's our burden of proof.  But if it goes to

11    the level of making some apportionment percentages, amounts

12    separating out all of the revenue to the two buckets of

13    infringing revenue and non-infringing revenue, absolutely no

14    basis to say that, make that distinction.

15           THE COURT:  And you're -- what you would then

16    effectively have is this is a -- this is an on-and-off

17    switch; either it contributes to revenue or it doesn't.  And

18    if the jury were to listen to the testimony of Bakewell and

19    in its mind say, Well, it contributes, but not very much,

20    FICO is willing to face the risk that they might just say,

21    Well, if I have to decide it contributes or doesn't

22    contribute and it's really minor, I'm going to find it

23    doesn't contribute.

24           MR. HINDERAKER:  I hope the jury instructions are

25    clear.

1          THE COURT:  Jury instructions will be clear.

2          MR. HINDERAKER:  And I hope the jury is advised

3     that if Blaze Advisor contributes to the smallest extent,

4     absent nonspeculative evidence of apportionment, Blaze --

5     FICO is presumptively entitled to it all.

6          THE COURT:  So given that this is a motion in

7     limine, what are you asking me to exclude?

8          MR. HINDERAKER:  That's a great question.  And I'm

9     asking -- and as I've reframed, as I reframed the discussion

10    in light of the response, I'm not asking for a ruling.  I'm

11    asking for -- I find that an opportunity to educate the

12    court on how the evidence is, and I view it as an

13    opportunity at the appropriate time to make the distinction

14    between a decision based upon evidence and a decision that's

15    not.

16         THE COURT:  Okay.  Understood.  Thank you.

17         Which one of you?  Ms. Janus.

18         MS. JANUS:  Yes.

19         THE COURT:  Come on up.

20         So here's what I've just heard.  Okay?  What I've

21    just heard is that the evidence that Judge Wright allowed in

22    is in and FICO and their counsel are suggesting that I may

23    not allow argument about or a suggestion on the jury verdict

24    form somehow about the amount of attribution.  So -- and I'm

25    not going to decide that issue today.

```
1              MS. JANUS:  Right.

2              THE COURT:  Do you need to say anything?

3              MS. JANUS:  I don't -- I don't think so.  That is

4     not the motion that, that is not Motion in Limine No. 4 -- I

5     heard the same, which is that Motion in Limine No. 4 is

6     essentially withdrawn, and I know enough to not say things

7     when something like that happens, so --

8              THE COURT:  Chief Judge Schiltz would applaud

9     that.  All right.

10             MS. JANUS:  Which should not suggest agreement

11    with any of the argument that counsel for FICO just made --

12             THE COURT:  Understood.

13             MS. JANUS:  -- other than to acknowledge that

14    Motion in Limine No. 4 has been withdrawn.

15             THE COURT:  Okay.  Very well.

16             So as to Motion in Limine No. 4, it is denied.

17    I'm going to deny it as moot, but I'll make it clear that

18    the evidence comes in.

19             All right.  Motion in Limine No. 5.  And that will

20    conclude FICO's motions.  And we're behind schedule, but

21    we're doing okay.

22             MS. STRADLEY:  Thank you, Your Honor.

23             Motion in Limine No. 5 comes down to a fairness

24    and prejudice argument.  As Ms. Kliebenstein said, the

25    parties have been at this for many years now.  And if you
```

1    take a look at the disclosures that are found in the second

2    supplemental initial disclosures of the defendants and you

3    do compare them to the current witness disclosures for the

4    subject matter that they intend to elicit testimony from the

5    witnesses on, there is just -- there's new testimony.

6    There's previously undisclosed categories of knowledge or

7    subject matter that they intend to elicit from these

8    witnesses.

9         And if you just look at the chart that we

10   provided, I think a comparison shows that it's simply not

11   apparent from a plain reading of the initial disclosures

12   versus the current descriptions that some of these are

13   encompassed by these initial disclosure descriptions.

14   That's one of their arguments, that we should somehow know

15   from the initial disclosure description that these new

16   topics are encompassed within the initial disclosure

17   description.  I just think that's not clear at all when you

18   actually look at what's been disclosed and compare the two.

19        One of the reasons for initial disclosures for

20   disclosures and interrogatory responses about who is

21   knowledgeable about certain topics is so that we don't have

22   to guess and try to read the defendants' minds, because

23   obviously we can't do that; and I think that's sort of what

24   they're asking us to have done here, when you look at the

25   comparison of those descriptions.

1          The other point that defendants make is they

2     reference some deposition testimony or documents.  And,

3     again, I think if you actually look at the documents and the

4     deposition testimony, it's not clear -- certainly not clear

5     that these witnesses are knowledgeable on the subjects that

6     the defendants have now identified them for.  For example,

7     some of the, some of the documents are emails where a person

8     is cc'd, and the email makes a passing reference to a

9     certain subject, but that person that was cc'd made no

10    comments, made no discussion.  It was just on an email with

11    a passing reference to, for example, global license or

12    something of that nature.  And I just think it's not -- if

13    you actually look at what they've identified as the

14    documents and the deposition testimony, it doesn't disclose

15    what they're now saying we should have known they were going

16    to call these witnesses for.

17          With respect to Mr. Hinderaker's point, one of the

18    new topics that they've identified witnesses for and that

19    we're particularly concerned about is this identification of

20    factors that contribute to the revenue generated and profit

21    that's been generated.  And to Mr. Hinderaker's point, they

22    haven't disclosed any witnesses or provided any evidence

23    that gets to the extent that these factors allegedly do or

24    do not contribute to the revenue and the profit generation.

25    And they shouldn't now be able to try to shore up, shore up

1   their evidence to try to meet this burden that we don't

2   think that they can meet.  And whether that's their intent

3   from this new disclosure or not, our concern is that that's

4   something they are going to try to do and they shouldn't be

5   allowed to do so.

6           Another point I wanted to touch on is the

7   declarations that they've referenced for -- I think it's

8   Ms. Lopata and Mr. Gibbs.  Those declarations were both

9   submitted during summary judgment.  So after the fact

10  discovery deadline had closed.  So it's not a notice that

11  really provides us with any opportunity to engage in

12  discovery, whether it's for the written -- written discovery

13  or depositions.  It's not a notice that's actually useful to

14  us because it occurred after the fact discovery deadline.

15  And so I don't think that that's a fair, a fair disclosure

16  that really gives us the full and fair opportunity we're

17  supposed to have to explore their knowledge before trial.

18  And at this point it's just -- it's too late to be

19  identifying these new topics, and there's simply no reason

20  that they couldn't have identified them earlier; and if you

21  look at their briefing papers, they don't suggest there's

22  any reason they couldn't have identified the subject matter

23  earlier.

24          And I do know we identified a lot of people that

25  we thought had subject matter that's now beyond the scope of

1    a prior identification.  Is there anyone in particular that

2    you had questions about or that I should address that would

3    be particularly helpful for you?

4             THE COURT:  No.  I have looked at the information

5    submitted regarding all seven of the witnesses.  Honestly,

6    the declaration witnesses, I believe, according to my chart,

7    we're talking Pamela Lopata and David Gibbs, right?

8             MS. STRADLEY:  That's correct.

9             THE COURT:  Yeah, those are perhaps the most

10   concerning, but I don't think I have questions about it.

11            MS. STRADLEY:  Okay.  Well, I will touch on

12   Ms. Lopata just briefly.  We already touched on her

13   declaration.  But I did want to note that the exhibits --

14   the documents that they cited that allegedly disclose her

15   knowledge, those are -- they cited to Exhibits 14 and 15 of

16   Docket 775.  Those don't actually even reference her.  She's

17   not identified -- excuse me -- on those.  And so I don't

18   think that that's very much disclosure of her alleged

19   knowledge.

20            And then also the fact that a communication might

21   happen to identify a client agreement doesn't disclose the

22   knowledge of a corporate structure or the nature of a

23   particular business, which is what they're alleging these

24   documents should have told us, so.

25            THE COURT:  Well, on that one, let me talk about

1    that one for a second, the corporate structure.  It seems to

2    me -- I'm sympathetic to their point that the corporate

3    structure is kind of baked into the case.  I mean, certainly

4    that's an item that FICO seems to be very interested in.

5    Clearly, they get to put on a witness to talk about it.  So,

6    you know, why is this -- I'm not sure I find the unfairness

7    in that one, as an example.

8              MS. STRADLEY:  Well, for one, we don't know what

9    she's actually going to say.  She could contradict things

10   that were previously said from the witnesses that they did

11   disclose as being knowledgeable on the corporate structure

12   or the nature of Chubb & Sons.

13             THE COURT:  That's a problem for them more than it

14   is for you.

15             MS. STRADLEY:  Well, without knowing what she's

16   going to say, it's hard to necessarily preempt or contradict

17   and prove that she's wrong.

18             THE COURT:  You have --

19             MS. STRADLEY:  We don't actually know what she

20   will say.

21             THE COURT:  You have 30(b)(6) testimony on this

22   topic, right?

23             MS. STRADLEY:  Yes, I believe we do.

24             THE COURT:  Okay.  So if any of those witnesses

25   testify contrary to what's been stated in a 30(b)(6)

1   deposition, they're in the awkward position of testifying in

2   contravention of the company itself, which, as I say, that's

3   a problem for them, in my view, but --

4           MS. STRADLEY:  It is, but I think our main point

5   is, in general, that there's numerous disclosures that are

6   beyond what -- what was previously disclosed and the

7   compounding of not just one witness, but multiple adds an

8   additional unfair prejudice.  Of course, it is already

9   unfairly prejudicial for one person, but, let alone, when

10  we're at this late stage of the case trying to -- excuse

11  me -- prepare for multiple witnesses where we now don't know

12  what they're going to say and we're trying to guess

13  essentially at what they might say.

14          THE COURT:  Okay.  Thank you, Ms. Stradley.

15          MS. GODESKY:  Your Honor, there's no unfair

16  prejudice here.  What's happening here in the motion is some

17  sort of attempt to technically police these initial

18  disclosures, and that definitely doesn't hold water with

19  four of these seven witnesses whose percipient witness

20  depositions were noticed and taken.

21          All of the authorities that FICO has cited in

22  their brief are so inapposite.  The two district court cases

23  are cases where no initial disclosures were done at all, so

24  there was no knowledge of anyone's witnesses names at all.

25  And the two Eighth Circuit cases are cases about expert

1   disclosures.  So they have no authority at all for what

2   they're asking you to do.

3          And when it comes to the four of the seven who

4   were deposed, if you look at their deposition transcripts,

5   they were deposed on topics that they are now saying they

6   didn't have notice of.  I will give you one example.

7   Mr. Schraer.  There's a complaint that he was not disclosed

8   on this topic that we're going to call him to testify on,

9   factors that contribute to generation of profit, generation

10  of revenue and profit.  If you look at Mr. Schraer's

11  deposition, he was noticed as a percipient witness, he was

12  questioned for hours on end, and he testified, quote, "It's

13  a very relationship-driven business," quote, "There's a

14  complex mix of all kinds of activities to make an

15  underwriting profit."  Right?  It was out there at

16  deposition, and they had an opportunity to probe it.  And

17  that's true for Mr. Ghislanzoni, Ms. Theberge and Mr. Pandey

18  as well.  And if the court is inclined to preclude any of

19  their testimony, I'm happy to walk you through you that

20  testimony as well.

21          But, but, you know, for this moment, I will focus

22  on Mr. Gibbs and Ms. Lopata, because the court said that you

23  had particular concerns about them.

24          As for Ms. Lopata, she was disclosed in

25  interrogatory responses in this case as someone

1    knowledgeable about the parties' agreement, communications

2    between the parties and the parties' course of dealing.

3    That disclosure necessarily encompasses the definition of

4    "client and affiliates" as it appears in the agreement and

5    what that means in terms of Federal's corporate structure.

6    They have hours of 30(b)(6) witness testimony on Federal's

7    corporate structure that they can use to impeach Ms. Lopata,

8    if they so choose to try to do so.

9         And if you look at the -- there's a hearing

10   transcript that we attached to our papers where counsel for

11   FICO acknowledged at one of the discovery hearings in this

12   case that Ms. Lopata was disclosed, they deemed her to be

13   completely duplicative of another witness, Ms. Tamra

14   Pawloski, and they decided not to take her deposition.  And

15   there's a discussion at length in that hearing transcript

16   about how their strategy in this case was to rely very

17   heavily on 30(b)(6) witness depositions.  So they can't come

18   here now and say, We wish we had -- we had taken more

19   percipient witness testimony as well.

20        The same is true for Mr. Gibbs.  He was disclosed

21   in the initial disclosures as knowledgeable on Federal's use

22   of Blaze in the UK, and that's what he's going to testify

23   about.  That necessarily includes talking about the software

24   license agreement.  Right?  Was the use of Blaze in the UK

25   done to his knowledge pursuant to the parties' license

1     agreement?  Squarely within the initial disclosure.

2            THE COURT:  Why is that relevant?  We talked about

3     territorial limitations, geographic limitations in the

4     license agreement.  Why is he going to talk about that at

5     all?  What's the point?

6            MS. GODESKY:  Well, because it's relevant to

7     FICO's claim that Chubb UK, Chubb Europe --

8            THE COURT:  Expanded?

9            MS. GODESKY:  -- that they were not allowed to use

10    the license, right, because they're affiliates of Federal --

11           THE COURT:  Okay.

12           MS. GODESKY:  -- and they're not affiliates of

13    Chubb & Son.  And so to address that we need to show FICO

14    was well aware that these Federal affiliates were using the

15    software as they were licensed to do so.

16           THE COURT:  It goes to the "client and its

17    affiliates" --

18           MS. GODESKY:  Yes, Your Honor.

19           THE COURT:  -- term in the contract.

20           MS. GODESKY:  Yes, Your Honor.

21           THE COURT:  All right.  Keep going, if there's

22    anything more.

23           MS. GODESKY:  So I wanted to address Ms. Lopata

24    and Mr. Gibbs, in particular, because you had expressed

25    concerns, but, otherwise, I'm happy to stop here in the

1    interests of time, unless you have questions.

2              THE COURT:  I don't.  Thank you.

3              MS. GODESKY:  Thank you.

4              THE COURT:  All right.  I am going to deny Motion

5    in Limine No. 5.

6              I just want you to know that I have reviewed

7    carefully the information from both sides, including, of

8    course, the information that Federal submitted regarding

9    these witnesses.  And I find that FICO has had -- and I'm

10   not going to go through it in detail, but has had reasonable

11   notice of these witnesses' testimony, and it's not unfair

12   that they be allowed to testify in accordance with the trial

13   witness notification.  Many of them were deposed.  The

14   depositions touched on some of these topics.  To the extent

15   that witnesses are going to testify about 30(b)(6) topics,

16   you have the best testimony on those topics.  So I don't

17   find unfair prejudice or surprise in that one.

18             Let me go back to Motion in Limine No. 3, I

19   believe it is, which is the Federal -- or the ACE agreement

20   from 2006.  I will grant that in part and deny that in part.

21   I deny it -- the agreement will come in.  I'm going to give

22   you guidance in advance of trial as to what it can come in

23   for and what you can argue about it, and it's fairly

24   limited, but the document itself can come into evidence.

25             Let's turn to Federal's motions.  And we have

1    really only two of them.  I believe 3 was withdrawn subject

2    to what I think has been called No. 4, which is the

3    stipulation.  Correct?

4              MR. HINDERAKER:  Your Honor, 3?

5              MS. GODESKY:  That is 3, Your Honor.

6              THE COURT:  That is 3?  What's 4?

7              MR. HINDERAKER:  Well, one of them was a

8    stipulation, leaving three.

9              THE COURT:  Right.  Okay.

10             So Federal Motion No. 1.  Who is arguing?

11             MS. GODESKY:  Your Honor, I apologize.  We did not

12   number our motions in limine.

13             THE COURT:  Oh, well, I did then.  Motion in

14   limine regarding FICO's presentation and evidence on its

15   alleged actual damages.

16             MR. FLEMING:  Your Honor, I had numbered ours, and

17   I have it as No. 2, but --

18             THE COURT:  That's No. 2.  Okay.  The Bill Waid

19   motion.

20             MR. FLEMING:  Exactly.  And you've stated that

21   you've read recently and repeatedly Judge Wright's opinion,

22   because it directly addresses the issue about the

23   admissibility of an app-based methodology proving actual

24   damages.

25             In her opinion, she's addressing Mr. Zoltowski's

1     app-based methodology for a $37 million actual damage

2     figure, but she said it's based on -- she excluded it and it

3     was on the basis that it was based on the wrong legal

4     theory.  FICO has argued that it's expectancy, it's what we

5     would have charged.  And Judge Wright clarified, well, no,

6     it's a fair market value, is the basis for determining

7     actual damages.  And this app-based methodology does not do

8     that.  It's subjective.  It only goes to what they would

9     have wanted to charge, but it doesn't show what a willing

10    buyer and a willing seller would reasonably have agreed to.

11    And she excluded it.

12         And two months later, three months later, FICO

13    files its supplementary interrogatories and they double

14    down.  They give a $47 million figure based on the exact

15    same methodology that has been excluded.  And there's no

16    difference between what Mr. Waid would testify than what

17    Mr. Zoltowski purported to testify, since his was based on

18    Mr. Waid's analysis.  There's no difference.  And it's a

19    collateral attack on Judge Wright's order because it does

20    not comport with the fair market value analysis, which is

21    the appropriate measure for damages here.

22         If Mr. Waid could testify as to that, then

23    Mr. Zoltowski could testify as to that.  I mean, it's a

24    circular -- it really makes no sense for Mr. Waid being able

25    to provide that app-based methodology, which the court has

1    already excluded.

2         And their only response is that the judge

3    referenced in passing what they could provide.  But what

4    Judge Wright said simply at the end, after explaining at

5    length why the app-based methodology is going to be

6    precluded, she says, "Although some of the facts underlying

7    Zoltowski's opinion may be relevant to the calculation of a

8    hypothetical loss license fee, his selective application of

9    the facts leads to a subjective and unreliable result."  I

10   mean, she simply says "some of the facts underlying" his

11   opinion.  I mean -- so there are other things that can be

12   testified about, but not this app-based methodology.  I

13   mean, she could not be more clear about the preclusion of

14   that evidence.

15        So, I mean, we're asking that his -- Mr. Waid's

16   testimony or any other FICO witnesses who comes forward and

17   uses an app-based methodology precisely as Mr. Zoltowski

18   had, that it be subject to the same order.

19        THE COURT:  I think -- here's where I think we

20   maybe part ways.  What she says is, and this is at page 31,

21   "Zoltowski's opinions as to FICO's actual damages do not

22   consider what a willing buyer and a willing seller would

23   have" -- sorry, Renee -- "contemplated.  Instead, his

24   opinions focus primarily on what FICO would have charged

25   defendants had FICO known that defendants were bound to the

1    license for the relevant three-year period with no prospect

2    of any future business dealing between the parties

3    afterwards.  According to FICO, its standard annual

4    application fee pricing for the period of unauthorized use

5    is the measure of FICO's loss, not the purported value to

6    Federal, but this measure does not accurately reflect the

7    legal standard."  So -- and then goes on to say that some of

8    the facts underlying the analysis are admissible.

9              So what I read in that is under no circumstances

10   can FICO argue that this methodology is the measure of its

11   actual damages because that's what FICO would have charged.

12   And I don't think they can argue it's the measure of

13   damages, period, but the underlying facts, here's how we

14   price, if we price on an application basis, here's how we

15   price it.  It's going to be untethered testimony, perhaps,

16   but the jury can hear it when it considers, I think, what a

17   willing buyer and a willing seller would negotiate.  And

18   they're free to argue that this is -- you know, these are

19   facts that the jury can use.  They're not free to say,

20   That's the measure of actual damages.  So I do think there

21   is a, there's a slice here that they get to put in, but it

22   has to be careful.

23             MR. FLEMING:  All right.

24             THE COURT:  And you think none of that methodology

25   comes in?

1          MR. FLEMING:  Well, not a methodology in which

2     they take 15 different applications, determine a fee on an

3     annual basis and then multiply it by the number of years

4     that they claim infringement, which is exactly what

5     Zoltowski did, which is exactly what was precluded and what

6     they've done in their most recent supplementary

7     interrogatory responses.  It's the exact same thing.  There

8     is no difference.

9          Now, if you are saying, Well, they can talk about

10    how they license applications on an annual basis, they can

11    do that; or if they have any license agreements where

12    they've sold somebody a license based on 15 different

13    applications being utilized in this way, but, oh, wait, he

14    said he's never done that, so they don't have any of that

15    evidence.

16          What we're asking here is an order precluding an

17    actual damage claim based on an app-based methodology, which

18    is the basis for their most recent interrogatory responses.

19          THE COURT:  Okay.  I understand.  Anything

20    further?

21          MR. FLEMING:  Not right now, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          Mr. Hinderaker.

24          MR. HINDERAKER:  Thank you, Your Honor.  And if

25    you wish, we could blend this together with the other motion

1    regarding Zoltowski.  I'm happy to talk about both at the

2    same time.

3            I think it's fair to say I've read Judge Wright's

4    order at least as many times as you, and I did not hear --

5    or I did not read one time where she uses the phrase

6    "application-based pricing."

7            What she does say at another point in the summary

8    judgment motion is, "Relevant evidence includes evidence of

9    FICO's standard pricing methodology.  That, together with

10   evidence of defendant's use of Blaze Advisor, creates a

11   genuine issue of disputed fact as to actual damages."

12           As we know, what Judge Wright said was damages

13   have to be proven by a hypothetical negotiation.  The

14   difficulty with Zoltowski's opinion was that he did not use

15   a hypothetical negotiation.  She ruled.  No quarrel.  He

16   doesn't talk about the amount of actual damages, Zoltowski.

17           But the application-based pricing stems from

18   FICO's standard pricing methodology.  And our approach is

19   going to be much as you suggested, Your Honor.  Bill Waid,

20   who has more experience than anybody at FICO in terms of

21   negotiating and pricing Blaze Advisor licensing agreements

22   and has a bigger title now, but at the time he's also been

23   the manager of the whole decision-making space, products of

24   FICO, more than enough personal experience, more than enough

25   personal knowledge, and he will testify to, first, How does

1    FICO in a standard pricing methodology approach this

2    situation.  And he will also testify based on his

3    experience, Well, what are other factors that go into all of

4    the negotiations that you've had.  And he will testify to

5    those.  And for those opinions that Judge Wright -- those

6    Zoltowski opinions that Judge Wright permits, permitted, he

7    will rely upon those.  That quantifies the extent to which

8    applications have benefited the defendants in terms of

9    revenue.  It quantifies the extent to which the applications

10   have benefited not just Chubb & Son, but dozens, two dozen

11   writing companies that Chubb & Son used Blaze Advisor for.

12        All of that will go into a hypothetical

13   negotiation, construct.  Your Honor, the court, will

14   instruct the jury on what factors may be considered in a

15   hypothetical negotiation.  The jury will decide what is the

16   actual damages through this hypothetical negotiation.

17        Bill Waid's supplemental -- our third supplemental

18   answer to Interrogatory Number 6 was from Bill Waid.  It

19   updated the, it updated the period of time from when

20   Zoltowski had $37 million to the time of those interrogatory

21   answers where it's just more years were added on to get to

22   47.  That gives disclosure to the defendants of what that

23   starting point of the negotiations are, but it's not going

24   to be -- it's not a hypothetical negotiation that the jury

25   will use to decide what fair market value is.

1          I think that the defendants, you know, the

2     defendants are free to cross-examine.  The defendants are

3     free to look at other license agreements that FICO has had

4     over the years.  The defendants are free to ask Bill Waid,

5     Have you ever priced another license on this

6     application-based way.  And I think he'll say yes.

7          The defendants talk about never before 15

8     applications.  Well, actually, it's 18, but two are from

9     Australia, a different company, four are from Europe, a

10    different company, three are from Canada, a different

11    company, ten are from the United States app use.

12         And Mr. Waid will have to explain and will how in

13    his judgment and his negotiations that, in this construct,

14    that is a fair market value for the economic circumstances

15    of this case, and he will distinguish that from the economic

16    circumstances of other situations.

17         You know, as Judge Wright said, the hypothetical

18    negotiation takes into account the evidence of defendants'

19    use.  The hypothetical negotiation is occurring at the time

20    of the breach.  The hypothetical negotiation is a

21    determination of what's the fair value to FICO having a

22    willing licensee and a willing licensor agreeing to

23    transition away from using Blaze Advisor.  Rather than just

24    take the product and use it as unlicensed, what would a

25    willing licensor and a willing licensee have priced for this

1    use of Blaze Advisor until you transition away.  That's

2    Mr. Waid's testimony.  He's perfectly capable of doing that,

3    when this court has already had the argument about a fact

4    witness who has got technical expertise being called an

5    expert, Mr. Marce, and that's not Mr. Waid either.

6    Defendants can cross-examine.  It will be a hypothetical

7    negotiation.  And the testimony that he will complete and

8    that the jury will decide will be the fair market value on

9    that hypothetical negotiation, not limited to an

10   application-based methodology, although it will stem from

11   FICO's standard pricing guidelines.

12            Thank you, Your Honor.

13            THE COURT:  Hang on one second.

14            You've used the phrase "standard pricing

15   methodology" and so did Judge Wright.  I've understood there

16   to be -- maybe you wouldn't call them standard, but they at

17   least distinguish between there's an application-based

18   methodology and an enterprise-wide methodology.  Those are

19   both -- are those both standard pricing methodologies?

20   Okay.  All right.

21            MR. HINDERAKER:  Mr. Waid was deposed a couple

22   times.  The FICO standard pricing methodology in existence

23   since I think it's October 2003 is one of the exhibits

24   Mr. Fleming used in that deposition.  In conjunction with

25   that guideline (indicating) is what's called a sizing

1   matrix.  That was also part of the deposition and is used in

2   conjunction.  This guideline (indicating) does discuss and

3   describe in what circumstances do we have a perpetual

4   license agreement, what is the fee for that, in what

5   circumstances is it an application-based license agreement,

6   how do we determine the fee for that.  Bill Waid will

7   explain how FICO's damages follow the guidelines as they're

8   written in the exhibits, in the documents.

9           THE COURT:  Okay.  Thank you.

10          MR. FLEMING:  Your Honor, I have a few responses

11   to what Mr. Hinderaker just said, and then Ms. Godesky was

12   going to talk about the admissibility of those Zoltowski

13   testimony.  So she'll follow me, if that's all right.

14          THE COURT:  Yep.

15          MR. FLEMING:  Okay.  So I don't know exactly what

16   Mr. Hinderaker is saying here, because it's as if he's

17   saying, well, as long as he uses this phrase "hypothetical

18   negotiation," he can testify about whatever he wants to.

19   And that's -- you can't simply do that, because Judge Wright

20   does give quite a bit of direction.

21          And one thing she says is that the copyright

22   owner's subjective beliefs or objections to an alleged

23   infringer's conduct are irrelevant to this inquiry.  But I

24   hear Mr. Hinderaker saying that those circumstances should

25   be taken into account in a hypothetical negotiation, but she

 1   has said they should not be.

 2          So what I'll end with is that to the extent that

 3   there is an attempt by Mr. Waid to provide an actual damage

 4   figure based on an app-based pricing, which, by the way, was

 5   used in Judge Wright's opinion on page 31, and he bases it

 6   on a 15 -- on a 15-app basis using the exact same

 7   methodology that Zoltowski used, that that evidence ought to

 8   be excluded.  Just a straightforward following of

 9   Judge Wright's order with regard to Zoltowski.  It applies

10   equally well to Mr. Waid.

11          THE COURT:  Okay.  Thank you, Mr. Fleming.

12          Hang on a second, Ms. Godesky.  I was going to

13   tell you what I was going to do on this motion --

14          MS. GODESKY:  Okay.

15          THE COURT:  -- and let me first.

16          The motion is granted in part and denied in part.

17   And I will give the parties some further direction about

18   experts at the end of all this, but here's what Mr. Waid can

19   testify to that is consistent with Judge Wright's ruling.

20          And in case it is not blindingly obvious, I am

21   going to follow every one of Judge Wright's rulings.  It's

22   the law of the case.

23          Mr. Waid can testify to the pricing structure for

24   application-based pricing.  In other words, he can testify

25   to how they price on an application-based contract.  He can

1       testify about what apps in Federal's group are subject to

2       what pricing.  In other words, are they small, medium, large

3       or very large, and what price would apply to that.  He can

4       testify to how many apps Federal has.  And the last thing

5       I'm about to say is the one that I am least certain about,

6       but I think he can do the math, meaning 15 apps at this

7       price means this amount.  Okay?  What he can't say is that

8       this is FICO's actual damages or use the phrase

9       "hypothetical negotiation" or say this is how much FICO

10      would have charged.

11              So the jury can have those facts about that

12      pricing methodology.  And Mr. Hinderaker and his team are

13      welcome to use those facts appropriately in their final

14      argument or in opening statement as factual matters.  They

15      can use it to say that the jury can consider these facts.

16      And in argument, he can make what argument he chooses about

17      what the actual damages are, but that's not coming out of a

18      witness's mouth, at least that's how I understand

19      Judge Wright's ruling.

20              So, all right, let's go to the last one.  I think

21      this is the last one, correct, Ms. Godesky?

22              MS. GODESKY:  Your Honor, there's actually two

23      more, but the first one is the one I was getting up to

24      argue --

25              THE COURT:  Right, Zoltowski.

1              MS. GODESKY:  Yeah.  And I think it's very brief,

2      because the issue here relates to what you just decided.

3              So as we have been discussing, Judge Wright held

4      unequivocally that Zoltowski's opinions with regard to

5      actual damages cannot be presented to the jury.

6              In their opposition to this motion, FICO says very

7      curiously, quote, "Mr. Zoltowski will offer facts and his

8      analysis of certain facts that the jury will consider in

9      determining actual damages."  And that is completely

10     contrary to Judge Wright's holding.  He may only testify as

11     to disgorgement.

12             To the extent that they envision calling

13     Mr. Zoltowski to echo the facts that you just explained

14     Mr. Waid may testify to, that would be completely improper,

15     because he has no personal knowledge of these facts, he's

16     never worked at FICO, and he would just be dressing up facts

17     with the imprimatur of your damages expert, right, to sort

18     of sneak in extra opinions regarding these facts that can

19     only come in through fact witnesses.  So I think this is

20     very clear-cut.

21             And so what we're asking for is additional

22     guidance to FICO that given Judge Wright's ruling and the

23     law of the case Mr. Zoltowski cannot offer facts and

24     analysis of facts relating to actual damages, because all of

25     his disclosed actual damages opinions have been excluded.

1        THE COURT:  Let me ask you this.  What's the

2   next -- you say there was one more after this.  What's the

3   next one after this?

4        MS. GODESKY:  That's the motion on Mr. Carretta's

5   testimony.

6        THE COURT:  Ah.  Okay.

7        MS. GODESKY:  Yes.

8        THE COURT:  All right.  Let me hear from FICO on

9   this.

10       MR. HINDERAKER:  As I've already said,

11   Mr. Zoltowski will not be giving testimony on a damage

12   amount, a dollar value.

13       He does have other opinions that were part of his

14   report, and those other opinions bear upon both disgorgement

15   and they also bear upon the intrinsic value of Blaze Advisor

16   to the defendant, to factors that a reasonable licensee

17   would consider.

18       And he was -- he's permitted to testify to the

19   corporate structure of the defendants, the subsidiary

20   structure of the defendants, the fact that the defendants

21   operate in what are called pooling arrangements by way of

22   which they share their revenue and expenses.  He testifies

23   to the fact that these companies operate together as a

24   single enterprise and that Blaze Advisor is being used in

25   connection with generating revenue from the policy sold by

1    all of those insurance companies.  He speaks to the economic

2    relationships of these corporate entities.  He speaks to the

3    use of Blaze Advisor in all of these various writing

4    companies.

5            He has the evidence and he has the analysis to

6    advise the jury in terms of the revenue per year or the full

7    period for each of the applications that use Blaze Advisor,

8    how many -- how many dollars do the defendants concede was

9    connected to the use of Blaze Advisor by these applications.

10   That gives us good evidence of the extent that Blaze Advisor

11   was used by the defendants, one of the factors Judge Wright

12   found to be relevant in hypothetical negotiation.

13           As Judge Wright said in footnote 1 about the

14   defendant's expert McCarter, testimony that's relevant to

15   actual damages is different from an opinion on actual

16   damages.

17           There's no quarrel that Mr. Zoltowski doesn't

18   testify to the amount of actual damages, but everything else

19   in his report, say, what, a page and a half or so, say the

20   limited amount where he was doing the math on the

21   application pricing, everything else in his report is in the

22   record -- I mean is admissible and he can testify to.  So --

23           And as I said with the other, with the other

24   motion, if I said that Mr. Zoltowski is going to testify to

25   the dynamics of a hypothetical negotiation, I don't -- I

1    hope I didn't say that, because it's not what he will

2    testify to.  His report doesn't -- it doesn't address a

3    hypothetical negotiation at all, so, of course, he didn't

4    testify to that and he won't be.  But the jury is going to

5    be able to consider with the court's guidance of what are

6    the factors that are relevant, these things that

7    Mr. Zoltowski does testify to and may testify to under

8    Judge Wright's order under *Daubert*.

9           THE COURT:  Okay.  Thank you.

10          So the best way to describe my ruling on this one

11   is that it's granted in part and denied in part as well, but

12   this is -- here's what I want to convey on the subject of

13   experts.  Hopefully, this guidance -- it not only answers I

14   think this motion, but it answers perhaps some unasked

15   questions or lurking questions.

16          So I'm going to start with Zoltowski.

17   Mr. Zoltowski cannot offer an opinion as to what FICO's

18   actual damages are.  Point one.

19          Point two.  He cannot testify to facts supporting

20   that opinion, the opinion he originally gave, because he

21   does lack foundation -- that's point two as to those

22   facts -- unless, and this is point 3, those facts have also

23   been disclosed as support for his opinion on disgorgement.

24   So if the facts have been disclosed or relied upon as to his

25   disgorgement opinion, he can testify to them.

1            Now, because Zoltowski can't testify to actual

2     damages, Bakewell can't testify to the flaws in Zoltowski's

3     actual damages analysis or to the facts that support his

4     opinion that Zoltowski's actual damages analysis was flawed.

5            Zoltowski's rebuttal opinions in his rebuttal

6     report are limited to only those opinions to which Bakewell

7     and Kursh actually testify at trial, and both of them have

8     been limited by Judge Wright as well.

9            And to make sure it's also clear, Zoltowski cannot

10     testify to opinions or matters that are not disclosed in his

11     expert reports or covered in his deposition.  I'm assuming

12     he was deposed.  So to the extent that he has now said

13     something and that's been put in here and that exceeds the

14     scope of those matters, he's not going beyond them.  Okay?

15            MS. GODESKY:  Your Honor, may I ask for a

16     clarification relating --

17            THE COURT:  Please do.

18            MS. GODESKY:  So this is not specific to experts.

19     That guidance was helpful.  This relates more to argument

20     and the boundaries for attorney argument, because --

21            THE COURT:  All right.

22            MS. GODESKY:  -- I heard Mr. Hinderaker talk about

23     how this hypothetical negotiation should take into account

24     how FICO, quote, "would approach this situation."  That's

25     how he phrased it.  And then he referenced the fact that the

1    hypothetical negotiation should take into account the

2    economic circumstances of this case and defendants' use in

3    this case.

4         And so I just want to be clear.  Mr. Fleming

5    referenced this line in Judge Wright's opinion where she

6    said, "The copyright owner's subjective beliefs or

7    objections to an alleged infringer's conduct are irrelevant

8    to this hypothetical negotiation."  And so I just want to

9    confirm that that is the law of the case.

10        And to the extent we're characterizing in argument

11   what this hypothetical negotiation looks like, I think it

12   would be outside the bounds for counsel to suggest that you

13   should be taking into account, you know, this situation

14   where you're dealing with someone you think to be infringing

15   on your product, you know, the economic circumstances of

16   this case, where you're accusing someone of breach and

17   infringement, because that is not the arm's length

18   hypothetical negotiation that, you know, the jury will be

19   asked to decide.

20        THE COURT:  The hypothetical negotiation, as I

21   understand it -- first of all, I think the first point you

22   make, I agree with.  How FICO would approach it is not

23   relevant.  How Federal would approach it is not relevant.

24        What is relevant is you have a software provider,

25   for lack of a better, more accurate description, and an

1    insurance company, and the insurance company uses it for

2    these processes and how often it's used and all that stuff,

3    and this is how this software manufacturer engages in

4    pricing.  And if you assume then you have a hypothetical

5    willing seller and a hypothetical willing buyer, the jury

6    has to arrive at a figure.  And the economic circumstances,

7    as I'm using that phrase, would include the extent of use of

8    the buyer and things like that.

9            And so when you, when you talked about point two

10   and point three that Mr. Hinderaker raised, my reaction is

11   those are fair.

12           You then raised another point, which is in the

13   context of someone who is allegedly infringing or who has

14   breached the contract.  I don't think those are reflective

15   of market value.  Those are subjective.

16           The question is, Given that the parties find

17   themselves at this moment in time and they are negotiating a

18   license with these characteristics, what would that

19   negotiation result in.  That's how I understand it.

20           MS. GODESKY:  So do I.

21           THE COURT:  Okay.

22           MS. GODESKY:  Thank you for the clarification.

23           THE COURT:  Mr. Hinderaker.

24           MR. HINDERAKER:  I think -- well, I can't repeat

25   what Ms. Godesky said to characterize what I said.  I do

1  agree -- and I am happy to have the guidance.  I do agree

2  that a hypothetical negotiation looks to what a reasonable

3  licensor and a reasonable licensee would do in the context

4  of that negotiation, in the context of the circumstances of

5  the negotiation.

6         I agree that FICO's claim of actual damages is

7  not, is not -- FICO cannot claim actual damages based upon

8  its subjective belief of what it wanted, because that's not

9  the hypothetical negotiation, but FICO can go into a

10  hypothetical negotiation saying, as licensor, One of the

11  first steps we do is we look at our pricing methodology and

12  our guidelines, we figure out what the sizing is and we come

13  to some sense of what value is and then -- but that's not

14  the end of the negotiations.  And I think that was

15  Judge Wright's points.  That's not a negotiation at that

16  point, and it's certainly not the end of a negotiation.  So

17  what does the -- what does a willing licensee look to and

18  what are those factors?  And how do they -- what weight do

19  they have in the circumstances of the negotiation?

20         So if we're -- I have no quarrel if the court's

21  guidance is that the evidence should be directed to the

22  factors that come into play in negotiating a license

23  agreement between a willing licensor and a willing licensee

24  under the circumstances at the time.  If it's something

25  other than that, then I'm not understanding Judge Wright's

1      order.

2                THE COURT:  The only thing that I think in that

3      that's -- where there's an ambiguity is what everyone means

4      by "under the circumstances at the time."  And I think that

5      means how much are they going to use, for how long, what

6      have they historically used, what are you guys doing.  But I

7      don't think it means, And they just breached our contract or

8      they just infringed our copyright.  Now, it does I think

9      include, We know that they intend to use it only for the

10     next three years or whatever.  Those circumstances are all

11     part of the negotiation.

12                MR. HINDERAKER:  And so that I'm clear and our

13     intention, I do not intend that the hypothetical negotiation

14     is premised on some putative notion that because you're an

15     infringer, we take a pound of flesh.

16                THE COURT:  Right.

17                MR. HINDERAKER:  I'm supposed to be in the context

18     of a willing licensor and a willing licensee.

19                THE COURT:  Who, for lack of a better way of

20     putting it, in essence, have come to the end of the contract

21     period and now they're negotiating a license going forward.

22                MR. HINDERAKER:  For the fair market value of

23     whatever that period of use is going to be, yes.

24                THE COURT:  Right.

25                MR. HINDERAKER:  At that stage where the

1    relationship has been ended.

2              THE COURT:  Right.  I think that's --

3              Ms. Godesky, you look concerned.

4              MS. GODESKY:  Just I was only concerned with the

5    last piece of what Mr. Hinderaker said, you know, that

6    you're taking into account that your relationship has ended?

7              THE COURT:  Well, I took that to mean kind of what

8    I just said, which is, You're at the end of your contract

9    period, now you got to negotiate a new license.

10             MS. GODESKY:  If that's the understanding, I

11   agree.

12             THE COURT:  Okay.  All right.

13             MS. GODESKY:  Thank you.  That was helpful

14   guidance.

15             THE COURT:  Was it?  I have no idea anymore.

16             All right.  Let's take up the last motion in

17   limine.  Carretta, I believe?

18             MS. GODESKY:  Yes, Your Honor.  So FICO -- this is

19   Mr. Thomas Carretta, in-house lawyer at FICO, and FICO

20   intends to call him to testify selectively about his advice

21   and work product.

22             He was approached by the business team at FICO

23   after they learned of the ACE acquisition and asked for

24   legal advice about the license agreement.  And, in

25   particular, they want to elicit testimony from Mr. Carretta

1    about how he interpreted the agreement with regard to

2    whether consent was required after an acquisition or merger

3    event.  And we have three problems with that.

4              First, that is a legal conclusion.  Right?  To

5    have any witness up on the stand interpreting a contract is

6    obviously problematic, and it's even more problematic when

7    you have someone who is introduced as a lawyer because then

8    the jury, you know, is going to give them credence.

9              THE COURT:  Let me stop you for a second.  Okay.

10   So one of the issues in the case is whether consent was

11   required.

12             MS. GODESKY:  Yes.

13             THE COURT:  The jury's going to have to decide

14   that.

15             MS. GODESKY:  Yes.

16             THE COURT:  FICO gets to say, We think consent was

17   required.

18             MS. GODESKY:  Yes.

19             THE COURT:  Federal gets to say, No, it wasn't.

20             MS. GODESKY:  Yes.

21             THE COURT:  That's got to come in through

22   witnesses, right?

23             MS. GODESKY:  Yes.

24             THE COURT:  Okay.  Just not Mr. Carretta.

25             MS. GODESKY:  Just not Mr. Carretta.

1          And that's what distinguishes Mr. Carretta from

2     the witnesses whose testimony we've designated and FICO

3     pointed out in their opposition brief, because the evidence

4     that is probative to how Section 8 should be interpreted is

5     the words on the page, testimony from people who were

6     involved in the negotiating and the drafting of the deal,

7     and then the course of conduct of people who were operating

8     for years under that agreement.

9          And so, for example, FICO pointed out that we've

10    designated some testimony from Mr. Schreiber and Mr. Sawyer,

11    the two business folks at FICO who were, you know, course of

12    dealing with Federal for years under this contract.  And so,

13    yes, their interpretation of the contract and the meaning of

14    its terms is relevant because it's reflected in their course

15    of dealing, their unobjected-to course of dealing for many

16    years.  Mr. Carretta is someone who is coming on the scene

17    after the fact and interpreting the contract.

18         And, you know, FICO says, Oh, we have to call

19    Mr. Carretta because you, Federal, are accusing us of

20    terminating the contract without basis, and we have to call

21    Mr. Carretta so he can explain our basis.  But whether the

22    contract was terminated without basis depends again on the

23    jury's evaluation of the extrinsic evidence at the time that

24    the deal was negotiated and the course of dealing that

25    followed, unless they were going to invoke some sort of

1    advice-of-counsel defense, which is not in play here.

2              THE COURT:  Well, hang on, though.  But you've

3    made the allegation that they breached the covenant of good

4    faith and fair dealing, they acted in bad faith.  Why isn't

5    reliance on the advice of a lawyer relevant to that?

6              MS. GODESKY:  Well, it could be, Your Honor, and

7    that's the third point.

8              THE COURT:  But that's not what he's doing.

9              MS. GODESKY:  That's not what he's doing.

10             And there's a major sword/shield problem here,

11   right, because they are selectively waiving privilege, is

12   essentially what they'd be doing, over Mr. Carretta's

13   communications and work product interpreting this contract.

14   They want to call him to the stand and have him say, My

15   interpretation is, no, you know, you needed to get consent.

16   But then at deposition when we said, Okay, so what's your

17   definition and interpretation of the "expanded use" phrase

18   that also appears in this provision you're now interpreting,

19   he was instructed not to answer on privilege grounds.

20             So if they want to go the advice-of-counsel route

21   and have counsel selectively interpreting in front of the

22   jury what the contract means, we get it all.  We get to

23   question Mr. Carretta about his work product.  There are

24   over 200 privilege entries for Mr. Carretta, withheld

25   communications in early 2016 after the merger.  We should

1    get to review all of them, because he may like his

2    interpretation and want to share it to the jury of what, you

3    know, the consent provision means, but I'm also interested

4    in knowing how he interpreted and gave advice about

5    "expanded use."

6            And so, you know, this is a legal opinion.  It's

7    irrelevant because it's after the fact.  They have not

8    invoked an advice-of-counsel argument.  And even if the

9    court were to allow them to do so now, I would say there's a

10   waiver.

11           THE COURT:  Okay.  Understood.

12           Mr. Hinderaker or Ms. Kliebenstein.  Ms. Stradley.

13   Hang on one second.  Okay?

14           MS. STRADLEY:  Yes.

15           THE COURT:  Okay.  Go ahead, Ms. Stradley.

16           MS. STRADLEY:  Thank you.

17           I would phrase things a little bit differently

18   than how Ms. Godesky phrased it.  I would say that

19   Mr. Carretta is testifying about his understanding and his

20   basis for comments that he raised in letters that he sent to

21   and from defendants during the cure negotiation.

22           So as we've heard throughout this argument on

23   different motions as well, there are lots of letters back

24   and forth during this 2016 time period.  Mr. Carretta was

25   involved in those cure negotiations.  He's explaining in

1    those letters the basis for why we think they needed consent

2    and that they've breached the contract by not asking for

3    consent or through this merger.  And he should be entitled

4    to explain his understanding for his letter and why he's

5    putting forth these opinions in his letter.  I don't think

6    that that's a legal conclusion.  It's an understanding as to

7    why he's put forth the basis for these breaches in the

8    letter that are definitely going to be coming into evidence,

9    as we discussed earlier.  There's no reason that he

10   shouldn't be able to explain his understanding and rationale

11   for why he was taking certain actions, particularly since

12   they have asserted a breach of good faith and fair dealing

13   claim that says we've asserted this, you know, alleged

14   breaches in bad faith.

15            THE COURT:  Who's putting the letters in?  Are

16   you?  Are they?

17            MS. STRADLEY:  If you don't mind?

18            THE COURT:  Sure.

19            MR. HINDERAKER:  I know, Your Honor.

20            The letters will come in through Mr. Carretta.

21   He's the author of the notice of breach letter.  He's the

22   author of some letters to his counterpart at Chubb, who is

23   also a lawyer, a Mr. Hopp most often.  He will be testifying

24   to the fact of what Mr. Hopp said back to him in terms of

25   the issues that were being discussed.

1          There will be other -- there will be business

2     people who are involved on some of the -- on the business

3     side of those same negotiations who will be testifying as

4     well, but much of the letter is written by, drafted by

5     Mr. Carretta.  He and his counterpart went back and forth

6     with some proposed amendments to the license agreement to

7     resolve the dispute.  He'll testify to those.  It's not a

8     legal opinion.  It's a fact that this proposed settlement

9     agreement had these words in it.  And he'll testify to

10    whether it was acceptable or not.  As Ms. Stradley said,

11    he's not offering a legal opinion to tell the jury what

12    anything means, but he wants to tell why he did what he did.

13          THE COURT:  Right.  I took this position, and

14    here's why I took it.

15          MR. HINDERAKER:  Maybe I was wrong, maybe I was

16    right, but this is what I said and this is why I said it.

17          THE COURT:  Okay.  All right.

18          MS. STRADLEY:  Does that answer your question?

19          THE COURT:  It does.  No.  I -- yeah, it does

20    answer my question.

21          MS. STRADLEY:  Okay.  The other point I did want

22    to make is -- I lost my train of thought -- oh, that it also

23    gets to the commercial purpose for some of the -- for some

24    of the provisions.  And there I should say Mr. Carretta's

25    understanding of the commercial purpose for the consent

1  provision that's at issue, which is one of the factors

2  that's considered when you are assessing the breach of good

3  faith and fair dealing.  The question is, Were FICO's

4  actions objectively reasonable in light of the commercial

5  purpose of the provision at issue.  And so his testimony

6  will speak to that as well and goes directly to defending

7  against the counterclaim that they've asserted.

8           And, finally, with respect to the sword and the

9  shield argument that Ms. Godesky made, our brief I think

10 does a nice job of going through the exact citations that

11 they put forth in their brief.  They only cited to two

12 selective invocations.  And we've gone through those in our

13 brief and shown that in fact he did not invoke privilege, he

14 actually answered the questions that were asked, and did not

15 use a sword and a shield for the privilege.

16          THE COURT:  There presumably were other questions

17 about that cure negotiation period, right, and some of them

18 directed to Mr. Carretta, and he answered questions about

19 whatever positions he took during that period and why he

20 took them?

21          MS. STRADLEY:  Well, I think we put forth a nice

22 big chunk in our brief on pages 5, 6 and through 7 in which

23 he discussed the consent provision.

24          I don't -- because they didn't cite it in their

25 brief, I certainly -- excuse me -- cannot speak to exactly

1    what she's talking about because we only addressed what was

2    raised, but what they raised is not an example of a

3    selective invocation.  He answered the questions, and we've

4    shown that he answered many other questions that we put

5    forth on those three pages and additional examples that

6    we've cited.  So I'm not sure -- you know, they didn't cite

7    anything else, but from the examples they gave us are not

8    proof of a sword and a shield use.

9              THE COURT:  Okay.  Thank you.

10             MS. GODESKY:  Your Honor, may I respond?

11             THE COURT:  You may.

12             MS. GODESKY:  Thank you.

13             THE COURT:  I'll tell you both right now I'm not

14   going to rule on this one right now.  I'm going to take it

15   under further advisement, but go ahead.

16             MS. GODESKY:  And what I wanted to do is direct

17   the court to more material in the record, so hopefully this

18   will be helpful.

19             So you summarize sort of FICO's pitch for this

20   testimony as Mr. Carretta saying, I took this position and

21   this is why.  Mr. Carretta can talk about the letter; he can

22   read it; he can say he sent it.  But the minute he starts

23   getting into why, that is work product.  And if you look at

24   where we cited in our brief the Carretta deposition at

25   pages 150 and 151, when he started talking about his

1    interpretation of the consent provision, Ms. Janus asked

2    him, Okay, how do you interpret "expanded use," instructed

3    not to answer at 150 and 151.

4            And I went painstakingly through FICO's brief that

5    was just referenced by counsel right now, pages 5, 6 and 7,

6    last night.  I highlighted every time the term "expanded

7    use" came up.  He never once testified about his

8    interpretation of the expanded use clause.  They stood on

9    that instruction not to answer.

10           So we have Mr. Carretta selectively disclosing his

11   work product and advice; and if he gets up there on the

12   stand at trial and does so, we are absolutely entitled to

13   probe broadly his advice about that provision after

14   receiving all of those withheld communications.

15           THE COURT:  So the line you would draw is, I took

16   this position, I'm not recanting it.

17           MS. GODESKY:  We're not calling --

18           THE COURT:  No, I understand.

19           MS. GODESKY:  Yeah.

20           THE COURT:  But to the extent they call him and

21   you want to say, Here's the line and once you cross over it,

22   you've waived, I'm hearing you say that the line is he can

23   say, I wrote this letter, I sent it, I meant it, and I still

24   mean it.

25           MS. GODESKY:  Exactly.

1              THE COURT:  And --

2              MS. GODESKY:  Yeah.  Sorry.

3              THE COURT:  But you can't ask him -- well, we

4      won't -- well, he can't say, And here's why.

5              MS. GODESKY:  No, I don't think he can, because,

6      again, they're not defending against this bad faith claim

7      with an advice-of-counsel argument.  Right?  They're not

8      saying, Oh, this wasn't bad faith, we're relying on advice

9      of counsel.  When you have an advice-of-counsel argument,

10     you get all the memos, you get all the communications, you

11     get all the back and forth.  They haven't gone there, Your

12     Honor.

13             And so they have to have -- they can introduce the

14     letter into evidence.  He can read it out loud.  They can

15     establish in front of the jury so that they don't think

16     anything untoward is happening.  You know, you can't talk

17     about more, right, because that would invade the privilege.

18     That's right; I can't talk about it because it's privileged.

19     Right?  So that's why he's not saying more.

20             But if they want to defend the interpretation

21     of -- or if they want to defend the things said in the

22     letter, it goes back to all of the extrinsic evidence that's

23     actually relevant under New York law.  Right?  What did the

24     people who actually negotiated the contract and drafted it

25     think?  What did the business people operating under the

1    contract for years think?  But absent an advice-of-counsel

2    argument, we don't get to put our lawyer up there basically

3    as a mouthpiece for our position in the litigation.

4            THE COURT:  So let's say they hew to the line you

5    are suggesting.  I'm assuming I don't hear a question coming

6    from Federal's counsel, Well, why did you say that.

7            MS. GODESKY:  Absolutely not.

8            THE COURT:  Right?  Because you're not going to

9    make them invoke the privilege in front of the jury.

10            MS. GODESKY:  Correct.

11            THE COURT:  Okay.  Okay.

12            MS. GODESKY:  Thank you.

13            THE COURT:  Thank you.

14            That one I'll take under advisement.  I will make

15    the observation, not that, again, to state the blindingly

16    obvious, it's an area where not only I, but you have to

17    proceed very carefully.  Okay?  Everyone.

18            All right.  Here's where we are.  We are woefully

19    behind time.  I'm going to let the court reporter go.  I

20    have a number of things to cover.  If there's -- if we need

21    to make a record of anything, we'll do it by --

22            Do we have a recording device up here?  We'll

23    figure it out.

24            Okay.  We do -- well, yeah, anyway, I want to let

25    her go, but I have a whole long agenda.

1            Are people able to stay?  Okay.

2            MS. GODESKY:  Yes.

3            THE COURT:  Okay.  Let's take a five-minute break.

4            (Court adjourned at 5:13 p.m., 02-03-2023.)

5                              *   *   *

6            I, Renee A. Rogge, certify that the foregoing is a

7    correct transcript from the record of proceedings in the

8    above-entitled matter.

9                       Certified by:  /s/Renee A. Rogge
                                       Renee A. Rogge, RMR-CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25