

O'Melveny & Myers LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067-6035

T: +1 310 553 6700
F: +1 310 246 6779
omm.com

February 15, 2023

Leah Godesky
D: +1 310 246 8501
lgodesky@omm.com

**BY ECF**

Honorable David T. Schultz
United States District Court
300 South Fourth Street
Minneapolis, MN 55415

Re:   *Fair Isaac Corp. v. Federal Insurance Co. et al.*, 16-cv-1054

Dear Judge Schultz:

I write on behalf of Defendants Federal Insurance Company and ACE American Insurance Company.

FICO seeks to admit two categories of evidence that is precluded under Federal Rule of Evidence 408—proposed financial terms for a compromise in advance of litigation and draft settlement agreements.  This evidence is irrelevant to any issue in this case because it merely reflects the parties' attempts to head off threatened litigation, not the legal merits of the dispute.  The evidence would also prejudice Defendants, waste time, and confuse the jury.  Rule 408 fosters the public policy favoring settlement over litigation by ensuring the parties' settlement negotiations cannot be wielded against them in court.  And consistent with that policy, the evidence here shows that FICO and Federal expected that Rule 408 would shield their sensitive compromise negotiations—both Federal and FICO specifically invoked Rule 408 in numerous March 2016 communications and FICO's counsel instructed a deponent not to answer questions about an early-2016 meeting on Rule 408 grounds.  The Court should uphold that shared expectation and exclude the exhibits identified below.

## Background

On January 27, 2016, Thomas Carretta, then FICO's Associate General Counsel, notified Federal of FICO's view that Federal, by continuing to use Blaze Advisor after the ACE acquisition, was in breach of the License Agreement.  D-0294.  This prompted a "notice period[,]" D-0299—a month of communications between FICO to understand "what is going on and what the issue is[,]" D-0152, and to reach a business resolution to FICO's concerns.

As the initial notice period drew to a close, Tamra Pawloski on February 25 sent FICO a "commercial proposal" to confine Blaze Advisor use to 100 seats and 15 applications at no additional cost.  D-0301.  The next day, FICO rejected that proposal.  D-0302.  In that correspondence, Carretta promised not to take any "action" for two weeks to allow FICO and



Federal time to compromise the claim.  *Id.*  But the end of the initial "notice period[,]" D-0299, combined with Carretta's temporary forbearance of "action[,]" D-0302, made clear that the dispute had crystallized, that litigation was on the table, and that ongoing compromise negotiations would be aimed at preventing a lawsuit.

For the next month, the parties worked to attempt to compromise FICO's potential claim.  On March 2, Mike Sawyer at FICO sent Federal a financial proposal containing two options for an "amicable and timely resolution" of the dispute.  P-0097; P-0256 (duplicate); P-0257 (duplicate); P-0614 (duplicate); P-0139 (March 3 internal FICO email confirming Pawloski read the proposal). On March 6, Sawyer sent an additional financial proposal with "additional information related to" one of those options.  P-0232; P-0258 (duplicate); P-0259 (duplicate); P-0689 (duplicate).

Then, on March 11, Carretta sent FICO a draft "Amendment Three" to the License Agreement— a proposed settlement—while upping the pressure to settle by suggesting (falsely, as the evidence will show) that FICO had just found "two non-compliant applications outside the authorized U.S. territory."  P-0066; P-0098 (duplicate).

Days later, on March 15, Pawloski sent FICO a "confidential settlement proposal" containing an explanation of Federal's proposed financial terms.  P-0261.  No one from FICO responded and stated that they disagreed the parties were engaged in settlement talks.  The parties scheduled a time to discuss Federal's offer, P-0141, and, ahead of that call, FICO sent Federal additional proposed financial terms, P-0262; P-0419 (duplicate); *see also* P-0233 (internal FICO discussion of this counterproposal noting that "we will need to make some additional changes to our most recent proposal to get them on board").

On March 22, Bill Waid sent Federal FICO's "best and final position"—"the full extent and final offers that will be made by FICO in this matter."  P-0265; P-0266 (spreadsheet containing financial terms).  Waid made clear that this was a take-it-or-leave it offer and that litigation was the next step:  "I have been instructed that all offers proposed and tabled will expire at close of business (COB) Wednesday March 30th, 2016 absent a fully executed agreement."  *Id.*  Indeed, Waid was clear to note that "the foregoing proposal is provided as a confidential settlement proposal and protected communication under Rule 408[.]"  *Id.*  And he reserved all "rights or remedies."  *Id.*

The next day, March 23, Carretta sent Federal an updated settlement agreement, while again ratcheting up the pressure to settle—he suggested (again, falsely) that FICO had just learned of foreign installations of Blaze Advisor and warned that "the settlement negotiation period" would end on March 30.  P-0068; P-0084 (duplicate).  The settlement proposal took the form of a draft contract containing financial terms.  P-0100; P-0853.  **Carretta labeled his message a "Confidential Settlement Proposal Subject to FRCP [sic] 408[.]"**  P-0068; *see also* P-0083 (discussion of FICO's "best and final offer" marked under Rule 408; email from Bill Waid repeating the claim that FICO had just learned of the foreign use of Blaze Advisor); P-0099 (duplicate); P-0615 (near duplicate); P-0234 (near duplicate).

On March 25, Federal, again invoking Rule 408, sent a financial "counter offer" and a "redline to the Amendment" proposal.  P-0101 (cover email and spreadsheet); P-0263 (duplicate); P-0854

2



(clean version of revisions to proposed Amendment); P-0933 (marked-up version of revisions to proposed Amendment); P-0852 (duplicate).

On March 27, FICO rejected Federal's proposal and ominously observed that "[g]iven how close we are to the end of the cure period" the parties should hold "a call between [their] respective counsels[.]"  P-0102; P-0142 (additional FICO communications regarding rejection).  That same day, Bill Waid admonished Federal that "Chubb does not fully understand the resolve and position regarding the breach of contract" and that "FICO will pursue all legal remedies."  P-0235.  ***This message was also marked by FICO under Rule 408.***  *Id.*

On March 30, FICO purported to terminate the License Agreement.  P-0103; P-0641 (duplicate); P-0069 (near duplicate).[1]

* * *

Defendants move to exclude from evidence under Rule 408 two categories of evidence:

1. **Proposed financial terms:**  FICO's March 2 proposal, P-0097; P-0256 (duplicate); P-0257 (duplicate); P-0614 (duplicate); P-0139, its March 6 addition to that proposal, P-0232; P-0258 (duplicate); P-0259 (duplicate); P-0689 (duplicate), Federal's March 15 counterproposal, P-0261, P-0141, FICO's additional financial information appended to that counterproposal, P-0262; P-0419 (duplicate); P-0233; the financial terms of FICO's March 22 "best and final position[,]" P-0265; P-0266; P-0083; P-0099; P-0615; P-0234; FICO's March 23 draft Third Amendment to the License Agreement, P-0100; P-0853, Federal's March 25 counteroffer, P-0101; P-0263 (duplicate), and revisions to the draft Third Amendment, P-0854; P-0933; P-0852 (duplicate); FICO's rejection of those terms and discussion of discounting, P-0102; P-0142.

2. **Draft settlement agreements:**  FICO's March 11 draft Amendment Three, P-0066; P-0098 (duplicate), FICO's March 23 draft, P-0100; P-0853; P-0068; P-0084, Federal's March 25 counterproposal, P-0854, P-0933, P-0852 (duplicate); and Bill Waid's summary of the negotiations and proposals, P-0235.

Defendants also seek to exclude all testimony about these communications.

## Argument

**I.    Rule 408 bars the use of settlement negotiation evidence to prove liability or the value of a suit.**

Federal Rule of Evidence 408 provides that evidence of "conduct or a statement made during compromise negotiations about the claim" is "not admissible—on behalf of either party—either to prove or disprove the *validity* or *amount* of a disputed claim[.]"  Fed. R. Evid. 408(a) (emphasis

---

[1] Defendants do not object to the admission of the termination notice.



added). Consequently, evidence of settlement negotiations is not admissible to prove an element of a claim, *Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 966-67 (8th Cir. 2011), or damages, *Coutard v. Municipal Credit Union*, 484 F.3d 102, 114 (2d Cir. 2017).

Rule 408 serves two important purposes. First, it recognizes that settlement-negotiation evidence is "irrelevant" because settlement negotiations "may be motivated by a desire for peace rather than from any concession of weakness of position." Fed. R. Evid. 408 advisory committee's note. Second, it promotes "the public policy favoring the compromise and settlement of disputes." *Id.* "[P]arties will have little incentive to settle claims amicably if evidence from compromises and compromise negotiations will come back to haunt them in subsequent litigation." *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1363 (10th Cir. 1987). "[A] court must apply Rule 408 'in light of its underlying purpose.'" *Steffen v. Northway Res. Dev., LLC*, 581 F. Supp. 3d 1138, 1151 (D. Minn. 2022) (quoting *Weems*, 665 F.3d at 965).

## II.    Communications after February 26 are settlement negotiations subject to Rule 408.

The parties agree that the exchanges between FICO and Federal up through February 26, 2016 were business negotiations that do not implicate Rule 408. On February 26, however, the negotiations entered a new phase when Thomas Carretta informed Federal that Federal's proposal was rejected. D-302. Although Carretta indicated that the parties could continue to seek a "business resolution[,]" the subtext of his promise to "take no action" "this week and next week" could not have been clearer—litigation was now on the table. *Id.*

With FICO making the threat of a lawsuit clear, the parties' disagreements crystallized and their negotiations took on a new tone. P-0265 (extending a "best and final position"); P-0068 (warning of the end of "the settlement negotiation period"); P-0235 ("FICO will pursue all legal remedies"). After February 26, Federal's efforts were devoted to avoiding litigation. To that end, Federal, starting in its first post-February 26 settlement communication with FICO and continuing through FICO's purported termination, appended a Rule 408 designation to its correspondence. *See, e.g.*, P-0261; P-0141; P-0101; *see also* P-0263 (containing an attachment entitled "Settlement Document"). FICO did too. *See, e.g.*, P-0068 (March 23 email from Carretta designated "Confidential Settlement Proposal Subject to FRCP [*sic*] Rule 408"); P-0084 (same); P-0100 (same); P-0853; P-0099 (containing a March 23 email from Mike Sawyer described as "a confidential settlement proposal and protected communication under Rule 408" and March 22 email from Bill Waid with a similar Rule 408 designation); P-0234 (same); P-0266 (same); P-0615 (same); P-0235 (March 27 email from Bill Waid designated "Confidential Settlement Proposal Subject to FRCP [*sic*] Rule 408"). The dispute also became more focused: the parties exchanged proposed financial terms, *see, e.g.*, P-0097; P-0232; P-0261; P-0266, and draft settlement agreements, *see, e.g.*, P-0066; P-0100; P-0853; P-0854, in an effort to reach a compromise.

In short, *both sides* understood that in March 2016, they were negotiating to compromise and settle an impending lawsuit. And their communications make clear that they expected their sensitive negotiations would not be used in litigation. A dispute "need not 'crystallize to the point of threatened litigation for the 408 exclusion to apply[,]'" *Weems*, 665 F.3d at 965 (quoting



*Affiliated Mfrs. v. Aluminum Co. of Am.*, 56 F.3d 521, 527 (3d Cir. 1995)), but once it has, as here, Rule 408 protects the confidentiality of the parties' settlement negotiations.

Not only did the parties understand these communications to be Rule 408 settlement discussions at the time they were made, but FICO maintained that view during discovery. During Sean Baseman's deposition, Defendants asked him about an early 2016 meeting between FICO and Chubb regarding "noncompliance with the license[.]" Deposition of Sean Baseman, 65:6-9. Counsel for FICO instructed Baseman not to answer because "[t]hat meeting was coordinated by counsel as a settlement discussion" under Rule 408. *Id.* at 66:9-17. Counsel maintained that "[t]he point of the meeting was to resolve the lawsuit outside of the legal construct. It was set up through the attorneys, and then it was followed up with mediation[.]" *Id.* at 67:3-7. FICO understood that the parties' communications were Rule 408 settlement discussions.

The Court, "apply[ing] Rule 408 in light of its underlying purpose" to foster free and uninhibited settlement negotiations, *Steffen*, 581 F. Supp. 3d at 1151, should uphold the parties' shared expectation of confidentiality by excluding the March 2016 settlement negotiations from evidence.

### III.  FICO's exhibits containing evidence of settlement negotiations are inadmissible under Rule 408.

FICO's inadmissible exhibits fall into two categories. First, exhibits containing proposed financial terms. As the Court observed in the parties' February 14 conference, financial proposals strongly implicate the policy concerns of Rule 408. Second, draft settlement agreements. These proposals are irrelevant and confusing—and FICO has already attempted to use them to prove that Defendants breached the License Agreement.

#### A.  Exhibits containing financial proposals impermissibly suggest the value of the lawsuit.

FICO seeks to admit a number of exhibits containing the parties' negotiations over the dollar value of a settlement. These include: FICO's March 2 proposal, P-0097; P-0256 (duplicate); P-0257 (duplicate); P-0614 (duplicate); P-0139, its March 6 addition to that proposal, P-0232; P-0258 (duplicate); P-0259 (duplicate); P-0689 (duplicate), Federal's March 15 counterproposal, P-0261, P-0141, FICO's additional financial information appended to that counterproposal, P-0262; P-0419 (duplicate); P-0233; the financial terms of FICO's March 22 "best and final position[,]" P-0265; P-0266; P-0083; P-0099; P-0615; P-0234; FICO's March 23 draft Third Amendment to the License Agreement, P-0100; P-0853, Federal's March 25 counteroffer, P-0101; P-0263 (duplicate), and revisions to the draft Third Amendment, P-0854; P-0933; P-0852 (duplicate); FICO's rejection of those terms and discussion of discounting, P-0102; P-0142.

These exhibits are inadmissible. Rule 408 bars the use of settlement negotiations to prove the "amount of a disputed claim[.]" Fed. R. Evid. 408(a). Consequently, settlement-negotiation evidence may not be "proffered . . . with respect to the amount of damages" a party seeks. *Coutard*, 484 F.3d at 114; *Branch v. Fid. & Cas. Co. of N.Y.*, 783 F.2d 1289, 1294 (5th Cir. 1986) (settlement evidence inadmissible to prove "the quantum of damages"). At the Court's February



14 conference, FICO indicated it intended to discuss the financial terms contained in the settlement negotiations in arguing the value of the case to the jury.  Rule 408 squarely prohibits the use of settlement-negotiation evidence for this purpose, as the Court observed.

In any event, whatever the purpose for which FICO claims to seek admission of the proposed financial terms, putting a financial proposal before the jury will unfairly prejudice Defendants by suggesting the "amount of a disputed claim[.]"  Fed. R. Evid. 408(a); *see Catipovic v. Turley*, 68 F. Supp. 3d 983, 1017 (N.D. Iowa 2014) (admission of a compromise offer including a "dollar amount" would be "more prejudicial than probative" because it was unknown whether the offer was made "out of a desire for peace" or because it "reflected the value of the services" at issue).  Because "the prejudicial effect significantly outweighs any probative value[,]" "any discussion of the financial terms of contract negotiations . . . is precluded under Rule 408."  *Deadwood Canyon Ranch, LLP v. Fid. Exploration & Prod. Co.*, 2013 WL 11971255, at *3 (D.N.D. Nov. 27, 2013); *accord Glaze v. G&B Marine, Inc.*, 1997 WL 35221, at *1 (E.D. La. Jan. 27, 1997) ("The specific terms of the settlement including the dollar amount are not admissible in that this information would tend to confuse the jury or is otherwise not admissible under Rule 408.").

### B.   Exhibits containing draft settlement agreements are confusing and irrelevant.

FICO seeks to admit a number of exhibits containing draft settlement agreements in both marked-up and clean form.  These include:  FICO's March 11 draft Amendment Three, P-0066; P-0098 (duplicate), FICO's March 23 draft, P-0100; P-0853; P-0068; P-0084, Federal's March 25 counterproposal, P-0854, P-0933, P-0852 (duplicate); and Bill Waid's summary of the negotiations and proposals, P-0235.

To begin with, these settlement proposals are, on their face, in the heartland of what Rule 408 excludes from evidence:  "conduct or a statement made during compromise negotiations about the claim[.]"  Fed. R. Evid. 408(a).  Accordingly, they are "irrelevant[.]"  *Id.* advisory committee's note.  What is more, they are confusing.  The clean versions are dense, unexecuted, abandoned contract proposals that have no logical relevance to any issue in the case.  The marked-up versions are all that and indecipherable to boot.  In addition to being inadmissible under Rule 408, introduction of these draft agreements would "confus[e] the issues, mislead[] the jury," and "wast[e] time[.]"  Fed. R. Evid. 403.

### C.   FICO's cases are inapposite.

The cases FICO cites to support these exhibits' admissibility are off-base.  *Athey v. Farmers Insurance Exchange*, 234 F.3d 357, 362 (8th Cir. 2000), involved an insurance bad-faith claim.  There, the court relied on a South Dakota law providing that "an insurer's attempt to condition the settlement of a breach of contract claim on the release of a bad faith claim may be used as evidence of bad faith."  *Id.*  In re MSTG, Inc., 675 F.3d 1337 (Fed. Cir. 2012), merely holds that Rule 408 does not create a "settlement negotiation privilege[,]" and that settlement communications are discoverable.  *Id.* at 1347.  Obviously, Defendants' do not disagree—these communications were all produced.  Finally, *S&S Diesel Marine Services, Inc. v. M/V F-Troop*,



2011 WL 1899402 (S.D. Fla. May 18, 2011), concerned whether a ship's sea trial implicated Rule 408.  *Id.* at *10 n.4.  None of these cases permit the admission of confidential settlement negotiations to prove liability or damages.

The Court should exclude the following exhibits:  P-0097, P-0256, P-0257, P-0614, P-0139, P-0232, P-0258, P-0259, P-0689, P-0261, P-0141, P-0262, P-0419, P-0233, P-0265, P-0266, P-0083, P-0099, P-615, P-0234, P-0100, P-0853, P-0101, P-0263, P-0854, P-0933, P-0852, P-0102, P-0142, P-0066, P-0098, P-0068, P-0084, P-0235.[2]

Respectfully submitted,

/s/ Leah Godesky

Leah Godesky

cc:     Counsel of Record

---

[2] FICO's voluminous exhibit list contains a large number of duplicate exhibits.  Defendants also move to exclude any duplicates of these exhibits not specifically listed.