

O'Melveny & Myers LLP  
1999 Avenue of the Stars  
8th Floor  
Los Angeles, CA 90067-6035

T: +1 310 553 6700  
F: +1 310 246 6779  
omm.com

Leah Godesky  
D: +1 310 246 8501  
lgodesky@omm.com

February 16, 2023

**BY ECF**

Honorable David T. Schultz  
United States District Court  
300 South Fourth Street  
Minneapolis, MN 55415

Re:   *Fair Isaac Corp. v. Federal Insurance Co. et al.*, 16-cv-1054

Dear Judge Schultz:

I write on behalf of Defendants Federal Insurance Company and ACE American Insurance Company. FICO's consultant reports (P-295 and P-1028) and its case studies and white papers (P-932, P-1024, P-1025, P-1170, P-1171, P-1172, and P-1174) are inadmissible.

**I.     The consultant reports are inadmissible.**

**A.     The consultant reports are hearsay.**

The consultant reports are classic hearsay. They are out-of-court statements being offered to prove the truth of the matter they assert—Blaze Advisor's value. Fed. R. Evid. 801.

The consultant reports are pieces of puffery that FICO purchased to market its products. Because FICO does not rely on their accuracy, but rather on their glowing positivity about its products, the consultant reports are categorically not business records admissible under Rule 803(6). At the very least, their "source of information [and] the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E).

Business records are excepted from the hearsay rule because a business has a pecuniary motivation to ensure the records it relies on to conduct business are accurate and reliable. *See* Fed. R. Evid. 803 advisory committee's note ("The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."); 2 McCormick on Evid. § 286 (8th ed. July 2022 update) ("Reliability is furnished by the fact that regularly kept records typically have a high degree of accuracy. The regularity and continuity of the records are calculated to train the recordkeeper in habits of precision; if of a financial nature, the records are periodically checked by balance-striking and audits; and in actual experience, the entire business of the nation and many other activities function in reliance upon records of this kind.").

Austin • Century City • Dallas • Houston • Los Angeles • Newport Beach • New York • San Francisco • Silicon Valley • Washington, DC  
Beijing • Brussels • Hong Kong • London • Seoul • Shanghai • Singapore • Tokyo

That is why a third-party statement only counts as an entity's business record when the entity "relie[s] on the accuracy of that record" in conducting its business. *Res. Fund. Co., LLC*, 725 F.3d at 921. To that end, FICO's cases only extend the business record exception to "a record created by a third party and integrated into another entity's records" when that entity has a business motivation to ensure the third party's record is *accurate*. *See Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010) (admitting two documents from a foreclosure file); *Smith v. SEECO, Inc.*, 922 F.3d 406, 412 (8th Cir. 2019) (admitting royalty statements); *Res. Fund. Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910, 921 (8th Cir. 2013) (admitting documents quantifying damages prepared by the successor to a portion of a party's business); *Estes v. ECMC Grp., Inc.*, 565 F. Supp. 3d 244, 255 (D.N.H. 2021) (admitting loan application and note obtained from a predecessor-in-interest).

FICO did not have the pecuniary interest that Rule 803(6) presupposes in ensuring the accuracy of the consultant reports. Quite the contrary: FICO's interest was in ensuring that the reports, which it distributed "to its prospective customers in the ordinary course of marketing its products[,]" Dkt. 1083 at 4, contain the fawning it paid for. This case is thus not like *Condus v. Howard Savings Bank*, 986 F. Supp. 914 (D.N.J. 1997), in which the court admitted an external consultant's report assessing "the quality of [a business's] credit administration process and the adequacy of [its] loan loss reserves." *Id.* at 915. There, the business relied on the consultant "to provide an accurate report so that the Governance Committee could rely on" it for the purpose of improving its business operations. *Id.* at 918. Here, by contrast, while FICO may have relied on the reports, it did not rely on their accuracy. The safeguard of reliability contemplated by business records exception thus does not apply to them. And, as purchased puffery, these consultant reports are untrustworthy. Fed. R. Evid. 803(6)(E).

### B.  Admitting the consultant reports would circumvent the rules governing expert testimony and unfairly prejudice Defendants.

FICO purchased these two reports so it could obtain the imprimatur of respected consultancies and their purportedly rigorous analysis on its marketing materials. *See* P-0295-001 ("This ESG White Paper was commissioned by FICO[.]"); P-1028-001 ("A Forrester Total Economic Impact™ Study commissioned by FICO[.]"); Baer Dep. 46:9-18 ("[T]here's distinct value in FICO writing a document that, you know, describes the value that our products provide to customers. But there's distinctly more value in having a third-party organization, like an ESG, for instance, in doing their own analysis, in doing their own assessments. . . . [W]e would subsidize that process because it makes [an] even more compelling business case for a lot of our customers to see this come from a third party.").

That may be fair play with prospective customers, but it is not with a jury. FICO is seeking to admit what is, in essence, unreliable, undisclosed expert testimony about Blaze Advisor's value through the testimony of a lay witness. "What is essentially expert testimony . . . may not be admitted under the guise of lay opinions. Such a substitution subverts the disclosure and discovery requirements of [Federal Rule of Civil Procedure 26] and the reliability requirements for



expert testimony as set forth in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)." *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001) (citations omitted).

The consultant reports are, for all intents and purposes, expert reports. They trade on "scientific, technical, or other specialized knowledge within the scope of Rule 702[.]" Fed. R. Evid. 701(c). P-0295, for instance, purports to base its conclusions about "a high ROI for Blaze Advisor–based applications" on, among other things, "Blaze Advisor ROI studies[.]" P-0295-011. These "ROI studies" surely rely on "specialized knowledge"—although it is hard to say because P-295 offers no description of its methodology and, as described below, FICO's custodial witness likewise could not explain what these studies were. Baer Dep. 48:11-49:12 (ESG "did whatever analysis they did."). P-1028 is even worse. It offers "key statistics" about FICO's Decision Modeler product's "[r]eturn on investment" and "[n]et present value" and lengthy discussion of Decision Modeler's "[q]uantified benefits." P-1028-003-004. The report is dressed up with charts, P-1028-006, tables, P-1028-014, and "framework[s,]" P-1028-007. It assumes all the trappings of "scientific, technical, or other specialized knowledge[.]" Fed. R. Evid. 702(c). But, like P-295, it contains no description of its methods, only broad references to an apparently propriety "Total Economic Impact" methodology that "helps companies demonstrate, justify, and realize the tangible value of IT initiatives to both senior management and other key business stakeholders." P-1028-024.

FICO may not supplement its lineup of experts by parading these black-box reports before the jury. They were not disclosed according to Rule 26. Their methodology has not been vetted for reliability under *Daubert*. Indeed, the Court could not conduct a *Daubert* analysis even if it wanted to because the reports' methodologies are unknown. And FICO cannot introduce these reports through the testimony of a lay witness. *Peoples*, 250 F.3d at 641.

### C.   Baer cannot lay foundation for the admission of P-295.

Baer cannot lay foundation for the admission of P-295 under Rule 803(6). As FICO's own cases make clear, a party may introduce a another entity's statement as a business record only if the party "relied on the accuracy of that record[.]" *Res. Fund. Co., LLC*, 725 F.3d at 921. Baer, however, revealed at his deposition that he cannot even describe the contents of P-295, much less offer a sufficient showing that FICO relied on the accuracy of those contents.

The reason FICO commissioned P-295 is its conclusion that "Blaze Advisor ROI studies and feedback from business partners and customers consistently show a high ROI for Blaze Advisor–based applications." P-295 at 11. At his deposition, however, Baer could not "say for certain" the basis for that conclusion—whether it came from FICO's own studies or the "third-party analysis" of ESG. Baer Dep. 49:4-11. But, in Baer's view, it did not matter: he assumed that ESG was "verifying and vetting the ROI themselves" with "whatever analysis they did." *Id.* at 49:18-19.

As this exchange makes clear, Baer cannot show that FICO "relied on the accuracy" of P-295. *Res. Fund. Co.*, 725 F.3d at 921. Instead, it relied on the glowing opinion of Blaze Advisor that ESG was paid to provide.



### D. P-1028 was improperly withheld in discovery and is irrelevant.

In April 2017, Defendants requested that FICO produce "[a]ll documents that support or relate to each element of damages being claimed." Defendants' Request for Prod. No. 15. FICO did not produce P-1028, however, until January 2023, nearly six years after Defendants' request for production and four years after the close of fact discovery. Defendants have thus not been able to take discovery on what is in essence an expert report. The Court should exclude P-295 for this reason.

Additionally, P-1028 discusses FICO Decision Modeler, not Blaze Advisor, and so is irrelevant.

## II. The case studies and white papers are inadmissible.

The case studies and white papers are inadmissible for the same reason as the consultant reports—they are not the kind of business records contemplated by Rule 803(6) and are, in any event, untrustworthy. As with the consultant reports, FICO does not rely on the accuracy of the information from customers contained in the case studies and white papers to conduct its business. *Res. Fund. Co., LLC*, 725 F.3d at 921. Instead, it relies on their positive evaluations of Blaze Advisor to sell more software. These are not business records of the sort Rule 803(6) envisions, but are rather untrustworthy puffery. Fed. R. Evid. 803(6)(E). Moreover, as the Court observed, they contain multiple levels of hearsay, meaning Baer cannot lay a foundation for their admission.

## III. All late-disclosed documents should be excluded.

As the Court has already indicated, late-disclosed exhibits (P-1024, P-1025, and P-1028) are inadmissible. These documents, created after the close of discovery, contain numerous self-serving comments and were likely created with litigation in mind, not as part of FICO's regular course of business.

The Court should exclude P-295, P-1028, P-932, P-1024, P-1025, P-1170, P-1171, P-1172, and P-1174.

Respectfully submitted,

/s/ Leah Godesky

Leah Godesky

cc:    Counsel of Record

Benjamin Baer   -   1/29/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 1084   Filed 02/16/23   Page 5 of 7

```
 1                    UNITED STATES DISTRICT COURT

 2                       DISTRICT OF MINNESOTA

 3

 4   FAIR ISAAC CORPORATION,       )
                                   )
 5                  Plaintiff,     )
                                   )
 6        vs.                      )  Case No. 16-cv-1054
                                   )  (WMW/DTS)
 7   FEDERAL INSURANCE COMPANY and )
     ACE AMERICAN INSURANCE COMPANY,)
 8                                 )
                     Defendants.   )
 9                                 )
     _____)
10

11

12

13

14
                      DEPOSITION OF BENJAMIN BAER
15

16

17

18

19

20   Date and Time:    Tuesday, January 29, 2019
                      9:28 a.m.
21

22                    San Carlos Street Executive Center
     Location:        453 West San Carlos Street
23                    San Jose, CA  95110

24

25   Reported by:    Cammi R. Bowen, CSR-13492
```

Benjamin Baer  -  1/29/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS   Doc. 1084   Filed 02/16/23   Page 6 of 7

**Page 44**

A. This is particularly geared towards an IT audience, an implementation audience.

Q. So when a white paper on a technical topic like this is prepared, does somebody -- currently, does somebody other than you review it and determine whether it should go out?

A. Yes. It -- particularly the technical documentation. I may review it for grammar or for messaging, but those are usually vetted by the engineering organization.

Q. Okay.

A. Or even, perhaps, the presales organization.

Q. Okay. And who are the -- the engineering people at FICO who would review a technical paper like this?

A. Oh, it depends on the product. It depends on the organization.

Q. What about Blaze for Chubb?

A. Probably someone like a John Cribbs in the engineering organization.

Q. And you said the presales. Who would that be?

A. Presales is an organization. We call them the global solutions architects. These are people with hands-on experience on how to implement the technologies in a -- in a solutions environment. So specific to

**Page 45**

solve a particular customer's implementation.

Q. And who would that be today?

A. Well, the person who leads that organization, his name is Sean Baseman.

Q. Okay.

MR. FLEMING: Can you mark this as Exhibit 294.

(Defendants' Exhibit 294 was marked for identification.)

THE WITNESS: Thank you.

BY MR. FLEMING:

Q. Mr. Baer, Exhibit 94 is a document entitled, "The Value of Embedding the FICO Blaze Advisor Decision Rules Managing -- Management System."

Is this a white paper that was prepared by your team?

A. No.

Q. Who was this prepared by?

A. A company called ESG. Enterprise Strategy Group, I think, is what they're referred to. We did work with them on this paper, but they wrote it.

Q. Okay. So why were they writing? Were they writing it at FICO's request?

A. Yes.

Q. Okay. So are they a outside vendor that prepared a white paper for FICO?

**Page 46**

A. Yeah, they're an industry analyst firm that -- that often take on projects like this.

Q. I see.

And what was the purpose?

Were you involved in hiring them to do this?

A. I -- I was consulted, yes.

Q. Okay. And what was the purpose in hiring them to do this?

A. So there -- there's distinct value in FICO writing a document that, you know, describes the value that our products provide to customers. But there's distinctly more value in having a third-party organization, like an ESG, for instance, in doing their own analysis, in doing their own assessments. We can provide them connections and contacts and -- in certain context, but this was based on their own interviews and their own research into the way that Blaze Advisor is used.

And, again, we would subsidize that process because it makes even more compelling business case for a lot of our customers to see this come from a third party.

Q. Uh-huh.

So is there a -- a set cost for this that ES -- ESG provided FICO in advance?

**Page 47**

A. Yes.

Q. Okay. And what was the cost?

A. I don't remember off the top of my head.

Q. Ballpark?

A. Something like this might be, I don't know, eight to $10,000.

Q. And to whom was it distributed then?

A. This would have been distributed to -- to prospective customers.

Q. And was it provided to prospective customers by FICO or did this organization distribute it?

A. So I can only claim -- I can only state that I know we distributed it. I don't know if ESG did as well. It's very possible they did.

Q. Okay. I mean, typically, would the outside organization distribute it or not?

A. It really depends on the firm.

Q. Okay. What about this firm?

A. I could see it being very feasible that they did distribute it themselves, but, again, I can't state for certain.

Q. Okay. And who did FICO distribute it to?

A. So this -- this would have been considered a lead gen deliverable. And generally, the way that lead generation works is you want to entice a customer or

Benjamin Baer - 1/29/2019
Fair Isaac Corporation vs. Federal Insurance Company, et al.
CASE 0:16-cv-01054-DTS Doc. 1084 Filed 02/16/23 Page 7 of 7

**Page 48**

prospective customer with conceptually something that addresses one of their own needs.

And this was specifically focused on helping us identify additional embedded customers or customers that would use Blaze Advisor in an embedded context within a larger solution.

So this was one of three deliverables that they provided to us that helped identify to prospective embedded customers how and where other companies have used the product and why it benefits them to use it.

Q. Okay. Can you turn to page 11.

Do you see in the second paragraph, under the section entitled "The Bigger Truth," it says, "Blaze Advisor ROI studies and feedback from business partners and customers consistently show a high ROI for Blaze Advisor-based applications."

Is that information that FICO provided to ESG?

A. Not to the best of my knowledge. This would have been something that they would have done themselves.

Q. Well, but when they are referencing Blaze Advisor ROI studies, presumably --

A. From -- from business partners and customers. Right.

Q. Okay. In the beginning of paragraph two, where

**Page 49**

it says, "Blaze Advisor ROI studies," is it your understanding that that is referencing studies that FICO prepared?

A. It -- it could have included ROI studies that we have compare -- that we have prepared. But one of the values of going to a company like ESG is that they do their own third-party analysis.

So I -- I can't say for certain it didn't include FICO ROI studies ourselves -- itself. But I don't know for certain, and I would assume that it would include a lot of their own analysis as well.

Q. Well, they talk about two things, don't they? Blaze Advisor ROI studies and then also feedback from business partners and customers?

A. That's interesting. That's not the way I originally read it. But I could see how you would come to that conclusion.

But, again, I would look at ESG as verifying and vetting the ROI themselves. A part of the -- this specific project was to have them talk to two of the embedded customers themselves. They facilitated those interviews themselves and did whatever analysis they did.

Q. Right.

So what -- an ROI, I take it, refers to return

**Page 50**

on investment?

A. That's correct.

Q. And what ROI studies has FICO done with respect to Blaze Advisor?

A. So I can't talk -- talk specifically to Blaze Advisor, but Blaze Advisor is a piece of what we call the decision management suite.

Q. Uh-huh.

A. We have done some analysis. I don't recall if it was with ESG or another firm. We created a tool that allows companies to figure out if they didn't use the decision management suite more holistically versus doing a more manual business process, exactly what kind of an ROI you can expect.

A lot of the ROI analysis has to do with underlying infrastructure, scalability, but it also, you know, would entail the automation of the decision logic and the agility and time to market benefits that customers would get.

So we -- we have attempted to quantify that, but I can't tell you for certain that ESG had it or didn't have it by the time they published this.

Q. Uh-huh.

Are you saying that FICO has done rate-of-return analyses with respect to the use of Blaze

**Page 51**

by Chubb?

A. I -- I can't tell you that at all.

Q. Okay. You don't know one way or another?

A. I -- I don't.

So the only ROI studies that I've ever been involved in have happened during my tenure. I don't know of any other ROI studies that happened prior to that.

THE WITNESS: Can I request a break now?

MR. FLEMING: Yes.

THE WITNESS: Please?

Thank you.

THE VIDEOGRAPHER: This marks the end of media unit number one in the videotaped deposition of Benjamin Baer. The time is 10:46 p.m. We're off -- a.m. We're off the record.

(Break taken.)

THE VIDEOGRAPHER: The time is 10:57 a.m. and this marks the beginning of media unit number two in the videotaped deposition of Benjamin Baer.

(Defendants' Exhibit 295 was marked for identification.)

BY MR. FLEMING:

Q. Mr. Baer, showing you what's been marked as Exhibit 295.