

O'Melveny & Myers LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067-6035

T: +1 310 553 6700
F: +1 310 246 6779
omm.com

February 20, 2023

**Leah Godesky**
D: +1 310 246 8501
lgodesky@omm.com

**BY ECF**

Honorable David T. Schultz
United States District Court
300 South Fourth Street
Minneapolis, MN 55415

**Re: *Fair Isaac Corp. v. Federal Insurance Co. et al.*, 16-cv-1054**

Dear Judge Schultz:

I write on behalf of Defendants Federal Insurance Company and ACE American Insurance Company.

For the second time since summary judgment, FICO is attempting to collaterally attack this Court's orders barring it from quantifying its actual damages based on "what FICO would have charged Defendants had FICO known that Defendants were bound to the license for the relevant three-year period, with no prospect of any future business dealings between the parties afterwards." Dkt. 731 at 31. This is not the proper measure of FICO's damages under the law. The proper measure of FICO's actual damages (assuming any breach or infringement at all) is "what a willing buyer and a willing seller would have contemplated." *Id.* Nevertheless, in his opening statement, FICO's counsel argued to the jury that FICO's damages are what it subjectively would have charged Defendants for a "transitional" license. That "subjective and unreliable result[,]" which is "inconsistent with the applicable legal standard[,]" should be excluded yet again. *Id.* at 32.

In particular, Defendants respectfully request that the Court preclude FICO from offering evidence or argument (i) suggesting that the proper measure of damages here is the price of a "transitional" license, or (ii) purporting to establish the price of such a license. Such evidence and argument is materially identical to the approach this Court has now rejected several times in its rulings on Defendants' *Daubert* motion and motions *in limine*, and is inconsistent with the proper legal standard applicable to determining copyright damages in this case—that is, "'the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use' of the copyrighted work." Dkt. 731 at 9 (quoting *On Davis v. The Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001)). In addition, it will substantially prejudice Defendants' damages defense if they are required to shadow box an alternative damages theory that has no basis in law.

In his opening statement, Mr. Hinderaker stated that the appropriate manner in which to determine actual damages for copyright infringement would be to determine the value of a so-called "transitional" license:



> There is one set of circumstances when you're trying to negotiate a license agreement with a brand new client, and there's another set of circumstances when you're trying to figure the fair value to be compensated when the license agreement has been terminated but the former client needs a transition license to move away from using Blaze Advisor.

Trial Tr. 44-45. According to FICO, it is only the latter "set of circumstances" that the jury should consider in calculating actual damages. Consistent with this theory, Mr. Hinderaker previewed Mr. Waid's testimony on this point: "And Mr. Waid will explain that [FICO][1] looks to the total lifetime value of the relationship when it's negotiating the fee. And so he will discuss total lifetime value in the context of a brand new client, total lifetime value in the context of the circumstance where a former client needs a transition license" because its prior license has been terminated. *Id.* at 45. Similarly, Mr. Hinderaker tried to counter Mr. Baseman's admission during cross-examination that Blaze customers are typically offered an enterprise-wide license if they intend to use Blaze in more than two applications, *see* Trial Tr. 178, by eliciting testimony on re-direct that Mr. Baseman has no "experience in setting Blaze Advisor pricing in the context where the relationship had ended and a transition license was being negotiated[,]" *id.* 190.

If all of this sounds familiar, it is because this is exactly the same license-pricing theory that the Court rejected in granting Defendants' *Daubert* motion to exclude Neil Zoltowski's actual damages testimony. Mr. Zoltowski testified about his approach to measuring damages as follows: "[W]hen FICO is negotiating a license from the perspective of entering into a perpetual license, [REDACTED] Zoltowski Dep. Tr. 182-83. But according to Mr. Zoltowski, the situation here is different because "you have two adversarial parties [REDACTED] "it's simply a bridge that's allowing Federal to continue using the software for as long as it decides to keep the implementation of the software and as it maybe contemplates moving to another platform." *Id.* at 183; *see also id.* at 122 ("[Y]ou have two parties that are at that point adversarial and are not looking to create a long-term relationship. And, effectively, the enterprise-wide license pricing in that type of structure really lends itself to, for FICO, two parties that they're going to have as customers long term." (edited for clarity)); Zoltowski Reply Rep. ¶ 65 ("[A] hypothetical negotiation culminating in a perpetual ELA is the wrong lens through which to evaluate FICO's lost license fees in this matter. Based on the facts of the case as I understand them, FICO's lost license fees should be evaluated only in light of Defendants' unauthorized exploitation of Blaze Advisor both before and after FICO terminated the SLM Agreement in 2016."). There is no difference between the "bridge" license about which Mr. Zoltowski testified and the "transitional" license Mr. Hinderaker discussed in opening, and about which Mr. Waid plans to testify this week.

[1] The transcript reflects that Mr. Hinderaker stated: "And Mr. Waid will explain that Chubb & Son looks to the total lifetime value …" Trial Tr. 45. Mr. Waid will presumably testify to what FICO, not the Chubb & Son division of Federal, looks to when pricing a license.

That testimony should be precluded as irrelevant, prejudicial, and contrary to law, as well as contrary to the law of the case. The Court has already rejected Mr. Zoltowski's "bridge license" approach as "subjective[,]" "unreliable[,]" and "inconsistent with the applicable legal standard." Dkt. 731 at 32. The Court explained that this "bridge license" approach to calculating actual damages was legally irrelevant because "Zoltowski's opinions as to FICO's actual damages do not consider what a willing buyer and a willing seller would have contemplated." *Id.* at 31. "Instead, his opinions focus primarily on what FICO would have charged Defendants had FICO known that Defendants were bound to the license for the relevant three-year period, with no prospect of any future business dealing between the parties afterwards." *Id.* "[T]his measure," the Court explained, "does not accurately reflect the legal standard for calculating actual damages in this case, which is an objective standard as opposed to what FICO subjectively would have charged." *Id.*

The Court repeated this conclusion in deciding Defendants' motions *in limine* on FICO's inappropriate actual damages calculation. It observed that FICO's damages quantification "focus[es] primarily on what FICO would have charged defendants had FICO known that defendants were bound to the license for the relevant three-year period with no prospect of any future business dealing between the parties afterwards." Feb. 3 Hr'g Tr. 55-56. And it repeated that "under no circumstances can FICO argue that this methodology is the measure of its actual damages because that's what FICO would have charged. And I don't think they can argue it's the measure of damages period[.]" *Id.* at 56.

If Mr. Zoltowski's "bridge license" theory is contrary to the applicable legal standard, then so too is FICO's current, identical "transitional license" theory. The Court should thus preclude any evidence or further argument based on that theory under the law of this case.

While the law of the case suffices to preclude FICO's "transitional license" theory, that theory is also fundamentally incompatible with the basic premise of the applicable measure of actual damages: a hypothetical negotiation between a willing buyer and a willing seller. Recall FICO's theory: the measure of damages requires imagining a licensee who has already been terminated but cannot immediately unwind the licensed product from its platform, and thus needs a "bridge" (or "transitional") license to allow it to avoid infringement liability. That theory is contrary to law because it does not hypothesize a *willing* buyer and willing seller—rather, it imagines a buyer who has no choice but to purchase a license under threat of being sued, and a seller who is thus able to extract an extortionate price. *See* Zoltowski Dep. Tr. 122 ("[Y]ou have one party that's using the software without authorization and you have two parties that are at that point adversarial[.]" (edited for clarity)).

That is not the law. Indeed, in *On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001)—the main case on which Judge Wright's exclusion of Mr. Zoltowski's "bridge license" theory relied—the Second Circuit *expressly rejected* a measure of damages that takes into account the defendant's infringement: the Second Circuit explained that it would be "abus[ive]" to determine the measure of damages taking into account the defendant's infringement, because "[o]nce the defendant has infringed, the owner may claim unreasonable amounts as the license fee." *Id.* at 166; *see also* Feb. 3 Hr'g Tr. at 73 (concluding that the hypothetical negotiation does not include FICO's



accusation that "they just breached our contract or they just infringed our copyright"). But the fact that the seller could exact such an unreasonable license fee in the context of infringement is irrelevant, because all that matters is the "fair market value" that would make the non-infringing party whole—*i.e.*, what the non-infringing party could have received in the market but for the infringing use. *On Davis*, 246 F.3d at 166. And "[m]aking the plaintiff whole is plainly different from punishing the infringer by charging the highest possible rate for the infringement." *Jarvis v. K2 Inc.*, 486 F.3d 526, 535 (9th Cir. 2007). To determine the amount that would have made the non-infringing party whole requires "objective inquiry" that "focuses on the fair market value of the work as 'negotiat[ed] between a willing buyer and a willing seller' contemplating the use the infringer made." *Dash v. Mayweather*, 731 F.3d 303, 313 (4th Cir. 2013) (quoting *On Davis*, 246 F.3d at 166).

Thus, the "willing buyer" in the hypothetical negotiation cannot be held at gunpoint. And once the "willing buyer" is properly understood—*i.e.*, when the threat of infringement liability is taken out of the hypothetical negotiation—there is nothing left to FICO's "transitional license" theory. FICO might *want* to charge a licensee more for a three-year license than for a perpetual license. *See* Trial Tr. 44-45. But no buyer would *willingly* accept that deal; he would do so only if he were coerced. And the "question is not what the owner would have charged, but rather what is the fair market value." *On Davis*, 246 F.3d at 166.

The Court should accordingly preclude FICO from arguing or offering testimony that actual damages should be measured by the value of a "transitional license" that a former licensee would be forced to purchase after the prior license was terminated. That evidence is legally irrelevant, while at the same time risking substantial prejudice to defendants by suggesting to the jury a legally improper and confusing measure of damages. The Court should thus limit FICO to offering evidence of what a hypothetical willing buyer and willing seller—not a seller able to extract maximum concessions from a coerced buyer—would agree to in a free negotiation.

Finally, because of FICO's persistent refusal to abide by the Court's preclusion orders on this point, Defendants respectfully request that if FICO crosses the line again, the Court issue a curative instruction.

Respectfully submitted,

/s/ Leah Godesky

Leah Godesky

cc: Counsel of Record