# Exhibit 1

```
                                        1
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2
     -------------------------------------------------------
 3                              )
     Fair Isaac Corporation,    )  File No. 16-cv-1054(DTS)
 4   a Delaware Corporation,    )
                                )
 5        Plaintiff,            )
                                )
 6   v.                         )
                                )
 7   Federal Insurance Company,)   Courtroom 14W
     an Indiana corporation,    )  Minneapolis, Minnesota
 8   and ACE American Insurance)   Friday, February 3, 2023
     Company, a Pennsylvania    )  3:00 p.m.
 9   Corporation,               )
                                )
10        Defendants.           )
                                )
11   -------------------------------------------------------

12

13

14         BEFORE THE HONORABLE DAVID T. SCHULTZ
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16             (FINAL PRETRIAL CONFERENCE)

17

18

19

20

21

22
        Proceedings recorded by mechanical stenography;
23   transcript produced by computer.
24                         * * *
25
```

```
                                        2
 1   APPEARANCES:

 2   For Plaintiff:         MERCHANT & GOULD P.C.
                            BY: ALLEN W. HINDERAKER
 3                               HEATHER J. KLIEBENSTEIN
                                 PAIGE S. STRADLEY
 4                               MICHAEL A. ERBELE
                                 JOSEPH W. DUBIS
 5                               GABRIELLE L. KIEFER
                            150 South Fifth Street, #2200
 6                          Minneapolis, Minnesota 55402

 7   For Defendants:        FREDRIKSON & BYRON
                            BY: TERRENCE J. FLEMING
 8                               LEAH C. JANUS
                                 CHRISTOPHER D. PHAM
 9                               RYAN C. YOUNG
                                 PANHIA VANG
10                          200 South Sixth Street, #4000
                            Minneapolis, Minnesota 55402
11
                            O'MELVENY & MYERS LLP
12                          BY: LEAH GODESKY
                                 ANTON METLITSKY
13                               DARYN E. RUSH
                                 ROXANA GUIDERO
14                          Times Square Tower
                            7 Times Square
15                          New York, New York 10036

16   Court Reporter:        RENEE A. ROGGE, RMR-CRR
                            United States District Courthouse
17                          300 South Fourth Street, Box 1005
                            Minneapolis, Minnesota 55415
18

19                         * * *
```

```
                                        3
 1                    P R O C E E D I N G S
 2                     IN OPEN COURT
 3           THE COURT: We're on the record in the matter of
 4   Fair Isaac Corporation versus Federal, et al., Civil
 5   Number 16-1054.
 6           Counsel for FICO, if you will note all of your
 7   appearances, please.
 8           MR. HINDERAKER: Your Honor, Allen Hinderaker from
 9   Merchant & Gould. And with me from Merchant & Gould is
10   Heather Kliebenstein, Paige Stradley, Michael Erbele and Joe
11   Dubis. And at the end of the table I'm at, Jim Woodward,
12   Vice President/Deputy General Counsel of FICO.
13           THE COURT: All right. Good afternoon to all of
14   you.
15           Counsel for the defendants, if you will note your
16   appearances, please.
17           MR. FLEMING: Good afternoon, Your Honor. Leah
18   Godesky, Anton Metlitsky and Roxana Guidero of the O'Melveny
19   firm. And along with me from the Fredrikson law firm, Leah
20   Janus and Ryan Young. And I'm Terry Fleming.
21           THE COURT: All right. Good afternoon to all of
22   you.
23           So I'll give you a general idea of what I had
24   planned for the afternoon. First of all, thanks for
25   accommodating my change in the schedule. It became apparent
```

```
                                        4
 1   to me that we needed more than an hour for this. So I had
 2   to move it to this afternoon. I'm planning that we'll be
 3   done by 5:00, but some of that's in your hands.
 4           My plan for this is to spend the next hour dealing
 5   with the motions in limine, if it takes that long. I don't
 6   know that it necessarily has to, but I'll give you each, you
 7   know, that half an hour to make your case about each and
 8   every one of the motions that you want to.
 9           I will tell you I will rule on them from the
10   bench. We'll follow that up with a brief written order on
11   the motions. I have largely made up my mind about them, but
12   that doesn't mean my mind is closed. So if you persuade me
13   otherwise, we'll certainly take it under advisement and rule
14   at a later date, but my hope is to get that all done here.
15           Second, I've got a whole list of things about how
16   we deal with the trial, the process and procedures and some
17   things that I want of all of you, and we'll go through that.
18   And, of course, anything that you want to raise that I
19   don't, by all means, we'll deal with that as well. Okay?
20           All right. Why don't we -- I'm still waiting for
21   the other stuff that I want, but we can go ahead with the
22   motions while we're waiting. Why don't we start --
23           Mr. Hinderaker, we'll take them in order, 1
24   through 6, as you see fit or whoever is arguing them.
25           MR. HINDERAKER: Okay. But you would like them in
```

69

1  Now, because Zoltowski can't testify to actual
2  damages, Bakewell can't testify to the flaws in Zoltowski's
3  actual damages analysis or to the facts that support his
4  opinion that Zoltowski's actual damages analysis was flawed.
5      Zoltowski's rebuttal opinions in his rebuttal
6  report are limited to only those opinions to which Bakewell
7  and Kursh actually testify at trial, and both of them have
8  been limited by Judge Wright as well.
9      And to make sure it's also clear, Zoltowski cannot
10 testify to opinions or matters that are not disclosed in his
11 expert reports or covered in his deposition. I'm assuming
12 he was deposed. So to the extent that he has now said
13 something and that's been put in here and that exceeds the
14 scope of those matters, he's not going beyond them. Okay?
15     MS. GODESKY: Your Honor, may I ask for a
16 clarification relating --
17     THE COURT: Please do.
18     MS. GODESKY: So this is not specific to experts.
19 That guidance was helpful. This relates more to argument
20 and the boundaries for attorney argument, because --
21     THE COURT: All right.
22     MS. GODESKY: -- I heard Mr. Hinderaker talk about
23 how this hypothetical negotiation should take into account
24 how FICO, quote, "would approach this situation." That's
25 how he phrased it. And then he referenced the fact that the

70

1  hypothetical negotiation should take into account the
2  economic circumstances of this case and defendants' use in
3  this case.
4      And so I just want to be clear. Mr. Fleming
5  referenced this line in Judge Wright's opinion where she
6  said, "The copyright owner's subjective beliefs or
7  objections to an alleged infringer's conduct are irrelevant
8  to this hypothetical negotiation." And so I just want to
9  confirm that that is the law of the case.
10     And to the extent we're characterizing in argument
11 what this hypothetical negotiation looks like, I think it
12 would be outside the bounds for counsel to suggest that you
13 should be taking into account, you know, this situation
14 where you're dealing with someone you think to be infringing
15 on your product, you know, the economic circumstances of
16 this case, where you're accusing someone of breach and
17 infringement, because that is not the arm's length
18 hypothetical negotiation that, you know, the jury will be
19 asked to decide.
20     THE COURT: The hypothetical negotiation, as I
21 understand it -- first of all, I think the first point you
22 make, I agree with. How FICO would approach it is not
23 relevant. How Federal would approach it is not relevant.
24     What is relevant is you have a software provider,
25 for lack of a better, more accurate description, and an

71

1  insurance company, and the insurance company uses it for
2  these processes and how often it's used and all that stuff,
3  and this is how this software manufacturer engages in
4  pricing. And if you assume then you have a hypothetical
5  willing seller and a hypothetical willing buyer, the jury
6  has to arrive at a figure. And the economic circumstances,
7  as I'm using that phrase, would include the extent of use of
8  the buyer and things like that.
9      And so when you, when you talked about point two
10 and point three that Mr. Hinderaker raised, my reaction is
11 those are fair.
12     You then raised another point, which is in the
13 context of someone who is allegedly infringing or who has
14 breached the contract. I don't think those are reflective
15 of market value. Those are subjective.
16     The question is, Given that the parties find
17 themselves at this moment in time and they are negotiating a
18 license with these characteristics, what would that
19 negotiation result in. That's how I understand it.
20     MS. GODESKY: So do I.
21     THE COURT: Okay.
22     MS. GODESKY: Thank you for the clarification.
23     THE COURT: Mr. Hinderaker.
24     MR. HINDERAKER: I think -- well, I can't repeat
25 what Ms. Godesky said to characterize what I said. I do

72

1  agree -- and I am happy to have the guidance. I do agree
2  that a hypothetical negotiation looks to what a reasonable
3  licensor and a reasonable licensee would do in the context
4  of that negotiation, in the context of the circumstances of
5  the negotiation.
6      I agree that FICO's claim of actual damages is
7  not, is not -- FICO cannot claim actual damages based upon
8  its subjective belief of what it wanted, because that's not
9  the hypothetical negotiation, but FICO can go into a
10 hypothetical negotiation saying, as licensor, One of the
11 first steps we do is we look at our pricing methodology and
12 our guidelines, we figure out what the sizing is and we come
13 to some sense of what value is and then -- but that's not
14 the end of the negotiations. And I think that was
15 Judge Wright's points. That's not a negotiation at that
16 point, and it's certainly not the end of a negotiation. So
17 what does the -- what does a willing licensee look to and
18 what are those factors? And how do they -- what weight do
19 they have in the circumstances of the negotiation?
20     So if we're -- I have no quarrel if the court's
21 guidance is that the evidence should be directed to the
22 factors that come into play in negotiating a license
23 agreement between a willing licensor and a willing licensee
24 under the circumstances at the time. If it's something
25 other than that, then I'm not understanding Judge Wright's

**73**

1  order.
2  THE COURT: The only thing that I think in that
3  that's -- where there's an ambiguity is what everyone means
4  by "under the circumstances at the time." And I think that
5  means how much are they going to use, for how long, what
6  have they historically used, what are you guys doing. But I
7  don't think it means, And they just breached our contract or
8  they just infringed our copyright. Now, it does I think
9  include, We know that they intend to use it only for the
10  next three years or whatever. Those circumstances are all
11  part of the negotiation.
12  MR. HINDERAKER: And so that I'm clear and our
13  intention, I do not intend that the hypothetical negotiation
14  is premised on some putative notion that because you're an
15  infringer, we take a pound of flesh.
16  THE COURT: Right.
17  MR. HINDERAKER: I'm supposed to be in the context
18  of a willing licensor and a willing licensee.
19  THE COURT: Who, for lack of a better way of
20  putting it, in essence, have come to the end of the contract
21  period and now they're negotiating a license going forward.
22  MR. HINDERAKER: For the fair market value of
23  whatever that period of use is going to be, yes.
24  THE COURT: Right.
25  MR. HINDERAKER: At that stage where the

**74**

1  relationship has been ended.
2  THE COURT: Right. I think that's --
3  Ms. Godesky, you look concerned.
4  MS. GODESKY: Just I was only concerned with the
5  last piece of what Mr. Hinderaker said, you know, that
6  you're taking into account that your relationship has ended?
7  THE COURT: Well, I took that to mean kind of what
8  I just said, which is, You're at the end of your contract
9  period, now you got to negotiate a new license.
10  MS. GODESKY: If that's the understanding, I
11  agree.
12  THE COURT: Okay. All right.
13  MS. GODESKY: Thank you. That was helpful
14  guidance.
15  THE COURT: Was it? I have no idea anymore.
16  All right. Let's take up the last motion in
17  limine. Carretta, I believe?
18  MS. GODESKY: Yes, Your Honor. So FICO -- this is
19  Mr. Thomas Carretta, in-house lawyer at FICO, and FICO
20  intends to call him to testify selectively about his advice
21  and work product.
22  He was approached by the business team at FICO
23  after they learned of the ACE acquisition and asked for
24  legal advice about the license agreement. And, in
25  particular, they want to elicit testimony from Mr. Carretta

**75**

1  about how he interpreted the agreement with regard to
2  whether consent was required after an acquisition or merger
3  event. And we have three problems with that.
4  First, that is a legal conclusion. Right? To
5  have any witness up on the stand interpreting a contract is
6  obviously problematic, and it's even more problematic when
7  you have someone who is introduced as a lawyer because then
8  the jury, you know, is going to give them credence.
9  THE COURT: Let me stop you for a second. Okay.
10  So one of the issues in the case is whether consent was
11  required.
12  MS. GODESKY: Yes.
13  THE COURT: The jury's going to have to decide
14  that.
15  MS. GODESKY: Yes.
16  THE COURT: FICO gets to say, We think consent was
17  required.
18  MS. GODESKY: Yes.
19  THE COURT: Federal gets to say, No, it wasn't.
20  MS. GODESKY: Yes.
21  THE COURT: That's got to come in through
22  witnesses, right?
23  MS. GODESKY: Yes.
24  THE COURT: Okay. Just not Mr. Carretta.
25  MS. GODESKY: Just not Mr. Carretta.

**76**

1  And that's what distinguishes Mr. Carretta from
2  the witnesses whose testimony we've designated and FICO
3  pointed out in their opposition brief, because the evidence
4  that is probative to how Section 8 should be interpreted is
5  the words on the page, testimony from people who were
6  involved in the negotiating and the drafting of the deal,
7  and then the course of conduct of people who were operating
8  for years under that agreement.
9  And so, for example, FICO pointed out that we've
10  designated some testimony from Mr. Schreiber and Mr. Sawyer,
11  the two business folks at FICO who were, you know, course of
12  dealing with Federal for years under this contract. And so,
13  yes, their interpretation of the contract and the meaning of
14  its terms is relevant because it's reflected in their course
15  of dealing, their unobjected-to course of dealing for many
16  years. Mr. Carretta is someone who is coming on the scene
17  after the fact and interpreting the contract.
18  And, you know, FICO says, Oh, we have to call
19  Mr. Carretta because you, Federal, are accusing us of
20  terminating the contract without basis, and we have to call
21  Mr. Carretta so he can explain our basis. But whether the
22  contract was terminated without basis depends again on the
23  jury's evaluation of the extrinsic evidence at the time that
24  the deal was negotiated and the course of dealing that
25  followed, unless they were going to invoke some sort of

CASE 0:16-cv-01054-DTS   Doc. 1101-1   Filed 02/22/23   Page 5 of 5
Fair Isaac Corporation v Federal Insurance Company, et al., File No. 16-cv-1054(DTS)
February 3, 2023

85

1 contract for years think?  But absent an advice-of-counsel
2 argument, we don't get to put our lawyer up there basically
3 as a mouthpiece for our position in the litigation.
4          THE COURT:  So let's say they hew to the line you
5 are suggesting.  I'm assuming I don't hear a question coming
6 from Federal's counsel, Well, why did you say that.
7          MS. GODESKY:  Absolutely not.
8          THE COURT:  Right?  Because you're not going to
9 make them invoke the privilege in front of the jury.
10         MS. GODESKY:  Correct.
11         THE COURT:  Okay.  Okay.
12         MS. GODESKY:  Thank you.
13         THE COURT:  Thank you.
14         That one I'll take under advisement.  I will make
15 the observation, not that, again, to state the blindingly
16 obvious, it's an area where not only I, but you have to
17 proceed very carefully.  Okay?  Everyone.
18         All right.  Here's where we are.  We are woefully
19 behind time.  I'm going to let the court reporter go.  I
20 have a number of things to cover.  If there's -- if we need
21 to make a record of anything, we'll do it by --
22         Do we have a recording device up here?  We'll
23 figure it out.
24         Okay.  We do -- well, yeah, anyway, I want to let
25 her go, but I have a whole long agenda.

86

1          Are people able to stay?  Okay.
2          MS. GODESKY:  Yes.
3          THE COURT:  Okay.  Let's take a five-minute break.
4          (Court adjourned at 5:13 p.m., 02-03-2023.)
5                    *  *  *
6          I, Renee A. Rogge, certify that the foregoing is a
7 correct transcript from the record of proceedings in the
8 above-entitled matter.
9                Certified by:   /s/Renee A. Rogge
10                               Renee A. Rogge, RMR-CRR