# Exhibit 2

## Page 11

```
  1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
  2    -----------------------------------------------------------
  3                                )
         Fair Isaac Corporation,   ) File No. 16-cv-1054(DTS)
  4      a Delaware Corporation,   )
                                   )
  5              Plaintiff,        )
                                   )
  6      v.                        )
                                   )
  7      Federal Insurance Company,) Courtroom 14W
         an Indiana corporation,   ) Minneapolis, Minnesota
  8      and ACE American Insurance) Thursday February 16, 2023
         Company, a Pennsylvania   ) 9:12 a.m.
  9      Corporation,              )
                                   )
 10              Defendants.       )
                                   )
 11    -----------------------------------------------------------
 12
 13
 14            BEFORE THE HONORABLE DAVID T. SCHULTZ
              UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
 15
 16
                   (JURY TRIAL PROCEEDINGS - VOLUME II)
 17
 18
 19
 20
 21
 22
           Proceedings recorded by mechanical stenography;
 23    transcript produced by computer.
 24                            * * *
 25
```

## Page 12

```
 1  APPEARANCES:
 2   For Plaintiff:        MERCHANT & GOULD P.C.
                           BY:  ALLEN W. HINDERAKER
 3                              HEATHER J. KLIEBENSTEIN
                                PAIGE S. STRADLEY
 4                              MICHAEL A. ERBELE
                                JOSEPH W. DUBIS
 5                              GABRIELLE L. KIEFER
                           150 South Fifth Street, #2200
 6                         Minneapolis, Minnesota 55402
 7   For Defendants:       FREDRIKSON & BYRON
                           BY:  TERRENCE J. FLEMING
 8                              LEAH C. JANUS
                                CHRISTOPHER D. PHAM
 9                              RYAN C. YOUNG
                                PANHIA VANG
10                         200 South Sixth Street, #4000
                           Minneapolis, Minnesota 55402
11
                           O'MELVENY & MYERS LLP
12                         BY:  LEAH GODESKY
                                ANTON METLITSKY
13                              DARYN E. RUSH
                                ROXANA GUIDERO
14                         Times Square Tower
                           7 Times Square
15                         New York, New York 10036
16   Court Reporters:      RENEE A. ROGGE, RMR-CRR
                           KRISTINE MOUSSEAU, CRR-RPR
17                         MARIA V. WEINBECK, RMR-FCRR
                           PAULA RICHTER, RMR-CRR-CRC
18                         United States District Courthouse
                           300 South Fourth Street, Box 1005
19                         Minneapolis, Minnesota 55415
20                              * * *
21
22
23
24
25
```

## Page 13

```
 1                INDEX - 2/16/23 - VOL. 2
 2                                              PAGE:
 3  Plaintiff Opening Statement.......................... 13
 4  Defendant Opening Statement.......................... 38
 5
 6  PLAINTIFF WITNESSES:
 7  SEAN BASEMAN:
 8    Direct Examination by Mr. Hinderaker............... 90
 9    Cross Examination by Ms. Godesky................... 175
10    Redirect Exam by Mr. Hinderaker.................... 190
11
12  JEAN-LUC MARCE:
13    Direct Examination by Ms. Kliebenstein............. 193
14
15
16  JOINT EXHIBITS:
17  J1, J2............................................... 100
18
19  PLAINTIFF EXHIBITS:
20  839-850.............................................. 236
21  1139-1149............................................ 236
22  1151-1165............................................ 236
23
24
25
```

## Page 14

```
 1                 (IN OPEN COURT)
 2                 (Jury seated)
 3                 (9:12)
 4         THE COURT:  Good morning, everyone.  Please be
 5  seated.
 6         Mr. Hinderaker, are you ready?
 7         MR. HINDERAKER:  I am, Your Honor.
 8         THE COURT:  All right.  You may proceed.  Thank
 9  you.
10         A JUROR:  Your Honor, our screen doesn't work.
11         THE COURT:  It's on now?
12         A JUROR:  Yes.
13         THE COURT:  Everyone else, your screens are all
14  up?  Okay.  Good.
15         MR. HINDERAKER:  Good morning, everyone.
16         Yesterday Judge Schultz mentioned about the rule
17  of law, and for me, that's the very best reason that there
18  is for me to be a lawyer.  I know that all of us have
19  something else to do than be here, but I do hope that
20  regardless of the outcome, regardless of -- for my client or
21  against my client, regardless of the outcome, that after our
22  weeks of work together, you think that this effort and this
23  experience has been worthwhile as well because we all are at
24  the moment participating together in the rule of law of this
25  country.
```

43

of all these other insurance companies, and ACE American became the one using Blaze Advisor to sell insurance. No license, no permission. As a consequence, that use is copyright infringement. FICO did not learn of ACE American's use of Blaze Advisor until this lawsuit. So in the chronology, we have the unlicensed use by Chubb & Son, Federal being responsible, and the unlicensed use by ACE American.

So now let me turn to the remedy or the damages that FICO seeks in this lawsuit. The employees of the three different insurance companies were able to use Blaze Advisor because Chubb & Son violated that provision of 3.1 regarding not permitting anybody but a Chubb & Son employee to use it. So there's a period of time before the license agreement is terminated that FICO seeks to be compensated for all the applications that these foreign insurance companies used to sell insurance with Blaze Advisor. And then the license agreement is terminated, but just like Chubb & Son, the foreign insurance companies don't stop. And so FICO seeks to be compensated for their use until their use actually does stop.

There is the period of time when Chubb & Son is using Blaze Advisor after termination, and FICO seeks to be compensated for that. And then there is the period of time where ACE American, unlicensed, infringer of copyrights,

44

uses Blaze Advisor on applications, and FICO wants to be compensated for that.

So FICO looks at the damages in this way: The unlicensed use of the foreign insurance companies before termination, foreign insurance company use after termination, unlicensed Federal use after termination, and then ACE American's copyright infringement. So how do we determine the dollar value to compensate FICO? That, ladies and gentlemen, is your job.

Our last witness will be Bill Waid, a person who has negotiated many hundreds of Blaze Advisor license agreements over the years. And as I mentioned, there is no one standard fee. And he'll explain first, you know, FICO's value-based pricing. He'll look to some pricing methodology that FICO has used since 2003. He'll testify how the marketplace has accepted that pricing methodology for the last 20 years. He'll relay his experience in negotiating license agreements under the unique facts of each circumstance. Every license, every licensee, every circumstance has its own uniqueness to it.

There is one set of circumstances when you're trying to negotiate a license agreement with a brand new client, and there's another set of circumstances when you're trying to figure the fair value to be compensated when the license agreement has been terminated but the former client

45

needs a transition license to move away from using Blaze Advisor.

Those circumstances are quite different. The motivations between those circumstances are quite different. And Mr. Waid will explain that Chubb & Son looks to the total lifetime value of the relationship when it's negotiating the fee. And so he will discuss total lifetime value in the context of a brand new client, total lifetime value in the context of the circumstance where a former client needs a transition license.

The evidence will also consider and present for your consideration well, how is Blaze Advisor used? How does the licensee use Blaze Advisor? Well, in this case, it was used -- it was central to the licensee's business because it was used to sell insurance, and their business is selling insurance.

Another consideration, and you figure out the fair fee, is how much insurance was sold using Blaze Advisor? As I mentioned, it's about $5 billion for each unlicensed year.

Of course, licensees have their counterpoints to be made in a negotiation. Mr. Waid will explain his experience with respect to that as well.

And then at the end you will be the ones to decide, what's the compensation to FICO for the years of unlicensed use in these many applications to sell insurance?

46

And, now, let me now turn to what the law calls disgorgement. This is the issue that the Court will be seeking your advice on.

Disgorgement is a legal word that means taking away from the infringer the benefits that are gained by the infringement. And FICO seeks an award of disgorgement because the infringement of intellectual property has consequences. So says the copyright law of the United States.

Here, over the years of infringement, Blaze Advisor was used in connection with selling $21 billion worth of insurance. That's a huge number. Putting that number in context, during that same period of time, Chubb Limited sold more than $150 billion worth of insurance. The amount of benefit to be taking away from the defendants is about 14 percent of that total.

Again, returning to the Chubb Limited 2018 annual report, technology is a competitive weapon. In this case, the defendants took the know-how, their own know-how of how to sell insurance, but then they made it operational by automating the process of selling and by automating the decisions necessary to sell insurance. As stated in the RFI, they needed Blaze Advisor in order to expand into the small and mid-markets.

We will have an industry expert by the name of

235

```
 1   A.  I guess.  Yes.
 2           MS. KLIEBENSTEIN:  No further questions.  Thank
 3   you.
 4           THE COURT:  Thank you, Ms. Kliebenstein.
 5           Which counsel for Federal?  Mr. Fleming, what is
 6   your best estimate of how long you'll go on cross?
 7           MR. FLEMING:  Like 25 to 35 minutes.  If I did it
 8   tomorrow, I'll shorten it by ten.
 9           THE COURT:  Make sure that microphone is on.  I
10   didn't hear the last part of that.  Twenty-five to 35
11   minute, you said?
12           MR. FLEMING:  Yes.
13           THE COURT:  I think we'll break then for the
14   evening.  We're five minutes before 5:00.  Sometimes if
15   we're close to finishing a witness, we'll finish them and go
16   a little past 5:00, but 25 to 35 minutes and then they get
17   redirect, I'm not going to keep you here until 6:00, okay?
18           So we're in recess for the evening.
19           (Jury leaves courtroom.)
20               (JURY NOT PRESENT)
21           THE COURT:  I have a couple of housekeeping
22   matters, just so you know.  I'm controlling the monitors up
23   here, and I am switching on and off the jury monitors, not
24   knowing if we're going to have an exhibit that's going to be
25   objected to.
```

236

```
 1           What I think may be the easiest way to deal with
 2   this is if you're the presenting lawyer and you know there's
 3   an exhibit -- there's an objection to the exhibit, just nod
 4   at me or something, so I'll keep the jury monitor off until
 5   we've resolved the admissibility.  If we know it's coming
 6   in, I'll leave it on.
 7           MS. KLIEBENSTEIN:  Did the jury see the exhibits I
 8   just showed?
 9           THE COURT:  Yes, they did.
10           MS. KLIEBENSTEIN:  Okay.  Thank you.
11           THE COURT:  And you didn't see, but I looked over
12   to Federal's table to make sure there was not an objection
13   coming, okay?
14           So do we have the exhibit list with the -- do we
15   know what is clearly objected to and what's not?
16           THE CLERK:  Yes.
17           THE COURT:  So we'll be looking at that too.  But
18   just be aware that unless I know that it's been admitted,
19   I'm not turning that on until I get some kind of
20   confirmation, okay?
21           MS. KLIEBENSTEIN:  Sure.  And I have one further
22   question, and I asked this a little bit with the joint
23   exhibits.  Even though we're not moving --
24           THE COURT:  Those are admitted.  I'm sorry.
25           MS. KLIEBENSTEIN:  Perfect.
```

237

```
 1           THE COURT:  Have I confused everyone, or does
 2   everyone follow what I'm saying?
 3           MS. KLIEBENSTEIN:  Yes, but I have another issue
 4   too.
 5           THE COURT:  Come on up to the podium, if you
 6   would.
 7           Mr. Marce, you can step down if you'd like.
 8           MS. KLIEBENSTEIN:  He's interested in what we're
 9   doing.
10           THE COURT:  You can stay there too.
11           MS. KLIEBENSTEIN:  The source code, highly
12   confidential - top secret, is on here (indicating).  We did
13   not move this in the courtroom because only minor excerpts
14   were shown and the trade secrets weren't revealed.  However,
15   it's going to stay on here.
16           How would Your Honor like to handle this from now
17   until the jury deliberates?
18           THE COURT:  Do you plan to use it again?
19           MS. KLIEBENSTEIN:  Nobody wants to see this again.
20           THE COURT:  I didn't say that.
21           MS. KLIEBENSTEIN:  Maybe Terry does.
22           THE COURT:  If nobody plans to use it again, we
23   will take custody of it.
24           Is the computer itself marked, by any chance?
25           MS. KLIEBENSTEIN:  No, but we can give it an
```

238

```
 1   exhibit number and mark the computer itself.
 2           THE COURT:  Let's give it an exhibit number and
 3   mark the computer.
 4           Now, we can take custody of it, I just said, but
 5   you can also retain custody if that's better for your
 6   clients, if you're more concerned that way.
 7           Do you have any objection to that?  Okay.  Why
 8   don't we do it that way.  Just make sure to have it here for
 9   when they deliberate.
10           Anything else, Ms. Kliebenstein?
11           MS. KLIEBENSTEIN:  No, Your Honor.
12           THE COURT:  Okay.  Anything for Federal?
13           MR. FLEMING:  No, Your Honor.
14           MS. GODESKY:  No, Your Honor.
15           THE COURT:  Thank you, everyone.  We are in
16   recess.
17           (Court adjourned at 4:59 p.m.)
18                   *    *    *
19           I, Paula K. Richter and Maria Weinbeck, certify
20   that the foregoing is a correct transcript from the record
21   of proceedings in the above-entitled matter.
22
23           Certified by:  s/ Paula K. Richter
24                          Paula K. Richter, RMR-CRR-CRC
                            Maria Weinbeck, RMR-FCRR
25
```