<pre>
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                               )
     Fair Isaac Corporation,     )  File No. 16-cv-1054(DTS)
 4   a Delaware Corporation,     )
                                 )
 5            Plaintiff,         )
                                 )
 6   v.                          )
                                 )
 7   Federal Insurance Company,  )  Audio Conference
     an Indiana corporation,     )  Minneapolis, Minnesota
 8   and ACE American Insurance  )  Tuesday, February 14, 2023
     Company, a Pennsylvania     )  5:04 p.m.
 9   Corporation,                )
                                 )
10            Defendants.        )
                                 )
11   ------------------------------------------------------------

12

13

14           BEFORE THE HONORABLE DAVID T. SCHULTZ
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16                    (STATUS CONFERENCE)

17

18

19

20

21

22
         Proceedings recorded by mechanical stenography;
23   transcript produced by computer.

24                         *   *   *

25
</pre>

```
1    APPEARANCES:

2       For Plaintiff:          MERCHANT & GOULD P.C.
                                 BY:  ALLEN W. HINDERAKER
3                                     HEATHER J. KLIEBENSTEIN
                                      PAIGE S. STRADLEY
4                                     MICHAEL A. ERBELE
                                 150 South Fifth Street, #2200
5                                Minneapolis, Minnesota 55402

6       For Defendants:         FREDRIKSON & BYRON
                                 BY:  TERRENCE J. FLEMING
7                                     LEAH C. JANUS
                                      RYAN C. YOUNG
8                                200 South Sixth Street, #4000
                                 Minneapolis, Minnesota 55402
9
                                 O'MELVENY & MYERS LLP
10                               BY:  LEAH GODESKY
                                      ROXANA GUIDERO
11                               Times Square Tower
                                 7 Times Square
12                               New York, New York 10036

13      Court Reporter:         RENEE A. ROGGE, RMR-CRR
                                 United States District Courthouse
14                               300 South Fourth Street, Box 1005
                                 Minneapolis, Minnesota 55415
15
16                                       *   *   *
17
18
19
20
21
22
23
24
25
```

3

1                     **P R O C E E D I N G S**

2        **IN OPEN COURT VIA AUDIO TELEPHONIC CONFERENCE**

3              THE COURT:  So we are on the record in the matter

4    of Fair Isaac Corporation versus Federal Insurance Company,

5    et al., Civil Number 16-1054.

6              The court will ask Mr. Hinderaker to again note

7    the appearances of everybody on behalf of FICO and then

8    Ms. Godesky on behalf of Federal.

9              Go ahead, Mr. Hinderaker.

10             MR. HINDERAKER:  Allen Hinderaker on behalf of

11   FICO, along with Heather Kliebenstein, Michael Erbele and

12   Paige Stradley, all from Merchant Gould, and James Woodward

13   from -- vice president/deputy general counsel of FICO.

14             THE COURT:  All right.  And counsel for Federal,

15   if you will note your appearances.

16             MS. GODESKY:  Sure, Your Honor.  This is Leah

17   Godesky.  And I'm joined by Leah Janus, Terry Fleming,

18   Roxana Guidero and Ryan Young, and Max Bryer from Chubb is

19   also with us.

20             THE COURT:  All right.  Thank you.

21             All right.  Just giving you guys all a sense of

22   how best to do this, since we're on the phone, you know, one

23   of the things that happens is inevitably if I have a

24   question or I interrupt you, we will have a period where you

25   may not hear me and we will be talking over each other.  Be

1    patient.  It happens.  The court reporter will figure it

2    out.

3              But I'll give each side ten minutes on each of the

4    two subjects.  So that's 40 minutes right there.  But then

5    we'll get done with this by 6:00, I believe.

6              So the first issue I would like to take up is the

7    question about the witnesses who will testify regarding the

8    use of Blaze Advisor by Federal's affiliates in Canada,

9    Europe and Australia.  And I believe, I believe FICO raised

10   the issue.  It doesn't much matter who goes first, but I'm

11   going to have the proponent of the, quote, "offending

12   evidence," if you will, go first in each of these two

13   matters.

14             So, Ms. Godesky, you first on the evidence you are

15   planning to admit or talk about in opening statement and why

16   it's felt as admissible.

17             MS. GODESKY:  Yes, Your Honor.  Thank you.  This

18   is Leah Godesky.  Ms. Janus is actually going to handle this

19   one.

20             THE COURT:  Okay.  Thank you.

21             MS. JANUS:  Hello, Your Honor.

22             THE COURT:  Ms. Janus.

23             MS. JANUS:  Thank you.  This is Ms. Janus.

24             So the defendants intend to present witness

25   testimony from Schreiber and Wachs and documents relating to

1  the defendants' use of Blaze outside of the United States,

2  FICO's knowledge of that use of Blaze, and FICO's

3  interpretation of the license agreements during the pendency

4  of the license agreements that was acknowledging the right

5  of Federal to use Blaze outside of the United States.

6        THE COURT:  Let me interrupt you for one second.

7        MS. JANUS:  Sure.

8        THE COURT:  Are the entities that used the

9  license, are they in fact distinct companies that are

10  properly described as Federal affiliates?

11        MS. JANUS:  Yes.  They are, yes, they are Federal

12  affiliates.

13        THE COURT:  Okay.  Keep going.

14        MS. JANUS:  So that is evidence that has been at

15  issue in the case throughout the pendency of the case, and

16  it remains an issue in the case.

17        The court need look no further than the second

18  paragraph of the introduction of FICO's trial brief to see

19  that FICO is continuing to assert a claim under the license

20  agreement based on the definition of "client and its

21  affiliates" in the license agreement.

22        And on page 1 of this trial brief, it makes clear

23  that the restriction on the definition of "client" was

24  breached before termination, quote, "because three foreign

25  insurance companies and two third party consultants were

1   permitted access to and use of Blaze Advisor."  So squarely

2   at issue in this case is the fact that FICO asserts it was a

3   breach of the license agreement for three foreign affiliates

4   of Federal to use Blaze.

5            Federal and the defendants --

6            THE COURT:  Is -- hang on a second.

7            MS. JANUS:  Go ahead.

8            THE COURT:  Sorry.  Was the -- I grant you the

9   current status of the argument, but at the time was the

10  allegation regarding these three affiliates that there

11  was -- it was a breach to allow them to use it strictly

12  because there was a territorial limit in the license

13  agreement or because they were a Federal affiliate and not a

14  Chubb affiliate or both?

15           MS. JANUS:  Well, you're talking about FICO's

16  allegations?

17           THE COURT:  Yes.

18           MS. JANUS:  I believe they would take the position

19  it's been both throughout the case.  And so they would take

20  the position that 3.1 was violated based on the foreign

21  company use, and they have several theories of getting at

22  that.  One was a territory theory, one is a client and

23  affiliates theory, but either way the issue is, Are these

24  foreign affiliates of Federal allowed to use Blaze prior,

25  you know, prior to the termination.  That is the issue on

1      this breach claim.

2             And regardless of how they frame it, Federal and

3      the defendants collectively are absolutely entitled to

4      counteract that argument and whatever evidence they're going

5      to, they're going to present to maintain that argument with,

6      frankly, you know, very, very clear document and testimonial

7      evidence that FICO knew all along that these Federal

8      affiliates were using Blaze, allowed the Federal affiliates

9      to use Blaze, marketed to the Federal affiliates for upsells

10     and internally discussed the fact that the license allowed

11     the Federal affiliates to use Blaze.

12            So the idea that somehow the defendants shouldn't

13     be able to present that evidence in response to a direct

14     breach argument about the Federal affiliates using Blaze is,

15     is really just contrary to the law.

16            THE COURT:  Okay.  Anything further, Ms. Janus?

17            MS. JANUS:  Well, we mentioned in our letter, Your

18     Honor, that the evidence is also relevant to the defendants'

19     counterclaims.

20            In the period of time of negotiation prior to the

21     purported termination, FICO took the position that it had

22     just learned of Federal's affiliates foreign use of Blaze

23     and that, you know, that was a breach of the agreement and

24     FICO attempted to extract additional license fees.  And then

25     Federal -- or I'm sorry -- FICO purported to terminate the

1    license, based in part on the Federal affiliates' foreign

2    use.  So the fact that FICO took those positions in an

3    effort to extract additional license fees in the face of

4    FICO's own knowledge of foreign use and consent to foreign

5    use is relevant to the counterclaims.

6            I want to be really clear, though, that it's

7    really -- FICO's letter attempts to sort of shoehorn our use

8    of the evidence solely into a counterclaim about litigation

9    strategy, and that is not the only use of the evidence.

10   This issue was not before the court at the pretrial

11   conference.  What was before the court, as the court knows,

12   is the summary judgment order and the complaint.  So while

13   we absolutely believe it's relevant to the counterclaims,

14   the fact of the matter is it's directly relevant to FICO's

15   breach claim as well.

16           THE COURT:  Okay.  One last chance, Ms. Janus.

17   You have one minute left.  Or have you said your peace?

18           MS. JANUS:  I've said my peace, Your Honor.  Thank

19   you.

20           THE COURT:  Okay.  Thank you.

21           Mr. Hinderaker, you or whoever on your team have

22   the floor.

23           MR. HINDERAKER:  There's a few issues going on

24   here.  Let me start with, let me start with the geographical

25   limitation.

1          You've already got -- you've already provided your

2     guidance that the issue of any geographical limitation of

3     the license agreement is not in this case.  You've given

4     your guidance that we will not be litigating the litigation

5     and, consequently, that should not be in the case.

6          The last paragraph of the defendants' letter

7     saying that this evidence that they now -- be used is

8     relevant to defendants' counterclaims, quote, "Based in part

9     on the use of Blaze Advisor by Federal's affiliates outside

10    of the United States," that is the geographical limitation

11    issue that is irrelevant simply recast.

12         Now, so we seek some clear guidance with respect

13    to that.  And you know our memorandum on Motion in Limine 6

14    and our recent letter with respect to the prejudice to FICO

15    from defending these new theories, relative to the

16    counterclaim, that were not raised until in one instance

17    15 days ago and now in the second one perhaps just this

18    afternoon.

19         But let me now turn to, to this issue that is

20    argument of "client and its affiliates."  And a review of

21    the summary judgment order will test whether I'm being

22    accurate or not.  And a review of the references that are in

23    Ms. Godesky's letter, I think the fact that 445, 17 through

24    19 and 20 through 21, and Docket 507 at 14, I think, with

25    all respect, belie the arguments that were just made.

1          In the defendants' arguments and the defendants'

2     briefing, everything is centered around whether the license

3     agreement was limited to use inside the United States or

4     whether it could be used outside of the United States and

5     was global in nature.  And it was the geographical

6     limitation that Judge Wright resolved.

7          And now let me turn to the issue of "client and

8     its affiliates," because that had nothing ever before to do

9     with any geographical limitation.

10          FICO has always agreed, it has never been in

11     dispute, that the three foreign insurance companies are

12     affiliates of Federal.  Not an issue.

13          If there was a geographical limitation to the

14     United States, as the license agreement had in its

15     definitions, then the use, the use by those foreign

16     insurance companies was improper because of the geographical

17     limitation.

18          If there was no geographical limitation and it

19     could be used internationally, that presents a different

20     issue and that presents the issue of who is the client,

21     because as Amendment Two says it is the client and its

22     affiliates that have permission to use Blaze Advisor.  And

23     if there is no geographical limitation, that permission is

24     international, but it is a permission given to the client

25     and the client's affiliates.  And the client is Chubb & Son,

1    and Chubb & Son has no affiliates.

2          So, and at the summary judgment stage the focus of

3    the defendants was, Well, "client" must mean Federal, not

4    because there was any issue about the foreign insurance

5    companies being affiliates, but "client" must mean Federal

6    because of the mistaken belief that only a legal entity can

7    contract and because of a mistaken belief that the

8    enterprise-wide license wasn't an expansion of permission,

9    expansion of scope from the divisional one unless Federal

10   was the client.

11         So this argument that somehow a geographical

12   restriction relates to who the client is makes no sense to

13   me and is the first out of the box today.  If Federal is not

14   the client, then it doesn't matter if there's no

15   geographical limitation because Chubb & Son has its

16   employees in the United States.

17         So the notion that the geographical limitation has

18   ever had anything to do with the meaning of "client and its

19   affiliates," a review of the summary judgment decision, a

20   review of the parties' briefing, a review of the particular

21   parts of the parties' briefing that are referenced in

22   Ms. Godesky's letter belie the argument.

23         The impact here as well is they want to make this

24   contention that FICO was extracting additional fees under

25   some international argument.  The evidence is that during

1 the negotiations FICO offered a new license with U.S. scope,

2 a new license with an international scope and a hybrid

3 license with some, you know, some -- with not a full

4 international -- I mean, Blaze -- FICO offered Chubb & Son

5 all of the options that might fit its needs.  There wasn't

6 an extraction of fees.  Instead, it was, If you want a U.S.

7 license, that's a smaller fee; If you want an international

8 license, that's a little bigger fee; Can we fit your needs,

9 and you decide, you tell us what those needs are.

10                  And to segue slightly into the next argument, the

11 notion now is, by the defendants, Well, those negotiations

12 of FICO offering whatever options would fit the defendants'

13 needs for granting its consent to continued use, now those

14 offers should be precluded from the jury's consideration

15 under the 408 argument.  The trial seems to be an effort of

16 precluding FICO from presenting relevant evidence to the

17 issues and also an effort to relitigate the geographical

18 restriction that's not, that's not in the case.

19                  THE COURT:  Okay.  Thank you, Mr. Hinderaker.

20                  Let's turn to -- the way we're going to do this is

21 I'm going to hear you all out on both of these, and then I'm

22 going to take a brief break, and then we'll come back and

23 I'll tell you what I'm going to do.  And everybody needs to

24 stay on the line, of course.

25                  On the other issue it appears that FICO is the

1   proponent of the, quote, "bad evidence," close quote.  And

2   so, Mr. Hinderaker, you get the floor first on this one.

3          I do have a question for you on it out of the box,

4   which is I've looked at the exhibits that at least were

5   attached -- well, I've looked at both sets of exhibits, but

6   I've looked at the ones that were attached to Ms. Godesky's

7   letter.  And so my question is, Relating to those exhibits,

8   what's the purpose for which FICO would offer them at trial?

9          MR. HINDERAKER:  Yes.  And for clarity, one of the

10  exhibits, P0855, the confidential settlement agreement and

11  general release, that was removed from our exhibit list a

12  few hours ago today, whether morning or early afternoon.  So

13  that particular document is not at issue.  FICO is not going

14  to be advancing that document as part of our --

15         THE COURT:  That one is an easy one.  I'm glad you

16  removed it.

17         MR. HINDERAKER:  Thank you.

18         The remainder are, and as Tamra Pawloski said, the

19  licensing representative for Chubb & Son, the remainder were

20  the back-and-forth negotiations in an effort to come to

21  mutual terms on FICO's consent to the continued use of Blaze

22  Advisor in a new expanded enterprise.  And as from the

23  documents referenced and as Tamra Pawloski's deposition

24  acknowledged, those negotiations at the time included

25  Chubb & Son's interest in additional FICO products, and

1    those additional possible technologies were also

2    incorporated into the discussions and into the pricing

3    options that were offered.

4           So FICO is -- and the original, the original

5    counterclaims were bad faith, covenant of -- breach of the

6    covenant.  The original one was that FICO unreasonably,

7    arbitrarily refused to give its consent to the continued use

8    of Blaze Advisor by the defendants.  And these negotiations

9    are all about business negotiations about FICO and the terms

10   under which it would give that consent.  So they're not

11   offered for Rule 408 purpose.  There are other elements of

12   those negotiations that are not objected to by the

13   defendants.  So their efforts are to select out those

14   communications that they prefer not the jury to see, keeping

15   in the communications that they like.

16          And our goal is to have a fair set of

17   communications, a fair story from the notice of breach

18   letter in January to the, through the negotiations and to

19   the point where the parties were not able to reach

20   agreement, showing that, one, showing the effort to comply

21   with paragraph 10.8 and, secondly, in terms of the original

22   counterclaim of breach of covenant of good faith, of

23   presenting evidence of the parties' efforts, actually they

24   were mutual, but FICO's efforts in good faith to reach an

25   agreement and a new license for the continued use of Blaze

1    Advisor.

2              So, Your Honor, that's not a poor boy issue or

3    purpose, and, secondly, it's certainly directly relevant to

4    the contention that's been in the lawsuit from the outset

5    that FICO did not meet its covenants of good faith by not

6    granting its consent.

7              THE COURT:  But let me ask you -- so if I'm

8    hearing it right -- first of all, this issue is somewhat

9    unique to this case.  If I'm hearing you right, what I'm

10   hearing is that FICO wants to put -- and I'm looking at P101

11   and P263 and all the other ones, other than the one you

12   removed from your list.  And FICO wants to put these in

13   front of the jury and say, The parties engaged in a process

14   of negotiation after the January 26 or 27, whatever it was,

15   notice of breach, and here's evidence of our good faith in

16   conducting those negotiations, and, therefore, it is

17   responsive to the idea that we breached the implied covenant

18   of good faith and fair dealing.

19             MR. HINDERAKER:  That's true.

20             THE COURT:  Fair summary?  Or am I missing

21   something else then as well, right?

22             MR. HINDERAKER:  Well, there's one other -- it

23   will come back into the case in another way, and we've heard

24   the arguments in recent motion practice, the arguments being

25   that here during these negotiations, if can get a new

1    license agreement, the offerings of price were ranged

2    between, I'll say, you know, approximately 2.5 million and

3    3.3, 3.4 million, depending on the option, depending on what

4    Chubb & Son wanted.  And as night follows to day, we're

5    going to hear the contention that the application-based

6    pricing of FICO's standard pricing methodology, which

7    results in tens of millions of dollars of fees, is

8    inappropriate in light of what we were offering in March of

9    2016.

10              So I believe that it is appropriate for FICO to

11   have the opportunity to explain why and what in its

12   motivations in March of 2016 that resulted in numbers of

13   single-digit millions and the circumstances and the

14   motivations after the termination of the license agreement

15   seeking fees in tens of, tens of millions.

16              So having a complete picture in front of the jury

17   will come into play at that stage of the case as well, Your

18   Honor.

19              THE COURT:  Okay.  Understood.  Anything further

20   for you, Mr. Hinderaker?  You have a --

21              MR. HINDERAKER:  I think I've -- I'm fine, Your

22   Honor.  Thank you very much.  I think I've had my ten

23   minutes.

24              THE COURT:  Okay.  Very well.

25              Ms. Godesky, you were -- whomever your team member

1     is who will be speaking?

2              MS. GODESKY:  Thank you, Your Honor.  This is Leah

3     Godesky.  I will handle this one.

4              THE COURT:  Let me start -- if I might.

5              MS. GODESKY:  Sure.

6              THE COURT:  Why these particular documents?  Why

7     do you think these documents don't come into evidence?

8              MS. GODESKY:  So --

9              THE COURT:  To put it differently, I mean, I

10    understand your argument is they don't come in because

11    they're excluded under Rule 408.  What I'm asking is really

12    what do you, for lack of a better way of putting it, what

13    are you afraid of that's going to happen when the jury sees

14    these documents?

15             MS. GODESKY:  Well, I think Rule 408, Your Honor,

16    exists for a reason.  Right?  Settlement negotiations should

17    not be admitted because they're inherently confusing to a

18    jury.

19             If a jury sees evidence of Chubb making settlement

20    offers, that's going -- you know, lay jurors are going to

21    see that and think, Well, Chubb must have thought they owed

22    some money.  That's the exact reason that Rule 408 exists,

23    and there is no exception to it here.

24             Now, there was absolutely a period of business

25    negotiations between the parties that is fair game and

1    admissible, and those are the communications that took place

2    in January 2016, around the time of that initial breach

3    letter, through February 26th.  There was a response by

4    Chubb to the breach letter; FICO wrote another letter; we

5    sent another business response.  All of these communications

6    were couched as, Here is our business proposal to resolve

7    the problem.

8           And if Your Honor looks at the cited testimony

9    from Ms. Pawloski in FICO's letter, it's clear that

10   Ms. Pawloski is talking about those communications.  At

11   page 155 of the transcript she's testifying about a meeting

12   that happened in, quote, "early February."  That's fair

13   game.  That's business negotiations.  We agree.

14          They also highlighted testimony from Ms. Pawloski

15   at pages 166 and 167.  And if Your Honor were to look at

16   page 164, it's clear that the lead-in to that line of

17   questioning was all, What was happening between you and FICO

18   between the beginning of February and early March.  So

19   Ms. Pawloski was talking about those business negotiations.

20   Those communications are on both sides' exhibit lists and

21   they can come in.

22          But when you talk about -- you know, you look at

23   these documents and it's exchanging numbers, bids, demands,

24   offers, haggling, drafts of settlement agreements.  They may

25   have taken one of them off today, but P933 is still on and

1       that's a redline of a settlement agreement.

2               You know, Mr. Hinderaker suggested that this is

3       necessary evidence to defend against the bad faith claim,

4       but that's still within the heartland of Rule 408, because

5       Rule 408 says conduct and statements made during compromise

6       negotiations are not admissible on behalf of either party

7       to, quote, "disprove the validity of a disputed claim."  And

8       so they want to try to disprove our breach of contract

9       counterclaim or our implied covenant counterclaim by

10      pointing to conduct during compromise negotiations, and that

11      is textbook evidence that should be precluded under

12      Rule 408.

13              And if Your Honor looks at the authorities they've

14      cited, it's clear that they are so far off base from the

15      type of relief they are asking here.  The Eighth Circuit

16      case, the *Athey* case, that's an insurance bad faith claim.

17      And there was a very nuanced reason as to why the evidence

18      in that case came in, very specific to South Dakota

19      insurance law.  Then they cite this Federal Circuit case

20      *MSTG*, and that case, Your Honor, only holds that Rule 408

21      does not protect settlement negotiations from discovery.

22      They have to be produced during discovery.  That's all that

23      the holding says.  And, of course, we agree.  We produced

24      these documents.  And then they cite a Florida case very,

25      very specific.  It's a contract for shipbuilders, and

1       there's a dispute as to whether a contract about a sea

2       trial, like a trial run of a boat, counts as a settlement

3       negotiation.  So, you know, they don't have any authority

4       for the type of relief that they are asking for.

5              And there's a real danger here.  The minute you

6       start putting markups of settlement agreements -- I mean,

7       these are not arm's length parties trying to reach a

8       particular agreement.  Right?  There's no probative value

9       there.  Everyone knows that people offer to settle for

10      reasons that might have nothing to do with their liability.

11      And jurors don't understand that.

12             And the minute we open up the parties'

13      communications after that February I would say 27th-ish

14      cut-off, we're in the heartland of Rule 408 and you can see

15      it stamped right on the parties' communications.  And, you

16      know, this has been consistently something that FICO has

17      said throughout the discovery in this case, saying over and

18      over at several depositions that a lot of these

19      communications were privileged under Rule 408.

20             THE COURT:  Let me interrupt you.  First of all,

21      you kind of waffled just a tiny bit on this cut-off date

22      when you said February 27th-ish.  What exactly is it that

23      turns what you call business negotiations into settlement

24      discussions on February 27th or thereabouts?  How on a

25      principle basis am I to distinguish between those two

1    things?

2         MS. GODESKY:  Yes, Your Honor.  So there's -- like

3    I said, the initial breach letter comes in.  In January

4    there's a response from Chubb.  I know that there was then

5    some meetings like the one referenced in Ms. Pawloski's

6    testimony in February.

7         Then on February 26th Ms. Pawloski sends -- 25,

8    sorry, I was just corrected -- February 25th Ms. Pawloski

9    sent a note to the business team.  She's not a lawyer.

10   Right?  She's in the vendor management group at Chubb.  She

11   sends a note to the business folks at FICO and she says,

12   Here's our business proposal to try to resolve this dispute,

13   and she attaches the proposal.  And then there is a response

14   within about 24 hours, We've reviewed your proposal and it

15   is rejected.  After that -- and I believe that "We've

16   reviewed your proposal and it is rejected" communication

17   happens on February 26th, the next day.

18        After that, there's a clear pivot to litigation.

19   Right?  The proposal has been rejected.  There's a specter

20   of litigation, and then the parties start trading numbers.

21   There are Rule 408 stamps on all of the communications.  And

22   it's very clear at that point that you're in the heartland

23   of what Rule 408 is worried about.  Right?  You're putting

24   numbers on the table that jurors might view as admissions of

25   liability.

1          And so everyone agrees -- and I don't think there

2     are any objections from anyone in this case to the

3     communications between the initial breach letter and

4     February 26th.  The dispute -- and I said February 27th-ish

5     because, you know, there might be one other document I don't

6     have front of mind, but it's this communication from

7     Ms. Pawloski on the 25th and the response from FICO on the

8     26th that to us is the hard line.

9          THE COURT:  When you say that from that moment

10    forward, from February 26th, when FICO says it's rejected,

11    your proposal is rejected, you said there is a clear pivot

12    to litigation.  How is that clear pivot to litigation

13    manifested?

14         MS. GODESKY:  There's then discussions in the

15    documents, Your Honor, about how they will be terminating

16    the document and they may, you know, we're reserving all

17    rights, including the right to pursue all rights and

18    remedies in court.  Right?

19         And before that, right, you have the business

20    folks making a very clear decision that they're going to try

21    first to resolve this.  There's even -- you know, those

22    initial letters are sent between lawyers, but you see

23    correspondence between those lawyers agreeing, You know

24    what, we're going to have our business teams try to come up

25    with a business proposal.  Right?  And that's what

1    Ms. Pawloski is leading the charge on and that's what's

2    first discussed.  But then -- and you can see Ms. Pawloski

3    says in her February 25th transmittal business proposal

4    there's no 408 stamp.

5            And then you can see in the communications that

6    follow in March, the ones that we attached to our letter,

7    you see a very different set of communications.  You know,

8    I'm looking right now, Your Honor, at Exhibit P101.

9    Ms. Pawloski is reaching out to the folks at FICO and this

10   time, you know, she's ending her correspondence with the 408

11   rider.  And that's true for all of those communications

12   throughout March.

13           THE COURT:  Well, hang on, though.  On

14   February 26th -- I'm looking at D302.  And maybe this is

15   what you were referring to.  But it says -- this is an email

16   from Carretta to Hopp saying, "Thank you for the email.

17   Proposal was not acceptable from our business and compliance

18   teams, and I confirm it is rejected."

19           MS. GODESKY:  Correct.

20           THE COURT:  "However, I respect the effort and

21   encourage continued aggressive business dialogue to seek a

22   resolution.  In that regard, I have advised our business

23   team to meet this week and next week and confirm FICO will

24   take no action during this period to provide an opportunity

25   for the respective business teams to explore alternative

1    business resolution."

2         So that sounds like on February 26th, even though

3    the proposal was rejected, they were -- FICO was technically

4    confirming this with their business teams, they were going

5    to take the position that this is business resolution.

6         MS. GODESKY:  Your Honor, as we read the

7    chronology, and I think if when you look at the

8    correspondence that then follows that's attached to our

9    motion, right, Chubb was making quite clear that this

10   posture had changed.  Right?  A lot of these documents have

11   portions redacted because you have lawyers involved.  And

12   the Rule 408 stamp is added because it's a confidential

13   settlement proposal now instead of a business solution.

14        I mean, this is not an area of the law that I

15   don't think, you know, can be interpreted in a gray area.

16   Parties need to have confidence and security when they're

17   engaging in settlement discussions under the specter of

18   litigation that they can do so freely.

19        You can see in the email from Ms. Pawloski in

20   Exhibit P101, she's putting a table in her March 25th email

21   that lays out Chubb's willingness to pay almost a million

22   dollars to FICO.  "Please note that this is a confidential

23   settlement proposal and it's protected under Rule 408."

24        There's a reason for Rule 408 exists, and it's not

25   only to protect parties at trial from jury confusion.  It's

1      also, of course, the public interest in facilitating and

2      supporting settlement communications.

3             And so it's true the parties did their best to try

4      to settle this case before it resulted in litigation, and

5      they may not have done so if they thought putting money on

6      the table might mean a jury four years from now is going to

7      be told that you once thought that you had at least a

8      million dollars in liability.  And so there is no authority

9      or precedent -- FICO has certainly not supported any -- for

10     overriding Rule 408 for communications, bids, demands,

11     offers, in this type of circumstance.

12            THE COURT:  I don't -- so we're -- I'm going to

13     hold everybody to their ten minutes, but I have a couple of

14     questions for you.

15            I'm not disagreeing with what you are saying.  The

16     problem that I'm struggling with is, What is the indicia --

17     well, how do I know that on February 27th it's no longer a

18     business discussion?  It's a settlement negotiation?  What

19     is it that indicates that?

20            MS. GODESKY:  I think it's the combination of the

21     Rule 408 stamps on the back and forth.  And, Your Honor,

22     there's no response from FICO saying, Wait a minute, I'm not

23     treating this as a privileged communication.

24            And I can tell you I've had that situation before.

25     Right?  I've sent lawyer -- I've sent emails to adversaries

1    with a 408 stamp.  And I might get a response back saying,

2    To be clear, we don't view this as a privileged settlement

3    discussion, We still view this conversation as having a

4    business purpose.  Right?  Lawyers make that type of

5    confirmation all the time.  That was never made here.  No

6    one ever wrote a letter and said, To be clear, Chubb, we're

7    still in business discussions, This isn't litigation.

8    Right?  Chubb was screaming from the rooftop Rule 408

9    privilege.  So there's that.

10           I'm sure that I have seen in the deposition

11   transcripts in this case numerous instances of FICO's

12   lawyers bringing up the Rule 408 privilege over these very

13   communications.  I do not have that at my fingerprints.  I'm

14   sure if we were to look at the privilege log, there were

15   probably also logged communications with lawyers around this

16   time period about settlement, but to me -- and all that the

17   court needs to rule on this motion right now is we've got

18   Rule 408 assertions by Chubb that are uncontested by FICO

19   during the time period in question.

20           THE COURT:  So let me ask you two other questions.

21   Prior to February 26th of 2016, did the parties exchange

22   numbers and are those numbers in documents that are going to

23   be proffered at trial?

24           MS. GODESKY:  No.

25           THE COURT:  Okay.  So what was the nature of

1        the -- if you are not exchanging numbers prior to

2        February 26th, what are you exchanging?

3               MS. GODESKY:  The information from FICO to Federal

4        was, Here's how we, you know, Here are our breach

5        allegations, You have breached the contract, and we're

6        laying out our assertions against you.  And then what you

7        see, there's some letters from Chubb saying, We're looking

8        into your allegations, but right now our technology systems,

9        they're running exactly as they were right before the

10       acquisition.

11              And then the business proposal that Ms. Pawloski

12       laid out on February 25th said, Here's what we're willing to

13       do from a business perspective; Even though we bought an

14       enterprise-wide perpetual license to use Blaze, so that

15       everyone can, can move forward, we, Chubb, would be willing

16       to cabin our use of Blaze going forward to a certain number

17       of named applications, because it seems like there's all

18       these concerns about expanded use and how everything is

19       going to change after the ACE acquisition, so here's what

20       we'd agree to, we'll use it in this way moving forward.  And

21       she lays it out in a chart in a letter.  And so that was the

22       business proposal that was then declined in that note from

23       Mr. Carretta.

24              THE COURT:  Okay.  One last question for you, and

25       you need to be complete and precise.  What is FICO's -- or

1    Federal's counterclaim in terms of the breach of the implied

2    covenant of good faith and fair dealing?

3              MS. GODESKY:  Our counterclaim is that -- there's

4    two aspects of it.  The first aspect is that FICO

5    terminated, rushed to terminate or withheld its consent to

6    continued use of Blaze after the acquisition and despite the

7    fact that it had no evidence of expanded use at Chubb, in

8    terms of the Blaze software.

9              The other aspect relates to the fact that, as

10   Ms. Janus suggested earlier in the context of the other

11   motion, in this initial period, in those initial breach

12   letters that Chubb received from FICO, FICO argued that it

13   had just discovered use of Blaze outside the United States,

14   in Europe, Canada, Australia.  And we believe, because the

15   discovery in this case has demonstrated, that that was an

16   allegation made in bad faith, because FICO had known for a

17   decade before this dispute arose that Blaze was being used

18   globally.

19             THE COURT:  Okay.  All right.  Thank you for that.

20             I'm going to take a couple of minutes.

21             MR. HINDERAKER:  Your Honor.

22             THE COURT:  Yes, sir.  Go ahead, Mr. Hinderaker.

23             MR. HINDERAKER:  Do I have some minutes left?

24   Because I think there are factual misstatements that I would

25   like to address.

1          THE COURT:  Go ahead.

2          MR. HINDERAKER:  The redlined, there are redlined

3    versions of an amendment to the license agreement.  One

4    example is P0852.  Ms. Godesky called that a settlement

5    agreement.  It is Amendment Three to the license agreement

6    of March 25, 2016, directly a chart of the parties' efforts

7    to amend the, you know, to find the path toward consent.  I

8    believe it's accurate.

9          I checked that the only communications that had

10   any Rule 408 designation were rather boilerplate, and they

11   came from the Chubb and some people, Tamra.  And it's not

12   surprising to me that the communications between business

13   people don't highlight that little boilerplate at the end

14   of -- at the end of the email.

15         In answer to your question regarding the

16   chronology, Your Honor, the beginning is at the end of

17   January of Carretta.  He is responded to by a gentleman by

18   the name of Hopp around February 17.  So Carretta has just

19   sent notice of breach.  Mr. Hopp then concludes his letter

20   saying, "We value the long-term relationship.  I fully agree

21   with you that we should have the business people make their

22   efforts robust to resolve this dispute."  That's about

23   February 17th.

24         On February 25 is when Tamra Pawloski sends a

25   commercial proposal.  That apparently is not part of the

1    settlement negotiations, but it certainly is part of the

2    business negotiations.  And she sets out Chubb's position,

3    including saying that they would use Blaze Advisor on 15

4    applications.

5            The communications then follow and include -- now

6    we're into March.  And the communications include

7    discussions with Tamra and the business people like, for

8    example, Bill Waid.  And on March 2nd FICO says, "FICO

9    shares your desire to address this issue through business

10    negotiations" and offers alternatives and options.  There

11    are communications by phone between business people of FICO

12    and business people of Chubb to where FICO discloses or

13    describes its pricing methodology, the way in which it is

14    setting out these prices.

15            Sawyer sends on March 17th, Please see columns K

16    through Q for today's discussion about -- one of the

17    communications that -- at the end of March is FICO pricing a

18    new license relationship based upon 15 applications, as was

19    per the February 25 commercial proposal.

20            The communications through the end of March were

21    triggered by -- were triggered and followed up from that

22    commercial proposal, included discussions with FICO how do

23    you do your pricing, included Chubb coming back and saying I

24    think that a better form of pricing would be something else.

25    Tamra's email of March 25 with Chubb's counter-proposal to

1    FICO's proposal goes through a pricing methodology that

2    conforms with the logic that the parties had been talking

3    about throughout the month, starting with what's the total

4    premium for the entity, you know, for Chubb.

5            So there is no distinction between some point

6    where it turns into negotiations over the settlement of some

7    dispute.  It comes to a place where, where what Chubb was

8    willing to do for FICO's consent and what FICO was willing

9    to do for FICO's consent differed, but that's the end of,

10   that's the end of a negotiation.

11           So I just wanted to have that, the rest of the

12   story there.  It's there for Your Honor to see when you look

13   at the documents and you look at the documents themselves.

14           The answer to the question about the

15   counterclaim -- the first answer is what the counterclaims

16   have been since the second amended -- since the answer to

17   the second amended complaint.  And the second basis for the

18   counterclaim is, is the territorial limitation dressed up

19   into different guises, whether it's a client or whether it's

20   you were negotiating against us because of that.

21           And when you go back to the lawyer communications,

22   which are not part of this set of documents, Carretta says,

23   We found these -- we discovered these installations outside

24   the United States, if that's -- let's keep the business

25   people talking.

1            I really think, Your Honor, that the jury is

2    entitled to see the full picture, and none of this is going

3    to bear on the policies behind Rule 408.

4            So thank you for hearing me out.

5            MS. GODESKY:  Your Honor, this is, this is Leah

6    Godesky.  I'm so sorry.  If I may just make one point that I

7    did not make earlier?

8            THE COURT:  Very briefly.

9            MS. GODESKY:  There was just a concern raised by

10   Mr. Hinderaker that we might be referencing the demands from

11   FICO during this settlement negotiation period.  Right?  The

12   fact that at one point they, they made a demand for over

13   $3 million to resolve the dispute.  And I just wanted to

14   make clear that we're drawing this bright line at

15   February 27th.  And, of course, our position is, you know,

16   nothing after that date would come in.  So we're not going

17   to seek to use their demands offensively.

18           THE COURT:  Yeah, that -- it strikes -- I

19   understand your point.  It's just a comment.  It strikes me

20   that if you -- if that were to come into evidence, you would

21   want to -- you would be tempted to say to the jury, See,

22   this case is worth 3 million, which is exactly what you

23   cannot do under Rule 408.

24           Here's what we're going to do.  I'm going to take

25   a break to think about this a little bit further for about

1    five minutes.

2            You all need to stay on the line, but mute your

3    microphones and, yeah, mute your microphones, otherwise

4    you're going to be talking to each other without knowing it

5    or talking to me without knowing it, and nobody wants to do

6    that.

7            Renee, if you could answer this.  Do you have ten

8    more minutes?

9            COURT REPORTER:  Yes, I do, Your Honor.

10           THE COURT:  Okay.  All right.  I'm going to take a

11   break.  I'll be back with you all.  Hang on.

12           (Recess taken at 5:58 p.m. till 6:06 p.m.)

13           THE COURT:  All right.  So here's what I am going

14   to do, starting first with the issue of the testimony of

15   Schreiber and Wachs.

16           I am not going to prohibit -- well, first of all,

17   we're here I think primarily about opening statements, but

18   that testimony and FICO's knowledge of the use by Federal

19   affiliates outside the United States is relevant and

20   admissible to show both the definition -- may use it to

21   argue what "client and affiliates" means.  It is also

22   relevant and admissible to the good faith and fair dealing,

23   implied covenant argument.  And I'm going to provide the

24   parties -- so no restriction on that testimony for the

25   opening statements.

1    I'm going to try and make it really clear what I

2    believe I said on the motions in limine on this topic.

3    Federal is free to argue that FICO breached the

4    implied covenant by improperly or outlandishly or raising

5    positions that were in bad faith.  Okay?  And when that gets

6    to the issue of territorial restriction in the license, we

7    have to be very clear and very careful.  Federal can say

8    through appropriate witnesses and documents that FICO took

9    this position as part of its breach and that Federal viewed

10   that as in bad faith and here is why.

11   What Federal cannot do, and I want to be extremely

12   clear, you will not use the court to prove that argument in

13   any way, shape or form.  So we're not referencing court

14   orders.  We're not arguing in final argument that, And, you

15   know, the court has found that there is no territorial

16   restriction.  We're not doing that.

17   I will, as necessary, craft something if I have to

18   that explains the absence of a territorial restriction, but

19   I don't think that's going to be necessary, because I can't

20   imagine that FICO is going to argue that there is in fact a

21   territorial restriction in the license agreement, but

22   Federal -- or FICO is very well within its right to argue

23   that, yes, it asserted that position and it believes that

24   that position was properly taken, but hopefully that gives

25   everybody a little further guidance.

1          Turning to the issues regarding what Federal says

2     are settlement documents, what FICO says are business

3     documents.  First and foremost, I am sure that at some point

4     along the spectrum of the discussions between the parties

5     that the tenor of that communication changed from "How do we

6     keep a business relationship going" to "How do we avoid

7     litigation."  It is not clear to me where that line is or

8     where that tenor changed, necessarily.

9          What I am going to order for purposes of the

10    opening statements, in an effort to be careful and fair to

11    all parties, the parties can talk about the period of

12    negotiation following the notice of breach, and you can use

13    in your opening statement documents up to the date of

14    February 26th for the opening statements.

15         I want the parties to submit to me a list of all

16    documents after February 26 and prior to the litigation that

17    encompass any dialogue between the parties that one side

18    will characterize as "settlement negotiations" and the other

19    won't.  You submit those lists to me.  And I want more

20    comprehensive briefing on this topic of where it crosses the

21    line and when it violates Rule 408.

22         I will tell you I'm very concerned about allowing

23    in evidence where the parties are tossing numbers back and

24    forth, whether or not those are settlement negotiations.

25    I'm very concerned about opening a can of worms there.  I'm

1    frankly -- well, Federal could certainly use some of those

2    numbers to its advantage in this litigation, and I think

3    that would be exactly beyond a violation of Rule 408.  FICO

4    could certainly use some of those numbers to its advantage

5    as well.

6            But for purposes of opening statements, you can

7    talk about the period in which the parties had business

8    negotiations, you can describe them generally without

9    identifying dollar numbers, and you can use documents up to

10   and including February 26.  I'm reserving for a later

11   date -- as soon as you can get me the lists and the

12   briefing, I will decide about documents from the period of

13   February 26 forward.

14           All right.  Let me just first ask Mr. Hinderaker,

15   no argument, but any questions or clarification needed?

16           MR. HINDERAKER:  I think I understand it, Your

17   Honor.

18           THE COURT:  Okay.  Thank you.

19           Ms. Godesky, questions or clarifications?

20           MS. GODESKY:  No thank you, Your Honor.

21           THE COURT:  Two last things.  When you brief this

22   issue -- and, you know, Mr. Hinderaker, I don't know how

23   soon you will be wanting to put this evidence in.  So if you

24   know it's, you know, something you want your first witness

25   to do, better get me the briefs on, you know, tomorrow

1    night.

2            And, Ms. Godesky, you have to at least communicate

3    with plaintiffs to understand how quickly this deadline

4    approaches so that we can get all the briefs in.

5            I would appreciate it if the parties would also

6    address in that briefing whether any of these documents can

7    be given with a limiting instruction.

8            Last comment or last direction or guidance for the

9    parties.  I've been looking at your exhibit lists and

10   objections.  I want to make one thing really clear.  I think

11   it's clear.  I understand FICO objects to documents coming

12   in without a sponsoring witness.  Understood.  No document

13   is being admitted except through a witness, and the witness

14   is going to have to be somebody who has knowledge or

15   foundation for the document.

16           My repeated suggestion to folks is, When there are

17   documents that you know if the right witness is there it's

18   clearly coming in, don't object to it, because then we can

19   save some time in trial.  We don't have to have somebody

20   saying, Mr. So and so, do you recognize Exhibit 12; yes, I

21   do; what is it; it is; did you receive it.  You don't have

22   to do all that if you know the document is coming in, but

23   I'm also depending on the lawyers to only use documents with

24   an appropriate witness.

25           And the last thing on that, as I said before, no

1    document is going to the jury that isn't used with a witness

2    during the trial.  Okay?

3              So with that, last call.  Mr. Hinderaker, anything

4    further we need to address right now?

5              MR. HINDERAKER:  No, Your Honor.

6              THE COURT:  Okay.  Anything further, Ms. Godesky?

7              MS. GODESKY:  No thank you.

8              THE COURT:  All right.  I should tell you this

9    last thing.  During the course of the trial, including

10   tonight since we start tomorrow, if something arises that

11   you need -- that you know you are going to want to take up

12   with me before court, if you will email it directly to my

13   email address and also copy my law clerk on it by 10:00 at

14   night, the night before, we'll for sure be able to be

15   prepared to address it in the morning.  Okay?

16             MS. GODESKY:  Thank you, Your Honor.

17             MR. HINDERAKER:  Thank you.

18             THE COURT:  Okay.  Everybody, have a good night.

19   Get some sleep, if you can, and we'll see you in the

20   morning.  We're in recess.

21             (Court adjourned at 6:17 p.m., 02-14-2023.)

22                          *   *   *

23             I, Renee A. Rogge, certify that the foregoing is a
     correct transcript from the record of proceedings in the
24   above-entitled matter.
                         Certified by:  /s/Renee A. Rogge
25                                      Renee A. Rogge, RMR-CRR