

O'Melveny & Myers LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067-6035

T: +1 310 553 6700
F: +1 310 246 6779
omm.com

Leah Godesky
D: +1 310 246 8501
lgodesky@omm.com

February 22, 2023

**BY ECF**

Honorable David T. Schultz
United States District Court
300 South Fourth Street
Minneapolis, MN 55415

Re:   *Fair Isaac Corp. v. Federal Insurance Co. et al.*, 16-cv-1054

Dear Judge Schultz:

I write on behalf of Defendants Federal Insurance Company and ACE American Insurance Company in response to FICO's February 21 bench memorandum asserting that "economic comparability" is a prerequisite for admissibility of FICO's agreements with other customers (the "Other Agreements").

The Other Agreements are relevant and admissible for at least two reasons. First, they provide extrinsic evidence of the meaning of Section 10.8, an ambiguous provision of the License Agreement. Second, they are probative of Blaze Advisor's fair market value. FICO only contests that second basis for admissibility, arguing that the Other Agreements are categorically incomparable to the circumstances of this case. Dkt. 1098 at 3. That is incorrect. To begin with, FICO's theory of incomparability—that an "initial purchase license[]" cannot be compared to the "transitional license" FICO hoped to foist on Defendants, *id.* at 3—has been repeatedly rejected by this Court and is the subject of Defendants' February 20 letter, which addresses this issue more fully. But even accepting the validity of FICO's "transitional license" theory (which Defendants do not), an agreement's economic comparability goes to the weight the jury should give the agreement in determining actual damages, not the agreement's admissibility.

**I.     The Other Agreements are probative of the meaning of Section 10.8.**

The Other Agreements are admissible as evidence of the meaning of Section 10.8. As this court has previously ruled, Section 10.8 is ambiguous. Dkt. 731 at 48-49. Under New York law, extrinsic evidence is admissible to resolve the meaning of an ambiguous term. *State v. Home Indem. Co.*, 66 N.Y.2d 669, 670 (N.Y. 1985).

It is blackletter law that the language of "other, similar contracts"—one variety of extrinsic evidence—is probative of an ambiguous provision's meaning. That is because when a drafter has shown that it knows how to adopt particular language, a departure from that language in a particular case is meaningful. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549,



572 (N.Y. 2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts, supports precisely this conclusion."); *Securiforce Int'l Am., LLC v. United States*, 127 Fed. Cl. 386, 397 (2016) ("[E]vidence of other contracts may be relevant in cases in which the language of a contract is ambiguous."); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999) (in resolving ambiguity, courts may look to "the content of any other agreement."); *accord Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 393-94 (S.D.N.Y. 2022).  This inference is common in other areas of law, too.  E.g., *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019) ("Congress has shown that it knows how to adopt the omitted language or provision.").

Here, the Other Agreements tend to demonstrate that Defendants' interpretation of Section 10.8 is correct.  For instance, the analogous section of a Blaze Advisor license agreement with ▮▮▮▮ provides that:



D-0280-008-009.  The first sentence of this provision describes the factors to which ▮▮▮ Blaze Advisor license fee is pegged, including "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  *Id.*  The License Agreement at issue in this case contains no such description.  Likewise, the ▮▮▮▮ agreement specifies in great detail the circumstances following an "M&A Event" under which "expanded use" occurs and the parties must renegotiate the license.  Once again, the License Agreement does not.

This is confirmed by FICO witness, Jandeen Boone, who testified at trial that ▮▮▮▮s Blaze Advisor license did not contain the second sentence of Section 10.8, deeming corporate reorganizations and changes in control to be assignments.  Trial Tr. 530:11-531:11.

Defendants will establish that these two agreements are far from outliers. Rather, FICO regularly agreed to assignment provisions with material differences from Section 10.8. For instance, the assignment provision of a license agreement with ███████████. provides in relevant part:



D-077-010. The assignment provision in the ██████ license is likely what FICO wishes Section 10.8 said. It makes clear (1) ████████████████████ and (2) that ████████████████████. These clear terms, however, do not appear in Section 10.8. "[T]he inescapable conclusion[,]" which Defendants will explain to the jury, is that FICO "intended the omission." *Quadrant Structured Prods. Co.*, 23 N.Y.3d at 572.

If nothing else, the Other Agreements are admissible to rebut Ms. Boone's testimony that Section 10.8 is a standard term in FICO license agreements. *See* Trial Tr. 462:22-25; 465:7-13; *see also id.* at 20:2-7 (counsel for FICO representing that all of Section 10.8 was "standard FICO language" except for the promise that "FICO's consent would not be unreasonably withheld"). As these three examples make clear, it is not.

FICO's bench memorandum does not—and cannot—dispute this basis for the Other Agreements' relevance. Moreover, this theory of relevance does not implicate the "comparability" concerns FICO raises. The Other Agreements are comparable to the License Agreement in the relevant sense—they are perpetual licenses between FICO and other Blaze Advisor clients. They should be admitted.

II.     **The Other Agreements are probative of Blaze Advisor's fair market value.**

The Other Agreements are also probative of FICO's alleged actual damages. In this case, the measure of any actual damages is Blaze Advisor's fair market value—"'the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use' of the copyrighted work." Dkt. 731 at 9 (quoting *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001)). Plainly, the Other Agreements—which show the price on which willing buyers and willing sellers *have* agreed for the use of Blaze Advisor—are relevant to this inquiry. *See Gaylord v. United*



*States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015) ("[P]ast arms-length licensing practices by the copyright owner or the infringer for similar uses and 'benchmark' licenses by others in the industry may be useful[.]"). For its part, FICO has agreed that its "established licensing and pricing standards for Blaze Advisor" and "[t]he acceptance of FICO's pricing standards in the marketplace by other licensees" are relevant. Dkt. 1006 at 59. Indeed, it is difficult to imagine what evidence could be *more* relevant.

Now, however, FICO seeks to exclude the Other Agreements on the ground that its actual damages should be the price of what it calls "a transition license to move away from Blaze Advisor[,]" and that "initial purchase licenses" between FICO and other licensees are not "comparable" to a transition license. Dkt. 1098 at 7. That argument is wrong for two reasons.

*First*, as Defendants explained in more detail in their February 20 letter, Dkt. 1094, the Court has *repeatedly* ruled that FICO's "transition license" theory—which turns on "what FICO would have charged Defendants had FICO known that Defendants were bound to the license for the relevant three-year period, with no prospect of any future business dealings between the parties afterward"—is a "subjective and unreliable result" that is "inconsistent with the applicable legal standard." Dkt. 731 at 31-32. In excluding FICO's expert testimony regarding so-called transition license pricing, the Court held that FICO's framework "do[es] not consider what a willing buyer and a willing seller would have contemplated" and so it "does not accurately reflect the legal standard for calculating actual damages in this case, which is an objective standard as opposed to what FICO subjectively would have charged." *Id.* at 31. And in granting Defendants' motions *in limine* to exclude evidence and testimony regarding FICO's transition-license-based actual damages analysis, the Court repeated—in no uncertain terms—that "under no circumstances can FICO argue that this methodology is the measure of its actual damages because that's what FICO would have charged. And I don't think they can argue it's the measure of damages period[.]" Feb. 3 Hr'g Tr. 56.

The transition-license model plainly reflects FICO's desire to extract as much money as possible from Defendants on pain of a copyright-infringement lawsuit. The theory is that once FICO terminated the original license, it would take Defendants some period of time to extract Blaze Advisor from their systems, so Defendants would be forced to purchase a "transitional license" to avoid copyright infringement liability during that time. As Defendants explained in their February 20 letter, the hypothetical negotiation required under the law does not contemplate such "abusive" tactics. *See* Dkt. 1094 at 3-4 (alteration omitted) (quoting *On Davis*, 246 F.3d at 166). Instead, the hypothetical negotiation identifies the license fee that would make the seller whole—that is, what price it could have obtained on the open market for the allegedly infringing use—and "[m]aking the plaintiff whole is plainly different from punishing the infringer by charging the highest possible rate for the infringement." *Jarvis v. K2 Inc.*, 86 F.3d 526, 535 (9th Cir. 2007). While FICO might wish to charge more for three years of Blaze usage than for a perpetual license, willing buyers on the market—as opposed to buyers who were forced to purchase a license to avoid the threat of a lawsuit—would not accept (and have never accepted) that framework. *See* Dkt. 1006 at 59 (identifying "[t]he acceptance of FICO's pricing standards in the marketplace by other licensees" as a key consideration in the hypothetical negotiation). And the "question is not



what the owner would have charged, but rather what is the fair market value." *On Davis*, 246 F.3d at 166.

*Second*, "whether these licenses are sufficiently comparable . . . goes to the weight of the evidence, not admissibility." *Apple Inc v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014), *overruled on other grounds*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *accord Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010) ("Here, Finjan noted multiple differences between the Finjan-Microsoft licensing scenario and a hypothetical negotiation with Defendants. . . . These differences permitted the jury to properly discount the Microsoft license."); *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331 (Fed. Cir. 2014) ("[T]hough there were undoubtedly differences between the licenses at issue and the circumstances of the hypothetical negotiation, the jury was entitled to hear the expert testimony and decide for itself what to accept or reject." (internal quotation marks and alterations omitted)). Even if FICO were allowed to press its "transitional license" theory, FICO's view that the Other Agreements are not probative of its damages would properly be raised on cross-examination, not in a motion to exclude.

As FICO's own cases make clear, to admit the Other Agreements, Defendants need only make a showing sufficient for the jury to find them relevant—that is, they must lay foundation, as with any other piece of evidence. *M2M Sols. LLC v. Motorola Sols., Inc.*, 2016 WL 767800, at *8 (D. Del. Feb. 25, 2016) ("Plaintiff must present evidence sufficient to allow the jury to weigh the economic value of the patented feature against the economic value of the features and services covered by the license agreement."). Defendants can easily lay foundation for the relevance of the Other Agreements. For one thing, the Other Agreements license the same software at issue in this case. *See Virnetx*, 767 F.3d at 1330 (affirming admission of licenses "relat[ing] to the actual patents in issue"). Moreover, they contain many terms and conditions similar to those in the License Agreement, and were entered into with corporations as big as or larger than Defendants.[1] FICO's concern that Defendants do not have a witness who can lay this foundation is misplaced and premature. FICO is free to object at trial if it feels this foundation is insufficient.[2]

---

[1] FICO contends that other licensees' public filings should be excluded as well. Dkt. 1098 at 8. Incorrect. These filings show that the other licensees' revenue is comparable to or greater than Defendants', which tends to show that the Other Agreements are comparable to the License Agreement. In any event, FICO acknowledges that the filings should be excluded only "[t]o the extent the Court excludes the Third-Party License Agreements[.]" Dkt. 1098 at 8. Because the Court should not exclude the Other Agreements, it should not exclude the filings.

[2] More broadly, even if FICO was correct that it could quantify its damages according to the transition-license framework, that would not change the admissibility analysis. Even then, the jury would not be *obligated* to accept FICO's outlandish theory that three years of Blaze Advisor usage costs an order of magnitude more than perpetual usage. Jurors could instead conclude—consistent with the law of the case and the law of copyright damages—that the license fees FICO has historically negotiated are more probative of Blaze Advisor's fair market value as determined by the hypothetical negotiation. Consequently,



### III. The acknowledged inadmissibility of the settlements with other companies has no bearing on the Other Agreements' admissibility.

FICO now agrees that settlement agreements entered into between FICO and other Blaze Advisor users are inadmissible. Dkt. 1098 at 1. Puzzlingly, though, it contends that "Defendants' analysis and reasoning as it relates to the settlement agreements . . . applies at least equally, if not more fully, to FICO's licenses with other third parties." *Id.* But it does not explain why. And for good reason—as Defendants explained in their February 16 letter, the reasons that settlement agreements between FICO and other licensees are inadmissible do not apply to arms-length license agreements. Dkt. 1086 at 2. Settlements are irrelevant, "since the offer may be motivated by a desire for peace[,]" Fed. R. Evid. 408 advisory committee's note, and prejudicial because they may improperly suggest to the jury the value of a claim, Fed. R. Evid. 408; *see Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 699-700 (8th Cir. 2008) (evidence that other claims settled "implicate[s] the same concerns of prejudice and deterrence of settlements which underlie Rule 408"). The Other Agreements, by contrast, are probative of the License Agreements' meaning and FICO's putative damages.

If anything, Defendants' arguments regarding the settlements demonstrate why FICO's transition-license theory of damages does not reflect the fair market value of Blaze Advisor. Just as the size of a settlement extracted under threat of litigation does not reflect the value of a claim, *see* Dkt. 1086 at 2; Fed. R. Evid. 408, the amount FICO could extort from a party for a transition license to avoid an infringement action does not reflect the value of Blaze Advisor. What *does* demonstrate fair market value, however, are other actual licenses that FICO has sold in the actual market to actual buyers. The Other Agreements are admissible for that reason.

Respectfully submitted,

/s/ Leah Godesky

Leah Godesky

cc:   Counsel of Record

---

whatever the fate of the transition-license theory, the jury is entitled to receive the Other Agreements and weigh them as it wishes in considering FICO's putative damages.