

O'Melveny & Myers LLP  
1999 Avenue of the Stars  
8th Floor  
Los Angeles, CA 90067-6035

T: +1 310 553 6700  
F: +1 310 246 6779  
omm.com

February 26, 2023

Leah Godesky  
D: +1 310 246 8501  
lgodesky@omm.com

**BY ECF**

Honorable David T. Schultz  
United States District Court  
300 South Fourth Street  
Minneapolis, MN 55415

Re:   *Fair Isaac Corp. v. Federal Insurance Co. et al.*, 16-cv-1054

Dear Judge Schultz:

I write on behalf of Defendants Federal Insurance Company and ACE American Insurance Company regarding the admissibility and use of FICO Blaze license agreements with customers other than Federal (the "Other Agreements").  We anticipate that this issue may arise again in connection with Bill Waid's testimony, which is expected on Tuesday or Wednesday of this week, and closing arguments.

Courts applying New York law have followed *Quadrant Structured Products Co., Ltd. v. Vertin*, 23 N.Y.3d 549 (2014), in concluding that "terms omitted from a contract should be treated as having been omitted intentionally, especially where sophisticated parties are involved and the omitted terms are readily found *in similar agreements*."  *Colfin Bulls Funding A, LLC v. DH Mortg. Holder, LLC*, 2016 WL 1660543, at *4 (N.D. Ill. Apr. 26, 2016) (emphasis added); *accord Mohr-Lercara v. Oxford Health Ins., Inc.*, 2022 WL 524059, at *6 (S.D.N.Y. Feb. 22, 2022).  The Court has already acknowledged that the Other Agreements are similar to the License Agreement:  "they are licenses for Blaze Advisor between FICO and another entity."  Trial Tr. 823 (explaining why the Other Agreements are admissible on fair-market-value issue).

In *EL Education, Inc. v. Public Consulting Group, Inc.*, 2016 WL 5816994 (S.D.N.Y. Sept. 23, 2016), the question was whether EL Education breached its license agreement with Public Consulting Group ("PCG") and committed copyright infringement by "sell[ing] and authoriz[ing] third parties to sell educational curriculum materials it produced under a contract with PCG."  *Id.* at *1.  PCG argued that "if the parties had intended to grant a sales right, they would have included one explicitly in the license."  *Id.* at *5.  The Court credited this inference, writing

> Both EL and PCG cite to copyright cases in their briefs in which the contract at issue specifically addressed the right to sell, and both EL and PCG are professional organizations that could have easily included such a term in the detailed license provision in their contract. Because they did not, and because—



> as their briefs demonstrate—this right is frequently addressed in similar contracts, it is reasonable to conclude that this term was intentionally excluded.

*Id.* In *EL*, the Court found it meaningful that the parties deviated from language used in contracts between entirely different parties. Here, Defendants urge a more modest inference: that the License Agreement's departure from other contracts *FICO* has entered is meaningful.

For its part, FICO has not identified a *single* case in which a court barred comparison between a contract at issue and another contract negotiated by a party in litigation for the same product with analogous terms. To the contrary, under New York law—at least since *Quadrant*—this reasoning is standard in interpreting contracts. Even New York's pattern jury instructions explain that "[u]nder the maxim *expressio unius est exclusio alterius*, if parties to an ambiguous contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission[.]" New York Pattern Jury Instr. Civil 4:1.3.VI.A.2; *see Intelligent Digital Sys., LLC v. Beazley Ins. Co., Inc.*, 207 F. Supp. 3d 242, 247-48 (E.D.N.Y. 2016) (looking to exclusion in policy at issue in different case to conclude that "[h]ad the Defendant wished to include such an exception it easily could have. The fact that it not do so suggests that there was no such exception"); *MeehanCombs Glob. Cred. Opp. Fund, LP v. Caesars Entm't Corp.*, 80 F. Supp. 3d 507, 518 (S.D.N.Y. 2015) (looking to "modifying clause" in "similarly worded indenture agreements" in another case that was "omitted from the Indentures" at issue to conclude that "the omission of this language is deemed intentional"); *see also Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1000 (2d Cir. 1974) ("Various exclusionary terms in use or being considered for use prior to the present loss would have excluded the loss had they been employed."). Defendants do not seek an instruction that the absence of certain language in Section 10.8 of the Federal agreement leads to the "inescapable conclusion" that "the parties intended the omission," but, certainly, Defendants should be permitted to introduce Blaze agreements with additional language and argue that the absence of the same language in the Federal agreement has significance.

Using the Other Agreements to assist the jury in resolving the ambiguity in Section 10.8 is particularly appropriate in this case, where the significance of particular language appearing in certain Other Agreements but not in Federal's was confirmed by FICO's own employees. On October 7, 2015, FICO's Mike Sawyer and Russ Schreiber discussed whether the ACE acquisition was a basis on which to demand additional license fees from Federal. Schreiber's *first question* was whether "the license [is] specifically tied to GWP," *i.e.*, Federal's revenue. P-123. When Sawyer responded, "No," Schreiber asked again: "Nothing in the contract?" Sawyer responded, "I don't see anything on GWP in the agreements." *Id.* Sawyer and Schreiber clearly thought that whether Section 10.8 expressly referenced increased revenue was important in determining the parties' rights and obligations under Section 10.8.

This exchange stands in stark contrast to FICO's current position that the "standard" business purpose of Section 10.8 is to guarantee that FICO *always* has consent rights in the context of an acquisition; indeed, under FICO's current theory, there would have been no need for Schreiber to even ask whether Section 10.8 linked the circumstances of an acquisition to revenue, as certain Other Agreements do. Defendants should be able to explain why—as Sawyer and Schreiber



understood—it is meaningful that Section 10.8 of the Federal contract says nothing about revenue. That point is relevant both to resolving the ambiguity in Section 10.8 and to Defendants' bad-faith claim.[1]

The Other Agreements are admissible as extrinsic evidence of the meaning of Section 10.8. Their admission so far—which, at least during Jandeen Boone's testimony, was not objected to, Trial Tr. 532-33—has not occasioned delay or confusion. *See also* Trial Tr. 917-22, 945-48 (brief questioning of Thomas Carretta on cross-examination and redirect regarding Other Agreements). The Court should permit them to be used to elucidate the ambiguity of Section 10.8 in addition to the purposes for which it has already admitted them.

Respectfully submitted,

/s/ Leah Godesky

Leah Godesky

cc:     Counsel of Record

---

[1] Counsel for FICO asserted on February 24 that only the phrase "[a]nd client shall make no expanded use" is ambiguous. Trial Tr. 837. That is incorrect. The Court found the entire second sentence of Section 10.8—"In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld"—is ambiguous. *See* Dkt. 731 at 45-49 ("In summary, Section 10.8 of the License Agreement is ambiguous."). In any event, even if counsel were correct that only the meaning of "expanded use" is ambiguous, the Other Agreements would still be probative in resolving that ambiguity. For instance, Jandeen Boone testified about an Blaze Advisor license agreement between FICO and Healthways, Inc., that measured expanded use based on the number of computer applications using Blaze Advisor. Trial Tr. 536; D-280 ("[W]ithin thirty (30) days of the public announcement of [an] M&A Event, Client shall provide written certification to Fair Isaac of the number of applications with which Client is using the Fair Isaac Products prior to the M&A Event and the Enterprise-Wide license granted herein shall be considered capped at the usage reported by Client.").