Exhibit 2

Fair Isaac Corporation v. Federal Insurance
Company et al.
Court File No. 16-cv-1054

**516**

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
 2
    -------------------------------------------------
 3                                    )
    Fair Isaac Corporation,           ) File No. 16-cv-1054(DTS)
 4  a Delaware Corporation,           )
                                      )
 5       Plaintiff,                   )
                                      )
 6  v.                                )
                                      )
 7  Federal Insurance Company,)         Courtroom 14W
    an Indiana corporation,   )         Minneapolis, Minnesota
 8  and ACE American Insurance)         Tuesday, February 21, 2023
    Company, a Pennsylvania   )         8:54 a.m.
 9  Corporation,              )
                              )
10       Defendants.          )
                              )
11  -------------------------------------------------
12
13
14        BEFORE THE HONORABLE DAVID T. SCHULTZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16         (JURY TRIAL PROCEEDINGS - VOLUME IV)
17
18
19
20
21
22  Proceedings recorded by mechanical stenography;
    transcript produced by computer.
23
                        * * *
24
25
```

**517**

```
 1  APPEARANCES:
 2  For Plaintiff:      MERCHANT & GOULD P.C.
                        BY:  ALLEN W. HINDERAKER
 3                           HEATHER J. KLIEBENSTEIN
                             PAIGE S. STRADLEY
 4                           MICHAEL A. ERBELE
                             JOSEPH W. DUBIS
 5                           GABRIELLE L. KIEFER
                        150 South Fifth Street, #2200
 6                      Minneapolis, Minnesota 55402
 7  For Defendants:     FREDRIKSON & BYRON
                        BY:  TERRENCE J. FLEMING
 8                           LEAH C. JANUS
                             CHRISTOPHER D. PHAM
 9                           RYAN C. YOUNG
                             PANHIA VANG
10                      200 South Sixth Street, #4000
                        Minneapolis, Minnesota 55402
11
                        O'MELVENY & MYERS LLP
12                      BY:  LEAH GODESKY
                             ANTON METLITSKY
13                           DARYN E. RUSH
                             ROXANA GUIDERO
14                      Times Square Tower
                        7 Times Square
15                      New York, New York 10036
16  Court Reporters:    RENEE A. ROGGE, RMR-CRR
                        KRISTINE MOUSSEAU, CRR-RPR
17                      MARIA V. WEINBECK, RMR-FCRR
                        PAULA RICHTER, RMR-CRR-CRC
18                      United States District Courthouse
                        300 South Fourth Street, Box 1005
19                      Minneapolis, Minnesota 55415
20
                              * * *
21
22
23
24
25
```

**518**

```
 1                      I N D E X
                                              PAGE
 2
    JANDEEN BOONE
 3    Cross-Examination (Resumed) By Ms. Godesky    520
      Redirect Examination By Mr. Hinderaker        538
 4
    CHRISTOPHER PATRICK IVEY
 5    Direct Examination By Ms. Kliebenstein        539
      Cross Examination By Ms. Janus                597
 6    Redirect Examination By Ms. Kliebenstein      612
 7  RAMESH PANDEY
      Cross Examination By Mr. Hinderaker           621
 8    Direct Examination                            684
      Recross Examination By Mr. Hinderaker         707
 9
10
11
12  DEFENDANTS' EXHIBITS                          REC'D
      D280                                         533
13
```

**519**

```
 1                  8:54 A.M.
 2
 3         (In open court with the Jury present.)
 4         THE COURT:  Go ahead and be seated.
 5         Good morning, Members of the Jury.  I hope you all
 6  had a good, long weekend.
 7         I'm going to let you know this now since we know
 8  it, I know it.  The Chief Judge of the District has
 9  indicated that he is going to some time today, probably this
10  morning yet, he will order closure of the courthouse on
11  Wednesday and Thursday in light of the incoming, you know,
12  snow-mageddon.  So I can tell you right now that we won't
13  have court on Wednesday and Thursday.
14         I know that we also -- supposedly the snow is
15  going to start here about one o'clock this afternoon.  We're
16  going to be keeping our eye on it and getting information
17  from a couple of localities, in particular, because I know
18  there is some of you that are driving a great distance.  And
19  we'll make that call as things play out, but I'm more
20  inclined to say we end early today so that you can, you
21  know, drive through the blizzard in daylight conditions so
22  that you get to see it in all its glory, as opposed to
23  driving at night.  Okay?
24         Yes, ma'am.
25         JUROR:  I have a question.  I live a quarter mile
```

```
                                                      596                                                         598
 1  Q.  And based on the contents of this row, does it raise any        1  A.  That's correct.
 2  red flags for you, ignoring that last column as to anything?        2  Q.  You were under oath during those depositions just like
 3  A.  Again, no, it wouldn't have raised any red flags.  We           3  you are giving testimony here in court today, correct?
 4  had done a lot of work with Chubb & Son, and this was a             4  A.  That was my understanding, yes.
 5  normal case coming from a Chubb.com e-mail address and no           5  Q.  And one of your depositions was in January of 2019 and
 6  red flags.                                                          6  one was in March of 2019.  Does that sound about right?
 7  Q.  All right.  Let's move up to the very top row.  Can you         7  A.  That sounds about right.
 8  just read for me the description in that third column.  Read        8  Q.  And you'll see that I just handed you the transcripts
 9  just the first few sentences.                                       9  just in case we need to reference there, and there are tabs
10  A.  "Hi, product support team.  Below is an issue faced by a      10  indicating which transcript is which.  Okay?
11  consultant whose client is Chubb.  Chubb seems to be an           11  A.  Perfect.  Yes.
12  existing BA user.  He has been struggling to upgrade the          12  Q.  And you don't have to have that open in front of you.
13  Blaze project on his own and he needs assistance with it."        13  A.  Okay.
14  Q.  And to the best of your knowledge, Mr. Ivey, the three,       14  Q.  It's just in case.
15  the three instances, the yellow highlighting rows that we         15  A.  Okay.  Understood.
16  just looked at, do you know one way or another, the product      16  Q.  Let's start where you just left off with P1112.
17  support team, did they provide support for those services?       17  A.  Okay.
18  A.  They did provide support I believe in two of the cases.      18  Q.  If we could pull that up.
19  I think in the first case, there was a red flag for us, and      19      So this is the call log that has been prepared by
20  we raised some questions about it.                                20  FICO from FICO systems, correct?
21  Q.  And does the role of the product support team at FICO,       21  A.  That's correct.
22  did they, for lack of a better phrase, do they check ID's at    22  Q.  And if we look at row 4, which you were just testifying
23  the door, you know, when folks are calling in for help as to    23  about --
24  who is a licensee?                                                24  A.  Okay.  Yep.
25  A.  No, we don't.  We typically -- again, if we see             25  Q.  -- I think we are going to get it on the screen, too, in

                                                      597                                                         599
 1  something that's unusual, we might, we might raise it, but       1  just a moment.
 2  really that wasn't our job.  And if there were, if there         2  A.  That will help.
 3  were issues where we were not supposed to provide support        3  Q.  There we go.  Row 4, this shows that FICO provided
 4  for a customer, that would typically come from our sort of      4  support to Chubb or one of its affiliates in Europe relating
 5  accounting team, accounting legal teams, who would instruct     5  to Blaze, correct?
 6  us to not -- you know, somebody hasn't paid or whatever it      6  A.  In line 4, so if you can scroll --
 7  might be.  They would instruct us to cease support; but         7  Q.  Yep.
 8  other than that, we would proceed as usual.                     8  A.  It lists that we did provide support to David Gibbs at
 9  Q.  And how often does that, does that happen when somebody     9  Chubb, yes.
10  reaches out to product support that doesn't have a license    10  Q.  Okay.  And you testified that there were no red flags?
11  to use Blaze Advisor?                                          11  A.  Correct, from what the engineer would typically be
12  A.  Not, not often.                                            12  looking for, if anything.
13        MS. KLIEBENSTEIN:  Okay.  No further questions.          13  Q.  And what would you characterize as a red flag?  What did
14        THE COURT:  Ms. Janus?                                   14  you mean by that?
15        THE WITNESS:  Thank you.                                 15  A.  So, just in looking at this, so a different e-mail
16               CROSS EXAMINATION                                 16  address or a question that seemed very odd, perhaps, but in
17  BY MS. JANUS:                                                  17  this case it was coming from someone at Chubb.com and seemed
18  Q.  Good morning, Mr. Ivey.                                    18  I think a reasonable request, and so I don't think it piqued
19  A.  Good morning.                                              19  any interest.
20  Q.  My name is Leah Janus, and I'm counsel for defendants in  20  Q.  And you made a point of saying that the entry stating
21  this case.  We met several years ago now, when you sat for a  21  United Kingdom in the last row wouldn't have been in this
22  deposition in this case, correct?                              22  data poll originally, correct?
23  A.  Correct.                                                   23  A.  That's correct.
24  Q.  And you actually sat for two depositions in this case,    24  Q.  But the description of the query further over to the
25  correct?                                                       25  left indicates that the query is coming from London, Europe,
```

**735**

```
UNITED STATES DISTRICT COURT
     DISTRICT OF MINNESOTA
-------------------------------------------------
                                  )
Fair Isaac Corporation,           ) File No. 16-cv-1054(DTS)
a Delaware Corporation,           )
                                  )
     Plaintiff,                   )
                                  )
v.                                )
                                  )
Federal Insurance Company,        ) Courtroom 14W
an Indiana corporation,           ) Minneapolis, Minnesota
and ACE American Insurance        ) Friday, February 24, 2023
Company, a Pennsylvania           ) 9:00 a.m.
Corporation,                      )
                                  )
     Defendants.                  )
                                  )
-------------------------------------------------


          BEFORE THE HONORABLE DAVID T. SCHULTZ
      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

             (JURY TRIAL PROCEEDINGS - VOLUME V)







   Proceedings recorded by mechanical stenography;
transcript produced by computer.
                      * * *
```

**736**

```
APPEARANCES:

For Plaintiff:       MERCHANT & GOULD P.C.
                     BY:  ALLEN W. HINDERAKER
                          HEATHER J. KLIEBENSTEIN
                          PAIGE S. STRADLEY
                          MICHAEL A. ERBELE
                          JOSEPH W. DUBIS
                          GABRIELLE L. KIEFER
                     150 South Fifth Street, #2200
                     Minneapolis, Minnesota 55402

For Defendants:      FREDRIKSON & BYRON
                     BY:  TERRENCE J. FLEMING
                          LEAH C. JANUS
                          CHRISTOPHER D. PHAM
                          RYAN C. YOUNG
                          PANHIA VANG
                     200 South Sixth Street, #4000
                     Minneapolis, Minnesota 55402

                     O'MELVENY & MYERS LLP
                     BY:  LEAH GODESKY
                          ANTON METLITSKY
                          DARYN E. RUSH
                          ROXANA GUIDERO
                     Times Square Tower
                     7 Times Square
                     New York, New York 10036

Court Reporters:     RENEE A. ROGGE, RMR-CRR
                     KRISTINE MOUSSEAU, CRR-RPR
                     MARIA V. WEINBECK, RMR-FCRR
                     PAULA RICHTER, RMR-CRR-CRC
                     United States District Courthouse
                     300 South Fourth Street, Box 1005
                     Minneapolis, Minnesota 55415

                          * * *
```

**737**

```
                    I N D E X
                                              PAGE

LAWRENCE WACHS VIA DEPOSITION
  Examination By Ms. Janus                     739
  Examination By Mr. Hinderaker                806

THOMAS CARRETTA
  Direct Examination By Mr. Hinderaker         843
  Cross-Examination By Ms. Godesky             892
  Redirect Examination By Mr. Hinderaker       934




DEFENDANTS' EXHIBITS                          REC'D
       4                                       921
      17                                       947
     282                                       945
     304                                       918
```

**738**

```
1                   9:00 A.M.
2
3          (In open court with the Jury present.)
4          THE COURT:  Good morning.  Please be seated go
5   ahead and be seated.
6          All right.  Good morning, Members of the Jury.
7   Thanks, everyone, for making it in here.  I don't know how
8   bad your commutes were, but thanks for making it.
9          Mr. Hinderaker, are you ready to proceed?
10         MR. HINDERAKER:  We are, Your Honor.
11         THE COURT:  All right.  Why don't you, you need to
12  explain what's going on now?
13         MR. HINDERAKER:  I do.  I do.
14         THE COURT:  Go right ahead.
15         MR. HINDERAKER:  Our first witness this morning is
16  a gentleman by the name of Larry Wachs, Lawrence Wachs, and
17  he will be showing -- his testimony will be presented by
18  video, so I will read this introduction about him.
19         Lawrence Wachs is a former FICO employee, now
20  living in New York, whose deposition was taken February 26,
21  2019.  His role was in sales; and when he left FICO, his
22  title was sales executive.  He was with FICO from 2006 to
23  2008.
24         Mr. Wachs' deposition was taken by Leah Janus, one
25  of the counsel for defendants.  There may be another voice
```

887

1    the United States and two applications utilized in the
2    United Kingdom.  Moreover, during the period of time in
3    which FICO and new Chubb attempted resolve the breach of
4    Section 10.8, we became aware of the further application in
5    Canada."  I'll stop there.
6    　　　　What was the source of your information to make
7    that statement?
8    A.   I can't recall it specifically, but I thought it was me
9    that asked the maintenance and support organization to look
10   at the maintenance logs.
11   Q.   Okay.
12   A.   So this is a process where they, a client is given a
13   key.  If they have bugs to report or need information, they
14   just log something into the system, and then it gets
15   captured.
16   Q.   That would be the same thing as a help desk log?
17   A.   The same thing.
18   Q.   So the information that you were stating in this letter
19   came to you from help desk log information?
20   A.   That's correct.
21   Q.   Then you go on to say, "And the disclosure of
22   confidential information to an unauthorized third-party
23   consultant."
24   　　　　And what was the source of your information to say
25   that in the letter?

888

1    A.   The same, same source.
2    Q.   Okay.  Thank you.  Then you finish, "This information
3    was conveyed to the new Chubb business counter part Tamra
4    Pawloski, VP of software compliance and optimization."
5    　　　　Now, when you say that disclosure of confidential
6    information to an unauthorized third party is a breach, is
7    that a reference to paragraph 3.1 of the license agreement?
8    A.   One moment.  Yes.
9    Q.   And when you said that Blaze Advisor software outside of
10   the United States and the United Kingdom and in Canada, what
11   was the basis of -- what in the license agreement led you to
12   believe that that was a breach?
13   A.   The reference to territory in paragraph 1 of the license
14   agreement.
15   Q.   Saying?
16   A.   That the software is to be installed and physically
17   located in the United States.
18   Q.   And then you conclude your letter, "Attempts to amicably
19   resolve the dispute have been unsuccessful.  This letter
20   serves as notice that the agreement is terminated effective
21   March 31st.  Please take further notice of the provisions of
22   Section 9.3 of the agreement.
23   　　　　"As noted in my January 27, 2016, letter, FICO
24   considers new Chubb's current use and any future use of the
25   software as a breach of the agreement and willful

889

1    infringement of all applicable intellectual property rights,
2    including but not limited FICO's underlying copyrights and
3    patents."
4    　　　　I'd like to then, I'd like to turn then, if we
5    could, to paragraph 9.3 of the license agreement J1, J001.
6    A.   Okay.
7    Q.   Let me get there myself.  And paragraph 9.3 is entitled
8    Effect of Termination.  Agreed?
9    A.   Yes.  That is correct.
10   Q.   And it says, "Upon expiration or termination of this
11   agreement for any reason, all licenses granted hereunder
12   shall terminate immediately.  All support and maintenance
13   obligations shall cease.  Client shall immediately cease
14   using all Fair Isaac products and related documentation
15   (including all intellectual property arising from or related
16   to the foregoing), shall remove all copies of the Fair Isaac
17   products and related documentation from client's computer
18   systems," and so on.
19   　　　　And that is the provision that you were
20   specifically referencing regarding the effect of termination
21   in your notice of breach letter?
22   A.   That is correct.
23   Q.   And shortly after that, this lawsuit was commenced.
24   　　　　Have you had any -- did you have any involvement,
25   other than being a witness, did you have any involvement in

890

1    the management or handling of this lawsuit?
2    A.   No.
3    Q.   Your participation or your role in this whole matter is,
4    is that of a witness?
5    A.   That is correct.
6    　　　　MR. HINDERAKER:  No further questions, Your Honor.
7    　　　　THE COURT:  Ms. Godesky.
8    　　　　MS. GODESKY:  Your Honor, may I approach?
9    　　　　THE COURT:  You may.
10   　　　　(Sidebar discussion)
11   　　　　MS. GODESKY:  So given Mr. Carretta's reference
12   just now in this last line of questions to his view that the
13   license agreement has a territorial restriction, I would
14   like to either be able to ask Mr. Carretta, as you suggested
15   during the pretrial conference, whether he's aware that the
16   court has held that the license agreement unambiguously does
17   not include a territory restriction or that Your Honor
18   instruct the jury to that fact.
19   　　　　MR. HINDERAKER:  And I disagree for all the
20   reasons that we've argued before and all the reasons that
21   the court should not interfere with this issue of whether
22   FICO acted in good faith or not.
23   　　　　THE COURT:  I understand the question to
24   Mr. Carretta.  It's an appropriate question.  It asks him
25   for why he said it, what's your good faith basis.

**899**

1  it sound right that it was $350,000?
2  A.  I think it was a little more than that, 355, something
3  like that.  I see it is 350 plus maintenance.
4  Q.  Okay.  And then the enterprise-wide amendment in
5  December 2006 increased the price to 1.3 million, correct?
6  A.  Right, with credit for the fees they had already paid.
7  Q.  Okay.  Now, I want to take a look at that December 2006
8  amendment that came with that price tag increase up to
9  $1.3 million.
10         So, Vanessa, if we could pull up J1.  It's already
11  in evidence.  And I want to look, if we could, at page 20.
12         And so, Mr. Carretta, just so you have your
13  bearings, and you can look at the hard copy, we're now in
14  the December 2006 amendment.  Okay?
15  A.  Correct.
16  Q.  And the top of the second page says, "For purposes of
17  this Amendment Two, the enterprise-wide license shall mean
18  that client and its affiliates may use the Fair Isaac
19  product."  Right?
20         And then it goes on to talk about internal
21  business purposes and no limitation on the number of seats
22  or CPUs, correct?
23  A.  Yes, it says what it -- I mean, what you have on your
24  screen.
25  Q.  Okay.  And that language was not in the two prior Blaze

**900**

1  license agreements, the ones from earlier in 2006, right?
2  This was new language.
3  A.  Right.  That's new language.
4  Q.  And you understand now that Federal Insurance Company
5  has global affiliates in Chubb Australia, Chubb Europe, and
6  Chubb Canada.  You've come to have that understanding,
7  right?
8  A.  Could you repeat that?
9  Q.  You've come to understand, Mr. Carretta, that Federal
10  Insurance Company has affiliates like Chubb Canada, Chubb
11  Australia, and Chubb Europe, correct?
12  A.  Federal does.  That's correct.
13  Q.  Okay.  And you anticipated my next question, because the
14  Chubb & Son division of Federal, the only entity that FICO
15  now says could use the Blaze program, they didn't have any
16  affiliates as of December 2006, correct?
17  A.  Chubb & Sons is not an affiliate.
18  Q.  Chubb & Son doesn't have affiliates because it's not a
19  legal entity, right?
20  A.  That is correct.
21  Q.  So in your view, since Chubb & Son is the only client,
22  the addition of all this language about how now client and
23  its affiliates can use Blaze did not actually expand Chubb's
24  ability to use Blaze at all, right?
25  A.  It was still captured within Chubb & Sons.  That's

**901**

1  right.
2  Q.  So there was no expansion with this new language and the
3  $1.3 million price tag.
4  A.  No.  That's what they apparently negotiated.  That's
5  right.
6  Q.  And your view is that Chubb paid all this extra money
7  for this new reference to affiliates because one day down
8  the road the Chubb & Son division of Federal might, one,
9  turn itself into a legal entity; and, two, acquire
10  affiliates that might need to use Blaze.
11  A.  I don't agree with that.  I don't know why Chubb would
12  want that language.
13  Q.  Okay.  Mr. Carretta, we have a binder in front of you
14  that has a copy of your October 9th, 2018, deposition.  Can
15  you find that tab, please.
16  A.  You said in October?
17  Q.  October 9th, yes.
18  A.  I have it.
19  Q.  And if I could direct your attention to page 122,
20  line 14.
21  A.  Okay.  Page 122.
22  Q.  Line 14.  Question, "You testified that Chubb & Son
23  could not have any affiliates, as far as you understand it?
24         "Answer:  At the point of time that this contract
25  was entered, Chubb & Son was not a legal entity in and of

**902**

1  itself.  Therefore, it could not have had affiliates within
2  the meaning of the definition, but things could change in
3  the future.  They could incorporate as a separate business,
4  in which case as an entity they could then have the
5  potential to have an affiliate, but at the time they did not
6  have that possibility.
7         "And I don't believe they've ever incorporated.
8  And if they incorporated, it would have implicated the
9  balance of the agreement as well so you would have to look
10  at it.  So it wasn't meaningless language, and it was
11  important to Chubb, I believe, to preserve their future."
12         Was that your testimony at your deposition?
13  A.  That is correct.
14  Q.  Okay.  And, of course, whether Chubb had any concerns
15  back in 2006 about preserving its future, you wouldn't be
16  able to speak to that because you were not involved in the
17  negotiations at the time, correct?
18  A.  That's correct.
19  Q.  This is just an explanation that you've come up with
20  after reviewing the contract for the first time in 2015,
21  correct?
22  A.  Yes.
23         THE COURT:  Ms. Godesky, are you at a convenient
24  breaking point?
25         MS. GODESKY:  I am.  Thank you.

**EXHIBIT 2**

911

1  A. We began to become curious about who was using the
2  software.
3  Q. And in the regular course of business, Mr. Carretta, you
4  don't usually scan maintenance logs for potential problems
5  with your customers, right?
6  A. I don't.
7  Q. And you don't direct people to do that either, right?
8  A. I don't direct people to do that.
9  Q. And it would have been helpful for you in this time
10 period, after the ACE acquisition was announced, if you
11 could find more potential problems with Chubb's use of
12 Blaze, correct?
13 A. Not necessarily, no.
14 Q. But it might give you more potential leverage in any
15 breach letters that you might want to send or conversations
16 that you want to have with Chubb, correct?
17 A. Not necessarily.
18 Q. But you did end up citing the use of Blaze by these
19 consultants, just like you cited use of Blaze in Europe, in
20 your termination letter, correct?
21 A. I reference it in my termination letter. That's
22 correct.
23 Q. You referred to them as material breaches.
24 A. Yes.
25 Q. And based on those material breaches, you said that the

912

1  next day the contract was over and Chubb couldn't use Blaze
2  anymore.
3  A. Among the other breach, the obvious one we spent all day
4  talking about.
5  Q. Did you do anything to investigate the full extent of
6  the use, like how many people at AppCentrica or DWS had laid
7  eyes on the Blaze software?
8  A. I did not personally, no.
9  Q. Any use of Blaze in connection with this potential
10 project in Australia would have been quite small in the
11 context of an enterprise-wide license like Chubb had,
12 correct?
13 A. I don't know that.
14 Q. Well, an enterprise-wide license means that you can use
15 the software in an unlimited number of applications, right?
16 A. I thought it was limited to the number of applications.
17 I'd have to look at the agreement to see how they defined it
18 again.
19 Q. So you can't -- you can't speak at all to the relative
20 impact of this issue with DWS and AppCentrica relative to
21 the size of Chubb's use of Blaze and the scope of its
22 license?
23 A. Well, it's more of an absolute. We don't guess that,
24 oh, this one is important. It was just two guys that looked
25 at it, versus Accenture.

913

1  Q. But my question is whether you did anything to
2  investigate the magnitude of this issue.
3  A. No, because of what I just said. It's an absolute, you
4  are not allowed to do this.
5  Q. And did you ever identify any evidence that AppCentrica
6  or DWS accessed Blaze for any purpose other than assisting
7  Chubb in its work on one of its internal computer
8  applications?
9  A. I don't know what they did. I don't remember.
10 Q. So you have not identified any evidence that AppCentrica
11 or DWS accessed Blaze for any purpose other than assisting
12 Chubb, correct?
13 A. The only thing I know is that they showed up in the
14 maintenance logs. I was told that. But I don't remember
15 any of the details that you are asking about.
16 Q. Okay. So I'm going to ask my question one more time.
17 You have no evidence that AppCentrica or DWS accessed Blaze
18 for any purpose other than to assist Chubb in it's computer
19 application work, correct?
20 A. I just told you I don't remember. I don't believe I was
21 told that.
22 Q. So that's a no. You don't have any evidence?
23 A. I don't personally have any evidence, no.
24 Q. And are you aware of any evidence that anyone at
25 AppCentrica or DWS shared Blaze with any third party outside

914

1  Chubb?
2  A. I don't know. I just know that third parties accessed
3  the software.
4  Q. So that's a no.
5  A. They are there in the log.
6  Q. So that's a no.
7  A. No. That's just what I said.
8  Q. Mr. Carretta, I'm entitled to an answer to the question
9  I'm asking. Are you aware of any evidence that anyone at
10 AppCentrica or DWS shared Blaze with any third party outside
11 Chubb?
12 A. Not that I'm aware of, other than that they appear in
13 the logs.
14 Q. Okay. Let's talk about Section 10.8 and this whole
15 concept of assignment.
16 A. Okay.
17 Q. During your direct examination, when you were talking
18 about that letter you sent to Chubb on January 27th, 2016,
19 you made a point of saying in your questioning with
20 Mr. Hinderaker that Chubb had not responded to Sawyer and
21 Schreiber at that point in time.
22        Do you remember that?
23 A. Yes.
24 Q. I want to take a look at P131, which is already in
25 evidence. And I want to go to page 3 of the PDF.

**EXHIBIT 2**

939

1  entered into?
2  A. That's correct.
3  Q. Let me not hit this mic again.
4      Let's go to -- you were asked some questions about
5  your termination letter, 103. Plaintiff's Exhibit 0103.
6  And keep the license agreement nearby as well. In fact --
7  A. Okay.
8  Q. -- on a reference, your termination letter, because in
9  the termination letter you speak of the two applications
10 outside the United States and then in Canada. I guess
11 three?
12 A. Yes.
13 Q. Would you go to the license agreement J001?
14 A. Okay.
15 Q. And if we could go to the seventh page, please.
16 A. Okay.
17 Q. The license agreement does include a provision 10.5 that
18 says Entire Agreement?
19 A. That is correct.
20 Q. It says it supercedes all prior or contemporaneous
21 proposals, and all other oral or written understandings,
22 representations, conditions and other communications between
23 the parties.
24     Agreed?
25 A. Agreed.

940

1  Q. It goes on to say that, "Each party represents and
2  warrants to the other party that entering into this
3  agreement it does not rely on any representation, promises
4  or assurances from any other party or employee," and so
5  forth.
6      And then it ends with the sentence, "Any other
7  terms or conditions or amendments shall not be incorporated
8  herein or be binding upon any party, unless expressly agreed
9  to in a writing signed by authorized representatives of
10 client and Fair Isaac."
11     Agreed?
12 A. Yes.
13 Q. And then the license agreement also has a provision
14 called 10.4, No Waiver.
15 A. Yes.
16 Q. And that provision ends, "No waiver of any rights of a
17 party under this agreement will be effective unless set
18 forth in a writing signed by the parties."
19     Agreed?
20 A. Agreed.
21 Q. Now at Fair Isaac, as a matter of fact, does Fair Isaac
22 have a policy that identifies those persons who have the
23 ability to enter into an agreement on behalf of FICO?
24 A. Yes.
25 Q. Do salesmen like Mr. Sawyer or Mr. Schreiber have the

941

1  authority under that written policy to enter into agreements
2  on behalf of FICO?
3      MS. GODESKY: Objection.
4      THE COURT: Overruled.
5      THE WITNESS: No, they do not.
6  BY MR. HINDERAKER:
7  Q. You were asked some questions about consultants, third
8  party. And you made the statement that the, the prohibition
9  is absolute. The magnitude does not matter.
10     What did you mean by that?
11 A. Essentially the slightest infraction is a breach. That
12 it effectively defines materiality. Lawyers sometimes call
13 it strict liability.
14 Q. Okay. Let's go to the license agreement again and
15 paragraph 3.6.
16 A. Okay.
17 Q. Why don't you review it briefly so that you can get some
18 context.
19 A. Okay.
20 Q. All right. And here in paragraph 3.6, FICO and Chubb &
21 Son have agreed that one consultant, ACS Commercial
22 Solutions, has the right to use Blaze Advisor software.
23     Do you see that?
24 A. That's correct.
25 Q. And in fact paragraph 3.6 expressly says, does it not,

942

1  that ACS Commercial Solutions is the information technology
2  infrastructure operations outsourced to ACS Commercial
3  Solutions?
4  A. That's correct.
5  Q. That's to say, ACS Commercial Solutions is going to be
6  using Blaze Advisor for the benefit of Chubb & Son, the
7  division?
8  A. That's correct.
9  Q. But to get that permission, it was negotiations of
10 paragraph 3.6?
11 A. Yes.
12 Q. And 3.6 further says, "Provided that such use is
13 otherwise subject to the terms and conditions of this
14 agreement and does not exceed the limitations and use for
15 other restrictions set forth herein." Correct?
16 A. Yes. That's correct.
17 Q. And it further says, "Client shall responsible," client
18 Chubb & Son, "shall be responsible for assuring ACS's
19 compliance with the terms and conditions of this agreement."
20     Agreed? That's what it says?"
21 A. Yes.
22 Q. "And client shall be liable to Fair Isaac for any breach
23 of the agreement by ACS." It says that?
24 A. Yes.
25 Q. "The rights granted to ACS herein shall not be extended

**1438**

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA

--------------------------------------------------------
                                )
Fair Isaac Corporation,         )  File No. 16-cv-1054(DTS)
a Delaware Corporation,         )
                                )
       Plaintiff,               )
                                )
v.                              )
                                )
Federal Insurance Company,)        Courtroom 14W
an Indiana corporation,         )  Minneapolis, Minnesota
and ACE American Insurance)        Wednesday, March 1, 2023
Company, a Pennsylvania  )         9:00 a.m.
Corporation,                    )
                                )
       Defendants.              )
                                )
--------------------------------------------------------


          BEFORE THE HONORABLE DAVID T. SCHULTZ
       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

            (JURY TRIAL PROCEEDINGS - VOLUME VIII)








   Proceedings recorded by mechanical stenography;
transcript produced by computer.
                    * * *
```

**1439**

```
APPEARANCES:

For Plaintiff:     MERCHANT & GOULD P.C.
                   BY: ALLEN W. HINDERAKER
                       HEATHER J. KLIEBENSTEIN
                       PAIGE S. STRADLEY
                       MICHAEL A. ERBELE
                       JOSEPH W. DUBIS
                       GABRIELLE L. KIEFER
                   150 South Fifth Street, #2200
                   Minneapolis, Minnesota 55402

For Defendants:    FREDRIKSON & BYRON
                   BY: TERRENCE J. FLEMING
                       LEAH C. JANUS
                       CHRISTOPHER D. PHAM
                       RYAN C. YOUNG
                       PANHIA VANG
                   200 South Sixth Street, #4000
                   Minneapolis, Minnesota 55402

                   O'MELVENY & MYERS LLP
                   BY: LEAH GODESKY
                       ANTON METLITSKY
                       DARYN E. RUSH
                       ROXANA GUIDERO
                   Times Square Tower
                   7 Times Square
                   New York, New York 10036

Court Reporters:   RENEE A. ROGGE, RMR-CRR
                   KRISTINE MOUSSEAU, CRR-RPR
                   MARIA V. WEINBECK, RMR-FCRR
                   PAULA RICHTER, RMR-CRR-CRC
                   United States District Courthouse
                   300 South Fourth Street, Box 1005
                   Minneapolis, Minnesota 55415

                         * * *
```

**1440**

INDEX

                                                     PAGE

**RANDOLPH BICKLEY WHITENER**
  Direct Examination (Resumed) By Mr. Hinderaker    1442
  Cross Examination By Ms. Godesky                  1532
  Redirect Examination By Mr. Hinderaker            1599

**N. WILLIAM PAUL WAID**
  Direct Examination By Mr. Hinderaker              1606


PLAINTIFF'S                                        REC'D
  1113                                              1675
  1116                                              1702

**1441**

    March 1, 2023                    9:00 A.M.

           (In open court without the Jury present.)

       THE COURT:  Good morning.  Be seated.

       We'll take up the issue with respect to
Mr. Waid's testimony over the lunch hour.  It is clear to
me he is not getting on the stand before then.  All right?

       MS. GODESKY:  Yes.

       THE COURT:  Okay.

       THE CLERK:  All rise for the jury.

           (Jury enters.)



           (In open court with the Jury present.)

       THE COURT:  Go ahead and be seated.

       Okay.  Good morning.  Thanks, everyone, for
braving our slippery roads.

       Mr. Hinderaker, are you ready to proceed?

       MR. HINDERAKER:  I am, Your Honor.

       THE COURT:  Go ahead and recall Mr. Whitener
back.

       MR. HINDERAKER:  I would call Mr. Whitener.

       THE COURT:  Whitener.  Come on up, Mr. Whitener.

       THE WITNESS:  Thank you.

       THE COURT:  Just remind you as you're walking up,

### 1682

1  A. No.
2  Q. From your point of view, was the commercial purpose of
3  the license agreement as signed, with the license agreement
4  as signed, if there is, if there are no affiliates of the
5  client, does that change anything in your view regarding
6  the license agreement?
7  A. No.
8  Q. Why not?
9  A. Still with the client.
10 Q. Now, we saw in Mr. Carretta's notice of termination
11 letter that it was effective, excuse me, effective the next
12 day. And he referenced in that letter paragraph 9.3 of the
13 license agreement. So let's just go to that for a moment.
14    Effective termination. We all can read it.
15 Client shall immediately cease using all Fair Isaac's
16 products and so forth.
17 A. Yeah.
18 Q. Okay. And we saw from Mr. Carretta's letter that he
19 specifically pointed out that provision and the
20 consequences of not stopping use.
21    Today, as of today -- well, at any time, did you
22 receive a communication from Chubb & Son that they had
23 stopped using Blaze Advisor?
24 A. I have not.
25 Q. Did you ever receive a return of the documentation or a

### 1683

1  certification that the documentation had been destroyed?
2  A. I have not.
3  Q. Let's turn to the subject matter of ACE American. We
4  saw in earlier testimony that there's a small license
5  agreement between FICO and ACE American. Are you generally
6  familiar with that?
7  A. I am.
8  Q. Does that license agreement have any, any applicability
9  to the use of Blaze Advisor by Chubb & Son, the client in
10 this agreement?
11 A. It does not.
12 Q. When did you first learn that ACE American Insurance
13 was using Blaze Advisor in connection with selling
14 insurance, using Blaze Advisor in the applications that
15 previously had been the ones run by Chubb & Son?
16 A. In this lawsuit.
17 Q. Never before?
18 A. No.
19 Q. So then it's obvious to say that no one from ACE
20 American ever reached out to FICO to your knowledge to try
21 to license Blaze Advisor to use in connection with selling
22 insurance?
23 A. No.
24 Q. I want to now turn to, I want to now turn to
25 standard -- well, I want to now turn to the experience,

### 1684

1  your personal experience in the negotiation of license
2  agreements.
3  A. Okay.
4  Q. And I guess let's begin with personally, speaking of
5  you personally, not me. Speaking of you personally.
6    How many negotiations of -- for Blaze Advisor
7  license fees have you been a part of?
8  A. That would be really hard to say, but it's definitely
9  hundreds and hundreds of them.
10 Q. And is it fair to say that you've been negotiating
11 Blaze Advisor license agreements in one form or another
12 since maybe 2002 or 2000?
13 A. Even before that.
14 Q. And as we noted in 2006 time frame, then you were the
15 person with final authority on pricing. Is that still, was
16 that true still in 2016?
17 A. Yes. In 2016, absolutely.
18 Q. Have you experience in negotiating agreements with
19 clients where, where the license agreement that they have
20 has come to an end, and you're negotiating with them for a
21 new license agreement?
22 A. Yes.
23 Q. And you've had experience where you're negotiating a
24 license agreement with someone who has never been a client
25 as well?

### 1685

1  A. Yes.
2  Q. And you mentioned before that, well, discounting
3  practices have changed. The guidelines for pricing really
4  have not, since 2003?
5  A. Yeah. The core -- the core pricing model has not
6  changed, no.
7  Q. So I would ask you to go to Exhibit 421, please.
8  A. I'm sorry. You said 421?
9  Q. 421. 418. It used to be called 421. Now it's called
10 418. Let's go to 418.
11    This is, as you see, Business Science Enterprise
12 Decision Management Design and Deployment, Tools and
13 Infrastructure Software Global Price List, 10/10/03.
14    I would like to first start by just understanding
15 the pricing methodology that FICO applies for the Blaze
16 Advisor licenses.
17 A. Okay.
18 Q. And let's begin with, with this document, and if you
19 could educate us about how to read it and how to use it.
20 A. Okay.
21 Q. All right? And by the by, it's been in place since
22 2003. Over the decades, what's the reaction, what's the
23 reaction from the marketplace to this methodology that FICO
24 applies in pricing?
25 A. Yeah. Ultimately the named application licensing that