## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION,

        Plaintiff,

    v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY,
a Pennsylvania corporation,

        Defendants.

Court File No.  16-cv-1054 (DTS)

**DEFENDANTS' MEMORANDUM
IN SUPPORT OF THEIR MOTION
FOR JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 52(c) or, in the alternative, Rule 50(a), Defendants Federal Insurance Company and ACE American Insurance Company submit this memorandum of law in support of their motion for judgment for Defendants on FICO's disgorgement claim because Plaintiff Fair Isaac Corporation ("FICO") has not carried its burden of proving a causal nexus between Defendants' use of Blaze Advisor and their revenue.

## INTRODUCTION

FICO contends that it is entitled to disgorge over twenty *billion* dollars of Defendants' profits.  This astounding claim is based on the assertion that 100 cents of every dollar of premium from each and every insurance policy that ever touched an application running Blaze Advisor at any point in its life cycle is "attributable" to the use of Blaze, a back-office software component used in a tiny share of Defendants' software infrastructure

that is concededly interchangeable with any number of other similar business rules management solutions available on the market.  17 U.S.C. § 504(b).

FICO's claim survived summary judgment based on proffered expert opinion purporting to show that Blaze Advisor contributed to Defendants' revenue.  But FICO has now put on its case.  And all it has offered to carry its burden of attributing Defendants' revenue to their alleged infringement is the amount of gross written premium generated by insurance policies that touched applications running Blaze Advisor.  What FICO promised to show at summary judgment but has been unable to show at trial—and, indeed, what all of its witnesses have admitted they do not know—is that any of that revenue is actually *attributable* to Blaze Advisor.  And since that is the legal standard for purposes of disgorgement, FICO has failed utterly to carry its burden of proof on this issue.  The Court should dismiss FICO's profits disgorgement claim under either Rule 52(c) or 50(a).

## LEGAL STANDARD

Federal Rule of Civil Procedure 52 applies "[i]n an action tried on the facts without a jury or with an advisory jury[.]"  Fed. R. Civ. P. 52(a)(1).  That rule thus applies  to FICO's disgorgement claim, which this Court held was an equitable issue to be resolved by the Court rather than the jury.

Under Rule 52(c), "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or

2

defeated only with a favorable finding on that issue."[1]  "In ruling on a Rule 52 motion the trial court need not consider the evidence in a light favorable to the plaintiff and may render judgment for the defendant if it believes the plaintiff's evidence is insufficient to make out a claim."  *Geddes v. Nw. Mo. State Univ.*, 49 F.3d 426, 429 n.7 (8th Cir. 1995).

But for the reasons explained below, judgment would be warranted even under the more stringent Rule 50(a) standard, under which judgment is appropriate if the evidence "is 'so one-sided that one party must prevail as a matter of law.'"  *Adeli v. Silverstar Automotive, Inc.*, 960 F.3d 452, 458 (8th Cir. 2020) (quoting *White v. Union Pac. R.R. Co.*, 867 F.3d 997, 1000 (8th Cir. 2017)).

# ARGUMENT

## I.   FICO's burden is to prove a causal nexus between Defendants' use of Blaze Advisor and their revenue.

Under the Copyright Act, "a copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are *attributable to the infringement* and are not taken into account in computing the actual damages."   17 U.S.C. § 504(b) (emphasis added).   In profits disgorgement, the copyright owner's initial burden is to prove "the infringer's gross revenue" resulting from the infringement.  *Id.*   In meeting this burden, the copyright owner must "demonstrate a nexus" between the alleged infringement and the alleged infringer's

---

[1] "[A] party has been fully heard when [it] rests [its] case." *Echeverria v. Chevron USA Inc.*, 391 F.3d 607, 610 (5th Cir. 2004); *accord McSherry v. City of Long Beach*, 423 F.3d 1015, 1021 (9th Cir. 2005); *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1149 (D.C. Cir. 2004); *Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999); *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 506 (3d Cir. 2005).

revenue. *Andreas v. Volkswagen of Am.*, 336 F.3d 789, 796 (8th Cir. 2003). To do so, it must prove that infringement "contributed to" (*i.e.*, was "attributable to") that revenue. *Id.* at 797; *Furnituredealer.net, Inc. v. Amazon.com, Inc.*, 2022 WL 891462, at *3 (D. Minn. Mar. 25, 2022); *see also On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001) (under the Copyright Act, "gross revenue" must be "reasonably related to the infringement").

Notably, a plaintiff cannot establish the requisite nexus by identifying revenue that is "only remotely and speculatively attributable to the infringement[.]" *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004); *accord* 4 Nimmer on Copyright § 14.03[B][2][a] (Dec. 2022 ed.) ("When an infringer's profits are only remotely and speculatively attributable to the infringement, courts deny recovery to the copyright owner."). Moreover, the fact that an infringing product may be important or valuable to the infringer does not mean that the infringing use contributed to its revenue. "[S]imply saying that copyrighted material may have played an 'important,' 'significant,' or 'meaningful' role' is insufficient" to satisfy the plaintiff's nexus burden, "particularly where, as part of [the defendant's] information technology infrastructure, it comprises only a portion of what enabled [the defendant] to conduct its business profitably." *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, 2013 WL 1775437, at *4 (S.D.N.Y. Apr. 25, 2013) (internal quotation marks omitted) (quoting *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 751 (D. Md. 2003)).

II.    **FICO has presented no evidence of a causal nexus between Defendants' use of Blaze Advisor and their revenue.**

FICO has not met its initial burden of proving a causal nexus between Defendants' use of Blaze Advisor and their revenue.  No witness has testified that Blaze Advisor contributed to Defendants' revenue.  To the contrary:  one by one, FICO's witnesses have conceded on cross-examination that they *do not know* whether Blaze Advisor contributed to revenue.

1.    **Sean Baseman.**  On cross-examination, Baseman squarely admitted that he is "not in a position to say whether Blaze had *any specific impact at all* on Chubb's revenue or profit[.]"  Trial Tr. 185 (emphasis added).  And he conceded that he "would not be capable of quantifying the value that Blaze provides to a customer[.]"  *Id.* at 179-80.  That is because he was "only vaguely familiar with how the software was used at Chubb."  *Id.* at 182.  He has "not done anything in the course of [his] work at FICO to specifically analyze the extent to which Blaze reduced time at Chubb[,]" "cannot identify a particular application that was developed faster at Chubb because of Blaze[,]" and "can't measure or talk about how quickly Chubb was able to make changes to its internal computer applications because of Blaze."  *Id.* at 183-84.  Indeed, he cannot "specifically identify *any insurance product* that Chubb was able to bring to market faster because of Blaze."  *Id.* at 185 (emphasis added).

2.    **Benjamin Baer.**  Likewise, Baer has "no idea what value, if any, that Blaze has had with respect to Chubb's use of it."  *Id.* at 295.

**3. Jean-Luc Marce.** Marce has no more than "a good educated guess" as to "how insurance companies use Blaze[,]" *id*. at 259, as a general matter, and offers nothing whatsoever on how *Chubb*, the insurance company at issue in this case, used it.

**4. Christopher Ivey.** Continuing the theme, Ivey has "no familiarity at all with how Blaze was implemented at Chubb." *Id.* at 608.

**5. Henry Mirolyuz.** Mirolyuz stated that he "would not be able to speak to any of the business benefits achieved through the use of the Blaze Advisor technology or business rules technology." *Id.* at 1022.

**6. Neil Zoltowski.** Zoltowski, FICO's damages expert, "did not endeavor to" offer any opinion on "how much, if any" of FICO's proffered $21 billion in Chubb revenue "is actually connected to Blaze[.]" *Id.* at 1349. Indeed, as explained below, his analysis did not focus on causation or nexus at all. He did not analyze the relative roles of Blaze Advisor and other factors in driving particular sales or applications. *See id.* at 1343-44. Rather, he merely regurgitated Defendants' interrogatory answers that identified premium revenue from every insurance policy processed through any application that incorporated Blaze Advisor. *Id.* 1342 (Q: "And you included all of the money paid by Chubb's customers to purchase if . . . those policies ever ran through a computer application that included Blaze, right?" A: "If it was under one of the writing entities, yes."); *id.* at 1343 (Q: "[W]hen you're talking about revenue, if dollars were paid for a policy that ran through an application including Blaze, you included the dollars?" A: "Yes. That's correct.")

**7. Bick Whitener.** The Court allowed FICO's disgorgement claim to proceed past summary judgment based on Whitener's report, and in particular, on his assertion that

"Blaze Advisor contributed to Defendants' gross revenue from the sale of insurance."  Dkt. 731 at 57; *id.* at 24.  But even before Whitener testified, FICO made clear that he would be offering no such testimony at trial.  Mindful of Whitener's total lack of experience with business rules decision software generally and Blaze Advisor in particular, FICO's counsel stated in no uncertain terms that Whitener is not "a Blaze Advisor expert" and would not "connect[] Blaze Advisor to the selling of insurance."  *Id.* at 1374.  In fact, FICO emphasized that Whitener would not be "touch[ing] [Blaze Advisor] to revenue."  *Id.* at 1378.  Rather, FICO indicated it would rely on Zoltowski, Baseman, Ivey, Baer, and Marce to prove a causal nexus between Blaze Advisor and revenue, *id.* at 1374, 1378—each of whom admitted that they could not draw any concrete, nonspeculative connection between Blaze Advisor and revenue, *see supra* at 5-6.

Then, during his testimony, Whitener repeatedly confirmed that he could not attribute any of Defendants' revenue to the use of Blaze Advisor.  He pointedly acknowledged that he did not know whether integration of Blaze Advisor into Defendants' applications contributed to a *single dollar* of Defendants' revenue.  *Id.* at 1599 (Q:  "But you do not know whether Blaze actually contributed to any increase in revenue or profit at Chubb, correct?"  A:  "[C]orrect.").  Indeed, Whitener made clear that he "did not measure anything."  *Id.* at 1565; *see also id.* at 1599 ("I did not measure anything."); *id.* at 1558 ("I measured none of these things.").  Just as FICO's counsel promised, he could not "connect[] Blaze Advisor to the selling of insurance."  *Id.* at 1374.

But Whitener did not simply concede that topline point.  He also conceded down to every particular, making emphatically clear that he could not tie a cent of revenue to Blaze Advisor.  Among his most crucial admissions were that:

- He spent "less than one second" reviewing the components of CSI Express—a Chubb application that incorporated Blaze Advisor—other than Blaze Advisor itself, and gave "zero thought" to whether he could measure whether Blaze Advisor contributed to the speed of CSI Express.  *Id*. at 1563-64.  He likewise did not measure how significant a role Blaze Advisor played in CSI Express, or its role in that application relative to other software.  *Id.* at 1562.  Indeed, he did not know whether CSI Express increased the speed of responses to requests for quotes at all. *Id.* at 1563.

- He did not know whether Blaze Advisor contributed to the effectiveness of other Chubb applications that incorporated Blaze Advisor: Profitability Indicator, DecisionPoint, Evolution, Adapt, Cornerstone, Premium Booking, TAPS, IRMA, CUW-IM, or CIS Claims.  *Id.* at 1565-69, 1594-95.  He had no basis to refute testimony that Blaze Advisor could easily have been replaced in TAPS by an Excel spreadsheet.  *Id.* at 1568.

- Indeed, he could not say whether Blaze Advisor made any contribution to revenue with respect to any aspect of Defendants' business.  *See, e.g.*, *id*. at 1555 (did not know whether the use of Blaze Advisor reduced Defendants' need for information technology resources); *id.* at 1556-57 (did not know whether Defendants' increased the speed of making renewal offers because of their use of Blaze Advisor); *id.* at

8

1558 (did not know whether Blaze Advisor allowed Defendants to increase speed to market by ensuring regulatory compliance); *id.* at 1558-59 (did not know whether Defendants increased the ease of use for agents and brokers by using Blaze Advisor); *id.* at 1560 (did not know whether Blaze Advisor improved Defendants' ability to define accurate and adequate pricing); *id.* (did not know whether Blaze Advisor permitted Defendants to increase the precision and accuracy of its quotes to customers); *id.* (did not know whether Blaze Advisor increased the precision and adequacy of Defendants' renewal offers); *id.* (did not know whether Blaze Advisor enabled Defendants to grow in the small commercial and mid-market segments).

- He also conceded that defendants use "many, many different technologies to sell insurance," but before rendering his written report, he "didn't do anything to investigate how many other technologies were deployed" at Chubb, and even incorrectly assumed that Defendants could not "possibly be using hundreds of other technologies in addition to Blaze[.]  *Id.* at 1550-51.  And he did not "ma[k]e any effort" to determine those other technologies' contribution to Defendants' revenue. *Id.* at 1551-52.

- He conceded that human judgment drives a substantial portion of Defendants' business, and that Blaze Advisor has no effect on that judgment.  *Id.* at 1544-50.

All of these admissions form the basis of Whitener's crucial topline concession— that he could not connect Blaze Advisor to FICO's revenue.  To the extent Whitener offered broad generalities about the value or importance of Blaze Advisor to Chubb, or technological innovation to insurers generally, that is insufficient to prove nexus.  *IBM*,

2013 WL 1775437, at *4 ("[S]imply saying that copyrighted material may have played an 'important,' 'significant,' or 'meaningful' role is insufficient, particularly where, as part of [the defendant's] information technology infrastructure, it comprises only a portion of what enabled [the defendant] to conduct its business profitably." (internal quotation marks omitted)). The question is not whether Blaze Advisor is generally useful or meaningful—it is whether it contributes to revenue in particular. And on that point, Whitener, by his own admission, offered nothing.[2] That gives away the game on FICO's disgorgement claim.

In sum, not one of FICO's witnesses has drawn a nonspeculative, concrete connection between Defendants' use of Blaze Advisor and their revenue. Instead, FICO's witnesses have consistently disclaimed knowledge of how Defendants used Blaze Advisor and what role it played in their business—much less how it contributed to their revenue. In place of such evidence, FICO offers the little more than its "elevator pitch" for how Blaze might conceivably be useful to the insurance industry in general, an elevator pitch

---

[2] Moreover, the Court should completely discount Whitener's opinions because of his total lack of experience with Blaze Advisor or business rules management software. As Whitener explained on cross-examination, he has never worked in the technology department of an insurance company, Trial Tr. at 1534, and has never used business rules management software in his work for insurance companies, *id.* at 1533-37. At the time he rendered his written reports, he had not written or reviewed peer-reviewed literature regarding rules software or coding rules, *id.* at 1542-43, had not spoken to other rules software vendors about their products, *id.* at 1546, and had not spoken about Blaze Advisor with anyone at Chubb, *id.* at 1545, any of FICO's customers, *id.* at 1546, or anyone in the insurance industry generally, *id.* at 1545. Indeed, he had never used Blaze Advisor at the time of his reports. *Id.* at 1537-38. He was first introduced to Blaze Advisor the day before his deposition through a 90-minute demonstration by FICO having to do with Blaze Advisor's application to college admissions, not insurance. *Id.* at 1540-42. That total lack of relevant qualifications and experience necessarily renders any of his opinions about Blaze Advisor pure speculation.

that bears little resemblance to the reality of how Blaze was actually used at Chubb.  *Id.* at 1160 (Ghislanzoni explaining that he had "never experienced" Blaze Advisor "allowing Chubb to do in one afternoon what otherwise would have taken months").

What's more, FICO's own witnesses have made clear that Blaze Advisor was interchangeable with any number of other business rules management programs—or by software engineers simply writing rules directly with no dedicated rules management software at all.  Former FICO sales executive Lawrence Wachs testified that other business rules management software was "comparable in its functionality[.]"  *Id.* at 741-42, 796. And Ramesh Pandey, called by FICO in its case-in-chief, explained that there is no "functional difference" between Blaze Advisor and Drools, a competitor program, and that in "99 percent of the cases" Defendants' software developers "code the rule by themselves"—*i.e.*, do not use any third-party software at all.  *Id.* at 688-89.  Indeed, Defendants' replacement of Blaze Advisor caused, according to Pandey, no "problems with the efficient functioning of [Defendants'] IT systems."  *Id.* at 706.  Likewise, Claudio Ghislanzoni, Chubb's Chief Enterprise Architect, also called in FICO's case-in-chief, made clear that since the removal of Blaze Advisor from Defendants' systems, he has received no "complaints or concerns about speed or efficiency" or "complaints or concerns about technology problems generally in those computer applications" that had previously used Blaze Advisor.  *Id.* at 1156-57.  To that end, he testified that Blaze Advisor had a "very low rate of adoption"—"[l]ess than one percent[.]"  *Id.* at 1161.  Rate of adoption "describes a scenario where technology adoption is expanding."  *Id.*  That Blaze Advisor's rate of adoption was so low undercuts the claim that it "could allow an insurance company

11

to do in an afternoon what it would normally take months to do." *Id.*  FICO challenged none of this testimony by Ghislanzoni on cross-examination.  Indeed, as Henry Mirolyuz testified, "Blaze Advisor can be replaced"—and was.  *Id.* at 1101.  Even Whitener identified a number of interchangeable alternatives to Blaze Advisor (while conceding that he analyzed none of them).  *Id.* at 1595.

This evidence further undermines FICO's claim that Defendants' revenue is attributable to Blaze Advisor.  Defendants "did not market or sell the [Blaze Advisor] software to [their] customers and there is no evidence that its customers cared what software system [they] used" and "migration to another software system . . . would have little or no effect."  *IBM*, 2013 WL 1775437, at *4 (internal quotation marks omitted); *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 2013 WL 5970065, at *11 (S.D.N.Y. Nov. 8, 2013) (finding no "causal link" between infringement and revenue because, among other reasons, a witness "stated explicitly that he did not know whether the revenues would have been any different had a processing system other than BankTrade been used by ABN").

FICO's only evidence of nexus is the revenue associated with policies that touched Blaze Advisor themselves, without any additional evidence that Blaze Advisor actually contributed to that revenue—that is what Zoltowski conceded on cross-examination.  *See supra* at 6.  Put simply, FICO's argument is: "Chubb generated revenue selling insurance, Chubb licensed Blaze, therefore Chubb's revenue is due to Blaze."

But revenue data alone cannot carry FICO's burden of proving at trial that Defendants' alleged infringement contributed to their revenue.  *Complex Sys.*, 2013 WL 5970065, at *13 (rejecting a claim for disgorgement of all revenue that "flowed through"

infringing software).  Indeed, during his cross-examination, Zoltowski made clear just how *disconnected* his crude gross written premium figures are from the actual drivers of Defendants' business:  he did not determine the role Blaze Advisor played in the purchase of any particular policy, *id.* at 1343, nor "adjust [his] gross written premium numbers based on Blaze's role in each particular application," *id.* at 1343-44, nor "adjust those revenue numbers to account for the role that folks at Chubb had in coming up with particular rules that were deployed through Blaze," *id.* at 1344, nor "adjust the revenue numbers at all to account for costs that Chubb would have incurred implementing Blaze . . . like time spent training software engineers on how to use the product," *id.*; *see Complex Systems*, 2013 WL 5970065, at *12 (no nexus where, while defendant's "capacity to provide trade finances services to its customers was perhaps aided by its use of BankTrade, the services provided by ABN are the result of a number of other factors as well.  Indeed, ABN uses a number of software applications and other technologies, in addition to skilled sales and trade finance personnel" (citation omitted)).

The bluntness of Zoltowski's analysis, paired with the many admissions by FICO's witnesses that there is no way of determining whether the use of Blaze Advisor contributed to Defendants' revenue, show that the only way a causal connection can be drawn between Blaze Advisor and *all revenue* associated with *all policies* that merely *touched* Blaze Advisor is rank "speculati[on.]"  *Polar Bear Prods., Inc.*, 384 F.3d at 711.  Zoltowski made that clear, conceding that even he "did not endeavor to"—and could not—establish a causal nexus between Defendants' use of Blaze Advisor and the revenues he discussed.  Trial Tr. at 1349.  And Whitener likewise did not purport to "connect[] Blaze Advisor to the selling

13

of insurance." *Id.* at 1374; *see Bayoh v. Afropunk LLC*, 2020 WL 6269300, at *6 (S.D.N.Y. Oct. 26, 2020) (finding no nexus where an expert "acknowledged that he is not providing any opinion on causality[,]" and "[w]ithout expert testimony explaining the basis for a finding that all of Afropunk's revenue over a four-year period is reasonably related to the infringement, [the expert's] calculation of Afropunk's gross revenues is irrelevant and must be excluded as highly prejudicial." (internal quotation marks and citation omitted)).

There is *no* evidence in the record concretely establishing that Blaze Advisor *in fact* "contributed to" Defendants' revenue. *Andreas*, 336 F.3d at 797. All that FICO has is testimony that Blaze Advisor may have been useful to Chubb. But again, "simply saying that copyrighted material may have played an 'important,' 'significant,' or 'meaningful' role is insufficient, particularly where, as part of [the defendant's] information technology infrastructure, it comprises only a portion of what enabled [the defendant] to conduct its business profitably." *IBM*, 2013 WL 2013 WL 1775437, at *4 (internal quotation marks omitted); *see Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 2013 WL 5970065, at *12 (observing, in finding no nexus, that "the evidence before the Court shows that while ABN's capacity to provide trade finance services to its customers was perhaps aided by its use of BankTrade, the services provided by ABN are the result of a number of other factors as well"); *Bayoh*, 2020 WL 6269300, at *6 (merely positing "that it is 'reasonable' to assume that viewing Bayoh's photographs in Afropunk's marketing materials could be a motivating factor for attending the festival . . . is asking the jury to engage in speculation" (internal quotation marks omitted)).

Because FICO has failed to identify gross revenue "attributable" to Defendants' alleged infringement, 17 U.S.C. § 504(b), Defendants are entitled to judgment as to FICO's profits disgorgement claim.[3]

## CONCLUSION

The Court should enter judgment for Defendants' on FICO's profits disgorgement claim under Rule 52(c), or, in the alternative, Rule 50(a).

Dated:  March 2, 2023

*/s/ Terrence J. Fleming*
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Ryan C. Young (#0397751)
ryoung@fredlaw.com
Panhia Vang (#399444)
pvang@fredlaw.com

**Fredrikson & Byron, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425

---

[3] This conclusion is the same under Rule 50 and Rule 52.  At summary judgment, the Court found that FICO's proffered revenue figure *in combination with* other "evidence about how Blaze Advisor contributed to Defendants' gross revenue from the sale of insurance"—Whitener's report, *see* Dkt. 731 at 24—was "sufficient to demonstrate a genuine dispute of material fact as to disgorgement of profits and, therefore, preclude summary judgment on this issue." Dkt. 731 at 57. Here, while FICO has presented evidence of Defendants' revenue, it has—as described above—completely failed to adduce any evidence that "Blaze Advisor contributed to Defendants' gross revenue from the sale of insurance[.]" *Id.* Indeed, every one of its witnesses who testified on the question—including Whitener—admitted that they could not determine whether even a single dollar of Defendants' revenue was attributable to Blaze Advisor.  So, even if judgment as a matter of law was not warranted as to FICO's disgorgement claim on the summary judgment record, it is fully warranted on the trial record.  *See Adeli*, 960 F.3d at 458 (judgment as a matter of law appropriate where the evidence "is so one-sided that one party must prevail as a matter of law" (internal quotation marks omitted)); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (summary judgment appropriate "[w]here the record *taken as a whole* could not lead a rational trier of fact to find for the non-moving party" (emphasis added)).

(612) 492-7000 (tel.)
(612) 492-7077 (fax)

Leah Godesky (Admitted Pro Hac Vice)
lgodesky@omm.com
Anton Metlitsky (Admitted Pro Hac Vice)
ametlitsky@omm.com
Daryn Rush (Admitted Pro Hac Vice)
drush@omm.com
Roxana Guidero (Admitted Pro Hac Vice)
rguidero@omm.com

**O'Melveny & Myers LLP**
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000

*Attorneys for Federal Insurance Company
and ACE American Insurance Company*

16