Exhibit 1

Fair Isaac Corporation v. Federal Insurance
Company et al.
Court File No. 16-cv-1054

**11**

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
 2
 3    ------------------------------------------
                                  )
 4    Fair Isaac Corporation,     )  File No. 16-cv-1054(DTS)
      a Delaware Corporation,     )
 5              Plaintiff,        )
                                  )
 6    v.                          )
                                  )
 7    Federal Insurance Company,  )  Courtroom 14W
      an Indiana corporation,     )  Minneapolis, Minnesota
 8    and ACE American Insurance  )  Thursday February 16, 2023
      Company, a Pennsylvania     )  9:12 a.m.
 9    Corporation,                )
                                  )
10              Defendants.       )
                                  )
11    ------------------------------------------
12
13
14          BEFORE THE HONORABLE DAVID T. SCHULTZ
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16
17           (JURY TRIAL PROCEEDINGS - VOLUME II)
18
19
20
21
22
           Proceedings recorded by mechanical stenography;
23     transcript produced by computer.
24                        * * *
25
```

**12**

```
 1    APPEARANCES:
 2    For Plaintiff:       MERCHANT & GOULD P.C.
                           BY:  ALLEN W. HINDERAKER
 3                              HEATHER J. KLIEBENSTEIN
                                PAIGE S. STRADLEY
 4                              MICHAEL A. ERBELE
                                JOSEPH W. DUBIS
 5                              GABRIELLE L. KIEFER
                           150 South Fifth Street, #2200
 6                         Minneapolis, Minnesota 55402
 7    For Defendants:      FREDRIKSON & BYRON
                           BY:  TERRENCE J. FLEMING
 8                              LEAH C. JANUS
                                CHRISTOPHER D. PHAM
 9                              RYAN C. YOUNG
                                PANHIA VANG
10                         200 South Sixth Street, #4000
                           Minneapolis, Minnesota 55402
11
                           O'MELVENY & MYERS LLP
12                         BY:  LEAH GODESKY
                                ANTON METLITSKY
13                              DARYN E. RUSH
                                ROXANA GUIDERO
14                         Times Square Tower
                           7 Times Square
15                         New York, New York 10036
16    Court Reporters:     RENEE A. ROGGE, RMR-CRR
                           KRISTINE MOUSSEAU, CRR-RPR
17                         MARIA V. WEINBECK, RMR-FCRR
                           PAULA RICHTER, RMR-CRR-CRC
18                         United States District Courthouse
                           300 South Fourth Street, Box 1005
19                         Minneapolis, Minnesota 55415
20
                                  * * *
21
22
23
24
25
```

**13**

```
 1              INDEX - 2/16/23 - VOL. 2
 2                                          PAGE:
 3    Plaintiff Opening Statement.............................. 13
 4    Defendant Opening Statement.............................. 38
 5
 6    PLAINTIFF WITNESSES:
 7    SEAN BASEMAN:
 8       Direct Examination by Mr. Hinderaker.............. 90
 9       Cross Examination by Ms. Godesky................... 175
10       Redirect Exam by Mr. Hinderaker................... 190
11
12    JEAN-LUC MARCE:
13       Direct Examination by Ms. Kliebenstein............. 193
14
15
16    JOINT EXHIBITS:
17    J1, J2................................................. 100
18
19    PLAINTIFF EXHIBITS:
20    839-850............................................. 236
21    1139-1149............................................. 236
22    1151-1165............................................. 236
23
24
25
```

**14**

```
 1                         (IN OPEN COURT)
 2                         (Jury seated)
 3                         (9:12)
 4           THE COURT:  Good morning, everyone.  Please be
 5    seated.
 6           Mr. Hinderaker, are you ready?
 7           MR. HINDERAKER:  I am, Your Honor.
 8           THE COURT:  All right.  You may proceed.  Thank
 9    you.
10           A JUROR:  Your Honor, our screen doesn't work.
11           THE COURT:  It's on now?
12           A JUROR:  Yes.
13           THE COURT:  Everyone else, your screens are all
14    up?  Okay.  Good.
15           MR. HINDERAKER:  Good morning, everyone.
16           Yesterday Judge Schultz mentioned about the rule
17    of law, and for me, that's the very best reason that there
18    is for me to be a lawyer.  I know that all of us have
19    something else to do than be here, but I do hope that
20    regardless of the outcome, regardless of -- for my client or
21    against my client, regardless of the outcome, that after our
22    weeks of work together, you think that this effort and this
23    experience has been worthwhile as well because we all are at
24    the moment participating together in the rule of law of this
25    country.
```

**EXHIBIT 1**

179

1  **A.** Oh, yes.  No, they would certainly require other
2  **software components.**
3  **Q.** Okay.  Blaze is also typically added to customers'
4  already existing computer applications, right?
5  **A.** Yes.
6  **Q.** And large companies may sometimes have hundreds of
7  different components working with Blaze in a single computer
8  application?
9  **A.** Yes.
10  **Q.** So when Blaze is used in these applications at large
11  companies like Chubb, Blaze is one component of a
12  multi-faceted complex system?
13  **A.** Yes.
14  **Q.** We can agree that when FICO sells Blaze to a client like
15  Chubb, Blaze itself does not contain the actual rules,
16  right?
17  **A.** Correct.
18  **Q.** And the actual idea of all of the rules comes from
19  humans?
20  **A.** Correct.
21  **Q.** And you testified during your direct examination that
22  Blaze Advisor provides some value to insurance companies,
23  right?
24  **A.** Yes.
25  **Q.** As a general matter, though, you agree that it would be

180

1  very difficult to try to measure the value that Blaze
2  provides to a particular company?
3  **A.** Difficult, yes, but not unachievable.
4  **Q.** But you personally would not be capable of quantifying
5  the value that Blaze provides to a customer?
6  **A.** Correct, in a monetary sense.
7  **Q.** So let's talk a little bit more about the world of
8  insurance.  I think you said during direct that you have a
9  cursory understanding of insurance, right?
10  **A.** That is correct.
11  **Q.** That means fairly basic, right?
12  **A.** Agreed.
13  **Q.** You have never been an insurance agent or a broker?
14  **A.** No.
15  **Q.** You have never been an insurance underwriter?
16  **A.** No.
17  **Q.** You have never worked in the technology group of an
18  insurance company?
19  **A.** Nope.
20  **Q.** And you've never worked on the claims side of an
21  insurance company?
22  **A.** No.
23  **Q.** You've never held any position at an insurance company?
24  **A.** Nope.  Only a customer.
25  **Q.** And you haven't conducted, as part of your work at FICO,

181

1  any survey of Chubb customers regarding why they purchase
2  insurance from Chubb?
3  **A.** Repeat the question.
4  **Q.** As part of your work at FICO, you haven't ever set out
5  to conduct a survey of Chubb customers to find out why
6  they're purchasing insurance from Chubb?
7  **A.** I have not, no.
8  **Q.** You don't even know what the term gross written premium
9  or GWP means, right?
10  **A.** I do not.
11  **Q.** You spoke during direct about some problem-solving
12  exercises you did for some unnamed insurance companies at
13  the beginning of your discussion with Mr. Hinderaker.
14      Do you remember that?
15  **A.** Yes.
16  **Q.** That was not specific to Chubb.  That was your general
17  experience?
18  **A.** General experience, correct.
19  **Q.** And then you started talking about Chubb and you said it
20  was apparent that Blaze was central to Chubb's systems,
21  right?
22  **A.** Yes.
23  **Q.** You said it was pivotal?
24  **A.** Yes.
25  **Q.** Correct?

182

1  **A.** Correct.
2  **Q.** But when it comes to the use of Blaze at Chubb, you are
3  only vaguely familiar with how the software was used, right?
4  **A.** I was very familiar with how the software was used in
5  **the context of everything else that they were doing,**
6  **correct.  But to what actual decisions they were using it,**
7  **no.**
8  **Q.** Is it true that you were only vaguely familiar with how
9  the software was used at Chubb?
10  **A.** Yes.
11  **Q.** All you knew was that Blaze may have been used in an
12  underwriting and claim fraud application, but beyond that,
13  you didn't have any intimate knowledge of how Chubb actually
14  used Blaze, correct?
15  **A.** Yes.
16  **Q.** If we could put up the fourth slide that you used during
17  your direct examination, Vanessa?
18      MR. HINDERAKER:  The one that's numbered 4.
19      MS. GODESKY:  Yes.  Thank you.
20  BY MS. GODESKY:
21  **Q.** So this slide is titled "The Business Value of Blaze
22  Advisor," right, Mr. Baseman?
23  **A.** Yes.
24  **Q.** And the first bullet says, Blaze reduces the time and
25  costs to develop decision-making applications.

**EXHIBIT 1**

183

1   **A.** Yes.
2   **Q.** And that's a general statement, right, Mr. Baseman? You
3   have not done anything in the course of your work at FICO to
4   specifically analyze the extent to which Blaze reduced time
5   at Chubb?
6   **A.** Correct.
7   **Q.** And then your third bullet says, new applications can be
8   developed and changes to existing applications can be made
9   faster than was possible before Blaze, right?
10  **A.** Yes.
11  **Q.** But you haven't analyzed and you don't have any
12  information from the course of your work at FICO that allows
13  you to say whether it's true that new applications were
14  developed faster at Chubb because of Blaze, correct?
15  **A.** Not so.  So we do have customers that continue
16  **relationships with FICO, which they talk about how much**
17  **value that they've received and we have those kind of**
18  **conversations.**
19  **Q.** But specifically at Chubb, you cannot identify a
20  particular application that was developed faster at Chubb
21  because of Blaze?
22  **A.** Only through heuristic conversations, yes.
23  **Q.** And you also can't measure or talk about how quickly
24  Chubb was able to make changes to its internal computer
25  applications because of Blaze.  You haven't measured that,

184

1   right?
2   **A.** Of their existing ones?
3   **Q.** Correct.
4   **A.** Correct.
5   **Q.** Your fourth bullet says, each insurance policy requires
6   a unique set of rule statements for deciding on whether to
7   offer an applicant a policy and at what price, right?
8   **A.** Yes.
9   **Q.** But just to be clear, you have not studied the specific
10  policies that Chubb offers and figured out exactly which
11  rules were being run against which lines of business?
12  **A.** No.
13  **Q.** Your fifth bullet is Blaze enhances business agility
14  because rule statement changes can be made quickly, correct?
15  **A.** Yes.
16  **Q.** But you didn't get any information in the course of your
17  work at FICO in terms of how quickly Chubb was implementing
18  rule changes, right?
19  **A.** Not necessarily, no.  So in the -- can I elaborate?
20  **Q.** Not necessarily, no, is good for now.  Thank you.
21       And you also don't have any specific information
22  on whether they actually did implement rule changes at
23  various points in time, correct?
24  **A.** No.  They certainly did make various rule changes, yes.
25  **Q.** Can you specifically identify rule changes that were

185

1   made and whether they were made faster at particular points
2   in time because of Blaze?
3   **A.** Only heuristically, yes.
4   **Q.** Your sixth bullet talks about rule statements for
5   decision can be changed faster, new insurance products can
6   be brought to market faster, each product being a unique set
7   of rule statements, right?
8   **A.** Correct.
9   **Q.** Can you specifically identify any insurance product that
10  Chubb was able to bring to market faster because of Blaze?
11  **A.** No.
12  **Q.** And based on all of this, Mr. Baseman, you are not in a
13  position to say whether Blaze had any specific impact at all
14  on Chubb's revenue or profit, correct?
15  **A.** Mathematically, no.
16  **Q.** Okay.  So I want to talk about briefly what goes into
17  removing Blaze from a computer application.  If a large
18  company has integrated Blaze into multiple applications, it
19  can be complex to remove the software, correct?
20  **A.** Potentially.
21  **Q.** And it could take days, months or even years to unravel
22  from internal systems, correct?
23  **A.** To unravel -- potentially.
24  **Q.** And you're saying potential because there's no typical
25  length of time.  It's going to depend on the nature of the

186

1   company, right?
2   **A.** It would be dependent on the nature of how the
3   **integration was done, what their software development life**
4   **cycles were, yes.**
5       MS. GODESKY:  I'm almost done, Your Honor, if I --
6       THE COURT:  That's fine.
7   BY MS. GODESKY:
8   **Q.** Now, the amount of time you spent working on Blaze has
9   shifted over time, correct?
10  **A.** Yes.
11  **Q.** And it has declined in recent years, fair?
12  **A.** Yes.
13  **Q.** In 2016, you were spending about 80 percent of your time
14  on Blaze, right?
15  **A.** 2016? Yes.
16  **Q.** By 2021, when you'd provided deposition testimony in
17  this case, you were only spending about 10 percent of your
18  time on Blaze?
19  **A.** Correct.
20  **Q.** And that's because there was the introduction of this
21  new FICO product called Decision Modeler, the cloud-based
22  product, right?
23  **A.** Partially, yes.
24  **Q.** And for the most part, Decision Modeler, the cloud-based
25  product, and Blaze do the same things?

**EXHIBIT 1**

**239**

```
 1            UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
 2
 3   ------------------------------------
                                      )
 4   Fair Isaac Corporation,          )  File No. 16-cv-1054(DTS)
     a Delaware Corporation,          )
 5                                    )
          Plaintiff,                  )
 6                                    )
     v.                               )
 7                                    )
     Federal Insurance Company,       )  Courtroom 14W
 8   an Indiana corporation,          )  Minneapolis, Minnesota
     and ACE American Insurance)         Friday, February 17, 2023
 9   Company, a Pennsylvania          )  8:40 a.m.
     Corporation,                     )
10                                    )
          Defendants.                 )
11   ------------------------------------
12
13
14        BEFORE THE HONORABLE DAVID T. SCHULTZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16        (JURY TRIAL PROCEEDINGS - VOLUME III)
17
18
19
20
21
22   Proceedings recorded by mechanical stenography; transcript
     produced by computer.
23
                  * * *
24
25
```

**240**

```
 1   APPEARANCES:
 2   For Plaintiff:       MERCHANT & GOULD P.C.
 3                        BY:  ALLEN W. HINDERAKER
                               HEATHER J. KLIEBENSTEIN
                               PAIGE S. STRADLEY
 4                             MICHAEL A.
                               JOSEPH W. DUBIS
 5                             GABRIELLE L. KIEFER
                         150 South Fifth Street, #2200
 6                       Minneapolis, Minnesota 55402
 7   For Defendants:     FREDRIKSON & BYRON
                         BY:  TERRENCE J. FLEMING
 8                             LEAH C. JANUS
                               CHRISTOPHER D. PHAM
 9                             RYAN C. YOUNG
                               PANHIA VANG
10                       200 South Sixth Street, #4000
                         Minneapolis, Minnesota 55402
11
                         O'MELVENY & MYERS LLP
12                       BY:  LEAH GODESKY
                               ANTON METLITSKY
13                             DARYN E. RUSH
                               ROXANA GUIDERO
14                       Times Square Tower
                         7 Times Square
15                       New York, New York 10036
16   Court Reporters:    RENEE A. ROGGE, RMR-CRR
                         KRISTINE MOUSSEAU, CRR-RPR
17                       MARIA V. WEINBECK, RMR-FCRR
                         PAULA RICHTER, RMR-CRR-CRC
18                       United States District Courthouse
                         300 South Fourth Street, Box 1005
19                       Minneapolis, Minnesota 55415
20
                              * * *
21
22
23
24
25
```

**241**

```
 1                I N D E X
                                              PAGE
 2
 3   JEAN-LUC MARCE
        Cross-Examination by Mr. Fleming        254
 4      Redirect Examination by Ms. Kliebenstein 266
 4
 5   BENJAMIN BAER
        Direct Examination by Mr. Erbele        269
 5      Cross-Examination by Mr. Fleming        293
 6      Redirect Examination by Mr. Erbele      300
 7   RUSSELL SCHREIBER - DEPOSITION
        Examination by Ms. Janus                310
 8
 9   BENJAMIN BAER - OFFER OF PROOF
        Direct Examination by Mr. Erbele        367
 9      Cross-Examination Mr. Fleming           390
10
11   RUSSELL SCHREIBER - DEPOSITION
        Examination by Ms. Janus                401
11      Examination by Mr. Hinderaker           438
12
13   JANDEEN BOONE
        Direct Examination by Mr. Hinderaker    441
13      Cross-Examination by Ms. Godesky        489
14
15   Offer of Proof                            367
16   PLAINTIFF EXHIBITS                        REC'D
     133                                        308
17   145                                        460
     P1171                                      242
18   P1172                                      242
     P1174                                      242
19
20
21
22
23
24
25
```

**242**

```
 1              (IN OPEN COURT)
 2              (8:40 a.m.)
 3        THE COURT:  All right.  Good morning, everyone.
 4        We're on the record in the matter of Fair Isaac
 5   Corporation versus Federal, et al., Civil Number 16-1054.
 6        We're here, all lawyers, assembled outside the
 7   presence of the jury so I can tell you what we're going to
 8   do regarding the various case studies, white papers and
 9   consultant reports.  I'm going to tell you first what the
10   ruling is, and then I'm going to give you detailed rationale
11   about why I'm doing what I'm doing.
12        So I'm going to exclude the following exhibits:
13   P1024, P1025, P1028, P295, P932, and P1170.
14        I will allow in P1171, P1172, and P1174 with some
15   redactions to two of those documents.
16        So, first, as regards P1024, P1025, and P1028,
17   these were produced to the defendants six weeks ago as
18   supplementation of prior discovery, but on the face of the
19   documents they were written in 2021.  And so I'm going to
20   exclude them on that basis, not because they should have
21   been produced in discovery, discovery was closed by then,
22   but the supplementation is too late.
23        I will have further comments about the consultant
24   report that is, I believe, P10 -- I believe it's 1024.  All
25   right.
```

**EXHIBIT 1**

**259**

1   A.   No, I'm not familiar with that.
2   Q.   And you're not familiar with how insurance companies use
3   Blaze, are you?
4   A.   Only from a good educated guess.  We -- based on what
5   we've been told by our internal teams, about product
6   management team, we know what kind of things their insurance
7   may use rules for, so -- and we have actually built some
8   examples based on insurance claims use cases, but this
9   example is more like my examples base on what our
10  understanding is, but we have no expertise really in this
11  area.
12  Q.   So when I took your deposition back in January of
13  2021 -- if you could turn to page 90 of that deposition
14  transcript.
15  A.   90.  Yes.  Go ahead.
16  Q.   And on lines 16 to 18, in response to the question, "Are
17  you familiar with how insurance companies use Blaze
18  Advisor," your response was, "No, I'm not."
19  A.   That's correct.  I have no expertise in that.
20  Q.   Okay.  Now, to determine how important or useful that
21  Blaze would be to any specific customer, you would have to
22  know the customer is using Blaze, right?
23  A.   Right.
24  Q.   Would you not be able to do that without taking a deep
25  dive into how their IT systems work.

**260**

1   A.   Well, I don't have expertise.  I don't know exactly how
2   they build the system, but from, indirectly, from our per
3   marketing, per management says teams, we know indirectly how
4   product customers use our products, so we have an overall
5   understanding of that.
6   Q.   Okay.  Could you turn to page 111 of your deposition?
7   A.   111, yes.
8   Q.   And starting at line 2 in response to the question, "And
9   I guess what I'm saying is to tell how important Blaze is in
10  any specific customer, you would have to look at how that
11  customer is using Blaze within its systems," and your
12  response was "Right."  Correct?
13  A.   Yes, to be precise in one particular case, you have to
14  look at the particular case.  So, generally speaking, we
15  know roughly how the product is used by our customers, but
16  only on general terms.  For a specific case you have to look
17  at the very specific system.
18  Q.   But in response to my question, when I asked you to
19  "tell how important Blaze is in any specific customer, you
20  would have to look at how that customer is using Blaze
21  within its system," and you said, "Right."  Correct?
22  A.   Correct.
23  Q.   And in response to the question, "So you wouldn't be
24  able to tell this without taking sort of a deep dive into
25  how their IT systems work," and your answer was, "That's

**261**

1   correct."
2   A.   That's correct.
3   Q.   Okay.  Now, you don't know how Chubb used Blaze?
4   A.   Only inferring from all of our use cases we've heard
5   about and again from general knowledge in this area.
6   Q.   Could you turn to page 70?
7   A.   70, yes.
8   Q.   Your response to the question, "Did you ever have any
9   knowledge of how the defendants in this case were using the
10  Blaze software at your company," your response was "No, I do
11  not."
12  A.   That's correct.
13  Q.   And that was a truthful answer, correct?
14  A.   Yes.
15  Q.   Okay.  And you don't know the Chubb applications that
16  used Blaze?
17  A.   I am not familiar with any specifics in their
18  application.
19  Q.   You don't know how many of Chubb software applications
20  use Blaze?
21  A.   Correct.
22  Q.   And you don't know the purpose of Chubb software
23  applications that use Blaze?
24  A.   No, I was not involved in their software applications.
25  Q.   Were you even aware that Chubb was a customer of FICO

**262**

1   prior to this lawsuit?
2   A.   Only because I remember, I recall some -- I have vague
3   memory of interactions with Chubb.  I don't remember the
4   years, but I remember the name from past interactions.
5   Q.   Well, you don't recall having any meeting with Chubb
6   personnel?
7   A.   Not specific meetings, no.
8   Q.   Now, Blaze is not functional as sold; is that right?
9   A.   Could you rephrase the question?  I'm not sure what you
10  mean "functional."
11  Q.   Sure.  It cannot be used out of the back.  It's not
12  usable as a stand-alone software?
13  A.   It is.  You can be installing Blaze Advisor and start
14  using it.
15  Q.   But Blaze is used with software application that provide
16  business rule functionality; is that right?
17  A.   So you can -- so the typical structure of customer
18  applications involve some elements of Blaze Advisor through
19  the server and some elements of some various components that
20  their customers have bid.
21       You could also consider the Blaze Advisor as a
22  stand-alone thing and start it and use it as it is, without
23  having additional components.  It could also be used
24  directly without any such master application.
25  Q.   Could you turn to page 109, please?

**EXHIBIT 1**

**295**

1  right?
2  A.  I have an interest to represent the value that I am
3  communicated to by our customers.
4  Q.  And your goal is for your salespeople to sell as many
5  products that they can at the highest price they can?
6  A.  I suppose that's true.
7  Q.  Okay.  Now, you're not involved with regard to the sales
8  of Blaze to Chubb, right?
9  A.  I was not.
10  Q.  Okay.  You didn't have any involvement with Chubb during
11  your time at FICO, correct?
12  A.  I have not.
13  Q.  All right.  You don't even know the salesperson who was
14  involved in that sale; is that correct?
15  A.  I don't.
16  Q.  Now, you don't have any knowledge of Chubb's actual use
17  of Blaze, right?
18  A.  I do not.
19  Q.  So you have no idea what value, if any, that Blaze has
20  had with respect to Chubb's use of it?
21  A.  Not Chubb specifically, no, I don't.
22  Q.  Now, Blaze is a business process tool, a decision
23  rule software, and you would agree that it has no
24  functionality until the rules are created and inserted into
25  the software?

**296**

1  A.  No different than Microsoft Office.
2  Q.  Okay.  And I wasn't asking about Microsoft Office, but
3  with regard to Blaze in particular.
4  A.  Again, like no enterprise software, you need to add
5  value to it, yes.
6  Q.  And the reason is it's a general tool.  It requires very
7  distinct authorship and unique rules that connect back to
8  the particular business, right?
9  A.  Correct, like most software.
10  Q.  And whether Blaze is useful to a customer depends in
11  part on the quality and usefulness of the actual rules
12  created and implemented by the customer?
13  A.  That's correct.
14  Q.  And you would agree with Mr. Marce that the quality of
15  the rules are very significant with regard to the efficacy
16  of the applications that use Blaze?
17  A.  The efficacy of the software is predominantly controlled
18  by the user itself of the software, that is correct.  It is
19  a tool and not a solution.
20  Q.  Okay.  Now, when Chubb purchased Blaze, Chubb had to
21  create and implement the rules to put into the software,
22  correct?
23  A.  I would presume so.  I was not there.
24  Q.  FICO had no part in it?
25  A.  Again, I wasn't even at the company at the time.

**297**

1  Q.  Okay.  So you don't have any knowledge who was involved
2  in the development of the rules that were implemented in
3  Blaze for Chubb's use?
4  A.  I do not.
5  Q.  You have no knowledge of the actual rules created and
6  implemented in Blaze by Chubb?
7  A.  I do not.
8  Q.  You don't know how many business rules were loaded, how
9  many?
10  A.  I do not.
11  Q.  You don't know what type of business rules?
12  A.  I do not.
13  Q.  Could you turn to Exhibit 1171.
14  A.  Yes, sir.
15  Q.  On the bottom left hand, there's a reference to "New
16  Blaze Advisor 7.4 authoring features empower greater
17  business-user control and ease-of-use without requiring
18  technical assistance" and it "now supports machine learning
19  to further refine business decisions."  Right?
20  A.  Yes.
21  Q.  And you realize that the Blaze version at issue in this
22  trial is 7.1, not 7.4, right?
23  A.  I wasn't aware of that, but okay.
24  Q.  All right.  And there are references -- well, let's go
25  to the last page, page 3.

**298**

1       Now, I noted when you were asked about what
2  companies use Blaze that you identified a number of
3  companies except the very first one that's identified in
4  this report, right?  And what is that very first company
5  that's identified?
6  A.  Southwest Airlines.
7  Q.  Southwest Airlines.  Now, why didn't you identify that
8  company as the one that was using Blaze rules?
9  A.  I missed it, to be honest with you.
10  Q.  You missed the first one?
11  A.  I missed the first one.
12  Q.  It wasn't because of the problems that they've been
13  having, as has been publicized lately?
14  A.  Actually, no.  And to the best of my knowledge, in my
15  conversations with Southwest, our software has nothing to do
16  with their problems.
17       MR. FLEMING:  Objection, nonresponsive, hearsay.
18       THE COURT:  That objection is sustained.  The
19  answer will be stricken.
20       The jury is instructed to disregard the answer.
21  BY MR. FLEMING:
22  Q.  Let's look at Exhibit 1172.  There's a number of
23  benefits listed on the left.  And you don't know if Chubb
24  received any of those benefits through its use of Blaze, do
25  you?

## EXHIBIT 1

**516**

```
 1            UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
 2
 3   ------------------------------------
                              )
 4   Fair Isaac Corporation,  )  File No. 16-cv-1054(DTS)
     a Delaware Corporation,  )
 5                            )
          Plaintiff,          )
 6                            )
     v.                       )
 7                            )
     Federal Insurance Company,)  Courtroom 14W
 8   an Indiana corporation,  )  Minneapolis, Minnesota
     and ACE American Insurance)  Tuesday, February 21, 2023
 9   Company, a Pennsylvania  )  8:54 a.m.
     Corporation,             )
10                            )
          Defendants.         )
11   ------------------------------------
12
13
14      BEFORE THE HONORABLE DAVID T. SCHULTZ
     UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16      (JURY TRIAL PROCEEDINGS - VOLUME IV)
17
18
19
20
21
22      Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23
                    * * *
24
25
```

**517**

```
 1   APPEARANCES:
 2     For Plaintiff:      MERCHANT & GOULD P.C.
                           BY:  ALLEN W. HINDERAKER
 3                              HEATHER J. KLIEBENSTEIN
                                PAIGE S. STRADLEY
 4                              MICHAEL A. ERBELE
                                JOSEPH W. DUBIS
 5                              GABRIELLE L. KIEFER
                           150 South Fifth Street, #2200
 6                         Minneapolis, Minnesota 55402
 7     For Defendants:     FREDRIKSON & BYRON
                           BY:  TERRENCE J. FLEMING
 8                              LEAH C. JANUS
                                CHRISTOPHER D. PHAM
 9                              RYAN C. YOUNG
                                PANHIA VANG
10                         200 South Sixth Street, #4000
                           Minneapolis, Minnesota 55402
11
                           O'MELVENY & MYERS LLP
12                         BY:  LEAH GODESKY
                                ANTON METLITSKY
13                              DARYN E. RUSH
                                ROXANA GUIDERO
14                         Times Square Tower
                           7 Times Square
15                         New York, New York 10036
16     Court Reporters:    RENEE A. ROGGE, RMR-CRR
                           KRISTINE MOUSSEAU, CRR-RPR
17                         MARIA V. WEINBECK, RMR-FCRR
                           PAULA RICHTER, RMR-CRR-CRC
18                         United States District Courthouse
                           300 South Fourth Street, Box 1005
19                         Minneapolis, Minnesota 55415
20
                                   * * *
21
22
23
24
25
```

**518**

```
 1                  I N D E X
                                                  PAGE
 2
     JANDEEN BOONE
 3     Cross-Examination (Resumed) By Ms. Godesky     520
       Redirect Examination By Mr. Hinderaker         538
 4
     CHRISTOPHER PATRICK IVEY
 5     Direct Examination By Ms. Kliebenstein         539
       Cross Examination By Ms. Janus                 597
 6     Redirect Examination By Ms. Kliebenstein       612
 7   RAMESH PANDEY
       Cross Examination By Mr. Hinderaker            621
 8     Direct Examination                             684
       Recross Examination By Mr. Hinderaker          707
 9
10
11
12   DEFENDANTS' EXHIBITS                           REC'D
       D280                                           533
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**519**

```
 1                  8:54 A.M.
 2
 3          (In open court with the Jury present.)
 4          THE COURT:  Go ahead and be seated.
 5          Good morning, Members of the Jury.  I hope you all
 6   had a good, long weekend.
 7          I'm going to let you know this now since we know
 8   it, I know it.  The Chief Judge of the District has
 9   indicated that he is going to some time today, probably this
10   morning yet, he will order closure of the courthouse on
11   Wednesday and Thursday in light of the incoming, you know,
12   snow-mageddon.  So I can tell you right now that we won't
13   have court on Wednesday and Thursday.
14          I know that we also -- supposedly the snow is
15   going to start here about one o'clock this afternoon.  We're
16   going to be keeping our eye on it and getting information
17   from a couple of localities, in particular, because I know
18   there is some of you that are driving a great distance.  And
19   we'll make that call as things play out, but I'm more
20   inclined to say we end early today so that you can, you
21   know, drive through the blizzard in daylight conditions so
22   that you get to see it in all its glory, as opposed to
23   driving at night.  Okay?
24          Yes, ma'am.
25          JUROR:  I have a question.  I live a quarter mile
```

**EXHIBIT 1**

**608**

1  together some of these statements of work, you did not have
2  any direct involvement with the Chubb account during your
3  time at FICO, right?
4  A.   Correct.  My, my -- I was limited in terms of, I
5  developed the statements of work and worked with them on
6  identifying what they wanted to do, but I didn't actually do
7  any of the implementation at that time.
8  Q.   And you don't recall any meetings with Chubb, right?
9  A.   I don't.
10  Q.   You don't recall any discussions that you had with
11  anyone at Chubb, right?
12  A.   Correct.  I remember Henry Mirolyuz I think.
13  Q.   I think you've answered the question.
14  A.   Oh, sorry.
15  Q.   Thank you.
16      You never worked on any products or projects for
17  Chubb, correct?
18  A.   Correct.
19  Q.   You have no familiarity at all with how Blaze was
20  implemented in Chubb, correct?
21  A.   I have a -- well, I have a rough understanding about how
22  we were implementing Blaze in insurance companies at the
23  time.  But yes, no direct knowledge.  I didn't work on the
24  project.
25  Q.   You have no familiarity at all, would you say, with how

**609**

1  Blaze was implemented at Chubb?
2  A.   Correct.
3  Q.   You don't know about specific projects that Chubb had
4  involving Blaze, correct?
5  A.   I do in that again I developed statements of work for
6  those projects.
7  Q.   But you don't have any personal knowledge of any of
8  those projects or the details of them?
9  A.   I did not develop those projects, no.
10  Q.   You talked about some applications that were listed in
11  the statements of work, correct?
12  A.   Correct.
13  Q.   But you don't know what Chubb applications used Blaze,
14  correct?
15  A.   Well, I know the ones that were described in the
16  statements of work since Blaze.
17  Q.   Can you look at your March 2019 deposition at page 84,
18  please.
19  A.   Sure.  March -- did you say page 84?
20  Q.   Yes.
21  A.   I'm sorry.  I'm looking at the page numbers up there.
22  Okay.
23  Q.   At line 15 I asked, "Do you know any of the applications
24  that Blaze was used in?"
25      And your answer was, "No."

**610**

1      Did I read that correctly?
2  A.   You did, yes.
3  Q.   You don't know what kind of technology architecture
4  Chubb had, correct?
5  A.   You're correct.
6  Q.   You testified about the SOWs documenting a transfer of
7  knowledge from FICO to Chubb, right?  But you weren't
8  involved in actually implementing any of the projects that
9  were discussed in the SOWs, correct?
10  A.   That's correct.
11  Q.   And you aren't aware of any situation in which FICO
12  helped Chubb develop a particular rule, correct?
13  A.   I mean, I guess I'm aware of it in that we developed the
14  statement of work to develop rules that was paid for, and I
15  would have a hard time -- I don't know why you would --
16      So I would presume that out of that we delivered
17  rules.
18  Q.   But you don't know whether FICO ever helped Chubb
19  develop any particular rule that was implemented in Blaze,
20  right?
21  A.   All I can say is, I did not personally develop a rule in
22  Blaze, but again it was listed as a deliverable in some of
23  the statements of work.  So that we would help develop
24  rules.
25  Q.   And you weren't involved in doing that?

**611**

1  A.   That's correct.
2  Q.   You testified that when Blaze is delivered from FICO,
3  it's not ready to run, right?
4  A.   That's correct.
5  Q.   It's like starting with a blank piece of paper?
6  A.   That's correct.
7  Q.   Blaze needs to be integrated into a customer's
8  preexisting systems, right?
9  A.   Correct.
10  Q.   And generally, it's taking the business logic, I think
11  you testified, right?
12  A.   Correct.
13  Q.   And -- go ahead.
14  A.   Correct.
15  Q.   And the business logic comes from Chubb, right?
16  A.   That's correct.
17  Q.   That is know-how that Chubb has developed over decades
18  and decades and decades, right?
19  A.   That's correct.
20  Q.   The subject matter experts that work on the projects are
21  Chubb employees, right?
22  A.   That's correct, for their business logic.
23  Q.   And Chubb's business logic is completely independent of
24  Blaze, right?
25  A.   That's correct.

**EXHIBIT 1**

**688**

1   A.   1000 plus.

2   Q.   So now I want to focus on a specific type of software

3   product, the rules based software products.  Okay?

4   A.   Yep.

5   Q.   And if we can go to defendants' Demonstrative 4.  Are

6   all of these software products on defendants' Demonstrative

7   4 rules programs?

8   A.   Yes.  That's correct.

9   Q.   Have all of these programs been available in one form or

10  another since the mid 2000s?

11  A.   Yes.

12  Q.   Which of these programs do you personally have

13  experience using?

14  A.   FICO, IBM Operational Decision Manager, Drools, Pega and

15  Red Hat Decision Manager.

16  Q.   So that's all of them, other than the SAS program,

17  right?

18  A.   Yes.

19  Q.   What's your understanding of the functional difference,

20  if any, between Blaze, FICO's program, and the IBM product,

21  IBM Operational Decision Manager?

22  A.   Yeah.  Operational Decision Manager from IBM, and FICO

23  Blaze, no difference for us.  No difference, functionally.

24  Q.   Okay.  How about Blaze's, the product Blaze and Drools?

25  Is there a functional difference in your mind between those

**689**

1   two products?

2   A.   No, for what we use for.

3   Q.   You mean in terms of how you use it at Chubb?

4   A.   Yeah.  How we use it, yeah.

5   Q.   Do you have to use a software program to run rules in a

6   computer application, or can software engineers write code

7   for the rules themselves?

8   A.   The software engineers and software developers, they can

9   code by themselves.  In fact majority, 99 percent of the

10  cases, all software developers, they code the rule by

11  themselves.

12  Q.   So in 99 percent of the applications at Chubb, the

13  developers are coding their own rules?

14  A.   Yes.

15  Q.   And was that true in the period before the ACE

16  acquisition as well?

17  A.   That's correct.  Yes.

18  Q.   Okay.  I want to put up a list of some computer

19  applications as defendants' Demonstrative 5, if we could,

20  Vanessa.  Thank you.

21       Is it your understanding that Blaze was used in

22  all 13 applications shown on the screen, Mr. Pandey?

23  A.   Yes.

24  Q.   Did the number of applications at Chubb using Blaze

25  change after the acquisition by ACE?

**690**

1   A.   Not at all.  Absolutely not.

2   Q.   Now, are all 13 of these applications the same size, or

3   do they vary?

4   A.   No.  They vary a lot.  CSI Express is a big one, and

5   others like TAPS and Premium Booking, these are very small.

6   Q.   Okay.  Is CSI Express the biggest application on this

7   chart?

8   A.   Yes.

9   Q.   Okay.  And then if we could go to Defendants

10  Demonstrative 6, please.  So, Mr. Pandey, on defendants'

11  Demonstrative 6, there are 1, 2, 3, 4, 5 different

12  applications highlighted in gold.  What's the significance

13  of that?

14  A.   They are after policies sold, this is the -- these are

15  the application.  Their function only after the policy is

16  sold.  They are not part of the policy selling process.

17  Q.   So these applications don't have anything to do with the

18  policy sale process?

19  A.   That's correct.

20  Q.   Now, there's another computer application that's being

21  discussed in this case called Claims Connect.  Are you

22  familiar?  Have you heard of that application?

23  A.   Yes, I am familiar with it.

24  Q.   Has Claims Connect ever used Blaze?

25  A.   No.

**691**

1   Q.   Was Blaze ever used in any application used to process

2   insurance claims at Chubb?

3   A.   No.

4   Q.   And there's some discussion of another application

5   called Small Commercial.  Are you familiar with that

6   application?

7   A.   Yes.

8   Q.   Was Blaze ever used in the Small Commercial application?

9   A.   No.  Small Commercial uses a product called Duck Creek,

10  which is a very powerful platform, that does enter in, and

11  Claim Correct also uses the Duck Creek as a platform.

12  Q.   Duck Creek is another software program?

13  A.   Yes.

14  Q.   Do you remember Mr. Hinderaker asking you some questions

15  about the CUW-IM application?

16  A.   Yes.

17  Q.   Okay.  And he showed you some emails, Mr. Pandey, do you

18  remember that talked about a project analysis and a Phase 1

19  and then a Phase 2?

20  A.   Yeah, that's -- yes, you do the high level design, and then

21  you do the material design, and that's how you come up with

22  an estimate.  And based upon that estimate, then we decide

23  if this project worth it or not.  Then we put into the

24  funding column, and then we get the funding and only when

25  they approve, then the project starts.

**EXHIBIT 1**

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    February 21, 2023 - Volume IV

704

1   developer to write the rules.
2   Q.   So the developers are coding the rules into Custom Mark?
3   A.   That's correct.
4   Q.   How many of the approximately 1500 software applications
5   that were used at Chubb before the acquisition used rules in
6   some way?
7   A.   All of them.
8   Q.   Okay.  Now I want to quickly take a look at
9   Exhibit P60 -- P960.  I apologize.  This is the -- I want to
10  look at an excerpt from the 2018 Chubb annual report.
11  A.   Okay.
12  Q.   This is an excerpt that the jury saw during FICO's
13  opening statement on page 15.
14       Let me know when you are with me, Mr. Pandey.  Do
15  you see it on the screen?
16  A.   Yes, I can see it.
17  Q.   Okay.  So the excerpt says, "In 2018 we continued to
18  make significant progress with our small commercial business
19  initiative globally.  Starting from a relatively small base
20  in '17, we produced strong double digit growth throughout
21  the year achieving an annual run rate of over 1 billion in
22  premium and project this business to exceed several billion
23  dollars over time."
24       And then it says, "In the US this is a highly
25  automated digital experience where 80 percent or more of the

705

1   submissions are not touched by humans after they leave the
2   agent's office.  Technology is a competitive weapon."
3        Do you see that?
4   A.   Yes.
5   Q.   So there's a reference here, Mr. Pandey, to small
6   commercial businesses.  What does that refer to?
7   A.   It's a small commercial business, a big business like
8   you have commercial specialty insurance which has for system
9   like CSI Express.  Similarly small business, small
10  commercial business, it is a totally different division of
11  Chubb, which does the insurance for mom and pop shops, say
12  flower shop, your plumber, your electrician, 2, 3, 4, 5
13  people company.
14       They use this system because they want quick.
15  They want fast.  They want to go run on the weekends and
16  nights because that's when they get their time.  So this is
17  a system straight-through, fast and always available for our
18  small commercial customers.
19  Q.   And is this reference here, Mr. Pandey, to the fact that
20  80 percent or more of the submissions are not touched by
21  humans, does that have anything to do with applications that
22  use Blaze?
23  A.   No.  This is Duck Creek.
24       MR. HINDERAKER:  Objection, Your Honor.  There's
25  no foundation for Mr. Pandey.

706

1        THE COURT:  Overruled.
2   BY MS. GODESKY:
3   Q.   So does this statement have anything to do with
4   applications that use Blaze?
5   A.   No.  No.  This is the Duck Creek application.  Duck
6   Creek is the one which I was talking about.  This is very
7   odd platform which is start to finish, writing, policy,
8   everything, forms, rate, underwriting experience,
9   everything.
10  Q.   Mr. Pandey, you started your testimony with
11  Mr. Hinderaker by confirming that Blaze has been removed
12  from all of the applications at Chubb, correct?
13  A.   That's yes.
14  Q.   What programs have replaced Blaze in those applications?
15  A.   So Red Hat Decision Manager and the new one Drools.
16  Q.   Drools and Red Hat Decision Manager?
17  A.   Yes.
18  Q.   Okay.  Have you received any complaints as the chief
19  architect at Chubb about the switch from Blaze to those
20  other rules software programs?
21  A.   Absolutely not.
22  Q.   And as the chief architect at Chubb, have you noticed
23  any problems with the efficient functioning of your IT
24  systems?
25  A.   No.

707

1   Q.   As the chief architect at Chubb, are you aware of any
2   complaints about the rules not being processed fast enough
3   without Blaze?
4   A.   No.
5        MS. GODESKY:  Okay.  Thank you, Mr. Pandey.  No
6   further questions from me.
7        THE COURT:  Mr. Hinderaker, further
8   cross-examination?
9        MR. HINDERAKER:  I do have some, yes.
10                    RECROSS EXAMINATION
11  BY MR. HINDERAKER:
12  Q.   Did you write the annual report of 2018 for Chubb
13  Limited?
14  A.   No, I did not.
15  Q.   And let me just ask you this question about what's said
16  there.
17       Separate from what particular technology the
18  author may have had in mind, do you agree with the statement
19  in the 2018 Chubb Limited annual report that technology is a
20  competitive weapon?  Yes or no.
21  A.   Yes.
22  Q.   Now, if I can find my notes.
23       Thank you.  I need all the help I can get.
24       So, Mr. Pandey, I am not too interested in what
25  applications you have that don't use Blaze Advisor.  I am

**EXHIBIT 1**

**735**

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
 2
 3   ------------------------------------------
                             )
 4   Fair Isaac Corporation,  )  File No. 16-cv-1054(DTS)
     a Delaware Corporation,  )
 5                            )
        Plaintiff,            )
 6                            )
     v.                       )
 7                            )
     Federal Insurance Company,)  Courtroom 14W
 8   an Indiana corporation,  )  Minneapolis, Minnesota
     and ACE American Insurance)  Friday, February 24, 2023
 9   Company, a Pennsylvania  )  9:00 a.m.
     Corporation,             )
10                            )
        Defendants.           )
11   ------------------------------------------
12
13
14        BEFORE THE HONORABLE DAVID T. SCHULTZ
     UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16        (JURY TRIAL PROCEEDINGS - VOLUME V)
17
18
19
20
21
22      Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23
                        * * *
24
25
```

**736**

```
 1   APPEARANCES:
 2     For Plaintiff:    MERCHANT & GOULD P.C.
                         BY:  ALLEN W. HINDERAKER
 3                            HEATHER J. KLIEBENSTEIN
                              PAIGE S. STRADLEY
 4                            MICHAEL A. ERBELE
                              JOSEPH W. DUBIS
 5                            GABRIELLE L. KIEFER
                         150 South Fifth Street, #2200
 6                       Minneapolis, Minnesota 55402
 7     For Defendants:   FREDRIKSON & BYRON
                         BY:  TERRENCE J. FLEMING
 8                            LEAH C. JANUS
                              CHRISTOPHER D. PHAM
 9                            RYAN C. YOUNG
                              PANHIA VANG
10                       200 South Sixth Street, #4000
                         Minneapolis, Minnesota 55402
11
                         O'MELVENY & MYERS LLP
12                       BY:  LEAH GODESKY
                              ANTON METLITSKY
13                            DARYN E. RUSH
                              ROXANA GUIDERO
14                       Times Square Tower
                         7 Times Square
15                       New York, New York 10036
16     Court Reporters:  RENEE A. ROGGE, RMR-CRR
                         KRISTINE MOUSSEAU, CRR-RPR
17                       MARIA V. WEINBECK, RMR-FCRR
                         PAULA RICHTER, RMR-CRR-CRC
18                       United States District Courthouse
                         300 South Fourth Street, Box 1005
19                       Minneapolis, Minnesota 55415
20
                              * * *
21
22
23
24
25
```

**737**

```
 1                  I N D E X
                                        PAGE
 2
     LAWRENCE WACHS VIA DEPOSITION
 3      Examination By Ms. Janus          739
        Examination By Mr. Hinderaker     806
 4
     THOMAS CARRETTA
 5      Direct Examination By Mr. Hinderaker  843
        Cross-Examination By Ms. Godesky      892
 6      Redirect Examination By Mr. Hinderaker 934
 7
 8
 9
     DEFENDANTS' EXHIBITS                 REC'D
10      4                                  921
        17                                 947
11      282                                945
        304                                918
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**738**

```
 1                  9:00 A.M.
 2
 3      (In open court with the Jury present.)
 4      THE COURT:  Good morning.  Please be seated go
 5   ahead and be seated.
 6      All right.  Good morning, Members of the Jury.
 7   Thanks, everyone, for making it in here.  I don't know how
 8   bad your commutes were, but thanks for making it.
 9      Mr. Hinderaker, are you ready to proceed?
10      MR. HINDERAKER:  We are, Your Honor.
11      THE COURT:  All right.  Why don't you, you need to
12   explain what's going on now?
13      MR. HINDERAKER:  I do.  I do.
14      THE COURT:  Go right ahead.
15      MR. HINDERAKER:  Our first witness this morning is
16   a gentleman by the name of Larry Wachs, Lawrence Wachs, and
17   he will be showing -- his testimony will be presented by
18   video, so I will read this introduction about him.
19      Lawrence Wachs is a former FICO employee, now
20   living in New York, whose deposition was taken February 26,
21   2019.  His role was in sales; and when he left FICO, his
22   title was sales executive.  He was with FICO from 2006 to
23   2008.
24      Mr. Wachs' deposition was taken by Leah Janus, one
25   of the counsel for defendants.  There may be another voice
```

**EXHIBIT 1**

**739**

1  on the video and, if so, that will be mine.
2       THE COURT:  Thank you, Mr. Hinderaker.  Go ahead.
3            (LAWRENCE WACHS)
4            EXAMINATION
5  BY MS. JANUS:
6  Q.  Please state your name for the record?
7  A.  My name is Lawrence Wachs.
8  Q.  Are you represented by counsel for FICO here today?
9  A.  I am.
10  Q.  I want to start just with a little bit of background
11  information.  Where, where did you receive your education
12  and tell us what degrees you obtained.
13  A.  I obtained a degree, bachelor of arts degree with a
14  major in economics from Brooklyn College in 1968.
15  Q.  In what year were you born?
16  A.  1947.
17  Q.  Are you currently employed?
18  A.  No.
19  Q.  What was your last -- most recent employment?
20  A.  IBM corporation in sales.
21  Q.  And what were the years that you were employed for IBM?
22  A.  2009 through 2016.
23  Q.  What was your position with IBM?
24  A.  Sales.
25  Q.  What types of, what type of sales?

**740**

1  A.  Large programs, technology sales, software sales.
2  Q.  Okay.  Prior to IBM, what was your employment?
3  A.  Fair Isaac.  Fair Isaac.
4  Q.  What were your years of employment with Fair Isaac?
5  A.  2006 to 2008.
6  Q.  What was your position with Fair Isaac?
7  A.  Technology sales.
8  Q.  Did you have a title?
9  A.  Sales executive, sales executive.
10  Q.  Prior to your position at FICO, what was your
11  employment?
12  A.  Prior to fair -- FICO, I was employed by RulesPower, a
13  technology start-up corporation.
14  Q.  What were the years of that employment?
15  A.  I'm not sure offhand, but it was ending in 2006,
16  probably beginning in 2005.
17  Q.  And what was your position with -- what was it?  Can you
18  repeat the name?
19  A.  RulesPower, one word.
20  Q.  What was your position with RulesPower?
21  A.  Technology sales.
22  Q.  So from 1995 through 2016, you were in the technology
23  sales industry as a --
24  A.  That's correct.
25  Q.  -- sales executive?

**741**

1  A.  Exactly right.
2  Q.  Okay.  Let's focus in then on the 2006 to 2008 time
3  period when you were employed with Fair Isaac.  Do you
4  recall the month in 2006 that you began your employment with
5  Fair Isaac?
6  A.  Not specifically, no.
7  Q.  We'll look at some documents, but it looks like you were
8  there in the beginning of the year 2006, does that --
9  A.  That's correct.
10  Q.  Okay.  So you started in the beginning of 2006.  And
11  when you began at Fair Isaac, what was your title?
12  A.  Sales executive.
13  Q.  Okay.  What, what did your position involve as a sales
14  executive?
15  A.  Locating organizations that could take advantage of the
16  FICO software in order to achieve business benefit.
17       COURT REPORTER:  How do you spell FICO?
18       MS. JANUS:  F-I-C-O.
19       COURT REPORTER:  Got it.
20  BY MS. JANUS:
21  Q.  Were you familiar with the software at FICO prior to
22  beginning your work with them?
23  A.  Yes.
24  Q.  And how was that?
25  A.  The RulesPower software was comparable in its

**742**

1  functionality and in fact, it's a matter record, I believe,
2  that the software at FICO was actually the RulesPower
3  software when FICO acquired the assets of RulesPower.
4  Q.  Was there a particular software that you were focused on
5  selling during your time at FICO?
6  A.  Yes.
7  Q.  What was that?
8  A.  The name of the software was Blaze Advisor, and it was a
9  decision management rules processing application.
10  Q.  Who did you work with while you were at FICO?
11  A.  I reported directly to a gentleman named John Haines,
12  H-A-I-N-E-S.
13  Q.  What was his position?
14  A.  Manager of sales for Blaze Advisor for the northeast.
15  Q.  Once the client selected Fair Isaac as a vendor, what
16  was your role, if any, in the deal going forward?
17  A.  Once we were advised that we were the selected vendor,
18  we would communicate the salient facts about the sale to our
19  contract administration process, who would have to render a
20  contract that would be appropriate for the deal, reflective
21  of the terms of the deal, including the price.  I would work
22  with senior management in establishing what that price would
23  be, which is part of the selection process, but assuming
24  that they've selected us already, we were already past that
25  approval stage.

**EXHIBIT 1**

**795**

1  A.  We were negotiating for a global ELA, correct.

2  Q.  Were you communicating with Sally about the status of

3  those negotiations, do you recall?

4  A.  I was speaking with Sally fairly regularly at this

5  point.  It was a big deal, and so Sally was tracking its

6  progress, and Sally did participate, it seems, according to

7  this note, that we did do an on-site meeting with 30

8  attendees to discuss the commercial side of the business and

9  get closer to an ELA in 2007.

10  Q.  It was a big deal, meaning a big deal for FICO?

11  A.  Size, dollar size.

12  Q.  Yep.  In the entry below the one you just referred to

13  with the 30 attendees --

14  A.  Yes.

15  Q.  -- the document states, "Larry has been working with

16  Chubb to get an ELA through this year.  The total after

17  credit for global ELA, including COBOL and SmartForms, was

18  priced out at 1.5 million.  I need to get an update on

19  Chubb's response to the proposal."  Is that right?

20  A.  Yes.

21  Q.  So is the 1.5 million proposal one that you provided

22  after entering into the June 2006 portion of the license?

23  A.  Yes.

24  Q.  Do you recall how you provided that?

25  A.  No, I don't.

**796**

1  Q.  Do you recall who you provided it to?

2  A.  Not specifically, no.

3  Q.  Do you recall any e-mails or discussions that you were

4  having in this time period with Chubb relating to the global

5  ELA?

6  A.  Yes.

7  Q.  Tell me what you recall.

8  A.  One negotiating point was that the 1.5 million was too

9  high, and there was a determination to de-limit the ELA by

10  two factors.  One is a COBOL, that's capitol C-O-B-O-L,

11  version of the software, and the second is to de-limit

12  SmartForms, which is a functionality specifically included

13  as an option, and together those would be $200,000, which

14  would bring down the price of the global ELA to 1.3 million

15  dollars, which is consistent with the Waid's original.

16  Q.  That was consistent with the e-mail we looked at earlier

17  today with the 1.6 and the 20 percent discount?

18  A.  Yeah -- well, Waid wasn't talking -- I don't know

19  whether he was talking about a global ELA at that 1.3

20  number.  This appears to be 1.3 million.

21  Q.  Right.  And we can -- I mean, the record speaks for

22  itself.

23  A.  Yes.

24  Q.  We did look at an e-mail talking about global and that

25  number; but when you're talking about the de-limiting of

**797**

1  COBOL and SmartForms and the 1.3 number, where are you

2  looking on the document?

3  A.  That's not contained on this.

4  Q.  And so there was -- there were conversations between you

5  and Chubb that FICO could do the global ELA deal for 1.3

6  million if COBOL and SmartForms were taken out of the --

7  A.  That's my understanding.

8  Q.  Do you recall who you had those conversations with?

9  A.  No.  It would have been John Haines, and he in turn with

10  Bill Waid.

11       COURT REPORTER:  And then in turn --

12       THE WITNESS:  And he in turn with Bill Waid.

13  BY MS. JANUS:

14  Q.  Do you recall who at Chubb you had the conversations

15  with?

16  A.  I, I don't have a specific recollection, but I would say

17  Sully.

18  Q.  Did Sully express to you why it was important to Chubb

19  to obtain a global license?

20  A.  It was beyond his purview.  He is not a global person.

21  Q.  So he was just passing on requests from others at Chubb?

22  A.  That's right.

23  Q.  Showing you what has been marked as Exhibit 113.  This

24  is an e-mail from you to Mark Layden, Michael Gordon, Bill

25  Waid, John Haines, Russ Schreiber on December 12th, 2006.

**798**

1  The subject of the e-mail is "Chubb ELA pricing rationale

2  from Russ and Larry," the quote pursuit team, correct?

3  A.  Yes.

4  Q.  And what do you mean by "the pursuit team"?

5  A.  The people who are driving the conversation, the sales

6  team.

7  Q.  The conversation with Chubb?

8  A.  Yes.

9  Q.  Do you recall what this e-mail related to, generally?

10  A.  Yes.  Mark Layden was going to have a personal

11  conversation with Folz and Bolen and negotiate the close --

12  closure.

13  Q.  Of the enterprise aspect of the license agreement?

14  A.  What was remaining for December, yes, for a December

15  close.

16  Q.  So was your purpose in writing this e-mail to update

17  them relating to the current status of negotiations?

18  A.  That's correct.

19  Q.  At this point on December 12th, the ELA that was being

20  negotiated was a global ELA, correct?

21  A.  I don't know the answer to that.  I don't see that.

22  Q.  Take a look at the back of Exhibit 113, the second page

23  of the e-mail.  In the third paragraph on that page, you

24  say, "Again, we're at 1.05 million for global ELA plus 50K

25  for unlimited seats."

**EXHIBIT 1**

**957**

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2
 3   ------------------------------------------
 4   Fair Isaac Corporation,   )
     a Delaware Corporation,    )  File No. 16-cv-1054(DTS)
 5                              )
         Plaintiff,             )
 6                              )
     v.                         )
 7                              )  Courtroom 14W
     Federal Insurance Company, )  Minneapolis, Minnesota
 8   an Indiana corporation,    )  Monday, February 27, 2023
     and ACE American Insurance )  9:00 a.m.
 9   Company, a Pennsylvania    )
     Corporation,               )
10                              )
         Defendants.            )
11   ------------------------------------------
12
13
14        BEFORE THE HONORABLE DAVID T. SCHULTZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16          (JURY TRIAL PROCEEDINGS - VOLUME VI)
17
18
19
20
21
22       Proceedings recorded by mechanical stenography;
23   transcript produced by computer.
24                        * * *
25
```

**958**

```
 1   APPEARANCES:
 2     For Plaintiff:      MERCHANT & GOULD P.C.
                           BY:  ALLEN W. HINDERAKER
 3                              HEATHER J. KLIEBENSTEIN
                                PAIGE S. STRADLEY
 4                              MICHAEL A. ERBELE
                                JOSEPH W. DUBIS
 5                              GABRIELLE L. KIEFER
                           150 South Fifth Street, #2200
 6                         Minneapolis, Minnesota 55402
 7     For Defendants:     FREDRIKSON & BYRON
                           BY:  TERRENCE J. FLEMING
 8                              LEAH C. JANUS
                                CHRISTOPHER D. PHAM
 9                              RYAN C. YOUNG
                                PANHIA VANG
10                         200 South Sixth Street, #4000
                           Minneapolis, Minnesota 55402
11
                           O'MELVENY & MYERS LLP
12                         BY:  LEAH GODESKY
                                ANTON METLITSKY
13                              DARYN E. RUSH
                                ROXANA GUIDERO
14                         Times Square Tower
                           7 Times Square
15                         New York, New York 10036
16     Court Reporters:    RENEE A. ROGGE, RMR-CRR
                           KRISTINE MOUSSEAU, CRR-RPR
17                         MARIA V. WEINBECK, RMR-FCRR
                           PAULA RICHTER, RMR-CRR-CRC
18                         United States District Courthouse
                           300 South Fourth Street, Box 1005
19                         Minneapolis, Minnesota 55415
20
                                   * * *
21
22
23
24
25
```

**959**

```
 1                     I N D E X
                                              PAGE
 2
     HENRY MIROLYUZ
 3     Examination By Mr. Hinderaker           971
 4   CLAUDIO GHISLANZONI
       Cross-Examination By Mr. Hinderaker    1046
       Direct Examination By Ms. Godesky      1131
       Recross-Examination By Mr. Hinderaker  1161
       Redirect Examination By Ms. Godesky    1170
       Recross-Examination By Mr. Hinderaker  1171
 8   JOHN TAYLOR
       Examination By Mr. Hinderaker          1174
 9
10
     PLAINTIFF'S EXHIBITS                     REC'D
11     517                                    1080
       518                                    1082
12     526                                    1096
       1002                                   1088
13     1005                                   1088
       1007                                   1088
14     1008                                   1088
15
     DEFENDANTS' EXHIBITS                     REC'D
16     39                                     1140
17
18
19
20
21
22
23
24
25
```

**960**

```
 1                    9:00 A.M.
 2
 3        (In open court without the Jury present.)
 4        THE COURT:  Please be seated.  Good morning,
 5   everyone.
 6        The record should reflect that we are in the
 7   courtroom outside the presence of the jury.  As I understand
 8   it, there is a couple of issues, at least one, that we need
 9   to take up now before we begin with testimony and that I
10   think is the interrogatory answer.
11        Is that correct, Mr. Hinderaker?
12        MR. HINDERAKER:  Yes, Your Honor.
13        THE COURT:  Okay.  And tell me what it is you plan
14   to put in and, if it's not obvious, why it's relevant.
15        MR. HINDERAKER:  This is a copy of it.
16        THE COURT:  Yeah, I've looked at it.  Go ahead and
17   bring it up.  Well, what are you proposing to do with this
18   exactly?
19        MR. HINDERAKER:  Well, mister -- well, I guess it
20   comes up in Mirolyuz's deposition because Mr. Mirolyuz is
21   the one who verified it.
22        THE COURT:  Right.
23        MR. HINDERAKER:  During the course of the
24   deposition we had an unsigned copy, and during the
25   deposition I asked Mr. Mirolyuz, and he did verify it in the
```

**EXHIBIT 1**

**1021**

1  ARP 2, the purpose of this document is to market the
2  business rules technology -- business rules across the
3  enterprise, across the Chubb.
4  Q. And that was the purpose. And what was the goal to be
5  achieved from that purpose?
6  A. We thought that using the business rules can bring the
7  benefits to the IT teams across the Chubb. So the goal is
8  as they become familiar, they would start implementing or
9  using the business rules technology that is making their
10 life simpler.
11 Q. Okay. So the -- was there a benefit to -- separate from
12 the simpler life of the underwriters, was there a benefit to
13 the business that you were advancing?
14 A. Benefit would be, from my view, would be quicker
15 turnaround of the projects; thus, we can deploy the business
16 requests significantly quicker, as was demonstrated by the
17 ARP 1 project.
18 Q. And from your point of view, what was the benefit to the
19 business when you were able to do that?
20 A. Again, the changes or business changes can be deployed;
21 thus, whatever benefit is intended for that particular
22 implementation can be achieved significantly faster.
23 Q. Does that mean then that new policies can be put to
24 market faster?
25 A. Not necessarily, but could be more precise guidance or

**1022**

1  more precise scoring for that particular example. It
2  doesn't necessarily impact the speed or increase on the
3  business.
4  Q. Let's back up a second. So the reason for having Blaze
5  Advisor is that it has an ultimate benefit for the business.
6  A. Correct.
7  Q. Correct?
8  A. Ultimately, yes.
9  Q. Yes, ultimately. And one of the benefits of, I think
10 that you just said, is that it makes people lives easier?
11 A. Correct.
12 Q. Correct? And the people that you're referencing are the
13 underwriters?
14 A. No. I'm referencing the IT teams because they're
15 ultimately responsible. Again, I'm talking -- my role was
16 from the IT perspective.
17 Q. Okay.
18 A. I would not be able to speak for any business benefits
19 achieved through the use of the Blaze Advisor technology or
20 business rules technology. I do speak around the
21 benefits -- that's what I speak in this document, is where
22 the business rules technology could benefit from the IT
23 point of view.
24 Q. Anyway, that's what I said. 4 of 42 and Bates number
25 0004.

**1023**

1  A. Okay.
2  Q. And you wrote Introduction and Scope 1.1?
3  A. Correct.
4  Q. All right. So you start that with, "The purpose of this
5  document is to illustrate." And then tell me what you mean
6  by, "Such as increasing agility to implement the business
7  change and reducing time to market the new products and
8  services."
9       First paragraph.
10 A. So we believed at the time of --
11     COURT REPORTER: I lost you.
12     THE WITNESS: Sorry. I believed at the time I
13 wrote this document that implementation of the business
14 rules technology --
15     MR. FLEMING: I'm sorry. I thought you were
16 saying 40.
17 BY MR. HINDERAKER:
18 Q. Let's try again.
19 A. Yeah. So at the moment of writing this document, I
20 believed that use of the business rules technology would
21 enable IT team to deploy any business request to production
22 or to come to market significantly faster as compared with
23 traditional technologies employed at Chubb at a that point
24 in time.
25 Q. Say what?

**1024**

1  A. It increases the agility of the project and increases --
2  and reducing time to market.
3  Q. It increases the agility of the business?
4  A. Agility of implementation. Again, as you can see
5  specifically here, it is agility to implement to business
6  changes.
7       So I'm not speaking to the business benefit for
8  this. This specifically says if I have a request from the
9  business to implement particular change, I can deploy it, I
10 can implement it significantly faster and deploy it
11 significantly faster for business to use.
12 Q. As a consequence, as you say, that reduces the time to
13 market for new products and services, correct?
14 A. If it's implemented in the Blaze Advisor. Again, big
15 disclaimer.
16 Q. And you just, you just, you just said the phrase, "if
17 implemented in Blaze Advisor."
18     And I want to turn you to the next page. And you
19 have a heading, "What are business rules?" And then you
20 have a description, you know, four paragraphs down,
21 "Traditionally embedded" -- "traditionally embedded inside
22 code." And then you say -- and then you have the next
23 paragraph, "Externalizing the business rules to be a
24 structured decision management."
25     Is that what you're meaning by if Blaze Advisor is

**EXHIBIT 1**

**1101**

1  A.  **Yes.**

2  Q.  All right.  And this should not be published yet.

3       Again, the title of this is Declaration of Zorica

4  Todorovic.  Have I read that right?

5  A.  **Yes.**

6  Q.  And then if you go to the last page, she declares

7  independently of perjury that the foregoing is true and

8  correct to the best of her knowledge.  Do you see that?

9  A.  **I see that.**

10  Q.  And you see a signature?

11  A.  **I see Zorica Todorovic and a signature.**

12  Q.  Okay.  And then you see in the top line case, and it has

13  numbers of a case and a docket number and a filing date.

14       Do you see that?

15  A.  **I see that.**

16       MR. HINDERAKER:  Your Honor, I move the admission

17  of the Declaration of Zorica Todorovic as an admission, also

18  as one that was adopted by the defendants because it was

19  filed with the court in the context of the court proceedings

20  in this case.

21       MS. GODESKY:  Objection, Your Honor.  Hearsay.  No

22  foundation.

23       THE COURT:  Let's approach.

24            (Sidebar discussion)

25       THE COURT:  It's a sworn statement under oath

**1102**

1  offered by Federal during the course of litigation.  So why

2  is it hearsay?

3       MS. GODESKY:  Your Honor, this would be completely

4  unprecedented.  If you could get documents in this way,

5  every declaration and expert report that a party cites in

6  support of or in opposition to a summary judgment filing

7  could then be admitted at trial.

8       MR. HINDERAKER:  Actually, not expert reports.

9  Just declarations under oath.

10       MS. GODESKY:  Some expert reports are sworn.

11       THE COURT:  No.

12       MS. GODESKY:  But this is a declaration of a

13  witness who is not here.  They had every opportunity to

14  depose, and the idea that you can put in a sworn declaration

15  of a witness that is not present in trial, there's

16  absolutely no authority for that at all.

17       MR. HINDERAKER:  May I have a moment, and I will

18  get some?

19       THE COURT:  Sure.

20       MR. HINDERAKER:  All right.

21       (Approaches counsel table and returns)

22       MR. HINDERAKER:  One case I have comes out of

23  bankruptcy court.  The objections to the admission of this

24  declaration is hearsay, is without merit.  This declaration

25  is expressly excluded from hearsay by Federal Rule of

**1103**

1  Evidence 801(d)(2)(B) as a party admission.

2       801 (d)(2)(B) provides in part that the statement

3  is not hearsay if the statement is offered against a party

4  and is a statement of which the party has manifested an

5  adoption on belief or belief in its truth.

6       Southern District of New York.  Defendants do not

7  contest the admissibility of statements by, nor could they,

8  the declarations from which these excerpts were taken were

9  submitted by defendants at summary judgment.  When

10  defendants submit these declarations at summary judgment,

11  they manifested that they adapted or believed to be true the

12  statements contained in these declarations.

13       And that's the Southern District of New York 2012.

14       MS. GODESKY:  Your Honor, I would like an

15  opportunity to look at that case law.  I think at a minimum

16  this isn't something that needs to be resolved with

17  Mr. Ghizlanzoni.  This is not his statement.

18       And I'm not even sure where Mr. Hinderaker is

19  going.

20       MR. HINDERAKER:  I would explain it, if you wish.

21       THE COURT:  Please.

22       MR. HINDERAKER:  So we have a party admission and

23  what her declaration does is flush out more details about

24  the AppCentrica/DWS transfer of knowledge between Canada and

25  Australia with respect to this Evolution application.

**1104**

1       So we have more context for the authentication of

2  these documents of which he admittedly is not a party to,

3  but the authentication is relatively low, and it is to the

4  point, is this what it purports to be.  And so we have a

5  sworn declaration detailing a little bit about this project

6  that makes the authenticity of these other documents and

7  emails more authentic, I guess.

8       MS. GODESKY:  So I don't have an authenticity

9  objection.

10       THE COURT:  I know your objection is foundation

11  and hearsay.

12       MS. GODESKY:  Exactly.  I would like more time to

13  consider the hearsay issue.  But certainly on foundation

14  under the rule that FICO argued for and this court adopted,

15  Mr. Ghislanzoni would not be the right witness to use this

16  with anyway, because as you look at the recitation of facts

17  in this declaration, paragraph 5 Ms. Zorica is talking about

18  events in 2015.

19       That's the time period that she was addressing.

20  She was at ACE and this is --

21       MR. HINDERAKER:  I think we're confusing the

22  foundation question.  I don't quarrel with the fact that

23  Mr. Ghizlanzoni doesn't have foundation about this.  But

24  what I was saying is, when this is out and the court's aware

25  of it and you look at the documents that I am showing him

**EXHIBIT 1**

**1153**

1  A.  **Yes.**

2  Q.  Based on your understanding of the legacy Chubb IT

3  infrastructure, was Blaze used before -- was Blaze used in

4  the Evolution application in Canada?

5  A.  **So Evolution Canada was making use of Blaze as a**

6  **software, yes.  That's correct.**

7  Q.  Was Blaze used after the acquisition in the Evolution

8  application in Australia?

9  A.  **No.  We utilized ODM for Evolution in Australia.**

10  Q.  Were there conversations at Chubb in spring 2016 after

11  the acquisition about potentially adding Blaze to Evolution

12  Australia?

13  A.  **The original intention was to take the entire technology**

14  **stack, meaning all the technology of Evolution Canada, and**

15  **use it in Australia.  That was the original intention.**

16  Q.  Did that happen?

17  A.  **No.**

18  Q.  Why not?

19  A.  **Because of the dispute I had to instruct Russ Hodey and**

20  **the team in Australia to adopt ODM, informing them that we**

21  **needed to -- we couldn't have adopted Blaze because of the**

22  **dispute.**

23  Q.  Now, Mr. Ghislanzoni, there's been a lot of references

24  to these ChEAR spreadsheets during this trial.  Do you have

25  a general familiarity with what they are?

**1154**

1  A.  **Yes.  They used to be used.  No longer exist.**

2  Q.  As the chief enterprise architect of the combined

3  organization, would you ever rely on a ChEAR spreadsheet to

4  tell you definitively what technology is in use and what

5  technology is not?

6  A.  **No.  The purpose of the ChEAR spreadsheet was to have a,**

7  **a collection of applications that were in the environment,**

8  **but also application that were potentially going to be**

9  **created.**

10  Q.  Okay.  I'd like to put up Plaintiff's Exhibit 517, if we

11  could.  Thank you.

12      Do you remember looking at this document,

13  Mr. Ghislanzoni?

14  A.  **Yes.**

15  Q.  Do you see how there's a column that says number of

16  users, and then it's divided into business and technical?

17  A.  **Yes.**

18  Q.  And then there's counts of the number of business users,

19  right?

20  A.  **Yes.**

21  Q.  Is that a count of the number of business users who are

22  using applications using Blaze, or is it a count of the

23  number of people who are actually going in and using Blaze,

24  the software product?

25  A.  **It is the users of the application.**

**1155**

1  Q.  Okay.  And then if we can look at the whole chart again.

2      You were also asked questions about the number of

3  rules and transactions that were processed by Blaze,

4  according to this chart, right?

5  A.  **Yes.**

6  Q.  Based on your decades of experience as an architect at

7  insurance companies, could approximately the same number of

8  rules and transactions have been processed by rules that

9  were coded by software engineers?

10  A.  **Yes.**

11  Q.  How about by rules that were run by other software

12  products like ODM or Red Hat Decision Manager?

13  A.  **Yes.**

14  Q.  We can take that down.  Thank you, Vanessa.

15      So you testified earlier that by 2020 Blaze had

16  been removed from the last computer application at Chubb,

17  correct?

18  A.  **Correct.**

19  Q.  Why did you decide to remove Blaze from all of Chubb's

20  systems in 2019 and is 2020?

21  A.  **Yeah, towards the end of 2018, beginning of 2019, it was**

22  **clear that, the because of the dispute, our relationship was**

23  **heavily damaged, and as such it was representing a**

24  **significant risk to the enterprise.**

25      So we were forced to make a difficult decision to

**1156**

1  recreate all of those rules that we had spent a significant

2  amount of dollars and time to create in Blaze, to recreate

3  them in another technology.

4  Q.  Excuse me.  How long did it take to remove from a

5  software program like CSI Express the Blaze rules?

6  A.  **It took months.  And the reason why it's taking this**

7  **long is, you saw the numbers, thousands of rules, complex.**

8  **So think in terms of every rule has to be recreated in a**

9  **different software product, and we chose Drools.**

10      All of these rules need to be tested.  The

11  behavior of the application has to be validated.  So we

12  needed to be certain that the application with the migrated

13  rules was behaving in exact same way as before, when it was

14  running Blaze.

15      Once all of that is done, then you can go live.

16  All of these efforts takes many weeks.

17  Q.  As the chief architect at Chubb, do complaints and

18  concerns about the IT infrastructure regularly make their

19  way to you?

20  A.  **Yes.**

21  Q.  Since you removed Blaze from all the computer

22  applications at Chubb, has anyone ever raised with you any

23  complaints or concerns about speed or efficiency?

24  A.  **No, no complaints.**

25  Q.  Has anyone raised with you any complaints or concerns

**EXHIBIT 1**

**1157**

1  about technology problems generally in those computer
2  applications?
3  A.  **No.**
4  Q.  Now, does Chubb currently have a preferred rules
5  software product that it's using?
6  A.  **That's correct.**
7  Q.  Which one?
8  A.  **It's called Drools and most specific Red Hat Decision**
9  **Manager, which is a distribution of Drools.  What it means**
10 **is Red Hat, which is also contributor to the open source,**
11 **decided to provide a supported version, which means they**
12 **download the open source.  They test it.  They check for**
13 **vulnerabilities, risks.**
14           They check the performance, and then they provide
15 it to a company like Chubb at a price and so that the
16 company like Chubb can be certain that the product is tested
17 and is secure.  But also if there was a problem with the
18 software, Red Hat, as a vendor, would be there to support
19 us.
20 Q.  Why did Chubb switch from IBM's ODM product as the
21 preferred vendor to Drools distributed by Red Hat?
22 A.  **It's linked to this IT strategy that we formulate in**
23 **2018.  In 2018 we decided that it was the right time to**
24 **embrace open source fully, and therefore we looked at**
25 **different technologies that were available in the open**

**1158**

1  **source community.  And Drools was a good one for us to adopt**
2  **at that time.**
3  Q.  Were you involved in discussions regarding the efforts
4  to obtain the Red Hat license for the combined ACE/Chubb
5  entity?
6  A.  **I was.**
7  Q.  How did you feel at the time about having to find a new
8  rules software license for the computer applications that
9  were running Blaze at the time?
10 A.  **I wasn't happy.  Neither of my colleagues were happy**
11 **because we were forced to do it.**
12 Q.  As the chief enterprise architect, do your
13 responsibilities include overseeing budget concerns relating
14 to software investments?
15 A.  **Yes.**
16 Q.  When you set out to obtain a replacement rules software
17 license, did you have a dollar range in mind for what you
18 would be willing to pay for the replacement rules software
19 from Red Hat?
20 A.  **Well, at the time I thought that possibly having a**
21 **budget of a million dollar would have been appropriate,**
22 **given the usage of rules at Chubb.**
23 Q.  Now is Chubb currently paying to access Drools?
24 A.  **Yes, we are paying Red Hat.**
25 Q.  And are you familiar with the amounts that Chubb has

**1159**

1  paid for the Drools license?
2  A.  **Yes.  I remember we paid for the first year was just**
3  **over $400,000.  And then we did a contract, a three-year**
4  **contract after that, which was just over a million.  In**
5  **total, in four years we spent around $1.5 million.**
6  Q.  Approximately, how many computer applications are used
7  today at the combined ACE/Chubb entity?
8  A.  **Using Red Hat?**
9  Q.  No.  Generally how many are running?
10 A.  **Oh, we have around 3,000 applications now.**
11 Q.  And do they all run rules in one way or another?
12 A.  **They all have rules.**
13 Q.  And how many of those approximately 3,000 applications
14 are using a rules-based software product like ODM or Drools?
15 A.  **Oh, less than one percent.**
16 Q.  And how are you rules run in all of the other
17 applications?
18 A.  **It's -- the rules are in, written as using a programming**
19 **language.**
20 Q.  By the software engineers?
21 A.  **By the software engineers.**
22 Q.  Can you think of an example where Blaze was replaced in
23 a computer application with code written by software
24 engineers?
25 A.  **Well, Evolution is a good one, Canada, because when we**

**1160**

1  **decided to -- we were forced to remove Blaze, we coded the**
2  **rules using programming language.  There was an initial**
3  **component already in the application that software engineers**
4  **had developed.  So we extended that component that was**
5  **developed by our software engineers.**
6  Q.  Are you talking about Evolution in Canada?
7  A.  **Evolution Canada, yes.**
8  Q.  Thank you.  The jury heard Mr. Wachs of FICO testify by
9  video on Friday that someone at Chubb told him that Blaze
10 allowed Chubb to do in one afternoon something that would
11 normally take months and hundreds of thousands of dollars if
12 done by IT.
13           Do you remember hearing that testimony?
14 A.  **I do.**
15 Q.  Based on your experience as the chief architect at two
16 insurance organizations, did you ever observe Blaze allowing
17 Chubb to do in one afternoon what otherwise would have taken
18 months and hundreds of thousands of dollars to do?
19 A.  **Never experienced that.**
20 Q.  Did anyone at Chubb ever suggest to you that Blaze had
21 so dramatically improved their ability to run rules in
22 computer applications?
23 A.  **No.**
24 Q.  Now, the jury has also heard some testimony about the
25 concept of rate of adoption of technology.  What does that

**EXHIBIT 1**

**1161**

1  refer to?

2  A.  **So rate of adoption is, of technology, it describes a**

3  **scenario where technology adoption is expanding.  So it's,**

4  **the utilization, it's growing.  And it's growing, and it can**

5  **grow at different speeds obviously.**

6  Q.  From the perspective of a technology architect, if a

7  rules engine could allow an insurance company to do in an

8  afternoon what it would normally take months to do, what

9  would you expect to see in terms of the rate of adoption?

10  A.  **To grow pretty fast, if that was possible.**

11  Q.  And what's your understanding of the rate of adoption of

12  rules software at the combined ACE/Chubb entity?

13  Approximately what percentage of the computer applications

14  are running rules?

15  A.  **Using a rules engine?**

16  Q.  Yes.

17  A.  **Less than one percent, so very low rate of adoption.**

18       MS. GODESKY:  Thank you.  I have no further

19  questions right now.

20       THE COURT:  Mr. Hinderaker, any recross?

21       MR. HINDERAKER:  Yes, please.  Thank you.

22            RECROSS-EXAMINATION

23  BY MR. HINDERAKER:

24  Q.  Hello again.

25  A.  **Hello.**

**1162**

1  Q.  Before the acquisition in 2016 you were with ACE

2  Limited, correct?

3  A.  **Yes.**

4  Q.  And your responsibilities were international?

5  A.  **International.**

6  Q.  And your international responsibilities did not include

7  the United States.

8  A.  **That's correct.**

9  Q.  And for the period of time from 20 -- from 2006 to the

10  acquisition, is it fair to say that you had no conversations

11  with anybody at Chubb Limited, whether it was Mr. Sullivan,

12  Owen Williams, Henry Mirolyuz, about their experience using

13  Blaze Advisor in connection with selling specialty

14  insurance?

15  A.  **I did not know those individuals.**

16  Q.  That's my point.  And in 2017, then, your

17  responsibilities became global and -- but somebody else,

18  Mr. Pandey, is responsible for North America.

19  A.  **In my team.**

20  Q.  Yes.  So you don't have day-to-day contact with the

21  people from either legacy Chubb -- well with legacy Chubb or

22  combined Chubb who are responsible for maintaining and using

23  and operating the applications that contain Blaze Advisor in

24  connection with selling insurance, correct?

25  A.  **Would you, would you mind asking the question again?**

**1163**

1  Q.  That was so hard to get out, I don't know.

2       My point was that given your roles, you do not

3  have day-to-day communications with the people who are

4  responsible for the applications that contained Blaze

5  Advisor and are used in connection with selling insurance

6  for the specialty insurance line of the former Chubb

7  Corporation or for the commercial insurance line of the

8  former Chubb Corporation?

9  A.  **We don't have Blaze Advisor in our landscape anymore.**

10  Q.  Now I'm speaking of the time frame 2016 through 2020.

11  A.  **Okay.  Well, I had pretty frequent interaction with my**

12  **team in the global organization as part of my role.**

13  Q.  Understood, with your team in the global organization.

14  Does your team include Henry Mirolyuz?

15  A.  **When Henry was here, yes, he was part of my --**

16  Q.  And did you have frequent conversations with Henry

17  Mirolyuz?

18  A.  **I had a number of communicates with Henry Mirolyuz.**

19  Q.  You're aware from being in the courtroom that in 2006,

20  amongst all the rules management software vendors available

21  at the time, Chubb & Son chose Blaze Advisor to be the rules

22  management technology, correct?

23  A.  **Yes, I'm aware.**

24  Q.  And then in 2016 you started your own review, after the

25  merger, and in the beginning stages with that TDA review,

**1164**

1  although you disagreed, I guess, with Mr. Tonkin's

2  conclusions, in that review as a work-in-progress in April

3  Blaze Advisor was identified as the superior technology over

4  ODM.

5  A.  **They had the highest score.**

6  Q.  And then as your decision processes continued, you

7  started to look at how to position the entire enterprise

8  from the point of view of technology, correct?

9  A.  **Yes.  You are referring to the, defining the new**

10  **technology standards for the new Chubb.**

11  Q.  Right.  And then that led you to the conclusion to adopt

12  an open source technology as an enterprise-wide standard.

13  A.  **That happened after we completed that effort.**

14  Q.  Of course.  After you completed the effort, one of the

15  conclusions from the effort was to adopt as an

16  enterprise-wide strategy an open source platform technology?

17  A.  **Yeah.  In 2019 we made that decision.**

18  Q.  Yes, I agree.  And so when you then went to Drools, the

19  decision to go to Drools was driven by the earlier decision

20  to go to open source.

21  A.  **It was contextual.**

22  Q.  Yes.  In other words, at that point once the decision

23  was open source, the alternatives of vendors like Blaze

24  Advisor or Duck Creek or Pegasus or ODM, all of those

25  third-party vendor choices are off the table because

**EXHIBIT 1**

Fair Isaac vs. Federal Insurance Company, et al.                    **February 28, 2023 - Volume VII**

---

1198

```
 1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
 2
 3    -----------------------------------------------
                                )
 4    Fair Isaac Corporation,    )  File No. 16-cv-1054(DTS)
      a Delaware Corporation,    )
 5                               )
          Plaintiff,             )
 6                               )
      v.                         )
 7                               )
      Federal Insurance Company, )  Courtroom 14W
 8    an Indiana corporation,    )  Minneapolis, Minnesota
      and ACE American Insurance )  Wednesday February 15 2023
 9    Company, a Pennsylvania    )  8:50 a.m.
      Corporation,               )
10                               )
          Defendants.            )
11                               )
      -----------------------------------------------
12
13
14         BEFORE THE HONORABLE DAVID T. SCHULTZ
      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16        (JURY TRIAL PROCEEDINGS - VOLUME VII)
17
18
19
20
21
22    Proceedings recorded by mechanical stenography; transcript
      produced by computer.
23
                         *  *  *
24
25
```

---

1199

```
 1    APPEARANCES:
 2    For Plaintiff:      MERCHANT & GOULD P.C.
                          BY:  ALLEN W. HINDERAKER
 3                             HEATHER J. KLIEBENSTEIN
                               PAIGE S. STRADLEY
 4                             MICHAEL A. ERBELE
                               JOSEPH W. DUBIS
 5                             GABRIELLE L. KIEFER
                          150 South Fifth Street, #2200
 6                        Minneapolis, Minnesota 55402
 7    For Defendants:     FREDRIKSON & BYRON
                          BY:  TERRENCE J. FLEMING
 8                             LEAH C. JANUS
                               CHRISTOPHER D. PHAM
 9                             RYAN C. YOUNG
                               PANHIA YANG
10                        200 South Sixth Street, #4000
                          Minneapolis, Minnesota 55402
11
                          O'MELVENY & MYERS LLP
12                        BY:  LEAH GODESKY
                               ANTON METLITSKY
13                             DARYN E. RUSH
                               ROXANA GUIDERO
14                        Times Square Tower
                          7 Times Square
15                        New York, New York 10036
16    Court Reporters:    RENEE A. ROGGE, RMR-CRR
17                        KRISTINE MOUSSEAU, CRR-RPR
                          MARIA V. WEINBECK, RMR-FCRR
18                        PAULA RICHTER, RMR-CRR-CRC
                          United States District Courthouse
19                        300 South Fourth Street, Box 1005
                          Minneapolis, Minnesota 55415
20
                              *  *  *
21
22
23
24
25
```

---

1200

```
 1                    I N D E X
                                          PAGE
 2
      JOHN TAYLOR
 3    Via Deposition By Mr. Hinderaker         1219
 4
 5
 6    NEIL J. ZOLTOWSKI
      DIRECT EXAMINATION BY MS. KLIEBENSTEIN   1246
 7    CROSS-EXAMINATION BY MS. GODESKY         1334
      REDIRECT EXAMINATION  BY MS. KLIEBENSTEIN 1350
 8    RECROSS-EXAMINATION BY MS. GODESKY       1351
 9    RANDOLPH BICKLEY WHITENER
      DIRECT EXAMINATION BY MR. HINDERAKER     1353
10
11    PLAINTIFF'S                            REC'D
      857                                    1361
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

1201

```
 1              February 28, 2023
 2                  8:50 A.M.
 3
 4       (In open court without the Jury present.)
 5       THE COURT:  Good morning.  Please be seated.
 6       All right.  Good morning, everyone.  We're on the
 7    record outside the presence of the jury.  I understand the
 8    parties have an issue with respect to some of the
 9    interrogatory answers that are intended to come in -- into
10    evidence today.
11       So, Ms. Kliebenstein, or whomever on that side,
12    come on up.
13       MS. KLIEBENSTEIN:  Thank you.  Good morning, Your
14    Honor.
15       We have, we have three -- two and a half issues,
16    if you will.  So one of them is the interrogatories, but I
17    think I'll start with something else first.  The defendants
18    have objected to our inclusion in Mr. Zoltowski's
19    demonstrative of revenues associated with the Chubb
20    Insurance Company Canada.  And as we -- they say that
21    it's -- it was decided on summary judgment, that it's not in
22    the case anymore.  But as we heard from Mr. Pandey and
23    Mr. Mirolyuz, that application -- the application running in
24    that entity in Canada is running out of Raleigh, North
25    Carolina, and we have outlined the case for infringement in
```

---

**EXHIBIT 1**

1342

1  amounts paid by Chubb's customers to purchase insurance
2  policies, right?
3  **A.** By the customers of whatever writing company that was,
4  yes.
5  **Q.** And you included all of the money paid by Chubb's
6  customers to purchase policies if it -- if those policies
7  ever ran through a computer application that included Blaze,
8  right?
9  **A.** If it was under one of the writing entities, yes.
10 **Q.** Okay.  So I just want to talk a little bit about what
11 that means.
12      So hypothetically, if you had a business in Texas
13 that paid $10,000 for a workers' compensation policy from
14 Chubb, if that policy ran through the TAPS application, in
15 2017 you would include that $10,000 premium in your $21
16 billion number.  Fair?
17 **A.** Yes.  That's correct.
18 **Q.** And that's because TAPS has a Blaze as a component,
19 right?
20 **A.** The policy touched Blaze in some way.
21 **Q.** And you were asked to include all premium dollars that
22 ran through these computer applications that included Blaze,
23 right?
24 **A.** Well, I was asked to determine what that amount would
25 be.  And like I said, I would have looked at costs as well.

1343

1  If I had the appropriate data to deduct them, I would have.
2  **Q.** But when you're talking about revenue, if dollars were
3  paid for a policy that ran through an application including
4  Blaze, you included the dollars?
5  **A.** Yes.  That's correct.
6  **Q.** You did not do any analysis to determine specifically
7  how Blaze was utilized in connection with particular
8  policies, correct?
9  **A.** I mean, other than understanding how the applications
10 worked.
11 **Q.** But you didn't go through and look at particular
12 policies and figure out whether -- whatever role Blaze had
13 with that particular purchase, right?
14 **A.** No.  I think there were hundreds of thousands of
15 policies, no.
16 **Q.** And you didn't do anything to adjust your written
17 premium numbers based on Blaze's particular role in an
18 application as compared to other technology components,
19 correct?
20 **A.** That's not my burden based upon the law, as I understand
21 it.
22 **Q.** I'm not asking you about the burden or the law.  The
23 judge is going to instruct the jury on the law.
24      My question is whether it's correct that you
25 haven't done anything to adjust your gross written premium

1344

1  numbers to account for Blaze's role in each particular
2  application, correct?
3  **A.** No, I have not.
4  **Q.** And you also haven't done anything to adjust those
5  revenue numbers to account for the role that folks at Chubb
6  had in coming up with the particular rules that were
7  deployed through Blaze, right?
8  **A.** I didn't have enough information that would allow me to
9  quantify that.
10 **Q.** So you did not do it, correct?
11 **A.** I could not do it.
12 **Q.** You did not do it.
13 **A.** Well, could not translates to did not, then yes.
14 **Q.** And your methodology also doesn't adjust the revenue
15 numbers at all to account for costs that Chubb would have
16 incurred implementing Blaze, right, like time spent training
17 software engineers on how to use the product, correct?
18 **A.** I didn't have the appropriate information to do so, so I
19 did not.
20 **Q.** And you also didn't do anything to investigate whether
21 Blaze was successfully or efficiently functioning in these
22 particular computer applications.  It was if it's a computer
23 application including Blaze, I'm including all the dollars,
24 right?
25 **A.** I'm not aware of any information related to it being not

1345

1  functioning correctly or any problems with it for any of the
2  policies that I quantified gross written premiums for.
3  **Q.** But as a damages expert, Mr. Zoltowski, you didn't sit
4  down and conduct an investigation into how well functioning
5  Blaze was in these particular computer applications,
6  correct?
7  **A.** I'm not sure I understand what you mean by "how well it
8  was functioning."
9  **Q.** You didn't sit down and do an investigation into how
10 efficient Blaze was in each particular computer application.
11 You didn't render opinions on that, correct?
12 **A.** I would need to know what you mean by "efficient" too.
13 I mean, the latency -- I mean, what is the --
14 **Q.** Did you do a latency analysis, Mr. Zoltowski?
15 **A.** There wasn't that information provided, I don't believe.
16 **Q.** So that's a no?
17 **A.** No.  When you don't have the information to do the
18 analysis, then you can't do the analysis.
19 **Q.** Okay.  I want to look at your slide 12, which is an
20 example of one of these slides that talks about revenue from
21 eight different ACE writing companies.  Do you remember
22 these slides?
23 **A.** I do.
24 **Q.** And you talked about ACE American, Westchester and the
25 others, right?

**EXHIBIT 1**

1346

1 **A.** Yes.

2 **Q.** So just to be clear, the only application at Chubb that

3 used Blaze and included revenue from ACE writing companies

4 is CUW Inventory Management, correct?

5 **A.** I'm sorry. Could you repeat that question?

6 **Q.** The only application at Chubb that used Blaze and

7 included revenue from these ACE writing companies is CUW

8 Inventory Management, correct?

9 **A.** The only application?

10 **Q.** Correct.

11 **A.** I'm not sure that's true.

12 **Q.** Let me see if I can refresh your recollection,

13 Mr. Zoltowski.

14      So I handed you an excerpt from one of your expert

15 reports, and if you look at page 30, footnote B, that might

16 help.

17 **A.** You said footnote B?

18 **Q.** On page 30, yes.

19 **A.** Yeah.

20 **Q.** Do you see footnote B from your report, Mr. Zoltowski,

21 reads, "The CUW application is the only application for

22 which defendants reported gross written premium from ACE

23 American subsidiaries."

24      Do you see that?

25 **A.** I do.

1347

1 **Q.** So does that refresh your recollection that the CUW

2 application is the only application that shows revenue from

3 the ACE writing companies?

4 **A.** It does, assuming I didn't make a mistake. We typically

5 check all of these things when we write our reports, so I

6 would assume that's true, but I would want to check the

7 interrogatories to confirm.

8 **Q.** But that's what you wrote in your report, right?

9 **A.** Yes.

10 **Q.** And you haven't investigated or offered opinions on the

11 particular people at Chubb who had access to the CUW

12 Inventory Management System, right? That's outside the

13 scope of your opinions.

14 **A.** I'm not sure I understand your question about "the

15 people."

16 **Q.** Have you done -- have you investigated, as part of your

17 expert work in this case, Mr. Zoltowski, the particular

18 people at Chubb who had access to CUW Inventory Management?

19 **A.** I looked at the information available. I don't believe

20 there was any information that would allow me to investigate

21 those particular individuals.

22 **Q.** So you don't know?

23 **A.** Based on what was available, no.

24 **Q.** Okay. So as we said, revenue is money that comes in the

25 door at an insurance company, right?

1348

1 **A.** Yes.

2 **Q.** And you agreed with Ms. Kliebenstein that revenue is not

3 the same thing as profit, correct?

4 **A.** That's correct.

5 **Q.** And so if you want to talk about an insurance company's

6 profit, you have to take the revenue dollars, that $21

7 billion, and then you have to subtract the costs and the

8 expenses, correct?

9 **A.** That's correct.

10 **Q.** And costs at an insurance company, that's going to be

11 money that goes out the door when a customer has a claim,

12 right, and you need to pay the customer?

13 **A.** Yes. That's correct.

14 **Q.** Things like employee salaries?

15 **A.** Yes.

16 **Q.** Rent on all of your office buildings, things like that,

17 right?

18 **A.** Depending on if they're attributable to the premiums

19 that are at issue here, yes.

20 **Q.** And your $21 billion figure doesn't include costs or

21 expenses at all, correct?

22 **A.** Yeah. I did not have the information to allow me to do

23 that accurately.

24 **Q.** And you are not here, Mr. Zoltowski, to opine that there

25 is a nexus or a connection between Blaze and defendants'

1349

1 revenue, correct?

2 **A.** I understand there's other witnesses and information

3 that will be doing that. I was not asked to do that.

4 **Q.** And so that means you are not here to offer opinions on

5 how much, if any, of this $21 billion in revenue is actually

6 connected to Blaze as opposed to all the other things that

7 make Chubb Chubb, right? That's someone else.

8 **A.** That would have been part of my analysis if there was

9 information to do so. I did not endeavor to do so, though.

10 **Q.** You do recognize, though, that there are plenty of

11 tangible and intangible assets at Chubb other than Blaze

12 that have contributed to that $21 billion figure, correct?

13 **A.** I've never said there were no costs associated with the

14 gross written premiums here. I just didn't have appropriate

15 information to do so accurately.

16 **Q.** But you also acknowledge that there are other assets at

17 Chubb that contribute to revenue, right, other than Blaze?

18 **A.** I'm sure there may be other things that contribute to

19 writing a premium, insurance premium.

20 **Q.** And your $21 billion figure just represents every single

21 dollar that was paid for an insurance policy that ran

22 through those computer applications that had Blaze in it

23 during the relevant period, correct?

24 **A.** Yes. That's correct.

25 **Q.** Okay. Thank you.

**EXHIBIT 1**

1374

1    MR. HINDERAKER: Maybe, Your Honor, before we get
2  to that, I can be very clear about the purpose for which his
3  testimony is being offered.
4    THE COURT: Sure.
5    MR. HINDERAKER: His purpose -- his testimony is
6  being offered to inform the jury regarding the process of
7  selling insurance, regarding the things that matter in that
8  process to selling more insurance or selling less insurance.
9    He has been engaged to -- and he has experience in
10 not only front line underwriting but corporate product
11 development, so he has knowledge with respect to those
12 things. And he has, as you heard, studied 10,000-plus pages
13 of the defendants' documents to analyze from his expertise
14 how the defendants were using -- how the defendants used
15 Blaze Advisor, in their words.
16   He is not offered a Blaze Advisor expert or as
17 somebody who with Blaze Advisor expertise connects Blaze
18 Advisor to the selling of insurance. We've heard
19 Mr. Baseman, Mr. Ivey, Mr. Baer, Mr. Marce regarding the
20 qualities or attributes that Blaze Advisor brings to the
21 industry.
22   And now we're looking it -- taking it from the
23 other side, with Mr. Whitener telling us, well, how does the
24 insurance industry work and how is insurance sold, and he
25 has experience with technology. I'm not pretending him to

1375

1  be a Blaze Advisor, but he does -- he has studied the
2  defendants' use of Blaze Advisor, if that's more clear.
3    THE COURT: And I'm assuming that all of the
4  opinions you intend to elicit are the ones that were
5  disclosed in his report.
6    MR. HINDERAKER: Absolutely.
7    THE COURT: I suspect I know what I'm going to
8  hear from Ms. Godesky, and that is that you described him as
9  testifying to the value of Blaze Advisor, but maybe I'll
10 hear something else, but I understand what you're telling
11 me.
12   MR. HINDERAKER: Yeah. And that value
13 proposition, if you will, is going to come from his analysis
14 of these case-specific facts. So it comes from, if you
15 will, the bottom up, the case-specific facts, not some Blaze
16 Advisor expertise top-down.
17   THE COURT: And he's not offering damage numbers?
18   MR. HINDERAKER: He's not offering damage numbers.
19   THE COURT: Ms. Godesky?
20   MS. GODESKY: Your Honor, slide 3 in their
21 presentation for Mr. Whitener --
22   THE COURT: I may be wrong.
23   MS. GODESKY: Summary of opinions. "Blaze Advisor
24 added significant value to the process of selling insurance
25 and hence added significant value to defendants' business."

1376

1    The last slide, "FICO Blaze Advisor added
2  significant value to defendants' business."
3    Slide 73, "Defendants needed Blaze Advisor to sell
4  insurance in underpenetrated markets."
5    And when you look at the text of his disclosed
6  reports, the headers in the reports are Blaze Advisor's
7  Contribution to Gross Written Premium, Chubb's use of Blaze
8  Advisor Contributes to Gross Written Premium.
9    And we have an objection to Mr. Whitener
10 testifying about the value or contribution of Blaze or even
11 decision management software generally, because I would like
12 to do a voir dire of the expert and show that he has no
13 experience in that area. And so you cannot create an expert
14 by having them study in the context of litigation.
15   He needed to be retained with the expertise that's
16 required under Rule 702.
17   THE COURT: But his experience and qualifications,
18 if I'm remembering Judge Wright's order correctly, I believe
19 she said that no -- no objection was made to his experience
20 or qualifications and then denied the motion to exclude
21 based on the objections that were made.
22   Am I accurately recalling what she said?
23   MS. GODESKY: She said that it was raised in
24 reply, and so she was not going to consider it. But it is
25 absolutely not waived because you have no obligation to

1377

1  challenge qualifications under Rule 702 in a *Daubert* motion,
2  and we can do so now.
3    THE COURT: I understand.
4    MR. HINDERAKER: Again, if I could repeat myself a
5  bit. It's -- looking at the defendants' documents without
6  having expertise in the insurance industry doesn't tell you
7  the picture that comes with studying how defendants use
8  Blaze Advisor with that knowledge from the insurance
9  industry.
10   So why did -- why did something matter -- why did
11 what the defendants were doing with Blaze Advisor matter?
12 It mattered because in the process of selling insurance,
13 that effect -- that attribute affects the outcome of the
14 selling process.
15   So I don't mind the jury being quite clear that
16 he's not a Blaze Advisor expert. He's an insurance industry
17 expert.
18   MS. GODESKY: Your Honor, his opinions go far
19 beyond that as disclosed on the slides and in his report.
20 If he was simply offering opinions about, this is the
21 process of selling insurance and certain things are
22 important in the process of selling insurance, that might be
23 appropriate.
24   But he was disclosed as an expert who offered
25 opinions on how Blaze contributed to gross written premium

EXHIBIT 1

1378

1 at Chubb, and he does not have the expertise to offer those
2 opinions.
3      MR. HINDERAKER:  Well, that's not exactly accurate
4 because the testimony is that if you can -- that defendants,
5 in fact, achieved certain outcomes using Blaze Advisor, by
6 the defendants own statements.  And those outcomes mattered
7 in the process of selling insurance because of the elements
8 of the process of selling insurance.
9      So you take -- you take what the defendants have
10 acknowledged as why they were using it, what they were
11 trying to achieve, and you apply it to the process of
12 selling insurance and why it matters in the process of
13 selling insurance.  And you reach a conclusion that it had
14 an impact.  It was significant.
15      He's not quantifying it in terms of -- he's not
16 touching it to revenue.  That was a different expert.  He's
17 just saying, how does this matter to the process of selling
18 insurance, from the defendants' own experience.
19      THE COURT:  Understood.  I understand your
20 objection.  I'm going to allow him to testify.  You can
21 bring this all out in cross.  You can make objections during
22 his testimony, if you wish.  But I'll hear the testimony or
23 we'll begin with the testimony, and we'll cross that bridge
24 here when we get to it.
25      MS. GODESKY:  Your Honor, just for the record,

1379

1 I'll lodge the additional objection that this is
2 particularly prejudicial given his lack of qualifications
3 and the fact that this all goes to the disgorgement question
4 that's going to be decided by the Court, not the jury.
5      And now they're hearing testimony from someone who
6 is, I think admittedly by plaintiffs, not qualified to
7 testify about Blaze Advisor.
8      With that, is he presented as qualified in
9 insurance?  Is that the qualification that the Court is
10 presenting?  I'm just trying to understand if he's allowed
11 to testify, what is the qualification?
12      THE COURT:  He's testified as to the width and
13 breadth of his experience and expertise in the insurance
14 industry and his knowledge of the use of technology in
15 underwriting, generally speaking.  Beyond that, he has Blaze
16 specific knowledge derived from the documents.
17      So on that basis and not knowing exactly what's
18 coming out of the witness' mouth, I'm going to let him
19 testify.  And I understand your concern, but let me be
20 blunt.  All of this is things that would have been
21 beneficially raised on *Daubert* motions, and if not at
22 *Daubert* motions, then raised in motions in limine, and we
23 could have addressed it then.
24      And I didn't use the word "waiver."  I didn't say
25 you'd waived it.

1380

1      So let's bring the jury in.
2           **IN OPEN COURT**
3      THE COURT:  Go ahead and be seated.
4      Mr. Whitener, come on back up to the witness
5 stand, if you would.
6      THE WITNESS:  Mic is on?
7      MR. HINDERAKER:  Yep.  Sounds good.  We can hear
8 you.
9 BY MR. HINDERAKER:
10 **Q.** Let's turn to -- let's turn to a discussion of the
11 different kinds of insurance products in the marketplace so
12 we start to get that understanding.
13      If we could go to slide 7, please.
14      This slide obviously shows four different kinds of
15 insurance.  And is that -- that's accurate?  We can put --
16 we can put insurance products into these four categories?
17 **A.** You can.  I generally refer to these as market segments.
18 **Q.** Market segments.  All right.
19      Well, I'd like to just go through each one so we
20 have an understanding of the marketplace with respect to
21 insurance products.  So if -- I think I can control this for
22 a moment.
23      Let's go to specialty insurance.  Tell us what it
24 is, please.
25 **A.** Specialty insurance is a type of commercial insurance

1381

1 generally segmented out from an organizational standpoint
2 inside of the underwriting functions of a company, the
3 corporate underwriting functions, even front line
4 underwriting functions.
5      Specialty insurance is insurance for unique risk,
6 and I'll use the phrase "as opposed to mainstream
7 commercial."  Commercial insurance, relatively less complex.
8 Special insurance, very complex.  A good example of this
9 might be directors and officers insurance.  This usually
10 revolves around various types of professional liability or
11 unique risk.
12      There was a time in the past where the Bengal
13 tiger, the white Bengal tiger at the Cincinnati Zoo was
14 loaned, I believe, to the San Diego Zoo and the specialty
15 marketplace of the general insurance property casualty
16 industry provided that coverage.
17      A good example would be medical malpractice.
18 Another good example is architects and engineers, people
19 that require liability protection because of -- because of
20 mistakes.
21 **Q.** In general, does specialty insurance require a higher
22 level of underwriting expertise?
23 **A.** Yes.
24 **Q.** And explain why, please.
25 **A.** The risk -- the risks are significantly higher.  The

**EXHIBIT 1**

**1438**

1    UNITED STATES DISTRICT COURT
     DISTRICT OF MINNESOTA
2

3    ------------------------------------
     )
4    Fair Isaac Corporation,      )  File No. 16-cv-1054(DTS)
     a Delaware Corporation,      )
5                                 )
     Plaintiff,                   )
6                                 )
     v.                           )
7                                 )
     Federal Insurance Company,   )  Courtroom 14W
8    an Indiana corporation,      )  Minneapolis, Minnesota
     and ACE American Insurance)     Wednesday, March 1, 2023
9    Company, a Pennsylvania      )  9:00 a.m.
     Corporation,                 )
10                                )
     Defendants.                  )
11   ------------------------------------

12

13

14       BEFORE THE HONORABLE DAVID T. SCHULTZ
     UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16      (JURY TRIAL PROCEEDINGS - VOLUME VIII)

17

18

19

20

21

22   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23

24                    * * *
25

**1439**

1    APPEARANCES:

2    For Plaintiff:      MERCHANT & GOULD P.C.
                         BY:  ALLEN W. HINDERAKER
3                             HEATHER J. KLIEBENSTEIN
                              PAIGE S. STRADLEY
4                             MICHAEL A. ERBELE
                              JOSEPH W. DUBIS
5                             GABRIELLE L. KIEFER
                         150 South Fifth Street, #2200
6                        Minneapolis, Minnesota 55402

7    For Defendants:     FREDRIKSON & BYRON
                         BY:  TERRENCE J. FLEMING
8                             LEAH C. JANUS
                              CHRISTOPHER D. PHAM
9                             RYAN C. YOUNG
                              PANHIA VANG
10                       200 South Sixth Street, #4000
                         Minneapolis, Minnesota 55402

11

12                       O'MELVENY & MYERS LLP
                         BY:  LEAH GODESKY
13                            ANTON METLITSKY
                              DARYN E. RUSH
14                            ROXANA GUIDERO
                         Times Square Tower
15                       7 Times Square
                         New York, New York 10036

16   Court Reporters:    RENEE A. ROGGE, RMR-CRR
                         KRISTINE MOUSSEAU, CRR-RPR
17                       MARIA V. WEINBECK, RMR-FCRR
                         PAULA RICHTER, RMR-CRR-CRC
18                       United States District Courthouse
                         300 South Fourth Street, Box 1005
19                       Minneapolis, Minnesota 55415

20
                              * * *
21

22
23
24
25

**1440**

1              **I N D E X**

2                                 PAGE

3    **RANDOLPH BICKLEY WHITENER**

     Direct Examination (Resumed) By Mr. Hinderaker   1442
4    Cross Examination By Ms. Godesky                 1532
     Redirect Examination By Mr. Hinderaker           1599
5

6    **N. WILLIAM PAUL WAID**
     Direct Examination By Mr. Hinderaker             1606

7

8
     PLAINTIFF'S                          REC'D
9    1113                                 1675
     1116                                 1702
10

11

12
13
14
15
16
17
18
19
20
21
22
23
24
25

**1441**

1    March 1, 2023              9:00 A.M.

2

3    **(In open court without the Jury present.)**

4        THE COURT:  Good morning.  Be seated.

5        We'll take up the issue with respect to

6    Mr. Waid's testimony over the lunch hour.  It is clear to

7    me he is not getting on the stand before then.  All right?

8        MS. GODESKY:  Yes.

9        THE COURT:  Okay.

10       THE CLERK:  All rise for the jury.

11           **(Jury enters.)**

12

13

14       **(In open court with the Jury present.)**

15       THE COURT:  Go ahead and be seated.

16       Okay.  Good morning.  Thanks, everyone, for

17   braving our slippery roads.

18       Mr. Hinderaker, are you ready to proceed?

19       MR. HINDERAKER:  I am, Your Honor.

20       THE COURT:  Go ahead and recall Mr. Whitener

21   back.

22       MR. HINDERAKER:  I would call Mr. Whitener.

23       THE COURT:  Whitener.  Come on up, Mr. Whitener.

24       THE WITNESS:  Thank you.

25       THE COURT:  Just remind you as you're walking up,

**EXHIBIT 1**

**1530**

1  responding to statutory and regulatory changes? Can I stay
2  more in compliance with both those statutory and those
3  underwriting -- corporate underwriting requirements? Can I
4  be easier to do business with? Can I take on -- can I
5  scale? Can I take on more business with my existing very,
6  very valuable staff?
7       And if I do that, take on more business with my
8  valuable staff, but I reduce the amount of use of human
9  capitol in the "buying, book process," I can now
10  concentrate on agents and brokers and spending time with
11  them in developing that relationship, my conclusion is that
12  Blaze Advisor deployed by agents in some places, not all,
13  added significant value to the defendants' business of
14  selling insurance.
15  Q.  Okay.  And in drawing this judgment about the
16  significant value of selling insurance, do I understand you
17  correctly that the attributes or the features that resulted
18  in the significant value were the ones you just described:
19  Speed, agility, precision and so forth?
20  A.  That is correct.
21  Q.  Did you have -- we saw in some of the slides of the
22  defendants where some other insurance companies had done
23  the work to quantify or measure the improvements that they
24  realized with Blaze Advisor.
25       Did you have that -- any kind of information like

**1531**

1  that available to you?
2  A.  I did not.
3  Q.  Is it necessary for you to have that kind of
4  quantification of information to draw your judgment that
5  Blaze Advisor added significant value?
6  A.  There are two different questions there in the
7  underwriting world I live in. The first is, did it? The
8  second is, how much did it? Okay? I had more than enough
9  information, documentation, 10,000-plus pages, to determine
10  that it did it.
11       I don't need a tape measurer or a stopwatch to
12  know that computers executing transactions is faster than
13  humans because I was a human underwriter, and I've worked
14  with many companies to -- to deploy technology into those
15  processes. I don't know -- I don't need to measure
16  variation in compliance because I know a computer system
17  with a set of facts is going to make the same decision with
18  those facts every time, and I know -- I have been out on
19  underwriting audits and audited underwriting functions --
20  that humans cannot do that.
21  Q.  So overall as a -- overall, Blaze Advisor added
22  significant value in the selling of insurance by the
23  defendants?
24  A.  My opinion is that Blaze Advisor added significant
25  value to the -- to the defendants' process of executing the

**1532**

1  "bind, book, issue" which is how I describe the process of
2  selling insurance where deployed.
3       MR. HINDERAKER:  Thank you for your time.
4       THE WITNESS:  You're welcome.
5       THE COURT:  Ms. Godesky.
6       MS. GODESKY:  Thank you.
7       THE WITNESS:  Thank you.  I'm overburdened here.
8            CROSS EXAMINATION
9  BY MS. GODESKY:
10  Q.  Good morning, Mr. Whitener.
11  A.  Good morning, Ms. Godesky.
12  Q.  You understand I represent the defendants in this case,
13  right?
14  A.  I do, in fact.
15  Q.  This is your first time testifying as an expert in
16  court, right?
17  A.  That is correct.
18  Q.  So no court or arbitrator has ever qualified you as an
19  expert in rules-based software?
20  A.  This is correct.
21  Q.  Your advanced degree is a college degree from Virginia
22  Commonwealth University where you majored in education,
23  correct?
24  A.  I have a degree in education, a Bachelor of Science
25  from Virginia Commonwealth University.  I struggle with the

**1533**

1  word "advanced."
2  Q.  It's a degree in education from Virginia Commonwealth,
3  right?
4  A.  That is correct.
5  Q.  You've never worked for a software company, correct?
6  A.  Correct.
7  Q.  And you've never worked as a software developer,
8  correct?
9  A.  Mostly correct -- well, no.  I'm sorry.  Correct.
10  Q.  During direct examination beginning of yesterday, you
11  talked about the work you've done at various insurance
12  companies, right?
13  A.  Various insurance companies and various vendors who
14  sell goods and services to the insurance companies.
15  Q.  Okay.  So I want to walk through the chronology of your
16  employment that Mr. Hinderaker took you through and asked
17  you a few different questions.
18       So you were at the Hartford, which is an
19  insurance company, from the late 1970s to the early 1990s?
20  A.  Mid-1993.
21  Q.  Okay.  And you did not do any work with decision
22  management software at that job because the software did
23  not exist in that time period, correct?
24  A.  Correct.
25  Q.  And then you were at the Prudential, which is another

**EXHIBIT 1**

**1534**

1  insurance company, right?
2  A.  **Again, correct.**
3  Q.  And that was in the mid-1990s?
4  A.  **Yes.**
5  Q.  And there was no use of decision management software
6  there, correct?
7  A.  **As you would define decision management software, that**
8  **is correct.**
9  Q.  The rules software programs we're all here to talk
10  about, right?
11  A.  **Correct.**
12  Q.  Then you moved on to a mid-sized personal auto
13  insurance company in the late 90's to the early 2000s,
14  right?
15  A.  **Correct.**
16  Q.  And there was no decision management software
17  experience there because that company had decided to write
18  all of its business rules in code by software engineers,
19  right?
20  A.  **Initially, yes.**
21  Q.  And you've never been a member of a technology
22  department at an insurance company, correct?
23  A.  **Correct.**
24  Q.  That means you've never worked as a software engineer
25  or computer developer who writes code for an insurance

**1535**

1  company, right?
2  A.  **Partially correct -- mostly correct.**
3  Q.  And you have no experience sitting down and writing
4  rules into computer applications using high-level
5  programming language because to the extent that was
6  happening at the insurance companies you worked at, other
7  people were doing that, correct?
8  A.  **Mostly correct.**
9  Q.  And you've never been a technology architect for an
10  insurance company, correct?
11  A.  **Correct.**
12  Q.  Okay.  So then your next job was, you were a
13  business -- you were at a business process outsourcer in
14  Montana in the early 2000s, right?
15  A.  **Absolutely correct.**
16  Q.  And that company did not use rules-based software?
17  A.  **Correct.**
18  Q.  Then in the mid-2000s, you joined a midsize property
19  and casualty insurance company called American Reliable,
20  right?
21  A.  **Again correct.**
22  Q.  And you were there from '04 to '05?
23  A.  **Yes.**
24  Q.  No decision management software in use at the time you
25  joined, correct?

**1536**

1  A.  **Correct.**
2  Q.  And while you were there -- you talked about this on
3  direct a little bit -- you had a role in selecting Duck
4  Creek as the policy administration software for American
5  Reliable, correct?
6  A.  **Yes, but I became responsible for the implementation**
7  **using Duck Creek.**
8  Q.  Okay.  And you -- you left, though, after about a year
9  at the company, correct?
10  A.  **I believe it was a little closer -- something in that**
11  **vicinity.**
12  Q.  Yeah.  You were only there from '04 to '05, right?
13  A.  **Yes.**
14  Q.  So you didn't see the implementation of Duck Creek
15  because you moved on.
16  A.  **Correct.**
17  Q.  And you didn't work with any rules-based software
18  programs while you were at American reliable, like ODM or
19  Blaze or Drools, right?
20  A.  **Right.**
21  Q.  Then you went to another insurance company, Unitrin
22  Specialty, from '05 to '09, right?
23  A.  **Correct.**
24  Q.  They sell insurance, but no experience with decision
25  management software at Unitrin, right?

**1537**

1  A.  **Correct.**
2  Q.  Then you went to a small technology services company
3  called Discoverture Solutions?
4  A.  **Correct.**
5  Q.  And that position didn't have anything to do with
6  rules-based software?
7  A.  **That also is correct.**
8  Q.  And so as we've seen over the course of your career,
9  you've worked a few different insurances companies but
10  never at Chubb, right, or ACE?
11  A.  **Correct.**
12  Q.  And so at the time when you sat down to form your
13  expert opinions in this case -- and your first report,
14  right, Mr. Whitener, was in April of 2019?
15  A.  **Correct.**
16  Q.  You had never used any decision management software,
17  correct?
18  A.  **Agreed.**
19  Q.  And that necessarily includes Blaze?
20  A.  **That necessarily includes Blaze.**
21  Q.  So when you sat down to provide all those expert
22  opinions in this case about the value of Blaze to Chubb,
23  you had never used Blaze or any computer applications that
24  included Blaze, correct?
25  A.  **That is correct.**

**EXHIBIT 1**

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)
March 1, 2023, Volume VIII

**1538**

1  Q.  You had never used IBM ODM?
2  A.  **Correct.**
3  Q.  You had never used Drools?
4  A.  **Correct.**
5  Q.  And you had never used Red Hat Decision Manager?
6  A.  **Correct.**
7  Q.  So that first report you submitted in this case in
8  April 2019, with all the appendices, it was more than 50
9  pages.  Sound right?
10  A.  **I'm fairly certain I can say yes to that one.**
11  Q.  And it was all about how Blaze contributes to revenue
12  at Chubb, right?  All the opinions you just offered with
13  Mr. Hinderaker about speed and ease of doing business and
14  agility, correct?
15  A.  **Mostly.**
16  Q.  But when you wrote those 50 pages of opinions, you
17  could not speak to what Blaze looks like to someone who is
18  going in and using it to implement rules, correct?
19  A.  **Correct.**
20  Q.  And you had never used a computer application that
21  incorporated Blaze?
22  A.  **Correct.**
23  Q.  Then about a month later, you did your second report in
24  this case, and that was due in May of 2019, right?
25  A.  **Sounds right.**

**1539**

1  Q.  And that was another 25 pages.
2  A.  **Okay.**
3  Q.  Focused on the value of Blaze to Chubb?
4  A.  **Approximately.**
5  Q.  Focused on the value of Blaze to Chubb?
6  A.  **Again, correct.**
7  Q.  So then as of May 2019, you submitted 75 pages of
8  written material about the value of Blaze to Chubb, but you
9  still hadn't seen the process of implementing rules into
10  Blaze, correct?
11  A.  **Would you restate the date, please?**
12  Q.  As of May 2019, that second report, 75 pages of
13  opinions about the value of Blaze to Chubb, but you still
14  hadn't seen the process of implementing rules, correct?
15  A.  **At some point in that time frame, I had been given a**
16  **demonstration of Blaze by FICO, but I can't date stamp that**
17  **quite as precisely as you're asking.**
18  Q.  Well, you were scheduled to provide sworn deposition
19  testimony in this case on June 27th, 2019.  Does that sound
20  right?
21  A.  **Yes.**
22  Q.  Okay.  And that's the process the jury has heard about
23  where you have to come to a conference room and sit down,
24  provide sworn testimony about all the opinions you've
25  offered, right?

**1540**

1  A.  **Yes.**
2  Q.  And you're questioned by Chubb's lawyers for the first
3  time, correct?
4  A.  **Correct.**
5  Q.  And one day before your deposition about those 75 pages
6  of opinions that you'd offered, FICO's lawyers had you sit
7  down and watch a Webex presentation about Blaze.  Sound
8  right?
9  A.  **Mostly.**
10  Q.  So that was the first demonstration ever of how Blaze
11  works, and it was done after all your opinions were in,
12  those 75 pages of opinions, right?
13  A.  **Yes.**
14  Q.  Now, you didn't actually use Blaze during this
15  demonstration.  You weren't coming up with the rules and
16  then putting them into the software yourself.  That was
17  someone at FICO, right?
18  A.  **In the demonstration?**
19  Q.  Correct.
20  A.  **I created a rule.**
21  Q.  You created a rule, but mostly it was someone at FICO
22  running the demo, right?
23  A.  **Correct.**
24  Q.  And the demo was about 90 minutes?
25  A.  **I couldn't remember.**

**1541**

1  Q.  Why don't you look in the binder in front of you.
2  There is a copy of your deposition transcript from June
3  2019.
4  A.  **I'm there.**
5  Q.  And why don't we look at page 21 to see if that
6  refreshes your recollection?
7  A.  **21 in the box, correct?**
8  Q.  Yes, please.
9  A.  **Correct.**
10  Q.  A 90-minute demonstration?
11  A.  **Correct.**
12  Q.  Okay.  And that demo is not particular to any
13  particular company's use of Blaze, right?
14  A.  **It was not.**
15  Q.  And it wasn't specific to the insurance industry in any
16  way?
17  A.  **No, it was not.**
18  Q.  The demo had nothing to do with Chubb's use of Blaze?
19  A.  **Correct.**
20  Q.  And, in fact, the demo was actually a college
21  admissions scenario, correct?
22  A.  **Yes.**
23  Q.  So when you sat down to provide sworn testimony to
24  Chubb's lawyers about these 75 pages of opinions, that
25  90-minute demo on college admission scenarios from FICO was

**EXHIBIT 1**

**1542**

1  the full extent of your firsthand experience of Blaze,
2  correct?
3  A. **Yes, but --**
4  Q. "Yes" is good enough for now.  Thank you, Mr. Whitener.
5        Do you have a general understanding that
6  peer-reviewed literature is a term that's used for
7  literature that has been read and vetted by people other
8  than those who wrote it?
9  A. **Yes.**
10  Q. And the idea behind peer-reviewed literature is you
11  have someone looking at the publication and vetting your
12  ideas and conclusions to make sure they're sound, right?
13  A. **Yes.**
14  Q. And you have never published any peer-reviewed
15  literature on decision management software or rules
16  software, right?
17  A. **Correct.**
18  Q. And you haven't conducted any studies about the nature
19  and impact of rules software on businesses, correct?
20  A. **I'm sorry.  Restate that, please.**
21  Q. You have not conducted any studies, scientific studies,
22  on the impact of rules software in business, correct?
23  A. **Correct.**
24  Q. And before you rendered your expert opinions in this
25  case about the value of Blaze, you did not read or consider

**1543**

1  any peer-reviewed literature about the value of rules
2  software, correct?  It's not something you cited.
3  A. **Correct.**
4  Q. And before you rendered your expert opinions in this
5  case, you didn't read or consider any peer-reviewed
6  literature examining the use of using high-level
7  programming language to code rules in businesses, right?
8  A. **Correct.**
9  Q. And you aren't aware of, and you haven't identified,
10  any literature or studies that compare the efficiency of
11  using rules software to the efficiency of having software
12  engineers write code themselves, right?
13  A. **Correct.**
14  Q. Now, before you rendered your expert opinions about all
15  the value that Blaze brought to Chubb, you didn't speak to
16  anyone at Chubb who had actually worked with Blaze, right?
17  A. **Correct.**
18  Q. And you said during direct examination that you read
19  some deposition testimony from witnesses in this case,
20  right?
21  A. **I did.**
22  Q. Those transcripts were sent to you by FICO's lawyers?
23  A. **Yes.**
24  Q. You didn't read every deposition transcript in this
25  case, but you read the ones that they sent you, correct?

**1544**

1  A. **Correct.**
2  Q. So let's talk about what you reviewed.  You reviewed
3  testimony from Benjamin Baer at FICO, right?
4  A. **Correct.**
5  Q. We've heard from him.  He was one of FICO's first
6  witnesses, and he works in FICO marketing, right?
7  A. **Yes.**
8  Q. You also read testimony from Chris Ivey, he was another
9  witness from FICO in this trial, right, and he talked about
10  all those statements of work with Chubb?
11  A. **Yes.**
12  Q. And then you read the testimony of Lawrence Wachs, a
13  FICO/Blaze salesperson, right?
14  A. **Again correct.**
15  Q. And then you reviewed the deposition testimony of one
16  witness from Chubb, right?  That's Henry Mirolyuz.
17  A. **No.  There were two depositions.**
18  Q. That was the only Chubb witness whose deposition
19  transcript FICO's lawyers sent you, correct?
20  A. **Correct.**
21  Q. And before you rendered all your opinions about the
22  value of Blaze to Chubb, you didn't review the testimony of
23  Mr. Claudio Ghislanzoni, correct?
24  A. **Correct.**
25  Q. Nor the testimony of Mr. Ramesh Pandey, correct?

**1545**

1  A. **Correct.**
2  Q. And you also didn't review the testimony of any Chubb
3  underwriters, right, folks like Alissa Theberge or Mike
4  Schraer, right?
5  A. **Correct.**
6  Q. And you didn't read the testimony of anyone at Chubb
7  involved in the process of writing rules using Blaze, like
8  Ellen Garnes?
9  A. **Correct.**
10  Q. Before you rendered your opinions in 1029, you also
11  didn't speak to any other people in the insurance industry,
12  people at companies other than Chubb, about their
13  experiences with Blaze or decision management software?
14  A. **Correct.**
15  Q. You didn't do a formal survey, right?
16  A. **Correct.**
17  Q. And you didn't have any informal conversations either,
18  correct?
19  A. **Correct.**
20  Q. Now, we saw some anecdotes about how other insurance
21  companies use Blaze.  Mr. Hinderaker showed you that on the
22  screen, right?
23  A. **Yes.**
24  Q. We're going to come back to that, but before you
25  rendered your expert opinions, you didn't try to do a study

**EXHIBIT 1**

**1546**

1  examination how the country's largest insurance companies
2  are using rules-based software as opposed to coding by
3  software engineers, right?
4  A.  **Correct.**
5  Q.  You also haven't conducted any survey of FICO's
6  customers regarding their experience with Blaze, right?
7  A.  **Correct.**
8  Q.  And you haven't spoken to other rules software vendors
9  about their software programs, correct?
10 A.  **Mostly correct.**
11 Q.  Now, Mr. Whitener, as a general baseline, based on your
12 direct testimony, I'm assuming we can agree that the
13 insurance business is complex, right?
14 A.  **I have described it that way before.  There are aspects**
15 **that are very, very simple, but generally speaking, it is a**
16 **complex industry.**
17 Q.  Okay.  And I want to talk about some of the factors
18 that drive an insurance company's ability to earn revenue,
19 okay?  So the relationship between a broker and an agent,
20 on one hand, and the insurance company on the other, that
21 can affect where customers want to buy their insurance,
22 right?
23 A.  **Yes.**
24 Q.  And Blaze doesn't have anything to do with the
25 interpersonal relationships that Chubb employees build with

**1547**

1  brokers and agents, right?
2  A.  **Mostly correct.**
3  Q.  Blaze isn't taking people out to the ball game or out
4  to dinner or a networking lunch, right?
5  A.  **Correct.**
6  Q.  And the insurance products that a company sells are
7  also part of what determines the success of an insurance
8  company, right?
9  A.  **Yes.**
10 Q.  Can be a meaningful contributor to what makes a company
11 successful, right?
12 A.  **Without products, there is no revenue, correct.**
13 Q.  And insurance products are developed based on the
14 expertise of the insurance company and the know-how of the
15 people who work there, correct?
16 A.  **In combination with statutory requirements of the**
17 **states in which they decided to do business and the state**
18 **requirements for the products they decided.**
19 Q.  Fair enough.  And you have not identified any
20 particular insurance product that was specifically
21 developed at Chubb because of Blaze, right?
22 A.  **Correct.**
23 Q.  An error-free billing process is also an important
24 factor in attracting customers to an insurance company,
25 right?

**1548**

1  A.  **I would say that different, but it is an important**
2  **factor.**
3  Q.  And Blaze has no role in Chubb's billing process,
4  right?
5  A.  **I saw no documentation that indicated that.**
6  Q.  Meaning you haven't seen anything connecting Blaze to
7  billing?
8  A.  **Correct.**
9  Q.  It's also very important that an insurance company have
10 a strong process for handling claims once they come in,
11 right?
12 A.  **Correct.**
13 Q.  And that's because brokers and agents aren't going to
14 have any desire to sell policies on behalf of insurance
15 companies that's not efficiently handling claims, right?
16 A.  **Correct.**
17 Q.  And it's important that an insurance company pays the
18 right amount of money when a claim comes in, and they do so
19 pretty fast?
20 A.  **I'm going to say it slightly differently.  It is**
21 **important that insurance companies pay the right amount,**
22 **and it's important that they get that right amount to the**
23 **policyholder quickly.**
24 Q.  And Blaze, I think as you said during your direct
25 examination, was not used in the claims handling side of

**1549**

1  Chubb at all, right?
2  A.  **Correct.**
3  Q.  Underwriting is another aspect of how insurance
4  companies make money.  You were an underwriter, right?
5  A.  **I was, yes.**
6  Q.  And from your experience as an underwriter, you know
7  that your personal human judgment is crucial to the
8  performance and execution of your duties as an underwriter,
9  right?
10 A.  **I'm not sure I agree with it.**
11 Q.  Okay.  Let's look at your deposition transcript at page
12 47.
13 A.  **Certainly.**
14 Q.  And if I could direct you to page 47, line 7.  Let me
15 know when you're there.
16 A.  **Patience, counselor.**
17     **I'm there.**
18 Q.  You were asked at your deposition "Question:  Your
19 personal judgment was crucial in the performance of your
20 underwriting duties, correct?"
21     "Answer:  Yes."
22     That was your testimony at your deposition,
23 right?
24 A.  **Yes.**
25 Q.  Your emotional quotient or your emotional intelligence

**EXHIBIT 1**

**1550**

1  was also crucial to your work as an underwriter, right?

2  A.  **Yes.**

3  Q.  And Blaze doesn't improve underwriters' ability to

4  exercise emotional intelligence and connect with people,

5  right?

6  A.  **Yes, but --**

7  Q.  I'll take the "yes," thank you.

8      Let's focus on the technology aspects of running

9  an insurance company.  You understand that Chubb uses many,

10  many different technologies to sell insurance, right?

11  A.  **Yes.**

12  Q.  Now, Mr. Hinderaker made a point of opening your

13  testimony this morning by pointing out that Duck Creek

14  technology was located in the CSI Express application

15  before Chubb purchased its license to use Blaze.  Do you

16  remember that?

17  A.  **I do.**

18  Q.  But before you rendered your expert opinions in this

19  case about the so-called importance of Blaze, you didn't do

20  anything to investigate how many other technologies were

21  deployed at the same time as Blaze at Chubb, correct?

22  A.  **Correct.**

23  Q.  And, in fact, at the time you rendered your expert

24  report and gave all these opinions, you denied that Chubb

25  could possibly be using hundreds of other technologies in

**1551**

1  addition to Blaze, right?

2  A.  **Yes.**

3  Q.  You said, wow, you know, I haven't seen that holy-cow

4  number, right, that there would be more than 100 different

5  technologies, right?

6  A.  **Correct.**

7  Q.  But now you've seen testimony from Mr. Pandey and

8  Mr. Ghislanzoni confirming that there were hundreds of

9  other technologies in use, right?

10  A.  **I have.**

11  Q.  And you didn't consider that at all before you wrote

12  those 75 pages of opinions about the value of Blaze to

13  Chubb, correct?

14  A.  **Correct.**

15  Q.  And you also have not done anything to measure the

16  relative contribution that Blaze made to all these things

17  like speed, ease of doing business, agility, as compared to

18  the benefits that Chubb got from other technologies, right?

19  You didn't look into that.

20  A.  **Correct.**

21  Q.  And certainly technologies other than Blaze are

22  contributing to Chubb's ability to acquire revenue, right?

23  A.  **Yes.**

24  Q.  But you haven't made any effort to determine how much

25  of a direct contribution those other technologies are

**1552**

1  making to revenue, right?  You haven't looked at that.

2  A.  **Correct.**

3  Q.  Now, the jury heard Mr. Ramesh Pandey talk about how

4  Duck Creek is the brain of CSI Express.  And you heard

5  that, too, right?

6  A.  **I did.**

7  Q.  But you didn't do anything to figure out how much Blaze

8  is contributing to CSI Express relative to Duck Creek,

9  correct?

10  A.  **Correct.**

11  Q.  And that same would be true for the CUW-IM application,

12  right?  You didn't do anything to examine, well, how much

13  is Blaze doing in CUW-IM as compared to the other

14  dozen-plus technologies, right?  You didn't look at that?

15  A.  **Correct.**

16  Q.  You talked about the rules that were in place at Chubb,

17  right?

18  A.  **Yes.**

19  Q.  And you understand, though, that when Blaze was used at

20  Chubb, it did not process all of the rules that Chubb was

21  running in the course of selling insurance, right?

22  A.  **Yes.**

23  Q.  And I think you said yesterday that when you sat down

24  to review the actual rules that Chubb was running, you

25  wanted to make sure that your thoughts about them made

**1553**

1  sense, so you spoke with a consultant, right, a Brian

2  Sacco?

3  A.  **Brian Sacco.**

4  Q.  Sacco.  And you characterized him as someone who is

5  highly knowledgeable about rule repositories, right?

6  A.  **I did.**

7  Q.  And you spoke to Mr. Sacco because you personally are

8  not someone who is highly knowledgeable about rule

9  repositories.  That's why you needed to talk to him, right?

10  A.  **Yes.**

11  Q.  And before you rendered all your expert opinions in

12  this case, you didn't do anything to investigate how many

13  other rules Chubb was running in its business, right?  You

14  said it would be pure, unadulterated speculation for you to

15  try to figure out how many non-Blaze rules Chubb was

16  running.

17  A.  **I did.**

18  Q.  So in offering all these opinions about the value of

19  Blaze to Chubb, you didn't do anything to examine the rate

20  at which the Blaze technology was adopted at Chubb, right?

21  You didn't look at how many rules were they deciding to run

22  with Blaze versus how many rules are they having software

23  engineers write.  You didn't run that comparison.

24  A.  **That is correct.**

25  Q.  Now, when Chubb uses Blaze in the selling of insurance,

**EXHIBIT 1**

**1554**

1  the process of defining the rules is decided and
2  articulated by people at Chubb, not people at FICO, right?
3  A.  **Yes.**
4  Q.  And the process of defining rules, you know from your
5  years in the insurance industry, takes substantial
6  experience, right?
7  A.  **Yes.**
8  Q.  If the rules do not accurately reflect an insurance
9  company's risk appetite and its view of what's an adequate
10  premium to charge, the result is, you're going to lose
11  money, right?
12  A.  **I would say that the result is negative things are**
13  **going to happen, which usually leads to that conclusion.**
14  Q.  Without good rules, Mr. Whitener, an insurance company
15  cannot make money, right?
16  A.  **Correct.**
17  Q.  And to the extent rules are being used to speed things
18  up, speed is only good if you're speeding up decisions that
19  are good for the insurance company, right?
20  A.  **I agree.**
21  Q.  If you're making a lot of quick decisions to bind and
22  renew policies that are not profitable, that's not a good
23  thing.
24  A.  **Agreed.**
25  Q.  Now, you also spoke on direct about how Blaze can

**1555**

1  increase speed compared to having software engineers
2  programming the code themselves, right?  So-called hard
3  coding by some.
4  A.  **Or professional coding, as it was described.**
5  Q.  Or professional coding, right?
6          Vanessa, can we pull up slide 23, please, from
7  Mr. Whitener's presentation?  Thank you.
8          This is one of the slides you showed the jury
9  during your direct examination, right?
10  A.  **It is.**
11  Q.  And you wrote -- under hard-coding the rules, you
12  wrote, "Hard coding requires substantial IT resources to
13  write business rules and changes to business rules in
14  computer language into application software."  Do you see
15  that?
16  A.  **I do.**
17  Q.  But you don't have any evidence that when folks at
18  Chubb used Blaze, they were able to stop using IT sources,
19  right?
20  A.  **Correct.**
21  Q.  And, in fact, you heard Mr. Pandey and Mr. Ghislanzoni
22  explain from the perspective of Chubb architects that the
23  Chubb business folks weren't able to write rules into
24  Blaze, right?  You heard that.
25  A.  **Yes, but --**

**1556**

1  Q.  You didn't consider that testimony from Mr. Pandey or
2  Mr. Ghislanzoni before you offered expert opinions in this
3  case, correct?  You didn't read their testimony?
4  A.  **Correct.**
5  Q.  And you, of course, don't have any personal knowledge
6  of the IT infrastructure at Chubb that would allow you to
7  say, oh, no, the business people are writing all the rules,
8  correct?
9  A.  **Oh, absolutely correct.**
10          MS. GODESKY:  Thank you, Vanessa.  We can take
11  that down.
12  BY MS. GODESKY:
13  Q.  Now, on this topic of your opinion that Chubb realized
14  benefits from Blaze by increasing speed, you don't know
15  whether Blaze actually increased the speed of responding to
16  requests for quotes, correct?
17  A.  **I know that it increased speed.  I do not know**
18  **precisely how much it increased speed.**
19  Q.  Let's look at your deposition transcript at page 135.
20  A.  **In the box, correct?**
21  Q.  Please.
22  A.  **Bear with me.**
23          **I'm there.**
24  Q.  So at page 135, line 14, the question was, "Do you know
25  whether Blaze increased the speed of response to quote

**1557**

1  requests in Federal?
2          "Answer:  I performed no quantitative analysis in
3  this process, no.  I do not know."
4          That was your testimony, correct, Mr. Whitener?
5  A.  **Correct.**
6  Q.  And you also can't say whether Chubb was actually able
7  to increase its speed of making renewal offers to
8  customers, correct?
9  A.  **Based on the same premise, I understand -- I understand**
10  **that the renewal does not have to go to a human, it gets**
11  **done faster.**
12  Q.  Mr. Whitener, you do not know whether Chubb increased
13  the speed of making renewal offers because of Blaze,
14  correct?
15  A.  **I do not know how much.**
16  Q.  Let's look at your deposition transcript at page 135.
17  A.  **I'm there.**
18  Q.  Actually, let's look at 136, line 8.
19  A.  **I'm there.**
20  Q.  "Question:  So you just don't know whether Federal
21  increased the speed of making renewal offers because of its
22  use of Blaze, correct?
23          "Answer:  That is correct."
24          That was your testimony back in 2019, correct?
25  A.  **Yes, but --**

**EXHIBIT 1**

**1558**

1  Q.  The "yes" is fine.  Thank you.
2  A.  **You're welcome.**
3  Q.  And you also don't know, Mr. Whitener, whether Blaze
4  actually allowed Chubb to increase its speed to market by
5  ensuring compliance with all those reporting requirements
6  you talked about, correct?
7  A.  **Yes, but --**
8  Q.  The answer is yes, right, Mr. Whitener?
9  A.  **Yes.**
10  Q.  Now, you talked on direct examination, and we saw on
11  the slide, your opinion that Blaze improved the ease of
12  doing business at Chubb, right?
13  A.  **Yes.**
14  Q.  But you did not try to quantify in this case whether
15  Blaze actually improved Chubb's ease of doing business,
16  correct?
17  A.  **Yes.  Allow me to point out, I quantified.  I measured**
18  **none of these things.**
19  Q.  You don't know whether Chubb increased the ease of use
20  for agents and brokers by using Blaze in certain
21  applications.  You don't know that, right?
22  A.  **I don't know how much.**
23  Q.  You don't know that they did, correct?
24  A.  **Yes, but --**
25  Q.  Mr. Whitener, let's look at your deposition testimony

**1559**

1  from June at page 140.
2  A.  **I'm there.**
3  Q.  Page 40 [sic], line 25, you were asked --
4  A.  **Counsel -- I'm sorry.  Go ahead.**
5  Q.  "Is it correct to say that you do not know whether
6  Federal increased its ease of use for agents and brokers by
7  way of those three bullet points?"  And those were your
8  bullet points about the value of Blaze, right?
9        And you answered, "That is correct."  That was
10  your testimony, correct?
11  A.  **Counselor, I'm at page 140.**
12  Q.  Yes.
13  A.  **Is that where you are?**
14  Q.  Yes.  At line 25?
15  A.  **I'm sorry.  I'm on the wrong line.**
16  Q.  You were asked, "Is it correct to say that you do not
17  know whether Federal increased the ease of use for agents
18  and brokers by way of those three bullet points," and that
19  was a reference to all your opinions, right?
20  A.  **You are correct.**
21  Q.  And your answer was, "You are correct."  Right?
22  A.  **You are correct.**
23  Q.  You also testified on direct examination, and we saw
24  the slides about how Blaze allowed Chubb to precisely price
25  its policies, right?  That was another thing you talked

**1560**

1  about with Mr. Hinderaker.
2  A.  **Yes.**
3  Q.  But you did not measure in this case whether Blaze
4  actually improved Chubb's ability to define accurate and
5  adequate pricing, right?
6  A.  **Correct.**
7  Q.  And you can't speak at all to whether Chubb actually
8  increased the precision and accuracy of its quotes to
9  customers?
10  A.  **Correct.**
11  Q.  You also don't know whether Chubb increased the
12  precision and adequacy of its renewal offers, do you?
13  A.  **Correct, but --**
14  Q.  It's correct, right?
15  A.  **Correct.**
16  Q.  There was also talk during your direct examination
17  about how the benefits of Blaze allowed Chubb to grow in
18  the Small Commercial and mid-market segments.  Do you
19  remember that?
20  A.  **I do.**
21  Q.  But you don't know whether it's, in fact, true that
22  Chubb grew in the Small Commercial and mid-market segments
23  because of Blaze, right?  You can't say that.
24  A.  **Correct.**
25  Q.  Vanessa, if we could put up slide 37, please.

**1561**

1        This is another slide you showed the jury during
2  your direct examination, right?
3  A.  **It is.**
4  Q.  And there is this quote, "Technology is a competitive
5  weapon."  And you said, oh, yes, you know, from my
6  examination of the document, Chubb agrees with that, right?
7  A.  **Yes.**
8  Q.  This is a discussion about a particular segment of the
9  Chubb business where 80 percent or more of submissions were
10  not touched by humans as reported in this document, right?
11  A.  **Yes.**
12  Q.  You understand from sitting through this trial that
13  this comment has nothing to do with Blaze, right?  This is
14  a discussion about a different area at Chubb that used Duck
15  Creek technology, right?
16  A.  **I wasn't, but yes.**
17  Q.  You have no reason to believe this is a reference to
18  Blaze Advisor software, correct?
19  A.  **No.  I believe it's a general statement by the CEO.**
20        MS. GODESKY:  Your Honor, I'm about to switch
21  topics, if it's a good time to break.
22        THE COURT:  Let's keep going a few more minutes.
23  Got about eight minutes.
24        MS. GODESKY:  Okay.
25  BY MS. GODESKY:

**EXHIBIT 1**

**1562**

1  Q.  Mr. Whitener, during direct examination, you walked us
2  through all the computer applications that you say use
3  Blaze, right?
4  A.  **Yes.**
5  Q.  You have never used any of those computer applications?
6  A.  **Correct.**
7  Q.  Let's start with CSI Express.  CSI Express is a policy
8  administration system, right?
9  A.  **It is.**
10  Q.  And like pretty much every policy administration
11  system, it's complex, correct?
12  A.  **Correct.**
13  Q.  It involves many different technologies?
14  A.  **It does.**
15  Q.  But before you rendered all your opinions in this case
16  about the value of Blaze and CSI Express, you didn't do
17  anything to measure how significant a part of CSI Express
18  Blaze is, right?
19  A.  **Yes.**
20  Q.  You have not done any analysis of what amount of
21  improvement to speed, ease of doing business or adequacy of
22  pricing is attributable to Blaze in CSI Express as opposed
23  to the application as a whole, correct?
24  A.  **Correct.**
25  Q.  That was outside the scope of the responsibilities you

**1563**

1  had in this case, right?
2  A.  **Correct.**
3  Q.  In fact, before rendering expert opinions in this case,
4  you spent less than one second reviewing the components of
5  CSI Express that had nothing to do with Blaze, correct?
6  A.  **Correct.**
7  Q.  And you spoke a lot on direct examination about how
8  Blaze must have brought speed to CSI Express, but you
9  haven't done any work to try to determine whether you're
10  talking about one day, two days or hours, right?
11  A.  **You are correct.**
12  Q.  You didn't look at that.
13  A.  **Correct.**
14  Q.  And also in the context of CSI Express, you do not know
15  whether CSI Express actually increased the speed of
16  response to requests for quotes at Chubb, right?
17  A.  **Yes, but --**
18  Q.  You do not know, right, Mr. Whitener?
19  A.  **Yes.**
20  Q.  You don't know.
21  A.  **Yes.**
22  Q.  And you do not know whether the speed of making renewal
23  offers through CSI Express was actually increased because
24  of Blaze.  You cannot say that, right?
25  A.  **I cannot say how much.  I can say I believe it was.**

**1564**

1  Q.  Mr. Whitener, before rendering all your opinions in
2  this case, you gave zero thought to whether you could have
3  measured all this contribution to speed that you say is
4  attributable to Blaze, correct?
5  A.  **Zero?**
6  Q.  Zero.  Sound right?
7  A.  **No.  I took zero action based on those thoughts.**
8  Q.  Let's look at your deposition page 153.
9  A.  **I'm there.**
10  Q.  Line 19.  "Question:  In your mind, would it be even
11  possible to measure the contribution that Blaze has to the
12  speed that you've discussed CSI Express creating?
13        "Answer:  Having had the privilege of giving that
14  question zero thought, I can't answer it."
15        That's the testimony you gave, correct?
16  A.  **It is.**
17  Q.  Let's talk about Profitability Indicator.  That's
18  another application you talked about, correct?
19  A.  **Correct.**
20  Q.  And you said it increased speed relating to renewals in
21  response to requests for quotes, correct?
22  A.  **I'm sorry.  Repeat that.**
23  Q.  You talked about how it increases speed because of
24  Blaze, right?
25  A.  **I did.**

**1565**

1  Q.  And Profitability Indicator is part of the CSI Express
2  application?
3  A.  **It is.**
4  Q.  Counted as a separate application on your direct
5  examination, but it's part of CSI Express, right?
6  A.  **It is an additional application deployed inside of CSI**
7  **Express.**
8  Q.  And you don't know whether Profitability Indicator,
9  including Blaze, actually contributed to increased
10  revenues, right?
11  A.  **Excuse me.  I didn't -- yes, I did not measure**
12  **anything.**
13  Q.  Let's move on to DecisionPoint.  You talked about all
14  of the value that Blaze brought to DecisionPoint during
15  your direct examination, right?
16  A.  **Yes.**
17  Q.  And DecisionPoint, just like Profitability Indicator,
18  is part of CSI Express, correct?
19  A.  **Yes.**
20  Q.  You're sort of counting it separately on your slides,
21  right?
22  A.  **Yes.**
23  Q.  You don't know whether DecisionPoint actually
24  contributed to revenue at Chubb, correct?
25  A.  **Yes, but --**

**EXHIBIT 1**

**1566**

1   Q.  It's correct, right, Mr. Whitener?
2   A.  **Yes.**
3   Q.  Next up was Evolution.  Based on your review of the
4   record in this case, you agree that Evolution uses many
5   different technologies in addition to Blaze, right?
6   A.  **Yes.**
7   Q.  And you do not know whether the speed of response to
8   quotes or requests for renewal were actually increasing
9   because of Blaze, right?
10  A.  **Yes, but -- yes.**
11  Q.  You don't know?
12  A.  **Yes.**
13  Q.  And you haven't done anything to determine whether the
14  use of Blaze in Evolution actually improved the
15  availability of underwriting, correct?
16  A.  **Correct.**
17  Q.  Then you talked about Adapt.  Adapt is a policy
18  administration system, right?
19  A.  **It is.**
20  Q.  It is complex, correct?
21  A.  **Yes.**
22  Q.  And you cannot say whether any of the benefits that you
23  talked about on direct examination with Mr. Hinderaker were
24  actually realized by Chubb, correct?
25  A.  **Correct.**

**1567**

1   Q.  Cornerstone is another policy administration system for
2   all those surety bonds, right?
3   A.  **Correct.**
4   Q.  Also complex.
5   A.  **Correct.**
6   Q.  And you don't know whether any of the benefits that you
7   spoke about on direct examination were actually realized by
8   Chubb because of Blaze, correct?
9   A.  **Yes.**
10  Q.  Then we have these compliance systems.  Premium Booking
11  is one of them, right?
12  A.  **Yes.**
13  Q.  That's also in CSI Express, right?
14  A.  **Yes.**
15  Q.  And the process underlying the Premium Booking
16  application used at Chubb is complex.
17  A.  **Yes.**
18  Q.  But before rendering all your expert opinions about the
19  value of Blaze and Premium Booking, you didn't do anything
20  to investigate what systems and software other than Blaze
21  are used in Premium Booking, correct?
22  A.  **Correct.**
23  Q.  And you haven't conducted any analysis to determine
24  whether Premium Booking actually enabled Chubb to bring new
25  products to market faster, right?

**1568**

1   A.  **Correct.**
2   Q.  And you haven't done any analysis to determine whether
3   Blaze's incorporation in Premium Booking meant that Chubb
4   could report data for their new products faster, right?
5   A.  **Correct.**
6   Q.  Next was TAPS, the Texas Accident Prevention System.
7   And you are aware that witnesses have testified in this
8   case that the function Blaze performed in TAPS could have
9   just as easily have been performed by an Excel spreadsheet,
10  right?
11  A.  **Yes.**
12  Q.  You can't speak to whether or not that's true.  You
13  don't know.
14  A.  **I know that the documents say that.**
15  Q.  But you agree, it's certainly possible that other
16  software could have been used in TAPS to perform exactly
17  the same function as Blaze, right?
18  A.  **Yes.**
19  Q.  And you don't know whether Blaze's inclusion in TAPS is
20  what actually ensured that each policy written in the
21  workers' compensation line of business at Chubb was in
22  compliance with Texas regulations, correct?
23  A.  **May I ask you to restate?**
24  Q.  You don't know whether Blaze's inclusion in TAPS is
25  what was actually ensuring that all of these workers' comp

**1569**

1   insurance policies satisfied Texas regulations, correct?
2   A.  **Correct.**
3   Q.  Then you talked about IRMA.  You have not determined
4   whether IRMA actually contributes to revenue at Chubb by
5   ensuring that quoted and issued policies are compliant,
6   right?
7   A.  **Correct.**
8   Q.  Then there was CUW inventory management.  That was
9   another application you walked us through, correct?
10  A.  **Yes.**
11  Q.  It uses many different technologies, right,
12  Mr. Whitener?
13  A.  **If you're referring to CUW, that is correct.**
14  Q.  And you cannot say anything as to whether the inclusion
15  of Blaze in CUW-IM actually accelerated inventory
16  management at Chubb, correct?
17  A.  **Correct.**
18          THE COURT:  Ms. Godesky, are you still at a
19  convenient breaking point?
20          MS. GODESKY:  Sure.
21          THE COURT:  Or --
22          MS. GODESKY:  Yeah, it's fine.  Thank you.
23          THE COURT:  All right.  Members of the Jury,
24  we're take our lunchtime recess.  Be back in the courtroom
25  at one o'clock.

**EXHIBIT 1**

**1594**

1  Q. So before the lunch break, we were going through all
2  the different computer applications at Chubb that used
3  Blaze that you talked about with Mr. Hinderaker, right?
4  A. **Agreed.**
5  Q. And the next one I want to talk about is Brokersite.
6  That is another application that you talked about during
7  direct, correct?
8  A. **Correct.**
9  Q. And you were in court yesterday, and you've heard
10  Mr. Miroluyz at Chubb testify that Brokersite does not use
11  Blaze Advisor, correct?
12  A. **Correct.**
13  Q. And you, of course, never worked at Chubb, so you don't
14  have a basis to dispute that with your personal knowledge,
15  right?
16  A. **Correct.**
17  Q. CIS Claims is another application that you talked about
18  with Mr. Hinderaker, right?
19  A. **Correct.**
20  Q. And even though it's called claims, it is not a claims
21  handling application, right?
22  A. **Correct.**
23  Q. And you cannot say whether the use of CIS Claims
24  contributed to Chubb's revenue, correct?
25  A. **I disagree.**

**1595**

1  Q. Let's look at your deposition at page 211.
2  A. **Bear with me.**
3  Q. Sure.
4  A. **I did better this time.**
5  Q. Your deposition at page 211, line 7. "Question: Do
6  you know whether that use of CIS Claims in fact contributes
7  to Federal's revenue?
8      "Answer: I have done no quantification research,
9  nor have I talked with anyone at Federal, Chubb, ACE
10  Limited."
11      That was your answer at your deposition, correct,
12  Mr. Whitener?
13  A. **Correct.**
14  Q. Now, Blaze is not the only decision management software
15  out there. Alternatives do exist, correct?
16  A. **Correct.**
17  Q. And your report identifies ten of them, right?
18  A. **Approximately, yes.**
19  Q. And those alternative decision management software
20  products could have been used in the computer applications
21  at Chubb that we've all been discussing in this trial,
22  right?
23  A. **Yes. I'm sorry. Yes.**
24  Q. But in forming your opinions in this case, you did not
25  look at all at those other decision management softwares

**1596**

1  and analyze how they compare to Blaze, correct?
2  A. **Correct.**
3  Q. Now, during your questioning with Mr. Hinderaker, you
4  talked a bit about other insurance companies making use of
5  rules software, right?
6  A. **I'm sorry. Say that again.**
7  Q. During your direct examination, you talked a little bit
8  about other insurance companies using Blaze.
9  A. **Yes.**
10  Q. And if we could pull up, Vanessa, slide 28 from
11  Mr. Whitener's PowerPoint.
12      This is one of those slides, right, Mr. Whitener?
13  A. **It is.**
14  Q. And Mr. Hinderaker showed you this slide during your
15  direct and he said, you know, this is internal
16  communications at Chubb, right?
17  A. **Yes.**
18  Q. He made a point of saying, this was Chubb reporting to
19  themselves about use of Blaze at other companies, right?
20  A. **Yes.**
21  Q. And do you see at the bottom of this document, there's
22  a source listed?
23  A. **It is.**
24  Q. Who is the source?
25  A. **Fair Isaac.**

**1597**

1  Q. And if you go to slide 28, Vanessa, the next slide or
2  29.
3      There's the continued discussion of how Blaze's
4  apparently being used in the P&C industry, right?
5  A. **Yes.**
6  Q. And what's the source on that slide?
7  A. **Fair Isaac.**
8  Q. And as we discussed earlier, before you rendered your
9  expert opinions in this case about the value of Blaze to
10  Chubb, you didn't conduct a study of how all these
11  insurance companies are using Blaze as compared to having
12  software engineers code.
13  A. **That's correct.**
14  Q. And you heard, sitting through this trial, that Chubb
15  used decision management software in just one percent of
16  its 1500 computer applications before the merger, right?
17  A. **As measured on a number of applications footprint**
18  **basis, yes.**
19  Q. And they were using software engineers to code the
20  rules in all the other applications, right? That's the
21  testimony.
22  A. **I believe so.**
23  Q. And the decision -- that was a decision that Chubb made
24  before the merger, even though it had an enterprise-wide
25  license to use Blaze without any limit on the number of

**EXHIBIT 1**

**1598**

1 applications, correct?

2 A. **That is my understanding.**

3 Q. That's a pretty low rate of adoption, right,

4 Mr. Whitener? One percent? It's pretty low.

5 A. **Yes.**

6 Q. And then you heard from Mr. Ghislanzoni that at ACE

7 before the merger, ACE had decided to put Blaze into one

8 computer application and then this ODM decision management

9 program in about three applications. You heard him testify

10 about that, right?

11 A. **I heard the testimony.**

12 Q. So at ACE, another giant insurance company, they're

13 only using rules software in less than one percent of their

14 applications, right?

15 A. **Sounds right.**

16 Q. And you don't have any basis to disagree with

17 Mr. Ghislanzoni's testimony that ACE didn't see a benefit

18 to using rules software more widely, correct?

19 A. **No.**

20 Q. And then you also heard Mr. Ghislanzoni explain that at

21 the combined ACE/Chubb entity today, rules software is

22 still used in only one percent of all of their computer

23 applications, right?

24 A. **Yes.**

25 Q. And you have no basis to disagree with that, correct?

**1599**

1 A. **None.**

2 Q. And unlike Mr. Ghislanzoni and Mr. Pandey, as part of

3 your day-to-day work, you've never spent time analyzing the

4 efficiencies and functionality of rules software versus

5 coding by software engineers, correct?

6 A. **In terms of the current technology, that is correct.**

7 Q. Now at the end of your examination, we all saw this

8 final summary slide, right, and the final summary slide was

9 Blaze brought value to Chubb.

10 That's the summary of your opinion, correct?

11 A. **I believe I added the word "significant" but yes.**

12 Q. Significant value. That's the summary of your opinion,

13 right?

14 A. **Correct.**

15 Q. But you do not know whether Blaze actually contributed

16 to any increase in revenue or profit at Chubb, correct?

17 A. **I did -- correct. I did not measure anything.**

18 Q. Thank you.

19 I have no further questions.

20 A. **Thank you.**

21 THE COURT: Mr. Hinderaker, redirect.

22 MR. HINDERAKER: Thank you.

23 REDIRECT EXAMINATION

24 BY MR. HINDERAKER:

25 Q. Mr. Whitener, my purpose is to talk about the analysis

**1600**

1 that -- the analysis that you did make as opposed to the

2 analysis that you did not make. So let me focus on the

3 analysis that you did make.

4 There were at various times in your answers to

5 the last set of questions where you would say mostly

6 correct, partially correct, yes, but, correct, but.

7 What was the qualification that you were trying

8 to express?

9 MS. GODESKY: Objection.

10 THE COURT: Overruled.

11 THE WITNESS: As I mentioned earlier, in my

12 underwriting thought process, there's a difference between

13 what something does and how much something does something.

14 So when you ask me does it make things faster? Yes. I've

15 been at this for a couple of decades. Okay. Maybe more

16 than a couple decades.

17 And the pursuit of responding to requests for new

18 business and improving that response timing and -- has been

19 a key strategy for 44 years. In fact, I was reading

20 Property Casualty 360 about three weeks ago, and another

21 company whose name escapes me, property casualty insurance

22 company, licensed another software package and in their

23 reasoning they quoted speed.

24 So that's an important thing. And when I go to

25 ease of doing business, I can say the same things. These

**1601**

1 are, these are value points that the property casualty

2 insurance company pursues and pursues intentionally. How

3 much they get in terms of deployment of an application,

4 they don't measure it. I haven't measured it.

5 And in all of the documentation I was provided,

6 there was nothing that could speak to any of that.

7 BY MR. HINDERAKER:

8 Q. And, for example, well I'll go back to that, but I want

9 to, I guess, stay on this examination for a moment, this

10 line.

11 And let me bring you to -- you were asked about

12 some stuff on your deposition at page 135. And if you can

13 find page 135, please.

14 MS. GODESKY: Objection.

15 THE COURT: Sustained.

16 BY MR. HINDERAKER:

17 Q. I'd like to -- Ms. Godesky asked you to look at

18 page 135, line 22, to 136, line 6. And she read -- I'd

19 like to read the rest of the testimony.

20 MS. GODESKY: Objection.

21 THE COURT: Sustained. You can ask him the

22 questions.

23 MR. HINDERAKER: Okay.

24 BY MR. HINDERAKER:

25 Q. It's, as you just said, you performed no quantitative

**EXHIBIT 1**