# Zoltowski Rep.
# Par. 122-125

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MINNESOTA**

FAIR ISAAC CORPORATION,

     Plaintiff,

v.

FEDERAL INSURANCE COMPANY, and
ACE AMERICAN INSURANCE COMPANY

     Defendants.

Case No. 16-CV-1054(WMW/DTS)

**EXPERT REPORT OF**
**NEIL J. ZOLTOWSKI**
**WITH RESPECT TO DAMAGES**

Respectfully submitted this 19th day of April, 2019

_____

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### C.      FICO's Actual Damages

121.    The Copyright Act permits recovery of actual damages suffered as a result of the infringement.  As discussed above in Section VII(A), FICO has lost deployment and develop seat license, support, and maintenance fees.

### D.      Disgorgement/Defendants' Profits[232]

#### i.      Defendants Use of Blaze Advisor Contributes to Insurance Premiums

122.    Defendants disclosed the gross written premiums of each company from all insurance policies in connection with which Blaze Advisor was used.[233]  I understand that these Blaze Advisor applications have contributed to the generation of billions of dollars in premiums.

123.    **Table 8** below is a summary of Defendants' domestic business units/segments and the corresponding Blaze Advisor applications that each uses.

**Table 8: Summary of Domestic Business Units/Segments and Blaze Advisor Applications**[234]

| Business Unit/Segment[235] | Blaze Advisor Application |
|---|---|
| Chubb Specialty Insurance/ Financial Lines | CSI eXPRESS |
| | CIS Claims |
| | Decision Point |
| | Profitability Indicator |
| | Automated Renewal Process |
| Chubb Commercial Insurance | CUW |
| | Individual Rate Modification Application (IRMA) |
| | Texas Accident Prevention System (TAPS) |
| Surety | Cornerstone |
| Commercial Business Systems | Premium Booking |

---

[232] I understand based on the Copyright Act (17 U.S.C. § 504(b)) that: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  As a result, the damages presented related to copyright infringement damages reflect the dollar amounts associated with the gross written premiums through Defendants' allegedly infringing use of Blaze Advisor.

[233] Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 16 and Sixth Supplemental Answer to Plaintiff's Interrogatory No. 17, dated March 21, 2019 at 3-19; Federal Insurance Company's Sixth Supplemental Answer to Plaintiff's Interrogatory No. 18, dated March 21, 2019 at 3; Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 20, dated March 21, 2019 at 3-5.

[234] Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 16 and Sixth Supplemental Answer to Plaintiff's Interrogatory No. 17, dated March 21, 2019 at 3-19; Federal Insurance Company's Sixth Supplemental Answer to Plaintiff's Interrogatory No. 18, dated March 21, 2019 at 3; Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 20, dated March 21, 2019 at 3-5.

[235] Mirolyuz 1/11/19 Deposition at 25.

### E.      Disgorgement/Defendants' Profits[236]

#### i.      Accused Domestic Infringement

124.    Based on my review of the documents produced and testimony given in this matter as well as my discussions with Bick Whitener, Defendants' use of Blaze Advisor contributes to the generation of gross written premiums. Consequently, FICO may be entitled to disgorge Defendants' profits from written premiums generated using Blaze Advisor. Between March 31, 2016 and March 2019, Defendants generated gross written premiums totaling $28.4 billion. (See **Schedules 3.0** and **8.0**).

125.    My computations of Federal's and ACE American's gross written premiums are limited to only those reported by Defendants as involving domestic Blaze Advisor applications.

#### ii.      Accused Foreign Infringement

126.    FICO may also be entitled to disgorge Defendants' profits derived from the gross written premiums generated using Blaze Advisor in foreign applications. Again, my computations of gross written premiums are limited to only those reported by Defendants as involving Blaze Advisor foreign applications. Between April 21, 2013 and March 2019, Defendants reported written premiums totaling $2.5 billion. (See **Schedules 3.0** and **9.0**).

---

[236] I understand based on the Copyright Act (17 U.S.C. § 504(b)) that: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." As a result, the damages presented related to copyright infringement damages reflect the dollar amounts associated with the gross written premiums through Defendants' allegedly infringing use of Blaze Advisor.

43

# Bakewell Rep.
# Par. 185-205

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania Corporation, | ) ) ) ) ) | |
| Defendant. | ) ) | |

**EXPERT REPORT OF
W. CHRISTOPHER BAKEWELL
REGARDING DAMAGES**

**May 17, 2019**

Respectfully Submitted,

W. Christopher Bakewell

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

184.    The above table shows that the CUW gross written premiums relied upon by Mr. Zoltowski, are greater than the gross written premiums per the revised data prepared by Federal.  Again, the CUW gross written premium data relied upon by Mr. Zoltowski included policies (and associated gross written premiums) that were captured multiple times in the data for other applications such as CSI eXPRESS and Premium Bookings.[260]  I understand that the revised CUW data eliminates any policies that also ran through CSI eXPRESS and Premium Bookings.[261]  This prevents double counting when the totals for each application are added together.

*Mr. Zoltowski Does Not Deduct Any of Federal's Costs That Were Incurred To Earn the Gross Written Premiums*

185.    Mr. Zoltowski states that it is his understanding that "the copyright owner is required to present proof of only the infringer's gross revenue."[262]  According to Mr. Zoltowski, "as a result, the damages presented related to copyright infringement damages reflect the dollar amounts associated with the gross written premiums through Federal's allegedly infringing use of Blaze Advisor."[263]  On only this basis, Mr. Zoltowski calculates his estimate of total gross revenue as represented by gross written premiums only.

186.    However, Mr. Zoltowski performed no analysis to determine if any of the revenues he captured had any link (*i.e.*, nexus) to the allegations of this case, or to the value provided by the accused software.  I explained at length above why this is problematic.  Moreover, compounding his error of having a lack of nexus, Mr. Zoltowski provided no consideration of the costs and expenses that are necessary for Federal to earn such revenue.

187.    Instead of engaging in financial analysis, or investigating issues that relate to value (as he claimed he did), Mr. Zoltowski's simply aggregated Federal's gross written premium (*i.e.,*

---

[260] Interview of Mr. McCarthy.
[261] Interview of Mr. McCarthy.
[262] Zoltowski Report, p. 43.
[263] Zoltowski Report, p. 43.

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

gross revenue).   Mr. Zoltowski did not perform any meaningful financial or economic analysis of these revenues.   Exacerbating this issue, he made no attempt to identify the costs Federal incurred to earn such revenue, or the corresponding profit generated from such revenue.   Without studying the economic attributes of what it took to generate the revenues that he identified as relevant, including their requisite costs, Mr. Zoltowski's work is incomplete, and does not provide any relevant measure of value, at least from a financial perspective.[264]

188.   Federal does not track or report financial information by software application in the normal course of business.[265]   I understand that Federal is unable to generate financial reports that report profit and loss information for insurance products that use Blaze Advisor.[266]   This is not unusual at all, because these products are just one of many products and intangibles that are used to run the business.   The lack of such information only helps illustrate why putting a revenue number in place like Mr. Zoltowski has, without further analysis, is not a meaningful measure of financial value.

189.   However, for purposes of this dispute, Federal prepared profit and loss statements for each of the relevant business segments and lines of business that may have used the Blaze Advisor application.[267]   These profit and loss statements reflect an overinclusive (*i.e.,* conservative) approximation of profit and loss for Blaze Advisor related lines of business. [268]

190.   I summarize the business segments and lines of business for which Federal prepared a profit and loss statement (*see* **Exhibit 11**).[269]   The information contained in the business segment

---

[264] Of course, there are significant costs required to support Federal's gross written premiums.  Mr. Zoltowski made no effort to account for these.  In addition to the issue of nexus, by not considering costs and expenses, Mr. Zoltowski does not utilize his financial and valuation expert skillset which shows that he has not studied the economic attributes of the revenues that he erroneously identifies as relevant.
[265] Deposition of Kevin Harkin, March 25, 2019, p. 123-124.
[266] Deposition of Kevin Harkin, March 25, 2019, p. 123-124.
[267] Deposition of Kevin Harkin, March 25, 2019, p. 124.
[268] Deposition of Kevin Harkin, March 25, 2019, p. 119, 123-124.
[269] Deposition of Kevin Harkin, March 25, 2019, p. 126-141.

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

and line of business profit and loss statements is pulled from various sources.  The process involved in pulling the data varies by line of business and geography, as described below:

- *Chubb Specialty Insurance ("CSI")*.  2016 data was pulled from the legacy general ledger by line of business.  The data was then filtered to include only the US and Canada business.[270]  2017 and 2018 was pulled from the general ledger based on unique identifiers for each line of business.[271]

- *Chubb Commercial Insurance ("CCI")*.  Federal used the same process as for CSI.

- *Chubb Canada Personal Lines*.  The data was gathered from the legacy general ledger system using the unique identifiers for the selected personal lines of business in Canada.[272]

- *Australia ADAPT*.  The data represents a pro-forma analysis prepared by Federal to estimate the underwriting income from 2007 to 2019 for accident and health insurance policies that processed through the ADAPT application and used Blaze Advisor.[273]  The information used to prepare the pro-forma analysis was pulled from the Prism system, a policy registration system.[274]

- *Chubb European Group*.  Financial data represents an attempt by Chubb European Group's CFO (Paul Johnston) to estimate the profit and loss of the European business that ran through the EZER and/or ADAPT applications.[275]  The approximation was prepared specifically for purposes of this litigation. The data is sourced from the legacy general ledger similar to CSI and CCI but filtered for Europe.[276]

191.  The line of business profit and loss statements report the profitability of each line of business for the relevant time period.  The profit and loss statements report both "gross" and "net" amounts.  Gross amounts reflect total amounts before deductions for amounts ceded to

---

[270] Deposition of Kevin Harkin, March 25, 2019, p. 119-120.
[271] Deposition of Kevin Harkin, March 25, 2019, p. 122-123.
[272] Deposition of Kevin Harkin, March 25, 2019, p. 210-211.
[273] Deposition of Kevin Harkin, March 25, 2019, p. 194.
[274] Deposition of Kevin Harkin, March 25, 2019, p. 188 and 194.
[275] Deposition of Kevin Harkin, March 25, 2019, p. 164.
[276] Deposition of Kevin Harkin, March 25, 2019, p. 167.

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

reinsurers.[277]  Net amounts are reported after deducting reinsurance costs.[278]  The originating insurer's risk exposure and profitability is based on the net amount after deducting reinsurance, as the net amount reflects the revenue and cost retained by the originating insurer.  Federal's underwriting gain/loss reflects Federal's reported profit from its insurance underwriting activities after consideration of all costs incurred to generate such underwriting income.[279]

192.  The line of business profit and loss statements identify the following revenue and expense items:

### Summary Of the Types Of Revenue And Costs
### Included In the Profit And Loss Statements

| Line Item | Account Classification | Description |
| --- | --- | --- |
| Written Premium | Revenue | The total revenue expected to be received from the sale of an insurance policy over the term of the policy. Reflects the price paid by the customer on a cash basis.[280] |
| Earned Premium | Revenue | The amount of insurance premium reported as earned for accounting purposes based on U.S. GAAP principles and accrual-based accounting.[281]  Customers typically pay premiums in advance, however for accounting purposes the premium is earned over the term of the insurance coverage. |
| Losses & LAE (Loss Adjustment Expenses) Incurred | Expense | The cost of insurance claims/losses and costs associated with claims handling (*e.g.*, legal fees).[282] |
| Commissions/Acquisition Costs | Expense | Policy level selling commissions and costs paid to insurance brokers and agents.[283]  Reflects a direct cost of sales of an insurance policy. |

---

[277] Deposition of Kevin Harkin, March 25, 2019, p. 136.
[278] Deposition of Kevin Harkin, March 25, 2019, p. 136. Reinsurance is a common insurance industry practice whereby an originating insurance company transfers a portion of its risk exposure to another insurer through a reinsurance agreement.  Investopedia (accessed https://www.investopedia.com/terms/r/reinsurance.asp).
[279] Interview of Mr. Harkin.
[280] Deposition of Kevin Harkin, March 25, 2019, p. 129.
[281] Deposition of Kevin Harkin, March 25, 2019, p. 129.
[282] Deposition of Kevin Harkin, March 25, 2019, p. 130.
[283] Deposition of Kevin Harkin, March 25, 2019, p. 132.

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

| Line Item | Account Classification | Description |
|---|---|---|
| G&A (Administrative) and TLF (Taxes, Licenses and Fees) | Expense | General and administrative expenses (*e.g.*, administrative salaries and benefits, IT costs, general office costs).[284] TLF expenses include state premium taxes, licensing fees and other fees.[285] |
| Expenses Incurred | Expense | Equal to the sum of commissions/acquisition costs, G&A and TLF expenses. |
| Dividends Incurred | Expense | Policy holder dividends which are specific to a small number of lines of business (*e.g.*,. surety).[286] |
| Underwriting Gain/Loss | Profit | The profitability of an insurance company's underwriting operations. Calculated as earned premium less losses & LAE expenses and expenses incurred.[287] |
| Combined Ratio | Ratio | A summary financial ratio of an insurance company's underwriting profitability. Calculated as losses and LAE expenses plus expenses and dividends incurred divided by earned premiums. |

193. I understand that in calculating profits, Federal is entitled to deduct the costs it incurs to generate revenue.  With this understanding, I performed additional analyses of these costs.  Setting aside the issue of nexus discussed above, I calculated Federal's profits following several steps, as I discuss below.

194. *First*, I calculated Federal's gross written premiums (gross revenue) associated with applications that used Blaze Advisor.  I adjusted Mr. Zoltowski's analysis to exclude those applications discussed in **Section 4.2** that do not use Blaze Advisor (see above) and to exclude duplicative gross written premiums that were included in Mr. Zoltowski's analysis.

195. *Second*, I deducted Federal's reinsurance costs to determine Federal's net written premium, being the amount of premium retained by Federal. Based on the evidence produced in this matter, including my discussions with Mr. Harkin, reinsurance costs are variable costs that are directly related to the sale of insurance policies.  Therefore, these costs are an appropriate

---

[284] Deposition of Kevin Harkin, March 25, 2019, p. 134.
[285] Deposition of Kevin Harkin, March 25, 2019, p. 57-58, 134.
[286] Deposition of Kevin Harkin, March 25, 2019, p. 144.
[287] Deposition of Kevin Harkin, March 25, 2019, p. 135.

Page 61

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

deduction in arriving at Federal's profits.  I estimated Federal's reinsurance costs based on Federal's actual reinsurance costs as reported in the profit and loss statements for the relevant business segments and lines of business.

196.  *Third*, I adjusted the net written premiums to reflect the amount of earned premiums.  The difference between written premium and earned premium is principally timing related and related to differences between cash (written) and accrual (earned) based accounting.  I adjusted the net written premiums to earned premiums based on the actual relationship between net written premiums and earned premiums as reflected in Federal's profit and loss statements for the relevant business segments and lines of business.

197.  *Fourth*, I deducted losses and LAE expenses incurred by Federal associated with the earned premiums.  Losses and LAE expenses are direct variable costs that directly relate to the earned insurance premiums.  Losses and LAE expenses reflect the direct cost of claims associated with the earned insurance premiums and are therefore an appropriate deduction. I estimated the losses and LAE expenses based on Federal's actual loss ratio as reported in the profit and loss statements for the relevant business segments and lines of business.  The loss ratio is a standard industry measure of losses as a percentage of earned premiums.  I adopted the following loss ratios (*see* also **Exhibits 8.0, 8.1, 8.2, 8.3** and **8.4**):

**Comparison of the Loss Ratios Between Business Segment/Line of Business Financials and Comparable Public Companies**

| | For the Years Ending December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2018** |
| **Business Segment/Line of Business Financials** | 53% | 58% | 56% |
| **Comparable Public Companies [1]** | | | |
| Low | 58% | 63% | 62% |
| **Median** | **61%** | **66%** | **64%** |
| High | 85% | 83% | 76% |
| **Average** | **66%** | **69%** | **66%** |

**Note:**
[1] Includes Chubb Limited; The Travelers Companies, Inc.; The Hanover Insurance Group, Inc.; American International Group, Inc.; and W.R. Berkley Corporation

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

198. As summarized in the above table, Federal's actual loss ratio is generally consistent, albeit lower, than the observed range in industry benchmark loss ratios and the loss ratios of comparable public companies.  Adopting Federal's actual loss ratio is conservative, meaning that if I adopted the higher loss ratios observed in industry benchmarks and comparable public companies, the losses would be higher and the underwriting profit would be smaller.

199. *Fifth,* I deducted commissions expenses incurred by Federal. Commissions expenses comprise the direct selling costs of the insurance policies and are therefore appropriately deducted as a direct variable cost.  I estimated Federal's commissions expenses attributable to the subject earned premiums based on Federal's actual reported commissions expenses as a percentage of earned premiums as reported in the profit and loss statements for the relevant business segments and lines of business.

200. *Sixth*, I deducted general and administrative expenses and taxes, licenses and fees incurred. These expenses represent expenses that are necessary for the operation of Federal's business and sale of insurance policies. General and administrative expenses include underwriter salaries and benefits, professional fees and advertising and marketing costs among other expenses. These costs are necessary to operate Federal's business and sell insurance policies (gross written premium). Taxes, licenses and fees are similarly necessary costs of operating as an insurance company. I understand that these costs cannot be attributed to specific insurance policies, but are allocated to the lines of business.[288]

201. I estimated Federal's general and administrative expenses and taxes, licenses and fees incurred based on Federal's actual reported expenses as a percentage of earned premiums as reported in the profit and loss statements for the relevant business segments and lines of business as follows (*see* also **Exhibits 8.0, 8.1, 8.2, 8.3** and **8.4**):

---

[288] Deposition of Kevin Harkin, March 25, 2019, p. 56-58.

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

**Comparison of the Expense Ratios Between Business Segment/Line of Business Financials and Comparable Public Companies**

| | For the Years Ending December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2018** |
| **Business Segment/Line of Business Financials** | 27% | 29% | 28% |
| **Comparable Public Companies [1]** | | | |
| Low | 30% | 29% | 29% |
| **Median** | **33%** | **33%** | **32%** |
| High | 34% | 34% | 36% |
| **Average** | **32%** | **32%** | **32%** |

<u>**Note:**</u>
[1] Includes Chubb Limited; The Travelers Companies, Inc.; The Hanover Insurance Group, Inc.; American International Group, Inc.; and W.R. Berkley Corporation

202. As summarized in the foregoing table, Federal's actual expense ratio is generally consistent, albeit on the low end, of the observed range in industry benchmark expense ratios and the expense ratios of comparable public companies.[289]

203. The following table summarizes Federal's underwriting profits from estimated gross written premiums that processed through Blaze Advisor applications and compares them to Mr. Zoltowski's estimate (*see* also **Exhibit 5**):

---

[289] Again, adopting Federal's actual expense ratio is conservative, meaning that I were to adopt the higher expense ratios observed in industry benchmarks and comparable public companies, the expenses would be higher and the underwriting profit would be smaller.

Page 64

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

**Comparison of the Profit and Loss Statements for Gross Written Premiums
Processed Through the Blaze Advisor Applications Between Mr. Zoltowski
and Federal Actual**
*(in US$ millions)*

| | Mr. Zoltowski's Estimate | Federal Actual |
|---|---|---|
| **Gross Written Premiums** | $ 30,876 | $ 16,189 |
| Net Written Premiums | | $ 14,688 |
| **Net Earned Premiums** | | $ 15,364 |
| Less: Losses | | $ (8,560) |
| *Loss Ratio* | *Was not estimated by Mr. Zoltowski* | *56%* |
| Less: Expenses (incl. commissions, G&A, taxes, dividends & other expenses) | | $ (4,348) |
| *Expense Ratio* | | *28%* |
| **Underwriting Profit** | | **$ 2,456** |
| *% of Net Earned Premiums* | | *16%* |
| *Combined Loss Ratio* | | *84%* |

204. Federal's underwriting profit calculations show a combined ratio of 84%. This combined ratio is consistent with industry benchmarks and comparable public companies (*see* **Exhibit 10**).

205. To recap, and absent establishing an economic nexus or causal link between any profits Federal received and the alleged infringement, a calculation of Federal's profits is inappropriate in these circumstances. As I discussed above, from a financial perspective my analysis is overinclusive relative to the claims in this case. By this I mean that it does not isolate gross written premiums and associated profits (if any) attributable to the alleged infringement, as opposed to other factors unrelated to any alleged infringement.

### 4.4    Summary

206. As I discussed at length above, Mr. Zoltowski's calculations are not tied to the allegations in this case. Both his "lost license fees" calculations and his "disgorgement" calculations lack

# Zoltowski Rep.
# Ex. 10.0

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania Corporation, | ) ) ) ) ) | |
| Defendant. | ) | |

**EXPERT REPORT OF
W. CHRISTOPHER BAKEWELL
REGARDING DAMAGES**

**May 17, 2019**

Respectfully Submitted,

W. Christopher Bakewell

**Fair Isaac Corporation v. Federal Insurance Company**                                                                                                                                    **Exhibit 10.0**
Loss & Expense Ratios for Public Comparable Companies
For the Years Ending December 31,

| Company Name [1] | Ticker | Consolidated Loss Ratio | | | | | | Consolidated Expense Ratio | | | | | | Consolidated Combined Ratio | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| Chubb Limited | NYSE: CB | 54% | 57% | 58% | 58% | 66% | 62% | 32% | 31% | 29% | 31% | 29% | 29% | 88% | 88% | 87% | 88% | 95% | 91% |
| The Travelers Companies, Inc. | NYSE: TRV | 58% | 58% | 57% | 61% | 67% | 67% | 32% | 31% | 32% | 30% | 31% | 32% | 90% | 89% | 88% | 92% | 98% | 97% |
| The Hanover Insurance Group, Inc. | NYSE: THG | 62% | 62% | 61% | 67% | 65% | 64% | 35% | 35% | 34% | 33% | 33% | 32% | 97% | 97% | 96% | 100% | 97% | 96% |
| The Hartford Financial Services Group, Inc. | NYSE: HIG | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 92% | 97% | 100% | 100% | 98% |
| American International Group, Inc. | NYSE: AIG | 65% | 70% | 74% | 85% | 83% | 76% | 30% | 30% | 36% | 34% | 34% | 36% | 102% | 100% | 110% | 119% | 117% | 111% |
| W. R. Berkley Corporation | NYSE: WRB | 61% | 61% | 61% | 61% | 63% | 62% | 34% | 33% | 33% | 33% | 33% | 33% | 95% | 94% | 94% | 94% | 97% | 95% |
| **Summary Statistics** | | | | | | | | | | | | | | | | | | | |
| Low | | 54% | 57% | 57% | 58% | 63% | 62% | 30% | 30% | 29% | 30% | 29% | 29% | 88% | 88% | 87% | 88% | 95% | 91% |
| **Median** | | **61%** | **61%** | **61%** | **61%** | **66%** | **64%** | **32%** | **31%** | **33%** | **33%** | **33%** | **32%** | **95%** | **93%** | **95%** | **97%** | **98%** | **97%** |
| High | | 65% | 70% | 74% | 85% | 83% | 76% | 35% | 35% | 36% | 34% | 34% | 36% | 102% | 100% | 110% | 119% | 117% | 111% |
| Average | | **60%** | **61%** | **62%** | **66%** | **69%** | **66%** | **32%** | **32%** | **33%** | **32%** | **32%** | **32%** | **94%** | **93%** | **95%** | **99%** | **101%** | **98%** |
| *Federal's Business Segment/Line of Business Financials Over Loss Period* | | *56%* | | | | | | *28%* | | | | | | *84%* | | | | | |

**Source:**
[1] Source: CapitalIQ & company public filings

# Zoltowski Rep. Ex. 8.0

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania Corporation, | ) ) ) ) ) | |
| Defendant. | ) | |

**EXPERT REPORT OF
W. CHRISTOPHER BAKEWELL
REGARDING DAMAGES**

**May 17, 2019**

Respectfully Submitted,

W. Christopher Bakewell

**Fair Isaac Corporation v. Federal Insurance Company**                                                                  **Exhibit 8.0**

Combined Pro-forma Income Statement Summary for Business Segments or Lines of Business Which Had an Income Statement Prepared by Federal
(in US$ millions)

|  | For the Years Ending December 31, [1] | | | | | |
|---|---|---|---|---|---|---|
|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| **Gross Written Premiums** | $      27 | $      27 | $      153 | $    7,016 | $    6,910 | $    6,353 |
| Net Written Premiums | 27 | 27 | 145 | 6,387 | 6,266 | 5,802 |
| *Net Written as a % of Gross Written* | *100%* | *100%* | *95%* | *91%* | *91%* | *91%* |
| **Net Earned Premiums** | $      27 | $      27 | $      140 | $    6,683 | $    6,613 | $    5,939 |
| *Net Earned as a % of Net Written* | *100%* | *100%* | *96%* | *105%* | *106%* | *102%* |
| Less: Losses | $    (13) | $    (13) | $    (89) | $  (3,559) | $  (3,838) | (3,309) |
| *Loss Ratio* | *49%* | *48%* | *64%* | *53%* | *58%* | *56%* |
| Less: Expenses | $    (15) | $    (16) | $    (57) | $  (1,816) | $  (1,900) | (1,669) |
| *Expense Ratio* | *58%* | *59%* | *41%* | *27%* | *29%* | *28%* |
| **Underwriting Profit / (Loss)** | $      (2) | $      (2) | $      (7) | $    1,308 | $      876 | $      961 |
| *% of Net Earned Premiums* | *-6%* | *-7%* | *-5%* | *20%* | *13%* | *16%* |
| *Combined Loss Ratio* | *106%* | *107%* | *105%* | *80%* | *87%* | *84%* |

**Note/Source:**

[1] This is the combined income statement for all of the business segments and lines of business which had a profit and loss statement prepared by Federal. The individual profit and loss statements for each of the business segments or lines of business can be seen in Exhibits 8.1 to 8.4.

# Zoltowski 2d
# Supp. Rep.
# Sch. 8.0

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MINNESOTA**

FAIR ISAAC CORPORATION,

      Plaintiff,

v.

FEDERAL INSURANCE COMPANY, and
ACE AMERICAN INSURANCE COMPANY

      Defendants.

Case No. 16-CV-1054(WMW/DTS)

**SECOND SUPPLEMENTAL
EXPERT REPORT
OF NEIL J. ZOLTOWSKI
WITH RESPECT TO DAMAGES**

Respectfully submitted this 13th day of May, 2021

_____

Neil J. Zoltowski

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

*Fair Isaac Corporation v. Federal Insurance Company and ACE American Insurance Company*

**SECOND SUPPLEMENTAL SCHEDULE 8.0: Summary of Defendants' Domestic Gross Written Premium**

| Domestic Applications | Defendants Only | Subsidiaries of Defendants | Pooling Entities (Not Subsidiaries) of Defendants | Defendants, Subsidiaries and Pooling Entities (b) |
|---|---|---|---|---|
| | | ***March 31, 2016 to May 2020*** (a) | | |
| *Undisputed Applications* | | | | |
| Commercial Underwriting Workstation (CUW) | $ 7,656,976,368 | $ 3,663,148,142 | $ 1,427,268,700 | $ 12,747,393,210 |
| CSI eXPRESS (c) | 4,783,945,129 | 132,704,843 | 94,672,823 | 5,011,322,794 |
| Premium Booking | 1,750,877,402 | - | - | 1,750,877,402 |
| Texas Accident Prevention System (TAPS) | 462,805,017 | 270,951,408 | 110,550,113 | 844,306,538 |
| Individual Rate Modification Application (IRMA) | 223,406,656 | 69,554,858 | 7,355,485 | 300,316,999 |
| Decision Point | 18,101,109 | 1,117,772 | 34,636 | 19,253,516 |
| *Disputed Application* | | | | |
| Cornerstone | $ 518,138,795 | $ (3,510,098) | $ 14,281,786 | $ 528,910,484 |
| Undisputed Total | $ 14,896,111,681 | $ 4,137,477,023 | $ 1,639,881,756 | $ 20,673,470,459 |
| Disputed Total | 518,138,795 | (3,510,098) | 14,281,786 | 528,910,484 |
| **TOTAL** | **$ 15,414,250,476** | **$ 4,133,966,925** | **$ 1,654,163,542** | **$ 21,202,380,943** |

*Note/Source(s):*

(a) See **Second Supplemental Schedules 10.3-10.6** and **12.0**. Defendants identified in its interrogatory responses that the Blaze Advisor component was removed from the applications used in the United States by May 2020. (Defendants' Ninth Supplemental Answer to Plaintiff's Interrogatory No. 17, dated September 24, 2020.)

(b) This is equaled to the sum of (i) Defendants Only; (ii) Subsidiaries of Defendants; and (iii) Pooling Entities of Defendants.

(c) I understand the gross written premium reported for CSI eXPRESS includes premium related to the Automated Renewals Process and Profitability Indicator applications. Further, CSI eXPRESS, Automated Renewals Process and Profitability Indicator are all used in connection with the same gross written premium policies. (Harkin Deposition at 72-74; Federal Insurance Company's Fifth Supplemental Answer to Plaintiff's Interrogatory No. 16 and Sixth Supplemental Answer to Plaintiff's Interrogatory No. 17, dated March 21, 2019 at 3-5, 11-13; Defendants' Ninth Supplemental Answer to Plaintiff's Interrogatory No. 17, dated September 24, 2019.)

# Bakewell Supp. Rep. Par. 4

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 16-cv-1054 (WMW/DTS) |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania Corporation, | ) ) ) ) ) | |
| Defendant. | ) ) | |

**SUPPLEMENTAL EXPERT REPORT OF
W. CHRISTOPHER BAKEWELL
REGARDING DAMAGES**

**November 17, 2021**

Respectfully Submitted,

W. Christopher Bakewell

*CONFIDENTIAL*
*ATTORNEY'S EYES ONLY*

Federal's domestic applications) Defendants generated gross written premiums in the United States totaling $21.2 billion.[3]

(ii)  Between April 21, 2010 (*i.e.*, six years prior to the filing of the complaint) and October 2019 (*i.e.*, date Blaze Advisor was removed in the United Kingdom, Canada, Europe, and Australia), the total amount of gross written premium connected to the use of Blaze Advisor in the sale of insurance by foreign insurance companies totaled $3.1 billion.[4]

(iii)  Between March 31, 2016 (*i.e.*, termination of the SLM agreement) and September 30, 2016 (*i.e.*, date Chubb Insurance Company of Canada was no longer a subsidiary of Federal), Chubb Insurance Company of Canada generated gross written premium connected to the use of Blaze Advisor in the Evolution application totaling $154.4 million.[5]

4.  Mr. Zoltowski's theories and methodologies remain unsound and unreliable; Mr. Zoltowski still has not established an economic or technical nexus between any claimed damages and FICO's allegations of wrongdoings.[6] Mr. Zoltowski merely adds revenue numbers from Federal's discovery responses, and declares that FICO "may" be able to recover some portion of the profits on these gross revenues without meaningful financial analysis. Mr. Zoltowski still has not specified a causal link of financial and economic nexus to the alleged wrongdoing; as a result, his conclusions are still without any basis relative to the facts of the case.[7]

5.  Additional agreements and negotiations have since been produced in this matter.[8] In my rebuttal report, I provided an overview of FICO's licenses and licensing practices involving

---

[3] Zoltowski Second Supplemental Report, p. 5 and Second Supplemental Schedule 8.0. Mr. Zoltowski also cited to his "schedule that set forth [his] computation of gross written premium based on the Eight Supplemental Answer to Plaintiff's Interrogatory No. 17" that concluded "Defendants generated gross written premium in the United States totaling $35.8 billion." *See* Zoltowski Second Supplemental Report, pp. 5-6 and First Supplemental Schedule 8.0.

[4] Zoltowski Second Supplemental Report, p. 6 and Second Supplemental Schedule 9.0A.

[5] Zoltowski Second Supplemental Report, p. 7 and Second Supplemental Schedule 9.0B.

[6] Bakewell Rebuttal Report, pp. 7, 33, 48-51, 58, 65-66.

[7] Bakewell Rebuttal Report, p. 7-9, 65-67.

[8] These further illustrate that the figures FICO previously provided as a measure of its lost licensing fees are unreasonable and overstated. I understand that FICO has notified Federal's counsel that it intends to attempt to present certain portions of Mr. Zoltowski's opinions related to licensing evidence at trial, and that it may attempt to provide other testimony and evidence at trial on this topic as well.

Page 2