

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036-6537

T: +1 212 326 2000
F: +1 212 326 2061
omm.com

**Anton Metlitsky**
D: +1 212 326 2291
ametlitsky@omm.com

March 5, 2023

**BY ECF**

Honorable David T. Schultz
United States District Court
300 South Fourth Street
Minneapolis, MN 55415

Re:   *Fair Isaac Corp. v. Federal Insurance Co. et al.*, 16-cv-1054

Dear Judge Schultz:

I write on behalf of Defendants Federal Insurance Company and ACE American Insurance Company to respond to FICO's position, most recently articulated during the preliminary discussion on Defendants' motions for judgment, Tr. 1978, that a breach of Section 3.1 of the Licensing Agreement need not satisfy New York's materiality standard to justify termination. That contention is contrary to the law of the case, New York law, and the terms of the Licensing Agreement.

Under New York law, the non-breaching party has the right to terminate an agreement only for a material breach.  *See, e.g.*, *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016).  As this Court has explained, "[a] breach of contract 'is material if it [goes] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract.'" Dkt. 731 at 44-45 (quoting *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379-80 (S.D.N.Y. 2014) (internal quotation marks omitted)).

FICO does not disagree with this basic rule of New York contract law, Tr. 1978 (acknowledging the "common law rule of materiality"), but contends that the parties contracted around that rule in Section 9.2 of the Licensing Agreement.  Section 9.2 provides in relevant part:

> 9.2  Events of Termination.  This agreement may be terminated upon the occurrence of any of the following events:
>
> (a) Uncured Breach.  Either party may terminate this agreement for a breach by the other party of any of the material terms of this Agreement, or numerous breaches of duties or obligations hereunder that cumulatively constitute a material breach if the breaching party fails to cure the breach(es) within 30 days from receipt of written notice from the non-breaching party identifying the breach(es) and requiring them to be remedied.
>
> * * *



      (c)  <u>Violation of License or Confidentiality Obligations</u>.  Fair Isaac may immediately terminate this Agreement, without requirement for prior notice or a cure period, if Client violates any terms of the licenses granted in this Agreement.  Either party may immediately terminate this Agreement by written notice to the other party if the other party materially breaches any of the provisions of this Agreement relating to the protection of Confidential Information or Intellectual Property.

J-001 § 9.2.  FICO concedes that termination is valid under Section 9.2(a) only for material breaches of some contract provisions, such as Section 10.8.  *See* Tr. 1656 (acknowledgement by Mr. Waid that an alleged breach of Section 10.8 triggers Section 9.2(a)'s 30-day cure period).  But FICO says that (i) even minor, technical breaches of "any terms of the licenses granted in this Agreement" justify immediate termination, and (ii) that a breach of Section 3.1—including, according to FICO, one-off use of Blaze Advisor by consultants working with Chubb—counts as a breach of the "terms of the licenses granted in this Agreement" under Section 9.2(c).  Dkt. 1003 at 10-11.

That argument is wrong.

**1.**  As an initial matter, FICO's argument contradicts the law of the case.  FICO made the same argument at summary judgment as it makes now—*viz.*, that Section 9.2(c) authorizes FICO to terminate the agreement for even technical, non-material breaches of Section 3.1, FICO SJ Reply Br., Dkt. 558, at 5—and this Court squarely rejected it.  *See* Dkt. 731 at 44-45 (holding that termination for use by third-party consultants is valid only if material, *i.e.*, if it goes "to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract" (quoting *VFS Fin., Inc.*, 17 F. Supp. 3d at 379-80)).  That suffices to reject FICO's contention here.  *See* Final Pretrial Conf. Hrg. Tr. 63 ("And in case it is not blindingly obvious, I am going to follow every one of Judge Wright's rulings. It's the law of the case.").[1]

**2.**  Even setting aside the law of the case, FICO's reading of Section 9.2(c) is incorrect for at least three reasons.

*First*, even if parties could contract around the general materiality requirement for termination, Section 9.2(c) does not purport to do any such thing.  Rather, the purpose of Section 9.2(c) is to carve out an exception to the 30-day cure period established in Section 9.2(a).  Subsection (a) is entitled "Uncured Breach" and says that "[e]ither party may terminate this Agreement for a breach . . . if the breaching party fails to cure the breach[es] within 30 days . . . ."  J-001 § 9.2(a).  Subsection (c) creates an exception to the cure period for breaches of "any terms of the licenses granted in this Agreement" or of the Agreement's provisions "relating to the protection of Confidential Information or Intellectual Property"—such breaches authorize termination "immediately," "without the requirement for prior notice or a cure period."  *Id.* § 9.2(c).

---

[1] The fact that Judge Wright definitively rejected FICO's argument—and this Court made clear at the pretrial conference that it would follow Judge Wright's rulings—makes it especially inexplicable that FICO solicited testimony from Mr. Carretta that the Agreement could be terminated for "the slightest infraction" of Section 3.1, which Mr. Carretta characterized as a "strict liability" provision.  Tr. 941



Thus, Section 9.2(c) authorizes immediate breach without the opportunity to cure in certain narrow circumstances. But it says nothing about authorizing termination based on a technical, non-material breach. Perhaps FICO would point to the fact that other parts of Section 9.2 use the word "material" whereas the relevant sentence in Section 9.2(c) does not. But that sort of weak negative inference would not be enough to overcome the default rule requiring a material breach for termination. After all, if two parties for some reason mutually agreed to allow termination for non-substantial breaches, one would expect them to do so quite clearly.

That is especially so, moreover, when the relevant provision also authorizes *immediate* termination without any cure period, as is true of Section 9.2(c). The consequence of FICO's reading—that it is authorized to terminate immediately based on the most minor, technical breach—would be that any such immaterial breach could immediately put Federal in violation of the federal copyright laws. It is difficult to imagine why any reasonable party would put itself in that untenable position. Certainly, such intent should not be imputed to the parties here without the clearest of statements, which indisputably does not exist. The Court should not adopt such a "commercially unreasonable" reading of Section 9.2(c) when a better interpretation—that Section 9.2(c), like Section 9.2(a), applies only to material breaches—is available. *Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010).

The facts of this case demonstrate the absurdity of FICO's position. FICO terminated the agreement, in part, on the ground that DWS, a third-party consultant in Australia, used Blaze Advisor while working with Chubb Australia. P-0103. But the trial record makes clear that FICO terminated on this ground knowing only that one DWS employee encountered technical problems using a publicly available "trial license" that "can be had from the FICO web site[,]" P-1114-008; *see also* P-1113 (exchange between this employee and FICO support); P-1116 (public post on a FICO message board by this employee). Indeed, Mr. Carretta confirmed that he made no effort to determine the magnitude of DWS's use of Blaze Advisor before purporting to terminate the License Agreement on this ground. Tr. 887. And Mr. Waid even admitted that when he learned of DWS's use of Blaze Advisor, he was "fine" with FICO "continu[ing] to be responsive" to the DWS consultant, so long as FICO did "not make any statements regarding Chubb's rights to use the software." Tr. 1771-72. If this was a breach of Section 3.1, it is on its face a minor, technical, admittedly harmless breach—presumably, Mr. Waid would not be "fine" with a continuing breach that was causing FICO harm. Yet according to FICO, the License Agreement still authorized it to *immediately* terminate the Agreement, thus putting Federal into immediate violation of the copyright laws that would continue until it could extract Blaze Advisor completely from its platform. Only the clearest of contractual language could plausibly support such an absurd result.[2]

---

[2] In its trial brief, FICO cited three cases in support of its view that the parties in this case "contracted around" New York's materiality rule, but none of those cases shows any such thing. In *Peter J. Solomon Co, L.P. v. ADC Products, Ltd.*, 2016 WL 1261136 (S.D.N.Y. Mar. 30, 2016), the parties, by contract, *strengthened* the materiality rule by requiring that the non-breaching party afford the breaching party an opportunity to cure before termination, even as the New York background rule would permit immediate termination. *Id.* at *3-4. That is also what FICO and Federal agreed to in Section 9.2(a) of the License Agreement. In *In Touch Concepts, Inc. v. Cellco Partnership*, 949 F. Supp. 2d 447 (S.D.N.Y. 2013), the

3



*Second*, and perhaps more important, a breach of Section 3.1 does not implicate Section 9.2(c) at all.

As explained, Section 9.2(c) applies only to a breach of the "terms of the licenses granted in this Agreement." FICO seems to assume that the restrictions in Section 3.1 are included within the terms of the Agreement's "licenses granted." But the same could be said about *any* of the Agreement's restrictions. *See* J-001 § 2.1 (license grant "[s]ubject to the terms, conditions and limitations of this Agreement"). Obviously, not every restriction on the terms of the license fall under Section 9(c)'s immediate-termination provision; if they did, then Section 9.2(a), which is the Agreement's general termination provision, and requires a 30-day cure period, would never apply. Yet FICO itself admits that the 30-day cure period applies to Section 10.8. *See, e.g.*, Tr. 1656. Thus, Section 9.2(c)'s reference to the "terms of the licenses granted in this Agreement" must apply to a subset of all the rights, restrictions, and obligations set forth in the Agreement. And FICO makes no effort to explain why the restrictions in Section 3.1 fall within that subset.

The language and structure of the License Agreement itself, however, make clear that breaches of Section 3.1 do not fall under Section 9.2(c)'s immediate-termination provision. Rather, Section 9.2(c)'s reference to the "terms of the licenses granted" applies specifically to the terms of Section 2 of the Agreement, which is entitled "License Grant." *See* J-001 § 2; *see also id.* § 2.1 ("License Grant to Fair Isaac Products"). Other restrictions and conditions on the terms of Section 2's license grant—such as the restrictions in Section 10.8 and Section 3.1—do not fall within the "terms of the licenses granted in the Agreement," and thus do not implicate Section 9.2(c).

The other FICO agreements admitted at trial confirm that the phrase "terms of the licenses granted in this Agreement" in Section 9.2(c) refers specifically (and exclusively) to the "License Grant" in Section 2 of the Agreement:

- FICO's agreement with ACE is similar to the Agreement here—it generally requires a 30-day cure period, but allows immediate termination for breaches of "any terms of the licenses granted in this Agreement." *See* D-0039 § 9.2(a), (c). And as with the Agreement here, Section 2 in the ACE agreement is entitled "License Grant" whereas Section 3 is entitled "Rights and Restrictions." *Id.* §§ 2, 3.

---

contract at issue provided that one party "has the right to terminate this Agreement at any time, with or without cause, upon six (6) months prior written notice." *Id.* at 456. That sort of mutual termination provision does not require *any* breach to terminate, so it does not implicate the background material-breach rule at all. And in any event, the *In Touch Concepts* agreement allowed for termination upon 6-months' notice—not *immediate* termination for non-material breaches, which is what FICO says the License Agreement here allows. *Southland Corp. v. Froelich*, 41 F. Supp. 2d 227 (E.D.N.Y. 1999), is the furthest afield. There, the court specifically "agree[d] that the principles of common law recission of a contract under New York law . . . *apply* to the facts presented here." *Id.* at 246. In the portion FICO cites, the court merely noted that, even where a contract specified certain grounds for termination, recission for an unenumerated *but material* breach was appropriate under the New York rule. *Id.*



- Other agreements, in contrast, do not include a provision allowing for immediate termination for breach of the terms of the "licenses granted." *See* D-280 (Healthways Agreement) § 9.2(a) (allowing for termination upon breach after cure period, with no separate section authorizing immediate termination on any ground); D-304 (Grange Insurance Agreement) § 12(a) (same). And those agreements do not have separate sections labeled "License Grant" and "Rights and Restrictions"; rather, they have a single section that combines all the basic provisions of Sections 2 and 3 of the License Agreement with Federal. *See* D-280 § 2 ("License Grants and Restrictions"); D-304 § 4 ("License Rights and Restrictions"). These other agreements show that when there is no special immediate-termination provision for breaches of the terms of the "licenses granted," there is also no need to separate out the section detailing the "License Grant" from the provision setting forth other contractual rights and restrictions.

- There is also a third category of agreements that includes an immediate-termination provision broader than Section 9.2(c) of the Agreement here—*viz.*, a provision allowing for termination if the Client breaches "the terms of any applicable license *or license restriction*." D-293 (CVS Agreement) § 9.2(c); *see also* D-077 (SeaBright Agreement) § 9.2(c). Because the immediate-termination provision applies not only to the terms of the license grant but rather to both the license grant and the license restrictions, there would be no reason to have separate sections labeled "License Grant" and "Rights and Restrictions." And, sure enough, these agreements combine those two provisions into one section entitled "License Grants and Restrictions." *See* D-293 § 2; D-077 § 2. Moreover, to the extent FICO argues that the term "licenses granted" necessarily encompasses "license restrictions," these agreements show that that argument is wrong—if a license restriction were a license grant, then these agreements would not specify that the immediate-termination clause also applies license restrictions in addition to license grants.

FICO's agreements are thus remarkably careful to ensure that when an immediate-termination provision applies only to breaches of the "terms of the licenses granted," it includes one section setting forth the terms of the "License Grant" (subject to the immediate-termination provision) and a separate section setting forth "Rights and Restrictions" (not subject to the immediate-termination provision). But when the agreement either (i) does not include an immediate-termination provision or (ii) allows for immediate termination of breaches of the license *and license restrictions*, that agreement combines the license grant and restrictions into a single section entitled "License Grant and Restrictions" (or similar). Defendants are aware of no agreement in the record, meanwhile, that includes an immediate-termination provision limited to the "terms of the licenses granted" but that also includes a combined "License Grants and Restrictions" section.

That consistent structure demonstrates that Section 9.2(c) in the License Agreement here—which only allows for immediate termination for breach of "any terms of the licenses granted in this Agreement"—applies to breaches of Section 2 ("License Grant") but not of Section 3 ("Rights and Restrictions"). Section 3.1, of course, is in Section 3, so a breach of that provision is subject to Section 9.2(a), not Section 9.2(c), even if FICO were right about what Section 9.2(c) means.



*Third*, FICO's argument is irreconcilable with its concession that breaches of Section 10.8 ("No Assignment") invoke Section 9.2(a), and thus must be material to justify termination. As the Court knows, the first sentence of Section 10.8 says that "Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof." J-001 § 10.8. But Section 3.1(v) precludes much the same thing: it says that "Client . . . shall not . . . assign, sublicense, lease, transfer or distribute the Fair Isaac Products." *Id.* § 3.1(v). So FICO's position is that it could only terminate the Agreement upon a material breach of the no-assignment provision in Section 10.8, but it could at the same time terminate based any minor, technical breach of the same no-assignment prohibition in Section 3.1(v). That, obviously, cannot be right.

Thus, FICO's position that it had the right to terminate the Agreement for non-material breaches should be rejected, not only because that position contradicts the law of the case, but because it is decidedly wrong under New York law and the terms of the License Agreement. As a consequence, the Court should grant Defendants' motion for judgment as a matter of law as to FICO's claim that Federal breached the Agreement based on the use of Blaze Advisor by two third-party consultants. Dkt. 1128. At the very least, though, the Court should instruct the jury that only a material breach of the License Agreement—including of Section 3.1—could justify FICO's 2016 termination.

Respectfully submitted,

/s/ Anton Metlitsky

Anton Metlitsky

cc:     Counsel of Record