# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) | Case No. 16-cv-1054 (DTS) |
| | ) | |
| Plaintiff, | ) | **Jury Trial Demanded** |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

## Table of Contents

I.    Introduction ................................................................................................ 1

II.   Federal's First Motion for Judgment as a Matter of Law: Federal's motion
      for judgment as a matter of law that FICO cannot establish breach of
      Paragraph 3.1(iv) based on use by Federal's Affiliates must be denied. ................ 6

      A.    "Client and its Affiliates" means "Chubb & Son and its Affiliates." .......... 6

            (1)    Unincorporated entities can contract under New York law. .............. 7

            (2)    The legal ability of Chubb & Son to contract is confirmed by
                   Defendants' own admissions. ........................................................... 10

            (3)    The plain language of "Client and its Affiliates" is
                   unambiguous, and extrinsic evidence cannot be used to create
                   ambiguity. ....................................................................................... 11

      B.    The License Agreement is not rendered meaningless or illusory. .............. 12

            (1)    The License Agreement is not illusory. The evidence supports
                   that Chubb & Son has employees. .................................................... 13

            (2)    Amendment Two gave Chubb & Son the ability to use Blaze
                   Advisor in connection with selling insurance across all lines
                   of business. ..................................................................................... 17

III.  Federal's Second Motion for Judgment as a Matter of Law: Federal's
      motion for judgment as a matter of law that FICO cannot establish breach
      of Paragraph 3.1(iv) based on use by third-party consultants must be
      denied. ................................................................................................... 21

      A.    The License Agreement prohibits the Client from disclosing, or
            permitting use of or access to, Blaze Advisor by third parties .................... 21

      B.    Disclosure, use of, and access to Blaze Advisor by third-party
            consultants is undisputed. ............................................................................ 21

      C.    Materiality is not required and is not a defense. ........................................ 23

            (1)    Materiality is not a requirement to establish breach under
                   New York law. ................................................................................. 24

            (2)    Paragraph 9.2(c) governs breach of Paragraph 3.1(iv) and
                   excludes a materiality requirement. .................................................. 26

(3)     The Court's summary judgment Order did not address the
        first sentence of Paragraph 9.2(c).....................................................29

(4)     Federal's breach is material.................................................................30

IV.     FICO's First Cross Motion for Judgment as a Matter of Law: Federal has
        breached Paragraph 3.1(iv) of the License Agreement by disclosing and
        permitting use and access to Blaze Advisor by third-party consultants.................34

        A.      FICO has performed under the License Agreement....................................35

        B.      FICO has been damaged by Federal's breach of Paragraph 3.1(iv). ..........35

        C.      Federal has no defense to its breach.........................................................36

                (1)     Materiality is not a defense. ...........................................................36

                (2)     Estoppel and waiver are not available or applicable defenses. ........36

V.      FICO's Second Cross Motion for Judgment as a Matter of Law: FICO
        properly terminated the License Agreement, and Federal's claim of breach
        of contract fails. ......................................................................................38

VI.     Conclusion ........................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Avis Rent-A-Car Sys. v. City of Dayton*,
  581 F. App'x 479, 482 (6th Cir. 2014) ........................................................................ 20

*In re Berman*,
  11-07886-8-DMW, 2015 WL 3777985 (Bankr. E.D.N.C. June 16, 2015) ................ 19

*Brown v. Bldg. Engines, Inc.*,
  No. 1:21-cv-10893, 2022 WL 2532177 (S.D.N.Y. Apr. 15, 2022) ........................... 18

*Callanan v. Keesevill, Ausable Chasm & Lake Champlain R.R. Co.*,
  199 N.Y. 268 (1910) ............................................................................................... 25

*CMAX/Cleveland, Inc. v. UCR, Inc.*,
  804 F. Supp. 337 (M.D. Ga. 1992) ........................................................................... 33

*Derr v. Footlocker, Inc.*,
  2006 U.S. Dist. LEXIS 15317 (C.D. Cal. Mar. 9, 2006) .......................................... 16

*Fiore v. Fiore*,
  415 N.Y.S.2d 826 (1979) .......................................................................................... 17

*Frank Felix Assocs. v. Austin Drugs*,
  No. 96-7604, 1997 U.S. App. LEXIS 19795 (2d Cir. Apr. 10, 1997) ....................... 30

*Golub Cap. LLC v. NB Alternatives Advisers LLC*,
  No. 21-cv-3991, 2022 WL 540653 (S.D.N.Y. Feb. 22, 2022) ....................... 7, 8, 9, 34

*Hanna Mining Co. v. Minn. Power & Light Co.*,
  573 F. Supp. 1395 (D. Minn. 1983) .......................................................................... 20

*Hrebal v. Nationstar Mortg. LLC*,
  385 F. Supp. 3d 849 (D. Minn. 2019) ....................................................................... 12

*Hunt v. Lincoln Cty. Mem'l Hosp.*,
  317 F.3d 891 (8th Cir. 2003) ...................................................................................... 5

*In Touch Concepts v. Cellco P'ship*,
  949 F. Supp. 2d 447 (S.D.N.Y. 2013) ................................................................. 28, 30

*Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*,
933 F. Supp. 347 (S.D.N.Y. 1996) ........................................................ 28, 30

*King v. Chubb & Son*,
563 F. App'x. 729 (11th Cir. April 22, 2014) ............................................. 15

*Korpak, Ltd. v. Williams Lea Inc.*,
No. 20 Civ. 6880, 2022 WL 375543 (S.D.N.Y. Feb. 7, 2022) .............................. 24, 25

*Manson v. Stacescu*,
11 F.3d 1127 (2d Cir. 1993) ............................................................. 20

*Maranatha Assocs. v. Titan Grp.*,
609 N.Y.S.2d 368 (App. Div. 3d Dep't 1994) ......................................... 7, 8, 9

*Menes v. Chubb & Son*,
101 F. Supp. 427 (D.N.J. 2015) ........................................................... 15

*Mergers & Acquisition Servs. v. Eli Glob., LLC*,
No. 1:15-cv-3723-GHW, 2017 WL 1157132 (S.D.N.Y. Mar. 27, 2017) ................... 28

*Millgard Corp. v. E.E. Cruz/NAB/Fronier-Kemper*,
99 Civ. 2952, 2003 WL 22741664 (S.D.N.Y. Nov. 18, 2003) .......................... 11, 17

*MVP Health Plan v. Optuminsight, Inc.*,
No. 1:13-CV-1578, 2016 U.S. Dist. LEXIS 189263 (N.D.N.Y. Sept. 30,
2016) ..................................................................................... 37

*Oppenheimer & Co. v. Oppenheim*,
86 N.Y.2d 685 (1995) ...................................................................... 19

*Orenbuch v. N. Shore Health Sys.*,
250 F. Supp. 2d 145 (E.D.N.Y. 2003) ...................................................... 16

*Orlander v. Staples, Inc.*,
802 F.3d 289 (2d. Cir. 2015) ........................................................ 24, 25, 26

*Paris Partners, L.P. v. Russo*,
94 Civ. 5684 (PKL), 1995 U.S. Dist. LEXIS 18648 (S.D.N.Y. Dec. 14,
1995) ..................................................................................... 20

*Peter J. Solomon Co., L.P. v. ADC Prods. (UK)*,
No. 14CV4086-LTS, 2016 U.S. Dist. LEXIS 42537 (S.D.N.Y. Mar. 30,
2016) .................................................................................. 28, 30

*Process Am., Inc. v. Cynergy Holdings, LLC*,
  839 F.3d 125 (2d Cir. 2016)........................................................................ 25

*Ran First Assocs. v. 363 E. 76th St. Corp.*,
  747 N.Y.S.2d 13 (App. Div. 1st Dep't 2002) ............................................. 18

*Rapid Print, Inc. v. Minn. Mining & Mfg. Co.*,
  Civil Action No. 78-3190-MC., 1980 WL 1999 (D. Mass. Sept. 10,
  1980) ........................................................................................................... 16

*Reiss v. Fin. Performance Corp.*,
  97 N.Y.2d 195 (2001) ............................................................................ 12, 18

*Septembertide Pub., B.V. v. Stein & Day, Inc.*,
  884 F.2d 675 (2d Cir. 1989)........................................................................ 25

*Taylor Precision Prods. v. Larimer Grp., Inc.*,
  No. 1:15-cv-4428, 2018 WL 4278286 (S.D.N.Y. March 26, 2018)............... 24, 25, 36

*VFS Fin., Inc. v. Falcon Fifty LLC*,
  17 F. Supp. 3d 372 (S.D.N.Y. 2014).................................................... 26, 30

*W.W.W. Assocs. v. Giancontieri*,
  77 N.Y.2d 157 (1990) ............................................................................ 11, 18

*Weeks Marine v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*,
  No. 08 Civ. 9878, 2011 WL 3796331 (S.D.N.Y. Aug. 24, 2011) ............... 37

*Weichman v. Chubb & Son*,
  552 F. Supp. 2d 271 (D. Conn. 2008)........................................................ 15

*ZBD Constructors, Inc. v. Billings Generation, Inc.*,
  No. 09 CIV. 6667 NRB, 2011 WL 1327144 (S.D.N.Y. Mar. 25, 2011) ................... 37

## Other Authorities

Fed. R. Civ. P. 50........................................................................................... 5

## I.     Introduction

This memorandum responds to Defendants Federal Insurance Company's ("Federal") and ACE American Insurance Company's ("ACE American") (collectively, "Defendants") two motions for judgment as a matter of law on Plaintiff Fair Isaac Corporation's ("FICO") claim for breach of contract.[1] The first of Federal's motions relates to FICO's breach of contract claim based on use of Blaze Advisor by Federal's foreign Affiliates. The second of Federal's motions relates to FICO's breach of contact claim based on disclosure, use of, and access to Blaze Advisor by two third-party consultants. Both should be denied.

This memorandum also supports two separate motions for judgment as a matter of law brought by FICO. FICO seeks judgment as a matter of law that Federal breached the 2006 License Agreement by disclosing and permitting use and access to Blaze Advisor by third-party consultants. FICO also seeks judgment as a matter of law that FICO did not breach the 2006 License Agreement.

_Federal's First Motion for Judgment as a Matter of Law._ The Parties dispute who the "Client" of the License Agreement is—Chubb & Son or Federal. Federal describes FICO's position that the "Client" is Chubb & Son as "absurd" and as "ignor[ing] the well-established legal rule that an unincorporated division has no legal identity apart from

---

[1] The motion for judgment as a matter of law on these claims is identified as being brought by Defendants Federal Insurance Company and ACE American Insurance Company. (Dkts. 1128, 1129.) However, FICO has not brought a claim for breach of contract against ACE American Insurance Company. (Dkt. 132 at ¶¶ 44-46.)

its corporate parent and so may not sue, be sued, or contract on its behalf." (Dkt. 1129 at 1-2.) But it is Federal that ignores the law and the facts.

Under New York law ambiguity in a contract must arise from within the four corners of the contract. It cannot be created from facts extrinsic to the contract. Here, the License Agreement defines the term "Client." It means "Chubb & Son, a division of Federal Insurance Company." The term "Affiliates" is also defined and unambiguous. Nothing in the four corners of the License Agreement renders these terms ambiguous. Rather, the alleged ambiguity comes from facts extrinsic to the License Agreement. As a matter of law, this Court cannot find the term "Client and its Affiliates" ambiguous based on such extrinsic facts.

At summary judgment the Court's finding of ambiguity as to "Client and its Affiliates" in large part stemmed from an unawareness of pertinent New York law which holds that unincorporated divisions may enter into contracts. Indeed, while Federal espouses that it is "blackletter New York law" that an unincorporated division cannot enter into a contract on its own behalf, it cites no New York law to support its position. (Dkt. 1129 at 7 (citing cases from outside of New York and the Second Circuit).)

Before this litigation began, Federal sang a completely different tune and agreed with FICO's allegedly "absurd" position. In his response to FICO's notice of breach, Chubb Deputy General Counsel Mr. Andrew Hopp stated that **"Chubb & Son, the contracting party to the Agreement**, remains a viable legal entity within the Chubb Group of Insurance Companies' corporate structure **and the contracting party to the Agreement**. In short, **Chubb & Son is still FICO's 'Client' as such term is defined in**

**the Agreement**." (Ex. 1 at P0091-001 (emphasis added).)[2] Chubb repeated this same position in its February 25, 2016 Commercial Proposal: "The contracting party to the license agreement is and remains Chubb & Son, a division of Federal Insurance Company." (Ex. 2 at P-094-002.) Mr. Hopp's representation, Chubb's Commercial Proposal, and FICO's position is fully consistent with the law.

Even if the law permitted the Court to find the License Agreement ambiguous based on extrinsic facts (it does not), FICO's position does not render the License Agreement, and Amendment Two in particular, meaningless. Amendment Two broadened the scope of the license grant from **divisional** (limited to use in the specialty insurance line of business) to **enterprise wide** (no limits on the types of insurance that Chubb & Son could sell using Blaze Advisor). Chubb & Son promptly reaped the benefits of that bargain—it began using Blaze Advisor in applications outside the specialty insurance line of business. Chubb & Son used Blaze Advisor to sell over $15 billion of dollars-worth of policies in the commercial insurance line of business using the CUW, IRMA, and TAPS applications and in the corporate systems using the Premium Booking application. None of that would have been permissible without Amendment Two.

FICO's position also does not render the contract illusory based on Federal's argument that Chubb & Son had no employees. Evidence introduced at trial, including the Chubb Corporation's own SEC filings and annual reports, show that Chubb & Son

---

[2] Unless otherwise noted, all exhibits are those attached to the Declaration of Paige Stradley.

did, in fact, have employees, including the "operating personnel" who provide the management services to the many insurance companies that had policies issued in connection with using Blaze Advisor. (Ex. 3 at P-017-003.) The Annual Reports identify the many officers of Chubb & Son. (Ex. 4 at P-0956-012 through P-0956-013.) Those annual reports also show that these Chubb & Son officers are distinct from the officers of Federal. Whether Chubb & Son had employees is a fact issue that precludes entering judgment as a matter of law.

      *Federal's Second Motion for Judgment as a Matter of Law.* Regardless of the dispute as to "Client and its Affiliates," and even accepting Defendants' position that the Client is Federal, Federal has breached Paragraph 3.1(iv) of the License Agreement. Paragraph 3.1(iv) prohibits the Client from disclosing, permitting use of, or access to Blaze Advisor by third parties. Federal, admittedly, disclosed and permitted use of and access to Blaze Advisor by two third-party consultants—DWS Group and AppCentrica. These third-party consultants had no right to use or access Blaze Advisor under the License Agreement, and Federal has no defense for this violation of Paragraph 3.1(iv). The only excuse that Federal puts forward and the basis for Federal's motion—that the breaches were not material—is just that, an excuse, not a valid legal requirement or defense.

      To be clear, under New York law, a party asserting a claim of breach of contract is not required to establish materiality, so FICO's claim survives regardless of the materiality of Federal's breach. Materiality is only relevant when considering the applicability of the remedy of rescission. Federal seems to acknowledge as much in its

4

memorandum, but it misses the point: New York law clearly allows parties to contract around the materiality requirement, which is exactly what the parties did in this case. The parties expressly agreed in the first sentence of Paragraph 9.2(c) that breaches of Paragraph 3.1(iv) gave FICO the right to immediately terminate the License Agreement with no materiality requirement. Materiality is simply not a requirement or a defense to Federal's breach. Federal's motion fails.

    *FICO's First Motion for Judgment as a Matter of Law.* All the evidence supports that Federal breached Paragraph 3.1(iv) by disclosing and permitting use of and access to Blaze Advisor by DWS Group and AppCentrica. No reasonable jury could find otherwise, and FICO is entitled to judgment as a matter of law on this claim. Fed. R. Civ. P. 50; *Hunt v. Lincoln Cty. Mem'l Hosp.*, 317 F.3d 891, 893 (8th Cir. 2003) ("A motion for judgment as a matter of law should be granted when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party.") (quotations omitted).

    *FICO's Second Motion for Judgment as a Matter of Law.* Because Federal breached at least Paragraph 3.1(iv) and the parties contracted around a materiality requirement, FICO had every right to terminate the License Agreement pursuant to Paragraph 9.2(c). This defeats Federal's breach of contract counterclaim which asserted that FICO improperly terminated the License Agreement.

    The Court should deny Federal's motion for judgment as a matter of law and grant FICO judgment as a matter of law that Federal breached Paragraph 3.1(iv) of the License Agreement (Dkt. 132 at ¶¶ 44-46 (Count I: Breach of License Agreement)) by disclosing

and permitting use of and access to Blaze Advisor by third-party consultants. The Court should also grant FICO judgment as a matter of law that it did not breach the License Agreement because it was entitled to terminate the License Agreement (Dkt. 569 at 23 (Counterclaim One)).

II.   **Federal's First Motion for Judgment as a Matter of Law:** Federal's motion for judgment as a matter of law that FICO cannot establish breach of Paragraph 3.1(iv) based on use by Federal's Affiliates must be denied.

   A.   **"Client and its Affiliates" means "Chubb & Son and its Affiliates."**

The License Agreement is a valid and enforceable contract. (Dkt. 1072 at No. 2.) It granted the right to use Blaze Advisor to the "Client and its Affiliates." (Ex. 5 at J-001-020.) The term "Client" is expressly defined in the License Agreement as "Chubb & Son, a division of Federal." (*Id.* at J-001-001.) Amendment Two also expressly defines the term "Affiliates": "'Affiliates' shall mean any other entity directly or indirectly controlled by Client, where 'control' means the ownership of more than 50% of the aggregate of all voting interests . . . in an entity." (*Id.* at J-001-020.) The terms of the License Agreement are unambiguous—"Client and its Affiliates" means "Chubb & Son and its Affiliates."

Despite this, the Court's summary judgment Order held the term was ambiguous and questioned whether FICO was trying to "have it both ways." The Court noted that "[t]he parties do not cite, and the Court's research has not identified, any legal authority addressing whether—under New York law—an unincorporated subdivision may enter a contract independently from its parent corporation. But it would make little sense if a non-legal entity could enter a contract yet never be sued on that contract should a dispute

arise." (Dkt. 731 at 43.) The Court's ruling was based on an unawareness of relevant case law.[3] Under New York law an unincorporated division, such as Chubb & Son, may enter contracts in its own name and, when it does so, the parent is held responsible for the division's actions as the defendant in any future lawsuits. FICO is not trying to "have it both ways." It seeks to have the License Agreement read consistently with New York law.

### (1)    Unincorporated entities can contract under New York law.

The question of whether an unincorporated division can legally enter into a contract independent from its parent now sits squarely before the Court. The answer is yes. New York law permits an unincorporated division, such as Chubb & Son, to enter contracts in its own name. *Maranatha Assocs. v. Titan Grp.*, 609 N.Y.S.2d 368, 369 (App. Div. 3d Dep't 1994); *Golub Cap. LLC v. NB Alternatives Advisers LLC*, No. 21-cv-3991, 2022 WL 540653, at *11 n.6, 11 (S.D.N.Y. Feb. 22, 2022).

In *Maranatha* the Court directly addressed whether an unincorporated division can enter into contracts independent from its parent corporation. The Court held it can and refused to find a contract between the unincorporated division and a third-party defendant void. 609 N.Y.S.2d at 369. In the event of a breach by the third-party defendant, the Court explained that the unincorporated division could sue in its own name, and, when

---

[3] The Court's ambiguity finding was also premised on a factual misunderstanding. The Court believed that Amendment Two is rendered ineffectual unless Federal is considered the Client. (Dkt. 731 at 43-44.) Respectfully, this is wrong as fully addressed in Section I(B)(2) below.

the breach is by the unincorporated division, the proper party for the third-party defendant to sue is the corporate entity. *Id.* ("In the case of a breach, [the third-party defendant] would have been free to sue third-party plaintiff through the legal entity of the corporation"). Federal argues that *Maranatha* supports its position because a suit brought by the unincorporated division is on behalf of the jural entity (Dkt. 1129 at 9), but Federal ignores the Court's further finding that an unincorporated division can enter contracts for itself when given authority to do so by the parent. That latter point is what matters here.

*Maranatha* is not an aberration. The recent *Golub Cap. LLC v. NB Alternatives Advisers LLC* case confirms that FICO's position is legally correct. There, the Court cited to *Maranatha* and confirmed that "[u]nder New York law, the fact that a business division is unincorporated and does not have a legal entity separate and apart from the corporation to which it belongs does not preclude it from entering contracts." 2022 WL 540653, at *11 n.6. The facts of the *Golub* case are complex but, in short, the division Dyal Capital Partners was part of a corporation called NBG and managed several other entities. *Id.* at *28-29. The Plaintiff argued that because Dyal Capital Partners was not a legal entity it could not be a contractual counterparty to an NDA and could not have legal obligations. *Id.* at *25. The Court rejected that argument and held the unincorporated division "Dyal Capital Partners thus is a party to the NDA." *Id.* at *28-29, 31. It further explained that, when an unincorporated division enters into a contract, the legal entity of which the division is a part is the proper party to a lawsuit and may be held liable for the division's actions. *Id.* at *36 n.6, 37 (explaining that its finding that Dyal Capital Partners is a party to the contract "does not, therefore, result in the lack of remedy envisioned by

Plaintiff. Plaintiff can, and indeed has, sued the legal entity to which Dyal Capital Partners is alleged to be a part").

Federal's assertion that it is a "well-established legal rule that an unincorporated division has no legal identity apart from its corporate parent and so may not sue, be sued, or contract on its own behalf" (Dkt. 1129 at 1-2) is belied by *Maranatha* and *Golub Cap*. Federal cites no New York cases to support that an unincorporated division may not contract on its own behalf. (*Id.* at 1-2, 6-8.) *Maranatha* and *Golub Cap.* also show the concern raised in Footnote 14 of the Court's summary judgment Order is misplaced. (Dkt. 731 at 43 n.14 ("FICO is suing Federal for breaching the License Agreement, yet argues that Federal is *not* a party to the License Agreement.").) FICO's suit against Federal as the party responsible for the actions of its division conforms to New York law. Chubb & Son can legally enter into a contract, just as it did with FICO and just as it has done with numerous other entities. (*See, e.g.*, Exs. 6-8.) Federal, as its parent is responsible for the actions of its division and is the proper defendant. *Maranatha*, 609 N.Y.S.2d at 369; *Golub Cap.*, 2022 WL 540653, at *11 n.6, *37. That the Court was unaware of this law when it issued its summary judgment Order does not mean the Parties and the Court may now ignore the law. Rather, the License Agreement must be construed consistently with New York law. Here, the term "Client" is unambiguously defined as "Chubb & Son, a division of Federal." New York law allows divisions like Chubb & Son to enter into contracts.

**(2)     The legal ability of Chubb & Son to contract is confirmed by Defendants' own admissions.**

Defendants' own documents confirm that, prior to this litigation, they too understood that (1) the "Client" is Chubb & Son, the division, and (2) Chubb & Son is a viable contracting party. In particular, following FICO's letter providing notice of breach and during post-acquisition negotiations, Chubb twice responded that Chubb & Son was the contracting party and was the "Client" as defined in the License Agreement. First, on February 17, 2016, Chubb Deputy General Counsel Mr. Hopp stated:

> We are in receipt of your letter dated January 27, 2016, which alleges that a transfer and assignment of the above-referenced Agreement occurred as a result of the acquisition of The Chubb Corporation (the former parent entity of Chubb & Son) by ACE Limited, and that The Chubb Corporation failed to obtain FICO's consent to such alleged transfer and assignment in contravention of Section 10.8 of the Agreement. Notwithstanding the acquisition, Chubb & Son, the contracting party to the Agreement, remains a viable legal entity within the Chubb Group of Insurance Companies' corporate structure and the contracting party to the Agreement. In short, Chubb & Son is still FICO's "Client" as such term is defined in the Agreement and it is our position that no transfer and assignment of the Agreement has occurred.

(Ex. 1 at P-0091-001.) That same position was re-articulated in a commercial proposal provided by Chubb to FICO on February 25, 2016:

> Although Chubb strongly disagrees with FICO's stated position, in a good faith effort to move the relationship forward, Chubb proposes that the parties renegotiate Chubb's current perpetual, unlimited, application-based enterprise license to downgrade and limit use of Blaze Advisor Development and Deployment to reflect Chubb's actual usage of fifteen (15) named applications of Blaze Advisor Deployment and one-hundred (100) seats of Blaze Advisor Development at no additional cost to Chubb (credit being given for all prior fees paid). All usage now and going forward does not and will not change from that permitted under the current license agreement and all usage remains with the same named applications. The contracting party to the license agreement is and remains Chubb & Son, a division of Federal Insurance Company. Under this proposal, Chubb will continue to pay for maintenance at the current cost of $237,028 per year in accordance with the terms of the parties' current agreement.

10

(Ex. 2 at P-0094-002.)

Defendants' admissions confirm that the License Agreement is not ambiguous. The Client is "Chubb & Son," an unincorporated division that can, under New York law, enter into contracts.

Separately, even if the Court were to view Chubb & Son as entering the License Agreement on the behalf of Federal, the scope of the license grant must still be construed as limited to Chubb & Son, not Federal. In other words, entities regularly enter into contracts for services that are to be provided to less than the entire entity. Here, the scope of the contract would be limited to use by the Chubb & Son division based on the plain language of the License Agreement.

### (3)   The plain language of "Client and its Affiliates" is unambiguous, and extrinsic evidence cannot be used to create ambiguity.

FICO seeks to have the contract read and applied as it was written. Here, the term "Client" is defined, and the term "Affiliate" is defined. New York law allows divisions like Chubb & Son to enter into contracts. Based only on the four corners of the License Agreement nothing about the term "Client and Affiliates" is ambiguous. New York law is clear: "[I]n New York, the court determines whether or not a contract is ambiguous solely by reference to the contract itself." *Millgard Corp. v. E.E. Cruz/NAB/Fronier-Kemper*, 99 Civ. 2952, 2003 WL 22741664, at *4 (S.D.N.Y. Nov. 18, 2003); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) ("An analysis that begins with consideration of extrinsic evidence of what the parties meant, instead of looking first to what they said and reaching extrinsic evidence only when required to do so because of some identified

ambiguity, unnecessarily denigrates the contract and unsettles the law."); *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001) ("An omission or mistake in a contract does not constitute an ambiguity and the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence. Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.") (quotations and citations omitted).

Analyzing only the four corners of the License Agreement, as the Court must, there is no basis to find that the Client is anyone other than Chubb & Son, a division of Federal, and that the term "Client and its Affiliates" is not ambiguous. It means "Chubb & Son and its Affiliates." This is not inconsistent with the law of the case because the Court's summary judgment Order stemmed from an unawareness of relevant law. *Hrebal v. Nationstar Mortg. LLC*, 385 F. Supp. 3d 849, 852-53 (D. Minn. 2019) (modifying its summary judgment order because "the court was not aware of this law at the time it rendered its summary judgment opinion").

### B.   The License Agreement is not rendered meaningless or illusory.

The Court at summary judgment and, again, recently expressed concern that reading the License Agreement as written would render the License Agreement illusory and certain terms meaningless. First, as described above, the concerns raised and the ambiguity previously found by the Court are based solely on extrinsic facts, not the four corners of the License Agreement as required by New York law, so such concerns and ambiguities are not proper to consider. Second, FICO's position does not in fact render

the Agreement illusory and does not render the overall purpose of the Agreement meaningless.

>    **(1)    The License Agreement is not illusory. The evidence supports that Chubb & Son has employees.**

This Court expressed concern that if it were to give effect to "Client" as actually defined in the License Agreement, i.e., Chubb & Son, the License Agreement would be illusory. In particular, the Court was concerned that the License Agreement limits use of Blaze Advisor to employees of the "Client" and "so they've now purchased a license through three amendments or through three iterations that nobody can use." (Ex. 9 at 1973:18-1974:12; *see also*, *id.* at 1976:1-9 (noting that FICO has not contended that use of Blaze Advisor by Federal employees breached the License Agreement and questioning how FICO could not have asserted breach for use by Federal employees if the License Agreement limits use to the Client's employees).) Underlying the Court's concern is the assumption that Chubb & Son has no employees. But the Court's summary judgment Order contemplates that Chubb & Son could have employees (Dkt. 731 at 44; *see also*, Dkt. 1129 at 13), and FICO has presented sufficient evidence for the jury to find that Chubb & Son does, in fact, have employees.

Chubb & Son is a real division comprised of personnel who are providing real services. It is the manager and servicer of numerous insurance companies had policies issued in connection with using Blaze Advisor. (*See, e.g.*, Ex. 3 at P-0017-003; Ex. 11 at P-0018-003; Exs. 6-8.) It provides the "day to day management and operating personnel" for those companies it manages. (*See, e.g.*, Ex. 3 at P-0017-003; Ex. 11 at P-0018-003.)

13

Chubb & Son's management responsibilities include issuing insurance policies; fixing the rates of premium; collecting premiums; settling, adjusting, arbitrating, and paying any accounts or claims; "prosecuting suits in the court"; paying agents and sub-agents of the insurance company; etc. (*See, e.g.*, Ex. 6 at P-0019-003, P-0019-005 through P-0019-006; Ex. 7 at P-0020 at P-0020-004 through P-0020-005; Ex. 8 at P-0021-007 through P-0021-008.) These services are provided by people—employees of Chubb & Son.

Indeed, in its 2014 10K the Chubb Corporation told the SEC, its shareholders, and the public that Chubb & Son had "operating personal." (Ex. 11 at P-0018-004.) That same year in its annual report the Chubb Corporation told its shareholders and the public that Chubb & Son had over 500 officers. (Ex. 4 at P-0956-012 through P-0956-013.) The jury actually heard from one of those officers and saw communications from another. Despite feigning to have never heard of Chubb & Son, Mr. Ramesh Pandey is, in fact, an officer of Chubb & Son, and Ms. Pawloski is also an officer of Chubb & Son:



14

(Ex. 4 at P-0956-013.) Importantly, the officers of Chubb & Son are not just the same individuals who are also Federal's officers. Sure, there is some overlap. But there is also a significant number of officers of Chubb & Son who are not Federal officers.

The management services agreements between Chubb & Son and the various insurance companies that it manages further confirm that Chubb & Son does, in fact, have employees: "The Manager [Chubb & Son] shall initially bear the expenses of its . . . employees' compensation, contributions to any employee benefit plan . . . ." (*See, e.g.*, Ex. 6 at P-0019-007; Ex. 7 at P-0020 at P-020-006; Ex. 8 at P-0021-009); *see also Menes v. Chubb & Son*, 101 F. Supp. 3d 427, 430 (D.N.J. 2015) (describing Plaintiff as being employed by Chubb & Son and describing Chubb & Son as the policyholder, plan sponsor, and plan administrator of the employee welfare benefit plan of Plaintiff).

Not only does the Chubb Corporation tell the SEC, its shareholders, and the public that Chubb & Son has employees, but people within the Chubb Corporation understood themselves to be a part of the Chubb & Son division. For example, Mr. Jim Black, who negotiated the License Agreement and the MSA, identified himself as being part of the Chubb & Son division. (Ex. 13 at P-0336-007, Ex. 14 at P-0144-001.) Mr. Henry Mirolyuz's signature block identifies him as being a Senior Systems Architect for Chubb & Son, a division of Federal Insurance Company. (Ex. 15 at P-0194-001.) People working within Chubb & Son understood the obvious—that they worked within the Chubb & Son division. *See Weichman v. Chubb & Son*, 552 F. Supp. 2d 271 (D. Conn. 2008) (employee filing suit against Chubb & Son, a division of Federal); *King v. Chubb & Son*, 563 F. App'x. 729 (11th Cir. April 22, 2014) (same). In these and similar cases,

15

Chubb & Son defended itself as the employer of these people.[4] Those people are Chubb & Son employees.

Underlying the Court's concern was a second assumption: that the people using Blaze Advisor were employees of Federal and not employees of Chubb & Son. Given the corporate structure of Federal and Chubb & Son, the two are not mutually exclusive. Employees of Chubb & Son are also employees of Federal. But that fact does not negate that such people are employees of Chubb & Son. *See Rapid Print, Inc. v. Minn. Mining & Mfg. Co.*, Civil Action No. 78-3190-MC., 1980 WL 1999, at *1 (D. Mass. Sept. 10, 1980) (in the context of an antitrust suit, acknowledging that unincorporated divisions may have employees); *Derr v. Footlocker, Inc.*, No. 04-9523 FMC (Ex), 2006 U.S. Dist. LEXIS 15317, at *2 (C.D. Cal. Mar. 9, 2006) ("Plaintiff Robert Derr was an employee of Champs Sports, an unincorporated operating division of Defendant Foot Locker Retail, Inc., for approximately 18 years.") (Ex. 33); *Orenbuch v. N. Shore Health Sys.*, 250 F. Supp. 2d 145, 147-48 (E.D.N.Y. 2003) (in the context of piercing the corporate veil, stating that an unincorporated division had 85 full time employees and 15 part-time employees). Further, the evidence shows that the individuals working on Blaze Advisor and/or who were negotiating the License Agreement were part of the Chubb & Son division, e.g., Ramesh Pandey, Henry Mirolyuz, and Jim Black. And, each of the three persons that executed the original License Agreement, Amendment One, and Amendment

---

[4] To be clear, FICO cites these cases not to suggest Chubb & Son would be a proper defendant to this lawsuit. Rather, FICO cites these cases because it shows Chubb & Son has employees and that individuals consider themselves employees of Chubb & Son.

Two were Officers of Chubb & Son. (Ex. 5 at J-001-009, J-001-018, J-001-020; *see also*,

Ex 4 at P-0956-012.) Apart from the breaches alleged by FICO, there is no evidence that

employees of Federal, who were not a part of the Chubb & Son division, were using

Blaze Advisor. Rather, as the manager and servicer of numerous other insurance

companies whose role it was to issue policies, it was Chubb & Son that provided those

management services and used Blaze Advisor software to do so.

FICO has put forth substantial evidence from which a jury could reasonably find

that Chubb & Son had employees. The jury should be permitted to decide this fact issue.

> **(2)    Amendment Two gave Chubb & Son the ability to use Blaze
> Advisor in connection with selling insurance across all lines of
> business.**

The Court's summary judgment Order also expressed concern that the term

"Affiliates" would be rendered meaningless under FICO's interpretation. That is true.

And FICO does not dispute that "an interpretation that gives a reasonable and effective

meaning to all the terms of a contract is generally preferred to one that leaves a part

unreasonable or of no effect." (Dkt. 1129 at 4.) But the law is clear that ambiguity cannot

be created by facts extrinsic to the contract, which, respectfully, is exactly what the Court

is being asked to do. In other words, this principle of contract interpretation is not

absolute, and must give way where the relevant terms are defined and there is no

ambiguity based on the four corners of the License Agreement. *Fiore v. Fiore*, 415

N.Y.S.2d 826, 826 (1979) ("The question, however, is not whether the agreement is

imperfect but whether it is ambiguous. The courts may not rewrite a term of a contract by

'interpretation' when it is clear and unambiguous on its face."); *Millgard Corp.*, 2003

WL 22741664, at *4; *W.W.W. Assocs.*, 77 N.Y.2d at 163; *Reiss*, 97 N.Y.2d at 199; *see also Brown v. Bldg. Engines, Inc.*, No. 1:21-cv-10893, 2022 WL 2532177, at *4-5 (S.D.N.Y. Apr. 15, 2022); *Ran First Assocs. v. 363 E. 76th St. Corp.*, 747 N.Y.S.2d 13, 15 (App. Div. 1st Dep't 2002).

Applying the plain language of the License Agreement does not render Amendment Two meaningless, and it does not mean that Chubb & Son paid an extra $950,000 for "nothing" as Federal claims. The original License Agreement allowed use in connection with a single, named application, the CSI Express application. (Ex. 5 at J-001-011.) Amendment One broadened Chubb & Son's rights, granting a divisional license that allowed use in any application so long as it was in connection with the specialty line of business. (*Id.* at J-001-017.) Amendment Two then further broadened the scope of that license grant from a divisional license to an enterprise-wide license. (*Id.* at J-001-0019.) The enterprise-wide license permitted Chubb & Son to use Blaze Advisor to sell insurance across all lines of business (e.g., specialty, commercial, and personal). (*Id.*)

With this broadened grant, Chubb & Son, rightly, began using Blaze Advisor outside of the specialty line of business, and it benefited from doing so. Chubb & Son used Blaze Advisor in connection with the CUW, IRMA, and TAPS applications, all of which fell under the commercial line of business, and Premium Booking which fell under corporate services systems. (Ex. 16; Ex. 10 at No. 17.) CUW averaged 1.22 million real-time transactions per month, which was the highest number of real-time transactions of all the applications run by Chubb & Son, and it used Blaze Advisor in connection with over $12 billion worth of policies. (Ex. 16; Ex. 10 at P-010-006 through P-010-008; Ex. 9

18

at 1326:6-16.) Use of Blaze Advisor in connection with CUW, as well as IRMA, TAPS, and Premium Booking generated approximately $15.6 billion dollars-worth of policies for Chubb & Son and would not have been permissible if not for Amendment Two and. (Ex. 9 at 1325-1334:14.)

The License Agreement was an arms-length transaction between two highly sophisticated parties. Federal, and the Chubb Corporation, chose a complicated and complex corporate structure and way of doing business because there are advantages to doing so. (Ex. 3 at P-017-003 (describing the decision to have Chubb & Son manage and service other insurance companies as offering "operational efficiencies through economies of scale and flexibility").) That Federal may now dislike the consequences of that choice and its bargain is not a permissible ground to re-write the contract to make it more favorable to Federal. *Oppenheimer & Co. v. Oppenheim*, 86 N.Y.2d 685, 695 (1995) ("Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, the time to say so was at the bargaining table.") (quotations omitted); *In re Berman*, 11-07886-8-DMW, 2015 WL 3777985, at *2 (Bankr. E.D.N.C. June 16, 2015) ("The parties freely negotiated and willingly signed the MSA. . . . Regardless of whether the failure to negotiate the terms of the turnover was an oversight at the time of mediation or whether the terms of Paragraph 13 are now regrettable in hindsight, the court should not modify the terms of an executed agreement resulting from an arms-length negotiation under the supervision of a seasoned

19

and experienced mediator."); *Avis Rent-A-Car Sys. v. City of Dayton*, 581 F. App'x 479, 482 (6th Cir. 2014) (affirming the district court and stating: "This case presents a routine contract dispute, and no miscarriage of justice will result from holding the City to freely-negotiated and agreed-upon contract terms, even if it now regrets the deal that it struck.").

Both parties must take the good with the bad. FICO took the bad when it believed that the License Agreement had a territorial restriction based on inclusion of "Territory" in the Definitions. The Court put aside the general preference of giving meaning to all terms when it found the License Agreement did not, as written, include a territorial restriction. Federal must now take the bad where it chose its corporate structure, chose to have its division Chubb & Son enter into a contract, and agreed to terms limiting use of Blaze Advisor to use by Chubb & Son and its Affiliates, of which there are none. *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993) ("David Manson, however, chose to operate his business as a corporation to gain certain advantages. He cannot now avoid the consequences of the corporate structure."); *Paris Partners, L.P. v. Russo*, 94 Civ. 5684 (PKL), 1995 U.S. Dist. LEXIS 18648, at *8-9 (S.D.N.Y. Dec. 14, 1995) (Ex. 36); *Hanna Mining Co. v. Minn. Power & Light Co.*, 573 F. Supp. 1395, 1400 (D. Minn. 1983) ("The plaintiffs chose such a corporate scheme, and they must live with the consequences.").

**III.** **Federal's Second Motion for Judgment as a Matter of Law:** **Federal's motion for judgment as a matter of law that FICO cannot establish breach of Paragraph 3.1(iv) based on use by third-party consultants must be denied.**

**A.** **The License Agreement prohibits the Client from disclosing, or permitting use of or access to, Blaze Advisor by third parties.**

Regardless of who the Client is (Federal or Chubb & Son), there is no dispute that Paragraph 3.1 places restrictions on the Client: "Client represents and warrants that it and its employees shall not: . . . (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products by, any third party or by any individuals other than the employees of Client . . . ." (Ex. 5 at ¶ 3.1.) This prohibition is clear and absolute.

**B.** **Disclosure, use of, and access to Blaze Advisor by third-party consultants is undisputed.**

Federal's brief does not dispute that third party consultants accessed and used Blaze Advisor nor has Federal genuinely challenged that fact at trial. As this Court noted, "[i]t doesn't strike me, to be honest with both of you, that the question of whether AppCentrica had Blaze or had access to Blaze and used it as a consulting tool [for] Chubb Canada is terribly in dispute." (Ex. 9 at 1109:13-16.) The Court is correct. AppCentrica had access to and used Blaze Advisor. The same is true of DWS Group.

FICO's Interrogatory No. 3 asked Federal to "[i]dentify every person, division, or entity, other than employees of the division Chubb & Son, of which Federal is aware, that has used the FICO Blaze Advisor® software after June 30, 2006 . . . ." (Ex. 17 at No. 3.) Federal, in its verified answer dated June 21, 2018, admitted that at least the following entities had used the Blaze Advisor software: "Chubb Insurance Company of Canada,

21

including through its relationship with AppCentrica" and "Chubb Insurance Company of Australia Limited, including through its relationship with DWS Group." (*Id.*)

Furthermore, Counsel for Defendants, Ms. Godesky, admitted during her Opening Statement that an employee of AppCentrica gave a DWS Group employee a demonstration of how Blaze Advisor worked. (Ex. 9 at 72:6-14.) Although Ms. Godesky shrugged this off as no big deal, it is an admission at trial that both DWS Group and AppCentrica had access to or used Blaze Advisor (and, accordingly, that Blaze Advisor was disclosed to them) and that Federal ignored FICO's right to, and frustrated FICO's ability to, control who uses and accesses its software.

The disclosure, use of, and access to Blaze Advisor by DWS Group and AppCentrica is further confirmed by witness testimony and the parties' own documents. For example, Mr. Ghislanzoni testified that Chubb Canada was working with AppCentrica consultants on a project aimed at "creating the Australia Evolution application from the Canadian Evolution application." (*Id.* at 1095:1-14; *see also id.* at 1092:10-23 (testifying that Evolution in Canada used Blaze Advisor and that the decision was made to take a copy of the Canadian Evolution application and use it as a base to create an Australian application).) He further explained that AppCentrica was working with Chubb Canada on transferring that copy of Evolution while DWS Group was working with Chubb Australia on that transfer. (*Id.* at 1117:23-1118:13.)

By way of another example, P-1112 is a FICO support log which includes an inquiry from an employee of DWS Group to FICO. The specifics of that inquiry illustrate that DWS Group had access to and was using Blaze Advisor:

> The problem is, I am experiencing all the project files in read only mode after importing them in Blaze Advisor 7.3. Below are the steps: I have checked out an old Blaze Advisor 7.1 project from svn repo and saved it somewhere on my C drive. Say it xyz folder. Later on after having import instructions from Jeremy, I imported the project by selecting Rule project from the import wizard, creating a new connection by pointing it to that xyz folder, and importing the Blaze project from that xyz location.

(Ex. 18 at row 2; *see also* Ex. 9 at 913:10-914:13 (Mr. Carretta testifying that DWS Group and AppCentrica showed up on FICO's maintenance logs).) Email communications and posts in a FICO chat community further show DWS was working in Blaze Advisor to support Chubb Australia. (Exs. 19-21.) Indeed, DWS Group project manager Martin Sill was communicating with Russell Hodey of Chubb Australia and had done a significant enough amount of work in Blaze Advisor to provide Chubb Australia with notes "on how rules are implemented in Blaze currently . . . ." (Ex. at P-0526-002.) None of Federal's employees have denied that DWS Group or AppCentrica used and accessed Blaze Advisor.

Disclosure to, and use and access by, DWS Group and AppCentrica has been proven. Accordingly, FICO has proven Federal breached Paragraph 3.1(iv).

### C.   <u>Materiality is not required and is not a defense.</u>

The entire premise of Federal's motion for judgment as a matter of law with respect to the violation of Paragraph 3.1(iv) by third-party consultants is that "FICO has not adduced evidence sufficient for a jury to find that any use of Blaze Advisor by third-party consultants was a material breach of the License Agreement." (Dkt. 1129 at 15.) This argument fails on multiple fronts. First, Federal conflates the legal requirements to prove a claim of breach of contract with the legal requirements necessary to rescind a

23

contract. A showing of materiality is not required to establish breach under New York law. This alone defeats Federal's motion. Second, with respect to the right to rescind, Federal ignores that FICO and the Client negotiated around a requirement of materiality, as New York law allows. Finally, in any event, FICO has put forth sufficient evidence to support that Federal's breach was material.

> ### (1)   Materiality is not a requirement to establish breach under New York law.

To establish breach of contract under New York law, FICO is not required to establish materiality:

> New York law does not require that Plaintiff demonstrate that the breach of contract was material; rather, materiality is a relevant consideration only when ascertaining the quantum of damages to be awarded (*e.g.*, a non-material breach would likely result in only nominal damages)

*Taylor Precision Prods. v. Larimer Grp., Inc.*, No. 1:15-cv-4428, 2018 WL 4278286, at \*15 (S.D.N.Y. March 26, 2018); *see also*, *e.g.*, *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d. Cir. 2015) ("The New York courts routinely allow a nonbreaching party to seek damages, not only for a material breach, but also for a minor, or immaterial, breach as well. . . . The materiality or non-materiality of a breach of contract only goes to the question of the type of remedy that may be allowed, not to the issue of liability."); *Korpak, Ltd. v. Williams Lea Inc.*, No. 20 Civ. 6880, 2022 WL 375543, at \*5 (S.D.N.Y. Feb. 7, 2022) ("However, the materiality *vel non* of a breach of contract goes only to the question of the type of remedy that may be allowed, not to the issue of liability.").

The cases cited by Federal do not support its position. Its cases relate to when the remedy of rescission is appropriate. (Dkt. 1129 at 15, 17.)[5] Indeed, Federal's brief even states "FICO has failed to introduce sufficient evidence for a jury to find that FICO satisfied its burden to show that any use of Blaze Advisor by third-party consultants was a material breach of Section 3.1 of the License Agreement **that would justify termination of the entire agreement.**" (Dkt. 1129 at 14 (emphasis added).) This conflates two separate issues and two separate causes of action.

Federal moved for a judgment as a matter of law that FICO cannot meet its burden to establish **its breach of contract claim** based on disclosure, access, and use by third-party consultants DWS Group and AppCentrica. (Dkt. 1128 ("Defendants Federal Insurance Company and ACE American Insurance Company move for the Court for judgment as a matter of law on Plaintiff Fair Isaac Corporation's ('FICO') claim that use of Blaze Advisor by Federal's foreign Affiliates and third-party consultants was a breach of the License Agreement.").) Materiality is not an element of this cause of action. *Taylor Precision Prods.*, 2018 WL 4278286, at *15; *Orlander*, 802 F.3d at 298; *Korpak, Ltd.*,

---

[5] In *Process Am., Inc. v. Cynergy Holdings, LLC*, the Second Circuit addressed whether defendant's failure to pay residuals was a material breach such that it permitted plaintiff to rescind the agreement and avoid its non-solicitation obligations. 839 F.3d 125, 136 (2d Cir. 2016). In *Septembertide Pub., B.V. v. Stein & Day, Inc.*, the court was considering whether the defendant's failure to pay a portion of fees due under an agreement permitted plaintiff to rescind the agreement. 884 F.2d 675, 679 (2d Cir. 1989). Similarly, in *Callanan v. Keesevill, Ausable Chasm & Lake Champlain R.R. Co.*, the court considered whether the plaintiff could properly rescind an agreement where defendant had failed to undertake the construction contemplated under the parties' agreement. 199 N.Y. 268, 284 (1910).

2022 WL 375543, at *5. Whether FICO had a proper basis to terminate the License Agreement is a separate question, one that is relevant to Federal's counterclaim of breach of contract (Dkt. 569 at ¶¶ 16-21), but not relevant to FICO's breach of contract claim.

The Court's summary judgment Order does not support holding otherwise. The Court simply did not investigate or address this issue at the summary judgment stage because FICO did not raise it. On summary judgment FICO argued that Federal's breach was material. (Dkt. 558 at 5.) FICO did not present the Court with law or argue to the Court that materiality is not required for breach under New York law.[6]

New York law is clear that materiality is not a requirement for a breach of contract claim. Federal's judgment for a matter of law must be denied on this basis alone.

### (2)    Paragraph 9.2(c) governs breach of Paragraph 3.1(iv) and excludes a materiality requirement.

Even if materiality was a requirement for a breach of contract claim (it is not), FICO still would not be required to prove materiality to establish its breach of contract claim and to establish it properly terminated the License Agreement. The parties to the License Agreement expressly contracted around a materiality requirement for breaches falling under Section 3 of the License Agreement.

---

[6]  The cases cited in the Court's summary judgment Order were also discussing materiality in the context of rescission, not breach of contract. (Dkt. 731 at 44-45 (citing *VFS Fin., Inc. v. Flacon Fifty LLC* and *Orlander v. Staples*).) *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379–80 (S.D.N.Y. 2014) discussed materiality in the context of determining whether a breach was material for the purpose of excusing nonperformance. *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015) distinguished between a claim for breach and whether nonperformance was excused. In discussing a claim for breach the *Orlander* Court held that materiality was not required while materiality is required for nonperformance. *Id.*

Paragraph 9 governs termination of the License Agreement. It includes three separate sub-provisions. Which sub-provision of Paragraph 9 applies depends on the type of breach. Here, the use and access by DWS Group and AppCentrica violated the License Restriction of Paragraph 3.1(iv). The License Restriction of Paragraph 3.1 is a part of the license granted under the License Agreement, i.e., it falls under Section 3 which relates to the License Agreement's Rights and Restrictions. (Ex. 5 at § 3.) Accordingly, Paragraph 9.2(c), directed to "Violation of License," applies. That paragraph gives FICO the right to terminate the Agreement, regardless of materiality and without any prior notice or a cure period, for violation of any terms of the license grant. (*Id.* at ¶ 9.2(c).) Materiality simply is not required under Paragraph 9.2(c) for a violation of the license grant, like the violation of Paragraph 3.1(iv) at issue here.

This lack of a materiality requirement for violations of the license grant is readily apparent when comparing the language within Paragraph 9.2(c):

> (c) <u>Violation of License or Confidentiality Obligations.</u> Fair Isaac may immediately terminate this Agreement ·without a requirement for prior notice or a cure period, if Client violates any terms of the licenses granted in this Agreement. Either party may immediately terminate this Agreement by written notice to the other party if the other party materially breaches any of the provisions of this Agreement relating to the protection of Confidential Information or Intellectual Property.

(*Compare id.* at ¶ 9.2(c) first sentence *with* ¶ 9.2(c) second sentence.) The first sentence allows termination, regardless of materiality, for breaches of the license grant while the second sentence allows termination when there is a material breach relating to Confidential Information or Intellectual Property. The lack of a materiality requirement for breach of the license grant is further confirmed by comparing the language of

Paragraph 9.2(c) to the language of Paragraph 9.2(a). Paragraph 9.2(a) expressly provides that to terminate the breach must be of "the material terms of this Agreement" or reflect numerous breaches that "cumulatively constitute a material breach." (*Id.* at ¶ 9.2(a).) Unlike Paragraph 9.2(a) and unlike the second sentence of Paragraph 9.2(c), the first sentence of Paragraph 9.2(c), directed to breach of the license grant, expressly excludes a materiality requirement.

FICO and the Client specifically and purposefully contracted to give FICO the unfettered right to terminate for any violation of the license grant regardless of materiality. *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*, 933 F. Supp. 347, 352 (S.D.N.Y. 1996) ("Under New York law, where the parties to a contract have agreed to a written termination clause, it must be enforced as written. . . . Furthermore, where a contract containing a written termination clause is silent as to whether cause is required for termination, the contract is terminable without cause."); *Peter J. Solomon Co., L.P. v. ADC Prods. (UK)*, No. 14CV4086-LTS, 2016 U.S. Dist. LEXIS 42537, at *12 (S.D.N.Y. Mar. 30, 2016) ("While is true that a material breach, if established, would typically relieve the non-breaching party of its obligation to perform and enable automatic termination, . . . the parties here have specifically contracted around this general rule.") (Ex. 37); *In Touch Concepts v. Cellco P'ship*, 949 F. Supp. 2d 447, 468 (S.D.N.Y. 2013) (enforcing, as written, a termination clause that did not require cause); *Mergers & Acquisition Servs. v. Eli Glob., LLC*, No. 1:15-cv-3723-GHW, 2017 WL 1157132, at *13 (S.D.N.Y. Mar. 27, 2017) (explaining that where a termination clause did "not require

that termination must be for cause or in good faith" that the plaintiff cannot "add more protections against tricky termination than it negotiated in its express contract").

Because there is not a materiality requirement for violation of Paragraph 3.1(iv), Federal's disclosure of Blaze Advisor to DWS Group and AppCentrica and their access and use of Blaze Advisor was a breach of Paragraph 3.1(iv) giving FICO the right to terminate.

> **(3)** **The Court's summary judgment Order did not address the first sentence of Paragraph 9.2(c).**

Defendants contend "[t]he Court squarely rejected" FICO's argument that it was entitled to terminate the License Agreement based on a non-material breach of Section 3.1. (Dkt. 1129 at 14 n.5 (citing Dkt. 387 at 23 and Dkt. 558 at 5).)[7] This mischaracterizes FICO's briefing and the Court's summary judgment Order.

First, as explained above, whether materiality is required to establish breach under New York law was not before the Court. Second, the Court also was not presented with the question of whether 9.2(c) excludes a materiality requirement. On summary judgment FICO stated that any violation of the license grant was material. (Dkt. 558 at 5.) Whether the parties contracted around a materiality requirement for breach of the license grant and whether the first sentence of Paragraph 9.2(c) provides for termination regardless of

---

[7] Dkt. 387 is a Notice of Hearing on Defendants' Motion to Exclude Expert Report and Testimony of Brooks Hilliard and, obviously, makes no reference to materiality. It is unclear what docket entry Federal intended to cite. Accordingly, FICO addresses only Dkt. 558 and the Court's summary judgment Order.

materiality was not before the Court and was not decided by the Court. (Dkt. 558 at 5; Dkt. 398; Dkt. 731 at 44-45.) The Court's summary judgment Order is inapplicable.

New York law unquestionably allows parties to negotiate around a materiality requirement. *Joseph Victori Wines, Inc.*, 933 F. Supp. at 352; *Peter J. Solomon Co., L.P.*, 2016 U.S. Dist. LEXIS 42537, at *12 (Ex. 37); *In Touch Concepts*, 949 F. Supp. 2d at 468. FICO and the Client did just that. No materiality was required to terminate the License Agreement for breaches of the license grant. The Court should find no materiality was required to terminate based on a violation of Paragraph 3.1(iv).

### (4)    Federal's breach is material.

Federal contends that FICO has not put forth sufficient evidence to meet its burden to show that use of, and access to, Blaze Advisor by third-party consultants was a material breach of Section 3.1. But the fair conclusion to draw from the fact that a violation of the license grant can be terminated without a cure period and without notice is that the license grant is important and that violation of the license grant is material. (*Compare* Ex. 5 at ¶ 9.2(c) first sentence *with* ¶ 9.2(a).) And the evidence introduced by FICO is sufficient for a jury to find disclosure to and use and access by DWS Group and AppCentrica was material.

A "material violation" or a "material breach" is one that deprives FICO of a benefit it reasonably expected under the License Agreement. *Frank Felix Assocs. v. Austin Drugs*, No. 96-7604, 1997 U.S. App. LEXIS 19795, at *14 (2d Cir. Apr. 10, 1997) (Ex. 34); *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379–80 (S.D.N.Y. 2014); *accord* Restatement (Second) of Contracts § 241. Here, Federal's violation of the

30

license restrictions deprived FICO of a benefit it reasonably expected under the License Agreement: to control who accesses and uses Blaze Advisor.

The testimony from FICO witnesses explained to the jury that FICO viewed Section 3.1 as significant. Mr. Waid testified that the purpose of Section 3.1 is to ensure the software is used in accordance with the specific constraints or limitations found in the license grant and to protect FICO's valuable intellectual property (Blaze Advisor). (Ex. 9 at 1637:10-20.) He further explained why it is important to FICO that Blaze Advisor software not be disclosed, used, or accessed by third parties:

> There's a number of reasons, two primary business reasons. We like to know who is using our software at all times. That third party could be a competitor or that third party could be leaking confidential information about the use of our software to a competitor. It has happened in the past, so we want very tight controls on who actually gets access to that software.
>
> Another business reason is also, there is a bit of an integrity issue in the business here. Third parties purport themselves to be Blaze experts all the time, and we do not want third parties getting access to Blaze software unless we've at least had a conversation with the client about that third party and any representations that they've made.

(*Id.* at 1637:21-1638:20.)

The materiality of the protections afforded under Section 3.1 are corroborated by FICO's actions. In the negotiations that ultimately led to execution of the License Agreement, FICO attorney Jandeen Boone and James Black of the Vendor Management Group of Chubb & Son exchanged drafts with redlines showing proposed changes to the standard FICO agreement originally provided by Ms. Boone. (Exs. 23-26.)

As these redlines and Ms. Boone's testimony illustrate, Chubb & Son sought to change the license agreement with respect to Paragraph 3.1. Indeed, Chubb & Son

31

essentially completely deleted FICO's standard language and input its own language, which, on its face, would have offered FICO significantly less protection. (Ex. 23; Ex. 9 at 452:23-453:3.) FICO rejected these proposed changes outright and reinserted its standard language for Paragraph 3.1. (Exs. 24-25; Ex. 9 at 455:12-456:14, 461:21-25.) The only change to Paragraph 3.1 that was ultimately included in the License Agreement was an addition to Paragraph 3.1(ii) that clarified that the restriction relating to altering, changing, etc. derivative works did not apply to alterations, changes, etc. in connection with rules. (Ex. 26; Ex. 9 at 463:19-464:14.) All other aspects of Paragraph 3.1, including 3.1(iv), was standard FICO language with none of Chubb & Son's proposed language. (Ex. 9 at 463:19-464:14.) In other words, FICO refused to agree to significant proposed changes to Paragraph 3.1 and insisted on including its standard language to ensure it had sufficient protections.

Chubb & Son also sought to change the agreement to give permission to a consultant ACS Commercial Solutions to use Blaze Advisor. (*Id.* at 453:7-454:5.) FICO did not blindly allow that addition either. Rather, it revised Chubb & Son's proposed language to add protections for FICO, namely to ensure that ACS's use was subject to the terms and conditions of the agreement and would not exceed the limitations on use and other restrictions found in the agreement. (*Compare* Ex. 24 *with* Ex. 25; *see also*, Ex. 9 at 462:1-17, 464:15-23.) As Mr. Waid explained, if FICO is going to allow third parties such as consultants to access and use Blaze Advisor, FICO wants to ensure that the third-party consultant is utilizing the software consistent with the license grant, requires the Client ensure compliance by the third-party consultant, and makes the Client responsible

should the third-party consultant breach the terms of the agreement. (Ex. 9 at 1638:21-1639:24; *see also id.* at 943:11-15 (explaining that if a third-party consultant were to use FICO's Blaze Advisor without permission, the third-party consultant is not subject to any of the restrictions of the license agreement); *Compare* Ex. 24 *with* Ex. 25.) FICO's actions speak volumes.

And, while Federal characterizes its breach as "technical" (Dkt. 1129 at 17), that description is inconsistent with the activities that were occurring. Mr. Ghislanzoni testified that these third-party consultants were helping Chubb Canada and Chubb Australia copy Chubb Canada's application containing Blaze Advisor to give it to Chubb Australia for Chubb Australia's use. This implicates the exact concerns mentioned by Mr. Waid, i.e., wanting to protect FICO's valuable intellectual property, wanting to understand who is using the software, and wanting to ensure control over the same. In short, although Federal may wish it were otherwise, copying and distributing a software program in violation of a License Agreement is not merely a "technical" breach. *See CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F. Supp. 337, 359 (M.D. Ga. 1992) (holding that defendants breached the license agreement as a matter of law by providing unlicensed third-parties access to the software).

Ms. Boone's, Mr. Carretta's, and Mr. Waid's testimony, and the facts shown in Plaintiff's Exhibits 307, 309, 310, and 311 are unrebutted. Federal offered no witnesses that even addressed the negotiations of the agreement or the commercial purpose behind Paragraph 3.1. Nor did Federal rebut Mr. Ghislanzoni's testimony and the related evidence showing third-party consultants were being used to help create copies of an

application containing Blaze Advisor. Federal only puts forth attorney argument, its own *ipse dixit*, as to the alleged immateriality of Paragraph 3.1. That is not evidence. The uncontradicted evidence shows breach of 3.1(iv) was material: FICO specifically protected itself against disclosure to, and use and access by, third parties; FICO viewed those protections as significant and fundamental to the License Agreement (fundamental enough to refuse Chubb & Son's proposed changes with lesser restrictions); FICO reasonably expected those provisions to be followed; and Federal flouted the License Agreement's restrictions in an effort to create copies of applications containing Blaze Advisor.

In summary, Federal's motion for judgment as a matter of law that FICO cannot prove breach of Paragraph 3.1(iv) because any such breach is not material must be denied: (1) materiality is not an element of proof for breach of contract under New York Law (*supra*, Section II(C)(1)); (2) the parties contracted around any materiality requirement in Paragraph 9.2(c) which governs breach of the license grant such that FICO was permitted to terminate for breaches of Paragraph 3.1(iv) regardless of materiality (*supra*, Section II(C)(2)); and (3) sufficient evidence has been introduced for a reasonable jury to find that Federal's breach of Paragraph 3.1(iv) was material (Section II(C)(4).

**IV.** **FICO's First Cross Motion for Judgment as a Matter of Law: Federal has breached Paragraph 3.1(iv) of the License Agreement by disclosing and permitting use and access to Blaze Advisor by third-party consultants.**

To establish breach of contract, FICO must show (1) existence of a contract; (2) performance by FICO; (3) breach by Federal; and (4) FICO sustained damages. *Golub*

*Cap. LLC*, 2022 WL 540653, at *7. As shown above, the License Agreement is a valid and enforceable contract and Federal breached that contract by disclosing and permitting use and access to Blaze Advisor by DWS Group and AppCentrica. (*See*, *supra*, Sections II(A)-(B).) The remaining two elements—performance by FICO and damages to FICO— have also been met.

### A.       FICO has performed under the License Agreement.

Federal does not contend that FICO failed to perform its obligations under the License Agreement. Nor could it. Under the License Agreement FICO was to provide the Client with the Blaze Advisor products and related maintenance services. (Ex. 5 at J-001-001.) The evidence introduced at trial shows that the Client received FICO's Blaze Advisor and used it in multiple applications. (*See, e.g.*, Ex. 2; Exs. 27-28.) The evidence also shows that FICO provided maintenance and support to Client over the years. (*See, e.g.*, Exs. 29-31.) Witnesses offered by both sides have testified regarding the good and mutually beneficial relationship that FICO and the Client enjoyed over the years. (*See* Ex. 9 at 306:24-307:5 (Schreiber), 973:2-7 (Mirolyuz), 1662:9-17 (Waid).) FICO has established it performed its obligations under the License Agreement.

### B.       FICO has been damaged by Federal's breach of Paragraph 3.1(iv).

On March 30, 2016, FICO Associate General Counsel Thomas Carretta wrote Mr. Hopp and terminated the License Agreement effective March 31, 2016. Among others, Mr. Carretta identified Federal's disclosure of confidential information to an unauthorized third-party consultant as a breach of the License Agreement and as a basis for terminating the License Agreement. (Ex. 32.) Despite this termination, Federal

admittedly continued using Blaze Advisor until April of 2020 (when Blaze Advisor was removed from the last of Defendants' applications). FICO has been damaged in the form of the lost license fees to compensate it for Federal's continued use of Blaze Advisor following termination. Moreover, FICO has put forth evidence regarding the import of Paragraph 3.1 and the protections it offers FICO. Due to Federal's breach, FICO lost the ability to understand and control who was accessing and using its software and ensure that such access and use was in accordance with the license grant and restrictions contained therein. The jury may take into account the materiality of Federal's breach in determining damages, even if nominal. *Taylor Precision Prods.*, 2018 WL 4278286 at *15.

      **C.**    <u>**Federal has no defense to its breach.**</u>

          **(1)**    **Materiality is not a defense.**

As described above, materiality is not relevant to Federal's liability. (*Supra*, Section II(C)(1).) It is not an element of proof under New York law, and the License Agreement is unambiguous—no materiality is required for breach of Section 3.1(iv).

          **(2)**    **Estoppel and waiver are not available or applicable defenses.**

Federal has not and may not assert estoppel or waiver in connection with breach of Paragraph 3.1(iv) stemming from use of Blaze Advisor by third-party consultants. The Court ruled that Federal's estoppel and waiver defenses only pertained to the License Agreement's purported (but nonexistent) territorial restriction. (Dkt. 731 at 41 n.13.) Federal has no estoppel and waiver defense in connection with an alleged violation of

Paragraph 3.1(iv) via disclosure and use and access to Blaze Advisor by DWS Group and AppCentrica, which is unrelated to the alleged territorial restriction.

Even if estoppel and waiver were available defenses (they are not), Federal cannot meet its burden of establishing waiver or estoppel. Federal has put forth no evidence that any FICO employee had knowledge of disclosure, access, or use of Blaze Advisor by DWS Group and AppCentrica until after notice of breach and shortly before FICO terminated the License Agreement. Separately, the License Agreement expressly precludes a finding of waiver or estoppel. FICO and the Client specifically agreed to a "No Waiver" provision as well as an integration clause. (Ex. 5 at ¶¶ 10.4, 10.5.) FICO's delay or failure to take action with respect to disclosure, access, and use of Blaze Advisor by the DWS Group or AppCentrica or any FICO statements/conduct relating to the same cannot constitute waiver or estoppel. *Weeks Marine v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, No. 08 Civ. 9878, 2011 WL 3796331, at *12-13 (S.D.N.Y. Aug. 24, 2011); *ZBD Constructors, Inc. v. Billings Generation, Inc.*, No. 09 CIV. 6667 NRB, 2011 WL 1327144, *9 (S.D.N.Y. Mar. 25, 2011). It is undisputed that a change to the scope of the License Agreement to allow disclosure, access, or use by DWS Group or AppCentrica was not agreed to in a writing signed by an authorized representative of FICO as required under the License Agreement. *ZBD Constructors*, 2011 WL 1327144, at *12-13; *MVP Health Plan v. Optuminsight, Inc.*, No. 1:13-CV-1578, 2016 U.S. Dist. LEXIS 189263, at *23-25 (N.D.N.Y. Sept. 30, 2016) (Ex. 35).

There is no basis to assert waiver or estoppel. FICO has established breach of Paragraph 3.1(iv) based on disclosure to and use and access by DWS Group and AppCentrica.

**V.** **FICO's Second Cross Motion for Judgment as a Matter of Law: FICO properly terminated the License Agreement, and Federal's claim of breach of contract fails.**

Federal has asserted a counterclaim for breach of contract, alleging that FICO did not have the right to terminate the License Agreement. (Dkt. 569 at 23 (Counterclaim One).) In particular, Federal contends that the License Agreement may only be terminated if one of the events identified in Paragraph 9.2 of the License Agreement occurs and that "[n]one of the events that allows FICO to terminate has occurred." (*Id.*)

In Mr. Carretta's termination letter he identified Federal's disclosure of confidential information to an unauthorized third-party consultant as a breach of the License Agreement and as a basis for terminating the License Agreement. (Ex. 32.) As shown above in Section II(A)-(B), Federal breached Paragraph 3.1(iv) via disclosure, use, and access to Blaze Advisor by DWS Group and AppCentrica. Paragraph 9.2(c) governed breach of the license grant and gave FICO the right to terminate for any breach of the license grant without any materiality requirement. Under Paragraph 9.2(c) FICO had the right to terminate the License Agreement based on Federal's breach of Paragraph 3.1(iv). Because FICO had the right to terminate the License Agreement, regardless of materiality, FICO is entitled to judgment as a matter of law that it did not breach the License Agreement (Federal Counterclaim One).

VI.     **Conclusion**

_Federal's First Motion for Judgment as a Matter of Law._ Federal's first motion for

judgment as a matter of law on FICO's breach of contract claim based on use of Blaze

Advisor by Federal's foreign affiliates should be denied. The License Agreement defines

"Client" and defines "Affiliates." New York law allows an incorporated division to enter

into a contract. With this understanding of the law, nothing within the four corners of the

License Agreement renders the term "Client and its Affiliates" ambiguous. The term

means what the definitions say: "Chubb & Son and its Affiliates." This conclusion does

not render the License Agreement illusory. FICO has presented sufficient evidence from

which a jury could find that Chubb & Son has employees. This fact issue precludes a

finding in favor of Federal.

_Federal's Second Motion for Judgment as a Matter of Law._ Federal's second

motion for judgment as a matter of law on FICO's breach of contract claim based on

breach of Paragraph 3.1(iv) by disclosure to, and use and access by, third-party

consultants must be denied. Materiality is not a requirement to establish breach of

contract under New York law. Moreover, the parties to the License Agreement agreed

that materiality was not a requirement for termination based on breaches of Paragraph

3.1(iv). And, even if materiality were a requirement under the law and even if the parties

had not contracted around materiality, FICO has introduced sufficient evidence for the

jury to conclude Federal's breach of Paragraph 3.1(iv) by disclosure, use, and access by

DWS and/or AppCentrica was material.

*FICO's First Motion for Judgment as a Matter of Law.* Because materiality is not a requirement under New York law or, as agreed by FICO and the Client, for breaches of Paragraph 3.1(iv), FICO is entitled to judgment as a matter of law that Federal breached the License Agreement—Federal admittedly disclosed and permitted access to and use of Blaze Advisor by DWS Group and AppCentrica in violation of Paragraph 3.1(iv).

*FICO's Second Motion for Judgment as a Matter of Law.* Finally, because under Paragraph 9.2(c) FICO had the right to terminate the License Agreement for breach of Paragraph 3.1(iv), regardless of materiality, Federal's counterclaim for breach of contract fails. FICO is entitled to judgment as a matter of law that it did not breach the License Agreement.


Dated: March 5, 2023

                                            MERCHANT & GOULD P.C.

                                            /s/ Heather Kliebenstein
                                            Allen Hinderaker, MN Bar # 45787
                                            Heather Kliebenstein, MN Bar # 337419
                                            Paige S. Stradley, MN Bar # 393432
                                            Michael A. Erbele, MN Bar # 393635
                                            Joseph W. Dubis, MN Bar # 398344
                                            Gabrielle L. Kiefer, MN Bar # 0402364
                                            MERCHANT & GOULD P.C.
                                            150 South Fifth Street
                                            Suite 2200
                                            Minneapolis, MN 55402
                                            Tel: (612) 332-5300
                                            Fax: (612) 332-9081
                                            ahinderaker@merchantgould.com
                                            hkliebenstein@merchantgould.com
                                            pstradley@merchantgould.com
                                            merbele@merchantgould.com

jdubis@merchantgould.com
gkiefer@merchantgould.com

*Attorneys for Plaintiff Fair Isaac*
*Corporation*

41