# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) | Case No. 16-cv-1054 (WMW/DTS) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Jury Trial Demanded** |
| v. | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.     Introduction ..................................................................................................... 1

II.    Legal Standard ................................................................................................ 3

III.   FICO Met Its Burden Under Section 504(b) of the Copyright Act ......................... 4

       A.     FICO specifically differentiated the revenue connect to
              infringement. ...................................................................................... 5

              (1)    Defendants' verified interrogatory answers provide the gross
                     written premiums connected to the use of Blaze Advisor. ............... 5

              (2)    Mr. Zoltowski relied on Defendants' verified interrogatory
                     answers as the basis for his disgorgement opinion. ........................ 9

              (3)    Defendants' collateral attack on their own interrogatory
                     answers is meritless. ......................................................... 10

       B.     FICO proved that Blaze Advisor contributed to the generation of
              gross written premium. ......................................................................... 12

              (1)    Defendants integrated Blaze Advisor into its applications to
                     sell insurance. ................................................................. 12

              (2)    Witness testimony and the record evidence demonstrate that
                     Defendants realized benefits from use of Blaze Advisor and
                     that Blaze Advisor contributed to Defendants' revenue. ............... 17

              (3)    Defendants' documents admit that Blaze Advisor was the
                     technology of choice. ........................................................ 46

       C.     FICO has met its burden of proof under Section 504(b) ............................. 46

IV.    Conclusion ..................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andreas v. Volkswagen of Am., Inc.*,
    336 F.3d 789 (8th Cir. 2003) ...................................................................... 2, 3, 44, 48

*Complex Systems v. ABN Ambro Bank N.V.*,
    2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013) ................................................... 47, 48

*Honeywell Int'l Inc. v. ICM Controls Corp.*,
    11-cv-569, 2017 U.S. Dist. LEXIS 11692 (D. Minn. Jan. 26, 2017) ........................... 3

*Hudson v. United Sys. Of Ark.*,
    709 F.3d 700 (8th Cir. 2013) ...................................................................... 49

*Int'l Bus. Machines Corp. v. BGC Partners, Inc.*,
    No. 10 CIV. 128 PAC, 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013) ....................... 48

*Oracle Am., Inc. v. Google Inc.*,
    2016 U.S. Dist. LEXIS 58819 (N.D. Cal. May 3, 2016) ............................................ 44

*Polar Bear Products v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) ...................................................................... 11

*Van Horn v. Specialized Support Servs.*,
    269 F. Supp. 2d 1064 (S.D. Iowa 2003) ...................................................... 49

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
    No. MJG-06-2662, 2011 WL 4596043 (D. Md. Sep. 30, 2011) ................................. 3

*Yu Lin v. Univ. of Neb.*,
    No. 4:05CV3153, 2006 WL 2927166 (D. Neb. Oct. 11, 2006) ................................. 49

**Statutes**

17 U.S.C. § 504(b) ....................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 50(a) ...................................................................................... 49

Fed. R. Civ. P. 50(a)(1) .................................................................................. 49

Fed. R. Civ. P. 52 ............................................................................................... 49

Fed. R. Civ. P. 52(c) .......................................................................................... 49

## I.    Introduction

Defendants Federal Insurance Company and ACE American Insurance Company (collectively, "Defendants") made unauthorized use of Plaintiff Fair Isaac Corporation's ("FICO") Blaze Advisor software to automate decisions connected to the sale of insurance. The trial evidence specifically connects more than $21 billion of gross written premium from those sales to the Defendants' infringing use of Blaze Advisor. There is overwhelming evidence, both exhibits and testimony, that the benefits of Blaze Advisor to the process of selling insurance contributed to the sale of those insurance policies.

Blaze Advisor contributed to the process of selling insurance, and thereby to the generation of revenue from insurance sales, by among other things speed of response to customers, and speed of getting new products to market faster; precision in pricing to be competitive, to make more targeted decisions regarding the customers to retain and to be more profitable; consistency in decision making to improve the customer experience and make better decisions in underwriting; agility to respond more quickly to changes in competitive requirements or customer opportunities; scale to handle a greater volume of applications with the same underwriting staff; compliance to conform to state and company requirements; and making it easier for independent agents and brokers to do business with Defendants to enhance loyalty and future customer referrals.

FICO introduced detailed evidence identifying the number of insurance policies sold using Blaze Advisor (not simply the polices sold that used Blaze Advisor

1

applications), with specific proof of the "Blaze Rule Capabilit[ies]" that were executed by Blaze Advisor in connection with the sale of these policies. (*See* Ex. 18.)[1]

Defendants' motion ignores FICO's proof of the business benefits from infringing Blaze Advisor that directly contributed to the revenue generated from the sale of these policies that used Blaze Advisor. Instead, Defendants seek to hold FICO to a higher burden than the copyright law requires in direct conflict with *Andreas*, the controlling precedent in the Eighth Circuit.

The unstated premise of Defendants' motion is that FICO has not established a direct causal relationship, *i.e.*, "but-for" causation, between the infringing use of Blaze Advisor and Defendants' revenue, and that FICO has not quantified the extent to which Blaze Advisor contributed to the generation of that revenue. But *Andreas* makes clear that "but-for" causation is not the standard, nor is it FICO's burden to quantify the extent to which Blaze Advisor contributed to the generation of revenue. FICO need only establish that Blaze Advisor contributed, at least in part, to the generation of the $21 billion dollars in gross written premium FICO seeks to disgorge. (Dkt. 731 at 21.) FICO has met its burden.

The evidence discussed herein shows that Blaze Advisor in fact contributed to the sale of insurance and the generation of Defendants' gross written premium. The bottom line is this: there is more than sufficient evidence to prove FICO's claim for

---

[1] Unless otherwise noted, all exhibits are those attached to the Declaration of Paige Stradley.

disgorgement under proof requirements of the Copyright Act. FICO has met its initial

burden under Section 504(b). Defendants' motion should be denied.

## II.    Legal Standard

A copyright owner is entitled to recover "any profits of [an] infringer that are

attributable to the infringement and are not taken into account in computing the actual

damages." 17 U.S.C. § 504(b). To prove such damages, "the copyright owner is required

to present proof only of the infringer's gross revenue, and the infringer is required to

prove his or her deductible expenses and the elements of profit attributable to factors

other than the copyrighted work." *Id.*

To meet its burden FICO must only prove Defendants' gross revenue connected to

or related to the infringement. *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 799

(8th Cir. 2003) ("[T]he copyright holder must first establish some connection or

relationship between the infringement and the profits he seeks."). This is not an "onerous

evidentiary burden." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, No. MJG-06-2662, 2011

WL 4596043, at *4 (D. Md. Sep. 30, 2011) (quoting *Phoenix Renovation Corp. v.

Rodriguez*, 258 F. Appx. 526, 534- 35 (4th Cir. 2007)). And this is not a burden of "but-

for" causation. *See Honeywell Int'l Inc. v. ICM Controls Corp.*, 11-cv-569, 2017 U.S.

Dist. LEXIS 11692, at *12, 15-16 (D. Minn. Jan. 26, 2017) (Ex. 56).

As the Court explained, "[FICO's] initial burden to prove 'attribution' requires

proof that the infringing use, at least in part, 'contributed to' the relevant gross revenues."

(Dkt. 731 at 20-21 (citing *Andreas*, 336 F.3d at 796).) *See also Honeywell Int'l*, 2017

U.S. Dist. LEXIS 11692, at *12, 15-16 (rejecting more onerous reading of § 504(b)) (Ex.

3

56). FICO need not "put a . . . buyer on the stand to testify that she bought the [insurance policy] because of the [infringement]." *Andreas*, 336 F.3d at 797. Nor must FICO quantify or apportion the extent to which Blaze Advisor contributed to Defendants' revenue. (Dkt. 731 at 7-8.)

## III.   FICO Met Its Burden Under Section 504(b) of the Copyright Act

FICO met its burden to prove that Blaze Advisor contributed, at least in part, to the gross written premium that FICO seeks to disgorge. FICO identified Defendants' gross written premium specifically tied to the use of Blaze Advisor, and it put forth sufficient evidence to show that Blaze Advisor contributed to the generation of that same gross written premium.

Defendants' arguments to the contrary are meritless. Using the same tactics employed on summary judgment, Defendants seek to shift the burden of quantification to FICO. They point to soundbite cross-examination testimony from FICO witnesses stating they are unable to confirm the "specific impact" of Blaze Advisor or to "quantify" or "measure" the impact that Blaze Advisor had on the Defendants' business. They argue that such testimony demonstrates FICO's failure to meet its burden under Section 504(b). These criticisms arise from Defendants' misapplication of the legal standard and an improper attempt to apply a "but-for" causation standard. Defendants' motion represents their third attempt to improperly shift Defendants' burden onto FICO and to apply the wrong legal standard.

Defendants also misrepresent FICO's proof as the following: "Chubb generated revenue selling insurance, Chubb licensed Blaze, therefore Chubb's revenue is due to Blaze." (Dkt. 1136 at 12.) In truth, FICO's proof is more accurately stated as follows:

1. Evidence of the specific number of insurance policies and amount of gross written premium generated through the infringing applications for those policies that *actually used Blaze Advisor software in the selling process*.

2. For each infringing application, evidence of the specific functions for which Blaze Advisor software was used for the policies identified in #1 above—namely the specific types of rules (*e.g.*, policy scoring, pricing calculations, renewal determinations, underwriting guidance) that Blaze Advisor software executed in connection with selling those insurance policies—accompanied by further evidence that those functions *played a critical role in the Defendants' ability to sell and profitably price their insurance policies*.

3. Extensive testimony describing the *business benefits obtained by using Blaze Advisor* to execute the types of rules identified in #2 above.

4. Testimony from Mr. Whitener and others detailing *how the business benefits identified in #3 contribute to greater sales and profitability* for the sale of insurance policies.

When FICO's evidence is considered in total and under the proper legal standard, it is difficult to imagine how the infringing use of Blaze Advisor software in the process of selling insurance could be more directly attributable to the revenue and profits generated by Defendants. FICO has met its burden under Section 504(b) to prove Defendants' infringing revenues in connection with which Blaze Advisor was used.

## A. FICO specifically differentiated the revenue connect to infringement.

### (1) Defendants' verified interrogatory answers provide the gross written premiums connected to the use of Blaze Advisor.

FICO proved gross revenue from policies connected to Defendants' infringing use of Blaze Advisor. Defendants admit the amount of gross written premium from the

domestic sale of insurance connected to the use of Blaze Advisor in their verified answers to interrogatories. Interrogatory No. 17 sought:

> For all insurance policies *in connection with which the Blaze Advisor software was used*, the gross written premium of Defendants and the gross written premium of each related company, including the specific identification of each related company, for each quarter from March 30, 2016 to date.

(*See* Ex. 38 (emphasis added); Ex. 40 (emphasis added).)

In their verified Ninth Supplemental Answer to Interrogatory 17, Defendants concede that $21,202,380,943 in gross written premium was connected to the use of Blaze Advisor. (*See* Ex. 40; *see also* Ex. 38.)

In answering the interrogatory, Defendants admitted that the gross written premiums listed for each application and each business unit were generated in connection with the use of Blaze Advisor software:

> For the Financial Lines United (post-merger) for the years identified below, the following applications used Blaze Advisor® software: CSI Express, Decision Point, Automated Renewal Process, Profitability Indicator, and Defined Book Run. The approximate gross written premiums, policy counts, and identification of the insurance writing companies that issued insurance policies that used these applications, *in connection with which the Blaze Advisor software was used*, is provided in the charts below for the years requested.

(Ex. 40 at P-1007A-002 through P-1007A-003 (emphasis added).)

> For Corporate Business Systems (CBS), which is not a strategic business unit (SBU), the following application used Blaze Advisor software: Premium Booking. The approximate gross written premiums and policy counts that used these applications, *in connection with which the Blaze Advisor software was used*, is provided in the charts below for the years requested.

(Ex. 40 at P-1007A-006 (emphasis added).)

> For the Chubb Commercial Insurance (CCI) business unit for the years identified below (post-merger), the following applications used Blaze Advisor software: CUM-IM, TAPS, and IRMA. The approximate gross written premiums, policy counts, and identification of the insurance writing companies that issued insurance policies that used these applications, *in connection with which the Blaze Advisor software was used*, is provided in the charts below for the years requested.

(*Id.* (emphasis added).)

Defendants' attempt to generate doubt regarding the specificity of the admitted connection between Defendants' use of Blaze Advisor and the gross written premiums identified in their interrogatory answers is disingenuous to say the least. The questions and answers are clear: the revenue identified and verified under oath by Defendants is that generated in connection with the use of Blaze Advisor software. Further, Defendants' own Chief Financial Officer, Mr. Harkin, testified at trial that the gross written premiums listed in Interrogatory No. 17 are from policies associated with the use of Blaze Advisor:

> Q.    Okay. And we just covered the gathering process for interrogatory number 16. If I asked you, just so we can move through this quickly, the same questions for interrogatory number 17 for the applications DecisionPoint, CSI Express, Premium Booking, CUW-IM, TAPS and IRMA, could you tell me at a 10,000-foot level how, what that data reflects?
>
> A.    The data reflects the policy count and associated gross written premium and writing company that ran through the applications you listed *and used the Blaze software*.
>
> Q.    For the policies that ran through the applications *and utilized Blaze Advisor software, correct*?
>
> A.    Correct.

(Ex. 9 at 1898:4-16 (emphasis added); *see also id.* at 1894:13-1897:17 (Mr. Harkin

confirming Defendants' answer to Interrogatory No. 16 listed gross written premium

from policies that were processed using Blaze Advisor).)

Defendants also admit to their continued use in the United States of the Blaze

Advisor application called Evolution in connection with the sale of insurance in Canada.

There is no dispute the Evolution application was hosted on servers in Raleigh, North

Carolina. (Ex. 9 at 635:9-638:9.) Defendants concede in the verified Seventh

Supplemental Answer to Interrogatory No. 19 that at least $154,380,023 of gross written

premium was connected to the United States use of Blaze Advisor in connection with the

sale of insurance in Canada in 2016. (Ex. 39 at P-1008A-003.) Defendants' answer

confirms this revenue was "in connection with which Blaze Advisor was used." (*Id.*)

Because it was generated from Defendants' domestic infringement, this revenue is also

subject to disgorgement.

The total gross written premium connected to the domestic infringement of Blaze

Advisor by Defendants' own admission is $21,356,760,966. (Ex. 40; Ex. 39.) The gross

written premium identified in Defendants' interrogatory answers is not undifferentiated.

(*See* Dkt. 731 at 57 ("FICO presents evidence of gross revenue from the sale of insurance

in connection with which Blaze Advisor was used. This evidence is not

'undifferentiated,' as it is tied to Defendants' use of Blaze Advisor.").) It is limited to

those gross written premiums "in connection with which the Blaze Advisor software was

used." (*See* Ex. 38; Ex. 40.)

### (2)   Mr. Zoltowski relied on Defendants' verified interrogatory answers as the basis for his disgorgement opinion.

This differentiated revenue stream formed the basis for Mr. Zoltowski's disgorgement opinion. Mr. Zoltowski assessed and quantified the gross written premium revenue from policies in connection with which Blaze Advisor was used. (Ex. 9 at 1260:25-1261:15.)

Mr. Zoltowski testified that FICO's interrogatories were "a very specific request targeted at the policies that specifically touched Blaze Advisor." (Ex. 9 at 1271:9-12.) Based on Defendants verified Ninth Supplemental Answer to Interrogatory 17, Mr. Zoltowski concluded that $21,202,380,943 in gross written premium was connected to the use of Blaze Advisor domestically between March 31, 2016, and the date Defendants' use of Blaze Advisor ceased. (Ex. 9 at 1325:18-1334:14.)

Mr. Zoltowski broke down the revenues by application on an annual basis, providing the jury with the following gross written premium figures and totals—all of which are admittedly generated in connection with use of Blaze Advisor:

| Application | Mar 31 – Dec 31, 2016 | 2017 | 2018 | 2019 | Jan - Jun 2020 | Total |
|---|---|---|---|---|---|---|
| Commercial Underwriting Workstation (CUW) | $2,802,600,382 | $3,409,127,185 | $2,882,872,838 | $3,652,792,805 | | $12,747,393,210 |
| CSI Express Profitability Indicator Automated Renewal Process | $1,008,080,734 | $1,358,180,203 | $1,241,993,390 | $1,277,242,740 | $125,825,726 | $5,011,322,794 |
| Premium Booking | $380,416,844 | $442,839,932 | $500,850,829 | $426,769,797 | | $1,750,877,402 |
| Texas Accident Prevention System (TAPS) | $215,420,480 | $252,219,200 | $216,490,943 | $160,175,914 | | $844,306,538 |
| Cornerstone | $158,202,931 | $248,313,042 | $122,400,980 | $(6,469) | | $528,910,484 |
| Individual Rate Modification Application (IRMA) | $68,975,636 | $89,449,543 | $80,968,955 | $60,922,865 | | $300,316,999 |
| Decision Point | $2,680,739 | $4,319,856 | $4,779,439 | $5,846,994 | $1,626,488 | $19,253,516 |
| TOTAL | $ 4,636,377,746 | $ 5,804,448,961 | $ 5,050,357,375 | $ 5,583,744,647 | $ 127,452,214 | $ 21,202,380,943 |

$ 21,202,380,943

(Ex. 9 at 1330:20-1334:6.)

9

Based on Defendants verified Seventh Supplemental Answer to Interrogatory 19, Mr. Zoltowski concluded that $154,380,023 in gross written premium was connected to the use of Blaze Advisor by Chubb Insurance Company of Canada between March 31, 2016, and the date Chubb Insurance Company of Canada ceased to be a wholly owned subsidiary of Federal.[2] (Ex. 9 at 1334:9-14.) Again, by Defendants' own admission, this $154,380,023 in gross revenue is connected to the use of Blaze Advisor. (Ex. 9 at 1260:25-1261:15; Ex. 39.)

### (3)   Defendants' collateral attack on their own interrogatory answers is meritless.

Defendants fault Mr. Zoltowski's reliance on their own verified interrogatory answers to prove gross written premium in connection with which Blaze Advisor was used. (Dkt. 1136 at 6, 13.) To the extent Defendants now argue that the gross written premium listed in Defendants' answer to Interrogatory No. 17 is not specifically tied to their infringing use of Blaze Advisor, that argument is belied by the plain language of the Interrogatories and Defendants' answer to the same. It is also belied by the testimony of their own CFO, Mr. Harkin. He confirmed the revenue was in fact generated from policies processed using Blaze Advisor just as the plain language of the Interrogatories and answers state. (Ex. 9 at 1898:4-16; *see also id.* at 1894:13-1897:17.) The gross written premium disclosed in Defendants' interrogatory answers *is* in fact "evidence of

---

[2] FICO is entitled to recover from Federal as disgorgement the gross revenue from the sale of insurance connected to the infringing use of Blaze Advisor with the Canadian Evolution application during the time Chubb Insurance of Canada was a wholly owned Federal subsidiary.

gross revenue from the sale of insurance in connection with which Blaze Advisor was used." (*See* Dkt. 731 at 57.)

Defendants' reliance on *Polar Bear Products v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004) is misplaced. (*See* Dkt. 1136 at 4, 13.) That case supports FICO. *Polar Bear Products* holds the "profits sought are those that arise from the infringement" and that a plaintiff may not "toss up an undifferentiated gross revenue number." *Id.* at 711. *Polar Bear Products* affirmed the award of indirect profits for two of three sought categories of revenue—the revenue that related to infringement. *Id.* at 715 (contrasting revenue from trade shows where infringing work was displayed with retail purchasers who never witnessed infringement). Here, Defendants admit the gross revenue detailed in its interrogatory answers is connected to the infringement—the use of Blaze Advisor. FICO's proof of gross revenue in connection with which Blaze Advisor was used is not an "undifferentiated gross revenue number." (*See* Dkt. 731 at 57 ("FICO presents evidence of gross revenue from the sale of insurance in connection with which Blaze Advisor was used. This evidence is not 'undifferentiated,' as it is tied to Defendants' use of Blaze Advisor.").)

Defendants also criticize Mr. Zoltowski for not "adjusting [his] gross written premium numbers based on Blaze's role in each particular application; not "adjust[ing] those revenue numbers to account for the role that folks at Chubb had in coming up with particular rules that were deployed through Blaze"; not "adjust[ing] the revenue numbers at all to account for costs that Chubb would have incurred implementing Blaze . . . like time spent training software engineers on how to use the product"; and "not analyz[ing]

the relative roles of Blaze Advisor and other factors in driving particular sales or applications." (Dkt. 1136 at 6, 13 (internal quotations omitted).) These criticisms of Mr. Zoltowski all stem from an application of Section 504(b). It is not Mr. Zoltowksi's nor FICO's burden to deduct costs. It is Defendants' burden. (Dkt. 731 at 7 ("the infringer is required to prove his or her deductible expenses").) And it is not Mr. Zoltowski's nor FICO's burden to account for the role that Chubb had in coming up with particular business rules or analyzing and accounting for the role other factors had in driving particular sales. It is Defendants' burden to prove apportionment. (*Id.*) None of Defendants' criticisms speak to whether FICO met its burden to prove Defendants' gross revenue connected to their infringing use of Blaze Advisor.

### B.   FICO proved that Blaze Advisor contributed to the generation of gross written premium.

FICO has also met its burden to prove that Blaze Advisor contributed, at least in part, to the generation of this differentiated revenue stream. (*See* Dkt. 731 at 7-8.)

#### (1)   Defendants integrated Blaze Advisor into its applications to sell insurance.

Blaze Advisor provided a framework for Defendants to formalize and codify their business concepts, policy manuals, heuristics, and human-based logic. (Ex. 9 at 94.) Blaze Advisor also provided the engine to automate those decisions—Blaze Advisor takes the data, executes against the rules, and presents the decision without human intervention in sub milliseconds. (Ex. 9 at 131:8-132:8.)

FICO worked extensively with Chubb & Son to develop and deploy Blaze Advisor applications to execute operational decisions to sell insurance. Chubb & Son paid FICO

over $3.7 million across 52 statements of work over nine years. (Ex. 9 at 541:1-8, 554:19-22.) They involved requests for consulting, implementation, and training. (*Id.* at 554:1-7.) FICO assisted Chubb & Son in defining, designing, developing and deploying Blaze Advisor into Chubb & Son's applications to sell insurance. This included extracting Chubb & Son's business rules and business logic; designing the rules in Blaze Advisor; and deploying the resulting applications into production. (*Id.* at 554:1-560:18.)

FICO's extensive work and the parties' lengthy relationship resulted in Blaze Advisor being "central" and "pivotal" to Defendants' decision-making process relating to insurance sales. (*Id.* at 162:24-163:7.)  Indeed, Defendants integrated Blaze Advisor into its policy administration applications, compliance applications, and utility applications, all of which contributed to the generation of revenue from selling insurance. It is undisputed that in the current environment, insurance companies cannot sell insurance competitively without a policy administration system. (*Id.* at 1389:3-9.) There is also no dispute that compliance is a required function to sell insurance. (*Id.* at 1394:23-1395:1.) And within those applications, Defendants used Blaze Advisor to develop and execute the business rules, resulting in the generation of gross written premium in each application. (*See* Ex. 16.)

The record evidence shows each application in which Blaze Advisor was used; the functionality and purpose served by Blaze Advisor in each application; the number of policies issued using Blaze Advisor in connection with each application; and the gross written premium generated using Blaze Advisor in connection with each application:

*CUW:* The Commercial Underwriting Workstation (CUW) application used Blaze Advisor for "Inventory Management & Workflow routing," "assignments," and "scoring." (P-518.) CUW used Blaze Advisor to allow underwriters to maintain records and manage the inventory of policies that have been assigned to a particular underwriter. (Ex. 9 at 999:17-1000:17.) 832,612 policies were processed using Blaze Advisor in connection with CUW, for a total of $12,747,393,210 in GWP. (Ex. 40; Ex. 9 at 1331:12-18.)

*CSI Express, Automated Renewal Process, Profitability Indicator:* The CSI Express and Profitability Indicator applications used Blaze Advisor for "Predictive Modeling" and "Underwriting guidance." (P-518.) The Automated Renewal Process application used Blaze Advisor for "[R]enewal categorization" and "Policy renewal automation, including endorsement generation." (Ex. 16.) CSI Express is a policy administration system that used Blaze Advisor to book, bind, and issue specialty insurance policies, i.e., **to sell specialty insurance**. (Ex. 9 at 986:25-988:3.) Automated Renewal Process used Blaze Advisor to automate the processing of renewals through CSI Express without human intervention. (Ex. 9 at 988:4-989:22.) Profitability Indicator used Blaze Advisor to assess the risk of a particular policy processed within CSI Express and calculate a resulting risk score that permits underwriters to assess the severity of the risk and price policies correctly. (Ex. 9 at 992:10-993:10.) 386,148 policies were processed using Blaze Advisor in connection with these applications, for a total of $5,011,322,794 in GWP. (Ex. 40; Ex. 9 at 1331:19-1332:4.)

14

***Premium Booking:*** The Premium Booking application used Blaze Advisor for "Validation Rules." (Ex. 16.) Premium Booking is a compliance application that used Blaze Advisor to ensure that insurance policy premiums comply with Defendants' rules and regulations. (Ex. 9 at 1004:6-24.) 518,485 policies were processed using Blaze Advisor in connection with Premium Booking, for a total of $1,750,877,402 in GWP. (P-Ex. 40; Ex. 9 at 1332:5-11.)

***TAPS:*** The Texas Accident Prevention System (TAPS) application used Blaze Advisor for "Accident Prevention Compliance." (Ex. 16.) TAPS is a compliance application that used Blaze Advisor to ensure that workers' compensation policies sold in the State of Texas complied with applicable state regulations. (Ex. 9 at 1003:6-1004:5.) These policies cannot be sold without compliance with Texas requirements. (*Id.* at 1004:21-24.) 2418 policies were processed using Blaze Advisor in connection with TAPS, for a total of $844,306,538 in GWP. (Ex. 40; Ex. 9 at 1332:12-19.)

***IRMA:*** The Individual Rate Modification Application (IRMA) application used Blaze Advisor for "Rate tables" and "Pricing Calculations." (Ex. 16.) IRMA is a compliance application that used Blaze Advisor to automatically calculate the appropriate premium within a set of rate table parameters for small policies. (Ex. 9 at 1002:13-1003:5.) 65,034 policies were processed using Blaze Advisor in connection with IRMA, for a total of $300,316,999 in GWP. (Ex. 40; Ex. 9 at 1333:5-12.)

***Decision Point:*** The Decision Point application used Blaze Advisor for "Rate tables and Pricing Calculations," "Eligibility determination," "Endorsement generation," and "Data normalization." (Ex. 16.) Decision Point is a policy administration system that

used Blaze Advisor to provide automated quotes, including risk assessment and pricing, for small policies. (Ex. 9 at 995:25-999:13.) The quote is the offer at a specific price to sell and bind insurance for that customer. (Ex. 9 at 999:9-11.) 6970 policies processed using Blaze Advisor in connection with Decision Point, for a total of $19,253,516 in GWP. (Ex. 40; Ex. 9 at 1333:13-21.)

*Cornerstone:* The Cornerstone application is a policy administration system that used Blaze Advisor for the quote, bind, book, issue process for surety products, *i.e.*, **to sell surety products**. It optimizes workflow when selling surety bonds. (Ex. 9 at 1500:5-1501:18.) Cornerstone implemented Blaze Advisor to increase underwriting capacity and improve controls and compliance. (*Id.*) 1,042,710 policies were processed using Blaze Advisor in connection with Cornerstone, for a total of $528,910,484 in GWP. (Ex. 40; ex. 9 at 1332:20-1333:4.)

*Evolution:* The Evolution application used Blaze Advisor for "Underwriting guidance." (Ex. 16.) Evolution is a policy administration system for specialty lines in Canada. (Ex. 9 at 1008:23-1010:23.) 92,000 policies were processed using Blaze Advisor in connection with Evolution, for a total of $154,380,023 in GWP in 2016. (Ex 39; Ex. 9 at 1334:9-14.)

      **(2)**      **Witness testimony and the record evidence demonstrate that Defendants realized benefits from use of Blaze Advisor and that Blaze Advisor contributed to Defendants' revenue.**

              ***a.***      ***Chubb & Son selected Blaze Advisor to expand into the small and mid-markets and grow its revenue.***

In February 2006, Chubb & Son found itself in a difficult position. It wanted to enter into a new, high-volume market, but its budgetary restrictions would not allow it to hire the additional staff necessary to handle that high volume. Accordingly, Chubb & Son issued a Request for Information ("RFI") to FICO to learn about Blaze Advisor. (Ex. 41.) Chubb & Son was interested in Blaze Advisor to increase revenue by expanding into the small and mid-market for Specialty insurance products. (*Id.*) The Specialty business in February 2006 was limited to a small number of large accounts, and expansion and growth into the mid-market was "viewed as a good opportunity as it is understood that 85% of the identified and targeted customer set does not currently buy Chubb products." (Ex. 41 at J-002-005.)

The "key strategic initiative" Chubb & Son sought to accomplish by licensing Blaze Advisor was "expanding and growing the business into mid-market and smaller accounts." The RFI explains:

> Chubb Specialty Insurance gets the majority of its revenue, typically achieved via premiums, from a relatively small number of very large accounts. They have approximately 1000 employees in this line of business driving $3.5B in revenue. ***The key strategic initiative in this area is expanding and growing the business into middle-market and smaller accounts***.

(Ex. 41 at J-002-005 (emphasis added).)

Chubb & Son's underwriters/personnel, reputation, marketing/advertising, sales force, relationships with agents and brokers, business rules, etc. all existed in 2006. The DuckCreek rating engine was also already in use by Chubb & Son at that time. (*Id.* at J-002-006 through J-002-007 ("The rating application uses the DuckCreek rating engine . . . .").) But those capabilities were not enough. Chubb & Son issued the RFI to find additional technology to grow revenue by entering a new market segment. That technology was Blaze Advisor.

> Blaze Advisor was necessary to scale in the small and mid-markets:
>
> There is an initiative to move work to service centers so CSR's/Underwriters can focus more time on marketing and selling to these agents and agencies. Movement to mid-market and smaller accounts has proven to be difficult, as this requires the team and systems to handle an increased volume of work (more transactions, policies, claims, etc.) in an environment where Chubb's current "Expense Management Strategy" does not allow for increased staffing.

(*Id.* at 5.)

Defendants had multiple options to select from, but they ultimately selected Blaze Advisor to help them enter this new market segment. And Defendants were successful.

The business benefits provided by Blaze Advisor allowed the Defendants to expand their business into the small and mid-markets. (Ex. 42 at P-0958-005, P-0958-011.) Indeed, the 2016 Chubb Corporation Annual Report touted that its middle market and small commercial operation was an $8.6 billion business and represented 26% of their overall net premiums written. (*Id.* at P-958-011, P-0958-016.) By automating human decisioning with Blaze Advisor, Defendants understood they could process the higher volume of transactions required to succeed in the small and mid-markets, without

18

increasing staff, and could also free up underwriters to focus on higher value selling

opportunities. (Ex. 41 at J-002-006.) The evidence and testimony demonstrate that these

business benefits, and others, were in fact realized by the Defendants' use of Blaze

Advisor to sell insurance, including during the period of infringement.

### b.    The testimony of Mr. Baseman

Mr. Baseman has experience applying Blaze Advisor in the insurance industry

(Ex. 9 at 115-116), and he explained the benefits obtained by using Blaze Advisor from a

technical perspective. He explained that Blaze Advisor uses business rules, customized

by the customer and FICO, to automate business decisions and it documents in a central

place the business logic of a customer. (*Id.* at 118:22-25.) It processes information in

milliseconds; allows customers to change, extend, document, and make better decisions;

reduces the time and cost to develop decision-making applications; and enables changes

to existing applications to be made faster in response to competition, regulatory changes,

etc., which enables products to be brought to market faster. (Ex. 9 at 131:8-134:23,

153:2-155:3.) As detailed below, Mr. Whitener explained that the benefits identified by

Mr. Baseman matter to the process of selling insurance and result in the generation of

revenue. (See, *infra*, Section III.B(2)(h).)

Mr. Baseman also has first-hand knowledge of the Defendants' recognition of

these business benefits. Mr. Baseman was involved in "countless" meetings, both in

person and via telephone, with Chubb & Son after Chubb & Son began using Blaze

Advisor. (Ex. 9 at 160:20-161:2) Those conversations were with architects,

businesspersons, Chubb leadership, and data analysts. (Ex. 9 at 161:3-19.) He testified

that "it was apparent that Blaze Advisor was central to all of their [Chubb & Son's] decision-making process within the group that we were talking about," it was "pivotal to what they were doing," and Chubb & Son was looking to further extend Blaze Advisor into other groups' work. (Ex. 9 at 162:24-163:7.) Mr. Baseman's testimony, based on direct conversations and interactions with Defendants, contradicts Defendants' contention that Blaze Advisor was unimportant and just one of numerous components utilized by Defendants.

Mr. Baseman also testified that the specific benefits of Blaze Advisor contribute to revenue. He explained that Blaze Advisor is "mostly used for decisions connected to revenue events" and that "[i]t is pivotal in those decision process[es]" [b]ecause it is the one actually making the decisions." (Ex. 9 at 172:4-13, 172:23-173:4.) "[P]eople don't use Blaze Advisor for unimportant decisions"; rather, Blaze Advisor "enable[s] those critical business decisions." (*Id.* at 173:12-19.)

Defendants' criticism of Mr. Baseman is not directed to his failure to connect use of Blaze Advisor to revenue. Their real complaint is that he could not quantify the specific amount that Blaze Advisor contributed to Defendants' revenue. (Dkt. 1136 at 5 (citing Mr. Baseman's testimony at Ex. 9 at 183-185).) Mr. Baseman's testimony on cross examination admitted only that he could not quantify the extent of contribution, not that Blaze Advisor did not contribute. For example, when asked whether he could identify a particular application that was developed faster at Chubb because of Blaze Advisor, he testified he could only do so through heuristic conversations, meaning he understood Chubb had, in fact, developed applications faster based on his conversations

with Chubb. (Ex. 9 at 183:19-22, 191:9-17.) He elaborated on redirect that he understood

from conversations with Chubb that they were realizing value from use of Blaze Advisor:

> So how you're able to deduce that the Blaze Advisor component is integral
> to the decision process is the conversations that we were there to discuss
> around taking pivotal analytic models and putting them into Blaze Advisor
> was to get a wider use of those models across all of the different systems they
> were using. They wouldn't have had that conversation if it wasn't being used.

(*Id.* at 191:18-192:2.)

### c.     *The testimony of Mr. Baer*

Mr. Baer is responsible for documenting the business successes realized by

FICO's clients. Mr. Baer testified regarding the numerous benefits of Blaze Advisor—

including control, speed, accuracy, consistency, transparency, agility—and confirmed

that these benefits were in fact realized by FICO's Blaze Advisor clients. (*Id.* at 284:4-7;

*see also* Ex. 43, Ex. 44.)

Mr. Baer testified that FICO's insurance industry customers have recognized

benefits from using Blaze Advisor including:

- "Increased processing on a new insurance policy from 22 days down to 4 minutes";

- "Transition from a manual underwriting process to 99% automated";

- "Reduced decisioning time by 85%";

- "5-10% increase in application volume capacity";

- "Double volume annually for 3 yrs.";

- "Increased revenues by 47%"; and

- "Lowered combined ratio by 8 points in 1 year."

(Ex. 45 at P-1174A-001; *see also* Ex. 9 at 289:13-291:9.) Mr. Baer testified that FICO's clients themselves reported these were business benefits they realized from Blaze Advisor. (Ex. 9 at 291:10-13.)

The type of benefits identified by Mr. Baer are the type of benefits that Defendants also realized. Defendants' own documents and testimony confirm this, and, again, Mr. Whitener testified why these benefits matter to the selling process and the generation of revenue.

### d.     The testimony of Mr. Schreiber

Mr. Schreiber, the sales executive responsible for FICO's insurance business, testified that Chubb & Son's purpose for issuing the RFI was to automate underwriting, and specifically underwriting of renewal policies, using Blaze Advisor:

> The problem was that on renewals, [Chubb & Son's] would do a full review of [] each policy so that it was effectively underwriting the whole customer from scratch, which is very expensive. So the premise of this RFI . . . was, our solution was how can they automate the underwriting – the renewal process so that they could move into a business model where they were – had less manual intervention with the renewal process.

(Ex. 9 at 319:1-14.)

Blaze Advisor delivered on that promise. Automated underwriting using Blaze Advisor permitted Chubb & Son to "move down to a bigger market, more prospective customers." (*Id.* at 318:17-23.) The evidence shows that those benefits continued during the period of infringement.

22

### e.  *The testimony of Mr. Wachs*

Mr. Wachs is the FICO sales executive responsible for responding to the Chubb & Son RFI in 2006, involved with negotiation of the License Agreement, and worked with Chubb & Son in the early use of Blaze Advisor. Mr. Wachs testified that Chubb & Son needed Blaze Advisor to succeed in its "key strategic initiative" of expanding the Specialty Lines division to the small and mid-market. Chubb & Son licensed Blaze Advisor to increase automation and scalability, which enabled an "order of magnitude" expansion and allowed Defendants to "take on new revenue streams":

> Q.   Did you learn anything more from Chubb & Sons regarding that – the nature of that key strategic initiative and your response to the RFI?
>
> A.   Yes . . . by expanding the marketplace to the small and middle-sized accounts, [Chubb & Son] expected an *order of magnitude increase* in the number of work items that they had to review and underwrite and they did not have the staff and did not have the budget for the staff that would be necessary in their current processing manner and so they were looking for an automated decision and management software that would positively affect the scalability of their business *so that they could take on new revenue streams*.

(*Id.* at 807:10-22 (emphasis added).)

One of the primary goals Chubb & Son sought to accomplish with automated underwriting was increasing its revenue profitability:

> Q.   . . . [O]n page 7 of the RFI, [Chubb & Son] describe[s] the current state of renewal processing . . . from your discussions with Chubb & Son, what changes to their current state were they seeking to achieve through the technology of Blaze Advisor?

A.      Well, there were a number of different changes . . . .The ability to – they talk about Section 1 rules within their specialty renewal business, they can vary the attributes of the claims . . . of the limits and the deductibles and the term length in various ways and be able to penetrate and make changes *that create a better reward-risk ratio and thus greater revenue profitability*.

(*Id.* at 810:12-811:13 (emphasis added).)

Mr. Wachs testified that Blaze Advisor provided Defendants with the following benefits:

- Enabling the processing of large transaction volumes, and permitting modification of business rules automatically and in real time to determine their impact on profit;

- Making faster, more informed, and more accurate business decisions, which enables getting products to the marketplace faster and increasing "time to value";

- Enabling modification of the insurance book of business by businesspersons instead of IT professionals, which enables real-time changes to the business rules;

- Allowing the reuse of business rules for new insurance products without having to continually re-write those rules, which enhances speed to market on new products;

- Reducing policy renewal cycle time, and enabling real-time changes to the policy attributes, such as term and deductible, which "create a better reward-risk ratio and thus greater revenue profitability"; and

- Increasing speed, consistency, uniformity, and auditability.

(*Id.* at 807:10-818:16.)

These benefits of Blaze Advisor were realized and continued during the period of infringement. Within the first year of using Blaze Advisor, Defendants were able to accept "considerably more business" with no increase in staff:

24

Q.      And then did any of the business – did any of the businesspeople of Chubb
        & Son comment on how the use of the products, that is Blaze Advisor,
        would be able to assist them in growing their revenue, moving into the mid-
        market?

A.      Only that within the first full year they did succeed in accepting
        considerably more business than they had in the previous year for no
        increase of staff.

(*Id.* at 816:8-14.)

Mr. Wachs testified that Blaze Advisor allowed Defendants to perform in an

afternoon what had previously taken months and hundreds of thousands of dollars of IT

budget. Defendants' implementation of Blaze Advisor "paid for itself on the first time

[they] ran it." (*Id.* at 815:20-816:7.)

### f.      The testimony of Mr. Mirolyuz

Henry Mirolyuz, a Senior Systems Architect at Chubb & Son, testified that by

using Blaze Advisor Defendants brought products to market faster, increased the

percentage of renewals, and better responded to changing market conditions. (*Id.* at

1021:11-22, 1023:19-1024:2, 1028:15-19, 1032:5-7.) Mr. Mirolyuz documented these

contributions of Blaze Advisor to selling insurance, thereby generating revenue. (*See* Exs.

46-48.)

A case study for the Automated Renewal Process application defined the business

benefits for that application, including:

- "Move more of the right business into automated renewal";

- "Increase retention on best accounts and more readily identify potentially

    less profitable accounts";

25

- "Create greater efficiency for underwriters and continued efficiency for underwriters, who will have fewer policies to handle and fewer questions to address"; and

- "Easily update underwriting rules as business needs change[.]"



(Ex. 46 at P-192-005.)

The case study states: "The [more] policies that are automatically renewed the more time the underwriter has to develop and produce additional business or handle additional business." (*Id.*) The case study also reported that the time to change renewal rules was reduced from 3-6 months of IT work to 2-3 days of IT work. Mr. Mirolyuz

confirmed that the defined business benefits for the Automated Renewal Process application were in fact achieved. (Ex. 9 at 1028:15-25.)

The Chubb Enterprise Architecture Business Rules Strategy/Roadmap presentation contained a case study for the Profitability Indicator application. The case study defined the business benefits of that application, including the same benefits listed above for the Automated Renewal application.



(Ex. 48 at P-0195-013.)

The case study confirmed that these defined business benefits for the Profitability Indicator application were in fact achieved. (*Id.* (***"The defined business benefit was realized"***) (emphasis added).)

The Chubb Enterprise Architecture Business Rules Strategy/Roadmap presentation also contained a case study for the Decision Point application. The case study defined the business benefits of that application:

- "Producer can obtain real-time quotes and a bind-able quote letter."

- "Enhances producers' productivity and client service."

- "Improved underwriters' responsiveness to producers."

- "Allows Underwriters to concentrate on business that requires true underwriting expertise."

- "It's devoted to new business: Profitable growth."



(*Id.* at P-0195-014.)

The case study confirmed that these defined business benefits for the Decision Point application were in fact achieved. (*Id.* (***"The defined business benefit was realized"***) (emphasis added).)

Mr. Mirolyuz confirmed that Chubb & Son's implementation of Blaze Advisor made decisioning more precise and consistent across the Chubb Specialty Insurance line of business. Mr. Mirolyuz testified that the use of business rules increased agility and reduced to time market. (Ex. 9 at 1020:23-1024:11.)

The business benefits of Blaze Advisor were so significant that Mr. Mirolyuz prepared presentations to the internal Chubb IT team highlighting those benefits. (Ex. 49; Ex. 9 at 1044:3-16.) A 2009 Introduction to Business Rules presentation, which was jointly prepared by FICO and Chubb & Son, identified the benefits of decision management:



(Ex. 50 at P-0193-012.)

Mr. Mirolyuz testified that the stated benefits of Blaze Advisor were realized in Defendants' applications using Blaze Advisor, including CSI Express, Profitability Indicator, and Decision Point. (Ex. 9 at 1031:6-1033:17.)

### g.   *The testimony of Mr. McCarter*

Defendants' technical expert, Mr. McCarter, testified on cross-examination that Chubb & Son licensed Blaze Advisor to automate decisioning. (Ex. 9 at 2117:23-2118:14, 2119:6-15.) He agreed that Chubb & Son was interested in licensing Blaze Advisor even though it was already using DuckCreek. (Ex. 9 at 2120:20-2121:6.) Mr.

McCarter testified on cross-examination that the use of technology "contributes to" the business of insurance companies. (*Id.* at 2125:9-18.) Mr. McCarter agreed that technology is a tool that determines the degree to which insurance companies are successful and contributes to the goals of the business, which include making money. (*Id.* at 2125:19-2126:7.) Mr. McCarter also acknowledged Defendants' documents demonstrating that the business benefits associated with the use of Blaze Advisor in the Decision Point, Profitability Indicator, and Automated Renewal Process applications were realized. (*Id.* at 2135:6-2137:8.) He testified that customer retention is important for insurance companies and that there is a business benefit to automatic renewals, specifically "[l]ess touch by humans." (*Id.* at 2144:6-10.)

### h.   *The testimony of Mr. Whitener*

FICO's insurance industry expert Mr. Whitener has over forty years of experience in the insurance industry, including experience with both front line and corporate underwriting. (*Id.* at 1362:21-1365:22.) He walked through the process of selling insurance. He then discussed the benefits that Defendants' own documents show were realized by use of Blaze Advisor and explained how Defendants' use of Blaze Advisor contributed to the generation of their gross written premium. (*Id.* at 1529:18-1532:2.)

#### i.   *Blaze Advisor was essential to Defendants' sale of insurance.*

Mr. Whitener explained that insurance is a decision business. (*See* Ex. 48 at P-0195-003.) Making smart, data-driven decisions is critical to the way property and casualty insurance companies do business today. FICO's penetration into the property

and casualty insurance industry market with Blaze Advisor is due, in part, to acceptance of data-driven analysis in decisioning. (*See* Ex. 9 at 1444:21-1448:17.)

Defendants themselves recognized the value of automated decision-making. They simply could not achieve its goal of penetrating the small to middle market despite its existing underwriters/personnel, reputation, marketing/advertising, sales force, relationships with agents and brokers, business rules, etc. Defendants' own documents, which formed the basis for Mr. Whitener's opinion, acknowledge that they realized the benefits of, *inter alia*, expert-level decision making, insurance value chain, increased retention on best accounts, identification of less profitable accounts, and more automatic renewals:

- The Chubb Enterprise Architecture Business Rules Strategy/Roadmap presentation—an internal Chubb presentation (*see* Ex. 48 at P-0195-002, bottom right corner) acknowledges that a business rules management system (BRMS) "Elevate[s] all decision making to the level of the organization['s] top expert" (*id.* at 5). Blaze Advisor contributed to revenue generation because through automated decisions in the sale of insurance the level of decision-making at its highest level, and each decision is consistently made at that high level of expertise. (Ex. 9 at 1405:3-18.)

- The Usage of Rules Technology in Insurance Value Chain BRCoE Foundation Framework whitepaper (Ex. 51; *see also* Ex. 47 at P-0194-007) identifies categories where automated decision-making can provide benefit in what Chubb refers to as the "Insurance Value Chain." Blaze Advisor specifically benefited Underwriting, Pricing/Rating, Product Configuration, and Predictive Analytics.

- The Creating & Managing a Business Rules Center of Excellence Presentation, given by Henry Mirolyuz, states that one of the objectives/benefits of the Automated Renewal I project using Blaze Advisor is to "Increase retention on best accounts and more readily identify potentially less profitable accounts." (Ex. 46 at P-0192-005.) Increasing retention on best accounts contributes to the generation of revenue by capturing written premium, and the identification of less profitable accounts contributes to a lower loss ratio. (Ex. 9 at 1401:19-25)

- Mr. Mirolyuz's Creating & Managing a Business Rules Center of Excellence Presentation also states: "The [more] policies that are automatically renewed the more time the underwriter has to develop and produce additional business or handle additional business." (Ex. 46 at P-0192-005.)

Defendants' own documents also confirm that they used Blaze Advisor to design, develop, execute, and maintain rules-based business applications and that they realized the benefits of increased precision, consistency, and agility of their high-volume operational decisions while reducing the time and cost to make those decisions by using Blaze Advisor. (*See* Ex. 46 at P-0192-006; Ex. 9 at 1480:5-1491:3.)

> ii.  *Defendants integrated Blaze Advisor into 18 applications.*

Mr. Whitener testified that Defendants used Blaze Advisor in eighteen (18) applications across their business, including policy administration systems, such as CSI Express[3]; compliance applications[4]; and utility applications, such as Commercial

---

[3] Policy Administration Systems include: (1) CSI eXpress; Automated Renewal Processing; Profitability Indicator; (4) Decision Point; (5) Evolution – Canada; (6) Evolution – Australia; (7)   EZER – Europe; (8) ADAPT UK; (9) ADAPT Europe; (10) ADAPT Australia; and (11) Cornerstone.

[4] Compliance applications include: (1) Premium Booking Modernization; (2) Texas Accident Prevention Systems (TAPS); and (3) Individual Rate Modification (IRMA).

Underwriting Workstation.[5] Defendants' integration of Blaze Advisor contributed to the generation of revenue from selling insurance. The CSI Express and Commercial Underwriting Workstation (CUW) applications are representative.

Defendants used Blaze Advisor in CSI Express to quote, bind, book, and issue new policies as well as renew existing insurance policies. (*See* Ex. 16; Ex. 28; Ex. 52; Ex. 53; Ex. 9 at 1399:14-18.) The quote, bind, book, and issue process is **the process by which insurance is sold**. (*See* Ex. 9 at 1389:21-1402:8 (describing process of selling insurance).)

CSI Express is Chubb Specialty Insurance's underwriting and policy administration system and is used for all new and renewal policies for Chubb Specialty Insurance. It supports all lines of business and handles all active products (113) for Chubb Specialty Insurance in the United States and Canada. (*See* Ex. 16; Ex. 28; Ex. 52; Ex. 53.) Because of the automation enabled by Blaze Advisor, Defendants can issue and renew policies with little or no human intervention. (Ex. 9 at 1505:3-8.)

Blaze Advisor was originally licensed for the CSI Express application and was the primary focus of the RFI in 2006. (*See* Ex. 5; Ex. 41.) The use of Blaze Advisor in CSI Express was necessary to support the expansion of Chubb Specialty Insurance to the small and middle markets. (*See* Ex. 41.) Within the CSI Express application, and

---

[5] Utility applications include: (1) Commercial Underwriting Workstation, Inventory Management (CUW-IM); (2) Broker Site – Canada; (3) Exari – Europe; and (4) CIS Claims.

continuing during the period of infringement, Blaze Advisor contributed to revenue in the following ways:

- Increased speed of response to a request for a quote and speed of making renewal offers, which increases the conversion rate and decreases the time to consider a competitor's quote (Ex. 9 at 1393:16-1394:5; *Id.* at 1481:10-15);

- Helps the underwriting process achieve a precise, adequate price, which increases the probability that the quote or renewal is competitive and will be accepted (*Id.* at 1482:7-1484:3);

- If human involvement is necessary, the issues for consideration are flagged, which makes the response time faster (*Id.* at 1504:19-1505:8);

- Makes it easier for agents and brokers to work with Chubb through better data capture and use of their-party data sources, which reduces the need to ask the applicant for more data, increases the accuracy of the data for underwriting, and making the price more competitive through better data (*Id.* at 1449:1-15, 1499:16-21, 1523:5-14); and

- Increases the time of underwriting staff to market to agents and brokers and to market new business (*Id.* at 1488:1-16).

Defendants also used Blaze Advisor in utility applications, such as Commercial Underwriting Workstation (CUW). (*See* Ex. 16; Ex. 28; Ex. 52; Ex. 53.) The CUW application is essential to the underwriting process: If the entire CUW application is down, field underwriting operations are shut down. (Ex. 9 at 1524:4-22.) CUW is used by over 6,000 users in the United States and Canada for Chubb Commercial Insurance, Chubb Specialty Insurance, Chubb Personal Insurance, Applied Benefits Life, and Marketing. (*See* Ex. 16; Ex. 28; Ex. 52; Ex. 53.)

Blaze Advisor is also used for the Inventory Management (IM) function of the CUW application (CUW-IM). (*See* Ex. 16; Ex. 28; Ex. 52; Ex. 53.) The IM function

provides workflow routing, assignments, and scoring, resulting in 1.22 million transactions per month. (*See* Ex. 16.) CUW-IM routes workflow to extend the workday by taking advantage of time zone differences (*i.e.*, extending workday by 3 hours East Coast to West Coast to quickly turn around an application review. (Ex. 9 at 1463:13-22.) If CUW-IM is inoperable, work orders cannot be created or viewed, which impacts the quoting and issuance of policies and creates delays in responding to agents and brokers. (*Id.* at 1524:4-22.)

   iii.  <u>Blaze Advisor provides seven key benefits to Defendants' business.</u>

  Based on Defendants' own documents, Mr. Whitener testified that Blaze Advisor provided seven key benefits that directly contributed to the Defendants' sale of insurance: speed of response, precision in pricing, consistency in underwriting decision making, agility in bringing new products to market faster and in responding faster to changing market conditions and regulations, scale to enable high-volume decisioning, improved compliance with company and regulatory requirements, and an improved experience for agents and brokers, enhancing the referral of insurance customers. These benefits, also discussed by numerous other witnesses, all improve the insurance selling process and generate revenue.

  **Speed:** Automated decisioning with Blaze Advisor enabled Defendants to execute a high volume of operational decisions. Mr. Whitener testified that speed in decisioning is valuable for to the process of selling insurance. (*Id.* at 1393:16-1394:5, 1480:9-1482:6.) Speed is important to respond to agents, bring new products to the market, and

modify existing products for regulatory review. (*Id.* at 1480:13-18.) Defendants' use of Blaze Advisor in applications achieved the attribute of speed, which contributed to the Defendants' generation of revenue. (*Id.* at 1481:10-15, 1498:2-3, 1498:10-1, 1505:24-1506:9 (Automated Renewal Process); *Id.* at 1481:16-23, 1498:25-1499:23, 1507:10-1509:3 (DecisionPoint); *Id.* at 1500:11-12 (Cornerstone); *Id.* at 1515:1-5, 1524:4-22 (CUW-Inventory Management).)

Mr. Whitener testified that Defendants successfully imported speed into their renewal quotations using Automated Renewal Process. (*Id.* at 1481:10-15; *see also* J-002.) The Blaze Advisor function of ARP-1 is renewal categorization (*i.e.*, whether straight-through processing applies) and the Blaze Advisor function of ARP-2 is policy renewal automations. (*Id.* at 1498:2-3, 1498:10-19; *see also* Ex. 16.) The Blaze Advisor functions are the primary functions of the application. Blaze Advisor also reduced the rule modification time from months to days. (Ex. 9 at 1505:24-1506:9; *see also* Ex. 42 at P-0192-005.)

Defendants successfully imported speed into their real-time, 24/7 quotes in Decision Point. (Ex. 9 at 1481:16-23, 1507:10-1509:3.) The Blaze Advisor function is rules tables and pricing to permit straight-through processing in real-time. (*Id.* at 1498:25-1499:23.) The Blaze Advisor functions are the primary functions of the application.

Defendants successfully imported speed into their processes by managing workflows. (*Id.* at 1500:11-12 (Cornerstone), 1524:4-22 (CUW-Inventory Management); *see also* Ex. 16.) Workflow management ensures that applications are routed to the

37

appropriate party (Ex. 9 at 1515:1-5). If applications cannot be routed, the work does not get done. (*Id.* at 1524:4-22.)

*Precision:* Blaze Advisor enabled Defendants to make operational decisions with increased precision because they are automated. Precision is a key aspect of selling insurance. (*Id.* at 1482:7-1484:3.) It ensures an accurate premium amount as defined by the actuarial analytics. (*Id.* at 1482:15-23.)

Defendants' use of Blaze Advisor in applications achieved the attribute of precision, which contributed to the Defendants' generation of revenue. (*Id.* at 1498:4-9 (CSI Express); *Id.* at 1499:24-1500:1 (Evolution Canada and Australia); *Id.* at 1500:2-4 (ADAPT Europe and Australia); *Id.* at 1506:18-22 (Profitability Indicator); *Id.* at 1512:12-22 (EZER); *Id.* at 1523:15-22; 1527:9-24 (CIS Claims).) Mr. Whitener testified that Defendants successfully imported precision into their policy administration systems through the underwriting guidance functions of Blaze Advisor (*Id.* at 1498:4-9 (CSI Express), 1499:24-1500:1 (Evolution Canada and Australia), 1500:2-4 (ADAPT Europe and Australia), 1512:12-22 (EZER)) and the predicative modeling using Blaze Advisor in Profitability Indicator (*Id.* at 1506:18-22). (*See also* Ex. 16.) Defendants also successfully imported precision into the CIS Claims application by using rules-based predicative modeling to ensure the right (*i.e.*, precise) price is obtained based on actuarial analysis of prior claims. (Ex. 9 at 1523:15-22; 1527:9-24.)

*Consistency:* Blaze Advisor allowed Defendants to make operational decisions with increased consistency because those decisions are automated. Mr. Whitener testified about the importance of consistency to selling insurance. (*Id.* at 1484:4-21.) Consistency

(*i.e.*, repeatability of decisions) is important because agents and brokers do not want to be surprised. (*Id.* at 1484:6-11.) Consistency is more readily achieved by computers than humans. (*Id.* at 1484:12-21.) Defendants' use of Blaze Advisor in applications achieved the attribute of consistency, which contributed to the Defendants' generation of revenue. (*Id.* at 1498:4-9 (CSI Express); *Id.* at 1499:24-1500:1 (Evolution Canada and Australia); *Id.* at 1500:2-4 (ADAPT Europe and Australia); *Id.* at 1512:12-22 (EZER).)

Mr. Whitener testified that Defendants successfully imported consistency into their policy administration systems through underwriting guidance functions of Blaze Advisor. (*Id.* at 1498:4-9 (CSI Express), 1499:24-1500:1 (Evolution Canada and Australia), 1500:2-4 (ADAPT Europe and Australia), 1512:12-22 (EZER); *see also* Ex. 16.)

*Agility:* Automated decisioning with Blaze Advisor enabled Defendants to rapidly respond to changing market conditions. Mr. Whitener testified about the importance of agility to selling insurance. (Ex. 9 at 1484:22-1486:16.) Agility is important to meet the business needs to respond to business opportunities. (*Id.* at 1485:3-7.) Defendants' use of Blaze Advisor in applications achieved the attribute of agility, which contributed to the Defendants' generation of revenue. (*Id.* at 1485:9-19; 1519:19-1520:15 (Premium Booking); *Id.* at 1505:24-1506:9 (Automated Renewal Process).)

Mr. Whitener discussed an example of agility whereby Chubb Custom Market was able to respond to a $25 million book of business that Chubb was looking to acquire from another insurance company by modifying their booking process (*i.e.*, Premium Booking). (*Id.* at 1485:9-19; 1519:19-1520:15.) Premium Booking's use of Blaze Advisor

accelerated the modifications that were needed to the booking process to meet the business needs and capture the business opportunity. (*Id.* at 1485:13-16.)

Blaze Advisor also achieved agility in the Automated Renewal Process application by reducing the rule modification time from months to days. (*Id.* at 1505:24-1506:9; *see also* Ex. 46 at P-0192-005.)

*Scale:* The efficiency of automated decisioning with Blaze Advisor increased revenue through scale. Mr. Whitener testified about the importance of scale to selling insurance. (Ex. 9 at 1486:17-1488:16.) Scale is important because it allows an insurance company to process more insurance applications with the same amount of human staffing. Underwriting talent at an insurance company is expensive to build and retain; automation handles the additional volume. (*Id.* at 1486:17-25.) Proper scaling also frees the time of the underwriter to pursue or evaluate new opportunities or projects. (*Id.* at 1487:20-1488:12.) Defendants' use of Blaze Advisor in applications achieved the attribute of scale, which contributed to the Defendants' generation of revenue. (*Id.* at 1481:10-15, 1498:2-3, 1498:10-19 (Automated Renewal Process); *Id.* at 1511:8-12 (Evolution-Canada).)

Mr. Whitener testified that Defendants successfully imported scale into their renewal quotations using Automated Renewal Process. (*Id.* at 1481:10-15; *see also* J-002.) The Blaze Advisor function of ARP-1 is renewal categorization (*i.e.*, whether straight-through processing applies) and the Blaze Advisor function of ARP-2 is policy renewal automations. (*Id.* at 1498:2-3, 1498:10-19; *see* Ex. 16.) The Blaze Advisor functions are the primary functions of the application. Defendants achieved a no touch

40

renewal rate of 82% with the Evolution Canada application. (Ex. 9 at 1511:8-12; *see also* Exs. 52-53.)

Blaze Advisor permits an increase in the volume of transactions with the same number of underwriting staff. (Ex. 41; Ex. 9 at 1528:11-1529:12.)

**Compliance:** Automated decisioning with Blaze Advisor permitted Defendants' compliance with regulatory requirements. Mr. Whitener testified about the importance of compliance to selling insurance. (Ex. 9 at 1488:17-1490:15.) Compliance is the stay-out-of-jail-rule. (*Id.* at 1488:18-1489:1.) Insurance cannot be sold without compliance with state and corporate requirements. (*Id.* at 1488:18-22, 1489:2-1490:15.) Defendants' use of Blaze Advisor in applications achieved the attribute of compliance, which contributed to the Defendants' generation of revenue. (*Id.* at 1489:6-9; 1489:15-1490:10, 1516:5-19 (IRMA); *Id.* at 1489:10-14; 1515:24-1516:4 (TAPS); *Id.* at 1516:20-1519:18 (Premium Booking).)

Mr. Whitener testified that Defendants used Blaze Advisor to automate decisioning into the Individual Rate Modification Application (IRMA) to ensure that the insurance quotes (*i.e.*, premium amounts) stayed between the floor and ceiling of allowable premium amounts (*i.e.*, guardrails) as defined by state regulatory commissions. (*Id.* at 1489:6-9; 1489:15-1490:10, 1516:5-19.) The Blaze Advisor function is the primary function of the application. (*See* Ex. 16.)

Defendants used Blaze Advisor in the Texas Accident Prevention Systems application (TAPS) for the same purpose: to meet a statutory requirement by the state of Texas for specific types of workers' compensation policies. (Ex. 9 at 1489:10-14;

1515:24-1516:4.) The Blaze Advisor function is the primary function of the application. (*See* Ex. 16.)

Defendants used Blaze Advisor in the Premium Booking application to comply with statutory reporting requirements by properly "booking" the premium into each code. (Ex. 9 at 1516:20-1519:18.) The Blaze Advisor function is the primary function of the application. (*See* Ex. 16.)

***Ease of Doing Business:*** The automated decisioning with Blaze Advisor created an improved experience for agents and brokers. Mr. Whitener testified about the importance of ease of doing business to selling insurance. (Ex. 9 at 1490:16-1491:3.) Ease of doing business is important because Chubb uses independent agents and brokers, who want fast, consistent answers. (*Id.* at 1490:23-1491:3.) Mr. Whitener confirmed that Defendants' use of Blaze Advisor in its applications greatly increased their ease of doing business, which contributed to the Defendants' generation of revenue. (*Id.* at 1504:19-1505:23 (Automated Renewal Process); *Id.* at 1511:8-12 (Evolution-Canada); *Id.* at 1507:10-1509:3 (DecisionPoint); *Id.* at 1522:17-1523:4 (Broker Site); *Id.* at 1523:5-14 (Exari).)

Mr. Whitener testified that Defendants successfully increased the ease of doing business into their renewal quotations using Automated Renewal Process by automating straight-through processing. (*Id.* at 1504:19-1505:23.) Similarly, they achieved 82% no touch renewal in the Evolution Canada application. (*Id.* at 1511:8-12; *see* Ex. 52-53.) Defendants successfully increased the ease of doing business through the Decision Point application allowing for real-time, 24/7 quotes and acceptances. (Ex. 9 at 1507:10-

1509:3.) Defendants successfully increased the ease of doing business through the Broker Site application by creating a client information access portal to allow the independent agents and brokers to find information on their policyholders. (*Id.* at 1522:17-1523:4.) Defendants successfully imported ease of doing business through the Exari application by creating a rules-based interview to capture data and generate documents. (*Id.* at 1523:5-14.)

In sum, Mr. Whitener's opinions demonstrate that the use of Blaze Advisor in Defendants' applications for selling insurance significantly contributed to the sale of insurance and Defendants' generation of revenue.

iv.    *Defendants' criticisms of Mr. Whitener's opinions are meritless.*

Defendants' criticisms seek to hold Mr. Whitener and FICO to a standard inconsistent with *Andreas* and this Court's summary judgment Order. Defendants complain that Mr. Whitener failed to measure the extent to which Blaze Advisor contributes to Defendants' revenue. (*See* Dkt. 1136 at 6-10.) But FICO is not required to offer an opinion or present evidence regarding quantification or apportionment, and Mr. Whitener's testimony is not deficient when the correct legal standard is applied. *See* 17 U.S.C. § 504(b); *Oracle Am., Inc. v. Google Inc.*, 2016 U.S. Dist. LEXIS 58819, at *23-24 (N.D. Cal. May 3, 2016) (Ex. 57). A quantification of the elements of profit not attributable to the infringement—apportionment—is exclusively Defendants' burden. *See* 17 U.S.C. § 504(b); *Andreas*, 336 F.3d at 796 ("The burden of proving apportionment (*i.e.*, the contribution to profits of elements other than the infringed property), is the

43

defendant's."); *Oracle*, 2016 U.S. Dist. LEXIS 58819, at *23-24 (Ex. 57). Mr. Whitener need not provide quantification.

Defendants also mischaracterize Mr. Whitener's credentials, the overall purpose of his testimony, and Mr. Hinderaker' s comments regarding the same. Indeed, they ask the Court to "completely discount Whitener's opinions because of his total lack of experience with Blaze Advisor or business rules management software." (Dkt. 1136 at 10 n.2.) Defendants miss the point. Mr. Whitener is a former underwriter and an expert in the insurance sales process with over 40 years' experience, just as Mr. Hinderaker said. He, more than anyone else presented at trial, understands the factors that contribute to the generation of revenue when selling insurance.

Defendants contend that Mr. Hinderaker told the court "in no uncertain terms" that Whitener would not "connect[] Blaze Advisor to the selling of insurance." (Dkt. 1136 at 7.) This takes Mr. Hinderaker's statement out of context. Mr. Hinderaker explained that Mr. Whitener is an expert in the process of selling insurance and the things that matter in that process to sell more insurance or less insurance and that he would testify about "why did something matter—why did what the defendants were doing with Blaze Advisor matter? It mattered because in the process of selling insurance, that effect – that attribute affects the outcome of the selling process." (Ex. 9 at 1374:5-1375:2, 1377:4-17; *see also*, *id.* at 1378:3-18.) And that is exactly what Mr. Whitener did. He explained, in detail, why Defendants' use of Blaze Advisor, and the benefits they admittedly realized, matter in the processing of selling insurance and the generation of revenue. Mr. Whitener is uniquely situated to explain and provide his opinion on the impact those benefits provided by

Blaze Advisor had on the generation of revenue. And his answers never wavered: the benefits offered by Blaze Advisor contributed to the Defendants' insurance sales process and the generation of revenue. (*Id.* at 1604:25-1605:18.)

Defendants further criticize Mr. Whitener's testimony that he did not know whether Blaze "actually contributed to any increase in revenue or profit at Chubb." (Dkt. 1136 at 7.) Defendants also identify a list of alleged "crucial admissions" from Mr. Whitener. (Dkt. No. 1136 at 8-9.) But in context, the testimony cited by Defendants makes clear that Mr. Whitener was merely testifying that he did not measure or quantify the extent of Blaze Advisor's contribution. (*E.g.*, *Id.* at 1565:8-12, 1599:14-17.)  Indeed, on redirect Mr. Whitener explained that

> there's a difference between what something does and how much something does something. So when you ask me does it make things faster? Yes. I've been at this for a couple of decades. Okay. Maybe more than a couple decades. And the pursuit of responding to requests for new business and improving that response timing and—has been a key strategy for 44 years. . . . So that's an important thing. And when I go to ease of doing business, I can say the same things. These are, these are value points that the property casualty insurance company pursues and pursues intentionally.

(*Id.* at 1600:4-1601:4.) Defendants' criticisms are again directed to a burden that FICO does not bear. When it came to the burden FICO does bear—whether Blaze Advisor contributed to Defendants' generation of revenue—Mr. Whitener testified it did and provided ample support for the same.

Defendants' own documents and Mr. Mirolyuz's testimony regarding the same, which Mr. Whitener relied upon, state that Defendants achieved the benefits of, among others, precision, consistency, agility, speed, and cost from use of Blaze

Advisor. (E.g., Ex. 50 at P-0193-012.) Mr. Whitener fully detailed how those factors contribute to the generation of revenue.

> **(3)     Defendants' documents admit that Blaze Advisor was the technology of choice.**

Defendants argue that because other business rules management systems exist, this somehow negates the contribution that Blaze Advisor had to Defendants' revenue. This is a non sequitur. Regardless of whether Defendants potentially could have used a different business rules management system or hard coding to implement their business rules, they chose Blaze Advisor to do so and it contributed to their generation of revenue. In fact, Defendants' documents demonstrate that Blaze Advisor was the "technology of choice for business rules," and Defendants ranked Blaze above other competing rules engines. (Exs. 54-55.) And, even after FICO sent its notice of termination, Defendants continued to use the Blaze Advisor software, rather than switching to an alternative option. What Defendants now say they could have done is irrelevant and does not speak to whether Blaze Advisor contributed to Defendants' generation of revenue.

### C.     FICO has met its burden of proof under Section 504(b)

FICO's burden to prove a contribution to revenue is not an onerous burden. FICO need only show some connection or relationship to revenue, a standard that is easily met by the evidence and testimony detailed *supra* Section III.

Contrary to Defendants' suggestion, FICO need not prove "but-for" causation. As the Court determined, "[FICO] initial burden to prove 'attribution' requires proof that the infringing use, at least in part, 'contributed to' the relevant gross revenues." (Dkt. 731 at

20-21 (citing *Andreas*, 336 F.3d at 796).) The evidence of record is more than enough to meet that standard.

Defendants' cited cases are inapposite. In each of these extra-circuit cases, the copyright owner made no attempt to connect the claimed revenue to the infringement (*i.e.*, the copyright owner proffered undifferentiated revenue). In *Complex Systems v. ABN Ambro Bank N.V.*, Complex Systems did not limit its claim to the revenue connected to the infringement. 2013 WL 5970065, at *12-13 (S.D.N.Y. Nov. 8, 2013) ("CSI seeks recovery from too large a swath of ABN activities . . . . CSI does not even limit its request to solely those transactions that occurred on BankTrade."). Instead, it sought disgorgement from down-stream revenues unrelated to the actual use of BankTrade. *Id.* at *17. The *Complex* court recognized that software copyright holders—including Complex on a different record—"could demonstrate a sufficient causal nexus, even when multiple factors are contributing to a company's profits." *Complex*, 2013 U.S. 2013 WL 5970065, at *14.

In *International Business Machines Corporation v. BGC Partners, Inc., v. BGC Partners, Inc*., IBM sought all of defendant's pre-tax income, independent of any relationship to the infringement. No. 10 CIV. 128 PAC, 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013). *IBM* is also inapposite for a second reason. IBM failed to show a relationship between the infringing use of the software and revenue because the Informix software was used to generate reports and invoices for "administratively processing trades **after their execution.**" 2013 WL 1775437, at *3 (emphasis added). Here, Blaze Advisor is used in the quote, bind, book, and issue process for the sale of insurance—**the**

**process that generates revenue**. Blaze Advisor automates the processes to sell insurance. Additionally, all the Compliance and Utility applications directly support the selling of insurance. None of the uses of Blaze Advisor by Defendants is unrelated to the generation of revenue.

Notably, Defendants cited these exact same cases when arguing for an improper heightened burden of proof during summary judgment. (*Compare* Dkt. 1136 at 12-14 *with* Dkt. 445 at 29-31.) The Court implicitly rejected the *IBM* and *Complex* decisions and properly applied the controlling *Andreas* standard. (Dkt. 731 at 7-8, 21.) Defendants' extra-circuit cases are irrelevant.

Judgement under Federal Rule of Civil Procedure 52 is inappropriate. Under Rule 52(c), after a party has been fully heard on an issue, the court may enter judgment against a party only if the court finds against a party on an issue. Fed. R. Civ. P. 52(c). *See Yu Lin v. Univ. of Neb.*, No. 4:05CV3153, 2006 WL 2927166, at *1-2 (D. Neb. Oct. 11, 2006) (denying Rule 52(c) motion); *Van Horn v. Specialized Support Servs.*, 269 F. Supp. 2d 1064, 1069 (S.D. Iowa 2003) (same). In view of the ample record evidence meeting FICO's burden of proof under Section 504(b), the Court should deny Defendants' request for judgment under Federal Rule of Civil Procedure 52.

There is also no basis to grant judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Under that Rule, judgment as a matter of law may only be granted where no reasonable jury could find for the non-moving party. Fed. R. Civ. P. 50(a)(1); *Hudson v. United Sys. Of Ark.*, 709 F.3d 700, 703 (8th Cir. 2013) (affirming denial of Rule 50(a) motion). The Court must construe all facts in the light most favorable to FICO

and grant all reasonable inferences in favor of FICO. *Id.* FICO's evidence more than meets its burden under Federal Rule of Civil Procedure 50(a). Defendants' motion should also be denied to the extent it is construed as a motion for judgment as a matter of law.

**IV.    Conclusion**

For all the foregoing reasons, Defendants' Motion for Judgment should be denied.

Dated: March 5, 2023

MERCHANT & GOULD P.C.

/s/ Heather Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Paige S. Stradley MN #393432
Michael A. Erbele, MN Bar # 393635
Joseph Dubis, MN Bar # 398344
Gabrielle L. Kiefer, MN Bar # 402364

MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
Tel: (612) 332-5300
Fax: (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
pstradley@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com
gkiefer@merchantgould.com

*Attorneys for Plaintiff Fair Isaac
Corporation*