**EXHIBIT 9**

67

1  you, the evidence will show that the final version of the
2  Blaze license agreement from December 2006 gave the client,
3  Federal, and all of affiliates, the right to use Blaze with
4  no limitations.
5      So how does the Chubb & Son division factor into
6  this? You heard about the Chubb & Son division. This is
7  Pamela Lopata. She is an attorney who has worked at Chubb
8  since before the ACE acquisition. And she will explain that
9  that Chubb & Son division was not a standalone company. It
10 did not have its own employees. It was simply the
11 contracting arm for Federal. It was a division within
12 Federal that signed contracts for Federal and issued
13 payments for Federal.
14     And Ms. Lopata will explain that before the ACE
15 acquisition, it was Federal's regular practice to have the
16 Chubb & Son division sign its contracts. And she'll explain
17 that Federal's vendors, they liked that practice, because
18 most of them knew and felt good about the Chubb name. No
19 one had ever heard of Federal.
20     And like I said earlier, the evidence will show
21 that pretty much everyone inside and outside the company,
22 including FICO, referred to this whole group of insurance
23 companies that you're seeing on the screen as the Chubb
24 group of insurance companies. That's the green ring on the
25 slide. That's why you are hearing me refer to Chubb.

68

1      So what happened after the ACE acquisition in
2  2016? The acquiring company was called ACE Limited. You
3  can see I replaced ACE on the outer ring of the slide. It's
4  replacing the Chubb Corp. But ACE Limited understood that
5  the name Chubb had a lot of name and brand recognition, so
6  it quickly changed its name to Chubb Limited. So you now
7  see Chubb Limited on the outer ring of the slide. And
8  Federal and ACE American, the two defendants in this case,
9  my two clients, were now both part of the Chubb Group of
10 Insurance Companies.
11     Now, as soon as this acquisition was announced,
12 FICO started talking about, what's this going to mean for
13 our business? And this is where I want to introduce you to
14 some of the key players at FICO.
15     You're going to hear a lot during this trial about
16 Russ Schreiber and Mike Sawyer. They were in FICO's sales
17 department, and they were the employees responsible for the
18 Chubb relationship. You won't get to meet them in person,
19 but you will see them on video testimony.
20     You will learn that Mr. Schreiber helped negotiate
21 the contract in 2006. And Mr. Sawyer is what's called a
22 client partner, which means he was Chubb's main point of
23 contact at FICO. And the evidence will show that Mr. Sawyer
24 and Mr. Schreiber started talking about the ACE acquisition
25 right after it was announced in July 2015, and you will see

69

1  that they were worried about the ACE acquisition because ACE
2  was buying Chubb and ACE was also a FICO customer, but ACE
3  was a much smaller FICO customer. So FICO was concerned
4  that if ACE were in charge, those millions of dollars in
5  maintenance fees that Chubb paid every year might be coming
6  to an end.
7      And so the evidence will show that Mr. Sawyer and
8  Mr. Schreiber started a process of trying to figure out, how
9  can we get more money before that transition happens? And
10 they recruited a lawyer to help them, Mr. Tom Carretta. You
11 will hear from him at trial. And the evidence will show
12 that Mr. Carretta is one of the top lawyers at FICO, but he
13 had nothing to do with negotiating the 2006 license
14 agreement. In fact, the evidence will show that he had
15 nothing to do with communicating with Chubb at all until
16 Mr. Sawyer and Mr. Schreiber gave him a call when they heard
17 about the ACE acquisition.
18     So now I want to talk about these two breach
19 arguments that FICO came up with. And the first is this
20 idea that Section 3.1 of the contract was breached. FICO
21 says that because the 2006 license agreement was signed by
22 the Chubb & Son Division of Federal Insurance Company, every
23 time Chubb Canada, Chubb Europe or Chubb Australia used
24 software that included Blaze, there was a breach of
25 contract. That's the theory. That is FICO's argument

70

1  today. But the evidence will show that when FICO sold
2  Federal the software license in 2006 and throughout that
3  whole decade that followed, FICO knew that it was granting
4  Federal and all of its global affiliates, including Canada,
5  Australia and Europe, the right to use the Blaze license.
6      You're going to hear from a former Chubb employee
7  who negotiated the 2006 license agreement, Mr. Phil Folz.
8  Mr. Folz is retired now, but he'll explain that he
9  negotiated that $1.3 million license fee knowing and
10 intending that it would allow all the global companies in
11 the Chubb Group to use Blaze.
12     As I told you earlier, during trial you're going
13 to get to see e-mails and communications at FICO from before
14 this litigation started, so you don't have to rely just on
15 what witnesses are telling you in the courtroom or on video
16 after the litigation began. When you pay chose attention,
17 as I know you will, you will see that in a lot of places,
18 what FICO is telling you now does not match what it was
19 saying back then. FICO is telling you now that Blaze could
20 not be used by Chubb Canada, Chubb Australia or Chubb
21 Europe, but you will see documents that tell you what FICO
22 was saying then. Back then, before this dispute, before
23 this litigation, FICO acknowledged that it sold Chubb a
24 global license that included all global affiliates in
25 Canada, Europe and Australia.

71

1    Here's another example of this then/now phenomena.
2  The evidence will show that FICO came up with that
3  $1.3 million license fee that Federal paid by looking at all
4  of Chubb Corporation's revenue, not just Chubb & Son's.  The
5  evidence will show that when the folks at FICO sat down in
6  2006 to figure out how much are we going to charge for
7  Blaze, they looked at the total revenue earned by the entire
8  Chubb Group of Insurance Companies worldwide, $12.3 billion
9  as the starting point for that license fee, all the global
10  entities in this navy blue frame on your screen.  And yet,
11  even though back then, FICO charged and Chubb paid
12  $1.3 million based on the revenue of all of its global
13  affiliates, FICO says, well, now those same global
14  affiliates' use of Blaze was a breach, and now we're
15  entitled to a second license fee.
16    Ladies and gentlemen, we are confident you will
17  reject this first breach claim as meritless.
18    Now, all the problems with FICO's claim that Chubb
19  Canada, Chubb Europe and Chubb Australia were not authorized
20  to use Blaze is why you also heard this other argument from
21  FICO about problems with consultants that use Blaze.  They
22  needed a backup argument.
23    FICO now says that Chubb shouldn't have shared
24  Blaze with two consultants who worked at Chubb Canada and
25  Chubb Australia.  On the screen is the IT director at Chubb

72

1  Australia, Russell Hodey, and he is coming to trial all the
2  way from Australia to address this.  He will explain how
3  Chubb Australia hired a consultant called DWS to help
4  develop an application called "Evolution" that was going to
5  be used in Australia.
6    Chubb Canada was also using the Evolution
7  application, so Chubb Australia and DWS asked Chubb Canada
8  for some help.  And in the course of that project, you'll
9  that an employee of AppCentrica, another consultant, gave
10  DWS a demonstration on how Blaze worked.  The evidence will
11  show that Chubb Australia did not use Blaze in its Evolution
12  application because all of this was unfolding in 2016 right
13  as this litigation was starting, and Chubb was committed to
14  not expanding its use of Blaze.
15    That's it.  That's all that happened.  It would be
16  the kind of thing that no one would ever think twice about,
17  but because it happened at the same time that Mr. Sawyer,
18  Mr. Schreiber and Mr. Carretta were claiming Chubb was in
19  breach, it got folded into this lawsuit, and now we all have
20  to address it.
21    So now we're on the second breach argument you've
22  heard from FICO.  They talked about this breach of Section
23  10.8, the assignment provision.  Now, in the world of
24  contracts, a person or a company who holds rights under the
25  contract can transfer them.  You can assign them to another

73

1  person.
2    So let's say that I go out and I rent an apartment
3  in Minneapolis for $1,000 a month, and that lease gives me
4  the right to live in the apartment as long as I pay the
5  landlord $1,000 a month.  But then my job transfers me to
6  Chicago in the middle of the lease.  So let's pretend that
7  my sister also lives in Minneapolis, and she happens to be
8  looking for an apartment with a $1,000-a-month budget.  I
9  might be able to assign, or transfer, the lease to my
10  sister, and it's like she's stepping into my shoes in the
11  contract, right?  Now she has to pay the $1,000 a month and
12  she gets to live in the apartment for whatever time is left
13  on the lease.
14    Because this concept of assignments is so common
15  in the world of business contracts, when FICO and Federal
16  sat down to negotiate their contract in 2006, they
17  negotiated assignment terms.  And the evidence will show
18  that the parties agreed that there would be two very
19  different approaches to assignments.
20    First, Federal and FICO agreed in the first
21  sentence of Section 10.8 that run-of-the-mill assignments, a
22  situation where Federal just decided I'm going to paper
23  transfer my rights to someone else, just like I might want a
24  paper transfer my rights to my sister for my apartment, not
25  allowed.  One of the executives at Chubb couldn't wake up

74

1  one morning and say, I'm done with Blaze; I'm going to
2  transfer the rights to my friend at MetLife.  Couldn't do
3  that.  Everyone agreed.  That's the first sentence of
4  Section 10.8.  And as FICO says, everyone agrees that type
5  of assignment didn't happen.
6    Now, FICO is hoping that you're going to see the
7  reference in the title of this section that says "No
8  assignment," and you're going to throw up your hands and
9  you're going to say, well, any and all assignments must have
10  been prohibited under this contract.  But Federal and ACE
11  know that you're here and you were picked for this jury
12  because you said that you could be impartial and you would
13  give the parties their fair day in court.  And that requires
14  hard work.  It requires thinking very critically about what
15  the parties intended when they entered this contract.  If
16  the no-assignment title on the contract was enough to
17  resolve this dispute, then we wouldn't need a trial where
18  you're asked to look at all available evidence to figure out
19  what the parties intended to agree to.
20    And the evidence will show that the second
21  sentence of Section 10.8 is very important.  I'm going to
22  read it in its entirety because it's so important.  It says,
23  "In the event of a change of control of client or if client
24  is merged with, acquired by, or inquires another entity or
25  undergoes a reorganization or otherwise acquires the right

75

1  to process the business of another entity, each such event
2  shall be deemed to be an assignment, subject to this
3  section, and client shall make no expanded use of the Fair
4  Isaac products as a result of such assignment -- of such
5  event unless and until Fair Isaac provides such written
6  consent, which will not be unreasonably withheld."
7         So I want to break that down a little bit and
8  start this process of the hard work.  There was some
9  reorganizing and some changes of control during all of these
10  merger events, but I want to focus right now on the
11  acquisition, that ACE acquisition, the main event, and
12  here's how I want you to think about it.
13         When you look at Section 10.8, you need to
14  substitute "Federal" for the first two times that "client"
15  appears, because the evidence will show that Federal was the
16  client who bought the Blaze license.  Then you can simplify
17  things.  You can forget about all these references to events
18  other than an acquisition, because we're focused on an
19  acquisition right now.  We're not worried about the merger
20  the reorganization, the right to process new business.  So
21  I've removed them.  I've simplified things with the green
22  dots.
23         And then you can fill in, well, what happened
24  here?  We know that Federal was acquired by ACE Limited.
25  And you heard, FICO agrees, that acquisition was a deemed

76

1  assignment.  And the evidence will show it's an automatic
2  assignment, not something you deem to paper.  Who was the
3  assignment to?  Well, it was to the acquiring company, ACE
4  Limited, which then became Chubb Limited because of the
5  brand recognition.  And once you do this, once you just
6  substitute in the words to reflect what was happening during
7  the acquisition event, what does the contract say?
8         Let's look at the first clause.  It says that "If
9  Federal is acquired by ACE Limited, the acquisition shall be
10  deemed an assignment subject to this section."  Easy enough.
11         So what is the rule?  What is it subject to?  It
12  says, "ACE Limited," which then became Chubb Limited, "shall
13  make no expanded use of the FICO products as a result of any
14  such acquisition unless and until FICO provides such written
15  consent which will not be unreasonably withheld."
16         So it requires some thought, no doubt about it.
17  But when you dig in and fill in what actually happened here,
18  it is clear what the parties intended.  The evidence will
19  show that the parties intended that if Federal were acquired
20  by another company, rights under the contract are assigned
21  to that new company.  They're deemed assigned.  In this
22  case, to ACE Limited and then Chubb Limited.  And Blaze use
23  can continue so long as there is no expanded use.  If use is
24  going to expand because you're growing your use of Blaze
25  through the acquisition, well, then you need to talk to FICO

77

1  and get some consent.
2         And you'll see that this makes perfect sense.  Why
3  should a merger or a reorganization or an acquisition
4  entitle FICO to say, you have to stop using Blaze if the use
5  of Blaze isn't expanding?  The evidence will show that the
6  parties agreed to a very specific expanded use rule.  And
7  the evidence will also show that FICO does not always agree
8  to an expanded use rule, but it did so here, and with this
9  lawsuit, with this Section 10.8 breach claim, it's going to
10  ask you to rewrite the contract.
11         But every word in this contract matters.  FICO is
12  going to be asking you to delete this expanded use rule
13  because the evidence will be that there was no expanded use
14  of Blaze after the ACE acquisition.  And FICO rushed to
15  terminate the contract in March 2016 anyway, and that's
16  really hard to justify.
17         This is a letter that Chubb sent FICO in
18  February 2016 right after ACE acquired Chubb.  Chubb
19  explained, "The applications that have been utilizing the
20  Blaze Advisor software since 2006 are currently running in
21  the exact same fashion as prior to the merger transaction."
22         The evidence will show that this assurance was
23  accurate.  The 13 applications that were using Blaze after
24  the acquisition were the applications that were using Blaze
25  before the acquisition.

78

1         You heard a reference to 15 applications during
2  FICO's presentation.  You'll see some of that during trial,
3  and it's because in these initial discussions, Chubb was
4  erring on the side of caution in trying to name how many
5  applications were using Blaze.  And so there's some
6  reference to 15, but the evidence will show it's only 13.
7         And you'll see that when FICO terminated the
8  license agreement in March 2016, less than two months after
9  this acquisition closed and despite a black-and-white
10  assurance of no expanded use from Chubb, there was no
11  evidence of expanded use.
12         Now, I'm sure FICO will have a theory during
13  trial, maybe many theories, on how use of Blaze just must
14  have expanded after the acquisition.  You already heard
15  today FICO talking about, well, some of the insurance
16  policies had new writing company names on them.  But the
17  evidence will show that these are just things that FICO came
18  up with during years of litigation once it had doubled down
19  and had no choice but to try to come up with some
20  justification for terminating the contract in 2016.  You
21  see, the evidence will show that FICO has known for years
22  that it would have trouble trying to show the use of Blaze
23  had expanded and that it a right to more fees just because
24  there had been an acquisition.
25         This is an e-mail exchange between Mr. Sawyer and

91

1   Q.  Well, let us start with the technical architecture.

2   What does that mean?

3   A.  Technical architecture is I work with a team of

4   individuals that design the future state of our products, or

5   software products.

6   Q.  And what does a solution architect mean?

7   A.  A solution architect is I work with our customers to

8   identify their problems and look for solutions using zero or

9   more FICO technologies.

10  Q.  Okay.  And can you describe -- on the solution

11  architecture side, can you describe a little bit more on

12  that so we understand what it means to meet with a client,

13  look at a problem, find a solution?

14  A.  Absolutely.  As you can imagine, customers all over the

15  planet have varying degrees of problems that they're trying

16  to solve, and they typically look for technology solutions

17  to help them.  So my role in that part of the organization

18  is to work with our customers, listen to what their problems

19  they're trying to solve, and help articulate a way to solve

20  those problems using technology that FICO would provide.

21  Q.  What type of problems is it that a client has that wants

22  to look at FICO technology?

23  A.  So typically they have efficiencies and business

24  problems they're trying to solve, where they would have

25  various connecting types of systems and they're looking for

92

1   ways to centralize those and bring business expertise out of

2   the -- out of their business users' heads and then put them

3   into technology and use them within their existing

4   infrastructures.

5   Q.  I wish I had caught all of those words.

6       You mentioned using technology to bring together

7   all of their existing structures?

8   A.  Correct.

9   Q.  Could you describe for us what that means in more common

10  language?

11  A.  Yes, of course.  I will attempt.

12      So most organizations of any type will have years

13  of computer systems that are already in place that do very

14  specific things.  And typically what they're trying to do is

15  bring those existing systems together to solve new types of

16  problems while not discarding those existing systems, right,

17  because they've been there for a while and they're useful.

18  Q.  When you say "new types of problems," are you

19  referencing business problems?

20  A.  Absolutely, yes.

21  Q.  Let's be a little more specific and turn the

22  conversation to when customers are looking at Blaze Advisor

23  as a means to solve business problems.  What's your

24  background with that?

25  A.  Correct.  So within Blaze Advisor space, I've been

93

1   working with Blaze Advisor now for 20 years for FICO.  Blaze

2   Advisor is a business rule management system upon which

3   allows our customers to bring into technology their existing

4   know-how and knowledge across the organization and automate

5   that.

6       Typically, they're trying to look at solving

7   problems around first documenting and understanding what

8   those policy and rules are.  The second is to be able to

9   automate those rules in the form of decisions, and then

10  typically there is some efficiencies around that of how they

11  bring things together for other purposes.

12  Q.  Okay.  The first part of your answer was bring their

13  know-how into technology?

14  A.  Correct.

15  Q.  Can you tell us what that means?

16  A.  Absolutely.  So all businesses are typically there to

17  support financial gains for companies.  And in those

18  financial gains for companies, there are usually hundreds or

19  thousands of individuals across the organization that know

20  how to do the things day to day that requires that.

21      One of the challenges that you have is when people

22  manage that, it's typically inconsistent.  You don't

23  necessarily know what decision you made and how that was

24  affected.  And the problems that they are trying to solve

25  is, first, identify what all of those rules are across the

94

1   organization so they can see them, and then, second, is to

2   empower them to change and modify those in a more consistent

3   way.

4   Q.  Is Blaze Advisor a solution to those problems?

5   A.  Absolutely.

6   Q.  So how?

7   A.  So being a business rule management system, it provides

8   a framework of which they can articulate or write down those

9   concepts that are in their heads, policy manuals, curistics

10  that they are doing, you know, human-based logic on, and

11  codify them in some form.

12      Now, the business rule management system provides

13  various functionality to make that easier.  For example,

14  metaphors is essentially a picture where you can represent

15  certain complex statements in a graphic.  And it also puts

16  the structure in place that allows them to change and modify

17  and create whole new rules or policies without the

18  interaction of IT, and that's the information technology

19  team.  That's a core group of programmers that would

20  typically do things.

21  Q.  Okay.  And you've used the title or name "business rules

22  management system."  I take it that's an industry title for

23  this kind of software?

24  A.  That is correct.  That is an industry standard term for

25  that type of software.

95

1    Q.  So as business rules and management -- and Blaze Advisor
2    is a business rules management system?
3    A.  That's correct.
4    Q.  And you mentioned, I think, if I heard you, two major
5    elements of a business rules management system or two major
6    elements of Blaze Advisor was, one, managing, and the other
7    automating?
8    A.  Correct.
9    Q.  Could we just talk about one at a time?
10   A.  Absolutely.  That would be the easiest way.
11   Q.  So if you would tell us how Blaze Advisor is used to
12   manage the decisions or decision-making process of a
13   company.
14   A.  Yes, absolutely.  So if you look at how it helps to
15   manage the decisioning process, right?  So we talk in terms
16   of rules and decisions, right?  And if you look at what a
17   rule is, a rule is essentially an "if" statement, right?  If
18   X, then Y.  And those are typically difficult to understand
19   as things get more and more complicated.
20           Now, notice I haven't actually made a decision
21   yet.  The decision that I make is at the point of
22   interaction with some sort of request, I need to make a
23   decision.  So what is the output of multiple rules?  That
24   would be the decision that I'd make.
25           The business rule management system provides a

96

1    framework of which nontechnical users can write and express
2    their logic in a standard format that can be readable and
3    usable and, thus, managed because there's a life cycle
4    associated with that".  Who did what?  Am I allowed to do
5    that?
6            Once I've made those changes, is that the change
7    that I expected it to do, right?  I can test that change.
8    Did I break something?  All of this is what's classified
9    rolled into the business rule management system.
10           And that's very separate from the business rule
11   engine side of it, which is the actual codification of that
12   logic.  That codification is essentially, you know, the
13   English language to programming languages, right, that sort
14   of transformation to how that happens, and that's the actual
15   running of those rules.  And, obviously, there's a lot of
16   technology that goes behind that as well.
17   Q.  Does Blaze Advisor technology itself accomplish that
18   transformation between the rules that are being managed and
19   the engine that executes those rules to make a decision?
20   A.  Yes, it does.
21   Q.  How does it do that?
22   A.  Through the relationships and how you store and manage
23   those rules, it actually interprets those rules and comes up
24   with the -- what we have to say, the path of least
25   resistance, to run those rules.

97

1            So one of the things that's interesting is humans
2    thing in a very interesting, you know, nonlinear fashion
3    most of the time, and the way they articulate their rules is
4    typically unorganized.  So by being able to put an
5    organization to it, to allow them to think in their own
6    terms, the engine actually translates that into a set of
7    statements that can be run by other computer programs.
8    Q.  And by the translation, is that a translation into the
9    software code that the computer can read and execute?
10   A.  Yes.
11   Q.  Before we go any further with this discussion, tell
12   us -- before we get to your specific experience with Chubb,
13   tell us what is your experience in the insurance industry
14   relative to Blaze Advisor and working with clients for
15   solutions?
16   A.  Yes.  So as stated earlier, I've been at FICO now for
17   20 years.  I've worked in various capacities at FICO around
18   implementing problems, that is in a delivery aspect where I
19   actually work with the customers to build those solutions,
20   as well as a sales capacity from a technical sales
21   perspective.  And that technical sales perspective is how
22   does the tool work?  How does this happen, et cetera.
23           Now, through those various years I've been exposed
24   to several large insurance companies across the planet and
25   helped them understand how Blaze Advisor could help solve

98

1    their particular problems that they're looking for.  And
2    each customer has various degrees of problems and different
3    problems they're trying to solve, and it's really a matter
4    of understanding what problem they're trying to solve which
5    requires an understanding cursory level of the industry and
6    how all that fits together, as well as what their existing
7    systems do, how they tie together, and how Blaze Advisor
8    would fit into that environment.  Or not.  Sometimes it
9    doesn't.
10   Q.  And can you tell us some of the insurance company names
11   that you've worked with?
12   A.  Sure.  So Allied would be one.  Mercury would be
13   another.  RGA, USAA, Norwich Union out of the United
14   Kingdom, are some of the ones that come to mind.
15   Q.  And we kind of got started right off with the -- right
16   into the meat of it, but let me back off a second and if you
17   would tell the jury what your educational background is
18   before you got to FICO with your history.
19   A.  Sure.  My educational background is I possess a bachelor
20   of science in management information system acquired through
21   Junior Commonwealth University.
22           THE COURT:  Mr. Hinderaker, let me interrupt for a
23   second.  Are you at a natural breaking point or close to
24   one?
25           MR. HINDERAKER:  Sure.  I can, Your Honor.

111

1    (Recess taken at 1:20 p.m.)
2    THE COURT:  Here's what I'm going to do for now:
3  I'm going to -- there's a couple of other things I want to
4  look at before I tell you conclusively what my ruling will
5  be.  So I'll let you know over the break in the afternoon,
6  and at that time, frankly, if Mr. Hinderaker, you're able to
7  say, you know what, we're not going to get to it today, more
8  time is better.
9    I will give you my -- a few preliminary thoughts.
10  If they come in, one thing I'm going to order is that the
11  quotations from clients be redacted out of the documents.  I
12  don't think those are -- we don't have the foundation to
13  establish the statement out of court by the client that it's
14  a summary somehow of the business records, and it's pretty
15  straight-up hearsay.
16    If they come in or if some of them come in, then
17  they'd be redacted of those remarks, but the conclusions and
18  analysis of the consultant or the white paper may come in.
19  But I'm still going to look at that a little bit further.
20    On the documents that were produced by way of
21  supplementation six weeks ago, I'm inclined to exclude those
22  for a number of reasons.  One, it's not the same kind of a
23  thing where you have an ongoing infringement and you have to
24  update and supplement all the way up to trial.  These
25  documents were produced -- or written, copyrighted at least,

112

1  in 2021.  It's 2023 that they were produced, or late 2022,
2  so not as timely as it could have been.  And there's the
3  other issue of having been created post-discovery, I,
4  frankly, have some concern that they could be created for
5  the wrong reasons.
6    So those three I'm inclined to exclude.  I'm going
7  to look carefully again at the consulting reports and the
8  white paper, and I'll give you, you know, a conclusive
9  ruling by the break or before we begin after the fact, okay?
10  All right.
11    MR. HINDERAKER:  Your Honor, there is a witness
12  between Mr. Baseman and Mr. Baer.
13    THE COURT:  Okay.
14    MR. HINDERAKER:  So just in terms of the timing
15  considerations.
16    THE COURT:  Well, that's helpful.  Honestly,
17  I'll -- this is a big issue.  It's an important issue.  I
18  want to get it right.  It's one that if we have the luxury
19  of time, and I can read more carefully and look more
20  carefully at the documents and the cases, I would prefer
21  that.
22    All right.  Anything else before we bring in the
23  jury?
24    All right.  Why don't you go ahead and get them.
25        **IN OPEN COURT**

113

1    THE COURT:  All right.  Mr. Hinderaker and
2  Mr. Baseman, come on back up.
3    And remember, Mr. Baseman, you're still under
4  oath, okay?
5    THE WITNESS:  Yes, sir.
6    THE COURT:  All right.
7  BY MR. HINDERAKER:
8  **Q.**  Okay.  Settled?  All right.  Welcome back.
9  **A.**  Thank you.
10  **Q.**  I'd like to kind of did as we said, kind of just jumped
11  in.  I'd like to back up a little bit.
12  **A.**  Of course.
13  **Q.**  You told us that you were at FICO for the last 20 years.
14  I'd like the jury to understand what your experience was,
15  your professional experience was before FICO, if you could
16  give us that overview.
17  **A.**  Yes, thank you.  So prior to FICO, I was one of these
18  children that were gifted a computer when they were quite
19  young, and I started building gaming systems and
20  communication systems as a hobby and were selling these
21  things to other companies as a kid.  And that morphed
22  into -- at the time it was pre-sort of super Internet, but
23  building websites and things like that.
24    After that, it progressed into doing work for the
25  Department of Defense in essentially designing systems for

114

1  nuclear submarines and how they operated and take care of
2  the people in the field.
3    From that, it morphed into an integration
4  consulting job, where I would work with customers on how to
5  integrate complex systems in the computers, which then I
6  started working with FICO through -- through an acquisition
7  that FICO acquired one of the companies that I was working
8  for, which my world changed dramatically.
9  **Q.**  What does it mean to integrate complex systems?  I guess
10  I understand complex systems, but integrate into what?
11  **A.**  Great, great, great question.  So, you know, typical
12  computer systems are made up of hundreds, if not thousands,
13  of various other computer systems that do very specific
14  jobs.  And a lot of times we would help customers figure out
15  how to bring data from one system in one format and present
16  it in another system in another format.  And a lot of times
17  we would build applications from scratch on how to use that
18  data for particular things.  Most of the work that I did in
19  that time was around marketing and how to target specific
20  individuals around activities.
21  **Q.**  Was this your time at Braun Consulting?
22  **A.**  Braun Consulting prior to that.  And another company I
23  worked prior to that was a company called netNumina and
24  there we were working with a lot of pharmaceutical company
25  website launches, essentially what we were doing.

115

1  Q.  Thank you.  And then from Braun Consulting, your next
2  stop was FICO?
3  A.  From Braun Consulting, yes.  So Braun consulting was
4  acquired by FICO and that's when I was interjected into the
5  FICO system, yes.
6  Q.  And that launch -- we started to talk about your
7  experience in the insurance industry.  And before we get to
8  your experience with Chubb, I'd like to go back to that for
9  a moment.
10          Can you -- so that we can understand that
11  experience, can you give us an example of a solution that an
12  insurance company wanted to solve, a problem --
13  A.  Yes, I can.
14  Q.  -- a problem that the insurance company wanted to solve
15  in which you used Blaze Advisor as a solution?
16  A.  Absolutely.  So as I stated before, right, a lot of the
17  job that I did -- well, the multiple jobs that I did within
18  FICO were first in an implementation perspective, which is
19  how do you actually develop the Blaze Advisor projects with
20  the customers.  But that morphed quite significantly as I
21  gained more and more experience with the product and the
22  company in the multiple industries that I worked with.
23          Now, you know, understand that in my role I
24  crossed multiple industries.  It all had very similar
25  problems.  Insurance in particular, a lot of the problems

116

1  that the customers -- insurance companies, large insurance
2  companies or reassurance companies, which are essentially
3  companies that resell insurance products, is their number
4  one primary objective that they typically would do is to
5  provide more policies for individuals, right?  To be able to
6  provide insurance for a larger set of the population.
7  Q.  And so that was a business challenge, a business problem
8  that you had experience with?
9  A.  That is correct.
10  Q.  Did you use Blaze Advisor to solve that for the
11  client or for the company?
12  A.  Yes, we did.
13  Q.  And tell us about that then, please.
14  A.  Yes.  So in these -- in these problem statements of how
15  do I provide more insurance products for a larger group of
16  customers, which most of the time are like you and me, they
17  have to do various different steps along the way, right?
18  They first have to evaluate who their customer is, right?
19  And there's a lot of criteria that goes into understanding
20  you as an individual, right?  How old you are?  Where do you
21  live?  Sort of those type of criterias, and in various
22  countries and regions, there's various degrees of criteria
23  that go into it.  But in the United States, it's very
24  specific about what they do.
25          But in order to do that, they also have to take

117

1  what sits in a lot of these large corporations, hundreds, if
2  not thousands of business users, right?  And what we
3  classify as business users are the non-technical experts
4  that understand the mechanics and the logic that goes behind
5  what it would mean to approve insurance to somebody and what
6  product fits their needs with respect to the risk implied
7  for the insurance company associated with those products,
8  right?  So you kind of have to do a mix of who are you?
9  What do you need?  What do you look at?  What do we have?
10  Based on these mix of criterias, what's the best offer for
11  you?  What is the best that will actually serve your needs?
12          And in order to do that, this knowledge typically
13  sits in people's heads, right?  This knowledge sits in
14  people's heads.  It sits in policy books.  Common, you know,
15  experience, we can say.
16          But to expand that out, typically what you have to
17  do is first identify what all of that logic is, right?  And
18  you have to identify what all of that logic is for various
19  different reasons, right?
20          First is, is it ethical and legal of what our
21  actual decision criteria is on this person?  So in order to
22  appreciate that, you have to actually document what that
23  logic is.  Well, that's one step.  So once you document what
24  that logic is and you actually configure what that logic is,
25  you have the next problem.

118

1          Well, now if I'm going to expand to a water -- a
2  wider group of an audience, I have to take more data from
3  various different places and I have to bring that data in
4  and evaluate that data, right?  Because it's all computer
5  systems behind the scenes.  So you have to take that data,
6  bring that data in a usable format and evaluate it in a
7  consistent fashion, the outcome of what that actual decision
8  is, and there's various steps in what that would look like.
9  And Blaze Advisor would sit in that environment as -- we
10  like to sort of refer to it as the brain, if you will, and
11  the brain is, well, I know all of the stuff that's going on,
12  but I have to put some rigor into the actual process because
13  I'm making certain decisions in parallel, I'm going out and
14  getting additional information, and I need to bring all of
15  that into a consistent way and then make the right
16  consistent decision for multiple parameters, right?
17          Because one policy says, I can give insurance to
18  everybody.  Well, unfortunately, that's not necessarily
19  profitable all the time, right, so you have to be able to
20  wait certain outcomes and risk appetite across the
21  organization.
22          So Blaze Advisor first starts with documenting in
23  a central place what all of that logic is.  There's a lot of
24  tools that we do in the management of that information,
25  which I think we'll get to later, so I don't want to jump

119

1 too far in the mechanics of that, but the other thing that
2 it does is it actually provides the engine.  So think of it
3 as the actual container of the software code that runs based
4 off of this human logic, because humans think in English,
5 for the most part.  At least here in the United States, they
6 can think in pictures.  They don't necessarily think in
7 programming language, so you have to kind of convert it to
8 that.  And Blaze Advisor then takes this data, choreographs
9 all of this different data in the context of which decision
10 I'm making and makes a repeatable decision automated.
11 Q.  And when you were working with that customer, client,
12 did the client experience the solution to the problem it was
13 trying to achieve?
14 A.  Absolutely, yes.  So there's multiple depths to the
15 problem that they're trying to achieve, right?  So on one
16 hand, there's the, I would like to ensure -- I would like to
17 ensure more people, right, which is grow business,
18 essentially, right?  They're all here for profit at the end
19 of the day.  Well, there's multiple dimensions to the
20 profit.  So not only do I need customers, but I also need to
21 make sure that that relationship is profitable within those
22 customers.  So Blaze Advisor puts those constructs of what
23 the rules and the logic are to make those repeated decisions
24 transparent to the process.
25 Q.  What's the value -- well, let me back up.  I want to

120

1 come back to the transparency.  But before doing that, what
2 are the components within Blaze Advisor that are
3 accomplishing what you just described regarding taking the
4 information of whatever number of business users, however
5 they're in heads or policy books or however spread, what's
6 the component or tool in Blaze Advisor that centralizes that
7 information?
8 A.  So Blaze Advisor itself is a complicated set of software
9 components, right?  You think of it as not a single entity
10 that does all things in a box, if you will.  There starts
11 with at the core of the architecture or how the software
12 make-up of Blaze Advisor is something called a repository,
13 right?  And essentially this repository is a structured way
14 upon which all of these rules, logic, business processes,
15 rule processes are stored.
16       From that repository, there are multiple ways upon
17 which both business users and technical users interface with
18 this logic.  The first piece is through what is
19 affectionately known as an integrated development
20 environment, so think of it as your programmer interface,
21 right?  Your programmer interface into Blaze Advisor is
22 where technologists do things like define data types, define
23 the framework upon which the data -- because you can't just
24 have random data pass into this.  It has to be in a
25 well-formed structure.  It has to match what you're

121

1 expecting it to be.  In that there's some conversion from
2 technical terms to business terms, right?
3       So, for example, business users think of age,
4 right?  Age is a pretty easy one to understand, but the data
5 elements that are associated with determining age can be
6 quite complex sometimes, especially as you go
7 internationally.
8       In that technical interface, you develop through
9 the generation from within the projects a, what we refer to
10 as a rule maintenance application, and the rule maintenance
11 application is a web-based front end that allows
12 non-technical users to interface with their logic.  So
13 they're actually writing rules in English for the most part.
14 They're using pictures.  Think most of us have probably seen
15 something like Excel, a table-type view, and there's other
16 graphical representations, which I'm sure you'll hear about
17 in other conversations.  And that's delivered to the
18 business user.  So the business user can now have a view
19 into the rules within guardrails of what the technical
20 infrastructure is in place to support that decision
21 attention.  And they actually define their decisions.
22       So I want to make X, Y, Z decision based upon this
23 particular element, and they have very usable interface to
24 do things, right?  And that's write rules, manage rules,
25 check things out, change them, make sure that I am approved

122

1 to do that.  So we put life cycle in that component.
2 There's also tools around verifying those rules to make sure
3 that I wrote rules that didn't break the system, right?
4 Because humans don't necessarily think all the mitigating
5 factors that go into various data, what happens if data
6 doesn't exist?  What happens with all of this?  So you put
7 the rails in place to make sure that, and Blaze Advisor
8 automates all of that, so in this particular case, insurance
9 agents, don't have to think about the underlying technology
10 that happens.  And that's presented in a web format that
11 they can log in, verify, test, and there is some visual
12 tools that allow them --
13       THE COURT:  Excuse me.  Mr. Baseman, just you have
14 a tendency sometimes once you get going to speak a little
15 bit too quickly.  The court reporter has got to take it
16 down, so just slow down a little bit, okay?
17       THE WITNESS:  All right.  I will try.
18       THE COURT:  Thank you.
19       THE WITNESS:  I do tend to speak fast sometimes,
20 especially when I'm nervous.  So, as you can imagine, this
21 is not pleasant.
22       So the other component that's related here is what
23 we refer to as the deployment component or the execution
24 component, right?  And Blaze Advisor takes all of this
25 logic, wraps it up in a software bundle and then delivers it

131

1  that is thus evaluated the rules and uses existing data to
2  augment that data process.  And that's what the enterprise
3  data on the right is, well, we also require data.  Insurance
4  companies have a lot of data on you.  They have a lot of
5  data on everyone.  They have a lot of data if you're a past
6  customer, a current customer, and other metrics that go into
7  that.
8       So Blaze Advisor will take all of the data, all of
9  the rules, work its magic, for lack of a better term, and
10 then present that back and what the decision is.
11 Q.  Without human intervention?
12 A.  Sorry?
13 Q.  Without human intervention?
14 A.  Without human intervention, that's correct.
15 Q.  And what's the speed of that process?
16 A.  This process?
17 Q.  Yes, what you just described.
18 A.  Sub-milliseconds, typically.  So, typically, this
19 architecture is to describe what I mean by sub-milliseconds.
20 It's very easy to think of it in a singularity of an event,
21 like me as a consumer, right.  I go to a web form.  I fill
22 out some data.  I hit a button.  Right.  We get that aspect.
23 You know, today we expect that come back in a less than a
24 second.  Right.
25      But if you think about a very complex -- complex

132

1  system or a complex set of systems, such as an insurance
2  company, they're getting thousands if not millions of these
3  over a rapid period of time.  So when I say, it's done in
4  sub-milliseconds time, which is less than a second, what I
5  say is this architecture allows thousands and millions of
6  records to be processed in less than a second, so you get a
7  scaling advantage.  Where humans would take a week to do
8  one, now you can do thousands of them in a second.
9  Q.  Have you had experience in applying the scaling
10 advantage from Blaze Advisor, that is the ability to handle
11 the greater volume in the insurance industry context?
12 A.  Yes.
13 Q.  And what has that been?
14 A.  For example, in order to -- so let's take a very valid
15 insurance example, right?  So today we talk about an
16 individual applying for a policy, and a business will have a
17 goal of I would like to sell more policies, right?  It's a
18 rather simple metric.  But behind insurance, there's
19 resellers and partners and groups that are associated with
20 all of this.  And usually one of the litmus tests is in
21 order to resell these policies and expand to a broader group
22 of audience, they want to go to full population sets, right?
23 They want to go from a few hundred people, a few hundred
24 policies, to being resold across multiple different
25 organizations that will go to tens of thousands, if not

133

1  millions of evaluations.
2  Q.  As part of the agility discussion and the rules
3  repository, is it fair to describe that as externalizing the
4  rules?
5  A.  You could certainly describe that as externalizing the
6  rules.  And where I would characterize that is externalizing
7  the rules is today it sits, prior to Blaze Advisor, it sits
8  in manuals and books and people's heads, right?  So --
9  Q.  Good.  We've gone through that.  And then is there a
10 distinction between the rules and the rules repository of
11 Blaze Advisor -- maybe this is what I'm asking -- a
12 distinction between the rules in Blaze Advisor and writing
13 those rules in the software applications themselves,
14 so-called hard --
15 A.  Oh, yes, yes, yes.  Okay.  So a lot of question comes
16 up, well, that's great.  So it's a decision process.  I have
17 existing systems today.  Can I do the same thing in my
18 existing applications today by just coding them directly in
19 the application today?
20      Well, the answer is, to some degree, yes, right?
21 But in reality, what that is is today those systems are --
22 there's hundreds of them, especially in an insurance
23 company.  Some of them are 60 if not 70 year old technology,
24 if you think of the old mainframes and cobalt applications
25 sitting out there.

134

1       In order to do that, you would have to write that
2  logic in multiple places and spend months, if not years, of
3  doing integration into actually making it work within that,
4  and then you would never get the flexibility because of the
5  second you go write code directly into these systems, if you
6  ever change that, you have to go back through the whole
7  process again.  And when we talk about the whole process
8  again is software development is complex, right?  We don't
9  just write code and send it out, especially an insurance
10 company or a bank, right?
11      So they will write the code.  They will test it.
12 They will validate it.  They will move it to multiple
13 environments.  They'll check it.  They'll performance test
14 it.  They'll do all this.  So the impact is by centralizing
15 that, you externalize all of the rules and logic in a
16 central place, thus decoupling the actual implementation
17 from the business logic because business logic changes all
18 the time.  Think of interest rates, right?  Interest rates
19 is a very important thing.  They fluctuate daily.  You can't
20 go through this whole process daily to change these types of
21 parameters.
22 Q.  Does Blaze Advisor enable a customer to do that?
23 A.  Yes, they do, in their own terms.
24 Q.  In their own terms?
25 A.  Yes.

135

1  Q.  And is that through the rules repository?
2  A.  That is through the rules repository and then the
3  management system that sits on top of that that allows them
4  to organize and categorize those rules as it's relevant to
5  them.
6  Q.  Is it in the management system then that the rules are
7  also tested to see if they achieve the business outcomes
8  that are desired?
9  A.  Yes.  So through the business rule management side of
10  the equation is just writing a rule is -- that's -- you know
11  it's quite pedestrian in itself, right?  It's the rules are
12  complex and humans when they write rules, most of the time
13  write bad rules.  They think they're really good, but they
14  might not actually be good.  So the management system,
15  through the whole architecture, allows them to test the
16  rule -- to first make sure that it works.
17  Q.  We're talking about Blaze Advisor?
18  A.  Yes, Blaze Advisor itself allows our business users to
19  test their rules.  Does it work?  Did it break?  Did I get
20  errors?  Right.  Okay, it worked.  Well, now I want to
21  validate my outcome.  Just because I've created a rule, I
22  want to be able to take sample data and run it through, did
23  I get the result that I expected?  So I think I automated
24  it.  But if my automated is I want to bring on more
25  policies, I write rules, and the actual fact is in my rules,

136

1  I get less policies?  Well, something is wrong.  How do I go
2  and change that without going through the whole process
3  again.
4  Q.  The whole process being the hard coding?
5  A.  The hard coding and rewriting everything, et cetera,
6  yes.
7  Q.  Can the business user, can a customer, can the client
8  validate the outcome before it's put into the --
9  A.  So that is crucial to the process, right?  So you're not
10  validating in a production sense.  You're validating before
11  it even goes there.  So you can make sure that your rules
12  are valid before go into existing systems, and Blaze Advisor
13  offers visual representations on how this looks and pretty
14  pictures and charts and graphs that sort of you can look at
15  and validate what those look like.
16  Q.  So when you're giving the example of a rule that results
17  in worst performance, that was not in a deployment context?
18  A.  Correct.  That's before you get to that point.
19  Q.  That's in the validation process that Blaze Advisor
20  provides?
21  A.  Yes.
22  Q.  Let me change the topic a little bit and now have the
23  management side of -- the manager side of the Blaze Advisor
24  functionalities, and we're going to go to the automated
25  decision and functionality.  In the context of a business

137

1  user's application, okay?
2  A.  Okay.
3  Q.  So Blaze Advisor is one component of the application?
4  A.  Typically, yes.
5  Q.  Typically.  Does it matter to Blaze Advisor whether
6  there are a couple other components in the application or
7  whether there are hundreds of components or thousands of
8  other components in the application?
9  A.  Not at all.
10  Q.  Why not?
11  A.  Because of the isolation from the underlying
12  implementation, it is completely agnostic, that means it
13  doesn't care, how many systems are providing the data, how
14  many places -- because it becomes a central location that
15  all things are brought through to it.
16  Q.  And we're talking, when we say "it is a central
17  location" --
18  A.  It is the decisioning component, yes.
19  Q.  Of Blaze Advisor?
20  A.  Of Blaze Advisor, yes.
21  Q.  Is the central location?
22  A.  Yes.
23  Q.  And when all things are brought to it, that's all of the
24  other components of the application are brought to Blaze
25  Advisor?

138

1  A.  Correct.
2  Q.  And what does Blaze Advisor do now that all of these
3  other components are brought to it?
4  A.  So without going into too much depth on the mechanics,
5  essentially it takes that data and evaluates that data in
6  multiple stages and based off of the evaluation of that
7  data, presents back the answer.
8  Q.  And how are the other software components of the
9  application fired, used, triggered?
10  A.  So in a large ecosystem that has multiple components,
11  there's a lot of various ways of data coming in from third
12  parties, there's a lot of systems that are supporting
13  certain things, there's a lot of human work flow
14  applications on how all this comes together.
15          So Blaze Advisor is the central point upon which
16  the next action is decided off of all of those components.
17  So Blaze Advisor would be the system that tells all the
18  other systems what to do based off of its decision.
19  Q.  Okay.  So is that your analogy to the central nervous
20  system?
21  A.  That would be, yes.
22  Q.  The commands to all the other systems are coming from
23  Blaze Advisor; is that right?
24  A.  They are -- it is a bidirectional relationship, so other
25  systems are sending data into Blaze Advisor, and Blaze

151

1    difficult.

2            Businesses don't think in coding language.  They

3    think in business terms, right?  They think in things such

4    as age, time of -- you know, how long has this customer

5    been?  They're not thinking of variable 1, 2, 3 on data pay

6    load from system 4, right?  So you want to be able to

7    translate that into the terminology that they're using.  So

8    you provide an interface through pictures, because those are

9    more powerful than writing sometimes and to be able to have

10   them write in their own words and language what that actual

11   rule is.

12           MR. HINDERAKER:  Bill, would you put up number 2.

13   BY MR. HINDERAKER:

14   Q.  This is an example of a simple rule set you were just

15   mentioning?

16   A.  Correct.

17   Q.  Correct?  I guess my question simply is this:  This is

18   the if/then statements that you and others have talked

19   about.

20           So my question is this:  If these five rules, if

21   that was going to be translated into computer language, is

22   it that simple or is it different?

23   A.  So these simple statements here, so let's take the first

24   one, for example, and then I'll spare you going into all of

25   them.  But let's take the first one.  "If at least two

152

1    children satisfy age is less than 8, then set discount to

2    .25."

3            In computer terms, this would be translated --

4    right here you have a very simple statement.  There's three

5    criterias that are met and I have an outcome.  Well, just

6    determining the three criteria, at least two children,

7    that's actually complicated.  You actually have to look at

8    the customer, all of their relationships.  You have to

9    iterate through multiple data sets.  You have to run

10   counters.  You have to go figure that out.  The software has

11   to figure that out.

12           Well, satisfy, well, I used the word satisfy here

13   is because I might want to change that to something else

14   later.  And, again, the construct behind that would be very

15   complicated.  So if you were to look at this in computer

16   terms, it would be if customer dot children loop count

17   number greater than, equals, right, and then what is my

18   discount?  Discount of what?  And then you have the other

19   models and you have to go and traverse all of that.  So it

20   puts it in easier form.

21   Q.  And then Blaze Advisor does the rest of the work?

22   A.  And Blaze Advisor does the rest of it.  So Blaze Advisor

23   will actually produce that code under the covers, right?

24   That's what it does.

25           MR. HINDERAKER:  Let's go back to slide 4, Bill.

153

1    BY MR. HINDERAKER:

2    Q.  So the third bullet point, "because it is easier and

3    faster to develop decision-making applications, new

4    applications can be developed and changes to existing

5    applications can be made faster than was possible before

6    Blaze Advisor."

7            Can you explain that, please?

8    A.  Yes, I can.  So as we've said before, right, to do and

9    achieve changes or create new decisioning -- new decisions

10   that you want to make, you would have to go and develop to

11   these existing applications relatively simple things.  By having the

12   framework in Blaze Advisor, you have one place to do it.

13   You have your language that you can do it, which is faster.

14   And then since you already have all the rails in place, you

15   can deploy new ones quicker without having to go through the

16   whole process.

17           And then the next bullet point beneath that sort

18   of highlights why you would be making those changes.

19   Regulatory changes, right.  Where you live here in the

20   United States, insurance laws change quite frequently.  The

21   date upon which they can make a decision is quite sensitive

22   at times.

23           COURT REPORTER:  I need you to slow down, please.

24           THE WITNESS:  Oh, sorry.  Again, I speak too fast.

25   BY MR. HINDERAKER:

154

1    Q.  The data, oh, in the insurance industry example?

2    A.  So, for example, the reasons why you would make these

3    decisions are very -- are very complex, right?  You have

4    regulatory changes, right?  So laws change daily across

5    various states, across various regions, across various

6    counties.  So you need to be able to change very quickly

7    what your interpretation of those regulations are.

8            Competition, competitors are constantly lowering

9    prices, lowering entry points, creating new product mixes.

10   So you would like to be able to respond to that faster, but

11   not only respond to that, but you can actually be a market

12   leader that you're now driving that because you're making

13   changes faster and trying new things out to see if it's

14   working and giving you the results that you want.

15   Q.  How does Blaze Advisor make it possible to make those

16   changes faster?

17   A.  Through the ecosystem of the rule authoring and the

18   whole environment that we've discussed with the rails.

19   Q.  The next bullet point, enhances business agility because

20   the rule statements changes can be made quickly.

21   A.  The business agility part comes in to once I have the

22   framework that I can do this in, I can create whole new

23   decision areas in seconds and be able to be agile, which is

24   quick, to all of these market-leading forces.

25   Q.  Next bullet point, because the rule statements for

155

1  decision can be changed faster, new insurance products can
2  be brought to market faster, each product being a unique set
3  of rule statements.
4      Can you explain that, please?
5  A.  Yes.  So typically in insurance products, there's not
6  necessarily a hard, fast, you know -- it's not a kleenex
7  box, right, like you've got various different mixes of
8  things.
9      So what the product actually is is the result of a
10  combination of rules, right?  So I can have different
11  pricing metrics.  I can have different population sets that
12  I want to do.  So by having the foundation of the data set,
13  I can actually create whole new mixes of rules and
14  combinations to create new products or new offerings based
15  off of that.
16  Q.  Next bullet point, makes faster more consistent business
17  decisions for any number of rule statements at any level of
18  complexity.
19      I'd like to break that down a little bit.  What do
20  you mean by "makes faster decisions"?
21  A.  So they're faster because you've automated them.  So
22  remember we talked about, you know, humans interacting with
23  it.  You know, you typically would go from manual review 10
24  or 20 to a day to fully automating hundreds if not thousands
25  a day, right?  So you're faster that way.  And just from

156

1  making those decisions faster.
2  Q.  What do you mean by more consistent?
3  A.  By consistency is I'm making the exact same decision
4  based off of that data that's repeatable and documented that
5  I've not adding any interpretation to what those decisions
6  are.  It's fact.  If it's this, then that.  I have -- that's
7  what I've done.
8  Q.  Is there any subjectivity into a decision made by a
9  Blaze Advisor?
10  A.  Subjectivity?
11  Q.  Subjectivity.
12  A.  No, there's no subjectivity.
13  Q.  Is there any biasing into a --
14  A.  There is no biasing, no.
15  Q.  Next one, rules statements and rule sets can be shared
16  across many applications.  Let's break that down into that
17  part and then we'll go into without the need for IT
18  resources?
19  A.  Yeah.  This is actually one of the ongoing value that
20  our customers start to have by using Blaze Advisor.
21  Typically, customers start with a singularity of a problem,
22  right?  I have one problem that I want to solve.  And
23  they'll go and they'll develop the applications around it,
24  they'll make the decision points to do that.
25      Well, as they've started to do that, they've

157

1  realized, wait a minute, I've now collected all of these
2  rules and decisions in one place.  These are the same rules
3  that I'm using over here in this line of business.  Why
4  would I want to go and recreate it over here?  I can just
5  use the exact same one.  So it provides that ability as
6  well.
7  Q.  And it goes on to say, without the need for IT resources
8  to write the rule statements into each application.
9  A.  Because you've already done all the connective tissue to
10  make it work.
11  Q.  And if a business wants to use its IT resources it can,
12  I suppose?
13  A.  Yes, customers can choose to use IT resources,
14  absolutely, yes.
15  Q.  The next bullet point, elevates all decision-making to
16  the level of the organization's top expert.
17      Tell us about that.
18  A.  So in these complex organizations, you have specialists,
19  right?  And specialists will know rate tables.  They'll know
20  risk actuarial tables.  They're very specific in what
21  they're looking at.  But the key decision maker isn't
22  necessarily those individuals.  They're the ones that are
23  managing the portfolio, right?  My ongoing profitability
24  model.  What does my product mix look like?
25      So by elevating all of these decisions in a

158

1  central place, the leaders, if you will, or the business
2  owners from an organization, have visibility into the whole
3  process where they never had before.
4  Q.  And next bullet point, enforces consistency and
5  compliance.  Let's take consistency first.
6  A.  Well, consistency, since I've now taken the logic out of
7  manuals and human process and heuristics and gut feeling,
8  and I've put them in a structured format, I know for a fact
9  that I'm making the exact same decision off of the exact
10  same data time and time again, right?  So I have that
11  repeatable fashion.
12      Now, that's very important in compliance because I
13  have to, as an insurance company, I have to declare to the
14  government and to the people that I'm not making decisions
15  based off of biased data, right?  So being able to provide
16  proof to what that looks like.
17  Q.  And I think the next bullet point, maybe I jumped ahead
18  and touched on or we've covered.  Agreed?
19  A.  So objective decisions based on data, not subjective
20  based on decisions.  I think we've --
21  Q.  We've got done.  And let's go to the last one.  Has
22  greater control over the results from high-volume
23  operational decisions.  Let's break that down.  What do you
24  mean by greater control?
25  A.  So greater control has different -- different

159

1  dimensions, right.  So let's back it up a little bit, and we
2  talk about high-volume applications.  We used the
3  illustration before about a couple hundred to 500 to
4  thousands to maybe millions of decisions, right?  So by
5  having the control of those aspects through Blaze Advisor, I
6  can actually introduce new concepts to subset of the
7  population that I'm working with, I can actually throttle
8  certain areas.  I have the full control from a business
9  without actually having to change anything.  And the beauty
10  is is Blaze Advisor doesn't care if it's 1,000 decisions
11  today and tomorrow is a million.  It doesn't care, right?
12  So you have the centralized control of being able to do
13  that.
14  Q.  And then it goes on, control over the results of
15  high-volume operational decisions.  I think we understand
16  what high-volume is from your testimony.  What do you mean
17  by operational decisions?
18  A.  So operational decisions actually impact the tactical
19  decision that I'm actually making at that point in time,
20  right?  So a business decision is I would like to originate
21  100 more applications a month, right?  That's a
22  business-level decision.
23        The operational decision is within that context, I
24  know exactly what decision I've made within what I'm trying
25  to do so I can actually prove it down.

160

1  Q.  And what's the technology that brings the rules of
2  decision to the point that where the decision is made and
3  something happens in the marketplace?
4  A.  That's the flexibility that we talked about upfront.
5        Now, there's one angle here that's also off the
6  ability to handle high-volume operational decisions and
7  there's a semicolon there that says "scale."  The scale is
8  what's very important in these context, right?  So as I
9  achieve my frontline business goal of originating more
10  customers, now I want to go after a bigger market, right?
11  So my scale changes.  And then by centralized control that
12  I'm making consistently across, regardless of how many
13  providers are reselling my insurance packages, how many
14  customers are applying for that, the Blaze Advisor doesn't
15  care.
16  Q.  It can scale?
17  A.  It scales.  Yes.
18        MR. HINDERAKER:  We can take that down now.
19  BY MR. HINDERAKER:
20  Q.  And let me turn now to your personal experience with
21  Chubb.  Over the years, about how many meetings have you
22  had, whether in-person or Zoom or telephone?
23  A.  So my interaction with Chubb was pre-Zoom, so we had a
24  lot of meetings in person and telephone.  So I can recall
25  three or four meetings in person post the sale of Blaze

161

1  Advisor to Chubb and countless phone conversations along the
2  way.
3  Q.  And in general, the purpose of those discussions --
4  well, first, who at Chubb were you speaking with?
5  A.  So at various levels.  So typically the conversations at
6  Chubb would be with architects, so people that were, you
7  know, in charge of the infrastructure systems.  Some
8  business owner capacity that would represent the business,
9  and I'm a little fuzzy with names, so, you know, it's been a
10  long time.
11        Another set of conversations would be with Chubb
12  leadership around sort of the value of Blaze Advisor and
13  things that we're doing inside of their environment.
14  Q.  So you've had -- you did, in fact, have conversations
15  with those three categories of people?
16  A.  Yeah.  And one more category I forgot, data analyst as
17  well.  So think of the data scientist, if you will, the
18  people that are building algorithms to evaluate the
19  customer.
20  Q.  Can you tell us the subject matter of these meetings in
21  general?
22  A.  So the subject matter of most of the meetings were
23  around, we're using Blaze Advisor.  We have new problem sets
24  that we're trying to solve.  For example, one of the most
25  prevalent conversations that we've had is we have an

162

1  analytic model, so think of it as fancy math, right?  Fancy
2  math to determine some aspect of their customer.
3        Well, in this process, they would develop these
4  analytic models over here with other data systems, but
5  taking that analytic data model and actually putting it in
6  this framework, this application that Blaze Advisor
7  provides, is complicated.  So Blaze Advisor provides an
8  ability for them to ingest those models directly into this
9  overall process.  So most of the conversations I had past
10  that was how Blaze Advisor and some of the remodel
11  translating techniques would support that.
12        There was also conversations around best practices
13  on growing Blaze Advisor within different problem sets and
14  the governance associated with that.  So how do they
15  actually organize themselves around it, et cetera.
16  Q.  Model translator, that's an add-on product to Blaze
17  Advisor?
18  A.  Model translator is an add-on product to Blaze Advisor.
19  Q.  I guess I heard you say so far sometimes the
20  discussion was about additional possible FICO add-ons to
21  Blaze Advisor and other times how to better use or more
22  fully use Blaze Advisor?
23  A.  That's correct.
24  Q.  Okay.  Did you gain an understanding of the extent to
25  which Blaze Advisor was integrated into their business at

163

1  Chubb?

2  A.  So in those conversations, it was apparent that Blaze

3  Advisor was central to all of their decision-making process

4  within the group that we were talking about.  And the reason

5  why they were looking at leveraging that is because they

6  wanted to extend other groups' works into Blaze Advisor.  So

7  it was pivotal to what they were doing.

8  Q.  Let me focus you on some meetings in 2015, 2016.

9  A.  Okay.

10  Q.  So in all of your occasions of meeting with Chubb at

11  that time frame, were you the initiator to be involved in

12  the conversation or were you being invited?

13  A.  No, I was always invited.

14  Q.  They were interested in talking to you?

15  A.  Yes.

16  Q.  And you mentioned model translation, were they also

17  interested in other FICO products at that time as add-ons to

18  Blaze Advisor?

19  A.  So they were interested in add-ons to Blaze Advisor not

20  just in model translator but the model governance solution

21  that we had, which is a how do I manage all of my different

22  models?  Because think -- you know, these insurance

23  companies have thousands of these analytic models and, you

24  know, hundreds of people that need to manage it.  And the

25  conversations were around how do we use model translator to

164

1  bring it into Blaze Advisor and what the best practices

2  of -- once it's in Blaze Advisor, how do we actually govern

3  that model and monitor the performance of that model over

4  time?  And various times it would be roadmap conversations

5  as well.  So what is FICO doing?  How are you guys sort of

6  progressing products, things like that.

7  Q.  They want to look forward to where FICO is going?

8  A.  Absolutely.

9  Q.  Were there any discussions that you were involved in

10  where the conversation was about FICO's cloud platform for

11  Blaze Advisor?

12  A.  Yes.

13  Q.  And what were they?  And first give us a time frame, if

14  you would, if you can recall?  I'm asking late 2015, early

15  2016?

16  A.  Well, I think it would have been, it was definitely

17  cold, so it would have been, yeah, around 2016 in the cold.

18  Q.  Okay.

19  A.  And it was -- you know, they were beginning the thought

20  process around moving to cloud.  Again, cloud technology was

21  very new at the time, so there was a lot of trepidation

22  around the cloud as a principle in itself.  And then, you

23  know, what value would our cloud offering of Blaze Advisor

24  provide them in those situations.

25  Q.  And we should now back up a little bit for all of us to

165

1  understand what do you mean by "cloud" and, you know, what

2  is this?

3  A.  What's the easiest description of cloud?  The easiest

4  description of cloud is traditionally large organizations

5  would manage all of their IT infrastructure, all the

6  thousands of computers that they run to be able to do

7  things.  The cloud is a central provider through Internet

8  technology does all of that for them.

9  Q.  Is it fair to say, in other words, in theory, all of the

10  IT staff of Chubb & Son becomes redundant because the IT is

11  put in the cloud and some other provider is doing that

12  work -- the work that was formerly done by in-house staff?

13  A.  That is certainly one aspect.  There certainly is a

14  redundancy of staff that occurs in that but really it allows

15  them to focus on more important strategic things and be more

16  transformative across the organization as opposed to just

17  keeping the lights on on old technology.

18  Q.  So the cloud service provider is providing a lot of the

19  technology to keep the software running in the cloud?

20  A.  Yes.

21  Q.  But as -- as you said, those are just beginning

22  exploratory discussions at that point?

23  A.  Yeah.  So at that time it was the beginning of our cloud

24  offering, so these were partnership-based conversations

25  around here's where we're thinking of going, where are you

166

1  guys thinking of going?  How does this sort of gel together?

2  Q.  And today is that called the FICO platform, your cloud

3  offering?

4  A.  That is called FICO platform, yes.

5  Q.  When you were meeting with these folks, were there any

6  conversations that came up about the fact that ACE had or

7  will be acquiring the Chubb Corporation?

8  A.  There were --

9        MS. GODESKY:  Your Honor, may we have a sidebar?

10        THE COURT:  You may.  Approach.

11        MS. GODESKY:  Thank you.

12        THE COURT:  Remind the members of the jury, while

13  we're doing this, feel freely to stand up, stretch your

14  legs.

15        (Sidebar discussion.)

16        MS. GODESKY:  Your Honor, this goes to the Rule

17  408 issue that we've been discussing.  We submitted a

18  supplemental submission on this yesterday, and we have an

19  excerpt that's quoted in our submission from Mr. Baseman's

20  deposition where when he was questioned about these early

21  2016 meetings, Ms. Kliebenstein, Mr. Hinderaker's partner,

22  asserted that Rule 408 privilege should apply to all of

23  these conversations that were happening in early 2016

24  because they were set up for the express purpose of

25  settlement negotiations.  It is in black and white in the

171

1  to the meeting room where the sales gentleman commented to
2  our host at the time, pretty crazy times.  You know, what do
3  you guys think is going to happen?  And the question was --
4  the answer was something along the lines of don't really
5  know, we're continuing on with what we're doing.  We'll see
6  what happens.
7  Q.  Continue to talk, huh.
8  A.  Sorry?
9  Q.  And did you have continuing meetings about Blaze Advisor
10  and its use at the --
11  A.  Oh, absolutely.  And -- yes, uh-huh.
12  Q.  So now if I could turn to slide 5, please.
13  BY MR. HINDERAKER:
14  Q.  From your experience of working with companies in the
15  various industries but including the insurance industry, I'd
16  like you to -- what factors do you look at to assess the
17  value of Blaze Advisor to the organization?
18  A.  Yes.  Value is an interesting dimension, right?  And
19  when you look at Blaze Advisor and what it does, you have to
20  look at several different factors.  So, first, you have to
21  look at what it is Blaze Advisor is actually doing and where
22  it sits in the organization.  So, for example, what types of
23  problems is it trying to solve, right?  An example would be
24  Blaze Advisor used to determine the placement of trash cans
25  is probably not as valuable to a financial institution

172

1  that's using it to originate customers.
2  Q.  Sure.
3  A.  Typically.
4  Q.  Second bullet point, is Blaze Advisor used to make
5  decisions connected to revenue generating events, like
6  selling insurance?
7           Can you describe that any more fully?
8  A.  So -- yeah.  So when Blaze Advisor is used for -- well,
9  let me rephrase that.  It's mostly used for decisions
10  connected to revenue events.  It is pivotal in those
11  decision process.
12  Q.  Why do you say that?
13  A.  Because it is the one actually making the decisions.
14  Q.  The number of decisions that are made with Blaze
15  Advisor.  Any comment on that?
16  A.  Yes.  So when you look at articulating the value of
17  Blaze Advisor in these situations, it's a mix, right?  So
18  what decision am I making?  Where does it sit in the
19  organization?  What type of decision am I making?  Well, how
20  many decisions am I making?  Because that affects the sort
21  of scale of the decisions with the context of the business
22  that's actually doing it.
23  Q.  Now, you said that revenue-generating events are
24  pivotal, if the transactions are not revenue -generating
25  events, how are they related to generating -- are they at

173

1  all related to revenue generating --
2  A.  They typically would be related at some point to revenue
3  generating event because they would be the supporting
4  decisions in an overall process.
5  Q.  The next bullet point, the significance to the business
6  of the decisions, what do you mean by that?
7  A.  Well, if Blaze Advisor is sitting in a position where
8  it's automating a hundred percent of its decisions and those
9  decisions are directly impacting the sale, the cost, the
10  onboarding of the customers and Blaze Advisor is pivotal in
11  that decision process.
12  Q.  The next bullet point, have we covered that or is there
13  something more there?  Business decisions that are core to
14  the business?
15  A.  Yes.  I mean, what this highlights is people don't use
16  Blaze Advisor for unimportant decisions.  So there's a lot
17  of other ways to sort of skin the cat, if you will, right?
18  And you use Blaze Advisor in the management system that it
19  provides to enable those critical business decisions.
20  Q.  The number of users authoring rules.  What does that
21  mean and why do you measure value from it?
22  A.  The value dimension for the number of users authoring
23  the rules is very significant, and it's significant because
24  whereas we talk about complex decisions and you're
25  automating those decisions where the -- let's just take an

174

1  example where there's three ladies that are running this
2  particular business division, right?  And there's only three
3  of them.  Well, the value of all of the tools that are
4  provided for the three of them to make those better
5  decisions, it's still significant, but it's not necessarily
6  the same impactful if you have a large organization with 500
7  people making the decision because automating and providing
8  all of this tooling, the more users that interact with the
9  authoring capabilities, the more value it brings.
10  Q.  And what's the meaning of the last bullet point, the
11  extent Blaze Advisor is integrated into other areas of the
12  business?
13  A.  So this is around, you know, I take a central set of
14  rules or logic and I integrate it into the existing
15  technology and how many different places are those same
16  rules being used?
17           So you look at supporting events as well.  So I
18  have this business decision is pivotal to this
19  revenue-generating arm.  I'm using the same rule set that's
20  managed here, and I'm using it over here, so now I'm getting
21  economies of scale and I'm impacting the whole enterprise as
22  opposed to just a particular division.
23  Q.  So is that to say that the impact of Blaze Advisor is
24  greater on an -- in a divisional context than it is on a
25  single named application context?

179

1    **A.  Oh, yes.  No, they would certainly require other**
2    **software components.**
3    Q.  Okay.  Blaze is also typically added to customers'
4    already existing computer applications, right?
5    **A.  Yes.**
6    Q.  And large companies may sometimes have hundreds of
7    different components working with Blaze in a single computer
8    application?
9    **A.  Yes.**
10   Q.  So when Blaze is used in these applications at large
11   companies like Chubb, Blaze is one component of a
12   multi-faceted complex system?
13   **A.  Yes.**
14   Q.  We can agree that when FICO sells Blaze to a client like
15   Chubb, Blaze itself does not contain the actual rules,
16   right?
17   **A.  Correct.**
18   Q.  And the actual idea of all of the rules comes from
19   humans?
20   **A.  Correct.**
21   Q.  And you testified during your direct examination that
22   Blaze Advisor provides some value to insurance companies,
23   right?
24   **A.  Yes.**
25   Q.  As a general matter, though, you agree that it would be

180

1    very difficult to try to measure the value that Blaze
2    provides to a particular company?
3    **A.  Difficult, yes, but not unachievable.**
4    Q.  But you personally would not be capable of quantifying
5    the value that Blaze provides to a customer?
6    **A.  Correct, in a monetary sense.**
7    Q.  So let's talk a little bit more about the world of
8    insurance.  I think you said during direct that you have a
9    cursory understanding of insurance, right?
10   **A.  That is correct.**
11   Q.  That means fairly basic, right?
12   **A.  Agreed.**
13   Q.  You have never been an insurance agent or a broker?
14   **A.  No.**
15   Q.  You have never been an insurance underwriter?
16   **A.  No.**
17   Q.  You have never worked in the technology group of an
18   insurance company?
19   **A.  Nope.**
20   Q.  And you've never worked in the claims side of an
21   insurance company?
22   **A.  No.**
23   Q.  You've never held any position at an insurance company?
24   **A.  Nope.  Only a customer.**
25   Q.  And you haven't conducted, as part of your work at FICO,

181

1    any survey of Chubb customers regarding why they purchase
2    insurance from Chubb?
3    **A.  Repeat the question.**
4    Q.  As part of your work at FICO, you haven't ever set out
5    to conduct a survey of Chubb customers to find out why
6    they're purchasing insurance from Chubb?
7    **A.  I have not, no.**
8    Q.  You don't even know what the term gross written premium
9    or GWP means, right?
10   **A.  I do not.**
11   Q.  You spoke during direct about some problem-solving
12   exercises you did for some unnamed insurance companies at
13   the beginning of your discussion with Mr. Hinderaker.
14          Do you remember that?
15   **A.  Yes.**
16   Q.  That was not specific to Chubb.  That was your general
17   experience?
18   **A.  General experience, correct.**
19   Q.  And then you started talking about Chubb and you said it
20   was apparent that Blaze was central to Chubb's systems,
21   right?
22   **A.  Yes.**
23   Q.  You said it was pivotal?
24   **A.  Yes.**
25   Q.  Correct?

182

1    **A.  Correct.**
2    Q.  But when it comes to the use of Blaze at Chubb, you are
3    only vaguely familiar with how the software was used, right?
4    **A.  I was very familiar with how the software was used in**
5    **the context of everything else that they were doing,**
6    **correct.  But to what actual decisions they were using it,**
7    **no.**
8    Q.  Is it true that you were only vaguely familiar with how
9    the software was used at Chubb?
10   **A.  Yes.**
11   Q.  All you knew was that Blaze may have been used in an
12   underwriting and claim fraud application, but beyond that,
13   you didn't have any intimate knowledge of how Chubb actually
14   used Blaze, correct?
15   **A.  Yes.**
16   Q.  If we could put up the fourth slide that you used during
17   your direct examination, Vanessa?
18          MR. HINDERAKER:  The one that's numbered 4.
19          MS. GODESKY:  Yes.  Thank you.
20   BY MS. GODESKY:
21   Q.  So this slide is titled "The Business Value of Blaze
22   Advisor," right, Mr. Baseman?
23   **A.  Yes.**
24   Q.  And the first bullet says, Blaze reduces the time and
25   costs to develop decision-making applications.

183

1   A.  Yes.
2   Q.  And that's a general statement, right, Mr. Baseman?  You
3   have not done anything in the course of your work at FICO to
4   specifically analyze the extent to which Blaze reduced time
5   at Chubb?
6   A.  Correct.
7   Q.  And then your third bullet says, new applications can be
8   developed and changes to existing applications can be made
9   faster than was possible before Blaze, right?
10  A.  Yes.
11  Q.  But you haven't analyzed and you don't have any
12  information from the course of your work at FICO that allows
13  you to say whether it's true that new applications were
14  developed faster at Chubb because of Blaze, correct?
15  A.  Not so.  So we do have customers that continue
16  relationships with FICO, which they talk about how much
17  value that they've received and we have those kind of
18  conversations.
19  Q.  But specifically at Chubb, you cannot identify a
20  particular application that was developed faster at Chubb
21  because of Blaze?
22  A.  Only through heuristic conversations, yes.
23  Q.  And you also can't measure or talk about how quickly
24  Chubb was able to make changes to its internal computer
25  applications because of Blaze.  You haven't measured that,

184

1   right?
2   A.  Of their existing ones?
3   Q.  Correct.
4   A.  Correct.
5   Q.  Your fourth bullet says, each insurance policy requires
6   a unique set of rule statements for deciding on whether to
7   offer an applicant a policy and at what price, right?
8   A.  Yes.
9   Q.  But just to be clear, you have not studied the specific
10  policies that Chubb offers and figured out exactly which
11  rules were being run against which lines of business?
12  A.  No.
13  Q.  Your fifth bullet is Blaze enhances business agility
14  because rule statement changes can be made quickly, correct?
15  A.  Yes.
16  Q.  But you didn't get any information in the course of your
17  work at FICO in terms of how quickly Chubb was implementing
18  rule changes, right?
19  A.  Not necessarily, no.  So in the -- can I elaborate?
20  Q.  Not necessarily, no, is good for now.  Thank you.
21      And you also don't have any specific information
22  on whether they actually did implement rule changes at
23  various points in time, correct?
24  A.  No.  They certainly did make various rule changes, yes.
25  Q.  Can you specifically identify rule changes that were

185

1   made and whether they were made faster at particular points
2   in time because of Blaze?
3   A.  Only heuristically, yes.
4   Q.  Your sixth bullet talks about rule statements for
5   decision can be changed faster, new insurance products can
6   be brought to market faster, each product being a unique set
7   of rule statements, right?
8   A.  Correct.
9   Q.  Can you specifically identify any insurance product that
10  Chubb was able to bring to market faster because of Blaze?
11  A.  No.
12  Q.  And based on all of this, Mr. Baseman, you are not in a
13  position to say whether Blaze had any specific impact at all
14  on Chubb's revenue or profit, correct?
15  A.  Mathematically, no.
16  Q.  Okay.  So I want to talk about briefly what goes into
17  removing Blaze from a computer application.  If a large
18  company has integrated Blaze into multiple applications, it
19  can be complex to remove the software, correct?
20  A.  Potentially.
21  Q.  And it could take days, months or even years to unravel
22  from internal systems, correct?
23  A.  To unravel -- potentially.
24  Q.  And you're saying potential because there's no typical
25  length of time.  It's going to depend on the nature of the

186

1   company, right?
2   A.  It would be dependent on the nature of how the
3   integration was done, what their software development life
4   cycles were, yes.
5       MS. GODESKY:  I'm almost done, Your Honor, if I --
6       THE COURT:  That's fine.
7   BY MS. GODESKY:
8   Q.  Now, the amount of time you spent working on Blaze has
9   shifted over time, correct?
10  A.  Yes.
11  Q.  And it has declined in recent years, fair?
12  A.  Yes.
13  Q.  In 2016, you were spending about 80 percent of your time
14  on Blaze, right?
15  A.  2016?  Yes.
16  Q.  By 2021, when you'd provided deposition testimony in
17  this case, you were only spending about 10 percent of your
18  time on Blaze?
19  A.  Correct.
20  Q.  And that's because there was the introduction of this
21  new FICO product called Decision Modeler, the cloud-based
22  product, right?
23  A.  Partially, yes.
24  Q.  And for the most part, Decision Modeler, the cloud-based
25  product, and Blaze do the same things?

187

1  A.  There are similarities.
2  Q.  And just so everyone understands, this is a little
3  technical, right, but Blaze is an on-premises program,
4  right?  It's not in the cloud.
5  A.  Correct.
6  Q.  And today most FICO customers are embracing cloud-based
7  technologies, right?
8  A.  Most, yes.
9  Q.  And since customers are focussed on the cloud-based
10 offerings, that's also where FICO has been focusing in
11 recent years?
12 A.  Yes.
13 Q.  The percentage of FICO's software revenue that is
14 attributable to Blaze has been decreasing in recent years,
15 correct?
16 A.  I'd say that's fair.
17 Q.  And most of the company's decision management revenue
18 now comes from that cloud-based FICO platform?
19 A.  Yes.
20 Q.  FICO still sells Blaze to some customers, but you've
21 said that it's better suited for small companies and
22 companies in places like Turkey and Latin America that are
23 not yet incorporating the cloud, correct?
24 A.  At that time, that was -- yes, that's what I said.
25 Q.  Okay.  And as of 2021, when you were deposed in this

188

1  case, the number of Blaze customers was not increasing,
2  correct?
3  A.  At that time, correct.
4  Q.  Okay.
5         MS. GODESKY:  Thank you.  I have no further
6  questions.
7         THE COURT:  All right.  We'll take our afternoon
8  break.  We'll plan to be back in the courtroom at 25 minutes
9  to 4:00, okay?  Thank you.
10        (Jury leaves courtroom.)
11            (WITHOUT JURY PRESENT)
12        THE COURT:  Mr. Hinderaker, any update on sort of
13 a time relative to Mr. Baer and some of the exhibits?
14        MR. HINDERAKER:  Your Honor, I think that -- I
15 have a short redirect, but my best estimate is that -- I
16 think Mr. Marce will be our last witness today, so we won't
17 be getting to -- if we got to Mr. Baer, there would be ten
18 minutes left in the day, that sort of thing.
19        THE COURT:  That's very helpful.  Thank you.  All
20 right.  We'll be in recess until -- yes, Mr. Godesky,
21 Mr. Fleming?
22        MR. FLEMING:  We've submitted a letter response to
23 FICO's arguments concerning the issues we discussed earlier
24 today.
25        THE COURT:  Okay.  I'll certainly look at that as

189

1  well.
2         MS. GODESKY:  I just had a question.  Does Your
3  Honor have a rule with regard to speaking to witnesses when
4  they're testifying?  May we speak to witnesses when they're
5  on direct but not on cross?  Are there any guardrails that
6  we both should be following?
7         THE COURT:  I think the rule, right, referencing
8  the sequestration rule is once the witness is in the
9  stand --
10        MS. GODESKY:  No discussion.
11        THE COURT:  -- no discussion.
12        MS. GODESKY:  Thank you.
13        THE COURT:  Thank you.  We're in recess until 25
14 minutes to 4:00.
15        (Recess taken at 3:20 p.m.)
16            IN OPEN COURT
17            (Jury seated)
18        THE COURT:  Mr. Hinderaker, any redirect?
19        MR. HINDERAKER:  Yes, Your Honor.
20        THE COURT:  And Mr. Baseman, once again, remember
21 you're under oath.
22        THE WITNESS:  Yes.
23        MR. HINDERAKER:  And remember to be slow in your
24 speech.
25        THE WITNESS:  That I will try.

190

1            REDIRECT EXAMINATION
2  BY MR. HINDERAKER:
3  Q.  A few follow-up questions.
4  A.  Yes, sir.
5  Q.  Do you have any responsibility for the pricing of Blaze
6  Advisor licenses?
7  A.  No.
8  Q.  Is that the responsibility primarily of Mr. Bill Waid?
9  A.  Among others, yes.
10 Q.  When you were asked the question about a customer with
11 two applications considering -- having -- using Blaze
12 Advisor for more applications --
13 A.  Yes.
14 Q.  -- and the wisdom of moving to an enterprise-based
15 license --
16 A.  Yes.
17 Q.  -- were you assuming that -- did you give your answer in
18 the -- under the assumption of an ongoing business
19 relationship?
20 A.  Yes.
21 Q.  Have you ever had experience in setting Blaze Advisor
22 pricing in the context where the relationship had ended and
23 a transition license was being negotiated?
24 A.  No.
25        MR. HINDERAKER:  Could we put slide 4 back up?  Is

191

1  that yours?

2          MS. GODESKY:  It's Heather's.

3  BY MR. HINDERAKER:

4  Q.  I'm sorry, on slide 4, do you have to be able to

5  monetize -- in your judgment, do you have to be able to

6  monetize the value of Blaze Advisor to know whether it's

7  valuable or not?

8  A.  No.

9  Q.  And in some answers to questions that you were asked,

10  you used -- used the phrase, heuristically or heuristic

11  conversations or only heuristically.

12  A.  Yes.

13  Q.  What did that mean?

14  A.  Casual, inference-based, based off of the context of

15  what we were talking about.  So you're able to deduce what

16  it was that they're talking about in the context of what

17  we're there to talk about.

18  Q.  And what did you assume, understand, deduce, regarding

19  the value that Chubb was realizing from Blaze Advisor from

20  these conversations?

21  A.  So how you're able to deduce that the Blaze Advisor

22  component is integral to the decision process is the

23  conversations that we were there to discuss around taking

24  pivotal analytic models and putting them into Blaze Advisor

25  was to get a wider use of those models across all of the

192

1  different systems they were using.  They wouldn't have had

2  that conversation if it wasn't being used.

3  Q.  A related question.  Do you have to know that one thing

4  is -- do you have to know the extent that one thing is

5  faster than another to know that it's faster?

6  A.  No.

7  Q.  Does the fact that you were not measuring, quantifying,

8  the significance of Blaze Advisor, change your testimony

9  about slide 4 with respect to Blaze Advisor's value to the

10  business?

11  A.  Not at all.

12  Q.  And at the close, you were asked about information that

13  you gave in 2021 regarding Blaze Advisor sales.  Do you have

14  any knowledge about the amount of success or lack of -- any

15  knowledge about Blaze Advisor sales today, the quantity, the

16  amount, the success?

17  A.  Not from numbers but trajectory, yes.

18  Q.  What's the trajectory?

19  A.  The trajectory is it continues to sell and is, in fact,

20  picking up in Latin America and especially regions that we

21  do not have the cloud.  So it is still a very viable product

22  of which customers still use.

23          MR. HINDERAKER:  Thank you.

24          No further questions, Your Honor.

25          THE COURT:  Thank you, Mr. Hinderaker.

193

1          Ms. Godesky, any re-cross?

2          MS. GODESKY:  Nothing further, thank you.

3          THE COURT:  All right.  Thank you.  Go ahead,

4  Mr. Baseman, you may step down.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  Mr. Hinderaker, or whomever, go ahead

7  and call your next witness.

8          MS. KLIEBENSTEIN:  Thank you, Your Honor.  We call

9  Mr. Jean-Luc Marce.

10          Your Honor, may I approach?

11          THE COURT:  You may.

12          Come on up here, Mr. Marce.  Good afternoon.  If

13  you would raise your right hand, please.

14              JEAN-LUC MARCE,

15      duly sworn, was examined and testified as follows:

16

17          THE COURT:  Go ahead and be seated.  Make sure to

18  speak into the microphone and state your full name for the

19  record, please.

20          THE WITNESS:  My name is Jean-Luc Marce,

21  M-A-R-C-E.

22              DIRECT EXAMINATION

23  BY MS. KLIEBENSTEIN:

24  Q.  Mr. Marce, is the microphone at a comfortable spot for

25  you?

194

1  A.  It is now.

2  Q.  Thank you very much.  And I have not met everyone yet.

3  My name is Heather Kliebenstein.  I'm at Merchant & Gould as

4  well.

5          Mr. Marce, can you identify your current employer

6  and job title for us?

7  A.  I'm a VP of software engineering at FICO.

8  Q.  And how long have you worked at FICO?

9  A.  Since 2002, so about 20 years.

10  Q.  And today what are your primary job duties?

11  A.  Today I lead a software development team responsible for

12  developing and mentoring and supporting decision technology

13  software at FICO.  And I'm also leading architect for the

14  software products.

15  Q.  And do you work with any particular software product

16  today at FICO?

17  A.  I'm particularly focusing on Blaze Advisor.

18  Q.  And can you tell the jury, in your words, what is Blaze

19  Advisor?

20  A.  So Blaze Advisor is what we call a business rule

21  management system, which companies use to automate

22  decisions, automate processes and procedures they may have.

23  It helps them do that in a more efficient way and in a more

24  consistent way.

25  Q.  For someone who doesn't work in IT and software

**283**

1 the process. By having it in software, it allows
2 organizations to change and adapt their business process
3 depending on changing economic climates, new marketing
4 opportunities or even in an interesting way you can do
5 simulation. I can say what if I change the threshold FICO
6 Score that we approve a loan for, and I can run that through
7 the simulation and see what impact that would have on my
8 portfolio.
9 Q. Why is agility a benefit for customers using Blaze
10 Advisor?
11 A. So organizations that adopt a software process like
12 this, again, it allows them to change and adapt. We live in
13 a very fast-paced world with lots of opportunity out there:
14 and so by moving process in a transparent way into software
15 like this, it allows them to change their pricing model,
16 make new offers, get into new markets, address a different
17 need very quickly and easily.
18 Q. Can you please turn to page 3 of this exhibit, Mr. Baer.
19 A. Yep.
20 Q. What is shown in the right-hand column at the bottom?
21 A. That's a list of companies that have adopted Blaze
22 Advisor.
23 Q. And can you give us some examples?
24 A. Sure. This list includes Toyota, United Health Care,
25 Verizon Wireless, Wells Fargo and a number of others.

**284**

1 Q. What are some other examples of FICO's clients using
2 Blaze Advisor?
3 A. Everyone from GEICO and Aviva. It runs the gamut.
4 Q. In your conversations with those clients, have they have
5 mentioned these benefits of Blaze Advisor?
6 A. Yes. That's where these benefits directly come from,
7 the conversations with the customer.
8 Q. Let's look at a different type of marketing document,
9 Mr. Baer. Can you please turn to Exhibit 1172 in your
10 binder.
11      Do you recognize this document?
12 A. I do.
13 Q. And what is it?
14 A. It's what we call an executive brief. It describes font
15 leadership and what FICO does in a broader context, in this
16 case underwriting.
17 Q. And who is responsible for creating this document,
18 Mr. Baer?
19 A. My team and I were responsible for creating documents
20 like this.
21 Q. And is it the regular practice of FICO's marketing
22 department to create documents such as this?
23 A. It is.
24 Q. And what this document created and kept in the regular
25 course of FICO's marketing department and its business?

**285**

1 A. Yes.
2      MR. ERBELE: Your Honor, I would move Exhibit 1172
3 into evidence.
4      THE COURT: Any objection?
5      MR. FLEMING: No objection.
6      THE COURT: 1172 is received.
7 BY MR. ERBELE
8 Q. Mr. Baer, who are executive briefs such as this one
9 distributed to?
10 A. Prospective customers, clients, existing customers,
11 industry analysts, other people who might be interested in
12 FICO's perspective.
13 Q. So can you turn to the left-hand column of this
14 executive brief. And you said this is an executive brief
15 for underwriting; is that correct?
16 A. That's correct.
17 Q. And that's in the context of insurance, right, Mr. Baer?
18 A. Correct.
19 Q. So what's listed in the left-hand column of these
20 executive brief?
21 A. Yes, these are some of the benefits that underwriters
22 can expect to attain by using the software.
23 Q. And can you walk through those benefits, Mr. Baer?
24 A. Reduced customer churn, improve business insight, speed
25 up processing, give business users fine-grained control, and

**286**

1 choose optimal strategies.
2 Q. And what is reducing customer churn? What does that
3 mean?
4 A. Reducing the number of customers who don't renew or
5 don't continue on as customers.
6 Q. And why is that a benefit?
7 A. Well, the lower your churn, the happier customers, the
8 more profitable those engagements are.
9 Q. And turning to the third bullet, speeding up processing,
10 why is that a benefit?
11 A. Well, there are two benefits, one to the customer, and
12 that is that they get a response to their request for a loan
13 or a request for an insurance policy much more quickly, and
14 I think that just delights the customer, but it also allows
15 the organizations to scale beyond, you know, the limitations
16 of humans to scale to address a larger volume of potential
17 customers.
18 Q. And would that be an example of the speed benefit we
19 discussed earlier?
20 A. Correct.
21 Q. Looking at the next bullet, giving business users
22 fine-grained control, why is that a benefit?
23 A. So organizations that determine what these processes
24 look like, they're very siloed and very structured, and
25 they're usually run by a business manager who doesn't, often,

287

1  without software like this, wouldn't often have insights
2  into the day-to-day process that somebody who might be
3  reviewing applications would be using.  So the ability to
4  document and codify these business rules or business process
5  gives everybody access to the process, they get to see it,
6  they get to modify it, they get to vet it, determine if
7  that's within their business practice.
8  Q.  That's an example of the control benefit we discussed
9  earlier?
10  A.  Correct.
11  Q.  Looking at the final bullet there, choosing the optimal
12  strategy by running "what if" analyses, what does that mean?
13  A.  So one of the benefits distinctly in the software is
14  once I've identified all of this process, I can take that
15  process and change it, and I can change it in a sandbox, so
16  to speak, so it's not impacting direct customers, but I can
17  see what changes and modifications, maybe changes to the
18  analytics, changes to the data, changes to the offering
19  would have on my profitability.  So I can run the process,
20  if you will, in silo, make those modifications and then
21  compare and contrast it to the process I'm currently using
22  and see if there's benefit to making those changes.
23  Q.  So out of those list of benefits we discussed earlier,
24  what would that be an example of?
25  A.  I can't remember the list.  I think it was transparency.

288

1  Yes.
2  Q.  Okay.  Would you turn to the next page, Mr. Baer,
3  page 2?  On the right-hand column in the lower right-hand
4  corner a list of bullets, what is shown there?
5  A.  These are also improvements that underwriters should
6  expect to see by enabling this process.
7  Q.  And can you walk through that list of bullets?
8  A.  Better identify risk and improve strategies to prevent
9  losses, transition from static to dynamic, variable-based
10  pricing models, more finely and accurately segment
11  customers, and view policyholder relationships as a whole to
12  optimize treatments.
13  Q.  And can you turn to page 3, Mr. Baer.  Starting on the
14  second column at the bottom and on to the third column,
15  there's a list of bolded headings.  What are those?
16  A.  These are capabilities within the software.
17  Q.  And can you walk through those capabilities?
18  A.  Ingest, synthesize, sense and respond to data of any
19  size in real time.
20  Q.  And so what does that mean in layman's terms?
21  A.  That the software allows you to integrate data sets.
22  They could be, you know, what we call streaming, they happen
23  in real time, or they could be a big database that you
24  already have.  And the ability of the software to ingest any
25  of that data, regardless of where it comes from, I think

289

1  empowers the decision-making process.
2  Q.  And when you say "the software," Mr. Baer, what are you
3  referring to specifically?
4  A.  The business rules management system.
5  Q.  And is that Blaze Advisor?
6  A.  Blaze Advisor.
7  Q.  I think this document refers also to Decision Management
8  Suite; is that correct?
9  A.  Yes.  So Decision Management Suite is an evolution of
10  our software to move it to the cloud, so there's a product
11  within the Decision Management Suite referred to as decision
12  modeler, which is Blaze Advisor in the cloud.
13  Q.  Okay.  I would like you to turn to Exhibit 1174 in your
14  binder.  Do you recognize this document, Mr. Baer?
15  A.  I do.
16  Q.  And what is it?
17  A.  This is an internal sales enablement sheet.  This is a
18  document that we produce for sales so that they understand
19  what they're selling and who they're selling it to.
20  Q.  And is this document created and kept in the ordinary
21  course of FICO's marketing business?
22  A.  Correct, it is.
23  Q.  And is it FICO's regular practice to produce sales
24  sheets such as this?
25  A.  Yes.

290

1          MR. ERBELE:  Your Honor, I would move Exhibit 1174
2  into evidence.
3          MR. FLEMING:  No objection.
4          THE COURT:  1174 is received.
5  BY MR. ERBELE:
6  Q.  And so who receives this document, Mr. Baer?
7  A.  Only sales.  This is an internal sales document.
8  Q.  So this is FICO's salespeople?
9  A.  Correct.
10  Q.  And at the top it says repeatable solution:  Insurance
11  underwriting.  So are these FICO's salespeople involved in
12  selling FICO products to the insurance industry?
13  A.  That is correct.
14  Q.  And which FICO products would be at issue here?
15  A.  Any product that addresses some of the concerns that
16  insurers might have in underwriting, including Blaze
17  Advisor.  It could include express optimization, as well as
18  analytic modeler or other products within the Decision
19  Management Suite.
20  Q.  So looking at the right-hand column there entitled
21  Benefits, what is shown in that column?
22  A.  These are benefits that insurers, that clients who use
23  the Decision Management Suite would -- could achieve based
24  on our customer feedback.
25  Q.  And why is benefits included in the sales document?

**291**

1  A.  So that salespeople would understand the benefits of the
2  software that they're selling.
3  Q.  And what benefits are listed here?
4  A.  Increase the processing time on new insurance policies,
5  transition from a manual underwriting process, reduced
6  decisioning times, an increase in application volume
7  capacity, reduced processing times, double volume, reduced
8  costs, increased revenue, and lowered or combined ratio,
9  which is increased profitability.
10  Q.  And how does FICO's marketing department know about
11  these benefits?
12  A.  These all came directly from customers who use the
13  software.
14  Q.  I would like you to turn to the third page, Mr. Baer.
15  Under Key Contacts for marketing, who is listed there?
16  A.  I am.
17  Q.  I'm going to change topics a bit and ask you about Blaze
18  Advisor's competitors.  Does Blaze Advisor have competitors
19  in the marketplace for decision rules management system
20  software?
21  A.  It does, yes.
22  Q.  And were you responsible for marketing the benefits of
23  Blaze Advisor with respect to those competitors?
24  A.  Yes.  So, again, we go back to what our customers tell
25  us, the values that they achieved and they value the

**292**

1  software for, and we focus on those values with regard to
2  our competitors.
3  Q.  And what attributes differentiate Blaze Advisor from its
4  competitors?
5  A.  It's all the ones we've just run through, control,
6  transparency, visibility, agility.
7  Q.  What's FICO's understanding of its market positioning
8  with respect to its competitors?
9  A.  So there isn't a single customer that exists today in
10  enterprise software, let alone FICO, but certainly for Blaze
11  Advisor, that doesn't do a competitive bake-off before they
12  buy the software, not a one.  So every single one of our
13  customers has access to competitive software, and they test
14  us against IBM or Pegasystems or SAS or a number of vendors.
15  And so at the end of the day, they choose our software
16  because it gives them these values.  So I can make an
17  assumption that the others don't, but we don't go into it
18  too deeply.
19  Q.  So your understanding of your market position is based
20  on your customer feedback; is that correct?
21  A.  That's correct.
22  Q.  So we've looked at a lot of different marketing
23  documents for Blaze Advisor and talked about the process.
24  Why does FICO invest the time and resources in creating
25  these documents and marketing Blaze Advisor?

**293**

1  A.  So it communicates the value in ways that, you know, the
2  spoken word cannot.  You know, when I talk about consumer
3  success stories, for instance, prospective customers want to
4  know that there are others who have used the software, use
5  the software for their particular use cases and achieved
6  some distinct and significant results.  They're interested
7  not only in the way that these customers measured that
8  success, but also, you know, what their alternatives are.
9  So we publish a wide variety of documents, work with
10  industry analysts to also convey these stories and allow
11  them to try the software and, you know, justify and
12  legitimatize the story that we have to tell.
13  Q.  Thank you, Mr. Baer.  I have no further questions.
14         THE COURT:  Counsel, cross-examination.
15               CROSS-EXAMINATION
16  BY MR. FLEMING:
17  Q.  Good morning, Mr. Baer.
18  A.  Good morning.
19  Q.  I'm Terry Fleming.  Counsel for the defendants.
20         At the beginning of your testimony, I noticed that
21  you mentioned a few of the companies that you worked with
22  before.  But you actually worked with nine other companies
23  before coming to FICO, right?
24  A.  I think that's correct, yes.
25  Q.  Okay.  And all of those are exclusively in the marketing

**294**

1  area?
2  A.  Correct.
3  Q.  And since you've been at FICO, you've just been working
4  in the marketing area, right?
5  A.  That's correct.
6  Q.  With a number of products under your purview, including
7  Blaze Advisor.
8  A.  Correct.
9  Q.  Okay.  And in your role in marketing, you are marketing
10  Blaze to persuade customers to buy the product, right?
11  A.  That is the role of marketing.
12  Q.  Okay.  And you're here today testifying to the jury
13  about what a great product Blaze is, right?
14  A.  Yes.
15  Q.  Okay.  You're paid to say that Blaze is a good product,
16  right?
17  A.  Yes.
18  Q.  You're paid to say that Blaze is valuable to customers,
19  right?
20  A.  Correct.
21  Q.  All right.  The marketing materials that your team
22  creates, the purpose is for your salespeople to sell FICO
23  products, right?
24  A.  That is correct.
25  Q.  You have interest in drumming up value to sell Blaze,

Fair Isaac Corporation v Federal Insurance Company, et al., File No. 16-cv-1054(DTS)                                February 17, 2023

**299**

1  A.  I have no idea.

2  Q.  Okay.  Let's look at Exhibit 1174.  Now, I note the

3  Target Audience for this solution are $250 million insurance

4  companies.  That's FICO's sweet spot, correct?  I'm looking

5  at the top under Target Audience in the middle column.

6  A.  Yes, that's what it says.

7  Q.  So FICO -- so Chubb would not be part of that Target

8  Audience?

9  A.  Well, so I imagine that this is -- was intended as the

10  minimum size, not as a maximum size.

11  Q.  Okay.  It doesn't say that, right?

12  A.  It does not say that.

13  Q.  Okay.  All right.  Now, let's look at the next page.

14  Now, you've mentioned briefly the competitors, the companies

15  that provide alternatives to Blaze software.  Can you

16  identify those?  I don't think they're listed here.

17  A.  Well, so we do have some competitors listed here, but

18  the ones that I normally run against are SAS, IBM,

19  Pegasystems, Experian and Red Hat application.

20  Q.  Drools?

21  A.  Drools.

22  Q.  Now, have those been -- if you listed the same

23  competitors from the 2016 time period, would you identify

24  the same list?

25  A.  Probably, yes.

**300**

1  Q.  Okay.  And are there some instances where a customer

2  could change from using a software like Blaze to a

3  competitor software and have no difference in the

4  performance?

5  A.  I wouldn't be in a position to know that.

6  Q.  Okay.  Let's see.  And, finally, we're looking at the

7  last page or the second page of this exhibit where you're

8  looking at competition, strengths and weaknesses?

9  A.  Yes.

10  Q.  And I notice that you say FICO's biggest competitor is

11  not these other companies, but internal builds.  What do you

12  mean by that?

13  A.  Well, one of the options that exists for customers is to

14  either develop custom code or use an open source

15  distribution of a business rules management system and build

16  it themselves.

17  Q.  All right.  Okay.  I have no further questions.  Thank

18  you.

19          THE COURT:  Thank you, Mr. Fleming.

20          Mr. Erbele, any redirect?

21          MR. ERBELE:  Yes, Your Honor.  Briefly.

22              REDIRECT EXAMINATION

23  BY MR. ERBELE:

24  Q.  So you walked through a list of value propositions or

25  benefits of Blaze Advisor.  I believe you testified to

**301**

1  control, speed, accuracy, consistency, transparency,

2  agility.  Do you believe those benefits to be actually

3  realize by FICO's clients?

4  A.  I do.

5  Q.  How do you know?

6  A.  Well, those came exclusively from conversations --

7          MR. FLEMING:  Objection, hearsay.

8          THE COURT:  Sustained.

9          You can talk generally about your process, but not

10  specific statements made by customers.  Okay?  You

11  understand the line I'm drawing?

12          MR. ERBELE:  Yes.

13          THE COURT:  Okay.

14          THE WITNESS:  So those --

15          THE COURT:  You weren't necessarily over the line,

16  but counsel makes an objection so that you don't go over it.

17          THE WITNESS:  Sure.

18          THE COURT:  Okay?

19          THE WITNESS:  So the process that we use to

20  develop these value propositions are -- come directly from

21  conversations that we have with our customers.

22  BY MR. ERBELE

23  Q.  And Mr. Fleming brought up Southwest Airlines.  What is

24  your understanding of the use of Blaze Advisor there?

25  A.  It's been so long.  I don't know that I could speak

**302**

1  specifically to Southwest Airlines' use, but I do know that

2  some of their recent challenges had nothing to do with their

3  use of Blaze Advisor.

4  Q.  And what is that understanding?

5  A.  That they, you know, they were challenged with --

6          MR. FLEMING:  Objection, Your Honor.  Hearsay.

7          THE COURT:  Sustain the objection as to

8  foundation.

9          Why don't you lay the foundation, Mr. Erbele?

10  BY MR. ERBELE

11  Q.  Have you had conversations with anyone regarding the

12  benefit -- or the issues with Southwest?

13  A.  A few weeks ago I did.

14  Q.  And who was that with?

15  A.  That was with a sales rep.

16  Q.  And based on that, what is your personal understanding

17  of the involvement of Blaze Advisor?

18          MR. FLEMING:  Objection, hearsay.

19          THE COURT:  Sustained.

20  BY MR. ERBELE

21  Q.  Mr. Fleming also asked about the versions of Blaze

22  Advisor.  He pointed out version 7.4 and asked if it was

23  comparable to other versions.  Do you know if the benefits

24  of Blaze Advisor changed from version to version?

25  A.  They get further enhanced.  It's not like there's a sea

**303**

1  change to the capabilities of a product, but oftentimes
2  they'll add either new features or enhance the speed by
3  which the process works.  That only enhanced the five or six
4  value propositions we've identified.
5  Q.  So you've been at FICO since 2013; is that correct?
6  A.  Correct.
7  Q.  And Blaze Advisor has gone through several version
8  changes since you began at FICO; is that correct?
9  A.  Correct.
10  Q.  But are the benefits of control, speed, accuracy,
11  consistency, transparency and agility realized in all the
12  versions of Blaze Advisor?
13  A.  They are, yes.
14  Q.  Thank you, Mr. Baer.  I have no further questions.
15       THE COURT:  Mr. Fleming, any recross?
16       MR. FLEMING:  Nothing further, Your Honor.
17       THE COURT:  Thank you, Mr. Baer.  You may step
18  down.
19       We are at 20 minutes after 10 and done with the
20  witness, so this would be a convenient time to take your
21  morning break.
22       Remember, members of the jury, no independent
23  research, no talking about the case.  Okay?
24       We'll be back in here at 25 minutes to 11.  Thank
25  you.

**304**

1       (Recess at 10:21 a.m.)
2
3            (IN OPEN COURT)
4       THE COURT:  Go ahead and be seated.
5       It would be my preference, if you're inclined to
6  do an offer of proof, with respect to the other documents,
7  to do it over the lunch hour, assuming Mr. Baer is still
8  going to be here and available.  Will that be acceptable?
9       MR. ERBELE:  Yes, Your Honor.
10       THE COURT:  Okay.  Next witness is Schreiber?
11       MR. HINDERAKER:  Yes, Your Honor.
12       THE COURT:  Should we take up the other issue now?
13       MR. HINDERAKER:  The issue of the --
14       THE COURT:  The testimony.
15       MR. HINDERAKER:  -- of Mr. Schreiber.  I think we
16  should.
17       THE COURT:  Do you have copies of the deposition?
18       MR. HINDERAKER:  I do.  If you would give me a
19  moment, what I have is my copy and I'm going to just make a
20  note and then give it to you.
21       The first bit of testimony that is being
22  challenged is on page 310.  I have a flag by it.
23       THE COURT:  Okay.  If it's easier for you, you
24  could always use the document camera.  That way you can see
25  it and I can, if that makes it easier.

**305**

1       MR. HINDERAKER:  Let's see if we can do without.
2       THE COURT:  Okay.
3       MR. HINDERAKER:  I don't like technology.
4       So you see that it begins on -- and I said, "Okay.
5  All right.  So Chubb could have said no, we're terminating
6  the license, you know, we're moving on to ASIS systems in
7  the next six months, we don't need your license anymore.  It
8  could have happened just like that, and that would have been
9  okay.  But they had told us nothing, so we had to price it
10  out, like it was a new site, a new sale -- or not a new
11  sale, but a transaction was taking place."  And this is in
12  context of an e-mail that is dated February 5th, 2016,
13  Exhibit 133.
14       And this, Your Honor, is that exhibit, and you see
15  the date of it, and you see that the date is before
16  February 25.  The date is before that period of time with
17  settlement negotiations.  It's in the period of time of the
18  business discussions.
19       In addition, during the opening statement, counsel
20  for the defendant tells the jury, "And so the evidence will
21  show that Mr. Sawyer and Mr. Schreiber started a process to
22  try to figure out how can we get more money before that
23  transaction happens?"  And the opening continued.
24       This is an e-mail exchange between Mr. Sawyer and
25  Mr. Schreiber in -- and the testimony is about an earlier

**306**

1  e-mail exchange, before the acquisition, and they're
2  brainstorming about this whole idea of using the acquisition
3  as a basis to get more money.
4       And Mr. Sawyer, he says, "I would think that
5  tripling the size of the GWP, that's a reference to
6  insurance revenue, of business by application should be
7  significant enough to get around that unreasonably withheld
8  language."
9       So it's clear from the opening that the issue of
10  Schreiber and Sawyer, thinking that we have a licensing
11  event, and here's an opportunity to get much more money from
12  a new license, during the period of time of negotiations, is
13  put at issue by the defendant, and this is some of the
14  testimony that relates to that February 5 e-mail.
15       And, relatedly, on page 343 at lines 22 through
16  344 at line 15, and now we're speaking most particularly
17  about the commercial proposal time frame that was within the
18  negotiations, and at line 22, this is what it boils down to.
19  I mean if someone engaged us when we tried to engage or
20  before we tried to engage, talking about 10.8 and when the
21  notice came, we would have found a way to let them
22  transition in a way that would have had maintain a really
23  good working relationship.  Love the client, want to
24  maintain a reference.  Really, wasn't looking to do anything
25  other than figure out how do we stay whole and continue the

307

1 relationship and was there a license opportunity?  Yes,
2 there was, but more important to us was that the long-term
3 relationship, the 3 million would have come and went, but I
4 had Chubb as a customer a decade and now a lawsuit?  Come
5 on.
6       He's responding to his reaction and his time frame
7 of Exhibit 94, which is before the tenor turned to
8 settlement.
9       In Defense Counsel's letter to the Court of the
10 15th, at the end of the initial notice period, combined with
11 temporary forbearance of action made clear that the dispute
12 had crystallized, the litigation was on the table.  That is
13 after these events.  Counsel has taken the position that
14 it's after these events.  Counsel has taken the position
15 that FICO has with Schreiber and Sawyer sought to have a
16 licensing opportunity to grab money, but this testimony is
17 necessary to fill in the rest of the story so that the jury
18 hears the rest of the story and enable Schreiber to say it
19 wasn't the money as much as the relationship that I was
20 trying to have as my top concern.  So this is -- none of
21 this is within Rule 408, Your Honor.
22       THE COURT:  All right.  Very well.  Counsel for
23 Federal?
24       MS. GODESKY:  Your Honor, our objection to these
25 two excerpts at 310 and 343 are that they are nonresponsive,

308

1 argumentative narratives from a witness.  He wouldn't be
2 allowed to give that kind of nonresponsive speech in court,
3 and the fact that these are deposition videos with no
4 opportunity for even a recross makes it even more
5 prejudicial than it would be if he did that here live.
6       MR. HINDERAKER:  If I can?
7       THE COURT:  Go ahead, Mr. Hinderaker.
8       MR. HINDERAKER:  Just commenting that now the
9 basis for the objection has changed from what it was this
10 morning, and this is the examination of defense counsel at
11 the time, and I don't have a transcript to get the full
12 context, but those were the answers that he was given to the
13 questions and there wasn't any effort made at the time of
14 the deposition to reserve any objection.
15       THE COURT:  Agreed, Mr. Hinderaker.  I do find
16 that these bits of testimony are admissible, that any
17 objection to the nonresponsive nature of the answer, if it
18 is nonresponsive have been waived, and the e-mail, which is
19 Exhibit 133, is also admissible.
20       All right.  We have exactly six minutes everyone.
21 See you back here.
22       (Recess at 10:31 a.m. till 10:39 a.m.)
23              (IN OPEN COURT)
24       THE COURT:  This is up like the old days, we don't
25 have to roll up a television screen or anything, right?

309

1 Just do it on your -- all right.
2       MR. HINDERAKER:  Your Honor, for housekeeping?
3       THE COURT:  Yes.
4       MR. HINDERAKER:  The video will run about 2 hours
5 and 11 minutes.
6       THE COURT:  Okay.  So you want to tell us when you
7 want us to stop or if you have an idea when we should stop,
8 Mr. Mayleben will just be here and available.  Right around
9 noon, if there's a natural break.
10       MR. HINDERAKER:  Yes.  And then we spoke at one of
11 the pretrials about being able to give a brief introduction
12 of who this witness is to the jury before it starts.  We've
13 exchanged what I expect -- what I will say and it's
14 agreeable so if you give me a moment to do that.
15       THE COURT:  Absolutely.  Thank you.
16       (Jury in.)
17
18              (IN OPEN COURT)
19       THE COURT:  Mr. Hinderaker.
20       MR. HINDERAKER:  The next witness that will be
21 called in our case, FICO's case, is a gentleman by the name
22 of Russell Schreiber.  I think you should appreciate that we
23 will be playing all of the video of Mr. Schreiber's
24 testimony that which is offered by FICO and that which is
25 offered by the defendants.  It will just be his whole

310

1 presentation.  And I'm just going to introduce Mr. Schreiber
2 to you.
3       Mr. Schreiber is a former FICO employee.  He now
4 lives in New York where his deposition was taken on
5 October 24, 2018.
6       He was in sales, and when he left FICO his title
7 was Vice President of Health Care and Insurance, and he was
8 with FICO from 2006 to 2016.  Thank you.
9       THE COURT:  Very well.  Thank you, Mr. Hinderaker.
10              RUSSELL SCHREIBER,
11 Whereupon, having been duly sworn upon his oath, testified
12 as follows:
13
14       (Whereupon, Deposition of RUSSELL SCHREIBER is
15 played, as follows:)
16              EXAMINATION
17 BY MS. JANUS:
18 A.  Russell Schreiber.
19 Q.  What is your work address?
20 A.  I work from home.  I'm self-employed, semi-retired.
21 Q.  What is your home address?
22 A.  It's 180 East End Avenue, New York, New York 10128.
23 Q.  What is your current employment?
24 A.  Self-employed.  Investor and self-employed.  Business
25 owner.  Multiple irons in the fire.

315

1   Q.   Okay.  Yeah, so you were saying the client partner role,
2   and it sounded like maybe -- in my mind, I've heard in the
3   context of this case reference to client partners.  And I'm
4   trying to figure out where what you're describing fits in
5   with the client partner role at FICO?
6   A.   Right.  So my business card at the time might have said
7   vice president, client partner.  So client partner was a, at
8   that time, was an organizational construct to bring industry
9   experts or industry folks into the FICO fold and be focused
10  on client relationships and making sure we're able to bridge
11  the FICO technologies with industries.  And so the people
12  that did that, I was one of them.  We're called client
13  partners.
14  Q.   As part of your job, were you familiar generally with
15  the way the clients you were responsible for used Blaze?
16  A.   Yes.
17  Q.   That was one of your job responsibilities?
18  A.   Yes.
19  Q.   Why was that?
20  A.   Well, it had multiple dimensions to it.  One was to help
21  solve the next one, so I could say, aha, you know, insurance
22  company X uses it for something and that's a great kind of,
23  you know, horizontal application that other insurers could
24  be thinking about doing.  And not, obviously, not a
25  confidential handling, you know, insure confidential -- I

316

1   would insure confidential information, by understanding how
2   one insurance company uses it at that point, and then I can
3   help others understand the art of the possible technology.
4   So that was one reason why we had to know what they were
5   doing.
6         Another reason was to be able to bring the rest of
7   FICO to bear and to help.
8   Q.   With that particular client?
9   A.   Yeah.
10  Q.   Yep.
11  A.   So I'd bring professional services person in to help
12  integrate to say Blaze and Duck Creek.  You know, pick a
13  product, whatever.
14  Q.   But generally the scope of the license with a given
15  client was something that you were familiar with?
16  A.   Or I had to figure it out, but, yes.  Sure.
17  Q.   And that would be important for what you are doing as a
18  client partner, I take it, because you need to know whether
19  there are additional products or services that could be sold
20  to a given client, correct?
21  A.   At one end or if that product is being sunset, and they
22  needed to know that it was being, you know, shelved in two
23  years, we can help them manage their way through that
24  process.
25  Q.   Yep.  And you would also need to know how widely that

317

1   client is able to use the software that they've licensed
2   under the terms of their license, correct?
3   A.   Say that again, please?
4   Q.   You would also need to know how widely that client is
5   able to use the software that they've licensed under the
6   term of their license?
7   A.   Right.  So if you mean is do you mean like what the
8   scope of the license is?
9   Q.   Yes.
10  A.   Because "widely" is -- yes, I would certainly want to
11  read the scope of the license, yeah, yeah.  I guess.
12  Q.   When did you first begin to work with Chubb?
13  A.   Chubb was my first client.  Chubb was my -- my entree
14  into FICO.  That's -- you know, put me on the map.  So that
15  would have been February, maybe March of '16, so maybe a
16  month or two we received an RFI, and I lead the response.
17        MR. HINDERAKER:  I think you said '16.
18        THE WITNESS:  Did I say '16?  I meant 2006, thank
19  you.
20  BY MS. JANUS:
21  Q.   So you said you received an RFI in the spring of 2006.
22  A.   Right.  I want to say February or March so early late,
23  winter early spring.  Yeah, it was right away.
24  Q.   And what is an RFI?
25  A.   The people's request for information be in our file.  I

318

1   did an RFP, a request for proposal, but it was a document
2   that we received to be able to present to Chubb, a solution
3   and pricing and an approach to a problem.
4   Q.   And do you recall, I know it was a while ago, but do you
5   recall off the top of your head just generally what nature
6   of the request for information or proposal was from Chubb?
7   A.   Oh, yeah, yeah.  It's funny how things you remember.
8   Anyway, so this was to create an automated renewals platform
9   for their specialty lines of business.  They had I think
10  like a 170 or maybe 220 different products in that business.
11  And so that would be like small manufacturers maybe or
12  nurses or, you know, plumbers.  But it's what they called
13  specialty lines.
14        And so the way they sold those products is they
15  have the underwriting process where they have underwriter
16  like price out how risky is this thing and set out an
17  insurance price premium.  What was happening is they had a
18  corporate initiative, their agenda was to be able to sell to
19  a larger market, which meant smaller value, smaller dollar
20  value, so I forget the numbers but most of the average
21  policy price was maybe -- let's call it $100,000 for this
22  discussion.  They wanted to be able to move down to a bigger
23  market, more prospective customers.  Say the average policy
24  is $20,000, so moving to like the Fortune 100s to the
25  Fortune 10,000, that kind of concept.

**319**

1    The way their business worked at that time was
2  they would write the new policy, they'd get a new prospect,
3  and they'd assess the risk.  And then they would, if they
4  won the work, they'd book the policy and they would have a
5  new customer.
6    The problem was that on renewals, they would do a
7  full review of the each policy so that it was effectively
8  underwriting the whole customer from scratch, which is very
9  expensive.  So the premise of this RFI or RFP or a request
10  for a pitch was, our solution was how can they automate the
11  underwriting -- the renewal process so that they could move
12  into a business model where they were -- had less manual
13  intervention with the renewal process.
14    So there's going to be some insurance customers
15  that would just, you know, not even touch this, just
16  automatically renew it.  There were others I think that were
17  at high risk.  They need to really do full underwriting.
18  There were some that were in the middle.  So they called
19  that low touch, no touch, high touch is, you know, and it's
20  become pretty big in the industry now.
21  Q.  And the idea was this renewal process would become a low
22  touch?
23  A.  So they would be able to segment the customers across
24  these 170 or 200-plus products.  And, again, don't quote me
25  on the product count, but there was hundreds of them.  They

**320**

1  could segment the customers at the renewal process into high
2  touch, low touch, no touch.  So if they have the high touch
3  ones were the more expensive ones to renew because they had
4  to throw some people out, look at the buildings, you know,
5  check the head count, make sure the staff is right.  So it's
6  how do you price that premium.
7    Whereas, the no touch, it's like our auto
8  insurance.  You just get a new bill for the next year,
9  right?  So they were trying to get more into the low to no
10  touch.
11  Q.  So the folks who aren't familiar with either the
12  insurance industry or Blaze, can you describe in general
13  terms how a product like Blaze would be used in a solution
14  like this?
15  A.  Sure.  So insurance policies are annual policies.  So
16  about three months before the end of a year, the policy
17  information and the claim information would be transferred,
18  be fed into a Blaze engine, and the Blaze software would
19  look at that information and rules would be -- rules in
20  Blaze would be applied to it.
21    So the rule might be, oh, there were no claims
22  that year so that means we could do a low or no touch.  Or
23  they had claims this year, so now it must be a high touch.
24  And the magic here was that Blaze, the rules that we're
25  talking about were set up in such a way that human beings

**321**

1  could maintain them.  So it didn't require like some, you
2  know, MIT Ph.D.'s.  You could bring a business analyst could
3  maintain those business rules.
4    So, right, so once a year a feed would come in,
5  the rules would be compared, and then the policies would be
6  segmented into high touch, low touch, no touch.
7  Q.  Well, I guess, again, for those who aren't familiar with
8  Blaze and necessarily this industry, you're talking about a
9  system of applying rules to or a renewal process, and I take
10  it there is some additional programming that goes along with
11  creating a system that works, for example, in Chubb for an
12  auto renewal process.  It's not just like you can put Blaze
13  in there and it sort of just automatically works?
14  A.  Well, that's correct.  You're right.
15  Q.  Okay.  And so I'm trying to, how would you refer to
16  that?  Is it that Blaze is used in applications that are
17  developed by Chubb or by, you know, Chubb with FICO's
18  assistance to use Blaze in these types of solutions?
19  A.  Right.  So Blaze, in this case it did integrate with
20  other -- other components.  Like there was, I think I
21  mentioned Duck Creek was a pricing engine.  There would have
22  been a policy platform, a claims platform.  So it would have
23  interacted with those three things or whatever they were,
24  those things.
25    But there were cases where Blaze was a standalone.

**322**

1  Not in this case, but Blaze would serve as a standalone
2  engine as well.
3  Q.  Okay.  So in February/March, FICO received the RFI.  Can
4  you tell us generally what you recall happening after FICO
5  received that RFI?
6  A.  Sure, sure.  So, gosh, where was our office then?  So it
7  was -- it was like the garment district where we had an
8  office at that time.  So I sat with our Blaze team.  Larry
9  and Dale I think were their names.  Anyway, sat with those
10  guys, and we created a proposal.
11  Q.  And then you presented it?
12  A.  Oh, I'm sorry, yes, we created a proposal and then,
13  well, probably April-ish we presented -- I lead the
14  presentation of our response to maybe a dozen people in the
15  Chubb side up in their -- I want to say Connecticut.  It's
16  funny what you remember what you know.
17    But anyway, one of the offices we went up to,
18  yeah, it was Connecticut.  I went up to the Connecticut
19  office, and we presented our answer to their questions.
20  Q.  And do you recall generally what time of year that was?
21  A.  It would have been pretty quickly -- call it April.
22  April, yeah, mid-April.  Because the deal was done
23  June 30th.
24  Q.  Were there discussions at that time that you were
25  involved with relating to the scope of the license --

447

1   Q.   Okay.  And then there's an Amendment Two that follows.
2   And were you involved in that?
3   A.   Yes.
4   Q.   You mentioned that you would be -- you were the legal
5   side, working with the business side, Mr. Schreiber,
6   Mr. Wachs.
7        Can you give us an understanding of how that
8   interaction -- and specific to this license agreement -- but
9   how that interaction between the in-house lawyer and the
10  business person, how you operate together to come to draft
11  what is the license agreement?
12  A.   Sure.  At Fair Isaac -- I think all companies are
13  different, but at Fair Isaac, we had a contract request
14  process that was automated.  So the business would complete
15  a contract request form.  And, again, this was an automated
16  document.  They would submit that.  And that form would go
17  through who is the customer, what are they licensing, what
18  are the restrictions of the license or the scope of the
19  license?  So, for example, can they use it worldwide?  Can
20  they only use it in the U.S.?  Is there a seat restriction
21  on how many licenses they're buying, or is it
22  enterprise-wide?  What specific components of the software
23  are they licensing?  And then also if there is any
24  restriction on how they're using it -- the client is using
25  it within their business.

448

1        Then they would also include fees.  If there is to
2   be a master services agreement, that could be in the
3   contract request form.  The maintenance agreement, as far as
4   how much were we going to charge for maintenance; the term
5   of the -- of all of the agreements together, you know, how
6   long is the customer licensing the software for, how long
7   are they buying maintenance for.
8        So they would complete that form, and then there
9   was an automated system based on selections that the
10  salesperson had made as far as software that was at issue.
11  That would -- the answer to that question would
12  automatically route the request form to the attorney
13  responsible for that piece of software.
14       So in this case, Blaze Advisor, that would have
15  been selected from the drop-down menu, and the request form
16  would have been automatically routed to me to work on.
17       So once a request form is routed to the attorney,
18  you would get an email saying, you have a request pending.
19  You could go into the system, pull down the request form and
20  then start working on the agreement.
21       And then if I had any questions around answers
22  that were in the form or as I started drafting, I would just
23  call the person who submitted the request form, who I think
24  was Russ Schreiber in this instance, but I don't recall his
25  specific role in the deal.

449

1   Q.   Understood.  And on this Exhibit J1, who is the client?
2   A.   The client is Chubb & Son, a division of Federal
3   Insurance Company.
4   Q.   And if you turn to the signature page of the main body
5   of the agreement, who signed it -- or what signed it as
6   client?
7   A.   It was signed by client Chubb & Son.
8   Q.   And if we go to Amendment One, is that -- is that still
9   true, the client is Chubb & Son, a division of Federal?
10  A.   Yes.
11  Q.   And if we turn to the signature page of Exhibit 1, that
12  signature page is in the name of whom?
13  A.   You are looking at Exhibit 1?
14  Q.   Of Amendment One.
15  A.   The signature block on Amendment One is client Chubb &
16  Son.
17  Q.   And then if we just do Amendment Two, is it the same?
18  Client is Chubb & Son, a division of Federal.  The signature
19  line is client Chubb & Son, a division of Federal Insurance
20  Company?
21  A.   Yes.
22  Q.   I'm going to put a marker where that is in my notebook,
23  and I suggest you might do something of the same, because
24  we'll be going back and forth to it.
25  A.   Okay.

450

1   Q.   And do you recall who your counterpart was at Chubb &
2   Son that you worked with in the drafting of this agreement?
3   A.   Yes.  It was a gentleman named Jim Black.
4   Q.   And could you please go to Exhibit P303?
5   A.   Yes.
6   Q.   And that is an email from yourself to J.W. Black?
7   A.   Yes.
8   Q.   Would you like to just tell the jury the purpose of this
9   email and what you did?
10  A.   So it looks like I had spoken with him the day prior to
11  sending this email, because I'm referencing a phone
12  conversation from the prior day.  And then I've attached an
13  updated version of the MSA, which would be a master services
14  agreement, with changes that I had made in tracked format.
15  And then I'm asking him to contact me to discuss remaining
16  open items after he's had a chance to review.  And then I
17  also attached the standard Blaze software license and
18  maintenance agreement for his review, and then indicated
19  that statements of work would be sent to him that afternoon,
20  June 6th, 2006.
21  Q.   Statements of work, is that a document that relates to
22  the master services agreement?
23  A.   Yes.
24  Q.   And a statement of work is a what?
25  A.   A statement of work would outline the specific work that

**451**

1  the services team was going to be doing, and then if there
2  were specific deadlines, timelines or deliverables related
3  to that work, as well as fees and how those were going to be
4  charged and paid.
5  Q.  So the master services agreement is as it says, the
6  master agreement under which statements of work would be
7  performed.  Is that fair?
8  A.  Yes.
9  Q.  Given that you were sending him back edits and changes
10  to the master services agreement and sending him the
11  original -- or the standard form Blaze Advisor license
12  agreement, it appears that you were negotiating or dealing
13  with the master services agreement first.
14         Is that your recollection?
15  A.  I don't recall that specifically, but based on the
16  email, it would seem that was the case, yes.
17  Q.  And then with respect to the client relationship, what's
18  the purpose of the master services agreement and the
19  provision of professional services?
20  A.  So generally, the professional services team would meet
21  with the client, their -- perhaps their business, also maybe
22  their technology team, to talk about how they want to
23  implement or access the software and then how they want the
24  rules drafted, which is what Blaze Advisor very
25  simplistically runs.  And so talking with the client around

**452**

1  how they were going to use the rules, what kind of rules
2  they need.  And then that may also help to inform how the
3  licenses needs to be scoped, ultimately, depending on what
4  may come out of those conversations.
5  Q.  Then if you would turn to P307.  And as we see, this is
6  from J.W. Black to yourself?
7  A.  Yes.
8  Q.  Perhaps just read what he says to you.
9  A.  So he said, "Jandeen, I have attached the SLA with some
10  Chubb revisions.  Let me know when you would like to
11  schedule a call to review.  Thanks, Jim."
12  Q.  And SLA stands for software license agreement?
13  A.  Yes.
14  Q.  All right.  So if we look at -- and then attached to his
15  email is indeed a version of the -- if we can go to the next
16  page please -- a version of the software license and
17  maintenance agreement showing the redlines that you received
18  from Mr. Black?
19  A.  Yes.
20  Q.  Is there any change from Mr. Black to the definition of
21  client as Chubb & Son?
22  A.  No, there is not.
23  Q.  Let's look at -- or next, paragraph 3.1 on the third
24  page, called "License Restrictions."  What does Mr. Black
25  suggest there by his redlines?

**453**

1  A.  He has quite a few edits.  He has essentially deleted
2  all of our original license restrictions and inserted his
3  own preferred language.
4  Q.  Okay.  We'll be going through the whole history, so we
5  will take it one step at a time.
6  A.  Okay.
7  Q.  And then if we go to paragraph 3.6 from Mr. Black, what
8  do we see there?
9  A.  Again, it looks like he has deleted all of our original
10  language, and he has inserted a new paragraph that he's
11  proposing that we accept instead.
12  Q.  And his paragraph relates to the use of Blaze Advisor by
13  a consultant called ACS Commercial Solutions?
14  A.  Yes.
15  Q.  Okay.  We're on the same paragraph?
16         And in this -- what is Mr. Black seeking by his
17  redlining at 3.6?
18  A.  He's wanting Fair Isaac's acknowledgement and agreement
19  that Chubb & Son, they have some infrastructure operations
20  that are outsourced to a company called ACS Commercial
21  Solutions.  So he's asking for Fair Isaac to grant ACS
22  Commercial Solutions and their affiliates, employees,
23  agents, consultants and subcontractors the right to use the
24  licensed software on behalf of client Chubb & Son for the
25  sole and exclusive purpose of fulfilling ACS Commercial

**454**

1  Solutions' obligations to provide information, technology,
2  services to client.
3  Q.  Okay.  So in summary, he's asking Fair Isaac to get
4  permission to a consultant, ACS, to use Blaze Advisor?
5  A.  Yes.
6  Q.  And then let's go to paragraph 9.3, Effective
7  Termination.
8         Mr. Black suggests some changes there as well?
9  A.  Yes.  He struck the -- I believe the last sentence --
10  the last two senses of Fair Isaac's original language.
11  Q.  Is what he struck related to a certification
12  requirement?
13  A.  Yes.
14  Q.  And then if we go to paragraph 10.8.  If we look at
15  that, Mr. Black made some changes to that as well?
16  A.  Yes, he did.
17  Q.  One of the changes that he makes is to -- well, let me
18  back up.
19         The first sentence without change is, "Neither
20  party shall, without the written consent of the other,
21  assign or transfer the agreement."
22         Have I read that right?
23  A.  Yes.
24  Q.  So that first sentence is mutual, is it not?
25  A.  It is mutual, yes.

455

1  Q.  Okay.  And then looking at the edit in the second
2  sentence, "In the event of a change of control of either
3  party."  So that's an edit of Mr. Black to make that second
4  sentence mutual as well?
5  A.  Correct.
6  Q.  And we'll see if it was accepted or not by FICO shortly.
7        And then Mr. Black also adds, regarding FICO's
8  consent, "which will not be unreasonably withheld"?
9  A.  Yes.
10 Q.  Those are his edits to 10.8?
11 A.  Correct.
12 Q.  And then let's go forward in time to Exhibit P309:
13        And this is your email to Mr. Black of June 27th?
14 A.  Yes.
15 Q.  So his to you, the one we just looked at, was on
16 June 26th.  So the next day you are back to him?  Fair?
17 A.  Yes.
18 Q.  Okay.  And what you say -- would you just tell us what
19 you said to him, please?
20 A.  Sure.  "Jim, attached is a redlined revised license
21 agreement incorporating the changes you requested to the
22 extent Fair Isaac is able to agree to them."
23 Q.  So each of his redline changes was given review, was it?
24 A.  Yes.
25 Q.  And to the extent Fair Isaac would accept them, it did?

456

1  A.  Correct.
2  Q.  And to the extent it could not, it did not?
3  A.  Correct.
4  Q.  So let's look at what happened then.
5        Attached to your email, P309, is the next version
6  of the software license and maintenance agreement that you
7  sent back to Mr. Black?
8  A.  Yes.
9  Q.  So paragraph 3.1, what is FICO's response to all of the
10 red lining that Mr. Black had done?
11 A.  It was rejected and, we I, reinserted our original 3.1
12 with the license restrictions.
13 Q.  So Mr. Black's suggestions, were they rejected in total?
14 A.  It appears so, yes.  Yep.
15 Q.  And then if we go to 3.6, please.  What was, what was
16 FICO's response to his efforts, his seeking of permission
17 for ACS the consultant?
18 A.  It's still in the agreement with red line in tract
19 changes, what we call it in the law department, but the
20 original Fair Isaac language that he struck has been
21 deleted.  So I'm not sure if I still had questions for him
22 in regard to what he's proposing in 3.6, since I did not
23 completely accept it, but it appears that we're working
24 toward accepting some version of 3.6.
25 Q.  Or putting it, in the words of the consultant,

457

1  identifying it more specifically.  FICO and you and
2  Mr. Black are working on the conditions under which FICO
3  will consent to ACS Consulting being permitted access to
4  Blaze Advisor?
5  A.  Yes.
6  Q.  It wasn't rejected out of hand like the changes to 3.1?
7  A.  Correct.
8  Q.  The last sentence of your red lining, would you read
9  that to us, please?
10 A.  Of 3.6?
11 Q.  I'm sorry.  Yes, of 3.6.
12 A.  "The rights granted to ACS herein shall not be extended
13 to any other third party without the prior express written
14 consent of Fair Isaac."
15 Q.  And when we get to the, when we go back to the J1, the
16 final agreement, we will check on the conformance of that to
17 the final language.
18        And then let's look at 9.3.  What happened to
19 Mr. Black's suggested changes?
20 A.  It appears they were accepted.  There are no further red
21 lines in 9.3.
22 Q.  Would you look at the language of 9.3 in Exhibit 309 to
23 the language in 9.3 in Exhibit J1?
24 A.  Yes, they are the same.
25 Q.  That is to say, you returned to the standard FICO

458

1  language for Section 9.3?
2  A.  Yes.
3  Q.  And then let's look at your response to his changes to
4  10.8.
5        Is it fair to say that the only change that FICO
6  accepted was that consent would not be unreasonably
7  withheld?
8  A.  Yes.
9  Q.  All other changes that Mr. Black had suggested were
10 rejected?
11 A.  Correct.
12        MR. HINDERAKER:  Your Honor, if you would like to
13 break, this would be a time.
14        THE COURT:  That sounds like a great idea.  Thank
15 you.
16        Ladies and gentlemen, we'll take our afternoon
17 recess.  As always, no research.  Talk about anything you
18 want except the case.
19        THE CLERK:  All rise for the jury.
20            IN OPEN COURT
21            (JURY NOT PRESENT)
22        THE COURT:  Just for planning purposes, what do
23 you think the time, excuse me, timeline is?
24        MR. HINDERAKER:  I almost -- I really hate to say
25 this, because of the impact it has on Ms. Boone, but I could

**459**

1   see that I would be going for a while yet, you know, maybe
2   as much as an hour, and I'm disappointed in that because
3   cross-examination my not be finished today.
4           THE COURT: Will you be doing the
5   cross-examination, Ms. Godesky?
6           MS. GODESKY: Yes.
7           THE COURT: And your best estimate? I know it's
8   hard to say.
9           MS. GODESKY: 45 minutes, 30 minutes.
10          THE COURT: Yeah. I don't want to keep the jury
11  here to 5:30 or quarter to 6 on Friday. We'll kind of play
12  it by ear, but it sounds like where we're going to break is
13  at the end of the direct.
14          Does that sound about right to you,
15  Mr. Hinderaker?
16          MR. HINDERAKER: It does. I could imagine that
17  the, I could imagine that it might be an early release
18  today.
19          THE COURT: Okay.
20          MR. HINDERAKER: I can maybe talk faster and see
21  what I can do, but that is a judgment.
22          THE COURT: Okay. Well, we'll see where we are.
23  We'll try and get through the witness, if at all possible.
24          We'll take 15 minutes, be back in at quarter to
25  four.

**460**

1           Oh, and, Mr. Hinderaker, to the extent that you
2   were asking about Exhibit 145, which was talked about but
3   not actually displayed during the depo, that's in. It was
4   talked about, and it was obviously going to be displayed.
5           MR. HINDERAKER: Yeah, that would be fine.
6           THE COURT: Okay.
7           MS. GODESKY: Sorry.
8           THE COURT: 145. With the video depo, it was
9   referenced and talked about; it just wasn't displayed.
10          MS. GODESKY: I see. That's on our list. Okay.
11  All right. Thank you.
12          (Recess taken 3:32 p.m.)
13  3:47 p.m.
14              IN OPEN COURT
15              (JURY PRESENT)
16          THE COURT: You may proceed.
17          MR. HINDERAKER: Thank you, Your Honor.
18  BY MR. HINDERAKER:
19  Q.   Ms. Boone, would you turn to Exhibit P310, please?
20  A.   Yes.
21  Q.   This is an email from yourself to Mr. Black on
22  June 29th, correct?
23  A.   Yes.
24  Q.   And what are you communicating to Mr. Black in this
25  email?

**461**

1   A.   There's an updated version of the agreement. I've made
2   some additional changes, most were grammatical, and also
3   clean up kinds of changes. So I did not highlight those.
4   Substantive changes that were made after input from other
5   groups and based on the business terms that are now included
6   in Exhibit A. There are a few of those.
7   Q.   Okay.
8   A.   And I included notes explaining the changes that I made.
9   Q.   And as you communicated -- transmitting the document
10  back to Mr. Black?
11  A.   Yes.
12  Q.   And the email does reference the fact that, that you had
13  a discussion with him the day before. Do you have any
14  memory of that?
15  A.   I do not. It does say we're having a discussion that
16  same day as the day of the email.
17  Q.   Okay. And any recall of that?
18  A.   No.
19  Q.   No. All right. Well, let's just go through these
20  provisions again.
21          Looking at 3.1.
22  A.   Yes.
23  Q.   Is it fair to say that that now is FICO standard
24  language per your draft to him of a couple days earlier?
25  A.   Yes.

**462**

1   Q.   And then if we go to paragraph 3.6, the third party,
2   there's still -- work is still being done on that provision?
3   A.   Yes. And I've added some highlighted language for his
4   review.
5   Q.   Yes. And would you tell us, read for us what the
6   highlighted language is that you added?
7   A.   "Provided that such use is otherwise subject to the
8   terms and conditions of this agreement and does not exceed
9   the limitations on use and other restrictions set forth
10  herein."
11  Q.   So that's an additional limitation that FICO proposed to
12  Chubb & Son?
13  A.   Correct.
14  Q.   And is the last sentence still the same as before, the
15  rights granted shall not be extended to any other third
16  party?
17  A.   Yes, that's consistent with the prior draft.
18  Q.   All right. And then if we go to paragraph 9.3, effect
19  of termination, has that returned or is that now the
20  standard FICO language?
21  A.   Yes, that's consistent with the FICO standard language.
22  Q.   And then if we go to paragraph 10.8, is it fair to say
23  that it's standard FICO language, say for the addition of
24  Mr. Black's suggestion of consent not unreasonably withheld?
25  A.   Correct.

**463**

1  Q.  So that's the progress that we're making in the
2  negotiations of the language?
3  A.  Yes.
4  Q.  Then let's go to Exhibit 311.  This is also on
5  June 29th?
6  A.  Yes.
7  Q.  And this must be the telephone call that you were
8  referencing earlier?
9  A.  Correct.
10  Q.  And is it fair to conclude from the email that some
11  changes were made in your discussion with him?
12  A.  Yes.
13  Q.  And then those were memorialized in the document that
14  you transmitted by Exhibit 311?
15  A.  Correct.
16  Q.  Okay.  As we know from J1, the license agreement is
17  in fact signed, the main body of the license agreement as
18  it's signed the next day on June 30th.
19        So let's go to paragraph 3.1 on this draft.  And
20  is there a change there?
21  A.  Yes, there is.  In subsection two.
22  Q.  And what is that, what is that change?
23  A.  So we're carving out an exception around the restriction
24  where otherwise Chubb & Son cannot alter, change, modify
25  adapt, translate or make derivative works of the Fair Isaac

**464**

1  products.  And we're calling out an exception there to say
2  that "other than in connection with rules" they cannot
3  alter, change, modify, adapt, translate or make derivative
4  works.
5  Q.  Okay.  Was that a suggestion from Mr. Black?
6  A.  I don't recall.
7  Q.  Okay.  It's not standard FICO language, though?
8  A.  Correct.
9  Q.  Is everything else in paragraph 3.1 standard FICO
10  language?
11  A.  I believe so, yes.
12  Q.  Looking specifically at 3.1 sub, you know, small Roman
13  IV, can you tell, is that standard FICO language?
14  A.  Yes.
15  Q.  And then if we go to paragraph 3.6, what's the state of
16  negotiations regarding permission for ACS to have access and
17  use of Blaze Advisor?
18  A.  It appears that we have agreed to the language at this
19  point.  And the highlighted language that I added and sent
20  to him in my prior email is now unhighlighted, which would
21  lead me to believe it's been accepted by the parties.
22  Q.  It's still there?
23  A.  It's still there, yes.
24  Q.  Yes.  Yes.  And then if we go to 9.3, what's the state
25  of the negotiations over the language of the term -- the

**465**

1  effective termination provision?
2  A.  That section has been agreed to.  There are no further
3  red lines or open items.
4  Q.  And as we saw before, that's now back to standard FICO
5  language?
6  A.  Yes.
7  Q.  And then if we go to paragraph 10.8, it looks like, what
8  is that telling you there?
9  A.  There are no open items remaining in 10.8, and that
10  appears to be FICO's standard language.
11  Q.  With the exception of "shall not be unreasonably
12  withheld"?
13  A.  With that exception, yes.  We agreed to include that.
14  Q.  Would you go to -- before we go forward to June 30th,
15  would you go to Exhibit P336 please?
16  A.  Yes.
17  Q.  All right.  And this master services agreement, look at
18  the, I guess look at the last page.  The master services
19  agreement is the final signed document?
20  A.  Yes.
21  Q.  Okay.  And at the signature page the client is whom?
22  A.  Chubb & Son, a division of Federal Insurance Company.
23  Q.  And the same is true as being the client on the first
24  page of the master services agreement?
25  A.  Yes.

**466**

1  Q.  And if you go to article 17 in the master services
2  agreement that's titled Notices.  It's on page 21684 of the
3  Bates?
4  A.  Yes.
5  Q.  And under Notices for Chubb, James Black is called out?
6  A.  Correct.
7  Q.  And how does Mr. Black identify himself?
8  A.  He is in the vendor management group with Chubb & Son, a
9  division of Federal Insurance Company, in Warren,
10  New Jersey.
11  Q.  Thank you.  Now I'd like to go, that being the history
12  of the negotiations, I'd like to go to J1.  During the, as
13  we saw, as we said at the outset, the client in the final
14  master -- the client in the final software license and
15  maintenance agreement is Chubb & Son, the division.
16        In all of your conversations with Mr. Black, was
17  there any request to make that anything, make the client
18  somebody else?
19  A.  Not that I recall, but it was never in a red line
20  document from him.
21  Q.  And we also saw that, yes.
22        From your, you know, in your role in drafting
23  these agreements, working with the business folks, but in
24  your understanding of the commercial purpose of the license
25  agreement, does the license agreement grant rights to

Fair Isaac Corporation v Federal Insurance Company, et al., File No. 16-cv-1054(DTS)                    February 17, 2023

467

1  anybody other than the client?
2  A.  No.
3       MS. GODESKY:  Objection.
4       THE COURT:  State your objection more fully,
5  please.
6       MS. GODESKY:  I think this is a sword/shield
7  problem.
8       THE COURT:  Yeah.  Why don't you rephrase the
9  question.
10      MR. HINDERAKER:  Is --
11      THE COURT:  Do you want to approach here?
12      MR. HINDERAKER:  Well, I can try to rephrase it
13  first.
14  BY MR. HINDERAKER:
15  Q.  As the, as the lawyer involved in the drafting of the
16  agreement, the software license and maintenance agreement,
17  is there significance in the drafting of the agreement in
18  all of the provisions to the identification of the client?
19      MS. GODESKY:  Same objection.
20      THE COURT:  Overruled.
21      THE WITNESS:  Yes.
22  BY MR. HINDERAKER:
23  Q.  What is that significance?
24  A.  All of the other provisions of the software license and
25  maintenance agreement are drafted between Fair Isaac and the

468

1  client.  So it's significant as to how the client is
2  identified because you have things like -- well, you have
3  rights and obligations of the client and rights and
4  obligations of Fair Isaac.
5       So it's important to understand who those parties
6  are specific to the license grant, confidentiality
7  protection, indemnification and a host of other legal
8  provisions.
9  Q.  We have seen when we were looking at paragraph 3.1, we
10  seen throughout the documents there are reference to the
11  client shall, the client shall.
12  A.  Correct.
13  Q.  What is the significance of that then referencing back
14  to the definition?
15  A.  It's signifying that that's an obligation on the part of
16  the client.  So the party that has that right or obligation,
17  depending on which section you are looking at, is Chubb &
18  Son, a division of Federal Insurance Company as the client.
19  Q.  We haven't reviewed every element of the license
20  agreement, but recognizing that, let me ask you this
21  question:  In FICO software license agreements for Blaze
22  Advisor, is the license agreement itself in any way tied to
23  the gross written premium of the client or the total revenue
24  of the client?
25  A.  The fee is generally related to the size, revenue of the

469

1  client, yes.
2  Q.  And is there anything in the agreement itself that
3  recognizes that fact?
4  A.  The way in which the license grant and the restrictions
5  are drafted would be reflective of the intent of the parties
6  with regard to who can use the software.
7  Q.  The scope of the license grant in the original, the
8  original agreement, we've had other testimony.  So maybe I
9  don't have to take your time, but if we go to Exhibit A --
10  A.  Yes.
11  Q.  -- it defines definition of named application?
12  A.  Correct.
13  Q.  So the original agreement was in FICO terms a named
14  application license?
15  A.  Yes.
16  Q.  And the definition of the application came from whom?
17  A.  I believe that would have come from Chubb, because it
18  is, it's saying in the, in subsection A that the application
19  is Chubb's specialty insurance's underwriting and automated
20  policy renewal application.
21  Q.  And you've described for us the components of Exhibit A
22  in terms of scope, quantity and so forth.
23       I would like to go to Amendment One and just
24  understand how the documents work.
25       So if we go to Amendment One, in contrast to the

470

1  many pages of the main body, Amendment One is two pages.
2  A.  Yes.
3  Q.  So how does Amendment One and the main body of the
4  license agreement, how do they interrelate?
5  A.  So once you have the main license agreement, if anything
6  in that document is changing, you can do that by amendment.
7  And an amendment is generally shorter, not always, but
8  oftentimes shorter, because you're simply changing things
9  that were originally agreed to in the license agreement, in
10  this case the original agreement.  So you don't have to
11  restate the entire agreement.
12  Q.  And if in Amendment One there is -- and everything in
13  Amendment One that is not referenced relative to the
14  original agreement, is it fair to say that the terms and
15  limitations and conditions of the original agreement apply?
16  A.  Correct.
17  Q.  And the same is true with Amendment Two, is that
18  correct, being, I guess, that also may be a three-page
19  document.
20       The amendment states what's different, and the
21  main body of the agreement is otherwise in full force and
22  effect?
23  A.  Correct.
24  Q.  Now, Amendment Two is calling itself an enterprise-wide
25  license.  As you were drafting the agreement, in light of

**540**

1   avoid the snow.

2   A.   I appreciate it.

3   Q.   Mr. Ivey, can you tell the jury your current employer

4   and role?

5   A.   So I'm the vice president of product support at FICO.

6   Q.   And how long have you worked at FICO?

7   A.   Since 2003, so about 20 years.

8   Q.   And how long have you been in the product support group?

9   A.   Since 2014, so nine years.

10  Q.   What does the product support group do at FICO?

11  A.   So the product support group is -- essentially it's a

12  help desk.  So if you were to call in for help on something,

13  we will help out with the software and the errors that are

14  occurring.

15  Q.   Could you move a little closer to microphone?

16  A.   Yes.

17  Q.   And your microphone can move, too, if that's easier.

18  A.   Okay.  There we go.

19  Q.   Perfect.  And before your role in product support, did

20  you have any other positions at FICO?

21  A.   I did.  I was in the professional services group within

22  FICO.

23  Q.   When did you start in the professional services group?

24  A.   So I started there in 2003 until 2014, so that was about

25  eleven years.

**541**

1   Q.   And we just talked about what the product support group

2   does.  What does the professional services group do at FICO?

3   A.   So the professional services group at FICO, I sort of

4   bucket it into three areas.  So we provide consulting to our

5   customers.  We provide kind of implementation or

6   configuration services for Blaze Advisor and for the

7   software, and then we provide mentoring around the software

8   as well.

9   Q.   Implementation.  What does implementation mean with

10  respect to the professional services group?

11  A.   So with respect to the professional services group,

12  implementation would be really getting the software kind of

13  up and running.  So it would be working with the customer to

14  take Blaze, which when it, when it is delivered from FICO,

15  it's not really ready to run.  You can't just take it and

16  plug it in and run it.  So it's the life cycle of taking

17  Blaze Advisor, configuring it and getting it up and running

18  at the customer site.

19  Q.   And so the FICO professional services group people help

20  perform that function, correct?

21  A.   Correct.

22  Q.   And you just mentioned another software industry buzz

23  word.  Configure.  What does "configure" mean?

24  A.   So configuration would be -- it's sort of part of the

25  broader implementation.  So configuration would be taking

**542**

1   the business logic, implementing it or configuring it within

2   Blaze Advisor and then get it running.  So kind of -- I

3   guess maybe an analogy would help.

4        So if you have an iPhone, a brand-new iPhone, and

5   you, you know, get it home and you unplug it -- sorry -- you

6   plug it in and you get it started, there is a lot of things

7   that you would need to configure on the phone.  Right?  So

8   what ring tones you want and, you know, all of the -- what

9   mail you're going to get and all the apps that you want to

10  download and things like that.

11       So that's the same way Blaze Advisor is similar to

12  that.  We would take it and work with you to find your

13  preferences and the logic that you want to put in it, and we

14  configure it within the system, if that helps.

15  Q.   And when you left the group in 2014 to move into product

16  support, how many people were on the professional services

17  team at FICO?

18  A.   We had about 80, 80 resources in the North American

19  group.

20  Q.   And what activities -- can you identify the activities

21  in big buckets that the professional services group does

22  with respect to Blaze Advisor, in particular?

23  A.   As I mentioned before, I would say in the sort of these

24  three big buckets that we did sort of consulting and then

25  the configuration, the implementation and really the

**543**

1   mentoring of a customer.

2   Q.   And who receives these services?  Who are you providing

3   them to?

4   A.   So our licensed customers would typically ask for and

5   receive these services.

6   Q.   Let's break down those three buckets and talk about each

7   of them generally.

8   A.   Okay.

9   Q.   Consulting.  What types of consulting did the group

10  offer to Blaze Advisor customers?

11  A.   So in consulting, we were really bringing our best

12  practices around the software.  So we've obviously

13  implemented it many, many times with many customers.  So our

14  knowledge around the best ways to take the software to use

15  it in a performant way, in a way that was -- you were

16  looking for it to be scaleable and adaptable and agile.  So

17  a lot of those best practices are around those areas.  We

18  provided a lot of that in the consulting aspect of it, how

19  you would implement a business rules management system

20  within your company, if you hadn't used one before.

21  Q.   And next bucket, configuration.  Can you explain what

22  are those services with respect to Blaze Advisor?

23  A.   So configuration is really the, the, again, part of the

24  area where we take the software, we're going to work with

25  the customer to understand their business logic, and then

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                                    February 21, 2023 - Volume IV

---

**552**

1  the requirements that they wanted, what they wanted this to
2  look like, we really worked back and forth with how this was
3  going to implement and work with their system as well.
4          And then we go into the design of it. So we said,
5  okay, what would this look like with a tax return, do we
6  have the right data that we need, do we have all the logic,
7  is it written down, is it in the auditor's heads, you know,
8  where is it. So we gathered a lot of that and put that
9  together.
10          And then we worked with them to actually develop
11  the system, so worked through actually implementing again
12  the full Blaze Advisor, the full repository, all the rules,
13  working hand in hand with them and then training them at the
14  same time and mentoring them. And we deployed that out into
15  the IRS. And the result was that they actually were then
16  able to go through really all one million tax returns
17  within, you know, hours versus 1,000 with, you know, eight
18  people sitting around a desk for two weeks. So it was a
19  huge success story. It was really good.
20  Q. And how, how do customers get a copy of Blaze Advisor?
21  A. So we have a fulfillment website where customers
22  typically would log in and download the software.
23  Q. And once it's installed, can FICO turn off Blaze Advisor
24  at its customer site?
25  A. No, we don't really have an option to do that. The

---

**553**

1  license is kind of on their premises. There is no way for
2  us to go in and turn it off. So it's not like a Cloud
3  account, like Spotify or Netflix or something, where we can
4  turn it off remotely.
5  Q. And let's drill down into the fun part, the contracts of
6  the professional services group. Can you pick up -- you've
7  got two big binders. Apologies, everyone. Pick up the
8  first one that starts with P212, in the first exhibit right
9  here.
10  A. This one here?
11  Q. Okay.
12  A. Oh, yeah. P212. Yes, sir.
13  Q. When you worked in the professional services group, were
14  you ever involved in documenting customer engagements?
15  A. I was. So I -- when I was in the professional services
16  group, I would document statements of work.
17  Q. And a statement of work, for someone who is not a lawyer
18  or who is not in the technical software industry, can you
19  tell me just at a top level what is a statement of work?
20  And then we will look at some.
21  A. Sure. Yeah. So a statement of work really just
22  describes what a customer has asked us to do for them. It
23  will run through what we're going to do, kind of the
24  deliverables that we will provide, and then usually the cost
25  and the -- excuse me -- and the number of hours that it will

---

**554**

1  likely take.
2  Q. Is a statement of work a license?
3  A. No, a statement of work is not a license. So typically
4  that would have been negotiated before I got involved. So
5  the license was -- or, rather, I'll say the professional
6  services statement of work would be an appendix to the
7  license.
8  Q. So it's a totally separate contract, correct?
9  A. Totally separate contracts, yes.
10  Q. And did you work on statements of work during your time
11  at FICO in the professional services group?
12  A. I did. I did. So I was for a period of time in charge
13  of, in charge of the Blaze group. So I would help negotiate
14  and understand what the customer was really looking for and
15  then write up the statements of work.
16  Q. And did you work on any of those statements of work
17  between FICO and Chubb & Son?
18  A. I did, yes.
19  Q. Do you know how many, how many of those statements of
20  work exist between Chubb & Son and FICO?
21  A. I did a count, and there were I believe 52 statements of
22  work.
23  Q. And have you personally reviewed all of those statements
24  of work?
25  A. I have.

---

**555**

1  Q. Based on your experience, do you recall generally what
2  type of services Chubb & Son requested from FICO?
3  A. Yes. So generally it followed a lot of ways I was
4  talking about earlier, so consulting, so the implementation,
5  that Four D approach that I talked about, training, there
6  was a number of trainings in there, and then that
7  mentorship, mentoring and guidance, yeah.
8  Q. Please turn to Exhibit 337 in your binder.
9          MS. KLIEBENSTEIN: AND, Your Honor, to my
10  knowledge, there is no objection to the exhibits we're going
11  to go through here.
12          THE COURT: Were you offering -- it hasn't been
13  displayed 212. Were you offering 212?
14          MS. KLIEBENSTEIN: Not yet.
15          THE COURT: Okay.
16          MS. KLIEBENSTEIN: Thank you.
17  BY MS. KLIEBENSTEIN:
18  Q. So Exhibit 337, do you recognize this exhibit, Mr. Ivey?
19  A. I do, yes. Yes.
20  Q. What is it?
21  A. So this is a statement of work dated the 12th of June,
22  2006.
23  Q. And, Mr. Mayleben, could you just show us the first page
24  there? Thank you.
25          So this is a statement of work contract. Can you

---

**556**

1  walk us through, for somebody who has never seen this type
2  of document before, walk us through the different pages and
3  just generally what types of information is in these
4  contracts based on your experience working on them?
5  A.  Sure.  Yeah.  So, generally, they would -- you have a
6  number of sections.
7         So the first section would be called the
8  Description of Services and would lay out, again, what we
9  were being asked to do and what we might be doing.
10        The second section would be the Deliverables, what
11  we're going to provide as a result of the statement of work.
12        And then Section 3 would describe what we aren't
13  going to do.
14        Four was kind of assumptions -- 4 and 5 were more
15  of the legalities.
16        And then 6 would cover kind of what we would be
17  paid and how many hours we would deliver, typically, unless
18  it was a fixed price and then --
19  Q.  And then it would end with the parties' signatures,
20  correct?
21  A.  Correct.  Yes.
22  Q.  Let's go back to the first page, if we could,
23  Mr. Mayleben.
24        Let's focus on the Description of Services.  This
25  was something that Chubb & Son was asking FICO to do, right?

**557**

1  A.  That's correct.
2  Q.  And can you tell me at a general level in this
3  Description of Services what was FICO being asked to do?
4  A.  So at a very high level, this, this was work to
5  identify -- so maybe the first section of what we were
6  talking about with the definitions.  So for this we were
7  being asked to -- actually, I can probably read the -- if I
8  look at the second paragraph, Fair Isaac will collaborate
9  with key client stakeholders to conduct a Blaze Advisor
10  project analysis for -- to perform discovery and analysis
11  activities for the pending renewal creation and
12  classification solution.  So, in general, it was that first
13  part of gathering the requirements, what do you want to do,
14  how would the rule management kind of fit within that
15  contract.
16  Q.  So to put this in the Four D frame work, what D are we
17  talking about?
18  A.  The first definition phase.
19  Q.  And what's the date on this contract?
20  A.  The 12th of June, 2006.
21  Q.  What were the fees for this particular statement of
22  work?
23  A.  So I'll go back to Section 6, and in the first paragraph
24  the fees were a fixed price of $30,000.
25  Q.  Do you know how many people hours at the time that would

**558**

1  have been?
2  A.  It would have been roughly between 120 and 160 hours
3  depending on the -- what rate we used underneath the covers,
4  but generally it would have been about that.
5  Q.  And how, how did you do that math?
6  A.  So if I take -- so I know the rough rate that we would
7  typically charge a customer.  So if I take 30,000 divided
8  by -- it was usually around 200, between 200 and $250 an
9  hour, and so that would give you 120 hours or 160 hours.
10  Q.  And going back to the first page down under 1(i), I
11  believe, if my eyes area correct, it says two deliverables.
12  Can you describe what those deliverables were to be in this
13  instance.
14  A.  Yes.  So it states that the first deliverable is,
15  "Pending Renewal Creation and Classification Solution Vision
16  document that outlines a baseline strategy and roadmap for
17  Blaze Advisor based Pending Renewal Creation and
18  Classification Solution."
19        And then the second deliverable would be a
20  "Conceptual Application Architecture Document that outlines
21  the various system components and infrastructure required to
22  implement the Pending Renewal Creation and Classification
23  Solution."
24  Q.  Can we set that exhibit aside and move to Exhibit 870 in
25  your binder.  And what is the date of this agreement?

**559**

1  A.  So this is a statement of work dated the 12th of June
2  2006.
3  Q.  And at a high level, at a high level, what services are
4  being described in this statement of work?
5  A.  So this statement of work is outlining -- it's a follow
6  on to that first statement of work, the pending renewal
7  creation and classification.  And it's essentially stating,
8  and if I look down in sort of the first bullet under the
9  first paragraph, it's talking about how we would conduct an
10  analysis of what would this whole implementation look like,
11  how many hours would it take, what would need to happen.
12  Q.  Implementation of what?
13  A.  Of the pending renewal creation and classification
14  application.
15  Q.  Implementation of Blaze Advisor into that application?
16  A.  Apologies.  Yes, yes.
17  Q.  And what's involved in implementation again, just
18  briefly?
19  A.  So the implementation would typically, again, cross that
20  Four D approach, the define, design, develop and deploy.  So
21  it would provide some consultative hours up front.  We would
22  go through gathering their business requirements around this
23  solution, all the way through developing it and deploying it
24  out into their system.
25  Q.  And moving to Section 2, Deliverables.

**560**

1  A.  Okay.

2  Q.  Can you tell me, what was the second deliverable

3  requested?

4  A.  So the second deliverable under part (b) was a proposal

5  for a fixed price implementation of the remainder of the

6  application.

7  Q.  And that was implementation by whom?

8  A.  It was a proposal for a fixed price implementation by

9  FICO of the --

10  Q.  And can we now move to Exhibit 341.  What is the date on

11  this statement of work?

12  A.  So this statement of work is dated August 11th, 2006.

13  Q.  So it was a couple of months after the last two we

14  looked at, right?

15  A.  Correct.

16  Q.  And what services are outlined in this statement of

17  work?

18  A.  So this statement of work outlines, is a follow on to

19  that last statement of work.  So it actually looks like the

20  result of that statement of work where it's outlining what

21  we would do for a full implementation of this renewal

22  application.

23  Q.  And implementation is that Four D approach that we just

24  discussed, right?

25  A.  That's correct.

**561**

1  Q.  And can you turn to -- well, actually, let's stay on

2  this first one.

3      Under the Project Background, can you tell me what

4  was the turbo batch renewal application identified in the

5  Project Background?

6  A.  Yeah.  So if I look at the second paragraph in 1.1, "The

7  turbo batch renewal application is a custom business

8  software application currently in use at Chubb.  The

9  application supports Chubb's underwriters and their

10  assistants at Chubb's renewal centers by classifying

11  specialty lines policies during Chubb's batch policy renewal

12  process.  Generally described, the application is a batch

13  process that assesses specialty lines insurance policies

14  with pending renewals and categorizes them for treatment."

15  Q.  And, Mr. Ivey, how many pages is this statement of work?

16  A.  Ahh.

17  Q.  I think the page numbers are in the upper right-hand

18  side.

19  A.  I wanted to take the long way.  17 pages.

20  Q.  Okay.  Now moving back to the second page under

21  Section 1.2, can you generally describe what, what work is

22  requested in Section 1.2 from FICO?

23  A.  So, generally, it's describing the implementation

24  project, how we would go about -- how we're going to go

25  about implementing this solution at the customer, the

**562**

1  pending renewal solution.  And it breaks down -- it has a

2  breakdown of the waves as described here.  So there were

3  four waves, in which we would be implementing an increasing

4  amount of the specialty lines that were being asked for.

5  Q.  And, Mr. Mayleben, if we could expand out.  And then

6  halfway down it says, "the wave breakdown."  Let's make that

7  bigger so everyone can read it.

8      You just briefly mentioned the wave breakdown.

9  What are you talking about?

10  A.  Yeah.  I think you have it up here.  So the wave

11  breakdown -- and this would be consistent with our kind of

12  mentoring cardiologist model, which is -- so the first wave

13  defines that FICO will do kind of 100 percent of the work.

14  And then in Waves 2, 3 and 4, you can see that Chubb & Son

15  would have an increasing amount of work that they would do

16  as they learn and start to use the software and learn how to

17  go about the implementation.

18  Q.  So let's set that project aside and move to Exhibit 346.

19  What is the date on this statement of work?

20  A.  Actually just give me one second here.  Here we go.  So

21  the date on this statement of work is May 21st, 2007.

22  Q.  And can you at a 10,000-foot level describe the services

23  requested in this statement of work?

24  A.  Just give me one second to make sure I'm -- so,

25  generally, the service here, services here are doing a

**563**

1  validation of a solution, and it looks as though it's the

2  commercial underwriting workstation.  So we were coming back

3  in and doing a high-level validation of their approach to

4  use a business rules management system for this commercial

5  underwriting workstation application.

6  Q.  So the application that's involved is what again?

7  A.  It's the commercial underwriting workstation

8  application.

9  Q.  And you mentioned "validating."  What is that?  What

10  does that mean in your line of work?

11  A.  So in our line of work, kind of back to that

12  cardiologist model where -- I believe we're being asked back

13  to kind of validate an approach that they have taken.  So

14  they had learned how to go about an implementation, and they

15  were then going into another solution here, having us come

16  back and, as kind of the cardiologist, and say, hey, have we

17  done everything right, are we on the right path so that we

18  don't get too far down before we have mistakes and problems.

19  Q.  And you just said they learned how to implement an

20  application.  What are you referring to?

21  A.  Sorry.  So Chubb & Son would have learned through some

22  of the prior styles that we saw -- we would have worked with

23  them; and, again, when we talked about the waves in the last

24  SOW, so they would have been picking up how to go about an

25  implementation of a solution.

**632**

1  Chubb & Son, a division of Federal, provided the support
2  services using Blaze Advisor?
3  A.  Before the acquisition, Chubb oral provided the services
4  for our products.
5  Q.  Would you turn to page 24 of your 29 -- that same
6  deposition in 2019.
7  A.  Page 24?
8  Q.  Page 24, please.
9  A.  Okay.
10  Q.  And then if you look at line 15, and I asked this
11  question:  "Okay.  Before ACE American Insurance Company
12  provided support for Blaze Advisor applications, in
13  connection with the sale of insurance policies, do you agree
14  that Chubb & Son, a division of Federal, provided those,
15  provided that support using Blaze Advisor applications:
16       "Answer:  That's correct."
17  A.  Yes.
18  Q.  Did I read that correctly?
19  A.  Yes.
20  Q.  And do you recall when all of the employees of Chubb &
21  Son and Federal became employees of ACE American?
22  A.  It became Chubb after the merger.
23  Q.  Let's stay on page 24.  Would you look at line 10?
24  Question:
25       MS. GODESKY:  Objection, Your Honor.

**633**

1       THE COURT:  What's the objection, Counsel?
2       MS. GODESKY:  I think the question was whether he
3  recalls, and the witness said he didn't.  I don't think that
4  this is impeachment.
5       MR. HINDERAKER:  No.  He said before -- that is
6  not what he said.
7       THE COURT:  Okay.  Overruled.  Hang on.
8  Overruled.
9       MR. HINDERAKER:  Okay.
10  BY MR. HINDERAKER:
11  Q.  So let's go to page 24, line 10.
12  A.  Okay.
13  Q.  Okay.  Are you with me?
14  A.  Yeah.
15  Q.  All right.  "And do you know when those employees who
16  were with Chubb & Son, a division of Federal, became
17  employees of ACE American Insurance Company?
18       "Answer:  January 1st, 2017, two oh one seven."
19       Did I read that correctly?
20  A.  Yes.
21  Q.  Thank you.
22       Is it correct to say, Mr. Pandey, that from the
23  time ACE American Insurance Company supported the sale of
24  insurance with Blaze Advisor applications until all use of
25  Blaze Advisor stopped -- let me back up.

**634**

1       Do you know that as of today, 2023, Blaze Advisor
2  is not used in any insurance applications to sell insurance
3  by ACE American or anybody within the whole Chubb
4  organization?
5  A.  All Chubb organization, yes.
6  Q.  It's all stopped?
7  A.  Yeah.
8  Q.  We can say that as of today?
9  A.  To the best of my knowledge, all stopped.
10  Q.  All right.  So with respect to -- then with respect to
11  the time period when ACE American was using Blaze Advisor in
12  applications to sell insurance, is it accurate to say that
13  ACE American was using Blaze Advisor in the same
14  applications connected to selling insurance that Chubb & Son
15  had used before?
16  A.  No.  The, we were selling -- can I answer this?  Okay.
17  Q.  All right.  Let's go to page 52.  And if you would go to
18  line 7, please, still in the 2019 deposition.
19  A.  Page 20?
20  Q.  Page 52, line 7, please.
21       And I ask the question:  "And rather than go
22  through each one of those applications individually, would
23  it be accurate to say that ACE American Insurance Company
24  now supports all the applications that use Blaze Advisor
25  being the same applications that Chubb & Son, a division of

**635**

1  Federal, supported:
2       Answer:  I'll say I'm fairly -- I'll say yes, but
3  to my knowledge, yes, but it could be other companies too."
4       And that was your answer?
5  A.  Yeah.
6  Q.  Thank you.  Let me change topics.  I want to ask about
7  the data centers and their location.  All right?
8  A.  Yeah.
9  Q.  Whether it was Chubb & Son using Blaze Advisor or ACE
10  American using Blaze Advisor, the data center where Blaze
11  Advisor was hosted was located in Raleigh, North Carolina?
12  A.  Yes.
13  Q.  And when a Blaze Advisor application was run on that
14  server in North Carolina, then a copy of the Blaze Advisor
15  software was made into the random access memory of the
16  server, correct?
17  A.  That's how the software work.  It's the same computer.
18  Q.  That's how the software works, correct?
19  A.  Yeah.
20  Q.  And then the applications that supported -- well, let me
21  back up.
22       Are you aware that Chubb Insurance Company of
23  Canada used Blaze Advisor in some applications connected to
24  selling insurance?
25  A.  Yeah, Chubb Canada used Evolution.

636

1   Q. Evolution?

2   A. Yeah.

3   Q. At least that one?

4   A. Evolution that I know of.

5   Q. And Evolution, as used by Chubb Insurance Company of

6   Canada, that software was hosted on the servers in Raleigh,

7   North Carolina?

8   A. Yes. As a primary, so it really doesn't --

9   Q. Your lawyer will be able to ask you as many questions --

10  A. No. No. I was thinking technical, because that's my

11  field.

12  Q. All right. Fair enough.

13       Yeah. So perhaps the underwriter or whoever the

14  business user was was sitting in Toronto, but when that

15  Toronto or Canadian based person was running Evolution, for

16  example, it was accessing the software on the servers in

17  Raleigh, North Carolina, correct?

18  A. Yes.

19  Q. And that's the only location that Chubb & Son had data

20  centers in the United States?

21  A. No. That's what I was going --

22  Q. Oh, okay.

23  A. The way IT works is you have to have the primary data

24  center. Then you have to have the secondary data center in

25  case all go off or upgrade happens, those scenarios. So you

637

1   always have primary and backup, so --

2   Q. Raleigh was the primary?

3   A. Yes.

4   Q. Where was the secondary?

5   A. So it was, in Connecticut, the other one, the secondary,

6   but for Canada, secondary was in Canada, Toronto.

7   Q. Okay. So Blaze Advisor was installed on servers in

8   Toronto, Canada, as a secondary backup?

9   A. No. It's primary in here in Raleigh.

10  Q. Yep.

11  A. And in Stansbury -- oh, not Stansbury. It is somebody

12  in data center in Connecticut. And that was the secondary

13  for us, but if disaster happens, let's say they have a

14  problem in the U.S., then we could deploy in Canada because

15  we had the data center which we didn't use at that time.

16  Q. Which you did or did not use?

17  A. Did not use at that time, but we had the data center in

18  Canada for other reasons.

19  Q. For other reasons like backup?

20  A. For other applications because Canada have some

21  application that is used only for Canada. So they had their

22  own data center.

23  Q. Okay. So let me just clarify this up. So for Blaze

24  Advisor software in Evolution, for example, when Evolution

25  was run, it was the application resident on the Raleigh,

638

1   North Carolina, server that was activated?

2   A. Yes, that was primary, and in case of some problem, then

3   it go to the Canada data center.

4   Q. But only if there was a problem?

5   A. There are some maintenance routine also that could

6   happen, but not the normal case.

7   Q. So Raleigh, North Carolina, or else someplace in

8   Connecticut?

9   A. Yeah.

10  Q. Fair enough. It doesn't matter where. Okay?

11  A. It's called Rainsbury or Stansbury, one of the "bury"

12  the name of the town. I'm forgetting. Salisbury.

13  Q. When we were together before, you were educating me

14  about what an underwriter does, and you told me that --

15       Tell me if you agree with this. That the

16  underwriter is the salesperson for the insurance company?

17  A. Underwriting, your language, laymen language, think of

18  them as a salesman, but they are not salesman. They are

19  underwriters. They are not salesmen, but in your tone to

20  explain you, I use the word think of them as salesmen.

21  Q. Yes.

22  A. But they're not salesmen. They are underwriters.

23  Q. And the function of underwriting is to sell insurance.

24  Do you agree?

25  A. Underwrite the policy, so if a customer ask a quote --

639

1   Q. Mr. Pandey, let me just back up. We know what

2   underwriting is. "Size the policy. Quote the policy. Do

3   all that underwriting work, and the purpose of all that by

4   the underwriter is to sell the insurance company insurance

5   policy," correct?

6   A. Sell, you can say it, but sale is done by agents and

7   brokers. They sell it.

8   Q. The purpose of the underwriter after he does all that

9   work is to sell the insurance policy to the agent and broker

10  and the agent and broker's customer?

11  A. We create multiple options, and we create the different

12  limits, the deductibles, different color and say here's

13  three options. Here the limit, here the premium. Here the

14  limit, here the premium.

15       We create multiple options. That's what

16  underwriter does, and go to agent and say tell the customer

17  which one they like, so use the option.

18  Q. And then get the options and hopefully one of them is

19  accepted and an insurance policy is sold, correct?

20  A. Yes.

21  Q. Correct?

22  A. Once they accept, then the issuance and billing and

23  other process starts.

24  Q. All right. Let's change topics. In your binder you

25  will see a tab that's P0154. Let me know when you've found

**803**

1  Q. So I've handed you what has been marked as Exhibit 116.

2  Is this one of the documents you reviewed to prepare for

3  your deposition?

4  A. Yes.

5  Q. This is an e-mail from you to Russ Schreiber dated

6  November 26th, 2008, correct?

7  A. That's right.

8  Q. Having reviewed the document, do you recall what led to

9  you writing this e-mail?

10  A. It appears that it was a request from Russ Schreiber for

11  my views on the status of the ELA and whether it did include

12  a global provision or not.

13  Q. And do you recall actually having a conversation with

14  Russ Schreiber on that topic?

15  A. No, I don't have a recollection of that.

16  Q. You state that in reviewing your notes and some archived

17  e-mails, "It's apparent to me that the corporate ELA that

18  was negotiated with Phil Folz and June Drewey intended to

19  include the global license," correct?

20  A. That is what I stated.

21  Q. So you concluded after reviewing archived e-mails and

22  your notes that the ELA was a global license?

23  A. That's -- that I don't agree with necessarily. It says

24  that it's apparent that it intended to include the global

25  license, but I can't tell you specifically that it did.

**804**

1  Q. Okay. What is the distinction between what you're

2  saying and what I said?

3  A. Well, the way I worded it, it's apparent that it

4  intended to include the global license. The question is in

5  the final what was actually paid by Chubb would indicate

6  that there is a difference of about $100,000, and I don't

7  see the wording, for example, changed from a definition of

8  territory. So there is some evidence that it did not

9  include -- that it was never finally accepted as global, but

10  I don't have the e-mail or any thread from Phil -- from Mark

11  Layden to indicate what was finally agreed on at that

12  private meeting that he attended, so I can't draw that

13  conclusion. It's apparent that they wanted global, but I

14  don't know if it ever came to fruition.

15  Q. So you just don't know --

16            COURT REPORTER: If it ever came to what?

17            THE WITNESS: Fruition.

18  BY MS. JANUS:

19  Q. But you believe that it was intended to include --

20  A. That's right.

21  Q. -- the ELA was intended to include the global license?

22  A. That is what I said.

23  Q. Do you know whether in fact after November of 2008 FICO

24  assisted Chubb in implementing the Blaze Advisor software in

25  Europe?

**805**

1  A. I don't believe that that was the way I read the e-mail

2  from the invitation of Mike Sawyer when he states that to --

3  license agreement and a plan for Chubb Europe, he's talking

4  about a sales opportunity.

5  Q. So you don't know whether FICO interpreted the

6  Enterprise License Agreement going forward as including

7  global access or not. You just don't know?

8  A. I don't know.

9  Q. What notes are you referring to in your e-mail marked as

10  116?

11  A. It would be the notes that -- the e-mails that you have

12  produced here clearly. Notes would have been perhaps

13  notebooks of -- as I attended meetings, I may have taken

14  notes at the meeting.

15  Q. So handwritten notes that you may have?

16  A. Handwritten notes, yes.

17  Q. Okay. And do you know where those handwritten notes are

18  today?

19  A. Thrown away years ago.

20  Q. Was that something that you took with you when you left

21  FICO?

22  A. The notebooks, yes.

23  Q. And do you know for a fact that you don't have those

24  anymore?

25  A. Yeah. We had a super storm, Sandy, and those notebooks

**806**

1  were in the basement and are no longer available.

2            MS. JANUS: Those are all the questions I have for

3  you.

4            THE WITNESS: Thank you.

5            MS. JANUS: Thank you for your time today.

6            THE WITNESS: Thank you.

7            MR. HINDERAKER: I have a few questions for you.

8  Let me get my materials.

9                    EXAMINATION

10  BY MR. HINDERAKER:

11  Q. Mr. Wachs, I'm going to give you a copy of Exhibit 143,

12  and you -- can you identify this as the RFI that was

13  received from Chubb & Son, a division of Federal Insurance

14  company?

15            COURT REPORTER: You identified this as the what?

16  BY MR. HINDERAKER:

17  Q. Can you identify this as the RFI that was received from

18  Chubb & Son, a division of Federal Insurance Company,

19  regarding its interest in the Blaze Advisor software?

20  A. Yes, I can.

21  Q. Okay. And that is what it is?

22  A. That is what it is.

23  Q. Okay. I just -- you mentioned some of this in your

24  earlier testimony, I believe, but if you would go to page 5

25  of this exhibit. And you see in the third paragraph there

**807**

1  is a description of the Chubb & Son specialty insurance?
2  A.  Yes, I do.
3  Q.  All right.  And referencing the relatively small number
4  of very large accounts, referencing the 1,000 employees that
5  we have seen in some of your e-mails, and then it has a
6  sentence, "The key strategic initiative in this area is
7  expanding and growing the business into mid-market and
8  smaller accounts."  Do you see where I have read?
9  A.  Yes.
10  Q.  Did you learn anything more from Chubb & Sons regarding
11  that -- the nature of that key strategic initiative and your
12  response to the RFI?
13  A.  Yes.  They -- by expanding the marketplace to the small
14  and middle-sized accounts, they expected an order of
15  magnitude increase in the number of work items that they had
16  to review and underwrite, and they did not have the staff
17  and did not have the budget for the staff that would be
18  necessary in their current processing manner.  And so they
19  were looking for an automated decision and management
20  software that would positively affect the scaleability of
21  their business so that they could take on new revenue
22  streams.
23  Q.  And by "scaleability," that's a phrase you used earlier.
24  Would you tell us what that means?
25  A.  To bring about -- for the use of automation to bring

**808**

1  about productivity gains so that their investment in the
2  processing can be reduced and they would not have to hire
3  and train and manage additional staffing.
4  Q.  Is scaleability a way of saying the ability to handle
5  higher volumes of business?
6  A.  Sure.
7  Q.  And how did -- how did you present Blaze Advisor
8  software as meeting that key strategic initiative?
9  A.  Decision management software in general and specifically
10  Blaze Advisor, as an industry leader, is able to process
11  large volumes of transactions, requests for decisions, rules
12  basis or -- can be greater than 25 to 50,000 rules making
13  decisions, and it can all be done in machine time.  So they
14  are able to meet deadlines, take on new business and -- and
15  become a much more agile organization as they can very
16  easily do what I call what-if transactions where they can
17  run the book of business at certain rules and then modify
18  the rules and run the same book of business and see the
19  positive effect on their balance sheet and profit and loss
20  statements.
21  Q.  You mentioned the what-if analysis earlier, and I
22  appreciate the description.  How does that benefit -- how
23  does that benefit Chubb & Son?
24  A.  They can make informed business decisions and they're no
25  longer trial and error.  They're able to determine what

**809**

1  level of investment and what marketplace to spend in, for
2  which gets the biggest bang for the buck.
3  Q.  Does it have any impact on speed?
4  A.  It's all about speed, not only speed of processing, but
5  there's the speed of examining the marketplace and being
6  able to change things quickly and interactively based upon a
7  sensing of what's going on in the marketplace.
8  Q.  With that ability, can you get products to market
9  faster?
10  A.  It's all about time to value, yes.
11  Q.  And by "time to value," what do you mean by that?
12  A.  Once there is a perceived need for modification of the
13  software, being able to set about to invoke a standard
14  development life cycle and get a product -- a change or a
15  new rules base or a new decision into production very
16  quickly.
17  Q.  And how does that relate to or impact the ability of
18  Chubb & Son to have a new insurance product to market?  You
19  can you answer my question, please.
20  A.  Sure.  You're able to modify the book of business on the
21  fly by business people rather than technologists.  You don't
22  have to suffer the standard queue online waiting for the IT
23  folk to make changes, because the business people are able
24  to make these changes with the software in English language
25  without having to do coding.  That enables them to change

**810**

1  things, to run AB analysis examining different groups,
2  changing the rules, and they can -- seeing the results of
3  those rules.  It positively affects the business.
4  Q.  If you turn to page 6 of the RFI, and you see it lists
5  out the current CSI business goals and then it has four
6  bullet points.  Can you tell us more from -- did you learn
7  more from Chubb & Son with respect to those business goals?
8  A.  As a result of our discovery effort, are you saying?
9  Q.  Yes, as a result of your working with Chubb & Son.
10  A.  I believe that they well stated their business goals,
11  they understood their business well.
12  Q.  Okay.  Good.  Then on page 7 of the RFI, they describe
13  their current state of renewal processing.  If you would
14  review that for a moment.
15           And my question is going to be to you on your
16  discussions and -- from your discussions with Chubb & Son,
17  what changes to their current state were they seeking to
18  achieve through the technology of Blaze Advisor?
19  A.  Well, there were a number of different changes.  For one
20  thing, they ran their policy -- the policy is up for renewal
21  on a monthly basis in -- in the current state of the world.
22  They were looking to do that with much more -- the cycle
23  time could be reduced greatly, they could run them daily,
24  or, more importantly, they could be run by the business unit
25  rather than waiting for a technologist to run those cycles

**811**

1  so that they can make adjustments to the extent that you can
2  change a policy rating more interactively, you can derive a
3  greater profitability because of the period of time that you
4  are now able to -- a variation in price rather than go with
5  the standard pricing, so you created a value in your actual
6  premium revenues.
7         The ability to -- they talk about Section 1 rules
8  within their specialty renewal business.  They can vary the
9  attributes of the claims, of the -- I'm sorry -- of the
10 limits and the deductibles and the term length in various
11 ways and be able to penetrate and make changes that create a
12 better reward-risk ratio and thus greater revenue
13 profitability.
14 Q.  And if we go to page 11 of the RFI, there is a heading
15 at the bottom of the page, "Renewal processing:  Future
16 state."
17 A.  Yes.
18 Q.  And they -- Chubb & Son in the RFI says, "The goal of
19 this project is to create an application and architecture to
20 allow for a streamlined rules" --
21        COURT REPORTER:  To what?
22 BY MR. HINDERAKER:
23 Q.  -- 'to allow for a streamlined rules-based renewal
24 processing engine."
25        It goes on to say, "An additional goal is to build

**812**

1  the foundation for a future state architecture for
2  rules-based processing that can be applied to new projects
3  as we seek to improve the efficiency of our
4  business-processing environment."
5  A.  A key architectural element of a rules-based product
6  like Blaze Advisor is that the rules are separated from the
7  likes and stored in a nonredundant central mass database;
8  therefore, as new products get created, you can now utilize
9  the rules that are sitting in this database for your
10 application without having to continually rewrite those
11 rules and then also to conform that a single rules change,
12 like an interest rate, for example, or risk factor in
13 changing it in one place, in one rule, can then affect all
14 of the applications that are drawing on that one rule
15 change.  So your ability to come to market with new products
16 in a new architecture is greatly enhanced.
17 Q.  Is that an element -- is that a matter of speed again?
18 A.  Certainly speed is a key consideration.
19 Q.  What other considerations go into that?
20 A.  Uniformity, auditability, the ability for a business to
21 consistently apply rules for the ability of people to
22 understand the rules that are firing and the decisions that
23 are being made.  And that's key in customer service.  It's
24 key in business to be able to accept or reject business.
25 Q.  Would you -- thank you.  Would you look and find

**813**

1  Exhibit 105, please.  Well, rather than search around, here
2  is another copy of it.
3         You were asked about Exhibit 105 earlier today,
4  and this is an another copy of Exhibit 105.  And I guess my
5  question to you about this, about this Exhibit 105 -- I
6  guess first we should establish that you are the author of
7  the content?
8  A.  I am.
9  Q.  And with respect to FICO's response to Chubb & Son's
10 RFI, is Exhibit 105 a fair summary of the response?
11 A.  Of whose response?
12 Q.  Of FICO's response to the RFI.
13 A.  In broadly general terms, yes.
14 Q.  So as we saw, the RFI is dated early February 2006.
15 Your e-mail, Exhibit 105, is February 22, 2006.  In those
16 discussions that you had with Chubb & Son, either weekly or
17 every ten days that you mentioned, what was the subject
18 matter of those discussions as you moved the process forward
19 before the license agreement was signed?
20 A.  Typically, those conversations had to do with the
21 creation of a proof of concept that would enable us to
22 remove any doubt that we had the superior product.  While
23 there were other rules management systems on the market, it
24 was incumbent on FICO at the time to be able to show that
25 rules could be created faster, that they could be executed

**814**

1  faster, that they could be managed easier and by business
2  people.
3         And each one of those attributes of the product
4  needed to be proved to the client, and so we would create
5  code, show examples of what we did, and define the scope --
6  understand their rationale and how they create their rules
7  and how they would create them in the new existence and new
8  product.  And then it was a question of refining their scope
9  so that we can give accurate pricing --
10 Q.  Okay.
11 A.  -- for both the product as well as the professional
12 services engagement.
13 Q.  All right.  So let me move the process forward a little
14 bit to after the license agreement is signed in June of
15 2006.  Is there a next phase that might be called client
16 acceptance or client testing?  What was the next phase?
17 A.  Well, as the license agreement is executed and then the
18 master services agreement was executed, it was necessary for
19 us to craft the actual product and the way it worked within
20 their environment.  That required our technical people to
21 begin to code, to begin to draft a bespoke version of the
22 software that made sense to the application it was being
23 written for.  Like any other application development
24 project, you have to follow a certain structured development
25 life cycle.

815

1    Once the units -- and I call them units. I call
2    them building blocks. Once those building blocks are
3    created, you unit test each of those building blocks, and
4    then you start to glue those building blocks together to
5    perform a more fully functional product, which then can be,
6    again, tested by the users in the form of acceptance testing
7    or full quality control to make sure that if I run this
8    business in the as-is state and then I run it again in the
9    future state, I'm going to get the same results or that I am
10   going to accept the changes because that was designed that
11   way.
12       So what I'm saying is, you have to quality control
13   your product acceptance, and that was conditional, and
14   anybody that is buying a professional services engagement
15   has to be able to finally accept the work product
16   deliverable. And those are steps -- were key steps in the
17   process.
18   Q.  And were you involved in that process with Chubb & Son?
19   A.  Yes, I attended the status meeting.
20   Q.  Okay. And were you in meetings where either the
21   business people or the IT people of Chubb commented upon the
22   performance of the software in that context of the
23   acceptance testing?
24   A.  One of those folks -- and this is told to me by, I
25   believe, Sully -- was so impressed, he said that I just did

816

1    in one afternoon myself, utilizing the Blaze Advisor
2    software, something that would have taken months and
3    hundreds of thousands of dollars of budget for that same
4    process to be done by IT. This product implementation has
5    basically paid for itself on the first time we ran it.
6    Q.  And that was from Sully?
7    A.  Yes.
8    Q.  Okay. And then did any of the business -- did any of
9    the business people of Chubb & Son comment on how the use of
10   the product, that is, Blaze Advisor, would be able to assist
11   them in growing their revenue, moving into the mid-market?
12   A.  Only that within the first full year they did succeed in
13   accepting considerably more business than they had in the
14   previous year for no increase in staff.
15   Q.  This was identified in an earlier deposition as
16   Exhibit 330, dated November 3, 2006. Placing a time, it's
17   after the June license agreement. It's after the divisional
18   and it's before the second amendment.
19       Do you know who prepared Exhibit 330?
20   A.  I did.
21   Q.  And what was the purposes of Exhibit 330?
22   A.  Sales training within FICO.
23   Q.  So internal, internal to FICO?
24   A.  Yes.
25   Q.  Okay. And I think maybe the title tells us what we need

817

1    to know, but would you just give us a general description of
2    what this document was intended to say and teach?
3    A.  It was a full, if you will, client journey document here
4    which described the business need, the intended solution,
5    how we built the solution, and the results of the
6    implementation.
7    Q.  Okay. And is this fair to say that this summarizes your
8    firsthand experience in that process of selling to Chubb?
9    A.  Certainly.
10   Q.  Maybe just a couple more questions about this. If you
11   go to the page that is 5877 where it says, "Chubb specialty
12   insurance business" and has the bullet points.
13   A.  Yes.
14   Q.  What, what was the source of this information that's on
15   this letter?
16   A.  Interestingly, the bullet that talks about 3.5 billion
17   comes from the RFI from Chubb.
18   Q.  Mm-hmm (Yes).
19   A.  1,000 employees comes from the RFI. 100,000 policies
20   written comes from RFI. And the enterprise-wide premium
21   revenue comes from the earlier intent -- or I should say a
22   summary intent to talk about what would have come from the
23   annual report.
24   Q.  Okay. And then on the next page, which is 5878, same
25   question: What was the source of your understanding of the

818

1    Chubb current state?
2    A.  Initially, in that first response, it was the RFI, and
3    it was refined through subsequent weekly conversations with
4    the technology team headed by Sully.
5    Q.  And then on the next page, 5879, you lay out the vision
6    statement and then you lay out success criteria. Do you
7    know if the success -- do you know if the success criteria
8    were met?
9    A.  I do know that they automated their renewals --
10   Q.  Mm-hmm.
11   A.  -- in short order. I do know that from the testimony of
12   the business people that they did -- they were able to
13   access and modify the rules; and through the analysis tools
14   of the Blaze Advisor product, they would be able to know
15   which rules are the best rules and which rules are the worst
16   rules and, in effect, modify them accordingly.
17       THE COURT:  All right. Members of the Jury, we're
18   going to take our break now. And I have a matter that I and
19   the lawyers need to take up during the break, so why don't
20   you plan to be back in the courtroom at 1:35 on that clock.
21   Okay?
22       THE CLERK:  All rise for the jury.
23       (Jury exits.)
24
25       (In open court without the Jury present.)

**819**

1    THE COURT:  All right.  Go ahead and be seated.

2    We're going to take about a ten-minute break here,

3 and then I will come back up and give you my ruling on the

4 various issues that have been briefed over the last couple

5 of days.  Okay?  Be back here about 12:00 or shortly

6 thereafter.

7    (Recess taken.)

8

9    (In open court without the Jury present.)

10    THE COURT:  All right.  Let's go on the record.

11    All right.  We're here in the courtroom outside

12 the presence of the jury.  I'm going to give the Court's

13 ruling on the various cross motions for exclusion of

14 evidence of -- defendants' motion to exclude evidence of

15 settlement agreements that FICO has achieved with other

16 Blaze Advisor licensees, and those are basically Dockets

17 Numbers 1086, 1094 and 1103, and FICO's motion to exclude

18 evidence of perpetual licenses between FICO and other Blaze

19 Advisor licensees.  Those are Dockets 1097, 1098, 1101, and

20 I believe either 1103 or 1106 from this morning -- 1106 from

21 last night, rather.

22    In order to give context to my ruling and further

23 guidance, I will give the parties -- I'm going to start with

24 the legal rule as it relates to actual damages in this case.

25    Judge Wright has found and neither party

**820**

1 challenges that the measure of actual damages in this case

2 is both for the alleged infringement and the alleged breach

3 of contract, that that measure is the market value of the

4 license fee for the infringing use.  This is found by

5 applying an objective standard using the paradigm of a

6 hypothetical negotiation between a willing seller and a

7 willing buyer.

8    As described by the Second Circuit in the On Davis

9 case, which appears to be the seminal decision in this area,

10 and it is the one on which Judge Wright relied most heavily,

11 and here I'm going to fully quote the relevant language from

12 that case.

13    "The reasonable license fee on which a willing

14 buyer and a willing seller would have agreed for the use

15 taken by the infringer," and again I'm going to emphasize

16 that last seven words of that test, "for the use taken by

17 the infringer," which is quoted at 246 F.3d at 167.

18    It is clear to this Court from On Davis and the

19 cases following it, as well as the somewhat, somewhat

20 analogous patent infringement context, that improving this

21 reasonable license fee that results from the hypothetical

22 negotiation, the jury may hear evidence that includes -- and

23 here I'm quoting from Safka, "expert testimony, prior sales

24 history and evidence of sales of comparable assets," which

25 is to say other reasonably similar license agreements, and I

**821**

1 would cite the parties to Safka Holdings at 42 F.Supp.3d

2 488, pin cite 493.

3    I would also virtually cite all of the cases cited

4 by the parties in their various filings on this issue,

5 including Gaylord, M2M Solutions, Audio MPEG and Utah

6 Medical.  Simply stated, the admission of other license

7 agreements is as a general proposition well accepted.

8    In addition, each party, and/or their experts as

9 appropriate, may introduce evidence of the kinds of

10 considerations that would factor into such a hypothetical

11 negotiation based on their knowledge and experience.

12    Finally, it is equally clear that neither party

13 can put in evidence, nor have their lawyers argue:  This is

14 what I would have charged or what I would have paid for such

15 a license.  With those rules in mind, let me turn to the

16 specific issues before the Court.

17    As to the settlement agreements between FICO and

18 third parties, they are inadmissible.  Third-party licenses

19 are admissible to show the value of a license, but in the

20 context of a settlement agreement, Rule 408 makes it clear

21 that the agreement is inadmissible to prove the value of the

22 claim, that is in that circumstance the license, since the

23 offer may be motivated by a desire for peace, and those

24 settlement agreements are therefore inadmissible.  They're

25 irrelevant as well as prejudicial because they may

**822**

1 improperly suggest to the jury the value of a claim.

2    And courts have routinely excluded such agreements

3 to settle that involved licenses like these, and I would

4 cite the parties to, among other things, LaserDynamics and

5 Uniloc.  So based on that, the following exhibits are

6 excluded, and these are all plaintiff numbers.

7    So P424, 425, 430, 437, 439, 803, 810 and 812.  I

8 am reserving ruling on two exhibits that have been

9 identified, P427 and P767.  These agreements do not on their

10 face indicate that they are settlements, and if FICO can lay

11 proper foundation that they were the result of an arm's

12 length negotiation that occurred not under the threat of a

13 claim of breach or infringement, they are admissible.

14    Turning now to the admissibility of the

15 third-party perpetual licenses involving FICO, FICO argues

16 that because they are perpetual initial licenses, they are

17 not economically comparable to the hypothetical license at

18 issue here, and therefore they must also be excluded.

19    I agree with FICO that third-party licenses may

20 only be admitted after a threshold showing that they are

21 sufficiently comparable.  From the cases the parties have

22 cited, however, that level of comparability is not a high

23 bar.  It is not by any means the same as substantially

24 similar.

25    Many of the cases are cited from the patent

**907**

1  client partners.

2  Q.  And Mr. Sawyer writes in the next sentence, "They,"

3  meaning Chubb, "do have a global ELA for Blaze and have an

4  automated UW," meaning underwriting, "application running in

5  the UK already."

6       Do you see that?

7  A.  I see that line, yes.

8  Q.  So this email shows that FICO through its Chubb client

9  partner, Mr. Mike Sawyer, was aware as of 2012 that Blaze

10  was up and running in Chubb Europe, correct?

11  A.  I don't, I don't know if I would agree with that.

12  Q.  But that's what it suggests, right, Mr. Carretta?

13  A.  Well, it says what it says.

14  Q.  And you're not aware of anyone at FICO ever suggesting

15  to Chubb or even suggesting internally that use of Blaze in

16  Chubb Europe was a material breach of the contract at any

17  time before 2016 when you sent this letter, correct?

18  A.  I believe that's correct.

19  Q.  I want to look at one more document that's also already

20  in evidence.  P60.  This is an April 1st, 2015, email from

21  Oliver Clark at FICO to Richard Lagerweij at FICO titled

22  "Decision Simulator Proposal."

23       Do you see that?

24  A.  I do.

25  Q.  And this is forwarding a message that a Mr. Moffat at

**908**

1  FICO had sent to Hamish Tonkin at Chubb earlier that day,

2  correct?

3  A.  I think I'd have to do the timing math because I think

4  Andrew was -- yeah, he is a London guy.  So I don't know if

5  that's correct or not.  You just have to sort out the

6  timing.  It looks like it.

7  Q.  Well, the email from Mr. Moffat is at the bottom of the

8  chain and then it gets forwarded, right, later in the day?

9  A.  That's what it looks like, yeah.

10  Q.  And Mr. Moffat, according to this document, is a senior

11  account executive at FICO, right?

12  A.  That's right.

13  Q.  And his address is listed as London.

14  A.  That's right.

15  Q.  And if you look at the email about towards the bottom of

16  the page, he says, "Hi, Hamish."

17       Do you see that?

18  A.  I do.

19  Q.  And he says, "Please see the attached proposal for the

20  licensing costs and associated training for decision

21  simulator.  The prices are heavily discounted in line with

22  the existing Blaze contract.  No additional Blaze licenses

23  are needed as it is covered within the overall global Blaze

24  ELA."

25       Do you see that?

**909**

1  A.  Yeah, what's that it says.

2  Q.  And that's a statement, just so everyone is clear, from

3  FICO, not Chubb, right?

4  A.  That is from Andy Moffat, who is a senior account

5  executive.  That's right.

6  Q.  At FICO?

7  A.  At FICO.

8  Q.  And that was made in April 2015 about a year before you

9  wrote that letter saying that there had been a material

10  breach you just learned about because there was improper use

11  of Blaze in Europe, correct?

12  A.  That's what they're referring to, yes.

13  Q.  And you didn't speak to Mr. Moffat or review any of his

14  communications with Chubb before you sent that letter,

15  right?

16  A.  No, I did not.

17  Q.  And in fact the first time you saw this communication,

18  blessing the use of Blaze in Europe, was at your deposition

19  in this case when you were showed it by one of the Chubb

20  lawyers, correct?

21  A.  The outside lawyers, yes.  That's correct.

22  Q.  Okay.  Thank you, Vanessa.  We can take that down.

23       You also spoke on direct examination about how

24  your termination letter refers to allegedly unauthorized use

25  of Blaze by outside consultants, correct?

**910**

1  A.  That's correct.

2  Q.  And was that a reference to these companies DWS and

3  AppCentrica?

4  A.  Yes.

5  Q.  Now as a general matter, Mr. Carretta, FICO does agree

6  in certain circumstances to let its customers share Blaze

7  with consultants, correct?

8  A.  Every deal is different, so it sort of depends.

9  Q.  But in your decade plus at the company, you have seen

10  circumstances where they agree to that, correct?

11  A.  Yes.

12  Q.  And there's no categorical rule at FICO, we never let

13  our customers share Blaze with their consultants?

14  A.  Like I said, every deal is negotiated.

15  Q.  But there's no categorical rule, correct?

16  A.  I wouldn't phrase it that way.  It's dependent on the

17  whole deal, and therefore it may or may not be.

18  Q.  Okay.  Now, again, you became aware of these issues

19  involving DWS and AppCentrica because after you heard about

20  the ACE acquisition, you asked folks to start reviewing

21  FICO's maintenance logs to see if they could see any

22  problems related to Chubb, right?

23  A.  Yes.

24  Q.  And you were doing this because you wanted to find a

25  problem, right?

911

1  A.  We began to become curious about who was using the
2  software.
3  Q.  And in the regular course of business, Mr. Carretta, you
4  don't usually scan maintenance logs for potential problems
5  with your customers, right?
6  A.  I don't.
7  Q.  And you don't direct people to do that either, right?
8  A.  I don't direct people to do that.
9  Q.  And it would have been helpful for you in this time
10  period, after the ACE acquisition was announced, if you
11  could find more potential problems with Chubb's use of
12  Blaze, correct?
13  A.  Not necessarily, no.
14  Q.  But it might give you more potential leverage in any
15  breach letters that you might want to send or conversations
16  that you want to have with Chubb, correct?
17  A.  Not necessarily.
18  Q.  But you did end up citing the use of Blaze by these
19  consultants, just like you cited use of Blaze in Europe, in
20  your termination letter, correct?
21  A.  I reference it in my termination letter.  That's
22  correct.
23  Q.  You referred to them as material breaches.
24  A.  Yes.
25  Q.  And based on those material breaches, you said that the

912

1  next day the contract was over and Chubb couldn't use Blaze
2  anymore.
3  A.  Among the other breach, the obvious one we spent all day
4  talking about.
5  Q.  Did you do anything to investigate the full extent of
6  the use, like how many people at AppCentrica or DWS had laid
7  eyes on the Blaze software?
8  A.  I did not personally, no.
9  Q.  Any use of Blaze in connection with this potential
10  project in Australia would have been quite small in the
11  context of an enterprise-wide license like Chubb had,
12  correct?
13  A.  I don't know that.
14  Q.  Well, an enterprise-wide license means that you can use
15  the software in an unlimited number of applications, right?
16  A.  I thought it was limited to the number of applications.
17  I'd have to look at the agreement to see how they defined it
18  again.
19  Q.  So you can't -- you can't speak at all to the relative
20  impact of this issue with DWS and AppCentrica relative to
21  the size of Chubb's use of Blaze and the scope of its
22  license?
23  A.  Well, it's more of an absolute.  We don't guess that,
24  oh, this one is important.  It was just two guys that looked
25  at it, versus Accenture.

913

1  Q.  But my question is whether you did anything to
2  investigate the magnitude of this issue.
3  A.  No, because of what I just said.  It's an absolute, you
4  are not allowed to do this.
5  Q.  And did you ever identify any evidence that AppCentrica
6  or DWS accessed Blaze for any purpose other than assisting
7  Chubb in its work on one of its internal computer
8  applications?
9  A.  I don't know what they did.  I don't remember.
10  Q.  So you have not identified any evidence that AppCentrica
11  or DWS accessed Blaze for any purpose other than assisting
12  Chubb, correct?
13  A.  The only thing I know is that they showed up in the
14  maintenance logs.  I was told that.  But I don't remember
15  any of the details that you are asking about.
16  Q.  Okay.  So I'm going to ask my question one more time.
17  You have no evidence that AppCentrica or DWS accessed Blaze
18  for any purpose other than to assist Chubb in it's computer
19  application work, correct?
20  A.  I just told you I don't remember.  I don't believe I was
21  told that.
22  Q.  So that's a no.  You don't have any evidence?
23  A.  I don't personally have any evidence, no.
24  Q.  And are you aware of any evidence that anyone at
25  AppCentrica or DWS shared Blaze with any third party outside

914

1  Chubb?
2  A.  I don't know.  I just know that third parties accessed
3  the software.
4  Q.  So that's a no.
5  A.  They are there in the log.
6  Q.  So that's a no.
7  A.  No.  That's just what I said.
8  Q.  Mr. Carretta, I'm entitled to an answer to the question
9  I'm asking.  Are you aware of any evidence that anyone at
10  AppCentrica or DWS shared Blaze with any third party outside
11  Chubb?
12  A.  Not that I'm aware of, other than that they appear in
13  the logs.
14  Q.  Okay.  Let's talk about Section 10.8 and this whole
15  concept of assignment.
16  A.  Okay.
17  Q.  During your direct examination, when you were talking
18  about that letter you sent to Chubb on January 27th, 2016,
19  you made a point of saying in your questioning with
20  Mr. Hinderaker that Chubb had not responded to Sawyer and
21  Schreiber at that point in time.
22      Do you remember that?
23  A.  Yes.
24  Q.  I want to take a look at P131, which is already in
25  evidence.  And I want to go to page 3 of the PDF.

---

**915**

1  A.  I'm looking at the screen now, yes.

2  Q.  Okay.  Perfect.  So this starts with an email from Mike

3  Sawyer to someone at Chubb on January 8th, 2016.  Do you see

4  that?

5  A.  Yes.

6  Q.  And he says, "Hi, Elie.  Happy new year!  I am following

7  up on the voicemail I left you before the holiday."

8         Do you see that?

9  A.  I do.

10  Q.  And then he says, "Can you get back to me about the ACE

11  acquisition?"

12  A.  Yes.

13  Q.  And then if you go to the second page of the PDF,

14  there's another email from Mr. Sawyer to Mr. Merheb at Chubb

15  the same day, about three hours later.  Do you see that?

16  A.  Where in this cycle of all these emails are you?

17  Q.  Sure.  I'm on the email from Mike Sawyer --

18  A.  Yes.

19  Q.  -- to Chubb at January 8th at 3:25 p.m.

20  A.  I see that.

21  Q.  And Mr. Sawyer says, "Elie.  Thanks for the call this

22  afternoon.  As discussed attached are Chubb's Blaze Advisor

23  license agreements for your review."  Do you see that?

24  A.  I do.

25  Q.  So this looks like Mr. Merheb at Chubb called Mr. Sawyer

---

**916**

1  at FICO the afternoon that Mr. Sawyer emailed him, correct?

2  A.  Yes.

3  Q.  And this was January 8th, 2016, a couple weeks before

4  you sent that letter alleging breach, correct?

5  A.  That is correct.

6  Q.  Now if we could go to Joint Exhibit 1, which is the

7  license agreement, I'd like to take a look at the text of

8  Section 10.8, which is on page 8.

9         So, Mr. Carretta, there's a few sentences in

10  Section 10.8, correct?

11  A.  Yes.

12  Q.  And during your direct examination with Mr. Hinderaker,

13  you distinguished between the first and the second sentence

14  of Section 10.8 several times, correct?

15  A.  They're independent, yes.  That's correct.

16  Q.  And you walked us through how certain things in your

17  breach letter related to the first sentence and how certain

18  things in your breach letter related to the second sentence.

19  Do you remember that?

20  A.  Yes.

21  Q.  Now it's true that FICO will sometimes enter license

22  agreements that don't have the second sentence that we see

23  in the Chubb agreement, right?  Sometimes FICO enters

24  license agreements that have assignment clauses without

25  specific references to mergers and acquisitions, correct?

---

**917**

1  A.  Like I said, they're all negotiated, so I'm sure there

2  are some that don't have that, but I am sure there are some

3  that do.

4  Q.  So you are sure that there are some that do not have

5  this second sentence that specifically references mergers

6  and acquisitions?

7  A.  Well, this particular sentence has a, an edit added on

8  to the end that was unique to Chubb.  The other, the rest of

9  the sentence starting with "in the event" and ending with

10  "provide such consent" is standard template language.

11  Q.  Okay.  I want to, if we could show Mr. Carretta, and not

12  yet publish to the jury, Exhibit D304.

13         This is in your binder, but we will put it on the

14  screen too, Vanessa.  I think the judge has turned it off

15  for the jury.

16  A.  Okay.

17  Q.  This is a software license agreement between FICO and

18  Grange Insurance Group, correct?

19  A.  That's what's in the header, yes.  That is correct.

20  Q.  And if you turn to page 15 you can see signatures from

21  FICO and Grange Insurance going off those --

22         THE JURY:  Your Honor, we don't have the --

23         THE COURT:  Did you just say that your monitors

24  are off?

25         THE JURY:  Yes.

---

**918**

1         THE COURT:  That's actually on purpose at this

2  time because the exhibit is not yet into evidence.

3         THE JURY:  Oh, I'm sorry.

4         THE COURT:  Quite all right.  I'm glad you asked.

5         THE WITNESS:  It's back on my screen.

6  BY MS. GODESKY:

7  Q.  Okay.  Terrific.  So on page 15 you can see that this

8  was signed by FICO and Grange Insurance, correct?

9  A.  That is correct.

10         MS. GODESKY:  Okay.  Defendants offer Exhibit 304

11  into evidence D304.

12         MR. HINDERAKER:  We just maintain our earlier

13  position, Your Honor.

14         THE COURT:  Overruled.  The exhibit is admitted.

15  BY MS. GODESKY:

16  Q.  And so then if we could publish the document to the jury

17  and go to page 13, there's an assignment clause.

18         If you could make that bigger Vanessa.  Thank you.

19         So, Mr. Carretta, this section reads, "Neither

20  party shall have the right to assign this agreement without

21  the prior written consent of the other party."

22         Your Honor, I think there's a --

23         THE COURT:  Oh, thank you.

24         MS. GODESKY:  Thank you.

25

---

**939**

1  entered into?
2  A.  That's correct.
3  Q.  Let me not hit this mic again.
4       Let's go to -- you were asked some questions about
5  your termination letter, 103.  Plaintiff's Exhibit 0103.
6  And keep the license agreement nearby as well.  In fact --
7  A.  Okay.
8  Q.  -- on a reference, your termination letter, because in
9  the termination letter you speak of the two applications
10  outside the United States and then in Canada.  I guess
11  three?
12  A.  Yes.
13  Q.  Would you go to the license agreement J001?
14  A.  Okay.
15  Q.  And if we could go to the seventh page, please.
16  A.  Okay.
17  Q.  The license agreement does include a provision 10.5 that
18  says Entire Agreement?
19  A.  That is correct.
20  Q.  It says it supercedes all prior or contemporaneous
21  proposals, and all other oral or written understandings,
22  representations, conditions and other communications between
23  the parties.
24       Agreed?
25  A.  Agreed.

**940**

1  Q.  It goes on to say that, "Each party represents and
2  warrants to the other party that entering into this
3  agreement it does not rely on any representation, promises
4  or assurances from any other party or employee," and so
5  forth.
6       And then it ends with the sentence, "Any other
7  terms or conditions or amendments shall not be incorporated
8  herein or be binding upon any party, unless expressly agreed
9  to in a writing signed by authorized representatives of
10  client and Fair Isaac."
11       Agreed?
12  A.  Yes.
13  Q.  And then the license agreement also has a provision
14  called 10.4, No Waiver.
15  A.  Yes.
16  Q.  And that provision ends, "No waiver of any rights of a
17  party under this agreement will be effective unless set
18  forth in a writing signed by the parties."
19       Agreed?
20  A.  Agreed.
21  Q.  Now at Fair Isaac, as a matter of fact, does Fair Isaac
22  have a policy that identifies those persons who have the
23  ability to enter into an agreement on behalf of FICO?
24  A.  Yes.
25  Q.  Do salesmen like Mr. Sawyer or Mr. Schreiber have the

**941**

1  authority under that written policy to enter into agreements
2  on behalf of FICO?
3       MS. GODESKY:  Objection.
4       THE COURT:  Overruled.
5       THE WITNESS:  No, they do not.
6  BY MR. HINDERAKER:
7  Q.  You were asked some questions about consultants, third
8  party.  And you made the statement that the, the prohibition
9  is absolute.  The magnitude does not matter.
10       What did you mean by that?
11  A.  Essentially the slightest infraction is a breach.  That
12  it effectively defines materiality.  Lawyers sometimes call
13  it strict liability.
14  Q.  Okay.  Let's go to the license agreement again and
15  paragraph 3.6.
16  A.  Okay.
17  Q.  Why don't you review it briefly so that you can get some
18  context.
19  A.  Okay.
20  Q.  All right.  And here in paragraph 3.6, FICO and Chubb &
21  Son have agreed that one consultant, ACS Commercial
22  Solutions, has the right to use Blaze Advisor software.
23       Do you see that?
24  A.  That's correct.
25  Q.  And in fact paragraph 3.6 expressly says, does it not,

**942**

1  that ACS Commercial Solutions is the information technology
2  infrastructure operations outsourced to ACS Commercial
3  Solutions?
4  A.  That's correct.
5  Q.  That's to say, ACS Commercial Solutions is going to be
6  using Blaze Advisor for the benefit of Chubb & Son, the
7  division?
8  A.  That's correct.
9  Q.  But to get that permission, it was negotiations of
10  paragraph 3.6?
11  A.  Yes.
12  Q.  And 3.6 further says, "Provided that such use is
13  otherwise subject to the terms and conditions of this
14  agreement and does not exceed the limitations and use for
15  other restrictions set forth herein."  Correct?
16  A.  Yes.  That's correct.
17  Q.  And it further says, "Client shall responsible," client
18  Chubb & Son, "shall be responsible for assuring ACS's
19  compliance with the terms and conditions of this agreement."
20       Agreed?  That's what it says?"
21  A.  Yes.
22  Q.  "And client shall be liable to Fair Isaac for any breach
23  of the agreement by ACS."  It says that?
24  A.  Yes.
25  Q.  "The rights granted to ACS herein shall not be extended

943

1  to any other third party without the prior written consent
2  of Fair Isaac."
3  A.  That's correct.
4  Q.  And if we went to paragraph 3.1, this contains a variety
5  of client representations and warrants that its employees
6  shall not under the heading License Restrictions?
7  A.  Yes, I see that.
8  Q.  An unauthorized third party using Blaze Advisor is not
9  subject to any of these restrictions, is it?
10  A.  I'm not sure I understand your question.
11  Q.  If a third-party consultant is using Blaze Advisor
12  without FICO's permission, that third-party consultant isn't
13  subject to any other restrictions of the license agreement,
14  correct?
15  A.  That's correct.
16  Q.  You were shown, you were shown some emails from Sawyer
17  and Moffat, maybe, and they were dated January 8, 2016.
18      So let's be clear.  Those are before your notice
19  of breach letter of January 27th.
20  A.  That's correct.
21  Q.  And in the third paragraph you say, "I am writing now to
22  again confirm."  And that "again" reference, the fact that
23  Sawyer had finally had gotten in contact with the client by
24  January about 10.8, as you say, "I am writing now to again
25  confirm"?

944

1  A.  That's right.
2  Q.  When you were asked questions about 10.8, you said the
3  first sentence and the second sentence are your words were,
4  "Independent restrictions."
5  A.  That's correct.
6  Q.  Why did you say that?
7  A.  Because that's the way it was designed.
8  Q.  Okay.  But what -- can you --
9  A.  Why did I say that?
10  Q.  Can you help us with that?
11  A.  Sure.  Because the first sentence which we have seen in
12  a number of these agreements, notwithstanding they're
13  negotiated in a little different -- is neither party without
14  the prior written consent of the other party, neither party
15  shall without the written consent of the other party, assign
16  or transfer this agreement or any part thereof.
17      So that's the absolute rule, the first rule.
18      MS. GODESKY:  Objection, Your Honor.
19      THE COURT:  Overruled.
20      THE WITNESS:  Okay.
21  BY MR. HINDERAKER:
22  Q.  Okay.  That's one restriction.  What's the other
23  independent restriction?
24  A.  The second restriction was designed to address mergers
25  and acquisitions and what happens in those circumstances

945

1  where there's a laundry list of these various kinds of ways
2  to get mergers done and acquisitions done, where each such
3  event shall be deemed it to be an assignment subject to this
4  section, which is 10.8.  And then it goes on.
5  Q.  Understood.  You were shown a couple license agreements.
6  A.  Correct.
7  Q.  And I'm going to show you a couple more.  And if you
8  would go to -- let's find the exhibit that's D282.
9      This is a license agreement between FICO and Alpha
10  Bank A.E., dated June 30, 2006; is that correct?
11  A.  Sorry.  I was in the wrong book.
12  Q.  Yeah.  Yeah.  It's the one called your name on it
13  redirect.
14  A.  Yes, I have it.  Alpha Bank.
15      MR. HINDERAKER:  Your Honor, I move Exhibit D0282.
16      MS. GODESKY:  No objection.
17      THE COURT:  D0282 is accepted.
18  BY MR. HINDERAKER:
19  Q.  Would you turn to paragraph 8.3, which is called No
20  Assignment?
21  A.  Correct.
22  Q.  Can you tell us looking at paragraph 8.3 of this exhibit
23  how it compares to 10.8 of the license agreement with Chubb
24  & Son?
25  A.  I think it's identical, the first sentence certainly is,

946

1  if I check it.  Sorry.
2      They're not quite identical, because it has the
3  words "or delayed" added at the end of the sentence.
4  Q.  All right.  So this one says such -- the Exhibit D0282,
5  Alpha Bank says, everything is the same except it says,
6  "Such consent shall not be unreasonably withheld or
7  delayed"?
8  A.  That is correct.
9  Q.  That's the difference?
10  A.  That's the difference.
11  Q.  With the exceptions of that difference, everything in,
12  everything else in 8.3 of the Alpha Bank agreement is the
13  same as 10.8 of the Chubb & Son's agreement.  Do you agree?
14  A.  Yes.
15  Q.  Okay.  Why don't you pull out the D0017 from that same
16  binder.
17  A.  Okay.
18  Q.  This one is with Humana, Inc.?
19  A.  That is correct.
20  Q.  This is dated May 23, 2006?
21  A.  That is correct.
22  Q.  I think the other was dated May -- no.  It was dated
23  June 30, 2006.
24  A.  Yes.
25  Q.  So on the Humana agreement, why don't we look at

947

1  paragraph 12.8.
2              THE COURT:  Will you be offering D17?
3              MR. HINDERAKER:  I will, yes.  I should.  Thank
4  you.
5              Your Honor, I offer D17.
6              MS. GODESKY:  No objection.
7              THE COURT:  D17 is received.
8  BY MR. HINDERAKER:
9  Q.  And now we can turn to paragraph 12.8.
10  A.  Okay.
11  Q.  And this is also entitled, No Assignment?
12  A.  Correct.
13  Q.  And could you do the same comparison for me, whether
14  there's any difference in the Humana 12.8 to the Chubb & Son
15  10.8?
16  A.  Excuse me.  This doesn't have the language at the --
17  following the last comma which says "will not be
18  unreasonably withheld" that's in the Chubb & Son agreement.
19  Q.  So with the Humana, the "shall not be unreasonably
20  withheld" element that's in the Chubb & Son agreement is not
21  present in the Humana agreement.
22  A.  No, it is not.
23  Q.  From your experience, can you -- are there indicia that
24  tell you whether a license agreement is, say, heavily
25  negotiated or lightly negotiated?  Can you discern the

948

1  difference?
2  A.  Sure.  I mean, the ones that are based on our template,
3  you can do line-by-line comparisons using a tool like Word.
4  Others are on the customer's paper and are therefore
5  radically different.
6  Q.  By definition?
7  A.  By definition.
8  Q.  And the two agreements that I just showed you, those are
9  both on basic paper, as FICO paper?
10  A.  Yes.
11  Q.  And did you notice whether the license agreements that
12  Ms. Godesky showed you, were they basic paper, was the basic
13  paper on those FICO as well?
14  A.  Yeah.  They definitely started with FICO paper or
15  template.
16  Q.  And is it fair to say that in those other agreements
17  they were simply more heavily negotiated?
18  A.  Yes.  Each one is different.
19  Q.  You were, you were asked a question by Ms. Godesky about
20  the second sentence of paragraph 10.8 and the, and then the,
21  "And client shall make no expanded use."
22              And you used the phrase from her examination to
23  you, "Well, that's a non sequitur."
24              Do you recall that?
25  A.  Yes.

949

1  Q.  What did you mean by that?
2  A.  Each of them are different restrictions, and so they all
3  work together, but they're different, independent from each
4  other.
5  Q.  And so what was the non sequitur nature of the question
6  then?
7  A.  Well, if I remember correctly, there's an event, comma,
8  "Client shall make no expanded use as a result," that's
9  driving towards maintaining the status quo.  Don't do
10  anything different today from what you were doing before
11  while we're in this period that we provided to them.
12  Q.  That period being the 30-day period?
13  A.  Yes.
14  Q.  So nothing different during the 30-day period than what
15  you did before?
16  A.  That is right.
17  Q.  Okay.
18              MS. GODESKY:  Objection, Your Honor.
19              THE COURT:  Sustained.
20  BY MR. HINDERAKER:
21  Q.  That's why you said it was a non sequitur.
22  A.  Right.
23              MS. GODESKY:  Objection.
24              THE COURT:  Sustained.
25

950

1  BY MR. HINDERAKER:
2  Q.  You were asked whether FICO had an obligation to explore
3  whether Chubb & Son had expanded its use in that 30-day
4  period.  Do you recall that?
5  A.  Yes.
6  Q.  Did FICO have such an obligation?
7  A.  No.
8  Q.  You've told us, of course, that you were not included in
9  the communications of the commercial proposal of Exhibit 94.
10  Nevertheless, you were asked about it.  You were asked about
11  what you saw just from the reading of it.
12              As you read Exhibit 94, is there any limitation on
13  the -- is there any limitation on the future use of Blaze
14  Advisor with respect to running more volume through the
15  applications?
16  A.  There's no reference to that.
17  Q.  Does it also say that -- I'm sorry.  I think it's in the
18  next paragraph down.
19              And it also says, "Chubb shall have the right to
20  change the applications utilizing the Blaze Advisor software
21  at any time and in its sole discretion without FICO's
22  consent so long as the named applications do not exceed an
23  amount of 15."
24              Also says that?
25  A.  I see that.  I see that.

**969**

1  use of the realtime transcript don't allow you to quote that
2  to the Court.  So -- but it's also been pointed out that the
3  transcript that was quoted was accurate, so no harm, no
4  foul.
5       All right.  Anything else from the parties?
6       MS. GODESKY:  Your Honor, I just wanted to point
7  out something we have noticed as we have been going back
8  through the transcripts, that I'm just concerned documents
9  that are admitted during videos --
10      THE COURT:  Mm-hmm.
11      MS. GODESKY:  -- were not -- there is nothing in
12 the transcript memorializing the P or the D number that's
13 been entered into evidence.  So I'm just concerned that
14 could be an issue for the appellate record.  So I think at
15 some point we need to orally read them in.
16      THE COURT:  That's fine with me.  We have been
17 tracking them, and I have been very attentive to
18 distinguishing the trial exhibit number from the deposition
19 exhibit number.  We have an accurate list, and we have been
20 cross-checking it with the parties, but we can certainly put
21 that, and I think it's a good idea, to put it on the record.
22      MS. GODESKY:  Okay.
23      THE COURT:  All right?  Anything else on your
24 side?
25      MS. GODESKY:  No.

**970**

1       THE COURT:  Mr. Hinderaker?  All right.  Let's
2  bring the jury in.
3       THE CLERK:  All rise for the jury.
4            (Jury enters.)
5
6       (In open court with the Jury present.)
7       THE COURT:  Go ahead and be seated.
8       Members of the Jury, first and foremost, our
9  apologies.  We were taking up some matters that we had to
10 deal with before we started testimony this morning.  As I
11 had indicated at the beginning of the trial, that happens on
12 occasion.  Today was one of those occasions.
13      Second of all, I hope you all had a nice weekend.
14 I appreciate your getting here today.  I am hoping that this
15 will be the last "iffy" travel day for all of you, but I
16 make no promises.
17      By way of planning, first of all, as we've
18 discussed -- okay.  We will shorten the lunch break
19 considerably, and that will speed things up.
20      For planning purposes, we think that you will get
21 the case for deliberation by approximately, well, early next
22 week, let's just put it that way for now.  Okay?
23      All right.  Mr. Hinderaker?
24      MR. HINDERAKER:  Your Honor, our first witness by
25 video is Mr. Henry Mirolyuz, and I will give you his

**971**

1  introduction.
2       Henry Mirolyuz is a former Chubb employee, who was
3  with Chubb from 2006 to 2018.  In July 2018, Mr. Mirolyuz
4  was a corporate representative and testified to the
5  knowledge of Federal.  At the time of his deposition his
6  title was senior architect, Chubb claims IT.  At that time
7  he was living in Simsbury, Connecticut.
8       The second deposition was taken January 2019.  And
9  this time Mr. Mirolyuz was testifying in his personal
10 capacity, as well as a corporate representative, to the
11 knowledge of Federal.  At that point he had left employment
12 with Chubb and he had left employment with Chubb effective
13 January 1, 2019.  Both of these depositions were taken by me
14 on behalf of FICO.
15            (HENRY MIROLYUZ)
16            EXAMINATION
17 BY MR. HINDERAKER:
18 Q.  Sir, good morning.
19 A.  Good morning.
20 Q.  Thank you for coming.
21 A.  My pleasure.
22 Q.  If you would give us, with spelling, your full name as
23 well as your current employer.
24 A.  My name is Henry Mirolyuz, M-I-R-O-L-Y-U-Z.  I'm an
25 employee of Chubb claims IT architecture team.

**972**

1  Q.  And where -- what's the location of your employment?
2  A.  I'm located in Simsbury, Connecticut.
3       COURT REPORTER:  I'm sorry?
4       THE WITNESS:  Sims bur.
5  BY MR. HINDERAKER:
6  Q.  And your residence is in the same area?
7  A.  Same area.
8  Q.  Sir, can you identify Exhibit 2 for us, please?
9  A.  Exhibit 2 is my resume.
10 Q.  And under professional experience, on the top line it
11 says, "July 2011 to present."  And in that context, my
12 question is, How current is this resume?
13 A.  This resume is as current as of 2015.  Pre Chubb/ACE
14 merger.
15 Q.  Pre-merger.  If you would -- I would like you to carry
16 your resume forward for us from this document to date.  So
17 pre-merger to date.  What changes would there be or what
18 additions would there be on here?
19 A.  Addition is I become the architect in claims IT
20 organization.  So my title changed from senior technical
21 analyst to senior architect, and my responsibility is I'm no
22 longer involved with Blaze software, and I'm in charge of
23 architecture of claims applications and systems.
24 Q.  When did you stop being involved with Blaze Advisor?
25 A.  Right after the post-merger activities due to the

**973**

1  litigations.
2  Q.  Well, before then, under accomplishments, you note you
3  have been a guest speaker on multiple FICO World and
4  Business Rules Forum conferences.  On how many occasions
5  were you a guest speaker?
6  A.  I believe three or four FICO World conferences and one
7  Business Rules Forum, which was not FICO specific.
8  Q.  And then under professional experience under the heading
9  senior technical analyst, in the second bullet, "Working
10  with EA."  What is EA?
11  A.  Enterprise architecture team.
12  Q.  And caring on with that bullet point, "DM life cycle."
13  What is DM?
14  A.  Decision -- DM, decision management.  It's a FICO
15  methodology which was provided to us by FICO.
16  Q.  By FICO?
17  A.  By FICO.
18  Q.  In the next bullet point is, "Worked with multiple teams
19  across DSO."  What is DSO?
20  A.  Development source organization.  It's a group of people
21  who is involved in the implementation of the application.
22  As an architect, I design the application and developers
23  implement the application.  That's such acronym DSO,
24  development services organization.
25  Q.  Let me try that in my words.  As architect, do you

**974**

1  design the application?
2  A.  Correct.
3  Q.  And then do the development service organization people
4  do the coding?
5  A.  Absolutely correct.
6  Q.  And with respect to your experience, then, what does --
7  in general, what did you do to facilitate presentations to
8  business analysts?
9  A.  I conducted the sessions overview of the benefits which
10  Blaze Advisor software or using Blaze Advisor software can
11  provide to the projects, future projects at Chubb, as well
12  as making sure people are familiar with the technology.
13  Q.  What do you mean by the benefits of Blaze Advisor for
14  future projects at Chubb?
15  A.  Any design can be implemented in multiple ways using the
16  different technology, Blaze Advisor being one of them.  My
17  role was to provide -- explain to people potential benefit
18  of using the software.
19  Q.  And the Blaze Advisor software resides on what's called
20  servers, correct?
21  A.  Correct.
22  Q.  And I would appreciate your definition of a server.
23  What is a server?
24  A.  It's a machine located -- not assigned to a specific
25  individual, and accessible by one or many developers or

**975**

1  parties.  It depends on the rights and authorization
2  provided by Chubb.
3  Q.  Okay.  And when you say a server is a machine, is it a
4  computer?
5  A.  A computer.
6  Q.  All right.  So you -- okay.  So you just used the phrase
7  to get the applications in one data center.  What is an
8  application?
9  A.  It's a software which allows user to perform specific
10  functions.  Depends on the components of the application.
11  Q.  And is an application something that you as the -- in
12  your role on the technical side, you were involved in
13  designing the architecture for these applications?
14  A.  Part of the architecture.
15  Q.  Part of it.  At least the Blaze Advisor part of it?
16  A.  Correct.
17  Q.  So you're making a distinction between the Blaze Advisor
18  software and an application that uses Blaze Advisor?
19  A.  That is correct.
20  Q.  And then if we go to Exhibit 5, you see the fifth
21  paragraph down, it is saying, "So we'll be using Blaze 7.1
22  with the Java business object model."
23  A.  Correct.
24  Q.  Do you understand that Blaze Advisor 7.1 is installed on
25  the servers in the UK?

**976**

1  A.  No.  I would interpret it that it will be or could be.
2  It doesn't say that they are using it at the point of right
3  in the e-mail.
4  Q.  So the point of writing the e-mail, your interpretation
5  is that they planned to use Blaze Advisor 7.1?
6  A.  Correct.
7  Q.  For an application?
8  A.  Where again, the question is I cannot say one way or
9  another if they plan to use it or they plan to use the
10  software Blaze 7.1.
11  Q.  What was the application of Blaze Advisor that he is
12  advising you about?
13  A.  They had a policy administration system for the CSI for
14  the specialty lines in Europe, and at the time of the
15  writing the e-mail they were planning to supplement it with
16  business rules written for Blaze Advisor software.
17  Q.  What is a policy administration system?
18  A.  It's a system which would allow them to provide the
19  insurance to the customers, such as software to allow them
20  to provide the insurance for the customers.
21  Q.  What is a no touch renewal?
22  A.  It's allow the renewal which can be issued -- it's a
23  policy renewal which can be issued without any human
24  interaction.  Essentially automated insurance of the
25  renewal.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    February 27, 2023, Volume VI

**977**

1  Q.  Is it fair to say this is an application that uses Blaze
2  Advisor, among other components, to automate the renewal
3  process for insurance policies?
4  A.  It's not the application.  It is a characterization of
5  the renewal, as part of the renewal process through the
6  application, no touch renewals.  It is characterization of
7  renewals into the no touch categories.
8       COURT REPORTER:  Into the no touch category?
9       THE WITNESS:  It's not a software.  It's a
10  process.
11  BY MR. HINDERAKER:
12  Q.  So does that mean that using the rules management system
13  with Blaze Advisor, the software determines that a
14  particular application can proceed without human
15  intervention?
16  A.  Correct, but particular renewal can proceed without
17  human intervention.
18  Q.  And that the judgment that the renewal can proceed
19  without -- you know, there is -- software is a -- and we're
20  talking about it doing things like thinking and judging, but
21  that determination that the renewal can proceed without
22  human intervention is a determination using the software
23  with Blaze Advisor?
24  A.  Correct.
25  Q.  Sir, Exhibit 6 is a document that's part of the

**978**

1  litigation process.  It's Federal Insurance Company's second
2  supplemental answers to interrogatory numbers 2, 3 and 4.
3       Do you know if you've seen this before?
4  A.  I did.
5  Q.  Okay.  And have you had a chance to review it, and do
6  you know whether the answers and responses in the document
7  are accurate?
8  A.  It is.  Yes, to both.
9  Q.  All right.  And in the last page of Exhibit 6, you will
10  see a verification or a page that's titled Verification.
11  A.  Yes.
12  Q.  Okay.  And it's unsigned, but it's set up for your
13  signature.
14       Would you read that verification and tell me
15  whether you agree with it?
16  A.  "Henry Mirolyuz" --
17  Q.  You can read it to yourself.
18  A.  I agree with it.
19  Q.  Okay.  And on page -- let me back up.  On page 2 there
20  is Interrogatory Number 2 that's set forth there.
21       And then -- I'm not trying to rush you.  I'm just
22  going to give you orientation.  And then under the second
23  supplemental answer on page 3, you will see where it says,
24  "1.  Chubb Insurance Company of Europe SC at least by 2010."
25       And do we agree, based upon the e-mails that

**979**

1  you've looked at, that Blaze Advisor software was installed
2  whether on a computer or a "server" in the UK in 2009?
3  A.  Agree.
4  Q.  And what is Evolution?
5  A.  It is the name of the policy administration system used
6  in Canada.
7  Q.  And the Chubb Insurance Company of Europe has used EZER
8  and ADAPT?
9  A.  Correct.
10  Q.  And those are application to use Blaze Advisor software,
11  correct?
12  A.  Correct.
13  Q.  And those applications were also installed on servers in
14  Europe?
15  A.  I -- correct.
16  Q.  And this, sir, is Deposition Exhibit 179.
17       Can we move that thing?  Thank you.
18       Have you seen this 30(b)(6) deposition before this
19  morning?
20  A.  I did.
21  Q.  Okay.  So just to reaffirm, you intend to testify on a
22  30(b)(6) basis to Topics 15, 16 and 17; is that correct?
23  A.  That's correct.  I do not know because I haven't looked
24  in my paycheck.
25  Q.  So you don't know one way or the other.

**980**

1  A.  Yes, exactly.
2  Q.  Who employees you now?
3  A.  Altair Technical Services.
4  Q.  When did you start that employment?
5  A.  January 1st of 2019.
6  Q.  Do you recall when you moved from your position working
7  with Blaze Advisor software to we'll call it Chubb IT
8  claims?
9  A.  I believe in the beginning of 2015.
10  Q.  Now the merger of Chubb and ACE was 2016?
11  A.  Correct.
12  Q.  And so you think it was the year before?
13  A.  A year before, yes.  Because of the internal
14  organization.
15  Q.  This is Exhibit 154 from an earlier deposition.  I just
16  have some questions for you about it.  I understand the date
17  is -- I understand the date, 2018.
18       But you're familiar with reports that are called
19  ChEAR reports or Chubb Enterprise Application Registry?
20  A.  Correct, I am.
21  Q.  Could you explain what they are for me, please?
22  A.  This is the repository or registry of all the
23  application -- production application at Chubb.
24  Q.  Okay.  So as a repository of the production applications
25  at Chubb, is it a report that reports on the status of

**981**

1  things as of the date of the report?
2  A.  Correct.  As they're entered into the repository.
3  Q.  The status of things as the information is entered into
4  the repository?
5  A.  Correct.
6  Q.  Go to the fifth page in.  Now it's on the bottom
7  third -- Evolution Asia Pacific, Blaze Advisor, and then
8  Blaze Advisor 7.1.  Do you see that line?
9  A.  Correct.
10 Q.  Okay.  So this is telling us that Blaze Advisor 7.1 is
11 being used for Evolution in the Asia Pacific zone?
12 A.  What it tells me is that the Evolution application was
13 used by Asia Pacific.
14 Q.  And does it tell -- yes.  And is it saying that that
15 application is running on Blaze 7.1?
16 A.  It's using Blaze 7.1, correct.
17 Q.  Okay.  Thank you.
18        So I've given you Exhibit 184, which is, by its
19 heading -- well, it's dated April 9, 2008, and by its
20 heading it's another ChEAR monthly maintenance, another
21 ChEAR report.  Do you agree?
22 A.  Agree.
23 Q.  Would you go to what's marked as page 8 of 26 in the
24 document.
25 A.  Okay.

**982**

1  Q.  So on page 8 of 26, if we go down, what, five and six
2  lines, it's telling us that, that Blaze Advisor 6.1 and 6.5X
3  are being used.  And can you tell from this exhibit where
4  that use is?
5  A.  No.  Actually it doesn't tell that it's being used.  It
6  says it's being available as a technology.
7  Q.  Okay.  Thank you.  So that's its meaning?
8  A.  Correct.
9  Q.  It's available as a technology.  Whether it's used or
10 not, we don't know from this exhibit?
11 A.  Correct.
12 Q.  If it is used, where it's used, we don't know from this
13 exhibit?
14 A.  We don't know.
15 Q.  This is an exhibit from your earlier deposition when we
16 talked about installations in the UK.  As you see, the
17 document comes from yourself to Richard Johnson and others.
18        Can you confirm for me that as of this date this
19 document reports that Blaze Advisor 6.7 is being used in
20 Europe?
21 A.  It does not confirm that it was used.  All it confirms
22 is that I provide the information where they can -- if they
23 choose so to download the software, but it does not confirm
24 that it was used.
25 Q.  Showing you Exhibit 185 an e-mail dated May 25, 2010.

**983**

1  Dean Lawton, is he from Europe?
2  A.  According to the e-mail header, yes, he is.
3  Q.  And are all of the recipients from Europe, according to
4  the header?
5  A.  That's correct.
6  Q.  And then the carbon copy of Ewen Setti.  He's European.
7  He is from London as well.
8  A.  Yes, he is.
9  Q.  Do you know what the application Adapt/Adapt BE is?
10 A.  To my knowledge, it's a policy administration system for
11 the -- the ABL line of business.
12 Q.  And would you give us the meaning of a policy
13 administration system?
14 A.  It's an application that allows to book, bind and issue
15 policies -- insurance policies for the specific line of
16 businesses.
17 Q.  Okay.  But I guess let's just talk about policy
18 administration systems in general and your knowledge about
19 that.  As a general statement, brokers and agents use policy
20 administration systems to sell insurance to their customers?
21 A.  It's primarily -- to my knowledge, it's primarily used
22 by the internal staff, basic information provided by brokers
23 and agents.  Of course, there could be the exception to the
24 rule, but as a general rule it's for the internal staff.
25 Q.  So then based upon the information provided by the

**984**

1  brokers and agents, the policy administration system then
2  responds to the broker and agent with the proposed solution
3  or the proposed policy and a quote for that policy?
4  A.  Correct.  And if they accept it, they the book, bind and
5  issue the policy.
6  Q.  Then in red -- and then you see the next three entries
7  in red with different Blaze Advisor versions.  Do you have
8  any understanding what the red designates?
9  A.  Red designates that we are behind the current version.
10 So 7.1 is the current version.  That particular application
11 could be using version which is behind the current one.
12 Q.  I'm now giving you Exhibit 187, October 9, 2013.  And if
13 you go to the table at the back, you'll see it's very
14 similar to the table that I just showed you.  I'd like to
15 direct my questions to the second to the last line where it
16 says, "EUZ" and then "Exari Pilot."  Do you see where I'm
17 saying?
18 A.  Yes.
19 Q.  Do you know what the application Exari Pilot is?
20 A.  I do not.
21 Q.  The document itself says it's running on Blaze Advisor
22 version 7.1.  Do you agree?
23 A.  Yes, according to the table.
24 Q.  Based upon that, can you identify any person from FICO
25 that assisted in the installation of Blaze Advisor in the

**985**

1 UK?

2 A. I cannot identify those. They dealt with the help desk

3 support, and they would raise the tickets. So they do

4 not -- that worked generically as FICO. Mike Sawyer would

5 be the contact person for me in case any additional

6 assistance would be needed.

7 Q. Do you recall yourself contacting or engaging Mike

8 Sawyer and yourself?

9 A. I did.

10 Q. And when was that?

11 A. That's during the -- between 2010 and 2014, if my memory

12 serves me correctly.

13 Q. Tell me about your contacts with Mike Sawyer.

14 A. I got informed by developers that there was an issue and

15 they need to be resolved quickly. So I would just make him

16 aware. Because as the client representative of FICO, he has

17 an influence to expedite the request to go to the help desk.

18 Q. So is it fair to say that you advised Mike Sawyer making

19 him aware that people in the UK were reaching out to the

20 help desk for help?

21 A. Correct. In the UK or U.S. That was normal part of my

22 working relationship with him.

23 Q. Okay. Do you recall specifically reaching out to Mike

24 Sawyer specific to install issues with regard to UK?

25 A. I believe I did.

**986**

1 Q. You believe you did?

2 A. Yes.

3 Q. Do you remember when?

4 A. I don't recall the exact date.

5 Q. Same questions with respect to installations in Canada.

6 A. Again, I did -- yes, I did. And I do not recall the

7 exact date.

8 Q. So, again, there is no individual person at FICO that

9 you know of that assisted in the installation?

10 A. No.

11 Q. To your knowledge, who do you -- did anybody tell you --

12 as opposed to your assumptions, did anybody tell you that

13 Canadian Chubb representatives placed tickets at the help

14 desk?

15 A. My conversations in the past with Tony Zahn, who was the

16 architect for the Canadian zone, that they opened the

17 ticket.

18 Q. Mr. Mirolyuz, I am showing you an exhibit that we are

19 numbering 188.

20      So I would like you to go to the table the last

21 page of 188, if you would, as well as go to that second

22 exhibit the 30(b) 6 notice. Do you have those two in front

23 of you. Do you have that?

24 A. Yes.

25 Q. What I would like to do is, with these two, these two in

**987**

1 mind, go through these applications. So let's start with

2 CSI Express?

3 A. Okay.

4 Q. So what's the function or purpose of CSI Express?

5 A. It's a policy administration system for --

6           COURT REPORTER: For what?

7           THE WITNESS: Policy administration system for

8 specialty lines.

9 BY MR. HINDERAKER:

10 Q. And does it encompass all of the lines within the

11 specialty line of business?

12 A. I believe -- it is a majority of them.

13 Q. Are you saying you don't know, so you're assuming a

14 majority?

15 A. I cannot speak for sure this it is all the lines within

16 the policy. So yes. I don't know for fact.

17 Q. And CSI Express uses Blaze Advisor?

18 A. Correct.

19 Q. Among other technologies?

20 A. Among other technologies, yes.

21 Q. When I say it's using Blaze Advisor, we'll assume it can

22 be among other technologies.

23 A. Correct.

24 Q. Okay. And what is the purpose of a policy

25 administration system?

**988**

1 A. As I said before, to book, bind and issue the policy

2 for -- in this particular case, specialty line of business

3 in the case of CSI Express.

4 Q. What is automated renewal process?

5 A. It is part of the CSI Express suite tools which allows

6 automated processing of the renewals issued through the CSI

7 Express.

8 Q. It allows the what?

9 A. Automated processing of renewals for policies issued

10 through the CSI Express.

11 Q. Okay. And by, "Automated renewal of policies issued

12 under CSI Express," does that mean renewal of policies

13 without human intervention?

14 A. Correct.

15 Q. What is CSI Express renewal rule maintenance center, its

16 purpose and function?

17 A. It is part -- it's an applications which is part of

18 Blaze Advisor software which allows nontechnical user

19 maintenance of the business rules.

20           COURT REPORTER: The business what?

21           THE WITNESS: Business rules.

22           COURT REPORTER: Rules?

23           THE WITNESS: Yeah. R-U-L-E-S.

24 BY MR. HINDERAKER:

25 Q. And what is the function and purpose of CSI Express

**989**

1  renewal What If Simulation Tool?

2  A.  It is a testing tool which allows to simulate the impact

3  of business rules changes.

4  Q.  Is it accurate to say that one of the features of Blaze

5  Advisor is that nontechnical people can enter the business

6  rules of Chubb into Blaze Advisor?

7  A.  Correct.

8  Q.  And that might be -- that is -- and they might use the

9  renewal rule maintenance center tool for that?

10  A.  That is correct.

11  Q.  And then to see if the rule that they just entered into

12  Blaze Advisor operates the way they intended that rule to

13  operate in any scene, right?

14  (Moves head in affirmative manner.)

15  Q.  That's the What If Simulation Tool?

16  A.  Correct.

17  Q.  So that at the end of the process, the automated renewal

18  application within the CSI Express policy administration

19  system will be operating in accordance with the company's

20  intentions for the -- for the offering and the booking and

21  the binding of a policy?

22  A.  That is correct.  For the renewal process.

23  Q.  In the context of a new policy, tell me how -- what CSI

24  Express does, how it functions?

25  A.  I cannot provide this information.  That's a part of the

**990**

1  business flow.  I'm not familiar with the business flow.

2  Q.  What do you mean by "business flow"?

3  A.  CSI Express is operated by the business people, in this

4  case underwriters.  What type of flow to create a new policy

5  or to add new customers, I'm not privy to that information.

6  Q.  Okay.  Do you know that they use CSI Express for that

7  function of new customers?

8  A.  Yes, I know they do.  Correct.

9  Q.  Okay.  And do you know that CSI Express for new

10  customers has a function of presenting to the new customer

11  the proposed policy for booking -- for quoting, booking and

12  binding?

13  A.  Not the CSI Express directly.  The underwriter would

14  work with the CSI Express, and it's up to them to present

15  the results to the customers.

16  Q.  Up "to them" being who?

17  A.  Underwriters.

18  Q.  The underwriters.  So the underwriters of we'll call it

19  "big Chubb" presents that solution to the broker who

20  presents it to his customer?

21  A.  Correct.  That's my understanding.

22  Q.  Mm-hmm.  Mm-hmm.  And in that process, the human

23  underwriter uses CSI Express?

24  A.  That is correct.  That's my, yes, my understanding.

25  Q.  Okay.  And do you have knowledge to tell us what

**991**

1  functions of CSI Express the human underwriter uses in that

2  process of the new policy?

3  A.  I do not.  Again, they have their own flow.  I'm not

4  private to that information.

5  Q.  All right.  And then the same kind of questions with

6  respect to renewals.

7  Now we have an existing customer whose policy is

8  up for renewal.  Tell me how -- tell me the function and

9  what CSI Express in conjunction with automated renewal

10  process does?

11  A.  Again, my answer is going to be similar to my other

12  answer.  I'm not familiar with the process to present the

13  renewal.

14  Q.  You're not familiar with what the underwriter does?

15  A.  Exactly.

16  Q.  Tell me what the application does.

17  A.  Again, I'm not sure of all the parts and I'm not

18  familiar with all the parts of the application.  The part I

19  am familiar is the policy, when it's due for renewal, would

20  go through the automated renewal process, which would either

21  automatically book, bind and issue the policy or allow the

22  underwriters to any potential problem with the renewals.

23  Q.  So we spoke before about the automated renewal

24  being a renewal without human intervention?

25  A.  Correct.

**992**

1  Q.  Correct?  And do you understand that CSI Express, using

2  Blaze Advisor, will -- I'll call it triage a renewal to

3  highlight for a human underwriter the issues that the person

4  has to address?

5  A.  Correct.

6  Q.  So one of the functions of the software application is

7  to focus the underwriter's work on those questions that need

8  his attention, not on all questions?

9  A.  Correct.

10  Q.  Let's go to profitability indicator.  What is the

11  function and purpose of that application?

12  A.  This is the part of the CSI Express, and its purpose to

13  assess the risk of that particular policy, associated with

14  that particular policy.

15  Q.  Would it be just as correct to say to assess the risk of

16  the particular customer?

17  A.  Correct.

18  Q.  So that a policy is offered whereby the pricing is

19  aligned with the risk policy?

20  A.  That is correct.

21  Q.  With that understanding, I'm still not clear what

22  profitability indicator does.

23  A.  It essentially calculates the risk factor or risk score

24  for that particular policy or particular customer as you

25  said.

**993**

1  Q.  All right.

2  A.  And that's based on that score, the underwriter can

3  assess the severity of the risk.

4  Q.  And assessing the severity of the risk then informs the

5  premium, the price?

6  A.  That, yes, among other things.

7  Q.  Among other things.  Yes, among other things.

8        It informs what solution is going to be provided

9  by way of the insurance policy?

10  A.  Exactly.

11  Q.  And are there situations in which, for the renewal --

12  well, and then does profitability indicator -- does that

13  operate with respect to each renewal application?

14  A.  For the specific line of businesses.  So not every line

15  of business would go through the profitability --

16  profitability indicator is only for a certain line of

17  businesses.

18  Q.  Okay.  So there is a broader -- there is a broader array

19  of business that goes through CSI Express?

20  A.  Correct.

21  Q.  And within that broader array, there is a subpart of

22  that which, to which profitability indicator functions?

23  A.  Correct.

24  Q.  And then within that subpart, will profitability

25  indicator function and then one possible outcome is that the

**994**

1  renewal is renewed automatically?

2  A.  Correct.

3  Q.  Okay.  So the information that profitability -- the

4  score that profitability indicator generates will inform

5  other parts of the system and perhaps -- and there will be

6  instances where human intervention is not necessary for the

7  policy to be renewed?

8  A.  Correct.

9  Q.  And if human intervention is necessary for the policy to

10  be renewed, the software application highlights for the

11  human underwriter what to address?

12  A.  That is correct.

13  Q.  On Exhibit 188 we have the SBU -- I'm still more or less

14  talking about CSI Express, but we have the SBU CSI.

15  A.  Correct.

16  Q.  And that's stands for Chubb specialty lines?

17  A.  Insurance.

18  Q.  Or insurance.  Chubb Specialty Insurance.

19        And then if we look at te cell CSI Express, it has

20  a corresponding subpart, predictive modeling?

21  A.  Correct.

22  Q.  What is that?

23  A.  It's the old name for profitability indicator.

24  Q.  And then it has another subcell, underwriting guidance.

25  What is that?

**995**

1  A.  It was an extension of the profitability indicator or

2  predictive modeling.  It's additional to provide the

3  guidance in human readable form, instead of score providing

4  the wording.

5  Q.  Okay.  And then under the CSI SBU, there is the

6  automated renewal process and that the subpart ARP 1,

7  renewal categorization.  What is that?

8  A.  Ultimately, the renewal process consists of two parts.

9  It is determining -- ARP 1 specifically focuses on te

10  determining if policy is eligible to be processed

11  automatically.

12  Q.  If it is, then it is processed automatically?

13  A.  Yes.

14  Q.  And if it isn't, it goes to a human underwriter?

15  A.  Exactly.  Correct.

16  Q.  And then the issues to be addressed are highlighted?

17  A.  Correct.

18  Q.  What is ARP 2?

19  A.  If policy is eligible for renewal automation, the ARP 2

20  is taking care for all the issuance -- book, binding and

21  issuance process associated with the renewal process.

22  Q.  So ARP 2 is the instances where the policy is

23  automatically renewed?

24  A.  Correct.

25  Q.  Let's talk about DecisionPoint.  What is that, its

**996**

1  function and purpose?

2  A.  DecisionPoint is how to make it quote, quote --

3        COURT REPORTER:  I'm sorry?

4        THE WITNESS:  Automated quoting system for small

5  book of business.

6  BY MR. HINDERAKER:

7  Q.  Is it, what is the -- is there a functional relationship

8  between DecisionPoint and CSI Express?

9  A.  Correct.  Yes.

10  Q.  And what is that relationship?

11  A.  The quote issued in the DecisionPoint, if they are

12  accepted by the customers, are ultimately entered as the

13  policy in CSI Express.

14  Q.  All right.  So let's start in the instance of -- so

15  DecisionPoint is an application intended for a certain

16  segment of the market?

17  A.  Correct.

18  Q.  And let's take a customer that's in that segment who is

19  interested in a new -- say a noncustomer in that segment who

20  is interested in becoming a customer, so it's a new policy.

21  DecisionPoint functions -- tell me how DecisionPoint

22  functions in the context of a new policy.

23  A.  The customer submits the form to the Chubb employee who

24  is responsible for entering the information into

25  DecisionPoint in the system.

**997**

1  Q.  Can I -- so the customer -- does a customer access the
2  portal directly, or does the customer access it through the
3  agent/broker?
4  A.  It is directly or through the agent/broker, but they
5  have to submit the application, paper application.
6  Q.  So there is a customer-facing portal in DecisionPoint?
7  A.  Not necessarily a customer-facing portal.  It's not a
8  customer-facing portal.  It's a paper application which they
9  fill up and submit it to the mailbox or fax it to the Chubb,
10  the Chubb team responsible for that.
11  Q.  Okay.  So hard copy application is submitted to either a
12  broker -- submitted to Chubb either directly or through a
13  broker/agent?
14  A.  Correct.
15  Q.  And now what happens?
16  A.  The part of the team who is responsible for entering the
17  information would enter the information into the
18  DecisionPoint application.
19  Q.  Is that a manual process?
20  A.  Manual process.  Internal Chubb manual process.
21  Q.  So the information is entered into DecisionPoint?
22  A.  Automated process picks up this information.  It goes
23  through the -- I'm just going to the list here -- goes
24  through the eligibility process, which validates if the risk
25  is acceptable.  I'm looking into the eligibility here.

**998**

1  Q.  Mm-hmm (Yes).
2  A.  It goes through the pricing process, which determines --
3  if risk is acceptable, determines a price for that
4  particular risk.  It goes through some of the data
5  normalization, if necessary.
6  Q.  What does "data normalization" mean?
7  A.  Sometimes application submitted -- if address is missing
8  or address might not be -- zip code might not be correct.
9  So type of data validation, data correction.  And it
10  generates the list of applicable endorsements.
11  Q.  So it looks to see if there is an opportunity to sell
12  more insurance?
13  A.  Not necessarily.  Whether there's limitations on the
14  policy.  Different outside limits, type of additional
15  coverage, which restricts the risk, because it depends on
16  the risk.
17  Q.  So I imagine, is it accurate to say that each individual
18  application is going to be individually accessed?
19  A.  Correct.
20  Q.  In that individual assessment a decision is made whether
21  additional endorsements would be appropriate for that
22  circumstance?
23  A.  Exactly.
24  Q.  It may be in some circumstances yes, and then they'll be
25  presented, and some circumstances no?

**999**

1  A.  It is never in bulk.  It is individual risk being
2  assessed.
3  Q.  So now that's completed.
4  A.  It generates the quote letter, which the person in
5  internal Chubb team responsible for DecisionPoint will
6  either mail or e-mail to the customer or agent or broker.
7  Q.  The quote letter?
8  A.  Yes.
9  Q.  And the quote letter is the offer at that price to sell
10  and bind insurance for that customer?
11  A.  Correct.
12  Q.  And DecisionPoint uses Blaze Advisor?
13  A.  Yes.
14  Q.  Let's go to -- if we look at Exhibit 188, the next SBU
15  is CCI, Chubb Commercial Insurance?
16  A.  Correct.
17  Q.  And let's talk about CUW.  Does CUW stand for
18  "commercial underwriting workstation"?
19  A.  That is correct.
20  Q.  If you would tell us the functional purpose of CUW.
21  A.  CUW is the system which allows underwriters to maintain
22  the records of the interaction with the customers --
23  documents, notes, et cetera.
24  Q.  Okay.  How is CUW, how CUW used in connection with
25  the sale of insurance?

**1000**

1  A.  As underwriter interacts with the customer, any
2  conversation, any documents he receives from insured has
3  been recorded and either manually or stored in the CUW.
4  Q.  Okay.  And CUW uses Blaze Advisor?
5  A.  One of -- CUW is the suite of tools.
6         COURT REPORTER:  The what?
7         THE WITNESS:  Suite.
8         MR. HINDERAKER:  S-U-I-T-E.
9         COURT REPORTER:  Oh.
10         THE WITNESS:  Only one application, inventory
11  management, is using in Blaze Advisor software.
12  BY MR. HINDERAKER:
13  Q.  What is the function and purpose of inventory
14  management?
15  A.  It assesses number of policies assigned to that
16  particular underwriter and raises the alert if number
17  exceeds certain thresholds.
18  Q.  Is there an interrelationship of function between CSI
19  Express and CUW?
20  A.  CUW is only as a ledger of records.  It has nothing to
21  do with the CSI Express, just additional convenience for the
22  underwriter to store their records.
23  Q.  Okay.  And let's go to, let's go to CSI claims.  Can you
24  tell me what that application is?
25  A.  This was a small application developed for the actuarial

**1001**

1  to assess a claim's severity based on the policy
2  information.
3  Q.  And when is this assessment done?
4  A.  After claims is processed, after claims is -- after
5  payment is issued, it gets stored.  And CSI compares
6  the policy information against the claims and payouts and,
7  based on that, determines severity and criteria.
8  Q.  And in the context of a customer whose policy is to be
9  renewed, does CSI Express in any of its functions or
10  automated renewal, does it then access the information in
11  CSI claims for processing in the context of a renewal?
12  A.  No, it's not.  It's purely a reporting tool for the
13  underwriter -- for the actuarials to get the insight into
14  the data.  It's not used by CSI Express or renewal process.
15  Q.  Okay.  And CSI claims uses Blaze Advisor?
16  A.  Correct.
17  Q.  And how does it use Blaze Advisor?
18  A.  It creates -- similar to profitability indicator, it
19  creates a severity score based on the criteria of the data,
20  based on a set of the business rules.
21  Q.  So we have the data that is the claims severity -- you
22  know, we have the underlying claim being the data.  And then
23  Blaze Advisor -- through Blaze Advisor scores are generated
24  that are the consequence of that data applied against the
25  business rules of Chubb?

**1002**

1  A.  Correct.
2  Q.  And then do you know how that is used for the processing
3  of the claims?
4  A.  It's not used for the processing of the claims itself.
5  It could be used potentially by actuarials for whatever role
6  they -- whatever functionality they execute, but it's not
7  used in a production sense or for the processing of
8  particular claim or the policy.
9  Q.  Okay.  And then let's go to -- let's go to -- let's go
10  back to CCI and let's go to IRMA.  And that stands for
11  individual rate modification application?
12  A.  Correct.
13  Q.  Okay.  And IRMA uses Blaze Advisor?
14  A.  That is correct.
15  Q.  And what's the function and purpose of IRMA?
16  A.  It's a calculation of the premium.  It has a set of the
17  rate tables and calculation of the premium for a certain
18  small book of business.
19  Q.  And how does that relate to the sale of that book of
20  business to the customer?
21  A.  It's just to provide them the quote on a potential
22  premium.
23  Q.  But it is the Blaze Advisor software that is used to
24  take the facts, apply the rules and generate the quote to
25  offer the customer?

**1003**

1  A.  Generate the premium, not even the quote, just generate
2  the premium.
3  Q.  Generate the premium?
4  A.  Then somebody takes the premium and present it to the
5  customer.  Whatever means they choose.
6  Q.  Okay.  Thank you.  And then let's go to TAPS.  And that
7  stands for Texas Accident Prevention System?
8  A.  Correct.
9  Q.  And TAPS uses Blaze Advisor?
10  A.  One of the functions, yes.  That's one of the tools.
11  Q.  And what's the functional purpose of TAPS?
12  A.  To my knowledge, in Texas there is a requirement that
13  certain workers' comp policies, holders of certain workers'
14  comp policies are offered additional services.  The purpose
15  of the TAPS is to issue the letter after the policy is --
16  generate a letter for certain types of workers' comp
17  policies after they are issued.
18  Q.  Is it fair to say that TAPS is used to ensure compliance
19  with Texas requirements?
20  A.  Yes.  I believe it is.
21  Q.  Is it fair to say that without compliance with Texas
22  requirements, insurance policies cannot be sold of this
23  particular kind?
24  A.  Yes.
25  Q.  Did you say TAPS -- what were the kinds of insurance

**1004**

1  policies that TAPS --
2  A.  It's certain types of the workers -- to my knowledge,
3  it's certain types of workers' comp.
4  Q.  Workers' comp?
5  A.  Workers' comp, yes.
6  Q.  Let's go to premium booking.  Premium booking uses Blaze
7  Advisor?
8  A.  For one particular functionality, yes.
9  Q.  Okay.  What is that?
10  A.  It's a premium -- premium validation.
11  Q.  And what does that mean?
12  A.  To make sure that the premium is in compliance with
13  Chubb rules and regulations.
14  Q.  Okay.  So that's the particular -- I'm sorry.  Are you
15  telling me that that's the particular function of the Blaze
16  Advisor component of premium booking?
17  A.  Correct.
18  Q.  Can you tell me anything more about the premium booking
19  application than you have already said in terms of the full
20  extent of the application?
21  A.  The only thing I can speak to that after the policy is
22  issued, the premium is processed to the premium booking to
23  make sure it's properly recorded.  That's the extent of my
24  knowledge for that particular application.
25  Q.  Let's go to Cornerstone.  Cornerstone on Exhibit 188 is

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    February 27, 2023, Volume VI

**1005**

1  part of the Surety SUB, and that's your understanding as
2  well?
3  A.  It is, Yes.
4  Q.  And Cornerstone uses Blaze Advisor?
5  A.  Actually, based on my knowledge, it was intended to use
6  the Blaze Advisor; however, it was never fully implemented.
7  Q.  When was Blaze Advisor intended to be used?
8  A.  It was -- the process of adding Blaze Advisor to the
9  Cornerstone applications started in around 2014, if my
10 memory is correct.
11 Q.  Mm-hmm.  And the process never completed?
12 A.  The entire process was never completed, and it was never
13 deployed to production as part of the Cornerstone
14 application.
15 Q.  Do you know if Chubb uses, as of the time you were with
16 the company, was there an application in use called
17 Cornerstone?
18 A.  It was deprecated after the merger, and then ACE
19 equivalent was chosen to use for the Surety.
20         COURT REPORTER:  I'm sorry?
21         THE WITNESS:  ACE, the name of the new company
22 was -- ACE software was chosen to be used for the Surety.
23 BY MR. HINDERAKER:
24 Q.  And "deprecated" for us commoners means?
25 A.  No longer being used.

**1006**

1  Q.  So the Cornerstone application was being used up to the
2  time of the merger -- up to the time it was deprecated?
3  A.  Yes.  It was used, but without the Blaze Advisor.
4  Q.  Tell me about the application called Claims Connect.
5  A.  Claims Connect is the ACE, original ACE claims, claims
6  system.
7  Q.  Does it use Blaze Advisor?
8  A.  No, it does not.
9  Q.  Tell me about the application Small Commercial?
10 A.  Small Commercial was intended to be an application to
11 process the small book of business for the commercial lines
12 of businesses --
13 Q.  Mm-hmm (Yes).
14 A.  -- and does not use Blaze Advisor.
15 Q.  Was it intended to use Blaze Advisor?
16 A.  It started development, but we never discuss it.  It was
17 intended to use the business rules; however, Blaze Advisor
18 as a tool was never discussed.
19 Q.  EZER.  Tell me the function and purpose of EZER.
20 A.  To my knowledge, it's a commercial policy admin system
21 for the European zone.
22 Q.  And it uses Blaze Advisor?
23 A.  As one of the functions, yes.
24 Q.  Do you know the particular functions that Blaze Advisor
25 uses -- that Blaze Advisor is used for in the context of the

**1007**

1  EZER application?
2  A.  Similar to CSI Express, it was used to develop
3  renewal -- automated renewal policy, ARP 1 portion of the
4  CSI Express automatic renewal process.
5  Q.  Do you know whether EZER is used in the context of new
6  applications in Europe?
7  A.  Can you clarify what "new application" means?
8  Q.  New application means not an existing customer, seeking
9  to become a customer.  Not a renewal, but a new policy.
10 A.  I believe, to my knowledge, at this point it's not used
11 for the new customers.  It's on a deprecation list and only
12 existing business being used EZER.
13 Q.  To your knowledge, EZER is being used today in Europe?
14 A.  Correct.  Let's put it this way:  It exists in Europe;
15 it has not been removed from the application list, but it's
16 on the list to be deprecated.
17 Q.  Someday.  Do you know when?
18 A.  I don't know.
19 Q.  Have you heard when?
20 A.  No.
21 Q.  How about an Adapt?  A-D-A-P-T.  What's the function and
22 purpose of Adapt?
23 A.  It is a policy admin system for the accident and health,
24 I believe, line of business.
25 Q.  Okay.  And do you know the geographical regions to which

**1008**

1  Adapt was used?
2  A.  To my knowledge, it was used in Canada.
3  Q.  Adapt uses Blaze Advisor?
4  A.  Correct, for one of the functions.
5  Q.  What function is that?
6  A.  Underwriting guidance.
7  Q.  Is Adapt -- to your knowledge, is the application called
8  Adapt different in terms of being a policy administration
9  system?
10 A.  It's not.  I believe it's one and the same.  I've not
11 heard of the stand-alone Adapt application.
12 Q.  So understanding you haven't heard of the stand-alone
13 Adapt application, did you say you believe it is a policy
14 administration system?
15 A.  It is a policy administration system for the ABL line of
16 business.  That's the context I know of Adapt.
17 Q.  And are you using the same definition of policy
18 administration system that we talked about before?
19 A.  Correct.  Yes.
20 Q.  And then do you know if there is any difference between
21 Adapt and Adapt ABL?
22 A.  No, I don't.  I've never heard.
23 Q.  And then let's go to Evolution.  Do you know -- what is
24 that application?
25 A.  It's a policy admin system for specialty lines in

**1009**

1  Canada.

2  Q.  It uses Blaze Advisor?

3  A.  Yes, for one of the functions.

4  Q.  Among other technologies?

5  A.  Among other technologies.  That's correct.

6  Q.  What was the e-mail?

7  A.  The e-mail was Ramesh Pandey.  Information fro the ChEAR

8  regarding the Broker Site application.

9  Q.  What did Mr. -- what did he say in the e-mail?

10  A.  He stated that according to the ChEAR that Broker Site

11  is -- it's an application for broker to get the information

12  about the policies or the claims, so they can serve their

13  clients.

14  Q.  And does broker site use Blaze Advisor?

15  A.  It does not use Blaze Advisor; however, it uses the

16  parts of the Evolution, which is using the Blaze Advisor.

17  Q.  So Broker Site is an application that's used in Canada?

18  A.  Correct.

19  Q.  And the Broker Site application -- and a broker or agent

20  who uses the Broker Site application in the, in the Broker

21  Site application then inter -- is the word "interfaces" with

22  Evolution?  What is the right word in how Broker Site uses

23  Evolution?

24  A.  It gets the information from Evolution, policy

25  information or claims information.  Part of it could be

**1010**

1  information generated by the Blaze Advisor in Evolution.

2  Q.  Okay.  The purpose of --  the intended purpose or

3  function of Broker Site is its ability to draw information

4  from Evolution?

5  A.  Correct.

6  Q.  The point of the -- one of the purposes of the Broker

7  Site application is its ability to draw information from

8  Evolution?

9  A.  Correct.  Among other data sources.

10  Q.  Among other data sources.  Evolution being a policy

11  administration system that is used in Canada?

12  A.  Correct.

13  Q.  And Evolution being an application that uses Blaze

14  Advisor?

15  A.  That is correct.

16  Q.  Now, going back to Evolution, you mentioned that Blaze

17  Advisor provides -- Blaze Advisor supports a particular

18  function of Evolution.  What is that function?

19  A.  Underwriting guidance.

20  Q.  And we talked -- you know, we said kind of much earlier

21  in the morning that these applications may use a number of

22  technologies in addition to Blaze Advisor?

23  A.  That is correct.

24  Q.  Okay.  Is it also accurate to say that without Blaze

25  Advisor none of the applications function as intended?

**1011**

1  A.  As any of the technology, Blaze Advisor can be replaced.

2  So it could function without the Blaze Advisor.

3  Q.  Exactly.  It could function with a different application

4  that performs those functions.

5  A.  Yeah.

6  Q.  I guess what I'm trying to see is if you agree with me

7  that any particular application when it is a combination of

8  more than one technology?

9  A.  Correct.  One or more.

10  Q.  One or more?

11  A.  Or more.

12  Q.  The reason that there is one or more technologies is

13  that the one or more technologies are all necessary for the

14  application to perform its intended functions?

15  A.  Correct.  I would --

16  Q.  So this goes back to whether CSI Express is used on new

17  applications.  You don't know one way or the other?

18  A.  CSI Express is used for the new applications.

19  Q.  Oh, it is?

20  A.  Yes.  It is for entering the new policies.  Book,

21  binding, issue.  That's a virtue of the policy admin system.

22  Q.  So CSI Express will be -- for a new policy, CSI Express

23  is implemented?

24  A.  New policies and maintenance of policies going forward.

25  Q.  Okay.  And then, of course, a renewal is also

**1012**

1  implemented through CSI Express, including the automatic

2  renewal processing function?

3  A.  Correct.  Correct.

4  Q.  That was -- okay.  All right.  And so now let's go back

5  to CSI Express in a new policy.  In the processing of a new

6  application, and assuming that the policy type is within the

7  range of profitability indicator --

8  A.  Yep.

9  Q.  -- will profitability indicator be used in that new

10  application?

11  A.  Correct.  If it fits the model of box for the

12  profitability indicator.

13  Q.  Got it.  And when we spoke about DecisionPoint, we spoke

14  about using DecisionPoint for a new policy, you know.  We

15  went through that.

16  A.  A new quote.  Correction.  New quote.

17  Q.  New quote.

18  A.  Not a policy.

19  Q.  Got it.  New quote.  So now with a new quote, it gets to

20  the customer, e-mail or snail mail.  The customer says,

21  yeah, I want that, or tells the broker, yeah, I want that.

22  Then does DecisionPoint do anything after that?

23  A.  No.  Information from DecisionPoint, whatever quote is

24  entered into the CSI Express.

25  Q.  So then it goes into the CSI Express?

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    February 27, 2023, Volume VI

---

**1013**

1  A.  Exactly.  So DecisionPoint, just to make sure it's
2  clear, is only for the quoting for the small book of
3  business.  No functionality is intended there.
4  Q.  Let's take a policy that was originally issued,
5  quoted -- quoted -- originally -- well, let me start over
6  again.
7          Let's use a policy that -- again, using a
8  DecisionPoint -- the customer accepts it, it goes into CSI
9  Express.  Now it's time for that particular policy to be
10  renewed.
11  A.  (Moves head in affirmative manner.)
12  Q.  Is that a functionality of DecisionPoint to
13  automatically renew?
14  A.  No.
15  Q.  Now CSI Express is used to support that policy?
16  A.  Correct.
17  Q.  Okay.  So is it fair to say that DecisionPoint is only
18  used for new applications?
19  A.  For the new quotes, yes.
20  Q.  For the new quotes.  Understood.  Because if that quote
21  turns into a policy, then that goes into CSI Express, and
22  then the administration of that policy and its renewals will
23  be through CSI Express going forward?
24  A.  Correct.
25  Q.  Can you tell me anything further about how -- and my

**1014**

1  question was phrased in the context of CUW pulling
2  information from CSI Express.
3          Can you tell me anything further about how CSI
4  Express and CUW inter function, separate from who pulls data
5  from whom?
6  A.  To my knowledge, when policy is created in CSI Express,
7  information is sent to -- limited policy information is sent
8  to CUW, which would in turn allows the underwriter to
9  provide, as I said before, notes, additional documents
10  associated with that particular policy.
11  Q.  Okay.
12  A.  So that's a kind of the way I understood the
13  functionality between CSI Express and CUW.
14  Q.  Were you aware of Chubb having licensed Blaze Advisor
15  when you started work?
16  A.  Yes, I am.
17  Q.  Okay.  So when you started, what was your role relative
18  to the Blaze Advisor software that Chubb had licensed?
19  A.  When I started, I had no intention or -- I was hired not
20  as the rules, but as a document developer.
21  Q.  Mm-hmm (Yes).
22  A.  However, part of my team was working on the Blaze
23  Advisor, and my manager at that time proposed for me to get
24  involved with the tool.
25  Q.  Okay.  Do you have a -- can you give us a time reference

**1015**

1  for when you first got involved with the Blaze Advisor
2  software?
3  A.  I believe it was, to the best of my knowledge, early
4  2007.  Initial conversation happened around December
5  probably, but my involvement was, I believe, either January
6  or February.
7  Q.  I've given you Exhibit 189 --
8          THE COURT:  Mr. Hinderaker, if we might pause the
9  video.  Since we're turning to a new exhibit, this would be
10  a convenient time to take our morning break.
11          Members of the Jury, be back, be ready to go at 15
12  minutes to 11:00 on that clock.  All right?
13          THE CLERK:  All rise for the jury.
14          (Jury exits.)
15
16          (In open court without the Jury present.)
17          THE COURT:  Be seated.  Why don't the lawyers come
18  on back in and be ready at 20 minutes to 11:00.  We will
19  deal quickly with the issue of the exhibits that are the
20  subject of concern with Mr. Ghislanzoni's testimony.
21          Mr. Hinderaker, you be prepared, obviously, to
22  tell me why they're relevant.
23          Ms. Godesky, tell me why they're irrelevant or
24  prejudicial.  All right?
25          MS. GODESKY:  Thank you.

**1016**

1          THE COURT:  We're in recess.
2          (Recess taken.)
3
4          (In open court without the Jury present.)
5          THE COURT:  Be seated.  All right.  Let's deal
6  with these exhibits, quickly, if we can.
7          Mr. Hinderaker, as I understand it, looking at
8  them, it's not entirely clear that they all do, but I think
9  they all do deal with AppCentrica; is that right?
10          MR. HINDERAKER:  As well as DWS.
11          THE COURT:  All right.  Ms. Godesky, why are these
12  irrelevant or unduly prejudicial?
13          MS. GODESKY:  Your Honor, our objection is that
14  it's improper to use these documents with Mr. Ghislanzoni.
15  He is the chief enterprise architect at Chubb.  He was a
16  legacy ACE employee, meaning he did not join the
17  organization until after the acquisition in 2016.
18          THE COURT:  Okay.
19          MS. GODESKY:  As you know, FICO took the position
20  in correspondence to the Court before trial began, FICO does
21  not agree that exhibits are admissible without a sponsoring
22  witness who is able to lay proper foundation for each
23  exhibit.
24          And then at the February 14th status conference,
25  Your Honor said, "No document is being admitted except

**1017**

1 through a witness, and the witness is going to have to be

2 somebody who has knowledge or foundation for the document."

3          And so through the first eight witnesses in this

4 trial, we planned our case based on FICO's objection and

5 then the Court's directive.

6          And so last night FICO sent us a list of about 20

7 different exhibits that they want to use with

8 Mr. Ghislanzoni.  He is our corporate representative, but he

9 is not a 30(b)(6) deponent.  He has not been educated on

10 topics outside his personal knowledge.

11          So the group of e-mails that were submitted to the

12 Court, there is an evidentiary issue separate and apart from

13 foundation for one of them, but all of them predate his time

14 at the company.  He is not on any of them, and he can't

15 speak to what happened.  And it's completely prejudicial to

16 be confronting our corporate representative with e-mails and

17 asking him questions about things that he has no knowledge

18 of.

19          Relatedly, Mr. Hinderaker also alluded to the fact

20 that they want to try to use interrogatories with

21 Mr. Ghislanzoni.  They disclosed last night these are

22 interrogatories that show various gross written premium

23 levels run through certain applications.  Mr. Ghislanzoni

24 doesn't know anything about that.  He wasn't involved in the

25 process of running that data.  And FICO took three or four

**1018**

1 days of 30(b)(6) deposition testimony of multiple deponents

2 on how that data was run, where it came from and what it

3 means.

4          So if they wanted party admissions about, you

5 know, those gross written premium numbers, they could have

6 designated that deposition testimony.  Apparently, they

7 don't like the deposition testimony, so, instead, they would

8 like to prejudice our case by confronting our corporate

9 representative with rogue responses that he had no

10 involvement of, no knowledge of and would be completely

11 confused by.

12          THE COURT:  Okay.  Mr. Hinderaker, very briefly.

13 You're going to have to lay foundation.

14          MR. HINDERAKER:  Absolutely.  So there will be --

15 a foundation will be laid through Mr. Ghislanzoni.  It will

16 or it won't.

17          THE COURT:  Okay.

18          MR. HINDERAKER:  He testified at his deposition,

19 "A decision was made to take a copy of the Canadian

20 application and use it as a base to create an Australian

21 application."

22          In his role as the architect overall, he was

23 knowledgeable and participated in the decisions of how and

24 when to remove Blaze Advisor.  He is not testifying as a

25 corporate representative or as a 30(b)(6), but as a person.

**1019**

1          THE COURT:  Right.

2          MR. HINDERAKER:  And in terms of jumping the gun

3 on the interrogatories, they also tell us when the

4 applications -- when Blaze Advisor was no longer used.  And

5 this goes to our earlier conversation.  We have to clean

6 them up with all the --

7          THE COURT:  Understood.  Yes.

8          Okay.  Let's bring in the jury.

9          By the way, one of the jurors informed me that

10 they are perfectly happy with a 60-minute lunch break, so we

11 will go to 60 minutes.

12          MR. HINDERAKER:  I hope they don't shorten it up

13 anymore.

14          THE COURT:  We will be down to 10 minutes by the

15 end of the week.

16          THE CLERK:  All rise for the jury.

17          (Jury enters.)

18

19          (In open court with the Jury present.)

20          THE COURT:  Be seated.

21          You may proceed, Mr. Hinderaker.

22 BY MR. HINDERAKER:

23 Q.  I have given you Exhibit 189.  It has the heading CSI IT

24 Summit.  I acknowledge that it bears a date of August 2006.

25 Have you seen this before?

**1020**

1 A.  No.

2 Q.  Okay.  So when you picked up your involvement with Blaze

3 Advisor, was this part of the background information --

4 information that you reviewed?

5 A.  At that point, no, it was not, because at that point in

6 time the decision to use the Blaze Advisor was already made

7 and the work on the project was already started.  So my role

8 at that time was a developer.  So I was really boots on the

9 ground to help with the development of Blaze Advisor.

10 Q.  I see.

11 A.  I was not an architect at that point of time.

12 Q.  Mm-hmm.  Who, who was the person leading the Blaze

13 Advisor project in November of 2006?

14 A.  Owen Williams who was one of the department managers at

15 CSI.  He was leading the Blaze Advisor project.

16 Q.  We've handed you Exhibit 191.

17 A.  Yes, I do.

18 Q.  Okay.  And from the metadata, I believe you were the

19 author of that.

20          From the metadata, I believe you are the author of

21 this.  Would you agree?

22 A.  Oh, yes.

23 Q.  Okay.  And what was the purpose of your creation of

24 Exhibit 191?

25 A.  After the success of the business rules project for the

**1021**

1  ARP 2, the purpose of this document is to market the
2  business rules technology -- business rules across the
3  enterprise, across the Chubb.
4  Q.  And that was the purpose.  And what was the goal to be
5  achieved from that purpose?
6  A.  We thought that using the business rules can bring the
7  benefits to the IT teams across the Chubb.  So the goal is
8  as they become familiar, they would start implementing or
9  using the business rules technology that is making their
10  life simpler.
11  Q.  Okay.  So the -- was there a benefit to -- separate from
12  the simpler life of the underwriters, was there a benefit to
13  the business that you were advancing?
14  A.  Benefit would be, from my view, would be quicker
15  turnaround of the projects; thus, we can deploy the business
16  requests significantly quicker, as was demonstrated by the
17  ARP 1 project.
18  Q.  And from your point of view, what was the benefit to the
19  business when you were able to do that?
20  A.  Again, the changes or business changes can be deployed;
21  thus, whatever benefit is intended for that particular
22  implementation can be achieved significantly faster.
23  Q.  Does that mean then that new policies can be put to
24  market faster?
25  A.  Not necessarily, but could be more precise guidance or

**1022**

1  more precise scoring for that particular example.  It
2  doesn't necessarily impact the speed or increase on the
3  business.
4  Q.  Let's back up a second.  So the reason for having Blaze
5  Advisor is that it has an ultimate benefit for the business.
6  A.  Correct.
7  Q.  Correct?
8  A.  Ultimately, yes.
9  Q.  Yes, ultimately.  And one of the benefits of, I think
10  that you just said, is that it makes people lives easier?
11  A.  Correct.
12  Q.  Correct?  And the people that you're referencing are the
13  underwriters?
14  A.  No.  I'm referencing the IT teams because they're
15  ultimately responsible.  Again, I'm talking -- my role was
16  from the IT perspective.
17  Q.  Okay.
18  A.  I would not be able to speak for any business benefits
19  achieved through the use of the Blaze Advisor technology or
20  business rules technology.  I do speak around the
21  benefits -- that's what I speak in this document, is where
22  the business rules technology could benefit from the IT
23  point of view.
24  Q.  Anyway, that's what I said.  4 of 42 and Bates number
25  0004.

**1023**

1  A.  Okay.
2  Q.  And you wrote Introduction and Scope 1.1?
3  A.  Correct.
4  Q.  All right.  So you start that with, "The purpose of this
5  document is to illustrate."  And then tell me what you mean
6  by, "Such as increasing agility to implement the business
7  change and reducing time to market the new products and
8  services."
9        First paragraph.
10  A.  So we believed at the time of --
11        COURT REPORTER:  I lost you.
12        THE WITNESS:  Sorry.  I believed at the time I
13  wrote this document that implementation of the business
14  rules technology --
15        MR. FLEMING:  I'm sorry.  I thought you were
16  saying 40.
17  BY MR. HINDERAKER:
18  Q.  Let's try again.
19  A.  Yeah.  So at the moment of writing this document, I
20  believed that use of the business rules technology would
21  enable IT team to deploy any business request to production
22  or to come to market significantly faster as compared with
23  traditional technologies employed at Chubb at a that point
24  in time.
25  Q.  Say what?

**1024**

1  A.  It increases the agility of the project and increases --
2  and reducing time to market.
3  Q.  It increases the agility of the business?
4  A.  Agility of implementation.  Again, as you can see
5  specifically here, it is agility to implement to business
6  changes.
7        So I'm not speaking to the business benefit for
8  this.  This specifically says if I have a request from the
9  business to implement particular change, I can deploy it, I
10  can implement it significantly faster and deploy it
11  significantly faster for business to use.
12  Q.  As a consequence, as you say, that reduces the time to
13  market for new products and services, correct?
14  A.  If it's implemented in the Blaze Advisor.  Again, big
15  disclaimer.
16  Q.  And you just, you just, you just said the phrase, "if
17  implemented in Blaze Advisor."
18        And I want to turn you to the next page.  And you
19  have a heading, "What are business rules?"  And then you
20  have a description, you know, four paragraphs down,
21  "Traditionally embedded" -- "traditionally embedded inside
22  code."  And then you say -- and then you have the next
23  paragraph, "Externalizing the business rules to be a
24  structured decision management."
25        Is that what you're meaning by if Blaze Advisor is

**1025**

1  used because it externalized the business rules?

2  A.  Correct.  And that is how it was marketed to us by FICO

3  when we bought the tools.

4  Q.  And then -- let's see.  And then on the same page at the

5  bottom, "Enhance business performance by."  And Number 1 is,

6  "Increasing Analytical Ability."

7         Over time, can you tell me how Blaze Advisor

8  applications were used to increase analytical ability?

9  A.  Profitability indicator is an example of such

10 application which provides the ability to determine the

11 severity of the risk as underwritted by Chubb.

12 Q.  Okay.  And then Number 2, Automate Decisions by, and

13 then it says, "Automating High-Volume, Low-Risk Decisions."

14 Is that a component of -- tell me what applications of Blaze

15 Advisor used that.

16 A.  DecisionPoint.

17 Q.  How about Automatic Renewal?

18 A.  Automatic Renewal -- it renews all the policies, so I

19 wouldn't qualify as at low risk.  It's entire book of

20 business, whereas DecisionPoint is for specific low-risk,

21 high-volume business.

22 Q.  And then II is "Establishing Uniform Decisions Across

23 Multiple Functions, Channels and Business Touch Points."

24 What applications using Blaze Advisor did that?

25 A.  Essentially, again, profitability indicator, because it

**1026**

1  is used in many different places.  Automatic Renewal, CSI

2  Express, DecisionPoint.  That's an example of uniform

3  decision about the risk.

4  Q.  It would be separate from profitability indicator.  Is

5  this also true for the underwriting guidance for CSI

6  Express?

7  A.  Underwriting guidance is developed -- yes, it is correct

8  in terms of application.  But since it speaks about multiple

9  functions and touch points, decision points, my view at

10 least, it's a better example.

11 Q.  Okay.  CSI Express and underwriting guidance does

12 establish underwriting decisions?

13 A.  Correct.  But in context of one application decision is

14 not shared across anywhere else.

15 Q.  This is Exhibit 192 for the record.  It's a cover e-mail

16 having a subject line of "Creating and Managing Business

17 Rules, CoE, Henry Mirolyuz, Chubb," dated 9/16/2009, and

18 then the attachment bearing Bates numbers FICO0057207

19 through 57222, bears as a title "FICO Forum:  Decision

20 Management Tools User Group, September 16-18, 2009."  It

21 includes on the title page, "Henry Mirolyuz, technical

22 analyst, business rules CoE, Chubb."

23         Do you recall this presentation, Mr. Mirolyuz?

24 A.  Yes, I do.

25 Q.  Okay.  Did you prepare this entire deck?

**1027**

1  A.  I prepared the deck in collaboration with Michael Sawyer

2  from FICO.

3  Q.  Okay.  All right.  Let me just go to the Bates number

4  57208?

5  A.  50208.

6  Q.  The second page.

7  A.  Yep.

8  Q.  And there is this quote from Donald Light.  Why did you

9  include that quote in the presentation?

10 A.  I felt that the term "business rules" was used a little

11 bit loosely.  People do not realize or do not have complete

12 understanding about what the business rules really is versus

13 the term of "decision business" and "decision-making

14 process" is a better illustration or a better terminology

15 for the technology itself.  I think it's gives the people

16 better insight into that.

17 Q.  And is that because as a consequence of the business

18 rules application, it enables a company to make decisions?

19 A.  Yes.  Same as wrote in the EcoSystem document.  Better

20 uniform decisions.

21 Q.  Let me turn to the next page, 209.  And, again, these

22 are your statements in the slides?

23 A.  Correct.

24 Q.  All right.  So we don't need to read them to each other.

25 But under the Potential Future Applications, there is a

**1028**

1  heading, Cross/Upselling?

2  A.  Yes.

3  Q.  Was that application implemented during your time at

4  Chubb?

5  A.  Not to my knowledge.  It was considered, as you can see

6  it here, but I don't believe it was implemented.

7  Q.  Would it have been a functionality of CSI Express?

8  A.  Correct.

9  Q.  And then the next header is Predictive Models.  Was that

10 implemented at CSI Express -- was that implemented at Chubb?

11 A.  Yes, it was.  Profitability indicator.

12 Q.  And if we go to the next page, 57210, you're giving a

13 case study of Automated Renewal I?

14 A.  Correct.

15 Q.  Thank you.  And in this, with respect to Automated

16 Renewal I on this slide, the overall business goal is to

17 increase the percentage of automated renewal submissions.

18 Was that accomplished?

19 A.  Correct.  Yes, it was.

20 Q.  And it goes on to say that the policies that are

21 automatically renewed, the more time the underwriter has to

22 develop and produce additional business or handle

23 additional -- produce additional business or handle

24 additional business.  And that also was achieved?

25 A.  I believe it was.

**1029**

1    Q.  And then there a header, "Objectives/Benefits, and
2    Reach."  Were those achieved as well?
3    A.  I cannot say if it was completely achieved or not.
4    Q.  I'm sorry?
5    A.  I cannot say if it was completely achieved or not.  It
6    was the goal to achieve those benefits.  But was it achieved
7    100 percent?  I'm not sure.  I cannot speak to that.
8    Q.  Okay.  Do you know if it was achieved to some extent?
9    A.  To some extent, yes, it was.
10   Q.  You have been handed Exhibit 196.
11           COURT REPORTER:  193.
12   BY MR. HINDERAKER:
13   Q.  I'm sorry.  193.  Thank you.  And an Introduction to
14   Business Rules, Improving Performance Through Decision
15   Management.  And you, sir, are one of the presenters; is
16   that right?
17   A.  That is correct.
18   Q.  And do you recall --
19   A.  Oh, yes.
20   Q.  -- the context of this?  What was it?
21   A.  It was a presentation on one of the forums which was
22   hosted by FICO to talk about the business rules and Chubb
23   experience in particular.
24   Q.  All right.  So this was an external presentation outside
25   of Chubb?

**1030**

1    A.  Yes.
2    Q.  Then the next -- the next page has the next slide,
3    Business Rules Overview, CoE, October of 2009.  Are you the
4    author of the slides that follow that?
5    A.  If my recollection is correct, it was a collaborative
6    effort, so we all work.  I mean, I would have provided the
7    information, but we all worked on all the presentations all
8    together.
9    Q.  Is it accurate to say that you were one of the
10   collaborators on this entire set of slides?
11   A.  Correct.
12   Q.  So you had an input into all of the slides?
13   A.  Yep.  At least I was able to review it and provide the
14   feedback, if necessary.
15   Q.  If you disagreed, you could say so?
16   A.  Yeah.
17   Q.  If you would go to the Bates number that has 0012 as its
18   ending.
19   A.  Okay.
20   Q.  You'll actually get the original 12 of this slide as
21   well.  You see that slide bears the heading, "What is
22   Decision Management?  FICO's Point of View."
23   A.  Yep.
24   Q.  And then it has five dimensions of Decision Management?
25   A.  (Moves head in affirmative manner.)

**1031**

1    Q.  And my question is:  From the deployment of Blaze
2    Advisor and the particular Blaze Advisor applications at
3    Chubb, can you describe for me how the Chubb Blaze Advisor
4    applications align with these five points?
5    A.  I'm not sure I follow the question the way it's stated.
6    Q.  Let me say it this way:  Blaze Advisor applications that
7    were implemented by Chubb aligned with the -- made
8    decisioning more precise?
9    A.  So again, Profitability Indicator, as I said before, is
10   a great -- is an example of precise decision to identify
11   high-risk policies or customers.
12   Q.  And Chubb's implementation of Blaze Advisor applications
13   made decisioning more consistent?
14   A.  For the lines which were implemented.  So the Blaze
15   Advisor for Profitability Indicator.
16   Q.  That's another example?
17   A.  Yep.
18   Q.  CSI Express is another example?
19   A.  CSI Express, again, is too in general, but Blaze
20   component is used for a specific line of -- as I said
21   before, specific line of business.  So for those implemented
22   for Blaze, yes, it makes decisioning much more precise.
23   Q.  And then another dimension of decisioning is agility.
24   And you mentioned that in your earlier slides --
25   A.  Correct.

**1032**

1    Q.  -- as one of the benefits of Blaze Advisor, deploying
2    Blaze Advisor?
3    A.  Correct.  We were able to implement the changes quicker
4    than what we were able to do it before.
5    Q.  And another dimension of using Blaze Advisor is speed to
6    market.  You were able to accomplish some of that?
7    A.  Correct.
8    Q.  And if you would -- the e-mail itself is 5/27/15, but
9    then the e-mail has 5/21/15, just to be clear.
10          And if you would go to the e-mail Bates numbered
11   5271, looking at that profitability indicator.  And,
12   Mr. Mirolyuz, are you the author of this slide?
13   A.  I could have provided the information for that slide.
14   However, I don't recall if I was the author or Mike created
15   the slide himself.
16   Q.  So whether your fingers touched the keys or not, the
17   information on the slide is your information?
18   A.  Correct.
19   Q.  And then on the top left corner is the heading
20   "Initiative," and it lists various objectives, benefits?
21   A.  Correct.
22   Q.  And are you listed -- and then under the bottom left,
23   there's another cell, "Plus/Delta," and then under Plus it
24   says, "The defined business benefit was realized."
25   A.  Correct.

**1033**

1  Q.  Let's go to the next slide.  And this one is talking
2  about DecisionPoint, correct?
3  A.  Correct.
4  Q.  Okay.  And, again, you list in the Initiative cell four
5  business benefits to be achieved by the DecisionPoint
6  application?
7  A.  Correct.
8  Q.  And then under Plus/Delta, you state that, "The defined
9  business benefit was realized"; is that correct?
10 A.  That is correct.
11 Q.  Can you just tell us -- maybe we know, but what's the
12 meaning of real-time quotes and bindable quote letter?
13 A.  That we can provide -- as requested, we can provide the
14 quotes in real-time.  They don't have to wait for -- the
15 customers don't have to wait overnight to get a quote.  They
16 can receive it -- real-time is not absolutely correct.  It's
17 near real-time but within a reasonable time frame.
18 Q.  Do you know if Chubb has -- I'm just talking the big
19 company Chubb -- undertaken the analysis to quantify the
20 business value which is realized from Blaze Advisor
21 applications?
22 A.  I cannot speak one way or another.  I'm looking from the
23 technical perspective.  As I said before, the decision
24 regarding using Blaze was already made before I started at
25 Chubb.

**1034**

1  Q.  You have Exhibit 195.  It says, "Chubb Enterprise
2  Architecture - Business Rules Strategy/Roadmap."
3  A.  Yeah.
4  Q.  I will just represent that the metadata suggests this is
5  a July 21, 2017, document with yourself as the author.  Do
6  you recall it?
7  A.  Yes, I do.
8  Q.  Okay.  What was the purpose of this document,
9  Exhibit 195?
10 A.  The purpose of this document is to summarize the
11 strategy around the business or provide a strategy in a
12 future roadmap regarding the business rules for the Chubb at
13 the Enterprise level.
14 Q.  Is this an internal presentation to Chubb?
15 A.  Correct.  Specifically it is limited to the Chubb
16 Enterprise Architecture.  So it's not even presented to the
17 broader audience.  It's specifically intended for the
18 Enterprise Architecture team.
19 Q.  The Enterprise Architecture team, is that speaking of --
20 speaking to IT personnel who have Enterprise-wide
21 responsibilities?
22 A.  In Chubb -- all Chubb architects.  All the architects
23 were the Enterprise architects.  It was not separated by the
24 business unit, so anybody who had the title "architect"
25 would be considered to be the Enterprise architect.  So this

**1035**

1  is specifically that team.
2  Q.  That team.  All right.
3       So that's to whom it was presented.  And then why
4  was it being presented?
5  A.  Again, to inform -- to develop the strategy and as
6  well as a future roadmap in regards to the use of the
7  Business Rules technology at Chubb.
8  Q.  Okay.  And are you the author of the entire document
9  then?
10 A.  With the input of information from others, but yes, I am
11 the one who compiled it.
12 Q.  So it's fair to say, this is your document?
13 A.  Yes.
14 Q.  All right.  If we could go to page 11, please, and that
15 slide has a header, "2015 Business Rules Projects at Chubb
16 (Active)."  Are we on the same page?
17 A.  Yes.
18 Q.  All right.  So the first line is "Corp" and then "PARS."
19 Do you recall that?
20 A.  Correct.
21 Q.  What is it?
22 A.  It's a CBS, corporate -- it's a Premium Booking.  So the
23 name acronym was the PARS, and we called it CBS, Corporate
24 Business Division.
25 Q.  Is Premium Booking and Corporate PARS the same thing?

**1036**

1  A.  Yes, it is the same thing.
2  Q.  And that project was completed per this slide?
3  A.  Correct.
4  Q.  Okay.  And why did you choose DecisionPoint and
5  Profitability Indicator as the applications to highlight in
6  the document?
7  A.  Profitability Indicator was our first attempt to
8  implement predictive models, risk assessment in Blaze.  By
9  itself, it was an interesting project, and people had raised
10 an interest on how we did it and the benefit of using it.
11 Q.  Mm-hmm (Yes).
12 A.  DecisionPoint was the project which we were using the
13 latest and greatest in terms of lessons learned and
14 experiences.  So we developed, actually in collaboration
15 with working with FICO as well, some assistance there,
16 application using --
17      (Court reporter asked for clarification.)
18      THE WITNESS:  -- agile methodologies.
19      MR. FLEMING:  Agile.
20 BY MR. HINDERAKER:
21 Q.  Is that what you mean, agile, A-G-I-L-E?
22 A.  Yeah.
23 Q.  Agile methodologies?
24 A.  Yeah.  And we were -- I mean, it was -- again, a number
25 of capabilities implemented in the DecisionPoint was

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    February 27, 2023, Volume VI

---

1037

1  essential.  As an architect, it was interesting for the
2  people to know.
3  Q.  Okay.
4  A.  So essentially, this touched on all the capabilities
5  which people were interested in at that point in time as an
6  architect.
7  Q.  Do we agree that Blaze Advisor aligns with each of the
8  business objectives that are bullet-pointed on the slide?
9  A.  Can you repeat the question again?  I apologize.
10  Q.  That Blaze Advisor aligns with, supports, achieves each
11  of the business objectives that are on that slide?
12  A.  I cannot speak for everything on here.  This slide
13  actually provided by FICO to me to propagate the use of the
14  technology, so this is the business objectives as FICO
15  defines them.
16  Q.  Understood.  Understood.
17       And then on the last page, Blaze Advisor Roadmap,
18  what is this?  What does this tell us?
19  A.  This is the information provided by FICO, more
20  specifically Michael Sawyer --
21  Q.  Mm-hmm (Yes).
22  A.  -- to me to illustrate the roadmap of a new
23  functionality in Blaze Advisor so I can educate people in
24  Enterprise Architecture team around what is upcoming with
25  FICO down the line.  Again, with a disclaimer that it's not

---

1038

1  guaranteed.
2  Q.  Is DecisionPoint a web quote solution?
3  A.  It's a solution -- it's an old name.  Web Quote is the
4  old name of the DecisionPoint.  It was re-branded as
5  DecisionPoint.
6  Q.  Okay.  The customer -- you mentioned the customer could
7  fill out the application and the hard copy gets sent in?
8  A.  Correct.
9  Q.  The customer can also fill out the application online?
10  A.  I don't believe so.  To my knowledge, no.  There was no
11  customer-facing solution.
12  Q.  Let me show you what has been marked as Exhibit 151.  Do
13  you acknowledge that this is an e-mail from Miranda Chang to
14  yourself on April 14th, 2016?
15  A.  Yes, I am.
16  Q.  As it says, she says, "See attached Technology of Choice
17  for Business Rules = Blaze" and then a smiley face?
18  A.  Correct.
19  Q.  What was the context she was sending this to you, do you
20  know?
21  A.  As part of the merger between Chubb and ACE, we went
22  through the portfolio application -- not application --
23  tools portfolio on both of the organizations to determine
24  going forward which technology stays or which technology
25  will be deprecated or eliminated from the list.

---

1039

1       I was asked to provide my feedback on Blaze
2  Advisor as the technology I was mostly familiar with.  I
3  provided the information to -- as you can see in the e-mail,
4  to Ramesh Pandey.  And based on this information, he and his
5  team, whatever team he was working on, was making a decision
6  in terms of which technology is applicable going forward.
7       As you can see from the e-mail, Blaze Advisor was
8  chosen at that point in time as the going-forward technology
9  for the combined Chubb organization.
10  Q.  If you go a couple of pages into the document, there is
11  a series of slides, and it begins with a header
12  "Cross-Divisional TDA, Technology Tool Due Diligence and
13  Recommendations."
14       If I understood your answer correctly -- well, let
15  me just put it this way, were you a part of preparing any of
16  these slides?
17  A.  Not the slides itself.  The slides, I believe, were
18  prepared by Ramesh Pandey or somebody on his team.  I was
19  the one who provided information around the Blaze Advisor,
20  which went to the slides around those.
21  Q.  And then you were not part of the decision-making
22  process of which way to -- what technologies to choose on
23  the integration?
24  A.  I could only provide my recommendation.  It was up to
25  the senior leadership to make those types of decisions.

---

1040

1  Q.  You have now Exhibit 199.  Can you identify that for us,
2  please?
3  A.  199 looks like a slide deck from the Interact 2007
4  conference.
5  Q.  And what is Interact?
6  A.  I believe, if I recall correctly, it's a conference
7  which was hosted by Fair Isaac for the users and the
8  developers of Blaze Advisor software.
9  Q.  And did you present at that with this program or with
10  this talk?
11  A.  I don't recall me presenting this slide deck.  I could
12  have been, or it could have been my manager who would have
13  presented it.
14  Q.  All right.  And your manager at that time was whom?
15  A.  Owen Williams.
16  Q.  Owen Williams.  All right.
17       Do we agree that this is a slide deck that either
18  yourself or Owen Williams prepared and presented at a FICO
19  conference?
20  A.  Yes.
21  Q.  Was the functionality of adding and removing and
22  replacing enhancement endorsements -- or adding, removing
23  and replacing endorsements part of the functionality of
24  ARP 2?
25  A.  Yes, it was.

**1041**

1  Q.  Can you identify Exhibit 204, please?

2  A.  Premium Booking Modernization Senior Leadership

3  Presentation.

4  Q.  Were you part of preparing this set of slides?

5  A.  No, I was not.

6  Q.  Have you seen it before?

7  A.  Let me take a look.

8  Q.  Yeah, sure.

9  A.  No, I do not.  I'm not part of the leadership team.

10  Q.  Do you have any doubt that this was a set of slides

11  presented to the senior leadership team at Chubb?

12  A.  I cannot say one way or the another.  It looks authentic

13  but, again, I cannot say one way or another.

14  Q.  All right.  Can you identify for us, please,

15  Exhibit 216?

16  A.  It is an e-mail from Cristian Vasilache.

17  Q.  And the attachment?

18  A.  The attachment is a report, a ChEAR software report,

19  application report.

20          COURT REPORTER:  Report -- I'm sorry.  What?

21          THE WITNESS:  Application report.

22  BY MR. HINDERAKER:

23  Q.  And this ChEAR report -- you've described to us earlier

24  what a ChEAR report is.  Is this another version of that

25  report?

**1042**

1  A.  Yes, it looks like.

2  Q.  And if we go one, two, three, four, five -- if you go

3  six pages in, it would be the first page of the tables?

4  A.  Okay.

5  Q.  Again, as we saw in an earlier document, there are some

6  entries that are in red.  For example, on the first page,

7  Broker Site, Technology Blaze Advisor, and I think it says

8  version 6.9 all in red, correct?

9  A.  Correct.

10  Q.  And is that meaning that it's running on version 6.9 and

11  it's due to be upgraded to 7.1, or what does that mean?

12  A.  I believe in that particular case it means that that

13  version will be eliminated.  If you read on the same line --

14  Q.  Yes.

15  A.  -- next after 6.9, it says "eliminate."

16  Q.  Okay.  What is being eliminated?

17  A.  The use of the Blaze Advisor technology, however it was

18  used or not.  If the technology was listed for that

19  application, mistakenly or not, this means it will be

20  eliminated to either correct or the technology is no longer

21  being used.

22  Q.  Okay.  Do you know if Blaze Advisor -- let me back up.

23          Was Blaze Advisor used for Broker Site before

24  elimination?

25  A.  Not -- I don't have any knowledge of Blaze Advisor used

**1043**

1  for the Broker Site.

2  Q.  Okay.  So to be consistent with your earlier testimony,

3  you would say that this entry that has Blaze Advisor 6.9

4  having been used for Broker Site is wrong?

5  A.  Correct.  Therefore, I would assume that why it was

6  eliminated.

7  Q.  So you have Exhibit 218?

8  A.  Yes, I do.

9  Q.  And this is another -- another version of an Amy Bell --

10  Business Analyst Amy Bell's statement for Solution Analysis

11  for DecisionPoint - Add Coverage?

12  A.  Correct.

13  Q.  Kind of a normal document you got in your work at Chubb?

14  A.  Yes, that's --

15  Q.  This is -- that's already been marked.  I'm sorry.  This

16  is Exhibit 168.  The metadata says that you are the author

17  and that it is -- has a date of May 20, 2015.

18          Do you recall building this set of slides,

19  "Overview of Business Rules" --

20          MR. FLEMING:  I'm sorry.  Can you give the date?

21          MR. HINDERAKER:  What?

22          MR. FLEMING:  Can you give the date?

23          MR. HINDERAKER:  I did.

24          MR. FLEMING:  Would you mind repeating that?

25          MR. HINDERAKER:  May 20, 2015.

**1044**

1

2  BY MR. HINDERAKER:

3  Q.  Do you recall building a set of -- a slide deck called

4  "Overview of Business Rules in DecisionPoint"?

5  A.  Yes.

6  Q.  And what was the context or purpose of this deck?

7  A.  To provide an overview of implementation of the Business

8  Rules in DecisionPoint application.

9  Q.  And you presented this overview to whom?

10  A.  Internal Chubb IT team.

11  Q.  Okay.  And why did you present it to the internal Chubb

12  IT team?

13  A.  Because I felt that success of this project, in terms of

14  implementation, at the time it implemented, is something I

15  should showcase to the IT team as well as highlight benefits

16  of the business rules.

17  Q.  Okay.  So is it fair to say you're the author of the

18  entire document?

19  A.  Yes.

20  Q.  Okay.  If an "account round" means to be able to add

21  endorsements or consider the adding of endorsements to an

22  application, do you know that that functionality is part of

23  DecisionPoint?

24  A.  DecisionPoint already had functionality to add and

25  remove endorsements.  So --

**1045**

1  Q.  Okay.

2  A.  -- it could have been.  Again, I don't want to speculate

3  in terms of what the -- what Amy meant by account round.

4  Q.  Okay.

5  A.  Since it's a business goal, I have no knowledge of that.

6  Q.  In light of your earlier testimony about CUW, how is

7  Blaze Advisor a key technology?

8  A.  As I said before, CUW is a suite of tools.  One of the

9  tools inventory management is using the Blaze Advisor.

10  Thus, that testimony is absolutely correct.

11       THE COURT:  All right.  Mr. Hinderaker, call your

12  next witness.

13       MR. HINDERAKER:  Mr. Ghislanzoni.  Take a moment,

14  Your Honor, and get the binders set up.

15       THE COURT:  Mr. Ghislanzoni, if you will raise

16  your right hand as you have.

17            (Witness sworn.)

18       THE WITNESS:  I do.

19       THE COURT:  Go ahead and be seated.  Turn your

20  microphone on and make sure you speak into it.

21       State your full name for the record.

22       THE WITNESS:  Claudio Ghislanzoni.

23

24

25

**1046**

1            (Claudio Ghislanzoni)

2            CROSS-EXAMINATION

3  BY MR. HINDERAKER:

4  Q.  Let's see here.  Good morning still.

5  A.  Good morning.

6  Q.  I understand that -- let me just give the jury a sense

7  of your employment background.  I understand that you're the

8  chief enterprise architect for the Chubb Group?

9  A.  Correct.

10  Q.  All right.  And you, in terms of -- we've heard many --

11  well, you have been here all trial, and so everybody knows

12  about the Chubb Corporation being acquired by ACE Limited.

13       And your legacy, that is to say you came from the

14  ACE Limited side, correct?

15  A.  I did.

16  Q.  And as chief enterprise architect by the title, I

17  imagine we all kind of simply assume that your

18  responsibilities are the architectural function, correct?

19  A.  That is correct.

20  Q.  And your responsibilities are, as I understand it,

21  they're global?

22  A.  Global.

23  Q.  So are you the, as being the chief enterprise architect,

24  are you the head?  You're the top enterprise architect for

25  the global, what is now Chubb Limited?

**1047**

1  A.  I am.

2  Q.  All right.  Now, you were, as we just mentioned, on the

3  ACE side at the time of the acquisition, and you were aware

4  that acquisition had been announced and would be happening

5  directly?

6  A.  Correct.

7  Q.  And I understand from your IT background that one of the

8  consequences of a merger is to consolidate technologies?

9  A.  That's a very important activity in IT.

10  Q.  Very important activity, did you say?

11  A.  Important activity, yes.

12  Q.  Yeah.  And the purpose, of course, is that in a merger

13  of two companies, it's a goal to eliminate the duplication

14  of the same assets?

15  A.  Where appropriate, yes.

16  Q.  And you were involved, as I understand it, on the ACE

17  side of looking at, from your point of view, which assets to

18  eliminate because it would be duplicate, and it would be

19  appropriate to eliminate them?

20  A.  Yes.  One important activity I took on the leadership of

21  as part of the integration was to look at software products

22  legacy ACE and legacy Chubb, Federal, and define together

23  with my team a new set of standards for the new enterprise.

24  Q.  Were you aware -- the merger, the acquisition, had

25  closed.  Were you aware in March, the end of March of 2016,

**1048**

1  that FICO had terminated the Blaze Advisor license agreement

2  that Chubb & Son, the division, had?

3  A.  I was not.

4  Q.  When did you become aware that FICO had terminated the

5  Chubb & Son Blaze Advisor license.

6  A.  At trial.

7  Q.  At trial?

8  A.  Yes.

9  Q.  Just now?

10  A.  In preparation to the trial.

11  Q.  Okay.  Were you aware -- were you aware during the time

12  that you were considering the -- well, let me come back to

13  that.  I will come back to that.

14       It's fair to say or it's correct to say that in

15  2016, you were involved and started the discussion around

16  the options and standardization of the parts -- the options

17  and standardization, what technologies to use going forward

18  in the new company?

19  A.  Yes.

20  Q.  And in 2016, you were in that assessment.  You were

21  assessing what technologies to use instead of Blaze Advisor?

22  A.  We were looking at all the different technologies.

23  Blaze Advisor was one of the technologies we assessed.

24  Q.  And you were assessing the other technologies so that

25  you could make a decision about what to use instead of Blaze

**1085**

1  read this document and I see Blaze Advisor 7.1, it says,
2  that's the version being used.  And when it says leveraged,
3  that's confirming that it is being used, correct?
4  A.  I did not produce this document.
5  Q.  Understood.  I didn't say you did.  I'm just asking if
6  you read it the same way I do.
7  A.  So what I can tell you about ChEAR is a repository where
8  we were recording existing application information and
9  potential future ones.
10  Q.  Okay.  And whether it's a future one, we just look at
11  other information to see if it's already existing, right?
12  A.  I cannot tell you how it was identified in this
13  spreadsheet.  I was not part of --
14  Q.  Stepping back from not being the author or participant
15  in creating it --
16  A.  Sure.
17  Q.  -- we have other people testify to that.  As the
18  architect in the company if you are reading this document
19  and it says leveraged, you would interpret that as Blaze
20  Advisor 7.1 is being used?
21  A.  I would be guessing the intention of the author.
22  Q.  You don't want to -- okay.  You don't want to read it.
23  All right.
24        The next portion of questioning that I would like
25  to go into with you is to identify the dates on which your

**1086**

1  use of Blaze Advisor ceased and you substituted in the
2  Drools application.
3        And why don't you -- we'll go slow for a minute
4  here.  And so if you would turn to Exhibit 1007.
5  A.  Okay.  1007.
6  Q.  Yep.  And you will see the title Non-Supplemental Answer
7  to Plaintiffs Interrogatory Number 7.  Why don't you go to
8  page 5.
9  A.  Page 5.
10  Q.  Please.
11  A.  Okay.
12  Q.  And you will see there's two bullet points, and the top
13  bullet point starts CSI Express?
14  A.  I can see.
15  Q.  Okay.  And then there's -- I won't read it yet, but then
16  there's a sentence that speaks about when the Blaze Advisor
17  component was removed.  Do you see that?
18  A.  You are reading the first paragraph?
19  Q.  First bullet point, last sentence, "the Blaze Advisor
20  component was removed."
21  A.  I can read the sentence, yes.
22  Q.  Okay.  Good.
23        MR. HINDERAKER:  Your Honor, I would like to offer
24  into evidence Exhibit 1007, which is the Non-Supplemental
25  Answer to Interrogatory Number 17; 1008, which is the

**1087**

1  Seventh Supplemental Answer to Interrogatory Number 19;
2  1002, which is the Seventh Supplemental Answer to
3  Interrogatory 18.
4        And I would -- I request that they be admitted
5  into evidence as the verified interrogatory answers, and
6  then we will, in terms of submitting the document for the
7  record, take out what I'll call the lawyer-eze and have
8  simply the facts.
9        MS. GODESKY:  That's fine, subject to the
10  redaction issue that we discussed.  And I think there's
11  content in these documents that goes beyond --
12        THE COURT:  The foundation?
13        MS. GODESKY:  Yes.
14        THE COURT:  And specifically in 1007, the graph at
15  the top half of that page is such a portion, correct?
16        MS. GODESKY:  Yes, that's what I have in mind.
17        MR. HINDERAKER:  Is what?
18        THE COURT:  The graph on page 5 of 1007, the graph
19  above the two bullet points, the objection is that it's
20  beyond the foundation of the witness.
21        MR. HINDERAKER:  I don't quarrel with that.  It
22  is.
23        THE COURT:  Okay.
24        MR. HINDERAKER:  It's not my intention to go into
25  any of that.

**1088**

1        THE COURT:  Yep.  Understood.
2        So for purposes of displaying it to the jury, if
3  you can redact that graph on page 5, let me know when you've
4  done that.
5        MR. MAYLEBEN:  Good, Your Honor.
6        THE COURT:  Okay.  So subject to those objections
7  and that redaction, 1002, 1005, 1007 and 1008 are received.
8        MS. GODESKY:  Your Honor, I'll just state for the
9  record I think those other exhibits have similar issues.
10        THE COURT:  The same issues, yep.
11        MS. GODESKY:  Yes.
12        MR. HINDERAKER:  And no dispute about that either.
13  Agreed.
14  BY MR. HINDERAKER:
15  Q.  So now we can go through this with a little bit of
16  speed, maybe.
17        So if we look at Exhibit 1007, I pointed you to
18  that first bullet point.  We can agree that Blaze Advisor
19  component was removed from the version of CSI Express,
20  automated renewal process and profitability indicator, on or
21  about January 17, 2020, right?
22  A.  This is what the document says.
23  Q.  That's all we can do.  That's right.
24        And then if we, if we -- with respect to
25  DecisionPoint, is it your recollection that DecisionPoint

**1089**

1  was replaced by Drools in the first half of 2020?

2  A.  I can't recollect exactly, but by end of April, 2020,

3  DecisionPoint for sure had been removed from Blaze usage.

4  Q.  Good.  And I should have just pointed you to page 3 of

5  the same exhibit.  Just put -- yep.

6        The Blaze Advisor component was removed from the

7  version of DecisionPoint used by the financial lines unit on

8  or about April 10, 2020.

9  A.  Right.

10 Q.  And then let's go to back to page 5 and talk about ARP.

11 So we touched on that already.  It was taken out at the same

12 time as CSI Express, on January 17, 2020.  Agreed?

13 A.  That's what the document says.

14 Q.  I know.  And then on page 9.

15        When we're talking about CUW at the top of the

16 page, the Blaze Advisor component was removed from the

17 version of CUW in early November, 2019.  That's what that

18 says there, right?

19 A.  I can see that, yes.

20 Q.  All right.  And then if we stay on this same page for

21 TAPS, we're going to know that it is -- the document says

22 Blaze Advisor was removed from the version of TAPS used by

23 the Chubb Commercial Insurance business unit in late

24 April -- sorry -- in late third quarter or early fourth

25 quarter 2019.

**1090**

1        That's what that says?

2  A.  Yes.

3  Q.  Okay.  And then if we go to page 10, the bullet point at

4  the bottom for IRMA?

5  A.  I can see.

6  Q.  The Blaze Advisor component was removed from the version

7  of IRMA used by Chubb Commercial Insurance business unit in

8  either the summer or early fall of 2019.  That's what it

9  says?

10 A.  Yes.

11 Q.  And then let's go back to page 6.  For premium booking,

12 kind of in the middle of the page, page 6?

13 A.  Yes.

14 Q.  You're there, but the screen isn't, so we will wait a

15 second.

16        Page 6.

17        Okay.  Well, we can read it.  Premium booking used

18 by corporate business systems was removed on or about

19 April 17, 2020, correct?

20 A.  That's what is stated, yes.

21 Q.  Okay.  Good.  If you would go to Exhibit 1008, please.

22 A.  Okay.

23 Q.  This is the Seventh Supplemental Answer to Interrogatory

24 19.  And if we go to page 3, we're told the Blaze Advisor

25 component --

**1091**

1        THE COURT:  Hang on a second.  Can we do the

2  redaction on that page as well, please?

3        Sorry, Mr. Hinderaker.

4        MR. HINDERAKER:  Yeah, we should.

5        Just the bullet point.  There we go.

6  BY MR. HINDERAKER:

7  Q.  The Blaze Advisor software component was removed from

8  the Evolution application described above on or about

9  September 27, 2019.  I read that right, I hope?

10 A.  Yes.

11 Q.  Okay.  And then let's go to Exhibit 1002.

12 A.  1002.

13 Q.  Got it.  Defendants' Seventh Supplemental Answer to

14 Interrogatory Number 18.  I'm interested in EZER.  So if we

15 can go to page 4.

16        And Blaze Advisor component was removed from the

17 version of EZER used by UK Federal on or about March 29,

18 2019.  That's what it reads?

19 A.  Yes.

20 Q.  And then let's go to Exhibit 105.

21 A.  105?

22 Q.  105.  And this is Defendants' Seventh Supplemental

23 Answer to Plaintiff's Interrogatory Number 20.  And if you

24 would go to page 6.

25 A.  I'm on page 6.

**1092**

1  Q.  Page 6, please.  First bullet point.

2        Blaze Advisor component was removed from the

3  version of Adapt used by CEG SE.  That's Europe, correct?

4  A.  Yes.

5  Q.  And Chubb Insurance Company of Australia on or about

6  January 27, 2019.  That's what it reads?

7  A.  Yes.

8  Q.  Okay.  Thank you for that.

9        Let's go to Australia.

10        You know that, that in -- we're going to go to

11 Australia, but we're got going to start off in Canada.  You

12 know that in Canada there was an application called

13 Evolution that used Blaze Advisor.

14 A.  Yes.

15 Q.  And you know that the decision was made to take a copy

16 of the Canadian application and use it as a base to create

17 an Australian application, which ended up also having the

18 name Evolution, correct?

19 A.  Yes.  That was correct.

20 Q.  And the copy of the Canadian application with Blaze

21 Advisor was the starting point for the Australian specific

22 application.  Agreed?

23 A.  That was the intention.

24 Q.  Yes.  And at the end of the day, the Blaze Advisor --

25 I'm sorry.  At the end of the day, the application that was

**1093**

1  used in Australia called Evolution had a rules engine of
2  ODM?
3  A.  Yes.
4  Q.  So for that, for the Australian application called
5  Evolution, the Blaze Advisor component that was in it was
6  removed, and then ODM was put into its place?
7  A.  What I can tell you is, I believe in first person, I
8  engaged with the Australian team in 2016 and facilitated the
9  adoption of ODM as the rules engine for the application.
10 Q.  Okay.  And so to put the -- I'm just making the simple
11 point, I think, that if you start off with Canadian
12 Evolution with that with Blaze Advisor is what you start
13 from, to get to the end point you first have to remove Blaze
14 Advisor and then put in ODM.
15 A.  I cannot tell you if that is what happened.
16 Q.  Okay.  Well, then let's, let's go back to 105 -- 1005.
17 And this is the Seventh Supplemental Answer to Plaintiff's
18 Interrogatory Number 20.
19          And if you would go to page 4.
20 A.  I'm on page 4.
21 Q.  Page 4?  Got it?
22          And there's a bullet point in the middle.  It
23 starts off the A&H business?
24 A.  The A&H business unit, yes.
25 Q.  And then a couple sentences in it reads, "Indeed Blaze

**1094**

1  Advisor was replaced with IBM operational decision
2  management before Blaze Advisor ever went live in
3  Australia."
4          Did I read that right?
5  A.  That's what this document says.  First time I see it.
6  Q.  Fair enough.  I'm not trying to quarrel with you.  This
7  is information I have from the lawsuit, and that's what it
8  says.
9  A.  That's what is reading here.
10 Q.  All right.  Are you familiar with Zorica Todorovic?
11 A.  I met Zorica at the time we started integration.
12 Q.  Okay.  And she's, she's out of Chubb Canada?
13 A.  Yeah.  She was IT lead CIO for Canada at the time.
14 Q.  And she was part of the process of taking the Evolution
15 application with Blaze Advisor as it was in Canada and
16 transferring that to Australia for ultimately the
17 development of the Australian application called Evolution?
18 A.  Yeah.  I cannot tell you if that is an accurate
19 statement.  I was not directly involved in that activity.
20 Q.  Did you know that she was involved in that activity?
21 A.  I know she owned the Evolution application in Canada.
22 Q.  Okay.  And you know that she was a senior vice president
23 operations of IT and chief information officer for Chubb
24 Insurance of Canada.
25 A.  Yes.

**1095**

1  Q.  Okay.  And did you know that she was working with a
2  consultant in Canada called AppCentrica in connection with
3  this project?
4  A.  When I met with Zorica, I remember her mentioning
5  AppCentrica being one of the consultants they were using in
6  Canada.
7  Q.  And in terms of the work being done by Chubb Australia,
8  you were aware that Chubb Australia was using a consultant
9  in connection with this project called DWS Group?
10 A.  Yes, I was aware of that.
11 Q.  And by "this project," I'm talking about the project of
12 creating the Australia Evolution application from the
13 Canadian Evolution application.  We're on the same page?
14 A.  Yes.
15 Q.  Okay.  Would you go to the exhibit in your notebook
16 called 526.
17 A.  526, yes.
18 Q.  I'm not as quick as you are.  All right.  There we go.
19          And Exhibit 526 is one where you happen to be on
20 the email chain.  It's from Hamish Tonkin to Russell Hodey
21 and yourself, among others.  Agreed?
22 A.  Yes.
23 Q.  As it bears the date of May 12, 2016.
24 A.  Yes.
25 Q.  And Russell Hodey is a Chubb representative out of Chubb

**1096**

1  Australia?
2  A.  Yes.
3  Q.  And Hamish Tonkin is out of the European zone of Chubb.
4  A.  Yes.  Hamish Tonkin was a legacy Chubb architect working
5  in the UK, in England.
6  Q.  And the subject matter of this email is Re:  Changing
7  Rules Engine Software.  Agreed?
8  A.  Yes.
9          MR. HINDERAKER:  I don't think there's an
10 objection to this exhibit, but I do offer it, Your Honor.
11         MS. GODESKY:  No objection.
12         THE COURT:  Exhibit 526 is received.
13 BY MR. HINDERAKER:
14 Q.  And the attachment, Rules Engine Matrix, if you would go
15 to Exhibit 527, the next one.
16 A.  527, yes.
17 Q.  And that's -- we're on the same page that Exhibit 527,
18 the Rules Engine Matrix, is the attachment to, excuse me,
19 Exhibit 526, the email.
20 A.  This doesn't say that, but --
21 Q.  If you look at -- go ahead.  If you look at the Bates
22 number that's produced in the litigation, the number for the
23 email is FED013893.  The number for the attachment
24 FED013894, just the next number.
25 A.  Understood.  Thank you.

**1097**

1  Q. So we can be in agreement that it's the attachment.

2  A. It's the attachment.

3  Q. All right. Thank you.

4        And this email is speaking like in the Hamish

5  Tonkin to Russell Hodey from Australia. In the second

6  paragraph, he says -- the subject matter again being

7  changing rules engine software.

8        He says, Blaze is fine for multiple operands and

9  parent/child/chaining/rete, as we don't want to develop this

10 sort of functionality into something we are building from

11 scratch.

12       He reads that, right?

13 A. So you are on the second paragraph?

14 Q. That I am, yes.

15 A. I can see that yes.

16 Q. Okay. I read that right?

17       And then on the bottom of that page it referenced

18 that Russell Hodey has been -- again, the email on the

19 bottom of the page, Russell Hodey to yourself, May 12, 2016,

20 Hodey is saying, "Having discussed this further with

21 Martin," you understand Martin is Martin Sill of DWS?

22 A. Yes.

23 Q. The solution architect at DWS and then he goes on to

24 suggest some proposals, including that DWS will continue to

25 explore Drools.

**1098**

1        That was happening at that time?

2  A. Yeah. DWS proposed the use of Drools, but we agreed

3  that ODM was the technology to be adopted, and that

4  happened.

5  Q. All right. Good.

6        And then on the last page of the email, it has the

7  number FED013893_002?

8  A. Yes.

9  Q. Martin is saying that he's going to pull together some

10 brief notes on how rules are implemented in Blaze currently

11 and saying it's very straightforward and he's going to

12 report on that.

13       Agreed?

14 A. That's what he's saying in the email.

15 Q. Okay. Thank you.

16       And then let's go to, let's go to Exhibit 1060.

17 A. 1060?

18 Q. Yep, 1060.

19 A. Okay.

20 Q. And you will see that it's from Zorica Todorovic who

21 you've identified already.

22 A. Yes.

23 Q. Chubb Canada. It's to a Julia Perle. Did you get a

24 chance to meet her too?

25 A. No.

**1099**

1  Q. But you see that her email address is at Chubb.com?

2  A. Yes.

3  Q. Any doubt that Julia Perle is also a Chubb Canada

4  person?

5  A. I don't remember Julia Perle.

6  Q. All right. All we know is her email address is at

7  Chubb.com, right?

8  A. Yes.

9  Q. And the subject is Evolution Transition, and then the

10 attachment is Knowledge Transfer Schedule.

11       And the subject matter is the Evolution transition

12 that we've been talking about already, Canada Evolution to

13 Australia, right?

14 A. Well, this is an email was produced in 2015.

15 Q. I know that.

16 A. Legacy Chubb.

17 Q. I agree.

18 A. So I was not part of that engagement.

19 Q. I know. And I'm not suggesting that you were. But you

20 do know that Zorica Todorovic is Chubb?

21 A. Yes, I know that.

22 Q. And you do know that there was an effort to transition

23 Blaze Advisor knowledge from Canada Evolution to Australia

24 Evolution. You know that too?

25 A. I see this email for the first time.

**1100**

1  Q. I understand that. Do you have any reason to think this

2  email isn't exactly what it purports to be, an email between

3  these people about the Evolution transition and the

4  knowledge transfer schedule?

5  A. I can tell you what is in the email.

6  Q. Okay. And let me just continue with some on this line.

7        And also on the email is Mr. Hodey at Chubb.com,

8  and you've told us that he's Chubb in Australia, correct?

9  A. Chubb Australia, yes.

10 Q. Yes. That's what I said, Chubb Australia.

11       And then on the email as well is Martin Sill at

12 DWS.com, and you identified Martin Sill as a DWS consultant

13 working with Chubb Australia, correct?

14 A. That is correct.

15 Q. And the subject matter again is Evolution Transition,

16 correct?

17 A. Correct.

18       MR. HINDERAKER: Your Honor, I offer Exhibit 1060

19 as an authenticated admission.

20       MS. GODESKY: Objection on foundation.

21       THE COURT: Sustained.

22 BY MR. HINDERAKER:

23 Q. Would you go to Exhibit 1169, please.

24 A. 1169.

25 Q. Yeah.

**1105**

1  for his authenticity for making, giving the foundation,
2  we're getting off track --
3          For showing the authenticity of those documents,
4  then the documents are admissions. I'm not suggesting, and
5  I haven't suggested, that Mr. Ghislanzoni has first-hand
6  knowledge of foundation to speak to these, but I can read
7  their admissions from authenticated documents.
8          THE COURT: I understand.
9          MR. HINDERAKER: Okay.
10         THE COURT: I think in fairness to Federal, I
11 think they need the opportunity to look at the case law that
12 you're citing. I think as I'm hearing it, I don't think you
13 need to use the exhibits themselves with the witness. They
14 can -- if they're admissible, then they will come in either
15 on their own because of the affidavit or through another
16 witness, the emails.
17         MR. HINDERAKER: The reason I -- I wasn't going to
18 do this right away, and the reason I went to it was when
19 Mr. Ghislanzoni identified all the people on the email --
20         THE COURT: Right.
21         MR. HINDERAKER: -- and I know he's not, he's not
22 one of them. He identifies all the people on the email.
23 There's no reason to think it's not exactly what it says it
24 is. And I offered it, and it was refused.
25         I said, well, I am going to find more foundation

**1106**

1  to show the subject matter of this email, the knowledge
2  transfer, is what he already knows about some, and this
3  brings us into AppCentrica and DWS a little bit deeper. If
4  he authenticated the email and the attachment that came from
5  Chubb Canada, I'm not going to ask him his first-hand
6  knowledge about it. He doesn't have it.
7          I'm just going to read the admissions that are in
8  Chubb's own documents.
9          MS. GODESKY: Your Honor, this is exactly what
10 FICO took the position we could not do, get documents into
11 evidence through witnesses who have no foundation to talk
12 about. And that has been the rule since the first day of
13 trial.
14         And what's happening here is, FICO did not take
15 depositions during discovery of Russ Hodey, even though he
16 was identified; Zorica, even though she was identified.
17 They chose not to take those depositions. They don't have
18 the evidentiary record that they need, and now they are
19 trying to shoehorn it in through someone who didn't even
20 start working at the company until after these emails were
21 authored.
22         He's admitted and he will testify that he has some
23 knowledge about what happened with Evolution Australia,
24 starting in spring 2016. But to try to use him as a vehicle
25 to get in the documents from 2015 that he was never on, he

**1107**

1  didn't participate in the conversations, again, when you can
2  look back at the correspondence that FICO sent the court,
3  they said this shouldn't happen, and the court said we
4  couldn't use documents with witnesses who couldn't lay a
5  foundation.
6          MR. HINDERAKER: And this man is going to lay the
7  authenticity through the document. I'm not asking his
8  personal knowledge. And, you know, Zorica is one of those
9  witnesses that we had yet another motion about, and the
10 defendants had her on the witness list. The defendants were
11 going to bring her to trial. Then they were going to take a
12 deposition.
13         I mean, it would have been easier for me if she
14 would have showed up, but that isn't in my control.
15         MS. GODESKY: It would have been easier for us,
16 too, but there's no power to compel her at that point, but
17 they could have taken a deposition earlier and so --
18         MR. HINDERAKER: My point is there's no reason to
19 blame around, either way.
20         MS. GODESKY: I'm not blaming anyone.
21         MR. HINDERAKER: We're dealing with the question
22 of -- I mean, the law is clear, in my judgment. If he can
23 authenticate that the document, email, is what it purports
24 to be and, he's already told me that the attachment connects
25 to the email, then that's all I need.

**1108**

1          It is an authentic record of the defendants, and
2  it's an admission.
3          THE COURT: I don't know that he can. I don't
4  think he has.
5          MR. HINDERAKER: Well, I know that he has already
6  agreed with me that the attachment is with the email. I
7  haven't gotten through your judgment that the email is an
8  authentic document produced in this litigation from Chubb.
9          THE COURT: Right. Well --
10         MR. HINDERAKER: And actually I don't know what
11 more I can because all of the, you know, he identifies the
12 people on it except for Perle and --
13         THE COURT: I haven't had an opportunity to read
14 the declaration of Zorica. What does it say, basically?
15         MR. HINDERAKER: Basically, we work with
16 AppCentrica, AppCentrica access to Blaze Advisor off of our
17 virtual desktops, and then AppCentrica was part of the work
18 with DWS. It's fairly high level. It's fairly high level.
19         THE COURT: Okay.
20         MS. GODESKY: He doesn't know anything about that,
21 Your Honor.
22         MR. HINDERAKER: I agree with you. He doesn't.
23         MS. GODESKY: So this is not the right witness.
24         THE COURT: Well, I agree with Federal. I don't
25 think -- well, I don't think currently we've gotten the

**1109**

1  foundation for the admission of the email with the
2  attachment.
3        Go ahead and lay more foundation if you can.
4        MR. HINDERAKER:  If I can.
5        THE COURT:  And on the affidavit we can deal with
6  that later.  And you're welcome to show him the affidavit,
7  but I don't know that that's -- I mean, he hasn't seen it
8  presumably.  He can't testify to its accuracy.
9        MR. HINDERAKER:  And I wouldn't ask him to.
10       THE COURT:  Right.
11       MR. HINDERAKER:  Its accuracy is the admission the
12 defendants have presented to the court as accurate.
13       THE COURT:  It doesn't strike me, to be honest
14 with both of you, that the question of whether AppCentrica
15 had Blaze or had access to Blaze and used it as a consulting
16 tool Chubb Canada is terribly in dispute.
17       MS. GODESKY:  We did not object when
18 Mr. Hinderaker showed the interrogatory response agreeing
19 with that in his opening.
20       MR. HINDERAKER:  It's not terribly undisputed.
21 These documents will -- they say, for example, this will get
22 the source code to DWS, that much.  It's a bit more than,
23 it's a bit more than DWS was in the same room as Blaze
24 Advisor as DWS, we're going to get the source code to DWS.
25       MS. GODESKY:  My objection is, Your Honor, this

**1110**

1  witness was not involved in DWS and AppCentrica vis-à-vis
2  Blaze, and so to have our corporate representative
3  questioned about correspondence he can't conceptualize, it's
4  just not fair.
5        MR. HINDERAKER:  Well, again, I don't -- he's
6  already testified to his general, his knowledge about that
7  transfer.  He's already testified he met with Zorica.  He's
8  not a 30(b)(6) deposition.  He's a human being witness in
9  the trial.
10       MS. GODESKY:  Sure.
11       THE COURT:  Right.  And you're welcome to explore
12 it further with him.
13       MR. HINDERAKER:  All right.
14       THE COURT:  Again, he, I think he's testified
15 about his knowledge, once he came on board, about DWS and
16 AppCentrica, has he not?
17       MR. HINDERAKER:  Yeah, he has.  And there's emails
18 that are going to be after his onboarding.  I mean, the one
19 I'm working with now is earlier in time, but he comes on
20 board, and he's part of the transition out, and then there's
21 other emails that are after, later in time.
22       THE COURT:  Okay.  Well, I think the "are you
23 aware" question is fair game.
24       MR. HINDERAKER:  I'm sorry.  What?
25       THE COURT:  The "are you aware" question is fair

**1111**

1  game.  But if he's not aware of it, he's not aware of it.
2  And you have a basis for asking it.
3        MR. HINDERAKER:  I do.  And my, what I lose -- I
4  will do that, but what I lose in the process is, to use one
5  of the defendants' own documents as an admission.
6        THE COURT:  I understand.  I understand.
7              (In open court)
8        THE COURT:  Mr. Ghislanzoni, you will have to turn
9  your microphone back on.  There you go.  Thanks.
10 BY MR. HINDERAKER:
11 Q.  Well, let's just cover a little ground that we've
12 already covered, but I need to do it to get back into a
13 context.  Okay?
14 A.  Okay.
15 Q.  So if we go to Exhibit 526, this is the email that you
16 are on.  It's in evidence, and the subject matter is
17 Changing Rules Engine Software.  And then the email, excuse
18 me, the email below -- well, the email above has Martin Sill
19 at DWS.comAU and then the email below Russell Hodey at
20 Chubb.com to yourself.
21        And then there's a discussion with Martin and DWS,
22 and as you said already, there was some exploration by DWS
23 into whether Drools would be a substitute for the Evolution
24 application in Australia, but ultimately the decision was to
25 go to ODM.

**1112**

1        So that's -- you agree with that?  All right?
2  A.  Yeah, I agree with the fact that we selected ODM, and we
3  utilized ODM.
4  Q.  Right.  Okay.  So then let me -- and you are also, you
5  also know, you said, that Chubb Canada was working with a
6  consultancy called AppCentrica.
7  A.  What I know that, Zorica, when I met her first time as
8  part of the integration, mentioned that AppCentrica was one
9  of the consultancy that they were utilizing in Canada.
10 Q.  Okay.  So I think we're on the same page.
11        And if you would go to, go to Exhibit 16A, please.
12 A.  Sorry.  Could you repeat the number?
13 Q.  Sure.  0016A.
14 A.  Okay.  I'm there.
15 Q.  And on this email it is from Robert Lokinger, and his
16 address is at AppCentrica.com, correct?
17 A.  I can see that in the email.
18 Q.  You don't disagree with that, do you?
19 A.  It's written on this paper.
20 Q.  All right.  And the email is to Zorica Todorovic at her
21 email address at Chubb.com?
22 A.  That's what the email shows.
23 Q.  Yep.  And then the email shows it also goes to another
24 person who is from from AppCentrica Ken Kitamura, I think.
25 Agreed?

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    February 27, 2023, Volume VI

1113

1 A. Yeah, it shows that.

2 Q. And the subject is SOW for Discussion Tomorrow. Do you

3 see that?

4 A. I can see it.

5 Q. And do you understand SOW means statement of work?

6 A. Yes, I do.

7 Q. All right. And the attachment is Arch, A-R-C-H, that

8 stands for architect?

9 A. First time I see this email.

10 Q. No. I know it is. I know it is. I'm not --

11 A. Okay.

12 Q. I'm not pretending otherwise. I'm just asking you what

13 it looks like, what it is.

14 A. I can read arch.

15 Q. Okay. Arch PLD project, right?

16 A. I don't know.

17 Q. Okay.

18 A. I would be guessing.

19 Q. Well, can you read arch PLD, SOW?

20 A. Yes.

21 Q. All right. Then go to Exhibit 16.

22 A. 16.

23 Q. Yeah, please.

24 A. Yes.

25 Q. And you see that this, the front page of this document,

1114

1 it is from AppCentrica?

2 A. Yes.

3 Q. Agreed? And the title of the document is Chubb Arch PLD

4 Project, right?

5 A. Yes.

6 Q. And the title on the email was Chubb -- was Arch PLD,

7 SOW, right?

8 A. Yes.

9 Q. And the front page of Exhibit 16 says Statement of Work,

10 right?

11 A. Yes.

12 Q. And I know you're not there at the time, but this

13 document says Statement of Work from AppCentrica, correct?

14 A. It does.

15 Q. And then if you go to page 3 where it says Introduction?

16 A. Yes.

17 Q. Does it say, "The following document provides a

18 statement of work for the Evolution engagement in 2015 and

19 2016 between AppCentrica and Chubb Insurance Company of

20 Canada. The focus of the work to be completed by

21 AppCentrica over the next two years will be the design and

22 development of the Evolution system for Australia."

23         Agreed?

24 A. That's what it says.

25 Q. And it goes on to say, "This is funded by the ARC

1115

1 program, the project name is Arch PLD," same as on the front

2 page of the document, right?

3 A. That's what it says, yes.

4 Q. You do know that after your, after the merger, you do

5 know from your involvement in that, Zorica and AppCentrica

6 were working in Canada together, and you know that

7 AppCentrica -- I'm sorry -- and you know that Evolution

8 Canada was being transferred to Australia.

9         And you know that AppCentrica was working with

10 Chubb Canada for that project, right?

11 A. The last part I didn't know. I don't know. I don't

12 have evidence. You are showing me a document that describes

13 an SOW, but I did not know.

14 Q. Is there anything in this SOW, Exhibit 16, that looks to

15 you to be not an authentic document of AppCentrica?

16 A. What I can tell you is what I see in the document, has

17 an AppCentrica name and a logo.

18 Q. Do you believe it to be an AppCentrica statement of

19 work?

20 A. That's what it says.

21 Q. Okay. And when you look at the earlier email, 16A, you

22 agree that Rob Lokinger was transmitting to Zorica Todorovic

23 this statement of work. And if you look at the Bates

24 numbers, the email is 6836, and the estimate of work is

25 6837.

1116

1 A. Yes, I can see.

2 Q. And I will represent to you that this came to us in the

3 course of the litigation.

4 A. I understand.

5 Q. All right? And do you have any reason to believe this

6 is a record that was kept by Chubb Canada regarding this

7 project?

8         MS. GODESKY: Objection. No foundation.

9         MR. HINDERAKER: I didn't ask for his personal

10 knowledge. I just asked him if he had reason not to believe

11 it from all the indicia on the documentation.

12         THE COURT: I will sustain the objection as asked.

13 BY MR. HINDERAKER:

14 Q. Looking at everything on this, looking at everything on

15 the documentation in terms of whether it appears to be

16 authentic or not, do you have any reason to think that it is

17 not?

18 A. I was not involved in this activity.

19 Q. I understand that, sir. That wasn't my question.

20         My question is: If you look at these documents on

21 their face, from, to, subject matter, logos, statement of

22 works, introduction, about a project that you know happened,

23 do you have any reason to believe that this is not authentic

24 records from Chubb Canada?

25         MS. GODESKY: Objection. No foundation, mis

**1117**

1  characterizes testimony.
2          THE COURT:  Overruled.
3          THE WITNESS:  So what I can tell you is, you're
4  showing me an email, and you are showing me a document that
5  is clearly an attachment of that email.
6  BY MR. HINDERAKER:
7  Q.  Okay.
8  A.  That says SOW.  I can agree that that is what you are
9  showing to me.
10  Q.  And can you agree that it, from everything on the
11  document, it appears to be the true thing that Zorica got
12  from AppCentrica?
13  A.  I cannot comment beyond -- I cannot say anything more
14  than what I have already said is, you are showing me an
15  email and an attachment that was -- and I have in front of
16  me.
17          Now since I was not working with Zorica at the
18  time, I wouldn't have any additional information to --
19  Q.  And, sir, I'm not going to ask you for additional
20  information.  But we agree that the attachment, that the
21  attachment went with the email, right?
22  A.  Yes, we agree.
23  Q.  And we agree that Zorica was involved in a project.  We
24  agree that Zorica worked with AppCentrica.
25  A.  Yes.

**1118**

1  Q.  And we agree that AppCentrica -- we agree that Chubb
2  Canada transferred Evolution Chubb Canada to Chubb
3  Australia.  Agreed?
4  A.  We agree that a copy of Evolution was taken from Canada
5  for Australia.
6  Q.  And that in Canada the consultancy that was being
7  worked, that was involved in that project was DWS?
8  A.  DWS was in Australia.
9  Q.  That's what I just said.  We agree that DWS was in
10  Australia.
11  A.  Yes.
12  Q.  And we agree that AppCentrica was in Canada.
13  A.  We agree AppCentrica was a consultancy in Canada, yes.
14          MR. HINDERAKER:  Your Honor, I offer these
15  exhibits as authenticated and as admissions.
16          MS. GODESKY:  There's no foundation, Your Honor,
17  and they're hearsay, unsigned documents.
18          THE COURT:  Sustained.
19  BY MR. HINDERAKER:
20  Q.  And now would you turn to Exhibit 900.
21  A.  900.
22  Q.  Please.
23  A.  Okay.
24  Q.  Who is A. Pavlenko at Chubb.com?
25  A.  If I remember correctly, Alex Pavlenko was a member of

**1119**

1  Zorica's team in Canada.
2  Q.  And this email is dated January 14, 2016, right?
3  A.  January 14, 2016, yes.
4  Q.  And this is beginning of your time in terms of the
5  integration of technologies, correct?
6  A.  Yes.
7  Q.  And the "to" is to Zorica Todorovic at Chubb.com.  Do we
8  agree?
9  A.  Yes.  Yes.
10  Q.  And do you know the cc's at Chubb.com?
11  A.  No.
12  Q.  Okay.  And the forward and the subject matter is re:
13  Work Manager code, Handover January 14th?
14  A.  Yeah, it says that.
15  Q.  And the work manager code was the element of Canadian
16  application called Evolution that was being handed over to
17  Australia, correct?
18  A.  I remember work manager code being a component of the
19  application.
20  Q.  Of the Evolution application.  I'm sorry.  I spoke over
21  you.  My bad.
22          You remember work manager being a component of the
23  Evolution application?
24  A.  Yes.
25  Q.  And you know that that component of the Evolution

**1120**

1  application then was transferred to Australia?
2  A.  Not at that level of detail.  I would be able to tell
3  you that, as I mentioned earlier, that Evolution was the
4  starting point for the development, Evolution Canada as an
5  application was the starting point for the development of
6  Evolution Australia.
7  Q.  And do you assume, as I do, that the full Evolution
8  application then from Canada was transferred to Australia?
9  A.  I don't have the details behind it.
10  Q.  And these emails also include on them references to, "I
11  will speak to Martin."  And do you understand Martin is
12  Martin Sill at DWS Group?
13  A.  Where do you see --
14  Q.  On the first page, Zorica to Abad Dokht and another
15  person re:  Work Manager Handover.  "Thanks so much for the
16  constant updates, Alex.  I will speak to Martin and see
17  where we go from there"?
18  A.  Oh, I can see now.  Yes.
19  Q.  And you knew Martin as a DWS person because he was part
20  of the Drools analysis in Australia.
21  A.  Yeah, I know there was an architect called Martin at DWS
22  Australia.
23  Q.  All right.  Good.
24          And then the second page of the email at the top
25  references the APZ team.  Do you see that?

1121

1  A.  Yes.
2  Q.  The APZ team is the Australian team, correct?
3  A.  Yeah, that was a term referring to Asia Pacific zone.
4  Q.  And then going back to the subject matter here, we're
5  talking about a code handover of work manager.  Agreed?
6  A.  That's the subject of the email.
7  Q.  Okay.  And so then I know you're not on the document.  I
8  know you weren't part of these communications.  My question
9  is to you, Isn't this an authentic document of emails in the
10  course of doing, being, in the course of being employees for
11  Chubb on this subject matter?  Yes or no.
12  A.  I can see this is an email.
13  Q.  No, I didn't ask that.  I asked is this an authentic
14  email between Chubb Corporation representatives on this date
15  with this subject matter.  Yes or no.
16  A.  I didn't produce these email.
17  Q.  I didn't ask that question.  Looking at this email, is
18  this an authentic email between these representatives of
19  Chubb regarding this subject matter on that date?
20  A.  It looks authentic to me.
21  Q.  Thank you.
22      I move the admission of Exhibit 900.
23      MS. GODESKY:  Objection.  No foundation.
24      THE COURT:  Sustained.
25

1122

1  BY MR. HINDERAKER:
2  Q.  Moving to the topic, just identifying people,
3  Mr. Ghislanzoni.  Is David Gibbs somebody at Chubb that you,
4  the name you recognize?
5  A.  No.
6  Q.  No? How about Tony Zhang?  Do you recognize that name?
7  A.  Sorry.
8  Q.  Tony Zhang?
9  A.  No.
10  Q.  When you were thinking about moving technologies away
11  from Blaze Advisor, did you ever consider using a manual
12  look-up table as a substitute for a rules engine?
13  A.  So when, when we looked at -- sorry.  Is the question
14  related to Blaze Advisor?
15  Q.  No.  It's related to your decisional process to look at
16  technologies in substitution of Blaze Advisor.  And as I
17  understand it, you had a goal which was to standardize
18  technologies, not eliminate technologies.  Is that fair?
19  A.  "Standardize" is a good term, yes.
20  Q.  All right.  And if you were causing the underwriters and
21  selling insurance to go back to the days of using a manual
22  look-up table, that would be eliminating technology, not
23  standardizing it, correct?
24  A.  I don't understand the question.
25  Q.  All right.  Well, let's see if I can refresh it with

1123

1  your deposition.
2  A.  Okay.
3  Q.  Go to page, if you go to page 53.
4  A.  53?
5  Q.  Well, I think we need to start on page 52 --
6  A.  Okay.
7  Q.  -- to give us some context.
8      MS. GODESKY:  Objection, Your Honor.  He said he
9  didn't understand the question, so I'm not sure why we're
10  going to a deposition.
11      MR. HINDERAKER:  To try to refresh his
12  recollection.
13      THE COURT:  All right.  Have him read it to
14  himself then.
15      MR. HINDERAKER:  So -- sure.
16  BY MR. HINDERAKER:
17  Q.  Why don't you start at page 52, and start at line 24,
18  through 6.
19  A.  Yes, I read.
20  Q.  Okay.  So I'll try to restate my question.
21      When you were considering, when you were
22  evaluating different options for decommissioning Blaze
23  Advisor, did you consider relying upon manual look-up
24  processes instead of rules engines?
25  A.  So we looked at the rules engine technology for

1124

1  standardization.  We considered the significant investment
2  in time and money that was made, millions of dollars, many
3  days, weeks, months, worth of effort to implement those
4  rules.
5      A natural progression, the easiest path, the most
6  logical, was to replace one rules engine with another if and
7  where required.
8  Q.  Well, let me read what you said at the time of the
9  deposition.
10      "Question:  And as part of your evaluation of
11  different options upon decommissioning Blaze Advisor, did
12  your team ever consider relying on manual look-up processes
13  instead of a rules engine?
14      "No.
15      "Why not?"  Question.
16      "Answer:  Our target in the options and evaluation
17  was to standardize technology, not eliminate technology."
18      Did I read that right?
19  A.  That's correct.
20  Q.  Would you go to Exhibit 526, please.
21  A.  Yes.
22  Q.  Thank you.  And this is an email from Hamish Tonkin to
23  people, including yourself?
24  A.  Yes.
25  Q.  Russell Hodey as well.  And the attachment is -- I'm

**1125**

1  sorry.

2         The subject is Changing Rules Engine Software.

3  A.  Yes.

4  Q.  And the attachment is Rules Engine Matrix.  Agreed?

5  A.  Yes.

6  Q.  And this is in May 2016.  This is that time frame when

7  there was some evaluation going on by yourself and your team

8  with respect to what to do with rules engine technology,

9  correct?

10  A.  That's correct.

11  Q.  And so then I'd like to go to the -- I'd like to go to

12  the attachment.

13         And I believe, Your Honor, this is in evidence

14  already.

15         If we go to the attachment, the rules engine

16  matrix.

17         This attachment represents criteria for

18  consideration to determine the type of rules engine that may

19  be adopted.  Agreed?

20  A.  Yes, this matrix represent a set of guidelines.

21  Q.  Okay.  And we looked at some of this before with

22  Mr. Pandey, but I want to look at a different part with you.

23  But for our context, solution number two includes using open

24  source technology.

25  A.  Yes, it says that.

**1126**

1  Q.  Yes.  And then in solution number three includes or

2  references using vendor technologies, such as Blaze or Duck

3  Creek, right?

4  A.  Yes.

5  Q.  Okay.  I'd like to focus my questions with you to

6  solution number one.

7  A.  Yes.

8  Q.  And it's titled, Application Subcomponent Rules Engine

9  (internally developed).

10         Is the information in this first column the

11  consideration of the pluses and minuses of what's termed

12  hard coding the rules into the applications?

13  A.  Well, this matrix represents a set of guidelines for, to

14  be used as a starting point to design and architect an

15  application.

16  Q.  No quarrel.  My question was, as you considered the

17  different options and choices, solution number one is

18  considering, well, should we think about writing the rules

19  directly into the applications, what's called hard coding.

20         That's what solution number one is referencing,

21  correct?

22  A.  Yeah.  Hard coding is an interesting term.  It's -- I

23  will call it pro coding, professional coding.

24  Q.  All right.  Well, we can call it professional coding.  I

25  know you had that same issue -- we can call it professional

**1127**

1  coding if you would like.

2         But this professional coding is when IT

3  professionals write the rules directly into the software,

4  into the application, right?

5  A.  Using programming language.

6  Q.  Of course.  Using programming language.  And in the

7  vernacular, people will call that hard coding.  Agreed?

8  A.  There is that general utilization of that term in that

9  respect.

10  Q.  Yeah.  And that's how I was using it.

11         And solution number one on this matrix is giving

12  the pluses and minuses of the considerations that follow if

13  one were to use programming language and a professional and

14  write the rules right into the application, right?

15  A.  This is very specific to these context that we were

16  evaluating, the Evolution context.

17  Q.  Good.  So then if we just look at solution number one,

18  what happens then under the factor atomic applicability,

19  what solution number one limits you to is the business rules

20  associated with the product or line of business are executed

21  in a single application.  That's true?

22  A.  That's what it says.

23  Q.  Mm-hmm.  And then let's just look at frequency of rule

24  modifications.  For solution number one, which I've

25  vernacularly calling hard coding, the frequency of rule

**1128**

1  changes is less than once per quarter, per rule.  That's

2  what it says?

3  A.  That's what it says, yes.

4  Q.  And we can look at solution two and solution three, and

5  in each instance the frequency of rule modifications

6  improves.  Agreed?

7  A.  Yeah.  As you shift to the right, you consider more

8  frequency.

9  Q.  Yep.  And then scenario, the next heading, Scenario

10  Validation.  The business has no requirements to be able to

11  perform "what if" analysis on the existing book of business

12  or potential rule changes.

13         That's a limitation of the so-called hard coding,

14  right?

15  A.  Not necessarily.

16  Q.  That's what it says on this document.

17  A.  It just states that there wasn't a requirement to carry

18  out a what if analysis, not a limitation.

19  Q.  You are assuming that in the application it's not

20  necessary.

21  A.  Not necessary.

22  Q.  If it was necessary, would you do hard coding or use a

23  vendor or open source?

24  A.  It depends.

25  Q.  One or the other, but not hard coding?

**1129**

1    A.   Professional programming, yeah.  Programming in our
2    language can be used to achieve the same goal as a rules
3    engine, if this is what you are inferring.
4    Q.   I am.  And then let's look at the number of rules on the
5    second page.
6              If we are doing the hard coding, not to exceed
7    100.  Is that what it says?
8    A.   That's what it says.
9    Q.   And if we are doing open source, not to exceed 400.  Is
10   that what it says?
11   A.   So second column is also -- yeah.  Open source, yes.
12   Q.   That's what I said.
13   A.   That's the one, 400, yes.
14   Q.   And then on the vendor, Blaze or Duck Creek, number of
15   business rules is estimated as large.  And it goes on to
16   talk more about each product, a hundred plus calculations
17   and so on.
18             That's what the document says for that, correct?
19   A.   Yes, that's what the document says.
20   Q.   That was the analysis at the time.
21   A.   Was a set of guidelines.
22   Q.   Understood.  I know.  I know.  I just wanted to know
23   what was being thought at the time and said.
24             I don't know if you know this, but let me ask.  Do
25   you know how long -- okay.  I won't -- I won't ask it.  I

**1130**

1    will find the information in the RFI, and that's well before
2    your time.  Good.
3              So I want to, I want to thank you for your time,
4    and I just want to, I guess, I just want to, I guess, sum up
5    with, with this.
6              You said -- where did I have that note?
7              There was a time in September of 2016 where you
8    knew that the relationship with FICO had, I think your words
9    were, severely deteriorated.  Do you recall that?
10   A.   In 2016.
11   Q.   September of 2016.
12   A.   Yeah.  2016 I was, I was informed, I can't remember the
13   exact month, but I was informed by my superior that a
14   dispute had started between FICO and Chubb.
15   Q.   And that being a fact, Blaze Advisor was not removed
16   from all of the applications until April 2020, right?
17   A.   The last application, the last component, that is
18   correct.
19   Q.   That's right.  And then when you were doing an
20   evaluation to integrate technologies, there was a mention in
21   your, you mentioned that ACE American had one application,
22   and that one application was running ODM, right?
23   A.   We had more than one application running ODM.
24   Q.   Maybe I misspoke.  In terms of looking at rules engine
25   technologies for the selling of insurance, ACE American had

**1131**

1    one application running ODM.
2    A.   I don't remember the specifics of that.
3    Q.   All right.  And then ACE American did have one small
4    license with FICO that had nothing to do with -- nothing to
5    do with rules engine technology in connection with selling
6    insurance?
7    A.   That is correct.
8    Q.   Thank you.
9    A.   Thank you.
10             THE COURT:  Hang on a second.
11             MR. HINDERAKER:  No further questions.
12             THE COURT:  Thank you, Mr. Hinderaker.
13             Ms. Godesky, do you have some direct?
14             MS. GODESKY:  I do.
15             THE COURT:  All right.  Just to let you know the
16   plan, we'll go about ten minutes and then take our afternoon
17   break.
18             MS. GODESKY:  Terrific.
19             Your Honor, I'm told we need to switch the system.
20             THE COURT:  Yep.
21             MS. GODESKY:  Thank you.
22                  DIRECT EXAMINATION
23   BY MS. GODESKY:
24   Q.   Good afternoon, Mr. Ghislanzoni.
25   A.   Good afternoon.

**1132**

1    Q.   If you meet someone new in a professional setting, what
2    company do you say you work for?
3    A.   Chubb.
4    Q.   You testified during examination with Mr. Hinderaker
5    that you are the chief enterprise architect at Chubb,
6    correct?
7    A.   I am.
8    Q.   Very briefly, what does it mean to be an architect at
9    Chubb?
10   A.   One way to describe being an architect, an IT architect,
11   could be drawing an analogy with a construction architect.
12   So a construction architect defines a blueprint of a
13   building and what materials are going to be used to create
14   the building.
15             In IT, an IT architect, enterprise architect,
16   defines the blueprint of the IT system of an enterprise and
17   which technologies, which software products to be used.
18   Q.   In what country are you currently working?
19   A.   In England.
20   Q.   And you, you mentioned during questioning from
21   Mr. Hinderaker that your responsibilities are global.  How
22   many people report to you?
23   A.   Over 100 worldwide.
24   Q.   And the jury has heard testimony from a Mr. Ramesh
25   Pandey, another Chubb architect.  How do his

**1133**

1  responsibilities relate to yours?
2  A.  So Ramesh Pandey is the chief architect for
3  North America, and he is part of my team.
4  Q.  Can you give the jury a sense of your day-to-day
5  responsibilities at Chubb as the chief enterprise architect?
6  A.  Sure.  So architecture is a function, the function of
7  leading provides a number of services to the organization.
8  One is the blueprint I've described.  Another one is
9  technology guidance, technology evaluation and selection,
10 and supporting the engineers in creating applications for
11 the enterprise and implementing and making them successful.
12 Q.  You mentioned the engineers.  Are those the folks who
13 write and code?
14 A.  Yes, the coders.
15 Q.  Now, I just want to make sure the chronology of your
16 employment is clear.  As of year end 2015, what company were
17 you working for?
18 A.  ACE.
19 Q.  And what was your position at ACE at the time?
20 A.  I was the chief architect for the international division
21 of ACE.
22 Q.  In what year did you first join ACE?
23 A.  I joined in 1999.
24 Q.  Were all of your roles at ACE between 1999 and 2015 in
25 the technology space?

**1134**

1  A.  Yes, technology space.
2  Q.  And in what country were you working for ACE?
3  A.  In England.
4  Q.  Across your entire professional history, how many years
5  have you been working in technology and architecture?
6  A.  Around 30 years.
7  Q.  And do you have a college degree?
8  A.  Yes.
9  Q.  What is your degree in?
10 A.  It's in accounting and software engineering.
11 Q.  And where did you obtain that degree?
12 A.  In Italy.
13 Q.  Okay.  I want to put up on the screen, if we could,
14 Defendants' Demonstrative 23.  Have you seen this before,
15 Mr. Ghislanzoni?
16 A.  Yes.
17 Q.  And did you help create it?
18 A.  Yes.
19 Q.  And what are you trying to show with these two pictures?
20 A.  It's another analogy.  So on the right-hand side, it's a
21 blueprint of an application.  I think you have seen
22 something like this week, last week.  Every box
23 represents a component.  Every line shows how a component
24 connects with another component.
25       Now, the analogy with LEGO is that all of these

**1135**

1  components come together.  They are assembled together.  In
2  LEGO, you have LEGO blocks that can be attached and composed
3  together to create an object.  They all have an analogous
4  function.
5  Q.  When you talk about components of a computer
6  application, is that generally software products?
7  A.  Yes.
8  Q.  Are all the different components of a computer
9  application usually the same size, or can they differ?
10 A.  No.  They differ in size and complexity.
11 Q.  How about importance?  Do they all have the same
12 importance, or does that differ too?
13 A.  Also importance.  There was a good example that
14 Mr. Pandey produced where he was talking about the rating
15 engine being Duck Creek being the critical component of an
16 application.
17 Q.  Can you give the jury a sense of how many software
18 products or individual components are found in a typical
19 computer application at Chubb?
20 A.  Yeah.  I would say probably on average 20 to 30.
21 Q.  So turning to ACE's IT infrastructure before the
22 acquisition, as of early 2016, right before the acquisition,
23 approximately how many different computer applications was
24 ACE using?
25 A.  Just over 1,000.

**1136**

1  Q.  And how many of those applications applied rules in some
2  way?
3  A.  All of them.
4  Q.  Approximately, how many different software products was
5  ACE using at the time?
6  A.  Hundreds.
7  Q.  And approximately how many different in-house IT
8  professionals did ACE have around the time of the
9  acquisition?
10 A.  Well over a thousand.
11 Q.  I want to focus on decision management software or rules
12 software.
13       Did you work with rules-based software products
14 during your years at ACE?
15 A.  Yes.
16 Q.  And in very simple terms, how would you describe rules
17 or decision management software?
18 A.  Yeah, rules management software is a software products
19 that allows, provides typically a user interface, could be a
20 web user interface, where rules are described.  And they are
21 stored in a repository.  And what happens with this, thanks
22 to the software, is programming language is generated from
23 the rules.
24       So ultimately what is executed on the, on the
25 servers is programming language.

1258

1 testimony of 20 different witnesses.

2          And then we do our own publicly -- we research

3 from publicly available sources.  So we will look at the

4 company's websites.  We will look at their filings if

5 they're a public company with the United States Security and

6 Exchange Commission, things of that nature.

7 **Q.** And did you speak with any individuals who had

8 information relevant to this matter?

9 **A.** I did.  I spoke with Bick Whitener.  He's in the

10 insurance industry.  He has had many, many years in the

11 insurance industry.  And he was retained on behalf of FICO,

12 and I think he will be speaking at some point either today

13 or tomorrow.  And also Bill Waid, or Willy Waid.  I think

14 his new title -- I had his old title in my head, it's chief

15 product manager at FICO.

16 **Q.** And did you prepare any reports?

17 **A.** I did.  I prepared four expert reports in this case.  My

18 initial report was issued back in April, I believe, of 2019,

19 and that summarized my initial opinions.

20          I then issued a -- or submitted a reply report a

21 few weeks after that, which was just a response to opinions

22 that the opposing expert had.

23          And then I want to say August of 2020, but it

24 was in 2020 and then also in 2021, I supplemented my

25 opinions with new data that was provided by the defendants.

1259

1 **Q.** And those reports, they formed the basis, the

2 foundation, for your opinion today; is that correct?

3 **A.** That's correct.

4 **Q.** And so we -- we talked at a high level about the

5 information you considered and your other previous work, and

6 you just talked about expert reports.

7          My question to you is, as an expert in economics

8 and accounting and damages, how do you get from point A to

9 point B, taking all that information and distilling it down

10 into conclusions that are applicable to the case at hand?

11 **A.** Sure.  So it kind of works like a funnel where we have a

12 lot of information that we need to process, information and

13 data, both qualitative and quantitative information.  And we

14 need to determine what's the most relevant to the case and

15 to what we're doing as experts in economic damages.

16          The best analogy that we've come up with our team

17 is, it's kind of like a jigsaw puzzle.  So if you are at

18 home doing a jigsaw puzzle and you have 1,000 pieces, when

19 you buy it and bring it home, you know you have 1,000 pieces

20 and you know what the picture looks like.

21          We -- when we do a case, we don't know if we have

22 1,000 pieces.  We don't know if we have 200 pieces or 800

23 pieces, and we have no idea what the picture is supposed to

24 look like at the end.  We kind of have an idea, but our job

25 is to really figure out how do we fill in those gaps, how do

1260

1 we build a story from what information we do have available

2 to us.

3          One example of where we would have a gap, for

4 example, would be in a case I currently have right now that

5 is actually going to trial in a couple months.  My client

6 was spun off from another company and then acquired by

7 another company a couple years later, so we have three

8 different financial and accounting systems that we're

9 dealing with to try to extract the data that we need for the

10 case.

11          And so we have been working with them -- or have

12 been working with them for months trying to figure out what

13 the systems were and get people into a system and extracting

14 the data, because some of it was legacy data that was stored

15 on some drive somewhere in a closet that we had to try to

16 figure out how to get information off of.

17          So that's the best kind of example I could give in

18 terms of what we do and how we get from point A to point B

19 because every case is different, and in some cases we might

20 have 999 pieces of the puzzle, and some we may have 150.

21 **Q.** And based on your review and analysis of this

22 information, you rendered certain opinions regarding gross

23 revenue in this case, correct?

24 **A.** Correct.

25 **Q.** And tell us what those opinions are.

1261

1 **A.** As I stated before, I assessed and quantified gross

2 revenue.  And you're going to hear kind of the two terms,

3 gross revenue and gross written premium, which are analogous

4 here for purposes of this case.  And I quantified that

5 related to the infringement of FICO's copyrights, and in

6 which there was a connection to Blaze Advisor.  And for the

7 United States that number was about 21.2 billion, and for

8 Canada it was 154.4 million.

9          And for ease of getting it into the record, I'm

10 just going to read the numbers with the commas for the court

11 reporter.  For the United States, it's 21,202,380,943, and

12 for Canada, it's 154,380,023.

13          So I also matched up the writing companies that

14 were associated with these gross written premiums as well,

15 which I identified through my work.

16 **Q.** And what are your conclusions with regard to the writing

17 companies that you matched up?

18 **A.** I'm not sure I understand your question.  I'm sorry.

19 **Q.** Maybe we will just get there in time.  We've had a lot

20 of claims and a lot of information come at folks quickly in

21 this case, so I just want to make sure we're crystal clear

22 about what your lane is and what it's not.

23 **A.** Sure.

24 **Q.** So I see on slide -- on this slide, the date March 30th,

25 2016.  Can you put a time period on your gross revenue

1262

1 calculations?

2 **A.** They began at the termination of the agreement, which is
3 that March 30th, 2016, date and --

4 **Q.** Go ahead. Sorry.

5 **A.** And they ended, depending on when the -- when Blaze
6 Advisor was removed in each application, which we understand
7 to be for these entities at issue sometime in April of 2020.

8 **Q.** And your opinions relate -- that was the time period.
9 The subject matter is about disgorgement under The Copyright
10 Act, correct?

11 **A.** Correct.

12 **Q.** Okay. Perfect. Before we dive into the details of your
13 opinions, are there certain assumptions that you must make
14 as an expert witness in this area that you must make for
15 purpose of calculating damages?

16 **A.** Yes. At the end of the day, as a damages expert, the
17 one inherit assumption we have is that wrongdoing actually
18 happened and there is liability. Obviously, without the
19 liability, there would be no damage. There would be no
20 reason for me to sit here today.

21         But there are other assumptions, depending on the
22 case, that I as an expert need to make to quantify damages.
23 And in this case, there are some in particular related to
24 copyrights and copyright infringement.

25         So these assumptions are that FICO's copyright

1263

1 registrations are valid, that FICO's copyright registrations
2 for Blaze Advisor are enforceable, that FICO controls and
3 owns the copyrights at issue and that, as I said previously,
4 Federal and ACE are liable for copyright infringement.

5         And while these sound like basic assumptions,
6 there are cases where there is a dispute over ownership of
7 the intellectual properties, say the copyrights, and so this
8 may be an assumption that may be in dispute, but I still
9 have to assume it's true for purposes of my analysis.

10 **Q.** And I think you just answered my next question. I
11 wanted to clarify. "Assumption" is kind of a term of art in
12 your industry. I just want to make it crystal clear as to
13 what is an assumption?

14 **A.** It's something we assume to be true for purposes of
15 really taking me from one lily pad to the next lily pad so I
16 can actually start quantifying damages.

17         The assumptions that we use have to be reasonable.
18 You know, some of them are given to us, and they are factual
19 that we can see on, you know, in plain black and white.
20 Some are not always, and we need to test those to make sure
21 they are reasonable.

22 **Q.** Let's move on to your -- your first opinion.

23 Mr. Zoltowski, can you tell us again what is the first
24 opinion you reached as a result of your analysis in this
25 case?

1264

1 **A.** Based on my analysis, I assessed and quantified the
2 gross written premium from policies in connection with --
3 which Blaze Advisor received, beginning in -- on March 30th,
4 2016, and that number is in the United States approximately
5 21.2 billion, and in Canada, it's 154.4 million.

6 **Q.** And generally, what are the steps you took to quantify
7 these amounts?

8 **A.** I'm not sure I understand your question. I'm sorry.

9 **Q.** How did you -- how did you -- what is the general
10 process you used to calculate these numbers?

11 **A.** I think, as I talked about, there is lots of information
12 that we receive and that we review and analyze. In this
13 case, there was information and data that was provided by
14 Federal and ACE regarding these gross written premiums that
15 had -- where their applications for their entities had used
16 Blaze Advisor in some way.

17 **Q.** And your next slide, can you describe this next slide
18 for us?

19 **A.** Sure. This is really just a breakdown of the $21.2
20 billion by application. You can see for Canada, it's only
21 one application, so that's why it's only one line item. And
22 so these are the different amounts that are associated with
23 each of the applications for Federal and ACE.

24         And so you have them listed here, Commercial
25 Underwriting Workstation. You may have heard CUW used as an

1265

1 acronym. There is CSI Express, Profitability Indicator, and
2 ARP-1 and 2. My understanding is the reason that they're
3 grouped together -- or the reason we did it, but my
4 understanding was that there is policies that go through
5 those systems -- the same policy may go through all three of
6 these systems or may go through two of the three, and,
7 therefore, some of the data we had received previously had
8 double-counted some of the policies and premiums.

9         And so my understanding now is that Federal and
10 ACE have been able to remove the duplicates, and the data we
11 finally received in the last supplement has removed all
12 of that -- the duplicate entries for these premiums or those
13 policies.

14         There is also premium booking; Texas Accident
15 Prevention System, which TAPS is the acronym that you may
16 have heard; Cornerstone; Individual Rate Modification
17 Application, or IRMA. And DecisionPoint for the U. S. You
18 can see the amounts are on the right side in the total
19 column.

20         And below is the application for Canada, which is
21 Evolution, which is the entire amount of 154.4 million.

22 **Q.** You just brought up something that people may have a
23 question about, so I want to answer that before we move on.
24 You mentioned that certain applications are grouped together
25 because policies run through several of them. Could you

1270

1 you used to run your calculations?
2 **A.** It is.
3 **Q.** And can you identify it for us?
4 **A.** It's Defendants' Eighth Supplemental Answer to
5 Plaintiff's Interrogatory Number 17. And I believe the date
6 is at the end. It was -- on the back there is some
7 verification pages related to the individuals who verified
8 the data. Sometimes those dates are not the same as when
9 they actually provide the data just because they have to
10 track down those individuals.
11 **Q.** The verifications start at page 13.
12 **A.** June 15th, 2020, is when this interrogatory is dated.
13        MS. KLIEBENSTEIN: Let's go to page 2 if we could,
14 Mr. Mayleben, page 2 of Exhibit 1004A. Excellent.
15 BY MS. KLIEBENSTEIN:
16 **Q.** So interrogatory is what, again?
17 **A.** I like to describe it as a fancy way of saying question.
18 **Q.** A question from whom to whom?
19 **A.** They're posed back and forth between the parties, but in
20 this instance, it's from the plaintiffs to the defendant.
21 **Q.** So this is -- this is a question that FICO asked the
22 defendants to answer, correct?
23 **A.** Correct.
24 **Q.** And here, if we could make interrogatory number 17 a bit
25 larger, what was the question that FICO asked the defendants

1271

1 to answer?
2 **A.** So interrogatory number 17, the question was, "For all
3 insurance policies in connection with which the Blaze
4 Advisor software was used, the gross written premium of
5 defendants and the gross written premium of each related
6 company, including the specific identification of each
7 related company, for each quarter from March 30th, 2016, to
8 date."
9 **Q.** And so this was asking for specific revenue, not general
10 company-wide revenue, correct?
11 **A.** Yes. It's a very specific request targeted at the
12 policies that specifically touched Blaze Advisor.
13 **Q.** And we have some redactions of lawyer objections and
14 stuff, but if we move down to the next page right there.
15 Thank you.
16        The data starts. If you could repeat for us again
17 who asked who for this data?
18 **A.** It was a FICO request to the defendants for this data.
19 **Q.** And so this is data that the defendants provided to us,
20 correct?
21 **A.** Correct.
22 **Q.** And let's just take this table at the top that says
23 "DecisionPoint." So that we know what we're even looking at
24 here, can you walk us through this table?
25 **A.** Sure. On the left-hand side, the first column is

1272

1 Year/Writing Company. So you can see in 2020, it lists
2 three different writing companies, and those are acronyms
3 for different entities. So, for example, CICNJ would be
4 Chubb Insurance Company of New Jersey, and then on down.
5        The middle column is the gross written premium
6 amounts. That relate to where policies touched Blaze
7 Advisor.
8        And then the right column is Called Policy Count
9 is the name of the header, and that's the number of policies
10 that are associated with that gross written premium.
11 **Q.** So this table is for the DecisionPoint application
12 specifically?
13 **A.** That's correct.
14 **Q.** And on the left-hand side is the writing companies that
15 wrote policies that -- that touched Blaze Advisor in the
16 DecisionPoint application; is that right?
17 **A.** That's right.
18 **Q.** And then in the middle is the gross written premium
19 revenue connected with those policies?
20 **A.** Correct. And then it has the amount associated with
21 each entity, and then it totals it for each year. And same
22 thing for the policy counts.
23 **Q.** What did your team do -- just focusing on this
24 DecisionPoint example so that we can understand the process
25 generally, what did your team do with this data?

1273

1 **A.** We took all the data and put it into -- I think we only
2 used Excel in this case, but many times we will use SQL
3 Server when we have really large tranches of data. And our
4 team will organize this data, sort it. We had to obviously
5 figure out in certain instances what the acronyms stood for
6 for the writing companies and match them up appropriately.
7 And we were trying to look at it different ways, so we
8 organized it in different ways.
9 **Q.** And moving on to the next table, and it spans -- well,
10 let's just deal with this one, this snapshot first. What
11 information is in this table?
12 **A.** This is CSI Express, ARP or Automated Renewal Process,
13 and Profitability Indicator or PI.
14 **Q.** And the information that is in each of the columns, is
15 it similar to what you just talked about with DecisionPoint?
16 **A.** It is. And so you can see the writing companies and the
17 associated year on the left, the gross written premium in
18 the middle column, and then the number of policies that
19 would relate to each entity and the gross written premium
20 for that particular year in the middle column.
21 **Q.** And then let's back out of this blowup and let's go
22 forward a page.
23        And that information is still for the CSI Express,
24 et cetera?
25 **A.** Correct. You can see it's for the years 2017 through

1318

1   **Q.** And what information in this agreement played a role in
2   your analysis relating to the -- to the ACE American led
3   pooling companies that are also writing companies in this
4   case?
5   **A.** Sure. There's a lot of information in here, but I will
6   try to highlight what's most important.
7        You can see that at least on the last page, it
8   does lay out in Addendum A all of the services that may be
9   provided under the agreement, which covers everything from
10  admin support, to claims, financial, HR, information
11  technology, legal, operations, so pretty much everything
12  that would relate to the operations of a company.
13       And this is the agreement, I believe -- let me
14  just check the first page. This is where the parties, being
15  Federal and ACE, agreed that they could provide services for
16  one another. And I believe that the amendment was then the
17  parties agreeing for ACE to actually provide that service to
18  the Federal pooling entities.
19  **Q.** Let's move back out to your demonstrative.
20       What information is contained on this slide?
21  **A.** So the blue box on the left is the Federal pooling
22  entities during the years 2016 and 2017. So you can see
23  them listed there as Chubb Custom Insurance, Chubb
24  Indemnity, Chubb National, Executive Risk Indemnity,
25  Executive Risk Specialty Insurance, Federal Insurance, Great

1319

1   Northern Insurance, Pacific Indemnity, and Vigilant
2   Insurance.
3   **Q.** And before we move on to the middle bucket, what are the
4   dates on the Federal pool?
5   **A.** This was the pool in effect in 2016 and 2017 that
6   Federal controlled.
7   **Q.** And those entities that you've listed, those are also
8   writing companies that we saw in the interrogatory number
9   17?
10  **A.** That's correct.
11  **Q.** And now let's move on to the middle bucket, ACE American
12  pool entities. Tell me about that bucket.
13  **A.** These are ACE American pool entities that are also
14  writing companies for the years 2016 and 2017. And the list
15  includes ACE American, ACE Fire underwriters Insurance
16  Company, ACE Property and Casualty Insurance, and Pacific
17  Employers Insurance.
18  **Q.** And did you say the dates?
19  **A.** Yes. It's 2016 and 2017.
20  **Q.** And let's move on to the third bucket. What is in that
21  bucket, and what's the color coding?
22  **A.** This is the green header or banner with a -- it's a
23  black box, and it's the Chubb INA pool entities for 2018 and
24  2020. And you can see that the four ACE American pool
25  entities are now part of this pool and that four of the

1320

1   Federal pool entities are now --
2        Actually, I take that back. Sorry. There's
3   five -- Chubb Insurance Company of New Jersey I thought
4   was -- no. It was added. I apologize. It's four from ACE
5   American, four from Federal, and two new entities who have
6   now joined this pool.
7        And this Chubb INA pool is what was created from
8   the agreement we just looked at.
9   **Q.** And just walk us through again, because it's -- it's a
10  factually intense topic. The 2016, the 2018 changes in the
11  pools that we just saw reflected in that slide, walk me
12  through so it's clear for the record what happened again. I
13  know we saw it a little bit. We saw it in Exhibit 32.
14  **A.** Yeah, it's confusing. ACE American had a pool of
15  entities, which we looked at. That was in the red box on
16  the prior page. Federal Insurance had its own pool. That
17  was in the blue box on the prior page, and that was for the
18  years 2016 and 2017.
19       In 2018, they decided to create this new pool,
20  which was a combination of entities from those two pools,
21  which now created a new pool called the Chubb INA pool.
22  However, ACE American is the one who controls the entity in
23  the Chubb INA pool.
24  **Q.** And what did you determine after reviewing these pooling
25  arrangements as it relates to the disgorgement amount in

1321

1   this case?
2   **A.** That the gross written premiums for those entities
3   should be included as they're under common control of
4   Federal and ACE American.
5   **Q.** The pool leaders are managing and in control of the
6   revenue?
7   **A.** Yes, among many other things.
8   **Q.** So would you agree they're acting as a single economic
9   unit in that instance?
10  **A.** I would.
11  **Q.** And so let's -- let's wrap up your -- how the pooling
12  entity analysis moves into your disgorgement figures. What
13  is your opinion in this case relating to the different
14  buckets of revenues that we saw in interrogatory number 17?
15  **A.** Based on the gross written premiums related to policies
16  that touched Blaze Advisor, there are gross written premiums
17  from three categories as laid out in this table. And you
18  can see that the different applications they relate to are
19  on the left-hand side.
20       But those three categories are the defendants,
21  Federal and ACE American; the subsidies, which we talked
22  about; and then the pooling entities. And they're laid out
23  from left to right in the table with the total in the right
24  column, furthest to the right.
25  **Q.** And I want to revisit something really quickly. The

1322

1 data that is in this table, where does it come from?
2 **A.** It was provided by Federal in their responses to
3 interrogatories that were sent by FICO to them.
4 **Q.** And I want to -- I want to do just one more thing with
5 these interrogatories.
6        Mr. Mayleben, if you could pull up P-1004A.
7        So this is the Eighth Supplemental Answer to
8 Interrogatory Number 17.
9 **A.** Yes.  That's correct.
10 **Q.** And could we move back to page 16 in the document,
11 Mr. Mayleben.  That's right.  Thank you.
12        What are we looking at on this page that's at the
13 back end of this interrogatory number 17, the eighth
14 supplemental?
15 **A.** This is a verification page, and it's signed by Malcolm
16 Irving, and it states that under oath he is the -- he is in
17 the financial lines information technology, I believe is
18 what IT would stand for, and that he was authorized to
19 respond to this interrogatory number 17 on behalf of Federal
20 as it relates to the Financial Lines Unit.
21 **Q.** And let's move to the next page.  Tell me what we see on
22 this page.
23 **A.** This is a similar verification page.  It's signed by C.
24 Chase McCarthy, and it states -- or he states under oath
25 that he is an IT, which again I believe is information

1323

1 technology, lead for North America Commercial Middle Market
2 and I believe Chief Architect for Personal Risk Services.  I
3 believe that slash is supposed to separate those two titles.
4        And that he is authorized to respond to this
5 interrogatory number 17 on behalf of Federal Insurance
6 Company as it relates to the Chubb Commercial Insurance
7 business unit, otherwise known as CCI.
8 **Q.** And just like we saw on the previous page verification,
9 he's relied on directors, employees, agents and attorneys to
10 provide information used in formulating the answer to the
11 above interrogatory being interrogatory number 17?
12 **A.** Correct.  And he is swearing under oath that the answer
13 is true and correct to the best of his knowledge, just like
14 the prior page.
15 **Q.** Let's move to the final page in this eighth supplemental
16 response to interrogatory number 17.  Is this a third
17 verification page?
18 **A.** It is, and it's signed by Tracie, that's T-R-A-C-I-E,
19 D., Jerd, J-E-R-D.  And it states under oath that she is the
20 program manager for Enterprise Content Management, Workflow
21 BPM, which would be Business Process Management, I assume,
22 and Sunset Applications for Chubb North America.
23        And again, just like the others, she is authorized
24 to respond on behalf of Federal to this interrogatory number
25 17, and it relates to Premium Booking and Cornerstone.  She

1324

1 relied on directors, employees, agents and attorneys to
2 formulate the answer and that the answer is both true and
3 correct to the best of her knowledge.
4 **Q.** Mr. Mayleben, if we could move back to the interrogatory
5 number 17 itself.  If we could move ahead a page and blow up
6 the interrogatory.
7        So there were three people on behalf of defendants
8 that certified under oath about the data provided in
9 response to interrogatory number 17.  Is that what we just
10 saw?
11 **A.** Yes.  That's correct.
12 **Q.** And moving quickly to P1007, which is Defendants' Ninth
13 Supplemental Answer to FICO's Interrogatory Number 17, if we
14 can go to the last page, do we again see the same type of
15 interrogatory -- apologies -- verification?
16 **A.** Yes.  It's -- again, it's signed by C. Chase McCarthy as
17 the IT lead North America Commercial Middle Market/Chief
18 Architect for Personal Risk Services.  And this is as it
19 relates to the Chubb Commercial Insurance Business unit or
20 CCI.
21        And again, formulated the answer by relying upon
22 directors, employees, agents and attorneys and that the
23 answer is true and correct to the best of his knowledge.
24 **Q.** So defendants again verified that the ninth supplemental
25 response to interrogatory number 17 was true and correct,

1325

1 correct?
2 **A.** That would be my understanding.
3 **Q.** And I think we already looked at the interrogatory
4 verification in 1008, so we don't need to do that.
5        Mr. Mayleben, can we move back to -- there we go.
6 Okay.
7        Mr. Zoltowski, you testified earlier that the data
8 in this slide came from interrogatory number 17, correct?
9 **A.** That's correct.
10        MR. KLIEBENSTEIN:  Your Honor, for efficiency
11 sake, I would like to move this single slide into admission
12 as Exhibit 1177.
13        MS. GODESKY:  Objection, Your Honor.
14        THE COURT:  The exhibit is received.
15        MS. GODESKY:  I said objection.
16        THE COURT:  Oh, you said objection.  In that case,
17 it's sustained.
18        MR. KLIEBENSTEIN:  Okay.  Then we will read into
19 the record the data that we see here, unfortunately.
20 BY MR. KLIEBENSTEIN:
21 **Q.** So let's start with -- let's start with the top row and
22 go across that way for Commercial Underwriting Workstation
23 and then identify the different columns that we have,
24 Mr. Zoltowski.
25 **A.** At the top of the table, there are five columns in

Fair Isaac vs. Federal Insurance Company, et al.                                        **February 28, 2023 - Volume VII**

---

1326

1 total, starting from left to right. The headings for each
2 of the columns read as follows: U.S. Applications is the
3 first. Defendants is the second. Subsidiaries is the
4 third. Pools is the forth, and Total is the fifth, which
5 will be furthest to the right.
6 Q. So now we have to read the monetary amounts into the
7 record.
8 A. I'm going to go row by row, and this is by application.
9 So for Commercial Underwriting Workstation, the amount of
10 gross written premiums for defendants is 7,656,976,388 -- I
11 apologize -- '368. I should have brought my reading
12 glasses.
13        The next amount is for the subsidiaries, for CUW,
14 and that's 3,663,148,142.
15        Pools for CUW is 1,427,268,700. And the total for
16 CUW is 12,747,393,210. The next line item is CSI Express
17 Profitability Indicator and Automated Renewal Process. This
18 is all on the same line item. For defendants, the amount is
19 4,783,945,129.
20        For subsidiaries, it's 132,704,843.
21        For pools, it's 94,672,823.
22        And the total for these three applications, which
23 are CSI Express, Profitability Indicator, and Automated
24 Renewal Process is 5,011,322,794.
25        The next line item is Premium Booking. The total

---

1327

1 for the defendants is 1,750,877,402. And the total for
2 Premium Booking would be that same amount, 1,750,877,402.
3        The next line item is TAPS or Texas Accident
4 Prevention System. For defendants, it's 462,805,017. The
5 total for subsidiaries is 270,951,408. The total for pools
6 is 110,550,113. And the total for TAPS is 844,306,538.
7        The next line item is IRMA or Individual Rate
8 Modification Application. The total for defendants is
9 223,406,656. The total for subsidiaries is 69,554,858. The
10 total for pools is 7,355,485. And the total for IRMA is
11 300,316,999.
12        The next line item is DecisionPoint. The total
13 for defendants is 18,101,109. The total for subsidiaries is
14 1,117,772. The total for pools is 34,636. And the total
15 for DecisionPoint is 19,253,516.
16        And the last application line item is Cornerstone.
17 For defendants, the total is 518,138,795. The subsidiaries
18 total is -- it's actually a negative number just because of
19 the way the data was received, so it's a negative 3,510,098.
20        And that's just because it's trying to split them
21 up in a certain way based upon the data we have and didn't
22 have insight into doing so. So the pools total is
23 14,281,786. And the total for Cornerstone is 528,910,484.
24        And the total for all of these, I know everyone
25 has been waiting for, defendants is 15,414,250,476.

---

1328

1 Subsidiaries total is 4,133,966,925. The pools total is
2 1,654,163,542. And the overall total is 21,202,380,943.
3 Q. And we'll have one more that we'll -- two more that
4 we'll talk about in a minute. But I wanted to take a break
5 from the reading and address one final topic with you.
6        So we talked about revenues with your testimony;
7 is that right?
8 A. That's correct, gross revenues or in this instance,
9 gross written premiums.
10 Q. And generally speaking, what is profit?
11 A. A profit basically is revenue less expenses.
12 Q. And your opinions just identified revenue and not
13 expenses or profit. Why is that?
14 A. Based on The Copyright Act, based on the law, I as the
15 plaintiff's expert only needs to identify the gross
16 revenues, and then it's the burden of the infringer as it's
17 written in the statute.
18        MS. GODESKY: Objection, Your Honor.
19        THE COURT: Sustained.
20 BY MR. KLIEBENSTEIN:
21 Q. Let's just talk about -- let's leave the law aside. And
22 in this situation, why are you only addressing revenues,
23 leaving the law aside?
24 A. Typically I would address costs if I had the appropriate
25 data that would allow me to do so, even as an expert working

---

1329

1 on behalf of a plaintiff.
2 Q. And why didn't you do that here?
3 A. Based on the information that was available, it was -- I
4 couldn't accurately or precisely quantify the costs that
5 were directly related to these particular -- the gross
6 written premiums.
7 Q. And can you give me -- can you give me an example, just
8 a general example, of where you would be able to identify
9 not just the revenues but the direct costs associated
10 with -- like the cost of goods sold or something like that?
11 A. Sure. So I mean, typically we're operating in widgets
12 or something like that, so maybe around here snowmobiles or
13 something of that nature. As a company that's reporting
14 their financials, there's materials and labor that go into
15 their production of that snowmobile.
16        It typically would have information that would
17 allow us to say here's the costs that relate to these
18 snowmobiles that are at issue that were sold and the
19 revenues associated with those sales and deduct those costs,
20 which would be the cost of goods sold as the terminology
21 is -- and get us to at least a gross profit number.
22        Now, there may be additional costs that might be
23 related, but we can at least get us to that first -- that
24 first step, and here we just did not have data that would
25 allow us to even make that first step.

---

1330

1   **Q.** And explain that further.  Why not?  What were you
2   missing in that initial first step?
3   **A.** My understanding is that we have data from business
4   units, and it was overinclusive of costs and -- cost data
5   and cost information, as well as even the revenue data that
6   was included with that.
7   **Q.** All right.  Let's move back to the data again.
8        Mr. Zoltowski, where do the numbers in this slide
9   come from?
10  **A.** This is the summary of U.S. gross written premiums by
11  application by year.  Correct?
12  **Q.** And that came from interrogatory 17, right?
13  **A.** Yes.  I just wanted to make sure I was on the right
14  slide.
15       MR. KLIEBENSTEIN:  Your Honor, I would ask to move
16  this single slide into evidence as Exhibit 1177.
17       MS. GODESKY:  Objection, Your Honor.
18       THE COURT:  Sustained.
19  BY MR. KLIEBENSTEIN:
20  **Q.** Mr. Zoltowski, can you, just like we did for the last
21  table, can you read the data in this table into the record,
22  and then we'll finish with Canada, and we'll be done.
23  **A.** I'd be happy to.
24       So, again, this table has application in the
25  furthest left column, and there are five other columns which

1331

1   are covering the time periods, from 2016 through 2020.  And
2   then the final column on the right is total.  And also want
3   to note that in 2016, it only covers the period March 31
4   through December 31.
5        And then I think this last column is actually just
6   a misprint, because it should be January, I believe, through
7   May based upon other tables.  So 2020 is January through
8   May.
9        And then below those header, that header row are
10  all of the applications and the associated gross written
11  premiums, which I'll read by line item by year.
12       For Commercial Underwriting Workstation or CUW,
13  for the March 31st through December 31st, 2016 period, the
14  number is 2,802,600,382.  In 2017, for CUW it's
15  3,409,127,185.  In 2018, for CUW it is 2,882,872,838.  In
16  2019, it is 3,652,792,805.  And it's zero for 2020.  And the
17  total for CUW over the March 31st, 2016, through May 2020
18  time period is 12,747,393,210.
19       The next line item is the three applications
20  bucketed together, once again, which are CSI Express,
21  Profitability Indicator, and Automated Renewal Process or
22  ARP.  For the March 31st through December 31st, 2016,
23  period, the total is 1,008,080,734.  2017, the total is
24  1,358,180,203.
25       For 2018, the total is 1,241,993,390.  For 2019,

1332

1   the total is 1,277,242,740.  And for the January through May
2   2020 period, it is 125,825,726.  And the total for CSI
3   Express, Profitability Indicator, Automated Renewal Process
4   or ARP is 5,011,322,794.
5        The next line item is Premium Booking.  For the
6   March 31st through December 31st, 2016, period, the number
7   is 380,416,844.  For 2017, the total is 442,839,932.  For
8   2018, the total is 500,850,829.  For 2019 the total is
9   426,769,797.  The number is zero for 2020.
10       And the overall total for Premium Booking for the
11  March 31st, 2016, through May 2020 period is 1,750,877,402.
12       The next line item is TAPS or Texas Accident
13  Prevention System.  The total for March 31st through
14  December 31st, 2016, is 215,420,480.  For 2017, the number
15  is 252,219,200.  For 2018, the total is 216,490,943.  For
16  2019, the total is 160,175,914.
17       The total for 2020 is zero.  Therefore, the
18  overall total for TAPS for the period March 31st, 2016,
19  through May 2020 is 844,306,538.
20       The next line item is Cornerstone.  For the March
21  31st through December 31st, 2016, period, the total is
22  158,202,931.  For 2017, the total is 248,313,042.  For 2018,
23  the total is 122,400,980.
24       And again, this is one of these quirky ones just
25  based on the data we had, and it's a negative number for

1333

1   2019.  It's negative 6,469.  And the total -- I'm sorry --
2   for 2020, it is zero for Cornerstone.  The total for
3   Cornerstone for the March 31st, 2016, through May 2020
4   period is 528,910,484.
5        The next line item is IRMA or Individual Rate
6   Modification Application.  From the period March 31st
7   through December 31st, 2016, the total is 68,975,636.  For
8   2017, the total is 89,449,543.  For 2018, the total is
9   80,968,955.  For 2019, the total for IRMA is 60,922,865.
10  The total in 2020 is zero.  And so the total for the whole
11  period of March 31st, 2016, through May 2020 for IRMA is
12  300,316,999.
13       And then the last line item is DecisionPoint for
14  the March 31st through December 31st, 2016, period.  The
15  total is 2,680,739.  For 2017, the total is 4,319,856.  For
16  2018, the total is 4,779,439.
17       For 2019 for DecisionPoint, the total is
18  5,846,994.  For the January through May 2020 period, the
19  total is 1,626,488.  And that brings us to a total for
20  DecisionPoint over the March 31st, 2016, through May 2020
21  period of 19,253,516.
22       And the totals for each year, this is for all
23  applications, the total amount for March 31 through December
24  31st, 2016, is 4,636,377,746.  For 2017, the overall total
25  for all applications is 5,804,448,961.  In 2018, the total

1334

1 is 5,050,357,375. For 2019, the overall total for all
2 applications is 5,583,744,647.
3        And for the January through May 2020 period, the
4 overall total is 127,452,214. And that gives an overall
5 total for the March 31st, 2016, through June -- I'm sorry --
6 through May 2020 period of 21,202,380,943.
7 **Q.** All right. One final read-in.
8 **A.** I'm surprised people are still awake.
9 **Q.** Yes. For Evolution Canada, can you read the total
10 amount?
11 **A.** For the Evolution application for Canada, the total
12 gross written premium is 154,380,023.
13 **Q.** And that was for the year 2016, correct?
14 **A.** Correct.
15 **Q.** Okay. Thank you, Mr. Zoltowski.
16        THE COURT: Thank you, Ms. Kliebenstein.
17        Ms. Godesky.
18        MS. GODESKY: Thank you.
19              CROSS-EXAMINATION
20 BY MS. GODESKY:
21 **Q.** Hi.
22 **A.** Hi.
23 **Q.** Good afternoon, Mr. Zoltowski.
24 **A.** Good afternoon.
25 **Q.** My name is Leah Godesky, and I represent the defendants

1335

1 in this case.
2        During the second half of your testimony with
3 Ms. Kliebenstein, you talked about certain pooling
4 agreements. Do you remember that?
5 **A.** Yes.
6 **Q.** And you talked about a pooling agreement between Federal
7 and Vigilant?
8 **A.** Yes.
9 **Q.** And you talked about how that agreement meant that
10 Federal is empowered on behalf of Vigilant to do certain
11 things. Does that sound like your testimony?
12 **A.** Yes, and that's based on what was in the agreement
13 itself.
14 **Q.** Okay. Let's, Vanessa, if we could, pull up Exhibit P21
15 in evidence.
16        MS. GODESKY: She doesn't have a signal to the
17 monitor.
18        THE COURT: Well, I don't control that signal.
19 The monitor is switched so that your side is presenting.
20        Ladies and gentlemen, you can stand up if you'd
21 like while we're waiting for this technological glitch.
22        Would you like me to turn off all the monitors and
23 turn them back on?
24        MS. WHEELER: That would not be a bad idea. Thank
25 you, Your Honor.

1336

1        MS. GODESKY: Thank you, Your Honor.
2        THE COURT: Ninety percent of problems are solved
3 by rebooting.
4        MS. GODESKY: Your Honor, can you switch over to
5 plaintiff so we can see if he's able to connect?
6        THE COURT: He's up.
7        MS. GODESKY: You have a connection?
8        MR. MAYLEBEN: Yes.
9        THE COURT: Let me try rebooting one more time
10 with a little bit more time delay. I'll have to sit here
11 for 60 second, but . . .
12        We have IT on our way up. Do you want to start?
13        MS. GODESKY: Are you seeing signs of action?
14        THE COURT: There we go. Something just flashed.
15        MS. WHEELER: My apologies to the Court, Your
16 Honor.
17        THE COURT: That's quite all right. Did we get
18 it?
19        MS. WHEELER: We did, yes, sir.
20        THE COURT: There we go.
21        MS. GODESKY: Yes.
22 BY MS. GODESKY:
23 **Q.** So, Mr. Zoltowski, we were talking about what you would
24 describe as this pooling agreement between Federal and
25 Vigilant, correct?

1337

1 **A.** That's correct.
2 **Q.** And I just want to take a look at, this first paragraph
3 of this agreement talks about how, "The addendum to be
4 attached and form a part of the management agreement (the
5 agreement) effective the 1st day of January, 1998, between
6 Vigilant Insurance Company and Chubb & Son, a division of
7 Federal Insurance Company," and then that's defined as
8 manager, correct?
9 **A.** Yes. That's correct.
10 **Q.** And then during your direct examination, you made a
11 point of highlighting the fourth page of the agreement.
12        If we could turn there, Vanessa.
13        And you pointed out how the fourth page of the
14 agreement at the top identifies Vigilant Insurance Company
15 as the company, right?
16 **A.** Correct.
17 **Q.** And then you said, it also identifies Federal Insurance
18 Company as the manager, right?
19 **A.** Yes.
20 **Q.** And you kept referring to Federal under this contract
21 because you understand that Chubb & Son Division was signing
22 the agreement on behalf of Federal, correct?
23 **A.** Chubb & Son is a division of Federal.
24 **Q.** And you described this as an agreement between Vigilant
25 and Federal because you understood the Chubb & Son Division

Fair Isaac vs. Federal Insurance Company, et al.                          **February 28, 2023 - Volume VII**

---

1338

1  was signing on behalf of Federal, correct?

2  A.  I can't tell you if they'd signed on behalf of Chubb &

3  Son, but they're a division of Federal, and they're the ones

4  who signed the agreement.

5  Q.  And you characterized this as an agreement between

6  Federal and Vigilant, correct, Mr. Zoltowski?

7  A.  Based upon, you know, my analysis because that's what I

8  was looking at as Federal.

9  Q.  Now, you generally spent a lot of time --

10        We can take that down, Vanessa.  Thank you.

11        You spent a lot of time during your direct

12  examination talking about subsidiaries and pooling

13  agreements, right?

14  A.  Yes.

15  Q.  And at one point you referenced companies that might

16  structure themselves in certain ways to avoid liability, and

17  you gave an example of alter ego cases.  Do you remember

18  that?

19  A.  Yeah.  I'm not sure if they were the same comments at

20  the same time, but I spoke about both those topics.

21  Q.  And this is not an alter ego case, right?

22  A.  No.

23  Q.  Now, you went to Trinity College in Connecticut and

24  obtained a Bachelor of Arts Degree, right?

25  A.  Yes.  That's correct.

---

1339

1  Q.  That is your only advanced degree.  You don't have a

2  master's or a doctorate, correct?

3  A.  Correct.

4  Q.  And you hold yourself out as an economic damages expert,

5  correct?

6  A.  That's correct.

7  Q.  You are not a Certified Public Accountant?

8  A.  No, I'm not.

9  Q.  And you don't hold yourself out as a tax expert?

10  A.  Definitely not.

11  Q.  And you have never worked at an insurance company in any

12  role, whether it be IT or underwriting or otherwise, right?

13  A.  I worked for AAA at one point, but it wasn't really part

14  of the insurance part.  They do have insurance, but that's

15  about it.

16  Q.  Never been an underwriter, Mr. Zoltowski, right?

17  A.  I have not.

18  Q.  And you never worked in IT at an insurance company?

19  A.  No.

20  Q.  And you went through on direct examination your general

21  understanding of all these computer applications at Chubb

22  that included Blaze, correct?

23  A.  Yes.

24  Q.  But you are not holding yourself out as an expert in

25  insurance, right?

---

1340

1  A.  No, I'm not.

2  Q.  And you're not presenting yourself as a software

3  industry expert either, correct?

4  A.  No.  I've done lots and lots of software cases in the

5  intellectual property world, but I'm not a software expert,

6  no.

7  Q.  And that also means you're not an expert in decision

8  management software or Blaze in particular, correct?

9  A.  No.  I've had other cases related to this type of

10  software, but no, I'm not an expert in it.

11  Q.  Okay.  Now, the opinions that you gave about Chubb's

12  revenue relate to damages that FICO is asking for in

13  connection with its copyright infringement claims, correct?

14  A.  Correct.

15  Q.  And at one point at the beginning of your testimony, you

16  said you were retained to provide opinions related to gross

17  written opinions related to copyright infringement by

18  defendants.  So I just want to be very clear here that you

19  were asked by FICO's lawyers to assume, in rendering your

20  opinions, that defendants are actually liable for

21  infringement, right?  That was an assumption.

22  A.  Yes, it's an assumption I would need to make for damages

23  to actually accrue.

24  Q.  Defendants have not been found liable for copyright

25  infringement, correct?

---

1341

1  A.  Not yet.

2  Q.  And that is a determination for the jury, not you,

3  correct?

4  A.  Correct.  Correct.

5  Q.  Now, before you rendered your expert opinions in this

6  case, you spoke to Mr. Bill Waid at FICO, right?

7  A.  Yes.

8  Q.  And then you also spoke to FICO's expert on the

9  purported value of Blaze to Chubb, and that's Mr. Bick

10  Whitener, right?

11  A.  I spoke with Bick about various topics, but that might

12  have been one of them.

13  Q.  And you spoke to him two or three times, each between

14  about 30 minutes and an hour?

15  A.  I don't recall, but that sounds about right.

16  Q.  Now, during your direct examination when you're talking

17  about revenue, you talked about a big gross written premium

18  number, $21 billion, right?

19  A.  Correct.

20  Q.  And in the world of insurance, we can agree that the

21  phrase "gross written premium" is referred to as revenue,

22  right?  That's the money coming in the door.

23  A.  Correct.

24  Q.  And all of the revenue numbers that you highlighted and

25  you read into the record during your examination, those are

---

Fair Isaac vs. Federal Insurance Company, et al.                                    February 28, 2023 - Volume VII

1358

1  reviewed their rules.  And as I reviewed the rules, I wanted
2  to make sure that I had a clear -- that my thoughts about it
3  made sense.
4          So I spoke with a gentleman named Brian Sacco, who
5  is highly knowledgeable about rule repositories.  He is not
6  a FICO employee, so just to make sure that I understood and
7  completely grasped and my thoughts were accurate.
8  Q. And when you referenced a rules repository, did you
9  understand that to be the defendants' rules repository from
10 their Blaze Advisor software that they had, you know, in
11 their -- it came from the defendants, and it was the rules
12 repository of Blaze Advisor?
13 A. Yes, I believe it was absent any of the rules that would
14 have applied to their policy administration system in Europe
15 called EZER.  I think it had been retired, and so I didn't
16 get those rules, which was fine.
17 Q. And with that exception, you had the rules for all of
18 the other applications that ran Blaze Advisor or where Blaze
19 Advisor was a component at the defendants?
20 A. Yes.
21 Q. So that is a case summary overview of the case specific
22 facts that you looked at.  I'd like to turn to your
23 experience in the insurance industry so we can understand
24 what you brought into that analysis of those case-specific
25 facts.

1359

1          If we could go to slide 5, Mr. Mayleben.
2          How many years have you been in the insurance
3  industry?
4  A. From the time I started at the Hartford in October of
5  1977 until now is approximately 45 years, 44 of those have
6  been dedicated to the property casualty insurance universe.
7  I took one year off and worked for the American Red Cross in
8  the state of Alabama.  But other than that, it's been
9  property casualty insurance.
10 Q. And on the screen, is this an accurate presentation of
11 your resumé?
12 A. Yes.
13 Q. Before we get into your prior experience with other
14 insurance companies, let's touch base on your current
15 employment, and what is that?
16 A. I am the principal of a small P & C consulting firm
17 named Bickley & Company.
18 Q. And that's at your home in Harvest, Alabama?
19 A. I operate out of my office in my home in Alabama and am
20 there generally until somebody engages me and needs me to be
21 somewhere else.
22 Q. And you started with Bickley & Company when?
23 A. July the 8th -- no.  I'm sorry.  July the 5th, 2014.
24 Q. And what is Bickley & Company?  Could you give us an
25 overview description?

1360

1  A. Sure.  Bickley & Company is a boutique property casualty
2  consulting entity.  My elevator speech is actually really
3  very simple.  I make change happen for property casualty
4  insurance companies or for the vendors who sell goods and
5  services to them.
6          Bickley & Company is 1.1 person.  I'm bless to
7  have any wife make travel arrangements and run the books and
8  send out the invoices and things like that, but it's
9  primarily me.
10 Q. Okay.  Let's go to the overview of your experience
11 before Bickley & Company.  You said you started at the
12 Hartford in 1977?
13 A. Yes, October 24th to be exact.
14 Q. All right.  And Hartford is a property and casualty
15 insurance company?
16 A. It is.  When I left them, they were, I believe, the
17 number ten property casualty insurance company with premium
18 in the $8.5 billion range, multi-lines, all 51
19 jurisdictions.  And when I say "51 jurisdictions," I'm
20 taking the 50 states plus the District of Columbia.  That
21 actually is an insurance jurisdiction.
22 Q. Would you look at -- in your book there's an
23 Exhibit 857.
24 A. Bear with me.
25 Q. Sure.

1361

1  A. Are they numerically numbered?
2  Q. Yes, they are.  They go from the smallest to the biggest
3  number.
4  A. So this will be at the back.  I'll point out I wasn't
5  engaged for my manual dexterity.
6  Q. It's a big book.
7  A. 0857?
8  Q. That's correct.
9  A. I'm there, sir.
10 Q. All right.  And again, as it is on the screen, is that
11 an accurate statement of -- is that an -- that's an accurate
12 resumé?
13 A. It is accurate and current.
14        MR. HINDERAKER:  Your Honor, I offer Exhibit 857.
15        MS. GODESKY:  No objection.
16        THE COURT:  Exhibit 857 is received.
17 BY MR. HINDERAKER:
18 Q. And as you started off to explain, you started at the
19 Hartford.  I think I'd just like to note, and then we'll go
20 into your specific experience, Mr. Whitener.  I'd like to
21 note that you started at the Hartford, and you've been at
22 these various, over the last 44 years, other companies in
23 the industry of insurance.
24        Is that a fair overall summary?
25 A. It is a fair overall summary.  Allow me to say, I

CASE 0:16-cv-01054-DTS   Doc. 1146-9   Filed 03/05/23   Page 94 of 147

Fair Isaac vs. Federal Insurance Company, et al.                                    February 28, 2023 - Volume VII

1362

1  consider myself to be one of the most blessed men in the
2  industry.  I've -- I've been allowed to branch out and not
3  get pigeon hole siloed into a specific function and do a lot
4  of different things.
5  Q. Well, then let's turn to that.
6          If we could have slide 6, please.
7          Over your 44 years, have you been involved in each
8  of these seven different functions or roles within the
9  insurance industry?
10 A. I have.
11 Q. So let's just go across the top.
12 A. Point of clarification, sir.
13 Q. Yes.
14 A. Is this in here?
15 Q. The slide?
16 A. Yeah.
17 Q. The slide should be on the screen.
18 A. Yeah.  But then I'm --
19 Q. No.  You have to look at the screen.
20 A. Look at the screen.  Got it.
21 Q. Okay.  So let's first talk about your personal
22 experience with underwriting.  And as I understand it, there
23 are two types of underwriting:  Corporate underwriting and
24 front line underwriting?
25 A. Yes, I describe it that way.

1363

1  Q. So let's start with corporate underwriting.
2  A. All right.
3  Q. First tell us what it is and then tell us what your
4  experience has been with it.
5  A. Certainly.  The corporate underwriting function is that
6  part of an insurance company where the appetite for risk --
7  every insurance company has those types of policies that
8  they want to write.  They have that amount of risk that
9  they're willing to take.
10         Inside of that, they have the definition of the
11 products that they're going to sell.  They have the
12 definition of the jurisdictions in which they want to sell
13 them.  Corporate underwriting does all of that.  It's
14 defining the strategies and the tactics that the insurance
15 company is going to use to execute their selling of
16 insurance process.
17 Q. Okay.  And then let's go to front line underwriting.
18 Tell us what that is and what your experience has been.
19 A. Certainly.  Front line underwriting is that part of the
20 process that executes the strategies and the tactics defined
21 by the corporate level.  I call it front line underwriting
22 because the corporate level you generally find in corporate
23 offices, whereas the front line underwriting you find them
24 out in field offices.
25         The front line underwriting has two

1364

1  responsibilities, really.  The first one is to execute those
2  strategies and tactics as it relates to the process of
3  selling insurance.  The second one is, in selling insurance,
4  they have this group of people called independent agents and
5  brokers.
6          A big part of independent agents and brokers and
7  insurance company offering products to be sold to the
8  purchasing population, be it personal or commercial, a big
9  part of that is relationship management.  It is the
10 responsibility of the front line underwriters to execute
11 those strategies and tactics and to manage the relationships
12 with the independent agents and brokers.
13 Q. When you started with the Hartford, did you start in the
14 front line underwriting?
15 A. I did.  I was a front line underwriter in East Hartford,
16 Connecticut.  I was actually hired by the Richmond office
17 but immediately transferred to Hartford, Connecticut.  I
18 participated for about four months in what they call an OJT,
19 an on-job trainee program, being taught the underwriting
20 process.
21         Also taught a few of the products -- the policy
22 types.  And then I -- when I finished that program, I moved
23 into an underwriting position in East Hartford until I was
24 subsequently sent to the Washington, D.C. office as a
25 promotion and a transfer into another underwriting function.

1365

1          And then I was in Washington, D.C. I think about
2  18 months, and somebody figured out I could do math.
3  Q. Okay.  While you were -- while you were responsible for
4  front line underwriting, was there a period of time where
5  you had a number of people reporting to you all engaged in
6  the --
7  A. Yes.
8  Q. -- effort of underwriting?
9  A. Yes, but not in the time frames I have been discussing.
10 Q. Okay.
11 A. So if you'll allow me, I mentioned that somebody
12 discovered I could do math, and so they brought me out of
13 Washington, D.C. back up to the headquarters in Hartford,
14 Connecticut, and I fulfilled a number of functions, as
15 outlined here, and I'm sure you're going to ask me about
16 those.  I'm confident you're going to ask me about those,
17 until the point where they sent me to Charlotte, North
18 Carolina in a -- we called it a center, but functionally a
19 field office.
20         And I went there as part of the management team.
21 I was the agency services manager was the title.  I had
22 about 122 people working for me.  I had the new business
23 process -- underwriting and processing unit.  I had the
24 renewal underwriting, new business and processing unit.  I
25 had the endorsement, which means make a change to a policy,

CASE 0:16-cv-01054-DTS   Doc. 1146-9   Filed 03/05/23   Page 95 of 147

Fair Isaac vs. Federal Insurance Company, et al.                    February 28, 2023 - Volume VII

1366

1  an existing policy.
2          I had the endorsement underwriting group working
3  with me and a few other ancillary departments.
4  Q. All right.  Then let's move on to the next category of
5  experience, financial management and reporting.  Is that a
6  corporate function or a front line function?
7  A. No.  No.  It's a corporate function, and this is one of
8  the functions that's not really related to the front line
9  selling of insurance process.  It is, however, a process of
10 looking at the results from that selling process.  So my
11 responsibility there was to collect data, to analyze data,
12 to put together -- I called it navigational reports.  Here
13 are the key performance indicators for these products.  This
14 is what our budgeted performance indicator result was to be.
15 Here's where it is now.
16         And if it's -- if it's at budget or better, you
17 get the privilege of smiling, and if it's not, you get the
18 privilege of talking about remedial action.
19 Q. Your personal experience with planning, what is that and
20 what did you do?
21 A. For the -- this is a Hartford Insurance industry
22 experience back in the early 1980s.  Corporate -- corporate
23 Hartford had a responsibility for all of its lines of
24 business, and I'm sorry.  Line of business means a group of
25 products.

1367

1          So in the world that we live in today, most of us
2  in here have a -- we have an auto policy.  A private
3  passenger auto is considered a line of business.  We have a
4  homeowner's policy.  Homeowner's is considered a line of
5  business.  There are a whole bunch of them in the insurance
6  industry.
7          I believe Hartford had 27, approximately, lines of
8  business and about 14 writing companies.  You've heard that
9  word before.  My job in corporate planning was to manage and
10 complete three planning cycles a year.  So the first thing
11 we did was look at current year and five years into the
12 future, a strategic plan, if you will.
13         Then when that was done, I got to breathe for 30
14 days, and then we would put together what we called an
15 operating plan, which was again a revisiting of the current
16 year but then next year and the following year.  And when I
17 finished I should that, I got another 30 days to breathe,
18 and we put together --
19         And this was usually happening in or around
20 September, October.  We started work on our budget for next
21 year for all of the products.  That planning process
22 encompassed all of the market segments, all of the lines of
23 business.
24         I was in the offices of the commercial casualty,
25 vice president of underwriting, the commercial property vice

1368

1  president of underwriting.  We organized specialty insurance
2  a little bit differently, so there were a couple of vice
3  presidents of underwriting for that.  I was in the office of
4  the vice president of underwriting for the personal
5  insurance division.
6          But the job was to take those planning processes,
7  create those plans, and get them into the office of the CEO
8  by a time frame.
9  Q. Thank you.  Now let's go to product development.
10 Similarly, if you would tell us what that is and what your
11 experience was -- has been.
12 A. Product development can be two things.  The first one is
13 we -- the insurance industry is always looking to innovate.
14 I know that sounds strange, but we're always looking to
15 innovate.  And so this could be creation of a new product
16 type, one of the new product types --
17         This happened in the mid -- mid-1980s, this new
18 high fangled thing that made it into the marketplace, it was
19 called a personal computer.  And so we -- they asked me, and
20 I created a personal computer -- I'm sorry -- personal
21 computer endorsement that would be an endorsement added to a
22 homeowner's policy to be able to provide more robust
23 coverage for personal computers because the homeowner's
24 policy actually covered it, but not adequately for the risk
25 that was involved in owning one.

1369

1          Another thing I did was, the Hartford had a
2  managing general agent out in the Midwest that wanted a
3  combined -- a combined policy, an automobile policy and a
4  homeowner's policy in one policy.  So the policy -- the
5  applicant or the policyholder would only have to deal one
6  time a year with the insurance policy.
7          So I took the two policies, and I put them
8  together into one policy and did all of the work that was
9  required for that.  And that's what brought me into the
10 world of insurance technology, because you don't want to
11 manually issue the policies.  You want the computer to do
12 it.
13 Q. We'll get back to that.
14         Let's go on to your product management.  If you
15 would tell us what it is and what your experience has been.
16 A. Certainly.  The product management function is a part of
17 that corporate underwriting process I talk about.  So when
18 you think about, we're going to define our appetite for
19 risk, we're going to define what states, what products we
20 want to sell.
21         Once you get through those decisions, you have to
22 start working from state regulators because in the United
23 States of America, insurance is regulated at the state level
24 inclusive of Washington, D.C. which is technically not a
25 state.  It's a jurisdiction.

1370

1    So there were 51 departments of insurance that we
2  had to deal with.  Every product has to be filed, and the
3  state carries an approval right.  And that filing has to do
4  with the rate you're going to use, the coverages that are
5  included in the policy and the rules that you're going to
6  use.
7  **Q.** Then let's move on to field operations management.  What
8  is it and what have you done in that area?
9  **A.** This is, again, the reference to my being the new
10 business, the renewal business, the endorsement underwriting
11 responsible manager in Charlotte, North Carolina, when I
12 went down to that insurance center.
13 **Q.** What was the geographical scope of that responsibility?
14 **A.** We had the southeast.  I believe we had nine or ten
15 states.  We had Virginia.  We had North Carolina.  We went
16 all the way down to Florida.  We went over to Mississippi.
17 **Q.** And then if you would -- your experience with
18 business -- with business management of technology or your
19 experience with technology used in selling insurance.
20 **A.** Certainly.  The underwriting department of an insurance
21 company has a finite amount of programming resources
22 available to it.  There are certain things that those
23 technology people need to succeed.
24      One is clear and well-defined and articulated
25 business requirements.  And in some of the testimony that

1371

1  we've heard leading up to now, the -- you've heard about
2  business analysts and business requirements.  Inside of -- I
3  hope I get this name right -- inside of I believe Mr. Ivey's
4  testimony, he talked about FICO's 4D defined.
5      Defined is business requirements.  The technology
6  people can't build if they don't know what they have to
7  build.  In addition to that, I ran into a situation where
8  the ten-pound bag of potatoes, if you'll allow me that
9  analogy, had a request for about a hundred pounds of
10 potatoes.  And the technology department was struggling with
11 what should I be working on this month?
12      And they came to my upline, and my upline gave me
13 the responsibility of determining the priorities for the use
14 of those data processing technology resources.
15 **Q.** Was that an occasion when you were a bridge between the
16 business --
17 **A.** Yeah.
18 **Q.** -- and the technologist?
19 **A.** Yes.  My wife describes me as sort of the United
20 Nations.  I speak -- I speak business requirements.  I speak
21 detail.  I speak technology.  But I'm also able to meet with
22 the technology people and speak technology to the business
23 people in such a way that they'll understand it.
24 **Q.** Have you had prior experience with the Duck Creek policy
25 administration system?

1372

1  **A.** I have, twice.
2      Mr. Hinderaker, let me time you out for about two
3  seconds.
4  **Q.** Absolutely.
5      THE COURT:  Mr. Hinderaker, are you at a
6  convenient breaking point?
7      MR. HINDERAKER:  You know, with less than five
8  minutes I am.  If we want to -- I can do it right now, of
9  course.
10     THE COURT:  No.  That's okay.  Finish this line
11 and we'll go then.
12     MR. HINDERAKER:  That's great.
13     THE WITNESS:  I am ready, sir.
14 BY MR. HINDERAKER:
15 **Q.** Also, have you had prior experience with implementing a
16 billing and claims technology called Insuresoft?
17 **A.** Insuresoft is a full insurance suite.  It has policy
18 admin.  It has claims.  It has billing.  It has management
19 reporting.  So, yes, I have -- I've actually installed that
20 at a start-up MGA.  I functioned as the chief operating
21 officer of the MGA while we brought it up out of the ground.
22 **Q.** Okay.  Have you had any prior experience before being
23 engaged by FICO with the Blaze Advisor business rules
24 management software system?
25 **A.** I have not.

1373

1  **Q.** So is it fair to say you came to the engagement without
2  any preconceived notions about Blaze Advisor?
3  **A.** That is correct.
4      MR. HINDERAKER:  Your Honor, before going further,
5  the testimony of Mr. Whitener will be direct -- expert
6  testimony directed to the insurance industry, the experience
7  and expertise on the process of selling insurance, the use
8  of technology in selling insurance, in the process of
9  selling insurance, and then his knowledge gained from the
10 analysis of the case-specific facts from the defendants
11 regarding Blaze Advisor and their applications.
12     I offer his testimony for those purposes.
13     MS. GODESKY:  We have an objection, Your Honor.
14     THE COURT:  All right.  Why don't we do this:
15 Let's take our afternoon break.  We'll take that up over the
16 break.  And, members of the jury, why don't you be back at
17 25 minutes after 3:00 on that clock.  Okay?
18     (Jury leaves courtroom.)
19     THE COURT:  Let's take this up at 20 minutes after
20 3:00.  Give ourselves five minutes to do that.  Give the
21 court reporter a break.
22     (Recess taken.)
23     (In open court without the Jury present.)
24     THE COURT:  Ms. Godesky, you have an objection to
25 Mr. Whitener's testimony; is that correct?

1374

1    MR. HINDERAKER:  Maybe, Your Honor, before we get
2  to that, I can be very clear about the purpose for which his
3  testimony is being offered.
4    THE COURT:  Sure.
5    MR. HINDERAKER:  His purpose -- his testimony is
6  being offered to inform the jury regarding the process of
7  selling insurance, regarding the things that matter in that
8  process to selling more insurance or selling less insurance.
9    He has been engaged to -- and he has experience in
10  not only front line underwriting but corporate product
11  development, so he has knowledge with respect to those
12  things.  And he has, as you heard, studied 10,000-plus pages
13  of the defendants' documents to analyze from his expertise
14  how the defendants were using -- how the defendants used
15  Blaze Advisor, in their words.
16    He is not offered a Blaze Advisor expert or as
17  somebody who with Blaze Advisor expertise connects Blaze
18  Advisor to the selling of insurance.  We've heard
19  Mr. Baseman, Mr. Ivey, Mr. Baer, Mr. Marce regarding the
20  qualities or attributes that Blaze Advisor brings to the
21  industry.
22    And now we're looking it -- taking it from the
23  other side, with Mr. Whitener telling us, well, how does the
24  insurance industry work and how is insurance sold, and he
25  has experience with technology.  I'm not pretending him to

1375

1  be a Blaze Advisor, but he does -- he has studied the
2  defendants' use of Blaze Advisor, if that's more clear.
3    THE COURT:  And I'm assuming that all of the
4  opinions you intend to elicit are the ones that were
5  disclosed in his report.
6    MR. HINDERAKER:  Absolutely.
7    THE COURT:  I suspect I know what I'm going to
8  hear from Ms. Godesky, and that is that you described him as
9  testifying to the value of Blaze Advisor, but maybe I'll
10  hear something else, but I understand what you're telling
11  me.
12    MR. HINDERAKER:  Yeah.  And that value
13  proposition, if you will, is going to come from his analysis
14  of these case-specific facts.  So it comes from, if you
15  will, the bottom up, the case-specific facts, not some Blaze
16  Advisor expertise top-down.
17    THE COURT:  And he's not offering damage numbers?
18    MR. HINDERAKER:  He's not offering damage numbers.
19    THE COURT:  Ms. Godesky?
20    MS. GODESKY:  Your Honor, slide 3 in their
21  presentation for Mr. Whitener --
22    THE COURT:  I may be wrong.
23    MS. GODESKY:  Summary of opinions.  "Blaze Advisor
24  added significant value to the process of selling insurance
25  and hence added significant value to defendants' business."

1376

1    The last slide, "FICO Blaze Advisor added
2  significant value to defendants' business."
3    Slide 73, "Defendants needed Blaze Advisor to sell
4  insurance in underpenetrated markets."
5    And when you look at the text of his disclosed
6  reports, the headers in the reports are Blaze Advisor's
7  Contribution to Gross Written Premium, Chubb's use of Blaze
8  Advisor Contributes to Gross Written Premium.
9    And we have an objection to Mr. Whitener
10  testifying about the value or contribution of Blaze or even
11  decision management software generally, because I would like
12  to do a voir dire of the expert and show that he has no
13  experience in that area.  And so you cannot create an expert
14  by having them study in the context of litigation.
15    He needed to be retained with the expertise that's
16  required under Rule 702.
17    THE COURT:  But his experience and qualifications,
18  if I'm remembering Judge Wright's order correctly, I believe
19  she said that no -- no objection was made to his experience
20  or qualifications and then denied the motion to exclude
21  based on the objections that were made.
22    Am I accurately recalling what she said?
23    MS. GODESKY:  She said that it was raised in
24  reply, and so she was not going to consider it.  But it is
25  absolutely not waived because you have no obligation to

1377

1  challenge qualifications under Rule 702 in a *Daubert* motion,
2  and we can do so now.
3    THE COURT:  I understand.
4    MR. HINDERAKER:  Again, if I could repeat myself a
5  bit.  It's -- looking at the defendants' documents without
6  having expertise in the insurance industry doesn't tell you
7  the picture that comes with studying how defendants use
8  Blaze Advisor with that knowledge from the insurance
9  industry.
10    So why did -- why did something matter -- why did
11  what the defendants were doing with Blaze Advisor matter?
12  It mattered because in the process of selling insurance,
13  that effect -- that attribute affects the outcome of the
14  selling process.
15    So I don't mind the jury being quite clear that
16  he's not a Blaze Advisor expert.  He's an insurance industry
17  expert.
18    MS. GODESKY:  Your Honor, his opinions go far
19  beyond that as disclosed on the slides and in his report.
20  If he was simply offering opinions about, this is the
21  process of selling insurance and certain things are
22  important in the process of selling insurance, that might be
23  appropriate.
24    But he was disclosed as an expert who offered
25  opinions on how Blaze contributed to gross written premium

1378

1  at Chubb, and he does not have the expertise to offer those
2  opinions.
3          MR. HINDERAKER:  Well, that's not exactly accurate
4  because the testimony is that if you can -- that defendants,
5  in fact, achieved certain outcomes using Blaze Advisor by
6  the defendants own statements.  And those outcomes mattered
7  in the process of selling insurance because of the elements
8  of the process of selling insurance.
9          So you take -- you take what the defendants have
10 acknowledged as why they were using it, what they were
11 trying to achieve, and you apply it to the process of
12 selling insurance and why it matters in the process of
13 selling insurance.  And you reach a conclusion that it had
14 an impact.  It was significant.
15         He's not quantifying it in terms of -- he's not
16 touching it to revenue.  That was a different expert.  He's
17 just saying, how does this matter to the process of selling
18 insurance, from the defendants' own experience.
19         THE COURT:  Understood.  I understand your
20 objection.  I'm going to allow him to testify.  You can
21 bring this all out in cross.  You can make objections during
22 his testimony, if you wish.  But I'll hear the testimony or
23 we'll begin with the testimony, and we'll cross that bridge
24 here when we get to it.
25         MS. GODESKY:  Your Honor, just for the record,

1379

1  I'll lodge the additional objection that this is
2  particularly prejudicial given his lack of qualifications
3  and the fact that this all goes to the disgorgement question
4  that's going to be decided by the Court, not the jury.
5          And now they're hearing testimony from someone who
6  is, I think admittedly by plaintiffs, not qualified to
7  testify about Blaze Advisor.
8          With that, is he presented as qualified in
9  insurance?  Is that the qualification that the Court is
10 presenting?  I'm just trying to understand if he's allowed
11 to testify, what is the qualification?
12         THE COURT:  He's testified as to the width and
13 breadth of his experience and expertise in the insurance
14 industry and his knowledge of the use of technology in
15 underwriting, generally speaking.  Beyond that, he has Blaze
16 specific knowledge derived from the documents.
17         So on that basis and not knowing exactly what's
18 coming out of the witness' mouth, I'm going to let him
19 testify.  And I understand your concern, but let me be
20 blunt.  All of this is things that would have been
21 beneficially raised on *Daubert* motions, and if not at
22 *Daubert* motions, then raised in motions in limine, and we
23 could have addressed it then.
24         And I didn't use the word "waiver."  I didn't say
25 you'd waived it.

1380

1          So let's bring the jury in.
2                   **IN OPEN COURT**
3          THE COURT:  Go ahead and be seated.
4          Mr. Whitener, come on back up to the witness
5  stand, if you would.
6          THE WITNESS:  Mic is on?
7          MR. HINDERAKER:  Yep.  Sounds good.  We can hear
8  you.
9  BY MR. HINDERAKER:
10 Q.  Let's turn to -- let's turn to a discussion of the
11 different kinds of insurance products in the marketplace so
12 we start to get that understanding.
13         If we could go to slide 7, please.
14         This slide obviously shows four different kinds of
15 insurance.  And is that -- that's accurate?  We can put --
16 we can put insurance products into these four categories?
17 A.  You can.  I generally refer to these as market segments.
18 Q.  Market segments.  All right.
19         Well, I'd like to just go through each one so we
20 have an understanding of the marketplace with respect to
21 insurance products.  So if -- I think I can control this for
22 a moment.
23         Let's go to specialty insurance.  Tell us what it
24 is, please.
25 A.  Specialty insurance is a type of commercial insurance

1381

1  generally segmented out from an organizational standpoint
2  inside of the underwriting functions of a company, the
3  corporate underwriting functions, even front line
4  underwriting functions.
5          Specialty insurance is insurance for unique risk,
6  and I'll use the phrase "as opposed to mainstream
7  commercial."  Commercial insurance, relatively less complex.
8  Special insurance, very complex.  A good example of this
9  might be directors and officers insurance.  This usually
10 revolves around various types of professional liability or
11 unique risk.
12         There was a time in the past where the Bengal
13 tiger, the white Bengal tiger at the Cincinnati Zoo was
14 loaned, I believe, to the San Diego Zoo and the specialty
15 marketplace of the general insurance property casualty
16 industry provided that coverage.
17         A good example would be medical malpractice.
18 Another good example is architects and engineers, people
19 that require liability protection because of -- because of
20 mistakes.
21 Q.  In general, does specialty insurance require a higher
22 level of underwriting expertise?
23 A.  Yes.
24 Q.  And explain why, please.
25 A.  The risk -- the risks are significantly higher.  The

CASE 0:16-cv-01054-DTS   Doc. 1146-9   Filed 03/05/23   Page 99 of 147

Fair Isaac vs. Federal Insurance Company, et al.                February 28, 2023 - Volume VII

1386

1 to sell that insurance by the state, the state of Virginia,
2 the state of Massachusetts, the State of Minnesota.
3         So the independent agent, if they decide that they
4 desire to make their career by having an insurance-selling
5 business, they go to the State, and they take tests, and
6 they acquire a license to sell. Then they go out and they
7 establish relationships with insurance companies.
8         When I entered into the industry in the late
9 1970s, it wasn't unusual for an independent agent to have
10 10, 12 companies in its arsenal of people for which it had a
11 license to sell insurance. Nowadays, that number is
12 probably a little closer to five because the agents started
13 to realize it costs money to have the insurance license for
14 that company.
15        But the reality is, the real bottom line here is
16 the independent agents are independent businesses. They run
17 their own business. They're licensed by the state. They
18 acquire that themselves. And then they go out, and they
19 market themselves to the insurance companies.
20        Insurance companies say, yes, we want to do
21 business with you, and they have a contractual agreement
22 that allows the independent agent to sell on behalf of the
23 company.
24 Q. But the independent agent doesn't have to only sell on
25 behalf of one company. He can sell on behalf of as many

1387

1 companies as he has agreements with?
2 A. Correct. As I mentioned, and nowadays it looks to be
3 about five.
4 Q. Okay.
5 A. And that creates an interesting dynamic in the
6 relationship because all of the insurance companies know
7 that the independent agent has a portfolio of companies
8 available, and so there's a -- there is a goal in that front
9 line underwriting function to establish for the agents you
10 select almost a loyalty, if you will, a preference for doing
11 business with each other.
12 Q. And then let's turn to the third, say, person involved
13 in the process of selling insurance, the underwriter of the
14 insurance company. I think at this point we're talking
15 about front line underwriting?
16 A. We are.
17 Q. And so what is the role, if you will, of the -- well,
18 let me ask you this: Is it possible to sell insurance
19 without front line underwriting?
20 A. No.
21 Q. Not whether you use technology or not, but you have to
22 underwrite to sell insurance?
23 A. Yes, because the definition of underwriting is within
24 the -- it's where the risk appetite and the type of policies
25 the company wants to write, and then inside of those types

1388

1 of policies, so let's go back to the flower shop. Okay? I
2 want to write flower shops. Okay?
3         Hey, front line underwriting, we want to write
4 flower shops, but we don't want you to write flower shops
5 that have five delivery vehicles. We want the small guys.
6 We want somebody that only has one or two vehicles.
7         All of that has to take place in the underwriting
8 process. Sometimes executed systemically and sometimes
9 executed by humans.
10 Q. Okay. And "systemically," did you mean by technology?
11 A. Yes. Yes.
12 Q. And I think that -- I go slow on the natural, but I
13 think you have to go slow on the unnatural. Slow down a
14 little bit.
15 A. I'll do my best, sir.
16 Q. All right.
17 A. As Mr. Pandey pointed out, he loves technology. I might
18 be guilty of the same thing as it respects property casualty
19 insurance.
20 Q. All right. Is it fair to say that the underwriter is
21 the key person in this process of selling insurance?
22 A. It is fair to say that the underwriter is the key -- the
23 front line underwriter is the key person in this.
24 Q. Okay. So that's the -- that's having the steps of
25 selling in mind. I want to go to a different topic being

1389

1 what we've heard defined, I guess, as a policy
2 administration system. Turn to that subject.
3         With or without technology, can insurance
4 companies sell insurance without a policy administration
5 system?
6 A. In today's current environment, it could be done, but
7 you can't be price-competitive because the expenses it would
8 cost to do that would drive your price way above the point
9 where you could sell in the marketplace.
10 Q. Okay. Fair to say regardless of what the particular
11 technology is, technology is used in the policy
12 administration system's process?
13 A. I would say that differently. Policy -- policy
14 administration system is a technology or a collection of
15 technologies used to administer the selling of insurance
16 process in the underwriting process.
17 Q. Thank you. I'm sorry to talk over you.
18         And that was your experience -- and that was true
19 in your experience in the industry?
20 A. Yes, across all 44 years.
21 Q. So let's go to the steps in the process of selling and
22 underwriting, just to walk us through the application. We
23 don't have to spend any more time than necessary, but let's
24 spend, as you might say, all the time that is necessary.
25         Describe for us the application step in the

1390

1 selling process.
2 **A.** As I start this, and I will talk slowly and do this as
3 fast as I can.
4         The Court has heard the word "application" several
5 times, and that's one of the aspects of property casualty
6 insurance. Words can have multiple meanings. So we've
7 heard applications referred to as CIS as an application.
8         This use of the word "application" is talking
9 about the collection of data from the applicant, the
10 person -- or the entity, the business requesting insurance,
11 the person requesting insurance.
12         They provide that information to the independent
13 agents or broker to be able -- for the independent agent and
14 broker to be able to submit it into the -- into the
15 underwriting process. So the first step of every policy
16 that is a prospect to be issued is, collect the data and it
17 starts with the application.
18 **Q.** Okay. Let's go to step number two then.
19 **A.** When that application comes into the underwriting
20 process, the first thing the underwriter or the underwriting
21 process is going to do is, it's going to ask itself a
22 question, and that question is, Is this data adequate and
23 accurate for the risk assessment?
24         And most frequently the answer is yes, but the
25 answer can be no. And of course, if the answer is no, the

1391

1 next question is, well, what data do I need and from whence
2 am I going to get it?
3         Once the underwriting has, my terminology, that
4 adequate amount of information and has confidence in its
5 accuracy, the underwriter will then go through a risk
6 assessment process, and that risk assessment process will
7 ultimately result in a here are the -- well, it's going to
8 result in a yes or a no first.
9         Let's take yes first. Okay? If it results in a
10 yes, it's going to be, what coverages am I willing to offer
11 this applicant? And that's coverage grants, coverage
12 restrictions. And then what price are we going to offer?
13         Okay. And the key to price is, the insurance
14 company wants a price that reflects the probability of loss,
15 the probability of future claims, not one-on-one with
16 policies. But in the collection of homogenous risk, similar
17 types of risk, they want to know that in population when
18 they collect the premium, they've got enough money to cover
19 the losses because not everybody is going to have a loss.
20 **Q.** Okay.
21 **A.** Now, the next part of that process -- so we're at yes.
22 There is a possibility that it's no. The risk may fall
23 outside of the -- I'm sorry. Where are we?
24 **Q.** The risk may fall outside of --
25 **A.** It's possible. So now I'm switching over to no. There

1392

1 is a possibility that the application does not represent a
2 request for insurance that fits into that company appetite.
3         If the risk doesn't fit the company appetite, the
4 underwriter is going to say no, and then the independent
5 agent, broker and the applicant are going to begin to search
6 for insurance through other insurance company alternatives.
7         If the -- can we now go back to yes? Are you
8 ready?
9         If we go back to yes, the underwriter then is
10 going -- going to craft the proposal. It's called a quote.
11 It's an offer for insurance. And the underwriter is going
12 to take a next step to make sure that that quote is in
13 compliance.
14 **Q.** So let's take those two things separately, please.
15         At the stage of the underwriter assessing the
16 adequately and accuracy of the information and fashioning a
17 quote, what is the value of being able to be precise? What
18 is the value of precision at that step?
19 **A.** There are two -- there are two impacts to precision.
20 Okay? The first impact is if it is acceptability to the
21 applicant. If your price is too high, a competitor may be
22 able to grab that policy instead of you. Okay?
23         If the price is too low, you'll grab the policy.
24 You'll write the policy, but when you collect number of
25 those policies and the losses start to come in, you do not

1393

1 have adequate enough premium to cover the losses plus your
2 expenses and produce a profit.
3         So the precision of the price is critical to the
4 long-term success of the profitability for that product
5 type.
6 **Q.** And we are in the scenario where the underwriter has
7 chosen to say yes, and that results in a quote, as you say,
8 on the --
9 **A.** Quote is insurance terminology for an offer to insure.
10 We would -- flower shop, we would like to insure you.
11 Here's what we can do for you. Here's the coverages, the
12 limits of liability, the property, the property amount of
13 coverage. Here are any restrictions that we place on the
14 policy. Here's the deductible, for instance, and here's the
15 price.
16 **Q.** Does the -- does speed, does the ability to respond to
17 the applicant faster rather than slower affect -- have an
18 impact on the sales process?
19 **A.** Yes.
20 **Q.** What is that?
21 **A.** The faster you get information about the offer, whether
22 the offer is coming or not, the more -- if the offer is
23 coming, the more likely it is you will convert that quote
24 into a policy. And part of that is, as you and I discussed
25 earlier, it's the insurance agent doesn't have an incentive

1394

1 to shop it.

2     If the applicant is sitting there waiting,
3 waiting, waiting, the agent may shop it out to one of those
4 other companies in the portfolio to see if the agent can get
5 an answer from them quicker.  Speed is important.
6 **Q.** Then the next step is compliance.  What is that?
7 **A.** Well, there are two aspects to compliance.  Right?  So
8 the product that you're selling has to fit inside of the
9 definition of the product approved by the State, so that's
10 compliance number one.
11     But the company, when it created that appetite for
12 risk in the definition of the products that they wanted to
13 write, they created something called a series of
14 underwriting guidelines.  And one of the most talked about
15 underwriting guidelines in the arena that most of us
16 understand is years and years and years ago, insurance
17 companies didn't like to insure red cars.
18     That's not true today, but that's the type of
19 thing that is considered there.  Am I, the individual
20 underwriter, the front line underwriter, in compliance with
21 the requirements of the corporate underwriting, and is this
22 policy in compliance with the regulation of the State?
23 **Q.** And of course no insurance company wants to sell an
24 insurance policy that's out of compliance?
25 **A.** I have never worked for an insurance company that did

1395

1 not have a "stay out of jail" rule.
2 **Q.** And then step number five, after underwriter has
3 fashioned his proposal, his quote, knows that the quote is
4 in compliance, the quote is sent to the agent and broker.
5 **A.** Yes, that's the next step.
6 **Q.** Okay.  Now, at that step, can you describe for us the
7 dynamics, if there are any, between the underwriter and the
8 agent and broker as the -- at that step number five?
9 **A.** Certainly.  The agent and broker is going to look at
10 this quote offer, and the agent and broker is going to talk
11 with the applicant about it.  It may be perfectly acceptable
12 to the applicant, or the applicant may say, you know, I'd
13 like to tweak this a little bit.
14     So in this process right here, there is
15 negotiation between the underwriter and the independent
16 agent, with the independent agent representing the
17 applicant.  And changes do get made to quote offers.  It
18 gets tweaked.  That happens.
19     But ultimately, at the end of that process, the
20 applicant is either going to accept or reject the quote
21 offer.  If the applicant rejects it, the independent agent
22 is going to go into the process of, okay, who else is in my
23 portfolio of companies that I can have a discussion about
24 this policy with?
25     If the offer is accepted, you now move into what I

1396

1 call bind book issue.
2 **Q.** Before we get to that, the question I had in mind was,
3 in this -- in this space that we're talking about, either
4 the specialty insurance market or the commercial insurance
5 market, it's typical, common, that there will be this
6 dynamic or this negotiation, if you will, between agent and
7 broker and underwriter.  Is that fair?
8 **A.** Everybody accepts that that's the reality, and it
9 happens.  I won't say it happens a hundred percent of the
10 time.  I also won't say it happens zero percent of the time,
11 but it happens.
12 **Q.** And is this a stage in the process where the
13 relationship that the underwriter may have with the agent
14 and broker matters?
15 **A.** Not only does it matter, it helps.  So if the
16 relationship is good, this is going to go great.  If the
17 relationship is poor, it's probably not going to go great.
18 **Q.** Is part of that relationship whether the company itself
19 is easy to do business with?
20 **A.** Yes.
21 **Q.** Can you describe that for us, please?
22 **A.** Certainly.  Independent agents and brokers, they're
23 independent people, business people, and they want things to
24 happen with as little effort on their part.  They want
25 things to happen as quickly as possible.

1397

1     And so inside of this, I want things to happen
2 quickly, and inside of this whole process of selling
3 underwriting insurance, they want companies that are easy to
4 do business with.
5     So I've seen situations where agents deemed a
6 company easier to do business with because it required less
7 underwriting information, but what the company was doing
8 was, it was purchasing from a third-party information vendor
9 information on the back end so that the agent wasn't forced
10 to get it.
11 **Q.** And as a consequence, thought it was going to be selling
12 more insurance?
13 **A.** Yes.
14 **Q.** So we've gone through the dynamics of the agent, broker
15 and underwriter.  Applicant accepts.  What's the next step
16 in the process?
17 **A.** When -- so because the underwriter has made an offer, if
18 it is accepted, it now enters into a legal status of bound.
19 **Q.** So tell us what that means, not legally but insurance
20 language.
21 **A.** Coverage exists.
22 **Q.** Coverage exists?
23 **A.** Coverage exists.  Bound -- bound means the insurance
24 company now, based on the effective date of the quote, will
25 be in effect on that effective date.  No policy has been

CASE 0:16-cv-01054-DTS   Doc. 1146-9   Filed 03/05/23   Page 102 of 147

Fair Isaac vs. Federal Insurance Company, et al.                    February 28, 2023 - Volume VII

1398

1  issued.  There is no paper.  There is no dec page.  But
2  coverage exists.  That's the binding process.
3  Q.  So when I trade in my car to the dealer and have a
4  different car but I want to be insured on my ride home, I
5  call my agent, give him the information.  The agent says,
6  okay, you're bound, you have insurance?
7  A.  That's a good understanding.
8  Q.  And then separate from bound is another step, policy is
9  booked and issued.  What does that mean?
10  A.  These are two processes that take place simultaneously.
11  So the policy is bound.  The underwriter has the
12  communication.  The applicant has accepted the policy.
13       Well, now -- this is an oversimplification.  A
14  button has to be pushed which says issue the policy.  Right?
15  The underwriter pushes that button, and now what insurance
16  technology people would call interfaces, interfaces start
17  the process.
18       One of the processes is an interface communication
19  out to whatever I call this fulfillment, but who is going to
20  print the dec page.  Right?  Who's going to stuff it into an
21  envelope.  Today that's a little bit of a misnomer because
22  many people receive their issued policy documents
23  electronically.
24       But it has to be issued, and a copy, electronic or
25  paper, of the policy and everything that comprises the

1399

1  policy has to go to the interested parties.  So the now
2  named insured is going to receive a copy of the policy.  You
3  move from applicant to named insured.
4       The agent, the independent agent, is going to
5  receive a copy.  If there is a financial institution
6  involved, so if you think about that flower shop and that
7  flower shop actually owns the physical property, they're not
8  renting, there's probably a mortgage, a financial loan on
9  that.  And the mortgage company is going to want to be named
10  on the policy, and they're going to want to get a copy of
11  the policy.
12       That's the issued process.  Dec page, policy
13  language, statutory endorsements.
14  Q.  And in your experience, technology is used inside of a
15  policy administration system to assist in that part of the
16  process as well?
17  A.  Yes.  The policy administration system is the technology
18  that is driving all of these processes.
19  Q.  Policy monitoring, what is that?
20  A.  Once a policy comes into existence, it is a concern of
21  the front line underwriter if significant, meaningful,
22  changes take place to the policy in the -- in the middle of
23  the term.
24       So they have usually systems checks, rules in
25  place that say, hey, if X or Y or Z, an easily understood

1400

1  but fairly radical example would be that flower shop that
2  all of a sudden starts selling fireworks, the underwriter
3  would want to know that.
4  Q.  How would the insurance company know that the flower
5  shop has changed business to fireworks?
6  A.  Well, the independent agent will -- the policyholder,
7  the named insured, would communicate to the independent
8  agent, hey, I've got a new business now.  I've got different
9  inventory.  I need to change the coverages.
10       The independent agent would communicate to the
11  underwriters, and red flags would flip up.
12  Q.  Okay.  And again, it's technology -- in this day and
13  age, it's technology that does that.
14  A.  For the most part, yes.
15  Q.  Yes.  And then policy renewal.  Maybe it's
16  self-explanatory, but in the whole process, would you
17  describe that, please?
18  A.  Certainly.  The preponderance, but not all, of policies
19  today carry an annual policy term.  So when you have a quote
20  that is converted to a policy, it's considered a new
21  business policy.  That's how the insurance industry
22  categorizes it.
23       Once that policy begins to approach the expiration
24  date of the policy, and if my memory is correct,
25  Mr. Pandey's description of this renewal process was a

1401

1  90-day ahead of time window, different products, different
2  companies have a different window.  It might be 95.  It
3  might be 82.  But a window exists.
4       That window is going to kick off, and the
5  evaluation of whether the insurance company wants to offer a
6  renewal will take place.  And if they decide the answer to
7  that is yes, they will send out a renewal offer.
8       Now, the renewal offer will look a whole lot like
9  a policy, a new policy with a second policy term, but the
10  reality is, it doesn't become a policy unless it is
11  accepted, and the acceptance is generally deemed to be the
12  receipt of premium.
13  Q.  Okay.  And in the -- and in your experience in the
14  industry, how valuable -- how valuable to the insurance
15  company is its ability to convert existing policies into
16  renewal policies, or maybe I could say another way:  How
17  valuable is the overall percentage of renewals to an
18  insurance company?
19  A.  Renewals are incredibly important to an insurance
20  company, and you'll see the phrase "renewal retention,"
21  because there's just not enough opportunity in the market of
22  people looking for a new insurance policy to accomplish the
23  written premium objectives that companies have if they don't
24  hold on to or if they're not good at holding on to their
25  renewals.

1402

1  **Q.** And then I take it that there's some aspects of the
2  underwriting process that repeats itself at the renewal
3  stage?
4  **A.** Yes.  The process that you have in front of you, the
5  real difference is, the application part of this is really
6  different because there's not an application to be filled
7  out because the insurance company has the preponderance of
8  that information.
9  **Q.** And that information is stored in its technology
10 systems?
11 **A.** Yes, in its databases and other things.
12 **Q.** So we went through the process.  I want to go back just
13 for a moment to that step in the process which is the front
14 line underwriting because of its central role.  And some of
15 this you've described, so -- in terms of the -- the
16 information needed to start the process and make sure that
17 all of the information is collected.
18       What is the dynamic, if I can put it that way, of
19 the underwriter's interface with the rules of decision for
20 underwriting and the information that the applicant has
21 provided?  Does that make sense?
22 **A.** So I believe you're asking me how does the underwriter
23 go about making the decision of whether to insure or not to
24 insure.  Is that what you're asking me?
25 **Q.** I guess that's right.

1403

1  **A.** Okay.  Let's try it this way:  Corporate underwriting,
2  definition of underwriting guidelines for the product, the
3  underwriter is going to make sure that they have the
4  information they need.  They're going to make sure that they
5  have a price that matches to the risk that that information
6  puts you.  When they do that, they're going to consider a
7  bunch of things.
8        So in commercial insurance -- and I wrote down a
9  few of these.  These are not all, but it's the type of
10 business.  An insurance company is going to look differently
11 at an architect and engineer's firm that has been going it
12 for 20 years versus one that's one year old.
13       An insurance company is going to look differently
14 at a flower shop, as opposed to a fire works manufacturer.
15 So you look at the type of business.  You look at the
16 ownership of the business.  You look at how long the
17 business has been in business.  You look at how long the
18 management of the business has been in place.
19       And in most of these that I've just articulated,
20 you know, longer is better.  The more experienced you are,
21 the better you are at the business and the better you are at
22 mitigating risk or avoiding risk.
23       So the underwriter goes through that process.  And
24 at the end, that gets you back on the chart to the quote
25 offer.  Okay.  I like this risk.  I like this price.  Here's

1404

1  what we can do.
2  **Q.** And the underwriter isn't making these decisions in a
3  vacuum?
4  **A.** Absolutely not.
5  **Q.** Fair to say that the underwriter is making these
6  decisions by applying or executing against the rules of
7  decision of the company that speak to that particular kind
8  of policy and that particular risk?
9  **A.** When I speak to underwriting guidelines, the
10 underwriting guidelines are the set of rules for that state
11 product that the front line underwriting function is going
12 to be responsible for compliance with those rules.
13 **Q.** Okay.  Now, you've had experience with -- let me put it
14 this way:  In your experience, do human underwriters, being
15 human, some are better.  Some are worse than others?
16 **A.** That's consistent across the industry.
17 **Q.** Sure.  And as human beings, underwriters may or may not
18 impose some subjectivity or their own ideas into the process
19 of decisioning?
20 **A.** That's true.  When I sat in the corporate underwriting
21 function at the Hartford, three or four times I got pulled
22 to be on an underwriting audit team and go out to -- go out
23 to a field office and do an audit.  And invariably in every
24 audit, we identified people whose compliance with those
25 underwriting guidelines, those underwriting rules, was not

1405

1  as good as some of the other people in the office.
2        That's the nature of humans.  I'm sorry.
3  **Q.** Of course.  Is it your experience that if technology is
4  deployed that you can place the underwriting guidelines and
5  rules of decision into the technology so that you use the
6  expertise of the top expert of the organization?
7  **A.** Yes.  And I'll put one caveat in it.  Right?  The system
8  could come back and say this:  If the system is built with
9  an override function, the human could be tempted to use the
10 override function.  But the beauty of technology there is,
11 it will know.  You will be alerted immediately if someone
12 has breached the rules because they overrode the rules.
13 **Q.** Okay.  So maybe you have a higher quality of rules being
14 executed because you placed a higher quality of rules into
15 the technology?
16 **A.** I would say that differently.  I would say the rules --
17 the rules -- you have a higher quality of the execution of
18 the rules consistently.
19 **Q.** And the consistency comes from the fact that the rules
20 are being applied and executed by technology by a computer?
21 **A.** Yes.
22 **Q.** Does the same thing every time against the same data.
23 **A.** Yes.
24 **Q.** If there are going to be any special limits placed upon
25 the scope of the coverage in this renewal or quoting process

**1442**

1  you're still under oath. I don't have to swear you again.

2         Do slow down a bit. Okay? The court reporter

3  has to take down what you say, and you will hear from her

4  if you're too fast.

5         THE WITNESS: Always delighted to hear from her.

6  I'm pouring water. There is a blessing and a curse to be

7  southern. We talk fast.

8         (Witness previously sworn.)

9         (RANDOLPH BICKLEY WHITENER)

10         DIRECT EXAMINATION (RESUMED)

11  BY MR. HINDERAKER:

12  Q. Good morning.

13  A. Good morning.

14  Q. In a few minutes, a couple minutes, I'm going to start

15  off where we left off, but I want to do this beforehand.

16         Mr. Mayleben, would you bring up the RFI, please?

17         And in your binder, if it's going to be better

18  for you, this is the J002 document.

19  A. I'm there.

20  Q. Okay. And on the screen is going to be -- there we go.

21  I would like to bring your attention to page 6.

22  A. I'm there.

23  Q. And then I would like to bring your attention to that

24  section which is titled "Current CSI IT Environment."

25  A. Yes.

**1443**

1  Q. And go down to that, please. And then first if we can

2  show the table, the graph. That's good.

3         And so you see that in the RFI, Chubb & Son is

4  telling FICO that in the business tier, there already is,

5  in their environment, Duck Creek?

6  A. Yes, I see.

7  Q. Okay. And then that's explained in the RFI, if we go

8  to the writing underneath that. "From an architectural

9  perspective the CSI environment can be broken out into four

10  distinct silos: Underwriting, rating, claims and

11  reporting."

12         In your analysis of all of the documents in this

13  case that you have reviewed, was Blaze Advisor -- which

14  silo was Blaze Advisor used in in the architecture of the

15  defendant?

16  A. Blaze Advisor was used in the business tier. I am not

17  completely certain what the underwriting worksheet is, so I

18  won't speak to that. The only deployment of Blaze Advisor

19  from the claims perspective was not in the claims services.

20  It was in providing support to actuarial -- to the

21  actuarial sciences group.

22  Q. Yes.

23  A. And then the underwriting services, it was deployed

24  here because you see the words, "Renewal," and I take you

25  back to my definition of this selling the insurance

**1444**

1  process. It's a quote, it's a bind, it's a book, it's an

2  issue. And I also point out that those words have been

3  used by other defendants.

4  Q. Understood. In this exhibit under the next paragraph

5  where it says "Additionally," it's describing that the

6  interface -- about midway in that paragraph on

7  "Additionally," the interface between CSI Express and the

8  rating application is based loosely on a repository design

9  style with the Infomix-based UWS database as a central

10  repository. And it concludes, the rating application uses

11  the Duck Creek rating engine to provide screen definition

12  and black box rating calculation."

13         Do you see where I read?

14  A. I do.

15  Q. In reviewing all the documents, is it accurate that

16  Blaze Advisor was used in the underwriting silo, and then

17  it accessed a different silo called "Ratings," which

18  included, at least in some applications, the use of Duck

19  Creek?

20  A. Yes.

21  Q. Thank you. And so now let's go and return to where we

22  were before. We were looking at -- we started off with --

23  well, let's pick up where we left off, and let's go to

24  slide 28, if we could.

25         And just as a quick review, this is a document of

**1445**

1  the defendants', internal communication to themselves,

2  different parts of it, the people, called Business Rules.

3  And on this page of that document, it's a reporting inside

4  the company, inside the division -- inside Chubb & Son, the

5  division, uses within the P&C industry. Do you see?

6  A. Yes.

7  Q. Okay. And in terms of companies, it's reporting on the

8  use of business rules within -- by different insurance

9  companies?

10  A. Yes.

11  Q. And just to be clear, in each of the -- like in the

12  results for AIG, it specifically references Blaze Advisor,

13  right?

14  A. It does.

15  Q. And then in the solution description for Kemper Auto,

16  it specifically addresses Blaze Advisor?

17  A. It does.

18  Q. And then for the Hartford Insurance Group, it

19  specifically addresses Blaze Advisor in the solution

20  descriptions column?

21  A. I agree.

22  Q. Okay. And in your view -- in your review of all of the

23  materials, what was the significance of this to you?

24  A. The significance of this document to me was the fact

25  that in internal communications within Chubb, they

**1446**

1 highlighted the fact that other companies had done some
2 quantification of benefits, and they stated those. So I
3 viewed this as a marketing department -- I'm sorry, not a
4 marketing department -- a marketing effort by presenter to
5 say, hey, you know, look, other people are seeing some
6 stuff from this. Maybe -- maybe we've got to take
7 advantage of it.
8 Q. This is inside the IT group at Chubb & Son?
9 A. Yes, the communication.
10 Q. Right. So that, for example, they are reporting to
11 themselves that AIG country-specific risk models, rating
12 criteria, Blaze Advisor can be developed in shorter time
13 periods, 5 to 14 days, versus several months. They
14 reported predictive modeling for Kemper Auto and Home,
15 eight-point reduction combined ratio after first year.
16 A. It does say that, yep.
17 Q. And that's insurance ease, insurance language. What
18 is -- what is a combined ratio?
19 A. In the insurance industry, we tend to manage and
20 measure on a ratio basis, so a combined ratio is a ratio of
21 written premium and earned premium versus the percentage of
22 various expense components of the profit and loss
23 statement.
24         So if you have a combined ratio that is exactly
25 100.0, you have broken even on your underwriting process.

**1447**

1 If you have a combined ratio greater than 100.0, you're
2 losing money on your underwriting process. If the combined
3 ratio is less than 100.0, you are making money. Your
4 underwriting process is profitable. That's the value of
5 the combined ratio.
6 Q. So an eight-point reduction in the combined ratio is
7 good; more money?
8 A. It is good from the perspective of something minus
9 eight is a lower number. If -- and I do not know these
10 numbers. I mean, I know -- pardon me. I know people at
11 Kemper Auto and Home, not many, but I am familiar with
12 them. But if their combined ratio -- and I'm going to go
13 with a little bit of hyperbole here. If their combined
14 ratio was 120 and they reduced it eight points, certainly
15 they would have an objective to reduce the combined ratio
16 because you're losing money on your underwriting process,
17 but what you would have done is -- if you received an
18 eight-point benefit, you would have gone from 120 to 112,
19 still more work to do.
20         Conversely, if that combined ratio had been 105
21 when they started the process of improving it and now
22 you're down to 98, you've entered into the arena of an
23 underwriting profit.
24 Q. And similarly, if you start off at an underwriting
25 profit with a combined ratio of 90 and you reducing it by

**1448**

1 eight points, now you have an underwriting profit of a
2 combine ratio of 82?
3 A. I agree with that, and that is a correct statement.
4 Q. So the reduction is a beneficial positive direction?
5 A. Yes.
6 Q. Okay. And then the Hartford Insurance Group,
7 straight-through processing was the objective. "The result
8 drastically reduced error collection cycles, lowered the
9 cost of writing policies."
10         Of course, that's what they reported internally.
11 And did you evidence of that happening with the use of
12 Blaze Advisor by Chubb & Son?
13 A. I would say yes to that. I saw use of Blaze Advisor to
14 create a straight-through processing process for them, and
15 I would expect those benefits. Computers do something the
16 same way every time, and so humans don't: therefore, error
17 processes go down.
18         I would also like to point out that since I have
19 talked about my career at the Hartford, this happened after
20 I was no longer working with the Hartford.
21 Q. Understood. Thank you.
22         Let's go to the next slide. This is a
23 continuation of the same presentation but different
24 insurance companies. Agreed?
25 A. Agreed.

**1449**

1 Q. And again, on the slide itself, it's being specific to
2 Blaze Advisor, Malaysia National Insurance Company
3 identifies Blaze in the solution column, republic Indemnity
4 identifies Blaze in the solution column, and Auto Club
5 Group identifies Blaze Advisor in the solution column?
6 A. Yes.
7 Q. And Malaysia National Insurance reports faster and more
8 consistent decisions, rapid updates as regulations and
9 corporate policies change.
10         And did you see that same kind of experience with
11 the defendants using Blaze Advisor?
12 A. I did.
13 Q. And Pacific Indemnity, improve data quality from all
14 channels and making it easier for all agents to do business
15 with the company.
16         Let me just focus on making it easy for the
17 agents to do business with the company, did you see
18 evidence of that with the defendants' use of Blaze Advisor?
19 A. Let me correct. It is actually Republic Indemnity, and
20 yes, I did see evidence of that.
21 Q. My bad.
22 A. My reading glasses are better than yours.
23 Q. I guess. And then Auto Club Group, talking about
24 increased straight-through profits and ease of doing
25 business, moved from manual review of 100 percent of all

**1450**

1  applications to a review of 1 percent, as well as a 35
2  percent increase in number of applications processed.
3         In your review of the documents, did you see that
4  the defendants were able to improve on the percentage of
5  their renewal applications?
6  A.  I saw that defendants were able to improve the
7  percentage of their renewals that did not require human
8  touch.  Going back to the phrase "straight-through
9  processing."  That's not exactly how this says it, but
10  that's what I saw.
11  Q.  That's what you saw to the defendants.
12  A.  Yes, and that's what this means.
13  Q.  Okay.  I'm going to move to another document, if this
14  thing works.  There we go.  And this document is called --
15  the title of the overall document is "Business Rules CoE
16  Update, January 2009."
17         MS. GODESKY:  Your Honor, may I approach?
18         THE COURT:  You may.
19         MS. GODESKY:  Thank you.
20
21         (Side-bar discussion.)
22         MS. GODESKY:  So these are all slides or
23  documents that are not in evidence, and I think it's
24  improper to keep publishing them page after page to the
25  jury.  That happened with the document we just walked

**1451**

1  through, and now there is another one.
2         THE COURT:  Are the slides within the documents?
3         MR. HINDERAKER:  Yes.
4         THE COURT:  Okay.  So are these slides -- tell me
5  your objection again.
6         MS. GODESKY:  My objection is --
7         THE COURT:  That that document is --
8         MS. GODESKY:  -- this is taken from P603, slide
9  28.
10         THE COURT:  Right.
11         MS. GODESKY:  And P603 is not in evidence.  And
12  that's going to happen with the next document, too, and
13  several of the others.  And while an expert can properly
14  testify about documents that aren't in the record --
15         THE COURT:  Right.
16         MS. GODESKY:  -- I don't think it's appropriate
17  to be publishing them.  He can elicit testimony that he
18  relied on certain documents, he reviewed documents that say
19  certain things, but if we're publishing them, it's almost
20  like they're in evidence, right?  The foundation hasn't
21  been laid through any FICO or Chubb witness, and so I think
22  we're just back-dooring publication to the jury at this
23  point.  It's fair game for testimony, but not publication.
24         MR. HINDERAKER:  I don't think we should be
25  changing the rules of the game at this stage.  These are

**1452**

1  demonstratives.  This is information that he relied upon in
2  forming his opinions, and I think the jury needs to know
3  what he relied upon.
4         THE COURT:  Okay.  So with that understanding,
5  you can do it on the record, if you want.  You can object.
6  I will admit them for demonstrative purposes only, but the
7  slides and the documents won't go back with the jury absent
8  foundation for the documents.  Okay?  So you can publish
9  them.
10         MR. HINDERAKER:  Of course.  I never thought that
11  the demonstrative would go to the jury.
12         MS. GODESKY:  Will the Court know -- you're
13  accepting them for demonstrative purposes even though they
14  have these stamps on them?  You know, I just -- stamps
15  suggest that they are in evidence.
16         THE COURT:  I understand.
17         MS. GODESKY:  Thank you.
18
19         (In open court with the Jury present.)
20         THE COURT:  Actually, I will just go ahead and
21  instruct the jury on this.
22         Members of the Jury, the last document,
23  Exhibit 603, and this next document, Exhibit 605, are not
24  in evidence.  They won't go back to the jury room with you.
25  The slides that are being displayed from those exhibits are

**1453**

1  simply used to illustrate the witness's testimony.  They
2  are demonstrative exhibits only, despite the number, the
3  exhibit stamp on the documents.
4         Go ahead, Mr. Hinderaker.
5         MR. HINDERAKER:  Thank you.
6  BY MR. HINDERAKER:
7  Q.  Let us go now to this document that's on the screen
8  now, Business Rules CoE Update, January 2009.  This is a
9  document you reviewed in forming your opinions?
10  A.  Yes.  Mr. Hinderaker, would you afford me the privilege
11  of just finding the document in the binders?
12  Q.  Sure, of course.  0605 is the number.
13  A.  Yes.  It's easier on my neck.
14         I'm there.  Thank you.
15  Q.  Okay.  Good.  So as the slide shows, this is a Business
16  Rules CoE Update.  And CoE stands for?
17  A.  Center of Excellence.
18  Q.  So this is an update of that Center of Excellence work.
19         I would like you to turn to page 14 of the
20  document.
21  A.  I am there.
22  Q.  Okay.  And this is called "Business Rules in the
23  Insurance Value Chain as Classified Into Ten Categories."
24  Tell us what that means?
25  A.  If we will look at the top line underneath the heading,

**1462**

1  A.  Mr. Hinderaker, the court record is important.  Can I
2  ask you to read the last two sentences back?  Okay.  Go
3  ahead, sir.
4  Q.  Don't worry about it.
5         With respect to the applications that defendants
6  had that use Blaze Advisor, one of them is CUW-IM?
7  A.  Yes.
8  Q.  IM being Inventory Management?
9  A.  Yes, Commercial Workstation Inventory Management.
10 Q.  Is that one of the -- is that an application that would
11 fall in the value chain of workflow routing and
12 orchestration?
13 A.  Yes.  Inventory management is, in fact, executing that
14 process I talk about, making sure the request gets to the
15 right party.
16 Q.  Okay.  And by "right party," are you saying the right
17 underwriter?
18 A.  Yes, if it is going to be human underwriting.
19 Q.  Yes.  Let's use human underwritten for a moment.
20 A.  So then the answer to the question is yes, and it's
21 going to get it to the right underwriting person.
22 Depending upon the complexity of the transaction, that
23 might be a special underwriting assistant.  It might be
24 a -- it might be an underwriter.  It's going to be somebody
25 in the underwriting department with the authority and

**1463**

1  authorization to execute that transaction.
2  Q.  Was it also used to direct the workflow and the
3  application to the underwriter with the appropriate
4  expertise to address -- the issue being to address the
5  policy for underwriting?
6  A.  In the specific case of defendant, yes.
7  Q.  Okay.
8  A.  There are -- there are insurance companies out there
9  that don't really leverage that concept, but in this case,
10 that is accurate.
11 Q.  The defendants did?
12 A.  The defendants did.
13 Q.  Were they also able to, with this CUW-IM, I'll call it,
14 extend the day?
15 A.  Yes.  Yes.  Because if you have a submission of a
16 request for policy that arrives at four o'clock in, just
17 arbitrarily speaking, Boston, Eastern time, and the agent
18 has communicated, I really need input on this by the close
19 of business today, well, that's only one hour.  But if you
20 had that expertise on the West Coast, now you take 5:00
21 p.m. and you extend it out to 6:00, 7:00- you extend it to
22 8:00 p.m.
23 Q.  Let's go now to number ten, predictive analytics of --
24 did -- well, if you would describe for us how the
25 defendants used Blaze Advisor applications with respect to

**1464**

1  this element of value called predictive analytics.
2  A.  Certainly.  This takes place in two points.  One of
3  their predictive -- and I'm going to use the phrase
4  "predictive modeling."  That's probably a little more
5  familiar phrase with people.
6         The first point where predictive modeling use
7  Blaze Advisor was applied is a policy capability called
8  profitability model.
9  Q.  Profitability Indicator?
10 A.  I'm sorry.  Profitability Indicator.  I apologize.
11        Profitability Indicator is a computer model using
12 Blaze Advisor that created a prediction on profitability,
13 as the name says, based on a given price point.  And then
14 the underwriter could look at that and say, oh, well, by
15 golly, the price point needs to go up X, 5 percent.  Or the
16 Profitability Indicator could say, hey, by golly, you don't
17 need all this money, you can go down 5 percent.  Okay?  And
18 the 5 percent is just for examples.  Okay?
19 Q.  Sure.
20 A.  So Profitability Indicator is a predictive modeling
21 application.  It used Blaze Advisor, and it was deployed
22 into CSI Express.
23 Q.  All right.  And how about CIS Claims?  Is that involved
24 in the predictive analytics category for value?
25 A.  It does.  CIS Express was a predictive model used

**1465**

1  primarily by the actuarial sciences folks --
2  Q.  We're talking about CIS Claims.
3  A.  I'm sorry.  I'm sorry.  CIS Claims is a predictive
4  model used in the actuarial sciences function.  And what
5  it's doing is it's taking a hindsight view of policies, and
6  it's recalculating the proposed premium for it.
7  Q.  All right.
8  A.  Okay?  And then that proposed premium, it could be spot
9  on, it could be exactly right, it can be too little, oh, my
10 goodness and we've got to adjust our pricing process, or it
11 could be too much and, again, we would have to adjust our
12 pricing process.
13 Q.  Okay.  Let's go to another slide that you reviewed,
14 another document.  This is Business Rules Situation
15 Overview, and we're going forward in time to May 2014.
16 This is a document that you reviewed as part of your
17 analysis in forming your opinions?
18 A.  Yes.
19 Q.  And -- oops.  And this document has the Donald Light
20 quote that we saw before.
21 A.  Yes, it does.
22 Q.  So Chubb & Son continues to reference that as it's
23 internally talking about Blaze Advisor.
24 A.  Agreed.
25 Q.  And then we've seen what drives the business value.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 1, 2023, Volume VIII

1474

1  Indicator for the real-time scoring of risks that were
2  used -- to use a computer word, used to leverage Blaze
3  Advisor and their various applications?
4  A.  Yes.  All these were points of emphasis for the
5  deployment of Blaze Advisor.
6  Q.  Through the applications?
7  A.  Through the applications, correct.
8  Q.  So what's the -- maybe you've covered some of this.  So
9  what's the takeaway that you have from this part of your
10  analysis of the documentation?
11  A.  I had several takeaways from this document.  One of the
12  first was, well, this is my positive sign that the business
13  community, the underwriting -- that corporate underwriting
14  function, if you will, and the IT people are working hard
15  together to execute those corporate strategies and tactics.
16  Q.  Okay.
17  A.  I mentioned earlier the word "defend," defend and grow
18  that small to mid-size commercial, that was a point of
19  emphasis for me.
20  Q.  Good.
21  A.  There are other things on the slide.  Would you like
22  for me to speak to them?
23  Q.  I'm just wondering if we haven't already touched them
24  when we were talking about it from the document itself.
25  A.  My answer would be, I have covered that thoroughly.

1475

1  Q.  Okay.  That's why I moved on.
2       And then this is another document, another one
3  that you reviewed called "SBP Profitability Indicator for
4  New Business, Business Requirements."  This is a document
5  you reviewed in forming your opinions?
6  A.  It is.
7  Q.  And going to -- this is August 2008.  I'm going to take
8  you to page 4, and we have it on the screen as well.  And
9  we have this header, "Project Background."
10  A.  Yes.
11  Q.  Then it is titled "The SBP Profitability Indicator," so
12  now we're more specific discussion of the small business
13  platform for Profitability Indicator?
14  A.  Yes.
15  Q.  All right.  And then in many ways this is a repeat of
16  the earlier documents, so we don't need to spend a lot of
17  time on it, but "In creating the next-level operating model
18  aided by technology, to defend and grow Chubb's specialty
19  highly profitable small to mid-market book of business.
20  The key to survival in this market is efficient
21  underwriting, speed of response and low-cost structure."
22  A.  The answer is yes.  Let me, for the Court, point out
23  that SBP is simply small business platform, the beginning
24  document that we just looked at.
25  Q.  All right.  And then we can go to the next slide where

1476

1  Chubb is talking to itself and saying -- is talking to
2  itself and saying, "The Profitability Indicator integration
3  with renewals project, these objectives were identified in
4  the business case."
5       And we have spoken about targeted nonrenewal,
6  focused retention, repatriation, upsell, cross-sell, right
7  pricing.  From your review of the case documents, was the
8  defendant able to identify -- was the defendant able to
9  achieve each of those business objectives?
10  A.  I would say most.
11  Q.  Okay.
12  A.  I'm not willing to comment on repatriation.  I can show
13  you in the documents where it was an aspirational project
14  on the -- on the list for the future.
15       I also will say the same thing for upsell and
16  cross-sell.  Upsell and cross-sell is spoken to through the
17  use of Blaze Advisor, in their deployment of Blaze Advisor
18  for underwriting guidance.  I have seen instances where
19  the -- the underwriting rules, response to the underwriting
20  was, move to a better product.
21       I've seen rules, responses in the underwriting
22  guidance that said, hey, this is a specialty product:
23  cross-sell them to commercial insurance.  I saw those.  But
24  repatriation, aspirational.
25  Q.  Okay.  With that -- with the exception of repatriation

1477

1  being aspirational, the other objectives were achieved?
2  A.  Yes.
3  Q.  Using Blaze Advisor?
4  A.  Yes.
5  Q.  Okay.  We have seen this document before.  It's in
6  evidence.  It's the 2018 Annual Report of Chubb Limited?
7  A.  Yes.
8  Q.  In your review of the documents, did Chubb Limited take
9  this statement to heart, "Technology is a competitive
10  weapon"?
11  A.  Yes.
12  Q.  Okay.
13  A.  Counselor, if I may add one point?  When I entered the
14  industry, there were no personal computers.  There was no
15  Duck Creek.  As time went on and technology capabilities
16  increased, insurance companies moved to begin to adopt and
17  deploy those technologies.
18       Some companies were rapid adopters.  Some
19  companies were slow adopters.  But by the early 2000s, I
20  sat in executive groups where the phrase "adequate
21  technology" is table stakes to be in the game came about.
22  We just got to a point where if you weren't
23  technology-capable, the independent agents and brokers
24  weren't going to send you business.
25  Q.  Got it.  Got it.  Let me -- I need to look for a

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 1, 2023, Volume VIII

---

**1478**

1  document. I'm going to -- if you would go to -- well, let
2  me --
3          This is the first page of a document,
4  Mr. Whitener, that you prepared, correct?
5  A.  Correct.
6  Q.  And here you are summarizing, from your review of the
7  documents of the defendant, the business reasons for using
8  Blaze Advisor in connection with selling insurance.
9  Agreed?
10  A.  Agreed.
11  Q.  And then in this document, which we won't -- in this
12  document -- well, I say "document" because I have it
13  printed, but then there are additional documents that
14  follow, slides if you will.
15          For example, in discussing speed and in
16  discussing precision, and we will go through each one of
17  those, but with respect to your analysis of each of those
18  attributes, at the bottom of the slide, you identify the
19  documents that are being summarized in that -- in that
20  analysis. Is that true?
21  A.  That is correct.
22  Q.  So you've identified all the source material that you
23  are looking to for a discussion of the meaning and the
24  application of these reasons for using Blaze Advisor from
25  the defendants.

---

**1479**

1  A.  Yes.
2          MR. HINDERAKER:  Your Honor, this has been marked
3  as Exhibit 1137A. It is this slide and the following
4  slides that speak to each of these elements, with the
5  identification of all of the documents that are being
6  referenced, and this notebook is all of the documents that
7  are being referenced.
8          And I offer as a Rule 1006 summary this
9  Exhibit 1137A. 1137A.
10          MS. GODESKY:  Objection.
11          THE COURT:  Counsel, approach.
12
13          (Side-bar discussion.)
14          THE COURT:  Well, my question at least is, have
15  all of those underlying documents already been admitted?
16          MR. HINDERAKER:  No.
17          THE COURT:  Then I think 1137A has to be a
18  demonstrative.
19          MR. HINDERAKER:  A demonstrative?
20          THE COURT:  Mm-hmm.
21          MR. HINDERAKER:  Fair enough.
22
23          (In open court with the Jury present.)
24          THE COURT:  Mr. Whitener, make sure your
25  microphone is back on.

---

**1480**

1  BY MR. HINDERAKER:
2  Q.  So let's, if we may, go through this.
3  A.  My time is yours. My wife disagrees, by the way.
4  Q.  Yeah, right.
5          All right. Let's keep working here. We're going
6  to go through each one of these. We've spoken about each
7  one to some extent, and let us go through each one together
8  now.
9          So turning to speed, if you would discuss how
10  Blaze Advisor was used by the defendants with regard to the
11  attribute -- positive attribute, in selling insurance that
12  we are calling speed.
13  A.  Each of these points in the slide, again, come from a
14  defendant document that I reviewed, so let me start at
15  50,000 feet. Speed is important. The faster you respond
16  to an agent, the faster you bring product to market, the
17  faster you modify existing products for approval by the
18  regulatory, statutory powers, the better you are. Okay?
19  Q.  Okay.
20  A.  So, was -- was speed a goal for defendant? Yes.
21  Q.  And was that goal achieved?
22  A.  Was Blaze Advisor deployed to make things -- to make
23  things faster? Yes. That goal was achieved.
24  Q.  Okay.
25  A.  Okay.

---

**1481**

1  Q.  Execute decisions faster even in real-time.
2  A.  Yes. I mean, if I -- if I go to the discussion of my
3  early days in underwriting, and I take you back to some of
4  my opening comments, the personal insurance group of
5  products is more simple. The commercial suite of -- main
6  street commercial suite of process increases in complexity.
7  The specialty insurance market base is more complex. Each
8  of those groups would have an amount of time it would take
9  to underwrite a policy, to underwrite a renewal.
10          So if in that market segment you have deployed
11  Blaze Advisor through Automated Renewal Processing, Phase 1
12  and Phase 2, and you have successfully done it, each of
13  those renewal policies that is coming through is going to
14  be done much faster, and the renewal offer is going to make
15  it to the independent agent and the policyholder faster.
16          If you look at new business -- and I'll use
17  specifically DecisionPoint in this case. If you have a
18  market-facing portal that will deliver back a real-time
19  quote and inside of that you embed other functions in terms
20  of the underwriting process, the rules, and you embed the
21  Profitability Indicator and you respond in real or near
22  real-time back to that request, that increases your
23  probability of converting the quote into a policy.
24          So yes, executing decisions faster was
25  accomplished.

**1482**

1  Q.  Do you agree with their statements in their documents
2  that speed is a key to survival in this market for
3  efficient underwriting and response and low-cost structure?
4  A.  Yes.  Multiple documents of the defendant emphasized
5  the need for speed and the deployment of Blaze Advisor to
6  accomplish that.
7  Q.  Let's go to precision.  We spoke about this in the
8  context of predictive modeling.  And was the application
9  called Profitability Indicator one of the applications that
10  did predictive modeling?
11  A.  Yes.
12  Q.  And what else about precision did you see in the
13  defendants' documents that was significant relative to the
14  use of Blaze Advisor?
15  A.  I'll initially in this discussion link back to
16  DecisionPoint, where you get a quote in real or near
17  real-time.  With that precise premium, accurate premium,
18  you increase your precision of your pricing, which
19  theoretically now means that when you come back and you
20  look at that policy in the future through CIS Claims, the
21  actuarial analytical, the actuarial analytical comes back
22  and says, we did great.  That's perfect.  We got the price
23  right.
24  Q.  Were the defendants able to use Blaze Advisor to
25  elevate decisionmaking to the level of the organization's

**1483**

1  top expert?
2  A.  The capability was there -- I would actually need to
3  know who wrote -- so let me delineate.  I've seen this
4  through testimony.
5          There are two aspects to the rules.  There is the
6  what should the rule be?  I'm going to use the word
7  "writing the rule," or the phrase, excuse me.  And then
8  there is the transfer of that rule into technology.  Okay?
9  And I'm going to use the phrase "authoring the rule."
10         So when it comes to writing the rules, until I
11  know who in the corporate underwriting function wrote those
12  rules, I can't -- and then the transfer of those rules and
13  the document transfers them, I can't say that.  I can't say
14  Blaze Advisor can make this happen if the deployment
15  chooses to.
16  Q.  If they want to.  Exactly so.
17         And the other bullet points that are on this
18  screen for precision, you saw those bullet points in all of
19  their documentation as well?
20  A.  All but one.  The reduced claim leakage.  Again, I have
21  found no indication that Blaze Advisor was deployed into
22  the claim system.  Much like cross-sell and upsell, this
23  was aspirational.
24  Q.  Got it.
25  A.  They hadn't gotten there yet.

**1484**

1  Q.  All right.  And with that exception, they had gotten to
2  the rest of them?
3  A.  Yes.
4  Q.  Then let's go to consistency.  Why is consistency
5  important to selling insurance?
6  A.  Consistency has two aspects.  The first aspect is, the
7  agents and brokers do not like to be surprised.  They --
8  they want to know what's coming.  So if you consistently
9  execute a request for quote on a specific type of
10  policy/state combination, that accrues to your benefit; you
11  are being consistent.
12         The other place that consistency applies is in
13  the execution of the underwriting rules because a computer
14  is going to take a set of facts, ten -- ten fact points.
15  Okay?  And it's going to analyze it and come to the same
16  conclusion every time as long as all ten of those fact
17  checks are unchanged.
18         We humans, we're not particularly good at that.
19  There is a reason I've never bowled a 300 game, and it's
20  because I can't do the same thing over and over again well
21  all those times.
22  Q.  Okay.  Agility.  From your review of all of the
23  documentation, there is a number of bullet points of what
24  follows from being agile.  Could you discuss some of those?
25  A.  Certainly.  Being agile is the twin of being fast.

**1485**

1  Being fast is just, get her done.  Agile is, change
2  quickly.  Okay?
3          And so there -- there were times where an
4  opportunity raised its head and pre- deployment of Blaze
5  Advisor -- pardon me -- that deployment didn't -- didn't
6  meet the needs of the business -- of achieving the business
7  opportunity, and after Blaze Advisor, it did.
8  Q.  What was that example?
9  A.  That is Chubb Custom Market.  It's a 25 million dollar
10  book of business that Chubb was looking to acquire from
11  another insurance company.
12  Q.  And using Blaze Advisor, they achieved that?
13  A.  Well, what they did -- to achieve that, they had to
14  modify their booking process, and they used Blaze Advisor
15  to accelerate the modifications that were needed to the
16  booking process so that they could get the business.
17  Q.  So they were -- they increased their speed and got the
18  opportunity.
19  A.  Yeah.
20  Q.  Okay.
21  A.  There are some -- there are some other points in here
22  that I will --
23  Q.  Well, I'm going to go back.
24  A.  Thank you.
25  Q.  Yeah.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                                            March 1, 2023, Volume VIII

**1486**

1  A.  The legacy modelization observation I think is
2  important.  I have been involved in several processing
3  transitions for policy administration, for billing, for
4  claims, not nearly as much in claims.  It is -- it is
5  difficult for exceedingly large companies.
6          And just to arbitrarily pick on one, I'm insured
7  by State Farm.  They're still using many legacy systems
8  because the transition to more modern technology is
9  difficult.  So what they do is, they use modern technology
10 to supplement the core legacy system sitting in the
11 background.  Okay?
12         And that was -- that was one of the things that
13 they were doing with Premium Booking modernization.
14 Q.  One of the things the defendants were doing with
15 Premium Booking modernization?
16 A.  That is correct.
17 Q.  Okay.  Moving on to scale, from your review of the
18 documents, was this achieved with Blaze Advisor?
19 A.  Yes.  They processed -- they processed business with
20 the same amount of humans.
21 Q.  They processed more business --
22 A.  More business.  I'm sorry.  I left out "more."
23         The underwriting talent of an insurance company
24 is expensive to build, and it is a critical human resource
25 strategy to retain.  You know, you don't -- you don't want

**1487**

1  to lose any percentage of your underwriting staff unless
2  they're just not good at it.  Okay?  And insurance
3  companies have lots of process and procedure to monitor
4  those things.
5          So if you can take -- and, again, I'm going to
6  use arbitrary numbers, if you can take a staff of 100 and
7  they're doing 200 policies, and now all of a sudden through
8  the deployment of technology you have a staff of 100, and
9  now they can do 400 policies, they want to do that.
10 That -- that's scale, and that is a point that Blaze
11 Advisor was used at because now all of a sudden that
12 eight-hour day, zero -- well, not zero.  Anytime -- well,
13 yeah.  Anytime a policy was coming up for renewal -- and I
14 remember in my underwriting days, I had to underwrite
15 renewals at my desk.  If a policy was coming up for renewal
16 and the automated renewal processing project allowed that
17 to go straight through and a human didn't have to touch it,
18 that is underwriting time that can be allocated to
19 something else.
20 Q.  And I want to move on to that.  You said the
21 underwriter is a critical human resource in the insurance
22 company.  Is there value in freeing the underwriter's
23 time -- letting Blaze Advisor do some of the work, is there
24 value in freeing the underwriter's time to do other things?
25 A.  Yes.

**1488**

1  Q.  And why is that valuable?
2  A.  Well, there are two -- there are two things that the
3  underwriter's time would be allocated to, and the most
4  important is that relationship with the agent and broker.
5  It frees them to spend more time with the agents and
6  brokers, working on that loyalty aspect of the relationship
7  that I talked about.
8          The other thing it does, is it's completely
9  possible now that you have underwriting capacity to pursue
10 or evaluate new opportunities, new projects, because if
11 you're -- if you're touching renewals with humans, those
12 humans' times is being lapsed, it's being used.
13         Now they have that time, and you can say things
14 like, wow, maybe we should have a combined auto and
15 homeowners policy, and I'll bet you Bick Whitener would
16 bill that for us.
17 Q.  Got it.  All right.  Yes.  And now let's go to
18 compliance.  I take it you don't sell insurance policies --
19 you have the stay-out-of-jail rule.  You don't sell
20 insurance policies without being in compliance with state
21 regulations and the company's requirements?
22 A.  Correct.
23 Q.  All right.
24 A.  The CEO's with whom I worked, if I had to walk into
25 their office and tell them that we had egregiously breached

**1489**

1  the rules of a state, I would not be well-received.
2  Q.  And did -- understood.  And did -- did the defendants
3  use Blaze Advisor in any of the applications to -- to be in
4  compliance with the requirements of the State?
5  A.  They used Blaze Advisor to both be in compliance with
6  the State and company requirements.  And they used Blaze
7  Advisor to control ranges where underwriting flexibility on
8  a certain item, it had a ceiling, it had a floor, and you
9  just had to make sure you stayed within that ceiling/floor.
10 Q.  Okay.  And so we've heard testimony about Texas
11 Accident Prevention Program, TAPS, an application the
12 defendants used with Blaze Advisor.  Is that an example of
13 staying in compliance with state requirements?
14 A.  Yes.
15 Q.  And then you mentioned applications that were used --
16 you mentioned how through Blaze Advisor containing
17 applications, they stayed in compliance with their own
18 company requirements?
19 A.  Yes.  Individual rate modification application would be
20 a good example of this.  On certain types of policies in
21 the commercial insurance arena, you are allowed to file
22 your rates in such a way that there is a -- there is a --
23 you can't go over this, and you can't go below that, and
24 that provides the underwriter some flexibility in terms of
25 that pricing process as they're working on the quote.

**1490**

1  Q.  And so that application that we now call IRMA was using
2  Blaze Advisor to inform the underwriters of the range
3  consistent with state regulation in which they could work
4  on the premium for the policy?
5  A.  I would say that a little differently.
6  Q.  How would you say it?
7  A.  But -- but the job of IRMA, Individual Rate
8  Modification Application, with Blaze Advisor was to just
9  simply not let the underwriter choose a point that was
10  outside of the range.
11  Q.  Okay.
12  A.  The nice thing about -- the nice thing about IRMA and
13  other rules is, you've got to obey them.
14  Q.  Got it.  All right.  I understand.  I think we're --
15  different ways of saying that.
16          And then let's go to ease of doing business.
17  We've spoken about this before.  This is the relationship
18  between the underwriter and the independent agent/broker.
19  A.  Yes.
20  Q.  And using Blaze Advisor, from your review, were the
21  defendants able to improve the ease of doing business
22  between themselves and the independent agents and brokers?
23  A.  Yes.  The independent agents and brokers got more
24  consistent answers.  The independent agents and brokers got
25  faster responses.  The independent agents and brokers got

**1491**

1  consistency.  This -- this was a tactical deployment aimed
2  at benefitting ease of doing business in addition to some
3  of the other value points we discussed.
4  Q.  Okay.  Now, I want to turn the subject matter to the
5  different kinds of systems that insurance companies use in
6  terms of selling insurance.  And we'll review the different
7  kinds of systems, give that an overview, and then we can
8  identify the various applications and put them in their
9  appropriate systems.  Okay?
10  A.  Fine.
11          THE COURT:  Mr. Hinderaker, it sounds to me like
12  this might be a convenient breaking point for the morning
13  break.
14          MR. HINDERAKER:  I fully agree with you.
15          THE COURT:  Okay.  Thank you.
16          Members of the Jury, we will take our morning
17  recess.  Be back in the courtroom at 15 minutes to 11:00.
18  Thank you.
19          THE CLERK:  All rise for the jury.
20          (Jury exits.)
21
22
23      (In open court without the Jury present.)
24          THE COURT:  Go ahead and be seated.
25  Mr. Whitener, you can go ahead and step down.

**1492**

1          Just a housekeeping from yesterday, we have
2  spoken with the jurors, and they are unwilling and/or
3  unable to go to 5:30, which we couldn't have done last
4  night because the building, by the way, was shutting off
5  all the water, which means many horrible consequences
6  result.
7          However, they're willing to shorten their lunch
8  break to 30 minutes.  And, Ms. Godesky, since you raised
9  the issue, do you want to have a 30-minute lunch break
10  today so that we can move things more quickly?
11          MS. GODESKY:  That's fine with defendants.
12          THE COURT:  Mr. Hinderaker, can you live with
13  that?
14          MR. HINDERAKER:  I'm going to try.
15          THE COURT:  Okay.  So plan accordingly,
16  obviously, get your food here.  We'll also take up the
17  issue then --
18          MS. KLIEBENSTEIN:  Can I jump in, Your Honor?
19          THE COURT:  You may.
20          MS. KLIEBENSTEIN:  Why -- let's just go through
21  this.  So Ms. Pawloski is coming tomorrow, and Mr. Waid is
22  going today.  So the concern about tomorrow is what again?
23          THE COURT:  It's both Mr. Harkin and
24  Ms. Pawloski, and I think we're just trying to ensure that
25  Ms. Pawloski can get on and off the stand tomorrow.

**1493**

1          MS. GODESKY:  Yes, and we're communicating with
2  her to figure out what our plan is.  But I just think
3  generally we need to move things along because, you know,
4  we're still in the middle of direct of Mr. Whitener, and so
5  I don't even have confidence that we're going to be able to
6  start our case midday tomorrow at this point.
7          THE COURT:  We'll see, but --
8          MS. KLIEBENSTEIN:  Here's -- so late last night
9  at 11:30 we got new exhibits that deal with Mr. Harkin.
10  Here is my concern:  I do not want Mr. Harkin to start
11  today.  I don't think nobody is really concerned about
12  that.
13          MS. GODESKY:  No.
14          MS. KLIEBENSTEIN:  It's tomorrow?  Okay.  Then I
15  am going to sit down.
16          THE COURT:  We will take a half an hour at lunch.
17  Twenty minutes after we break, we will take up the issue of
18  Mr. Waid's testimony that was raised this morning.  Okay?
19  So you guys get effectively 20 minutes, as do I.
20          MS. GODESKY:  Your Honor, before we go off the
21  record, I do want to at this point renew our objection to
22  Mr. Whitener's qualifications under Rule 702, and we move
23  to strike his testimony and instruct the jury to disregard
24  it.
25          FICO conceded that he was not an expert in

**1494**

1  decision management software, let alone Blaze. Defendants
2  asked for a voir dire of his credentials. We didn't have
3  that opportunity. He was essentially presented based on
4  Mr. Hinderaker's representation that he would be talking
5  about insurance principles, and we have now listened to
6  four hours of freewheeling testimony about the value of
7  Blaze to Chubb. And we are defending a 21 billion dollar
8  revenue disgorgement claim, and it is enormously
9  prejudicial to have this presented to the jury when he is
10  not meeting the standards of Rule 702.
11        THE COURT: The motion is denied. On the
12  question of whether you were permitted to voir dire the
13  witness, what I said yesterday was that we would take this
14  up as appropriate during the testimony, so I didn't deny
15  you that opportunity. I denied you that opportunity at the
16  outset of his testimony.
17        Regardless of that, I understand the defendants'
18  objection. Having read and re-read Judge Wright's order, I
19  believe the objection falls within her prior ruling that
20  Mr. Whitener's methodology and his opinions are admissible
21  and that the issues you're raising, including his
22  qualifications, because that was really raised in the guise
23  of his methodology, in my view. But regardless of that,
24  the concerns you are raising in my judgment go to the
25  weight and credibility of the witness's testimony.

**1495**

1        So -- but your issue is preserved.
2        MS. GODESKY: Thank you.
3        THE COURT: Thank you. We will be back.
4              (Recess taken.)
5
6
7        (In open court without the Jury present.)
8        THE COURT: Be seated. Mr. Whitener, before the
9  jury comes in, I'm going to give you a couple of
10  instructions.
11        THE WITNESS: Yes.
12        THE COURT: Slow down, number one.
13        Number two, I know you wouldn't know this, but
14  you can't ask questions, okay, of your lawyer or of court
15  staff. Allow that to happen properly, if it's going to
16  happen. Okay?
17        THE WITNESS: Yes, sir.
18        THE COURT: All right.
19        We will -- we're going to chew up that lunch
20  hour, 30 minutes, on the early side, so we're going to go a
21  little bit later now, and then we will plan to break at
22  12:30.
23        THE CLERK: All rise for the jury.
24              (Jury enters.)
25

**1496**

1
2        (In open court with the Jury present.)
3        THE COURT: Be seated.
4        Mr. Hinderaker, you may proceed.
5        MR. HINDERAKER: Thank you.
6  BY MR. HINDERAKER:
7  Q. As we said just at the break, there are three different
8  kinds of functions related to selling insurance: Policy
9  administration systems, compliance systems, and utility
10  systems. Agreed?
11  A. Agree.
12  Q. I think we've spoken about the policy administration
13  systems, and we can do that more in the context of the
14  specific applications.
15        We've spoken about the compliance systems, and we
16  can do that a bit more in the context of the specific
17  applications.
18        And then let's talk about the utility systems as
19  well in the context of the specific applications.
20  A. Agreed.
21  Q. So the first set is the policy administration system
22  applications. And in overview, is this correct that these
23  are the systems that execute the "bind, book and issue"
24  process that you have described for us?
25  A. Yes.

**1497**

1  Q. And is it these systems that would be the ones to
2  modify existing policies, either to cancel or renew as
3  well?
4  A. Yes.
5  Q. And is it also the truth -- true that the defendants
6  with Blaze Advisor policy administration system
7  applications automated the business decisions in the steps
8  of selling insurance?
9  A. Were deployed, yes.
10  Q. Yes. And these defendants chose to use Blaze Advisor
11  as one of the technologies in their policy administration
12  systems -- systems?
13  A. Yes.
14  Q. And is it possible to sell insurance without a policy
15  administration system?
16  A. Not and be competitive.
17  Q. All right. So let's turn to the applications. And do
18  you place each of these ten applications in the category
19  of -- of a policy administration system?
20  A. I do.
21  Q. All right. So we have CSI Express, Automated Renewal
22  Processing 1 and 2, Profitability Indicator, DecisionPoint,
23  Evolution Canada, Evolution Australia, EZER for the
24  European United Kingdom zone, Adapt for Europe, Adapt for
25  Australia and Cornerstone. Those are the ones?

**1498**

1  A.  Yes.
2  Q.  All right.  Now let's look at what the Blaze Advisor
3  function was in these applications.
4        With respect to CSI Express, is that accurate
5  from your analysis?
6  A.  It is.
7  Q.  So predictive modeling, policy scoring and underwriting
8  guidance?
9  A.  Yes.
10  Q.  And then for Automated Renewal Processing 1 and 2, is
11  that accurate from your assessment of the evidence?
12  A.  It is.
13  Q.  So ARP-1 is the renewal categorization, whether it can
14  or cannot be automated -- whether it can or cannot be
15  straight-through process, and ARP-2 is the policy renewal
16  automation?
17  A.  Correct.
18  Q.  And did ARP-2 include endorsement generation?
19  A.  It did.
20  Q.  Profitability Indicator, we've spoken about that, I
21  think.  The predictive modeling, the scoring?
22  A.  Yes.
23  Q.  That was a Blaze Advisor application, correct?
24  A.  Correct.
25  Q.  And then DecisionPoint, rules tables and pricing

**1499**

1  calculations, I don't think we spoke about that yet.  Could
2  you describe what that was using Blaze Advisor?
3  A.  Yes.  I'm sorry.  DecisionPoint is the market-facing
4  capability for the -- for an approach into four products.
5  Okay?  It -- it brought information in.  It priced it.  It
6  went through the process of taking it through the
7  underwriting guidelines for those specific products, and it
8  was capable of giving back a real-time quote based on
9  defendant documents.
10  Q.  And so the eligibility determination is, in the steps
11  of selling insurance that we looked at, that is the
12  yes-or-no box?
13  A.  Yes.  It's the yes-or-no box.  It is, does this meet
14  the underwriting criteria, yes or no.
15  Q.  And endorsement generation we spoke about.
16        And data normalization, would you tell us what
17  that was?
18  A.  Actually, this was referred to earlier.  Data
19  normalization is just -- it's going to outside databases
20  and saying, hey, the data that you have given me here
21  doesn't match.  As an example, I about every 45 days get a
22  notification from the U. S. Postal Service that my address
23  is wrong, and it's because of a period.
24  Q.  Okay.  Then Evolution Canada and Australia, the Blaze
25  Advisor function was underwriting guidance?

**1500**

1  A.  Yes.
2  Q.  And the Adapt application in European and Australia --
3  in Europe and Australia was also underwriting guidance?
4  A.  Yes.
5  Q.  And then Cornerstone was -- would you describe -- we
6  haven't really touched on Cornerstone, bond and transaction
7  validation, workflow routing.  How was Blaze Advisor used
8  in Cornerstone?
9  A.  Cornerstone is the policy administration system for
10  surety bond type of products.  They're a little bit of a
11  different animal, but Blaze Advisor was used for these
12  steps for the workflow routing and for the validation.
13  Q.  Saying they're a different animal, is it accurate to
14  say that underwriting a surety bond transaction is a bit
15  more complex than commercial?
16  A.  Yes.
17  Q.  And is that because of the risk that is associated with
18  underwriting -- with surety bonds?
19  A.  Yes.
20        MS. GODESKY:  Objection.  Leading.
21        THE COURT:  Sustained.
22  BY MR. HINDERAKER:
23  Q.  Tell us why, please.
24  A.  Surety bonds are a little bit of a different animal
25  because the exposure risk is higher.

**1501**

1  Q.  Uh-huh.
2  A.  But more importantly, the exposure risk is higher
3  because in all of the insurance I have been talking about
4  at this point, there are two parties.  There is the --
5  there is the applicant who is going to have the policy, and
6  there is the writing company providing the policy.  In
7  surety -- in surety bond there are now three players.
8  There's the -- because surety bond is functionally a
9  performance guarantee.  So when you see large construction
10  projects, every one of those contractors, the people that
11  gave them the contract, to get the contract, they demand a
12  surety bond.
13        The contractor has to get the surety bond, so you
14  have the -- the person receiving the service, you have the
15  person providing the service, and you have the insurance
16  company providing the financial protection in terms of the
17  guarantee.  A little more complicated, a little more
18  involved.
19  Q.  Okay.  So that's the overview of those policy
20  administration applications or systems and the applications
21  within them.  I want to go now -- have you review for us
22  your analysis of the defendants' documents with respect
23  to -- with respect to them.
24        Perhaps the most efficient way to do that is if I
25  could ask you to speak to the --

**1502**

1    THE COURT:  Counsel, approach, please.

2

3    (In open court with the Jury present.)

4    THE COURT:  Please put that back up.  Thank you.

5

6    (Side-bar discussion.)

7    THE COURT:  Sorry, but the second to the last

8  bullet point on that slide refers to the cost of basically

9  replacing and getting the application new.  I want to make

10  it clear, you're talking about the CSI Express application.

11    MR. HINDERAKER:  I am.

12    THE COURT:  Okay.  I just wanted to make sure, as

13  opposed to --

14    MR. HINDERAKER:  Not the whole schmiel.

15  Application by application.  There will be a couple other

16  instances of that, but it's application by application.

17    THE COURT:  And the applications we're

18  referencing are the applications of Chubb.

19    MR. HINDERAKER:  Only, yes.

20    THE COURT:  Okay.  I just wanted to make sure.

21

22    (In open court with the Jury present.)

23  BY MR. HINDERAKER:

24  Q.  In my view, this is important information, and I'm also

25  trying to think about the most efficient way to convey the

**1503**

1  information.  So I'm suggesting, Mr. Whitener, if -- using

2  this slide, if you could speak to the bullet points that

3  you have put on the slide regarding the CSI Express

4  application, and tell us in your view the significance at

5  the defendants.

6  A.  Certainly.  CSI Express is the policy administration

7  system for the specialty products of defendant.  You will

8  notice in the -- in the second bullet point that we note

9  from defendant documentation that they have 113 of those

10  specialty products.  So CSI Express is doing the policy

11  processing, it's doing the new business, the quotes, the

12  renewals, the terminations.  It's executing -- or managing

13  the execution of the "bind, book, issue" process for these

14  products.

15    CSI Express is the named application, computer

16  system in the 2006 RFI, requesting the information about

17  solutions.  There is a lot of other information on here.

18  Let me highlight just one or two things, and I'm going to

19  look at the slide to do this, because I don't remember the

20  details.

21  Q.  Please look.

22  A.  Probably the most important point here is the fact that

23  it supports Automated Renewal Processing, so that's through

24  two projects, ARP-1 and ARP-2.  It has a simulation tool in

25  it, a what-if, so that the corporate underwriting process

**1504**

1  at Chubb and that product development function I -- product

2  management function I spoke to can take a book of business

3  or a product and it can take all of that -- all of those

4  policies, and it can change rules and parameters and get a

5  result back that says, hey, if you do this, this is what we

6  expect to happen, which is very powerful.

7    And the last point I will make -- the last two

8  points I'll make is, this is one of the places where the

9  predictive modeling capability turned into Profitability

10  Indicator is applied, and it used Blaze 7.1.

11  Q.  Okay.  Then let's do a similar approach with Automated

12  Renewal Processing.  We'll combine both ARP-1 and ARP-2.

13  From the documents and your review, if you would explain

14  for us the significance of the bullet points you put on

15  this slide.

16  A.  Certainly.  So with the goal for straight-through

17  processing and the goal to improve speed and the goal to be

18  easier -- I'm sorry.  I apologize.

19    The first goal being straight-through processing;

20  the second goal being improved speed; the third goal being,

21  it would be easier to do business with, using Blaze Advisor

22  7.1, defendant built two renewal processing projects.  They

23  deployed ARP-1, when ARP-1 was just simply a

24  categorization.  Here is a policy's risk characteristics.

25  It fits into high touch, the underwriter has to do this.

**1505**

1  Low touch, maybe somebody else can do it, an underwriting

2  assistant.  And no touch.

3    But with ARP-1 even though it categorized it no

4  touch, the system still wouldn't issue the renewal.  I

5  mean, a -- a minor, minor amount of human interaction was

6  required.  When they flushed out and implemented and

7  deployed ARP-2 now in that no-touch category, that minor

8  amount of button-pushing was no longer required.

9    The goal that was stated in the documents was to

10  eventually get to 90 percent of the renewals going through

11  straight-through processing within three years.  It's a --

12  it's a learning process.  It's a step-by-step process.  So

13  you would go in, and if you had stuff that categorized at

14  high touch, you would look at it, and say, anything we can

15  do with the rules.

16    If it were low touch, you would now be looking

17  at, okay, what can we do that might turn more of those into

18  low touch.  So it is an iterative process, if you'll allow

19  me that phrase.

20  Q.  And then no touch would be characterized as

21  straight-through processing?

22  A.  Yes.  No touch and straight-through processing mean the

23  same thing.

24  Q.  And in your review of the defendants' documents, did

25  you see where they were able to change the renewal rules

**1506**

1  within a couple days as compared to months using Blaze

2  Advisor?

3  A.  Yes.  Defendant documents have several statements that

4  say that the use of Blaze Advisor in this rule modification

5  process modified the time frame to change rules from three

6  to four months to -- and I'm going to use less than a week.

7  It was three or four days.

8  Q.  With Blaze Advisor, three or four days?

9  A.  Correct.

10  Q.  And then Blaze Advisor 7.1, was that the version being

11  used for ARP-1 and ARP-2?

12  A.  That also was correct.

13  Q.  Profitability Indicator, I know we've spoken some about

14  that, so we don't have to repeat what we have heard, but to

15  save time, from your review of the documentation and the

16  things that you put on the slide, could you speak to the

17  ones we haven't addressed?

18  A.  Profitability Indicator uses -- or used Blaze 7.1.

19  Profitability Indicator's job was to enable the

20  underwriting function to have a more accurate and precise

21  price in the quoting or in the renewal process.  It

22  accomplished that well.

23      There are several things in here that I mentioned

24  that I had seen as desires:  Cross-sell, upsell,

25  repatriation.  I see indication that none of those were

**1507**

1  actually fully implemented but that they were in the

2  underwriting guidance.

3  Q.  They were in the underwriting guidance?

4  A.  Yeah, they're in the underwriting guidance.  Cross-sell

5  this, upsell that.  Repatriation, no indication that

6  anything was done.

7  Q.  So with cross-sell and upsell, if not fully

8  implemented, they had begun to do that?

9  A.  They had begun to help the underwriters with that, yes.

10  Q.  DecisionPoint, same process, if you will.  Trying not

11  to repeat what we said already, but speak to the

12  significance of what you saw Blaze Advisor doing for the

13  defendants with DecisionPoint.

14  A.  My review of the defendants' documents indicated that

15  DecisionPoint was -- was a market-facing capability,

16  meaning that you could get to it through the Internet.  I

17  believe the Internet address was at Chubb.  It had -- the

18  interface initially has a number of commercial and

19  specialty types of products with it, and this -- this was

20  used with four specific products.  It allowed the

21  underwriting process and profitability -- with

22  Profitability Indicator to be able to provide a quote and

23  through a technology process that would allow the agent and

24  the customer to accept it and the binding take place right

25  there.

**1508**

1  Q.  Of course, you noticed on the bullet point that it was

2  available 24/7, given the nature of that.

3      And you said the four -- four kinds of products.

4  D&O means what, please?

5  A.  Directors and officers.

6  Q.  EPL means what?

7  A.  Employment practices liability.

8  Q.  Crime means?

9  A.  Crime.

10  Q.  And fiduciary means?

11  A.  Fiduciary is financial protection for financial

12  institutions against employee malpractice -- employee

13  misbehavior.

14  Q.  And what is the significance in closing a sale of an

15  insurance policy if you're able to issue the quote at the

16  point of sale, right at the point of sale?

17  A.  You accomplish two things.  The first one is that much

18  faster than it having to come into the office and being

19  touched by an underwriting process.  And as I've mentioned

20  before, the faster you respond to quotes, the higher the

21  probability that you convert the quote to a policy.  And in

22  all of my years of experience, quote conversion percentage

23  was an important -- it was a key performance metric, if you

24  will.

25      The second thing is, with this happening so fast,

**1509**

1  you are being easy to do business with, and the combination

2  of speed and ease of doing business helps with the

3  relationship with the agent and broker.

4  Q.  And then the DecisionPoint application, you have here,

5  files all supporting documentation to commercial

6  underwriter's workstation.

7      DecisionPoint, why don't you describe the

8  relationship, then -- the interrelationship between

9  DecisionPoint and the information into underwriter's

10  workstation?

11  A.  Sure.  So DecisionPoint is going to gather a lot of

12  information, and what's it's going to do in the execution

13  of the "bind, book, issue" process, is it's going to make a

14  decision.  Its decision that it makes, its price that it

15  applies to the quote, all of that is going through a

16  communications interface to go back to the -- to the

17  commercial underwriter workstation, which is a -- it's an

18  application that is there for the underwriters to be able

19  to see information about the policies and any -- any

20  pertinent interactions between the underwriter or the

21  special underwriting assistant and the independent agent

22  and broker.

23  Q.  On your slide here, you have the statement that the

24  estimate of cost to purchase new or develop internally is

25  between 5 and 10 million dollars.  That's speaking

1510

1  specifically to the DecisionPoint application?
2  A.  It speaks specifically to the DecisionPoint
3  application, and the document I take that from isn't
4  provided there.  I can't remember the name of the -- the
5  organization that provided that estimate.  Perhaps Duff &
6  Phelps.
7  Q.  And we've had testimony about that earlier, about Duff,
8  D-U-F-F, and Phelps evaluation?
9  A.  Yes.
10 Q.  And I should have asked, going back a couple slides, it
11 said, for CSI Express, the same Duff & Phelps evaluation,
12 it set the cost to purchase or develop CSI Express at
13 between 25 and 40 million?
14 A.  It does say that.
15 Q.  Let's go to Evolution Canada, another policy
16 administration system.  Using the same approach, tell us
17 the significance that you gleaned, discerned, from the
18 documents of the defendants regarding Evolution Canada.
19 A.  Evolution Canada is the policy administration system
20 executing the "bind, book, issue" process for the country
21 of Canada.  Evolution is a little bit unique in that it is
22 processing both personal lines, commercial lines and
23 specialty lines; whereas, CSI Express is processing no
24 personal lines.  Okay?
25         The primary thing I noted in Evolution is that

1511

1  the Automated Renewal Processing is -- is up there in that
2  system, deployed into that system as well.  So it's going
3  through the process of, okay, here comes a renewal.  I
4  believe Mr. Pandey's definition of the renewal window was
5  90 days.  So 90 days in advance, look at the risk
6  characteristics.  Is it high touch?  Is it medium touch?
7  Is it low touch?
8  Q.  Okay.  And did you see from the documents of the
9  defendants that in Canada they were able to achieve an 82
10 percent of the renewals at no touch?
11 A.  I did -- I did see that stated in the documentation.
12 It was a Duff & Phelps document.
13 Q.  And in Canada for Evolution, it uses both .net and
14 dot -- I'm sorry -- .net and Java architecture.  That was
15 in the documentation as well?
16 A.  Yes.
17 Q.  And you have on a slide version 7.1 is the Blaze
18 Advisor being used?
19 A.  I do.
20 Q.  Okay.  Let's go to Evolution Australia.  What did you
21 see in the documentations of the -- documentation of the
22 defendants regarding Evolution Australia?
23 A.  The documents indicate that the intent was to take the
24 Evolution policy administration system from Canada and
25 transport it to Australia to be the policy administration

1512

1  of use in the country of Australia.  And I saw that that
2  did not happen because as they started the deployment
3  process, Blaze Advisor in that was replaced by the IBM
4  product ODM.
5  Q.  Okay.  As originally received in Australia, the Blaze
6  Advisor software was in the Evolution application?
7  A.  The documents do indicate that.
8  Q.  Now let's go to EZER, European Zone Executive Risk,
9  another policy administration system --
10 A.  Yes.
11 Q.  -- correct?
12         And what did you find to be significant and
13 meaningful regarding the use of Blaze Advisor for this
14 application?
15 A.  So, again, EZER takes on a little bit different flavor.
16 This application is very similar to the functions performed
17 by CSI Express with the combination of Commercial
18 Underwriter Workstation.  Blaze Advisor is used in it for
19 transactional processing, but primarily in terms of giving
20 underwriting guidance.  It does have the automated renewal
21 capability to categorize into the -- into the three
22 categories.
23 Q.  Okay.
24 A.  And it does use Blaze 7.1.
25 Q.  And then the -- underwriting element of it is -- is

1513

1  the underwriting element of it supporting the quotation,
2  binding, renewal, endorsement, cancellation, reinstatement,
3  document generation, reporting, that's all -- I'm sorry.
4  When we speak of a policy administration system, we're
5  speaking of a system that supports quotation, binding,
6  renewal, endorsement, cancellation, reinstatement, document
7  generation and reporting, right?
8  A.  Correct.
9  Q.  We go to Adapt Europe and Australia, did you see that
10 Adapt was used in both of those geographical areas?
11 A.  I did.
12 Q.  And so we can -- we can -- but we can speak of the
13 application together.  The application did the same thing
14 in each of the geographical areas?
15 A.  Correct.
16 Q.  So from your review of the documents of the defendants,
17 what was significant about the use of Blaze Advisor in
18 Adapt?
19 A.  Let me start by saying, this is the first demonstration
20 outside of the property and casualty universe.  This is
21 actually -- Adapt is the policy administration for a life
22 health product called Accident Benefit Life.  In the
23 document you will see it referred to as ABL.  But in Adapt,
24 Adapt is managing the "bind, book, issue" process and the
25 transactional streams that you would expect a policy

**1514**

1 administration system to manage.

2          And Adapt is using version 7.1.

3 Q. Okay.

4 A. I'm sorry. I am wrong. I think Adapt was a different

5 version number. No, I'm incorrect again. 7.1.

6 Q. All right. And did Adapt support using Blaze Advisor

7 straight-through, no-touch processing, real-time, bind and

8 issue, back-end administration, automation, document

9 generation and electronic filing?

10 A. It did.

11 Q. Going to Cornerstone, another policy administration

12 system. You mentioned that Cornerstone supported the Chubb

13 surety line of business?

14 A. Correct.

15 Q. To be distinguished from the specialty line of

16 business?

17 A. Correct.

18 Q. And as a policy administration system, did Cornerstone

19 support the "bind, book, issue" process for those kinds of

20 products?

21 A. It did.

22 Q. Is there more -- you're telling us that it was using

23 version 7.1 of Blaze Advisor. Is there any more

24 significance in your analysis regarding Cornerstone that we

25 haven't spoken to?

**1515**

1 A. The only other point I would make is, it was used to

2 optimize and manage workflow.

3 Q. And could you explain that, please?

4 A. Routing of work to the appropriate party, very similar

5 to the Inventory Management aspect of CUW.

6 Q. Okay. Understood. Thank you.

7          Let's move to what are called the compliance

8 applications.

9 A. Certainly.

10 Q. And in your review, Blaze Advisor was used in three

11 compliance applications.

12 A. That is correct.

13 Q. And the slide here identifies them as Premium Booking,

14 we've spoken some about; Texas Accident Prevention Systems,

15 TAPS; and Individual Rate Modification, IRMA?

16 A. Correct.

17 Q. All of those have been identified -- we've mentioned

18 them each, so let's just go through each one individually.

19          Premium Booking modernization, the Blaze Advisor

20 function was -- was what?

21 A. Validation of the rules for the Premium Activity

22 Reporting System. You will see this Premium Activity

23 Reporting System referred to as PARS, P-A-R-S.

24 Q. When we discuss that application in its individual way,

25 we will look at that in some more detail.

**1516**

1          Texas Accident Prevention Systems?

2 A. This is a compliance use simply to meet a statutory

3 requirement by the great state of Texas for specific types

4 of workers' compensation policies.

5 Q. Okay. And individual rate modification, pricing rules,

6 would you describe that if you haven't -- well, you did

7 some.

8 A. I did some. My description now will not be radically

9 different. Individual rate modification used with certain

10 commercial and specialty types of products is a mechanism

11 to give pricing flexibility to the underwriter in the

12 pricing of the policy.

13          And individual rate modification, if you will

14 allow me to use the term "guardrails," the top of the range

15 is a guardrail, the bottom of the range is a guardrail, and

16 the job of IRMA is to make sure that nothing -- nothing

17 crashes through the guardrails.

18 Q. Stay within the guardrails?

19 A. Stay within the guardrails.

20 Q. So now we will -- we will turn to Premium Booking

21 modernization. I want to go forward on a slide here

22 because you spoke, I think, of this element of the PARS

23 modernization and resulting in the Premium Booking

24 application.

25          From the defendants' documents, could you

**1517**

1 describe what that image is showing?

2 A. This image is not technology-specific. This is a

3 business view of what has to happen. So when an insurance

4 company issues -- well, binds a policy, okay? So the --

5 figuratively speaking, the bind button has been pushed, the

6 quote has been accepted, the renewal offer has been

7 accepted, there are a number of things that need to happen.

8 Because we are a highly regulated industry, 51

9 jurisdictions, information has to go to multiple places.

10 One of those places is going to be statistical reporting.

11          So we -- we watched a testimony deposition, and I

12 have already forgotten this gentleman's name, but in his

13 title he used statutory reporting. Statutory reporting is

14 just simply the insurance company sending to the

15 appropriate regulatory bodies information about policies.

16 Okay?

17          In statutory reporting, a policy is just not one

18 set of data. So if I go back to that commercial fire

19 policy that I talked about, a commercial fire policy has

20 fire coverage. I'm sure that's a big surprise, right? But

21 that fire -- that fire coverage, it has a coverage code,

22 and part of the total policy premium is attributed to that

23 code. And then that information, through a booking

24 process, in this case PARS, improved upon by Blaze Advisor

25 through a project called Premium Booking Modernization is

**1518**

1 now feeding that information.

2       Well, I can tell you there is a code there for

3 lightning, and a premium would be associated to lightning.

4 There is a code there for wind and hail, and it will be

5 associated to hail. I won't bore you with all 17 or 18 of

6 those coverages, but that's what happens.

7 Q. Okay.

8 A. And it is important because it is statutorily required,

9 okay?

10       The nice thing about -- the nice thing about this

11 chart it is shows you how many places a premium has to go

12 after that booking has been executed. And if you look at

13 this chart, it's got to go to one, so daily premium and

14 loss control. It's got to go to billing. It's got to go

15 to actuarial bureau reporting. Those are -- actuarial

16 bureau reporting means data aggregators for the industry --

17 I'm sorry. It's a statutory requirement. There are

18 companies that aggregate data for the insurance industry,

19 and companies contribute to them. The NAIC is a good

20 example of that.

21       So then -- we've got three places the data has

22 got to go now. We are going to go to a fourth -- it's

23 going to send information to the policy -- I'm sorry, to

24 the CIS Claims -- speaking specifically to CIS, it's going

25 to send policy to claims because the claims department

**1519**

1 might get a phone call that says, hey, I'm X; I've got a

2 claim. The first thing that they are going to do is they're

3 going to confirm that the policy exists.

4 Q. Slow down.

5 A. I'm sorry. So CIS Claims is going to get a phone call

6 about a claim. They need to confirm that the policy is

7 active, that data transfer to claims allows that to be

8 done.

9 Q. Okay.

10 A. Then you come down to -- then you come down to profit,

11 and you notice that there are three sub-boxes under that.

12 So data has got to go to those three boxes. So if you add

13 all those boxes up, one, two, three, four, five, six, there

14 are seven places that data has got to be sent. There has

15 to be something that manages that sending. At the

16 defendant, that something is named Premium Activity

17 Recording System, and it is that system that was modernized

18 using Blaze Advisor 7.1.

19 Q. And that then is the Premium Booking application?

20 A. As defined by the defendants' documents, yes.

21 Q. And by modernizing this process resulting in the

22 Premium Booking application, is this the instance where,

23 because all that back-end -- all that back-end reporting

24 was done using Blaze Advisor and much faster, they were

25 able to capture the market -- the 25 million dollar market

**1520**

1 opportunity you spoke about?

2 A. That is correct. Think about it not in terms of that

3 specific opportunity, but if you have a new opportunity in

4 front of you -- it might be aviation insurance. It might

5 be automobile manufacturers. At the end of the day, to

6 bring that product to market, in addition to all of the

7 work I talked about in the product management function and

8 the information technology function, you've got to be able

9 to book and report to the statutory authorities about that

10 premium. That's what this is.

11 Q. Okay. And now we turn to this slide. It is about

12 Premium Booking modernization. It may be that we have

13 spoken about it. I think so. This was another -- this

14 also used Blaze Advisor version 7.1?

15 A. Correct.

16 Q. All right. Let's go to Texas Accident Prevention

17 Systems. Oops. And we have these bullet points of yours.

18 We've described it already as relating to workers' comp in

19 Texas. This application used version 7.1 of Blaze Advisor?

20 A. Correct.

21 Q. Okay. Unless you see something that we haven't spoken

22 about on Texas Accident Prevention Systems, I'm ready to

23 move on.

24 A. I will only say one sentence additional, if allowed.

25 Q. Yeah.

**1521**

1 A. This is a use of Blaze Advisor to fulfill a statutory

2 reporting requirement. It's not participating at this

3 point with anything with the "bind, book, issue." It's

4 just saying, hey, this is a policy. Here are the state

5 requirements. Read it.

6 Q. And hence, we put it in the compliance category?

7 A. Correct. And I'm sure that any insurance company would

8 prefer not to be slapped on the wrist and fined for not

9 complying with the requirement.

10 Q. Okay. Then let's go to IRMA. And have we spoken about

11 this in terms of the guardrails?

12 A. Yes.

13 Q. It used Blaze Advisor version 7.1, from your review?

14 A. Yes.

15 Q. I think maybe we've spoken about each of the bullet

16 points on this slide. Do you agree?

17 A. I agree.

18 Q. Okay. Then let's go to the utility applications, and

19 we didn't define that before. So what do you mean by

20 utility application?

21 A. They are applications that are deployed to make

22 people's lives easier but specifically as it relates to the

23 "bind, book, issue" process of selling insurance.

24 Q. But it does -- does it --

25 A. I'm sorry?

**1522**

1  Q.  Do these utility applications -- although not being
2  policy administration systems, do they connect to the
3  selling of insurance?
4  A.  Absolutely.
5  Q.  So at the defendants' utility applications were
6  commercial -- are these the utility applications at the
7  defendants?
8  A.  Yes.
9  Q.  We have spoken about CUW-IM, Broker Site in Canada.  We
10 will speak more about Exari in Europe.  We haven't really
11 addressed that.  And we've talked about CIS Claims.
12       So the Blaze Advisor function at Commercial
13 Underwriter Workstation.  That is what it was?
14 A.  Yes.
15 Q.  And I think we're spoken about that.
16 A.  I agree.
17 Q.  Okay.  And then Brokersite, we haven't really spoken
18 about that, client information access portal for brokers.
19 How did Brokersite use the Blaze Advisor function?
20 A.  It is a tool made available to the independent agents
21 and brokers to discover information about their
22 policyholders.  So if -- using a very, very simple example,
23 if the business calls the independent agent and broker and
24 says, when is my next premium due?  In this deployment and
25 in this function, the independent agent would go to the

**1523**

1  Brokersite, look up that policy and say, oh, look, you have
2  a thousand books due on August the 1st.
3  Q.  This is an ease of doing business benefit?
4  A.  Correct.
5  Q.  Exari, data capture and document generation.  What was
6  that?
7  A.  Exari never deployed into production but built using
8  Blaze Advisor, is a use of Blaze Advisor to create an
9  interview tool to walk someone through an interview
10 process, an agent and broker, or potentially a customer,
11 asking them questions, and then the application Exari is
12 going to fill out paperwork based on those answers.
13 Q.  For the purpose of selling the insurance policy?
14 A.  Agreed.
15 Q.  And then CIS Claims, claims categorization, I think I
16 could use a little better understanding of what that means.
17 A.  CIS Claims is the predictive modeling use that looks
18 back at information and says, did we get the price right?
19 So when you think about categorization, really, there are a
20 couple, right?  There is, I got it right, or I didn't get
21 it right, and if I didn't get it right, I missed by --
22 Q.  Okay.  Got it.  Understood.
23       Now let's go through each of them in a little
24 more detail.  Commercial Underwriting Workstation Inventory
25 Management, this -- in terms of these bullet points, from

**1524**

1  your review of the documents, was it used by 6,000 users in
2  the United States and Canada?
3  A.  Based on the documents, yes.
4  Q.  You had the bullet point, If CUW Inventory Management
5  is down and work orders cannot be created or reviewed, what
6  did you see from the documents that was the consequence of
7  CUW-IM being down?
8  A.  I believe the direct words of the document, and I
9  believe it here is the -- there was little to no "bind" --
10 "bind, book, issue" taking place.  This is the deployment
11 to -- for inventory management, and so inventory management
12 makes sure that any individual participant in the
13 underwriting process, it makes sure that their in-box does
14 not -- in-box of "bind, book, issue," in-box of any other
15 type of underwriting work, be it underwriting endorsements
16 or underwriting renewals, it's making sure that's what's in
17 their in-box is within their defined capacity.  And if it
18 does not, taking that work and getting it into some other
19 similar skill set person whose in-box can absorb the work.
20 Q.  And if that can't be done, then the work doesn't get
21 done?
22 A.  If that can't be done, the work doesn't get done.
23 Q.  You have here that commercial -- Chubb Commercial
24 Insurance processes over 5 billion dollars worth of
25 business with CUW-IM?

**1525**

1  A.  It does.
2  Q.  Is that on an annual basis or what time frame?
3  A.  No.  That is annually.
4  Q.  You also have on here that there were 1.22 million
5  transactions per month.  That was CUW-IM?
6  A.  Correct.
7  Q.  And some of these other bullet points we've spoken to,
8  it uses Blaze Advisor 7.1?
9  A.  It does.
10 Q.  And then you have the estimated cost to purchase or
11 redevelop CUW at between 5 and 10 million dollars?
12 A.  Yes.  That's from the same data source as before.
13 Q.  Same data source as before, this Duff & Phelps?
14 A.  Correct.
15 Q.  Let's go to Brokersite.  We've spoken about it a bit.
16 So the interface between Brokersite and Evolution was what,
17 as you saw from the documents?
18 A.  The Blaze Advisor is used in Brokersite.
19 Q.  Mm-hmm (Yes).
20 A.  And it participates in that -- in that interface.  And
21 as I mentioned before, Brokersite's job is to get
22 information back to the agent and the broker as it relates
23 a specific policy, suite of policies, customer.
24 Q.  And as you've already said, the Canadian application
25 called Evolution used Blaze Advisor?

**1526**

1  A.  Yes.

2  Q.  Now let's go to Exari.  We haven't heard much about

3  that.  You identified it a moment ago as the

4  document-authoring.  What did you see from the -- it's a

5  document-authoring application.

6       Tell us what you learned from the defendants'

7  documents regarding Exari and its use of Blaze Advisor?

8  A.  It was designed to be used with EZER, which I will

9  refresh your memories.  That is the European executive risk

10  policy administration system.  It was the -- through most

11  of the software development life cycle and 30 days before

12  moving to its scheduled move to production date, it was

13  tabled and put on the shelf.

14  Q.  Okay.  You have on that slide that the development of

15  Exari began in 2013?

16  A.  I do.

17  Q.  And that's from the documents of the defendants?

18  A.  Yes.

19  Q.  And then the date on which it was put on the shelf, in

20  your words, was January 27, 2016?

21  A.  Yes, again from defendant documents.

22  Q.  You have Blaze Advisor version 7.1?

23  A.  Correct.

24  Q.  Okay.  CIS Claims.  We've spoken about it already as a

25  predictive analytic application.  Maybe you can describe

**1527**

1  how actuaries used this information and its relationship to

2  CSI Express?

3  A.  CSI Express is a very large application.  It has a

4  policy administration component.  It has a claims

5  component.  Excuse me.  Both of those components have

6  information that the actuarial department needs, as I

7  pointed out in the Premium Booking business slide.

8  Q.  Yeah.

9  A.  So what is going to happen is, periodically, CIS Claims

10  is going to take that information, policy claims, and it's

11  going to go through a predictive modeling process that --

12  as I said before, it just basically determines, is this

13  price right, or is this price not right and provide -- when

14  the answer is "not right," provide insight for reasons as

15  to why they now consider it not right.

16  Q.  And that's the actuarial element of it?

17  A.  Yes, that is the actuarial element of pursuing the

18  adequate accurate predictable price.

19  Q.  And then the ultimate result of that analysis, that

20  actuarial analysis, how is that then used?

21  A.  It's going to go back to the corporate underwriting

22  product management function, who will then use that to take

23  it into their underwriting guidelines and standards

24  definitions and potentially pricing definitions.

25  Q.  I'm sorry.  And then if the underwriting guidelines are

**1528**

1  written into Blaze Advisor, it gets written there?

2  A.  It comes back to the deployment of the rules.  In this

3  case, in Blaze Advisor.

4  Q.  And this used version 7.1?

5  A.  Correct.

6  Q.  So we've gone through the insurance industry, the

7  process of selling insurance, the applications that use

8  Blaze Advisor, all of your analysis of what they did and

9  why, and the defendants' documents.  Let's use this slide

10  to summarize your overall view.

11  A.  My overall view from a time frame of defendants' use of

12  Blaze Advisor begins in 2006 midyear with the -- with the

13  RFI that says, we've got a corporate growth strategy that

14  now involves a tactic of moving to small and mid-market

15  specialty, and we have -- we recognize that that results in

16  increased transactional volume, which as staffed today, we

17  can't handle.  In addition, our systems are not really

18  built for this segment of the market.  And, oh, by the way,

19  we have a corporate expense strategy that will not allow us

20  to increase staff, so we need to find a way to do this

21  within our existing staff.

22       We that with that RFI, there were a series of

23  events that took place.  Some of them referenced in other

24  testimonies that I have not seen those documents, but I

25  have seen the ultimate license agreement that comes out of

**1529**

1  that.  Blaze Advisor was licensed to be a technical

2  capability applied to the execution of those tactics.

3  Right?

4       Blaze Advisor was deployed initially through

5  ARP-1 and 2.  That, according to the documents, was a

6  success, and so then they started to -- to do two things.

7  Number one is expand the use of Blaze Advisor.  I believe

8  predictive modeling now came onto the table pretty quickly.

9  But they also went through an internal marketing process to

10  improve the knowledge of concepts of business rules

11  management and decision management in other parts of the

12  organization.

13  Q.  Okay.  And then on this slide we show the applications

14  that were -- all of the applications that ultimately used

15  Blaze Advisor?

16  A.  These are all of the uses of Blaze Advisor.

17  Q.  That we have just gone through.

18       And then were you able -- in your judgment, what

19  was the extent of -- in your judgment, what was the value

20  that the defendants realized using Blaze Advisor in selling

21  insurance?

22  A.  So when I talk about the value, I go back to the quote,

23  "buying, book, issue process."  Can I make things faster?

24  Can I make them more consistent?  Can I be more agile as it

25  respects to the opportunity in the marketplace and to

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                                    March 1, 2023, Volume VIII

1530

1    responding to statutory and regulatory changes? Can I stay
2    more in compliance with both those statutory and those
3    underwriting -- corporate underwriting requirements? Can I
4    be easier to do business with? Can I take on -- can I
5    scale? Can I take on more business with my existing very,
6    very valuable staff?
7            And if I do that, take on more business with my
8    valuable staff, but I reduce the amount of use of human
9    capitol in the "buying, book process," I can now
10   concentrate on agents and brokers and spending time with
11   them in developing that relationship, my conclusion is that
12   Blaze Advisor deployed by agents in some places, not all,
13   added significant value to the defendants' business of
14   selling insurance.
15   Q.  Okay.  And in drawing this judgment about the
16   significant value of selling insurance, do I understand you
17   correctly that the attributes or the features that resulted
18   in the significant value were the ones you just described:
19   Speed, agility, precision and so forth?
20   A.  That is correct.
21   Q.  Did you have -- we saw in some of the slides of the
22   defendants where some other insurance companies had done
23   the work to quantify or measure the improvements that they
24   realized with Blaze Advisor.
25          Did you have that -- any kind of information like

1531

1    that available to you?
2    A.  I did not.
3    Q.  Is it necessary for you to have that kind of
4    quantification of information to draw your judgment that
5    Blaze Advisor added significant value?
6    A.  There are two different questions there in the
7    underwriting world I live in.  The first is, did it?  The
8    second is, how much did it?  Okay?  I had more than enough
9    information, documentation, 10,000-plus pages, to determine
10   that it did it.
11          I don't need a tape measurer or a stopwatch to
12   know that computers executing transactions is faster than
13   humans because I was a human underwriter, and I've worked
14   with many companies to -- to deploy technology into those
15   processes.  I don't know -- I don't need to measure
16   variation in compliance because I know a computer system
17   with a set of facts is going to make the same decision with
18   those facts every time, and I know -- I have been out on
19   underwriting audits and audited underwriting functions --
20   that humans cannot do that.
21   Q.  So overall as a -- overall, Blaze Advisor added
22   significant value in the selling of insurance by the
23   defendants?
24   A.  My opinion is that Blaze Advisor added significant
25   value to the -- to the defendants' process of executing the

1532

1    "bind, book, issue" which is how I describe the process of
2    selling insurance where deployed.
3            MR. HINDERAKER:  Thank you for your time.
4            THE WITNESS:  You're welcome.
5            THE COURT:  Ms. Godesky.
6            MS. GODESKY:  Thank you.
7            THE WITNESS:  Thank you.  I'm overburdened here.
8                    CROSS EXAMINATION
9    BY MS. GODESKY:
10   Q.  Good morning, Mr. Whitener.
11   A.  Good morning, Ms. Godesky.
12   Q.  You understand I represent the defendants in this case,
13   right?
14   A.  I do, in fact.
15   Q.  This is your first time testifying as an expert in
16   court, right?
17   A.  That is correct.
18   Q.  So no court or arbitrator has ever qualified you as an
19   expert in rules-based software?
20   A.  This is correct.
21   Q.  Your advanced degree is a college degree from Virginia
22   Commonwealth University where you majored in education,
23   correct?
24   A.  I have a degree in education, a Bachelor of Science
25   from Virginia Commonwealth University.  I struggle with the

1533

1    word "advanced."
2    Q.  It's a degree in education from Virginia Commonwealth,
3    right?
4    A.  That is correct.
5    Q.  You've never worked for a software company, correct?
6    A.  Correct.
7    Q.  And you've never worked as a software developer,
8    correct?
9    A.  Mostly correct -- well, no.  I'm sorry.  Correct.
10   Q.  During direct examination beginning of yesterday, you
11   talked about the work you've done at various insurance
12   companies, right?
13   A.  Various insurance companies and various vendors who
14   sell goods and services to the insurance companies.
15   Q.  Okay.  So I want to walk through the chronology of your
16   employment that Mr. Hinderaker took you through and asked
17   you a few different questions.
18          So you were at the Hartford, which is an
19   insurance company, from the late 1970s to the early 1990s?
20   A.  Mid-1993.
21   Q.  Okay.  And you did not do any work with decision
22   management software at that job because the software did
23   not exist in that time period, correct?
24   A.  Correct.
25   Q.  And then you were at the Prudential, which is another

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 1, 2023, Volume VIII

---

**1546**

1 examination how the country's largest insurance companies
2 are using rules-based software as opposed to coding by
3 software engineers, right?
4 A. Correct.
5 Q. You also haven't conducted any survey of FICO's
6 customers regarding their experience with Blaze, right?
7 A. Correct.
8 Q. And you haven't spoken to other rules software vendors
9 about their software programs, correct?
10 A. Mostly correct.
11 Q. Now, Mr. Whitener, as a general baseline, based on your
12 direct testimony, I'm assuming we can agree that the
13 insurance business is complex, right?
14 A. I have described it that way before. There are aspects
15 that are very, very simple, but generally speaking, it is a
16 complex industry.
17 Q. Okay. And I want to talk about some of the factors
18 that drive an insurance company's ability to earn revenue,
19 okay? So the relationship between a broker and an agent,
20 on one hand, and the insurance company on the other, that
21 can affect where customers want to buy their insurance,
22 right?
23 A. Yes.
24 Q. And Blaze doesn't have anything to do with the
25 interpersonal relationships that Chubb employees build with

---

**1547**

1 brokers and agents, right?
2 A. Mostly correct.
3 Q. Blaze isn't taking people out to the ball game or out
4 to dinner or a networking lunch, right?
5 A. Correct.
6 Q. And the insurance products that a company sells are
7 also part of what determines the success of an insurance
8 company, right?
9 A. Yes.
10 Q. Can be a meaningful contributor to what makes a company
11 successful, right?
12 A. Without products, there is no revenue, correct.
13 Q. And insurance products are developed based on the
14 expertise of the insurance company and the know-how of the
15 people who work there, correct?
16 A. In combination with statutory requirements of the
17 states in which they decided to do business and the state
18 requirements for the products they decided.
19 Q. Fair enough. And you have not identified any
20 particular insurance product that was specifically
21 developed at Chubb because of Blaze, right?
22 A. Correct.
23 Q. An error-free billing process is also an important
24 factor in attracting customers to an insurance company,
25 right?

---

**1548**

1 A. I would say that different, but it is an important
2 factor.
3 Q. And Blaze has no role in Chubb's billing process,
4 right?
5 A. I saw no documentation that indicated that.
6 Q. Meaning you haven't seen anything connecting Blaze to
7 billing?
8 A. Correct.
9 Q. It's also very important that an insurance company have
10 a strong process for handling claims once they come in,
11 right?
12 A. Correct.
13 Q. And that's because brokers and agents aren't going to
14 have any desire to sell policies on behalf of insurance
15 companies that's not efficiently handling claims, right?
16 A. Correct.
17 Q. And it's important that an insurance company pays the
18 right amount of money when a claim comes in, and they do so
19 pretty fast?
20 A. I'm going to say it slightly differently. It is
21 important that insurance companies pay the right amount,
22 and it's important that they get that right amount to the
23 policyholder quickly.
24 Q. And Blaze, I think as you said during your direct
25 examination, was not used in the claims handling side of

---

**1549**

1 Chubb at all, right?
2 A. Correct.
3 Q. Underwriting is another aspect of how insurance
4 companies make money. You were an underwriter, right?
5 A. I was, yes.
6 Q. And from your experience as an underwriter, you know
7 that your personal human judgment is crucial to the
8 performance and execution of your duties as an underwriter,
9 right?
10 A. I'm not sure I agree with it.
11 Q. Okay. Let's look at your deposition transcript at page
12 47.
13 A. Certainly.
14 Q. And if I could direct you to page 47, line 7. Let me
15 know when you're there.
16 A. Patience, counselor.
17       I'm there.
18 Q. You were asked at your deposition "Question: Your
19 personal judgment was crucial in the performance of your
20 underwriting duties, correct?"
21       "Answer: Yes."
22       That was your testimony at your deposition,
23 right?
24 A. Yes.
25 Q. Your emotional quotient or your emotional intelligence

---

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)    March 1, 2023, Volume VIII

**1562**

1  Q. Mr. Whitener, during direct examination, you walked us
2  through all the computer applications that you say use
3  Blaze, right?
4  A. Yes.
5  Q. You have never used any of those computer applications?
6  A. Correct.
7  Q. Let's start with CSI Express. CSI Express is a policy
8  administration system, right?
9  A. It is.
10 Q. And like pretty much every policy administration
11 system, it's complex, correct?
12 A. Correct.
13 Q. It involves many different technologies?
14 A. It does.
15 Q. But before you rendered all your opinions in this case
16 about the value of Blaze and CSI Express, you didn't do
17 anything to measure how significant a part of CSI Express
18 Blaze is, right?
19 A. Yes.
20 Q. You have not done any analysis of what amount of
21 improvement to speed, ease of doing business or adequacy of
22 pricing is attributable to Blaze in CSI Express as opposed
23 to the application as a whole, correct?
24 A. Correct.
25 Q. That was outside the scope of the responsibilities you

**1563**

1  had in this case, right?
2  A. Correct.
3  Q. In fact, before rendering expert opinions in this case,
4  you spent less than one second reviewing the components of
5  CSI Express that had nothing to do with Blaze, correct?
6  A. Correct.
7  Q. And you spoke a lot on direct examination about how
8  Blaze must have brought speed to CSI Express, but you
9  haven't done any work to try to determine whether you're
10 talking about one day, two days or hours, right?
11 A. You are correct.
12 Q. You didn't look at that.
13 A. Correct.
14 Q. And also in the context of CSI Express, you do not know
15 whether CSI Express actually increased the speed of
16 response to requests for quotes at Chubb, right?
17 A. Yes, but --
18 Q. You do not know, right, Mr. Whitener?
19 A. Yes.
20 Q. You don't know.
21 A. Yes.
22 Q. And you do not know whether the speed of making renewal
23 offers through CSI Express was actually increased because
24 of Blaze. You cannot say that, right?
25 A. I cannot say how much. I can say I believe it was.

**1564**

1  Q. Mr. Whitener, before rendering all your opinions in
2  this case, you gave zero thought to whether you could have
3  measured all this contribution to speed that you say is
4  attributable to Blaze, correct?
5  A. Zero?
6  Q. Zero. Sound right?
7  A. No. I took zero action based on those thoughts.
8  Q. Let's look at your deposition page 153.
9  A. I'm there.
10 Q. Line 19. "Question: In your mind, would it be even
11 possible to measure the contribution that Blaze has to the
12 speed that you've discussed CSI Express creating?
13      "Answer: Having had the privilege of giving that
14 question zero thought, I can't answer it."
15      That's the testimony you gave, correct?
16 A. It is.
17 Q. Let's talk about Profitability Indicator. That's
18 another application you talked about, correct?
19 A. Correct.
20 Q. And you said it increased speed relating to renewals in
21 response to requests for quotes, correct?
22 A. I'm sorry. Repeat that.
23 Q. You talked about how it increases speed because of
24 Blaze, right?
25 A. I did.

**1565**

1  Q. And Profitability Indicator is part of the CSI Express
2  application?
3  A. It is.
4  Q. Counted as a separate application on your direct
5  examination, but it's part of CSI Express, right?
6  A. It is an additional application deployed inside of CSI
7  Express.
8  Q. And you don't know whether Profitability Indicator,
9  including Blaze, actually contributed to increased
10 revenues, right?
11 A. Excuse me. I didn't -- yes, I did not measure
12 anything.
13 Q. Let's move on to DecisionPoint. You talked about all
14 of the value that Blaze brought to DecisionPoint during
15 your direct examination, right?
16 A. Yes.
17 Q. And DecisionPoint, just like Profitability Indicator,
18 is part of CSI Express, correct?
19 A. Yes.
20 Q. You're sort of counting it separately on your slides,
21 right?
22 A. Yes.
23 Q. You don't know whether DecisionPoint actually
24 contributed to revenue at Chubb, correct?
25 A. Yes, but --

**1566**

1  Q.  It's correct, right, Mr. Whitener?

2  A.  Yes.

3  Q.  Next up was Evolution.  Based on your review of the

4  record in this case, you agree that Evolution uses many

5  different technologies in addition to Blaze, right?

6  A.  Yes.

7  Q.  And you do not know whether the speed of response to

8  quotes or requests for renewal were actually increasing

9  because of Blaze, right?

10  A.  Yes, but -- yes.

11  Q.  You don't know?

12  A.  Yes.

13  Q.  And you haven't done anything to determine whether the

14  use of Blaze in Evolution actually improved the

15  availability of underwriting, correct?

16  A.  Correct.

17  Q.  Then you talked about Adapt.  Adapt is a policy

18  administration system, right?

19  A.  It is.

20  Q.  It is complex, correct?

21  A.  Yes.

22  Q.  And you cannot say whether any of the benefits that you

23  talked about on direct examination with Mr. Hinderaker were

24  actually realized by Chubb, correct?

25  A.  Correct.

**1567**

1  Q.  Cornerstone is another policy administration system for

2  all those surety bonds, right?

3  A.  Correct.

4  Q.  Also complex.

5  A.  Correct.

6  Q.  And you don't know whether any of the benefits that you

7  spoke about on direct examination were actually realized by

8  Chubb because of Blaze, correct?

9  A.  Yes.

10  Q.  Then we have these compliance systems.  Premium Booking

11  is one of them, right?

12  A.  Yes.

13  Q.  That's also in CSI Express, right?

14  A.  Yes.

15  Q.  And the process underlying the Premium Booking

16  application used at Chubb is complex.

17  A.  Yes.

18  Q.  But before rendering all your expert opinions about the

19  value of Blaze and Premium Booking, you didn't do anything

20  to investigate what systems and software other than Blaze

21  are used in Premium Booking, correct?

22  A.  Correct.

23  Q.  And you haven't conducted any analysis to determine

24  whether Premium Booking actually enabled Chubb to bring new

25  products to market faster, right?

**1568**

1  A.  Correct.

2  Q.  And you haven't done any analysis to determine whether

3  Blaze's incorporation in Premium Booking meant that Chubb

4  could report data for their new products faster, right?

5  A.  Correct.

6  Q.  Next was TAPS, the Texas Accident Prevention System.

7  And you are aware that witnesses have testified in this

8  case that the function Blaze performed in TAPS could have

9  just as easily have been performed by an Excel spreadsheet,

10  right?

11  A.  Yes.

12  Q.  You can't speak to whether or not that's true.  You

13  don't know.

14  A.  I know that the documents say that.

15  Q.  But you agree, it's certainly possible that other

16  software could have been used in TAPS to perform exactly

17  the same function as Blaze, right?

18  A.  Yes.

19  Q.  And you don't know whether Blaze's inclusion in TAPS is

20  what actually ensured that each policy written in the

21  workers' compensation line of business at Chubb was in

22  compliance with Texas regulations, correct?

23  A.  May I ask you to restate?

24  Q.  You don't know whether Blaze's inclusion in TAPS is

25  what was actually ensuring that all of these workers' comp

**1569**

1  insurance policies satisfied Texas regulations, correct?

2  A.  Correct.

3  Q.  Then you talked about IRMA.  You have not determined

4  whether IRMA actually contributes to revenue at Chubb by

5  ensuring that quoted and issued policies are compliant,

6  right?

7  A.  Correct.

8  Q.  Then there was CUW inventory management.  That was

9  another application you walked us through, correct?

10  A.  Yes.

11  Q.  It uses many different technologies, right,

12  Mr. Whitener?

13  A.  If you're referring to CUW, that is correct.

14  Q.  And you cannot say anything as to whether the inclusion

15  of Blaze in CUW-IM actually accelerated inventory

16  management at Chubb, correct?

17  A.  Correct.

18      THE COURT:  Ms. Godesky, are you still at a

19  convenient breaking point?

20      MS. GODESKY:  Sure.

21      THE COURT:  Or --

22      MS. GODESKY:  Yeah, it's fine.  Thank you.

23      THE COURT:  All right.  Members of the Jury,

24  we're take our lunchtime recess.  Be back in the courtroom

25  at one o'clock.

**1594**

1  Q.  So before the lunch break, we were going through all
2  the different computer applications at Chubb that used
3  Blaze that you talked about with Mr. Hinderaker, right?
4  A.  Agreed.
5  Q.  And the next one I want to talk about is Brokersite.
6  That is another application that you talked about during
7  direct, correct?
8  A.  Correct.
9  Q.  And you were in court yesterday, and you've heard
10  Mr. Mirolyuz at Chubb testify that Brokersite does not use
11  Blaze Advisor, correct?
12  A.  Correct.
13  Q.  And you, of course, never worked at Chubb, so you don't
14  have a basis to dispute that with your personal knowledge,
15  right?
16  A.  Correct.
17  Q.  CIS Claims is another application that you talked about
18  with Mr. Hinderaker, right?
19  A.  Correct.
20  Q.  And even though it's called claims, it is not a claims
21  handling application, right?
22  A.  Correct.
23  Q.  And you cannot say whether the use of CIS Claims
24  contributed to Chubb's revenue, correct?
25  A.  I disagree.

**1595**

1  Q.  Let's look at your deposition at page 211.
2  A.  Bear with me.
3  Q.  Sure.
4  A.  I did better this time.
5  Q.  Your deposition at page 211, line 7.  "Question:  Do
6  you know whether that use of CIS Claims in fact contributes
7  to Federal's revenue?
8       "Answer:  I have done no quantification research,
9  nor have I talked with anyone at Federal, Chubb, ACE
10  Limited."
11       That was your answer at your deposition, correct,
12  Mr. Whitener?
13  A.  Correct.
14  Q.  Now, Blaze is not the only decision management software
15  out there.  Alternatives do exist, correct?
16  A.  Correct.
17  Q.  And your report identifies ten of them, right?
18  A.  Approximately, yes.
19  Q.  And those alternative decision management software
20  products could have been used in the computer applications
21  at Chubb that we've all been discussing in this trial,
22  right?
23  A.  Yes.  I'm sorry.  Yes.
24  Q.  But in forming your opinions in this case, you did not
25  look at all at those other decision management softwares

**1596**

1  and analyze how they compare to Blaze, correct?
2  A.  Correct.
3  Q.  Now, during your questioning with Mr. Hinderaker, you
4  talked a bit about other insurance companies making use of
5  rules software, right?
6  A.  I'm sorry.  Say that again.
7  Q.  During your direct examination, you talked a little bit
8  about other insurance companies using Blaze.
9  A.  Yes.
10  Q.  And if we could pull up, Vanessa, slide 28 from
11  Mr. Whitener's PowerPoint.
12       This is one of those slides, right, Mr. Whitener?
13  A.  It is.
14  Q.  And Mr. Hinderaker showed you this slide during your
15  direct and he said, you know, this is internal
16  communications at Chubb, right?
17  A.  Yes.
18  Q.  He made a point of saying, this was Chubb reporting to
19  themselves about use of Blaze at other companies, right?
20  A.  Yes.
21  Q.  And do you see at the bottom of this document, there's
22  a source listed?
23  A.  It is.
24  Q.  Who is the source?
25  A.  Fair Isaac.

**1597**

1  Q.  And if you go to slide 28, Vanessa, the next slide or
2  29.
3       There's the continued discussion of how Blaze's
4  apparently being used in the P&C industry, right?
5  A.  Yes.
6  Q.  And what's the source on that slide?
7  A.  Fair Isaac.
8  Q.  And as we discussed earlier, before you rendered your
9  expert opinions in this case about the value of Blaze to
10  Chubb, you didn't conduct a study of how all these
11  insurance companies are using Blaze as compared to having
12  software engineers code.
13  A.  That's correct.
14  Q.  And you heard, sitting through this trial, that Chubb
15  used decision management software in just one percent of
16  its 1500 computer applications before the merger, right?
17  A.  As measured on a number of applications footprint
18  basis, yes.
19  Q.  And they were using software engineers to code the
20  rules in all the other applications, right?  That's the
21  testimony.
22  A.  I believe so.
23  Q.  And the decision -- that was a decision that Chubb made
24  before the merger, even though it had an enterprise-wide
25  license to use Blaze without any limit on the number of

**1598**

1  applications, correct?
2  A.  That is my understanding.
3  Q.  That's a pretty low rate of adoption, right,
4  Mr. Whitener?  One percent?  It's pretty low.
5  A.  Yes.
6  Q.  And then you heard from Mr. Ghislanzoni that at ACE
7  before the merger, ACE had decided to put Blaze into one
8  computer application and then this ODM decision management
9  program in about three applications.  You heard him testify
10  about that, right?
11  A.  I heard the testimony.
12  Q.  So at ACE, another giant insurance company, they're
13  only using rules software in less than one percent of their
14  applications, right?
15  A.  Sounds right.
16  Q.  And you don't have any basis to disagree with
17  Mr. Ghislanzoni's testimony that ACE didn't see a benefit
18  to using rules software more widely, correct?
19  A.  No.
20  Q.  And then you also heard Mr. Ghislanzoni explain that at
21  the combined ACE/Chubb entity today, rules software is
22  still used in only one percent of all of their computer
23  applications, right?
24  A.  Yes.
25  Q.  And you have no basis to disagree with that, correct?

**1599**

1  A.  None.
2  Q.  And unlike Mr. Ghislanzoni and Mr. Pandey, as part of
3  your day-to-day work, you've never spent time analyzing the
4  efficiencies and functionality of rules software versus
5  coding by software engineers, correct?
6  A.  In terms of the current technology, that is correct.
7  Q.  Now at the end of your examination, we all saw this
8  final summary slide, right, and the final summary slide was
9  Blaze brought value to Chubb.
10      That's the summary of your opinion, correct?
11  A.  I believe I added the word "significant" but yes.
12  Q.  Significant value.  That's the summary of your opinion,
13  right?
14  A.  Correct.
15  Q.  But you do not know whether Blaze actually contributed
16  to any increase in revenue or profit at Chubb, correct?
17  A.  I did -- correct.  I did not measure anything.
18  Q.  Thank you.
19      I have no further questions.
20  A.  Thank you.
21      THE COURT:  Mr. Hinderaker, redirect.
22      MR. HINDERAKER:  Thank you.
23           REDIRECT EXAMINATION
24  BY MR. HINDERAKER:
25  Q.  Mr. Whitener, my purpose is to talk about the analysis

**1600**

1  that -- the analysis that you did make as opposed to the
2  analysis that you did not make.  So let me focus on the
3  analysis that you did make.
4      There were at various times in your answers to
5  the last set of questions where you would say mostly
6  correct, partially correct, yes, but, correct, but.
7      What was the qualification that you were trying
8  to express?
9      MS. GODESKY:  Objection.
10      THE COURT:  Overruled.
11      THE WITNESS:  As I mentioned earlier, in my
12  underwriting thought process, there's a difference between
13  what something does and how much something does something.
14  So when you ask me does it make things faster?  Yes.  I've
15  been at this for a couple of decades.  Okay.  Maybe more
16  than a couple decades.
17      And the pursuit of responding to requests for new
18  business and improving that response timing and -- has been
19  a key strategy for 44 years.  In fact, I was reading
20  Property Casualty 360 about three weeks ago, and another
21  company whose name escapes me, property casualty insurance
22  company, licensed another software package and in their
23  reasoning they quoted speed.
24      So that's an important thing.  And when I go to
25  ease of doing business, I can say the same things.  These

**1601**

1  are, these are value points that the property casualty
2  insurance company pursues and pursues intentionally.  How
3  much they get in terms of deployment of an application,
4  they don't measure it.  I haven't measured it.
5      And in all of the documentation I was provided,
6  there was nothing that could speak to any of that.
7  BY MR. HINDERAKER:
8  Q.  And, for example, well I'll go back to that, but I want
9  to, I guess, stay on this examination for a moment, this
10  line.
11      And let me bring you to -- you were asked about
12  some stuff on your deposition at page 135.  And if you can
13  find page 135, please.
14      MS. GODESKY:  Objection.
15      THE COURT:  Sustained.
16  BY MR. HINDERAKER:
17  Q.  I'd like to -- Ms. Godesky asked you to look at
18  page 135, line 22, to 136, line 6.  And she read -- I'd
19  like to read the rest of the testimony.
20      MS. GODESKY:  Objection.
21      THE COURT:  Sustained.  You can ask him the
22  questions.
23      MR. HINDERAKER:  Okay.
24  BY MR. HINDERAKER:
25  Q.  It's, as you just said, you performed no quantitative

**1602**

1  analysis, correct?

2  A.  Correct.

3          THE COURT:  Mr. -- excuse me a second.

4          Mr. Whitener, you cannot be reading from your

5  deposition right now.

6          THE WITNESS:  I'm sorry.  I'm sorry.

7  BY MR. HINDERAKER:

8  Q.  You -- in your report and in your opinions, those are

9  drawn from, as you started to describe, and in the process

10  of drawing your opinions, you did not have the information

11  available to quantify, measure, the extent of which Blaze

12  Advisor was contributing to the value of selling

13  software -- to the value of selling insurance at the

14  defendants.

15          MS. GODESKY:  Objection.  Leading.

16          THE COURT:  Overruled.

17          THE WITNESS:  That is correct.

18  BY MR. HINDERAKER:

19  Q.  You were forthright about that in your deposition as

20  well.

21  A.  To the best of my ability.

22  Q.  Now, your -- I'll just represent to you, and it's in

23  the book here if you want to check it out.  You have a

24  reply report in the defendants' binder.  And that reply

25  report is May 31, 2019.

**1603**

1  A.  Yes.

2  Q.  I'll represent to you that -- do you recall doing a

3  supplemental report in approximately May 2020 that was

4  limited to your analysis of the rules repository?

5  A.  Yes.

6  Q.  Okay.  And then of course your original report was, was

7  dated April 19, 2019.

8          So the fact -- counsel asked you whether you

9  reviewed Mr. Ghislanzoni's deposition before you wrote

10  these reports.

11  A.  That is correct.  I was asked that.

12  Q.  You were.  And given that his deposition was taken

13  after all -- after these two reports were written, it would

14  have been impossible for you to do that, correct?

15  A.  It would have been an exceedingly large challenge

16  bordering on the impossible.

17  Q.  Yes.  Well, you can't go into the future.

18          The deposition of Mr. Schreiber, Ms. Theberge,

19  Ms. Garnes taken in April of 2020, you would not have had

20  the opportunity to review those either before your reports

21  were written in 2019.

22  A.  That is also correct.

23  Q.  You were asked some questions about hard coding.  I

24  don't need to go over that again, but in your analysis of

25  the defendants case specific facts with respect to their

**1604**

1  use of Blaze Advisor, did they report that they were able

2  to change rules, get products to market faster, because

3  rather than spending months doing coding, they could modify

4  the rules and days?

5          MS. GODESKY:  Objection.  Leading.

6          THE COURT:  Sustained.

7  BY MR. HINDERAKER:

8  Q.  What did you see in terms of the speed of being able to

9  modify rules from the defendants' documents?

10  A.  There are several places in the defendant documents

11  where the defendant documents give a case study from an

12  implementation?  DecisionPoint is one.  Profitability

13  Indicator is another.  I believe Premium Booking is

14  another, but that's less of a concrete memory.

15          In those, there are -- pardon me -- there are

16  statements about the reduction in time to modify rules from

17  three to four months down to a few days, three to

18  four days.

19  Q.  You were asked a question about Brokersite.  Your

20  understanding that Brokersite used Blaze Advisor is based

21  on what?

22  A.  The documents I referenced in that slide at the bottom

23  as my sources from the defendant documents.

24  Q.  From the defendant documents.  Okay.

25          Finally, Mr. Whitener, understanding that you

**1605**

1  are, understanding that you are not an IT professional but

2  instead an insurance expert, why are you so confident in

3  your opinion that Blaze Advisor added significant value to

4  the defendants and their selling of insurance?

5  A.  With my underwriting background, the fact that I have

6  been very heavily involved in the execution of the quote,

7  bind, book and issue process, the fact that I have been so

8  heavily involved at the corporate underwriting function,

9  including several instances where I managed the selection

10  of vendors for policy administration systems and billing

11  systems for companies, the fact that I've been heavily

12  involved in the primary setting for technologists and

13  making sure that technologists receive from the business

14  units for which I worked the requirements and documentation

15  that they needed to increase their probability of success,

16  I have seen the value of automating underwriting and

17  compliance and statutory rules through use of technology.

18  I'm very, very confident in that.

19  Q.  Thank you for your time.

20  A.  You are welcome.

21          THE COURT:  Ms. Godesky, any recross?

22          MS. GODESKY:  No further questions.  Thank you.

23          THE COURT:  All right.  Mr. Whitener, you may

24  step down.  Thank you.

25          (Witness excused.)

**1606**

1    THE COURT: Mr. Hinderaker, are you ready to call
2    your next witness.
3    MR. HINDERAKER: I am, Your Honor. William Waid.
4    THE COURT: Mr. Waid, come on up here, please.
5    If you would raise your right hand.
6    N. WILLIAM PAUL WAID,
7    called on behalf of the plaintiff, was duly sworn, was
8    examined and testified as follows:
9    THE WITNESS: I do.
10   THE COURT: Go ahead and sit down and make sure
11   you are speaking into a turned-on microphone and state your
12   full name for the record.
13   THE WITNESS: N. William Paul Waid.
14   DIRECT EXAMINATION
15   BY MR. HINDERAKER:
16   Q. I think I'm getting myself organized. Okay.
17   Good afternoon.
18   A. Good afternoon.
19   Q. Mr. Waid, where do you, where do you reside?
20   A. Spring City, Pennsylvania.
21   Q. And before that, where have you lived?
22   A. I grew up in Oley, Pennsylvania, on a 500-acre dairy
23   farm. After college, I moved to Boston, Massachusetts, for
24   12 years, after which I moved back to Pennsylvania because
25   my parents were getting a little bit older, and I needed to

**1607**

1    take care of them.
2    Q. Is that for us, for our reference, is that in the
3    Philadelphia area?
4    A. It's generally outside of Philadelphia. Pretty far
5    out, about 45 minutes outside.
6    Q. I'd like to understand your entrance into the field of
7    technology, and perhaps we can start that by letting the
8    jury understand your educational background and go from
9    there.
10   A. Okay.
11   Q. So you went to college where?
12   A. Lehigh University for civil engineering.
13   Q. And then how did you get into technology from civil
14   engineering?
15   A. It was quite by accident. I really couldn't afford to
16   go to Lehigh, so I had to take overloaded courses, meaning
17   I took extra course loads. It afforded me the opportunity
18   as a freshman to take a CAD cam, GKS programming and an
19   analytics course. It was a junior level course.
20   And the professor took note of this and actually
21   offered me a job that summer working on a project for the
22   National Science Foundation.
23   Q. And what was that project?
24   A. The project was actually called the Bridge Fatigue
25   Investigator. It's actually the early use of artificial

**1608**

1    intelligence, more specifically a technique called Expert
2    Systems.
3    And the project was to take the world renowned
4    leader in bridge fatigue investigation, put what they know
5    inside a computer so that anybody inspecting a bridge could
6    take the knowledge of that expert and apply it. And that
7    was my first introduction to artificial intelligence.
8    Q. Maybe we should have a laymen's understanding of what
9    artificial intelligence is.
10   A. That's a bit of a buzz word today.
11   It actually started back in the 60s as a research
12   project. In the late 80s, when I got involved in it, it
13   was just starting to come into the compute world. Compute
14   was a little light back then. The principal of artificial
15   intelligence is really to get the computer to act like a
16   human, to actually be able to have the computer take the
17   same knowledge or experience of a human or make the
18   decisions of a human.
19   Expert System is just one of many techniques that
20   can be used. It's been around for a long time. And it's
21   really predicated on sort of what's called an inference
22   engine.
23   Q. All right. So that's college introduction to AI and
24   Expert Systems.
25   After college how did you continue on?

**1609**

1    A. Yeah, so the project sort of give me an opportunity to
2    see, you know, a lot of value could come from applying just
3    technology. Here we're actually talking about bridge
4    fatigue investigation and repairing bridges. It was more
5    interesting to me than going down the path of building
6    high-rises or doing my own bridge design.
7    So I pursued through a connection from the same
8    professor an attorney at Stone & Webster, the division of
9    Stone -- they actually designed nuclear power plants, but
10   the division I worked for was called the Advanced Systems
11   Development Services Group.
12   Q. And how did that, what did that do and how did that
13   bear on your continuing work and experience into this kind
14   of technology?
15   A. They were a consulting firm. We actually built
16   solutions for clients. I worked on fire damage control in
17   nuclear submarines. We did a simulation of coal switching
18   at Ontario Hydro, like $25 billion coal contracts, and they
19   had to decide what coal to actually run through the plant.
20   We simulated that. We also built Barbie Doll
21   packaging, for F150 steering knuckle design, Cessna
22   aircraft leading spar design, all automated design
23   activities.
24   Q. Using this AI and Expert Systems?
25   A. A variety of techniques beyond Expert Systems, neural

1630

1   rule by its very nature and by its label refers to rules
2   that the business actually control or own.
3        So they're the ones that come up with it.
4   They're the ones that have to actually get it into some
5   kind of operating function.  They're the ones that have to
6   ensure that it's separating the way they intend it to be.
7   They're the ones who have to make sure it's a compliant
8   rule.
9        And so there's this connectivity between the
10  business having a care and ownership of that versus not.
11  I'll give you an example.
12       You actually want to convert a date of birth to
13  an age.  That actually constitutes a rule, not something a
14  business person is generally interested in.
15  Q.  Then now let's talk about what a business rule is in
16  contrast to that.
17  A.  They can be quite varied.  But by their pure
18  definition, they are rules that the business actually cares
19  to use to operate their business.  Very frequently those
20  rules change.  They change from pressures from a variety of
21  reasons.
22       One is compliance.  Another one would be new
23  product introduction.  Some of it might be competitive
24  pressure that they have to adjust against.  There's a lot
25  of reasons why, but in the core systems of banks and

1631

1   insurance, those core rules actually become the
2   representation of how they do business.
3   Q.  So if we were going to try to understand the
4   significance within a company, I take it that we should be
5   asking about the business rules as opposed to their rules.
6   A.  Yes.
7   Q.  Let me change topics again.  Well, let me -- yeah, let
8   me do this first.
9        If we could get J1, please, the license
10  agreement.  There we go.  Thank you.
11       So we have on the screen, and you have the book
12  there, Mr. Waid, J1, the software license and maintenance
13  agreement between Chubb & Son, a division, and FICO, right?
14       I'd like to know, at this stage what was your
15  personal role with respect to, with respect to this license
16  agreement?
17  A.  So 2006, this would have been when the team was growing
18  to become international.  So I had international remit for
19  Blaze and other related tools products.
20       So I would have actually been involved in any
21  sort of core decisions made around pricing or material
22  changes in our contract terms or things of that nature.
23  They would have had to come to me for approval.
24  Q.  So your involvement at the management level?
25  A.  Yes.

1632

1   Q.  And in fact were you the person who gave final approval
2   for the pricing of this license agreement?
3   A.  I don't recall that, but it would have been me, yes.
4   Q.  Okay.  And would it have been you that approved the
5   pricing for each of the amendments, Amendment one and
6   Amendment two?
7   A.  It would have required my approval, yes.
8   Q.  In 2006, and going back to the discussion we just had
9   about the -- we can take this down now for a little bit.
10       Going back to the discussion that we had about
11  the business model and the software industry and the
12  investment before turning profit, in 2006, that time frame,
13  what were FICO's discounting practices regarding Blaze
14  Advisor?
15  A.  I would use the word "aggressive."
16  Q.  Okay.  Can you build on that for us?
17  A.  Look.  2002 we just get this thing off the ground.
18  2003, there's three of us kicking around into 2004.  We're
19  look to go secure enough business to get references in the
20  industry.
21       Once you get those references and clients see
22  what you are able to accomplish with other clients, that
23  builds on itself, and you start to build a base of more
24  sales, both with the same clients or with new clients.
25       So it's not uncommon early in software to be

1633

1   quite aggressive by discounting very low sometimes in order
2   to secure those reference accounts and secure that initial
3   business.
4   Q.  For the prospect of future business?
5   A.  Always for the prospect of future business, yes.
6   Q.  And when we look at the license agreement, we see that
7   Amendment Two was signed at the end of December of 2006.
8   A.  Yes.
9   Q.  Did that, does that timing bear on FICO motivations
10  with this product for discounting?
11  A.  At this time it did.
12  Q.  Why?
13  A.  It was -- it was our general practice to incent
14  customers to move to larger deals as quickly as possible.
15  It was our common practice at the time, if they bought an
16  initial license, to communicate to them in some form,
17  either written or go back and try to convince them, hey, if
18  you upgrade your license or if you buy more, I will credit
19  back what you've already bought 100 percent, just so you
20  buy more.
21       Those practices were quite common at that time
22  frame, yes.
23  Q.  Okay.  Can you contrast that to 2016?
24  A.  Very different.
25  Q.  And how and why?

**1634**

1   A.   Our pricing model -- well, pricing model always been
2   our pricing model, but our pricing practices around
3   discount around the 2010-11, time frame, we started
4   becoming more stringent in how and where we actually
5   offered discounts.   That's reflected in the business.
6          We also changed other practices too.   Like we
7   began moving away from perpetual licenses.   The market was
8   moving away.   We were moving away.   We were moving towards
9   term licenses, which establish a reoccurring revenue base
10   for the product.
11   Q.   You mentioned standard pricing guidelines did not
12   change from that time frame.
13   A.   The pricing and how we priced did not change, no.   It's
14   the same pricing model that we had all the way back in
15   2003.
16   Q.   But discounting has changed?
17   A.   Yes.
18   Q.   And in terms of market acceptance to FICO's pricing
19   without the aggressive discounting, can you describe that?
20   A.   Yeah.   We began in the 2000 -- I said 2010, 2011 time
21   frame of sort of pulling back on the level of discounts and
22   by 2015 into '16, you know, relatively strong flat sales.
23   Going into '17 we had even more sales, 20 percent by my
24   last look of that.
25          So it was, it was a strong business at that point

**1635**

1   in time.
2   Q.   Without aggressive discount?
3   A.   Without aggressive discounting, yes.
4   Q.   If we could go back to the license agreement, please.
5          You see at the top of the, at the top of the
6   license agreement in the first paragraph, if we could open
7   that up.
8   A.   Yes.
9   Q.   The software license and maintenance agreement is
10   entered into as of June 30, 2006, between Fair Isaac
11   Corporation and Chubb & Son, a division of Federal, client.
12          From your role on the business of FICO, but
13   specifically in the licensing of Blaze Advisor, what's the
14   significance, what's the business significance of defining
15   who the client is?
16   A.   It defines who you are doing business with.   It defines
17   who you are licensing the software to.
18   Q.   Okay.   And does it also -- well, a license agreement
19   is, of course, a two-way agreement, licensor/licensee.
20   A.   Yes.
21   Q.   And FICO as the licensor is bound by the terms of the
22   agreement.
23   A.   Yes.
24   Q.   And then on the licensee side, it's the client that's
25   bound by the terms of the agreement.

**1636**

1   A.   Yes, the client is bound to all of the terms of the
2   agreement.
3   Q.   And the -- we've seen already that in the definition
4   of -- in Amendment One and Amendment Two, the definition of
5   "client" did not change.
6          Were you part of any discussions during that time
7   frame of Chubb & Son wanting to sign -- of any discussion
8   about the client being anybody else but Chubb & Son?
9   A.   No.
10   Q.   Going back to the basic, to the base agreement, we look
11   at the license grant in paragraph 2.1.   And there we see,
12   just as you said, the licenses is a, "hereby grants to
13   client."
14          But I'm also interested in asking your, the
15   business reasons for the fact that the license agreement
16   says it's non-transferrable, nonexclusive and a limited
17   license.
18   A.   Yeah, so first of all, software licenses are a
19   construct whereby ownership stays with FICO.   It's our IPR
20   software.   The license just gives them a right to use, and
21   there's specific conditions under that right to use.
22          This begins to outline the fact that this
23   agreement is with the client, and they cannot transfer this
24   agreement to anybody else, and it is nonexclusive, meaning
25   it is not just for them, and that there are limits framed

**1637**

1   within this agreement that they must adhere to.
2   Q.   And what's the business thinking behind the phrase "for
3   internal business purposes only"?
4   A.   Yeah.   So this is an additional protection that we want
5   to make sure that the use of the license, the right to use
6   the license, is for the individual that we're licensing to,
7   in this case the client, and that it is for their internal
8   business purposes, and they can't extend or reach that use
9   of the license outside of the use just for that client.
10   Q.   Let's turn to 3.1.   This is called License
11   Restrictions.   There's a number of them, but overall,
12   what's the commercial business reason for FICO to put
13   restrictions into the license?
14   A.   They're all there to make sure that the software is
15   used in accordance with very specific constraints or
16   limitations that we place on that license grant.   There's
17   various reasons for them from a business perspective, but
18   all of it is to protect a very valuable piece of IP.
19   Q.   Being Blaze Advisor?
20   A.   In this case Blaze Advisor.
21   Q.   If we go into 3.1, we see the small Roman iv.   So it.
22   Begins, "Client represents and warrants that it and its
23   employees shall not," and then Roman, small Roman iv,
24   "disclose the Fair Isaac products to or permit use or
25   access of the Fair Isaac products by any third party or any

**1638**

1  individuals other than the employees of client."

2        So let me stop at that point with "any third

3  party."

4        Why does FICO care that the Blaze Advisor

5  software cannot be disclosed used or accessed by any third

6  party?

7  A.  There's a number of reasons, two primary business

8  reasons.  We like to know who is using our software at all

9  times.  That third party could be a competitor or that

10 third party could be leaking confidential information about

11 the use of our software to a competitor.  It has happened

12 in the past, so we want very tight controls on who actually

13 gets access to that software.

14       Another business reason is also, there is a bit

15 of an integrity issue in the business here.  Third parties

16 purport themselves to be Blaze experts all the time, and we

17 do not want third parties getting access to Blaze software

18 unless we've at least had a conversation with the client

19 about that third party and any representations that they've

20 made.

21 Q.  Well then let's go to, we'll come back to 3.1, but then

22 let's go to 3.6.  And here we have a provision, Use By

23 Third party.

24       Is this an instance of what you just described

25 where the client wishes to have a third party, here ACS

**1639**

1  Commercial Solutions, have access and use of Blaze Advisor

2  on behalf of the client?

3  A.  Yes.  It looks like a negotiated term whereby

4  third-party use was granted in a very specific case of ACS.

5  That conversation must have occurred.  And furthermore,

6  I'll point out here that this section holds ACS to the

7  obligations of the license grant and also the client to

8  ACS's responsibility to the license grant, which is what I

9  didn't mention yet another thing we're concerned about.

10       If the third party is going to use it, we want to

11 make sure that they're aware and they're beholding to the

12 contract terms of the license grant.

13 Q.  And you also bound the client to be responsible should

14 ACS not abide by it.

15 A.  Absolutely, because it's arm's reach for us, so yes.

16 Q.  And then the last sentence is clear saying what?

17 A.  This is basically saying you have a, you have a right

18 to use it with ACS but nobody else unless you actually come

19 back and ask for our consent.

20 Q.  You mentioned just by looking at it that this was a

21 negotiated term.  How did you, how were you able to tell

22 that?

23 A.  Well, it's easy because we don't allow ACS to use our

24 software in every one of our contracts.

25 Q.  All right.  Okay.  Dumb question.

**1640**

1        Let's go back to 3.1(iv,) small Roman four,

2  "Client represents and warrants that it and its employees

3  shall not," and we read about the disclosed.  And then it

4  goes on, "permit use or access by any third party or by any

5  individual other than the employees of client."

6        From the business point of view, why is that

7  further restriction limiting, further restriction saying

8  only employees of the client?

9  A.  Well, it's very similar to the third party.  Our

10 agreement is with the client, and they are responsible for

11 making sure that the terms are agreed to and that flows

12 down through the employees of the client.  If they end up

13 giving it to somebody who is not an employee, where is the

14 terms and conditions being enforced?

15 Q.  Your further understanding of the license agreement,

16 I'd like to go to what's called Exhibit A.

17 A.  Exhibit A.

18 Q.  Exhibit A of the base document.  It's J001-011 on the,

19 our copy.

20 A.  Exhibit A of the contract.

21 Q.  Yes.  Yes.

22 A.  I am there.

23 Q.  And this Exhibit A is called Pricing and Payment.

24       And I want to ask you to explain for us some of

25 the things that are on here, including and starting with

**1641**

1  Blaze Advisor Development.  And what is that as a product?

2  A.  Yeah.  So Blaze Advisor is actually broken down into

3  multiple licensing components.  The two primary components

4  of the licensing are around what we call our development

5  and our deployment licenses.

6        A development license is in the Blaze world are

7  licenses that are granted and limited to the purposes of

8  writing rules, connecting your Blaze Advisor application to

9  your systems and data and actually generating the

10 deployment that gets eventually put into the servers of the

11 client.

12       It's predominantly a technical tool, but the

13 technical tool also generates what we call rule maintenance

14 application, which is where business users can use that.

15 So it's the, it's the primary licensing component for that,

16 that development, authoring, connectivity and integration

17 work.

18 Q.  And at the outset at the original agreement in June for

19 use up to five seats, and then it goes on, "to be used

20 solely in connection with the named application."  We'll

21 get to that named application component in a bit, but what

22 does it mean for up to five seats?

23 A.  Yeah.  The, the development license is actually

24 associated with a portion of the software that actually

25 installs on a personal computer or a workstation.

**1642**

1  Developers or programmers that use Blaze Advisor would have

2  that installed on their development machine where they do

3  their programming and where they do their work.  And this

4  is saying, you know, five of them.

5  Q.  Okay.  And I'm going to skip over platform for a moment

6  because it's both in development and deployment.  Let's

7  distinguish development so that we can under what

8  deployment is.

9  A.  Yeah, so the deployment license is actually referring

10  to, when you have authored your rules and tested them that

11  they are what you want them to be, you have to take those.

12        Rules and push them out into a server or some

13  processing unit somewhere.  And there's actually various

14  ways you can do that, technical ways you can do that, not

15  really relevant here, but the license to do that is that

16  run time piece that allows it to eventually go to

17  production and execute or operate, run those rules.

18  Q.  Okay.  And then in terms of the scope and quantity,

19  scope and quantity for development is five seats.  Scope

20  and quantity for deployment is named application.

21  A.  Correct.

22  Q.  And that, of course, is defined below as the CSI

23  Express.

24        Now going back to product, there's the reference

25  here platform, Java and .NET.  Would you explain what those

**1643**

1  are?

2  A.  Yeah, they're essentially programming languages.

3  They're technology that programmers would use.  If you

4  remember, I said you could deploy.  You could actually pull

5  in the data that the client has, and you can deploy to the

6  servers.  If that data is or that server is in the .NET

7  platform or technology, you would need that particular

8  license.  If it was based on the Java technology, you would

9  need that license.

10        So -- and they are separate licenses, and in this

11  case this order form has both.

12  Q.  Okay.  And in terms of the standard pricing of, you're

13  using a FICO pricing methodology that you've been using

14  over the years, decades now, does the number of platforms

15  that are licensed impact the price?

16  A.  It does.

17  Q.  We will catch up with that issue later on, but just to

18  make that note.

19        Then the limitation --

20        We'll go down, if you will, Mr. Mayleben,

21  Definition of Named Application.

22        And I think we've seen the definition before, but

23  in terms of the permission granted to use Blaze Advisor,

24  what is the limitation of scope in this agreement?

25  A.  It's described as the CSI Express application,

**1644**

1  parenthetically, which is Chubb's specialty insurance

2  underwriting and automated policy renewal application.  And

3  it's supporting systems applications excluding claims.

4  Q.  And in a general nomenclature, is this called a named

5  application license?

6  A.  It is what we call a named application license, yes.

7  Q.  Well, let's go to Amendment Two -- or I'm sorry --

8  Amendment One.

9  A.  I'm there.

10  Q.  Okay.  Our product.  We have the Blaze Advisor

11  development product, Blaze Advisor deployment product.  The

12  platform is still both, Java and .NET.  And the scope

13  quantity is now, let's do development first.  For use on up

14  to ten seats to be used solely by the Chubb specialty lines

15  division.

16        And then for development, that product, scope

17  quantity, for use solely by the Chubb specialty lines

18  division.  No other limitations, i.e. seat, or named

19  application limits apply.

20        So from your business perspective point of view,

21  can you interpret that in -- just tell us what that means.

22  A.  I think you meant deployment.

23  Q.  I -- yes, I did.

24  A.  Yeah.  The fencing around our licensing in this

25  particular case is a very specific business function.  So

**1645**

1  call it specialty, specialty lines or the division of

2  specialty lines.  What it's saying is that in that division

3  and in that scope of that business type, they can use Blaze

4  Advisor for any number of applications that they wish to

5  without measure CPUs or others or limitations.

6  Q.  If it's for that division.

7  A.  For that division, yes.

8  Q.  Now when you say "they," is that the client?

9  A.  Absolutely.

10  Q.  And in your terminology this is called a divisional

11  license?

12  A.  Divisional license, yes.

13  Q.  And now let's turn to Amendment Two.

14        THE COURT:  Mr. Hinderaker, are you at a

15  convenient breaking point?

16        MR. HINDERAKER:  I surely am.

17        THE COURT:  Okay.  Members of the jury, we'll

18  take our afternoon or at least one of our afternoons

19  breaks, but I think we'll try and shorten it up if you can

20  be back in at ten minutes after 3:00.  All rise for the

21  jury.

22        (Recess taken)

23        THE COURT:  Be seated.

24  BY MR. HINDERAKER:

25  Q.  So at the break we were just going to start talking

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 1, 2023, Volume VIII

**1658**

1    And as you see -- I'll wait till it's on the
2  screen.  This is from Russ Schreiber to Natasha Fowlin, and
3  you are one of the CC recipients?
4    A.  Yes.
5    Q.  And Russ says, "Can you put 30 minutes on the calendar
6  for this group to discuss ACE's acquisition of Chubb and
7  potential licensing expansion fees?"
8        And obviously you were part of that
9  communication.
10   A.  Yes.
11   Q.  Okay.  At this point in time, did you have any
12  information about the acquisition, other than what was
13  publicly announced?
14   A.  No.
15   Q.  Nothing came, no information from Chubb & Son to you?
16   A.  No.
17   Q.  What did you understand -- well, what was your reaction
18  to -- you don't have to say what Mr. Schreiber thought, but
19  what was your reaction to him saying, "Let's discuss ACE's
20  acquisition of Chubb and potential licensing fees
21  expansion"?
22   A.  Well, I have regular calls with Russ, because he's our
23  insurance global lead, and I'm at this point in time
24  running our platform line of business.  So we speak on a
25  regular basis, and so I had become aware of the merger

**1659**

1  announcement in October.
2        And in my last conversation with him, I asked him
3  where do we sit in actually having a conversation with
4  Chubb about the impending merger.  And his answer was, we
5  don't have one.  We don't have any contact.  So I asked
6  him, I'm like let's get Mike Sawyer on the phone.  Let's
7  figure out who do we call.  We got to know somebody at
8  Chubb who can actually address this, right?
9        This is Russ's conclusion about the licensing
10  event.  It's not an unfair conclusion.  It typically
11  happens this way that there's a license event.  But the
12  purpose of this call was actually entirely about how do we
13  reach Chubb, who do we reach at Chubb, because we need some
14  information about what's coming.
15   Q.  And then did you get any information before the
16  acquisition closed?
17   A.  I did not.  I knew that Mike went back and tried a
18  bunch of his resources, but we did not have any information
19  all the way through into January.
20   Q.  All right.  So we've seen from Mr. -- let me turn your
21  attention to Exhibit 90.  And this is Mr. Carretta's
22  January 27, 2016, letter to Joseph Wayland at Chubb
23  Limited.
24        Were you aware that -- are you aware of this
25  notice of breach letter on or about its time?

**1660**

1    A.  I was.
2    Q.  Other than, other than -- I take it you -- Mr. Carretta
3  had authority to send the letter.
4    A.  He did.
5    Q.  But were you involved at all in the crafting of the
6  language of the letter?
7    A.  Not the language, no.
8    Q.  So we'll leave that to Mr. Carretta's testimony about
9  that.
10       And then if you would turn to Exhibit Number 91.
11  And now it's Andrew Hopp, Deputy General Counsel,
12  responding to Mr. Carretta, February 17, 2016.  You were
13  aware of this response, were you?
14   A.  Yes.
15   Q.  And did you read this response from Mr. Hopp?
16   A.  Yes.
17   Q.  What was your reaction to what he's saying?
18   A.  There were a couple.  The first one was, he sort of
19  missed the point that there was an event that needed our
20  consent.
21   Q.  Okay.  Agreed.  And the second one was what?
22   A.  He, he made a reference to, that the client remained
23  the same and that that was sufficient, which confused me.
24   Q.  Okay.  And you say in the second paragraph, he says,
25  "Our initial findings indicate that the applications that

**1661**

1  have been utilizing the Blaze Advisor software since 2006
2  are currently running in the exact same fashion as prior to
3  the merger transaction."
4        Did that have any significance to you?
5    A.  It reassured me that he was following the contract in
6  that he was, during this period, before consent was given,
7  he was locking it down.  I'm not sure how convinced I was,
8  but it was reassuring.
9    Q.  And he also references that his IT people are in the
10  process of gathering information.  Let's stay in or around
11  this time frame of February.  Were you the -- did you
12  receive any additional, any information -- let me back up.
13       Before the letter from Mr. Carretta went out, you
14  said you had no information from Chubb & Son regarding the
15  acquisition.
16   A.  That's correct.
17   Q.  And in a reasonable time frame after February 17th, did
18  you on the business side, receive any information regarding
19  any more information that wasn't in this letter from
20  Mr. Hopp?
21   A.  No.
22   Q.  And then Mr. Carretta responded on February 22nd, and
23  we've heard his testimony.
24       And were you on the business side with respect to
25  the working with -- the authority for Mr. Carretta to send

**1662**

1  Exhibit 92 out?  Did you have any?

2  A.  I'm sorry.

3  Q.  I'm sorry.  I was waiting for an answer, but you were

4  waiting for a question.

5       You okayed Mr. Carretta to send this letter out?

6  A.  Yes, I agreed.

7  Q.  All right.  I was going to ask you something about

8  this.

9       And the Carretta, the two Carretta letters are,

10  at the conclusion, encouraging business discussions with

11  Chubb & Son.  Did you share that desire?

12  A.  Absolutely.  Ten years of wonderful relationship with

13  Chubb, and they're our first foray into commercial and

14  specialty lines insurance.  They were a great reference.

15  They spoke at FICO World.  They took reference calls for

16  clients on new sales all the time, and they were great

17  people too.  They were, they were good to work with.

18  Q.  So then let's move forward to Exhibit 94.  You were

19  aware of -- the communication of course is from Tamra

20  Pawloski to Mike Sawyer, carbon copy to Russ Schreiber; and

21  then the second page of the document has a proposal

22  February 25, 2016, sent to FICO.

23       Were you aware of this response from Chubb & Son

24  at the time?

25  A.  Yes, it was sent to me.

**1663**

1  Q.  Okay.  And -- well, what was your reaction and reading

2  of it?

3  A.  It's what I would call a non-starter.  That basically

4  means it cannot be accepted on its face value.

5  Q.  Why do you say that?  And give us the details for that.

6  A.  There's a number of reasons why, but let me start with

7  the most egregious one of them, which is this statement

8  here that the applications listed below, "That currently

9  utilize Blaze Advisor software, these are the same

10  applications using the software both prior to and after the

11  merger.  Under the above proposal, Chubb shall have the

12  right to change the applications utilizing Blaze software

13  at any time at its sole discretion without FICO's concept

14  so long as the named applications do not exceed 15," the

15  amount of 15.

16       We grant licenses.  Our clients don't grant

17  themselves licenses.  That's a core tenet of our license

18  agreement.  Besides that, fundamentally there's no

19  governance on that statement.  They could call anything,

20  you know, an application and say that's going here from

21  there to here, right.

22       There's no definition of it.  There's no common

23  understanding of it.  That alone completely threw the

24  proposal out of question.

25  Q.  Okay.  Did you draw a judgment whether it was a good

**1664**

1  faith or bad faith proposal?

2  A.  My impression was, this was a bad faith proposal.

3  Q.  For the reasons you said or for any additional ones?

4  A.  For the reasons I just said.

5  Q.  As a consequence of receiving this proposal, did you

6  have any -- was there any reason to doubt that Blaze

7  Advisor would be used in the new larger organization now

8  called Chubb Limited now, the 30 plus billion dollar

9  organization?

10  A.  No.  The letter itself is very clear.  They want the

11  right to use the 15 applications and change them however

12  they want, whenever they want.  So it's clear that they're

13  talking about the 15 to begin with, but they're talking

14  about open door policy for anything in the future.

15  Q.  In any single Blaze Advisor application, is it possible

16  to change the functionality within that application to

17  service more business?

18  A.  The intention of the license definition and grant is

19  no.

20  Q.  Under the proposal of February 25, 2016, what's your

21  interpretation?

22  A.  That's exactly what she's asking to do.

23  Q.  If you would go to Exhibit 227.  And we see this is a

24  Chubb Corporation annual report of 2005.

25  A.  Yes.

**1665**

1  Q.  And on page 22, if we go to that, we saw a similar list

2  earlier.  Here we have the list of the officers of the

3  division Chubb & Son, right?

4  A.  I'm sorry.  22 or 24?

5  Q.  Yeah, I'm on page 20 -- well, the Bates number, the

6  Exhibit Number is 0227-024.

7  A.  I'm there now.

8  Q.  Okay.  So there we have the, well the whole page is

9  bigger than on the screen, and there we have the officers

10  of Chubb & Son at that point in time.

11       And then I want to go to, I want to go to page 4

12  and just use this as a reference where we see net written

13  premiums grew 2 percent to 12.3 billion, on page 4.  It

14  would be the second full paragraph.

15  A.  Can I ask you to clarify page 4 of what?  It's the

16  Bates page 4?

17  Q.  Yeah.  So page 2 of the actual document, and at the

18  bottom it says P-0227-004.

19  A.  Thank you.  Yes, I see it now.

20  Q.  Okay.  So, so that's a reference point for the 2006

21  license agreement?

22  A.  Yes.

23  Q.  And then I think we've mentioned that that was the data

24  point used in pricing of the original license agreement in

25  2006, correct?

**1666**

1  A.  It was a data point used in several pricing exercises
2  in 2006, yes.
3  Q.  Right.  Right.  But as a data point.  And then let's go
4  to 958.
5         And the front page is the Chubb Limited annual
6  report for 2016.
7  A.  Yes.
8  Q.  And let's go to page 3 of the annual report, not -- or
9  5 on the exhibit number or 3 on the report.
10  A.  Page 3.
11  Q.  Yes.
12  A.  There.
13  Q.  All right.  And here it reports that, if we can go to
14  the left-hand column, "We completed to my fellow
15  shareholders," there we go.  Right at the top, "We
16  completed the largest merger in insurance company history
17  and integrated two complementary insurance organizations,
18  ACE Limited and the Chubb Corporation, transforming
19  ourselves into the highest quality and largest
20  publicly-traded property and casualty insurance company in
21  the world."
22         And if we go to -- trying to find the reference
23  to, the reference to the size of the new organization, and
24  honestly I'm not finding it fast enough.
25         So let me simply just ask, In terms of the

**1667**

1  value-based pricing of FICO and in terms of the business
2  purposes around that second sentence in paragraph 10.8,
3  what from your business point of view is the consequence of
4  Chubb & Son going from $12 billion -- going from being a
5  part of a $12 billion organization to being a part of a 30
6  plus billion dollar organization?
7  A.  That is a very significant change in circumstances.
8  Q.  And then if we go to Exhibit 95.  And this is building
9  off of or in the same time, the next day after that
10  commercial proposal of February 25th.
11         Mr. Carretta says, "The proposal was not
12  acceptable from our business and compliance teams, and I
13  confirm it is rejected."
14  A.  Yes, that's what it says.
15  Q.  And you authorized that?
16  A.  Yes.
17  Q.  And then if we go to Exhibit 103, this is
18  Mr. Carretta's notice of termination letter, which we've
19  gone through with him, the termination being effective the
20  next day.  And you --
21         Did you authorize the sending of the termination
22  letter as well?
23  A.  Yes, I agreed.
24  Q.  I would like to now change topics, and I want to talk
25  about the, I want to talk about the, what you know about

**1668**

1  the third-party consultant called DWS Group, and then after
2  that I want to ask you questions about what you know about
3  the third-party consultant called AppCentrica.  We will
4  take them one at a time.
5         So if you would go to Exhibit 147A, please.
6  A.  I am there.
7  Q.  All right.  And if we can put that on the screen.  I
8  see the cursor, but -- he's having a little glitch.  Hang
9  on a second.  There we go.
10         From the first page, you see this is Federal
11  Insurance Company's Second Supplemental Answer to
12  Interrogatories 2, 3 and 4.
13         And let's look at interrogatory 2 on the next
14  page.
15  MS. GODESKY:  Mr. Hinderaker.
16  MR. HINDERAKER:  Yes.
17  MS. GODESKY:  I just want to confirm you are
18  showing 147A because it says 147.
19  MR. HINDERAKER:  It's on the screen.
20  MS. GODESKY:  Okay.
21  MR. HINDERAKER:  No.  147A.  All the blackout.
22  MS. GODESKY:  Sorry.
23  MR. HINDERAKER:  We seem to be having a
24  transmission issue.
25         All right.

**1669**

1         So interrogatory number 2, if we can get that a
2  little bigger, please.
3  BY MR. HINDERAKER:
4  Q.  "Identify every person, division or entity, other than
5  employees of the division Chubb & Son, to whom Federal has
6  disclosed the FICO Blaze Advisor software after June 30,
7  2006."  And then there are those subparts.
8         Now let's go down the page to the second
9  supplemental answer.  It would be page 2 of the document.
10  I think you are on page 3.
11         Well, let me read it.  You have it in your
12  binder.
13  A.  I do.  I do.
14  Q.  The second supplemental answer, "Disclosure of the
15  Blaze Advisor software was made to at least the following:
16  One, Chubb Insurance Company of Europe SE.  Two, Chubb
17  Insurance Company of Canada, including through its
18  relationship with AppCentrica and Chubb Insurance Company
19  of Australia Limited including through its relationship
20  with DWS Group."  Do you see that?
21  A.  I do.
22  Q.  And I'm going to first go, before more questions, we'll
23  go to the interrogatory number 3, if we could get there.
24         Great.  Interrogatory number 3, and you see it
25  says, "Identify every person, division or entity, other

1892

1  A. Mm-hmm.
2  Q. Okay. So in your deposition we reviewed, we reviewed
3  some interrogatory responses, and we reviewed some
4  financials. Do you recall that?
5  A. Yes.
6  Q. And I'd like you to look at Exhibit P404A, which is a
7  redacted copy. And you'll see on this --
8        Your Honor, this is not in evidence yet, so I
9  just want to slow down and check that box before we get too
10 far.
11       So this is Deposition Exhibit Number 407, which
12 was Plaintiff's Trial Exhibit 404A, which we've redacted
13 consistent with the ninth supplemental interrogatory
14 responses.
15       Mr. Harkin, do you recall seeing this at your
16 deposition?
17 A. Generally, yes.
18 Q. Okay.
19       Your Honor, I move to admit Exhibit P404A.
20       MS. JANUS: No objection.
21       THE COURT: P404A is received.
22 BY MS. KLIEBENSTEIN:
23 Q. And the title of this document is Federal Insurance
24 Company's Fifth Supplemental Answer to Plaintiff's
25 Interrogatory Number 16 and Sixth Supplemental Answer to

1893

1  Plaintiff's Interrogatory Number 17.
2        Do you see that?
3  A. I do.
4  Q. And so this was an interrogatory, a question, from FICO
5  to the defendants. Do you agree with that?
6  A. Yes.
7  Q. And the defendants provided answers to FICO, correct?
8  A. Correct.
9  Q. And in our deposition we went through these
10 interrogatories to determine where the gross written
11 premium revenue dollars, where they came from, how they
12 were collected. Do you recall that?
13 A. Yes.
14 Q. Let's just take the time to look at interrogatory
15 number 16 and number 17.
16       And I have interrogatory number 16 up on the
17 screen. And it is, it says, "For all insurance policies in
18 connection with which the Blaze Advisor software was used,
19 the gross written premium of defendants and the gross
20 written premium of each related company, including the
21 specific identification of each related company, for each
22 year from 2007 to 2012."
23       Do you agree with that?
24 A. Yes.
25 Q. And then let's go just to level set, let's go to

1894

1  page 10 where it defines interrogatory number 17.
2        And let's blow that up.
3        And interrogatory number 17 is, "For all
4  insurance policies in connection with which the Blaze
5  Advisor software was used, the gross written premium of
6  defendants and the gross written premium of each related
7  company, including the specific identification of each
8  related company, for each quarter from March 30th, 2016, to
9  date."
10       Do you agree with my reading of interrogatory
11 number 17?
12 A. Yes.
13 Q. So I wanted to spend some time confirming how the
14 numbers, if we can scroll back out and back to
15 interrogatory number 16. I just want to take the time to
16 confirm for the record how the numbers were pulled.
17       Let's go to 16. Perfect. Now move forward one
18 page, Mr. Mayleben. All right.
19       So on that page, do you see a table titled
20 DecisionPoint?
21 A. Yes.
22 Q. And in your deposition, I asked you what's your
23 understanding of the information that's --
24       MS. JANUS: Objection.
25       THE COURT: Sustained. You can ask him the

1895

1  question directly and then impeach him with the deposition,
2  if need be.
3        MS. KLIEBENSTEIN: We can go that route too.
4        At a 10,000-foot level what is your understanding
5  of the information that's contained in this first table
6  titled DecisionPoint, for DecisionPoint?
7        THE WITNESS: It is the gross written premium and
8  policy count that ran through the DecisionPoint application
9  and used the Blaze software.
10 BY MS. KLIEBENSTEIN:
11 Q. And scrolling back out and down.
12       For CSI Express, can you tell me, same question,
13 right, at a 10,000-foot level, what data is reflected in
14 that table?
15 A. It is the gross written premium and the policy count
16 for policies that ran through CSI Express and used the
17 Blaze software.
18 Q. And I'm not, I'm not sure if this is a distinction with
19 any difference or not, but in your deposition you told me
20 it is policy count, written premium associated with those
21 policies and writing companies for the policies that ran
22 through the automated renewal process and/or -- sorry.
23 Wrong one.
24       Yeah. Okay. CSI Express. I asked you the
25 second table titled CSI Express Automated Renewal and

**1896**

1    Profitability Indicator, can you tell me at a 10,000 foot
2    level what data is reflected in that label.
3           And I think this is what you just said, but I
4    just want to make sure we're on the same page.  It's the
5    policy count, written premium associated with those
6    policies and writing companies for the policies that ran
7    through the Automated Renewal Process and/or Profitability
8    Indicator for the, that used the Blaze software.
9           Are we saying the same thing?
10   A.  Yes.
11   Q.  Okay.  Perfect.
12          And let's scroll back out and go to the next page
13   and the next page and the next page.
14          And here we, at the very top, we have Premium
15   Booking.  And I'll ask you -- I'd like the table
16   highlighted.
17          I'll ask you the same question.  At a 10,000-foot
18   level, can you tell me what data is reflected in this
19   table?
20   A.  It's the policy count and gross written premium that
21   ran through the premium booking system and used the Blaze
22   software.
23   Q.  And then let's scroll out and go down to CUW-IM.
24          And I'll ask you the same question again.  At a
25   10,000-foot level, what is the data that's shown in this

**1897**

1    table?
2    A.  This is the policy count, written premium and writing
3    companies for policies that went through CUW-IM and used
4    the Blaze software.
5    Q.  And let's scroll out.
6           And the -- you have this document in front of
7    you.  We also have IRMA and the TAPS applications.  Well
8    actually wait.  Just the IRMA, just the IRMA application in
9    here.
10          If I asked you the same answer or the same
11   question, at a 10,000-foot level what data is reflected in
12   this, would you give me the same answer?
13   A.  Yes.
14   Q.  Okay.  Then let's move forward to interrogatory number
15   17.  And in interrogatory number 17 we have, again,
16   DecisionPoint, CSI Express, CUW-IM, TAPS, IRMA, and Premium
17   Booking.
18          Do you recall the location of the data center at
19   which Blaze Advisor was -- Blaze Advisor software was
20   installed that's used in these applications?
21   A.  I don't recall it, no.
22   Q.  Is it the Raleigh, North Carolina, data center?
23   A.  If that's what I said in the deposition, yeah.  I was
24   prepped for the deposition at that time.
25   Q.  And if you want to refresh your recollection, I'm on

**1898**

1    page 102 and 103 of your deposition.  I don't want to put
2    words in your mouth.
3    A.  Raleigh data center, correct.
4    Q.  Okay.  And we just covered the gathering process for
5    interrogatory number 16.  If I asked you, just so we can
6    move through this quickly, the same questions for
7    interrogatory number 17 for the applications DecisionPoint,
8    CSI Express, Premium Booking, CUW-IM, TAPS and IRMA, could
9    you tell me at a 10,000-foot level how, what that data
10   reflects?
11   A.  The data reflects the policy count and associated gross
12   written premium and writing company that ran through the
13   applications you listed and used the Blaze software.
14   Q.  For the policies that ran through the applications and
15   utilized Blaze Advisor software, correct?
16   A.  Correct.
17   Q.  Okay.  We also talked about Legacy ACE writing
18   companies in the context of interrogatory number 17.  And
19   if you could move to page 15 of your interrogatory.
20          Do you agree that the writing companies listed in
21   the middle of the left-hand column, the following are
22   Legacy ACE Writing Companies:  ACE American Insurance Co.,
23   ACE Fire Underwriters Insurance, ACE Property and Casualty,
24   Illinois Union Insurance, Indemnity Insurance Co., Pacific
25   Employers Insurance, Westchester Surplus Sidelines and WFIC

**1899**

1    for business effective 1/1/11?
2    A.  Yes.
3    Q.  I want to spend a little bit of time on the expense
4    information that we looked at in your deposition, if we
5    could.
6           So in your deposition we look at, we looked at
7    some spreadsheets that had expenses on them, like claims
8    losses, commissions and other general expenses in running a
9    business.  Do you agree with that?
10   A.  We did look at some schedules that had that information
11   on it, yes.
12   Q.  And I asked you, I asked you about the policies that we
13   saw in interrogatories number 16 and 17, and particularly
14   as it related to Premium Booking.  For the policies that we
15   saw in Exhibit 16 and 17, would you agree that it's
16   extremely difficult, it's very difficult to identify
17   expenses directly related to the policies we looked at in
18   interrogatory number 17?
19   A.  I would say we don't track or identify expenses at a
20   policy level.
21   Q.  So you would agree it's, it would be impossible,
22   actually, to identify those expenses under your
23   recordkeeping?
24   A.  Under our recordkeeping, yes.
25   Q.  And then we also went through one -- we went through a

**1900**

1  couple of spreadsheets, but one in particular was
2  Exhibit 409. And I have a copy if you need your
3  recollection refreshed.
4       And it was the, it was the expenses for the CSI
5  and CCI business units from 2016 to 2018. Do you recall
6  that?
7  A. That was our best estimate of the CSI and CCI business
8  units. We stopped tracking it at that level beginning in
9  2016.
10  Q. I've printed out a large copy for our eyes.
11  A. Thank you.
12  Q. Is this the document that we were just referring to?
13  A. Yes.
14  Q. Okay. And it's got a big number on the bottom,
15  FED017882, and it was Deposition Exhibit Number 409.
16       And can you tell me, what are the dates? What
17  are the dates on this document?
18  A. The dates are the years in question. So I guess more
19  specifically what date are you referring to?
20  Q. It spans from 2016 to 2018, correct?
21  A. Correct.
22  Q. Okay. That's what I meant.
23       And can you tell me at a 10,000-foot level, this
24  data also included data from Canada in it as well; is that
25  right?

**1901**

1  A. Yes.
2  Q. And the data in this expense spreadsheet is not
3  specific to the policies that touch Blaze Advisor that we
4  looked at in interrogatory 17; is that right?
5  A. Not directly, no.
6  Q. And would you agree with me that this report as its
7  run, it's not part of your typical reporting processes?
8  A. This is not part of our typical reporting process.
9  Q. And the data that's in here comes from the CCI and the
10  CSI segments. Is that the right word for you?
11  A. It was our best estimate of what they would look like
12  given that we changed the way we tracked data after the
13  acquisition.
14  Q. For CCI and CSI?
15  A. For CCI and CSI.
16  Q. And we saw those acronyms on those combined ratios and
17  those revenue charts that we just looked at?
18  A. For the 2002 to 2014 years.
19  Q. Yep. Because CSI is the acronym that Chubb Corp. used
20  to use for its specialty lines?
21  A. Correct.
22  Q. And CCI was the acronym for Chubb Commercial that Chubb
23  Corp. used to use before the acquisition, right?
24  A. Correct.
25  Q. Okay. And so the policies that we looked at in

**1902**

1  interrogatory number 17 fell under that, those CSI and CCI
2  buckets?
3  A. From the years prior to 2016.
4  Q. Right. And the data that's in FED017882, that's from
5  2016 to the end of 2018. It doesn't include any Legacy ACE
6  revenue or expenses in it, right?
7  A. No.
8  Q. And there's no way for us to definitively link up the
9  costs and expenses in that document to the gross written
10  premiums in interrogatory 17; is that right?
11  A. That's correct.
12  Q. And in that cost and expense spreadsheet that you are
13  refreshing your recollection with, there's premium revenue
14  that doesn't touch Blaze Advisor, correct?
15  A. There would be premium in here that potentially does
16  not touch Blaze Advisor. It's hard to definitively say.
17  Q. And then touching on that Legacy ACE issue, going back
18  to interrogatory number 17 when I had you identify those
19  writing companies from Legacy ACE, do you recall where you
20  gathered the policy and the policy information, the policy
21  count and the revenues, what database you looked at for the
22  Legacy ACE companies?
23  A. For what application? For the CUW-IM?
24  Q. That's correct.
25  A. I believe there was a query run up against a -- the

**1903**

1  CUW-IM application that included an identifier, and that
2  identifier was then pulled up against a registration
3  system.
4  Q. I'll ask it a different way. The Legacy ACE data, it
5  came from a database called Genius Legacy ACE, correct?
6  A. A registration system Genius, yes.
7  Q. And that's not a Legacy Chubb database, correct?
8  A. Correct.
9  Q. And in the context of the spreadsheet, the big
10  spreadsheet that you are refreshing your recollection with,
11  we talked about bulk expenses and direct expenses. And
12  bulk expenses are things like general administrative
13  expenses, taxes, licenses and fees. Would you agree with
14  that?
15  A. Yes.
16  Q. And those are tracked at the North American level from
17  2016 to 2018, correct?
18  A. They're tracked at department levels within
19  North America.
20  Q. In your deposition you told me the bulk expenses are
21  tracked in a larger bucket and apportioned to a line of
22  business. Do you agree with that?
23  A. Yes.
24  Q. And would you agree that these bulk expenses cannot
25  specifically be linked to an individual policy or premium?

**1972**

1  a ruling on these issues obviously before the charge
2  conference.
3        Is your best estimate that you will be done on
4  Tuesday or Wednesday and who do you have left?  Just give
5  me the list.
6        MS. GODESKY:  So tomorrow we're calling three
7  witnesses.  Well, we'll have to continue Mr. Sawyer's
8  video, and then we have three live witnesses, Ellen Garnes
9  and two experts.  So our directs are fairly targeted, but,
10 you know, if they're crossing two experts, that could bleed
11 into Monday.
12       And then we have at least five more witnesses and
13 one video, I believe, and that comes with the caveat that
14 we're tinkering.
15       THE COURT:  Sure.
16       MS. GODESKY:  But I think end of day Tuesday is a
17 fair estimate, but it could bleed into Wednesday.
18       THE COURT:  It would be aggressive, or not
19 aggressive, but certainly optimistic.  And will one of your
20 expert witnesses be Kursh.
21       MS. GODESKY:  No.  The parties have reached an
22 agreement that we are not calling Kursh, and they are not
23 calling their own rebuttal expert.
24       THE COURT:  Okay.
25       MS. GODESKY:  Yes.

**1973**

1        THE COURT:  Okay.  So just so everybody's on the
2  same page.  Assuming that we get this done, testimony, at
3  least speaking, by Tuesday, sometime 3:00 or later -- well,
4  realistically noon or later, then closing arguments will be
5  Wednesday morning.
6        And -- but if we bleed over into testimony a
7  little bit on Wednesday, we will have had the charge
8  conference on Tuesday anyway, I think, and we'll go with,
9  we'll get to final arguments likely Wednesday afternoon.
10       MS. GODESKY:  Okay.  Understood.  Thank you for
11 that.
12       THE COURT:  Okay.  Thank you.
13       Mr. Hinderaker, come on up.  Like I say, you
14 don't need to argue anything at this point.  Nothing is
15 decided.  And you get the time that you -- I'll give you as
16 much time as I can.
17       MR. HINDERAKER:  Sure.
18       THE COURT:  Let me just on my side of it, I think
19 the serious issue, the most serious issue is this question
20 about "client."  And, you know, looking at it from the
21 perspective of, if I, if FICO's interpretation of Chubb &
22 Son, a division of Federal, is valid, how would that not
23 render the contract just basically illusory?  So, I mean
24 that's my concern.
25       MR. HINDERAKER:  Of course.

**1974**

1        Well, we'll bring forth the law and actually some
2  nice New York law.
3        THE COURT:  Okay.
4        MR. HINDERAKER:  That an unincorporated division
5  is indeed capable of contracting and bound by contracts,
6  and --
7        THE COURT:  Again the bigger -- my problem is
8  less that one than it is this issue of if they have no, if
9  they have employees, fundamental to the license is, they
10 can't let anybody but their employees use it, so they've
11 now purchased a license through three amendments or
12 through three iterations that nobody can use.
13       MR. HINDERAKER:  Yeah.  I think that's not quite
14 the way to think about it.  Okay?
15       So what, what New York law, now I know New York
16 law, is that the division, unincorporated, is capable of
17 contracting and being bound by, and being bound by the
18 agreement.
19       The fact that the division inside of the entity
20 Federal has a consequence of a paycheck coming to the
21 division members from Federal doesn't change the scope of
22 the license agreement to Chubb & Son.
23       Federal, of course, is the defendant because as
24 the legal entity you need a legal entity to sue, but in
25 terms of the performance of the contract, Chubb & Son --

**1975**

1  I'm sorry -- Federal has chosen to organize itself into a
2  division.  Very large, which division contracts with other
3  insurance companies and contracts with vendors.
4        These are not illusory contracts, they are not
5  fraud, and is bound to them.  The fact that the -- Federal
6  is the employer doesn't change what the contract itself is.
7  So as the manager and servicer, as we've seen, these many,
8  many, hundred thousand -- I mean not a hundred thousand, I
9  mean hundreds or a thousand employees that are organized
10 around Chubb & Son, they provide these services to the
11 other insurance companies without employees.
12       That's the scope of this license agreement.  Now,
13 there's a, you know, one of the cases in New York is, says
14 this:  The unincorporated division or unincorporated
15 entity, the nonlegal entity, is the contracting party.  If
16 that party breaches, the entity will be a defendant.
17       But the plaintiff's remedy, the scope of the
18 plaintiff's remedy is limited to the assets of the
19 unincorporated thing that it contracted with.  The two
20 parties are indeed bound by the agreement that they made.
21       So I think there's a bit of smoke in the sense
22 that, there's a bit of smoke regarding Federal being
23 responsible for Chubb & Son and the fact that they chose to
24 enter into a contract with FICO in this way, and they are
25 bound to it.

**1976**

1      THE COURT:  So let me put my concern a different
2   way.  FICO has never contended, at least as I understand it
3   in this trial, that the use of Blaze Advisor by Federal
4   employees breached the contract.
5      MR. HINDERAKER:  No, we haven't, because --
6      THE COURT:  How can they maintain that and yet
7   say that the scope of the license is defined by Chubb &
8   Son, a division of Federal, and the license can't be used
9   by people other than the client's employees, then?
10      MR. HINDERAKER:  In our law firm, we have a
11   litigation department.  The paycheck comes from Merchant &
12   Gould.  Everybody in the litigation department knows that
13   we -- that that's the organization in which we are a part.
14   When we sign license agreements for certain products that
15   we decide in the litigation department, we are signing it
16   as in the litigation department, not as Merchant & Gould.
17      It's a way that they chose to organize
18   themselves, and we recognize that they are within, they are
19   within Federal, and we recognize that they are within
20   Federal.  And we haven't said that a Federal employee can't
21   use a software if that person is in the Chubb & Son
22   division of, in the Chubb & Son division, that group.
23      Now, in the testimony of Mr. Taylor, you know, I
24   said, are there any Federal employees outside of the
25   United States?  And he said no.  And the reason I did that

**1977**

1   is because obviously that means there's no, there's no
2   Chubb & Son division people outside the United States
3   either.
4      So that's why the use by the foreign affiliates
5   is outside of the scope of the license, because those are
6   not Chubb & Son employees.
7      I might say that the notion that was, that we
8   just heard, that FICO has at some point said, has at any
9   point said the foreign insurance companies are not
10   affiliates is not right.  We've always said that they were
11   affiliates.  They're just not -- just that the client
12   doesn't have affiliates.
13      Does that make that the client and its affiliates
14   inoperable?  Yes, it does.  Does it make Amendment Two
15   meaningless?  No, it doesn't because Chubb & Son that was
16   providing all of the services for the dozen other insurance
17   companies to use Blaze Advisor for selling insurance now
18   could use it not just for the specialty insurance, but they
19   could use it for commercial insurance, or if any of the
20   companies that they managed wanted to sell personal
21   insurance, the scope of the applications of the product
22   types, the insurance types, was no longer limited.
23      So that's the expansion of scope to the
24   enterprise of what Chubb & Son does.  That's why we spent
25   so much time just identifying, well, what is Chubb & Son?

**1978**

1   Well, it's the management.  That's why we put in the
2   contracts of their management.
3      We'll think about it more along with you, but the
4   notion that Chubb & Son enters into contracts and says it
5   will do stuff, but then it's illusory because paychecks are
6   coming from Federal doesn't make sense to me either.
7      THE COURT:  Okay.  Understood.
8      MR. HINDERAKER:  And my only other comment as you
9   want to think about this and you are looking at it, that
10   first sentence of 9.2c does not require materiality.  The
11   first sentence speaks to breach of the license restriction.
12      We'll put the law in the memorandum that parties
13   are quite free to contract around the common law rule of
14   materiality.  And in that first sentence we did.  Yeah, the
15   stuff we can address in the briefs.
16      THE COURT:  Okay.  So let's talk about timing of
17   that.
18      When can you -- can you be fully briefed by
19   Sunday at 6:00 p.m. or -- or tell me.  And the difference
20   being from my perspective, are we going to argue this
21   Monday night?  Are we going to argue it Tuesday before
22   whatever charging conference is done?
23      MR. HINDERAKER:  Well, I'd like to have until,
24   I'd like to have as much time as we can, given the timing
25   to us in terms of doing it.

**1979**

1      THE COURT:  Okay.
2      MR. HINDERAKER:  So deeper into Sunday would be
3   nice.
4      THE COURT:  Okay.  Well, that's fine.
5      Then why don't you file by midnight -- I can
6   never remember.  If midnight is Monday morning, then, then.
7   If midnight is Sunday night, then, then.  But midnight, the
8   hour between very late Sunday night and Monday morning.
9      And we'll plan on arguing then at the end of the
10   day on Monday.
11      And, certainly, if I don't rule on Monday, I will
12   rule Tuesday morning before we start taking testimony.
13   Okay?
14      MR. HINDERAKER:  Would it be -- not if it's
15   improper, but we've been fairly openly with the sequence of
16   our witnesses.  I hear there's five more.  I hear there's
17   five more witnesses.  Could you disclose who they are?
18      MS. GODESKY:  We will be presenting, after the
19   next three tomorrow, Ms. Theberge, Mr. Schraer, Mr. Folz.
20   We have the Clark video.  And that's what we're certain
21   about right now.  So we can, we can get back to you with
22   more detail this weekend.
23      MR. HINDERAKER:  Thank you.
24      MS. GODESKY:  Mm-hmm.
25      THE COURT:  Okay.  Anything else we should be

**2113**

1    So I'm going to stick to what I said before,
2    2019, '20 and '21 come off of slide 10 and slide 17.
3        I will note obviously -- I'm not saying that it's
4    improper argument to make that point in final argument.
5    And as I've already stated, it's proper to ask Mr. Bakewell
6    to the effect of whether -- that he's aware of anything
7    that makes the analysis as to 2016, '17 and '18 unique to
8    those years. But beyond that, that's the line I'm drawing.
9        Welcome, Mr. Fleming. I just got done explaining
10   what I ruled, so I'm actually not going to repeat myself.
11       MR. FLEMING: Okay.
12       MS. GODESKY: May I ask one clarifying question?
13       THE COURT: You may.
14       MS. GODESKY: May we just remove those bars, as
15   opposed to redacting with a black box?
16       THE COURT: Of course.
17       MS. GODESKY: Thank you.
18       THE COURT: Okay. Let's bring in the jury.
19   1:08 p.m.
20           IN OPEN COURT
21           (JURY PRESENT)
22       THE COURT: Be seated, everyone.
23   Go ahead, Ms. Janus.
24       MS. JANUS: Thank you, Your Honor.
25

**2114**

1    BY MS. JANUS:
2    Q. Mr. McCarter, when we broke for lunch, we were talking
3    about some of Mr. Whitener's demonstrative. Do you
4    remember that?
5    A. Yes.
6    Q. We talked about the bullet point slide demonstrative
7    about CSI Express.
8    A. Yes.
9    Q. And you in part talked about how the demonstrative and
10   Mr. Whitener's testimony conflated the value of this
11   application with the usefulness of Blaze, right?
12   A. Correct.
13   Q. During the course of Mr. Whitener's testimony, we were
14   shown bullet point slides like that for all of the
15   applications that, that Mr. Whitener testified about,
16   correct?
17   A. Correct.
18   Q. And that was Automated Renewal Processing,
19   Profitability Indicator, DecisionPoint, Evolution Canada,
20   Evolution Australia --
21   A. Yeah.
22   Q. -- EZER, Adapt, Europe and Australia, and Cornerstone.
23       Generally, would your opinion -- is your opinion
24   the same with respect to Mr. Whitener's testimony about
25   those applications and the demonstratives that he used?

**2115**

1    A. Yes, they are. I think that was a Duff & Phelps set of
2    numbers that were created for the whole application, not
3    for just Blaze.
4    Q. And would you say that the testimony that Mr. Whitener
5    provided about those applications, similar to CSI Express,
6    conflated the application itself, the functionality of the
7    application, with Blaze?
8    A. Yeah. Blaze is a rules management system and rules
9    service, and he was presenting it as if it was the policy
10   administration rate, quote, bind and issue kind of
11   capability, and it's not.
12       So, yeah, absolutely.
13   Q. And that would be the same for each of those
14   applications he went through?
15   A. For each of them, yeah.
16       MS. JANUS: Those are all the questions I have
17   for you, Mr. McCarter. Thank you.
18       THE WITNESS: Thank you.
19       THE COURT: Thank you, Ms. Janus.
20   Mr. Hinderaker.
21       MR. HINDERAKER: Yes, Your Honor. Thank you.
22           CROSS-EXAMINATION
23   BY MR. HINDERAKER:
24   Q. Well, good afternoon.
25   A. Good afternoon.

**2116**

1    Q. We haven't met except to open the doorway for each
2    other back and forth the last eight, nine days. My name is
3    Al Hinderaker. I'm one of the lawyers representing FICO.
4    I know you know that part.
5    A. Yes.
6    Q. What I would like to do at the outset is to, what I'll
7    call, maybe just set the point of view for you at which
8    FICO and I am coming at the subject matter of your
9    testimony.
10   A. Okay.
11   Q. So just to be clear, we are not - FICO's claims are
12   not, you know directed at the $35 billion of annual revenue
13   of Chubb Limited year after year. It's not directed to the
14   whole group of insurance companies.
15       Understood?
16   A. Yes.
17   Q. And indeed, FICO's claims are not directed simply at
18   the applications. FICO's claims are directed at the
19   approximately $5 billion a year of insurance that was sold
20   that ran through the applications and used Blaze Advisor.
21   So you can have that point of view in mind.
22       Also, this lawsuit is not about those insurance
23   policies that did not touch Blaze Advisor as going through
24   an application.
25       So I would like to also acknowledge this, but

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                              March 3, 2023, Volume X

**2117**

1  also get your point of view on it.  The jury will decide
2  what Mr. Whitener said in terms of the policy
3  administration system as being an application with many
4  components.  I didn't hear him say the same thing you did,
5  but that's not my job, either.  That's the jury job.
6          MS. JANUS:  Your Honor, objection.
7          THE COURT:  Sustained.
8  BY MR. HINDERAKER:
9  Q.  Do we -- we do agree that like CSI Express is a policy
10 administration system that has many components.
11 A.  Yes.
12 Q.  And all of the components are, call it developed.  The
13 application is developed with all of those components, with
14 all of those components interacting in a particular way so
15 as to achieve the desired business outcome of the
16 application.
17 A.  Correct.
18 Q.  Do we agree?
19 A.  Yes.
20 Q.  And each of those components in the application has its
21 own purpose.  Do we agree?
22 A.  Yes.
23 Q.  And do we agree that when Blaze Advisor is one of the
24 components, the purpose of the Blaze Advisor component is
25 to decision, automate the decisioning.

**2118**

1  A.  It's not automating a decision.  It's rendering a
2  decision that Chubb automated.
3  Q.  It's rendering a decision based upon the rules and
4  business logic that is written into the -- written into the
5  software, and as a consequence of firing up those rules,
6  the application renders a decision.
7  A.  It renders Chubb's decision, yes.
8  Q.  Yes, of course it would render Chubb's decision.  Blaze
9  Advisor is agnostic to the industry, is it not?
10 A.  That's correct.
11 Q.  So if Blaze Advisor is going to be used at Chubb, the
12 whole purpose of it is to render Chubb-desired decisions.
13 We agree?
14 A.  Yes.
15 Q.  And do we also agree that if any one component or any
16 one meaningful component, I suppose -- well are there any
17 components in the application that are not meaningful to
18 the end goal of the business function?
19 A.  I guess that could be in the eye of the beholder.
20 Q.  All right.  Maybe I should use a different word than
21 "meaningful."  If any one of the components in an
22 application is removed and not substituted with an
23 equivalent, is the application at that point, I'll call,
24 broken?
25 A.  No.

**2119**

1  Q.  The application still meet the business objective for
2  original development?
3  A.  Absolutely could.  It depends on what's, what component
4  is not there.
5  Q.  Okay.  Fair enough.
6          And with respect to the Blaze Advisor -- the
7  applications that use Blaze Advisor, certainly a different
8  rules engine or different business management rules system
9  could be used in those applications, rather than Blaze
10 Advisor?
11 A.  Yes.
12 Q.  Yes.  But in this lawsuit during the period of time of
13 our interest, you understand that the defendants chose to
14 use Blaze Advisor in those applications.
15 A.  Yes.
16 Q.  If I could see, if I could see Exhibit P15, please.
17 That says 0015.  I'm interested in P518.
18         MS. JANUS:  Mr. Hinderaker -- okay.
19         MR. HINDERAKER:  It's not in that book.
20         MS. JANUS:  Okay.
21         MR. HINDERAKER:  Yeah.  Didn't think about it
22 until having my salad at lunch.
23         MS. JANUS:  Okay.
24 BY MR. HINDERAKER:
25 Q.  This is in evidence.  You were here in the courtroom

**2120**

1  when it was introduced into evidence, were you?
2  A.  I believe I was, yes.
3  Q.  Yes.  And I want to just point out to you that this is
4  an exhibit from the defendants, and for the various
5  applications that are reported on the exhibit, it
6  identifies the Blaze rules capability that was implemented
7  for each of those specific applications.
8          Do we agree?
9  A.  Yes.
10 Q.  Okay.  Thank you.
11         I would now like to, I would now like to go to
12 Exhibit J001 -- I'm sorry -- J002, which is also not in the
13 book.
14         And I think you've reviewed the request for
15 information that Chubb & Son September to FICO.
16 A.  Yes, I did.
17 Q.  Yes.  And if we could go to page 6, if I recall right.
18 And can we focus in on that section called Current CSI, IT
19 Environment.
20         And do you see from this exhibit that the Duck
21 Creek software was in the business tier and in the systems
22 of Chubb & Son at the time they sent the RFI?
23 A.  Yes.
24 Q.  Okay.  So it's fair to conclude that having Duck Creek
25 in their system, Chubb & Son was interested in also

**2121**

1  licensing Blaze Advisor.
2  A.  Yes.
3  Q.  I know you said that Duck Creek is more specialized to
4  the insurance industry.  And does Duck Creek itself execute
5  rules?
6  A.  It does.
7  Q.  Thank you.
8      In your work -- that's good for that.  Thank you.
9      In your work in forming your opinions, did you
10  review any of the statements of work regarding the
11  professional services that FICO personnel provided to
12  Chubb & Son in the years of Chubb & Son's use of Blaze
13  Advisor?
14  A.  I do remember seeing something on a statement of work
15  for assistance of training or, you know, that type of
16  activity.  I also saw a summary of the statement of work
17  totals, you know, of what they've used.
18  Q.  Was that a document that was generated for the
19  litigation, the summary document?
20  A.  Yeah, it was.
21  Q.  Yeah.  We saw that, yeah.
22      Did you do any, I'll call it, analysis, any
23  serious review of the statements of work before forming
24  your opinions here?
25  A.  I asked Henry Mirolyuz and probably Ramesh in the

**2122**

1  conversation of who was loading the rules and doing the
2  rules development and all that.  And they said that FICO
3  was training Chubb to do that work.  So Chubb would have
4  been the one loading the rules.
5  Q.  Right.  So you were at least generally aware that --
6  A.  Yeah.
7  Q.  -- that Chubb & Son purchased, I mean the statements of
8  work, professional services aren't free -- Chubb & Son
9  purchased professional services so that there could be a
10  knowledge transfer, if you will, from FICO to Chubb & Son
11  in terms of the use of Blaze Advisor.
12  A.  Yeah, how to use the tool.  Not what rules would come
13  over from Blaze.
14  Q.  No quarrel about that, sir.  I'm never going to contend
15  otherwise in the questioning.
16  A.  Yeah.
17  Q.  I know that is something you want to -- I agree with
18  you.
19  A.  Okay.
20  Q.  I agree with you that -- and isn't it true that Chubb &
21  Son went to FICO to license Blaze Advisor.  Chubb & Son
22  licensed Blaze Advisor, and Chubb & Son licensed Blaze
23  Advisor so it could use that tool into which it would load
24  its business logic?
25  A.  Yes.

**2123**

1  Q.  Yes.
2      You mentioned how, you mentioned how customers
3  really don't know what the technology is behind some of
4  their experiences with insurance companies.  Do you recall
5  that?
6  A.  Yes.
7  Q.  I have to confess I haven't.  My daughter has.  Have
8  you ever used GEICO to buy car insurance online?
9  A.  Yeah, it's my auto insurer.
10  Q.  All right.  And maybe you do, but do you think the
11  normal customer knows what the technology is behind GEICO's
12  ability to sell an insurance online without talking to a
13  human being?
14  A.  For personal auto, it's different than commercial auto,
15  but yes.
16  Q.  Do you think the customer knows there's technology --
17  knows what the technology is?
18  A.  No.  I'm sorry.  They don't know what the technology
19  is.
20  Q.  But they do enjoy the experience, and they buy from
21  GEICO because of that?
22  A.  Sure.
23  Q.  Sure.
24  A.  I don't buy because they got a great website, though.
25  I bought because they had a great price.

**2124**

1  Q.  And you chose to buy it online and do it that way.
2  A.  That's the way GEICO sold their policies.
3  Q.  That's exactly so.
4      I want to actually come back to this and not do
5  it now.
6      So let me, let me turn to this.  I'm having --
7  tried to focus the discussion on FICO's claims as being
8  those that are relevant to --
9      MS. JANUS:  Objection, Your Honor.
10      THE COURT:  Well --
11      MR. HINDERAKER:  I just want to change topics.
12  That's all.
13      THE COURT:  Yep.
14  BY MR. HINDERAKER:
15  Q.  So I'm going to change topics a little bit and go to
16  the topic of your years of experience with technology in
17  the insurance space.
18  A.  Okay.
19  Q.  All right.  So this is more general --
20  A.  Okay.
21  Q.  -- discussion.
22      Do you agree that all of the resources, that all
23  of the resources of an insurance company are focussed on
24  trying to sell more policies and reduce the amount of
25  losses?

**2137**

1  can be added fairly quickly, two weeks.  Can be leveraged
2  across projects.
3          That's what's said in this document.
4  A.  Yeah, the model that Chubb built.
5  Q.  Agreed.  The model that Chubb built inside of Blaze
6  Advisor that it licensed from FICO.
7  A.  Agreed.
8  Q.  Agreed.
9          Let's go to Exhibit 518 again, Plaintiff's 518.
10 And if we could just, if we can increase that column which
11 is Business Rules Capability.
12         So according to Chubb & Son, the Blaze rules
13 capability for DecisionPoint was rate tables and pricing
14 calculations, eligibility determinations, endorsement
15 generation, and data normalization.
16         Agreed?
17 A.  That's what it says, yes.
18 Q.  And off the top of my, top of the screen, I am not
19 seeing Profitability Indicator detailed out on this one, so
20 we'll move on.
21         We can take that down and let me change slides.
22         Do we agree that policy administration systems
23 are core systems of an insurance company?
24 A.  They are.
25 Q.  And do we agree that the meaning of a core system is a

**2138**

1  system that's a primary one that supports the insurance
2  operations?
3  A.  It supports the insurance operation, yes.
4  Q.  Okay.  And you understood in your review that Blaze
5  Advisor in CSI Express, as one of the policy administration
6  systems, supported the underlying process for CSI Express?
7  A.  I don't understand your question.
8  Q.  Blaze Advisor supports the -- Blaze Advisor supports
9  the underlying process of CSI Express.  Yes or no?
10 A.  What underlying process?  I don't --
11 Q.  Oh, I understand the confusion.  The process of being a
12 business administration system.
13 A.  It does not do business administration or policy
14 administration.  Blaze does not.
15 Q.  Understood.  Let me go back to 518.  I can get a better
16 question.
17         If we look at 518 and look at CSI Express, Blaze
18 Advisor supported the underwriting guidance in the CSI
19 Express policy administration system application.
20 A.  It provided Chubb's rules for underwriting guidance,
21 yes.
22 Q.  Agreed.  It provided the rules that came from Chubb
23 that it chose to put into Blaze Advisor.
24 A.  Yeah, just to be clear.  It didn't do the guidance.  It
25 provided the guidance rules that Chubb had loaded into the

**2139**

1  system.
2  Q.  It executed against those rules.
3  A.  It did.
4  Q.  Yes.  I think we're trying to say the same thing.
5  A.  No, we're not.
6  Q.  Well, we'll see.
7  A.  Okay.
8  Q.  The underwriting rules for acceptance or rejection of a
9  risk come from Chubb.
10 A.  Correct.
11 Q.  It is the company that's deciding what its own business
12 logic is.  And that is written into Blaze Advisor for CSI
13 Express.
14 A.  Yes.
15 Q.  Agree with me so far?
16 A.  Yes.
17 Q.  And when an insurance application is received, CSI
18 Express, using Blaze Advisor, compares the risk to the
19 rules of Chubb and executes a decision accordingly.
20 Agreed?
21 A.  I agree with what you are saying.
22 Q.  Thank you.
23         And indeed when a policy is accepted in CSI
24 Express, there are a lot of business rules that are fired
25 or retrieved in the process to bind and book the policy to

**2140**

1  decide whether it should be, whether to decide whether to
2  renew, and the various functions of the policy
3  administration system, because you said all those things.
4  A.  All those functionalities were built by Chubb to call
5  out to various rules engines, Duck Creek, Blaze, and
6  homegrown rules.
7  Q.  Yes.  And Blaze was one of the components that was
8  executing rules that were put into its software in
9  accordance with the business logic of Chubb & Son.
10 A.  Yes.
11 Q.  In your -- you did some looking at what CUW was.
12 A.  Yes.
13 Q.  In your view, CUW was also a core system?
14 A.  It was part of the CSI Express is the way it was
15 initially presented to me.
16 Q.  Okay.
17 A.  And so, yes, it was part of that core policy
18 administration system.
19 Q.  And we can be -- we can agree, I think, that while it's
20 called out as a separate application, CUW-IM, there is an
21 interfunctionality, if I can use that word, with CUW and
22 CSI Express.
23 A.  The two are integrated.
24 Q.  Better word.  The two are integrated.  We will use
25 that.

**2141**

1  A.  Yeah.

2  Q.  And CIS Claims is another core system and one of the --

3  agreed?

4  A.  CIS Claims, as I understand it, is really mislabeled.

5  It's not a claims system.

6  Q.  Yes.  You've heard the testimony that it's a, feeds

7  into the actuarial process.

8  A.  It's basically a function of the policy administration

9  system to feed data into a repository for claims for

10  analysis.

11  Q.  I think we both heard the same testimony in that

12  regard.

13  A.  Okay.

14  Q.  I understand the confusion given its title.

15  A.  So I wouldn't call that a core system, no.  It's a

16  business intelligence capability.

17  Q.  Okay.

18  A.  I mean, it provides data to the actuary to --

19  Q.  Well, if we go back to your deposition then.  I guess

20  I'm confused.  If you go to line 11, please, or page 11.

21  A.  Of the deposition?

22  Q.  Yes, please.  And I'm going to start on line 14, when

23  you get a chance to get there.

24  A.  Line?

25  Q.  14?

**2142**

1  A.  14.

2  Q.  The question -- are you there with me now?

3  A.  Yep.

4  Q.  Okay.  The question says, "What does the word 'core'

5  mean?

6          "Answer:  It's the primary system that supports

7  the insurance operations.

8          "Question:  In the case of Federal can you give

9  me an example of that?  What would be a core system?

10          "Answer:  Sure.  CSI suppress would be one.

11          "Question:  Any others come to mind?

12          "Answer:  CUW, TAPS, CIS Claims."

13          Did I read that right?

14  A.  Yes.  At the time of this deposition, I still

15  understood that to be the claims system.

16  Q.  Okay.  Your understanding changed.

17  A.  It changed after that.

18  Q.  All right.  Good.  So whether --

19          Let me put it this way.  Rather than debate the

20  use of the word "core," CSI Express is a core system.

21  Agreed?  Right?  And we agree that CIS Claims, your word,

22  I'm going to use your word "integrated," integrates into

23  CSI Express.

24  A.  Yes.  But to be clear it's not the claims system.

25  Q.  No.  We -- yeah, absolutely.

**2143**

1  A.  Okay.

2  Q.  I'm not contending otherwise.

3  A.  Okay.

4  Q.  Yeah.  If we were to speak to the Blaze Advisor role in

5  DecisionPoint, you would agree that Blaze Advisor can serve

6  up a rule quickly?

7  A.  Some rules, yes.

8  Q.  I'm speaking, yeah, I'm speaking of the rules in

9  DecisionPoint at this point.

10  A.  DecisionPoint, there's multiple parts of DecisionPoint,

11  right?

12  Q.  So do we agree -- well, let's put up the 518 again

13  then.

14          So do we agree that for DecisionPoint the Blaze

15  Advisor capability includes rate tables and pricing

16  calculations, eligibility determination, endorsement

17  generation and data normalization?

18  A.  Yes.

19  Q.  Okay.  We can put that down.

20          Let's turn to automated renewal.

21          Do we agree that for insurance companies

22  retaining their customers is important?

23  A.  Absolutely.

24  Q.  And so we agree that the more customers that renew

25  their policies, the better.

**2144**

1  A.  Yes.

2  Q.  Do we also agree that being able to renew policies

3  without human intervention or human touch results in more

4  renewals?

5  A.  Not necessarily.

6  Q.  Do you think there is a business benefit to automatic

7  renewals?

8  A.  Yes.

9  Q.  What is that business benefit?

10  A.  Less touch by humans.

11  Q.  And do you also agree -- well, do you agree that while

12  in any individual case it may or may not make a difference

13  that over the aggregate if you can automate renewals you

14  are going to increase the percentage of renewals overall?

15  A.  I don't agree with that.

16  Q.  Do you have any data that suggests otherwise?

17  A.  I don't have the rules that were actually being used to

18  determine whether it was one that would, a customer would

19  actually renew.  I mean, at the end of the day, renewals

20  aren't something that just automatically happens.  The

21  customer has to say he wants to renew the policy.

22  Q.  Well, I agree.  Of course that's right.

23  A.  So if they don't renew the policy, whether it made it

24  all the way through the process to the end and he didn't

25  renew or she didn't renew.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 3, 2023, Volume X

**2145**

1  Q.  I think your answer is highlighting the, an example of
2  an individual customer.  Agreed?
3  A.  Yeah.
4  Q.  My question was directed to, let's call it a hundred
5  customers or a thousand customers.  If you can
6  automatically issue renewal policies to a thousand existing
7  customers rather than do it individually, are you going to
8  increase your rate of renewals from your experience in the
9  industry?
10  A.  Yes.
11  Q.  Do we agree that -- let me turn to, we did some of the
12  applications.  I want to sort of speak about Blaze Advisor
13  more generally now and some of the business benefits from
14  Blaze Advisor.
15       Do we agree that Blaze Advisor was implemented
16  into applications to enhance precision, agility, quality
17  and all the efficiencies that you get out of externalizing
18  rules and managing rules?
19  A.  That's the stated benefits from FICO's document, yes.
20  Q.  And do you think that Blaze Advisor does not produce or
21  achieve those benefits?
22  A.  I don't, I don't have the evidence for what they used
23  it for.  It wasn't clear to me that it had achieved those
24  benefits.
25  Q.  So on page 91 --

**2146**

1  A.  Of?
2  Q.  Your deposition, please.
3  A.  Okay.
4  Q.  And I'm starting at line 3.
5  A.  On 91?
6  Q.  No.  No.  91.
7  A.  90.  Mr. Folz?  Is that the line?
8  Q.  No.  The -- at your deposition, page 91.
9  A.  Oh, 91.
10  Q.  Yeah, nine one.
11  A.  You said 90.
12  Q.  91.
13  A.  And after -- does it start with, "And after that"?
14  Q.  Yeah.  And then, so question -- yes, it does.
15       "And after that 2006 initial engagement, Federal?
16  Then expanded their use of Blaze into other applications;
17  isn't that right?
18       "Answer:  That's correct."
19  A.  "That's correct."
20  Q.  "Question:  And did you speak with any other
21  individuals or review any other documents about the
22  business justifications for implementation in Blaze into
23  those other applications?
24       "Answer:  There were a number of documents I
25  recall reviewing that basically repeated the same

**2147**

1  justification for multiple instances of precision and
2  agility and quality and all of the efficiencies that you
3  get out of externalizing rules and managing rules and so
4  forth.
5       "Question:  Precision, consistency, agility,
6  speed, time and costs?
7       "Answer:  Yes."
8  A.  Mm-hmm, correct.
9  Q.  I read that correctly.
10  A.  You did.
11  Q.  And with respect to your analysis, do you agree that
12  Blaze Advisor can achieve those outcomes?
13  A.  I don't know if it can or it can't, but that's the
14  stated goal of the technology.
15  Q.  Good.  Yes, I agree.  And then let's go to page 92,
16  just up, starting at line 4:
17       "Question" -- are you with me now?
18  A.  Yep.
19  Q.  "Question:  Generally speaking, they are efficiencies,
20  do you, do you dispute that Blaze Advisor can achieve those
21  five as you call them efficiencies?
22       "Answer:  No, I don't dispute that."
23       Agreed?
24  A.  Yes.
25  Q.  Changing topics a little bit.  Do we agree that if you

**2148**

1  have the organization's top expert develop the rules that
2  are then loaded into, put into Blaze Advisor, used to drive
3  decisions, you will get better risk decisions and -- well,
4  you will get better decisions overall?
5  A.  Not necessarily.
6  Q.  If you have the top expert developing the rules that
7  then drive the decisions, you don't think you will get
8  better decisions?
9  A.  The application, as I understand it, allow the under
10  writer to override what the system will say.  So wouldn't
11  necessarily get the result that Chubb was looking for, but
12  got a different result that may still be okay.
13  Q.  Okay.  But it would be the consequence of another
14  underwriter overriding?
15  A.  Overriding what the system was saying you should think
16  about doing it this way.  It's guidance.  It's
17  underwriting -- that's why they call it underwriting
18  guidance, not underwriting absolutes.
19  Q.  All right.  So the system and the guidance would be
20  able to produce a better decision, but an individual human
21  underwriter could override that and change the results?
22  A.  You don't know if it was that that underwriter knew
23  something better than the one that wrote the rule about
24  that particular rule.  So they could have put a different
25  rule in that said do it this way and found out they had