# EXHIBIT 35


Neutral
As of: March 5, 2023 8:21 PM Z

# *MVP Health Plan, Inc. v. Optuminsight, Inc.*

United States District Court for the Northern District of New York

September 30, 2016, Decided; September 30, 2016, Filed

1:13-CV-1578 (BKS-CFH)

**Reporter**
2016 U.S. Dist. LEXIS 189263 *

MVP HEALTH PLAN, INC., Plaintiff, v. OPTUMINSIGHT, INC., Defendant.

**Prior History:** *MVP Health Plan, Inc. v. OptumInsight, Inc., 2014 U.S. Dist. LEXIS 153748 (N.D.N.Y., Oct. 29, 2014)*

## Core Terms

parties, bid, actuarial, waive, signed writing, terms, schedules, bind, partial summary judgment, oral agreement, provisions, quotation, email, contractual, Customer, invoices, deposition testimony, summary judgment, contract claim, damages, argues, summary judgment motion, matter of law, ambiguities, documents, nonmoving, contends, happened, software, genuine

**Counsel:** [*1] For Plaintiff: Arthur J. Siegel, Esq., Bond, Schoeneck & King, PLLC, Albany, NY.

For Defendant: Karl Geercken, Esq., Alston & Bird LLP, New York, NY.

**Judges:** Hon. Brenda K. Sannes, United States District Judge.

**Opinion by:** Brenda K. Sannes

## Opinion

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiff MVP Health Plan, Inc. ("MVP") brings this diversity action against Defendant OptumInsight, Inc. ("Optum"), alleging breach of a contract to provide actuarial services.[1] As a result of the alleged breach, MVP seeks judgment in the amount of $15.1 million or, alternatively, $399,428.75. (Dkt. No. 1, ¶¶ 100-01). In its "Second Affirmative Defense," Optum claims that a master agreement limits damages to "the amount MVP paid or owes [Optum] for the 12 month period immediately prior to the incident giving rise to the cause of action."[2] (Dkt. No. 40, p. 11). Pending before the Court is MVP's motion for partial summary judgment under *Rule 56 of the Federal Rules of Civil Procedure*, which seeks to dismiss Optum's Second Affirmative Defense. (Dkt. No. 54). Optum cross-moves for summary judgment and, in the alternative, for partial summary judgment in favor of its Affirmative Defense. (Dkt. No. 56-26). For the reasons set forth below, MVP's motion for partial summary judgment [*2] is granted and Optum's motions for summary judgment are denied.

**II. FACTUAL BACKGROUND**[3]

---

[1] MVP is a New York corporation, and Optum is a Delaware corporation with its principal place of business in Minnesota. (Dkt. No. 1, ¶¶ 1, 3). As noted above, the amount-in-controversy exceeds $75,000. Thus, the matter is properly before the Court under *28 U.S.C. § 1332*.

[2] In its entirety, Optum's Second Affirmative Defense alleges: "MVP's damages are limited by the Master Agreement between Ingenix, Inc. (OptumInsight's predecessor) and MVP, dated December 20, 2003, which limits damages arising out of the Master Agreement to the amount MVP paid or owes OptumInsight for the 12 month period immediately prior to the incident giving rise to the cause of action. *See* Master Agreement § 6.1." (Dkt. No. 40).

[3] The facts herein are drawn from the undisputed facts in MVP's Complaint (Dkt. No. 1), MVP's Statement of Undisputed Material Facts (Dkt. No. 54-18), Optum's Statement of Material Facts (Dkt. No. 56-27), MVP's Response to Statement of Undisputed Material Facts (Dkt. No. 58-3), Optum's Opposition to Plaintiff MVP Health Plan, Inc.'s Statement of Undisputed Material Facts (Dkt. No. 57-4), Optum's Reply to MVP's

CASE 0:16-cv-01054-DTS   Doc. 1146-34   Filed 03/05/23   Page 3 of 12

Page 2 of 11
2016 U.S. Dist. LEXIS 189263, *2

### A. The Parties' Business Relationship

MVP is a corporation engaged in the business of providing health care plans, including Medicare Advantage plans. (Dkt. No. 1, ¶¶ 1, 12-13). In order to provide these Medicare Advantage plans, MVP and all other plan providers must submit annual bids to The Centers for Medicare & Medicaid Services ("CMS"). (*Id.* at ¶¶ 13-14). Plan providers submit these bids in the year prior to the effective year of the health care plan. (*Id.* at ¶ 16). Upon CMS' acceptance of a Medicare bid, the plan provider is "required . . . to provide health care coverage for Medicare Advantage recipients within the [bid's] pricing parameters." (*Id.* at ¶ 15). As part of this annual process, MVP retains an outside actuary to help "prepare and calculate the Medicare bids" for the next year of coverage. (*Id.* at ¶ 17; Dkt. No. 56-27, ¶ 10).

Prior to this litigation, the parties had a "longstanding" business relationship. (Dkt. No. 56-27, ¶ 7; Dkt. No. 1, ¶ 21; Dkt. No. 54-18, ¶ 3). MVP had retained Optum (previously known as Ingenix, Inc.) since at least 2003 to provide various services pertaining [*3] to its health care plan offerings. (Dkt. No. 56-27, ¶ 11; Dkt. No. 57-4, ¶ 4). Furthermore, "[t]here was a . . . working relationship between Brent Greenwood, Optum's Vice President of Actuarial Services, and MVP and its predecessor . . . spanning 15-17 years." (Dkt. No. 54-18, ¶ 3; Dkt. No. 57-4, ¶ 3). From 2006 through the 2013 Medicare bid work, Greenwood was the "lead actuary for [the] bids for MVP." (Dkt. No. 54-4, p. 21). He considered MVP a "relationship client" that was "more than important," and he testified to being "involved considerably with [them]." (*Id.* at p. 256). Where the facts stated by the parties are not controverted or are supported by testimonial or documentary evidence, and denied with only a conclusory statement, the Court has found such facts to be true. *See Local Rule 7.1(a)(3)* ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."); *J & J Sports Prods., Inc. v. Mari, No 10-CV-455(DLI)(JMA), 2012 U.S. Dist. LEXIS 40284, at \*4, 2012 WL 1004842, at \*2 (E.D.N.Y. Mar. 23, 2012)* ("The Court will not permit [the defendant] to create a genuine issue of material fact where the unsubstantiated facts asserted contradict those supported by plaintiff's admissible evidence.").

___

Response to OptumInsight's Statement of Undisputed Material Facts (Dkt. No. 64-4), and the exhibits the parties submitted in support of their respective motions.

### B. 2003 Master Services [*4] and License Agreement ("MSLA")

On December 20, 2003, the parties executed the "Ingenix, Inc. Master Services and License Agreement" ("MSLA"). (Dkt. No. 59-3). It is undisputed that Ingenix, Optum's predecessor company, drafted the document. (Dkt. No. 57-4, ¶ 16). The MSLA provides that it "sets forth the terms under which Ingenix will provide the requested products and services" and states:

> When Customer agrees to purchase and Ingenix agrees to provide Software, Data or Services to Customer *under this Agreement, the parties shall sign appropriate product Schedules to this Agreement. Each Schedule shall define the Software, Data and Services to be provided to Customer and the prices and terms applicable to them*. To the extent the terms of a Schedule conflict with the terms of this Master Services and License Agreement, the terms of the Schedule shall control.

(Dkt. No. 59-3, ¶ 1.2) (emphasis added).[4] Under the parties' written amendment dated March 11, 2011, the MSLA further provides:

> Except as provided in any paragraph relating to indemnification or for any intentional infringement of the intellectual property rights of Ingenix, or for a breach of a party's confidentiality rights hereunder, [*5] or for personal injury, death or damage to tangible property caused by the negligence or misconduct of a party or its personnel, *each party's liability to the other party for direct damages arising out of this Agreement shall not exceed the amount Customer has paid or owes Ingenix under this Agreement for the 12-month period immediately prior to the incident giving rise to the cause of action*. . . . Under no circumstances will either party . . . be responsible under this Agreement for any indirect, incidental, special or consequential damages resulting from either party's performance or failure to perform *under this Agreement* . . . .

___

[4] The MSLA defines "Data" as "all databases, data sets and other collections of information that Customer licenses from Ingenix pursuant to this Agreement," "Services" as "all consulting, training, research, data management, support, maintenance, reporting and other services Customer obtains from Ingenix pursuant to this Agreement," and "Software" as "all computer software programs Customer licenses from Ingenix pursuant to this Agreement." (Dkt. No. 54-12, p. 2).

(*Id.* at ¶ 6.1; Dkt. No. 54-13, ¶ 4) (emphasis added). Finally, the MSLA includes a merger clause which states:

> This Agreement [(the MSLA)] constitutes the entire understanding between the parties and supersedes all prior proposals, communications and agreements between the parties relating to its subject matter. *No amendment, change, or waiver of any provision of this Agreement will be binding unless in writing and signed by both parties.*

(Dkt. No. 59-3, ¶ 10.1) (emphasis added).

Richard McSorley, the Optum sales professional who became the client executive **[*6]** in charge of the MVP account in 2012, testified that "[t]he purpose of [the MSLA] was to detail out the overall terms and conditions for the business relationship between [Optum] and our given customer" and that "if you had individual projects, software sales, they would have individual . . . product schedules, licensing agreements to be tagged on to [the MSLA]." (Dkt. No. 54-5, p. 17, 33). When asked whether he would "agree the only time that there is an actual agreement to provide services for MVP to pay for those services is if there is a signed product schedule that's incorporated into [the MSLA]," McSorley responded,

> For the most part, yes. And I have to clarify that, because in our business the way things work and progressed for a long period . . . there . . . was an existing relationship between Optum and MVP for the deliverables around actuarial services . . . . [T]here was typically discussions between Brent Greenwood on our end and Mark Fish on behalf of MVP to request him to deliver certain services, certain projects. At a lot of times that was done in e-mails and then further invoices and purchase orders as opposed to the normal product schedule/MSLA process that we have in place.

(Dkt. **[*7]** No. 54-5, pp. 22-23). He further stated that, in his opinion, "all agreements need to hang off of this MSLA." (*Id.* at 39-40).

After execution of the MSLA, the parties established multiple product schedules in accordance with its terms. In 2009, for example, they executed a product schedule "that specifically incorporated the MSLA into a software agreement between [them]." (Dkt. No. 57-4, ¶ 23). Similarly in 2011, they executed a document labelled "Ingenix Additional Service Offerings Product Schedule," under which Ingenix agreed to provide education, product training, and other services. (Dkt. No. 56-10, ¶ 1(A)). This schedule was also "incorporated into and made a part of the" MSLA. (*Id.*).[5] However, from at least 2006 to 2012, MVP and Optum did not execute any such product schedules pertaining to their annual Medicare bid work. (Dkt. No. 64-4, ¶ 24, Dkt. No. 54-17, pp. 2-3).[6] In fact, the record contains no evidence that MVP and Optum ever executed a product schedule under the MSLA for actuarial work related to the Medicare bids. (*See, e.g.*, Dkt. No. 54-5, pp. 20-21 (containing McSorley's deposition testimony that, although he found product schedules under the MSLA in Optum's customer relationship **[*8]** management system, he found no such product schedules that "relate to the provision of actuarial services")).

## C. 2013 Medicare Bid

In 2012, the parties agreed that, as it had for several previous years, MVP would retain Optum to provide actuarial services for the 2013 Medicare bid. (Dkt. No. 57-4, ¶ 5; Dkt. No. 56-27, ¶ 25). A February 7, 2012 letter from Li Li — Optum's Associate Director of Actuarial Consulting — to Lucinda Lewis — MVP's Vice President of Actuarial, Government Programs — states, "OptumInsight (OI) is pleased to be assisting . . . MVP[] with 2013 bid preparation. To address adequately the Health Care Reform related changes being implemented for the 2013 bids, we would like to allow a little additional time this year for the preparation of your bids." (Dkt. No. 59-9, p. 2).[7] Appended to the letter is a data request form, indicating the information that Optum already had and the information that it still needed to perform the bid work (*Id.* at pp. 4-17), as well as a spreadsheet that details tasks for the 2013 bid and a timeline for their completion, (Dkt. No. 59-10). Neither the letter nor its enclosures found in the record refer to the MSLA or a product schedule.

---

[5] MVP filed an additional purported Product Schedule under the MSLA. (Dkt. No. 54-14). That document, however, references a September 1, 2000 MSLA between Optum and MVP rather than the 2003 MSLA that is at issue in this litigation. (*Id.*).

[6] Optum expressly admits that there were no signed schedules for the Medicare bid work throughout this period. (Dkt. No. 64-4, ¶ 24).

[7] Before its work on MVP's 2012 Medicare bid, Optum sent MVP a similar letter in 2011, which also included requests for data. (*See* Dkt. Nos. 59-22-59-23).

**1. February 2012 [*9] Scope of Services Product Schedule**

In her deposition testimony, Lewis explained that she started drafting a product schedule for actuarial consulting services after her superior asked her to "codify the arrangement with Optum around the actuarial services." (Dkt. No. 54-6, pp. 181-82). She said that there was "kind of an iterative process over several months . . . maybe almost the whole year," in which she, Greenwood, and the MVP in-house attorney were involved.[8] (*Id.* at p. 182). On February 14, 2012, Lewis emailed Greenwood and the MVP in-house attorney, stating that she had "taken a stab at drafting a 'contract' for the actuarial services for which we engage OptumInsight" and asking the recipients to "provide any suggested or needed changes." (Dkt. No. 59-20). Lewis noted that she "would like to get this executed . . . ASAP." (*Id.*). Attached to that email was a document entitled "Scope of Services Product Schedule for Actuarial Consulting Services," ("February 2012 SOS") which contains an effective date of December 1, 2011. (*Id.*; Dkt. No. 59-21, p. 2). Lewis testified that she is not sure whether the February 2012 SOS is the "final document" or "which version" it is. (Dkt. No. 54-6, pp. 181, 183). **[*10]** [9] The February 2012 SOS provides that it "is incorporated into and made part of the [2003 MSLA]."[10] (Dkt. No. 59-21, p. 2). It also contains a non-exhaustive list of services, a timeline for performance of services, an overview of fees and compensation, a provision for termination of the agreement, and a process for requesting changes to the document. (*Id.* at pp. 2-4).

In his deposition testimony, Greenwood explained that before Lewis' email, he had sent her a sample of an SOS and that she "took sections of that and put that into a contract . . . [a]nd then from there [he] would have sent that off to legal for review." (Dkt. No. 54-4, p. 39). Greenwood noted that while he had, in the past, contributed to the development of an SOS, he remarked that the documents are "the responsibility of our legal staff for final authorization and signature." (*Id.* at p. 34).

---

[8] The record contains no documentation that shows this iterative process.

[9] Optum refers to this document as "the 2012 SOS;" MVP refers to it as "the draft SOW." (Dkt. Nos. 57, 63).

[10] Lewis testified that she was unaware of the 2011 amendment to the master services and license agreement. (Dkt. No. 54-6, pp. 179-80); (*see* Dkt. No. 56-11, p. 2) (*first amendment* to the master services and license agreement).

Greenwood testified did not know what happened to the February 2012 SOS after he sent it to the legal department:

> Q. Do you know what, if anything, happened after you sent [the February 2012 SOS] off to legal?
> A. I do not have or recall what transpired once it went to legal and who would have authorized or signed it.
>
> Q. Do you have any recollection whether any SOS **[*11]** was ever signed?
> A. I do not.
> Q. You don't know one way or another?
> A. No, we proceeded as if the SOS was sent out.

(*Id.* at pp. 38-39). Greenwood testified that he assumed "that the SO[S] was in place," and that "we were working under the MSLA." (*Id.* at p. 45). Greenwood further testified that he had never seen a "fully executed copy" of an SOS for Optum-MVP actuarial work. (*Id.* at pp. 34-35). Indeed, Optum has not provided any evidence regarding what happened to the February 2012 SOS after Greenwood sent it to the legal department, and it is undisputed that the parties never signed the document. (Dkt. No. 54-18, ¶ 27; Dkt. No. 56-27, ¶ 28).

In an email dated February 17, 2012, McSorley thanks Pete Lopatka, Lewis' boss, for a meeting the previous day, in which they had discussed the MSLA and product schedules. (Dkt. No. 59-25, pp. 3-4). In a list of items they discussed, McSorley notes that "[m]oving forward[,] all Agreements (Product Schedules, SO[S]s) will hang off of this MSLA." (Dkt. No. 59-25, p. 4). McSorley later testified that, at the same meeting, Lopatka requested "very specific statements of work with a timeline[,] deliverable project costs, [ and] . . . a cap." (Dkt. No. 54-5, pp. 38-39). The February 2012 SOS contains no such specifics. **[*12]** (*See* Dkt. No. 54-16).

In another email to Lopatka dated February 28, 2012, McSorley described a recent conversation with Greenwood, saying that Greenwood "was under the impression we were already working under the attached MSLA for his consulting services although admittedly the scope of services included in his SOW is somewhat undefined" and that Greenwood "underst[ood] [MVP's] need to have a definitive scope of work." (Dkt. No. 59-25, pp. 2-3; *see also* Dkt. No. 54, pp. 45-46). McSorley later testified that Greenwood "understood, but he was also trying to be responsive to a client" and that Greenwood said, "I can't hold back and wait for a contract on this stuff if I need it to go through." (Dkt. No.

54-5, p. 46).

McSorley, however, wanted a signed schedule for Greenwood's work in Optum's "system" because it was a prerequisite to his compensation for the business. (*Id.* at pp. 45-46). Despite his communication with Greenwood and Lopatka in February, McSorley found in July 2012 that there was still no signed schedule for the 2013 MVP bid work. (Dkt. No. 59-26). He emailed Greenwood on July 20, 2012 looking for the schedule and stating that Optum's in-house sales and contract management system "does not reflect any **[\*13]** new SOWs for 2012" and "do[es] not reflect any of the projects you have been working on." (*Id.*).

Lewis' deposition testimony may explain why. She noted that the February 2012 SOS "was never executed because [Lopatka] stopped [her] from working on it," after she, in-house MVP counsel, and Greenwood "were pretty much in agreement . . . that the [February 2012 SOS] would be okay." (Dkt. No. 54-6, pp. 182-83).[11] Lewis stated that Lopatka

> said he was working on going in a different direction, that he had started to talk to Optum about all of their services and they were going to try to do something different and perhaps incorporate the actuarial work under one big umbrella with everything else or something, *so [the February 2012 SOS] never got executed*.

(*Id.* at p. 183) (emphasis added). There is no evidence in the record indicating precisely when Lewis stopped working on the SOS.

Notably, MVP's *30(b)(6)* deponent Gregory Backus focuses not on the February 2012 SOS, but rather on the parties' broader relationship. When asked to describe his "understanding of the relationship between Optum and MVP with respect to actuarial services performed for the 2013 Medicare bid," he replied,

> [M]y understanding was that it was an **[\*14]** oral agreement between the parties that had — it had been an oral agreement for several years on end, going — I don't know how far back that oral agreement would have gone, but my understanding was the work being performed was based on an oral agreement, and that's my understanding at this point in time. At the time of the bid, I don't know that I was aware of the actual happenings of what agreement was even in place then.

(Dkt. No. 56-14, pp. 174-75). Pressed to state how he knew about the oral agreement, he gave several uncertain answers before stating, "I guess, I — if there was no signed agreement in place, but the work was performed and we paid Optum for the work performed, to me, that's how I would know that an oral agreement must have been in place." (*Id.* at 177). Asked later if he knew "if there was an oral agreement between Optum and MVP relating to the 2013 bid submission," Backus replied,

> I don't know that I know, because if there was an oral agreement, I — to me, how — I don't know, I guess — I don't know. I don't know if I would know based on the fact that Optum performed actuarial services on MVP's behalf and then we paid Optum. *I don't know if that constitutes an oral agreement **[\*15]** or not, just the fact that that happened*.

(*Id.* at 184) (emphasis added).

## 2. Parties' 2012 Performance

Optum performed actuarial services for MVP's 2013 Medicare bid, and MVP paid Optum for those services. (Dkt. No. 54-8, pp. 2-3; Dkt. No. 54-18, ¶ 8; Dkt. No. 58-3, ¶ 8). Invoices included in the record indicate periodic billing for services throughout 2012. (Dkt. No. 56-17; Dkt. No. 56-19; Dkt. No. 56-24; Dkt. Nos. 59-15-59-19).[12] The record also shows that actuaries from both parties conducted regular meetings, wherein they discussed the bid project and issues that arose. (Dkt. No. 59-5, pp. 158-62; Dkt. No. 59-12). Ultimately, "MVP submitted its 2013 Medicare bids to CMS on or before June 4, 2012," and "Optum electronically certified the accuracy and validity of MVP's . . . bid on or about June 9, 2012. (Dkt. No. 57-4, ¶¶ 6-7).

In a January 2013 email chain between MVP and Optum employees, representatives from MVP inquired

---

[11] When she was asked if there was "an agreement between MVP and Optum on the services to be performed," Lewis answered, "Yeah, I believe so. We got the statement of work down to our satisfaction." (*Id.* at 183).

[12] None of the invoices in the record refer to a signed SOS or the MSLA. Likewise, the only emails in the record that refer specifically to the February 2012 SOS are the Lewis email that contained it (Dkt. No. 54-15), and a February 28, 2012 email from McSorley to Lopatka saying that the document "is somewhat undefined." (Dkt. No. 59-25, pp. 2-3).

CASE 0:16-cv-01054-DTS   Doc. 1146-34   Filed 03/05/23   Page 7 of 12

Page 6 of 11
2016 U.S. Dist. LEXIS 189263, *15

why Optum had changed a "benefit factor" for the 2013 bid to .908 from the 2012 bid's .937. (Dkt. No. 54-9). In deposition testimony, Lewis defined the benefit factor as representing "the portion of the total allowable claim cost that is absorbed by the plan as opposed to the [*16] cost-sharing portion that's paid by the member." (Dkt. No. 54-6, p. 117). It is a significant aspect of bid calculations, which impacts MVP's projected costs for its Medicare plan offerings. (*Id.* at pp. 67, 122, 151-56). As MVP began receiving results of its 2013 health plan usage, they became aware that there was a problem with their Medicare bid, which they ultimately attributed to the incorrect benefit factor and related cost assumptions. (*Id.*).

Months later, on June 26, 2013, Greenwood sent a letter to MVP's Chief Financial Officer. (Dkt. No. 54-10). In the letter, Greenwood recognizes that "MVP management is concerned with the emerging first quarter experience in 2013" and identifies several factors that he believed were impacting MVP's "2013 experience," many of which pertain to the benefit factor. (*Id.* at pp. 2-3, 7-8).[13] Greenwood also states that the bankruptcy of Kodak, with which MVP had an account, led to its "retirees moving to [healthcare] plans of their choosing" and made it "very difficult to target and identify margins associated with these retirees." (*Id.* at p. 2). An expert retained by MVP for this litigation ultimately estimated the damages from alleged Optum errors to be $12,408,641. (Dkt. No. 56-25, pp. 5, 21).

### III. STANDARD [*17] OF REVIEW

Under *Federal Rule of Civil Procedure 56(a)*, summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; see also *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323*. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248*; see also *Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)* (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*; see also *Selevan v. N.Y. Thruway Auth., 711 F.3d 253, 256 (2d Cir. 2013)* (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue [*18] for trial." *Anderson, 477 U.S. at 248, 250*; see also *Celotex, 477 U.S. at 323-24*; *Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)*. "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003)*.

### IV. DISCUSSION

MVP alleges that its contractual relationship with Optum regarding work on the 2013 Medicare bid was "developed over many years" and is governed by "numerous invoices, purchase orders, letters, and other documentation." (Dkt. No. 58, p. 8; Dkt. No. 58-3, ¶ 34). Optum rejects this interpretation and argues that, assuming MVP can assert a contract claim for the 2013 Medicare bid, (1) the February 2012 SOS incorporates the MSLA and (2) "the [February] 2012 SOS is the operative contract." (Dkt. No. 64, p. 8). In support of this claim, Optum asserts that "the parties performed in accordance with the unsigned 2012 SOS" and that they "waived technical compliance with Sections 1.2 and 10.1 of the [MSLA]," which contain the signed writing requirements. (*Id.* at p. 8). In light of this waiver, Optum argues, the MSLA's damages limitation provision applies to the actuarial work at issue.

---

[13] In his *30(b)(6)* deposition testimony, Gregory Backus (MVP) identified three major 2013 events that drove MVP's "negative variance" (its Medicare business's worse-than-anticipated performance): (1) the termination of an account with Kodak, which "had been a long-time account of MVP's;" (2) Federal Government sequestration; and (3) "benefit factors in the bid, [which] were much lower than what they were coming out to be in 2013." (Dkt. No. 56-14, pp. 76-77).

## A. The MSLA's Applicability to the 2013 Medicare Bid Actuarial Work

### 1. The [*19] MSLA is unambiguous and requires a signed schedule of work to bind the parties

MVP argues that the MSLA is unambiguous and that it governs Optum's provision of products or services only when both parties sign a schedule. (Dkt. No. 54-19, pp. 9-10). Conversely, Optum contends that even absent a signed product schedule, the MSLA "and its terms, including the limitation of remedies provision, would still apply." (Dkt. 64, p. 4). "Under New York law[14] . . . the initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010)* (internal quotation omitted). "The matter of whether the contract is ambiguous is a question of law for the court." *Id.* An ambiguous contract term is one that "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id. at 466* (internal quotation omitted).

In relevant part, Section 1.2 of the MSLA states that "[w]hen [MVP] agrees to purchase and [Optum] [*20] agrees to provide . . . Services to [MVP] *under this Agreement*, the parties *shall* sign appropriate product Schedules to this Agreement." (Dkt. No. 59-3) (emphasis added).[15] Courts interpret the word "shall" as an "express[ion of] what is mandatory." *Seabury Constr. Corp. v. Jeffrey Chain Corp., 289 F.3d 63, 68 (2d Cir. 2002)* (internal quotation omitted); *see also Turner Constr. Co. v. Kleinknecht Elec., Inc., 2011 N.Y. Misc. LEXIS 3471, at *11-18 (N.Y. Sup. Ct. 2011)* (declining to enforce a provision of an MSLA where that MSLA required a signed job order and the parties never executed such a job order). Thus, by its plain meaning, the provision mandates a signed product schedule when the parties intend for their later agreements to fall "under this Agreement [(the MSLA)]."

Nevertheless, Optum contends that introductory language in the MSLA "clearly establishes that it was to be the overarching agreement between the parties" such that "any agreement in place between OptumInsight and MVP . . . would be subject to the terms of the [MSLA]." (Dkt. No. 56-26, pp. 15-16). The relevant sentence states, "This Agreement sets forth the terms under which [Optum] will provide the requested products and services." (Dkt. No. 59-3, p. 2).

Optum's reliance on this introductory sentence is unavailing, particularly in the context of the entire contract. *See Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie, 784 F.3d 78, 87 (2d Cir. 2015)* ("In construing a contract, [*21] a court should read the contract as a whole . . . and avoid any interpretation that would render a contractual provision without force and effect.") (internal citations omitted); *see also Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003)* ("New York law . . . disfavors interpretations that render contract provisions meaningless or superfluous."). The MSLA's definitions section narrows the meaning of the sentence. "Services" is described as "all . . . services [MVP] obtains from [Optum] *pursuant to this Agreement*." (Dkt. No. 59-3, ¶ 1.1(b), (g)) (emphasis added). The MSLA similarly limits the definitions of its product offerings — data and software — to those acquired "*pursuant to this Agreement*." (Dkt. No. 59-3, ¶ 1.1(c), (h)) (emphasis added). Applying those definitions to the introductory sentence that Optum cites, its clear meaning is that the MSLA and associated product schedules bind the parties only with respect to products and services that are *obtained under the MSLA and associated product schedules*. This self-referential provision does not limit

---

[14] The parties assume that New York law applies. (Dkt. 54-19, ¶ p. 7; Dkt. No. 56-26, pp. ii—iii). "A federal court sitting in diversity must apply the choice of law rules of the forum state, in this case New York." *Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1538 (2d Cir. 1997)*. "In contract cases, New York courts . . . apply a 'center of gravity' . . . approach." *Id.* (citing *Babcock v. Jackson, 12 N.Y.2d 473, 481-82, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963)*). MVP's Complaint alleges that the "agreement entered into between MVP and Optum, which is the subject of this controversy, was negotiated, executed, performed and breached by Optum in the State of New York." (Dkt. 1, ¶ 10). Though Optum denied this assertion in its Answer (Dkt. 40, ¶ 10), its filings to the Court cite New York law as the governing law for this litigation. The Court finds that New York's choice of law provisions would lead its courts to apply its own substantive law to this matter.

[15] Both parties state in memoranda of law that this provision constitutes a condition precedent. (Dkt. No. 54-19, p. 19; Dkt. No. 57, pp. 12-13).

CASE 0:16-cv-01054-DTS   Doc. 1146-34   Filed 03/05/23   Page 9 of 12

Page 8 of 11
2016 U.S. Dist. LEXIS 189263, *21

the parties' ability to contract under a separate agreement.

Additionally, Section 1.2, which mandates a signed product schedule in order to bind the parties under the MSLA, further clarifies [*22] the parties' rights to contract outside its bounds. As MVP contends, "[i]f the Court were to interpret the MSLA as Optum suggests, and hold that it applies to any work performed with or without a signed schedule, Section 1.2 would be rendered meaningless." (Dkt. No. 58, p. 14) Such an interpretation is disfavored, as noted above, and the Court will not disregard this well-settled rule of construction. Moreover, Section 1.2 again includes language limiting the MSLA's applicability to products and services acquired under the Agreement. Thus, interpreted as a whole so as to give effect to each of its provisions, the MSLA indicates that its terms apply only to work performed under a signed schedule and leaves open the possibility of work outside its terms. The Court therefore finds as a matter of law that the MSLA requires a signed product schedule to bind the parties to its provisions.

### 2. Waiver of the MSLA's Signed Writing Requirements

Because the MSLA requires a signed product schedule, the parties' cross-motions for partial summary judgment turn on (1) whether the parties waived that requirement and (2) whether the parties waived an additional MSLA provision requiring that all waivers be in a signed writing.

### [*23] a. Waiver Under New York State Law

Optum argues that the parties waived both of the MSLA's signed writing requirements. "A waiver is 'the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable.'" *Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 303 (2d Cir. 1996)* (quoting *Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 184, 436 N.E.2d 1265, 451 N.Y.S.2d 663 (N.Y. 1982)).* Parties can waive contractual provisions and can even "waive no-waiver provisions through their course of conduct." *Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Valley LLC, No. 09 CIV. 2085 (LTS), 2010 WL 1005169, at *4 n.3, 2010 U.S. Dist. LEXIS 25581, at *12 n.3 (S.D.N.Y. Mar. 18, 2010)*; see also *Neonex Int'l, Ltd. v. Norris Grain Co., 338 F. Supp. 845, 853 (S.D.N.Y. 1972)* ("In New York the doctrine is well established that, even where a contract provides that there shall be no waiver or amendment not evidenced by a writing, the prohibition of oral waiver, may itself be waived.") (internal quotation omitted). However, the "[w]aiver . . . must be clear, unmistakable, and without ambiguity" and it "will not be inferred from doubtful or equivocal acts or language." 57 N.Y. Jur.2d Estoppel, Ratification, and Waiver § 87; see also *Pfrmf Inv. Holdings v. Interpublic Group of Cos., No. 11 Civ. 6008 (CM), 2012 U.S. Dist. LEXIS 96981, at *25-26, 2012 WL 2849771, at *9 (S.D.N.Y. July 20, 2012)* (noting that waiver "must be *intentional*" and that "such intention must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act) (emphasis in original) (internal quotations omitted).

Where a written contract prohibits waiver absent a writing signed by the parties, courts usually enforce [*24] the provision. *See Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320, 324 (2d Cir. 1997)* (applying New York law and noting that a provision that "no other promises or agreements shall be binding unless in writing and signed by the parties" constitutes "persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement"); *Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 521-22 (2d Cir. 1990)* (concluding under New York law that a party's "reliance on alleged oral . . . waivers was foreclosed as a matter of law" where a written contracted stated that "a modification could occur only by an agreement in writing, signed by all of the parties" and "there could be no waiver by either party . . . unless such waiver is in writing and signed by the party waiving said right") (internal quotation omitted); *Parkway Plaza Shopping Ctr. v. Stop & Shop Cos., No. 77 Civ. 5817, 1980 U.S. Dist. LEXIS 14161, at *25-26 (S.D.N.Y. Oct. 2, 1980)* (enforcing a contractual provision mandating that waiver be in writing where it "explicitly protects each party from claims of oral waiver, *or waiver by action or inaction*" and noting that "New York courts apply the doctrine of waiver only upon a clear showing that there has been an intent to waive") (emphasis added); *Press v. Marvalan Indus., Inc., 422 F. Supp. 346, 349 (S.D.N.Y. 1976)* (finding that under New York law, "[a] claim of oral or 'implied by conduct' waiver cannot succeed" in part because "the agreement contains a prohibition against waivers [*25] or modifications except by a signed writing").

### b. The Parties' Cross-Motions for Partial Summary Judgment

There are two signed writing requirements in the MSLA. The first, contained in Section 1.2, requires a signed product schedule as discussed above. (Dkt. No. 59-3). The second, contained in Section 10.1, states that "No . . . waiver of any provision of this Agreement will be binding unless in writing and signed by both parties." (*Id.*). Therefore, to establish that the MSLA's damages limitation binds the parties, Optum must adduce evidence showing that the parties unequivocally (1) intended to waive the signed schedule of work requirement and (2) intended to waive the signed waiver provision.

"Waiver of a contractual right 'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.'" *Travelers Cas. & Sur. Co. v. Dormitory Auth., 735 F. Supp. 2d 42, 66 (S.D.N.Y. 2010)* (quoting *Natale v. Ernst, 63 A.D.3d 1406, 881 N.Y.S.2d 232, 233 (N.Y. App. Div. 2009)*) (internal quotation omitted)). "[F]or the parties' conduct to amount to a waiver, it must not otherwise be compatible with the agreement as written, and the conduct of the parties must evidence an indisputable mutual departure from the written agreement." *Travelers Cas. & Sur. Co., 735 F.Supp.2d at 66* (quoting *Dallas Aerospace, Inc. v. CIS Air Port., 352 F.3d 775, 783 (2d Cir 2003)*) (quotations omitted). The doctrine of waiver is applied "only upon a clear showing that there **[*26]** has been an intent to waive." *Parkway Plaza Shopping Center, 1980 U.S. Dist. LEXIS 14161, at *25-26*. While the existence of an intent to waive a contractual right generally presents a question of fact," *Travelers Cas. & Sur. Co., 735 F. Supp. 2d at 66* (quoting *Natale, 881 N.Y.S.2d at 234*), courts may determine the existence of waiver at the summary judgment stage where "the record establishes as a matter of law" whether the parties intended to waive the provisions at issue. *See Natale, 881 N.Y.S.2d at 234*; *Travelers, 735 F. Supp. 2d at 67-69*.

The thrust of Optum's argument is that the parties performed under the terms of the February 2012 SOS, which, Optum contends, demonstrates waiver of the MSLA's signed writing provisions. (*See* Dkt. No. 57, pp. 13-14; Dkt. No. 64, pp. 8-10). Optum asserts that MVP paid for 2013 bid work at a billing rate found in the February 2012 SOS but not prior years' agreements (Dkt. No. 64, pp. 9-10) and that Optum provided all the services that the document described (*Id.* at p. 6).[16]

Optum further asserts that MVP's acceptance of and payment for the 2013 bid work provides "direct evidence" that MVP intended to waive. (*Id.* at p. 8).

Optum also contends that the deposition testimony of MVP representatives demonstrates that MVP waived the MSLA's signed writing provisions. (*Id.* at p. 7). Optum cites to the Lewis testimony that "[w]e got the statement of work down to our satisfaction" and notes that she **[*27]** thought the parties "were pretty much in agreement." (*Id.* at p. 7; Dkt. No. 54-6, pp. 182-83).[17] Optum also references the Backus testimony that "Optum performed actuarial services on MVP's behalf and we paid Optum," as proof that the parties intended to be bound under the unsigned 2012 SOS and thus waived the signed writing requirements." (Dkt. No. 64, p. 7) (alterations omitted).

Optum has, however, failed to identify any evidence from which it could be inferred that there was an indisputable mutual departure from the MSLA requirements of a signed product schedule and a signed waiver. Optum has failed to identify evidence in the record that the parties intended to waive the two signed writing requirements in the MSLA. As noted above, the MSLA did not limit the parties' ability to contract under a separate agreement. The February 7, 2012 Li letter, which predated the February 2012 SOS and noted that Optum would be providing actuarial services for the 2013 Medicare bid, did not contain any reference to the MSLA, or evince an intent to waive the writing requirements of the MSLA. (*See* Dkt. No. 59-9). The fact that Lewis later attempted to finalize a product schedule is indicative of an intent to enforce **[*28]** the MSLA requirement of a signed product schedule. While she stopped working on the product schedule after her superior told her that the contractual agreement was

---

[16] Documentation in the record calls into question Optum's billing rate assertion. Optum asserts that the February 2012 SOS's specification of Greenwood's billing rate at $535 per hour, which differs from the $585 per hour billed in a 2009 invoice, is evidence of the parties' intent to operate under that document and to waive the signed writing requirement. (Dkt. No. 59-21, p. 4; Dkt. No. 64-3, p. 2). However, the February 2012 SOS states that this rate is the "2011 Preferred Billing Rate[]" (Dkt. No. 59-21, p. 2), and another invoice dated August 23, 2011 bills for some of Greenwood's 2011 work at the same $535 per hour rate. (Dkt. No. 56-23, p. 2). Thus, despite Optum's claim to the contrary, a reasonable factfinder could conclude that MVP's payment for Greenwood's work at the rate of $535 per hour does not reflect the parties' intent to waive the signed writing requirement and operate under the February 2012 SOS.

[17] As noted above, the record does not reflect whether the February 2012 SOS is the "final document" from the iterative process or "which version" it is. (Dkt. No. 54-6, pp. 181, 183).

"going in another direction," there is no evidence of an intent by MVP to waive the writing requirements of the MSLA. (Dkt. No. 54-6, pp. 182-83).

In light of the history of the parties' performance of the actuarial work via emails, invoices and purchase orders, and the February 7th letter from Optum confirming that it would be assisting with the 2013 bid preparation, Optum's conduct in performing the actuarial work for the 2013 Medicare bid is not unequivocally related to waiver of the two writing requirements in the MSLA. As noted above, New York law requires waiver to be "unmistakably manifested" and not "inferred from a doubtful or equivocal act." This standard is a significant hurdle, particularly in the case-at-bar, where Optum seeks to prove waiver of not just one signed writing requirement, but two. The facts here, even construed in the light most favorable to Optum and with all ambiguities resolved in its favor, fail to meet this standard.

Although questions of fact remain unresolved as to what terms govern the parties' **[*29]** agreement, such questions are not material to the question of waiver and therefore do not prevent the Court from awarding summary judgment. Because Optum has failed to adduce evidence sufficient to permit a reasonable factfinder to conclude that the parties intended to waive the signed writing provisions, the Court finds as a matter of law that the parties did not waive the MSLA signed writing requirements. MVP's motion for partial summary judgment is therefore granted, and Optum's motion for partial summary judgment is denied.

**B. Optum's Motion for Summary Judgment Dismissing MVP's Contract Claims**

Alternatively, Optum moves for summary judgment dismissing MVP's contract claims on the ground that MVP cannot show the existence of a contract. (Dkt. No. 56-26, p. 13). In the Complaint, MVP alleges that "[c]onsistent with its agreements with Optum in previous years, in early 2012, MVP entered into an agreement with Optum for Optum to provide outside actuarial services to MVP relating to the 2013 Medicare bids ('2012' Agreement')." (Dkt. No. 1, ¶ 22). Optum, alleging that this assertion refers to a single, executed document, argues that MVP has failed to produce the governing contract and that in the **[*30]** absence of evidence of a contract, MVP's breach of contract claim must be dismissed. However, the Complaint never actually refers to a singular document. Furthermore, MVP's memoranda of law clarify its argument, which is that "the contract between the parties, developed over many years, was evidenced and defined by a series of documents, timelines, requests for information and invoices." (Dkt. No. 58, p. 8).

It is well-settled that "questions as to what the parties said, what they intended, and how a statement by one party was understood by the other are questions of fact; however, the matter of whether or not there was a contract, in light of the factual findings on these questions, is an issue of law." *Beautiful Jewellers Private Ltd. v. Tiffany & Co., 438 Fed. Appx. 20, 22 (2d Cir. 2011)* (quoting *Ronan Assocs., Inc. v. Local 94-94A-94-B, Int'l Union of Operating Eng'rs, 24 F.3d 447, 449 (2d Cir. 1994))*. "[P]erformance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69 (2d Cir. 1984)*.

The record is replete with documentation of the parties' relationship that clearly indicates a meeting of the minds, including the February 7, 2012 Li letter and its appendices, (Dkt. No. 59-9; Dkt. No. 59-10), evidence of meetings, (Dkt. No. 59-5, **[*31]** pp. 158-62; Dkt. No. 59-12), and various invoices. (Dkt. No. 56-17; Dkt. No. 56-19; Dkt. Nos. 56-23-56-24; Dkt. Nos. 59-15-59-19). *See Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC, 07CV6665(HB), 2009 WL 1803458, at \*2, 24, 2009 U.S. Dist. LEXIS 54670, at \*4, 78 (S.D.N.Y. June 23, 2009)* (finding a contract where the parties did not execute a master agreement but instead "conducted business pursuant to a system of purchase orders and invoices"). The parties' performance in 2012 and in years prior is itself a clear indication of a contract.

Optum argues, however, that "MVP's *30(b)(6)* corporate representative, Mr. Backus . . . testified that he was not aware of *any* agreement, oral or written, related to the 2013 Medicare Bid work performed by OptumInsight" and therefore bound MVP to that assertion. (Dkt. No. 56-26, p. 10). However, construing the facts in a light most favorable to MVP, this assertion is not a fair synopsis of his testimony. His testimony indicates uncertainty about what conversations or documents constitute an agreement, but he does not state a belief that there was no agreement. Moreover, even if Backus had testified that he did not know of any agreements, his testimony explicitly mentions the parties' performance, which alone supports a finding that **[*32]** the parties had entered a contract. Finally, the Backus

testimony cannot bind MVP to the legal conclusion that there was no contract. See *S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control, 731 F.3d 799, 811 (8th Cir. 2013)* ("A 30(b)(6) witness's legal conclusions are not binding on the party who designated him."); *AstenJohnson, Inc. v. Columbia Cas. Co., 562 F.3d 213, 229 n.9 (3d Cir. 2009)* (noting that the testimony of a 30(b)(6) witness is not binding where it "offered only [the deposed individual's] interpretation of the contract based on his reading of it"). Accordingly, the parties contracted for performance of the 2013 Medicare bid work, and Optum's motion for summary judgment dismissing MVP's contract claims is therefore denied.[18]

## V. CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiff's motion for partial summary judgment (Dkt. No. 54) is **GRANTED**; and it is further

**ORDERED** that Defendant's motion for partial summary judgment and summary judgment (Dkt. No 56; Dkt. No 56-26, pp. 2, 24) is **DENIED**; and it is further

**ORDERED** that Defendant's "Second Affirmative Defense" (Dkt. No. 40, p. 11) is dismissed.

**IT IS SO ORDERED**.

/s/ Brenda K. Sannes

Brenda K. Sannes

U.S. District Judge

September 30, 2016

Syracuse, New York

**End of Document**

---

[18] Having reached this conclusion, the Court need not address MVP's contention that Optum is estopped from denying existence of the contract. (Dkt. No. 58, pp. 11-13). Similarly, the Court need not address whether the parties' contract includes agreement with respect to limitation of damages, and this Opinion implies no determination of that issue.

Abigail Krueger