**EXHIBIT 37**



Neutral
As of: March 5, 2023 8:22 PM Z

# Peter J. Solomon Co., L.P. v. ADC Prods. (UK)

United States District Court for the Southern District of New York

March 30, 2016, Decided; March 30, 2016, Filed

No. 14CV4086-LTS

**Reporter**
2016 U.S. Dist. LEXIS 42537 *

PETER J. SOLOMON COMPANY, L.P. and PETER J. SOLOMON SECURITIES COMPANY, LLC, Plaintiffs, -v- ADC PRODUCTS (UK) LIMITED f/k/a SPIROGEN LIMITED, Defendant.

**Subsequent History:** Summary judgment granted by, in part *Peter J. Solomon Co., L.P. v. ADC Prods. (UK), 2017 U.S. Dist. LEXIS 217371 (S.D.N.Y., May 10, 2017)*

## Core Terms

termination, parties, key man, abandoned, summary judgment, repudiation, departure, engagement, advisory, notice, argues, Tail, opportunity to cure, fee provision, notified, cure, material breach, material fact, docket entry, hereunder, quotation, marks

**Counsel:** [*1] For Peter J. Solomon Company, L.P., Peter J. Solomon Securities Company, L.L.C., Plaintiffs: Matthew Schenker, Fox Rothschild, Attorneys at Law (NYC), New York, NY; Mitchell Berns, Lane Sash & Larrabee LLP, White Plains, NY.

For ADC Products (UK) Limited, Defendant: Eric Shin-Lin Lee, Michael David Schissel, LEAD ATTORNEYS, Carmela T. Romeo, Arnold & Porter, LLP, New York, NY.

**Judges:** LAURA TAYLOR SWAIN, United States District Judge.

**Opinion by:** LAURA TAYLOR SWAIN

## Opinion

### MEMORANDUM OPINION AND ORDER

Peter J. Solomon Company, L.P. and Peter J. Solomon Securities Company, LLC (together, "PJSC" or "Plaintiffs"), bring this breach of contract action against ADC Products (UK) Limited f/k/a Spirogen Limited ("Spirogen" or "Defendant"), claiming that Spirogen owes them fees under an agreement for PJSC's financial advisory services. The parties have both moved for summary judgment.

The Court has jurisdiction of this action pursuant to *28 U.S.C. § 1332*.

The Court has carefully reviewed the parties' submissions. For the following reasons, Plaintiffs' motion is granted as to the issue of liability, and Defendant's motion is denied.

### BACKGROUND

Unless otherwise noted, the following material facts are undisputed.[1]

Plaintiff Peter J. Solomon Company L.P. is an investment banking advisory firm organized as a Delaware limited partnership whose partners are citizens of New York, New Jersey and Connecticut. (Def. Statement of Undisputed Material Facts Pursuant to *Local Civil Rule 56.1* ("Def. 56.1 Stmt.") ¶ 1; see also docket entry no. 11 at 2.) Plaintiff Peter J. Solomon Securities Company, LLC is a Delaware limited liability company and an affiliate of Peter J. Solomon Company, L.P. (*Id.*) Defendant ADC Products (UK) Limited, formerly known as Spirogen Limited, is a corporation organized under the laws of the United Kingdom with its principal place of business in London. (Def. 56.1 Stmt. ¶ 2; docket entry no. 11 at 2.) Spirogen focused on developing cancer drug technology and therapies, and it

---

[1] The facts recited are drawn primarily [*2] from the parties' statements pursuant to S.D.N.Y. *Local Civil Rule 56.1*, or from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective *Local Civil Rule 56.1* Statements incorporate by reference the parties' citations to underlying evidentiary submissions.

was the company's business plan to license its technology to other parties. (Def. 56.1 Stmt. ¶ 2.)

Frederick Frank is a preeminent investment banker in the life sciences **[*3]** field. (Id. ¶ 3.) He established the first life sciences practice on Wall Street nearly six decades ago in 1959. (Id.) Frank joined PJSC to create and develop a life sciences practice for PJSC. (Id. ¶ 5.)

In October 2010, Stephen Evans-Freke introduced Spirogen to Frank concerning a possible engagement for investment advisory services. (Id. ¶ 6.) Evans-Freke is a co-founder of Auven Therapeutics Holdings L.P. ("Auven"), a private equity firm that held a 10 percent stake in Spirogen at the time of the introduction. (Id.) The lead negotiators of the engagement letter signed by the parties (the "Agreement") were Scott Napolitano for PJSC and Chris Martin, Chief Executive Officer of Spirogen, for Spirogen. (Id. ¶¶ 2, 8.) Spirogen requested that PJSC include a "key man" provision in the Agreement with respect to Frank. (Id. ¶ 9.) Key man provisions are not typically included in PJSC's agreements for investment advisory services. (Id. ¶ 10.) Section 7(j) ("Key Man") of the Agreement provides that "PJSC agrees that Frederick Frank will be substantially involved in providing, or supervising the provision of, financial advisory services to the Company throughout the term of this agreement." ("Key Man Provision," **[*4]** id. ¶ 11.)

In December 2010, Spirogen and PJSC signed the final version of the Agreement. (Id. ¶ 12.) Section 7 ("Miscellaneous") of the Agreement provides that the Agreement shall be governed by and construed in accordance with the laws of New York. (See Napolitano Decl. Ex. A ("Agreement").) Section 6 ("Term") of the Agreement states that: "[t]he term of PJSC's engagement shall extend from the date hereof and shall continue thereafter until (a) three months after such time as the Company or PJSC shall have notified the other party in writing of the termination of this agreement or (b) if PJSC shall be in breach of Section 7(j) below [(the Key Man Provision)], 30 days after such time as the Company shall have notified PJSC in writing of such breach unless PJSC shall sooner cure such breach." (Id.) The same section states that: "provided, however, that . . . PJSC shall be entitled to its full fees under Section 3 hereof in the event that a Transaction is consummated with an Eligible Party (as defined below) at any time prior to the expiration of one year after such termination." ("Tail Fee Provision," id. (emphasis in original).) An "Eligible Party" is defined as "any potential Buyer or Counterparty (x) as to which PJSC advised **[*5]** the Company hereunder or (y) identified to the Company by PJSC or with which the Company had discussions regarding a Transaction, in each case, during the term of PJSC's engagement hereunder." (Id.)

Section 3 of the Agreement lays out a fee schedule for payment of PJSC which provides that, in a transaction where property or assets of the Company are sold, PJSC is to receive, in accordance with Exhibit B to the Agreement, 2% of the portion of the aggregate consideration that is US $50 million or greater but less than or equal to US $100 million, and 1.75% of the portion of aggregate consideration that is greater than US $100 million but less than or equal to U.S. $200 million. (See Agreement § 3, Ex. B.)

The parties dispute the purpose of the engagement of PJSC. Defendant claims that the purpose of the Agreement was "to generate a bidding war between two companies—Genentech and Seattle Genetics—for the acquisition of Spirogen." (Def. 56.1 Stmt. ¶ 7.) PJSC denies this assertion, citing, inter alia, the broad engagement language of the Agreement. (Pl. Resp. to Def. 56.1 Stmt. ¶ 7.)

Frank served on Auven's Advisory Board from December 2007 to June 2013. (Id. ¶ 18.) He left PJSC's employ in January **[*6]** 2013 to join another firm, Burrill & Company. (Def. 56.1 Stmt. ¶ 15.) On March 13, 2013, Auven held an Advisory Board meeting, which Frank attended by telephone. (Id. ¶ 19.) At the time of the March 2013 Auven Advisory Board meeting, Spirogen SARL was the parent company of Spirogen. (Id. ¶ 20.) During this meeting, the sale of Spirogen SARL was discussed, as well as as "the interest expressed by various investment banks to represent the Fund on a potential transaction involving the chemistry platform of Spirogen SARL beginning in the second calendar quarter of 2013 and the feedback from various bankers on their perception of how this transaction might be received in the industry." (Id. ¶ 19.)

In April 2013, Spirogen SARL retained Lazard, an investment banking firm, to identify a potential buyer. (Id. ¶ 21.) Discussions about a potential sale between Spirogen SARL and AstraZeneca ("AZ") did not begin until early July 2013, approximately six months after Frank left PJSC. (Id. ¶ 22.) PJSC did not provide any services to Spirogen relating to the AZ transaction. (Id. ¶ 24.) On October 15, 2013, AZ purchased a 50 percent or greater interest in the securities, assets or business of Defendant **[*7]** and its affiliates. (Pls. Local 56.1 Statement ("Pls. 56.1 Stmt.") ¶ 4.) The sale of Spirogen

CASE 0:16-cv-01054-DTS   Doc. 1146-36   Filed 03/05/23   Page 4 of 6

Page 3 of 5
2016 U.S. Dist. LEXIS 42537, *7

SARL to MedImmune, an affiliate of AZ, was publicly announced on October 15, 2013. (Def. 56.1 Stmt. ¶ 23.) The parties dispute the total amount of consideration paid as part of the AZ transaction. Plaintiffs claim that AZ paid $200 million in connection with the AZ transaction, including $163.5 million to or for the benefit of the shareholders of Spirogen SARL and $36.5 million into several escrow accounts. (Pls. 56.1 Stmt. ¶ 5.) Spirogen claims that AZ has paid only $173.5 million in connection with the transaction; of the remaining $26.5 million, Spirogen alleges that $16.5 million comprises payments that have not yet been realized from escrow, and that $10 million has been forfeited and returned to AZ. (Def. Resp. to Pls. 56.1 Stmt. ¶ 5.)

Defendant never sent PJSC a notice terminating the Agreement. (Pls. 56.1 Stmt. ¶ 3.) Defendant has not paid a fee to PJSC. (Id. ¶ 7.)

PJSC filed suit in New York state court on May 1, 2014, alleging breach of the Agreement, and seeking damages of no less than $3,750,000, plus pre-judgment interest and costs. Defendant removed the action to this Court on **[*8]** June 5, 2014. (Docket entry no. 1.)

DISCUSSION

Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted)). The Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010) (citation omitted). When a properly supported motion for summary judgment is made, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 249 (internal quotation marks and citation omitted). If the evidence presented by the non-moving party "is merely colorable, or is not significantly probable," summary judgment may be granted. Id. at 250-51 (citations omitted). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . . [M]ere conclusory allegations **[*9]** or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

"Whether a contract is ambiguous and the meaning of an unambiguous contract are questions of law." Oppenheimer & Co. Inc. v. Metal Mgmt., Inc., No. 08 Civ. 3697, 2011 U.S. Dist. LEXIS 67762, 2011 WL 2462588, at *7 (S.D.N.Y. Jun. 20, 2011) (citing Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 51 (2d Cir. 2011)). "[T]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (citation and internal quotation marks omitted). "[I]f an agreement is 'complete, clear and unambiguous on its face [, it] must be enforced according to the plain meaning of its terms.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177-78 (2d Cir. 2004) (citation omitted) (second alteration in original).

Spirogen argues that it is entitled to summary judgment because the departure of Frank from PJSC was a material breach of the Agreement, specifically of the Key Man Provision, and that the material breach excuses Spirogen from performance. Spirogen also argues that the Tail Fee Provision under Section 6 of the Agreement does not apply because AZ is not an "Eligible Party." Finally, Spirogen argues that PJSC abandoned the Agreement. PJSC, on the other hand, argues that it is entitled to summary judgment because the Tail Fee Provision applies, Spirogen did not follow the Agreement's **[*10]** notice and cure requirements, Frank's departure did not constitute a repudiation of the Agreement, and the Agreement was not abandoned.

Under New York law, where an agreement specifies conditions precedent to the right of cancellation or termination, the conditions must be complied with to effectuate a valid cancellation or termination. See Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 727 (2d Cir. 1992) (citation omitted). "Generally, a party asserting nonperformance must afford a defaulting party any contractually-secured opportunity to cure prior to termination of a contract." Point Productions A.G. v. Sony Music Entm't, Inc., No. 93 Civ. 4001, 2000 U.S. Dist. LEXIS 10066, 2000 WL 1006236, *3 (S.D.N.Y. Jul. 20, 2000) (internal quotation marks and citation omitted). In limited circumstances, New York law permits a party to terminate a contract immediately,

Abigail Krueger

CASE 0:16-cv-01054-DTS   Doc. 1146-36   Filed 03/05/23   Page 5 of 6

Page 4 of 5
2016 U.S. Dist. LEXIS 42537, *10

without affording the breaching party notice and opportunity to cure. *Needham v. Candie's, Inc., No. 01 Civ. 7184, 2002 U.S. Dist. LEXIS 15144, 2002 WL 1896892, \*4 (S.D.N.Y. Aug. 16, 2002)* (citing *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F. 2d 1003, 1009 (2d Cir. 1991))*. Such circumstances include when the non-performing party expressly repudiates the parties' contract, where any cure would be futile, or where the contract has been abandoned. See id. (citations omitted).

The Agreement here clearly and specifically provides that, if Frank is no longer substantially involved in providing or supervising the provision of services to Spirogen under the contract (i.e., the Key Man Provision is breached), the Agreement will not **[\*11]** terminate automatically. Rather, it will only terminate "30 days after such time as the Company shall have notified PJSC in writing of such breach unless PJSC shall sooner cure such breach." (Agreement § 6.) This clause also includes a provision for payment of fees to PJSC notwithstanding such a termination: "provided, however, that . . . PJSC shall be entitled to its full fees . . . in the event that a Transaction is consummated with an Eligible Party . . . at any time prior to the expiration of one year after such termination." (Id. (emphasis in original).) The Agreement clearly contemplates a situation where Frank is no longer substantially involved in providing the services to Spirogen, PJSC is unable to cure that breach and the Agreement is terminated, but PJSC would nonetheless be entitled to collect its fee under Tail Fee Provision. The Agreement unambiguously provides that (1) Spirogen must notify and give PJSC an opportunity to cure a breach of the Key Man Provision prior to any termination of the Agreement for breach of the Key Man Provision and (2) even if PJSC breaches the Key Man Provision and Spirogen terminates the Agreement, PJSC is entitled to collect its fee under certain **[\*12]** circumstances.

While is true that a material breach, if established, would typically relieve the non-breaching party of its obligation to perform and enable automatic termination, see *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117 (2d Cir. 2006)*, the parties here have specifically contracted around this general rule. The plain language of the Agreement eviscerates Spirogen's argument that Frank's departure relieved Spirogen of its obligation to comply with the notice, opportunity to cure, and tail fee provisions of the contract.

Spirogen also argues that the Agreement was repudiated or abandoned, which, if true, would relieve Spirogen of performance under the Agreement and of the need to abide by the notice and opportunity to cure provisions for termination. To constitute repudiation of a contract, a party's conduct must "indicate an unequivocal intent to forego performance of [its] obligations under the contract." See *Pitcher v. Benderson-Wainberg Associates II, Ltd. P'ship, 277 A.D.2d 586, 588, 715 N.Y.S.2d 104 (N.Y. App. Div. 2000)*; see also *Bressler, 977 F.2d at 728* (aggrieved party not under duty to abide by notice provisions where "the repudiating party expressly disavowed any further duties under the contract at issue, in effect declaring the contract at an end.") In this regard, Spirogen essentially argues that, because the departure of Frank was a material breach of the Agreement, **[\*13]** Frank's departure also constituted a repudiation of the Agreement since it rendered PJSC unable to perform its obligations to Spirogen. (Def. Br. 8-10.) A material breach is not tantamount to a repudiation, however, and Spirogen offers no authority in support of its position. Other than the fact of Frank's departure, Spirogen has proffered no evidence suggesting that PJSC has indicated at all, let alone unequivocally, its intent not to perform. Provisions for termination notice, opportunity to cure and payment of tail fees negate any inference of repudiation based solely on Frank's departure. Spirogen's repudiation argument is thus unavailing.

Rescission of a contract by abandonment requires the mutual assent of the parties. *Jones v. Hirschfeld, 348 F. Supp. 2d 50, 58 (S.D.N.Y. 2004)* (citation omitted). "The intention to abandon a contract need not be manifested expressly, however, but may 'be inferred from attendant circumstances and conduct of the parties.'" Id. (quoting *Armour & Co. v. Celic, 294 F.2d 432, 435 (2d Cir. 1961))*. Where conduct is relied upon to establish the abandonment, the acts of the parties must be "positive, unequivocal and inconsistent with an intent to be further bound by the contract." *Armour & Co., 294 F.2d at 436* (citation omitted). Generally, a finding of abandonment will be based on "clear, affirmative **[\*14]** conduct by at least one of the parties that is entirely at odds with the contract." *Jones, 348 F. Supp. 2d at 59* (quoting *EMF General Contracting Corp. v. Bisbee, 6 A.D.3d 45, 50, 774 N.Y.S.2d 39 (N.Y. App. Div. 2004))*. Here, Spirogen contends that the Agreement was abandoned by both parties because "the purpose of the Agreement was for PJSC to generate a bidding war between Genentech and Seattle Genetics for the acquisition of Spirogen" and that, after the bidding war did not materialize, PJSC ceased to offer any services to Spirogen and Spirogen did not request any services from PJSC. (Def. Br. 12.)

Abigail Krueger

While Plaintiffs do not deny that the Agreement was entered into in the context of efforts to conclude a transaction involving Genentech or Seattle Genetics, the terms of the executed Agreement are not limited to a transaction with either of those parties. The executed Agreement does not focus on specific potential buyers but, rather, states that its "purpose" was to engage PJSC "on an exclusive basis as financial and strategic advisor to the Company, including without limitation in connection with a possible transaction or series or combination of transactions" involving a purchase, sale or licensing of Spirogen property. (See Agreement p. 1 (emphasis added).) The lack of activity between the parties after [*15] the beginning of 2011 falls short of "clear, affirmative conduct" that indicates an "unequivocal" intention by either or both of the parties to abandon the contract.

Finally, Spirogen argues that the Tail Fee Provision does not apply here because AZ is not an "Eligible Party." The Agreement defines "Eligible Party" as "any potential Buyer or Counterparty (x) as to which PJSC advised the Company hereunder or (y) identified to the Company by PJSC or with which the Company had discussions regarding a Transaction, in each case, during the term of PJSC's engagement hereunder." (Agreement § 6.) Spirogen claims that discussions between Spirogen's parent company, Spirogen SARL, and AZ that resulted in the transaction at issue did not commence until six months after Frank's departure, and two and a half years after PJSC stopped providing services to Spirogen in any manner, and thus did not take place during "the term of PJSC's engagement hereunder." (Def. Br. 10-11.) The Agreement does not provide a termination date, and only provides for termination "(a) three months after such time as the Company or PJSC shall have notified the other in writing of the termination of this agreement or (b) if PJSC [*16] shall be in breach of Section 7(j) below [(the Key Man Provision)], 30 days after such time as the Company shall have notified PJSC in writing of such breach unless PJSC shall sooner cure such breach . . . ." (Agreement § 6.) As explained above, the Agreement specifically provides that it will not be terminated automatically upon Frank's departure from PJSC. It is undisputed that Spirogen had not sent written notice of termination prior to the AZ transaction and there is no indication that it has done so to date. AZ, "a party with which the Company had discussions concerning a Transaction" during the term of the Agreement, thus qualifies an "Eligible Party" and Spirogen is obligated to pay PJSC its transaction-related fee as provided under the Agreement. That PJSC may be paid for a transaction that it never worked on is no reason for the Court to ignore the plain terms of the Agreement, which were negotiated by two sophisticated parties.[2]

CONCLUSION [*17]

Plaintiffs' motion for summary judgment is granted as to the issue of liability only. Defendant's motion for summary judgment is denied. Because there are material disputed issues of fact regarding the total amount of consideration that was paid in connection with the AZ transaction, and thus regarding the fee owed to Plaintiffs under the Agreement, the Court denies the Plaintiffs' summary judgment motion to the extent it seeks an award of damages. The parties are directed to use their best efforts to resolve the damages issue.

The trial of this action will be limited to the issue of damages. The final pre-trial conference is hereby adjourned to June 16, 2016, at 10:00 a.m., and the parties are directed to consult and make submissions in advance of the conference as provided in the Pre-trial Scheduling Order (docket entry no. 14.)

This Memorandum Opinion and Order resolves docket entry numbers 51 and 53.

SO ORDERED.

Dated: New York, New York

March 30, 2016

/s/ Laura Taylor Swain

LAURA TAYLOR SWAIN

United States District Judge

---

**End of Document**

---

[2] Spirogen does not dispute that, in December 2012, it had entered into discussions with MedImmune, an affiliate of AZ, regarding "a Transaction." (See Def. Reply at 5-6; see also Agreement at 1, § 6; Supp. Berns Decl. Ex. LL; Martin Tr. 81-86; Forer Tr. 66-67.)

Abigail Krueger