# EXHIBIT 3

75

1 to process the business of another entity, each such event
2 shall be deemed to be an assignment, subject to this
3 section, and client shall make no expanded use of the Fair
4 Isaac products as a result of such assignment -- of such
5 event unless and until Fair Isaac provides such written
6 consent, which will not be unreasonably withheld."
7         So I want to break that down a little bit and
8 start this process of the hard work.  There was some
9 reorganizing and some changes of control during all of these
10 merger events, but I want to focus right now on the
11 acquisition, that ACE acquisition, the main event, and
12 here's how I want you to think about it.
13         When you look at Section 10.8, you need to
14 substitute "Federal" for the first two times that "client"
15 appears, because the evidence will show that Federal was the
16 client who bought the Blaze license.  Then you can simplify
17 things.  You can forget about all these references to events
18 other than an acquisition, because we're focused on an
19 acquisition right now.  We're not worried about the merger
20 the reorganization, the right to process new business.  So
21 I've removed them.  I've simplified things with the green
22 dots.
23         And then you can fill in, well, what happened
24 here?  We know that Federal was acquired by ACE Limited.
25 And you heard, FICO agrees, that acquisition was a deemed

76

1 assignment.  And the evidence will show it's an automatic
2 assignment, not something you deem to paper.  Who was the
3 assignment to?  Well, it was to the acquiring company, ACE
4 Limited, which then became Chubb Limited because of the
5 brand recognition.  And once you do this, once you just
6 substitute in the words to reflect what was happening during
7 the acquisition event, what does the contract say?
8         Let's look at the first clause.  It says that "If
9 Federal is acquired by ACE Limited, the acquisition shall be
10 deemed an assignment subject to this section."  Easy enough.
11         So what is the rule?  What is it subject to?  It
12 says, "ACE Limited," which then became Chubb Limited, "shall
13 make no expanded use of the FICO products as a result of any
14 such acquisition unless and until FICO provides such written
15 consent which will not be unreasonably withheld."
16         So it requires some thought, no doubt about it.
17 But when you dig in and fill in what actually happened here,
18 it is clear what the parties intended.  The evidence will
19 show that the parties intended that if Federal were acquired
20 by another company, rights under the contract are assigned
21 to that new company.  They're deemed assigned.  In this
22 case, to ACE Limited and then Chubb Limited.  And Blaze use
23 can continue so long as there is no expanded use.  If use is
24 going to expand because you're growing your use of Blaze
25 through the acquisition, well, then you need to talk to FICO

77

1 and get some consent.
2         And you'll see that this makes perfect sense.  Why
3 should a merger or a reorganization or an acquisition
4 entitle FICO to say, you have to stop using Blaze if the use
5 of Blaze isn't expanding?  The evidence will show that the
6 parties agreed to a very specific expanded use rule.  And
7 the evidence will also show that FICO does not always agree
8 to an expanded use rule, but it did so here, and with this
9 lawsuit, with this Section 10.8 breach claim, it's going to
10 ask you to rewrite the contract.
11         But every word in this contract matters.  FICO is
12 going to be asking you to delete this expanded use rule
13 because the evidence will be that there was no expanded use
14 of Blaze after the ACE acquisition.  And FICO rushed to
15 terminate the contract in March 2016 anyway, and that's
16 really hard to justify.
17         This is a letter that Chubb sent FICO in
18 February 2016 right after ACE acquired Chubb.  Chubb
19 explained, "The applications that have been utilizing the
20 Blaze Advisor software since 2006 are currently running in
21 the exact same fashion as prior to the merger transaction."
22         The evidence will show that this assurance was
23 accurate.  The 13 applications that were using Blaze after
24 the acquisition were the applications that were using Blaze
25 before the acquisition.

78

1         You heard a reference to 15 applications during
2 FICO's presentation.  You'll see some of that during trial,
3 and it's because in these initial discussions, Chubb was
4 erring on the side of caution in trying to name how many
5 applications were using Blaze.  And so there's some
6 reference to 15, but the evidence will show it's only 13.
7         And you'll see that when FICO terminated the
8 license agreement in March 2016, less than two months after
9 this acquisition closed and despite a black-and-white
10 assurance of no expanded use from Chubb, there was no
11 evidence of expanded use.
12         Now, I'm sure FICO will have a theory during
13 trial, maybe many theories, on how use of Blaze just must
14 have expanded after the acquisition.  You already heard
15 today FICO talking about, well, some of the insurance
16 policies had new writing company names on them.  But the
17 evidence will show that these are just things that FICO came
18 up with during years of litigation once it had doubled down
19 and had no choice but to try to come up with some
20 justification for terminating the contract in 2016.  You
21 see, the evidence will show that FICO has known for years
22 that it would have trouble trying to show the use of Blaze
23 had expanded and that it a right to more fees just because
24 there had been an acquisition.
25         This is an e-mail exchange between Mr. Sawyer and

79

Mr. Schreiber in October 2015, before the acquisition. And they're brainstorming about this whole idea of using the acquisition as a basis to get more money. And Mr. Schreiber says in the top email, "The unreasonably withheld bit has me a little concerned." And that's a reference to the expanded use rule. He's worried about it.

And Mr. Sawyer responds a few minutes later and says I'm not so concerned about it. He says, the idea that the companies got bigger should be enough to get around the contract language. He says, "I would think that tripling the size of the GWP" -- that's a reference to insurance revenue -- "of business by application should be significant enough to get around that unreasonably withheld language."

But it didn't take Mr. Schreiber long to identify the problem with that argument back when FICO thought no one was watching. Mr. Schreiber responds a few minutes later and he says, "Well, is the license specifically tied to GWP?" Meaning, is it tied to revenue? And the answer is no. Mr. Sawyer responds, "I don't see anything on GWP on the agreements."

And the evidence will show that this was disappointing to Mr. Schreiber and Mr. Mr. Sawyer because FICO has negotiated contracts with other customers that say if -- that says FICO gets more money if the revenue of a customer increases because of a merger or acquisition. But

80

as Mr. Schreiber and Mr. Sawyer were acknowledging back in 2015, that is not the agreement that they had negotiated with Federal.

This is another example of FICO asking you to rewrite, to renegotiate their contract for them. FICO could have negotiated for that language, but the evidence will show that it didn't, and that matters because words in a contract are significant, and they can change the whole meaning of a party's agreement.

You do not get a do-over at negotiating your contract just because you file a lawsuit. And so by the end of this trial, it will be clear that you should reject FICO's claim that Federal breached Section 10.8.

Now, you also heard that FICO has brought claims for copyright infringement, but the evidence will show that when you do the hard work of closely examining what happened after the acquisition, ACE American had every right to use Blaze. In fact, the evidence will show that the whole point of Section 10.8 was to guard against exactly the type of infringement argument we're hearing today. Let me show you what I mean.

So we're going back to the contract language in 10.8. As I showed you earlier, ACE Limited, which quickly became Chubb Limited, stepped into Federal's shoes into the contract and became the client. Then, just like my sister

81

obtains all the rights under my apartment lease if I assign it to her, ACE Limited, then Chubb Limited, had all the rights that Federal used to have under the Blaze license.

And as we discussed earlier, the evidence will show that under the Blaze license agreement, the client, now ACE Limited and Chubb Limited, and it's affiliates, could use Blaze. And if you go back to the organization chart we looked at before, you know that the evidence will show ACE American was an affiliate of ACE Limited and then Chubb Limited.

I was not kidding when I said that your jury service will require hard work. I really meant it, but it is important work because it's a lot easier to get swept up in terms like infringement, indifference to contracts, than it is to dig into the words of these contracts and parse all of these corporate acquisitions that happened and figure out what was actually intended. But you're all here on this jury because ACE and Federal are confident that when you look at this closely, if you're willing to do the hard work, you will reject the copyright infringement claim too.

And now we're on the final topic I wanted to talk to you about this morning. I want to thank you for your attention so far. I really appreciate it. And I just wanted to ask you to continue your attention for a few more minutes while I talk about something that's very important

82

to ACE and Federal.

You see, Federal is not just a defendant in this case. Federal is also asserting claims against FICO. As we discussed before, Federal had a perpetual license to use Blaze. It was supposed to last forever. Federal paid more than a million dollars for that right. And you will see that the agreement said that FICO could only terminate Federal's use to use Blaze if there was a material breach of the agreement. And for the reasons we talked about, the evidence will show that Federal did not breach the agreement. That means FICO could not and should not have terminated the agreement and doing so was a breach.

Federal also has a very important second claim. You'll learn that under the law, a covenant of good faith and fair dealing is implied into every single contract, and that means exactly what it sounds like. Parties to a contract must act in good faith in their interactions and they must be fair. And this is so important that parties don't have to memorialize it in an agreement. It's just automatically put into every contract that's signed.

And we're going to show that when FICO rushed to terminate the agreement, even though there wasn't a stitch of evidence of expanded use, there was no evidence that that expanded use rule had been violated, it breached the implied covenant.

143

1  A.  So we talk about the complexity of these decisions.  By
2  having a visual representation of the flow, you can start to
3  drill down into it to look at what's only important to you
4  and sort of back up and see the whole process and then drill
5  down and look at that.  It allows you to also reuse those,
6  so you can define one and you can embed those into either
7  rule flows and more complex rule flows, so you can actually
8  create these very nested trees, is the word we use, for them
9  off of the rule flow.  So it models the business process in
10 the form of decisions by utilizing the rules to do that.
11 Q.  What's the purpose of that for the business?
12 A.  The purpose of that is for the business, yes.
13 Q.  And why does the business care to have that?
14 A.  Because they can not visualize all the thousands of
15 rules and thousands of complex micro decisions without that
16 visualization.
17 Q.  And what value comes from being able to visualize it?
18 A.  It allows them to have an ability to change, extend, and
19 document exactly what's happening and ensure that when that
20 is actually executed, that it is executing exactly the way
21 they said it should be.
22 Q.  Is the business goal to make better decisions?
23 A.  They will make better decisions based off of that, yes.
24 Q.  Let me turn to scoring.  In the context of a Blaze
25 Advisor, what does that mean?

144

1  A.  So scoring is, and we'll refer to this later, is what we
2  call a score metaphor, right?  And if you think about how do
3  you weight the various outcome of all of these decisions,
4  right?  So these the scoring, which is in the context
5  we're talking at Blaze Advisor, is the scorecard that says,
6  I assign this result this numeric value.  I assign this
7  result this numeric value.  As I execute all of these rules,
8  I add up, and there's some complex math that goes into that
9  as well, but we'll just say for sake of argument it adds
10 them up.  And it adds up what the outcome of all of those
11 weighted, all of those decisions are or rules, the output of
12 those rules are that gives a confidence level so that I can
13 make a broader set of decisions within a degree of
14 confidence and range that says it's -- not everything is
15 black and white.  There's some gray in that area, right?  So
16 we want to be able to put a mathematical computation between
17 that gray so that I can actually, with confidence, know
18 exactly why I made that decision.
19 Q.  Why do you say with confidence?
20 A.  Because we have traceability and reportability into what
21 metrics went into actually do that, the calculation, they're
22 all assigned, et cetera.
23 Q.  Is Blaze Advisor able to accommodate decision-making
24 when all of the factors that bear on the decision aren't of
25 the same significance --

145

1  A.  Yes.
2  Q.  -- or importance?
3  A.  Yes, absolutely.
4  Q.  How does it do that?
5  A.  Well, it allows to you weight, apply weight to what
6  those decisions are.
7  Q.  And apply that weight in the process of making the
8  decision?
9  A.  Apply that and make that in the process.  Let's take an
10 easy example for a second, right.  The easy example is I
11 don't assign insurance policy for anybody under the age of
12 18.  It's a pretty easy -- easy rule, right?  I get a data
13 pay load that comes in.  My customer is 16 years old.  I
14 have an easy answer, okay?  Done.
15         Well, that gets a little more complex.  That says,
16 okay, well, I've passed this particular set of criteria, but
17 now I think it's more important that my customer has
18 financial stability.  I think it's more important that my
19 customer is in a particular region that I want them to be in
20 based off the product mix.  So it allows them to weigh
21 certain options to be more flexible in how they actually
22 come back and make the decision.
23 Q.  So if we change the scenario a little bit, Blaze Advisor
24 is a component in a business application.
25         I take it that -- let's go back to slide 3, if we

146

1  could.  And at the bottom of the screen you have your
2  application server on the web -- you have an application
3  server or web server?
4  A.  Correct, correct.
5  Q.  When Blaze Advisor is a component of a business
6  application, that component is typically stored on a server?
7  A.  Yes.
8  Q.  And if you would define what a server is?
9  A.  Yes.  So server is one of those interesting terms in
10 technology, right?  And what's very different about Blaze
11 Advisor and other architectures that are server-based, a lot
12 of architectures have a central server, right, which the
13 vendor provides this instance of technology, right?  And all
14 things go through it.
15         Blaze Advisor is slightly different, where it
16 creates a deployable artifact that's in the code that
17 actually gets embedded in customers' existing applications,
18 which are typically on servers.
19 Q.  Okay.  And is there any limit to the number of users,
20 number of application users that can access that application
21 that's residing on a server?
22 A.  That is one of the beautiful things about Blaze Advisor
23 is there is no theoretical limit to the number of users or
24 transactions that can be processed through it.
25 Q.  So from the technology of it all, a business user is

147

1 accessing an application containing Blaze Advisor on a
2 server. What happens with the code, just technically?
3 A. Technically, the code is actually -- I'm trying to use
4 what terminology -- it is actually compiled, which
5 essentially means it is transformed into the lowest level of
6 programming language for that environment. So it gets
7 compiled into a package and thus then copied over into that
8 existing environment.
9 Q. Copied to where?
10 A. Typically into the memory, the RAM memory of the
11 application --
12 Q. The ram memory of the application, or the ram memory of
13 the server?
14 A. The RAM memory of the server.
15 Q. And how long does the Blaze Advisor code reside in the
16 RAM memory of the server?
17 A. As long as the configuration requires. So we have no
18 control over that. That is -- it could be indefinite.
19 Q. So is the limitation on that simply the limitation of
20 the customer server?
21 A. It is a limitation of the customer and how they've
22 developed their architecture. We have some client instances
23 where a Blaze Advisor rule server component that is embedded
24 in existing application has been up for 10, 15 years.
25 Q. And each time it's accessed for use by an underwriter or

148

1 any user, then a copy of that code goes to the RAM of the
2 server?
3 A. So without going too much into the mechanics of how we
4 manage the memory within itself, for every interaction,
5 Blaze Advisor actually copies itself multiple times. So
6 think, for example, if I have 1,000 applications and I'm
7 processing through a single point, I don't just have one
8 copy. I actually create 1,000 copies within that.
9 Q. Those copies are in the RAM?
10 A. They are in memory, yes.
11 Q. I see. Okay.
12         Could we pull up slide 4, please, Bill?
13         MR. HINDERAKER: Could we pull up slide 4, please,
14 Bill.
15 BY MR. HINDERAKER:
16 Q. You've said many things. I'm not being critical. I'm
17 just saying we've covered a lot of ground in the hour, and
18 I'd like you to -- will this help -- can we use this as a
19 summary of your testimony regarding the value of Blaze
20 Advisor?
21 A. We can.
22 Q. So let's just run through the bullet points, not
23 repeating ourselves but making sure we've touched the base.
24         Reduces the time and cost to develop
25 decision-making applications. Does that relate to the

149

1 flexibility and agility issues that you were chatting about,
2 or more?
3 A. So reducing the time and cost to develop decision-making
4 applications has multiple perspectives. So, first, let's
5 talk about the cost of developing decision-making
6 applications. So in a traditional, I build it in my
7 existing applications, I've got a, you know, typically
8 several developers are developing. There's the cost of that
9 associated with it. There's the cost associated with the
10 time. There's the cost of the old multiple environments
11 that you have to spin up to do that. The time to develop
12 those is because we've abstracted with rails, the rules and
13 decision process for our business users, they can interact
14 directly with Blaze Advisor application to create new rules,
15 new policy, change those rules and then deploy those into
16 production in minutes as opposed to days.
17 Q. And you used the word "rails," I think was the word?
18 A. Rails is the word I used, right.
19 Q. What does it mean?
20 A. Sorry.
21 Q. No. What does that mean?
22 A. So we are all flawed, and since there are certain
23 constraints that are required to make effective decisions,
24 so think about, well, I, A, need to make sure I have the
25 data available. So that would be one rail, right?

150

1         Now, the other rail is I also need to make sure
2 it's performing because I can write rules that will be very
3 imperformant, not performant, very slow. Well, I want to
4 make sure that that is set up in a framework that the users
5 don't hurt themselves.
6         The other thing is as you provide more flexibility
7 and enable more creativity for the business users to
8 interact in their own language with the rules, you want to
9 make sure that they are doing it with the construct of A,
10 where they're allowed to do it and within a governance model
11 that says not only did they do it, but I can prove that, you
12 know, Jane did what she was supposed to do and sent it to
13 Stewart and Stewart approved that what he was trying to do.
14 So you have both business rails and technology rails that
15 are all encompassed in Blaze Advisor.
16 Q. The second bullet point, it has a human-usable interface
17 to write the business rule statements in English, and Blaze
18 Advisor transforms that to computer code.
19 A. Yes.
20 Q. I know we spoke about that.
21 A. We did. So the principle here is, yes, software
22 development languages or programming languages are very
23 complicated, and they're very nuanced and you require a
24 certain technology skill to be able to navigate them. It's
25 become a little easier in recent times, but it's still very

CASE 0:16-cv-01054-DTS   Doc. 1150-3   Filed 03/06/23   Page 6 of 6

Fair Isaac vs. Federal Insurance Company, et al.                            February 28, 2023 - Volume VII

                                                                            1230

1  **Q.** Okay. All right. Let's see if your understanding is
2  similar to mine. We've got some whereas clauses, and then
3  "So now, therefore, the parties agree as follows: The
4  following entities shall be added to the agreement as
5  service recipients of ACE American," and then it lists a
6  number of entities.
7        Do you see that? And all of the entities that it
8  lists are wholly-owned subsidiaries of Federal Insurance,
9  correct?
10 **A.** At what time period?
11 **Q.** Well, before the merger and after the merger.
12 **A.** That is, I believe, incorrect.
13 **Q.** And the amendment, this amendment number one, as we
14 said, is effective January 1st, 2008. So do you have an
15 understanding of how this amendment number one affects the
16 service agreements that we've looked at between Chubb & Son,
17 a Division of Federal, or between Federal and these various
18 entities -- and all of these entities?
19 **A.** I'm not sure it would have any impact.
20 **Q.** Okay. And why do you say that?
21 **A.** The agreements are still -- the other agreements are
22 still in place.
23 **Q.** We just looked at a number of service management
24 agreements between Federal or Chubb & Son, a Division of
25 Federal.

                                                                            1231

1  **A.** Mm-hmm (Yes).
2  **Q.** You just said that all of those managements service
3  agreements, to your knowledge, still exist?
4  **A.** Mm-hmm (Yes).
5  **Q.** And my question is whether you understand that, and I'm
6  not saying -- whether you understand one way or another that
7  pursuant to amendment number one to this service agreement
8  32, all of the services that Chubb & Son, a Division of
9  Federal provided to those various entities is now being --
10 is now being met by ACE American Insurance Company.
11       Do you understand that question?
12 **A.** I understand that -- I understand that question. I'm
13 not -- at the exact date, now Federal no longer has
14 employees. Employees were moved to ACE American at, I
15 believe -- I believe it was 1/1/17.
16 **Q.** ACE American Insurance provided listed services to
17 Federal, and by way of doing that, meets Federal's
18 obligations to the various entities under Federal or Chubb &
19 Son, a Division of Federal's, management services agreement?
20 **A.** ACE American -- to the best of my knowledge, yes, I
21 would agree with that. ACE American provides services to
22 Federal.
23 **Q.** And as of January 1, 2017, did all of the employees of
24 Federal or Chubb & Son, a Division of Federal, become
25 employees of ACE American Insurance Company?

                                                                            1232

1  **A.** To the best of my knowledge.
2  **Q.** Exhibit 33 is a blowup of another document that was
3  produced to us in the litigation, Federal 004420_001. You
4  can look at the original if you want, but I think the bigger
5  blowup is easier.
6        So we agree we're looking at a document where, in
7  the key at the right-hand bottom, it says, "As of December
8  31, 2008." With me so far?
9  **A.** Yes.
10 **Q.** Agreed? Okay. And then I would like you to confirm
11 that to the best of your knowledge as of December 31, 2008,
12 this exhibit is giving us the organizational structure of
13 Federal Insurance Company?
14 **A.** To the best of my knowledge, that's what the document
15 says.
16 **Q.** Okay. And so for context later on, can we agree that as
17 of the end of December 2008, Chubb Insurance Company of
18 Europe, Chubb Insurance Company of Canada and Chubb
19 Insurance Company of Australia Limited are all wholly-owned
20 subsidiaries of Federal?
21 **A.** That's what the chart indicates, yes.
22 **Q.** Mr. Taylor, Exhibit Number 34 is a document produced to
23 FICO in the context of litigation as Federal 000060_001 and
24 2. And take the time that you would like. I will represent
25 that it is an exhibit from -- a year-end statement of the

                                                                            1233

1  Chubb Corporation December 31, 2013. And I would like you
2  to confirm that it accurately identifies those subsidiaries,
3  the wholly-owned subsidiaries of Federal as of its date?
4  **A.** Yes, it appears to.
5  **Q.** Mr. Taylor, Exhibit 35 is a very similar agreement, only
6  for the time period December 31, 2014. And to the best of
7  your knowledge, does this accurately show the wholly-owned
8  subsidiaries of Federal Insurance Company as of this time
9  frame?
10 **A.** Yes, it appears to.
11 **Q.** Do we agree that Exhibit 36 is a 10-K submission to the
12 United States Securities and Exchange Commission for the
13 period ending December 31, 2016, on behalf Chubb Limited?
14 **A.** Correct. It appears that.
15 **Q.** Exhibit 37, you will see from the first page, it says it
16 is a sub document, Exhibit 21.1, and I'll represent that it
17 is from the December 31, 2016 10-K that we just identified
18 as Exhibit 36. If you would like to confirm, feel free. If
19 you are willing to accept my representation, we will move
20 on.
21 **A.** I will accept your representation.
22 **Q.** And so then if we go to the Bates numbered page 6, do we
23 agree that this states the wholly-owned subsidiaries of
24 Federal Insurance Company as of year end 2016?
25 **A.** It appears to, yes.