# Exhibit 6

79

Mr. Schreiber in October 2015, before the acquisition. And they're brainstorming about this whole idea of using the acquisition as a basis to get more money. And Mr. Schreiber says in the top email, "The unreasonably withheld bit has me a little concerned." And that's a reference to the expanded use rule. He's worried about it.

And Mr. Sawyer responds a few minutes later and says I'm not so concerned about it. He says, the idea that the companies got bigger should be enough to get around the contract language. He says, "I would think that tripling the size of the GWP" -- that's a reference to insurance revenue -- "of business by application should be significant enough to get around that unreasonably withheld language."

But it didn't take Mr. Schreiber long to identify the problem with that argument back when FICO thought no one was watching. Mr. Schreiber responds a few minutes later and he says, "Well, is the license specifically tied to GWP?" Meaning, is it tied to revenue? And the answer is no. Mr. Sawyer responds, "I don't see anything on GWP on the agreements."

And the evidence will show that this was disappointing to Mr. Schreiber and Mr. Mr. Sawyer because FICO has negotiated contracts with other customers that say if -- that says FICO gets more money if the revenue of a customer increases because of a merger or acquisition. But

80

as Mr. Schreiber and Mr. Sawyer were acknowledging back in 2015, that is not the agreement that they had negotiated with Federal.

This is another example of FICO asking you to rewrite, to renegotiate their contract for them. FICO could have negotiated for that language, but the evidence will show that it didn't, and that matters because words in a contract are significant, and they can change the whole meaning of a party's agreement.

You do not get a do-over at negotiating your contract just because you file a lawsuit. And so by the end of this trial, it will be clear that you should reject FICO's claim that Federal breached Section 10.8.

Now, you also heard that FICO has brought claims for copyright infringement, but the evidence will show that when you do the hard work of closely examining what happened after the acquisition, ACE American had every right to use Blaze. In fact, the evidence will show that the whole point of Section 10.8 was to guard against exactly the type of infringement argument we're hearing today. Let me show you what I mean.

So we're going back to the contract language in 10.8. As I showed you earlier, ACE Limited, which quickly became Chubb Limited, stepped into Federal's shoes into the contract and became the client. Then, just like my sister

81

obtains all the rights under my apartment lease if I assign it to her, ACE Limited, then Chubb Limited, had all the rights that Federal used to have under the Blaze license.

And as we discussed earlier, the evidence will show that under the Blaze license agreement, the client, now ACE Limited and Chubb Limited, and it's affiliates, could use Blaze. And if you go back to the organization chart we looked at before, you know that the evidence will show ACE American was an affiliate of ACE Limited and then Chubb Limited.

I was not kidding when I said that your jury service will require hard work. I really meant it, but it is important work because it's a lot easier to get swept up in terms like infringement, indifference to contracts, than it is to dig into the words of these contracts and parse all of these corporate acquisitions that happened and figure out what was actually intended. But you're all here on this jury because ACE and Federal are confident that when you look at this closely, if you're willing to do the hard work, you will reject the copyright infringement claim too.

And now we're on the final topic I wanted to talk to you about this morning. I want to thank you for your attention so far. I really appreciate it. And I just wanted to ask you to continue your attention for a few more minutes while I talk about something that's very important

82

to ACE and Federal.

You see, Federal is not just a defendant in this case. Federal is also asserting claims against FICO. As we discussed before, Federal had a perpetual license to use Blaze. It was supposed to last forever. Federal paid more than a million dollars for that right. And you will see that the agreement said that FICO could only terminate Federal's use to use Blaze if there was a material breach of the agreement. And for the reasons we talked about, the evidence will show that Federal did not breach the agreement. That means FICO could not and should not have terminated the agreement and doing so was a breach.

Federal also has a very important second claim. You'll learn that under the law, a covenant of good faith and fair dealing is implied into every single contract, and that means exactly what it sounds like. Parties to a contract must act in good faith in their interactions and they must be fair. And this is so important that parties don't have to memorialize it in an agreement. It's just automatically put into every contract that's signed.

And we're going to show that when FICO rushed to terminate the agreement, even though there wasn't a stitch of evidence of expanded use, there was no evidence that that expanded use rule had been violated, it breached the implied covenant.

83

1 Federal had paid for the right to use Blaze with
2 no limitations. It had an enterprise-wide, perpetual
3 license. It knew that it had to be careful if was an
4 acquisition event because under that expanded use rule, it
5 would need consent from FICO if it wanted to start using the
6 software differently.
7 Federal upheld its end of the deal, but FICO's
8 termination meant that Federal only got ten years out of a
9 contract that it expected to last forever. And that bad
10 faith meant that Federal had to spend time and money
11 transitioning Blaze out of those 13 computer applications
12 and replacing it with different software. So this claim,
13 the second claim, is about maintaining the integrity of the
14 deal that FICO and Federal made.
15 I will not get to speak to you again directly
16 until the end of the trial, so I want to thank you right now
17 for all of the hard work I'm asking you to do, and we know
18 that you will do it. You will do the hard work to figure
19 out what did these parties really intend when they entered
20 this contract? And at the end of trial, we're going to be
21 asking you to hold FICO to their end of the deal. And I'm
22 confident that when you hear from all the witnesses in the
23 case and you see the documents, you will do exactly that.
24 Thank you very much.
25 THE COURT: Thank you, Ms. Godesky.

84

1 Counsel, if I might get you both to rearrange the
2 podium and the cart so that they're facing appropriately.
3 Members of the jury, you've now heard the opening
4 statements, and we will start taking evidence in the case.
5 The evidence -- I believe I told you this was
6 coming. The evidence is going to start by my reading to you
7 a list of uncontested facts. They're uncontested facts
8 because the parties -- I'll wait until they're done.
9 MR. HINDERAKER: I'm trying not to break it.
10 THE COURT: Yeah.
11 All right. Thank you, both.
12 So they're uncontested facts because the parties
13 agree that these are, in fact, the facts and have been
14 established, so I'm going to read them to you. Please pay
15 careful attention to the facts that have been stipulated to.
16 Number 1, you will see an Exhibit J1. Exhibit J1
17 is the software license and maintenance agreement including
18 Amendment One and Amendment Two. We're going to call that
19 the license agreement.
20 2, the license agreement is a valid and
21 enforceable contract.
22 3, Chubb & Son is an unincorporated division of
23 Federal Insurance Company. We're going to call Federal
24 Insurance Company "Federal."
25 Chubb & Son does not have subsidiaries, number 4.

85

1 Number 5, Chubb & Son does not have affiliates as
2 that term is defined in Amendment Two.
3 6, Chubb & Son operated as the manager of domestic
4 and foreign insurance company subsidiaries of Federal.
5 Number 7, as manager of insurance company
6 subsidiaries of Federal, Chubb & Son was empowered to manage
7 the business and insurance by and on behalf of and in the
8 name of the insurance company subsidiaries of Federal.
9 Exhibit J2 is the February 3, 2006, request for
10 information of Chubb & Son, a division of Federal Insurance
11 Company, for itself and as servicer for the Chubb
12 Corporation and its non-insurance company subsidiaries or as
13 manager of its insurance company subsidiaries sent to FICO
14 in February 2006.
15 Before the acquisition of the Chubb Corporation by
16 ACE Limited, Federal was wholly owned by the Chubb
17 Corporation.
18 Before January 15, 2016, all the ownership and
19 voting rights of the stock of Federal Insurance Company were
20 held by the Chubb Corporation.
21 11, before the acquisition, the Chubb Corporation
22 was the parent of a group of insurance companies that
23 operated together as a $12 billion enterprise.
24 Number 12, before the acquisition, ACE INA
25 Holdings, Inc. was a wholly owned subsidiary ACE Limited

86

1 created for the purpose of effectuating a merger transaction
2 with the Chubb Corporation.
3 Number 13, after the acquisition of the Chubb
4 Corporation by ACE Limited, the Chubb Corporation ceased to
5 exist.
6 Number 14, after the acquisition of the Chubb
7 Corporation by ACE Limited, ACE Limited changed its name to
8 Chubb Limited.
9 Number 15, after January 15, 2016, Federal was a
10 wholly owned subsidiary of ACE INA Holdings, Inc.
11 Number 16, Federal and ACE American are now part
12 of a group of insurance companies with Chubb Limited as the
13 ultimate parent of both.
14 Number 17, Federal and ACE American are both
15 indirect wholly owned subsidiaries of Chubb Limited.
16 Number 18, after the acquisition, Chubb Limited
17 was the parent of a group of insurance companies with total
18 annual revenue of 30-plus billion dollars.
19 Number 19, the acquisition was the largest merger
20 in insurance history, resulting in the largest publicly
21 traded property and casualty insurer in the world.
22 Number 20, I am going to be -- 20 through 30 are a
23 list of applications in which Blaze Advisor was used.
24 Number 20, Blaze Advisor was used in the CSI
25 Express application.

183

1  A. Yes.
2  Q. And that's a general statement, right, Mr. Baseman? You
3  have not done anything in the course of your work at FICO to
4  specifically analyze the extent to which Blaze reduced time
5  at Chubb?
6  A. Correct.
7  Q. And then your third bullet says, new applications can be
8  developed and changes to existing applications can be made
9  faster than was possible before Blaze, right?
10 A. Yes.
11 Q. But you haven't analyzed and you don't have any
12 information from the course of your work at FICO that allows
13 you to say whether it's true that new applications were
14 developed faster at Chubb because of Blaze, correct?
15 A. Not so. So we do have customers that continue
16 relationships with FICO, which they talk about how much
17 value that they've received and we have those kind of
18 conversations.
19 Q. But specifically at Chubb, you cannot identify a
20 particular application that was developed faster at Chubb
21 because of Blaze?
22 A. Only through heuristic conversations, yes.
23 Q. And you also can't measure or talk about how quickly
24 Chubb was able to make changes to its internal computer
25 applications because of Blaze. You haven't measured that,

184

1  right?
2  A. Of their existing ones?
3  Q. Correct.
4  A. Correct.
5  Q. Your fourth bullet says, each insurance policy requires
6  a unique set of rule statements for deciding on whether to
7  offer an applicant a policy and at what price, right?
8  A. Yes.
9  Q. But just to be clear, you have not studied the specific
10 policies that Chubb offers and figured out exactly which
11 rules were being run against which lines of business?
12 A. No.
13 Q. Your fifth bullet is Blaze enhances business agility
14 because rule statement changes can be made quickly, correct?
15 A. Yes.
16 Q. But you didn't get any information in the course of your
17 work at FICO in terms of how quickly Chubb was implementing
18 rule changes, right?
19 A. Not necessarily, no. So in the -- can I elaborate?
20 Q. Not necessarily, no, is good for now. Thank you.
21      And you also don't have any specific information
22 on whether they actually did implement rule changes at
23 various points in time, correct?
24 A. No. They certainly did make various rule changes, yes.
25 Q. Can you specifically identify rule changes that were

185

1  made and whether they were made faster at particular points
2  in time because of Blaze?
3  A. Only heuristically, yes.
4  Q. Your sixth bullet talks about rule statements for
5  decision can be changed faster, new insurance products can
6  be brought to market faster, each product being a unique set
7  of rule statements, right?
8  A. Correct.
9  Q. Can you specifically identify any insurance product that
10 Chubb was able to bring to market faster because of Blaze?
11 A. No.
12 Q. And based on all of this, Mr. Baseman, you are not in a
13 position to say whether Blaze had any specific impact at all
14 on Chubb's revenue or profit, correct?
15 A. Mathematically, no.
16 Q. Okay. So I want to talk about briefly what goes into
17 removing Blaze from a computer application. If a large
18 company has integrated Blaze into multiple applications, it
19 can be complex to remove the software, correct?
20 A. Potentially.
21 Q. And it could take days, months or even years to unravel
22 from internal systems, correct?
23 A. To unravel -- potentially.
24 Q. And you're saying potential because there's no typical
25 length of time. It's going to depend on the nature of the

186

1  company, right?
2  A. It would be dependent on the nature of how the
3  integration was done, what their software development life
4  cycles were, yes.
5       MS. GODESKY: I'm almost done, Your Honor, if I --
6       THE COURT: That's fine.
7  BY MS. GODESKY:
8  Q. Now, the amount of time you spent working on Blaze has
9  shifted over time, correct?
10 A. Yes.
11 Q. And it has declined in recent years, fair?
12 A. Yes.
13 Q. In 2016, you were spending about 80 percent of your time
14 on Blaze, right?
15 A. 2016? Yes.
16 Q. By 2021, when you'd provided deposition testimony in
17 this case, you were only spending about 10 percent of your
18 time on Blaze?
19 A. Correct.
20 Q. And that's because there was the introduction of this
21 new FICO product called Decision Modeler, the cloud-based
22 product, right?
23 A. Partially, yes.
24 Q. And for the most part, Decision Modeler, the cloud-based
25 product, and Blaze do the same things?

187

1  A. There are similarities.
2  Q. And just so everyone understands, this is a little
3  technical, right, but Blaze is an on-premises program,
4  right? It's not in the cloud.
5  A. Correct.
6  Q. And today most FICO customers are embracing cloud-based
7  technologies, right?
8  A. Most, yes.
9  Q. And since customers are focussed on the cloud-based
10 offerings, that's also where FICO has been focusing in
11 recent years?
12 A. Yes.
13 Q. The percentage of FICO's software revenue that is
14 attributable to Blaze has been decreasing in recent years,
15 correct?
16 A. I'd say that's fair.
17 Q. And most of the company's decision management revenue
18 now comes from that cloud-based FICO platform?
19 A. Yes.
20 Q. FICO still sells Blaze to some customers, but you've
21 said that it's better suited for small companies and
22 companies in places like Turkey and Latin America that are
23 not yet incorporating the cloud, correct?
24 A. At that time, that was -- yes, that's what I said.
25 Q. Okay. And as of 2021, when you were deposed in this

188

1  case, the number of Blaze customers was not increasing,
2  correct?
3  A. At that time, correct.
4  Q. Okay.
5       MS. GODESKY: Thank you. I have no further
6  questions.
7       THE COURT: All right. We'll take our afternoon
8  break. We'll plan to be back in the courtroom at 25 minutes
9  to 4:00, okay? Thank you.
10      (Jury leaves courtroom.)
11           (WITHOUT JURY PRESENT)
12      THE COURT: Mr. Hinderaker, any update on sort of
13 a time relative to Mr. Baer and some of the exhibits?
14      MR. HINDERAKER: Your Honor, I think that -- I
15 have a short redirect, but my best estimate is that -- I
16 think Mr. Marce will be our last witness today, so we won't
17 be getting to -- if we got to Mr. Baer, there would be ten
18 minutes left in the day, that sort of thing.
19      THE COURT: That's very helpful. Thank you. All
20 right. We'll be in recess until -- yes, Mr. Godesky,
21 Mr. Fleming?
22      MR. FLEMING: We've submitted a letter response to
23 FICO's arguments concerning the issues we discussed earlier
24 today.
25      THE COURT: Okay. I'll certainly look at that as

189

1  well.
2       MS. GODESKY: I just had a question. Does Your
3  Honor have a rule with regard to speaking to witnesses when
4  they're testifying? May we speak to witnesses when they're
5  on direct but not on cross? Are there any guardrails that
6  we both should be following?
7       THE COURT: I think the rule, right, referencing
8  the sequestration rule is once the witness is in the
9  stand --
10      MS. GODESKY: No discussion.
11      THE COURT: -- no discussion.
12      MS. GODESKY: Thank you.
13      THE COURT: Thank you. We're in recess until 25
14 minutes to 4:00.
15      (Recess taken at 3:20 p.m.)
16           IN OPEN COURT
17           (Jury seated)
18      THE COURT: Mr. Hinderaker, any redirect?
19      MR. HINDERAKER: Yes, Your Honor.
20      THE COURT: And Mr. Baseman, once again, remember
21 you're under oath.
22      THE WITNESS: Yes.
23      MR. HINDERAKER: And remember to be slow in your
24 speech.
25      THE WITNESS: That I will try.

190

1           **REDIRECT EXAMINATION**
2  BY MR. HINDERAKER:
3  Q. A few follow-up questions.
4  A. Yes, sir.
5  Q. Do you have any responsibility for the pricing of Blaze
6  Advisor licenses?
7  A. No.
8  Q. Is that the responsibility primarily of Mr. Bill Waid?
9  A. Among others, yes.
10 Q. When you were asked the question about a customer with
11 two applications considering -- having -- using Blaze
12 Advisor for more applications --
13 A. Yes.
14 Q. -- and the wisdom of moving to an enterprise-based
15 license --
16 A. Yes.
17 Q. -- were you assuming that -- did you give your answer in
18 the -- under the assumption of an ongoing business
19 relationship?
20 A. Yes.
21 Q. Have you ever had experience in setting Blaze Advisor
22 pricing in the context where the relationship had ended and
23 a transition license was being negotiated?
24 A. No.
25      MR. HINDERAKER: Could we put slide 4 back up? Is

1230

1  **Q.** Okay. All right. Let's see if your understanding is
2  similar to mine. We've got some whereas clauses, and then
3  "So now, therefore, the parties agree as follows: The
4  following entities shall be added to the agreement as
5  service recipients of ACE American," and then it lists a
6  number of entities.
7       Do you see that? And all of the entities that it
8  lists are wholly-owned subsidiaries of Federal Insurance,
9  correct?
10 **A.** At what time period?
11 **Q.** Well, before the merger and after the merger.
12 **A.** That is, I believe, incorrect.
13 **Q.** And the amendment, this amendment number one, as we
14 said, is effective January 1st, 2008. So do you have an
15 understanding of how this amendment number one affects the
16 service agreements that we've looked at between Chubb & Son,
17 a Division of Federal, or between Federal and these various
18 entities -- and all of these entities?
19 **A.** I'm not sure it would have any impact.
20 **Q.** Okay. And why do you say that?
21 **A.** The agreements are still -- the other agreements are
22 still in place.
23 **Q.** We just looked at a number of service management
24 agreements between Federal or Chubb & Son, a Division of
25 Federal.

1231

1  **A.** Mm-hmm (Yes).
2  **Q.** You just said that all of those managements service
3  agreements, to your knowledge, still exist?
4  **A.** Mm-hmm (Yes).
5  **Q.** And my question is whether you understand that, and I'm
6  not saying -- whether you understand one way or another that
7  pursuant to amendment number one to this service agreement
8  32, all of the services that Chubb & Son, a Division of
9  Federal provided to those various entities is now being --
10 is now being met by ACE American Insurance Company.
11      Do you understand that question?
12 **A.** I understand that -- I understand that question. I'm
13 not -- at the exact date, now Federal no longer has
14 employees. Employees were moved to ACE American at, I
15 believe -- I believe it was 1/1/17.
16 **Q.** ACE American Insurance provided listed services to
17 Federal, and by way of doing that, meets Federal's
18 obligations to the various entities under Federal or Chubb &
19 Son, a Division of Federal's, management services agreement?
20 **A.** ACE American -- to the best of my knowledge, yes, I
21 would agree with that. ACE American provides services to
22 Federal.
23 **Q.** And as of January 1, 2017, did all of the employees of
24 Federal or Chubb & Son, a Division of Federal, become
25 employees of ACE American Insurance Company?

1232

1  **A.** To the best of my knowledge.
2  **Q.** Exhibit 33 is a blowup of another document that was
3  produced to us in the litigation, Federal 004420_001. You
4  can look at the original if you want, but I think the bigger
5  blowup is easier.
6       So we agree we're looking at a document where, in
7  the key at the right-hand bottom, it says, "As of December
8  31, 2008." With me so far?
9  **A.** Yes.
10 **Q.** Agreed? Okay. And then I would like you to confirm
11 that to the best of your knowledge as of December 31, 2008,
12 this exhibit is giving us the organizational structure of
13 Federal Insurance Company?
14 **A.** To the best of my knowledge, that's what the document
15 says.
16 **Q.** Okay. And so for context later on, can we agree that as
17 of the end of December 2008, Chubb Insurance Company of
18 Europe, Chubb Insurance Company of Canada and Chubb
19 Insurance Company of Australia Limited are all wholly-owned
20 subsidiaries of Federal?
21 **A.** That's what the chart indicates, yes.
22 **Q.** Mr. Taylor, Exhibit Number 34 is a document produced to
23 FICO in the context of litigation as Federal 000060_001 and
24 2. And take the time that you would like. I will represent
25 that it is an exhibit from -- a year-end statement of the

1233

1  Chubb Corporation December 31, 2013. And I would like you
2  to confirm that it accurately identifies those subsidiaries,
3  the wholly-owned subsidiaries of Federal as of its date?
4  **A.** Yes, it appears to.
5  **Q.** Mr. Taylor, Exhibit 35 is a very similar agreement, only
6  for the time period December 31, 2014. And to the best of
7  your knowledge, does this accurately show the wholly-owned
8  subsidiaries of Federal Insurance Company as of this time
9  frame?
10 **A.** Yes, it appears to.
11 **Q.** Do we agree that Exhibit 36 is a 10-K submission to the
12 United States Securities and Exchange Commission for the
13 period ending December 31, 2016, on behalf Chubb Limited?
14 **A.** Correct. It appears that.
15 **Q.** Exhibit 37, you will see from the first page, it says it
16 is a sub document, Exhibit 21.1, and I'll represent that it
17 is from the December 31, 2016 10-K that we just identified
18 as Exhibit 36. If you would like to confirm, feel free. If
19 you are willing to accept my representation, we will move
20 on.
21 **A.** I will accept your representation.
22 **Q.** And so then if we go to the Bates numbered page 6, do we
23 agree that this states the wholly-owned subsidiaries of
24 Federal Insurance Company as of year end 2016?
25 **A.** It appears to, yes.

1234

1 **Q.** To the best of your knowledge, it does?
2 **A.** To the best of my knowledge, it appears to, yes.
3 **Q.** So do we agree that as of December 31, 2016, Chubb
4 Insurance Company of Europe SE is not a Federal subsidiary?
5 **A.** I'm sorry. As of what? What date?
6 **Q.** This document is an SEC report for the year ending
7 December 31, 2016. And so my question was to have you
8 confirm that as of the date of this, as of the time frame
9 for reporting, that is December 31, 2016, Chubb Insurance
10 Company of Europe is not a Federal subsidiary?
11 **A.** Correct. It appears that way based on this document.
12 **Q.** Okay. Why don't we go to Bates number 10, and at the
13 top, do you read this document as telling us that Chubb
14 Insurance Company of Europe SE is as of this time a
15 subsidiary of Chubb Insurance Investment Holdings, Limited?
16 **A.** It appears to be based on this document, correct.
17 **Q.** Okay. And based on this document, Chubb Insurance
18 Investment Holdings Limited is a subsidiary of Chubb INA
19 Overseas Holdings, Inc.?
20 **A.** Based on this document, it appears to be, yes.
21 **Q.** Have you seen Exhibit 38 before?
22 **A.** It looks familiar.
23 **Q.** Okay. In what context do you recall seeing it?
24 **A.** In just my normal day-to-day activities.
25 **Q.** Got it. All right. Let us -- if I can direct your

1235

1 attention to the Bates numbered page 13, and keep your
2 finger on 13, and then for context of the question,
3 Exhibit 38 says on its face, "As of September 30, 2016."
4 **A.** Okay.
5 **Q.** So can we agree, looking at Bates number page 13, that
6 as of September 30, 2016, Chubb Insurance Company of Europe
7 SE is a subsidiary of Federal?
8 **A.** Agreed. It appears that way on this document, yes.
9 **Q.** Let's go back to Exhibit 37, and if I could put you to
10 Bates numbered page 6. And again, as a reminder, Exhibit 37
11 is speaking for the time period ending December 31, 2016.
12    So looking at Bates numbered page 6, do we agree
13 that Chubb Insurance Company of Canada is not a Federal
14 subsidiary?
15 **A.** Agreed, based upon this document. Yes.
16 **Q.** Okay. And then if we go to Bates numbered page 11 in
17 the same exhibit, do we agree that Chubb Insurance Company
18 of Canada is a wholly-owned subsidiary of Chubb Holdings
19 Canada, Limited?
20 **A.** Agreed. Based upon this document, yes.
21 **Q.** Okay. And then based upon this document, do we agree
22 that Chubb Holdings Canada Limited is itself a subsidiary of
23 Chubb Canada Holdings, Inc.?
24 **A.** Agreed, based upon this document.
25 **Q.** Okay. And then let's go back to Exhibit 38, which for

1236

1 context is as of September 30, 2016. If we go to page Bates
2 numbered 17, do we agree that Chubb Insurance Company of
3 Canada is not a subsidiary of Federal as of September 30,
4 2016?
5 **A.** Agreed, based upon this document.
6 **Q.** And do we agree that Chubb Insurance Company of Canada
7 is not a subsidiary of Federal today?
8 **A.** To the best of my knowledge, that's right.
9 **Q.** All right. Let's return to Exhibit 37, go to the Bates
10 numbered page 6. Do we agree that Chubb Insurance Company
11 of Australia is not a subsidiary of Federal as of December
12 31, 2016?
13 **A.** Agreed, based upon this document.
14 **Q.** Okay. And then let's go to Exhibit 38. Go to Bates
15 numbered page 5. Based on this document, do we agree that
16 Chubb Insurance Company of Australia Limited became a
17 subsidiary of Chubb Holdings Australia PTY effective April
18 1, 2016?
19 **A.** Agreed, based upon this document.
20 **Q.** Okay. So based upon this document, we can say that at
21 least as of April 1, 2016, Chubb Insurance Company of
22 Australia was not a wholly-owned subsidiary of Federal?
23 **A.** Based upon this document, yes.
24 **Q.** Okay. And do you have any reason to disagree with the
25 information on the document?

1237

1 **A.** None that I'm aware of, no.
2 **Q.** And speaking of today, Chubb Insurance Company of
3 Australia Limited is not a wholly-owned subsidiary of
4 Federal?
5 **A.** Correct. To the best of my knowledge, yes.
6 **Q.** Continuing on with this corporate structural
7 organization -- if you told me this, I apologize, but let me
8 confirm that -- ACE American Insurance Company is not a
9 subsidiary of Federal?
10 **A.** That's correct.
11 **Q.** ACE American Insurance Company is a sister to Federal;
12 is that correct?
13 **A.** It's an affiliate. I'm not sure what you mean by
14 sister.
15 **Q.** An affiliate. Federal Insurance Company and ACE
16 American Insurance Company have a common parent?
17 **A.** Ultimately, a common parent, yes.
18 **Q.** Ultimate through -- ultimately a common parent today
19 called Chubb Limited?
20 **A.** Correct.
21 **Q.** Exhibit 39 let me represent is a Chubb Limited 10-K for
22 the period ending December 31, 2017. I did not bring other
23 copies because I wanted to keep your load light carrying
24 home. And I don't have any more questions for you, but I
25 just want you to authenticate Exhibit 39 is the 10-K for the