1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
2
      ------------------------------------------------------------
3                                      )
      Fair Isaac Corporation,          )  File No. 16-cv-1054(DTS)
4     a Delaware Corporation,          )
                                       )
5             Plaintiff,               )
                                       )
6     v.                               )
                                       )
7     Federal Insurance Company,       )  Courtroom 14W
      an Indiana corporation,          )  Minneapolis, Minnesota
8     and ACE American Insurance       )  Monday, February 27, 2023
      Company, a Pennsylvania          )  9:00 a.m.
9     Corporation,                     )
                                       )
10            Defendants.              )
                                       )
11    ------------------------------------------------------------

12

13

14            BEFORE THE HONORABLE DAVID T. SCHULTZ
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16          **(JURY TRIAL PROCEEDINGS - VOLUME VI)**

17

18

19

20

21

22       Proceedings recorded by mechanical stenography;
      transcript produced by computer.
23
                          *   *   *
24

25

```
 1    APPEARANCES:

 2      For Plaintiff:          MERCHANT & GOULD P.C.
                                BY:  ALLEN W. HINDERAKER
 3                                   HEATHER J. KLIEBENSTEIN
                                     PAIGE S. STRADLEY
 4                                   MICHAEL A. ERBELE
                                     JOSEPH W. DUBIS
 5                                   GABRIELLE L. KIEFER
                                150 South Fifth Street, #2200
 6                              Minneapolis, Minnesota 55402

 7      For Defendants:         FREDRIKSON & BYRON
                                BY:  TERRENCE J. FLEMING
 8                                   LEAH C. JANUS
                                     CHRISTOPHER D. PHAM
 9                                   RYAN C. YOUNG
                                     PANHIA VANG
10                              200 South Sixth Street, #4000
                                Minneapolis, Minnesota 55402
11
                                O'MELVENY & MYERS LLP
12                              BY:  LEAH GODESKY
                                     ANTON METLITSKY
13                                   DARYN E. RUSH
                                     ROXANA GUIDERO
14                              Times Square Tower
                                7 Times Square
15                              New York, New York 10036

16      Court Reporters:        RENEE A. ROGGE, RMR-CRR
                                KRISTINE MOUSSEAU, CRR-RPR
17                              MARIA V. WEINBECK, RMR-FCRR
                                PAULA RICHTER, RMR-CRR-CRC
18                              United States District Courthouse
                                300 South Fourth Street, Box 1005
19                              Minneapolis, Minnesota 55415

20
                                     *   *   *
21

22

23

24

25
```

1          <u>I N D E X</u>

2                                                           PAGE

3      **HENRY MIROLYUZ**
            Examination By Mr. Hinderaker                 971

4      **CLAUDIO GHISLANZONI**
            Cross-Examination By Mr. Hinderaker          1046
5           Direct Examination By Ms. Godesky            1131
            Recross-Examination By Mr. Hinderaker        1161
6           Redirect Examination By Ms. Godesky          1170
            Recross-Examination By Mr. Hinderaker        1171
7
       **JOHN TAYLOR**
8           Examination By Mr. Hinderaker                1174

9

10
       <u>PLAINTIFF'S EXHIBITS</u>                        <u>REC'D</u>
11          517                                         1080
            518                                         1082
12          526                                         1096
            1002                                        1088
13          1005                                        1088
            1007                                        1088
14          1008                                        1088

15
       <u>DEFENDANTS' EXHIBITS</u>                        <u>REC'D</u>
16          39                                          1140

17

18

19

20

21

22

23

24

25

```
 1                    9:00 A.M.

 2

 3            (In open court without the Jury present.)

 4            THE COURT:  Please be seated.  Good morning,

 5     everyone.

 6            The record should reflect that we are in the

 7     courtroom outside the presence of the jury.  As I understand

 8     it, there is a couple of issues, at least one, that we need

 9     to take up now before we begin with testimony and that I

10     think is the interrogatory answer.

11            Is that correct, Mr. Hinderaker?

12            MR. HINDERAKER:  Yes, Your Honor.

13            THE COURT:  Okay.  And tell me what it is you plan

14     to put in and, if it's not obvious, why it's relevant.

15            MR. HINDERAKER:  This is a copy of it.

16            THE COURT:  Yeah, I've looked at it.  Go ahead and

17     bring it up.  Well, what are you proposing to do with this

18     exactly?

19            MR. HINDERAKER:  Well, mister -- well, I guess it

20     comes up in Mirolyuz's deposition because Mr. Mirolyuz is

21     the one who verified it.

22            THE COURT:  Right.

23            MR. HINDERAKER:  During the course of the

24     deposition we had an unsigned copy, and during the

25     deposition I asked Mr. Mirolyuz, and he did verify it in the
```

1    transcript, and that was objected to.  That was Exhibit 6.

2                    THE COURT:  Okay.

3                    MR. HINDERAKER:  That was objected to.  And we

4    offered, well, we have Exhibit 147, which is signed, let's

5    just simply replace them and avoid that confusion.  And that

6    was objected to.

7                    So the relevance of these interrogatory answers --

8    the relevance of the interrogatory answer to Number 2 is

9    where Blaze Advisor was used, including in Canada with third

10   party AppCentrica, and where Blaze Advisor was used in

11   Australia, including the third party DWS Group.  And

12   Mr. Mirolyuz is the one who verified that.

13                   Interrogatory 4.  The answer to interrogatory 4 is

14   also pertinent to the case in that it identifies

15   applications that use Blaze Advisor.  It's clear in this

16   answer that CIS Claims is part of CSI Express, but the -- so

17   that's how the, that's how the interrogatory is relevant to

18   our claims, and it does come up first in Mr. Mirolyuz's

19   deposition.

20                   THE COURT:  And he is our first witness, correct?

21                   MR. HINDERAKER:  And he is our first witness.

22                   Our second witness is Mr. Ghislanzoni, and he is

23   knowledgeable about the transfer of the Evolution

24   application from Canada that had Blaze Advisor to Australia,

25   so Canada Evolution with Blaze Advisor was transferred to

1    Australia, and the Australian version of Evolution is built

2    from that.  These interrogatory answers are pertinent to

3    that story line or context of Mr. Ghislanzoni as well.

4              And, frankly, I fail to see the objection.  The

5    interrogatories are admissible for any purpose under the

6    rules, 33(c).  These are verified.  They are offered as an

7    admission against the defendants.  I think it's a

8    quintessential piece of evidence that is admissible, Your

9    Honor.

10              THE COURT:  Thank you, Mr. Hinderaker.

11              Ms. Godesky?

12              MS. GODESKY:  Thank you.

13              I think Mr. Hinderaker accurately described the

14   pieces of the interrogatory that they want to present.

15   Right?  This interrogatory response says, "Blaze was used in

16   Canada, right, Mr. Mirolyuz?"  "Correct."

17              And we have no objection to presenting that

18   testimony on the video and the jury hearing it.  Our

19   objection is to entering the entirety of these

20   interrogatories responses into evidence because they are

21   confusing, they are filled with legal objections that the

22   jury will never understand.

23              THE COURT:  Right.

24              MS. GODESKY:  I think it's akin to Your Honor

25   excluding FICO's complaint, right?  That's a party

1      admission, too, but it wasn't entered into evidence because

2      of the potential for confusion and the context and all these

3      things about legal documents.

4              So we have no objection to the jury hearing about

5      the interrogatory responses and Mr. Mirolyuz assent to them,

6      but, you know, putting into evidence these

7      interrogatories -- and this is something that's going to

8      come up in different contexts, because there is other

9      interrogatory responses that they want to introduce as well,

10     and, you know, there is, there is other interrogatory

11     responses that we would argue are not relevant, but are also

12     in the same document.

13             And so I think given the potential for confusion

14     and the fact that, quite frankly, none of these facts are

15     even in dispute -- I mean, we opened this trial reading a

16     list of applications that use Blaze in the undisputed facts.

17     And so there has to be another way to establish the evidence

18     other than putting these voluminous, dense, confusing

19     documents in the jury room.

20             THE COURT:  Well, here is the issue from my

21     perspective.  First of all, I think the answers are, if

22     relevant, and they are, although I agree with you these do

23     not seem to be facts that are terribly disputed, but the

24     answers are admissions by a party opponent.  They are

25     relevant.  They are not -- we are not -- I guess the only

1    question in my mind is, Do we put in a redacted copy of the

2    document or simply the relevant answer as testimony, if you

3    will, which is, at least my experience has been that that's

4    really the way in which it comes in.  It's essentially the

5    equivalent of testimony, but I haven't gone back to look at

6    that particular issue.

7           So, A, I'm glad you don't have an objection to the

8    substance, and I think the substance is coming in.

9           Mr. Hinderaker?

10          MR. HINDERAKER:  I was going to correct a -- we do

11   have, we do have uncontested facts with respect to many of

12   the applications that use Blaze Advisor.  It happens to be

13   not all.

14          THE COURT:  Right.  CIS is not one of them?

15          MR. HINDERAKER:  I think it is now.  It wasn't

16   once upon a time in the case.

17          THE COURT:  Okay.

18          MR. HINDERAKER:  And the other bit of what I think

19   is an overstatement, I haven't -- we don't have a stipulated

20   fact that Blaze Advisor was used by AppCentrica Canada or

21   DWS.  Having said all of that, I really have no quarrel with

22   eliminating -- we need the question.

23          THE COURT:  Right.  And the answer and the

24   relevant portion of the answer.

25          MR. HINDERAKER:  I have no quarrel with getting

1    rid of all the boilerplate of objection.  I would like the

2    portion that identifies the people with knowledge, because

3    that will come back and bear on other witnesses.  So I have

4    no quarrel with eliminating the objections and just have,

5    just have the subject to -- or even cut that out and just

6    have the statement of what is admitted.

7              THE COURT:  Okay.  Very well.  Anything further,

8    Ms. Godesky?

9              MS. GODESKY:  No.  I think because we're not

10   objecting to the actual content of the video, I would

11   suggest that FICO provide us with a proposed redacted copy,

12   and we can see if we can get to -- I mean, you know, we

13   should be able to just cut down the volume of the document

14   and put in a few pages with some redactions.

15             THE COURT:  I agree with that and that approach.

16   So we will go ahead on that basis.  Presumably, you will be

17   able to figure out the right level of redaction.

18             MR. HINDERAKER:  I think so.  And we will have,

19   with respect to Mr. Ghislanzoni's examination, similar

20   issues in the sense that interrogatory answers are used by

21   me or will be, I intend to, to set certain facts in place.

22             THE COURT:  Yep.

23             MR. HINDERAKER:  And, again, I think it's no

24   quarrel from our point to clean it up and just have the

25   facts.

1           THE COURT:  Yep.

2           MR. HINDERAKER:  We won't introduce it per se

3    today, but I will be using them and on the understanding

4    that they are admissions and we just get them cleaned up

5    appropriately.

6           THE COURT:  Very well.  We will cross that bridge

7    if we have to again later.

8           A couple of other things on my end.  We have

9    talked to the jury about shortening the lunch break, and

10   they are in agreement.  So we will shorten it to an hour and

11   15 minutes, saving us all kinds of time.

12          On the issue of what the parties are calling the

13   curative instruction relative to -- what's his last name?

14   Car --

15          MS. GODESKY:  Carretta.

16          THE COURT:  I was going to say Carletta.

17   Mr. Carretta.

18          Look, I'm giving you an instruction.  You can call

19   it a curative, if you want.  I would describe it as an

20   explanatory instruction.  It is basically going to say, What

21   you have heard from and/or will hear from lawyers involved

22   in the negotiation of the 2006 license agreement and from

23   Mr. Carretta, who sent the notice of termination.

24          I'm going to explain to you, Members of the Jury,

25   what that testimony is and is not about.  Lawyers are not

1    permitted to testify and have not testified about the proper

2    interpretation or legal meaning of the license agreement.

3    They are permitted to talk about the circumstances of the

4    negotiation, the change in language, the business purpose,

5    but not the legal meaning.

6           So to the extent that you understood that

7    testimony to be as to the legal meaning, I'm instructing you

8    it is not and you are to disregard that assumption as it

9    were.

10          That's not verbatim, but that's essentially what

11   it's going to be.  And my plan, at least at the moment, is

12   I'm going to give that instruction at the close of their

13   case, before your case, and I will indicate that you are

14   calling the lawyer -- is it Hobbs?  No.  Black from Federal

15   to testify as well.

16          Is that your current plan?

17          MS. GODESKY:  Mr. Black is not a lawyer.

18          THE COURT:  Okay.

19          MS. GODESKY:  We have a lawyer, Ms. Pam Lopata,

20   in-house.

21          THE COURT:  And will she be testifying?

22          MS. GODESKY:  She will be testifying, but she is

23   not going to be interpreting the contract.

24          THE COURT:  Well, and I'm going to make that

25   clear, obviously.

1        So if anybody has an objection to that plan, at

2   least we can -- now you know.  You have something a little

3   bit more definitive to shoot at.

4        As to the e-mails that were raised this morning,

5   is that something that's going to come up during the

6   Mirolyuz deposition?

7        MR. HINDERAKER:  No, Your Honor.  It will -- the

8   plan is that it will come up during the Ghislanzoni

9   testimony.

10       THE COURT:  Okay.  All right.

11       MR. HINDERAKER:  It would be in that context that

12   some foundation could be laid as well.

13       THE COURT:  Understood.  My look at them is they

14   don't appear to be irrelevant to me.  So let me know.  We

15   will discuss this over the noon hour.  It seems like that's

16   when we will get to it, right?

17       MR. HINDERAKER:  Yes, I think so.  Mr. Mirolyuz is

18   about an hour, 40.  So Mr. Ghislanzoni might come -- might

19   start a bit before lunch or certainly after lunch, yeah.

20       THE COURT:  Well, we will take it up in a time

21   fashion.

22       One more thing, just reminding the parties of one

23   thing.  On Friday during one of our discussions outside the

24   presence of the jury, one or the other or both of you quoted

25   from the realtime transcript.  Remember that the terms of

1    use of the realtime transcript don't allow you to quote that

2    to the Court.  So -- but it's also been pointed out that the

3    transcript that was quoted was accurate, so no harm, no

4    foul.

5              All right.  Anything else from the parties?

6              MS. GODESKY:  Your Honor, I just wanted to point

7    out something we have noticed as we have been going back

8    through the transcripts, that I'm just concerned documents

9    that are admitted during videos --

10             THE COURT:  Mm-hmm.

11             MS. GODESKY:  -- were not -- there is nothing in

12   the transcript memorializing the P or the D number that's

13   been entered into evidence.  So I'm just concerned that

14   could be an issue for the appellate record.  So I think at

15   some point we need to orally read them in.

16             THE COURT:  That's fine with me.  We have been

17   tracking them, and I have been very attentive to

18   distinguishing the trial exhibit number from the deposition

19   exhibit number.  We have an accurate list, and we have been

20   cross-checking it with the parties, but we can certainly put

21   that, and I think it's a good idea, to put it on the record.

22             MS. GODESKY:  Okay.

23             THE COURT:  All right?  Anything else on your

24   side?

25             MS. GODESKY:  No.

```
 1              THE COURT:  Mr. Hinderaker?  All right.  Let's
 2      bring the jury in.
 3              THE CLERK:  All rise for the jury.
 4                      (Jury enters.)
 5
 6              (In open court with the Jury present.)
 7              THE COURT:  Go ahead and be seated.
 8              Members of the Jury, first and foremost, our
 9      apologies.  We were taking up some matters that we had to
10      deal with before we started testimony this morning.  As I
11      had indicated at the beginning of the trial, that happens on
12      occasion.  Today was one of those occasions.
13              Second of all, I hope you all had a nice weekend.
14      I appreciate your getting here today.  I am hoping that this
15      will be the last "iffy" travel day for all of you, but I
16      make no promises.
17              By way of planning, first of all, as we've
18      discussed -- okay.  We will shorten the lunch break
19      considerably, and that will speed things up.
20              For planning purposes, we think that you will get
21      the case for deliberation by approximately, well, early next
22      week, let's just put it that way for now.  Okay?
23              All right.  Mr. Hinderaker?
24              MR. HINDERAKER:  Your Honor, our first witness by
25      video is Mr. Henry Mirolyuz, and I will give you his
```

1     introduction.

2              Henry Mirolyuz is a former Chubb employee, who was

3     with Chubb from 2006 to 2018.  In July 2018, Mr. Mirolyuz

4     was a corporate representative and testified to the

5     knowledge of Federal.  At the time of his deposition his

6     title was senior architect, Chubb claims IT.  At that time

7     he was living in Simsbury, Connecticut.

8              The second deposition was taken January 2019.  And

9     this time Mr. Mirolyuz was testifying in his personal

10    capacity, as well as a corporate representative, to the

11    knowledge of Federal.  At that point he had left employment

12    with Chubb and he had left employment with Chubb effective

13    January 1, 2019.  Both of these depositions were taken by me

14    on behalf of FICO.

15                         **(HENRY MIROLYUZ)**

16                          **EXAMINATION**

17    BY MR. HINDERAKER:

18    Q.  Sir, good morning.

19    A.  Good morning.

20    Q.  Thank you for coming.

21    A.  My pleasure.

22    Q.  If you would give us, with spelling, your full name as

23    well as your current employer.

24    A.  My name is Henry Mirolyuz, M-I-R-O-L-Y-U-Z.  I'm an

25    employee of Chubb claims IT architecture team.

1    Q.  And where -- what's the location of your employment?

2    A.  I'm located in Simsbury, Connecticut.

3            COURT REPORTER:  I'm sorry?

4            THE WITNESS:  Sims bur.

5    BY MR. HINDERAKER:

6    Q.  And your residence is in the same area?

7    A.  Same area.

8    Q.  Sir, can you identify Exhibit 2 for us, please?

9    A.  Exhibit 2 is my resume.

10   Q.  And under professional experience, on the top line it

11   says, "July 2011 to present."  And in that context, my

12   question is, How current is this resume?

13   A.  This resume is as current as of 2015.  Pre Chubb/ACE

14   merger.

15   Q.  Pre-merger.  If you would -- I would like you to carry

16   your resume forward for us from this document to date.  So

17   pre-merger to date.  What changes would there be or what

18   additions would there be on here?

19   A.  Addition is I become the architect in claims IT

20   organization.  So my title changed from senior technical

21   analyst to senior architect, and my responsibility is I'm no

22   longer involved with Blaze software, and I'm in charge of

23   architecture of claims applications and systems.

24   Q.  When did you stop being involved with Blaze Advisor?

25   A.  Right after the post-merger activities due to the

973

1    litigations.

2    Q.  Well, before then, under accomplishments, you note you

3    have been a guest speaker on multiple FICO World and

4    Business Rules Forum conferences.  On how many occasions

5    were you a guest speaker?

6    A.  I believe three or four FICO World conferences and one

7    Business Rules Forum, which was not FICO specific.

8    Q.  And then under professional experience under the heading

9    senior technical analyst, in the second bullet, "Working

10   with EA."  What is EA?

11   A.  Enterprise architecture team.

12   Q.  And caring on with that bullet point, "DM life cycle."

13   What is DM?

14   A.  Decision -- DM, decision management.  It's a FICO

15   methodology which was provided to us by FICO.

16   Q.  By FICO?

17   A.  By FICO.

18   Q.  In the next bullet point is, "Worked with multiple teams

19   across DSO."  What is DSO?

20   A.  Development source organization.  It's a group of people

21   who is involved in the implementation of the application.

22   As an architect, I design the application and developers

23   implement the application.  That's such acronym DSO,

24   development services organization.

25   Q.  Let me try that in my words.  As architect, do you

1    design the application?

2    A.  Correct.

3    Q.  And then do the development service organization people

4    do the coding?

5    A.  Absolutely correct.

6    Q.  And with respect to your experience, then, what does --

7    in general, what did you do to facilitate presentations to

8    business analysts?

9    A.  I conducted the sessions overview of the benefits which

10   Blaze Advisor software or using Blaze Advisor software can

11   provide to the projects, future projects at Chubb, as well

12   as making sure people are familiar with the technology.

13   Q.  What do you mean by the benefits of Blaze Advisor for

14   future projects at Chubb?

15   A.  Any design can be implemented in multiple ways using the

16   different technology, Blaze Advisor being one of them.  My

17   role was to provide -- explain to people potential benefit

18   of using the software.

19   Q.  And the Blaze Advisor software resides on what's called

20   servers, correct?

21   A.  Correct.

22   Q.  And I would appreciate your definition of a server.

23   What is a server?

24   A.  It's a machine located -- not assigned to a specific

25   individual, and accessible by one or many developers or

1   parties.  It depends on the rights and authorization

2   provided by Chubb.

3   Q.  Okay.  And when you say a server is a machine, is it a

4   computer?

5   A.  A computer.

6   Q.  All right.  So you -- okay.  So you just used the phrase

7   to get the applications in one data center.  What is an

8   application?

9   A.  It's a software which allows user to perform specific

10  functions.  Depends on the components of the application.

11  Q.  And is an application something that you as the -- in

12  your role on the technical side, you were involved in

13  designing the architecture for these applications?

14  A.  Part of the architecture.

15  Q.  Part of it.  At least the Blaze Advisor part of it?

16  A.  Correct.

17  Q.  So you're making a distinction between the Blaze Advisor

18  software and an application that uses Blaze Advisor?

19  A.  That is correct.

20  Q.  And then if we go to Exhibit 5, you see the fifth

21  paragraph down, it is saying, "So we'll be using Blaze 7.1

22  with the Java business object model."

23  A.  Correct.

24  Q.  Do you understand that Blaze Advisor 7.1 is installed on

25  the servers in the UK?

1    A.   No.  I would interpret it that it will be or could be.

2    It doesn't say that they are using it at the point of right

3    in the e-mail.

4    Q.   So the point of writing the e-mail, your interpretation

5    is that they planned to use Blaze Advisor 7.1?

6    A.   Correct.

7    Q.   For an application?

8    A.   Where again, the question is I cannot say one way or

9    another if they plan to use it or they plan to use the

10   software Blaze 7.1.

11   Q.   What was the application of Blaze Advisor that he is

12   advising you about?

13   A.   They had a policy administration system for the CSI for

14   the specialty lines in Europe, and at the time of the

15   writing the e-mail they were planning to supplement it with

16   business rules written for Blaze Advisor software.

17   Q.   What is a policy administration system?

18   A.   It's a system which would allow them to provide the

19   insurance to the customers, such as software to allow them

20   to provide the insurance for the customers.

21   Q.   What is a no touch renewal?

22   A.   It's allow the renewal which can be issued -- it's a

23   policy renewal which can be issued without any human

24   interaction.  Essentially automated insurance of the

25   renewal.

1    Q.  Is it fair to say this is an application that uses Blaze

2    Advisor, among other components, to automate the renewal

3    process for insurance policies?

4    A.  It's not the application.  It is a characterization of

5    the renewal, as part of the renewal process through the

6    application, no touch renewals.  It is characterization of

7    renewals into the no touch categories.

8              COURT REPORTER:  Into the no touch category?

9              THE WITNESS:  It's not a software.  It's a

10   process.

11   BY MR. HINDERAKER:

12   Q.  So does that mean that using the rules management system

13   with Blaze Advisor, the software determines that a

14   particular application can proceed without human

15   intervention?

16   A.  Correct, but particular renewal can proceed without

17   human intervention.

18   Q.  And that the judgment that the renewal can proceed

19   without -- you know, there is -- software is a -- and we're

20   talking about it doing things like thinking and judging, but

21   that determination that the renewal can proceed without

22   human intervention is a determination using the software

23   with Blaze Advisor?

24   A.  Correct.

25   Q.  Sir, Exhibit 6 is a document that's part of the

Fair Isaac Corporation v. Federal Insurance Company

 1    litigation process.  It's Federal Insurance Company's second

 2    supplemental answers to interrogatory numbers 2, 3 and 4.

 3            Do you know if you've seen this before?

 4    A.  I did.

 5    Q.  Okay.  And have you had a chance to review it, and do

 6    you know whether the answers and responses in the document

 7    are accurate?

 8    A.  It is.  Yes, to both.

 9    Q.  All right.  And in the last page of Exhibit 6, you will

10    see a verification or a page that's titled Verification.

11    A.  Yes.

12    Q.  Okay.  And it's unsigned, but it's set up for your

13    signature.

14            Would you read that verification and tell me

15    whether you agree with it?

16    A.  "Henry Mirolyuz" --

17    Q.  You can read it to yourself.

18    A.  I agree with it.

19    Q.  Okay.  And on page -- let me back up.  On page 2 there

20    is Interrogatory Number 2 that's set forth there.

21            And then -- I'm not trying to rush you.  I'm just

22    going to give you orientation.  And then under the second

23    supplemental answer on page 3, you will see where it says,

24    "1.  Chubb Insurance Company of Europe SC at least by 2010."

25            And do we agree, based upon the e-mails that

979

1    you've looked at, that Blaze Advisor software was installed

2    whether on a computer or a "server" in the UK in 2009?

3    A.  Agree.

4    Q.  And what is Evolution?

5    A.  It is the name of the policy administration system used

6    in Canada.

7    Q.  And the Chubb Insurance Company of Europe has used EZER

8    and ADAPT?

9    A.  Correct.

10   Q.  And those are application to use Blaze Advisor software,

11   correct?

12   A.  Correct.

13   Q.  And those applications were also installed on servers in

14   Europe?

15   A.  I -- correct.

16   Q.  And this, sir, is Deposition Exhibit 179.

17            Can we move that thing?  Thank you.

18            Have you seen this 30(b)(6) deposition before this

19   morning?

20   A.  I did.

21   Q.  Okay.  So just to reaffirm, you intend to testify on a

22   30(b)(6) basis to Topics 15, 16 and 17; is that correct?

23   A.  That's correct.  I do not know because I haven't looked

24   in my paycheck.

25   Q.  So you don't know one way or the other.

CASE 0:16-cv-01054-DTS Doc. 1182

980

```
 1    A.  Yes, exactly.

 2    Q.  Who employees you now?

 3    A.  Altair Technical Services.

 4    Q.  When did you start that employment?

 5    A.  January 1st of 2019.

 6    Q.  Do you recall when you moved from your position working

 7    with Blaze Advisor software to we'll call it Chubb IT

 8    claims?

 9    A.  I believe in the beginning of 2015.

10    Q.  Now the merger of Chubb and ACE was 2016?

11    A.  Correct.

12    Q.  And so you think it was the year before?

13    A.  A year before, yes.  Because of the internal

14    organization.

15    Q.  This is Exhibit 154 from an earlier deposition.  I just

16    have some questions for you about it.  I understand the date

17    is -- I understand the date, 2018.

18           But you're familiar with reports that are called

19    ChEAR reports or Chubb Enterprise Application Registry?

20    A.  Correct, I am.

21    Q.  Could you explain what they are for me, please?

22    A.  This is the repository or registry of all the

23    application -- production application at Chubb.

24    Q.  Okay.  So as a repository of the production applications

25    at Chubb, is it a report that reports on the status of
```

 1     things as of the date of the report?

 2     A.  Correct.  As they're entered into the repository.

 3     Q.  The status of things as the information is entered into

 4     the repository?

 5     A.  Correct.

 6     Q.  Go to the fifth page in.  Now it's on the bottom

 7     third -- Evolution Asia Pacific, Blaze Advisor, and then

 8     Blaze Advisor 7.1.  Do you see that line?

 9     A.  Correct.

10     Q.  Okay.  So this is telling us that Blaze Advisor 7.1 is

11     being used for Evolution in the Asia Pacific zone?

12     A.  What it tells me is that the Evolution application was

13     used by Asia Pacific.

14     Q.  And does it tell -- yes.  And is it saying that that

15     application is running on Blaze 7.1?

16     A.  It's using Blaze 7.1, correct.

17     Q.  Okay.  Thank you.

18            So I've given you Exhibit 184, which is, by its

19     heading -- well, it's dated April 9, 2008, and by its

20     heading it's another ChEAR monthly maintenance, another

21     ChEAR report.  Do you agree?

22     A.  Agree.

23     Q.  Would you go to what's marked as page 8 of 26 in the

24     document.

25     A.  Okay.

1     Q.  So on page 8 of 26, if we go down, what, five and six

2     lines, it's telling us that, that Blaze Advisor 6.1 and 6.5X

3     are being used.  And can you tell from this exhibit where

4     that use is?

5     A.  No.  Actually it doesn't tell that it's being used.  It

6     says it's being available as a technology.

7     Q.  Okay.  Thank you.  So that's its meaning?

8     A.  Correct.

9     Q.  It's available as a technology.  Whether it's used or

10    not, we don't know from this exhibit?

11    A.  Correct.

12    Q.  If it is used, where it's used, we don't know from this

13    exhibit?

14    A.  We don't know.

15    Q.  This is an exhibit from your earlier deposition when we

16    talked about installations in the UK.  As you see, the

17    document comes from yourself to Richard Johnson and others.

18            Can you confirm for me that as of this date this

19    document reports that Blaze Advisor 6.7 is being used in

20    Europe?

21    A.  It does not confirm that it was used.  All it confirms

22    is that I provide the information where they can -- if they

23    choose so to download the software, but it does not confirm

24    that it was used.

25    Q.  Showing you Exhibit 185 an e-mail dated May 25, 2010.

1    Dean Lawton, is he from Europe?

2    A.  According to the e-mail header, yes, he is.

3    Q.  And are all of the recipients from Europe, according to

4    the header?

5    A.  That's correct.

6    Q.  And then the carbon copy of Ewen Setti.  He's European.

7    He is from London as well.

8    A.  Yes, he is.

9    Q.  Do you know what the application Adapt/Adapt BE is?

10   A.  To my knowledge, it's a policy administration system for

11   the -- the ABL line of business.

12   Q.  And would you give us the meaning of a policy

13   administration system?

14   A.  It's an application that allows to book, bind and issue

15   policies -- insurance policies for the specific line of

16   businesses.

17   Q.  Okay.  But I guess let's just talk about policy

18   administration systems in general and your knowledge about

19   that.  As a general statement, brokers and agents use policy

20   administration systems to sell insurance to their customers?

21   A.  It's primarily -- to my knowledge, it's primarily used

22   by the internal staff, basic information provided by brokers

23   and agents.  Of course, there could be the exception to the

24   rule, but as a general rule it's for the internal staff.

25   Q.  So then based upon the information provided by the

984

```
1    brokers and agents, the policy administration system then

2    responds to the broker and agent with the proposed solution

3    or the proposed policy and a quote for that policy?

4    A.  Correct.  And if they accept it, they the book, bind and

5    issue the policy.

6    Q.  Then in red -- and then you see the next three entries

7    in red with different Blaze Advisor versions.  Do you have

8    any understanding what the red designates?

9    A.  Red designates that we are behind the current version.

10   So 7.1 is the current version.  That particular application

11   could be using version which is behind the current one.

12   Q.  I'm now giving you Exhibit 187, October 9, 2013.  And if

13   you go to the table at the back, you'll see it's very

14   similar to the table that I just showed you.  I'd like to

15   direct my questions to the second to the last line where it

16   says, "EUZ" and then "Exari Pilot."  Do you see where I'm

17   saying?

18   A.  Yes.

19   Q.  Do you know what the application Exari Pilot is?

20   A.  I do not.

21   Q.  The document itself says it's running on Blaze Advisor

22   version 7.1.  Do you agree?

23   A.  Yes, according to the table.

24   Q.  Based upon that, can you identify any person from FICO

25   that assisted in the installation of Blaze Advisor in the
```

1    UK?

2    A.  I cannot identify those.  They dealt with the help desk

3    support, and they would raise the tickets.  So they do

4    not -- that worked generically as FICO.  Mike Sawyer would

5    be the contact person for me in case any additional

6    assistance would be needed.

7    Q.  Do you recall yourself contacting or engaging Mike

8    Sawyer and yourself?

9    A.  I did.

10   Q.  And when was that?

11   A.  That's during the -- between 2010 and 2014, if my memory

12   serves me correctly.

13   Q.  Tell me about your contacts with Mike Sawyer.

14   A.  I got informed by developers that there was an issue and

15   they need to be resolved quickly.  So I would just make him

16   aware.  Because as the client representative of FICO, he has

17   an influence to expedite the request to go to the help desk.

18   Q.  So is it fair to say that you advised Mike Sawyer making

19   him aware that people in the UK were reaching out to the

20   help desk for help?

21   A.  Correct.  In the UK or U.S.  That was normal part of my

22   working relationship with him.

23   Q.  Okay.  Do you recall specifically reaching out to Mike

24   Sawyer specific to install issues with regard to UK?

25   A.  I believe I did.

1    Q.  You believe you did?

2    A.  Yes.

3    Q.  Do you remember when?

4    A.  I don't recall the exact date.

5    Q.  Same questions with respect to installations in Canada.

6    A.  Again, I did -- yes, I did.  And I do not recall the

7    exact date.

8    Q.  So, again, there is no individual person at FICO that

9    you know of that assisted in the installation?

10   A.  No.

11   Q.  To your knowledge, who do you -- did anybody tell you --

12   as opposed to your assumptions, did anybody tell you that

13   Canadian Chubb representatives placed tickets at the help

14   desk?

15   A.  My conversations in the past with Tony Zahn, who was the

16   architect for the Canadian zone, that they opened the

17   ticket.

18   Q.  Mr. Mirolyuz, I am showing you an exhibit that we are

19   numbering 188.

20        So I would like you to go to the table the last

21   page of 188, if you would, as well as go to that second

22   exhibit the 30(b) 6 notice.  Do you have those two in front

23   of you.  Do you have that?

24   A.  Yes.

25   Q.  What I would like to do is, with these two, these two in

```
 1    mind, go through these applications.  So let's start with

 2    CSI Express?

 3    A.  Okay.

 4    Q.  So what's the function or purpose of CSI Express?

 5    A.  It's a policy administration system for --

 6              COURT REPORTER:  For what?

 7              THE WITNESS:  Policy administration system for

 8    specialty lines.

 9    BY MR. HINDERAKER:

10    Q.  And does it encompass all of the lines within the

11    specialty line of business?

12    A.  I believe -- it is a majority of them.

13    Q.  Are you saying you don't know, so you're assuming a

14    majority?

15    A.  I cannot speak for sure this it is all the lines within

16    the policy.  So yes.  I don't know for fact.

17    Q.  And CSI Express uses Blaze Advisor?

18    A.  Correct.

19    Q.  Among other technologies?

20    A.  Among other technologies, yes.

21    Q.  When I say it's using Blaze Advisor, we'll assume it can

22    be among other technologies.

23    A.  Correct.

24    Q.  Okay.  And what is the purpose of a policy

25    administration system?
```

```
1    A.  As I said before, to book, bind and issue the policy

2    for -- in this particular case, specialty line of business

3    in the case of CSI Express.

4    Q.  What is automated renewal process?

5    A.  It is part of the CSI Express suite tools which allows

6    automated processing of the renewals issued through the CSI

7    Express.

8    Q.  It allows the what?

9    A.  Automated processing of renewals for policies issued

10   through the CSI Express.

11   Q.  Okay.  And by, "Automated renewal of policies issued

12   under CSI Express," does that mean renewal of policies

13   without human intervention?

14   A.  Correct.

15   Q.  What is CSI Express renewal rule maintenance center, its

16   purpose and function?

17   A.  It is part -- it's an applications which is part of

18   Blaze Advisor software which allows nontechnical user

19   maintenance of the business rules.

20             COURT REPORTER:  The business what?

21             THE WITNESS:  Business rules.

22             COURT REPORTER:  Rules?

23             THE WITNESS:  Yeah.  R-U-L-E-S.

24   BY MR. HINDERAKER:

25   Q.  And what is the function and purpose of CSI Express
```

```
1    renewal What If Simulation Tool?
2    A.   It is a testing tool which allows to simulate the impact
3    of business rules changes.
4    Q.   Is it accurate to say that one of the features of Blaze
5    Advisor is that nontechnical people can enter the business
6    rules of Chubb into Blaze Advisor?
7    A.   Correct.
8    Q.   And that might be -- that is -- and they might use the
9    renewal rule maintenance center tool for that?
10   A.   That is correct.
11   Q.   And then to see if the rule that they just entered into
12   Blaze Advisor operates the way they intended that rule to
13   operate in any scene, right?
14   A.   (Moves head in affirmative manner.)
15   Q.   That's the What If Simulation Tool?
16   A.   Correct.
17   Q.   So that at the end of the process, the automated renewal
18   application within the CSI Express policy administration
19   system will be operating in accordance with the company's
20   intentions for the -- for the offering and the booking and
21   the binding of a policy?
22   A.   That is correct.  For the renewal process.
23   Q.   In the context of a new policy, tell me how -- what CSI
24   Express does, how it functions?
25   A.   I cannot provide this information.  That's a part of the
```

1    business flow.  I'm not familiar with the business flow.

2    Q.  What do you mean by "business flow"?

3    A.  CSI Express is operated by the business people, in this

4    case underwriters.  What type of flow to create a new policy

5    or to add new customers, I'm not privy to that information.

6    Q.  Okay.  Do you know that they use CSI Express for that

7    function of new customers?

8    A.  Yes, I know they do.  Correct.

9    Q.  Okay.  And do you know that CSI Express for new

10   customers has a function of presenting to the new customer

11   the proposed policy for booking -- for quoting, booking and

12   binding?

13   A.  Not the CSI Express directly.  The underwriter would

14   work with the CSI Express, and it's up to them to present

15   the results to the customers.

16   Q.  Up "to them" being who?

17   A.  Underwriters.

18   Q.  The underwriters.  So the underwriters of we'll call it

19   "big Chubb" presents that solution to the broker who

20   presents it to his customer?

21   A.  Correct.  That's my understanding.

22   Q.  Mm-hmm.  Mm-hmm.  And in that process, the human

23   underwriter uses CSI Express?

24   A.  That is correct.  That's my, yes, my understanding.

25   Q.  Okay.  And do you have knowledge to tell us what

```
1    functions of CSI Express the human underwriter uses in that
2    process of the new policy?
3    A.  I do not.  Again, they have their own flow.  I'm not
4    private to that information.
5    Q.  All right.  And then the same kind of questions with
6    respect to renewals.
7            Now we have an existing customer whose policy is
8    up for renewal.  Tell me how -- tell me the function and
9    what CSI Express in conjunction with automated renewal
10   process does?
11   A.  Again, my answer is going to be similar to my other
12   answer.  I'm not familiar with the process to present the
13   renewal.
14   Q.  You're not familiar with what the underwriter does?
15   A.  Exactly.
16   Q.  Tell me what the application does.
17   A.  Again, I'm not sure of all the parts and I'm not
18   familiar with all the parts of the application.  The part I
19   am familiar is the policy, when it's due for renewal, would
20   go through the automated renewal process, which would either
21   automatically book, bind and issue the policy or allow the
22   underwriters to any potential problem with the renewals.
23   Q.  Okay.  So we spoke before about the automated renewal
24   being a renewal without human intervention?
25   A.  Correct.
```

1    Q.  Correct?  And do you understand that CSI Express, using

2    Blaze Advisor, will -- I'll call it triage a renewal to

3    highlight for a human underwriter the issues that the person

4    has to address?

5    A.  Correct.

6    Q.  So one of the functions of the software application is

7    to focus the underwriter's work on those questions that need

8    his attention, not on all questions?

9    A.  Correct.

10   Q.  Let's go to profitability indicator.  What is the

11   function and purpose of that application?

12   A.  This is the part of the CSI Express, and its purpose to

13   assess the risk of that particular policy, associated with

14   that particular policy.

15   Q.  Would it be just as correct to say to assess the risk of

16   the particular customer?

17   A.  Correct.

18   Q.  So that a policy is offered whereby the pricing is

19   aligned with the risk policy?

20   A.  That is correct.

21   Q.  With that understanding, I'm still not clear what

22   profitability indicator does.

23   A.  It essentially calculates the risk factor or risk score

24   for that particular policy or particular customer as you

25   said.

1   Q.  All right.

2   A.  And that's based on that score, the underwriter can

3   assess the severity of the risk.

4   Q.  And assessing the severity of the risk then informs the

5   premium, the price?

6   A.  That, yes, among other things.

7   Q.  Among other things.  Yes, among other things.

8            It informs what solution is going to be provided

9   by way of the insurance policy?

10  A.  Exactly.

11  Q.  And are there situations in which, for the renewal --

12  well, and then does profitability indicator -- does that

13  operate with respect to each renewal application?

14  A.  For the specific line of businesses.  So not every line

15  of business would go through the profitability --

16  profitability indicator is only for a certain line of

17  businesses.

18  Q.  Okay.  So there is a broader -- there is a broader array

19  of business that goes through CSI Express?

20  A.  Correct.

21  Q.  And within that broader array, there is a subpart of

22  that which, to which profitability indicator functions?

23  A.  Correct.

24  Q.  And then within that subpart, will profitability

25  indicator function and then one possible outcome is that the

1    renewal is renewed automatically?

2    A.  Correct.

3    Q.  Okay.  So the information that profitability -- the

4    score that profitability indicator generates will inform

5    other parts of the system and perhaps -- and there will be

6    instances where human intervention is not necessary for the

7    policy to be renewed?

8    A.  Correct.

9    Q.  And if human intervention is necessary for the policy to

10   be renewed, the software application highlights for the

11   human underwriter what to address?

12   A.  That is correct.

13   Q.  On Exhibit 188 we have the SBU -- I'm still more or less

14   talking about CSI Express, but we have the SBU CSI.

15   A.  Correct.

16   Q.  And that's stands for Chubb specialty lines?

17   A.  Insurance.

18   Q.  Or insurance.  Chubb Specialty Insurance.

19           And then if we look at te cell CSI Express, it has

20   a corresponding subpart, predictive modeling?

21   A.  Correct.

22   Q.  What is that?

23   A.  It's the old name for profitability indicator.

24   Q.  And then it has another subcell, underwriting guidance.

25   What is that?

```
1    A.  It was an extension of the profitability indicator or

2    predictive modeling.  It's additional to provide the

3    guidance in human readable form, instead of score providing

4    the wording.

5    Q.  Okay.  And then under the CSI SBU, there is the

6    automated renewal process and that the subpart ARP 1,

7    renewal categorization.  What is that?

8    A.  Ultimately, the renewal process consists of two parts.

9    It is determining -- ARP 1 specifically focuses on te

10   determining if policy is eligible to be processed

11   automatically.

12   Q.  If it is, then it is processed automatically?

13   A.  Yes.

14   Q.  And if it isn't, it goes to a human underwriter?

15   A.  Exactly.  Correct.

16   Q.  And then the issues to be addressed are highlighted?

17   A.  Correct.

18   Q.  What is ARP 2?

19   A.  If policy is eligible for renewal automation, the ARP 2

20   is taking care for all the issuance -- book, binding and

21   issuance process associated with the renewal process.

22   Q.  So ARP 2 is the instances where the policy is

23   automatically renewed?

24   A.  Correct.

25   Q.  Let's talk about DecisionPoint.  What is that, its
```

```
1     function and purpose?

2     A.  DecisionPoint is how to make it quote, quote --

3               COURT REPORTER:  I'm sorry?

4               THE WITNESS:  Automated quoting system for small

5     book of business.

6     BY MR. HINDERAKER:

7     Q.  Is it, what is the -- is there a functional relationship

8     between DecisionPoint and CSI Express?

9     A.  Correct.  Yes.

10    Q.  And what is that relationship?

11    A.  The quote issued in the DecisionPoint, if they are

12    accepted by the customers, are ultimately entered as the

13    policy in CSI Express.

14    Q.  All right.  So let's start in the instance of -- so

15    DecisionPoint is an application intended for a certain

16    segment of the market?

17    A.  Correct.

18    Q.  And let's take a customer that's in that segment who is

19    interested in a new -- say a noncustomer in that segment who

20    is interested in becoming a customer, so it's a new policy.

21    DecisionPoint functions -- tell me how DecisionPoint

22    functions in the context of a new policy.

23    A.  The customer submits the form to the Chubb employee who

24    is responsible for entering the information into

25    DecisionPoint in the system.
```

```
1     Q.  Can I -- so the customer -- does a customer access the
2     portal directly, or does the customer access it through the
3     agent/broker?
4     A.  It is directly or through the agent/broker, but they
5     have to submit the application, paper application.
6     Q.  So there is a customer-facing portal in DecisionPoint?
7     A.  Not necessarily a customer-facing portal.  It's not a
8     customer-facing portal.  It's a paper application which they
9     fill up and submit it to the mailbox or fax it to the Chubb,
10    the Chubb team responsible for that.
11    Q.  Okay.  So hard copy application is submitted to either a
12    broker -- submitted to Chubb either directly or through a
13    broker/agent?
14    A.  Correct.
15    Q.  And now what happens?
16    A.  The part of the team who is responsible for entering the
17    information would enter the information into the
18    DecisionPoint application.
19    Q.  Is that a manual process?
20    A.  Manual process.  Internal Chubb manual process.
21    Q.  So the information is entered into DecisionPoint?
22    A.  Automated process picks up this information.  It goes
23    through the -- I'm just going by the list here -- goes
24    through the eligibility process, which validates if the risk
25    is acceptable.  I'm looking into the eligibility here.
```

1    Q.  Mm-hmm (Yes).

2    A.  It goes through the pricing process, which determines --

3    if risk is acceptable, determines a price for that

4    particular risk.  It goes through some of the data

5    normalization, if necessary.

6    Q.  What does "data normalization" mean?

7    A.  Sometimes application submitted -- if address is missing

8    or address might not be -- zip code might not be correct.

9    So type of data validation, data correction.  And it

10   generates the list of applicable endorsements.

11   Q.  So it looks to see if there is an opportunity to sell

12   more insurance?

13   A.  Not necessarily.  Whether there's limitations on the

14   policy.  Different outside limits, type of additional

15   coverage, which restricts the risk, because it depends on

16   the risk.

17   Q.  So I imagine, is it accurate to say that each individual

18   application is going to be individually accessed?

19   A.  Correct.

20   Q.  In that individual assessment a decision is made whether

21   additional endorsements would be appropriate for that

22   circumstance?

23   A.  Exactly.

24   Q.  It may be in some circumstances yes, and then they'll be

25   presented, and some circumstances no?

```
 1    A.  It is never in bulk.  It is individual risk being

 2    assessed.

 3    Q.  So now that's completed.

 4    A.  It generates the quote letter, which the person in

 5    internal Chubb team responsible for DecisionPoint will

 6    either mail or e-mail to the customer or agent or broker.

 7    Q.  The quote letter?

 8    A.  Yes.

 9    Q.  And the quote letter is the offer at that price to sell

10    and bind insurance for that customer?

11    A.  Correct.

12    Q.  And DecisionPoint uses Blaze Advisor?

13    A.  Yes.

14    Q.  Let's go to -- if we look at Exhibit 188, the next SBU

15    is CCI, Chubb Commercial Insurance?

16    A.  Correct.

17    Q.  And let's talk about CUW.  Does CUW stand for

18    "commercial underwriting workstation"?

19    A.  That is correct.

20    Q.  If you would tell us the functional purpose of CUW.

21    A.  CUW is the system which allows underwriters to maintain

22    the records of the interaction with the customers --

23    documents, notes, et cetera.

24    Q.  Okay.  How is CUW, how is CUW used in connection with

25    the sale of insurance?
```

1000

1    A.  As underwriter interacts with the customer, any

2    conversation, any documents he receives from insured has

3    been recorded and either manually or stored in the CUW.

4    Q.  Okay.  And CUW uses Blaze Advisor?

5    A.  One of -- CUW is the suite of tools.

6            COURT REPORTER:  The what?

7            THE WITNESS:  Suite.

8            MR. HINDERAKER:  S-U-I-T-E.

9            COURT REPORTER:  Oh.

10           THE WITNESS:  Only one application, inventory

11   management, is using in Blaze Advisor software.

12   BY MR. HINDERAKER:

13   Q.  What is the function and purpose of inventory

14   management?

15   A.  It assesses number of policies assigned to that

16   particular underwriter and raises the alert if number

17   exceeds certain thresholds.

18   Q.  Is there an interrelationship of function between CSI

19   Express and CUW?

20   A.  CUW is only as a ledger of records.  It has nothing to

21   do with the CSI Express, just additional convenience for the

22   underwriter to store their records.

23   Q.  Okay.  And let's go to, let's go to CSI claims.  Can you

24   tell me what that application is?

25   A.  This was a small application developed for the actuarial

Federal Government Litigation Document

1001

```
 1    to assess a claim's severity based on the policy
 2    information.
 3    Q.  And when is this assessment done?
 4    A.  After claims is processed, after claims is -- after
 5    payment is issued, it gets stored.  And CSI claims compares
 6    the policy information against the claims and payouts and,
 7    based on that, determines severity and criteria.
 8    Q.  And in the context of a customer whose policy is to be
 9    renewed, does CSI Express in any of its functions or
10    automated renewal, does it then access the information in
11    CSI claims for processing in the context of a renewal?
12    A.  No, it's not.  It's purely a reporting tool for the
13    underwriter -- for the actuarials to get the insight into
14    the data.  It's not used by CSI Express or renewal process.
15    Q.  Okay.  And CSI claims uses Blaze Advisor?
16    A.  Correct.
17    Q.  And how does it use Blaze Advisor?
18    A.  It creates -- similar to profitability indicator, it
19    creates a severity score based on the criteria of the data,
20    based on a set of the business rules.
21    Q.  So we have the data that is the claims severity -- you
22    know, we have the underlying claim being the data.  And then
23    Blaze Advisor -- through Blaze Advisor scores are generated
24    that are the consequence of that data applied against the
25    business rules of Chubb?
```

```
 1    A.  Correct.

 2    Q.  And then do you know how that is used for the processing

 3    of the claims?

 4    A.  It's not used for the processing of the claims itself.

 5    It could be used potentially by actuarials for whatever role

 6    they -- whatever functionality they execute, but it's not

 7    used in a production sense or for the processing of

 8    particular claim or the policy.

 9    Q.  Okay.  And then let's go to -- let's go to -- let's go

10    back to CCI and let's go to IRMA.  And that stands for

11    individual rate modification application?

12    A.  Correct.

13    Q.  Okay.  And IRMA uses Blaze Advisor?

14    A.  That is correct.

15    Q.  And what's the function and purpose of IRMA?

16    A.  It's a calculation of the premium.  It has a set of the

17    rate tables and calculation of the premium for a certain

18    small book of business.

19    Q.  And how does that relate to the sale of that book of

20    business to the customer?

21    A.  It's just to provide them the quote on a potential

22    premium.

23    Q.  But it is the Blaze Advisor software that is used to

24    take the facts, apply the rules and generate the quote to

25    offer the customer?
```

1  A.  Generate the premium, not even the quote, just generate

2  the premium.

3  Q.  Generate the premium?

4  A.  Then somebody takes the premium and present it to the

5  customer.  Whatever means they choose.

6  Q.  Okay.  Thank you.  And then let's go to TAPS.  And that

7  stands for Texas Accident Prevention System?

8  A.  Correct.

9  Q.  And TAPS uses Blaze Advisor?

10  A.  One of the functions, yes.  That's one of the tools.

11  Q.  And what's the functional purpose of TAPS?

12  A.  To my knowledge, in Texas there is a requirement that

13  certain workers' comp policies, holders of certain workers'

14  comp policies are offered additional services.  The purpose

15  of the TAPS is to issue the letter after the policy is --

16  generate a letter for certain types of workers' comp

17  policies after they are issued.

18  Q.  Is it fair to say that TAPS is used to ensure compliance

19  with Texas requirements?

20  A.  Yes.  I believe it is.

21  Q.  Is it fair to say that without compliance with Texas

22  requirements, insurance policies cannot be sold of this

23  particular kind?

24  A.  Yes.

25  Q.  Did you say TAPS -- what were the kinds of insurance

 1    policies that TAPS --

 2    A.  It's certain types of the workers -- to my knowledge,

 3    it's certain types of workers' comp.

 4    Q.  Workers' comp?

 5    A.  Workers' comp, yes.

 6    Q.  Let's go to premium booking.  Premium booking uses Blaze

 7    Advisor?

 8    A.  For one particular functionality, yes.

 9    Q.  Okay.  What is that?

10    A.  It's a premium -- premium validation.

11    Q.  And what does that mean?

12    A.  To make sure that the premium is in compliance with

13    Chubb rules and regulations.

14    Q.  Okay.  So that's the particular -- I'm sorry.  Are you

15    telling me that that's the particular function of the Blaze

16    Advisor component of premium booking?

17    A.  Correct.

18    Q.  Can you tell me anything more about the premium booking

19    application than you have already said in terms of the full

20    extent of the application?

21    A.  The only thing I can speak to that after the policy is

22    issued, the premium is processed to the premium booking to

23    make sure it's properly recorded.  That's the extent of my

24    knowledge for that particular application.

25    Q.  Let's go to Cornerstone.  Cornerstone on Exhibit 188 is

1    part of the Surety SUB, and that's your understanding as

2    well?

3    A.  It is, Yes.

4    Q.  And Cornerstone uses Blaze Advisor?

5    A.  Actually, based on my knowledge, it was intended to use

6    the Blaze Advisor; however, it was never fully implemented.

7    Q.  When was Blaze Advisor intended to be used?

8    A.  It was -- the process of adding Blaze Advisor to the

9    Cornerstone applications started in around 2014, if my

10   memory is correct.

11   Q.  Mm-hmm.  And the process never completed?

12   A.  The entire process was never completed, and it was never

13   deployed to production as part of the Cornerstone

14   application.

15   Q.  Do you know if Chubb uses, as of the time you were with

16   the company, was there an application in use called

17   Cornerstone?

18   A.  It was deprecated after the merger, and then ACE

19   equivalent was chosen to use for the Surety.

20           COURT REPORTER:  I'm sorry?

21           THE WITNESS:  ACE, the name of the new company

22   was -- ACE software was chosen to be used for the Surety.

23   BY MR. HINDERAKER:

24   Q.  And "deprecated" for us commoners means?

25   A.  No longer being used.

1    Q.  So the Cornerstone application was being used up to the

2    time of the merger -- up to the time it was deprecated?

3    A.  Yes.  It was used, but without the Blaze Advisor.

4    Q.  Tell me about the application called Claims Connect.

5    A.  Claims Connect is the ACE, original ACE claims, claims

6    system.

7    Q.  Does it use Blaze Advisor?

8    A.  No, it does not.

9    Q.  Tell me about the application Small Commercial?

10   A.  Small Commercial was intended to be an application to

11   process the small book of business for the commercial lines

12   of businesses --

13   Q.  Mm-hmm (Yes).

14   A.  -- and does not use Blaze Advisor.

15   Q.  Was it intended to use Blaze Advisor?

16   A.  It started development, but we never discuss it.  It was

17   intended to use the business rules; however, Blaze Advisor

18   as a tool was never discussed.

19   Q.  EZER.  Tell me the function and purpose of EZER.

20   A.  To my knowledge, it's a commercial policy admin system

21   for the European zone.

22   Q.  And it uses Blaze Advisor?

23   A.  As one of the functions, yes.

24   Q.  Do you know the particular functions that Blaze Advisor

25   uses -- that Blaze Advisor is used for in the context of the

CASE 0:16-cv-01054-DTS Doc. 1182 Filed 03/14/23

1007

1    EZER application?

2    A.  Similar to CSI Express, it was used to develop

3    renewal -- automated renewal policy, ARP 1 portion of the

4    CSI Express automatic renewal process.

5    Q.  Do you know whether EZER is used in the context of new

6    applications in Europe?

7    A.  Can you clarify what "new application" means?

8    Q.  New application means not an existing customer, seeking

9    to become a customer.  Not a renewal, but a new policy.

10   A.  I believe, to my knowledge, at this point it's not used

11   for the new customers.  It's on a deprecation list and only

12   existing business being used EZER.

13   Q.  To your knowledge, EZER is being used today in Europe?

14   A.  Correct.  Let's put it this way:  It exists in Europe;

15   it has not been removed from the application list, but it's

16   on the list to be deprecated.

17   Q.  Someday.  Do you know when?

18   A.  I don't know.

19   Q.  Have you heard when?

20   A.  No.

21   Q.  How about an Adapt?  A-D-A-P-T.  What's the function and

22   purpose of Adapt?

23   A.  It is a policy admin system for the accident and health,

24   I believe, line of business.

25   Q.  Okay.  And do you know the geographical regions to which

1008

```
 1    Adapt was used?

 2    A.  To my knowledge, it was used in Canada.

 3    Q.  Adapt uses Blaze Advisor?

 4    A.  Correct, for one of the functions.

 5    Q.  What function is that?

 6    A.  Underwriting guidance.

 7    Q.  Is Adapt -- to your knowledge, is the application called

 8    Adapt different in terms of being a policy administration

 9    system?

10    A.  It's not.  I believe it's one and the same.  I've not

11    heard of the stand-alone Adapt application.

12    Q.  So understanding you haven't heard of the stand-alone

13    Adapt application, did you say you believe it is a policy

14    administration system?

15    A.  It is a policy administration system for the ABL line of

16    business.  That's the context I know of Adapt.

17    Q.  And are you using the same definition of policy

18    administration system that we talked about before?

19    A.  Correct.  Yes.

20    Q.  And then do you know if there is any difference between

21    Adapt and Adapt ABL?

22    A.  No, I don't.  I've never heard.

23    Q.  And then let's go to Evolution.  Do you know -- what is

24    that application?

25    A.  It's a policy admin system for specialty lines in
```

1    Canada.

2    Q.  It uses Blaze Advisor?

3    A.  Yes, for one of the functions.

4    Q.  Among other technologies?

5    A.  Among other technologies.  That's correct.

6    Q.  What was the e-mail?

7    A.  The e-mail was Ramesh Pandey.  Information fro the ChEAR

8    regarding the Broker Site application.

9    Q.  What did Mr. -- what did he say in the e-mail?

10   A.  He stated that according to the ChEAR that Broker Site

11   is -- it's an application for broker to get the information

12   about the policies or the claims, so they can serve their

13   clients.

14   Q.  And does broker site use Blaze Advisor?

15   A.  It does not use Blaze Advisor; however, it uses the

16   parts of the Evolution, which is using the Blaze Advisor.

17   Q.  So Broker Site is an application that's used in Canada?

18   A.  Correct.

19   Q.  And the Broker Site application -- and a broker or agent

20   who uses the Broker Site application in the, in the Broker

21   Site application then inter -- is the word "interfaces" with

22   Evolution?  What is the right word in how Broker Site uses

23   Evolution?

24   A.  It gets the information from Evolution, policy

25   information or claims information.  Part of it could be

```
 1    information generated by the Blaze Advisor in Evolution.
 2    Q.  Okay.  The purpose of --  the intended purpose or
 3    function of Broker Site is its ability to draw information
 4    from Evolution?
 5    A.  Correct.
 6    Q.  The point of the -- one of the purposes of the Broker
 7    Site application is its ability to draw information from
 8    Evolution?
 9    A.  Correct.  Among other data sources.
10    Q.  Among other data sources.  Evolution being a policy
11    administration system that is used in Canada?
12    A.  Correct.
13    Q.  And Evolution being an application that uses Blaze
14    Advisor?
15    A.  That is correct.
16    Q.  Now, going back to Evolution, you mentioned that Blaze
17    Advisor provides -- Blaze Advisor supports a particular
18    function of Evolution.  What is that function?
19    A.  Underwriting guidance.
20    Q.  And we talked -- you know, we said kind of much earlier
21    in the morning that these applications may use a number of
22    technologies in addition to Blaze Advisor?
23    A.  That is correct.
24    Q.  Okay.  Is it also accurate to say that without Blaze
25    Advisor none of the applications function as intended?
```

1   A.  As any of the technology, Blaze Advisor can be replaced.

2   So it could function without the Blaze Advisor.

3   Q.  Exactly.  It could function with a different application

4   that performs those functions.

5   A.  Yeah.

6   Q.  I guess what I'm trying to see is if you agree with me

7   that any particular application when it is a combination of

8   more than one technology?

9   A.  Correct.  One or more.

10  Q.  One or more?

11  A.  Or more.

12  Q.  The reason that there is one or more technologies is

13  that the one or more technologies are all necessary for the

14  application to perform its intended functions?

15  A.  Correct.  I would --

16  Q.  So this goes back to whether CSI Express is used on new

17  applications.  You don't know one way or the other?

18  A.  CSI Express is used for the new applications.

19  Q.  Oh, it is?

20  A.  Yes.  It is for entering the new policies.  Book,

21  binding, issue.  That's a virtue of the policy admin system.

22  Q.  So CSI Express will be -- for a new policy, CSI Express

23  is implemented?

24  A.  New policies and maintenance of policies going forward.

25  Q.  Okay.  And then, of course, a renewal is also

```
 1    implemented through CSI Express, including the automatic

 2    renewal processing function?

 3    A.  Correct.  Correct.

 4    Q.  That was -- okay.  All right.  And so now let's go back

 5    to CSI Express in a new policy.  In the processing of a new

 6    application, and assuming that the policy type is within the

 7    range of profitability indicator --

 8    A.  Yep.

 9    Q.  -- will profitability indicator be used in that new

10    application?

11    A.  Correct.  If it fits the model of box for the

12    profitability indicator.

13    Q.  Got it.  And when we spoke about DecisionPoint, we spoke

14    about using DecisionPoint for a new policy, you know.  We

15    went through that.

16    A.  A new quote.  Correction.  New quote.

17    Q.  New quote.

18    A.  Not a policy.

19    Q.  Got it.  New quote.  So now with a new quote, it gets to

20    the customer, e-mail or snail mail.  The customer says,

21    yeah, I want that, or tells the broker, yeah, I want that.

22    Then does DecisionPoint do anything after that?

23    A.  No.  Information from DecisionPoint, whatever quote is

24    entered into the CSI Express.

25    Q.  So then it goes into the CSI Express?
```

1    A.   Exactly.  So DecisionPoint, just to make sure it's

2    clear, is only for the quoting for the small book of

3    business.  No functionality is intended there.

4    Q.   Let's take a policy that was originally issued,

5    quoted -- quoted -- originally -- well, let me start over

6    again.

7              Let's use a policy that -- again, using a

8    DecisionPoint -- the customer accepts it, it goes into CSI

9    Express.  Now it's time for that particular policy to be

10   renewed.

11   A.   (Moves head in affirmative manner.)

12   Q.   Is that a functionality of DecisionPoint to

13   automatically renew?

14   A.   No.

15   Q.   Now CSI Express is used to support that policy?

16   A.   Correct.

17   Q.   Okay.  So is it fair to say that DecisionPoint is only

18   used for new applications?

19   A.   For the new quotes, yes.

20   Q.   For the new quotes.  Understood.  Because if that quote

21   turns into a policy, then that goes into CSI Express, and

22   then the administration of that policy and its renewals will

23   be through CSI Express going forward?

24   A.   Correct.

25   Q.   Can you tell me anything further about how -- and my

1    question was phrased in the context of CUW pulling

2    information from CSI Express.

3              Can you tell me anything further about how CSI

4    Express and CUW inter function, separate from who pulls data

5    from whom?

6    A.  To my knowledge, when policy is created in CSI Express,

7    information is sent to -- limited policy information is sent

8    to CUW, which would in turn allows the underwriter to

9    provide, as I said before, notes, additional documents

10   associated with that particular policy.

11   Q.  Okay.

12   A.  So that's a kind of the way I understood the

13   functionality between CSI Express and CUW.

14   Q.  Were you aware of Chubb having licensed Blaze Advisor

15   when you started work?

16   A.  Yes, I am.

17   Q.  Okay.  So when you started, what was your role relative

18   to the Blaze Advisor software that Chubb had licensed?

19   A.  When I started, I had no intention or -- I was hired not

20   as the rules, but as a document developer.

21   Q.  Mm-hmm (Yes).

22   A.  However, part of my team was working on the Blaze

23   Advisor, and my manager at that time proposed for me to get

24   involved with the tool.

25   Q.  Okay.  Do you have a -- can you give us a time reference

1    for when you first got involved with the Blaze Advisor

2    software?

3    A.  I believe it was, to the best of my knowledge, early

4    2007.  Initial conversation happened around December

5    probably, but my involvement was, I believe, either January

6    or February.

7    Q.  I've given you Exhibit 189 --

8             THE COURT:  Mr. Hinderaker, if we might pause the

9    video.  Since we're turning to a new exhibit, this would be

10   a convenient time to take our morning break.

11            Members of the Jury, be back, be ready to go at 15

12   minutes to 11:00 on that clock.  All right?

13            THE CLERK:  All rise for the jury.

14                    **(Jury exits.)**

15

16        **(In open court without the Jury present.)**

17            THE COURT:  Be seated.  Why don't the lawyers come

18   on back in and be ready at 20 minutes to 11:00.  We will

19   deal quickly with the issue of the exhibits that are the

20   subject of concern with Mr. Ghislanzoni's testimony.

21            Mr. Hinderaker, you be prepared, obviously, to

22   tell me why they're relevant.

23            Ms. Godesky, tell me why they're irrelevant or

24   prejudicial.  All right?

25            MS. GODESKY:  Thank you.

1    THE COURT:  We're in recess.

2                **(Recess taken.)**

3

4         **(In open court without the Jury present.)**

5    THE COURT:  Be seated.  All right.  Let's deal

6    with these exhibits, quickly, if we can.

7         Mr. Hinderaker, as I understand it, looking at

8    them, it's not entirely clear that they all do, but I think

9    they all do deal with AppCentrica; is that right?

10   MR. HINDERAKER:  As well as DWS.

11   THE COURT:  All right.  Ms. Godesky, why are these

12   irrelevant or unduly prejudicial?

13   MS. GODESKY:  Your Honor, our objection is that

14   it's improper to use these documents with Mr. Ghislanzoni.

15   He is the chief enterprise architect at Chubb.  He was a

16   legacy ACE employee, meaning he did not join the

17   organization until after the acquisition in 2016.

18   THE COURT:  Okay.

19   MS. GODESKY:  As you know, FICO took the position

20   in correspondence to the Court before trial began, FICO does

21   not agree that exhibits are admissible without a sponsoring

22   witness who is able to lay proper foundation for each

23   exhibit.

24        And then at the February 14th status conference,

25   Your Honor said, "No document is being admitted except

1    through a witness, and the witness is going to have to be

2    somebody who has knowledge or foundation for the document."

3              And so through the first eight witnesses in this

4    trial, we planned our case based on FICO's objection and

5    then the Court's directive.

6              And so last night FICO sent us a list of about 20

7    different exhibits that they want to use with

8    Mr. Ghislanzoni.  He is our corporate representative, but he

9    is not a 30(b)(6) deponent.  He has not been educated on

10   topics outside his personal knowledge.

11             So the group of e-mails that were submitted to the

12   Court, there is an evidentiary issue separate and apart from

13   foundation for one of them, but all of them predate his time

14   at the company.  He is not on any of them, and he can't

15   speak to what happened.  And it's completely prejudicial to

16   be confronting our corporate representative with e-mails and

17   asking him questions about things that he has no knowledge

18   of.

19             Relatedly, Mr. Hinderaker also alluded to the fact

20   that they want to try to use interrogatories with

21   Mr. Ghislanzoni.  They disclosed last night these are

22   interrogatories that show various gross written premium

23   levels run through certain applications.  Mr. Ghislanzoni

24   doesn't know anything about that.  He wasn't involved in the

25   process of running that data.  And FICO took three or four

1    days of 30(b)(6) deposition testimony of multiple deponents

2    on how that data was run, where it came from and what it

3    means.

4           So if they wanted party admissions about, you

5    know, those gross written premium numbers, they could have

6    designated that deposition testimony.  Apparently, they

7    don't like the deposition testimony, so, instead, they would

8    like to prejudice our case by confronting our corporate

9    representative with rogue responses that he had no

10   involvement of, no knowledge of and would be completely

11   confused by.

12          THE COURT:  Okay.  Mr. Hinderaker, very briefly.

13   You're going to have to lay foundation.

14          MR. HINDERAKER:  Absolutely.  So there will be --

15   a foundation will be laid through Mr. Ghislanzoni.  It will

16   or it won't.

17          THE COURT:  Okay.

18          MR. HINDERAKER:  He testified at his deposition,

19   "A decision was made to take a copy of the Canadian

20   application and use it as a base to create an Australian

21   application."

22          In his role as the architect overall, he was

23   knowledgeable and participated in the decisions of how and

24   when to remove Blaze Advisor.  He is not testifying as a

25   corporate representative or as a 30(b)(6), but as a person.

```
1              THE COURT:  Right.

2              MR. HINDERAKER:  And in terms of jumping the gun

3    on the interrogatories, they also tell us when the

4    applications -- when Blaze Advisor was no longer used.  And

5    this goes to our earlier conversation.  We have to clean

6    them up with all the --

7              THE COURT:  Understood.  Yes.

8              Okay.  Let's bring in the jury.

9              By the way, one of the jurors informed me that

10   they are perfectly happy with a 60-minute lunch break, so we

11   will go to 60 minutes.

12             MR. HINDERAKER:  I hope they don't shorten it up

13   anymore.

14             THE COURT:  We will be down to 10 minutes by the

15   end of the week.

16             THE CLERK:  All rise for the jury.

17                        (Jury enters.)

18

19             (In open court with the Jury present.)

20             THE COURT:  Be seated.

21             You may proceed, Mr. Hinderaker.

22   BY MR. HINDERAKER:

23   Q.  I have given you Exhibit 189.  It has the heading CSI IT

24   Summit.  I acknowledge that it bears a date of August 2006.

25   Have you seen this before?
```

1   A.  No.

2   Q.  Okay.  So when you picked up your involvement with Blaze

3   Advisor, was this part of the background information --

4   information that you reviewed?

5   A.  At that point, no, it was not, because at that point in

6   time the decision to use the Blaze Advisor was already made

7   and the work on the project was already started.  So my role

8   at that time was a developer.  So I was really boots on the

9   ground to help with the development of Blaze Advisor.

10  Q.  I see.

11  A.  I was not an architect at that point of time.

12  Q.  Mm-hmm.  Who, who was the person leading the Blaze

13  Advisor project in November of 2006?

14  A.  Owen Williams who was one of the department managers at

15  CSI.  He was leading the Blaze Advisor project.

16  Q.  We've handed you Exhibit 191.

17  A.  Yes, I do.

18  Q.  Okay.  And from the metadata, I believe you were the

19  author of that.

20          From the metadata, I believe you are the author of

21  this.  Would you agree?

22  A.  Oh, yes.

23  Q.  Okay.  And what was the purpose of your creation of

24  Exhibit 191?

25  A.  After the success of the business rules project for the

1    ARP 2, the purpose of this document is to market the

2    business rules technology -- business rules across the

3    enterprise, across the Chubb.

4    Q.  And that was the purpose.  And what was the goal to be

5    achieved from that purpose?

6    A.  We thought that using the business rules can bring the

7    benefits to the IT teams across the Chubb.  So the goal is

8    as they become familiar, they would start implementing or

9    using the business rules technology that is making their

10   life simpler.

11   Q.  Okay.  So the -- was there a benefit to -- separate from

12   the simpler life of the underwriters, was there a benefit to

13   the business that you were advancing?

14   A.  Benefit would be, from my view, would be quicker

15   turnaround of the projects; thus, we can deploy the business

16   requests significantly quicker, as was demonstrated by the

17   ARP 1 project.

18   Q.  And from your point of view, what was the benefit to the

19   business when you were able to do that?

20   A.  Again, the changes or business changes can be deployed;

21   thus, whatever benefit is intended for that particular

22   implementation can be achieved significantly faster.

23   Q.  Does that mean then that new policies can be put to

24   market faster?

25   A.  Not necessarily, but could be more precise guidance or

```
 1    more precise scoring for that particular example.  It

 2    doesn't necessarily impact the speed or increase on the

 3    business.

 4    Q.  Let's back up a second.  So the reason for having Blaze

 5    Advisor is that it has an ultimate benefit for the business.

 6    A.  Correct.

 7    Q.  Correct?

 8    A.  Ultimately, yes.

 9    Q.  Yes, ultimately.  And one of the benefits of, I think

10    that you just said, is that it makes people lives easier?

11    A.  Correct.

12    Q.  Correct?  And the people that you're referencing are the

13    underwriters?

14    A.  No.  I'm referencing the IT teams because they're

15    ultimately responsible.  Again, I'm talking -- my role was

16    from the IT perspective.

17    Q.  Okay.

18    A.  I would not be able to speak for any business benefits

19    achieved through the use of the Blaze Advisor technology or

20    business rules technology.  I do speak around the

21    benefits -- that's what I speak in this document, is where

22    the business rules technology could benefit from the IT

23    point of view.

24    Q.  Anyway, that's what I said.  4 of 42 and Bates number

25    0004.
```

1    A.   Okay.

2    Q.   And you wrote Introduction and Scope 1.1?

3    A.   Correct.

4    Q.   All right.  So you start that with, "The purpose of this

5    document is to illustrate."  And then tell me what you mean

6    by, "Such as increasing agility to implement the business

7    change and reducing time to market the new products and

8    services."

9             First paragraph.

10   A.   So we believed at the time of --

11            COURT REPORTER:  I lost you.

12            THE WITNESS:  Sorry.  I believed at the time I

13   wrote this document that implementation of the business

14   rules technology --

15            MR. FLEMING:  I'm sorry.  I thought you were

16   saying 40.

17   BY MR. HINDERAKER:

18   Q.   Let's try again.

19   A.   Yeah.  So at the moment of writing this document, I

20   believed that use of the business rules technology would

21   enable IT team to deploy any business request to production

22   or to come to market significantly faster as compared with

23   traditional technologies employed at Chubb at a that point

24   in time.

25   Q.   Say what?

1    A.  It increases the agility of the project and increases --

2    and reducing time to market.

3    Q.  It increases the agility of the business?

4    A.  Agility of implementation.  Again, as you can see

5    specifically here, it is agility to implement to business

6    changes.

7         So I'm not speaking to the business benefit for

8    this.  This specifically says if I have a request from the

9    business to implement particular change, I can deploy it, I

10   can implement it significantly faster and deploy it

11   significantly faster for business to use.

12   Q.  As a consequence, as you say, that reduces the time to

13   market for new products and services, correct?

14   A.  If it's implemented in the Blaze Advisor.  Again, big

15   disclaimer.

16   Q.  And you just, you just, you just said the phrase, "if

17   implemented in Blaze Advisor."

18        And I want to turn you to the next page.  And you

19   have a heading, "What are business rules?"  And then you

20   have a description, you know, four paragraphs down,

21   "Traditionally embedded" -- "traditionally embedded inside

22   code."  And then you say -- and then you have the next

23   paragraph, "Externalizing the business rules to be a

24   structured decision management."

25        Is that what you're meaning by if Blaze Advisor is

1    used because it externalized the business rules?

2    A.   Correct.  And that is how it was marketed to us by FICO

3    when we bought the tools.

4    Q.   And then -- let's see.  And then on the same page at the

5    bottom, "Enhance business performance by."  And Number 1 is,

6    "Increasing Analytical Ability."

7              Over time, can you tell me how Blaze Advisor

8    applications were used to increase analytical ability?

9    A.   Profitability indicator is an example of such

10   application which provides the ability to determine the

11   severity of the risk as underwritted by Chubb.

12   Q.   Okay.  And then Number 2, Automate Decisions by, and

13   then it says, "Automating High-Volume, Low-Risk Decisions."

14   Is that a component of -- tell me what applications of Blaze

15   Advisor used that.

16   A.   DecisionPoint.

17   Q.   How about Automatic Renewal?

18   A.   Automatic Renewal -- it renews all the policies, so I

19   wouldn't qualify it as low risk.  It's entire book of

20   business, whereas DecisionPoint is for specific low-risk,

21   high-volume business.

22   Q.   And then II is "Establishing Uniform Decisions Across

23   Multiple Functions, Channels and Business Touch Points."

24   What applications using Blaze Advisor did that?

25   A.   Essentially, again, profitability indicator, because it

1    is used in many different places.  Automatic Renewal, CSI

2    Express, DecisionPoint.  That's an example of uniform

3    decision about the risk.

4    Q.  It would be separate from profitability indicator.  Is

5    this also true for the underwriting guidance for CSI

6    Express?

7    A.  Underwriting guidance is developed -- yes, it is correct

8    in terms of application.  But since it speaks about multiple

9    functions and touch points, decision points, my view at

10   least, it's a better example.

11   Q.  Okay.  CSI Express and underwriting guidance does

12   establish underwriting decisions?

13   A.  Correct.  But in context of one application decision is

14   not shared across anywhere else.

15   Q.  This is Exhibit 192 for the record.  It's a cover e-mail

16   having a subject line of "Creating and Managing Business

17   Rules, CoE, Henry Mirolyuz, Chubb," dated 9/16/2009, and

18   then the attachment bearing Bates numbers FICO0057207

19   through 57222, bears as a title "FICO Forum:  Decision

20   Management Tools User Group, September 16-18, 2009."  It

21   includes on the title page, "Henry Mirolyuz, technical

22   analyst, business rules CoE, Chubb."

23          Do you recall this presentation, Mr. Mirolyuz?

24   A.  Yes, I do.

25   Q.  Okay.  Did you prepare this entire deck?

```
 1    A.  I prepared the deck in collaboration with Michael Sawyer

 2    from FICO.

 3    Q.  Okay.  All right.  Let me just go to the Bates number

 4    57208?

 5    A.  50208.

 6    Q.  The second page.

 7    A.  Yep.

 8    Q.  And there is this quote from Donald Light.  Why did you

 9    include that quote in the presentation?

10    A.  I felt that the term "business rules" was used a little

11    bit loosely.  People do not realize or do not have complete

12    understanding about what the business rules really is versus

13    the term of "decision business" and "decision-making

14    process" is a better illustration or a better terminology

15    for the technology itself.  I think it's gives the people

16    better insight into that.

17    Q.  And is that because as a consequence of the business

18    rules application, it enables a company to make decisions?

19    A.  Yes.  Same as wrote in the EcoSystem document.  Better

20    uniform decisions.

21    Q.  Let me turn to the next page, 209.  And, again, these

22    are your statements in the slides?

23    A.  Correct.

24    Q.  All right.  So we don't need to read them to each other.

25    But under the Potential Future Applications, there is a
```

1    heading, Cross/Upselling?

2    A.  Yes.

3    Q.  Was that application implemented during your time at

4    Chubb?

5    A.  Not to my knowledge.  It was considered, as you can see

6    it here, but I don't believe it was implemented.

7    Q.  Would it have been a functionality of CSI Express?

8    A.  Correct.

9    Q.  And then the next header is Predictive Models.  Was that

10   implemented at CSI Express -- was that implemented at Chubb?

11   A.  Yes, it was.  Profitability indicator.

12   Q.  And if we go to the next page, 57210, you're giving a

13   case study of Automated Renewal I?

14   A.  Correct.

15   Q.  Thank you.  And in this, with respect to Automated

16   Renewal I on this slide, the overall business goal is to

17   increase the percentage of automated renewal submissions.

18   Was that accomplished?

19   A.  Correct.  Yes, it was.

20   Q.  And it goes on to say that the policies that are

21   automatically renewed, the more time the underwriter has to

22   develop and produce additional business or handle

23   additional -- produce additional business or handle

24   additional business.  And that also was achieved?

25   A.  I believe it was.

1    Q.  And then there a header, "Objectives/Benefits, and

2    Reach."  Were those achieved as well?

3    A.  I cannot say if it was completely achieved or not.

4    Q.  I'm sorry?

5    A.  I cannot say if it was completely achieved or not.  It

6    was the goal to achieve those benefits.  But was it achieved

7    100 percent?  I'm not sure.  I cannot speak to that.

8    Q.  Okay.  Do you know if it was achieved to some extent?

9    A.  To some extent, yes, it was.

10   Q.  You have been handed Exhibit 196.

11            COURT REPORTER:  193.

12   BY MR. HINDERAKER:

13   Q.  I'm sorry.  193.  Thank you.  And an Introduction to

14   Business Rules, Improving Performance Through Decision

15   Management.  And you, sir, are one of the presenters; is

16   that right?

17   A.  That is correct.

18   Q.  And do you recall --

19   A.  Oh, yes.

20   Q.  -- the context of this?  What was it?

21   A.  It was a presentation on one of the forums which was

22   hosted by FICO to talk about the business rules and Chubb

23   experience in particular.

24   Q.  All right.  So this was an external presentation outside

25   of Chubb?

1    A.   Yes.

2    Q.   Then the next -- the next page has the next slide,

3    Business Rules Overview, CoE, October of 2009.  Are you the

4    author of the slides that follow that?

5    A.   If my recollection is correct, it was a collaborative

6    effort, so we all work.  I mean, I would have provided the

7    information, but we all worked on all the presentations all

8    together.

9    Q.   Is it accurate to say that you were one of the

10   collaborators on this entire set of slides?

11   A.   Correct.

12   Q.   So you had an input into all of the slides?

13   A.   Yep.  At least I was able to review it and provide the

14   feedback, if necessary.

15   Q.   If you disagreed, you could say so?

16   A.   Yeah.

17   Q.   If you would go to the Bates number that has 0012 as its

18   ending.

19   A.   Okay.

20   Q.   You'll actually get the original 12 of this slide as

21   well.  You see that slide bears the heading, "What is

22   Decision Management?  FICO's Point of View."

23   A.   Yep.

24   Q.   And then it has five dimensions of Decision Management?

25   A.   (Moves head in affirmative manner.)

1    Q.  And my question is:  From the deployment of Blaze

2    Advisor and the particular Blaze Advisor applications at

3    Chubb, can you describe for me how the Chubb Blaze Advisor

4    applications align with these five points?

5    A.  I'm not sure I follow the question the way it's stated.

6    Q.  Let me say it this way:  Blaze Advisor applications that

7    were implemented by Chubb aligned with the -- made

8    decisioning more precise?

9    A.  So again, Profitability Indicator, as I said before, is

10   a great -- is an example of precise decision to identify

11   high-risk policies or customers.

12   Q.  And Chubb's implementation of Blaze Advisor applications

13   made decisioning more consistent?

14   A.  For the lines which were implemented.  So the Blaze

15   Advisor for Profitability Indicator.

16   Q.  That's another example?

17   A.  Yep.

18   Q.  CSI Express is another example?

19   A.  CSI Express, again, is too in general, but Blaze

20   component is used for a specific line of -- as I said

21   before, specific line of business.  So for those implemented

22   for Blaze, yes, it makes decisioning much more precise.

23   Q.  And then another dimension of decisioning is agility.

24   And you mentioned that in your earlier slides --

25   A.  Correct.

1    Q.  -- as one of the benefits of Blaze Advisor, deploying

2    Blaze Advisor?

3    A.  Correct.  We were able to implement the changes quicker

4    than what we were able to do it before.

5    Q.  And another dimension of using Blaze Advisor is speed to

6    market.  You were able to accomplish some of that?

7    A.  Correct.

8    Q.  And if you would -- the e-mail itself is 5/27/15, but

9    then the e-mail has 5/21/15, just to be clear.

10             And if you would go to the e-mail Bates numbered

11   5271, looking at that profitability indicator.  And,

12   Mr. Mirolyuz, are you the author of this slide?

13   A.  I could have provided the information for that slide.

14   However, I don't recall if I was the author or Mike created

15   the slide himself.

16   Q.  So whether your fingers touched the keys or not, the

17   information on the slide is your information?

18   A.  Correct.

19   Q.  And then on the top left corner is the heading

20   "Initiative," and it lists various objectives, benefits?

21   A.  Correct.

22   Q.  And are you listed -- and then under the bottom left,

23   there's another cell, "Plus/Delta," and then under Plus it

24   says, "The defined business benefit was realized."

25   A.  Correct.

1    Q.  Let's go to the next slide.  And this one is talking

2    about DecisionPoint, correct?

3    A.  Correct.

4    Q.  Okay.  And, again, you list in the Initiative cell four

5    business benefits to be achieved by the DecisionPoint

6    application?

7    A.  Correct.

8    Q.  And then under Plus/Delta, you state that, "The defined

9    business benefit was realized"; is that correct?

10   A.  That is correct.

11   Q.  Can you just tell us -- maybe we know, but what's the

12   meaning of real-time quotes and bindable quote letter?

13   A.  That we can provide -- as requested, we can provide the

14   quotes in real-time.  They don't have to wait for -- the

15   customers don't have to wait overnight to get a quote.  They

16   can receive it -- real-time is not absolutely correct.  It's

17   near real-time but within a reasonable time frame.

18   Q.  Do you know if Chubb has -- I'm just talking the big

19   company Chubb -- undertaken the analysis to quantify the

20   business value which is realized from Blaze Advisor

21   applications?

22   A.  I cannot speak one way or another.  I'm looking from the

23   technical perspective.  As I said before, the decision

24   regarding using Blaze was already made before I started at

25   Chubb.

1     Q.  You have Exhibit 195.  It says, "Chubb Enterprise

2     Architecture - Business Rules Strategy/Roadmap."

3     A.  Yeah.

4     Q.  I will just represent that the metadata suggests this is

5     a July 21, 2017, document with yourself as the author.  Do

6     you recall it?

7     A.  Yes, I do.

8     Q.  Okay.  What was the purpose of this document,

9     Exhibit 195?

10     A.  The purpose of this document is to summarize the

11     strategy around the business or provide a strategy in a

12     future roadmap regarding the business rules for the Chubb at

13     the Enterprise level.

14     Q.  Is this an internal presentation to Chubb?

15     A.  Correct.  Specifically it is limited to the Chubb

16     Enterprise Architecture.  So it's not even presented to the

17     broader audience.  It's specifically intended for the

18     Enterprise Architecture team.

19     Q.  The Enterprise Architecture team, is that speaking of --

20     speaking to IT personnel who have Enterprise-wide

21     responsibilities?

22     A.  In Chubb -- all Chubb architects.  All the architects

23     were the Enterprise architects.  It was not separated by the

24     business unit, so anybody who had the title "architect"

25     would be considered to be the Enterprise architect.  So this

1     is specifically that team.

2     Q.   That team.  All right.

3            So that's to whom it was presented.  And then why

4     was it being presented?

5     A.   Again, to inform them -- to develop the strategy and as

6     well as a future roadmap in regards to the use of the

7     Business Rules technology at Chubb.

8     Q.   Okay.  And are you the author of the entire document

9     then?

10    A.   With the input of information from others, but yes, I am

11    the one who compiled it.

12    Q.   So it's fair to say, this is your document?

13    A.   Yes.

14    Q.   All right.  If we could go to page 11, please, and that

15    slide has a header, "2015 Business Rules Projects at Chubb

16    (Active)."  Are we on the same page?

17    A.   Yes.

18    Q.   All right.  So the first line is "Corp" and then "PARS."

19    Do you recall that?

20    A.   Correct.

21    Q.   What is it?

22    A.   It's a CBS, corporate -- it's a Premium Booking.  So the

23    name acronym was the PARS, and we called it CBS, Corporate

24    Business Division.

25    Q.   Is Premium Booking and Corporate PARS the same thing?

```
1    A.  Yes, it is the same thing.

2    Q.  And that project was completed per this slide?

3    A.  Correct.

4    Q.  Okay.  And why did you choose DecisionPoint and

5    Profitability Indicator as the applications to highlight in

6    the presentation?

7    A.  Profitability Indicator was our first attempt to

8    implement predictive models, risk assessment in Blaze.  By

9    itself, it was an interesting project, and people had raised

10   an interest on how we did it and the benefit of using it.

11   Q.  Mm-hmm (Yes).

12   A.  DecisionPoint was the project which we were using the

13   latest and greatest in terms of lessons learned and

14   experiences.  So we developed, actually in collaboration

15   with working with FICO as well, some assistance there,

16   application using --

17              (Court reporter asked for clarification.)

18              THE WITNESS:  -- agile methodologies.

19              MR. FLEMING:  Agile.

20   BY MR. HINDERAKER:

21   Q.  Is that what you mean, agile, A-G-I-L-E?

22   A.  Yeah.

23   Q.  Agile methodologies?

24   A.  Yeah.  And we were -- I mean, it was -- again, a number

25   of capabilities implemented in the DecisionPoint was
```

1    essential.  As an architect, it was interesting for the

2    people to know.

3    Q.  Okay.

4    A.  So essentially, this touched on all the capabilities

5    which people were interested in at that point in time as an

6    architect.

7    Q.  Do we agree that Blaze Advisor aligns with each of the

8    business objectives that are bullet-pointed on the slide?

9    A.  Can you repeat the question again?  I apologize.

10   Q.  That Blaze Advisor aligns with, supports, achieves each

11   of the business objectives that are on that slide?

12   A.  I cannot speak for everything on here.  This slide was

13   actually provided by FICO to me to propagate the use of the

14   technology, so this is the business objectives as FICO

15   defines them.

16   Q.  Understood.  Understood.

17           And then on the last page, Blaze Advisor Roadmap,

18   what is this?  What does this tell us?

19   A.  This is the information provided by FICO, more

20   specifically Michael Sawyer --

21   Q.  Mm-hmm (Yes).

22   A.  -- to me to illustrate the roadmap of a new

23   functionality in Blaze Advisor so I can educate people in

24   Enterprise Architecture team around what is upcoming with

25   FICO down the line.  Again, with a disclaimer that it's not

1    guaranteed.

2    Q.  Is DecisionPoint a web quote solution?

3    A.  It's a solution -- it's an old name.  Web Quote is the

4    old name of the DecisionPoint.  It was re-branded as

5    DecisionPoint.

6    Q.  Okay.  The customer -- you mentioned the customer could

7    fill out the application and the hard copy gets sent in?

8    A.  Correct.

9    Q.  The customer can also fill out the application online?

10   A.  I don't believe so.  To my knowledge, no.  There was no

11   customer-facing application.

12   Q.  Let me show you what has been marked as Exhibit 151.  Do

13   you acknowledge that this is an e-mail from Miranda Chang to

14   yourself on April 14th, 2016?

15   A.  Yes, I am.

16   Q.  As it says, she says, "See attached Technology of Choice

17   for Business Rules = Blaze" and then a smiley face?

18   A.  Correct.

19   Q.  What was the context she is sending this to you, do you

20   know?

21   A.  As part of the merger between Chubb and ACE, we went

22   through the portfolio application -- not application --

23   tools portfolio on both of the organizations to determine

24   going forward which technology stays or which technology

25   will be deprecated or eliminated from the list.

1  I was asked to provide my feedback on Blaze

2  Advisor as the technology I was mostly familiar with.  I

3  provided the information to -- as you can see in the e-mail,

4  to Ramesh Pandey.  And based on this information, he and his

5  team, whatever team he was working on, was making a decision

6  in terms of which technology is applicable going forward.

7  As you can see from the e-mail, Blaze Advisor was

8  chosen at that point in time as the going-forward technology

9  for the combined Chubb organization.

10  Q.  If you go a couple of pages into the document, there is

11  a series of slides, and it begins with a header

12  "Cross-Divisional TDA, Technology Tool Due Diligence and

13  Recommendations."

14  If I understood your answer correctly -- well, let

15  me just put it this way, were you a part of preparing any of

16  these slides?

17  A.  Not the slides itself.  The slides, I believe, were

18  prepared by Ramesh Pandey or somebody on his team.  I was

19  the one who provided information around the Blaze Advisor,

20  which went to the slides around those.

21  Q.  And then you were not part of the decision-making

22  process of which way to -- what technologies to choose on

23  the integration?

24  A.  I could only provide my recommendation.  It was up to

25  the senior leadership to make those types of decisions.

1    Q.  You have now Exhibit 199.  Can you identify that for us,

2    please?

3    A.  199 looks like a slide deck from the Interact 2007

4    conference.

5    Q.  And what is Interact?

6    A.  I believe, if I recall correctly, it's a conference

7    which was hosted by Fair Isaac for the users and the

8    developers of Blaze Advisor software.

9    Q.  And did you present at that with this program or with

10   this talk?

11   A.  I don't recall me presenting this slide deck.  I could

12   have been, or it could have been my manager who would have

13   presented it.

14   Q.  All right.  And your manager at that time was whom?

15   A.  Owen Williams.

16   Q.  Owen Williams.  All right.

17          Do we agree that this is a slide deck that either

18   yourself or Owen Williams prepared and presented at a FICO

19   conference?

20   A.  Yes.

21   Q.  Was the functionality of adding and removing and

22   replacing enhancement endorsements -- or adding, removing

23   and replacing endorsements part of the functionality of

24   ARP 2?

25   A.  Yes, it was.

```
1    Q.  Can you identify Exhibit 204, please?

2    A.  Premium Booking Modernization Senior Leadership

3    Presentation.

4    Q.  Were you part of preparing this set of slides?

5    A.  No, I was not.

6    Q.  Have you seen it before?

7    A.  Let me take a look.

8    Q.  Yeah, sure.

9    A.  No, I do not.  I'm not part of the leadership team.

10   Q.  Do you have any doubt that this was a set of slides

11   presented to the senior leadership team at Chubb?

12   A.  I cannot say one way or the another.  It looks authentic

13   but, again, I cannot say one way or another.

14   Q.  All right.  Can you identify for us, please,

15   Exhibit 216?

16   A.  It is an e-mail from Cristian Vasilache.

17   Q.  And the attachment?

18   A.  The attachment is a report, a ChEAR software report,

19   application report.

20              COURT REPORTER:  Report -- I'm sorry.  What?

21              THE WITNESS:  Application report.

22   BY MR. HINDERAKER:

23   Q.  And this ChEAR report -- you've described to us earlier

24   what a ChEAR report is.  Is this another version of that

25   report?
```

```
 1   A.  Yes, it looks like.

 2   Q.  And if we go one, two, three, four, five -- if you go

 3   six pages in, it would be the first page of the tables?

 4   A.  Okay.

 5   Q.  Again, as we saw in an earlier document, there are some

 6   entries that are in red.  For example, on the first page,

 7   Broker Site, Technology Blaze Advisor, and I think it says

 8   version 6.9 all in red, correct?

 9   A.  Correct.

10   Q.  And is that meaning that it's running on version 6.9 and

11   it's due to be upgraded to 7.1, or what does that mean?

12   A.  I believe in that particular case it means that that

13   version will be eliminated.  If you read on the same line --

14   Q.  Yes.

15   A.  -- next after 6.9, it says "eliminate."

16   Q.  Okay.  What is being eliminated?

17   A.  The use of the Blaze Advisor technology, however it was

18   used or not.  If the technology was listed for that

19   application, mistakenly or not, this means it will be

20   eliminated to either correct or the technology is no longer

21   being used.

22   Q.  Okay.  Do you know if Blaze Advisor -- let me back up.

23           Was Blaze Advisor used for Broker Site before

24   elimination?

25   A.  Not -- I don't have any knowledge of Blaze Advisor used
```

1   for the Broker Site.

2   Q.  Okay.  So to be consistent with your earlier testimony,

3   you would say that this entry that has Blaze Advisor 6.9

4   having been used for Broker Site is wrong?

5   A.  Correct.  Therefore, I would assume that why it was

6   eliminated.

7   Q.  So you have Exhibit 218?

8   A.  Yes, I do.

9   Q.  And this is another -- another version of an Amy Bell --

10  Business Analyst Amy Bell's statement for Solution Analysis

11  for DecisionPoint - Add Coverage?

12  A.  Correct.

13  Q.  Kind of a normal document you got in your work at Chubb?

14  A.  Yes, that's --

15  Q.  This is -- that's already been marked.  I'm sorry.  This

16  is Exhibit 168.  The metadata says that you are the author

17  and that it is -- has a date of May 20, 2015.

18          Do you recall building this set of slides,

19  "Overview of Business Rules" --

20          MR. FLEMING:  I'm sorry.  Can you give the date?

21          MR. HINDERAKER:  What?

22          MR. FLEMING:  Can you give the date?

23          MR. HINDERAKER:  I did.

24          MR. FLEMING:  Would you mind repeating that?

25          MR. HINDERAKER:  May 20, 2015.

1044

1    

2    BY MR. HINDERAKER:

3    Q.  Do you recall building a set of -- a slide deck called

4    "Overview of Business Rules in DecisionPoint"?

5    A.  Yes.

6    Q.  And what was the context or purpose of this deck?

7    A.  To provide an overview of implementation of the Business

8    Rules in DecisionPoint application.

9    Q.  And you presented this overview to whom?

10   A.  Internal Chubb IT team.

11   Q.  Okay.  And why did you present it to the internal Chubb

12   IT team?

13   A.  Because I felt that success of this project, in terms of

14   implementation, at the time it implemented, is something I

15   should showcase to the IT team as well as highlight benefits

16   of the business rules.

17   Q.  Okay.  So is it fair to say you're the author of the

18   entire document?

19   A.  Yes.

20   Q.  Okay.  If an "account round" means to be able to add

21   endorsements or consider the adding of endorsements to an

22   application, do you know that that functionality is part of

23   DecisionPoint?

24   A.  DecisionPoint already had functionality to add and

25   remove endorsements.  So --

```
 1    Q.  Okay.

 2    A.  -- it could have been.  Again, I don't want to speculate

 3    in terms of what the -- what Amy meant by account round.

 4    Q.  Okay.

 5    A.  Since it's a business goal, I have no knowledge of that.

 6    Q.  In light of your earlier testimony about CUW, how is

 7    Blaze Advisor a key technology?

 8    A.  As I said before, CUW is a suite of tools.  One of the

 9    tools inventory management is using the Blaze Advisor.

10    Thus, this statement is absolutely correct.

11              THE COURT:  All right.  Mr. Hinderaker, call your

12    next witness.

13              MR. HINDERAKER:  Mr. Ghislanzoni.  Take a moment,

14    Your Honor, and get the binders set up.

15              THE COURT:  Mr. Ghislanzoni, if you will raise

16    your right hand as you have.

17                        (Witness sworn.)

18              THE WITNESS:  I do.

19              THE COURT:  Go ahead and be seated.  Turn your

20    microphone on and make sure you speak into it.

21              State your full name for the record.

22              THE WITNESS:  Claudio Ghislanzoni.

23

24

25
```

```
 1                      (Claudio Ghislanzoni)

 2                     CROSS-EXAMINATION

 3      BY MR. HINDERAKER:

 4      Q.  Let's see here.  Good morning still.

 5      A.  Good morning.

 6      Q.  I understand that -- let me just give the jury a sense

 7      of your employment background.  I understand that you're the

 8      chief enterprise architect for the Chubb Group?

 9      A.  Correct.

10      Q.  All right.  And you, in terms of -- we've heard many --

11      well, you have been here all trial, and so everybody knows

12      about the Chubb Corporation being acquired by ACE Limited.

13              And your legacy, that is to say you came from the

14      ACE Limited side, correct?

15      A.  I did.

16      Q.  And as chief enterprise architect by the title, I

17      imagine we all kind of simply assume that your

18      responsibilities are the architectural function, correct?

19      A.  That is correct.

20      Q.  And your responsibilities are, as I understand it,

21      they're global?

22      A.  Global.

23      Q.  So are you the, as being the chief enterprise architect,

24      are you the head?  You're the top enterprise architect for

25      the global, what is now Chubb Limited?
```

1    A.  I am.

2    Q.  All right.  Now, you were, as we just mentioned, on the

3    ACE side at the time of the acquisition, and you were aware

4    that acquisition had been announced and would be happening

5    directly?

6    A.  Correct.

7    Q.  And I understand from your IT background that one of the

8    consequences of a merger is to consolidate technologies?

9    A.  That's a very important activity in IT.

10   Q.  Very important activity, did you say?

11   A.  Important activity, yes.

12   Q.  Yeah.  And the purpose, of course, is that in a merger

13   of two companies, it's a goal to eliminate the duplication

14   of the same assets?

15   A.  Where appropriate, yes.

16   Q.  And you were involved, as I understand it, on the ACE

17   side of looking at, from your point of view, which assets to

18   eliminate because it would be duplicate, and it would be

19   appropriate to eliminate them?

20   A.  Yes.  One important activity I took on the leadership of

21   as part of the integration was to look at software products

22   legacy ACE and legacy Chubb, Federal, and define together

23   with my team a new set of standards for the new enterprise.

24   Q.  Were you aware -- the merger, the acquisition, had

25   closed.  Were you aware in March, the end of March of 2016,

1    that FICO had terminated the Blaze Advisor license agreement

2    that Chubb & Son, the division, had?

3    A.  I was not.

4    Q.  When did you become aware that FICO had terminated the

5    Chubb & Son Blaze Advisor license.

6    A.  At trial.

7    Q.  At trial?

8    A.  Yes.

9    Q.  Just now?

10   A.  In preparation to the trial.

11   Q.  Okay.  Were you aware -- were you aware during the time

12   that you were considering the -- well, let me come back to

13   that.  I will come back to that.

14           It's fair to say or it's correct to say that in

15   2016, you were involved and started the discussion around

16   the options and standardization of the parts -- the options

17   and standardization, what technologies to use going forward

18   in the new company?

19   A.  Yes.

20   Q.  And in 2016, you were in that assessment.  You were

21   assessing what technologies to use instead of Blaze Advisor?

22   A.  We were looking at all the different technologies.

23   Blaze Advisor was one of the technologies we assessed.

24   Q.  And you were assessing the other technologies so that

25   you could make a decision about what to use instead of Blaze

1    Advisor?

2    A.  So at the beginning of 2016, in February, around

3    February time, we commenced the activity of analysis of all

4    the software products, and we formed the working group

5    called a cross divisional TDA, and I believe one of the

6    evidence that you have seen today carried that name.

7    Q.  Yes.  And I think we will look at that in a little

8    while.

9    A.  Yes.

10   Q.  And so now to go from this time in 2016, and is it

11   accurate also to say that it was in the beginning of 2018

12   that a new IT strategy for the whole enterprise was being

13   formulated?

14   A.  Yes.  It was at the beginning of that year, 2018, we

15   formulated a new IT strategy for the enterprise.

16   Q.  And between the date of March 16th -- date of March 2016

17   and this time frame in 2018, you started to look at a new IT

18   strategy for the whole enterprise, Blaze Advisor continued

19   to be used for applications in connection with selling

20   insurance?

21   A.  Blaze Advisor continued to be used in those applications

22   that had Blaze Advisor as a component that came from legacy

23   Chubb and one application legacy ACE.

24   Q.  We'll talk about that one application in a bit, but that

25   one application from legacy ACE, you're speaking of a legacy

1   ACE license agreement with Blaze Advisor?

2   A.  That is correct.

3   Q.  And we can -- and with respect to that license

4   agreement, Blaze Advisor was not used by legacy ACE in

5   connection with selling insurance?

6   A.  It was a set of rules called common rules.

7   Q.  Right.  A set of rules for a different purpose than

8   selling insurance?

9   A.  Yes.

10  Q.  And then as you progressed into 2018 with your IT

11  strategy for the whole enterprise, at a certain point, you

12  reached a decision to adapt an open source technology

13  strategy.  Agreed?

14  A.  As part of the or embedded in the IT strategy that we

15  formulated in 2018, one important decision we made at the

16  time is to expand, increase adaption of open source

17  software.

18  Q.  So now this brings us from March 2016 through 2017

19  through 2018, and it becomes later in the beginning of 2019

20  that you made a decision to replace Blaze Advisor with

21  Drools, the open source solution?

22  A.  That is correct statement.

23  Q.  And then in approximately -- it's approximate, but once

24  you made the decision in the beginning of 2019 to replace

25  Blaze Advisor with Drools, it took about nine months after

1  that for some -- for some, many of the applications to

2  actually accomplish the replacement of Blaze Advisor with

3  Drools, correct?

4  A.  Yeah.  We completed an entire migration from Blaze

5  Advisor to Drools in April 2020.

6  Q.  That was going to be my next question, just to follow

7  up.  The whole project of replacing Blaze Advisor was not

8  completed until April 2020.  Agreed?

9  A.  That's when the last application was replaced, the rules

10  were replaced.

11  Q.  Understood.  So from March 2016, '17, '18, '19 to

12  probably March/April of 2020, that was a time frame that was

13  consumed to fully replace Blaze Advisor and all the

14  applications that Chubb & Son had them in?

15  A.  I would correct that statement in terms of, we commenced

16  the activities of migration away from Blaze Advisor at the

17  beginning of 2019, and we completed them in April 2020.

18  Q.  I think we just said the same thing.  All right.  Fine.

19           When you were in the process of considering what

20  technology to use enterprise-wide instead of Blaze Advisor,

21  my understanding is that you looked at only two other

22  technologies, one of them was ODM.  You agree?  Yes?

23  A.  Yes.

24  Q.  And the other one was Drools, correct?

25  A.  Yes.

1    Q.  And ODM is a product from IBM?

2    A.  Yes.

3    Q.  And Drools is an open source technology, correct?

4    A.  Yes.

5    Q.  Meaning anybody can use it, but if you want maintenance

6    service, you get that, you pay a fee for maintenance service

7    from a provider?

8    A.  That is correct.

9    Q.  All right.  And if we haven't already said so, Drools

10   is, Drools is open source.

11   A.  Correct.  Drools is open source.

12   Q.  All right.  All right.  Maybe we said that.  So now I

13   would like to turn to that time frame before Blaze Advisor

14   was replaced, and in your binder is a document that you have

15   a tab for 517.  Could you put that in front of you, please?

16   A.  517, did you say?

17   Q.  Yes.

18   A.  Found it.

19            MS. GODESKY:  Your Honor, is this published to the

20   jury?

21            THE COURT:  Not now.

22            MS. GODESKY:  Thank you.

23            MR. HINDERAKER:  Your Honor, this exhibit and the

24   other one are in the same category.  We will do them one at

25   a time.

```
1    BY MR. HINDERAKER:

2    Q.  So, looking at Exhibit 517, I know that you are familiar

3    with the document, correct?

4    A.  I am.

5    Q.  And the document was created to describe the

6    applications that leverage Blaze Advisor.  Agree?

7    A.  Yes.

8    Q.  And we've heard the word "leverage" a couple of times.

9    Leverage in your language means that Blaze Advisor is used

10   in the applications, correct?

11   A.  That is correct.

12   Q.  And while you had a team of people, that the document

13   was created by a team of your people, you contributed to the

14   creation of this document?

15   A.  Yeah, I oversaw the activity.

16   Q.  Yes.  You oversaw it.  And as we just -- as you said

17   already, the document then in its totality describes the

18   applications that leverage or use Blaze Advisor.  Agreed?

19   A.  Yes.  At that point in time.

20   Q.  At that point in time.

21            Your Honor, I offer Exhibit 517.

22            MS. GODESKY:  We object, Your Honor.

23            THE COURT:  Overruled.  517 is received.

24            MS. GODESKY:  Your Honor, may I approach, please?

25            THE COURT:  You may.
```

1

2                     **(Side-bar discussion.)**

3               THE COURT:  Make sure you both speak clearly into

4      the mic.

5               MS. GODESKY:  These charts, there is another one.

6      These charts were created in connection with mediation.

7      They are not business records.  They are documents that were

8      created in connection with litigation.  They are privileged

9      under Rule 408, and there is no basis to admit them into

10     evidence.

11              THE COURT:  I did not hear him say they were

12     created for the mediation; is that true?

13              MR. HINDERAKER:  I think we received, we received

14     a copy of it during that correct time frame.  He testified

15     they were created for -- they were created by him and his

16     team.  They were created for, knowing the Blaze Advisor

17     applications that leverage -- knowing the applications that

18     leverage Blaze Advisor as part of the transition to and

19     away.  And it's their business facts.  We're not going to

20     get within 100 miles of discussing some settlement or some

21     mediation.

22              THE COURT:  No.  I understand.

23              MR. HINDERAKER:  And this isn't, and the only

24     document that we received, if we did receive it in this

25     context is this one.  There are other documents like the

```
 1    same that were just produced to us in litigation.
 2              MS. GODESKY:  Your Honor, I could show you the
 3    deposition transcript from Mr. Ghislanzoni's deposition
 4    where Ms. Kliebenstein marked.  Mr. Fleming said, aren't
 5    these the documents I just sent you in connection with the
 6    mediation?  Ms. Kliebenstein said yes, and then she said you
 7    would be free to object under 408 and other bases at trial.
 8              MR. HINDERAKER:  Only with respect to that
 9    document.  Only with respect to that document.
10              MS. GODESKY:  I have no objection to
11    Mr. Hinderaker questioning Mr. Ghislanzoni about the
12    information.
13              THE COURT:  About the information in the document.
14              MS. GODESKY:  But this is not a business record,
15    and it's not admissible, and there is also the Rule 408
16    issue.
17              THE COURT:  Understood.
18              MR. HINDERAKER:  I will be taking a long time and
19    I will read every line item in every column.
20              THE COURT:  I understand.
21              MR. HINDERAKER:  Which is a waste.  No reason to
22    know it's even close -- you know, this whole issue about
23    settlement conferences and Rule 408, Rule 408 is not a
24    shield that prevents business information from being
25    discussed in a trial.
```

1          THE COURT:  Right.  I agree with that statement,

2     if this is ordinary business information, but I think --

3          MS. GODESKY:  It was created for purposes of

4     litigation, not normal course of business.

5          MR. HINDERAKER:  It's ordinary business

6     information.  He didn't make up those numbers.

7          MS. GODESKY:  I would have no objection to a

8     demonstrative that has these numbers, but it's not

9     admissible.

10          MR. HINDERAKER:  If you are reading Rule 408 it's

11     not for the purpose of a claim, it's not for the purpose of

12     liability.

13          THE COURT:  Hang on.  Arguably it's a statement

14     made during compromised negotiations.  I'm not sure it's

15     about a claim.

16          MR. HINDERAKER:  But it's not offered for any

17     purpose related to 408.

18          MS. GODESKY:  Your Honor, I want to be clear that

19     my objection is primarily that it's hearsay.  It's offered

20     for its truth and it's not a business record.  This is not a

21     document made in the regular course of business at Chubb.

22     It was a document made at the direction of counsel in

23     connection with settlement negotiations.

24          MR. HINDERAKER:  I don't know that that's true,

25     and it's not in the deposition.  The conversation gets

```
 1   into --
 2              THE COURT:  I -- I --
 3              MS. GODESKY:  If it is -- sorry, Your Honor.
 4              THE COURT:  I agree with you that I think this is
 5   a tempest, frankly, in a teapot.  The information is coming
 6   in.  If you need to read it line by line, you are welcome to
 7   do that.  The document can be published to the jury for
 8   demonstrative purposes, but absent something further, I
 9   won't allow it, admitting it into evidence, but the
10   information seems to me to be quite clearly admissible.
11   Okay.
12              MS. GODESKY:  I have no objection to a
13   demonstrative, if we turn this into plaintiff's
14   demonstrative.
15              MR. HINDERAKER:  I am going to go through the
16   process of having that information before the jury for the
17   truth of the matter of the information.
18              THE COURT:  Yep.
19              MR. HINDERAKER:  So he gets to testify to it.
20              THE COURT:  Understood.
21
22              **(In open court with the Jury present.)**
23              THE COURT:  Mr. Ghislanzoni, you will have to turn
24   your microphone back on.  Exhibit 517 will be received for
25   demonstrative purposes only.
```

```
 1     BY MR. HINDERAKER:

 2     Q.  And now, Mr. Ghislanzoni --

 3     A.  Yes.

 4     Q.  We're going to spend some time with it now.

 5     A.  Okay.

 6     Q.  And when -- and let me just confirm this:  When you and

 7     your team created this document, to the best of your

 8     knowledge, the information on the document is accurate?

 9     A.  To the best of my knowledge, this was a good

10     representation of what we found in the end of 2018.

11     Q.  So we have in front of us, let us -- first I want to go

12     across the top line, top row, and we will identify each of

13     those.  The SBU stands for the business unit?

14     A.  Yes.

15     Q.  The application is the name of the application?

16     A.  Yes.

17     Q.  This document, all of the applications on this document

18     are applications using Blaze Advisor?

19     A.  That used it at the time.

20     Q.  Of course.  At the time of its creation?

21     A.  Yes.

22     Q.  And then under application status, you will see, we can

23     read down that column, not retiring, not retiring, not

24     retiring, not retiring, not retiring, not retiring, meaning

25     what?
```

1   A.  So as part of the integration activity between ACE and

2   Chubb, one important activity for us in IT was to decide

3   which applications were going to remain in the landscape and

4   therefore continue to be used and which ones we were going

5   to retire, eliminate from the IT landscape and stop using

6   them.

7           What it means is, at the end of 2018, this was the

8   status of the application at the time.

9   Q.  And then if we go to the next row down where it says

10  Corporate Systems SBU, Premium Booking Application, it says

11  "Retiring but no ETA." So it says what it says.  You don't

12  know when it will be retired, but the notion at this time is

13  to retire, correct?

14  A.  Correct.

15  Q.  And then we go to Canada.  Evolution, not retiring, to

16  Adapt-ABL.  COZ stands for which region?

17  A.  COG?

18  Q.  Yes.

19  A.  COG is a term, is used to describe.  It stands for Chubb

20  overseas general, which is the division of Chubb.

21  Q.  Thank you.  And EUZ is for Europe?

22  A.  Euro zone.

23  Q.  Better said.  And for Adapt-ABL the plan at this time

24  was to retire 12/2018?

25  A.  Yes.

1    Q.  We'll look later to see if that was accomplished on time

2    or not, and then EZER for PAS and Europe, retiring 6/2019,

3    and again we'll look from other documents and see if that

4    was accomplished or not.  So far so good?

5    A.  So far so good.

6    Q.  And so far, to the best of your knowledge, all of this

7    was accurate?

8    A.  That was what the team that worked at the time together

9    with me produced looking at all the data available.

10   Q.  Good.  Thank you.  And then country supported on that

11   top row, we can look down the column and align the

12   application to the country that is identified.  Are we

13   agreed?

14   A.  That's the -- describes where, in which countries the

15   application is in use.

16   Q.  Yep.  And then Adapt-ABL, for example, is used both in

17   Europe and Australia?

18   A.  Yes, at the time.

19   Q.  At the time.  All of this, of course, is at the time?

20   A.  Mm-hmm (Yes).

21   Q.  Yeah.  Okay.  And then the next heading is L ACE, L

22   Chubb.  And I take it that L ACE stands for legacy ACE and L

23   Chubb stands for legacy Chubb?

24   A.  Yes.

25   Q.  And all of the applications on the page that we're

```
 1    looking at are legacy Chubb, right?

 2    A.  Yes.

 3    Q.  Now the next column is number of users.  Agreed?

 4    A.  Yes.

 5    Q.  And that column is divided into two parts.  On the left

 6    side is the business users.  And on the right side is the

 7    technical users, agreed?

 8    A.  Yes.

 9    Q.  And so let's use CSI Express for example.  This is

10    telling us that there are 500 business users and 3 technical

11    users for CSI Express, right?

12    A.  Yes.  So --

13    Q.  That's right?

14    A.  That's what it says.

15    Q.  That's what it says.  And so then if we go down, if we

16    look at that column, number of users in business, and we

17    just go down the column.  We can line up the number of

18    business users with the different applications, right?

19    Agreed?

20    A.  I don't know which line you are on.

21    Q.  I was just speaking in general.

22    A.  Okay.  Thank you, Your Honor.

23    Q.  Let's do DecisionPoint.

24    A.  Okay.

25    Q.  So here we have 1200 business users on DecisionPoint, or
```

1    is it 1200 times 4?

2    A.  No.  It was 1200 --

3    Q.  Agreed.  All right.  And then on the technical side is

4    5?

5    A.  Yes.

6    Q.  Yes.  And then automated renewal process, on the

7    business side it says not applicable because it's a batch,

8    and on the technical side, it says there is 5 technical

9    users?

10   A.  Yes.

11   Q.  And then if we go to CUW, the business users is 1,000 --

12   I'm sorry -- it's 3,197?

13   A.  Yes.

14   Q.  And then the technical users is 60, right?

15   A.  That's what it says.

16   Q.  And then on the application IRMA, business users is 434,

17   434, right?

18   A.  Yes.

19   Q.  Technical users is 2, correct?

20   A.  Yes.

21   Q.  TAPS, Texas Action and Prevention System, this again is

22   a batch process, so no business users, and batch means what?

23   A.  Batch is a term we use to describe a process, an

24   application that runs without the interaction with a human

25   being through a user interface, and to expand from there, it

1    is typically an application that runs towards the end of the

2    day or the end of a week or the end of a month.

3    Q.  Right.  And hence the name "batch"?

4    A.  Batch.

5    Q.  Exactly.  So we were looking at TAPS, and here we have

6    technical users of 2, agreed?

7    A.  That's what it says.

8    Q.  And then let's go to premium booking corporate systems,

9    it has 10 technical users?

10   A.  That's what it says.

11   Q.  And if we go to application Canada, 350 business users?

12   A.  Yes.

13   Q.  And 3 technical users, agreed?

14   A.  Yes.

15   Q.  We go to Adapt-ABL for Europe/Australia, 525 business

16   users and 5 technical users, agreed?

17   A.  That's what it says.

18   Q.  Believe me.  It's not my choice to do it this way, but

19   we will just do it.

20           And then EZER, business users 300, and technical

21   users 3?

22   A.  That's what it says.

23   Q.  Okay.  So now let's go over to the next column,

24   complexity, number of rules, and this is a description of

25   whether the rules are complex, high, low or not, and the

1    number of rules that are being run in Blaze Advisor,

2    correct?

3    A.  That is correct.

4    Q.  All right.  So if we go to CSI Express, its complexity

5    is high, and the number of rules is 8,300, correct?

6    A.  Yes.

7    Q.  If we go to, also part of CSI Express, the complexity is

8    high and the number of rules is 12,800?

9    A.  Yeah.  That was the ABL service.

10   Q.  For the underwriting guidance at the time?

11   A.  Yes.

12   Q.  Before disablement it was 12,800, and high complexity?

13   A.  Yes.

14   Q.  For DecisionPoint, it's high complexity and the decision

15   services run to 2500?

16   A.  Yes.

17   Q.  The complexity is high and the number of rules is 3,410.

18   Agreed?

19   A.  Yes.

20   Q.  Then we go to CUW, and we have low complexity, right?

21   Agreed?

22   A.  That's true.

23   Q.  The number of rules is 680, right?

24   A.  Yes.

25   Q.  And IRMA, low complexity, and number of rules 460?

1    A.  Yes.

2    Q.  And then TAPS, low complexity, number of rules 270,

3    right?

4    A.  That's what the document says.

5    Q.  Yep.  And then premium booking, we have a high

6    complexity, and 5,460 rules, right?

7    A.  Yes.

8    Q.  And then for Evolution Canada, a medium complexity and

9    1,000 to 1500 rules, right?

10   A.  Yes.

11   Q.  And then for Adapt-ABL in Europe and Australia, medium

12   complexity, 1,720 rules?

13   A.  Yes.

14   Q.  And for EZER in Europe, medium complexity, 910 rules,

15   right?

16   A.  That's what it says.

17   Q.  So the next column is number of decision services, and

18   give me the definition of that, please?

19   A.  Decision service fundamentally is how the rules were

20   being combined together for the execution.

21   Q.  And then as that column is populated by numbers, what

22   does the 1 mean in contrast to a 3?

23   A.  One way to describe it would be when you have lots of

24   rules, we are talking about thousands in many cases, and we

25   group them together.  So is a group a 1 versus some other

1    lines you have a 2 groups.  We created 2 groups of those.

2    Q.  And then the next column is the number of entry points

3    per service, and why don't you please define that?

4    A.  Yeah, those were -- so service is an object that has,

5    contains all of these rules.  So these object interact with

6    other objects.  What we described so far is, we term, we

7    refer these to components in application.  So the term

8    "entry points" is a point of integration.

9    Q.  Okay.  Thank you.  And then on the last column on the

10   first page here, number of RMAs.  Now an RMA is the rules

11   maintenance application that's part of Blaze Advisor?

12   A.  Yes.

13   Q.  Yes.  And so like this is saying to us for

14   DecisionPoint, for example, there is, there is one RMA?

15   A.  Yes.

16   Q.  So the business people -- there is one RMA that the

17   business people can use to write rules into Blaze Advisor

18   relative to DecisionPoint?

19   A.  Which, which in our case was the IT people were doing

20   it.

21   Q.  Understood.  And you chose to have IT people use the

22   rules maintenance application for that purpose?

23   A.  That was the net result of our experience.

24   Q.  All right.  And so the number of RMAs we will know by

25   going down that column for each of the applications that is,

1    that it is designated for.  So if all told, one, two,

2    three -- so all told you have five RMAs for the applications

3    that are listed on the first page?

4    A.  Yes.

5         THE COURT:  Mr. Hinderaker, we're just after noon.

6    It sounds like you're at a convenient breaking point.

7         MR. HINDERAKER:  I am, Your Honor.  I finished the

8    first page.

9         THE COURT:  All right.  Very well.  We will take

10   our noon break.  Be back and ready at five minutes after one

11   o'clock.

12        THE CLERK:  All rise for the jury.

13

14        **(In open court without the Jury present.)**

15        THE COURT:  Everyone be seated, please.

16   Mr. Hinderaker, just going forward with this witness, we're

17   going to proceed in the vein of, I'm not going to publish

18   until you've moved for admission, just to be on the safe

19   side.

20        Ms. Godesky, why isn't this admissible as a

21   Rule 1006 summary of voluminous business records?

22        MS. GODESKY:  My understanding is that this is not

23   a summary of voluminous business records.  I do not think

24   that Chubb keeps in the regular course of business records

25   with the information reflected on P 517.  It's my

1   understanding that this information was hunted and gathered

2   from --

3           THE COURT:  From Chubb's business records, right,

4   from its computer systems and the thing that it uses every

5   day of its existence to run its business, right?

6           MS. GODESKY:  I think that's correct.

7           THE COURT:  Okay.

8           MR. HINDERAKER:  And as a point of information,

9   Your Honor, this same document is on their exhibit list as

10  175.

11          THE COURT:  All right.  Thank you, Mr. Hinderaker.

12  We're in recess.

13                    **(Lunch recess taken.)**

14  Monday 2/27/23, afternoon session

15                        *   *   *

16  1:05 p.m.

17                    **IN OPEN COURT**

18                    **(JURY PRESENT)**

19          THE COURT:  Go ahead and be seated.

20          Mr. Hinderaker.

21          MR. HINDERAKER:  Thank you.

22  BY MR. HINDERAKER:

23  Q.  Sir, we're going to stay on this Exhibit 517.

24  A.  Okay.

25  Q.  Over the lunch hour I noticed that I had missed

 1    something on the first page.  I just would like to go back

 2    to that for a moment.

 3              And if you go to the, if you go to the premium

 4    booking line --

 5    A.  Yes.

 6    Q.  -- and you go across to countries supported, I believe

 7    we mentioned the U.S.A., but this document shows it's U.S.A.

 8    and Canada, correct?

 9    A.  That's what it shows.

10    Q.  Okay.  Now we can turn to the second page.

11              I take it this information was gathered from your

12    organization's records wherever they were kept and then

13    summarized on this document?

14    A.  So this data was, it was at a point in time analysis,

15    and we looked at value sources starting from the servers

16    where the software was running.

17    Q.  Thank you.  So on the second page.

18              Now, to read the second page, you have to have the

19    first page in mind in that, like the call to the top row

20    that's in light blue, corresponds to the preceding page for

21    us to know that it's CSI Express, right?

22    A.  Yes.

23    Q.  Okay.  So let's stay with CSI Express on the second

24    page.

25              The transaction processing column is divided into

1    two parts, batch/realtime and then the other is overlap, if

2    both.

3              So on CSI Express under batch/realtime it says

4    both?

5    A.  Yes.

6    Q.  So that means that it processes transactions both in

7    realtime and by batch?

8    A.  Yes.

9    Q.  Okay.  And then the other half of that column where it

10   says overlap, if both, well then of course the answer is

11   yes?

12   A.  Yes.

13   Q.  The next line down or we go down from there, going to

14   the first page the, SBU is commercial financial.  And we

15   look across to see what it's talking about, and now we're

16   talking about DecisionPoint, correct?

17   A.  The second line, yes.

18   Q.  Yes.  And so where it says transaction processing,

19   batch/realtime, for DecisionPoint, it's realtime?

20   A.  Yes.

21   Q.  So then the next column overlap, if both, well it's not

22   both.  So it says and slash A, not applicable.  Am I reading

23   that right?

24   A.  Correct.

25   Q.  And then under the DecisionPoint we have automated

1    renewal processing, and that's batch only, right?

2    A.  The third line, yes.

3    Q.  Okay.  Now let's go to the commercial MMI.  The top row

4    is CUW.  It is, CUW is both batch and realtime, correct?

5    A.  So you looking at the first one.

6    Q.  Yes, I am.

7    A.  CUW.

8    Q.  Yes.

9    A.  Batch.  Sorry.  Both.

10   Q.  It's both, right?

11   A.  Both.  Both.

12   Q.  Yep, that's what I thought.

13          And then under that we have IRMA, and that's

14   realtime?

15   A.  Yes.

16   Q.  And under that we have TAPS, and that's batch, right?

17   A.  Yes.

18   Q.  And then if we go to corporate systems, the premium

19   booking, that's batch?

20   A.  Yes.

21   Q.  And we go under that to Evolution Canada, that's batch?

22   A.  Yes.

23   Q.  And then we go to Adapt-ABL in Europe and Australia,

24   that's batch, correct?

25   A.  Yes.

1    Q.  And EZER is batch, correct?

2    A.  Yes.

3    Q.  Okay.  So then let's go to the next large column,

4    realtime transactions.  Do you see that?

5    A.  Yes.

6    Q.  And that's divided into, I'd say, we'll call it three

7    subparts for my purposes.  All right?

8            So let's go, the first is average number per

9    month.  So is that telling us the average number of

10   transactions for the application per month?

11   A.  Yes.  Related to that particular --

12   Q.  Application?

13   A.  -- line, application.  Yes.

14   Q.  Exactly.  So let's do it again.  CSI Express is at the

15   top.  Average number per month of realtime transactions,

16   7,500 to 1 million, right?

17   A.  Yes.

18   Q.  And then we go to DecisionPoint and we have, we have

19   average number of transactions per month, and it's showing

20   10,000, 50,000, 30,000 and 50,000.  Am I reading that right?

21   A.  Yes.

22   Q.  So do we add that all up to get the total?

23   A.  In this case, yes.

24   Q.  And then we go down to CUW, realtime transactions,

25   1.22 million per month, correct?

1    A.  Yes.

2    Q.  And then under that is IRMA, realtime transactions

3    184,072?

4    A.  Yes.

5    Q.  And no information is reported on TAPS.  And that's that

6    column, so in terms of information.

7          Let's go to maximum number of concurrent users.

8    A.  Yes.

9    Q.  So a concurrent user is what?

10   A.  Number of users of the application that are using in

11   exact same time the application.

12   Q.  Thank you.  And for CSI Express it's 100?

13   A.  Yes.

14   Q.  And then for DecisionPoint it's 3 to 5, 3 to 5, 3 to 5,

15   3 to 5.  So again I can add those all up.

16   A.  Well, in this case it's 3 to 5 for the whole

17   application.

18   Q.  Okay.  Very good.  And then we go down to -- everything

19   else is -- no more information on maximum number of

20   concurrent users.

21          So let's go to maximum processing time.  Start

22   again with CSI Express.  My eyes aren't so -- I wish they

23   were better, but is that saying 5S?  Five seconds, what is

24   that saying?

25   A.  Yeah, five seconds.

1074

1    Q.  Five seconds?

2    A.  Yeah.

3    Q.  Maximum processing time.  Then we go to DecisionPoint,

4    10 seconds, 2 seconds, 2 seconds, 5 seconds?

5    A.  Yeah, that's for one realtime transaction --

6    Q.  Okay.

7    A.  -- interaction.

8    Q.  I see.  So if I go across, there's a realtime average

9    per month, 10,000; maximum concurrent users, 3-5; maximum

10   processing time 10 seconds?

11   A.  Yes, for one transaction.

12   Q.  One transaction.  And I would do the same on

13   DecisionPoint across the line to understand that, right?

14   A.  Yes.

15   Q.  Okay.  And then, then under CUW, maximum processing

16   time, it says the longest recorded was 37 seconds.  Accurate

17   to the best of your knowledge, right?

18   A.  That's what we were able to capture.

19   Q.  And then on IRMA, maximum processing time, it says

20   1.794.  1.794 what, do you know?

21   A.  Seconds.

22   Q.  Seconds, okay.  Good.

23            Now let's go to batch transactions.  That column

24   is also divided into three parts.  Agreed?

25   A.  Yes.

```
1    Q.  So the number of transactions -- I'm sorry.  Number of
2    transactions on -- on per job.  So under the heading, Batch
3    Transactions, what does that mean "on per job"?
4    A.  Per job, meaning one execution of a batch is called a
5    job.
6    Q.  Oh, good.  And so the number of transactions in a job
7    for CUW is 150,000?
8    A.  Yes.
9    Q.  Okay.  Nothing for, and we pick up again with automated
10   renewal, right?
11   A.  Yes.
12   Q.  And the number of transactions per job is 10,000?
13   A.  Yeah.  The first line, yes.
14   Q.  And then on the second line is 500 to 1,000?
15   A.  Yes.
16   Q.  And then on CUW, the transactions per job for batch is
17   32,000, correct?
18   A.  Yes.
19   Q.  And we go to TAPS, and the number of jobs, batch per job
20   is 8,456?
21   A.  Yes.
22   Q.  And then we'll go to premium booking, and the number for
23   transactions per job is 482, right?
24   A.  Yes.
25   Q.  And that fills out that column.
```

```
 1                   So now let's go to time window under batch
 2       transactions.
 3                   So for CSI Express -- well, first time window
 4       means what?
 5       A.   The execution window --
 6       Q.   Okay.
 7       A.   -- for the entire batch.
 8       Q.   Beginning to end.  Beginning to end?
 9       A.   Beginning to end for a job.
10       Q.   For a job, yeah.
11                   So time window, CIS express varies from 20 minutes
12       to multiple days.  Have I read that right?
13       A.   Yes.
14       Q.   The next time it's applicable is, automated renewal runs
15       at night for 4-6 hours is one entry, and then runs at night
16       30-minute to 1 hour is another entry, right?
17       A.   Yes.
18       Q.   For CUW it runs 2:30 a.m. to 4:30 a.m.?
19       A.   Yes.
20       Q.   And then for TAPS it runs from 14:02 to 14:28, right?
21       A.   Yes.
22       Q.   So in Minnesota time that's two minutes after 2:00 to
23       28 minutes after 2:00, right?
24       A.   It --
25       Q.   You're using military time?
```

```
 1    A.  Yes.  28 minutes after 2:00 p.m.

 2    Q.  And then premium booking is overnight.  Evolution is

 3    overnight, correct?

 4    A.  Overnight, yes.

 5    Q.  And then Adapt-ABL is every morning for the European

 6    zone and overnight for Australia, correct?

 7    A.  Yes.

 8    Q.  And then for EZER in Europe it's overnight, right?

 9    A.  Yes.

10    Q.  All right.  So the third column in batch transactions,

11    run frequency.  And if you tell us what that means?

12    A.  It means when is the batch run.

13    Q.  Okay.

14    A.  Could be daily, monthly, weekly.

15    Q.  Got it.  So CSI Express, run frequency, multiple type of

16    batches, on average twice per week.  Agreed?

17    A.  Yes.

18    Q.  For automated renewal, it says monthly openly or monthly

19    and daily?

20    A.  Yeah, because there are two type of batches.

21    Q.  Got it.

22             And then for CUW, it's nightly?

23    A.  Yes.

24    Q.  For TAPS, it's monthly?

25    A.  Yes.
```

1   Q.  For premium booking, daily?

2   A.  Yes.

3   Q.  For Evolution, daily once?

4   A.  Yes.

5   Q.  Evolution Canada for Adapt-ABL, daily twice, right?

6   A.  Yes.

7   Q.  And for EZER, daily once?

8   A.  Yes.

9   Q.  Okay.  And the next column is transaction payload, and

10  that's divided into two.  One of them is type.  And all of

11  them have -- the type for all of them is Java?

12  A.  That's correct.

13  Q.  And that's a certain kind of software platform?

14  A.  So the rules that you define in Blaze gets translated

15  into a programming language.  The one we chose or the one

16  that Federal Insurance chose was called Java.

17  Q.  Thank you.  And then transaction payload.  And then you

18  have the approximate number of attributes.  And an attribute

19  means what?

20  A.  A data item.

21  Q.  I'm sorry.  A what?

22  A.  A data item.

23  Q.  Data item?

24  A.  Yes.  Could be, I don't know, premium number, a premium

25  figure or --

 1     Q.  Got it.  So CSI Express has 140, the number of

 2     attributes?

 3     A.  Yes.

 4     Q.  And DecisionPoint has 120, right?

 5     A.  As you can see, we broke it down into four different

 6     groups because there were different set of rules, each one

 7     requiring different number of attributes.  That's why you

 8     have these four lines.

 9     Q.  All right.  That's why it says 120, 140, 60 and 250?

10     A.  Yes.

11     Q.  All right.  Thank you.

12               And then for automated renewal, there's a, one

13     line is 140 and the other line is 120?

14     A.  Yes.

15     Q.  For the same reason?

16     A.  Same reason.

17     Q.  And then for CUW, 125, right?

18     A.  Yes.

19     Q.  And for IRMA, 60, right?

20     A.  Yes.

21     Q.  And for TAPS, 60, right?

22     A.  Yes.

23     Q.  And then we go to premium booking, and that's 300,

24     right?

25     A.  Yes, 300.

1    Q.  And then Evolution Canada, 120?

2    A.  Yes.

3    Q.  And then we're into Adapt-ABL for Europe/Australia, 140,

4    right?

5    A.  Yes.

6    Q.  And for EZER in Europe 140, right?

7    A.  Yes.

8    Q.  And then the last column is number of sandboxes needed.

9    What is a sandbox?

10   A.  A sandbox is a term we use in IT to describe a test

11   environment.

12   Q.  Okay.  And for every, for every --

13   A.  Application.

14   Q.  -- line that's filled in, it's one?

15   A.  One per -- yeah.  An application required a sandbox.

16           MR. HINDERAKER:  Okay.  Good.

17           Your Honor, I move again for the admission of 517

18   as a business record or as a Rule 1006 summary of their

19   business records.

20           MS. GODESKY:  We object for the reasons discussed

21   and also the second sentence of Rule 1006.

22           THE COURT:  The objection is overruled.  The

23   exhibit is received.

24   BY MR. HINDERAKER:

25   Q.  Now, Mr. Ghislanzoni, let us move on to -- if you would

```
 1    look at Exhibit 518.

 2    A.  518.

 3    Q.  518.

 4    A.  Okay.

 5    Q.  And you are also familiar with this document --

 6    A.  Yes.

 7    Q.  -- correct?  And I understand -- and this document to

 8    the best of your knowledge was made about April or maybe

 9    March, March, April, 2019, correct?

10    A.  So this document, which is similar to the one we just

11    looked at.

12    Q.  It is.

13    A.  Yeah.  My recollection is, was produced towards the end

14    of 2018.

15    Q.  Let me see if -- would you look at the end of the -- the

16    back of that binder there's your deposition transcript.

17    A.  Okay.

18    Q.  And I'm just seeing if that would refresh your

19    recollection.  If you go to page 101.

20    A.  Sure.

21    Q.  I'm sorry.  Let me know when you are there.

22    A.  Page 101, yes.

23    Q.  Page 101.  And so you were talking about Exhibit 406,

24    and then you said that was before 503 which is the one we

25    are talking about now.
```

```
 1              And the answer is, "So when did you receive 553,"
 2     which is the exhibit we are talking about now is as trial
 3     Exhibit 518.  And at page -- you say, "I believe it was
 4     maybe March or April 2018."
 5              And the answer March, April -- I'm sorry.  March
 6     or April 2019.  And the answer is, "March, April 2018, so at
 7     that point in time."
 8              Does that refresh your recollection it's in the
 9     spring of March, April 2018?
10     A.  Yeah, what I remember is we started creating this view
11     at the end of 2018.  We might as well possibly have refined
12     the view at the beginning of 2019.
13     Q.  Fair enough.  And then one of the things that's in
14     Exhibit 51 -- let me.  Hang on.
15              And Exhibit 518 was prepared in the same general
16     process as the earlier exhibit?
17     A.  Yeah, the foundation in terms of data gathering was the
18     same.
19     Q.  And to the best of your knowledge, Exhibit 518 is an
20     accurate reflection of the information in your organization
21     at the time?
22     A.  To the best of my knowledge, yes.
23              MR. HINDERAKER:  Your Honor, I offer Exhibit 518.
24              MS. GODESKY:  We have the same objections.
25              THE COURT:  Overruled.  518 is received.
```

```
1    BY MR. HINDERAKER:

2    Q.  And if we look at Exhibit 518, sir, a lot of the

3    information -- information being the same, but look at

4    what's different.  If we go to Adapt-ABL, do you agree with

5    me that in the later document, 518, Adapt-ABL shows both for

6    the European zone and Australia, right?

7    A.  Same as before.

8    Q.  Same as before.  Just different terminology.  So on 518

9    for Adapt-ABL, you said writing guidance for EUZ, that's the

10   European zone and Australia, and then 517 is, 517 doesn't

11   say underwriting guidance, does it?

12   A.  No, it doesn't.

13   Q.  Well, 518 is in evidence, and we can compare those two

14   exhibits in terms of their differences, not in the same

15   level of detail we did before, but 518 has as a header:  Has

16   a header application as before, but now it has a header

17   Blaze Rules Capability, right?

18   A.  Yes.  I remember I said in this column to explain the

19   main capability that was provided through the rules.

20   Q.  Right.  And then the complexity and number of rules,

21   realtime transactions, month average per day, batch, that's

22   likely information from the earlier exhibit?

23   A.  Complexity of rules, yes.

24   Q.  Yeah.  Okay.  So 518 is useful in terms of new

25   information because it has the Blaze rules capability as
```

```
 1    part of, as part of its expression.  Agreed?
 2    A.  Sorry.  Could you repeat the question?
 3    Q.  518 has the heading Blaze Rules Capability, and then
 4    that information is filled in?
 5    A.  Yes.
 6    Q.  Okay.  Thank you.
 7            Would you go to Exhibit 156 in the notebook.
 8    A.  156.
 9    Q.  Thank you.  And I believe this is in evidence but the
10    subject is ChEAR Application and Technology Stack Summary.
11    Do you see that?
12    A.  Legacy Chubb application summary.
13    Q.  Right.  And then the attachment is legacy Chubb
14    application summary.  Agreed?
15    A.  That's what it says.
16    Q.  Okay.  I would rather not walk you through this
17    document.  I would like to only know from your expertise and
18    familiarity to how to read it correctly.  All right?
19            And so, for example, if in the attachment I go to
20    the second page, and I was to find the, near the top
21    third -- there we go -- where it says the technology Blaze
22    Advisor, and then it says preferred primary, 7.1 and
23    leverage.
24            I just want to know from -- and I think from your
25    earlier testimony it is, but I just want to know that when I
```

1    read this document and I see Blaze Advisor 7.1, it says,

2    that's the version being used.  And when it says leveraged,

3    that's confirming that it is being used, correct?

4    A.  I did not produce this document.

5    Q.  Understood.  I didn't say you did.  I'm just asking if

6    you read it the same way I do.

7    A.  So what I can tell you about ChEAR is a repository where

8    we were recording existing application information and

9    potential future ones.

10   Q.  Okay.  And whether it's a future one, we just look at

11   other information to see if it's already existing, right?

12   A.  I cannot tell you how it was identified in this

13   spreadsheet.  I was not part of --

14   Q.  Stepping back from not being the author or participant

15   in creating it --

16   A.  Sure.

17   Q.  -- we have other people testify to that.  As the

18   architect in the company if you are reading this document

19   and it says leveraged, you would interpret that as Blaze

20   Advisor 7.1 is being used?

21   A.  I would be guessing the intention of the author.

22   Q.  You don't want to -- okay.  You don't want to read it.

23   All right.

24           The next portion of questioning that I would like

25   to go into with you is to identify the dates on which your

1   use of Blaze Advisor ceased and you substituted in the

2   Drools application.

3           And why don't you -- we'll go slow for a minute

4   here.  And so if you would turn to Exhibit 1007.

5   A.  Okay.  1007.

6   Q.  Yep.  And you will see the title Non-Supplemental Answer

7   to Plaintiffs Interrogatory Number 7.  Why don't you go to

8   page 5.

9   A.  Page 5.

10  Q.  Please.

11  A.  Okay.

12  Q.  And you will see there's two bullet points, and the top

13  bullet point starts CSI Express?

14  A.  I can see.

15  Q.  Okay.  And then there's -- I won't read it yet, but then

16  there's a sentence that speaks about when the Blaze Advisor

17  component was removed.  Do you see that?

18  A.  You are reading the first paragraph?

19  Q.  First bullet point, last sentence, "the Blaze Advisor

20  component was removed."

21  A.  I can read the sentence, yes.

22  Q.  Okay.  Good.

23          MR. HINDERAKER:  Your Honor, I would like to offer

24  into evidence Exhibit 1007, which is the Non-Supplemental

25  Answer to Interrogatory Number 17; 1008, which is the

1    Seventh Supplemental Answer to Interrogatory Number 19;

2    1002, which is the Seventh Supplemental Answer to

3    Interrogatory 18.

4         And I would -- I request that they be admitted

5    into evidence as the verified interrogatory answers, and

6    then we will, in terms of submitting the document for the

7    record, take out what I'll call the lawyer-eze and have

8    simply the facts.

9         MS. GODESKY:  That's fine, subject to the

10   redaction issue that we discussed.  And I think there's

11   content in these documents that goes beyond --

12        THE COURT:  The foundation?

13        MS. GODESKY:  Yes.

14        THE COURT:  And specifically in 1007, the graph at

15   the top half of that page is such a portion, correct?

16        MS. GODESKY:  Yes, that's what I have in mind.

17        MR. HINDERAKER:  Is what?

18        THE COURT:  The graph on page 5 of 1007, the graph

19   above the two bullet points, the objection is that it's

20   beyond the foundation of the witness.

21        MR. HINDERAKER:  I don't quarrel with that.  It

22   is.

23        THE COURT:  Okay.

24        MR. HINDERAKER:  It's not my intention to go into

25   any of that.

```
 1                 THE COURT:  Yep.  Understood.
 2                 So for purposes of displaying it to the jury, if
 3       you can redact that graph on page 5, let me know when you've
 4       done that.
 5                 MR. MAYLEBEN:  Good, Your Honor.
 6                 THE COURT:  Okay.  So subject to those objections
 7       and that redaction, 1002, 1005, 1007 and 1008 are received.
 8                 MS. GODESKY:  Your Honor, I'll just state for the
 9       record I think those other exhibits have similar issues.
10                 THE COURT:  The same issues, yep.
11                 MS. GODESKY:  Yes.
12                 MR. HINDERAKER:  And no dispute about that either.
13       Agreed.
14       BY MR. HINDERAKER:
15       Q.  So now we can go through this with a little bit of
16       speed, maybe.
17                 So if we look at Exhibit 1007, I pointed you to
18       that first bullet point.  We can agree that Blaze Advisor
19       component was removed from the version of CSI Express,
20       automated renewal process and profitability indicator, on or
21       about January 17, 2020, right?
22       A.  This is what the document says.
23       Q.  That's all we can do.  That's right.
24                 And then if we, if we -- with respect to
25       DecisionPoint, is it your recollection that DecisionPoint
```

 1   was replaced by Drools in the first half of 2020?

 2   A.  I can't recollect exactly, but by end of April, 2020,

 3   DecisionPoint for sure had been removed from Blaze usage.

 4   Q.  Good.  And I should have just pointed you to page 3 of

 5   the same exhibit.  Just put -- yep.

 6        The Blaze Advisor component was removed from the

 7   version of DecisionPoint used by the financial lines unit on

 8   or about April 10, 2020.

 9   A.  Right.

10   Q.  And then let's go to back to page 5 and talk about ARP.

11   So we touched on that already.  It was taken out at the same

12   time as CSI Express, on January 17, 2020.  Agreed?

13   A.  That's what the document says.

14   Q.  I know.  And then on page 9.

15        When we're talking about CUW at the top of the

16   page, the Blaze Advisor component was removed from the

17   version of CUW in early November, 2019.  That's what that

18   says there, correct?

19   A.  I can see that, yes.

20   Q.  All right.  And then if we stay on this same page for

21   TAPS, we're going to know that it is -- the document says

22   Blaze Advisor was removed from the version of TAPS used by

23   the Chubb Commercial Insurance business unit in late

24   April -- sorry -- in late third quarter or early fourth

25   quarter 2019.

1    That's what that says?

2    A.  Yes.

3    Q.  Okay.  And then if we go to page 10, the bullet point at

4    the bottom for IRMA?

5    A.  I can see.

6    Q.  The Blaze Advisor component was removed from the version

7    of IRMA used by Chubb Commercial Insurance business unit in

8    either the summer or early fall of 2019.  That's what it

9    says?

10   A.  Yes.

11   Q.  And then let's go back to page 6.  For premium booking,

12   kind of in the middle of the page, page 6?

13   A.  Yes.

14   Q.  You're there, but the screen isn't, so we will wait a

15   second.

16        Page 6.

17        Okay.  Well, we can read it.  Premium booking used

18   by corporate business systems was removed on or about

19   April 17, 2020, correct?

20   A.  That's what is stated, yes.

21   Q.  Okay.  Good.  If you would go to Exhibit 1008, please.

22   A.  Okay.

23   Q.  This is the Seventh Supplemental Answer to Interrogatory

24   19.  And if we go to page 3, we're told the Blaze Advisor

25   component --

1091

```
 1                  THE COURT:  Hang on a second.  Can we do the
 2       redaction on that page as well, please?
 3                  Sorry, Mr. Hinderaker.
 4                  MR. HINDERAKER:  Yeah, we should.
 5                  Just the bullet point.  There we go.
 6       BY MR. HINDERAKER:
 7       Q.  The Blaze Advisor software component was removed from
 8       the Evolution application described above on or about
 9       September 27, 2019.  I read that right, I hope?
10       A.  Yes.
11       Q.  Okay.  And then let's go to Exhibit 1002.
12       A.  1002.
13       Q.  Got it.  Defendants' Seventh Supplemental Answer to
14       Interrogatory Number 18.  I'm interested in EZER.  So if we
15       can go to page 4.
16                  And Blaze Advisor component was removed from the
17       version of EZER used by UK Federal on or about March 29,
18       2019.  That's what it reads?
19       A.  Yes.
20       Q.  And then let's go to Exhibit 105.
21       A.  105?
22       Q.  105.  And this is Defendants' Seventh Supplemental
23       Answer to Plaintiff's Interrogatory Number 20.  And if you
24       would go to page 6.
25       A.  I'm on page 6.
```

1    Q.  Page 6, please.  First bullet point.

2         Blaze Advisor component was removed from the

3    version of Adapt used by CEG SE.  That's Europe, correct?

4    A.  Yes.

5    Q.  And Chubb Insurance Company of Australia on or about

6    January 27, 2019.  That's what it reads?

7    A.  Yes.

8    Q.  Okay.  Thank you for that.

9         Let's go to Australia.

10        You know that, that in -- we're going to go to

11   Australia, but we're got going to start off in Canada.  You

12   know that in Canada there was an application called

13   Evolution that used Blaze Advisor.

14   A.  Yes.

15   Q.  And you know that the decision was made to take a copy

16   of the Canadian application and use it as a base to create

17   an Australian application, which ended up also having the

18   name Evolution, correct?

19   A.  Yes.  That was correct.

20   Q.  And the copy of the Canadian application with Blaze

21   Advisor was the starting point for the Australian specific

22   application.  Agreed?

23   A.  That was the intention.

24   Q.  Yes.  And at the end of the day, the Blaze Advisor --

25   I'm sorry.  At the end of the day, the application that was

1   used in Australia called Evolution had a rules engine of

2   ODM?

3   A.  Yes.

4   Q.  So for that, for the Australian application called

5   Evolution, the Blaze Advisor component that was in it was

6   removed, and then ODM was put into its place?

7   A.  What I can tell you is, I believe in first person, I

8   engaged with the Australian team in 2016 and facilitated the

9   adoption of ODM as the rules engine for the application.

10  Q.  Okay.  And so to put the -- I'm just making the simple

11  point, I think, that if you start off with Canadian

12  Evolution with that with Blaze Advisor is what you start

13  from, to get to the end point you first have to remove Blaze

14  Advisor and then put in ODM.

15  A.  I cannot tell you if that is what happened.

16  Q.  Okay.  Well, then let's, let's go back to 105 -- 1005.

17  And this is the Seventh Supplemental Answer to Plaintiff's

18  Interrogatory Number 20.

19          And if you would go to page 4.

20  A.  I'm on page 4.

21  Q.  Page 4?  Got it?

22          And there's a bullet point in the middle.  It

23  starts off the A&H business?

24  A.  The A&H business unit, yes.

25  Q.  And then a couple sentences in it reads, "Indeed Blaze

1    Advisor was replaced with IBM operational decision

2    management before Blaze Advisor ever went live in

3    Australia."

4         Did I read that right?

5    A.  That's what this document says.  First time I see it.

6    Q.  Fair enough.  I'm not trying to quarrel with you.  This

7    is information I have from the lawsuit, and that's what it

8    says.

9    A.  That's what is reading here.

10   Q.  All right.  Are you familiar with Zorica Todorovic?

11   A.  I met Zorica at the time we started integration.

12   Q.  Okay.  And she's, she's out of Chubb Canada?

13   A.  Yeah.  She was IT lead CIO for Canada at the time.

14   Q.  And she was part of the process of taking the Evolution

15   application with Blaze Advisor as it was in Canada and

16   transferring that to Australia for ultimately the

17   development of the Australian application called Evolution?

18   A.  Yeah.  I cannot tell you if that is an accurate

19   statement.  I was not directly involved in that activity.

20   Q.  Did you know that she was involved in that activity?

21   A.  I know she owned the Evolution application in Canada.

22   Q.  Okay.  And you know that she was a senior vice president

23   operations of IT and chief information officer for Chubb

24   Insurance of Canada.

25   A.  Yes.

1    Q.  Okay.  And did you know that she was working with a

2    consultant in Canada called AppCentrica in connection with

3    this project?

4    A.  When I met with Zorica, I remember her mentioning

5    AppCentrica being one of the consultants they were using in

6    Canada.

7    Q.  And in terms of the work being done by Chubb Australia,

8    you were aware that Chubb Australia was using a consultant

9    in connection with this project called DWS Group?

10   A.  Yes, I was aware of that.

11   Q.  And by "this project," I'm talking about the project of

12   creating the Australia Evolution application from the

13   Canadian Evolution application.  We're on the same page?

14   A.  Yes.

15   Q.  Okay.  Would you go to the exhibit in your notebook

16   called 526.

17   A.  526, yes.

18   Q.  I'm not as quick as you are.  All right.  There we go.

19          And Exhibit 526 is one where you happen to be on

20   the email chain.  It's from Hamish Tonkin to Russell Hodey

21   and yourself, among others.  Agreed?

22   A.  Yes.

23   Q.  As it bears the date of May 12, 2016.

24   A.  Yes.

25   Q.  And Russell Hodey is a Chubb representative out of Chubb

1    Australia?

2    A.  Yes.

3    Q.  And Hamish Tonkin is out of the European zone of Chubb.

4    A.  Yes.  Hamish Tonkin was a legacy Chubb architect working

5    in the UK, in England.

6    Q.  And the subject matter of this email is Re:  Changing

7    Rules Engine Software.  Agreed?

8    A.  Yes.

9         MR. HINDERAKER:  I don't think there's an

10   objection to this exhibit, but I do offer it, Your Honor.

11        MS. GODESKY:  No objection.

12        THE COURT:  Exhibit 526 is received.

13   BY MR. HINDERAKER:

14   Q.  And the attachment, Rules Engine Matrix, if you would go

15   to Exhibit 527, the next one.

16   A.  527, yes.

17   Q.  And that's -- we're on the same page that Exhibit 527,

18   the Rules Engine Matrix, is the attachment to, excuse me,

19   Exhibit 526, the email.

20   A.  This doesn't say that, but --

21   Q.  If you look at -- go ahead.  If you look at the Bates

22   number that's produced in the litigation, the number for the

23   email is FED013893.  The number for the attachment

24   FED013894, just the next number.

25   A.  Understood.  Thank you.

1    Q.  So we can be in agreement that it's the attachment.

2    A.  It's the attachment.

3    Q.  All right.  Thank you.

4         And this email is speaking like in the Hamish

5    Tonkin to Russell Hodey from Australia.  In the second

6    paragraph, he says -- the subject matter again being

7    changing rules engine software.

8         He says, Blaze is fine for multiple operands and

9    parent/child/chaining/rete, as we don't want to develop this

10   sort of functionality into something we are building from

11   scratch.

12        He reads that, right?

13   A.  So you are on the second paragraph?

14   Q.  That I am, yes.

15   A.  I can see that yes.

16   Q.  Okay.  I read that right?

17        And then on the bottom of that page it referenced

18   that Russell Hodey has been -- again, the email on the

19   bottom of the page, Russell Hodey to yourself, May 12, 2016,

20   Hodey is saying, "Having discussed this further with

21   Martin," you understand Martin is Martin Sill of DWS?

22   A.  Yes.

23   Q.  The solution architect at DWS and then he goes on to

24   suggest some proposals, including that DWS will continue to

25   explore Drools.

```
 1                That was happening at that time?
 2    A.  Yeah.  DWS proposed the use of Drools, but we agreed
 3    that ODM was the technology to be adopted, and that
 4    happened.
 5    Q.  All right.  Good.
 6                And then on the last page of the email, it has the
 7    number FED013893_002?
 8    A.  Yes.
 9    Q.  Martin is saying that he's going to pull together some
10    brief notes on how rules are implemented in Blaze currently
11    and saying it's very straightforward and he's going to
12    report on that.
13                Agreed?
14    A.  That's what he's saying in the email.
15    Q.  Okay.  Thank you.
16                And then let's go to, let's go to Exhibit 1060.
17    A.  1060?
18    Q.  Yep, 1060.
19    A.  Okay.
20    Q.  And you will see that it's from Zorica Todorovic who
21    you've identified already.
22    A.  Yes.
23    Q.  Chubb Canada.  It's to a Julia Perle.  Did you get a
24    chance to meet her too?
25    A.  No.
```

```
1    Q.  But you see that her email address is at Chubb.com?

2    A.  Yes.

3    Q.  Any doubt that Julia Perle is also a Chubb Canada

4    person?

5    A.  I don't remember Julia Perle.

6    Q.  All right.  All we know is her email address is at

7    Chubb.com, right?

8    A.  Yes.

9    Q.  And the subject is Evolution Transition, and then the

10   attachment is Knowledge Transfer Schedule.

11            And the subject matter is the Evolution transition

12   that we've been talking about already, Canada Evolution to

13   Australia, right?

14   A.  Well, this is an email was produced in 2015.

15   Q.  I know that.

16   A.  Legacy Chubb.

17   Q.  I agree.

18   A.  So I was not part of that engagement.

19   Q.  I know.  And I'm not suggesting that you were.  But you

20   do know that Zorica Todorovic is Chubb?

21   A.  Yes, I know that.

22   Q.  And you do know that there was an effort to transition

23   Blaze Advisor knowledge from Canada Evolution to Australia

24   Evolution.  You know that too?

25   A.  I see this email for the first time.
```

```
1    Q.  I understand that.  Do you have any reason to think this

2    email isn't exactly what it purports to be, an email between

3    these people about the Evolution transition and the

4    knowledge transfer schedule?

5    A.  I can tell you what is in the email.

6    Q.  Okay.  And let me just continue with some on this line.

7             And also on the email is Mr. Hodey at Chubb.com,

8    and you've told us that he's Chubb in Australia, correct?

9    A.  Chubb Australia, yes.

10   Q.  Yes.  That's what I said, Chubb Australia.

11            And then on the email as well is Martin Sill at

12   DWS.com, and you identified Martin Sill as a DWS consultant

13   working with Chubb Australia, correct?

14   A.  That is correct.

15   Q.  And the subject matter again is Evolution Transition,

16   correct?

17   A.  Correct.

18            MR. HINDERAKER:  Your Honor, I offer Exhibit 1060

19   as an authenticated admission.

20            MS. GODESKY:  Objection on foundation.

21            THE COURT:  Sustained.

22   BY MR. HINDERAKER:

23   Q.  Would you go to Exhibit 1169, please.

24   A.  1169.

25   Q.  Yeah.
```

```
 1    A.  Yes.
 2    Q.  All right.  And this should not be published yet.
 3              Again, the title of this is Declaration of Zorica
 4    Todorovic.  Have I read that right?
 5    A.  Yes.
 6    Q.  And then if you go to the last page, she declares
 7    independently of perjury that the foregoing is true and
 8    correct to the best of her knowledge.  Do you see that?
 9    A.  I see that.
10    Q.  And you see a signature?
11    A.  I see Zorica Todorovic and a signature.
12    Q.  Okay.  And then you see in the top line case, and it has
13    numbers of a case and a docket number and a filing date.
14              Do you see that?
15    A.  I see that.
16              MR. HINDERAKER:  Your Honor, I move the admission
17    of the Declaration of Zorica Todorovic as an admission, also
18    as one that was adopted by the defendants because it was
19    filed with the court in the context of the court proceedings
20    in this case.
21              MS. GODESKY:  Objection, Your Honor.  Hearsay.  No
22    foundation.
23              THE COURT:  Let's approach.
24                      (Sidebar discussion)
25              THE COURT:  It's a sworn statement under oath
```

1   offered by Federal during the course of litigation.  So why

2   is it hearsay?

3              MS. GODESKY:  Your Honor, this would be completely

4   unprecedented.  If you could get documents in this way,

5   every declaration and expert report that a party cites in

6   support of or in opposition to a summary judgment filing

7   could then be admitted at trial.

8              MR. HINDERAKER:  Actually, not expert reports.

9   Just declarations under oath.

10             MS. GODESKY:  Some expert reports are sworn.

11             THE COURT:  No.

12             MS. GODESKY:  But this is a declaration of a

13  witness who is not here.  They had every opportunity to

14  depose, and the idea that you can put in a sworn declaration

15  of a witness that is not present in trial, there's

16  absolutely no authority for that at all.

17             MR. HINDERAKER:  May I have a moment, and I will

18  get some?

19             THE COURT:  Sure.

20             MR. HINDERAKER:  All right.

21             (Approaches counsel table and returns)

22             MR. HINDERAKER:  One case I have comes out of

23  bankruptcy court.  The objections to the admission of this

24  declaration is hearsay, is without merit.  This declaration

25  is expressly excluded from hearsay by Federal Rule of

1      Evidence 801(d)(2)(B) as a party admission.

2            801 (d)(2)(B) provides in part that the statement

3      is not hearsay if the statement is offered against a party

4      and is a statement of which the party has manifested an

5      adoption on belief or belief in its truth.

6            Southern District of New York.  Defendants do not

7      contest the admissibility of statements by, nor could they,

8      the declarations from which these excerpts were taken were

9      submitted by defendants at summary judgment.  When

10     defendants submit these declarations at summary judgment,

11     they manifested that they adapted or believed to be true the

12     statements contained in these declarations.

13           And that's the Southern District of New York 2012.

14           MS. GODESKY:  Your Honor, I would like an

15     opportunity to look at that case law.  I think at a minimum

16     this isn't something that needs to be resolved with

17     Mr. Ghizlanzoni.  This is not his statement.

18           And I'm not even sure where Mr. Hinderaker is

19     going.

20           MR. HINDERAKER:  I would explain it, if you wish.

21           THE COURT:  Please.

22           MR. HINDERAKER:  So we have a party admission and

23     what her declaration does is flush out more details about

24     the AppCentrica/DWS transfer of knowledge between Canada and

25     Australia with respect to this Evolution application.

1    So we have more context for the authentication of

2    these documents of which he admittedly is not a party to,

3    but the authentication is relatively low, and it is to the

4    point, is this what it purports to be.  And so we have a

5    sworn declaration detailing a little bit about this project

6    that makes the authenticity of these other documents and

7    emails more authentic, I guess.

8         MS. GODESKY:  So I don't have an authenticity

9    objection.

10        THE COURT:  I know your objection is foundation

11   and hearsay.

12        MS. GODESKY:  Exactly.  I would like more time to

13   consider the hearsay issue.  But certainly on foundation

14   under the rule that FICO argued for and this court adopted,

15   Mr. Ghislanzoni would not be the right witness to use this

16   with anyway, because as you look at the recitation of facts

17   in this declaration, paragraph 5 Ms. Zorica is talking about

18   events in 2015.

19        That's the time period that she was addressing.

20   She was at ACE and this is --

21        MR. HINDERAKER:  I think we're confusing the

22   foundation question.  I don't quarrel with the fact that

23   Mr. Ghizlanzoni doesn't have foundation about this.  But

24   what I was saying is, when this is out and the court's aware

25   of it and you look at the documents that I am showing him

1    for his authenticity for making, giving the foundation,

2    we're getting off track --

3              For showing the authenticity of those documents,

4    then the documents are admissions.  I'm not suggesting, and

5    I haven't suggested, that Mr. Ghislanzoni has first-hand

6    knowledge of foundation to speak to these, but I can read

7    their admissions from authenticated documents.

8              THE COURT:  I understand.

9              MR. HINDERAKER:  Okay.

10             THE COURT:  I think in fairness to Federal, I

11   think they need the opportunity to look at the case law that

12   you're citing.  I think as I'm hearing it, I don't think you

13   need to use the exhibits themselves with the witness.  They

14   can -- if they're admissible, then they will come in either

15   on their own because of the affidavit or through another

16   witness, the emails.

17             MR. HINDERAKER:  The reason I -- I wasn't going to

18   do this right away, and the reason I went to it was when

19   Mr. Ghislanzoni identified all the people on the email --

20             THE COURT:  Right.

21             MR. HINDERAKER:  -- and I know he's not, he's not

22   one of them.  He identifies all the people on the email.

23   There's no reason to think it's not exactly what it says it

24   is.  And I offered it, and it was refused.

25             I said, well, I am going to find more foundation

1    to show the subject matter of this email, the knowledge

2    transfer, is what he already knows about some, and this

3    brings us into AppCentrica and DWS a little bit deeper.  If

4    he authenticated the email and the attachment that came from

5    Chubb Canada, I'm not going to ask him his first-hand

6    knowledge about it.  He doesn't have it.

7           I'm just going to read the admissions that are in

8    Chubb's own documents.

9           MS. GODESKY:  Your Honor, this is exactly what

10   FICO took the position we could not do, get documents into

11   evidence through witnesses who have no foundation to talk

12   about.  And that has been the rule since the first day of

13   trial.

14          And what's happening here is, FICO did not take

15   depositions during discovery of Russ Hodey, even though he

16   was identified; Zorica, even though she was identified.

17   They chose not to take those depositions.  They don't have

18   the evidentiary record that they need, and now they are

19   trying to shoehorn it in through someone who didn't even

20   start working at the company until after these emails were

21   authored.

22          He's admitted and he will testify that he has some

23   knowledge about what happened with Evolution Australia,

24   starting in spring 2016.  But to try to use him as a vehicle

25   to get in the documents from 2015 that he was never on, he

```
1    didn't participate in the conversations, again, when you can

2    look back at the correspondence that FICO sent the court,

3    they said this shouldn't happen, and the court said we

4    couldn't use documents with witnesses who couldn't lay a

5    foundation.

6              MR. HINDERAKER:  And this man is going to lay the

7    authenticity through the document.  I'm not asking his

8    personal knowledge.  And, you know, Zorica is one of those

9    witnesses that we had yet another motion about, and the

10   defendants had her on the witness list.  The defendants were

11   going to bring her to trial.  Then they were going to take a

12   deposition.

13             I mean, it would have been easier for me if she

14   would have showed up, but that isn't in my control.

15             MS. GODESKY:  It would have been easier for us,

16   too, but there's no power to compel her at that point, but

17   they could have taken a deposition earlier and so --

18             MR. HINDERAKER:  My point is there's no reason to

19   blame around, either way.

20             MS. GODESKY:  I'm not blaming anyone.

21             MR. HINDERAKER:  We're dealing with the question

22   of -- I mean, the law is clear, in my judgment.  If he can

23   authenticate that the document, email, is what it purports

24   to be and, he's already told me that the attachment connects

25   to the email, then that's all I need.
```

```
1            It is an authentic record of the defendants, and

2     it's an admission.

3            THE COURT:  I don't know that he can.  I don't

4     think he has.

5            MR. HINDERAKER:  Well, I know that he has already

6     agreed with me that the attachment is with the email.  I

7     haven't gotten through your judgment that the email is an

8     authentic document produced in this litigation from Chubb.

9            THE COURT:  Right.  Well --

10           MR. HINDERAKER:  And actually I don't know what

11    more I can because all of the, you know, he identifies the

12    people on it except for Perle and --

13           THE COURT:  I haven't had an opportunity to read

14    the declaration of Zorica.  What does it say, basically?

15           MR. HINDERAKER:  Basically, we work with

16    AppCentrica, AppCentrica access to Blaze Advisor off of our

17    virtual desktops, and then AppCentrica was part of the work

18    with DWS.  It's fairly high level.  It's fairly high level.

19           THE COURT:  Okay.

20           MS. GODESKY:  He doesn't know anything about that,

21    Your Honor.

22           MR. HINDERAKER:  I agree with you.  He doesn't.

23           MS. GODESKY:  So this is not the right witness.

24           THE COURT:  Well, I agree with Federal.  I don't

25    think -- well, I don't think currently we've gotten the
```

```
 1    foundation for the admission of the email with the
 2    attachment.
 3              Go ahead and lay more foundation if you can.
 4              MR. HINDERAKER:  If I can.
 5              THE COURT:  And on the affidavit we can deal with
 6    that later.  And you're welcome to show him the affidavit,
 7    but I don't know that that's -- I mean, he hasn't seen it
 8    presumably.  He can't testify to its accuracy.
 9              MR. HINDERAKER:  And I wouldn't ask him to.
10              THE COURT:  Right.
11              MR. HINDERAKER:  Its accuracy is the admission the
12    defendants have presented to the court as accurate.
13              THE COURT:  It doesn't strike me, to be honest
14    with both of you, that the question of whether AppCentrica
15    had Blaze or had access to Blaze and used it as a consulting
16    tool Chubb Canada is terribly in dispute.
17              MS. GODESKY:  We did not object when
18    Mr. Hinderaker showed the interrogatory response agreeing
19    with that in his opening.
20              MR. HINDERAKER:  It's not terribly undisputed.
21    These documents will -- they say, for example, this will get
22    the source code to DWS, that much.  It's a bit more than,
23    it's a bit more than DWS was in the same room as Blaze
24    Advisor as DWS, we're going to get the source code to DWS.
25              MS. GODESKY:  My objection is, Your Honor, this
```

```
1    witness was not involved in DWS and AppCentrica vis-à-vis

2    Blaze, and so to have our corporate representative

3    questioned about correspondence he can't conceptualize, it's

4    just not fair.

5              MR. HINDERAKER:  Well, again, I don't -- he's

6    already testified to his general, his knowledge about that

7    transfer.  He's already testified he met with Zorica.  He's

8    not a 30(b)(6) deposition.  He's a human being witness in

9    the trial.

10             MS. GODESKY:  Sure.

11             THE COURT:  Right.  And you're welcome to explore

12   it further with him.

13             MR. HINDERAKER:  All right.

14             THE COURT:  Again, he, I think he's testified

15   about his knowledge, once he came on board, about DWS and

16   AppCentrica, has he not?

17             MR. HINDERAKER:  Yeah, he has.  And there's emails

18   that are going to be after his onboarding.  I mean, the one

19   I'm working with now is earlier in time, but he comes on

20   board, and he's part of the transition out, and then there's

21   other emails that are after, later in time.

22             THE COURT:  Okay.  Well, I think the "are you

23   aware" question is fair game.

24             MR. HINDERAKER:  I'm sorry.  What?

25             THE COURT:  The "are you aware" question is fair
```

1    game.  But if he's not aware of it, he's not aware of it.

2    And you have a basis for asking it.

3              MR. HINDERAKER:  I do.  And my, what I lose -- I

4    will do that, but what I lose in the process is, to use one

5    of the defendants' own documents as an admission.

6              THE COURT:  I understand.  I understand.

7                        (In open court)

8              THE COURT:  Mr. Ghislanzoni, you will have to turn

9    your microphone back on.  There you go.  Thanks.

10   BY MR. HINDERAKER:

11   Q.  Well, let's just cover a little ground that we've

12   already covered, but I need to do it to get back into a

13   context.  Okay?

14   A.  Okay.

15   Q.  So if we go to Exhibit 526, this is the email that you

16   are on.  It's in evidence, and the subject matter is

17   Changing Rules Engine Software.  And then the email, excuse

18   me, the email below -- well, the email above has Martin Sill

19   at DWS.comAU and then the email below Russell Hodey at

20   Chubb.com to yourself.

21              And then there's a discussion with Martin and DWS,

22   and as you said already, there was some exploration by DWS

23   into whether Drools would be a substitute for the Evolution

24   application in Australia, but ultimately the decision was to

25   go to ODM.

```
1              So that's -- you agree with that?  All right?

2    A.  Yeah, I agree with the fact that we selected ODM, and we

3    utilized ODM.

4    Q.  Right.  Okay.  So then let me -- and you are also, you

5    also know, you said, that Chubb Canada was working with a

6    consultancy called AppCentrica.

7    A.  What I know that, Zorica, when I met her first time as

8    part of the integration, mentioned that AppCentrica was one

9    of the consultancy that they were utilizing in Canada.

10   Q.  Okay.  So I think we're on the same page.

11             And if you would go to, go to Exhibit 16A, please.

12   A.  Sorry.  Could you repeat the number?

13   Q.  Sure.  0016A.

14   A.  Okay.  I'm there.

15   Q.  And on this email it is from Robert Lokinger, and his

16   address is at AppCentrica.com, correct?

17   A.  I can see that in the email.

18   Q.  You don't disagree with that, do you?

19   A.  It's written on this paper.

20   Q.  All right.  And the email is to Zorica Todorovic at her

21   email address at Chubb.com?

22   A.  That's what the email shows.

23   Q.  Yep.  And then the email shows it also goes to another

24   person who is from from AppCentrica Ken Kitamura, I think.

25   Agreed?
```

```
 1   A.  Yeah, it shows that.

 2   Q.  And the subject is SOW for Discussion Tomorrow.  Do you

 3   see that?

 4   A.  I can see it.

 5   Q.  And do you understand SOW means statement of work?

 6   A.  Yes, I do.

 7   Q.  All right.  And the attachment is Arch, A-R-C-H, that

 8   stands for architect?

 9   A.  First time I see this email.

10   Q.  No.  I know it is.  I know it is.  I'm not --

11   A.  Okay.

12   Q.  I'm not pretending otherwise.  I'm just asking you what

13   it looks like, what it is.

14   A.  I can read arch.

15   Q.  Okay.  Arch PLD project, right?

16   A.  I don't know.

17   Q.  Okay.

18   A.  I would be guessing.

19   Q.  Well, can you read arch PLD, SOW?

20   A.  Yes.

21   Q.  All right.  Then go to Exhibit 16.

22   A.  16.

23   Q.  Yeah, please.

24   A.  Yes.

25   Q.  And you see that this, the front page of this document,
```

1    it is from AppCentrica?

2    A.  Yes.

3    Q.  Agreed?  And the title of the document is Chubb Arch PLD

4    Project, right?

5    A.  Yes.

6    Q.  And the title on the email was Chubb -- was Arch PLD,

7    SOW, right?

8    A.  Yes.

9    Q.  And the front page of Exhibit 16 says Statement of Work,

10   right?

11   A.  Yes.

12   Q.  And I know you're not there at the time, but this

13   document says Statement of Work from AppCentrica, correct?

14   A.  It does.

15   Q.  And then if you go to page 3 where it says Introduction?

16   A.  Yes.

17   Q.  Does it say, "The following document provides a

18   statement of work for the Evolution engagement in 2015 and

19   2016 between AppCentrica and Chubb Insurance Company of

20   Canada.  The focus of the work to be completed by

21   AppCentrica over the next two years will be the design and

22   development of the Evolution system for Australia."

23           Agreed?

24   A.  That's what it says.

25   Q.  And it goes on to say, "This is funded by the ARC

1    program, the project name is Arch PLD," same as on the front

2    page of the document, right?

3    A.   That's what it says, yes.

4    Q.   You do know that after your, after the merger, you do

5    know from your involvement in that, Zorica and AppCentrica

6    were working in Canada together, and you know that

7    AppCentrica -- I'm sorry -- and you know that Evolution

8    Canada was being transferred to Australia.

9            And you know that AppCentrica was working with

10   Chubb Canada for that project, right?

11   A.   The last part I didn't know.  I don't know.  I don't

12   have evidence.  You are showing me a document that describes

13   an SOW, but I did not know.

14   Q.   Is there anything in this SOW, Exhibit 16, that looks to

15   you to be not an authentic document of AppCentrica?

16   A.   What I can tell you is what I see in the document, has

17   an AppCentrica name and a logo.

18   Q.   Do you believe it to be an AppCentrica statement of

19   work?

20   A.   That's what it says.

21   Q.   Okay.  And when you look at the earlier email, 16A, you

22   agree that Rob Lokinger was transmitting to Zorica Todorovic

23   this statement of work.  And if you look at the Bates

24   numbers, the email is 6836, and the estimate of work is

25   6837.

1    A.  Yes, I can see.

2    Q.  And I will represent to you that this came to us in the

3    course of the litigation.

4    A.  I understand.

5    Q.  All right?  And do you have any reason to believe this

6    is a record that was kept by Chubb Canada regarding this

7    project?

8              MS. GODESKY:  Objection.  No foundation.

9              MR. HINDERAKER:  I didn't ask for his personal

10   knowledge.  I just asked him if he had reason not to believe

11   it from all the indicia on the documentation.

12             THE COURT:  I will sustain the objection as asked.

13   BY MR. HINDERAKER:

14   Q.  Looking at everything on this, looking at everything on

15   the documentation in terms of whether it appears to be

16   authentic or not, do you have any reason to think that it is

17   not?

18   A.  I was not involved in this activity.

19   Q.  I understand that, sir.  That wasn't my question.

20             My question is:  If you look at these documents on

21   their face, from, to, subject matter, logos, statement of

22   works, introduction, about a project that you know happened,

23   do you have any reason to believe that this is not authentic

24   records from Chubb Canada?

25             MS. GODESKY:  Objection.  No foundation, mis

```
 1    characterizes testimony.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  So what I can tell you is, you're

 4    showing me an email, and you are showing me a document that

 5    is clearly an attachment of that email.

 6    BY MR. HINDERAKER:

 7    Q.  Okay.

 8    A.  That says SOW.  I can agree that that is what you are

 9    showing to me.

10    Q.  And can you agree that it, from everything on the

11    document, it appears to be the true thing that Zorica got

12    from AppCentrica?

13    A.  I cannot comment beyond -- I cannot say anything more

14    than what I have already said is, you are showing me an

15    email and an attachment that was -- and I have in front of

16    me.

17              Now since I was not working with Zorica at the

18    time, I wouldn't have any additional information to --

19    Q.  And, sir, I'm not going to ask you for additional

20    information.  But we agree that the attachment, that the

21    attachment went with the email, right?

22    A.  Yes, we agree.

23    Q.  And we agree that Zorica was involved in a project.  We

24    agree that Zorica worked with AppCentrica.

25    A.  Yes.
```

```
1    Q.  And we agree that AppCentrica -- we agree that Chubb

2    Canada transferred Evolution Chubb Canada to Chubb

3    Australia.  Agreed?

4    A.  We agree that a copy of Evolution was taken from Canada

5    for Australia.

6    Q.  And that in Canada the consultancy that was being

7    worked, that was involved in that project was DWS?

8    A.  DWS was in Australia.

9    Q.  That's what I just said.  We agree that DWS was in

10   Australia.

11   A.  Yes.

12   Q.  And we agree that AppCentrica was in Canada.

13   A.  We agree AppCentrica was a consultancy in Canada, yes.

14           MR. HINDERAKER:  Your Honor, I offer these

15   exhibits as authenticated and as admissions.

16           MS. GODESKY:  There's no foundation, Your Honor,

17   and they're hearsay, unsigned documents.

18           THE COURT:  Sustained.

19   BY MR. HINDERAKER:

20   Q.  And now would you turn to Exhibit 900.

21   A.  900.

22   Q.  Please.

23   A.  Okay.

24   Q.  Who is A. Pavlenko at Chubb.com?

25   A.  If I remember correctly, Alex Pavlenko was a member of
```

```
 1    Zorica's team in Canada.
 2    Q.  And this email is dated January 14, 2016, right?
 3    A.  January 14, 2016, yes.
 4    Q.  And this is beginning of your time in terms of the
 5    integration of technologies, correct?
 6    A.  Yes.
 7    Q.  And the "to" is to Zorica Todorovic at Chubb.com.  Do we
 8    agree?
 9    A.  Yes.  Yes.
10    Q.  And do you know the cc's at Chubb.com?
11    A.  No.
12    Q.  Okay.  And the forward and the subject matter is re:
13    Work Manager code, Handover January 14th?
14    A.  Yeah, it says that.
15    Q.  And the work manager code was the element of Canadian
16    application called Evolution that was being handed over to
17    Australia, correct?
18    A.  I remember work manager code being a component of the
19    application.
20    Q.  Of the Evolution application.  I'm sorry.  I spoke over
21    you.  My bad.
22            You remember work manager being a component of the
23    Evolution application?
24    A.  Yes.
25    Q.  And you know that that component of the Evolution
```

```
1    application then was transferred to Australia?

2    A.  Not at that level of detail.  I would be able to tell

3    you that, as I mentioned earlier, that Evolution was the

4    starting point for the development, Evolution Canada as an

5    application was the starting point for the development of

6    Evolution Australia.

7    Q.  And do you assume, as I do, that the full Evolution

8    application then from Canada was transferred to Australia?

9    A.  I don't have the details behind it.

10   Q.  And these emails also include on them references to, "I

11   will speak to Martin."  And do you understand Martin is

12   Martin Sill at DWS Group?

13   A.  Where do you see --

14   Q.  On the first page, Zorica to Abad Dokht and another

15   person re:  Work Manager Handover.  "Thanks so much for the

16   constant updates, Alex.  I will speak to Martin and see

17   where we go from there"?

18   A.  Oh, I can see now.  Yes.

19   Q.  And you knew Martin as a DWS person because he was part

20   of the Drools analysis in Australia.

21   A.  Yeah, I know there was an architect called Martin at DWS

22   Australia.

23   Q.  All right.  Good.

24           And then the second page of the email at the top

25   references the APZ team.  Do you see that?
```

```
 1    A.  Yes.

 2    Q.  The APZ team is the Australian team, correct?

 3    A.  Yeah, that was a term referring to Asia Pacific zone.

 4    Q.  And then going back to the subject matter here, we're

 5    talking about a code handover of work manager.  Agreed?

 6    A.  That's the subject of the email.

 7    Q.  Okay.  And so then I know you're not on the document.  I

 8    know you weren't part of these communications.  My question

 9    is to you, Isn't this an authentic document of emails in the

10    course of doing, being, in the course of being employees for

11    Chubb on this subject matter?  Yes or no.

12    A.  I can see this is an email.

13    Q.  No, I didn't ask that.  I asked is this an authentic

14    email between Chubb Corporation representatives on this date

15    with this subject matter.  Yes or no.

16    A.  I didn't produce these email.

17    Q.  I didn't ask that question.  Looking at this email, is

18    this an authentic email between these representatives of

19    Chubb regarding this subject matter on that date?

20    A.  It looks authentic to me.

21    Q.  Thank you.

22              I move the admission of Exhibit 900.

23              MS. GODESKY:  Objection.  No foundation.

24              THE COURT:  Sustained.

25
```

```
 1    BY MR. HINDERAKER:

 2    Q.  Moving to the topic, just identifying people,

 3    Mr. Ghislanzoni.  Is David Gibbs somebody at Chubb that you,

 4    the name you recognize?

 5    A.  No.

 6    Q.  No?  How about Tony Zhang?  Do you recognize that name?

 7    A.  Sorry.

 8    Q.  Tony Zhang?

 9    A.  No.

10    Q.  When you were thinking about moving technologies away

11    from Blaze Advisor, did you ever consider using a manual

12    look-up table as a substitute for a rules engine?

13    A.  So when, when we looked at -- sorry.  Is the question

14    related to Blaze Advisor?

15    Q.  No.  It's related to your decisional process to look at

16    technologies in substitution of Blaze Advisor.  And as I

17    understand it, you had a goal which was to standardize

18    technologies, not eliminate technologies.  Is that fair?

19    A.  "Standardize" is a good term, yes.

20    Q.  All right.  And if you were causing the underwriters and

21    selling insurance to go back to the days of using a manual

22    look-up table, that would be eliminating technology, not

23    standardizing it, correct?

24    A.  I don't understand the question.

25    Q.  All right.  Well, let's see if I can refresh it with
```

```
 1    your deposition.

 2    A.  Okay.

 3    Q.  Go to page, if you go to page 53.

 4    A.  53?

 5    Q.  Well, I think we need to start on page 52 --

 6    A.  Okay.

 7    Q.  -- to give us some context.

 8          MS. GODESKY:  Objection, Your Honor.  He said he

 9    didn't understand the question, so I'm not sure why we're

10    going to a deposition.

11          MR. HINDERAKER:  To try to refresh his

12    recollection.

13          THE COURT:  All right.  Have him read it to

14    himself then.

15          MR. HINDERAKER:  So -- sure.

16    BY MR. HINDERAKER:

17    Q.  Why don't you start at page 52, and start at line 24,

18    through 6.

19    A.  Yes, I read.

20    Q.  Okay.  So I'll try to restate my question.

21          When you were considering, when you were

22    evaluating different options for decommissioning Blaze

23    Advisor, did you ever consider relying upon manual look-up

24    processes instead of rules engines?

25    A.  So we looked at the rules engine technology for
```

```
1    standardization.  We considered the significant investment

2    in time and money that was made, millions of dollars, many

3    days, weeks, months, worth of effort to implement those

4    rules.

5            A natural progression, the easiest path, the most

6    logical, was to replace one rules engine with another if and

7    where required.

8    Q.  Well, let me read what you said at the time of the

9    deposition.

10           "Question:  And as part of your evaluation of

11   different options upon decommissioning Blaze Advisor, did

12   your team ever consider relying on manual look-up processes

13   instead of a rules engine?

14           "No.

15           "Why not?"  Question.

16           "Answer:  Our target in the options and evaluation

17   was to standardize technology, not eliminate technology."

18           Did I read that right?

19   A.  That's correct.

20   Q.  Would you go to Exhibit 526, please.

21   A.  Yes.

22   Q.  Thank you.  And this is an email from Hamish Tonkin to

23   people, including yourself?

24   A.  Yes.

25   Q.  Russell Hodey as well.  And the attachment is -- I'm
```

1    sorry.

2              The subject is Changing Rules Engine Software.

3    A.  Yes.

4    Q.  And the attachment is Rules Engine Matrix.  Agreed?

5    A.  Yes.

6    Q.  And this is in May 2016.  This is that time frame when

7    there was some evaluation going on by yourself and your team

8    with respect to what to do with rules engine technology,

9    correct?

10   A.  That's correct.

11   Q.  And so then I'd like to go to the -- I'd like to go to

12   the attachment.

13             And I believe, Your Honor, this is in evidence

14   already.

15             If we go to the attachment, the rules engine

16   matrix.

17             This attachment represents criteria for

18   consideration to determine the type of rules engine that may

19   be adopted.  Agreed?

20   A.  Yes, this matrix represent a set of guidelines.

21   Q.  Okay.  And we looked at some of this before with

22   Mr. Pandey, but I want to look at a different part with you.

23   But for our context, solution number two includes using open

24   source technology.

25   A.  Yes, it says that.

1    Q.  Yes.  And then in solution number three includes or

2    references using vendor technologies, such as Blaze or Duck

3    Creek, right?

4    A.  Yes.

5    Q.  Okay.  I'd like to focus my questions with you to

6    solution number one.

7    A.  Yes.

8    Q.  And it's titled, Application Subcomponent Rules Engine

9    (internally developed).

10          Is the information in this first column the

11   consideration of the pluses and minuses of what's termed

12   hard coding the rules into the applications?

13   A.  Well, this matrix represents a set of guidelines for, to

14   be used as a starting point to design and architect an

15   application.

16   Q.  No quarrel.  My question was, as you considered the

17   different options and choices, solution number one is

18   considering, well, should we think about writing the rules

19   directly into the applications, what's called hard coding.

20          That's what solution number one is referencing,

21   correct?

22   A.  Yeah.  Hard coding is an interesting term.  It's -- I

23   will call it pro coding, professional coding.

24   Q.  All right.  Well, we can call it professional coding.  I

25   know you had that same issue -- we can call it professional

1      coding if you would like.

2              But this professional coding is when IT

3      professionals write the rules directly into the software,

4      into the application, right?

5      A.  Using programming language.

6      Q.  Of course.  Using programming language.  And in the

7      vernacular, people will call that hard coding.  Agreed?

8      A.  There is that general utilization of that term in that

9      respect.

10     Q.  Yeah.  And that's how I was using it.

11             And solution number one on this matrix is giving

12     the pluses and minuses of the considerations that follow if

13     one were to use programming language and a professional and

14     write the rules right into the application, right?

15     A.  This is very specific to these context that we were

16     evaluating, the Evolution context.

17     Q.  Good.  So then if we just look at solution number one,

18     what happens then under the factor atomic applicability,

19     what solution number one limits you to is the business rules

20     associated with the product or line of business are executed

21     in a single application.  That's true?

22     A.  That's what it says.

23     Q.  Mm-hmm.  And then let's just look at frequency of rule

24     modifications.  For solution number one, which I've

25     vernacularly calling hard coding, the frequency of rule

1    changes is less than once per quarter, per rule.  That's

2    what it says?

3    A.  That's what it says, yes.

4    Q.  And we can look at solution two and solution three, and

5    in each instance the frequency of rule modifications

6    improves.  Agreed?

7    A.  Yeah.  As you shift to the right, you consider more

8    frequency.

9    Q.  Yep.  And then scenario, the next heading, Scenario

10   Validation.  The business has no requirements to be able to

11   perform "what if" analysis on the existing book of business

12   or potential rule changes.

13            That's a limitation of the so-called hard coding,

14   right?

15   A.  Not necessarily.

16   Q.  That's what it says on this document.

17   A.  It just states that there wasn't a requirement to carry

18   out a what if analysis, not a limitation.

19   Q.  You are assuming that in the application it's not

20   necessary.

21   A.  Not necessary.

22   Q.  If it was necessary, would you do hard coding or use a

23   vendor or open source?

24   A.  It depends.

25   Q.  One or the other, but not hard coding?

1    A.  Professional programming, yeah.  Programming in our

2    language can be used to achieve the same goal as a rules

3    engine, if this is what you are inferring.

4    Q.  I am.  And then let's look at the number of rules on the

5    second page.

6             If we are doing the hard coding, not to exceed

7    100.  Is that what it says?

8    A.  That's what it says.

9    Q.  And if we are doing open source, not to exceed 400.  Is

10   that what it says?

11   A.  So second column is also -- yeah.  Open source, yes.

12   Q.  That's what I said.

13   A.  That's the one, 400, yes.

14   Q.  And then on the vendor, Blaze or Duck Creek, number of

15   business rules is estimated as large.  And it goes on to

16   talk more about each product, a hundred plus calculations

17   and so on.

18             That's what the document says for that, correct?

19   A.  Yes, that's what the document says.

20   Q.  That was the analysis at the time.

21   A.  Was a set of guidelines.

22   Q.  Understood.  I know.  I know.  I just wanted to know

23   what was being thought at the time and said.

24             I don't know if you know this, but let me ask.  Do

25   you know how long -- okay.  I won't -- I won't ask it.  I

1    will find the information in the RFI, and that's well before

2    your time.  Good.

3             So I want to, I want to thank you for your time,

4    and I just want to, I guess, I just want to, I guess, sum up

5    with, with this.

6             You said -- where did I have that note?

7             There was a time in September of 2016 where you

8    knew that the relationship with FICO had, I think your words

9    were, severely deteriorated.  Do you recall that?

10   A.  In 2016.

11   Q.  September of 2016.

12   A.  Yeah.  2016 I was, I was informed, I can't remember the

13   exact month, but I was informed by my superior that a

14   dispute had started between FICO and Chubb.

15   Q.  And that being a fact, Blaze Advisor was not removed

16   from all of the applications until April 2020, right?

17   A.  The last application, the last component, that is

18   correct.

19   Q.  That's right.  And then when you were doing an

20   evaluation to integrate technologies, there was a mention in

21   your, you mentioned that ACE American had one application,

22   and that one application was running ODM, right?

23   A.  We had more than one application running ODM.

24   Q.  Maybe I misspoke.  In terms of looking at rules engine

25   technologies for the selling of insurance, ACE American had

1    one application running ODM.

2    A.  I don't remember the specifics of that.

3    Q.  All right.  And then ACE American did have one small

4    license with FICO that had nothing to do with -- nothing to

5    do with rules engine technology in connection with selling

6    insurance?

7    A.  That is correct.

8    Q.  Thank you.

9    A.  Thank you.

10                THE COURT:  Hang on a second.

11                MR. HINDERAKER:  No further questions.

12                THE COURT:  Thank you, Mr. Hinderaker.

13                Ms. Godesky, do you have some direct?

14                MS. GODESKY:  I do.

15                THE COURT:  All right.  Just to let you know the

16   plan, we'll go about ten minutes and then take our afternoon

17   break.

18                MS. GODESKY:  Terrific.

19                Your Honor, I'm told we need to switch the system.

20                THE COURT:  Yep.

21                MS. GODESKY:  Thank you.

22                            DIRECT EXAMINATION

23   BY MS. GODESKY:

24   Q.  Good afternoon, Mr. Ghislanzoni.

25   A.  Good afternoon.

1   Q.  If you meet someone new in a professional setting, what

2   company do you say you work for?

3   A.  Chubb.

4   Q.  You testified during examination with Mr. Hinderaker

5   that you are the chief enterprise architect at Chubb,

6   correct?

7   A.  I am.

8   Q.  Very briefly, what does it mean to be an architect at

9   Chubb?

10  A.  One way to describe being an architect, an IT architect,

11  could be drawing an analogy with a construction architect.

12  So a construction architect defines a blueprint of a

13  building and what materials are going to be used to create

14  the building.

15          In IT, an IT architect, enterprise architect,

16  defines the blueprint of the IT system of an enterprise and

17  which technologies, which software products to be used.

18  Q.  In what country are you currently working?

19  A.  In England.

20  Q.  And you, you mentioned during questioning from

21  Mr. Hinderaker that your responsibilities are global.  How

22  many people report to you?

23  A.  Over 100 worldwide.

24  Q.  And the jury has heard testimony from a Mr. Ramesh

25  Pandey, another Chubb architect.  How do his

1   responsibilities relate to yours?

2   A.  So Ramesh Pandey is the chief architect for

3   North America, and he is part of my team.

4   Q.  Can you give the jury a sense of your day-to-day

5   responsibilities at Chubb as the chief enterprise architect?

6   A.  Sure.  So architecture is a function, the function of

7   leading provides a number of services to the organization.

8   One is the blueprint I've described.  Another one is

9   technology guidance, technology evaluation and selection,

10   and supporting the engineers in creating applications for

11   the enterprise and implementing and making them successful.

12   Q.  You mentioned the engineers.  Are those the folks who

13   write and code?

14   A.  Yes, the coders.

15   Q.  Now, I just want to make sure the chronology of your

16   employment is clear.  As of year end 2015, what company were

17   you working for?

18   A.  ACE.

19   Q.  And what was your position at ACE at the time?

20   A.  I was the chief architect for the international division

21   of ACE.

22   Q.  In what year did you first join ACE?

23   A.  I joined in 1999.

24   Q.  Were all of your roles at ACE between 1999 and 2015 in

25   the technology space?

1134

```
1    A.  Yes, technology space.

2    Q.  And in what country were you working for ACE?

3    A.  In England.

4    Q.  Across your entire professional history, how many years

5    have you been working in technology and architecture?

6    A.  Around 30 years.

7    Q.  And do you have a college degree?

8    A.  Yes.

9    Q.  What is your degree in?

10   A.  It's in accounting and software engineering.

11   Q.  And where did you obtain that degree?

12   A.  In Italy.

13   Q.  Okay.  I want to put up on the screen, if we could,

14   Defendants' Demonstrative 23.  Have you seen this before,

15   Mr. Ghislanzoni?

16   A.  Yes.

17   Q.  And did you help create it?

18   A.  Yes.

19   Q.  And what are you trying to show with these two pictures?

20   A.  It's another analogy.  So on the right-hand side, it's a

21   blueprint of an application.  I think you have seen

22   something like this this week, last week.  Every box

23   represents a component.  Every line shows how a component

24   connects with another component.

25            Now, the analogy with LEGO is that all of these
```

1    components come together.  They are assembled together.  In

2    LEGO, you have LEGO blocks that can be attached and composed

3    together to create an object.  They all have an analogous

4    function.

5    Q.  When you talk about components of a computer

6    application, is that generally software products?

7    A.  Yes.

8    Q.  Are all the different components of a computer

9    application usually the same size, or can they differ?

10   A.  No.  They differ in size and complexity.

11   Q.  How about importance?  Do they all have the same

12   importance, or does that differ too?

13   A.  Also importance.  There was a good example that

14   Mr. Pandey produced where he was talking about the rating

15   engine being Duck Creek being the critical component of an

16   application.

17   Q.  Can you give the jury a sense of how many software

18   products or individual components are found in a typical

19   computer application at Chubb?

20   A.  Yeah.  I would say probably on average 20 to 30.

21   Q.  So turning to ACE's IT infrastructure before the

22   acquisition, as of early 2016, right before the acquisition,

23   approximately how many different computer applications was

24   ACE using?

25   A.  Just over 1,000.

CASE 0:16-cv-01054-DTS  Doc. 1

1136

1   Q.  And how many of those applications applied rules in some

2   way?

3   A.  All of them.

4   Q.  Approximately, how many different software products was

5   ACE using at the time?

6   A.  Hundreds.

7   Q.  And approximately how many different in-house IT

8   professionals did ACE have around the time of the

9   acquisition?

10  A.  Well over a thousand.

11  Q.  I want to focus on decision management software or rules

12  software.

13      Did you work with rules-based software products

14  during your years at ACE?

15  A.  Yes.

16  Q.  And in very simple terms, how would you describe rules

17  or decision management software?

18  A.  Yeah, rules management software is a software products

19  that allows, provides typically a user interface, could be a

20  web user interface, where rules are described.  And they are

21  stored in a repository.  And what happens with this, thanks

22  to the software, is programming language is generated from

23  the rules.

24      So ultimately what is executed on the, on the

25  servers is programming language.

1   Q.  And if we can put up on the screen Defendants'

2   Demonstrative 4.  This is one we've seen before.  But what

3   are we looking at here, Mr. Ghislanzoni?

4   A.  They are all software products that embed rules

5   capabilities.

6   Q.  And when did rules-based software products first become

7   available?

8   A.  I would say, my experience, where we started seeing

9   adoption of these type of products were in the 90s, 1990s.

10  Q.  Which of the software products on Defendants'

11  Demonstrative 4 are you personally familiar with?

12  A.  All of them.

13  Q.  Which, if any, of these products can be used for free?

14  A.  Drools.

15  Q.  And I think you mentioned with Mr. Hinderaker that

16  that's because it's open source software.  What does that

17  mean?

18  A.  So open source software is software that developed by

19  software engineers who decides to donate it to the world

20  through the internet.

21  Q.  When it comes to the process of applying rules first at

22  ACE and now at Chubb, is there any material difference in

23  your mind between these programs on Defendants'

24  Demonstrative 4 in terms of functionality?

25  A.  So I would group this in two categories.  The four at

1   the top, Red Hat, FICO, IBM and Drools, are pure rules

2   engine.  They do one thing only.  The rules, they are, you

3   create rules and generates code.

4           SAS is an analytic, analytical platform.  It

5   specializes in analyticals, predictive models environment.

6   Pega is a business process management, so is a different

7   type of software product where you describe a process flow,

8   and in there you can also define rules.

9   Q.  Is there any difference in your mind, material

10  difference, in terms of the efficiency of these programs and

11  running rules?

12  A.  No material.

13  Q.  At the time that ACE acquired Chubb in 2016, what

14  rules-based software products was ACE using?

15  A.  So at ACE we had pure, pure rules engine was IBM

16  operation decision manager.  BPM we had Pega, and we also

17  had SAS for analytics.

18  Q.  And were you also running Blaze in one computer

19  application?

20  A.  In one computer application in North America was running

21  Blaze Advisor.

22  Q.  The jury has heard testimony from Mr. Russ Schreiber

23  characterizing ACE as a small client for FICO; is that true?

24  A.  We only had one application using Blaze Advisor.

25  Q.  Okay.

```
 1                    THE COURT:  Are you at, are you at a convenient
 2      break?
 3                    MS. GODESKY:  Sure.
 4                    THE COURT:  Members of the jury, we'll take our
 5      afternoon break.  Be back here at 15 minutes after 3:00.
 6      Thank you.
 7                    THE CLERK:  All rise for the jury.
 8                              (Recess taken)
 9      3:31 p.m.
10                             IN OPEN COURT
11                            (JURY PRESENT)
12                    THE COURT:  Go ahead and be seated.
13                    Go ahead.
14                    MS. GODESKY:  Thank you.
15      BY MS. GODESKY:
16      Q.  Mr. Ghislanzoni, before the break we were talking about
17      ACE's license for Blaze.  Do you remember that?
18      A.  Yes.
19      Q.  Okay.
20      A.  Yes.
21      Q.  So I'd like to take a look at Defendants' Exhibit 39.
22      A.  Okay.
23      Q.  And is this the license agreement that ACE had with FICO
24      for Blaze before the acquisition?
25      A.  Correct.
```

1    Q.  In what year was the license obtained?

2    A.  2006.

3           MS. GODESKY:  And, Your Honor, is this being

4    published?

5           THE COURT:  Not yet.

6           MS. GODESKY:  Okay.  I'll offer Defendants'

7    Exhibit 39.

8           MR. HINDERAKER:  Subject to the earlier motion

9    practice, Your Honor, but no objection.

10          THE COURT:  Okay.  Defendants' Exhibit 39 is

11   received.

12   BY MS. GODESKY:

13   Q.  Mr. Ghislanzoni, what was the scope of this license?

14   A.  One application.

15   Q.  What does that mean?

16   A.  That we purchase the use of FICO Blaze Advisor, license

17   for one application called common rules and the license were

18   perpetual in nature.

19   Q.  Perpetual?

20   A.  Perpetual.

21   Q.  Meaning forever?

22   A.  Forever.

23   Q.  Okay.  As the chief architect at ACE responsible for

24   technology and computer applications, in this period leading

25   up to the acquisition, was ACE looking to increase or

1    decrease or stay the same in terms of its use of Blaze?

2    A.  No increase on use of Blaze at ACE.

3    Q.  You also mentioned that ACE had a license to use IBM's

4    ODM product; is that right?

5    A.  Yes.

6    Q.  Approximately, how many computer applications at ACE

7    were using ODM before the acquisition?

8    A.  I remember three primary applications.

9    Q.  Did ACE ever use ODM or Blaze as a stand-alone software

10   product, or were they always integrated into computer

11   applications?

12   A.  Always integrated in other applications.

13   Q.  So you said before the acquisition there were a

14   thousand, about a thousand computer applications at ACE,

15   correct?

16   A.  Yes.

17   Q.  And so we have Blaze in one of them, and then about

18   three had ODM?

19   A.  Yes.

20   Q.  What was ACE's primary tool before the acquisition for

21   running business rules in the process of selling insurance?

22   A.  So primary one was to use programming languages like

23   Java to develop applications.

24   Q.  And that's the process of using software engineers to

25   write code themselves?

1    A.   Yes.  What I refer to as professional coding.

2    Q.   And you resisted the label "hard coding" earlier.  Why

3    is that?

4    A.   Hard coding has a very specific connotation.  It is when

5    you store data attributes in the code.  So that's the very

6    specific, but generally speaking, people tend to refer to as

7    writing code.  It is factually incorrect in my view.

8    Q.   Why didn't ACE use rules-based software products more

9    widely after it became available starting in the 1990s?

10   A.   So based on the pilot of rules that we carried out, we

11   didn't identify a real advantage compared to professional

12   coding, writing coding.  So we therefore decided to pursue

13   the programming path instead.

14   Q.   Now we've heard from FICO witnesses that Blaze can

15   process rules in sub milliseconds.  And you've heard that

16   because you've been here during trial.

17             Is that your experience with Blaze?

18   A.   No, it's not my experience.  In fact we saw a chart

19   earlier that was showing seconds for realtime, for example.

20   Q.   And you talked about batch mode with Mr. Hinderaker,

21   right?

22   A.   Yes.  And that one was referred to as minutes to hours,

23   to even to days.

24   Q.   And just to remind us, what is batch mode?

25   A.   Batch mode is when you process the rules, typically at

1    the end of a day or a week or a month, as opposed to an

2    interactive realtime activity.

3    Q.  In your world what does latency mean?

4    A.  Latency means, is a delay in communication between two

5    components in an application.

6    Q.  Are there circumstances in your experience where adding

7    a rules-based software product like Blaze instead of having

8    engineers write their own code can introduce latencies or

9    delays into your IT infrastructure?

10   A.  Yes.  So an example is, and we saw a diagram last week

11   where the rules engine was separate from the application,

12   meaning they were sitting on two different servers.  So

13   therefore the communication between the two takes time.  We

14   call that latency.

15   Q.  How did it work at Chubb?  Were the rules products on

16   separate servers than the application?

17   A.  Yeah, that was the standard implementation.

18   Q.  If you want to use Blaze in a computer application, do

19   you need software engineers who are trained in Blaze?

20   A.  That has been our experience.

21   Q.  And has it been easy or difficult in your experience to

22   find software engineers who are trained to do so?

23   A.  You're referring to Blaze?

24   Q.  Yes.

25   A.  Yes, we couldn't find a lot of talent in the market.

1    Q.  You couldn't find?

2    A.  We could not.

3    Q.  Now we've heard testimony from FICO's witnesses about

4    how Blaze can be use in a way that business people, the

5    underwriters at an insurance company, can change and write

6    rules themselves.  Has that been your experience at ACE and

7    Chubb?

8    A.  Yeah, my experience at ACE and then Chubb has been that

9    we tried that model, but it didn't work out.  There was a

10   technical knowledge background that was required to be able

11   to use these type of tools, and therefore IT took the full

12   responsibility.

13   Q.  In your work as a software -- as an IT architect, have

14   you encountered other rules software programs that have

15   similarly claimed that their products can allow business

16   people to write rules?

17   A.  Yes.  I mean, I can tell you my direct experience with

18   Pega.  When we first met with Pega as a company, they had

19   the same type of projection of how their tool would be able

20   to be used by business users.  Reality is that IT needed to

21   take on the responsibility because of the technical

22   technology background required.

23   Q.  Okay.  Now you testified earlier that you were involved

24   in integrating the technology from ACE and Chubb, right?

25   A.  Yes.

1    Q.  At a high level, what was your role?  What were you

2    doing day-to-day as part of that work?

3    A.  So first and foremost, at the beginning of 2016, we

4    formed a working group.  We called it TDA, Technical Design

5    Authority, cross-divisional meaning legacy ACE, legacy

6    Chubb.

7              And what we did was we, on a day-to-day basis, we

8    were selecting which technologies we wanted to analyze and

9    assess and compare, and we had hundreds to assess and

10   compare.

11   Q.  And as part of your work on that comparative process,

12   did you come to have a general familiarity with the computer

13   applications and technology that was being used at the time

14   at Chubb?

15   A.  Yes.

16   Q.  So as of the acquisition, and you're starting the

17   integration work, were ACE and Chubb using all of the same

18   technologies, or were they different?

19   A.  There were some similarities, and there were some

20   differences as well.

21   Q.  Did you have any responsibility, Mr. Ghislanzoni, for

22   reviewing license agreements and determining whether

23   software could be used or not after the acquisition?

24   A.  No direct responsibility.  The vendor management office

25   and the legal teams had that responsibility.

1    Q.  When you looked at both organizations together, after

2    the acquisition closed, approximately how many rules were

3    being run, you know, across the entire combined

4    organization?

5    A.  We had thousands of applications, and over 2,000, and we

6    had millions of rules running.

7    Q.  And approximately how many of those millions of rules

8    were running through the Blaze software in the legacy Chubb

9    applications?

10   A.  Tens of thousands.

11   Q.  Now, when you started your integration plan, was the

12   idea that you would continue to use software engineers to

13   write code themselves in certain applications?

14   A.  Yes.

15   Q.  And did you also plan to select a preferred rules

16   software vendor?

17   A.  Yes, as a standard for the organization.

18   Q.  In the initial period after the ACE acquisition, what

19   was the preliminary thinking in terms of what the preferred

20   rules vendor would be?

21   A.  The initial thinking, beginning 2016, was that we would

22   have adopted FICO Blaze Advisor.

23   Q.  Was there ever a final decision to select Blaze as the

24   preferred rules software vendor?

25   A.  No.

1    Q.  Now, you testified earlier that in 2016 you found out

2    about a dispute between Chubb and FICO, correct?

3    A.  Yes.

4    Q.  What role, if any, did the dispute with FICO play in

5    Chubb's ultimate decision regarding a preferred rules

6    software vendor?

7    A.  It played a very important decision because when we

8    assess the technology, we assess the technology from a

9    functionality standpoint, from a technical, security, but

10   also from availability of expertise and, most importantly,

11   the relationship between vendor of a software product and

12   the company.

13          So a dispute was translating into alteration of

14   that relationship, therefore a big risk for the enterprise.

15   Q.  What do you mean by that, a big risk by the enterprise?

16   A.  Yeah.  So not being supported by a vendor that, of the

17   technology that you are running means in case of problems

18   not having support, and that could have an impact on to the

19   Chubb business.

20   Q.  What was the policy at Chubb after the dispute with FICO

21   arose regarding whether and how Chubb could continue to use

22   Blaze?

23          MR. HINDERAKER:  Objection.  Lack of foundation.

24          THE COURT:  Overruled.

25          THE WITNESS:  So when the dispute started, my

1  direct managers communicated that we needed to take the

2  following direction.  We needed to reconsider our strategy

3  for the standards of business rule management system.

4  BY MS. GODESKY:

5  Q.  What, if any, policy or directive was there regarding

6  continued use of Blaze?

7  A.  So as part of that was not to expand the use of Blaze

8  Advisor.

9  Q.  Was there any directive or policy regarding continuing

10  to use Blaze in the applications that already had Blaze in

11  them?

12  A.  Yes, the direction given, the direct given was not to

13  expand.  Continue to maintain the applications that are

14  using Blaze Advisor.

15  Q.  From the perspective of an architect, how do you

16  generally measure whether use of a software product is

17  expanding?

18  A.  Typically an expansion of user software product is when

19  you use the same software product to create new

20  applications.

21  Q.  Was Blaze ever added to any ACE computer applications

22  after the acquisition?

23  A.  No.

24  Q.  To your knowledge, were any ACE underwriters given

25  access to applications, including Blaze?

1    A.  Not to my knowledge.

2    Q.  Initially after the ACE acquisition, what rules software

3    product was formally identified as the preferred vendor?

4    A.  IBM ODM.

5    Q.  And what did it mean to select IBM ODM in that period of

6    time?

7    A.  It meant positioning IBM ODM.  It meant that if there

8    was a need to develop an application using a rules engine,

9    IBM ODM would have been the technology of choice.

10   Q.  I want to show you Exhibit P511, which is already in

11   evidence.

12              Mr. Ghislanzoni, do you recognize this document?

13   A.  Yes.

14   Q.  And if we could go to page 7.

15   A.  Yes.

16   Q.  I should ask.  This technology tool summary evaluation,

17   were these analyses created at your direction?

18   A.  My team created these views.

19   Q.  And were you supervising this process?

20   A.  Yes, I was overseeing the entire process.

21   Q.  Who created this chart?

22   A.  This one was created by Hamish Tonkin.

23   Q.  Was Mr. Tonkin a legacy ACE or a legacy Chubb employee?

24   A.  Legacy Chubb.

25   Q.  Now we've seen earlier in the trial that as of this

1    document, you can see the chart, right, and there's a total

2    score of IBM ODM versus Blaze.

3              Do you see that in the yellow and the green?

4    A.  Yes.

5    Q.  How would you characterize the difference between those

6    two scores, the 1.92 and the 2.14?

7    A.  They are very close.  When we do this spider, it's

8    called spider diagram, this chart, and the target is 2.  So

9    1.92 and just over 2, they are good scores.

10   Q.  There's a subcategory here for vendor.  Do you see that?

11   A.  Yes.

12   Q.  What does that category take into consideration?

13   A.  That category takes into consideration the profile of

14   the vendor, so means their presence, geographical presence

15   in the world, their footprint in terms of customer base.

16   Those I would say two primary components.

17   Q.  There's also a subcategory for Chubb landscape impact.

18   What does that mean?

19   A.  That is a score that's related to number of applications

20   using a technology in the overall IT landscape.

21   Q.  And Blaze was rated higher than ODM in terms of the

22   Chubb landscape impact, correct?

23   A.  Correct.

24   Q.  Why was that?

25   A.  Because we had more Blaze Advisor based applications

1   than ODM.

2   Q.  How can you reconcile the fact that Blaze scored higher

3   on this chart than IBM ODM with your testimony earlier that

4   you don't think there's any material functional differences

5   between these software programs?

6   A.  So this chart was a work-in-progress.  So it was a view

7   produced by Hamish Tonkin, brought to the technology design

8   authority meeting for review and discussion.  I disagreed

9   with this view being accurate because it was not truly

10  representing the similarities of the two products, based

11  upon our requirements at Chubb.

12  Q.  Do you have an understanding of why Blaze outscored ODM

13  in this particular chart in the functional category?

14  A.  So Blaze for sure had more features than ODM at the

15  time.  However, when I remember when we looked at the

16  scoring, there were certain capabilities like automated

17  import of rules from SAS, which we did not require at the

18  new Chubb, that was included in the scoring.  That was

19  increasing the score for Blaze, and that needed to be

20  changed.

21  Q.  And Mr. Tonkin wrote, "Blaze is functionally rich and

22  has built in modules for integration."  Do you see that?

23  A.  Yes.

24  Q.  And then it says, "ODM can perform the basic rules

25  engines tasks but requires custom development in large

1    number of cases."  Do you see that?

2    A.  Yes, and I disagreed.

3    Q.  Why do you disagree?

4    A.  Because it's not my experience.

5    Q.  With these software products?

6    A.  Yeah, when we looked at ODM and Blaze, both products had

7    similar capabilities.

8    Q.  Now Mr. Tonkin also wrote that, Blaze, quote, "is used

9    widely in legacy Chubb."  Do you see that?

10   A.  Yes.

11   Q.  Would you characterize that as an accurate statement

12   across the whole architecture enterprise?

13   A.  No.

14   Q.  Why not?

15   A.  The way I would look at that term would be probably the

16   intention was, is used within the context of use of rules

17   engines, is the most used, but very different from within

18   the application landscape.

19   Q.  And how many of Chubb's overall computer applications

20   incorporated Blaze as of early 2006, approximately?

21   A.  It was less than 20.

22   Q.  We can take that down, Vanessa.  Thank you.

23             So you were asked questions by Mr. Hinderaker

24   about the use of Blaze in the Evolution application.  Do you

25   remember that?

1    A.  Yes.

2    Q.  Based on your understanding of the legacy Chubb IT

3    infrastructure, was Blaze used before -- was Blaze used in

4    the Evolution application in Canada?

5    A.  So Evolution Canada was making use of Blaze as a

6    software, yes.  That's correct.

7    Q.  Was Blaze used after the acquisition in the Evolution

8    application in Australia?

9    A.  No.  We utilized ODM for Evolution in Australia.

10   Q.  Were there conversations at Chubb in spring 2016 after

11   the acquisition about potentially adding Blaze to Evolution

12   Australia?

13   A.  The original intention was to take the entire technology

14   stack, meaning all the technology of Evolution Canada, and

15   use it in Australia.  That was the original intention.

16   Q.  Did that happen?

17   A.  No.

18   Q.  Why not?

19   A.  Because of the dispute I had to instruct Russ Hodey and

20   the team in Australia to adopt ODM, informing them that we

21   needed to -- we couldn't have adopted Blaze because of the

22   dispute.

23   Q.  Now, Mr. Ghislanzoni, there's been a lot of references

24   to these ChEAR spreadsheets during this trial.  Do you have

25   a general familiarity with what they are?

1     A.  Yes.  They used to be used.  No longer exist.

2     Q.  As the chief enterprise architect of the combined

3     organization, would you ever rely on a ChEAR spreadsheet to

4     tell you definitively what technology is in use and what

5     technology is not?

6     A.  No.  The purpose of the ChEAR spreadsheet was to have a,

7     a collection of applications that were in the environment,

8     but also application that were potentially going to be

9     created.

10    Q.  Okay.  I'd like to put up Plaintiff's Exhibit 517, if we

11    could.  Thank you.

12              Do you remember looking at this document,

13    Mr. Ghislanzoni?

14    A.  Yes.

15    Q.  Do you see how there's a column that says number of

16    users, and then it's divided into business and technical?

17    A.  Yes.

18    Q.  And then there's counts of the number of business users,

19    right?

20    A.  Yes.

21    Q.  Is that a count of the number of business users who are

22    using applications using Blaze, or is it a count of the

23    number of people who are actually going in and using Blaze,

24    the software product?

25    A.  It is the users of the application.

1    Q.  Okay.  And then if we can look at the whole chart again.

2         You were also asked questions about the number of

3    rules and transactions that were processed by Blaze,

4    according to this chart, right?

5    A.  Yes.

6    Q.  Based on your decades of experience as an architect at

7    insurance companies, could approximately the same number of

8    rules and transactions have been processed by rules that

9    were coded by software engineers?

10   A.  Yes.

11   Q.  How about by rules that were run by other software

12   products like ODM or Red Hat Decision Manager?

13   A.  Yes.

14   Q.  We can take that down.  Thank you, Vanessa.

15        So you testified earlier that by 2020 Blaze had

16   been removed from the last computer application at Chubb,

17   correct?

18   A.  Correct.

19   Q.  Why did you decide to remove Blaze from all of Chubb's

20   systems in 2019 and is 2020?

21   A.  Yeah, towards the end of 2018, beginning of 2019, it was

22   clear that the, because of the dispute, our relationship was

23   heavily damaged, and as such it was representing a

24   significant risk to the enterprise.

25        So we were forced to make a difficult decision to

CASE 0:16-cv-01054-DTS  Doc. 1182

1156

1   recreate all of those rules that we had spent a significant

2   amount of dollars and time to create in Blaze, to recreate

3   them in another technology.

4   Q.  Excuse me.  How long did it take to remove from a

5   software program like CSI Express the Blaze rules?

6   A.  It took months.  And the reason why it's taking this

7   long is, you saw the numbers, thousands of rules, complex.

8   So think in terms of every rule has to be recreated in a

9   different software product, and we chose Drools.

10          All of these rules need to be tested.  The

11  behavior of the application has to be validated.  So we

12  needed to be certain that the application with the migrated

13  rules was behaving in exact same way as before, when it was

14  running Blaze.

15          Once all of that is done, then you can go live.

16  All of these efforts takes many weeks.

17  Q.  As the chief architect at Chubb, do complaints and

18  concerns about the IT infrastructure regularly make their

19  way to you?

20  A.  Yes.

21  Q.  Since you removed Blaze from all the computer

22  applications at Chubb, has anyone ever raised with you any

23  complaints or concerns about speed or efficiency?

24  A.  No, no complaints.

25  Q.  Has anyone raised with you any complaints or concerns

1    about technology problems generally in those computer

2    applications?

3    A.  No.

4    Q.  Now, does Chubb currently have a preferred rules

5    software product that it's using?

6    A.  That's correct.

7    Q.  Which one?

8    A.  It's called Drools and most specific Red Hat Decision

9    Manager, which is a distribution of Drools.  What it means

10   is Red Hat, which is also contributor to the open source,

11   decided to provide a supported version, which means they

12   download the open source.  They test it.  They check for

13   vulnerabilities, risks.

14          They check the performance, and then they provide

15   it to a company like Chubb at a price and so that the

16   company like Chubb can be certain that the product is tested

17   and is secure.  But also if there was a problem with the

18   software, Red Hat, as a vendor, would be there to support

19   us.

20   Q.  Why did Chubb switch from IBM's ODM product as the

21   preferred vendor to Drools distributed by Red Hat?

22   A.  It's linked to this IT strategy that we formulate in

23   2018.  In 2018 we decided that it was the right time to

24   embrace open source fully, and therefore we looked at

25   different technologies that were available in the open

1   source community.  And Drools was a good one for us to adopt

2   at that time.

3   Q.  Were you involved in discussions regarding the efforts

4   to obtain the Red Hat license for the combined ACE/Chubb

5   entity?

6   A.  I was.

7   Q.  How did you feel at the time about having to find a new

8   rules software license for the computer applications that

9   were running Blaze at the time?

10  A.  I wasn't happy.  Neither of my colleagues were happy

11  because we were forced to do it.

12  Q.  As the chief enterprise architect, do your

13  responsibilities include overseeing budget concerns relating

14  to software investments?

15  A.  Yes.

16  Q.  When you set out to obtain a replacement rules software

17  license, did you have a dollar range in mind for what you

18  would be willing to pay for the replacement rules software

19  from Red Hat?

20  A.  Well, at the time I thought that possibly having a

21  budget of a million dollar would have been appropriate,

22  given the usage of rules at Chubb.

23  Q.  Now is Chubb currently paying to access Drools?

24  A.  Yes, we are paying Red Hat.

25  Q.  And are you familiar with the amounts that Chubb has

```
 1    paid for the Drools license?
 2    A.  Yes.  I remember we paid for the first year was just
 3    over $400,000.  And then we did a contract, a three-year
 4    contract after that, which was just over a million.  In
 5    total, in four years we spent around $1.5 million.
 6    Q.  Approximately, how many computer applications are used
 7    today at the combined ACE/Chubb entity?
 8    A.  Using Red Hat?
 9    Q.  No.  Generally how many are running?
10    A.  Oh, we have around 3,000 applications now.
11    Q.  And do they all run rules in one way or another?
12    A.  They all have rules.
13    Q.  And how many of those approximately 3,000 applications
14    are using a rules-based software product like ODM or Drools?
15    A.  Oh, less than one percent.
16    Q.  And how are you rules run in all of the other
17    applications?
18    A.  It's -- the rules are in, written as using a programming
19    language.
20    Q.  By the software engineers?
21    A.  By the software engineers.
22    Q.  Can you think of an example where Blaze was replaced in
23    a computer application with code written by software
24    engineers?
25    A.  Well, Evolution is a good one, Canada, because when we
```

1   decided to -- we were forced to remove Blaze, we coded the

2   rules using programming language.  There was an initial

3   component already in the application that software engineers

4   had developed.  So we extended that component that was

5   developed by our software engineers.

6   Q.  Are you talking about Evolution in Canada?

7   A.  Evolution Canada, yes.

8   Q.  Thank you.  The jury heard Mr. Wachs of FICO testify by

9   video on Friday that someone at Chubb told him that Blaze

10  allowed Chubb to do in one afternoon something that would

11  normally take months and hundreds of thousands of dollars if

12  done by IT.

13          Do you remember hearing that testimony?

14  A.  I do.

15  Q.  Based on your experience as the chief architect at two

16  insurance organizations, did you ever observe Blaze allowing

17  Chubb to do in one afternoon what otherwise would have taken

18  months and hundreds of thousands of dollars to do?

19  A.  Never experienced that.

20  Q.  Did anyone at Chubb ever suggest to you that Blaze had

21  so dramatically improved their ability to run rules in

22  computer applications?

23  A.  No.

24  Q.  Now, the jury has also heard some testimony about the

25  concept of rate of adoption of technology.  What does that

1    refer to?

2    A.  So rate of adoption is, of technology, it describes a

3    scenario where technology adoption is expanding.  So it's,

4    the utilization, it's growing.  And it's growing, and it can

5    grow at different speeds obviously.

6    Q.  From the perspective of a technology architect, if a

7    rules engine could allow an insurance company to do in an

8    afternoon what it would normally take months to do, what

9    would you expect to see in terms of the rate of adoption?

10   A.  To grow pretty fast, if that was possible.

11   Q.  And what's your understanding of the rate of adoption of

12   rules software at the combined ACE/Chubb entity?

13   Approximately what percentage of the computer applications

14   are running rules?

15   A.  Using a rules engine?

16   Q.  Yes.

17   A.  Less than one percent, so very low rate of adoption.

18           MS. GODESKY:  Thank you.  I have no further

19   questions right now.

20           THE COURT:  Mr. Hinderaker, any recross?

21           MR. HINDERAKER:  Yes, please.  Thank you.

22                    RECROSS-EXAMINATION

23   BY MR. HINDERAKER:

24   Q.  Hello again.

25   A.  Hello.

1  Q.  Before the acquisition in 2016 you were with ACE

2  Limited, correct?

3  A.  Yes.

4  Q.  And your responsibilities were international?

5  A.  International.

6  Q.  And your international responsibilities did not include

7  the United States.

8  A.  That's correct.

9  Q.  And for the period of time from 20 -- from 2006 to the

10  acquisition, is it fair to say that you had no conversations

11  with anybody at Chubb Limited, whether it was Mr. Sullivan,

12  Owen Williams, Henry Mirolyuz, about their experience using

13  Blaze Advisor in connection with selling specialty

14  insurance?

15  A.  I did not know those individuals.

16  Q.  That's my point.  And in 2017, then, your

17  responsibilities became global and -- but somebody else,

18  Mr. Pandey, is responsible for North America.

19  A.  In my team.

20  Q.  Yes.  So you don't have day-to-day contact with the

21  people from either legacy Chubb -- well with legacy Chubb or

22  combined Chubb who are responsible for maintaining and using

23  and operating the applications that contain Blaze Advisor in

24  connection with selling insurance, correct?

25  A.  Would you, would you mind asking the question again?

```
 1   Q.  That was so hard to get out, I don't know.
 2         My point was that given your roles, you do not
 3   have day-to-day communications with the people who are
 4   responsible for the applications that contained Blaze
 5   Advisor and are used in connection with selling insurance
 6   for the specialty insurance line of the former Chubb
 7   Corporation or for the commercial insurance line of the
 8   former Chubb Corporation?
 9   A.  We don't have Blaze Advisor in our landscape anymore.
10   Q.  Now I'm speaking of the time frame 2016 through 2020.
11   A.  Okay.  Well, I had pretty frequent interaction with my
12   team in the global organization as part of my role.
13   Q.  Understood, with your team in the global organization.
14   Does your team include Henry Mirolyuz?
15   A.  When Henry was here, yes, he was part of my --
16   Q.  And did you have frequent conversations with Henry
17   Mirolyuz?
18   A.  I had a number of communicates with Henry Mirolyuz.
19   Q.  You're aware from being in the courtroom that in 2006,
20   amongst all the rules management software vendors available
21   at the time, Chubb & Son chose Blaze Advisor to be the rules
22   management technology, correct?
23   A.  Yes, I'm aware.
24   Q.  And then in 2016 you started your own review, after the
25   merger, and in the beginning stages with that TDA review,
```

1   although you disagreed, I guess, with Mr. Tonkin's

2   conclusions, in that review as a work-in-progress in April

3   Blaze Advisor was identified as the superior technology over

4   ODM.

5   A.  They had the highest score.

6   Q.  And then as your decision processes continued, you

7   started to look at how to position the entire enterprise

8   from the point of view of technology, correct?

9   A.  Yes.  You are referring to the, defining the new

10  technology standards for the new Chubb.

11  Q.  Right.  And then that led you to the conclusion to adopt

12  an open source technology as an enterprise-wide standard.

13  A.  That happened after we completed that effort.

14  Q.  Of course.  After you completed the effort, one of the

15  conclusions from the effort was to adopt as an

16  enterprise-wide strategy an open source platform technology?

17  A.  Yeah.  In 2019 we made that decision.

18  Q.  Yes, I agree.  And so when you then went to Drools, the

19  decision to go to Drools was driven by the earlier decision

20  to go to open source.

21  A.  It was contextual.

22  Q.  Yes.  In other words, at that point once the decision

23  was open source, the alternatives of vendors like Blaze

24  Advisor or Duck Creek or Pegasus or ODM, all of those

25  third-party vendor choices are off the table because

 1    enterprise-wide the decision is to standardize on open

 2    source.

 3    A.  No, not necessarily.  So I can explain.

 4    Q.  No, isn't that -- let me -- simple point.

 5             Enterprise-wide, you made a decision to go to open

 6    source?

 7    A.  To embrace open source as a whole more widely than we've

 8    ever done in the past.

 9    Q.  Agreed.  And then Drools is the open source solution for

10    embracing open source more widely.

11    A.  Drools is the leading open source rules management

12    system, as you know.

13    Q.  And the third-party vendors like ODM, Blaze Advisor from

14    FICO, Pega, whatever, on your sheet, those are not open

15    source?

16    A.  No, they are not.

17    Q.  That's what we just want to be clear about.

18    A.  Okay.

19    Q.  So in 2006, of all of the vendors that were available to

20    Chubb & Son at the time, Blaze Advisor was chosen.  In 2016

21    you're starting to look at Blaze Advisor and ODM, and the

22    relationship with FICO is deteriorated.

23             That takes Blaze Advisor off the table for

24    consideration, and you go to ODM, correct?

25    A.  That's what we did.

1    Q.  And then you start to want to embrace an open source

2    solution more widely, and that forces or takes you to the

3    Drools decision.  Agreed?

4    A.  That's what we did.

5    Q.  All right.  So let me change topics a little bit.  You

6    know, I'd like to see if we could focus on the things that

7    we're here, you know, what this lawsuit is about and what

8    this lawsuit is not about.

9           First, we can agree that this lawsuit is not about

10   the one application license that ACE American had with FICO.

11   Agreed?

12   A.  I understand.

13   Q.  And you agree?

14   A.  I agree.

15   Q.  This lawsuit is about a different license that Chubb &

16   Son had with FICO.  We agree on that?

17   A.  Yes.

18   Q.  And do we also agree that with respect to the use of

19   Blaze Advisor in the applications by Chubb & Son, they used

20   it primarily in the applications for the specialty insurance

21   group of Chubb Corporation?

22   A.  Yeah, that was one of the category.

23   Q.  And the other category was a few applications were used

24   in the commercial line of insurance.  Agreed?

25   A.  Yeah, a few applications.  Yes.

```
 1    Q.  And so we can talk about those applications in
 2    connection with selling the insurance of those specialty
 3    lines, of those lines of business separate from talking
 4    about everything else that goes on in Chubb or legacy ACE or
 5    Chubb Limited now.  Agreed?
 6    A.  If we want to, yes.
 7    Q.  I do want to.
 8    A.  We can talk about --
 9    Q.  Let me focus on what we are doing in the lawsuit and
10    what we are not doing.
11         You said you don't know -- you said that -- I
12    think you were asked the question:  Post merger, were any of
13    the legacy Chubb applications changed so that legacy ACE
14    underwriters and legacy ACE insurance products could be sold
15    in connection with the use of those legacy Chubb
16    applications.  Do you recall that?
17    A.  The question I recall was did -- to the best of my
18    knowledge, did legacy ACE underwriters access legacy Chubb
19    applications, and I don't have that data point, so I said to
20    the best of my knowledge, no.
21    Q.  So is it also accurate to say that to the best of your
22    knowledge you don't know one way or the other?
23    A.  I don't know.
24    Q.  That's the point.  You do not know one way or the other.
25         You testified that it takes months, it took you
```

1    months, to migrate off of Blaze Advisor on to Drools, and

2    you explained why?

3    A.  Yes.

4    Q.  I don't need it again, but my question is to only

5    underscore that the process of going from Blaze Advisor to

6    Drools, doing it well so that you don't have any problems as

7    a consequence, nice job, nice transition, that transition

8    was a matter of months.  Agreed?

9    A.  Yes.  Zero disruption to our business and our customers.

10   Q.  As opposed to a matter of years.  So your relationship

11   with FICO was terminated in 2016.  In the fall of 2016 you

12   know that the relationship has deteriorated?

13   A.  Yes.

14   Q.  And it's not until 2020, first quarter of 2020, that all

15   of your applications are off Blaze Advisor, right?

16   A.  Yeah, and we started in 2019.

17   Q.  And you started in 2019.  And once you started, it only

18   takes nine months to make that migration.

19   A.  It took a number of months, yes.

20   Q.  As a professional in the, in the technology space, do

21   you think that there's some importance in -- well, as a

22   professional in technology space, you are familiar with the

23   fact that technologies are licensed from one company who

24   owns the technology to another company who wants to use the

25   technology.

1    Do we agree on that?

2    A.  That's one modality or open source.

3    Q.  Or open source.  Let's stay with the vendors --

4    A.  Okay.

5    Q.  -- where you have a license.

6    A.  Yes.

7    Q.  You understand that a license is a permission to use?

8    A.  A license gives you the right to use the technology,

9    yes.

10   Q.  Yes.  And you understand that a license has terms and

11   conditions that put constraints on both parties with respect

12   to the arrangement for that permission to use.

13   A.  Yes, license can be structured with different

14   parameters.

15   Q.  Exactly so.  And typically it's the product of

16   negotiations between the licensor and licensee.  Agreed?

17   A.  Yes.

18   Q.  Do you think license agreements should be honored and

19   kept by the licensee?

20   A.  I think license agreements are an important construct of

21   a relationship between two companies, in this case we're

22   talking about technology, the supplier and the consumer.

23   Q.  Agreed.  And do you think there's consequences or should

24   be consequences when the licensee violates the license

25   agreement?

```
 1    A.  As a legal contract, I agree that if there's a

 2    violation, then an action needs to be taken.

 3              MR. HINDERAKER:  No further questions.

 4              THE COURT:  Thank you, Mr. Hinderaker.

 5         Ms. Godesky, any redirect?

 6                   REDIRECT EXAMINATION

 7    BY MS. GODESKY:

 8    Q.  Mr. Ghislanzoni, you were asked some questions about the

 9    Blaze license that Chubb purchased, correct?

10    A.  Yes.

11    Q.  Did Chubb purchase a license to use Blaze on an

12    enterprise-wide basis or specific to certain applications?

13    A.  Specific to one application.

14    Q.  I'm talking about Chubb?

15    A.  Oh, legacy Chubb?

16    Q.  Yes.

17    A.  Enterprise-wide.

18    Q.  And was that license perpetual or was it limited in

19    time?

20              MR. HINDERAKER:  Objection.  Lacks of foundation,

21    not involved with that.

22              THE WITNESS:  The document I see?

23              THE COURT:  Lay some foundation.

24    BY MS. GODESKY:

25    Q.  Mr. Ghislanzoni, do you have a general familiarity with
```

```
 1    the license that Chubb purchased to use Blaze Advisor back

 2    in 2006?

 3    A.  Legacy Chubb?

 4    Q.  Yes.

 5    A.  Back in 2006?

 6    Q.  Do you have a general understanding of the terms?

 7    A.  Now that I have seen the license, I do.

 8    Q.  And was it a perpetual license?

 9              MR. HINDERAKER:  Same objection, Your Honor.

10              THE COURT:  Overruled.

11              THE WITNESS:  So the license contract that I've

12    seen between -- shows enterprise-wide perpetual license.

13              MS. GODESKY:  Thank you.  No further questions.

14              MR. HINDERAKER:  I don't have a copy of the

15    license agreement in hand.

16              Could I have -- could you put up Joint Exhibit 1,

17    please?  And could we go to the top paragraph where it

18    defines client?

19                       RECROSS-EXAMINATION

20    BY MR. HINDERAKER:

21    Q.  Could we read this together and could we agree that the

22    client on this license agreement is Chubb & Son, a division

23    of Federal Insurance Company?

24    A.  That's how it's described in this paragraph.

25    Q.  That's right.  And can we agree that when we're talking
```

1   about an enterprise, it's the enterprise of the client that

2   is being addressed, not somebody else's enterprise?

3   A.  Yeah, enterprise of the client.

4   Q.  The client.  Yeah.  So an enterprise-wide license in

5   this instance is a license that is as wide as the enterprise

6   of Chubb & Son, a division of Federal.

7           Do we agree?

8   A.  I wouldn't be able to agree on this.  I know this is the

9   point of this agreement between FICO and Chubb.

10  Q.  Well, I was just curious because you were just asked

11  questions about the license agreement and what it meant in

12  your view and -- but when you get my questions, you defer.

13          MS. GODESKY:  Objection.

14          THE COURT:  Sustained.

15          MR. HINDERAKER:  Yes.

16  BY MR. HINDERAKER:

17  Q.  We don't have to quarrel about it.  It says what it

18  says.

19          And do you have the license agreement, Defendants'

20  Exhibit 39, in front of you?  It should be in the binder

21  from your counsel.

22  A.  39?

23  Q.  I believe it's D0039.

24  A.  Oh, yeah.  This is the ACE, ACE agreement.

25  Q.  Yes.  Yes.  Yes.  Yes.  Can you go to, it's called

1    page 10 of, 0039-10.

2    A.  Page 10, yes.

3    Q.  And can you -- can we show, it has a paragraph 10.8.

4    Can we show that?

5    A.  Yes.

6    Q.  Can we show that on the screen, Your Honor?

7            There we go.

8            And paragraph 10.8 of the license agreement with

9    ACE American dated June 29, 2006, has a no assignment

10   provision that reads exactly like that.  Can we agree?

11   A.  I can see the no assignment provision.

12           MR. HINDERAKER:  Thank you very much.

13           THE COURT:  Thank you.

14           MS. GODESKY:  No questions from me.

15           THE COURT:  All right.  Mr. Ghislanzoni, you may

16   step down.  Thank you.

17           THE WITNESS:  Thank you.

18           THE COURT:  Mr. Hinderaker.

19           MR. HINDERAKER:  Your Honor, we would like to call

20   John Taylor.  And if I find it, I will have some -- John

21   Taylor will be here by video.

22           And this is the introduction for Mr. Taylor.

23           John Taylor is an employee of ACE American

24   Insurance Company.  His title is senior vice president,

25   shared -- finance shared services.  His deposition was taken

```
 1    August 2, 2018.  And Mr. Taylor's deposition was taken by

 2    myself on behalf of FICO.

 3                              JOHN TAYLOR,

 4    called on behalf of the plaintiff, was duly sworn, was

 5    examined and testified as follows:

 6                              EXAMINATION

 7    BY MR. HINDERAKER:

 8    Q.  Sir, would you tell us with whom you are employed today?

 9    A.  Chubb.

10    Q.  So Chubb to me has a lot of different, a lot of

11    different Chubbs to me.  What's the precise name of the

12    entity that employs you?

13    A.  ACE American Insurance Company.

14    Q.  And what's the relationship, if any, between ACE

15    American Insurance Company and Federal Insurance Company?

16    A.  They are affiliate companies.

17    Q.  What do you mean by affiliate -- what do you mean by an

18    affiliate?

19    A.  They are owned by a common parent.

20    Q.  And who is the common parent?

21    A.  Chubb Limited.

22    Q.  Is it correct that ACE American Insurance Company is not

23    a subsidiary of Federal Insurance Company?

24    A.  Correct.

25    Q.  And for how long have you been employed by ACE American
```

1    Insurance Company?

2    A.  14 and a half years.

3    Q.  Can you give us an overview -- just give us an overview,

4    if you would, of your history of employment with ACE

5    American Insurance?

6    A.  I was hired in January 2004.  Over the years my

7    responsibilities have included, I do statutory reporting.

8              COURT REPORTER:  What?

9              THE WITNESS:  Statutory reporting.  Let's see.

10   Statistical reporting, investment accounting, premium tax

11   function, pools and associations, and ACE Bermuda.

12   BY MR. HINDERAKER:

13   Q.  All right.  And have these responsibilities been for ACE

14   American Insurance Company only?

15   A.  No.  No.

16   Q.  Okay.  So what are the other entities for whom those

17   responsibilities were done?

18   A.  Prior to acquisition, it would be all of the US property

19   casualty insurance companies of ACE Limited.

20   Q.  Prior to the acquisition, we're talking about the

21   acquisition of 2016?

22   A.  Of Chubb in 2016, correct.

23   Q.  Chubb in 2016.

24              If I use the -- so in 2016 there was, there was a

25   merger between the Chubb Corporation and ACE, one of the ACE

1     companies.

2              Were you legacy ACE or -- are you legacy ACE or

3     legacy Chubb?

4     A.  I am legacy ACE.

5     Q.  Do you have any personal knowledge of the financial

6     reporting of the legacy Chubb -- of legacy Chubb or any of

7     its affiliated companies?

8     A.  Yes.

9     Q.  And how do you have that personal knowledge?

10    A.  From speaking to the folks that I mentioned earlier.

11    Q.  That person -- you acquired that personal knowledge as a

12    consequence of preparing for today's deposition?

13    A.  I was also responsible for legacy Chubb financial U.S.

14    statutory financial reporting from date of acquisition to

15    present.

16    Q.  And you use -- you use the phrase P&C group well P&C

17    group.  What does that mean?

18    A.  Property casualty insurance.

19    Q.  And by way of group, are you referencing various

20    companies that are affiliates that are in the property and

21    casualty insurance business?

22    A.  Correct.

23    Q.  So I just am trying get my head around this.

24              So pre-merger, you had no responsibility --

25    responsibilities with respect to the P&C group of the Chubb

1    Corporation, correct?

2    A.  Correct.

3    Q.  Post merger, you have responsibilities for the P&C group

4    of ACE, as well as from post merger forward responsibilities

5    for what was legacy Chubb?

6    A.  Correct.

7    Q.  Mr. Taylor, do we agree that Exhibit 17 is a Form 10-K

8    filed by the Chubb Corporation with the SEC for the year

9    ending December 31, 2014?

10   A.  Yes.

11   Q.  The court reporter has given you Exhibit 18, which I'm

12   representing is the cover page of the same 10-K, along with

13   pages 3, 4 and 5 of that 10-K, and the Part 1 Item 1 general

14   heading Business.

15          If you'd like to compare Exhibit 18 to that part

16   of Exhibit 17, feel free, otherwise I'll proceed.

17   A.  I'll take your word for it.

18   Q.  Let's go to page 3.  Under property and casualty

19   insurance, the 10-K says that Federal Insurance Company is

20   the largest insurance subsidiary in the P&C group and is the

21   parent of most of the corporations other insurance

22   subsidiaries.

23          Do you see where I'm reading?  It's right under

24   Casualty and Property Insurance.

25   A.  I see.

1    Q.  All right.  So there's no disagreement with that

2    statement, is there?

3    A.  Correct.

4    Q.  Do you know if this statement, that Federal Insurance

5    Company is the largest subsidiary in the P&C group is true

6    after the merger, post merger?

7    A.  At a specific point in time or --

8    Q.  Well, between 2016 and today.

9    A.  By what measure?

10   Q.  Premium --

11   A.  Yes.

12   Q.  What other measures are there?

13   A.  Surplus, asset based.

14   Q.  And then on page 3 of this 2014 10-K, you will see that

15   insurance companies in the P&C group based in the

16   United States are listed.

17          And so just so we're on the same page, this list

18   of subsidiaries, do we agree, is a list of the subsidiaries

19   of the Chubb Corporation at this time?

20   A.  At 12/31/2014?

21   Q.  Yes.

22   A.  Correct.

23   Q.  Because Federal Insurance Company is one of the

24   subsidiaries listed.

25          Do you know that all of the other subsidiaries

1    listed on this page 3 are themselves subsidiaries of Federal

2    Insurance Company, as of year end 2014?

3    A.  Correct.

4    Q.  Do you know whether it is still true that these various

5    companies, other than Federal Insurance Company, are

6    subsidiaries of Federal Insurance Company post merger from

7    2016 to date?

8    A.  They are not.

9    Q.  Some of them are not?

10   A.  Correct.

11   Q.  Which ones are not subsidiaries of Federal Insurance

12   Company following, during the period 2016 to date?

13   A.  Texas Pacific Indemnity, Pacific Indemnity and Great

14   Northern.

15   Q.  Any others?

16   A.  No, I believe that is it.

17   Q.  Do those companies post merger become subsidiaries of

18   another corporation?

19   A.  Texas Pacific merged with Pacific Indemnity.

20   Q.  Okay.

21   A.  The other companies became subs of a holding company and

22   are now affiliates of Federal.

23   Q.  Okay.  So Federal and the holding company are owned by a

24   common parent?

25   A.  Correct.

```
1    Q.  And then Great Northern Insurance Company, what happened
2    to that?
3    A.  Same as --
4    Q.  Pacific?
5    A.  Came up, yes.
6    Q.  If we turn to page 4, it reports at the top of the page
7    under Principal Insurance Companies in the P&C group based
8    outside of the United States as of year end 2014.
9              As of year end 2014, were each of these companies
10   also subsidiaries of Federal?
11   A.  Yes.
12   Q.  Post merger for the period 2016 to date, are these
13   companies still subsidiaries of Federal as of today?
14   A.  Chubb Australia no longer is merged with the legacy ACE
15   Company.
16   Q.  I'm sorry.  No longer is merged with the legacy ACE
17   Company?
18   A.  It no longer is a subsidiary of Federal.
19   Q.  It's no longer a subsidiary of Federal?
20   A.  Correct.
21   Q.  All right.  So for year end 2014, all of the
22   subsidiaries identified on page 3 of this exhibit are
23   wholly-owned subsidiaries of Federal?
24   A.  There may have been a company -- they were not
25   directly -- they may not be directly owned by Federal.
```

1    There might be a stacking.

2    Q.  Okay.  When you say "might be," do you know one way or

3    the other?

4    A.  I know one of them was.  I don't recall which one off

5    the top of my head.

6    Q.  All right.  Other than the one, do you know that any

7    others were?

8    A.  No.

9    Q.  Okay.  So as far as you know, all of the others are

10   wholly-owned by Federal?

11   A.  Correct.  Texas Pacific was the one that was stacked.

12   Q.  Okay.  All the rest wholly-owned by Federal?

13   A.  Yes.

14   Q.  And then on page 4, the subsidiaries outside of the

15   United States, all of those year end 2014 were wholly-owned

16   by Federal?

17   A.  Yes.

18   Q.  Are these companies outside of the United States the

19   principal insurance companies in the P&C group currently

20   post merger?  Maybe that's a bad question?

21           Looking at the business outside of the

22   United States, are the companies listed on page 4 the

23   principal ones included in the P&C group?  And by

24   "principal," again I mean by measuring written premium.

25   A.  They are, yes.

1  Q.  May be a stupid question, but put it on the record.

2  Federal Insurance Company selling P&C insurance policies?

3  A.  Correct.

4  Q.  As well as personal lines?

5  A.  Correct.

6  Q.  And this was true before the merger and after the

7  merger?

8  A.  Correct.

9  Q.  And the three lines of business that Federal has sold

10  and continues to sell are personal insurance, commercial

11  insurance and special insurance?

12  A.  Correct.

13  Q.  Would you tell us, give us a -- your working definition

14  of personal insurance?

15  A.  Personal insurance is sold to cover, to individuals to

16  cover personal property, cars, homes, things like that.

17  Q.  Okay.  Same question for commercial insurance.

18  A.  Sold to, sold to businesses for, again, property,

19  property coverages, liability coverages.

20  Q.  Specialty insurance, same question.

21  A.  It is sold to, it is sold to businesses, but for

22  non-property type coverages.

23  Q.  Examples of which are?

24  A.  Director's D&O coverage, E&O coverage, things like that.

25  Q.  Non-practice coverage, accountants, attorneys, lawyers,

1    medical?

2    A.  Correct.

3    Q.  What's surety bonds, that sort of thing?

4    A.  Sureties are, surety bonds are generally sold to cover

5    construction projects.

6    Q.  So is that commercial or surety?

7    A.  It is surety.

8    Q.  Do all of the subsidiaries that are listed on page 3 of

9    Exhibit 18, looking at each one of them, do they also sell

10   the same kinds of insurance in the United States?

11   A.  The same kinds of insurance?

12   Q.  The three lines of business.  They also sell commercial

13   insurance, personal insurance, specialty insurance in the

14   United States?

15   A.  The company -- yes.

16   Q.  And then with respect to the companies outside of the

17   United States that are listed on page 4 or on page -- yeah,

18   page 4, each of those companies also sells personal lines,

19   commercial lines and specialty lines of insurance?

20   A.  Yes.

21   Q.  For the time period before the merger, were the

22   insurance policies sold in the name of Federal and its

23   various subsidiaries in the United States, sold by

24   independent insurance agencies or independent brokers?

25   A.  Yes.

1    Q.  Post merger, are the insurance policies of Federal and

2    its various subsidiaries sold in the United States still

3    sold through independent agencies and independent brokers?

4    A.  Yes.

5    Q.  Pre-merger, did Federal or any of its subsidiaries have

6    a captive sales force?

7    A.  Not that I'm aware of.

8    Q.  Okay.  And post merger does it have -- does Chubb

9    Limited -- I'm sorry.

10         Post merger does Federal or any of its

11   subsidiaries now have a captive sales force?

12   A.  Not that I'm aware of.

13   Q.  Okay.  Is there, is there a meaningful difference

14   between the term "insurance agent" and "insurance broker"?

15   A.  Yes.

16   Q.  What are the -- what is an insurance agent?  What is the

17   definition of an insurance agent?

18   A.  An agent is generally an individual that sells insurance

19   policies.

20   Q.  Okay.  How do you distinguish that from an insurance

21   broker?

22   A.  A broker, a broker deals with larger risks and think of

23   more of as a brokerage house as opposed to an individual

24   broker.

25   Q.  So are you saying an insurance agent as being more of a

1   solo practitioner and an insurance broker as being more of

2   someone who is operating in a group?

3   A.  Correct.

4   Q.  Does Federal Insurance Company have any employees

5   outside of the United States, pre-merger?

6   A.  I don't believe so.

7   Q.  Does Federal Insurance Company have any employees

8   outside of the United States post merger?

9   A.  I don't believe so.

10  Q.  We know pre-merger that one of the divisions of Federal

11  Insurance Company is Chubb & Son.  Are you aware of that?

12  A.  Yes.

13  Q.  You know that?

14  A.  I know that.

15  Q.  All right.  Pre-merger did Federal Insurance Company

16  have any other divisions in addition to Chubb & Son?

17  A.  Not that I'm aware of.

18  Q.  Post merger, does Federal Insurance Company have any

19  divisions other than Chubb & Son?

20  A.  No, not that I'm aware of.

21  Q.  And post merger Chubb & Son continues to be a division

22  of Federal?

23  A.  Correct.

24  Q.  Do we agree that Chubb & Son as a division is an

25  unincorporated entity?

```
1    A.  As of what -- to the best of my knowledge, that's what a

2    division is.

3    Q.  Correct.  Agreed.

4    A.  To the best of my knowledge, yes.  To the best of my

5    knowledge.

6    Q.  So is it also accurate to say that Chubb & Son as a

7    division itself does not have any subsidiaries?

8    A.  Correct.

9    Q.  Staying with this Exhibit 18, on page 3 and under

10   property and casualty insurance again, it tells us that

11   Chubb & Son, a division of Federal, is the manager of

12   several U.S. subsidiaries in the P&C group.

13          Pre-merger, do you have, can you give us an

14   overview of the responsibilities of Chubb & Son, a division,

15   as a manager of several U.S. subsidiaries in the P&C group?

16          Do you understand what I'm asking?

17   A.  Could you repeat that?

18   Q.  I sure can.  My time frame is pre-merger.

19   A.  Mm-hmm.

20   Q.  My question is, An overview of the responsibilities of

21   Chubb & Son as a manager of several U.S. subsidiaries in the

22   P&C group.

23   A.  Federal had a number of agreements with subsidiaries to

24   manage the various underwriting activities and other

25   administrative duties of the subsidiaries.
```

1    Q.  And then it goes on to say, "And also provides certain

2    services to other insurance companies."  Do you know what if

3    there is a difference between what Federal, through its

4    division Chubb & Son, did as a manager relative to what it

5    did as a servicer?

6    A.  There were management and service agreements, I tend to

7    think of them as one and the same, that Federal, that

8    Federal had with the subsidiaries.  Federal had all the

9    employees.  The subsidiaries did not have employees.

10           So Federal essentially through its employees

11   managed the service -- the subsidiaries.

12   Q.  From 2016 to date, has the responsibility of Federal

13   through the division of Chubb & Son changed when we speak to

14   providing services and management?

15   A.  Federal still manages all the subsidiaries.

16   Q.  It does post merger as well?

17   A.  Post merger.

18   Q.  Do you know if pre-merger Federal provided management

19   service, management and service for Chubb Insurance Company

20   of Europe SE?

21   A.  I don't.  I don't specifically know that.

22   Q.  Okay.  And then, you know, I asked you, I asked you a

23   question that was post merger.  And let me ask you another

24   question post merger but a bit more specifically.  That is

25   to say, post merger has -- does Federal provide management

1    and service functions to legal entities that are no longer

2    its wholly-owned subsidiaries?

3    A.   Yes.

4    Q.   Yes.  Okay.  Confirming that post merger there's been no

5    change in Federal's functions with respect to providing

6    management of services.

7    A.   Correct.  They're -- yes.

8    Q.   You mentioned before the break that the United States

9    subsidiaries -- I have to do this in time frames again.

10   A.   Sure.

11   Q.   So let me first start off with pre-merger, that the

12   United States subsidiaries of Federal have no employees.

13   A.   Correct.

14   Q.   Okay.  So my question is, how do the various, how did,

15   pre-merger, the various subsidiaries of Federal without

16   employees write, issue, sell insurance policies?

17   A.   Through various management service agreements.

18   Q.   With the people, the arms and legs and facilities and

19   technologies provided through Federal Chubb & Son, a

20   division?

21   A.   Through Federal, correct.

22   Q.   Okay.  And then same question post merger.  Continues to

23   be true that the subsidiaries have no employees.

24   A.   Correct.

25   Q.   Pre-merger, did Federal provide services and management

1  to any entities that were not wholly-owned subsidiaries of

2  Federal?

3  A.  To the best of my knowledge, no.

4  Q.  Okay.  And then post merger, Federal does provide

5  management and services agreement to entities that are not

6  wholly-owned subsidiaries of Federal?

7  A.  Correct.

8  Q.  If you go to Exhibit 18, please.

9         And on page 3, and then under Property and

10  Casualty Insurance, you will see where it says, the sentence

11  begins, "Acting subject to the supervision and control of

12  the respective boards of directors of the insurance

13  companies included in the P&C group, Chubb & Son provides

14  day-to-day management and operating personnel."

15         Do you see where I've read?

16  A.  Yes.

17  Q.  So let me just sort of unpack that a little bit.

18         So as I just said, Chubb & Son acts pursuant to

19  the directions of the board of directors of the

20  subsidiaries.  With me so far?

21  A.  Correct.

22  Q.  These are the subsidiaries that's wholly-owned by

23  Federal?

24  A.  Correct.

25  Q.  So and each of those instances, then, Federal has the

1   authority to control and determine the board of directors of

2   the subsidiaries.

3   A.  Subject to state regulation.

4   Q.  Is it fair to say that, that but for the services and

5   management provided by Federal through Chubb & Son, its

6   division, none of the subsidiaries in the United States,

7   subsidiaries of Federal, would be able to sell insurance

8   policies?

9   A.  Would you say that again?

10  Q.  Could any of the legal entities that are subsidiaries of

11  Federal have no employees sell insurance policies without

12  the services and the management provided by Federal through

13  Chubb & Son?

14  A.  To the best of my knowledge, employees don't sell

15  insurance for these companies.

16  Q.  All right.  Instead of sell, underwrite, write, issue,

17  present to customers, policies?

18  A.  To the best of my knowledge, yeah, the -- to the best of

19  my knowledge, yes.  Agreeing.

20  Q.  Agree that the services of Federal through Chubb & Son

21  are absolutely necessary for each of those subsidiaries to

22  underwrite, issue, sell -- to underwrite, issue insurance

23  policies for sell?

24  A.  Any Chubb & Son or Federal, they operate under

25  management agreements and service agreements with Federal.

1    Q.  All right.  And but for those management agreements and

2    service agreements with Federal, could any of those

3    insurance companies issue an insurance policy?

4    A.  Hypothetically, they could have a management service

5    agreement with anyone.

6    Q.  And that's how they would have to do it, though, with no

7    employees?

8    A.  The companies don't have employees, correct.

9    Q.  Okay.  Mr. Taylor, I'm going to go through -- I have for

10   you a series of documents that are marked Exhibit 19, and

11   they are being presented to you in the form or order in

12   which they were produced to FICO.

13          And I mention that only because oftentimes the

14   most recent document is on top and the base document is on

15   the bottom.  And let's see if you and I can work this in a

16   way that you're comfortable and -- but also at the same time

17   efficient.

18          So do we agree that Exhibit 19 is the service

19   agreement with Pacific Indemnity Company between itself and

20   Chubb & Son, a division of Federal Insurance Company?

21   A.  Yes.

22   Q.  And to your knowledge, is this a complete service

23   agreement between Chubb & Son, a division of Federal, and

24   Pacific Insurance Company?

25   A.  Yes, to my knowledge.

TRIAL TRANSCRIPT - DEPOSITION

1192

```
1    Q.  And, and you've described in general terms the services

2    and management that Chubb & Son, a division of Federal, that

3    Federal provides through Chubb & Son, a division with

4    respect to the various U.S. subsidiaries?

5              And is this an example of the agreement that you

6    were referencing?

7    A.  Yes.

8    Q.  Under Article 2, paragraph 1, you see that the manager

9    shall manage the business of insurance by and on behalf of

10   the company?

11   A.  Correct.

12   Q.  All right.  And manager is Chubb & Son, a division of

13   Federal, correct?

14   A.  Correct.

15   Q.  So do we agree that Chubb Insurance Company, a division

16   of Federal, as manager is empowered to effect, sign,

17   countersign and issue all policies of insurance and

18   reinsurance which Pacific Indemnity Company is authorized to

19   issue?

20   A.  Actually Federal Insurance Company, I think.  Federal

21   Insurance -- Chubb & Son, a division of Federal, not Chubb &

22   Son a division of --  I think you just -- but yes.

23   Q.  Okay.  With correcting my question, the answer is yes?

24   A.  Yes.

25   Q.  All right.  With respect to Exhibit 20, Mr. Taylor, I'd
```

```
 1    like to know if we can agree that this document includes the

 2    agreement between Texas Pacific Indemnity and Chubb & Son, a

 3    division of Federal Insurance Company, June 1, 2004, as well

 4    as an addendum dated December 31, 2007.

 5    A.  Yes.

 6    Q.  And so to the best of your knowledge, this is the

 7    complete service agreement with Texas Pacific Indemnity?

 8    A.  The word "service" is scratched and "management" is

 9    written in.  So it's either service or management agreement.

10    Q.  Okay.  And earlier in the examination you were

11    commenting on how maybe there's no real substantive

12    difference between being a servicer and being a manager, and

13    so from that context your detail is accurate.  But does it

14    change the substance of the arrangement?

15    A.  Not to my knowledge.

16    Q.  Is it true that Federal through Chubb & Son, its

17    division, as manager has the authority to underwrite, effect

18    and issue all of the insurance policies that are in the name

19    of Texas Pacific Indemnity?

20    A.  Correct.

21    Q.  I hope the same thing as we've just done for the last

22    two, now you have the document Exhibit 21.  Let's see if we

23    can agree that Exhibit 21 is an agreement between Vigilant

24    Insurance Company and Chubb & Son, a division of Federal

25    Insurance Company, dated January 1, 1998, as well as an
```

1    addendum effective January 1, 2002, as well as addendum

2    number two effective January 1, 2005, and addendum number

3    three effective January 1, 2008, and addendum number three,

4    except effective December 31, 2007.

5    A.  Only note that the earlier two addendums are

6    not numbered.  I'm not sure if the numbers you referenced

7    line up with the numbers on here, but yes.  Agree.

8    Q.  All right.  To the best of your knowledge, Exhibit 21 is

9    the complete agreement between Chubb & Son, a division of

10   Federal Insurance Company, and Vigilant Insurance Company?

11   A.  Yes, to the best of my knowledge.

12   Q.  All right.  And as I have asked before, do we agree that

13   the manager of Chubb & Son, a division of Federal Insurance

14   Company, has the authority to effect, sign, countersign and

15   issue all policies or contracts of insurance in the name of

16   Vigilant Insurance Company?

17   A.  Yes.

18   Q.  With respect to Exhibit 22, this includes an agreement

19   effective January 1, 1998, between Chubb Indemnity Insurance

20   Company and Chubb & Son, a division of Federal Insurance

21   Company, effective January 1, 1998, as well as an addendum

22   number two effective January 1, 2005, and -- well, let me

23   back up.

24          On Bates number 3, page 3 Bates number, we have

25   addendum number two which shall be effective on January 1,

```
1    2008, and then the signature page on the next page says,

2    this addendum shall be effective on the first day of January

3    2005.

4              Agree?

5    A.  Agree.

6    Q.  And then Exhibit 21 has an addendum number three saying

7    it is effective on 31st day of December 2007.

8              Agree.

9    A.  This is Exhibit 22?

10   Q.  22, yeah.

11   A.  And what was the date again?  I'm sorry.

12   Q.  And then Exhibit 22 includes addendum number three

13   having an effective date of December 31, 2007.

14   A.  Agree.

15   Q.  And so to the best of your knowledge, is Exhibit 22 the

16   complete agreement between -- service management agreement

17   between Chubb, Chubb Indemnity Insurance Company and Chubb &

18   Son, a division of Federal Insurance?

19   A.  Yes.  Agree, to the best of my knowledge.

20   Q.  And we agree that Chubb & Son, a division of Federal,

21   has the authority under this agreement to effect, sign

22   countersign, issue, all policies or contracts of insurance

23   sold in the name of Chubb Indemnity Insurance Company or

24   issued in the name of Chubb Indemnity Insurance Company?

25   A.  Agreed.
```

```
1    Q.  So Exhibit 23 --
2              THE COURT:  Mr. Hinderaker, how much more time do
3    you think this runs?
4              MR. HINDERAKER:  52 minutes.
5              THE COURT:  Oh, more?
6              MR. HINDERAKER:  Yes.
7              THE COURT:  Okay.  Then we will break for the
8    evening.
9              Members of the jury, we're in recess.  We'll see
10   you in the morning.  Don't talk about the case with anyone.
11   Okay?  Thanks.
12             THE CLERK:  All rise for the jury.
13   5:00 p.m.
14                          IN OPEN COURT
15                        (JURY NOT PRESENT)
16             THE COURT:  Go ahead and be seated.
17             Mr. Hinderaker, is there anything we need to take
18   up before the end of the day?
19             MR. HINDERAKER:  No, I don't think so.  Just as a
20   housekeeping matter, after Mr. Taylor, the next witness will
21   be Neil Zoltowski, the damages expert.  You know, we
22   admitted various interrogatories today, and his testimony,
23   of course, will include the revenue components of those
24   interrogatory answers.
25             THE COURT:  Right.
```

1    MR. HINDERAKER:  And we'll do the best we can over

2  the evening to take out the lawyer stuff, try to make them

3  clean, but if we don't, we'll be sure to --

4    THE COURT:  Yep.

5    MR. HINDERAKER:  -- you know, present the dollars

6  without the rest of the stuff.

7    THE COURT:  Understood.  Thank you.  And after

8  Mr. Zoltowski, you have --

9    MR. HINDERAKER:  Then the expectation is Bick

10  Whitener --

11    THE COURT:  Whitener.

12    MR. HINDERAKER:  -- who is the insurance industry

13  expert.

14    THE COURT:  And that would be your case in chief?

15    MR. HINDERAKER:  And then Mr. Bill Waid will be

16  the last witness.

17    THE COURT:  Mr. Bill Waid.  I keep forgetting

18  about him.  Sorry about that.

19    Ms. Godesky, anything we need to take up?

20    MS. GODESKY:  No.  Thank you.

21    THE COURT:  Okay.  Thanks, everyone.  We're in

22  recess.

23    (Court adjourned at 5:02 p.m., 02-27-2023.)
       We, Kristine Mousseau and Renee A. Rogge, certify
24  that the foregoing is a correct transcript of proceedings.
       Certified by:  /s/Kristine Mousseau CRR-RPR
25                     /s/Renee A. Rogge, RMR-CRR