```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
         ------------------------------------------------------------
 3                                    )
         Fair Isaac Corporation,      )  File No. 16-cv-1054(DTS)
 4       a Delaware Corporation,      )
                                      )
 5              Plaintiff,            )
                                      )
 6       v.                           )
                                      )
 7       Federal Insurance Company,   )  Courtroom 14W
         an Indiana corporation,      )  Minneapolis, Minnesota
 8       and ACE American Insurance   )  Tuesday, February 28, 2023
         Company, a Pennsylvania      )  8:50 a.m.
 9       Corporation,                 )
                                      )
10              Defendants.           )
                                      )
11       ------------------------------------------------------------

12

13

14             BEFORE THE HONORABLE DAVID T. SCHULTZ
              UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16              (JURY TRIAL PROCEEDINGS - VOLUME VII)

17

18

19

20

21

22       Proceedings recorded by mechanical stenography; transcript
         produced by computer.
23
                               *   *   *
24

25
```

```
 1    APPEARANCES:

 2       For Plaintiff:          MERCHANT & GOULD P.C.
                                 BY:  ALLEN W. HINDERAKER
 3                                    HEATHER J. KLIEBENSTEIN
                                      PAIGE S. STRADLEY
 4                                    MICHAEL A. ERBELE
                                      JOSEPH W. DUBIS
 5                                    GABRIELLE L. KIEFER
                                 150 South Fifth Street, #2200
 6                               Minneapolis, Minnesota 55402

 7       For Defendants:         FREDRIKSON & BYRON
                                 BY:  TERRENCE J. FLEMING
 8                                    LEAH C. JANUS
                                      CHRISTOPHER D. PHAM
 9                                    RYAN C. YOUNG
                                      PANHIA VANG
10                               200 South Sixth Street, #4000
                                 Minneapolis, Minnesota 55402
11
                                 O'MELVENY & MYERS LLP
12                               BY:  LEAH GODESKY
                                      ANTON METLITSKY
13                                    DARYN E. RUSH
                                      ROXANA GUIDERO
14                               Times Square Tower
                                 7 Times Square
15                               New York, New York 10036

16       Court Reporters:        RENEE A. ROGGE, RMR-CRR
                                 KRISTINE MOUSSEAU, CRR-RPR
17                               MARIA V. WEINBECK, RMR-FCRR
                                 PAULA RICHTER, RMR-CRR-CRC
18                               United States District Courthouse
                                 300 South Fourth Street, Box 1005
19                               Minneapolis, Minnesota 55415

20
                                      *   *   *
21

22

23

24

25
```

1

### I N D E X

PAGE

2

**JOHN TAYLOR**

3      Via Deposition By Mr. Hinderaker                  1219

4

5

6      **NEIL J. ZOLTOWSKI**
       DIRECT EXAMINATION BY MS. KLIEBENSTEIN       1246
7      CROSS-EXAMINATION BY MS. GODESKY             1334
       REDIRECT EXAMINATION  BY MS. KLIEBENSTEIN    1350
8      RECROSS-EXAMINATION BY MS. GODESKY           1351

9      **RANDOLPH BICKLEY WHITENER**
       DIRECT EXAMINATION BY MR. HINDERAKER         1353

10

11     PLAINTIFF'S                                       REC'D
          857                                            1361

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **February 28, 2023**

2            **8:50 A.M.**

3

4          **(In open court without the Jury present.)**

5          THE COURT:  Good morning.  Please be seated.

6          All right.  Good morning, everyone.  We're on the

7    record outside the presence of the jury.  I understand the

8    parties have an issue with respect to some of the

9    interrogatory answers that are intended to come in -- into

10   evidence today.

11         So, Ms. Kliebenstein, or whomever on that side,

12   come on up.

13         MS. KLIEBENSTEIN:  Thank you.  Good morning, Your

14   Honor.

15         We have, we have three -- two and a half issues,

16   if you will.  So one of them is the interrogatories, but I

17   think I'll start with something else first.  The defendants

18   have objected to our inclusion in Mr. Zoltowski's

19   demonstrative of revenues associated with the Chubb

20   Insurance Company Canada.  And as we -- they say that

21   it's -- it was decided on summary judgment, that it's not in

22   the case anymore.  But as we heard from Mr. Pandey and

23   Mr. Mirolyuz, that application -- the application running in

24   that entity in Canada is running out of Raleigh, North

25   Carolina, and we have outlined the case for infringement in

1    our trial brief at page 39.

2              So it's very much an open, active issue, so we

3    request the inclusion of Canada in Mr. Zoltowski's

4    presentation and his testimony, and I have a copy for it if

5    you just want to see what I'm talking about.

6              THE COURT:  Yeah.  Go ahead and give it up here.

7              My recollection of that issue was that the

8    question of infringement due to out-of-U. S. downloading was

9    disposed of and that that kind of set the statute of

10   limitations issue front and center, but it's not my

11   understanding that the revenues associated with Chubb of

12   Canada were determined to be not subject to disgorgement.

13             MS. KLIEBENSTEIN:  Correct.

14             THE COURT:  Okay.

15             MS. KLIEBENSTEIN:  The infringement is in the

16   U. S.  We heard the testimony about the Raleigh server.

17             THE COURT:  Right.

18             MS. KLIEBENSTEIN:  Yep.  And you can see on that

19   page that it's basically that, Canada 154 million, and then

20   there are other slides where it's repeated.

21             THE COURT:  Got it.  Okay.

22             MS. KLIEBENSTEIN:  So that's issue number one.

23             THE COURT:  Okay.

24             MS. KLIEBENSTEIN:  Issue number two, we're back

25   with the interrogatories again.  So I have copies for Your

 1    Honor of FICO's proposal and defendants' proposal.

 2              THE COURT:  Okay.  And these relate to two

 3    different interrogatory answers?

 4              MS. KLIEBENSTEIN:  Three.

 5              THE COURT:  Three?  All right.  Hang on.

 6              MS. KLIEBENSTEIN:  Yep, sure.  I think it's

 7    easiest if we start with 1005.

 8              THE COURT:  Okay.

 9              MS. KLIEBENSTEIN:  Actually, do you have 5 or 4 up

10    there?

11              THE COURT:  I have 4A.

12              MS. KLIEBENSTEIN:  Oh, perfect.  Good.  There are

13    too many numbers rolling around.

14              So if you look at 4A --

15              THE COURT:  Yep.

16              MS. KLIEBENSTEIN:  Are on you FICO's version or

17    defendants'?

18              THE COURT:  I'm on plaintiff's version.

19              MS. KLIEBENSTEIN:  Okay.  So if you go back to

20    page 6, CUW-IM, and you see a few what look to be

21    international names, Chubb Mexico, Chubb European Group,

22    Chubb Insurance Australia, Chubb Brazil -- I'm horrible

23    with --

24              THE COURT:  Yep.

25              MS. KLIEBENSTEIN:  What defendants want to do is,

1    they want to redact out those -- they want to redact out the

2    names of those writing companies because they believe that

3    they were disposed of on the summary judgment motion.

4    However, that motion dealt with the applications that are

5    run abroad:  EZER, Adapt, et cetera.

6              CUW-IM is squarely run in the United States, and

7    we have Mr. Harkin's testimony where he said for those

8    writing companies that have international names, they're

9    written in the United States.

10             THE COURT:  Okay.

11             MS. KLIEBENSTEIN:  So as a result, they're in

12   those written premium amounts, and our expert spent a lot of

13   time going through all of that data in determining which

14   entities properly fell under what revenue should be captured

15   for disgorgement.

16             THE COURT:  Okay.  Is that the same issue, then,

17   for 107 -- or 1007 and 1008?

18             MS. KLIEBENSTEIN:  It is the same for 1007.

19             THE COURT:  Okay.

20             MS. KLIEBENSTEIN:  1008 dovetails back to Chubb

21   Insurance of Canada.

22             THE COURT:  All right.  Hang on one sec.

23             Okay.  Anything else you want to point out on this

24   issue?

25             MS. KLIEBENSTEIN:  No.  I guess, you know, I

1    haven't -- I'll wait to see what opposing counsel says about

2    it.

3            You know, the other issue that is just kind of

4    bubbling here as we get into -- as we get into experts is

5    how we talk about burdens and do we talk about burdens.

6            THE COURT:  That's a good question.  I hadn't

7    intended that the parties would talk about burdens in their

8    examination.  Obviously your burden is only that of

9    attribution with respect to disgorgement.

10           MS. KLIEBENSTEIN:  Our burden is to identify the

11   gross revenues --

12           THE COURT:  Right.

13           MS. KLIEBENSTEIN:  -- and the causal nexus --

14           THE COURT:  And attribute them -- "attributed to"

15   is the phrase that seems to be used.

16           MS. KLIEBENSTEIN:  Correct.

17           THE COURT:  It's not a but-for causation.  It's

18   contributed to.

19           MS. KLIEBENSTEIN:  Correct.

20           THE COURT:  And I'm using the shorthand

21   attribution to describe that.

22           MS. KLIEBENSTEIN:  We're in alignment.

23           So I just want the clarity that I'm not to bring

24   that up with my expert, nor can he be crossed on burdens

25   that were not his to undertake.

1          THE COURT:  I think we part company on that last

2     issue.  I think he can be examined about you haven't done

3     this, you haven't done that.  Certainly the jury is going to

4     be instructed that that wasn't his burden or your burden,

5     but the limits of what he testifies to is fair game, I

6     think.  But the questions also cannot suggest that it was

7     his burden to do that.

8          MS. KLIEBENSTEIN:  We're in alignment.  Thank you.

9          THE COURT:  All right.  Thank you.

10          Ms. Godesky, come on up, or whomever is addressing

11     this.  I have Judge Wright's summary judgment order with me,

12     so if you are able to point me to what portion of it you're

13     relying on with respect to these OUS writing companies.

14          MS. GODESKY:  Sure.  So I think I can eliminate

15     one of the issues.  So we looked again at the second issue

16     Ms. Kliebenstein raised this morning, which is the writing

17     companies in P1004A and 1007.  We're not going to object to

18     that.

19          THE COURT:  Okay.

20          MS. GODESKY:  On the Chubb Canada piece --

21          THE COURT:  Yep.

22          MS. GODESKY:  -- and the interrogatories and

23     demonstratives, though, it's our position that under Judge

24     Wright's order -- I'm looking at docket 840.

25          THE COURT:  Hmm.

1          MS. GODESKY:  -- according to FICO, after Federal

2    made Blaze Advisor version 7.1 available on its computer

3    server in North Carolina, unauthorized individuals in Canada

4    and Europe accessed, installed and used the software, and

5    she goes on to say that FICO contends that this access

6    constitutes copyright infringement.

7          The primary flaw in this argument is that it

8    necessary depends on the extraterritorial conduct of foreign

9    actors which renders the conduct no longer a predicate act

10    of purely domestic infringement, let alone an act

11    attributable to Federal.  And then she goes on to say, FICO

12    has not demonstrated that an unauthorized act of copying or

13    distributing Blaze Advisor was, quote, in italics, completed

14    entirely in the United States.  So --

15          THE COURT:  Do you happen to have that document

16    with you?  If you don't, yeah, go get it, because of course

17    I have 731 with me and not --

18          MS. GODESKY:  The first order?

19          THE COURT:  -- the supplemental order.  Yeah,

20    bring it on up.

21          MS. GODESKY:  So I was reading from page 13, Your

22    Honor.

23          MS. KLIEBENSTEIN:  Ms. Godesky, could you give me

24    the page cite for that?

25          MS. GODESKY:  13.

1              MS. KLIEBENSTEIN:  Thank you.

2              THE COURT:  Okay.  Keep going if there is more you

3    wanted to say.

4              MS. GODESKY:  That's really just my point is,

5    under the law of the case, I mean the existence of the

6    computer server in North Carolina was before the Court in

7    summary judgment, and she held that in order to have a

8    copyright-infringement claim under The Copyright Act, it

9    needs to be exclusively domestic conduct.  And obviously, in

10   order to allege copyright infringement in Canada, they're

11   relying on actions by the folks at Chubb Canada.

12             THE COURT:  Isn't -- I'm not sure these are

13   entirely the same issues.  That was the issue of the

14   Predicate Act Doctrine, et cetera.  Isn't Federal's argument

15   that those revenues are still generated in part by domestic

16   infringement, and isn't that enough for their disgorgement

17   attribution argument?

18             MS. GODESKY:  No, I don't think it is, under the

19   law of the case.  Absolutely not.  I mean, you have to have

20   an act that constitutes copyright infringement exclusively

21   in the United States.  That's the case law that Judge Wright

22   recites in this order.  And they're relying on acts by

23   unauthorized foreign persons in order to try to demonstrate

24   copyright infringement.

25             THE COURT:  Well, that's not now I understand

1    their argument.  Their argument, I think, is that after

2    March 30th of 2016, the license was terminated and,

3    therefore, revenues generated using Blaze are fair game,

4    arguably because they are generated after the termination of

5    the license.  And so it's not a question of domestic versus

6    foreign infringement from the perspective of the statute of

7    limitations, but from March 30th, 2016 forward, generation

8    of revenue using Blaze Advisor is subject to disgorgement.

9            MS. GODESKY:  I think that's true with regard to

10    the writing company issue, and that's the issue --

11            THE COURT:  Right.

12            MS. GODESKY:  -- I said we're not objecting to.

13            THE COURT:  No.  I understand.

14            MS. GODESKY:  So to the extent there were Chubb

15    Canada, Chubb Mexico, Chubb Australia, writing papers

16    sitting in CW-IM purely in the United States, no objection.

17            THE COURT:  Right.

18            MS. GODESKY:  But there is a separate revenue

19    stream coming from Chubb Canada in those foreign computer

20    applications, computer applications like Evolution Australia

21    that are, you know -- I'm sorry -- Evolution Canada that are

22    sitting in Canada, and there, there is no actionable claim

23    for copyright infringement because there is no domestic

24    activity.

25            So there is -- you know, you can get at the Chubb

1    Canada revenue to the extent that it was sitting in the

2    domestic computer applications.  I agree.

3                THE COURT:  But?

4                MS. GODESKY:  But the revenue that's flowing and

5    is shown -- so if you look at Mr. Zoltowski's

6    demonstratives, right, he has domestic gross written premium

7    numbers, including Chubb Canada, because those -- he is

8    including those because the money was in -- you know,

9    CUW-IM, CSI Express, all of these domestic applications, we

10   don't have an objection.

11               But then when he has separately gross written

12   premium flowing through the Chubb Canada affiliate, there's

13   no hope for copyright infringement because it's not

14   domestic.  It's not actionable under The Copyright Act.

15               THE COURT:  And those revenues -- you are saying

16   that those revenues were generated exclusively from conduct

17   occurring in Canada?

18               MS. GODESKY:  Yes.

19               THE COURT:  And not using the server in North

20   Carolina, or it doesn't matter?

21               MS. GODESKY:  It doesn't matter.

22               THE COURT:  Okay.

23               MS. GODESKY:  Now, to the extent -- yes, it

24   doesn't matter.

25               THE COURT:  Go ahead and finish what you were

1  going to say, if you don't mind.

2       MS. GODESKY:  I was just going to reiterate, you

3  know, to the extent there is Chubb Canada dollars sitting in

4  CUW-IM, he has included that, and we have no objection.

5       THE COURT:  All right.  Let me hear back from

6  Ms. Kliebenstein.

7       MS. KLIEBENSTEIN:  I think I agree with the way

8  Your Honor was approaching this.  So the order at issue

9  dealt with whether use prior to termination of the license

10  was permitted or not.

11       THE COURT:  Right.

12       MS. KLIEBENSTEIN:  Right.  And so we have a sea

13  change on March 31st, 2016, and those are the revenues that

14  we're seeking to disgorge here as it relates to the Chubb

15  Insurance Company of Canada.

16       I think the key fact that is in dispute is the

17  access, the place that the code was continually copied from,

18  the remote user access code that was coming back into the

19  United States.

20       THE COURT:  Say that again.

21       MS. KLIEBENSTEIN:  The infringement happens when

22  the code in Raleigh -- and this is what Mr. Pandey talked

23  about and what Mr. Mirolyuz talked about -- when it's

24  accessed in the United States, and that's where the code is

25  copied.  That's the act of infringement that we're talking

1        about after March 31st, 2016.

2                  THE COURT:  Okay.  And the previous, the OUS issue

3        was -- again, I'm paraphrasing -- but as Judge Wright

4        described it, the fact that the software was made available

5        in Raleigh and then downloaded from Canada to Canada meant

6        that it was not a domestic act of infringement, and,

7        therefore, the Predicate Act Doctrine didn't apply, and that

8        was relating to pretermination conduct.

9                  MS. KLIEBENSTEIN:  Yes, in part.  You know, I want

10       to divorce what happened in Europe, right --

11                 THE COURT:  Right.

12                 MS. KLIEBENSTEIN:  -- where the software went

13       over.

14                 THE COURT:  Yep.

15                 MS. KLIEBENSTEIN:  In North America, we have a

16       different set of facts.

17                 THE COURT:  Right.  But I'm trying to distinguish

18       between what Judge Wright held about the Predicate Act

19       Doctrine from what you're arguing here.  And when I say

20       "OUS," I'm talking about Chubb Canada right now.

21                 The predicate act of infringement had to occur

22       within the statute of limitations, and Judge Wright defined

23       that predicate act as infringement occurring within the

24       United States, and then said that when Chubb Canada copied

25       Blaze Advisor from -- or downloaded Blaze Advisor into

1    Canada from Raleigh, that that was not a domestic act of

2    infringement because the copying occurred in Canada.

3              MS. KLIEBENSTEIN:  I hear what you're saying --

4              THE COURT:  If I've got it wrong, by all means,

5    correct me.

6              MS. KLIEBENSTEIN:  Sure.  We've got two totally

7    different time periods and two totally different breaches.

8              THE COURT:  Right.

9              MS. KLIEBENSTEIN:  And that's where this confusion

10   is coming from.  The predicate act, the stuff that happened

11   before 2016, relates to use outside of the scope, the whole,

12   "Who is the client?"

13             THE COURT:  Right.

14             MS. KLIEBENSTEIN:  "Where does it go?"

15             THE COURT:  Right.

16             MS. KLIEBENSTEIN:  Those are the issues that

17   relate to the statute of limitations and when the predicate

18   act happened.  However, the evidence has shown that after

19   March 31st, 2016, Canada is still accessing it and still

20   using it for the Raleigh server.  So that's what we're

21   talking about with respect to this.

22             THE COURT:  So it's not the act of copying in

23   Canada that is generating your claim for disgorgement.  It's

24   the use of the software, wherever that use occurs.

25             MS. KLIEBENSTEIN:  It's the use of the software in

1        the United States.

2               THE COURT:  Would it make a difference if it were

3        not used in the United States at that point in time?

4               MS. KLIEBENSTEIN:  Well, regrettably --

5               THE COURT:  Possibly?

6               MS. KLIEBENSTEIN:  -- disgorgement figures don't

7        include Europe because to the extent that the European

8        entities don't write the policies here in the United States,

9        which we just talked about with CUW-IM --

10              THE COURT:  Right.

11              MS. KLIEBENSTEIN:  -- that's why those aren't in

12       the disgorgement post-2016, is because the software went

13       over to Europe.

14              THE COURT:  Right.

15              MS. KLIEBENSTEIN:  And that's where it was used,

16       accessed, downloaded, you have it.  That's the distinction.

17              THE COURT:  But in the Chubb Canada case, the

18       software was used in Raleigh to write policies --

19              MS. KLIEBENSTEIN:  Correct.

20              THE COURT:  -- here, write policies for Canada but

21       used the software in the U. S.

22              MS. KLIEBENSTEIN:  Accessed, download -- so the

23       Copyright Act is broader than use, right?

24              THE COURT:  Right.

25              MS. KLIEBENSTEIN:  Downloading, accessing, those

1    are the activities --

2              THE COURT:  Occurring in the U. S. after March

3    30th.

4              MS. KLIEBENSTEIN:  Correct.

5              THE COURT:  Okay.  Okay.  Thank you.

6              MS. KLIEBENSTEIN:  Does Mr. Hinderaker have more,

7    maybe?

8              MR. HINDERAKER:  Would you mind if I added just

9    one comment?

10             THE COURT:  Not at all.  Yeah.  Keep going.

11             MR. HINDERAKER:  I think it's helpful to

12   distinguish between two different elements of Section 106 of

13   The Copyright Act.

14             THE COURT:  Yep.

15             MR. HINDERAKER:  So one of the exclusive rights of

16   FICO is the right to control copying.  So when we're talking

17   about this issue about the revenue connected to copying in

18   the United States for Canada, we're talking about the

19   exclusive right to copying.

20             And the software code of that application

21   Evolution resided in Raleigh, North Carolina.  And when

22   anybody in the world hit a button to fire the application,

23   the application -- the code of that application, as

24   Mr. Pandey and others have explained, was copied from the

25   server and put into the random access memory of the server

1    in Raleigh, North Carolina.

2         That's the copyright infringement.  The fact --

3    everything else about how it's done, the remote access from

4    Canada is noise around the copyright's exclusive right to

5    control who copies my software.

6         With respect to the European applications, our

7    theory under the Predicate Act Doctrine depended upon

8    proving a different right, and that was the right of

9    distribution, to control distribution.

10        And so we had the evidence that from the United

11   States, Chubb -- Chubb & Son, Mr. Mirolyuz and others gave

12   instructions on how others in Europe could access the code

13   sitting in the U. S. and bring it over to Europe and then

14   put it on their servers in Europe.

15        THE COURT:  When they were using it in Europe,

16   then, it was replicated or copied in Europe.

17        MR. HINDERAKER:  It was, but The Copyright Act

18   does not have extraterritorial jurisdiction.

19        THE COURT:  Right.

20        MR. HINDERAKER:  We're not contending that --

21   you're right that as computers work, necessarily the copying

22   was in Europe, but because The Copyright Act has geographic

23   restraints to the U. S., our theory was that the U. S.

24   infringement -- the infringement that was happening in the

25   U. S. with respect to that issue was the distribution in the

1    U. S. because the code originated from a Chubb & Son server

2    where they kept it all, and it was transmitted over to

3    Europe.

4            Judge Wright found statute of limitations issues

5    with respect to that, and that whole bucket of facts that

6    was depending upon infringement by way of distribution --

7            THE COURT:  Right.  Because she -- to paraphrase

8    it perhaps inelegantly, I seem to recall that she said that

9    the act of distribution did not occur by the -- by virtue of

10   it being sent, but rather, by virtue of it being received.

11           MR. HINDERAKER:  That's correct.

12           THE COURT:  And therefore, the distribution

13   occurred outside the U. S.

14           MR. HINDERAKER:  That's right.  And in the

15   briefing, there is this body of law that says if it came

16   from the U. S., that's distribution in the U. S.  There is

17   this body of law, no, you have to wait to where it's all

18   reassembled in the computer --

19           THE COURT:  And she followed that body of law.

20           MR. HINDERAKER:  Fair enough.

21           THE COURT:  But in the Chubb Canada case, the

22   basis for infringement is unauthorized copying because the

23   license has been terminated, and the copying is the

24   replication of the code in the random access memory in

25   Raleigh, North Carolina.

```
1              MR. HINDERAKER:  Exactly so.  And it's a
2    replication of the Blaze Advisor code, to be more specific,
3    even though all of the code in the application would have
4    been copied.
5              Thank you.
6              THE COURT:  Thank you, Mr. Hinderaker.
7              Ms. Godesky, I will give you the last word.
8              MS. GODESKY:  We have nothing else to add, Your
9    Honor.
10             THE COURT:  Okay.  All right.  I'm glad that we
11   have resolved the issue with respect to 1004A and 1007 on
12   the demonstrative and 1008.  I will overrule the objection.
13   I'm going to allow the revenues relative to Chubb Canada
14   after March 30th of 2016 to be included in those -- in the
15   document and in the demonstrative.  Okay?
16             All right.  Before we bring the jury in, just
17   letting you know, unless -- have you been in the jury room?
18             THE CLERK:  Not since 8:30.
19             THE COURT:  Not this morning?  Okay.  Unless there
20   is a surprising presence, I have had to excuse one of the
21   jurors late last night, Ms. Chellsen who sits in the lower
22   end toward the gallery, for personal reasons.  She didn't
23   want to be excused but had no choice but to excuse her.  So
24   we will continue on with eleven jurors.
25             Go ahead.
```

1    THE CLERK:  All rise for the jury.

2    **(Jury enters.)**

3

4

5    **(In open court with the Jury present.)**

6    THE COURT:  Go ahead and be seated.  Members of

7    the Jury, as you can see, I had to excuse one of your

8    members from further service on the jury.  Ms. Chellsen

9    didn't want to be excused, in a sense, but recognized, and I

10   agreed, that it needed to occur for her sake and that of her

11   family.

12   So the federal rules allow us to proceed with

13   eleven jurors, and we're going to do that.  So all the time

14   that you've invested is not wasted.  We're going forward.

15   Okay?

16   All right.  Mr. Hinderaker?

17   MR. HINDERAKER:  I'll resume the video testimony

18   of John Taylor, Your Honor.

19   THE COURT:  All right.

20   **(JOHN TAYLOR)**

21   **VIA DEPOSITION**

22   BY MR. HINDERAKER:

23   Q.  So Exhibit 23 before you, let's look at it.  Do we agree

24   it includes an agreement with an effective date of January

25   1, 1998, between Chubb National Insurance Company and Chubb

1    & Son, a Division of Federal Insurance Company, as well as

2    an addendum with an effective date of December 31, 2007?

3    A.  Yes.  Yes.

4    Q.  Okay.  And to the best of your knowledge, this is a

5    complete management/service agreement between Chubb National

6    Insurance Company and Chubb & Son, a Division of Federal?

7    A.  Yes, to the best of my knowledge.

8    Q.  Okay.  And as I've asked, and again under this

9    agreement, Chubb & Son, a Division of Federal, has the

10   authority to effect, sign, countersign, issue all policies

11   or contracts of insurance issued in the name of Chubb

12   National Insurance Company.  Agreed?

13   A.  Agreed.

14   Q.  Exhibit Number 24 is before you.  Do we agree it

15   includes or it is an agreement dated or effective January 1,

16   2000 between Executive Risk Specialty Insurance Company and

17   Chubb & Son, a Division of Federal Insurance, as well as an

18   addendum effective January 1, 2005, and an addendum number

19   two effective January 1, 2008, and addendum number three

20   effective December 31, 2007?

21            COURT REPORTER:  What was the month?

22   BY MR. HINDERAKER:

23   Q.  December 31, 2007, and addendum four effective January

24   1, 2008?

25   A.  Agreed.

1    Q.  To your knowledge, this is the complete agreement for

2    management or services between Executive Risk Specialty

3    Insurance Company and Chubb & Son, a Division of Federal?

4    A.  Yes, to the best of my knowledge.

5    Q.  Okay.  And do we agree that pursuant to this agreement,

6    Chubb & Son, a Division of Federal, has the authority to

7    effect, sign, countersign, issue contracts of insurance

8    issued in the name of Executive Risk Specialty Insurance

9    Company?

10   A.  Yes, agreed.

11   Q.  So you now have Exhibit 25 before you.  Do you?

12   A.  Yes.

13   Q.  Okay.  So we have been through this together again.

14   Exhibit 25 includes an agreement between Executive Risk

15   Indemnity, Inc., and Chubb & Son, a Division of Federal,

16   effective January 1, 2000, and an addendum number two,

17   effective January 2005, although the first page of addendum

18   number two also says effective the 1st day of January 2008,

19   as well as an addendum number three, effective December 31,

20   2007.  Agreed?

21   A.  Yes.

22   Q.  Okay.  And then to the best of your knowledge, this is

23   the complete agreement on this subject matter between

24   Executive Risk Indemnity and Chubb Insurance -- I'm sorry --

25   and Chubb & Son, a Division of Federal?

1    A.  Yes, to the best of my knowledge.

2    Q.  And do we agree that pursuant to this agreement, Chubb &

3    Son, a Division of Federal, is empowered to effect, sign,

4    countersign, issue all contracts or policies of insurance

5    issued in the name of Executive Risk Indemnity?

6    A.  Yes, agreed.

7    Q.  With Exhibit 26 before you, let's go through it.  This

8    includes an agreement dated January 1, 1998, between Great

9    Northern Insurance Company and Chubb & Son, a Division of

10   Federal Insurance Company, plus an addendum effective

11   December 31, 2007.  Agreed?

12   A.  Agreed.

13   Q.  And to your knowledge, this is the complete agreement on

14   this subject matter between Great Northern Insurance Company

15   and Chubb & Son, a Division of Federal?

16   A.  To the best of my knowledge, yes.

17   Q.  And pursuant to this agreement, Chubb & Son, a Division

18   of Federal, is empowered to effect, sign, countersign and

19   issue all policies or contracts of insurance and reinsurance

20   issued in the name of Great Northern Insurance Company.

21   Agreed?

22   A.  Agreed.

23   Q.  So with Exhibit 27 before you, do we agree that we have

24   a management agreement made this 1st day of January 1998, as

25   well as an addendum effective December 31 -- December --

JOHN DOE CROSS-EXAMINATION

1    effective December 31, 2007, between Chubb Insurance Company

2    of New Jersey, and Chubb & Son, a Division of Federal.

3    Agreed?

4    A.  Agreed.

5    Q.  Okay.  And to the best of your knowledge, this is the

6    complete agreement for management services between Chubb

7    Insurance Company of New Jersey, and Chubb & Son, a Division

8    of Federal?

9    A.  Agreed.  Yes, to the best of my knowledge.

10   Q.  All right.  And do we agree that pursuant to this

11   agreement, the manager, Chubb & Son, a Division of Federal,

12   has the power to bind, sign, countersign and issue all

13   policies or contracts issued in the name of Chubb Insurance

14   Company of New Jersey?

15   A.  Agreed.

16   Q.  Do we agree that Exhibit 28 is a service agreement so

17   titled between -- between Chubb & Son, Inc., of Illinois and

18   Federal Insurance Company, effective January 1, 1998?

19   A.  I agree.

20   Q.  Okay.  And then as we go on in the document, Chubb &

21   Son, Inc., and do we agree that Chubb & Son, Inc., is not

22   Chubb & Son, a Division of Federal?

23   A.  Agree.

24   Q.  So you see in the second paragraph -- well, in the first

25   paragraph, Chubb & Son, Inc., is hereafter collectively

JOHN TAYLOR - DEPOSITION

1    designated as CCM.

2    A.  Okay.  Yes.

3    Q.  All right.  And is it your understanding that by way of

4    this agreement 28, Federal provides facilities and services

5    to CCM in which CCM provides -- through which CCM meets its

6    service agreement obligations with Chubb Custom Insurance?

7    A.  Correct.

8    Q.  Okay.  In your preparation for the deposition today, did

9    you see the service agreement between CCM and Chubb Custom

10   Insurance Company?

11   A.  No.

12   Q.  As a practical matter, do you have any reason to suggest

13   that the services provided to Chubb Custom Market by Federal

14   through CCM are any different than the kinds of services

15   provided by Chubb & Son in the various other agreements

16   we've looked at?

17   A.  No, not to the best of my knowledge.

18   Q.  The court reporter has put in front of you, Mr. Taylor,

19   Exhibit 29, and as we have done with the others, let's

20   identify its components.

21        We have a service agreement between Chubb Lloyd's

22   Insurance Company of Texas and Federal Insurance Company,

23   signed the 1st day of January 1998, as well as addendum

24   number two on its facing page saying, effective 1st day of

25   January -- I'm sorry -- addendum number two being effective

1   December 31, 2007.

2          And to your best knowledge, is this the complete

3   agreement between Chubb Lloyd's Insurance Company of Texas

4   and Federal Insurance Company?

5   A.  Yes, to the best of my knowledge.

6   Q.  Okay.  And do we agree that pursuant to this

7   Exhibit 29 -- actually, I'm going to just read at paragraph

8   number 2 at the bottom of the third page onto the fourth

9   page, that "Federal shall provide all facilities, services

10  and personnel necessary to conduct all the operations of

11  Lloyd's."

12         Do we --

13  A.  Correct.

14  Q.  And that's the authority that this agreement grants to

15  Federal?

16  A.  Correct.

17  Q.  We have -- are you -- are you aware -- to your best

18  knowledge, are all of the management and service agreements

19  we just went through effective today as well?

20  A.  Yes, with the exception of Texas Pacific Insurance

21  Company because that no longer exists.

22  Q.  And while Texas Pacific insurance Company no longer

23  exists, were all of its operations brought into Pacific

24  Indemnity?

25  A.  Correct.  Pacific Indemnity was a private company.

SCHREINER - CROSS-EXAMINATION

1    Q.  And let's look at Exhibit 30 together, sir.  So we have

2    a service agreement effective January 1, 1998, between

3    Federal Insurance Company and Chubb Insurance Company of

4    Canada, as well as an addendum effective December 31, 2007,

5    and an addendum number two effective January 1, 2008.  And

6    then on the Bates numbered page 5, there is another addendum

7    effective December 31, 2007.  Agreed?

8    A.  Yes.

9    Q.  And to the best of your knowledge, is this the complete

10   service agreement with Chubb Insurance Company of Canada?

11   A.  To the best of my knowledge, yes.

12   Q.  Did you tell us already, and forgive me if you have, but

13   did you tell us that Chubb Insurance Company of Canada as of

14   today is no longer a wholly-owned subsidiary of Federal?

15   A.  I don't recall if I said that or not, to be honest.

16   Q.  Is it true that Chubb Insurance Company of Canada as of

17   today is not a wholly-owned subsidiary of Federal?

18   A.  I don't know.

19   Q.  To the best of your knowledge, is this agreement -- this

20   agreement, Exhibit 30, in full force and effect today?

21   A.  I don't know.  To the best my knowledge.

22   Q.  To the best of your knowledge, it is?

23   A.  To the best of my knowledge, it is, but I don't know for

24   sure.

25   Q.  Let's start at the beginning of this document.  That

1    Exhibit 31 includes amendment number three effective January

2    1, 2008, and amendment number two effective December 31,

3    2007, plus amendment number one, and that is signed by Chubb

4    & Son, a Division of Federal, on July 31, 2002.  And then

5    beginning on Bates numbered page 6, we have a service

6    agreement.  Agreed?

7    A.  Agreed.

8    Q.  All right.  And to the best of your knowledge, this is

9    the complete service agreement between Chubb Insurance

10   Company of Australia, Limited, and Chubb & Son, a Division

11   of Federal Insurance Company?

12   A.  Yes, to the best of my knowledge.

13   Q.  Do you if this agreement, Exhibit 31, continues in full

14   force and effect as of today?

15   A.  No, I do not.

16   Q.  You don't know one way or the other?

17   A.  Correct.

18   Q.  Okay.  So you don't know that it's not, either?

19   A.  Correct.

20   Q.  Okay.  So let's look at Exhibit 32, and that kind of got

21   mixed up here.

22            COURT REPORTER:  I'm sorry, what?

23            MR. HINDERAKER:  I'm speaking to myself.

24            COURT REPORTER:  Oh, okay.

25   BY MR. HINDERAKER:

1    Q.  So Exhibit 32 includes, if we look at the Bates numbered

2    3, a service agreement effective March 14th, 2016, between

3    Federal Insurance Company and ACE American Insurance

4    Company, as well as an amendment that is dated on the second

5    page February 22, 2018.

6              Have I accurately described Exhibit 32?

7    A.  Yes.  You appear to, yes.

8    Q.  All right.  And then to your knowledge, is this the

9    complete agreement between Federal Insurance Company and ACE

10   American Insurance Company with respect to the subject

11   matter of the services agreement?

12   A.  To the best of my knowledge, yes.

13   Q.  Okay.  Now for context, we agree that March 14, 2016, is

14   post-merger?

15   A.  Agreed.

16   Q.  Okay.  So I would like to get your understanding of the

17   service agreement before moving to your understanding of

18   amendment number one.  Let's see if we can read it together.

19              The first whereas clause tells us that the

20   parties, Federal Insurance Company and ACE American

21   Insurance Company, provide services to each other under this

22   agreement.

23              So far correct?

24   A.  Correct.  That's what it says.

25   Q.  Okay.  And that when services are provided, the

1  agreement calls that entity the service provider, and when

2  services are received, the agreement calls that entity

3  service recipient.  Agreed?

4  A.  Correct.  That's what the document says.

5  Q.  Okay.  So under this agreement, services can be provided

6  between Federal Insurance Company and ACE American Insurance

7  company.  And if they're the recipient, they will call it

8  service recipient; if they are provider, they will call it

9  service provider?

10  A.  Correct.  That's what the agreement says.

11  Q.  If we look at the agreement paragraph numbered 1, it

12  tells us that, "Such services are set forth in Addendum A to

13  this agreement."

14  A.  I'm sorry.  Where are you at?

15  Q.  Paragraph 1, Performance Standards for Services.

16  A.  Okay.  Thank you.

17  Q.  Okay?  And the agreement includes an Addendum A that

18  identifies the services of this agreement, correct?

19  A.  Yes, it does appear to.  Yes.

20  Q.  Okay.  And then your Exhibit 32 has an Addendum A and a

21  list of services, correct?

22  A.  Correct.

23  Q.  All right.  And then we have amendment number one -- and

24  by the way, have you seen this document before?

25  A.  Not that -- not that I recall.

1     Q.  Okay.  All right.  Let's see if your understanding is

2     similar to mine.  We've got some whereas clauses, and then

3     "So now, therefore, the parties agree as follows:  The

4     following entities shall be added to the agreement as

5     service recipients of ACE American," and then it lists a

6     number of entities.

7            Do you see that?  And all of the entities that it

8     lists are wholly-owned subsidiaries of Federal Insurance,

9     correct?

10    A.  At what time period?

11    Q.  Well, before the merger and after the merger.

12    A.  That is, I believe, incorrect.

13    Q.  And the amendment, this amendment number one, as we

14    said, is effective January 1st, 2008.  So do you have an

15    understanding of how this amendment number one affects the

16    service agreements that we've looked at between Chubb & Son,

17    a Division of Federal, or between Federal and these various

18    entities -- and all of these entities?

19    A.  I'm not sure it would have any impact.

20    Q.  Okay.  And why do you say that?

21    A.  The agreements are still -- the other agreements are

22    still in place.

23    Q.  We just looked at a number of service management

24    agreements between Federal or Chubb & Son, a Division of

25    Federal.

1    A.   Mm-hmm (Yes).

2    Q.   You just said that all of those managements service

3    agreements, to your knowledge, still exist?

4    A.   Mm-hmm (Yes).

5    Q.   And my question is whether you understand that, and I'm

6    not saying -- whether you understand one way or another that

7    pursuant to amendment number one to this service agreement

8    32, all of the services that Chubb & Son, a Division of

9    Federal provided to those various entities is now being --

10   is now being met by ACE American Insurance Company.

11            Do you understand that question?

12   A.   I understand that -- I understand that question.  I'm

13   not -- at the exact date, now Federal no longer has

14   employees.  Employees were moved to ACE American at, I

15   believe -- I believe it was 1/1/17.

16   Q.   ACE American Insurance provided listed services to

17   Federal, and by way of doing that, meets Federal's

18   obligations to the various entities under Federal or Chubb &

19   Son, a Division of Federal's, management services agreement?

20   A.   ACE American -- to the best of my knowledge, yes, I

21   would agree with that.  ACE American provides services to

22   Federal.

23   Q.   And as of January 1, 2017, did all of the employees of

24   Federal or Chubb & Son, a Division of Federal, become

25   employees of ACE American Insurance Company?

```
 1    A.  To the best of my knowledge.

 2    Q.  Exhibit 33 is a blowup of another document that was

 3    produced to us in the litigation, Federal 004420_001.  You

 4    can look at the original if you want, but I think the bigger

 5    blowup is easier.

 6            So we agree we're looking at a document where, in

 7    the key at the right-hand bottom, it says, "As of December

 8    31, 2008."  With me so far?

 9    A.  Yes.

10    Q.  Agreed?  Okay.  And then I would like you to confirm

11    that to the best of your knowledge as of December 31, 2008,

12    this exhibit is giving us the organizational structure of

13    Federal Insurance Company?

14    A.  To the best of my knowledge, that's what the document

15    says.

16    Q.  Okay.  And so for context later on, can we agree that as

17    of the end of December 2008, Chubb Insurance Company of

18    Europe, Chubb Insurance Company of Canada and Chubb

19    Insurance Company of Australia Limited are all wholly-owned

20    subsidiaries of Federal?

21    A.  That's what the chart indicates, yes.

22    Q.  Mr. Taylor, Exhibit Number 34 is a document produced to

23    FICO in the context of litigation as Federal 000060_001 and

24    2.  And take the time that you would like.  I will represent

25    that it is an exhibit from -- a year-end statement of the
```

1  Chubb Corporation December 31, 2013.  And I would like you

2  to confirm that it accurately identifies those subsidiaries,

3  the wholly-owned subsidiaries of Federal as of its date?

4  A.  Yes, it appears to.

5  Q.  Mr. Taylor, Exhibit 35 is a very similar agreement, only

6  for the time period December 31, 2014.  And to the best of

7  your knowledge, does this accurately show the wholly-owned

8  subsidiaries of Federal Insurance Company as of this time

9  frame?

10  A.  Yes, it appears to.

11  Q.  Do we agree that Exhibit 36 is a 10-K submission to the

12  United States Securities and Exchange Commission for the

13  period ending December 31, 2016, on behalf Chubb Limited?

14  A.  Correct.  It appears that.

15  Q.  Exhibit 37, you will see from the first page, it says it

16  is a sub document, Exhibit 21.1, and I'll represent that it

17  is from the December 31, 2016 10-K that we just identified

18  as Exhibit 36.  If you would like to confirm, feel free.  If

19  you are willing to accept my representation, we will move

20  on.

21  A.  I will accept your representation.

22  Q.  And so then if we go to the Bates numbered page 6, do we

23  agree that this states the wholly-owned subsidiaries of

24  Federal Insurance Company as of year end 2016?

25  A.  It appears to, yes.

1    Q.  To the best of your knowledge, it does?

2    A.  To the best of my knowledge, it appears to, yes.

3    Q.  So do we agree that as of December 31, 2016, Chubb

4    Insurance Company of Europe SE is not a Federal subsidiary?

5    A.  I'm sorry.  As of what?  What date?

6    Q.  This document is an SEC report for the year ending

7    December 31, 2016.  And so my question was to have you

8    confirm that as of the date of this, as of the time frame

9    for reporting, that is December 31, 2016, Chubb Insurance

10   Company of Europe is not a Federal subsidiary?

11   A.  Correct.  It appears that way based on this document.

12   Q.  Okay.  Why don't we go to Bates number 10, and at the

13   top, do you read this document as telling us that Chubb

14   Insurance Company of Europe SE is as of this time a

15   subsidiary of Chubb Insurance Investment Holdings, Limited?

16   A.  It appears to be based on this document, correct.

17   Q.  Okay.  And based on this document, Chubb Insurance

18   Investment Holdings Limited is a subsidiary of Chubb INA

19   Overseas Holdings, Inc.?

20   A.  Based on this document, it appears to be, yes.

21   Q.  Have you seen Exhibit 38 before?

22   A.  It looks familiar.

23   Q.  Okay.  In what context do you recall seeing it?

24   A.  In just my normal day-to-day activities.

25   Q.  Got it.  All right.  Let us -- if I can direct your

JOHN LOCK - DEPOSITION

1     attention to the Bates numbered page 13, and keep your

2     finger on 13, and then for context of the question,

3     Exhibit 38 says on its face, "As of September 30, 2016."

4     A.   Okay.

5     Q.   So can we agree, looking at Bates number page 13, that

6     as of September 30, 2016, Chubb Insurance Company of Europe

7     SE is a subsidiary of Federal?

8     A.   Agreed.  It appears that way on this document, yes.

9     Q.   Let's go back to Exhibit 37, and if I could put you to

10    Bates numbered page 6.  And again, as a reminder, Exhibit 37

11    is speaking for the time period ending December 31, 2016.

12              So looking at Bates numbered page 6, do we agree

13    that Chubb Insurance Company of Canada is not a Federal

14    subsidiary?

15    A.   Agreed, based upon this document.  Yes.

16    Q.   Okay.  And then if we go to Bates numbered page 11 in

17    the same exhibit, do we agree that Chubb Insurance Company

18    of Canada is a wholly-owned subsidiary of Chubb Holdings

19    Canada, Limited?

20    A.   Agreed.  Based upon this document, yes.

21    Q.   Okay.  And then based upon this document, do we agree

22    that Chubb Holdings Canada Limited is itself a subsidiary of

23    Chubb Canada Holdings, Inc.?

24    A.   Agreed, based upon this document.

25    Q.   Okay.  And then let's go back to Exhibit 38, which for

```
 1   context is as of September 30, 2016.  If we go to page Bates
 2   numbered 17, do we agree that Chubb Insurance Company of
 3   Canada is not a subsidiary of Federal as of September 30,
 4   2016?
 5   A.  Agreed, based upon this document.
 6   Q.  And do we agree that Chubb Insurance Company of Canada
 7   is not a subsidiary of Federal today?
 8   A.  To the best of my knowledge, that's right.
 9   Q.  All right.  Let's return to Exhibit 37, go to the Bates
10   numbered page 6.  Do we agree that Chubb Insurance Company
11   of Australia is not a subsidiary of Federal as of December
12   31, 2016?
13   A.  Agreed, based upon this document.
14   Q.  Okay.  And then let's go to Exhibit 38.  Go to Bates
15   numbered page 5.  Based on this document, do we agree that
16   Chubb Insurance Company of Australia Limited became a
17   subsidiary of Chubb Holdings Australia PTY effective April
18   1, 2016?
19   A.  Agreed, based upon this document.
20   Q.  Okay.  So based upon this document, we can say that at
21   least as of April 1, 2016, Chubb Insurance Company of
22   Australia was not a wholly-owned subsidiary of Federal?
23   A.  Based upon this document, yes.
24   Q.  Okay.  And do you have any reason to disagree with the
25   information on the document?
```

1    A.  None that I'm aware of, no.

2    Q.  And speaking of today, Chubb Insurance Company of

3    Australia Limited is not a wholly-owned subsidiary of

4    Federal?

5    A.  Correct.  To the best of my knowledge, yes.

6    Q.  Continuing on with this corporate structural

7    organization -- if you told me this, I apologize, but let me

8    confirm that -- ACE American Insurance Company is not a

9    subsidiary of Federal?

10   A.  That's correct.

11   Q.  ACE American Insurance Company is a sister to Federal;

12   is that correct?

13   A.  It's an affiliate.  I'm not sure what you mean by

14   sister.

15   Q.  An affiliate.  Federal Insurance Company and ACE

16   American Insurance Company have a common parent?

17   A.  Ultimately, a common parent, yes.

18   Q.  Ultimate through -- ultimately a common parent today

19   called Chubb Limited?

20   A.  Correct.

21   Q.  Exhibit 39 let me represent is a Chubb Limited 10-K for

22   the period ending December 31, 2017.  I did not bring other

23   copies because I wanted to keep your load light carrying

24   home.  And I don't have any more questions for you, but I

25   just want you to authenticate Exhibit 39 is the 10-K for the

1    year ending December 31, 2017.

2    A.  It appears to be, based on that document.

3    Q.  Okay.  The whole point of that is this.  I'm going to

4    represent to you that Exhibit 40 is a schedule for an

5    exhibit from the December 31, 2017, 10-K that I just showed

6    you.  And if you would like to confirm that, you have the

7    10-K to do that, and if you want to take my representation,

8    that would be fine, too.

9    A.  With everything else, with all the documents we've

10   reviewed, I'll take your representation.

11   Q.  All right.  Fair enough.  And can we agree that

12   Exhibit 40 includes, beginning on page -- at page 5 of 19,

13   the identification of the wholly-owned subsidiaries of

14   Federal Insurance Company as of the time period December 31,

15   2017?

16   A.  It appears to, correct.  Yes.

17   Q.  I have had that marked as Exhibit 41, Federal Insurance

18   Company and its U. S. Insurance Subsidiaries' audited

19   financial statements, years ending December 31, 2016 and

20   2015.  Are you familiar with this document?

21   A.  Yes, I am.

22   Q.  Did you have a role in preparing it?

23   A.  Yes, I did.

24   Q.  Okay.  And were you one -- were you one of the

25   responsible people in having it submitted to the NAIC?

1    A.  They fell under my management.

2    Q.  Okay.  And for the record, would you define the acronym

3    NAIC?

4    A.  National Association of Insurance Commissioners.

5    Q.  So do we agree that Exhibit 41 is an audited statement

6    prepared by PWC?

7    A.  It appears to be.

8    Q.  Whether the differences are material.  I mean, are they

9    material to the accuracy of the financial reporting?

10   A.  These statements are materially correct as presented in

11   accordance with U. S. statutory reporting.

12   Q.  On page 5, there is a heading, Underwriting, and then

13   Premiums Earned, and it gives me --

14            I would like the definition of premiums earned,

15   that category, Mr. Taylor.  Can you tell me from your

16   knowledge what premiums earned means on this report?

17   A.  It is the premium earned to match the risk to -- the

18   premium earned over the year, which would coincide with, you

19   know, how a policy term runs.

20   Q.  Earlier in the day, you told us what the difference was

21   between earned premium and direct premium.  So is this

22   statement premium earned a different way of saying earned

23   premium?

24   A.  Correct.

25   Q.  Okay.  And as reported on page 5, this is reporting in

1    thousands, so one of the numbers would be 8 billion

2    something, 8,103,000?

3    A.   Correct.

4    Q.   And unfortunately, I have to give you another odd page,

5    page 7, and it has premiums net of commission and

6    reinsurance, and so I will give you the page.  I have had

7    the question in mind for a while.  One of the descriptors

8    there is premium.

9    A.   Mm-hmm (Yes).

10   Q.   So my question is, When it says premium on this

11   financial -- on this report, is that the same thing as

12   direct premium that you told us earlier -- that you defined

13   for us earlier?

14   A.   This refers to premiums collected.

15   Q.   Premiums collected?

16   A.   Mm-hmm (Yes).

17   Q.   Does that mean premiums on the policies sold in that

18   reporting year?

19   A.   No, not necessarily.

20   Q.   Okay.  Tell me, what does it mean that it's premiums

21   collected?

22   A.   Premiums collected from insurance.

23   Q.   Over what time frame?

24   A.   Over the time frame of the financial statements.

25   Q.   Okay.  And so the collecting of the premium may not be

1    coincident with the sale of the policy?

2    A.  It could -- yes, it could or could not be.  Yes.

3    Q.  So is page 32 -- all right.  On the far right end of the

4    page, page 32 reports the consolidated premiums earned of

5    the various subsidiaries of Federal and consolidated into

6    Federal premiums earned; is that correct?

7    A.  No.

8    Q.  What does page -- what is the -- where it reports on

9    consolidated premiums, which companies are included in that

10   consolidated number?

11   A.  All the companies that are listed.

12   Q.  That was my question.  Now we're on the same page.

13          And that page and the companies that are listed

14   are Federal and Federal subsidiaries.  Agreed?

15   A.  The end of '16 -- I don't think -- yeah, I believe so.

16   I don't think anyone had moved out at that point.

17   Q.  Now, I would like you to look at the premium -- what's

18   reported as the premiums earned for Vigilant Insurance

19   Company, Chubb Custom Insurance, Chubb National Insurance,

20   Chubb Indemnity and Executive Risk Specialty Insurance.

21   Would you look at that?

22   A.  Yes.

23   Q.  Is the premium noted to be 38 million one dollar -- I'm

24   sorry, $38,001,851?

25   A.  It appears to be, yes.

1    Q.  Can you explain to me how five different insurance

2    companies report exactly the same premium earned for the

3    year 2016?

4    A.  This is a net premium number.

5    Q.  How does the net premium number result in the exact same

6    number for each of those -- each of those five companies?

7    A.  There is a -- the companies share premiums and losses.

8    Q.  So whatever that number was, it got divided by five and

9    they all had the same report?

10   A.  For the companies you mentioned, yes.

11   Q.  Now, this report to the NAIC is a consolidation of the

12   United States subsidiaries, as we saw.  Agreed?

13   A.  Correct.

14   Q.  And I have a couple questions on page 8.  So I pointed

15   you to page 8, but let's first agree that Exhibit 42 is

16   Federal Insurance Company combined financial statement,

17   December 31, 2017 and 2016, reported to the NAIC.

18   A.  Correct.

19   Q.  Okay.  And then to page 8.  That page 8 lists,

20   identifies the various subsidiaries of Federal who -- for

21   whom this report reports Federal on a consolidated basis?

22   A.  Correct.  That appears to be, yes.

23   Q.  And then there is a statement on page 8 of a, "Federal

24   pool."  Do you see that?

25   A.  Yes.

```
1    Q.  My question simply is, what does that mean?

2    A.  The Federal pool is -- is a -- an agreement between the

3    companies that share premiums and losses.

4    Q.  Are all the members of the Federal pool Federal

5    subsidiaries, wholly-owned?

6    A.  As of?

7    Q.  As of the reporting date.

8    A.  Yes.

9    Q.  I'm going to bring you to an exhibit.  At the end of the

10   exhibit, it doesn't bear a page, but we can identify it at

11   the top of the page as underwriting income, and then

12   premiums earned.

13           So I think -- I think if we start at the page with

14   premiums earned at the top, and then I think you have to go

15   to the next page as well because the various subsidiaries

16   across the columns go on to the next page, agree?  And on

17   that second page, we've got the consolidated combined

18   premiums.

19           All right.  So we're at that page at the heading

20   Premiums Earned, and the column listed Subsidiaries of

21   Federal, and then you go to the next page, more subsidiaries

22   of Federal?

23   A.  Correct.  Excuse me.

24   Q.  And then it reports on a consolidated basis for Federal?

25   A.  Yes.
```

1    Q.  Thank you.  In this instance, as well if you would look

2    at the premiums earned for the same companies, Vigilant,

3    Chubb Customs, Chubb Indemnity, Executive Risk, Chubb

4    National, I think all of those -- each of those companies

5    reports premiums earned within four dollars of each other.

6    A.  Mm-hmm (Yes).

7    Q.  Is the explanation the same for this report as it was

8    earlier, that they are part of a pool?

9    A.  Yes.

10   Q.  Okay.  Can you identify Exhibit 43?

11   A.  It is Federal Insurance Company -- or appears to be

12   Federal Insurance Company's 12/31/2017 annual statement.

13   Q.  And is this report also submitted to the NAIC?

14   A.  Yes, it is.

15   Q.  Would you go to the Bates numbered 8.  Let me just

16   unclip that.  It might be easier.

17   A.  Okay.

18   Q.  I just want to make sure I understand it.  There is a

19   column -- a column called Line of Business, and under that

20   is -- it's reporting various kinds of lines of business,

21   correct?

22   A.  Correct.

23   Q.  And then the column called Direct Business reports

24   dollar values for the lines of business identified.

25           What does direct business mean?

```
 1    A.  The same as it was -- as we discussed before.

 2    Q.  I don't -- we talked about direct premium.  I don't know

 3    that we've talked about direct business.

 4    A.  This is the -- this is -- this is premiums written, if

 5    you look at the top.

 6    Q.  Okay.  Mighty fine.

 7         Okay.  And then let's go to Bates number 2 -- 0233

 8    through 0246.

 9    A.  Okay.  0233 through --

10    Q.  0246.  I just want to confirm that that is the -- that

11    is an organizational chart relative to Fe=deral Insurance

12    Company?

13    A.  Yes.

14         MR. HINDERAKER:  Thank you for your time.  No more

15    questions.

16         THE COURT:  All right.  Mr. Hinderaker, I think

17    we'll go until about 10:30, so if you could call your next

18    witness.

19         MS. KLIEBENSTEIN:  Yes, Your Honor.  We call Neil

20    Zoltowski.

21         THE COURT:  Thank you, Ms. Kliebenstein.

22         Come on up here, Mr. Zoltowski.  Good morning.  If

23    you would raise your right hand, please.

24                        (Witness sworn.)

25         THE WITNESS:  I do.
```

1      THE COURT:  Go ahead and be seated.  Turn your

2  microphone on.  Speak into it, and state your full name for

3  the record.

4      THE WITNESS:  My name is Neil Joseph Zoltowski.

5                    **(NEIL J. ZOLTOWSKI)**

6                    **DIRECT EXAMINATION**

7  BY MS. KLIEBENSTEIN:

8  Q.  Good morning, Mr. Zoltowski.

9  A.  Good morning.

10 Q.  You just introduced yourself.  Can you tell us who you

11 work for?

12 A.  Yes.  I'm a partner at a company called StoneTurn.

13 Q.  And StoneTurn is not a party to this lawsuit.  It's not

14 a name we have heard yet.  Why are you here?

15 A.  I was retained as an expert on damages-related issues.

16 And so in cases like this, there is a need for people like

17 myself and in a lot of cases related to corporations, there

18 is a need for, different types of experts, but I can give

19 you an example of that.  In my work on patent infringement

20 cases, patents can be very technical, the inventions that

21 are at issue and the technology, and so there are a lot of

22 technical experts who might be experts in semiconductors or

23 transistors or other things related to those inventions.

24      Here I'm speaking about the financial issues, the

25 economic damages issues.

1    Q.  And which party retained you?

2    A.  FICO.

3    Q.  And you're here to provide what, again?

4    A.  An expert opinion related to the gross revenue, meaning

5    gross written premiums, related to the copyright

6    infringement by the defendants.

7    Q.  And you prepared a set of slides to assist with your

8    testimony today?

9    A.  I have.

10   Q.  And you also have a clicker right now to you as well, so

11   let's get started.

12           Mr. Zoltowski, can you tell us, let's just start

13   off with your educational background so that folks can have

14   an understanding of who you are and what your background is

15   in.

16   A.  Sure.  I received a degree in economics from Trinity

17   College in Hartford, Connecticut, where I was -- I received

18   some accolades related to some honor societies, one being

19   Phi Betta Kappa and another being Pi Gamma Nu which is one

20   that is kind of a funny name that no one has really heard of

21   but relates to social sciences, and also received an award

22   from the economics department for my work in economics at

23   Trinity College while I was there, and I also did some

24   graduate work, a few courses related to valuation and

25   economics as well.

```
 1     Q.  And let's turn to your professional experience.  You

 2     stated that you work at StoneTurn.  What is your position at

 3     StoneTurn, and how long are you been there?

 4     A.  I am currently a partner at StoneTurn.  I have been

 5     there since 2004 when we started the company, other than a

 6     nine-month period when I left but then came back.

 7     Q.  What is the business of StoneTurn?  What does StoneTurn

 8     do?

 9     A.  StoneTurn is a consulting firm, and the best way to

10     characterize it is to break it up into three different

11     buckets.  There is disputes, investigations and then

12     compliance-related consulting.

13          Disputes obviously is here today.  This is the

14     work I'm doing as a consultant.  And that work can be

15     anything from assisting a company outside of litigation who

16     wants to maybe look through their patent portfolio and help

17     them understand what they might be able to do with it in

18     terms of licensing those patents.

19          It could be assisting them in determining if they

20     have a target market for a potential litigation they want to

21     bring, and we can value that for them, either for a specific

22     target or for an entire market.

23          There is also work, like I'm doing here today,

24     which gets all the way down the line to trial where we

25     assist through the process of discovery.  I will help the
```

1    company many times respond to requests for production of

2    data where -- although the company itself, you know, our

3    client, may have people who understand their systems and

4    their financial accounting systems, they -- requests are

5    very specific in our cases for the data that we would use,

6    and so many times they need some assistance in extracting

7    that data and querying their system appropriately, and we

8    have people that can help them do that.  So to help be

9    responsive to those requests.

10          And then also as part of this work we issue expert

11   reports within this type of context and provide testimony in

12   deposition, and if it makes it to trial, which doesn't

13   always happen that much, then we come to trial and provide

14   testimony.

15   Q.  You also mentioned briefly that StoneTurn does

16   investigations and compliance work.  Can you touch on that

17   briefly?

18   A.  Sure.  So in terms of investigations, we started out as

19   a company that did mostly forensic accountant

20   investigations.  And back then, it was mostly fraud

21   investigations.  Forensic accounting is kind of a generic

22   term now used in our industry for all types of consulting.

23   But the investigations we do kind of cover a wide spectrum.

24          I can give you an example of one I actually ran

25   which related to the Service Member Civil Relief Act.  And

1    the Department of Justice had -- were looking into some of

2    the banks, and they alleged that the banks were foreclosing

3    on service members while they were on active duty illegally.

4    And so we were brought in to investigate one of the banks

5    of -- I think there were five banks total, to determine if

6    they had illegally foreclosed upon service members while

7    these service members were in, say, Afghanistan or Iraq,

8    unbeknownst to them coming home to a house they no longer

9    owned.

10          And so we did that work for about six or eight

11   months, going through thousands and thousands of loan files

12   to determine what went on.  I think for our bank it was

13   about 30-plus million dollars that we found in terms of

14   fines and other things that they had to pay.

15          In terms of compliance work, we do a lot of

16   different types of compliance work, and most of it relates

17   to monitorship work, which people haven't heard that term

18   very much.  But many companies will run into some problems

19   with the government, and instead of going through the

20   process of a trial and having some news and headlines about

21   them, they would rather enter into a plea agreement or

22   settlement or consent decree, whatever it might be.

23          One of the things I can mention, because most of

24   them are confidential, is Volkswagen.  I'm sure most people

25   heard about the emission scandal where they manipulated

1    their cars -- their diesel cars so that when the cars were

2    tested by the EPA here in the United States, they had

3    software that would actually make it cheat the system, and

4    so their mileage and other things were not being read

5    appropriately by the testing by the EPA.  And so Volkswagen

6    entered into a plea agreement, and they were required to

7    install a monitor.

8            I think that monitor's name was Larry Thompson.

9    He is a former deputy U. S. attorney general, I believe.

10   And we were a part of that team and helping them really

11   remediate, you know, what happened internally, what's the

12   problem with the culture?  Are people concerned or scared to

13   speak up if they see something that's wrong, thinking

14   they're going to get fired?  Has there been retaliation by

15   the company in the past that created that problem?  And what

16   steps can they put in place and policies and procedures to

17   fix that going forward?

18            And they actually met their timeline, which --

19            (Court reporter clarification.)

20            THE WITNESS:  I'm sorry?  Oh, I'm sorry.  They met

21   their burden in terms of what requirements they had under

22   their monitorship within their time frame, which is not

23   typical in our business, which is great for them, and so

24   we're no longer working on that.

25   Q.  Mr. Zoltowski, prior to StoneTurn, did you work for

1    similar firms doing similar work, if you could run through

2    them quickly?

3    A.  Sure.  I worked for a number of companies before

4    StoneTurn.  One was NERA Consulting.  That was my first

5    position out of undergrad where I worked in the regulatory

6    world.  So I was assisting companies, telecommunications

7    companies, really the old Ma Bell companies.  When the

8    Telecommunications Act of 1996 came out, both local and the

9    long distance companies were trying to get into each other's

10   markets, more the locals into the long distance because

11   that's where the profits were and the money was. And so we

12   were assisting those local old Ma Bell companies as they

13   went to the regulatory commissions and petitions to enter

14   the markets.

15            We also were assisting in pricing what a phone

16   call should cost back then.  So back then they had to

17   interconnect with each other.  So if you wanted to make a

18   phone call, say, from here to California, it wasn't carried

19   just by, you know, Ameritech or whoever was the local phone

20   company.  It went through Ameritech and maybe AT&T carrier

21   or someone and then it went to another local company, when

22   we finished the call and we were pricing what that should be

23   going forward and presenting to the Federal Communications

24   Commission on that issue as well.  So that was my first

25   three years.

1   Q.  And what about at Tucker, Alan & Deloitte?  Could you

2   briefly touch on those experiences as well?

3   A.  Sure.  At Tucker Alan is when I first started doing this

4   type of work in litigation consulting.  That was back in

5   2000, 20-plus years now.  There I was working on one of the

6   largest arbitrations in U. S. history, which was really

7   interesting.  It related to a drug that could be used for

8   various indications.  But the agreement between the parties

9   only did it by hospital instead of by indication, so

10  hospitals don't typically buy drugs for certain indications.

11  They buy drugs for the entire hospital.

12          And we were chartered to go in and figure out how

13  do you split up how much was bought by -- bought for certain

14  indications versus others.  So I did that for about a year.

15  That arbitration lasted eleven years and finally concluded

16  in 2008.

17          At Deloitte & Touche, which is one of the big four

18  accounting firms, I was part of the intellectual property

19  consulting group there and did the same type of work I'm

20  doing here today, same as at Tucker Alan.  So it's been

21  about 22 years or so that I have been doing

22  litigation-related consulting and economic damages

23  consulting.

24  Q.  And you touched on your litigation work.  Can you tell

25  me, what percentage of your litigation work is for the

```
 1    plaintiff versus the defendant?

 2    A.  For me personally, it's about 50/50, and same with my

 3    team.  You know, we work in teams in this business.  It's

 4    not just me.  I have a great group of people who work with

 5    me, and then also some other senior practitioners who are

 6    experts, and most of our work is split 50/50.  We don't sort

 7    of have a weight towards one or the other, nor do we market

 8    ourselves to work for one or the other.

 9    Q.  And so overall, your last 25 years have been spent doing

10    work in economics and damages, correct?

11    A.  Correct.

12    Q.  Can you briefly walk through your -- your expert witness

13    experience and your certifications?

14    A.  Sure.  So I've been retained on about 40 or 50 matters

15    as an expert and written expert reports in probably about 30

16    of those, I would say.  A lot of them never maybe get to

17    that expert report phase.  I have testified 20 times, 15

18    times in deposition and 5 times in trial.

19         In our business, you are kind of beholden to the

20    companies if they decide to go to trial or not, so sometimes

21    -- I have certain partners who have a lot of experience in

22    testifying at trials and some who have zero.  It's all kind

23    of just the luck of the draw.

24         And in terms of my certifications, I have four of

25    them.  They all relate to either valuation or licensing and
```

1    things related to the work I do, specifically in

2    intellectual property.

3           The first is a Certified Valuation Analyst.

4    That's a valuation credential related to valuation of

5    businesses and intangible assets, and that's provided by the

6    National Association of Certified Valuation Analysts, I

7    think is what it's called.  It's a mouthful, NACVA.

8           I also have the Master Analyst and Financial

9    Forensics, and I'm only looking at the title because they

10   changed it a couple years ago.  And that one specifically

11   relates to business and intellectual property damages work

12   like I'm doing here today.  That's also from NACVA.

13          I have the Certified Licensing Professional, the

14   CLP.  That is a credential that is granted by the Licensing

15   Executive Society, which is kind of the foremost licensing

16   organization here in the country related to the licensing of

17   technology and intellectual property.

18          And then I have the Certified Patent Valuation

19   Analyst, which is a credential related to the valuation of

20   patents, which is a large proportion of the work I do.

21   Q.  And, Mr. Zoltowski, what were you asked to do

22   specifically in this case?

23   A.  In this case, I was asked to quantify the amount of

24   gross revenue -- here it's going to be gross written premium

25   as you'll hear that term -- related to the defendants'

1   infringement of FICO's copyright.

2   Q.  And were you also tasked with identifying the writing

3   companies associated with that revenue?

4   A.  Yes, I was.

5          MS. KLIEBENSTEIN:  Your Honor, FICO offers

6   Mr. Neil Zoltowski as an expert on economic damages.

7          MS. GODESKY:  No objection, Your Honor.

8          THE COURT:  You may proceed.  However, it's time

9   for our break, so you may proceed after that.

10          Members of the Jury, we'll take our morning

11   recess.  We will plan to be back at quarter to 11:00 on that

12   clock.  As always, you can talk about anything you want

13   except this case.

14          THE CLERK:  All rise for the jury.

15                    **(Jury exits.)**

16

17          **(In open court without the Jury present.)**

18          THE COURT:  You may be seated.  We're in recess.

19                   **(Recess taken.)**

20

21          **(In open court without the Jury present.)**

22          THE COURT:  Please be seated.

23          THE CLERK:  All rise for the jury.

24                   **(Jury enters.)**

25

```
1              (In open court with the Jury present.)

2              THE COURT:  Be seated, everyone.

3              Ms. Kliebenstein, you may proceed.

4              MS. KLIEBENSTEIN:  All right.  Thank you.

5     BY MS. KLIEBENSTEIN:

6     Q.  Mr. Zoltowski, we left off, we were just about to

7     summarize your opinions, but first I wanted to ask you what

8     types of information in this case did you review in reaching

9     your conclusions?

10    A.  Like in any case, we typically look at a lot of

11    different categories for information.  And this case was no

12    different.  It was probably tens of thousands of pages we

13    looked at.  And that included, obviously, the agreement, the

14    settlement -- sorry, the software license and maintenance

15    agreement between the parties and the amendments, a lot of

16    documents produced by both parties in this litigation.

17             Legal documents, which would include the

18    complaint, which is what began this proceeding, as well as

19    interrogatory responses between the parties, interrogatory

20    being a fancy way of saying questions, questions and

21    answers.  There are were lots -- many, many iterations of

22    those.

23             We read and reviewed a number of depositions,

24    testimony that was given by witnesses from both parties'

25    witnesses.  I think we read over 20 different deposition --
```

1   testimony of 20 different witnesses.

2          And then we do our own publicly -- we research

3   from publicly available sources.  So we will look at the

4   company's websites.  We will look at their filings if

5   they're a public company with the United States Security and

6   Exchange Commission, things of that nature.

7   Q.  And did you speak with any individuals who had

8   information relevant to this matter?

9   A.  I did.  I spoke with Bick Whitener.  He's in the

10  insurance industry.  He has had many, many years in the

11  insurance industry.  And he was retained on behalf of FICO,

12  and I think he will be speaking at some point either today

13  or tomorrow.  And also Bill Waid, or Willy Waid.  I think

14  his new title -- I had his old title in my head, it's chief

15  product manager at FICO.

16  Q.  And did you prepare any reports?

17  A.  I did.  I prepared four expert reports in this case.  My

18  initial report was issued back in April, I believe, of 2019,

19  and that summarized my initial opinions.

20         I then issued a -- or submitted a reply report a

21  few weeks after that, which was just a response to opinions

22  that the opposing expert had.

23         And then in I want to say August of 2020, but it

24  was in 2020 and then also in 2021, I supplemented my

25  opinions with new data that was provided by the defendants.

1    Q.  And those reports, they formed the basis, the

2    foundation, for your opinion today; is that correct?

3    A.  That's correct.

4    Q.  And so we -- we talked at a high level about the

5    information you considered and your other previous work, and

6    you just talked about expert reports.

7            My question to you is, as an expert in economics

8    and accounting and damages, how do you get from point A to

9    point B, taking all that information and distilling it down

10   into conclusions that are applicable to the case at hand?

11   A.  Sure.  So it kind of works like a funnel where we have a

12   lot of information that we need to process, information and

13   data, both qualitative and quantitative information.  And we

14   need to determine what's the most relevant to the case and

15   to what we're doing as experts in economic damages.

16           The best analogy that we've come up with our team

17   is, it's kind of like a jigsaw puzzle.  So if you are at

18   home doing a jigsaw puzzle and you have 1,000 pieces, when

19   you buy it and bring it home, you know you have 1,000 pieces

20   and you know what the picture looks like.

21           We -- when we do a case, we don't know if we have

22   1,000 pieces.  We don't know if we have 200 pieces or 800

23   pieces, and we have no idea what the picture is supposed to

24   look like at the end.  We kind of have an idea, but our job

25   is to really figure out how do we fill in those gaps, how do

1    we build a story from what information we do have available

2    to us.

3            One example of where we would have a gap, for

4    example, would be in a case I currently have right now that

5    is actually going to trial in a couple months.  My client

6    was spun off from another company and then acquired by

7    another company a couple years later, so we have three

8    different financial and accounting systems that we're

9    dealing with to try to extract the data that we need for the

10   case.

11           And so we have been working with them -- or have

12   been working with them for months trying to figure out what

13   the systems were and get people into a system and extracting

14   the data, because some of it was legacy data that was stored

15   on some drive somewhere in a closet that we had to try to

16   figure out how to get information off of.

17           So that's the best kind of example I could give in

18   terms of what we do and how we get from point A to point B

19   because every case is different, and in some cases we might

20   have 999 pieces of the puzzle, and some we may have 150.

21   Q.  And based on your review and analysis of this

22   information, you rendered certain opinions regarding gross

23   revenue in this case, correct?

24   A.  Correct.

25   Q.  And tell us what those opinions are.

1     A.  As I stated before, I assessed and quantified the gross

2     revenue.  And you're going to hear kind of the two terms,

3     gross revenue and gross written premium, which are analogous

4     here for purposes of this case.  And I quantified that

5     related to the infringement of FICO's copyrights, and in

6     which there was a connection to Blaze Advisor.  And for the

7     United States that number was about 21.2 billion, and for

8     Canada it was 154.4 million.

9              And for ease of getting it into the record, I'm

10    just going to read the numbers with the commas for the court

11    reporter.  For the United States, it's 21,202,380,943, and

12    for Canada, it's 154,380,023.

13             So I also matched up the writing companies that

14    were associated with these gross written premiums as well,

15    which I identified through my work.

16    Q.  And what are your conclusions with regard to the writing

17    companies that you matched up?

18    A.  I'm not sure I understand your question.  I'm sorry.

19    Q.  Maybe we will just get there in time.  We've had a lot

20    of claims and a lot of information come at folks quickly in

21    this case, so I just want to make sure we're crystal clear

22    about what your lane is and what it's not.

23    A.  Sure.

24    Q.  So I see on slide -- on this slide, the date March 30th,

25    2016.  Can you put a time period on your gross revenue

1    calculations?

2    A.   They began at the termination of the agreement, which is

3    that March 30th, 2016, date and --

4    Q.   Go ahead.  Sorry.

5    A.   And they ended, depending on when the -- when Blaze

6    Advisor was removed in each application, which we understand

7    to be for these entities at issue sometime in April of 2020.

8    Q.   And your opinions relate -- that was the time period.

9    The subject matter is about disgorgement under The Copyright

10   Act, correct?

11   A.   Correct.

12   Q.   Okay.  Perfect.  Before we dive into the details of your

13   opinions, are there certain assumptions that you must make

14   as an expert witness in this area that you must make for

15   purpose of calculating damages?

16   A.   Yes.  At the end of the day, as a damages expert, the

17   one inherit assumption we have is that wrongdoing actually

18   happened and there is liability.  Obviously, without the

19   liability, there would be no damage.  There would be no

20   reason for me to sit here today.

21            But there are other assumptions, depending on the

22   case, that I as an expert need to make to quantify damages.

23   And in this case, there are some in particular related to

24   copyrights and copyright infringement.

25            So these assumptions are that FICO's copyright

```
 1    registrations are valid, that FICO's copyright registrations

 2    for Blaze Advisor are enforceable, that FICO controls and

 3    owns the copyrights at issue and that, as I said previously,

 4    Federal and ACE are liable for copyright infringement.

 5           And while these sound like basic assumptions,

 6    there are cases where there is a dispute over ownership of

 7    the intellectual properties, say the copyrights, and so this

 8    may be an assumption that may be in dispute, but I still

 9    have to assume it's true for purposes of my analysis.

10    Q.  And I think you just answered my next question.  I

11    wanted to clarify.  "Assumption" is kind of a term of art in

12    your industry.  I just want to make it crystal clear as to

13    what is an assumption?

14    A.  It's something we assume to be true for purposes of

15    really taking me from one lily pad to the next lily pad so I

16    can actually start quantifying damages.

17           The assumptions that we use have to be reasonable.

18    You know, some of them are given to us, and they are factual

19    that we can see on, you know, in plain black and white.

20    Some are not always, and we need to test those to make sure

21    they are reasonable.

22    Q.  Let's move on to your -- your first opinion.

23    Mr. Zoltowski, can you tell us again what is the first

24    opinion you reached as a result of your analysis in this

25    case?
```

1   A.  Based on my analysis, I assessed and quantified the

2   gross written premium from policies in connection with --

3   which Blaze Advisor received, beginning in -- on March 30th,

4   2016, and that number is in the United States approximately

5   21.2 billion, and in Canada, it's 154.4 million.

6   Q.  And generally, what are the steps you took to quantify

7   these amounts?

8   A.  I'm not sure I understand your question.  I'm sorry.

9   Q.  How did you -- how did you -- what is the general

10  process you used to calculate these numbers?

11  A.  I think, as I talked about, there is lots of information

12  that we receive and that we review and analyze.  In this

13  case, there was information and data that was provided by

14  Federal and ACE regarding these gross written premiums that

15  had -- where their applications for their entities had used

16  Blaze Advisor in some way.

17  Q.  And your next slide, can you describe this next slide

18  for us?

19  A.  Sure.  This is really just a breakdown of the $21.2

20  billion by application.  You can see for Canada, it's only

21  one application, so that's why it's only one line item.  And

22  so these are the different amounts that are associated with

23  each of the applications for Federal and ACE.

24           And so you have them listed here, Commercial

25  Underwriting Workstation.  You may have heard CUW used as an

1    acronym.  There is CSI Express, Profitability Indicator, and

2    ARP-1 and 2.  My understanding is the reason that they're

3    grouped together -- or the reason we did it, but my

4    understanding was that there is policies that go through

5    those systems -- the same policy may go through all three of

6    these systems or may go through two of the three, and,

7    therefore, some of the data we had received previously had

8    double-counted some of the policies and premiums.

9            And so my understanding now is that Federal and

10   ACE have been able to remove the duplicates, and the data we

11   finally have received in the last supplement has removed all

12   of that -- the duplicate entries for these premiums or those

13   policies.

14           There is also premium booking; Texas Accident

15   Prevention System, which TAPS is the acronym that you may

16   have heard; Cornerstone; Individual Rate Modification

17   Application, or IRMA.  And DecisionPoint for the U. S.  You

18   can see the amounts are on the right side in the total

19   column.

20           And below is the application for Canada, which is

21   Evolution, which is the entire amount of 154.4 million.

22   Q.  You just brought up something that people may have a

23   question about, so I want to answer that before we move on.

24   You mentioned that certain applications are grouped together

25   because policies run through several of them.  Could you

1    just identify that in our chart specifically?

2    A.  Yes.  It's the -- it's the second line item of

3    application, so it's the third line down.  It's CSI Express,

4    Profitability Indicator, ARP-1 and 2.

5    Q.  And ARP is an abbreviation for Automated Renewal

6    Process; is that right?

7    A.  That's correct.

8    Q.  Okay.  Let's -- while we're on the subject of

9    applications, let's do a little more base setting so we're

10   all on the same page and back up and discuss the

11   applications that are at issue.

12           Did you review any information in this case to

13   understand generally, at a high level, what the software

14   applications that used Blaze Advisor in this case -- what

15   functions they perform?

16   A.  Yes.  There was deposition testimony provided by

17   witnesses for Federal and ACE.  There also were exhibits

18   that were part of that testimony that related to the

19   applications.  There also were a number of documents that

20   the parties produced that provided us with information

21   regarding the different applications that are at issue.

22   Q.  And for -- we have two buckets of applications, as we

23   have seen on the slides.  We've got U. S., and we've got one

24   in Canada.  What do you understand are the functions of each

25   of the U. S. applications?

A.  So there is summarized in this table, which I'm sure
everyone can read but I will try to summarize the summary.

So for the U. S. Blaze Advisor applications, there
is Commercial Underwriting Workstation, or CUW.  That's an
application that supports commercial underwriting and
processing throughout the whole cycle.

CSI Express, that's a policy administration
application, and that's only in the specialty line of
business in the U. S. and Canada.

Automated Renewal Process, that was the ARP you
saw on that line item.  That's an application used to book,
bind and issue renewal policies.

Profitability Indicator, that's an application
used to assess the risk associated with an insurance policy
to precisely price that policy.

Premium Booking ensures that insurance premiums
for issued policies comply with rules and various
regulations.

TAPS, or Texas Accident Prevention System,
generates letters related to issued workers' comp policies
that are required by the State of Texas.  So there must be
some sort of requirement in the State of Texas, and that
system issues those letters that are necessary to meet that
requirement.

Cornerstone is used for surety bond issuance and

1    maintenance.

2         And then IRMA, which is Individual Rate

3    Modification Application, and that ensures individual rate

4    modifications are applied consistently and they meet state

5    regulations.

6         And then finally, DecisionPoint, which is an

7    application that is used by the producers and agents of

8    policies to generate quotes for those new policies.

9    Q.  And these are not all of the U. S. applications that

10   we've been talking about over the past week or so in this

11   lawsuit.  It's just the ones that are -- that are at issue

12   for the disgorgement analysis after the termination,

13   correct?

14   A.  Correct.  The ones where they touch Blaze Advisor --

15   they touch Blaze Advisor in some way.

16   Q.  And what about the non-U. S. application?  What do you

17   understand to be the -- what do you understand to be the

18   function of the non-U. S. application at issue?

19   A.  That's the highlighted one in the middle, Evolution.

20   That's a policy administration application for all the lines

21   of business in Canada.  As you can see, there are other

22   applications here.  There are non-U. S. applications in this

23   table.

24        On the right you can see the regions -- the

25   different regions across the globe that are not in the

1   United States, obviously.

2           And then the other columns are the start year, and

3   the end year is just quantifying the years of use where

4   those applications touched Blaze Advisor when issuing or

5   binding policies.

6   Q.  Okay.  Now I want to take a deep dive into the data.  I

7   know everyone is excited about that.

8           What -- when I look at this chart, you've got a

9   lot of numbers.  What the source of information or the

10  sources that you used to quantify these revenues?

11  A.  The source came from the defendants.  They had responded

12  to interrogatories, and they provided this data as a

13  response to interrogatories.  And there were various

14  supplements over time that we would look at and update our

15  numbers accordingly, if it made sense to do so.

16  Q.  Let's take a look at a few of these.

17          MS. KLIEBENSTEIN: Mr. Mayleben, if we could switch

18  out the presentation and move to P 1004A.

19  BY MS. KLIEBENSTEIN:

20  Q.  And, Mr. Zoltowski, you have a binder up there.

21  A.  Mm-hmm.

22  Q.  Are you there?

23  A.  Yeah.

24  Q.  And we're here.  Perfect.

25          So is this one of the pieces of information that

1    you used to run your calculations?

2    A.  It is.

3    Q.  And can you identify it for us?

4    A.  It's Defendants' Eighth Supplemental Answer to

5    Plaintiff's Interrogatory Number 17.  And I believe the date

6    is at the end.  It was -- on the back there is some

7    verification pages related to the individuals who verified

8    the data.  Sometimes those dates are not the same as when

9    they actually provide the data just because they have to

10   track down those individuals.

11   Q.  The verifications start at page 13.

12   A.  June 15th, 2020, is when this interrogatory is dated.

13           MS. KLIEBENSTEIN:  Let's go to page 2 if we could,

14   Mr. Mayleben, page 2 of Exhibit 1004A.  Excellent.

15   BY MS. KLIEBENSTEIN:

16   Q.  So interrogatory is what, again?

17   A.  I like to describe it as a fancy way of saying question.

18   Q.  A question from whom to whom?

19   A.  They're posed back and forth between the parties, but in

20   this instance, it's from the plaintiffs to the defendant.

21   Q.  So this is -- this is a question that FICO asked the

22   defendants to answer, correct?

23   A.  Correct.

24   Q.  And here, if we could make interrogatory number 17 a bit

25   larger, what was the question that FICO asked the defendants

1    to answer?

2    A.   So interrogatory number 17, the question was, "For all

3    insurance policies in connection with which the Blaze

4    Advisor software was used, the gross written premium of

5    defendants and the gross written premium of each related

6    company, including the specific identification of each

7    related company, for each quarter from March 30th, 2016, to

8    date."

9    Q.   And so this was asking for specific revenue, not general

10   company-wide revenue, correct?

11   A.   Yes.  It's a very specific request targeted at the

12   policies that specifically touched Blaze Advisor.

13   Q.   And we have some redactions of lawyer objections and

14   stuff, but if we move down to the next page right there.

15   Thank you.

16          The data starts.  If you could repeat for us again

17   who asked who for this data?

18   A.   It was a FICO request to the defendants for this data.

19   Q.   And so this is data that the defendants provided to us,

20   correct?

21   A.   Correct.

22   Q.   And let's just take this table at the top that says

23   "DecisionPoint."  So that we know what we're even looking at

24   here, can you walk us through this table?

25   A.   Sure.  On the left-hand side, the first column is

1    Year/Writing Company.  So you can see in 2020, it lists

2    three different writing companies, and those are acronyms

3    for different entities.  So, for example, CICNJ would be

4    Chubb Insurance Company of New Jersey, and then on down.

5            The middle column is the gross written premium

6    amounts.  That relate to where policies touched Blaze

7    Advisor.

8            And then the right column is Called Policy Count

9    is the name of the header, and that's the number of policies

10   that are associated with that gross written premium.

11   Q.  So this table is for the DecisionPoint application

12   specifically?

13   A.  That's correct.

14   Q.  And on the left-hand side is the writing companies that

15   wrote policies that -- that touched Blaze Advisor in the

16   DecisionPoint application; is that right?

17   A.  That's right.

18   Q.  And then in the middle is the gross written premium

19   revenue connected with those policies?

20   A.  Correct.  And then it has the amount associated with

21   each entity, and then it totals it for each year.  And same

22   thing for the policy counts.

23   Q.  What did your team do -- just focusing on this

24   DecisionPoint example so that we can understand the process

25   generally, what did your team do with this data?

1    A.  We took all the data and put it into -- I think we only

2    used Excel in this case, but many times we will use SQL

3    Server when we have really large tranches of data.  And our

4    team will organize this data, sort it.  We had to obviously

5    figure out in certain instances what the acronyms stood for

6    for the writing companies and match them up appropriately.

7    And we were trying to look at it different ways, so we

8    organized it in different ways.

9    Q.  And moving on to the next table, and it spans -- well,

10   let's just deal with this one, this snapshot first.  What

11   information is in this table?

12   A.  This is CSI Express, ARP or Automated Renewal Process,

13   and Profitability Indicator or PI.

14   Q.  And the information that is in each of the columns, is

15   it similar to what you just talked about with DecisionPoint?

16   A.  It is.  And so you can see the writing companies and the

17   associated year on the left, the gross written premium in

18   the middle column, and then the number of policies that

19   would relate to each entity and the gross written premium

20   for that particular year in the middle column.

21   Q.  And then let's back out of this blowup and let's go

22   forward a page.

23            And that information is still for the CSI Express,

24   et cetera?

25   A.  Correct.  You can see it's for the years 2017 through

1274

```
 1    2019, and it spans that entire page and onto the next page.
 2    Q.  Let's move forward.  There we go.
 3            Okay.  And then let's move to page 6.
 4    A.  I was going to say on page 5 at the bottom and also
 5    related to that table we were talking about and also my
 6    summary schedule earlier, CSI Express, ARP and PI are
 7    together just because certain policies ran through either
 8    multiple -- either two or maybe even three applications, and
 9    this was I believe the defendants' attempt to remove that
10    dedupe -- I'm sorry, to dedupe the duplicative entries.
11    Q.  Thank you.  Let's move forward a page.
12            What application data is at the top of this page?
13    A.  This is Corporate Business Systems, or CBS.
14    Q.  I see Premium Booking.
15    A.  I apologize.  I was reading it from the wrong paragraph.
16    Yes, that's Premium Booking at the top.
17    Q.  And so the information that's contained in the table, is
18    it the same type of information that we were looking at with
19    the other two?
20    A.  It is.
21    Q.  So we've got the year, the gross written premium and the
22    policy count?
23    A.  Correct.
24    Q.  All right.  If we could expand back out again.
25            Now, I see CUW-IM, but I want to set that aside
```

1    until we get to the next supplemental interrogatory because

2    I know the data is different.

3              Let's go back to page 10.

4    A.  Okay.

5    Q.  And what application data do we see at the bottom of

6    page 10?

7    A.  This is for the -- I believe this is the surety business

8    and Cornerstone.

9    Q.  And walk us through again for the record what

10   information is contained in the different columns.

11   A.  On the left-hand side, the left column is year and

12   writing company, so it has each year at issue with each of

13   the writing companies below it.  The middle column is the

14   policy count, so it's the policy counts related to the gross

15   written premium, which is the right column.  It reflects the

16   GWP, gross written premium, for policies that touched Blaze

17   Advisor.

18              And that goes on through from 2016 through 2020.

19   Q.  Thank you.  Let's close this one up.  Move on to

20   P10007A.

21   A.  Okay.

22   Q.  Can you identify this exhibit for us, Mr. Zoltowski?

23   A.  I can.  It is Defendants' Ninth Supplemental Answer to

24   Plaintiff's Interrogatory Number 17, and this was provided

25   on September 24th, 2020.

1    Q.  So P 1004A was the eighth supplemental, and this is the

2    ninth supplemental, correct?

3    A.  Correct.

4    Q.  And let's go to the second page and blow up

5    interrogatory number 17.

6         Is it the same question that was asked before to

7    the defendants?

8    A.  It is.

9    Q.  And what question is that?

10   A.  "For all insurance policies in connection with which the

11   Blaze Advisor software was used, the gross written premium

12   of defendants and the gross written premium of each related

13   company, including the specific identification of each

14   related company for each quarter from March 30th, 2016, to

15   date."

16   Q.  And I would like to skip to page 6 and focus on CUW-IM.

17        Is it your understanding that this interrogatory

18   has the most up-to-date tabulation of the policy count and

19   the written premium for CUW-IM?

20   A.  That's my understanding, yes.

21   Q.  And can you walk us through, again, the various columns

22   and what information is contained in those columns?

23   A.  Sure.  For CUW-IM, it's laid out a little differently,

24   just that it has the year column on the left.  The writing

25   company is now split out in its own column, which is the

1    second column over to the right.  Then it has policy count

2    next instead of gross written premium this time.  And on the

3    right-hand side, the furthest to the right column is written

4    premium -- or gross written premium for CUW by year.

5    Q.  Thank you.

6           Can we move to the next page?

7           So this page I see more data for 2016, '17 and

8    '18; is that correct?

9    A.  That's correct.  It gives data through 2020, from 2016

10   through 2020.

11   Q.  And let's focus at the top, which is 2016 data, correct?

12   A.  Correct.

13   Q.  Can you identify for me what writing companies listed

14   here are legacy ACE writing companies?

15   A.  That would be the companies beginning at ACE American

16   Insurance Company, about halfway -- group in 2016.  So it

17   would be ACE American Insurance Company, ACE Fire

18   Underwriters, ACE Property and Casualty, Illinois Union

19   Insurance, Indemnity Insurance Company, Pacific Employers

20   Insurance, Westchester Surplus Lines and Westchester Fire

21   Insurance Company.

22   Q.  And let's span back out, Mr. Mayleben, please.

23           Do you see those same writing companies in 2017?

24   A.  Yes, you do.  You see them right below, down towards the

25   bottom of the page, and they're in the same order -- the

1    same eight companies are in the same order, from ACE

2    American Insurance Company through Westchester Fire

3    Insurance Company.

4    Q.  And spanning back out, that was 2017.

5             All right.  2018 is continued on to the next page.

6    We don't need to focus in on this, but do you see those same

7    legacy ACE writing companies for 2018 and 2019?

8    A.  I do.

9    Q.  Moving to the next page.

10            Now I see information for TAPS at the top of page

11   9 in this exhibit.  Can you walk us through the data that

12   we're seeing for TAPS?

13   A.  Sure.  It is the same format as the data for CUW.  The

14   year column is on the left.  The writing company is the next

15   column which lists all the writing companies that are

16   associated with policies that touched Blaze Advisor.  The

17   policy count is the third column over, and that's the

18   policies that touched Blaze Advisor.  And the written

19   premium is the last column on the right, and that's the

20   gross written premium that's associated with the policies

21   that touched Blaze Advisor.

22   Q.  Thank you.  Let's span back out.

23            And finish with IRMA.  What information is

24   conveyed underneath the IRMA header?

25   A.  Again, this data is presented the same way as CUW and

1    for TAPS.  The year is the first column.  Writing company is

2    the next column over to the right.  The third column to the

3    right is policy count, again the number of policies that

4    touched Blaze Advisor.  And then lastly, the furthest column

5    to the right is written premium, and this is the gross

6    written premium associated with the policies that touched

7    Blaze Advisor for using the TAPS -- sorry -- for using IRMA.

8    Q.  Thank you.  Let's close out of that one, and move on to

9    our final interrogatory that we're going to talk about,

10   P1008A.

11         Can you identify this interrogatory for us?

12   A.  This is Defendants' Seventh Supplemental Answer to

13   Plaintiff's Interrogatory Number 19, and this --

14   Q.  And this is a question from FICO to the defendants,

15   correct?

16   A.  Correct.  And the specific response is dated September

17   24th, 2020.

18   Q.  Let's move to the second page, interrogatory number 19.

19   A.  Okay.

20   Q.  What question did FICO ask the defendants?

21   A.  So interrogatory number 19, FICO asked the defendants

22   the following:  "From the date of first use of the Blaze

23   Advisor software in Canada and thereafter by quarter, the

24   gross written premium of each such company, including

25   specific identification of each company, from all insurance

1    policies in connection with which the software was used."

2            And I believe by "software," which is probably

3    defined earlier, they mean Blaze Advisor.

4    Q.  Can we move to the next page.

5            Can you tell us what data we're looking at and

6    identify the application?

7    A.  Sure.  This is for PRS, or Personal Risk Services, and

8    it is laid out similar to what we were just looking at for

9    CUW, TAPS and IRMA.  It has the year on the left column --

10   I'm sorry.  They mixed it up on me.  The gross written

11   premium is next instead of writing company.  The policy

12   count is the third column.  You can see that it has in

13   parentheses "approx," so they must have approximated these

14   amounts because they weren't able to identify the exact

15   dollars -- or sorry, the exact number of policies.  And then

16   writing company is on the far right which you can just see

17   is Chubb Insurance Company of Canada for all entries.

18   Q.  At the top I see the application is Evolution, correct?

19   A.  Correct.

20   Q.  So what did you do with this data from this

21   interrogatory response?

22   A.  We did the same thing as we did with the other data from

23   interrogatory number 17, although it was a lot easier to

24   work with since it was a lot less data.

25   Q.  All right.  Let's move out of the interrogatories and go

1    back into our Power Point if we could.

2              And we just looked at the Canada data, and I

3    didn't see 154 -- 154 million listed there.  Can you explain

4    to me how the calculation worked for Canada so we can

5    understand?

6    A.  Sure.  My understanding is that Canada was no longer a

7    subsidiary of Federal or ACE at the end of 2016, and so the

8    only applicable period was from March 30th, 2016, through

9    12/31/2016.  And after that point, we removed them from the

10   analysis.

11   Q.  And you removed them from the analysis because they

12   moved -- they moved in the corporate tree?

13   A.  Correct.

14   Q.  And when we were looking at the CUW-IM data in that

15   ninth supplemental response just now, Exhibit 10007A, I had

16   you list out the legacy ACE writing companies; is that

17   correct?

18   A.  Yes, that's correct.

19   Q.  And what data are we looking at in this slide?

20   A.  It's the written premium.  It's the total for each of

21   these writing companies within that interrogatory response.

22   Q.  And can you read that total into the record?

23   A.  Sure.  If you total it all for those eight writing

24   companies in 2016, it's $359,428,227.

25   Q.  And that's for 2016, correct?

1    A.  Correct.

2    Q.  Now, moving to the next slide, tell me what's in this

3    slide.  I see 2017.  Is it the same data for 2017?

4    A.  It's the same entities, same data.  Obviously, different

5    amounts for 2017.  And the total for all these eight

6    entities in 2017 is $995,568,314.

7    Q.  And those are legacy ACE writing companies associated

8    with the CUW-IM application, correct?

9    A.  That's correct.

10   Q.  Now, here I see another -- a different sorting of your

11   data.  Can you walk us through what information is visually

12   being displayed in this demonstrative?

13   A.  Sure.  This is just taking the total amount, which I've

14   already spoken about from our other tables, the 21.2 billion

15   for the U. S. and the 154 million for Canada for Evolution

16   application, and it breaks it out on an annual basis.  And

17   you can see that it starts in 2016.  Obviously we start our

18   analysis on March 31st.  It's the day after the termination

19   agreement.  And so that runs through the rest of the year

20   through December 31st.

21            And then as you progress through, you see 2017,

22   2018 and 2019 are full years. And in 2020, data has been

23   truncated, so it's only the January through May 2020 period

24   when our understanding is the applications -- or sorry --

25   Blaze Advisor had been used -- been removed from the

1   applications at issue.

2   Q.  And we'll do the tedious work of reading this into the

3   record at the end, not now, but just to confirmm on the

4   right-hand side I see a blue column total, and I see about

5   12.7 billion associated with CUW; 5 billion with CIS

6   Express, Profitability Indicator and ARP; 1.7 billion with

7   Premium Booking; about 844 million with TAPS; 528 million

8   with cornerstone; 300 million with IRMA; and 19 million with

9   DecisionPoint, all adding up to that 21.2 number; is that

10  right?

11  A.  That's correct.  If you took all of those amounts for

12  each application in the total column and added them all up,

13  you would get that $21.2 billion number.

14  Q.  And these numbers come from the data in the

15  interrogatories that we just looked at, right?

16  A.  Correct.  That would come from interrogatory number 17.

17  Q.  And did you -- did you do anything else with your data?

18  Did you sort it any other way for us?

19  A.  We also looked at the data by writing company.

20  Q.  And why?  Why did you do that?

21  A.  Well, part of what I was asked to do was determine, you

22  know, again, what entities were associated with the gross

23  written premium or gross revenue related to the infringement

24  of the copyrights and come to a determination as to if there

25  is a relationship between those entities from an economic

```
 1    perspective.
 2    Q.   And so we see writing companies on this chart, correct?
 3    A.   Correct.
 4    Q.   Where do the names of these writing companies come from?
 5    Where did we last see them?
 6    A.   Some of them you saw the full name in the interrogatory.
 7    Some you just saw the acronym of the company.  So the
 8    acronyms within the interrogatories in number 17 match up to
 9    the entities here, the full names here on this table.
10    Q.   And I see Federal Insurance Company -- strike that.
11         Why don't you just walk us through what we're
12    looking at specifically in these two different tables, the
13    blue and the green.
14    A.   Sure.  On the left is the blue table, which is the --
15    for Federal Insurance Company.  And it's Federal Insurance
16    Company at the top and all of the related entities for
17    Federal.  And the gross written premium is the next column
18    to the right, and so this is the gross written premium that
19    relates to each of these entities.  And when I say "gross
20    written premium," this is that touched Blaze Advisor --
21    policies that touched Blaze Advisor for policies that were
22    issued by these writing companies.
23    Q.   And who -- can you identify for us the named defendants
24    and the gross written premium revenue associated with them?
25    A.   Sure.  So for -- and just to summarize, on the
```

1    right-hand side, it's the green column -- green table, which

2    is the same just for ACE American.  But looking only at the

3    defendants for Federal Insurance Company, the gross written

4    premium is about 13.9 billion, so that's 13,932,510,728.

5            And for the other named defendant, ACE American

6    Insurance Company, the gross written premium total is

7    approximately 1.1, and that number is 1,133,269,524.

8    Q.  And I think we just slid into the second opinion in your

9    case relating to writing companies and revenues associated

10   with different writing companies.

11           What information are we looking at in this slide?

12   A.  In this slide, it is the Federal and ACE American gross

13   written premium that touched Blaze Advisor, so it's only for

14   the two named defendants.

15   Q.  Only for the two named defendants.

16           And so I -- you just read the totals into the

17   record.  It's about 16 and a half billion.  You had been

18   talking about 21.2 earlier.  Why the discrepancy?  What are

19   we missing in this slide?

20   A.  So as you can see, it's broken up by application, but

21   this is for the two named defendants, so Federal Insurance

22   Company and ACE American Insurance Company.  It does not

23   include any gross written premiums for any of their

24   associated companies or any of their subsidiaries or pooling

25   entities.

```
 1    Q.  And does this slide that we're looking at titled
 2    "Domestic Gross Written Premium by Writing Company," does
 3    this slide include these subsidiaries and pooling entities?
 4    A.  Yes, it does.
 5    Q.  So just to clarify, your calculation, your sum total of
 6    21.2 billion, that includes the named defendants?
 7    A.  Correct.
 8    Q.  Pooling entities, which we just heard about earlier with
 9    Mr. Taylor, correct?
10    A.  Correct.
11    Q.  And subsidiaries?
12    A.  Correct.
13    Q.  And why?
14    A.  There is common control of the entities, specifically
15    the subsidiaries are wholly-owned by Federal and ACE.  And
16    there is also pooling arrangements, which we will talk
17    about, where essentially the pooling manager has control
18    over the revenue and premiums and expenses for the entire
19    pool, and some of these entities are part of those pools
20    during the relevant period.
21    Q.  And as we saw in the interrogatory responses, all of
22    these entities are writing and selling insurance together,
23    correct?
24    A.  Correct.
25    Q.  So let's -- let's break that down and get into the
```

1    subsidiaries and the pools so that we can create the

2    different buckets.

3              Mr. Zoltowski, what is a subsidiary?

4    A.   A subsidiary is simply another corporation owned by a

5    corporation.  So it's a company owned by a company,

6    typically set up so that you have a holding company on the

7    top and then an operating company below it.  Many times

8    companies use them to spread risk, you know.  Many times it

9    will be used in the insurance industry.  It could be also

10   for tax-related reasons, things of that nature.

11   Q.   And how do you -- as an expert in economics and damages

12   and accounting, how do you go about determining the

13   relationships between Federal and its subsidiaries and ACE

14   and its subsidiaries?

15   A.   It would depend on the company if it's public or not.

16   But in this situation, we have public filings, and there is

17   an org chart that is filed as an exhibit to their 10-K's.

18              In this particular proceeding, there also was an

19   org chart, some kind of a company tree, that was provided in

20   one of the depositions as an exhibit as well.

21   Q.   Thank you.

22              Subsidiaries, we've discussed that.  Let's move to

23   pooling.  What -- what is pooling as it pertains to this

24   case?

25   A.   So pooling for insurance companies is, it's a group of

1    related insurance companies that pool together, again, for

2    similar reasons.  It's spreading risk and it's -- and they

3    have really a common manager who -- the manager controls

4    really who -- and binding policies for all of the members

5    and really controls the revenue and expenses for all of the

6    entities within that pool.

7    Q.  And in this case, not all subsidiaries are part of the

8    pooling entities and vice versa, correct?

9    A.  Correct.  There is some cross-over, so there are some

10   subsidiaries that are also in the pooling arrangements.

11          The other thing I will mention, too, for th

12   subsidiaries, they don't have any employees during the

13   relevant period we're talking about.  So Federal Insurance

14   has employees.  All the subsidiaries do not, according to

15   one of their -- according to their witness's testimony.  And

16   then that even was true after the termination -- I'm

17   sorry -- after the acquisition by ACE.

18   Q.  And this -- this concept of looking at companies that

19   are not the named defendants and figuring out if the revenue

20   can be attributed to the defendants, does this concept pop

21   up in your industry?

22   A.  It does, and it has before.

23   Q.  Tell me about those experiences.

24   A.  I've had a few cases over my career where this has been

25   an issue, and some people actually focus on one of these,

1    which is alter ego.  Alter ego just -- similar to here,

2    they're demonstrating that -- you know, many companies are

3    trying to shield themselves from liability so they will set

4    up another company.

5            And, therefore, when they end up in litigation

6    they're trying to demonstrate they're not one and the same,

7    and so it's their alter ego, so that's what the analysis is.

8    It's very similar to this -- this type of analysis.

9            The other place where this has come in is in

10   patent infringement cases, and that's where it relates to

11   standing, which is do you have the right to bring a suit.

12   And then similar to this, but a little different is that

13   that relates to a lost profits remedy.

14           So if a subsidiary is the one who has brought --

15   I'm sorry -- the parent company has brought suit but the

16   subsidiary is the one who is actually selling the products

17   at issue that are relevant to the issue of patent

18   infringement of the infringing products, the question is, do

19   the -- do the profits flow from the subsidiary up to the

20   parent company or not, because many times subsidiaries may

21   not be wholly-owned.  They could be owned by a smaller

22   portion.  It just depends on your corporate structure on if

23   you want to flow your profits up from your subsidiary or

24   not.

25           And so that's a very similar test that we do there

1    that we are doing here.

2    Q.  Let's start with the subsidiaries and then go to the

3    pool.

4    A.  Sure.

5    Q.  So what are we looking at on this slide?

6    A.  This is a list of Federal and ACE American subsidiaries.

7    So on the left in blue is the subsidiary writing companies

8    for Federal, and on the right is ACE American.

9    Q.  I'll wait for you to pour your water before I ask you to

10   read them into the record.

11            Mr. Zoltowski, could you read the names into the

12   record, please?

13   A.  Sure.  For Federal subsidiary writing companies, it is

14   Chubb Custom Insurance Company, Chubb de Mexico Copmania

15   Afianzadora, Chubb de Mexico Copmania de Seguros, Chubb

16   Indemnity Insurance Company, Chubb Insurance Company

17   Limited, Chubb Insurance Company of Canada, Chubb Insurance

18   Company of New Jersey, Chubb National Insurance Company.

19   Executive Risk Indemnity, Inc., Executive Risk Specialty

20   Insurance Company, Great Northern Insurance Company, Pacific

21   Indemnity Company, and Vigilant Insurance Company.

22   Q.  And before you move to the four ACE American

23   subsidiaries, confirm for me the relevant time period.

24   Those are subsidiaries from 2016 to about 2020?

25   A.  Yes, over the damages period we have.

1   Q.  Okay.  And then could you read in the ACE American

2   subsidiaries, too?

3   A.  Sure.  For ACE American, the subsidiary writing

4   companies are Bankers Standard Insurance Company, Illinois

5   Union Insurance Company, Indemnity Insurance Company of

6   North America, and Pacific Employers Insurance Company.

7   Q.  And why did you include the revenue from these

8   subsidiaries in your disgorgement calculations in this case?

9   A.  As I stated, they are all related entities, and the

10  revenue and profits flow up to and through Federal and ACE

11  American.  There is common control through the relationship.

12  Q.  And how do you know that?  What types of documents did

13  you look at to come to that conclusion?

14  A.  We looked at a number of different documents.  We looked

15  at the company's annual report and the Form 10-Ks, the Form

16  10-K being a requirement if you're a public company that you

17  have to file annually with the Securities and Exchange

18  Commission.

19          We looked at tax filings that were consolidated

20  for the entities, and we looked at some reporting.  I can't

21  remember the name of the actual reports they are, but

22  they're required by the National Association of Insurance

23  Commissioners, and there are statements that they need to

24  file each year with that commission.

25  Q.  And just to back up and level set, what is an annual

1    report?

2    A.  An annual report and a Form 10-K, they both have similar

3    information.  The annual report, for lack of a better way of

4    saying it, it's more of a marketing document.  It's probably

5    glossy paper, pretty pictures, some nice charts.  It's

6    really to attract investors to invest in the company.  It

7    will have a lot of the same information as the Form 10-K.

8            The Form 10-K is no frills, black and white, filed

9    with the government and the Securities Exchange Commission,

10   but it's much more detailed financial information.

11   Q.  And where did you start in your analysis to determine

12   the relationship between Federal and its subsidiaries and

13   ACE and its subsidiaries?

14   A.  We started with 2006 through 2014 and looked at the Form

15   10-K's and the annual reports for Chubb Corporation before

16   the acquisition.  ^^^ HERE hERE ^^^

17   Q.  And I think in your binder, Mr. Mayleben, if we can move

18   out of this presentation over to P1088.

19   A.  I'm there.

20   Q.  Can you identify this exhibit for us?

21   A.  This is the Chubb Corporation annual report for 2006.

22   And as you can see, the pretty graphics and pictures.  With

23   this one, and they sometimes do this, is they will have the

24   Form 10-K for the same year attached, and if you turn to I

25   think it's page -- the 33rd page begins the Form 10-K for

1    the Chubb Corporation for fiscal year 2006.  So you can see

2    the difference between the pretty pictures and the more

3    marketing related document of the annual report versus the

4    very detailed financial information, both qualitative and

5    quantitative for the company in the Form 10-K.

6    Q.  And what did you look at in this 10-K that's a back --

7    that's at the back of the 2006 annual report?  What

8    information did you look at specifically to inform your

9    analysis?

10   A.  At the back of the annual report is an exhibit.  The

11   company is required to file relationships with subsidiaries,

12   and that's in Exhibit 21.1.

13   Q.  Which is on page --

14   A.  It's on page 142.

15   Q.  All right.  What are we -- what are we looking at on

16   page 142 in Exhibit 1088?

17   A.  So this is Federal Insurance at the top as the parent.

18   And you can see subsidiaries at the next indention, so the

19   ones aligned with Vigilant and Pacific Indemnity, the ones I

20   just read out earlier from that prior slide, Great Northern,

21   Chubb Insurance Company of New Jersey, and it does down that

22   way.

23        Then you can see the next indention are

24   subsidiaries of the subsidiaries.  So Northwestern Pacific

25   Indemnity Company and Texas Pacific Indemnity Company are

1    subsidiaries of Pacific Indemnity Company.

2    Q.  And what about the ownership piece?

3    A.  You can see on the right-hand side, the furthest column

4    to the right, has a percentage of ownership, and they're all

5    100 percent for Federal Insurance company, all the

6    subsidiaries below.

7    Q.  And then -- thank you.

8         What was the next piece of evidence that you

9    looked at in determining these relationships between the

10   named defendants and the subsidiaries?

11   A.  We looked at, as I said, through the whole period 2006

12   through 2014, but 2014 was really the next relevant 10-K

13   that we looked at in great detail.

14   Q.  And, Mr. Mayleben, can we pull up P17.

15        Is this that 2014 10-K for the Chubb Corporation?

16   A.  Almost there.

17   Q.  All right.

18   A.  Yes, it is.

19   Q.  And what information did you look at in this 10-K?

20   A.  The same exhibit as in the 2006 Form 10-K we just looked

21   at is in the back of this one as well.  It's Exhibit 21.1,

22   and that's page 136.

23   Q.  And what did this page tell you about the relationship

24   between the named defendant, Federal, and its various

25   subsidiaries as of 2014?

1    A.  Well, you can see that there is -- all of the names

2    below Federal and the percentage ownership is 100 percent

3    except for one, which is -- it looks like it's based in

4    Argentina, and that's 99.9 percent ownership.

5    Q.  And what else?  What else did you -- did you review to

6    make your determination about the relationship between the

7    subsidiaries and the parent -- or the subsidiaries and the

8    named defendants in this case?

9    A.  Well, we also wanted to see what transpired after the

10   acquisition, so we looked at the Form 10-K for the fiscal

11   year ended in 2016 for now Chubb Limited.

12   Q.  And is that P36?

13   A.  Yes, it is.  They put the fiscal year ended in really

14   small fonts, the second line below Form 10-K on the front

15   page.

16   Q.  And I read it to say, "For the year ended December 31st,

17   2016," correct?

18   A.  Correct.

19   Q.  And what information did you want to point out from this

20   document?

21   A.  Again, we looked at Exhibit 21.1 to this 10-K filing for

22   the fiscal year ended 2016 for Chubb Limited.  Previously it

23   was Chubb Corporation.  Now it's Chubb Limited is the new

24   entity after the acquisition.  And there Exhibit 21.1 is on

25   page 318, so a lot further in the last one.  And it goes

1    until page 333.

2    Q.  So this tree starts at 318 and ends at 333?

3    A.  Yes.  It's obviously a lot longer than the ones we were

4    looking at previously.

5    Q.  Can you move us to Federal Insurance Company.

6    A.  It's on page 322, and you can see it's indented.  If you

7    start at the beginning and wanted to understand the whole

8    organization, you have to go indention by indention by

9    indention which will tell you parent, subsidiary, subsidiary

10   of subsidiary and then down each level.

11   Q.  And what are we looking at with Federal Insurance

12   Company on this page?

13   A.  This is Federal Insurance Company with its subsidiaries

14   below it listed.  They're the ones indented on the page.

15   Q.  And what information is in the right-hand column?

16   A.  Again, it's the percentage ownership, and you can see

17   for the most part they are all wholly-owned subsidiaries.

18   There is one that is based in Mexico, that's 99.9 percent,

19   also in Chili and Brazil.  Excuse me.  I'm sorry.  It's two

20   in Mexico, but very high ownership percentages, and then

21   there is one in Indonesia that is 80 percent ownership by

22   Federal.

23   Q.  Where do we find ACE American in this corporate listing?

24   A.  They're on page 324 five lines from the bottom, ACE

25   American Insurance Company.

1    Q.  And it -- can you identify -- the pagination is a bit

2    strange.

3         Can you identify the subsidiaries for ACE American

4    Insurance Company that we see spanning over page 324 through

5    325?

6    A.  Sure.  I may just read them all because I can't tell as

7    I read the pages which lines up with which the insurance

8    company.  There is -- so we start with ACE American

9    Insurance Company at the top, and the first subsidiary is

10   Penn Millers Hold Corporation.  The next is a subsidiary of

11   that organization, and that subsidiary's name is PMMHC Corp.

12        There is then another level down which is a

13   subsidiary of that organization, that is Penn Millers

14   Insurance Company, and then we go one more level deeper,

15   which is Penn Millers Agency, Inc., which is a subsidiary of

16   Penn Millers Insurance Company.

17        On the next page is Pacific Employees Insurance

18   Company, which I believe is a subsidiary directly under ACE

19   American.  Illinois Union Insurance Company is a subsidiary

20   of Pacific Employers.  Rain and Hail Insurance Service,

21   Inc., that is a subsidiary of ACE American, I believe, and

22   then below that is a number of subsidiaries and subsidiaries

23   of the subsidiaries.

24        The first is Agri, A-g-r-i, General Insurance

25   Company, and then that organization has a subsidiary named

1    Rain and Hail LLC.  The next is Agri, A-g-r-i General

2    Insurance Service, Inc.  That's a subsidiary of Rain and

3    Hail Insurance Service, Inc., like I had said earlier.  The

4    name is Rain and Hail Service International, and then below

5    that are Rain and Hail Insurance Service Limited and Rain

6    and Hail Insurance Service de Mexico.  Those are the two

7    subsidiaries of Rain and Hail Insurance Service

8    International.

9         And then the last one is Rain and Hail Financial,

10   Inc., and that's a subsidiary of the first Rain and Hail

11   organization that I mentioned, which is Insurance Services,

12   Inc.

13   Q.  All right.  Let's move on.  Did you look at, did you

14   look at anything, anything else that you wanted to point out

15   to the jury?

16   A.  Within this document?

17   Q.  No.

18   A.  No.  As I said, we looked at the consolidated tax

19   filings.  We also looked at the filings that they were

20   required to submit to the National Association of Insurance

21   Commissioners, which is all the states who are commissioners

22   since insurance is regulated by state for the most part.

23   Q.  What about Exhibit P38?

24   A.  We did look at this as well.  This was the corporate

25   tree that I had spoken about earlier.  This was the

1    Exhibit 2 I believe of Mr. Taylor's deposition.

2    Q.  And what information, what trees are you talking about,

3    what pages informed your analysis in this case?

4    A.  Sure.  So after the first there is seven changes which

5    is the changes that Chubb Limited made after.  Some are name

6    changes.  Some are corporate changes.  On the eighth page

7    begins kind of a corporate tree structure that lasts for

8    several pages after that.

9    Q.  And can you point out for me the two named defendants in

10   these trees?  Why don't you just walk us through at a very

11   high level each of the pages in the trees?

12   A.  Sure.  So you can see on page one, at the top is Chubb

13   Limited, the Swiss entity, and that flows into its

14   subsidiaries which are ACE, ACE Reinsurance and ACE

15   Insurance, as well as Chubb Group Holdings, Inc., and Chubb

16   Group Management and Holdings Limited.  And then it flows

17   down from Chubb Group Management Holdings Limited to various

18   subsidiaries and other entities.

19        I believe Chubb Group Holdings, Inc., which is the

20   third subsidiary from the left, it has its own subsidiaries

21   which are reflected on page two.  So now this is the

22   breakdown of Chubb U. S. Holdings, Inc., which is the U. S.

23   entity.  And if you look down in the middle of the page down

24   below, Federal Insurance Company is below, but it's a

25   subsidiary from Chubb INA Holdings, Inc., which is off to

```
1    the right.
2    Q.  And what's on the next page of these corporate trees?
3    A.  On the next page is a breakdown of INA Financial
4    Corporation, and this is their, their tree for lack of a
5    better term, with their subsidiaries and then subsidiaries
6    of subsidiaries.
7    Q.  And I think I see ACE American Insurance Company in the
8    middle; is that right?
9    A.  ACE American is, I was going to point out right down the
10   middle, three below, and so that's INA Holdings Corporation
11   is a subsidiary of INA Financial Corporation, and then ACE
12   American Insurance Company falls under INA Holdings
13   Corporation as a subsidiary.
14   Q.  All right.  Why don't we --
15            Yes, Your Honor?
16            THE COURT:  We are at noon.  Will you -- how long
17   would it take you to finish your direct examination?
18            MS. KLIEBENSTEIN:  Why don't we take a break for
19   lunch?
20            THE COURT:  Okay.
21            MS. KLIEBENSTEIN:  It will be longer than --
22            THE COURT:  Longer than ten minutes.
23            MS. KLIEBENSTEIN:  I'm always longer than I think
24   I will be.
25            THE COURT:  Very well.
```

1       Members of the Jury, we will take our lunch break.

2   We will be back here at one o'clock on the court clock.

3   Thank you.

4       THE CLERK:  All rise for the jury.

5                   **(Jury exits.)**

6

7

8           **(In open court without the Jury present.)**

9       THE COURT:  Go ahead and be seated.  Just for the

10  record, Ms. Godesky, Federal did not object, but I believe

11  the objection -- well, the objection is preserved as to

12  P1008A, and I want to make that clear on the record.  Okay?

13      MS. GODESKY:  All right.

14      THE COURT:  That relates to the Chubb Canada issue

15  that was raised.

16      MS. KLIEBENSTEIN:  Okay.

17      THE COURT:  Anything we need to take up?

18      MS. KLIEBENSTEIN:  No, Your Honor.

19      MS. GODESKY:  I did mean to object to 1008.

20      THE COURT:  It's preserved.  Use the mic.

21      MR. FLEMMING:  Could we get some idea of FICO's

22  plan for this afternoon, the length?

23      THE COURT:  Sure.  What do you think, first of

24  all, how much more with Mr. Zoltowski?

25      MS. KLIEBENSTEIN:  I was thinking four hours of

1    corporate trees if that worked for you.  Kidding.

2           I hope we're done in 15 minutes with Neil and then

3    cross and redirect, and then we will move on to

4    Mr. Whitener.

5           MR. FLEMMING:  Thank you.

6           THE COURT:  All right.  Frankly it would be my

7    hope at least that we will to be able to get completely done

8    with Mr. Whitener, Whitener, but we will see.  Okay.

9                    **(Lunch recess taken.)**

10

11    **February 28, 2023                      Afternoon Session**

12

13                       **IN OPEN COURT**

14           THE COURT:  Go ahead and be seated.

15           Ms. Kliebenstein, you may proceed.

16           MR. KLIEBENSTEIN:  Thank you, Your Honor.

17    BY MR. KLIEBENSTEIN:

18    Q.  Mr. Zoltowski, where did we leave off?  One question for

19    clarification of what we've been talking about.  We've been

20    using the word "writing company" a lot.  We saw them in the

21    interrogatories.  We've seen them in your slides.  What is a

22    writing company as it pertains to this case?

23    A.  They're companies that wrote policies that touch Blaze

24    Advisor.

25    Q.  And the writing companies at issue are on this slide

1    that -- go closer to your microphone.  I'm not sure we can

2    hear you?

3    A.  These are -- these are the subsidiaries, as well as

4    obviously Federal and ACE as the defendants.

5    Q.  And so the copyright disgorgement damages that we're

6    seeking in this case doesn't involve every single writing

7    company that exists at Chubb Limited today, correct?

8    A.  That's correct.

9    Q.  And what subset are we limiting ourselves to?

10   A.  The ones that used -- that Blaze Advisor touched, the

11   policies that were written and bound.

12   Q.  And right before we broke for lunch, we looked at some

13   annual reports and some 10-Ks; is that right?

14   A.  Yes.

15   Q.  And where are those documents distributed?  Where are

16   they published?

17   A.  Companies will have them on their investor relations

18   portions of their website, but their Form 10-K is a filing

19   with the Securities and Exchange Commission.

20   Q.  And with those facts in mind, do you have any reason to

21   question their accuracy?

22   A.  No.

23   Q.  You mentioned the phrase "consolidated tax return."  You

24   also review consolidated tax returns.  What are those?

25   A.  Those are the organization's tax returns with the

1    government that are consolidated to include all of the

2    entities, including these subsidiaries and pooling entities.

3    Q.  And what did you see in those consolidated tax returns?

4    A.  The same things I've seen in the other documents.  The

5    relationship between the parties and that there is common

6    control of the subsidiaries and pooling entities by the

7    defendants in this case.

8    Q.  And right before we broke for lunch, we looked at a

9    number of -- a document with a bunch of corporate trees.  Do

10   you remember that document?

11   A.  Yes.

12   Q.  P38?

13   A.  Yes.

14   Q.  What year was that document?

15   A.  I believe it's from 2016 or 2017.

16   Q.  And so it's a postmarker --

17   A.  It's post-acquisition of Chubb Corporation.

18   Q.  Let's move forward in the demonstrative that you

19   created.  What are we looking at here?

20   A.  This is the corporate tree or corporate structure in

21   this figure for the Chubb Corporation prior to -- it's from

22   2006, well before the acquisition.

23   Q.  And so does this slide summarize the data that we looked

24   at in that P1088, that Chubb Corporation annual report from

25   2006?

1    A.  Yes.  It's just a graphical representation, so you can

2    see Federal Insurance Company is on the far left as a

3    subsidiary of Chubb Corporation, and then below Federal are

4    its subsidiaries.  And then below those, I think it's 11 or

5    12 --

6    Q.  You can take your time to count them.

7    A.  12 subsidiaries.  There's four subsidiaries of those

8    subsidiaries.

9    Q.  So there's 12 subsidiaries to Federal Insurance Company

10   in this slide reflecting 2006, the Chubb Corporation?  Is

11   that what I heard you say?

12   A.  There's 12 direct subsidiaries, and then there are 4

13   others that are subsidiaries of Federal subsidiaries.  So

14   there would be 16 in total.

15   Q.  And then how many subsidiaries do you see of the Chubb

16   Corporation?

17   A.  There's six subsidiaries of the Chubb Corporation, plus

18   all of the other ones that fall underneath.

19   Q.  And moving forward one slide, what data are you

20   presenting in this slide?

21   A.  This is the corporate tree, the corporate structure of

22   the Chubb Corporation in 2014.  So, again, prior to the

23   acquisition.

24   Q.  And this is what we looked at in table form in P0017

25   isn't that right?

```
 1    A.  Yes.  It was the Exhibit 21.1 to the Form 10-K for Chubb
 2    Corporation for the fiscal year-ended 2014.
 3    Q.  And let's do that same counting again.  How many
 4    subsidiaries do you see under the Chubb Corporation in this
 5    slide?
 6    A.  There's 14 subsidies underneath Federal Insurance
 7    Company.  And then there are five subsidiaries of those
 8    subsidiaries, making a total of 19.
 9    Q.  19 under Federal Insurance Company; is that right?
10    A.  Correct.
11    Q.  And how many do you see under the Chubb Corp, direct
12    subsidiaries?
13    A.  There are four.
14    Q.  And what information -- what is the source of this
15    slide?
16    A.  I believe it was constructed by Chubb Limited itself.
17    Q.  Right.  But what exhibit did we look at that had this
18    tree in it?
19    A.  The same information presumably should be reflected in
20    the Form 10-K, Exhibit 21.1 for the fiscal year-ended
21    12/31/2016.
22    Q.  And did we also not see this table in P0038?
23    A.  Just refreshing my memory.  Yes.
24    Q.  Okay.  Why don't you walk me through.  You have a
25    clicker too.  Why don't you walk me through the next four
```

1    slides and what we're looking at.

2    A.  Would you like me to start at the beginning?

3    Q.  No.  I just want you to look at what's on the slide and

4    walk us through it?

5    A.  This is Chubb Limited's corporate tree or corporate

6    structure as of 2016, or this would be the fiscal year-ended

7    December 31st, 2016.  And you can see under Chubb Limited,

8    the Swiss entity.  There are four subsidiaries, Chubb Group

9    Holdings Inc., being one of those.

10           And if you go to page 2, it then has the corporate

11   structure of that entity, Chubb Group Holdings, Inc.  And if

12   you follow the pretty colors down, you can see Chubb INA

13   Holdings is a subsidiary of Chubb Group Holdings, Inc., and

14   below that, Federal Insurance Company is a subsidiary of

15   Chubb INA Holdings, Inc.

16           And there's also a second subsidiary named INA

17   Financial Corporation, and that will bring us to the next

18   page, their corporate structure.

19           And on this page, which is P0038, so it's page 3,

20   you have INA Financial Corporation.  It flows down to two

21   subsidiaries, one being INA Holdings Corporation.  That's

22   the one in purple, and if you follow the purple line, it

23   brings you down finally to ACE American Insurance Company,

24   which is colored red in the slide.

25   Q.  And then we have one more final slide from this P0038.

```
 1    What are we looking at here?

 2    A.  This is just taking Federal Insurance Company from one

 3    of the prior slides, I think it was page 2, and it's now

 4    showing the corporate structure of Federal Insurance Company

 5    and its subsidiaries and related entities for that

 6    organization.

 7    Q.  And the source of these trees is dated post-acquisition,

 8    correct?

 9    A.  Yes, that's my understanding.  Since we're seeing

10    Federal Insurance Company and ACE American in there.

11    Q.  And how many subsidiaries do we see under Federal on

12    this page?

13    A.  There is 22 subsidiaries.  It's a tricky corporate tree

14    just because it's all the blue entities, and they just

15    couldn't fit them on one line.  So they're kind of moved

16    around in different places so you could see them all

17    represented that way.

18    Q.  And what type of entities are in the yellow boxes?

19    A.  Those would be subsidiaries of the Federal Insurance

20    Company, direct subsidiaries.

21    Q.  And I count 11.  Correct me if I'm wrong.

22    A.  That's correct.  It's 11, so there's 33 entities in

23    total.

24            MR. KLIEBENSTEIN:  Mr. Mayleben, if we could put

25    up P0041.
```

```
1    BY MR. KLIEBENSTEIN:

2    Q.  Mr. Zoltowski, did this document also inform your

3    analysis regarding the subsidiaries of the named defendants?

4    A.  It did.

5    Q.  In what way?

6    A.  It's consolidated financial statements that Federal is

7    required to submit to the National Association of Insurance

8    Commissioners, which is the state commissioners who regulate

9    insurance.

10   Q.  Apologies.  Before you move on, what -- in basic terms,

11   what is an audited consolidated financial statement?

12   A.  It is the financials for the company, the financial

13   statements related to the performance typically for specific

14   periods.  Here it's for the years ended December 31st, 2016

15   and 2015.  And by "audited," it would be done by auditors

16   who would sign off on the financial statements.

17   Q.  And what information in this document did you find

18   helpful to your analysis relating the subsidiaries of

19   Federal Insurance Company?

20   A.  First, as I stated, it's the consolidated financial

21   statements for the entire entity with its subsidiaries.  But

22   I know that there was some language in here.  I've just got

23   to figure out which page it's on.  I believe it's on page 8

24   in the notes to the statements.

25            It's the first note, organization and nature of
```

1    operations, and it states that the accompanying consolidated

2    financial statements of Federal Insurance Company and its

3    U.S. insurance subsidiaries, it calls it the group, include

4    the accounts of Federal Insurance Company, which is Federal

5    based in Indiana and its wholly-owned U.S. property and

6    casualty insurance subsidiaries.

7            And it goes on it name them, Pacific Indemnity

8    Company, which owns all outstanding shares of Texas Pacific

9    Indemnity Company; Executive Risk Indemnity Company, which

10   owns all outstanding shares of Executive Risk Specialty

11   Insurance Company; Great Northern Insurance Company;

12   Vigilant Insurance Company; Chubb Custom Insurance Company;

13   Chubb National Insurance Company, Chubb Indemnity Insurance

14   Company; and Chubb Insurance Company of New Jersey.

15           And I believe this matches up with the tree that

16   we looked at previously.

17   Q.  And so this document wraps up into Federal Insurance

18   Company the financials of its subsidiaries.  Is that how I'm

19   reading this?

20   A.  Yes.

21   Q.  And with that in mind, how does that inform your

22   conclusions in this case?

23   A.  That the subsidiaries are owned and in common control of

24   the Federal Insurance Company entity.

25   Q.  And would you agree they're reporting as a single

1    economic unit?

2    A.  Yes, I would.

3    Q.  What are the dates on this document?

4    A.  It's for the years ended December 31, 2016 and 2015.

5    And there appears to be a letter from the auditors on page

6    3, which has a date of May 30th, 2017.

7    Q.  And we've looked through a couple of 10-Ks and a couple

8    of annual reports.  Now we've looked at an audited

9    consolidated financial statement.  In making your

10   conclusions about the ACE subsidiaries and the Federal

11   subsidiaries, did you look at other such documents from

12   various years?

13   A.  Related to the subsidiaries?

14   Q.  Correct.

15   A.  We looked at tax returns as well.

16   Q.  Right.  Over the period post-termination, correct?

17   A.  Yes.

18   Q.  Okay.

19   A.  Yes.  And I'd also state that the Form 10-Ks would be

20   audited financial statements as well.

21   Q.  And when you say the Form 10-Ks are audited --

22   A.  The financial statements within the Form 10-K.

23   Q.  Audited by whom?

24   A.  Whoever their auditor is, which I believe was

25   PricewaterhouseCoopers.

1    Q.  And does that have any indication of accuracy, being

2    audited?

3    A.  Yes, because there are specific standards and procedures

4    that auditors will follow related to Generally Accepted

5    Accounting Principles.

6            MR. KLIEBENSTEIN:  Mr. Mayleben, could we move

7    back to the presentation.

8    BY MR. KLIEBENSTEIN:

9    Q.  And how did -- thank you.

10           How did this analysis relating to the subsidiaries

11   of Federal and ACE American, how did this analysis impact

12   your disgorgement calculations?

13   A.  Like I said, it told me that those entities are under

14   common control of Federal, and therefore, their revenue

15   flows up through the Federal entity.

16   Q.  And you said, "Those entities."  You mean the writing

17   companies that we saw earlier in the list --

18   A.  Correct.

19   Q.  -- and the slides and the interrogatories, those writing

20   companies that are subsidiaries of what?

21   A.  Correct.  The writing companies that are a subset of the

22   total group of subsidiaries.  So the particular ones that

23   we're identifying here that -- where they wrote inbound

24   policies where -- that touched the Blaze Advisor software.

25   Q.  So those revenues were included in your damages

1    analysis; is that right?

2    A.  Correct.  And the other subsidiaries we did not include.

3    Q.  Let's define that when you said -- I know what you mean.

4    A.  Yes.

5    Q.  Everyone else.  When you said the other subsidiaries, we

6    did not include.

7    A.  So there are a larger group of subsidiaries as we went

8    through with each of the years here that did not write and

9    bind the policies that touched Blaze Advisor, and for those

10   entities, we would not have included any of their gross

11   written premium since it would not relate to this analysis.

12   Q.  And so what are we looking at in this slide that's up

13   right now?

14   A.  This has the applications on the left in the table.  Not

15   to confuse anyone, but the top is just the timeline.  So

16   this isn't annual data.  It's just an aggregate for the

17   entire period.  And it's by application.  You can see in the

18   left column.

19          The middle column is just Federal and ACE American

20   themselves as the defendants and the gross written premiums

21   related to those policies they wrote and bound that touched

22   Blaze Advisor.

23          And then the far right column is just the

24   subsidiaries of Federal and the subsidiaries of ACE

25   American, and that amount of 4.1 billion is what was -- what

1    were the policies that touched Blaze Advisor that were

2    written by those specific subsidiaries.

3    Q.  Let's move on to the pooling companies.  The pooling

4    companies are different than subsidiaries, the concept,

5    correct?

6    A.  Correct.

7    Q.  At a 10,000-foot level before we get into the how, what

8    is your overarching opinion as it relates to disagreement

9    damages from companies that are in pooling arrangements with

10   ACE and Federal?

11   A.  My opinion is that the gross written premiums from those

12   pooling entities where they wrote and issued policies that

13   touched Blaze Advisor should be included in this -- the

14   amount of revenue that may be disgorged.

15   Q.  And what did you review to make your determination?

16   A.  We looked at a lot of information, but particularly the

17   pooling agreements themselves.

18   Q.  And if you would, based on your review of those

19   documents, could you give us a 10,000-foot overview of what

20   is a pooling arrangement in the context of this lawsuit?

21   A.  A pooling arrangement as it relates to insurance

22   companies is -- where one, where one entity controls the

23   members and really controls all aspects of the writing of

24   policies in terms of the premiums, and it really controls

25   the revenues and the expenses of all of those entities that

1    are members of the pool.

2    Q.   Let's look at a few of these.

3         MR. KLIEBENSTEIN:  Mr. Mayleben, if we could move

4    back out to P0021.

5    BY MR. KLIEBENSTEIN:

6    Q.   Now, we just spent some time with pooling agreements in

7    the deposition testimony before your testimony,

8    Mr. Zoltowski, so I don't want to go do deep.  But I do want

9    you to highlight for us just what these agreements are, what

10   we're looking at and then the language in these pooling

11   agreements that you paid particular attention to in your

12   analysis.

13   A.   So this is a pooling arrangement, and this relates to

14   Vigilant Insurance Company, which is actually one of the

15   subsidiaries of Federal, but you can see in this agreement

16   that Federal is the manager of the pool.

17        And if you look at page -- on page 4, it shows

18   that Vigilant is labeled as company, and Federal is labeled

19   as the manager.  And if you scroll into the actual agreement

20   itself on page 7, section A, it lays out what the manager is

21   empowered to do on behalf of Vigilant, which is a pooling

22   entity, so on behalf of the pool.

23   Q.   And let's go slow here so Mr. Mayleben can track what

24   you're talking about, because this is a big paragraph.  But

25   what language in particular was -- did you use in your

1    analysis?

2    A.  Most of it.  But you can see on the end of the first

3    sentence and into the second sentence that the manager can

4    sign, countersign and issue all policies or contracts of

5    insurance or reinsurance, which the company, meaning

6    Vigilant, is authorized to issue.

7         So essentially, Federal is empowered on behalf of

8    Vigilant to sign for it, really controlling anything it

9    wants to do.

10   Q.  And I see in the middle -- oh, gosh, seven lines down,

11   Mr. Mayleben, and the line that starts with, "And pay the

12   compensation of attorneys."  If you can highlight that line.

13        I see at the end it says, "To establish in the

14   name of the manager one or more joint bank accounts on

15   behalf of the company and other companies managed by it, to

16   deposit funds of the company in such bank accounts, to

17   withdraw monies from such bank accounts for the payment of

18   losses, reinsurance, expenses and other disbursements."

19        Did that language play into your analysis at all?

20   A.  Yes.  It's essentially operating as a parent, almost to

21   a little kid as an analogy.  They really have no rights to

22   do anything, and they can -- the manager, being Federal, can

23   control all of the money, both the revenue that comes in and

24   then the expenses that goes out, which makes sense seeing

25   as, according to what I understand was what Federal

1    represented, there are no employees in Vigilant.

2         So they may have a board of directors or some sort

3    of management overseeing them, but there's no employees on a

4    day-to-day basis.

5    Q.  Let's move to P0032 next.  And again, I believe we just

6    saw this in the prior testimony, but I want to hear what

7    information you found pertinent in this agreement to your

8    analysis.

9    A.  So the first page is Amendment One to the services

10   agreement, and it lays out the entities to which services

11   will be provided by Federal -- I'm sorry -- by ACE American.

12   And those entities are in number 1, which are actually the

13   Federal entities.

14        So I understand this whole agreement to be where

15   ACE American started servicing Federal's pooling entities

16   following acquisition.

17   Q.  And what about the -- so that's the first page, and

18   that's dated in February of 2018, correct?

19   A.  Yes.

20   Q.  And let's move on to the second page.  Okay.  The third

21   page.

22   A.  This is the actual service agreement itself.

23   Q.  And what is the date on this service agreement?

24   A.  This service agreement is dated March 14th, 2016, so

25   about two years prior to the amendment.

```
 1    Q.  And what information in this agreement played a role in
 2    your analysis relating to the -- to the ACE American led
 3    pooling companies that are also writing companies in this
 4    case?
 5    A.  Sure.  There's a lot of information in here, but I will
 6    try to highlight what's most important.
 7              You can see that at least on the last page, it
 8    does lay out in Addendum A all of the services that may be
 9    provided under the agreement, which covers everything from
10    admin support, to claims, financial, HR, information
11    technology, legal, operations, so pretty much everything
12    that would relate to the operations of a company.
13              And this is the agreement, I believe -- let me
14    just check the first page.  This is where the parties, being
15    Federal and ACE, agreed that they could provide services for
16    one another.  And I believe that the amendment was then the
17    parties agreeing for ACE to actually provide that service to
18    the Federal pooling entities.
19    Q.  Let's move back out to your demonstrative.
20              What information is contained on this slide?
21    A.  So the blue box on the left is the Federal pooling
22    entities during the years 2016 and 2017.  So you can see
23    them listed there as Chubb Custom Insurance, Chubb
24    Indemnity, Chubb National, Executive Risk Indemnity,
25    Executive Risk Specialty Insurance, Federal Insurance, Great
```

1    Northern Insurance, Pacific Indemnity, and Vigilant

2    Insurance.

3    Q.  And before we move on to the middle bucket, what are the

4    dates on the Federal pool?

5    A.  This was the pool in effect in 2016 and 2017 that

6    Federal controlled.

7    Q.  And those entities that you've listed, those are also

8    writing companies that we saw in the interrogatory number

9    17?

10   A.  That's correct.

11   Q.  And now let's move on to the middle bucket, ACE American

12   pool entities.  Tell me about that bucket.

13   A.  These are ACE American pool entities that are also

14   writing companies for the years 2016 and 2017.  And the list

15   includes ACE American, ACE Fire underwriters Insurance

16   Company, ACE Property and Casualty Insurance, and Pacific

17   Employers Insurance.

18   Q.  And did you say the dates?

19   A.  Yes.  It's 2016 and 2017.

20   Q.  And let's move on to the third bucket.  What is in that

21   bucket, and what's the color coding?

22   A.  This is the green header or banner with a -- it's a

23   black box, and it's the Chubb INA pool entities for 2018 and

24   2020.  And you can see that the four ACE American pool

25   entities are now part of this pool and that four of the

1    Federal pool entities are now --

2            Actually, I take that back.  Sorry.  There's

3    five -- Chubb Insurance Company of New Jersey I thought

4    was -- no.  It was added.  I apologize.  It's four from ACE

5    American, four from Federal, and two new entities who have

6    now joined this pool.

7            And this Chubb INA pool is what was created from

8    the agreement we just looked at.

9    Q.  And just walk us through again, because it's -- it's a

10   factually intense topic.  The 2016, the 2018 changes in the

11   pools that we just saw reflected in that slide, walk me

12   through so it's clear for the record what happened again.  I

13   know we saw it a little bit.  We saw it in Exhibit 32.

14   A.  Yeah, it's confusing.  ACE American had a pool of

15   entities, which we looked at.  That was in the red box on

16   the prior page.  Federal Insurance had its own pool.  That

17   was in the blue box on the prior page, and that was for the

18   years 2016 and 2017.

19           In 2018, they decided to create this new pool,

20   which was a combination of entities from those two pools,

21   which now created a new pool called the Chubb INA pool.

22   However, ACE American is the one who controls the entity in

23   the Chubb INA pool.

24   Q.  And what did you determine after reviewing these pooling

25   arrangements as it relates to the disgorgement amount in

```
1    this case?
2    A.  That the gross written premiums for those entities
3    should be included as they're under common control of
4    Federal and ACE American.
5    Q.  The pool leaders are managing and in control of the
6    revenue?
7    A.  Yes, among many other things.
8    Q.  So would you agree they're acting as a single economic
9    unit in that instance?
10   A.  I would.
11   Q.  And so let's -- let's wrap up your -- how the pooling
12   entity analysis moves into your disgorgement figures.  What
13   is your opinion in this case relating to the different
14   buckets of revenues that we saw in interrogatory number 17?
15   A.  Based on the gross written premiums related to policies
16   that touched Blaze Advisor, there are gross written premiums
17   from three categories as laid out in this table.  And you
18   can see that the different applications they relate to are
19   on the left-hand side.
20          But those three categories are the defendants,
21   Federal and ACE American; the subsidies, which we talked
22   about; and then the pooling entities.  And they're laid out
23   from left to right in the table with the total in the right
24   column, furthest to the right.
25   Q.  And I want to revisit something really quickly.  The
```

1    data that is in this table, where does it come from?

2    A.  It was provided by Federal in their responses to

3    interrogatories that were sent by FICO to them.

4    Q.  And I want to -- I want to do just one more thing with

5    these interrogatories.

6            Mr. Mayleben, if you could pull up P-1004A.

7            So this is the Eighth Supplemental Answer to

8    Interrogatory Number 17.

9    A.  Yes.  That's correct.

10   Q.  And could we move back to page 16 in the document,

11   Mr. Mayleben.  That's right.  Thank you.

12           What are we looking at on this page that's at the

13   back end of this interrogatory number 17, the eighth

14   supplemental?

15   A.  This is a verification page, and it's signed by Malcolm

16   Irving, and it states that under oath he is the -- he is in

17   the financial lines information technology, I believe is

18   what IT would stand for, and that he was authorized to

19   respond to this interrogatory number 17 on behalf of Federal

20   as it relates to the Financial Lines Unit.

21   Q.  And let's move to the next page.  Tell me what we see on

22   this page.

23   A.  This is a similar verification page.  It's signed by C.

24   Chase McCarthy, and it states -- or he states under oath

25   that he is an IT, which again I believe is information

```
 1     technology, lead for North America Commercial Middle Market

 2     and I believe Chief Architect for Personal Risk Services.  I

 3     believe that slash is supposed to separate those two titles.

 4             And that he is authorized to respond to this

 5     interrogatory number 17 on behalf of Federal Insurance

 6     Company as it relates to the Chubb Commercial Insurance

 7     business unit, otherwise known as CCI.

 8   Q.  And just like we saw on the previous page verification,

 9     he's relied on directors, employees, agents and attorneys to

10     provide information used in formulating the answer to the

11     above interrogatory being interrogatory number 17?

12   A.  Correct.  And he is swearing under oath that the answer

13     is true and correct to the best of his knowledge, just like

14     the prior page.

15   Q.  Let's move to the final page in this eighth supplemental

16     response to interrogatory number 17.  Is this a third

17     verification page?

18   A.  It is, and it's signed by Tracie, that's T-R-A-C-I-E,

19     D., Jerd, J-E-R-D.  And it states under oath that she is the

20     program manager for Enterprise Content Management, Workflow

21     BPM, which would be Business Process Management, I assume,

22     and Sunset Applications for Chubb North America.

23             And again, just like the others, she is authorized

24     to respond on behalf of Federal to this interrogatory number

25     17, and it relates to Premium Booking and Cornerstone.  She
```

1    relied on directors, employees, agents and attorneys to

2    formulate the answer and that the answer is both true and

3    correct to the best of her knowledge.

4    Q.  Mr. Mayleben, if we could move back to the interrogatory

5    number 17 itself.  If we could move ahead a page and blow up

6    the interrogatory.

7             So there were three people on behalf of defendants

8    that certified under oath about the data provided in

9    response to interrogatory number 17.  Is that what we just

10   saw?

11   A.  Yes.  That's correct.

12   Q.  And moving quickly to P1007, which is Defendants' Ninth

13   Supplemental Answer to FICO's Interrogatory Number 17, if we

14   can go to the last page, do we again see the same type of

15   interrogatory -- apologies -- verification?

16   A.  Yes.  It's -- again, it's signed by C. Chase McCarthy as

17   the IT lead North America Commercial Middle Market/Chief

18   Architect for Personal Risk Services.  And this is as it

19   relates to the Chubb Commercial Insurance Business unit or

20   CCI.

21            And again, formulated the answer by relying upon

22   directors, employees, agents and attorneys and that the

23   answer is true and correct to the best of his knowledge.

24   Q.  So defendants again verified that the ninth supplemental

25   response to interrogatory number 17 was true and correct,

1    correct?

2    A.  That would be my understanding.

3    Q.  And I think we already looked at the interrogatory

4    verification in 1008, so we don't need to do that.

5           Mr. Mayleben, can we move back to -- there we go.

6    Okay.

7           Mr. Zoltowski, you testified earlier that the data

8    in this slide came from interrogatory number 17, correct?

9    A.  That's correct.

10          MR. KLIEBENSTEIN:  Your Honor, for efficiency

11   sake, I would like to move this single slide into admission

12   as Exhibit 1177.

13          MS. GODESKY:  Objection, Your Honor.

14          THE COURT:  The exhibit is received.

15          MS. GODESKY:  I said objection.

16          THE COURT:  Oh, you said objection.  In that case,

17   it's sustained.

18          MR. KLIEBENSTEIN:  Okay.  Then we will read into

19   the record the data that we see here, unfortunately.

20   BY MR. KLIEBENSTEIN:

21   Q.  So let's start with -- let's start with the top row and

22   go across that way for Commercial Underwriting Workstation

23   and then identify the different columns that we have,

24   Mr. Zoltowski.

25   A.  At the top of the table, there are five columns in

1    total, starting from left to right.  The headings for each

2    of the columns read as follows:  U.S. Applications is the

3    first.  Defendants is the second.  Subsidiaries is the

4    third.  Pools is the forth, and Total is the fifth, which

5    will be furthest to the right.

6    Q.  So now we have to read the monetary amounts into the

7    record.

8    A.  I'm going to go row by row, and this is by application.

9    So for Commercial Underwriting Workstation, the amount of

10   gross written premiums for defendants is 7,656,976,388 -- I

11   apologize -- '368.  I should have brought my reading

12   glasses.

13            The next amount is for the subsidiaries, for CUW,

14   and that's 3,663,148,142.

15            Pools for CUW is 1,427,268,700.  And the total for

16   CUW is 12,747,393,210.  The next line item is CSI Express

17   Profitability Indicator and Automated Renewal Process.  This

18   is all on the same line item.  For defendants, the amount is

19   4,783,945,129.

20            For subsidiaries, it's 132,704,843.

21            For pools, it's 94,672,823.

22            And the total for these three applications, which

23   are CSI Express, Profitability Indicator, and Automated

24   Renewal Process is 5,011,322,794.

25            The next line item is Premium Booking.  The total

1    for the defendants is 1,750,877,402.  And the total for

2    Premium Booking would be that same amount, 1,750,877,402.

3              The next line item is TAPS or Texas Accident

4    Prevention System.  For defendants, it's 462,805,017.  The

5    total for subsidiaries is 270,951,408.  The total for pools

6    is 110,550,113.  And the total for TAPS is 844,306,538.

7              The next line item is IRMA or Individual Rate

8    Modification Application.  The total for defendants is

9    223,406,656.  The total for subsidiaries is 69,554,858.  The

10   total for pools is 7,355,485.  And the total for IRMA is

11   300,316,999.

12             The next line item is DecisionPoint.  The total

13   for defendants is 18,101,109.  The total for subsidiaries is

14   1,117,772.  The total for pools is 34,636.  And the total

15   for DecisionPoint is 19,253,516.

16             And the last application line item is Cornerstone.

17   For defendants, the total is 518,138,795.  The subsidiaries

18   total is -- it's actually a negative number just because of

19   the way the data was received, so it's a negative 3,510,098.

20             And that's just because it's trying to split them

21   up in a certain way based upon the data we have and didn't

22   have insight into doing so.  So the pools total is

23   14,281,786.  And the total for Cornerstone is 528,910,484.

24             And the total for all of these, I know everyone

25   has been waiting for, defendants is 15,414,250,476.

```
 1    Subsidiaries total is 4,133,966,925.  The pools total is

 2    1,654,163,542.  And the overall total is 21,202,380,943.

 3    Q.  And we'll have one more that we'll -- two more that

 4    we'll talk about in a minute.  But I wanted to take a break

 5    from the reading and address one final topic with you.

 6              So we talked about revenues with your testimony;

 7    is that right?

 8    A.  That's correct, gross revenues or in this instance,

 9    gross written premiums.

10    Q.  And generally speaking, what is profit?

11    A.  A profit basically is revenue less expenses.

12    Q.  And your opinions just identified revenue and not

13    expenses or profit.  Why is that?

14    A.  Based on The Copyright Act, based on the law, I as the

15    plaintiff's expert only needs to identify the gross

16    revenues, and then it's the burden of the infringer as it's

17    written in the statute.

18              MS. GODESKY:  Objection, Your Honor.

19              THE COURT:  Sustained.

20    BY MR. KLIEBENSTEIN:

21    Q.  Let's just talk about -- let's leave the law aside.  And

22    in this situation, why are you only addressing revenues,

23    leaving the law aside?

24    A.  Typically I would address costs if I had the appropriate

25    data that would allow me to do so, even as an expert working
```

1    on behalf of a plaintiff.

2    Q.  And why didn't you do that here?

3    A.  Based on the information that was available, it was -- I

4    couldn't accurately or precisely quantify the costs that

5    were directly related to these particular -- the gross

6    written premiums.

7    Q.  And can you give me -- can you give me an example, just

8    a general example, of where you would be able to identify

9    not just the revenues but the direct costs associated

10   with -- like the cost of goods sold or something like that?

11   A.  Sure.  So I mean, typically we're operating in widgets

12   or something like that, so maybe around here snowmobiles or

13   something of that nature.  As a company that's reporting

14   their financials, there's materials and labor that go into

15   their production of that snowmobile.

16          It typically would have information that would

17   allow us to say here's the costs that relate to these

18   snowmobiles that are at issue that were sold and the

19   revenues associated with those sales and deduct those costs,

20   which would be the cost of goods sold as the terminology

21   is -- and get us to at least a gross profit number.

22          Now, there may be additional costs that might be

23   related, but we can at least get us to that first -- that

24   first step, and here we just did not have data that would

25   allow us to even make that first step.

1    Q.  And explain that further.  Why not?  What were you

2    missing in that initial first step?

3    A.  My understanding is that we have data from business

4    units, and it was overinclusive of costs and -- cost data

5    and cost information, as well as even the revenue data that

6    was included with that.

7    Q.  All right.  Let's move back to the data again.

8              Mr. Zoltowski, where do the numbers in this slide

9    come from?

10   A.  This is the summary of U.S. gross written premiums by

11   application by year.  Correct?

12   Q.  And that came from interrogatory 17, right?

13   A.  Yes.  I just wanted to make sure I was on the right

14   slide.

15             MR. KLIEBENSTEIN:  Your Honor, I would ask to move

16   this single slide into evidence as Exhibit 1177.

17             MS. GODESKY:  Objection, Your Honor.

18             THE COURT:  Sustained.

19   BY MR. KLIEBENSTEIN:

20   Q.  Mr. Zoltowski, can you, just like we did for the last

21   table, can you read the data in this table into the record,

22   and then we'll finish with Canada, and we'll be done.

23   A.  I'd be happy to.

24             So, again, this table has application in the

25   furthest left column, and there are five other columns which

1   are covering the time periods, from 2016 through 2020.  And

2   then the final column on the right is total.  And also want

3   to note that in 2016, it only covers the period March 31

4   through December 31.

5           And then I think this last column is actually just

6   a misprint, because it should be January, I believe, through

7   May based upon other tables.  So 2020 is January through

8   May.

9           And then below those header, that header row are

10  all of the applications and the associated gross written

11  premiums, which I'll read by line item by year.

12          For Commercial Underwriting Workstation or CUW,

13  for the March 31st through December 31st, 2016 period, the

14  number is 2,802,600,382.  In 2017, for CUW it's

15  3,409,127,185.  In 2018, for CUW it is 2,882,872,838.  In

16  2019, it is 3,652,792,805.  And it's zero for 2020.  And the

17  total for CUW over the March 31st, 2016, through May 2020

18  time period is 12,747,393,210.

19          The next line item is the three applications

20  bucketed together, once again, which are CSI Express,

21  Profitability Indicator, and Automated Renewal Process or

22  ARP.  For the March 31st through December 31st, 2016,

23  period, the total is 1,008,080,734.  2017, the total is

24  1,358,180,203.

25          For 2018, the total is 1,241,993,390.  For 2019,

1    the total is 1,277,242,740.  And for the January through May

2    2020 period, it is 125,825,726.  And the total for CSI

3    Express, Profitability Indicator, Automated Renewal Process

4    or ARP is 5,011,322,794.

5           The next line item is Premium Booking.  For the

6    March 31st through December 31st, 2016, period, the number

7    is 380,416,844.  For 2017, the total is 442,839,932.  For

8    2018, the total is 500,850,829.  For 2019 the total is

9    426,769,797.  The number is zero for 2020.

10           And the overall total for Premium Booking for the

11   March 31st, 2016, through May 2020 period is 1,750,877,402.

12           The next line item is TAPS or Texas Accident

13   Prevention System.  The total for March 31st through

14   December 31st, 2016, is 215,420,480.  For 2017, the number

15   is 252,219,200.  For 2018, the total is 216,490,943.  For

16   2019, the total is 160,175,914.

17           The total for 2020 is zero.  Therefore, the

18   overall total for TAPS for the period March 31st, 2016,

19   through May 2020 is 844,306,538.

20           The next line item is Cornerstone.  For the March

21   31st through December 31st, 2016, period, the total is

22   158,202,931.  For 2017, the total is 248,313,042.  For 2018,

23   the total is 122,400,980.

24           And again, this is one of these quirky ones just

25   based on the data we had, and it's a negative number for

1    2019.  It's negative 6,469.  And the total -- I'm sorry --

2    for 2020, it is zero for Cornerstone.  The total for

3    Cornerstone for the March 31st, 2016, through May 2020

4    period is 528,910,484.

5         The next line item is IRMA or Individual Rate

6    Modification Application.  From the period March 31st

7    through December 31st, 2016, the total is 68,975,636.  For

8    2017, the total is 89,449,543.  For 2018, the total is

9    80,968,955.  For 2019, the total for IRMA is 60,922,865.

10   The total in 2020 is zero.  And so the total for the whole

11   period of March 31st, 2016, through May 2020 for IRMA is

12   300,316,999.

13        And then the last line item is DecisionPoint for

14   the March 31st through December 31st, 2016, period.  The

15   total is 2,680,739.  For 2017, the total is 4,319,856.  For

16   2018, the total is 4,779,439.

17        For 2019 for DecisionPoint, the total is

18   5,846,994.  For the January through May 2020 period, the

19   total is 1,626,488.  And that brings us to a total for

20   DecisionPoint over the March 31st, 2016, through May 2020

21   period of 19,253,516.

22        And the totals for each year, this is for all

23   applications, the total amount for March 31 through December

24   31st, 2016, is 4,636,377,746.  For 2017, the overall total

25   for all applications is 5,804,448,961.  In 2018, the total

```
 1    is 5,050,357,375.  For 2019, the overall total for all

 2    applications is 5,583,744,647.

 3            And for the January through May 2020 period, the

 4    overall total is 127,452,214.  And that gives an overall

 5    total for the March 31st, 2016, through June -- I'm sorry --

 6    through May 2020 period of 21,202,380,943.

 7    Q.  All right.  One final read-in.

 8    A.  I'm surprised people are still awake.

 9    Q.  Yes.  For Evolution Canada, can you read the total

10    amount?

11    A.  For the Evolution application for Canada, the total

12    gross written premium is 154,380,023.

13    Q.  And that was for the year 2016, correct?

14    A.  Correct.

15    Q.  Okay.  Thank you, Mr. Zoltowski.

16            THE COURT:  Thank you, Ms. Kliebenstein.

17            Ms. Godesky.

18            MS. GODESKY:  Thank you.

19                        CROSS-EXAMINATION

20    BY MS. GODESKY:

21    Q.  Hi.

22    A.  Hi.

23    Q.  Good afternoon, Mr. Zoltowski.

24    A.  Good afternoon.

25    Q.  My name is Leah Godesky, and I represent the defendants
```

1    in this case.

2              During the second half of your testimony with

3    Ms. Kliebenstein, you talked about certain pooling

4    agreements.  Do you remember that?

5    A.  Yes.

6    Q.  And you talked about a pooling agreement between Federal

7    and Vigilant?

8    A.  Yes.

9    Q.  And you talked about how that agreement meant that

10   Federal is empowered on behalf of Vigilant to do certain

11   things.  Does that sound like your testimony?

12   A.  Yes, and that's based on what was in the agreement

13   itself.

14   Q.  Okay.  Let's, Vanessa, if we could, pull up Exhibit P21

15   in evidence.

16              MS. GODESKY:  She doesn't have a signal to the

17   monitor.

18              THE COURT:  Well, I don't control that signal.

19   The monitor is switched so that your side is presenting.

20              Ladies and gentlemen, you can stand up if you'd

21   like while we're waiting for this technological glitch.

22              Would you like me to turn off all the monitors and

23   turn them back on?

24              MS. WHEELER:  That would not be a bad idea.  Thank

25   you, Your Honor.

```
 1                    MS. GODESKY:  Thank you, Your Honor.
 2                    THE COURT:  Ninety percent of problems are solved
 3          by rebooting.
 4                    MS. GODESKY:  Your Honor, can you switch over to
 5          plaintiff so we can see if he's able to connect?
 6                    THE COURT:  He's up.
 7                    MS. GODESKY:  You have a connection?
 8                    MR. MAYLEBEN:  Yes.
 9                    THE COURT:  Let me try rebooting one more time
10          with a little bit more time delay.  I'll have to sit here
11          for 60 second, but . . .
12                    We have IT on our way up.  Do you want to start?
13                    MS. GODESKY:  Are you seeing signs of action?
14                    THE COURT:  There we go.  Something just flashed.
15                    MS. WHEELER:  My apologies to the Court, Your
16          Honor.
17                    THE COURT:  That's quite all right.  Did we get
18          it?
19                    MS. WHEELER:  We did, yes, sir.
20                    THE COURT:  There we go.
21                    MS. GODESKY:  Yes.
22          BY MS. GODESKY:
23          Q.  So, Mr. Zoltowski, we were talking about what you would
24          describe as this pooling agreement between Federal and
25          Vigilant, correct?
```

```
1    A.  That's correct.

2    Q.  And I just want to take a look at, this first paragraph

3    of this agreement talks about how, "The addendum to be

4    attached and form a part of the management agreement (the

5    agreement) effective the 1st day of January, 1998, between

6    Vigilant Insurance Company and Chubb & Son, a division of

7    Federal Insurance Company," and then that's defined as

8    manager, correct?

9    A.  Yes.  That's correct.

10   Q.  And then during your direct examination, you made a

11   point of highlighting the fourth page of the agreement.

12             If we could turn there, Vanessa.

13             And you pointed out how the fourth page of the

14   agreement at the top identifies Vigilant Insurance Company

15   as the company, right?

16   A.  Correct.

17   Q.  And then you said, it also identifies Federal Insurance

18   Company as the manager, right?

19   A.  Yes.

20   Q.  And you kept referring to Federal under this contract

21   because you understand that Chubb & Son Division was signing

22   the agreement on behalf of Federal, correct?

23   A.  Chubb & Son is a division of Federal.

24   Q.  And you described this as an agreement between Vigilant

25   and Federal because you understood the Chubb & Son Division
```

1    was signing on behalf of Federal, correct?

2    A.  I can't tell you if they'd signed on behalf of Chubb &

3    Son, but they're a division of Federal, and they're the ones

4    who signed the agreement.

5    Q.  And you characterized this as an agreement between

6    Federal and Vigilant, correct, Mr. Zoltowski?

7    A.  Based upon, you know, my analysis because that's what I

8    was looking at was Federal.

9    Q.  Now, you generally spent a lot of time --

10             We can take that down, Vanessa.  Thank you.

11             You spent a lot of time during your direct

12   examination talking about subsidiaries and pooling

13   agreements, right?

14   A.  Yes.

15   Q.  And at one point you referenced companies that might

16   structure themselves in certain ways to avoid liability, and

17   you gave an example of alter ego cases.  Do you remember

18   that?

19   A.  Yeah.  I'm not sure if they were the same comments at

20   the same time, but I spoke about both those topics.

21   Q.  And this is not an alter ego case, right?

22   A.  No.

23   Q.  Now, you went to Trinity College in Connecticut and

24   obtained a Bachelor of Arts Degree, right?

25   A.  Yes.  That's correct.

1    Q.  That is your only advanced degree.  You don't have a

2    master's or a doctorate, correct?

3    A.  Correct.

4    Q.  And you hold yourself out as an economic damages expert,

5    correct?

6    A.  That's correct.

7    Q.  You are not a Certified Public Accountant?

8    A.  No, I'm not.

9    Q.  And you don't hold yourself out as a tax expert?

10    A.  Definitely not.

11    Q.  And you have never worked at an insurance company in any

12    role, whether it be IT or underwriting or otherwise, right?

13    A.  I worked for AAA at one point, but it wasn't really part

14    of the insurance part.  They do have insurance, but that's

15    about it.

16    Q.  Never been an underwriter, Mr. Zoltowski, right?

17    A.  I have not.

18    Q.  And you never worked in IT at an insurance company?

19    A.  No.

20    Q.  And you went through on direct examination your general

21    understanding of all these computer applications at Chubb

22    that included Blaze, correct?

23    A.  Yes.

24    Q.  But you are not holding yourself out as an expert in

25    insurance, right?

```
1    A.  No, I'm not.

2    Q.  And you're not presenting yourself as a software

3    industry expert either, correct?

4    A.  No.  I've done lots and lots of software cases in the

5    intellectual property world, but I'm not a software expert,

6    no.

7    Q.  And that also means you're not an expert in decision

8    management software or Blaze in particular, correct?

9    A.  No.  I've had other cases related to this type of

10   software, but no, I'm not an expert in it.

11   Q.  Okay.  Now, the opinions that you gave about Chubb's

12   revenue relate to damages that FICO is asking for in

13   connection with its copyright infringement claims, correct?

14   A.  Correct.

15   Q.  And at one point at the beginning of your testimony, you

16   said you were retained to provide opinions related to gross

17   written opinions related to copyright infringement by

18   defendants.  So I just want to be very clear here that you

19   were asked by FICO's lawyers to assume, in rendering your

20   opinions, that defendants are actually liable for

21   infringement, right?  That was an assumption.

22   A.  Yes, it's an assumption I would need to make for damages

23   to actually accrue.

24   Q.  Defendants have not been found liable for copyright

25   infringement, correct?
```

1    A.  Not yet.

2    Q.  And that is a determination for the jury, not you,

3    correct?

4    A.  Correct.  Correct.

5    Q.  Now, before you rendered your expert opinions in this

6    case, you spoke to Mr. Bill Waid at FICO, right?

7    A.  Yes.

8    Q.  And then you also spoke to FICO's expert on the

9    purported value of Blaze to Chubb, and that's Mr. Bick

10   Whitener, right?

11   A.  I spoke with Bick about various topics, but that might

12   have been one of them.

13   Q.  And you spoke to him two or three times, each between

14   about 30 minutes and an hour?

15   A.  I don't recall, but that sounds about right.

16   Q.  Now, during your direct examination when you're talking

17   about revenue, you talked about a big gross written premium

18   number, $21 billion, right?

19   A.  Correct.

20   Q.  And in the world of insurance, we can agree that the

21   phrase "gross written premium" is referred to as revenue,

22   right?  That's the money coming in the door.

23   A.  Correct.

24   Q.  And all of the revenue numbers that you highlighted and

25   you read into the record during your examination, those are

1    amounts paid by Chubb's customers to purchase insurance

2    policies, right?

3    A.  By the customers of whatever writing company that was,

4    yes.

5    Q.  And you included all of the money paid by Chubb's

6    customers to purchase policies if it -- if those policies

7    ever ran through a computer application that included Blaze,

8    right?

9    A.  If it was under one of the writing entities, yes.

10   Q.  Okay.  So I just want to talk a little bit about what

11   that means.

12            So hypothetically, if you had a business in Texas

13   that paid $10,000 for a workers' compensation policy from

14   Chubb, if that policy ran through the TAPS application, in

15   2017 you would include that $10,000 premium in your $21

16   billion number.  Fair?

17   A.  Yes.  That's correct.

18   Q.  And that's because TAPS has a Blaze as a component,

19   right?

20   A.  The policy touched Blaze in some way.

21   Q.  And you were asked to include all premium dollars that

22   ran through these computer applications that included Blaze,

23   right?

24   A.  Well, I was asked to determine what that amount would

25   be.  And like I said, I would have looked at costs as well.

```
1     If I had the appropriate data to deduct them, I would have.
2     Q.  But when you're talking about revenue, if dollars were
3     paid for a policy that ran through an application including
4     Blaze, you included the dollars?
5     A.  Yes.  That's correct.
6     Q.  You did not do any analysis to determine specifically
7     how Blaze was utilized in connection with particular
8     policies, correct?
9     A.  I mean, other than understanding how the applications
10    worked.
11    Q.  But you didn't go through and look at particular
12    policies and figure out whether -- whatever role Blaze had
13    with that particular purchase, right?
14    A.  No.  I think there were hundreds of thousands of
15    policies, no.
16    Q.  And you didn't do anything to adjust your written
17    premium numbers based on Blaze's particular role in an
18    application as compared to other technology components,
19    correct?
20    A.  That's not my burden based upon the law, as I understand
21    it.
22    Q.  I'm not asking you about the burden or the law.  The
23    judge is going to instruct the jury on the law.
24          My question is whether it's correct that you
25    haven't done anything to adjust your gross written premium
```

1   numbers to account for Blaze's role in each particular

2   application, correct?

3   A.  No, I have not.

4   Q.  And you also haven't done anything to adjust those

5   revenue numbers to account for the role that folks at Chubb

6   had in coming up with the particular rules that were

7   deployed through Blaze, right?

8   A.  I didn't have enough information that would allow me to

9   quantify that.

10  Q.  So you did not do it, correct?

11  A.  I could not do it.

12  Q.  You did not do it?

13  A.  Well, could not translates to did not, then yes.

14  Q.  And your methodology also doesn't adjust the revenue

15  numbers at all to account for costs that Chubb would have

16  incurred implementing Blaze, right, like time spent training

17  software engineers on how to use the product, correct?

18  A.  I didn't have the appropriate information to do so, so I

19  did not.

20  Q.  And you also didn't do anything to investigate whether

21  Blaze was successfully or efficiently functioning in these

22  particular computer applications.  It was if it's a computer

23  application including Blaze, I'm including all the dollars,

24  right?

25  A.  I'm not aware of any information related to it being not

1  functioning correctly or any problems with it for any of the

2  policies that I quantified gross written premiums for.

3  Q.  But as a damages expert, Mr. Zoltowski, you didn't sit

4  down and conduct an investigation into how well functioning

5  Blaze was in these particular computer applications,

6  correct?

7  A.  I'm not sure I understand what you mean by "how well it

8  was functioning."

9  Q.  You didn't sit down and do an investigation into how

10 efficient Blaze was in each particular computer application.

11 You didn't render opinions on that, correct?

12 A.  I would need to know what you mean by "efficient" too.

13 I mean, the latency -- I mean, what is the --

14 Q.  Did you do a latency analysis, Mr. Zoltowski?

15 A.  There wasn't that information provided, I don't believe.

16 Q.  So that's a no?

17 A.  No.  When you don't have the information to do the

18 analysis, then you can't do the analysis.

19 Q.  Okay.  I want to look at your slide 12, which is an

20 example of one of these slides that talks about revenue from

21 eight different ACE writing companies.  Do you remember

22 these slides?

23 A.  I do.

24 Q.  And you talked about ACE American, Westchester and the

25 others, right?

1     A.   Yes.

2     Q.   So just to be clear, the only application at Chubb that

3     used Blaze and included revenue from ACE writing companies

4     is CUW Inventory Management, correct?

5     A.   I'm sorry.  Could you repeat that question?

6     Q.   The only application at Chubb that used Blaze and

7     included revenue from these ACE writing companies is CUW

8     Inventory Management, correct?

9     A.   The only application?

10    Q.   Correct.

11    A.   I'm not sure that's true.

12    Q.   Let me see if I can refresh your recollection,

13    Mr. Zoltowski.

14          So I handed you an excerpt from one of your expert

15    reports, and if you look at page 30, footnote B, that might

16    help.

17    A.   You said footnote B?

18    Q.   On page 30, yes.

19    A.   Yeah.

20    Q.   Do you see footnote B from your report, Mr. Zoltowski,

21    reads, "The CUW application is the only application for

22    which defendants reported gross written premium from ACE

23    American subsidiaries."

24          Do you see that?

25    A.   I do.

1    Q.  So does that refresh your recollection that the CUW

2    application is the only application that shows revenue from

3    the ACE writing companies?

4    A.  It does, assuming I didn't make a mistake.  We typically

5    check all of these things when we write our reports, so I

6    would assume that's true, but I would want to check the

7    interrogatories just to confirm.

8    Q.  But that's what you wrote in your report, right?

9    A.  Yes.

10   Q.  And you haven't investigated or offered opinions on the

11   particular people at Chubb who had access to the CUW

12   Inventory Management System, right?  That's outside the

13   scope of your opinions.

14   A.  I'm not sure I understand your question about "the

15   people."

16   Q.  Have you done -- have you investigated, as part of your

17   expert work in this case, Mr. Zoltowski, the particular

18   people at Chubb who had access to CUW Inventory Management?

19   A.  I looked at the information available.  I don't believe

20   there was any information that would allow me to investigate

21   those particular individuals.

22   Q.  So you don't know?

23   A.  Based on what was available, no.

24   Q.  Okay.  So as we said, revenue is money that comes in the

25   door at an insurance company, right?

1     A.  Yes.

2     Q.  And you agreed with Ms. Kliebenstein that revenue is not

3     the same thing as profit, correct?

4     A.  That's correct.

5     Q.  And so if you want to talk about an insurance company's

6     profit, you have to take the revenue dollars, that $21

7     billion, and then you have to subtract the costs and the

8     expenses, correct?

9     A.  That's correct.

10    Q.  And costs at an insurance company, that's going to be

11    money that goes out the door when a customer has a claim,

12    right, and you need to pay the customer?

13    A.  Yes.  That's correct.

14    Q.  Things like employee salaries?

15    A.  Yes.

16    Q.  Rent on all of your office buildings, things like that,

17    right?

18    A.  Depending on if they're attributable to the premiums

19    that are at issue here, yes.

20    Q.  And your $21 billion figure doesn't include costs or

21    expenses at all, correct?

22    A.  Yeah.  I did not have the information to allow me to do

23    that accurately.

24    Q.  And you are not here, Mr. Zoltowski, to opine that there

25    is a nexus or a connection between Blaze and defendants'

1    revenue, correct?

2    A.  I understand there's other witnesses and information

3    that will be doing that.  I was not asked to do that.

4    Q.  And so that means you are not here to offer opinions on

5    how much, if any, of this $21 billion in revenue is actually

6    connected to Blaze as opposed to all the other things that

7    make Chubb Chubb, right?  That's someone else.

8    A.  That would have been part of my analysis if there was

9    information to do so.  I did not endeavor to do so, though.

10   Q.  You do recognize, though, that there are plenty of

11   tangible and intangible assets at Chubb other than Blaze

12   that have contributed to that $21 billion figure, correct?

13   A.  I've never said there were no costs associated with the

14   gross written premiums here.  I just didn't have appropriate

15   information to do so accurately.

16   Q.  But you also acknowledge that there are other assets at

17   Chubb that contribute to revenue, right, other than Blaze?

18   A.  I'm sure there may be other things that contribute to

19   writing a premium, insurance premium.

20   Q.  And your $21 billion figure just represents every single

21   dollar that was paid for an insurance policy that ran

22   through those computer applications that had Blaze in it

23   during the relevant period, correct?

24   A.  Yes.  That's correct.

25   Q.  Okay.  Thank you.

```
1                    No further questions.

2                    THE COURT:  Ms. Kliebenstein, redirect?

3                           REDIRECT EXAMINATION

4     BY MR. KLIEBENSTEIN:

5     Q.  Mr. Zoltowski, just one thing.  You were just asked,

6     your 21 billion figure just represents every single dollar

7     that was paid for an insurance policy that ran through those

8     computer applications that had Blaze in it during the

9     relevant period.

10                   And I want to redirect you to interrogatory number

11    17.  You can either -- let's pick P1004A.

12                   And, Mr. Mayleben, if we could just pull that up

13    and move to the second page.

14                   Your data was based on information provided under

15    oath by the defendants in response to this interrogatory,

16    correct?

17    A.  Correct.

18    Q.  And the data provided was for all insurance policies in

19    connection with which the Blaze Advisor software was used.

20    So it's policies connected to Blaze Advisor software, not

21    just policies that ran through each application, correct?

22    A.  Correct.

23    Q.  And that's all of -- that's all of the data that we've

24    looked at in these interrogatory responses that then made

25    their way into your calculations, correct?
```

```
 1    A.  Yes.  That's correct.
 2              MR. KLIEBENSTEIN:  No final questions.
 3              MS. GODESKY:  I have one question, Your Honor.
 4              THE COURT:  Hang on.  Are you all done, did you
 5    say?
 6              MR. KLIEBENSTEIN:  Yes.
 7              THE COURT:  Okay.  Thank you, Ms. Kliebenstein.
 8              Go ahead, Ms. Godesky.
 9              MS. GODESKY:  Vanessa, if we could bring up,
10    please, the exhibit we were just looking at, which was 1004A
11    at page 2.
12                        RECROSS-EXAMINATION
13    BY MS. GODESKY:
14    Q.  Are you with me, Mr. Zoltowski?
15    A.  I'm just got there.
16    Q.  Okay.  And Ms. Kliebenstein just pointed you to
17    interrogatory number 167 that starts, "For all insurance
18    policies in connection with which the Blaze Advisor software
19    was used."
20              Do you see that?
21    A.  I do.
22    Q.  Okay.  And then I want to look at Federal's answer to
23    the interrogatory, which is lower on the page.  Do you see
24    where it says, "Federal states the following"?
25    A.  Below the redacted area, you mean?
```

1    Q.  Right.  Right after the redactions, do you see, "Federal

2    states the following"?

3    A.  Yes.

4    Q.  And this is Federal's response to the interrogatory,

5    right?

6    A.  Yes.

7    Q.  And then there's -- it says, "For the financial lines

8    unit post-merger for the years identified below, the

9    following applications used Blaze Advisor software:  CSI

10   Express, DecisionPoint, Automated Renewal Process,

11   Profitability Indicator, and Defined Book Run."

12           Do you see that?

13   A.  I do.

14   Q.  And then Federal's answer is, "The approximate gross

15   written premiums policy counts and identifications of the

16   insurance writing companies that issued insurance policies

17   that used these applications in connection with which the

18   Blaze Advisor software was used is provided in the charts

19   below."

20           That's what it says, correct?

21   A.  Yes.

22           MS. GODESKY:  Thank you.  No further questions.

23           THE COURT:  Anything further, Ms. Kliebenstein?

24           MR. KLIEBENSTEIN:  No, Your Honor.

25           THE COURT:  All right.  Thank you.  Mr. Zoltowski,

1    you may step down.  Thank you.

2              THE WITNESS:  Thank you.  Should I leave these

3    here?

4                      (Witness excused)

5              THE COURT:  Let's call the next witness.

6              MR. HINDERAKER:  Your Honor, FICO called Mr. Bick

7    Whitener.

8                      RANDOLPH BICKLEY WHITENER,

9    duly sworn, was examined and testified as follows:

10              THE COURT:  Go ahead and be seated.  Make sure the

11    microphone is on and you're speaking into it and then state

12    your full name for the record.

13              MR. HINDERAKER:  Your Honor, this looks a lot

14    worse than it's going to be.

15              THE COURT:  Good.

16              MR. HINDERAKER:  There's one more to come, so

17    anyway.

18              So this is your two volumes.

19              THE WITNESS:  I've got them.

20              Your Honor, may I pour myself a glass of water?

21              MR. HINDERAKER:  I should probably have that 1137

22    as well.

23                      **DIRECT EXAMINATION**

24    BY MR. HINDERAKER:

25    Q.  So are we all -- I'm all set finally.

```
 1    A.  I'm working on it.

 2    Q.  Like I said, we'll see how much of it we use, but it's

 3    available to us.

 4              So if you would introduce yourself, please.

 5    A.  Certainly.  I am Randolph Bickley Whitener.  I have

 6    always been called Bick, with a K.

 7    Q.  And where are you from?

 8    A.  I am from a small town just outside of Huntsville,

 9    Alabama, named Harvest.

10    Q.  And you were engaged to -- let me see if I can get these

11    slides up and running.

12              Do I have to do something extra here,

13    Mr. Mayleben?

14              You're as good as I am at this.  Is this something

15    we're doing wrong.

16              MR. MAYLEBEN:  It's still set on --

17              MR. KLIEBENSTEIN:  Oh, here.  There's a delay.

18              MR. HINDERAKER:  Okay.  Voila.  All right.

19    BY MR. HINDERAKER:

20    Q.  So before we -- before we spend some time with respect

21    to your background and your experience in the insurance

22    industry, first I'd just like to set the stage as to the

23    scope of your engagement by FICO.

24              Maybe we should back up.  You had been engaged by

25    FICO to provide expert testimony in this case?
```

1    A.  That is correct.

2    Q.  And have you ever provided expert testimony in a lawsuit

3    before?

4    A.  I have not.

5    Q.  This is your first experience being in a witness chair

6    and providing expert opinions.

7    A.  It is.  Although allow me to say, I do not present

8    myself in the industry as an expert witness.

9    Q.  As an expert witness?

10   A.  Correct.

11   Q.  But you do present yourself as an expert?

12   A.  Yes.  I'm willing to admit that I'm old as dirt and have

13   been doing it a long time.

14   Q.  All right.  We will get into that.

15           So you were engaged by FICO to do what?

16   A.  I was engaged by FICO to provide them probably four

17   things.  The first one is they requested that I provide them

18   an overview of the property casualty insurance industry.

19   They asked me to give them an overview of the selling

20   process in property casualty insurance company, how a policy

21   moves from someone that's requested insurance through to an

22   insurance policy exists.

23           They asked me to provide them an overview of the

24   use of business rules and business rules management systems

25   inside of the selling of insurance, and then they requested

1    that I provide them with an overview of Blaze Advisor based

2    on case documents that I was given to review.

3    Q.  An overview of Blaze Advisor used in connection with

4    selling insurance by these defendants?

5    A.  That is correct.

6    Q.  And the documents that you were given to review were

7    coming from this lawsuit?

8    A.  That is correct also.

9    Q.  With respect to the documents that you were given to

10   review before forming any opinions in the case, how many

11   documents did you review that came from the defendants?

12   A.  A little over 275.  The actual number is 279.

13   Q.  And how many pages of material was that?

14   A.  It's a little over 10,000.

15   Q.  Did you do further work with respect to understanding

16   how Blaze Advisor was used by these defendants before you

17   formed your opinions?

18   A.  I did.  I did several things.  Let me start with the

19   documents.  While I have reviewed every document, I

20   concentrated primarily on the documents created and provided

21   by defendant.  You would know those as FED documents.

22   Q.  As what?

23   A.  As FED.  The label in the number that I have in my

24   tracking system.

25   Q.  Oh, you're talking about the Bates number that's at the

1    bottom of the documents as they're produced in a lawsuit.

2    A.   I'm sorry.  I don't speak legal.  But yes, I think so.

3    Q.   Yes.

4    A.   FED000275.

5    Q.   Understood.

6    A.   Thank you.  I reviewed those documents for two things.

7    The first one is, I wanted to see the thought process from

8    defendant as it relates to the licensing of Blaze, and then

9    once having reviewed that, I wanted to understand the

10   defendants' use and deployment of Blaze Advisor inside of

11   their selling of insurance processes.  And after review of

12   documents and during review of documents, I read testimony,

13   deposition.  I'll come back to that.

14        I did talk with Mr. William Waid at FICO to get a

15   general overview of the product from a FICO perspective.  I

16   read and studied testimony by both plaintiff and defendants.

17   I believe at this point I've reviewed six depositions.

18        I've reviewed the two depositions by Mr. Mirolyuz.

19   I've reviewed the deposition by defendants' expert witness,

20   Mr. William McCarter, and I've reviewed FICO depositions

21   with Mr. Ivey, Mr. Baer, and Mr. Wachs.  I think that's

22   W-A-C-H, I think.

23   Q.   It is spelled that way.

24   A.   While I was conducting my study, I also received a

25   fairly robust rules repository from the defendants, and I

1    reviewed their rules.  And as I reviewed the rules, I wanted

2    to make sure that I had a clear -- that my thoughts about it

3    made sense.

4           So I spoke with a gentleman named Brian Sacco, who

5    is highly knowledgeable about rule repositories.  He is not

6    a FICO employee, so just to make sure that I understood and

7    completely grasped and my thoughts were accurate.

8    Q.  And when you referenced a rules repository, did you

9    understand that to be the defendants' rules repository from

10   their Blaze Advisor software that they had, you know, in

11   their -- it came from the defendants, and it was the rules

12   repository of Blaze Advisor?

13   A.  Yes, I believe it was absent any of the rules that would

14   have applied to their policy administration system in Europe

15   called EZER.  I think it had been retired, and so I didn't

16   get those rules, which was fine.

17   Q.  And with that exception, you had the rules for all of

18   the other applications that ran Blaze Advisor or where Blaze

19   Advisor was a component at the defendants?

20   A.  Yes.

21   Q.  So that is a case summary overview of the case specific

22   facts that you looked at.  I'd like to turn to your

23   experience in the insurance industry so we can understand

24   what you brought into that analysis of those case-specific

25   facts.

1    If we could go to slide 5, Mr. Mayleben.

2    How many years have you been in the insurance

3    industry?

4    A.  From the time I started at the Hartford in October of

5    1977 until now is approximately 45 years, 44 of those have

6    been dedicated to the property casualty insurance universe.

7    I took one year off and worked for the American Red Cross in

8    the state of Alabama.  But other than that, it's been

9    property casualty insurance.

10   Q.  And on the screen, is this an accurate presentation of

11   your resumé?

12   A.  Yes.

13   Q.  Before we get into your prior experience with other

14   insurance companies, let's touch base on your current

15   employment, and what is that?

16   A.  I am the principal of a small P & C consulting firm

17   named Bickley & Company.

18   Q.  And that's at your home in Harvest, Alabama?

19   A.  I operate out of my office in my home in Alabama and am

20   there generally until somebody engages me and needs me to be

21   somewhere else.

22   Q.  And you started with Bickley & Company when?

23   A.  July the 8th -- no.  I'm sorry.  July the 5th, 2014.

24   Q.  And what is Bickley & Company?  Could you give us an

25   overview description?

1     A.  Sure.  Bickley & Company is a boutique property casualty

2     consulting entity.  My elevator speech is actually really

3     very simple.  I make change happen for property casualty

4     insurance companies or for the vendors who sell goods and

5     services to them.

6          Bickley & Company is 1.1 person.  I'm bless to

7     have any wife make travel arrangements and run the books and

8     send out the invoices and things like that, but it's

9     primarily me.

10    Q.  Okay.  Let's go to the overview of your experience

11    before Bickley & Company.  You said you started at the

12    Hartford in 1977?

13    A.  Yes, October 24th to be exact.

14    Q.  All right.  And Hartford is a property and casualty

15    insurance company?

16    A.  It is.  When I left them, they were, I believe, the

17    number ten property casualty insurance company with premium

18    in the $8.5 billion range, multi-lines, all 51

19    jurisdictions.  And when I say "51 jurisdictions," I'm

20    taking the 50 states plus the District of Columbia.  That

21    actually is an insurance jurisdiction.

22    Q.  Would you look at -- in your book there's an

23    Exhibit 857.

24    A.  Bear with me.

25    Q.  Sure.

1    A.  Are they numerically numbered?

2    Q.  Yes, they are.  They go from the smallest to the biggest

3    number.

4    A.  So this will be at the back.  I'll point out I wasn't

5    engaged for my manual dexterity.

6    Q.  It's a big book.

7    A.  0857?

8    Q.  That's correct.

9    A.  I'm there, sir.

10   Q.  All right.  And again, as it is on the screen, is that

11   an accurate statement of -- is that an -- that's an accurate

12   resumé?

13   A.  It is accurate and current.

14              MR. HINDERAKER:  Your Honor, I offer Exhibit 857.

15              MS. GODESKY:  No objection.

16              THE COURT:  Exhibit 857 is received.

17   BY MR. HINDERAKER:

18   Q.  And as you started off to explain, you started at the

19   Hartford.  I think I'd just like to note, and then we'll go

20   into your specific experience, Mr. Whitener.  I'd like to

21   note that you started at the Hartford, and you've been at

22   these various, over the last 44 years, other companies in

23   the industry of insurance.

24              Is that a fair overall summary?

25   A.  It is a fair overall summary.  Allow me to say, I

```
1    consider myself to be one of the most blessed men in the
2    industry.  I've -- I've been allowed to branch out and not
3    get pigeon hole siloed into a specific function and do a lot
4    of different things.
5    Q.  Well, then let's turn to that.
6              If we could have slide 6, please.
7              Over your 44 years, have you been involved in each
8    of these seven different functions or roles within the
9    insurance industry?
10   A.  I have.
11   Q.  So let's just go across the top.
12   A.  Point of clarification, sir.
13   Q.  Yes.
14   A.  Is this in here?
15   Q.  The slide?
16   A.  Yeah.
17   Q.  The slide should be on the screen.
18   A.  Yeah.  But then I'm --
19   Q.  No.  You have to look at the screen.
20   A.  Look at the screen.  Got it.
21   Q.  Okay.  So let's first talk about your personal
22   experience with underwriting.  And as I understand it, there
23   are two types of underwriting:  Corporate underwriting and
24   front line underwriting?
25   A.  Yes, I describe it that way.
```

1    Q.  So let's start with corporate underwriting.

2    A.  All right.

3    Q.  First tell us what it is and then tell us what your

4    experience has been with it.

5    A.  Certainly.  The corporate underwriting function is that

6    part of an insurance company where the appetite for risk --

7    every insurance company has those types of policies that

8    they want to write.  They have that amount of risk that

9    they're willing to take.

10          Inside of that, they have the definition of the

11   products that they're going to sell.  They have the

12   definition of the jurisdictions in which they want to sell

13   them.  Corporate underwriting does all of that.  It's

14   defining the strategies and the tactics that the insurance

15   company is going to use to execute their selling of

16   insurance process.

17   Q.  Okay.  And then let's go to front line underwriting.

18   Tell us what that is and what your experience has been.

19   A.  Certainly.  Front line underwriting is that part of the

20   process that executes the strategies and the tactics defined

21   by the corporate level.  I call it front line underwriting

22   because the corporate level you generally find in corporate

23   offices, whereas the front line underwriting you find them

24   out in field offices.

25          The front line underwriting has two

1    responsibilities, really.  The first one is to execute those

2    strategies and tactics as it relates to the process of

3    selling insurance.  The second one is, in selling insurance,

4    they have this group of people called independent agents and

5    brokers.

6              A big part of independent agents and brokers and

7    insurance company offering products to be sold to the

8    purchasing population, be it personal or commercial, a big

9    part of that is relationship management.  It is the

10   responsibility of the front line underwriters to execute

11   those strategies and tactics and to manage the relationships

12   with the independent agents and brokers.

13   Q.  When you started with the Hartford, did you start in the

14   front line underwriting?

15   A.  I did.  I was a front line underwriter in East Hartford,

16   Connecticut.  I was actually hired by the Richmond office

17   but immediately transferred to Hartford, Connecticut.  I

18   participated for about four months in what they call an OJT,

19   an on-job trainee program, being taught the underwriting

20   process.

21             Also taught a few of the products -- the policy

22   types.  And then I -- when I finished that program, I moved

23   into an underwriting position in East Hartford until I was

24   subsequently sent to the Washington, D.C. office as a

25   promotion and a transfer into another underwriting function.

```
 1            And then I was in Washington, D.C. I think about
 2    18 months, and somebody figured out I could do math.
 3    Q.  Okay.  While you were -- while you were responsible for
 4    front line underwriting, was there a period of time where
 5    you had a number of people reporting to you all engaged in
 6    the --
 7    A.  Yes.
 8    Q.  -- effort of underwriting?
 9    A.  Yes, but not in the time frames I have been discussing.
10    Q.  Okay.
11    A.  So if you'll allow me, I mentioned that somebody
12    discovered I could do math, and so they brought me out of
13    Washington, D.C. back up to the headquarters in Hartford,
14    Connecticut, and I fulfilled a number of functions, as
15    outlined here, and I'm sure you're going to ask me about
16    those.  I'm confident you're going to ask me about those,
17    until the point where they sent me to Charlotte, North
18    Carolina in a -- we called it a center, but functionally a
19    field office.
20            And I went there as part of the management team.
21    I was the agency services manager was the title.  I had
22    about 122 people working for me.  I had the new business
23    process -- underwriting and processing unit.  I had the
24    renewal underwriting, new business and processing unit.  I
25    had the endorsement, which means make a change to a policy,
```

1    an existing policy.

2            I had the endorsement underwriting group working

3    with me and a few other ancillary departments.

4    Q.  All right.  Then let's move on to the next category of

5    experience, financial management and reporting.  Is that a

6    corporate function or a front line function?

7    A.  No.  No.  It's a corporate function, and this is one of

8    the functions that's not really related to the front line

9    selling of insurance process.  It is, however, a process of

10   looking at the results from that selling process.  So my

11   responsibility there was to collect data, to analyze data,

12   to put together -- I called it navigational reports.  Here

13   are the key performance indicators for these products.  This

14   is what our budgeted performance indicator result was to be.

15   Here's where it is now.

16           And if it's -- if it's at budget or better, you

17   get the privilege of smiling, and if it's not, you get the

18   privilege of talking about remedial action.

19   Q.  Your personal experience with planning, what is that and

20   what did you do?

21   A.  For the -- this is a Hartford Insurance industry

22   experience back in the early 1980s.  Corporate -- corporate

23   Hartford had a responsibility for all of its lines of

24   business, and I'm sorry.  Line of business means a group of

25   products.

1        So in the world that we live in today, most of us

2    in here have a -- we have an auto policy.  A private

3    passenger auto is considered a line of business.  We have a

4    homeowner's policy.  Homeowner's is considered a line of

5    business.  There are a whole bunch of them in the insurance

6    industry.

7        I believe Hartford had 27, approximately, lines of

8    business and about 14 writing companies.  You've heard that

9    word before.  My job in corporate planning was to manage and

10   complete three planning cycles a year.  So the first thing

11   we did was look at current year and five years into the

12   future, a strategic plan, if you will.

13       Then when that was done, I got to breathe for 30

14   days, and then we would put together what we called an

15   operating plan, which was again a revisiting of the current

16   year but then next year and the following year.  And when I

17   finished I should that, I got another 30 days to breathe,

18   and we put together --

19       And this was usually happening in or around

20   September, October.  We started work on our budget for next

21   year for all of the products.  That planning process

22   encompassed all of the market segments, all of the lines of

23   business.

24       I was in the offices of the commercial casualty,

25   vice president of underwriting, the commercial property vice

1    president of underwriting.  We organized specialty insurance

2    a little bit differently, so there were a couple of vice

3    presidents of underwriting for that.  I was in the office of

4    the vice president of underwriting for the personal

5    insurance division.

6              But the job was to take those planning processes,

7    create those plans, and get them into the office of the CEO

8    by a time frame.

9    Q.  Thank you.  Now let's go to product development.

10   Similarly, if you would tell us what that is and what your

11   experience was -- has been.

12   A.  Product development can be two things.  The first one is

13   we -- the insurance industry is always looking to innovate.

14   I know that sounds strange, but we're always looking to

15   innovate.  And so this could be creation of a new product

16   type, one of the new product types --

17             This happened in the mid -- mid-1980s, this new

18   high fangled thing that made it into the marketplace, it was

19   called a personal computer.  And so we -- they asked me, and

20   I created a personal computer -- I'm sorry -- personal

21   computer endorsement that would be an endorsement added to a

22   homeowner's policy to be able to provide more robust

23   coverage for personal computers because the homeowner's

24   policy actually covered it, but not adequately for the risk

25   that was involved in owning one.

1           Another thing I did was, the Hartford had a

2     managing general agent out in the Midwest that wanted a

3     combined -- a combined policy, an automobile policy and a

4     homeowner's policy in one policy.  So the policy -- the

5     applicant or the policyholder would only have to deal one

6     time a year with the insurance policy.

7           So I took the two policies, and I put them

8     together into one policy and did all of the work that was

9     required for that.  And that's what brought me into the

10    world of insurance technology, because you don't want to

11    manually issue the policies.  You want the computer to do

12    it.

13    Q.  We'll get back to that.

14          Let's go on to your product management.  If you

15    would tell us what it is and what your experience has been.

16    A.  Certainly.  The product management function is a part of

17    that corporate underwriting process I talk about.  So when

18    you think about, we're going to define our appetite for

19    risk, we're going to define what states, what products we

20    want to sell.

21          Once you get through those decisions, you have to

22    start working from state regulators because in the United

23    States of America, insurance is regulated at the state level

24    inclusive of Washington, D.C. which is technically not a

25    state.  It's a jurisdiction.

1    So there were 51 departments of insurance that we

2    had to deal with.  Every product has to be filed, and the

3    state carries an approval right.  And that filing has to do

4    with the rate you're going to use, the coverages that are

5    included in the policy and the rules that you're going to

6    use.

7    Q.  Then let's move on to field operations management.  What

8    is it and what have you done in that area?

9    A.  This is, again, the reference to my being the new

10   business, the renewal business, the endorsement underwriting

11   responsible manager in Charlotte, North Carolina, when I

12   went down to that insurance center.

13   Q.  What was the geographical scope of that responsibility?

14   A.  We had the southeast.  I believe we had nine or ten

15   states.  We had Virginia.  We had North Carolina.  We went

16   all the way down to Florida.  We went over to Mississippi.

17   Q.  And then if you would -- your experience with

18   business -- with business management of technology or your

19   experience with technology used in selling insurance.

20   A.  Certainly.  The underwriting department of an insurance

21   company has a finite amount of programming resources

22   available to it.  There are certain things that those

23   technology people need to succeed.

24        One is clear and well-defined and articulated

25   business requirements.  And in some of the testimony that

1    we've heard leading up to now, the -- you've heard about

2    business analysts and business requirements.  Inside of -- I

3    hope I get this name right -- inside of I believe Mr. Ivey's

4    testimony, he talked about FICO's 4D defined.

5         Defined is business requirements.  The technology

6    people can't build if they don't know what they have to

7    build.  In addition to that, I ran into a situation where

8    the ten-pound bag of potatoes, if you'll allow me that

9    analogy, had a request for about a hundred pounds of

10   potatoes.  And the technology department was struggling with

11   what should I be working on this month?

12        And they came to my upline, and my upline gave me

13   the responsibility of determining the priorities for the use

14   of those data processing technology resources.

15   Q.  Was that an occasion when you were a bridge between the

16   business --

17   A.  Yeah.

18   Q.  -- and the technologist?

19   A.  Yes.  My wife describes me as sort of the United

20   Nations.  I speak -- I speak business requirements.  I speak

21   detail.  I speak technology.  But I'm also able to meet with

22   the technology people and speak technology to the business

23   people in such a way that they'll understand it.

24   Q.  Have you had prior experience with the Duck Creek policy

25   administration system?

```
 1   A.  I have, twice.
 2            Mr. Hinderaker, let me time you out for about two
 3   seconds.
 4   Q.  Absolutely.
 5            THE COURT:  Mr. Hinderaker, are you at a
 6   convenient breaking point?
 7            MR. HINDERAKER:  You know, with less than five
 8   minutes I am.  If we want to -- I can do it right now, of
 9   course.
10            THE COURT:  No.  That's okay.  Finish this line
11   and we'll go then.
12            MR. HINDERAKER:  That's great.
13            THE WITNESS:  I am ready, sir.
14   BY MR. HINDERAKER:
15   Q.  Also, have you had prior experience with implementing a
16   billing and claims technology called Insuresoft?
17   A.  Insuresoft is a full insurance suite.  It has policy
18   admin.  It has claims.  It has billing.  It has management
19   reporting.  So, yes, I have -- I've actually installed that
20   at a start-up MGA.  I functioned as the chief operating
21   officer of the MGA while we brought it up out of the ground.
22   Q.  Okay.  Have you had any prior experience before being
23   engaged by FICO with the Blaze Advisor business rules
24   management software system?
25   A.  I have not.
```

1    Q.  So is it fair to say you came to the engagement without

2    any preconceived notions about Blaze Advisor?

3    A.  That is correct.

4            MR. HINDERAKER:  Your Honor, before going further,

5    the testimony of Mr. Whitener will be direct -- expert

6    testimony directed to the insurance industry, the experience

7    and expertise on the process of selling insurance, the use

8    of technology in selling insurance, in the process of

9    selling insurance, and then his knowledge gained from the

10   analysis of the case-specific facts from the defendants

11   regarding Blaze Advisor and their applications.

12           I offer his testimony for those purposes.

13           MS. GODESKY:  We have an objection, Your Honor.

14           THE COURT:  All right.  Why don't we do this:

15   Let's take our afternoon break.  We'll take that up over the

16   break.  And, members of the jury, why don't you be back at

17   25 minutes after 3:00 on that clock.  Okay?

18           (Jury leaves courtroom.)

19           THE COURT:  Let's take this up at 20 minutes after

20   3:00.  Give ourselves five minutes to do that.  Give the

21   court reporter a break.

22           (Recess taken.)

23           (In open court without the Jury present.)

24           THE COURT:  Ms. Godesky, you have an objection to

25   Mr. Whitener's testimony; is that correct?

1          MR. HINDERAKER:  Maybe, Your Honor, before we get

2     to that, I can be very clear about the purpose for which his

3     testimony is being offered.

4          THE COURT:  Sure.

5          MR. HINDERAKER:  His purpose -- his testimony is

6     being offered to inform the jury regarding the process of

7     selling insurance, regarding the things that matter in that

8     process to selling more insurance or selling less insurance.

9          He has been engaged to -- and he has experience in

10    not only front line underwriting but corporate product

11    development, so he has knowledge with respect to those

12    things.  And he has, as you heard, studied 10,000-plus pages

13    of the defendants' documents to analyze from his expertise

14    how the defendants were using -- how the defendants used

15    Blaze Advisor, in their words.

16         He is not offered a Blaze Advisor expert or as

17    somebody who with Blaze Advisor expertise connects Blaze

18    Advisor to the selling of insurance.  We've heard

19    Mr. Baseman, Mr. Ivey, Mr. Baer, Mr. Marce regarding the

20    qualities or attributes that Blaze Advisor brings to the

21    industry.

22         And now we're looking it -- taking it from the

23    other side, with Mr. Whitener telling us, well, how does the

24    insurance industry work and how is insurance sold, and he

25    has experience with technology.  I'm not pretending him to

1    be a Blaze Advisor, but he does -- he has studied the

2    defendants' use of Blaze Advisor, if that's more clear.

3            THE COURT:  And I'm assuming that all of the

4    opinions you intend to elicit are the ones that were

5    disclosed in his report.

6            MR. HINDERAKER:  Absolutely.

7            THE COURT:  I suspect I know what I'm going to

8    hear from Ms. Godesky, and that is that you described him as

9    testifying to the value of Blaze Advisor, but maybe I'll

10   hear something else, but I understand what you're telling

11   me.

12           MR. HINDERAKER:  Yeah.  And that value

13   proposition, if you will, is going to come from his analysis

14   of these case-specific facts.  So it comes from, if you

15   will, the bottom up, the case-specific facts, not some Blaze

16   Advisor expertise top-down.

17           THE COURT:  And he's not offering damage numbers?

18           MR. HINDERAKER:  He's not offering damage numbers.

19           THE COURT:  Ms. Godesky?

20           MS. GODESKY:  Your Honor, slide 3 in their

21   presentation for Mr. Whitener --

22           THE COURT:  I may be wrong.

23           MS. GODESKY:  Summary of opinions.  "Blaze Advisor

24   added significant value to the process of selling insurance

25   and hence added significant value to defendants' business."

1          The last slide, "FICO Blaze Advisor added

2     significant value to defendants' business."

3          Slide 73, "Defendants needed Blaze Advisor to sell

4     insurance in underpenetrated markets."

5          And when you look at the text of his disclosed

6     reports, the headers in the reports are Blaze Advisor's

7     Contribution to Gross Written Premium, Chubb's use of Blaze

8     Advisor Contributes to Gross Written Premium.

9          And we have an objection to Mr. Whitener

10     testifying about the value or contribution of Blaze or even

11     decision management software generally, because I would like

12     to do a voir dire of the expert and show that he has no

13     experience in that area.  And so you cannot create an expert

14     by having them study in the context of litigation.

15          He needed to be retained with the expertise that's

16     required under Rule 702.

17          THE COURT:  But his experience and qualifications,

18     if I'm remembering Judge Wright's order correctly, I believe

19     she said that no -- no objection was made to his experience

20     or qualifications and then denied the motion to exclude

21     based on the objections that were made.

22          Am I accurately recalling what she said?

23          MS. GODESKY:  She said that it was raised in

24     reply, and so she was not going to consider it.  But it is

25     absolutely not waived because you have no obligation to

1    challenge qualifications under Rule 702 in a *Daubert* motion,

2    and we can do so now.

3              THE COURT:  I understand.

4              MR. HINDERAKER:  Again, if I could repeat myself a

5    bit.  It's -- looking at the defendants' documents without

6    having expertise in the insurance industry doesn't tell you

7    the picture that comes with studying how defendants use

8    Blaze Advisor with that knowledge from the insurance

9    industry.

10             So why did -- why did something matter -- why did

11   what the defendants were doing with Blaze Advisor matter?

12   It mattered because in the process of selling insurance,

13   that effect -- that attribute affects the outcome of the

14   selling process.

15             So I don't mind the jury being quite clear that

16   he's not a Blaze Advisor expert.  He's an insurance industry

17   expert.

18             MS. GODESKY:  Your Honor, his opinions go far

19   beyond that as disclosed on the slides and in his report.

20   If he was simply offering opinions about, this is the

21   process of selling insurance and certain things are

22   important in the process of selling insurance, that might be

23   appropriate.

24             But he was disclosed as an expert who offered

25   opinions on how Blaze contributed to gross written premium

1    at Chubb, and he does not have the expertise to offer those

2    opinions.

3           MR. HINDERAKER:  Well, that's not exactly accurate

4    because the testimony is that if you can -- that defendants,

5    in fact, achieved certain outcomes using Blaze Advisor, by

6    the defendants own statements.  And those outcomes mattered

7    in the process of selling insurance because of the elements

8    of the process of selling insurance.

9           So you take -- you take what the defendants have

10   acknowledged as why they were using it, what they were

11   trying to achieve, and you apply it to the process of

12   selling insurance and why it matters in the process of

13   selling insurance.  And you reach a conclusion that it had

14   an impact.  It was significant.

15          He's not quantifying it in terms of -- he's not

16   touching it to revenue.  That was a different expert.  He's

17   just saying, how does this matter to the process of selling

18   insurance, from the defendants' own experience.

19          THE COURT:  Understood.  I understand your

20   objection.  I'm going to allow him to testify.  You can

21   bring this all out in cross.  You can make objections during

22   his testimony, if you wish.  But I'll hear the testimony or

23   we'll begin with the testimony, and we'll cross that bridge

24   here when we get to it.

25          MS. GODESKY:  Your Honor, just for the record,

1    I'll lodge the additional objection that this is

2    particularly prejudicial given his lack of qualifications

3    and the fact that this all goes to the disgorgement question

4    that's going to be decided by the Court, not the jury.

5         And now they're hearing testimony from someone who

6    is, I think admittedly by plaintiffs, not qualified to

7    testify about Blaze Advisor.

8         With that, is he presented as qualified in

9    insurance?  Is that the qualification that the Court is

10   presenting?  I'm just trying to understand if he's allowed

11   to testify, what is the qualification?

12        THE COURT:  He's testified as to the width and

13   breadth of his experience and expertise in the insurance

14   industry and his knowledge of the use of technology in

15   underwriting, generally speaking.  Beyond that, he has Blaze

16   specific knowledge derived from the documents.

17        So on that basis and not knowing exactly what's

18   coming out of the witness' mouth, I'm going to let him

19   testify.  And I understand your concern, but let me be

20   blunt.  All of this is things that would have been

21   beneficially raised on *Daubert* motions, and if not at

22   *Daubert* motions, then raised in motions in limine, and we

23   could have addressed it then.

24        And I didn't use the word "waiver."  I didn't say

25   you'd waived it.

1          So let's bring the jury in.

2                        **IN OPEN COURT**

3          THE COURT:  Go ahead and be seated.

4          Mr. Whitener, come on back up to the witness

5     stand, if you would.

6          THE WITNESS:  Mic is on?

7          MR. HINDERAKER:  Yep.  Sounds good.  We can hear

8     you.

9     BY MR. HINDERAKER:

10    Q.  Let's turn to -- let's turn to a discussion of the

11    different kinds of insurance products in the marketplace so

12    we start to get that understanding.

13              If we could go to slide 7, please.

14              This slide obviously shows four different kinds of

15    insurance.  And is that -- that's accurate?  We can put --

16    we can put insurance products into these four categories?

17    A.  You can.  I generally refer to these as market segments.

18    Q.  Market segments.  All right.

19              Well, I'd like to just go through each one so we

20    have an understanding of the marketplace with respect to

21    insurance products.  So if -- I think I can control this for

22    a moment.

23              Let's go to specialty insurance.  Tell us what it

24    is, please.

25    A.  Specialty insurance is a type of commercial insurance

1    generally segmented out from an organizational standpoint

2    inside of the underwriting functions of a company, the

3    corporate underwriting functions, even front line

4    underwriting functions.

5            Specialty insurance is insurance for unique risk,

6    and I'll use the phrase "as opposed to mainstream

7    commercial." Commercial insurance, relatively less complex.

8    Special insurance, very complex. A good example of this

9    might be directors and officers insurance. This usually

10   revolves around various types of professional liability or

11   unique risk.

12           There was a time in the past where the Bengal

13   tiger, the white Bengal tiger at the Cincinnati Zoo was

14   loaned, I believe, to the San Diego Zoo and the specialty

15   marketplace of the general insurance property casualty

16   industry provided that coverage.

17           A good example would be medical malpractice.

18   Another good example is architects and engineers, people

19   that require liability protection because of -- because of

20   mistakes.

21   Q.  In general, does specialty insurance require a higher

22   level of underwriting expertise?

23   A.  Yes.

24   Q.  And explain why, please.

25   A.  The risk -- the risks are significantly higher. The

1    risks are significantly less frequent in occurrence, but the

2    risks if an occurrence takes place and the liability that

3    would come from that is very, very, very large.

4    Q.  So as between specialty insurance -- and we'll talk

5    about commercial insurance in a moment.  As between those

6    two, is specialty insurance more complex in its underwriting

7    challenges?

8    A.  Yes.

9    Q.  Let's go to commercial property insurance.  If you would

10   define that for us, give a little more meat to the bone from

11   this slide.

12   A.  This is insurance protection that businesses purchase to

13   protect their property.  So it could be the physical

14   location of the property.  It could be their inventory of

15   products, if they're selling products.  If they're a

16   manufacturer of products, it could be the machines and

17   equipment that they use in selling product -- or I'm

18   sorry -- manufacturing product.

19   Q.  So this is commercial property insurance.  Let's turn to

20   commercial casualty insurance.  And if you would help us

21   make the distinction between those two kinds.

22   A.  Certainly.  With property insurance, covering the risk

23   associated with physical property, commercial casualty

24   insurance covers the risk as associated to third-party

25   liability.  So if you have a flower shop and the flower shop

1    has a delivery truck, you have a risk as it respects to

2    third-party injury caused by your truck.

3           If you manufacture product and that product

4    happens to be a lawn mower, you have a product liability

5    risk as it respects to your design of the lawn mower and

6    then its performance when purchased by a consumer, damaging

7    somebody and you being held liable for that.

8    Q.  And hence, the name casualty as opposed to property?

9    A.  Correct.

10   Q.  And then personal insurance, I think we all know what

11   that is, but let's touch that base.

12   A.  Those are the types of insurance protection on a

13   property in the casualty basis that are purchased by

14   individuals.  So most of us, as I mentioned earlier, have a

15   private passenger auto.  We have a private passenger auto

16   policy.

17          Most of us have some type of a residence.  It

18   might be a home.  It might be an apartment.  It might be a

19   condo.  But in that arena of protection need, you're going

20   to buy a homeowner's policy.

21          THE COURT:  Mr. Whitener, I need to get you to

22   slow down a little bit.  Okay?

23          THE WITNESS:  Yes, sir.

24   BY MR. HINDERAKER:

25   Q.  So those are the kinds of insurance policies.  Take a

 1    moment and get some water and --

 2    A.  Thank you.  Thank you.

 3    Q.  Now let's turn and talk about the people who are

 4    involved in the process of selling insurance.

 5    A.  Certainly.

 6    Q.  So we have the potential customer.  I take it, is

 7    that -- is that just self-explanatory?  Is there anything

 8    more to say?

 9    A.  It's pretty close to self-explanatory.  What I might add

10    there is that in terms of the -- of the existing case, the

11    primary market segment was specialty with some commercial,

12    primary not the only.  So the commercial customer is usually

13    somebody inside of the company seeking to purchase insurance

14    coverage for their risk management needs.

15    Q.  All right.  Let me unpack that a little bit.

16          As you reviewed the case documents, most of the

17    applications that use Blaze Advisor by the defendants were

18    connected to the selling of specialty insurance?

19    A.  Yes.

20    Q.  Now, some were also connected to the selling of

21    commercial insurance?

22    A.  Yes.

23    Q.  And I think, is it fair to say that that covers the

24    category.  Most were specialty.  Some were commercial, and

25    those were the two kinds of insurance lines that defendants

```
 1    used Blaze Advisor in connection with selling?

 2    A.  Yes.

 3    Q.  And so when most of the -- which is to then say, I

 4    think, if I understood you, that most of the customers

 5    purchasing insurance with applications connected to the use

 6    of Blaze Advisor were specialty customers?

 7    A.  Commercial customers with a need for insurance product

 8    sold by the specialty market segment, yes, sir.

 9    Q.  Okay.  All right.  Customers needing insurance products

10    that required a higher degree or expertise of underwriting

11    than a commercial product?

12    A.  Than Main Street commercial, yes.

13    Q.  Let's go to -- talk about the -- talk about the second

14    person, if you will, on the screen, the independent agent or

15    broker.

16             How does that person connect in to the process of

17    selling insurance?

18    A.  Independent agents and brokers are the people out in the

19    open marketplace that are helping insurance customers find

20    and purchase insurance.

21    Q.  And we used the title independent agent or broker.  What

22    makes them independent?

23    A.  They are independent because they are free-standing

24    businesses.  So to sell insurance in any of the

25    jurisdictions, the 51 jurisdictions, you have to be licensed
```

1     to sell that insurance by the state, the state of Virginia,

2     the state of Massachusetts, the State of Minnesota.

3          So the independent agent, if they decide that they

4     desire to make their career by having an insurance-selling

5     business, they go to the State, and they take tests, and

6     they acquire a license to sell.  Then they go out and they

7     establish relationships with insurance companies.

8          When I entered into the industry in the late

9     1970s, it wasn't unusual for an independent agent to have

10    10, 12 companies in its arsenal of people for which it had a

11    license to sell insurance.  Nowadays, that number is

12    probably a little closer to five because the agents started

13    to realize it costs money to have the insurance license for

14    that company.

15         But the reality is, the real bottom line here is

16    the independent agents are independent businesses.  They run

17    their own business.  They're licensed by the state.  They

18    acquire that themselves.  And then they go out, and they

19    market themselves to the insurance companies.

20         Insurance companies say, yes, we want to do

21    business with you, and they have a contractual agreement

22    that allows the independent agent to sell on behalf of the

23    company.

24    Q.  But the independent agent doesn't have to only sell on

25    behalf of one company.  He can sell on behalf of as many

1    companies as he has agreements with?

2    A.  Correct.  As I mentioned, and nowadays it looks to be

3    about five.

4    Q.  Okay.

5    A.  And that creates an interesting dynamic in the

6    relationship because all of the insurance companies know

7    that the independent agent has a portfolio of companies

8    available, and so there's a -- there is a goal in that front

9    line underwriting function to establish for the agents you

10   select almost a loyalty, if you will, a preference for doing

11   business with each other.

12   Q.  And then let's turn to the third, say, person involved

13   in the process of selling insurance, the underwriter of the

14   insurance company.  I think at this point we're talking

15   about front line underwriting?

16   A.  We are.

17   Q.  And so what is the role, if you will, of the -- well,

18   let me ask you this:  Is it possible to sell insurance

19   without front line underwriting?

20   A.  No.

21   Q.  Not whether you use technology or not, but you have to

22   underwrite to sell insurance?

23   A.  Yes, because the definition of underwriting is within

24   the -- it's where the risk appetite and the type of policies

25   the company wants to write, and then inside of those types

1    of policies, so let's go back to the flower shop.  Okay?  I

2    want to write flower shops.  Okay?

3              Hey, front line underwriting, we want to write

4    flower shops, but we don't want you to write flower shops

5    that have five delivery vehicles.  We want the small guys.

6    We want somebody that only has one or two vehicles.

7              All of that has to take place in the underwriting

8    process.  Sometimes executed systemically and sometimes

9    executed by humans.

10   Q.  Okay.  And "systemically," did you mean by technology?

11   A.  Yes.  Yes.

12   Q.  And I think that -- I go slow on the natural, but I

13   think you have to go slow on the unnatural.  Slow down a

14   little bit.

15   A.  I'll do my best, sir.

16   Q.  All right.

17   A.  As Mr. Pandey pointed out, he loves technology.  I might

18   be guilty of the same thing as it respects property casualty

19   insurance.

20   Q.  All right.  Is it fair to say that the underwriter is

21   the key person in this process of selling insurance?

22   A.  It is fair to say that the underwriter is the key -- the

23   front line underwriter is the key person in this.

24   Q.  Okay.  So that's the -- that's having the steps of

25   selling in mind.  I want to go to a different topic being

1    what we've heard defined, I guess, as a policy

2    administration system.  Turn to that subject.

3              With or without technology, can insurance

4    companies sell insurance without a policy administration

5    system?

6    A.  In today's current environment, it could be done, but

7    you can't be price-competitive because the expenses it would

8    cost to do that would drive your price way above the point

9    where you could sell in the marketplace.

10   Q.  Okay.  Fair to say regardless of what the particular

11   technology is, technology is used in the policy

12   administration system's process?

13   A.  I would say that differently.  Policy -- policy

14   administration system is a technology or a collection of

15   technologies used to administer the selling of insurance

16   process in the underwriting process.

17   Q.  Thank you.  I'm sorry to talk over you.

18              And that was your experience -- and that was true

19   in your experience in the industry?

20   A.  Yes, across all 44 years.

21   Q.  So let's go to the steps in the process of selling and

22   underwriting, just to walk us through the application.  We

23   don't have to spend any more time than necessary, but let's

24   spend, as you might say, all the time that is necessary.

25              Describe for us the application step in the

1    selling process.

2    A.  As I start this, and I will talk slowly and do this as

3    fast as I can.

4         The Court has heard the word "application" several

5    times, and that's one of the aspects of property casualty

6    insurance.  Words can have multiple meanings.  So we've

7    heard applications referred to as CIS is an application.

8         This use of the word "application" is talking

9    about the collection of data from the applicant, the

10   person -- or the entity, the business requesting insurance,

11   the person requesting insurance.

12        They provide that information to the independent

13   agents or broker to be able -- for the independent agent and

14   broker to be able to submit it into the -- into the

15   underwriting process.  So the first step of every policy

16   that is a prospect to be issued is, collect the data and it

17   starts with the application.

18   Q.  Okay.  Let's go to step number two then.

19   A.  When that application comes into the underwriting

20   process, the first thing the underwriter or the underwriting

21   process is going to do is, it's going to ask itself a

22   question, and that question is, Is this data adequate and

23   accurate for the risk assessment?

24        And most frequently the answer is yes, but the

25   answer can be no.  And of course, if the answer is no, the

1    next question is, well, what data do I need and from whence

2    am I going to get it?

3           Once the underwriting has, my terminology, that

4    adequate amount of information and has confidence in its

5    accuracy, the underwriter will then go through a risk

6    assessment process, and that risk assessment process will

7    ultimately result in a here are the -- well, it's going to

8    result in a yes or a no first.

9           Let's take yes first.  Okay?  If it results in a

10   yes, it's going to be, what coverages am I willing to offer

11   this applicant?  And that's coverage grants, coverage

12   restrictions.  And then what price are we going to offer?

13          Okay.  And the key to price is, the insurance

14   company wants a price that reflects the probability of loss,

15   the probability of future claims, not one-on-one with

16   policies.  But in the collection of homogenous risk, similar

17   types of risk, they want to know that in population when

18   they collect the premium, they've got enough money to cover

19   the losses because not everybody is going to have a loss.

20   Q.  Okay.

21   A.  Now, the next part of that process -- so we're at yes.

22   There is a possibility that it's no.  The risk may fall

23   outside of the -- I'm sorry.  Where are we?

24   Q.  The risk may fall outside of --

25   A.  It's possible.  So now I'm switching over to no.  There

1  is a possibility that the application does not represent a

2  request for insurance that fits into that company appetite.

3           If the risk doesn't fit the company appetite, the

4  underwriter is going to say no, and then the independent

5  agent, broker and the applicant are going to begin to search

6  for insurance through other insurance company alternatives.

7           If the -- can we now go back to yes?  Are you

8  ready?

9           If we go back to yes, the underwriter then is

10  going -- going to craft the proposal.  It's called a quote.

11  It's an offer for insurance.  And the underwriter is going

12  to take a next step to make sure that that quote is in

13  compliance.

14  Q.  So let's take those two things separately, please.

15           At the stage of the underwriter assessing the

16  adequately and accuracy of the information and fashioning a

17  quote, what is the value of being able to be precise?  What

18  is the value of precision at that step?

19  A.  There are two -- there are two impacts to precision.

20  Okay?  The first impact is if it is acceptability to the

21  applicant.  If your price is too high, a competitor may be

22  able to grab that policy instead of you.  Okay?

23           If the price is too low, you'll grab the policy.

24  You'll write the policy, but when you collect number of

25  those policies and the losses start to come in, you do not

1    have adequate enough premium to cover the losses plus your

2    expenses and produce a profit.

3            So the precision of the price is critical to the

4    long-term success of the profitability for that product

5    type.

6    Q.  And we are in the scenario where the underwriter has

7    chosen to say yes, and that results in a quote, as you say,

8    on the --

9    A.  Quote is insurance terminology for an offer to insure.

10   We would -- flower shop, we would like to insure you.

11   Here's what we can do for you.  Here's the coverages, the

12   limits of liability, the property, the property amount of

13   coverage.  Here are any restrictions that we place on the

14   policy.  Here's the deductible, for instance, and here's the

15   price.

16   Q.  Does the -- does speed, does the ability to respond to

17   the applicant faster rather than slower affect -- have an

18   impact on the sales process?

19   A.  Yes.

20   Q.  What is that?

21   A.  The faster you get information about the offer, whether

22   the offer is coming or not, the more -- if the offer is

23   coming, the more likely it is you will convert that quote

24   into a policy.  And part of that is, as you and I discussed

25   earlier, it's the insurance agent doesn't have an incentive

1      to shop it.

2             If the applicant is sitting there waiting,

3      waiting, waiting, the agent may shop it out to one of those

4      other companies in the portfolio to see if the agent can get

5      an answer from them quicker. Speed is important.

6      Q. Then the next step is compliance. What is that?

7      A. Well, there are two aspects to compliance. Right? So

8      the product that you're selling has to fit inside of the

9      definition of the product approved by the State, so that's

10     compliance number one.

11            But the company, when it created that appetite for

12     risk in the definition of the products that they wanted to

13     write, they created something called a series of

14     underwriting guidelines. And one of the most talked about

15     underwriting guidelines in the arena that most of us

16     understand is years and years and years ago, insurance

17     companies didn't like to insure red cars.

18            That's not true today, but that's the type of

19     thing that is considered there. Am I, the individual

20     underwriter, the front line underwriter, in compliance with

21     the requirements of the corporate underwriting, and is this

22     policy in compliance with the regulation of the State?

23     Q. And of course no insurance company wants to sell an

24     insurance policy that's out of compliance?

25     A. I have never worked for an insurance company that did

 1    not have a "stay out of jail" rule.

 2    Q.  And then step number five, after underwriter has

 3    fashioned his proposal, his quote, knows that the quote is

 4    in compliance, the quote is sent to the agent and broker.

 5    A.  Yes, that's the next step.

 6    Q.  Okay.  Now, at that step, can you describe for us the

 7    dynamics, if there are any, between the underwriter and the

 8    agent and broker as the -- at that step number five?

 9    A.  Certainly.  The agent and broker is going to look at

10    this quote offer, and the agent and broker is going to talk

11    with the applicant about it.  It may be perfectly acceptable

12    to the applicant, or the applicant may say, you know, I'd

13    like to tweak this a little bit.

14          So in this process right here, there is

15    negotiation between the underwriter and the independent

16    agent, with the independent agent representing the

17    applicant.  And changes do get made to quote offers.  It

18    gets tweaked.  That happens.

19          But ultimately, at the end of that process, the

20    applicant is either going to accept or reject the quote

21    offer.  If the applicant rejects it, the independent agent

22    is going to go into the process of, okay, who else is in my

23    portfolio of companies that I can have a discussion about

24    this policy with?

25          If the offer is accepted, you now move into what I

```
1    call bind book issue.

2    Q.  Before we get to that, the question I had in mind was,

3    in this -- in this space that we're talking about, either

4    the specialty insurance market or the commercial insurance

5    market, it's typical, common, that there will be this

6    dynamic or this negotiation, if you will, between agent and

7    broker and underwriter.  Is that fair?

8    A.  Everybody accepts that that's the reality, and it

9    happens.  I won't say it happens a hundred percent of the

10   time.  I also won't say it happens zero percent of the time,

11   but it happens.

12   Q.  And is this a stage in the process where the

13   relationship that the underwriter may have with the agent

14   and broker matters?

15   A.  Not only does it matter, it helps.  So if the

16   relationship is good, this is going to go great.  If the

17   relationship is poor, it's probably not going to go great.

18   Q.  Is part of that relationship whether the company itself

19   is easy to do business with?

20   A.  Yes.

21   Q.  Can you describe that for us, please?

22   A.  Certainly.  Independent agents and brokers, they're

23   independent people, business people, and they want things to

24   happen with as little effort on their part.  They want

25   things to happen as quickly as possible.
```

```
 1            And so inside of this, I want things to happen

 2      quickly, and inside of this whole process of selling

 3      underwriting insurance, they want companies that are easy to

 4      do business with.

 5            So I've seen situations where agents deemed a

 6      company easier to do business with because it required less

 7      underwriting information, but what the company was doing

 8      was, it was purchasing from a third-party information vendor

 9      information on the back end so that the agent wasn't forced

10      to get it.

11      Q.  And as a consequence, thought it was going to be selling

12      more insurance?

13      A.  Yes.

14      Q.  So we've gone through the dynamics of the agent, broker

15      and underwriter.  Applicant accepts.  What's the next step

16      in the process?

17      A.  When -- so because the underwriter has made an offer, if

18      it is accepted, it now enters into a legal status of bound.

19      Q.  So tell us what that means, not legally but insurance

20      language.

21      A.  Coverage exists.

22      Q.  Coverage exists?

23      A.  Coverage exists.  Bound -- bound means the insurance

24      company now, based on the effective date of the quote, will

25      be in effect on that effective date.  No policy has been
```

1    issued.  There is no paper.  There is no dec page.  But

2    coverage exists.  That's the binding process.

3    Q.  So when I trade in my car to the dealer and have a

4    different car but I want to be insured on my ride home, I

5    call my agent, give him the information.  The agent says,

6    okay, you're bound, you have insurance?

7    A.  That's a good understanding.

8    Q.  And then separate from bound is another step, policy is

9    booked and issued.  What does that mean?

10   A.  These are two processes that take place simultaneously.

11   So the policy is bound.  The underwriter has the

12   communication.  The applicant has accepted the policy.

13          Well, now -- this is an oversimplification.  A

14   button has to be pushed which says issue the policy.  Right?

15   The underwriter pushes that button, and now what insurance

16   technology people would call interfaces, interfaces start

17   the process.

18          One of the processes is an interface communication

19   out to whatever I call this fulfillment, but who is going to

20   print the dec page.  Right?  Who's going to stuff it into an

21   envelope.  Today that's a little bit of a misnomer because

22   many people receive their issued policy documents

23   electronically.

24          But it has to be issued, and a copy, electronic or

25   paper, of the policy and everything that comprises the

1    policy has to go to the interested parties.  So the now

2    named insured is going to receive a copy of the policy.  You

3    move from applicant to named insured.

4           The agent, the independent agent, is going to

5    receive a copy.  If there is a financial institution

6    involved, so if you think about that flower shop and that

7    flower shop actually owns the physical property, they're not

8    renting, there's probably a mortgage, a financial loan on

9    that.  And the mortgage company is going to want to be named

10   on the policy, and they're going to want to get a copy of

11   the policy.

12          That's the issued process.  Dec page, policy

13   language, statutory endorsements.

14   Q.  And in your experience, technology is used inside of a

15   policy administration system to assist in that part of the

16   process as well?

17   A.  Yes.  The policy administration system is the technology

18   that is driving all of these processes.

19   Q.  Policy monitoring, what is that?

20   A.  Once a policy comes into existence, it is a concern of

21   the front line underwriter if significant, meaningful,

22   changes take place to the policy in the -- in the middle of

23   the term.

24          So they have usually systems checks, rules in

25   place that say, hey, if X or Y or Z, an easily understood

1    but fairly radical example would be that flower shop that

2    all of a sudden starts selling fireworks, the underwriter

3    would want to know that.

4    Q.  How would the insurance company know that the flower

5    shop has changed business to fireworks?

6    A.  Well, the independent agent will -- the policyholder,

7    the named insured, would communicate to the independent

8    agent, hey, I've got a new business now.  I've got different

9    inventory.  I need to change the coverages.

10            The independent agent would communicate to the

11   underwriters, and red flags would flip up.

12   Q.  Okay.  And again, it's technology -- in this day and

13   age, it's technology that does that.

14   A.  For the most part, yes.

15   Q.  Yes.  And then policy renewal.  Maybe it's

16   self-explanatory, but in the whole process, would you

17   describe that, please?

18   A.  Certainly.  The preponderance, but not all, of policies

19   today carry an annual policy term.  So when you have a quote

20   that is converted to a policy, it's considered a new

21   business policy.  That's how the insurance industry

22   categorizes it.

23            Once that policy begins to approach the expiration

24   date of the policy, and if my memory is correct,

25   Mr. Pandey's description of this renewal process was a

1　90-day ahead of time window, different products, different

2　companies have a different window.  It might be 95.  It

3　might be 82.  But a window exists.

4　　　　That window is going to kick off, and the

5　evaluation of whether the insurance company wants to offer a

6　renewal will take place.  And if they decide the answer to

7　that is yes, they will send out a renewal offer.

8　　　　Now, the renewal offer will look a whole lot like

9　a policy, a new policy with a second policy term, but the

10　reality is, it doesn't become a policy unless it is

11　accepted, and the acceptance is generally deemed to be the

12　receipt of premium.

13　Q.  Okay.  And in the -- and in your experience in the

14　industry, how valuable -- how valuable to the insurance

15　company is its ability to convert existing policies into

16　renewal policies, or maybe I could say another way:  How

17　valuable is the overall percentage of renewals to an

18　insurance company?

19　A.  Renewals are incredibly important to an insurance

20　company, and you'll see the phrase "renewal retention,"

21　because there's just not enough opportunity in the market of

22　people looking for a new insurance policy to accomplish the

23　written premium objectives that companies have if they don't

24　hold on to or if they're not good at holding on to their

25　renewals.

```
1    Q.  And then I take it that there's some aspects of the
2    underwriting process that repeats itself at the renewal
3    stage?
4    A.  Yes.  The process that you have in front of you, the
5    real difference is, the application part of this is really
6    different because there's not an application to be filled
7    out because the insurance company has the preponderance of
8    that information.
9    Q.  And that information is stored in its technology
10   systems?
11   A.  Yes, in its databases and other things.
12   Q.  So we went through the process.  I want to go back just
13   for a moment to that step in the process which is the front
14   line underwriting because of its central role.  And some of
15   this you've described, so -- in terms of the -- the
16   information needed to start the process and make sure that
17   all of the information is collected.
18          What is the dynamic, if I can put it that way, of
19   the underwriter's interface with the rules of decision for
20   underwriting and the information that the applicant has
21   provided?  Does that make sense?
22   A.  So I believe you're asking me how does the underwriter
23   go about making the decision of whether to insure or not to
24   insure.  Is that what you're asking me?
25   Q.  I guess that's right.
```

1    A.  Okay.  Let's try it this way:  Corporate underwriting,

2    definition of underwriting guidelines for the product, the

3    underwriter is going to make sure that they have the

4    information they need.  They're going to make sure that they

5    have a price that matches to the risk that that information

6    puts out.  When they do that, they're going to consider a

7    bunch of things.

8         So in commercial insurance -- and I wrote down a

9    few of these.  These are not all, but it's the type of

10   business.  An insurance company is going to look differently

11   at an architect and engineer's firm that has been going it

12   for 20 years versus one that's one year old.

13        An insurance company is going to look differently

14   at a flower shop, as opposed to a fire works manufacturer.

15   So you look at the type of business.  You look at the

16   ownership of the business.  You look at how long the

17   business has been in business.  You look at how long the

18   management of the business has been in place.

19        And in most of these that I've just articulated,

20   you know, longer is better.  The more experienced you are,

21   the better you are at the business and the better you are at

22   mitigating risk or avoiding risk.

23        So the underwriter goes through that process.  And

24   at the end, that gets you back on the chart to the quote

25   offer.  Okay.  I like this risk.  I like this price.  Here's

1   what we can do.

2   Q.  And the underwriter isn't making these decisions in a

3   vacuum?

4   A.  Absolutely not.

5   Q.  Fair to say that the underwriter is making these

6   decisions by applying or executing against the rules of

7   decision of the company that speak to that particular kind

8   of policy and that particular risk?

9   A.  When I speak to underwriting guidelines, the

10  underwriting guidelines are the set of rules for that state

11  product that the front line underwriting function is going

12  to be responsible for compliance with those rules.

13  Q.  Okay.  Now, you've had experience with -- let me put it

14  this way:  In your experience, do human underwriters, being

15  human, some are better.  Some are worse than others?

16  A.  That's consistent across the industry.

17  Q.  Sure.  And as human beings, underwriters may or may not

18  impose some subjectivity or their own ideas into the process

19  of decisioning?

20  A.  That's true.  When I sat in the corporate underwriting

21  function at the Hartford, three or four times I got pulled

22  to be on an underwriting audit team and go out to -- go out

23  to a field office and do an audit.  And invariably in every

24  audit, we identified people whose compliance with those

25  underwriting guidelines, those underwriting rules, was not

```
 1        as good as some of the other people in the office.

 2                 That's the nature of humans.  I'm sorry.

 3        Q.  Of course.  Is it your experience that if technology is

 4        deployed that you can place the underwriting guidelines and

 5        rules of decision into the technology so that you use the

 6        expertise of the top expert of the organization?

 7        A.  Yes.  And I'll put one caveat in it.  Right?  The system

 8        could come back and say this:  If the system is built with

 9        an override function, the human could be tempted to use the

10        override function.  But the beauty of technology there is,

11        it will know.  You will be alerted immediately if someone

12        has breached the rules because they overrode the rules.

13        Q.  Okay.  So maybe you have a higher quality of rules being

14        executed because you placed a higher quality of rules into

15        the technology?

16        A.  I would say that differently.  I would say the rules --

17        the rules -- you have a higher quality of the execution of

18        the rules consistently.

19        Q.  And the consistency comes from the fact that the rules

20        are being applied and executed by technology by a computer?

21        A.  Yes.

22        Q.  Does the same thing every time against the same data.

23        A.  Yes.

24        Q.  If there are going to be any special limits placed upon

25        the scope of the coverage in this renewal or quoting process
```

1    or policy monitoring process, that also is a function of

2    applying the underwriting guidelines, the rules of decision

3    of the company.

4    A.  Yes, regardless of human or system.

5    Q.  Okay.

6    A.  System does it better.

7    Q.  Similarly, if there's going to be any endorsements added

8    that is to expand the scope of coverage or to restrict it by

9    an endorsement, consistency and precision will follow with

10   the use of technology?

11   A.  Yes.

12   Q.  Let me turn to -- well, good.

13          Can we go to slide 16.

14          Mr. Whitener, if you want to use your book, the

15   exhibit is J002, but I think it's also on the screen next to

16   you.

17   A.  I see it.

18   Q.  And we've seen this before in the case, of course.  And

19   this is the January -- this is the February 2006 request for

20   information from Chubb & Son to FICO?

21   A.  Yes.

22   Q.  This is one of the documents that you reviewed in your

23   analysis and forming your opinions?

24   A.  It is.  In fact, this is probably the first document I

25   reviewed.

1    Q.  You'll see from the title page, the front page, it says

2    that Chubb & Son, a Division of Federal Insurance Company,

3    for itself and as servicer of the Chubb Corporation and its

4    non-insurance company subsidiaries -- of which I'm not

5    interested in.  And it goes on to say, as manager of its

6    insurance company subsidiaries.

7         And I'd like to turn -- ask a few questions about

8    what it means to be a manager.  I don't think we have to

9    repeat unnecessarily the testimony of Mr. Taylor that was

10   played by video today when he was speaking to that, but I

11   would like to put a little more context into it.

12        From your experience, how common is it for large

13   insurance company groups to operate in this manager fashion?

14   A.  Very.  Very common.

15   Q.  And from your experience, why is that?

16   A.  A manager with subsidiaries, the subsidiaries are going

17   to be writing companies.  Okay?  I'll speak to that in just

18   a second.

19   Q.  Okay.

20   A.  So the manager of the insurance companies, there are two

21   strategies here.  The first primary strategy is efficiency

22   and effectiveness.  Every one of those subsidiaries does not

23   need a human resource department.  Every one of those

24   subsidiaries does not need a marketing department.

25        I count from my days in my corporate planning, we

1      had 11 different functional departments, and we put the

2      responsibilities and the staffing of all of those

3      departments underneath the manager, and then the manager

4      sold those services back to the subsidiaries.

5           So the subsidiaries were writing companies.  The

6      writing companies owned the product, if you will.  So if a

7      writing company issued a policy or booked a policy and now

8      the policy is issued and there's a declarations page, it's

9      not going to be the manager of the insurance company's name

10     at the top.  It's going to be the writing company.

11          So when I worked for Hartford Insurance Group, we

12     had 14 companies maybe, and the manager was Hartford Fire

13     Insurance.  But if we issued a policy through Hartford

14     Accident and Indemnity, the first page of the policy, the

15     declarations page, said Hartford Accident and Indemnity.

16          So that's the value.  You take all of that

17     corporate function, you take all of that human capital

18     function, all of those functional departments, and you lump

19     them together in one entity, and then that entity sells

20     those services on some kind of a percentage basis back to

21     the writing companies, the subsidiaries.

22          And then the writing companies -- step number two

23     in this is the writing companies.  That's where you're going

24     to alter your products.  Okay?  So you may have a writing

25     company that you want to do high risk for earthquake, and

1    you use that writing company in California.

2        You may have another writing company that you want

3    to take high risk, and you put that company with Florida for

4    all of the wind, the hurricane, the tornado exposures there,

5    and then you may have a writing company that you want

6    writing those similar products but writing them in a state

7    where there's low risk.

8        And I'll just arbitrarily pick Illinois.  So

9    that's the second purpose, to be able to improve your

10    competitive position as it respects deployment of your

11    products out into the 51 jurisdictions.

12    Q.  And in your description from your experience of the

13    manager over -- the manager providing management to many

14    other writing companies, you used the context of an entity

15    that had subsidiaries.

16        Now, in this case, the manager is Chubb & Son, a

17    Division of Federal, not the entity Federal, but Chubb &

18    Son, a division.  Does that make any difference to your

19    description of what a manager is?

20    A.  The only difference is, now it has specifically

21    identified that it is Chubb & Son being the manager, Chubb &

22    Son happens to be a division of Federal.

23    Q.  And then we saw it with Mr. Taylor that these

24    arrangements are reduced to contracts with manager entering

25    into a management agreement with the writing company.  We

1   saw many of them Chubb & Son, a division, and then the

2   writing company.

3           Is it also common in your experience that these

4   arrangements are contracted and they're memorialized in

5   contracts?

6   A.  Yes, they need to be.

7   Q.  And they need to be because of state regulation?

8   A.  It's a combination of state regulation and shared

9   understanding.

10  Q.  Understood.

11          We have, you know, heard and seen a variety of

12  examples of, we have Chubb Limited, very big.  We'll call

13  ourself Chubb.  Is that a common way in which insurance

14  company groups market themselves?

15  A.  Yes.

16  Q.  So other examples would be what?  Allstate?

17  A.  Hartford Financial Services is a group of companies

18  arranged with a manager and then subsidiaries.  Travelers

19  St. Paul, the same.  Allstate, the same.  State Farm, the

20  same.

21          I've seen this corporate structural organization

22  tech -- I'm sorry -- technique used by companies or by

23  groups of companies as small as three.

24  Q.  Some bigger, I guess.  All right.

25          I'd also like to put a little more -- a little

1    more meat on the bone with respect to pooling arrangements.

2    It was described briefly by Mr. Taylor, but would you tell

3    us what they are and why they exist in the insurance

4    industry?

5    A.   A pooling arrangement is a contractual agreement between

6    a series of related writing companies.  The pooling

7    arrangement will declare a lead company and then what --

8    this is a financial management -- financial performance

9    profit and loss smoothing technique.

10            So each of the participating companies in the

11   pooling arrangement will feed their data up to the lead in

12   the pool.  The lead in the pool will aggregate all of that

13   data, and then -- so now you've got a total gross written

14   premium.

15            Now you've got a total earned premium.  Now you've

16   got a total other underwriting expense, a total loss

17   adjustment expense, a total incurred losses.  And then it

18   will then feed the aggregated data back to each of the

19   members of the pooling agreement on a percentage basis.

20   Q.   That's what we saw in Mr. Taylor's deposition, how the

21   premium line of five companies could be exactly the same.

22   A.   They were using the exact same percentage in the pooling

23   agreement.

24   Q.   And in your experience, do these companies that are --

25   chosen to become -- chosen to be participants in a pooling

1  arrangement, they are all acting together in this -- they're

2  all acting together for the single purpose of selling

3  insurance.

4  A.  Yes.

5  Q.  And are they all subjecting themselves by their

6  contracts to the control and operations of the manager to do

7  so, in your experience?

8  A.  Yes.

9  Q.  Is it surprising to you to hear Mr. Taylor say that

10  these -- so many of these writing companies do not have

11  employees?

12  A.  Not at all.

13  Q.  That is also typical in the industry.

14  A.  It is typical in the industry.  When I went to work

15  for -- well, when I first went into corporate planning for

16  the Hartford, I believe we had approximately 17,000

17  employees in continental United States, and they all worked

18  for the manager.  The paychecks came out of the manager.

19  Q.  Even though there were many other writing companies?

20  A.  Yeah.  Hartford Accident and Indemnity did not have any

21  employees.  Hartford Casualty Insurance Company didn't have

22  any employees, Twin City Fire.  Just to name three.

23          The employees were nested under Hartford Fire

24  Insurance Company, if my memory is correct.

25  Q.  Well, let's turn now back to the Chubb & Son request for

1    information.

2         And Chubb & Son is telling FICO in the request for

3    information that Chubb Specialty Insurance gets the majority

4    of its revenue, typically achieved via premiums, from a

5    relatively small number of very large accounts.  This is

6    what they -- FICO was told in February of 2006.

7         Can you unpack that for us and tell us what that

8    means, from your experience?

9    A.  Chubb Specialty Insurance, in this time period, was a

10   highly successful property casualty insurance company

11   operating in what I would refer to as the large specialty

12   insurance market, and the large specialty insurance market,

13   it's not that many policies, but each policy carries a very,

14   very large premium.

15        And that's what this says.  It says we don't have

16   a whole lot of policies, we don't have a whole lot of

17   accounts, but on average, each one of them has got a really,

18   really large premium and accounts times -- I'm sorry --

19   accounts times premium equals gross written premium.

20   Q.  And give us a sense of what a large or a really large

21   premium means in this context of commercial insurance.

22   A.  You're talking about hundreds of thousands of dollars.

23   Q.  Per policy?

24   A.  Yes.

25   Q.  Is the -- so that's the -- fair to say now that's the --

1    that's the market segment that's called the large market

2    segment, right?

3    A.  It is the large market segment of specialty lines.

4    Q.  All right.  And does the specialty insurance divide

5    itself into other market categories?

6    A.  Yes.  What I would say that of commercial insurance as

7    well.  The insurance industry from an underwriting -- a

8    corporate underwriting perspective, we tend to divide the

9    marketplace of available insurance customers into small

10   customers, mid size -- medium-sized customers and large

11   customers.  So based on this document, I would say in the

12   2006 -- in the years leading up to 2006, Chubb had been very

13   focused on that large specialty insurance marketplace.

14   Q.  All right.  And if you're going to focus on the smaller

15   or mid market marketplace, what are the -- what are the

16   dynamics of that?  You just described the large in terms of

17   premium and risk.  Give us the contrasting now for the small

18   and the mid.

19   A.  Well, let's -- let's start with, there are a whole bunch

20   more of them.  Okay?  Less than 2 percent of the business --

21   this is U.S. Census data, by the way.  Less than 2 percent

22   of the businesses in the U.S. have more than I believe 100

23   employees, which leaves 98 percent of them having less than

24   that.

25           So when you think about the small commercial --

1    I'm sorry -- small specialty market and the small -- the

2    mid-sized specialty market, you start thinking in terms of

3    lower premiums and lots more policies to be underwritten and

4    to be processed, issued, quoted, bound, et cetera.

5    Q.  Is this a graphic a fair depiction of what you just

6    said?

7    A.  Yes.  Small to mid market, higher transactional volumes.

8    Lower average premiums.  Therefore, your total premium is

9    going to be determined by the amount of success you have

10    issuing policies.  The large markets, lower volume,

11    significantly higher premiums.

12    Q.  All right.  And so to succeed in the small to mid

13    market, you must be able to handle a larger volume of

14    transactions.

15    A.  You must, and the RFI says that, yes.

16    Q.  Being able to handle a higher volume of transactions

17    with the same underwriting staff, that's a function of

18    scale.

19    A.  Yes.  People refer to that as scaling.

20    Q.  Scaling.  So let's go back to the -- let's go back to

21    the RFI.

22              "The key strategic initiative in this area is

23    expand being and growing the business into mid -market and

24    smaller accounts."

25              It goes on to say, "This is viewed as a good

1    opportunity, as it is understood that 85 percent of the

2    identified and targeted customer set does not currently buy

3    Chubb products."

4            Obviously the RFI is being present to FICO in

5    terms of understanding the Blaze Advisor technology, but

6    give us your view from your experience, and give us your

7    view after your review of all of the materials in the case

8    that you've seen.

9            Have you seen anything to question that Chubb &

10   Son was interested in Blaze Advisor to expand and grow into

11   the mid-market and smaller accounts?

12   A.  No.  I believe there's a one-to-one relationship there.

13   Q.  The RFI goes on to say, "Movement to the mid-market and

14   smaller accounts has proven to be difficult, as this

15   requires the team and systems to handle an increased volume

16   of work (more transactions, policies, claims, et cetera) in

17   an environment where Chubb's current Expense Management

18   Strategy does not allow for increases in staffing."

19           Is this another way of saying they need to be able

20   to scale with technology?

21   A.  I would word that slightly differently.

22   Q.  Okay.

23   A.  But the ultimate answer to that is going to be yes.  I

24   read this and interpret this to mean, well, we're set up to

25   handle all of these large specialty insurance accounts, and

```
 1    now we want to go mid-market and small, significantly higher
 2    transaction volume.  We can't do that with the systems and
 3    with the human resources that we have in place today.
 4           But I'm limited because I -- I have an expense
 5    management strategy in place that says you can't hire more
 6    people, which means that now, yes, I have to be able to
 7    scale because I have to be able to get more work done with
 8    the same amount of people.
 9    Q.  Got it.
10           The RFI set out this statement as the CSI business
11    goals that they were seeking to achieve.  One, do we agree
12    that they're fairly clear in what those business goals are?
13    A.  Yes.
14    Q.  Reduce time to market for new products, enhance
15    relationships with producers, enhance services provided for
16    internal customers, and quickly adapt to changes in
17    regulations in market conditions.
18    A.  Those are clear.
19    Q.  After your review of all of the documents from this
20    case, all of the study that you've done, and with your
21    experience, can you say whether Blaze Advisor achieved those
22    business goals for Chubb & Son?
23    A.  I cannot speak to enhancing services provided for
24    internal customers based on the documents, but I can say it
25    for the others.
```

1    Q.  You can.  All right.

2              And with respect to reduce time to market for new

3    products, first, what do you understand that to mean?

4    A.  In the -- in the technology world, if you create a new

5    product -- pardon me.  So if I take you back to my Hartford

6    days and now I've got this new combined policy, it's got to

7    come off of a computer system.  Well, I've got to write a

8    business -- this is software development lifecycle.

9              I've got to write a business requirement.  I've

10   got to have a technical review session explaining the

11   requirement to the technology staff and giving them a chance

12   to answer questions.

13             Once they are where they need to be grasping the

14   product, they have got to go into a technical session, and

15   they've got to design how they're going to do it inside of

16   the existing system or how they're going to build a new

17   system.

18             They then need to move into, today we call it

19   development.  In the old days, we called it programming.

20   They need to write the code to do that.  Then it has to move

21   through a testing process inside of technology, and then it

22   has to move to a testing process for the user.

23             The user has to run a -- what we call a user

24   acceptance testing process.  And it is then that it is able

25   to go to production.  So that's an elongated process.

1    Q.  And by "production," do you mean then the product can go

2    to market?

3    A.  The product can go to market and when the -- when the

4    quote, bind, book, issue process successfully executes, the

5    computer will send a policy out.  There will be an active

6    policy.

7    Q.  In your review of the case facts, was Chubb & Son able

8    to reduce the time to market by using Blaze Advisor instead

9    of that process?

10   A.  I reviewed documents that said yes.

11   Q.  We'll get into some of that later then.

12               Enhance relationship with producers.  Producers,

13   is that the independent agent and broker we spoke about

14   earlier?

15   A.  It is.  It's another nomenclature thing inside of our

16   industry.

17   Q.  And from your review of all of the case facts, was

18   Chubb & Son -- did Chubb & Son first want to enhance its

19   relationships with producers; and secondly, did they

20   accomplish that, at least in part, using Blaze Advisor?

21   A.  They did, in fact, want to.  I believe the documents say

22   that they, at least in part, did.  What I find interesting

23   about this one is this RFI is written in 2006, and there

24   will be another reference to this in a Chubb strategy called

25   The Small Business Platform three years later in 2009.  This

1    was very important.

2    Q.  And then quickly adapt to changes in regulations.  From

3    your review and analysis, was Chubb & Son able to achieve

4    that business goal with Blaze Advisor?

5    A.  I will extend that they were able to quickly respond to

6    changes in regulation, and they were able to more quickly

7    respond to business opportunity.

8    Q.  Market conditions, changes, customer requests --

9    requirements.

10   A.  Correct.

11   Q.  Is that -- is it accurate to call that feature being

12   able to be agile, more agile?

13   A.  I have seen it referred to that, yes.

14   Q.  I would like you to go to Exhibit 195, which is in

15   evidence, and I'm going to try to find it on the book here.

16          It's slide 22.

17          Now, slide 22 has the number 482, but it's the

18   same document as 195 that's in evidence, so we'll refer to

19   it as Exhibit 195.

20          The title of this document is Chubb Enterprise

21   Architecture Business Rule Strategy and Roadmaps.  This is

22   one of the documents that you reviewed in your analysis and

23   in forming your opinions?

24   A.  It is.

25   Q.  And you'll see that Chubb & Son puts out in its own

1    roadmap this quote from Don Light regarding insurance as a

2    decision business.  Would you tell us who Donald Light is?

3    A.  Donald Light is the senior analyst inside of the

4    property casualty industry analysis offering by Celent.

5    Celent operates as an advisory firm inside a financial

6    services space.  So you see Celent in more than property

7    casualty insurance companies.

8            You see them in banks, brokerage houses, things

9    like that.  Mr. Light runs Celent's property casualty

10   analytical practice.

11   Q.  Obviously we just went through the steps of selling

12   insurance and the process of underwriting.  This might be

13   kind of a silly question, but clearly insurance -- do you

14   agree that clearly insurance is a decision business?

15   A.  I agree that insurance is a decision business from my

16   underwriting background, field and front line and corporate.

17           I also agree with other statements that Mr. Light

18   makes in here.

19   Q.  And they are?

20   A.  It's traditionally insurers have relied on written

21   procedures training, and his words, hard-coded mainframe

22   programs for consistency.  I'm going to skip to the last

23   sentence.  "But as changes become more frequent and

24   decisions more complex, insurers need a better solution."

25   Q.  You agree with that.

1  A.  I do.

2  Q.  And you know that the -- of course, we just went through

3  the RFI where Chubb & Son was seeking an unlicensed Blaze

4  Advisor, and this Exhibit 195, was it an internal document

5  speaking to the use of rules management -- well, use of

6  Blaze Advisor as a business rules management system inside

7  of Chubb & Son and describing its value?

8  A.  Yes.  This document is published by Chubb.  The target

9  audience is Chubb.

10  Q.  And do you -- maybe you've said.  You agree with Mr. --

11  Mr. Light that manual look-up tables are impractical, kind

12  of return to horse and buggy?

13  A.  I do.  I point out that I started the industry with hard

14  written procedures and underwriting guidelines.  When I sat

15  at my desk in East Hartford, Connecticut, and then my

16  underwriting desk in Washington, D.C., I had this metal --

17  I'll call it a contraption, we called a rat, and it was

18  about that wide.  And it was filled with state product

19  manuals and state product underwriting guidelines.

20  Q.  You have seen some of the exhibits in the case.  You've

21  been in the courtroom all the time.

22  A.  I have.

23  Q.  Yeah.  And you saw some exhibits the other day of the

24  number of transactions that are run by in a day or in a

25  month, let's just say if we're using CSI Express.  In your

1  experience, would that be possible if manual look-up tables

2  were the source of underwriting guidance?

3  A.  Possible, yes, but I go back to a point I made earlier.

4  The requirement for the human resources to do that would

5  drive your expense ratio up to the point where your adequate

6  precise premium would not be sellable in the marketplace.

7  Q.  All right.  In other words, you would have to hire a lot

8  more underwriters and staff; is that right?

9  A.  Yes.

10  Q.  And with respect to your views about hard-coding the

11  rules, you make the point here that you saw in the documents

12  of the defendants that with respect to the ARP application,

13  for example, they were able to reduce the time from three to

14  six months to two to three days using Blaze Advisor for

15  changing the rule-set for the underwriting guidance.

16          Could you describe what that means?

17  A.  ARP, Automated Renewal Processing, has a series of rules

18  in it.  This is a comparison of once automated renewal

19  processing, now my terminology project, was implemented

20  inside of CSI Express.  It was -- the IT people, or whomever

21  was making the rule changes, were now able to make changes

22  in just a couple of days, compared to rules inside of other

23  points where it was taking them three or four months to

24  change the rules.

25          So you're going down radically in number of

1    invested days.

2    Q.  And we've described that, it's been described by others

3    as agility?

4    A.  Yes.

5    Q.  And what's its relationship to speed and speed to

6    market?

7    A.  If you can -- if you can change your rules in two days,

8    three days, four days versus three months, four months,

9    whatever -- whatever results you're going to get from that

10   rule change is going to make it to the marketplace faster.

11   So now if you -- if you just kind of use arbitrarily January

12   1st of any year we start the clock, now you're in the

13   marketplace January the 5th, kind of an arbitrary selection,

14   versus in the marketplace in, sometime in March.  That's the

15   difference.

16   Q.  And let me -- let me back up on that a little bit

17   because I want to -- I want to connect or explain the

18   relationship between the change of rules and the insurance

19   product that's sold that when we're talking about getting to

20   market faster.

21            So for background, is it accurate to say that the

22   insurance -- an insurance product being sold, we think of it

23   as the piece of paper or the coverages, but the insurance

24   product being sold is the result of the rule-set and the

25   underwriting guidance that the company has set relative to

1    the willingness to sell that particular policy?

2    A.   That's a fair statement.

3    Q.   So if the marketplace is changed or if the regulations

4    change or in some fashion something in that policy has to be

5    different, that difference is going to be the product -- or

6    that difference requires the rules, and the rules and the

7    underwriting guidance have to change to be in alignment with

8    either the new regulations or the market requirements.  Is

9    that also fair?

10   A.   That's fair.

11   Q.   And that's what we mean by being able to get to market

12   faster because of the agility of changing rules.

13   A.   Yes.

14   Q.   Staying on this Exhibit 195, this is what Chubb & Son

15   says internally to itself about what decision management is.

16   A.   I agree.

17   Q.   So they said to themselves, "It's an approach that

18   automates, improves, and connects decisions across the

19   enterprise."

20           Can you explain for us what that means?

21   A.   You have multiple products.  Inside of those products,

22   each one has some rules that are similar.  They have some

23   rules that you are unique to that product.

24           This statement is about the ability to put all of

25   your rules in one place and be able to find those rules, but

1    while simultaneously giving you the benefit of being able to

2    get to those rules quickly, modify those rules quickly, and

3    therefore quickly impact your state and product offerings,

4    depending upon how you do that, how you deploy it, depending

5    on what the need is.

6    Q.  Let's drop to the bottom dash under what it is.

7    "Automates, improves and connects decisions, enables better

8    decisions."

9            Can you unpack that for us?  Tell us what that

10   means.

11   A.  There are multiple things going on here, but yes.  If

12   you're -- if you're looking at all of your rules for all of

13   your products in one place, right, you can look and you can

14   say, oh, look, we've got this rule in product state/product

15   A.  Got a very similar rule in state/state B/product B.  We

16   want to -- we want to tighten that up.  That's a value.

17           But it also provides you the ability to take those

18   rules and get them out into the, quote, bind, book, issue

19   sale, sale process.  So you have greater control.  You have

20   the ability to know where your rules are, to know which

21   product rules apply to, to know -- to easily spot rules that

22   you want replicate into other products and then easily

23   replicate them into those other products.

24   Q.  And then the next question is, What does it enable?

25   "Businesses using Decision Management gain much greater

REINHOLD - CROSS - WHITERSPOON - DIRECT

```
 1    control over the results from high-volume operational

 2    decisions."

 3             From your review and your experience, what does

 4    that mean?

 5    A.  One of the earlier testimonies made the comment -- and

 6    I'm sorry.  I don't remember who it was -- made the comment

 7    about, you never want to automate something that you're only

 8    going to do one time.

 9             I interpret this last statement to mean, you know

10    what?  With Decision Management, and I'm going to say driven

11    by business rules management, we have the ability to be more

12    consistent with our decisions.  Our earlier, discussion,

13    right?

14             Two humans will see the same set of facts and not

15    necessarily reach the same conclusion.  Okay?  That is

16    consistency.  When you look at, hey, we're going to be more

17    precise.  Now I specifically reference predictive modeling

18    capabilities.  You have the ability to zone in on that

19    price, get much more precisely aligned with that point where

20    the premium is X.

21             And I'm just going to arbitrarily say $100.  The

22    premium is $100 versus 110 when your risk appetite and the

23    application probability of loss demands 100.

24    Q.  Got it.

25             In your review of 10,000 pages, all the documents,
```

1    did the documentation of Chubb & Son acknowledge the fact
2    that they did gain greater control over the results of five
3    volume decisions with Blaze Advisor?
4    A.   Yes.
5    Q.   As well as increased precision and increased consistency
6    that you just mentioned?
7    A.   Yes.  And I can relate each of those to specific things.
8    Q.   Within -- within Chubb & Son and the defendants'
9    documents?
10   A.   And the use of Blaze Advisor.
11   Q.   And the use of Blaze Advisor?  All right.
12          Let's continue on with this exhibit.
13          Reasons for adoption.  Again, we're talking about
14   an internal Chubb communication, and they're talking about
15   the reasons to adapt -- adopt Blaze Advisor.
16          And my question to you is, the reasons are
17   well-said.  These are the things they wanted to accomplish.
18   In your review and analysis, my question is, did they
19   accomplish these things by adapting Blaze Advisor?
20   A.   I can say that they accomplished most of these things.
21   I can't say that they elevated all of their decision-making
22   to the level of the organization's top expert because I
23   don't know who defined the rules that were going to be
24   placed into Blaze Advisor.  That would be erroneous on my
25   part.

REYNOLDS v. CHUBB - MASTERSON - DIRECT

1429

```
 1    Q.  And with the remainder?

 2    A.  The remainder I can point to the accomplishment.

 3    Q.  That they did reduce the time and cost involved in

 4    developing decision applications?

 5    A.  Yes.

 6    Q.  They did enable decision logic to be reused by multiple

 7    applications?

 8    A.  Yes.

 9    Q.  They did enable advanced decisioning to be added to

10    legacy systems?

11    A.  Yes.

12    Q.  They cut operational costs and cycle times through

13    automation?

14    A.  I won't say they cut operational costs.  I will

15    definitely say they cut cycle times.

16    Q.  Enforce consistency and compliance across channels?

17    A.  Yes.

18    Q.  Increase business control and understanding by enabling

19    managers to see in one place all the rules contributing to a

20    decision?

21    A.  Yes.

22    Q.  And then Chubb & Son is saying to itself, listing

23    attributes of what drives business value, saying, decision

24    management is comprised of five key dimensions that drive

25    decision value -- or decision yield, and they call it value.
```

1    Let's just go through each.

2    Precision, more -- make more profitable and

3    targeted decisions.  In your analysis, did Chubb & Son use

4    Blaze Advisor to achieve that value?

5    A.  They did.  I would point to the predictive modeling uses

6    as this.

7    Q.  Would that include the application called Profitability

8    Indicator?

9    A.  It does.

10   Q.  Did they achieve consistency, ensuring coherence across

11   channels, business units and geographies?

12   A.  They did.

13   Q.  Agility.  Dynamic -- adapt dynamically to changing

14   conditions.  Did they achieve that?

15   A.  They did.

16   Q.  Speed.  Execute decisions faster, even in real-time.

17   Did they achieve that?

18   A.  They did.

19   Q.  And cost.  I think you mentioned you don't have the

20   information to make an opinion about cost, or do you?

21   A.  I know -- I can't say anything other than I know that

22   the deployment of Blaze Advisor reduced the amount of time

23   it took to make decisions where deployed and anytime you

24   reduce the amount of time, you reduce cost.

25   Q.  Okay.

```
1   A.  Now, whether they captured that cost, I can't speak to

2   that.

3   Q.  Understood.  All right.

4           I'm going to turn to another slide.  This is not

5   in evidence.  I won't be offering the document, but I just

6   want to look at the information on the document.

7           Business Rules Fair Isaac Advisor -- Blaze

8   Advisor.  This is another document that you reviewed in

9   forming your opinions?

10  A.  It is.

11  Q.  And it sets out business objectives.  And I'd like to go

12  through them without repeating what we just did.  So I think

13  we've spoken about speed to market.

14          But with respect to the business objective,

15  increase straight-through processing.  First let's define

16  what is straight-through processing.

17  A.  Straight-proof -- excuse me.  Straight-through

18  processing is a phrase that is pretty common in the

19  insurance industry, and really what it means is execute the,

20  quote, bind, book, process without human intervention.

21  Q.  And from your analysis, was Chubb & Son able to increase

22  straight-through processing with Blaze Advisor?

23  A.  Yes.

24  Q.  Predictive modeling we spoke about, referencing

25  Profitability Indicator.
```

1    A.  Yes.

2    Q.  Reduce claim leakage.  What did you see there?

3    A.  I saw no evidence that Blaze Advisor was used in any

4    claims functions other than CIS claims, which is not really

5    a claims function.  It's an actuarial pricing function.

6    Q.  So the fact of the matter is that CIS -- I'm sorry.  The

7    fact of the matter is that Blaze Advisor -- none of the

8    applications that used Blaze Advisor by Chubb & Son were

9    claims applications.

10   A.  That is correct.

11   Q.  And we'll talk about CIS claims separately as it related

12   to the actuarial process.

13          Accurately assess risk on a consistent basis.

14   Were they able to achieve that outcome?

15   A.  Yes.

16   Q.  And improve compliance monitoring and fraud detention.

17   Were they able to achieve that?

18   A.  I would say they were able to achieve improved

19   compliance monitoring.  I didn't see a lot about fraud

20   detection.  That would probably more come out of the claims

21   usage.

22   Q.  Understood.  So most of those, one, two, three, four,

23   part of five, six of those business objectives were

24   achieved?

25   A.  Yes.

1        Mr. Hinderaker, may I take 30 seconds and pour

2    myself some more water?

3    Q.  Oh, yeah.  That would be great.

4        THE COURT:  Are you near a convenient breaking

5    point?

6        MR. HINDERAKER:  You know, Your Honor -- Your

7    Honor, I am.  We could stop now and reorganize and . . .

8        THE COURT:  Okay.  All right.

9        Members of the jury, we'll take our break for the

10   evening.  I know that we have snow on the way, supposedly,

11   which will affect some of you more than others.  We're going

12   to start at 9:00 a.m., and I think some of you may have to

13   leave a little bit earlier so you can drive slowly enough to

14   be safe and still get here at 9:00.

15       If something changes overnight, if for some reason

16   the road conditions or the weather is really bad, check your

17   phones before you leave home.  We'll certainly notify you

18   by, say, 7:00 a.m., and that should give everyone enough

19   time, I think.

20       So with that, don't talk to anybody about the

21   case.  Okay?

22       THE CLERK:  All rise for the jury.  (Jury leaves

23   courtroom.

24       (In open court without the Jury present.)

25       THE COURT:  Go ahead and be seated.  Counsel, do

1    you anticipate we need to, we will need to take anything up

2    tomorrow morning before 9 a.m.?

3              MR. HINDERAKER:  I don't have anything in mind,

4    Your Honor?

5              MS. GODESKY:  Not from defendants, Your Honor.

6              THE COURT:  Well, we'll be here just in case.  But

7    if something comes up and you know we're going to need to

8    deal with it, let us know as soon as you know.

9              MS. GODESKY:  Your Honor, just timing-wise, I know

10   the Court suggested to the jury recently that they might

11   have the case early next week.  My estimate from last Friday

12   still holds, that we need about four to five days.

13             THE COURT:  Okay.

14             MS. GODESKY:  We're working on pruning our

15   witnesses.  We told FICO yesterday about a few that were on

16   our list that we're not going to call, but it would be

17   helpful to know whether they can close their case tomorrow

18   with the balance of Mr. Whitener and Mr. Waid.

19             THE COURT:  It would certainly seem that way.

20             MS. GODESKY:  I would hope.

21             THE COURT:  Mr. Hinderaker?

22             MR. HINDERAKER:  Everything is contingent on

23   cross-examination.  Putting that out there.  The direct

24   examination of -- finishing Mr. Whitener and Mr. Waid will

25   take, those two will take less than a day.  But whether the

1    cross bleeds over, I don't know.

2              THE COURT:  Do you have a sense of -- let's just

3    break it down -- how much longer you have with Mr. Whitener

4    on direct.

5              MR. HINDERAKER:  I would have to review my notes,

6    but off the top of my head, I would say we're half through.

7              THE COURT:  Okay.

8              MR. HINDERAKER:  I don't know when we started.

9              MR. FLEMING:  3:30.

10             THE COURT:  3:30.  Well, we were on before that.

11   How much time do you think on direct with Mr. Waid?

12             MR. HINDERAKER:  I would say two and a half.

13             THE COURT:  All right.  I'm less sanguine than I

14   was a moment ago.

15             MS. GODESKY:  Yeah.  If there's any way if we push

16   to 5:30 tomorrow, because we are going to start bumping up

17   against some witness travel schedules.

18             THE COURT:  Well, we'll see about that.

19             MS. GODESKY:  Okay.

20             THE COURT:  But I understand the concern.  Who do

21   you have -- I mean, give me a little specifics on what

22   you're bumping up against.

23             MS. GODESKY:  So we planned our first witness to

24   be Kevin Harkin, and then I have Tamra Pawloski, who can

25   only really be here Thursday.

1    THE COURT:  Okay.

2    MS. GODESKY:  Yeah.

3    THE COURT:  Okay.  Well, we'll kind of review it

4    as it's in progress tomorrow.

5    MS. GODESKY:  Okay.  Thank you.

6    THE COURT:  Thanks, everyone.  Have a good night.

7    (Court adjourned at 5:02 p.m.)

8    *       *       *

1          We, Kristine Mousseau and Paula Richter, certify

2    that the foregoing is a correct transcript from the record

3    of proceedings in the above-entitled matter.

4

5

6    Certified by:  s/  *Kristine Mousseau, CRR-RPR*
                         Kristine Mousseau, CRR-RPR

7                   s/  *Paula Richter, RMR, CRR, CRC*
8                        Paula Richter, RMR, CRR, CRC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25