```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
     ------------------------------------------------------------
3                                  )
     Fair Isaac Corporation,       )  File No. 16-cv-1054(DTS)
4    a Delaware Corporation,       )
                                   )
5            Plaintiff,            )
                                   )
6    v.                            )
                                   )
7    Federal Insurance Company,    )  Courtroom 14W
     an Indiana corporation,       )  Minneapolis, Minnesota
8    and ACE American Insurance    )  Tuesday, March 7, 2023
     Company, a Pennsylvania       )  8:57 a.m.
9    Corporation,                  )
                                   )
10           Defendants.           )
                                   )
11   ------------------------------------------------------------

12

13

14          BEFORE THE HONORABLE DAVID T. SCHULTZ
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16          (JURY TRIAL PROCEEDINGS - VOLUME XII)

17

18

19

20

21

22       Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23
                          *   *   *
24

25
```

1   <u>APPEARANCES:</u>

2   For Plaintiff:          MERCHANT & GOULD P.C.
                            BY:  ALLEN W. HINDERAKER
3                                HEATHER J. KLIEBENSTEIN
                                 PAIGE S. STRADLEY
4                                MICHAEL A. ERBELE
                                 JOSEPH W. DUBIS
5                                GABRIELLE L. KIEFER
                            150 South Fifth Street, #2200
6                           Minneapolis, Minnesota 55402

7   For Defendants:         FREDRIKSON & BYRON
                            BY:  TERRENCE J. FLEMING
8                                LEAH C. JANUS
                                 CHRISTOPHER D. PHAM
9                                RYAN C. YOUNG
                                 PANHIA VANG
10                          200 South Sixth Street, #4000
                            Minneapolis, Minnesota 55402
11
                            O'MELVENY & MYERS LLP
12                          BY:  LEAH GODESKY
                                 ANTON METLITSKY
13                               DARYN E. RUSH
                                 ROXANA GUIDERO
14                          Times Square Tower
                            7 Times Square
15                          New York, New York 10036

16  Court Reporters:        RENEE A. ROGGE, RMR-CRR
                            KRISTINE MOUSSEAU, CRR-RPR
17                          MARIA V. WEINBECK, RMR-FCRR
                            PAULA RICHTER, RMR-CRR-CRC
18                          United States District Courthouse
                            300 South Fourth Street, Box 1005
19                          Minneapolis, Minnesota 55415

20
                                  *   *   *
21

22

23

24

25

1                            **I N D E X**

2      PAGE

3      **PHILIP FOLZ**
            Direct Examination By Ms. Godesky                2397
4           Cross Examination By Mr. Hinderaker              2427

5      **NEIL ZOLTOWSKI**
            Direct Examination By Ms. Kliebenstein           2443
6           Cross Examination By Ms. Godesky                 2456
            Redirect Examination By Ms. Kliebenstein         2465
7
       DEFENDANTS' EXHIBITS                                  REC'D
8              58                                            2409
              328                                            2423
9
       AS READ BY THE COURT
10
       PLAINTIFF'S EXHIBITS                                  2473
11     2, 5, 17, 18, 19, 20, 21 through 43 inclusive.  46,
       47, 57, 60, 69, 73.  90 through 96 inclusive.  103,
12     105, 106, 107, 108.  110 through 113 inclusive.  116.
       120 through 126 inclusive.  131, 133, 143, 144, 145,
13     147A, 151, 154A, 156, 158, 168, 171, 171A, 175, 176, 184,
       185, 187, 188, 189, 191, 192, 193, 194, 195, 199, 204,
14     212, 216, 218, 226, 227, 282, 283, 284, 299, 303, 307,
       309, 310, 311.  328 through 331 inclusive.  336, 337.
15     341 through 351 inclusive.  353 through 360 inclusive.
       362 through 377 inclusive.  404A, 418, 504, 510, 511,
16     517, 518, 520, 521, 526, 527, 540, 576, 655A.
       839 through 850 inclusive.  857, 870, 871.
17     873 through 897 inclusive.  948, 956, 958, 960, 1002A,
       1004A, 1005A, 1007A, 1008A, 1073, 1088, 1090, 1112,
18     1113, 1114, 1116.  1139 through 1149 inclusive.  1151
       through 1164.  1165, 1165A, 1171A, 1172A, 1174A.  1177
19     through 1181 inclusive.

20     DEFENDANTS' EXHIBITS                                  2472
       4, 8, 12, 14, 17, 30, 39, 58, 67, 77, 92, 96, 97, 99,
21     108, 109, 110, 113, 114, 116, 118, 125, 155, 156, 169,
       172, 196, 199, 200, 202, 207, 208, 209, 210, 211, 212,
22     263A, 276, 280, 282, 283, 284, 293, 304, 309, 328, 330,
       343, 355, 356, 357, 358, 359, 360, 361 and 362
23
       JOINT EXHIBITS
24     1 and 2                                               2478

25     COURT'S EXHIBITS
       1 and 2                                               2478

1          March 7th, 2023 - 8:57 A.M.

2

3          **(In open court without the Jury present.)**

4          THE COURT:  Good morning, everyone.  Be seated.

5          All right.  On the exhibit -- I've forgotten the

6     number of it.  What is the number of it?

7          THE CLERK:  P1180.

8          THE COURT:  P1180.  Should Mr. Hinderaker decide

9     to use it with Mr. Folz, I will allow it to be used.  It

10     was produced by Federal in discovery.  It's, unless I'm

11     missing it, frankly, not that critical a document.  I don't

12     think it's terribly prejudicial.

13          MS. GODESKY:  I will just state on the record

14     because I spoke to Ms. Solomon off the record.

15          You know, Mr. Hinderaker objected to our using

16     documents produced by FICO, license agreements that

17     Mr. Waid is quite familiar with, on the grounds that they

18     were disclosed during trial.  So our position is just that

19     the rules of the road should apply equally to both parties.

20          THE COURT:  Did I exclude those?

21          MS. GODESKY:  You did.  You told me I could only

22     use them for impeachment.

23          MR. HINDERAKER:  And the rules of the road should

24     apply to both parties.  And those documents that you

25     excluded, except for impeachment, were sent to us at

1    11:30 p.m. on the night before Mr. Waid was to continue his

2    testimony.  So we got it while he was sequestered and got

3    them at 11:30 at night.  These were given to the defendants

4    a few days ago, in fact, although we could anticipate

5    Mr. Folz testifying, it was before we were officially

6    noticed that he would.

7         THE COURT:  Understood.  Thank you, Counsel.

8         Everybody else ready to proceed?

9         MS. GODESKY:  Yes.

10        THE COURT:  Okay.  And one last second before you

11   bring them in.  Give me your current estimate how long with

12   Mr. Folz.

13        MS. GODESKY:  45 minutes to an hour for direct.

14        THE COURT:  Okay.  And then are you still about

15   45 minutes with Zoltowski?

16        MS. KLIEBENSTEIN:  I hope I am well under 30.

17        THE COURT:  Okay.  Good.

18        THE CLERK:  All rise for the jury.

19              **(Jury enters.)**

20

21        **(In open court with the Jury present.)**

22        THE COURT:  Be seated.

23        Good morning, Members of the Jury.  As I had

24   indicated yesterday, this will be the last day of

25   testimony.  I'm hopeful that we will conclude that

1    testimony before the lunch break, and then I can send you

2    on your way.  And then first thing in the morning tomorrow,

3    we will have instructions, final argument, and you will

4    begin your deliberations then.  Okay?

5            All right.  Ms. Godesky, call your witness.

6            MS. GODESKY:  Your Honor, defendants call Phil

7    Folz.

8            THE COURT:  Mr. Folz, come on up here, please.

9    If you will raise your right hand.

10                        **(Witness sworn.)**

11           THE WITNESS:  I do.

12           THE COURT:  Go ahead and sit down.  Turn your

13   microphone on, and speak into it, and state your full name

14   for the record.

15           THE WITNESS:  My name is Phillip Folz.

16                        **(PHILIP FOLZ)**

17                    **DIRECT EXAMINATION**

18   BY MS. GODESKY:

19   Q.  Good morning, Mr. Folz.  Are you currently retired from

20   Chubb?

21   A.  Yes, I am.

22   Q.  When did you retire?

23   A.  March 1st, 2018.

24   Q.  For how many years did you work for Chubb?

25   A.  28 years.

PHILIP POLZ - DIRECT

1    Q.  And what years were those?

2    A.  1990 up until March 2018.  So January of 1990 through

3    March -- March 1st, '18.

4    Q.  Is Chubb paying you by the hour to be here today?

5    A.  No.

6    Q.  Why are you here?

7    A.  I heard about this case, and I was the individual who

8    actually negotiated the deal on behalf of Chubb and thought

9    my perspective would be important to hear on the case,

10   so --

11   Q.  What was your title at Chubb at the time of your

12   retirement?

13   A.  I was the Chief Information Officer for the commercial

14   lines division.

15   Q.  And when we talk about commercial lines insurance, what

16   kind of insurance are we talking about?

17   A.  So it's really insurance that is sold to businesses.

18   So it could be workers' comp.  It could be commercial auto.

19   We had marine products, more general property casualty,

20   liability products, access umbrella.  So a whole host of

21   products.

22   Q.  What were your general responsibilities as the chief

23   information officer or CIO?

24   A.  So I ran or I managed the technology aspect of the

25   commercial lines division, which meant that any technology

1    that commercial lines needed to support their business we

2    provided.  Okay?  In that more specifically, though, in

3    that role for the two years that I was in it, my primary

4    responsibilities were integrating the two organizations.

5    So Chubb was acquired by ACE, and we were integrating the

6    two organizations to become one.

7    Q.  Were you managing a budget as the CIO?

8    A.  Yes.

9    Q.  How big a budget were you responsible for managing in

10   that role?

11   A.  It was approximately 100 million dollars.

12   Q.  Now, the jury has heard from architects who work at

13   Chubb.  How is the role of an information officer different

14   from the role of an architect?

15   A.  Yeah.  So a chief information officer actually uses

16   input from architects and others in order to come up with

17   the technology strategies in order to support the business.

18   So the architects give you the technical aspects of what

19   we're trying to do and architect it.  You get input from

20   other areas, you apply a cost element to it, and you come

21   up with a strategy as to how you're best going to support

22   the business goals of the underlying business that you

23   support.

24   Q.  Now I want to take you further back in time to 2006.

25   What was your position at Chubb as of 2006?

1    A.  2006 I was the IT controller for the core IT division

2    within Chubb.  And the core IT division was a set of

3    departments that provided a set of shared services and

4    technologies across all of Chubb.

5    Q.  In the context of your work as a controller, what does

6    the term "cost allocation" mean?

7    A.  So when we spend money on products being in a

8    centralized area, I needed to then allocate those costs out

9    to the areas that were benefiting from the use of those

10   products.  It's cost allocation.

11   Q.  And so cost allocation was part of your

12   responsibilities as the controller?

13   A.  Yes, it was.

14   Q.  Mr. Folz, did you provide deposition testimony in this

15   case where you walked in a conference room and provided

16   testimony under oath?

17   A.  Yes, I did.

18   Q.  You provided live deposition testimony?

19   A.  Oh, no, not deposition.  It was a legal statement.

20   Q.  Okay.  Legal statement.  So did you provide a sworn

21   written statement at one point in this case?

22   A.  Yes, I did.

23   Q.  And did you review that statement before you testified

24   here today?

25   A.  Yes, I did.

1    Q.  Is there anything in that statement you wanted to

2    correct?

3    A.  Yeah.  I mean, there were two things at the beginning

4    of that particular statement.

5              One was that I worked for Federal Insurance

6    Company for those 28 years.  That is partially true.  That

7    was up until about 2016.  I was a Federal Insurance Company

8    employee.  When we were acquired by ACE and became Chubb

9    Limited, that Federal Insurance went away.  So I can't tell

10   you who I was an employee of, but it wasn't Federal

11   Insurance.  So for those couple of years it changed.

12             The other one is, there is mention in the, in the

13   legal statement that I was the controller for North

14   America.  And at the time when I was giving that legal

15   statement, silly on my part, I thought North America meant

16   only the United States.  Okay?  So I clarify that with, I

17   was a controller for a centralized group that provided

18   services worldwide, but my budget responsibilities were

19   North America -- excuse me -- were the United States, not

20   Canada or Mexico.

21   Q.  So when you said in your sworn written statement that

22   you were the controller for North America, that was a

23   mistake?

24   A.  That was a mistake.

25   Q.  Okay.  And you meant just to refer to the U. S.?

1    A.  Yes.

2    Q.  Okay.  Returning to your work at Chubb in this 2006

3    time period, to whom were you reporting?

4    A.  June Drewry, who was the global chief information

5    officer.

6    Q.  And during your nearly 30 years at Chubb, Mr. Folz,

7    approximately how many software license agreements and

8    renewals were you involved in?

9    A.  Probably a couple hundred.

10   Q.  Did there come a time in 2006 when you became involved

11   in negotiations with FICO for a license for Blaze?

12   A.  Yes.

13   Q.  And can you describe the circumstances that led to your

14   involvement?

15   A.  So at Chubb we already had FICO.  We were already using

16   FICO within one of our divisions at Chubb, our specialty

17   lines division.  We had an interest in taking that rules

18   engine capability and extending it to other areas, both

19   within the United States and globally.

20           So my role was to work with FICO and our vendor

21   management and legal folks to try to come up with the best

22   deal possible to acquire what's called an enterprise

23   license that would extend the rights and usage of that

24   software globally.

25   Q.  You talked about an enterprise license.  In the context

1    of your work at Chubb, was the term "enterprise"

2    interchangeable with "global" or did those two things mean

3    something different?

4    A.   That's a good question.  So "enterprise," "global" and

5    "worldwide" all mean the same thing at Chubb.  So if we

6    said, We want a worldwide deal, right, it means we want a

7    worldwide deal, global, enterprise, all the same thing.

8    Q.   What was your understanding of why Ms. Drewry, your

9    boss at the time, wanted to explore turning the Blaze

10   license into an enterprise or global deal?

11   A.   So one of June's strategies was to standardize certain

12   functionality across zones so that we could better leverage

13   capability -- we could better leverage human resources and

14   leverage costs.

15   Q.   At the time Ms. Drewry asked you to get involved in the

16   negotiations with FICO, you understood that Chubb already

17   had a license with FICO, right?

18   A.   Yes.

19   Q.   And what was your understanding of the scope of that

20   already-existing license?

21   A.   So the existing license was for one strategic business

22   unit.  That strategic business unit was our specialty group

23   in the United States.

24   Q.   What do you recall doing when you were first asked by

25   Ms. Drewry to get involved in this?

1    A.  So the first thing I would do is contact our vendor

2    management group, let them know that we have an interest in

3    opening up a negotiation or at least a discussion with FICO

4    on the possibility of doing an enterprise deal.

5           Next, I would have called Mark Berthiaume, who

6    was the senior IT manager within the Chubb specialty unit,

7    the area that already had the license, and, you know, kind

8    of discuss the license agreement that we already had with

9    him.

10          And then, finally, we would reach out to FICO,

11   and I believe it was Larry Wachs that we spoke to, and open

12   up negotiations.

13   Q.  Were you personally involved in those communications

14   with FICO?

15   A.  Yes, I was.

16   Q.  You mentioned Larry Wachs at FICO.  Was there anyone

17   else at Chubb that was involved?

18   A.  Yes.  So Jim Black from vendor management was involved

19   with me.

20   Q.  And what's your recollection about the general process

21   of those negotiations?  Was it phone calls, e-mails,

22   letters?  Tell us about that.

23   A.  Mostly phone calls and a couple of e-mails, as I

24   recall.

25   Q.  When you set out to determine whether the Blaze license

1    could be expanded to enterprise-wide, did you have a budget

2    or a high-end dollar amount in mind for what Chubb would be

3    willing to pay?

4    A.   Yes, I did.

5    Q.   And what was that?

6    A.   It was approximately two million dollars was my upper,

7    upper end.

8    Q.   And how did you come up with that number?

9    A.   So I took a look at what we had spent so far for what

10   we had bought.  And I also, to be quite honest with you, I

11   had -- that's what I kind of had left over in the budget to

12   spend.  So if it was going to be five million dollars, it

13   was a nonstarter.

14   Q.   And once you had that two million high end target in

15   mind, what, if any, plan did you have for how to allocate

16   those costs across the organization if you were able to

17   close the deal?

18   A.   Mm-hmm.  So prior to the, prior to negotiating the

19   deal, we did reach out to all of the areas within IT to

20   gauge interest in using this particular piece of software,

21   you know, within their applications.  And as we did that,

22   it was with the understanding that if we were to come to a

23   deal, I would then allocate expenses to them in future

24   years for like the maintenance aspects of the license

25   agreement.

1    Q.  You talked about these other IT areas.  Did that

2    include Chubb Australia, Canada and Europe?

3    A.  Yes.  Yes, it did.

4    Q.  Now, at this point in time in 2006, you had been at

5    Chubb for more than 15 years, correct?

6    A.  Yes.

7    Q.  As of that time period, what was the highest dollar

8    value of a software license you had been involved in

9    negotiating?

10   A.  Personally?  Four or five million dollars, yeah.

11   Q.  What were the circumstances of that type of license

12   fee?

13   A.  So it was a complete suite of IBM products that did

14   much more than the rules engine.

15   Q.  So from the perspective of an IT controller at Chubb,

16   was a suite of IBM products comparable to the Blaze

17   software in terms of functionality?

18   A.  No, no.  Much broader.

19   Q.  From the perspective of a controller who negotiated

20   hundreds of agreements for Chubb, what would your reaction

21   have been to a proposal that Chubb pay 50 million dollars

22   to access Blaze to use for a period of ten years in 17

23   applications?

24   A.  I think that's ridiculous.

25   Q.  Okay.  I want to take a look at the back and forth

1    between Chubb and FICO over the license agreement.  And if

2    we could pull up on the screen P112, which is already in

3    evidence.

4    A.  Is this water?

5    Q.  Yes.  You can use the water.

6          Mr. Folz, do you recognize this e-mail exchange?

7    A.  Yes, I do.  Yes, I do.

8    Q.  And this is from December 12th, 2006, right?

9    A.  Yes, it is.

10   Q.  Okay.  And if you look at this first page, the second

11   e-mail down, there is a message from Mr. Wachs.  Do you see

12   that?

13   A.  Yes.

14   Q.  And it says, "Jim, see our responses to the questions

15   raised by Phil.  They are noted in blue text.  Should you

16   need further clarification or wish to discuss these

17   further, please don't hesitate to call," right?

18   A.  Yes.

19   Q.  And the "Jim" is Mr. Black at Chubb?

20   A.  Yes, it is.

21   Q.  Do you have an understanding why Mr. Wachs is referring

22   in this e-mail to questions raised by Phil?

23   A.  Yes.

24   Q.  What's your understanding?

25   A.  I asked these questions.  So this was later in the

1   deal.  So this was in December, early December.  I asked

2   these questions of Jim to relay to Mr. Wachs.

3   Q.  And did Mr. Black then relay FICO's responses to you at

4   some point?

5   A.  Yes, he did.

6   Q.  Okay.  I want to focus on the second question that you

7   asked Mr. Black to pass along to FICO.

8        And that's about a third of the way down the

9   second page, Vanessa, if we could flip to the second page.

10       And if you look at number 2 in that list of

11   questions, we can blow that up.  Thank you.

12       It says, "For options 1 and 2 are there any

13   restriction in using or redistributing the licenses across

14   SBUs or other IT areas.  Said another way, do we get

15   licensing rights to 30 and 45 licenses respectively to

16   distribute as we see fit anywhere at Chubb?"

17       Do you see that?

18  A.  Yes.

19  Q.  When you used the word "Chubb" there, did you intend to

20  refer to Chubb & Son or the Chubb Group?

21  A.  The Chubb Group.

22  Q.  What does SBU mean?

23  A.  Strategic business unit.

24  Q.  And why did you have this question for FICO?

25  A.  So, again, the context of the deal was to use it

1    globally.  And what we wanted to do was we wanted to be

2    able to distribute the software globally without

3    restrictions on the number of seats.  So if there was an

4    interest in more of our applications, wanting to use the

5    software, we wanted to be able to do that.

6    Q.  Can you read FICO's response which is embedded

7    underneath the question?

8    A.  Yes.  "There are no usage or redistribution

9    restrictions within Chubb in any of the options within the

10   seat limitations of options 1 and 2."

11   Q.  And what did you understand that to mean in terms of

12   the scope of what FICO was offering at that point in the

13   negotiations?

14   A.  Okay.  So within the 30 and 45 seat limitations for

15   those two options, I can distribute that software anywhere

16   I want.

17   Q.  Okay.  Let's take a look at D58, which should be in the

18   binder in front of you, Mr. Folz.

19              It is not in evidence yet, but I believe there is

20   no objection?

21              Is that correct?

22              MR. HINDERAKER:  Yeah.  That's correct.

23              MS. GODESKY:  Okay.  So defendants offer D58 in

24   evidence.

25              THE COURT:  D58 is received.

PHILIP FOLZ - DIRECT

1      MS. GODESKY:  Thank you.

2    BY MS. GODESKY:

3    Q.  Mr. Folz, do you recognize the e-mail on this document?

4    A.  Yes.

5    Q.  And what's happening here?

6    A.  So that's an e-mail that I drafted to our leadership

7    team.  And I'm just, more or less, informing them what the

8    major components of the deal was and that it would be

9    discussed at our next senior management meeting for, you

10   know, approval.

11   Q.  What's the date on this document?

12   A.  My e-mail was 12/15/2006.

13   Q.  And in the first sentence you wrote, "Today, Julia, Jim

14   Black and I had a conference call with the folks from Fair

15   Isaac and received their best and final pricing offer for

16   an enterprise deal."  Do you see that?

17   A.  Yes.

18   Q.  To what enterprise were you referring when you said

19   "enterprise deal"?

20   A.  The Chubb Group of Insurance Companies.

21   Q.  Did your reference to an enterprise deal in this

22   message include Chubb Canada, Australia and Europe, or were

23   you excluding them?

24   A.  I was including them.

25   Q.  What, if any, conversations have you had with the folks

1    at Chubb Canada, Chubb Australia and Europe at this time

2    period regarding the potential for them to use Blaze?

3    A.  Again, you know, as part of our -- during negotiations

4    we reached out to each one of them to gauge interest, and

5    we were receiving favorable responses.

6    Q.  So let's look at number 3 in your e-mail, the second to

7    last paragraph.

8         You wrote, "They've also asked that we allow them

9    to issue a press release once we execute the deal.  I told

10   them that we do not typically do this, but would inquire

11   with Corp Communications if we were going to do the deal.

12   Finally, they've asked that we speak at a future client

13   forum."

14        Do you see that?

15   A.  Yes.

16   Q.  To what were you referring with your reference to "Corp

17   Communications"?

18   A.  So Chubb had an overall -- non-IT-related, but an

19   overall corporate communications department that did all of

20   the messaging, external messaging for Chubb.  That's what I

21   was referring to.

22   Q.  What, if any, understanding did you have at the time as

23   to why FICO wanted a press release and someone to speak at

24   this forum?

25   A.  So within the insurance industry, Chubb is considered a

1   marquis client; and FICO landing an enterprise deal with a

2   company like Chubb is a big deal for them.

3   Q.  As someone who worked in the Chubb Group of Insurance

4   Companies for three decades, how would you describe the

5   brand recognition of Federal Insurance Company?

6   A.  No one outside of Chubb knows Federal.

7   Q.  Was the decision to agree to a press release for FICO

8   in this time period typical or was it a special

9   accommodation?

10  A.  It would have been a special accommodation.

11  Q.  Okay.  Let's turn to the license agreement, which is in

12  evidence as J1.  And if we could turn to page 8, Vanessa.

13          Do you see on the screen, Mr. Folz, there is a

14  provision titled No Assignment?

15  A.  Yes.

16  Q.  Were you responsible for negotiating assignment

17  provisions at Chubb?

18  A.  No.

19          MR. HINDERAKER:  Your Honor?  Could we have a

20  side-bar, and I will raise my objection?

21          THE COURT:  Approach.

22

23              **(Side-bar discussion.)**

24          MR. HINDERAKER:  Mr. Folz's e-mail communications

25  and involvement with the license agreement began in

1    December with respect to Amendment Number Two.  He has no

2    foundation to discuss the license agreement as it was

3    negotiated in June of 2006.

4          And as Ms. Godesky's question raised was not

5    whether he had negotiations -- I'm sorry -- about 10.8 of

6    this license agreement, but does he have experience

7    negotiating assignment agreements in general, not specific

8    to this contract.

9          THE COURT:  Where are you going?

10         MS. GODESKY:  I just want to ask him, Did you

11   have responsibilities for negotiating assignment provisions

12   at Chubb?  No.  Who had that responsibility?  Legal.  I

13   just want them to know I'm not addressing this with him

14   because it's outside of his bounds.

15         MR. HINDERAKER:  I agree it's outside of his

16   bonds, so we're on the same page.  Thank you.

17

18         **(In open court with the Jury present.)**

19         THE COURT:  Mr. Folz, you will have to turn your

20   microphone back on.

21   BY MS. GODESKY:

22   Q.  So, Mr. Folz, we were looking at this assignment

23   provision on the screen, right?

24   A.  Yes.

25   Q.  Did you have responsibilities at Chubb for negotiating

PHILIP FOLZ - DIRECT

1    assignment provisions?

2    A.  No.  Provisions like this are negotiated by our legal

3    department.

4    Q.  Okay.  So I want to look at the second amendment, which

5    starts at J19.  And this is the amendment to the license

6    agreement that you were negotiating, right?

7    A.  Yes, it is.

8    Q.  And if we could look at the table on this first page,

9    what was the scope of this Blaze license as amended in

10   December 2006?

11   A.  So enterprise-wide.

12   Q.  And to what enterprise are you referring?

13   A.  The Chubb Group of Insurance Companies.

14   Q.  We saw some references in the e-mail that we were just

15   looking at to limitations on the number of seats that could

16   use Blaze.  Do you remember that?

17   A.  Yes.

18   Q.  Did the final version of this amendment have any

19   limitations on seats or use?

20   A.  There were no limitations on seats or use.

21   Q.  And how long was this license meant to last?

22   A.  It's a perpetual license, so it's forever.

23   Q.  What was the pricing arrangement for this license?

24   A.  So we paid -- the price was a million, three.  We got a

25   $350,000 discount for moneys we had paid for the previous

1    SBU-based license earlier in the year.  And so it netted

2    out that we paid a one-time fee of $950,000, plus the first

3    year's maintenance.

4    Q.  Vanessa, could we pull up defendants' demonstrative 22,

5    please.

6            Mr. Folz, have you seen this before?

7    A.  Yes, I have.

8    Q.  And is it a summary of key terms in the various license

9    agreements?

10   A.  Yes, it is.

11   Q.  Can you walk the jury through how the Blaze license

12   agreements changed over time?

13   A.  Yes.  So it basically evolved over time.  We started

14   out -- and this is typical in the way Chubb and other

15   companies do this.  You start out, you're acquiring this

16   capability, you want to try it out.

17           So our first license agreement June 30th, 2006,

18   is for a single application within the overall portfolio.

19   So one application we could use it.  On, and it was limited

20   to five seats.  Okay?

21           Then we decided that we were going to expand the

22   usage to one SBU, strategic business unit.  Chubb had

23   multiple strategic business units.  So we were going to

24   expand it to one.  It was the SBU in which the application,

25   the original application that we did the initial license

1    for resided.  So now we were going to get the rights to use

2    it throughout the SBU.  They had multiple applications that

3    they were interested in using it on.  And for that we

4    negotiated a price of $350,000 plus maintenance.  And we

5    got the right to use it on up to ten seats, so we could

6    deploy it to ten developers for that price.

7           So then we did that in August.  We now see that

8    this has a potential to be a strategic asset that we could

9    deploy and leverage globally.  So we now decide that we're

10   going to pursue an enterprise-deal to where, instead of

11   limiting it to one SBU, we're going to deploy it everywhere

12   throughout the Chubb Group of Insurance Companies, which

13   includes our international locations.

14          And that was the deal that we did at the end of

15   the year in December, and that was the 1.3 million with the

16   credit and the maintenance.  So it netted out to $950,000

17   for that deal, plus first year's license fees.

18   Q.  From the perspective of a controller at Chubb, what, if

19   any, significance was there to you in the fact that there

20   were no limitations on the number of seats in the agreement

21   that you negotiated?

22   A.  Yeah, that's great for us because, you know that gives

23   us ultimate flexibility to deploy the software in

24   situations where we think it best can fit.

25   Q.  So that had some value to Chubb?

1    A.  Yes, it did.

2    Q.  Okay.  Now if we could, Vanessa, jump back to the

3    license agreement and look at page 9.  This is J1.

4            So Vanessa blew up on the screen the signature

5    blocks on the June 2006 license agreement.  Do you see

6    that?

7    A.  Yes.

8    Q.  And the original contract was signed by Mr. Mark

9    Berthiaume on behalf of Chubb, right?

10   A.  Yes.

11   Q.  What was his role in 2006?

12   A.  So Mark was the senior IT leader that ran the Chubb

13   specialty lines strategic business unit.  So he provided

14   the IT services back to that strategic business unit.

15   Q.  Would Mr. Berthiaume have signed a global or

16   enterprise-wide license agreement in 2006?

17   A.  No, he wouldn't.

18   Q.  Why not?

19   A.  He didn't have global responsibilities.

20   Q.  Okay.  Now I want to look at the amendment that you

21   negotiated at the end of the year, which is on page 20.

22   And we can see that this time it was signed by Ms. Drewry

23   on behalf of Chubb, correct?

24   A.  Yes.

25   Q.  Why didn't you sign it?

1    A.  I couldn't sign it.  June Drewry was the global CIO, so

2    she had responsibilities globally.  I didn't have those

3    responsibilities globally.  I could negotiate a global

4    deal.  I couldn't commit us to a global deal.

5    Q.  During this time period did anyone other than

6    Ms. Drewry have authority to sign enterprise-wide global

7    deals?

8    A.  Within IT, no.

9    Q.  During this time period to what extent were license

10   agreements for Federal signed under the name Chubb & Son, a

11   division of Federal?

12   A.  I would venture to say almost all of them.

13   Q.  Do you have an understanding of why that is?

14   A.  That was provided by legal.

15   Q.  Okay.  Let's go to page 20 of the second amendment, if

16   we could.

17          And so we're still in the license amendment that

18   you negotiated, Mr. Folz.  Can you read the first two

19   sentences of this portion of the document out loud?

20   A.  "For purposes of this Amendment Two, the

21   enterprise-wide license shall mean that client and its

22   affiliates may use the Fair Isaac product for their

23   internal business purposes, with no limitation on the

24   number of seats or CPUs, subject to and in accordance with

25   all of the provisions of the agreement.  'Affiliates' shall

1     mean any other entity directly or indirectly controlled by

2     client where control means the ownership of more than 50

3     percent of the aggregate of all voting interests

4     (representing the right to vote for the election of

5     directors or other managing authority) in an entity."

6     Q.  Mr. Folz, was it your intent at the time you negotiated

7     this agreement to ensure that Federal's affiliates at Chubb

8     Canada, Australia and Europe could use Blaze, or were you

9     limiting things to just the Chubb & Son division?

10    A.  This was a global deal, so all of those other

11    affiliates would have the right to use it.

12    Q.  Chubb Canada, Chubb Australia, Chubb Europe?

13    A.  Yes.

14    Q.  Were you involved in any communications with

15    representatives of FICO where you expressed that your

16    intent was for the entirety of Chubb Group to have access

17    to the software?

18    A.  Yes.  Throughout the entire negotiation, that intent

19    was made abundantly clear through -- in multiple

20    conversations with Larry, Larry Wachs.  And, you know,

21    quite frankly, if this was not going to be a global deal, I

22    wouldn't have been involved in it.

23    Q.  Did you believe that Mr. Wachs shared your

24    understanding in 2006 that if the deal was signed, all of

25    Chubb's global affiliates would be able to use Blaze?

1    A.   Absolutely.

2    Q.   Did anyone from FICO ever suggest to you during these

3    negotiations that only the Chubb & Son division of Federal

4    could use Blaze?

5    A.   No.

6    Q.   Would you have agreed to pay 1.3 million dollars for a

7    Blaze license that excluded Federal's affiliates in Canada,

8    Australia and Europe?

9    A.   No.  If this was not going to be an enterprise deal, we

10   were not going to continue with the negotiation.

11   Q.   Now, Mr. Folz, do you have a general understanding that

12   FICO is taking the position in this case that the Blaze

13   license agreement limited access to Blaze to the Chubb &

14   Son division of Federal?

15              MR. HINDERAKER:  Your Honor, approach again.

16              THE COURT:  Pardon me?

17              MR. HINDERAKER:  May we approach again.

18

19              **(Side-bar discussion.)**

20              MR. HINDERAKER:  I believe you've already ruled

21   that we're not going to be litigating the litigation.

22              THE COURT:  True.

23              Again, where are you going on this one?

24              MS. GODESKY:  I just want to ask him if he has a

25   general understanding and what's his reaction to that.  As

1      the person who negotiated the deal, I think that is highly

2      probative and relevant evidence, what's his reaction to

3      FICO taking the position that, you know, he negotiated a

4      deal on behalf of Chubb & Son.

5              MR. HINDERAKER:  I would prefer that he be asked

6      a question that's factual, meaning to say, without

7      characterizing FICO's position, without denigrating FICO's

8      position, without litigating the litigation.

9              THE COURT:  I think we have asked throughout the

10     trial if people understand what the respective parties'

11     positions are and their reaction to it.  I believe FICO has

12     been asked that, and so I will let those -- respond to

13     that.

14             MS. GODESKY:  I'll ask that.

15             THE COURT:  Yeah.

16             MR. HINDERAKER:  I have no quarrel with his

17     understanding of an issue.

18             THE COURT:  Right.

19             MR. HINDERAKER:  I have a quarrel with litigating

20     the litigation and denigrating the FICO position in the

21     litigation with respect to his understanding of our

22     position.

23             MS. GODESKY:  I'm not denigrating.  I'm not

24     characterizing it in any way in my question.

25             THE COURT:  I understand.

```
 1
 2                 (In open court with the Jury present.)
 3     BY MS. GODESKY:
 4     Q.  You have to turn your mic back on.
 5     A.  I did.
 6     Q.  Okay.  Do you have a general understanding, Mr. Folz,
 7     that FICO has taken the position in this case that the
 8     Blaze license is limited to the Chubb & Son division and
 9     that the software could not be used by Chubb Australia,
10     Chubb Europe and Chubb Canada?
11     A.  Yes.
12     Q.  What's your reaction to that?
13     A.  That's ridiculous.  That's not what we negotiated and
14     agreed to.
15     Q.  When you say "we," do you mean you and Mr. Wachs?
16     A.  Chubb and FICO.
17     Q.  In your decades of negotiating license agreements on
18     behalf of Chubb, did you ever consider licensing structures
19     where Chubb would pay more money if it started earning more
20     revenue?
21     A.  No.
22     Q.  Did that come up from time to time?  Did vendors ever
23     suggest it?
24     A.  So in an initial negotiation, yes, but not subsequent
25     to doing a deal and --
```

1    Q.  What -- I'm sorry.

2    A.  I'm sorry.  And we typically would not do revenue-based

3    deals.

4    Q.  Why do you say that?

5    A.  They're harder to administer.  You fight over what's

6    revenue, what's not revenue.  It just gets a little bit

7    messy.

8    Q.  Okay.  Mr. Folz, I want to look at defendants'

9    demonstrative 5, if we could.  And this is a list of

10   applications that use Blaze at Chubb.

11            Did you ever use any of the computer applications

12   listed on this chart as part of your day-to-day work at

13   Chubb?

14   A.  No.

15   Q.  Okay.  Thank you.  We can take that down.

16            And then, Vanessa, if we could go to D328.

17            Which I think is also in your binder, Mr. Folz.

18            This is not in evidence, so I think we should

19   wait to publish it, if there is an objection.

20            MR. HINDERAKER:  There is no objection to this or

21   the other two, Your Honor, unless they are all one.

22            MS. GODESKY:  Thank you.

23            THE COURT:  I'm sorry.  That exhibit is received.

24            MR. GODESKY:  Thank you.

25

1   BY MS. GODESKY:

2   Q.  So if we could put that back up on the screen.

3              What are we looking at here, Mr. Folz in

4   Exhibit D328?

5   A.  So our vendor management group kept a database of all

6   the contracts that we enter into, and this is a record, a

7   printout of the Blaze Advisor contract.

8   Q.  And would you from time to time reference these vendor

9   management printouts in your work at Chubb?

10  A.  Yes.

11  Q.  Okay.  Let's look at the second page.

12             Do you see in the upper right-hand corner where

13  it says Chubb Department Contact, Phil Folz?

14  A.  Yes.

15  Q.  And what was the significance of that?

16  A.  Because I led the negotiation, I was the primary

17  contact within IT during the negotiation, my name is there.

18  Q.  And then Mr. Wachs's name is listed underneath yours,

19  right?

20  A.  Yes.

21  Q.  And then I want to look at the box that says "Contract

22  Notes."  Do you see that towards the bottom?

23  A.  Yes.

24  Q.  It says, "Amendment Two upgrades CSI divisional license

25  to a worldwide enterprise license."  Do you see that?

1    A.  Yes, I do.

2    Q.  And what would be the significance of that entry from

3    the perspective of an IT controller?

4    A.  So for me that means that now we have extended usage in

5    this case from going from a division to worldwide, use of a

6    particular piece of software.  And from an IT controller

7    standpoint, that now, the cost of those, the cost of that

8    software going forward, like the maintenance, would be in

9    my budget, would now be retained in my budget, and I would

10   allocate out expenses to other budgets based upon who was

11   using the software.

12   Q.  From the perspective of a Chubb controller, would this

13   reference to a worldwide enterprise license include

14   entities like Chubb Canada, Chubb Europe and Chubb

15   Australia?

16   A.  Yes, it would.

17   Q.  Now I want to switch topics and return to that concept

18   of allocation you've mentioned a few times.  And let's look

19   at D67, which is now in evidence.

20        Mr. Folz, do you recognize this e-mail?

21   A.  Yes, I do.

22   Q.  And this is an e-mail that you sent in March of 2009,

23   correct?

24   A.  Yes.

25   Q.  And you sent it to the Knight Direct Reports.  What

1    does that mean?

2    A.   So June Drewry was the global CIO at the time of the

3    2006.   Jim Knight succeeded her as global CIO after she

4    retired.

5    Q.   Can you read the message in your e-mail out loud?

6    A.   Sure.  "At our November offsite we agreed that we would

7    review and as necessary revise the current controllable

8    expense allocations for the Blaze business rules engine.

9    There is an agenda item on tomorrow's SLT meeting" -- SLT

10   is senior leadership team -- " meeting agenda, and I've

11   pulled together the attached aid our discussions tomorrow.

12   Thank you, Phil."

13   Q.   So you created the document that's attached?

14   A.   Yes, I did.

15   Q.   And let's look at page 3, the attachment.  And there we

16   see a chart titled, Fair Isaac - Blaze Enterprise Asset

17   Discussion.  Do you see that?

18   A.   Yes.

19   Q.   What does this chart show in terms of to what parts of

20   the Chubb Group costs for the Blaze license were allocated?

21   A.   It shows that we are allocating across all areas of

22   Chubb.  And I can particularly highlight OUS, the bottom

23   one.  That's all of our overseas location.

24   Q.   So what does OUS stand for?

25   A.   Outside of U. S.

1    Q.  And from the perspective of a Chubb controller, would

2    that include Chubb Canada, Chubb Australia and Chubb

3    Europe?

4    A.  Yes, it would.

5    Q.  Did you end up charging Chubb Australia, Chubb Canada

6    and Chubb Europe for use of Blaze consistent with the

7    allocations in this chart?

8    A.  Yes, we did.

9    Q.  And to your knowledge, did they then pay consistent

10   with the allocations?

11   A.  Yes, they did.

12   Q.  Mr. Folz, in what circumstances, if any, would you have

13   charged Chubb Canada, Chubb Australia and Chubb Europe for

14   a software license that they weren't permitted to use?

15   A.  I could try it, but they would come back at me.  I

16   couldn't do it, and that's the short answer.

17            MS. GODESKY:  Thank you, Mr. Folz.  I have no

18   further questions.

19            THE COURT:  Thank you, Ms. Godesky.

20            Mr. Hinderaker.

21            MR. HINDERAKER:  Thank you.

22                        **CROSS EXAMINATION**

23   BY MR. HINDERAKER:

24   Q.  Get myself reset.  Okay.  Are you ready?  I think I am

25   finally.

1    A.  I'm fine.

2    Q.  Okay.  Good.  We haven't met.  My name is Al

3    Hinderaker.  I'm one of the lawyers for FICO in the

4    lawsuit.

5    A.  Nice to meet you.

6    Q.  Nice meeting you.  I have some follow-up questions.  I

7    enjoyed your answers.

8            Now, let me start in that 2016 time frame in the

9    context of the, in the context of the acquisition of Chubb

10   Corporation by ACE Limited.  And you mentioned that when

11   you were acquired by ACE, your words were, "Federal went

12   away."

13           Now, are you saying to us that as a legal entity

14   and on the legal organizational chart of now Chubb Limited

15   that the legal entity Federal Insurance Company ceased to

16   exist?

17   A.  I'll clarify.  I'm not offering a legal interpretation.

18   Q.  Uh-huh.

19   A.  I just got a paycheck from a different company.

20   Q.  So outside of your control; but as a consequence of the

21   acquisition, where you were once paid by Federal, now

22   you're paid by ACE American?

23   A.  Somebody else, yeah.

24   Q.  Somebody else.  All right.  And, I take it, we've

25   heard -- well, from your experience then as well, it was

1     true that about January 1st of 2017, whoever was an

2     employee of Federal became an employee of ACE American?

3     A.  Yes.

4     Q.  Yes.  And then within the, within the Federal division

5     of Chubb & Son, everyone who identified as a member of the

6     Chubb & Son division also became employed by ACE American,

7     this other company?

8     A.  I don't think I can answer that.

9     Q.  All right.

10    A.  I think that's more a legal interpretation between the

11    two entities, because we were -- we identified ourselves as

12    Chubb.

13    Q.  Understood.

14    A.  That was our brand.  That's, you know, how we

15    represented ourself to the public.  The Federal/ACE America

16    thing, that's just a legal entity that I guess was used to

17    pay us.  So I don't know.  I don't know how else to answer

18    that question.

19    Q.  That's fair.  We'll just leave it at that point in time

20    you were paid by somebody else?

21    A.  Somebody else.

22    Q.  All right.

23    A.  Somebody who acquired us.

24    Q.  As I understood, understood your testimony, as Chubb

25    understood the term "global" -- I'm sorry.  As Chubb

1    understood the term "enterprise," as Chubb understood the

2    term "enterprise," "enterprise" means "global," correct?

3    A.  Correct.

4    Q.  Now, I know that you were -- let's look at that J1

5    document.

6             And with respect to the original license

7    agreement, that was June 30, 2006.  As I heard your

8    testimony, you were not a part of those negotiations.

9    A.  That is correct.

10   Q.  Indeed, as I heard your testimony, you would not have

11   been a part of those negotiations because the original

12   license was one application for a specialty lines' use?

13   A.  That's correct.

14   Q.  All right.  And then if we go to, if we go to Amendment

15   Two -- I'm sorry.  If we go to Amendment One in the

16   document, which is -- FICO signed August 1, Robert Cox

17   signed July 21, 2006.  You were not a part of that

18   negotiation, either?

19   A.  That's correct.

20   Q.  Okay.  And Robert Cox signs as an executive vice

21   president of Chubb & Son.  Do you have any reason to

22   believe he was not an executive vice president of Chubb &

23   Son?

24   A.  Well, Bob Cox ran the Chubb specialty division, so he

25   was the senior business lead for Chubb specialty.

1    Q.   Okay.   And then, and then in terms of the Amendment

2    Two, as you described, that was signed by June Drewry.  And

3    she signs that as the CIO of Chubb & Son, a division of

4    Federal Insurance Company.

5              So I'm not -- you know, I hear and understand, I

6    think, that inside Chubb, "enterprise" means "global."  If

7    you were going to confirm whether that understanding was

8    shared by the parties, in your judgment, it would be fair

9    to look at what the license agreement actually says?

10   A.   Yes, and our discussions.  Sure.

11   Q.   Sure.  And I'm not dismissing your discussions by one

12   bit, but would you agree with me that if those discussions

13   turn into -- the way to find out if those discussions turn

14   into what the agreement really is between the parties,

15   you're going to look to the license agreement itself?

16   A.   Yes, but also -- I mean, we do have some documentation

17   that says it.

18   Q.   I saw the e-mails.

19   A.   Yeah.

20   Q.   Do you think your e-mails override the written words of

21   the license agreement?

22   A.   There is an understanding between the parties.  As an

23   example, while I was preparing to testify today, I did see

24   an e-mail from Larry to his management saying, yeah, we

25   sold them a global deal.

1    Q.  The evidence may be that there is a misunderstanding.

2    But my question to you is, If you want to find out if there

3    is a misunderstanding or if both sides have the same

4    understanding, the place to find that answer is in the

5    written agreement that the parties signed, being the

6    license agreement.  Do you disagree with that?

7    A.  I don't disagree.  That's fair.

8    Q.  And then the Amendment One -- we know that the original

9    license agreement was limited to the specialty lines.  And

10   then we also know, do we not, that through the various

11   amendments, Amendment One divisional lines, the full

12   division of the specialty, and we do agree, do we not, that

13   as a consequence of Amendment Two, the rights to use Blaze

14   Advisor extended now to the commercial lines of insurance

15   that were sold.

16   A.  It extended to all lines.  Amendment Two extended to

17   all lines around the world.

18   Q.  And the allocation document that you looked at -- I'm

19   not sure I have it.

20          Do you recall -- the allocation document you

21   looked at, where you had that meeting to think about

22   allocations, I noticed that CPI was one of the lines of

23   business for which an allocation was made.  Do you recall

24   that?

25   A.  Can I just refer to my document?

1    Q.  Absolutely.  I'm trying to find the same thing.  There

2    we go.  It's what -- your Exhibit D0067.

3    A.  Yes.  I see that.

4    Q.  You see that.  So 7 percent of the license fee.  Do I

5    read that correctly?

6    A.  13 percent.  13 percent of the maintenance went to CPI.

7    Q.  And that stands for?

8    A.  Chubb personal insurance.

9    Q.  So not only did the permission to use Blaze Advisor

10   extend to the commercial lines, it extended to the personal

11   lines as well?

12   A.  Yes.  The entire, the entire enterprise.

13   Q.  Well, like I say, we'll look at the license agreement

14   with respect to the meaning of things.

15         Now, did -- in your role in negotiations, did you

16   work at all with the legal department in the drafting of

17   the terms of the license agreement?

18   A.  Not the legal terms.

19   Q.  Okay.  And I would like to, if I might, go to your

20   Exhibit D0328.

21         And this is, this is one of the documents that

22   comes from your vendor management system at Chubb?

23   A.  Yes.

24   Q.  So for the, just to read this together a bit, for the

25   software license and maintenance agreement, the original

1    agreement, the Chubb entity in which this is filed is Chubb

2    & Son, a division of Federal, right?

3    A.  That's what it says.

4    Q.  And then the -- and as I said already, the Chubb vendor

5    management contact is Jim Black?

6    A.  Yes.

7    Q.  And then in terms of the Chubb department contact, it

8    references Dolores Sutton, agreed?

9    A.  Agree.

10   Q.  Then in your vendor management system, we will go two

11   documents forward.  You have Amendment One that gives CSI a

12   divisional license, and that, of course, we know is Chubb

13   specialty.  Again, the Chubb entity in which this is filed

14   is Chubb & Son, a division of Federal.  Agreed?

15   A.  Agree.

16   Q.  And as before, the vendor management contact is Jim

17   Black?

18   A.  Yes.

19   Q.  Agreed?  And now the Chubb contact is Dolores Sutton.

20   Agree?

21   A.  I agree.

22   Q.  And then if we go to the document that is Amendment

23   Two, again, Chubb entity is the division of Federal, Chubb

24   & Son the division of Federal?

25   A.  Yes.

1    Q.  And again Jim Black is the contact person?

2    A.  Yes.

3    Q.  And now you, with respect to Amendment Two, are the

4    Chubb department contact?

5    A.  Yes.

6    Q.  Okay.  So that's the progression through.

7            And I noticed, you know, from your direct

8    examination now, as Chubb stored the information in its

9    system, it describes it as worldwide enterprise license.

10   But as before, you and I agree that if we're going to

11   confirm the accuracy of that, we would go and look at the

12   license agreement itself.  Agree?

13   A.  Agreed.

14   Q.  Then let me go to D0058.  And do you have that?  I

15   believe this is in evidence.

16           Do you have that in front of you now, sir?

17   A.  Yes, I do.

18   Q.  And this is a document that's dated December 21, 2006,

19   and the title of it is Fair Isaac - Enterprise License.

20   And Mr. Berthiaume -- and we saw him as a signatory to the

21   original agreement, right?

22   A.  Yes.

23   Q.  And you are -- Dolores Sutton is one of the people on

24   the e-mail as well.  And Mr. Berthiaume is saying to the

25   management team in December 21, we -- with respect to the

1    FICO Blaze Advisor license, "We got a good deal as a first

2    in."

3              Do I read that right?

4    A.  Yes.

5    Q.  And -- yes.  And all of the pricing in terms of this

6    license agreement was pricing that was negotiated in the

7    time frame of 2006?

8    A.  Can you clarify "this license agreement"?

9    Q.  The license agreement that is this J1 in front of you

10   between Chubb & Son and FICO.  And that license agreement

11   and the terms, but particularly the price, were all

12   negotiated in 2006?

13   A.  Yes.

14   Q.  Okay.  Let me just look at my notes a minute more.  And

15   if we could go back to the J1, please.

16              And let's just go to Amendment Two that you were

17   a part of.  Do you have that?

18   A.  Yes.

19   Q.  All right.  And I just want to see if you agree with me

20   that Amendment Two says that it's effective on a certain

21   date, December 28, and it amends the software license and

22   services agreement entered into on June 30th, and by and

23   between Fair Isaac and Chubb & Son, a division of Federal

24   Insurance Company, define term client.  That's what it

25   says?

1    A.  That's what it says.

2    Q.  And so from, from your frame of reference, if someone

3    was to ask, what's the -- if someone was to ask, Is the

4    width and breadth, the full scope of the enterprise, the

5    scope of the enterprise that is the client under the

6    license agreement being Chubb & Son, a division, is that a

7    question that you would go seek legal advice on?

8    A.  Yes.

9    Q.  If I could direct your attention to P1180.  Do you have

10   that before you?

11   A.  It was here, but it went off, so --

12   Q.  Okay.

13   A.  It's back.

14   Q.  And this is an e-mail from a Michael G. Meyer,

15   November 22, 2011, to you, right?

16   A.  Yes.

17   Q.  Among others, of course.

18           And the e-mail says, "Phil, FICO would like to

19   nominate Chubb for a Celent model carrier award for the

20   work we did with them on the Premium Booking modernization

21   program using their Blaze Advisor product and professional

22   services."

23           Did I read that right?

24   A.  Yes.

25   Q.  And Celent is a -- do you know the organization Celent?

1    A.   Yes.

2    Q.   And Celent is what?

3    A.   It's more or less like a research type organization.

4    Q.   Analyze -- gives analytical reports, market reports,

5    company product reports --

6    A.   Yes.

7    Q.   -- in this technology space and insurance.  Agreed?

8    A.   Yes.

9    Q.   And so FICO would like to nominate Chubb for this

10   Celent model carrier award.  Did you have any role or -- in

11   the Premium Booking modernization program that's being

12   referenced in the e-mail?

13   A.   No.

14   Q.   Then I would like to ask you to go to Exhibit 1073,

15   please.  And let me know when you have it.

16   A.   It's here.

17   Q.   Okay.  Great.  And this is from a Robert Iskols?  Did

18   I --

19   A.   Iskols, yes.

20   Q.   To yourself and a bunch of others.  And the subject is,

21   Vendor Day - Need Input Please.

22   A.   Okay.

23   Q.   And in the second paragraph it says, "In terms of the

24   vendors (and this is where I need your input), we will

25   adjust last year's invitee list accordingly."

```
 1              Then if we go a little farther into that same
 2      paragraph, "Last year's invitees were Mckinsey, CAI, and
 3      then Computer Associates, BCT Partners (who did not attend)
 4      and Fair Isaac," among others.
 5              Did I read that right?
 6      A.  Yes, that's what it says.
 7      Q.  So in 2010 Fair Isaac was considered a strategic
 8      partner at Chubb, as well as 2011?
 9      A.  Yes.
10      Q.  Thank you.  And then if I -- and I am going to ask you
11      to, go to P0171A, please.  And do you have that?
12      A.  Yes.
13      Q.  Okay.  You are ahead of me.  0171.  All right.
14              So 0171A is this e-mail from yourself to Ramesh
15      Pandey dated July 10, 2015, right?
16      A.  Yes.
17      Q.  And the e-mail references -- well, the subject line,
18      the attachment is, Chubb IT Overview for ACE.  Do you see
19      that?
20      A.  Yes.
21      Q.  And so this time frame, even as early as July 2015, the
22      subject matter of this e-mail -- and we'll look at the
23      attachment briefly -- is the integration addressing the
24      integration plan of the technologies of the Chubb
25      Corporation and the ACE Limited companies?
```

1    A.  Yes.  Just starting.

2    Q.  Just starting.  But we know that the acquisition closed

3    in January of 2016 on a certain date.

4    A.  Yes.

5    Q.  And so we're about six months ahead of it at this point

6    starting that integration planning.  Agreed?

7    A.  Yes.  So this was -- the deal was actually announced

8    July 1st, I believe it was, of 2015.  So this is like ten

9    days after the deal was announced.

10    Q.  Yeah.

11    A.  So we're just kind of getting to know each other.

12    Q.  Got it.  And my point only is that you did start to get

13    to know each other?

14    A.  Yes.

15    Q.  And then the -- and then the attachment -- or the

16    attachment that goes with this is in your book as 171.  Do

17    you see that?  A big, big tech slides.  I'm not going to

18    ask you about all this.

19    A.  Okay.

20    Q.  What is there?  80 slides?  90 slides?  100 slides.

21    I'm not going to ask you about all that.  I just want you

22    to confirm that this Chubb information technology deck of

23    slides dated July 14 to 16, 2015, is some of the

24    documentation of the work that had begun at this July 2015

25    time frame for the integration of technologies in the two

1    companies?

2    A.  I haven't had a chance to take a look at this, but I'm

3    somewhat familiar with this.  This is like a lot of

4    introductory information that we were giving the acquiring

5    firm, ACE.

6    Q.  Yep.  Now it looks like that to me, too.  I agree.

7              So, Mr. Folz, I enjoyed talking with you.  Thank

8    you for your time.

9    A.  Oh, thank you.

10             THE COURT:  Thank you, Mr. Hinderaker.

11             Ms. Godesky, any further questions?

12             MS. GODESKY:  I have no further questions.  Thank

13   you, Mr. Folz.

14             THE COURT:  Thank you, Mr. Folz.

15             THE WITNESS:  Thank you.

16                        **(Witness excused.)**

17             THE COURT:  Ms. Godesky?

18             MS. GODESKY:  Your Honor, may I approach?

19             THE COURT:  You may.

20

21                      **(Side-bar discussion.)**

22             MS. GODESKY:  So we have no additional witnesses,

23   and we'll rest.  But my only concern is we haven't done

24   that thing where we were going to read into the record all

25   of those exhibits that everyone agrees are in, but were

1   referenced during depositions.  So if everyone is in

2   agreement we will do that at a break or something, I'm fine

3   with that, but I just wanted to make sure they all get in.

4          THE COURT:  That's fine.  We don't need to do

5   that in the presence of the jury.

6          MR. HINDERAKER:  No.

7          MS. GODESKY:  Certainly not in my mind, but I

8   didn't want to rest if they're not all in agreement.

9          THE COURT:  I think we're all in agreement.  You

10  have been doing it every day?

11         THE CLERK:  Yes.  I have communicated with

12  representatives with the parties.  So we will just need to

13  confirm today's exhibits and then everything should be

14  fine.

15         THE COURT:  And we will read it into the record.

16         THE CLERK:  Yeah.

17         THE COURT:  Okay.  Very well.

18         MS. GODESKY:  Okay.  Thank you.

19

20         **(In open court with the Jury present.)**

21         MS. GODESKY:  Thank you, Your Honor.  Defendants

22  rest.

23         THE COURT:  Thank you, Ms. Godesky.

24         Mr. Hinderaker?

25         MR. HINDERAKER:  Not me, Your Honor.

```
 1              THE COURT:  Ms. Kliebenstein.

 2              MS. KLIEBENSTEIN:  Yes, Your Honor.  We call one

 3     witness.  Mr. Neil Zoltowski.

 4              THE COURT:  Very well.  Thank you.

 5              Mr. Zoltowski, come on up.  I'm going to swear

 6     you in again.

 7                        (Witness sworn.)

 8              THE WITNESS:  I do.

 9              THE COURT:  Go ahead and be seated.  Your

10     microphone will have to be turned back on.

11              THE WITNESS:  Okay.

12              THE COURT:  Make sure you speak into it.

13                        (NEIL ZOLTOWSKI)

14                      DIRECT EXAMINATION

15     BY MS. KLIEBENSTEIN:

16     Q.  Good morning, Mr. Zoltowski.

17     A.  Good morning.

18     Q.  I laid a folder on your table right there of some

19     documents that we'll go through.

20     A.  Okay.

21     Q.  You're back.  I would like to ask you some questions in

22     response to some of the opinions from Mr. Bakewell, who we

23     met last week.

24              The first area that I would like to start with is

25     the company-wide revenues, the year after year, the line
```

```
 1      charts, the bar charts that we saw.  Do you agree with

 2      Mr. Bakewell's position that Blaze Advisor couldn't

 3      possibly affect revenue because the company-wide revenues

 4      roughly stayed the same from 2006 to 2015 and then again

 5      after the acquisition from 2016 to 2020?

 6      A.  No, I don't agree with him whatsoever.  I think that

 7      analysis or it's more of an observation, I guess, not an

 8      analysis, and the conclusion from that observation is

 9      flawed.

10              You can't look at a company with 30 billion

11      dollars of revenue on average per year and make any sort

12      of determination with 100 percent accuracy, which is what it

13      seems like he did, about Blaze Advisor's impact on their

14      revenue.  I mean, you couldn't do that for any asset that

15      the company has at all.

16              It's like he's saying that if revenue was flat

17      from one year to the next that all of the factors that they

18      put up on the board, that none of them really did anything

19      to impact that revenue.  It's really they have zero value.

20      Again, an example might be in 2007 if Federal had or Chubb

21      had hired a thousand new employees and revenue stayed flat

22      from 2007 to 2008 that those 1,000 employees did nothing

23      whatsoever.  They have zero value to the company.

24              It just doesn't make any sense.  It's illogical.

25      It just doesn't follow common sense.
```

1    Q.  And while you were preparing to come back today, did

2    you look back over Interrogatory Numbers 16 and 17, which

3    we've looked at previously?

4    A.  I did.

5    Q.  And did you notice any trends in those interrogatories?

6    A.  Yes.  If you look at those interrogatories, the policy

7    counts were increasing, generally speaking, for the

8    applications year over year.

9    Q.  And, Mr. Zoltowski, did you read Mr. Bakewell's

10   discussion about valuation of Blaze Advisor?

11   A.  I did.

12   Q.  Do you agree with his conclusion that Blaze Advisor

13   added no value to the defendants?

14   A.  I wholeheartedly disagree.  It's pretty clear that

15   there are economic benefits from the use of Blaze Advisor

16   by the defendants just in the insurance industry, generally

17   speaking.  Flexibility, there is scaleability, there is

18   consistency with the underwriting process in total.  There

19   is all sorts of benefits that are provided by the Blaze

20   Advisor software.

21        And you can see that with the fact that there was

22   the RFI that Chubb & Son put out in 2006 when they want to

23   enter the mid market, the middle market.  They obviously

24   were looking for a solution that would help them do that.

25   They also, after they signed the license agreement for the

1    software, they expanded that use of the software over time.

2    And even after the acquisition and the termination of the

3    contract, they were still using the software.

4            So, I mean, it took more than I think four years

5    before they finally removed it from their systems, which,

6    if it had zero value as a profit maximizing enterprise, I

7    don't see why they would keep it.  I don't know any of my

8    clients that would continue to use anything that provided

9    zero value to them.

10   Q.  And your, your testimony that you spoke about earlier

11   on subsidiaries and pooling arrangements, does that have

12   any bearing on valuation?

13   A.  I think it's just another example of the extended and

14   expanded use of the software, which just goes to value and

15   the fact that there was, obviously, there was value that

16   was, that was seen by individuals within that company, and

17   obviously they expanded that use to different subsidiaries

18   and other parts of the company.

19   Q.  And what about FICO's revenues?  We also heard

20   Mr. Bakewell talk about how FICO -- FICO's revenues would

21   impact valuation.  What is your thought on that topic?

22   A.  That really has zero bearing on this equation.  It's

23   really about the defendants' use and the extent of use.

24           Interrogatory Number 17 really provides a roadmap

25   of the gross written premiums related to the applications

1    and the applications that used Blaze Advisor to price,

2    book, bind, analyze, quote insurance policies, as well as

3    use it to comply with regulatory requirements as well.

4            So there is a lot of ways that Blaze Advisor was

5    related to revenue-generating events within the defendants.

6    Q.  And this is, this is a similar question, but I just

7    want to clarify what you just said.  We heard about

8    economic connections on Friday, and it was suggested that

9    you didn't make any economic connections between the

10   revenues in your report and your testimony.

11           Do you agree with that statement?

12   A.  No, I do not agree.

13   Q.  Why not?

14   A.  I laid that out in my report, just about the benefits,

15   and I've talked about those benefits from an economic

16   perspective.  There is a connection; and as I said with the

17   Interrogatory Number 17, it's a roadmap.  It shows that

18   there is use of the technology, and it's connected to

19   revenue or gross written premiums in this case.

20   Q.  Let's move into the expense analysis that we saw on

21   Friday.  I just wanted to clarify some things around the

22   expense analysis as well.

23           Do you understand Mr. Bakewell to have presented

24   any expenses relating to Chubb Canada in his disgorgement

25   analysis?

1    A.  No, he did not.

2    Q.  And what about deductions or expenses relating to the

3    Legacy ACE companies?

4    A.  No, he did not do that, either.

5    Q.  And based on your calculations from Interrogatory

6    Number 17, how much revenue identified in your earlier

7    testimony came from Legacy ACE writing companies?

8    A.  It's properly 3.5 billion.

9    Q.  After reading Mr. Bakewell's testimony, what do you

10   understand to be Mr. Bakewell's opinion regarding cost

11   deductions in this case?

12   A.  He has a schedule that he put together.  It might be

13   easier just to go through his analysis from his report.

14   Q.  Sure.

15        Mr. Mayleben, could you pull up slide 1 of the

16   demonstratives for today?

17        Here you go, Mr. Zoltowski.  Same question:  What

18   are we looking at here?

19   A.  This is from Mr. Bakewell's analysis.  And so it lays

20   out his analysis as it relates to the costs associated with

21   the gross written premiums at issue in this case for the

22   years 2016, 2017 and 2018.  This was, I believe, part of

23   his report that he submitted back in 2019.

24   Q.  And can you get a little closer to the microphone --

25   A.  Sure.  Sorry.

1    Q.  -- or move it down.  That's okay.  I know you have to

2    look at the screen, too.

3    A.  Sure.

4    Q.  And walk us through -- take us through 2016.  How do we

5    get, how do we do the math to get from the top to the

6    bottom?

7    A.  Sure.  So this is for the -- I should probably be clear

8    here.  It's for the commercial and specialty insurance

9    lines, and it's for both of them combined.

10           And in 2016, if you look at the first, the first

11   row below the title Commercial and Specialty Insurance,

12   it's the gross written premium for 2016 of about 6.5

13   billion.  And you'll note that that's about -- I think it's

14   about 2 billion dollars higher than the number in my

15   report -- or I'm sorry -- in my schedules that I provided

16   during my testimony, because these numbers are from a prior

17   supplement of the Interrogatory Response Number 17.

18           And if you take that 6.5, just to do the math, to

19   get to net written premium, he reduces the gross written

20   premium by 9 percent.  So you can see the 91 percent below

21   the net written premium is just really the -- 100 minus 91

22   gets you your 9 percent production.  And that's the

23   adjustment for any reinsurance that, that the commercial

24   and specialty insurance lines obtains.

25           And then there is one more step, again, which

1    Mr. Bakewell talked about, which is the accounting

2    adjustment.  And that just relates to the type that, the

3    methodology of accounting, either cash or accrual

4    accounting.  And so if you look from -- it's about 5.9

5    billion for net written premiums, and you see it actually

6    goes up into net earned premiums to 6.2 billion.  That's

7    about a 4 percent increase.  And, again, that's just an

8    adjustment for when revenue is actually recognized by the

9    company based on the accounting rules.

10   Q.  Why don't you finish that column out, and then we'll do

11   a recap.

12   A.  Sure.  This is where we get into the expenses.  So the

13   next line is the losses and LAE that's incurred.  It's

14   about 3.3 billion.  You can see below that that's the loss

15   ratio that Mr. Bakewell used of 53 percent.

16          And then the expense ratio, 27 percent, down

17   below the line, is made up of the commissions, the general

18   administrative expenses and the dividends incurred, which

19   total to the total expenses.  And that expense ratio is

20   27 percent.

21          When you combine that 27 percent with the 53

22   percent loss ratio, that's where you get your combined loss

23   ratio of 80 percent.  And as Mr. Bakewell stated, if you

24   take the inverse of that, that's your profit margin.  So

25   100 minus 80 is 20 percent, and that's the number that is

1    right above the combined loss ratio.  And that's what he

2    used to get his underwriting profit on the bottom line with

3    the big bold line below it of 1.3 billion.

4    Q.  And so let me see if I can summarize what, what you

5    said in non- finance terms.

6    A.  Sure.

7    Q.  You would take the top number, that 2016 6.5, and

8    multiply -- reduce it by 9 percent.  That's step one; is

9    that right?

10   A.  Correct.

11   Q.  And then you would actually increase it for that year

12   by 4 percent due to the --

13   A.  Correct.

14   Q.  -- timing of when cash is received, right?

15   A.  Exactly.  It's just a timing issue and an

16   accounting-related issue.

17   Q.  And then you take that number and reduce it by the

18   losses and the expenses, correct?

19   A.  Correct.  The shortcut would be you could take that net

20   earned premium and then take 20 percent of that to get your

21   profit.

22   Q.  That's another shortcut.  And so -- period.  That's,

23   that's the math that I see that you agree with, correct?

24   A.  Correct.  And it would be the same for 2017 and 2018.

25   Again, I think it's about 5 or 5.5 to 6 billion of

1    additional gross written premiums in Mr. Bakewell's

2    schedules compared to mine.

3    Q.  And just to close out this, this spreadsheet, this

4    comes from Mr. Bakewell's report, correct?

5    A.  Yes.  That's my understanding.

6    Q.  And the source -- what is the source of the data in

7    this schedule?

8    A.  You can see it down below on the bottom left where it

9    says, source, it's FED 017882 underscore 0001.

10   Q.  And so that's a spreadsheet that the defendants

11   produced in this case, correct?

12   A.  Yes.  That's my understanding.

13   Q.  And we talked about this briefly before.  What lines of

14   business were reflected in that spreadsheet?

15   A.  My understanding is it was the two that are reflected

16   here in this schedule, which are the commercial and

17   specialty insurance lines.

18   Q.  Why those two?

19   A.  Because that's the lines that were using the

20   applications that used Blaze Advisor.

21   Q.  And is line of business -- I think the answer is going

22   to be obvious, but is line of business, cost and expense

23   data, the same as company-wide loss and expense data?

24   A.  No.  It would be obviously different.  It's going to be

25   a subset of the overall company.  The business lines would

1    flow up together to consolidate, depending again on the

2    structure of the company.  But this would just be one or

3    two of the lines compared to other lines which the company

4    has.  So this would be a much, much smaller set of data.

5    Q.  And did you see the formula that Mr. Bakewell wrote up

6    on the white board?

7    A.  Yes.

8    Q.  Did you see any errors in that formula, based on his

9    own schedule 8.1?

10   A.  I think he tried to shortcut some of the numbers and

11   oversimplified them, but he had -- I believe he had a loss

12   ratio of 85 percent.  And if you look at the bottom of this

13   schedule down in the box underneath the three-year average

14   column, it's 83 percent here.  And you can see that it's,

15   for the three years of 2016, 2017 and 2018, it's 80

16   percent, 87 percent and 83 percent respectively.

17   Q.  Did defendants ever update this slide 8.1, this

18   schedule 8.1?

19   A.  Not to my knowledge.

20   Q.  And do you know if the defendants ever ran any 2019

21   expense and loss data?

22   A.  I do believe that was provided, yes.

23   Q.  And was that company-wide or line of business?

24   A.  It was similar to the information that Mr. Bakewell

25   used here for his source to create this schedule.  So it

1    was the same commercial and specialty insurance line data.

2    Q.  I would like to move to the next slide to finish this

3    off.

4           Could you explain to me what are we looking at in

5    this slide?

6    A.  So this is the Interrogatory 17 revenue or the gross

7    written premiums based upon the data from Interrogatory 17

8    showing the applications that used Blaze Advisor over this

9    period, and it's broken up by year from 2016 through 2020.

10          And what this does is it takes that revenue and

11   it applies Mr. Bakewell's methodology, based upon the

12   percentages of his 2016 through 2018 schedule that we just

13   looked at.

14   Q.  So the, in 2016, the 4.6 billion, that was the number

15   from your report, correct?

16   A.  Yes.  Like I said, it's almost 2 billion dollars less

17   than what Mr. Bakewell had in his schedule.

18   Q.  And that's because of the correction of some

19   duplication issues in earlier versions of the interrogatory

20   responses, correct?

21   A.  Correct.  That's my understanding.

22   Q.  And so you took that 4.6 and reduced it by 9 percent,

23   correct?

24   A.  Correct.

25   Q.  And that's from what we saw in the previous slide from

1    2016.  And then you increased it by 4 percent due to the

2    104 percent we saw in the previous slide, correct?

3    A.  Right.  So you would have to go through this step.  If

4    you take the 4.6, you reduce it by 9 percent, you will get

5    a number, which will obviously be less.  I think it's about

6    4.3 or so.  And then you would take that number and

7    increase it by 4 percent, which would get you to your net

8    earned premium number for 2016.

9    Q.  Oh, I apologize.  And then what's the last step leading

10   to the total?

11   A.  You would multiply it by the profit margin of 20

12   percent, which is based on the combined loss ratio from

13   Mr. Bakewell's analysis.

14   Q.  And so what is reflected in that lower column -- or

15   lower row?

16   A.  That's just the total or the result of doing all that

17   math for each of the years for 2016 through 2020.  And then

18   obviously in red font is the total, which adds up to about

19   8.1 billion in, after doing the math, for 2016 through

20   2020.

21   Q.  And why is there no data in the columns for 2019 and

22   2020?

23   A.  Because Mr. Bakewell didn't update his analysis.

24   Q.  I think one more question.  Under, under what

25   circumstances in your profession, in your field, would you

1    use old historical data, if at all?

2    A.  It really depends, but typically, the valuation of a

3    business, you're typically looking out into the future in

4    terms of valuing a business to bring it back to present

5    value of today.

6         Another situation might be where you're trying to

7    just project out into the future whatever is your analysis

8    might be trying to reflect, maybe it's loss, and the

9    periods haven't happened yet, so you don't actually have

10   the actual data.  So you're creating, you're creating the

11   future yourself based upon historical data.

12        But if you do have actual data, we would always

13   use the actual data for purposes of our analyses.

14   Q.  So in your view using a profit margin from, say, 2016,

15   2017 or 2018 to calculate profits for 2019 and 2020, given

16   that they've already happened, that wouldn't be best

17   practices, would it?

18   A.  No, I mean, especially when you have impacts like COVID

19   and things of that nature that might, you know, skew the

20   numbers for that year.

21        MS. KLIEBENSTEIN:  No further questions.  Thank

22   you, Mr. Zoltowski.

23                    **CROSS EXAMINATION**

24   BY MS. GODESKY:

25   Q.  Welcome back, Mr. Zoltowski.

1    A.   Thank you.

2    Q.   When you were here last week, you offered opinions

3    about the 21.3 billion dollars in gross written premium

4    generated by defendants, right?

5    A.   Correct.

6    Q.   And as we talked about last week, gross written premium

7    is revenue in the world of insurance?

8    A.   Correct.

9    Q.   And as Ms. Kliebenstein said, you left trial after you

10   testified, but it sounds like you reviewed some

11   transcripts; is that correct?

12   A.   That's correct.

13   Q.   Did you -- you were reviewing all of the trial

14   transcripts to keep up with everything or just some

15   excerpts?

16   A.   I've reviewed most of it.

17   Q.   So you've read the testimony of experts like

18   Mr. Whitener and Mr. Bakewell?

19   A.   Yes.

20   Q.   And as you discussed with Ms. Kliebenstein, you know

21   that defendants' damages expert, Mr. Bakewell, came here on

22   Friday afternoon and talked about costs and expenses that

23   he thinks should be deducted from your 21-billion-dollar

24   figure.  Fair?

25   A.   That was some of his testimony, yes.

1    Q.  And then you just talked about some of the problems

2    that you see with his deductions, correct?

3    A.  Correct.

4    Q.  Okay.  Now, the gist of Mr. Bakewell's position is that

5    in order to translate revenue to profit, you have to make

6    certain deductions, including reducing gross written

7    premium to net written premium, right?  That's one thing

8    Mr. Bakewell says.

9    A.  Yeah, that was his first step.

10   Q.  And then his second step is, you need to deduct the

11   losses and expenses from that converted net written premium

12   amount, correct?

13   A.  No, I don't believe that's correct.  I think he -- the

14   next step was he went to net earned premium, which was

15   based on the accounting adjustment he did.

16   Q.  And then he deducted the costs and expenses?

17   A.  Correct.

18   Q.  And you have offered certain criticisms of

19   Mr. Bakewell's math, but you have not put out an

20   alternative number to your 21 billion dollars in revenue

21   that accounts for all of Chubb's costs and expenses,

22   correct?

23   A.  No, I have not.

24   Q.  You're sticking with that all in 21-billion-dollar

25   number that we talked about last week in terms of the

1    official number you're putting out there, correct?

2    A.   That was my opinion, yes.

3    Q.   And you said just now during direct examination that in

4    your view, as far as economic damages go, it's really all

5    about defendants' use of Blaze.  Do you remember saying

6    that?

7    A.   I don't remember my particular words, but that sounds

8    about right.

9    Q.   But the 21-billion-dollar figure you're putting out

10   there, we agreed last week, does not account for things

11   like Blaze's role in each of these computer applications

12   because you didn't look at that, right?

13   A.   I'm not sure I understand your question.

14   Q.   Isn't it true, Mr. Zoltowski, that the

15   21-billion-dollar revenue figure was not adjusted in any

16   way to account for Blaze's particular role in specific

17   computer applications at Chubb?  Whether it was a big role,

18   a small role, whatever it is that Blaze was doing, you

19   didn't adjust the figures, correct?

20   A.   I did not adjust the figures.

21   Q.   You also don't deny that Chubb incurred costs and

22   expenses in selling these policies, correct?  That

23   happened.

24   A.   That's correct.

25   Q.   It has to pay its employees.  It has to pay customer

1    claims when it comes in.  All those things are expenses,

2    correct?

3    A.  Correct.

4    Q.  Now, you reached the opinions you offered in this case

5    regarding that 21-billion-dollar revenue based on your

6    review of the testimony given by various witnesses, your

7    discussions with Mr. Whitener, and the information that

8    defendants produced about gross written premiums.  Sound

9    right?

10   A.  I think there was more to it than just that, but there

11   was a lot more that I looked at.

12   Q.  But those were three things you considered?

13   A.  Three of many, yes.

14   Q.  And when you were here last week, you confirmed that

15   just like you set aside costs and expenses in giving that

16   21-billion-dollar number, you did not endeavor to offer

17   opinions on how much of that 21 billion dollars is actually

18   connected to use of Blaze as opposed to other things at

19   Chubb, correct?

20   A.  Based on the information I had, that's correct.  I did

21   not do that.  I could not do that.

22   Q.  And since there was some questions during your direct

23   examination about your views on an economic connection

24   between Blaze and revenue, I want to be very clear.  You

25   are not here to opine that there is a nexus or connection

1    between Blaze and revenue, correct?

2    A.  I spoke about an economic connection and that there is

3    value to Blaze Advisor earlier today, when Ms. Kliebenstein

4    was asking me questions, but I'm not sure I understand what

5    your question is getting at.

6    Q.  You are not here, Mr. Zoltowski, to opine that there is

7    a nexus or connection between Blaze and defendants'

8    revenue, correct?

9    A.  I provided information about my understanding and my

10   opinions as to the economic connection.

11   Q.  That's not my question.  I'm going to ask it one more

12   time.

13   A.  Sure.

14   Q.  You are not here to opine that there is a nexus or

15   connection between Blaze and defendants' revenue, correct?

16   A.  I'm still not sure I understand your question; but if

17   it means from a legal perspective, I'm not a legal expert.

18   And many times in our cases we rely upon industry experts

19   who have better knowledge about, you know, that nexus that

20   you're talking about, but I have provided information and

21   opinions on the economic connection.

22   Q.  Mr. Zoltowski, I've handed you a binder that has a copy

23   of your trial testimony from last week.

24   A.  Okay.

25   Q.  Do you see that tab?

```
1    A.  I do.

2    Q.  I want to direct you to page 1348 at line 24.  This is

3    just last week, right?

4    A.  Yes.  That's correct.

5    Q.  And I asked you at line 24, "You are not here,

6    Mr. Zoltowski, to opine that there is a nexus or a

7    connection between Blaze and defendants' revenue, correct?

8              "Answer:  I understand that there is other

9    witnesses and information that will be doing that.  I was

10   not asked to do that."

11             That was your testimony last week, correct?

12   A.  That's correct.

13   Q.  Did you meet with counsel for FICO before you returned

14   to testify today?  Did you talk to them?

15   A.  Yes.

16   Q.  Now, you left this question of a nexus or connection

17   between Blaze and defendants' revenue to other people,

18   right?  That's what you said in your testimony last week.

19   "There is other witnesses and information that will be

20   doing that."  Correct?

21   A.  From that perspective, yes.  My report talks about the

22   value of Blaze Advisor in certain places and the economic

23   benefits of that software to defendants or in the insurance

24   industry itself.

25   Q.  When you rendered your expert opinions in this case,
```

1    you specifically identified Mr. Bick Whitener as someone

2    who is going to be addressing this question of whether you

3    could find a connection between Blaze and Chubb's revenue.

4    Do you remember that?

5    A.  Yes, I do.  And typically industry experts are better

6    suited to do that because of their inherent knowledge of

7    the industry and their experience.

8    Q.  An industry expert like Mr. Whitener?

9    A.  If it's a software case, then that's where -- or

10   insurance case and that's his expertise, then yes.

11   Q.  And before you reviewed and relied on Mr. Whitener in

12   offering your expert opinions in this case, you reviewed

13   his qualifications, you spoke to him, and you felt like his

14   qualifications spoke for themselves.  Right?

15   A.  Based on my layperson's review.  I mean, I'm not an

16   attorney who retained him, so I don't really have an

17   opinion on his qualifications.

18   Q.  But you felt like they spoke for themselves when you

19   read his qualifications back before you rendered your

20   expert opinions in this case, correct?

21   A.  He was an individual who had a significant amount of

22   experience in the industry.

23   Q.  And you, before you relied on Mr. Whitener's

24   qualifications in rendering expert opinions in this case,

25   you determined that his qualifications were quite

1    impressive.  That was your view, right?

2    A.  I don't know if I had a particular view on if they were

3    impressive or not.  I felt that he had the qualifications

4    necessary to serve in the role he was serving in.

5    Q.  Let's look at your deposition testimony from this case,

6    which is also in your binder.  And this would have been

7    closer in time to when you had first reviewed

8    Mr. Whitener's qualifications, correct?

9    A.  Correct.  Yes.

10   Q.  Let's look at page 65, line 11.

11   A.  Okay.

12   Q.  You were asked at line 11, "Question:  What independent

13   analysis did you do to determine the reasonableness or

14   reliability of Mr. Whitener's assessments?

15        "Answer:  My understanding is Mr. Whitener has

16   significant insurance experience and he is rendering his

17   own expert opinions in this matter.  I found his

18   qualifications to be quite impressive, based upon his

19   experience, and his opinions relate to the insurance

20   industry and his expertise in that regard."

21        Do you see that?

22   A.  I do.

23   Q.  And you said that you reviewed Mr. Whitener's testimony

24   about the value of Blaze before you returned to court

25   today, correct?

1    A.   I reviewed his testimony, yes.

2    Q.   And do you still find Mr. Whitener's qualifications to

3    be quite impressive in terms of the opinions he is offering

4    about a connection between Blaze and Chubb's revenues?

5    A.   I'm kind of laughing.  I didn't realize I had such

6    strong opinions, but I am from Boston, so I typically do.

7              I think he does have the qualifications

8    necessary.  He was in the insurance industry for many, many

9    years.  I spoke with him on a few occasions, and I found

10   him to be particularly insightful.

11             MS. GODESKY:  No further questions.  Thank you.

12             THE COURT:  Ms. Kliebenstein, any redirect?

13             MS. KLIEBENSTEIN:  Yes, Your Honor.

14                        REDIRECT EXAMINATION

15   BY MS. KLIEBENSTEIN:

16   Q.   Mr. Zoltowski, you're not taking the position in this

17   matter that the defendants have no costs and no expenses;

18   is that right?

19   A.   That's correct.  And I said that during my testimony

20   the other day.

21   Q.   Your issue is with the level of proof --

22             MS. GODESKY:  Objection.  Leading.

23             THE COURT:  Sustained.

24   BY MS. KLIEBENSTEIN:

25   Q.   What is your concern relating to the evidence we have

1    seen about costs and expenses?

2    A.  I just haven't seen information that allowed me to feel

3    comfortable with performing an analysis that deducted costs

4    accurately and precisely.

5    Q.  And you were asked about the percentage of, the

6    percentage of revenues that were Blaze Advisor versus what

7    makes Chubb Chubb.  Do you recall that?

8    A.  I faintly recall that, yes.

9    Q.  And what are your concerns relating to -- well, do you

10   have any concerns -- do you have any concerns relating to

11   the nature of the proof on that question, what makes Chubb

12   Chubb?

13   A.  Sorry.  I missed one of your words in the middle of the

14   question, which is probably the most important one.

15   Q.  That was a long question.  I have to ask it again.

16           Do you recall, you were asked what percentage of

17   Blaze Advisor versus what makes Chubb Chubb?

18   A.  Yes.

19   Q.  And regarding the percentage that makes Chubb Chubb, do

20   you have any concerns relating to that proof, in

21   particular?

22   A.  There is really no information to -- that allows me to

23   accurately quantify what that percentage might be.  There

24   is just a lack of that type of information that would allow

25   me to do so.

1    Q.  You've been asked a lot of questions about nexus, and I

2    wanted to get your thoughts, you know.  You've been

3    involved in a lot of litigations.  Do you, do you typically

4    always opine on nexus?

5    A.  Not always and not typically.  And like I said, it

6    really depends on the case.  If there is an industry type

7    of expert or someone who is closer to -- if it's technology

8    based or what have you, they're usually the more qualified

9    person to do that type of analysis and render that type of

10   opinion.

11   Q.  To take that next step, correct?

12   A.  Correct.

13   Q.  Now let's focus on just for a few questions what you

14   did do in this case.

15             Mr. Mayleben, can we pull up P1007A.

16             And this is Defendants' Ninth Supplemental Answer

17   to Plaintiff's Interrogatory Number 17.  If we can move to

18   the second page and blow up the interrogatory itself.

19             Now, Mr. Zoltowski, what was your job as it

20   relates to this case and this interrogatory and the data

21   produced in connection with it?

22   A.  I was asked to quantify the amount of gross written

23   premiums that was connected to Blaze Advisor and through

24   the use of the applications here listed in this

25   interrogatory.

1    Q.  And so that revenue stream was a company-wide revenue

2    stream or was it something different?

3    A.  No.  It's something different.  It's more targeted and

4    specific to these specific lines of business.

5    Q.  In what way?  What's it relationship?  The revenue

6    reported under Interrogatory 17, what is its relationship

7    to Blaze Advisor?

8    A.  It's connected in that it's the applications used Blaze

9    Advisor, like I said previously, to book, bind, to price,

10   to quote insurance policies and in certain instances to

11   comply with regulatory requirements.

12   Q.  And the policies in particular reported under

13   Interrogatory Number 17, is it your understanding that they

14   touched Blaze Advisor?

15   A.  Yes.

16   Q.  And the second part of your opinion, we talked about

17   corporate structures, pooling arrangements?

18   A.  Yes.

19   Q.  Why did you do that work in this case?

20   A.  It was showing the connection between the defendants

21   and their various subsidiaries and pooling entities that

22   all used Blaze Advisor and touched the gross written

23   premiums that are part of this interrogatory.

24   Q.  So you identified revenue that touched Blaze Advisor

25   and then tracked it throughout the company, correct?

```
 1    A.  Correct.

 2    Q.  And was that a small task?

 3    A.  No.  It was -- it's in question because I asked one of

 4    my team to do something the other day, and I said I think

 5    it will be easy, and they said nothing in this case is

 6    easy.

 7              MS. KLIEBENSTEIN:  All right.  No further

 8    questions.

 9              MS. GODESKY:  Nothing further from me.  Thank

10    you.

11              THE COURT:  Mr. Zoltowski, you may be excused.

12    Thank you.

13              THE WITNESS:  Thank you.

14                   (Witness excused.)

15              THE COURT:  Mr. Hinderaker?

16              MR. HINDERAKER:  Plaintiff rests, Your Honor.

17              THE COURT:  All right.  Members of the Jury, with

18    that, we have concluded defendants' case in chief and the

19    plaintiff's rebuttal case.  And as I indicated yesterday,

20    that will be the end of the admission of evidence in this

21    case.

22              As I also told you yesterday, the lawyers and I

23    have several hours of legal work that we can only do now

24    before you get the case.  So we will do that for the

25    remainder of the day, and you will be back at nine o'clock
```

1    tomorrow to hear instructions and closing arguments and

2    then deliberate.

3              With that, we are in recess.

4              THE CLERK:  All rise for the jury.

5                        **(Jury exits.)**

6

7         **(In open court without the Jury present.)**

8              THE COURT:  Be seated.

9              Here's what we're going to do.  I'm going to have

10   Miriam print the list of exhibits, and I will supplement it

11   with the exhibits that were introduced this morning, and I

12   know which ones those are, I believe, but there might be a

13   little duplication.  Regardless, I will read the list into

14   the record and then ask each counsel to confirm that that

15   list is accurate.  It will take us a minute.

16             And then while we're waiting for the list to be

17   printed, let me ask the lawyers.  When will you be ready to

18   argue the motions and then follow up with the charge

19   conference?  Mr. Hinderaker?

20             MR. HINDERAKER:  Should we come back at 1:30 or

21   2:00?  How much time do we need?

22             THE COURT:  That's certainly fine with me.  I'm

23   leaving it to you folks because you have things to do.  So

24   1:30 is fine?

25             MS. GODESKY:  We're ready whenever you want.

```
1            THE COURT:  Okay.  You prefer 1:30?

2            MR. HINDERAKER:  Sure.

3            THE COURT:  That's fine.  We will do it at 1:30.

4            I will just preview it for everyone.  Be short on

5    the arguments.  Okay?  I mean, we will listen to them.  I

6    will have to issue a ruling on the various motions, and

7    then we will do the charging and the verdict form.

8                   (Off-the-record discussion.)

9            THE COURT:  You can all stand and stretch if you

10   want.

11           MR. HINDERAKER:  Could we have a minute to --

12           THE COURT:  Pardon me?

13           MR. HINDERAKER:  Could we have a couple minutes?

14           THE COURT:  Yes.  By all means.

15                        (Pause.)

16           THE COURT:  I think I'm ready when you folks are.

17           MR. HINDERAKER:  Good.

18           MS. GODESKY:  Your Honor, we just need

19   Ms. Guidero, because she has been tracking exhibits for us.

20           THE COURT:  Yep.  All right.  Let's go back on

21   the record.

22           The way I'm going to do this:  I will read in the

23   Court's record of what has been introduced.  I'm starting

24   with defendants' numbers, and then I will let you know when

25   I change to plaintiff's; and then when I'm done with
```

1    plaintiff's, we'll reference the joint exhibits.

2              So -- and then at the end of this, obviously

3    we're asking each side to let me know of any errors or

4    omissions.

5              The following Defendants' Exhibits have been

6    introduced:  4, 8, 12, 14, 17, 30, 39, 58, 67, 77, 92, 96,

7    97, 99, 108, 109, 110, 113, 114, 116, 118, 125, 155, 156,

8    169, 172, 196, 199, 200, 202, 207, 208, 209, 210, 211, 212,

9    263A, 276, 280, 282, 283, 284, 293, 304, 309, 328, 330,

10   343, 355, 356, 357, 358, 359, 360, 361 and 362.

11             Counsel for Federal, do you note any errors in

12   that list or any omissions from that list?

13             MS. GUIDERO:  Just one thing, Your Honor.  I

14   didn't have D8 on the list.

15             THE CLERK:  I'm sorry.  It was admitted at P105.

16             THE COURT:  Okay.  So D8 was admitted as P105.

17   Okay.

18             Any other errors or omissions, Ms. Guidero?

19             MS. GUIDERO:  Nothing from us.  Thank you, Your

20   Honor.

21             THE COURT:  Okay.  Ms. Stradley?

22             MS. STRADLEY:  I pulled up the list a little

23   late.  I don't think so, Your Honor.  I will double-check

24   as soon as I'm --

25             THE COURT:  Okay.  Can I go ahead, or are you

1    still checking?

2         MS. STRADLEY:  Go ahead.

3         THE COURT:  All right.  Turning to plaintiff's

4    list, it is lengthier.  2, 5, 17, 18, 19, 20.

5         I'm going to do these slightly in a bunch.  Just

6    bear with me for one second.

7         21 through 43 inclusive.  46, 47, 57, 60, 69, 73.

8    90 through 96 inclusive.  103, 105, 106, 107, 108.  110

9    through 113 inclusive.  116.  120 through 126 inclusive.

10   131, 133, 143, 144, 145, 147A, 151, 154A, 156, 158, 168,

11   171, 175, 176, 184, 185, 187, 188, 189, 191, 192, 193, 194,

12   195, 199, 204, 212, 216, 218, 226, 227, 282, 283, 284, 299,

13   303, 307, 309, 310, 311.  328 through 331 inclusive.  336,

14   337.  341 through 351 inclusive.  353 through 360

15   inclusive.  362 through 377 inclusive.  404A, 418, 504,

16   510, 511, 517, 518, 520, 521, 527, 540, 576, 655A.  839

17   through 850 inclusive.  857, 870, 871.  873 through 897

18   inclusive.  948, 956, 958, 960, 1002A, 1004A, 1005A, 1007A,

19   1008A, 1073, 1088, 1090, 1012 -- hang on -- 1112, 1113,

20   1114, 1116.  1139 through 1149 inclusive.  1151 through

21   1164.  1165A, 1171A, 1172A, 1174A.  And then, lastly, 1177

22   through 1181 inclusive.

23        Ms. Stradley, any errors or omissions?

24        MS. STRADLEY:  Yes.  Thank you, Your Honor.

25   First, we had P171 on our exhibit list.  I believe we may

1     have had redactions such that it should be 171 --

2               THE COURT:  Hang on.  I have it as 171 on my

3     list.

4               MS. STRADLEY:  I'm sorry?

5               THE COURT:  I have it as 171 on my list.

6               MR. DUBIS:  Your Honor, today we talked about 171

7     and 171A.  The 171A was the e-mail, and the 171 was the

8     attachment, both of them came into evidence.

9               THE COURT:  171A is in evidence.  So let me amend

10    this list.  So I have added 171A to the list.

11              Other omissions or errors?

12              MS. STRADLEY:  Just one second, please.  I did

13    not hear you say P1165.  I may have missed it.  That's on

14    our list, though.

15              THE COURT:  Let me see if it's on the list.

16              THE CLERK:  Was 1165 a placeholder and then it

17    became 1165A?

18              MS. STRADLEY:  That could be.

19              THE COURT:  It is on my list as 1165A.

20              THE CLERK:  It's the computer with the source

21    code, right?

22              MS. STRADLEY:  Okay.

23              THE CLERK:  So do we need 1165 also?

24              MS. KLIEBENSTEIN:  The thing that nobody has

25    wanted to decide this whole trial.  So the computer has the

 1      source code files on it, and the source code files are each

 2      labeled with an exhibit number.

 3              The computer will go back with the jury.  I don't

 4      care one way or the other if we mark the computer itself,

 5      if that makes it easier for the Court to keep track of

 6      things.  I might suggest we give it a brand-new number,

 7      because 1165 I believe is a particular source code version

 8      on that computer.

 9              THE COURT:  Well, what I have on my list is

10      1165A.  What is 1165A?  Is that a particular file on the

11      computer?

12              THE CLERK:  It's the computer.

13              MS. KLIEBENSTEIN:  It's the computer.

14              THE COURT:  It's the computer.

15              You realize, of course, that if it is kept in

16      this fashion and the matter is appealed, that if the Court

17      of Appeals wanted 1165A, you would be transmitting the

18      computer to the Court of Appeals?

19              MS. KLIEBENSTEIN:  I do.

20              THE COURT:  Okay.  How many exhibits are

21      separately labeled on the computer itself with respect to

22      the software code?

23              MS. KLIEBENSTEIN:  Around ten.  I don't know the

24      specific number off the top of my head.

25              THE COURT:  Let me ask the defendants.  I'm

1    inclined to let it go as the computer just marked.

2              MS. GODESKY:  I think that's fine.

3              THE COURT:  Okay.  So we will retain the marking

4    of the computer as 1165A.  And any exhibits separately

5    labeled, but already contained on the computer, are in as

6    well, without my reading the list.  Okay?

7              MS. KLIEBENSTEIN:  Thank you.

8              THE COURT:  Okay.  Any other omissions or

9    corrections, Ms. Stradley?

10             MS. STRADLEY:  None from me.

11             MR. ERBELE:  I do have a question, Your Honor.

12             THE COURT:  Yes.

13             MR. ERBELE:  And that's regarding the exhibits

14   that were subject to Mr. Baer's offer of proof.  Obviously,

15   they're not admitted; but just for preservation purposes,

16   should we note those?

17             THE COURT:  We do need to preserve those.  I

18   believe those are -- I know those are referenced in the

19   Court's written order on the motion, but we will

20   double-check that as well and before -- obviously, it's got

21   going to the jury.

22             MR. ERBELE:  Mm-hmm.

23             THE COURT:  But before the case is decided, we

24   will prepare a list of those as well and make sure that

25   those are tracked.  Okay?

```
 1                   MR. ERBELE:  Okay.  Thank you, Your Honor.

 2                   MS. GUIDERO:  I just have one thing, Your Honor.

 3        I didn't hear you say P526.

 4                   THE COURT:  P 5 what?

 5                   MS. GUIDERO:  526.

 6                   THE COURT:  Well, it's on the list.  I was pretty

 7        careful to read it, but it's there.

 8                   MS. GUIDERO:  Okay.  Perfect.

 9                   THE COURT:  Any others?

10                   MS. GUIDERO:  No.  That's it.  Thank you, Your

11        Honor.

12                   THE COURT:  Okay.  Let me turn to the extensive

13        joint exhibit list.  1 and 2.

14                   In addition, the Court has marked two exhibits.

15        1 and 2.  1 is the flipchart sheet.  And I know that the

16        plaintiffs have photographed that and put a court exhibit

17        on that.

18                   In addition, Court Exhibit 2 is the chart that

19        was shown again today with Mr. Zoltowski that was used

20        during the cross-examination of Mr. Bakewell.

21                   And so those exhibits are preserved as well.

22        They will be in the possession -- when this case is done,

23        they will be -- the Court is going to keep a copy of it,

24        but FICO will be responsible for submitting that in the

25        event of an appeal.
```

1          Okay.  Anything on exhibits, Mr. Hinderaker?

2          MR. HINDERAKER:  No, Your Honor.

3          THE COURT:  Okay.  Thank you.

4          Ms. Godesky?

5          MS. GODESKY:  No.  Thank you for doing that.

6          THE COURT:  Okay.  Is there anything else we need

7   to take care of now before we break and then reconvene at

8   1:30?

9          MR. HINDERAKER:  Would anybody object if we

10  reconvened at 2:00?

11         THE COURT:  I do not object.

12         MS. GODESKY:  That's fine.

13         THE COURT:  Okay.  We will reconvene at 2:00.  It

14  will be my plan to be done with that between -- some time

15  between 3:00 and 4:00 at the latest, but remains to be

16  seen.

17         With that, we are in recess.  We will see you

18  back here at 2:00.

19                      **(Recess taken.)**

20         Tuesday, 3/7/2023, afternoon session.

21                      *   *   *

22  2:05 p.m.

23                    **IN OPEN COURT**

24                  **(JURY NOT PRESENT)**

25         THE COURT:  Let's go first with docket number

1    1128, Federal's motion regarding the foreign affiliates and

2    the third-party uses.

3              Mr. Metlitsky, are you arguing?

4              MR. METLITSKY:  Yes, Your Honor.

5              THE COURT:  Okay.  Come on up.  I will give you

6    five minutes.  Don't worry, I'm not giving him six.

7              MR. METLITSKY:  Sure.  So I don't need, I don't

8    think, any minutes on the first one because we've talked

9    about it many times.

10              THE COURT:  Yes.

11              MR. METLITSKY:  If you have any questions, I'm

12    happy to answer them.  And I would like to reserve the

13    right to respond to anything that I need to respond to, but

14    I don't think we have to talk about that.

15              THE COURT:  Okay.  That's fine.  I appreciate it.

16              Mr. Hinderaker, will you be arguing?

17              MR. HINDERAKER:  Not that one, Your Honor.

18    Ms. Stradley will be.

19              THE COURT:  Ms. Stradley.

20              MR. METLITSKY:  Oh, sorry.  Just -- that was just

21    on the client and its affiliates.

22              THE COURT:  Yeah.

23              MR. METLITSKY:  I do want to argue the consultant

24    one, which is also part of that motion.

25              THE COURT:  Okay.  Argue the consultant one then.

1          MR. METLITSKY:  Okay.  So let me do that one.  So

2     that one, as the court knows, turns on two different

3     issues.  One is whether materiality is required for a

4     breach of Section 3.1, and one is whether there is

5     sufficient evidence for the jury to find materiality.

6          I'm happy to answer questions on the second one.

7     I'm sure the court has thought about that.  I would like to

8     talk about the first one, if the court is considering

9     charging the jury that the contract might have, you know,

10    displaced the regular materiality rule.

11         THE COURT:  I am -- I think you've seen the

12    instruction --

13         MR. METLITSKY:  Yes.

14         THE COURT:  -- that is likely to be --

15         MR. METLITSKY:  Okay.

16         THE COURT:  -- used.  I am not going to instruct

17    them that the contract does provide a certain thing.

18         MR. METLITSKY:  Right.

19         THE COURT:  But my intention is to instruct them

20    that it either has to be material or the contract has to

21    provide otherwise.

22         MR. METLITSKY:  So I would like to try very hard

23    to get you off of that --

24         THE COURT:  Okay.

25         MR. METLITSKY:  -- including based on the law of

1    the case.  I don't have to do it now.  I can do it during

2    the charge conference, whatever you would like.

3              THE COURT:  Yeah, let's do that during the charge

4    conference.

5              MR. METLITSKY:  Okay.

6              THE COURT:  Okay?

7              Ms. Stradley.

8              MS. STRADLEY:  I will start with the foreign

9    affiliate issue, and we have talked about it a lot, so I'm

10   just going to jump to I think the two concerns that the

11   court expressed in, earlier in the trial, which was

12   relating to the fact that there's no affiliates of Chubb &

13   Son and the fact that Chubb & Son, at least defendants

14   contend, do not have employees.

15             So both of those concerns arise from facts that

16   are extrinsic to the four corners of the license agreement.

17   We explained in our brief extensively that under the

18   New York law which governs this particular agreement,

19   ambiguity has to arise from within the four corners of the

20   agreement itself.

21             The first concern relating to affiliates, that

22   term is defined.  Client is defined as well.  And so any

23   ambiguity that's arising from affiliates is not from the

24   definition of the term itself.  It's arising because of an

25   extrinsic fact, the fact being that Chubb & Son doesn't

1    have any affiliates.

2              THE COURT:  So hang on.  So I perceive in that

3    argument, though you are not saying it directly, but I

4    perceive that you are saying that Judge Wright's summary

5    judgment ruling found, I believe, that the term "client"

6    was ambiguous, and I believe that is directly in her

7    finding.

8              And I think -- so then I infer from what you are

9    saying that that finding is wrong because she relied on

10   extrinsic evidence to find an ambiguity in the phrase

11   "client."

12             MS. STRADLEY:  I would frame it slightly

13   differently.  I read her opinion as acknowledging that

14   "client" is defined as Chubb & Son, but then ultimately

15   finding the term "client and its affiliates" to be

16   ambiguous.

17             I think that the underpinnings from her finding

18   are based on her concern that she was unaware of case law

19   in which an unincorporated division could in fact be a

20   party to a contract.  So we've put forth that law that now

21   shows that that can in fact be the case.

22             And so I think that that underpinning of the

23   concern relating to can this even happen, can a division in

24   fact contract, led her to this concern relating to

25   "affiliates," but she ultimately did find that it was

1    ambiguous.  We would say "affiliates" is not ambiguous; she

2    got it wrong.

3            But the overall finding of her decision I think

4    was, was -- "tainted" is not the right word, but was

5    influenced by her unawareness of case law that we've now

6    put before the court.

7            THE COURT:  And I've read all of those cases

8    closely.  And where I think we may part company is

9    Judge Wright, that reference in her order said that she's

10   unaware of any authority that a, an unincorporated division

11   may contract independently.

12           And as I read the cases, including, I think it's

13   *Marantha*, obviously, but is it *Golub* or *Golub*, whichever

14   the name is.

15           MS. STRADLEY:  I've been saying *Golub*.

16           THE COURT:  That's probably what it is.

17           Those decisions to me seem fairly clear that,

18   yes, a division can be a contracting entity in the sense

19   that they can negotiate and sign a contract, but that even

20   when that happens, the legal entity is still the

21   corporation.

22           And that's what -- if my reading of the cases is

23   right, and I obviously think it is, if you accept that

24   premise, then I don't think there's a way around reading

25   client, Chubb & Son a division of Federal, as meaning

1    anything other than Federal Insurance Company.

2            So that's where I think it just really hits the

3    road.

4            MS. STRADLEY:  And I just for the *Golub* case I

5    actually think it supports our position even maybe more

6    clearly than the *Marantha*.  It's a quite dense case, but

7    I've read it a few times now trying to get my mind around

8    it.

9            And what actually happened in that case was, a

10   legally incorporated entity signed a contract, and the

11   language was signed "on behalf of," it used that language

12   "on behalf of," the unincorporated division.

13           And so the court actually found that the language

14   "on behalf of" the unincorporated division indicated that

15   the legal entity, when they signed it, wanted the

16   contracting entity to be that unincorporated division and

17   that in fact it was the unincorporated division that had

18   the obligations under the contract and was the contracting

19   party.

20           Now ultimately if there was a lawsuit, the

21   defendant would have been the parent corporation of that

22   division, but the fact that a corporation that was a legal

23   entity signed on behalf of an unincorporated division and

24   then the court still found that it was the unincorporated

25   division that was the contracting party, I think supports

1    that you, you can in fact have an unincorporated division

2    as the contracting party.

3              And in that case, it was not the parent that the

4    court found had, had the obligations or was, excuse me, or

5    was the contracting party.  So I think that we've put the

6    law before you, and that's our position.

7              And with that in mind, we do think that the

8    extrinsic facts are what are creating the ambiguity and not

9    in fact the face of the contract itself.

10             THE COURT:  Okay.  Very well.  Thank you.

11             Mr. Metlitsky, do you want to use your brief

12   rebuttal?

13             MR. METLITSKY:  I mean just for a moment on the

14   *Golub* case.

15             THE COURT:  Sure.

16             MR. METLITSKY:  The division there was a -- the

17   division there was a conglomerate of limited partners, so

18   it was a bunch of legal entities together.

19             And on the extrinsic evidence point, we agree

20   with you that the court said that the contract was

21   ambiguous, so you can use extrinsic evidence.

22             I also don't think this is extrinsic evidence.

23   The question whether Chubb & Son, a division of Federal, is

24   in fact a division of Federal, which necessarily means they

25   can't have affiliates because it's not a legal entity, is

1     just a fact about the company, basic fact, the same way

2     that FICO is a corporation is an extrinsic evidence.

3              So in any event, it doesn't matter either way

4     because either the contract is ambiguous and you can use

5     extrinsic evidence, or this is just intrinsic evidence.  By

6     the way, the result is the same.

7              THE COURT:  Okay.

8              Ms. Stradley, anything further?

9              MS. STRADLEY:  I would just say I think we put

10    forth, if they are saying extrinsic evidence comes into

11    play, to address your concern about the employee issue,

12    certainly defendants contend that there are not employees

13    of Chubb & Son, the division.

14             We put forth evidence in the brief that at least

15    there's sufficient evidence to get to the jury as to

16    whether there are employees of Chubb & Son, including their

17    own annual reports that identify officers and personnel of

18    Chubb.

19             & Son.

20             THE COURT:  Okay.  Very well.  Thank you.

21             MS. STRADLEY:  And then I was unclear about what

22    we're doing about the 3.14 termination immateriality.  Are

23    we addressing that at the charging conference?  Is that

24    what we're doing?

25             THE COURT:  We are.  Yes, on the issue of whether

1    the third party use can lead to both a breach and a

2    termination.

3              MS. STRADLEY:  Okay.

4              THE COURT:  Okay.  All right.  So that's Docket

5    1128.

6              Let's turn to Docket 1136 or 1135, disgorgement.

7              MR. METLITSKY:  So, Your Honor, on this one I do

8    want to take a few minutes to discuss, because I think we

9    have a legal disagreement and a factual disagreement, which

10   I don't think really is a disagreement.  But there is a

11   legal disagreement.

12             I think everyone agrees on what the basic

13   standard is, the "contributed to" standard, but I think

14   there is a legal disagreement about what it means for

15   something to contribute to revenue.

16             It seems to me that they think that you can say

17   something is valuable, something is important, something is

18   significant, and a jury or the court can conclude from that

19   that it contributes to revenue.

20             I do not think that's the law.  If you look at

21   the *Andreas* case, Audi TT coupe case, if you look at the

22   kind evidence the court accepted there, it was all evidence

23   that was tied to sales, right.  So Audi was very

24   enthusiastic with its dealers about this ad, the dealers --

25   and so was telling them, take more cars because you are

1       going to sell more cars.

2                Audi's revenues, actual revenues during the time

3       the ad with the infringing content ran, was higher than its

4       projected revenues for that period, et cetera, et cetera,

5       right?  It was all tied to sales.

6                I'm not sure I'm aware of a case where you don't

7       actually have to tie the infringing use to actual revenues.

8       And in fact, when -- if all you have to do is say something

9       like, you know, this was an important component of the

10      business, it seems to me that the consequence is shifting

11      the burden from them to us.

12               And there are cases having to do with software,

13      like the *IBM* case and the *Complex Systems* case, where the

14      testimony is very, very similar, if not identical, to the

15      testimony here which is, this is a very important component

16      of the business.  It's significant, you know.  It's

17      meaningful.  It plays a meaningful role in the business.

18               And the courts there made clear that that is not

19      enough.  That is not enough to satisfy the causal nexus

20      test.

21               And here -- and so that's what I think the law

22      is, that they actually have to tie the infringing use to

23      revenue and not to importance and those kinds of

24      adjectives.

25               And then there's the evidence, right, and you

1      know we've laid this out, and Your Honor has been sitting

2      here listening to it.  So you heard Mr. Baseman say he

3      couldn't tie it to revenue.  I can go through all the fact

4      witnesses.  I think that was pretty clear.

5              And everybody agreed, I think, that the main

6      witness that they were relying on is Mr. Whitener.  And

7      Mr. Whitener conceded that he couldn't tie it to revenue.

8      In fact, Mr. Hinderaker in the colloquy with Ms. Godesky

9      about his qualifications said that, you know, just to quote

10     him, "that he's not a Blaze Advisor expert and he's not

11     going to connect Blaze Advisor to the selling of insurance.

12     That's revenue."

13             Right?  And the reason, I think, Mr. Hinderaker

14     said that is because Mr. Whitener didn't know anything

15     about Blaze Advisor.  And so how could he connect the use

16     of Blaze Advisor to revenue?  And so it seems to me that

17     there's a complete failure of proof on this issue, and

18     there's good reason not to ask the jury about it, because

19     they've already heard about inflated numbers, but hearing

20     about it in summation is all the more prejudicial.

21             THE COURT:  Let me ask you this:  I'd like you to

22     explain a little bit what your view of causation or causal

23     nexus would require in a case like this.  And let me tell

24     you what I think I'm inferring from your argument.

25             I infer from what you said that it's your

1    position that in order to establish the causal nexus, what

2    FICO would need to show is that the applications that used

3    Blaze Advisor, that touched these policies, had to touch

4    those policies in the presale, if you will, at a minimum.

5              You may disagree with this entirely, but they

6    have to touch the policies before the top policies are sold

7    and that somehow that fact would have to be known to and

8    important to customers.  That's what I'm inferring your

9    argument to be.

10             MR. METLITSKY:  That's one way to do it.  If I

11   can just take a step back.

12             THE COURT:  Sure.

13             MR. METLITSKY:  There has been dispute in the

14   cases about whether the standard for direct and indirect

15   infringement cases is the same or different.  And the court

16   held they're the same.  The standard, the standard is the

17   standard.  But of course it's harder to satisfy in indirect

18   cases.

19             The fact that they are relying on an infringing

20   use, where it's hard to demonstrate a connection to

21   revenue, does not mean that their burden to demonstrate a

22   connection to revenue is lower.

23             Most of these case are about promotional

24   material, the *Audi* case, the *Polar Bears*, *Mackie*, case all

25   those cases are about promotions.  And so at least the

1    infringing use is like touching the customer.

2          This is somewhere, you know, in the back room of

3    the business.  And so, you know, that's their argument, but

4    they still have to demonstrate the same connection to

5    revenue that anybody else does, whether it's, you know, a

6    direct infringement case or indirect infringement case.

7          So, yeah, it may be hard as cases like *IBM* and

8    *Complex Systems* hold when it's, you know, it's a software

9    component of a big, technological enterprise, but I

10   think -- so with that said, I think the answer is more or

11   less decided in the summary judgment decision.

12         I think what Judge Wright said was, first, there

13   was this thing that you were talking about touching.  I

14   think that's the --

15         THE COURT:  Yeah.

16         MR. METLITSKY:  -- phrase we've been using, it's

17   got to touch.  But that is not enough, and it can't be, it

18   touches Blaze, plus Blaze is good, right?

19         It has to be, it touches Blaze.  That's number

20   one, and then it contributes to revenue.  And what

21   Judge Wright cited for it contributes to revenue was

22   Mr. Whitener's opinion.

23         And, you know, then Mr. Whitener said, no, I

24   can't tell you whether it contributed to revenue.  So

25   that's the difference between his expert report and his

1    trial testimony.

2            And under the summary judgment decision, I mean,

3    you know, first of all, this is understand Rule 52, so I

4    don't have to satisfy the, you know, summary judgment

5    standards essentially.  But I think we satisfy it, because

6    there just isn't any revenue.

7            Excuse me.  Well, yeah.  There isn't any revenue

8    tied to Blaze Advisors.  There is no evidence of it at all.

9            THE COURT:  Okay.  Thank you.

10           Mr. Hinderaker.

11           MR. HINDERAKER:  My turn?

12           THE COURT:  Yep.

13           MR. HINDERAKER:  I think that the defendants'

14   position confuses many things.

15           THE COURT:  Including the court.

16           MR. HINDERAKER:  So let's separate, let's

17   separate out a couple things, if we might.  This notion of

18   being tied to revenue:  As the case law says, *Andreas* says,

19   as Judge Wright says, you need to have a reasonable

20   relationship to the revenue that you are claiming.

21           I think it's more than self-evident that we have

22   more than a reasonable relationship.  We have the

23   defendants' admissions.  So we have the interrogatory

24   number 17 that asks directly, revenue and policy counts for

25   everything that touched -- or that was connected to the

```
1    language in the interrogatory, was connected to Blaze,

2    using Blaze Advisor.

3           And Mr. Harkin's testimony, if there was any --

4    what's the right word?  If in the defendants' answers to

5    that interrogatory, where they sort of rephrase a little

6    bit what we were asking, if they were trying to create some

7    crevice, Mr. Harkin said a few times in his testimony, "I

8    was responsible for collecting that data.  That data

9    identifies each policy and the associated revenue, that not

10   only went through the application, but used Blaze Advisor."

11          So Mr. Zoltowski, in his expert opinion and his

12   use of that data, sorted that data by writing companies,

13   sorted that data useful ways for understanding the total

14   amounts and by years.

15          But the evidence of the direct connection between

16   the infringement and the revenue is the defendants'

17   admissions.

18          Now the defendants want Mr. Whitener to do too

19   much because Zoltowski took care of the dollars and the

20   connection to revenue with Mr. Harkin and the interrogatory

21   answers.

22          Mr. Whitener then says, when you -- and let's

23   back up again.  These applications are used for the purpose

24   of selling insurance.  And Mr. Whitener then is described,

25   from not only the defendants' own documents but from his
```

1        own experience in the industry, why having these benefits

2        from the technology contributes to the sale of insurance.

3                Another element of the positioning here is that

4        we're not talking about those insurance policies that did

5        not use Blaze Advisor.  So like we heard, was it yet today,

6        yesterday, Mr. Schraer talking about all of the high touch

7        underwriting that he might do.

8                Well, fine, but we're talking about the renewals

9        that don't have any human touch, which was the CSI Express

10       application.  So we're talking about those policy that is

11       touch, that touch Blaze Advisor.

12               The defendants are citing the same cases that

13       they cited to Judge Wright.  Well, you can't -- and

14       Judge Wright said, I reject these cases.  FICO's proof is

15       not undifferentiated.  It is differentiated.  We're only

16       asking for the revenue under the 504( b) standards.

17               THE COURT:  FICO has -- first of all, let me just

18       say on the record, I pick the low hanging fruit.  I didn't

19       mean to -- I was not being serious.  Your argument,

20       Mr. Metlitsky, does not confuse the court.  Okay?

21               MR. METLITSKY:  I didn't think you were being

22       serious, Your Honor.

23               THE COURT:  FICO has limited its universe to

24       those policies which pass through applications that use

25       Blaze and that those policies themselves in some way used

1    Blaze.

2              MR. HINDERAKER:  Yes.

3              THE COURT:  What defendants seem to be arguing,

4    to put it in slightly different terms, is that's just a

5    narrowed down version of general overhead.  That's like

6    saying, well, you know, these policies pass through a

7    certain department.

8              And they're saying you have to distinguish -- you

9    have to -- that may be fine for discovery purposes, but to

10   get to the jury, you have to further refine that universe

11   in some way connecting the policies to, I think, the sale

12   as related to the customer.

13             MR. HINDERAKER:  It's a rather -- let's just take

14   the various policy administration systems.  The easiest

15   example for me is the renewals, which because of the use of

16   technology don't involve the customer.  Automatically --

17   and the testimony -- I mean, there's testimony of in fact

18   the defendants enjoyed a greater percentage of renewals

19   because they were using technology to be able to do those

20   renewals.

21             It's hard for me to imagine any circumstance

22   where there's not a more direct connection to the customer

23   than when revenue is being generated as a result of the

24   transaction.

25             The testimony in fact, because of the technology,

1    the defendants were able to get to market faster with new

2    products, get to market faster to take opportunities that

3    they were not otherwise able to capture, like the

4    $25 million opportunity with Premium Booking.

5            Those are things that happened and generated

6    revenue because of the technology.

7            THE COURT:  Their argument in part, I think, also

8    says -- even if we grant you that, there is language in *IBM*

9    and *Complex Systems* that says, again not verbatim, but to

10   the effect that you have to show that somehow that's unique

11   to Blaze as distinct from other market alternatives.

12           MR. HINDERAKER:  I disagree with that, Your

13   Honor, completely because that's to say, I could have

14   infringed somebody else's business rules management

15   technology.  They chose to infringe ours.  They chose to

16   take the advantages that our technology provided to their

17   sale of insurance.

18           They chose to take the speed from Blaze Advisor.

19   They chose to take the agility from Blaze Advisor.  They

20   chose to take the consistency and decision-making.  They

21   chose to have smarter decision-making on the underwriting

22   side to sell insurance, and they chose to do that with our

23   technology.

24           It's not an issue of whether they could have done

25   it with somebody else's technology, you know.  After some

1    four years of use, they indeed did transfer to jurals.

2    That's not the point.

3              The point is, until they did that, they chose to

4    treat Blaze Advisor like their own and infringe and

5    generating the revenue as a consequence.

6              To say it's back office is to be quite

7    disingenuous of what it is.  How many of our last witnesses

8    in the last few days, do I use CSI Express in the renewals?

9    Yes, I do.  Why did we use DecisionPoint?  To sell

10   policies.  Some agents don't like it; others do.

11             Policy counts go up year over year.  We're not

12   asking for revenue from the agents that don't use it; we're

13   asking for revenue from the agents that do.

14             So it's, I think that it's not -- these insurance

15   companies are in the business of selling insurance, and

16   that's what this technology was used for.

17             What did Mr. McCarter say?  Technology

18   contributes to the success of insurance policies.  What did

19   he say about renewals?  Customer retention is very

20   important.  When I asked him a question about using Blaze

21   Advisor, his answer was, well, it might be true and might

22   not be true if it's just one -- you know, his answer was

23   always, well, the one customer.

24             And so I asked him, well, can I get your answer

25   on one confident?  Let's say it's a thousand customers.

1    You know, overall, if you can do the renewals faster, do

2    you have a higher retention rate?  And he had to say yes,

3    because the technology gives that ability to do.

4           We've had many people say, well, underwriting is

5    a very intensive relationship business.  Does having

6    automation and scale create the opportunity for the

7    underwriters to go sell?  Yes, it does.  Is that a

8    contribution?  Yes, it is.

9           Our burden under the act is to show that it

10   contributes at least in part, and it does, Your Honor.  I

11   think there's -- in my judgment, there's more than enough

12   evidence to go to the jury.

13          Frankly, if when I look at the *Andreas* case and I

14   have an advertisement that's running at the same time that

15   TT coupes are being sold and that is a sufficient

16   connection, we have much more than that in this case.

17          THE COURT:  All right.  Thank you,

18   Mr. Hinderaker.

19          You may briefly Mr. Metlitsky.

20          MR. METLITSKY:  Briefly on *Andreas*, we talked

21   about already how it's directly tied to revenue.

22   Interrogatory number 17, this whole idea of touching Blaze,

23   okay?  That's the equivalent of saying if somebody was

24   violating copyright a font, okay, and invoices use that

25   font and the interrogatory asked how many, you know,

1        invoices used the violating font, and it would be

2        $21 billion.

3               Obviously that does not satisfy the burden.  It's

4        maybe one step in satisfying the burden, but you're not

5        showing that the font is actually contributing to revenue.

6        You're just showing that it was used in an invoice.

7               You know, you could make -- do that with

8        anything, chairs.  How many, you know, how much do chairs

9        contribute to revenue?  You know everybody that sells

10       things sits on chairs.  I mean, that doesn't satisfy the

11       standard.  You need to take the next step.

12              And so what I heard Mr. Hinderaker say was,

13       technology is important.  That's true.  That's not about

14       Blaze Advisor.  He talk about the applications that use

15       Blaze Advisor, but that's not Blaze Advisor.  And that's

16       the whole point of those *IBM* cases and *Complex Systems*.

17              When you're talking about software, that's a

18       little piece of a big technological enterprise.  You can't

19       just say the technological enterprise is important and this

20       is an important -- the technological enterprise drives

21       revenue.  This is an important piece of the technological

22       enterprise; and therefore, we've satisfied our burden

23       because, again, the consequence of that is just, you're

24       always going to be able to satisfy that standard because,

25       you know, any little piece of a big money-making enterprise

1    is, you know, always going to be a little piece of it,

2    whether it drives the revenue or not.

3           And so the consequence of not forcing them to

4    show that that little piece drives the revenue, as opposed

5    to the application as a whole, is to shift the burden to us

6    to say all the revenue that touches Blaze is, you know,

7    satisfies their standard, and then we have to do the

8    deductions and all the rest of it.  And that is not the

9    law.

10           And then one last thing I would say is,

11    Judge Wright didn't reject those cases.  Judge Wright held

12    that not only did they do the touching Blaze thing, which

13    was the first part.  That's when she said it was not

14    undifferentiated, but she also said that they put on

15    evidence in the form of Mr. Whitener's report that it

16    contributed to revenue.

17           Two different points.  Not the same point, two

18    different points.  And so I think the question for the

19    court is whether that second point stood up at trial.  And

20    I think the answer, based on all the admissions of their

21    witnesses, is no.

22           THE COURT:  All right.

23           Mr. Hinderaker, you may have the last word.

24           MR. HINDERAKER:  One last word.

25           THE COURT:  Yeah.

1              MR. HINDERAKER:  It was tough too.  I think the

2    defendants characterization of what Blaze Advisor -- I

3    think the defendants' characterization by way of examples

4    which have such a different font, my point is what was the

5    purpose of their use of Blaze Advisor?  The business

6    purpose of the use was to sell insurance.  That's quite

7    different.

8              And in terms of the burden of proof, I think the

9    defendants have it mostly upsidedown.

10              The plaintiff's burden of proof is to prove this

11    connection to revenue from the infringement at least in

12    part.  What is the defendants' burden to do?  Not only

13    prove the expense deductions that are appropriate, but also

14    to prove all of the other factors that contributed to the

15    revenue, in addition to the, in addition to the technology,

16    in addition to the applications that, the policies that

17    touch Blaze Advisor.

18              So this notion of Mr. Whitener couldn't say

19    what's the impact, that's to shift the burden of proof on

20    us to measure that.  When they ask the witnesses, did you

21    measure that, that's to shift the burden of proof.

22              So they're more subtle this go-around than they

23    were with Judge Wright, but they're asking this court to

24    make the same error that they asked Judge Wright to make,

25    that is to reject the burdens of proof of *Andreas*.

1          THE COURT:  Thank you, Mr. Hinderaker.

2          All right.  Let's turn to Docket 1148, FICO's

3     motion for a judgment as a matter of law that ACE American

4     infringed.

5          MR. HINDERAKER:  I would say the proposition of

6     the motion is that let's assume, let's assume the license

7     agreement with, I would say Chubb & Son, you might say

8     Federal, let's assume the license agreement was not

9     terminated and it's still ongoing.

10         What is the, what is the mechanism by which ACE

11    American, a separate legal entity, could be the one using

12    the software now and -- well, what's the mechanism by which

13    they could be using the software now with FICO's

14    permission?

15         And frankly, I found the response to our motion

16    to be fairly kitchen-sinky in the sense there's many

17    different, if not this, then that and alternatives, and

18    I'll get to those eventually, I think.  But I would just

19    like to talk about 10.8 first.

20         So the first sentence is neither party, you know,

21    can transfer or assign without the consent of the other.

22    So that's a straight traditional document of assignment.

23    And that didn't happen here.  Nobody disputes that.

24         And so then we go into the second sentence, which

25    is, which is if the client undergoes a change of control,

1    if the client acquires or is acquired by another company,

2    or if the client goes through a reorganization or process

3    of somebody else's business, notice that it's always "the

4    client," "the client," "the client."

5              In that second sentence, there's no transfer of

6    rights.  The client is still the licensee.  Now, it's

7    considered to be an assignment.  It's a deemed assignment,

8    considered to be an assignment, so that it can be subject

9    to this section.

10             And therefore as subject to this section, FICO

11   can't have an opportunity to consent whether Blaze Advisor

12   will be used under these very different circumstances.

13             So you heard that when the license agreement is

14   originally made, 2006, the client is of a certain kind.

15   Here, it's within the Chubb Corporation.  The pricing is

16   reflective of that use and that size organization.  And

17   that's the 2006 circumstances.

18             In 2016, the client, the client, the client, in

19   the second sentence, became -- went through a very

20   significant change of circumstances.  The client was

21   acquired; the client was -- went into a change of control.

22   Those are the two that applied.

23             And as a consequence, the circumstances of the

24   original bargain in 2006 are no longer the circumstances.

25   They are 2016 circumstances, from pricing within a

1    $12 billion organization to pricing within a $30 billion

2    organization.

3              So in all of that, there's still no transfer of

4    rights from the client to anybody else, period.  It's

5    always the client.

6              Now in the argument now it's, well -- the

7    argument now is that, call the client Federal.  Federal was

8    acquired by ACE American.  Well, the first point about that

9    is, it's simply not true.  Is ACE American the parent above

10   everything else?  Of course, it is.

11             Federal by the stipulated, uncontested facts of

12   number 15, became a wholly-owned subsidiary of ACE INA

13   Holdings, Inc.

14             So Federal was acquired, and it became

15   wholly-owned by somebody else, ACE INA Holdings Inc.

16   That's not ACE American.

17             And still the license agreement is with Federal,

18   the client.  That hasn't changed either.

19             So how is it that, how is it that the argument

20   goes that ACE American can use the software as a magical

21   assignment?  Well, let me just -- we've seen this many

22   times (indicating).

23             We have to believe that this is an organizational

24   chart, to make any of the argument of the defendants' work

25   that ACE American has rights because the truth of the

1    matter is, is that -- and it's a little harder to see

2    here -- is that when you look at the, when you look at the

3    corporate structure, ACE American goes up this chain

4    (indicating).

5            Federal Insurance Company goes up this chain

6    (indicating).  Ultimately, they get to Chubb Limited.  But

7    they're on separate chains, and never -- and as a

8    consequence, ACE American is not, never has been, and

9    cannot be an affiliate of Federal as defined by the license

10   agreement.

11           Federal does not own 50 percent or more of the

12   voting stock of ACE American.  The only connection that

13   they have is that they are both owned by Chubb Limited.

14           So now we're back into, how can you use the

15   mechanisms of paragraph 10.8 to give ACE American rights to

16   use Blaze Advisor?  And you can't unless you -- well, you

17   simply can't, because there is no transfer of rights under

18   the second sentence.

19           It's just a different circumstance with the

20   client that causes a revisiting of price.  A deemed

21   assignment is not an assignment.  If it was an actual

22   assignment, we'd be in the first sentence.

23           And so the argument then becomes, well, Federal

24   wasn't acquired.  The argument becomes Federal was acquired

25   by Chubb Limited.  Well, no, it wasn't.  It was acquired by

1      ACE INA Holdings, Inc., which was, you know, down the chain

2      from Chubb Limited.

3            So the argument simply doesn't fit the

4      circumstances.  The brief that we presented to you also

5      looks at the law of judicial admissions, and this argument

6      is another argument that was the creation of counsel at the

7      beginning of this trial.

8            Up until February 15th, the argument of the

9      defendants is that the client was always Federal, it's

10     always Federal, it's always Federal.  And the way

11     paragraph 10, the second sentence reads, indeed that's

12     true.  The client never changes.  It just goes through a

13     change of circumstance.

14           The defendants are bound by that.  Now they want

15     to not be bound by that by saying we're making a legal

16     argument.  They were making a statement of fact, who's the

17     client?  Federal, in advance of a legal argument, but now

18     we're facing at this time in the trial a very different

19     argument that they should be precluded from making under

20     the law of judicial admission.

21           And then in the kitchen sink notion, now we're

22     arguing, well, maybe it was a reorganization because --

23     maybe it was a reorganization because Federal lost its

24     employees.  Well, that's the first one too.  And paragraph,

25     the second sentence says or, you know, a reorganization

1    requires the rights to process another person's business.

2            So again, when you look at the rationale for the

3    sentence, it says, well, does the client circumstances

4    change?  So it's going to be using Blaze Advisor more.  The

5    value proposition goes up.  If there was a reorganization,

6    it was a reorganization of Federal to go out of business

7    and not process with Blaze Advisor at all.  And, hence,

8    that's why ACE American became a user.

9            I think this circumstance is much like Pamela

10   Lopata said on her testimony, much like Mr. Folz said

11   today.  I woke up one morning, and I had a different -- I

12   had a different employer.

13           We had a license agreement with Chubb & Son or

14   Federal, depending on the point of view, and one day ACE

15   American woke up and said, Well, we're just going to use

16   your, we're just going to use your software as if we own

17   it.  But there's no way under the law or under this

18   provision that they acquired any permission from FICO to do

19   so.

20           So their argument that at the trial is that

21   somehow paragraph 10.8, when it considers a different, a

22   change of circumstance of the client, somehow transforms

23   that change of circumstance of the client to, a transfer to

24   somebody else.

25           And, of course, they have to argue that it was a

1    transfer to the parent corporation of all Chubb Limited,

2    when in fact the entity that the, that owned Federal, the

3    change of control of Federal was much lower down in the

4    chain, ACE INA Holdings, Inc.

5            So in summary to shorten it up, you have to

6    accept the fact that the separate jural entities of this

7    complicated company are mean meaningless and that you have

8    to believe that this is an organizational chart, and we can

9    ignore all those separate companies, so that whatever Chubb

10   Limited does through any of it's a hundred and -- or 220,

11   whatever, subsidiaries, it's all for one and one for all,

12   and the license agreement, what are those words?

13           So I think that there is, frankly, there's no

14   evidence in this case.  There's certainly no evidence of an

15   assignment.  There's no evidence of a corporate structure

16   that fits, that enables ACE American to be an affiliate of

17   Federal under any, under any definition of the terms of

18   "affiliate" in Amendment two.

19           That's undoubtedly clear.  Must be owned, Federal

20   must own 50 percent, Federal must own 50 percent of ACE

21   American.  Federal does not.  Undisputed fact.  Can't be

22   disputed.  They're not even in the same chain.

23           So thank you.

24           THE COURT:  Thank you, Mr. Hinderaker.

25           Mr. Metlitsky, let me ask you a question --

1           MR. METLITSKY:  Yeah.

2           THE COURT:  -- at the outset.  January 1, 2017,

3      right?  The Federal Insurance Company employees become

4      employees of what corporate entity?

5           MR. METLITSKY:  ACE American, I believe.

6           THE COURT:  Okay.

7           MR. METLITSKY:  Yeah, so I think I need to unpack

8      this a little bit --

9           THE COURT:  Okay.

10          MR. METLITSKY:  -- because I know the explanation

11     of our theory that Mr. Hinderaker gave is not exactly

12     right.

13          So I'm going to use the original names of the

14     companies because it gets real confusing when you start

15     changing ACE to Chubb.

16          So what happened on the first day of the merger

17     was that ACE Limited purchased Chubb Corporation, acquired

18     it.  And so there was a change of control at Federal.  It

19     used to be owned by Chubb Corporation, and now it was

20     ultimately owned by ACE Limited.

21          The next day, through some intercompany stuff, it

22     became the immediate subsidiary of ACE INA Holdings, and

23     that company's parent was ACE Limited.  It doesn't matter

24     which of those ended up being the change of control for

25     purposes of our theory, and I'll explain why.

1          So recall that there are two competing

2     constructions of Section 10.8 that Judge Wright said were

3     both reasonable.  So I think the way that Mr. Hinderaker

4     was describing it assumes that they're right about what it

5     means.

6          The only thing that matters for purposes here is

7     that we're right about what it means because the only

8     way -- the whole premise of this argument is that we win as

9     to whether the termination was proper.  And so there's no

10    copyright infringement by Federal.

11         Their argument is that there still must

12    necessarily have been copyright infringement by ACE

13    American, right?

14         So under our reading of Section 10.8, the second

15    sentence has nothing to do with the first sentence.  The

16    first sentence is about real assignments, and you need a,

17    you know, permission for that.  The second sentence, as

18    Judge Wright held was reasonable, is that a change of

19    control or any of the other events results in a deemed

20    assignment.

21         Now a deemed assignment is still an assignment.

22    An assignment means you are assigning something from one

23    entity to another entity.  So the fact that it uses the

24    word "client" in there doesn't mean that there's no

25    assignment if there's a deemed assignment.

1          It means that if the client engages -- if there's

2     a change of control of the client or if the client is

3     merged with or acquired by another company, et cetera,

4     et cetera, that results in a deemed assignment, and we say

5     you don't need consent for that.  You only need consent for

6     expanded use.

7          And one of the arguments we want to put before

8     the jury, which is consistent with a letter that

9     Mr. Carretta wrote right at the beginning of all this, is

10    that the assignment we're talking about is to the acquiring

11    company, right?  That's the consequence of our construction

12    of the agreement.

13         If you don't need written consent and there is

14    just a deemed assignment, what the agreement means, we'll

15    argue to the jury, is that there has been an assignment as

16    a matter of law.  The assignment has to be from somebody to

17    somebody, and the "from somebody" is Federal and the "to

18    somebody" is, you know, ACE Limited or ACE INA Holdings.

19    It doesn't matter.  Okay?

20         THE COURT:  Hang on.  Bear with me.  All right.

21    I'll just do it from what you just said.

22         MR. METLITSKY:  Mm-hmm.

23         THE COURT:  Your point, your construction of 10.8

24    is that if the client undergoes some event that's deemed an

25    assignment, boom, we're now in section -- or we're in

1    sentence two.  If that happens, then no expanded use may be

2    made.

3            But I purposefully phrased that in the passive

4    voice because Mr. Hinderaker's argument is, client may make

5    no expanded use.

6            MR. METLITSKY:  That's right.

7            THE COURT:  And so your argument then turns back

8    to, once that event occurs, it necessarily carries with it

9    a redefinition of "client."

10           MR. METLITSKY:  Yeah.  So this is Judge Wright's

11   explanation of our reasonable, you know, construction.  The

12   plain language of this clause reflects that after a deemed

13   assignment occurs, such as Chubb Corporation's merger,

14   Federal is prohibited from making expanded use of Blaze

15   Advisor without first obtaining FICO's written consent.

16           But that doesn't mean that Federal is the client.

17   There's been an assignment, right?  There's been an

18   assignment.  And an assignment has to be from somebody to

19   somebody else.  That's the only meaning of assignment, or

20   at least it's a plausible meaning of assignment that we can

21   argue the to the jury, right?

22           So who would it be to?  In the context of a

23   change of control, I assume it's got to be to the new

24   controlling entity.  And so if we're right about that,

25   right, that there's been an assignment to either ACE

1        Limited or ACE INA Holdings, then that entity is the

2        client, and all of its affiliates now have the right to use

3        the software so long as there's no expanded use, right?

4                And both Federal and ACE American are affiliates

5        of both ACE Limited and ACE INA Holding.  That's the,

6        that's the basic argument.

7                And again Mr. Carretta's letter at the, you know,

8        we've seen those letters going back and forth.  His

9        argument was that the assignment was to at the time it was

10       called Chubb Limited, because the name had already changed,

11       but, you know, the big company, the one at the very top.

12       We just want to present that argument to the jury, and if

13       we're right about that, then ACE American is a, is a

14       licensee.

15               And then we have to -- oh, and then there's this

16       argument that there's some kind of judicial admission,

17       which is totally wrong.  We were making a legal argument

18       that there wasn't a change of control, a legal argument

19       that was eventually rejected by the court.

20               And what we said was, there wasn't a change of

21       control.  Federal itself remained the same following the

22       merger.  So there was no change to the entity of FICO's

23       client.

24               The implicit point there was that if there was a

25       change of control, as I think was made clear in the summary

```
1    judgment opinion, then Federal would no longer be the

2    client.  Somebody else must be the client.  Well, who could

3    it be?  Right?  So that's the first argument.

4           There's no judicial estoppel there or anything

5    like that, right, because the court didn't accept our legal

6    position that there was no change of control.  So we're not

7    precluded from making a new argument now.

8           And then we have two fall-back arguments.  If you

9    don't think that for some reason there was a deemed

10   assignment on, you know, whenever the first merger

11   happened, when ACE American took over all the employees of

12   Federal, how could that not be a reorganization?  And in

13   the context of reorganization, it's like the new company

14   must be the deemed assignee, otherwise what does this

15   clause even mean on our reading, right?

16          In that case, ACE American would be the licensee

17   also.  And then the third argument is, to the extent that

18   none of that is true, and, you know, Federal breached the

19   license by allowing ACE American to use it, we should be

20   able to argue to the jury that there wasn't a material

21   breach because all that happened was the name of the

22   company changed.

23          So, Your Honor, these are all arguments we want

24   to make to the jury.  That's all.  And they're certainly

25   supported by the contract.  They're supported by the
```

1    evidence, and there's no basis to preclude us from making

2    it.

3              THE COURT:  Thank you, Mr. Metlitsky.

4              Go ahead, Mr. Hinderaker.  Here's what I'm going

5    to do, though:  In an effort to keep us on the track that

6    I've hoped to be on, I'm going to dispense with argument on

7    Federal's counterclaim, unless that's what you stood up to

8    address.

9              I think you're standing up to say something in

10   response to Mr. Metlitsky.

11             MR. HINDERAKER:  I am.  I want to just try to

12   make some bullet points if you will.

13             THE COURT:  Sure.

14             MR. HINDERAKER:  To be that direct.

15             Just to point out, just to point out what their

16   argument depends on.

17             One thing it depends on is that it depends on a

18   deemed assignment, something considered to be an

19   assignment, to be a real assignment.  If we were dealing

20   with a real assignment, we would be in the first sentence.

21   Deemed assignment is for a different purpose.

22             Then there's this sort of quick, quick shift

23   between Federal being acquired by Chubb Limited and then

24   ACE INA Holdings, Inc., to acknowledge the stipulated fact

25   that Federal became wholly-owned by ACE INA Holdings, Inc.

1              ACE INA Holdings, Inc., was the entity that was

2        created to be the merger entity.  ACE Limited creates INA

3        Holdings, Inc., and the Chubb Corporation goes into ACE INA

4        Holdings, Inc.  The facts are different than said.

5              I'm happy to look at the Carretta letter, and I'm

6        sure the court will.  It's Plaintiff's Exhibit 90.  On the

7        notice of breach letter, he addresses it to Chubb Limited.

8        He says I'd be happy to have a new license agreement with

9        you, Chubb Limited, going to the highest level of the

10       control.

11             I've read it a few thousand times.  He talks

12       about the deemed assignment of the second sentence.  That's

13       to suggest that -- to suggest that Mr. Carretta says, let's

14       make an assignment to you, Chubb Limited.  That's not in

15       the letter.

16             Also, did you notice in the argument that the

17       definition of affiliates changes?  Rather than the

18       definition in Amendment two, somebody downstream, that you

19       own more than 50 percent of.  Now the argument depends upon

20       everybody being an affiliate, because they're all under the

21       same big tree of Chubb Limited.  That's not the license

22       agreement.

23             And by the way.  Federal still exists, it's still

24       a judicial or jural entity.  And that have fact and that

25       proposition is purely one of law.  It is for you to decide,

```
 1      Your Honor.  It doesn't matter that corporations that exist
 2      and still exist are different from other corporations that
 3      exist and still exist.
 4            And doesn't matter that Federal Insurance Company
 5      and ACE American are not affiliates, as that is defined by
 6      the license agreement.  It's a matter of looking at the
 7      corporate tree that's in evidence, and the judgment is
 8      right there.
 9            So I find the argument that they have to be one
10      that requires shifting definitions and a passing reference
11      to who actually acquired who and who actually is owned by
12      whom.
13            Thank you.
14            THE COURT:  All right.  Thank you.
15            MR. METLITSKY:  Can I just say one last thing?
16            THE COURT:  Yes.
17            MR. METLITSKY:  On the definition of "affiliate,"
18      it says, "Shall mean any other entity directly or
19      indirectly controlled," by the client so it doesn't have to
20      be a direct subsidiary.
21            THE COURT:  Understood.
22            MR. HINDERAKER:  And I do not disagree.
23      Indirectly or otherwise, Federal and ACE American are not
24      in that relationship.
25            MR. METLITSKY:  That is true.  Our argument is
```

1    not that ACE American is -- yes.

2            THE COURT:  Your argument is that the client

3    changed.

4            MR. METLITSKY:  Yes.

5            THE COURT:  All right.  We're going to take a

6    recess.  I'll be back hopefully in here at quarter after

7    3:00, and I'll tell you what we are doing on these various

8    motions.

9            I would strongly suggest -- we're off the record.

10           (Recess taken)

11

12                    **P R O C E E D I N G S**

13    **IN OPEN COURT**                    **3:21 p.m.**

14           THE COURT:  All right.  First turning to Docket

15    Number 1128 and the associated, that's Federal's motion,

16    but FICO's response also requested relief, but was not

17    docketed as a separate motion.  So I'm referring to both by

18    the reference to 1128.

19           On the question of the breach or infringement by

20    use by foreign affiliates, this turns on the definition of

21    Chubb & Son, a division of Federal.  The question is what

22    does that phrase mean.  Does it mean Federal Insurance

23    Company, or does it literally mean Chubb & Son, a division

24    of Federal.

25           I find that as a matter of law, Chubb & Son, a

1    division of Federal, means Federal Insurance Company.  An

2    unincorporated division is not a legal entity, and even

3    though it can sign contracts, it cannot be sued for the

4    contracts.

5         And when it does enter into contracts, it doesn't

6    do that independently of its corporation of which it's a

7    division.

8         I have read every one of the cases that have been

9    cited.  I believe that this finding is required by New York

10   law.  I think all of the cases say that.  And so as a

11   matter of law, I'm finding that Chubb & Son, a division of

12   Federal Insurance, has to mean Federal Insurance Company.

13        And I will also note that were it to mean

14   otherwise, I think it would be, it would lead to an

15   impossible result.  It would literally mean that the

16   license grant to Chubb & Son employees, or the restriction

17   that doesn't allow it to be used beyond employees, would

18   mean that no one could use it, given the testimony that's

19   been in the case.  It would also render the definition of

20   affiliates in the original license agreement meaningless.

21        So as a result of that then, there can't be a

22   breach of the contract or an infringement through use of

23   the Blaze Advisor software by Chubb Canada, Chubb Europe or

24   Chubb Australia.

25        Turning to the question of use by third-party

1    consultants, Federal urges that that use is di minimis.  It

2    was allowed; and therefore, FICO could not terminate the

3    contract because it was not a material breach.

4            The first question is whether a nonmaterial

5    breach is nonetheless actionable or can be the basis for a

6    verdict in FICO's favor, and the answer under New York law

7    clearly is that it can.

8            FICO urges that because the use is proven, it is

9    entitled to judgment as a matter of law that the contract

10    was breached.  But there's been evidence from which a jury

11    could reasonably decide that the use was known, consented

12    to, harmless and not a breach.

13            So I am not finding as a matter of law that the

14    use by third-party consultants was a breach, and I am not

15    finding that it was not a breach.  That is for the jury to

16    decide.

17            Federal nonetheless urges the court to hold that

18    the breach, if it was one, was not material as a matter of

19    law and therefore FICO could not have properly terminated

20    the license agreement on this basis.  I find two flaws with

21    that argument.

22            Number one, though New York law says a breach

23    must be material in order to terminate a contract,

24    Section 9.2 (C) of the license agreement can reasonably be

25    read to mean that FICO could terminate the agreement even

1    if this particular kind of breach, which is to say a breach

2    of the license grant, which could then be interpreted to

3    include a breach of the restrictions on the license grant,

4    that that provision could be reasonably read to mean that

5    you can terminate the contract without a material breach.

6              Even if that weren't reasonable, based on the

7    evidence at trial, including the structure and content of

8    the license agreement and the testimony of several

9    witnesses, this jury could reasonably find that the breach,

10   despite the magnitude of the use, could still be material.

11             So Federal's motion is granted in part to the

12   extent with respect to the Chubb Canada, Chubb Europe,

13   Chubb Australia and then denied as to the rest of it.

14             FICO's counter motion is denied.

15             On disgorgement, I am going to deny the motion at

16   this stage based on the state of the evidence.  And because

17   the verdict is advisory, I think the court will benefit

18   from the jury's advice on that finding, whatever it is.

19             However, at the end of this case, it is an

20   advisory finding, and I will exercise my own best

21   independent judgment on this question, even if it means

22   departing from the advisory verdict, whichever way it goes.

23             Docket 1135 then is denied.

24             Docket 1148, FICO's judgment for a matter --

25   judgment as a matter of law on infringement by ACE

1    American.  I will also deny this motion.  Federal's

2    position with respect to ACE American is not unfairly

3    prejudicial, nor do I find that it is a surprise.

4         It is not inconsistent, in my judgment, with

5    Federal's position as to the meaning of the phrase "client"

6    in the license agreement, and the testimony at trial would

7    permit a reasonable jury to find either way on the issue of

8    ACE American's alleged infringement.

9         And I do also rely on Judge Wright's analysis of

10   this issue, even though it was stated in terms of the

11   breach, rather than the infringement, at approximately

12   pages 45 to 50.

13        FICO's judgment, FICO's motion for a judgment as

14   a matter of law on Federal's counterclaim.  I am going to

15   deny the motion for JMOL.  Federal has put in evidence

16   during the trial that it sustained damage in the form of

17   costs and time to remove Blaze Advisor, as well as in the

18   form of loss of use of a license that it claims it had in

19   perpetuity, despite the merger.

20        However, Federal has not offered a calculation of

21   the value of the lost time of its employees or the cost of

22   removing Blaze Advisor from its software.  And so it will

23   not offer a calculation in final argument.

24        There is considerable evidence in the record as

25   to the parties' allegations regarding the value of the use

1    of Blaze Advisor, and that evidence is also in the record

2    and could be used, if desired, regarding the counterclaim.

3              So that's the ruling on the motions as described.

4              On the request to take the counterclaim at the

5    end of the case, I'm going to deny that request.  You will

6    have to address it in your summation initially.

7              MS. GODESKY:  Thank you, Your Honor.

8              THE COURT:  All right.  Any questions regarding

9    these motions?

10             Mr. Hinderaker?

11             MR. HINDERAKER:  No, Your Honor.

12             THE COURT:  All right.  Thank you.

13             Ms. Godesky, any questions?

14             MS. GODESKY:  No, Your Honor.

15             THE COURT:  Okay.  Let's turn then to the jury

16   instructions and special verdict form.  Will you all be

17   staying, or will some be departing?  You're all welcome to

18   stay.  I'm just --

19             You have a temperature update.  What is it, that

20   it's hot?

21             THE CLERK:  I do.  That's not so much an update.

22             THE COURT:  It's not an update.

23             THE CLERK:  According to the U.S. GSA, the

24   outside air unit is down and is impacting the temperature

25   throughout the building.  We are working on this and will

```
1    update you all as soon as we have further information.

2    Thank you for your patience.

3              THE COURT:  Okay.  That's right.  The windows

4    don't open.  All right.  So it's going to remain hot.

5              So let's take up the jury instructions.  You've

6    all been given a copy of them.  And I'm just going to go

7    through them in order and ask you each if you have any --

8    if you contend that the instruction is contrary to law or

9    unfairly prejudicial.

10             So the first instruction, which is very general,

11   is only on the first page.

12             Mr. Hinderaker, any concern with that page?

13             MR. HINDERAKER:  Are you speaking about the very

14   first page or --

15             THE COURT:  The very first page.

16             MR. HINDERAKER:  No.  No.  No problems, Your

17   Honor.

18             THE COURT:  Okay.  Ms. Godesky, Mr. Metlitsky?

19   Who's going to talk on your behalf, Mr. Metlitsky?

20             MR. METLITSKY:  Yes, and no concern.

21             THE COURT:  Okay.  The next one is burden of

22   proof.  Any concern, Mr. Hinderaker?

23             MR. HINDERAKER:  No, Your Honor.

24             THE COURT:  Mr. Metlitsky?

25             MR. METLITSKY:  I don't object to it, but I would
```

1    offer a suggestion because I'm concerned that "proved by

2    the greater weight or preponderance of the evidence" sounds

3    like those are two different things.  And so I would

4    suggest by the "greater weight of the evidence also called

5    the preponderance of the evidence" or some such

6    formulation.

7              THE COURT:  Are you okay with that amendment,

8    Mr. Hinderaker?

9              MR. HINDERAKER:  I am, Your Honor.

10             THE COURT:  All right.  Okay.  That change will

11   be made.

12             I'm going to amend the way I'm doing this.  I'm

13   going to read the title of the instruction, and if I hear

14   nothing, I will move on to the next one and understand that

15   nobody has an objection.

16             Credibility of witnesses.

17             Impeachment.

18             Expert opinion.

19             Deposition testimony.

20             Corporate representative testimony.

21             Limiting instruction regarding Exhibit P1116.

22             Other software license agreements.

23             Demonstrative summaries not received as evidence.

24             Now I know what's coming.  Breach of contract.

25             Mr. Hinderaker.

1          MR. HINDERAKER:  No concerns, Your Honor.

2          THE COURT:  Okay.  Mr. Metlitsky.

3          MR. METLITSKY:  No concerns with the text, Your

4    Honor, but -- and I don't know if it would go here or

5    somewhere close to here, but we do think we're entitled to

6    a course of conduct -- or extrinsic evidence instruction,

7    because we notice that the, you know, it says that here are

8    the elements of breach, but it doesn't tell them how to --

9    what evidence they're allowed to look at to figure out what

10   the contract means.

11          I have, you know, a suggestion, but, you know,

12   there's -- these are sort of form instructions.  But the

13   basic point is, you know, they should be able to look at

14   the language of the agreement, how a reasonable business

15   person would have understood the language, what the parties

16   actually intended.

17          And then they can look for that, you can consider

18   evidence of the parties' prior negotiations, circumstances

19   surrounding the formation of the license agreement, and you

20   may also look to how the parties conducted themselves after

21   the license agreement was executed.  Something like that,

22   because otherwise there's no -- there's no guidance to them

23   about what they're allowed to look at.

24          THE COURT:  It's a fair comment.  Before I hear

25   from Mr. Hinderaker, let me just make a comment in

1    response, which is:  What I don't want to do is, you know,

2    we're standing on the edge of a slippery slope, but that

3    one seems reasonable to me if generically phrased.

4            Mr. Hinderaker.

5            MR. HINDERAKER:  I would like to see it to see

6    how specific it gets.

7            THE COURT:  Sure.

8            MR. HINDERAKER:  It strikes me that now -- that's

9    the sort of thing that one talks about in closing argument,

10   if there are facts that bear on those different elements.

11           THE COURT:  Yeah.  It will not -- I can guarantee

12   you it won't address any facts.

13           MR. HINDERAKER:  No, I don't mean it would say

14   factually, but what I'm saying, in closing argument either

15   of us can talk about what goes into the considerations from

16   the record, consistent with the generality of the jury

17   instructions.

18           THE COURT:  Say that again.

19           MR. HINDERAKER:  The jury instruction advises the

20   jurors that it's their judgment to make these decisions.

21           THE COURT:  Right.

22           MR. HINDERAKER:  And closing argument, the

23   lawyers can say, well, from the evidence this bears on that

24   decision or something else bears on that decision.  And I

25   think that's fine closing argument.

1           I don't think it needs to be, the instruction

2      doesn't have to have a series of bullet points to,

3      suggesting that something is not within the framework of

4      what can be said.

5           THE COURT:  Yeah, and I -- let's do this.  After

6      this conference, we'll draft an instruction for your, both

7      of your review.  It will certainly be structured as, you

8      may consider this, this, this, this, and any other evidence

9      bearing on the meaning.

10          And we'll see what you think of that.

11          MR. METLITSKY:  That would be fine.  And just --

12     I'm sorry.  Go ahead.

13          MR. HINDERAKER:  I was just going to make a

14     housekeeping -- when we're done with this discussion, I

15     just wanted to make a housekeeping comment.

16          THE COURT:  Okay.

17          MR. METLITSKY:  I was just going to say that

18     there's already an instruction that says you can't look at

19     the --

20          THE COURT:  Right.  The settlement agreements.

21          MR. METLITSKY:  It seems like we should tell them

22     what they can look at.

23          THE COURT:  I agree -- I'm sorry.  We should not

24     talk over each other.

25          I agree that it would be probably prudent.

```
 1              Mr. Hinderaker, what's your housekeeping comment?
 2              MR. HINDERAKER:  I was just going to say that I
 3    presume this is the case, but in terms of preserving FICO's
 4    record with respect to the jury instructions, I don't
 5    intend to repeat the court's decisions on all the arguments
 6    that we have just made, so it's understood that if we had a
 7    contrary temporary position then --
 8              THE COURT:  Absolutely.
 9              MR. HINDERAKER:  -- and conflict with the
10    instruction that our objection with respect to that is
11    preserved.
12              THE COURT:  All of that is preserved, as well as
13    the court's rejection of previously proposed, but not
14    adopted instructions, should you decide to raise those
15    issues.
16              Okay.  Breach of contract materiality.  I think,
17    Mr. Metlitsky, you have a concern about this one.
18              MR. METLITSKY:  Yes, Your Honor.  So two grounds
19    for the -- well, first of all, let me tell you concern.  I
20    think you know what it is.
21              But there's language, so just take the first
22    sentence, a breach -- sorry -- the third sentence,
23    performance by the non-breaching party is excused only if
24    the breach is material or if the contract provides
25    otherwise.
```

1           That, and there's language to that effect

2      throughout the charge.

3           So we think that is both contrary to the law of

4      the case and also incorrect as a matter of law.  We're only

5      raising now the incorrectness as a matter of law because we

6      thought that everyone was bound by the law of the case.

7           So let me go through the law of the case first.

8      I'm sure Your Honor recalls when you said that if it

9      weren't blindingly obvious, you were going to follow

10     Judge Wright's decision.  So I just want to take you

11     through the briefing.  Okay?

12          In their summary judgment motion, they said they

13     want a judgment that they properly terminated the agreement

14     on the ground of the third-party consultants.  Right?

15     Okay.

16          So we opposed.  Here's what we said in our

17     opposition:  "There is no breach and certainly no material

18     breach to justify recission of the licensing agreement,"

19     and we cited *VFS Financial versus Falcon Fifty*, which

20     holds -- that's the New York breach standard:  A breach is

21     material if it goes to the root of the agreement between

22     the parties, et cetera.  Right?

23          And then we said, whether a breach is material is

24     a question of fact.

25          So they said in their response, "Any violation of

1    the license grant is material.  Compare Section 9.2(c) with

2    Section 9.2(a)," So exactly the argument they are making

3    now.  In response to our argument that that *VFS* case

4    provides the materiality standard, they said no 9.2(c)

5    overrides.  Okay?

6            So here's what Judge Wright said:  "FICO also

7    contends that Federal breached Section 3.1 by permitting

8    the consultants to use Blaze Advisor," et cetera et cetera.

9    "A breach of contract is material if it goes to the root of

10   the agreement between the parties and is so substantial

11   that it defeats the object of the parties from making the

12   contract, citing *VFS Financial Versus Falcon Fifty*, the

13   exact case that we cited.

14           "Whether the breach of contract is material is a

15   question of fact," citing the exact case we cited.  And

16   then it said that, you know, it's going to be a jury

17   question.

18           So we were operating on the assumption, because

19   Your Honor said so, that we were, the parties were going to

20   be bound by Judge Wright's decision on that question.  And

21   so a breach of Section 3.14 by these, you know, with these

22   third-party consultants was going to require proof of a

23   material breach to justify the termination.

24           And so we didn't put on a case about this.  And,

25   you know, we had a conference on the record on Thursday

1    where the court suggested that the court agreed with us.

2    You said something to the effect of it says materiality in

3    the rule or anything.

4          The first, you know, we heard of this, the

5    possibility that the court wasn't going to follow

6    Judge Wright's decision, was yesterday whether we got this

7    proposed charge.  And what are we supposed to do now?  You

8    know, we didn't put on a case about how to construe

9    Section 9.2(c), because Judge Wright already construed it.

10         And so we think we're entitled to an instruction

11   that just says, the termination is allowed if the breach is

12   material under the New York materiality standard because

13   that is exactly what Judge Wright held.

14         THE COURT:  Well, what page are you referring to

15   in Judge Wright's ruling, if you would?

16         MR. METLITSKY:  So it's 44 to 45.

17         THE COURT:  All right.  Just hang on a second.

18         MR. METLITSKY:  And -- and I think just as

19   important as her ruling is the briefing that sort of

20   resulted in her ruling.

21         THE COURT:  Well, it's a little bit like the

22   briefing that you just argued regarding the infringement by

23   ACE.  I'm not sure that -- I have to read it again, but I'm

24   not sure that the briefing precludes the argument that

25   9.2(c) doesn't require materiality.

1              But let me review this.

2              THE COURT:  All right.

3              MR. METLITSKY:  Your Honor, can I add one more

4     thing?

5              THE COURT:  You may.

6              MR. METLITSKY:  I think that opinion has to be

7     read in light of the briefing that preceded it, right?  And

8     as I said, our response to their argument that they're

9     entitled to judgment that the termination was proper was

10    that recission is, whether the recission was proper is a

11    question for the jury, citing the *VFS Financial* case

12    providing the New York standard and then the next case for

13    the proposition that it's as a matter of law.

14             And their reply said any violation of the license

15    grant is material, and they cited Section 9.2(c).  And

16    obviously Judge Wright rejected that.  That's the whole

17    point of her opinion because if she had accepted it, she

18    would have granted them judgment; or at the very least, or

19    at the very least she would have said that there's an

20    ambiguity in the contract about what standard you had to

21    satisfy, but she said what standard you have to satisfy.

22             THE COURT:  How is this -- but, you know, here's

23    where I think -- you're making an argument that sounds a

24    lot to my Ear like the argument Mr. Hinderaker made about

25    10.8 and the infringement by ACE American.

```
 1              You moved for summary judgment on the grounds of,

 2      can't be a material breach.  They responded to that.  And

 3      Judge Wright said, material breach based on the facts and

 4      the evidence and the argument of the cases is a matter of

 5      fact for the jury.

 6              They did not say that 9.2(c) required that the

 7      breach be material.

 8              MR. METLITSKY:  No.  They said 9.2(c) said that

 9      any breach is material.  That's what they said in their

10      brief.  That's the literal -- any violation of the license

11      grant is material under 9.2(c).

12              And Judge Wright just squarely rejected that.

13      She said, a breach of contract is material, and then she

14      cited the New York standard.

15              THE COURT:  She was -- I'm sorry.  She was

16      rejecting their, the interpretation they were proffering at

17      summary judgment, but that's not -- well, you're not using

18      this phrase.  Maybe you don't.  Maybe this isn't necessary

19      to your argument, but that certainly isn't a binding

20      judicial admission on them.

21              MR. METLITSKY:  No.  No.  No.  I'm not

22      suggesting -- it's nothing about what they said.  I'm just

23      saying that she rejected their argument because they said

24      any violation of the license grant is material.  They could

25      have won that argument.
```

1              THE COURT:  Right.

2              MR. METLITSKY:  But they lost the argument

3    because she said, a material breach is material if it goes

4    to -- not any license breaches, like the basic opposite of

5    what they said, what they said.  They said, any violation

6    of the license grant is material.

7              She said, a breach of contract is material if it

8    goes to the root of the agreement between the parties and

9    is so substantial that it defeats the object of the parties

10   in making the contract.  That's just the regular New York

11   standard.  And that's what we want charged.

12             THE COURT:  Well, but she did not construe, and

13   she was not asked to construe Section 9.2(c) as to whether

14   it required a material breach.

15             MR. METLITSKY:  But she was.  That's what they

16   argued.  Any violation of the license grant is material

17   under 9.2(c).  And she said, a breach of contract is

18   material if it goes to the root of the agreement.  I mean,

19   she just rejected their argument.

20             And so we were under the impression that that was

21   the law of the case.  I can also explain to you why she was

22   totally right.  I mean, we filed a letter on this.  But

23   it's like crystal clear that she was right that the terms,

24   that when 9.2(c) refers to the terms of the license grant,

25   what it's referring to is Section 2.

1            And the reason you know that is because there's a

2       bunch of other very similar agreements in the record that

3       when they mean, when they don't have one of those immediate

4       termination provisions, they lump Section 2, License Grant,

5       and Section 3, Rights and restrictions together, because

6       you don't need to separate out License Grant.

7            And there are other groups of contracts in the

8       record that say rather than saying there is -- you can

9       immediately terminate based on a breach of the license

10      granted, it says you can immediately terminate based on a

11      breach of the license granted or license restrictions.

12           And in those cases they group license grant and

13      restrictions together.  And that falls under, I forget the

14      name of the case, Your Honor, that we talked about long

15      ago, *Quadrant*, right, because it's exactly the same

16      language except one difference.

17           When they mean license grant and restrictions,

18      they say license grant and restrictions.  When they mean

19      license grant, they say license grant.  Here it says

20      license grant, and the contract splits out license grant is

21      Section 2.  Restrictions is Section 3.

22           And One other point on this:  Section 3.1, right

23      next to the, you know, third-party provision, includes an

24      anti-assignment provision.  It's just duplicative of

25      Section 10.8.

1                So when you breach Section 10.8, that's got to be

2        material, but when you breach the same provision, almost

3        the same provision in Section 3.1, it doesn't?  That

4        doesn't make any sense.  So Judge Wright was exactly

5        correct when she held that the New York materiality

6        standard applies, because that's totally clear under the

7        agreement.

8                THE COURT:  Okay.  Would you agree with me that

9        as a statement of New York law, set aside law of the case,

10       set aside for a moment what you contend Judge Wright

11       decided, that this is an accurate statement of New York

12       law:  Performance by the non-breaching party is excused

13       only if the breach is material or if the contract provides

14       otherwise?

15               MR. METLITSKY:  You know, Your Honor, I don't

16       know -- so I've seen contract provisions that just say any

17       party can terminate them, like six months' notice or

18       something like that.  And so in that sense, that is not a

19       provision dealing with termination on the basis of breach.

20               It's just, you know, termination or whatever

21       reason.  I have not seen a case where the, where the

22       parties negotiated around the materiality provision, and

23       more important, I have never seen a case, and I -- there is

24       no way you will ever find a case where the parties

25       contracted around the materiality provision in an immediate

1    termination context in a licensing agreement, because the

2    consequence of that is if, you know, Federal sends the

3    third-party consultant Blaze Advisor and says, oh, man, two

4    seconds later says, oh, goodness, I didn't mean to send you

5    that, I call it back, they can terminate the provision.

6    They put you in breach of the copyright laws, and then they

7    exact, you know, 50 million, whatever license fee they're

8    going to try to exact from you because now you've just

9    become a copyright violator.

10         That's completely implausible.  And then the

11   final point, this came up in the brief that they filed the

12   other day.  They cited Mr. Waid's testimony that one of the

13   main reasons for this provision was to preserve

14   confidentiality.

15         And so if we're going to get down this road about

16   whether 9.2(c) applies or whatever, why doesn't the second

17   sentence apply, right, that material breaches of

18   confidentiality provision?  So for like many, many reasons,

19   this is incorrect as a matter of law, and Judge Wright was

20   correct as a matter of law, that a material breach is

21   required.

22         THE COURT:  Okay.

23         Mr. Hinderaker, I'll hear you on this.  My

24   intention right now is to set this aside and keep moving,

25   and then we'll come back to it, but --

1          MR. HINDERAKER:  Your Honor, we have briefed

2     this.  We spent time today arguing it.  You made a decision

3     on it, and now we're hearing the same argument again, can't

4     let it go.

5          If you wish to have further argument on this

6     issue, I'll defer to Ms. Stradley, who is more deep into

7     the cases, and I believe in her response addressed this

8     notion of what Judge Wright did and didn't do and what she

9     considered and didn't consider, but I think we've been down

10    this path, this road, already.

11         THE COURT:  Ms. Stradley, you can stay at your

12    seat.  Just turn the microphone on.  Why don't you address

13    for me what you believe is the import of Judge Wright's

14    summary judgment ruling?

15         MS. STRADLEY:  Sure.  Well, as he said, what was

16    stated in the briefing at five -- Docket 558 at page 5 is

17    that the breach was not material.  What we argued to

18    Judge Wright was that, I'm sorry.  What we argued to

19    Judge Wright was that the breach was material and therefore

20    we had proven our case.

21         And what we're arguing here is something

22    completely different, which is that paragraph 9.2(c) does

23    not require materiality that the parties contracted around

24    materiality.  And she was not faced with that question, and

25    you can see from her analysis, she didn't even address that

1      question.

2              She simply said that there's a fact issue as to

3      whether the breach is or is not material.

4              So I think he's reading too much into her

5      decision to infer that she had actually assessed this issue

6      when there's nothing to show that she had, when the issue

7      was not squarely before her in the briefing.  The issue

8      squarely before her that was stated by FICO was that the

9      breach was material.  And that's what she addressed.

10             MR. HINDERAKER:  And could I add one comment as

11     the person who argued that issue?

12             THE COURT:  Certainly.

13             MR. HINDERAKER:  The argument was look at the,

14     look at 9.2(c) and see what rights that gives FICO when

15     there is or if there is a violation of the license grant.

16             And that difference there in that first sentence

17     relative to other parts of Section 9 itself demonstrated

18     the seriousness, the materiality, the consequently

19     importance to FICO when there is a violation of the license

20     grant.

21             We were using that contrast to point to the, just

22     as Mr. Waid testified as well, to the importance of

23     protecting the intellectual property.  And then as

24     Ms. Stradley said, Judge Wright never gets into an analysis

25     of what the, of construing the first sentence.  We weren't

1    making the argument of being able to terminate regardless

2    of materiality.

3         We were making the argument that because we can

4    terminate under those circumstances, it shows how important

5    the license restrictions and the license grant is to us.

6         So we are now at a different stage of the case.

7    And 9.2(c) has not been dealt with, except by Your Honor in

8    terms of the contracting round, as the phrase goes, how the

9    materiality and the application of 9.2(c) to the facts of

10    this case.

11         THE COURT:  Go ahead, Mr. Metlitsky.  Anything

12    further to add?

13         MR. METLITSKY:  Five seconds.  I just want to

14    point you to the cite in their brief.  It's Docket Number

15    558 at page 5, and the sentence I'm talking about is the

16    first sentence of the last paragraph, where they say, "Any

17    violation of the license grant is material.  See 9.2(c).

18    Compare that to 9.2(a)," and then they say that the

19    disclosure to the third parties is a breach, and thus it's

20    material.

21         MR. HINDERAKER:  I think I made my case.

22         THE COURT:  Okay.  All right.  Moving on, we'll

23    come back to that.

24         Termination.

25         MR. HINDERAKER:  Before we go on, this isn't an

1    objection, Your Honor.  This is just a question of whether

2    the phrasing is clear or not confusing.

3              THE COURT:  In termination or the one we were

4    just in?

5              MR. HINDERAKER:  In materiality.

6              THE COURT:  Okay.

7              MR. HINDERAKER:  So if we go to the last

8    paragraph, If you find that Federal breached the license

9    agreement, FICO was allowed to terminate the license

10   agreement, if that breach was material or, and I think

11   you'd like to add "or" if termination was expressly

12   permitted by the contract.

13             THE COURT:  Yes.  That -- if that instruction is

14   going in that direction, that language is necessary.

15             Okay.  Termination, the next instruction.

16             Construction of the license agreement.

17             Actually, now, in light of the court's ruling, we

18   have two of those.  One appears at page 15.  The other is

19   at page 16.

20             It is my intention to use the one at page 16 but

21   because it incorporates what I've ruled as to the

22   definition of client.  So your comments should be directed

23   to that instruction, recognizing, of course, that FICO

24   preserves its objection to that ruling and an instruction

25   based on it.

1          MR. HINDERAKER:  So I have no quarrel -- I mean,

2     recognizing FICO's position, page 16 is fine.

3          THE COURT:  Okay.

4          MR. METLITSKY:  Your Honor, I think it should say

5     at the end that the -- this isn't the language I'm

6     proposing, but the consequence is there's no breach by the

7     use of the foreign affiliates, because I think the court's

8     ruling is not just that --

9          THE COURT:  I've taken care of that in the

10    verdict form.

11         MR. METLITSKY:  Oh, okay.  Well, I think we

12    probably need some guidance on -- we can talk about what --

13         THE COURT:  All right.  I'm going to leave that

14    aside for the moment.

15         All right.  Breach of implied covenant of good

16    faith and fair dealing.

17         MR. METLITSKY:  We have an objection here because

18    it doesn't capture the full scope of our claim.  We talked

19    about this at the conference the day before trial, I guess,

20    and Ms. Godesky explained the two bases for the claim.  One

21    is the withholding consent.  That's one for expanded use.

22         And the other one is, what she said was, FICO

23    argued that it had just discovered use of Blaze outside the

24    United States.  We believe because the discovery in this

25    case has demonstrated that that was an allegation made in

1    bad faith because FICO had known for a decade before this

2    dispute, et cetera, et cetera.  That was page 28 of that

3    transcript.

4            And then the court, more important, the court

5    said, I'm going to try to make it really clear what I

6    believe I said in the motions in limine on this topic.

7    Federal is free to argue that FICO breached the implied

8    covenant by improperly or outlandishly raising positions

9    that were in bad faith.

10           And when that gets to the issue of the

11   territorial restriction in the license, we have to be very

12   clear not to use the court's opinions.  But clearly the

13   court allowed us to --

14           THE COURT:  Yes, and you are -- it strikes me

15   that the better way to deal with this is not to try to

16   characterize your allegation.

17           MR. METLITSKY:  Perfect.  Just strike --

18           THE COURT:  I am going to strike that.

19           Copyright infringement.

20           MR. HINDERAKER:  So, then, Your Honor, just as a

21   point on the record, we have on file, I guess, but we've

22   raised objections to this new theory of the case, after

23   interrogatory answers had a different theory and after the

24   pleadings had a different theory.

25           So until this trial started, the only basis for

1   the so-called bad faith claim, the only basis for the

2   implied covenant of good faith and fair dealing was the one

3   that's described here in the instructions.

4         This notion of an implied covenant of breach

5   because of the territorial language, that entered the case

6   in February of this year, and I don't think the court has

7   said clearly one way or the other, but we have objected to

8   new theory of the case with interrogatories never

9   supplemented, and so that's our record.

10         MR. METLITSKY:  I can respond if -- okay.

11         THE COURT:  Please do.

12         MR. METLITSKY:  So first of all, I mean I just

13   read how the court expressly allowed us to do this.

14         THE COURT:  I did.

15         MR. METLITSKY:  Yeah.  We had this fight already

16   at the motion in limine stage and at this conference.  And

17   I take it from what the court said that the court rejected

18   their argument.

19         But if we're fighting this again, the question is

20   whether there's prejudice, right?  You can, you know,

21   conform to the proof even at trial under Rule 15(b) if

22   there's no prejudice, and the idea that there's prejudice

23   here frankly is, well, they, until today they have

24   maintained in this case that their global affiliates

25   could -- were not allowed to use the license.

1          So all of the evidence, literally every single

2     piece of evidence that is relevant to this aspect of our

3     counterclaim, was invited by them when they were arguing

4     that there was no global scope to this license.

5          They even, they played deposition testimony in

6     their own case about this.  The idea that there's prejudice

7     to them that we would take all of that exact same evidence

8     that they insisted was relevant to this trial and just, you

9     know, argue it back in a counterclaim, seems to me to be

10    incorrect.

11         And so, you know, the fact that combined with the

12    fact that the court expressly already held the day before

13    trial that we were allowed to make this claim, two of those

14    things in combination, seems to me that, you know, deleting

15    that language is fine with us.

16         But as for the rest of it we're allowed to press

17    that claim, as the court held.

18         THE COURT:  I understand.  And I did make that

19    ruling.  And I do recall making that ruling.

20         I want to emphasize something that I said at the

21    time, which of course is, you will not drag the court into

22    that argument.

23         MR. METLITSKY:  That was very well-understood

24    from the language I just read, Your Honor.

25         MR. HINDERAKER:  Your Honor, with respect to this

1  then?

2          THE COURT:  Yes.

3          MR. HINDERAKER:  Because the evidence is some

4  salesmen were aware of -- the evidence is that people on

5  the sales side, Mike Sawyer, Russell Schreiber, had some

6  knowledge of use outside the United States, and their

7  understanding of the license agreement as we've heard

8  changed over time.

9          But my point is that if this is going to be in

10  the case on the instructions, then I think we should

11  address instructions that are directed to authority of

12  agents, instructions that are directed to the license

13  agreement with respect to the entirety of the agreement, no

14  amendments without writing; and instructions with respect

15  to the license agreement that says, no express waiver

16  without a writing.

17          So if the, if we're going to be impacted by the

18  knowledge of salespeople out in the sales force in contrast

19  with the knowledge of the executives, then an instruction

20  regarding whether the salespeople have authority to bind

21  FICO would be appropriate.

22          MR. METLITSKY:  Your Honor, definitely would

23  object to that.  First of all, these are high level people.

24  They were the client partners.  All that evidence came in,

25  but what -- even setting that aside, the question of

1        whether who can bind FICO is totally irrelevant here.

2              We're not saying that there was a new contract

3        formed or anything like that.  We're just saying it was a

4        bad faith claim.  And the jury, if they want to say that,

5        you know, these people -- they could say whatever they

6        want, right, and I'm sure -- they would have said all the

7        same things under their 3.1 claim, whatever they're going

8        to say in defense to our bad faith argument.

9              But the scope of authority is about who can bind.

10       And that's not what this claim is about.  It's about bad

11       faith.

12             THE COURT:  Here's -- well, I'm not going to do

13       the instructions that you suggested, Mr. Hinderaker, but my

14       understanding of this claim, even in light of what I said,

15       was that the bad faith that is alleged occurred in 2016,

16       when Mr. Carretta and others took the position that you say

17       is unfounded.

18             Well, and the court has found that it's not in

19       the contract, but that is the bad faith, that they relied

20       on a territorial restriction that isn't in the contract.

21             And, of course, quite obviously, FICO can respond

22       to that by pointing to the terms of the license and to the

23       testimony in which they have explained why it wasn't in bad

24       faith.  Okay?  All right.

25             Copyright infringement.

```
 1              Proof of damages.

 2              MR. METLITSKY:  Your Honor, my only comment on

 3    this was that we should do a nominal damages charge.

 4              THE COURT:  And that is in here.  It's coming.

 5              MR. METLITSKY:  Okay.

 6              THE COURT:  So the next one is breach of

 7    contract, implied covenant damages.  And then after that,

 8    it's nominal damages because nominal damages only apply to

 9    those claims.

10              MR. METLITSKY:  Okay.

11              THE COURT:  And you've received the nominal

12    damages instruction, correct?

13              MR. METLITSKY:  Yes.

14              THE COURT:  All right.  Next one, infringement

15    damages.

16              MR. METLITSKY:  Your Honor?

17              THE COURT:  Yep.

18              MR. METLITSKY:  Two little points, but I think

19    they're important.  First of all, licensor in the middle

20    here is capitalized.

21              THE COURT:  Yeah.

22              MR. METLITSKY:  Yeah.  And it also says the

23    licensor and the licensee, and we think it should --

24              THE COURT:  Oh, you are on a different --

25              MR. METLITSKY:  I'm sorry.  Where are we?
```

 1                    THE COURT:  I'm on page 21, infringement damages.

 2                    MR. METLITSKY:  Oh, I was going to the next one.

 3      Sorry.

 4                    THE COURT:  Determination of actual damages.

 5                    And is that where we have the issue?

 6                    MR. METLITSKY:  Yeah.  So like right in the

 7      middle of the second paragraph, there's a capital L.

 8                    THE COURT:  That's coming out.

 9                    MR. METLITSKY:  Yeah.  And at the beginning of

10      that paragraph, we think it should say a licensor and a

11      licensee because it's hypothetical.

12                    THE COURT:  I've been thinking about that since

13      you raised it yesterday, and I'm going to not make that

14      change for two reasons:

15                    Number one, I think this is an accurate statement

16      of the law, and I think it is fair for this jury to

17      consider FICO and Federal; but even with that, the phrase

18      "the licensor and the licensee" can certainly be read by a

19      jury in a generic sense.

20                    So I'm not going to make that change, but I am

21      taking out the capital.

22                    Mr. Hinderaker, any other?

23                    MR. HINDERAKER:  No, Your Honor.

24                    MS. GODESKY:  Your Honor, may I raise an issue

25      with regard to actual damages?

1          THE COURT:  You may.

2          MS. GODESKY:  So in light of the court's ruling

3    on that there can be no breach of 3.1, vis-à-vis the

4    foreign affiliates.

5          THE COURT:  Right.

6          MS. GODESKY:  We would request an instruction

7    that the jury, an explanation and instruction that the jury

8    was presented with certain license fee calculations by

9    Mr. Waid, including use in Canada, Australia and Europe,

10   right, his $50 million number that was constructed around

11   Chubb's actual use, right, and then Mr. Hinderaker walked

12   him through how you would apply that to the, quote unquote,

13   "standard pricing guide at FICO."

14          But I think we need, you know, some guardrails

15   along with your instruction about how that's no longer in

16   the case.  I think we need to be telling them, you know,

17   I'm just sort of thinking about it now, right, but there

18   needs to be some sort of instruction and explanation as to

19   how more than half of the damages that they've been

20   presenting are out of the case, in terms of that

21   hypothetical license fee.

22          THE COURT:  I have to confess that I don't

23   remember the numbers specifically with respect to that

24   issue.  I thought you were going to the, I think the

25   Zoltowski issue of 154 million, which is --

1              MS. GODESKY:  That too.

2              THE COURT:  -- also in the case.

3              MS. GODESKY:  Yes, that too.  But the $50 million

4      hypothetical license fee was built around the assumption

5      that it would be possible, you know, that there's a need to

6      find a license fee that would cover infringing use by

7      Canada, Australia and Europe.

8              So I just, I think we need to level set with the

9      jury in terms of what's changed.

10             MR. HINDERAKER:  A comment:  We were very

11     careful, and the court was quite instructive and direct, in

12     the fact that after applications were sized, if you will,

13     that pricing matrix against the defendants' data, the next

14     slides and all of the next slides on the named application

15     license never identify an application.

16             The testimony was, if you have a certain mix, and

17     here we have some very large, some large, this is how the

18     pricing works out.  It was never identified to be an

19     application in the U.S. or anywhere and never identified to

20     be an application.  So there isn't that issue.

21             Secondly, when the testimony turned to, well, how

22     would you price it with a perpetual, again, there was never

23     a reference to -- we had a hypothetical $35 billion company

24     and we had a hypothetical $3.5 billion company.  It was

25     never identified where does 3.5 come from.

1          We just, the jury just heard, well, let's see how

2     it works out if you have a tenth of the size of the

3     company, and that's the information that they got.

4          THE COURT:  And the infringing use at the point

5     of the hypothetical negotiation is not based on whether the

6     affiliates could use it while the license was in play.  So

7     I don't think I should do that instruction.  There just --

8          They're hypothetically negotiating over the use

9     that was made, which includes Canada and the UK, maybe not

10    much of Australia.  But, in other words, it's still

11    appropriate to consider that use because the infringement

12    isn't based on the territory restriction.

13         You are not following me.

14         MS. GODESKY:  No.  I'm following you on the

15    infringement piece.

16         THE COURT:  Okay.

17         MS. GODESKY:  But I still think there's a big

18    problem on the actual damages piece, because, you know,

19    whether the slides were labeled Chubb's use of Blaze or

20    not, Mr. Waid walked through, Chubb had a very large

21    application in Australia.  I'm making up the country,

22    right, but it was very large in Australia, and it was used

23    for four years.  And then the chart he put up right after

24    that was very large, four years, price, and all of it

25    totaled up to $50 million.

```
1          So, you know, if the jury is tracking what was

2    being presented, they're thinking that there's a

3    $50 million license fee covering the use that was discussed

4    during Mr. Waid's direct examination.

5          THE COURT:  Prior to 2016.

6          MS. GODESKY:  Correct.

7          MR. HINDERAKER:  Well, $50 million isn't all

8    prior to 2016, but the -- the jury is going to be

9    instructed -- the jury is going to hear the court's

10   instructions.  The argument is going to conform with the

11   court's instructions and the court's rulings.

12         And from the termination of the license

13   agreement, we will be looking at those applications, and we

14   will be going through the sizing and pricing and the

15   testimony that relates only to those applications.

16         Some of those applications will be the Canadian

17   application and will be the UK application for license fee

18   because those uses carried on after the license agreement

19   was terminated.

20         So today the client is Federal.  Today they're

21   affiliates of Federal, and they were clients and affiliates

22   but not after March 31, 2016.  So those application names

23   are going to be in the case as well.  I think the jury's

24   just going to hear our closing argument in light of your

25   instructions.
```

1           And will the numbers be different overall?  Sure.

2     But they're going to hear what we're asking for.

3           THE COURT:  As I'm hearing all this, it strikes

4     me that Mr. Metlitsky's suggestion back on construction of

5     the license agreement with adding a sentence that says that

6     I found that -- this isn't the exact language I'll use, and

7     you get to see the language.

8           But prior to 2016, the license -- it was not a

9     violation of the license agreement to use the software by

10    Chubb Canada, Chubb Australia, Chubb UK.  And I think that

11    will give you what you need in final argument to discuss

12    what you need about the numbers for the actual damages.

13          I understand your concern.

14          MS. GODESKY:  May I reference that expressly?

15    You know, the judge just instructed you that --

16          THE COURT:  Yes.

17          MS. GODESKY:  -- however it is that you phrase

18    it.

19          THE COURT:  Yes.

20          MS. GODESKY:  And then address it that way?

21          THE COURT:  Yes.

22          MS. GODESKY:  My second -- I would propose, just

23    so we're all on the same page, that at a certain time

24    tonight soon, to the extent there's going to be a

25    demonstrative that would summarize --

1          You know, Mr. Waid put up his demonstrative that

2     they got to 50 million.  I would expect they would have

3     probably used that in closing.

4          I think I have to close first.  I'm sort of

5     flying blind, you know.  Mr. Hinderaker is saying it's

6     going to conform to the court's ruling, but I think it

7     would be in everyone's interest for us all to just make

8     sure we don't have any dispute about that before openings

9     start in terms of, if you take the $50 million number and

10    extract the pre-2016 use, right, what's the number and how

11    are they going to say they get there?

12              THE COURT:  I think that's fair, but --

13              MR. HINDERAKER:  I hope that both sides exchange

14    their --

15              THE COURT:  Right.

16              MR. HINDERAKER:  -- their demonstrative slides.

17    I hope both sides exchange their demonstrative slides

18    timely after they're prepared.

19              THE COURT:  They will.

20              MR. HINDERAKER:  But I can't exchange what I

21    don't have.

22              THE COURT:  No, I understand.

23          So if you both need me to set a time, I will, but

24    it seems to me that you guys are better off just agreeing

25    on a time at which you will exchange those tonight at a

1    reasonable hour, recognizing lawyers' definition of

2    "reasonable" in this context.

3            MS. GODESKY:  So we did not have an agreement to

4    exchange demonstratives for closing.  I mean, is it the

5    court's order that we need to do that in terms of, you

6    know, I mean, most of this is in evidence.

7            THE COURT:  Right.  Well, you're going to have to

8    exchange it before you give the closing, obviously, yes.

9    You know, let me put it this way:

10           Well, nobody wants a situation where somehow a

11   demonstrative is used during closing that is wildly

12   inappropriate or would constitute some grounds for arguing

13   error or objecting even.

14           I take your point.  I guess the parties probably

15   don't want to exchange them before closing; and if that's

16   the case, then I would say -- I take Mr. Hinderaker at his

17   representation, but let's do this:

18           If you're going to use a slide about that actual

19   damages negotiation, why don't you at least submit it to me

20   for in camera review this evening.  And, Ms. Godesky, if I

21   have no concern with it, we'll have to go.

22           MS. GODESKY:  That's fine with me, Your Honor,

23   but I would ask that we should know what the number is.

24   You know --

25           THE COURT:  What is the number?  I mean, is

1      this --

2                  MS. GODESKY:  I think it takes out more than

3      half, but, you know --

4                  THE COURT:  That should be a matter of testimony.

5      Isn't it already in the record?

6                  MR. HINDERAKER:  Sure.  She has the information

7      from the slides from -- and our demonstratives with

8      Mr. Waid.  It's a matter of just doing the math.

9                  THE COURT:  Okay.

10                 MS. GODESKY:  Okay.

11                 THE COURT:  Okay.

12                 MR. HINDERAKER:  I mean, we know the

13     applications.  We know the new time period.

14                 THE COURT:  Well share the number with each other

15     in case you don't agree.  Okay?

16                 MR. HINDERAKER:  Once we figure out -- yeah, but

17     it's math for us too.  Just have to do the math.  So I'm

18     happy -- let me back up for a moment.

19                 I'm happy to share the number once we have it.

20     And then if we're not going to exchange closing slides, I

21     get that point as well.  But then maybe there's no reason

22     for us to send you a slide.

23                 THE COURT:  There is none.  I agree with you.

24     Share the number.  Make sure you are on the same page.  If

25     you are not on the same page, I expect I will hear

1    something.

2                    MR. HINDERAKER:  You will hear.

3                    MS. GODESKY:  Thank you.

4                    THE COURT:  Other than -- okay.  So I think we're

5    done on determination of actual damages, having rejected

6    Mr. Metlitsky's request.

7                    Profits -- and by the way, thank you parties

8    for -- I don't know what lodged in my brain that I called

9    this throughout lost profits, but thanks for pointing that

10   out.

11                   Profits.

12                   Page 24, Profits:  Indirect profits.

13                   MR. HINDERAKER:  Is that a necessary instruction?

14   It is, of course, an indirect profits case, but I don't see

15   how it matters to the jury.

16                   THE COURT:  Yeah, I've been thinking about that.

17   I don't know that it is a necessary instruction.

18                   MR. METLITSKY:  Leave it up to you, Your Honor.

19                   THE COURT:  So we'll take it out.

20                   Profits:  Plaintiff's burden.

21                   MR. HINDERAKER:  We have some comments.

22                   THE COURT:  Okay.

23                   MR. HINDERAKER:  The first comment is the use of

24   the word "causal."  We have no quarrel with the use of the

25   word "nexus."  You know, we referenced Judge Wright's

1    decision, of course, and on page 7, I think it's 7, it is

2    page 7.  "In doing so the copyright owner has the initial

3    burden to demonstrate a nexus between the infringement and

4    the infringer's profits."

5              The word "causal" isn't there.

6              THE COURT:  It's not in her order; I would agree

7    with that.

8              MR. HINDERAKER:  And it starts to sneak up on

9    these arguments of "but for."  And I think nexus serves the

10   same purpose as causal without the mischief of suggesting

11   that it's more than a nexus.

12             THE COURT:  My recollection is that *Andreas* ^

13   used that word.  One of the cases cited here did.  I

14   thought it was *Andreas*.

15             Yeah, it was *Andreas*.

16             MR. HINDERAKER:  I know that she's cites *Andreas*

17   as support for the sentence that I just read.  I don't have

18   the case in front of me to know one way or the other.

19             THE COURT:  All right.

20             MR. HINDERAKER:  The next sentence, of course, is

21   after that nexus is established, then the burden shifts.

22             THE COURT:  Okay.  Let me do this -- well, let me

23   first hear from Mr. Metlitsky on this particular.

24             MR. HINDERAKER:  Okay.  I have some more comments

25   on this instruction.

```
 1                  THE COURT:  Yep.
 2                  MR. METLITSKY:  Your Honor, so we would object to
 3        taking out "causal."  We think that's the standard.  It's a
 4        causation standard.
 5                  And, you know, we don't see any reason to take it
 6        out.  The fact that it wasn't in Judge Wright's opinion,
 7        she wasn't writing a jury instruction.  So --
 8                  THE COURT:  Well, and let's be clear about
 9        something.  I -- it's not a "but for" standard.  And
10        nobody's going to be arguing that it is.  Right?  Okay.
11                  MR. METLITSKY:  Nobody's going to be arguing that
12        it is, but the word "causal" is in Andreas many, many times
13        so we would --
14                  THE COURT:  All right.  Mr. Hinderaker, keep
15        going.
16                  MR. HINDERAKER:  I'm just looking at Andreas.
17                  Andreas argues that he met his burden by
18        establishing a causal connection.  We don't have to read
19        the full case here, but I think a quick reference to
20        Andreas conforms with Judge Wright's expression of what
21        Andreas stands for, and nexus is not a component.
22                  My second point is, and the court made this
23        change some places, that is to add the phrase "at least in
24        part," which conforms with Andreas, conforms with the
25        Honeywell case and conforms with Judge Wright.
```

1              So here it would be the third line, this is

2      referred to as attribution.  FICO must identify defendants'

3      revenues that are attributable at least in part to the

4      alleged infringement.

5              Now, the court uses that phrasing in the special

6      verdict at question nine.  I don't think it's arguable that

7      that is the legal standard.  And so we would ask that that

8      phrase be added to plaintiff's burden.

9              THE COURT:  As long as you're speaking,

10     Mr. Hinderaker, other comments on this before I turn back

11     to Mr. Metlitsky?

12             MR. HINDERAKER:  No, not on this instruction.

13     Oh, I guess there is one more.

14             MS. KLIEBENSTEIN:  You got it.

15             MR. HINDERAKER:  Oh, yeah.  So I was just

16     pointing out where that same phrase should be added.  Where

17     you sum up at the end of the paragraph, that is, FICO must

18     show that the use of Blaze Advisor contributed, and it

19     should be again at least in part to the generation of the

20     revenue, just to be --

21             THE COURT:  Consistent.

22             MR. HINDERAKER:  -- consistent.

23             MR. METLITSKY:  Your Honor, we object.  We object

24     to that.

25             THE COURT:  I know you do.

1              MR. METLITSKY:  Yeah.

2              THE COURT:  All right.  I'll put that one aside

3      for the moment.

4              MR. METLITSKY:  Can I explain my objection?

5              THE COURT:  Yes, by all means.

6              MR. METLITSKY:  So on the first one,

7      "attributable to" that's just language from the statute.

8      You should not be adding language to, you know, statutory

9      language.

10             And I don't think it's correct.  I mean,

11     "contributed to at least in part" is wrong.  "Contributed

12     to" already means at least in part.  That's, it's already

13     implied in the phrase.

14             "Contributed to at least in part" is nowhere in

15     *Andreas*.  And the problem with "at least in part" is, it

16     leads into the issue that we were discussing earlier where

17     you are a small part of a big application, and they're

18     going to think that that means that just because the big

19     application contributes to revenue, this then contributes

20     in part.

21             That language is not in the governing case in the

22     Eighth Circuit.  And so I do not think we should add it

23     because it's going to cause mischief.

24             THE COURT:  Well, and I understand your point.  I

25     am inclined to agree.  And, frankly, because of this

1    causation standard, this nexus standard, I'm inclined to

2    say if I were going to add that phrase, there is a phrase

3    that I would be inclined to then add from -- it's either

4    *IBM* or *Complex Systems*.

5            And I don't think we want to start walking down

6    that path.  Let me think about this one.  I understand the

7    concerns on both sides.

8            MR. HINDERAKER:  And my last comment on it, of

9    course, there is that to the extent that defendants have

10   raised a concern with respect to what it means, I view the

11   concern as a similar effort to shift the burden.

12           The extent to which all other things, except the

13   infringement, contributes to the revenue, is their

14   obligation to show.

15           THE COURT:  Right.  And I think, you know, if

16   that phrase is out, I certainly think that you can argue in

17   final argument that you, the jury, knows what contribution

18   means.  It's means it's got to contribute in part.

19           MR. HINDERAKER:  It would be much better to not

20   have to -- I can --

21           THE COURT:  I know.

22           MR. HINDERAKER:  It's a nice argument that he

23   made, but I can read and understand contribution to be

24   quite different.  That's why the case law says contribution

25   at least in part, to eliminate that ambiguity.

1          THE COURT:  Is -- what case law uses that phrase,

2    if you know?

3          MR. HINDERAKER:  Well, we don't rely on the *Polar*

4    *Bear* case for, *Polar Bear Products* case for other reasons,

5    but that case has the phrase "at least partially caused."

6    And I can't --

7          THE COURT:  All right.

8          MR. HINDERAKER:  -- at the moment go otherwise,

9    help you with more than that.

10         THE COURT:  Okay.  Well, I'll give that some

11   further thought.

12         Profits:  Defendants' burden.

13         All right.  View of damages.  I'm sure we have no

14   problem with that, right?

15         Okay.  And then after all those are given and

16   after final argument, then the last instruction is the

17   election of foreperson.  And I assume there's no objection

18   to that.

19         Let's turn to the latest version of the verdict

20   form.

21         Mr. Hinderaker, why don't you begin?  Let's just

22   start with part one.

23         MR. HINDERAKER:  All right.  We discussed this

24   yesterday in the informal conference.  And I think I was

25   told that I wasn't saying it very well, but --

1              THE COURT:  I can just tell you.  I don't know

2      what the issue is.

3              MR. HINDERAKER:  Then I can't screw up yet.

4              Judge Wright at page 49 of her decision addresses

5      this circumstance where FICO is arguing its interpretation

6      of the, "and client shall make no expanded use."  And then

7      the defendant is arguing its interpretation of you don't, I

8      don't need your consent if I don't expand use.

9              And she says the parties vigorously dispute the

10     meaning and significance of this evidence.  And then she

11     goes on to say, "Moreover, if Federal's interpretation were

12     accepted, material fact disputes exist as to whether

13     Federal expanded its use of Blaze Advisor after the Chubb

14     Corporation merger."

15             So our theory of the case is that the consent

16     requirement applied, as the verdict form is drafted, before

17     termination.  But the defendants' theory of the case is

18     that the consent requirement doesn't apply until they

19     expand use.

20             And we've developed the case of the expanded

21     usee.

22             THE COURT:  Both before and after, or what?

23             MR. HINDERAKER:  Well, before, you know, we're

24     talking about within days of the merger.

25             THE COURT:  Right.

1          MR. HINDERAKER:  Before, we're talking about the

2    intention to expand use.  We're talking about the planning

3    to expand use.  We're talking about how the reasons for

4    having 10.8 are in play.

5          And then under Judge Wright's interpretation, if

6    the defendants' theory holds, well, then the question

7    becomes as a matter of fact did they not expand use?  And

8    we have evidence that as a matter of fact they did,

9    because, you know, the data, it shows, you know, what is

10   it, $360 million of additional volumes just in the first

11   year.

12         So we think that there should be a number three,

13   you know, which is:  Did FICO prove that Federal breached

14   paragraph 10.8 of the license agreement after March or just

15   say, did FICO prove that Federal breached Section 10.8 of

16   the license agreement and not tie it to a date.

17         But that's where the concern comes from.  We feel

18   like we're going to get caught in a catch-22.  And if we

19   can show that the defendants' representation of no expanded

20   use is in fact a false one, we don't want to be denied our

21   remedies because we got schnuckered.

22         THE COURT:  Hang on one second.

23         Judge Wright says at page 50, "FICO's argument

24   that the continued use of Blaze Advisor is a breach of

25   Section 9.3.  FICO's argument is contingent upon a finding

1      that Federal breached Section 3.1 or Section 10.8 prior to

2      March 30, 2016."

3                  MR. HINDERAKER:  That is FICO's theory of the

4      case, yes.

5                  THE COURT:  I don't think Federal is taking the

6      position that, well, we didn't expand before 20 --

7      March 30th, 2016, but we sure as hell did afterwards.

8                  MR. HINDERAKER:  Well, Federal's position is, we

9      never expanded; therefore, we never needed your consent.

10                 THE COURT:  Right.

11                 So you would want a third question or a

12     reformulation of question two to say, Did FICO prove that

13     Federal breached Section 10.8, period.

14                 MR. HINDERAKER:  Yes.

15                 THE COURT:  Mr. Metlitsky.

16                 MR. METLITSKY:  I don't think we can do that,

17     Your Honor, because it gets very complicated if you, if you

18     depart from this, because there's implications for the

19     copyright claim.  It also is not true that -- so let's take

20     the scenario that I think Mr. Hinderaker --

21                 THE COURT:  Just explain the first clause of your

22     sentence.

23                 MR. METLITSKY:  The copyright claim?

24                 THE COURT:  Yeah.

25                 MR. METLITSKY:  So let me just sort of set the

1       stage.

2               So the way this would work is, the termination

3       was improper, right, because we didn't need consent.  And

4       then let's say, I don't know what it is, a year later, just

5       hypothetically, there's expanded use.

6               First of all, it's not a breach of the agreement

7       to expand use.  It's a breach of the agreement to expand

8       use without consent, and they can't unreasonably withhold

9       it.  So what they would have to show is not just that there

10      was expanded use, but obviously we couldn't ask for consent

11      because the license was already terminated.

12              So I think you would have had to assume consent

13      was requested, and then wouldn't have been reasonable to

14      deny the consent?  I think that's what they would have to

15      show, I think, because that's what the contract requires.

16              But then let's say they did show that, right, the

17      way this works now, because it's teed off the termination

18      is, if the termination was proper, the use of the software

19      after the moment of the termination, was a copyright

20      infringement in total.

21              But if, if there's no termination, right, which

22      is by hypothesis what's happening then -- and they proved

23      expanded use, right, so like if you have an agreement to

24      use ten things and you use eleven things, only the eleventh

25      thing is a breach of the copyright agreement if the license

1    wasn't terminated.

2              So it would only -- exactly.  So the copyright

3    infringement would only be to the extent of the expanded

4    use for which it was unreasonable to withhold consent.  So

5    I don't think -- I don't know if there's any -- I don't

6    know where a jury could --

7              THE COURT:  Here's -- yeah, I understand.

8              Here's what I understand was the case that we

9    tried.  Maybe I'm wrong.  Federal says -- well, no, let's

10   start with the plaintiff.

11             FICO says, you merged and therefore received the

12   right or got the right to process the claims of the larger

13   entity and in fact did, and that is expanded use, and

14   therefore, we terminated under Section -- well, because of

15   your breach of 10.8.

16             Federal says, no, it's not expanded use.  We had

17   the same software running and the same applications doing

18   the same thing, and the only thing that ever happened over

19   time may be that our -- trying to think of the way I want

20   to phrase this -- but our revenue expanded.

21             And then you have the debate about, well, but, is

22   it organic or not organic, but that's I think the case we

23   tried.  Right?

24             And so FICO's -- what you're saying, though, is

25   you can't be snuckered by them saying, we locked it down.

1      Nothing changed.  FICO terminated the contract.  We didn't

2      think it was effective, and therefore we started expanding

3      use at that time, neener, neener, right?

4              All right.  What do you say to that?

5              MR. METLITSKY:  Well, the first thing I would say

6      is, it's not, expanded use doesn't violate the contract.

7      It is expanded use for which it would be unreasonable to

8      give consent.

9              MR. HINDERAKER:  Don't you have to ask first?

10             MR. METLITSKY:  Well, we couldn't ask because you

11     terminated our license.  By hypothesis, the termination was

12     invalid.  So their claim -- expanded use by itself doesn't

13     terminate -- doesn't breach the contract on our theory.

14     If --

15             Our theory would be that there was, there was a

16     merger.  We didn't have to seek consent, but if we expanded

17     use, then we would have to seek consent, right?  That's

18     just our theory.

19             They're saying that now by hypothesis, we're

20     right about our theory, but they terminated the license

21     anyway because we didn't seek consent.  So now who, who are

22     we supposed to ask?

23             So I don't -- so it can't just be that expanded

24     use breaches the contract because that is not the only

25     predicate in the contract for breach based on expanded use.

1          And then, as I said, I don't, I mean maybe they

2     want to -- I don't know if they want to argue copyright

3     infringement in this breach scenario.  So maybe -- I don't

4     know.  Because if they do, as I said, it would be a

5     completely different type of copyright case.

6          It would be an argument that you've expanded

7     beyond the scope of your license, but since the termination

8     would have been improper, they couldn't get all of the

9     disgorgement of all of the revenue.  They couldn't get

10    actual damages as to all the revenue.

11         It would only be the expanded use.  And there's,

12    what's the evidence of that, you know?

13         MR. HINDERAKER:  What I had proposed once a time

14    earlier was to have, was another proposal that we made once

15    upon a time was to have a third question so that you could

16    have the question prove breach before March 30th, 2016,

17    have that clarity of date, or, and then have a second

18    question prove breach without the date limitation.  That's

19    one way of --

20         THE COURT:  And would that question three, your

21    proposed question three, go after or before the instruction

22    at the bottom of the first page?

23         MR. HINDERAKER:  It would go -- after or

24    before -- I mean, it would go after three?

25         THE COURT:  Would it go after -- I've got at the

1    bottom of the first page, instruction if you find in favor

2    of Federal on both one and two, skip the remainder.

3              MR. HINDERAKER:  Yeah, so if Federal wins all

4    ways, yeah.  I mean, if Federal wins, if FICO fails to

5    prove breach before March 30, 2016, if FICO fails to prove

6    breach at any time, if FICO fails to prove breach of 3.1, I

7    mean, if FICO fails to prove its claim, Federal, Federal is

8    on all questions, yeah, then you have to skip to ACE

9    American.

10             THE COURT:  The -- well, I think, I think that --

11   all right.  This is -- I don't know the way around this.

12   I'm going to raise a complication that hasn't been raised

13   yet, because it fits in sort of here.

14             Third-party use.  If that is a breach of the

15   licensing agreement, it is copyright infringement, right?

16             MR. HINDERAKER:  Well, if the proof, if the

17   breach of the third-party use of 3.1 is proven, and it is

18   the basis of the termination, then the copyright

19   infringement -- that triggers the copyright infringement

20   against the claims of the defendants.

21             So AppCentrica, on using Blaze Advisor in an

22   unauthorized way, would be copyright infringement of

23   AppCentrica, but that's not what we're trying.

24             THE COURT:  I know.

25             MR. HINDERAKER:  Yeah.

1          THE COURT:  It's certainly not what you've been

2     after.

3          MR. HINDERAKER:  Yeah.

4          THE COURT:  I think the whole -- so it seems to

5     me that the whole question of copyright infringement has to

6     come down to whether the contract was properly terminated;

7     and if it was properly terminated on March 30th of 2016,

8     or -- it's not even clear to me whether it should be stated

9     as March 30th, or March 31st.

10          But if it were properly terminated on March 30th

11     of 2016, then it would be really tough for the defendants

12     to prove they didn't infringe.

13          MR. HINDERAKER:  If it was properly terminated,

14     Federal infringed.

15          THE COURT:  Right.  I understand your, right,

16     argument about ACE.

17          But I agree with Mr. Metlitsky that the theory of

18     the case and the -- Federal's infringement comes down to

19     the propriety of the termination, sort of full stop.  ACE's

20     infringement may or may not, but -- and so the question of

21     expanded use, which was the basis or a basis for

22     termination -- well, violation of 10.8, which was the basis

23     for the termination, occurs or doesn't occur before, on or

24     before March 30th.

25          So why wouldn't -- so I'm not --

1              MR. HINDERAKER:  It's the catch-22 of it, the

2       nanner, nanner problem.  I follow your logic as well, Your

3       Honor.  I follow your logic.  And I'm really keying off of

4       where Judge Wright is saying, well, if you do read it that

5       other way --

6              THE COURT:  Their way.

7              MR. HINDERAKER:  -- their way, the defendants'

8       way, then they should be held to the truth of, to the truth

9       of the proposition that they did not expand use.  And I'm

10      not trying to run away from the complications that that

11      presents.  It does.

12             THE COURT:  Right.

13             MR. HINDERAKER:  On the other hand, being able to

14      say one thing and then do another without the consequences

15      in the case is troublesome.

16             THE COURT:  Let me just think for a second.

17             Is the, the quality of the expanded use, okay --

18      you understand what he's getting at, right?

19             MR. METLITSKY:  I understand the argument.  My,

20      first of all, well, I understand the argument.  I think the

21      breach of contract standard that he's stating for what they

22      have to prove is wrong because there's this unreasonably

23      withheld consent piece of it, and we can't ask for consent

24      because they've improperly terminated the license.

25             So there's that complication to the contract

 1    claim.  There's a very significant complication -- again,

 2    I'm not sure that they would be making a --

 3              THE COURT:  Let me interrupt you.  I've just in

 4    my mind figured out how I want to articulate it.

 5              MR. METLITSKY:  Okay.

 6              THE COURT:  They want to make sure that you're

 7    not going to argue that no expanded use was made before the

 8    termination, so they improperly terminated the contract

 9    and, yeah, we expanded use after it was terminated, but

10    what else were we going to do?  We don't have anybody we

11    can ask.

12              In other words, they don't want you to make kind

13    of the argument that you're implicitly making now, which

14    is, we were well within our rights to expand use after

15    March 31, 2016, because we didn't have anybody to ask.

16              MR. METLITSKY:  That was not the argument that I

17    was trying to make.  I think our argument is that we never

18    expanded use.

19              THE COURT:  Right.

20              MR. METLITSKY:  Right.  But their argument is

21    that we did, right?

22              THE COURT:  Right.

23              MR. METLITSKY:  And they say that was a breach of

24    contract.  Let me just give you an example.

25              THE COURT:  Right.

```
 1              MR. METLITSKY:  Let's say we expanded use that
 2     had the quantitative effect of .001 percent on whatever
 3     their relevant metric is.  I think it would be unreasonable
 4     in that circumstance to with withhold consent.  But you
 5     can't ask for consent -- there was no opportunity to ask
 6     for consent because the license had already been
 7     terminated.
 8              I'm just saying that what they would have to show
 9     is not just that there was expanded use, but that it would
10     have been unreasonable to withhold consent if we had asked.
11     That's just what the contract says, right?
12              THE COURT:  Right.
13              MR. METLITSKY:  Yeah, that's all.
14              MR. HINDERAKER:  The telephone number at FICO is,
15     didn't change.  Email addresses are still the same.  If
16     they wanted to contact FICO after they expanded the use, it
17     works.  They can.  This notion that the license agreement
18     is no longer and so therefore they can't pick up the phone,
19     obviously not true.  So --
20              THE COURT:  Yeah.
21              MR. HINDERAKER:  And to presume that whatever we
22     do would be unreasonable gets the cart in front of the
23     horse.  First you have to ask and then we have to act
24     reasonably.
25              THE COURT:  Right.  And I think it seems to me
```

1     the way through this issue is to -- what you're raising in

2     a sense is a, you don't want them to make the prematurity

3     argument, you terminated prematurely.  And if you follow

4     that, you -- so it seems to me that the way through this is

5     that, part of your argument is they received the right --

6     they are three times larger.

7             They received the right to process the business

8     of another business entity, and in fact they did that.  And

9     the fact that they, quote, the "they did that" occurred

10    after March 30th of 2016 can't be used as a way of saying,

11    even if FICO's theory is right, at the time they terminated

12    the contract, the expanded use had not been made.

13            MR. HINDERAKER:  That would work.

14            THE COURT:  Am I -- is this -- it's a little

15    complicated.

16            MS. GODESKY:  Well, our -- one of our bad faith

17    arguments is, they rushed to terminate with no evidence of

18    expanded use, right?  That's our second theory of bad

19    faith.

20            And so we do absolutely intend to argue that

21    Mr. Carretta sent the notice of termination without a

22    stitch of evidence or an inkling of expanded use, whether

23    it be under Federal's view of the world, measured by

24    applications, or whether it be measured by any other

25    metric, right?

1          I mean, I asked all of their witnesses:  Did you

2     have any evidence of any expanded use?  No.  No.  No.  And

3     so that is absolutely our bad faith theory, and we should

4     be able to argue it.

5          MR. HINDERAKER:  Doesn't that, Your Honor, go to

6     the very point that you're making?  I guess it was a

7     premature -- I guess it was a premature termination because

8     we didn't get around to expanding the volume of use until

9     after March 30th.

10          THE COURT:  Well, but -- yeah, I -- you, Federal,

11    your argument about the rush to judgment -- well, you know,

12    I don't know how we -- I understand the debate that's going

13    on.

14          I don't know that you guys are talking in the

15    same language exactly.  You're absolutely right to make

16    your rush-to-judgment argument.

17          What I'm trying to say is -- let me ask it this

18    way.  Your we didn't expand use argument --

19          First of all, you take the position that up until

20    2020 we never expanded use, correct?

21          MS. GODESKY:  Correct.

22          THE COURT:  And that was because the Blaze

23    Advisor software was used in the same applications, running

24    in the same fashion.  You're not suggesting that more

25    policies didn't run through those applications that touched

1    Blaze but that it's the same use.

2            MS. GODESKY:  Correct.

3            THE COURT:  And the rush to judgment in a sense

4    is not only -- it's not that we hadn't expanded use at that

5    time.  It's that we told them what we were going to do.

6    That's not expanded use.  They didn't listen to the

7    evidence or wait and see.  They just said, nope, that's

8    expanded use and you are done.

9            MS. GODESKY:  Correct.  I mean, I think it's

10   both, right?  I mean, they didn't have any evidence of

11   expanded use under either Federal's metric of application

12   by application or whatever metric we're going to hear from

13   FICO, number of policies, number of writing companies,

14   whatever it is.

15           When Mr. Carretta sent that breach letter, he did

16   not have evidence of expanded use under any metric.  And

17   then I would say, but the only metric that matters, right,

18   is my argument would be, number of applications, and that

19   was never expanded.

20           THE COURT:  And I think their metric is -- the

21   way I'm trying to cut this baby is, their argument is you

22   received the right to process the business of an expanded

23   entity and whether you began that process on day 1 or day

24   30 doesn't matter.  It's the fact that you've gotten that

25   right, and so the application measure is not the right

1    measure of expanded use.

2            MS. GODESKY:  Sure.

3            THE COURT:  And so I guess what I'm trying to get

4    to is, they get to say, when we heard about the merger and

5    we had our discussions, this is what we -- this is how we

6    understood expanded use and sure and begorrah, it sure

7    happened.

8            MS. GODESKY:  They can say that, Your Honor, but

9    I don't think they have any witnesses who have said that.

10   That may be Mr. Hinderaker's argument.  But when I asked

11   the witnesses if they had evidence of expanded use, they

12   all said no.

13           They didn't say, you know, well in our view

14   evidence of expanded use is additional writing companies.

15   We knew that -- I mean, that's just not the testimony.  I

16   understand that's the argument, but it's not the testimony.

17           THE COURT:  There was some testimony to the

18   effect, I think, that -- there was a suggestion that the

19   right to process the business of an expanded entity is

20   expanded use.

21           MR. HINDERAKER:  There was that, and there was

22   the, there was the proposal that the defendant sent that

23   February 25th.

24           THE COURT:  Right.

25           MR. HINDERAKER:  We're going to do whatever we

1    want, we're going to change the applications as ever we

2    wish.  Mr. Carretta testified to that.  Mr. Schreiber

3    testified to that.  He called it FICO, the sucker.

4    Mr. Waid testified to that.

5                THE COURT:  Right.  No.  I get all that.

6                All right.  I don't see a way of doing this on

7    the verdict form per se.  I see this as a setting some

8    limits on arguments of counsel and how we approach it.

9                I think, Mr. Hinderaker, I mean, first of all,

10   you can say that expanded use is the right -- is receipt of

11   the right to process, you know, a larger entity's policies.

12               MR. HINDERAKER:  Sure.  That's the beginning of

13   our case.

14               THE COURT:  Right.

15               MR. HINDERAKER:  That's the beginning.

16               THE COURT:  And that you -- and the proposal, you

17   know, offered another version of that.

18               And isn't the testimony that, that Federal

19   started processing the policies of the ACE writing --

20   Legacy ACE writing companies?

21               MR. HINDERAKER:  That's our -- that's our, that's

22   our case.  Exactly so.  And there is, you know, we spent

23   some time.

24               THE COURT:  I mean there's --

25               MR. HINDERAKER:  Legacy companies running through

1    the applications and additional volume and additional

2    revenue.

3                THE COURT:  Right.

4                MS. GODESKY:  The evidence based on the

5    interrogatory responses is that Legacy ACE policies ran

6    through one application the CUW-IM application.  And based

7    on the interrogatory response, that started happening in

8    2016.

9                THE COURT:  Okay.  So I guess what we're trying

10   to get at it is this:  You're both free to make your

11   arguments.

12               Your point is, they rushed to judgment.  There

13   was never a threat of expanded use, and there never was

14   expanded use, and they had no evidence of it.

15               MS. GODESKY:  Yes.  With the bad faith and on the

16   actual breach claim our argument is, under the language of

17   10.8, we didn't have to do anything in the event of an

18   acquisition unless we intended to expand use, right?

19               THE COURT:  Right.

20               MS. GODESKY:  And we didn't, so there was no

21   breach.

22               THE COURT:  Right.

23               MS. GODESKY:  And then in the world of bad faith,

24   we told them we're not expanding use, and yet they

25   terminated despite the lack of evidence, right?  That's our

1    argument.

2              THE COURT:  Right.  And they get to argue, no,

3    we -- they get to argue there was expanded use.  They got

4    this right to process policies.  Their proposal proposed

5    expanded use, and in fact as we know, they did start

6    processing Legacy ACE policies.

7              I think those two things are, they're different.

8    It's going to be hard to say they both happened, right?  I

9    mean, that they're both right, but I think you can both say

10   them.

11             MR. HINDERAKER:  Sure.

12             MS. GODESKY:  I think that's what we've both been

13   saying.

14             MR. HINDERAKER:  That's our intention.  This

15   whole long conversation started with tying everything to,

16   you know, to the specific date of March 30th.

17             THE COURT:  Right.  And maybe the way to, you

18   know, maybe the way to say it is, did FICO prove that

19   Federal breached Section 10.8 of the license agreement?

20   Stop.

21             MR. HINDERAKER:  Period, yeah.

22             THE COURT:  Did Federal properly terminate the

23   license agreement on March 30th?

24             MR. HINDERAKER:  Or did FICO properly

25   terminate --

1          THE COURT:  Did I say Federal?  I am sorry.

2          And so take out -- that would move the

3    instruction down below question three that's now on the

4    verdict form, but take care of, I think, the issue.

5          MS. GODESKY:  Yes.

6          THE COURT:  Okay.  Mr. Hinderaker.

7          MR. HINDERAKER:  I think so.  Could I see --

8    well --

9          THE COURT:  Yes.

10          MR. HINDERAKER:  -- when we see it again, let's

11    look at that again.

12          THE COURT:  Right.  Okay.  We'll make that

13    change, and you can see it again.

14          And then how about questions four, five and six,

15    assuming that structural change works.

16          MR. HINDERAKER:  I think on four -- sorry -- I

17    think on four the -- it's just a matter of it being

18    confusing to us.  If you find FICO properly terminated the

19    license agreement, please enter the amount of damages FICO

20    incurred as a result of Federal's breach of the license

21    agreement.

22          I think it should say "after" not "prior to."

23          THE COURT:  Well, and -- see, that's the other

24    question.  There's an allegation -- I'm fine with "after."

25    I'd rather "after."  It make my life easier.  But before

1      there are allegations that they breached the contract prior

2      to the date of termination.

3              And are you seeking damages for that?  Life's a

4      lot easier if you don't.  It's fairly small, obviously.

5              MR. HINDERAKER:  Well, given that "client" means

6      Federal and given that the foreign insurance companies are

7      affiliates --

8              THE COURT:  It would only be the consultants.

9              MR. HINDERAKER:  And I'm not, we're not -- the

10     only issue with the consultants is that it was the basis

11     for the termination.  There's not a separate damages

12     claim --

13             THE COURT:  Okay.

14             MR. HINDERAKER:  -- relative to the consultants,

15     Your Honor.

16             THE COURT:  All right.  So then we'll change that

17     to after March 31st?

18             MR. HINDERAKER:  Yeah, that's the damages period

19     issue.

20             THE COURT:  And then -- okay.  So do we want

21     to -- in light of that change, four and six are now asking

22     the same thing.

23             MR. HINDERAKER:  Four and six.

24             THE COURT:  So that their answers should be

25     consistent.

1           MR. HINDERAKER:  They should be, yes.

2           THE COURT:  Okay.

3           MR. HINDERAKER:  Actual damages under copyright

4    and lost license fees under contract should be the same

5    amount for this element.

6           THE COURT:  Okay.

7           MR. METLITSKY:  And, Your Honor, I think the same

8    is true of three and five, if I'm not mistaken.  If their

9    termination is proper, then they should say yes to

10   copyright infringement.  If the termination is improper,

11   they should say no, right?

12          THE COURT:  Right.

13          MR. HINDERAKER:  And we would be fine with that

14   because it does -- if they find that termination is proper,

15   they don't have to -- in our judgment, you should instruct

16   them by the form that that is copyright infringement.

17          THE COURT:  Well, right.

18          MR. METLITSKY:  I'm just suggesting in the

19   instruction you should say the same thing for both.

20          THE COURT:  Right.  There's actually -- I

21   understand.

22          MR. METLITSKY:  Yeah.

23          THE COURT:  Okay.  Part two.  Okay.  Hearing

24   nothing --

25          MS. KLIEBENSTEIN:  Hold on just a second, Your

1   Honor.

2          THE COURT:  Say, everyone, we're going to take a

3   brief break.  Our poor court reporter has been going at it

4   for a long time.

5                  (Recess taken)

6          THE COURT:  All right.  What was the issue

7   relative to question four?

8          MR. HINDERAKER:  So if you find that FICO

9   properly terminated the license agreement, please enter the

10  amount of damages FICO incurred as a result of, and I think

11  it should say not as as a result of the Federal breach.  It

12  should say as a result of -- just as it does in five -- as

13  a result of the use of Blaze Advisor.

14         Kind of confusing to say what's our damages

15  because Federal breached, I think --

16         THE COURT:  Right.

17         MR. HINDERAKER:  So as a result of Federal's use

18  of Blaze Advisor after March 31st.

19         MR. METLITSKY:  I think that's okay with us, so

20  long as it says "after," you know, instead of "prior to."

21         THE COURT:  Right.

22         MR. METLITSKY:  Can we just go back to one for a

23  second?

24         THE COURT:  Yeah.

25         MR. METLITSKY:  I think we would just add at the

1    end by sharing the Blaze Advisor software with third-party

2    consultants or something like that.

3            THE COURT:  Yes, we have that.  I didn't realize

4    that that wasn't in this version that was given to you, but

5    we have that language.

6            MR. METLITSKY:  I now know what you meant when

7    you said I would have solved that problem in the verdict

8    form.

9            THE COURT:  Yeah, I have put that in.

10           MR. METLITSKY:  Okay.

11           THE COURT:  Okay.  With those changes -- and I

12   just, so you guys know what's coming, so on question five I

13   put a parenthetical note, If you answered yes to question

14   three above, you must answer yes to this question.

15           Now it's a little awkward because if they answer

16   no, they're never going to see this, but that's fine.

17           And then at the bottom of six, I've added back in

18   the note, Your answer to question four and six must be the

19   same.

20           MR. METLITSKY:  Great.

21           THE COURT:  Part two.  Any concerns?

22           MR. HINDERAKER:  We're good, I think.

23           MR. METLITSKY:  Yeah, we're okay.

24           THE COURT:  Okay.  Part three.  Profits.  I

25   suppose somebody's going to object to the bolding of the

1    words "revenue" and "profits."

2              MR. HINDERAKER:  Well, we didn't think about

3    that.

4              THE COURT:  Sorry I raised it.

5              MR. METLITSKY:  We would object to at least in

6    part for the reasons we discussed below, especially because

7    it says "contributed at least in part."

8              THE COURT:  Right.  I understand.

9              MR. METLITSKY:  That's double counting there.

10             MR. HINDERAKER:  And can we move to ten then?

11             THE COURT:  Sure.

12             MR. HINDERAKER:  So what --

13             THE COURT:  Take out "directly."

14             MR. HINDERAKER:  Take out "directly" and add "at

15   least in part."

16             THE COURT:  I know you don't want the "at least

17   in part."

18             MR. HINDERAKER:  Take out "directly."

19             THE COURT:  I am going to take out the "at least

20   in part" because of the word "contributed."

21             MR. HINDERAKER:  Up in nine or --

22             THE COURT:  Yeah, I'm going to take it out in

23   nine.  Well, just because the word "contributed" implies at

24   least in part.

25             MR. HINDERAKER:  Well, can you put "at least in

1    part" in parenthesis then?

2              THE COURT:  I think it really does -- it

3    contributed.  It made a contribution.  It's just in part.

4              MR. HINDERAKER:  Okay.

5              THE COURT:  And even though -- I think I will

6    take out "directly," though it is in the instruction

7    because that is the law but --

8              MR. METLITSKY:  So long as -- I mean, we prefer

9    "directly" in there.  Can we argue the --

10             THE COURT:  Yes.  Yes.

11             Okay.  11, I've changed it to say, not taken into

12   account by computing FICO's actual damages in your answers

13   to questions four and six, because now we've reinstituted

14   that.

15             MR. HINDERAKER:  We have some suggestions about

16   number 11.  And our suggestions in many ways -- our

17   suggestions are built from the instruction regarding

18   profits and defendants' burden of proof on page 26.

19             THE COURT:  Okay.

20             MR. HINDERAKER:  So this is what we suggest on

21   number 11:  Enter the amount of profits to be awarded to

22   FICO -- we didn't say if any because that's already in the

23   revenue line in 10, but --

24             THE COURT:  Yeah, I'm just, so you all know, I

25   had that in some and not in others.  I'm just going to take

1      it out of all of them.

2             MR. HINDERAKER:  Okay.  So enter the amount of

3      profits to be awarded to FICO, calculated by reducing the

4      revenue from number ten by the amounts, if any, defendants

5      have proven are costs associated with that revenue and by

6      the amounts, if any, defendants have proven are

7      contributions to that revenue from other factors.

8             So we're not trying to change things, really, or

9      at all.  We're trying to conform with the instructions on

10     26 and to be clear that there is the issue of the costs,

11     and separate from the issue of the costs, the issue of the

12     contribution of factors other than infringement.  Yeah, I

13     would be happy to hand you what we wrote.

14            MR. METLITSKY:  Your Honor, we would, we would

15     just object to -- that's already in the instruction.  We

16     don't need to reinstruct, right?

17            So, you know, certainly wouldn't include "if any"

18     in the discussion of costs.

19            THE COURT:  Yeah, "if any" isn't coming in.

20            MR. METLITSKY:  But no, I don't think we -- I

21     don't see any -- we don't do that in any other of the

22     questions where you just like rewrite the instruction into

23     the question.  The jury's going to know how to figure that

24     out because you're going to instruct them on it.

25            THE COURT:  By that logic, Mr. Metlitsky,

```
1    shouldn't this question just say:  Enter the amount of

2    profits.

3              MR. METLITSKY:  Well, no.

4              THE COURT:  Hang on.

5              MR. METLITSKY:  Oh, I'm sorry.

6              THE COURT:  That are not taken into account by

7    computing FICO's actual damages.

8              MR. METLITSKY:  Yeah.  We'd be fine with that.

9              MR. HINDERAKER:  And then that keys us back into,

10   into 26.  I think we're fine with that too.

11             THE COURT:  Okay.

12             MR. HINDERAKER:  Yeah, we're good.

13             THE COURT:  Okay.  Federal's claims, part four.

14             MR. HINDERAKER:  Nothing from the plaintiff, Your

15   Honor.

16             MR. METLITSKY:  Your Honor, we leave it up to the

17   court, but if the, I think, if the jury finds that their

18   termination was proper, they can't find for us.

19             THE COURT:  Correct.

20             MR. METLITSKY:  Okay.  So however you want to

21   deal with that, that's fine.  We do not want -- it's very

22   hot.  We don't want to do this.

23             THE COURT:  Right.  No.  I'll make sure that that

24   instruction is taken care of.

25             So with that, what we'll do is, we'll make these
```

1    final edits, and we'll circulate them to the parties

2    imminently.  If anybody, if we've gotten it wrong or

3    there's a concern, just let us know, and we'll meet before

4    court at 8:00.

5            I'm just going to tell you what I've decided to

6    do on the instructions that we had ongoing disputes about.

7            On breach of contract, materiality, I am going to

8    leave it the way it is.  I understand your argument.  I

9    don't believe this is law of the case.  So that's what I'm

10   going to do.

11           On number, page 16, construction of the license

12   agreement, at the end of that second paragraph, here's what

13   I've drafted:  "Therefore, use of Blaze Advisor by Chubb

14   Canada, Chubb Europe, and Chubb Australia, before the

15   license agreement was terminated, was not a breach of the

16   license agreement."

17           And then on paragraph -- or on profits,

18   plaintiff's burden, as I've indicated, I'm not going to put

19   in "at least in part."  I am going to confirm.  I'm going

20   to reread *Andreas*, and I am likely to leave "causal nexus"

21   in.

22           So we also have to draft an instruction, unless

23   you already have it drafted, Mr. Metlitsky, for us to

24   modify about factors that the jury may consider.

25           Do you have one already drafted?

 1           MR. METLITSKY:  We do.  What's the best way to --

 2           THE COURT:  Do you have it in paper?

 3           MR. METLITSKY:  I do, actually.

 4           THE COURT:  Hand it up.

 5           MR. METLITSKY:  Or I could actually, not really,

 6    but I can get it in paper.

 7           THE COURT:  Well, just email it to the court then

 8    and -- email it to Miriam.

 9           MR. METLITSKY:  I might have it in paper.  If I

10    have it in paper, I will.

11           THE COURT:  Yeah.  And we will modify it and

12    circulate it.

13           MS. GODESKY:  May I ask for guidance on just one

14    issue?

15           THE COURT:  Sure.

16           MS. GODESKY:  I don't want to run afoul of the

17    court's directives.  And I understand that there's been a

18    directive not to highlight the court's ruling on the

19    territorial issue in connection with bad faith.  Completely

20    understood.

21           I would -- and I don't intend to make a big show

22    of it, but I do think in discussing the damages piece, I do

23    need to be able to reference, you know, something along the

24    lines of, as you've heard from the judge, there's been a

25    finding that use by Chubb Australia, Chubb Europe and Chubb

1    Canada could not constitute a breach of contract.

2            In framing, you know, why that number, whatever

3    it is, once we extract, you know, the foreign affiliates

4    values from that $50 million number, I just feel like I

5    need to frame that for the jury because they're going to be

6    very disoriented after having spent weeks hearing about

7    that issue in dispute, so I just want to make sure that's

8    clear.

9            THE COURT:  Yeah.  I think that's appropriate.

10           Mr. Hinderaker, does that give you heartburn?

11           MR. HINDERAKER:  Yeah.

12           THE COURT:  Tell me why.

13           MR. HINDERAKER:  I think, one, I don't share the

14   premise that there's any confusion or any, any confusion to

15   the jury.

16           THE COURT:  I don't share the premise that

17   they've necessarily written down any of these numbers.

18           MR. HINDERAKER:  I fully agree.  I think that the

19   purpose of this mention is to talk about the, you know, the

20   merits of FICO's case.  It gives that implication.  I think

21   that, as we've spoken before, the closing arguments and the

22   numbers are going to be the numbers that are in the case

23   now, and the jury's going to receive those, and that will

24   be the framework.

25           So I just reject the premise, and I think its, I

1    think that its real purpose is to go to the merits of

2    FICO's case, not an explanation that isn't necessary.

3              MS. GODESKY:  Your Honor?

4              THE COURT:  Go ahead.

5              MS. GODESKY:  I will say, it's complicated by the

6    fact that I'm going first, right?  So if they were going

7    first and Mr. Hinderaker was going to present his, let's

8    call it a, $25 million number, then I'm attacking, you

9    know, what's been presented.

10             But we spent weeks in this case talking about

11   breach by the Federal affiliates in those three countries,

12   and they've heard, you know, $50 million number.  So

13   they're going to be wondering why is she talking about a

14   different number that doesn't include these affiliates,

15   right?

16             And so it's just very disorienting, and I'm not

17   intending to, you know, jump up and down and say, aha,

18   they've already lost one claim.  I mean, that's really not

19   what I'm going to do.

20             THE COURT:  So well, here's what I think.  I

21   think when you share the number, which you're still going

22   to do, this will get taken care of in combination with my

23   instruction so -- but it still leaves me confused.

24             It seems to me that the actual, the number, and

25   maybe I, God knows, I may well have missed it, but the

1    actual -- the hypothetical number is a going forward

2    number, basically from 2016 forward.

3              MS. GODESKY:  No.  What they presented was in

4    those foreign affiliates applications, ten years of use.

5    Those were the numbers went up on the charts, ten years

6    going back to '06, because that's when --

7              THE COURT:  I see.

8              MS. GODESKY:  Yes.

9              THE COURT:  I remember that now.

10             MR. HINDERAKER:  The other element of it, Your

11   Honor, is that you recall we never -- it was clear we

12   shouldn't, and we never did.

13             THE COURT:  Connect.

14             MR. HINDERAKER:  Any of those dollars as FICO's

15   damages claim.  The first time the jury is going to hear,

16   well, actually the jury isn't even going to hear that

17   tomorrow.

18             They're just going to hear a beginning place.

19             THE COURT:  Right.

20             MR. HINDERAKER:  So, you know, what I heard

21   counsel say is that the jury has an expectation that FICO's

22   claim is.  Well, FICO isn't going to tell the jury.  We're

23   going to be consistent with what our guidance already is.

24   We're not going to contend a particular number.

25             We're going to go through the methodology again,

1    because it's the jury that has to decide that actual, that

2    actual number.

3              THE COURT:  Right.  I think the way I would

4    prefer you to handle it is to say that number, whatever

5    number you're going to present or whatever you are going to

6    say, covers the use from 2016 forward.  And that's what

7    happens when I talk too slowly, I forgot the first half of

8    what I was going to say.

9              MR. HINDERAKER:  And that is consistent with your

10   instructions as well.

11             THE COURT:  No.  I understand.  I was going to

12   say, you could say something to the effect that the period

13   of use is 2016 forward as --

14             MS. GODESKY:  Which the judge has instructed you

15   is the only period relevant to any actual damages in the

16   case, something like that?

17             THE COURT:  Well, is the only period of use at

18   issue.

19             MS. GODESKY:  Sure, which as the judge has

20   instructed you is the only period of use you need to be

21   concerned about.

22             THE COURT:  Right.  And -- yes.  You okay with

23   that?

24             MR. HINDERAKER:  I am, Your Honor.

25             THE COURT:  Okay.

1          MR. HINDERAKER:  Now it's neutral.

2          THE COURT:  Yeah.

3          MR. HINDERAKER:  It's just factual what the

4    instructions are.

5          THE COURT:  Understood.

6          Okay.  Get out of here, right?

7          Thanks, everyone.  We'll see you in the morning.

8          MR. HINDERAKER:  Thank you, Your Honor.

9          MS. GODESKY:  Thank you, Your Honor.

10         (Court adjourned at 5:37 p.m., 03-07-2023.)

11

12                        *   *   *

13         We, Kristine Mousseau and Renee A. Rogge, certify

14    that the foregoing is a correct transcript from the record

15    of proceedings in the above-entitled matter.

16

17                   Certified by:  /s/Kristine Mousseau
                               Kristine Mousseau, CRR-RPR
18                                 /s/Renee A. Rogge
                               Renee A. Rogge, RMR-CRR
19

20

21

22

23

24

25