```
1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2        ----------------------------------------------------------
         Fair Isaac Corporation, a      )
3        Delaware corporation,          )  File No. 16-cv-1054
                                        )             (DTS)
4                 Plaintiff,            )
                                        )
5        vs.                            )  Minneapolis, Minnesota
                                        )  December 13, 2022
6        Federal Insurance Company, an  )  3:56 p.m.
         Indiana corporation, and ACE   )
7        American Insurance Company, a  )
         Pennsylvania corporation,      )
8                                       )  REDACTED TRANSCRIPT
                  Defendants.           )
9        ----------------------------------------------------------

10             BEFORE THE HONORABLE DAVID T. SCHULTZ
            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11              (MOTION HEARING - REDACTED TRANSCRIPT)
         APPEARANCES:
12       For the Plaintiff:          Merchant & Gould, PC
                                     ALLEN W. HINDERAKER, ESQ.
13                                   MICHAEL A. ERBELE, ESQ.
                                     PAIGE S. STRADLEY, ESQ.
14                                   HEATHER J. KLIEBENSTEIN, ESQ.
                                     150 South Fifth Street
15                                   Suite 2200
                                     Minneapolis, Minnesota 55402
16
         For the Defendants:         O'Melveny & Myers, LLP
17                                   LEAH GODESKY, ESQ.
                                     7 Times Square
18                                   New York, New York 10036

19                                   Fredrikson & Byron
                                     TERRENCE J. FLEMING, ESQ.
20                                   RYAN C. YOUNG, ESQ.
                                     200 South Sixth Street
21                                   Suite 4000
                                     Minneapolis, Minnesota 55402
22
         Court Reporter:             PAULA K. RICHTER, RMR-CRR-CRC
23                                   300 South Fourth Street
                                     Minneapolis, Minnesota 55415
24
             Proceedings reported by certified stenographer;
25       transcript produced with computer.
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3    THE COURT:  Good afternoon, everyone.  We're on
4  the record in the matter of FICO versus Federal, civil
5  number 16-1054.
6    Counsel for FICO, if you'll note your appearances
7  for the record, please.
8    MR. HINDERAKER:  Your Honor, Allen Hinderaker from
9  Merchant & Gould.  And with me from Merchant & Gould at
10  counsel table is Paige Stradley and Michael Erbele, and
11  behind us is Heather Kliebenstein.
12    THE COURT:  Good afternoon to the four of you.
13    Counsel for Federal, if you'll note your
14  appearances.
15    MR. FLEMING:  Your Honor, for defendants, Terry
16  Fleming; Leah Godesky, who will be arguing; and Ryan Young.
17    THE COURT:  Good afternoon to the three of you.
18    So we're here on a motion to bifurcate the trial.
19  I've read everything, so you don't have to repeat what
20  you've said, but you can certainly find ways of emphasizing
21  it.
22    If you're ready to proceed, go ahead, Counsel.
23    MS. GODESKY:  Thank you, Your Honor.
24    Your Honor, we have two very different buckets of
25  damages at issue in this case.  First, FICO is seeking

1    actual damages for the breach of contract and copyright

2    claims based on fair market value of a Blaze license for any

3    unauthorized use.  And as the Court observed in ruling on

4    the *Daubert* motions on this case, determining the fair

5    market value of the copyrighted work is an objective inquiry

6    that evaluates what a reasonable seller and buyer would pay

7    for a Blaze license in the relevant time period.  And we

8    know in 2006, when Federal and FICO engaged in those

9    negotiations, they agreed on a XXXXXXXXXXXX license fee for

10   an enterprise-wide license.

11          The fair market value question will be decided by

12   the jury, and Federal intends to prove that any actual

13   damages in this case will be much closer to the XXXXXXXXXXXX

14   license fee that the parties agreed on in 2006 rather than

15   the very fanciful $47 million license fee that FICO intends

16   to present.

17          Then on the other hand, you have the disgorgement

18   damages claim, and there they're seeking to disgorge up to

19   $35 billion in profits.  And this damages claim will be

20   decided by the Court.  You've already held that.  And the

21   disgorgement framework is completely different.  The core

22   question there will be whether there's a nexus between Blaze

23   and defendants' profits.  And so the fair market value for a

24   Blaze license, that proxy for actual damages, and the

25   nuances of how Blaze fit into defendants' business, those

1    are two completely different questions.  And as the Court

2    observed in ruling on prior motions in this case, the

3    profits that FICO is seeking to disgorge are not actual

4    damages and they are not a proxy for them.

5            So in addition to the fact that we have two very

6    distinct inquiries taking place here, we're seeking

7    bifurcation because of the enormous prejudice and confusion

8    that would occur if both damage theories are presented at

9    the same time.

10           THE COURT:  Let me interrupt you for a second.

11   First of all, you used the word "inquiries," but you could

12   also substitute the word "conclusions" for what I think

13   you're saying, to which their response, at least in paper, I

14   think, is they may be separate conclusions, but some of the

15   evidence that the Court or the jury needs to rely on to

16   arrive at those conclusions is the same.  So, for example,

17   in the hypothetical negotiation, the revenues, the gross

18   profits, if you will, of Federal and ACE are relevant to

19   that negotiation.

20           What's your response?

21           MS. GODESKY:  So they've identified two categories

22   of allegedly overlapping evidence, and the first one is they

23   say that defendants' alleged revenue from use of Blaze will

24   be relevant to both fair market value and disgorgement.

25   That's wrong.

1              We absolutely agree that defendants' total revenue

2      is relevant to FICO's pricing model, and so that will be

3      considered if the jury is evaluating fair market value,

4      actual damages.  But it's a completely different thing to

5      say, as FICO does, that in order to determine fair market

6      value, the jury also needs to consider the specific profits

7      that defendants earned from use of Blaze.  That's different.

8      That's a different inquiry.  Not just total revenue of

9      defendants, but actually how many profits were defendants

10     earning from Blaze, and that's blurring the distinction

11     between fair market value and disgorgement damages.

12             THE COURT:  But wait a second.  How does that

13     advance your argument?  They're saying when it comes to the

14     hypothetical negotiation, we get to tell the jury, you know,

15     the fact that they're a 13 billion or whatever dollar a year

16     organization is relevant to the license fee we would charge

17     and it's relevant to their expectation of the license fee

18     they would have to pay, so that figure -- that evidence

19     about just total revenue is coming in for that purpose.

20             And then on the disgorgement, 504(b) says you get

21     to dump it into evidence.  You know, here's the 13 billion;

22     you sort out what's profit and what's related or not

23     related.

24             MS. GODESKY:  Your Honor, there's a very

25     different -- it's very different for FICO to say -- present

1    their pricing model, right, which starts with a very large

2    revenue number, just like it did in 2006.  And then when you

3    apply their pricing model to that starting point, you get to

4    a very low number, right?  So there was a very large revenue

5    number for Federal back in 2006, billions of dollars, and

6    that got to a XXXXXXXXXXXX license fee.

7         It is very different for them to open this trial

8    and argue that they are entitled to $35 billion in disgorged

9    profits.  That framing is enormously prejudicial, and the

10   anchoring effect of presenting that argument from the outset

11   of the trial just cannot be denied.

12        Your Honor, 1 percent of $35 billion is $350

13   million, right?  And we cite cases in our papers, like the

14   Federal Circuit case in that *Uniloc USA* case, right?  There

15   was an observation from the Federal Circuit about how a

16   disclosure that a company has made even only $19 billion has

17   an enormous anchoring effect regardless of whether evidence

18   is then later presented that shows that the infringed

19   product contributed to a small, small portion of it.

20        And so it's true, the jury is going to hear that

21   these companies have a lot of revenue, right?  But then the

22   math of how FICO actually then calculates its license fees

23   in these traditional arm's length transactions translates to

24   a much smaller dollar figure, right?  It's very different to

25   say these companies make a lot of money than it is to say we

1     are entitled to disgorge, ladies and gentlemen of the jury,

2     $31 billion in profits.

3              THE COURT:  So a different way of coming at it,

4     isn't the logical conclusion of what you're arguing then is

5     not that the case should be bifurcated -- the trial should

6     be bifurcated, but that I shouldn't impanel an advisory jury

7     on the question and I should just allow all the evidence to

8     come in, and they have to figure out the license fee and I

9     have to figure out what, if any, profits are to be

10    disgorged?

11             MS. GODESKY:  No, Your Honor, because the

12    prejudice point, the confusion point, if the evidence is

13    presented around the impact of Blaze or alleged impact of

14    Blaze on defendants' business, the $31 billion damages

15    number, the days, probably a week of testimony about whether

16    and how Blaze functioned within defendants' business, all of

17    that is enormously confusing and distracting.

18              This is a breach of contract case, right?  And you

19    can imagine the opening statement in a trial where we're

20    presenting evidence relevant to disgorgement is going to

21    address the nuances of Blaze, how it worked within

22    defendants, right?  That's a whole frolic and detour into a

23    week's worth of evidence that wouldn't need to be presented

24    if we're just focusing the jury on the very clear questions

25    of what is the nature and effect of Section 10.8 and 3.4 of

1    the agreement.

2            THE COURT:  Wouldn't you want that evidence about

3    a frolic and detour to come in to hold down the license fee

4    too?  I mean, wouldn't you want to say -- they want to say

5    that we would have negotiated -- that reasonable people

6    would have negotiated a $47 million license but, in fact,

7    Blaze is just a tiny piece of a very large set of software

8    that's only, within that, a tiny piece of our business,

9    blah, blah, blah, blah, blah.  All that, what you've

10   described as a frolic and detour, also can be used to argue

11   that so, therefore, the license fee really isn't that high

12   or shouldn't be.

13           MS. GODESKY:  Your Honor, there may be, and of

14   course there will be some evidence in a trial even if

15   disgorgement is bifurcated in terms of what Blaze is and how

16   it functioned in defendants' business.  We don't deny that.

17   They're going to need to describe what their product is.

18   We're going to need to describe how the business used it.

19           But I think, for the most part, in terms of

20   defending the actual damages claim, what you're going to see

21   from us is a presentation of evidence that focuses on the

22   arm's length transaction that happened between these parties

23   in 2006; the many, many, many arm's length transactions that

24   have occurred between FICO and other similarly situated

25   customers over time, none of whom entered license agreements

1    even approaching the orders of magnitude of what they're

2    demanding here.

3              And so no, I don't think in order to defend

4    against the actual damages claim there is going to need to

5    be this frolic and detour into the types of recited evidence

6    that you see in their opposition brief, page after page

7    after page from their perspective touting the benefits of

8    Blaze.

9              What we want to do in this trial is focus the jury

10   on the question of, was there a breach of contract?  What

11   was the parties' intent when they entered into this license

12   agreement in 2006?

13             And I think when you read FICO's opposition

14   papers, you know, there's sort of very short shrift given to

15   the nature of evidence that would have to be presented on

16   this disgorgement claim.  I think they say, oh, we just need

17   to put some numbers on a screen and have our expert describe

18   them, but that cannot be further from the truth.  I mean,

19   you have to examine each of the applications in which Blaze

20   was used.  We have to examine it from a computer science

21   sense, right?  What did it mean that this particular

22   software program was one of many that comprised the

23   application?  We have to examine it from a business sense.

24   What did it mean that this rules-based software program was

25   used when the rules were written by Federal employees, and

1    what type of impact did it have on the ability to bring in

2    business on an application-by-application basis?  I mean,

3    that is days of testimony that would not be needed at all if

4    we're centering the jury on the breach and copyright

5    questions and actual damages.

6            And on that point, I would refer the Court to the

7    *Oracle* case that we cite in our papers.  I think there was a

8    very astute observation from the judge in that case where

9    there was a bifurcation of certain monetary relief, and the

10   judge said that those questions of monetary relief were

11   poised to present bone-crushing analytics on how to

12   apportion profits attributable to infringement versus

13   profits attributable to non-infringement.  So our trial was

14   managed by postponing that mind-bender to phase 2 so that

15   the jury could give its undivided attention in phase 1 to

16   fair use.

17           And what the jury needs to do in this case is give

18   its undivided attention to the question of was there a

19   breach of contract?  What did the parties intend when they

20   entered this license agreement?  Not be, you know, head in

21   the -- head in the stars thinking about $350 million in

22   disgorgement damages.

23           THE COURT:  But that argument really seems to

24   prove a slightly different point, which you haven't asked

25   for, and which is better that the trial be bifurcated

1  between liability and damages, which you haven't asked for

2  and isn't going to happen, okay?  But that's what that seems

3  to suggest to me, that quote from *Oracle*.

4       MS. GODESKY:  I don't think so, Your Honor,

5  because I think the bone-crushing analytics that would be

6  required to assess the damages claim, that applies here to

7  disgorgement, right, those very complicated questions of

8  what did Blaze do within these different applications and

9  how did it affect the defendants' ability to sell insurance,

10  which, you know, is not involved at all in evaluating the

11  actual damages claim.  So I think that that case quote is

12  exactly on point because the nuances of apportionment on a

13  computer application by computer application basis is, you

14  know, mind-bending.

15       The other thing I'll say in terms of the argument

16  from FICO that there would be overlapping evidence and this

17  question of whether actual and anticipated profits would

18  come into evidence in evaluating both damages claim, I would

19  point out to the Court that all of the cases that they cite

20  on this, the *Navarro* case, the *Pinn* case, the *Interactive*

21  *Pictures* case, the *Probatter* case, those are all cases

22  involving damages based on a reasonable royalty rate.  And

23  so it's not surprising that the Court in those cases said,

24  yeah, you know, actual profits, future profits, those are

25  relevant to assessing actual damages because when you're

1    evaluating a royalty rate, you have to consider profits.

2    That's going to be part of the hypothetical negotiation,

3    right?  If you have a 10 percent profit margin, you're not

4    going to give an 11 percent royalty rate.  That would not be

5    a rational choice.

6         Whereas here, you know, the question of profits

7    doesn't need to come in at all.  And we know that, Your

8    Honor, because we have the benefit of knowing exactly how

9    FICO does business.  The record in this case shows, and they

10   say in their opposition brief, the way that they negotiate

11   these license agreements is they look at the revenue that

12   the counterparty brings in, and then they have a formula,

13   and then they also take into account the scope of the

14   license in certain instances, how broadly is it going to be

15   used?  But there is never an analysis in their arm's length

16   transactions of the types of profits that are being derived

17   from the use of Blaze.  That wouldn't be possible in an

18   arm's length transaction.

19        So these cases that FICO cites in their opposition

20   are really inapposite to the question presented here.

21        THE COURT:  Go back to *Navarro* for a second.  I'll

22   confess that I had focused on a different aspect of that

23   decision and perhaps missed the nuance that you pointed out

24   that the actual damages in that case were reasonable

25   royalty.  Is that right?

1          MS. GODESKY:  That's correct, Your Honor.  I don't

2     have the *Pinn* cite.  I know it's at the very end of the

3     opinion.

4          THE COURT:  But it was a copyright infringement

5     matter.

6          MS. GODESKY:  It was a case where the question was

7     a photograph on an Oil of Olay product and whether there was

8     a -- you know, the copyright to the photo on the Oil of Olay

9     lotion bottle, right?  So the type of damages, the Court

10    says at the end of the opinion, was a reasonable royalty

11    rate, and so that's why they were considering the profits

12    from that Oil of Olay product.

13         And I would also say on *Navarro*, since FICO so

14    heavily cites it, is that's a different case.  I mean, that,

15    yes, admittedly involved large numbers too.  It involved

16    $600 million in revenue.  That was the number that the

17    plaintiff wanted to put out to the jury.  $600 million, Your

18    Honor, is not 335 billion, right?  One percent of 600

19    million is $6 million.  One percent of 35 billion is $350

20    million.  These numbers have an enormous anchoring effect,

21    and it is not surprising that FICO wants to be able to put

22    that number out in front of the jury from day one.

23         And I would say that the prejudice and confusion

24    concerns that we've highlighted in our brief are even

25    amplified here because we're talking about an issue that the

1    jury won't even be deciding at all.

2              THE COURT:  Okay.

3              MS. GODESKY:  Those are the primary points I

4    wanted to cover, Your Honor, unless the Court has further

5    questions.

6              THE COURT:  Well, I don't think so, although --

7    well, why can't this all be -- if I were to agree that

8    you've raised some concerns, to the extent that the concern

9    is prejudice in the form of confusion or the anchoring

10   effect of big numbers, why can't those all be handled by

11   careful pretrial or preliminary instruction as opposed to

12   bifurcation?

13             MS. GODESKY:  I understand, Your Honor, that the

14   Court obviously is starting from the assumption that the

15   jury will proceed as instructed, and we certainly are too,

16   but I do think, you know, the *Uniloc* case and that Federal

17   Circuit case had it right with that $19 billion damages

18   figure having just too high of an anchoring effect.

19             And I think that's particularly true here, given

20   not only the fact that we're talking about 35 billion,

21   right?  It's an enormous number.  But also when you compare

22   it to the actual -- like the reasonable realm of damages for

23   fair market value, right?  When these parties were

24   negotiating back in 2006, they agreed on a XXXXXXXXXXXX

25   license fee.  So that risk, that anchoring effect, is

1    enormous here.

2          And then I don't think an instruction could cure

3    at all the confusion.  The week of testimony, dense expert

4    testimony walking through application by application,

5    dueling expert opinions, dueling witness opinions, on how

6    Blaze impacted the defendants' business.  I mean, that is

7    a -- I will use the phrase again -- frolic and detour that

8    has nothing to do with the central questions that this jury

9    is impaneled to answer, which are, is the contract breached

10   and was there copyright infringement.

11         THE COURT:  And if so, how much damages are they

12   owed?

13         MS. GODESKY:  And if so, how much actual damages

14   are they owed, yes.

15         THE COURT:  And your argument on anchoring effect

16   is that when and if the jury comes to that question, how

17   much damage they're owed, actual damage, they won't be able

18   to adequately analyze that number because they will be

19   influenced by the $35 billion number.

20         MS. GODESKY:  Correct.  And I also think there

21   could even be prejudice to Federal's defense of the

22   liability question in this case, right?  If you have the

23   jury consider and evaluate, spend weeks on this, right, the

24   extent of the connection between Blaze and defendants'

25   profits and hearing these giant numbers, that could suggest

1   to the jury that Blaze is far, far, far more valuable than

2   the XXXXXXXXXXXX that Federal paid, right?  And that could

3   also taint the consideration of the liability question as

4   jurors inevitably, you know, grapple with questions of

5   fairness.

6           THE COURT:  Well, I'll say it again in a different

7   fashion.  It's a sword that cuts in both directions, right?

8   Because the evidence that you'll put on about how Blaze

9   really didn't do very much and it wasn't that useful and

10   we're the ones that wrote the rules and et cetera, et

11   cetera, all of which, to the extent it comes in, comes in at

12   least primarily on the disgorgement side.  Maybe not.  It

13   also has a tendency to hold down the reasonable license fee,

14   doesn't it?

15           MS. GODESKY:  I think my answer on that is the

16   same, Your Honor.  I do think some of that is relevant to

17   holding it down, but there is enormously powerful evidence,

18   objective evidence of, you know, FICO's license fee to

19   Federal and FICO's license fee to other similarly situated

20   counterparties that any reasonable juror is going to see

21   that that $47 million number is enormously inflated.

22           THE COURT:  Okay.  Thank you, Counsel.

23           MS. GODESKY:  Thank you, Your Honor.

24           THE COURT:  Mr. Hinderaker.

25           MR. HINDERAKER:  Thank you, Your Honor.

1          THE COURT:  Rather than let you get started, let

2     me jump to one thing and then you can go back and get

3     started.

4          MR. HINDERAKER:  I had such a good opening line

5     too.

6          THE COURT:  What's that?

7          MR. HINDERAKER:  I had such a good opening line

8     too.  I'm sorry.

9          THE COURT:  Go ahead.

10          MR. HINDERAKER:  Well, what I was going to say,

11    Your Honor, is that this lawsuit is between some very big

12    corporations -- companies.  FICO is a worldwide company with

13    annual revenue over a billion dollars.  There is no

14    prejudice card that either party has to play.  There is no

15    sympathy card that either party has to play.  We're just too

16    big.  It isn't David versus Goliath.

17          Both parties, the best we can ask for is a just

18    result on the evidence, on the law, and that's what we

19    should get.  And I think you're -- and my comments are going

20    to be directed to doing exactly that with the advisory jury.

21          THE COURT:  I think -- well, on that statement, I

22    agree.  I don't think that -- this isn't a case with an

23    injured person -- a physically injured person suing a huge

24    corporation and you worry about the jury saying, give her a

25    million or two; it's, you know, nothing off -- it doesn't

1    hurt them.

2         But I heard two things in particular of interest

3    that I want you to address.  One is this notion, at least as

4    I'm understanding it -- I don't think I quite understood it

5    in the same way when I read the papers.  But what I'm

6    hearing is that, for lack of a better way of putting it,

7    there's a right number, whatever it is.  The jury will

8    decide what the number is for actual damages.  They think

9    it's a lot smaller than you think it is.

10        Their concern is once the jury starts hearing $35

11   billion, that what they're going to -- it's not that they're

12   going to be motivated by sympathy, but they're going to use

13   that figure to overestimate or overcalculate the license fee

14   figure.

15        What's your response to that?

16        MR. HINDERAKER:  I'm going to give a long-winded

17   one, and it starts with the proposition that FICO has the

18   right to try its case.  This argument started with the

19   notion that our damages for lost license fees is

20   approximately XXXXXXXXXXXX because we licensed that amount

21   in 2006.  Nonsense.

22        Our interrogatory answers detail out the basis of

23   our lost license fee as $47 million.  The lost license fee

24   is based upon an annual license fee for each year in which a

25   Blaze advisor was used without authority, a stark contrast

1    to the perpetual license fee that was negotiated in 2006

2    with a very different organization.

3            In 2016, when we had the assignment event, when

4    the Chubb Corporation was acquired by a much larger

5    insurance company, there were negotiations for a perpetual

6    license that FICO premised off of a $30 billion enterprise,

7    which was at the time of 2016.  That number is in.  That

8    number relates to our commercial purpose and our

9    understanding of the breach of paragraph 10.8.  It also

10   relates to the license fee that we sought at that time,

11   which was also a perpetual one.

12           THE COURT:  Which was what, if I might ask?

13           MR. HINDERAKER:  About XXXXXXXXXXX.

14           And our witnesses are going to have to answer the

15   question, why are you seeking $47 million now for four years

16   of use, of unauthorized use, when you were willing to

17   negotiate a perpetual license for three and a half million?

18   And we will answer that.  We will answer that to the -- we

19   will answer that on the primary proposition that when we

20   priced that perpetual at XXXXXXXXXXX, we had a lot of other

21   value in place that we felt deserved recognition, and we

22   priced XXX to get that perpetual business relationship for

23   all of the reasons that will be described at the trial.  In

24   terms of our theory of the case being honored, our witnesses

25   will explain how $47 million for four years of unauthorized

 1    use is reasonable in light of that perpetual negotiation.

 2    They're very different.

 3            Now, Judge Wright has a nice quote that also is

 4    part of the answer to the question, which is not

 5    acknowledged, but it is this:  She was discussing the

 6    evidence that's relevant to our lost license fee claim, and

 7    she says, quote, at page 55 of the summary judgment order,

 8    "This includes evidence of FICO's standard pricing

 9    methodology and together with evidence of defendants' use of

10    Blaze Advisor."

11            So we will put in our evidence of our standard

12    pricing methodology.  And we price annual license fees on a

13    standard basis much, much different than we do a perpetual,

14    for all the reasons we'll describe.  And then when we put on

15    the evidence of the annual license fee per our standard

16    practices, we will, according to -- and we have to.  Judge

17    Wright didn't like how we were doing it before and she says,

18    you have to look at the objective evidence of how the

19    defendants are using the software.  And we will do that for

20    the lost license fee.  And one thing I do agree with is that

21    our lost license fees are application by application by

22    application.

23            So, for example, we have -- the largest annual

24    license fee that we seek for the largest application is

25    about XXXXXXXX for one year.  The jury should hear why

1   that's a reasonable amount.  It's a reasonable amount for at

2   least these two reasons:  One, it's connected to revenue

3   transactions resulting in, just for that application, more

4   than $1,500,000.  Our license fee is seeking less than

5   XXXXXXXXXXXXXXXXXXXXXXXXX of the revenue that's connected to

6   the use of Blaze Advisor.

7          They should also hear for the reasons -- for the

8   intrinsic value of Blaze Advisor to the defendants, all

9   right, it's connected to the revenue, but what good -- how

10  is it connected?  It's connected to the revenue because it

11  automates the policy administration system, and if you don't

12  have a policy administration system, you can't sell

13  insurance.

14         They will have their expert testify about, well,

15  it's just one little bit and one little bit of a big

16  application.  And our fact witnesses will say it's the

17  brains or the central nervous system of the application and

18  you cannot automate the human underwriting process without

19  it.

20         So that's part of my long-winded answer.  The rest

21  of the answer I think is this, Your Honor:  Underlying the

22  argument that you've heard is this notion that FICO has the

23  obligation to prove profits, FICO has the obligation to

24  prove the nexus to profits.  In addition to not being aware

25  of FICO's interrogatory answers, the argument simply ignores

1    Judge Wright's ruling on summary judgment.  FICO's

2    obligation disgorgement is one -- well, it's two things:

3    How much revenue is connected to the use of the

4    applications?  Second thing, does the application

5    contribute, at least in some part, to the generation of that

6    revenue?  That's FICO's burden to prove.

7         And on that second place, it also goes to the

8    intrinsic value.  The application is important to the

9    would-be licensee because they use it in a system central to

10   the whole process of selling insurance.  That's intrinsic

11   value.  How useful is it to the process of selling

12   insurance?  How significant is it?  That's more than $1.5

13   billion a year.  You add up all of those revenue streams on

14   each application, times ten applications times four years,

15   and you get to $35 billion.

16        There's another application that they have where I

17   think our annual license fee that we seek is XXX -- rather

18   than XXXXXXXXXXXXXXXXXXXXXX.  Well, why?  There isn't much

19   revenue connected to it.  It doesn't do as much.  It's not

20   as central to their business processes.  Central to their

21   business processes is intrinsic value for lost license fees.

22   Central to their business processes is it makes a

23   contribution to revenue, at least in part, under 504(b).  It

24   is the same.

25        In my mind, when counsel argues everything is

1    premised off of a profit finding, it's certainly wrong as a

2    matter of law per -- well, it's certainly wrong as a matter

3    of law, and Judge Wright happens to agree with it.

4         But I also think there's some of this to it.  You

5    know, in their brief they say our proof of disgorgement is

6    specious.  Well, why do they say that, I say?  Well, if we

7    don't have any proof of disgorgement, well, then offering

8    the proof of $35 billion of use of our applications for the

9    four years of unauthorized use doesn't have any value,

10   doesn't have any relevance because our claims are specious.

11   But if you turn that proposition around, then you -- our

12   claims are not specious and then the whole argument falls

13   for a false premise.

14        The *Uniloc* case, which was mentioned a couple

15   times, is worth a few comments.  It's a patent case, not a

16   copyright case.  In patent law, the patentee has the

17   obligation to apportion and determine the extent to which

18   the technology contributed to the business benefit, to the

19   revenue, to the profit.  It is the patentee's obligation to

20   figure out that extent to profit from the technology that is

21   part of a bigger system.

22        That case stands for that proposition.  In that

23   case, the patentee acknowledged that the technology did not

24   drive market demand.  The patentee acknowledged he has no

25   basis for seeking damages for the full market value and yet,

1    in the trial he does the 19 billion full market value

2    number.

3              None of that is these facts.  One, FICO has the

4    obligation to prove gross revenue.  Any apportionment is for

5    them, not us.

6              Two, our evidence of gross revenue is directly

7    connected to the infringement, and the analogy would be

8    directly connected to that little piece of technology in the

9    big piece.  We're not -- and in our case, directly connected

10   to the infringement of Blaze Advisor.

11             THE COURT:  Say, hang on a second.  Say that

12   again.  Gross revenue is directly connected to the

13   infringement?

14             MR. HINDERAKER:  In this case?

15             THE COURT:  Yeah.

16             MR. HINDERAKER:  Yeah.  That's the disgorgement

17   case.

18             THE COURT:  I'm not sure I'm following that point.

19   The gross revenue is directly connected -- at least as I

20   understood it, directly connected to or relevant to the

21   hypothetical negotiation on the actual damages side.  And

22   then the gross revenues are the starting point for

23   disgorgement, assuming you can connect them to the use of

24   Blaze Advisor, right?

25             MR. HINDERAKER:  Gross revenue is the starting

1     point for disgorgement.

2               THE COURT:  Right.

3               MR. HINDERAKER:  The defendants' interrogatory

4     answers identify the amount of money connected to the use of

5     Blaze Advisor applications.  Their interrogatory answers

6     answer that question:  How much revenue is connected to the

7     use of these applications over the infringing period?

8               THE COURT:  I remember we -- I seem to recall we

9     had a discovery dispute about that.

10              MR. HINDERAKER:  We did.

11              THE COURT:  Okay.

12              MR. HINDERAKER:  So there's nothing complicated

13    about putting a table up before the jury that says these are

14    the numbers for these applications according to their

15    interrogatory answers.

16              THE COURT:  This is the revenue associated with

17    these applications which use Blaze Advisor.

18              MR. HINDERAKER:  Exactly.  And only that revenue.

19    Unlike the *Uniloc* situation, only that revenue.

20              And then our other primary burden under 504(b) is

21    to show that using the application made some contribution to

22    the generation of that revenue.  And that's where we get

23    into what does the application do?  How does it do it?  How

24    is it connected to the selling process?  That's evidence

25    that 504(b) makes a contribution to revenue.  It's also

1    exactly evidence of intrinsic value of the business purpose,

2    the value of why a licensee would pay something for the

3    license.

4            There's this argument a number of times about some

5    bone-chilling -- no, bone-crunching testimony about

6    apportionment.  Like I said, in a patent case, the plaintiff

7    carries that burden.  In a copyright case, the defendant

8    carries that burden.

9            Their damages expert is a fellow by the name of

10   Bakewell.  Bakewell was asked, were you engaged to apportion

11   these revenues to the extent they were related to the

12   infringement as opposed to other factors?  And he says, no,

13   I wasn't asked to do that; it wasn't part of my engagement.

14   I don't know of an expert that they have with bone-crushing

15   complexity in terms of apportionment.

16           They have another expert, more of a technology

17   side, but he didn't do any factual analysis.  He just said,

18   well, all the revenue is because they're great companies and

19   they have rules of decision-making, and you use automation

20   to make them more efficient, but that doesn't generate the

21   revenue.  That's not a hard argument.  It's what they have.

22   The jury can understand it.  They'll have counterevidence

23   from us.  But this notion of bone-crushing complexity is not

24   something that I understand from our six years of discovery.

25           The *Navarro* case, Your Honor, that you mentioned,

1    it was a copyright case, it was photographs, and the

2    reasonable royalty was built off of profits, naturally so.

3    And again, there the amount of damages was directly linked

4    to the benefit from the use.  And I can't tell you off the

5    top of my head whether the profit number was because -- I

6    think the profit number was because of the defendants'

7    evidence, that the judge said, well, Defendant, you're going

8    to want to put in your profit number for the reasonable

9    royalty, the same profit number that's disgorgement.

10           In this case, Mr. Bakewell, the damages expert, he

11   will -- he's opined that the profits are 2.456 billion.

12   Now, if I was the defendants and I was listening to the

13   evidence of the amount of license fees that we want, because

14   our applications in one year generate -- over all ten of

15   them, you know, generate $12, $15 billion worth of revenue,

16   I'd want the jury to hear if I was the defendant, well, yeah

17   it does, but that revenue is, you know, 2.45 billion.  Now,

18   it's still a billion, but it's not the numbers that we're --

19   you know, that the jury is going to hear the full case.

20           Apparently, according to the defendants, that's

21   not relevant to intrinsic value.  I don't understand that

22   because it certainly is.  And if they don't want to give it

23   to the jury, then that's fine with me.  But this notion of

24   no overlapping evidence simply isn't true.

25           And frankly, I think that when the Court's idea of

1    using an advisory jury so that we can -- the Court's idea of

2    using an advisory jury will be beneficial to avoiding any

3    confusion.

4         We should have a case where each witness comes to

5    the stand and testifies once.  Because everything is

6    overlapping, testifies completely once.

7         THE COURT:  Let me ask you a grubby factual

8    question.  And recognizing you're an officer of the court,

9    so let's -- we've got the case on liability and actual

10   damages proceeding, and we've got a separate case on

11   disgorgement.  How many witnesses do you call in this case

12   that you then call back on this case?  That's the first

13   question.

14        MR. HINDERAKER:  Well, I was going to say whether

15   it was going to be all of them or not.  We have one witness

16   who's primarily professional services.  Probably not him.

17   But we have -- the FICO fact witnesses are going to describe

18   what automated decision-making with Blaze Advisor means and

19   does and how you take a company's rules of decision, let's

20   say underwriting, and how do you automate the human

21   decision-making process of deciding whether to give John

22   Jones, you know, a homeowner's policy without human

23   involvement?  They will testify to that.  I think that

24   testimony is directly relevant to the intrinsic value of

25   Blaze Advisor to their business.  That's why they meet with

1   customers.  Here's our value proposition to their business.

2   Intrinsic value.  That same testimony is that's how Blaze

3   Advisor contributes to the generation of revenue.  It's

4   connected to a revenue generation event and it helps.

5          So the damages expert will be the same.  The

6   insurance industry expert would be in both places.  The

7   people negotiating the terminating the -- the business

8   people involved in terminating the contract will be in both

9   places.  In addition to the professional service person,

10  there is a person who was involved in negotiating the 2006

11  license.  She would be not one.  And there was a person who

12  was involved in the termination of the license in 2016, and

13  he's not one.

14         So to answer your question the best I can, I can

15  think of three witnesses who do not -- whose testimony does

16  not relate to both the intrinsic value of the software to

17  the business and to the contribution the software makes to

18  the revenue.

19         THE COURT:  And within those witnesses who

20  straddle both cases -- and I recognize, you know, number

21  one, this isn't exact, and number two, obviously you're

22  going to say one thing, they're going to say another -- but

23  what is your estimate of the overlap between those

24  witnesses?  Half of what they say in the first trial they're

25  going to say again in the second trial?  What's your

1    estimate?

2              MR. HINDERAKER:  I can think of some where the

3    overlap is 100 percent because intrinsic value and the

4    contribution to generating revenue are the same thing.  I

5    mean, business purpose, how do you use it in the business

6    and the question, how does that generate revenue?  Why do

7    you use it in the business and how does it generate revenue

8    are the same thing.

9              Some witnesses will be -- some witnesses will be

10   maybe 50 percent.  I can't sort out -- in my own mind, I

11   can't sort out -- here's why somebody licenses Blaze

12   Advisor:  Because it generates revenue.  And a witness will

13   say that.  Nobody licenses Blaze Advisor for any other

14   reason.

15             Well, that's the intrinsic value, but it's also

16   part of the 504(b) disgorgement proof.  And because we don't

17   have -- we don't try to prove profit, we don't try to prove

18   what portion is not attributable to infringement, those

19   issues aren't on our witness list.  Another way of answering

20   your question, I don't have any witness, other than the

21   three that I mentioned, that I think are exclusively

22   compensatory damages, intrinsic value.

23             THE COURT:  Okay.  Thank you, Mr. Hinderaker.

24   Anything further, or are you good?

25             MR. HINDERAKER:  Nothing further, Your Honor.

1              THE COURT:  Okay.  Thank you.

2              Ms. Godesky.

3              MS. GODESKY:  Godesky.  May I make just four brief

4     points, Your Honor?

5              THE COURT:  Yes.  Godesky?

6              MS. GODESKY:  Godesky, yes.

7              So four points, if I may.  Number one, we agree

8     they have every right to try their case on actual damages.

9     They can put out their $47 million figure and the evidence

10    that they say supports it.  No one is talking about limiting

11    the evidence on that front.  What we are talking about is

12    there's a separate issue with numbers that dwarf that $47

13    million figure that the Court has decided the Court will not

14    even decide.  And so the anchoring effect, the possibility

15    of split-the-baby considerations, right, all of those things

16    that are as old as time, and *Uniloc* is not the only case

17    that raises them, should absolutely factor into the decision

18    here.

19              Number two, I heard a lot of talk from counsel

20    about this concept of intrinsic value, and they spend a lot

21    of time in their papers talking about how the intrinsic

22    value of Blaze is relevant to the hypothetical negotiations

23    for the license fee, and I don't know where that came from.

24    There is no authority cited in their papers for this idea

25    that intrinsic value is relevant to calculating fair market

1   value.  And it's not.  Because, again, how it was just

2   described by counsel, this concept of intrinsic value is,

3   "how significant it is to the process of selling insurance

4   in terms of revenue generated."  That is not information

5   that FICO has when it's negotiating an arm's length

6   transaction with an insurance counterparty.  That is

7   information that counsel said several times they obtained in

8   litigation through our interrogatory responses, but that is

9   not how they go about pricing their license agreements.

10  They consider other things, and their witnesses will testify

11  about it.  But no one is going to say that in a typical

12  arm's length transaction they walk through an analysis of

13  how many profits are generated because of use of Blaze.

14          The third thing, I would say we don't think it's

15  necessary, Your Honor, to have an advisory jury on this

16  topic.  We do object to that.  But if that's the direction

17  the Court is headed because of appellate concerns or

18  whatever else might be driving it, there could still be an

19  advisory jury even with bifurcation.  That doesn't need to

20  be a barrier to bifurcating the case.

21          And then finally, counsel has not articulated any

22  real prejudice to FICO that even begins to compete with the

23  enormous prejudice to defendants if disgorgement is

24  presented from the outset of this case.  Number one, there

25  would not need to be a repetition of evidence.  Everything

1       that's said during phase 1 could be deemed admitted into the

2       record and the Court could consider it in ruling on

3       disgorgement in phase 2.  There would not be a need to

4       recall witnesses to say the exact same thing.

5              The other piece of this is I went through

6       counsel's paper and they identified in those pages and pages

7       of purportedly overlapping testimony, expert witnesses and

8       three fact witnesses who would be giving testimony on this

9       topic.  The experts, they're paid experts.  It's not the

10      biggest imposition in the world to require paid experts to

11      appear twice.  That's what they do for a living.  That's not

12      prejudice.

13             And then as for the three fact witnesses

14      identified in the papers, there's a Mr. Waid, a Mr. Wachs,

15      and a Mr. Baseman, and as I understand it, two of those

16      gentlemen are current FICO employees.  You know, they are a

17      plaintiff in this case, and so I'm sure it can be easily

18      accommodated to have those gentlemen appear twice if need

19      be.

20             So what we're left with is the possibility of one

21      former employee potentially being called to provide

22      additional testimony on a second day.  That is not prejudice

23      that can overcome the anchoring effect and the risk

24      associated with these eye-popping numbers.

25             Thank you.

```
1                    THE COURT:  Okay.  Thank you.

2                    Mr. Hinderaker.

3                    MR. HINDERAKER:  Can I respond to those four

4       points?

5                    THE COURT:  Go right ahead.

6                    MR. HINDERAKER:  Relevant evidence is never

7       unfairly prejudicial.  The so-called anchoring, it isn't

8       anchoring for an improper purpose, if there is any

9       anchoring, which I don't see.  Nevertheless, the numbers

10      come in because it's relevant evidence to the fair market

11      value of the lost license fees.

12                   Counsel says she doesn't know where this intrinsic

13      value proposition comes from.  I refer her to Judge Wright's

14      summary judgment order and Daubert order.  I think it's

15      docket number 731.  She lays out the law and the

16      propositions with respect to that.  This is one of those

17      points where it's noteworthy about what isn't said and said

18      depending on what the motion is.

19                   Mr. Bakewell testified to the fact that in a lost

20      licensing fee situation -- McCarter testified to the fact

21      that there's no contribution to revenue because the

22      defendants could use a different product than Blaze Advisor.

23      Mr. Bakewell picks up on that.  He's a damages expert.  He

24      doesn't know anything about the technology.  He picks up on

25      that.  And the point being that Judge Wright says:  The same
```

1    evidence, that is, alternative products, is relevant to two

2    different legal propositions.  Mr. Bakewell can testify to

3    the fact that there are products alternative to Blaze

4    Advisor as part of his lost license fee negotiation,

5    downward factor hypothetical, and it also bears on the

6    proposition of disgorgement and any contribution to revenue.

7         The other point -- another point, the law of

8    damages for infringement is it's a bit backward-looking, but

9    it's the lost -- it's the hypothetical negotiation at the

10   time of infringement for the unauthorized use.  As I hear

11   counsel's argument, the proposition is that we would license

12   on a perpetual basis, ongoing business relationship basis,

13   to someone who has infringed our copyrights for four years.

14   It's a non sequitur.  It's not how it works.  At the time of

15   infringement, what's the value of the fee -- of the software

16   that you're using without authority.

17        And then finally, as I hear the argument, FICO

18   would be -- would not be permitted to tell the jury that its

19   lost license fee numbers are very reasonable because

20   automated decision-making with Blaze Advisor brought, in the

21   aggregate over four years, $35 billion worth of value

22   through this company -- or these companies.  That's fair

23   that we be able to do that.  $47 million is not a huge

24   percentage of that number, but it aligns with how we license

25   and the value that the software gives.

1            THE COURT:  Okay.  Thank you, Mr. Hinderaker.

2            MS. GODESKY:  Nothing further, Your Honor, unless

3     the Court has questions.

4            THE COURT:  All right.  This motion is submitted.

5     We'll get an order out very quickly.

6            While you're all here, I think I said when you

7     came back we would have further discussion -- maybe I

8     didn't; everybody is looking perplexed -- about the jury

9     instructions and special verdict form I gave you all.  I was

10    looking for feedback on that.  And Ms. Kliebenstein -- I

11    almost called you Scobie -- you had said that you and

12    Ms. Janus had worked out a proposal for some deadlines for

13    motions in limine or had at least talked about that.

14           So does anybody recall this other than me?  Is

15    this just me?

16           MS. KLIEBENSTEIN:  I recall the discussion on the

17    schedule, and I think we should be in a position to

18    submit --

19           MS. GODESKY:  Very soon.

20           MS. KLIEBENSTEIN:  Yeah.  So there are two -- it's

21    going to be a proposed schedule with, you know, all the nuts

22    and bolts that go along with trial.  There are going to

23    be two areas where we don't agree --

24           THE COURT REPORTER:  I'm sorry.  I can't hear you.

25           THE COURT:  Yeah, come on up to the podium.

1    Sorry.

2            MS. KLIEBENSTEIN:  We'll be submitting shortly to

3    you a proposal for all of the trial -- the pretrial dates

4    with all the nuts and bolts, jury instructions, things like

5    that, modifications to the same.

6            There are two areas where we don't agree, the

7    trial brief and the findings of fact and conclusions of law,

8    so that document will set forth both parties' position for

9    you to make a decision on your final order.

10           And we can submit that -- do you prefer an email

11   so you have a Word copy?

12           THE COURT:  Yes.

13           MS. KLIEBENSTEIN:  Okay.

14           THE COURT:  If I heard you properly.  An email to

15   chambers, copying opposing counsel.

16           MS. KLIEBENSTEIN:  Perfect.  And we'll have that

17   within the next day or two, the last drafts with Fredrikson.

18           THE COURT:  And in that process, am I getting any

19   input from you on verdict form, instructions, et cetera?

20           MS. KLIEBENSTEIN:  Eventually.  Oh, Al is going to

21   take it back.

22           MR. HINDERAKER:  I can answer that, Your Honor.

23           THE COURT:  Come on up.

24           MR. HINDERAKER:  Yes, it will.

25           First, with respect to the scheduling order that

1  the parties are negotiating, everything has -- nothing

2  Heather said is wrong.  Just the rest of the story is that

3  FICO requested an opportunity to file trial briefs and

4  findings of fact and conclusions of law per the local rules,

5  and the defendants don't want to.  That's the conflict.  Not

6  the date.

7          THE COURT:  Okay.

8          MR. HINDERAKER:  In terms of your other question,

9  I can tell you that our intention is to take your special

10  verdict form as well as the instructions that you suggested

11  or, you know, the beginning of them and meld them as best we

12  can into FICO's proposed jury instructions.  I know that we

13  don't agree with everything that was in yours, and we'll

14  tell you why, and to the extent that yours are what we would

15  have done anyway or are doing, we'll let you know that this

16  is the same as what you proposed.

17          So that's how I intend, on FICO's behalf, to get

18  FICO's proposed jury instructions to you in a way that melds

19  with what you have given us or identifies any conflict.

20          THE COURT:  Yes.  I want to know what you're

21  changing and why, as it were, a low-brow way of saying it.

22          MS. GODESKY:  Mr. Young.

23          MR. YOUNG:  Yeah, Your Honor, I can respond.

24          THE COURT:  You've got to come up here so we can

25  all hear you, though.

1          MR. YOUNG:  Well, I don't have much in addition to

2     add.  As Ms. Kliebenstein said, the parties have exchanged

3     proposed orders.  You know, we're largely in agreement in

4     terms of dates to exchange things.  We've provided dates in

5     which we would exchange, you know, comments to the proposed

6     jury instructions, special verdict form, so we'll get those

7     to you.

8          The areas in which there are disagreement, I mean,

9     this will be set forth in our proposal to you, but in terms

10     of trial briefing, we certainly understand the local rules

11     provide for trial briefing.  In this case, we feel that, in

12     general, the generic sort of rule regarding trial briefing

13     and what is generally submitted is largely going to be

14     information that, you know, we've covered in extensive

15     briefing, and we also understood from your guidance at the

16     first pretrial that, you know, in general, trial briefing

17     probably wouldn't be of a substantial amount of assistance

18     in this case.  Certainly if there's, you know, areas of --

19     you know, factual areas or legal areas that you want the

20     parties to address in briefing, we'd be happy to do that.

21     We just think that it's better than submitting just general,

22     generic trial briefing that we don't think will be of, you

23     know, a significant amount of assistance.

24          On the second point -- and, again, this will be

25     covered in our proposal, but on proposed findings of fact

1     and conclusions of law, from our meet-and-confer we

2     understand that what the plaintiff is looking at submitting

3     is just proposed findings of fact and conclusions of law

4     solely related to the issue that Your Honor will be

5     deciding, which is the disgorgement claim.  We certainly

6     understand that the local rules provide situations in which

7     proposed findings of fact and conclusions of law are

8     submitted pretrial.

9          In this case, you know, we view that as an issue

10    that is -- you know, the disgorgement claim is a highly

11    complex issue.  It's an issue that will likely -- to the

12    extent we get there and there's a finding on liability, it

13    will involve a significant amount of evidence presentation.

14    Our proposal would be that it would be more efficient for

15    the parties to submit proposed findings of fact and

16    conclusions of law post-trial, to the extent Your Honor

17    wants them, and that we can, you know, after the

18    presentation of all evidence, identify, you know, a briefing

19    schedule for that and what exactly Your Honor wants in

20    addition.

21          THE COURT:  Okay.  Understood.  You'll be

22    submitting -- the thing that I care most about is I'm going

23    to get from the parties where they think the instructions

24    are wrong or incomplete or shouldn't be had and where the

25    parties think the verdict form is wrong or misleading or

1    what have you.  In other words, I want your feedback on

2    those two things.

3                MR. YOUNG:  Yeah, absolutely.

4                THE COURT:  Okay.  Thank you.

5                MR. YOUNG:  Thank you.

6                THE COURT:  All right.  Anything further for FICO

7    on this matter?

8                MR. HINDERAKER:  Minor housekeeping.

9                THE COURT:  Yep.

10               MR. HINDERAKER:  February 20th, a Monday, is

11   President's Day.  I assume the court is closed and our trial

12   is off, but I wanted to hear it from you.

13               THE COURT:  Well, if it were up to me, we'd go

14   right ahead and continue on with trial, but the courthouse

15   is closed and God knows they don't want to -- I should have

16   said we could go off the record -- but God knows I don't

17   want to figure out what havoc I would wreak by having trial

18   that day, okay?  So we're off on the 20th.

19               MR. HINDERAKER:  Yes, Your Honor.

20               THE COURT:  Anything further from Federal?

21               MS. GODESKY:  No, Your Honor.

22               THE COURT:  Thank you, all.  We're in recess.

23               (Court adjourned at 5:03 p.m.)

24                         *     *     *

25

1          I, Paula K. Richter, certify that the foregoing is

2     a correct transcript from the record of proceedings in the

3     above-entitled matter.

4

5                    Certified by:  *s/ Paula K. Richter* _____

6                                   Paula K. Richter, RMR-CRR-CRC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25