# EXHIBIT 3

**957**

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA

---------------------------------------------------
                                )
Fair Isaac Corporation,         )  File No. 16-cv-1054(DTS)
a Delaware Corporation,         )
                                )
    Plaintiff,                  )
                                )
v.                              )
                                )
Federal Insurance Company,      )  Courtroom 14W
an Indiana corporation,         )  Minneapolis, Minnesota
and ACE American Insurance      )  Monday, February 27, 2023
Company, a Pennsylvania         )  9:00 a.m.
Corporation,                    )
                                )
    Defendants.                 )
                                )
---------------------------------------------------


          BEFORE THE HONORABLE DAVID T. SCHULTZ
       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


              (JURY TRIAL PROCEEDINGS - VOLUME VI)










    Proceedings recorded by mechanical stenography;
transcript produced by computer.
                        * * *
```

**958**

```
APPEARANCES:

For Plaintiff:     MERCHANT & GOULD P.C.
                   BY:  ALLEN W. HINDERAKER
                        HEATHER J. KLIEBENSTEIN
                        PAIGE S. STRADLEY
                        MICHAEL A. ERBELE
                        JOSEPH W. DUBIS
                        GABRIELLE L. KIEFER
                   150 South Fifth Street, #2200
                   Minneapolis, Minnesota 55402

For Defendants:    FREDRIKSON & BYRON
                   BY:  TERRENCE J. FLEMING
                        LEAH C. JANUS
                        CHRISTOPHER D. PHAM
                        RYAN C. YOUNG
                        PANHIA VANG
                   200 South Sixth Street, #4000
                   Minneapolis, Minnesota 55402

                   O'MELVENY & MYERS LLP
                   BY:  LEAH GODESKY
                        ANTON METLITSKY
                        DARYN E. RUSH
                        ROXANA GUIDERO
                   Times Square Tower
                   7 Times Square
                   New York, New York 10036

Court Reporters:   RENEE A. ROGGE, RMR-CRR
                   KRISTINE MOUSSEAU, CRR-RPR
                   MARIA V. WEINBECK, RMR-FCRR
                   PAULA RICHTER, RMR-CRR-CRC
                   United States District Courthouse
                   300 South Fourth Street, Box 1005
                   Minneapolis, Minnesota 55415

                        * * *
```

**959**

I N D E X
                                                       PAGE

HENRY MIROLYUZ
  Examination By Mr. Hinderaker                         971

CLAUDIO GHISLANZONI
  Cross-Examination By Mr. Hinderaker                  1046
  Direct Examination By Ms. Godesky                    1131
  Recross-Examination By Mr. Hinderaker                1161
  Redirect Examination By Ms. Godesky                  1170
  Recross-Examination By Mr. Hinderaker                1171

JOHN TAYLOR
  Examination By Mr. Hinderaker                        1174


DEFENDANTS' EXHIBITS                                  REC'D
  517                                                  1080
  518                                                  1082
  526                                                  1096
  1002                                                 1088
  1005                                                 1088
  1007                                                 1088
  1008                                                 1088


PLAINTIFF'S EXHIBITS                                  REC'D
  39                                                   1140

**960**

                         9:00 A.M.


        (In open court without the Jury present.)
        THE COURT:  Please be seated.  Good morning,
everyone.
        The record should reflect that we are in the
courtroom outside the presence of the jury.  As I understand
it, there is a couple of issues, at least one, that we need
to take up now before we begin with testimony and that I
think is the interrogatory answer.
        Is that correct, Mr. Hinderaker?
        MR. HINDERAKER:  Yes, Your Honor.
        THE COURT:  Okay.  And tell me what it is you plan
to put in and, if it's not obvious, why it's relevant.
        MR. HINDERAKER:  This is a copy of it.
        THE COURT:  Yeah, I've looked at it.  Go ahead and
bring it up.  Well, what are you proposing to do with this
exactly?
        MR. HINDERAKER:  Well, mister -- well, I guess it
comes up in Mirolyuz's deposition because Mr. Mirolyuz is
the one who verified it.
        THE COURT:  Right.
        MR. HINDERAKER:  During the course of the
deposition we had an unsigned copy, and during the
deposition I asked Mr. Mirolyuz, and he did verify it in the

**1017**

1  through a witness, and the witness is going to have to be
2  somebody who has knowledge or foundation for the document."
3       And so through the first eight witnesses in this
4  trial, we planned our case based on FICO's objection and
5  then the Court's directive.
6       And so last night FICO sent us a list of about 20
7  different exhibits that they want to use with
8  Mr. Ghislanzoni. He is our corporate representative, but he
9  is not a 30(b)(6) deponent. He has not been educated on
10 topics outside his personal knowledge.
11      So the group of e-mails that were submitted to the
12 Court, there is an evidentiary issue separate and apart from
13 foundation for one of them, but all of them predate his time
14 at the company. He is not on any of them, and he can't
15 speak to what happened. And it's completely prejudicial to
16 be confronting our corporate representative with e-mails and
17 asking him questions about things that he has no knowledge
18 of.
19      Relatedly, Mr. Hinderaker also alluded to the fact
20 that they want to try to use interrogatories with
21 Mr. Ghislanzoni. They disclosed last night these are
22 interrogatories that show various gross written premium
23 levels run through certain applications. Mr. Ghislanzoni
24 doesn't know anything about that. He wasn't involved in the
25 process of running that data. And FICO took three or four

**1018**

1  days of 30(b)(6) deposition testimony of multiple deponents
2  on how that data was run, where it came from and what it
3  means.
4       So if they wanted party admissions about, you
5  know, those gross written premium numbers, they could have
6  designated that deposition testimony. Apparently, they
7  don't like the deposition testimony, so, instead, they would
8  like to prejudice our case by confronting our corporate
9  representative with rogue responses that he had no
10 involvement of, no knowledge of and would be completely
11 confused by.
12      THE COURT: Okay. Mr. Hinderaker, very briefly.
13 You're going to have to lay foundation.
14      MR. HINDERAKER: Absolutely. So there will be --
15 a foundation will be laid through Mr. Ghislanzoni. It will
16 or it won't.
17      THE COURT: Okay.
18      MR. HINDERAKER: He testified at his deposition,
19 "A decision was made to take a copy of the Canadian
20 application and use it as a base to create an Australian
21 application."
22      In his role as the architect overall, he was
23 knowledgeable and participated in the decisions of how and
24 when to remove Blaze Advisor. He is not testifying as a
25 corporate representative or as a 30(b)(6), but as a person.

**1019**

1       THE COURT: Right.
2       MR. HINDERAKER: And in terms of jumping the gun
3  on the interrogatories, they also tell us when the
4  applications -- when Blaze Advisor was no longer used. And
5  this goes to our earlier conversation. We have to clean
6  them up with all the --
7       THE COURT: Understood. Yes.
8       Okay. Let's bring in the jury.
9       By the way, one of the jurors informed me that
10 they are perfectly happy with a 60-minute lunch break, so we
11 will go to 60 minutes.
12      MR. HINDERAKER: I hope they don't shorten it up
13 anymore.
14      THE COURT: We will be down to 10 minutes by the
15 end of the week.
16      THE CLERK: All rise for the jury.
17           (Jury enters.)
18
19      (In open court with the Jury present.)
20      THE COURT: Be seated.
21      You may proceed, Mr. Hinderaker.
22 BY MR. HINDERAKER:
23 Q.  I have given you Exhibit 189. It has the heading CSI IT
24 Summit. I acknowledge that it bears a date of August 2006.
25 Have you seen this before?

**1020**

1  A.  No.
2  Q.  Okay. So when you picked up your involvement with Blaze
3  Advisor, was this part of the background information --
4  information that you reviewed?
5  A.  At that point, no, it was not, because at that point in
6  time the decision to use the Blaze Advisor was already made
7  and the work on the project was already started. So my role
8  at that time was a developer. So I was really boots on the
9  ground to help with the development of Blaze Advisor.
10 Q.  I see.
11 A.  I was not an architect at that point of time.
12 Q.  Mm-hmm. Who, who was the person leading the Blaze
13 Advisor project in November of 2006?
14 A.  Owen Williams who was one of the department managers at
15 CSI. He was leading the Blaze Advisor project.
16 Q.  We've handed you Exhibit 191.
17 A.  Yes, I do.
18 Q.  Okay. And from the metadata, I believe you were the
19 author of that.
20      From the metadata, I believe you are the author of
21 this. Would you agree?
22 A.  Oh, yes.
23 Q.  Okay. And what was the purpose of your creation of
24 Exhibit 191?
25 A.  After the success of the business rules project for the

**1021**

1  ARP 2, the purpose of this document is to market the
2  business rules technology -- business rules across the
3  enterprise, across the Chubb.
4  Q.  And that was the purpose.  And what was the goal to be
5  achieved from that purpose?
6  A.  We thought that using the business rules can bring the
7  benefits to the IT teams across the Chubb.  So the goal is
8  as they become familiar, they would start implementing or
9  using the business rules technology that is making their
10 life simpler.
11 Q.  Okay.  So the -- was there a benefit to -- separate from
12 the simpler life of the underwriters, was there a benefit to
13 the business that you were advancing?
14 A.  Benefit would be, from my view, would be quicker
15 turnaround of the projects; thus, we can deploy the business
16 requests significantly quicker, as was demonstrated by the
17 ARP 1 project.
18 Q.  And from your point of view, what was the benefit to the
19 business when you were able to do that?
20 A.  Again, the changes or business changes can be deployed;
21 thus, whatever benefit is intended for that particular
22 implementation can be achieved significantly faster.
23 Q.  Does that mean then that new policies can be put to
24 market faster?
25 A.  Not necessarily, but could be more precise guidance or

**1022**

1  more precise scoring for that particular example.  It
2  doesn't necessarily impact the speed or increase on the
3  business.
4  Q.  Let's back up a second.  So the reason for having Blaze
5  Advisor is that it has an ultimate benefit for the business.
6  A.  Correct.
7  Q.  Correct?
8  A.  Ultimately, yes.
9  Q.  Yes, ultimately.  And one of the benefits of, I think
10 that you just said, is that it makes people lives easier?
11 A.  Correct.
12 Q.  Correct?  And the people that you're referencing are the
13 underwriters?
14 A.  No.  I'm referencing the IT teams because they're
15 ultimately responsible.  Again, I'm talking -- my role was
16 from the IT perspective.
17 Q.  Okay.
18 A.  I would not be able to speak for any business benefits
19 achieved through the use of the Blaze Advisor technology or
20 business rules technology.  I do speak around the
21 benefits -- that's what I speak in this document, is where
22 the business rules technology could benefit from the IT
23 point of view.
24 Q.  Anyway, that's what I said.  4 of 42 and Bates number
25 0004.

**1023**

1  A.  Okay.
2  Q.  And you wrote Introduction and Scope 1.1?
3  A.  Correct.
4  Q.  All right.  So you start that with, "The purpose of this
5  document is to illustrate."  And then tell me what you mean
6  by, "Such as increasing agility to implement the business
7  change and reducing time to market the new products and
8  services."
9          First paragraph.
10 A.  So we believed at the time of --
11         COURT REPORTER:  I lost you.
12         THE WITNESS:  Sorry.  I believed at the time I
13 wrote this document that implementation of the business
14 rules technology --
15         MR. FLEMING:  I'm sorry.  I thought you were
16 saying 40.
17 BY MR. HINDERAKER:
18 Q.  Let's try again.
19 A.  Yeah.  So at the moment of writing this document, I
20 believed that use of the business rules technology would
21 enable IT team to deploy any business request to production
22 or to come to market significantly faster as compared with
23 traditional technologies employed at Chubb at a that point
24 in time.
25 Q.  Say what?

**1024**

1  A.  It increases the agility of the project and increases --
2  and reducing time to market.
3  Q.  It increases the agility of the business?
4  A.  Agility of implementation.  Again, as you can see
5  specifically here, it is agility to implement to business
6  changes.
7          So I'm not speaking to the business benefit for
8  this.  This specifically says if I have a request from the
9  business to implement particular change, I can deploy it, I
10 can implement it significantly faster and deploy it
11 significantly faster for business to use.
12 Q.  As a consequence, as you say, that reduces the time to
13 market for new products and services, correct?
14 A.  If it's implemented in the Blaze Advisor.  Again, big
15 disclaimer.
16 Q.  And you just, you just, you just said the phrase, "if
17 implemented in Blaze Advisor."
18         And I want to turn you to the next page.  And you
19 have a heading, "What are business rules?"  And then you
20 have a description, you know, four paragraphs down,
21 "Traditionally embedded" -- "traditionally embedded inside
22 code."  And then you say -- and then you have the next
23 paragraph, "Externalizing the business rules to be a
24 structured decision management."
25         Is that what you're meaning by if Blaze Advisor is

1025

1  used because it externalized the business rules?
2  A.  Correct.  And that is how it was marketed to us by FICO
3  when we bought the tools.
4  Q.  And then -- let's see.  And then on the same page at the
5  bottom, "Enhance business performance by."  And Number 1 is,
6  "Increasing Analytical Ability."
7       Over time, can you tell me how Blaze Advisor
8  applications were used to increase analytical ability?
9  A.  Profitability indicator is an example of such
10 application which provides the ability to determine the
11 severity of the risk as underwritted by Chubb.
12 Q.  Okay.  And then Number 2, Automate Decisions by, and
13 then it says, "Automating High-Volume, Low-Risk Decisions."
14 Is that a component of -- tell me what applications of Blaze
15 Advisor used that.
16 A.  DecisionPoint.
17 Q.  How about Automatic Renewal?
18 A.  Automatic Renewal -- it renews all the policies, so I
19 wouldn't qualify it as low risk.  It's entire book of
20 business, whereas DecisionPoint is for specific low-risk,
21 high-volume business.
22 Q.  And then II is "Establishing Uniform Decisions Across
23 Multiple Functions, Channels and Business Touch Points."
24 What applications using Blaze Advisor did that?
25 A.  Essentially, again, profitability indicator, because it

1026

1  is used in many different places.  Automatic Renewal, CSI
2  Express, DecisionPoint.  That's an example of uniform
3  decision about the risk.
4  Q.  It would be separate from profitability indicator.  Is
5  this also true for the underwriting guidance for CSI
6  Express?
7  A.  Underwriting guidance is developed -- yes, it is correct
8  in terms of application.  But since it speaks about multiple
9  functions and touch points, decision points, my view at
10 least, it's a better example.
11 Q.  Okay.  CSI Express and underwriting guidance does
12 establish underwriting decisions?
13 A.  Correct.  But in context of one application decision is
14 not shared across anywhere else.
15 Q.  This is Exhibit 192 for the record.  It's a cover e-mail
16 having a subject line of "Creating and Managing Business
17 Rules, CoE, Henry Mirolyuz, Chubb," dated 9/16/2009, and
18 then the attachment bearing Bates numbers FICO0057207
19 through 57222, bears as a title "FICO Forum:  Decision
20 Management Tools User Group, September 16-18, 2009."  It
21 includes on the title page, "Henry Mirolyuz, technical
22 analyst, business rules CoE, Chubb."
23      Do you recall this presentation, Mr. Mirolyuz?
24 A.  Yes, I do.
25 Q.  Okay.  Did you prepare this entire deck?

1027

1  A.  I prepared the deck in collaboration with Michael Sawyer
2  from FICO.
3  Q.  Okay.  All right.  Let me just go to the Bates number
4  57208?
5  A.  50208.
6  Q.  The second page.
7  A.  Yep.
8  Q.  And there is this quote from Donald Light.  Why did you
9  include that quote in the presentation?
10 A.  I felt that the term "business rules" was used a little
11 bit loosely.  People do not realize or do not have complete
12 understanding about what the business rules really is versus
13 the term of "decision business" and "decision-making
14 process" is a better illustration or a better terminology
15 for the technology itself.  I think it's gives the people
16 better insight into that.
17 Q.  And is that because as a consequence of the business
18 rules application, it enables a company to make decisions?
19 A.  Yes.  Same as wrote in the EcoSystem document.  Better
20 uniform decisions.
21 Q.  Let me turn to the next page, 209.  And, again, these
22 are your statements in the slides?
23 A.  Correct.
24 Q.  All right.  So we don't need to read them to each other.
25 But under the Potential Future Applications, there is a

1028

1  heading, Cross/Upselling?
2  A.  Yes.
3  Q.  Was that application implemented during your time at
4  Chubb?
5  A.  Not to my knowledge.  It was considered, as you can see
6  it here, but I don't believe it was implemented.
7  Q.  Would it have been a functionality of CSI Express?
8  A.  Correct.
9  Q.  And then the next header is Predictive Models.  Was that
10 implemented at CSI Express -- was that implemented at Chubb?
11 A.  Yes, it was.  Profitability indicator.
12 Q.  And if we go to the next page, 57210, you're giving a
13 case study of Automated Renewal I?
14 A.  Correct.
15 Q.  Thank you.  And in this, with respect to Automated
16 Renewal I on this slide, the overall business goal is to
17 increase the percentage of automated renewal submissions.
18 Was that accomplished?
19 A.  Correct.  Yes, it was.
20 Q.  And it goes on to say that the policies that are
21 automatically renewed, the more time the underwriter has to
22 develop and produce additional business or handle
23 additional -- produce additional business or handle
24 additional business.  And that also was achieved?
25 A.  I believe it was.

**1029**

1  Q.  And then there a header, "Objectives/Benefits, and
2  Reach."  Were those achieved as well?
3  A.  I cannot say if it was completely achieved or not.
4  Q.  I'm sorry?
5  A.  I cannot say if it was completely achieved or not.  It
6  was the goal to achieve those benefits.  But was it achieved
7  100 percent?  I'm not sure.  I cannot speak to that.
8  Q.  Okay.  Do you know if it was achieved to some extent?
9  A.  To some extent, yes, it was.
10 Q.  You have been handed Exhibit 196.
11      COURT REPORTER:  193.
12 BY MR. HINDERAKER:
13 Q.  I'm sorry.  193.  Thank you.  And an Introduction to
14 Business Rules, Improving Performance Through Decision
15 Management.  And you, sir, are one of the presenters; is
16 that right?
17 A.  That is correct.
18 Q.  And do you recall --
19 A.  Oh, yes.
20 Q.  -- the context of this?  What was it?
21 A.  It was a presentation on one of the forums which was
22 hosted by FICO to talk about the business rules and Chubb
23 experience in particular.
24 Q.  All right.  So this was an external presentation outside
25 of Chubb?

**1030**

1  A.  Yes.
2  Q.  Then the next -- the next page has the next slide,
3  Business Rules Overview, CoE, October of 2009.  Are you the
4  author of the slides that follow that?
5  A.  If my recollection is correct, it was a collaborative
6  effort, so we all work.  I mean, I would have provided the
7  information, but we all worked on all the presentations all
8  together.
9  Q.  Is it accurate to say that you were one of the
10 collaborators on this entire set of slides?
11 A.  Correct.
12 Q.  So you had an input into all of the slides?
13 A.  Yep.  At least I was able to review it and provide the
14 feedback, if necessary.
15 Q.  If you disagreed, you could say so?
16 A.  Yeah.
17 Q.  If you would go to the Bates number that has 0012 as its
18 ending.
19 A.  Okay.
20 Q.  You'll actually get the original 12 of this slide as
21 well.  You see that slide bears the heading, "What is
22 Decision Management?  FICO's Point of View."
23 A.  Yep.
24 Q.  And then it has five dimensions of Decision Management?
25 A.  (Moves head in affirmative manner.)

**1031**

1  Q.  And my question is:  From the deployment of Blaze
2  Advisor and the particular Blaze Advisor applications at
3  Chubb, can you describe for me how the Chubb Blaze Advisor
4  applications align with these five points?
5  A.  I'm not sure I follow the question the way it's stated.
6  Q.  Let me say it this way:  Blaze Advisor applications that
7  were implemented by Chubb aligned with the -- made
8  decisioning more precise?
9  A.  So again, Profitability Indicator, as I said before, is
10 a great -- is an example of precise decision to identify
11 high-risk policies or customers.
12 Q.  And Chubb's implementation of Blaze Advisor applications
13 made decisioning more consistent?
14 A.  For the lines which were implemented.  So the Blaze
15 Advisor for Profitability Indicator.
16 Q.  That's another example?
17 A.  Yep.
18 Q.  CSI Express is another example?
19 A.  CSI Express, again, is too in general, but Blaze
20 component is used for a specific line of -- as I said
21 before, specific line of business.  So for those implemented
22 for Blaze, yes, it makes decisioning much more precise.
23 Q.  And then another dimension of decisioning is agility.
24 And you mentioned that in your earlier slides --
25 A.  Correct.

**1032**

1  Q.  -- as one of the benefits of Blaze Advisor, deploying
2  Blaze Advisor?
3  A.  Correct.  We were able to implement the changes quicker
4  than what we were able to do it before.
5  Q.  And another dimension of using Blaze Advisor is speed to
6  market.  You were able to accomplish some of that?
7  A.  Correct.
8  Q.  And if you would -- the e-mail itself is 5/27/15, but
9  then the e-mail has 5/21/15, just to be clear.
10     And if you would go to the e-mail Bates numbered
11 5271, looking at that profitability indicator.  And,
12 Mr. Mirolyuz, are you the author of this slide?
13 A.  I could have provided the information for that slide.
14 However, I don't recall if I was the author or Mike created
15 the slide himself.
16 Q.  So whether your fingers touched the keys or not, the
17 information on the slide is your information?
18 A.  Correct.
19 Q.  And then on the top left corner is the heading
20 "Initiative," and it lists various objectives, benefits?
21 A.  Correct.
22 Q.  And are you listed -- and then under the bottom left,
23 there's another cell, "Plus/Delta," and then under Plus it
24 says, "The defined business benefit was realized."
25 A.  Correct.

1033

1  Q.  Let's go to the next slide.  And this one is talking
2  about DecisionPoint, correct?
3  A.  Correct.
4  Q.  Okay.  And, again, you list in the Initiative cell four
5  business benefits to be achieved by the DecisionPoint
6  application?
7  A.  Correct.
8  Q.  And then under Plus/Delta, you state that, "The defined
9  business benefit was realized"; is that correct?
10 A.  That is correct.
11 Q.  Can you just tell us -- maybe we know, but what's the
12 meaning of real-time quotes and bindable quote letter?
13 A.  That we can provide -- as requested, we can provide the
14 quotes in real-time.  They don't have to wait for -- the
15 customers don't have to wait overnight to get a quote.  They
16 can receive it -- real-time is not absolutely correct.  It's
17 near real-time but within a reasonable time frame.
18 Q.  Do you know if Chubb has -- I'm just talking the big
19 company Chubb -- undertaken the analysis to quantify the
20 business value which is realized from Blaze Advisor
21 applications?
22 A.  I cannot speak one way or another.  I'm looking from the
23 technical perspective.  As I said before, the decision
24 regarding using Blaze was already made before I started at
25 Chubb.

1034

1  Q.  You have Exhibit 195.  It says, "Chubb Enterprise
2  Architecture - Business Rules Strategy/Roadmap."
3  A.  Yeah.
4  Q.  I will just represent that the metadata suggests this is
5  a July 21, 2017, document with yourself as the author.  Do
6  you recall it?
7  A.  Yes, I do.
8  Q.  Okay.  What was the purpose of this document,
9  Exhibit 195?
10 A.  The purpose of this document is to summarize the
11 strategy around the business or provide a strategy in a
12 future roadmap regarding the business rules for the Chubb at
13 the Enterprise level.
14 Q.  Is this an internal presentation to Chubb?
15 A.  Correct.  Specifically it is limited to the Chubb
16 Enterprise Architecture.  So it's not even presented to the
17 broader audience.  It's specifically intended for the
18 Enterprise Architecture team.
19 Q.  The Enterprise Architecture team, is that speaking of --
20 speaking to IT personnel who have Enterprise-wide
21 responsibilities?
22 A.  In Chubb -- all Chubb architects.  All the architects
23 were the Enterprise architects.  It was not separated by the
24 business unit, so anybody who had the title "architect"
25 would be considered to be the Enterprise architect.  So this

1035

1  is specifically that team.
2  Q.  That team.  All right.
3      So that's to whom it was presented.  And then why
4  was it being presented?
5  A.  Again, to inform them -- to develop the strategy and as
6  well as a future roadmap in regards to the use of the
7  Business Rules technology at Chubb.
8  Q.  Okay.  And are you the author of the entire document
9  then?
10 A.  With the input of information from others, but yes, I am
11 the one who compiled it.
12 Q.  So it's fair to say, this is your document?
13 A.  Yes.
14 Q.  All right.  If we could go to page 11, please, and that
15 slide has a header, "2015 Business Rules Projects at Chubb
16 (Active)."  Are we on the same page?
17 A.  Yes.
18 Q.  All right.  So the first line is "Corp" and then "PARS."
19 Do you recall that?
20 A.  Correct.
21 Q.  What is it?
22 A.  It's a CBS, corporate -- it's a Premium Booking.  So the
23 name acronym was the PARS, and we called it CBS, Corporate
24 Business Division.
25 Q.  Is Premium Booking and Corporate PARS the same thing?

1036

1  A.  Yes, it is the same thing.
2  Q.  And that project was completed per this slide?
3  A.  Correct.
4  Q.  Okay.  And why did you choose DecisionPoint and
5  Profitability Indicator as the applications to highlight in
6  the presentation?
7  A.  Profitability Indicator was our first attempt to
8  implement predictive models, risk assessment in Blaze.  By
9  itself, it was an interesting project, and people had raised
10 an interest on how we did it and the benefit of using it.
11 Q.  Mm-hmm (Yes).
12 A.  DecisionPoint was the project which we were using the
13 latest and greatest in terms of lessons learned and
14 experiences.  So we developed, actually in collaboration
15 with working with FICO as well, some assistance there,
16 application using --
17     (Court reporter asked for clarification.)
18     THE WITNESS:  -- agile methodologies.
19     MR. FLEMING:  Agile.
20 BY MR. HINDERAKER:
21 Q.  Is that what you mean, agile, A-G-I-L-E?
22 A.  Yeah.
23 Q.  Agile methodologies?
24 A.  Yeah.  And we were -- I mean, it was -- again, a number
25 of capabilities implemented in the DecisionPoint was

**1704**

```
            UNITED STATES DISTRICT COURT
               DISTRICT OF MINNESOTA

--------------------------------------------------------
                                )
Fair Isaac Corporation,         )  File No. 16-cv-1054(DTS)
a Delaware Corporation,         )
                                )
      Plaintiff,                )
                                )
v.                              )
                                )
Federal Insurance Company,      )  Courtroom 14W
an Indiana corporation,         )  Minneapolis, Minnesota
and ACE American Insurance      )  Thursday, March 2, 2023
Company, a Pennsylvania         )  8:47 a.m.
Corporation,                    )
                                )
      Defendants.               )
                                )
--------------------------------------------------------



            BEFORE THE HONORABLE DAVID T. SCHULTZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


             (JURY TRIAL PROCEEDINGS - VOLUME IX)








     Proceedings recorded by mechanical stenography;
transcript produced by computer.
                        * * *
```

**1705**

```
APPEARANCES:

For Plaintiff:     MERCHANT & GOULD P.C.
                   BY:  ALLEN W. HINDERAKER
                        HEATHER J. KLIEBENSTEIN
                        PAIGE S. STRADLEY
                        MICHAEL A. ERBELE
                        JOSEPH W. DUBIS
                        GABRIELLE L. KIEFER
                   150 South Fifth Street, #2200
                   Minneapolis, Minnesota 55402

For Defendants:    FREDRIKSON & BYRON
                   BY:  TERRENCE J. FLEMING
                        LEAH C. JANUS
                        CHRISTOPHER D. PHAM
                        RYAN C. YOUNG
                        PANHIA VANG
                   200 South Sixth Street, #4000
                   Minneapolis, Minnesota 55402

                   O'MELVENY & MYERS LLP
                   BY:  LEAH GODESKY
                        ANTON METLITSKY
                        DARYN E. RUSH
                        ROXANA GUIDERO
                   Times Square Tower
                   7 Times Square
                   New York, New York 10036

Court Reporters:   RENEE A. ROGGE, RMR-CRR
                   KRISTINE MOUSSEAU, CRR-RPR
                   MARIA V. WEINBECK, RMR-FCRR
                   PAULA RICHTER, RMR-CRR-CRC
                   United States District Courthouse
                   300 South Fourth Street, Box 1005
                   Minneapolis, Minnesota 55415

                        * * *
```

**1706**

I N D E X

PAGE

N. WILLIAM PAUL WAID
   Direct Examination By Mr. Hinderaker    1712
   Cross Examination By Ms. Godesky        1747
   Redirect Examination By Mr. Hinderaker  1828

KEVIN HARKIN
   Direct Examination By Ms. Janus         1849
   Cross-Examination By Ms. Kliebenstein   1871

PAMELA LOPATA
   Direct Examination By Ms. Godesky      1906
   Cross-Examination By Mr. Hinderaker    1917

MICHAEL SAWYER BY DEPOSITION


| PLAINTIFF'S EXHIBITS | REC'D |
|---|---|
| 404A | 1892 |
| 1177 | 1875 |
| 1178 | 1875 |
| 1179 | 1875 |

| DEFENDANTS' EXHIBITS | REC'D |
|---|---|
| 12 | 1821 |
| 30 | 1800 |
| 77 | 1756 |
| 172 | 1829 |
| 276 | 1818 |
| 283 | 1817 |
| 284 | 1817 |
| 293 | 1817 |
| 330 | 1810 |
| 343 | 1819 |
| 356 | 1857 |

**1707**

```
                March 2, 2023                    8:47 A.M.

           (In open court without the Jury present.)
           THE COURT:  Good morning.  Please be seated.
           All right.  We're on the record outside the
presence of the jury.  I understand that we've got an issue
with some late-added exhibits to the plaintiff's exhibit
list.  I've reviewed the exhibits.
           Let me ask, first of all, if there is a -- have
the parties had a chance to meet and confer and resolve the
issue?
           MR. HINDERAKER:  No, we haven't, Your Honor.
They came to us at like 11:30 last night.
           THE COURT:  Okay.
           MS. GODESKY:  Your Honor, Mr. Waid is in the
courtroom.  Is it possible for him to step out while we're
talking about these documents?
           THE COURT:  Sure.
           MS. GODESKY:  Thank you.
           MR. HINDERAKER:  Could I also clarify what we're
talking about a little bit from our point of view?
           THE COURT:  Sure.
           MR. HINDERAKER:  Both parties have -- you know,
there is a court order about when exhibits are to be filed
with the Court.  And both parties have been adding to the
```

1892

1  A. Mm-hmm.
2  Q. Okay. So in your deposition we reviewed, we reviewed
3  some interrogatory responses, and we reviewed some
4  financials. Do you recall that?
5  A. Yes.
6  Q. And I'd like you to look at Exhibit P404A, which is a
7  redacted copy. And you'll see on this --
8      Your Honor, this is not in evidence yet, so I
9  just want to slow down and check that box before we get too
10 far.
11     So this is Deposition Exhibit Number 407, which
12 was Plaintiff's Trial Exhibit 404A, which we've redacted
13 consistent with the ninth supplemental interrogatory
14 responses.
15     Mr. Harkin, do you recall seeing this at your
16 deposition?
17 A. Generally, yes.
18 Q. Okay.
19     Your Honor, I move to admit Exhibit P404A.
20     MS. JANUS: No objection.
21     THE COURT: P404A is received.
22 BY MS. KLIEBENSTEIN:
23 Q. And the title of this document is Federal Insurance
24 Company's Fifth Supplemental Answer to Plaintiff's
25 Interrogatory Number 16 and Sixth Supplemental Answer to

1893

1  Plaintiff's Interrogatory Number 17.
2      Do you see that?
3  A. I do.
4  Q. And so this was an interrogatory, a question, from FICO
5  to the defendants. Do you agree with that?
6  A. Yes.
7  Q. And the defendants provided answers to FICO, correct?
8  A. Correct.
9  Q. And in our deposition we went through these
10 interrogatories to determine where the gross written
11 premium revenue dollars, where they came from, how they
12 were collected. Do you recall that?
13 A. Yes.
14 Q. Let's just take the time to look at interrogatory
15 number 16 and number 17.
16     And I have interrogatory number 16 up on the
17 screen. And it is, it says, "For all insurance policies in
18 connection with which the Blaze Advisor software was used,
19 the gross written premium of defendants and the gross
20 written premium of each related company, including the
21 specific identification of each related company, for each
22 year from 2007 to 2012."
23     Do you agree with that?
24 A. Yes.
25 Q. And then let's go just to level set, let's go to

1894

1  page 10 where it defines interrogatory number 17.
2      And let's blow that up.
3      And interrogatory number 17 is, "For all
4  insurance policies in connection with which the Blaze
5  Advisor software was used, the gross written premium of
6  defendants and the gross written premium of each related
7  company, including the specific identification of each
8  related company, for each quarter from March 30th, 2016, to
9  date."
10     Do you agree with my reading of interrogatory
11 number 17?
12 A. Yes.
13 Q. So I wanted to spend some time confirming how the
14 numbers, if we can scroll back out and back to
15 interrogatory number 16. I just want to take the time to
16 confirm for the record how the numbers were pulled.
17     Let's go to 16. Perfect. Now move forward one
18 page, Mr. Mayleben. All right.
19     So on that page, do you see a table titled
20 DecisionPoint?
21 A. Yes.
22 Q. And in your deposition, I asked you what's your
23 understanding of the information that's --
24     MS. JANUS: Objection.
25     THE COURT: Sustained. You can ask him the

1895

1  question directly and then impeach him with the deposition,
2  if need be.
3      MS. KLIEBENSTEIN: We can go that route too.
4      At a 10,000-foot level what is your understanding
5  of the information that's contained in this first table
6  titled DecisionPoint, for DecisionPoint?
7      THE WITNESS: It is the gross written premium and
8  policy count that ran through the DecisionPoint application
9  and used the Blaze software.
10 BY MS. KLIEBENSTEIN:
11 Q. And scrolling back out and down.
12     For CSI Express, can you tell me, same question,
13 right, at a 10,000-foot level, what data is reflected in
14 that table?
15 A. It is the gross written premium and the policy count
16 for policies that ran through CSI Express and used the
17 Blaze software.
18 Q. And I'm not, I'm not sure if this is a distinction with
19 any difference or not, but in your deposition you told me
20 it is policy count, written premium associated with those
21 policies and writing companies for the policies that ran
22 through the automated renewal process and/or -- sorry.
23 Wrong one.
24     Yeah. Okay. CSI Express. I asked you the
25 second table titled CSI Express Automated Renewal and

**1896**

1  Profitability Indicator, can you tell me at a 10,000 foot
2  level what data is reflected in that label.
3        And I think this is what you just said, but I
4  just want to make sure we're on the same page. It's the
5  policy count, written premium associated with those
6  policies and writing companies for the policies that ran
7  through the Automated Renewal Process and/or Profitability
8  Indicator for the, that used the Blaze software.
9        Are we saying the same thing?
10 A.   Yes.
11 Q.   Okay. Perfect.
12       And let's scroll back out and go to the next page
13 and the next page and the next page.
14       And here we, at the very top, we have Premium
15 Booking. And I'll ask you -- I'd like the table
16 highlighted.
17       I'll ask you the same question. At a 10,000-foot
18 level, can you tell me what data is reflected in this
19 table?
20 A.   It's the policy count and gross written premium that
21 ran through the premium booking system and used the Blaze
22 software.
23 Q.   And then let's scroll out and go down to CUW-IM.
24       And I'll ask you the same question again. At a
25 10,000-foot level, what is the data that's shown in this

**1897**

1  table?
2  A.   This is the policy count, written premium and writing
3  companies for policies that went through CUW-IM and used
4  the Blaze software.
5  Q.   And let's scroll out.
6        And the -- you have this document in front of
7  you. We also have IRMA and the TAPS applications. Well
8  actually wait. Just the IRMA, just the IRMA application in
9  here.
10       If I asked you the same answer or the same
11 question, at a 10,000-foot level what data is reflected in
12 this, would you give me the same answer?
13 A.   Yes.
14 Q.   Okay. Then let's move forward to interrogatory number
15 17. And in interrogatory number 17 we have, again,
16 DecisionPoint, CSI Express, CUW-IM, TAPS, IRMA, and Premium
17 Booking.
18       Do you recall the location of the data center at
19 which Blaze Advisor was -- Blaze Advisor software was
20 installed that's used in these applications?
21 A.   I don't recall it, no.
22 Q.   Is it the Raleigh, North Carolina, data center?
23 A.   If that's what I said in the deposition, yeah. I was
24 prepped for the deposition at that time.
25 Q.   And if you want to refresh your recollection, I'm on

**1898**

1  page 102 and 103 of your deposition. I don't want to put
2  words in your mouth.
3  A.   Raleigh data center, correct.
4  Q.   Okay. And we just covered the gathering process for
5  interrogatory number 16. If I asked you, just so we can
6  move through this quickly, the same questions for
7  interrogatory number 17 for the applications DecisionPoint,
8  CSI Express, Premium Booking, CUW-IM, TAPS and IRMA, could
9  you tell me at a 10,000-foot level how, what that data
10 reflects?
11 A.   The data reflects the policy count and associated gross
12 written premium and writing company that ran through the
13 applications you listed and used the Blaze software.
14 Q.   For the policies that ran through the applications and
15 utilized Blaze Advisor software, correct?
16 A.   Correct.
17 Q.   Okay. We also talked about Legacy ACE writing
18 companies in the context of interrogatory number 17. And
19 if you could move to page 15 of your interrogatory.
20       Do you agree that the writing companies listed in
21 the middle of the left-hand column, the following are
22 Legacy ACE Writing Companies: ACE American Insurance Co.,
23 ACE Fire Underwriters Insurance, ACE Property and Casualty,
24 Illinois Union Insurance, Indemnity Insurance Co., Pacific
25 Employers Insurance, Westchester Surplus Sidelines and WFIC

**1899**

1  for business effective 1/1/11?
2  A.   Yes.
3  Q.   I want to spend a little bit of time on the expense
4  information that we looked at in your deposition, if we
5  could.
6        So in your deposition we look at, we looked at
7  some spreadsheets that had expenses on them, like claims
8  losses, commissions and other general expenses in running a
9  business. Do you agree with that?
10 A.   We did look at some schedules that had that information
11 on it, yes.
12 Q.   And I asked you, I asked you about the policies that we
13 saw in interrogatories number 16 and 17, and particularly
14 as it related to Premium Booking. For the policies that we
15 saw in Exhibit 16 and 17, would you agree that it's
16 extremely difficult, it's very difficult to identify
17 expenses directly related to the policies we looked at in
18 interrogatory number 17?
19 A.   I would say we don't track or identify expenses at a
20 policy level.
21 Q.   So you would agree it's, it would be impossible,
22 actually, to identify those expenses under your
23 recordkeeping?
24 A.   Under our recordkeeping, yes.
25 Q.   And then we also went through one -- we went through a

**2747**

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2
    --------------------------------------------------------
 3                                )
    Fair Isaac Corporation,       ) File No. 16-cv-1054(DTS)
 4  a Delaware Corporation,       )
                                  )
 5       Plaintiff,               )
                                  )
 6  v.                            )
                                  )
 7  Federal Insurance Company,    ) Courtroom 14W
    an Indiana corporation,       ) Minneapolis, Minnesota
 8  and ACE American Insurance    ) Friday, March 10, 2023
    Company, a Pennsylvania       ) 9:08 a.m.
 9  Corporation,                  )
                                  )
10       Defendants.              )
                                  )
11  --------------------------------------------------------
12
13
14         BEFORE THE HONORABLE DAVID T. SCHULTZ
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16         (JURY TRIAL PROCEEDINGS - VOLUME XV)
                (CONFERENCE WITH ATTORNEYS)
17
...
22   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23
                        * * *
24
25
```

**2748**

```
 1  APPEARANCES:
 2   For Plaintiff:     MERCHANT & GOULD P.C.
                        BY: ALLEN W. HINDERAKER
 3                           HEATHER J. KLIEBENSTEIN
                             PAIGE S. STRADLEY
 4                           MICHAEL A. ERBELE
                             JOSEPH W. DUBIS
 5                           GABRIELLE L. KIEFER
                        150 South Fifth Street, #2200
 6                      Minneapolis, Minnesota 55402

 7   For Defendants:    FREDRIKSON & BYRON
                        BY: TERRENCE J. FLEMING
 8                           LEAH C. JANUS
                             CHRISTOPHER D. PHAM
 9                           RYAN C. YOUNG
                             PANHIA VANG
10                      200 South Sixth Street, #4000
                        Minneapolis, Minnesota 55402
11
                        O'MELVENY & MYERS LLP
12                      BY: LEAH GODESKY
                             ANTON METLITSKY
13                           DARYN E. RUSH
                             ROXANA GUIDERO
14                      Times Square Tower
                        7 Times Square
15                      New York, New York 10036

16   Court Reporter:    RENEE A. ROGGE, RMR-CRR
                        United States District Courthouse
17                      300 South Fourth Street, Box 1005
                        Minneapolis, Minnesota 55415
18
19                        * * *
```

**2749**

```
 1                     P R O C E E D I N G S
 2                       IN OPEN COURT
 3       THE COURT:  Good morning, everyone.  Please be
 4  seated.
 5       All right.  We are on the record in the matter of
 6  FICO versus Federal, et al., Civil Number 16-1054.
 7       Counsel for the plaintiff, if you will note your
 8  appearances, please.
 9       MR. HINDERAKER:  Your Honor, Allen Hinderaker and
10  Heather Kliebenstein from Merchant & Gould and Jim Woodward
11  from FICO.
12       THE COURT:  All right.  Good morning to all of
13  you.
14       Counsel for Federal, if you will note your
15  appearances.
16       MS. GODESKY:  Good morning, Your Honor.  Leah
17  Godesky from O'Melveny for the defendants.
18       MS. JANUS:  Leah Janus and Terry Fleming from
19  Fredrikson & Byron for the defendants.
20       THE COURT:  All right.  Thank you.  Good morning
21  to the three of you and people in the gallery.
22       Thanks for coming here this morning.  I wanted to
23  let you know what I was going to do.
24       I am going to accept the verdict on disgorgement
25  and enter judgment on the verdict today.  That will begin
```

**2750**

```
 1  the clock for post-trial motions, et cetera.
 2       I told you that I would exercise my own
 3  independent judgment on the issue of disgorgement, and I
 4  have.  I have been considering the issue, well, simply
 5  stated, since the motion to strike the jury, but then more
 6  intensively since the motion to bifurcate and certainly with
 7  the JMOL and hearing the evidence.
 8       I, nonetheless, wanted the jury's input so that I
 9  could certainly reexamine my own decision, should that be
10  necessary; but I'm persuaded and I was persuaded based on
11  the law and the evidence at trial that this is not only a
12  proper result, I am persuaded that it is the proper result.
13       So that's what I'm going to do.  I don't want to
14  spend time and resources of the parties having you
15  extensively brief an issue that I know how I will rule on it
16  anyway.  So that's why I called you in here this morning.
17  That's what I'm going to do.  And that will, as I said,
18  start your clock running.
19       While you're all here, I also want to put this out
20  there for your consideration.  Sometimes parties obviously
21  negotiate potential settlements after a trial.  If the
22  parties decide they want to do that, and if the parties
23  decide they want to utilize the services of a magistrate
24  judge here, I will facilitate that happening.  It wouldn't
25  be me; but if the parties met and decided they thought a
```

2751

1  particular magistrate judge in this district would be well
2  suited to that, we would make sure you got in front of that
3  magistrate judge.  But, of course, you know, that's all
4  entirely up to the parties.
5         So with that, I'll just ask if there are any
6  questions.  Mr. Hinderaker?
7         MR. HINDERAKER:  No questions from the plaintiff,
8  Your Honor.
9         THE COURT:  All right.  Well, maybe there is one.
10         MR. HINDERAKER:  Actually, with the judgment
11 entered and the clock running, you know, obviously there
12 will be the briefing that follows from that, and I think the
13 particular issue that I was just alerted to will be included
14 in that, in that briefing.  So for today and we understand
15 your decision --
16         THE COURT:  Understood.
17         MR. HINDERAKER:  -- I don't think there's anything
18 to be brought up now.
19         THE COURT:  Okay.  Very well.  Thank you.
20         Ms. Godesky, any questions or needed
21 clarification?
22         MS. GODESKY:  The only question we have at this
23 point, Your Honor, would be whether we could get a modest
24 extension of the deadline for a JNOV motion.
25         THE COURT:  What amount of time are you seeking?

2752

1         MS. GODESKY:  An extra two weeks.
2         THE COURT:  I will, yes, give both parties an
3  extra two weeks.
4         MS. GODESKY:  Okay.  Thank you.
5         THE COURT:  So that would be 42 days, correct?
6  That's my calculation.
7         MS. GODESKY:  I think that's right, mm-hmm.
8         THE COURT:  Okay.  I will put something on the
9  record or on the ECF setting a deadline by which you should
10 file any such motions.
11        Yes, Mr. Hinderaker.
12        MR. HINDERAKER:  And then with respect to
13 attorneys fees, prejudgment interest and so forth, you know,
14 I think the rule is a 14-day clock.  If there's an extension
15 on this, can we get those dates extended as well?
16        THE COURT:  Yes.  We'll make them all 42 days, and
17 we'll go from there.  Okay?
18        MR. HINDERAKER:  Very good.
19        THE COURT:  Okay.  Thank you, everyone.
20        MR. HINDERAKER:  Thank you.
21        MS. GODESKY:  Thank you.
22        (Court adjourned at 9:14 a.m., 03-10-2023.)
23        I, Renee A. Rogge, certify that the foregoing is a
   correct transcript from the record of proceedings in the
24 above-entitled matter.
                Certified by:  /s/Renee A. Rogge
25                             Renee A. Rogge, RMR-CRR