# EXHIBIT A

1   UNITED STATES DISTRICT COURT
    DISTRICT OF MINNESOTA
2
    ------------------------------------------------------------
3                                      )
    Fair Isaac Corporation,            )   File No. 16-cv-1054(DTS)
4   a Delaware Corporation,            )
                                       )
5            Plaintiff,                )
                                       )
6   v.                                 )
                                       )
7   Federal Insurance Company,         )   Courtroom 14W
    an Indiana corporation,            )   Minneapolis, Minnesota
8   and ACE American Insurance         )   Thursday February 16, 2023
    Company, a Pennsylvania            )   9:12 a.m.
9   Corporation,                       )
                                       )
10           Defendants.               )
                                       )
    ------------------------------------------------------------
11

12

13

14          BEFORE THE HONORABLE DAVID T. SCHULTZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16

        **(JURY TRIAL PROCEEDINGS - VOLUME II)**
17

18

19

20

21

22

        Proceedings recorded by mechanical stenography;
23   transcript produced by computer.

24                        *   *   *

25

```
 1    APPEARANCES:

 2      For Plaintiff:          MERCHANT & GOULD P.C.
                                BY:  ALLEN W. HINDERAKER
 3                                   HEATHER J. KLIEBENSTEIN
                                     PAIGE S. STRADLEY
 4                                   MICHAEL A. ERBELE
                                     JOSEPH W. DUBIS
 5                                   GABRIELLE L. KIEFER
                                150 South Fifth Street, #2200
 6                              Minneapolis, Minnesota 55402

 7      For Defendants:         FREDRIKSON & BYRON
                                BY:  TERRENCE J. FLEMING
 8                                   LEAH C. JANUS
                                     CHRISTOPHER D. PHAM
 9                                   RYAN C. YOUNG
                                     PANHIA VANG
10                              200 South Sixth Street, #4000
                                Minneapolis, Minnesota 55402
11
                                O'MELVENY & MYERS LLP
12                              BY:  LEAH GODESKY
                                     ANTON METLITSKY
13                                   DARYN E. RUSH
                                     ROXANA GUIDERO
14                              Times Square Tower
                                7 Times Square
15                              New York, New York 10036

16      Court Reporters:        RENEE A. ROGGE, RMR-CRR
                                KRISTINE MOUSSEAU, CRR-RPR
17                              MARIA V. WEINBECK, RMR-FCRR
                                PAULA RICHTER, RMR-CRR-CRC
18                              United States District Courthouse
                                300 South Fourth Street, Box 1005
19                              Minneapolis, Minnesota 55415

20
                                        *   *   *
21

22

23

24

25
```

INDEX - 2/16/23 - VOL. 2

PAGE:

**Plaintiff Opening Statement**.......................... 13

**Defendant Opening Statement**.......................... 38


**PLAINTIFF WITNESSES:**

SEAN BASEMAN:

    Direct Examination by Mr. Hinderaker............... 90

    Cross Examination by Ms. Godesky................... 175

    Redirect Exam by Mr. Hinderaker................... 190


JEAN-LUC MARCE:

    Direct Examination by Ms. Kliebenstein............. 193


**JOINT EXHIBITS:**

J1, J2............................................... 100


**PLAINTIFF EXHIBITS:**

839-850.............................................. 236

1139-1149............................................ 236

1151-1165............................................ 236

```
 1                        (IN OPEN COURT)

 2                        (Jury seated)

 3                           (9:12)

 4              THE COURT:  Good morning, everyone.  Please be

 5     seated.

 6              Mr. Hinderaker, are you ready?

 7              MR. HINDERAKER:  I am, Your Honor.

 8              THE COURT:  All right.  You may proceed.  Thank

 9     you.

10              A JUROR:  Your Honor, our screen doesn't work.

11              THE COURT:  It's on now?

12              A JUROR:  Yes.

13              THE COURT:  Everyone else, your screens are all

14     up?  Okay.  Good.

15              MR. HINDERAKER:  Good morning, everyone.

16              Yesterday Judge Schultz mentioned about the rule

17     of law, and for me, that's the very best reason that there

18     is for me to be a lawyer.  I know that all of us have

19     something else to do than be here, but I do hope that

20     regardless of the outcome, regardless of -- for my client or

21     against my client, regardless of the outcome, that after our

22     weeks of work together, you think that this effort and this

23     experience has been worthwhile as well because we all are at

24     the moment participating together in the rule of law of this

25     country.
```

1          That said, you're wondering, why did FICO bring

2     this lawsuit?  And you'll be hearing a lot about a product

3     called Blaze Advisor to explain the answer to that question.

4          Blaze Advisor was first conceived in 1996, and at

5     the time, it was a revolutionary product.  Now 27 years of

6     improvements later, 27 years of enhancements later, many

7     consider Blaze Advisor to be the leading software product of

8     its kind.

9          Relevant to this lawsuit, the software code of

10    Blaze Advisor is protected by 13 copyrights.  FICO brought

11    this lawsuit because Blaze Advisor was used without FICO's

12    permission for years and FICO seeks to be compensated for

13    the years of that unlicensed use.

14         Also, defendants should not benefit from

15    infringing FICO's copyrights.  And the Court, Judge Schultz,

16    will ask your advice at the end of the trial for the amount

17    of money to be taken away from defendants because Blaze

18    Advisor copyrights were infringed for four years.  I want to

19    be clear, that is not compensation to FICO.  It is taking

20    away the benefit from the infringement that is provided by

21    the copyright laws.  FICO does seek to have that benefit

22    taken away from the defendants.

23         So in sum, the evidence will show, and I suggest,

24    in sum, the evidence will show the indifference the

25    defendants had for FICO's rights and the evidence will show

1      that they knowingly infringed FICO's copyrights.

2              Who is Fair Isaac?  You heard yesterday that Fair

3      Isaac is also called FICO.  It was founded in 1956.  Today

4      it considers itself, and many agree, a world leader in the

5      design and development of predictive analytic software and

6      decision management software.  FICO software is now in 90

7      countries around the world, when businesses seek to make

8      better decisions to drive higher levels of growth and

9      profitability and to increase customer satisfaction.

10             So let me turn to Blaze Advisor.  It is a software

11     product, and it takes the company's know-how and makes that

12     know-how operational.  It both manages the decision-making

13     of a business so that better decisions are made, and it also

14     automates those decisions so that high-volume, operational

15     decisions are made faster and smarter.  In short, Blaze

16     Advisor powers decision-making.

17             Back in 1996, when Blaze Advisor was first

18     conceived, about 16 people worked full-time for two years

19     writing software code just to create the beta version to

20     first put out into the marketplace.

21             Today, now 27 years later, about 60 people work on

22     Blaze Advisor software.  There are three million lines of

23     software code in Blaze Advisor, and it is a bit difficult to

24     imagine how big that is, but there are about 57 lines of

25     code on a page.  And if there's 3 million lines of code,

1    there is more than 52,000 pages to record 3 million lines of

2    code.  And that 52 -- almost 53,000 pages, if you take a

3    ream of paper of being about two and a half inches, almost

4    52,000 pages are 20-feet high.  That's the quantity of

5    software code that makes up Blaze Advisor.

6            You'll hear a lot about the license agreement, and

7    that is one way in which FICO protects the Blaze Advisor

8    software under the conditions and limitations of the license

9    agreement itself.

10           The other way in which Blaze Advisor is protected

11   is by copyright law, and this is a graphic of the

12   registrations with the United States Copyright Office that

13   protect Blaze Advisor.  It is noteworthy that the defendants

14   have not challenged the validity of any of those

15   registrations.

16           So what did the defendants do with Blaze Advisor?

17   They used Blaze Advisor to sell more insurance, to sell more

18   profitable insurance, and to avoid selling unprofitable

19   insurance.  In this case, for example, you will hear that

20   Blaze Advisor was used by the defendants to automatically

21   decide whether to offer a potential customer an insurance

22   policy.  The software did that.  To automatically decide the

23   scope of coverage the policy should have.  The software did

24   that.  And to automatically set the price at what premium

25   should the policy be offered.  Again, the software did that.

1            In insurance language, that's called underwriting.

2     And the evidence will show that Blaze Advisor was used

3     without any -- was used for underwriting purposes, as well

4     as many others, and the evidence will show that Blaze

5     Advisor was used without any right to do so, and the

6     infringement of FICO's copyright was connected to $5 billion

7     of insurance sold per year.

8            I'm going to introduce you to Chubb Limited in a

9     bit, but this is what Chubb Limited said in 2018 to its

10    shareholders, "Technology is a competitive weapon."  Blaze

11    Advisor was one of the technologies the defendants used to

12    sell insurance.

13           Now, let me go back in time.  For ten years, there

14    was a good relationship between FICO and Chubb & Son.  This

15    lawsuit was commenced in 2016.  So let me review the

16    evidence that was -- the relationship the parties had before

17    the lawsuit began.

18           This is the front page of the software license and

19    maintenance agreement between FICO and the client, Chubb &

20    Son, a division of Federal Insurance.  You will see

21    throughout the documents that the client is also identified

22    as Chubb & Son.

23           Why is Federal a defendant in this lawsuit?

24    Federal is a defendant in this lawsuit because it is

25    responsible for the actions of its division, Chubb & Son,

1    the license agreement being with Chubb & Son.  And this

2    relationship, as I said, was a good one for ten years.  So

3    what happened?  Why the lawsuit?

4        In January of 2016, a different very large

5    insurance company called ACE American acquired the Chubb

6    Corporation.  That acquisition created the largest publicly

7    traded property and casualty insurer in the world, and that

8    new company had annual revenues at the time of about 30

9    billion a year.  And this acquisition was the largest

10   insurance company merger in history.

11       Chubb & Son was no longer a part of the Chubb

12   Corporation, and because of the acquisition, the Chubb

13   Corporation ceased to exist.  So now ten years later we have

14   the Chubb & Son, client of the license agreement, being part

15   of a different organization.

16       That triggered some provision in the license

17   agreement.  One of the ways the license agreement protects

18   FICO's investments and it's ownership of Blaze Advisor is by

19   a provision called the no-assignment provision.  You'll be

20   seeing a lot of that.  It is paragraph 10.8 of the license

21   agreement.  And 10.8 states that when there is an

22   assignment, it must be with FICO's prior consent.  And 10.8

23   goes further to say that certain events will be considered

24   assignment events, and they must also have FICO's consent.

25   I will be going into those provisions in some more detail in

1    a moment.

2         There was one provision in the standard language

3    of 10.8 that Chubb wanted in the negotiations that FICO

4    agreed to, and that was that FICO's consent would not be

5    unreasonably withheld.  It wasn't a hard addition to agree

6    to, and that is the only change in that paragraph that is

7    not standard FICO language.

8         In overview, the defendants will show that those

9    protections of 10.8 that FICO had over its ownership and

10   investment were ignored.  The Defendant Chubb & Son did not

11   care to let FICO revisit the fairness of the original

12   license fee now that Blaze Advisor was going to be used in a

13   $30 billion organization, one that was twice the size of the

14   organization of the original license agreement.

15        But that is one of the commercial purposes of the

16   license agreement itself.  It permits FICO to revisit the

17   fairness of the original license agreement when the

18   circumstances surrounding the client go through a

19   significant change.  At the outset, the parties sought to

20   negotiate a business resolution.  That did not happen.

21        Let me show you the chronology of the events that

22   I'm talking about now.  This license agreement was entered

23   into in 2006.  There was a good relationship.  The

24   acquisition of the Chubb Corporation by ACE American,

25   January 16, 2016.  And because FICO's prior written consent

1    was not requested, let alone given, but not requested, there

2    was a notice of breach letter that went out on January 27,

3    2016.  As I mentioned in the beginning, the parties wanted

4    to reach a business resolution, and 30 days was set for that

5    negotiation.

6         Sixty days later the license agreement was

7    terminated by a letter dated March 31st.  And at that point,

8    Chubb & Son was no longer licensed, and at that point, FICO

9    expected all use of Blaze Advisor to stop because that's

10   what the license agreement says.  When there is no license

11   agreement, there is no permission.  All use of Blaze Advisor

12   will immediately stop.  But there was indifference to that

13   as well because the use did not stop.

14        So let me turn now to some history and introduce

15   you to some of the parties that you'll be hearing -- or the

16   organizations that you'll be hearing throughout the case.

17        The Chubb Corporation, Federal Insurance Company,

18   how it fit in that, and Chubb & Son the division.  At the

19   time of the original license agreement, this is a graphic of

20   the Chubb Corporation.  It is a holding company with many

21   other insurance companies underneath it.  It was the

22   eleventh largest property and casualty insurance company in

23   the United States at the time, and its annual revenue was 12

24   billion.

25        Federal was one of the main insurance company

1    subsidiaries of the Chubb Corporation, and Federal itself

2    owned many other insurance company subsidiaries.  The

3    evidence will show that Chubb & Son, the division, was the

4    operating unit of Federal.  The evidence will also show that

5    Chubb & Son, the division, this operating unit, managed the

6    business of many other insurance companies in the Chubb

7    Group of Insurance Companies.

8            So what does it mean to be a manager?  Chubb &

9    Son, as a manager, did all the things necessary for other

10   insurance companies to issue policies in their names.  Why

11   was Chubb & Son the one that did all those things necessary

12   so a policy could be issued in a different insurance

13   company's name?  Because in many instances, those other

14   insurance companies had no employees.  Chubb & Son provided

15   all the services so that policies could have the name on the

16   top but be issued without employees.

17           In other instance, it's cost-effective to take the

18   operations of many insurance companies and have Chubb & Son,

19   the division, do all the work necessary for those companies

20   to sell insurance.

21           That was the role of manager, and that was what

22   Chubb & Son did during the license period to using Blaze

23   Advisor in connection with selling insurance of many

24   companies.

25           How did this relationship with FICO begin?  It

1    began in -- well, it began in 2006 with the license

2    agreement, but the warmup, if you will, is this

3    February 2006 request for information.  It comes from Chubb

4    & Son, and as RFI says, Chubb & Son for itself and as

5    manager of its insurance company subsidiaries.

6           A request for information, or short, an RFI, is a

7    fairly typical way in which a business that's interested in

8    another company's product will ask, tell me about your

9    product.  And the other side of the conversation, Chubb &

10   Son, reveals to FICO how it wants to use Blaze Advisor to

11   see if Blaze Advisor would fit its needs.  So it's an

12   exploration.  Will Blaze Advisor do what we want to

13   accomplish?  And so Chubb & Son tells us why it's asking for

14   Blaze Advisor.

15          It tells us it's doing so because the key

16   strategic initiative in this area is expanding and growing

17   the business into mid-market and smaller accounts.  It's why

18   they wanted to look at Blaze Advisor.

19          The RFI further explained that expansion into the

20   small and mid-markets was "viewed as a good opportunity"

21   because 85 percent of the target customers in that market

22   did not currently buy Chubb insurance products.  Chubb & Son

23   tells us in the RFI that it was interested in Blaze Advisor

24   because it knew it had to use technology, Blaze Advisor

25   technology, to grow and expand into the small and

1    mid-markets.

2         So Chubb & Son entered into a license agreement

3    with FICO.  Now, a license agreement is not a purchase.  A

4    license agreement is permission.  So Chubb & Son got FICO's

5    permission to use Blaze Advisor to automate decisions,

6    automate decision-making related to insurance and to sell

7    more insurance by growing into the small and mid-market.

8         So returning to the license agreement itself, June

9    of 2006.  And this permission that FICO gave Chubb & Son and

10   that Chubb & Son agreed to abide by the terms and conditions

11   in the license agreement are set forth in the document

12   itself.  So as -- you will be receiving this evidence, and

13   as you will read, in paragraph 2.1, that's the license

14   grant, and you will read that it is non-transferable, it is

15   nonexclusive so that FICO can license somebody else and it

16   is a limited license.  Non-transferable, limited license and

17   for the internal business purposes of Chubb & Son only.

18   That was the scope of the permission.

19        You will hear that FICO's decades worth of

20   investment in Blaze Advisor depends on FICO having the

21   exclusive ownership and the exclusive control of its

22   software product, and the license then details more

23   restrictions to accomplish that goal.

24        There is a paragraph 3.1 called "Rights and

25   Restrictions."  And in that paragraph, the client, Chubb &

1    Son, represents and warrants that it and its employees shall

2    not -- it's a promise -- shall not, and it details various

3    things that they promise they shall not do.

4            Relevant to this lawsuit, they promise that they

5    shall not, would not, disclose the Fair Isaac product or

6    permit the use or access of the Fair Isaac products by any

7    third party.  Further, that provision goes on to say, they

8    would not permit use or access by any individual other than

9    an employee of Blaze Advisor.  So that's an overview of the

10   original agreement in detail about the conditions and its

11   limitations.

12           Now, let me go through some more.  That original

13   agreement was for, one, named application.  We'll be hearing

14   a lot of testimony, you'll be hearing a lot of conversation

15   about an application.  It begs the question, what is an

16   application?  What does that mean?

17           The witnesses will explain that an application is

18   software.  It's a computer program.  We all have

19   applications on our phones.  We call them apps.  An

20   application is a computer program, and it's designed to

21   perform specific business functions.

22           If we just look at what Chubb & Son licensed Blaze

23   Advisor for at the outset, the application that Chubb & Son

24   had was called CSI Express.  It's an application for

25   underwriting and automated policy renewals.

1          The business function that this application was

2     intended to accomplish was just that.  That's why it's an

3     application.  You will hear testimony that these

4     applications for particular business outcomes are made up of

5     many components.  They are made up of many component of

6     software.  The components of software together constitute

7     the application.

8          When Blaze Advisor is one of those software

9     components, the evidence will be that Blaze Advisor is both

10    the brains and the central nervous system of that

11    application.  Blaze Advisor is the brains because it's the

12    software that automates the decision-making.  Blaze Advisor

13    is the central nervous system because it's the software that

14    orchestrates all of the other components in the application,

15    telling them what to do, their functions.  So it's both the

16    brains and the central nervous system.  Without Blaze

17    Advisor in the application, it does not fulfill its business

18    purpose.

19          The software license agreement was amended twice.

20    Originally, a one named application, Chubb & Son wished to

21    have greater permission for the use of Blaze Advisor, and it

22    entered into Amendment Number One.  And Amendment Number One

23    gave Chubb & Son permission to use Blaze Advisor for as many

24    applications as it wanted so long as those applications were

25    in the specialty insurance division.  And then later Chubb &

1    Son wanted to expand the permission more, and we have

2    Amendment Number Two.

3            Amendment Number Two gave Chubb & Son the

4    permission to use Blaze Advisor in what is called an

5    enterprise-wide scope.  So Chubb & Son can use it in a

6    division.  Now Chubb & Son can use it enterprise-wide.  But

7    it still -- Chubb & Son, the name of the client and the

8    scope of the client, hasn't changed.

9            So now Chubb & Son employees have permission to

10   use Blaze Advisor in connection with selling insurance of

11   whatever kind of insurance the companies that Blaze Advisor

12   managed sold.  And throughout the lawsuit, we will call all

13   three of those together as the license agreement.  And

14   you'll hear that over the years, the number of applications

15   that Chubb & Son used that contain Blaze Advisor grew and

16   grew.

17           Blaze Advisor functioned in these applications,

18   included automating decisions about underwriting guidance,

19   the renewal of policies and eligibility determinations, just

20   to name a few.

21           I mentioned that we had a good relationship for

22   ten years and FICO valued that relationship.  Because of

23   that relationship, FICO was called upon to provide

24   professional services.  Over the years, FICO provided about

25   15,000 hours of professional services to Chubb & Son to help

1    Chubb & Son implement the Blaze Advisor software into their

2    applications to sell insurance.  FICO was called upon for

3    the more complex problems, and that's the way it should have

4    been.

5         The client relationship also gave FICO the

6    opportunities to license other products to Chubb & Son.  And

7    Chubb & Son, from time to time, was interested in additional

8    FICO's technologies that they could use to tell insurance.

9         Then in January of 2016, the Chubb Corporation

10   ceased to exist and ACE American -- or ACE Limited acquires

11   it.  ACE Limited acquired the Chubb Corporation but ACE

12   Limited chose to keep the reputation of Chubb, and so it

13   changed it's name from ACE Limited to Chubb Limited.  And

14   now we turn to paragraph 10.8 that was triggered by that

15   acquisition.

16        As I said, the provision is a no assignment

17   provision.  The commercial purpose, you will hear, is to

18   protect FICO's ownership and its rights to control the use

19   of Blaze Advisor.  It is to give -- also to give FICO the

20   chance to revisit the fairness of its value-based pricing

21   when circumstances affecting the client significantly

22   change.

23        Who I do mean by value-based pricing?  FICO prices

24   Blaze Advisor based upon the potential benefit that Blaze

25   Advisor gives to an organization.  There is not a fixed

1    price for Blaze Advisor.  The potential benefit of Blaze

2    Advisor for a big company is greater than it is for a small

3    company, and FICO's value-based pricing recognizes that

4    difference.  So a larger company will pay a larger fee for

5    Blaze Advisor.  A smaller company pays a smaller fee for

6    Blaze Advisor, based in accordance with the benefit.  It's

7    the same software.

8         So the first sentence of paragraph 10.8 says,

9    "Neither party shall, without the prior written consent of

10   the other party, assign or transfer the agreement or any

11   part thereof."

12        FICO has the exclusive control of who can use

13   Blaze Advisor.  And if Chubb & Son wants to -- Chubb & Son

14   has the license agreement and another company wants to

15   acquire that license agreement through transfer and

16   assignment, now Blaze Advisor with a different company, that

17   assignment or transfer requires FICO's prior consent.

18        You will hear that that did not happen in this

19   case.  There is no assignment document between Chubb & Son,

20   the client, and ACE American.  So the first sentence of

21   paragraph 10.8 does not have any application to the case,

22   but it sets up the paragraph as to what it's all about.

23        Then the second sentence.  The second sentence

24   states, "Very certain and specific events that are

25   significant changes to the client as compared to when the

1    license agreement was originally made."

2         These aren't the assignments of the first sentence

3    where -- I'm sorry -- Chubb & Son to a different company.

4    These are circumstances where Chubb & Son itself has a

5    significant change to its circumstance.  And these are also

6    deemed assignments so that they would be subject to this

7    section and they require FICO's prior consent to the use of

8    Blaze Advisor by the client under these very different

9    circumstances.

10        So what are those different circumstances?  In the

11   event of a change of control of the client, and the evidence

12   will be that this happened here.  The client, Chubb & Son,

13   as well as Federal, in which it was a division, became under

14   the control of a different company.

15        The second event, if the client is merged with,

16   acquired by or acquires another entity.  That happened here

17   too.  The acquisition of the Chubb Corporation by ACE

18   Limited was that acquisition.  And Federal, which was owned

19   by the Chubb Corporation, became owned by a different

20   subsidiary of ACE Limited, so it went under an acquisition

21   as well as a change of control.  That also deemed to be

22   assignment, although the client is still Chubb & Son; it's

23   just different now because of the change of control and

24   being part of a different organization.

25        And the third event, when the client undergoes a

1   reorganization or otherwise acquires the right to process

2   the business of another entity.  That one did not happen

3   here.  Chubb & Son did not reorganize itself or be able to

4   do -- process the business of -- process more business.  The

5   evidence will be instead that in January of 2017, all the

6   employees of Chubb & Son became employees of ACE American.

7   So the client, Chubb & Son, in fact, lost its ability to

8   process business in the January -- as a consequence of the

9   acquisition.  You will be asked to sort out and look at the

10   evidence in light of the words of paragraph 10.8.

11        But returning for a moment to the acquisition, we

12   have an event deemed to be an assignment.  There is no

13   dispute that prior written consent for the assignment event

14   was never requested.  And so we have the third sentence of

15   paragraph 10.8, "Any attempt to assign or transfer all or

16   any part of the agreement without first obtaining FICO's

17   consent is void and of no force or effect."

18        I mentioned value-based pricing, the opportunity

19   to revisit that pricing in fairness of that.  And you'll

20   recall that in 2006 I mentioned that Chubb & Son was

21   licensed, and Chubb & Son was part of a $12 billion group of

22   insurance companies.  The value-based fee for that was based

23   upon that fact in 2006.

24        With the 2016 acquisition, Chubb & Son became part

25   of a different organization, and now that different

1    organization is a $30 billion one.  Standard FICO

2    value-based pricing is more for a $30 billion company than

3    it is for a $12 billion company.

4           Now, the acquisition of one company by another is

5    not uncommon.  We heard examples of that yesterday.  And the

6    evidence in this case will include the fact that FICO and

7    its client, and other clients, have had acquisition events,

8    and FICO and it's other clients have been able to come to

9    terms for FICO's consent to the continued use of Blaze

10   Advisor.  But that did not happen here in this case, and

11   that's why we're together.

12          We are at the time now at this stage in the

13   chronology, we have the license agreement, the assignment

14   event, no request for our consent, and FICO sent a notice of

15   termination letter on January 27, 2016.

16          Tom Carretta was the author, and we should be

17   meeting with him -- or you should be being introduced to him

18   next week.  That letter gave official notice of breach of

19   paragraph 10.8.  The letter also requested, FICO wanted it,

20   information about the intentions to use Blaze Advisor so

21   FICO could have an informed consent about -- well, it could

22   have information about which to make an informed consent

23   about any continued use of Blaze Advisor.  And that, of

24   course, assumes that the new organization wanted to.  If

25   they didn't want to use Blaze Advisor, that's fine, but if

1    they did want to, we were asking for information.

2          The letter was also clear that any use of Blaze

3    Advisor without FICO's consent was not only in violation of

4    the license agreement, but was also intentional infringement

5    of FICO copyrights.

6          So notice was given, you breached, we would like

7    some information, and you don't have our permission to

8    continue to use Blaze Advisor without our consent.

9          On February 17th, Mr. Carretta received a response

10   from one of the Chubb lawyers, a gentleman by the name of

11   Hopp.  And one of the things he said to Mr. Carretta was,

12   "Chubb & Son, the contracting party to the agreement,

13   remains a viable legal entity within the Chubb Group of

14   Insurance Companies, corporate structure and the contracting

15   party to the agreement.  In short, Chubb & Son is still

16   FICO's client as such term is defined in the agreement, and

17   it is our position that no transfer or assignment of the

18   agreement has occurred."

19         In this litigation, FICO agrees with Mr. Hopp that

20   Chubb & Son is the client.  FICO agrees with Mr. Hopp that

21   there was no assignment from Chubb & Son to anybody else

22   under the first sentence of paragraph 10.8.  The issue isn't

23   that.  The issue is the second sentence of paragraph 10.8

24   that Mr. Hopp doesn't address.

25         And so now Mr. Carretta has sent his letter.

34

1    Sixty days pass.  I mentioned at the outset, it was an

2    effort to find a deal.  And in that effort to find a deal,

3    FICO received on February 25, 2016, this commercial

4    proposal -- they labelled it that -- from Chubb.  This came

5    from Chubb's vice president of software compliance and

6    optimization, Global Vendor Services Organization, Tamra

7    Pawloski.  It is worth looking at.

8            The evidence shows that Chubb's position was

9    clear.  Blaze Advisor would be used in the new Chubb Limited

10   Group of insurance companies in any way it chose.  Chubb

11   reserved the right to change the applications using Blaze

12   Advisor at any time in its sole discretion.  And while it

13   was said that there would be a limit on the number of

14   applications, limiting it to 15, you will hear that putting

15   a limit on 15 to the names of applications is meaningless.

16   FICO witnesses will explain that any number of applications

17   can be wrapped into a single name.

18           The FICO witnesses who -- FICO, when it received

19   this commercial proposal, thought it was a game.  Actually

20   thought it was in bad faith, because of the meaninglessness

21   of 15 limitations.  Because that doesn't say anything at all

22   about expanding the volume of transactions that go through

23   the applications.  It doesn't say anything at all about

24   expanding the use from the $12 billion organization and

25   integrating it into a $30 billion organization.  As I said,

1    the new organization was twice the size of the Chubb

2    Corporation.

3         The evidence will show -- oh, and, you know, in

4    addition to just limiting it to 15 applications, that

5    commercial proposal also is silent on any limit to volume.

6    So change the applications any way they wish, at their

7    discretion, no limitations on the volume of transactions to

8    go through the applications in the new larger organization.

9         The evidence will show that this is the writing

10   companies that use Blaze Advisor in connection with selling

11   insurance before the acquisition.  Blaze Advisor was used in

12   connection with selling insurance in the name of 12 writing

13   companies in addition to Federal.

14        In the first nine months after that acquisition,

15   Blaze Advisor was used in connection with selling an

16   additional $360 million of insurance in the names of

17   insurance companies that were never before connected to

18   Blaze Advisor.

19        The next year, Blaze Advisor was used in

20   connection with selling $995 million of insurance from

21   insurance companies that had no connection to Blaze Advisor

22   before the acquisition.

23        After the acquisition, the use of Blaze Advisor is

24   now connected to 27 different writing companies, 14 more

25   than at the time of the acquisition.

1          I suspect that the defendants will be saying they

2     do not require FICO's consent because there was no expanded

3     use, the argument based upon the limitation of applications

4     to 15, saying nothing about the expanded use of those

5     applications.

6          Because applications were changed, the result was

7     millions, hundreds of millions of dollars more of insurance

8     transaction through Blaze Advisor applications and the

9     benefit given to twice as many writing companies.

10         The language of the license agreement is, in that

11    second sentence, we have the various specific assignment

12    events.  Those events trigger deemed assignments that are

13    subject to this section that required FICO's consent.  And

14    then the sentence goes on to say "And clients shall make no

15    expanded use until Fair Isaac provides its consent."  We

16    have the assignment events, and the commercial purpose is

17    until FICO gives that consent, nothing different happens

18    with Blaze Advisor.

19         The status quo has to be maintained.  If we

20    consent, that's another deal.  Then there's a change.  If we

21    don't consent, the license agreement becomes terminated.

22         It's noteworthy that the paragraph begins with the

23    word "And."  There is not a loophole to -- there is not a

24    way to rewrite this paragraph to find a loophole that says,

25    well, if they don't expand use, we don't need your consent.

1    The "and" makes "and you shall not expand use until we have

2    an agreement" a further limitation on Chubb & Son.  The word

3    does not begin with "but."  That phrase does not begin with

4    "except that."  The language agreement and the license

5    agreement is as it is written.  And it is the client, Chubb

6    & Son, that will make no expanded use.

7            None of this discussion has anything to do with

8    ACE American.  We haven't gotten to that yet because ACE

9    American is never the client.

10           So we are here now in the chronology.  The license

11   agreement is terminated and time marches on, and the use of

12   Blaze Advisor continues.  And so we have the termination

13   letter of March 30 saying, this serves as notice that the

14   agreement will be terminated the next day.  And it further

15   says, please take further notice that provision of 9.3 FICO

16   considers you must stop use, FICO considers Chubb's current

17   use, any future use of the software not only a breach but

18   willful infringement of all applicable intellectual property

19   rights, including copyright infringement.  The expectation

20   was that use would stop because the license agreement says

21   so.  Paragraph 9.3 is the termination -- effective

22   termination provision, and it says, "Client shall

23   immediately cease using Blaze Advisor products."  As I've

24   said, the use did not stop.

25           Blaze Advisor does not have a kill switch.

 1    Control of its investment and ownership of the software

 2    depends first on compliance with the license agreement.

 3    And, secondly, it depends on the copyright registrations.

 4    Now that there is no license agreement, now that there is

 5    not permission to use Blaze Advisor, the unlicensed

 6    without-permission use of Blaze Advisor is copyright

 7    infringement.  And despite the specific notice of

 8    termination, the continued use of Blaze Advisor went on

 9    knowingly.  Paragraph 9.3 was ignored, and FICO starts this

10    lawsuit within less than a month because use did not stop.

11         I would like to return to some of the other

12    provisions of the license agreement that I introduced you

13    to, and now I'll talk about them in the context of their

14    violation.

15         We looked at 9 -- 3.1, representations and

16    warranties that Chubb & Son shall not, and those

17    representations and warranties were ignored in two ways.

18         First, Blaze Advisor software was disclosed to

19    third parties, consultants that did not have FICO's consent

20    to use or access Blaze Advisor.  FICO first learned about

21    this near the end of March when a company called DWS Group

22    sought help from FICO's help desk about Blaze Advisor.

23    During the lawsuit, we learned about a second consultant

24    that was using Blaze Advisor without our consent, an outfit

25    called AppCentrica, and it was helping in Canada.  The

1    license agreements 3.1, subdivision iv, were ignored.

2          Now, the process of litigation involves something

3    called interrogatories, which are simply questions, but the

4    questions are answered under oath.  And so FICO asked

5    questions:  Identify every person, division or entity, other

6    than employees of the Division Chubb & Son, to whom Blaze

7    Advisor has been disclosed or has used Blaze Advisor."

8          The answers under oath, Chubb Insurance Company of

9    Canada, including through its relationship with AppCentrica,

10   the consultant; Chubb Insurance Company of Australia,

11   including through it's relationship with DWS, the

12   consultant.  Neither had FICO's permission.

13         Paragraph 3.1 also says, "There shall not be use

14   or access by any individual other than employees of Chubb &

15   Son."  And the evidence will show that three foreign

16   insurance companies used Blaze Advisor in connection with

17   selling insurance using eight applications.

18         FICO learned for the first time -- it did not know

19   before.  FICO learned for the first time in this lawsuit

20   that none of the employees of Chubb & Son are outside of the

21   United States.  So that use by foreign insurance companies

22   was by non-Chubb & Son insurance companies.

23         Another thing in litigation is called admissions.

24   We submitted admissions requests, and the defendants

25   answered this way:  Federal admits that Chubb Insurance

1    Company of Europe made use of Blaze Advisor software.

2    Federal admits that Chubb Insurance Company of Canada made

3    use of Blaze Advisor software.  Federal admits that Chubb

4    Insurance of Australia made use of Blaze Advisor software.

5    And with no Chubb & Son employees outside of the United

6    States, paragraph 3.1 is violated in that second way, as the

7    evidence will show.

8            Now in this instance, I expect the defendants will

9    say, well, it doesn't matter.  The excuse is, it doesn't

10   matter.  And the argument may be that without materiality,

11   it doesn't count.

12           Paragraph 9.2(c) of the license agreement, in its

13   first sentence says, "FICO can immediately terminate this

14   agreement without a requirement for prior notice or cure

15   when the license -- when the license grant is violated."

16   Breach of 3.1 is exactly that.  Materiality is not a

17   requirement.  It is a requirement of the second sentence,

18   but not the first.

19           Now, in the context of the "it doesn't matter," it

20   does matter to FICO, and I want to try to overview the

21   evidence as to why.

22           You will see that the beginning of paragraph 3.1

23   has a variety of specific things that shall not be done.

24   Blaze Advisor will not be used in a manner that exceeds the

25   scope of the license.  Blaze Advisor cannot be used -- it is

1    forbidden to alter, change, modify, adapt, translate or make

2    any derivative work of Blaze Advisor.  And it is prohibited

3    to reverse-engineer, decompile, disassemble or otherwise

4    attempt to reduce the object code of Blaze Advisor.

5            Those are protections to the investment and

6    ownership that FICO has over Blaze Advisor.  And when the

7    parties want to have permission for a consultant to use

8    Blaze Advisor, they put it in the agreement.

9            And paragraph 3.6 says, "Third-party use."  And

10   the protections to FICO are put into the agreed third-party

11   use.  Use is subject to the terms and conditions of the

12   license agreement.  Use cannot exceed the limitations and

13   other restrictions.  Chubb & Son is responsible for ensuring

14   the third party complies.  Chubb & Son and liable to FICO if

15   the third party does not comply.  And the rights granted

16   cannot be extended to any third party without FICO's

17   consent.  None of those protections.  FICO had none of those

18   protections when unauthorized third parties used and

19   accessed Blaze Advisor.

20           I also expect to hear evidence that the three

21   foreign insurance companies are affiliates of Federal.  They

22   are.  There's never been a dispute about that.  FICO fully

23   agrees.  But the evidence is that the client of the license

24   agreement is Chubb & Son, and the evidence also is that

25   Chubb & Son is not Federal, and the evidence is that Chubb &

1    Son does not have divisions -- I'm sorry, that Chubb & Son

2    does not have affiliates.  And I meant -- and let me tell

3    you where the affiliate language comes from.  It comes from

4    Amendment Two to the license agreement, and an affiliate is

5    specifically defined.  It's another company of which the

6    client owns more than 50 percent.

7            Chubb & Son, the client, did not own more than

8    50 percent of any of those foreign insurance companies.

9    Chubb & Son did not own a stock of any other company.

10           This provision of client and its affiliates in the

11   license agreement because Chubb & Son is the client just

12   simply has no operation in the case.  There is no reason for

13   it to apply.  The defendants would like it to be otherwise,

14   but that's not the agreement that's written and it's not the

15   agreement that Chubb & Son signed.  So let me now turn to

16   ACE American.

17           I overviewed the 10.8 being disregarded.  I

18   overviewed 3.1 being ignored in two ways.  I've overviewed

19   paragraph 9.3, effect of termination being ignored.  Now let

20   me mention ACE American.

21           ACE American had nothing to do with the license

22   agreement.  It did not breach the license agreement because

23   it never was a party to it.  It's a completely different

24   company.  And in January 1 of 2017, ACE American took over

25   the role of Chubb & Son, and ACE American became the manager

1    of all these other insurance companies, and ACE American

2    became the one using Blaze Advisor to sell insurance.  No

3    license, no permission.  As a consequence, that use is

4    copyright infringement.  FICO did not learn of ACE

5    American's use of Blaze Advisor until this lawsuit.  So in

6    the chronology, we have the unlicensed use by Chubb & Son,

7    Federal being responsible, and the unlicensed use by ACE

8    American.

9             So now let me turn to the remedy or the damages

10   that FICO seeks in this lawsuit.  The employees of the three

11   different insurance companies were able to use Blaze Advisor

12   because Chubb & Son violated that provision of 3.1 regarding

13   not permitting anybody but a Chubb & Son employee to use it.

14   So there's a period of time before the license agreement is

15   terminated that FICO seeks to be compensated for all the

16   applications that these foreign insurance companies used to

17   sell insurance with Blaze Advisor.  And then the license

18   agreement is terminated, but just like Chubb & Son, the

19   foreign insurance companies don't stop.  And so FICO seeks

20   to be compensated for their use until their use actually

21   does stop.

22            There is the period of time when Chubb & Son is

23   using Blaze Advisor after termination, and FICO seeks to be

24   compensated for that.  And then there is the period of time

25   where ACE American, unlicensed, infringer of copyrights,

1    uses Blaze Advisor on applications, and FICO wants to be

2    compensated for that.

3            So FICO looks at the damages in this way:  The

4    unlicensed use of the foreign insurance companies before

5    termination, foreign insurance company use after

6    termination, unlicensed Federal use after termination, and

7    then ACE American's copyright infringement.  So how do we

8    determine the dollar value to compensate FICO?  That, ladies

9    and gentlemen, is your job.

10           Our last witness will be Bill Waid, a person who

11   has negotiated many hundreds of Blaze Advisor license

12   agreements over the years.  And as I mentioned, there is no

13   one standard fee.  And he'll explain first, you know, FICO's

14   value-based pricing.  He'll look to some pricing methodology

15   that FICO has used since 2003.  He'll testify how the

16   marketplace has accepted that pricing methodology for the

17   last 20 years.  He'll relay his experience in negotiating

18   license agreements under the unique facts of each

19   circumstance.  Every license, every licensee, every

20   circumstance has its own uniqueness to it.

21           There is one set of circumstances when you're

22   trying to negotiate a license agreement with a brand new

23   client, and there's another set of circumstances when you're

24   trying to figure the fair value to be compensated when the

25   license agreement has been terminated but the former client

1    needs a transition license to move away from using Blaze

2    Advisor.

3         Those circumstances are quite different.  The

4    motivations between those circumstances are quite different.

5    And Mr. Waid will explain that Chubb & Son looks to the

6    total lifetime value of the relationship when it's

7    negotiating the fee.  And so he will discuss total lifetime

8    value in the context of a brand new client, total lifetime

9    value in the context of the circumstance where a former

10   client needs a transition license.

11        The evidence will also consider and present for

12   your consideration well, how is Blaze Advisor used?  How

13   does the licensee use Blaze Advisor?  Well, in this case, it

14   was used -- it was central to the licensee's business

15   because it was used to sell insurance, and their business is

16   selling insurance.

17        Another consideration, and you figure out the fair

18   fee, is how much insurance was sold using Blaze Advisor?  As

19   I mentioned, it's about $5 billion for each unlicensed year.

20        Of course, licensees have their counterpoints to

21   be made in a negotiation.  Mr. Waid will explain his

22   experience with respect to that as well.

23        And then at the end you will be the ones to

24   decide, what's the compensation to FICO for the years of

25   unlicensed use in these many applications to sell insurance?

1          And, now, let me now turn to what the law calls

2     disgorgement.  This is the issue that the Court will be

3     seeking your advice on.

4          Disgorgement is a legal word that means taking

5     away from the infringer the benefits that are gained by the

6     infringement.  And FICO seeks an award of disgorgement

7     because the infringement of intellectual property has

8     consequences.  So says the copyright law of the United

9     States.

10          Here, over the years of infringement, Blaze

11     Advisor was used in connection with selling $21 billion

12     worth of insurance.  That's a huge number.  Putting that

13     number in context, during that same period of time, Chubb

14     Limited sold more than $150 billion worth of insurance.  The

15     amount of benefit to be taking away from the defendants is

16     about 14 percent of that total.

17          Again, returning to the Chubb Limited 2018 annual

18     report, technology is a competitive weapon.  In this case,

19     the defendants took the know-how, their own know-how of how

20     to sell insurance, but then they made it operational by

21     automating the process of selling and by automating the

22     decisions necessary to sell insurance.  As stated in the

23     RFI, they needed Blaze Advisor in order to expand into the

24     small and mid-markets.

25          We will have an industry expert by the name of

1    Bick Whitener, who has studied hundreds of the documents

2    that the defendants have produced in this litigation, and he

3    will explain how they used Blaze Advisor in order to sell

4    insurance.  In conclusion, his testimony is that the use of

5    Blaze Advisor made a significant contribution to the sale of

6    insurance.

7         Defendants have asserted counterclaims against

8    Blaze Advisor in reaction to the lawsuit.  For all of the

9    reasons and the evidence that I have just overviewed, FICO

10   properly terminated the license agreement.  For all the

11   reasons that I have just overviewed, that termination was in

12   good faith.  For all the reasons I have overviewed, the

13   copyright and counterclaims have no merit.

14        So in summary, FICO brought this lawsuit because

15   its software was used without permission for years.  That

16   unlicensed use was a knowing use.  It was in disregard of

17   the license agreement, and it was in disregard of FICO's

18   copyrights.

19        We request to be compensated for the years of that

20   unlicensed and infringing use, and we request that the

21   benefits that the infringers gained from their infringement

22   of FICO's copyrights be taken away.

23        I thank you for your attention.

24        THE COURT:  Thank you, Mr. Hinderaker.

25        Members of the jury, we're going to take our

```
 1    morning recess now, and so we'll ask that you be back in the

 2    courtroom at 25 minutes to 11:00 on that clock.

 3              Now, remember, no research, no talking to outside

 4    people, and you can talk amongst yourself about anything

 5    except this case.

 6              Thank you.  We're in recess.

 7              (Jury leaves the courtroom.)

 8                        (JURY NOT PRESENT)

 9              THE COURT:  Federal, I'm going to switch the input

10    here and make sure that it works for you.

11              MS. GODESKY:  Sure.

12              THE COURT:  Okay.  Why don't you put something up,

13    anything, just to make sure that it's coming up.

14              Okay.  Very well.

15              All right.  We're in recess until 25 minutes to

16    11:00.

17              Counsel, nothing to talk about right now, right?

18              MR. HINDERAKER:  I assume the slides have been

19    changed?

20              MS. GODESKY:  Yes.

21              THE COURT:  All right.  Thank you.

22

23                  (Recess taken at 10:21 a.m.)

24                      (IN OPEN COURT)

25                        (10:37 a.m.)
```

```
 1                        (Jury seated.)

 2              THE COURT:  Thank you everyone.  You may be

 3    seated.

 4              All right.  Ms. Godesky.

 5              MS. GODESKY:  Thank you.

 6              Good morning, everyone.  As you know by now, my

 7    name is Leah Godesky, and I represent the defendants in this

 8    case, Federal Insurance Company and ACE American Insurance

 9    Company.  As you will hear, both defendants are what's

10    commonly referred to as the Chubb Group of Insurance

11    Companies.  And many of the witness from Chubb that you'll

12    see testify here today will call themselves Chubb employees.

13    And it will be a shorthand that I use a lot as well.  I'm

14    very proud to represent Chubb in this case, and it means a

15    lot to these companies.

16              I'll be joined at counsel table throughout by

17    Mr. Claudio Ghislanzoni, who's sitting over there with the

18    glasses, and he's travelled all the way from England to be

19    here for the trial every day.  Maxwell Bryer, who is an

20    attorney at Chubb, is also sitting next to Mr. Ghislanzoni.

21              Claudio being here from England is just a preview

22    of something you'll see about a lot of the Chubb witnesses

23    you'll meet during this trial because this case is about

24    technology infrastructure.  And as you'll learn, you need

25    hands from all around the world to keep the technology
```

1    infrastructure of a big company like Chubb running.

2            I also want to introduce again Leah Janus -- there

3    are two Leahs -- and Terry Fleming, who are with the

4    Fredrikson firm right here in Minneapolis.  And they, like

5    me, are representing -- lawyers representing the defendants

6    in this case, and they'll be presenting witnesses during

7    trial.

8            We also have Vanessa Wheeler, who's sitting in the

9    back there, and she's going to be running our exhibits and

10   videos so you can see documents throughout trial.

11           We're also working with a few other lawyers and

12   paralegals that you'll see from time to time because they're

13   working behind the scenes to keep things running as

14   efficiently as possible because we do not want to waste your

15   time.  This is a very important case to our clients, and

16   it's very important to us that you're all taking time out of

17   your very busy lives to be here, so we are going to be as

18   efficient as possible, and I'm going to get started right

19   now.

20           So FICO just told you -- made references to the

21   fact that the defendants in this case did things like they

22   had indifference to the copyright, they were ignoring a

23   contract, there were unauthorized third parties using Blaze.

24   And all of those references are intended to make you feel

25   like Federal and ACE did something wrong and they should be

1     punished.  So I want to start by making something very

2     clear.  This case is not about whether FICO should be paid

3     for Blaze Advisor.  The evidence will show that Federal

4     Insurance Company paid.  It bought a perpetual license to

5     use Blaze, a never-ending license to use Blaze, across it's

6     entire global enterprise, with no limitation on how Blaze

7     could be used.  And federal will show that it paid a fair

8     market price for that license, $1.3 million, plus hundreds

9     of thousands of dollars every year for ongoing technical

10    support from FICO.  No one will tell you that FICO wasn't

11    paid for that license.  They should have been paid.  And

12    they were paid.

13            So let me tell you what this case is about.  This

14    case is about FICO trying to get a lot of money that it did

15    not earn.  FICO wants to convince you that it is entitled to

16    both an additional second license fee for Blaze -- that's

17    what you're going to hear referred to as actual damages --

18    and part of the revenue and profits that Federal and ACE

19    earned during the period that Blaze was used at Chubb, and

20    that's called disgorgement damages.

21            Now, at the end of this trial, I do not think that

22    you're going to need to deliberate about how much money

23    Federal and ACE should pay FICO.  That's because this

24    question of Federal and ACE owing money to FICO only becomes

25    relevant if you find that Federal somehow breached it's

1    contract with FICO or that Federal and ACE somehow committed

2    copyright infringement, and we do not believe that you will

3    find either of those things.

4            But the way trials work is that all of the

5    evidence gets mixed together.  So the parties will put on

6    all their evidence about whether the license was breached,

7    whether there was copyright infringement, and this whole

8    question of damages at the same time.  It gets all mixed

9    together.  And I think you're going to probably find that

10   FICO wants to spend a lot of time talking about all of the

11   damages it hopes you will award.  So I'm going to start

12   there, and I'm going to talk a bit about the money that FICO

13   is asking for.

14           First is this concept that defendants should pay

15   FICO another license fee for Blaze.  You not going to hear

16   any evidence that shows they're asking for the actual market

17   value of a Blaze license.  You won't hear any testimony from

18   any expert that actually supports the many millions of

19   dollars you're going to hear their witnesses talk about.

20   You'll hear a lot about really big amounts of money, but you

21   won't see any evidence that that was actually the going rate

22   for a Blaze license at any point in time in the last

23   20 years.

24           And that matters because the judge will tell you

25   that these license fee damages have to be based on the

1       actual fair market value of a Blaze license.  And like I

2       said, the evidence will show that Federal paid $1.3 million

3       for that enterprise-wide never-ending Blaze license.  The

4       numbers and the figures that you're going to hear thrown

5       around by FICO's witnesses for this second license fee will

6       be many times that.

7               Now, you might by thinking, well, maybe Federal

8       just negotiated a better-than-market deal back in 2006.  But

9       it's not just Federal.  The evidence will show that FICO

10      regularly sells perpetual, never-ending, enterprise-wide

11      license to major companies, household-name companies, for

12      amounts ranging between $750,000 and about $2 million.  You

13      will learn that no customer has paid anywhere near the

14      numbers that you will hear FICO presenting in this trial.

15              Now, you also heard FICO talk about these

16      disgorgement damages.  This idea that FICO is also entitled

17      to a portion of Federal's and ACE's revenue.  Now, revenue

18      is money that comes in the door at a company, and it's very

19      important, especially at insurance companies, that money

20      coming in the door is not the same thing as profit.  Profits

21      are much lower because the whole point of an insurance

22      company is you have to be able to pay your customers'

23      losses.  And the evidence will show that at the Chubb Group

24      of Insurance Company, a lot of money goes out the door to

25      pay customers when they have insurance claims.

1          Now, to try to justify this idea that FICO is

2    entitled to a portion of ACE's and Federal's revenues,

3    you're going to hear FICO's witnesses talk a lot about how

4    valuable Blaze is.  Ladies and gentlemen, of course Blaze

5    has some value.  Federal would not have paid $1.3 million

6    for a Blaze license if it didn't, but the evidence will show

7    that FICO has already received that payment.  Again, Federal

8    paid $1.3 million for a never-ending, enterprise-wide

9    license, and when FICO said in 2016 that it was going to

10   terminate that license, it took away all of the rights that

11   Federal had already paid for.

12          Now, I told you that you won't have to think about

13   damages at all if you agree with us that Federal did not

14   breach its contract with FICO, so I want to spend most of my

15   time talking about other things right now.

16          It's going to take about 45 minutes of your time,

17   and I'm going to divide this into four parts so you know

18   what's coming.

19          First, I want to talk about FICO and Blaze.  It's

20   very important that you understand FICO's very sophisticated

21   approach to selling Blaze and the nature of exactly what

22   Blaze does and what it cannot do for an insurance company

23   like Chubb.

24          Second, I'm going to show you the license

25   agreement between Federal and FICO, and I want to give you a

1    sense of some of the big problems with these breach claims.

2         Third, I'm going to talk about that copyright

3    infringement claim.

4         And then, finally, I just want to take a few

5    minutes to talk to you about the importance of keeping

6    promises and why Federal is bringing claims against FICO.

7         So part one, FICO.  The evidence will show that

8    FICO is a big company with thousands of employees all around

9    the world.  And FICO makes money in two main ways.  First,

10   it provides credit scores.  You may be familiar with that

11   aspect of FICO.  It also sells software programs, like the

12   Blaze Advisor software program.  And FICO is very

13   sophisticated when it comes to running its business.

14        This is from FICO's website.  You can see that

15   FICO does business with all of the Top 10 Fortune 500

16   companies and 95 of the 100 largest financial institutions

17   in the United States.

18        Each time FICO sells a software program, it enters

19   a license agreement, and the evidence will show that these

20   license agreements differ a bit depending on who FICO is

21   doing business with.  FICO will propose some terms to

22   protect its interests.  The customer will propose some terms

23   to protect the customer's interests.  And the end result is

24   a unique contract that everyone has to abide by and carry

25   out in good faith.

1          You'll learn that FICO has some guidelines for how

2     they think about pricing these license agreements, and

3     they're intended, as Mr. Hinderaker just said, to capture

4     the proximate value that FICO believes Blaze brings to a

5     company.  And that makes sense, right?  If anyone who makes

6     a product believes their product has value, and you want to

7     get paid based on what you believe the value of your product

8     is.

9          But critically, the evidence will show that when

10    these massive companies buy Blaze, companies with sprawling

11    operations and billions of dollars in revenue, FICO sells a

12    license to them for a few million dollars.  Now, don't get

13    me wrong, a few million dollars is a lot of money.  No one

14    in this room is buying at-home software licenses for a few

15    million dollars.  But a few million dollars is nowhere in

16    the same stratosphere as the billions of dollars you just

17    heard FICO talking about.

18         And here's something I want you to remember as you

19    watch the witnesses testify at trial.  FICO is in the

20    business of selling Blaze, and they are pretty good at

21    trying to get as much money as they can for their Blaze

22    software.  There's nothing wrong with that.  But if FICO

23    truly believed that Blaze was so valuable to businesses that

24    it could help generate billions of dollars of revenue, the

25    evidence would show that FICO charges mountains of money for

1     a Blaze software, and the evidence will show that it

2     doesn't.  Remember, the evidence will show that FICO charged

3     Chubb $1.3 million for that enterprise-wide perpetual

4     license.

5             Let's talk a little bit more about what Blaze

6     does.  I want to be very clear from the beginning that we

7     are not here to criticize Blaze.  Blaze is FICO's program,

8     and there is absolutely nothing wrong with them being very

9     proud of it.  Of course, they are.  And like I told you

10    before, Blaze has value.  That's why Federal and plenty of

11    other companies purchase licenses to use the software.  But

12    FICO has to make Blaze seem more important to Federal than

13    it actually was because that's the hook for the big payday.

14    That's the only way to try to justify large damages in this

15    case.

16            And after listening to FICO's opening, you might

17    be thinking that Blaze is a revolutionary piece of software

18    that was critical to the ability to sell insurance, but the

19    evidence will show that Blaze is one of multiple options,

20    multiple different software programs that all do the same

21    thing.  They run business rules across a data set.  You'll

22    see during trial that all of these software programs on the

23    screen right now have the ability to run business rules or

24    business logic, and you can even access the Drools program

25    for free.

1          I want to give you an example of a business rule

2      that was run at Chubb.  The evidence will show that one of

3      the Chubb computer applications that integrated Blaze was

4      called the Texas Accident Prevention System, TAPS for short.

5      And you'll see a lot of what Chubb does is sell insurance to

6      businesses, and there are certain Texas laws that Chubb has

7      to comply with if it want to sell insurance in Texas to

8      business.

9          So here's two examples of Blaze rules.  They both

10      have an "if, then" structure.  If a customer has an fatality

11      in the last year at their business site, then the policy

12      would be flagged so that Chubb needs to follow up with an

13      in-person visit.

14          If a customer has a flood, then the policy will be

15      flagged so that Chubb can send out a brochure to help the

16      customer prevent floods, in accordance with Texas law.

17          These are the business rules.  And while Blaze had

18      its uses, it also had its limitations.  Blaze does not tell

19      you how many rules you should have, it doesn't tell you what

20      the rules should be, and it does not implement any of the

21      rules.  Blaze didn't come up with any of these rules.  The

22      evidence will show that Chubb employees did.  It's the

23      people at Chubb who come up with the rules and then execute

24      on whatever the rules say need to be done, like sending out

25      a brochure.

1          People like Chubb Technology Executive Ellen

2     Garnes can explain this.  You're going to get to meet her

3     during trial.  Ms. Garnes worked on developing the TAPS

4     application I was just telling you about, and she will

5     explain all of the work and the judgment by the people at

6     Chubb that went into deciding what rules would be run in

7     that TAPS program.

8          The other thing is, the evidence will show that

9     Blaze was only integrated into 13 computer applications at

10     Chubb.  That may sound like a lot, but the evidence will

11     show that Chubb had at least 1500 different computer

12     applications running at a given time.  That means that Blaze

13     was used in less than 1 percent of the computer applications

14     at Chubb.

15          Now, I don't want you to think that Blaze wasn't

16     used in the remaining 99 percent of applications because

17     those applications didn't need to run business rules.

18     That's not the case.  The evidence will show that nearly all

19     of the applications ever used at Chubb, all 1500 of them,

20     were running some type of business rules and logic.  It's

21     just that in those other applications, the technology

22     architects decided it would be better to run rules a

23     different way.

24          I showed you that slide with all of the different

25     software programs that can do what Blaze does.  Well, people

1    can do it too.  And the evidence will show that in these

2    other applications, the 1500 applications shown on this

3    diagram, software engineers at Chubb were writing rules into

4    the applications with code that they wrote themselves.  Why

5    would they do that?

6            Well, just like a lot of products, Blaze made

7    certain things easier and certain things harder.  And the

8    evidence will show that Blaze slowed down Chubb's overall

9    technology system, and there was delay problems.  And a lot

10   of the software engineers at Chubb were just more

11   comfortable writing their own code than they were using

12   Blaze.

13           Another thing about these computer applications,

14   even in these 1300 applications that use Blaze, Blaze was a

15   very small component.  One of the applications you're going

16   to hear about in this trial was called CSI Express, and it's

17   an important application, but it was made up of at least 20

18   different software programs.  Blaze was only one of them.

19   And that's true for all of these applications that use

20   Blaze.  Blaze was never a standalone component of any of

21   them.

22           Ladies and gentlemen, the evidence will be that

23   Blaze had a very small role in the company's technology

24   infrastructure, and it simply wasn't the reason why Chubb

25   generated revenue, let alone why Chubb was able to turn some

1    of that revenue into profit.

2          A lot of things need to happen before you have a

3    successful company.  We all know that.  And at an insurance

4    company, everything from reputation, to financial

5    management, to operations, to compliance is going to have a

6    role in whether you're generating revenue and profit.  And

7    you're going to hear during this trial from several Chubb

8    witnesses who will walk you though the pillars of what makes

9    Chubb the successful insurance company that it is and that

10   it has been for 230 years.

11         On the left is Mr. Kevin Harkin.  He is CFO of

12   Chubb North America.  Alissa Theberge is in the middle right

13   there.  She's an executive at the group at Chubb that sells

14   insurance to businesses, and she's been with Chubb for more

15   than 20 years.

16         On the right is Mr. Mike Schraer.  He is the chief

17   underwriting officer, meaning he oversees people who sell

18   insurance, and he's been with the company since the 1980s.

19   He worked his way up from being an on-the-ground underwriter

20   selling insurance to the top of the group.

21         And Mr. Harkin, Ms. Theberge and Mr. Schraer will

22   explain that what makes Chubb Chubb is the fact that it has

23   a reputation for paying insurance claims and paying them

24   promptly.  It built that reputation by backing up its

25   promises with action.  That's the main reason that the Chubb

1    Group of Insurance Companies has been around for hundreds of

2    years and why money comes in the door.

3          Remember, most of the insurance that Chubb sells

4    isn't sold to people like you and me.  It's sold to

5    businesses, and those businesses buy insurance through

6    agents and brokers.  And the folks at Chubb, like

7    Ms. Theberge and Mr. Schraer, have spent decades cultivating

8    relationships with agents and brokers all around the world

9    who tell their customers, their business customers, with

10   confidence:  If you buy coverage from Chubb, your claims

11   will be paid.

12         And, of course, that only works and it only

13   generates revenue and profits if those agents and those

14   brokers then actually do see those claims getting paid.

15   Otherwise, they would stop bringing their customers to

16   Chubb.

17         The evidence will show that Blaze has nothing to

18   do with anything I'm describing right now.  Remember, you'll

19   learn that Blaze was just one component of only 13 computer

20   applications, and it didn't even touch most of the things

21   that generate revenue for Chubb.

22         One more thing on revenue and profits before I

23   move on to another topic.  The evidence will show that Chubb

24   removed Blaze from its internal systems in 2019 and 2020.

25   And that was a big deal because, remember, the evidence is

1    going to show that Federal had paid for a never-ending,

2    enterprise-wide license, so Chubb should never have had to

3    remove that software from its systems.  But to use software

4    productively, you need to be able to count on your software

5    company for support and maintenance, and Chubb realized it

6    couldn't count on FICO after FICO had made up these breach

7    claims, so it was forced into a position where it had to

8    remove Blaze.

9           Now, if Blaze was really the reason why Chubb was

10   making revenues and profits, you would expect big problems

11   when Blaze is removed from the technology infrastructure,

12   right?  But the evidence will show that when Blaze was

13   removed from these 13 applications, business went on as

14   usual.  There were no reports of inefficiencies or problems

15   selling insurance.  There were no problems bringing

16   customers in the door.  There were no hiccups communicating

17   with those agents and brokers.  And, in fact, the evidence

18   will show that the Chubb Group saw revenue growth, increased

19   revenue, in the years after Blaze was removed.

20          Okay.  So we talked about FICO and Blaze, and now

21   I want to turn to the second thing I said I would cover this

22   morning, which is the license agreement that Federal

23   negotiated for Blaze and the breach claims.

24          So this slide here summarizes the first license

25   agreement that Federal and FICO entered in June 2006.  And

1    the evidence will show that Federal started by paying

2    $173,000 for the right to use Blaze at five seats, or with

3    five employees, and it agreed that it would only use Blaze

4    in a single application, that's CSI express application I

5    just mentioned.

6         The evidence will show that about a month later,

7    in August 2006, Federal and FICO issued the First Amendment

8    to the license agreement, and they agreed to expand the ways

9    that Federal could use Blaze.  You can see here the purpose

10   of this expansion was to say, now you can use it at ten

11   seats instead of five, and you can use it within the entire

12   Chubb specialty lines division.  So more seats, more people

13   can use Blaze, and there's no longer this limitation to just

14   keep it in one application.  Use it anywhere in the

15   division.  And the cost of this license was $350,000.

16        Then just before year end 2006, on December 28th,

17   Federal and FICO executed a final amendment to the contract,

18   and this time Federal and FICO agreed that Federal would

19   have an enterprise-wide license, a perpetual license, with

20   no limitation on the number of applications, no limitation

21   on the divisions where you could use the software, and no

22   limitations on the number of seats.  And the cost for this

23   license, this all-in, it's supposed-to-last-forever license

24   was $1.3 million.  And this shows you why FICO is wrong when

25   it says that this case is about Federal using something it

1    didn't pay for.  Federal paid, the evidence will show, for a

2    perpetual, enterprise-wide license.

3           You'll hear from Federal witnesses that in the

4    world of vendor management where you enter contracts like

5    this all the time, enterprise-wide means that the product

6    you licensed can be used anywhere in the organization.  And

7    the agreement could not have been clearer.

8           This is another excerpt from the second amendment.

9    It says "The enterprise-wide license shall mean that client

10   and its affiliates may use the Blaze product for their

11   internal business purposes with no limitation on the number

12   of seats or CPUs."  CPUs is computer processing units.

13          And the evidence will show that the absence of any

14   limitations on this agreement was very significant.  FICO

15   was agreeing that for $1.3 million, whether Blaze was used

16   by five software engineers or 5,000, it could be used across

17   the enterprise.  If Federal decided to go on a hiring spree

18   and hire 10,000 more underwriters around the world, FICO had

19   agreed that that $1.3 million fee meant that Blaze could be

20   used around the enterprise with no additional payments.

21          So after this agreement was signed, Federal and

22   its affiliates, just like the contract says, including those

23   affiliates in Canada, Australia, and Europe, integrated the

24   Blaze software into those 13 applications.

25          As FICO said, the evidence will show that for

1    almost a decade, there were no issues between the parties.

2    You will see that Chubb and FICO communicated frequently

3    about how Chubb was using Blaze, and FICO never had any

4    concerns.  So what changed?

5            On July 1, 2015, ACE announced it was acquiring

6    Federal's parent company, Chubb Corporation.  And I know

7    I've been throwing the names of a lot of different insurance

8    companies at you, so I want to pause here and talk a little

9    bit about the corporate structure of Chubb before it was

10   acquired by ACE.

11           You will learn during trial that before Chubb was

12   acquired by ACE in 2016, it was called the Chubb

13   Corporation, and that's what you see on the outer ring of

14   this slide in the dark navy blue.  The evidence will show

15   that before the acquisition, Federal Insurance Company,

16   which is in the middle of the box, that's one of my clients

17   in this case, conducted almost all of the insurance business

18   for the Chubb Corporation.  And Federal had many different

19   affiliates all around world, including those foreign

20   affiliates you heard FICO talking about, Chubb Insurance

21   Companies of Europe, Australia and Canada.  And those are

22   shown in the blue boxes underneath the box for Federal

23   because Federal controlled them.

24           And the fact that these companies were Federal

25   affiliates is important because remember what I just showed

1    you, the evidence will show that the final version of the

2    Blaze license agreement from December 2006 gave the client,

3    Federal, and all of affiliates, the right to use Blaze with

4    no limitations.

5            So how does the Chubb & Son division factor into

6    this?  You heard about the Chubb & Son division.  This is

7    Pamela Lopata.  She is an attorney who has worked at Chubb

8    since before the ACE acquisition.  And she will explain that

9    that Chubb & Son division was not a standalone company.  It

10   did not have its own employees.  It was simply the

11   contracting arm for Federal.  It was a division within

12   Federal that signed contracts for Federal and issued

13   payments for Federal.

14           And Ms. Lopata will explain that before the ACE

15   acquisition, it was Federal's regular practice to have the

16   Chubb & Son division sign its contracts.  And she'll explain

17   that Federal's vendors, they liked that practice, because

18   most of them knew and felt good about the Chubb name.  No

19   one had ever heard of Federal.

20           And like I said earlier, the evidence will show

21   that pretty much everyone inside and outside the company,

22   including FICO, referred to this whole group of insurance

23   companies that you're seeing on the screen as the Chubb

24   group of insurance companies.  That's the green ring on the

25   slide.  That's why you are hearing me refer to Chubb.

1          So what happened after the ACE acquisition in

2     2016?  The acquiring company was called ACE Limited.  You

3     can see I replaced ACE on the outer ring of the slide.  It's

4     replacing the Chubb Corp.  But ACE Limited understood that

5     the name Chubb had a lot of name and brand recognition, so

6     it quickly changed its name to Chubb Limited.  So you now

7     see Chubb Limited on the outer ring of the slide.  And

8     Federal and ACE American, the two defendants in this case,

9     my two clients, were now both part of the Chubb Group of

10    Insurance Companies.

11          Now, as soon as this acquisition was announced,

12    FICO started talking about, what's this going to mean for

13    our business?  And this is where I want to introduce you to

14    some of the key players at FICO.

15          You're going to hear a lot during this trial about

16    Russ Schreiber and Mike Sawyer.  They were in FICO's sales

17    department, and they were the employees responsible for the

18    Chubb relationship.  You won't get to meet them in person,

19    but you will see them on video presenting testimony.

20          You will learn that Mr. Schreiber helped negotiate

21    the contract in 2006.  And Mr. Sawyer is what's called a

22    client partner, which means he was Chubb's main point of

23    contact at FICO.  And the evidence will show that Mr. Sawyer

24    and Mr. Schreiber started talking about the ACE acquisition

25    right after it was announced in July 2015, and you will see

1    that they were worried about the ACE acquisition because ACE

2    was buying Chubb and ACE was also a FICO customer, but ACE

3    was a much smaller FICO customer.  So FICO was concerned

4    that if ACE were in charge, those millions of dollars in

5    maintenance fees that Chubb paid every year might be coming

6    to an end.

7            And so the evidence will show that Mr. Sawyer and

8    Mr. Schreiber started a process of trying to figure out, how

9    can we get more money before that transition happens?  And

10   they recruited a lawyer to help them, Mr. Tom Carretta.  You

11   will hear from him at trial.  And the evidence will show

12   that Mr. Carretta is one of the top lawyers at FICO, but he

13   had nothing to do with negotiating the 2006 license

14   agreement.  In fact, the evidence will show that he had

15   nothing to do with communicating with Chubb at all until

16   Mr. Sawyer and Mr. Schreiber gave him a call when they heard

17   about the ACE acquisition.

18           So now I want to talk about these two breach

19   arguments that FICO came up with.  And the first is this

20   idea that Section 3.1 of the contract was breached.  FICO

21   says that because the 2006 license agreement was signed by

22   the Chubb & Son Division of Federal Insurance Company, every

23   time Chubb Canada, Chubb Europe or Chubb Australia used

24   software that included Blaze, there was a breach of

25   contract.  That's the theory.  That is FICO's argument

1    today.  But the evidence will show that when FICO sold

2    Federal the software license in 2006 and throughout that

3    whole decade that followed, FICO knew that it was granting

4    Federal and all of its global affiliates, including Canada,

5    Australia and Europe, the right to use the Blaze license.

6          You're going to hear from a former Chubb employee

7    who negotiated the 2006 license agreement, Mr. Phil Folz.

8    Mr. Folz is retired now, but he'll explain that he

9    negotiated that $1.3 million license fee knowing and

10    intending that it would allow all the global companies in

11    the Chubb Group to use Blaze.

12          As I told you earlier, during trial you're going

13    to get to see e-mails and communications at FICO from before

14    this litigation started, so you don't have to rely just on

15    what witnesses are telling you in the courtroom or on video

16    after the litigation began.  When you pay chose attention,

17    as I know you will, you will see that in a lot of places,

18    what FICO is telling you now does not match what it was

19    saying back then.  FICO is telling you now that Blaze could

20    not be used by Chubb Canada, Chubb Australia or Chubb

21    Europe, but you will see documents that tell you what FICO

22    was saying then.  Back then, before this dispute, before

23    this litigation, FICO acknowledged that it sold Chubb a

24    global license that included all global affiliates in

25    Canada, Europe and Australia.

1         Here's another example of this then/now phenomena.

2    The evidence will show that FICO came up with that

3    $1.3 million license fee that Federal paid by looking at all

4    of Chubb Corporation's revenue, not just Chubb & Son's.  The

5    evidence will show that when the folks at FICO sat down in

6    2006 to figure out how much are we going to charge for

7    Blaze, they looked at the total revenue earned by the entire

8    Chubb Group of Insurance Companies worldwide, $12.3 billion

9    as the starting point for that license fee, all the global

10   entities in this navy blue frame on your screen.  And yet,

11   even though back then, FICO charged and Chubb paid

12   $1.3 million based on the revenue of all of its global

13   affiliates, FICO says, well, now those same global

14   affiliates' use of Blaze was a breach, and now we're

15   entitled to a second license fee.

16        Ladies and gentlemen, we are confident you will

17   reject this first breach claim as meritless.

18        Now, all the problems with FICO's claim that Chubb

19   Canada, Chubb Europe and Chubb Australia were not authorized

20   to use Blaze is why you also heard this other argument from

21   FICO about problems with consultants that use Blaze.  They

22   needed a backup argument.

23        FICO now says that Chubb shouldn't have shared

24   Blaze with two consultants who worked at Chubb Canada and

25   Chubb Australia.  On the screen is the IT director at Chubb

1    Australia, Russell Hodey, and he is coming to trial all the

2    way from Australia to address this.  He will explain how

3    Chubb Australia hired a consultant called DWS to help

4    develop an application called "Evolution" that was going to

5    be used in Australia.

6          Chubb Canada was also using the Evolution

7    application, so Chubb Australia and DWS asked Chubb Canada

8    for some help.  And in the course of that project, you'll

9    that an employee of AppCentrica, another consultant, gave

10   DWS a demonstration on how Blaze worked.  The evidence will

11   show that Chubb Australia did not use Blaze in its Evolution

12   application because all of this was unfolding in 2016 right

13   as this litigation was starting, and Chubb was committed to

14   not expanding its use of Blaze.

15         That's it.  That's all that happened.  It would be

16   the kind of thing that no one would ever think twice about,

17   but because it happened at the same time that Mr. Sawyer,

18   Mr. Schreiber and Mr. Carretta were claiming Chubb was in

19   breach, it got folded into this lawsuit, and now we all have

20   to address it.

21         So now we're on the second breach argument you've

22   heard from FICO.  They talked about this breach of Section

23   10.8, the assignment provision.  Now, in the world of

24   contracts, a person or a company who holds rights under the

25   contract can transfer them.  You can assign them to another

1    person.

2             So let's say that I go out and I rent an apartment

3    in Minneapolis for $1,000 a month, and that lease gives me

4    the right to live in the apartment as long as I pay the

5    landlord $1,000 a month.  But then my job transfers me to

6    Chicago in the middle of the lease.  So let's pretend that

7    my sister also lives in Minneapolis, and she happens to be

8    looking for an apartment with a $1,000-a-month budget.  I

9    might be able to assign, or transfer, the lease to my

10   sister, and it's like she's stepping into my shoes in the

11   contract, right?  Now she has to pay the $1,000 a month and

12   she gets to live in the apartment for whatever time is left

13   on the lease.

14            Because this concept of assignments is so common

15   in the world of business contracts, when FICO and Federal

16   sat down to negotiate their contract in 2006, they

17   negotiated assignment terms.  And the evidence will show

18   that the parties agreed that there would be two very

19   different approaches to assignments.

20            First, Federal and FICO agreed in the first

21   sentence of Section 10.8 that run-of-the-mill assignments, a

22   situation where Federal just decided I'm going to paper

23   transfer my rights to someone else, just like I might want a

24   paper transfer my rights to my sister for my apartment, not

25   allowed.  One of the executives at Chubb couldn't wake up

1    one morning and say, I'm done with Blaze; I'm going to

2    transfer the rights to my friend at MetLife.  Couldn't do

3    that.  Everyone agreed.  That's the first sentence of

4    Section 10.8.  And as FICO says, everyone agrees that type

5    of assignment didn't happen.

6              Now, FICO is hoping that you're going to see the

7    reference in the title of this section that says "No

8    assignment," and you're going to throw up your hands and

9    you're going to say, well, any and all assignments must have

10   been prohibited under this contract.  But Federal and ACE

11   know that you're here and you were picked for this jury

12   because you said that you could be impartial and you would

13   give the parties their fair day in court.  And that requires

14   hard work.  It requires thinking very critically about what

15   the parties intended when they entered this contract.  If

16   the no-assignment title on the contract was enough to

17   resolve this dispute, then we wouldn't need a trial where

18   you're asked to look at all available evidence to figure out

19   what the parties intended to agree to.

20             And the evidence will show that the second

21   sentence of Section 10.8 is very important.  I'm going to

22   read it in its entirety because it's so important.  It says,

23   "In the event of a change of control of client or if client

24   is merged with, acquired by, or inquires another entity or

25   undergoes a reorganization or otherwise acquires the right

1    to process the business of another entity, each such event

2    shall be deemed to be an assignment, subject to this

3    section, and client shall make no expanded use of the Fair

4    Isaac products as a result of such assignment -- of such

5    event unless and until Fair Isaac provides such written

6    consent, which will not be unreasonably withheld."

7           So I want to break that down a little bit and

8    start this process of the hard work.  There was some

9    reorganizing and some changes of control during all of these

10   merger events, but I want to focus right now on the

11   acquisition, that ACE acquisition, the main event, and

12   here's how I want you to think about it.

13          When you look at Section 10.8, you need to

14   substitute "Federal" for the first two times that "client"

15   appears, because the evidence will show that Federal was the

16   client who bought the Blaze license.  Then you can simplify

17   things.  You can forget about all these references to events

18   other than an acquisition, because we're focused on an

19   acquisition right now.  We're not worried about the merger

20   the reorganization, the right to process new business.  So

21   I've removed them.  I've simplified things with the green

22   dots.

23          And then you can fill in, well, what happened

24   here?  We know that Federal was acquired by ACE Limited.

25   And you heard, FICO agrees, that acquisition was a deemed

1   assignment.  And the evidence will show it's an automatic

2   assignment, not something you deem to paper.  Who was the

3   assignment to?  Well, it was to the acquiring company, ACE

4   Limited, which then became Chubb Limited because of the

5   brand recognition.  And once you do this, once you just

6   substitute in the words to reflect what was happening during

7   the acquisition event, what does the contract say?

8          Let's look at the first clause.  It says that "If

9   Federal is acquired by ACE Limited, the acquisition shall be

10  deemed an assignment subject to this section."  Easy enough.

11         So what is the rule?  What is it subject to?  It

12  says, "ACE Limited," which then became Chubb Limited, "shall

13  make no expanded use of the FICO products as a result of any

14  such acquisition unless and until FICO provides such written

15  consent which will not be unreasonably withheld."

16         So it requires some thought, no doubt about it.

17  But when you dig in and fill in what actually happened here,

18  it is clear what the parties intended.  The evidence will

19  show that the parties intended that if Federal were acquired

20  by another company, rights under the contract are assigned

21  to that new company.  They're deemed assigned.  In this

22  case, to ACE Limited and then Chubb Limited.  And Blaze use

23  can continue so long as there is no expanded use.  If use is

24  going to expand because you're growing your use of Blaze

25  through the acquisition, well, then you need to talk to FICO

1    and get some consent.

2            And you'll see that this makes perfect sense.  Why

3    should a merger or a reorganization or an acquisition

4    entitle FICO to say, you have to stop using Blaze if the use

5    of Blaze isn't expanding?  The evidence will show that the

6    parties agreed to a very specific expanded use rule.  And

7    the evidence will also show that FICO does not always agree

8    to an expanded use rule, but it did so here, and with this

9    lawsuit, with this Section 10.8 breach claim, it's going to

10   ask you to rewrite the contract.

11           But every word in this contract matters.  FICO is

12   going to be asking you to delete this expanded use rule

13   because the evidence will be that there was no expanded use

14   of Blaze after the ACE acquisition.  And FICO rushed to

15   terminate the contract in March 2016 anyway, and that's

16   really hard to justify.

17           This is a letter that Chubb sent FICO in

18   February 2016 right after ACE acquired Chubb.  Chubb

19   explained, "The applications that have been utilizing the

20   Blaze Advisor software since 2006 are currently running in

21   the exact same fashion as prior to the merger transaction."

22           The evidence will show that this assurance was

23   accurate.  The 13 applications that were using Blaze after

24   the acquisition were the applications that were using Blaze

25   before the acquisition.

1              You heard a reference to 15 applications during

2     FICO's presentation.  You'll see some of that during trial,

3     and it's because in these initial discussions, Chubb was

4     erring on the side of caution in trying to name how many

5     applications were using Blaze.  And so there's some

6     reference to 15, but the evidence will show it's only 13.

7              And you'll see that when FICO terminated the

8     license agreement in March 2016, less than two months after

9     this acquisition closed and despite a black-and-white

10    assurance of no expanded use from Chubb, there was no

11    evidence of expanded use.

12             Now, I'm sure FICO will have a theory during

13    trial, maybe many theories, on how use of Blaze just must

14    have expanded after the acquisition.  You already heard

15    today FICO talking about, well, some of the insurance

16    policies had new writing company names on them.  But the

17    evidence will show that these are just things that FICO came

18    up with during years of litigation once it had doubled down

19    and had no choice but to try to come up with some

20    justification for terminating the contract in 2016.  You

21    see, the evidence will show that FICO has known for years

22    that it would have trouble trying to show the use of Blaze

23    had expanded and that it a right to more fees just because

24    there had been an acquisition.

25             This is an e-mail exchange between Mr. Sawyer and

1    Mr. Schreiber in October 2015, before the acquisition.  And

2    they're brainstorming about this whole idea of using the

3    acquisition as a basis to get more money.  And Mr. Schreiber

4    says in the top email, "The unreasonably withheld bit has me

5    a little concerned."  And that's a reference to the expanded

6    use rule.  He's worried about it.

7         And Mr. Sawyer responds a few minutes later and

8    says I'm not so concerned about it.  He says, the idea that

9    the companies got bigger should be enough to get around the

10   contract language.  He says, "I would think that tripling

11   the size of the GWP" -- that's a reference to insurance

12   revenue -- "of business by application should be significant

13   enough to get around that unreasonably withheld language."

14        But it didn't take Mr. Schreiber long to identify

15   the problem with that argument back when FICO thought no one

16   was watching.  Mr. Schreiber responds a few minutes later

17   and he says, "Well, is the license specifically tied to

18   GWP?"  Meaning, is it tied to revenue?  And the answer is

19   no.  Mr. Sawyer responds, "I don't see anything on GWP on

20   the agreements."

21        And the evidence will show that this was

22   disappointing to Mr. Schreiber and Mr. Mr. Sawyer because

23   FICO has negotiated contracts with other customers that say

24   if -- that says FICO gets more money if the revenue of a

25   customer increases because of a merger or acquisition.  But

1    as Mr. Schreiber and Mr. Sawyer were acknowledging back in

2    2015, that is not the agreement that they had negotiated

3    with Federal.

4         This is another example of FICO asking you to

5    rewrite, to renegotiate their contract for them.  FICO could

6    have negotiated for that language, but the evidence will

7    show that it didn't, and that matters because words in a

8    contract are significant, and they can change the whole

9    meaning of a party's agreement.

10        You do not get a do-over at negotiating your

11   contract just because you file a lawsuit.  And so by the end

12   of this trial, it will be clear that you should reject

13   FICO's claim that Federal breached Section 10.8.

14        Now, you also heard that FICO has brought claims

15   for copyright infringement, but the evidence will show that

16   when you do the hard work of closely examining what happened

17   after the acquisition, ACE American had every right to use

18   Blaze.  In fact, the evidence will show that the whole point

19   of Section 10.8 was to guard against exactly the type of

20   infringement argument we're hearing today.  Let me show you

21   what I mean.

22        So we're going back to the contract language in

23   10.8.  As I showed you earlier, ACE Limited, which quickly

24   became Chubb Limited, stepped into Federal's shoes into the

25   contract and became the client.  Then, just like my sister

1     obtains all the rights under my apartment lease if I assign

2     it to her, ACE Limited, then Chubb Limited, had all the

3     rights that Federal used to have under the Blaze license.

4           And as we discussed earlier, the evidence will

5     show that under the Blaze license agreement, the client, now

6     ACE Limited and Chubb Limited, and it's affiliates, could

7     use Blaze.  And if you go back to the organization chart we

8     looked at before, you know that the evidence will show ACE

9     American was an affiliate of ACE Limited and then Chubb

10    Limited.

11          I was not kidding when I said that your jury

12    service will require hard work.  I really meant it, but it

13    is important work because it's a lot easier to get swept up

14    in terms like infringement, indifference to contracts, than

15    it is to dig into the words of these contracts and parse all

16    of these corporate acquisitions that happened and figure out

17    what was actually intended.  But you're all here on this

18    jury because ACE and Federal are confident that when you

19    look at this closely, if you're willing to do the hard work,

20    you will reject the copyright infringement claim too.

21          And now we're on the final topic I wanted to talk

22    to you about this morning.  I want to thank you for your

23    attention so far.  I really appreciate it.  And I just

24    wanted to ask you to continue your attention for a few more

25    minutes while I talk about something that's very important

1    to ACE and Federal.

2              You see, Federal is not just a defendant in this

3    case.  Federal is also asserting claims against FICO.  As we

4    discussed before, Federal had a perpetual license to use

5    Blaze.  It was supposed to last forever.  Federal paid more

6    than a million dollars for that right.  And you will see

7    that the agreement said that FICO could only terminate

8    Federal's use to use Blaze if there was a material breach of

9    the agreement.  And for the reasons we talked about, the

10   evidence will show that Federal did not breach the

11   agreement.  That means FICO could not and should not have

12   terminated the agreement and doing so was a breach.

13             Federal also has a very important second claim.

14   You'll learn that under the law, a covenant of good faith

15   and fair dealing is implied into every single contract, and

16   that means exactly what it sounds like.  Parties to a

17   contract must act in good faith in their interactions and

18   they must be fair.  And this is so important that parties

19   don't have to memorialize it in an agreement.  It's just

20   automatically put into every contract that's signed.

21             And we're going to show that when FICO rushed to

22   terminate the agreement, even though there wasn't a stitch

23   of evidence of expanded use, there was no evidence that that

24   expanded use rule had been violated, it breached the implied

25   covenant.

1          Federal had paid for the right to use Blaze with

2     no limitations.  It had an enterprise-wide, perpetual

3     license.  It knew that it had to be careful if was an

4     acquisition event because under that expanded use rule, it

5     would need consent from FICO if it wanted to start using the

6     software differently.

7          Federal upheld its end of the deal, but FICO's

8     termination meant that Federal only got ten years out of a

9     contract that it expected to last forever.  And that bad

10    faith meant that Federal had to spend time and money

11    transitioning Blaze out of those 13 computer applications

12    and replacing it with different software.  So this claim,

13    the second claim, is about maintaining the integrity of the

14    deal that FICO and Federal made.

15          I will not get to speak to you again directly

16    until the end of the trial, so I want to thank you right now

17    for all of the hard work I'm asking you to do, and we know

18    that you will do it.  You will do the hard work to figure

19    out what did these parties really intend when they entered

20    this contract?  And at the end of trial, we're going to be

21    asking you to hold FICO to their end of the deal.  And I'm

22    confident that when you hear from all the witnesses in the

23    case and you see the documents, you will do exactly that.

24          Thank you very much.

25          THE COURT:  Thank you, Ms. Godesky.

1          Counsel, if I might get you both to rearrange the

2     podium and the cart so that they're facing appropriately.

3          Members of the jury, you've now heard the opening

4     statements, and we will start taking evidence in the case.

5          The evidence -- I believe I told you this was

6     coming.  The evidence is going to start by my reading to you

7     a list of uncontested facts.  They're uncontested facts

8     because the parties -- I'll wait until they're done.

9          MR. HINDERAKER:  I'm trying not to break it.

10          THE COURT:  Yeah.

11          All right.  Thank you, both.

12          So they're uncontested facts because the parties

13     agree that these are, in fact, the facts and have been

14     established, so I'm going to read them to you.  Please pay

15     careful attention to the facts that have been stipulated to.

16          Number 1, you will see an Exhibit J1.  Exhibit J1

17     is the software license and maintenance agreement including

18     Amendment One and Amendment Two.  We're going to call that

19     the license agreement.

20          2, the license agreement is a valid and

21     enforceable contract.

22          3, Chubb & Son is an unincorporated division of

23     Federal Insurance Company.  We're going to call Federal

24     Insurance Company "Federal."

25          Chubb & Son does not have subsidiaries, number 4.

1      Number 5, Chubb & Son does not have affiliates as

2   that term is defined in Amendment Two.

3      6, Chubb & Son operated as the manager of domestic

4   and foreign insurance company subsidiaries of Federal.

5      Number 7, as manager of insurance company

6   subsidiaries of Federal, Chubb & Son was empowered to manage

7   the business and insurance by and on behalf of and in the

8   name of the insurance company subsidiaries of Federal.

9      Exhibit J2 is the February 3, 2006, request for

10   information of Chubb & Son, a division of Federal Insurance

11   Company, for itself and as servicer for the Chubb

12   Corporation and its non-insurance company subsidiaries or as

13   manager of its insurance company subsidiaries sent to FICO

14   in February 2006.

15      Before the acquisition of the Chubb Corporation by

16   ACE Limited, Federal was wholly owned by the Chubb

17   Corporation.

18      Before January 15, 2016, all the ownership and

19   voting rights of the stock of Federal Insurance Company were

20   held by the Chubb Corporation.

21      11, before the acquisition, the Chubb Corporation

22   was the parent of a group of insurance companies that

23   operated together as a $12 billion enterprise.

24      Number 12, before the acquisition, ACE INA

25   Holdings, Inc. was a wholly owned subsidiary ACE Limited

1    created for the purpose of effectuating a merger transaction

2    with the Chubb Corporation.

3          Number 13, after the acquisition of the Chubb

4    Corporation by ACE Limited, the Chubb Corporation ceased to

5    exist.

6          Number 14, after the acquisition of the Chubb

7    Corporation by ACE Limited, ACE Limited changed its name to

8    Chubb Limited.

9          Number 15, after January 15, 2016, Federal was a

10   wholly owned subsidiary of ACE INA Holdings, Inc.

11         Number 16, Federal and ACE American are now part

12   of a group of insurance companies with Chubb Limited as the

13   ultimate parent of both.

14         Number 17, Federal and ACE American are both

15   indirect wholly owned subsidiaries of Chubb Limited.

16         Number 18, after the acquisition, Chubb Limited

17   was the parent of a group of insurance companies with total

18   annual revenue of 30-plus billion dollars.

19         Number 19, the acquisition was the largest merger

20   in insurance history, resulting in the largest publicly

21   traded property and casualty insurer in the world.

22         Number 20, I am going to be -- 20 through 30 are a

23   list of applications in which Blaze Advisor was used.

24         Number 20, Blaze Advisor was used in the CSI

25   Express application.

1          Number 21, Blaze Advisor was used in the decision

2     point application.

3          Number 22, Blaze Advisor was used in the automated

4     renewal process application.

5          Number 23, Blaze Advisor was used in the CUW-IM

6     application.

7          Number 24, Blaze Advisor was used in the IRMA

8     which stands for individual rate modification application,

9     application.

10         Number 25, Blaze Advisor was used in the TAPS, an

11    acronym for Texas Accident Prevention System Application.

12         Number 26, Blaze Advisor was used in the Premium

13    booking application.

14         Number 27, Blaze Advisor was used in the Adapt-ABL

15    (EUZ) application.  It's Adapt-ABL, (EUZ) application.

16         Number 28, Blaze Advisor was used in the EZER

17    (EUZ) application.

18         Number 29, Blaze Advisor was used in the

19    Adapt-ABL, application use by Chubb Insurance Company of

20    Australia.

21         Number 30, Blaze Advisor was used in the

22    Profitability Indicator Application.

23         Number 31, the Blaze Advisor component was removed

24    from the version of Decision Point used by the Financial

25    Lines Unit on or about April 10th of 2020.

1          Number 32, the Blaze Advisor component was removed

2     from the version of CSI Express Automated Renewal Process

3     and Profitability Indicator used by the Financial Lines Unit

4     on or about January 17th of 2020.

5          Number 33, the Blaze Advisor component was removed

6     from the version of Premium Booking used by Corporate

7     Business Systems on or about April 17 of 2020.

8          Number 34, the Blaze Advisor component was removed

9     from the version of CUW-IM used by the Chubb Commercial

10    Insurance Business Unit in early November 2019.

11         Number 35, the Blaze Advisor component was removed

12    from the version of TAPS used by the Chubb Commercial

13    Insurance Business Unit in the late third quarter or early

14    fourth quarter of 2019.

15         Number 36, the Blaze Advisor component was removed

16    from the version of the IRMA used by the Chubb Commercial

17    Insurance -- I should have been indicating Chubb Commercial

18    Insurance has the acronym in parentheses "CCI" -- Business

19    Unit in either the summer or early fall of 2019.

20         Number 37, the Blaze Advisor component was removed

21    from the version of EZER used by CEGSE, on or about March 29

22    of 2019.

23         Number 38, the Blaze Advisor component was removed

24    from the version of Adapt, used by CEGSE and Chubb Insurance

25    Company of Australia on or about January 27, 2019.

1            Number 39, the Blaze Advisor component was removed

2     from the version of EZER used by UK Federal on or about

3     March 29, 2019.

4            Number 40, the Blaze Advisor component was removed

5     from the Evolution Application on or about September 27,

6     2019.

7            Number 41, FICO owns a valid copyright for Blaze

8     Advisor versions 3.0, 4.0, 5.0, 6.0, 6.5, 6.6, 6.7, 6.8,

9     6.9, 7.0, 7.1, and 7.2.

10            Number 42, after March 31, 2016, the Blaze Advisor

11     software code was not modified in any way by Chubb & Son, a

12     division of Federal -- or Federal, or any other associated

13     entity or person.

14            Number 43, one of the versions of the Blaze

15     Advisor software at issue in this case is Blaze Advisor

16     version 7.1.  Blaze Advisor version 7.1 was derived from

17     FICO's registered copyright in version 7.0.  FICO's

18     registered copyright in Blaze Advisor version 7.2 is derived

19     from Blaze Advisor version 7.1.

20            Those are the stipulated facts between the

21     parties.

22            Mr. Hinderaker, we may begin with the presentation

23     of your evidence.  It's about quarter to 12:00.  Do you have

24     a witness who could start his or her testimony?

25            MR. HINDERAKER:  Your Honor, Sean Baseman, if I

1    may gather him.

2              THE COURT:  Okay.  We'll go for another 15 minutes

3    before the lunch break or shortly after that, and then we'll

4    break for lunch, okay?

5              Come on up, Mr. Baseman.  If you will come up here

6    and raise your right hand.  Come on over here.

7

8                            **SEAN BASEMAN,**

9         duly sworn, was examined and testified as follows:

10

11             THE COURT:  Go ahead and be seated.  And state

12   your full name for the record, please.

13             THE WITNESS:  My name is Sean Justin Baseman.

14             THE COURT:  Go ahead.

15             MR. HINDERAKER:  Thank you.

16                        **DIRECT EXAMINATION**

17   BY MR. HINDERAKER:

18   Q.  And, Mr. Baseman, where are you from?

19   A.  Where am I from?

20   Q.  Where do you live?

21   A.  I currently live in Los Angeles, California.

22   Q.  What is your current position with FICO?

23   A.  My current position in FICO is I have responsibility for

24   technical architecture and solution architecture for the

25   firm.

1    Q.  Well, let us start with the technical architecture.

2    What does that mean?

3    A.  Technical architecture is I work with a team of

4    individuals that design the future state of our products, or

5    software products.

6    Q.  And what does a solution architect mean?

7    A.  A solution architect is I work with our customers to

8    identify their problems and look for solutions using zero or

9    more FICO technologies.

10   Q.  Okay.  And can you describe -- on the solution

11   architecture side, can you describe a little bit more on

12   that so we understand what it means to meet with a client,

13   look at a problem, find a solution?

14   A.  Absolutely.  As you can imagine, customers all over the

15   planet have varying degrees of problems that they're trying

16   to solve, and they typically look for technology solutions

17   to help them.  So my role in that part of the organization

18   is to work with our customers, listen to what their problems

19   they're trying to solve, and help articulate a way to solve

20   those problems using technology that FICO would provide.

21   Q.  What type of problems is it that a client has that wants

22   to look at FICO technology?

23   A.  So typically they have efficiencies and business

24   problems they're trying to solve, where they would have

25   various connecting types of systems and they're looking for

1    ways to centralize those and bring business expertise out of

2    the -- out of their business users' heads and then put them

3    into technology and use them within their existing

4    infrastructures.

5    Q.  I wish I had caught all of those words.

6            You mentioned using technology to bring together

7    all of their existing structures?

8    A.  Correct.

9    Q.  Could you describe for us what that means in more common

10   language?

11   A.  Yes, of course.  I will attempt.

12           So most organizations of any type will have years

13   of computer systems that are already in place that do very

14   specific things.  And typically what they're trying to do is

15   bring those existing systems together to solve new types of

16   problems while not discarding those existing systems, right,

17   because they've been there for a while and they're useful.

18   Q.  When you say "new types of problems," are you

19   referencing business problems?

20   A.  Absolutely, yes.

21   Q.  Let's be a little more specific and turn the

22   conversation to when customers are looking at Blaze Advisor

23   as a means to solve business problems.  What's your

24   background with that?

25   A.  Correct.  So within Blaze Advisor space, I've been

1   working with Blaze Advisor now for 20 years for FICO.  Blaze

2   Advisor is a business rule management system upon which

3   allows our customers to bring into technology their existing

4   know-how and knowledge across the organization and automate

5   that.

6            Typically, they're trying to look at solving

7   problems around first documenting and understanding what

8   those policy and rules are.  The second is to be able to

9   automate those rules in the form of decisions, and then

10  typically there is some efficiencies around that of how they

11  bring things together for other purposes.

12  Q.  Okay.  The first part of your answer was bring their

13  know-how into technology?

14  A.  Correct.

15  Q.  Can you tell us what that means?

16  A.  Absolutely.  So all businesses are typically there to

17  support financial gains for companies.  And in those

18  financial gains for companies, there are usually hundreds or

19  thousands of individuals across the organization that know

20  how to do the things day to day that requires that.

21            One of the challenges that you have is when people

22  manage that, it's typically inconsistent.  You don't

23  necessarily know what decision you made and how that was

24  affected.  And the problems that they are trying to solve

25  is, first, identify what all of those rules are across the

SEAN JOHNSON - DIRECT

1    organization so they can see them, and then, second, is to

2    empower them to change and modify those in a more consistent

3    way.

4    Q.   Is Blaze Advisor a solution to those problems?

5    A.   Absolutely.

6    Q.   So how?

7    A.   So being a business rule management system, it provides

8    a framework of which they can articulate or write down those

9    concepts that are in their heads, policy manuals, curistics

10   that they are doing, you know, human-based logic on, and

11   codify them in some form.

12          Now, the business rule management system provides

13   various functionality to make that easier.  For example,

14   metaphors is essentially a picture where you can represent

15   certain complex statements in a graphic.  And it also puts

16   the structure in place that allows them to change and modify

17   and create whole new rules or policies without the

18   interaction of IT, and that's the information technology

19   team.  That's a core group of programmers that would

20   typically do things.

21   Q.   Okay.  And you've used the title or name "business rules

22   management system."  I take it that's an industry title for

23   this kind of software?

24   A.   That is correct.  That is an industry standard term for

25   that type of software.

```
1    Q.  So as business rules and management -- and Blaze Advisor

2    is a business rules management system?

3    A.  That's correct.

4    Q.  And you mentioned, I think, if I heard you, two major

5    elements of a business rules management system or two major

6    elements of Blaze Advisor was, one, managing, and the other

7    automating?

8    A.  Correct.

9    Q.  Could we just talk about one at a time?

10   A.  Absolutely.  That would be the easiest way.

11   Q.  So if you would tell us how Blaze Advisor is used to

12   manage the decisions or decision-making process of a

13   company.

14   A.  Yes, absolutely.  So if you look at how it helps to

15   manage the decisioning process, right?  So we talk in terms

16   of rules and decisions, right?  And if you look at what a

17   rule is, a rule is essentially an "if" statement, right?  If

18   X, then Y.  And those are typically difficult to understand

19   as things get more and more complicated.

20          Now, notice I haven't actually made a decision

21   yet.  The decision that I make is at the point of

22   interaction with some sort of request, I need to make a

23   decision.  So what is the output of multiple rules?  That

24   would be the decision that I'd make.

25          The business rule management system provides a
```

SEAN HOSSMANN - DIRECT

1    framework of which nontechnical users can write and express

2    their logic in a standard format that can be readable and

3    usable and, thus, managed because there's a life cycle

4    associated with that".  Who did what?  Am I allowed to do

5    that?

6            Once I've made those changes, is that the change

7    that I expected it to do, right?  I can test that change.

8    Did I break something?  All of this is what's classified

9    rolled into the business rule management system.

10           And that's very separate from the business rule

11   engine side of it, which is the actual codification of that

12   logic.  That codification is essentially, you know, the

13   English language to programming languages, right, that sort

14   of transformation to how that happens, and that's the actual

15   running of those rules.  And, obviously, there's a lot of

16   technology that goes behind that as well.

17   Q.  Does Blaze Advisor technology itself accomplish that

18   transformation between the rules that are being managed and

19   the engine that executes those rules to make a decision?

20   A.  Yes, it does.

21   Q.  How does it do that?

22   A.  Through the relationships and how you store and manage

23   those rules, it actually interprets those rules and comes up

24   with the -- what we like to say, the path of least

25   resistance, to run those rules.

```
1            So one of the things that's interesting is humans

2       thing in a very interesting, you know, nonlinear fashion

3       most of the time, and the way they articulate their rules is

4       typically unorganized.  So by being able to put an

5       organization to it, to allow them to think in their own

6       terms, the engine actually translates that into a set of

7       statements that can be run by other computer programs.

8       Q.  And by the translation, is that a translation into the

9       software code that the computer can read and execute?

10      A.  Yes.

11      Q.  Before we go any further with this discussion, tell

12      us -- before we get to your specific experience with Chubb,

13      tell us what is your experience in the insurance industry

14      relative to Blaze Advisor and working with clients for

15      solutions?

16      A.  Yes.  So as stated earlier, I've been at FICO now for

17      20 years.  I've worked in various capacities at FICO around

18      implementing problems, that is in a delivery aspect where I

19      actually work with the customers to build those solutions,

20      as well as a sales capacity from a technical sales

21      perspective.  And that technical sales perspective is how

22      does the tool work?  How does this happen, et cetera.

23            Now, through those various years I've been exposed

24      to several large insurance companies across the planet and

25      helped them understand how Blaze Advisor could help solve
```

1    their particular problems that they're looking for.  And

2    each customer has various degrees of problems and different

3    problems they're trying to solve, and it's really a matter

4    of understanding what problem they're trying to solve which

5    requires an understanding cursory level of the industry and

6    how all that fits together, as well as what their existing

7    systems do, how they tie together, and how Blaze Advisor

8    would fit into that environment.  Or not.  Sometimes it

9    doesn't.

10   Q.  And can you tell us some of the insurance company names

11   that you've worked with?

12   A.  Sure.  So ████████ would be one.  ████████ would be

13   another.  ██████████████████ out of the United

14   Kingdom, are some of the ones that come to mind.

15   Q.  And we kind of got started right off with the -- right

16   into the meat of it, but let me back off a second and if you

17   would tell the jury what your educational background is

18   before you got to FICO with your history.

19   A.  Sure.  My educational background is I possess a bachelor

20   of science in management information system acquired through

21   Junior Commonwealth University.

22          THE COURT:  Mr. Hinderaker, let me interrupt for a

23   second.  Are you at a natural breaking point or close to

24   one?

25          MR. HINDERAKER:  Sure.  I can, Your Honor.

```
 1                THE COURT:  Okay.  Why don't we take our noon
 2      break.  Be back in the courtroom at 1:30, okay?
 3                THE CLERK:  All rise for the jury.
 4                     (Jury leaves courtroom.)
 5                       (JURY NOT PRESENT)
 6                THE COURT:  You may step down, but let me show you
 7      something.  When you pivot, your voice is going away from
 8      the microphone and sometimes a little bit too far, so try
 9      and keep that in mind and not move back and forth, okay?
10                THE WITNESS:  Yes.
11                THE COURT:  All right.  Counsel, you may be
12      seated.
13                I know we have to take up an issue regarding some
14      of the documents that were coming through Mr. Baer, correct?
15                MR. HINDERAKER:  Yes.
16                THE COURT:  And do you anticipate that that might
17      be this afternoon that he will be wanting to use those
18      exhibits?
19                MR. HINDERAKER:  I think the underlying word is
20      "might."  It would certainly be the last witness of the day.
21      I can't say he won't be.
22                THE COURT:  Why don't we plan then on taking that
23      up.  Why don't we be back in here at 1:00, if we can, to
24      take that up.  Does that give you all enough time?
25                MR. ERBELE:  Yes, it does, Your Honor.
```

```
 1              MS. GODESKY:  Yes.

 2              THE COURT:  Okay.  We'll see you back here at

 3    1:00.  Thank you.

 4              MS. KLIEBENSTEIN:  Your Honor, I have one super

 5    quick housekeeping question.  J1 and J2 were read out loud

 6    in the statement of uncontested facts.  Do you want us to

 7    move for admission of those when exhibits are coming in

 8    without objection?

 9              THE COURT:  Those are admitted.

10              MS. KLIEBENSTEIN:  Perfect.  Thank you.

11              THE COURT:  All right.  Thank you.

12              (Lunch recess taken at 12:06 p.m.)

13

14                    (JURY NOT PRESENT)

15                      (1:03 p.m.)

16              THE COURT:  All right.  We're back on the record

17    in FICO versus Federal, et al., taking up a motion to

18    exclude certain exhibits that are anticipated to be offered

19    through Benjamin Baer, who is likely or possibly to be

20    called this afternoon.  Who is going to address Federal's

21    argument?

22              MR. FLEMING:  Good morning, Your Honor.  Or good

23    afternoon.

24              THE COURT:  Good afternoon.

25              MR. FLEMING:  Your Honor, the documents fall into
```

1      three categories.  There's third-party consultant reports,

2      two documents.  There are white papers, and then there are

3      overlapping categories, three documents that were disclosed

4      late.

5             In speaking about the consultant reports first, it

6      is straightforward hearsay.  There are third parties who are

7      providing -- I mean, we use the word fawning, very

8      supportive report about FICO, but they don't have any

9      foundation that can be laid.  When Mr. Baer was deposed, he

10     said he wasn't sure whether it was based on FICO information

11     or third-party analysis and beyond that, they're not

12     business records.  They're not kept in the ordinary course.

13     They're not reliable.  They're inherently unreliable.

14             THE COURT:  Which are the consultant reports,

15     which numbers?

16             MR. FLEMING:  95, the ESG report; and 102.8, which

17     is the Forrester report.

18             THE COURT:  Keep going.

19             MR. FLEMING:  Well, and the EST report was

20     actually paid for by FICO.  I mean, it was for the purpose

21     of getting a report that's positive like this to give to

22     customers.  One of the hallmarks of a business record is its

23     reliability, and this is the opposite of that.  There's no

24     reason to believe they're accurate or that they were

25     prepared for the purpose of being accurate, Rather they were

1    paid for to provide the results as to their customers.  I

2    mean, it's not a -- it's a pretty straightforward, just

3    hearsay with no business records exception.

4         And then with regard to the white papers, it's the

5    same issue.  They're not reliable.  There's no reason to

6    believe they're accurate.  They don't have the ordinary

7    indicia of business records as opposed to they were prepared

8    for a particular purpose:  To provide positive information

9    about FICO's products with regard to particular customers.

10   They rely simply on positive evaluations, and its entire

11   purpose is to sell more software.  So they are not, you

12   know, traditional business records for those reasons.

13        And then there's three documents that weren't

14   disclosed during discovery, and those are 1024, 1025, and

15   1028.

16        And if I may make one more point, there's also the

17   issue with many of these documents providing, you know,

18   pseudo-expert testimony.  I mean, 1024, for example, talks

19   about a 356 percent return on investment.  There are -- you

20   know, rate of returns provided in these documents.  They

21   provide present value.  It's the typical type of expert

22   testimony where we haven't had a report relating to that

23   information, we haven't had an opportunity to engage in

24   discovery on that information.

25             THE COURT:  That's with respect to 1024, 1025 and

1      1028, did you say?

2                  MR. FLEMING:  That is 1024.  1025 and 1028 are the

3      late-produced documents.

4                  THE COURT:  And they were not produced in

5      discovery?

6                  MR. FLEMING:  Correct.

7                  THE COURT:  So it's not an issue about whether

8      they were on the exhibit list.

9                  MR. FLEMING:  Correct.

10                 That's all.

11                 THE COURT:  Okay.  Thank you, Mr. Fleming.

12                 Mr. Erbele?  Do repeat your name for the court

13     reporter's benefit.

14                 MR. ERBELE:  Yes.  This is Michael Erbele

15     appearing on behalf of FICO.

16                 So I'll take these in order, Your Honor.

17                 First is the third-party consulting reports.  And

18     Mr. Baer will lay the foundation for these reports.  These

19     were created by third parties, but FICO was involved in the

20     creation process and FICO provided information to the third

21     parties in creating these reports.

22                 The ultimate conclusion, and the name on the

23     report, however, is the third party, and it's their

24     independent analysis that is providing the reliability.

25                 THE COURT:  What is he going to testify to about

1    FICO's involvement in the creation?  What's he going say?

2         MR. ERBELE:  He's going to say that FICO's

3    marketing department identified these third parties as

4    consulting leaders in the IT consulting industry.  The

5    reason they did so is because these third parties provide

6    many IT consulting reports.  They're recognized in the

7    industry, and that FICO provided information about the

8    performance of the Blaze Advisor software to these third

9    parties in the course of them creating these reports.

10        THE COURT:  Okay.

11        MR. ERBELE:  He'll also explain that FICO verified

12   the accuracy of the information provided to these third

13   parties.

14        Mr. Fleming says they're not business records of

15   FICO, but the Eighth Circuit recognized the adoptive

16   business record rule under which a business record of a

17   third party, here, the consulting reports, can be

18   incorporated into the business records of the custodian,

19   here, FICO.

20        THE COURT:  Let me ask you about that.  The cases

21   that you cite seem to be slightly different in the sense

22   that what they're taking is what's apparently, on its face,

23   a business record of an entity and then incorporating that

24   into their own business record.  So like an invoice or

25   things of that nature.  This does seem different from that.

1    So how is the consulting -- sticking with the consulting

2    report, how is that a business record of FICO's?

3              MR. ERBELE:  This is analogous to the *Condus* case

4    that's cited on page 3 of docket 1083.  So in this case

5    there was a bank that had interviewed with consultants.  The

6    third-party consultant received information from the bank

7    based on a review of those documents and interviews with

8    employees, which is the same types of information that FICO

9    provided to third-party consultants here.  And the Court in

10   that case applied the adoptive business rule to find the

11   consulting report to be a business record of the proponent.

12   You know, the Court noted that the investigation of fact

13   gathering used to create it was conducted contemporaneously

14   with the presentation of that report and that the reports

15   were made in the ordinary course of the consulting industry,

16   of the consultant because they were in that industry.

17              THE COURT:  Okay.

18              MR. ERBELE:  And so I would submit that same logic

19   applies here.  It is a consultant report.  It is

20   incorporated into FICO's business records, and FICO

21   themselves rely on the accuracy of these reports because

22   they're distributing them to their potential clients in the

23   ordinary course of their marketing.

24              THE COURT:  Okay, so turn to the white papers.

25   How are those generated?

1          MR. ERBELE:  White papers are all FICO documents.

2     They are prepared by FICO's marketing department.  And for

3     those documents, some of these documents incorporate the

4     successes that FICO's clients realize from using Blaze

5     Advisor software.

6          So in these instances, FICO's marketing department

7     interviews FICO's clients that have used Blaze Advisor for a

8     period of time.  Through this interview process and from

9     receiving documents from FICO's clients, they understand and

10    document the business successes of Blaze Advisor.  They then

11    draft a draft of the report.  The report is exchanged with

12    the client.  The client has an opportunity to review and

13    verify the accuracy of the information.  And before the case

14    study is published, the client confirms the accuracy of that

15    information.

16          THE COURT:  That's really perhaps a triple hearsay

17    problem.  The statements by the customers, some of which are

18    quoted here in some of these documents, how do you get those

19    statements around -- I mean, they're obviously hearsay.  How

20    do you get them around hearsay?

21          MR. ERBELE:  For the business benefits themselves,

22    they're based on the business records of FICO's client,

23    which is then incorporated into FICO's own business record,

24    the business record of the case study itself produced by

25    FICO's marketing department.

1          THE COURT:  Who's going to testify that they're

2     based on the client's business records?

3          MR. ERBELE:  Mr. Baer will lay the foundation.  He

4     will establish that the business benefits of Blaze Advisor

5     are recognized by the client and kept by the client in the

6     course of their business and that they are then incorporated

7     into FICO's business records of FICO's marketing department.

8          THE COURT:  What's his foundation for that?

9          MR. ERBELE:  In his role as the VP of marketing,

10    he was in charge of working with FICO's clients to

11    understand these benefits realized by their business.

12          And I'd like to call Your Honor's attention to a

13    case regarding foundation from the Eighth Circuit.  Let me

14    find it.  That is the *Resolution Trust* case cited on page 5

15    of docket 1083, and that deals with the foundation

16    requirement of the witness.  There need not be personal

17    knowledge of that witness to authenticate the business

18    record.  They only need to have knowledge of its

19    reliability, which Mr. Baer does have.

20          THE COURT:  Yeah, I think my question was directed

21    to a slightly different problem, I think.  He, Mr. Baer, is

22    going to say that the information received from the clients

23    is based on the client' business records, and I'm concerned

24    about that last piece.  How will he -- how's he going to say

25    that other than, well, they told me it was based on their

```
 1    business records?

 2              MR. ERBELE:  Well, it's inherently reliable

 3    because the information arises from the client's business

 4    process.  They're using Blaze Advisor and documenting Blaze

 5    Advisor in the client's -- in the course of the client's

 6    business and that is what they're conveying to Mr. Baer.

 7    And so in this situation, the adoptive business rule that

 8    the Eighth Circuit recognizes, that's the Brauner case and

 9    its progeny applies.

10              THE COURT:  Why don't you tell me about 1024, 1025

11    and 1028.

12              MR. ERBELE:  The reason why those documents were

13    not produced during fact discovery, Your Honor, is because

14    they were not created during fact discovery.  They were

15    created after the close of fact discovery, and they were

16    timely supplemented under Rule 26.  And so the fact that

17    they were not produced during the pendency of fact discovery

18    is immaterial.

19              THE COURT:  When were they produced to the

20    defendants?

21              MR. ERBELE:  Six weeks ago, the first week of

22    January.  They were also publicly available documents, and

23    they are similar types of documents as the other case

24    studies and white papers that were produced earlier.

25              THE COURT:  Okay.  Anything else?
```

```
1              MR. ERBELE:  Nothing else, Your Honor.

2              THE COURT:  Thank you, Mr. Erbele.

3              Mr. Fleming, I'll give you the last word, if you

4     want to come back up.

5              MR. FLEMING:  Your Honor, virtually looking at the

6     date of those three documents, 1028 is dated February 2021.

7     The Forrester report.

8              And two other points, one with regard to

9     foundation with regard to 295 in particular.  I inquired of

10    Mr. Baer as to the foundation for that, and he said he

11    didn't know whether it was -- analysis was based on FICO's

12    information or a third-party analysis.  So at least on that

13    one he cannot provide that information.

14             And with regard to the adoptive business records,

15    it is different.  With regard to, you know, documents from a

16    foreclosure file or royalty statements, that's one thing,

17    but the issue is that exception is allowed when the entity

18    has a business motivation to ensure that the third party's

19    record is accurate.  There's no reason to believe that.

20             And it's the same with the white papers.  FICO has

21    no business motivation to ensure the accuracy of the success

22    stories.  They are using it to sell the product.  It's the

23    opposite.  They're not going to say anything negative about

24    it.  They're not going to take any steps to ensure that

25    positive information is verified in any way.  It's different
```

1    than the other types of record, which have been included in

2    this adoptive business record exception.

3               THE COURT:  Okay.  Thank you.

4               MR. ERBELE:  Your Honor, may I briefly respond?

5               THE COURT:  Come on up.

6               MR. ERBELE:  Thank you.

7               So the touchstone of these adoptive business

8    record cases is reliability.  Did the custodian, here FICO,

9    rely on the accuracy of the documents in the course of its

10   business?  The answer is yes.  FICO distributes these

11   documents to prospective clients in the ordinary course of

12   its marketing business and ensures that the information

13   received from its clients is accurate, and it relies on the

14   accuracy of the information in distributing this.  If it was

15   distributing inaccurate benefits regarding -- inaccurate

16   information regarding the benefits of Blaze Advisor, that

17   would reflect negatively on FICO not positively because the

18   customers it was selling Blaze Advisor to or licensing in

19   this case, would not be able to realize these.  So it is in

20   FICO's best interests to ensure the accuracy of them.  That

21   reliability component underlies all of these adoptive

22   business record cases, and it is met here.

23              THE COURT:  Thank you, Mr. Erbele.  We're going to

24   take a brief break.  I'll be back before 1:30.  I'll let you

25   know what we're going to do.  Thanks.

FERN A. ZENZEN   DIRECT

```
 1                (Recess taken at 1:20 p.m.)

 2                THE COURT:  Here's what I'm going to do for now:

 3     I'm going to -- there's a couple of other things I want to

 4     look at before I tell you conclusively what my ruling will

 5     be.  So I'll let you know over the break in the afternoon,

 6     and at that time, frankly, if Mr. Hinderaker, you're able to

 7     say, you know what, we're not going to get to it today, more

 8     time is better.

 9                I will give you my -- a few preliminary thoughts.

10     If they come in, one thing I'm going to order is that the

11     quotations from clients be redacted out of the documents.  I

12     don't think those are -- we don't have the foundation to

13     establish the statement out of court by the client that it's

14     a summary somehow of the business records, and it's pretty

15     straight-up hearsay.

16                If they come in or if some of them come in, then

17     they'd be redacted of those remarks, but the conclusions and

18     analysis of the consultant or the white paper may come in.

19     But I'm still going to look at that a little bit further.

20                On the documents that were produced by way of

21     supplementation six weeks ago, I'm inclined to exclude those

22     for a number of reasons.  One, it's not the same kind of a

23     thing where you have an ongoing infringement and you have to

24     update and supplement all the way up to trial.  These

25     documents were produced -- or written, copyrighted at least,
```

1    in 2021.  It's 2023 that they were produced, or late 2022,

2    so not as timely as it could have been.  And there's the

3    other issue of having been created post-discovery, I,

4    frankly, have some concern that they could be created for

5    the wrong reasons.

6             So those three I'm inclined to exclude.  I'm going

7    to look carefully again at the consulting reports and the

8    white paper, and I'll give you, you know, a conclusive

9    ruling by the break or before we begin after the fact, okay?

10   All right.

11            MR. HINDERAKER:  Your Honor, there is a witness

12   between Mr. Baseman and Mr. Baer.

13            THE COURT:  Okay.

14            MR. HINDERAKER:  So just in terms of the timing

15   considerations.

16            THE COURT:  Well, that's helpful.  Honestly,

17   I'll -- this is a big issue.  It's an important issue.  I

18   want to get it right.  It's one that if we have the luxury

19   of time, and I can read more carefully and look more

20   carefully at the documents and the cases, I would prefer

21   that.

22            All right.  Anything else before we bring in the

23   jury?

24            All right.  Why don't you go ahead and get them.

25                          **IN OPEN COURT**

```
 1              THE COURT:  All right.  Mr. Hinderaker and
 2   Mr. Baseman, come on back up.
 3              And remember, Mr. Baseman, you're still under
 4   oath, okay?
 5              THE WITNESS:  Yes, sir.
 6              THE COURT:  All right.
 7   BY MR. HINDERAKER:
 8   Q.  Okay.  Settled?  All right.  Welcome back.
 9   A.  Thank you.
10   Q.  I'd like to kind of did as we said, kind of just jumped
11   in.  I'd like to back up a little bit.
12   A.  Of course.
13   Q.  You told us that you were at FICO for the last 20 years.
14   I'd like the jury to understand what your experience was,
15   your professional experience was before FICO, if you could
16   give us that overview.
17   A.  Yes, thank you.  So prior to FICO, I was one of these
18   children that were gifted a computer when they were quite
19   young, and I started building gaming systems and
20   communication systems as a hobby and were selling these
21   things to other companies as a kid.  And then that morphed
22   into -- at the time it was pre-sort of super Internet, but
23   building websites and things like that.
24              After that, it progressed into doing work for the
25   Department of Defense in essentially designing systems for
```

SCHRILER - DIRECT

1   nuclear submarines and how they operated and take care of

2   the people in the field.

3        From that, it morphed into an integration

4   consulting job, where I would work with customers on how to

5   integrate complex systems in the computers, which then I

6   started working with FICO through -- through an acquisition

7   that FICO acquired one of the companies that I was working

8   for, which my world changed dramatically.

9   Q.  What does it mean to integrate complex systems?  I guess

10  I understand complex systems, but integrate into what?

11  A.  Great, great, great question.  So, you know, typical

12  computer systems are made up of hundreds, if not thousands,

13  of various other computer systems that do very specific

14  jobs.  And a lot of times we would help customers figure out

15  how to bring data from one system in one format and present

16  it in another system in another format.  And a lot of times

17  we would build applications from scratch on how to use that

18  data for particular things.  Most of the work that I did in

19  that time was around marketing and how to target specific

20  individuals around activities.

21  Q.  Was this your time at Braun Consulting?

22  A.  Braun Consulting prior to that.  And another company I

23  worked prior to that was a company called netNumina and

24  there we were working with a lot of pharmaceutical company

25  website launches, essentially what we were doing.

1    Q.  Thank you.  And then from Braun Consulting, your next

2    stop was FICO?

3    A.  From Braun Consulting, yes.  So Braun consulting was

4    acquired by FICO and that's when I was interjected into the

5    FICO system, yes.

6    Q.  And that launch -- we started to talk about your

7    experience in the insurance industry.  And before we get to

8    your experience with Chubb, I'd like to go back to that for

9    a moment.

10           Can you -- so that we can understand that

11   experience, can you give us an example of a solution that an

12   insurance company wanted to solve, a problem --

13   A.  Yes, I can.

14   Q.  -- a problem that the insurance company wanted to solve

15   in which you used Blaze Advisor as a solution?

16   A.  Absolutely.  So as I stated before, right, a lot of the

17   job that I did -- well, the multiple jobs that I did within

18   FICO were first in an implementation perspective, which is

19   how do you actually develop the Blaze Advisor projects with

20   the customers.  But that morphed quite significantly as I

21   gained more and more experience with the product and the

22   company in the multiple industries that I worked with.

23           Now, you know, understand that in my role I

24   crossed multiple industries.  It all had very similar

25   problems.  Insurance in particular, a lot of the problems

1    that the customers -- insurance companies, large insurance

2    companies or reassurance companies, which are essentially

3    companies that resell insurance products, is their number

4    one primary objective that they typically would do is to

5    provide more policies for individuals, right?  To be able to

6    provide insurance for a larger set of the population.

7    Q.  And so that was a business challenge, a business problem

8    that you had experience with?

9    A.  That is correct.

10   Q.  Did you use Blaze Advisor to solve that for the

11   client or for the company?

12   A.  Yes, we did.

13   Q.  And tell us about that then, please.

14   A.  Yes.  So in these -- in these problem statements of how

15   do I provide more insurance products for a larger group of

16   customers, which most of the time are like you and me, they

17   have to do various different steps along the way, right?

18   They first have to evaluate who their customer is, right?

19   And there's a lot of criteria that goes into understanding

20   you as an individual, right?  How old you are?  Where do you

21   live?  Sort of those type of criterias, and in various

22   countries and regions, there's various degrees of criteria

23   that go into it.  But in the United States, it's very

24   specific about what they do.

25            But in order to do that, they also have to take

1     what sits in a lot of these large corporations, hundreds, if

2     not thousands of business users, right?  And what we

3     classify as business users are the non-technical experts

4     that understand the mechanics and the logic that goes behind

5     what it would mean to approve insurance to somebody and what

6     product fits their needs with respect to the risk implied

7     for the insurance company associated with those products,

8     right?  So you kind of have to do a mix of who are you?

9     What do you need?  What do you look at?  What do we have?

10    Based on these mix of criterias, what's the best offer for

11    you?  What is the best that will actually serve your needs?

12            And in order to do that, this knowledge typically

13    sits in people's heads, right?  This knowledge sits in

14    people's heads.  It sits in policy books.  Common, you know,

15    experience, we can say.

16            But to expand that out, typically what you have to

17    do is first identify what all of that logic is, right?  And

18    you have to identify what all of that logic is for various

19    different reasons, right?

20            First is, is it ethical and legal of what our

21    actual decision criteria is on this person?  So in order to

22    appreciate that, you have to actually document what that

23    logic is.  Well, that's one step.  So once you document what

24    that logic is and you actually configure what that logic is,

25    you have the next problem.

1          Well, now if I'm going to expand to a water -- a

2    wider group of an audience, I have to take more data from

3    various different places and I have to bring that data in

4    and evaluate that data, right?  Because it's all computer

5    systems behind the scenes.  So you have to take that data,

6    bring that data in a usable format and evaluate it in a

7    consistent fashion, the outcome of what that actual decision

8    is, and there's various steps in what that would look like.

9    And Blaze Advisor would sit in that environment as -- we

10   like to sort of refer to it as the brain, if you will, and

11   the brain is, well, I know all of the stuff that's going on,

12   but I have to put some rigor into the actual process because

13   I'm making certain decisions in parallel, I'm going out and

14   getting additional information, and I need to bring all of

15   that into a consistent way and then make the right

16   consistent decision for multiple parameters, right?

17          Because one policy says, I can give insurance to

18   everybody.  Well, unfortunately, that's not necessarily

19   profitable all the time, right, so you have to be able to

20   wait certain outcomes and risk appetite across the

21   organization.

22          So Blaze Advisor first starts with documenting in

23   a central place what all of that logic is.  There's a lot of

24   tools that we do in the management of that information,

25   which I think we'll get to later, so I don't want to jump

1    too far in the mechanics of that, but the other thing that

2    it does is it actually provides the engine.  So think of it

3    as the actual container of the software code that runs based

4    off of this human logic, because humans think in English,

5    for the most part.  At least here in the United States, they

6    can think in pictures.  They don't necessarily think in

7    programming language, so you have to kind of convert it to

8    that.  And Blaze Advisor then takes this data, choreographs

9    all of this different data in the context of which decision

10   I'm making and makes a repeatable decision automated.

11   Q.  And when you were working with that customer, client,

12   did the client experience the solution to the problem it was

13   trying to achieve?

14   A.  Absolutely, yes.  So there's multiple depths to the

15   problem that they're trying to achieve, right?  So on one

16   hand, there's the, I would like to ensure -- I would like to

17   ensure more people, right, which is grow business,

18   essentially, right?  They're all here for profit at the end

19   of the day.  Well, there's multiple dimensions to the

20   profit.  So not only do I need customers, but I also need to

21   make sure that that relationship is profitable within those

22   customers.  So Blaze Advisor puts those constructs of what

23   the rules and the logic are to make those repeated decisions

24   transparent to the process.

25   Q.  What's the value -- well, let me back up.  I want to

1    come back to the transparency.  But before doing that, what

2    are the components within Blaze Advisor that are

3    accomplishing what you just described regarding taking the

4    information of whatever number of business users, however

5    they're in heads or policy books or however spread, what's

6    the component or tool in Blaze Advisor that centralizes that

7    information?

8    A.  So Blaze Advisor itself is a complicated set of software

9    components, right?  You think of it as not a single entity

10   that does all things in a box, if you will.  There starts

11   with at the core of the architecture or how the software

12   make-up of Blaze Advisor is something called a repository,

13   right?  And essentially this repository is a structured way

14   upon which all of these rules, logic, business processes,

15   rule processes are stored.

16          From that repository, there are multiple ways upon

17   which both business users and technical users interface with

18   this logic.  The first piece is through what is

19   affectionately known as an integrated development

20   environment, so think of that as your programmer interface,

21   right?  Your programmer interface into Blaze Advisor is

22   where technologists do things like define data types, define

23   the framework upon which the data -- because you can't just

24   have random data pass into this.  It has to be in a

25   well-formed structure.  It has to match what you're

1    expecting it to be.  In that there's some conversion from

2    technical terms to business terms, right?

3            So, for example, business users think of age,

4    right?  Age is a pretty easy one to understand, but the data

5    elements that are associated with determining age can be

6    quite complex sometimes, especially as you go

7    internationally.

8            In that technical interface, you develop through

9    the generation from within the projects a, what we refer to

10   as a rule maintenance application, and the rule maintenance

11   application is a web-based front end that allows

12   non-technical users to interface with their logic.  So

13   they're actually writing rules in English for the most part.

14   They're using pictures.  Think most of us have probably seen

15   something like Excel, a table-type view, and there's other

16   graphical representations, which I'm sure you'll hear about

17   in other conversations.  And that's delivered to the

18   business user.  So the business user can now have a view

19   into the rules within guardrails of what the technical

20   infrastructure is in place to support that decision

21   attention.  And they actually define their decisions.

22           So I want to make X, Y, Z decision based upon this

23   particular element, and they have very usable interface to

24   do things, right?  And that's write rules, manage rules,

25   check things out, change them, make sure that I am approved

```
 1    to do that.  So we put life cycle in that component.
 2    There's also tools around verifying those rules to make sure
 3    that I wrote rules that didn't break the system, right?
 4    Because humans don't necessarily think all the mitigating
 5    factors that go into various data, what happens if data
 6    doesn't exist?  What happens with all of this?  So you put
 7    the rails in place to make sure that, and Blaze Advisor
 8    automates all of that, so in this particular case, insurance
 9    agents, don't have to think about the underlying technology
10    that happens.  And that's presented in a web format that
11    they can log in, verify, test, and there is some visual
12    tools that allow them --
13              THE COURT:  Excuse me.  Mr. Baseman, just you have
14    a tendency sometimes once you get going to speak a little
15    bit too quickly.  The court reporter has got to take it
16    down, so just slow down a little bit, okay?
17              THE WITNESS:  All right.  I will try.
18              THE COURT:   Thank you.
19              THE WITNESS:  I do tend to speak fast sometimes,
20    especially when I'm nervous.  So, as you can imagine, this
21    is not pleasant.
22              So the other component that's related here is what
23    we refer to as the deployment component or the execution
24    component, right?  And Blaze Advisor takes all of this
25    logic, wraps it up in a software bundle and then delivers it
```

1    in various ways to actually interact with that data.  So

2    that would be the architecture of what Blaze Advisor is.

3    BY MR. HINDERAKER:

4    Q.  And going back to the -- going back to the particular

5    experience within the insurance customer, were you able to

6    measure at all the extent of difference between the problem

7    before Blaze Advisor was deployed and after?

8    A.  So we are able to achieve -- we are able to observe

9    various ways to validate that the goals have been met

10   through Blaze Advisor.  We do that in a couple different

11   ways, right?

12          So, as I started earlier, but I don't believe I

13   finished the thought was, you know, yes, we have one problem

14   statement that says, I want to want -- excuse me, I want to

15   onboard more customers.  Well, we have a very easy metric

16   that says before we use Blaze Advisor and after we use Blaze

17   Advisor, we onboarded say 500 a month and then after Blaze

18   Advisor we're able to go to 10,000 a month, right, and these

19   are sort of within the realm of numbers they're looking for.

20          Another measurable view of the problem statement

21   is a lot of customers come and say, well, not only do I want

22   to add more policies, but I want to add more policies with

23   less human intervention, right?  So before Blaze Advisor you

24   would have, let's just say, 500 case managers.  They would

25   manually evaluate this data, they would look at it, they

1  would run through rules.  It would be a lengthy process.  It

2  could sometimes take days or weeks depending on, you know,

3  the complexity of what things are doing, and they say, I

4  would like to automate 80 percent of my decisions, right?

5  So we have a very measurable achievement that says before

6  Blaze Advisor I was manually intervening with a hundred

7  percent.  After Blaze Advisor, only 20 percent of those were

8  manual intervention.  And Blaze Advisor gives the rules and

9  the outcomes that say, yep, I with confidence -- this is the

10  engine speaking -- with confidence, you meet all of my

11  criteria through this complex set of rules.  Automate, move

12  on to the next stage of the process.  Or a human needs to

13  look at this and actually add some compassion or logic or

14  some other type of element to the process as well.

15  Q.  In this interaction with the customers, do you have

16  something that's called a POW, a Proof of Value

17  demonstration?

18  A.  So in the sales process, right, so Blaze Advisor is not

19  a typical software product where you have your sort of

20  typical sales process where a customer calls and says, I

21  would like to buy 50 of your beautiful software components

22  and the price is X, right, and ship it out.  They come and

23  say, I have a problem to solve.  I need to be sure that it

24  actually solved the problem I'm looking for.  And we break

25  those down in the initial process of what we would classify

1     as a proof of value and then a proof of concept, right?  So

2     depending on where customers are in this curve, they would

3     be, well, first, can I actually use Blaze Advisor in my

4     systems today?  So that would be a proof of concept.  So

5     that would mostly be a technical task where we have Blaze

6     Advisor and, yes, we can run it in that environment and

7     there would be some criteria around performance and data,

8     pay load sizes, things like that.

9              And then there's the proof of value.  And the

10    proof of value is my end metric is I want to automate 80

11    percent of my decisions.  Can I actually articulate my logic

12    in business rules and automate those and measure that

13    performance?  And we would do small samples of the problem

14    set, not the big problem set, but you would take small to

15    give an illustration of how it would provide value in those

16    situations.

17    Q.  So have you had experience where indeed through a proof

18    of value concept or the business company, the insurance

19    company getting back to you after deployment, can you say,

20    as a matter of fact, that these kind of changes in

21    performance were accomplished using Blaze Advisor?

22    A.  Absolutely, yes.

23    Q.  Is this decision-making that's automated through Blaze

24    Advisor, the same as human decision-making?

25    A.  It is not the same as human decision-making.  It's

1    augmented and better than human decision-making.

2    Q.  And why is it better than human decision-making?

3    A.  Humans, people, have emotions.  They have perspectives.

4    They have best practices that they follow, gut feelings,

5    right?  Now, these are valuable in a lot of cases, right?

6    I'm not minimizing the value of that.  But in highly

7    regulated industries, such as banking and insurance and

8    financial services, I need to be able to, without a doubt,

9    prove exactly what rules I used at a particular point in

10   time that I actually made that decision.  Was it an ethical

11   decision?  Was it a repeatable decision?  Seven years from

12   now, can I go back and prove that that's exactly the

13   decision I made based on that because there's other

14   behavior?  And Blaze Advisor allows them to do that.

15           It also allows them flexibility that once they

16   create the -- what we call the framework of the decision,

17   and I won't go into some of the nuanced terminology that we

18   use there, but once I have the framework of a decision, I

19   can now go beyond the type of decisions I was making prior.

20   I can actually start to change certain values.  I can start

21   to be more competitive in certain things and not have to go

22   in and revamp my whole policies and procedures.  And then

23   with the press of a button create documentation that says

24   here are all my rules, here's all the states that they go,

25   and there's other visual tools that will actually show how

1      that transverses through the trees.

2      Q.  Okay.  I think you've just described the ability to

3      audit decision-making and audit your rule sets, correct?

4      A.  Correct.  Audit and document.

5      Q.  And document?

6      A.  Correct.

7      Q.  And I think you described -- you used the word

8      "flexibility."  Does that -- do you also use the word

9      agility for that function or that feature?

10     A.  So markets change.  The world changes.  Competitive

11     markets change.  Product matrixes change.  You know, how

12     they actually compose products change.  I mean, essentially

13     the end of an insurance product is pricing based off of

14     particular risk criteria, right?

15              So as you're able to centralize this logic, you

16     can actually come up with new ways of new products and new

17     offers and, you know, think of higher risk individuals,

18     right?  Because we want everybody to be protected to some

19     degree, but there's risk associated with that protection.

20     So they want to be able to add new extension points to that

21     logic that's still within the process that says, you know,

22     we accept this risk in these particular criteria, so that's

23     almost creating new products.  And then not having to go

24     back through the whole IT cycle, they're literally able to

25     operationalize is the word we use, but that's essentially

1    bring it from inception to code and running in a matter of

2    minutes versus months or years depending on some of these

3    large corporations' life cycles.

4    Q.  So you used the word "logic."  Can you translate that

5    into a -- what does that mean?

6    A.  Sure, sure.  So logic in the simplest term is -- we use

7    here it's not a good word.  Logic is essentially the

8    know-how that I have, right, as a person.  I know that if

9    this is present and this is present and a combination of

10   this yields this type of result.  That's logic.

11   Q.  And so the logic then gets into the rules repository --

12   A.  Logic becomes rules.

13   Q.  -- in the ways you described?

14   A.  In the ways that we described, correct.

15   Q.  And you mentioned the word "product," and I take it that

16   means an insurance product?

17   A.  In this context, I'm referring to an insurance product.

18   Q.  And then you used the word "operationalize."

19   A.  Correct.

20   Q.  So how does Blaze Advisor operationalize what you call

21   the business logic of a customer?

22   A.  Yes.  So another thing to understand is these aren't

23   simple -- the word we use is a decision strategy, and I'll

24   explain what that is.

25              So a rule is one element of it.  A rule is

1    essentially if X is greater than Y, do 1, right?  And then

2    you have various criteria of that.  Well, these processes

3    aren't simple.  There's literally thousands of these points

4    and sometimes tens of thousands of these that you have to

5    bring together at the particular point that you're going to

6    make that decision, because a rule and logic has no use

7    unless you're actually making a decision, right, and that

8    decision is a customer comes and applies for a policy.  My

9    decision is yes.  The next decision is is what product is

10   offered, and then there's other steps that go with that.

11           So what Blaze Advisor does is, through the

12   software itself, is it takes these rules that are

13   represented in English, in pictures, and it breaks them down

14   into code and generates a code library that then is deployed

15   into the customer's existing technology environment that

16   actually makes those decisions.

17   Q.  I want to pull up a graphic and see if this helps us.

18           MR. HINDERAKER:  Bill, can you pull up slide 3.

19   BY MR. HINDERAKER:

20   Q.  Can we use that to get some imagery around what you're

21   just describing?

22   A.  We can.

23   Q.  So you're talking -- I need a decision made.  That's our

24   customer -- or why don't you go through and tell us what

25   this says.

FENWICK - DIRECT

1    A.   Okay.   There are several pieces to sort of highlight in

2    this picture.   The first piece -- the first piece to

3    highlight is I talked a little bit before about the sort of

4    multiple components that make up Blaze Advisor.   We talked

5    about the repository.   We talked about the rule maintenance

6    application, and we talk about the ID.   And this diagram

7    will simplify that and say, the business rules in the

8    oval-looking red box in the bottom is the logic and the

9    rules in their storage mechanism.

10         The Blaze Advisor rule service component, right,

11   is the piece of software that actually has taken that logic,

12   and I'll keep it at that level for this conversation, that

13   is then deployed into an existing application.   So if you

14   look at the dark blue box at the bottom that says, your

15   application server or web server, is essentially you're

16   existing infrastructure.   We're not requiring you to build a

17   whole set of infrastructure around us.   That sits with

18   inside yours.

19         The I-need-a-decision-made component could be a

20   couple different things, right?   So that could be the

21   service entry point.   That could be the web application

22   that's actually collecting the information from the

23   customer.   So think of, I fill out a web form; I click a

24   button.   That's the decision I want to make.   So that data

25   is then passed into the Blaze Advisor rule service component

1    that is thus evaluated the rules and uses existing data to

2    augment that data process.  And that's what the enterprise

3    data on the right is, well, we also require data.  Insurance

4    companies have a lot of data on you.  They have a lot of

5    data on everyone.  They have a lot of data if you're a past

6    customer, a current customer, and other metrics that go into

7    that.

8              So Blaze Advisor will take all of the data, all of

9    the rules, work its magic, for lack of a better term, and

10   then present that back and what the decision is.

11   Q.  Without human intervention?

12   A.  Sorry?

13   Q.  Without human intervention?

14   A.  Without human intervention, that's correct.

15   Q.  And what's the speed of that process?

16   A.  This process?

17   Q.  Yes, what you just described.

18   A.  Sub-milliseconds, typically.  So, typically, this

19   architecture is to describe what I mean by sub-milliseconds.

20   It's very easy to think of it in a singularity of an event,

21   like me as a consumer, right.  I go to a web form.  I fill

22   out some data.  I hit a button.  Right.  We get that aspect.

23   You know, today we expect that come back in a less than a

24   second.  Right.

25             But if you think about a very complex -- complex

1    system or a complex set of systems, such as an insurance

2    company, they're getting thousands if not millions of these

3    over a rapid period of time.  So when I say, it's done in

4    sub-milliseconds time, which is less than a second, what I

5    say is this architecture allows thousands and millions of

6    records to be processed in less than a second, so you get a

7    scaling advantage.  Where humans would take a week to do

8    one, now you can do thousands of them in a second.

9    Q.  Have you had experience in applying the scaling

10   advantage from Blaze Advisor, that is the ability to handle

11   the greater volume in the insurance industry context?

12   A.  Yes.

13   Q.  And what has that been?

14   A.  For example, in order to -- so let's take a very valid

15   insurance example, right?  So today we talk about an

16   individual applying for a policy, and a business will have a

17   goal of I would like to sell more policies, right?  It's a

18   rather simple metric.  But behind insurance, there's

19   resellers and partners and groups that are associated with

20   all of this.  And usually one of the litmus tests is in

21   order to resell these policies and expand to a broader group

22   of audience, they want to go to full population sets, right?

23   They want to go from a few hundred people, a few hundred

24   policies, to being resold across multiple different

25   organizations that will go to tens of thousands, if not

1    millions of evaluations.

2    Q.  As part of the agility discussion and the rules

3    repository, is it fair to describe that as externalizing the

4    rules?

5    A.  You could certainly describe that as externalizing the

6    rules.  And where I would characterize that is externalizing

7    the rules is today it sits, prior to Blaze Advisor, it sits

8    in manuals and books and people's heads, right?  So --

9    Q.  Good.  We've gone through that.  And then is there a

10   distinction between the rules and the rules repository of

11   Blaze Advisor -- maybe this is what I'm asking -- a

12   distinction between the rules in Blaze Advisor and writing

13   those rules in the software applications themselves,

14   so-called hard --

15   A.  Oh, yes, yes, yes.  Okay.  So a lot of question comes

16   up, well, that's great.  So it's a decision process.  I have

17   existing systems today.  Can I do the same thing in my

18   existing applications today by just coding them directly in

19   the application today?

20           Well, the answer is, to some degree, yes, right?

21   But in reality, what that is is today those systems are --

22   there's hundreds of them, especially in an insurance

23   company.  Some of them are 60 if not 70 year old technology,

24   if you think of the old mainframes and cobalt applications

25   sitting out there.

1         In order to do that, you would have to write that

2     logic in multiple places and spend months, if not years, of

3     doing integration into actually making it work within that,

4     and then you would never get the flexibility because of the

5     second you go write code directly into these systems, if you

6     ever change that, you have to go back through the whole

7     process again.  And when we talk about the whole process

8     again is software development is complex, right?  We don't

9     just write code and send it out, especially an insurance

10    company or a bank, right?

11        So they will write the code.  They will test it.

12    They will validate it.  They will move it to multiple

13    environments.  They'll check it.  They'll performance test

14    it.  They'll do all this.  So the impact is by centralizing

15    that, you externalize all of the rules and logic in a

16    central place, thus decoupling the actual implementation

17    from the business logic because business logic changes all

18    the time.  Think of interest rates, right?  Interest rates

19    is a very important thing.  They fluctuate daily.  You can't

20    go through this whole process daily to change these types of

21    parameters.

22    Q.  Does Blaze Advisor enable a customer to do that?

23    A.  Yes, they do, in their own terms.

24    Q.  In their own terms?

25    A.  Yes.

1    Q.  And is that through the rules repository?

2    A.  That is through the rules repository and then the

3    management system that sits on top of that that allows them

4    to organize and categorize those rules as it's relevant to

5    them.

6    Q.  Is it in the management system then that the rules are

7    also tested to see if they achieve the business outcomes

8    that are desired?

9    A.  Yes.  So through the business rule management side of

10   the equation is just writing a rule is -- that's -- you know

11   it's quite pedestrian in itself, right?  It's the rules are

12   complex and humans when they write rules, most of the time

13   write bad rules.  They think they're really good, but they

14   might not actually be good.  So the management system,

15   through the whole architecture, allows them to test the

16   rule -- to first make sure that it works.

17   Q.  We're talking about Blaze Advisor?

18   A.  Yes, Blaze Advisor itself allows our business users to

19   test their rules.  Does it work?  Did it break?  Did I get

20   errors?  Right.  Okay, it worked.  Well, now I want to

21   validate my outcome.  Just because I've created a rule, I

22   want to be able to take sample data and run it through, did

23   I get the result that I expected?  So I think I automated

24   it.  But if my automated is I want to bring on more

25   policies, I write rules, and the actual fact is in my rules,

1    I get less policies?  Well, something is wrong.  How do I go

2    and change that without going through the whole process

3    again.

4    Q.  The whole process being the hard coding?

5    A.  The hard coding and rewriting everything, et cetera,

6    yes.

7    Q.  Can the business user, can a customer, can the client

8    validate the outcome before it's put into the --

9    A.  So that is crucial to the process, right?  So you're not

10   validating in a production sense.  You're validating before

11   it even goes there.  So you can make sure that your rules

12   are valid before go into existing systems, and Blaze Advisor

13   offers visual representations on how this looks and pretty

14   pictures and charts and graphs that sort of you can look at

15   and validate what those look like.

16   Q.  So when you're giving the example of a rule that results

17   in worst performance, that was not in a deployment context?

18   A.  Correct.  That's before you get to that point.

19   Q.  That's in the validation process that Blaze Advisor

20   provides?

21   A.  Yes.

22   Q.  Let me change the topic a little bit and now have the

23   management side of -- the manager side of the Blaze Advisor

24   functionalities, and we're going to go to the automated

25   decision and functionality.  In the context of a business

1    user's application, okay?

2    A.  Okay.

3    Q.  So Blaze Advisor is one component of the application?

4    A.  Typically, yes.

5    Q.  Typically.  Does it matter to Blaze Advisor whether

6    there are a couple other components in the application or

7    whether there are hundreds of components or thousands of

8    other components in the application?

9    A.  Not at all.

10   Q.  Why not?

11   A.  Because of the isolation from the underlying

12   implementation, it is completely agnostic, that means it

13   doesn't care, how many systems are providing the data, how

14   many places -- because it becomes a central location that

15   all things are brought through to it.

16   Q.  And we're talking, when we say "it is a central

17   location" --

18   A.  It is the decisioning component, yes.

19   Q.  Of Blaze Advisor?

20   A.  Of Blaze Advisor, yes.

21   Q.  Is the central location?

22   A.  Yes.

23   Q.  And when all things are brought to it, that's all of the

24   other components of the application are brought to Blaze

25   Advisor?

1    A.  Correct.

2    Q.  And what does Blaze Advisor do now that all of these

3    other components are brought to it?

4    A.  So without going into too much depth on the mechanics,

5    essentially it takes that data and evaluates that data in

6    multiple stages and based off of the evaluation of that

7    data, presents back the answer.

8    Q.  And how are the other software components of the

9    application fired, used, triggered?

10   A.  So in a large ecosystem that has multiple components,

11   there's a lot of various ways of data coming in from third

12   parties, there's a lot of systems that are supporting

13   certain things, there's a lot of human work flow

14   applications on how all this comes together.

15          So Blaze Advisor is the central point upon which

16   the next action is decided off of all of those components.

17   So Blaze Advisor would be the system that tells all the

18   other systems what to do based off of its decision.

19   Q.  Okay.  So is that your analogy to the central nervous

20   system?

21   A.  That would be, yes.

22   Q.  The commands to all the other systems are coming from

23   Blaze Advisor; is that right?

24   A.  They are -- it is a bidirectional relationship, so other

25   systems are sending data into Blaze Advisor, and Blaze

1    Advisor is sending data back into these other systems.  And

2    in that data that we send back is the actual decision of

3    what the next step and the next actions are.

4    Q.  I see.  Okay.

5         So that's the complex application.  Let's talk for

6    a moment about Blaze Advisor in the context of the legacy

7    systems of the insurance company or any company.  How does

8    Blaze Advisor -- how is Blaze Advisor used in the context of

9    the legacy systems of a company?

10   A.  Okay.  So let's first define what we mean by a legacy

11   system.

12   Q.  Yes, thank you.  I should have done that.

13   A.  Essentially, a legacy system is an old piece of software

14   that's sitting around, right?  So if you think of like an

15   insurance company, they typically have multiple computer

16   systems that have been around for 30 and 40 years, right?

17   These systems do what they do very well.  There is typically

18   nothing wrong with them.

19        The problem is is this older technology is very

20   rigid for various reasons, right?  One is its antiquated

21   technology that's sort of based off of the paradigm that it

22   was built in, doesn't allow for much flexibility.  Others is

23   it's been modified through decades of changes so nobody can

24   really find and find the place where to change things.  So

25   what Blaze Advisor allows our customers to do is extend the

```
 1   use of those legacy systems by providing new capabilities in
 2   the context of what business problems are trying to solve in
 3   a technology-neutral fashion, meaning Blaze Advisor doesn't
 4   care what the underlying systems are.
 5   Q.  How does Blaze Advisor add value to the existing legacy
 6   systems?
 7   A.  Because you can't extend easily the data that comes into
 8   those existing systems or how you actually evaluate those
 9   existing systems.  So by sitting on top of it or next to it,
10   it actually will extend what it's doing by making decisions
11   and adding onto different decisions that can feed back into
12   that existing process.
13   Q.  Got it.  Okay.
14              Let me turn to -- we're in the application
15   context.  Let me discuss the situation where the
16   decision-making that's necessary is complex.
17              In your experience, how does Blaze Advisor compare
18   in making complex decision-making -- now, I'm not talking
19   about scale at the moment --
20   A.  Yes.
21   Q.  -- because we know about volume, but just one decision
22   to be made and it's a complex decision.
23   A.  Yes.
24   Q.  Does Blaze Advisor bring value to that decision-making
25   process that isn't available purely from a human?
```

```
1    A.  Yes, it does.

2    Q.  What are those values?

3    A.  Sorry.  Yes, it does.

4         So we talked a little bit earlier about, well, a

5    rule is a rule, right, and typically there's thousands of

6    these rules.  But the overall decision is a relationship of

7    how all of the outcomes of these individual rules are

8    weighted in the context of what decision I'm trying to make.

9    So if you look at a large organization where humans would do

10   it, you would typically have divisions, right?  You have a

11   pricing division.  You have a product division.  You have an

12   underwriting division.  All of these people are experts in

13   their particular world view of what logic they have.

14        In order to coordinate all of that, it's very

15   difficult to do without Blaze Advisor because what Blaze

16   Advisor allows you to do is compartmentalize that logic for

17   the individuals to work within just their context, and then

18   Blaze Advisor choreographs, think of like a dance, right?

19   The choreographer is telling them to dance over here, dance

20   over here.  And if one dancer is just dancing, it doesn't

21   put the whole show together.

22        So it allows all of the different actors to come

23   together and weight out what that individual decision is in

24   that particular context.  So that they can think in smaller,

25   manageable pieces but then Blaze Advisor ties it all
```

1     together in one complex flow.

2     Q.  And when it ties it all together in a complex form, to

3     what end is that put?

4     A.  In what end is that put?

5     Q.  To what end is that all tied together in a complex form

6     in Blaze Advisor?

7     A.  So --

8     Q.  I'm asking, does it then make a decision?

9     A.  So the end result is, yes, I have all of these rules,

10    but all of these rules together are useless without the

11    actual decision I'm trying to make.  And then Blaze Advisor

12    puts the context around, what is the decision I'm trying to

13    make, and it choreographs all the different parts to make

14    that decision.

15    Q.  In discussing how Blaze Advisor functions, is there a

16    concept called rule flow?

17    A.  There is a concept called a rule flow, so --

18    Q.  Excuse me.  And is rule flow part of the

19    decision-making?

20    A.  Rule flow is the visual representation of that

21    choreography or orchestration that I just mentioned.

22    Q.  That then results in the decision?

23    A.  And it results in the decision, correct.

24    Q.  And what's the value to the business of having that rule

25    flow visible?

```
1    A.  So we talk about the complexity of these decisions.  By
2    having a visual representation of the flow, you can start to
3    drill down into it to look at what's only important to you
4    and sort of back up and see the whole process and then drill
5    down and look at that.  It allows you to also reuse those,
6    so you can define one and you can embed those into either
7    rule flows and more complex rule flows, so you can actually
8    create these very nested trees, is the word we use, for them
9    off of the rule flow.  So it models the business process in
10   the form of decisions by utilizing the rules to do that.
11   Q.  What's the purpose of that for the business?
12   A.  The purpose of that is for the business, yes.
13   Q.  And why does the business care to have that?
14   A.  Because they can not visualize all the thousands of
15   rules and thousands of complex micro decisions without that
16   visualization.
17   Q.  And what value comes from being able to visualize it?
18   A.  It allows them to have an ability to change, extend, and
19   document exactly what's happening and ensure that when that
20   is actually executed, that it is executing exactly the way
21   they said it should be.
22   Q.  Is the business goal to make better decisions?
23   A.  They will make better decisions based off of that, yes.
24   Q.  Let me turn to scoring.  In the context of a Blaze
25   Advisor, what does that mean?
```

1   A.  So scoring is, and we'll refer to this later, is what we

2   call a score metaphor, right?  And if you think about how do

3   you weight the various outcome of all of these decisions,

4   right?  So these the scoring, which is in the context that

5   we're talking at Blaze Advisor, is the scorecard that says,

6   I assign this result this numeric value.  I assign this

7   result this numeric value.  As I execute all of these rules,

8   I add up, and there's some complex math that goes into that

9   as well, but we'll just say for sake of argument it adds

10  them up.  And it adds up what the outcome of all of those

11  weighted, all of those decisions are or rules, the output of

12  those rules are that gives a confidence level so that I can

13  make a broader set of decisions within a degree of

14  confidence and range that says it's -- not everything is

15  black and white.  There's some gray in that area, right?  So

16  we want to be able to put a mathematical computation between

17  that gray so that I can actually, with confidence, know

18  exactly why I made that decision.

19  Q.  Why do you say with confidence?

20  A.  Because we have traceability and reportability into what

21  metrics went into actually do that, the calculation, they're

22  all assigned, et cetera.

23  Q.  Is Blaze Advisor able to accommodate decision-making

24  when all of the factors that bear on the decision aren't of

25  the same significance --

```
 1    A.  Yes.

 2    Q.  -- or importance?

 3    A.  Yes, absolutely.

 4    Q.  How does it do that?

 5    A.  Well, it allows to you weight, apply weight to what

 6    those decisions are.

 7    Q.  And apply that weight in the process of making the

 8    decision?

 9    A.  Apply that and make that in the process.  Let's take an

10    easy example for a second, right.  The easy example is I

11    don't assign insurance policy for anybody under the age of

12    18.  It's a pretty easy -- easy rule, right?  I get a data

13    pay load that comes in.  My customer is 16 years old.  I

14    have an easy answer, okay?  Done.

15            Well, that gets a little more complex.  That says,

16    okay, well, I've passed this particular set of criteria, but

17    now I think it's more important that my customer has

18    financial stability.  I think it's more important that my

19    customer is in a particular region that I want them to be in

20    based off the product mix.  So it allows them to weigh

21    certain options to be more flexible in how they actually

22    come back and make the decision.

23    Q.  So if we change the scenario a little bit, Blaze Advisor

24    is a component in a business application.

25            I take it that -- let's go back to slide 3, if we
```

FEINBERG/MORAN - DIRECT

1    could.  And at the bottom of the screen you have your

2    application server on the web -- you have an application

3    server or web server?

4    A.  Correct, correct.

5    Q.  When Blaze Advisor is a component of a business

6    application, that component is typically stored on a server?

7    A.  Yes.

8    Q.  And if you would define what a server is?

9    A.  Yes.  So server is one of those interesting terms in

10   technology, right?  And what's very different about Blaze

11   Advisor and other architectures that are server-based, a lot

12   of architectures have a central server, right, which the

13   vendor provides this instance of technology, right?  And all

14   things go through it.

15           Blaze Advisor is slightly different, where it

16   creates a deployable artifact that's in the code that

17   actually gets embedded in customers' existing applications,

18   which are typically on servers.

19   Q.  Okay.  And is there any limit to the number of users,

20   number of application users that can access that application

21   that's residing on a server?

22   A.  That is one of the beautiful things about Blaze Advisor

23   is there is no theoretical limit to the number of users or

24   transactions that can be processed through it.

25   Q.  So from the technology of it all, a business user is

```
1    accessing an application containing Blaze Advisor on a

2    server.  What happens with the code, just technically?

3    A.  Technically, the code is actually -- I'm trying to use

4    what terminology -- it is actually compiled, which

5    essentially means it is transformed into the lowest level of

6    programming language for that environment.  So it gets

7    compiled into a package and thus then copied over into that

8    existing environment.

9    Q.  Copied to where?

10   A.  Typically into the memory, the RAM memory of the

11   application --

12   Q.  The ram memory of the application, or the ram memory of

13   the server?

14   A.  The RAM memory of the server.

15   Q.  And how long does the Blaze Advisor code reside in the

16   RAM memory of the server?

17   A.  As long as the configuration requires.  So we have no

18   control over that.  That is -- it could be indefinite.

19   Q.  So is the limitation on that simply the limitation of

20   the customer server?

21   A.  It is a limitation of the customer and how they've

22   developed their architecture.  We have some client instances

23   where a Blaze Advisor rule server component that is embedded

24   in existing application has been up for 10, 15 years.

25   Q.  And each time it's accessed for use by an underwriter or
```

1    any user, then a copy of that code goes to the RAM of the

2    server?

3    A.  So without going too much into the mechanics of how we

4    manage the memory within itself, for every interaction,

5    Blaze Advisor actually copies itself multiple times.  So

6    think, for example, if I have 1,000 applications and I'm

7    processing through a single point, I don't just have one

8    copy.  I actually create 1,000 copies within that.

9    Q.  Those copies are in the RAM?

10   A.  They are in memory, yes.

11   Q.  I see.  Okay.

12              Could we pull up slide 4, please, Bill?

13              MR. HINDERAKER:  Could we pull up slide 4, please,

14   Bill.

15   BY MR. HINDERAKER:

16   Q.  You've said many things.  I'm not being critical.  I'm

17   just saying we've covered a lot of ground in the hour, and

18   I'd like you to -- will this help -- can we use this as a

19   summary of your testimony regarding the value of Blaze

20   Advisor?

21   A.  We can.

22   Q.  So let's just run through the bullet points, not

23   repeating ourselves but making sure we've touched the base.

24              Reduces the time and cost to develop

25   decision-making applications.  Does that relate to the

SEAN CONNOLLY - DIRECT

 1    flexibility and agility issues that you were chatting about,

 2    or more?

 3    A.  So reducing the time and cost to develop decision-making

 4    applications has multiple perspectives.  So, first, let's

 5    talk about the cost of developing decision-making

 6    applications.  So in a traditional, I build it in my

 7    existing applications, I've got a, you know, typically

 8    several developers are developing.  There's the cost of that

 9    associated with it.  There's the cost associated with the

10    time.  There's the cost of the old multiple environments

11    that you have to spin up to do that.  The time to develop

12    those is because we've abstracted with rails, the rules and

13    decision process for our business users, they can interact

14    directly with Blaze Advisor application to create new rules,

15    new policy, change those rules and then deploy those into

16    production in minutes as opposed to days.

17    Q.  And you used the word "rails," I think was the word?

18    A.  Rails is the word I used, right.

19    Q.  What does it mean?

20    A.  Sorry.

21    Q.  No.  What does that mean?

22    A.  So we are all flawed, and since there are certain

23    constraints that are required to make effective decisions,

24    so think about, well, I, A, need to make sure I have the

25    data available.  So that would be one rail, right?

```
1              Now, the other rail is I also need to make sure
2       it's performing because I can write rules that will be very
3       imperformant, not performant, very slow.  Well, I want to
4       make sure that that is set up in a framework that the users
5       don't hurt themselves.
6              The other thing is as you provide more flexibility
7       and enable more creativity for the business users to
8       interact in their own language with the rules, you want to
9       make sure that they are doing it with the construct of A,
10      where they're allowed to do it and within a governance model
11      that says not only did they do it, but I can prove that, you
12      know, Jane did what she was supposed to do and sent it to
13      Stewart and Stewart approved that what he was trying to do.
14      So you have both business rails and technology rails that
15      are all encompassed in Blaze Advisor.
16      Q.  The second bullet point, it has a human-usable interface
17      to write the business rule statements in English, and Blaze
18      Advisor transforms that to computer code.
19      A.  Yes.
20      Q.  I know we spoke about that.
21      A.  We did.  So the principle here is, yes, software
22      development languages or programming languages are very
23      complicated, and they're very nuanced and you require a
24      certain technology skill to be able to navigate them.  It's
25      become a little easier in recent times, but it's still very
```

```
1   difficult.
2           Businesses don't think in coding language.  They
3   think in business terms, right?  They think in things such
4   as age, time of -- you know, how long has this customer
5   been?  They're not thinking of variable 1, 2, 3 on data pay
6   load from system 4, right?  So you want to be able to
7   translate that into the terminology that they're using.  So
8   you provide an interface through pictures, because those are
9   more powerful than writing sometimes and to be able to have
10  them write in their own words and language what that actual
11  rule is.
12          MR. HINDERAKER:  Bill, would you put up number 2.
13  BY MR. HINDERAKER:
14  Q.  This is an example of a simple rule set you were just
15  mentioning?
16  A.  Correct.
17  Q.  Correct?  I guess my question simply is this:  This is
18  the if/then statements that you and others have talked
19  about.
20          So my question is this:  If these five rules, if
21  that was going to be translated into computer language, is
22  it that simple or is it different?
23  A.  So these simple statements here, so let's take the first
24  one, for example, and then I'll spare you going into all of
25  them.  But let's take the first one.  "If at least two
```

```
1    children satisfy age is less than 8, then set discount to
2    .25."
3              In computer terms, this would be translated --
4    right here you have a very simple statement.  There's three
5    criterias that are met and I have an outcome.  Well, just
6    determining the three criteria, at least two children,
7    that's actually complicated.  You actually have to look at
8    the customer, all of their relationships.  You have to
9    iterate through multiple data sets.  You have to run
10   counters.  You have to go figure that out.  The software has
11   to figure that out.
12             Well, satisfy, well, I used the word satisfy here
13   is because I might want to change that to something else
14   later.  And, again, the construct behind that would be very
15   complicated.  So if you were to look at this in computer
16   terms, it would be if customer dot children loop count
17   number greater than, equals, right, and then what is my
18   discount?  Discount of what?  And then you have the other
19   models and you have to go and traverse all of that.  So it
20   puts it in easier form.
21   Q.  And then Blaze Advisor does the rest of the work?
22   A.  And Blaze Advisor does the rest of it.  So Blaze Advisor
23   will actually produce that code under the covers, right?
24   That's what it does.
25             MR. HINDERAKER:  Let's go back to slide 4, Bill.
```

1    BY MR. HINDERAKER:

2    Q.  So the third bullet point, "because it is easier and

3    faster to develop decision-making applications, new

4    applications can be developed and changes to existing

5    applications can be made faster than was possible before

6    Blaze Advisor."

7              Can you explain that, please?

8    A.  Yes, I can.  So as we've said before, right, to do and

9    achieve changes or create new decisioning -- new decisions

10   that you want to make, you would have to go and develop to

11   these existing applications multiple things.  By having the

12   framework in Blaze Advisor, you have one place to do it.

13   You have your language that you can do it, which is faster.

14   And then since you already have all the rails in place, you

15   can deploy new ones quicker without having to go through the

16   whole process.

17              And then the next bullet point beneath that sort

18   of highlights why you would be making those changes.

19   Regulatory changes, right.  Where you live here in the

20   United States, insurance laws change quite frequently.  The

21   date upon which they can make a decision is quite sensitive

22   at times.

23              COURT REPORTER:  I need you to slow down, please.

24              THE WITNESS:  Oh, sorry.  Again, I speak too fast.

25   BY MR. HINDERAKER:

1    Q.  The data, oh, in the insurance industry example?

2    A.  So, for example, the reasons why you would make these

3    decisions are very -- are very complex, right?  You have

4    regulatory changes, right?  So laws change daily across

5    various states, across various regions, across various

6    counties.  So you need to be able to change very quickly

7    what your interpretation of those regulations are.

8            Competition, competitors are constantly lowering

9    prices, lowering entry points, creating new product mixes.

10   So you would like to be able to respond to that faster, but

11   not only respond to that, but you can actually be a market

12   leader that you're now driving that because you're making

13   changes faster and trying new things out to see if it's

14   working and giving you the results that you want.

15   Q.  How does Blaze Advisor make it possible to make those

16   changes faster?

17   A.  Through the ecosystem of the rule authoring and the

18   whole environment that we've discussed with the rails.

19   Q.  The next bullet point, enhances business agility because

20   the rule statements changes can be made quickly.

21   A.  The business agility part comes in to once I have the

22   framework that I can do this in, I can create whole new

23   decision areas in seconds and be able to be agile, which is

24   quick, to all of these market-leading forces.

25   Q.  Next bullet point, because the rule statements for

```
 1        decision can be changed faster, new insurance products can

 2        be brought to market faster, each product being a unique set

 3        of rule statements.

 4              Can you explain that, please?

 5   A.   Yes.  So typically in insurance products, there's not

 6        necessarily a hard, fast, you know -- it's not a kleenex

 7        box, right, like you've got various different mixes of

 8        things.

 9              So what the product actually is is the result of a

10        combination of rules, right?  So I can have different

11        pricing metrics.  I can have different population sets that

12        I want to do.  So by having the foundation of the data set,

13        I can actually create whole new mixes of rules and

14        combinations to create new products or new offerings based

15        off of that.

16   Q.   Next bullet point, makes faster more consistent business

17        decisions for any number of rule statements at any level of

18        complexity.

19              I'd like to break that down a little bit.  What do

20        you mean by "makes faster decisions"?

21   A.   So they're faster because you've automated them.  So

22        remember we talked about, you know, humans interacting with

23        it.  You know, you typically would go from manual review 10

24        or 20 to a day to fully automating hundreds if not thousands

25        a day, right?  So you're faster that way.  And just from
```

1    making those decisions faster.

2    Q.  What do you mean by more consistent?

3    A.  By consistency is I'm making the exact same decision

4    based off of that data that's repeatable and documented that

5    I've not adding any interpretation to what those decisions

6    are.  It's fact.  If it's this, then that.  I have -- that's

7    what I've done.

8    Q.  Is there any subjectivity into a decision made by a

9    Blaze Advisor?

10   A.  Subjectivity?

11   Q.  Subjectivity.

12   A.  No, there's no subjectivity.

13   Q.  Is there any biasing into a --

14   A.  There is no biasing, no.

15   Q.  Next one, rules statements and rule sets can be shared

16   across many applications.  Let's break that down into that

17   part and then we'll go into without the need for IT

18   resources?

19   A.  Yeah.  This is actually one of the ongoing value that

20   our customers start to have by using Blaze Advisor.

21   Typically, customers start with a singularity of a problem,

22   right?  I have one problem that I want to solve.  And

23   they'll go and they'll develop the applications around it,

24   they'll make the decision points to do that.

25              Well, as they've started to do that, they've

1    realized, wait a minute, I've now collected all of these

2    rules and decisions in one place.  These are the same rules

3    that I'm using over here in this line of business.  Why

4    would I want to go and recreate it over here?  I can just

5    use the exact same one.  So it provides that ability as

6    well.

7    Q.  And it goes on to say, without the need for IT resources

8    to write the rule statements into each application.

9    A.  Because you've already done all the connective tissue to

10   make it work.

11   Q.  And if a business wants to use its IT resources it can,

12   I suppose?

13   A.  Yes, customers can choose to use IT resources,

14   absolutely, yes.

15   Q.  The next bullet point, elevates all decision-making to

16   the level of the organization's top expert.

17            Tell us about that.

18   A.  So in these complex organizations, you have specialists,

19   right?  And specialists will know rate tables.  They'll know

20   risk actuarial tables.  They're very specific in what

21   they're looking at.  But the key decision maker isn't

22   necessarily those individuals.  They're the ones that are

23   managing the portfolio, right?  My ongoing profitability

24   model.  What does my product mix look like?

25            So by elevating all of these decisions in a

```
1    central place, the leaders, if you will, or the business

2    owners from an organization, have visibility into the whole

3    process where they never had before.

4    Q.  And next bullet point, enforces consistency and

5    compliance.  Let's take consistency first.

6    A.  Well, consistency, since I've now taken the logic out of

7    manuals and human process and heuristics and gut feeling,

8    and I've put them in a structured format, I know for a fact

9    that I'm making the exact same decision off of the exact

10   same data time and time again, right?  So I have that

11   repeatable fashion.

12            Now, that's very important in compliance because I

13   have to, as an insurance company, I have to declare to the

14   government and to the people that I'm not making decisions

15   based off of biased data, right?  So being able to provide

16   proof to what that looks like.

17   Q.  And I think the next bullet point, maybe I jumped ahead

18   and touched on or we've covered.  Agreed?

19   A.  So objective decisions based on data, not subjective

20   based on decisions.  I think we've --

21   Q.  We've got done.  And let's go to the last one.  Has

22   greater control over the results from high-volume

23   operational decisions.  Let's break that down.  What do you

24   mean by greater control?

25   A.  So greater control has different -- different
```

1    dimensions, right.  So let's back it up a little bit, and we

2    talk about high-volume applications.  We used the

3    illustration before about a couple hundred to 500 to

4    thousands to maybe millions of decisions, right?  So by

5    having the control of those aspects through Blaze Advisor, I

6    can actually introduce new concepts to subset of the

7    population that I'm working with, I can actually throttle

8    certain areas.  I have the full control from a business

9    without actually having to change anything.  And the beauty

10   is is Blaze Advisor doesn't care if it's 1,000 decisions

11   today and tomorrow is a million.  It doesn't care, right?

12   So you have the centralized control of being able to do

13   that.

14   Q.  And then it goes on, control over the results of

15   high-volume operational decisions.  I think we understand

16   what high-volume is from your testimony.  What do you mean

17   by operational decisions?

18   A.  So operational decisions actually impact the tactical

19   decision that I'm actually making at that point in time,

20   right?  So a business decision is I would like to originate

21   100 more applications a month, right?  That's a

22   business-level decision.

23         The operational decision is within that context, I

24   know exactly what decision I've made within what I'm trying

25   to do so I can actually prove it down.

1    Q.  And what's the technology that brings the rules of

2    decision to the point that where the decision is made and

3    something happens in the marketplace?

4    A.  That's the flexibility that we talked about upfront.

5            Now, there's one angle here that's also off of the

6    ability to handle high-volume operational decisions and

7    there's a semicolon there that says "scale."  The scale is

8    what's very important in these context, right?  So as I

9    achieve my frontline business goal of originating more

10   customers, now I want to go after a bigger market, right?

11   So my scale changes.  And then by centralized control that

12   I'm making consistently across, regardless of how many

13   providers are reselling my insurance packages, how many

14   customers are applying for that, the Blaze Advisor doesn't

15   care.

16   Q.  It can scale?

17   A.  It scales.  Yes.

18           MR. HINDERAKER:  We can take that down now.

19   BY MR. HINDERAKER:

20   Q.  And let me turn now to your personal experience with

21   Chubb.  Over the years, about how many meetings have you

22   had, whether in-person or Zoom or telephone?

23   A.  So my interaction with Chubb was pre-Zoom, so we had a

24   lot of meetings in person and telephone.  So I can recall

25   three or four meetings in person post the sale of Blaze

1   Advisor to Chubb and countless phone conversations along the

2   way.

3   Q.  And in general, the purpose of those discussions --

4   well, first, who at Chubb were you speaking with?

5   A.  So at various levels.  So typically the conversations at

6   Chubb would be with architects, so people that were, you

7   know, in charge of the infrastructure systems.  Some

8   business owner capacity that would represent the business,

9   and I'm a little fuzzy with names, so, you know, it's been a

10  long time.

11          Another set of conversations would be with Chubb

12  leadership around sort of the value of Blaze Advisor and

13  things that we're doing inside of their environment.

14  Q.  So you've had -- you did, in fact, have conversations

15  with those three categories of people?

16  A.  Yeah.  And one more category I forgot, data analyst as

17  well.  So think of the data scientist, if you will, the

18  people that are building algorithms to evaluate the

19  customer.

20  Q.  Can you tell us the subject matter of these meetings in

21  general?

22  A.  So the subject matter of most of the meetings were

23  around, we're using Blaze Advisor.  We have new problem sets

24  that we're trying to solve.  For example, one of the most

25  prevalent conversations that we've had is we have an

1    analytic model, so think of it as fancy math, right?  Fancy

2    math to determine some aspect of their customer.

3            Well, in this process, they would develop these

4    analytic models over here with other data systems, but

5    taking that analytic data model and actually putting it in

6    this framework, this application that Blaze Advisor

7    provides, is complicated.  So Blaze Advisor provides an

8    ability for them to ingest those models directly into this

9    overall process.  So most of the conversations I had past

10   that was how Blaze Advisor and some of the remodel

11   translating techniques would support that.

12           There was also conversations around best practices

13   on growing Blaze Advisor within different problem sets and

14   the governance associated with that.  So how do they

15   actually organize themselves around it, et cetera.

16   Q.  Model translator, that's an add-on product to Blaze

17   Advisor?

18   A.  Model translator is an add-on product to Blaze Advisor.

19   Q.  So I guess I heard you say so far sometimes the

20   discussion was about additional possible FICO add-ons to

21   Blaze Advisor and other times how to better use or more

22   fully use Blaze Advisor?

23   A.  That's correct.

24   Q.  Okay.  Did you gain an understanding of the extent to

25   which Blaze Advisor was integrated into their business at

1      Chubb?

2      A.  So in those conversations, it was apparent that Blaze

3      Advisor was central to all of their decision-making process

4      within the group that we were talking about.  And the reason

5      why they were looking at leveraging that is because they

6      wanted to extend other groups' works into Blaze Advisor.  So

7      it was pivotal to what they were doing.

8      Q.  Let me focus you on some meetings in 2015, 2016.

9      A.  Okay.

10     Q.  So in all of your occasions of meeting with Chubb at

11     that time frame, were you the initiator to be involved in

12     the conversation or were you being invited?

13     A.  No, I was always invited.

14     Q.  They were interested in talking to you?

15     A.  Yes.

16     Q.  And you mentioned model translation, were they also

17     interested in other FICO products at that time as add-ons to

18     Blaze Advisor?

19     A.  So they were interested in add-ons to Blaze Advisor not

20     just in model translator but the model governance solution

21     that we had, which is a how do I manage all of my different

22     models?  Because think -- you know, these insurance

23     companies have thousands of these analytic models and, you

24     know, hundreds of people that need to manage it.  And the

25     conversations were around how do we use model translator to

1    bring it into Blaze Advisor and what the best practices

2    of -- once it's in Blaze Advisor, how do we actually govern

3    that model and monitor the performance of that model over

4    time?  And various times it would be roadmap conversations

5    as well.  So what is FICO doing?  How are you guys sort of

6    progressing products, things like that.

7    Q.  They want to look forward to where FICO is going?

8    A.  Absolutely.

9    Q.  Were there any discussions that you were involved in

10   where the conversation was about FICO's cloud platform for

11   Blaze Advisor?

12   A.  Yes.

13   Q.  And what were they?  And first give us a time frame, if

14   you would, if you can recall?  I'm asking late 2015, early

15   2016?

16   A.  Well, I think it would have been, it was definitely

17   cold, so it would have been, yeah, around 2016 in the cold.

18   Q.  Okay.

19   A.  And it was -- you know, they were beginning the thought

20   process around moving to cloud.  Again, cloud technology was

21   very new at the time, so there was a lot of trepidation

22   around the cloud as a principle in itself.  And then, you

23   know, what value would our cloud offering of Blaze Advisor

24   provide them in those situations.

25   Q.  And we should now back up a little bit for all of us to

1    understand what do you mean by "cloud" and, you know, what

2    is this?

3    A.  What's the easiest description of cloud?  The easiest

4    description of cloud is traditionally large organizations

5    would manage all of their IT infrastructure, all the

6    thousands of computers that they run to be able to do

7    things.  The cloud is a central provider through Internet

8    technology does all of that for them.

9    Q.  Is it fair to say, in other words, in theory, all of the

10   IT staff of Chubb & Son becomes redundant because the IT is

11   put in the cloud and some other provider is doing that

12   work -- the work that was formerly done by in-house staff?

13   A.  That is certainly one aspect.  There certainly is a

14   redundancy of staff that occurs in that but really it allows

15   them to focus on more important strategic things and be more

16   transformative across the organization as opposed to just

17   keeping the lights on on old technology.

18   Q.  So the cloud service provider is providing a lot of the

19   technology to keep the software running in the cloud?

20   A.  Yes.

21   Q.  But as -- as you said, those are just beginning

22   exploratory discussions at that point?

23   A.  Yeah.  So at that time it was the beginning of our cloud

24   offering, so these were partnership-based conversations

25   around here's where we're thinking of going, where are you

```
 1    guys thinking of going?  How does this sort of gel together?

 2    Q.  And today is that called the FICO platform, your cloud

 3    offering?

 4    A.  That is called FICO platform, yes.

 5    Q.  When you were meeting with these folks, were there any

 6    conversations that came up about the fact that ACE had or

 7    will be acquiring the Chubb Corporation?

 8    A.  There were --

 9              MS. GODESKY:  Your Honor, may we have a sidebar?

10              THE COURT:  You may.  Approach.

11              MS. GODESKY:  Thank you.

12              THE COURT:  Remind the members of the jury, while

13    we're doing this, feel freely to stand up, stretch your

14    legs.

15              (Sidebar discussion.)

16              MS. GODESKY:  Your Honor, this goes to the Rule

17    408 issue that we've been discussing.  We submitted a

18    supplemental submission on this yesterday, and we have an

19    excerpt that's quoted in our submission from Mr. Baseman's

20    deposition where when he was questioned about these early

21    2016 meetings, Ms. Kliebenstein, Mr. Hinderaker's partner,

22    asserted that Rule 408 privilege should apply to all of

23    these conversations that were happening in early 2016

24    because they were set up for the express purpose of

25    settlement negotiations.  It is in black and white in the
```

```
 1    transcript.
 2              MR. HINDERAKER:  We aren't going to ask that
 3    question, by the way, but go ahead.  Continue.
 4              MS. GODESKY:  But we're probing into these
 5    meetings that were set up for settlement negotiations.
 6              MR. HINDERAKER:  I do believe you're jumping the
 7    gun.
 8              MS. GODESKY:  I don't know what's happening here
 9    and we don't have a ruling on settlement so --
10              THE COURT:  So far we're limited to meetings prior
11    to February 27.
12              MS. GODESKY:  Correct.
13              THE COURT:  Of 2016.  Are you inquiring about a
14    meeting after that?
15              MR. HINDERAKER:  Absolutely not, and I expect the
16    sum total of the testimony to be with the people he was
17    talking to, yeah, we don't know what's going to happen, so
18    let's keep on talking.
19              THE COURT:  And it's pre --
20              MR. HINDERAKER:  And it's pre-February -- yes, it
21    is pre-February 27th.
22              THE COURT:  Okay.  Then --
23              MS. GODESKY:  Okay, okay.  I just.
24              MR. HINDERAKER:  Fair question.  I wasn't going to
25    go close.
```

```
1              THE COURT:  And as long as you're here on that

2    topic, if you were -- the take away was you were to file

3    whatever briefing you wanted on that topic, that's offering

4    the exhibits.

5              MR. HINDERAKER:  Yes.  And so the sequence has

6    been we asked the defendants, which are the documents that

7    you want to challenge?  And rather than get -- and that's

8    fine.  Rather than get a precise response to that, the

9    letter last night was filed about 10:00.

10             THE COURT:  Okay.

11             MR. HINDERAKER:  So now we know.

12             THE COURT:  Now you know.

13             MR. HINDERAKER:  And we'll be responding.  The

14   first time that, you know, we're kind of still thinking

15   about what we're going to say, but the first time this issue

16   raises its head, I believe will be Thomas Carretta, and he's

17   not --

18             THE COURT:  Next week.

19             MR. HINDERAKER:  He's next week.

20             MS. GODESKY:  The reason we filed the letter last

21   night is because there are designations that are marked to

22   be played on -- tomorrow from Mr. Schreiber about the

23   settlement negotiations that we've moved to exclude.  So

24   that's why we thought there was a real time pressure.  There

25   is designated testimony from that.
```

```
1              MR. HINDERAKER:  Did you object to that?

2              MS. GODESKY:  Yes.  At settlement, yes.

3              MR. HINDERAKER:  Well, we went through this back

4      and forth about -- we just went through a back and forth on

5      Schreiber, and this morning I read the email from your

6      people, take the confidential designation off the bottom.

7      We're going to do that, but just not showing the text.  You

8      missed something on this line.  We changed that.  So my own

9      impression was I thought we were all kosher with that

10     because I never was alerted that there was any --

11             MS. GODESKY:  Okay.

12             MR. HINDERAKER:  Now, well, I'm not really aware

13     that Schreiber was -- I think Schreiber was an information

14     source.  Schreiber is not part of any decision-making to do

15     anything.  I mean, he's head of -- vice president of

16     insurance sales in health care, but I'm sure he was a source

17     of information, but in terms of a decision to say something

18     or not say something, he wasn't that guy.  But I think what

19     I need to do then is, if you wouldn't mind, somehow key me

20     into exactly what we're talking about.

21             MS. GODESKY:  Yes.  So there's --

22             MR. HINDERAKER:  I'm not trying to get ahead of

23     us.

24             MS. GODESKY:  Sure.  There's designated testimony

25     about numbers that were exchanged that we've objected to as
```

1    settlement related from, and I think the miscommunication

2    may have been my colleague emailed your team and said so

3    that we can narrow the issues before the Court can you do

4    these things and you agreed to do it.

5               MR. HINDERAKER:  I read that as getting everything

6    fixed.

7               MS. GODESKY:  Yeah, and so there is this other

8    issue.

9               MR. HINDERAKER:  So if you would give me that.

10   I'm not all that sure we're going to quarrel about it, but I

11   just need to know.

12              MS. GODESKY:  Okay.  Sounds like this is fine.

13   Thank you, Your Honor.

14                          **IN OPEN COURT**

15   BY MR. HINDERAKER:

16   Q.  So I have to remember where I was.

17              So we were in, you know, late 2015, maybe early

18   2016, your meeting with the people at Chubb that are

19   involved with Blaze Advisor.  I asked you if anything was --

20   any comments were made about whether the pending or recent,

21   immediate, acquisition of the Chubb Corporation by ACE.  And

22   were there any at all?

23   A.  Yes, there was.

24   Q.  And to what extent were they?

25   A.  It was a casual conversation in the hallway on the way

1   to the meeting room where the sales gentleman commented to

2   our host at the time, pretty crazy times.  You know, what do

3   you guys think is going to happen?  And the question was --

4   the answer was something along the lines of don't really

5   know, we're continuing on with what we're doing.  We'll see

6   what happens.

7   Q.  Continue to talk, huh.

8   A.  Sorry?

9   Q.  And did you have continuing meetings about Blaze Advisor

10  and its use at the --

11  A.  Oh, absolutely.  And -- yes, uh-huh.

12  Q.  So now if I could turn to slide 5, please.

13  BY MR. HINDERAKER:

14  Q.  From your experience of working with companies in the

15  various industries but including the insurance industry, I'd

16  like you to -- what factors do you look at to assess the

17  value of Blaze Advisor to the organization?

18  A.  Yes.  Value is an interesting dimension, right?  And

19  when you look at Blaze Advisor and what it does, you have to

20  look at several different factors.  So, first, you have to

21  look at what it is Blaze Advisor is actually doing and where

22  it sits in the organization.  So, for example, what types of

23  problems is it trying to solve, right?  An example would be

24  Blaze Advisor used to determine the placement of trash cans

25  is probably not as valuable to a financial institution

1    that's using it to originate customers.

2    Q.  Sure.

3    A.  Typically.

4    Q.  Second bullet point, is Blaze Advisor used to make

5    decisions connected to revenue generating events, like

6    selling insurance?

7         Can you describe that any more fully?

8    A.  So -- yeah.  So when Blaze Advisor is used for -- well,

9    let me rephrase that.  It's mostly used for decisions

10   connected to revenue events.  It is pivotal in those

11   decision process.

12   Q.  Why do you say that?

13   A.  Because it is the one actually making the decisions.

14   Q.  The number of decisions that are made with Blaze

15   Advisor.  Any comment on that?

16   A.  Yes.  So when you look at articulating the value of

17   Blaze Advisor in these situations, it's a mix, right?  So

18   what decision am I making?  Where does it sit in the

19   organization?  What type of decision am I making?  Well, how

20   many decisions am I making?  Because that affects the sort

21   of scale of the decisions with the context of the business

22   that's actually doing it.

23   Q.  Now, you said that revenue-generating events are

24   pivotal, if the transactions are not revenue -generating

25   events, how are they related to generating -- are they at

1    all related to revenue generating --

2    A.  They typically would be related at some point to revenue

3    generating event because they would be the supporting

4    decisions in an overall process.

5    Q.  The next bullet point, the significance to the business

6    of the decisions, what do you mean by that?

7    A.  Well, if Blaze Advisor is sitting in a position where

8    it's automating a hundred percent of its decisions and those

9    decisions are directly impacting the sale, the cost, the

10   onboarding of the customers and Blaze Advisor is pivotal in

11   that decision process.

12   Q.  The next bullet point, have we covered that or is there

13   something more there?  Business decisions that are core to

14   the business?

15   A.  Yes.  I mean, what this highlights is people don't use

16   Blaze Advisor for unimportant decisions.  So there's a lot

17   of other ways to sort of skin the cat, if you will, right?

18   And you use Blaze Advisor in the management system that it

19   provides to enable those critical business decisions.

20   Q.  The number of users authoring rules.  What does that

21   mean and why do you measure value from it?

22   A.  The value dimension for the number of users authoring

23   the rules is very significant, and it's significant because

24   whereas we talk about complex decisions and you're

25   automating those decisions where the -- let's just take an

1    example where there's three ladies that are running this

2    particular business division, right?  And there's only three

3    of them.  Well, the value of all of the tools that are

4    provided for the three of them to make those better

5    decisions, it's still significant, but it's not necessarily

6    the same impactful if you have a large organization with 500

7    people making the decision because automating and providing

8    all of this tooling, the more users that interact with the

9    authoring capabilities, the more value it brings.

10   Q.  And what's the meaning of the last bullet point, the

11   extent Blaze Advisor is integrated into other areas of the

12   business?

13   A.  So this is around, you know, I take a central set of

14   rules or logic and I integrate it into the existing

15   technology and how many different places are those same

16   rules being used?

17           So you look at supporting events as well.  So I

18   have this business decision is pivotal to this

19   revenue-generating arm.  I'm using the same rule set that's

20   managed here, and I'm using it over here, so now I'm getting

21   economies of scale and I'm impacting the whole enterprise as

22   opposed to just a particular division.

23   Q.  So is that to say that the impact of Blaze Advisor is

24   greater on an -- in a divisional context than it is on a

25   single named application context?

```
 1    A.  Yes.

 2    Q.  Is the value of Blaze Advisor greater on an

 3    enterprise-wide context than it is in a divisional context?

 4    A.  Yes.

 5            MR. HINDERAKER:  Thank you, Mr. Baseman.  I have

 6    no further questions.

 7            THE WITNESS:  Thank you, sir.

 8            THE COURT:  Ms. Godesky, I was planning to go

 9    until about 3:15 before a break.  Will that be convenient

10    with your cross-examination?

11            MS. GODESKY:  Sure.  May I approach the witness

12    with a binder?

13            THE COURT:  You may.

14            THE WITNESS:  Thank you.

15            MS. GODESKY:  Sure.

16            Do we have control, Your Honor?

17            THE COURT:  Yep, you do.

18                          CROSS-EXAMINATION

19    BY MS. GODESKY:

20    Q.  Good afternoon.  My name is Leah Godesky, and I

21    represent defendants in this case.

22    A.  Good afternoon.

23    Q.  You previously sat for a deposition in this litigation a

24    couple of years ago in 2021, right?

25    A.  I believe it was 2021, yes.
```

1    Q.  And that means you provided sworn testimony under

2    penalty of perjury in a conference room no different than

3    you are right now in this courtroom, right?

4    A.  Correct.

5    Q.  And I put in front of you, just so you know,

6    Mr. Baseman, a copy of your deposition transcript in that

7    binder, just in case we need to reference it, okay?

8    A.  Okay.

9    Q.  Now, you talked about how your responsibilities at FICO

10   include understanding each of the products FICO offers and

11   knowing what product is the best fit for a particular

12   customer, fair?

13   A.  Correct, yes.

14   Q.  And one product you work on is the cloud-based decision

15   management platform, also known as the FICO platform?

16   A.  Correct.

17   Q.  And you also continue to work on Blaze Advisor's

18   software projects?

19   A.  Yes.

20   Q.  Now, back in time to when FICO and my client were doing

21   business together, you referred to my client simply as

22   Chubb; is that fair?

23   A.  That is fair.

24   Q.  And you understood that Chubb was one of FICO's

25   insurance company customers, but beyond that, the particular

```
 1    name of the entity didn't have any specific meaning to you?

 2    A.  No significance whatsoever.

 3    Q.  Now, even though you were at FICO as far back as 2004,

 4    you were not involved at all in FICO's sale of Blaze to

 5    Chubb back in 2006, correct?

 6    A.  Correct.  I was in Europe at the time.

 7    Q.  And you do not know who ran the negotiations on that

 8    contract?

 9    A.  I do not.

10    Q.  In fact, you had not even seen the Chubb license

11    agreement before 2021 when you sat down for your deposition

12    in this case.  Sound right?

13    A.  I have not seen it, no.  I don't recall if I've seen it

14    in 2021, but I'll -- I might have.

15    Q.  So you may not have seen it ever?

16    A.  I might not have seen it ever.

17    Q.  And that's because as a general matter, you do not work

18    on Blaze licenses at FICO?

19    A.  That is correct.

20    Q.  And you are not responsible for pricing Blaze licenses?

21    A.  No.

22    Q.  You're aware that there is a Blaze pricing guide, but

23    you've never seen it?

24    A.  The Blaze pricing guide?

25    Q.  Correct.
```

1    A.  I have seen a Blaze pricing guide, yes.

2    Q.  But you don't apply it as part of your daily work?

3    That's not your job?

4    A.  I do not apply it, no.

5    Q.  Now, over time at FICO you have become aware of a rule

6    of thumb where if one customer uses Blaze in two or more

7    applications, FICO might discuss with the customer the

8    possibility of moving to an enterprise-wide license, fair?

9    A.  That's a -- yes.

10   Q.  And that's because once a customer buys a license for

11   two or three computer applications, it might make more sense

12   for them to buy an enterprise license to save some money?

13   A.  Yes.

14   Q.  Typically, when you talk about an enterprise Blaze

15   license, you're talking about something that's open-ended,

16   perpetual, based on customer size, and it's supposed to

17   reflect the value that Blaze brings to the company?

18   A.  Yes.  There is a distinction of enterprise in various

19   large organizations, but yes.

20   Q.  Okay.  And in terms of how Blaze works, it is not the

21   kind of software that is typically used by companies

22   successfully on its own, correct?

23   A.  We have a large percentage of customers that do, in

24   fact, use Blaze Advisor with zero professional services.

25   Q.  I meant not combined with other software components.

FELTEN - CROSS

1   A.  Oh, yes.  No, they would certainly require other

2   software components.

3   Q.  Okay.  Blaze is also typically added to customers'

4   already existing computer applications, right?

5   A.  Yes.

6   Q.  And large companies may sometimes have hundreds of

7   different components working with Blaze in a single computer

8   application?

9   A.  Yes.

10  Q.  So when Blaze is used in these applications at large

11  companies like Chubb, Blaze is one component of a

12  multi-faceted complex system?

13  A.  Yes.

14  Q.  We can agree that when FICO sells Blaze to a client like

15  Chubb, Blaze itself does not contain the actual rules,

16  right?

17  A.  Correct.

18  Q.  And the actual idea of all of the rules comes from

19  humans?

20  A.  Correct.

21  Q.  And you testified during your direct examination that

22  Blaze Advisor provides some value to insurance companies,

23  right?

24  A.  Yes.

25  Q.  As a general matter, though, you agree that it would be

SEGAL - CROSS

1   very difficult to try to measure the value that Blaze

2   provides to a particular company?

3   A.  Difficult, yes, but not unachievable.

4   Q.  But you personally would not be capable of quantifying

5   the value that Blaze provides to a customer?

6   A.  Correct, in a monetary sense.

7   Q.  So let's talk a little bit more about the world of

8   insurance.  I think you said during direct that you have a

9   cursory understanding of insurance, right?

10  A.  That is correct.

11  Q.  That means fairly basic, right?

12  A.  Agreed.

13  Q.  You have never been an insurance agent or a broker?

14  A.  No.

15  Q.  You have never been an insurance underwriter?

16  A.  No.

17  Q.  You have never worked in the technology group of an

18  insurance company?

19  A.  Nope.

20  Q.  And you've never worked in the claims side of an

21  insurance company?

22  A.  No.

23  Q.  You've never held any position at an insurance company?

24  A.  Nope.  Only a customer.

25  Q.  And you haven't conducted, as part of your work at FICO,

1    any survey of Chubb customers regarding why they purchase

2    insurance from Chubb?

3    A.  Repeat the question.

4    Q.  As part of your work at FICO, you haven't ever set out

5    to conduct a survey of Chubb customers to find out why

6    they're purchasing insurance from Chubb?

7    A.  I have not, no.

8    Q.  You don't even know what the term gross written premium

9    or GWP means, right?

10   A.  I do not.

11   Q.  You spoke during direct about some problem-solving

12   exercises you did for some unnamed insurance companies at

13   the beginning of your discussion with Mr. Hinderaker.

14            Do you remember that?

15   A.  Yes.

16   Q.  That was not specific to Chubb.  That was your general

17   experience?

18   A.  General experience, correct.

19   Q.  And then you started talking about Chubb and you said it

20   was apparent that Blaze was central to Chubb's systems,

21   right?

22   A.  Yes.

23   Q.  You said it was pivotal?

24   A.  Yes.

25   Q.  Correct?

1    A.  Correct.

2    Q.  But when it comes to the use of Blaze at Chubb, you are

3    only vaguely familiar with how the software was used, right?

4    A.  I was very familiar with how the software was used in

5    the context of everything else that they were doing,

6    correct.  But to what actual decisions they were using it,

7    no.

8    Q.  Is it true that you were only vaguely familiar with how

9    the software was used at Chubb?

10   A.  Yes.

11   Q.  All you knew was that Blaze may have been used in an

12   underwriting and claim fraud application, but beyond that,

13   you didn't have any intimate knowledge of how Chubb actually

14   used Blaze, correct?

15   A.  Yes.

16   Q.  If we could put up the fourth slide that you used during

17   your direct examination, Vanessa?

18            MR. HINDERAKER:  The one that's numbered 4.

19            MS. GODESKY:  Yes.  Thank you.

20   BY MS. GODESKY:

21   Q.  So this slide is titled "The Business Value of Blaze

22   Advisor," right, Mr. Baseman?

23   A.  Yes.

24   Q.  And the first bullet says, Blaze reduces the time and

25   costs to develop decision-making applications.

1    A.  Yes.

2    Q.  And that's a general statement, right, Mr. Baseman?  You

3    have not done anything in the course of your work at FICO to

4    specifically analyze the extent to which Blaze reduced time

5    at Chubb?

6    A.  Correct.

7    Q.  And then your third bullet says, new applications can be

8    developed and changes to existing applications can be made

9    faster than was possible before Blaze, right?

10   A.  Yes.

11   Q.  But you haven't analyzed and you don't have any

12   information from the course of your work at FICO that allows

13   you to say whether it's true that new applications were

14   developed faster at Chubb because of Blaze, correct?

15   A.  Not so.  So we do have customers that continue

16   relationships with FICO, which they talk about how much

17   value that they've received and we have those kind of

18   conversations.

19   Q.  But specifically at Chubb, you cannot identify a

20   particular application that was developed faster at Chubb

21   because of Blaze?

22   A.  Only through heuristic conversations, yes.

23   Q.  And you also can't measure or talk about how quickly

24   Chubb was able to make changes to its internal computer

25   applications because of Blaze.  You haven't measured that,

1    right?

2    A.  Of their existing ones?

3    Q.  Correct.

4    A.  Correct.

5    Q.  Your fourth bullet says, each insurance policy requires

6    a unique set of rule statements for deciding on whether to

7    offer an applicant a policy and at what price, right?

8    A.  Yes.

9    Q.  But just to be clear, you have not studied the specific

10   policies that Chubb offers and figured out exactly which

11   rules were being run against which lines of business?

12   A.  No.

13   Q.  Your fifth bullet is Blaze enhances business agility

14   because rule statement changes can be made quickly, correct?

15   A.  Yes.

16   Q.  But you didn't get any information in the course of your

17   work at FICO in terms of how quickly Chubb was implementing

18   rule changes, right?

19   A.  Not necessarily, no.  So in the -- can I elaborate?

20   Q.  Not necessarily, no, is good for now.  Thank you.

21           And you also don't have any specific information

22   on whether they actually did implement rule changes at

23   various points in time, correct?

24   A.  No.  They certainly did make various rule changes, yes.

25   Q.  Can you specifically identify rule changes that were

1    made and whether they were made faster at particular points

2    in time because of Blaze?

3    A.  Only heuristically, yes.

4    Q.  Your sixth bullet talks about rule statements for

5    decision can be changed faster, new insurance products can

6    be brought to market faster, each product being a unique set

7    of rule statements, right?

8    A.  Correct.

9    Q.  Can you specifically identify any insurance product that

10   Chubb was able to bring to market faster because of Blaze?

11   A.  No.

12   Q.  And based on all of this, Mr. Baseman, you are not in a

13   position to say whether Blaze had any specific impact at all

14   on Chubb's revenue or profit, correct?

15   A.  Mathematically, no.

16   Q.  Okay.  So I want to talk about briefly what goes into

17   removing Blaze from a computer application.  If a large

18   company has integrated Blaze into multiple applications, it

19   can be complex to remove the software, correct?

20   A.  Potentially.

21   Q.  And it could take days, months or even years to unravel

22   from internal systems, correct?

23   A.  To unravel -- potentially.

24   Q.  And you're saying potential because there's no typical

25   length of time.  It's going to depend on the nature of the

FEDINA - CROSS

1    company, right?

2    A.  It would be dependent on the nature of how the

3    integration was done, what their software development life

4    cycles were, yes.

5              MS. GODESKY:  I'm almost done, Your Honor, if I --

6              THE COURT:  That's fine.

7    BY MS. GODESKY:

8    Q.  Now, the amount of time you spent working on Blaze has

9    shifted over time, correct?

10   A.  Yes.

11   Q.  And it has declined in recent years, fair?

12   A.  Yes.

13   Q.  In 2016, you were spending about 80 percent of your time

14   on Blaze, right?

15   A.  2016?  Yes.

16   Q.  By 2021, when you'd provided deposition testimony in

17   this case, you were only spending about 10 percent of your

18   time on Blaze?

19   A.  Correct.

20   Q.  And that's because there was the introduction of this

21   new FICO product called Decision Modeler, the cloud-based

22   product, right?

23   A.  Partially, yes.

24   Q.  And for the most part, Decision Modeler, the cloud-based

25   product, and Blaze do the same things?

1    A.  There are similarities.

2    Q.  And just so everyone understands, this is a little

3    technical, right, but Blaze is an on-premises program,

4    right?  It's not in the cloud.

5    A.  Correct.

6    Q.  And today most FICO customers are embracing cloud-based

7    technologies, right?

8    A.  Most, yes.

9    Q.  And since customers are focussed on the cloud-based

10   offerings, that's also where FICO has been focusing in

11   recent years?

12   A.  Yes.

13   Q.  The percentage of FICO's software revenue that is

14   attributable to Blaze has been decreasing in recent years,

15   correct?

16   A.  I'd say that's fair.

17   Q.  And most of the company's decision management revenue

18   now comes from that cloud-based FICO platform?

19   A.  Yes.

20   Q.  FICO still sells Blaze to some customers, but you've

21   said that it's better suited for small companies and

22   companies in places like Turkey and Latin America that are

23   not yet incorporating the cloud, correct?

24   A.  At that time, that was -- yes, that's what I said.

25   Q.  Okay.  And as of 2021, when you were deposed in this

```
 1   case, the number of Blaze customers was not increasing,

 2   correct?

 3   A.  At that time, correct.

 4   Q.  Okay.

 5           MS. GODESKY:  Thank you.  I have no further

 6   questions.

 7           THE COURT:  All right.  We'll take our afternoon

 8   break.  We'll plan to be back in the courtroom at 25 minutes

 9   to 4:00, okay?  Thank you.

10           (Jury leaves courtroom.)

11               (WITHOUT JURY PRESENT)

12           THE COURT:  Mr. Hinderaker, any update on sort of

13   a time relative to Mr. Baer and some of the exhibits?

14           MR. HINDERAKER:  Your Honor, I think that -- I

15   have a short redirect, but my best estimate is that -- I

16   think Mr. Marce will be our last witness today, so we won't

17   be getting to -- if we got to Mr. Baer, there would be ten

18   minutes left in the day, that sort of thing.

19           THE COURT:  That's very helpful.  Thank you.  All

20   right.  We'll be in recess until -- yes, Mr. Godesky,

21   Mr. Fleming?

22           MR. FLEMING:  We've submitted a letter response to

23   FICO's arguments concerning the issues we discussed earlier

24   today.

25           THE COURT:  Okay.  I'll certainly look at that as
```

```
 1    well.

 2              MS. GODESKY:  I just had a question.  Does Your

 3    Honor have a rule with regard to speaking to witnesses when

 4    they're testifying?  May we speak to witnesses when they're

 5    on direct but not on cross?  Are there any guardrails that

 6    we both should be following?

 7              THE COURT:  I think the rule, right, referencing

 8    the sequestration rule is once the witness is in the

 9    stand --

10              MS. GODESKY:  No discussion.

11              THE COURT:  -- no discussion.

12              MS. GODESKY:  Thank you.

13              THE COURT:  Thank you.  We're in recess until 25

14    minutes to 4:00.

15              (Recess taken at 3:20 p.m.)

16                        IN OPEN COURT

17                        (Jury seated)

18              THE COURT:  Mr. Hinderaker, any redirect?

19              MR. HINDERAKER:  Yes, Your Honor.

20              THE COURT:  And Mr. Baseman, once again, remember

21    you're under oath.

22              THE WITNESS:  Yes.

23              MR. HINDERAKER:  And remember to be slow in your

24    speech.

25              THE WITNESS:  That I will try.
```

FICO v. FEDERAL - REDACTED

1              **REDIRECT EXAMINATION**

2     BY MR. HINDERAKER:

3     Q.  A few follow-up questions.

4     A.  Yes, sir.

5     Q.  Do you have any responsibility for the pricing of Blaze

6     Advisor licenses?

7     A.  No.

8     Q.  Is that the responsibility primarily of Mr. Bill Waid?

9     A.  Among others, yes.

10    Q.  When you were asked the question about a customer with

11    two applications considering -- having -- using Blaze

12    Advisor for more applications --

13    A.  Yes.

14    Q.  -- and the wisdom of moving to an enterprise-based

15    license --

16    A.  Yes.

17    Q.  -- were you assuming that -- did you give your answer in

18    the -- under the assumption of an ongoing business

19    relationship?

20    A.  Yes.

21    Q.  Have you ever had experience in setting Blaze Advisor

22    pricing in the context where the relationship had ended and

23    a transition license was being negotiated?

24    A.  No.

25              MR. HINDERAKER:  Could we put slide 4 back up?  Is

1    that yours?

2            MS. GODESKY:  It's Heather's.

3    BY MR. HINDERAKER:

4    Q.  I'm sorry, on slide 4, do you have to be able to

5    monetize -- in your judgment, do you have to be able to

6    monetize the value of Blaze Advisor to know whether it's

7    valuable or not?

8    A.  No.

9    Q.  And in some answers to questions that you were asked,

10   you used -- used the phrase, heuristically or heuristic

11   conversations or only heuristically.

12   A.  Yes.

13   Q.  What did that mean?

14   A.  Casual, inference-based, based off of the context of

15   what we were talking about.  So you're able to deduce what

16   it was that they're talking about in the context of what

17   we're there to talk about.

18   Q.  And what did you assume, understand, deduce, regarding

19   the value that Chubb was realizing from Blaze Advisor from

20   these conversations?

21   A.  So how you're able to deduce that the Blaze Advisor

22   component is integral to the decision process is the

23   conversations that we were there to discuss around taking

24   pivotal analytic models and putting them into Blaze Advisor

25   was to get a wider use of those models across all of the

1    different systems they were using.  They wouldn't have had

2    that conversation if it wasn't being used.

3    Q.  A related question.  Do you have to know that one thing

4    is -- do you have to know the extent that one thing is

5    faster than another to know that it's faster?

6    A.  No.

7    Q.  Does the fact that you were not measuring, quantifying,

8    the significance of Blaze Advisor, change your testimony

9    about slide 4 with respect to Blaze Advisor's value to the

10   business?

11   A.  Not at all.

12   Q.  And at the close, you were asked about information that

13   you gave in 2021 regarding Blaze Advisor sales.  Do you have

14   any knowledge about the amount of success or lack of -- any

15   knowledge about Blaze Advisor sales today, the quantity, the

16   amount, the success?

17   A.  Not from numbers but trajectory, yes.

18   Q.  What's the trajectory?

19   A.  The trajectory is it continues to sell and is, in fact,

20   picking up in Latin America and especially regions that we

21   do not have the cloud.  So it is still a very viable product

22   of which customers still use.

23           MR. HINDERAKER:  Thank you.

24           No further questions, Your Honor.

25           THE COURT:  Thank you, Mr. Hinderaker.

```
 1                    Ms. Godesky, any re-cross?

 2                    MS. GODESKY:  Nothing further, thank you.

 3                    THE COURT:  All right.  Thank you.  Go ahead,

 4          Mr. Baseman, you may step down.

 5                    THE WITNESS:  Thank you, Your Honor.

 6                    THE COURT:  Mr. Hinderaker, or whomever, go ahead

 7          and call your next witness.

 8                    MS. KLIEBENSTEIN:  Thank you, Your Honor.  We call

 9          Mr. Jean-Luc Marce.

10                    Your Honor, may I approach?

11                    THE COURT:  You may.

12                    Come on up here, Mr. Marce.  Good afternoon.  If

13          you would raise your right hand, please.
```

**JEAN-LUC MARCE,**

```
15            duly sworn, was examined and testified as follows:

16

17                    THE COURT:  Go ahead and be seated.  Make sure to

18          speak into the microphone and state your full name for the

19          record, please.

20                    THE WITNESS:  My name is Jean-Luc Marce,

21          M-A-R-C-E.
```

**DIRECT EXAMINATION**

```
23          BY MS. KLIEBENSTEIN:

24          Q.  Mr. Marce, is the microphone at a comfortable spot for

25          you?
```

1    A.  It is now.

2    Q.  Thank you very much.  And I have not met everyone yet.

3    My name is Heather Kliebenstein.  I'm at Merchant & Gould as

4    well.

5            Mr. Marce, can you identify your current employer

6    and job title for us?

7    A.  I'm a VP of software engineering at FICO.

8    Q.  And how long have you worked at FICO?

9    A.  Since 2002, so about 20 years.

10   Q.  And today what are your primary job duties?

11   A.  Today I lead a software development team responsible for

12   developing and mentoring and supporting decision technology

13   software at FICO.  And I'm also leading architect for the

14   software products.

15   Q.  And do you work with any particular software product

16   today at FICO?

17   A.  I'm particularly focusing on Blaze Advisor.

18   Q.  And can you tell the jury, in your words, what is Blaze

19   Advisor?

20   A.  So Blaze Advisor is what we call a business rule

21   management system, which companies use to automate

22   decisions, automate processes and procedures they may have.

23   It helps them do that in a more efficient way and in a more

24   consistent way.

25   Q.  For someone who doesn't work in IT and software

1   engineering regularly, what example can you give us to

2   explain what is a business rules management system and where

3   might a normal civilian see such a thing?

4   A.  So typically normal civilian do not see the software

5   directly, but you will see it through procedures that you do

6   in your life, like applying for a job, applying for a loan,

7   buying some large products, like a car and so on.  So

8   whenever we fill forms, whether it's for a bank or for the

9   insurance company, typically those companies have systems

10  behind to validate what you have entered, to make sure that

11  it's consistent, that it's -- it has the right qualification

12  for you to get that loan or to get that product.

13            And the system that they're running by those

14  banks, insurance, telecommunication companies and so on,

15  typically run software such as our software.

16  Q.  And, Mr. Marce, how long have you personally been

17  working on Blaze Advisor software?

18  A.  So Blaze Advisor started in 1996, and I was one of the

19  original developer and lead for Blaze Advisor, so since

20  1996, so it's 27 years.

21  Q.  And 27 years, that's a long time.  Why have you stuck

22  with the same software for 27 years?

23  A.  So since my childhood, I always like things like things

24  like logic and puzzles.  I was doing a lot of chess.  So I

25  was subscribing to some magazines that where they have lots

1    of games to meet my interest.  So chess and Rubik's Cube,

2    and many other logic games that I was doing.  So I always

3    liked logic.

4            And for me, I also studied that in school as well.

5    I took some classes related to how to do inferencing, how to

6    do logic in different systems.  And I really like it a lot

7    and when I had this opportunity to join this company to work

8    on software, which is all about automating and processing

9    logic in its pure way, that was too much of an attraction

10   for me, so I decided to join the company.  It was at that

11   time Neuron Data.

12   Q.  And backing up before we get into Neuron Data, did you

13   attend college, Mr. Marce?

14   A.  Yes, I did.

15   Q.  Where?  Can you tell us?

16   A.  In France, Ecole Polytechnique, which is one of their

17   premier engineering schools in France.  So where I

18   studied -- it's basically a major where mathematics and

19   physics and computer science.  Then I did a two-year

20   associate's degree in another school, at Telecom Paris,

21   where I study computer science, computer engineering and

22   telecommunications.

23   Q.  And so I'm going to guess by that, that you grew up in

24   France; is that correct?

25   A.  That's correct.

1    Q.  And after you finished school, where was your first job?

2    A.  So my very first job was actually back in the U.S.  I

3    had to do some internship during my school.  I did some

4    internship in a start-up called Neuron Data, and because I

5    was so in love with what they were doing and opportunities

6    to work on their product, in software, so I jumped on the

7    opportunity that was given to me to come back and start

8    there.  So I started in 1991 at Neuron Data.

9    Q.  At Neuron Data.  And what were your job duties at Neuron

10   Data back in 1991 when you started there?

11   A.  So I started working on doing software development on

12   various products that they had.  So I joined as a senior

13   software engineer as part of their team.

14   Q.  Did you focus on any particular products at Neuron Data?

15   A.  Pretty soon I started -- a few years after I joined, we

16   started Blaze Advisor, and most of my professional

17   experience at Neuron Data and in later companies I've been

18   with Blaze Advisor.

19   Q.  What year did you start working on Blaze Advisor?

20   A.  So Blaze Advisor we started in 1996.

21   Q.  And Neuron Data, Blaze Advisor, is that the same Blaze

22   Advisor software that we're talking about today in court?

23   A.  Yes, it is.

24   Q.  And how is it that you ended up working at FICO on Blaze

25   Advisor software too?

1    A.  So Neuron Data started Blaze Advisor, so in the early

2    '90s, and then it changed its name at some point, late '90s

3    into Blaze Software.  And Blaze Software, we then went to

4    some acquisitions.  Blaze Software was acquired by Brokat

5    Technologies and then later was acquired by HNC Software,

6    and then HNC Software itself was acquired by Fair Isaac, now

7    called FICO.

8    Q.  Were you an employed by each of those companies along

9    the way?

10   A.  Yes.

11   Q.  And did your job duties change in any way?

12   A.  No.

13   Q.  So you kept working on Blaze Advisor through each of

14   those acquisitions, correct?

15   A.  That's correct.

16   Q.  Now let's shift back a little bit to talk about the

17   creation of Blaze Advisor back in 1996.  Could you specify

18   for us, what were your -- I know you worked on Blaze

19   Advisor, but what were your particular job duties with

20   respect to Blaze Advisor in '96?

21   A.  So in '96, I had two main roles.  One is I worked

22   closely with their chief architect of the company to come up

23   with a new representation of logic, a new language.  We

24   started -- because one of the things we observed in the

25   prior generation of products and all the products that were

1  available at that time, most of them used a very technical

2  language.  You had to use some at sign between words and you

3  have to use question marks and all kinds of punctuation

4  marks, and it was okay for technical users, but we really

5  were left leaving out the majority of target users.  We are

6  more on the business side.  So we really wanted to develop a

7  new language that was enabling a business user to be able

8  to -- to make best use of this tool.

9          So we started with looking at different ideas.

10  And, first of all, we started with the English language, and

11  it could have been another language, but English was our

12  primary base.  And we found actually English has a lot of

13  keywords that we use on a day to day bases that can be used

14  to represent relationships between objects that can

15  represent logic itself.  When you say, if something happens,

16  if such-and-such conditions are true, then other things will

17  happen.  We use that commonly in language and that's kind of

18  realization decide to create this language that started from

19  English.

20          So that's one of the things that Hector, the

21  architect, to develop the ideas and come up with this

22  language.  And then also I personally started doing some

23  software development on one main piece of what would become

24  Blaze Advisor later.

25  Q.  And, Mr. Marce, let's just make sure we're on the same

1    page.  What is logic?

2    A.  So what I mean by -- what I mean by business logic, the

3    set of policies and procedures and regulations and all kinds

4    of internal reference documents that companies have to

5    direct their business.  So they basically represented in

6    their own form, in their preferred form, so it could be any

7    kind of document.  It could be some Word document, some --

8    maybe some spreadsheets, maybe some PDF files.  So they're

9    going to create different documents that are capturing what

10   the business does and how it performs.

11   Q.  And so this new language that you were creating, it was

12   a new language to represent this logic; is that right?

13   A.  That's right.  So when you write things in documents,

14   the document itself cannot be run and put in a machine and

15   executed.  So what we did was come up with a language which

16   is close to English, so it's more familiar for business

17   users, but it's more structured in the way that it could be

18   formalized and when it's formalized, it can then be

19   processed by a machine, by software and then compiled and

20   then run.  So that was a major thing, be able to capture

21   business logic in a way that enables this execution of this

22   business logic.

23   Q.  And this new language that you created, did it have a

24   special name?

25   A.  Yes.  So we created structured rule language.  Not very

1    creative, but that's what we had.

2    Q.  And did this language, did this language get put into

3    Blaze Advisor?

4    A.  Yes.  So that's the core of Blaze Advisor is this

5    language, which is used to express any rule expressions and

6    rule logic.  So it's preferable to other products.  We use

7    it in authoring and design and when we process, process the

8    rules, execute the rules, they are part of their core of the

9    system.

10   Q.  And just to make sure I'm understanding your word, it's

11   the core of the system?

12   A.  Yes.  It's really the main part of their product.

13   Q.  And why did you feel the need to develop this new

14   language rather than just using a language that already

15   existed for Blaze Advisor?

16   A.  So the main part is that there were really no precedent.

17   There were no existing products with or languages that were

18   business friendly and that businesses could use to write

19   such logic.  So we figured out that we had to come up with

20   our own syntax and our own language.

21   Q.  Was this language easy to create?

22   A.  Mostly, not really, because there was no precedent, so

23   we had to figure out how to -- what other element of the

24   language that was the most beneficial.  We started from the

25   pure academic, we started creating a modern language first

1    based on English and then from the modern language, modern

2    language is how you mother the word around you.  What other

3    objects, what other relationships between objects.  So we

4    started from that kind of language approach and then we

5    added our logic -- business logic to this language and

6    eventually it become their structured language.  And there

7    was nothing on the market, no precedent at all at the time.

8    Q.  Mr. Marce, besides the structure of rule language, does

9    Blaze Advisor have any additional parts in addition to the

10   structured rule language?

11   A.  Yes, in addition to the language, there are four main

12   components in Blaze Advisor.

13   Q.  And have you prepared a graphic that will help you

14   explain your testimony today?

15   A.  Yes.  So there's an architecture document that shows

16   those four components.

17          MS. KLIEBENSTEIN:  Mr. Mayleben, can you bring up

18   page 1.

19   BY MS. KLIEBENSTEIN:

20   Q.  Is this that graphic?

21   A.  Yes.

22   Q.  And to somebody who's not a software engineer, it's

23   difficult for me to read this type of graphic.  Could you,

24   you know, at a 10,000-foot level, just explain what we're

25   looking at right now?

1    A.  So this diagram has two main sides, two main parts.  It

2    has the parts that we provide as part of a product, which

3    are the rule components on the left-hand side and with the

4    blue background.  And then the right-hand shows their

5    applications that all customers did with their own

6    components, and with their own components as well.  So there

7    are additional components that they are building that make

8    the whole application.

9          At some point during the execution, they will call

10   our product at least on part of their execution is using

11   that --

12          COURT REPORTER:  Can you repeat that sentence?

13          THE WITNESS:  Sure.

14          THE COURT:  Go ahead and repeat your answer.

15          THE WITNESS:  Yes.  So the left-hand side contains

16   the blue components, which are the ones we provide.  And the

17   right hand side show their customer application components,

18   those that our customers are building that are providing the

19   overall processing that they do on the side, there's only

20   certain parts of the applications where logic is needed.

21   BY MS. KLIEBENSTEIN:

22   Q.  Mr. Marce, while you're looking at your screen down

23   there, I think you can move your microphone a little closer.

24   Sorry.  I know this is not a natural setting.

25          Okay.  Let's focus on the left-hand side, what's

1    in blue under rule components.  Tell us what's on the

2    left-hand side of this diagram?

3    A.  So we show four -- four main components, which are

4    numbered from 1 to 4 on the screen.  Together, they provide

5    the whole functionality to be able to design a rule system,

6    author business rules, test business rules, and deploy

7    business rules to a server, which is where the rules will

8    run.

9         So the middle part in the orange background is a

10   rule repository.  The rule repository is where we store and

11   keep track of all changes made to the rules.  So other rules

12   and other objects we have.  We have our tables and trees and

13   classes and objects and valuables, all those kind of

14   entities are authored and stored in that repository.

15   Q.  Mr. Marce, the word repository is not something that

16   many of us use on a daily basis.  Can you tell us, what is a

17   repository in your line of business?

18   A.  So in addition to storing these objects, we also -- the

19   repository is responsible for tracking what changes were

20   made, by whom and when, and you can also add comments.  You

21   say, I've made this change to this rule because such things,

22   one event I need to make that change.  So you can keep track

23   of all changes made by any user.

24   Q.  Would another way to put it be that it's a super

25   technical file folder that can store and track rules?

1    A.   It's like a file system but with tracking ability.

2    Q.   Thank you.

3              Now, let's move on to the red box, number 2.  Can

4    you tell us, what part of Blaze Advisor is shown in the red

5    box?

6    A.   So we have, in the red box, we have an IDE, which the

7    IDE stands for Integrated Development Environment, and it's

8    designed mostly for technical users or people who are more

9    architects who are going to think through what needs to be

10   bid from the business logic perspective, how to structure

11   the project, where to store it.  So the repository could be

12   stored right here off Blaze, so the architect will use the

13   IDE to configure, to control where it's stored, how it's

14   configured, and as well as what is -- it will create within

15   IDE, the users would create projects, which are collections

16   of entities.  And they can also create something which is

17   then used by their box, next box, they can also create rule

18   templates.

19             So rule templates.  It's an interesting concept as

20   well.  It's one where it's like a pre-filled rule.  It's a

21   form where some part of the rules are really present, and

22   there are boxes and checked boxes and drop-downs for

23   business users to be able to make their own entries.  So

24   that's IDE.  It's configuration, creation of projects,

25   creation of work templates.

1    Q.  So the IDE is the place where rules can be written by

2    more technical users; is that right?

3    A.  Written as well as the structure of the project is

4    created typically in an IDE.

5    Q.  Now let's move on to the third blue box at the top of

6    the screen titled Rule Maintenance Application, or RMA.  Can

7    you tell us, what does this part of Blaze Advisor do?

8    A.  So that's really the document that we provide to

9    business users is really our target, our main target.  So

10   the RMA, first big difference is where is the IDE, is an

11   application running on a desktop, on a computer locally?

12   Their RMA will typically be running on the web.  So it could

13   be accessed by more users, and it could be accessed from any

14   web browser.

15          And then it's where the business users will then

16   fill in their actual content, their actual logic that need

17   to be automated.  They will create those business rules in

18   that RMA, and they can also test those business rules as

19   well.

20   Q.  Let's move on to box number 4 at the bottom of this

21   screen, titled "Rule Server."  What does the rule server do

22   in Blaze Advisor?

23   A.  So the rule server is taken from, after authoring and

24   some testing, rule server is really what gets integrated

25   with their main customer application.  So the rule server

1    knows how to extract the rules from the repository, so if

2    you pull the rules from that, it knows how to understand

3    those rules and be able to parse them and translate them, so

4    it's a compiler that translates those rules into a form that

5    can then be executed.

6          And then after it's done with translating rules

7    into an executable form, then it waits for the customer

8    application to send request. So you can see that actually

9    with the ROs -- within the green background, the customer

10   application will make a request to a rule server, say

11   process this application with all this information. The

12   rule server would then apply its own rules to categorize and

13   validate and approve of, that's all the processing on this

14   form. It naturally pull data from their customer database

15   itself is a way to configure the product so that it actually

16   can also retrieve data on its own and then it returns value

17   back to the customer application. It says, okay, so this

18   application is qualified because this and this was -- had

19   the right numbers and all are typical of those reasons.

20   Q. And when you just said the rule server returns a value

21   back to the application, that means it's giving an answer,

22   right?

23   A. Yes. So the application center requests and then gets

24   back from the rule server a value or the new object that

25   says it's had -- which decision it's reached.

1    Q.  And for Blaze Advisor, when did development start?

2    A.  So we started in 1996.

3    Q.  And was Blaze Advisor developed from scratch?

4    A.  Yes, from scratch.

5    Q.  And how many people were working on it at the time?

6    A.  So in the beginning, about 12 to 15 people.

7    Q.  How many years did it take to develop Blaze Advisor, the

8    first version?

9    A.  The first commercial version was in 1998, so it took two

10   years for us to get to the first major commercial version.

11   Q.  And how many lines of code are in Blaze Advisor today?

12   A.  A little bit over 3 million lines of code.

13   Q.  So about 3 million lines of code is what's needed to

14   make the blue box on the left work; is that right?

15   A.  That's right.

16   Q.  So when did, I know this is Neuron Data at the time,

17   when did Neuron Data get its first paying customer?

18   A.  After the first commercial version, so soon after that,

19   in 1998.

20   Q.  So all of this work was done before there was a paying

21   customer for Blaze Advisor?

22   A.  Right.  And that's because we -- the company realized

23   that there was a strong need for this product, our language.

24   We felt that this would be a revolutionary type of product.

25   It needed some investment.  So we used prior generation of

1    products essentially to fund the development of this new

2    one.  And we had to make investments to make a new product.

3    That took two years and that many people.

4    Q.  And how was the market reception to Blaze Advisor

5    initially?

6    A.  So, from what I've been told and what I've heard, is

7    that it went very well.  Prior customers as well as new

8    customers were very excited about the possibilities of using

9    this new rule language, and we had quite a few successful

10   deals right away.

11   Q.  So let's imagine that a customer buys a license to Blaze

12   Advisor, how do they get a copy?

13   A.  So once they purchase a license, they get their -- they

14   can download a copy from our download system.

15   Q.  And I'd like to talk a little bit about how Blaze

16   Advisor gets into a customer's system and how it gets up and

17   running for a bit.

18           After installation, what are the steps -- what are

19   the steps to get Blaze Advisor up and running?

20   A.  So, yeah, first, they have to install the product, and

21   that's not -- the beginning.  Then they can start working

22   with their IDE to -- they typically will start with examples

23   that you provide, but pretty soon they're going to create

24   their own repository, their own projects and start --

25   designing, essentially, what their work project will be.  So

1   that's the first step is their discovery and design of the

2   system.

3   Q.  And I forgot to ask you a question earlier.  We started

4   talking about structured rule language, the language that

5   was invented for Blaze Advisor.  I don't see that anywhere

6   on the blue box titled "rule components."  Where is the

7   structured rule language in this drawing?

8   A.  So it's actually integral part of every one of those

9   four components.  The rules are stored in the structured

10  rule language in the repository.  The rule builder IDE will

11  create entities including rules in that language as well.

12  Same thing for the RMAs.  So the two authoring environments

13  create rules in that language.

14          And then in the rule server, the rule server

15  understands the language as well and knows how to process

16  it.  So the rule language is also known and used by the rule

17  server as well.

18  Q.  Now moving us back to where I just was, you just talked

19  about the design phase.  What's the next phase after design

20  when you're getting Blaze Advisor up and running?

21  A.  So the normal practice is then the RMA is used by

22  business users, and business users will then fill in --

23  normal business users, it could also be subcontracted as

24  well.  There's different ways to do it.  But the rules are

25  then entered using the RMA into the rule repository.

211

1    Q.  And what happens next?  What's the next phase?

2    A.  So there, again, best practice is to verify and test

3    before deploying.  So after the rules are returned, there's

4    some tool that can be used to verify that the rules are

5    consistent and they've covered all cases, they don't

6    contradict each other.  And there's also some tools that

7    provide that can validate, that can check that the rules

8    return the values that are a business expense.  So there's a

9    number of tools that you provide to do this whole testing

10   and validation.

11   Q.  And after testing, then what?

12   A.  So then rules are really to be deployed.  So that's

13   where the rule server becomes the main piece.  The rules are

14   then essentially -- there's some commands that are sent to

15   the server that knows, okay, so those rules are ready to be

16   deployed.  So it pulls the rules from the repository,

17   compiles them, and then waits for request to be sent.  So

18   that's why we call it deployment phase.

19   Q.  This case we'll be talking about rules a lot, so I want

20   to go into what is a rule and how does one write it in Blaze

21   Advisor.

22          So from your point of view, as the author of the

23   code for Blaze Advisor, what is a rule?

24   A.  So a rule is -- you have to think about like a little

25   piece of logic.  It's something that say under these

1    conditions, perform some actions.  There's always an if

2    part, some set of conditions, and then a then part, some

3    actions.

4    Q.  And how does one write a rule in Blaze Advisor?

5    A.  So we actually provide -- and that's part of the

6    richness, part of the product, we provide a variety of

7    different forms of writing rules.  The first form is people

8    are either in an IDE or the RMA could enter those rules in

9    that new language, that structural language.  They can

10   enter -- it's a free form editors that you can directly type

11   their syntax.  There's some assistance to help the

12   first-time users and even later users to create rules in the

13   right form.  So that's the first form, structured rule

14   language.  Should I continue?

15   Q.  You know what?  Why don't we just go through some

16   examples.  First, I want to make sure I understood a word

17   you said at the beginning of your answer.  Did you say the

18   richness of the product?

19   A.  Yes.  So richness of functionality.  We just don't

20   provide just one form, one editor, but we provide many.

21   Q.  Perfect.

22            MS. KLIEBENSTEIN:  Mr. Mayleben, can you move

23   forward one slide.  Thank you.

24   BY MS. KLIEBENSTEIN:

25   Q.  Mr. Marce, what are we looking at now?

1    A.  So this is actually the first page that a new user of

2    the IDE will see.  So when they open the IDE, they will

3    first see a start page, which lets them discover

4    documentation of all the products, find examples and run

5    examples, find tutorials and then also where they can create

6    their own projects.

7    Q.  So this is -- if I were an IT person working on Blaze

8    Advisor, I hit click open, this is the first screenshot I

9    would see; is that right?

10   A.  That's right.

11   Q.  And at a 10,000-foot level, can you tell me, not each

12   one of the icons, but, generally, what are the icons in the

13   top two rows that I see?  What do those icons do generally?

14   A.  So all these icons -- there's a bar at the top, and then

15   after that you have two rows of icons.  So those icons are

16   used to create projects, create tables, create trees, create

17   rules, sets of rules, objects and so on.  So they have

18   commands to create different things, and they also have

19   commands to run things to test things, which is mostly the

20   second row.

21        In this particular picture, nothing has been

22   opened yet, so all of those commands are visible.

23        So that's the two bars at the top and then in the

24   main program says start.  You have on the left-hand side

25   different titles or tabs, going from the users projects to

FEINBERG - DIRECT

 1    their examples, tutorials and help.  And then if it selects

 2    projects, then on the right-hand side, then you see a table

 3    which has, under name it has both the names of repositories,

 4    so we talked about repositories earlier, so repositories are

 5    things where rules are stored.  So we provide -- out of the

 6    box, we provide two repositories at the start so they get

 7    use right away.  One contains examples, so it's examples

 8    repository and then the other one is a default repository.

 9            And then under the examples repository, you'll see

10    a number of projects within that repository and then using

11    those links, you can directly open one of those projects.

12            MS. KLIEBENSTEIN:  Mr. Mayleben, could we move

13    forward one slide.

14    BY MS. KLIEBENSTEIN:

15    Q.  And we were talking about the different ways to write a

16    rule earlier and we wanted to give some examples of how to

17    write a rule.

18    A.  Uh-huh.

19    Q.  What are we looking at in this slide, Mr. Marce?

20    A.  So this is another form of rules, so not -- the thing is

21    is that having to write SRL for every rule can be tedious if

22    you have lots of rules which have the same form.  If you

23    have many rules that apply on the same properties and do the

24    same kind of action, there may be different rules, but they

25    follow the same pattern.  So for that kind of case, we use

1    decision tables, which are -- represent rules in a table

2    format.  A lot easier to represent a large number of rules.

3              Each main row of that table correspond to one

4    rule.  And for each row you have some says, the ones that

5    are white or very light gray background, those are the

6    conditions of the rules.  So if, taking the first row, if

7    the -- so here we are frankly looking at some health care

8    claim processing.  So if the deductible of a policy that the

9    person has is $600 and the claim is between zero and $200,

10   then, and actually the next one is also a light gray, and

11   this is either an office visit or follow-up visit and the

12   network is in network, then apply this, you approve the

13   claim and you pay -- it's covered at 90 percent and it gets

14   paid to a doctor directly.  That's what this kind of rules

15   say from that.

16   Q.  And so for this example, this decision table would be

17   created in the IDE or the RMA or both?

18   A.  Both.  It can be both.

19   Q.  And then when a decision needs to be made about these

20   rules, how does that work?  How does Blaze Advisor use this

21   rule to answer a call?

22   A.  So let's say that you have a request coming from the

23   customer application to validate a claim, some data would be

24   passed to the rule server with that information about the

25   claim.  And that gets sent to this particular table and the

1    table we say, okay, so which are -- first, so we need

2    information about the claim and about the policy of their

3    health care patients.  So with that information, the

4    information is compared with the values of the conditions.

5    If all the conditions in one row match, then their

6    actions -- their values in their action columns, which are

7    on the right, get applied.

8             MS. KLIEBENSTEIN:  Mr. Mayleben, next slide,

9    please.

10   BY MS. KLIEBENSTEIN:

11   Q.  And Mr. Marce, is this another example of how to write a

12   rule in Blaze Advisor?

13   A.  Yes.  So this is another form.  So the first one was

14   case we had a lot of rules on the same template, same form.

15            This one is a special one that's been the main

16   stay of Fair Isaac, which is score models.  So a score model

17   is where you get to look at different properties or what you

18   call characteristics and then for each characteristic,

19   you're going to calculate a score for each characteristic

20   and then when all characteristic has got the score, you add

21   the score together.  So it's called an additive model.  You

22   add scores.

23            So in this particular case, it's actually an

24   example of student application, so a student applying for

25   college.  And they're going to submit to the college their

1    GPA, their ACT score, and a bunch of other things, so ensure

2    the whole set of characteristics.  There are many more, of

3    course.  And for each characteristic let's say GPA, we're

4    going to find a bucket, a bin, that the GPA falls within.

5    So if it's a very strong student, GPA between 3.6 and 4.0,

6    we assign a maximum score of 50 for the GPA.  And for

7    slightly lower GPA, get a score of 30, and 25, and then if

8    it's something less, then there's no score.

9         So in addition to providing the score for each of

10   their characteristic, we also can assign a reason code.  So

11   one says reason C, it's actually reason code.  And what that

12   that is not in addition to reaching the final score at the

13   end, it can also give reasons why a particular person score

14   high or low on their total score is because of those

15   reasons.  So it's -- we have been using that technique for

16   all the cases at FICO.

17        MS. KLIEBENSTEIN:  Mr. Mayleben, may we have the

18   next slide.

19   BY MS. KLIEBENSTEIN:

20   Q.  Mr. Marce, can you briefly describe what rule-writing

21   technique are we looking at on this slide?

22   A.  So this is the case where the rules are written directly

23   in a structured rule language.  In this case, it's an IDE.

24   And you see on the right-hand side -- so on the left-hand

25   side of this page, first of all, you see the icons on the

1    top all lit up.  They're all active because we are within a

2    project.  We have opened this rule server project and lots

3    of commands are now enabled.

4            And then on the left-hand side on the project, you

5    see what's inside that project.  You could have tables and

6    trees and functions and rule sets and so on.

7            And then on the right-hand side, it focuses -- it

8    shows one of the rule sets in this project.  And so you see

9    on the rule set on the side, on the right-hand side you see

10   it's rule set name.  It's called Selection Rule Set.  It

11   shows the written type, which is what kind of things it can

12   return.  It has also an option for the execution mode.  An

13   execution mode is something that we -- it's an advanced

14   feature that lets users control how it gets processed.  So

15   it's some optimization option.

16           And then under that, under content, that's where

17   we see there are three main sections under content, three

18   items.  There's a top one in the account.  It's what we call

19   a pattern.  Then we have two rules, one called healthy

20   account rule and minimum average not satisfy rule.  And for

21   each rule, you see immediately under the name of the rules

22   you see some text which start with if something.  If any

23   account's monthly average is at least 1,000, and then

24   there's some kind of formula, then do something.  So this is

25   a typical rule written in a structural language.

1    Q.  And, Mr. Marce, the examples that we've just looked at,

2    those are just a subset of the ways to write a rule,

3    correct?

4    A.  Correct.  So this is a way where you can right them

5    directly in their IDE or their RMA in that language.  You

6    can also -- there's also a -- within an RMA, there's a way

7    to create graphically rules.  There's a point and click

8    dialogue where you can construct rules with form instead of

9    having to write rules in every form way.

10            And then a third representation we have as well,

11   we can create what's called a rule template.  A rule

12   template is one where the technical user can completely

13   customize how the rules look.  Some business I used to write

14   rules in a different syntax, not this way.  They may say

15   apply this policy when this condition of care.  So they may

16   reverse the actions and conditions.  They may use different

17   words.  They may not have any words.  They may just have

18   tables.  And for doing this kind of interface, that's

19   possible as well.  The technical user can create rule

20   templates, which are then transferred to their RMA for

21   creating customizing rule forms.

22   Q.  And these techniques and forms to write rules, that's

23   what the $3 million lines of code would do?

24   A.  Yes.

25            MS. KLIEBENSTEIN:  Now, if we could skip to the

1    last slide in this, Mr. Mayleben.

2    BY MS. KLIEBENSTEIN:

3    Q.  After we've written our rules, what comes next?  Are

4    they ready to test and deploy or does something else need to

5    happen?

6    A.  So in addition to different forms of rules, so we have

7    all of them, but there's also decision trees and decision

8    graphs, and so we have quite a few different types.  In

9    addition, we have a way to organize those rules, to have a

10   way to sequence which rules are applied when.

11           So that's done by what's called a decision flow,

12   which is what you see on the right right now.  And the

13   decision flow specify, okay, you start from the very first

14   bubble on the left, that's the start bubble.  From the

15   first -- from that first start you go to the first -- very

16   first task, which it says preliminary scoring.  And this

17   preliminary scoring is done by rule set, which is one of

18   those that we saw earlier, which is a set of rules.

19           So you have a first rule set that calculates the

20   preliminary score.  And then the next step you see a kind of

21   triangle shape node, that's what I call a branch, something

22   that tests a particular property, and based on how the

23   property compares to some values, you go to the top branch

24   or the bottom branch.  So that's what happens here.

25           In this case, it reads as nothing on the top, and

```
1    if it goes to the bottom branch, it will apply another rule

2    set.  And then later on you have another branch that's

3    getting into multiple branches.  So you can have pretty

4    complex flows of logic.  Each one contains branches as well

5    as notes of tasks that corresponds to calling a function or

6    rule set or table and rule set, trees and so on.

7    Q.  These different ways -- well, let me ask a different

8    question.

9            What is the results of organized rules?

10   A.  So the result of that is you're controlling the overflow

11   of logic from the time their server receives a request.

12   Typically, the first entity, the first thing that sees that

13   request, it would be a decision flow.  So it knows -- okay,

14   so I get this new request.  Now what do I do?  So I first

15   call this rule set, then do that one, then maybe I'm done.

16   Maybe that's the end of it, and I can return the value back

17   to the request -- to the requester.

18   Q.  And these different ways to write and organize the

19   rules, do you know, do the customers -- what value does that

20   add to Blaze Advisor for customers?

21   A.  So that allows them to group them in a way that's one

22   logical from a business point of view and can also --

23   performs only the parts that are needed for a given

24   application.

25   Q.  Switching topics to today, do you know today how many
```

1    people in the FICO software engineering division work on

2    Blaze Advisor?

3    A.  So working on -- so Blaze Advisor has changed over time.

4    It's now part of a bigger group of products, decision

5    products.  The other set of people working on the decision

6    products is about 60 people today.  Some of whom worked on

7    Blaze Advisor piece only, some work on some other aspects.

8    We have another component product that's similar that's

9    based on the same source code but is delivered through the

10   cloud.  And most of those 60 people work on the common code,

11   on the part that's used by the different products.

12   Q.  And why does FICO have 60 people still working on the

13   code that is Blaze Advisor?

14   A.  So year after year we keep adding, making changes,

15   improving -- the technology keeps changing, keep having to

16   refresh.  The user face has to be made better over time.

17   We're getting requests from customers.  There are some

18   issues in the product we have to fix.  So all those

19   activities is constantly demanding resources to keep making

20   the product better and better year after year.

21   Q.  So it's to continually improve the product, correct?

22   A.  That's right.

23   Q.  Mr. Marce, I'm going to walk up to hand you Exhibits

24   1139 through 1149 and 1151.

25   A.  Thank you.

1   Q.  And can you tell me, Mr. Marce, what did I just hand

2   you?

3   A.  So these are certificates coming from the copyright

4   office of copyright registrations that we have made over the

5   years for other products -- other versions of the products.

6   So we have the first document, there are computer

7   registration for Blaze Advisor 3.0.  That's the first one.

8                Next one is Blaze Advisor 4.0.  We have 5.0.

9   Blaze Advisor 6.0, 6.5.5, 6.5, 6.6, 6.7, 6.8.1, 6.9, 7.0,

10  and 7.2.

11  Q.  Now I'm going to make you count again.  How many are

12  there?

13  A.  Twelve.

14  Q.  Can you pull out the registration for 6.8.1, which is

15  Exhibit 1147?

16               MS. KLIEBENSTEIN:  And Mr. Mayleben, can we have

17  that on the screen, please.

18  BY MS. KLIEBENSTEIN:

19  Q.  Can you tell the jury which registration this is for,

20  which version?

21  A.  So this is version 6.8.1.

22  Q.  And I want to talk about the numbers to make sure we all

23  understand what all these numbers mean.  So the first

24  number, 6, represents what?

25  A.  So this represents the major version of our products

1    that this particular version was based on.

2    Q.  And the second number, 8, means what?

3    A.  It's a minor version, and the 1 at the end is what's

4    called a maintenance release number.

5    Q.  So for someone who's not a software engineer, where

6    would a typical person experience or see different versions

7    of software in their day to day life?

8    A.  So your, of course, on computers, you see applications

9    with different numbers, different versions like this.  But

10   what's most common for most of us is phones, right?  You

11   open your phone, you have an operating system running, you

12   have an IOS under the iPhone or you have Android for the

13   Android phones.

14           So you can see -- on the settings on your phone,

15   you can see the version that this phone is running and

16   sometimes it prompts you, you need to upgrade, you need to

17   update for the latest.  And the same thing for the apps that

18   you have already installed on your phone.  All of those

19   apps, each one has its own version number and, periodically,

20   their creators of those apps will produce new versions of

21   those apps constantly, so you're going to be prompted -- so

22   you had version 2.5, you need to upgrade to 2.6, and you

23   need to go through that upgrade.

24   Q.  And for Blaze Advisor, is there a technical starting

25   point for developing a new version?

1   A.  Yeah.  So the code that we -- it's true also for almost

2   every product -- every copyright software, we never start

3   from scratch.  It's always we start from what you have built

4   previously, which is a base, so from a previous version,

5   it's always a base for whatever we billed next.

6   Q.  And so today for Blaze Advisor, in terms of the entire

7   source code over the years, how much does one version vary

8   from another?

9   A.  So it depends on their size of the version.  So major

10  versions tend to be favored more than minor versions.  Minor

11  versions varies fairly little from their previous version.

12  Q.  Does FICO store the code for each version?

13  A.  Yes.

14  Q.  Where?

15  A.  So we store them in what's called our source control

16  system or our source versioning system.  It's where we store

17  every version of every file in that system, and the system

18  gets -- we call it -- it's called GIT, in the current

19  nowadays, and using this GIT system, it's G-I-T, we can tell

20  what change was made to which file at what time and when.

21  Q.  And who has access?  Is it open for anyone who comes

22  into FICO to look at the source code?

23  A.  No.  Only the developers and the people responsible for

24  testing the software have access.

25  Q.  And the people who write the code for Blaze Advisor are

```
 1    whom?
 2    A.  Those are employees of FICO or prior companies that
 3    created Blaze software before.
 4    Q.  Let's put 1147 aside and grab 1149.
 5            Can you tell the jury what is this exhibit?
 6    A.  So this is the registration of copyright for Blaze
 7    Advisor 7.0.
 8    Q.  Can you turn to page 2 and read the title for us?
 9    A.  So there -- so again, Certificate Of Registration, the
10    title of work, Blaze Advisor 7.0.
11    Q.  And who is listed as the author?
12    A.  The author is Fair Isaac Corporation.
13    Q.  Can you set that aside and pull out 1151.
14            Can you tell us, what does this registration
15    cover?
16    A.  This is for Blaze Advisor 7.2.
17    Q.  And can you go to the second page?
18    A.  Yes.  The title is Blaze Advisor 7.2 and the author is
19    Fair Isaac Corporation.
20    Q.  And have you been involved in the copyright registration
21    process at FICO over the years?
22    A.  Yes, I have.
23    Q.  Why does FICO ask the U.S. government for these
24    certificates?
25    A.  So this is a mainly for the action for our work.  We
```

1    work hard on our product, and we want to make sure that it

2    has the full protection that's provided by the law.

3    Q.  And you authored the code.  Are these registrations

4    important to you?

5    A.  Yes.  It guarantees that their ownership and authorship

6    of the products are tracked and well-respected and the

7    product is used according to its license.

8    Q.  Is there any other intellectual property that covers

9    Blaze Advisor?

10   A.  Yes.  We have two main forms.  One is we have patents

11   that cover not the source but it covers their -- you know,

12   the inventions, their innovations within the products.  We

13   have about 20 patents that have been registered.  I

14   personally worked on six of them.  And we have -- as well,

15   we have trademarks as well.  It's another form of

16   protection, that protects the name Blaze Advisor.

17   Q.  These are heavier.  I'm going to bring these to you too.

18   These are marked as Plaintiff's Exhibit 839 through 849 --

19   I'm sorry, 839 through 850.  That was easier than I made it.

20          Mr. Marce, can you tell us, what are these

21   exhibits?

22   A.  So these actually are supplements to their copyright

23   registration.  So they contain extracts of their source that

24   we had at the time, so whenever we register their copyright,

25   we also have to provide to the copyright office some

1    extracts.

2           So in this particular -- on the first one, for

3    instance, so this -- some documents -- some documents that

4    satisfies their provision of the software.  There's some

5    compact disc that contains this extract, and then some text

6    printouts of this extract.

7    Q.  Mr. Marce, that doesn't look like 3 million lines of

8    code.  Can you tell me why?

9    A.  Yeah.  So we're only required to provide extracts.  So

10   again, it's a very small percentage of the entire source

11   code.

12   Q.  Mr. Marce, do you have a mouse up there?

13   A.  Yes.

14   Q.  Let's see if I can do this.  I did it.

15          Mr. Marce, you're looking at Plaintiff's Exhibits

16   1152 through 1165.

17   A.  Uh-huh, yes.

18   Q.  And they're on a computer right here.  Can you tell us

19   what we're looking at?

20   A.  So these were not the extracts.  Those were the entire

21   Java source code that came for each version, so we

22   extracted -- we obtained that from our GIT repository.

23   Q.  So these are the versions that are registered, correct?

24   A.  Correct.

25   Q.  And can you open up -- or can you identify for me

1    Exhibit 1162?

2    A.  Yes.  So this would be their source code for Blaze

3    Advisor 7.0.

4    Q.  And can you open up that folder for me.  Thank you.

5         Now what are we looking at?

6    A.  So now what we see are there -- there are folders, they

7    are contain files.  There are documents within those

8    folders.  And those folders map, more or less, to their main

9    components of Blaze Advisor.  So we call these four main

10   components, and we have more than four because some of the

11   components require multiple folders.

12   Q.  So the components, again, were the rule repository, the

13   IDE, the RMA --

14   A.  And the rule server.

15   Q.  -- and the rule server.

16        Can you show up -- so let's start with the rule

17   repository, that box in the middle of the last diagram we

18   looked at.  Where can I find the code that makes the rule

19   repository?

20   A.  So the rule repository is on -- in the folder called

21   "Innovator."  I won't go into the details of why it's called

22   that way.  And within this folder, first level just say,

23   this is a source for that folder.  And then sometimes you

24   have multiple levels of folders.  And at some point you're

25   going to see more details of what is inside the repository.

1    So here you have a folder which actually -- where

2    the storage and the versioning is implemented, it's in this

3    repository folder.  And we have a template folder, which

4    where the rule template mechanism is implemented.  And we

5    have a verifier folder with the verifier logic, which can

6    verify rules, is implemented and so on.  So we have

7    different folders for different things.

8    Q.  And can you go into one of the folders to show us what

9    the source code looks like?

10   A.  Sure.  Let's take, for instance, rule template

11   mechanism.  So again, there's another layer under that.

12   I'll take the first one.  And then one of the main classes

13   in this package is ND template manager, which is this one.

14   The ND template manager is really what controls the whole

15   rule template mechanism, and so it's one of the most

16   important classes in a code.

17       So for every -- so what you see now is a document.

18   In the document you have some lines at the top which are

19   called header.  It starts with slash, slash.  Those are the

20   header part of their file.

21       Then you have package imports, and I'm going to

22   spare you what the code means.  But basically this will

23   present one class out of -- I forgot how many -- it's more

24   than ███████ classes we have.  One of the classes is this

25   one, and that will present one key part of the overall

1   system.  And this particular class is particularly large.

2   You have definitions of constants, which is what you see at

3   the top.  And then you're going to see -- look variables, we

4   saw those entities here.  So all this is written.  Then you

5   have what's called methods.

6              So all that is returned in the language called

7   Java.  I don't know if you're familiar with Java, but that's

8   one of the main languages that started as well in the

9   mid-'90s, and it's still one of the main programming

10  languages used today.

11  Q.  Can we can go back out of this file?

12  A.  Uh-huh.

13  Q.  And can we can back to the main folder for Blaze Advisor

14  7.0?

15             So what we just looked at was -- what we just

16  drilled way down into was just one file of many thousands

17  for the RMA, correct?

18  A.  Correct.

19  Q.  Can you tell me, how many separate folders are in 7.0?

20  A.  Actually, one way to see that is ask it -- ask this

21  machine to give us answer, so I'm going to use that.

22             So there's a total of ████████.  Most of them

23  are classes.  So let's say maybe -- maybe ████████████

24  ████████ we have in our system, and there's like ████████

25  ████████.

1    Q.  So ████████████ have codes similar to what we just

2    drilled way down into; is that correct?

3    A.  Right.

4    Q.  And so that's -- that, in total, will be the 3 million

5    that we keep referencing, correct?

6    A.  Yeah.  So each file is -- some of them are short; some

7    of them are very long.  And the total number is about 3-plus

8    million lines of code.

9    Q.  And I've always been confused by this.  The code excerpt

10   that we just looked at with the text lines, it looks nothing

11   like the visual representations in the rule editor, in the

12   decision table, in the scorecard.  Why?

13   A.  Because all this Java code does not directly represent

14   the visual.  It's actually -- it specifies the concepts

15   represented in a visual.  It represents the implementation

16   of what's running on the server side on the back end to

17   support this representation.  So we have things like

18   defining relationships between the different parts of

19   decision tables.  You have lots behind to make the visual

20   appear.

21   Q.  In this code that we're looking at right now, that is

22   what you were a part of writing, correct?

23   A.  Correct.

24   Q.  And so it's the back end that creates that visual

25   representation?

```
1    A.  Correct.

2    Q.  Mr. Marce, I'd like to quickly wrap up your testimony

3    with just a few more questions.

4              Can you tell the jury, as the person who's written

5    the code for Blaze Advisor for 27 years, does FICO consider

6    these copyrighted works to have value?

7    A.  Absolutely.  This is something that we feel is an

8    important set of protections that we have on the product.

9    People like me, I spent most of our professional life

10   working on this software, so it's very important to us.

11   Having the software be something which is very protected and

12   paid off by people buying and using a product is important,

13   as well it helps to fund the development and the maintenance

14   of this software, it pays us our salary as well.

15   Q.  And 27 years in the software space is a long time.  Why

16   do you believe Blaze Advisor has lasted, has stood the test

17   of time for 27 years?

18   A.  A number of things.  One is it was truly remarkable

19   innovation.  It was revolutionary when it came out.  Nothing

20   was comparable to that.

21             And then we created a very strong team that really

22   had to make the product as strong as it is today.  And

23   there's constant demand for making it better and adding

24   things and then making things more modern.  And it stood the

25   test of time.  We still have several hundred customers --
```

1    paying customers today, and there's a lot of companies that

2    pays our -- that renews their licenses, and this is

3    something that continues to be successful.

4    Q.  And for people like us who aren't software engineers and

5    who don't work at companies that license Blaze Advisor, has

6    it impacted our lives in every way?

7    A.  Probably the best is you -- either you have worked in

8    those companies, but if you haven't, you interact with those

9    companies through buying things and getting loans and

10   getting insurance policies and so on.

11        And so lots of our life essentially is enabled by

12   software like Blaze Advisor, which is the -- they're the

13   system or the brain of these applications.  They're the ones

14   making the decisions about how to process things, how to

15   process your application, but how to process millions of

16   applications per day.

17        So those kind of rapid and efficient processing

18   would not be possible without a rule management system such

19   as Blaze Advisor.

20   Q.  And finally, when most people think of copyrights, they

21   think of musicians or people that write books or people that

22   make movies.  Those are artists.

23        You, as someone who's written code that's

24   copyrighted, do you consider yourself an artist, albeit of a

25   different sort?

```
1    A.  I guess.  Yes.

2              MS. KLIEBENSTEIN:  No further questions.  Thank

3    you.

4              THE COURT:  Thank you, Ms. Kliebenstein.

5              Which counsel for Federal?  Mr. Fleming, what is

6    your best estimate of how long you'll go on cross?

7              MR. FLEMING:  Like 25 to 35 minutes.  If I did it

8    tomorrow, I'll shorten it by ten.

9              THE COURT:  Make sure that microphone is on.  I

10   didn't hear the last part of that.  Twenty-five to 35

11   minute, you said?

12             MR. FLEMING:  Yes.

13             THE COURT:  I think we'll break then for the

14   evening.  We're five minutes before 5:00.  Sometimes if

15   we're close to finishing a witness, we'll finish them and go

16   a little past 5:00, but 25 to 35 minutes and then they get

17   redirect, I'm not going to keep you here until 6:00, okay?

18             So we're in recess for the evening.

19             (Jury leaves courtroom.)

20                      (JURY NOT PRESENT)

21             THE COURT:  I have a couple of housekeeping

22   matters, just so you know.  I'm controlling the monitors up

23   here, and I am switching on and off the jury monitors, not

24   knowing if we're going to have an exhibit that's going to be

25   objected to.
```

1              What I think may be the easiest way to deal with

2      this is if you're the presenting lawyer and you know there's

3      an exhibit -- there's an objection to the exhibit, just nod

4      at me or something, so I'll keep the jury monitor off until

5      we've resolved the admissibility.  If we know it's coming

6      in, I'll leave it on.

7              MS. KLIEBENSTEIN:  Did the jury see the exhibits I

8      just showed?

9              THE COURT:  Yes, they did.

10             MS. KLIEBENSTEIN:  Okay.  Thank you.

11             THE COURT:  And you didn't see, but I looked over

12     to Federal's table to make sure there was not an objection

13     coming, okay?

14             So do we have the exhibit list with the -- do we

15     know what is clearly objected to and what's not?

16             THE CLERK:  Yes.

17             THE COURT:  So we'll be looking at that too.  But

18     just be aware that unless I know that it's been admitted,

19     I'm not turning that on until I get some kind of

20     confirmation, okay?

21             MS. KLIEBENSTEIN:  Sure.  And I have one further

22     question, and I asked this a little bit with the joint

23     exhibits.  Even though we're not moving --

24             THE COURT:  Those are admitted.  I'm sorry.

25             MS. KLIEBENSTEIN:  Perfect.

```
1              THE COURT:  Have I confused everyone, or does
2      everyone follow what I'm saying?
3              MS. KLIEBENSTEIN:  Yes, but I have another issue
4      too.
5              THE COURT:  Come on up to the podium, if you
6      would.
7              Mr. Marce, you can step down if you'd like.
8              MS. KLIEBENSTEIN:  He's interested in what we're
9      doing.
10             THE COURT:  You can stay there too.
11             MS. KLIEBENSTEIN:  The source code, highly
12     confidential - top secret, is on here (indicating).  We did
13     not move this in the courtroom because only minor excerpts
14     were shown and the trade secrets weren't revealed.  However,
15     it's going to stay on here.
16             How would Your Honor like to handle this from now
17     until the jury deliberates?
18             THE COURT:  Do you plan to use it again?
19             MS. KLIEBENSTEIN:  Nobody wants to see this again.
20             THE COURT:  I didn't say that.
21             MS. KLIEBENSTEIN:  Maybe Terry does.
22             THE COURT:  If nobody plans to use it again, we
23     will take custody of it.
24             Is the computer itself marked, by any chance?
25             MS. KLIEBENSTEIN:  No, but we can give it an
```

1    exhibit number and mark the computer itself.

2          THE COURT:  Let's give it an exhibit number and

3    mark the computer.

4          Now, we can take custody of it, I just said, but

5    you can also retain custody if that's better for your

6    clients, if you're more concerned that way.

7          Do you have any objection to that?  Okay.  Why

8    don't we do it that way.  Just make sure to have it here for

9    when they deliberate.

10          Anything else, Ms. Kliebenstein?

11          MS. KLIEBENSTEIN:  No, Your Honor.

12          THE COURT:  Okay.  Anything for Federal?

13          MR. FLEMING:  No, Your Honor.

14          MS. GODESKY:  No, Your Honor.

15          THE COURT:  Thank you, everyone.  We are in

16    recess.

17          (Court adjourned at 4:59 p.m.)

18                        *      *      *

19          I, Paula K. Richter and Maria Weinbeck, certify

20    that the foregoing is a correct transcript from the record

21    of proceedings in the above-entitled matter.

22

23          Certified by:  *s/ Paula K. Richter* _____

24                         Paula K. Richter, RMR-CRR-CRC
                           Maria Weinbeck, RMR-FCRR
25