# EXHIBIT B

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3                                   )
       Fair Isaac Corporation,       )  File No. 16-cv-1054(DTS)
 4     a Delaware Corporation,       )
                                     )
 5            Plaintiff,             )
                                     )
 6     v.                            )
                                     )
 7     Federal Insurance Company,    )  Courtroom 14W
       an Indiana corporation,       )  Minneapolis, Minnesota
 8     and ACE American Insurance    )  Friday, February 17, 2023
       Company, a Pennsylvania       )  8:40 a.m.
 9     Corporation,                  )
                                     )
10            Defendants.            )
                                     )
11     ------------------------------------------------------------

12

13

14            BEFORE THE HONORABLE DAVID T. SCHULTZ
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16           (JURY TRIAL PROCEEDINGS - VOLUME III)

17

18

19

20

21

22      Proceedings recorded by mechanical stenography; transcript
       produced by computer.
23
                            *   *   *
24

25
```

```
 1    APPEARANCES:

 2       For Plaintiff:        MERCHANT & GOULD P.C.
                               BY:  ALLEN W. HINDERAKER
 3                                  HEATHER J. KLIEBENSTEIN
                                    PAIGE S. STRADLEY
 4                                  MICHAEL A.
                                    JOSEPH W. DUBIS
 5                                  GABRIELLE L. KIEFER
                               150 South Fifth Street, #2200
 6                             Minneapolis, Minnesota 55402

 7       For Defendants:       FREDRIKSON & BYRON
                               BY:  TERRENCE J. FLEMING
 8                                  LEAH C. JANUS
                                    CHRISTOPHER D. PHAM
 9                                  RYAN C. YOUNG
                                    PANHIA VANG
10                             200 South Sixth Street, #4000
                               Minneapolis, Minnesota 55402
11
                               O'MELVENY & MYERS LLP
12                             BY:  LEAH GODESKY
                                    ANTON METLITSKY
13                                  DARYN E. RUSH
                                    ROXANA GUIDERO
14                             Times Square Tower
                               7 Times Square
15                             New York, New York 10036

16       Court Reporters:      RENEE A. ROGGE, RMR-CRR
                               KRISTINE MOUSSEAU, CRR-RPR
17                             MARIA V. WEINBECK, RMR-FCRR
                               PAULA RICHTER, RMR-CRR-CRC
18                             United States District Courthouse
                               300 South Fourth Street, Box 1005
19                             Minneapolis, Minnesota 55415

20
                                       *   *   *
21

22

23

24

25
```

241

**I N D E X**

PAGE

**JEAN-LUC MARCE**
  Cross-Examination by Mr. Fleming                    254
  Redirect Examination by Ms. Kliebenstein           266

**BENJAMIN BAER**
  Direct Examination by Mr. Erbele                    269
  Cross-Examination by Mr. Fleming                    293
  Redirect Examination by Mr. Erbele                  300

**RUSSELL SCHREIBER - DEPOSITION**
  Examination by Ms. Janus                            310

**BENJAMIN BAER - OFFER OF PROOF**
  Direct Examination by Mr. Erbele                    367
  Cross-Examination Mr. Fleming                       390

**RUSSELL SCHREIBER - DEPOSITION**
  Examination by Ms. Janus                            401
  Examination by Mr. Hinderaker                       438

**JANDEEN BOONE**
  Direct Examination by Mr. Hinderaker                441
  Cross-Examination by Ms. Godesky                    489

  Offer of Proof                                      367


PLAINTIFF EXHIBITS                                   REC'D
    133                                               308
    145                                               460
    P1171                                             242
    P1172                                             242
    P1174                                             242

```
 1                          (IN OPEN COURT)

 2                          (8:40 a.m.)

 3          THE COURT:  All right.  Good morning, everyone.

 4          We're on the record in the matter of Fair Isaac

 5   Corporation versus Federal, et al., Civil Number 16-1054.

 6          We're here, all lawyers, assembled outside the

 7   presence of the jury so I can tell you what we're going to

 8   do regarding the various case studies, white papers and

 9   consultant reports.  I'm going to tell you first what the

10   ruling is, and then I'm going to give you detailed rationale

11   about why I'm doing what I'm doing.

12          So I'm going to exclude the following exhibits:

13   P1024, P1025, P1028, P295, P932, and P1170.

14          I will allow in P1171, P1172, and P1174 with some

15   redactions to two of those documents.

16          So, first, as regards P1024, P1025, and P1028,

17   these were produced to the defendants six weeks ago as

18   supplementation of prior discovery, but on the face of the

19   documents they were written in 2021.  And so I'm going to

20   exclude them on that basis, not because they should have

21   been produced in discovery, discovery was closed by then,

22   but the supplementation is too late.

23          I will have further comments about the consultant

24   report that is, I believe, P10 -- I believe it's 1024.  All

25   right.
```

1              As to P295.  On the consultant report by ESG, I

2     don't find that the record itself is necessarily a record of

3     ESG's regularly-conducted activity.  And so it does not fall

4     within the traditional framework of a business record; but

5     even if it does, I'll come back to that.

6              Now, the plaintiff argues that it's an adaptive or

7     an adoptive business record and cites several cases,

8     particularly *Condus versus Howard Savings Bank*, 986 F.Supp.

9     914.  *Condus* is not like this case.  In *Condus* the court

10     admitted the outside consultant's report because the

11     recipient commissioned it precisely so that it could rely on

12     its accuracy in order to run its business, and that I find

13     is not the case here.

14              The other cases *Brawner*, *Smith* and *Terrace*

15     *Mortgage* and *Estes* all involved a business integrating into

16     its business records what were obviously business records of

17     the providing company, so, for example, royalty statements

18     or invoices that were then incorporated into the recipient's

19     business record.

20              This report is not a business record in my

21     judgment because it did not come clothed with the ordinary

22     indicia of reliability.  FICO doesn't use the document to

23     conduct its business.  It doesn't rely on the accuracy of

24     the document so that it may make ordinary business

25     decisions.  Rather, the report was commissioned, according

1    to what I've seen of Mr. Baer's testimony, in order to

2    market Blaze Advisor to potential customers and because

3    having the imprimatur of the third party on the report makes

4    it more compelling to potential customers.  It's a marketing

5    document, and it does not come with the circumstantial

6    guarantees of reliability required under 803.6 to be

7    admissible.

8            In addition, the source of the information and the

9    circumstances of its preparation in my judgment indicate a

10   lack of sufficient trustworthiness.

11           All of the same can be said about Exhibit 1028,

12   which I've already excluded on other grounds; but in

13   addition as to the 1028, it contains the further problem of

14   being, I would say, riddled with hearsay statements.

15           As to P1170 and 932, these are the two case

16   studies.  And even if they were prepared by FICO in the

17   ordinary course of FICO's business, the information

18   underlying it is hearsay, that is, it comes from client

19   statements or our client statements, and those are hearsay.

20   And, again, these two case studies suffer from the same

21   underlying issue in that FICO does not rely on the accuracy

22   of the information from customers to run its business

23   operations.  For example, if it had commissioned a study of

24   client's experiences with Blaze Advisor in order to rely on

25   that to review and improve the performance of its product,

 1     that would be different.  That is not, as I understand it,

 2     the case with these case studies.  Nor is the evidence

 3     underlying the case study business records that are kept in

 4     the ordinary course of business.  They are anecdotal

 5     descriptions of customer satisfaction.  And in order to

 6     incorporate a business record into a business record, 803

 7     requires that the underlying record be a record of

 8     regularly-conducted activity.

 9          And the problem with the white papers is that

10     they're mostly on the face of the document client statements

11     about their satisfaction with Blaze Advisor.  Those, in

12     turn, may be based in part on business records that that

13     client maintains, but it's not clear where those lines are

14     from the documents themselves.  And this is the kind of

15     information that needs to be subject to cross-examination of

16     the people making the statements, that is to say, the

17     customers, in order to test the veracity of those

18     statements.

19          So those are the white papers, the consultant

20     reports.

21          The last three that I've said are admissible,

22     P1171, P1172, and P1174.  These are admissible.  They are

23     marketing documents, but they were created by FICO in the

24     ordinary course of its business.  They contain minimal

25     hearsay, which will be redacted, but they're relevant to

1    show why FICO asserts that Blaze Advisor has unique value

2    and how it markets that value to clients.  And to the extent

3    that it relies on client satisfaction, FICO is -- its

4    permitted to say that it understands that it has satisfied

5    customers, that its customers find value in Blaze, and it

6    uses that to market to other customers.  Where the line is

7    that I've drawn is having specific statements by customers

8    saying, Here's our experience, because that statement, those

9    kinds of statements have to be subject to cross-examination

10   by Federal and ACE American.

11           So give you specifics as to the documents.

12           On 1171, on the first page of that document, FICO

13   5306 in the lower right-hand corner, that Bates number, in

14   the left-hand side of the page, I am going to order that the

15   following be redacted:

16           The first sentence under "Improved business

17   agility by a factor of 10.  Blaze Advisor customers have

18   realized order-of-magnitude acceleration and cycle times,

19   such as changing pricing and new account processing."  That

20   statement is -- I find that statement is hearsay and not

21   subject to an exception, but, again, FICO can describe

22   generally that its customers have -- its understanding is

23   that its customers have experienced increased cycle -- or

24   faster cycle times.

25           On P1172, there are three boxes that are described

1   as client stories.  On page 5310, in the lower left-hand

2   corner, the box entitled "Client:  A large auto insurer in

3   Canada," that box shall be redacted.

4           On page 5311, in the upper right-hand corner, the

5   box that is labeled, "Client:  A top 50 national carrier

6   with written premiums of nearly $1 billion across personal,

7   home, auto, P&C," that box will be redacted.

8           And then on page 5312, the upper third of the

9   page, with information about Aviva, AAA and Kemper, those

10  will be redacted.  The document as redacted is admissible.

11          And then on document or Exhibit P1174, the first

12  page of that document, 5315, "Case studies and ROI Metrics,"

13  that box -- hang on one second -- the left-hand side of that

14  box, "Customer examples," will be redacted.

15          On page 5316, that box continues, and, again, the

16  left-hand side that contains the customer statements will be

17  redacted.

18          And then no redactions on page 5317.

19          A couple of other comments.  One, certainly, if

20  FICO wants to make an offer of proof through the witness,

21  we'll make time to do that, but we'll try and do that at a

22  break with the jury.

23          Second, Ms. Kliebenstein's memorandum raises the

24  point -- actually, I think Mr. Erbele's did too, which is a

25  fair point that these were not raised in motions in limine.

1    That doesn't waive the right to object to the admission of

2    documents, but, candidly, this is the kind of thing that

3    would have been useful to have been raised on a motion in

4    limine, and everyone would have had more time to fully

5    digest what they would do in light of the Court's ruling.

6         So I know that, Ms. Godesky, you also have raised

7    an issue now with regard to certain exhibits that you are

8    describing as settlement documents.  We can take that up

9    later.  I don't perceive that to be coming up with Mr. Baer.

10        Is that correct, Mr. Hinderaker?

11        MR. HINDERAKER:  Yes.  After Mr. Baer will be a

12   video of Mr. Schreiber.  And I think we have worked out all

13   of our disagreements with the exception of one.

14        THE COURT:  Okay.

15        MR. HINDERAKER:  And so I think we should come to

16   resolution on that.  It's two segments of his testimony, but

17   one issue should come to resolution on that.

18        And then relatedly, you know, we've had this

19   Rule 408 issue regarding the documents.  And we proposed a

20   stipulation last night to be clear that from the date that

21   the defendants say settlement negotiations began to the day

22   before the termination letter, we would agree to this.

23   Under Rule 408 we have a stipulation and a proposed court

24   order to make clear that it's a two-way street, to make it

25   clear it's not only the documents, it's the communications

1   about them, and we identified the exact documents that fell

2   within that range.  The defendants take exception with one

3   of those.

4         So at some point we should talk about that

5   document that the defendants take exception with.

6         THE COURT:  Okay.  Very well.  Glad to hear it.  I

7   think that's helpful and productive.  I'm happy to take up

8   what that one exception is at all of your convenience.

9         On the other set of documents, it sounds like you

10  may have agreement on that.  I'm not certain.  But let me

11  just tell you in advance what I'm -- well, the easy thing to

12  say is if there is settlement agreements, they're excluded.

13  If they're not settlement agreements, then they're not

14  excluded and that will be -- I mean, FICO is arguing that

15  these, at least I'm assuming, these are license agreements

16  that were fashioned through business negotiations in the

17  context of the parties seeing the end of the license; and as

18  such, those would be admissible.  If they're clearly

19  settlement agreements, that's another thing, but that's the

20  line that will be drawn, and I'll wait further factual

21  development of that if the parties are not in agreement on

22  those documents.  Okay?

23        MR. HINDERAKER:  Yes, Your Honor.  And --

24        THE COURT:  Come on up to the podium, please.  It

25  helps me.

 1          MR. HINDERAKER:  Yes, of course.  Yes.

 2          So we'll delve into that over the weekend.

 3          And just as a heads up then, the defendants want a

 4    certain set of these license agreements with other companies

 5    excluded, as they identified, and then there's another long

 6    list of sets of license agreements with yet other companies

 7    that they have not sought to exclude.  And we're going to,

 8    FICO will be looking at each of those.  And a fundamental

 9    question that I think is, well, I know is the Court's

10    decision, is whether any of these other license agreements

11    are comparable to the circumstances that we're trying here

12    in this lawsuit.  So we'll try to detail that out so that

13    issue can be teed up and the documents can be considered

14    with as much -- as soon as we can, so the Court has that as

15    well.

16          Going back to Schreiber, he will be, as I

17    mentioned, the witness after Baer.  So that would be

18    relatively discreet subject matter for you to consider and

19    would be, of course, useful to have that decision made

20    before we play any video.

21          THE COURT:  And that's with respect to one

22    document in that period from February 27th to March 30th?

23          MR. HINDERAKER:  With respect to the deposition,

24    it's really about two segments of his testimony.  And I'd be

25    happy to -- I'd be happy to tell you what it is now and then

1    argue it, if I may, but it's two segments of testimony, and

2    it's about the commercial proposal of February 25th.

3              THE COURT:  Okay.

4              MR. HINDERAKER:  And it relates arguments that the

5    defendants made in opening statement as well.  And so that's

6    what that's about.  And there is one other exhibit within

7    that two snippets, which is dated February 2nd, so well

8    before and in the time frame that the defendants agree is

9    negotiations of the license.

10             THE COURT:  Okay.  Thank you.  It's useful to that

11   have background.  We can take it up later, but we'll do it

12   obviously before Mr. Schreiber gets on the stand.

13             MR. HINDERAKER:  Or his video is played.

14             THE COURT:  Or his video is played, whatever.

15   Anything further for FICO, Mr. Hinderaker?

16             MR. HINDERAKER:  No, Your Honor.

17             MR. ERBELE:  Your Honor, I do have a question.

18   It's about the redacted exhibits.  The exhibits that we

19   submitted are not yet redacted.

20             THE COURT:  Right.

21             MR. ERBELE:  May I question the witness using the

22   unredacted exhibits, you know, not referring to those

23   specific boxes and then substitute the exhibits afterwards?

24             THE COURT:  Yes, you may.  And to the extent that

25   you're going to display them -- I can give you my copy,

1    which I have highlighted so that you know specifically what

2    the redactions are; and perhaps while you're waiting for the

3    testimony, your tech people are able to redact.

4            MR. ERBELE:  We should be able to do that, Your

5    Honor, yes.

6            THE COURT:  That way it doesn't get displayed to

7    the jury.  So hang on.

8            All right.  We're giving you 1171, 1172, and 1174,

9    and they contain the court's highlighting which shows the

10   portions to redact, except on that last document, if you

11   look at 1174, I had originally said take the entire box out.

12   I have amended that.  It's only the left-hand side of that

13   box that talks about customers.  The right-hand side talks

14   about advantages and does not refer to customer statements.

15   So the right-hand side can be admitted.

16           MR. ERBELE:  Understood, Your Honor.  Thank you.

17           THE COURT:  Okay.  Thank you, Mr. Erbele.

18           Mr. Fleming.

19           MR. FLEMING:  Your Honor, one question about

20   Exhibit 1174 on page 18.

21           THE COURT:  I no longer have it in front of me,

22   but keep going.

23           MR. FLEMING:  Well, there is a reference to the

24   ESG economic value validation, which has been excluded.

25           THE COURT:  Yes.

```
 1              MR. FLEMING:  And I would ask that that paragraph
 2      be excluded to be consistent.
 3              THE COURT:  Is that on the right-hand side in that
 4      box?
 5              MR. FLEMING:  It's on the left-hand side.
 6              THE COURT:  It's on the left-hand side of that
 7      box?
 8              MR. FLEMING:  Yes.
 9              THE COURT:  That's all coming out.  The entire
10      left-hand side of the big box is coming out.
11              MR. FLEMING:  Okay.  Thank you.
12              THE COURT:  Okay.  Thank you.
13              Anything further?
14              MR. HINDERAKER:  No, Your Honor.
15              THE COURT:  Okay.  Ms. Godesky, anything further
16      for Federal and ACE?
17              MS. GODESKY:  No.  Thank you.
18              THE COURT:  Let's go ahead and bring the jury in.
19              You're up first, correct, Mr. Fleming?
20              MR. FLEMING:  I am, Your Honor.  I'm going to put
21      the deposition transcript in front of the witness.
22              THE COURT:  Yep.  And just so you all recall, you
23      don't have to ask me to approach.  Okay?
24                          (9:07 a.m.)
25                          (Jury in.)
```

1          THE COURT:  Go ahead and be seated.

2          Members of the jury, thanks for your patience.  We

3     were actually in here since about 8:40 a.m. doing some

4     additional work to make your jobs easier.  I neglected to

5     mention last night, but I'm sure you recall.  Had I

6     mentioned it, the primary instruction would have been don't

7     talk about the case.  Right?  Okay.

8          All right, Mr. Fleming.

9          And I believe Mr. Marce needs to return.

10         Come on back up, Mr. Marce.

11         THE WITNESS:  Good morning.

12         THE COURT:  Go ahead and take your seat,

13    Mr. Marce.  I just want to remind you that you're still

14    under oath.

15         THE WITNESS:  Thank you.

16         THE COURT:  Thank you.

17         Go ahead, Mr. Fleming.

18                    JEAN-LUC MARCE,

19    called on behalf of the plaintiff, was previously sworn, was

20    examined and testified as follows

21                   **CROSS-EXAMINATION**

22    BY MR. FLEMING:

23    Q.  Good morning, Mr. Marce.  My name is Terry Fleming.  I'm

24    an attorney for the defendants in this case.

25         I put before you a deposition transcript relating

1    to the deposition that you had on January 29, 2019.  Do you

2    recall that?

3    A.  Yes, I do.

4    Q.  And you were under oath during that deposition?

5              COURT REPORTER:  Excuse me.  Can you turn your

6    microphone on?

7              THE WITNESS:  Is it working?

8              COURT REPORTER:  Okay.  Can you repeat the

9    question?

10   BY MR. FLEMING:

11   Q.  I asked whether you understood you were under oath at

12   the time of your deposition?

13   A.  Yes, I do.

14   Q.  Okay.  Now, let's talk first about the development of

15   Blaze Advisor.  That began in 1996, right?

16   A.  Right.

17   Q.  And in his opening, FICO counsel said that 16

18   programmers worked for 2 years to write the code for Blaze.

19   Is that your recollection?

20   A.  About that, yes.

21   Q.  Okay.  And there weren't any FICO employees who were

22   working on the creation of Blaze, correct?

23   A.  So those Neuron Data employees at that time.

24             COURT REPORTER:  I'm sorry.  What?

25             THE WITNESS:  So it's -- the company, we were

1    bought off in the late 90's and recall that company

2    eventually got acquired by FICO in early 2000s.

3              THE COURT:  Maria, it's called Neuron Data.

4    BY MR. FLEMING

5    Q.  All right.  Thank you.

6              So the company that created Blaze was Neuron Data?

7    A.  Correct.

8    Q.  And that was a start-up company?

9    A.  Yes.

10   Q.  And you worked there when Blaze was created?

11   A.  Yes.

12   Q.  Okay.  And then Neuron Data was then acquired by Brokat

13   Technologies?

14   A.  That's correct.

15   Q.  And when Neuron Data was acquired by Brokat

16   Technologies, you became an employee of Brokat?

17   A.  Right, yes.

18   Q.  And then as a result of that acquisition by Brokat,

19   Brokat became the owner of Blaze, correct?

20   A.  I cannot tell exactly who owns the code exactly, which

21   entity.  I know that's a legal question, so I'm not fully

22   qualified.  I know who authored the code, because I was part

23   of team, and I've been part of the creators of the code, so

24   I know well the authorship, much less the ownership.

25   Q.  Fair enough.  You weren't involved in the legal writing

JEAN-LUC MARCE - CROSS

1   of the agreement.  But you did know that the company that

2   created Blaze was acquired by another company by the name of

3   Brokat, right?

4   A.  Yes.

5   Q.  And you became an employee of Brokat?

6   A.  Yes.

7   Q.  And then Brokat was acquired by still another company

8   called HNC Software, correct?

9   A.  Yes.

10  Q.  And following that acquisition, you became an employee

11  of HNC?

12  A.  That's correct.

13  Q.  Okay.  As a result of that acquisition, HNC then was the

14  owner of Blaze?

15  A.  Presumably, yes.  I don't know again the ownership

16  exactly, how it was their corporation structure.  I don't

17  know the details, but we were an employee of HNC Software,

18  correct.

19  Q.  Fair enough.  Again, you weren't involved in drafting

20  the merger and acquisition papers.  You just know that a

21  company bought the company you were working at.  And now

22  you're an employee at HNC?

23  A.  Yes.

24  Q.  Okay.  And after that, HNC was acquired by FICO?

25  A.  Yes.

JEAN-LUC MARCOS - CROSS

```
 1    Q.   Okay.  And that was in 2002?

 2    A.   Yes.

 3    Q.   And at that time, FICO acquired ownership of Blaze?

 4    A.   Same thing.  I cannot tell exactly who -- which entity

 5    is the owner, but I know that we were employees of FICO or

 6    Fair Isaac Corporation.

 7    Q.   Okay.  Fair enough.  And that's, to the best of your

 8    knowledge, how FICO came to acquire Blaze?

 9    A.   Essentially.

10    Q.   Now, you have no expertise in the insurance industry; is

11    that right?

12    A.   That's correct.

13    Q.   Okay.  And you're not familiar with the insurance

14    underwriting process?

15    A.   I have no expertise in that at all.  And I know only

16    from our consumer of insurance product, as most of us are.

17    That's what I know.

18    Q.   And you're not familiar with how insurance is sold?

19    A.   No, I've not been involved in that.

20    Q.   You don't know what the role of brokers and agents in

21    that process would be?

22    A.   Only vaguely, but I couldn't tell between an agent and a

23    broker, what's the difference.  I don't really know.

24    Q.   And you're not familiar with the claims paid process

25    either, are you?
```

1    A.  No, I'm not familiar with that.

2    Q.  And you're not familiar with how insurance companies use

3    Blaze, are you?

4    A.  Only from a good educated guess.  We -- based on what

5    we've been told by our internal teams, about product

6    management team, we know what kind of things their insurance

7    may use rules for, so -- and we have actually built some

8    examples based on insurance claims use cases, but this

9    example is more like my examples base on what our

10   understanding is, but we have no expertise really in this

11   area.

12   Q.  So when I took your deposition back in January of

13   2021 -- if you could turn to page 90 of that deposition

14   transcript.

15   A.  90.  Yes.  Go ahead.

16   Q.  And on lines 16 to 18, in response to the question, "Are

17   you familiar with how insurance companies use Blaze

18   Advisor," your response was, "No, I'm not."

19   A.  That's correct.  I have no expertise in that.

20   Q.  Okay.  Now, to determine how important or useful that

21   Blaze would be to any specific customer, you would have to

22   know how the customer is using Blaze, right?

23   A.  Right.

24   Q.  Would you not be able to do that without taking a deep

25   dive into how their IT systems work.

JEAN-LUC MARCE-CROSS

1    A.  Well, I don't have expertise.  I don't know exactly how

2    they build the system, but from, indirectly, from our per

3    marketing, per management says teams, we know indirectly how

4    product customers use our products, so we have an overall

5    understanding of that.

6    Q.  Okay.  Could you turn to page 111 of your deposition?

7    A.  111, yes.

8    Q.  And starting at line 2 in response to the question, "And

9    I guess what I'm saying is to tell how important Blaze is in

10   any specific customer, you would have to look at how that

11   customer is using Blaze within its systems," and your

12   response was "Right."  Correct?

13   A.  Yes, to be precise in one particular case, you have to

14   look at the particular case.  So, generally speaking, we

15   know roughly how the product is used by our customers, but

16   only on general terms.  For a specific case you have to look

17   at the very specific system.

18   Q.  But in response to my question, when I asked you to

19   "tell how important Blaze is in any specific customer, you

20   would have to look at how that customer is using Blaze

21   within its system," and you said, "Right."  Correct?

22   A.  Correct.

23   Q.  And in response to the question, "So you wouldn't be

24   able to tell this without taking sort of a deep dive into

25   how their IT systems work," and your answer was, "That's

1    correct."

2    A.  That's correct.

3    Q.  Okay.  Now, you don't know how Chubb used Blaze?

4    A.  Only inferring from all of our use cases we've heard

5    about and again from general knowledge in this area.

6    Q.  Could you turn to page 70?

7    A.  70, yes.

8    Q.  Your response to the question, "Did you ever have any

9    knowledge of how the defendants in this case were using the

10   Blaze software at your company," your response was "No, I do

11   not."

12   A.  That's correct.

13   Q.  And that was a truthful answer, correct?

14   A.  Yes.

15   Q.  Okay.  And you don't know the Chubb applications that

16   used Blaze?

17   A.  I am not familiar with any specifics in their

18   application.

19   Q.  You don't know how many of Chubb software applications

20   use Blaze?

21   A.  Correct.

22   Q.  And you don't know the purpose of Chubb software

23   applications that use Blaze?

24   A.  No, I was not involved in their software applications.

25   Q.  Were you even aware that Chubb was a customer of FICO

1      prior to this lawsuit?

2      A.  Only because I remember, I recall some -- I have vague

3      memory of interactions with Chubb.  I don't remember the

4      years, but I remember the name from past interactions.

5      Q.  Well, you don't recall having any meeting with Chubb

6      personnel?

7      A.  Not specific meetings, no.

8      Q.  Now, Blaze is not functional as sold; is that right?

9      A.  Could you rephrase the question?  I'm not sure what you

10     mean "functional."

11     Q.  Sure.  It cannot be used out of the back.  It's not

12     usable as a stand-alone software?

13     A.  It is.  You can be installing Blaze Advisor and start

14     using it.

15     Q.  But Blaze is used with software application that provide

16     business rule functionality; is that right?

17     A.  So you can -- so the typical structure of customer

18     applications involve some elements of Blaze Advisor through

19     the server and some elements of some various components that

20     their customers have bid.

21              You could also consider the Blaze Advisor as a

22     stand-alone thing and start it and use it as it is, without

23     having additional components.  It could also be used

24     directly without any such master application.

25     Q.  Could you turn to page 109, please?

JEAN-LUC MARCE - CROSS

1   A.  Okay.

2   Q.  On line 16 in response to the question, "So Blaze is

3   used with software applications that need business rule

4   functionality, right," and your response was, "That's

5   correct."

6   A.  That's right, yeah.

7   Q.  Okay.  And that's an accurate response, a truthful

8   response, correct?

9   A.  Correct.  So, again, Blaze Advisor could be used on its

10  own, but most commonly it's used with broader customer

11  applications that uses Blaze to make their decisions.

12  Q.  And Blaze typically is one of many components in

13  software applications that need business rules, correct?

14  A.  It could be.  It's more specifics.  Some applications

15  may put a lot of additional components around and using

16  Blaze Advisor for specific decisions, and there's other

17  things that are going on.  Some products, some applications

18  may be very much centered on the rule spot and only do

19  additional, a few additional things.  It would be -- it

20  depends.

21  Q.  Now, FICO did not build Chubb software applications that

22  use Blaze, correct?

23  A.  I'm not -- I was not part of their team.  I was part of

24  engineering team.  So I don't know exactly what FICO

25  contributed to Chubb.

JEAN - DIRECT / CROSS

1    Q.  Okay.  Now, users need to create business rules to input

2    into Blaze, right?

3    A.  Typically, yes.

4    Q.  Okay.  And it's a typical case when a customer buys

5    Blaze that they create the rules and implement the rules

6    because of their knowledge of the industry.  That's how it's

7    ordinarily done, correct?

8    A.  So I hear that's -- some customers like to do that.

9    Some customers prefer to use our professional services for

10   doing their additional set of rules.  Maybe they do the

11   maintenance of rules after the initial creation.  I don't

12   know how Chubb contracted with their professional services

13   in this case, I was not involved, but it's a spectrum of

14   interactions between customers and FICO.

15   Q.  Now, the quality of the rules are significant with

16   respect to the efficacy of the applications that use Blaze,

17   correct?

18   A.  Yes.

19   Q.  Okay.  Now, to your knowledge, FICO did not create any

20   of the rules that were implemented in the applications that

21   use Blaze at Chubb?

22   A.  So I have no knowledge in this area, so I don't know

23   whether they did or did not.

24   Q.  Okay.  So let's look, finally, at the demonstrative that

25   you used and talked about very quickly.  All right?

1          Could you turn to slide 3 of that demonstrative.

2          Now, this deals with health care claims; is that

3    right?

4    A.   Yes.  This is an example that we include in our product

5    to illustrate the possible usage of the product.

6    Q.   Turn to slide 6.  This deals with academic scores for

7    college admissions; is that right?

8    A.   That's right.

9    Q.   And turn to slide 10.  This deals with consumer loan

10   applications; is that right?

11   A.   That's my best guess based on what's on the screen, yes.

12   Q.   Okay.  Now, the applications in this case have nothing

13   to do with health care claims, academic scores or consumer

14   loan applications, correct?

15   A.   What do you mean by "nothing to do"?  This is

16   illustrative examples.

17   Q.   You don't have any illustrative examples in your

18   demonstrative about any of the Chubb applications that use

19   Blaze, correct?

20   A.   I don't know.  We might have.  Those are examples I've

21   pulled, but I don't recall whether we have additional

22   examples in that closer to the space where Chubb is.  I do

23   not know.

24   Q.   The ones that you talked about during your initial

25   testimony did not deal with any Chubb applications that use

1    Blaze, correct?

2    A.  I don't think so.

3    Q.  Okay.  Nothing further.  Thank you.

4         THE COURT:  Thank you, Mr. Fleming.

5         Ms. Kliebenstein.

6                    **REDIRECT EXAMINATION**

7    BY MS. KLIEBENSTEIN:

8    Q.  Good morning, Mr. Marce.

9    A.  Good morning.

10   Q.  I have just a few followup questions.  Can you pick up

11   the copyright certificates that I handed you just now?

12   A.  Yes.

13   Q.  And can you tell me who is the owner of those copyright

14   certificates?

15   A.  So, so I don't remember where to the ownership is.  I

16   see authorship.  I see author.

17   Q.  Mr. Marce, can you tell us which exhibit you're looking

18   at?

19   A.  So I'm looking at this copyright registration for Blaze

20   Advisor 7.2, and I'm trying to find where the owner is

21   recorded in this document.

22   Q.  The exhibit number is on the first page at the bottom,

23   if you could tell me what the exhibit number is.

24   A.  So I see rights and permissions, I guess if that

25   represent ownership, and organization name is Fair Isaac

1    Corporation.

2    Q.  Thank you.

3         And you don't have to pull this out, but focusing

4    on the ownership and the code for a little bit.  The version

5    7.0, who wrote that code?

6    A.  That's our team who was at that time we were bought by

7    Fair Isaac.

8    Q.  And for version 7.1, who wrote that code?

9    A.  Same team, continuing from 7.0.

10   Q.  And for version 7.2, who wrote that code?

11   A.  Same team again.

12   Q.  And while you were preparing for your testimony today,

13   did you -- hold on one moment.  Let me pull this up.  I have

14   to plug it in.  There we go.  All right.

15        Mr. Marce, while you were preparing for your

16   testimony today, did you review the source code that's shown

17   on the screen?

18   A.  I've made sure that the folders contain what was

19   expected in terms of the main folders included for each

20   version and that old versions were included.  And then I

21   also during the registration of the copyright, we submit

22   those extracts.  So one of the things I did is making sure

23   that the copyright extracts are indeed included in the

24   source code and make sure more visually and through making

25   sure that the text matches exactly.

 1    Q.  And, Mr. Marce, in your comparison work, comparing

 2    version 7.1 to 7.0, would you agree the code is nearly

 3    identical?

 4    A.  It substantially is.  Most of that, most of the code, I

 5    forgot to present, I think it's over 95 percent the same.

 6    Q.  And what about comparing version 7.1 to 7.2?  Would the

 7    hold same true?  Over 95 percent similarity?

 8    A.  Yes.

 9              MS. KLIEBENSTEIN:  I have no further questions.

10    Thank you, Mr. Marce.

11              THE COURT:  All right.  Mr. Fleming?  Nothing

12    further?

13              MR. FLEMING:  Nothing further, Your Honor.

14              THE COURT:  All right.  Go ahead and step down,

15    Mr. Marce.  Thank you.

16              Go ahead and call your witness.

17              MR. ERBELE:  Benjamin Baer, Your Honor.

18              THE COURT:  Thank you, Mr. Erbele.

19              Come on up here, Mr. Baer.

20              Mr. Baer, before you sit down, if you would raise

21    your right hand.

22                           BENJAMIN BAER,

23    called on behalf of the plaintiff, was duly sworn, was

24    examined and testified as follows:

25              THE COURT:  Go ahead and be seated.  State your

BENJAMIN BAER - DIRECT

```
1    full name for the record, and make sure you're talking into

2    the microphone.  Okay?

3                THE WITNESS:  My name is Benjamin Baer.

4                MR. ERBELE:  May I approach the witness, Your

5    Honor?

6                THE COURT:  You may.

7                          DIRECT EXAMINATION

8    BY MR. ERBELE:

9    Q.  Good morning, Mr. Baer.

10   A.  Good morning.

11   Q.  Please tell us where you currently work and state your

12   job title.

13   A.  So I work for FICO Corporation out of San Jose,

14   California, and I'm the vice president of partner and

15   industry marketing.

16   Q.  And what are your job duties at FICO, Mr. Baer?

17   A.  General marketing activities, which include creating

18   documentation, success stories, executive briefs, basically

19   outlining the value proposition of our products.

20   Q.  How long have you worked for FICO?

21   A.  10 years.

22   Q.  And in your time at FICO, have you always been the

23   vice president of partner and industry marketing?

24   A.  No.  I was originally hired in 2013 as senior director

25   of product marketing.
```

1    Q.  And what were your job duties as senior director of

2    product marketing?

3    A.  To basically coordinate product marketing activities

4    across what we call a horizontal tool set of products.  That

5    included everything from creating value propositions,

6    messaging, target markets, and collateral, like success

7    stories, executives briefs and white papers.

8    Q.  And did you have any other marketing position at FICO?

9    A.  Yes.  So I was promoted to vice president of product

10   marketing in about 2018 or so.

11   Q.  And how long were you in that position?

12   A.  Until about 18 months ago.

13   Q.  And what were your job duties as vice president of

14   product marketing?

15   A.  I was managing a team of people focused on those same

16   deliverables.

17   Q.  Backing up a bit, Mr. Baer, do you have a college

18   degree?

19   A.  I do.  I graduated from the University of California,

20   Berkeley, with a degree in social sciences and a focus on

21   international relations.

22   Q.  And can you tell us a bit about your professional

23   experience before you joined FICO?

24   A.  So I've spent, it seems like, this is the 30th year,

25   30 years in a variety of marketing roles, all focused on

1    technology.  So I've worked for companies like Silicon

2    Graphics, Sun Microsystems, VMware, Citrix, Juniper Networks

3    and a couple of startups.

4    Q.  So as FICO's vice president of product marketing, did

5    you focus on marketing any specific FICO products?

6    A.  Yes.  So I focused on products that we call tools,

7    they're horizontal in nature, as opposed to a set of

8    products that were focused on financial services.  So

9    specifically my products were products like Blaze Advisor,

10   express optimization, customer communication services, those

11   kinds of products.

12   Q.  You use the term "predictive analytics."  Can you

13   explain what that term means from a non-technical

14   perspective?

15   A.  Sure.  It's basically the art and science of taking data

16   and adding math, usually very complex algorithms, to use

17   that data to make predictions about what's likely to happen

18   in the future.

19   Q.  How does that relate to FICO's software?

20   A.  Well, we -- we're primarily in the business of

21   operationalizing analytics, but we also deliver a number of

22   analytic products to the market, products like the FICO

23   Score.  We have a cluster analytics product called identity

24   resolution engine.  One of our biggest products, FICO

25   Falcon, is a credit card predictive analytics solution or

1    fraud detention solution.

2    Q.  So can you explain how FICO's predictive analytics are

3    used in credit scoring?

4    A.  So the FICO Score is an interesting story.  Before the

5    FICO Score, financial institutions would have to determine

6    whether or not to give you a loan for a car or for your

7    house or for a credit card, but they only had a limited

8    amount of data.  So Wells Fargo isn't going to share their

9    customer data with Bank of America to make a lending

10   decision, so they have no idea if the house you're using for

11   collateral on a home loan hasn't already been used by

12   another bank in collateral for their debt.  And so this

13   became a very complex and very cumbersome process for

14   financial institutions.

15           So FICO came up with the idea of a FICO Score,

16   which is basically a way for financial institutions to

17   measure and moderate the risk in their portfolio without

18   exposing each bank, the customer data for each institution.

19   Q.  And what's the predictive part of that process?

20   A.  So the FICO Score is basically a predictive analytic

21   that allows companies or these institutions to understand if

22   you represent a credit risk, how likely you are to pay your

23   loan or prioritize that loan for other loans.

24   Q.  You also mentioned identity resolution.  Can you explain

25   how predictive analytics are used there?

1    A.  So identity resolution, it's basically -- we basically

2    call it cluster analytics, and it basically also allows

3    organizations to look at their databases filled with lots of

4    information about lots of people and make some

5    determinations about whether John Smith and Jay Smith or

6    John S. or a variety of people with a similar name residing

7    at a similar address are actually the same people.

8          Analytics like this are really critical for things

9    like ███████████, which uses it through their ██, to

10   determine when people apply for either customs or enter a

11   country, whether that is somebody pretending to be someone

12   else.

13   Q.  What about credit card fraud detection?  You also

14   mentioned that as an example.  Can you describe that?

15   A.  Sure.  FICO has a product called Falcon, which today

16   over two-thirds of the world's credit card transactions run

17   through this engine.  And the engine has a predictive

18   analytic in the front end that basically looks at all the

19   credit card transactions and determines which ones are

20   likely fraudulent.  So in the same way the analytics can

21   determine what's likely to happen in the future, it can also

22   be used to determine what's not likely to happen.  And

23   that's what happens in this case.

24         Falcon is an even more interesting solution in

25   that it includes a series of additional capabilities that

```
 1    allow the financial institutions to not only detect what's
 2    fraudulent, but also treat it.  So depending on where the
 3    fraud potentially happened, how big the customer is, how
 4    much money they have in the bank, the banks can determine,
 5    well, we're just going to cancel that one transaction and
 6    send a text message to your phone or have somebody from the
 7    call center call you.  There's a whole bunch of treatment
 8    that goes on behind that.  And Falcon uses not only the
 9    predictive analytics, but also allow the financial
10    institution to author, if you will, what that treatment
11    looks like and then automate that process.
12    Q.  You mentioned you were responsible for marketing FICO's
13    Blaze Advisor software.  How long have you had that
14    responsibility?
15    A.  That was one of my original responsibilities from the
16    day that I joined 10 years ago.
17    Q.  And what is Blaze Advisor?
18    A.  It's a business rules management system.
19    Q.  So let's break down what that term means.  What is a
20    "business rule"?
21    A.  So a business rule is a decision point.  There's so many
22    metaphors.  There's a marketing -- I'm always thinking of
23    better stories to describe to people who might not be
24    exposed to software like this what it is and what it does,
25    and one of the best examples that I came up with was getting
```

1    ready in the morning.

2              We all roll out of bed, right, to show up in

3    places like this.  We all have a process that we go through

4    in our mind.  We might not think of it that way, but we set

5    an alarm at night, the night before.  We get out of bed.  We

6    take a shower or we brush our teeth.  We might decide what

7    clothes we're going to wear and what shoes we're going to

8    put on.  And then we go into the kitchen and decide what

9    we're going to have to eat before we go.

10             And we actually even use predictive analytics in

11   this process, at least I do.  I pick up my phone, and I

12   check the weather app.  Well, the weather app is a

13   predictive analytic.  It uses weather data to determine and

14   predict the likelihood that it's going to be cold outside or

15   it's going to rain, and that informs all of those decisions

16   that we make in the morning.  Whether we're going to leave a

17   little early to beat the rush, we put on heavier shoes, we

18   wear a rain coat, all of those are informed by that

19   predictive analytic.  In the same way as we look at data, if

20   we have kids, we might look at their schedule and say I need

21   to take them to school today because it's going to rain and

22   I don't want them to walk, so then I have to leave 20

23   minutes earlier.

24             And, by the way, when we get in our car, we use

25   another predictive analytic and that is our mapping

1    software.  We look at the software to figure out the best

2    route to get to work, where there's going to be traffic and

3    where there isn't.  That's all predictive analytics that is

4    happening behind the scenes.

5            So if I think about that entire process, the

6    process of getting up and getting where we need to go in the

7    morning as a business process, companies have the same

8    challenge.  Before software like this, they might use some

9    analytics in making those decisions, but they're usually

10   beholden to a single person in the process to determine what

11   is that process, what are those decision points, what goes

12   into making a decision about whether I'm going to loan

13   somebody money or I'm going to underwrite a loan.

14           So this process allows them to document or this

15   software allows them to document this process, collaborate

16   with other people, is this the right process, what data are

17   we going to use, are we going to use analytics like the FICO

18   Score in making those determinations, and then package those

19   up in such a way that they can automate the decision and

20   scale them beyond, you know, one or two or ten people to

21   hundreds of applications.

22   Q.  So from a nontechnical perspective, how does Blaze

23   Advisor automate those decisions?

24   A.  Well, it's basically an authoring platform that allows

25   somebody who understands all the rules to articulate those

1     rules, connect those rules, identify all the approvers in a

2     process, identify which data sources they want to use and

3     package those up in such way that it can be shared, it can

4     be printed out on paper, it can be audited, it can be

5     simulated, and at the end of the day it can also be packaged

6     as an execution, so as a software component, that can then

7     run through an application process.

8     Q.  You said you were responsible for marketing Blaze

9     Advisor, right?

10    A.  Correct.

11    Q.  Let's look at some of these marketing documents.  Can

12    you please turn to page 1170 -- or Exhibit 1171 in your

13    binder?

14    A.  Yes, sir.

15    Q.  Do you recognize this document?

16    A.  I do.

17    Q.  And what is it?

18    A.  This is what we call a product sheet.  It's a brief

19    description of the product itself and its value.

20    Q.  And what is the product here?

21    A.  It says, "Blaze Advisor is the world's leading decision

22    rules management system, maximizing control, agility and

23    actionability to optimize high-volume operational

24    decisions."

25    Q.  So this is a product sheet for Blaze Advisor; is that

1     right?

2     A.   That's correct.

3     Q.   And who created this document?

4     A.   My team and I created this document.

5     Q.   How are these documents used by FICO?

6     A.   These are used for prospective customers to understand

7     what the product is, how it's used, where it's used.

8     Q.   And are product sheets such as this one created and kept

9     in the ordinary course of FICO's marketing business?

10    A.   It is.

11    Q.   And is it FICO's regular practice to produce practice

12    sheets such as this one?

13    A.   It is.

14    Q.   And does FICO rely on the accuracy of these documents in

15    its marketing?

16    A.   It does.

17              MR. ERBELE:  Your Honor, I would like to move this

18    document into evidence.

19              THE COURT:  Any objection?

20              MR. FLEMING:  No objection.

21              THE COURT:  Exhibit 1171 is received.

22              MR. ERBELE:  Mr. Mayleben, can we publish the

23    exhibit, please?

24    BY MR. ERBELE:

25    Q.   There we go.  So looking at this product sheet,

BENDARZ - CROSS - DIRECT

1    Mr. Baer, what is shown in the left-hand column?

2    A.  This is a brief list of the values that Blaze Advisor

3    gives to a customer who adopts the software.

4    Q.  And what are the values listed here?

5    A.  Control, speed, accuracy, consistency, and transparency,

6    and the bottom bullet is agility.

7    Q.  And as VP of marketing, were you responsible for

8    marketing these values to FICO's potential clients?

9    A.  Correct, I was.

10   Q.  And do you know what each of these values or benefits

11   are in the context of Blaze Advisor?

12   A.  Sure.

13   Q.  So let's walk through them one by one.  The first one is

14   control.  What does that mean in the context of Blaze

15   Advisor?

16   A.  So control is about making sure that the decision logic,

17   the underwriting process, for instance, is something that

18   can be viewed and collaborated with a number of different

19   people in the organization.  As opposed to just having it in

20   a person's head, it's now on paper and people can see it and

21   understand it.

22   Q.  What is the benefit of control?

23   A.  It basically allows organizations to understand the

24   logic in a way that benefits the business and benefits the

25   organization.  If you leave it to one person and just their

1    perspective, if something happens to that person, if they go

2    on vacation, for instance, you're kind of beholden to the

3    knowledge they take away with them.  So being able to share

4    that knowledge empowers the entire organization.

5    Q.  The next benefit listed here is speed.  What does speed

6    mean in the context of Blaze Advisor?

7    A.  So it's about time to market.  It's about quickness.  In

8    other words, if I'm, again, I have ten or 100 or 200 people

9    in my organization approving loans or approving an insurance

10   policy, for instance, this allows it to scale much more

11   broadly and much more quickly and process hundreds or in

12   some cases thousands rather than just tens.

13   Q.  So what are the benefits of speed?

14   A.  It allows organizations to grow much more quickly to

15   scale.  It allows them to achieve their revenue and

16   profitability targets.  It allows them to be much more agile

17   in a marketplace.

18   Q.  Let's look at the next benefit.  Accuracy.  Can you

19   explain what that means in the context of Blaze Advisor?

20   A.  So, again, it's about exposing the logic behind what

21   these organizations do to approve new customers.  It allows

22   them to use more data, use different analytics; and by

23   exposing that logic and where that data and analytics comes

24   from, it allows them to see and understand what else they

25   could do, what they could do to improve it.  By having

1    access to new data and access to new analytics, having

2    access to new perspectives only benefits and improves the

3    ability of that organization to respond.

4    Q.   And so what are the benefits of accuracy?

5    A.   Just improved business performance, improved

6    profitability, improve business responsiveness.

7    Q.   So the next benefit listed there is consistency.  Can

8    you walk through what that means in the context of Blaze

9    Advisor?

10   A.   Sure.  So we hear this a lot from a lot of customers,

11   and that is how do I overcome the challenge of having

12   different people treat different customers different ways.

13   People like to be treated fairly.  And so by instituting a

14   process like this, it allows me to guarantee that I'm

15   treating all of my policyholders, I'm treating all of my

16   depositors in my financial institution in a fair way and in

17   a common and consistent way.

18   Q.   So what are the benefits of consistency?

19   A.   Well, it not only improves the profitability, potential

20   profitability to the organization, because I can see and

21   control the way in which I'm interacting with all of my

22   customers, but it also makes more loyal customers, that is,

23   I as a consumer feel like I'm treated fairly by the

24   organization, and there isn't some built-in bias that might

25   rear its head.

1    Q.  Finally, what is transparency listed there in the

2    context of Blaze Advisor?

3    A.  So transparency is an interesting one because most of

4    the companies that we deal with that address business rules

5    or business process in this way are also regulated.  They

6    also have to follow the letter of the law.  They have

7    auditors who want to review their books.  They want to

8    understand why they treat certain customers one way and

9    other customers in a different way.

10           By documenting this process, the software actually

11   captures every bit of the customer engagement and can be

12   audited.  If the software can capture it, it can print it

13   out, it can create audit reports that allow third parties to

14   look at the process and say, You guys are upholden to the

15   law, you are following the regulation.

16   Q.  And why is transparency a benefit?

17   A.  Well, they're obviously legal requirements that each of

18   those institutions need to make, but I think it also comes

19   back to fairness, to make sure that people are treated

20   fairly, appropriately and consistently.

21   Q.  Moving down on the left-hand column, Mr. Baer, you also

22   mentioned business agility.  What does that mean in the

23   context of Blaze Advisor?

24   A.  So by documenting the process and having it laid out in

25   front of you, you can change the process.  You can modify

1   the process.  By having it in software, it allows

2   organizations to change and adapt their business process

3   depending on changing economic climates, new marketing

4   opportunities or even in an interesting way you can do

5   simulation.  I can say what if I change the threshold FICO

6   Score that we approve a loan for, and I can run that through

7   the simulation and see what impact that would have on my

8   portfolio.

9   Q.  Why is agility a benefit for customers using Blaze

10  Advisor?

11  A.  So organizations that adopt a software process like

12  this, again, it allows them to change and adapt.  We live in

13  a very fast-paced world with lots of opportunity out there;

14  and so by moving process in a transparent way into software

15  like this, it allows them to change their pricing model,

16  make new offers, get into new markets, address a different

17  need very quickly and easily.

18  Q.  Can you please turn to page 3 of this exhibit, Mr. Baer.

19  A.  Yep.

20  Q.  What is shown in the right-hand column at the bottom?

21  A.  That's a list of companies that have adopted Blaze

22  Advisor.

23  Q.  And can you give us some examples?

24  A.  Sure.  This list includes Toyota, United Health Care,

25  Verizon Wireless, Wells Fargo and a number of others.

```
1    Q.  What are some other examples of FICO's clients using

2    Blaze Advisor?

3    A.  Everyone from GEICO and Aviva.  It runs the gamut.

4    Q.  In your conversations with those clients, have they have

5    mentioned these benefits of Blaze Advisor?

6    A.  Yes.  That's where these benefits directly come from,

7    the conversations with the customer.

8    Q.  Let's look at a different type of marketing document,

9    Mr. Baer.  Can you please turn to Exhibit 1172 in your

10   binder.

11          Do you recognize this document?

12   A.  I do.

13   Q.  And what is it?

14   A.  It's what we call an executive brief.  It describes font

15   leadership and what FICO does in a broader context, in this

16   case underwriting.

17   Q.  And who is responsible for creating this document,

18   Mr. Baer?

19   A.  My team and I were responsible for creating documents

20   like this.

21   Q.  And is it the regular practice of FICO's marketing

22   department to create documents such as this?

23   A.  It is.

24   Q.  And what this document created and kept in the regular

25   course of FICO's marketing department and its business?
```

1    A.  Yes.

2              MR. ERBELE:  Your Honor, I would move Exhibit 1172

3    into evidence.

4              THE COURT:  Any objection?

5              MR. FLEMING:  No objection.

6              THE COURT:  1172 is received.

7    BY MR. ERBELE

8    Q.  Mr. Baer, who are executive briefs such as this one

9    distributed to?

10   A.  Prospective customers, clients, existing customers,

11   industry analysts, other people who might be interested in

12   FICO's perspective.

13   Q.  So can you turn to the left-hand column of this

14   executive brief.  And you said this is an executive brief

15   for underwriting; is that correct?

16   A.  That's correct.

17   Q.  And that's in the context of insurance, right, Mr. Baer?

18   A.  Correct.

19   Q.  So what's listed in the left-hand column of these

20   executive brief?

21   A.  Yes, these are some of the benefits that underwriters

22   can expect to attain by using the software.

23   Q.  And can you walk through those benefits, Mr. Baer?

24   A.  Reduced customer churn, improve business insight, speed

25   up processing, give business users fine-grained control, and

1    choose optimal strategies.

2    Q.  And what is reducing customer churn?  What does that

3    mean?

4    A.  Reducing the number of customers who don't renew or

5    don't continue on as customers.

6    Q.  And why is that a benefit?

7    A.  Well, the lower your churn, the happier customers, the

8    more profitable those engagements are.

9    Q.  And turning to the third bullet, speeding up processing,

10   why is that a benefit?

11   A.  Well, there are two benefits, one to the customer, and

12   that is that they get a response to their request for a loan

13   or a request for an insurance policy much more quickly, and

14   I think that just delights the customer, but it also allows

15   the organizations to scale beyond, you know, the limitations

16   of humans to scale to address a larger volume of potential

17   customers.

18   Q.  And would that be an example of the speed benefit we

19   discussed earlier?

20   A.  Correct.

21   Q.  Looking at the next bullet, giving business users

22   fine-grained control, why is that a benefit?

23   A.  So organizations that determine what these processes

24   look like, they're very siloed and very structured, and

25   they're usually run by a business manager who doesn't often,

BENJAMIN EVANS - DIRECT

1    without software like this, wouldn't often have insights

2    into the day-to-day process that somebody who might be

3    reviewing applications would be using.  So the ability to

4    document and codify these business rules or business process

5    gives everybody access to the process, they get to see it,

6    they get to modify it, they get to vet it, determine if

7    that's within their business practice.

8    Q.  That's an example of the control benefit we discussed

9    earlier?

10   A.  Correct.

11   Q.  Looking at the final bullet there, choosing the optimal

12   strategy by running "what if" analyses, what does that mean?

13   A.  So one of the benefits distinctly in the software is

14   once I've identified all of this process, I can take that

15   process and change it, and I can change it in a sandbox, so

16   to speak, so it's not impacting direct customers, but I can

17   see what changes and modifications, maybe changes to the

18   analytics, changes to the data, changes to the offering

19   would have on my profitability.  So I can run the process,

20   if you will, in silo, make those modifications and then

21   compare and contrast it to the process I'm currently using

22   and see if there's benefit to making those changes.

23   Q.  So out of those list of benefits we discussed earlier,

24   what would that be an example of?

25   A.  I can't remember the list.  I think it was transparency.

1    Yes.

2    Q.  Okay.  Would you turn to the next page, Mr. Baer,

3    page 2?  On the right-hand column in the lower right-hand

4    corner a list of bullets, what is shown there?

5    A.  These are also improvements that underwriters should

6    expect to see by enabling this process.

7    Q.  And can you walk through that list of bullets?

8    A.  Better identify risk and improve strategies to prevent

9    losses, transition from static to dynamic, variable-based

10   pricing models, more finely and accurately segment

11   customers, and view policyholder relationships as a whole to

12   optimize treatments.

13   Q.  And can you turn to page 3, Mr. Baer.  Starting on the

14   second column at the bottom and on to the third column,

15   there's a list of bolded headings.  What are those?

16   A.  These are capabilities within the software.

17   Q.  And can you walk through those capabilities?

18   A.  Ingest, synthesize, sense and respond to data of any

19   size in real time.

20   Q.  And so what does that mean in layman's terms?

21   A.  That the software allows you to integrate data sets.

22   They could be, you know, what we call streaming, they happen

23   in real time, or they could be a big database that you

24   already have.  And the ability of the software to ingest any

25   of that data, regardless of where it comes from, I think

1    empowers the decision-making process.

2    Q.  And when you say "the software," Mr. Baer, what are you

3    referring to specifically?

4    A.  The business rules management system.

5    Q.  And is that Blaze Advisor?

6    A.  Blaze Advisor.

7    Q.  I think this document refers also to Decision Management

8    Suite; is that correct?

9    A.  Yes.  So Decision Management Suite is an evolution of

10   our software to move it to the cloud, so there's a product

11   within the Decision Management Suite referred to as decision

12   modeler, which is Blaze Advisor in the cloud.

13   Q.  Okay.  I would like you to turn to Exhibit 1174 in your

14   binder.  Do you recognize this document, Mr. Baer?

15   A.  I do.

16   Q.  And what is it?

17   A.  This is an internal sales enablement sheet.  This is a

18   document that we produce for sales so that they understand

19   what they're selling and who they're selling it to.

20   Q.  And is this document created and kept in the ordinary

21   course of FICO's marketing business?

22   A.  Correct, it is.

23   Q.  And is it FICO's regular practice to produce sales

24   sheets such as this?

25   A.  Yes.

1          MR. ERBELE:  Your Honor, I would move Exhibit 1174

2     into evidence.

3          MR. FLEMING:  No objection.

4          THE COURT:  1174 is received.

5     BY MR. ERBELE

6     Q.  And so who receives this document, Mr. Baer?

7     A.  Only sales.  This is an internal sales document.

8     Q.  So this is FICO's salespeople?

9     A.  Correct.

10    Q.  And at the top it says repeatable solution:  Insurance

11    underwriting.  So are these FICO's salespeople involved in

12    selling FICO products to the insurance industry?

13    A.  That is correct.

14    Q.  And which FICO products would be at issue here?

15    A.  Any product that addresses some of the concerns that

16    insurers might have in underwriting, including Blaze

17    Advisor.  It could include express optimization, as well as

18    analytic modeler or other products within the Decision

19    Management Suite.

20    Q.  So looking at the right-hand column there entitled

21    Benefits, what is shown in that column?

22    A.  These are benefits that insurers, that clients who use

23    the Decision Management Suite would -- could achieve based

24    on our customer feedback.

25    Q.  And why is benefits included in the sales document?

1    A.  So that salespeople would understand the benefits of the

2    software that they're selling.

3    Q.  And what benefits are listed here?

4    A.  Increase the processing time on new insurance policies,

5    transition from a manual underwriting process, reduced

6    decisioning times, an increase in application volume

7    capacity, reduced processing times, double volume, reduced

8    costs, increased revenue, and lowered or combined ratio,

9    which is increased profitability.

10   Q.  And how does FICO's marketing department know about

11   these benefits?

12   A.  These all came directly from customers who use the

13   software.

14   Q.  I would like you to turn to the third page, Mr. Baer.

15   Under Key Contacts for marketing, who is listed there?

16   A.  I am.

17   Q.  I'm going to change topics a bit and ask you about Blaze

18   Advisor's competitors.  Does Blaze Advisor have competitors

19   in the marketplace for decision rules management system

20   software?

21   A.  It does, yes.

22   Q.  And were you responsible for marketing the benefits of

23   Blaze Advisor with respect to those competitors?

24   A.  Yes.  So, again, we go back to what our customers tell

25   us, the values that they achieved and they value the

BENJAMIN/CROSS-DIRECT

1     software for, and we focus on those values with regard to

2     our competitors.

3     Q.  And what attributes differentiate Blaze Advisor from its

4     competitors?

5     A.  It's all the ones we've just run through, control,

6     transparency, visibility, agility.

7     Q.  What's FICO's understanding of its market positioning

8     with respect to its competitors?

9     A.  So there isn't a single customer that exists today in

10    enterprise software, let alone FICO, but certainly for Blaze

11    Advisor, that doesn't do a competitive bake-off before they

12    buy the software, not a one.  So every single one of our

13    customers has access to competitive software, and they test

14    us against IBM or Pegasystems or SAS or a number of vendors.

15    And so at the end of the day, they choose our software

16    because it gives them these values.  So I can make an

17    assumption that the others don't, but we don't go into it

18    too deeply.

19    Q.  So your understanding of your market position is based

20    on your customer feedback; is that correct?

21    A.  That's correct.

22    Q.  So we've looked at a lot of different marketing

23    documents for Blaze Advisor and talked about the process.

24    Why does FICO invest the time and resources in creating

25    these documents and marketing Blaze Advisor?

1    A.  So it communicates the value in ways that, you know, the

2    spoken word cannot.  You know, when I talk about consumer

3    success stories, for instance, prospective customers want to

4    know that there are others who have used the software, use

5    the software for their particular use cases and achieved

6    some distinct and significant results.  They're interested

7    not only in the way that these customers measured that

8    success, but also, you know, what their alternatives are.

9    So we publish a wide variety of documents, work with

10   industry analysts to also convey these stories and allow

11   them to try the software and, you know, justify and

12   legitimatize the story that we have to tell.

13   Q.  Thank you, Mr. Baer.  I have no further questions.

14        THE COURT:  Counsel, cross-examination.

15                       **CROSS-EXAMINATION**

16   BY MR. FLEMING:

17   Q.  Good morning, Mr. Baer.

18   A.  Good morning.

19   Q.  I'm Terry Fleming.  Counsel for the defendants.

20        At the beginning of your testimony, I noticed that

21   you mentioned a few of the companies that you worked with

22   before.  But you actually worked with nine other companies

23   before coming to FICO, right?

24   A.  I think that's correct, yes.

25   Q.  Okay.  And all of those are exclusively in the marketing

1    area?

2    A.  Correct.

3    Q.  And since you've been at FICO, you've just been working

4    in the marketing area, right?

5    A.  That's correct.

6    Q.  With a number of products under your purview, including

7    Blaze Advisor.

8    A.  Correct.

9    Q.  Okay.  And in your role in marketing, you are marketing

10   Blaze to persuade customers to buy the product, right?

11   A.  That is the role of marketing.

12   Q.  Okay.  And you're here today testifying to the jury

13   about what a great product Blaze is, right?

14   A.  Yes.

15   Q.  Okay.  You're paid to say that Blaze is a good product,

16   right?

17   A.  Yes.

18   Q.  You're paid to say that Blaze is valuable to customers,

19   right?

20   A.  Correct.

21   Q.  All right.  The marketing materials that your team

22   creates, the purpose is for your salespeople to sell FICO

23   products, right?

24   A.  That is correct.

25   Q.  You have interest in drumming up value to sell Blaze,

1   right?

2   A.  I have an interest to represent the value that I am

3   communicated to by our customers.

4   Q.  And your goal is for your salespeople to sell as many

5   products that they can at the highest price they can?

6   A.  I suppose that's true.

7   Q.  Okay.  Now, you're not involved with regard to the sales

8   of Blaze to Chubb, right?

9   A.  I was not.

10  Q.  Okay.  You didn't have any involvement with Chubb during

11  your time at FICO, correct?

12  A.  I have not.

13  Q.  All right.  You don't even know the salesperson who was

14  involved in that sale; is that correct?

15  A.  I don't.

16  Q.  Now, you don't have any knowledge of Chubb's actual use

17  of Blaze, right?

18  A.  I do not.

19  Q.  So you have no idea what value, if any, that Blaze has

20  had with respect to Chubb's use of it?

21  A.  Not Chubb specifically, no, I don't.

22  Q.  Okay.  Now, Blaze is a business process tool, a decision

23  rule software, and you would agree that it has no

24  functionality until the rules are created and inserted into

25  the software?

1    A.  No different than Microsoft Office.

2    Q.  Okay.  And I wasn't asking about Microsoft Office, but

3    with regard to Blaze in particular.

4    A.  Again, like no enterprise software, you need to add

5    value to it, yes.

6    Q.  And the reason is it's a general tool.  It requires very

7    distinct authorship and unique rules that connect back to

8    the particular business, right?

9    A.  Correct, like most software.

10   Q.  And whether Blaze is useful to a customer depends in

11   part on the quality and usefulness of the actual rules

12   created and implemented by the customer?

13   A.  That's correct.

14   Q.  And you would agree with Mr. Marce that the quality of

15   the rules are very significant with regard to the efficacy

16   of the applications that use Blaze?

17   A.  The efficacy of the software is predominantly controlled

18   by the user itself of the software, that is correct.  It is

19   a tool and not a solution.

20   Q.  Okay.  Now, when Chubb purchased Blaze, Chubb had to

21   create and implement the rules to put into the software,

22   correct?

23   A.  I would presume so.  I was not there.

24   Q.  FICO had no part in it?

25   A.  Again, I wasn't even at the company at the time.

1    Q.  Okay.  So you don't have any knowledge who was involved

2    in the development of the rules that were implemented in

3    Blaze for Chubb's use?

4    A.  I do not.

5    Q.  You have no knowledge of the actual rules created and

6    implemented in Blaze by Chubb?

7    A.  I do not.

8    Q.  You don't know how many business rules were loaded, how

9    many?

10   A.  I do not.

11   Q.  You don't know what type of business rules?

12   A.  I do not.

13   Q.  Could you turn to Exhibit 1171.

14   A.  Yes, sir.

15   Q.  On the bottom left hand, there's a reference to "New

16   Blaze Advisor 7.4 authoring features empower greater

17   business-user control and ease-of-use without requiring

18   technical assistance" and it "now supports machine learning

19   to further refine business decisions."  Right?

20   A.  Yes.

21   Q.  And you realize that the Blaze version at issue in this

22   trial is 7.1, not 7.4, right?

23   A.  I wasn't aware of that, but okay.

24   Q.  All right.  And there are references -- well, let's go

25   to the last page, page 3.

1          Now, I noted when you were asked about what

2     companies use Blaze that you identified a number of

3     companies except the very first one that's identified in

4     this report, right?  And what is that very first company

5     that's identified?

6     A.   ████████████████████.

7     Q.   ████████████████████.  Now, why didn't you identify that

8     company as the one that was using Blaze rules?

9     A.   I missed it, to be honest with you.

10    Q.   You missed the first one?

11    A.   I missed the first one.

12    Q.   It wasn't because of the problems that they've been

13    having, as has been publicized lately?

14    A.   Actually, no.  And to the best of my knowledge, in my

15    conversations with ████████, our software has nothing to do

16    with their problems.

17              MR. FLEMING:  Objection, nonresponsive, hearsay.

18              THE COURT:  That objection is sustained.  The

19    answer will be stricken.

20              The jury is instructed to disregard the answer.

21    BY MR. FLEMING

22    Q.   Let's look at Exhibit 1172.  There's a number of

23    benefits listed on the left.  And you don't know if Chubb

24    received any of those benefits through its use of Blaze, do

25    you?

1    A.  I have no idea.

2    Q.  Okay.  Let's look at Exhibit 1174.  Now, I note the

3    Target Audience for this solution are $250 million insurance

4    companies.  That's FICO's sweet spot, correct?  I'm looking

5    at the top under Target Audience in the middle column.

6    A.  Yes, that's what it says.

7    Q.  So FICO -- so Chubb would not be part of that Target

8    Audience?

9    A.  Well, so I imagine that this is -- was intended as the

10   minimum size, not as a maximum size.

11   Q.  Okay.  It doesn't say that, right?

12   A.  It does not say that.

13   Q.  Okay.  All right.  Now, let's look at the next page.

14   Now, you've mentioned briefly the competitors, the companies

15   that provide alternatives to Blaze software.  Can you

16   identify those?  I don't think they're listed here.

17   A.  Well, so we do have some competitors listed here, but

18   the ones that I normally run against are SAS, IBM,

19   Pegasystems, Experian and Red Hat application.

20   Q.  Drools?

21   A.  Drools.

22   Q.  Now, have those been -- if you listed the same

23   competitors from the 2016 time period, would you identify

24   the same list?

25   A.  Probably, yes.

1    Q.  Okay.  And are there some instances where a customer

2    could change from using a software like Blaze to a

3    competitor software and have no difference in the

4    performance?

5    A.  I wouldn't be in a position to know that.

6    Q.  Okay.  Let's see.  And, finally, we're looking at the

7    last page or the second page of this exhibit where you're

8    looking at competition, strengths and weaknesses?

9    A.  Yes.

10   Q.  And I notice that you say FICO's biggest competitor is

11   not these other companies, but internal builds.  What do you

12   mean by that?

13   A.  Well, one of the options that exists for customers is to

14   either develop custom code or use an open source

15   distribution of a business rules management system and build

16   it themselves.

17   Q.  All right.  Okay.  I have no further questions.  Thank

18   you.

19              THE COURT:  Thank you, Mr. Fleming.

20              Mr. Erbele, any redirect?

21              MR. ERBELE:  Yes, Your Honor.  Briefly.

22                    **REDIRECT EXAMINATION**

23   BY MR. ERBELE:

24   Q.  So you walked through a list of value propositions or

25   benefits of Blaze Advisor.  I believe you testified to

BENJAMIN CTVBINK - REDIRECT

1    control, speed, accuracy, consistency, transparency,

2    agility.  Do you believe those benefits to be actually

3    realize by FICO's clients?

4    A.  I do.

5    Q.  How do you know?

6    A.  Well, those came exclusively from conversations --

7            MR. FLEMING:  Objection, hearsay.

8            THE COURT:  Sustained.

9            You can talk generally about your process, but not

10   specific statements made by customers.  Okay?  You

11   understand the line I'm drawing?

12           MR. ERBELE:  Yes.

13           THE COURT:  Okay.

14           THE WITNESS:  So those --

15           THE COURT:  You weren't necessarily over the line,

16   but counsel makes an objection so that you don't go over it.

17           THE WITNESS:  Sure.

18           THE COURT:  Okay?

19           THE WITNESS:  So the process that we use to

20   develop these value propositions are -- come directly from

21   conversations that we have with our customers.

22   BY MR. ERBELE

23   Q.  And Mr. Fleming brought up ██████████████.  What is

24   your understanding of the use of Blaze Advisor there?

25   A.  It's been so long.  I don't know that I could speak

```
 1    specifically to ████████████' use, but I do know that

 2    some of their recent challenges had nothing to do with their

 3    use of Blaze Advisor.

 4    Q.  And what is that understanding?

 5    A.  That they, you know, they were challenged with --

 6                MR. FLEMING:  Objection, Your Honor.  Hearsay.

 7                THE COURT:  Sustain the objection as to

 8    foundation.

 9                Why don't you lay the foundation, Mr. Erbele?

10    BY MR. ERBELE

11    Q.  Have you had conversations with anyone regarding the

12    benefit -- or the issues with ████████?

13    A.  A few weeks ago I did.

14    Q.  And who was that with?

15    A.  That was with a sales rep.

16    Q.  And based on that, what is your personal understanding

17    of the involvement of Blaze Advisor?

18                MR. FLEMING:  Objection, hearsay.

19                THE COURT:  Sustained.

20    BY MR. ERBELE

21    Q.  Mr. Fleming also asked about the versions of Blaze

22    Advisor.  He pointed out version 7.4 and asked if it was

23    comparable to other versions.  Do you know if the benefits

24    of Blaze Advisor changed from version to version?

25    A.  They get further enhanced.  It's not like there's a sea
```

1      change to the capabilities of a product, but oftentimes

2      they'll add either new features or enhance the speed by

3      which the process works.  That only enhanced the five or six

4      value propositions we've identified.

5      Q.  So you've been at FICO since 2013; is that correct?

6      A.  Correct.

7      Q.  And Blaze Advisor has gone through several version

8      changes since you began at FICO; is that correct?

9      A.  Correct.

10     Q.  But are the benefits of control, speed, accuracy,

11     consistency, transparency and agility realized in all the

12     versions of Blaze Advisor?

13     A.  They are, yes.

14     Q.  Thank you, Mr. Baer.  I have no further questions.

15              THE COURT:  Mr. Fleming, any recross?

16              MR. FLEMING:  Nothing further, Your Honor.

17              THE COURT:  Thank you, Mr. Baer.  You may step

18     down.

19              We are at 20 minutes after 10 and done with the

20     witness, so this would be a convenient time to take your

21     morning break.

22              Remember, members of the jury, no independent

23     research, no talking about the case.  Okay?

24              We'll be back in here at 25 minutes to 11.  Thank

25     you.

```
 1                    (Recess at 10:21 a.m.)

 2

 3                         (IN OPEN COURT)

 4            THE COURT:  Go ahead and be seated.

 5            It would be my preference, if you're inclined to

 6     do an offer of proof, with respect to the other documents,

 7     to do it over the lunch hour, assuming Mr. Baer is still

 8     going to be here and available.  Will that be acceptable?

 9            MR. ERBELE:  Yes, Your Honor.

10            THE COURT:  Okay.  Next witness is Schreiber?

11            MR. HINDERAKER:  Yes, Your Honor.

12            THE COURT:  Should we take up the other issue now?

13            MR. HINDERAKER:  The issue of the --

14            THE COURT:  The testimony.

15            MR. HINDERAKER:  -- of Mr. Schreiber.  I think we

16     should.

17            THE COURT:  Do you have copies of the deposition?

18            MR. HINDERAKER:  I do.  If you would give me a

19     moment, what I have is my copy and I'm going to just make a

20     note and then give it to you.

21            The first bit of testimony that is being

22     challenged is on page 310.  I have a flag by it.

23            THE COURT:  Okay.  If it's easier for you, you

24     could always use the document camera.  That way you can see

25     it and I can, if that makes it easier.
```

1          MR. HINDERAKER:  Let's see if we can do without.

2          THE COURT:  Okay.

3          MR. HINDERAKER:  I don't like technology.

4          So you see that it begins on -- and I said, "Okay.

5     All right.  So Chubb could have said no, we're terminating

6     the license, you know, we're moving on to ASIS systems in

7     the next six months, we don't need your license anymore.  It

8     could have happened just like that, and that would have been

9     okay.  But they had told us nothing, so we had to price it

10    out, like it was a new site, a new sale -- or not a new

11    sale, but a transaction was taking place."  And this is in

12    context of an e-mail that is dated February 5th, 2016,

13    Exhibit 133.

14          And this, Your Honor, is that exhibit, and you see

15    the date of it, and you see that the date is before

16    February 25.  The date is before that period of time with

17    settlement negotiations.  It's in the period of time of the

18    business discussions.

19          In addition, during the opening statement, counsel

20    for the defendant tells the jury, "And so the evidence will

21    show that Mr. Sawyer and Mr. Schreiber started a process to

22    try to figure out how can we get more money before that

23    transaction happens?"  And the opening continued.

24          This is an e-mail exchange between Mr. Sawyer and

25    Mr. Schreiber in -- and the testimony is about an earlier

1    e-mail exchange, before the acquisition, and they're

2    brainstorming about this whole idea of using the acquisition

3    as a basis to get more money.

4          And Mr. Sawyer, he says, "I would think that

5    tripling the size of the GWP, that's a reference to

6    insurance revenue, of business by application should be

7    significant enough to get around that unreasonably withheld

8    language."

9          So it's clear from the opening that the issue of

10   Schreiber and Sawyer, thinking that we have a licensing

11   event, and here's an opportunity to get much more money from

12   a new license, during the period of time of negotiations, is

13   put at issue by the defendant, and this is some of the

14   testimony that relates to that February 5 e-mail.

15         And, relatedly, on page 343 at lines 22 through

16   344 at line 15, and now we're speaking most particularly

17   about the commercial proposal time frame that was within the

18   negotiations, and at line 22, this is what it boils down to.

19   I mean if someone engaged us when we tried to engage or

20   before we tried to engage, talking about 10.8 and when the

21   notice came, we would have found a way to let them

22   transition in a way that would have had maintain a really

23   good working relationship.  Love the client, want to

24   maintain a reference.  Really, wasn't looking to do anything

25   other than figure out how do we stay whole and continue the

1    relationship and was there a license opportunity?  Yes,

2    there was, but more important to us was that the long-term

3    relationship, the 3 million would have come and went, but I

4    had Chubb as a customer a decade and now a lawsuit?  Come

5    on.

6            He's responding to his reaction and his time frame

7    of Exhibit 94, which is before the tenor turned to

8    settlement.

9            In Defense Counsel's letter to the Court of the

10   15th, at the end of the initial notice period, combined with

11   temporary forbearance of action made clear that the dispute

12   had crystallized, the litigation was on the table.  That is

13   after these events.  Counsel has taken the position that

14   it's after these events.  Counsel has taken the position

15   that FICO has with Schreiber and Sawyer sought to have a

16   licensing opportunity to grab money, but this testimony is

17   necessary to fill in the rest of the story so that the jury

18   hears the rest of the story and enable Schreiber to say it

19   wasn't the money as much as the relationship that I was

20   trying to have as my top concern.  So this is -- none of

21   this is within Rule 408, Your Honor.

22           THE COURT:  All right.  Very well.  Counsel for

23   Federal?

24           MS. GODESKY:  Your Honor, our objection to these

25   two excerpts at 310 and 343 are that they are nonresponsive,

 1    argumentative narratives from a witness.  He wouldn't be

 2    allowed to give that kind of nonresponsive speech in court,

 3    and the fact that these are deposition videos with no

 4    opportunity for even a recross makes it even more

 5    prejudicial than it would be if he did that here live.

 6              MR. HINDERAKER:  If I can?

 7              THE COURT:  Go ahead, Mr. Hinderaker.

 8              MR. HINDERAKER:  Just commenting that now the

 9    basis for the objection has changed from what it was this

10    morning, and this is the examination of defense counsel at

11    the time, and I don't have a transcript to get the full

12    context, but those were the answers that he was given to the

13    questions and there wasn't any effort made at the time of

14    the deposition to reserve any objection.

15              THE COURT:  Agreed, Mr. Hinderaker.  I do find

16    that these bits of testimony are admissible, that any

17    objection to the nonresponsive nature of the answer, if it

18    is nonresponsive have been waived, and the e-mail, which is

19    Exhibit 133, is also admissible.

20              All right.  We have exactly six minutes everyone.

21    See you back here.

22              (Recess at 10:31 a.m. till 10:39 a.m.)

23                        (IN OPEN COURT)

24              THE COURT:  This is up like the old days, we don't

25    have to roll up a television screen or anything, right?

1     Just do it on your -- all right.

2              MR. HINDERAKER:  Your Honor, for housekeeping?

3              THE COURT:  Yes.

4              MR. HINDERAKER:  The video will run about 2 hours

5     and 11 minutes.

6              THE COURT:  Okay.  So you want to tell us when you

7     want us to stop or if you have an idea when we should stop,

8     Mr. Mayleben will just be here and available.  Right around

9     noon, if there's a natural break.

10             MR. HINDERAKER:  Yes.  And then we spoke at one of

11    the pretrials about being able to give a brief introduction

12    of who this witness is to the jury before it starts.  We've

13    exchanged what I expect -- what I will say and it's

14    agreeable so if you give me a moment to do that.

15             THE COURT:  Absolutely.  Thank you.

16             (Jury in.)

17

18                       (IN OPEN COURT)

19             THE COURT:  Mr. Hinderaker.

20             MR. HINDERAKER:  The next witness that will be

21    called in our case, FICO's case, is a gentleman by the name

22    of Russell Schreiber.  I think you should appreciate that we

23    will be playing all of the video of Mr. Schreiber's

24    testimony that which is offered by FICO and that which is

25    offered by the defendants.  It will just be his whole

DEPOSITION OF RUSSELL SCHREIBER

1    presentation.  And I'm just going to introduce Mr. Schreiber

2    to you.

3             Mr. Schreiber is a former FICO employee.  He now

4    lives in New York where his deposition was taken on

5    October 24, 2018.

6             He was in sales, and when he left FICO his title

7    was Vice President of Health Care and Insurance, and he was

8    with FICO from 2006 to 2016.  Thank you.

9             THE COURT:  Very well.  Thank you, Mr. Hinderaker.

10                        **RUSSELL SCHREIBER,**

11   Whereupon, having been duly sworn upon his oath, testified

12   as follows:

13

14             (Whereupon, Deposition of RUSSELL SCHREIBER is

15   played, as follows:)

16                          EXAMINATION

17   BY MS. JANUS:

18   A.   Russell Schreiber.

19   Q.   What is your work address?

20   A.   I work from home.  I'm self-employed, semi-retired.

21   Q.   What is your home address?

22   A.   It's 180 East End Avenue, New York, New York 10128.

23   Q.   What is your current employment?

24   A.   Self-employed.  Investor and self-employed.  Business

25   owner.  Multiple irons in the fire.

1    Q.  What type of work do you do as a business owner?

2    A.  So I have real estate properties, and I've got a small

3    tool handling business that I've got a 20-million-a-year

4    business, a material handling business that I'm an investor

5    in.

6    Q.  For those who aren't in that line of business, what is

7    material handling?

8    A.  Oh, warehouse.  Forklifts is probably the easiest way.

9    So forklifts, yeah.

10   Q.  And is your work in New York?

11   A.  Yes.

12   Q.  Prior to being self-employed, what was your employment?

13   A.  At that time I was with FICO.

14   Q.  Okay.  And what were the years of your employment with

15   FICO?

16   A.  It was 2006 through 2016.  And I had a four or six

17   month -- I forgot now -- hiatus where I left FICO and I came

18   back.  So that was in the pre-2010 window somewhere.

19   Q.  Somewhere in 2009 or?

20   A.  Maybe '7 or '8, but it was just for a short period of

21   time, say four to six months, as they say.  I left and they

22   sucked me back in.

23   Q.  Other than that four to six month hiatus, you were

24   employed at FICO from 2006 to 2016 continuously?

25   A.  That's correct.

1    Q.  And what were your positions at FICO?

2    A.  So I joined FICO with responsibility for the northeast

3    insurance market.  And from -- and then over time, I moved

4    to be responsible for the United States insurance market.

5            I have to give some thought if you want to know

6    the years, but -- and then from the north -- from the U.S.

7    insurance market, I moved to the global insurance market

8    lead.  And then after that I took on I added to that the

9    U.S. health care lead.  So I was global insurance, U.S.

10   health care, then ultimately I had global remit for

11   insurance and health care markets.

12   Q.  Global remit?

13   A.  Right, responsibility.

14   Q.  Oh, okay.

15   A.  So my title I think at the end was -- that's great, with

16   the insuring markets -- but I was vice president of health

17   care and insurance, global vice president or something like

18   that.

19   Q.  So let's try to, exact dates aren't crucial but just put

20   rough times on those positions.  You started with, you said

21   you were responsible for the northeast insurance market?

22   A.  Right.  So that's January of '06.  And then I left in

23   around late '07.  Right.  So say I came back mid-'08, and at

24   that point mid-'08 forward, I had the U.S. insurance market.

25   That was about two years.  Then I had the global insurance

1    market.  And then the U.S. health care was kind of a very

2    short shift until global health care, so say by 2013, '14, I

3    had all of the insurance in North America markets.

4    Q.  So from 2010 to the end of your employment there, you

5    were responsible for the global insurance market.  It's just

6    --

7    A.  A piece of it.

8    Q.  -- at some point in time there was health care added in?

9    A.  February, roughly.

10   Q.  All right.  And so first I want to just understand what

11   you mean by responsible for a given insurance market, so we

12   can start with when you were responsible for the northeast

13   insurance market, what does that mean at FICO?

14   A.  Right.  So that means revenue.  Revenue, r-e-v, okay,

15   revenue.  So that means that includes new business, customer

16   retention of old business, customer satisfaction.

17   Basically, you let out a revenue plan, put together a

18   revenue plan, and then how do you achieve that.  It's

19   through sales and service.

20   Q.  Well, FICO sells software?

21   A.  Right.

22   Q.  That's a source of revenue generation for FICO, that

23   might be one area of revenue generation that would apply the

24   to the insurance market?

25   A.  Right.

```
1    Q.  Is that fair?
2    A.  So there's software and services, yes.  So software is
3    multiple lines, and software -- the services have multiple
4    lines, yes.
5    Q.  And "services," you mean professional services?
6    A.  Right.
7    Q.  Okay.  So when you started, you were in charge of the
8    northeast insurance market.  And you've described that to
9    mean essentially you were responsible for the revenues that
10   FICO realized from the northeast insurance market.  In terms
11   of your actual job duties, what did that look like,
12   generally?
13   A.  So it was planning how do we achieve revenue goals;
14   work -- work back and forth with the leadership at that time
15   to set a goal and then see how we can fit into it based on
16   the tools that we had.  It would be working with various
17   sales teams.  Like I know we're here to talk about Blaze, so
18   Blaze had a sales team.  There were other products and other
19   sales team.
20           So I'd work with all those teams to see what we're
21   going to bring to a customer or to a territory.  We'd set up
22   road shows.  We'd have marketing events where a hotel room
23   would 80 people invited in and tell our story.
24   Q.  Were you also in a role of client partner at times?
25   A.  Yes.  Yes.
```

```
 1    Q.  Okay.  Yeah, so you were saying the client partner role,
 2    and it sounded like maybe -- in my mind, I've heard in the
 3    context of this case reference to client partners.  And I'm
 4    trying to figure out where what you're describing fits in
 5    with the client partner role at FICO?
 6    A.  Right.  So my business card at the time might have said
 7    vice president, client partner.  So client partner was a, at
 8    that time, was an organizational construct to bring industry
 9    experts or industry folks into the FICO fold and be focused
10    on client relationships and making sure we're able to bridge
11    the FICO technologies with industries.  And so the people
12    that did that, I was one of them.  We're called client
13    partners.
14    Q.  As part of your job, were you familiar generally with
15    the way the clients you were responsible for used Blaze?
16    A.  Yes.
17    Q.  That was one of your job responsibilities?
18    A.  Yes.
19    Q.  Why was that?
20    A.  Well, it had multiple dimensions to it.  One was to help
21    solve the next one, so I could say, aha, you know, insurance
22    company X uses it for something and that's a great kind of,
23    you know, horizontal application that other insurers could
24    be thinking about doing.  And not, obviously, not a
25    confidential handling, you know, insure confidential -- I
```

1    would insure confidential information, by understanding how

2    one insurance company uses it at that point, and then I can

3    help others understand the art of the possible technology.

4    So that was one reason why we had to know what they were

5    doing.

6              Another reason was to be able to bring the rest of

7    FICO to bear and to help.

8    Q.  With that particular client?

9    A.  Yeah.

10   Q.  Yep.

11   A.  So I'd bring professional services person in to help

12   integrate to say Blaze and Duck Creek.  You know, pick a

13   product, whatever.

14   Q.  But generally the scope of the license with a given

15   client was something that you were familiar with?

16   A.  Or I had to figure it out, but, yes.  Sure.

17   Q.  And that would be important for what you are doing as a

18   client partner, I take it, because you need to know whether

19   there are additional products or services that could be sold

20   to a given client, correct?

21   A.  At one end or if that product is being sunset, and they

22   needed to know that it was being, you know, shelved in two

23   years, we can help them manage their way through that

24   process.

25   Q.  Yep.  And you would also need to know how widely that

1    client is able to use the software that they've licensed

2    under the terms of their license, correct?

3    A.  Say that again, please?

4    Q.  You would also need to know how widely that client is

5    able to use the software that they've licensed under the

6    term of their license?

7    A.  Right.  So if you mean is do you mean like what the

8    scope of the license is?

9    Q.  Yes.

10   A.  Because "widely" is -- yes, I would certainly want to

11   read the scope of the license, yeah, yeah.  I guess.

12   Q.  When did you first begin to work with Chubb?

13   A.  Chubb was my first client.  Chubb was my -- my entree

14   into FICO.  That's -- you know, put me on the map.  So that

15   would have been February, maybe March of '16, so maybe a

16   month or two we received an RFI, and I lead the response.

17              MR. HINDERAKER:  I think you said '16.

18              THE WITNESS:  Did I say '16?  I meant 2006, thank

19   you.

20   BY MS. JANUS:

21   Q.  So you said you received an RFI in the spring of 2006.

22   A.  Right.  I want to say February or March so early late,

23   winter early spring.  Yeah, it was right away.

24   Q.  And what is an RFI?

25   A.  The people's request for information be in our file.  I

DEPOSITION OF RUSSELL BOURBONNAIS

1   did an RFP, a request for proposal, but it was a document

2   that we received to be able to present to Chubb, a solution

3   and pricing and an approach to a problem.

4   Q.  And do you recall, I know it was a while ago, but do you

5   recall off the top of your head just generally what nature

6   of the request for information or proposal was from Chubb?

7   A.  Oh, yeah, yeah.  It's funny how things you remember.

8   Anyway, so this was to create an automated renewals platform

9   for their specialty lines of business.  They had I think

10   like a 170 or maybe 220 different products in that business.

11   And so that would be like small manufacturers maybe or

12   nurses or, you know, plumbers.  But it's what they called

13   specialty lines.

14           And so the way they sold those products is they

15   have the underwriting process where they have underwriter

16   like price out how risky is this thing and set out an

17   insurance price premium.  What was happening is they had a

18   corporate initiative, their agenda was to be able to sell to

19   a larger market, which meant smaller value, smaller dollar

20   value, so I forget the numbers but most of the average

21   policy price was maybe -- let's call it $100,000 for this

22   discussion.  They wanted to be able to move down to a bigger

23   market, more prospective customers.  Say the average policy

24   is $20,000, so moving to like the Fortune 100s to the

25   Fortune 10,000, that kind of concept.

1    The way their business worked at that time was

2    they would write the new policy, they'd get a new prospect,

3    and they'd assess the risk.  And then they would, if they

4    won the work, they'd book the policy and they would have a

5    new customer.

6    The problem was that on renewals, they would do a

7    full review of the each policy so that it was effectively

8    underwriting the whole customer from scratch, which is very

9    expensive.  So the premise of this RFI or RFP or a request

10   for a pitch was, our solution was how can they automate the

11   underwriting -- the renewal process so that they could move

12   into a business model where they were -- had less manual

13   intervention with the renewal process.

14   So there's going to be some insurance customers

15   that would just, you know, not even touch this, just

16   automatically renew it.  There were others I think that were

17   at high risk.  They need to really do full underwriting.

18   There were some that were in the middle.  So they called

19   that low touch, no touch, high touch is, you know, and it's

20   become pretty big in the industry now.

21   Q.  And the idea was this renewal process would become a low

22   touch?

23   A.  So they would be able to segment the customers across

24   these 170 or 200-plus products.  And, again, don't quote me

25   on the product count, but there was hundreds of them.  They

DEPOSITION OF RUSSEL BOURBEAU

320

1    could segment the customers at the renewal process into high

2    touch, low touch, no touch. So if they have the high touch

3    ones were the more expensive ones to renew because they had

4    to throw some people out, look at the buildings, you know,

5    check the head count, make sure the staff is right. So it's

6    how do you price that premium.

7          Whereas, the no touch, it's like our auto

8    insurance. You just get a new bill for the next year,

9    right? So they were trying to get more into the low to no

10   touch.

11   Q. So the folks who aren't familiar with either the

12   insurance industry or Blaze, can you describe in general

13   terms how a product like Blaze would be used in a solution

14   like this?

15   A. Sure. So insurance policies are annual policies. So

16   about three months before the end of a year, the policy

17   information and the claim information would be transferred,

18   be fed into a Blaze engine, and the Blaze software would

19   look at that information and rules would be -- rules in

20   Blaze would be applied to it.

21         So the rule might be, oh, there were no claims

22   that year so that means we could do a low or no touch. Or

23   they had claims this year, so now it must be a high touch.

24   And the magic here was that Blaze, the rules that we're

25   talking about were set up in such a way that human beings

1    could maintain them.  So it didn't require like some, you

2    know, MIT Ph.D.'s.  You could bring a business analyst could

3    maintain those business rules.

4              So, right, so once a year a feed would come in,

5    the rules would be compared, and then the policies would be

6    segmented into high touch, low touch, no touch.

7    Q.  Well, I guess, again, for those who aren't familiar with

8    Blaze and necessarily this industry, you're talking about a

9    system of applying rules to or a renewal process, and I take

10   it there is some additional programming that goes along with

11   creating a system that works, for example, in Chubb for an

12   auto renewal process.  It's not just like you can put Blaze

13   in there and it sort of just automatically works?

14   A.  Well, that's correct.  You're right.

15   Q.  Okay.  And so I'm trying to, how would you refer to

16   that?  Is it that Blaze is used in applications that are

17   developed by Chubb or by, you know, Chubb with FICO's

18   assistance to use Blaze in these types of solutions?

19   A.  Right.  So Blaze, in this case it did integrate with

20   other -- other components.  Like there was, I think I

21   mentioned Duck Creek was a pricing engine.  There would have

22   been a policy platform, a claims platform.  So it would have

23   interacted with those three things or whatever they were,

24   those things.

25              But there were cases where Blaze was a standalone.

 1    Not in this case, but Blaze would serve as a standalone

 2    engine as well.

 3    Q.  Okay.  So in February/March, FICO received the RFI.  Can

 4    you tell us generally what you recall happening after FICO

 5    received that RFI?

 6    A.  Sure, sure.  So, gosh, where was our office then?  So it

 7    was -- it was like the garment district where we had an

 8    office at that time.  So I sat with our Blaze team.  Larry

 9    and Dale I think were their names.  Anyway, sat with those

10    guys, and we created a proposal.

11    Q.  And then you presented it?

12    A.  Oh, I'm sorry, yes, we created a proposal and then,

13    well, probably April-ish we presented -- I lead the

14    presentation of our response to maybe a dozen people in the

15    Chubb side up in their -- I want to say Connecticut.  It's

16    funny what you remember what you know.

17         But anyway, one of the offices we went up to,

18    yeah, it was Connecticut.  I went up to the Connecticut

19    office, and we presented our answer to their questions.

20    Q.  And do you recall generally what time of year that was?

21    A.  It would have been pretty quickly -- call it April.

22    April, yeah, mid-April.  Because the deal was done

23    June 30th.

24    Q.  Were there discussions at that time that you were

25    involved with relating to the scope of the license --

DEPOSITION OF RUSSEL BOUCHER

1     A.  Oh, yeah.

2     Q.  -- that was being negotiated?

3     A.  Yeah, absolutely.  Yeah, yeah.

4     Q.  What do you recall of those discussions?

5     A.  Right.  So the initial license was very much desired to

6     be for specialty lines, which is U.S. business, right?

7     Specialty U.S.

8              As we got to contracting, it became apparent they

9     couldn't get the deal done for the June 30th window that

10    they talked about, so we broke out an expansion to include

11    the specialty division, and then for the rest of the U.S.

12    business that they did.

13             So they had, I want to say it was a May -- June --

14    June 30th would have been the first license signature for

15    the named application CSI underwriting or something like

16    that, whatever the name was.  I'm sure you have the

17    contract.  You can look it up.

18             Then somewhere over the summer it would have been

19    an expansion to be a CSI divisional license.  So that would

20    be -- that would exclude personal lines, commercial lines,

21    claims business, any corporate overhead.  It was just

22    literally within that specialty lines business.

23             And then they had an option to buy out by the

24    calendar year end -- I think it was calendar year end -- in

25    ELA for the rest -- sorry, for commercial, personal lines

```
1    and claims, (inaudible) we called it basically an enterprise

2    license.

3    Q.  All right.  And were you involved I guess describe your

4    role in negotiating or discussing the scope of those

5    licenses as they were --

6    A.  Yeah, so I was the face.  I was the guy.  So I lead FICO

7    and then on the other side was Owen Williams from Chubb.

8         Again, there were multiple layers of negotiation, people

9    involved.  So you had the Blaze salespeople dealing with

10   procurement.  But in terms of how much and what's the scope,

11   it was really between Owen and I, and his boss at some point

12   got involved.

13   Q.  And so you said "ELA."  That stands for enterprise

14   license agreement?

15   A.  Yes.

16   Q.  And with respect to Chubb, was your understanding that

17   that essentially allowed Chubb to use Blaze throughout its

18   enterprise?

19   A.  Chubb, we have to be careful what Chubb is because Chubb

20   is a messy organization.  I mean that in a -- in a -- in a

21   -- subjective way.  I just mean like there's a lot of

22   organizational lines and overlap.  So -- so from the Chubb

23   Insurance level down, Chubb & Sons, policy -- I'm sorry --

24   personal lines, commercial lines, specialty lines, and the

25   claims.  Those were the operating business units under Chubb
```

DEPOSITION OF RUSSELL BOURNE 325

1    & Sons as we understood it at that time, and it was very

2    much U.S. focused.

3    Q.  Was the license, the enterprise license that was

4    ultimately negotiated, however, a global enterprise license?

5    A.  No, no.  There was rumor of that, but, no.

6    Q.  Okay.  Did you ever understand it to be a global

7    enterprise license?

8    A.  No, no.  I may have had a hiccup once or twice where

9    people -- I've had people read parts of agreements.  Let's

10   say, oh, they haven't read the whole agreement and say it's

11   global.  And I'd just correct them and say, no, I was there.

12   It was not global.  And I'd get an email that would say, oh,

13   it's global.  And they'd -- so there may be moments where I

14   didn't really refer back to the documents.  I might have

15   said it was global, but never, ever told Chubb it was

16   global.  I never had a contract that said it was global,

17   so --

18           And I woke up every day thinking this was a U.S.

19   license.

20   Q.  Were you aware that Chubb in Europe was using Blaze

21   pursuant to the ELA?

22   A.  I did become aware at some point, yes.  It's not really

23   clear to me, maybe it was clear.  I don't remember now

24   because it's been a few years since I've looked at this.

25   But there was talk of them using it for development to try

```
 1    it out, proof of concept.  But I don't recall ever -- did
 2    they use it an anchor for running their business.  And so I
 3    just don't recall.  We can look.  I'm sure -- I'm sure in
 4    your stack I'm sure we'll see something that says something
 5    there.
 6    Q.  So you just don't recall whether you were aware that
 7    Chubb Europe was using Blaze?
 8    A.  I recall that they had their hands on it.  I don't
 9    recall that it was used in production, so what I mean by
10    that is that they could have used it to test out ideas to
11    for proof of concepts that were not used in the actual
12    running of their business.  Does that make sense?  Okay.
13    Q.  Did you ever tell anyone at Chubb that use in Europe was
14    not allowed under the ELA?
15    A.  I don't know.  I only met with Chubb Europe a small
16    handful of times.
17    Q.  You did meet with Chubb Europe?
18    A.  Yes, a small handful of times.  We were in the same
19    office in London.  We were literally in the same building.
20    Q.  And was the purpose of those meetings to check on how
21    Chubb Europe's use of Blaze under the ELA was --
22    A.  It would have been to try to expand the license.  This
23    is like 2010.  These were very short, passing meetings.  So
24    I don't have notes on that stuff.
25    Q.  So in your view, if you had an opportunity to expand the
```

DEPOSITION OF RUSSEL POMERANCE

1    Blaze license to Chubb Europe, you would have done that?

2    A.  Yes, yeah.  If I could have sold more -- more scope,

3    absolutely.  That was our job.

4    Q.  Okay.

5    A.  It's revenue growth.

6    Q.  So in your view, Chubb Europe was fair game actually to

7    purchase a Blaze license if it wanted to use Blaze?

8    A.  Chubb -- in my view, Chubb Europe had to purchase a

9    Blaze license if they wanted to use it for production.

10   (Inaudible)  Chubb Europe had to buy a Blaze license to use

11   it.

12   Q.  And is the reason for that, that your view was the ELA,

13   Blaze ELA with Chubb was limited to the United States?

14   A.  That's correct.

15   Q.  And that was your view from the beginning of the license

16   in December of 2016 or December of 2006?

17   A.  Right, that's why I sold it.

18   Q.  Showing you what's been marked as Exhibit 105.

19   A.  Well, Larry Wachs, wow, I haven't heard his name in a

20   decade or more.  Should I read this or what am I doing?

21   Q.  Yeah, take a moment to familiarize yourself with it.

22   Let me know when you're ready.

23   A.  Okay.  John Haines, oh, my goodness.  Right, you know.

24   There you go.  All right, from Larry.

25              There you go, February of '6.  It's funny what you

```
 1   remember in life, right?
 2   Q.  Who is Larry Wachs?
 3   A.  Larry Wachs was a Blaze sales representative.
 4   Q.  And what position did Bill Waid have at this time, if
 5   you know?
 6   A.  He might have been the head of Blaze sales, maybe.
 7   Q.  So you mentioned that your first experience with Chubb
 8   was an RFI in early 2006?
 9   A.  Right.
10   Q.  I take it this e-mail relates to that process?
11   A.  Yes, this is that.  This is that.
12   Q.  Okay.
13   A.  So it says RFI.  So we can clear up the RFP, RFQ.  It's
14   an RFI.  That's what it was, yeah.
15   Q.  And there's reference to -- in the middle of the first
16   paragraph, the "divisions revenue"?
17   A.  Yes.
18   Q.  -- is 3.35 billion with 1,000 employees.  Do you see
19   that?
20   A.  I do see that.
21   Q.  And do you think that's referring to the specialty
22   insurance division?
23   A.  No, but, yes, yes.
24   Q.  Okay.  And is the relevance of that 3.5 billion linked
25   to the pricing for whatever the proposal was that FICO
```

1    provided?

2    A.  Yes.

3    Q.  So FICO would look at the revenue for the entity or

4    entities that it was going to provide a license to and

5    determine its pricing in some ways based on that revenue?

6    A.  Yes, revenue would certainly be a consideration of

7    pricing.  One element.

8    Q.  Okay.  Why is that?

9    A.  How do you mean?

10   Q.  Do you know why it is that revenue is a consideration in

11   pricing for FICO software licenses?

12   A.  Well, do I know exactly how?  There are parts that I

13   know, but I'm not really on the pricing team.

14         Well, not to too cute, but, sorry, it's really

15   very simple in many ways.  So Blaze is a tool that can be

16   used in a lot of different ways.  So there are things that

17   it does that we'd sell a what we called a named application

18   for very limited use that didn't derive a lot of business

19   value, but it did derive some functional value.  So we'd

20   find ways to price out appropriately.

21         But when we're in a high volume -- high value,

22   high dollar amount business, we really try to price based on

23   the value of the software.  Of course, you see a lot of the

24   software licenses are done based on CPUs or transactions or

25   volume.  We didn't really have that in a pricing model.  We

1    had revenue.

2    Q.  Showing you what's been marked as Exhibit 107.  Take a

3    minute to review this string of e-mails and let me know when

4    you're ready.

5    A.  So this was what was going on in the sausage factory

6    when I wasn't looking.  Huh.  It's very interesting.  Okay.

7    Q.  So if you look at the second page of the e-mail, it's an

8    e-mail from Larry Wachs to John Haines and you?

9    A.  He copied me, right.

10   Q.  What role is John Haines at this --

11   A.  John Haines would have been a territorial sales manager,

12   so Larry would be the sales rep.  John would have, say, call

13   it the northeast or the east or whatever.  He would have

14   some sort of territory less than the United States.  There

15   would be someone that probably had the United States at that

16   time, and then someone who had the world.  Maybe, maybe not,

17   at that time.

18   Q.  And in this e-mail, Larry is talking about negotiation

19   of the Chubb license, correct?

20   A.  Larry is, yes, Larry is, yeah.  Yeah, sure.  That's

21   correct.

22   Q.  And if you look in the middle of the page, Larry states,

23   "The following additional salient points should be

24   considered."  Point number C, "the renewal project."

25              And that's the project that was being negotiated

1    for the first phase of the license in June of 2006, correct?

2    A.  That's correct.

3    Q.  Okay.  "The renewal project is a showcase that will,

4    when successfully completed in December 2006 result in a

5    push to negotiate a global ELA that Bill Waid has quoted at

6    around 1.6 million with 100 percent credit of license

7    amounts paid in the previous 12 months."  Do you see that?

8    A.  I do see that.

9    Q.  So at this time in June of 2006, there clearly was

10   discussion about a global ELA for Chubb, correct?

11   A.  How do you mean?

12   Q.  Well, this says, "push to negotiate a global ELA that

13   Bill Waid has quoted around 1.6 million."

14   A.  So that would have been internal between Bill Waid and

15   John Haines and Larry.  Chubb never saw a global price like

16   that.

17   Q.  Okay.

18   A.  If they did, I would like to see where they saw that.

19   Q.  Okay.

20   A.  Okay.

21   Q.  So your position is that -- well, I guess was Chubb

22   talking about a global ELA in June 2006?

23   A.  No, but FICO was.  So the sales team and the Blaze sales

24   team said, okay, how do I sell more?  Well, put some

25   buildups here.

1    Q.  Okay.  And so your position is Chubb wasn't talking

2    about a global ELA, internally FICO was talking about a

3    global ELA in June of 2006, fair?

4    A.  Bill Waid and John Haines and Larry may have been, yeah.

5    That's what this e-mail complies or states, yeah.

6    Q.  Showing you what's been marked as Exhibit 108.

7    A.  Yeah, yeah.

8    Q.  So this is an e-mail dated June 16, 2006, from John

9    Haines to Bill Waid, copy to Larry Wachs, Subject:  Chubb

10   Question.

11   A.  Without me on it though, right?  Okay.

12   Q.  Showing you what's been marked as Exhibit 110.  Take a

13   look back at Exhibit 108 for me.

14          This is the e-mail from John Haines to Bill Waid

15   and Larry Wachs where John Haines states, "Chubb is

16   inquiring again about an enterprise price but they want to

17   know if it would include international."  Correct?

18   A.  That's what it says, yeah.

19   Q.  Okay.  And that was June 16th of 2006, correct?

20   A.  That's right.

21   Q.  Okay.  And then --

22   A.  That's what it says.

23   Q.  A few days later in Exhibit 107.

24   A.  Oh, it goes by -- interesting, the exhibits go in

25   different order than the dates.  Okay.

```
1    Q.  This was the e-mail that we looked at that you were

2    copied on between Larry Wachs and John Haines again?

3    A.  Yes.

4    Q.  A few days later in item C, Mr. Wachs there will be a

5    push to negotiate a global ELA that Bill Waid has quoted at

6    around 1.6 million, correct?

7    A.  I'm sorry, the question is?

8    Q.  Just use of that language, bear with me?

9    A.  Paragraph C, yes.

10   Q.  Yep.  And where Mr. Wachs says that there will be a push

11   to negotiate a global ELA that Bill Waid has quoted at

12   around 1.6 million.  Do you see that?

13   A.  I do see that.

14   Q.  Okay.  And your position is that by "quoted," FICO is

15   not saying that that price was actually given to Chubb, is

16   that fair?

17   A.  Right.  That's correct.  Bill Waid would have quoted

18   that to John and to Larry, but it would have went through me

19   or through Larry to get to Chubb.  I haven't seen anything

20   that says 1.6 on it.

21   Q.  Okay.  But 1.6 was the number that was being discussed

22   as the number associated with the global ELA, correct?

23   A.  Between Bill and John and Larry with a copy to me.

24   Q.  Okay.

25   A.  It looks like.
```

DEPOSITION OF RUSSELL SCHREIBER

1    Q.  Okay.  So we're talking about Exhibit 110.  There are

2    actually three documents encompassed in Exhibit 110,

3    correct?

4    A.  Uh-huh.  I'm pausing while I make sure there are three

5    documents.  Yes, there are three documents.

6    Q.  Okay, the first document is entitled, "Software License

7    and Maintenance Agreement," is that correct?

8    A.  That is correct.

9    Q.  And that document is dated June 30, 2006, correct?

10   A.  Oh, yes.  There it is, yes.

11   Q.  And this is the first license agreement that Chubb and

12   FICO entered into for the use of Blaze, correct?

13   A.  Yes, it is.  Yes.

14   Q.  The second document is titled, "Amendment One to

15   Software License and Services Agreement," correct?

16   A.  That's the title, yes.

17   Q.  Dated August 1, 2006?

18   A.  Correct.

19   Q.  And this is the second license that Chubb and FICO

20   entered into for the use of Blaze, correct?

21   A.  Is this -- yes, correct.

22   Q.  Okay.  And then the final document in Exhibit 110 is the

23   "Amendment two to Software License and Services Agreement,"

24   dated December 28, 2006, correct?

25   A.  Right.  That's correct.  That's only 1.1 -- okay, yes,

1    correct.

2    Q.  And this is the enterprise license that we have been

3    referring to earlier this morning, correct?

4    A.  That's right.  We have referred to it, yes, yeah.

5    Q.  Okay.

6    A.  This is why we're here.

7    Q.  Does this document reflect roughly $200,000 in license

8    fees were paid in connection with the first license?

9    A.  Yes, 199,813 include -- well, no, it's license and

10   maintenance.

11   Q.  Okay.  License and maintenance together?

12   A.  Right.

13   Q.  All right.

14   A.  Very different, maintenance.

15   Q.  All right.  And then the second license, how much was

16   paid in connection with the second license?

17   A.  Oh, so I need to go the second thing, right?

18   Q.  Amendment One.

19   A.  Right.  Amendment One, the license was 350.  License and

20   maintenance was 402,500.

21   Q.  Okay.  And was that -- okay.  And then the third --

22   A.  I like these are signed, good.

23   Q.  -- document, Amendment Two --

24   A.  Yep.

25   Q.  -- is the enterprise license, and let's go through what

1   was paid for that.  So on the first page there's a breakdown

2   of the license and maintenance fees, correct?

3   A.  On the first page, right, this chart and this table, is

4   that what you're referring to?

5   Q.  Yes?

6   A.  Yes.

7   Q.  Okay.  So the Blaze Advisor development license fee was

8   1.3 million, correct?

9   A.  That's right.  For Java and .Net.  Did not include

10  Cobol, did not --  okay, yes, for Java and .Net only,

11  correct.

12  Q.  Okay.  And so 1.3 was the enterprise-wide license fee,

13  right?

14  A.  That's right.

15  Q.  And then there was a credit for license fees paid under

16  the agreement?

17  A.  Right.

18  Q.  And that agreement was entered into in December 28,

19  2006?

20  A.  Right.

21  Q.  Were you involved in December of 2006 in the efforts by

22  FICO to close that enterprise license agreement?

23  A.  Yes.

24  Q.  Take a look at Exhibit 12.

25  A.  Yep.  Okay.  I've read it.

1   Q.  So this is a string of e-mails that involve you and

2   Larry Wachs, and Jack -- or Jim Black at Chubb dated first

3   December 1, 2006, and then later on December 12, 2006,

4   correct?

5   A.  That's correct.

6   Q.  And at the top of Exhibit 112, you write an e-mail to

7   several people at FICO.

8   A.  Uh-huh.

9   Q.  And you're providing this background in preparation for

10  a call, correct?

11  A.  Right.

12  Q.  Okay.  I take it the call was going to be about the

13  negotiation or the ELA?

14  A.  Yes, I would take it that way too.

15  Q.  At this point, FICO and Chubb are in active negotiations

16  relating to what Chubb is going to buy in terms of an

17  enterprise license, correct?

18  A.  Right.

19  Q.  And then you say, "As I was thinking about it, why drop

20  our price further (other than being easy) a press release

21  would be worth 100 K to us"?

22  A.  Right.

23  Q.  What do you mean "other than being easy"?

24  A.  Just to say, yes, so we can -- so to be a good vendor,

25  yes, we'll give you an additional discount and get it done.

1   Q.  So you're saying we could get a press release to drop

2   our price 100K?

3   A.  In preparation for the call, saying let's think about

4   reasons why we could drop our price further.  And that was

5   the only thing I could think of plus it was a pretty good

6   price already.

7   Q.  And do you recall off the top of your head whether you

8   ended up doing that?

9   A.  No, I don't recall.

10  Q.  Showing you what's been marked as Exhibit 113.  Tell me

11  when you've had a chance to look through this e-mail.

12  A.  That's fun.  Global -- This is first time I've seen

13  global, okay.

14  Q.  This is the first time you've seen what?

15  A.  Global in the way that makes sense to me and the way

16  you're trying to get me to.

17  Q.  Okay.  So this is an e-mail around the same time as the

18  e-mail we were just looking at in Exhibit 112.

19  A.  So this is the 12/12 date, which is right, same as my

20  day.  Okay.

21  Q.  You're on the e-mail?

22  A.  Yep.

23  Q.  The e-mail goes through the original negotiations in

24  June of '06.  And states that in June of '06, 1.6 million

25  for a corporate ELA was quoted to Chubb, correct?

1   A.  That's what it states.  Although, I haven't seen that in

2   any of our numbers before.  This is the first time I've seen

3   this number, right?

4   Q.  Well, we looked at a document earlier today that said

5   Bill Waid had quoted 1.6 for a global ELA?

6   A.  Right, but not a corporate ELA.  So that's why I'm

7   confused.  It's got limited dev seats.  It's just not

8   footing for me.  Until I see like a quote, it's all internal

9   chitchat.  Okay.

10  Q.  And the third bullet makes clear that FICO agreed to

11  hold 100 percent of the license fees paid as creditable

12  towards the 1.6 million corporate ELA for 12 months.

13          And then the e-mail talks about December

14  discussions, correct?

15  A.  December discussions, right, that's correct.

16  Q.  And it talks about the fact that the Chubb came back

17  with different prices for the ELA, correct?

18  A.  Right.  There was back and forth, yes, okay, yes.

19  Q.  Okay.  And, ultimately, that FICO came in at 1.5 for

20  everything, which included COBOL and SmartForms, the

21  second-to-last bullet, right?

22  A.  Right.

23  Q.  Then it says Chubb backed off everything saying they

24  didn't have projects on the board, and asked us to sharpen

25  our pencils for an ELA on unlimited seats, correct?

340

1    A.  That's right.

2    Q.  So do you recall making that $1.5 million offer and

3    Chubb just saying no?

4    A.  I don't.  I don't recall.

5    Q.  You don't recall it?

6    A.  No.

7    Q.  But does this refresh your recollection that that --

8    A.  No.

9    Q.  No?

10   A.  No.  You know, numbers are thrown around all the time

11   and terms used loosely all the time internally.

12   Q.  Sure.  Okay.  And it's from -- the subject line, I

13   should say is, "Chubb ELA Pricing Rationale -- from Russ and

14   Larry, quote "The Pursuit Team," correct?

15   A.  That's right.

16   Q.  At this point in time, the focus was closing the Blaze

17   ELA?

18   A.  The December close, that's right.

19   Q.  Does that indicate to you that the revenue from global

20   was included in the pricing rationale for the Blaze ELA?

21   A.  Is this -- just say it again, please.

22   Q.  Was the revenue from global, from Chubb's global

23   operations included in making the pricing determination for

24   the Blaze ELA?

25   A.  I'm just reading, okay.  Let me read the rest here.

 1    That's what Larry wrote here, yes.  It was an internal

 2    e-mail, that's right.

 3    Q.  How would you compare the amount of revenue that FICO

 4    generated from Chubb over the 10-year period that FICO did

 5    business with Chubb?

 6    A.  Perfectly fine.

 7    Q.  Fine, middle of the road?

 8    A.  I wouldn't put it -- I wouldn't put it in a bucket.  I

 9    just don't know.

10    Q.  Okay.

11    A.  The thing that was great about Chubb was we had a great

12    relationship.  They could count on us.  If I need reference,

13    we can count on them.  We had a great history together.

14    Q.  But they were not viewed by you or anyone else at FICO

15    as one of the bigger clients?

16    A.  As a big revenue generator year after year after year,

17    no.  But certainly as a name brand and a great client who we

18    had a great track record with.

19    Q.  Did you or do you recall ever talking with Mike

20    Schreiber or, I'm sorry, Mike Sawyer about what Mr. Sawyer

21    believed the scope of the Chubb ELA was?

22    A.  Specifically, no, but I can tell you we spoke about it.

23    I can't tell you when or what years or how often.  Probably

24    four times I would say over the -- over the course of a

25    decade I'm sure it's come up a handful of times.

1    Q.  Okay.  So you think you've spoken to Mike Sawyer about

2    whether the Chubb license is a global ELA about four times?

3    A.  Easily could be four times, could have been two, could

4    have been five, but certainly more than once though.

5    Q.  Do you recall what Mr. Sawyer's conclusion was about

6    whether the Chubb ELA was global?

7    A.  At any one time I can tell you Mike has come to me and

8    said, oh, they've got a global, and then, oh, no, they don't

9    have a global, okay.

10   Q.  Okay.  So he's come to you --

11   A.  With both answers.

12   Q.  I see, okay.

13   A.  And on his own, like -- of course, I know my reaction is

14   going to be always what we had today was, no, it was U.S.

15   And so he'd say, no, it's global.  And I'd say, all right,

16   go do some homework.

17   Q.  Okay.  Interesting.  So there were times during your

18   working relationship when Mike Sawyer came to you and said

19   Chubb's ELA is a global ELA?

20   A.  To paraphrase, you know, it looks like it's a global ELA

21   or, you know, I think it's a global.

22   Q.  Do you know when that was?

23   A.  No.  No, I don't.  But --

24   Q.  Do you know whether you talked about it over the phone

25   or in person?

1   A.  More likely over the phone because he was based out of

2   Boston, and I was based out of New York.

3   Q.  And how many times, based on what you can recall, did he

4   come to you and say Chubb's Blaze ELA is global?

5   A.  I can't -- I can't recall.

6   Q.  But it was more than once?

7   A.  Probably twice.  No more than three times.  When I say

8   the third time, it might have been that we looked at this

9   and I think if I saw -- yeah, forgot about the first two

10  agreements, you know, whatever.

11  Q.  Okay.  So you would actually pull the agreements and

12  talk about them with Sawyer?

13  A.  No, I don't think I've ever pulled the agreements, but

14  I've told people to pull the agreement.  And I'd say, no, I

15  did the deal.  I didn't do a global deal.  And they'd come

16  back and say, oh, there's a broken contracting process

17  because it looks like it's global.  I'd say keep reading the

18  contracts.

19  Q.  And then you said that Mr. Sawyer had come to you and

20  said that it was a global contract, but he had also come to

21  you and said it's not global.  Is that --

22  A.  That's true.

23  Q.  Okay.  And how many times did he come and tell you it

24  wasn't a global ELA?

25  A.  Every time.

```
1    Q.  Every time?

2    A.  Every time.  So each time we'd start out, oh, it looks

3    like they have a global.  Really?  And these would be years

4    in between, right?  So it probably happened in -- maybe this

5    '8 was the first time.  It happened again in '11 or '12.  It

6    may have happened in '15 or '16.  I mean it's not like we

7    spent a lot of time on this.

8    Q.  Is it important to you to determine what the proper

9    scope of the license is?

10   A.  It was already determined.  It would come up as a

11   question.  So if someone would call and say, do they have

12   coverage?  I'd say, no.  Mike would say, oh, maybe they do.

13   I'd say look again.  Oh, it looks like they don't.

14   Q.  And so --

15   A.  This literally was not -- I know this is a big thing for

16   all -- you all here, but this was like -- this is one of the

17   many things that happens every day.  And it was pretty

18   clear.  The contract says it was U.S.  There's no -- nothing

19   about global.  It just was not global.  So it would come up

20   occasionally over a decade.

21   Q.  Okay.  And so is it your recollection that when it would

22   come up, the conclusion would be this is not a global ELA

23   and, therefore, use outside of the United States is not

24   allowed.

25   A.  By definition, right.
```

1    Q.  So your testimony is you sort of vaguely recall that you

2    talked about this with Mr. Sawyer on several occasions?

3    A.  Right.

4    Q.  Correct?

5    A.  I would have said in 2011 and '15, but you showed me

6    from '8, so, oh, maybe there's something I'll remember.

7    Q.  And so you don't really have time periods when you can

8    say you had those discussions, is that fair?

9    A.  That's fair.

10   Q.  Okay.  And is it fair to say that you don't know what

11   precipitated the conversations when they did occur?

12   A.  That would be fair.

13   Q.  So you don't recall whether the topic came up because

14   Chubb actually approached FICO and said, hey, we have a use

15   in Europe that we need assistance with, is this covered in

16   the license?

17   A.  That's correct.  I would not know that off the top of my

18   head.  If you show me the e-mail, I'd say, huh, maybe.

19   Q.  Okay.  And would you think though based on your

20   recollection and your testimony today that the answer back

21   to Chubb Europe or FICO Europe, if they were dealing with

22   Chubb Europe, would have been nope, can't do it, enter into

23   license negotiations with Chubb Europe.

24   A.  I'm sorry, just play that whole thing together for me.

25   Just -- so if Chubb Europe asked us do we have licensees,

1    would FICO have said, no, you do not or yes, you do?

2    Q.  Yeah.  Yeah.

3    A.  No, I would have said, no, you do not have licensees in

4    Europe.

5    Q.  Okay.  And so --

6    A.  That would have been the right answer when someone says

7    there's, you know, someone could have said anything, but

8    that would have been the right answer.

9    Q.  Okay.  And so if someone said you do not need a license

10   to use Blaze in Europe, that was the wrong answer?

11   A.  That would be the wrong answer.

12   Q.  Do you have generally a recollection of Chubb

13   approaching FICO about use outside of the United States

14   asking for an answer about whether the license covered such

15   use?

16   A.  No.  No, we talked about using other products outside

17   of -- like Decision Simulator was the big push to use

18   outside of the United States, but not so much Blaze, if

19   Blaze at all.

20   Q.  Showing you what's been previously marked as Deposition

21   Exhibit 47.  So in Exhibit 47, the earliest e-mail in time

22   is on the second page, and it's an e-mail from Richard Hill

23   to you.

24   A.  Right.

25   Q.  Dated August 14, 2012, right?

```
 1    A.  Right.

 2    Q.  Deposition Exhibit 73 included Richard Hill and said it

 3    was a call to discuss the Chubb license agreement and plan

 4    for Chubb Europe?

 5    A.  Okay.

 6    Q.  So presumably in November of 2008, you had discussed

 7    with Richard Hill the Chubb license agreement and a plan for

 8    Chubb Europe, is that a fair statement?

 9    A.  Chubb license discussion, yes.

10    Q.  Okay.

11    A.  That's what it says, exactly what it says, yep.

12    Q.  All right.  And then in 2012, Richard Hill e-mails you?

13    A.  Four years later, yep.

14    Q.  And says, "Chubb UK have started being interested in

15    Blaze again"?

16    A.  Right.  Okay.

17    Q.  He talks about who the relationship people are in the

18    middle paragraph, right, or who they used to be?

19    A.  Right.

20    Q.  And in the third paragraph, he says "let me know if

21    anything has changed good or bad" are you with me?

22    A.  Yep.

23    Q.  And "more importantly whether we can actually sell

24    anything new here as I seem to remember their U.S. Blaze

25    license allowed them the software for free."
```

1    A.  Right.

2    Q.  So Richard Hill is e-mailing to you after that 2008

3    conversation about a plan for Blaze in Europe?

4    A.  Right.

5    Q.  And saying is there anything we can sell in Europe

6    because my recollection is they get Blaze for free.  Is that

7    a fair characterization of his e-mail?

8    A.  That's what Richard says in his e-mail, that's right.

9    Q.  Okay.  And your response is they do have Blaze ELA?

10   A.  Uh-huh.

11   Q.  Right?

12   A.  I do say they have a Blaze ELA.  Yes, I say that.

13   Q.  You do not say, no, no, no, Richard, hold on here.

14   You're wrong.  Go for it.  Get a Blaze ELA negotiated for

15   Chubb Europe.  That is not your response, is it?

16   A.  Right, that is not our response.

17   Q.  So fair to say in 2012, you understand that Chubb Europe

18   is using Blaze pursuant to the Chubb ELA, correct?

19   A.  Wrong.

20   Q.  What part of it is wrong?

21   A.  Well, they haven't started using it because they said

22   they were starting interest in using it, so that means they

23   haven't used it.

24            And I didn't say they have a global ELA or they

25   have -- don't have a global ELA.  I said, check with Mike

1    Sawyer to see what the lay of the land is.

2    Q.  So the first page then, the bottom of the page has an

3    email from Mike Sawyer to Richard Hill with a copy to you?

4    A.  Yep.

5    Q.  And Mike says, "I am the CP for Chubb.  They do have a

6    global ELA for Blaze and have an automated underwriting

7    application running in the UK already."  Do you see that?

8    A.  Yeah, yeah.

9    Q.  Okay.  You're on that e-mail?

10   A.  Yeah, yeah, I see it.

11   Q.  Okay.  So at that point why didn't you say whoa, whoa,

12   whoa, guys, you got it all wrong?

13   A.  Well, maybe I didn't read the email.  Maybe I sent it to

14   -- Maybe I picked up the phone and called him.  I don't

15   know.

16   Q.  Wait a second, they've already got an automated

17   underwriting application running in the UK.  And you're

18   telling them there's a global ELA for Blaze.

19   A.  Where am I saying that?

20   Q.  No.  Mr. Sawyer is telling them they have a global ELA

21   for Blaze.  And you're on the e-mail.

22   A.  Yes, I am.

23   Q.  Do you think you did anything in response to this amend?

24   A.  I would have picked up the phone.

25   Q.  Okay.  Called Mike Sawyer?

```
1    A.  Uh-huh, or Richard or lawyers or, yeah.
2    Q.  And do you recall doing anything in response to this
3    e-mail?
4    A.  I didn't recall the e-mail until you showed it to me.
5    So, no.  Now it's conceivable.
6    Q.  It's conceivable that you learned that they had an
7    automated underwriting application running in the UK already
8    in 2012?
9    A.  It's conceivable that I learned that this day or
10   whenever I got this e-mail.  It could have been three weeks
11   later, whenever I got it.
12   Q.  And you chose not to respond to prevent Chubb in Europe
13   from using Blaze, correct?
14   A.  Well, I don't know.  It's conceivable.
15   Q.  So you're saying it's possible that you sent an e-mail
16   and who would that e-mail have been sent to?
17   A.  It could have been to any of these people.  It could
18   have been to counsel, said we need to look at this, said we
19   need to look at this.  It would have been very brief.  I
20   would not have dug the hole deeper.
21   Q.  So it could have been to Mike Sawyer, Richard Hill or
22   FICO in-house counsel?
23   A.  The lawyers at the time, yeah.
24   Q.  Okay.  And you would have just said let's discuss?
25   A.  Yeah.
```

1    Q.  Okay.  You don't have a recollection of doing that?

2    A.  No, but I would have been consistent with what I do.

3    Q.  Okay.  What about the phone call, do you recall making a

4    call in response to the e-mail at the bottom of the first

5    page of Exhibit 47?

6    A.  I remember more phone calls than e-mails around this, so

7    these e-mails kind of surprises me, but here they are, so.

8    Q.  Okay.  And so do you recall the phone call relating to

9    Chubb's use of Blaze in Europe as a result of the exchange

10   we see in Exhibit 47?

11   A.  No.  I do remember phone calls about Chubb's use of

12   Blaze outside of the U.S. and in Europe but not in

13   connection with this necessarily.

14   Q.  Showing you what's been previously marked as Deposition

15   Exhibit 57.

16   A.  Yeah.  So here I say we have a global ELA, so I was

17   wrong.

18   Q.  You mean you were wrong in your testimony earlier today?

19   A.  No, I was wrong here.

20   Q.  This is a series of e-mails in 2015.

21   A.  Uh-huh.

22   Q.  And if you look at the bottom e-mail on the second page,

23   and it continues to the top of the third page.

24   A.  Page from the front.  I'm trying to read from the oldest

25   to the newest.  Bottom e-mail, so from me to Andy Moffat?

1    Q.  No, it's from Andy Moffat to you?  So it's from Andy

2    Moffat to you, and it's on page labeled FICO 1770.

3    A.  Got it.  Okay.

4    Q.  Okay.  So Andy Moffat on March 26, 2015 writes, "Hi,

5    Russ, hope you are well.  Larry and Ollie" -- and those are

6    UK guys, right?

7    A.  Yep.

8    Q.  FICO UK, "Recently met with Chubb in London and we are

9    looking to do some work with them."  And then he lists two

10   categories of work, correct?

11   A.  Right.

12   Q.  One is, "An additional Blaze license for commercial

13   property European-wide," correct?

14   A.  Right.

15   Q.  And the second is, "Check if they have Decision

16   Simulator as part of the contract," correct?

17   A.  Uh-huh.  Yes.

18   Q.  And then he says, "Can you help here?"

19          All right.  And then you get back to him the same

20   day?

21   A.  Right.

22   Q.  And your response is, "Chubb has global ELA for Blaze?"

23   A.  Yep, I see it.

24   Q.  "But no Simulator"?

25   A.  That's right.

1   Q.  So earlier today you testified that if someone had come

2   to you from FICO and said, hey, can we sell --

3   A.  We've had a note like this probably.

4   Q.  -- you need to let me finish my question.

5        Can we sell a Blaze license to Chubb in Europe?

6   A.  Uh-huh.

7   Q.  Or does the existing enterprise license cover Chubb

8   Europe's Europe's use?

9   A.  Uh-huh.

10  Q.  Your testimony was you would have said, no, we got to

11  sell them a license in Europe?

12  A.  Right.

13  Q.  Right.  And then you said it's possible that you even

14  tried to sell a license in Europe to Chubb when you met with

15  them in 2012?

16  A.  Right.

17  Q.  Even though you have no recollection of doing that, but

18  it would be possible if they brought it up, right?

19  A.  Of course.

20  Q.  Now, the question is actually posed directly to you?

21  A.  That's right.

22  Q.  Okay.  Chubb Europe is in conversations with FICO in

23  Europe, and FICO in Europe is saying, Russ, can we sell

24  Chubb in Europe a Blaze license?  And your answer is no.

25  A.  That's my answer, yeah.

1    Q.  The Chubb ELA covers Chubb's Europe use?

2    A.  That's right.  That's what I said in this e-mail.

3    Q.  Showing you what's been previously marked as Exhibit 60.

4    That is the quote for Decision Simulator that you approved,

5    correct?

6    A.  Right.  So I would not have seen this document, but,

7    yes, the numbers are right.

8    Q.  Okay.  So you did not see -- can I look at real quick.

9    You did not see the actual quote?

10   A.  That's correct.

11   Q.  Okay.  But you approved the numbers?  Okay.  Yes?

12   A.  I approved --  yes, I approved the numbers, the pricing

13   that's in there.

14   Q.  And the use of Decision Simulator requires an existing

15   Blaze license, correct?

16   A.  No, it doesn't, but that's -- technically it does not.

17   But in this case it -- it says that it does.  That's

18   included because of the Blaze, right.

19   Q.  Okay.  And so the quote that was provided to Chubb

20   Europe for Decision Simulator took into account --

21   A.  My mistake, yes.

22   Q.  That it was on top of an existing Blaze ELA, correct?

23   A.  That is correct.

24   Q.  And you can see in the e-mail from Andy Moffat to

25   Mr. Tonkin at Chubb and David Gibbs at Chubb, do you see

355

1    that?

2    A.  I do see that.

3    Q.  Mr. Moffat states, "No additional Blaze licenses are

4    needed as it is covered with the overall global Blaze ELA?"

5    A.  I see where he wrote that, yes.  Want that?

6    Q.  Thanks.  So he was telling Chubb Europe that Chubb

7    Europe did not need any additional Blaze licenses because it

8    was covered under the overall global Blaze ELA?

9    A.  In 2015, he said that, yes.  I think it was '15, right?

10   Is that '15 on there?

11   Q.  Yes.

12   A.  Okay.

13   Q.  Showing you what's been marked as Exhibit 120.

14   A.  Oh, from me.

15   Q.  This is an e-mail from you dated April 2014.  Do you

16   recall sending this e-mail?

17   A.  No, but I could have easily.  Oh, I just forwarded an

18   e-mail though.  I see.  Okay.  I'm forwarding the e-mail.

19   Okay.

20   Q.  And you're forwarding it to Marlene Zimmerling, Andrew

21   DiStefano?

22   A.  So that would be the Larry Wachs and Dale Zwizinski's of

23   today, of that time period.

24   Q.  Okay.

25   A.  I'm sorry, sales -- Blaze sales person and Blaze sales

1    engineer respectively.

2    Q.  And do you recall why it is that you're sending them --

3    A.  Yeah.

4    Q.  -- information about Chubb contacts and projects summary

5    around April of 2014?

6    A.  Specifically, no, but they were new hires around that

7    time.  It would have been a welcome to FICO and here's

8    Chubb.  That's my suspicion.

9    Q.  And attached to the e-mail is a couple of slides.  The

10   second page of the slides reads "Chubb Blaze Projects."  Do

11   you see that?

12   A.  I do see that.

13   Q.  And Chubb International is listed?

14   A.  I do see that.

15   Q.  And it says, "EUZ Automated Underwriting" under it,

16   correct?

17   A.  I do see that.

18   Q.  Is it fair to say that you were aware that Chubb

19   International was one of Chubb's current Blaze current

20   projects in April of 2014?

21   A.  Not from this.  Not from this.

22   Q.  Okay.  Why is that?

23   A.  Because I just forwarded this.  Someone else said, you

24   know, Mike, give me this stuff, give me the projects Chubb's

25   working on.  He gave it to me, and I forwarded it on.

1    Q.  Okay.

2    A.  So chances are I didn't read this, by the way.  So this

3    does not tell me that I was aware of their projects.

4    Q.  Do you take the position you were not aware of Chubb's

5    use of Blaze in -- Chubb Europe's use of Blaze in 2014?

6    A.  In 2014, yeah, I do.  I don't recall it.

7    Q.  We've seen several e-mails where other people have said

8    it's global that you're on, and you didn't ever say, no,

9    that's wrong.  Or, correct, those other statements.

10   A.  We haven't seen any -- anything to that effect that I

11   responded to any of those e-mails.  We haven't seen a single

12   response to any of those e-mails.  Right?

13   Q.  Right.

14   A.  We haven't seen any response that they're correct or

15   incorrect.

16   Q.  Right.  And so tell me, do you actually recall ever

17   responding to one of those e-mails in any way, responding to

18   a statement that the Chubb ELA is global?

19   A.  So the only recollection I have is the e-mail that you

20   showed me.

21   Q.  Okay.  So we do not have any writing from you in

22   connection with any of the e-mails on this topic indicating

23   that you believe the license is limited to the United

24   States; is that fair?

25   A.  No, you haven't shown me any.  I'm not saying there

1    aren't any.  You haven't shown me any.  And what's

2    interesting here it says pull up the contract -- and even

3    that one email that says it's global.  I also say pull up

4    the -- pull up the contract.

5    Q.  So we don't have any e-mails here today that we've

6    looked at in which you have said in writing the Chubb ELA is

7    alluded to the United States, is that a fair statement?

8    A.  That's a fair statement.

9    Q.  Do you think you ever wrote anything like that in an

10   e-mail during your time at Chubb, I mean FICO?

11   A.  Probably.  Likely.  I don't know.  I don't know.  I just

12   don't know.  I just don't know.

13   Q.  You just don't know?

14   A.  I'm telling you you'll find that I'm probably the least

15   -- of all the people involved I have probably the fewest

16   emails of anyone in your -- in your discovery.  I'm not a

17   big e-mail person.

18   Q.  So the question though is do you actually have a

19   specific recollection?

20   A.  One way or the other.

21   Q.  Of ever sending an e-mail that says something to the

22   effect of the Chubb ELA is limited to the United States?

23   A.  I remember having very specific positions that it was.

24   I can't tell you if I put it in an email or it was a phone

25   call with Sawyer or a phone call with Brodie saying it's a

1   U.S., U.S., U.S.  So I just can't tell you if it's e-mail or

2   phone call.

3   Q.  You have written at least one e-mail saying it is a

4   global ELA, correct?

5   A.  I did not have a recollection of that until you showed

6   it to me though either but, yes, that's correct.

7   Q.  Okay.  And you've been on other e-mails that reference

8   the ELA as being a global ELA.

9   A.  Well, there's the Larry Wachs one.

10  Q.  And the Mike Sawyer one?

11  A.  Right.

12  Q.  So the answer to that is yes?

13  A.  I've been copied on some of those e-mails, that's right.

14  Q.  Okay.  That covers it on e-mails, right, no specific

15  recollection of sending an e-mail saying that Chubb ELA is

16  limited to the United States, fair?

17  A.  Right, as I sit here today years later, did I send an

18  e-mail on such-and-such a date in 2011?  I don't know.

19  Q.  Well, I'm just here asking for your specific

20  recollection.

21  A.  Right.  I don't have a recollection sending an e-mail

22  like that.

23  Q.  Okay.  All right.  So who, I mean just tell me

24  everything that you, if you can specifically remember having

25  a conversation with someone on the topic of the Chubb ELA

1    and, you know, the scope of the Chubb ELA and whether it's

2    limited to the United States.

3            So you had a conversation with Ms. Boone by phone

4    pre-June 2006, and it was about the territory scope of the

5    license?

6    A.  Yes.

7    Q.  Okay.  Other than Jandeen Boone then, what is the next

8    conversation that you recall, that you have a specific

9    recollection of relating to the scope of the Chubb ELA?

10   A.  I believe with Owen Williams, your guy, a Chubb guy.

11   Q.  Okay.

12   A.  It would have been around between Thanksgiving and year

13   end, as we were getting a final deal done.  And global would

14   have come up at that point.

15   Q.  Okay.

16   A.  And if it was in, I'm sorry --

17   Q.  Was that an in-person or phone?

18   A.  Phone call.

19   Q.  And tell me what you recall him saying and what you

20   recall you saying?

21   A.  I recall him saying, can we make this global?  I recall

22   me saying, no, we cannot.  It's outside the scope of what we

23   priced.  At this point, we're down -- we're too far down the

24   road to make it for the numbers that they were offering.  We

25   were just too far apart.

1   Q.  Now Larry believes that the ELA actually was a global

2   ELA, correct?  Or based on the e-mail we've seen from him,

3   it appears he believes that it was global, correct?

4   A.  Based on Larry's e-mail, he certainly believes it's

5   global.  No doubt.

6   Q.  Do you have a specific recollection of having a

7   conversation with Larry?

8   A.  No.

9   Q.  About that?

10  A.  No.

11  Q.  Okay.  So here I'm really trying to be careful about

12  asking you what your specific recollections are of

13  conversations because there are times when you seem to

14  switch into assuming you might have had a conversation?

15  A.  Right.

16  Q.  Okay.  What is the next conversation that you recall

17  having relating to the scope of the Chubb ELA?

18  A.  Nothing specific.  Everything is kind of vague.  No,

19  nothing specific.  I'd be kind of projecting at that point.

20  Q.  At some point in 2015, you learned that Chubb was going

21  to enter into a transaction with ACE?

22  A.  Right.

23  Q.  Do you recall when you learned about the proposal --

24  A.  Yeah, the day of the announcement, absolutely.  It was

25  July 10 or whatever it was.

1    Q.  What was your response upon learning that?

2    A.  I mean literally or -- I don't know.  But I could tell

3    you I know it had a license event.  A license event would

4    have been my response.

5    Q.  Okay.  But do you recall like did you just start having

6    conversations with people?  Did you do anything specifically

7    that you recall once you learned about the potential

8    transaction?

9    A.  I do.  I do.  I knew we had a license problem because

10   our license is pretty generous in the way we do it at FICO.

11   So you have a lot of capacities and a lot of different ways

12   within the scope.  Like for growth like if you have -- your

13   business grows, you can still use it.  We don't really deal

14   with that.  But what we're very specific about is change of

15   ownership, change of control.  If you acquire a company, if

16   you sell a company, if you're acquired by a company, then

17   you got to -- you have a license of that.

18          So I remember very specifically saying oh, boy,

19   big license event because I knew Ace was huge.  It's like

20   twice the size of Chubb, as I recall.  That would have been

21   my reaction.

22          And I quickly thereafter, it would have been to

23   Sawyer most likely, I think it was Sawyer at the time, start

24   looking into it.

25   Q.  Did you --

1          THE COURT:  Why don't we stop it there and take

2     our noon break.  Okay?

3          MR. HINDERAKER:  Your Honor, before the jury is

4     released, could I have a sidebar with you?

5          THE COURT:  By all means, come on up.

6          (Sidebar discussion.)

7          MR. HINDERAKER:  I should have done this at the

8     outset.  The deposition, of course, is being played in our

9     case, but I think to avoid the confusion, I think the jury

10    should know that this examination now is by Leah Janus for

11    the defense.  I'll have some -- my voice will appear near

12    the end of the transcript, but just that it's clear about

13    from whom the questions are coming I think would be

14    appropriate.

15          THE COURT:  I agree.

16          MS. GODESKY:  That's fine.

17          THE COURT:  Do you want me to do it now?

18          MR. HINDERAKER:  If you could do it, better you,

19    but.

20          THE COURT:  All right.  I'll do it then.

21                    (IN OPEN COURT)

22          THE COURT:  Members of the jury, we're going to

23    take our noon break in just a second.  I want to make sure

24    that you understand the context of what you just listened

25    to, you were hearing questioning by Ms. Janus, who is one of

 1    the lawyers for Federal and ACE American.  That testimony

 2    comes in as part of the defendant's case.  It's not

 3    testimony that is being offered by FICO.  You will hear

 4    Mr. Hinderaker's voice later on the video when he's

 5    questioning --

 6              MR. HINDERAKER:  Schreiber.

 7              THE COURT:  Schreiber and that is testimony coming

 8    in through FICO.  All right.  Counsel, is that sufficient?

 9              MR. HINDERAKER:  Thank you, Your Honor.

10              THE COURT:  All right.  We'll take your noon

11    break.  Plan to be back at about 1:30.  Okay?

12              (Jury out at 12:03 p.m.)

13                        (IN OPEN COURT)

14              THE COURT:  Go ahead and be seated.  Just for

15    planning purposes.  Mr. Eberle, how long do you think it

16    will take to do the offer of proof and in what form do you

17    plan to do it?

18              MR. EBERLE:  Your Honor, a formal offer would be

19    preferable that --

20              May we do a formal offer of proof by questioning

21    Mr. Baer?

22              THE COURT:  That's fine.  How long do you think

23    that will take?

24              MR. ERBELE:  Maybe a half hour.

25              THE COURT:  Okay.  Well, let's come back here.

1    Mimi, why don't you give them until 1:45.  Let them know

2    real quick, and we'll come back at 1:15.

3             Mr. Fleming, I guess would you do a limited cross

4    with respect to that offer of proof?

5             MR. FLEMING:  Yes.

6             THE COURT:  How long do you think that will take?

7             MR. FLEMING:  Ten to 15 minutes.

8             THE COURT:  Okay.  All right.  Well, let's come

9    back here about 1:10 then and we'll take that up on the

10   record.  Okay.

11            MR. ERBELE:  Thank you, Your Honor.

12            THE COURT:  Thank you.  We're in recess.

13            (Lunch recess at 12:05 p.m. till 1:10 p.m.)

14                       **IN OPEN COURT**

15                     **(JURY NOT PRESENT)**

16            THE COURT:  Good afternoon.  Be seated.

17            All right.  Mr. Erbele, do you want to proceed?

18            MR. ERBELE:  Yes, Your Honor.  And we are still

19   compiling some of the exhibits.

20            THE COURT:  You have to speak up if you are not at

21   the mic.  I'm sorry.

22            MR. ERBELE:  We're compiling a couple of the

23   excluded exhibits for use with the testimony, but I can get

24   started --

25            THE COURT:  Okay.

1          MR. ERBELE:  -- on background if you would prefer.

2          THE COURT:  It's fine.  How long will it take to

3     get those done, do you think?

4          MR. ERBELE:  About five minutes.

5          THE COURT:  Okay.  That's fine.  Well, do you need

6     Mr. Baer, or will it distract you to go ahead and start?

7          MR. ERBELE:  It won't distract me.

8          THE COURT:  All right.  Why don't we start then

9     and whatever we need to do to get those in or what have you.

10          MR. ERBELE:  And then there was a housekeeping

11     matter with respect to the exhibits that were admitted with

12     Mr. Baer.

13          THE COURT:  Yep.

14          MR. ERBELE:  I think the redacted exhibits we had

15     provided as -- with the suffix of A.

16          THE COURT:  Yep.

17          MR. ERBELE:  And so it was 1171A, and the other

18     two was A, just to make sure everything is consistent.

19          THE COURT:  I notice that those are admitted as

20     redacted, and so the numbers that will be recorded will be

21     the redacted versions.  And any objection you want to

22     preserve to the unredacted versions is preserved.

23          MR. ERBELE:  Okay.

24          THE COURT:  Okay.

25          MR. ERBELE:  Thank you, Your Honor.  I will go

```
 1    find Mr. Baer.

 2              THE COURT:  Okay.  Thank you.

 3              Come on up, Mr. Baer, come on back to the witness

 4    stand.

 5              So, Mr. Baer, just so you know what we're doing --

 6    go ahead and be seated -- we're doing what's called an offer

 7    of proof, what the testimony would have been and shown had I

 8    allowed you to testify to certain documents that I didn't

 9    allow.  You just need to understand you are under oath

10    during this process, okay?

11              THE WITNESS:  Okay.

12                         BENJAMIN BAER,

13    called on behalf of the plaintiff, was duly sworn, was

14    examined and testified as follows:

15              THE COURT:  All right.  Go ahead, Mr. Eberle.

16                       DIRECT EXAMINATION

17    BY MR. ERBELE:

18    Q.  Mr. Baer, as vice president of product marketing, what

19    was your involvement in preparing FICO's case studies,

20    success stories and white papers?

21              COURT REPORTER:  Can you turn on your microphone,

22    please?

23              THE WITNESS:  Is that better?  Can you hear me

24    now?

25              One more time.
```

```
 1    BY MR. ERBELE:
 2    Q.  As vice president of product marketing, what was your
 3    involvement in preparing FICO's case studies, success
 4    stories and white papers?
 5    A.  My team was responsible for helping to identify
 6    potential success stories and then funding the initiative
 7    and doing all the reviews.
 8    Q.  And what was your specific involvement in FICO's case
 9    studies and success stories?
10    A.  So among others on my team, I would talk with a lot of
11    salespeople after deals were closed, and they made the
12    announcements that we had signed on a new customer.  And
13    we'd interview them and understand the use case.  And then
14    depending on how the implementation went and over a period
15    of, you know, six months to a year, we would initiate,
16    usually through a contractor, but initiate a connection
17    between the documentarian and the customer themselves, and
18    they would do interviews and document the success story.
19    Q.  So what is a success story?
20    A.  It's a document that really outlines a single customer's
21    implementation:  What problems they face, how they went
22    about resolving those challenges, how the products were used
23    and ultimately articulating the metrics that they used to
24    articulate success.
25    Q.  And what is a case study?
```

1    A.  So a case study is just another name for success story.

2    We use those terms interchangeably.

3    Q.  And who are the success stories given to?

4    A.  They're given to a variety of people.  I think that

5    there are basically three main constituents.  The first is

6    product management -- product managers, for them to better

7    understand what the use cases are, what values our customers

8    are looking for from the products and potentially even

9    enhance the products themselves.

10              The second group is sales reps.  We use it as an

11   enablement piece, so they can understand what the market

12   opportunity is and some of the key metrics and value

13   statements that customers value in the products.

14              And then lastly, we use it as dimension.  We use

15   it with prospective customers.

16   Q.  Are they given to FICO's product development team?

17   A.  Yes.

18   Q.  Why?

19   A.  Just so they can learn where and how the product is

20   being used.  And, you know, the documents clearly articulate

21   the value statements that the customers have in where and

22   how the products are used.

23   Q.  So how does FICO's marketing department prepare these

24   documents?

25   A.  It's a relatively long process.  We interview -- once we

1    identify a prospective customer and we get their approval to

2    move forward with the success story, then they'll be

3    interviewed usually in a number of rounds of interviews,

4    depending on who the stakeholders are.  They will also do

5    some internal interviews to understand the sales process and

6    integrate that also into the success story.

7         And then we usually go through many rounds over

8    the course of months back and forth with the customer,

9    because we want it to be accurate and reflective of the

10   customer's real experience.

11   Q.  And what kind of information is obtained in that

12   interview process?

13   A.  The -- we usually try to articulate what are the

14   challenges the customer faced in them going and looking for

15   a business rules management solution.  Sometimes we'll talk

16   to them about other competitors that they looked at or what

17   that process looked like.

18        And then we try to articulate what the

19   implementation was like, so the installation of the

20   software, the creation of business rules, the integration of

21   an automated solution.

22        And then we also try to measure with them what

23   were the metrics you used to measure success and what were

24   those metrics, the outcome.  So what happened before and

25   what happened after the implementation.

1   Q.  Can you describe the revision process for success

2   stories?

3   A.  They go back and forth until the customer is comfortable

4   with the document.  It's supposed to be an accurate

5   reflection of the customer's real-world experiences.  They

6   provide the metrics.  They provide the challenge statement,

7   if you will.  And we want to make sure that before we

8   publish anything, it's something that they're comfortable

9   with.

10  Q.  And what about the approval process?  Can you describe

11  that?

12  A.  So the approval process is pretty simple.  The customer

13  needs to approve it.  We'll go back and forth in terms of

14  changes and updates, but at the end of the day, it needs to

15  accurately reflect what the customer is comfortable with and

16  what the customer experienced.

17  Q.  Are they ever published before receiving customer

18  approval?

19  A.  Never.

20  Q.  And how do you know that the client information included

21  in the success stories is accurate?

22  A.  I can only take the word of the customer themselves.  We

23  usually talk to a wide variety of constituents, so including

24  IT, including business management, even some CXOs, within

25  the organization, as well as the business managers in the

1    deployment itself.

2    Q.  And do clients always allow their names to be used on

3    the success stories?

4    A.  No.  So we actually go through a long, lengthy process

5    to create something that everyone is comfortable with, but

6    at the end of the day, there are some customers who come

7    back and say, we like the story, it's accurate, but we

8    can't, for legal reasons or competitive reasons, put our

9    name on it.

10   Q.  Is the same approval process followed for anonymous

11   clients?

12   A.  That's correct.  And just for clarification, even if

13   it's all accurate, the customers in some cases come back and

14   say, we don't want that published at all, even anonymously,

15   so we will withhold.

16   Q.  To your knowledge, does FICO improve its products based

17   on customer feedback?

18   A.  To the best of my knowledge, it's part of the customer

19   inquiry process for product management.

20   Q.  And is the information received from FICO's customers

21   transmitted to its product department?

22   A.  Yes.

23   Q.  And to your knowledge, do they rely on the accuracy of

24   that information to review and improve the performance of

25   FICO's products?

```
1    A.  To the best of my knowledge, they do.

2    Q.  And that would include Blaze Advisor?

3    A.  That would include Blaze Advisor.

4    Q.  Did FICO produce the success stories before you started

5    in 2013?

6    A.  Yes.

7    Q.  And how do you know?

8    A.  Because it was part of the orientation package.  The

9    education that I went through when I started was reviewing

10   success stories.

11   Q.  And do you know if the process for creating them was the

12   same before you started at FICO?

13   A.  So part of my job in coming to FICO was to create a

14   center of excellence around product marketing, so I spent a

15   lot of time within the organization asking, what is the

16   process that you follow; how does this all work?  And to the

17   best of my knowledge, it's the same process.

18   Q.  Do you have Exhibit P1025 in your binder?

19   A.  Yeah.

20   Q.  And do you recognize this document?

21   A.  I do.

22   Q.  And what is it?

23   A.  It's one of the anonymous case studies that we referred

24   to, or success stories.

25   Q.  And do you have Exhibit 1024, Mr. Baer?  Can you turn to
```

1    that one?

2    A.  Yes.  Yes.

3    Q.  And what is that document?

4    A.  That's a compilation of success stories.  We created the

5    compilation to make it easier to find relevant industries in

6    use cases.

7    Q.  And are all of the success stories in that compilation

8    produced in the same manner that you just described?

9    A.  They are.

10   Q.  And is it the regular practice of FICO to assess the

11   benefits of Blaze Advisor realized by its clients?

12   A.  Yes.

13   Q.  And are all of the case studies in that compilation

14   created and kept in the ordinary coerce of FICO's business?

15   A.  They are.

16   Q.  And to your knowledge, is the information received from

17   FICO's clients kept in the ordinary course of their

18   business?

19   A.  It is.

20   Q.  And are the case studies and success stories produced

21   closely after FICO receives this information from its

22   clients?

23   A.  Shortly after they are approved by the client, yes.

24   Q.  And does FICO rely on the results of the case studies

25   and success stories in the course of its business?

1    A.  It does.

2    Q.  Including by improving its products, as you described,

3    right?

4    A.  Correct.

5    Q.  So I'm going to ask you about several of the specific

6    case studies in this compilation.  Can you turn to --

7            MR. ERBELE:  Mr. Mayleben, would you publish the

8    exhibit, please?

9    BY MR. ERBELE:

10   Q.  Can you turn to page 3, I believe, Mr. Baer?

11   A.  Yes.

12   Q.  And what is shown on that page?

13   A.  This is a table of contents that lists the industry

14   segments that we categorized within this document.

15   Q.  And is insurance one of the industries listed?

16   A.  It is.

17   Q.  Can you turn to the insurance industry section on

18   page 119?

19   A.  Yep.

20   Q.  And can you list the clients that appear there,

21   Mr. Baer?

22   A.  A Leading Insurer, Medscheme, Mercury Insurance,

23   Prudential Life, and Top Auto Insurer.

24   Q.  Can you turn the page to Leading Insurer?  And what does

25   that show?

```
 1    A.  So the first page of the success story lists a

 2    description of -- well, in this case, it will be a customer

 3    quote.  But it lists the client, a brief description, the

 4    challenge they faced, the solution they used and the

 5    results.

 6    Q.  Can you just briefly describe the challenge solution and

 7    results?

 8    A.  Make more efficient and consistent underwriting

 9    decisions.  The solution they used was FICO Decision

10    Management Suite, including FICO Blaze Advisor decision

11    rules management system and FICO predictive models.  And the

12    results said realtime underwriting of new business, which

13    lowered it's combined ratio, reduced underwriting losses and

14    improved targeting of new business.

15              MR. ERBELE:  Mr. Mayleben --

16              MR. FLEMING:  Mr. Erbele, what exhibit are you on

17    now?

18              MR. ERBELE:  This one is 1024.  It's a

19    compilation.

20              There we go.

21              Mr. Fleming, do you see that one on your screen?

22              MR. FLEMING:  I do.

23    BY MR. ERBELE:

24    Q.  Could you just walk through the challenge, solution and

25    results again, Mr. Baer?
```

1    A.  Sure.

2         The challenge is make more efficient, consistent

3    underwriting decisions.  The solution is the FICO Decision

4    Management Suite, including FICO Blaze Advisor decision

5    management rule system and FICO predictive models, and the

6    result is realtime underwriting of new business, which

7    lowered combined -- its combined ratio, reducing

8    underwriting losses and improved targeting of new business.

9    Q.  Can you turn to the Medscheme case study on page 126?

10   A.  Yep.

11   Q.  Or I believe it begins on page 122.

12         And what's shown there?

13   A.  So this is -- is similar to the last one.  It describes

14   Medscheme, who they are, the challenge they faced, the

15   solution they used and the results that they achieved.

16   Q.  And turning to page 126, can you walk through those

17   results?

18   A.  Sure.  So we summarized the metrics that Medscheme

19   achieved with these ten bullets, the first being

20   scaleability, their ability to process the number of claims,

21   400,000 claim lines per day on average; traceability, the

22   documentation of their rules became much easier and

23   mappable, allowing for quick changes and inquiry; claims

24   efficiency, they reduced their claims interventions by

25   15 percent; reliability of the solution, their speed time to

1    market; a more efficient use of resources; continued

2    stability of the overall claim system; greater flexibility;

3    a building of new skills for their employees; and increased

4    agility with regards to the rules capabilities.

5    Q.  Can you turn to page 131?  And what is shown there?

6    A.  This is a Prudential success story.

7    Q.  And what is this list?

8    A.  Also a brief description of the company, a brief on

9    their challenge, the solutions that they used and a list of

10    the results.

11    Q.  Can you walk through the solution and the results,

12    Mr. Baer?

13    A.  So the solution they -- it deployed was a FICO Blaze

14    Advisor Decision Rules Management System and FICO Model

15    Builder.  And the results, they're automating -- they

16    automated the evaluation and underwriting of up to

17    50 percent of their policies, reducing their loss ratio and

18    cutting operating costs by 70 percent.

19    Q.  Can you turn to Exhibit 1170, Mr. Baer?

20    A.  I don't think that I have 1170 here.

21    Q.  I may have that copy.

22         Do you recognize this document, Mr. Baer?

23    A.  I do.  This is an older version of a compilation of

24    success stories.

25    Q.  So were each of the success stories in this compilation

1    produced according to the process we described earlier?

2    A.  They were, yes.

3    Q.  And did FICO rely on the accuracy of these success

4    stories in the same manner as we described earlier?

5    A.  Yes.

6    Q.  Can you -- can you turn to Exhibit 932?  It may be in

7    your -- in the red rope instead of the binder.

8    A.  Yes, sir.

9    Q.  And what is that document?

10   A.  This is a success story for Aviva.

11   Q.  And was that success story produced in the same manner

12   we described previously?

13   A.  Yes, it was.

14   Q.  And FICO relies on that success story in the same

15   manner?

16   A.  Yes.

17   Q.  Taking the success stories as a whole, how important is

18   it to FICO that all of these documents are absolutely

19   accurate?

20   A.  It's a hundred percent critical that they're accurate.

21   Q.  And why is that?

22   A.  Well, it not only helps us internally and improve the

23   product, but we're representing customers here, so we don't

24   want to put any of those claims at risk or in jeopardy and

25   sour -- potentially sour the relationship.

```
 1    Q.  And what would happen if they weren't accurate?

 2    A.  Well, they wouldn't get published.

 3    Q.  Can you turn to Exhibit P1028?  I think that one would

 4    be in your binder.

 5              And do you recognize this document?

 6    A.  I do.

 7    Q.  And what is it?

 8    A.  This is a Forrester industry analyst report, the total

 9    economic impact of FICO Decision Modeler.

10    Q.  And I believe you testified earlier that Decision

11    Modeler includes cloud-based Blaze Advisor; is that correct?

12    A.  They have the same capabilities, yes.

13    Q.  And who is Forrester?

14    A.  Forrester is a well-known leading industry analyst firm.

15    Q.  In what industry?

16    A.  So they do technology assessments.  They're one of the,

17    I think, three largest industry analyst firms that focus on

18    helping companies determine which technologies they should

19    adopt, what benefits they would get from those adoptions.

20    They do industry analyst reports that cover trends, cover

21    new technologies.

22    Q.  And when you say "well-known," what do you mean by that?

23    A.  Well, in the industry analyst trade, they're basically a

24    top tier of technology industry analyst firms.  There are

25    three:  Gartner, Forrester and IDC.  And then there's a
```

1    whole bunch of other ones.  They are really the three big

2    dogs in this space.

3    Q.  Can you turn to page 5 or numbered page 5, which I

4    believe is the seventh page in the document?

5            Do you see the gray box?

6    A.  I'm not there yet.  Page 5.  Okay.

7            Yes, the gray box.

8    Q.  And can you read the second to last sentence there

9    beginning with "FICO reviewed"?

10   A.  "FICO reviewed and provided feedback to Forrester, but

11   Forrester maintains editorial control over the study and its

12   findings and does not accept changes to the study that

13   contradict Forrester's findings or obscure the meaning of

14   the study."

15   Q.  So what was FICO's involvement in this study?

16   A.  So the TEI, the total economic impact report or

17   methodology, is a uniquely Forrester methodology for

18   measuring the total economic impact of adopting a

19   technology.  They have produced these kinds of reports for

20   years and refined the methodology they use to measure this.

21   When I saw these reports, I said, that's something that we

22   would benefit from.  And so we reached out to Forrester, and

23   this is a paid document.  We paid them to do -- run their

24   methodology on our customers.

25   Q.  But in your experience, did Forrester indeed maintain

1    editorial control like this box said?

2    A.  Complete editorial control, yes.

3    Q.  And did FICO provide any information to Forrester for

4    this study?

5    A.  We did.  We provided access to some of the documentation

6    that we've shared today.  We -- we had them -- they asked to

7    interview a number of sales implementation engineers within

8    FICO, and we gave them five customers to interview.

9    Q.  And did FICO ensure that information was accurate?

10   A.  To the best of our ability, yes.

11   Q.  How so?

12   A.  Well we reviewed all the documentation as a normal

13   course of action, course of publishing.  And things like the

14   success stories would never have been given to Forrester

15   unless they were already vetted.

16   Q.  Can you turn to numbered page 1, which I believe is

17   page 2 of the document?

18              And what is shown there?

19   A.  This is an executive summary of the study itself and a

20   really quick synopsis of the net results of their study.

21   Q.  And what were those net results?

22   A.  A return on investment of 356 percent, representing a

23   net present value of $8.1 million; an increase in revenue

24   and profit of $4.9 million; and an overall reduction in

25   losses by $3.3 million.

1    Q.  And after this Forrester study was published, did FICO

2    distribute it to anybody?

3    A.  Yes.  We made this available as a prospecting document

4    on our website.

5    Q.  And why would FICO do that?

6    A.  Because I think this reflects accurately something that

7    would be of interest to prospective customers, what it means

8    to adopt our software and implement a business rules

9    solution.

10   Q.  Does FICO rely on analyst reports, such as this study,

11   for anything else?

12   A.  We rely heavily on industry analyst reports.  Industry

13   analysts represent a third party, if you will.  They provide

14   tremendous viability and credibility to the story that we

15   are trying to tell, and they're largely seen by IT

16   purchasing customers as an independent third party to

17   provide a fair assessment of the technology.

18   Q.  Can you turn to Exhibit P295, Mr. Baer?

19   A.  I can't find that in my documents.

20   Q.  It may be in the red rope.

21   A.  Yes, it is.  The last one.  Yes, sir.

22   Q.  Do you recognize this document?

23   A.  I do.

24   Q.  And what is it?

25   A.  This is a white paper from another industry analyst firm

1    called Enterprise Strategy Group that focuses on the value

2    of embedding Blaze Advisor to build solutions.

3    Q.  And is Enterprise Strategy Group, or ESG, well known in

4    the technology industry?

5    A.  They are.  They are not one of the top firms.

6    Q.  And what was FICO's involvement in the production of

7    this document?

8    A.  We contracted or consulted with Steve Hendrick at ESG

9    and hired him to write this paper.

10   Q.  And what types of information did FICO provide to ESG?

11   A.  A copy of all the externally facing documentation much

12   like what we've gone through today, as well as access to

13   some of our customers and partners.

14   Q.  And did FICO ensure that information is accurate?

15   A.  The documentation we provided to them, yes, and we hoped

16   and asked that our partners, for instance, and our customers

17   would be totally forthcoming to him.

18   Q.  And do you know if ESG did their own due diligence on

19   this?

20   A.  They did.  This, again, like the Forrester paper comes

21   on their letterhead, and their credibility is at stake.

22   Q.  And what did FICO use this document for?

23   A.  The same thing.  It was used and continues to be used in

24   prospecting for new customers and customers interested in

25   the value of our software.

1    Q.  And how important is it to FICO that this document is

2    absolutely accurate?

3    A.  It's essential.

4    Q.  And do you know if ESG confirmed the accuracy before

5    they published it?

6    A.  To the best of my knowledge, they did.

7    Q.  Can you turn to page 3 of the document, Mr. Baer?

8    A.  Yes.

9    Q.  Looking at the second paragraph, what is ESG's

10   conclusion regarding the role of Blaze Advisor and commerce?

11   A.  This means that Blaze Advisor is responsible for driving

12   trillions of dollars of commerce each year across vertical

13   industries such as financial services telecommunications,

14   manufacturing, retail, health care, utilities,

15   transportation and government.

16            This is due to the critical role that Blaze

17   Advisor plays in IT process automation.

18   Q.  And what is ESG's conclusion regarding the effect of

19   Blaze Advisor on revenue?

20   A.  Enterprises are also now realizing the, that the more

21   specificity they use in identifying, defining and executing

22   their policies and approaches to risk management, the better

23   their deals will perform and the faster the revenues will

24   grow.

25   Q.  I'd like to turn back to some of the exhibits we

```
 1   reviewed earlier today.  Do you have Exhibit P1172?
 2   A.  Yes, sir.
 3   Q.  And so turning to page 2 of that document, what is shown
 4   in the lower left-hand corner?
 5   A.  This is a list of -- sorry.  This is a large auto
 6   insurer in Canada.
 7   Q.  And what else is described there?
 8   A.  Again, the challenge that they faced, the solution they
 9   deployed and the outcome.
10   Q.  Can you walk through the challenge, solution and
11   outcome?
12   A.  The insurer lacked robust analytics, so was unable to
13   quickly understand and adjust to market changes, including
14   increasing competition from sophisticated competitors.
15   Q.  And the solution?
16   A.  FICO Decision Management Suite.
17   Q.  And the outcome?
18   A.  The insurer was able to increase its volume of new
19   business and acceptance rate without additional staff.  This
20   resulted in revenue growth of 47 percent while maintaining
21   its profitable loss ratio.
22   Q.  Can you turn to page 3.  And what's shown in the box in
23   the upper right-hand corner?
24   A.  A top 50 national carrier with written premiums of
25   nearly $1 billion across personal home, auto and property
```

1    and casualty.

2    Q.  Can you walk through the challenge, solution and outcome

3    shown here?

4    A.  The insurer needed to replace a cumbersome paper based

5    manual underwriting processing system in order to achieve a

6    more efficient streamlined and consistent underwriting

7    approach for auto and home, and they used a solution built

8    on the FICO Decision Management Suite.

9    Q.  And what was the outcome that they realized?

10   A.  Realtime underwriting of new business reduced

11   underwriting losses and improved targeting.  This lowered

12   the combined ratio of the insurer.

13   Q.  Can you turn to the next page, page 4.  And what's shown

14   at the top of page 4?

15   A.  These are three more customers.

16   Q.  Let's walk through them.  So who is the first customer

17   shown there?

18   A.  It's Aviva.

19   Q.  And what does it say about Aviva?

20   A.  Using FICO technology, Aviva was able to reduce the

21   processing time for new insurance policy from 22 days to 4

22   minutes and significantly increased retention rates.

23   Q.  And what about the next one?

24   A.  This is AAA.

25   Q.  And what does it say about AAA?

1    A.  They used FICO solutions to reduce manual underwriting

2    by 80 percent and dramatically increasing new application

3    volume processing.

4    Q.  And what about the next one?

5    A.  Kemper Insurance.

6    Q.  And what does it say about Kemper?

7    A.  They increased their pricing optimization and improved

8    risk management by moving from 6 to 48 pricing tiers in its

9    auto lines and from 6 to 24 tiers in its home lines.

10   Q.  Can you turn to Exhibit 1174, Mr. Baer.  And what is

11   shown in the lower left-hand conner of page 1 and on to

12   page 2?

13   A.  These are additional success stories that we included in

14   this document.

15   Q.  And can you just briefly walk through those?

16   A.  British Columbia Automobile Association increased

17   revenues by 47 percent, experienced faster new business

18   intake and increased acceptance of more business, maintained

19   profitability and loss ratios and avoided staff cuts.

20           Also, listed here is ICICI Bank doubled their

21   customers from 2 million to 4 million in 18 months.

22   Q.  And turning on to the next page, are those similar

23   customer success stories and results?

24   A.  Yes, they are.

25   Q.  And so the success stories and results that we looked at

1    in this exhibit and the last one, 1172, were those derived

2    from the FICO case studies and success stories that we

3    discussed earlier?

4    A.  Yes.

5    Q.  And they were produced according to that process?

6    A.  Yes, they were.

7    Q.  And did FICO rely on those in its business in the same

8    manner as previously discussed?

9    A.  Yes.

10   Q.  Turning back briefly to the two consultant articles we

11   discussed.

12           How common is it in the IT industry to rely on

13   outside consultants?

14   A.  Very common.

15   Q.  And why is that?

16   A.  It's a question of expertise and enhancing the internal

17   kind of bench strength of IT knowledge, being able to turn

18   to someone who isn't selling a solution, isn't dependent on

19   selling a solution, to ask for advice and best practice and

20   insights into what the technology trends are and the

21   directions they should invest in.

22   Q.  And in the technology industry, are analyst reports such

23   as the ones we discussed considered to be accurate?

24   A.  Yes.

25   Q.  And are they relied upon?

```
 1    A.  Yes.
 2            MR. ERBELE:  I don't think I have any further
 3    questions, Mr. Baer.  Thank you.
 4            THE WITNESS:  Thank you.
 5            THE COURT:  Thank you Mr. Erbele.  I just want to
 6    note that your estimate of time was spot on.
 7            MR. ERBELE:  All right.  Thank you, Your Honor.
 8            THE COURT:  Go ahead, Mr. Fleming.
 9                     CROSS-EXAMINATION
10    BY MR. FLEMING:
11    Q.  Good afternoon Mr. Baer.
12    A.  Good afternoon.
13    Q.  Mr. Baer, did you speak with your lawyers since the time
14    you last testified?
15    A.  I have not.
16    Q.  All right.  Do you know if FICO ever asked Chubb to do a
17    success story?
18    A.  I do not.
19    Q.  Let's first start at Exhibit 295.
20    A.  Bear with me, I got lots of paper here.
21    Q.  Sure.
22    A.  Yes, sir.
23    Q.  This is the ESG consulting report?
24    A.  Yes.
25    Q.  Okay.  It wasn't prepared by FICO?
```

1    A.  That's correct.

2    Q.  It was prepared by a third-party consultant?

3    A.  That's correct.

4    Q.  And you state that ESG relied in part on its independent

5    research; is that right?

6    A.  That's correct.

7    Q.  What was the due diligence they conducted?

8    A.  So they reviewed a lot of our material.  They talked

9    with some partners, I believe.

10   Q.  I'm sorry.  They talked with?

11   A.  Partners of FICO, organizations that resell our solution

12   and embed the product within their own solutions.  I can't

13   remember who they were off the top of my head, though.  And

14   they also talked to a couple of customers, although I don't

15   recall exactly who those were.

16   Q.  Okay.  And you said to the best of your knowledge they

17   confirmed the accuracy of the report?

18   A.  That's correct.

19   Q.  Do you mean that you hoped they did?

20   A.  Well, we had a number of conversations with them to back

21   up a lot of the conclusions that they had in here, but for

22   all intents and purposes as an industry analyst firm, we're

23   a little beholden to them to make sure they do the due

24   diligence that we would expect.

25   Q.  Okay.  So you don't know whether they confirmed the

1    accuracy, right?

2    A.  Well, beyond the fact they put their own name on the

3    document, I can't confirm with any greater accuracy.

4    Q.  Okay.  And FICO paid ESG to prepare this report, right?

5    A.  That is correct.

6    Q.  And at a cost of 8 to 10 thousand dollars?

7    A.  I don't recall the exact price, but it's probably in the

8    ball park.

9    Q.  Do you have the transcript before you?

10   A.  I'm sorry?

11   Q.  Do you have your transcript before you?

12   A.  I don't.

13            THE COURT:  I think it's that binder in front of

14   you.  Maybe it's not.

15            MR. ERBELE:  Mr. Fleming, do you have a copy of

16   the transcript?

17            MR. FLEMING:  I do.

18   BY MR. FLEMING:

19   Q.  You don't have one.

20   A.  I don't.

21            MR. FLEMING:  May I approach?

22            THE COURT:  You may.

23   BY MR. FLEMING:

24   Q.  Could you read from line 2 to line 6?

25            MR. ERBELE:  What was the question?

1          THE COURT:  Read lines 2 to 6.

2          MR. FLEMING:  I asked him to read line 2 to page 6

3     on page 47.

4          MR. ERBELE:  Okay.

5          THE WITNESS:  Okay.  "And what was the cost?

6          "I don't remember off the top of my head.  Ball

7     park, something like this might be, I don't know, 8 to 10

8     thousand dollars."

9     BY MR. FLEMING:

10    Q.  Okay.  And FICO ultimately distributed this report to

11    potential customers; is that right?

12    A.  That's correct.

13    Q.  Okay.  Turn to Exhibit 932.

14    A.  You guys are drowning me in paper.

15          Yes, sir.

16    Q.  This is the Aviva success story?

17    A.  Yes.

18    Q.  Now this report was made in 2009?

19    A.  Yeah.  I'm not aware of the date.

20    Q.  Well --

21    A.  Yes.  It has a copyright date of 2009.  That is correct.

22    Q.  Okay.  You started at FICO in 2013, right?

23    A.  That is correct.

24    Q.  Okay.  And do you know who actually prepared that

25    report?

```
1    A.  I do not.

2    Q.  Okay.  So you don't know what actual steps the person

3    who prepared this report did in preparing that report?

4    A.  So short of the due diligence that I did in 2013 to

5    understand the success story development process, that would

6    be my understanding of what was done to prepare this report.

7    Q.  But in 2013 you didn't ask somebody, well, how did you

8    prepare this 2009 report?

9    A.  Not this specific report.

10   Q.  Okay.  So with regard to this specific report, you don't

11   have any idea what was done in terms of the due diligence

12   and the preparation process.

13   A.  I have an idea, but can I verify and confirm for you

14   absolutely positively that was done for this specific

15   success story?

16   Q.  Yes.

17   A.  No, I cannot.

18   Q.  Let's look at Exhibit 1024.

19   A.  Yes, sir.

20   Q.  This is a compilation of case studies?

21   A.  Yep.

22   Q.  And this was created in 2021, right?

23   A.  I believe so, yes.

24   Q.  Five years after the litigation began?

25   A.  If you say so, yes.
```

1    Q.  Okay.  Were you aware of the litigation at the time this

2    report was prepared?

3    A.  I must have.  I think I was deposed prior to this.

4    Q.  Okay.  Was there any discussion about the use of this

5    report in litigation at the time it was prepared?

6    A.  No.

7    Q.  Were you the one who personally prepared this?

8    A.  Personally prepared it?  I oversaw it.  There were quite

9    a few people involved.

10   Q.  Okay.  And do you know whether those other people who

11   were involved had discussions with attorneys about the

12   possibility of using this in the litigation?

13   A.  No.

14            MR. ERBELE:  I'm going to object to this line of

15   questioning just to the extent it seeks attorney-client.

16            THE COURT:  Do you have a microphone back there

17   Mr. Erbele?

18            Go ahead and stay seated for this purpose and

19   speak into the microphone.  Go ahead.

20            MR. ERBELE:  Thank you, Your Honor.

21            I'm just going to object to this line of

22   questioning to the extent it seeks disclosure of

23   attorney-client communications.

24            THE COURT:  The question may well have, so to that

25   extent it's sustained.

1    BY MR. FLEMING:

2    Q.  So this compilation concerns, includes a number of

3    products that aren't at issue in this litigation; is that

4    right?

5    A.  Yes.

6    Q.  Okay.  For example, just on page 2, there's a report

7    about a rate of return of 356 percent for FICO Decision

8    Modeler.  Well, that is -- is that the Cloud based Blaze?

9    A.  That is correct and that is the Forrester TEI study.

10   Q.  And what is in the suite?

11   A.  The suite is a, it's a, the original version of the FICO

12   platform, and there are a lot of components to it, including

13   FICO analytic modeler, which is a predictive analytics

14   modeling tool; express optimization, which is an

15   optimization modeling and deployment capability, as well as

16   an agile application development solution.

17   Q.  Okay.  And to your knowledge, the only software that --

18   that Chubb used was Blaze out of that suite?

19   A.  That's correct.

20   Q.  Okay.  Can you turn to Exhibit 1025.  This is a -- I'm

21   sorry.  A lot of documents.

22          Exhibit 1025, again this is a case study?

23   A.  Yes.

24   Q.  And this was created in 2021 as well also?

25   A.  I believe so.

```
 1    Q.  All right.

 2    A.  Yes.

 3    Q.  It involves the entire Decision Management Suite, many

 4    products in addition to Blaze?

 5    A.  That's correct.

 6    Q.  Let's look at Exhibit 1028.  This is another

 7    consultant's report?

 8    A.  Yes.  This is the Forrester Total Economic Impact of

 9    FICO Decision Modeler.

10    Q.  And it was prepared in February 2021?

11    A.  Yes.

12    Q.  And FICO paid for Forrester Group to generate this

13    report?

14    A.  That is correct.

15    Q.  Okay.  How much did it pay?

16    A.  You know, that's a good question.  I don't know off the

17    top of my head.

18    Q.  In the 8 to 10 thousand dollar range?

19    A.  I think it was a little bit more than that.

20    Q.  Okay.  10 to 20 thousand?

21    A.  Honestly, I don't recall.

22    Q.  Okay.  At the time -- oh, never mind.

23            You don't know what methodology Forrester used?

24    A.  We do.  We had a conversation with them beforehand to

25    better understand what goes into a total economic impact
```

1    methodology.

2    Q.  All right.  Who did you speak with?

3    A.  The analyst who prepared this.

4    Q.  Who is that?

5    A.  Again, I don't have those names off the top of my head.

6    Q.  Did you speak with him?

7    A.  Yes.  Among others I spoke with him, yes.

8    Q.  Okay.  So this was prepared after the litigation was

9    began, right?

10   A.  Correct.

11   Q.  And it's a document used in FICO sales processes and

12   sent to prospective customers?

13   A.  Yes.

14   Q.  All right.  Finally, let's look at Document 1170.

15   A.  Yes, sir.

16   Q.  These are client success stories?

17   A.  That's correct.  This is another compilation.

18   Q.  Okay.  And none of those relate, specifically relate to

19   how Chubb used Blaze Advisor, right?

20   A.  To the best of my knowledge, we never did a success

21   story on Chubb.

22   Q.  Okay.  And these success stories involve products other

23   than Blaze?

24   A.  That's correct.

25   Q.  And many of the case studies are about FICO Decision

1    Management Suite and not specifically about Blaze?

2    A.  That's correct.

3            MR. FLEMING:  All right.  I have no further

4    questions.

5            THE COURT:  Mr. Erbele, do you have any redirect?

6            MR. ERBELE:  No redirect, Your Honor.

7            THE COURT:  All right.

8            Mr. Baer, I have just a couple of quick questions.

9            THE WITNESS:  Yes, sir.

10           THE COURT:  The client success stories or

11   whatever, that's the phrase you used, right.

12           THE WITNESS:  Yes.

13           THE COURT:  At the heart of those as a main

14   component of each of those client success stories were

15   interviews with the underlying clients, right?

16           THE WITNESS:  That's correct.

17           THE COURT:  Do you know personally what, if any,

18   of the clients' documents were reviewed in the preparation

19   of these client support or client success stories?

20           THE WITNESS:  You mean on the client side?

21           THE COURT:  Yes.

22           THE WITNESS:  I don't, but the clients were very

23   specific with us about the metrics that they were using and

24   identifying the ORY of the investments that they were using.

25           THE COURT:  In their conversations?

1    THE WITNESS:  That's correct, in their

2    conversations with us.

3    THE COURT:  Okay.  Very well.  Thank you.

4    In light of the court's very brief questioning,

5    either of you wish to ask other questions?

6    MR. HINDERAKER:  On behalf of, on behalf of FICO,

7    we'd like to reoffer the exhibits in light of the additional

8    information we have on foundation, as well as

9    trustworthiness and reliability.

10    THE COURT:  All right.  Very well.

11    Any objection?

12    MR. FLEMING:  We object.

13    THE COURT:  My ruling will stand as I announced

14    earlier this morning.

15    Thank you, Mr. Baer.

16    All right.  Let's get the jury and start playing

17    depos.

18    Thanks again, Mr. Baer.

19    1:59 p.m.

20    **IN OPEN COURT**

21    **(JURY PRESENT)**

22    THE COURT:  Thank you.  Members of the jury, rest

23    assured when you were in the jury room, we were busy

24    working.

25    Can I ask one of you to close that door for me?

RUSSELL SCHREIBER (Court)

1    THE JURY:  I think we're waiting.

2    THE COURT:  Oh, never mind.  Then don't close it.

3    THE JURY:  I guess we lost somebody.

4    THE COURT:  All right.  I think we're ready to

5    proceed with playing the deposition, the continuation of

6    that of Mr. Schreiber.

7                    RUSSELL SCHREIBER,

8    called on behalf of the plaintiff, was duly sworn, was

9    examined and testified as follows:

10                    EXAMINATION

11   BY MS. JANUS:

12   Q.  Did you assume that there would be a change in the

13   license due to the acquisition, or was it uncertain to you?

14   A.  I assume there would be a change in the license, almost

15   certain to me.

16   Q.  It was certain?  Okay?

17   A.  Yes.  It was certain to me.

18   Q.  And why was that?

19   A.  Because the -- our contracts as a rule have a change in

20   ownership as a, by definition, license change.  I forget.

21   You guys know better than me what the legal language is, but

22   there's a term that -- change in ownership is a license

23   event.

24   Q.  So you heard about the ACE merger --

25   A.  Right.

1   Q. -- in July of 2015.  Immediately upon hearing about it,

2   you determined that there would need to be a change in the

3   license?

4   A. That's right.

5   Q. And so tell me then what the process was generally after

6   you heard about it?

7   A. Right.  So generally the process was, okay, let's take a

8   look at what ACE looks like because they were a client but a

9   small client.  They were one of those people that we didn't

10  know what was going on.  Remember we talked about earlier in

11  the day.

12          So they had a small, very specific license, but we

13  weren't close to them.  We would try to sell them.  They

14  wouldn't take the phone call, so, so it was the first step

15  was to kind of get smarter about who ACE was, and then be

16  prepared for when Chubb called us to say, hey, we're going

17  to this thing and we need to, we need to get assignment, we

18  need to sign, yeah, we need to sign the license that we

19  would be in a position to have an intelligent conversation.

20  Q. Did you see this as an opportunity for FICO to increase

21  its licensing revenue for the Chubb license?

22  A. Did I see this as a-- could have been, yes.  Certainly

23  could have been.

24  Q. And that was a positive for FICO, right?

25  A. Yeah.  Revenue growth is good, yeah.  Yeah.

1    Q.  In your view you wanted, I mean, you wanted to position

2    FICO so that it could recognize as much additional revenue

3    as possible in connection with this license change.

4    A.  It sounds like you are saying that it's a bad thing.

5    Fair revenue.  Good, honest, clean, fair revenue, yeah.

6    Yeah.  If I sold it to a $12 billion company, now a

7    $30 billion company is using it, it's a different price

8    point.  That's all.

9    Q.  Is that true even if the use of the software that Chubb

10   purchased, a perpetual enterprise-wide license for, didn't

11   change or expand in any way?

12   A.  Is that true?  It's maybe not intuitive, but yeah.

13   Yeah, because they couldn't be assured that -- we went into,

14   went into CPUs.  You know, we didn't license by CPU or by

15   physically measured kind of things.  We measured by the size

16   of the business.  That was our license model.

17          That's just what it is, so if you have a bigger

18   business by definition it's a different price point.  If we

19   license it by CPU or some other measurable kind of thing

20   then, then as we bought CPUs, that would have been

21   additional license revenue.

22          But we didn't license it that way.  I don't think

23   they still do unless they changed.  So that, yeah, by

24   definition, bigger company means a bigger license.

25   Q.  Sure.  And so my question for you is, if there's a

REBECCA RUSSELL CORRIDOR (Cont.)

1    merger that ends up creating, you know that whatever, choose

2    your number, $30 billion company, is there any way in your

3    mind for the original licensee to show that its use was not

4    expanded?

5    A.  Yeah.  Yeah.

6    Q.  Okay.  So would that have been a possibility in this

7    situation with Chubb and ACE?

8    A.  Yes.

9    Q.  Okay.  So you said when you learned about the merger in

10   July of 2015, you concluded immediately that there would be

11   a new license with increased license fees?

12   A.  I think I said it separately.  I said new license.  I

13   don't know that I said increased fees.

14   Q.  Okay.  Was it -- had you decided -- when did you decide

15   that there would be increased license fees, due to the

16   merger?

17   A.  At some point we learned that it was not going to be a

18   holding company set on the side, was going to be integrated

19   into ACE or ACE was going to integrate them, but they would

20   blend the enterprises.

21        At that point it became clear that there was no

22   real way for us to track the systems that they used.  We

23   didn't even know what systems they had.  I mean, we had

24   some, some inventory of systems, but even as we kind of, as

25   this thing got you ugly, we kept learning about new

1    implementations that we didn't even know about.

2          So it became harder and harder for us to ever know

3    what current use was to be able to determine what expanded

4    use would be.

5    Q.  All right.  Showing you what's been marked as

6    Exhibit 121.

7          So this is, is this the first time you learned

8    about the transaction?

9    A.  I forgot Greenberg did this.  Oh, let's see.  Lamont.

10   Yeah, Lamont Boyd.  Right.  Lamont.  Yes, it is.

11   Q.  And your response is, "Driving costs out will be

12   interesting, and there may be a major license transfer"; is

13   that right?

14   A.  That's what I said.

15   Q.  What does "driving costs out will be interesting," what

16   does that mean?

17   A.  You got two accounting system departments, two IT

18   departments.  There ought to have been a major organization

19   transformation agenda laid out there.  It is probably a

20   three-year plan to pull out, I would think, multi billion

21   dollars' worth of costs.  That's why you do these

22   acquisitions partly, right?

23   Q.  And then you say, "Maybe a major license transfer," and

24   I take it you are meaning that in a positive way, because it

25   may result in increased revenues for FICO?

1    A.  Yep.  I may have meant it that way.

2    Q.  When did you decide how much FICO was going to increase

3    its license fees to Chubb due to the merger?

4    A.  Oh, I don't know.  I really don't know.  I don't know

5    that I decided per se.  I think it might have been more of a

6    pricing discussion internally.  I do know that we tried to

7    get ahold of them.  They never notified us.  Right?  I mean,

8    they had an obligation as I recall to notify us, and we had

9    to reach out to them and say what are you doing.

10           And so at that point it kind of felt bad.  So I

11   don't know.  We didn't really -- I think we were kind of

12   waiting for them to call because it was their merger, right?

13   So we were waiting for them to call us.  I think it wasn't

14   until late in the calendar year that Sawyer actually got

15   through to somebody.

16   Q.  Is that when you first tried, though?

17   A.  Could be.  It's not when I was first asked to do it,

18   though.

19   Q.  It's what?

20   A.  Sorry.  A little lettuce.

21           It's not the first time he was asked to do it.  I

22   think at some point around Thanksgiving we said this is

23   getting too close, it going to be very uncomfortable.

24   Q.  And so you would have asked him to reach out to Chubb?

25   A.  Yes.

1    Q.  Showing you what's been marked as 122.  This is an email

2    from Mike Sawyer to you with the subject line:  Chubb

3    language.

4         Did you ask him to put this together?

5    A.  I may have.  It's likely I would have.

6    Q.  So he says, "I think we are in a good spot.  See below.

7    First excerpt is from the original MSLA and states they have

8    no assignment rights."

9         And then he cites to a couple other provisions as

10   well.

11        Did you, do you recall whether you agreed with

12   him?

13   A.  Do I recall whether I agreed with him?  I don't recall.

14   Q.  If you take a look at the no assignment clause and read

15   that.

16   A.  Right.  I'm sorry.

17   Q.  Have you read it?

18   A.  Almost.  I have read it.

19   Q.  So the first sentence of the paragraph simply states

20   that, "Neither party shall without prior written consent of

21   the other party assign or transfer this agreement or any

22   part thereof," correct?

23   A.  That's what it says, yes.

24   Q.  Okay.  And then the second sentence more specifically

25   applies to a change of control of client or if client is

1    merged with, acquired by or acquires another entity or

2    undergoes a reorganization, et cetera, correct?

3          Do you see that?

4    A.  Do I see the second sentence?  I see the second

5    sentence, yes.

6    Q.  Okay.  And do you agree with me that the second sentence

7    as opposed to the first sentence, applies specifically to

8    the situation in which there is an event of change of

9    control or a merger or an acquisition of another entity,

10   et cetera?

11   A.  That's what it says.

12   Q.  Okay.  And the provision goes on to state that, "Each

13   such event shall be deemed an assignment subject to the

14   section and client shall make no expanded use of the Fair

15   Isaac products as a result of any such event unless and

16   until Fair Isaac provides such written consent which will

17   not be unreasonably withheld"?

18   A.  That's what it says.

19   Q.  Okay.  So do you agree with me that in the case of a

20   merger or change of control one of these events that the

21   second sentence lists, in that event the analysis is, is

22   there an expanded use, and if so, there needs to be consent,

23   but FICO may not unreasonably with hold it?

24   A.  You say your position is -- no, I don't agree with you.

25   Q.  Okay.

```
1    A.  Okay.

2    Q.  What do you disagree with?

3    A.  I -- this "expanded use" bit on the side is really kind

4    of a safety net while working through the change of control

5    issue is how I read it.

6    Q.  Okay.

7    A.  As opposed to how you just described it to me.

8    Q.  What do you mean by, "A safety net while working through

9    the expanded" -- or I'm sorry.  What do you mean by "a

10   safety net"?

11   A.  Just make sure that you're not running additional

12   business through it, that you're not using -- creating new

13   applications -- not running additional business through it

14   or creating new applications, even if it was the legacy

15   enterprise.

16              At that point this thing should be frozen, like

17   there should not be one more transaction run through it.

18   We're out in limbo there.  You're off the -- you're like

19   Wile E. Coyote off the cliff.

20              You are using it in a way that you are not

21   licensed to use it is how I read that.

22   Q.  So your interpretation is that the provision and client

23   shall make no expanded use of the Fair Isaac products as a

24   result of any such event is a safety net?

25   A.  Yeah.  Yes.  My words.
```

RUSSELL DAGROSA (Voice)

1    Q.  And I mean do you agree with me that it makes sense,

2    that mergers and acquisitions in your world of business, I

3    mean, they happen all the time, right?

4    A.  Mergers and acquisitions happen all the time, yes.

5    Q.  Well, I'm saying that isn't a fair reading of this

6    sentence essentially that so long as you make no extended

7    use of the software, you're okay?

8    A.  No.  No.  No.  No.  I don't see --

9    Q.  What's the point of having the extended use language in

10   there, then?

11   A.  So you stop.  So we got to get this license transferred.

12   This is about, that expanded use is in the meanwhile while

13   you've got a license that hasn't been transferred yet.

14   That's why we did it.  So you got an unassigned -- you have

15   got an event here that took place.

16           An assignment never was agreed to, and all we're

17   saying is, you know, lock it down.  That's how I read it.

18   Q.  So you continued to use the software, just not in an

19   expanded way?

20   A.  Until -- we're not saying you have to turn it off.  We

21   are saying you can lock it down and use it as is until we

22   get a transfer done or an assignment done.

23   Q.  Okay.  But that's --

24   A.  That's how I read it.

25   Q.  And would you agree with me that that consent shall not

RUSSELL MICHELSON (CONT'D)

1    be unreasonably withheld even if it is expanded use?

2    A.   Huh?

3    Q.   It says, the sentence reads that, "There shall not be

4    expanded use unless and until"?

5    A.   Right.

6    Q.   So no expanded use unless and until you get your written

7    consent, which shall not be unreasonably withheld, and then

8    presumably you can make your expanded use?

9    A.   So I think we just, we read it very differently.  I do.

10   So to me right now you have got a change in ownership, which

11   is a problem.  If we would have sat together well in advance

12   of the change in ownership and said here's how I am using

13   it, I've got this much revenue going through it, told me

14   what you were doing beforehand, we could have managed our

15   way through it.

16            You could have said, oh, if you want to pay no

17   fee, we can create an entity to do that, but by not doing

18   any of those things, at that point because we had no insight

19   into what the plans were, at that point -- and this could

20   happen in any company, right?

21            If you don't tell me what you're doing or whoever

22   is at FICO on that day what's going on, then you have just

23   got to lock it down until we either terminate it or we

24   renegotiate something.  That's what expanded use means to

25   me.

1   Q.  You agree there was an obligation on the part of FICO to

2   not unreasonably with hold its consent to transfer.

3   A.  That's right.  That's what it says right here.

4   Q.  But do you see anything in the -- I understand you are

5   not looking at the whole agreement right now, but do you see

6   anything in this provision that we're looking at that

7   requires Chubb to reach out to FICO to obtain consent versus

8   FICO initiating the conversation?

9   A.  Yes.  So I view this as an attempt to transfer the

10  agreement without, without first obtaining such written

11  concept.  That's what I view what happened, the last bit.

12          Right here it says, Any attempt to assign or

13  transfer without first obtaining will be void and no force

14  effect, which means you lost your license that day.  You had

15  no license at that point in my mind.

16  Q.  Take a look at this email exchange and let me know.

17  A.  There you go.  23.  There you go.

18  Q.  So this is an email exchange between you and Mike

19  Sawyer?

20  A.  Yep.

21  Q.  In October of 2015, right?

22  A.  Yep.

23  Q.  The first portion of the email is, contains the email we

24  were looking at in 122.

25  A.  Mm-hmm.

```
 1    Q.  Your response to Mr. Sawyer's email on October 7th is,

 2    "The unreasonably withheld bit has me a little concerned.

 3    So it may come down to how did we size the enterprise

 4    discussion."

 5    A.  Yep.

 6    Q.  So you had some concern about that language we looked at

 7    that "such written consent will not be unreasonably

 8    withheld"?

 9    A.  Mm-hmm.

10    Q.  Yes?

11    A.  Yes.  I say it right here.

12    Q.  What --

13    A.  I say, yeah, right here.  "Unreasonably withheld has me

14    a little bit concerned."

15    Q.  Right.  And that's because you understood that FICO had

16    an obligation to not unreasonably with hold its consent,

17    correct?

18    A.  Yeah, there were two things that had me worried about

19    this.  This is like in modern day, so I kind of remember

20    this one.  It is kind of nice.  There were two things.  One,

21    that "unreasonably withheld" is not a defined term.

22              So in a contract if I have a term like that and

23    it's not defined, I get antsy, so that would have been the

24    first thing.

25              The next bit was literally, you know, how do we
```

1   size it, so we knew we sized it on a $12 billion deal, and

2   now you got acquired by a $23 billion entity, so it's now up

3   to a $35 billion company.

4           So the lack of a defined what is "unreasonably

5   withheld" would have caused me to pause.

6   Q.  Okay.  Yep.

7   A.  But that would have been it.

8   Q.  And by the way, so the deal, the enterprise deal was

9   sized on $12.3 billion of premium revenue?

10  A.  Sounds about right.

11  Q.  Premium revenue and he said, "Sounds about right."

12          Do you recall whether that 12.3 billion in terms

13  of sizing the original deal included Chubb's global

14  revenues?

15  A.  I don't.  I don't.

16  Q.  If it did, do you agree with me that that counsel's in

17  favor of an interpretation of the ELA as being a global ELA?

18  A.  All right.  So I agree that there's some things here

19  that would one to think there was a global, but at the end

20  of the day, the agreements rule, and the agreements are not

21  a global.

22  Q.  All right.  Then Mike Sawyer responds to you and says,

23  "I am not as concerned about it."

24          He talks about this --

25  A.  Yep.

1    Q.  -- size in revenue issue that you pointed out.  And he

2    says, "Our pricing model is based on," is that gross written

3    premium, GWP?

4    A.  Yes, it is.

5    Q.  "So I would think that tripling the size of GWP by

6    acquisition should be significant."

7              And then you respond, "Is the license specifically

8    tied to GWP?"

9              Does your question indicate that you think the

10   argument would be stronger to increase the licensing

11   revenues if the license specifically tied to GWP?

12   A.  No.  Just wondering is it in the contract.  Does it say

13   based on GWP, you know.  It was a simple question.

14   Q.  What would the significance of that been to you?

15   A.  That would have been clearer.  Would have been clearly

16   stated, the same way definition of unreasonably withheld

17   would have been helpful if it was clearly stated.

18   Q.  Okay.  And so the fact that the contract was not

19   specifically tied to GWP made it less clear for you.

20   A.  It meant it just wasn't documented in the contract.  So

21   one less piece of fact that I had, one less, one less fact I

22   had in writing.

23   Q.  Okay.  And then Mike Sawyer gets back to you finally and

24   says, "I don't see anything on gross written premium" --

25   A.  Right.

RUSSELL SCHRADER (Direct)

1   Q.  -- "in the agreements," right?

2   A.  Right.  Right, which we saw already.  Yes.

3   Q.  Do you recall then what happened after this exchange in

4   October of 2015?

5   A.  So I can tell you I was becoming less and less

6   comfortable that we had not heard from Chubb about this

7   because I would have thought, you know, before I was at

8   FICO, I was a consulting partner.  And we would, these kinds

9   of situations you make sure you reached out to the vendors.

10  There's a whole sourcing strategy.

11           I was really becoming uncomfortable that nobody

12  had reached out to us, the vendors, that a contract needed

13  to be resolved.  We should have been on someone's list and

14  worked through.

15           So at that point, the fact that we hadn't been

16  contacted, I start pushing Mike to contact them.

17  Q.  Okay.  Do you recall when that was?

18  A.  I don't, but I know by December I was really -- the

19  alarm signals were blaring, so it might have been December

20  before he actually made contact with somebody.

21  Q.  And during this time, you know, we looked at

22  October 2015, November 2015, September 2015, it was business

23  as usual between Chubb and FICO?

24  A.  We weren't really doing anything, though.

25  Q.  You were doing quite a bit I think, weren't you?  You

1    were doing Chubb app studio, professional services scoping.

2    There have been voluminous emails provided in the lawsuit

3    relating to work that FICO was doing --

4    A.   In the second --

5    Q.   -- with Chubb?

6    A.   I don't remember us doing work with FICO -- with Chubb

7    in the second half of calendar year '15 or even actually at

8    all in calendar year '15.  So could have been doing little

9    bits, but certainly not having the interactions we had three

10   years before that.

11   Q.   Here's an example of some of the things that were being

12   talked about.  Exhibit 124.

13   A.   Okay.

14   Q.   Does that refresh your recollection that there was

15   activity happening with Chubb during this time?

16   A.   Yes, it was something that was not acquired.  It was a

17   sales pitch to Henry who was pretty far down the food chain

18   to buy a little piece of software, very, specific and narrow

19   use.

20            So this would be consistent, and they didn't buy

21   it.  So Henry asked for a price.  We gave a price and, and

22   nothing ever came of it.

23   Q.   I'm wondering about whether there was a conclusion

24   reached internally at FICO on that issue prior to

25   January 2015.

1    A.  I don't recall that to be the case.  We probably

2    pencilled some numbers out, but we didn't -- I'm sure we

3    didn't finalize it because we never had a conversation with

4    the to be entity.

5           So we didn't really know what we were talking

6    about.  So we would have certainly bounced around some

7    ideas, but we never would have, like, firmed up a price

8    because we would be negotiating with ourselves at that

9    point.  We would be making stuff up.

10    Q.  But you and Mike, were you and Mike the primary two

11    people dealing with this issue at FICO?

12    A.  Yes.

13    Q.  So you don't have a specific recollection of talking

14    with Mike about that issue prior to January of 2016?

15    A.  The timing is a little complicated.  I don't remember

16    timing.  I remember talking about various numbers, 1

17    million, 2, million, 3 million, 5 million.  I remember

18    talking about them.

19           Now, I just can't tell you what we talked about

20    before versus after the merger.  And then once it happened,

21    I mean, my God, they had us jumping through hoops trying to

22    create all kinds of scenarios that -- so, I just can't tell

23    you if we talked about it beforehand.

24    Q.  Showing you what's been marked as Exhibit 125.

25    A.  Okay.

1    Q.  So this is a November 2015 email from Russ to Natasha,

2    you and Bill.  So I'm sorry.  From you to Natasha, Mike and

3    Bill, and you're asking for 30 minutes to be put on the

4    calendar to discuss ACE's acquisition of Chubb and potential

5    licensing expansion fees, correct?

6    A.  Mm-hmm.  That's right.

7    Q.  Okay.  So was this the first time you would have been

8    raising the issue with Bill Waid?

9    A.  Looks like it.

10   Q.  And what was his role in November of 2015?

11   A.  So at that time Bill had responsibility for the business

12   unit we called -- I don't remember whether it was Decision

13   Management or something like that, but it was basically the

14   tools division, of which Blaze is a part of.

15           And so he had the ultimate -- he was a general

16   manager of that area.  So he had ultimate pricing and had

17   the most experience in pricing and licensing and scoping of

18   the Blaze product.

19   Q.  And again at this time, you are really viewing this as

20   an opportunity to expand your licensing fees, correct?

21   A.  Potentially.  Potentially.  But again, if they would

22   have said, oh, Chubb's going to be -- it's going to be

23   holding company.  We're a holding company.  They're going to

24   be on the side and continue to run the way they were, there

25   would have been really nothing to discuss.

FEDERICO RUSSELL, DIRECTOR (Oshe)

1    It would have been mechanic.  It would have been

2    administrative, but nothing was told to us.

3    Q.  Did you, in fact, meet with Mike Sawyer and Bill Waid?

4    A.  I don't recall.  We may have.  We may have.  I just

5    don't recall.

6    Q.  So you have no recollection of --

7    A.  So once things started getting busy, we were talking two

8    or three times -- we were talking a lot, so I just don't

9    recall how much we spent before Christmas, before.

10   Q.  Do you have any recollection of coming to a decision in

11   this November -- mid-November 2015 time period about how

12   much FICO was going to demand in terms of increased license

13   fees for Chubb's continued use of the Blaze software?

14   A.  How much we were going to demand.  Interesting way to

15   describe that.

16        I don't know, but I certainly can see how we would

17   have put the numbers on the board, put them through the

18   engine, come back with a pricing, absent any facts.

19   Q.  So you think you would have been doing that in this

20   November time period?

21   A.  I'm sure we could have done that.  We could have

22   penciled out, put in the 12 billion and 23 billion, whatever

23   it was.  Okay, 35 billion, what does that look like?  What

24   have they paid so far?  Sure, we could have done that.

25   Q.  Showing you what's been marked as Exhibit 126.

SAWYER v. RUSSELL - CROSS (Oiled)

1    A.  All right.

2    Q.  This is an email in December of 2015?

3    A.  Right.

4    Q.  And Mike Sawyer is referencing his conversations with

5    Henry around this time, correct?

6    A.  Right.

7    Q.  And on December 15th, Mike Sawyer says, "I spoke with

8    Henry late last week."

9         This is on the top of the second page of the

10   document.

11   A.  Oh, thank you.

12   Q.  "Everything is still at a virtual standstill there at

13   the moment as they are awaiting announcements on the IT

14   leadership positions going forward"?

15   A.  Mm-hmm.

16   Q.  So it looks like in mid-December Mike Sawyer was having

17   conversations with Henry about the transitions that were

18   happening in connection with the Chubb/ACE merger, correct?

19   A.  That's what it looks like, yes.

20   Q.  And then in the December 16th, 2015 email, Mike Sawyer

21   is reporting on another conversation he had with Henry in

22   which it looks like Sawyer and Henry were talking about

23   additional business opportunities for FICO at Chubb,

24   correct?

25   A.  Yes, correct.

1    Q.  So at this point, not only were the two of them talking

2    about and acknowledging the fact that this transaction was

3    happening, but they were also -- Mike appears to be dealing

4    with Henry, you know, sort of business as usual.

5            Do you agree with that?

6    A.  That's what it appears to be.

7    Q.  When did Henry -- I'm sorry.

8            When did Mike Sawyer first reach out to Chubb on

9    the topic of the merger?

10   A.  First?  I don't know.  I know when we got -- when we

11   started escalating, it was in December.

12   Q.  So you don't know that he reached out prior to December?

13   A.  That's right.  I do not know that.

14   Q.  Take a look back at Exhibit 126, please.  And then in

15   126, you see at the bottom of the second page of the

16   document Dave Woods -- who is Dave Woods?

17   A.  Dave Woods was responsible for a -- this thing we

18   called -- what did we call it?  It is a line of business

19   practice leader for analytics tools, but there was a

20   specific solution that we thought would be really exciting

21   for Chubb.  What was the thing called?  Like model -- Model

22   Essential, I guess, something like that.  Dave Woods was

23   like a specific product line-of-business leader.

24   Q.  Okay.  And so he sends an email to Mike Sawyer --

25   A.  That's the wife.  She gets a special ringtone.

LEBLANC v. RUSSELL DOBRZAKER (Color)

1    Q.  With the subject line "Chubb."

2    A.  Right.

3    Q.  And he says "When are you thinking we push on Chubb?"

4         Do you see that?

5    A.  I do.

6    Q.  So at this point, it appears that FICO had made the

7    decision not to push on Chubb as of December 15, 2015; is

8    that fair?

9    A.  Do you know what "push" means in this context?

10   Q.  No.

11   A.  Okay.  Do you want to know?

12   Q.  Sure.

13   A.  Yeah.  So "push," in Dave Woods' language, means he has

14   a solution completely separate from Blaze, so we're going to

15   try to help push and sell his solution or we're going to

16   just let it sit.

17   Q.  Okay.  So you don't view his email as having to do with

18   the -- with the merger?

19   A.  It's not relevant to this at all.

20   Q.  Showing you what's been marked as Exhibit 131.  This is

21   January 27th, 2016.

22   A.  Mm-hmm.

23   Q.  And Mike Sawyer's emailing to Elie Merheb, with a copy

24   to you, forwarding a letter that Chubb's general counsel

25   sent to -- I'm sorry, FICO's general counsel sent to Chubb,

SAWYER - CROSS (Coiled)

1    correct?

2              On January 27th, Mike Sawyer forwarded a letter

3    from FICO's associate general counsel to Elie Merheb,

4    correct?

5    A.  On January 27th, that's right.

6    Q.  Okay.  And did you consult with Tom Carretta, associate

7    general counsel for FICO, in connection with the sending of

8    the letter?

9    A.  I would have, yes.

10   Q.  Do you specifically recall consulting with him about it?

11   A.  Yes.

12   Q.  Showing you what's been marked as Exhibit 133.  This is

13   a February 5th exchange of emails.  Mike Sawyer writes to

14   you and says "She accepted, so we are on for Thursday,

15   February 11th."  And he's referring, I believe, to Tamra

16   Pawloski, correct?

17   A.  Mm-hmm.

18   Q.  Yes?

19   A.  Yes.

20   Q.  And you write back and say, "I was thinking they're

21   playing it kind of close with less urgency than maybe we

22   want."

23              Did you think that this was maybe a game to Chubb?

24   A.  I don't know if I would describe it as -- I don't know

25   what it was to Chubb.  I know they certainly didn't respect

ELISABETH RUSSELL - CROSS (Coid)

1    the license that they had acquired.

2    Q.  Was it a game to FICO?

3    A.  A game?

4    Q.  Yeah.

5    A.  I don't know -- what do you mean by "a game"?

6    Q.  I don't know.  You tell me.

7    A.  I don't -- well, a game, I think Monopoly, I think

8    Pinochle.  No -- so in that case, no it was not a game.  It

9    was a business transaction.

10   Q.  And then Mr. Sawyer writes back to you and says "Maybe.

11   They probably don't have a sense that we are going to be

12   asking for 3-plus million."  That's what Sawyer says, right?

13   A.  Yep.

14   Q.  So he's saying, yeah, Chubb is not acting with urgency.

15   They don't know what they're up against here, right?

16   A.  Well, they don't know that we're going to be asking for

17   3-plus million since they breached the contract, right.

18   Q.  They'd be acting with a lot more urgency if they thought

19   that FICO was going to try to require Chubb to pay 3-plus

20   million more in licensing fees for a license that they had

21   already purchased.

22   A.  They didn't purchase the license.  The license was gone

23   the day they transferred it.  It was done.  The license was

24   over, in my mind.

25   Q.  At this point, February 5th, 2016, obviously FICO had

FICO v. FEDERAL INSURANCE COMPANY, et al.

 1    decided that it was going to be asking for more than

 2    $3 million in additional license fees from Chubb, correct?

 3    A.  Well, yeah, it looks like it.  Yeah, correct.

 4    Q.  And FICO had not informed Chubb of that fact at this

 5    point, correct?

 6    A.  Chubb was nonresponsive until we sent a termination or a

 7    breach, whatever Carretta sent.

 8    Q.  FICO had not informed Chubb of FICO's plan to charge

 9    Chubb more than $3 million more in licensing fees; is that

10    correct?

11    A.  We didn't know that we were going to be charging 3

12    million in license fees.  We didn't know what we were

13    selling.  All we knew is --

14    Q.  Well, this email is Exhibit 133 says that Chubb is

15    really not acting with urgency maybe because they don't have

16    a sense that we are going to be asking for more than

17    $3 million in additional licensing fees.

18    A.  Right.

19    Q.  Okay.

20    A.  Right.  So Chubb could have said, no, we're terminating

21    the license and now we're moving on to ACE's systems in the

22    next six months; we don't need your license anymore.  It

23    could have happened just like that and that would have been

24    okay.  But they told us nothing, so we had to price it out

25    like it was a new sale -- or not a new sale, but a

```
 1    transaction was taking place.

 2    Q.  Showing you what's been previously marked as Deposition

 3    Exhibit 94.  So Exhibit 94 is Tamra's February 25th, 2016,

 4    email.  And she says, "I've attached the commercial proposal

 5    for review, and I'm open tomorrow if you'd like to discuss."

 6              And then attached is the commercial proposal,

 7    correct?

 8    A.  Well, it looks like the front page of the commercial

 9    proposal, but okay.

10    Q.  Was there more to it than this?

11    A.  I don't know.  It's your document.  I don't know.

12    Q.  This is how it was produced to us by FICO.

13    A.  Okay.

14    Q.  And --

15    A.  This is a Chubb document, though.

16    Q.  The proposal is that the parties renegotiate the license

17    to downgrade and limit the use of Blaze Advisor development

18    and deployment to reflect Chubb's actual usage of 15 named

19    applications and 100 seats of Blaze Advisor development --

20              MS. GODESKY:  Your Honor, can we pause the video?

21              THE COURT:  Pardon me?

22              MS. GODESKY:  May we have a sidebar?

23              THE COURT:  You may.

24                    (Sidebar discussion)

25              MS. GODESKY:  So this is the second time that the
```

```
 1    video -- when there's portions of the document that we
 2    happen to like, it's not being shown on the video.
 3                MR. HINDERAKER:  What's missing, we'll make it
 4    right.
 5                MS. GODESKY:  The actual commercial proposal that
 6    is being read into the record is not being shown.
 7                MR. HINDERAKER:  I want it shown too.
 8                MS. GODESKY:  The second page.  And then this
 9    happened earlier with the exchange with Sawyer and
10    Schreiber, there were portions of the email that weren't
11    show.  And so I've been trying -- I know everyone is working
12    fast.
13                MR. HINDERAKER:  I'm not trying to -- just so
14    there's no -- I'm sorry to interrupt.  I want it shown too.
15                MS. GODESKY:  Okay.
16                THE COURT:  This is an issue of what the trial
17    record is bringing up, right, as opposed to what was part of
18    the exhibit, correct?
19                MR. HINDERAKER:  Yeah, there is more to the
20    exhibit than what's being -- there's more to it than the
21    cover email page.
22                THE COURT:  Right.
23                MR. HINDERAKER:  And, you know, in fairness to
24    both parties, we've both been working hard --
25                MS. GODESKY:  I know.
```

```
1          MR. HINDERAKER:  But this video has gone back and
2    forth, back and forth, back and forth, and they've had as
3    much chance to check it as we have, so if there's a mistake,
4    let's not just throw blame around.  Let's fix the mistake.
5          THE COURT:  And from what I'm hearing, there's not
6    a concern about what portions of the video are being played.
7    It's just a matter of asking the trial --
8          MS. GODESKY:  Correct.
9          MR. HINDERAKER:  Getting the second page up.
10         THE COURT:  And is he doing that as it's being
11   played now, or is he doing that -- has he done that already
12   and we're playing the documents already?
13         MR. HINDERAKER:  No.  He had -- as I understand
14   it, he takes the exhibits that are agreeable to being shown
15   with the video, and he does something to make sure that the
16   exhibits are also lowered into whatever system he's using.
17         Let me go talk with him -- I know it's Exhibit 94
18   we are talking about -- and see if he has in his system the
19   second page.  And if he doesn't, well, he's got -- we can
20   just use one of the other exhibits that's -- you know,
21   Exhibit 94 is all over the place.
22         THE COURT:  Right.
23         MR. HINDERAKER:  And so we'll just get Exhibit 94
24   loaded in so that's shown on the video while Schreiber is
25   talking about 94.
```

```
1              THE COURT:  That's fine.

2              MS. GODESKY:  Yeah, that's great.

3              THE COURT:  And does that take long?

4              MR. HINDERAKER:  I have no idea.

5              THE COURT:  All right.

6              MS. GODESKY:  Thank you.

7                        (In open court)

8              THE COURT:  We're just working out a technical

9    issue real quick, so bear with us.  We don't know how long

10   it will take.

11             MR. HINDERAKER:  Your Honor, it was set up as it

12   should be.  It just didn't load up, so it will do it

13   mechanically.  And it's all there.

14             THE COURT:  Okay.  Good.

15   BY MS. GODESKY:

16   Q.  The proposal is that the parties renegotiate the license

17   to downgrade and limit the use of Blaze Advisor development

18   and deployment to reflect Chubb's actual usage of 15 named

19   applications and 100 seats of Blaze Advisor development at

20   no extra cost to Chubb.

21             All usage now and going forward does not and will

22   not change from that permitted under the current license

23   agreement and all usage remains with the same named

24   applications.

25             Do you see that?
```

```
 1    A.   Yep.

 2    Q.   Okay.  So essentially the proposal appears to be,

 3    actually the scope of the license will be downgraded, right?

 4    A.   That's what the words on the page say.  I don't agree

 5    with that at all, but keep going.

 6    Q.   Okay.

 7    A.   Keep going.

 8    Q.   And the usage will not change from that that's permitted

 9    under the current license, correct?

10    A.   That's what it says, but that's not downgrade then, so

11    it kind of defeat -- it's an internal -- it conflicts with

12    itself.

13    Q.   Well, the proposal contemplates that the license would

14    actually be limited to 15 named applications, right?

15    A.   Yeah.

16    Q.   And those are the current -- according to the proposal,

17    currently used applications, correct?

18    A.   Right.

19    Q.   There is no limit on number of applications in the Chubb

20    enterprise license, is there?

21    A.   All use remains with the same -- there is no limit on --

22    the global dispute notwithstanding, right.  So that's right,

23    they could have 500 applications in the United States,

24    easily.

25    Q.   Okay.  So what they're saying is, we understand we could
```

RUSSELL - CROSS (Colle)

1    have unlimited applications under our ELA, but we're going

2    to limit it to the 15 applications that we are actually

3    using Blaze in, right?

4    A.   Right.

5    Q.   And we're going to limit ourselves to 100 seats of Blaze

6    Advisor development.  So development seats, correct?

7    A.   Right.

8    Q.   And we discussed the fact previously that the current

9    ELA does not have a limit on development seats, correct?

10   A.   Mm-hmm.

11   Q.   Yes?

12   A.   Yes.

13   Q.   So this would create yet another limit in the license

14   that didn't exist when Chubb purchased the license?

15   A.   That's true.

16   Q.   In addition to that, Chubb has said that the use will

17   not change from that permitted under the current license

18   agreement and all use -- usage remains with the same named

19   applications.

20   A.   That's what it says so far.

21   Q.   Okay.  So what, I guess, was your response to receiving

22   this proposal?

23   A.   I thought this was a terrible proposal.  I thought it

24   was a bad-faith proposal.  To be at this stage making a

25   proposal like this, it was disgraceful, actually.

1   Q.  Why is that?

2   A.  Well, under their proposal, Chubb shall write to change

3   the applications to utilize the Blaze Advisor software

4   anytime in its sole discretion.

5   Q.  So long as they don't exceed the amount of 15, though?

6   A.  So -- so what that means is they could create an

7   application, call it "FICO the sucker," which wrappers CSI

8   Express, Decision Point, Automated Renewal, Process, CUW,

9   all the --

10              COURT REPORTER:  Excuse me.

11  A.  Wrappers, the first ten applications, and it will be

12  treated like one named application.

13              So to me that was a really disingenuous proposal,

14  and the fact that we were four days away from the breach --

15  I mean, from the termination period, it just felt like such

16  bad faith.  There was no recognition of limits on revenue,

17  CPs.  There was no constraint here.  In fact, it went the

18  other way to say, you know what?  Yeah, as long as we call

19  it 15 of any things and we get to make it up as Chubb.

20  Q.  So was your main concern about this proposal that Chubb

21  reserved the right to change the applications so long as the

22  applications didn't exceed an amount of 15?

23  A.  That's the most glaring concern, yeah.

24  Q.  Okay.

25  A.  That like jumps off the page and it's -- it wasn't good.

1    Q.  Okay.  So if that part of the provision -- of -- if that

2    part of the proposal had been taken out, then, in your view,

3    FICO and Chubb could have worked together on a proposal like

4    this to come to a resolution?

5    A.  Possibly.  Possibly.  It required a lot more, but at

6    that point when they said, we can do whatever we want

7    with -- as long as we pull out 15 names, it was not a

8    serious proposal.

9    Q.  So regardless of -- basically what you're saying is

10   Chubb waited too long, and they really could not make a

11   proposal at this point that didn't involve significant

12   payments to FICO --

13   A.  No, not necessarily.  But they could have -- if they

14   would have said, we need to solve it, we need a bridge, we

15   need to do something, we would have figured out something.

16   We want to keep Chubb as a customer.

17   Q.  So at this time -- at this point in time, you were still

18   willing to work with them on a reasonable proposal?

19   A.  Absolutely.

20   Q.  And really the only thing that made the proposal marked

21   as Exhibit 94 unreasonable in your mind was this right to

22   change the applications provision?

23   A.  No.  I said that was the first thing that jumped off and

24   slapped me in the face about it.  There was a lot more to

25   it.  There was no scope around any of it.  If we're going to

LEVY - CROSS - RUSSELL - DOC. 1216-2 (Coiled)

1    do a transitional thing, we're going to bury an ELA that we

2    sold to a $12 billion company into a $35 billion company,

3    and we knew that they lost track of use.  This is the use

4    signatory they gave us that day, but we knew there was other

5    stuff out there.  We didn't know what it was, but we knew

6    there had to be.  It's been there a decade.

7            There's a lot more defining of what scope would

8    have been needed to be -- and it would have been a

9    transition.  We would have had to do some sort of transitory

10   thing, I think, but I don't know.  Of course, we never got

11   to that point.

12   Q.  Well, that's confusing to me because you keep saying

13   that despite the timing, which of course FICO knew about the

14   transaction for seven months before bringing it up with

15   Chubb, but --

16   A.  Chubb knew about it too.  Chubb knew about it before

17   seven months.

18   Q.  Take a look at Exhibit Number 95 previously marked.

19   A.  So February 26th.  Okay.

20   Q.  So Tamra sent her proposal, which is marked as

21   Exhibit 94, on February 25th at 2:06 p.m. Eastern, correct?

22   A.  I'm sorry.  Which was -- so Tamra, to 9:50.  Tamra said

23   something, 12:30.  I don't see 2:06 Eastern.

24   Q.  Exhibit 94 --

25   A.  The previous one.

```
 1    Q.  -- Tamra sent her email with the proposal on February
 2    25th --
 3    A.  Right, to Mike and I, yes.
 4    Q.  -- at 2:06 Eastern, right?
 5    A.  That's right.
 6    Q.  Okay.  And then Tom Carretta responded to Chubb's
 7    counsel at 9:50 the next morning, correct?
 8    A.  Right.
 9    Q.  And Tom Carretta's response was, "Thank you for the
10    email.  The proposal was not acceptable from our business
11    and compliance teams, and I confirm it as rejected."
12    A.  Okay.
13    Q.  Do you see that?
14    A.  I see that.
15    Q.  Okay.  And then he says that his business teams will
16    meet and presumably propose a solution from FICO, correct?
17    A.  Right.
18    Q.  So this confirms that at least at this point -- first of
19    all, very quick response on the proposal?
20    A.  Yes.
21    Q.  You did not want to negotiate the proposal that Tamra
22    sent in Exhibit 94, right?
23    A.  Not a proposal so broken that there was nothing to
24    negotiate from.  It's not that I didn't want to.  I needed a
25    proposal that was responsive.
```

1    Q.  So if Tamra had made that proposal that's marked as 94

2    prior to the close of the ACE merger, would you have just

3    negotiated about that proposal and taken out the provision

4    relating to a right to change applications?

5    A.  This is what it boils down to to me:  If someone would

6    have engaged us when we tried to engage or before we tried

7    to engage, we would have found a way to let them transition

8    in a way that would have had a -- maintained a really great

9    working relationship.  Loved the client, wanted to maintain

10   a reference.  Really wasn't looking to do anything other

11   than figure how do we stay whole and continue the

12   relationship.

13          And was there a license opportunity?  Yes, there

14   was.  But more important to us was that long-term client

15   relationship.  The $3 million would have come and went.  I

16   had Chubb as a customer for a decade, and now a lawsuit?

17   Come on.

18   Q.  You knew about use of Blaze in at least the UK prior

19   to --

20   A.  I knew of one, yeah.

21   Q.  But you knew about uses in the UK prior to Tom Carretta

22   starting to write letters on this dispute, correct?

23   A.  Whether that's true or not doesn't -- it's still

24   unauthorized, non-compliant.  Noncompliance versus Russ

25   said, oh, yeah, that's global.  That's different than being

1    compliant, right?

2    Q.  And do you think that they were unauthorized uses even

3    if FICO said to Chubb, you're up; yes, you can use Blaze in

4    you're -- under the Chubb ELA?

5    A.  Yeah.  Oh, sorry.

6             MS. JANUS:  Those are all the questions I have.

7    Thank you.

8             MR. HINDERAKER:  I just have a few.  Would you

9    mark that as -- let me grab some more copies here -- 143.

10   And then would you mark -- would you mark this as the next

11   one, please.

12                          EXAMINATION

13   BY MR. HINDERAKER:

14   Q.  First, with respect to Exhibit 143, can you identify

15   this for us?

16   A.  This is, "Hello.  Welcome to FICO.  Welcome to Chubb."

17            This is the actual document that kicked off this

18   whole journey that we've been talking about.

19   Q.  Okay.  At the very beginning of the deposition, you were

20   asked about an RFI.  At a certain point in time, there was a

21   question of whether it was an RFI or RFP.  But you were

22   asked about the document from Chubb against which FICO

23   fashioned its original solution.

24            Is this that document?

25   A.  This looks to be that document, yes.

EDWARD RUSSELL - CROSS (Video)

1    Q.  And if you look at Exhibit 144, can you identify that

2    for us?  This is the other one.

3    A.  RFI.  This is the transmittal letter probably that came

4    over -- this is the transmittal on top of the RFI.

5    Q.  On Exhibit 143, do you agree that it shows redlining in

6    various places?

7    A.  Yes, I do.

8    Q.  Okay.  And then if I can show you Exhibit 145, then that

9    details out the authors of the redlines on the various

10   pages?

11   A.  Yes.

12   Q.  Are any of these people that are identified on

13   Exhibit 145 recognizable to you as being from FICO?

14   A.  From FICO?  No, no.  These are Chubb people.

15   Q.  All of them?

16   A.  Yes.  Dave Panagrosso I don't recognize, but --

17   Q.  Who?

18   A.  David Panagrosso I don't recognize.  But Dolores Sutton

19   and Jim Black, obviously with Chubb, but I just don't

20   recognize David.

21   Q.  Do you know David is not a FICO employee?

22   A.  That is right.  Well, I don't know, but I don't

23   recognize the name.

24                        (End of video)

25             THE COURT:  Is that the end of the depo?

```
1              MR. HINDERAKER:  I believe so.

2              THE COURT:  All right.

3              MR. HINDERAKER:  We have some exhibits to read in.

4              THE COURT:  Pardon me?  I'm sorry.

5              MR. HINDERAKER:  When would you like us to read --

6      I'm sorry.

7              When would you like us to read exhibits in that

8      were referenced in the deposition?

9              THE COURT:  We've been keeping track.  Do you want

10     to -- do you mean publish them, or do you mean just make

11     sure we have the record --

12             MR. HINDERAKER:  I mean for the court

13     administration, not --

14             THE COURT:  Yeah.

15             MR. HINDERAKER:  I think they've been published

16     with the video.

17             THE COURT:  Okay.  We have them all.  We can go

18     over the numbers at the end of the day.

19             MR. HINDERAKER:  We'll check in at that time.

20             THE COURT:  Yeah.

21             Who's the next witness?

22             MR. HINDERAKER:  The next witness is Jandeen

23     Boone.

24             THE COURT:  Okay.  Why don't we start and then

25     maybe take a break in 30 minutes, since we've only been
```

```
 1    going for you folks about an hour.  Okay?

 2              Come on up, Ms. Boone.  We'll swear you in and

 3    then you can be seated, okay?

 4              THE WITNESS:  All right.  Thank you.

 5                         JANDEEN BOONE,

 6    called on behalf of the plaintiff, was duly sworn, was

 7    examined and testified as follows:

 8              THE WITNESS:  I do.

 9              THE COURT:  Go ahead and be seated and state your

10    full name for the record, please.

11              THE WITNESS:  Jandeen Mary Boone.

12                      DIRECT EXAMINATION

13    BY MR. HINDERAKER:

14    Q.  Good afternoon.

15    A.  Hi.

16    Q.  You can hear me fine?

17    A.  Yes.

18    Q.  All right.  Ms. Boone, if you would make some

19    introductions.  What is your current employment?

20    A.  I'm currently employed at Ecolab, Inc., in St. Paul.

21    Q.  What is your position today?

22    A.  I'm the sector general counsel of the institutional and

23    specialty sector as well as the international business.

24    Q.  And what does that -- translate that down to what that

25    means.
```

```
1    A.  I lead a team of about 25 people.  We support about

2    eight and a half billion dollars' worth of global business

3    in the U.S., Latin America, EMEA and Asia Pacific.  So we

4    support Ecolab's businesses through primarily commercial

5    contracts with our customers as well as distributors and

6    other commercial partners.

7    Q.  And what was your position with Ecolab before that?

8    A.  Prior to that, I was the associate general counsel for

9    institutional and specialty.

10   Q.  And you started in Ecolab in 2015?

11   A.  Correct.

12   Q.  Before that, were you with Fair Isaac Corporation?

13   A.  Not immediately prior, but yes.

14   Q.  Well, I guess I didn't know that step.  What was between

15   Ecolab and Fair Isaac?

16   A.  Prior to Ecolab, I worked at Pentair, Inc.

17   Q.  And then from Pentair, the previous employer was Fair

18   Isaac?

19   A.  Prior to Pentair, I was at MGI Pharma.  And then prior

20   to that, I was at Fair Isaac.

21   Q.  All right.  And you're time frame at Fair Isaac was what

22   then?

23   A.  Mid-2005 to late 2007.

24   Q.  And what was -- you were in the legal department, of

25   course?
```

```
1    A.  Yes.

2    Q.  And what was your role relative to Blaze Advisor

3    licensing?

4    A.  I was one of the attorneys who supported the licensing

5    agreements for the Blaze Advisor product.

6    Q.  What is that -- can you give us a little more

7    description of what it means for an in-house lawyer to

8    support a product?

9    A.  Sure.  So within Fair Isaac, there was a product -- a

10   software product called Blaze Advisor.  So I was one of the

11   of attorneys assigned to work on licensing agreements with

12   the business, when they reached agreement with customers who

13   wanted to license Blaze Advisor.

14   Q.  Were you also involved in the related ancillary

15   agreements that go along with the license agreement?

16   A.  Yes.

17   Q.  And what were those names?  Name the types of

18   agreements.

19   A.  Sure.  Sometimes we would do master services agreements

20   with customers, so that would be related to our

21   implementation services.  Once a customer licenses the

22   software, they could hire Fair Isaac's professional services

23   team to help them implement and design the software to

24   operate the way the customer needed it to operate.

25          And then we would also do maintenance agreements,
```

1    which would allow the customer to have a hotline, if you

2    will, to call for support if they were having issues with

3    the software.  And then that would also allow them to get

4    software upgrades as those were rolled out.

5    Q.  And throughout your legal career, to what extent has it

6    involved writing and drafting the agreements that embody a

7    commercial transaction?

8    A.  I think pretty much my entire career, which is coming up

9    on 21 years.

10   Q.  You've got a ways to go.

11   A.  Some days it feels like forever.

12   Q.  You have a -- maybe you don't.

13        This is a binder.  That's -- Ms. Boone, that's a

14   binder of the exhibits that we'll be talking about in your

15   examination.

16   A.  Okay.

17   Q.  And they are in numerical order but not necessarily the

18   order in which I'll be asking you about them.

19   A.  All right.

20   Q.  So if you would first go to what's on the binder maybe

21   312.  Is there a 312 on the binder, or is it J1?

22   A.  They are marked "P."

23   Q.  That's right.

24   A.  I don't see a 312.  A 311.

25   Q.  Do you see a P1 -- or a J1?

```
1    A.  Yes.

2    Q.  Okay.  Let's go to J1.

3            And I think we could publish that.

4            J1 is the software license and maintenance

5    agreement of Blaze Advisor?

6    A.  Yes.

7    Q.  What was your role with respect to this agreement?

8    A.  I was the person who drafted this agreement, working in

9    consultation with the business.

10   Q.  And the -- do you recall the business -- the business

11   people that you were working with in the creation of the

12   software license and maintenance agreement?

13   A.  I don't recall specifically their roles, but I know Russ

14   Schreiber was involved, Larry Wachs.  Those are the two that

15   I primarily remember.

16   Q.  All right.  First I want to get an overall orientation

17   of the license agreement and its components.

18           So you will see -- you will see the license

19   agreement and Exhibit A and Exhibit B.

20           And could you tell us what that portion of the

21   overall document is?

22   A.  So Exhibit A goes through the pricing that the client,

23   in this case, Chubb & Son, is going to be paying for the

24   components of the software that they're licensing.  And then

25   it talks also about how -- how and when their payment is
```

1    due, as well as when their maintenance fee is due.

2            And then it also kind of gives an explanation of

3    the various terms that are in the chart that talks about

4    named application, or where you have scope and quantity,

5    there's some language at the bottom below the table that

6    explains what's happening kind of in that chart.

7            And then Exhibit B is the actual software support

8    and maintenance policy.  So this would be, again, kind of

9    how they call in for support if they have issues with how

10   the software is operating.

11   Q.  And before the Exhibits A and B, is it fair to call all

12   those pages ahead of that the main body of the license

13   agreement?

14   A.  Yes, correct.

15   Q.  And if we were looking for the limitations and the

16   conditions and the nature of the license grant, we would

17   find that in the main body of the agreement?

18   A.  Yes.

19   Q.  Then following that, there's an Amendment One to the

20   license agreement?

21   A.  Yes.

22   Q.  And you were involved -- were you involved in the

23   preparation of that as well?

24   A.  I believe so, yes.  Yes, my seal is actually on the --

25   or my initials are in the seal on the second page, yes.

1    Q.  Okay.  And then there's an Amendment Two that follows.

2    And were you involved in that?

3    A.  Yes.

4    Q.  You mentioned that you would be -- you were the legal

5    side, working with the business side, Mr. Schreiber,

6    Mr. Wachs.

7            Can you give us an understanding of how that

8    interaction -- and specific to this license agreement -- but

9    how that interaction between the in-house lawyer and the

10   business person, how you operate together to come to draft

11   what is the license agreement?

12   A.  Sure.  At Fair Isaac -- I think all companies are

13   different, but at Fair Isaac, we had a contract request

14   process that was automated.  So the business would complete

15   a contract request form.  And, again, this was an automated

16   document.  They would submit that.  And that form would go

17   through who is the customer, what are they licensing, what

18   are the restrictions of the license or the scope of the

19   license?  So, for example, can they use it worldwide?  Can

20   they only use it in the U.S.?  Is there a seat restriction

21   on how many licenses they're buying, or is it

22   enterprise-wide?  What specific components of the software

23   are they licensing?  And then also if there is any

24   restriction on how they're using it -- the client is using

25   it within their business.

```
 1              Then they would also include fees.  If there is to
 2     be a master services agreement, that could be in the
 3     contract request form.  The maintenance agreement, as far as
 4     how much were we going to charge for maintenance; the term
 5     of the -- of all of the agreements together, you know, how
 6     long is the customer licensing the software for, how long
 7     are they buying maintenance for.
 8              So they would complete that form, and then there
 9     was an automated system based on selections that the
10     salesperson had made as far as software that was at issue.
11     That would -- the answer to that question would
12     automatically route the request form to the attorney
13     responsible for that piece of software.
14              So in this case, Blaze Advisor, that would have
15     been selected from the drop-down menu, and the request form
16     would have been automatically routed to me to work on.
17              So once a request form is routed to the attorney,
18     you would get an email saying, you have a request pending.
19     You could go into the system, pull down the request form and
20     then start working on the agreement.
21              And then if I had any questions around answers
22     that were in the form or as I started drafting, I would just
23     call the person who submitted the request form, who I think
24     was Russ Schreiber in this instance, but I don't recall his
25     specific role in the deal.
```

```
 1    Q.  Understood.  And on this Exhibit J1, who is the client?

 2    A.  The client is Chubb & Son, a division of Federal

 3    Insurance Company.

 4    Q.  And if you turn to the signature page of the main body

 5    of the agreement, who signed it -- or what signed it as

 6    client?

 7    A.  It was signed by client Chubb & Son.

 8    Q.  And if we go to Amendment One, is that -- is that still

 9    true, the client is Chubb & Son, a division of Federal?

10    A.  Yes.

11    Q.  And if we turn to the signature page of Exhibit 1, that

12    signature page is in the name of whom?

13    A.  You are looking at Exhibit 1?

14    Q.  Of Amendment One.

15    A.  The signature block on Amendment One is client Chubb &

16    Son.

17    Q.  And then if we just do Amendment Two, is it the same?

18    Client is Chubb & Son, a division of Federal.  The signature

19    line is client Chubb & Son, a division of Federal Insurance

20    Company?

21    A.  Yes.

22    Q.  I'm going to put a marker where that is in my notebook,

23    and I suggest you might do something of the same, because

24    we'll be going back and forth to it.

25    A.  Okay.
```

1    Q.  And do you recall who your counterpart was at Chubb &

2    Son that you worked with in the drafting of this agreement?

3    A.  Yes.  It was a gentleman named Jim Black.

4    Q.  And could you please go to Exhibit P303?

5    A.  Yes.

6    Q.  And that is an email from yourself to J.W. Black?

7    A.  Yes.

8    Q.  Would you like to just tell the jury the purpose of this

9    email and what you did?

10   A.  So it looks like I had spoken with him the day prior to

11   sending this email, because I'm referencing a phone

12   conversation from the prior day.  And then I've attached an

13   updated version of the MSA, which would be a master services

14   agreement, with changes that I had made in tracked format.

15   And then I'm asking him to contact me to discuss remaining

16   open items after he's had a chance to review.  And then I

17   also attached the standard Blaze software license and

18   maintenance agreement for his review, and then indicated

19   that statements of work would be sent to him that afternoon,

20   June 6th, 2006.

21   Q.  Statements of work, is that a document that relates to

22   the master services agreement?

23   A.  Yes.

24   Q.  And a statement of work is a what?

25   A.  A statement of work would outline the specific work that

1    the services team was going to be doing, and then if there

2    were specific deadlines, timelines or deliverables related

3    to that work, as well as fees and how those were going to be

4    charged and paid.

5    Q.  So the master services agreement is as it says, the

6    master agreement under which statements of work would be

7    performed.  Is that fair?

8    A.  Yes.

9    Q.  Given that you were sending him back edits and changes

10   to the master services agreement and sending him the

11   original -- or the standard form Blaze Advisor license

12   agreement, it appears that you were negotiating or dealing

13   with the master services agreement first.

14            Is that your recollection?

15   A.  I don't recall that specifically, but based on the

16   email, it would seem that was the case, yes.

17   Q.  And then with respect to the client relationship, what's

18   the purpose of the master services agreement and the

19   provision of professional services?

20   A.  So generally, the professional services team would meet

21   with the client, their -- perhaps their business, also maybe

22   their technology team, to talk about how they want to

23   implement or access the software and then how they want the

24   rules drafted, which is what Blaze Advisor very

25   simplistically runs.  And so talking with the client around

1    how they were going to use the rules, what kind of rules

2    they need.  And then that may also help to inform how the

3    licenses needs to be scoped, ultimately, depending on what

4    may come out of those conversations.

5    Q.  Then if you would turn to P307.  And as we see, this is

6    from J.W. Black to yourself?

7    A.  Yes.

8    Q.  Perhaps just read what he says to you.

9    A.  So he said, "Jandeen, I have attached the SLA with some

10   Chubb revisions.  Let me know when you would like to

11   schedule a call to review.  Thanks, Jim."

12   Q.  And SLA stands for software license agreement?

13   A.  Yes.

14   Q.  All right.  So if we look at -- and then attached to his

15   email is indeed a version of the -- if we can go to the next

16   page please -- a version of the software license and

17   maintenance agreement showing the redlines that you received

18   from Mr. Black?

19   A.  Yes.

20   Q.  Is there any change from Mr. Black to the definition of

21   client as Chubb & Son?

22   A.  No, there is not.

23   Q.  Let's look at -- or next, paragraph 3.1 on the third

24   page, called "License Restrictions."  What does Mr. Black

25   suggest there by his redlines?

1    A.  He has quite a few edits.  He has essentially deleted

2    all of our original license restrictions and inserted his

3    own preferred language.

4    Q.  Okay.  We'll be going through the whole history, so we

5    will take it one step at a time.

6    A.  Okay.

7    Q.  And then if we go to paragraph 3.6 from Mr. Black, what

8    do we see there?

9    A.  Again, it looks like he has deleted all of our original

10   language, and he has inserted a new paragraph that he's

11   proposing that we accept instead.

12   Q.  And his paragraph relates to the use of Blaze Advisor by

13   a consultant called ACS Commercial Solutions?

14   A.  Yes.

15   Q.  Okay.  We're on the same paragraph?

16           And in this -- what is Mr. Black seeking by his

17   redlining at 3.6?

18   A.  He's wanting Fair Isaac's acknowledgement and agreement

19   that Chubb & Son, they have some infrastructure operations

20   that are outsourced to a company called ACS Commercial

21   Solutions.  So he's asking for Fair Isaac to grant ACS

22   Commercial Solutions and their affiliates, employees,

23   agents, consultants and subcontractors the right to use the

24   licensed software on behalf of client Chubb & Son for the

25   sole and exclusive purpose of fulfilling ACS Commercial

1  Solutions' obligations to provide information, technology,

2  services to client.

3  Q.  Okay.  So in summary, he's asking Fair Isaac to get

4  permission to a consultant, ACS, to use Blaze Advisor?

5  A.  Yes.

6  Q.  And then let's go to paragraph 9.3, Effective

7  Termination.

8        Mr. Black suggests some changes there as well?

9  A.  Yes.  He struck the -- I believe the last sentence --

10 the last two senses of Fair Isaac's original language.

11 Q.  Is what he struck related to a certification

12 requirement?

13 A.  Yes.

14 Q.  And then if we go to paragraph 10.8.  If we look at

15 that, Mr. Black made some changes to that as well?

16 A.  Yes, he did.

17 Q.  One of the changes that he makes is to -- well, let me

18 back up.

19        The first sentence without change is, "Neither

20 party shall, without the written consent of the other,

21 assign or transfer the agreement."

22        Have I read that right?

23 A.  Yes.

24 Q.  So that first sentence is mutual, is it not?

25 A.  It is mutual, yes.

1    Q.  Okay.  And then looking at the edit in the second

2    sentence, "In the event of a change of control of either

3    party."  So that's an edit of Mr. Black to make that second

4    sentence mutual as well?

5    A.  Correct.

6    Q.  And we'll see if it was accepted or not by FICO shortly.

7            And then Mr. Black also adds, regarding FICO's

8    consent, "which will not be unreasonably withheld"?

9    A.  Yes.

10   Q.  Those are his edits to 10.8?

11   A.  Correct.

12   Q.  And then let's go forward in time to Exhibit P309:

13           And this is your email to Mr. Black of June 27th?

14   A.  Yes.

15   Q.  So his to you, the one we just looked at, was on

16   June 26th.  So the next day you are back to him?  Fair?

17   A.  Yes.

18   Q.  Okay.  And what you say -- would you just tell us what

19   you said to him, please?

20   A.  Sure.  "Jim, attached is a redlined revised license

21   agreement incorporating the changes you requested to the

22   extent Fair Isaac is able to agree to them."

23   Q.  So each of his redline changes was given review, was it?

24   A.  Yes.

25   Q.  And to the extent Fair Isaac would accept them, it did?

1    A.  Correct.

2    Q.  And to the extent it could not, it did not?

3    A.  Correct.

4    Q.  So let's look at what happened then.

5              Attached to your email, P309, is the next version

6    of the software license and maintenance agreement that you

7    sent back to Mr. Black?

8    A.  Yes.

9    Q.  So paragraph 3.1, what is FICO's response to all of the

10   red lining that Mr. Black had done?

11   A.  It was rejected, and we, I, reinserted our original 3.1

12   with the license restrictions.

13   Q.  So Mr. Black's suggestions, were they rejected in total?

14   A.  It appears so, yes.  Yep.

15   Q.  And then if we go to 3.6, please.  What was, what was

16   FICO's response to his efforts, his seeking of permission

17   for ACS the consultant?

18   A.  It's still in the agreement with red line in tract

19   changes, what we call it in the law department, but the

20   original Fair Isaac language that he struck has been

21   deleted.  So I'm not sure if I still had questions for him

22   in regard to what he's proposing in 3.6, since I did not

23   completely accept it, but it appears that we're working

24   toward accepting some version of 3.6.

25   Q.  Or putting it, in the words of the consultant,

1    identifying it more specifically.  FICO and you and

2    Mr. Black are working on the conditions under which FICO

3    will consent to ACS Consulting being permitted access to

4    Blaze Advisor?

5    A.  Yes.

6    Q.  It wasn't rejected out of hand like the changes to 3.1?

7    A.  Correct.

8    Q.  The last sentence of your red lining, would you read

9    that to us, please?

10   A.  Of 3.6?

11   Q.  I'm sorry.  Yes, of 3.6.

12   A.  "The rights granted to ACS herein shall not be extended

13   to any other third party without the prior express written

14   consent of Fair Isaac."

15   Q.  And when we get to the, when we go back to the J1, the

16   final agreement, we will check on the conformance of that to

17   the final language.

18            And then let's look at 9.3.  What happened to

19   Mr. Black's suggested changes?

20   A.  It appears they were accepted.  There are no further red

21   lines in 9.3.

22   Q.  Would you look at the language of 9.3 in Exhibit 309 to

23   the language in 9.3 in Exhibit J1?

24   A.  Yes, they are the same.

25   Q.  That is to say, you returned to the standard FICO

1    language for Section 9.3?

2    A.  Yes.

3    Q.  And then let's look at your response to his changes to

4    10.8.

5         Is it fair to say that the only change that FICO

6    accepted was that consent would not be unreasonably

7    withheld?

8    A.  Yes.

9    Q.  All other changes that Mr. Black had suggested were

10   rejected?

11   A.  Correct.

12        MR. HINDERAKER:  Your Honor, if you would like to

13   break, this would be a time.

14        THE COURT:  That sounds like a great idea.  Thank

15   you.

16        Ladies and gentlemen, we'll take our afternoon

17   recess.  As always, no research.  Talk about anything you

18   want except the case.

19        THE CLERK:  All rise for the jury.

20                    **IN OPEN COURT**

21                   **(JURY NOT PRESENT)**

22        THE COURT:  Just for planning purposes, what do

23   you think the time, excuse me, timeline is?

24        MR. HINDERAKER:  I almost -- I really hate to say

25   this, because of the impact it has on Ms. Boone, but I could

```
1    see that I would be going for a while yet, you know, maybe
2    as much as an hour, and I'm disappointed in that because
3    cross-examination my not be finished today.
4              THE COURT:  Will you be doing the
5    cross-examination, Ms. Godesky?
6              MS. GODESKY:  Yes.
7              THE COURT:  And your best estimate?  I know it's
8    hard to say.
9              MS. GODESKY:  45 minutes, 30 minutes.
10             THE COURT:  Yeah.  I don't want to keep the jury
11   here to 5:30 or quarter to 6 on Friday.  We'll kind of play
12   it by ear, but it sounds like where we're going to break is
13   at the end of the direct.
14             Does that sound about right to you,
15   Mr. Hinderaker?
16             MR. HINDERAKER:  It does.  I could imagine that
17   the, I could imagine that it might be an early release
18   today.
19             THE COURT:  Okay.
20             MR. HINDERAKER:  I can maybe talk faster and see
21   what I can do, but that is a judgment.
22             THE COURT:  Okay.  Well, we'll see where we are.
23   We'll try and get through the witness, if at all possible.
24             We'll take 15 minutes, be back in at quarter to
25   four.
```

1          Oh, and, Mr. Hinderaker, to the extent that you

2     were asking about Exhibit 145, which was talked about but

3     not actually displayed during the depo, that's in.  It was

4     talked about, and it was obviously going to be displayed.

5          MR. HINDERAKER:  Yeah, that would be fine.

6          THE COURT:  Okay.

7          MS. GODESKY:  Sorry.

8          THE COURT:  145.  With the video depo, it was

9     referenced and talked about; it just wasn't displayed.

10         MS. GODESKY:  I see.  That's on our list.  Okay.

11    All right.  Thank you.

12              (Recess taken 3:32 p.m.)

13    3:47 p.m.

14                     **IN OPEN COURT**

15                     **(JURY PRESENT)**

16         THE COURT:  You may proceed.

17         MR. HINDERAKER:  Thank you, Your Honor.

18    BY MR. HINDERAKER:

19    Q.  Ms. Boone, would you turn to Exhibit P310, please?

20    A.  Yes.

21    Q.  This is an email from yourself to Mr. Black on

22    June 29th, correct?

23    A.  Yes.

24    Q.  And what are you communicating to Mr. Black in this

25    email?

1    A.  There's an updated version of the agreement.  I've made

2    some additional changes, most were grammatical, and also

3    clean up kinds of changes.  So I did not highlight those.

4    Substantive changes that were made after input from other

5    groups and based on the business terms that are now included

6    in Exhibit A.  There are a few of those.

7    Q.  Okay.

8    A.  And I included notes explaining the changes that I made.

9    Q.  And as you communicated -- transmitting the document

10   back to Mr. Black?

11   A.  Yes.

12   Q.  And the email does reference the fact that, that you had

13   a discussion with him the day before.  Do you have any

14   memory of that?

15   A.  I do not.  It does say we're having a discussion that

16   same day as the day of the email.

17   Q.  Okay.  And any recall of that?

18   A.  No.

19   Q.  No.  All right.  Well, let's just go through these

20   provisions again.

21            Looking at 3.1.

22   A.  Yes.

23   Q.  Is it fair to say that that now is FICO standard

24   language per your draft to him of a couple days earlier?

25   A.  Yes.

1    Q.  And then if we go to paragraph 3.6, the third party,

2    there's still -- work is still being done on that provision?

3    A.  Yes.  And I've added some highlighted language for his

4    review.

5    Q.  Yes.  And would you tell us, read for us what the

6    highlighted language is that you added?

7    A.  "Provided that such use is otherwise subject to the

8    terms and conditions of this agreement and does not exceed

9    the limitations on use and other restrictions set forth

10   herein."

11   Q.  So that's an additional limitation that FICO proposed to

12   Chubb & Son?

13   A.  Correct.

14   Q.  And is the last sentence still the same as before, the

15   rights granted shall not be extended to any other third

16   party?

17   A.  Yes, that's consistent with the prior draft.

18   Q.  All right.  And then if we go to paragraph 9.3, effect

19   of termination, has that returned or is that now the

20   standard FICO language?

21   A.  Yes, that's consistent with the FICO standard language.

22   Q.  And then if we go to paragraph 10.8, is it fair to say

23   that it's standard FICO language, say for the addition of

24   Mr. Black's suggestion of consent not unreasonably withheld?

25   A.  Correct.

```
 1    Q.  So that's the progress that we're making in the

 2    negotiations of the language?

 3    A.  Yes.

 4    Q.  Then let's go to Exhibit 311.  This is also on

 5    June 29th?

 6    A.  Yes.

 7    Q.  And this must be the telephone call that you were

 8    referencing earlier?

 9    A.  Correct.

10    Q.  And is it fair to conclude from the email that some

11    changes were made in your discussion with him?

12    A.  Yes.

13    Q.  And then those were memorialized in the document that

14    you transmitted by Exhibit 311?

15    A.  Correct.

16    Q.  Okay.  And as we know from J1, the license agreement is

17    in fact signed, the main body of the license agreement as

18    it's signed the next day on June 30th.

19              So let's go to paragraph 3.1 on this draft.  And

20    is there a change there?

21    A.  Yes, there is.  In subsection two.

22    Q.  And what is that, what is that change?

23    A.  So we're carving out an exception around the restriction

24    where otherwise Chubb & Son cannot alter, change, modify

25    adapt, translate or make derivative works of the Fair Isaac
```

```
1    products.  And we're calling out an exception there to say

2    that "other than in connection with rules" they cannot

3    alter, change, modify, adapt, translate or make derivative

4    works.

5    Q.  Okay.  Was that a suggestion from Mr. Black?

6    A.  I don't recall.

7    Q.  Okay.  It's not standard FICO language, though?

8    A.  Correct.

9    Q.  Is everything else in paragraph 3.1 standard FICO

10   language?

11   A.  I believe so, yes.

12   Q.  Looking specifically at 3.1 sub, you know, small Roman

13   IV, can you tell, is that standard FICO language?

14   A.  Yes.

15   Q.  And then if we go to paragraph 3.6, what's the state of

16   negotiations regarding permission for ACS to have access and

17   use of Blaze Advisor?

18   A.  It appears that we have agreed to the language at this

19   point.  And the highlighted language that I added and sent

20   to him in my prior email is now unhighlighted, which would

21   lead me to believe it's been accepted by the parties.

22   Q.  It's still there?

23   A.  It's still there, yes.

24   Q.  Yes.  Yes.  And then if we go to 9.3, what's the state

25   of the negotiations over the language of the term -- the
```

1    effective termination provision?

2    A.  That section has been agreed to.  There are no further

3    red lines or open items.

4    Q.  And as we saw before, that's now back to standard FICO

5    language?

6    A.  Yes.

7    Q.  And then if we go to paragraph 10.8, it looks like, what

8    is that telling you there?

9    A.  There are no open items remaining in 10.8, and that

10   appears to be FICO's standard language.

11   Q.  With the exception of "shall not be unreasonably

12   withheld"?

13   A.  With that exception, yes.  We agreed to include that.

14   Q.  Would you go to -- before we go forward to June 30th,

15   would you go to Exhibit P336 please?

16   A.  Yes.

17   Q.  All right.  And this master services agreement, look at

18   the, I guess look at the last page.  The master services

19   agreement is the final signed document?

20   A.  Yes.

21   Q.  Okay.  And at the signature page the client is whom?

22   A.  Chubb & Son, a division of Federal Insurance Company.

23   Q.  And the same is true as being the client on the first

24   page of the master services agreement?

25   A.  Yes.

1    Q.  And if you go to article 17 in the master services

2    agreement that's titled Notices.  It's on page 21684 of the

3    Bates?

4    A.  Yes.

5    Q.  And under Notices for Chubb, James Black is called out?

6    A.  Correct.

7    Q.  And how does Mr. Black identify himself?

8    A.  He is in the vendor management group with Chubb & Son, a

9    division of Federal Insurance Company, in Warren,

10   New Jersey.

11   Q.  Thank you.  Now I'd like to go, that being the history

12   of the negotiations, I'd like to go to J1.  During the, as

13   we saw, as we said at the outset, the client in the final

14   master -- the client in the final software license and

15   maintenance agreement is Chubb & Son, the division.

16           In all of your conversations with Mr. Black, was

17   there any request to make that anything, make the client

18   somebody else?

19   A.  Not that I recall, but it was never in a red line

20   document from him.

21   Q.  And we also saw that, yes.

22           From your, you know, in your role in drafting

23   these agreements, working with the business folks, but in

24   your understanding of the commercial purpose of the license

25   agreement, does the license agreement grant rights to

```
1     anybody other than the client?
2     A.  No.
3              MS. GODESKY:  Objection.
4              THE COURT:  State your objection more fully,
5     please.
6              MS. GODESKY:  I think this is a sword/shield
7     problem.
8              THE COURT:  Yeah.  Why don't you rephrase the
9     question.
10             MR. HINDERAKER:  Is --
11             THE COURT:  Do you want to approach here?
12             MR. HINDERAKER:  Well, I can try to rephrase it
13    first.
14    BY MR. HINDERAKER:
15    Q.  As the, as the lawyer involved in the drafting of the
16    agreement, the software license and maintenance agreement,
17    is there significance in the drafting of the agreement in
18    all of the provisions to the identification of the client?
19             MS. GODESKY:  Same objection.
20             THE COURT:  Overruled.
21             THE WITNESS:  Yes.
22    BY MR. HINDERAKER:
23    Q.  What is that significance?
24    A.  All of the other provisions of the software license and
25    maintenance agreement are drafted between Fair Isaac and the
```

1    client.  So it's significant as to how the client is

2    identified because you have things like -- well, you have

3    rights and obligations of the client and rights and

4    obligations of Fair Isaac.

5            So it's important to understand who those parties

6    are specific to the license grant, confidentiality

7    protection, indemnification and a host of other legal

8    provisions.

9    Q.  We have seen when we were looking at paragraph 3.1, we

10   seen throughout the documents there are reference to the

11   client shall, the client shall.

12   A.  Correct.

13   Q.  What is the significance of that then referencing back

14   to the definition?

15   A.  It's signifying that that's an obligation on the part of

16   the client.  So the party that has that right or obligation,

17   depending on which section you are looking at, is Chubb &

18   Son, a division of Federal Insurance Company as the client.

19   Q.  We haven't reviewed every element of the license

20   agreement, but recognizing that, let me ask you this

21   question:  In FICO software license agreements for Blaze

22   Advisor, is the license agreement itself in any way tied to

23   the gross written premium of the client or the total revenue

24   of the client?

25   A.  The fee is generally related to the size, revenue of the

1   client, yes.

2   Q.  And is there anything in the agreement itself that

3   recognizes that fact?

4   A.  The way in which the license grant and the restrictions

5   are drafted would be reflective of the intent of the parties

6   with regard to who can use the software.

7   Q.  The scope of the license grant in the original, the

8   original agreement, we've had other testimony.  So maybe I

9   don't have to take your time, but if we go to Exhibit A --

10  A.  Yes.

11  Q.  -- it defines definition of named application?

12  A.  Correct.

13  Q.  So the original agreement was in FICO terms a named

14  application license?

15  A.  Yes.

16  Q.  And the definition of the application came from whom?

17  A.  I believe that would have come from Chubb, because it

18  is, it's saying in the, in subsection A that the application

19  is Chubb's specialty insurance's underwriting and automated

20  policy renewal application.

21  Q.  And you've described for us the components of Exhibit A

22  in terms of scope, quantity and so forth.

23          I would like to go to Amendment One and just

24  understand how the documents work.

25          So if we go to Amendment One, in contrast to the

1    many pages of the main body, Amendment One is two pages.

2    A.  Yes.

3    Q.  So how does Amendment One and the main body of the

4    license agreement, how do they interrelate?

5    A.  So once you have the main license agreement, if anything

6    in that document is changing, you can do that by amendment.

7    And an amendment is generally shorter, not always, but

8    oftentimes shorter, because you're simply changing things

9    that were originally agreed to in the license agreement, in

10    this case the original agreement.  So you don't have to

11    restate the entire agreement.

12    Q.  And if in Amendment One there is -- and everything in

13    Amendment One that is not referenced relative to the

14    original agreement, is it fair to say that the terms and

15    limitations and conditions of the original agreement apply?

16    A.  Correct.

17    Q.  And the same is true with Amendment Two, is that

18    correct, being, I guess, that also may be a three-page

19    document.

20          The amendment states what's different, and the

21    main body of the agreement is otherwise in full force and

22    effect?

23    A.  Correct.

24    Q.  Now, Amendment Two is calling itself an enterprise-wide

25    license.  As you were drafting the agreement, in light of

1    the client, what's the enterprise, the scope of the

2    enterprise that's licensed as understand it in Amendment

3    Two?

4              MS. GODESKY:  Objection.

5              THE COURT:  Let's approach.

6                   (Sidebar discussion)

7              THE COURT:  Your objection is that you have a

8    lawyer testifying to a meeting of the contract, right?

9              MS. GODESKY:  Yes.  Yes.  I think, you know, most

10   of what's she's done is fine.  She's talking about the

11   negotiations between the parties and, you know, some basic

12   understandings of how the agreements interact.  But once we

13   start interpreting what she understood "enterprise" to mean,

14   it's a sword/shield problem because they withheld a ton of

15   her documents.

16             MR. HINDERAKER:  I doubt that, but given the fact

17   that -- I really doubt that.

18             MS. GODESKY:  I have the privilege log.  There's

19   hundreds.

20             MR. HINDERAKER:  Of Jandeen Boone?

21             MS. GODESKY:  Yes.  I can hand it to you right

22   now.

23             MR. HINDERAKER:  No.  That's all right.  I don't

24   care.

25             As the drafter of the agreement, I think that she

1    should be able to tell the jury how the various parts of the

2    agreement interrelate.

3              THE COURT:  I think she can do that.  And I think

4    she can, although I'll hear your objection on it, I think

5    she can testify to what she intended.

6              Do you disagree with that?

7              MS. GODESKY:  I disagree with that.

8              THE COURT:  Okay.  She can certainly talk about

9    how parts of the agreement interrelated.

10             MR. HINDERAKER:  Okay.

11             THE COURT:  I don't think that any of the lawyers

12   can come in and testify to a meaning of terms in the

13   agreement.

14             MR. HINDERAKER:  I'm not trying to make --

15   instructing the jury on what something means.  I'm trying

16   to -- but she's not writing that.  She's not drafting that

17   agreement in a, without a mind behind of it what she's

18   intending to accomplish.

19             But I'll ask her how they all interrelate and use

20   it that way.

21             THE COURT:  Understood.  That's fine.

22             MS. GODESKY:  But are we allowing intent?

23             THE COURT:  No, we're not.

24             MS. GODESKY:  Okay.

25             MR. HINDERAKER:  I'll ask how they all

```
1    interrelate.

2               THE COURT:  Okay.  That's fair.

3               Counsel, come on back for a second.

4               Let me make something clear.  When I asked about

5    intent, that's a two-way street, obviously.

6               MS. GODESKY:  Of course, yes.

7               THE COURT:  So that's why I'm asking.

8               MS. GODESKY:  Okay.

9               THE COURT:  All right.

10                        (In open court)

11   BY MR. HINDERAKER:

12   Q.  We were talking about Amendment Two?

13   A.  Yes.

14   Q.  And as the Amendment Two, the scope is now

15   enterprise-wide?

16   A.  Correct.

17   Q.  How does the enterprise-wide scope of Amendment Two

18   interrelate with the other elements of the license agreement

19   that define the client as Chubb & Son?

20   A.  So the original license agreement I believe had a seat

21   restriction to it, meaning they could use it on up to five

22   seats.  So five users, essentially.  Amendment One then

23   changed that to say they could use it on up to ten seats.

24   Q.  And when you say "they," who is "they"?

25   A.  I'm sorry.  Chubb & Sons.
```

1    Q.  Okay.

2    A.  And then Amendment Two, taking it to enterprise-wide

3    would have lifted that seat restriction for Chubb & Son, a

4    division of Federal Insurance Company.

5    Q.  Whose enterprise are we talking about?

6    A.  The enterprise of Chubb & Sons, a division of Federal

7    Insurance Company, the client.

8    Q.  On J1, going back to -- no.  No.  I'm sorry.  Let's stay

9    with Amendment Two.  I thought I had it.

10          And on the second page at the top of Amendment Two

11   you will see that paragraph that begins, "For the purposes

12   of this Amendment Two."

13   A.  Yes.

14   Q.  Yes.  And the enterprise-wide license shall mean that

15   client, and this interrelates back to the definition Chubb &

16   Son?

17   A.  Yes.

18   Q.  And its affiliates may use Fair Isaac product.

19          And then the paragraph has a specific definition

20   of "affiliates," is that so?

21   A.  Yes.

22   Q.  And what is that definition?

23   A.  "Affiliates shall mean any other entity, directly or

24   indirectly, controlled by client; where control means the

25   ownership of more than 50 percent of the aggregate of all

1    voting interests, representing the right to vote for the

2    election of directors or other managing authority, in an

3    entity.

4            "Such other entity is an affiliate only during the

5    period that such control exists.  Client shall at all times

6    be responsible for its affiliates' use of the Fair Isaac

7    products."

8    Q.  And in -- I just want to spend a minute on, first it

9    gives a specific definition of affiliates.  And when it

10   looks to -- to be an affiliate, you must be, the client must

11   own more than 50 percent of your stock?

12   A.  Correct.

13   Q.  Is another way of expressing that that the affiliate

14   runs downhill?  How do you say that in your contract

15   language?

16   A.  Downstream.

17   Q.  Downstream?

18   A.  Yes.

19   Q.  So the affiliate must be downstream from the client?

20   A.  Correct.

21   Q.  And then the client must own more than 50 percent of the

22   stock of the downstream entity?

23   A.  Correct.

24   Q.  Did you appreciate at the time that you were drafting a

25   license agreement where FICO was contracting with a

1    division?

2    A.  Yes.

3    Q.  Have you had experience with FICO or with agreements

4    with divisions in other situations?

5    A.  Yes.

6    Q.  Did you have any special -- did you think about the fact

7    that this definition of client and its affiliates with

8    Chubb & Son, the division being a client, meant anything

9    special?

10   A.  I didn't have any specific concerns about it.  To me it

11   was a very specific definition of who the client was in this

12   instance.

13   Q.  I know we didn't see any red lining on it.  Do you

14   recall any conversations with Mr. Black where he wished to

15   have a different definition?

16   A.  I do not.

17   Q.  Let me turn to paragraph 10.8.  This is where I wish I

18   had better eyes.

19          As we saw, this is entitled No Assignment.  And

20   you've told us with the exception of "shall not be

21   unreasonably withheld" that it's standard FICO language.

22          Do you have an understanding of the commercial

23   purpose, the business reason for this language in the

24   license agreement and for you including it in the license

25   agreement?

1    A.  Yes.

2    Q.  What is the business reason behind you drafting this?

3    A.  So from FICO's perspective, when the license is

4    sculpted, so whether it's going to be seat or CPU

5    restrictions or ultimately enterprise-wide, there is a cost

6    that's assigned to that license based on how large the

7    client is, the scope of the business the client is going to

8    be using the software for.

9         So from Fair Isaac's perspective as the licensor

10   of the software, you need to have specificity and certainty

11   as to who your client is and that the use is as intended.

12   So the client, in this case Chubb & Son, cannot simply

13   assign their license to a much larger entity, a much smaller

14   entity.

15        The license is specifically granted to Chubb &

16   Son, and they cannot assign it without Fair Isaac's consent

17   to do so.

18   Q.  Okay.  And you used the word "cost."  Is that the same

19   thing as a license fee?

20   A.  Yes.

21   Q.  Okay.  So you were referencing the first sentence?

22   A.  Correct.

23   Q.  Let's go to the -- well, let's go to the third sentence,

24   and if you would read that, please.

25   A.  I'm looking for the start of the third.

1    Q.  I think it starts, "Any attempt."

2    A.  "Any attempt to assign or transfer all or any part of

3    this agreement without first obtaining such written consent

4    will be void and of no force or effect."

5    Q.  And the business purpose of that is what?

6              MS. GODESKY:  Objection.

7              MR. HINDERAKER:  Why?

8              THE COURT:  Overruled.

9    BY MR. HINDERAKER:

10   Q.  Why do you include that in the language of the license

11   agreement?

12             MS. GODESKY:  Objection.

13             THE COURT:  Let's have an answer to the first

14   question.

15             MR. HINDERAKER:  Okay.

16             THE WITNESS:  Can you repeat the first question?

17             MR. HINDERAKER:  I'd like to.  Could you repeat

18   the first question?

19                   (Record read as requested)

20             THE WITNESS:  So the business purpose of this,

21   again, goes to the license fees that would be associated

22   with the grant of the license, also potentially the scope.

23   A multitude of things could or might need to be changed if

24   an assignment is going to be consented to.

25             And so therefore it -- the license cannot be

1    assigned without that consent.

2    BY MR. HINDERAKER:

3    Q.  And when you use the word "scope," that means what in

4    other language?

5    A.  Any kind of restriction, seats, CPUs.

6    Q.  Okay.

7    A.  Applications.

8    Q.  Okay.  And let's turn to the second sentence.

9           So overall what's the business purpose of the

10   second sentence?

11   A.  So the business purpose of the second sentence is,

12   again, to outline various events that can happen to an

13   organization and that if those things happen, those would be

14   deemed an assignment, which would require consent.

15          And the client, Chubb & Son, shall make no

16   expanded use of the Fair Isaac product as a result of any

17   such event unless and until Fair Isaac provides its written

18   consent, which would not be unreasonably withheld, which is

19   the language added from Mr. Black.

20   Q.  Right.  Well, are there business impacts to FICO that

21   are addressed in that second sentence?

22   A.  Yes.  I mean, again, going to the issue of the license

23   fee.  So I don't know what the size of Chubb & Son, a

24   division of Federal Insurance, was at the time in 2006 when

25   this was signed, but the size of that division, as well as

1    how they were using the Fair Isaac product, would impact the

2    license fee they were charged.

3            So if that changed, either their size --

4    Q.  Could I interrupt you again?

5    A.  Sure.

6    Q.  When you say "their" or "they," is that --

7    A.  Chubb & Son.

8    Q.  Okay.

9    A.  So if Chubb & Son's size changed from a revenue

10   perspective or if they started using the application to

11   support, they, Chubb & Son, used the application to support

12   a larger business, that would have consequences to the

13   license fee.

14   Q.  And can you tell us why?  I mean, the consequences come

15   from what?

16   A.  The price, the license fee is largely based on how the

17   client, in this case Chubb & Son, is going to use the

18   product.  So if that usage is suddenly expanded, the license

19   fee needs to or may need to be adjusted accordingly.

20           So going from -- again, I don't know the size of

21   Chubb & Son in 2006, but going from the size they were to if

22   they were bought by another company or merged with someone,

23   going to a significantly larger size would result in a

24   bigger license fee, generally speaking.

25   Q.  Is that what you mean by "expand"?

1    A.  Yes.

2    Q.  So they are in a bigger organization?

3    A.  Correct.

4    Q.  The second sentence of 10.8 identifies those different

5    specific events in connection with the client; is that

6    correct?

7    A.  Yes.

8    Q.  The second sentence with the client and those different

9    events, we have these changes of circumstances that affect

10   the client.  Is anything in the second sentence speaking

11   about an actual transfer of -- an actual transfer?

12            MS. GODESKY:  Objection.

13            THE COURT:  Sustained.

14   BY MR. HINDERAKER:

15   Q.  Okay.  You in your explanation of purposes and impacts

16   of this, you go back to the pricing and fee of the original

17   license agreement here in 2006.

18   A.  Yes.

19   Q.  And you seem to contrast that with the events that are

20   in the second sentence of paragraph 10.8.  Can you tell us

21   why you do make that contrast?

22            MS. GODESKY:  Objection.

23            THE COURT:  Sustained.

24   BY MR. HINDERAKER:

25   Q.  As you're drafting paragraph 10.8 and its

1    interrelationship with the rest of the agreement, is 10.8

2    speaking -- is there any particular point in time that 10.8

3    is speaking to?

4              MS. GODESKY:  Objection.

5              THE COURT:  Counsel, approach.

6                   (Sidebar discussion)

7              THE COURT:  I think we may be talking at cross

8    purposes.  I understand your objection.  I'm not sure you're

9    intending to ask her to interpret 10.8 or that's what her

10   objection was.

11             MR. HINDERAKER:  I don't want her to.

12             THE COURT:  Right.  You were trying to -- well, if

13   you can rephrase the question.

14             MR. HINDERAKER:  I think I can go back inside some

15   of her answers and pull out what she's trying to say that

16   way.  It's not an interpretation of what it is.  It's a

17   context in which it operates, just the straight language.

18   That's all.

19             MS. GODESKY:  I mean, the questions as they're

20   phrased to me are how --

21             THE COURT:  As it's been phrased, yeah, I agree,

22   but let's go back.

23             MR. HINDERAKER:  I'll try better.

24                   (In open court)

25             THE COURT:  I'm going to try my questions about

1    this.

2              Going back to one of your earlier answers where --

3    if you recall you used the word "scope."  And I said do you

4    mean part of a larger organization, correct?

5              THE WITNESS:  Yes.

6    BY MR. HINDERAKER:

7    Q.  All right.  So I wasn't misinterpreting you?

8    A.  No.

9    Q.  Okay.  So as you were describing the events that are in

10   the second sentence of 10.8, you were describing them as

11   events that -- correct me if I'm not getting you right.  You

12   were describing them as events that could change the scope

13   from the original license, from the -- change the scope of

14   the client from the original license time.

15   A.  Correct.

16   Q.  And when there is such -- well, you know the business

17   reason why FICO wants to have the opportunity to consent

18   should there be a change of scope of the client as compared

19   to when the license agreement was first entered into.

20   A.  So the main business reason, again, would be financial

21   related, because the license fee that's charged is

22   calculated based on the original client that enters into the

23   license agreement, so in this case Chubb & Son.

24              If that client changes for some reason, the

25   license fee may also need to be adjusted in order to account

1    for that.

2    Q.  Understood.  We've mentioned a few times that, that

3    Chubb & Son wanted the additional language "consent should

4    not be unreasonably withheld."  The addition to that of the

5    agreement, was that a business decision or a legal one?

6    A.  A legal decision.

7    Q.  Why did you accept that change?

8    A.  Because it has been accepted case law that in software

9    license situations it is not considered unreasonable for a

10   licensor, in this case FICO, to --

11            MS. GODESKY:  Objection.

12            THE COURT:  Sustained.

13   BY MR. HINDERAKER:

14   Q.  Did you have any concerns in accepting that change?

15   A.  No, I did not.

16   Q.  The paragraph 10.8 second sentence and then the second

17   part goes on to say, "And client shall make no expanded use

18   of the Fair Isaac products as a result of any such event

19   unless and until Fair Isaac provides such consent."

20            Do you know what the business purpose of that is?

21   A.  Yes.  So again in the event the client undergoes one of

22   these entity or structure related events, the client, in

23   this case Chubb & Son, cannot expand its use of the products

24   outside of the license grant unless Fair Isaac provides

25   written consent for it to do so.

1    Q.  What does that -- well I, don't want to have you

2    interpret the contract.

3            Do you have a business understanding of what

4    "expanded use" means?

5    A.  Yes.

6            MS. GODESKY:  Objection.  Foundation.

7            THE COURT:  Just answer that question yes or no.

8    Do you have an understanding of the business?

9            THE WITNESS:  Yes.

10   BY MR. HINDERAKER:

11   Q.  Okay.  And let me ask you this question, then.  In your

12   understanding, if the client goes through a change of scope,

13   as you've described it, is that in the business

14   understanding of FICO an expanded use?

15           MS. GODESKY:  Objection.  Foundation.

16           THE COURT:  Do you have the foundation to answer

17   that question?  Do you understand it, and do you have

18   personal knowledge of that business purpose?

19           THE WITNESS:  Yes.

20           THE COURT:  Overruled.

21   BY MR. HINDERAKER:

22   Q.  And what the business purpose is --

23           Can you read it back so we get that right, please?

24           (Record read as requested)

25           THE COURT:  And let me just say, your answer is to

1     the business understanding.  We're not testifying about the

2     meaning of Section 10.8 in a legal sense.

3               THE WITNESS:  Yes, I believe the business would

4     consider that to be an expanded use.

5     BY MR. HINDERAKER:

6     Q.  I would like to touch on some of the other provisions in

7     the license agreement.  And we've spoken about 3.1, but I

8     don't think I've asked you if you have knowledge of the

9     business reasons behind having that license restriction

10    paragraph in the license agreement.

11              First question I guess is, Do you have the

12    knowledge of the business reasons?

13    A.  Yes.

14    Q.  And they are what?

15    A.  So from a business perspective, again, the license fee

16    is tied to how the client, in this case Chubb & Son, is

17    going to be using the Fair Isaac product.  So the

18    restrictions are really outlining what they can't do with

19    the Fair Isaac product.

20    Q.  Let me turn to, let me turn to paragraph -- where is

21    it -- 10.10.

22              This is called Press Release, not the hottest

23    issue in the case, but do you have an understanding of the

24    business reason behind paragraph 10.10?

25    A.  Yes.

```
1    Q.  And what is that?

2    A.  So as the licensor, Fair Isaac, of this software, the

3    company is wanting to be able to use Chubb & Son's name in

4    things like press releases, marketing materials.  And then

5    Chubb & Son is agreeing to specifically participate in two

6    different types of marketing activities as well, which would

7    go to really helping Fair Isaac to build its brand and

8    reputation within the industry.

9    Q.  That was agreed upon.  And then 10.4, No Waiver.

10            Do you know what the business purpose is behind

11   that?  That's a yes or no.

12   A.  Yes.

13   Q.  And what is it?

14   A.  So it's essentially saying that the parties agree that

15   as the parties kind of live out the rights and obligations

16   of the agreement, neither of them is waiving their right to

17   bring an action against the other party, if, even if it has

18   gone on for some time.

19   Q.  Even if what has gone on for some time?

20   A.  Where the other party is acting out of compliance or in

21   breach of the agreement.

22   Q.  And then paragraph 10.5 entitled Entire Agreement, do

23   you have an understanding of the business purpose behind

24   that?

25   A.  Yes.
```

1    Q.  And what is that?

2    A.  That's to say that the parties to this agreement, so

3    Fair Isaac and Chubb & Son, a division of Federal Insurance,

4    do not have any other agreements outside of the, what we

5    call, the four corners of this document.

6    Q.  And then if we go to paragraph 10.12, do you understand

7    the commercial purpose behind that no third-party

8    beneficiaries?

9    A.  Yes.

10    Q.  What is that commercial purpose?

11    A.  So there are no parties outside of Fair Isaac

12    Corporation and Chubb & Son, a division of Federal

13    Insurance, there are no third-party beneficiaries.  So no

14    other party outside of those two parties has any rights or

15    obligations under this agreement.

16    Q.  You are saying the only people, the only companies, the

17    only ones who have rights under the agreement are FICO and

18    Chubb & Son?

19    A.  Correct.

20    Q.  And then if we go to paragraph 9.4, please.  That is

21    called Survival.

22    A.  Yes.

23    Q.  Do you know the commercial purpose behind that?

24    A.  Yes.

25    Q.  And what is it?

1    A.  So after an agreement terminates, you will often have a

2    survival provision similar to this where the parties are

3    agreeing to the sections of the agreement that will survive,

4    that will live on, even after the agreement has terminated.

5    Q.  And is one of those surviving provisions Section 3.1?

6    A.  Yes, it is.

7    Q.  And is another one of the surviving provisions

8    Section 9.3?

9    A.  Yes.

10   Q.  Effective Termination.

11            Ms. Boone, that's my questions for you.  Thank you

12   for your attention and your time.

13            THE COURT:  Ms. Godesky, how long do you think you

14   will go?

15            MS. GODESKY:  I think it will go past five.

16            THE COURT:  Okay.  Would you like to start?  Shall

17   we start?

18            MR. HINDERAKER:  Let's start.

19            MS. GODESKY:  Sure.  We can start.

20            THE COURT:  Okay.

21                     CROSS-EXAMINATION

22   BY MS. GODESKY:

23   Q.  Good afternoon, Ms. Boone.

24   A.  Hello.

25   Q.  My name is Leah Godesky, and I represent the defendants

1    in this case.

2           You said a few times during your direct

3    examination as you were looking at various iterations of the

4    contract that it represented standard FICO language.  Do you

5    remember saying that?

6    A.  Yes.

7    Q.  What's the basis for saying that?  Have you, do you

8    remember all of the words and phrases in the contracts from

9    back when you work at FICO in 2006 and 2007?

10    A.  I wouldn't say that I remembered them prior to reviewing

11    a standard template from FICO in preparation for my

12    deposition.

13    Q.  So they gave you something before you testified here

14    today to refresh your recollection?

15    A.  Correct.

16    Q.  Do you have that document with you, the template

17    document you just referenced?

18    A.  No, unless it's in the exhibits.

19    Q.  Okay.

20           Does counsel have a copy of that document?

21           MR. HINDERAKER:  I believe you're miss --

22    Ms. Boone said in her deposition and I believe you are

23    mischaracterizing it.

24           THE COURT:  She did say her deposition.

25           MS. GODESKY:  I'm sorry.  I misunderstood.

1    BY MS. GODESKY:

2    Q.  So it was at your deposition that your recollection was

3    refreshed?

4    A.  Correct.

5    Q.  Okay.  And your deposition was in 2019?

6    A.  Yes.

7    Q.  And so as you're looking at things now and you're

8    saying, oh, this is the standard FICO language in all of

9    these different contract provisions, that's based off of

10   seeing a template at your deposition in 2019?

11   A.  Well, I believe there's also exhibits where we looked at

12   where I say to Mr. Black that I'm attaching our standard

13   Blaze license and maintenance agreement for his review.  So

14   that's -- we went through that in the exhibits during my

15   direct.

16   Q.  And when you were asked about your reference in that

17   email during your deposition in 2019, your reference to the

18   standard FICO agreement, you said in 2019 that you really

19   couldn't say whether what you attached was or was not the

20   standard FICO agreement, correct?

21   A.  If that's what I said in my deposition, yes.  I mean, I

22   believe I was referring to an email that said I was

23   attaching it.  So I was relying on the accuracy of that

24   email, yes.

25   Q.  Okay.  I'm just going to hand you a binder.

1    A.  Okay.

2    Q.  Ms. Boone, if you open the binder, I think there's going

3    to be a tab that says Transcripts, and you will find a

4    transcript of your 2019 deposition in this case, correct?

5    A.  Yes.

6    Q.  Okay.  Can I refer you to page 33.

7    A.  Are you talking about the bottom number or the numbers

8    in the squares.

9    Q.  The numbers in the squares.

10   A.  Yes.

11   Q.  And if you look at the top of page 33, you're talking

12   about the email you just talked about today with

13   Mr. Hinderaker where you describe to Mr. Black that you're

14   attaching the, quote unquote, "standard Blaze software

15   license."  Do you see that at lines 1 to 3?

16   A.  Yes.

17   Q.  And then you were asked at line 6, "Question:  Was this

18   in fact the standard Blaze software license in June of 2006?

19           "Answer:  I don't specifically recall, but I've

20   stated in my email that it was."

21           That was your answer then, correct?"

22   A.  Yes.

23   Q.  Okay.  Are you represented by counsel for FICO for

24   purposes of your testimony here today?

25   A.  Yes.

```
 1    Q.  Did you meet with them to prepare to testify?

 2    A.  Yes.

 3    Q.  Now, you joined FICO in 2005, right?

 4    A.  Correct.

 5    Q.  And at the time there were 30 attorneys in the legal

 6    department.  Does that sound right?

 7    A.  I don't recall.  That sounds roughly correct.

 8    Q.  Okay.  And at the time you were just a few years out of

 9    law school?

10    A.  Yes.

11    Q.  You've described yourselves, yourself as relatively low

12    on the ladder at FICO at the time you joined the legal

13    department.

14    A.  Yes.

15    Q.  And you were specifically assigned, as you explained

16    during direct, to supporting FICO's Blaze software business,

17    right?

18    A.  Correct.

19    Q.  And your main responsibilities were to draft the Blaze

20    software license agreements and related ancillary agreements

21    like that master services agreement you looked at with

22    Mr. Hinderaker, right?

23    A.  Correct.

24    Q.  Now you were not the one with primary responsibility for

25    drafting Blaze license agreements.  That was a Mr. Jim
```

1    Woodward, your boss at the time, right?

2    A.  Jim Woodward, yes.

3    Q.  Thank you.  And when you were assigned a Blaze license

4    agreement to draft, the key terms of the deal, like how a

5    customer was going to use Blaze or what the price was going

6    to be, would be decided by the business folks first, right?

7    A.  Yes.

8    Q.  That would be people like Mr. Schreiber and Mr. Wachs?

9    A.  Yes.

10   Q.  Things like the scope of the license, who was going to

11   be able to use it, and pricing was purely a business

12   decision, not legal?

13   A.  Correct.

14   Q.  And so you talked during your direct examination right

15   now a lot about pricing concerns from a business

16   perspective, right?  Like if use were going to expand under

17   a Blaze license.  Do you remember that?

18   A.  Yes.

19   Q.  Okay.  But to be clear, you were not in charge of

20   pricing license.  You relied on Mr. Schreiber and Mr. Wachs

21   and others to do that?

22   A.  Correct.  But I would say as the lawyer supporting the

23   business, it's also my job to point out if I would see

24   things that were an anomaly or changes to how a client

25   wanted to modify their scope to let the business know

1    they've requested this change, does that impact the license

2    fee.

3    Q.  Okay.  And I think you mentioned during your direct

4    examination after a FICO member of the business team, like

5    Mr. Schreiber or Mr. Wachs, made a decision on pricing and

6    scope, you would get a contract request form with all of

7    that information filled out, right?

8    A.  Yes.

9    Q.  Okay.  And then you'd start drafting consistent with

10   whatever had been negotiated.

11   A.  Correct.

12   Q.  And you were assigned responsibility for drafting and

13   negotiating the Blaze license agreements for Chubb in 2006,

14   less than a year after you joined FICO.

15   A.  Yes.

16   Q.  You would have received that assignment to draft the

17   Chubb license agreement just the same way you've been

18   describing the process generally, right?  It would have come

19   in through that contract request form.

20   A.  That's generally how they came in, so I'm assuming

21   that's how the Chubb request came in, yes.

22   Q.  And so just as with all other Blaze license agreements,

23   you were not responsible for negotiating the scope or the

24   price of the Chubb Blaze license agreement, correct?

25   A.  Correct.

```
 1    Q.  And as you talked about with Mr. Hinderaker, one of the

 2    agreements that you negotiated between FICO and Chubb was

 3    that master services agreement, correct?

 4    A.  Yes.

 5    Q.  Okay.  And the purpose of the master services agreement

 6    was to assist with the implementation of the software that

 7    was the subject of the Blaze license Chubb was purchasing,

 8    correct?

 9    A.  Correct.

10    Q.  It's a document that you would characterize as ancillary

11    to the actual Blaze license.

12    A.  Yes.

13    Q.  And they were negotiated around the same time, right?

14    A.  Correct.

15    Q.  Okay.  Can we pull up Exhibit P303, which is now in

16    evidence.

17              And this is a June 6, 2006, email from you to

18    Mr. Black at Chubb that you saw during your direct

19    testimony, right?

20    A.  Yes.

21    Q.  And you talked about how Mr. Black was negotiating the

22    master services agreement on behalf of Chubb at the time,

23    right?

24    A.  It says that an updated version of the MSA is attached

25    yes.
```

1    Q.  And Mr. Black was sort of the person you were dealing

2    with at Chubb as you were negotiating these contracts,

3    right?

4    A.  Correct.

5    Q.  And Mr. Hinderaker asked you if you remember Mr. Black

6    ever asking you to make changes to the definition of Chubb &

7    Son or client in any of these contracts.  Do you remember

8    that question?

9    A.  I do, yes.

10   Q.  And you said, no, you didn't recall, right?

11   A.  Correct.

12   Q.  But to be clear, you don't recall any communications

13   with Mr. Black, one way or another, from back in 2006,

14   right?

15   A.  Correct.

16   Q.  Now, with this email you forward to him what you

17   referred to as an updated version of the MSA with my changes

18   in tracked format, right?

19   A.  Yes.

20   Q.  And as we talked about or we heard from your direct

21   examination, that means probably Mr. Black had sent you an

22   initial draft and then you are marking it up, right?

23   A.  Well, it was likely Fair Isaac's paper, which I think we

24   have established that it is Fair Isaac's contract versus

25   being Chubb & Son's contract.  So it would appear from this

1    email that there were some prior changes to the MSA before

2    June 6th.

3    Q.  And then you're marking up a draft and sending it back,

4    right?

5    A.  Yes.

6    Q.  Okay.  Can we look at the top of the first page of the

7    draft MSA, go to page 2 of the document, please.  And here

8    you can see that the parties to the master services

9    agreement are identified as or at least one of the parties

10   is Chubb & Son, a division of Federal Insurance Company, an

11   Indiana corporation.

12            Correct?

13   A.  Yes.

14   Q.  Okay.  And then if we go down a little bit to numbered

15   paragraph 1, do you see that, where there's a definition of

16   Chubb?

17   A.  Yes.

18   Q.  And it says, "Chubb is defined as Chubb & Son, a

19   division of Federal Insurance Company, for itself and as

20   servicer for the Chubb corporation and its noninsurance

21   company subsidiaries or as manager of its insurance company

22   subsidiaries."

23            Do you see that?"

24   A.  Yes.

25   Q.  And Chubb would have provided that definition.  That

 1   wouldn't have been something you typed up, right?

 2   A.  Presumably, yes.

 3   Q.  And you don't recall if you had, if you knew what that

 4   definition even meant at the time that it was put in this

 5   agreement, correct?

 6   A.  Correct.

 7   Q.  And Mr. Hinderaker asked you during direct examination

 8   about who the client was in this agreement, right?  And you

 9   identified Chubb & Son.  Do you remember that?

10   A.  Yes.

11   Q.  But you were not involved at all in determining what the

12   proper entity was on Chubb's side to enter into these

13   agreements with FICO, right?  That wasn't your job?

14   A.  Correct.

15   Q.  That would have been the business team.

16   A.  That would have been, yes, in their contract request

17   form.

18   Q.  And you don't have any specific recollection of any

19   directions that you received from the FICO business team

20   regarding the scope of the Chubb license, correct?

21   A.  Correct.

22   Q.  Okay.  Now I want to take a look at, if we could, P336

23   which is also now in evidence.  It's the final June 19th,

24   2006, master services agreement.

25              And I pulled up on the screen, Ms. Boone, is the

1    signature block for the master services agreement.  Do you

2    see that?

3    A.  Yes.

4    Q.  And when Mr. Hinderaker showed you the signature block,

5    you said it was signed by Chubb & Son, right?

6    A.  Correct.

7    Q.  Okay.  But the signature line for Chubb actually

8    contains the same language describing Chubb & Son, a

9    division of Federal Insurance Company for itself and as

10   servicer and manager of the Chubb corporations that we were

11   just looking at earlier in the agreement, right?

12   A.  Yes.

13   Q.  And you never asked to change that language.

14   A.  No.

15   Q.  Okay.  Now let's look, if we could, at J1, which is also

16   in evidence, which is the final license agreement.  And if

17   we can just pull up -- now this is P --

18           Thank you, Vanessa.

19           If we could look at the very first paragraph of

20   the agreement.  And in J1, Ms. Boone, it says that, "The

21   software license and maintenance agreement is entered into

22   as of June 30th, 2006, between Fair Isaac Corp and Chubb &

23   Son, a division of Federal Insurance Company, client."

24           And then it goes on, right?

25   A.  Yes.

1   Q.  And during your direct examination you talked about how,

2   "Significant it is how the client is defined in these

3   contracts."

4           Do you remember saying that?

5   A.  Yes.

6   Q.  But you did not consider the difference in the language

7   used to identify Chubb in the MSA and the language used to

8   identify Chubb in the license agreement up on the screen to

9   have any significance, correct?

10  A.  Well, I don't recall if I ever raised it, but the

11  signature block in the MSA is different than how the client

12  is identified in the license, yes.

13  Q.  But that did not have any significance in your mind,

14  correct?

15  A.  I don't know that I can speak to what was in my mind in

16  2006.

17  Q.  Okay.  Let's look at your deposition transcript, and I

18  want to look at page 26.

19  A.  Okay.

20  Q.  So at page 26, line 14, you are asked, "There was no

21  significance to you in the difference of the language

22  between the signature block on the master services agreement

23  we're looking at and the description of client in the

24  license agreement.

25          "Answer:  "Well, I haven't read the master

1    services agreement, but how Chubb is used is a defined term

2    and then how it's used throughout the agreements, I don't

3    know if that has some relevance.  To me the license

4    agreement is with Chubb & Son, a division of Federal

5    Insurance Company.  I don't know why the extra language was

6    on the MSA.

7              "Question:  And again my question was, Is there

8    any significance in your mind to that difference:

9              "Answer:  No."

10             And that was your testimony back at your

11   deposition in 2019?

12             THE COURT:  Hang on, Counsel.

13             MR. HINDERAKER:  I object.  We're going into

14   intent.

15             THE COURT:  Come on up.

16                  (Sidebar discussion)

17        MS. GODESKY:  He opened the door by saying who was

18   the client, wasn't it significant to you.  It is absolutely

19   fair to respond by pointing out there wasn't a significance

20   in these two differences.

21             MR. HINDERAKER:  I was never permitted to ask

22   about intent.

23             THE COURT:  Right.  And I think, I think this is

24   slightly different.  I do think this particular door opened

25   a little bit.  Your question is did she recognize or did she

1    put any significance on it.

2              MS. GODESKY:  And at her deposition she said there

3    was no significance to her between this definition and that.

4    That's all I'm going to establish.

5              And the initial questions were, it was significant

6    to use it said Chubb & Son, so I just want to establish it

7    wasn't significant, but these are slightly different

8    phrasing.

9              MR. HINDERAKER:  Now we're getting into her

10   intent.  The reference to the deposition is irrelevant

11   because 90 percent of the deposition -- her deposition was

12   all about her understanding and interpretation of the

13   contract.

14             So her deposition had a different -- she was

15   asked -- under today's standards in this trial, the

16   deposition had a lot of wrong questions.

17             THE COURT:  I understand.

18             I think on this narrow question she was asked

19   about the significance of the client definition, and she

20   testified to it.  So I think it's fair to ask her if she

21   placed a significance on the fact that the -- that different

22   language is used.

23             You can't ask her what significance.

24             MS. GODESKY:  I'm not going to.

25             THE COURT:  Okay.  That question?

1          MS. GODESKY:  All I wanted to do was establish

2     that there's no significance between the two phrases, and

3     then I was going to move on but she hedged, so I --

4          MR. HINDERAKER:  Ms. Godesky is asking whether the

5     definition of Chubb & Son is broader language than just the

6     words Chubb & Son should be of any significance?

7          MS. GODESKY:  Yes, that was my question.

8          MR. HINDERAKER:  Well, it wasn't phrased that way.

9          THE COURT:  I understood it that way.

10          MS. GODESKY:  Do you want me to continue?

11          THE COURT:  Why don't you finish with this and

12     then --

13          MS. GODESKY:  I think I'm done sort of this line,

14     so it would be a good time.

15          THE COURT:  So you can stop.  If you were going to

16     keep going?

17          MS. GODESKY:  At least another 20 minutes, half

18     hour.

19          THE COURT:  We will just finish this.

20          MS. GODESKY:  Okay.  I will see if there's more.

21                    (In open court)

22          MS. GODESKY:  Your Honor, I think this would be a

23     good time to stop.

24          THE COURT:  Okay.  Let's break for the weekend.

25     It's a long weekend.  You get Monday off.  So let me grab

1    something.

2              I don't have it here, so I'll do it.  You know

3    what's coming, right?  You are taking a long break.  Don't

4    do any research about the case.  And by "research" it's

5    really nothing, looking on the internet, even if you think

6    it's benign about, oh, who is Fair Isaac or who is Federal.

7    Don't do that.

8              Don't talk to anyone outside the courtroom or

9    amongst yourself about the case itself.  Okay?

10             All right.  With that we are in recess for the

11   weekend.  We'll be starting again Tuesday morning at nine in

12   the morning.

13             THE CLERK:  All rise for the jury.

14   4:55 p.m.

15                        **IN OPEN COURT**

16                      **(JURY NOT PRESENT)**

17             THE COURT:  You can step down.

18             All right.  Go ahead and be seated.

19             Counsel, anything we need to take up before the

20   blissfully long weekend?

21             MR. HINDERAKER:  If we want to.

22             THE COURT:  Well, come on up.

23             MR. HINDERAKER:  I'm sorry.  Yes.  I mentioned

24   this morning that we have -- we propose a stipulation with

25   respect to the documents that fall within the Rule 408

1    issue.

2          I think there's agreement to the stipulated

3    language and to the proposed order for the court to sign,

4    save and except for whether one document should be included

5    in the set of documents that are covered by 408.  With a

6    moment's time, I can find the document.

7          We believe that it should be within 408 because it

8    falls within the date range.  And, and while the -- and when

9    you look at the full set of email, you go all the way down

10    the chain to the bottom.  It includes discussions between a

11    FICO person and Henry Mirolyuz, who is at Chubb.

12          So it falls within, it is a discussion and was

13    within that time frame, and it should be within the, within

14    the stipulation.

15          THE COURT:  Why don't you find the document now,

16    and I can at least look at it.

17          MR. HINDERAKER:  It is D0160.

18          THE COURT:  Okay.  Okay.  Do you want to speak on

19    this, Ms. Godesky?

20          MS. GODESKY:  Yes, Your Honor.

21          So this to us does not have any indicia of

22    settlement negotiations or 408 related.  I mean, the

23    introduction email from Mr. Mirolyuz to Mr. Sawyer at FICO,

24    you know, titled Licensing Question.  When we purchase

25    software from FICO, does the up-front price include

1    maintenance for the first year.

2            The question isn't phrased as, under your recent

3    settlement proposal, how would this work.  This is just a

4    question about how the parties typically do business.  And

5    we expect this to be a potential factual dispute, and we may

6    need this to prove that you only have to pay maintenance for

7    FICO licensing software for the first year.  That's why we

8    want to be able to use the document.

9            THE COURT:  Well, if that were to come up, then it

10   wouldn't be offered for a Rule 408 purpose.

11           MS. GODESKY:  Correct.

12           THE COURT:  But unless and until it does, I'm

13   going to keep it out because, you know, once we get into

14   this period of negotiations from February 27 or 28 to

15   March 30th, the parties have defined that as a period of

16   settlement negotiations.

17           And while this doesn't appear to be on its face

18   settlement negotiations, you know, once I have to start

19   making document by document by document decision, I'm going

20   to have arguments about every single one.

21           So for the moment this is not coming in.  If FICO

22   testifies or claims that the facts are otherwise, we'll see

23   about it then.

24           But Mr. Hinderaker.

25           MR. HINDERAKER:  I just want to not accept the

1    characterization of the discussions during that time frame.

2    FICO has said before that the discussions during the 408

3    period were licensing.

4            But we accept -- we're accepting the judgment of

5    the court and the guidance, and we would just like to have a

6    two-way street and a bright line.

7            THE COURT:  Understood.  Understood.

8            Any questions?

9            MS. GODESKY:  I would just say, Your Honor, we

10   never --

11           THE COURT:  I know.  I understand.

12           MS. GODESKY:  Okay.

13           THE COURT:  I don't know where this email question

14   is coming from.  I don't have the context of it.  On its

15   face it's quite anodyne, and it doesn't on its face relate

16   to settlement negotiations, but I don't have the context for

17   it.

18           MS. GODESKY:  And I'm unaware of any context that

19   would suggest it is settlement related, but as long as the

20   court's guidance is, we may be able to use it if we need it,

21   I think that's fine.  It's just that FICO was looking to

22   stipulate that this is inadmissible.

23           And we cannot agree to that right now, because if

24   this becomes something that we have to prove, I think this

25   document should be fair game for that purpose.

1          THE COURT:  What is the thing that you would have

2     to prove, just say it again, if FICO is taking the position

3     that, what?

4          MS. GODESKY:  You have to pay maintenance every

5     year that you're using Blaze, as opposed to maintenance fees

6     only being required for the first year of a license.

7          THE COURT:  Is that different from the -- I seem

8     to recall seeing in the documents that there were ongoing

9     fees over the years.  That's a different fee.

10          MS. GODESKY:  Well, so the -- that's exactly what

11     our concern is, right?  You look at the contracts, and they

12     list the annual maintenance price, which will be, I think

13     it's 15 percent of the license agreement.  Right?

14          So you pay your license fee.  In this case it was

15     $1.3 million, and then under the license agreement you owe

16     15 percent maintenance.  And so to the extent we need to

17     prove maintenance is only mandatory for the first year.  If

18     you choose as a licensee to keep using Blaze but not have

19     FICO's support, you can do that.  You just lose the support.

20          THE COURT:  Understood.

21          Mr. Hinderaker.

22          MR. HINDERAKER:  The answer to the question that

23     she's asking, of course, is found in the license agreement.

24     If we are going to start to get into the negotiations of how

25     a new license would be developed, now we're back at the

1     beginning, and all of those documents should be in.

2          THE COURT:  And I think the concern -- well, I

3     think this is frankly a phantom concern.  I don't think --

4          MS. GODESKY:  It may be, yeah.

5          THE COURT:  Right.  I don't think I'm going to

6     hear FICO witnesses saying you're required to pay this

7     maintenance fee -- that you're required to have maintenance

8     from us after year one.  I think what, if they say anything,

9     they're going to say, if we provide maintenance services,

10    you have got to pay the fee.

11         MR. HINDERAKER:  Well, the license agreement

12    provides that maintenance -- maintenance is a fee that's

13    annual for every year that you have the, you have the

14    license.  The fee is one time.  Maintenance is annual.

15         The answer is in the license agreement, but now if

16    we're talking about a different agreement --

17         THE COURT:  Right.

18         MR. HINDERAKER:  -- that's the whole issue that

19    we've been trying to resolve.

20         THE COURT:  Right.  Understood.  Well, we'll kick

21    the can down the road a little bit.

22         MS. GODESKY:  I just suggest we enter the

23    stipulation without this document.

24         THE COURT:  We will.

25         MS. GODESKY:  And then -- okay.

1        THE COURT:  Yes, we'll enter the stipulation.

2   We'll reserve this document, but, you know, my -- absent a

3   compelling reason, I'm inclined -- just so you know we're

4   going, it's going to have to be a non-408 purpose for which

5   you're going to use it.

6        MS. GODESKY:  Understood.  Thank you.

7        THE COURT:  Okay.  And as long as --

8        Go ahead, Mr. Hinderaker.

9        MR. HINDERAKER:  And in a non-408 context.

10       THE COURT:  Well, even -- the difficulty with

11  that, of course, is even in a 408 context, if a 408 document

12  is offered for a non-408 purpose.

13       MR. HINDERAKER:  If on one day is that, it's that

14  factual information, and it's all in the context of what the

15  defendants call the settlement negotiations, the defendants

16  have requested, and we're fine if we can get some clarity,

17  that an amendment to the, you know the Amendment Three to

18  the, the Amendment Three to the license agreement, which is

19  the business negotiations to go from, to get FICO's consent

20  to the continued use, is being called a settlement

21  agreement.

22       I'm fine simplifying the case, but I'm not fine

23  being precluded from having, putting in evidence of the new

24  licensing agreement that the parties were talking about, and

25  if that's relating to the maintenance of that new agreement,

1      then so much other stuff comes in.

2                  THE COURT:  Understood.

3                  All right.  One last comment.  Anything else

4      for -- yep.

5                  MR. HINDERAKER:  So we may or may not have a

6      stipulation shall, but that will -- I mean, we propose a

7      stipulation that includes that document.  Defendants don't

8      want it in.  We may not have a stipulation.

9                  THE COURT:  I understand.  I understand.

10                 I can tell you I took a long look at what was

11     submitted by Ms. Godesky and the documents, and I can tell

12     you that I was strongly leaning in the direction of that

13     those negotiations that occurred after February 27th were

14     Rule 408 settlement discussions.

15                 You know, as I say, we don't have a witness.  I

16     don't know what the context of exactly this question and

17     this discussion is, so I can't say it is or it isn't.

18                 MS. GODESKY:  I don't want this document to upend

19     our, you know, this issue.  We're truly not trying to

20     circumvent, kind of stick a 408 -- in my view, in truly good

21     faith, this is completely divorced from the settlement

22     negotiations.

23                 We will take another look at this, Your Honor, and

24     see if we can figure out another document that establishes

25     this fact and come at it a different way so that we can

1    hopefully moot the issue.

2         THE COURT:  Right.  I think that would be helpful,

3    because as I say, as I look at it, the document itself

4    doesn't tell me that the question isn't being posed relative

5    to the proposal that was going back and forth between the

6    parties in that period.

7         It doesn't say that it is, but it occurred in that

8    context, and I can't -- I can't say that it's not, if you're

9    following what I'm saying.

10        MS. GODESKY:  I understand.

11        THE COURT:  Mr. Hinderaker, your document back.

12        MR. HINDERAKER:  Thank you, sir.

13        THE COURT:  So hopefully to avoid future such

14   issues, here's the line I am drawing with respect to lawyers

15   testifying about the contract.

16        When they're asked, What's the business purpose

17   behind this, I really want them to testify to the business

18   purpose behind it, not its legal meaning.  So the business

19   purpose, for example, behind the survival clause may be

20   because the business wants to be able to enforce rights

21   after the license is terminated, should that happen.  That's

22   different from saying, here's what it says and what it

23   means.

24        So I don't know if you're, if you're tracking the

25   line I'm drawing.  I think you are.  I'll tell you I think

1      this witness was very -- was skirting the line on a couple

2      of answers, but make sure your witnesses know, you know,

3      what is the business understand or what's the business

4      purpose, not what does this section mean.

5                Okay?

6                All right.  Anything further?  Yes.

7                MS. GODESKY:  I think we wanted to read into the

8      record the documents that were introduced during

9      Mr. Schreiber's depo.

10               THE COURT:  I don't know that we need to.

11               MS. GODESKY:  While you were tracking it, I'm just

12     concerned that you were taking down the deposition exhibit

13     number rather than the trial exhibit number.

14               THE COURT:  I was taking -- well, I was taking

15     down the numbers that were taken from the numbers that were

16     used there.

17               MS. GODESKY:  Okay.  Visually.

18               THE COURT:  Visually.

19               MS. GODESKY:  Okay.

20               THE COURT:  Well, no.  He was testifying using

21     numbers.  If those numbers are different than the trial

22     numbers, then we'd better be -- we should look at that.

23               MS. GODESKY:  I think they are in certain cases.

24     They are, yeah.

25               THE COURT:  Okay.

1              (Off record discussion)

2         MS. GODESKY:  We have the list.

3         THE COURT:  You have the list.  Okay.

4                   (Counsel confer)

5         MS. GODESKY:  Would you just want me to read them,

6    or I could just give you the list.

7         THE COURT:  Just give the list to my clerk.  I

8    will just put on the record the parties agree as to which

9    documents, which exhibits were entered during the deposition

10   of -- what's his first name?

11        MS. GODESKY:  Russell Schreiber.

12        THE COURT:  Russell Schreiber.

13        All right.  With that then, we're off the record,

14   Renee.

15           (Court adjourned at 5:12 p.m., 02-17-2023.)

16                      *   *   *

17        We, Maria V. Weinbeck and Renee A. Rogge, certify

18   that the foregoing is a correct transcript from the record

19   of proceedings in the above-entitled matter.

20        Certified by:  Maria V. Weinbeck/Renee A. Rogge
                         Maria V. Weinbeck, RMR-FCRR
21                       Renee A. Rogge, RMR-CRR

22

23

24

25