# EXHIBIT C



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                    )
Fair Isaac Corporation,             )  File No. 16-cv-1054(DTS)
a Delaware Corporation,             )
                                    )
          Plaintiff,                )
                                    )
v.                                  )
                                    )
Federal Insurance Company,          )  Courtroom 14W
an Indiana corporation,             )  Minneapolis, Minnesota
and ACE American Insurance          )  Tuesday, February 21, 2023
Company, a Pennsylvania             )  8:54 a.m.
Corporation,                        )
                                    )
          Defendants.               )
                                    )
------------------------------------------------------------

BEFORE THE HONORABLE DAVID T. SCHULTZ
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**(JURY TRIAL PROCEEDINGS - VOLUME IV)**

     Proceedings recorded by mechanical stenography;
transcript produced by computer.

                         *   *   *

```
 1     APPEARANCES:

 2        For Plaintiff:          MERCHANT & GOULD P.C.
                                  BY:  ALLEN W. HINDERAKER
 3                                     HEATHER J. KLIEBENSTEIN
                                       PAIGE S. STRADLEY
 4                                     MICHAEL A. ERBELE
                                       JOSEPH W. DUBIS
 5                                     GABRIELLE L. KIEFER
                                  150 South Fifth Street, #2200
 6                                Minneapolis, Minnesota 55402

 7        For Defendants:         FREDRIKSON & BYRON
                                  BY:  TERRENCE J. FLEMING
 8                                     LEAH C. JANUS
                                       CHRISTOPHER D. PHAM
 9                                     RYAN C. YOUNG
                                       PANHIA VANG
10                                200 South Sixth Street, #4000
                                  Minneapolis, Minnesota 55402
11
                                  O'MELVENY & MYERS LLP
12                                BY:  LEAH GODESKY
                                       ANTON METLITSKY
13                                     DARYN E. RUSH
                                       ROXANA GUIDERO
14                                Times Square Tower
                                  7 Times Square
15                                New York, New York 10036

16        Court Reporters:        RENEE A. ROGGE, RMR-CRR
                                  KRISTINE MOUSSEAU, CRR-RPR
17                                MARIA V. WEINBECK, RMR-FCRR
                                  PAULA RICHTER, RMR-CRR-CRC
18                                United States District Courthouse
                                  300 South Fourth Street, Box 1005
19                                Minneapolis, Minnesota 55415

20
                                       *   *   *
21

22

23

24

25
```

1
### I N D E X

                                                                PAGE
2

**JANDEEN BOONE**
3    Cross-Examination (Resumed) By Ms. Godesky          520
     Redirect Examination By Mr. Hinderaker             538
4

**CHRISTOPHER PATRICK IVEY**
5    Direct Examination By Ms. Kliebenstein              539
     Cross Examination By Ms. Janus                      597
6    Redirect Examination By Ms. Kliebenstein            612

7    **RAMESH PANDEY**
     Cross Examination By Mr. Hinderaker                 621
8    Direct Examination                                  684
     Recross Examination By Mr. Hinderaker               707
9

10

11

12   DEFENDANTS' EXHIBITS                                REC'D
        D280                                             533
13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    8:54 A.M.

2

3                **(In open court with the Jury present.)**

4                THE COURT:  Go ahead and be seated.

5                Good morning, Members of the Jury.  I hope you all

6       had a good, long weekend.

7                I'm going to let you know this now since we know

8       it, I know it.  The Chief Judge of the District has

9       indicated that he is going to some time today, probably this

10      morning yet, he will order closure of the courthouse on

11      Wednesday and Thursday in light of the incoming, you know,

12      snow-mageddon.  So I can tell you right now that we won't

13      have court on Wednesday and Thursday.

14               I know that we also -- supposedly the snow is

15      going to start here about one o'clock this afternoon.  We're

16      going to be keeping our eye on it and getting information

17      from a couple of localities, in particular, because I know

18      there is some of you that are driving a great distance.  And

19      we'll make that call as things play out, but I'm more

20      inclined to say we end early today so that you can, you

21      know, drive through the blizzard in daylight conditions so

22      that you get to see it in all its glory, as opposed to

23      driving at night.  Okay?

24               Yes, ma'am.

25               JUROR:  I have a question.  I live a quarter mile

 1   down a private road.  What do I do if my plow guy doesn't

 2   get there in time for me to get out on Friday?

 3             THE COURT:  Well, I don't know.

 4             JUROR:  I can try and see if he will come early.

 5             THE COURT:  Yeah, I don't know what -- I think the

 6   short answer is, impress upon your plow driver that you have

 7   to be here at 9:00 a.m. on Friday morning.

 8             JUROR:  Okay.  Thank you.

 9             THE COURT:  Thank you.

10             All right.  With that, let's resume the testimony.

11   I believe Ms. Boone is on the stand.

12             And, Ms. Boone, let me remind you you're still

13   under oath.

14             THE WITNESS:  Yes, Your Honor.

15                        JANDEEN BOONE,

16   called on behalf of the Plaintiff, was previously sworn, was

17   further examined and testified as follows:

18                  CROSS-EXAMINATION (Resumed)

19   BY MS. GODESKY:

20   Q.  Good morning, Ms. Boone.

21   A.  Good morning.

22   Q.  I want to start today by talking more about the Chubb

23   client who purchased the right to use the Blaze license back

24   in 2006.  Okay?

25   A.  Okay.

```
1    Q.  We looked on Friday before the break at how the master

2    services agreement that's ancillary to the license agreement

3    defines Chubb.  Do you remember that?

4    A.  I do, yes.

5    Q.  Okay.  So let's quickly pull up P336, which is in

6    evidence.  That's the master services agreement.  And I just

7    want to refresh on the definition of Chubb in paragraph 1.a,

8    if you can let me know when you're there.

9    A.  I'm here.

10   Q.  So the master services agreement for Blaze defined Chubb

11   as, "Chubb & Son, a division of Federal Insurance Company,

12   for itself and as servicer for the Chubb Corporation and its

13   non-insurance company subsidiaries or as manager of its

14   insurance company subsidiaries."  Right?

15   A.  Yes.

16   Q.  Now, you testified on Friday, you said that you were not

17   responsible for pricing Blaze licenses, but you have a

18   general understanding that the license fee FICO charges is

19   usually related to the size and the revenue of the company;

20   is that correct?

21   A.  Yes.

22   Q.  So basically what you're saying is that if you have

23   company A that wants to buy an enterprise-wide Blaze

24   license, FICO will look to company A's revenue to decide

25   what to charge.
```

1    A.  That would be one component of the revenue -- or of the

2    license fee to be charged, yes.

3    Q.  So the revenue or the size of the client is one of the

4    proxies for the value that Blaze will bring to the customer,

5    correct?

6    A.  That's my understanding, yes.

7    Q.  And you said on Friday that from FICO's perspective,

8    when the license is sculpted, whether it's going to be a

9    seat restriction or enterprise-wide, there's a cost that's

10   assigned to the license based on how large the client is,

11   correct?

12   A.  That's my understanding, yes.

13   Q.  And then in questioning from Mr. Hinderaker, you

14   identified the client in the Blaze license agreement for

15   Chubb as, "The enterprise of Chubb & Son, a division of

16   Federal"; is that right?

17   A.  I'm not sure I used the word "enterprise," but the

18   client is Chubb & Son, a division of Federal.

19   Q.  When you say that the client is Chubb & Son, a division

20   of Federal, you're going off the literal words on the page,

21   correct?

22   A.  Correct.

23   Q.  Now, just so we're clear, in your experience as an

24   attorney, you have seen instances where a division of a

25   company will sign a contract even though the division itself

1    is not an independent legal entity, correct?

2    A.  I have seen that, yes.

3    Q.  And so the fact that the 2006 license agreement was

4    signed by Chubb & Son, a division of Federal, did not strike

5    you as unusual, correct?

6    A.  Correct.

7    Q.  I want to pull up Defendants' Demonstrative 1, which is

8    an organizational chart.  Do you have a screen up there,

9    Ms. Boone?

10   A.  I do, yes.

11   Q.  Okay.  So you can see it?

12   A.  Yes.

13   Q.  Okay.  Can you say whether the 1.3 million dollar that

14   Chubb paid for its Blaze license was based on the revenue of

15   Chubb & Son, a division of Federal, that small box in the

16   middle of the org chart, or on the revenue of the entire

17   Chubb Corporation entity that is shown on the outer ring of

18   the org chart?  Do you know that?

19   A.  I do not know that.

20   Q.  And if the 1.3 million dollar fee was based on the

21   revenue of the entire global Chubb Corporation, that would

22   suggest that the license was for all of the insurance

23   companies in the Chubb Corporation, correct?

24        MR. HINDERAKER:  Objection, Your Honor.  Lack of

25   foundation.  Argumentative.

1              THE COURT:  Rephrase it to ask the foundational

2       question first.

3       BY MS. GODESKY:

4       Q.  You testified earlier that it's your understanding that

5       Blaze license fees are generally based on the revenue of the

6       customer that's buying the Blaze license, correct?

7       A.  That's my understanding, yes.

8       Q.  So if the 1.3 million dollar fee that Chubb paid was

9       based on the revenue of the entire Chubb Corporation revenue

10      at that time, would that suggest that the license covered

11      all of the insurance companies in Chubb Corporation?

12      A.  I don't know that I know the answer to that; but based

13      on the chart, I would say no because in that instance the

14      license should have been with the parent company, not with

15      the division.

16      Q.  You just said yourself, you can't say for sure because

17      you're not in charge of pricing, correct?

18      A.  Correct.

19      Q.  Let's, let's switch and look at the Blaze license

20      agreement, which is in evidence as J1, and if you turn,

21      Ms. Boone, to the second page of the second amendment to the

22      license agreement.  I'm going to let you catch up with me.

23      A.  Yes.

24      Q.  Sorry.  There are a lot of binders over there.

25      A.  There are a lot of binders, and they're slippery.  Okay,

```
 1    J1.

 2    Q.  J1.  And I want to go to page 20.  If you look at the

 3    little numbers on the bottom of the page, you will see it's

 4    the second amendment to the Blaze license agreement, the one

 5    from December.

 6    A.  And it's the signature page?

 7    Q.  Yes.

 8    A.  Yes.

 9    Q.  There is a stamp on this page indicating that you

10    reviewed it, right?  It says per J. Boone?

11    A.  Yes.

12    Q.  And then at the top of the same page there is a

13    paragraph that references affiliates.  Do you see that?

14    A.  I do, yes.

15    Q.  And the first sentence says, "For purposes of this

16    Amendment Two, the enterprise-wide license shall mean that

17    client and its affiliates may use the Fair Isaac product for

18    their internal business purposes with no limitation on the

19    number of seats or CPUs subject to and in accordance with

20    all of the provisions of the agreement."  Do you see that?

21    A.  Yes.

22    Q.  And the agreement goes on to define "affiliate."  You

23    talked about that with Mr. Hinderaker on Friday, right?

24    A.  Yes.

25    Q.  And you understood when you reviewed this agreement back
```

```
 1    in December 2006 that this addition to the license agreement
 2    now meant that the affiliates of the client could use Blaze,
 3    correct?
 4    A.  To the extent there were affiliates, yes.
 5    Q.  And you agree that it would be pretty odd for a division
 6    like Chubb & Son to have affiliates, because a division is
 7    not a legal entity, correct?
 8    A.  I would agree with that, yes.
 9    Q.  Federal Insurance Company, though, has affiliates,
10    right, like Chubb Canada, Chubb Australia and Chubb Europe?
11    A.  I don't know that those are affiliates of Federal.
12    Q.  But you know that Chubb & Son, the division of Federal,
13    does not have affiliates, correct?
14    A.  I don't know the org chart of Chubb & Son.
15    Q.  But you agree that it would be pretty odd for a
16    division, a nonlegal entity, to have affiliates, correct,
17    Ms. Boone?
18    A.  It would be odd, yes, but I don't know that it would be
19    completely unheard of.
20    Q.  Now, issues of scope, questions like who the client is
21    and what the affiliates are, as you said on Friday, that was
22    typically worked out by the business team like
23    Mr. Schreiber, right?
24    A.  Yes.
25    Q.  And you were not part of the negotiations about this
```

1    amendment that occurred between the business people at FICO

2    and the business people at Chubb, correct?

3    A.  I was not part of those negotiations, no.

4    Q.  And so you don't know anything about statements anyone

5    at FICO made to anyone at Chubb about the meaning of

6    "affiliates" in this amendment, correct?

7    A.  Correct.

8    Q.  Okay.  Now I want to talk about Section 10.8, the

9    assignment provision of the license agreement, and this is

10   also in Joint Exhibit 1 in evidence.

11            Ms. Boone, if you're working in the hard copy,

12   this is page 8.

13   A.  Got it.

14   Q.  Now you have a general understanding, Ms. Boone, that

15   one of the reasons we're all here today is because FICO is

16   alleging that this provision Section 10.8 was breached,

17   correct?

18   A.  Yes.

19   Q.  Okay.  So I want to start by making two points about

20   this provision.  Number one, is it true that you do not

21   remember any conversations that anyone at FICO had with

22   anyone at Chubb about Section 10.8?

23   A.  That is true, yes.

24   Q.  And so that means everything you said on Friday about

25   the business purpose of Section 10.8 is just your

1    understanding of the business purpose.  You can't say

2    whether anyone at FICO ever conveyed that understanding of

3    the business purpose to Chubb, correct?

4    A.  Correct.  That's my understanding of the business

5    purpose.

6    Q.  Okay.  And then the second thing I want to point out is,

7    you talked on Friday about the second clause of the second

8    sentence of Section 10.8.

9             And if we could highlight on the screen.  Thank

10   you, Vanessa.

11            This is the clause that says, "And client shall

12   make no expanded use of the Fair Isaac products as a result

13   of any such event unless and until Fair Isaac provides such

14   written consent which will not be unreasonably withheld,"

15   correct?

16   A.  Yes.

17   Q.  And we saw on Friday that Mr. Black at Chubb

18   specifically added that "will not be unreasonably withheld"

19   language, correct?

20   A.  Yes.

21   Q.  And that language is not in every FICO license

22   agreement?

23   A.  I can't say that for certain, but he added it, so it was

24   not in the 2006 template he was provided.

25   Q.  Now you made a pretty big deal during your direct

1    examination on Friday of saying that Section 10.8 as it

2    appears in the Chubb license agreement is a standard FICO

3    provision.  Do you remember saying that?

4    A.  I don't specifically remember saying that with regard to

5    10.8.

6    Q.  Is Section 10.8 consistent with a standard FICO

7    assignment provision in your view?

8    A.  It would seem to be a standard provision, yes.

9    Q.  When you're talking about whether language in a FICO

10   contract is standard, I think if I understood you on Friday

11   you were saying, understandably, when you left FICO back in

12   2007, over time you kind of forgot what a standard license

13   agreement might look like, but your recollection was

14   refreshed in 2019 by FICO's lawyers; is that correct?

15   A.  In my deposition in 2019, yes.

16   Q.  Okay.  Now, whether or not there was a standard FICO

17   contract, you did regularly approve contracts with language

18   in them that's different from the language that appears in

19   Section 10.8 of the Chubb contract, correct?

20   A.  I don't know that I can say that for a fact.

21   Q.  If we could highlight the entirety of the second

22   sentence of Section 10.8, Vanessa, please.

23            The second sentence of Section 10.8, Ms. Boone,

24   references changes of control, right, mergers, acquisitions,

25   change of control, the right to process the business of

STANDARD-BOONE-CROSS (Resumed)

1    another entity, right?  Those phrases all appear in the

2    second sentence?

3    A.  Yes.

4    Q.  And then there is also a reference to expanded use in

5    the second sentence of Section 10.8, correct?

6    A.  Yes.

7    Q.  And during your time at FICO, you approved contracts

8    that did not have the second sentence that we're looking at

9    here on the screen, correct?

10   A.  I don't recall.

11   Q.  Okay.  So I want to -- if you could look at the binder

12   in front of you, there is a tab on the side that says,

13   ██████████████    And I don't want to publish this to the jury

14   right now.  I just want Ms. Boone to look at the document.

15   A.  Okay.

16   Q.  And this is a license agreement for Blaze between FICO

17   and another customer called ████████, correct?

18   A.  Yes.

19   Q.  And if you look at page 9 of the PDF, you can see that

20   it was signed in 2006, correct?

21   A.  Yes.

22   Q.  And you reviewed it because there is your stamp on that

23   page of the document, right?

24   A.  Correct.

25   Q.  And then if you could look at page 7, just go back a

1    couple pages, there is an assignment provision at the bottom

2    of that page, correct?

3    A.  Yes.

4    Q.  Why don't you take a second and read that.

5    A.  Okay.

6    Q.  Does that refresh your recollection, Ms. Boone, that

7    during your time at FICO you did approve Blaze license

8    agreements that did not contain a sentence that looks like

9    the second sentence of Section 10.8 in the Chubb agreement?

10   A.  Yes.  Well, I approved this agreement, and it does not

11   include that language, yes.

12   Q.  Okay.  Now I want to talk about another aspect of

13   Section 10.8.  You said on Friday that the business purpose

14   of this standard assignment provision is that FICO may need

15   to change the license fees that it's charging if the size of

16   the customer increases through a merger or an acquisition.

17   Is that generally right?

18   A.  That's generally correct, yes.

19   Q.  And if we look at Section -- I'm sorry -- the second

20   sentence of Section 10.8, which is still on the screen, just

21   so we're all clear, nothing in Section 10.8 of the Chubb

22   agreement says, well, if Chubb's revenue increases by X

23   amount through an acquisition, that's going to be expanded

24   use, correct?

25   A.  There is not language to that effect, correct.

1    Q.  And the word "revenue" doesn't appear at all in

2    Section 10.8, correct?

3    A.  Correct.

4    Q.  In the approximately two-year period that you were at

5    FICO, you did approve contracts that specifically referenced

6    revenue changes in the assignment provision, correct?

7    A.  I don't necessarily recall that.

8    Q.  Okay.  Let's look at Exhibit D280, and we won't publish

9    it to the jury yet.  It should be in your binder.

10   A.  Yes.

11   Q.  This is a June 30th, 2007, agreement between FICO and a

12   company called ████████, correct?

13   A.  Yes.

14   Q.  And it's a Blaze Advisor contract?

15   A.  Correct.

16   Q.  And if you go to page 10, looking at the little numbers

17   on the bottom, there is a stamp that says it was reviewed by

18   you, correct?

19   A.  Yes.

20   Q.  And then if you go forward two more pages to page 12,

21   you can see that this was an ████████████████████████

22   ████████████ concerned, correct?

23   A.  Yes.

24   Q.  Okay.

25              Defendants offer Exhibit D280 into evidence.

KRISTINE MOUSSEAU, CRR-RPR
(612) 664-5106

```
 1                    MR. HINDERAKER:  No objection, Your Honor.

 2                    THE COURT:  Exhibit D280 is received.

 3                    MS. GODESKY:  Okay.  So Vanessa, if we could put

 4       page 12 up so the jury could see it, that would be great.

 5       BY MS. GODESKY:

 6       Q.  This is what we were just looking at, right, Ms. Boone,

 7       the aspect of this contract that says it was an

 8       ██████████████████████████████████████████ of Blaze,

 9       correct?

10       A.  Correct.

11       Q.  And the cost for that license was ████████?

12       A.  Yes.

13       Q.  For an additional three development seats for Blaze,

14       they paid ██████, correct?

15       A.  Correct.

16       Q.  Now I want to look at page 8 of the agreement.  Do you

17       see there is a paragraph (b) titled Mergers and Acquisitions

18       Involving Client?

19       A.  Yes.

20       Q.  So it says in the first sentence, ████████████████████

21       ██████████████████████████████████████████████████████

22       ██████████████████████████████████████████████████

23       ████████████████████████████████████████████████

24       ██████████████████████████████████████████████

25       ██████████████████████████████████████████████
```

```
1
2                Do you see that?
3    A.  Yes.
4    Q.  And that language does not appear in Chubb's Blaze
5    contract, correct?
6    A.  That is correct.
7    Q.  And there is no record of you trying to negotiate this
8    into the Chubb contract, correct?
9    A.  Correct.
10   Q.  And you don't know whether Mr. Black at Chubb ever would
11   have agreed to language like this, correct?
12   A.  No, I would not know that.
13   Q.  And this doesn't say that in a merger or acquisition
14   event the sheer size of the new company is going to
15   determine whether a new fee is owed.  It says that the
16   number of installations and the quantity of data will be
17   considered, correct?
18   A.  I haven't read the section in its entirety, but so far
19   that's what it says, yes.
20   Q.  Okay.  Let's look at the second sentence.  So the second
21   sentence says,
22
23
24
25
```

1   ████████████████████████████████████████

2   ██████████████████████████████████████

3   ██████████████████████████████████████

4   ████████████████████████████████████████

5   ██████████████████████████████████

6          Do you see that?

7   A.  I do, yes.

8   Q.  So this language suggests that one of the ways that FICO

9   would evaluate at least with regard to ██████████ whether

10  use was expanding was by looking at the number of

11  applications using Blaze, correct?

12  A.  I don't know that that was a trigger for the expanded

13  use component, but they do talk about use of the

14  applications prior to the M&A event, yes.

15  Q.  And then it says they've agreed in this contract that

16  then they're going to cap usage based on the number of

17  applications that are using Blaze before the event, right?

18  A.  Correct.

19  Q.  Now, you left FICO in 2007 shortly after the Chubb

20  agreement was signed, so you have no idea whether Chubb

21  agreed after the ACE acquisition to provide FICO with a list

22  of applications using Blaze, right?  You don't know that.

23  A.  I do not know that, no.

24  Q.  And you can't speak to whether there was any evidence of

25  expanded use in the months after the ACE acquisition closed

1    because that's after your time at FICO, right?

2    A.  Correct.

3    Q.  Okay.  So let's look at the third sentence of this

4    provision.  It says, ████████████████████████████

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████

14           Do you see this?

15   A.  Yes.

16   Q.  So this assignment provision in the ████████ contract

17   does have a specific reference to revenue, right?

18   A.  It has a specific reference to the entity's

19   transactions, yes, which could be translated into revenue

20   ultimately, yes.

21   Q.  And revenue, right, because in sub (1) it says if the

22   annual gross revenues of the surviving entity exceed prior

23   revenue by ████████████████, right?

24   A.  Yes.

25   Q.  And it doesn't say that FICO will definitely get more

```
1     fees even if revenue has gone up by ████████ and the

2     customer is using Blaze to process more transactions, right?

3     A.  It is not a definitive that they would collect

4     additional fees, correct.

5     Q.  It just says that FICO and ████████ agree to negotiate

6     in good faith about additional fees, if any, right?

7     A.  Correct.

8     Q.  And this type of language did not appear in Section 10.8

9     of the Chubb agreement, correct?

10    A.  No, it did not.

11    Q.  And just like the first sentence of this agreement,

12    there is no record of you trying to add this to the Chubb

13    agreement either, correct?

14    A.  No, but to me one of the key differences is this

15    agreement is actually with a company versus a division.  So

16    I think there would be different ways of approaching it.

17    Q.  And you don't know if you had tried to add this

18    agreement whether Mr. Black at Chubb would have agreed to

19    it, correct?

20    A.  No.

21            MS. GODESKY:  Thank you.  I have no further

22    questions.

23            THE COURT:  Thank you, Ms. Godesky.

24            Mr. Hinderaker, redirect?

25            MR. HINDERAKER:  Yes.  Thank you.
```

JENDIBIT COURT-REDACTED

```
 1                        REDIRECT EXAMINATION
 2    BY MR. HINDERAKER:
 3    Q.  Good morning.
 4    A.  Good morning.
 5    Q.  In your experience at FICO supporting the business side,
 6    were license agreements individually negotiated by FICO to
 7    the client?
 8    A.  Yes.
 9    Q.  And then you received the business terms from the
10    negotiations that happened between the business people
11    representing FICO and the business people representing the
12    client.
13    A.  Correct.
14    Q.  So in that context, each license agreement is unique per
15    the negotiations between the parties; is that fair?
16    A.  That's fair, yes.
17    Q.  With respect to the license agreement that is with
18    Chubb & Son, the division of Federal, do we agree that
19    that's J1 in your binder?
20    A.  Yes.
21            MR. HINDERAKER:  Thank you.  I have no further
22    questions, Your Honor.
23            THE COURT:  Any recross, Ms. Godesky?
24            MS. GODESKY:  No thank you, Your Honor.
25            THE COURT:  Very well.  Ms. Boone, you are
```

```
 1    excused.  Thank you.
 2              THE WITNESS:  Thank you.
 3                        (Witness excused.)
 4              THE COURT:  Mr. Hinderaker, do you know how you
 5    wish to proceed?
 6              Ms. Kliebenstein?
 7              MR. HINDERAKER:  Maybe if we could go with
 8    Mr. Ivey.
 9              THE COURT:  Is that what you intend to do?
10              MS. KLIEBENSTEIN:  I think he is here.
11              THE COURT:  Okay.  Come on up, Mr. Ivey.  Come on
12    around here.  And if you will pause here and raise your
13    right hand, please.
14                        (Witness sworn.)
15              THE WITNESS:  I do.
16              THE COURT:  Go ahead and be seated.  State your
17    full name for the record, if you will, and make sure you're
18    speaking into the microphone.
19              THE WITNESS:  Christopher Patrick Ivey.
20                   (CHRISTOPHER PATRICK IVEY)
21                      DIRECT EXAMINATION
22    BY MS. KLIEBENSTEIN:
23    Q.  Good morning, Mr. Ivey.
24    A.  Good morning.
25    Q.  Apologies for the schedule shift.  Everyone is trying to
```

1    avoid the snow.

2    A.  I appreciate it.

3    Q.  Mr. Ivey, can you tell the jury your current employer

4    and role?

5    A.  So I'm the vice president of product support at FICO.

6    Q.  And how long have you worked at FICO?

7    A.  Since 2003, so about 20 years.

8    Q.  And how long have you been in the product support group?

9    A.  Since 2014, so nine years.

10   Q.  What does the product support group do at FICO?

11   A.  So the product support group is -- essentially it's a

12   help desk.  So if you were to call in for help on something,

13   we will help out with the software and the errors that are

14   occurring.

15   Q.  Could you move a little closer to microphone?

16   A.  Yes.

17   Q.  And your microphone can move, too, if that's easier.

18   A.  Okay.  There we go.

19   Q.  Perfect.  And before your role in product support, did

20   you have any other positions at FICO?

21   A.  I did.  I was in the professional services group within

22   FICO.

23   Q.  When did you start in the professional services group?

24   A.  So I started there in 2003 until 2014, so that was about

25   eleven years.

1    Q.  And we just talked about what the product support group

2    does.  What does the professional services group do at FICO?

3    A.  So the professional services group at FICO, I sort of

4    bucket it into three areas.  So we provide consulting to our

5    customers.  We provide kind of implementation or

6    configuration services for Blaze Advisor and for the

7    software, and then we provide mentoring around the software

8    as well.

9    Q.  Implementation.  What does implementation mean with

10   respect to the professional services group?

11   A.  So with respect to the professional services group,

12   implementation would be really getting the software kind of

13   up and running.  So it would be working with the customer to

14   take Blaze, which when it, when it is delivered from FICO,

15   it's not really ready to run.  You can't just take it and

16   plug it in and run it.  So it's the life cycle of taking

17   Blaze Advisor, configuring it and getting it up and running

18   at the customer site.

19   Q.  And so the FICO professional services group people help

20   perform that function, correct?

21   A.  Correct.

22   Q.  And you just mentioned another software industry buzz

23   word.  Configure.  What does "configure" mean?

24   A.  So configuration would be -- it's sort of part of the

25   broader implementation.  So configuration would be taking

1    the business logic, implementing it or configuring it within

2    Blaze Advisor and then get it running.  So kind of -- I

3    guess maybe an analogy would help.

4           So if you have an iPhone, a brand-new iPhone, and

5    you, you know, get it home and you unplug it -- sorry -- you

6    plug it in and you get it started, there is a lot of things

7    that you would need to configure on the phone.  Right?  So

8    what ring tones you want and, you know, all of the -- what

9    mail you're going to get and all the apps that you want to

10   download and things like that.

11          So that's the same way Blaze Advisor is similar to

12   that.  We would take it and work with you to find your

13   preferences and the logic that you want to put in it, and we

14   configure it within the system, if that helps.

15   Q.  And when you left the group in 2014 to move into product

16   support, how many people were on the professional services

17   team at FICO?

18   A.  We had about 80, 80 resources in the North American

19   group.

20   Q.  And what activities -- can you identify the activities

21   in big buckets that the professional services group does

22   with respect to Blaze Advisor, in particular?

23   A.  So I mentioned before, I would say in the sort of these

24   three big buckets that we did sort of consulting and then

25   the configuration, the implementation and really the

1    mentoring of a customer.

2    Q.  And who receives these services?  Who are you providing

3    them to?

4    A.  So our licensed customers would typically ask for and

5    receive these services.

6    Q.  Let's break down those three buckets and talk about each

7    of them generally.

8    A.  Okay.

9    Q.  Consulting.  What types of consulting did the group

10   offer to Blaze Advisor customers?

11   A.  So in consulting, we were really bringing our best

12   practices around the software.  So we've obviously

13   implemented it many, many times with many customers.  So our

14   knowledge around the best ways to take the software to use

15   it in a performant way, in a way that was -- you were

16   looking for it to be scaleable and adaptable and agile.  So

17   a lot of those best practices are around those areas.  We

18   provided a lot of that in the consulting aspect of it, how

19   you would implement a business rules management system

20   within your company, if you hadn't used one before.

21   Q.  And next bucket, configuration.  Can you explain what

22   are those services with respect to Blaze Advisor?

23   A.  So configuration is really the, the, again, part of the

24   area where we take the software, we're going to work with

25   the customer to understand their business logic, and then

1    find the best way, the most performant way to implement it

2    within and configure Blaze Advisor in order to get it up and

3    running.  So we're kind of getting it up and running at that

4    point.

5    Q.  When you were in the professional services group, what

6    percentage of new customers of Blaze Advisor worked with

7    your group for configuration?

8    A.  It was nearly 100 percent, would typically sign up for

9    some professional services work to help at the outset.

10   Q.  Now walk me through that third bucket, the mentoring.

11   What is mentoring with respect to Blaze Advisor?

12   A.  So mentoring was really where we would work alongside

13   the customer.  So a lot of times in either in a staff

14   augmentation role, we would sit with the customer and be

15   able to mentor their resources so that they could become

16   knowledgeable and take over the aspects of the

17   implementation and sort of bringing them up to speed.

18   Q.  And during your time at the professional services group,

19   did the group have a mission that they followed?

20   A.  Yeah.  In, in our group it was really -- the approach

21   that we took was we used kind of an analogy, the

22   cardiologist model, we would call it.  And the idea was that

23   we were, you know, sort of the, you know, the medical

24   analogy, the heart surgeon doing the really hard work, the

25   conveying, you know, the best practices, a lot of the

1    knowledge around what we knew.  We weren't there so much for

2    the sniffles or the coughs, as it were.  And so that was the

3    idea, was that -- you know, the whole point about Blaze was

4    that we could eventually empower a customer and their

5    business users to really run Blaze Advisor.  So that was

6    kind of the idea.  The mission was to go in and empower

7    customers and let them, you know, expand the use of it and

8    own it.

9    Q.  And we just talked about the three buckets of things

10   that the professional services group did.  Now I want to

11   spend a little time drilling down into the how.

12              So when you were in the professional services

13   group, what, what activities specifically were you involved

14   with?

15   A.  So, specifically, when we got down to a project -- are

16   you asking kind of the methodology approach we would take or

17   the --

18   Q.  Yes.

19   A.  -- the approach?  So we used what we called -- it was a

20   take on an industry approach, but we called it the Four D

21   approach, which was define, design, develop and deploy, and

22   we would use this model to work with customers to implement

23   the software.

24   Q.  And so that Four D approach, that's how you did the work

25   for customers, correct?

1    A.  Correct.  That's how, yes.

2    Q.  And tell me about the first step, define.  What types of

3    work was done in that first step?

4    A.  So in the definition phase, it was really a requirement

5    gathering phase that we would do up front.  So, again, much

6    like maybe the iPhone example, what colors do you want, what

7    picture do you want in the background, things like that.

8           So we would go in and work with a customer to

9    really understand their business, how are you going to

10   implement Blaze Advisor within your system, what are your

11   requirements for timing and up time, things like that.  And

12   then we would work one level deeper on working with them to

13   harvest out the rules.  And we would use a, what we call the

14   draw workshop, which was a decision requirements analysis

15   workshop to sit down with them, really understand the

16   decisions they were trying to make that would ultimately

17   turn into the rules within the software.

18   Q.  And you just mentioned the phrase "harvest out the

19   rules."  Is there another phrase that we might have been

20   hearing about in this courtroom that is the same thing is

21   "harvest out the rules"?

22   A.  So rule harvesting, perhaps, I think was --

23   Q.  And what is "rule harvesting," specifically?

24   A.  So rule harvesting was the act of actually sitting down

25   with the customer and extracting the business logic from

1    around their, around their company.

2           So in insurance, it was often -- you had some

3    rules or some business logic that was kind of hard coded

4    perhaps in some software, and then they might even have, you

5    know, booklets where they were looking through when they are

6    going through a, you know, flipping through pages and

7    looking at specific business lines and ways to categorize

8    insurance for underwriting.

9           So it was capturing all of that logic and then

10   putting it together in a very consistent way through

11   spreadsheets and all that so that you could then understand

12   the patterns that were within the business logic and then

13   ultimately turn that into rules.

14   Q.  So we just talked about define, that first step.  Let's

15   talk about design, the second step.  What does design the

16   rules in Blaze Advisor mean?

17   A.  So, so within Blaze Advisor, there were -- well, there

18   are many ways to take a rule and to put it into Blaze

19   Advisor.  So that could be things like decision tables or

20   SRL, structured rule language, things like that.  And so it

21   was, it was the act, it was the act of sitting down, really

22   understanding how we were going to configure the rules

23   within Blaze Advisor itself.  What was the best way that you

24   would get the most performance, then taking the patterns

25   that we saw because the idea was to educate and empower the

1    business users to use it.  So you had to turn some of those

2    rules into more templates that would then be exposed to the

3    business user to create and author rules and modify them.

4    So that was a big part of it.

5              And then the other aspect of design is, how was

6    the, how is Blaze going to fit in the sort of ecosystem that

7    the type of customer held, how would it be called, what data

8    would be sent in, what data needed to be returned, a lot of

9    things, so kind of to start to finish, if that makes sense.

10   Q.  So those services that you just described, are they

11   services that FICO provides to customers?  Is that what

12   we're talking about?

13   A.  That's correct.  Those are services we provide to our

14   customers, yes.

15   Q.  Is Blaze Advisor customizable?

16   A.  Yes.  Yes, it's very customizable.  So I often described

17   it as starting with a blank sheet of paper in a good way and

18   sometimes, sometimes it was -- you have a lot, a lot to

19   customize in there and configure, but it's sort of, you

20   know, first drawing the lines on the paper, collecting all

21   the words and kind of the business logic and then organizing

22   them into the right paragraphs and, you know, to make a full

23   story, so that's to kind of make an analogy of it, but

24   that's kind of how we would approach it, right.

25   Q.  So we just talked about define and design.  Let's move

1    on to the third bucket, develop.  In the develop phase, what

2    happens in that phase?  What type of work does FICO do in

3    the develop phase?

4    A.  So in the develop phase, we're actually taking the

5    output from the definition and the design phases, and we're

6    writing the rules into, into Blaze Advisor, so actually

7    sitting down, hands on keyboard, putting the rules into, you

8    know, a decision table or other sort of rule metaphors,

9    things like that, and then ultimately being able to generate

10   a rules service that we could, we could end up deploying out

11   to a customer into a customer's architecture.

12   Q.  And the final D I believe was deploy; is that right?

13   A.  Deploy, yes.

14   Q.  And tell me what happens in that phase.

15   A.  So in the deploy phase, we're actually taking, we're

16   taking the rules, the rules from the Blaze IDE.  We're

17   typically compiling them up, kind of making a code package,

18   if you will, and then deploying that out to a, into the

19   customer's infrastructure, so deploying it out so that, you

20   know, a machine could call it and then take the response.

21   It was kind of the act of getting it out there.

22   Q.  And this Four D approach, when you were in the FICO

23   professional services group, what percent of first-time

24   Blaze Advisor customers would have FICO come and help and do

25   those services?

1    A.  Again, I would say it was nearly 100 percent for the

2    first time, and over time different customers had different

3    approaches, but they often -- well, they almost 100 percent

4    of the time needed help to start, get leverage in the best

5    practices, things like that.

6    Q.  In your opinion, did FICO bring any know-how to the

7    table when it was helping with these configuration

8    implementation services?

9    A.  Yeah.  Absolutely.  I think we brought a lot of domain

10   knowledge around business rules management services from the

11   technology industry, so how they were being leveraged, the

12   best use cases in, you know, ways to use them and ways not

13   to use them, which was very important as well, really

14   knowledge around -- and then a lot of knowledge around Blaze

15   itself, the IDE, the RMA, the rules repository, things like

16   that, so the way in which -- the best practices in which you

17   are going to leverage Blaze to be performant and, again,

18   scaleable and all these other things I mentioned earlier.

19   Q.  And you mentioned another sort of industry term.  I want

20   to make sure we're all on the same page.  Domain knowledge.

21   What is "domain knowledge" in your line of business?

22   A.  So "domain knowledge" had sort of two aspects to it.

23   Domain knowledge of business rules management systems and

24   the technology, was one aspect, and really knowledge about

25   Blaze Advisor.  And then there can be industry domain

1   knowledge as well, such as -- so we're talking about

2   insurance here, so having worked with a number of insurance

3   companies, having some rough domain knowledge that would

4   apply to business rules management systems, how are they

5   typically being implemented.

6   Q.  And can you give me an example of when you were involved

7   in this Four D process in the professional services group?

8   A.  Sure.  So a big one that I was a part of and I actually

9   was part of the implementation, it was quite a long time

10  ago, was with the ███████████████████.  And we -- they

11  came to us with a business problem and said, hey -- so it

12  was kind of interesting.  They were -- for ████████████████

13  ███████, they were -- which would be, let's say, a million

14  ████████████ or something like that -- they would cherry

15  pick, say, a thousand of them, and they would send a group

16  out to, I think it was Tulsa, Oklahoma, a group of maybe

17  eight or nine ████████████████, and then they would sit

18  around the table with ██████████████████, and they would

19  manually go through them.  So they are manually going

20  through a thousand of them, let's say a million, and trying

21  to find areas where they audit or people were off on their

22  ████████████ or things like that.

23          So they came and said obviously there must be a

24  better way or faster way of doing this.  We're struggling.

25  So that was sort of the definition phase.  We got a lot of

1    the requirements that they wanted, what they wanted this to

2    look like, we really worked back and forth with how this was

3    going to implement and work with their system as well.

4           And then we go into the design of it.  So we said,

5    okay, what would this look like with ████████████, do we

6    have the right data that we need, do we have all the logic,

7    is it written down, is it in the ████████████, you know,

8    where is it.  So we gathered a lot of that and put that

9    together.

10          And then we worked with them to actually develop

11   the system, so worked through actually implementing again

12   the full Blaze Advisor, the full repository, all the rules,

13   working hand in hand with them and then training them at the

14   same time and mentoring them.  And we deployed that out into

15   ████████.  And the result was that they actually were then

16   able to go through really all ██████████████████████

17   within, you know, hours versus 1,000 with, you know, eight

18   people sitting around a desk for two weeks.  So it was a

19   huge success story.  It was really good.

20   Q.  And how, how do customers get a copy of Blaze Advisor?

21   A.  So we have a fulfillment website where customers

22   typically would log in and download the software.

23   Q.  And once it's installed, can FICO turn off Blaze Advisor

24   at its customer site?

25   A.  No, we don't really have an option to do that.  The

1   license is kind of on their premises.  There is no way for

2   us to go in and turn it off.  So it's not like a Cloud

3   account, like Spotify or Netflix or something, where we can

4   turn it off remotely.

5   Q.  And let's drill down into the fun part, the contracts of

6   the professional services group.  Can you pick up -- you've

7   got two big binders.  Apologies, everyone.  Pick up the

8   first one that starts with P212, in the first exhibit right

9   here.

10  A.  This one here?

11  Q.  Okay.

12  A.  Oh, yeah.  P212.  Yes, sir.

13  Q.  When you worked in the professional services group, were

14  you ever involved in documenting customer engagements?

15  A.  I was.  So I -- when I was in the professional services

16  group, I would document statements of work.

17  Q.  And a statement of work, for someone who is not a lawyer

18  or who is not in the technical software industry, can you

19  tell me just at a top level what is a statement of work?

20  And then we will look at some.

21  A.  Sure.  Yeah.  So a statement of work really just

22  describes what a customer has asked us to do for them.  It

23  will run through what we're going to do, kind of the

24  deliverables that we will provide, and then usually the cost

25  and the -- excuse me -- and the number of hours that it will

1    likely take.

2    Q.  Is a statement of work a license?

3    A.  No, a statement of work is not a license.  So typically

4    that would have been negotiated before I got involved.  So

5    the license was -- or, rather, I'll say the professional

6    services statement of work would be an appendix to the

7    license.

8    Q.  So it's a totally separate contract, correct?

9    A.  Totally separate contracts, yes.

10   Q.  And did you work on statements of work during your time

11   at FICO in the professional services group?

12   A.  I did.  I did.  So I was for a period of time in charge

13   of, in charge of the Blaze group.  So I would help negotiate

14   and understand what the customer was really looking for and

15   then write up the statements of work.

16   Q.  And did you work on any of those statements of work

17   between FICO and Chubb & Son?

18   A.  I did, yes.

19   Q.  Do you know how many, how many of those statements of

20   work exist between Chubb & Son and FICO?

21   A.  I did a count, and there were I believe 52 statements of

22   work.

23   Q.  And have you personally reviewed all of those statements

24   of work?

25   A.  I have.

1    Q.  Based on your experience, do you recall generally what

2    type of services Chubb & Son requested from FICO?

3    A.  Yes.  So generally it followed a lot of ways I was

4    talking about earlier, so consulting, so the implementation,

5    that Four D approach that I talked about, training, there

6    was a number of trainings in there, and then that

7    mentorship, mentoring and guidance, yeah.

8    Q.  Please turn to Exhibit 337 in your binder.

9              MS. KLIEBENSTEIN:  AND, Your Honor, to my

10   knowledge, there is no objection to the exhibits we're going

11   to go through here.

12             THE COURT:  Were you offering -- it hasn't been

13   displayed 212.  Were you offering 212?

14             MS. KLIEBENSTEIN:  Not yet.

15             THE COURT:  Okay.

16             MS. KLIEBENSTEIN:  Thank you.

17   BY MS. KLIEBENSTEIN:

18   Q.  So Exhibit 337, do you recognize this exhibit, Mr. Ivey?

19   A.  I do, yes.  Yes.

20   Q.  What is it?

21   A.  So this is a statement of work dated the 12th of June,

22   2006.

23   Q.  And, Mr. Mayleben, could you just show us the first page

24   there?  Thank you.

25             So this is a statement of work contract.  Can you

1    walk us through, for somebody who has never seen this type

2    of document before, walk us through the different pages and

3    just generally what types of information is in these

4    contracts based on your experience working on them?

5    A.  Sure.  Yeah.  So, generally, they would -- you have a

6    number of sections.

7         So the first section would be called the

8    Description of Services and would lay out, again, what we

9    were being asked to do and what we might be doing.

10        The second section would be the Deliverables, what

11   we're going to provide as a result of the statement of work.

12        And then Section 3 would describe what we aren't

13   going to do.

14        Four was kind of assumptions -- 4 and 5 were more

15   of the legalities.

16        And then 6 would cover kind of what we would be

17   paid and how many hours we would deliver, typically, unless

18   it was a fixed price and then --

19   Q.  And then it would end with the parties' signatures,

20   correct?

21   A.  Correct.  Yes.

22   Q.  Let's go back to the first page, if we could,

23   Mr. Mayleben.

24        Let's focus on the Description of Services.  This

25   was something that Chubb & Son was asking FICO to do, right?

1    A.  That's correct.

2    Q.  And can you tell me at a general level in this

3    Description of Services what was FICO being asked to do?

4    A.  So at a very high level, this, this was work to

5    identify -- so maybe the first section of what we were

6    talking about with the definitions.  So for this we were

7    being asked to -- actually, I can probably read the -- if I

8    look at the second paragraph, Fair Isaac will collaborate

9    with key client stakeholders to conduct a Blaze Advisor

10   project analysis for -- to perform discovery and analysis

11   activities for the pending renewal creation and

12   classification solution.  So, in general, it was that first

13   part of gathering the requirements, what do you want to do,

14   how would the rule management kind of fit within that

15   contract.

16   Q.  So to put this in the Four D frame work, what D are we

17   talking about?

18   A.  The first definition phase.

19   Q.  And what's the date on this contract?

20   A.  The 12th of June, 2006.

21   Q.  What were the fees for this particular statement of

22   work?

23   A.  So I'll go back to Section 6, and in the first paragraph

24   the fees were a fixed price of ███████ .

25   Q.  Do you know how many people hours at the time that would

1    have been?

2    A.  It would have been roughly between 120 and 160 hours

3    depending on the -- what rate we used underneath the covers,

4    but generally it would have been about that.

5    Q.  And how, how did you do that math?

6    A.  So if I take -- so I know the rough rate that we would

7    typically charge a customer.  So if I take ███████ divided

8    by -- it was usually around 200, between ████████████ an

9    hour, and so that would give you 120 hours or 160 hours.

10   Q.  And going back to the first page down under 1(i), I

11   believe, if my eyes area correct, it says two deliverables.

12   Can you describe what those deliverables were to be in this

13   instance.

14   A.  Yes.  So it states that the first deliverable is,

15   "Pending Renewal Creation and Classification Solution Vision

16   document that outlines a baseline strategy and roadmap for

17   Blaze Advisor based Pending Renewal Creation and

18   Classification Solution."

19        And then the second deliverable would be a

20   "Conceptual Application Architecture Document that outlines

21   the various system components and infrastructure required to

22   implement the Pending Renewal Creation and Classification

23   Solution."

24   Q.  Can we set that exhibit aside and move to Exhibit 870 in

25   your binder.  And what is the date of this agreement?

```
1    A.  So this is a statement of work dated the 12th of June

2    2006.

3    Q.  And at a high level, at a high level, what services are

4    being described in this statement of work?

5    A.  So this statement of work is outlining -- it's a follow

6    on to that first statement of work, the pending renewal

7    creation and classification.  And it's essentially stating,

8    and if I look down in sort of the first bullet under the

9    first paragraph, it's talking about how we would conduct an

10   analysis of what would this whole implementation look like,

11   how many hours would it take, what would need to happen.

12   Q.  Implementation of what?

13   A.  Of the pending renewal creation and classification

14   application.

15   Q.  Implementation of Blaze Advisor into that application?

16   A.  Apologies.  Yes, yes.

17   Q.  And what's involved in implementation again, just

18   briefly?

19   A.  So the implementation would typically, again, cross that

20   Four D approach, the define, design, develop and deploy.  So

21   it would provide some consultative hours up front.  We would

22   go through gathering their business requirements around this

23   solution, all the way through developing it and deploying it

24   out into their system.

25   Q.  And moving to Section 2, Deliverables.
```

1    A.  Okay.

2    Q.  Can you tell me, what was the second deliverable

3    requested?

4    A.  So the second deliverable under part (b) was a proposal

5    for a fixed price implementation of the remainder of the

6    application.

7    Q.  And that was implementation by whom?

8    A.  It was a proposal for a fixed price implementation by

9    FICO of the --

10   Q.  And can we now move to Exhibit 341.  What is the date on

11   this statement of work?

12   A.  So this statement of work is dated August 11th, 2006.

13   Q.  So it was a couple of months after the last two we

14   looked at, right?

15   A.  Correct.

16   Q.  And what services are outlined in this statement of

17   work?

18   A.  So this statement of work outlines, is a follow on to

19   that last statement of work.  So it actually looks like the

20   result of that statement of work where it's outlining what

21   we would do for a full implementation of this renewal

22   application.

23   Q.  And implementation is that Four D approach that we just

24   discussed, right?

25   A.  That's correct.

1    Q.  And can you turn to -- well, actually, let's stay on

2    this first one.

3              Under the Project Background, can you tell me what

4    was the turbo batch renewal application identified in the

5    Project Background?

6    A.  Yeah.  So if I look at the second paragraph in 1.1, "The

7    turbo batch renewal application is a custom business

8    software application currently in use at Chubb.  The

9    application supports Chubb's underwriters and their

10   assistants at Chubb's renewal centers by classifying

11   specialty lines policies during Chubb's batch policy renewal

12   process.  Generally described, the application is a batch

13   process that assesses specialty lines insurance policies

14   with pending renewals and categorizes them for treatment."

15   Q.  And, Mr. Ivey, how many pages is this statement of work?

16   A.  Ahh.

17   Q.  I think the page numbers are in the upper right-hand

18   side.

19   A.  I wanted to take the long way.  17 pages.

20   Q.  Okay.  Now moving back to the second page under

21   Section 1.2, can you generally describe what, what work is

22   requested in Section 1.2 from FICO?

23   A.  So, generally, it's describing the implementation

24   project, how we would go about -- how we're going to go

25   about implementing this solution at the customer, the

1    pending renewal solution.  And it breaks down -- it has a

2    breakdown of the waves as described here.  So there were

3    four waves, in which we would be implementing an increasing

4    amount of the specialty lines that were being asked for.

5    Q.  And, Mr. Mayleben, if we could expand out.  And then

6    halfway down it says, "the wave breakdown."  Let's make that

7    bigger so everyone can read it.

8            You just briefly mentioned the wave breakdown.

9    What are you talking about?

10   A.  Yeah.  I think you have it up here.  So the wave

11   breakdown -- and this would be consistent with our kind of

12   mentoring cardiologist model, which is -- so the first wave

13   defines that FICO will do kind of 100 percent of the work.

14   And then in Waves 2, 3 and 4, you can see that Chubb & Son

15   would have an increasing amount of work that they would do

16   as they learn and start to use the software and learn how to

17   go about the implementation.

18   Q.  So let's set that project aside and move to Exhibit 346.

19   What is the date on this statement of work?

20   A.  Actually just give me one second here.  Here we go.  So

21   the date on this statement of work is May 21st, 2007.

22   Q.  And can you at a 10,000-foot level describe the services

23   requested in this statement of work?

24   A.  Just give me one second to make sure I'm -- so,

25   generally, the service here, services here are doing a

1    validation of a solution, and it looks as though it's the

2    commercial underwriting workstation.  So we were coming back

3    in and doing a high-level validation of their approach to

4    use a business rules management system for this commercial

5    underwriting workstation application.

6    Q.  So the application that's involved is what again?

7    A.  It's the commercial underwriting workstation

8    application.

9    Q.  And you mentioned "validating."  What is that?  What

10   does that mean in your line of work?

11   A.  So in our line of work, kind of back to that

12   cardiologist model where -- I believe we're being asked back

13   to kind of validate an approach that they have taken.  So

14   they had learned how to go about an implementation, and they

15   were then going into another solution here, having us come

16   back and, as kind of the cardiologist, and say, hey, have we

17   done everything right, are we on the right path so that we

18   don't get too far down before we have mistakes and problems.

19   Q.  And you just said they learned how to implement an

20   application.  What are you referring to?

21   A.  Sorry.  So Chubb & Son would have learned through some

22   of the prior styles that we saw -- we would have worked with

23   them; and, again, when we talked about the waves in the last

24   SOW, so they would have been picking up how to go about an

25   implementation of a solution.

1    Q.  And you just used some more jargon.  What is a SOW?

2    A.  Apologies.  So a SOW is shorthand for a statement of

3    work.  SOW.

4    Q.  And can you turn to page 2 under Deliverables,

5    Section 2.  Can you identify the deliverables for me that

6    FICO was to provide to Chubb & Son?

7    A.  So if we look at that second -- sorry -- first bullet,

8    "Fair Isaac is to create a validation approach report

9    document to include results of the analysis of the automated

10   assignment and Drools to Blaze projects as follows,"

11   including recommendations for changes.  And under that we

12   can see the bullet points there, gap analysis, risk

13   analysis, hardware sizing and a deployment support model

14   recommendation.

15   Q.  And have you ever heard of Drools before?

16   A.  I have.  It's another business rules management system.

17   I think it was owned by IBM at the time.

18   Q.  And based on this statement of work, what was happening

19   with Drools and Blaze Advisor?

20   A.  So this would indicate that we were converting from

21   Drools to Blaze Advisor, so we were going to move rules from

22   that system to Blaze Advisor.

23   Q.  In Chubb & Son's application?

24   A.  In Chubb & Son's new application, yes.  In Chubb & Son's

25   application.

```
 1    Q.  And let's move to Exhibit 349.

 2              THE COURT:  Counsel, before you begin with 349,

 3    are you reaching a break point that's convenient?

 4              MS. KLIEBENSTEIN:  Works for me.

 5              THE COURT:  Okay.  Why don't we take our morning

 6    break now.  Be back in the courtroom at 10:30 on that clock.

 7              THE CLERK:  All rise for the jury.

 8                        (Jury exits.)

 9

10              THE COURT:  You can go ahead and step down.

11              I don't have anything I need to raise.  Does

12    anybody else?  Nope?  Okay.  We will be back at 10:30.

13                       (Recess taken.)

14

15              COURTROOM DEPUTY:  All rise for the jury.

16                       (Jury enters.)

17

18         (In open court with the Jury present.)

19              THE COURT:  Go ahead, Ms. Kliebenstein.

20              MS. KLIEBENSTEIN:  Thank you.

21    BY MS. KLIEBENSTEIN:

22    Q.  Mr. Ivey, can we backtrack to Exhibit P346 again.

23    A.  Sure.

24    Q.  And I want to go to page 2, Section 2.

25    A.  Okay.
```

1    Q.  And I just want to make sure everybody understands, what

2    is a deliverable in your line of work?

3    A.  So a deliverable in our line of work is something, be it

4    a piece of code or a document, typically, or a training

5    course or something like that that we would actually deliver

6    to the customer.  It is the output, so we could say, hey,

7    this is being completed, this is being delivered.

8    Q.  Okay.  So it's something that FICO is giving or

9    delivering to the customer?

10   A.  Correct.

11   Q.  Okay.  Now, let's move back to Exhibit 349, if you

12   could.

13   A.  All right.

14   Q.  And what's the date on this statement of work?

15   A.  This is dated October 22nd, 2007.

16   Q.  And at a 10,000-foot level, can you tell me, What's the

17   project overview for this statement of work between FICO and

18   Chubb & Son?

19   A.  So this one, as I read through Section B, the

20   Description of Services, so it looks like what we're

21   providing to Chubb & Son was a test strategy for a rules

22   service that they would have had implemented, so, again,

23   allowing them to -- we were building a test strategy for

24   them.  Kind of back to that cardiologist model, we were

25   coming in to help them with a strategy about something.

```
1    Q.  So FICO was participating in helping implement Blaze
2    into this application, correct?
3    A.  We were participating in developing this test strategy,
4    correct.
5    Q.  And what were the objectives of the test strategy in
6    this statement of work?
7    A.  So if I look at Section B, again, the second paragraph
8    in the bullet point, it states, "The objectives of the test
9    strategy are to provide recommendations and best practice
10   that:  Achieves comprehensive test coverage and minimize
11   risk; minimizes redundant testing; clarify testing roles and
12   responsibilities; meets the objectives of key stakeholders;
13   allow for faster time to market and more agility; and
14   delivers a solution with minimal defects at reduced costs.
15   Q.  Expanding back up to the Project Overview, can you tell
16   me what application was listed in this statement of work?
17   A.  So it lists -- it states, "Specifically, the CPSS
18   Inventory Management 2B Automated Assignments project."
19   Q.  And that's the project.  And the next sentence --
20   A.  "Within," yep, "within the current Chubb Client
21   Commercial Underwriting Workstation application."  So it's
22   the commercial underwriting workstation that we saw before.
23   Q.  And so with this statement of work, FICO was being asked
24   to participate in getting Blaze Advisor into this
25   application, correct?
```

```
1    A.  Correct.  This statement of work was really helping to

2    define the strategy and the approach to the test strategy

3    of -- for Blaze in this solution, yes, in this application.

4    Q.  Can we move to Exhibit 882.  Can you tell me, What is

5    the date on this statement of work?

6    A.  The date is September 22nd, 2009.

7    Q.  So 2009, a couple of years later, right?

8    A.  Correct.

9    Q.  Can you tell me at a 10,000-foot level, what is the

10   Project Overview for this statement of work?

11   A.  So at a very high level, this is another very broad

12   implementation start to finish.  It's sort of laying out the

13   Four D process again within the description of services for

14   this premium booking validation service.  So it looks like

15   everything from definition, some design, development,

16   deployment, assisting Chubb & Son with that.

17   Q.  And with regard to the services in Section 1,

18   Description of Services, can you describe generally for me

19   the services that were requested to FICO by Chubb & Son in

20   this statement of work?

21   A.  So we would have been requested to -- there is decision

22   analysis, definition, a lot of analysis and design.  There

23   is implementation.  There is testing.  There is deployment.

24   And I would say that kind of summarizes it.

25   Q.  And if we focus on 1(h) specifically, "Implementation of
```

1    the above-described designs and specifications," what does

2    that mean?  What was FICO being asked to do?

3    A.  So that, that lays out the -- that's where the -- excuse

4    me -- the development aspect of it.  So we're being asked to

5    actually implement the designs, configure Blaze Advisor for

6    this rules project and write the rules into the system,

7    configure it and then deploy it.

8    Q.  And, again, this statement of work is for what

9    application again?

10   A.  This is for the Premium Booking Validation Service.

11   Q.  And if you go to page 4, how many hours of time, of

12   FICO's time, was estimated for this project?

13   A.  So the estimated hours are listed as up to 6,000 hours.

14   Q.  Now can we jump all the way back to 371 in your binder.

15   And what is the date on this statement of work?

16   A.  So this one is dated March 1st of 2010.

17   Q.  And who is it between?

18   A.  So if I go -- actually --

19   Q.  On the very first page.

20   A.  Yeah, on the first page.  So it's between Chubb & Son, a

21   division of Federal Insurance Company, and Fair Isaac

22   Corporation.

23   Q.  And what services in this statement of work was FICO

24   being asked to perform for Chubb & Son?

25   A.  So we were generally being asked to provide rules

1    harvesting and analysis assistance, rules harvesting

2    training and then mentoring.  So if I look at, yeah, in the

3    background here.

4    Q.  With respect to what Chubb & Son application or --

5    strike that.  With respect to what Chubb & Son project?

6    A.  So it lists the Chubb & Son's Surety Cornerstone

7    Project.

8    Q.  And, again, what is rule harvesting again?

9    A.  So, yeah, rule harvesting is when we would sit down with

10   the customer, we would actually work with them through their

11   business logic, which again could be stored in many areas,

12   booklets or hard code or many areas.  We would gather all

13   those rules into a cohesive documentation and whatnot so

14   that they could then be developed.

15   Q.  And so FICO was asked to do that work for the Surety

16   Cornerstone project?

17   A.  That's correct.

18   Q.  All right.  Let's move on to Exhibit 871 in your binder.

19   What is the date on this statement of work?

20   A.  This statement of work is dated August 14th, 2007.

21   Q.  And if we span back out, Mr. Mayleben.

22             This statement of work looks a little bit

23   different than the ones we were just looking at.

24   A.  Yeah.

25   Q.  Can you tell me, What is the Description of Services in

1   this statement of work?

2   A.  Yeah.  So just as background again, we talked about the

3   things that we would typically provide to the customer were

4   around consulting and then implementation, integration and

5   then training and mentoring.  So this falls into that

6   training bucket.  So generally we were providing three,

7   three training classes.

8   Q.  And why would FICO -- sorry.  Apologies.  Why would a

9   client, a customer, ask FICO for training sessions on Blaze

10  Advisor?

11  A.  So oftentimes it was -- there could be multiple reasons,

12  but oftentimes it was if they had new employees that were

13  coming up to speed on Blaze Advisor, they might have them

14  attend a training class; or if they were expanding the use

15  into a new area, they might need their resources to come up

16  to speed on Blaze Advisor.  So it was -- these classes are

17  good at laying the fundamental building blocks of Blaze

18  Advisor, so the -- we would oftentimes recommend that the

19  customers take these training courses first before we got

20  into an implementation.  Then you had kind of the base

21  understanding of the software.

22  Q.  And let's move to Exhibit 351 in your binder.  And can

23  you tell me, What is the date on this statement of work?

24  A.  The 15th of April 2008.

25  Q.  And spanning back out, what services did Chubb & Son

1    ask, ask FICO to provide with this statement of work?

2    A.  So the services listed were rule harvesting workshop and

3    then a rule harvesting checkpoint workshop.

4    Q.  And why would a customer be asking for this type of

5    workshop, based on your experience in the professional

6    services group?

7    A.  So, again, if they were, if they were looking at

8    implementing, you know, a new solution, they would ask for

9    us to come in and help.  This was a consultative aspect,

10   walking them through the best practices of how to harvest

11   their rules, how to look for them, look for the patterns in

12   the rules that they might then end up exposing to a business

13   user, and kind of walking them through -- making sure they

14   were doing it in the right way and documenting them in the

15   right way to really cut down on problems and defects that

16   might arise later.

17   Q.  And turning to another statement of work now,

18   Exhibit 355, this one looks a little bit different yet as

19   well.  Can you describe for me what type of services are

20   being asked of FICO by Chubb & Son in this agreement?

21   A.  So, yeah, so this one is what we sometimes would call a

22   bucket of hours statement of work.  So it was often -- back

23   to kind of that cardiologist model, so once customers have

24   gotten used to the software and they had implemented a few

25   projects, they would sometimes allocate a bucket of hours to

1   have us come back in.  So it was easier to set out a

2   statement of -- one statement of work that had a number

3   of -- rather than asking us, hey, can you come in for five

4   hours on this and ten hours for that and doing a whole

5   contractual, doing contracts for each of those.  So they'd

6   set out a bucket of hours and say, hey, we will call you and

7   ask for some help and we will draw down on this bucket of

8   hours.

9   Q.  And that help that was requested, it wasn't help

10  desk/product support type of help, right?

11  A.  No, no.  This would be more back to that coming in,

12  reviewing what they had done.  They might have found a new

13  use for it and asking us, yeah, you know, is this a right

14  fit, things like that, the high-level work.

15  Q.  So FICO would be participating in getting Blaze Advisor

16  up and running, correct?

17  A.  Correct.

18  Q.  And you mentioned the phrase "bucket of hours."  How

19  many hours are in this bucket?

20  A.  So if I go to Section 6 and the table there, it looks

21  like 450 hours.

22  Q.  All right.  Let's move to Exhibit 299.  What is the date

23  on -- what is the date on this agreement?

24  A.  June of 2012.

25  Q.  And is this another bucket of hours agreement?

1    A.  This, this is another bucket of hours agreement, yes.

2    Q.  And in the Description of Services, what, specifically,

3    what type of services were being requested?

4    A.  So in this bucket, it is both mentoring as well as

5    actual development.  So it refers to template and rule

6    design, template and rule development, testing, engagement

7    management, so it's really implementing or developing on a

8    project.

9    Q.  And let's move to Exhibit 376.  What is the date on this

10   statement of work?

11   A.  October 29th, 2010.

12   Q.  And looking at the Background, what services were being

13   requested of FICO?

14   A.  So "Fair Isaac will provide 320 hours of Blaze Advisor

15   consulting assistance to Chubb & Son's Business Rule

16   Management Center of Excellence."  Generally, that included

17   a value statement and industry overview, rules taxonomy and

18   harvesting methodologies and so on.

19   Q.  Let's back up and just look at the front page of this.

20   A.  Okay.

21   Q.  And back into all that.  So you mentioned a phrase,

22   "Center of Excellence."

23   A.  Yes.

24   Q.  I don't think that's a phrase we've heard quite yet.

25   A.  Okay.

```
 1    Q.  What in industry terms is a "Center of Excellence"?
 2    A.  So in industry terms, it was typically where you
 3    would -- at a point in time where you had, you had used the
 4    software enough and you were looking to use it in different
 5    areas, you might build a center of excellence that was a
 6    centralized repository of -- I'll boil it down is knowledge,
 7    that you would then leverage across your company, so that
 8    you had consistency in the way you were implementing, that
 9    you were -- kind of following the same best practices that
10    you had been trained on and that you had some kind of
11    experts that generally that you could go to in that Center
12    of Excellence.  So does that make sense?
13    Q.  Who would build a Center of Excellence?
14    A.  So the companies would build a Center of Excellence, so
15    in this case Chubb & Son would build a Center of Excellence.
16    Q.  So a client in particular, it would be a group of people
17    within the client?
18    A.  Yes.  Correct.
19    Q.  Okay.  And why?  Do you know why companies created
20    Centers of Excellence around Blaze Advisor?
21    A.  Yes.  So I think, as I mentioned, I think as you started
22    to use the software more and more, and it was our model as
23    well, they wanted to get away from having to use consulting
24    quite as much and they also wanted to retain the knowledge
25    that they learned from, obviously, a number of projects and
```

```
1    kind of keep that in a core centralized fashion.
2              So that's, that is why they would, they would go
3    about it to, again, consistency in the Blaze projects that
4    were all around, potential reuse, where you had rules that
5    could be and rule templates that you didn't need to start
6    from scratch because this project over here had used them,
7    and so there is a new project here, and, oh, we can save
8    some time and leverage them.  So it's a lot about that.
9    It's about being able to leverage your growing expertise or
10   knowledge.
11   Q.  So the client would leverage expertise?
12   A.  Correct.
13   Q.  Okay.  And a Center of Excellence, is that the same as a
14   help desk or is it different?
15   A.  It's different in our vernacular.  A help desk for us is
16   really just a place if you have an error -- my iPhone won't
17   turn on, right; you call for help -- versus this is more
18   about strategic knowledge and ability to set up ongoing
19   projects in a consistent manner.
20   Q.  And with this statement of work, how was FICO being
21   asked to participate in Chubb & Son's Center of Excellence
22   around business rules?
23   A.  So this statement of work is really laying out --
24   essentially, it's documenting a lot of the knowledge that we
25   had transferred to Chubb & Son over, I guess, a number of
```

1    years, as well as some additional information that they were

2    interested in.  So it looks like they were interested in

3    setting up a Center of Excellence.  They really wanted a

4    comprehensive sort of document that approached how would we

5    set up our Center of Excellence, why would we set it up, how

6    best to use it, and some of the, again, the consistency that

7    we talked about, so, you know, what should our rules look

8    like, things like that.

9    Q.  And you said earlier you were documenting knowledge that

10   "we" had transferred to Chubb & Son.  Did you mean that FICO

11   had transferred to Chubb & Son?

12   A.  Sorry.  Yes.  That FICO had transferred to Chubb & Son.

13   Q.  And the statements of work that we looked at earlier, is

14   that, is that reflecting the knowledge transfer?

15   A.  It is.  This is sort of a summation of some of that,

16   correct.  It's representing let's take a lot of what we have

17   learned and document it all out.

18   Q.  And the date on this statement of work is what?

19   A.  October 29th, 2010.

20   Q.  Now, drilling down into -- if we could expand back out

21   to the front page, Mr. Mayleben.

22          Beside Chubb & Son, did you assist in any

23   statements of work or help with any other Centers of

24   Excellence for other clients?

25   A.  I did.  They weren't always called a Center of

1    Excellence, but for a number of clients certainly we helped

2    set up a Center of Excellence, at ▇▇▇▇, again, back to my

3    prior example, but at ▇▇▇▇ we also kind of helped set

4    them up with a Center of Excellence.

5    Q.  And drilling down into the -- let's look at small

6    numeral (ii), Industry Overview.

7    A.  Okay.

8    Q.  Well, let me back up.  Sorry.

9           Just to get this clear, Chubb & Son was asking for

10   what kind of deliverable?  Were they asking for software

11   code?  Were they asking for paper?  What kind of deliverable

12   was expected out of this statement of work?

13   A.  So the deliverable here would have been a, would have

14   been a document documenting out these items.  So, in fact,

15   the reference is in Section (i) it says, "This document may

16   include the following overviews" and so on and so forth.

17   Q.  And so part of that document, Chubb & Son wanted an

18   industry overview; is that right?

19   A.  That's correct.

20   Q.  Do you -- based on your experience in the professional

21   services group, why would a client want that kind of written

22   deliverable with an industry overview?

23   A.  So typically for something like that, it would have, it

24   would have use for them in terms of us bringing to a

25   customer what kind of use cases we're seeing out there in

1     the industry.  So, you know, how else are other in this case

2     insurance companies using Blaze Advisor and what methods and

3     how might that help them look around their business and say,

4     hey, how can we get better, what, you know, what areas could

5     we potentially use a rules management system in to improve

6     our business and so on.

7     Q.  And let's move to Exhibit 212.  What is this document?

8     A.  So this is the Business Rule Management Systems Strategy

9     Assessment and Recommendations.

10    Q.  And how does this document relate, if at all, to the

11    last statement of work we just looked at?

12    A.  So I believe this is the deliverable that would have

13    come out of the last statement of work.

14    Q.  And if you can estimate based on what you're holding in

15    your hand, about how thick is this document?

16    A.  100 pages or so, maybe more.  Now I can go look at the

17    last page and -- we're at a couple hundred pages, yeah,

18    200-plus pages.

19    Q.  How would this document, do you know, how would this

20    document -- at a 10,000-foot level, what type of information

21    is in this document?

22    A.  So at a high level, I think, you know, we touched on it

23    with some of the last statement of work, but essentially

24    it's, at a high level, it's capturing a lot of the

25    information that, that goes into implementing Blaze Advisor,

1    in addition to the industry overview.  And so, you know,

2    it's including across that Four D process, right, how are

3    you going to go about defining it, rule harvesting

4    workshops.  It's really laying out kind of everything that

5    we did, right, to kind of build out a Center of Excellence

6    and essentially a professional services group.

7    Q.  You said "essentially a professional services group."

8    Explain that further to me.

9    A.  So I, I mean, the Center of Excellence, in part, would

10   be, partially meant to be a professional services group

11   within a, within a company, right, so they could then start

12   to go deliver the kind of services that we were delivering,

13   that FICO was delivering.

14   Q.  And so would this manual teach Chubb & Son how to do

15   that?

16   A.  Correct.  Correct.

17   Q.  Can we move to the second page of this document,

18   Mr. Mayleben.

19              And what are we looking at here?

20   A.  So this is the first page of the Table of Contents.

21   Q.  And the Table of Contents goes on for how many pages?

22              If we could scroll through them, Mr. Mayleben.

23   A.  I count five pages.

24   Q.  Let's go to, let's go to page 159, if we could.  And

25   it's Section 7 titled Personal Lines Insurance Rule Use

1      Cases.  Do you agree?

2      A.  Yes.

3      Q.  And, you know, at a 10,000-foot level, for this Section

4      7, what types of information is contained in this section?

5      A.  So this is what I was referring to actually just a few

6      minutes ago.  So this would be laying out -- we were laying

7      out use cases that an insurance company would typically use

8      Blaze Advisor or rules management system for within their

9      business.  So under the overview, it lays out a number of

10     these use cases and how they might be approached.

11     Q.  And did Chubb & Son ask for this information in this

12     statement of work we looked at earlier?

13     A.  I believe they did, yes.  They asked for -- part of the

14     industry overview was best practices, how is it being used.

15     Q.  And can we move back -- move to the next page.  And I

16     want to look at the paragraph right under 7.2.1.

17     A.  Okay.

18     Q.  And what information did FICO provide to Chubb & Son in

19     this paragraph?

20     A.  So, so in this, if I look at the second paragraph, it

21     says, "This white paper explores how Decision Management

22     impacts revenue:  Through real-time point-of-sale decisions

23     and improved channel management; expanded risk tiering and

24     innovative pricing; speedy cross-channel deployments of

25     products addressing a wide range of markets than ever

1   before."  So really how are we going to leverage Blaze

2   Advisor for improve for revenue management.

3   Q.  And "decision management" is another word for Blaze

4   Advisor, correct?

5   A.  Correct.

6   Q.  If we could pull up, Mr. Ivey -- well, wait.  Let me ask

7   the question.

8            Mr. Ivey, did you prepare a demonstrative to help

9   assist your testimony today?

10  A.  I did.  I did.  I created a table of essentially every

11  statement of work, along with some of the information about

12  the statements of work to get some holistic view.

13  Q.  Mr. Mayleben, if we could --

14           Can you walk us through what the different columns

15  in this exhibit are.

16  A.  Sure.  So the first is the trial exhibit number that you

17  have been mentioning.  The title, second column is the

18  title.  The third would be a short description -- sorry -- a

19  short description of each of the statements of work, and

20  finally the hours and payment and the date of the statement

21  of work.

22  Q.  And so I see for 2006 -- how many are listed, how many

23  statements of work -- let me back up.

24           How many pages are in this spreadsheet?

25  A.  Two.

1   Q.  It's challenging when you don't have a paper copy.

2   A.  Yeah, I don't have it in front of me.  It's a

3   spreadsheet, so it doesn't typically fall into pages, but

4   yeah.  Thank you, very much.

5   Q.  You're welcome.

6        Let's try that again.  Now that you have the

7   paper, how many pages?

8   A.  Five pages.

9   Q.  Okay.  And how many statements of work are for 2006?

10  A.  So we have four statements of work in 2006.

11  Q.  Okay.  Are you sure there's not five?

12  A.  I'm sorry.  I think there is a typo here.  So it would

13  be five statements of work in 2006.  Apologies.

14  Q.  And, and what types of services generally do you see

15  being requested of FICO in 2006?

16  A.  So, generally, a lot of these are, with any new

17  customer, from sort of an entire implementation from start

18  to finish.  So that Four D process that we talked about, a

19  lot of actually delivering, training and then leading,

20  leading them through a first project, first number of

21  projects.

22  Q.  And what about -- same questions for 2007.  How many

23  statements of work?

24  A.  So I count eight statements of work in 2007.  Similarly,

25  we're starting to see, we're starting to see some validation

1    work, but we're still working with Chubb & Son on the

2    delivery of some of the rule projects and, again, more

3    training and mentoring.

4    Q.  So FICO was participating in the work with Blaze Advisor

5    at Chubb & Son, would you agree?

6    A.  Yes.

7    Q.  And now 2008, how many statements of work for that year?

8    A.  Five statements of work.

9    Q.  And, generally, what types of services?

10   A.  So, generally, this starts to be, again, we've got more

11   training.  There is delivering the rule harvesting workshop.

12   We're assisting in architecture reviews, and we're reviewing

13   deliverables.  So we're starting to get a little bit more to

14   that kind of assistance model, consultative model.

15   Q.  And what about the next year?  How many statements of

16   work in the next year?

17   A.  Nine.  Actually -- wait.  So I have one listed here as

18   2008.  It's roughly nine statements of work, I think.

19   Q.  And that was for what year?

20   A.  2009.

21   Q.  '09.  And can you generally describe the services

22   requested of FICO with those nine statements of work in

23   2009?

24   A.  So again, similarly, it continues from 2008.  It's a lot

25   of rule harvesting assistance, a lot of probably best

1    practice knowledge, providing consulting services and

2    mentorship.

3    Q.  What about 2010?  How many agreements in 2010?

4    A.  I count about 13.

5    Q.  And is it generally the same types of services you've

6    discussed for the other years or is it different in any way?

7    A.  It looks like roughly the same types of services, yeah.

8    Q.  And what about 2011?  How many in 2011?

9    A.  Three statements of work in 2011.

10   Q.  And what types of services were requested of FICO in

11   2011?

12   A.  Again, it's consulting hours.  It looks like general,

13   general assistance, exploratory phase of a new project, so,

14   again, bringing us back in to assess how they were

15   implementing in a new project.

16   Q.  Now, what about 2012?

17   A.  Four statements of work, and they -- so it looks like in

18   this one we are starting to get back into a little bit more

19   of a -- there is one here for template rule design and

20   development, but, again, mentoring, remote consulting, some

21   of these type of bucket of hours types of work that we were

22   talking about, as well as some more training.

23   Q.  Same question for 2013.  How many in 2013?

24   A.  So three in 2013, providing, again, mentoring

25   assessment, training, delivering another training class and

1    then review and assessment of another -- of the C pack print

2    (phonetic) project, so, again, along the same lines.

3    Q.  And what about 2014?

4    A.  I don't see any statements of work in 2014.

5    Q.  And, lastly, 2015?

6    A.  Two statements of work in 2015.

7    Q.  And remind me, for that Exhibit 212, the thick document,

8    what was the date on that?

9    A.  The date of the document was -- apologies; let me just

10   go back and look here -- was March 28th of 2011.

11   Q.  March 28th, 2011.  So I've heard you say in 2010 there

12   were 13 statements of work and in 2011 there were three.

13   That's a different, a number of a different magnitude.

14            Does the deliverable in Exhibit 212, does that

15   have any bearing on those numbers?

16   A.  It certainly could.  I mean, the intention here on both

17   sides was to transition our knowledge, to document all the

18   knowledge.  They were building this Center of Excellence.

19   So if that were successful, you would think they would

20   start -- excuse me -- they would start to need us, you know,

21   less and less.

22   Q.  And how did FICO feel about clients developing a Center

23   of Excellence?  Good?  Bad?

24   A.  That was fantastic.  That was wonderful for us because,

25   again, it was empowering the customer to leverage the

1    software.  They would typically start to use it, use it more

2    around their business.  And it brought us back to more of

3    that cardiologist model, you know, that I talked about

4    earlier.  Again, we were more trying to act in that

5    consultative manner in the cardiologist model.

6    Q.  And do you know how much, generally speaking, how much

7    Chubb & Son paid for these services from FICO, the

8    professional support services?

9    A.  Yes.  So I added it up with the help of this sheet, and

10   I came up with around 3.7 million dollars.

11   Q.  Now let's shift gears to product support.  What

12   functions, product support, specifically, what functions

13   does that group perform at FICO?

14   A.  So product support, again, help desk-like, so really the

15   function is that when there is an error in the software, so

16   the customer is out running the software and it doesn't do

17   something they thought it would do, they call us and say,

18   hey, we need some help, can you help us diagnose where the

19   problem is.  So that's really where we spend our time.

20   Q.  And what is your job title in that group, Mr. Ivey?

21   A.  So I'm the vice president of product support.

22   Q.  You mentioned that customers call in with problems.  How

23   does your group help solve those problems?

24   A.  So usually through -- a lot of times the issues are

25   relatively complex.  What we try to do is replicate the

```
1    issue.  We will have the software kind of installed
2    in-house.  So we will try to replicate the issue,
3    understand -- we will work with the customer, understanding
4    what data has come in, what went out, what exactly --
5    there's log files that we can capture from the software.  So
6    we'll capture all of that data and then try to figure out
7    where the problem is, and it can usually be many areas.
8    Q.  And how do customers get ahold of the group to let them
9    know they have a problem?
10   A.  There is a few ways.  They can e-mail us.  They can
11   phone us usually with higher severity problems.  And then we
12   have a web portal where they can log in and log a case.
13   Q.  And what is the process when a customer sends in a
14   question or a problem?
15   A.  So typically we will respond to them.  We will ask for
16   some follow-up information.  So we will ask for, again, the
17   logs that I talked about or other diagnostic information
18   that could help us solve the problem.  We will work back and
19   forth with them.  Again, I mentioned we would probably try
20   to replicate the problem, if we could.  If we can't, we will
21   work with the customer looking at their system to see if we
22   can replicate it there and understand why it's failing.  We
23   will provide a resolution usually in some way and then close
24   out, close out the issue.
25   Q.  Let's turn to Exhibit P1112.
```

1    A.  Is that in this binder?

2    Q.  I hope it's in one of your binders.

3    A.  In this one?

4    Q.  It should be at the very end of that first binder.

5    A.  Is it?  Okay.

6    Q.  But if you don't have a copy, it's also on the screen.

7    A.  Oh, yes.  Yep.  Okay.  It's at the end of the --

8    apologies.  All right.

9    Q.  Mr. Ivey, do you recognize this document?

10   A.  I do.  I do, yes.

11   Q.  What is it?

12   A.  So this is a listing of all the product support cases

13   that would have come out of our system.  This would have

14   been an export, except for the last column.

15   Q.  Product support cases for what customer?

16   A.  For Chubb & Son.

17   Q.  So this would reflect phone calls, e-mails, et cetera,

18   from Chubb & Son for product support help, correct?

19   A.  Exactly, yes.  So this would be the cases that were

20   logged in our case management system when they e-mailed in

21   or called in and we would log it for them.  Yes.

22   Q.  And can you walk me through each of the column titles?

23   What does that mean?

24   A.  Yes.  So our case system logs, logs a case number, just

25   so we can track everything.  So that's the first column.

DIRECT EXAMINATION - XIRROC

1          The second is the Subject, and that typically

2     would be -- most of our cases are logged through e-mail, so

3     that would be the subject likely on the e-mail.

4          The description would be a high-level description

5     of what the case is, and that's sort of put in there.

6          The -- thank you -- the case owner is after the

7     description.  So that's the person on my team that is owning

8     the case.

9          The date and time they opened it.

10          The account name that was logged for that case.

11          The installed product that was chosen within the

12     system.

13          The contact name, so that would be the customer

14     contact name.

15          And the contact e-mail.

16          Then, finally, there was a column added by a FICO

17     representative for the purposes I think of this trial.

18     Q.  So you mentioned a case system.  What is that?

19     A.  So we use software from another company that specializes

20     in, in support case software, case management software.  So

21     when an e-mail comes in, it's logged in the case.  Again, it

22     creates a new case number and lists all the information.

23     And then we work, work back and forth with the customer

24     through that case.  You've probably seen some of that if you

25     work with Amazon or any of their case.  A lot of times

1    pretty much every time you log a help desk ticket, somewhere

2    it goes into a case system.

3    Q.  And so all of the columns except the last columns are

4    part of that case system, correct?

5    A.  That's correct.

6    Q.  Okay.  So I see Australia in the upper right-hand

7    column.  That would not be within the case system, correct?

8    A.  That's correct.

9    Q.  And how did that extra column -- why is that extra

10   column added on this particular exhibit?

11   A.  So my understanding is, again, a FICO colleague worked

12   through this and added that manually.

13   Q.  And so let's take this first yellow row.  Can you walk

14   me through -- what are we looking at in this first yellow

15   row?

16   A.  So we're looking at a case that has come in related to

17   an upgrade for Blaze Advisor.  So what Chubb & Son was --

18              MS. JANUS:  Objection.  Foundation.

19              THE COURT:  Sustained.  Go ahead and lay the

20   foundation for it.

21              MS. KLIEBENSTEIN:  Sure.

22   BY MS. KLIEBENSTEIN:

23   Q.  Mr. Ivey, what is the date on this first row?

24   A.  If you can scroll over just a bit, yeah.  This sheet

25   here is going to be very small for me.  So this one is March

1    21st, 2016.

2    Q.  And what is the account name?

3    A.  The account is Chubb & Son.

4    Q.  And moving over to Contact Name, can you tell me -- read

5    that name for me.

6    A.  The name is Shaikh Imran Aziz.

7    Q.  And let's go to the contact e-mail.

8    A.  The e-mail is imran.aziz@dws.com.au.

9    Q.  Let's move on to that third row.  And tell me, What

10   information do we see in that third row?

11   A.  So the third row, again, is a case number, a subject.

12   Blaze Advisor rules engine configuration help.  And in the

13   description, it's describing --

14            MS. JANUS:  Objection.  Foundation.

15   BY MS. KLIEBENSTEIN:

16   Q.  Mr. Ivey, is this -- clarify for me again, What is this

17   a printout of?

18   A.  This is a printout of FICO product support cases out of

19   our case management system.

20   Q.  And so there are cases that are recorded real-time when

21   a help request comes in, correct?

22   A.  Correct.

23   Q.  By a FICO employee, correct?

24   A.  That's correct.

25   Q.  And is this data in your case system kept in the

1    ordinary course of business?

2    A.  It is.

3    Q.  And do you rely on it in the product support group for

4    your business purposes?

5    A.  We do, absolutely.

6    Q.  And what I'm asking you to do is not, not characterize

7    or describe that description column --

8    A.  Okay.

9    Q.  -- as we're looking at in the second yellow row.

10   A.  Okay.

11   Q.  But just read it out loud.

12   A.  Okay.  Query, "They would want to use the Blaze Advisor

13   rules engine to configure for an insurance rating project.

14   They would need help on configuring it.  Their engineer in

15   their company is on leave now, so they need help from

16   someone in FICO.  Caller:  David Gibbs.  Product:  Blaze

17   Advisor rules engine.  Org:  Chubb Insurance Company.

18   Location:  Europe, London."  And it provides a phone number

19   and e-mail address.

20   Q.  And what's in the -- I'll have to scroll over to the

21   next column.  I see Piao Wang.  Who is that?  Do you know

22   that person?

23   A.  I do.  So Piao Wang is a FICO engineer in the product

24   support group.

25   Q.  And why is Piao Wang's name in this column and row?

1    A.  So he was assigned the case and would have worked back

2    and forth with Chubb & Son on the case.

3    Q.  And what is the date/time opened?

4    A.  March 3rd, 2015.

5    Q.  And the account name is listed as?

6    A.  Chubb Insurance.

7    Q.  And who is the contact name and e-mail?

8    A.  David Gibbs at Chubb.com.

9    Q.  And I see over on the right-hand side the word United

10   Kingdom.  What was your role?  You were the vice president

11   of product support at this time in 2015, correct?

12   A.  That's correct.

13   Q.  And did Mr. Wang -- did he call you about this?

14   A.  He did not.

15   Q.  And why wouldn't he have called you about this?

16   A.  There would be no reason to call me about a product

17   support case.  We receive many, many cases, and so this case

18   would have -- there would have been no reason to call.  It

19   was coming from David Gibbs at Chubb.com, and it appeared to

20   be a reasonable request, and so there wouldn't have been any

21   reason to escalate it to me.

22   Q.  So in your position at product support, are there any

23   red flags to you that you can see from this row?

24   A.  Not in this row, not -- no.

25   Q.  Excuse me.  Let me clarify that.  Any red flags from the

1    information in the case management system?

2    A.   There are no red flags in the case management system,

3    correct, for this one, yes.

4    Q.   Now let's move down a couple of rows to the next yellow

5    row.

6            All right.  Mr. Ivey, can you tell me what

7    information is listed in this row?  What is the, what is the

8    subject of this case management report?

9    A.   The subject is BA-DEV-user wants to know the new Blaze

10   also supports WebSphere.

11   Q.   And who is the case owner?

12   A.   The case owner in this case is Karen Yue.

13   Q.   And what is the date?

14   A.   November 17th, 2011.

15   Q.   And the client is Chubb & Son?

16   A.   The client is Chubb & Son.

17   Q.   And who is the contact name?

18   A.   Tony Zhang.

19   Q.   And what was his mail?

20   A.   tonyzhang@chubb.com.

21   Q.   And remind me again the column that says Canada, that's

22   not from your case management system.  When was that added?

23   A.   Correct.  That was added -- that is not part of our case

24   management system and would have been added -- or was added

25   as part of the preparation I think for this trial.

1    Q.  And based on the contents of this row, does it raise any

2    red flags for you, ignoring that last column as to anything?

3    A.  Again, no, it wouldn't have raised any red flags.  We

4    had done a lot of work with Chubb & Son, and this was a

5    normal case coming from a Chubb.com e-mail address and no

6    red flags.

7    Q.  All right.  Let's move up to the very top row.  Can you

8    just read for me the description in that third column.  Read

9    just the first few sentences.

10   A.  "Hi, product support team.  Below is an issue faced by a

11   consultant whose client is Chubb.  Chubb seems to be an

12   existing BA user.  He has been struggling to upgrade the

13   Blaze project on his own and he needs assistance with it."

14   Q.  And to the best of your knowledge, Mr. Ivey, the three,

15   the three instances, the yellow highlighting rows that we

16   just looked at, do you know one way or another, the product

17   support team, did they provide support for those services?

18   A.  They did provide support I believe in two of the cases.

19   I think in the first case, there was a red flag for us, and

20   we raised some questions about it.

21   Q.  And does the role of the product support team at FICO,

22   did they, for lack of a better phrase, do they check ID's at

23   the door, you know, when folks are calling in for help as to

24   who is a licensee?

25   A.  No, we don't.  We typically -- again, if we see

1  something that's unusual, we might, we might raise it, but

2  really that wasn't our job.  And if there were, if there

3  were issues where we were not supposed to provide support

4  for a customer, that would typically come from our sort of

5  accounting team, accounting legal teams, who would instruct

6  us to not -- you know, somebody hasn't paid or whatever it

7  might be.  They would instruct us to cease support; but

8  other than that, we would proceed as usual.

9  Q.  And how often does that, does that happen when somebody

10  reaches out to product support that doesn't have a license

11  to use Blaze Advisor?

12  A.  Not, not often.

13          MS. KLIEBENSTEIN:  Okay.  No further questions.

14          THE COURT:  Ms. Janus?

15          THE WITNESS:  Thank you.

16                    **CROSS EXAMINATION**

17  BY MS. JANUS:

18  Q.  Good morning, Mr. Ivey.

19  A.  Good morning.

20  Q.  My name is Leah Janus, and I'm counsel for defendants in

21  this case.  We met several years ago now, when you sat for a

22  deposition in this case, correct?

23  A.  Correct.

24  Q.  And you actually sat for two depositions in this case,

25  correct?

1    A.  That's correct.

2    Q.  You were under oath during those depositions just like

3    you are giving testimony here in court today, correct?

4    A.  That was my understanding, yes.

5    Q.  And one of your depositions was in January of 2019 and

6    one was in March of 2019.  Does that sound about right?

7    A.  That sounds about right.

8    Q.  And you'll see that I just handed you the transcripts

9    just in case we need to reference there, and there are tabs

10   indicating which transcript is which.  Okay?

11   A.  Perfect.  Yes.

12   Q.  And you don't have to have that open in front of you.

13   A.  Okay.

14   Q.  It's just in case.

15   A.  Okay.  Understood.

16   Q.  Let's start where you just left off with P1112.

17   A.  Okay.

18   Q.  If we could pull that up.

19        So this is the call log that has been prepared by

20   FICO from FICO systems, correct?

21   A.  That's correct.

22   Q.  And if we look at row 4, which you were just testifying

23   about --

24   A.  Okay.  Yep.

25   Q.  -- I think we are going to get it on the screen, too, in

1    just a moment.

2    A.  That will help.

3    Q.  There we go.  Row 4, this shows that FICO provided

4    support to Chubb or one of its affiliates in Europe relating

5    to Blaze, correct?

6    A.  In line 4, so if you can scroll --

7    Q.  Yep.

8    A.  It lists that we did provide support to David Gibbs at

9    Chubb, yes.

10   Q.  Okay.  And you testified that there were no red flags?

11   A.  Correct, from what the engineer would typically be

12   looking for, if anything.

13   Q.  And what would you characterize as a red flag?  What did

14   you mean by that?

15   A.  So, just in looking at this, so a different e-mail

16   address or a question that seemed very odd, perhaps, but in

17   this case it was coming from someone at Chubb.com and seemed

18   I think a reasonable request, and so I don't think it piqued

19   any interest.

20   Q.  And you made a point of saying that the entry stating

21   United Kingdom in the last row wouldn't have been in this

22   data poll originally, correct?

23   A.  That's correct.

24   Q.  But the description of the query further over to the

25   left indicates that the query is coming from London, Europe,

1   correct?

2   A.  It does, yes.

3   Q.  And, Vanessa, could you scroll over to the description?

4   Thank you.

5         So that information would have been available in

6   your system if you were reviewing this query?

7   A.  Absolutely, yes.

8   Q.  Would that have been a red flag?

9   A.  It would not really have been a red flag to a level one

10  engineer.

11  Q.  The account name in this row is Chubb Insurance, right?

12  A.  Is this the one -- can you scroll back over?  I know

13  there is one that says Chubb Insurance.  Yes, this is the

14  one that is chosen as Chubb Insurance.

15  Q.  And is that information that FICO would have submitted

16  in this form?

17  A.  Yes.  So the engineer would have chosen that from a list

18  of customers, yes.

19  Q.  So Chubb Insurance was a choice in your system in your

20  list of customers?

21  A.  That's correct.  And when I looked back, that, that name

22  is actually an old account that was transferred over when we

23  purchased neuron data a long time ago, so the engineer chose

24  the wrong, the wrong name.

25  Q.  And if you look down at row 65, that row shows that

1    Chubb in Canada requested service from FICO in 2011, right?

2    A.  That's correct.

3    Q.  And you don't have any information about whether the

4    individuals involved in providing that service knew they

5    were working with Chubb in Canada, correct?

6    A.  That's correct.  We wouldn't have known.  Right.

7    Q.  You personally wouldn't have known, but you also don't

8    know whether the individuals at FICO knew at the time they

9    were providing the service, right?

10   A.  That's correct.  Karen would not have.  Again, no red

11   flag.  She wouldn't have known.

12   Q.  That's not my question.  My question is, Do you know

13   whether the individuals providing the service to Chubb in

14   Canada from FICO knew that they were working with Chubb

15   Canada?

16   A.  No, I don't personally.

17   Q.  You don't know that.  Okay.  Let's move to P212, which

18   is one of the documents that you were asked about on direct.

19            Vanessa, if we could pull that document up, the

20   cover page.

21            This was a document you were asked about on

22   direct, correct?

23   A.  Correct.

24   Q.  And this was a document that was a deliverable from a

25   statement of work that you testified about, correct?

1    A.  Correct.

2    Q.  FICO prepared the document pursuant to that statement of

3    work?

4    A.  Correct.

5    Q.  And it was prepared for the Chubb Group of Insurance

6    Companies, correct?

7    A.  Correct.

8    Q.  And if we look at page 55 of the document, are you

9    there?

10   A.  I am, yeah.  Yeah.  There we go.  I'm sorry.

11   Q.  Under Bad Types of Decisioning?

12   A.  Okay.

13   Q.  Are you with me on page 55?

14   A.  I am.

15   Q.  Okay.  If we go seven paragraphs down, the paragraph

16   starting with, "Advisory."

17   A.  Okay.

18   Q.  Could you read that, please.

19   A.  "Advisory systems where the approach to giving advice is

20   not clearly defined.  FICO faced challenges at Chubb in the

21   UK where the rules were just a huge cloud of advice strings

22   and no real decisioning going on."

23   Q.  So FICO was providing service to Chubb in Europe

24   relating to Blaze, correct?

25   A.  Not from any of the statements of work that I saw.

1    Q.  So your testimony is that even though this statement is

2    in the document saying, "FICO faced challenges at Chubb in

3    the UK where the rules were just a huge cloud of advice

4    strings and no real decisioning going on," despite that

5    statement in FICO's work product in 2011, FICO was not

6    providing services to Chubb in the UK relating to Blaze?

7    That's your testimony?  That's a yes or no.

8              THE WITNESS:  Do I have to answer yes or no?

9              THE COURT:  Answer the question.

10             THE WITNESS:  Sorry.  Could you ask the question

11   again?

12   BY MS. JANUS:

13   Q.  Your testimony is that despite this statement in FICO's

14   work product prepared for Chubb in 2011 that FICO faced

15   challenges at Chubb in the UK where the rules were just a

16   huge cloud of advice strings and no real decisioning going

17   on, despite that statement, your testimony is that FICO was

18   not providing services to Chubb in the UK relating to Blaze,

19   is that --

20   A.  To tell you the truth, I didn't see any statements of

21   work related to that, yeah, myself.

22   Q.  So you just don't know?

23   A.  I don't know.

24   Q.  Okay.  And you were asked questions about specifics in

25   this document.  You were asked to read part of 7.2,

1    specifically 7.2.1, right?

2    A.  Correct.

3    Q.  And you were asked, what is that about, and you answered

4    that question, right?

5    A.  Yes.

6    Q.  Okay.  And have you, had you ever read this document

7    prior to preparing for your testimony here today?

8    A.  I recall the document I believe from back when it was

9    delivered roughly, but I had not read, and I still have not

10   read completely this document.

11   Q.  And you weren't involved in preparing it, correct?

12   A.  Correct.

13   Q.  You weren't familiar with the contents of the document

14   prior to preparing for your testimony, correct?

15   A.  That's correct.

16   Q.  Do you know -- the question you were asked, if we could

17   go to page 159 and zoom in on 7.2, that heading.  Thank you,

18   Vanessa.

19           The question you were asked related to this

20   section BRMS and Underwriting For Personal Lines Insurance,

21   correct?

22   A.  That's correct.

23   Q.  Do you know whether Chubb ever used Blaze in personal

24   lines insurance?

25   A.  I'm trying to recall if any of those statements of work

```
 1    mentioned personal lines insurance.  I can't recall.  I'm
 2    trying to --
 3    Q.  So you don't know?
 4    A.  I don't know.
 5    Q.  The paragraph you were asked to read on the following
 6    page under 7.2.1, that doesn't have anything to do with
 7    Chubb at all.  That's just a general statement about what
 8    FICO is hoping to accomplish apparently or your general
 9    statement about rules management systems, correct?
10    A.  That's correct.
11    Q.  You talked on direct about your ███████.  That has
12    nothing to do with FICO's work at Chubb, correct?
13    A.  That's correct.
14    Q.  You talked about Chubb's Center of Excellence.  You did
15    not work on Chubb's Center of Excellence in any way,
16    correct?
17    A.  Other than reading the statements of work, that's
18    correct.
19    Q.  But you don't have any knowledge of it other than
20    actually reading the statements of work, correct?
21    A.  Correct, and my knowledge of it at the time when we were
22    going through it.
23    Q.  Which you don't recall, right?
24    A.  I'm aware.
25    Q.  Other than statements of work?
```

1    A.  I'm aware of centers of excellence that we had

2    developed, correct.

3    Q.  You testified at length about many of the statements of

4    work that were entered into between Chubb and FICO, but you

5    don't have any independent personal recollection of those

6    statements of work, correct?

7    A.  Some of them, I mean, it was obviously a long, long time

8    ago, so I recall drafting some of those, but, no, I don't,

9    you know --

10   Q.  The vast majority of them --

11            COURT REPORTER:  You are talking over each other.

12            THE COURT:  So let me just weigh in.

13            Mr. Ivey, wait until her question is done.  Okay?

14            THE WITNESS:  Understood.

15   BY MS. JANUS:

16   Q.  You talked about, and we don't need to pull it up.  We

17   talked about a document P346 that referenced Drools, do you

18   remember that?

19   A.  I do.

20   Q.  And Drools I think you said it's an IBM product, right?

21   A.  Yes.  It was, at the time it was a rules management

22   system, yes.

23   Q.  It's a product that was similar to Blaze, right?

24   A.  Correct.

25   Q.  You worked with Mike Sawyer on some of the statements of

```
1    work that you put together, right?
2    A.  I did.
3    Q.  Mike Sawyer and Russ Schreiber were the point people for
4    the Chubb relationship at FICO, right?
5    A.  That's correct.
6    Q.  And in connection with your involvement in this
7    litigation, you've come to learn that both Russ Schreiber
8    and Mike Sawyer were aware that Chubb was using Blaze in
9    Europe, correct?
10   A.  That's correct.
11   Q.  And you also learned that Oliver Clark, another FICO
12   employee, was aware that Chubb was using Blaze in Europe,
13   correct?
14           MS. KLIEBENSTEIN:  Objection.
15           THE COURT:  What's the objection?
16           MS. KLIEBENSTEIN:  Foundation.  Hearsay.
17           THE COURT:  The question called for his
18   foundation.  Go ahead.
19           THE WITNESS:  That's correct.
20   BY MS. JANUS:
21   Q.  Other than working with Mike Sawyer -- so we heard a lot
22   about the statements of work that you put together.  You
23   read from several of them during your direct, correct?
24   A.  Correct.
25   Q.  But other than working with Mike Sawyer and putting
```

1   together some of these statements of work, you did not have

2   any direct involvement with the Chubb account during your

3   time at FICO, right?

4   A.  Correct.  My, my -- I was limited in terms of, I

5   developed the statements of work and worked with them on

6   identifying what they wanted to do, but I didn't actually do

7   any of the implementation at that time.

8   Q.  And you don't recall any meetings with Chubb, right?

9   A.  I don't.

10  Q.  You don't recall any discussions that you had with

11  anyone at Chubb, right?

12  A.  Correct.  I remember Henry Mirolyuz I think.

13  Q.  I think you've answered the question.

14  A.  Oh, sorry.

15  Q.  Thank you.

16         You never worked on any products or projects for

17  Chubb, correct?

18  A.  Correct.

19  Q.  You have no familiarity at all with how Blaze was

20  implemented in Chubb, correct?

21  A.  I have a -- well, I have a rough understanding about how

22  we were implementing Blaze in insurance companies at the

23  time.  But yes, no direct knowledge.  I didn't work on the

24  project.

25  Q.  You have no familiarity at all, would you say, with how

1    Blaze was implemented at Chubb?

2    A.  Correct.

3    Q.  You don't know about specific projects that Chubb had

4    involving Blaze, correct?

5    A.  I do in that again I developed statements of work for

6    those projects.

7    Q.  But you don't have any personal knowledge of any of

8    those projects or the details of them?

9    A.  I did not develop those projects, no.

10   Q.  You talked about some applications that were listed in

11   the statements of work, correct?

12   A.  Correct.

13   Q.  But you don't know what Chubb applications used Blaze,

14   correct?

15   A.  Well, I know the ones that were described in the

16   statements of work used Blaze.

17   Q.  Can you look at your March 2019 deposition at page 84,

18   please.

19   A.  Sure.  March -- did you say page 84?

20   Q.  Yes.

21   A.  I'm sorry.  I'm looking at the page numbers up there.

22   Okay.

23   Q.  At line 15 I asked, "Do you know any of the applications

24   that Blaze was used in?"

25            And your answer was, "No."

1              Did I read that correctly?

2    A.  You did, yes.

3    Q.  You don't know what kind of technology architecture

4    Chubb had, correct?

5    A.  You're correct.

6    Q.  You testified about the SOWs documenting a transfer of

7    knowledge from FICO to Chubb, right?  But you weren't

8    involved in actually implementing any of the projects that

9    were discussed in the SOWs, correct?

10   A.  That's correct.

11   Q.  And you aren't aware of any situation in which FICO

12   helped Chubb develop a particular rule, correct?

13   A.  I mean, I guess I'm aware of it in that we developed the

14   statement of work to develop rules that was paid for, and I

15   would have had a hard time -- I don't know why you would --

16           So I would presume that out of that we delivered

17   rules.

18   Q.  But you don't know whether FICO ever helped Chubb

19   develop any particular rule that was implemented in Blaze,

20   right?

21   A.  All I can say is, I did not personally develop a rule in

22   Blaze, but again it was listed as a deliverable in some of

23   the statements of work.  So that we would help develop

24   rules.

25   Q.  And you weren't involved in doing that?

1    A.  That's correct.

2    Q.  You testified that when Blaze is delivered from FICO,

3    it's not ready to run, right?

4    A.  That's correct.

5    Q.  It's like starting with a blank piece of paper?

6    A.  That's correct.

7    Q.  Blaze needs to be integrated into a customer's

8    preexisting systems, right?

9    A.  Correct.

10   Q.  And generally, it's taking the business logic, I think

11   you testified, right?

12   A.  Correct.

13   Q.  And -- go ahead.

14   A.  Correct.

15   Q.  And the business logic comes from Chubb, right?

16   A.  That's correct.

17   Q.  That is know-how that Chubb has developed over decades

18   and decades and decades, right?

19   A.  That's correct.

20   Q.  The subject matter experts that work on the projects are

21   Chubb employees, right?

22   A.  That's correct, for their business logic.

23   Q.  And Chubb's business logic is completely independent of

24   Blaze, right?

25   A.  That's correct.

```
1    Q.  Chubb decides what rules it's going to implement in

2    Blaze, right?

3    A.  Correct.

4    Q.  And it's the rules within Blaze Advisor, the rules that

5    come from Chubb's business logic, that lead to the decision

6    being made in Blaze, right?

7              MS. KLIEBENSTEIN:  Objection.  Foundation.

8              THE COURT:  Overruled, but I didn't hear an

9    answer.  Do you know the answer?

10             THE WITNESS:  Can you restate the question just to

11   make sure I get it?

12   BY MS. JANUS:

13   Q.  It's the rules within Blaze Advisor which come from

14   Chubb's business logic that lead to the decision being made,

15   correct?

16   A.  That's correct.

17             MS. JANUS:  Those are all the questions I have.

18   Thank you.

19             THE COURT:  Thank you, Ms. Janus.

20             Ms. Kliebenstein?

21                   REDIRECT EXAMINATION

22   BY MS. KLIEBENSTEIN:

23   Q.  All right.  Mr. Ivey, first question:  Thinking back to

24   that spread sheet that you ended our discussion with and you

25   started the discussion with Ms. Janus, are your engineers,
```

1    your engineers in the professional services group are not

2    responsible for ensuring that FICO clients are complying

3    with their license agreements, correct?

4    A.  That's correct.

5    Q.  And you were asked, you were asked a question about

6    Chubb and its affiliates.  Do you recall that?

7    A.  I do.

8    Q.  And you're not a lawyer, correct?

9    A.  I am not a lawyer.

10   Q.  And you aren't aware of the license agreement and how it

11   defines affiliates, correct?

12   A.  That's correct.

13   Q.  You were also asked a question about your awareness of

14   Mr. Schreiber, Mr. Sawyer and Mr. Clark.  That knowledge you

15   were referring to, you acquired that after this lawsuit was

16   filed, correct?

17   A.  That's correct in reading their depositions, yes.

18   Q.  And you were asked, you were asked a lot of questions

19   about what you didn't do at Chubb & Son, and you're in the

20   professional services group, professional services, not the

21   product support, professional services group from when

22   again?  What years?  Remind me.

23   A.  2003 until 2014.

24   Q.  And what position ultimately did you achieve in that

25   group?

CHRISTOPHER LIVELY - CROSS

1    A.  So I was the senior director running, running the Blaze

2    group and a number of other professional services groups

3    within North America.

4    Q.  So you were the fellow who was running the Blaze Advisor

5    professional services group, correct?

6    A.  That's correct.

7    Q.  So you were spending how much of every day on Blaze

8    Advisor professional services?

9    A.  Every hour of every day, yeah.  At one point when I ran,

10   when I ran, you know, when I was running Blaze, the Blaze

11   group.

12   Q.  And so the words in the statements of work that we just

13   saw like "implementation," "rules harvesting," "validation,"

14   "vision," all of those words, were they specific only to

15   Chubb & Son, or were they words that you used generally in

16   the professional services group applying it to Blaze?

17   A.  We used those words generally.  A lot of the, again, the

18   Four D model, a lot of things that we talked about earlier

19   were leveraged across, yeah, all the statements of work

20   across customers.

21   Q.  So when you saw those words in the Chubb & Son contracts

22   earlier, how is it that you were able to describe what was

23   being requested of FICO?

24   A.  I guess as we just said, they're very standard

25   terminology.  The statements of work were crafted in a

1    standard way.  The wording there was the same wording as in

2    many other contracts, so I was well versed and again wrote

3    many of them.

4    Q.  And Chubb & Son paid for what they asked for in those

5    agreements, correct?

6    A.  Correct.

7    Q.  And in those agreements, those agreements were asking

8    FICO to do something for Chubb & Son, correct?

9    A.  That's correct.

10   Q.  To participate in something?

11   A.  Correct.

12   Q.  And what was, what was that thing based on your read of

13   the contracts?

14   A.  So it varied across all of the statements of work, but

15   again, it ranged from high level consulting to rules

16   harvesting to definition to development to design -- design,

17   development, to mentoring them, training, and so on, review

18   and helping them to set up a Center of Excellence and so on.

19          MS. KLIEBENSTEIN:  I have no further questions.

20   Thank you, Mr. Ivey.

21          THE WITNESS:  Thank you.

22          THE COURT:  Ms. Janus, any recross?

23          MS. JANUS:  No.  Thank you, Your Honor.

24          THE COURT:  All right.  Very well.  You may step

25   down, Mr. Ivey.  Thank you.

```
1              THE WITNESS:  Thank you.
2                         (Witness excused.)
3              THE COURT:  All right.  Members of the Jury, we're
4      going to take our lunch break, and I'm going to be
5      monitoring the weather situation as best we can.  Right now
6      the plan is, we'll be back at 1:30, and we'll finish with
7      one more witness who will be presented by way of deposition,
8      I believe, but again, we'll see how the weather develops
9      between now and 1:30.
10             Okay?
11             COURTROOM DEPUTY:  All rise for the jury.
12                         (Jury exits.)
13
14
15             (In open court without the Jury present.)
16             THE COURT:  Go ahead and be seated.
17             MR. HINDERAKER:  One of the witnesses, going back
18     to the pretrial conference when you told us that if the
19     person is in the employ of the adverse party, person in the
20     employ of defendants, I could call them live in my case.
21             Ramesh Pandey is one of those people.  Ms. Godesky
22     just told me during one of the breaks that he is out of
23     town, too.  So it's a question of getting to the airport and
24     getting out of here, and I'm told he has an additional issue
25     that --
```

1          MS. GODESKY:  Yes, Your Honor.  So he is here

2     because --

3          THE COURT:  I see.

4          MS. GODESKY:  Because he was supposed to be called

5     today or tomorrow.

6          THE COURT:  Got it.

7          MS. GODESKY:  His wife is supposed to travel to

8     London for a week, and they have an eight-year-old child

9     they have to care for.

10          THE COURT:  He needs to get back.

11          MS. GODESKY:  Mr. Hinderaker would call him after

12     lunch, and there would be time for me to do a cross, and we

13     could get him on a plane before snow-meggedon.

14          MR. HINDERAKER:  Or just to keep on the

15     conversation, I don't know when you might want to -- now I'm

16     thinking about the jury's departure, and I don't know when

17     you might want to do that.  Offering other alternatives in

18     addition to what was suggested, one, I could do my adverse

19     examination of Mr. Pandey leaving the direct examination and

20     my recross for the defendants' case in chief if Mr. Pandey

21     comes back.

22          I would like to have a full opportunity to examine

23     Mr. Pandey.  Another alternative which takes -- I offer it

24     because there would be less time involved.  We would be done

25     by, if they're back at 1:30, we would be done by 2:30, 3:00,

1    something like that if there is not the direct, or FICO

2    could designate his deposition components, put that into

3    evidence, not today obviously, and then comes back in the

4    defendants' case and examine him live fully.

5              I'm trying to accommodate by options the jury and

6    Mr. Pandey's desires as well.

7              THE COURT:  Understood.

8              Ms. Godesky?

9              MS. GODESKY:  To me, do we have an update on the

10   weather because it would be great if there is a way to get

11   this all done today?

12             THE COURT:  Right.

13             MS. GODESKY:  So he doesn't have to return.  That

14   would certainly be our preference.

15             THE COURT:  Yep.

16             MS. GODESKY:  Mr. Hinderaker's alternative

17   suggestions seems workable, although, you know, if he does

18   his direct, I would probably need at least maybe a brief

19   direct within the scope of whatever it is that he does.

20             THE COURT:  Right.

21             MR. HINDERAKER:  I'm not really calling mine a

22   direct.  It's an adverse exam.

23             THE COURT:  Mr. Hinderaker, how long do you think

24   you would go with Mr. Pandey?

25             MR. HINDERAKER:  I'm sure it will be, in all

1    candor, I found Mr. Pandey to be a difficult witness, but

2    not as a person, but in terms of time, and so I'm -- I'm

3    pretty sure that there is an hour plus in my, in my adverse

4    exam.

5            THE COURT:  The update I have just been handed and

6    the source of this information?

7            THE CLERK:  AccuWeather.com.

8            MR. HINDERAKER:  Objection --

9            THE COURT:  Well, if it's on the Internet, it's

10   got to be right.

11           MR. HINDERAKER:  Got to be true.

12           THE COURT:  Snow in the Cities starting at 4:00,

13   and roughly speaking the jurors that travel the furthest

14   are, as I said, south and southeast, so it would be arguably

15   about the same time.  I think we should try and go through

16   Mr. Pandey and get him done today.  If that takes us to 3:30

17   or so, hopefully nobody will be traveling through too much.

18           And the other update I have been given is that,

19   despite what I told you all this morning, the chief has yet

20   to formally close the courthouse for tomorrow and Thursday,

21   but I believe that is for sure coming.

22           So we will continue at 1:30 with Mr. Pandey.

23           MR. HINDERAKER:  Very good.

24           MS. GODESKY:  Thank you.

25           THE COURT:  Thank you.

**(Lunch recess taken.)**

1:29 p.m.

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT: Be seated.

Members of the jury, just briefly by way of update, the chief judge now has in fact officially closed the courthouse for tomorrow and Thursday. Weather is not starting here until 3:00 or 4:00. It's already snowing lightly in parts of southern Minnesota.

So we're going to try and get through one more witness and then call it a day. And this witness is live rather than by video and so therefore has some travel necessities of theirs. Okay?

Mr. Hinderaker.

MR. HINDERAKER: Mr. Ramesh Pandey, Your Honor.

THE COURT: Thank you.

Come on up here, Mr. Pandey. And if you pause here, come on up a little bit further and raise your right hand.

RAMESH PANDEY,

called on behalf of the plaintiff, was duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

```
1            THE COURT:  Go ahead and be seated.  State and

2      spell your full na me for the court reporter.  And then make

3      sure the microphone is pulled up where you can speak into

4      it.

5            THE WITNESS:  My name is Ramesh Pandey.  Ramesh

6      Pandey.

7                      CROSS EXAMINATION

8      BY MR. HINDERAKER:

9      Q.  Mr. Pandey, this is a notebook of exhibits we might talk

10     about, and at the back is copies of the transcripts of your

11     earlier depositions.

12     A.  Okay.

13     Q.  So good afternoon.

14     A.  Good afternoon.

15     Q.  And we'll do the best we can to have you on the flight

16     home before travel gets awful.

17     A.  Thank you.

18     Q.  You and I have met before I think on three different

19     occasions.  Do you recall?

20     A.  Long back, yes.  Long time.

21     Q.  Yes.  And as I mentioned to you, when I gave you those

22     notebooks in the back of that notebook, are the three

23     depositions that we had together, one of them in 2018 and

24     two of them were in 2019.

25            We may or may not refer to them, but if we do,
```

```
1    that's where they are.

2    A.  Yes.

3    Q.  Okay.  And if you can maybe move the mic again or in

4    some way project your voice.

5    A.  Closer?

6              THE COURT:  Bring it closer.

7              MR. HINDERAKER:  Project your voice so the jury

8    can hear what you are saying.

9              THE WITNESS:  Okay.  Good.

10   BY MR. HINDERAKER:

11   Q.  Good.  I'm going to go through just a bit of your

12   background.  When we were together in 2018, you were in the

13   employ of ACE American Insurance Company, correct?

14   A.  Chubb Insurance.

15   Q.  Pardon me?

16   A.  Chubb Insurance.

17   Q.  I'm talking about 2018 before the acquisition.

18   A.  Before the, before the acquisition I was part of Chubb

19   Insurance.

20   Q.  Correct.  Before the acquisition, you were an employee

21   of Chubb & Son?

22   A.  Chubb Insurance.

23   Q.  And then about January of 2016, ACE Limited acquired the

24   Chubb Corporation.

25   A.  Yes.
```

1    Q.  And then we were together in 2018 after that, at which

2    point you were an employee of ACE American Insurance

3    Company?

4    A.  After the acquisition, it became the Chubb Insurance.

5    They took the name.  ACE took the name of Chubb so went to

6    Chubb Insurance.  I'm an employee of Chubb Insurance.

7    Q.  We understand that that's what you want to say, but we

8    understand that ACE Limited, when it acquired the Chubb

9    Corporation took the name Chubb Limited.

10           Let's just turn to your transcript from the

11   November 13, 2018, deposition, and if you would find

12   page 12, please.  Let me know when you've found it.

13   A.  This is 11/13, 2018, right?

14   Q.  I can't hear you.

15   A.  11/13/2018?

16   Q.  November 13, 2018, that's correct.

17   A.  Okay.

18   Q.  Have you found page 12?

19   A.  Yeah, I see pages 10 through 13.

20           MR. HINDERAKER:  Can I?

21           THE COURT:  You may.

22           MR. HINDERAKER:  If you see how each page has four

23   quadrants, four boxes.

24           THE WITNESS:  Okay.

25

```
 1     BY MR. HINDERAKER:

 2     Q.  And I'm looking at the page number of each of these

 3     individual ones.

 4     A.  Okay.

 5     Q.  Okay?  And if you would, you found page 12?

 6     A.  Yes.

 7     Q.  And maybe we should start at page 11, line 22.

 8     A.  Yes.

 9     Q.  And I asked you, "What is the particular or the specific

10     company from whom you receive your compensation?"

11              And you say, "So right now it's part of ACE

12     Insurance which is in North America.  So Chubb is a big

13     company in North America, which is United States, Canada and

14     Bermuda in one part, rest of 52 country are different parts,

15     and I'm part of North America."

16     A.  Yes.

17     Q.  "The paycheck I receive is from," and it goes on page --

18     page -- line 9, "is North American, is North American Chubb

19     division, and the paycheck is from ACE American."

20              My question, "ACE American Insurance?"

21              Your answer "ACE American North America."

22              That's what you testified to then?

23     A.  It is part of, and we became part --

24              THE COURT:  Excuse me.  Hold on, Mr. Pandey.

25              THE WITNESS:  Yes.
```

```
 1              THE COURT:  Mr. Pandey, you have to answer the
 2     question that was asked.  Okay.
 3              MR. HINDERAKER:  Leave your lawyer's job for your
 4     lawyer.  Okay?
 5              THE WITNESS:  Okay.
 6     BY MR. HINDERAKER:
 7     Q.  So, and can we agree that before you became an employee
 8     of ACE American Insurance Company, you were employed by
 9     Chubb & Son, a division of Federal Insurance Company?
10     A.  I was employed with Chubb Insurance.  We work with Chubb
11     Insurance.  I worked in insurance industry for 27 years.
12     Q.  Mr. Pandey, it would be helpful if you answer the
13     question I ask.
14     A.  Okay.
15     Q.  And the question I just want to establish is a very
16     simple proposition.
17     A.  Okay.
18     Q.  Once you were employed by Chubb & Son, a division of
19     Federal, and at the time of the deposition, you were
20     employed by ACE American Insurance Company, correct?
21     A.  Could I explain it?  You asking before merger or after
22     merger?
23     Q.  Both of the -- I'll start again.
24     A.  Yeah.
25     Q.  Before the merger you were employed by Chubb & Son, a
```

```
1     division of Federal, correct?

2     A.  Chubb Insurance.  I don't know the legal names, but

3     Chubb Insurance, yes.

4     Q.  Before the merger you were employed by Chubb & Son?

5     A.  Chubb.

6     Q.  Chubb & Son?

7     A.  Chubb Insurance.

8     Q.  And after the merger, you were employed by ACE American

9     Insurance Company?

10    A.  No.  I was employed by Chubb.  I'm still employed by

11    Chubb.

12    Q.  We'll just do it one more time.  Go back to your line --

13    page 12.

14            And I'm asking you, "The paycheck I receive is

15    from?"

16            And your answer, "ACE American North America."

17            Correct?

18    A.  I made the mistake, I think, but it's Chubb.  I work for

19    Chubb before and after.  That's what I say.

20    Q.  Mr. Pandey, there's no question pending.

21    A.  Okay.

22    Q.  Why don't you go to page 82 of your deposition.

23    A.  Okay.  Yes.

24    Q.  Just a moment.  So at line, so let me ask you the

25    question.  In 2018 at the time of the deposition, after the
```

1    merger --

2    A.  Yes.

3    Q.  The applications that used Blaze Advisor software, it

4    was ACE American Insurance employees who maintained those

5    applications, maintained the data center, and was

6    responsible for continuing -- was responsible for those

7    applications to function?

8              MS. GODESKY:  Objection.  Foundation.

9              THE COURT:  Overruled.

10   BY MR. HINDERAKER:

11   Q.  And your answer was, "So let me ask clarifying question

12   just to make certain.  When you say 'employees of ACE,' we

13   all became ACE employees, correct, after the merger?"

14   A.  Yes.

15   Q.  "You were all ACE employees."

16             And then you go on and say, "So it would be Chubb

17   and ACE.  After the merger we are new Chubb actually.  On

18   paper we are ACE, right.  We get the paper check says ACE,

19   but it's Chubb."

20             Is that your testimony?

21   A.  Yes.

22   Q.  Then I asked you, "So let me ask you this:  When did

23   your employment change to ACE American Insurance Company?"

24             You don't have to look at your deposition yet.

25   Can you just answer the question?

CASE 0:16-cv-01054-DTS

1    A.  Yes.  Okay.  The question is when did I -- 2028 -- 2018.

2    Q.  The merger was 2016.

3    A.  Yes, but it took time to decide.

4    Q.  If you go to page 13, line 7.

5            Question --

6    A.  Which page?

7    Q.  13.  You know in the four little boxes.

8    A.  Yes.

9    Q.  All right.  Question at line 7, "So immediately upon the

10   merger being effective, did your employment change to become

11   an employee of ACE American Insurance Company?

12           "Answer:  Yes, it did.  Yeah."

13           That was your testimony at that deposition?

14   A.  Yes.

15   Q.  All right.  Thank you.

16           In 2018 you told me that your title is chief

17   architect North America.  Has your title changed?

18   A.  No.  I was still the chief architect for North America.

19   Q.  Okay.  And is it fair to say that you are knowledgeable

20   about applications that run for the businesses in

21   North America?

22   A.  Yes.

23   Q.  And is it also fair to say that you are not

24   knowledgeable about the applications that run for the

25   businesses outside of North America?

```
1    A.  Yes.

2    Q.  Now let me turn to the subject of what ACE American does

3    for a little bit.

4           One of the things that ACE American does, and

5    again your deposition was in 2018 and then in 2019?

6    A.  Yes.

7    Q.  One of the things that ACE American Insurance did at

8    that time was sell insurance in the name of Federal,

9    correct?

10   A.  In the name of Chubb.

11   Q.  Pardon me?

12   A.  In the name of Chubb.  Chubb is a brand, so people buy

13   Chubb brand.

14   Q.  Why don't you find the deposition that's January 22,

15   2019.

16           And when you have found the January 2019

17   deposition --

18   A.  Yes.

19   Q.  -- let me know you have it.

20   A.  Yes.

21   Q.  Why don't you turn to page 20.  Have you found page 20?

22   A.  Yes.

23   Q.  Look for line 19.

24   A.  Yes.

25   Q.  I say, "Thank you.  All right."
```

1          And I go on at line 20.  "So ACE American

2     Insurance -- well, tell me how.  Tell me in your words how

3     ACE American Insurance provides services regarding Blaze

4     Advisor applications to Federal and its subsidiaries."

5          Your answer was, "So we sell the policies through

6     Federal, right?  Federal is the entity, Federal is the

7     company carrier, insurance carrier."

8          That was my question, and that was your answer at

9     that deposition in January of 2019.  Did I read it

10    correctly?

11    A.  Yes, you read it right.

12    Q.  Okay.  Then let's go in the same deposition to page 21,

13    line 16, or I guess probably, better said line 18.

14    A.  Okay.

15    Q.  Have you found it?

16    A.  Yeah.

17    Q.  The question was, "And do you agree with me that not

18    only, that what you just said that Federal is the legal

19    entity licensed in certain states to sell certain policies

20    in those states."

21          Your answer was, "Yeah.

22          "And do you agree with me that subsidiaries of

23    Federal, other legal entities, are also licensed to sell

24    insurance in various states?"

25          And your answer is, "For different products."

```
1    A.  Yes.

2    Q.  And my question goes on, and that the, we are

3    referencing a certain exhibit -- and that's working,

4    "Referencing Exhibit 32 that we're working from is between

5    Federal and a legal entity called ACE American Insurance

6    Company.  And is it your testimony that the legal entity ACE

7    American Insurance Company is providing the IT support for

8    the issuance of insurance policies by Federal and its

9    various subsidiaries?"

10            And your answer was, "Yes, but they may be

11   different products."

12            Did I read that correctly?

13   A.  Yes.

14   Q.  Yes?

15   A.  Yes.

16   Q.  Thank you.

17            And then if you would -- I would ask you the

18   question before we turn.

19            And so then do you agree that before the

20   acquisition Chubb & Son, a division of Federal, supported

21   the support services using Blaze Advisor?  Do you want to

22   look at me and answer the question or --

23   A.  Which line?

24   Q.  First I'm just going to ask you the question and see

25   what the answer is.  The question is, Before the acquisition
```

1    Chubb & Son, a division of Federal, provided the support

2    services using Blaze Advisor?

3    A.  Before the acquisition, Chubb oral provided the services

4    for our products.

5    Q.  Would you turn to page 24 of your 29 -- that same

6    deposition in 2019.

7    A.  Page 24?

8    Q.  Page 24, please.

9    A.  Okay.

10   Q.  And then if you look at line 15, and I asked this

11   question: "Okay.  Before ACE American Insurance Company

12   provided support for Blaze Advisor applications, in

13   connection with the sale of insurance policies, do you agree

14   that Chubb & Son, a division of Federal, provided those,

15   provided that support using Blaze Advisor applications:

16        "Answer:  That's correct."

17   A.  Yes.

18   Q.  Did I read that correctly?

19   A.  Yes.

20   Q.  And do you recall when all of the employees of Chubb &

21   Son and Federal became employees of ACE American?

22   A.  It became Chubb after the merger.

23   Q.  Let's stay on page 24.  Would you look at line 10?

24   Question:

25        MS. GODESKY:  Objection, Your Honor.

1        THE COURT:  What's the objection, Counsel?

2        MS. GODESKY:  I think the question was whether he

3   recalls, and the witness said he didn't.  I don't think that

4   this is impeachment.

5        MR. HINDERAKER:  No.  He said before -- that is

6   not what he said.

7        THE COURT:  Okay.  Overruled.  Hang on.

8   Overruled.

9        MR. HINDERAKER:  Okay.

10  BY MR. HINDERAKER:

11  Q.  So let's go to page 24, line 10.

12  A.  Okay.

13  Q.  Okay.  Are you with me?

14  A.  Yeah.

15  Q.  All right.  "And do you know when those employees who

16  were with Chubb & Son, a division of Federal, became

17  employees of ACE American Insurance Company?

18        "Answer:  January 1st, 2017, two oh one seven."

19        Did I read that correctly?

20  A.  Yes.

21  Q.  Thank you.

22        Is it correct to say, Mr. Pandey, that from the

23  time ACE American Insurance Company supported the sale of

24  insurance with Blaze Advisor applications until all use of

25  Blaze Advisor stopped -- let me back up.

 1              Do you know that as of today, 2023, Blaze Advisor

 2    is not used in any insurance applications to sell insurance

 3    by ACE American or anybody within the whole Chubb

 4    organization?

 5    A.  All Chubb organization, yes.

 6    Q.  It's all stopped?

 7    A.  Yeah.

 8    Q.  We can say that as of today?

 9    A.  To the best of my knowledge, all stopped.

10    Q.  All right.  So with respect to -- then with respect to

11    the time period when ACE American was using Blaze Advisor in

12    applications to sell insurance, is it accurate to say that

13    ACE American was using Blaze Advisor in the same

14    applications connected to selling insurance that Chubb & Son

15    had used before?

16    A.  No.  The, we were selling -- can I answer this?  Okay.

17    Q.  All right.  Let's go to page 52.  And if you would go to

18    line 7, please, still in the 2019 deposition.

19    A.  Page 20?

20    Q.  Page 52, line 7, please.

21              And I ask the question:  "And rather than go

22    through each one of those applications individually, would

23    it be accurate to say that ACE American Insurance Company

24    now supports all the applications that use Blaze Advisor

25    being the same applications that Chubb & Son, a division of

1    Federal, supported:

2             Answer:  I'll say I'm fairly -- I'll say yes, but

3    to my knowledge, yes, but it could be other companies too."

4             And that was your answer?

5    A.  Yeah.

6    Q.  Thank you.  Let me change topics.  I want to ask about

7    the data centers and their location.  All right?

8    A.  Yeah.

9    Q.  Whether it was Chubb & Son using Blaze Advisor or ACE

10   American using Blaze Advisor, the data center where Blaze

11   Advisor was hosted was located in Raleigh, North Carolina?

12   A.  Yes.

13   Q.  And when a Blaze Advisor application was run on that

14   server in North Carolina, then a copy of the Blaze Advisor

15   software was made into the random access memory of the

16   server, correct?

17   A.  That's how the software work.  It's the same computer.

18   Q.  That's how the software works, correct?

19   A.  Yeah.

20   Q.  And then the applications that supported -- well, let me

21   back up.

22             Are you aware that Chubb Insurance Company of

23   Canada used Blaze Advisor in some applications connected to

24   selling insurance?

25   A.  Yeah, Chubb Canada used Evolution.

```
 1    Q.  Evolution?

 2    A.  Yeah.

 3    Q.  At least that one?

 4    A.  Evolution that I know of.

 5    Q.  And Evolution, as used by Chubb Insurance Company of

 6    Canada, that software was hosted on the servers in Raleigh,

 7    North Carolina?

 8    A.  Yes.  As a primary, so it really doesn't --

 9    Q.  Your lawyer will be able to ask you as many questions --

10    A.  No.  No.  I was thinking technical, because that's my

11    field.

12    Q.  All right.  Fair enough.

13             Yeah.  So perhaps the underwriter or whoever the

14    business user was was sitting in Toronto, but when that

15    Toronto or Canadian based person was running Evolution, for

16    example, it was accessing the software on the servers in

17    Raleigh, North Carolina, correct?

18    A.  Yes.

19    Q.  And that's the only location that Chubb & Son had data

20    centers in the United States?

21    A.  No.  That's what I was going --

22    Q.  Oh, okay.

23    A.  The way IT works is you have to have the primary data

24    center.  Then you have to have the secondary data center in

25    case all go off or upgrade happens, those scenarios.  So you
```

1    always have primary and backup, so --

2    Q.  Raleigh was the primary?

3    A.  Yes.

4    Q.  Where was the secondary?

5    A.  So it was, in Connecticut, the other one, the secondary,

6    but for Canada, secondary was in Canada, Toronto.

7    Q.  Okay.  So Blaze Advisor was installed on servers in

8    Toronto, Canada, as a secondary backup?

9    A.  No.  It's primary in here in Raleigh.

10   Q.  Yep.

11   A.  And in Stansbury -- oh, not Stansbury.  It is somebody

12   in data center in Connecticut.  And that was the secondary

13   for us, but if disaster happens, let's say they have a

14   problem in the U.S., then we could deploy in Canada because

15   we had the data center which we didn't use at that time.

16   Q.  Which you did or did not use?

17   A.  Did not use at that time, but we had the data center in

18   Canada for other reasons.

19   Q.  For other reasons like backup?

20   A.  For other applications because Canada have some

21   application that is used only for Canada.  So they had their

22   own data center.

23   Q.  Okay.  So let me just clarify this up.  So for Blaze

24   Advisor software in Evolution, for example, when Evolution

25   was run, it was the application resident on the Raleigh,

```
 1      North Carolina, server that was activated?
 2      A.  Yes, that was primary, and in case of some problem, then
 3      it go to the Canada data center.
 4      Q.  But only if there was a problem?
 5      A.  There are some maintenance routine also that could
 6      happen, but not the normal case.
 7      Q.  So Raleigh, North Carolina, or else someplace in
 8      Connecticut?
 9      A.  Yeah.
10      Q.  Fair enough.  It doesn't matter where.  Okay?
11      A.  It's called Rainsbury or Stansbury, one of the "bury"
12      the name of the town.  I'm forgetting.  Salisbury.
13      Q.  When we were together before, you were educating me
14      about what an underwriter does, and you told me that --
15              Tell me if you agree with this.  That the
16      underwriter is the salesperson for the insurance company?
17      A.  Underwriting, your language, laymen language, think of
18      them as a salesman, but they are not salesman.  They are
19      underwriters.  They are not salesmen, but in your tone to
20      explain you, I use the word think of them as salesmen.
21      Q.  Yes.
22      A.  But they're not salesmen.  They are underwriters.
23      Q.  And the function of underwriting is to sell insurance.
24      Do you agree?
25      A.  Underwrite the policy, so if a customer ask a quote --
```

1   Q.  Mr. Pandey, let me just back up.  We know what

2   underwriting is.  "Size the policy.  Quote the policy.  Do

3   all that underwriting work, and the purpose of all that by

4   the underwriter is to sell the insurance company insurance

5   policy," correct?

6   A.  Sell, you can say it, but sale is done by agents and

7   brokers.  They sell it.

8   Q.  The purpose of the underwriter after he does all that

9   work is to sell the insurance policy to the agent and broker

10  and the agent and broker's customer?

11  A.  We create multiple options, and we create the different

12  limits, the deductibles, different color and say here's

13  three options.  Here the limit, here the premium.  Here the

14  limit, here the premium.

15          We create multiple options.  That's what

16  underwriter does, and go to agent and say tell the customer

17  which one they like, so use the option.

18  Q.  And then get the options and hopefully one of them is

19  accepted and an insurance policy is sold, correct?

20  A.  Yes.

21  Q.  Correct?

22  A.  Once they accept, then the issuance and billing and

23  other process starts.

24  Q.  All right.  Let's change topics.  In your binder you

25  will see a tab that's P0154.  Let me know when you've found

1     that.

2     A.  Yes, I found it.

3     Q.  Okay.  And I should correct the record, Your Honor.

4            154 had some markings on it.  So 154A has been

5     substituted for that, and I think your binder and,

6     Mr. Pandey, your binder has 154A.

7     A.  Yes.

8     Q.  At the time of the deposition it was called 154.

9     A.  Yes.

10    Q.  All right.  And the subject of 154 -- correct me if I

11    have it -- is 2018 ChEAR Chubb Enterprise application

12    registry validation Asia Pacific.

13           Have I read that correctly?

14    A.  Yes.

15    Q.  And as the document says, the ChEAR, CHEAR, stands for

16    Chubb Enterprise Architecture Repository, correct?

17    A.  Yes.

18    Q.  And in Chubb when you say I want a ChEAR report,

19    everybody knows what you are talking about.

20    A.  Yes.

21    Q.  And a ChEAR report is a record that documents what you

22    have, excuse me, what you have so that you know what you

23    have, correct?

24    A.  Yes.  This is the, my team is enterprise -- okay.  Go

25    ahead.

1   Q.  Thank you.

2            THE COURT:  Hang on.  Did you finish your answer?

3            THE WITNESS:  I was saying that my team manage

4   Enterprise Architect, and ChEAR, CHEAR is Chubb Enterprise

5   Architecture Repository, C-H-E-A-R, that is used by my team.

6   BY MR. HINDERAKER:

7   Q.  Thank you.  I got that wrong.  I had -- I had the A

8   as --

9   A.  Application.

10  Q.  Because I was reading the document, but, yes, it stands

11  for Chubb Enterprise Architecture Repository?

12  A.  Yes.

13  Q.  That's right.  And this is a record that you have, and

14  it keeps track and stores the information about your IT

15  systems?

16  A.  IT system that we use today that we did the analysis and

17  research and that we used to use, so this is like our

18  scratch pad, like it is our tracker.

19  Q.  And it's, a ChEAR report is something that you in IT and

20  your IT colleagues really use internally?

21  A.  Internally.  For all the technical community, all the

22  architects, all the testers it goes back to.

23  Q.  So I'm going to -- if you would go to the second page of

24  the Exhibit 154A, has the email, which has the attachment.

25  And then the attachment is where I'm referencing now.

Evidentiary Hearing

```
 1                And on the second page of that attachment, and on
 2        the bottom of the document you will see it's numbered 5.  So
 3        P104-P0154-005.
 4        A.   005, okay.
 5        Q.   Do you see that?
 6        A.   Yeah.
 7        Q.   And if you go up from the bottom, you will see the area
 8        Asia Pacific.
 9        A.   Yes.
10        Q.   And you go across, and you will see Evolution Asia
11        Pacific, and you go across further to the technology, Blaze
12        Advisor.  And you go across further, and it says Blaze
13        Advisor 7.1.
14                Do we agree?
15        A.   Yes.  It is there.
16        Q.   Thank you.  And the 7.1 refers to the version of Blaze
17        Advisor?
18        A.   Yeah, they did the research.  They were interested in
19        it, so they have to document it.
20        Q.   Let's now go to the exhibit that is numbered P0540.  Now
21        just for reference, 154A that we just looked at is
22        February 5, 2018.  And so now I've done that, I'm going to
23        go back in time a little bit.
24                And so Exhibit 540 is October 28, 2015.  And the
25        subject matter is ChEAR Application Data Validation.  The
```

1    attachment is ChEAR Application and Technology Mapping

2    Summary.

3    A.  Which one are you on?

4    Q.  Did I read that correctly?

5    A.  I don't have -- 0154A.

6    Q.  No. 0540.  May be the last tab in the notebook.

7    A.  Okay.  Got it.  Yes, got it.

8    Q.  Okay.  P0540.

9    A.  Yes.

10   Q.  All right.  And then looking at the attachment, turning

11   the page, on the far left column this attachment has

12   reference rows.  Do you see that?

13   A.  Yes.

14   Q.  So let's go to reference Row 1148.  Are you there with

15   me?

16   A.  Yes.

17   Q.  And the business unit is CAZ for Canada, correct?

18   A.  Yes.

19   Q.  The application is broker site?

20   A.  Yes.

21   Q.  We go across the line, Blaze Advisor?

22   A.  Yes.

23   Q.  And we go across the line to the Version 6.9?

24   A.  Yes.

25   Q.  Have I read that right?

```
1    A.  Yes.  That last column is eliminate, right?  That is the

2    one.

3    Q.  And then let's go to reference line 1194.  Have you

4    found that?

5    A.  Yes.

6    Q.  And if we go across the line, Canada, Evolution,

7    Evolution, Blaze Advisor, 7.1?

8    A.  Yeah, 7.1 leverage.  Yes.

9    Q.  Let's go to reference line 2580.

10   A.  258?

11   Q.  Let me know when you are there.

12   A.  Say it again?

13   Q.  2580.

14   A.  2580.

15            THE COURT:  Same document.

16   BY MR. HINDERAKER:

17   Q.  Same document.  Just a different reference line.

18            THE COURT:  And, Mr. Pandey, it's also being

19   displayed on your screen there.

20            THE WITNESS:  Oh.

21            THE COURT:  If that helps you.

22            THE WITNESS:  Thank you.  Yes, I have it.

23   BY MR. HINDERAKER:

24   Q.  All right.  Have you found it?  You found it?

25   A.  Yes.
```

645

```
 1    Q.  All right.  We go across that line, it says, "Premium

 2    booking services."  Continuing to the right, "Blaze

 3    Advisor"?

 4    A.  Yes.

 5    Q.  Version 7.1.  Did I read that right?

 6    A.  Yes.

 7    Q.  Let's go to reference line 4429.  Have you found it?

 8    A.  429.

 9    Q.  I'm sorry.  I may be misspoke.  4229.

10    A.  4229.  Yes, I found it.

11    Q.  Okay.  First column is CCI, that's Chubb Commercial

12    Insurance?

13    A.  Yes.

14    Q.  And then CUW?

15    A.  Yes.

16    Q.  Providing workstation.  Going across, Blaze Advisor.

17    Going across, 7.1.  Correct?

18    A.  Yes.

19    Q.  All right.  Let's go to 4692, reference line.

20    A.  Yes.

21    Q.  I have to find it myself now.  Okay.

22          CCI, Chubb Commercial Insurance.  Texas Accident

23    Prevention Services.  Going to the column, Blaze Advisor,

24    7.1?

25    A.  Yes.
```

1    Q.  Correct?

2    A.  Yes.

3    Q.  And let's go to 6870.  Are you with me now?

4    A.  Yes.

5    Q.  The business unit is CSI, Chubb Commercial Insurance.

6    I'm sorry.  Chubb Specialty Insurance?

7    A.  Yes.

8    Q.  And it goes CSI Express?

9    A.  Yes.

10   Q.  Go across the line, Blaze Advisor?

11   A.  Yes.

12   Q.  Go across, 7.1?

13   A.  Yes.  Leverage.

14   Q.  And then let's go to reference 6910.  6910.

15   A.  Yes.

16   Q.  Okay.

17   A.  Yep.

18   Q.  Business unit, CSI.  Application, CSI Express.  Goes

19   across, CSI Express Renewal Rules Maintenance Center?

20   A.  Yes.

21   Q.  Blaze Advisor, 7.1?

22   A.  Yes.

23   Q.  Correct?  All right.  Let's go to 6923.  CSI, CSI

24   Express?

25   A.  Yes.

1    Q.  CSI Express Renewal, what if simulation tool.

2    A.  Yes.

3    Q.  Blaze Advisor, 7.1?

4    A.  Yes.

5    Q.  Let's go to 7042.

6    A.  Yes, decision point.

7    Q.  Yeah.  You're ahead of me.  7042.  CSI, so specialty,

8    DecisionPoint.  Blaze Advisor, 7.1?

9    A.  7.1 leverage, yes.

10   Q.  Okay.  And then let's go to 7147.  Let me know when you

11   are there?

12   A.  Yes.

13   Q.  CSI, profitability indicator, CSI Express, Blaze

14   Advisor, 7.1?

15   A.  Yes.

16   Q.  Okay.  And now let's go to 7993.  Are you there with me

17   now, 7993?

18   A.  Yes.

19   Q.  And the business units, EUZ stands for Europe?

20   A.  Yes.

21   Q.  The application EZER, E-Z-E-R?

22   A.  Yes.

23   Q.  Go across the line, Blaze Advisor, 7.1?

24   A.  Yes.  But Europe I'm not responsible.

25   Q.  Understood.  I did accurately read that.

```
 1    A.  Yes.

 2    Q.  Yes.  Okay.  And then 8552.  Yeah, 8552.

 3             Business unit is Surety --

 4    A.  Cornerstone, yes.

 5    Q.  -- Cornerstone.  Go across the line, Blaze Advisor, 7.1?

 6    A.  Yes.

 7    Q.  Okay.  So that was October of 2015.

 8    A.  Yeah.

 9    Q.  Now let me ask you or I will ask you to go to the tab

10    that is P0156.

11    A.  Yes.

12    Q.  Okay.  And this is dated January 28, 2016.  Do we agree?

13    A.  Yes.

14    Q.  So we are going forward a bit in time.  The subject is

15    ChEAR Application and Technology Stack Summary.

16    A.  Yes.

17    Q.  And the attachment is Legacy Chubb Application Summary

18    January 2016.  Agreed?

19    A.  Yep.

20    Q.  So this one is organized a bit differently.  I have to

21    ask you to go to pages.  So if you go to page -- well, the

22    second page of the attachment on the document is called

23    number four.

24             And if we go down a few lines where you see Canada

25    Accident and Health Insurance Adapt, ABL.  And then in the
```

1    middle column you will see Blaze Advisor.  Are you with me?

2    Or you can look on the screen.

3    A.  Yes.

4    Q.  Okay.  And this is, this ChEAR report is also later in

5    time, but it's reporting Blaze Advisor 7.1.  Agreed?

6    A.  7.1, yes.

7    Q.  Yeah.  Okay.  Let's go to the next page 3.  And I'm

8    going to be asking about broker sites.  But then you go down

9    just 1, 2, 3, 4, 5 lines.  You see broker site, Blaze

10   Advisor, and the version is 6.9.

11           Agreed?

12   A.  Yes.  Eliminate, yes.

13   Q.  Let's go to page 4.  We're in Canada.

14   A.  Yes.

15   Q.  I got to catch up with myself.

16           We're in Evolution?

17   A.  Yes.

18   Q.  All right.  And it's on the screen faster than I can

19   find it in my eyes, but about a third of the way down from

20   the top where it says Blaze Advisor?

21   A.  7.1 leverage.

22   Q.  7.1.  Let's go to page 5.  And I'm interested in the

23   application called Premium Booking.

24   A.  Yes.

25   Q.  And we look for the technology.  The top line, the first

1    line of Premium Booking is Blaze Advisor, and Version 7.1?

2    A.  Yes.

3    Q.  Okay.  Let's go to page 6.  We're looking for the

4    application near the bottom of the page called IRMAA?

5    A.  IRMAA, yep.

6    Q.  And third from the bottom, the technology is Blaze

7    Advisor and the version is 7.1.  Agreed?

8    A.  Yes.

9    Q.  The next page is CUW Commercial Workstation, and we go

10   down, as you see, about almost half way where it says Blaze

11   Advisor.

12   A.  Yes.

13   Q.  And the version is 7.1.  Agreed?

14   A.  Yes.

15   Q.  Let's go to page 9.  CIS claims, maybe the third of the

16   way down.  CIS claims, you see Blaze Advisor?

17   A.  Yes.

18   Q.  And the version is 7.1?

19   A.  Yes.

20   Q.  And if we go to page 10, CSI Express.

21   A.  Yes.

22   Q.  Do you see where the technology is Blaze Advisor?

23   A.  Yeah.  7.1 leverage.

24   Q.  7.1.

25   A.  Yeah.

1    Q.  Let's go to page 11.  CSI Express Renewal Rules

2    Maintenance.  Do you see about a third of the way down or

3    maybe close to half, Blaze Advisor?

4    A.  Yeah.

5    Q.  7.1?

6    A.  Yep.

7    Q.  Okay.  Page 12.  DecisionPoint.

8    A.  Yes.

9    Q.  And on this document, later in time, at the top, the

10   technology, one of the technologies for DecisionPoint is

11   Blaze Advisor?

12   A.  Yes.

13   Q.  And 7.1?

14   A.  Yep.

15   Q.  Then on page 13, Profitability Indicator?

16   A.  Yeah.

17   Q.  Do you see where it says Blaze Advisor as the

18   technology?

19   A.  Yes.  7.1 leverage, yes.

20   Q.  7.1.  And let's go to page 25.  I think it's 25.

21   A.  25?

22   Q.  Well, I think I've gone too far.  Let's go to the last

23   page.

24   A.  15.

25   Q.  Yeah, 15.  Cornerstone?

1    A.  Cornerstone.

2    Q.  And the technology Blaze Advisor, kind of in the middle

3    of the page?

4    A.  Yeah.

5    Q.  And Version 7.1?

6    A.  Yeah.

7    Q.  Okay.  And then I want -- if you would find

8    Exhibit 0158.  Have you found that?

9    A.  Yes.

10   Q.  Okay.  And this is dated May 9th.  So now we're moving

11   forward in time a bit more.

12   A.  Yeah.

13   Q.  May 9th, 2017.  The subject is ChEAR Apps and Techs?

14   A.  Yeah.

15   Q.  Attachment ChEAR application and technologies, May 2017.

16   A.  Yeah.

17   Q.  Have I read that right?  All right.  Let's go to the

18   attachment.

19          And let's go to the third page of the attachment

20   for broker site in the Canadian zone, and you will see in

21   the lower half, Blaze Advisor, Version 6.9.

22   A.  Yes.

23   Q.  Okay.  Let's go to the page 5 and CIS Claims.  And near

24   the bottom of the page, the technology -- two more pages,

25   Mr. Mayleben.  Be page 5 of the attachment.

Fair v. Anderson Cross

```
 1    A.  Yes.  CIS claims, Blaze Advisor 7.1.

 2    Q.  There we go.  Yeah.  CIS claims, Blaze Advisor, 7.1.

 3              Okay.  Let's go to the next page.

 4    A.  Yes.

 5    Q.  And I'm interested in the application IRMAA.

 6    A.  IRMAA, yeah.  Yes.

 7    Q.  Top half.

 8    A.  Blaze Advisor, 7.1.

 9    Q.  Blaze Advisor, 7.1.  And then the next page, the

10    application CSI Express, again the top third, do you see

11    Blaze Advisor is the technology used in CSI Express, Version

12    7.1?

13    A.  Yeah.

14    Q.  Agreed?

15    A.  Yeah.

16    Q.  Okay.  And then the next page, I'm interested in CSI

17    Express Renewals Rule Maintenance.  And on the top part,

18    Blaze Advisor, Version 7.1.  Agreed?

19    A.  Yeah, the new one.

20    Q.  And if we go to CSI Express Renewal, renewal what if, we

21    see Blaze Advisor 7.1 again.

22    A.  Yes.

23    Q.  Agreed?  All right.

24              Let's finish this document with the -- -- I want

25    to go.  We were on page 8.  I would like to go to the next
```

1    page, which is CUW, and there we go near the top.

2              Do you see Blaze Advisor?

3    A.   Yeah.

4    Q.   7.1?

5    A.   Yeah.

6    Q.   Okay.  And then on page 10, I want to talk about

7    DecisionPoint.  Near the bottom, Blaze Advisor 7.1.  Agreed?

8    A.   Yes.

9    Q.   Go to page 11.  I want to talk about TAPP or Texas

10   Accident Prevention Program.  And we go near the bottom

11   again, Blaze Advisor 7.1?

12   A.   Yeah.  Same.

13   Q.   Okay.  And then -- so that's 11.  Let's go to page 12,

14   Profitability Indicator.

15   A.   Yep.

16   Q.   And we look for the technology Blaze Advisor just on the

17   top half.  Version, Blaze Advisor Version 7.1 is being used

18   in that application.  Agreed?

19   A.   Yeah.

20   Q.   Let's go to the next page.  Cornerstone.  And near the

21   top you see Blaze Advisor Version 7.1.  Agreed?

22   A.   Yeah.

23   Q.   And then let's go to the next page, and we're going to

24   be looking for Premium Booking?

25   A.   Yeah.

1    Q.  And kind of in the middle, Blaze Advisor 7.1.

2    A.  Yes.

3    Q.  And then on the next page, we're going to be looking for

4    Adapt ABL.  Now that is in the European zone, and I know

5    that's outside of your space, but this report puts it in the

6    European zone, correct?

7    A.  Yes.

8    Q.  And Blaze Advisor Version 7.1.  Agreed?

9    A.  Yes.

10   Q.  Now I'd like you to find the document which is P0175.

11   A.  Yes, I have it.

12   Q.  And P0175 is a November 25, 2015, email from Lance

13   Martin to yourself?

14   A.  Yeah.

15   Q.  And you will see the subject is Duff & Phelps Template,

16   and the attachment is ACE Chubb Valuation.

17             Do you see that?

18   A.  Yes.

19   Q.  And because of the -- let's put this in some context,

20   Mr. Pandey, this Duff & Phelps evaluation.

21   A.  Yeah.

22   Q.  Okay?  Because of the acquisition, Duff & Phelps was

23   hired to make an evaluation of the assets of Chubb, the

24   Chubb Corporation.

25   A.  Chubb assets, yes.

1    Q.  Yes.

2    A.  Yes.

3    Q.  And Duff & Phelps people did interviews through Chubb --

4    did interviews, did interviews of IT staff, did interviews

5    within the Chubb group.

6    A.  Yes.

7    Q.  And in fact they talked, to your knowledge, they talked

8    to many people about the evaluation of the assets that were

9    the subject of their study, agreed?

10   A.  Yes.

11   Q.  And then this document is now in the records of Chubb

12   from the work product of Duff & Phelps.  Agreed?

13   A.  Yes.

14   Q.  And so let us just look at that for a moment.  We'll see

15   that one of the things that Duff & Phelps did was give

16   estimated costs to purchase or develop some of the

17   applications.

18           They gave descriptions of the applications.  They

19   gave various -- they reported on the results of their

20   interviews.  Agreed?

21   A.  Yeah, just appraise at a high level.  Yes.

22   Q.  I'm sorry.  What?

23   A.  Appraise the systems at a high level, just through

24   interviews, and they say, oh, it cost this much.

25   Q.  Good.  Now let's go to the attachment then.

1    A.  Yeah.

2    Q.  And on the far left column are line numbers.  So I'd

3    like to go to line 7.  And I can't read my paper copy, and I

4    need the, I need the -- there.  Thank you.  I need the

5    visual blown up.

6             On line 7, this is Duff & Phelps reporting on CUW.

7    A.  Yes.

8    Q.  And let me just -- I'll just read it, and you read along

9    with me and see if I have it right.

10            "The commercial underwriting workstation provides

11   an electronic environment to support and enhance the

12   commercial underwriting business process.  It provides quick

13   access to key customer relationships, underwriting

14   documentation, service and producer information needed to

15   service customers.

16            "There are also additional work management tools

17   to support a variety of functions, including a personal

18   suspense log.  There are over 6,000 users in US and Canada

19   from CCI, CSI, CPI (i.e., Signature Solutions), ABL,

20   marketing and ODS."

21            Did I read that right?

22   A.  Yes, this is a document in the system.

23   Q.  Yes.  And let's go to the column called Contribution.

24   Bring that over a little bit.

25            The Duff & Phelps evaluation says -- well, the

1    definition again, make sure I read it right.

2           The definition of contribution:  Increased revenue

3    growth, increased customer retention, cost savings,

4    efficiency gains, compliance, analytic, business

5    maintenance.

6           So far I've read right?

7    A.  Yeah.  That's what it says, but that doesn't mean it is

8    correct.

9    Q.  So now let me read what Duff & Phelps said.

10   A.  Yeah, I agree.

11   Q.  "CUW and its supporting data sources allow CCI to

12   process over 5 billion worth of commercial business in an

13   efficient manner."

14   A.  Yeah:

15   Q.  "It provides a standardized electronic environment to

16   support commercial underwriting.  Provides holistic view of

17   customer's relationship with Chubb organized in a tab format

18   via the electronic customer file.  Provides a single point

19   of interface to the most frequently used systems with access

20   via drop-offs.  Streamlines all correspondence and

21   documentation generated or received from an account.

22   Integrates with various systems for policy status, tracking

23   and document filing."

24          And if we could scroll up a little bit, please.

25   "Supports manage" -- okay, that's it.  Good.

1           I read that correctly.

2    A.  Yes, that's what it says.  It's a document in the

3    system.

4    Q.  Yes.  And then let's go to Strengths and read what that

5    says.

6    A.  Yeah.

7    Q.  Again on CUW.  "Advanced visibility into US commercial

8    operations with 360 view of the US commercial customer,

9    flexible intuitive user interface, high performance and

10   highly stable, functionality extends across multiple lines

11   of business and policy administration systems/technologies."

12          Did I read that right?

13   A.  Yes.

14   Q.  Let's go to line 11, please.  And line 11 is CSI

15   Express, do you see?  Agreed?

16   A.  Yes.

17   Q.  All right.  And CSI Express, as it says on the far left

18   column, is a policy -- is policy management/underwriting.

19   So let's, let's go to the description of, the description of

20   use.

21          "CSI Express is the policy administration system

22   for Chubb's specialty lines developed in-house.  It is a.net

23   desktop application with an in formix back-end that has

24   delivered underwriters for processing quote, bind and issue.

25   It handles all active CSI products (total of 113), processes

1    new lines and renewals, and endorsements transactions.  The

2    rating- functionality is being backed by the CSI rating

3    application-online job of WebSphere application and the Duck

4    Creek Rating System?"

5    A.  Yes.

6    Q.  Okay.  Did I read that correctly?

7    A.  Yes.

8    Q.  Let's go to Contribution.  "The total premium for CSI is

9    approximately, give or take, 1.9 billion, including Canada.

10   Regarding the relative weight or contribution to the

11   profitability generated for CSI, approximately 95 percent of

12   the premium (about 1.8 billion) is processed via CSI Express

13   with approximately give or take 5 percent, processed by a

14   system called BD Ratings, which is the policy administration

15   system for financial fidelity bonds."

16           Did I read that correctly?

17   A.  Yes.  CSI, can I explain that or no?

18   Q.  That's all right.

19   A.  Okay.

20   Q.  And then let's go to Strengths.

21   A.  Okay:

22   Q.  "User interface simple to use, supports speciality lines

23   business for all 50 states and Canada."

24   A.  Yeah.

25   Q.  "Processes over 2.1 billion in premium, highly

1  performative, utilizes predictive modeling in underwriting

2  and rating, supports multiple product definition and rating

3  models in the same state based on writing company, supports

4  very sophisticated automated renewal processing, supports

5  book analytics utilizing predictive analytics services,

6  system is componentized, use of Blaze decision services for

7  predictive analytics and underwriting guidance."

8          And I have read that correctly?

9  A.  Yep.

10  Q.  And then -- all right.  So that was the strengths.  So

11  let's go to line -- nah.  Now let's go to line 12.

12          And this is DecisionPoint, CSI.  And let's do the

13  description of Use.  We have to get to DecisionPoint on

14  line 12.  Okay.  There we go.

15          DecisionPoint.  "DecisionPoint is a market facing

16  web quote solution which can be accessed directly from at

17  Chubb targeting primarily agent use.

18          "Solution supports online new business,

19  submission, creation and quote generation for the selected

20  specialty lines of business (D & O, EPL, crime and

21  fiduciary).

22          "User interface is a WebSphere application running

23  in the extranet environment.

24          "DecisionPoint provides external user interface to

25  CSIX processing within business limits.

1          "DecisionPoint supports internal E application

2     upload, as well as email upload and round trip capabilities.

3          "It supports an AMS integration, Veretafore

4     provides a direct upload from the system to DecisionPoint."

5          Have I read that right?

6     A.  Yes.

7     Q.  Let's go to Contribution.

8          "The target new business goal is 6 million with an

9     8 million target in 2016.  CSI's new business through

10    DecisionPoint last year was 4.3 million.  For 2015, this

11    represents approximately 15 percent of the new business

12    total (a combination of new business through DecisionPoint

13    and via traditional methods) for these lines of coverage.

14          "We currently do not perform an actuarial

15    profitability study on DecisionPoint business, but based on

16    size and coverage offered, we assume an 88 percent combined

17    ratio and a 90 percent retention rate.  This is based on

18    studies of business with similar size and coverage

19    characteristics."

20          Correct?  Read that right?

21    A.  Yes.

22    Q.  And let's move on to Strengths then.

23          "Additional business intake, support of

24    competitors applications, speed of generating new quotes,

25    support of an AMS integration, use of Blaze decision

1    services to determine eligibility, pricing, predictive

2    analytics, and endorsements, supports forms app load and

3    email upload."

4         Did I read that right?

5    A.  Yes.

6    Q.  Let's go to line 17, which is CIS Claims.

7         The description of use.  "ERCIS executive risk

8    claims information systems, claim systems for specialty

9    LOB," is that line of business, "for the policies issued out

10   of CSI Express policy system.  It supports the following

11   business capabilities (high level).  Claims management,

12   financials, administrative tasks, and downstream."

13        Have I read that correctly?

14   A.  Yep.

15   Q.  Let's go to Strengths.  "Tightly integrated with CSI

16   Express, very stable, low maintenance, user-friendly

17   interface, meets all business needs."

18   A.  Yes.

19   Q.  Okay.  If we go to line 21, Evolution out of Canada.

20   A.  I don't have page numbers, so --

21   Q.  We'll see what the document says once we get to line 21.

22   Lovely.  We'll do description of use.

23        "Evolution is a new policy administration system

24   that facilitates low, medium and high touch business."

25   A.  Yeah.

1    Q.  "It is a platform that will be used for all lines of

2    business.  Evolution supports the entire policy life cycle

3    and is designed for internal and external users, with

4    internationalization support.  We are taking a phased

5    approach to build all functionalities.  The whole

6    application construction will take multiple years.

7              "Evolution includes some major

8    components/applications such as E policy, Chubb folio

9    (online document delivery) work manager and so forth.

10   Evolution is due to be finished building out by the end of

11   2017 (shutting down renaissance)."

12             Have I read that right?

13   A.  Yes.  Can I point something?  It's personalized, right?

14   Q.  That's good.  And then go To strengths please.

15             "Contribution to growth equals 7.2 million (2.4

16   percent on 300 million GWP) cost savings 6 million annual,

17   two percent on 300 million GWP.

18             "Cost savings based on an estimated savings of

19   approximately 2 percent on expense ratio due to the

20   automation the system provides (82 percent of 85,000

21   renewals are 0 touch automatically renewed by the system)."

22             Did I read that right?

23   A.  Yes.

24   Q.  And let's go finally on this document to line 23.

25             And this is the policy management underwriting

1    system called EZER?

2    A.  Yes.

3    Q.  And if we go to the description of use.  "Underwriting

4    workstation and policy administration application that

5    supports complete end-to-end policy life cycle for all CCI

6    and CSI business in Europe."

7            Are you with me there?

8    A.  Yes.

9    Q.  Okay.  And I read that correctly?

10   A.  Yes.

11   Q.  Then let's go to Strengths.

12           "Single platform for all European commercial

13   policy management, validation services all for external

14   quoting via broker or other sites."

15           And I read that correctly?

16   A.  Yep.

17   Q.  So let me now bring your attention to another

18   Document 176, and 176 is a lot like what we just did, but --

19           Well, you will see -- I can do it more quickly,

20   but can I back up for a second, Mr. Pandey?

21   A.  Yes.

22   Q.  So in the ChEAR reports that we went through and all of

23   the applications that were identified as using Blaze Advisor

24   and then they were -- the version that was identified was

25   7.1.

666

1           What that document is telling us is that -- let me

2     ask you.  That document is telling us that at the point in

3     time of the report, the application that was using Blaze

4     Advisor was using Version 7.1 of Blaze Advisor?

5     A.  So it does two things.  One either it is using the 7.1,

6     or it is considering to use the 7.1 or investigating.  It

7     does two things.  Either system is already using 7.1 or they

8     considered -- investigated that that 7.1 might be the useful

9     one.

10          So it's two things, intent, did research and also

11    are we using.  So it take both of them.  This doesn't mean

12    that we are using it.

13    Q.  And it doesn't mean that you are not?

14    A.  It doesn't mean that -- but it's there on the frequency

15    eliminate, obsolete, retired, then probably not, but mostly

16    if it's there, then either you're using or researching it or

17    you talked about it.

18    Q.  And in the instance where you're not using, if there is

19    an instance where you are not using 7.1, then you'd be using

20    the prior version before 7.1?

21    A.  No.  Either we use the 7.1 or we hand code the rules.

22    Q.  I didn't catch --

23    A.  Or code our own rules by ourself, not through Blaze.

24    Q.  If Blaze is being used in the application --

25    A.  Yes.

1    Q.  -- you are using a version of Blaze Advisor.

2    A.  If you are already using it, then it will be either 7.1,

3    either we using it or considering it.

4    Q.  Thank you.

5    A.  Yes.

6    Q.  Right.  If the application has Blaze Advisor then it is

7    using 7.1 per those documents.

8    A.  Yeah, or they are planning to use it.  They are thinking

9    of using it.  It's research.

10   Q.  Fine.  Fine.  Let's go to, let's go to Exhibit 176.

11           And this is another ACE Chubb valuation like 175

12   that we just went through, and you will see this one is

13   dated December 2, 2015.  Agreed?

14   A.  Yeah.

15   Q.  All right.  And Mr. Martin on this email, and you are

16   one of the, you are one of the recipients of the email.

17   It's sent to you, correct?

18   A.  Yes.

19   Q.  And Mr. Martin is putting out some of the questions that

20   Duff & Phelps is looking into.

21   A.  Yes.

22   Q.  And, for example, number two on the email is,

23   "Assessment as to the strengths and weaknesses of the

24   technology as compared to the technology used by key

25   competitors."

1              Did I read that right?

2     A.  Yes.

3     Q.  And number three, "Assessment as to the relative weight

4     or contribution to the profitability, i.e., increased

5     revenue growth, increased customer retention, cost savings

6     and so forth, generated by each reporting unit through the

7     use of and reliance on the technology."

8              Did I read that right?

9     A.  Yes.

10    Q.  All right.  So now I'm going to go through the, the

11    attachment.  And if you want to double-check me, you are

12    free to do so.  Each of the columns that we looked at in the

13    earlier Duff & Phelps report are the same in this one.  This

14    one is a little later in time.

15             And this report has the column about estimate of

16    cost to purchase or develop filled in for some of the

17    applications.  So I'm just going to look at that column.

18    A.  Okay.

19    Q.  So let's go to, let's go to line 5 for CUW.  And you go

20    over to the column that is estimate of current cost to

21    purchase or develop.

22             There you go.  All right.

23             And so on Exhibit 176 for CUW, they report that

24    the estimate to -- current cost to purchase or develop is 5

25    to 10 million, correct?

1    A.  Yeah, they are saying the range of 5 somewhere between 5

2    to 10.

3    Q.  A range?

4    A.  It could be five.  It could be six, yeah.

5    Q.  And let's go to line 9.

6    A.  Yeah.

7    Q.  CSI Express, and there they have a range of 25 to 40

8    million, right?

9    A.  Yes.

10   Q.  And then let's go to line 10 for DecisionPoint.

11   A.  Yeah, and technically if I want to here --

12   Q.  I'm sorry?

13   A.  I will leave it out.  When they say 5 to 10, what they

14   are saying, if you have to start from scratch, do not

15   include anything existing, everything new from scratch,

16   that's how much it will cost you.

17   Q.  That's what I want.  Cost to purchase or develop 5 to

18   10.

19   A.  From scratch.

20   Q.  Let's go to line 10.

21   A.  Yeah.

22   Q.  DecisionPoint, and there the cost to purchase or develop

23   is between 5 and 10 million.  Right?

24   A.  Yes.

25   Q.  And then let's go to line 15 for CIS Claims, and there

1   the cost is 5 to 10 million.  Agreed?

2   A.  Yes.

3   Q.  And then let's go to line 19 for Evolution.  And -- I'm

4   sorry.  We don't have any more information for Evolution.

5            So we've covered the applications where Duff &

6   Phelps provided us more information in this exhibit.

7   A.  Yeah.

8   Q.  Let me change topics a bit.

9   A.  Yeah.

10  Q.  I just want to talk a moment about automated or

11  automatic renewal.

12  A.  Okay.

13  Q.  Okay.  Can we talk about that?  Automated renewals are

14  processed through CSI Express.

15  A.  Yes.  CSI Express is the application, and that

16  application after policy is sold, but before the policy

17  expires, you would renew the policy.  Like you start 90 days

18  before the policy expired and look for the policy that's

19  ready to renew, and you renew it.  Yes.

20  Q.  And with automated renewal through CSI Express, it is

21  possible to do what you in the industry called

22  straight-through processing, correct?

23  A.  No.  Straight-through processing is where customer

24  summons the quote and you issue the quote.  Like let's say I

25  call my agent.  They, and tell the information for quote,

1    and then do the quote right away, here is your premium.

2    That's your quote, processing while on the phone.  This is

3    talking about renewal.

4    Q.  Would you go to your 2018 deposition, please,

5    November 13, 2018.

6    A.  What was that?

7    Q.  And when you find the deposition, then go to page 47.

8    A.  11/22?

9    Q.  Page 47.  Again that's the page in the quadrant.

10   A.  Yeah.

11   Q.  Have you found page 47?

12   A.  47.  Page 47 of 1/22/19.

13   Q.  Page 47.  Have you found page 47?

14   A.  Yes.

15   Q.  Start at line 2.

16   A.  Yeah.

17   Q.  All right.  I asked you a question.  Do you have it with

18   you?  Do you see it.  Okay.  I just want you to be caught

19   up.  I asked you --

20            MS. GODESKY:  I think the witness is on 1/22/19.

21            THE WITNESS:  Yes.

22            MS. GODESKY:  And I think you are referring to

23   11/13.

24   BY MR. HINDERAKER:

25   Q.  Maybe you are in the different date.  I'm referring

KRISTINE MOUSSEAU, CRR-RPR
(612) 664-5106

 1    to --

 2    A.   1/22?

 3    Q.   November 13th, 2018.

 4    A.   November 13, 2018, page 47.

 5    Q.   Yeah.  There you go.  And 47.

 6              Thank you.

 7    A.   Yes.

 8    Q.   Okay.  Now we have page 47?

 9    A.   Yes.

10    Q.   All right.  Line 2, question from me.  "Okay.  So an

11    existing policy is up for renewal"?

12    A.   Yeah.

13    Q.   "That renewal will be processed through CSI Express?"

14              Your answer was, "Yes."

15    A.   Yes.

16    Q.   All right.  I go on.  "Correct."  Line 7, "And one of

17    the functions of CSI Express will be or is to identify those

18    policies up for renewal that can be automatically renewed

19    without human intervention, correct?"

20    A.   Yes.

21    Q.   Your answer?

22    A.   Yes.

23    Q.   "That's correct.  That's what we call straight-through

24    processing."

25    A.   No, it -- okay.  Can I correct it?

1    Q.  No, you can't.

2    A.  Okay.

3              THE COURT:  Hang on.  Let him finish.

4              THE WITNESS:  Okay.

5    BY MR. HINDERAKER:

6    Q.  First I'm going to ask you if this is what you swore to

7    under oath in 2018.

8    A.  Okay.

9    Q.  Okay.  Line 7, "And one of the functions of CSI Express

10   will be or is to identify those policies up for renewal that

11   can be automatically renewed without human intervention,

12   correct?

13             "Answer:  That's correct.  That's what we call

14   straight-through processing.  So renewal and CSI Express is

15   designed for straight-through processing, not 100 percent,

16   nobody can do it in industry as high as possible."

17   A.  Yeah.

18   Q.  Did you give me that answer to that testimony back then?

19   A.  Yes.  I was mistaken because it's automated renewal, not

20   a straight-through processing.  That's different.  Automated

21   renewal, I agree 100 percent.

22   Q.  Okay.  And my question, I intended my question to be

23   relative to automated renewal.  And as to that, you agree

24   100 percent.

25   A.  Automated renewal process only for three product.

1    That's what we automated, and that's, you are right, and

2    that's 80 plus percent that we are able to automate for

3    those three products out of 113 products.

4    Q.  I'm going to change topics now, Mr. Pandey?

5    A.  Yeah.

6    Q.  Okay.

7              THE COURT:  Mr. Hinderaker, let me interrupt one

8    quick second.  About how much longer do you think for

9    direct?

10             MR. HINDERAKER:  We're adverse.

11             THE COURT:  All right.

12             MR. HINDERAKER:  I am near the end.  It kind of

13   depends, but --

14             THE COURT:  Do you think 15 minutes will do it?

15             MR. HINDERAKER:  Well, I think 20 will do it.

16             THE COURT:  Okay.  Let's keep going.  Yep, we can

17   go.

18   BY MR. HINDERAKER:

19   Q.  In your notebook, Mr. Pandey, is P0282.

20   A.  282.

21   Q.  0282.

22   A.  Yes.

23   Q.  Okay.  Do you have it?

24   A.  Yes.

25   Q.  And this is an email of December 28, 2015, and it's to

1    you, among other people.  Agreed?

2    A.  Yes.

3    Q.  All right.  And this email is addressing the application

4    CUW called Commercial Underwriting Workstation.  Right?

5    A.  This email, this is Chubb underwriting entirety system.

6    You are starting from bottom.

7    Q.  Let's go to your January 2019 deposition.  January 22,

8    2019.  Go to page 126.

9    A.  Yep.  Page 26?

10   Q.  Page 126.

11   A.  126.  Yep.

12   Q.  Okay.  And I'm also going -- when we're on Exhibit 282,

13   I'm going to reference you to the email that's from yourself

14   to Peter Davis of December 28.

15   A.  Yes.

16   Q.  So let's start, let's start on page 127 at line 15.

17          So and then Peter Davis says to you above that,

18   "Please send me the CUW or other UW onboarding costs per

19   user."

20   A.  Yes.

21   Q.  Do you see that, and you answer, "Yes"?

22   A.  Yes.

23   Q.  "Question:  So when you're asking here for the CUW

24   that's Commercial Underwriting Workstation, correct?"

25          You answer, "Yeah."

1    A.  Yes.

2    Q.  "And then or other UW, does that mean other underwriting

3    workstation?

4             "Answer:  Yep.

5             "And you are asking for the onboarding cost per

6    user?

7             "Answer:  Yes."

8    A.  Yes.

9    Q.  "And the onboarding cost is a -- and we spoke before

10   lunch about an onboarding ACE legacy agents.

11            "Answer:  Not agents, underwriters;

12            "Question:  Underwriters.  Okay.

13            "Answer:  Yeah.

14            "So here you're talking about onboarding ACE

15   legacy underwriters and to the commercial underwriting

16   workstation, correct?

17            "Yeah.

18            "And then to support, to support ACE products" --

19   and your answer was yeah.  Your answer was, "To support, to

20   support ACE products."

21            And my question:  "Okay.

22            "And then on the first page we have there may be

23   soft costs for rolling out the CUW application to ACE

24   personnel.  So this is this a reference to, the reference to

25   ACE personnel is to underwriters?

1              "Answer:  Yeah, underwriting supporting the ACE

2       products.

3              "Question:  And giving them access to commercial

4       underwriting workstation?

5              "Yes."

6              Then I go on at page, just go down to page 29.

7       A.  Yeah.

8       Q.  Line 11.  "And so you have CUW used by Legacy Chubb

9       underwriters, and this is addressing integrating, addressing

10      giving Legacy ACE underwriters access to CUW, correct?

11             "Answer:  Yes, so what would be the cost?

12             "Question:  And what will be the cost --

13             "Yeah.

14             "-- if we do that."

15             Those are the questions and those were the answers

16      you gave at the time?

17      A.  Yeah.  I also talk about CUA versus CUW.  There was

18      confusion about CUA which is commercial underwriting

19      authority, and CUW.  So I am on page 9 on 126.

20             MR. HINDERAKER:  Your Honor, Mr. Pandey, I prefer

21      that Mr. Pandey you answer my questions.

22             THE WITNESS:  Okay.  Yes.

23             THE COURT:  Mr. Pandey, let me just let you

24      understand what the rule is.  When he's using your

25      deposition and he's asking you, did I ask that question and

```
 1    did you give that answer, you have to just answer that yes

 2    or no.

 3               THE WITNESS:  Okay.

 4               THE COURT:  If there's something that needs

 5    following up, that may or may not come later, but you need

 6    to answer his question.

 7               THE WITNESS:  Okay.

 8               And so yes.

 9    BY MR. HINDERAKER:

10    Q.  Okay.  Thank you.  Let's go to the next exhibit, 0283.

11    A.  Okay.

12    Q.  This is an email of January 12, 2016.

13    A.  Yes.

14    Q.  The subject.  Business Requirements Review.

15    A.  Yeah.

16    Q.  CUW-IM support ACE Processing Phase 1.  Did I read that

17    correctly?

18    A.  Yeah.

19    Q.  CUW is Commercial Underwriting Workstation, correct?

20    A.  Yeah.

21    Q.  IM is Inventory Management, correct?

22    A.  Yes.

23    Q.  And this is addressing phase 1.  Is that also correct?

24    A.  Yes.

25    Q.  All right.  And then with this document is the
```

679

1    attachment called Business Rules, and the attachment

2    references BRE business rules, and the document has business

3    rules requirement document attached to it.

4            Do you see that, the next page?

5    A.   Yes.

6    Q.   And the project name is CUW-IM Support for ACE

7    Processing-Phase 1.  Agreed?

8    A.   Yes.

9    Q.   And the document, the business requirements document, if

10   we go into it another page, you see Section 2 or review

11   called 2.1 Project Background?

12   A.   Yes.

13   Q.   And I'll read it and see if you agree.

14           "Project background.  The new Chubb plans to

15   leverage the efficiencies of CBs," that's Chubb

16   Corporations, right?

17   A.   Chubb.

18   Q.   Chubb?

19   A.   Yes.

20   Q.   "The efficiencies of Chubb's centralized processing

21   model and expand it to include ACE business."

22   A.   Yeah.

23   Q.   "A requirement of integrating ACE business into the

24   centralized processing centers is the use of Chubb's CUW

25   inventory management (CUW-IM) system.  Chubb supports

1    routing, assigning and managing the transactional work

2    submitted to the centralized processing centers using IM,"

3    referencing inventory management.

4            Agreed?

5    A.  Yes.

6    Q.  And then the same document goes on in Section 2.3 to

7    have Business Objectives and Success Criteria.

8            Let me read that and see if I get it right.

9            "Business objective.  Integrate specified ACE

10   processing into the Chubb centralized processing model."

11           Did I read that right?

12   A.  Yes.

13   Q.  And then, "Success Criteria.  Implement a CUW-IM

14   solution that facilitates the integration of ACE

15   processing."

16           Agreed?

17   A.  Yeah.

18   Q.  Let's go to Exhibit 284, and you will see that this is

19   forward in time, April 1, 2016, And the subject on this is

20   CUW ACE Phase 2.

21   A.  Yes.

22   Q.  BRDS.  Agreed?

23   A.  Yes.

24   Q.  As I understand it from you, Phase 2 is when there are

25   detailed requirements to get a refined estimate.

```
1    A.  That's correct.

2    Q.  Okay.  And when the refined -- and with the refined

3    estimate, then you will make a decision to go -- to go

4    forward or not go forward, right?

5    A.  Yes.

6    Q.  All right.  This document is, also has the project name

7    CUW-IM ACE Support Phase 2.  Agreed?

8    A.  Yes.

9    Q.  Let's go to Section 2.1, Background.

10   A.  Okay.

11   Q.  It's not quite the same description.  Let me read it.

12          "The new Chubb is" -- I'm sorry -- "The new Chubb

13   is leveraging the efficiencies of Legacy Chubb's centralized

14   processing model and has expanded it had to include ACE

15   business.  A requirement of integrating ACE business into

16   the centralized processing centers is the use of Chubb's CUW

17   inventory management (CUW-IM) system.

18          "Chubb supports routing, assigning and managing

19   the transactional work submitted to the centralized

20   processing centers using IM."

21          I've read that right?

22   A.  Yeah.

23   Q.  And then on Section 2.3, Business Objectives and Success

24   Criteria, Business Objective.  "Enable the centralized

25   processing centers to process transactional business
```

1   processed in a Legacy ACE system," right?

2   A.  Yeah.

3   Q.  "Success Criteria.  Enhancing the CUW-IM component to

4   allow underwriting to submit IM work orders and perform as

5   the UA role."

6           Did I read that right?

7   A.  Yeah.  Yes.

8   Q.  And UA means underwriting?

9   A.  Assistant.

10  Q.  Assistant.  Yes.  Thank you.  Yes, underwriting

11  assistant.

12          All right.  If you would go -- I want to go back

13  to something you said about these ChEAR reports when they

14  list out Blaze Advisor as the version, and I would like you

15  to go to your November 2018 deposition.  And if you would go

16  to page 130.

17  A.  What number?

18  Q.  I'm getting there.  So November 13, 2018.

19  A.  Yeah.

20  Q.  Page 130.

21  A.  Yes.

22  Q.  Yes, I'm trying to catch up with myself here.  All

23  right.  Got it.  I'm not finding what I want.  I'm sorry.

24          Could I have just a minute, Your Honor, to get a

25  reference?

1          THE COURT:  You bet.  Take your time.

2     BY MR. HINDERAKER:

3     Q.  All right.  Only a page off.  So same deposition.

4     A.  Yes.

5     Q.  But page 131.

6     A.  Yes.

7     Q.  Have you got that?

8     A.  Yes.

9     Q.  All right.  And I asked you -- and you were telling me

10    that in the ChEAR reports when it says leverage, about Blaze

11    Advisor Version 7.1, and it says leveraged, leveraged means

12    that Blaze Advisor is going to be used, correct?

13    A.  Yeah, it's going to be used.

14    Q.  Okay.  That's what I wanted to clarify.

15    A.  Yep.

16    Q.  Mr. Pandey, thank you for your time.

17          THE COURT:  All right.  Members of the jury, we're

18    going to take our afternoon break.  Let's be back in the

19    courtroom at 3:30.  I believe we'll be able to finish

20    Mr. Pandey this afternoon, and you'll all be on your way.

21    Thank you.

22          THE CLERK:  All rise for the jury.

23          (Recess taken at 3:16 p.m. till 3:31 p.m.)

24                     **IN OPEN COURT**

25                    **(JURY PRESENT)**

```
 1                THE COURT:  Ms. Godesky.

 2                MS. GODESKY:  Thank you.

 3                      DIRECT EXAMINATION

 4   BY MS. GODESKY:

 5   Q.  Good afternoon, Mr. Pandey.

 6   A.  Good afternoon.

 7   Q.  Could you put the microphone in front of your face so

 8   that everyone with hear you.

 9   A.  Good afternoon.

10   Q.  Thank you.  So I want to back a bit up and clarify.

11   When did you first join Chubb Group of Insurance Companies?

12   A.  I join Chubb in January 2014.

13   Q.  Okay.  So that was before the ACE acquisition?

14   A.  Yes.

15   Q.  And in the world of information technology or IT, what

16   does it mean to be an architect?

17   A.  Architect, job of architect, to design the blueprint.

18   Like for house you do the blueprint.  That's what we do, the

19   blueprint for applications, computer applications.

20   Q.  You are designing the computer applications?

21   A.  Yes.

22   Q.  How many people report to you?

23   A.  20.

24   Q.  And are your responsibilities limited to the

25   United States, or do you have responsibilities in other
```

1    countries too?

2    A.   United States and Canada, mostly.

3    Q.   And what advance degrees do you hold?

4    A.   I'm a Bachelor's in Engineering and also Master's in

5    Engineering.

6    Q.   And where did you obtain those degrees?

7    A.   From Indian Institute of Science, India.

8    Q.   Before the ACE acquisition when you were working as the

9    chief architect, if someone asked you what company you

10   worked for, what would you say?

11   A.   Chubb Insurance.

12   Q.   And how about now?  After the ACE acquisition, if you

13   bump into someone at work through professional activities

14   and they ask who you work for, what do you say?

15   A.   Chubb Insurance.

16   Q.   You were asked a lot of questions by Mr. Hinderaker

17   about corporate structure and when you became an employee of

18   certain entities.

19        Do you remember that?

20   A.   Yes.

21   Q.   Are those things that you think about a lot in your work

22   as an IT professional?

23   A.   So I'm the computer geek.  So I learn, I know Chubb.

24   That's what I work for.  The legal language, legal wordings,

25   no, that's not my area of strength.

1   Q.  Had you ever heard of the Chubb & Son division of

2   Federal before this litigation was filed?

3   A.  Say again?

4   Q.  Had you ever heard of the Chubb & Son division of

5   Federal before this litigation?

6   A.  No.  Never.

7   Q.  Okay.  So before the company was acquired by ACE, I want

8   to talk about what the IT infrastructure looks like.  How

9   many IT professionals did you have working at Chubb?

10   A.  Before the merger, it was 1100 plus.

11   Q.  How many of those people were software engineers or

12   computer developers?

13   A.  700 plus.

14   Q.  And how about now?  How many IT professionals do you

15   have at the combined ACE/Chubb entity?

16   A.  4500 plus.

17   Q.  Does that include outside consultants?

18   A.  Yes.  That's correct.

19   Q.  Okay.  Now the jury's been hearing a lot about computer

20   applications, and I want to just briefly break them down a

21   little bit and have you talk through how this works.

22          So if we could put on the screen defendants'

23   Demonstrative 2, and there's a packet in your binder as

24   well, Mr. Pandey.  You can see it on the screen.

25          What do these three boxes represent?

1    A.  So this is a computer application which have three

2    parts:  User interface, business logic and data storage.

3    Q.  So these are the three pieces of a computer application?

4    A.  That's correct.

5    Q.  Okay.  Stay with the mic.

6    A.  Yes.

7    Q.  Thank you.  Okay.  Let's go to defendants' Demonstrative

8    3.  Is this a visual depiction of a computer application?

9    A.  Yes, it is.

10   Q.  What do the small boxes throughout the demonstrative

11   represent?

12   A.  These are the different second level components.  Under

13   the business logic, you have multiple components and

14   technologies.  Same thing you have on data technology side.

15   You have multiple technologies, multiple component and same

16   thing as user interface.

17   Q.  And when you are talking about components and

18   technology.  Are those software products?

19   A.  They are software components, software products.

20   Q.  Around the time of the ACE acquisition in 2016,

21   approximately how many different computer applications were

22   being used at Chubb?

23   A.  A thousand -- computer application?  1500 plus.

24   Q.  And how many different software products were in all of

25   those applications?

1    A.  1000 plus.

2    Q.  So now I want to focus on a specific type of software

3    product, the rules based software products.  Okay?

4    A.  Yep.

5    Q.  And if we can go to defendants' Demonstrative 4.  Are

6    all of these software products on defendants' Demonstrative

7    4 rules programs?

8    A.  Yes.  That's correct.

9    Q.  Have all of these programs been available in one form or

10   another since the mid 2000s?

11   A.  Yes.

12   Q.  Which of these programs do you personally have

13   experience using?

14   A.  FICO, IBM Operational Decision Manager, Drools, Pega and

15   Red Hat Decision Manager.

16   Q.  So that's all of them, other than the SAS program,

17   right?

18   A.  Yes.

19   Q.  What's your understanding of the functional difference,

20   if any, between Blaze, FICO's program, and the IBM product,

21   IBM Operational Decision Manager?

22   A.  Yeah.  Operational Decision Manager from IBM, and FICO

23   Blaze, no difference for us.  No difference, functionally.

24   Q.  Okay.  How about Blaze's, the product Blaze and Drools?

25   Is there a functional difference in your mind between those

1    two products?

2    A.  No, for what we use for.

3    Q.  You mean in terms of how you use it at Chubb?

4    A.  Yeah.  How we use it, yeah.

5    Q.  Do you have to use a software program to run rules in a

6    computer application, or can software engineers write code

7    for the rules themselves?

8    A.  The software engineers and software developers, they can

9    code by themselves.  In fact majority, 99 percent of the

10   cases, all software developers, they code the rule by

11   themselves.

12   Q.  So in 99 percent of the applications at Chubb, the

13   developers are coding their own rules?

14   A.  Yes.

15   Q.  And was that true in the period before the ACE

16   acquisition as well?

17   A.  That's correct.  Yes.

18   Q.  Okay.  I want to put up a list of some computer

19   applications as defendants' Demonstrative 5, if we could,

20   Vanessa.  Thank you.

21        Is it your understanding that Blaze was used in

22   all 13 applications shown on the screen, Mr. Pandey?

23   A.  Yes.

24   Q.  Did the number of applications at Chubb using Blaze

25   change after the acquisition by ACE?

1    A.  Not at all.  Absolutely not.

2    Q.  Now, are all 13 of these applications the same size, or

3    do they vary?

4    A.  No.  They vary a lot.  CSI Express is a big one, and

5    others like TAPS and Premium Booking, these are very small.

6    Q.  Okay.  Is CSI Express the biggest application on this

7    chart?

8    A.  Yes.

9    Q.  Okay.  And then if we could go to Defendants

10   Demonstrative 6, please.  So, Mr. Pandey, on defendants'

11   Demonstrative 6, there are 1, 2, 3, 4, 5 different

12   applications highlighted in gold.  What's the significance

13   of that?

14   A.  They are after policies sold, this is the -- these are

15   the application.  Their function only after the policy is

16   sold.  They are not part of the policy selling process.

17   Q.  So these applications don't have anything to do with the

18   policy sale process?

19   A.  That's correct.

20   Q.  Now, there's another computer application that's being

21   discussed in this case called Claims Connect.  Are you

22   familiar?  Have you heard of that application?

23   A.  Yes, I am familiar with it.

24   Q.  Has Claims Connect ever used Blaze?

25   A.  No.

1    Q.  Was Blaze ever used in any application used to process

2    insurance claims at Chubb?

3    A.  No.

4    Q.  And there's some discussion of another application

5    called Small Commercial.  Are you familiar with that

6    application?

7    A.  Yes.

8    Q.  Was Blaze ever used in the Small Commercial application?

9    A.  No.  Small Commercial uses a product called Duck Creek,

10   which is a very powerful platform, that does enter in, and

11   Claim Correct also uses the Duck Creek as a platform.

12   Q.  Duck Creek is another software program?

13   A.  Yes.

14   Q.  Do you remember Mr. Hinderaker asking you some questions

15   about the CUW-IM application?

16   A.  Yes.

17   Q.  Okay.  And he showed you some emails, Mr. Pandey, do you

18   remember that talked about a project analysis and a Phase 1

19   and then a Phase 2?

20   A.  Yeah, that's -- you do the high level design, and then

21   you do the material design, and that's how you come up with

22   an estimate.  And based upon that estimate, then we decide

23   if this project worth it or not.  Then we put into the

24   funding column, and then we get the funding and only when

25   they approve, then the project starts.

1          So that's the second phase, where you go to the

2     detail of the design for any future, any product.

3     Q.  Does the fact that a project analysis has progressed to

4     Phase 2 mean that the project is happening?

5     A.  No, not at all.

6     Q.  To your knowledge, Mr. Pandey, did ACE underwriters ever

7     get access to CUW-IM?

8     A.  Not to my knowledge, no.

9     Q.  Do you understand generally that there's a dispute in

10    this lawsuit as to whether use of the Blaze software

11    expanded at Chubb after the ACE acquisition?  Do you

12    generally get that?

13    A.  Yes.

14    Q.  Yeah.  Okay.  Did Chubb put Blaze into more computer

15    applications after the ACE acquisition, or was Blaze limited

16    to the existing applications that had always used the

17    software?

18    A.  It was limited to the existing software.  We never

19    expanded to any new applications of software.

20    Q.  The jury has heard testimony from a Mr. Schreiber at

21    FICO suggesting in his deposition that Chubb might have

22    tried after the acquisition to wrap multiple applications

23    together and say it was just one application.

24          Did Chubb ever plan on doing that?

25    A.  Never, not at all.  In fact, if you see the list of 13,

1    which you referred earlier, CSI Express application have

2    multiple competents.  We listed those components also, like

3    your premium booking.

4            All those components we listed as part of.  It is

5    a double counting, different countings.

6    Q.  So are you saying premium booking is part of CSI

7    Express?

8    A.  Yeah.  And automated renewal process and DecisionPoint,

9    premium booking, all of it, their profitability indicator,

10   PI, that's part of CSI Express.  That's one of the

11   component.

12   Q.  Okay.  So CSI Express was one of the applications on

13   that Duff & Phelps spreadsheet that Mr. Hinderaker was

14   reading during your testimony.

15           Do you remember that?

16   A.  Yes.

17   Q.  Okay.  So I want to talk a little bit more about CSI

18   Express.  At a high level what was CSI Express used for?

19   A.  CSI Express is a policy system.  That's one which does

20   the rate and creates the code that is used that

21   creates multiple code, then goes to customer.  Then they can

22   select which one they like.  Then once they like it, they

23   issue the policy.

24           After the policy you can, you can cancel it or you

25   can reinstate it or you can renew it.  So policy admin

1    system for code A, code bind issue, cancellation, renewal.

2    At least reinstate the policy if somebody forgot to pay the

3    bill.

4    Q.  So it's called a policy administration system?

5    A.  Yes.

6    Q.  Okay.  Let's go to defendants' Demonstrative 7.  So you

7    said earlier as an architect, you do blueprints for

8    applications.  Is that sort of what we're looking at here?

9    A.  Yeah.  At high level, yes.

10   Q.  How many different software components are there in CSI

11   Express?

12   A.  20 plus.

13   Q.  Okay.  Now I want to focus for a minute on the parts of

14   CSI Express that did not use Blaze.  So if we can go to

15   defendants' Demonstrative 8.

16          So we have blown up on the screen this ratings

17   box, and it says Duck Creek.

18   A.  Yeah.

19   Q.  What does this signify?

20   A.  So CSI Express, the most critical part in a policy

21   administration system is rating.  That's the one that

22   creates the code.  You say that for this coverage for this

23   limit, here the premium.  For this car or house or car

24   here's your limit.

25          It creates the whole rating process.  That's a

1    brand written but for policy administration system.  It's

2    very complex.

3    Q.  As the chief architect at Chubb, how would you

4    characterize the importance of the ratings piece and Duck

5    Creek and CSI Express?

6    A.  This is my mind the most critical part of component for

7    us, for any insurance company.

8    Q.  Does the ratings component of CSI Express use business

9    rules?

10   A.  Rating component, yes, it does.

11   Q.  How are those rules processed?

12   A.  Duck Creek itself had the -- we can code the rules in

13   Duck Creek using the Duck Creek manuscript and that you have

14   a lot of rules, essentially.  And that coding was done

15   directly into the Duck Creek.

16   Q.  Does that have anything to do with Blaze?

17   A.  Not at all.

18   Q.  Okay.  Let's look at defendants' Demonstrative 9.  And

19   here we've blown up two boxes for document storage and

20   document generation.

21   A.  Yes.

22   Q.  Can you briefly explain to the jury what that part of

23   CSI Express does?

24   A.  So after the, we do the rating in Duck Creek, we create

25   multiple code, and we create the whole folder and say that

1     this is how your policy would look like.  And once customer

2     says yes, I like this policy, I like this price with this

3     limit and this deductible, we, we issue the policy, and that

4     policy becomes a binder.

5          You get a folder which have multiple forms which

6     state for all the inclusion and exclusion, everything, and

7     we create the PDF.  We do the white marking on it.  We store

8     it, and it becomes a legal contract document between

9     insurance company and customers, policyholders.

10         This is what you see every day.  This is like

11    approval of insurance you see.  These are the documents that

12    gets in our platform.  Also this is the second most critical

13    platform I have, which is the expression and policy view,

14    which is policy tools, and expression which can oversee it.

15    Q.  Okay.  So does this part of the application that

16    generates the documents have anything to do with Blaze?

17    A.  No, not at all.

18    Q.  And if we can go to defendants' Demonstrative 10 I see

19    we have four gold squares on this one, Mr. Pandey.

20    A.  Yeah.

21    Q.  What do those four squares signify?

22    A.  So these are the component as part of CSI Express, these

23    are the components which use the Blaze idea to code the

24    rules.

25    Q.  So the Blaze software was used in those four software

1   components?

2   A.  That's correct.  Yes.

3   Q.  Did all of the policies that were processed through CSI

4   Express touch Blaze in some way?

5   A.  Not all of it because we implement this capability like

6   automated renewal.

7   Q.  Slow down.

8   A.  We implemented Blaze best capability for automated

9   renewal process, profitability indicator, premium booking,

10  and this is again only for 3, 3 products out of 113 product,

11  as you saw earlier in the exhibit.

12  Q.  Mr. Pandey, the jury has heard Blaze referred to as the

13  brain or the central nervous system of a computer

14  application.

15          Do you agree with that characterization for CSI

16  Express?

17  A.  Absolutely not.

18  Q.  Why not?

19  A.  Because the brain is written.  That's what decide what

20  your premium will be.  Brand brain is the one when we

21  compile all the forms, say for Minneapolis these are the

22  forms.  For the New York, if you have ten leads, these are

23  the forms.  This is the file, these are the forms.

24          So there's all the document is is in forms and

25  rules.  That's what they do, but the most critical part of

1    the rating itself, how to come up with the price, how to

2    say, okay, here's my customer, you have house, you have car,

3    what should be your premium.  You are to literally like have

4    lot of rules and logic to come up with that number.  It's a,

5    that's the brain of the CSI Express.

6    Q.  And if we can go to the next slide, which I think is

7    back to defendants' Demonstrative 5, this is our list of

8    applications.  Since we have the snowstorm coming, I'm not

9    going to go through all 13 of these applications like we

10   just did CSI Express and instead I'll ask Mr. Pandey, was

11   Blaze the only component of any of these applications?

12   A.  Not at all.  Absolutely not.

13   Q.  Could all of these applications have been developed

14   without Blaze?

15   A.  That's correct.  And that's what we have for a lot of

16   applications.  For majority of applications, we quoted all

17   rule but also not in Blaze.

18   Q.  Now the jury has heard that Blaze could process rules in

19   sub milliseconds.  Was that your experience using Blaze at

20   Chubb.

21   A.  No.  That's what the promise is, but it didn't work for

22   us, and we gave the feedback.  It was slow and no, because

23   we all experience it different.

24   Q.  Some FICO witnesses have testified that Blaze is unique

25   because it allows business people to write rules and rules

 1      don't have to be written by IT professionals like yourself.

 2              In your experience was that true at Chubb?

 3      A.  No.  In fact that's why we barred the two Blaze to start

 4      with, but with the promise that Blaze is a business person.

 5      You just write in plain English, and you can change the

 6      rule.

 7              MR. HINDERAKER:  Objection, Your Honor.  Excuse

 8      me.  Your Honor, objection.  Lack of foundation.  He wasn't

 9      at Chubb till 2014.

10              THE COURT:  Sustained.  You have to lay

11      foundation.

12              MS. GODESKY:  Sure.

13      BY MS. GODESKY:

14      Q.  Mr. Pandey, you joined Chubb as the chief architect in

15      2014; is that correct?

16      A.  That's correct.

17      Q.  And so as part of your responsibilities between 2014 and

18      2016 as the chief architect --

19      A.  Yeah.

20      Q.  -- did you gain a familiarity with the process of

21      writing rules into the Blaze software?

22      A.  That's correct.  I have gained familiarity, and we had a

23      dedicated auditor from my team who was wholesale job

24      full-time job was just to support the rule and make it work.

25      Q.  So you had a full-time member of your team working with

```
 1      Blaze?

 2      A.  That's correct.

 3      Q.  What was his name?

 4      A.  Henry Mirolyuz.

 5      Q.  And how frequently did you communicate with Henry over

 6      the years about the process of writing rules into the Blaze

 7      software at Chubb?

 8      A.  Almost every day.

 9      Q.  So returning to my question:  In your experience,

10      Mr. Pandey, was it true that at Chubb you could use business

11      people to write the rules instead of relying on IT

12      professionals?

13      A.  Say again?

14      Q.  I just, I'm returning back to my question.

15      A.  Okay.

16      Q.  At Chubb --

17      A.  Yeah.

18      Q.  -- were you able to have business people write the rules

19      instead of the IT professionals?

20      A.  No, we could not.  We tried.  We go to business.

21      Business tried.  Still it didn't work.  Developers had to

22      jump in and fix it.  In fact it break so many times that

23      developers had to go and fix that.  It created more problem

24      for us.  Then business gave up and said, okay, you coder,

25      you developer, you computer geek, you fix it.  I am not
```

1    going to.  Our team, technical, that you go and quote it, we

2    couldn't do it.  We couldn't do it.

3    Q.  For the Chubb software engineers who used Blaze, was it

4    a difficult or easy program to use?

5    A.  Blaze --

6              MR. HINDERAKER:  Objection.  Foundation.

7              THE COURT:  Overruled.

8              THE WITNESS:  So Blaze is a propriety language.

9    It's not like every developer can start quoting Blaze.  So

10   you have to have the specific, like Henry, to do the quote

11   for Blaze which creates problems for us, yes.

12   BY MS. GODESKY:

13   Q.  Now obviously Chubb did use Blaze for many years.  Were

14   there some positive aspects of using Blaze?

15   A.  Yes.  We were able to externalize and say that here are

16   the three rules expert in the company.  They could do the

17   quoting, but the problem became for us that we didn't have

18   that many people just doing the rules.

19            At the same time in the systemwide when you

20   externalize the rule, your application become very.  Here

21   let's say you have C drive on your laptop.  If you click a

22   Word document on C drive, it will be fast, but if you share

23   drive, you click on that, it is slow because it is remote.

24            So when you take out, you think that you are

25   getting the benefit, but it makes computer slower.  So

1    that's the issue we have.

2    Q.  The jury has heard testimony from a Mr. Sean Baseman who

3    works at FICO.  Did you ever interact with him?

4    A.  No, not that I recall.

5    Q.  They also heard testimony from a Mr. Benjamin Baer.  Did

6    you ever interact with him?

7    A.  No.  I don't recall.

8    Q.  How about Mike Sawyer and Russ Schreiber, did you ever

9    communicate with them?

10   A.  Yes.  Yes.  Yes.  Sorry.  Those ones definitely, yes.

11   Q.  Okay.  Briefly I want to talk about an application at

12   Chubb that did not use Blaze.  So if we could go to

13   defendants' Demonstrative 21.

14           And, Mr. Pandey, what do all of the yellow dots on

15   this slide represent?

16   A.  So these are the representative of 13 applications which

17   use Blaze.  And the total 1500 Chubb applications are total.

18   1300 were Blaze.

19   Q.  Okay.  Stay near your microphone so everyone can hear

20   you.

21   A.  Okay.

22   Q.  I'm just going to ask you for one example.  Can you talk

23   about the Custom Mark application.  What's that?

24   A.  Custom Mark is the policy administration system like CSI

25   Express.  It's bigger than CSI Express.  It does the rate,

1    quote, bind, issue, cancel, rewrite, reinstate, all life

2    cycle of policies.

3    Q.  What type of -- what part of the business issues Custom

4    Mark policies or uses the Custom Mark application?

5    A.  This is the commercial insurance for middle market.

6    Q.  One more time?

7    A.  Commercial insurance for middle market.

8    Q.  Thank you.  Did this application ever include Blaze?

9    A.  Not at all.  Absolutely not.

10   Q.  And is it still in use today?

11   A.  Yes.

12   Q.  Does it include business rules?

13   A.  A lot.  Tons.

14   Q.  And how are those rules in the application if the

15   application doesn't use Blaze?

16   A.  Say it again?

17   Q.  How are those rules in the application if Custom Mark

18   does not use Blaze?

19   A.  We quote it.  That's part of rules.  We quote in our

20   language, in COBALT, in Java.  These are the computer

21   languages, which every developer knows.  So we quote all --

22   we pay for it actually to quote their rules in their native

23   language that they're familiar with.

24            We could have COBALT, Java, any of the language.

25   Every language, every computer technology, will have a

1   developer to write the rules.

2   Q.  So the developers are coding the rules into Custom Mark?

3   A.  That's correct.

4   Q.  How many of the approximately 1500 software applications

5   that were used at Chubb before the acquisition used rules in

6   some way?

7   A.  All of them.

8   Q.  Okay.  Now I want to quickly take a look at

9   Exhibit P60 -- P960.  I apologize.  This is the -- I want to

10  look at an excerpt from the 2018 Chubb annual report.

11  A.  Okay.

12  Q.  This is an excerpt that the jury saw during FICO's

13  opening statement on page 15.

14          Let me know when you are with me, Mr. Pandey.  Do

15  you see it on the screen?

16  A.  Yes, I can see it.

17  Q.  Okay.  So the excerpt says, "In 2018 we continued to

18  make significant progress with our small commercial business

19  initiative globally.  Starting from a relatively small base

20  in '17, we produced strong double digit growth throughout

21  the year achieving an annual run rate of over 1 billion in

22  premium and project this business to exceed several billion

23  dollars over time."

24          And then it says, "In the US this is a highly

25  automated digital experience where 80 percent or more of the

1    submissions are not touched by humans after they leave the

2    agent's office.  Technology is a competitive weapon."

3              Do you see that?

4    A.  Yes.

5    Q.  So there's a reference here, Mr. Pandey, to small

6    commercial businesses.  What does that refer to?

7    A.  It's a small commercial business, a big business like

8    you have commercial specialty insurance which has for system

9    like CSI Express.  Similarly small business, small

10   commercial business, it is a totally different division of

11   Chubb, which does the insurance for mom and pop shops, say

12   flower shop, your plumber, your electrician, 2, 3, 4, 5

13   people company.

14             They use this system because they want quick.

15   They want fast.  They want to go run on the weekends and

16   nights because that's when they get their time.  So this is

17   a system straight-through, fast and always available for our

18   small commercial customers.

19   Q.  And is this reference here, Mr. Pandey, to the fact that

20   80 percent or more of the submissions are not touched by

21   humans, does that have anything to do with applications that

22   use Blaze?

23   A.  No.  This is Duck Creek.

24             MR. HINDERAKER:  Objection, Your Honor.  There's

25   no foundation for Mr. Pandey.

```
1              THE COURT:  Overruled.

2     BY MS. GODESKY:

3     Q.  So does this statement have anything to do with

4     applications that use Blaze?

5     A.  No.  No.  This is the Duck Creek application.  Duck

6     Creek is the one which I was talking about.  This is very

7     odd platform which is start to finish, writing, policy,

8     everything, forms, rate, underwriting experience,

9     everything.

10    Q.  Mr. Pandey, you started your testimony with

11    Mr. Hinderaker by confirming that Blaze has been removed

12    from all of the applications at Chubb, correct?

13    A.  That's yes.

14    Q.  What programs have replaced Blaze in those applications?

15    A.  So Red Hat Decision Manager and the new one Drools.

16    Q.  Drools and Red Hat Decision Manager?

17    A.  Yes.

18    Q.  Okay.  Have you received any complaints as the chief

19    architect at Chubb about the switch from Blaze to those

20    other rules software programs?

21    A.  Absolutely not.

22    Q.  And as the chief architect at Chubb, have you noticed

23    any problems with the efficient functioning of your IT

24    systems?

25    A.  No.
```

PANDEY - RECROSS

```
 1    Q.  As the chief architect at Chubb, are you aware of any
 2    complaints about the rules not being processed fast enough
 3    without Blaze?
 4    A.  No.
 5              MS. GODESKY:  Okay.  Thank you, Mr. Pandey.  No
 6    further questions from me.
 7              THE COURT:  Mr. Hinderaker, further
 8    cross-examination?
 9              MR. HINDERAKER:  I do have some, yes.
10                     RECROSS EXAMINATION
11    BY MR. HINDERAKER:
12    Q.  Did you write the annual report of 2018 for Chubb
13    Limited?
14    A.  No, I did not.
15    Q.  And let me just ask you this question about what's said
16    there.
17              Separate from what particular technology the
18    author may have had in mind, do you agree with the statement
19    in the 2018 Chubb Limited annual report that technology is a
20    competitive weapon?  Yes or no.
21    A.  Yes.
22    Q.  Now, if I can find my notes.
23              Thank you.  I need all the help I can get.
24              So, Mr. Pandey, I am not too interested in what
25    applications you have that don't use Blaze Advisor.  I am
```

1    interested in how Blaze Advisor was used, so I'm going to

2    try to focus in on that.

3    A.   Okay.

4    Q.   Can we agree that on the -- in the applications that do

5    use Blaze Advisor that Blaze Advisor, when it's used in

6    larger software applications, helps those applications make

7    automated decisions?

8    A.   Yes.

9    Q.   When you, when you -- in your role as chief architect,

10   have you always -- you've always been on the technology

11   side?

12   A.   Yes.

13   Q.   So just for clarity in terms of your description of the

14   process of selling insurance, you have never been an

15   underwriter?

16   A.   I have not been an underwriter, but I work in insurance

17   specially for 27 years, so yes.

18   Q.   Yes, your knowledge is the knowledge that comes from

19   being in the insurance industry?

20   A.   Yeah, I work with business data.

21   Q.   Understood.  And your specialty is the technology side?

22   A.   Yeah, I'm computer geek.

23   Q.   Yeah.  So now -- you showed us, or we saw, we saw a

24   graphic of a bunch of dots of 1500 applications or, yeah, I

25   guess 1500 applications.

```
 1              Do you know the business function of those 1500
 2    applications?
 3    A.  I don't memorize, not in memory, but if you give me the
 4    application and give me the time, I could tell you and I
 5    could teach you.
 6    Q.  Of course.  You're not suggesting those 1500
 7    applications are directly corrected to the generation of
 8    revenue, are you?
 9    A.  Not all of them, but they support one way or another,
10    yes.
11    Q.  So let me -- on the first binder that you had, there was
12    an Exhibit 156.  And you want to -- we will just pull that
13    out for a moment.  That's the January 28, 2016, ChEAR
14    application and technology stack.  Agreed?
15    A.  At 156.
16    Q.  At 156.
17    A.  Yes.
18    Q.  We're now in the binder that I just gave you, go to the
19    Exhibit 576.
20    A.  576.
21    Q.  It's one of the last exhibits in the notebook that I
22    just gave you.  Did I say -- I may have -- yeah, 576.  I
23    said it right.
24              Can I help you?
25    A.  576, I am here.
```

1    Q.  576.

2    A.  Yeah.

3    Q.  All right.  Okay.  Good.  Now let's go to that.  And

4    this is a file that is sorted in 576.

5    A.  Yes.

6    Q.  It is sorted by application.  You see in column B is the

7    name of many applications.

8    A.  Yeah.

9    Q.  Okay.  Would you go to the back of this document.

10   A.  Yeah.

11   Q.  And tell me how many rows or how many applications are

12   recorded in the ChEAR report.  Just go to the last row, is

13   it number 805?

14   A.  Yeah, this is 805.

15   Q.  Yeah.  And if you notice that the first row is the title

16   header.

17   A.  Mm-hmm.

18   Q.  In fact, there happens to be 804 applications listed on

19   this ChEAR report.

20           Blaze Advisor was used in the commercial, in Chubb

21   specialty insurance, correct?

22   A.  Mm-hmm.

23   Q.  And we can sort this document by CSI.

24   A.  Yes.

25   Q.  Why don't you go to Row 567.

1    A.  567.  Okay.

2    Q.  And there you see, do you not, that it's starting to

3    list those applications that are part of the Chubb specialty

4    insurance business unit.

5    A.  Yeah.

6    Q.  Correct?

7    A.  Yep.

8    Q.  The 1500 applications that you mentioned were part of

9    all of the business units of the Chubb Corporation, right?

10   A.  All the business unit, all corporation, yeah.

11   Q.  Whole big thing.

12   A.  Yes.

13   Q.  Let's just look at specialty insurance.  And so on

14   specialty insurance, that goes from Row 567 --

15   A.  Yeah.

16   Q.  -- to Row 629.  Do you see that?

17   A.  Yep.

18   Q.  So my -- you're a better mathematician than I am, but I

19   think I have this right.  If I go from Rows 567 to 629, I

20   have a total of 62 rows.  That means I have a total of 62

21   applications in this ChEAR report for Chubb specialty

22   insurance.

23              Agreed?

24   A.  62 rows for others application are application

25   components.

1    Q.  Good point.  Not 1500.  62?

2    A.  Well, this is for CSI.

3    Q.  Just exactly.  Just CSI.  Now, Mr. Pandey, that was,

4    that was my question.

5    A.  Okay.

6    Q.  When we looked at the -- when we looked at the ACE

7    valuations, Exhibit 176, in terms of the technologies that

8    were evaluated by Duff & Phelps in that document -- are you

9    back to that document?

10   A.  Which page is it?

11   Q.  Well, 176.

12   A.  176, yes.

13   Q.  And Duff & Phelps reports in its analysis in 176 on 23

14   different applications, correct?

15   A.  Yeah.

16   Q.  And of those 23, CUW, CSI Express, DecisionPoint, CSI

17   Claims and Evolution and EZER as we saw in your earlier

18   examination, 1, 2, 3, 4, 5, 6 of them use Blaze Advisor.

19   A.  Okay.  Yes.

20   Q.  Now, let me turn to another topic.  And I'd like to

21   direct your attention to Exhibit P0510.

22   A.  P05 --

23   Q.  10?

24   A.  10.  Okay.

25   Q.  And this is an email of April 14, 2016, to Henry

1    Mirolyuz.  And it is the technology due diligence?

2    A.  Yes.

3    Q.  And then below that in the other email, April 14, 2016,

4    Hamish Tonkin to yourself, right?  Agreed?

5    A.  Which page?

6    Q.  First page.  I'm sorry.  First page on the bottom to

7    Hamish Tonkin, Thursday April 14, 2016, to --

8    A.  He sent to a lot of people here.  I was one of them,

9    yes.

10   Q.  You were one of them.  You were the first one.

11   A.  Yes.  You are right.

12   Q.  And the attachment is the technology tool, technology

13   due diligence and recommendations.

14   A.  You are right, yes.

15   Q.  So let me turn to that, the Exhibit 511, which is the

16   next exhibit.  Do you see the cover page cross divisional

17   TDA, technology tool due diligence and recommendations?

18   A.  Yes.

19   Q.  All right.  Go to slide seven.

20   A.  Yes.

21   Q.  You see in this document at that time, if we could blow

22   it up a little bit maybe, it's the Technology Tool Summary

23   Evaluation For Rules Engine?

24   A.  Yes.

25   Q.  Do you see WIP in red.  It is still a work-in-progress?

1    A.  It's a doc yes.

2    Q.  We're talking about its point in time in April.

3    A.  Yeah.

4    Q.  And what was said in April, I'll read it and you agree

5    with me if I've got it right.  Blaze -- this is a comparison

6    of Blaze to ODM.  Agreed?

7    A.  Yes.  We call it spider analysis, so you see spider

8    there.

9    Q.  Yep.  And slide seven says, "Blaze is functionally rich

10   and is built in modules for integration.  It is used widely

11   in Legacy Chubb."

12   A.  Yes.

13   Q.  It goes on to say, "ODM can perform the basic rule

14   engine tasks, but requires custom development in larger

15   numbers of cases.  Legacy ACE has only one application in

16   ODM."

17            Did I read that right?

18   A.  Yes.

19   Q.  And in this table, if you just look at the functional

20   rating --

21   A.  Yeah.

22   Q.  -- Blaze Advisor is rated at .95 and the functional

23   rating for ODM is .54.  That's what's reported, correct?

24   A.  Yeah.

25   Q.  At least in this analysis at this time the author saw

1    that there was a difference between Blaze Advisor and ODM.

2    A.   Yeah.  They are very close.  You see the total number --

3    Q.   Mr. Pandey?

4    A.   Okay.

5    Q.   My question is, does this report that there is a

6    difference between Blaze Advisor and ODM?

7    A.   No.  They are very close.  See the last row.  That's

8    what I'm saying.  You have to see the context.

9    Q.   All right.  I'll ask you about that too.

10   A.   Yeah.

11   Q.   Let me first ask you about the qualitative conclusion.

12   A.   Yeah.

13   Q.   "Blaze Advisor is functionally rich and has built in

14   modules.  ODM can perform the basic rules engine tasks but

15   requires custom development."

16            That's what the document says, right?

17   A.   Yeah.

18   Q.   And now let me go to the total-total down at the bottom.

19   ODM is rated at 1.92.  Blaze Advisor is rated at 2.14.

20   Agreed?

21   A.   Yes.

22   Q.   Thank you.  Let's go to page 8.  This document at this

23   time has recommendation.  "Based on the technology

24   assessment, Blaze is the preferred choice for rules engine."

25            That's what the document says, correct?

```
 1    A.  Till that time.

 2    Q.  Yes.  At that time, is that what the document says?

 3    A.  Yes.

 4    Q.  Thank you.  You don't have to quarrel with me,

 5    Mr. Pandey.

 6              THE COURT:  Okay.  Hold on.  Hold on.

 7              Mr. Pandey, this is cross-examination, so he gets

 8    to ask you questions that you just have to answer yes or no

 9    if they can be answered yes or no.  Just respond to his

10    question.

11              Don't elaborate.

12              THE WITNESS:  Thank you.  Yes.

13    BY MR. HINDERAKER:

14    Q.  Let's go to Exhibit 520, Mr. Pandey.

15    A.  520.

16    Q.  Yeah, 0520.

17    A.  Okay.

18    Q.  Let me know when you are there.

19    A.  Yes.

20    Q.  Okay.  And I do have some questions about that, but I

21    sort of want to just maybe state the obvious.

22              But with respect to the TDA that we just looked at

23    in April --

24    A.  Yes.

25    Q.  -- the comparison and the analysis for rules engine
```

1    alternatives to Blaze Advisor was ODM.

2    A.  Yes.  IBM.

3    Q.  IBM ODM.  So let me just be clear.  That document did

4    not assess Red Hat Decision Manager, did not assess SAS, did

5    not assess Pega, and that document did not address Drools.

6           Is that a yes or a no?

7    A.  They are by gone, but I would say yes.

8    Q.  Thank you.  Thank you.  Now let's go to 520.  I'm sorry.

9    520.  Ramesh Pandey to Claudio Ghislanzoni, BRE Development

10   Model Cost Estimate.  Do I have that right?

11   A.  Yeah.

12   Q.  And now let's go to 521.

13   A.  Yes.

14   Q.  Technology Tool Summary Evaluation, Rules Engine.

15   A.  Yes.

16   Q.  If we can blow that up, so we can read it.

17          "Blaze and IBM are the top two market leading

18   products for business rules engine BRE capability."

19   A.  Yes.

20   Q.  "Legacy Chubb used Blaze extensively across 16

21   applications.  Legacy Chubb North America utilized Blaze in

22   13 applications, where at three international applications

23   used it in UK, Canada and Australia."

24          Have I read that correctly?

25   A.  Yeah.

FAIR ISA - VANDEWALLE - CROSS

```
1    Q.  That's a yes or a no.

2    A.  Yes.

3    Q.  Thank you.

4            And again in this assessment, the only two

5    products that are being assessed are IBM and Blaze Advisor.

6            Let's go to Exhibit 561.

7    A.  561?

8    Q.  Yeah.

9            That's a mistake.

10           Well, let's go to 527.

11   A.  527.

12   Q.  Yeah.  And you see here we have a rules engine matrix

13   with three different solutions at the top.

14   A.  Yes.

15   Q.  Okay.  Solution number one that's being analyzed is,

16   "Application subcomponent rule engine internally developed."

17   That's number one.

18   A.  Yes.

19   Q.  Number two is, "Service based rules engine internally

20   developed or open source"?

21   A.  Yes.

22   Q.  And if we were going to be thinking about Drools, we'd

23   be in solution number two?

24   A.  Number three.  Look at number three.

25   Q.  And number three is third-party vendor based rules,
```

1    third-party Blaze, Duck Creek?

2    A.  Duck Creek.

3    Q.  Isn't Drools open source?

4    A.  Drools is open source.

5    Q.  So doesn't solution two speak about open source?

6    A.  Solution two, it said internally developed or open

7    source.  So it's both.  Either Drools or internally

8    developed component.

9    Q.  Exactly.  So if we were going to look at the qualities

10   of open source, we would look at that column number,

11   solution number two.

12   A.  No.  You are to look at all three.  What if you like the

13   rules better?

14   Q.  Pardon me?

15   A.  If you like because if you have external Drools, you can

16   write an open source in Drools.  It will be slow.  You need

17   20,000 plus --

18   Q.  Mr. Pandey, you are not responding to a question.

19   A.  So answer is no.

20           MS. GODESKY:  Your Honor, he was responding to the

21   question.

22           THE COURT:  He was responding to the question.

23           Please repeat your answer.

24           THE WITNESS:  So answer is no.

25           MS. GODESKY:  And if you use the microphone,

1    Mr. Pandey.

2            THE WITNESS:  This is my area, so I get excited.

3    So the answer is no.  You can try Drool, which is better

4    than any third party.  In certain cases, you have to write

5    your rule faster anyway.  If you ask vendor Microsoft,

6    they're not going to use the Drools because they want fast.

7            In the cases like, these cases like you have

8    analytic actuarial stuff, when you are doing the 20,000,

9    30,000, 100,000, it reasons every second.  Any open source

10   rule or third-party rule will not work.  You have to write

11   most efficient code what works for you.  If you want, I can

12   give you example.

13   BY MR. HINDERAKER:

14   Q.  I don't need it?

15   A.  Okay.  Because that's my area.  You are good at legal.

16   I'm good at technology.

17   Q.  I'm not quarreling with that at all.  I was just, I was

18   only asking.  When something says solution two, service

19   based rules engine, internally developed or open source.

20   A.  Yes.

21   Q.  That's what I was asking about.

22   A.  Yeah.  So rules engine you can build up your own.

23   Q.  I understand one choice is to develop your own.

24   A.  That's the first one.  You can develop the rule itself.

25   Second, I'm saying you can develop the rule engine by

```
 1    yourself or use open source, and third one is saying use
 2    something existing like Duck Creek or Blaze.  They're
 3    different.
 4    Q.  I think we're on the same page if I can slow you down
 5    enough.
 6    A.  Okay.  Get me excited.  Technology, that's my thing.
 7    Q.  If I can slow you down enough --
 8    A.  Yeah.
 9    Q.  -- solution two is you can internally develop rules
10    management software, correct?
11    A.  Yes.
12    Q.  Or you can go to open source?
13    A.  Yes.
14    Q.  Correct?
15    A.  Yes.
16    Q.  Those are alternatives?
17    A.  Yes, or develop rule yourself, first one.
18    Q.  And Drools is an open source product.
19    A.  Yeah.
20    Q.  We are on the same page.  And that's in contrast to
21    vendor, to solution number three, where you would go to a
22    vendor like Blaze or Duck Creek.
23    A.  Or IBM or out source.
24    Q.  Or others, but my point is, on this analysis the choices
25    are Blaze or Duck Creek.
```

```
 1              But now that we have that cleared up, I'm just
 2     interested in the, in what the analysis was at this time for
 3     some of the comparisons.
 4     A.  Okay.
 5     Q.  So we'll compare two and three, Drools or Blaze.  Under
 6     atomic applicability, the first row, solution two says, "The
 7     business rules are associated with a product or line of
 8     business or executed in multiple applications," correct?
 9              And under solution three it says, "The business
10     rules are associated with multiple products or line of
11     business and are executed in multiple applications."
12              Have I read that right?
13     A.  Yeah.
14     Q.  We can make another comparison.  Let's say at frequency
15     of rule modification.
16     A.  Yep.
17     Q.  And for solution two the frequency of rule changes is
18     less than once per month per rule, and with Blaze or Duck
19     Creek, the frequency of rules changes is more than once per
20     month per rule.
21              Correct?
22     A.  Yeah.
23     Q.  And then we can go to auditability.  With open source
24     the business have requirements to understand what rule
25     changes were made, when and by whom.  If governance -- IT
```

1    governance to provide the business with the audit log upon

2    request, right?

3    A.  Yeah.

4    Q.  And under the third-party vendor, may be Blaze, "A full

5    audit trail of every rule change is available for the

6    business to see, based on authority level, including who

7    made the change, date old rule was expired, date new rule is

8    applied, old rule values, new rule values, old

9    rule/decision, new rule/decision."

10            Have I read that right?

11   A.  Yes.

12   Q.  And then time to execute is another metric that was

13   being looked at under solution two.  "Once rule changes have

14   been modelled, scenario tested, and have been signed off on,

15   the business would expect IT to release the production

16   within one or two weeks."

17   A.  Yeah.

18   Q.  Under solution three, "Once rule changes have been

19   modelled, scenario tested and have been signed off, then the

20   business would expect an automated or semi-automated release

21   to production within one week."

22            And let me just finish with this comparison on

23   the -- I thought there was a number -- -- well, I was going

24   to find a number of rules, but let's not worry about the,

25   worry about that when we're all worrying about the weather.

```
 1              This is the -- all right.  So we have that
 2      analysis.  And that is one piece of information that will
 3      give us some information about if we were going to compare
 4      Drools, for example, if you're going on the open source
 5      alternative, to Blaze or Duck Creek.
 6              Now, so far when we looked at these analyses that
 7      have been done, we've seen Blaze.  We've seen ODM, and we've
 8      seen Drools.  Those are the three, right?
 9      A.  Also Duck Creek, yeah.
10      Q.  I'm sorry.  And Duck Creek on the solution.
11      A.  Yeah.
12      Q.  Exactly so.
13              We have not seen in the documentation that I'm
14      aware of any analysis of InRule, any analysis of
15      Pegasystems, any analysis of SAS.  Agreed?
16      A.  You haven't seen here.  That's what I was saying.
17      Q.  We haven't seen it?
18      A.  But not here, yeah.
19      Q.  Let me go to -- let me go to slide, your
20      Demonstrative 6 --
21      A.  Okay.
22      Q.  -- and those applications that you put in gold.
23      A.  Yeah.
24      Q.  The first, the top one automated renewal process.
25      A.  Yes.  CSI Express.
```

```
1    Q.  That's -- automated renewal process is an application

2    that is triggered --

3              THE COURT:  It's not showing yet.  Do you have it

4    in your system, or do you need me to switch?

5              MS. GODESKY:  Vanessa could you put that up?

6              MR. HINDERAKER:  Thank you.

7              MS. GODESKY:  Thank you.

8    BY MR. HINDERAKER:

9    Q.  I think, Mr. Pandey, if we go slower, we're going to end

10   up being faster.

11   A.  Okay.

12   Q.  All right?  You're the one with the plane to catch, so

13   let's go slower.

14   A.  Okay.

15   Q.  Automated renewal process is an application that applies

16   to renewals.

17   A.  Yeah.  CSI Express.

18   Q.  Understood.

19   A.  Yeah.

20   Q.  You made the statement that because it's in gold it is

21   not related to the sale of an insurance policy.

22   A.  It's at renewal time.  It's another quote.  So when the

23   policy is expiring within a year, then 90 days before the

24   policy expires we start the renewal process.

25   Q.  And do you -- don't you agree with me that a renewal
```

```
 1    policy is also sold?

 2    A.  It's also sold.

 3    Q.  When the customers renews a policy and brings it --

 4    writes the check for a new premium --

 5    A.  They already have a bill set up and we just keep

 6    collecting it.

 7    Q.  That's right.

 8    A.  Yeah.

 9    Q.  So automatic renewal results in more revenue to Chubb

10    because the policy is renewed and the premium is paid.  Yes

11    or no.

12    A.  Not more, but same revenue continues.

13    Q.  Well, if the policy wasn't renewed and the customer

14    didn't send in the check, no revenue?

15    A.  That --

16    Q.  That's true.

17    A.  Yeah, but renewal license of 3 product out of 130.

18    Q.  Mr. Pandey, CIS claims is an application that analyzes

19    the claims history.

20    A.  Yeah, just flags if the claim was a large complex claim

21    or simple claim.

22    Q.  Understood.  And when the next policy is under, like,

23    for example, when a renewal is underwritten, CSI claims

24    history is going to be one of the components that's

25    considered.
```

1    A.  Which one you talking about?

2    Q.  CIS claims.

3    A.  Oh, claims.  The flag of the claim.  That's

4    for actuarial.

5              COURT REPORTER:  Would you repeat that?

6              THE WITNESS:  Actuarial team.

7    BY MR. HINDERAKER:

8    Q.  Mr. Pandey, we all know that -- or I know that, and it's

9    not one of my questions.

10   A.  Okay.

11   Q.  My question is, The information from CIS claims, which

12   goes into actuarial --

13   A.  Yes.

14   Q.  -- which assesses the history of claims and makes

15   assessments of future risks --

16   A.  Yeah.

17   Q.  -- those are important considerations when a policy is

18   being quoted for sale.

19   A.  No.  That's for pricing.  Actuarial, here's the price.

20   This would be the price, and then we go to --

21             THE COURT:  You have to speak into the mic.

22             THE WITNESS:  The actuarial, what they do the

23   pricing.  Price means when they do the analysis and said

24   that in future these type of policy, like in Florida and

25   certain county, they get a lot of flood policy, their

1    highest policy.  So that's their analysis.  That becomes

2    price in future.  Then they have to go to the rating

3    process.  Rating is the one, is the --

4    BY MR. HINDERAKER:

5    Q.  Yes.

6    A.  But that's a price list.  Price.  You have to go to the

7    department of insurance of each state, responding state, and

8    get it approved.

9    Q.  Yes.  Can we agree on this?  The price of the policy,

10   the price that's being offered for a policy, has an impact

11   on whether the policy is sold.

12   A.  The policy gets sold with quote, quote the rate.  It's

13   already approved.

14   Q.  So you don't think the price that the customer is

15   receiving for the policy matters?

16   A.  No.  You have to do the math and then pick the best one,

17   what is best for them.

18   Q.  Sure.  Of course.  That's all I'm saying.

19   A.  Yeah.

20   Q.  And then IRMAA, individual rate modification, do you

21   think it's important that Chubb, when it sells insurance, or

22   any of the writing companies that sell insurance are in

23   compliance with the regulations of the state regarding the

24   extent they can modify rates?

25   A.  Yeah, they can modify the rates.  Yes.

1    Q.  It's part of the background of compliance, so you can

2    sell insurance.  Agreed?

3    A.  Yes.  State have to agree before we can modify the rate.

4    Q.  And then TAPS similarly, for the state, State of Texas

5    and southern workers compensation insurance, it's important

6    to comply with the state requirements through TAPS so that

7    your sales are complying with law.  Agreed?

8    A.  Yeah, you have to, have to decide which document to

9    send.  If it's, if you have swimming pool --

10   Q.  Thank you.

11   A.  -- you get the document how to keep it safe.

12   Q.  We have other people to talk about what they are.  My

13   question was, You want to comply with Texas regulations to

14   sell insurance?

15   A.  Yeah, sending their documents.

16   Q.  And then the premium booking is a downstream system so

17   that when you do sell a policy, all your systems downstream

18   are properly populated with the information.  Do you agree

19   with that?

20   A.  Yeah, accounting system.

21   Q.  And you want to have a downstream systems operating so

22   that your company can sell insurance.  Do you agree with

23   that?

24   A.  That's correct.

25   Q.  Thank you.

1        Now, you said that -- well, we talked -- I know I

2   showed you the stages of Phase 1 and Phase 2 where the, by

3   those documents Legacy ACE underwriters were -- there was

4   consideration at least in those documents for Legacy ACE

5   underwriters to be able to use CUW-IM to sell Legacy ACE

6   products?

7   A.  Not sell.  Okay.  It's task assignment.  It says that

8   who work on it.  That's work we consider.

9   Q.  Let me back up then.

10  A.  Yeah.

11  Q.  CUW-IM assigns underwriters to work on the client.  They

12  assign the underwriter with the best experience to the need.

13  They assign the underwriter who is most available to be

14  responsive.  And in that CUW-IM application to the assign

15  the best underwriter in the most timely way.  The whole

16  point is try to respond to the broker agent or customer.  Do

17  we agree?

18  A.  CUW-IM is not integrated with people's calling them, so

19  if you go on vacation, they know you.  All it does --

20  Q.  Let's not --

21  A.  So it finds -- I agree for the complexity of the policy.

22  And to say if this is --

23  Q.  I will move on to the next question.

24  A.  Okay.

25  Q.  You're not aware of, you're not aware -- I think you

FABER - CROSS

1  said that you're not aware of Legacy ACE writing

2  companies --

3  A.  No.

4  Q.  Could I finish my question?

5  A.  Okay.  I thought you did.

6  Q.  No, I wasn't.

7  A.  Sorry.

8  Q.  I know the answer you want to get to, but let's just try

9  to get my question out.

10          You said I think that you would be surprised --

11  you don't, you do not know if Legacy ACE underwriters used

12  CUW-IM to sell Legacy ACE products.  You said you did not

13  know, correct?

14  A.  Yeah, you're right.

15  Q.  Would you be surprised if the information that was

16  developed in this case shows that writing companies who are

17  Legacy ACE writing companies have used CUW-IM in connection

18  with selling insurance?

19  A.  Writing company, legal entity, not my area.  I --

20  Q.  You don't know you.

21  A.  I wouldn't be comfortable.  That's why I was --

22  Q.  So you can't answer the question?

23  A.  No.

24  Q.  All right.  Can we agree that Legacy ACE underwriters

25  were selling insurance on behalf of Legacy ACE insurance

FABISH - CROSS

```
 1    companies?

 2    A.  Say again.

 3    Q.  Can we agree --

 4    A.  Yeah.

 5    Q.  -- that Legacy ACE underwriters were selling insurance

 6    on behalf of Legacy ACE insurance companies?

 7              MS. GODESKY:  Objection.  Foundation.

 8              THE COURT:  Do you know the answer to that

 9    question?

10              THE WITNESS:  Any time legal --

11              THE COURT:  Do you know?

12              THE WITNESS:  No, not -- I can guess it.

13              THE COURT:  All right.  Sustained.

14    BY MR. HINDERAKER:

15    Q.  So then let's be clear.  You don't have knowledge how

16    Legacy ACE underwriters sell insurance, you don't have

17    knowledge of whether Legacy ACE insurance companies use

18    CUW-IM, and yet you are able to say on direct examination

19    that Legacy ACE underwriters were not selling insurance with

20    CUW-IM.  Do I have that clear?

21    A.  They are not -- what I have from the personal contact

22    that our systems were used by Chubb, underwriters at the

23    time.  That I can tell you.

24              MR. HINDERAKER:  I have no further questions.

25              THE WITNESS:  That's what I have.
```

```
 1              MR. HINDERAKER:  I have no further questions.

 2              THE COURT:  All right.  Ms. Godesky, do you have

 3     further redirect?

 4              MS. GODESKY:  Nothing further from me.

 5              THE COURT:  All right.  Thank you.

 6              Mr. Pandey, you may step down.  Thank you.

 7              All right.  Members of the jury, we have reached

 8     the end of today.  We won't be back here until 9:00 on

 9     Friday morning.  If something changes between now and

10     then --

11              You can go ahead.  Go ahead.

12              If something changes between now and then, you

13     will be notified, though that's unlikely from what I'm

14     reading from the Chief Judge and the weather reports.

15              So in the meantime, in the two days that you have

16     not here, don't talk about the case with anybody, don't do

17     any independent investigation or recess -- or research.

18     Okay?

19              Now I can say recess.

20              THE CLERK:  All rise for the jury.

21     4:43 p.m.

22                          IN OPEN COURT

23                        (JURY NOT PRESENT)

24              THE COURT:  All right.  Go ahead and be seated,

25     everyone.
```

734

1     You know everything I know about scheduling at

2   this point.  I assume we will start up at 9:00 a.m. on

3   Friday.

4           Before I ask you all for any housekeeping matters,

5   if we need to do anything of, you know, that you need to

6   involve me in, a hearing of any kind, tomorrow and Thursday,

7   it can be done remotely, but you will have to send an email

8   to chambers requesting that.  And I'm not suggesting that

9   you need to have a hearing between now and Friday.

10          Anything else for plaintiffs today,

11  Mr. Hinderaker?

12          MR. HINDERAKER:  No, Your Honor.  No.  As you

13  noted, we have some filings that are due, but -- or

14  responses that we should make, but other than that sort of

15  thing, I have nothing to discuss.

16          THE COURT:  Okay.  Ms. Godesky, anything for you?

17          MS. GODESKY:  Nothing from defendants.  Thank you.

18          THE COURT:  Okay.  So we're in recess until 9:00

19  in the morning on Friday.  Everybody travel safely.

20          (Court adjourned at 4:44 p.m., 02-21-2023.)

21          We, Kristine Mousseau and Renee A. Rogge, certify

22  that the foregoing is a correct transcript from the record

23  of proceedings in the above-entitled matter.

24                  Certified by:  /s/Kristine Mousseau
                                   Kristine Mousseau, CRR-RPR
25                                 /s/Renee A. Rogge
                                   Renee A. Rogge, RMR-CRR