# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

|  |  |
|---|---|
| Fair Isaac Corporation, | ) File No. 16-cv-1054(DTS) |
| a Delaware Corporation, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| Federal Insurance Company, | ) Courtroom 14W |
| an Indiana corporation, | ) Minneapolis, Minnesota |
| and ACE American Insurance | ) Friday, February 24, 2023 |
| Company, a Pennsylvania | ) 9:00 a.m. |
| Corporation, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

------------------------------------------------------------

BEFORE THE HONORABLE DAVID T. SCHULTZ
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**(JURY TRIAL PROCEEDINGS - VOLUME V)**

Proceedings recorded by mechanical stenography;
transcript produced by computer.

*   *   *

```
 1      APPEARANCES:

 2        For Plaintiff:        MERCHANT & GOULD P.C.
                                BY:  ALLEN W. HINDERAKER
 3                                   HEATHER J. KLIEBENSTEIN
                                     PAIGE S. STRADLEY
 4                                   MICHAEL A. ERBELE
                                     JOSEPH W. DUBIS
 5                                   GABRIELLE L. KIEFER
                                150 South Fifth Street, #2200
 6                              Minneapolis, Minnesota 55402

 7        For Defendants:       FREDRIKSON & BYRON
                                BY:  TERRENCE J. FLEMING
 8                                   LEAH C. JANUS
                                     CHRISTOPHER D. PHAM
 9                                   RYAN C. YOUNG
                                     PANHIA VANG
10                              200 South Sixth Street, #4000
                                Minneapolis, Minnesota 55402
11
                                O'MELVENY & MYERS LLP
12                              BY:  LEAH GODESKY
                                     ANTON METLITSKY
13                                   DARYN E. RUSH
                                     ROXANA GUIDERO
14                              Times Square Tower
                                7 Times Square
15                              New York, New York 10036

16        Court Reporters:      RENEE A. ROGGE, RMR-CRR
                                KRISTINE MOUSSEAU, CRR-RPR
17                              MARIA V. WEINBECK, RMR-FCRR
                                PAULA RICHTER, RMR-CRR-CRC
18                              United States District Courthouse
                                300 South Fourth Street, Box 1005
19                              Minneapolis, Minnesota 55415

20
                                      *   *   *
21

22

23

24

25
```

1

<u>**I N D E X**</u>

2                                                             PAGE

3       **LAWRENCE WACHS VIA DEPOSITION**
            Examination By Ms. Janus                          739
            Examination By Mr. Hinderaker                     806
4
        **THOMAS CARRETTA**
5           Direct Examination By Mr. Hinderaker              843
            Cross-Examination By Ms. Godesky                  892
6           Redirect Examination By Mr. Hinderaker            934

7

8

9

        <u>DEFENDANTS' EXHIBITS</u>                          <u>REC'D</u>
10              4                                             921
               17                                             947
11            282                                             945
              304                                             918

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **9:00 A.M.**

2

3         **(In open court with the Jury present.)**

4              THE COURT:  Good morning.  Please be seated go

5    ahead and be seated.

6              All right.  Good morning, Members of the Jury.

7    Thanks, everyone, for making it in here.  I don't know how

8    bad your commutes were, but thanks for making it.

9              Mr. Hinderaker, are you ready to proceed?

10             MR. HINDERAKER:  We are, Your Honor.

11             THE COURT:  All right.  Why don't you, you need to

12   explain what's going on now?

13             MR. HINDERAKER:  I do.  I do.

14             THE COURT:  Go right ahead.

15             MR. HINDERAKER:  Our first witness this morning is

16   a gentleman by the name of Larry Wachs, Lawrence Wachs, and

17   he will be showing -- his testimony will be presented by

18   video, so I will read this introduction about him.

19             Lawrence Wachs is a former FICO employee, now

20   living in New York, whose deposition was taken February 26,

21   2019.  His role was in sales; and when he left FICO, his

22   title was sales executive.  He was with FICO from 2006 to

23   2008.

24             Mr. Wachs' deposition was taken by Leah Janus, one

25   of the counsel for defendants.  There may be another voice

Lawrence Wachs - Direct-Examination

1    on the video and, if so, that will be mine.

2            THE COURT:  Thank you, Mr. Hinderaker.  Go ahead.

3                        **(LAWRENCE WACHS)**

4                           **EXAMINATION**

5    BY MS. JANUS:

6    Q.  Please state your name for the record?

7    A.  My name is Lawrence Wachs.

8    Q.  Are you represented by counsel for FICO here today?

9    A.  I am.

10   Q.  I want to start just with a little bit of background

11   information.  Where, where did you receive your education

12   and tell us what degrees you obtained.

13   A.  I obtained a degree, bachelor of arts degree with a

14   major in economics from Brooklyn College in 1968.

15   Q.  In what year were you born?

16   A.  1947.

17   Q.  Are you currently employed?

18   A.  No.

19   Q.  What was your last -- most recent employment?

20   A.  IBM corporation in sales.

21   Q.  And what were the years that you were employed for IBM?

22   A.  2009 through 2016.

23   Q.  What was your position with IBM?

24   A.  Sales.

25   Q.  What types of, what type of sales?

Donald Wddler Videotaped Deposition

```
1    A.  Large programs, technology sales, software sales.

2    Q.  Okay.  Prior to IBM, what was your employment?

3    A.  Fair Isaac.  Fair Isaac.

4    Q.  What were your years of employment with Fair Isaac?

5    A.  2006 to 2008.

6    Q.  What was your position with Fair Isaac?

7    A.  Technology sales.

8    Q.  Did you have a title?

9    A.  Sales executive, sales executive.

10   Q.  Prior to your position at FICO, what was your

11   employment?

12   A.  Prior to fair -- FICO, I was employed by RulesPower, a

13   technology start-up corporation.

14   Q.  What were the years of that employment?

15   A.  I'm not sure offhand, but it was ending in 2006,

16   probably beginning in 2005.

17   Q.  And what was your position with -- what was it?  Can you

18   repeat the name?

19   A.  RulesPower, one word.

20   Q.  What was your position with RulesPower?

21   A.  Technology sales.

22   Q.  So from 1995 through 2016, you were in the technology

23   sales industry as a --

24   A.  That's correct.

25   Q.  -- sales executive?
```

Jefferson Wells - Transcript

```
 1    A.  Exactly right.

 2    Q.  Okay.  Let's focus in then on the 2006 to 2008 time

 3    period when you were employed with Fair Isaac.  Do you

 4    recall the month in 2006 that you began your employment with

 5    Fair Isaac?

 6    A.  Not specifically, no.

 7    Q.  We'll look at some documents, but it looks like you were

 8    there in the beginning of the year 2006, does that --

 9    A.  That's correct.

10    Q.  Okay.  So you started in the beginning of 2006.  And

11    when you began at Fair Isaac, what was your title?

12    A.  Sales executive.

13    Q.  Okay.  What, what did your position involve as a sales

14    executive?

15    A.  Locating organizations that could take advantage of the

16    FICO software in order to achieve business benefit.

17              COURT REPORTER:  How do you spell FICO?

18              MS. JANUS:  F-I-C-O.

19              COURT REPORTER:  Got it.

20    BY MS. JANUS:

21    Q.  Were you familiar with the software at FICO prior to

22    beginning your work with them?

23    A.  Yes.

24    Q.  And how was that?

25    A.  The RulesPower software was comparable in its
```

Schwendimann v. Fair Isaac - Depositors

1  functionality and in fact, it's a matter record, I believe,

2  that the software at FICO was actually the RulesPower

3  software when FICO acquired the assets of RulesPower.

4  Q.  Was there a particular software that you were focused on

5  selling during your time at FICO?

6  A.  Yes.

7  Q.  What was that?

8  A.  The name of the software was Blaze Advisor, and it was a

9  decision management rules processing application.

10  Q.  Who did you work with while you were at FICO?

11  A.  I reported directly to a gentleman named John Haines,

12  H-A-I-N-E-S.

13  Q.  What was his position?

14  A.  Manager of sales for Blaze Advisor for the northeast.

15  Q.  Once the client selected Fair Isaac as a vendor, what

16  was your role, if any, in the deal going forward?

17  A.  Once we were advised that we were the selected vendor,

18  we would communicate the salient facts about the sale to our

19  contract administration process, who would have to render a

20  contract that would be appropriate for the deal, reflective

21  of the terms of the deal, including the price.  I would work

22  with senior management in establishing what that price would

23  be, which is part of the selection process, but assuming

24  that they've selected us already, we were already past that

25  approval stage.

1   Q.  So establishing the price is something you would work

2   with senior management at Fair Isaac?

3   A.  That's correct, which would include John Haines, who I

4   mentioned before and his superiors.

5   Q.  Do you remember who else was involved in that process

6   other than John Haines?

7   A.  John Haines reported to Bill Waid, W-A-I-D.

8   Q.  Were you involved in the negotiation of the contract --

9   and we're speaking here in general about your

10  responsibilities there.  We'll get to Chubb specifically.

11  But, in general, would you be involved on some level with

12  the contract negotiation process?

13  A.  I would generally facilitate in the specific case of

14  what I would call the Chubb or Federal, Chubb & Son, Inc.,

15  there was a vendor manager at Chubb, and there was a

16  contract person at FICO, and the two would need to work

17  things out, and I would stay within that process to

18  facilitate to make sure that all of the business issues were

19  at least conformed between the two parties.

20  Q.  Okay.

21  A.  Not necessarily the legal issues.

22  Q.  Mm-hmm.  Mm-hmm.  What did you do to prepare for your

23  deposition today?

24  A.  I met with Mr. Woodward and Mr. Hinderaker yesterday in

25  these offices.

1    Q.  And without talking about the substance of your

2    communications, did you do anything else other than meeting

3    with Mr. Hinderaker and Mr. Woodward?

4    A.  No.

5    Q.  Did you review any documents during your meeting with

6    Mr. Hinderaker and Mr. Woodward?

7    A.  Yes.

8    Q.  What documents did you review?

9    A.  I would assume the documents that were part of the

10   discovery process.

11   Q.  And so were there e-mails that you reviewed?

12   A.  There were some e-mails, I believe, as part of that

13   process.

14   Q.  How long did you meet with Mr. Hinderaker and

15   Mr. Woodward?

16   A.  Approximately three hours, three to four hours.

17   Q.  Okay.  When did you first become involved in the Chubb

18   account?

19   A.  Early 2006.

20   Q.  What is your recollection of how you became involved?

21   A.  I was referred to the account by our sales, in-house

22   sales intake person, who received a request for information.

23   Q.  At the time you became involved in early 2006, was Chubb

24   an existing client of FICO's?

25   A.  Not that I know of.

1    Q.  Okay.  So this is something where they were approaching

2    FICO to possibly become a client?

3    A.  Yes.

4    Q.  Okay.  And what do you recall about what took place then

5    when you first became involved?

6    A.  We required -- to communicate our intention to bid -- to

7    respond to the RFI and were given a deadline, which was

8    probably within two weeks of our receipt of the document in

9    order to respond.

10   Q.  When you say, "respond to the RFI," what do you mean?

11   A.  There were specific questions dealing with the

12   appropriateness of the software and of FICO to be able to

13   respond, typical things would be references and just general

14   capabilities, and that would have to be submitted to the

15   client and then responded to and then determined whether we

16   would be qualified for the short list.

17   Q.  And those are questions issued by Chubb?

18   A.  That's correct.

19   Q.  Okay.  What did you understand that Chubb was looking

20   for?  For someone who is not in your industry, how would you

21   describe this?

22   A.  They were looking for a product that would enable them

23   to satisfy their business requirements, which included being

24   able to penetrate new markets, down -- downscaling their

25   product in this division to a more small to medium-sized

1    business marketplace and potentially to retail.

2           And they recognized that with a higher volume of

3    input business on their part that they did not have a

4    scaleable solution and that it would require numerous more

5    underwriters to approve the business -- require numerous

6    more underwriters to approve the business and to understand

7    the risk of the business, and they were looking for an

8    automation product that would assist them in that.

9    Q.  And the automation product -- one automation product

10   would have been Blaze; is that correct?

11   A.  Yes.  The automation product is in a platform that is

12   not industry specific or solution specific.  It's not an

13   out-of-the-box solution.  It would have to be crafted to

14   respond to the specific needs of any given client.

15   Q.  Well -- and tell me what is -- how would you describe

16   Blaze's then role in that process?

17   A.  It's a rules engine, which is a place or a repository

18   where the sum of all of the rules that are necessary to make

19   decisions on an automated decision management basis are

20   kept, and it's a way for people who are nontechnical to be

21   able to make changes to those rules and in effect to get new

22   outcomes in the decisions as a result of those changes.

23           And recognizing that capability, their secondary

24   desire was to be able to have the business people directly

25   craft changes, both on a production basis, but perhaps just

LAWRANCE VIDEO DEPOSITION

1    as importantly on a modeling basis, so they could do what-if

2    scenarios.  For example, if we changed the threshold for

3    approval on size or number of claims or various client

4    attributes, what would the new effect be, and they could do

5    that on a modeled basis rather than empirically, and that

6    was a tremendous business advantage to them since in order

7    to do that in the current state at that time would require

8    large lead times, lead times as a result of both the queue

9    in developing the software by IT and then the actual

10   programming in the existing state of the art, whereas, with

11   the rules engine, this could be done by business people in

12   days, not months or years.

13   Q.  And when you say "business people," you're referring to

14   business people at Chubb?

15   A.  That's right.  The underwriting managers.

16   Q.  Who were your contacts during the initial conversations

17   with Chubb?

18   A.  Initial conversations with Sully, S-U-L-L-Y, and I

19   believe his name was John Sullivan.  I'm --

20   Q.  Could it have been Patrick?

21   A.  Patrick Sullivan, yes.  I'm sorry.  John Sullivan was a

22   fighter.

23   Q.  Patrick -- so Sully, and he goes by Sully, right?

24   A.  That's correct.

25   Q.  Okay.  And he was at Chubb?

1    A.  That's right.  He was the primary gatekeeper.  He had

2    the business clients' requirements, and he was tasked with

3    the responsibility of making certain that the software would

4    be appropriate and that the value would be there for the

5    software -- the value would be there with the software.

6    Q.  And so was it you and Sully who were the main people who

7    were involved in these early discussions on Blaze?

8    A.  On the FICO side I also worked closely with Russ

9    Schreiber, who was the -- S-C-H-R-E-I-B-E-R -- who was the

10   insurance specialist at FICO, so that myself, representing

11   the technology, and Russ Schreiber, representing the

12   business acumen, together we formed an alliance that helped

13   convince the client that our software was the best

14   available.

15   Q.  So from FICO's side, you and Russ Schreiber were the

16   primarily sales team, correct?

17   A.  Yes.

18   Q.  From Chubb's side, Sully was the primary contact, and

19   anyone else at Chubb that you recall dealing with?

20   A.  The name Owen Williams comes up, but he entered probably

21   at the time of software licensing.  I don't believe he was

22   involved before then in the selection process.  He was

23   tasked by Chubb with the responsibility to make certain that

24   the software was delivered on time and appropriate for

25   business needs.

1    Q.  During the selection process what -- how would you

2    characterize the frequency of your contact with Chubb, and

3    were you meeting with them, having phone calls?  Tell us how

4    that went, as far as you recall.

5    A.  Shortly after the submission of the response to the

6    request for information, Russ Schreiber and I visited with

7    the client and the client technical team in Simsbury,

8    Connecticut, Simsbury, and responded to their ad hoc

9    questions about the software and its appropriateness and

10   who, who -- references, things like that, expanding on the

11   response for information.

12   Q.  Okay.  And was that the only in-person meeting you had

13   during this process?

14   A.  Actually we were at that point waiting for the client to

15   make the short list, to make the short list available; and

16   when we were informed that we were on the short list, we

17   were meeting with the client probably every week to ten

18   days.

19   Q.  And that was in Connecticut or --

20   A.  First in Connecticut and then in Warren, New Jersey.

21   Q.  What -- what were the conversations you were having

22   with -- was it just Sully you were meeting with?

23   A.  There was a team of people.  Sully was the primary

24   driving force.  I don't remember --

25   Q.  Do you -- okay.  Okay.

1    A.   -- any of the other names.

2    Q.   And was it just you and Russ who were attending the

3    meetings from FICO's side?

4    A.   At the response, there was one large meeting and

5    Schreiber's boss, Mike Gordon, was in attendance at that

6    meeting as well, just the three of us, though -- I'm sorry.

7    And Mr. Zwizinski, who was a technical consultant for FICO.

8    Q.   Back to my question.  What were the topics of

9    discussions during these meetings?

10   A.   We first built a proof of concept based upon some sample

11   rules that the client gave us, and so we were able to

12   demonstrate how the product would work and how they would

13   work the product and build the solution.  And then the

14   conversation evolved into a commercial conversation about

15   the cost of the software and our collection discovery, if

16   you will, on the type of usage, number of transactions, the

17   number of rules, which are all determinants on a micro-level

18   for determining the pricing of the software, as well as our

19   investigation of the corporate financials of the client, if

20   you will, so that we could determine the revenue of the

21   client and determine the -- on a macro-level what our

22   pricing would be, since both ingredients would go into our

23   final pricing.

24   Q.   Okay.  Let's start with the, the micro-level you

25   mentioned.  What were the considerations that you said go

LAWRENCE W. WHITE - DEPOSITION

```
1    into the micro-level?

2    A.  A description of the application and the scope, the

3    number of decisions that would have to be made, the number

4    of seats of developers who would actually utilize the

5    software to build and manage the software over time, the

6    geography, where it would be utilized and, if I didn't say,

7    the number of rules that were assumed would be required.

8    Q.  Is that the same as the number of decisions or --

9    A.  Interestingly, so a single rule doesn't make a decision.

10   There are multiple rule sets that go into making a decision.

11   So if you kind of wanted to be able to, you know, both of

12   you could.

13   Q.  So "description of the application and scope," what do

14   you mean by "the application"?

15   A.  The usage of the software once it's in production.  So

16   that could include -- when I say "scope," that could

17   include, again, the number of users who would be utilizing

18   the software, the number of policy requests and then,

19   finally, the number of different application areas, and in

20   this case only one application area was specified and that

21   was the underwriting group for this renewal process.

22   Q.  And this was in the early, early discussions?

23   A.  That's right.

24   Q.  Okay.  So there was one application at issue here.  And

25   the number of decisions, what does that refer to, generally?
```

1    A.  If we were looking at a particular policy, we would want

2    to know what the business has to tell us, the attributes

3    that we would have to look at at the policy submission

4    stage, again, the name of the client, the business

5    relationship of that client to -- of their client to them,

6    the number of claims that they have had in the past, the

7    size of the policy that was being written.  All of the

8    factors that a traditional underwriter would look at in

9    determining the risk-reward ratio and what their pricing

10   would be for the premium for that policy.  Those are the

11   decisions.  There may be ten decisions, but there might be

12   100 rules or more that would go into those decisions.

13   Q.  Mm-hmm.  The number of seats of developers to build?

14   A.  Yes.

15   Q.  Does that refer to seats at Chubb?

16   A.  The number of developers utilizing the software on an

17   ongoing basis.  Again, we didn't know at that time whether

18   the client would want FICO to build the software as a

19   services, professional services, so we would contemplate how

20   many seats of developer license would be required --

21              Of developer license.

22              COURT REPORTER:  Would be required?

23              THE WITNESS:  Yes.

24   BY MS. JANUS:

25   Q.  And then the number of rules you alluded to earlier, but

1    can you just describe what you mean by "the number of

2    rules"?

3    A.   Discreet, if/then statements.  If the client is located

4    in this geographic, then we're talking about Chubb's client

5    at this point; but if the client were located in this

6    geography and he had a prior number of claims, each one of

7    those would be -- if the client is in this geography, then

8    the client is something and then you would have to cascade

9    those rules together to make that informed decision, but at

10   this point in the conversation, having not done original

11   discovery of the client's actual processes, those kind of

12   microelements are less important than the macroelements of

13   size and scope.

14   Q.   Mm-hmm.  In terms of the pricing --

15   A.   That's right.

16   Q.   -- decision?

17   A.   Right.

18   Q.   And then you mentioned another microelement was

19   geography, where utilized?

20   A.   That's right.

21   Q.   What are you referring to with that?

22   A.   In broad terms, it would be United States or global.

23   Q.   Mm-hmm.  And how would these micro factors actually be

24   used to develop a price?

25   A.   We would submit the statistics, for example, annual

EDWARD MACAULEY - DEPOSITION

1    revenue by division, if it were available, specific to this

2    application within a particular division.  I would give that

3    to John Haines, and he would communicate with Bill Waid.

4    The first break would be, Is it a small, medium or large

5    application; and based upon that, the pricing assumptions

6    would be made and then perhaps it would be a percentage of

7    revenue would be the cost of the software.

8    Q.  Mm-hmm.  What do you mean based on that, "pricing

9    assumptions would be made"?

10   A.  Based upon the dollar value of the revenue, on an annual

11   basis, we would take a percentage of that and that might be

12   the price.

13   Q.  So you take a percentage of Chubb's --

14   A.  Revenue.

15   Q.  -- revenue to determine the price?

16   A.  Of the software.

17   Q.  Okay.  And, and so how do the micro factors that you --

18   because you -- you described the revenue --

19   A.  Right.

20   Q.  -- the corporate finances of the client as the macro

21   sort of considerations for pricing.  How do the micro

22   considerations that you described factor into the price

23   determination?

24   A.  The micro would be small, medium and large.

25   Q.  Okay.

LAWRANCE HYMAS - BY DEPOSITION

1   A.  And then based upon small, medium and large, we would

2   apply the appropriate percentage.  If there were, for

3   example, argumentatively, a ubiquitous software solution

4   like accounts payable where thousands of people at Chubb,

5   that would be a large product and it would be a different

6   pricing percentage of the revenue than a small product.

7   Frankly, a lot of this was management's decision.

8   Q.  Mm-hmm (Yes).

9   A.  And I -- at FICO.

10  Q.  Were discounts regularly applied by FICO in determining

11  final prices?

12  A.  I would argue that perhaps -- in the customer journey of

13  FICO selling to Chubb, I would argue that we have a

14  progression.  We would like to sell an application,

15  transactional, and prove the value of the software and then

16  perhaps sell a second application or a third application and

17  then perhaps a change of geography from United States only

18  to global, for example.

19          And that progression enables you to sell with more

20  value than if you -- without any proof of product capability

21  were to, for example, start off with -- excuse me -- an

22  enterprise license.  So as a salesman in the field, you

23  always want to do this transactional level pricing.  So I

24  would argue -- to answer the specific question -- that as a

25  first transaction with a new customer with a lot of

1   potential, a lot of needs for automation, that we would want

2   to discount as low as we could go on a first pricing basis.

3           COURT REPORTER:  On what?

4           THE WITNESS:  -- on a first pricing basis and then

5   build value and probably charge additional fees as we are

6   progressing.

7   BY MS. JANUS:

8   Q.  Throughout that process of building value and continuing

9   to sell, were discounts a part of FICO's internal pricing

10  models?

11  A.  I would tell you that discounts are exceptional, and

12  they're X of a pricing model.

13          COURT REPORTER:  And they're what?

14          THE WITNESS:  X, separate from a pricing model.

15  BY MS. JANUS:

16  Q.  Okay.  And what do you recall about the conversations

17  that you had with Chubb relating to the enterprise deal and

18  what Chubb wanted out of the enterprise deal?

19  A.  I don't remember anything specific.  I believe that -- I

20  don't have any recollection of what, what was specifically

21  drove that other than our desire to continue to sell into

22  the account and there seeing the appropriateness of the

23  software and being able to see where they would want to

24  expand beyond the single, that first transaction, but I

25  don't know the dates involved.

1    Q.  Sure.  Do you recall discussing that geography factor

2    that you mentioned, the geographical scope of the enterprise

3    license?

4    A.  I do recall the folks at Chubb did request us to look at

5    the cost of extending the license agreement beyond

6    territorial United States.

7    Q.  Do you recall when that was?

8    A.  Part of the same -- before the product license agreement

9    was signed was the first request, first time.

10   Q.  Okay.  And do you recall what the outcome of that

11   discussion was?

12   A.  We did not -- we priced it, and the client was not

13   interested at that time.

14   Q.  And you think that was prior to the initial license

15   agreement being entered into in June of 2006?

16   A.  Yes.

17   Q.  Do you recall actually having an oral conversation with

18   anyone at Chubb about that topic?

19   A.  Certainly, both Sully and Jim Black.

20   Q.  When did you discuss that with Sully?

21   A.  I don't remember the time frame.

22   Q.  Do you think it was before or after the June 2006

23   license agreement was entered into?

24   A.  There were multiple conversations, but the initial one

25   was prior to the execution of the license.

1    Q.  Okay.  But you recall interacting with Sully on this

2    issue?

3    A.  There was a request made to find out how much it

4    would -- additional it would cost to have a global license,

5    and I would have certainly responded to that request and

6    the -- Chubb did not undertake any action at that time.

7    Q.  Do you think that generally a response from you about

8    how much it would cost to do a global license would -- you

9    would expect that to be an e-mail?

10   A.  It should have been some written response, I would

11   assume, but, again, I have no specific recollection.

12   Q.  Okay.

13   A.  I would say, though, that the scope of the original RFI,

14   as I remember it, was U. S. domestic only.

15              COURT REPORTER:  Was?

16              THE WITNESS:  U. S. domestic only.

17   BY MS. JANUS:

18   Q.  That is the RFI you were responding to in early 2006?

19   A.  That's correct.

20   Q.  Okay.  And then at some point during the commercial

21   phase of the conversations, the concept of a global license

22   entered the picture, correct?

23   A.  As I remember the situation, and specifically there was

24   some thought that as the software was being built

25   appropriately for the review of incoming contract requested

1   claim applications for license -- for software -- excuse

2   me -- for premium and for acceptance by the underwriting

3   staff, there was a feeling that the software that was being

4   developed would apply to the European business as well, and

5   they wanted to be able to take advantage of that.

6   Q.  "They" being Chubb?

7   A.  Yes.

8   Q.  Did you learn about that during the meetings you were

9   having with Chubb?

10  A.  Yes.

11  Q.  Okay.  What other conversations do you recall having

12  relating to the geographical scope of the license?

13  A.  That was it.

14  Q.  Okay.

15  A.  The request came in and we responded to the request.

16  The license was executed, and it did not include the global.

17  Q.  The license was executed.

18  A.  With just U. S. territory.

19  Q.  Have you always had a recollection of the interaction

20  with Sully that you just described here today?

21  A.  I don't understand the question in terms of, have I

22  always had it.  I know that the request came in and we

23  responded to the request, and it was never acted upon that I

24  know of during my tenure at FICO, but I can't answer how

25  long I knew that or if I have always known it.

1    Q.  Okay.  So you don't know whether that's something you

2    just recalled recently in connection with preparing for this

3    deposition or whether that's something that you had as a

4    recollection since 2006?

5    A.  I would say that my memory was refreshed as I reviewed

6    the contract work yesterday.

7    Q.  Okay.  So prior to preparing for your deposition, you

8    did not have a recollection of that interaction with Sully?

9    A.  I did not have an awareness.  It was certainly something

10   that I do remember once I did see the documentation

11   yesterday.

12   Q.  Well, I don't want to put words in your mouth, but you

13   described a process of sort of progressing from a

14   transaction level commitment to a larger commitment and then

15   to an enterprise-wide agreement.  Do you recall that?

16   A.  I recall that, and that was an aspirational statement.

17   As a salesperson, that is the ideal sales journey.  I was

18   not involved, to my recollection, in the final conversations

19   extending beyond the original product license agreement.

20   Q.  Okay.  So are you generally aware that the original

21   license agreement was entered into in June of 2006?

22   A.  Yes.

23   Q.  With me so far?  Okay.  And then there were two

24   subsequent amendments that were entered into by the parties

25   later in 2006.

LAWRENCE CHRISTOPHER DEPOSITION

1     A.   Yes.

2     Q.   Okay.  And we'll look at some documents, but do you

3     recall whether you were involved in those two subsequent

4     amendments?

5     A.   Definitely the first.  I'm not sure about the second.  I

6     don't remember.

7     Q.   Okay.  Are you aware that negotiations took place

8     relating to the Amendment Two, which was the amendment that

9     expanded the license to be enterprise-wide?

10    A.   I can't tell you then that I was aware of it.  I am

11    aware of it now.  And I say that because during the period

12    in question, Mike Sawyer became the client and principal

13    with the client, and I moved on to other sales opportunities

14    beyond Chubb, so I don't know that I was involved in those

15    conversations at the time.

16    Q.   When did that take place?

17    A.   I can't tell you that at this point.  I have no

18    recollection.

19    Q.   Okay.  But sometime in the second part of 2006?

20    A.   If that is supported by the contract signings.

21    Q.   Okay.  As you were engaged in conversations with Chubb

22    leading up to the June 2006 license agreement, did you place

23    any significance on what Chubb entity entered into the

24    license agreement?

25              COURT REPORTER:  Sorry, did you place any

EDWARD C. WENCK - DEPOSITION

1    significance --

2    BY MS. JANUS:

3    Q.  On what Chubb entity entered into the license agreement?

4    A.  Yes, certainly, because that was a component of the

5    pricing.

6    Q.  And explain what you mean by that.

7    A.  Based upon the scope of the usage license would

8    determine the pricing.

9    Q.  And how do you determine that?

10   A.  We would ask the client.

11   Q.  So you say, "Based on the scope of the usage license" --

12   A.  That's right.

13   Q.  -- "that would determine the pricing"?

14   A.  Yes.

15   Q.  Okay.  And I want to understand what you mean by that,

16   especially for someone who is not in your area of expertise.

17   So -- strike that -- in your area of work.

18          So when you say, "The scope of the usage license,"

19   what do you mean by that?

20   A.  To what geographic location, to what business group, to

21   what product line, all of those would be components as they

22   would determine the value of the software to the client and

23   our product is a value-based price model.

24   Q.  My question originally was, Was it significant to you

25   which Chubb entity entered into the license?

1    A.  That's correct.  And that was significant to me because

2    you can draw a straight line between the entity that's --

3    and its usage within the company.  So that would certainly

4    be an input that Bill Waid would utilize in order to make

5    his decision as to the price model.

6    Q.  And to determine that, you were looking at the

7    geographic issue, the business group and the product line;

8    is that correct?

9    A.  We had to determine the organizational structure of the

10   Chubb group of companies, specifically the Chubb & Son,

11   Inc., servicing arm, to determine where this software

12   product might find itself and the value that it might give

13   Chubb, and that would determine and drive the price model.

14   So, yes, it was important to us to know what the contracting

15   entity was.

16   Q.  And did you go through that process of determining the

17   organizational structure?

18   A.  Not in the detail, other than what would be available

19   through, for example, the annual report.

20   Q.  So you reviewed the annual report in connection with the

21   negotiation of the 2006 license agreement?

22   A.  That's correct.

23   Q.  And what did you determine that was significant to the

24   organizational structure and how the software would be used

25   from that annual report?

1    A.  The answer is, I don't have any recollection of that at

2    this time.

3    Q.  But you do recall reviewing it in connection with

4    determining how the software would ultimately be used by

5    Chubb?

6    A.  That's correct.

7    Q.  And I take it you -- your intent was that you were

8    negotiating with the Chubb group of companies, is that -- to

9    use your phrase.  Is that fair?

10   A.  I don't have recollection now as to what I did then.  I

11   certainly do know what I reviewed yesterday as part of our

12   preparation, but I do not have any recollection of the

13   process I undertook 13 years ago.

14   Q.  You understood that Chubb was purchasing a license to

15   use the Blaze software, correct?

16   A.  Yes.

17   Q.  And that it was purchasing a license to develop

18   applications using the Blaze software, correct?

19   A.  A single application.

20   Q.  At the first instance, and then when we get to

21   enterprise, as many applications as it wanted, correct, for

22   the license agreement, correct?

23   A.  Again, I can't answer that question.  At the time I

24   would be truthful to say that we only knew that it was part

25   of the Chubb specialty insurance group for which this

1    underwriting effort was directed.  So we, again, rated this

2    as a small application for a small division, if you will, of

3    the overall companies of Chubb.

4    Q.  And that was the initial June 2006 --

5    A.  That's correct.

6    Q.  -- license agreement?

7             Showing you what has been marked previously as

8    Deposition Exhibit 106, this is a string of e-mails, the

9    earliest one of which involves you.  Is this one of the

10   e-mails you reviewed to prepare for your deposition?

11   A.  Yes.

12   Q.  The e-mail at the bottom of the first page is from you,

13   dated February 21, 2006, to John Haines and Russ Schreiber,

14   correct?

15   A.  Yes.

16   Q.  Subject line is, "Quote, Chubb licensing."  So is this

17   in the beginning stages of the conversations you were having

18   with Chubb?

19   A.  Yes.

20   Q.  You say, "John, I brought down the enterprise

21   (divisional license) to 840,000 based upon the division

22   sales of 3.5 billion confirmed on their annual report."  Do

23   you see that?

24   A.  Yes.

25   Q.  Explain what you were referring to in that sentence.

LAWRANCE VIDEOTAPED DEPOSITION

1    A.  We were looking at the -- if there were a divisional

2    license for the use of this group of companies, that it

3    would be $840,000 based upon the sales of 3.5 million.

4    Again, we priced on a macro basis.  This particular

5    license -- and just to describe, .NET and Java are two

6    different types of program language, if you will, or

7    operating systems -- that it only pertains to the Chubb

8    specialty insurance policy application, and therefore it's a

9    small application, like $200,000, which was our initial

10   thought process before it went to Bill Waid.

11          COURT REPORTER:  Before it went to?

12          THE WITNESS:  Before it went to Bill Waid.

13   BY MS. JANUS:

14   Q.  Okay.  And so then John -- you send it to John Haines,

15   who is your supervisor at the time, correct?

16   A.  Yes.

17   Q.  And then at the top, John Haines forwards the message to

18   Bill Waid, correct?

19   A.  Yes.

20   Q.  And he says, "This is standard pricing"?

21   A.  He said that to Mr. Waid, yes.

22   Q.  Showing you what has been previously marked as

23   Deposition Exhibit 105, this is an e-mail dated

24   February 22nd, 2006, from you to Bill Waid, with a copy to

25   Russ Schreiber and John Haines, correct?

1    A.  Yes.

2    Q.  Did you review this e-mail in preparation for your

3    deposition?

4    A.  Yes.

5    Q.  What are you writing about in this e-mail?

6    A.  I'm -- on the date that Bill Waid said in his previous

7    e-mail that application description was missing, I'm

8    responding to Bill Waid's question directly, trying to

9    describe the application requirement and how that will be --

10   how our product will be used in that division and to the

11   purpose of getting a pricing decision from Bill Waid.

12   Q.  So in connection with describing how the product would

13   be used in the division, you state, "The division's revenue

14   is 3.5 billion with 1,000 employees," correct, in the middle

15   of the first paragraph?

16   A.  Correct.

17   Q.  Specialty insurance, is that the division you're talking

18   about?

19   A.  That's correct.

20   Q.  Okay.  Handing you a document that's been marked as

21   Exhibit 331, this appears to be Bill Waid's response to you

22   on February 22nd, 2006.  Do you see that?

23   A.  I do.

24   Q.  And he notes, "Approved, but in the future I need more

25   lead time," correct?

LAWRANCE WILLIAMS - 30(b)(6) DEPOSITION

```
1    A.  Correct.

2              COURT REPORTER:  More?

3              MS. JANUS:  Lead time.

4              THE WITNESS:  Correct.

5    BY MS. JANUS:

6    Q.  So Bill Waid approved the pricing you suggested for the

7    application you were discussing?

8    A.  Exactly.

9    Q.  Okay.  Handing you what has been marked as Deposition

10   Exhibit 332, this is an e-mail from John Haines to Bill

11   Waid, "Subject:  Pricing approval for Chubb ELA," correct?

12   A.  Yes.

13   Q.  And "ELA" stands for what?

14   A.  Enterprise License Agreement.

15   Q.  So in the April 2006 time period, was FICO discussing

16   the terms of an ELA with Chubb?

17   A.  Correct.

18   Q.  And you were involved in those discussions?

19   A.  I wasn't cc'd on this e-mail, carbon copied, so I don't

20   know that I saw this specifically, but I was involved in the

21   conversations, yeah.

22   Q.  And in the second paragraph of the e-mail, John Haines

23   says, "Chubb Group of Insurance Companies signed 12.3

24   billion in policies in 2005," correct?

25   A.  Correct.
```

LAWRENCE VELLEDA - DEPOSITION

1    Q.  Then he goes on, "And based on that, we used a .24

2    percent (24 percent of 1 percent) as the basis for the

3    pricing in the attached," correct?

4    A.  Correct.

5    Q.  So he is using the revenue information for the Chubb

6    Group of Insurance Companies in pricing the ELA, correct?

7    A.  It appears that way.

8    Q.  And then he refers to, "ten dev seats and a 30 percent

9    volume discount."  What is a 30 percent volume discount?

10   A.  It's a request by John to have variation pricing, and it

11   could be based upon -- and I don't know the answer, but

12   the -- subjectively, it would be either because of the

13   nature of the business relationship with Chubb, the time of

14   year, his commission quota or whatever else, that he is

15   going to reduce that .24 percent of 12.3 billion dollars by

16   30 percent.  He doesn't describe the reason for the

17   30 percent volume discount.

18   Q.  Would a 30 percent volume discount be unusual?

19   A.  No.

20   Q.  The attachment to the e-mail is a three-page chart.  And

21   you can, if you take the clip off, you can actually spread

22   it out.  It's a little easier to read.

23        So you see towards the top of the page, you're

24   listed as the account executive, correct?

25   A.  That's right.

1    Q.  And then Russ Schreiber, consistent with your previous

2    testimony, is listed as the client partner?

3    A.  Correct.

4    Q.  And then Dale Zwizinski is the person you've mentioned a

5    couple of times as the technical person involved?

6    A.  Correct.

7    Q.  It says, "Note:  The following enterprise license

8    quotation is included at this time for budgetary purposes."

9            Do you know what that means?

10   A.  That it wasn't a final quotation.  It was just for

11   estimation purposes.

12   Q.  So this was an internal number that was being generated

13   for purposes of FICO's budget?

14   A.  Well, no, because it was sent to Jim Black, James Black.

15   Q.  Right.

16   A.  So I would tell him that he was looking, without

17   specificity, he was looking for a range of what this

18   enterprise license could look like, what the dollars could

19   be, and that's what we did here.  We used the typical

20   pricing model formula, what would be included in the

21   enterprise license, and it was our -- it was our expectation

22   that this would beget a conversation to fine tune the

23   license points here, and even at that point to negotiate a

24   higher or lower enterprise license quotation based upon what

25   they, what they really think they need and what they would

LAWRENCE WILLIAMS - DEPOSITION

1    achieve.

2    Q.  After that statement, it says, "The final quotation is

3    contingent upon a number of factors, including," and then it

4    lists six bullet points.

5    A.  All of those -- was that the end of your question?

6    Q.  Yes.

7    A.  All of those bullet points relate to the value of the

8    software that would be -- that they would license.

9    Q.  The third bullet is, "Rate of technology adoption, e.g.

10   20 applications within five years or in 20 years."  Do you

11   see that?

12   A.  Yes.

13   Q.  And what is -- what does that relate to?

14   A.  It could be the best product in the world; but if the

15   business units don't choose to adopt it and to fund the

16   development world, then the value for the client would be

17   reduced because the product is not being adopted at an

18   assumed rate.

19   Q.  So the rate of adoption may have an impact on the final

20   price?

21   A.  Sure.

22   Q.  Or projected rate of adoption?

23   A.  It's what we would use to project its impact to the

24   organization, and you can see in the final paragraph there

25   we wanted to discover the answers to these questions so that

1    we could fine tune or enterprise license quotation.

2    Q.   In line 6 of the chart that's below the bullet points,

3    it says, "Enterprise deployment license for Chubb Group of

4    Insurance Companies."  Do you see that?

5    A.   I do.

6    Q.   Is that the enterprise license that is being discussed

7    in this e-mail and proposal?

8    A.   Yes.

9    Q.   Showing you what has been marked as Deposition

10   Exhibit 305, this is an e-mail from Jandeen Boone to Jim

11   Black with a copy to you, correct?

12   A.   Yes.

13   Q.   It's dated June 6th, 2006?

14   A.   Yes.

15   Q.   Were you involved in the negotiation of the master

16   services agreement?

17   A.   Yes.

18   Q.   What was the purpose in general terms of the master

19   services agreement?

20   A.   Once the software was acquired, it would have no use to

21   the client unless the software were built for the purpose

22   that it was -- the rules would have to be built, and the

23   software would have to be built out as part of a standard

24   development life cycle.  It would have to be unit tested --

25   project managed, unit tested, client acceptance tested, and

LAWRENCE WALDER - BY DEPOSITION

1    there is a process that guarantees that at the conclusion of

2    the service period that the software could be installed and

3    become productive, and that would be -- the purpose of the

4    MSA would be for us to provide our professional services

5    people to assist them within the scope of work.

6    Q.  And when you say, "Our professional people," you're

7    talking about FICO?

8    A.  Yes.

9    Q.  Did you refer to them as "professional services" or how

10   would you --

11   A.  I did refer to them now as professional services because

12   typically that's what the industry calls the technicians

13   that install the software.

14   Q.  Would the FICO professional services folks actually be

15   working on site with Chubb on the issues you've identified?

16   A.  Typically, yes.

17   Q.  So FICO was expecting to be closely involved with

18   Chubb's use of the Blaze software.  Is that a fair

19   statement?

20   A.  Yes.  Again, as a master services agreement, typically

21   it's only a vehicle that exists between the organizations

22   upon which specific work orders are attached that describe

23   the work effort and the price for that work effort.  So the

24   master services agreement is something that Chubb wanted to

25   have executed, I believe even before the product license

1   agreement, to make sure that we were compatible.

2   Q.  What do you mean by that?

3   A.  "Compatible" meaning that we would accept their terms

4   for an MSA and that we didn't have any untoward terms that

5   they couldn't live with.

6   Q.  And this agreement was related to the software license

7   agreement?

8   A.  It would only be related to the software license

9   agreement in that it would be that product, that license

10  product, that we would be talking about here.

11  Q.  In the master services agreement?

12  A.  That's right.

13  Q.  Sure.  If you take a look at the master services

14  agreement that is attached to the e-mail -- actually, before

15  I get there, you mentioned additional agreements that would

16  be entered into relating to work that would be performed by

17  FICO.  Are those referred to as statements of work or SOWs?

18  A.  The statement of work would drive the work order, yes --

19  Q.  Okay.

20  A.  -- and the pricing.

21  Q.  So just describe to me sort of what documents or

22  agreements are associated with all these things at FICO.

23  A.  Once -- in order to bid and tell the client how much it

24  would cost to build out the appropriate software, you would

25  have to sit with the client and create a statement of -- a

1    scope of work, which is the limits, and it enables the

2    professional services organization to estimate with

3    precision the number of people hours that would be required

4    to build the application suitable to purpose.

5           And so there would be an initial discovery session

6    with the client.  That would be a deliverable document, a

7    discovery document, and then that would drive a statement of

8    work and the pricing for the statement of work, and those

9    would become attachments to the master services agreement.

10   Q.  And then is there a separate work order?

11   A.  I don't know the mechanics in this particular case.

12   Typically, there would be a work order as an exhibit to

13   every -- an addendum to each of the -- to the master

14   services agreement.

15   Q.  Okay.  All right.  So in the e-mail marked as 305,

16   Ms. Boone says she is attaching the updated version of the

17   master services agreement and the standard Blaze software

18   license and maintenance agreement.

19   A.  Yes.

20   Q.  Do you see that in her e-mail?

21   A.  Yes.

22   Q.  Okay.  Then if you look at the master services

23   agreement, which is the first document she attaches, on the

24   first page under the heading "Definitions" --

25   A.  Yes.

1    Q.  -- do you see that Chubb is defined as "Chubb & Son, a

2    division of Federal insurance company, for itself and as

3    servicer for the Chubb Corporations and its non-insurance

4    company subsidiaries or as manager of its insurance company

5    subsidiaries"?  Do you see that?

6    A.  Yes, I do.

7    Q.  And did you place any significance on that definition of

8    Chubb in the master services agreement?

9    A.  I did not place any significance on it.  I assumed that

10   was the requested definition of the client.

11   Q.  From your perspective, you were entering into a

12   license -- FICO was entering into a license agreement with

13   the Chubb group of entities.  Is that a fair statement?

14   A.  I believe that the client definition as contained in

15   this paragraph was what we were entering into.  Again,

16   typically, again, our pricing model is based upon the scope

17   of who the contract entity is --

18              COURT REPORTER:  The model is based upon the

19   scope?

20              THE WITNESS:  Yes, the scope, which is based

21   upon -- which drives the pricing model.  I would not

22   typically get -- it would not interest me what the client's

23   requested legal definition of their company or the

24   contracting party, other than the pricing which we talked

25   about.

1    BY MS. JANUS:

2    Q.  The second document attached to the e-mail marked as

3    Exhibit 305 is what Ms. Boone referred to as FICO's standard

4    Blaze software license and maintenance agreement.

5    A.  Yes.

6    Q.  Do you see that?  Okay.  And this document in the first

7    paragraph states that it's between Fair Isaac Corporation

8    and Chubb & Son, a division of Federal Insurance Company?

9    A.  Yes.

10   Q.  Did you understand that the same entity was entering

11   into both the software license and maintenance agreement and

12   the master services agreement?

13   A.  I would have no reason to think anything other than

14   that.

15   Q.  And, again, that entity was not of significance to you?

16   A.  No.

17   Q.  Paragraph 10.8 of the standard form license agreement

18   relates to -- or is titled "no assignment."  Do you see

19   that?

20   A.  I do.

21   Q.  Are you familiar with that paragraph in the standard

22   FICO license agreement?

23   A.  I'm not familiar with it, but it is typical that a

24   no-assignment clause would be contained within a software

25   licensing agreement.

1    Q.  Did you have any role in negotiating the no-assignment

2    paragraph in the Chubb --

3    A.  No.

4    Q.  -- FICO license agreement?

5    A.  No role.

6    Q.  Have you ever been called upon to interpret the

7    Chubb/FICO no-assignment provision in the license agreement?

8    A.  No.

9    Q.  As you sit here today, unless I asked you to read that

10   paragraph in the final agreement, do you have any idea what

11   the parties agreed to --

12   A.  No, I don't.

13   Q.  -- in connection with the no-assignment paragraph?

14   A.  No.

15   Q.  During your time at FICO, did you have occasion to deal

16   with clients who merged with other entities and engaged with

17   FICO relating to what that merger meant in the context of

18   their license agreement?

19   A.  Not during my tenure at FICO.

20   Q.  Do you have any understanding based on your time at FICO

21   as to how FICO deals with those types of situations?

22   A.  Not at all.

23   Q.  Handing you what has been marked as Deposition Exhibit

24   333 -- no, actually --

25   A.  I believe that the client definition as contained in

```
 1    this paragraph --

 2              THE COURT:  Why don't we pause it now?  There we

 3    go.

 4              Members of the Jury, we've reached our morning

 5    break.  So why don't we plan to be back in the courtroom at

 6    25 minutes to 11:00 on that clock.

 7              THE CLERK:  All rise for the jury.

 8                       (Jury exits.)

 9

10         (In open court without the Jury present.)

11              THE COURT:  Okay.  We're in recess.  See you in 15

12    or so.

13                      (Recess taken.)

14

15         (In open court with the Jury present.)

16              THE COURT:  Go ahead and be seated.

17              All right.  Mr. Hinderaker, we can continue.

18    BY MS. JANUS:

19    Q.  Showing you what has been marked as Deposition Exhibit

20    333 -- actually, no.  You can have that back.  Sorry.  You

21    can keep yours.

22              I'm handing you what has been marked as a document

23    that was previously marked as Deposition Exhibit 108.  This

24    is an e-mail from John Haines to Bill Waid with a copy to

25    you.  And the subject is "Chubb question," correct?
```

LAWRENCE WHITE - DEPOSITION

1    A.  That's correct.

2    Q.  It's dated June 16th, 2006, so it's around the time that

3    the parties have been negotiating the master services

4    agreement, and the standard form license agreement was

5    provided to Chubb at this time, correct?

6    A.  Right.  Yes.

7    Q.  And John Haines says, "Bill, Chubb is inquiring again

8    about an enterprise price, but they want to know if this

9    would include international.  I have attached the quote for

10   your review, but I think that if they wanted to do an ELA,

11   then for this price we could grant them global rights.  They

12   made need more Def seats beyond the 10, so maybe we bump it

13   to a 30-pack."  Did I read that correctly?

14   A.  You did.

15   Q.  Do you recall at this time that Chubb was asking about

16   the enterprise price and whether it would include

17   international?

18   A.  Yes.

19   Q.  And why was the enterprise price being discussed in June

20   of 2006?

21   A.  It's in response to -- it's in response to requests

22   specifically by the client, and I believe that we talked

23   about Ash Winshah's request for a global license capability,

24   and that would have entered into the decision about

25   executing the standard license agreement in June of 2006.

1    Q.   Okay.  So Chubb was inquiring about -- your

2    understanding based on interactions with Chubb was that they

3    were inquiring by enterprise pricing so that they could

4    assess whether they wanted to enter into the first step of

5    the license agreement in June of 2006?

6    A.   Correct.

7    Q.   And do you recall actually having e-mails or

8    conversations with him about this topic?

9    A.   It was a telephonic conversation.

10   Q.   When did that occur?

11   A.   Prior to June 16th.

12   Q.   And what do you recall him saying?

13   A.   He wanted to know if that which we were executing would

14   include rights on an international basis.

15   Q.   Did you respond to him during the phone call?

16   A.   Ultimately, yes.

17   Q.   What do you mean "ultimately"?

18   A.   Finally we did respond, and the price that we had given

19   them for Enterprise License Agreement --

20             COURT REPORTER:  Speak louder.

21             THE WITNESS:  The price that we had finally

22   rendered for the Enterprise License Agreement was not

23   accepted by the client.

24   BY MS. JANUS:

25   Q.   And when did that response take place?

1    A.  Prior to the execution of the licenses.

2    Q.  In June of 2006?

3    A.  Yes.

4    Q.  So was the enterprise license price finalized prior to

5    the license being entered into in June of 2006?

6    A.  No.

7    Q.  Okay.  But a price was provided to Chubb prior to June

8    of 2000 -- or in June of 2006 for enterprise?

9    A.  I submitted a price to James Black, according to your

10   document, on April 4th, 2006 for 2,585,000.

11            COURT REPORTER:  Two million.

12            THE WITNESS:  $2,585,000.

13   BY MS. JANUS:

14   Q.  Where are you looking at?

15   A.  The attachment.

16   Q.  Okay.

17   A.  And that was not a number that Chubb wanted to even

18   negotiate at that point.  It was out of their price range.

19   Q.  So was it left for another day?

20   A.  I have, I have, I have no -- it was certainly put on the

21   back burner.

22   Q.  And this is in the June 2006 time period?

23   A.  That's right.

24   Q.  Okay.  So you believe that you actually e-mailed this --

25   the price quote that is attached to Exhibit 108 to Jim Black

```
1    at some point?

2    A.  According to this document.

3    Q.  Showing you what has been marked as Deposition

4    Exhibit 226.  If you look on the second page of the document

5    and then the bottom of the first page, the same first two

6    e-mails --

7    A.  Yes.

8    Q.  -- have started the e-mail, and then John Haines

9    responds to Bill Waid with a copy to you, again, this is

10   June 16th, 2006, with additional financial information for

11   the Chubb Corporation, correct?

12   A.  Yes.

13   Q.  He states in the third full paragraph of his e-mail,

14   "Net written premiums in 2005 increased 2 percent to 2.3

15   billion," correct?

16   A.  Yes, he does.

17   Q.  "Premiums for the insurance business grew 4 percent, 3

18   percent in the U. S. and 8 percent outside the U. S."?

19   A.  Yes.

20   Q.  So the Chubb Corporations outside of the United States's

21   revenues are included in the information that John Haines is

22   presenting to Bill Waid, correct?

23   A.  That's correct.

24   Q.  In the e-mail above that e-mail, second from the top of

25   the page, Bill Waid writes to Mark Layden, who is mark
```

1    Layden?

2    A.  Waid's boss.

3    Q.  And this is again, June 16th, 2006.  And he says, "Mark,

4    this would be a 1.6 million dollar list price.  John

5    proposed 3 million with 30 percent.  I recommend we do 1.6

6    million with 20 percent.  Thoughts?"

7    A.  It sounds accurate.

8    Q.  What do you mean, "It sounds accurate"?

9    A.  That would come out to about a 1.3 million dollar net

10   deal, and that would include global based upon the numbers

11   that I see here.

12   Q.  And then Mark Layden's response is, "You are correct.

13   Let's not get greedy.  You should make this easier if

14   possible."

15   A.  Tacit approval.

16             COURT REPORTER:  What was that?

17             THE WITNESS:  Tacit approval.

18   BY MS. JANUS:

19   Q.  So at this point it appears that there has been approval

20   for a global enterprise deal at 1.3 million dollars net?

21   A.  Based upon what I see here, 20 percent of 1.6 million

22   would be rounded to 1.3 million.

23   Q.  We were talking about the negotiations between Chubb and

24   FICO in June of 2006.  The last document we looked at was

25   Exhibit 226, which was dated June 16th, 2006.

1          I'm handing you what's been previously marked as

2     Exhibit 107, which is an e-mail dated June 21, 2006.

3          I'm going to be focusing first on the e-mail from

4     you which starts on the second page of Exhibit 107, but take

5     your time to familiarize yourself with the document and let

6     me know when you have done so.

7     A.   Okay.

8     Q.   Okay.  Let's start with the first paragraph.  What are

9     you addressing in that first paragraph?

10    A.   In the software business, quarterly revenue is very

11    important.  We wanted to bring this to a conclusion by the

12    June 30th quarter end.  And so the best time to sell to --

13    to buy from a software vendor is at quarter ends.  So

14    they're looking for concessions expanding the scope when

15    decreasing the price would be examples of concessions.  And

16    that's what we're doing here.  I say without establishing a

17    quid pro quo, meaning it doesn't follow, they, immediately

18    or automatically, they are willing to work hard to expedite

19    the agreement execution, especially if we would extend the

20    scope beyond just the renewals that we had been talking

21    about to include their overall processing, so the specialty

22    business, which they call CSI Express.

23    Q.   And so this is for that first contemplated stage of the

24    license agreement?

25    A.   That's correct.

 1    Q.  Okay.  The second -- I'm sorry.  The last sentence of

 2    the first paragraph states, "They have relented on a

 3    divisional ELA as it's unlikely that claims will be revamped

 4    any time soon."  Do you recall what that refers to?

 5    A.  Divisional ELA would be the all-encompassing processing

 6    for the CSI division.  CSI Express is a portion of that, a

 7    subset of that.

 8    Q.  And so do you recall, was that divisional ELA the

 9    contemplated second step of the license agreement?

10    A.  At this time it was relented.  They did not pursue the

11    divisional ELA.

12    Q.  Okay.

13    A.  But I know that later on they did move to that.

14    Q.  Okay.  And then you talk about the statistics in 2005

15    below your first paragraph; correct?

16    A.  Yes.

17    Q.  And is that relevant to the pricing decision that

18    you're -- and scope decision that you're bringing to --

19    A.  Since the pricing model is contingent upon a

20    determination as to the size of the deal, small, medium and

21    large, if you extended to CSI Express, it might push from a

22    small application to a medium application, which would

23    affect the price computation.

24              COURT REPORTER:  What?

25              THE WITNESS:  Computation.

LAWRENCE - CROSS BY DEPOSITION

```
 1    BY MS. JANUS:

 2    Q.  Under the chart you write --

 3    A.  Yes.

 4    Q.  -- "The following additional salient points should be

 5    considered."

 6              (Interruption during the video)

 7              THE COURT:  I think that's on the video.  Believe

 8    me, you wouldn't confuse it if it were in the courthouse.

 9    BY MS. JANUS:

10    Q.  In your first point, which is labeled A, you talk about

11    your offer on the table.  Could you explain what the details

12    are in the offer?  So you could start with 880,000 in deploy

13    license.  What is that?

14    A.  That's the actual software license --

15    Q.  Okay.

16    A.  -- itself, yeah, plus the 6075, which would be for the,

17    the five seats.

18    Q.  And how is that different, the deploy license versus the

19    developer seats?

20    A.  I don't have a recollection that there is a difference.

21    Q.  Well, it may be sort of second nature for you because

22    you're in the industry; but if you were going to describe to

23    someone, what is a developer seat in the context of a

24    software license agreement?

25    A.  It's the number of people who can simultaneously access
```

LAWRENCE WMOLLOY-BED DEPOSITION A

1    the software for the purpose of building it.

2    Q.  And the deploy aspect of the license?

3    A.  I don't remember the term "deploy license."

4    Q.  Okay.

5    A.  No recollection of it.

6    Q.  Okay.  The next thing is training is at 40K.  So there

7    was an aspect of the deal that FICO would provide training

8    for 40,000?

9    A.  Yes.

10   Q.  And "PS engagement will likely go for somewhere between

11   650,000 and 800,000, depending on final configuration."

12   What is that?

13   A.  For the renewal segment for CSI, we would charge for our

14   technicians to build the software depending upon the

15   statement of work, so priced between $650 and 800,000

16   additional, over and above the license costs.

17   Q.  Subpart B is "Upon undertaking a rewrite of CSI Express,

18   we would likely close a PS deal of at least one million."

19   What does that --

20   A.  Again --

21   Q.  -- mean?

22   A.  I'm sorry.  Assuming that we're talking about the larger

23   component of which renewals is a subset, but to utilize our

24   professional services technical staff to rewrite their

25   entire processing business, CSI Express, the deal would be

LAWRENCE WYNKOOP - DEPOSITION

1    one million dollars.

2    Q.   Subpoint C is, "The renewal project is a showcase that

3    will -- when successfully completed in December 2006 --

4    result in a push to negotiate a global ELA that Bill Waid

5    has quoted at around 1.6 million with 100 percent credit of

6    the license amounts paid in the previous 12 months."

7         Did I read that correctly?

8    A.   Absolutely, yes.  And the interpretation or variation of

9    that is this initial small project, small -- in pricing

10   terminology small is that first step; and once the results

11   are shown and the value is perceived, there will be add-on

12   requirements for the global ELA, which Waid has said would

13   be 1.6 million.

14   Q.   And in this e-mail on June 21, 2006, you do not state

15   that Chubb has rejected the proposed global ELA price,

16   correct?

17   A.   Well, it's at this point, as I look at this, it's off

18   the table for this first go-around; but once the results of

19   the production implementation is accomplished, they would be

20   interested in going the next step.

21   Q.   Okay.  So it was still on the table for future --

22   A.   That's right.

23   Q.   -- negotiation?

24   A.   Exactly right.

25   Q.   Then you say, "John, we're at a critical point in the

1  negotiation of the PS deal.  I'd like to be able to give a

2  small win to the Chubb team, and I think we'll more than

3  make it up in goodwill dollars going forward."

4          What did you mean by that?

5  A.  Because of the size of the professional services

6  engagement, I was recommending that they expand the scope

7  beyond the renewal segment to include all CSI Express for no

8  additional expense.

9  Q.  Handing you what has been marked as Deposition

10  Exhibit 333.

11          COURT REPORTER:  What number?

12          MS. JANUS:  333.

13  BY MS. JANUS:

14  Q.  This is a series of e-mails, if you want to just take a

15  look through it and let me know when you have familiarized

16  yourself with it.

17  A.  Good.  I'm ready whenever you are.

18  Q.  Okay.  So Exhibit 333 starts with the same e-mail

19  exchange that we looked at in Exhibit 107 towards the back

20  of the document, correct?

21  A.  In the back, yes.

22  Q.  And then there are a couple of additional e-mails

23  exchanged between you and others on the FICO team, correct?

24  A.  Yes.

25  Q.  On the bottom of the second page and the top of the

1    third page, Bill Waid wrote to John Haines on June 21, "Are

2    these annual numbers?  What is net written premium?"

3              So he, again, is looking for the, as you called

4    it, the macro information relating to the entity's revenues?

5    A.  Yes.

6    Q.  Then John writes to you on June 21, 2006, and says,

7    "Larry, see Bill's comments below.  Let's clarify info

8    before we make the deal, but I also want to get the

9    reference, press release, and case study commitment too."

10             What is he referring to there?

11   A.  If we sweeten the deal as Chubb requested we do, we want

12   some assurance that they will, A, always be a good reference

13   for us and that we could refer other clients outside of

14   Chubb or even within Chubb to this group for positive

15   feedback, which would help us sell new business, likewise, a

16   press release, which is where the joint -- well FICO and

17   Chubb would agree on wording to announce this close of

18   business and what they're intending to do with the business

19   and what the potential results could be and that would be

20   important for us on a marketing basis, and also finally for

21   us to professionally write up a slip page, two-page

22   document, that would describe the business problem and the

23   business solution and the results perceived as a result of

24   the implementation, and that would be in the form of a case

25   study, and that's typically the way most software

1    organizations sell their -- and market their product to

2    others.  It's a mechanism of case studies.  That would be a

3    real value -- I'm sorry -- that would be real value to FICO.

4    Q.  You respond at the bottom of the first page of

5    Exhibit 333 on June 21 to John Haines, and you include

6    information relating to CSI underwriting processes, correct?

7    A.  Yes.  Yes.

8    Q.  Including the number of renewals, the number of new

9    business quotes, number of policies issued and what

10   percentage renewals represent, correct?

11   A.  Yes.

12   Q.  And then you include additional information relating to

13   the -- Chubb specialty insurance line of business, including

14   the fact that it has 1,000 employees and 3.5 billion in

15   revenue, correct?

16   A.  Right.

17   Q.  And then if you follow the chain up, it looks like at

18   the top of the first page Bill Waid approves the proposal

19   that you made?

20   A.  That's correct.

21   Q.  Showing you what's been marked as Deposition

22   Exhibit 110.  After you've had a chance to familiarize with

23   this document, my question would be, Do you recognize

24   Exhibit 110 to be the final software license and maintenance

25   agreement between Chubb and FICO, along with Amendment One

1    and Amendment Two?

2    A.  Yes.

3    Q.  So the final software license agreement was entered into

4    a June 30th, 2006, correct?

5    A.  Correct.

6    Q.  Showing you what has been marked as Deposition

7    Exhibit 111, this is an e-mail from Sally Holt to Bill Waid

8    dated December 1, 2006.

9              MR. HINDERAKER:  I suppose for clarity of the

10   record we should just acknowledge that this is an excerpt

11   from a document that is probably an inch thick.  I

12   understand why we're dealing with only a selected portion of

13   it, but just so we know where it came from.

14             MS. JANUS:  Yes.

15   BY MS. JANUS:

16   Q.  The attachment to the e-mail is named "SE Opt Reports."

17   Do you see in the subject line of the e-mail?

18   A.  Yes.

19   Q.  And the attachment to Exhibit 111 is an excerpt from

20   that document as it was produced by FICO.

21   A.  Yes.

22   Q.  If you look at the page labeled on the bottom 5639,

23   there is an entry or several entries under the heading

24   "Chubb Global" ELA.  Do you see that?

25   A.  Yes.

1    Q.  And do you recall what the purpose of the document was

2    at FICO?

3    A.  I have never seen it before.  It was done by Sally, who

4    is the director of engineering, reporting to Bill Waid.

5    It's not something that I would typically see that I

6    remember anyway at this point.

7    Q.  So the title of the entry is "Chubb Global ELA,"

8    correct?

9    A.  Yes.

10   Q.  And if you look halfway down the page, there is a yellow

11   set of boxes under the heading "Current Status."  Do you see

12   that?

13   A.  Yes.

14   Q.  It says, "Last update date November 30th, 2006,"

15   correct?

16   A.  Yes.

17   Q.  And then it says, "Current status, pricing sent to Chubb

18   of 1.5 million for global ELA (Blaze Advisor)," correct?

19   A.  Correct.

20   Q.  At this time FICO and Chubb were negotiating the

21   enterprise aspect of the license agreement, correct?

22   A.  That's correct.

23   Q.  This document indicates that internally at Chubb the ELA

24   that was being negotiated was considered to be a global ELA,

25   correct?

LAWRANCE VINCENT HADLEY - DEPOSITION

795

1    A.  We were negotiating for a global ELA, correct.

2    Q.  Were you communicating with Sally about the status of

3    those negotiations, do you recall?

4    A.  I was speaking with Sally fairly regularly at this

5    point.  It was a big deal, and so Sally was tracking its

6    progress, and Sally did participate, it seems, according to

7    this note, that we did do an on-site meeting with 30

8    attendees to discuss the commercial side of the business and

9    get closer to an ELA in 2007.

10   Q.  It was a big deal, meaning a big deal for FICO?

11   A.  Size, dollar size.

12   Q.  Yep.  In the entry below the one you just referred to

13   with the 30 attendees --

14   A.  Yes.

15   Q.  -- the document states, "Larry has been working with

16   Chubb to get an ELA through this year.  The total after

17   credit for global ELA, including COBOL and SmartForms, was

18   priced out at 1.5 million.  I need to get an update on

19   Chubb's response to the proposal."  Is that right?

20   A.  Yes.

21   Q.  So is the 1.5 million proposal one that you provided

22   after entering into the June 2006 portion of the license?

23   A.  Yes.

24   Q.  Do you recall how you provided that?

25   A.  No, I don't.

1    Q.  Do you recall who you provided it to?

2    A.  Not specifically, no.

3    Q.  Do you recall any e-mails or discussions that you were

4    having in this time period with Chubb relating to the global

5    ELA?

6    A.  Yes.

7    Q.  Tell me what you recall.

8    A.  One negotiating point was that the 1.5 million was too

9    high, and there was a determination to de-limit the ELA by

10   two factors.  One is a COBOL, that's capitol C-O-B-O-L,

11   version of the software, and the second is to de-limit

12   SmartForms, which is a functionality specifically included

13   as an option, and together those would be $200,000, which

14   would bring down the price of the global ELA to 1.3 million

15   dollars, which is consistent with the Waid's original.

16   Q.  That was consistent with the e-mail we looked at earlier

17   today with the 1.6 and the 20 percent discount?

18   A.  Yeah -- well, Waid wasn't talking -- I don't know

19   whether he was talking about a global ELA at that 1.3

20   number.  This appears to be 1.3 million.

21   Q.  Right.  And we can -- I mean, the record speaks for

22   itself.

23   A.  Yes.

24   Q.  We did look at an e-mail talking about global and that

25   number; but when you're talking about the de-limiting of

EDWARD C. MCVANEY - 30(b)(6) DEPOSITION

1    COBOL and SmartForms and the 1.3 number, where are you

2    looking on the document?

3    A.  That's not contained on this.

4    Q.  And so there was -- there were conversations between you

5    and Chubb that FICO could do the global ELA deal for 1.3

6    million if COBOL and SmartForms were taken out of the --

7    A.  That's my understanding.

8    Q.  Do you recall who you had those conversations with?

9    A.  No.  It would have been John Haines, and he in turn with

10   Bill Waid.

11              COURT REPORTER:  And then in turn --

12              THE WITNESS:  And he in turn with Bill Waid.

13   BY MS. JANUS:

14   Q.  Do you recall who at Chubb you had the conversations

15   with?

16   A.  I, I don't have a specific recollection, but I would say

17   Sully.

18   Q.  Did Sully express to you why it was important to Chubb

19   to obtain a global license?

20   A.  It was beyond his purview.  He is not a global person.

21   Q.  So he was just passing on requests from others at Chubb?

22   A.  That's right.

23   Q.  Showing you what has been marked as Exhibit 113.  This

24   is an e-mail from you to Mark Layden, Michael Gordon, Bill

25   Waid, John Haines, Russ Schreiber on December 12th, 2006.

```
 1    The subject of the e-mail is "Chubb ELA pricing rationale

 2    from Russ and Larry," the quote pursuit team, correct?

 3    A.  Yes.

 4    Q.  And what do you mean by "the pursuit team"?

 5    A.  The people who are driving the conversation, the sales

 6    team.

 7    Q.  The conversation with Chubb?

 8    A.  Yes.

 9    Q.  Do you recall what this e-mail related to, generally?

10    A.  Yes.  Mark Layden was going to have a personal

11    conversation with Folz and Bolen and negotiate the close --

12    closure.

13    Q.  Of the enterprise aspect of the license agreement?

14    A.  What was remaining for December, yes, for a December

15    close.

16    Q.  So was your purpose in writing this e-mail to update

17    them relating to the current status of negotiations?

18    A.  That's correct.

19    Q.  At this point on December 12th, the ELA that was being

20    negotiated was a global ELA, correct?

21    A.  I don't know the answer to that.  I don't see that.

22    Q.  Take a look at the back of Exhibit 113, the second page

23    of the e-mail.  In the third paragraph on that page, you

24    say, "Again, we're at 1.05 million for global ELA plus 50K

25    for unlimited seats."
```

LAWRENCE WILLIAMS - DEPOSITION

```
 1    A.  Okay.

 2    Q.  Does that refresh your recollection then at this point

 3    the negotiation was for a global ELA?

 4    A.  Yeah, and that number a million 50 is net, net meaning

 5    after credits.

 6    Q.  What do you mean by that?

 7    A.  There was a stipulation that the June '06 contract

 8    payments, the 350K, would be creditable towards an ELA if it

 9    were done in '06, and these numbers here are net numbers.

10    Although it doesn't say it specifically, it's intended that

11    that million, 50 was after the $350,000 credit.

12    Q.  Okay.  So that's just something you recall?

13    A.  Yes.

14    Q.  Okay.  Because that's not apparent from the document --

15    A.  No, not at all.

16    Q.  -- the document itself, correct?

17    A.  That's right.

18    Q.  Same question for e-mails.  Do you recall whether any of

19    the back and forth relating to the December discussions took

20    place, between FICO and Chubb, took place by e-mail?

21    A.  No, I don't remember that.  Typically we would do it in

22    telephone conversations, negotiating.

23    Q.  Then there is the pricing rationale section and you say,

24    "Following is a breakdown of premium revenue '05 by business

25    unit at Chubb," correct?
```

EDWARD WOJTOWICZ - DEPOSITION

1    A.   Yes.

2    Q.   And this is information that you took from their annual

3    report?

4    A.   I don't remember.   I would have.

5    Q.   Okay.   Why did you include that information in this

6    e-mail?

7    A.   Again, it's consistent with our macro pricing model, the

8    macro pricing model being that we would take a percentage of

9    the revenues as our fee.   Interestingly, the international

10   piece of business is not here.   This total is like 90

11   percent and --

12   Q.   Well, if you look at the next page --

13   A.   Oh, there it is.   8.1.   Okay.   There it is.   Okay.

14   Q.   So the global business is included --

15   A.   Yes.

16   Q.   -- in what you set forth for the pricing rationale,

17   correct?

18   A.   Yes.

19   Q.   Again -- okay.   So the next paragraph states, "Again,

20   we're at 1,050,000 for global ELA plus 50,000 for unlimited

21   seats," correct?

22   A.   That's what it states.

23   Q.   And then you say, "I think we need to find out what

24   number they're trying to fit too, so we can possibly offer

25   the ELA in chunks as we did the June deal.   Chunks could

LAWRENCE WACHS - 30(b)(6) DEPOSITION

1    include .NET, Java or unlimited Dev sets," correct?

2    A.  Yes.

3    Q.  So you thought that there would still be some room to

4    maneuver on the price for the global ELA?

5    A.  Piecemeal Yes.

6    Q.  All right.  Moving on then to Exhibit 112.  This is an

7    e-mail exchange between you and Jim Black and Russ Schreiber

8    and then -- so lower on the page and then at the top some

9    internal correspondence.  Give me a sign when you've had a

10   chance to review it.

11   A.  Sure.  Okay.

12   Q.  And then Russ says, "As I was thinking about it, why we

13   would drop our price further (other than being easy), a

14   press release would be worth 100K to us."

15           Do you see that?

16   A.  Yes, I do.

17   Q.  So Russ Schreiber was suggesting that dropping the ELA

18   price by 100,000 in exchange for a press release would be,

19   would be --

20   A.  Good business.

21   Q.  -- good business?

22           Mr. Wachs, before the break we were talking about

23   the e-mails that were exchanged in December of 2006 among

24   FICO employees relating to the negotiation of the enterprise

25   aspect of the license, correct?

1    A.  Correct.

2    Q.  Did you conclude at that time that Chubb had purchased a

3    global Enterprise License Agreement?

4    A.  I did not conclude that.

5    Q.  Did you conclude that Chubb had purchased a license that

6    was in some way different from a global Enterprise License

7    Agreement?

8    A.  In none of the conversations and during the pricing

9    finally agreed upon did we extend beyond the United States

10   as far as I know.

11   Q.  So --

12   A.  As far as I remember.

13   Q.  So at the time you were not a part of the conversation

14   that took place to finally negotiate the Enterprise License

15   Agreement between Mark Layden, Phil Folz and Julia Bolen,

16   correct?

17   A.  That's correct.

18   Q.  And you have no recollection of any conversations with

19   anyone relating to the outcome of that meeting, correct?

20   A.  Correct.

21   Q.  Did you actually form a conclusion about whether the

22   Enterprise License Agreement that was entered into in

23   December 2006 was global or not global?

24   A.  I didn't have any reason to form that conclusion.  No

25   one asked me.

EDWARD W. WELKER - DEPOSITION

```
 1    Q.  So I've handed you what has been marked as Exhibit 116.

 2    Is this one of the documents you reviewed to prepare for

 3    your deposition?

 4    A.  Yes.

 5    Q.  This is an e-mail from you to Russ Schreiber dated

 6    November 26th, 2008, correct?

 7    A.  That's right.

 8    Q.  Having reviewed the document, do you recall what led to

 9    you writing this e-mail?

10    A.  It appears that it was a request from Russ Schreiber for

11    my views on the status of the ELA and whether it did include

12    a global provision or not.

13    Q.  And do you recall actually having a conversation with

14    Russ Schreiber on that topic?

15    A.  No, I don't have a recollection of that.

16    Q.  You state that in reviewing your notes and some archived

17    e-mails, "It's apparent to me that the corporate ELA that

18    was negotiated with Phil Folz and June Drewey intended to

19    include the global license," correct?

20    A.  That is what I stated.

21    Q.  So you concluded after reviewing archived e-mails and

22    your notes that the ELA was a global license?

23    A.  That's -- that I don't agree with necessarily.  It says

24    that it's apparent that it intended to include the global

25    license, but I can't tell you specifically that it did.
```

1    Q.  Okay.  What is the distinction between what you're

2    saying and what I said?

3    A.  Well, the way I worded it, it's apparent that it

4    intended to include the global license.  The question is in

5    the final what was actually paid by Chubb would indicate

6    that there is a difference of about $100,000, and I don't

7    see the wording, for example, changed from a definition of

8    territory.  So there is some evidence that it did not

9    include -- that it was never finally accepted as global, but

10   I don't have the e-mail or any thread from Phil -- from Mark

11   Layden to indicate what was finally agreed on at that

12   private meeting that he attended, so I can't draw that

13   conclusion.  It's apparent that they wanted global, but I

14   don't know if it ever came to fruition.

15   Q.  So you just don't know --

16            COURT REPORTER:  If it ever came to what?

17            THE WITNESS:  Fruition.

18   BY MS. JANUS:

19   Q.  But you believe that it was intended to include --

20   A.  That's right.

21   Q.  -- the ELA was intended to include the global license?

22   A.  That is what I said.

23   Q.  Do you know whether in fact after November of 2008 FICO

24   assisted Chubb in implementing the Blaze Advisor software in

25   Europe?

```
1    A.  I don't believe that that was the way I read the e-mail

2    from the invitation of Mike Sawyer when he states that to --

3    license agreement and a plan for Chubb Europe, he's talking

4    about a sales opportunity.

5    Q.  So you don't know whether FICO interpreted the

6    Enterprise License Agreement going forward as including

7    global access or not.  You just don't know?

8    A.  I don't know.

9    Q.  What notes are you referring to in your e-mail marked as

10   116?

11   A.  It would be the notes that -- the e-mails that you have

12   produced here clearly.  Notes would have been perhaps

13   notebooks of -- as I attended meetings, I may have taken

14   notes at the meeting.

15   Q.  So handwritten notes that you may have?

16   A.  Handwritten notes, yes.

17   Q.  Okay.  And do you know where those handwritten notes are

18   today?

19   A.  Thrown away years ago.

20   Q.  Was that something that you took with you when you left

21   FICO?

22   A.  The notebooks, yes.

23   Q.  And do you know for a fact that you don't have those

24   anymore?

25   A.  Yeah.  We had a super storm, Sandy, and those notebooks
```

LAWRENCE WACHS - BY DEPOSITION

1    were in the basement and are no longer available.

2              MS. JANUS:  Those are all the questions I have for

3    you.

4              THE WITNESS:  Thank you.

5              MS. JANUS:  Thank you for your time today.

6              THE WITNESS:  Thank you.

7              MR. HINDERAKER:  I have a few questions for you.

8    Let me get my materials.

9                            **EXAMINATION**

10   BY MR. HINDERAKER:

11   Q.  Mr. Wachs, I'm going to give you a copy of Exhibit 143,

12   and you -- can you identify this as the RFI that was

13   received from Chubb & Son, a division of Federal insurance

14   company?

15             COURT REPORTER:  You identified this as the what?

16   BY MR. HINDERAKER:

17   Q.  Can you identify this as the RFI that was received from

18   Chubb & Son, a division of Federal Insurance Company,

19   regarding its interest in the Blaze Advisor software?

20   A.  Yes, I can.

21   Q.  Okay.  And that is what it is?

22   A.  That is what it is.

23   Q.  Okay.  I just -- you mentioned some of this in your

24   earlier testimony, I believe, but if you would go to page 5

25   of this exhibit.  And you see in the third paragraph there

LAWRENCE WILLIAMS - DEPOSITION

1   is a description of the Chubb & Son specialty insurance?

2   A.  Yes, I do.

3   Q.  All right.  And referencing the relatively small number

4   of very large accounts, referencing the 1,000 employees that

5   we have seen in some of your e-mails, and then it has a

6   sentence, "The key strategic initiative in this area is

7   expanding and growing the business into mid-market and

8   smaller accounts."  Do you see where I have read?

9   A.  Yes.

10  Q.  Did you learn anything more from Chubb & Sons regarding

11  that -- the nature of that key strategic initiative and your

12  response to the RFI?

13  A.  Yes.  They -- by expanding the marketplace to the small

14  and middle-sized accounts, they expected an order of

15  magnitude increase in the number of work items that they had

16  to review and underwrite, and they did not have the staff

17  and did not have the budget for the staff that would be

18  necessary in their current processing manner.  And so they

19  were looking for an automated decision and management

20  software that would positively affect the scaleability of

21  their business so that they could take on new revenue

22  streams.

23  Q.  And by "scaleability," that's a phrase you used earlier.

24  Would you tell us what that means?

25  A.  To bring about -- for the use of automation to bring

1    about productivity gains so that their investment in the

2    processing can be reduced and they would not have to hire

3    and train and manage additional staffing.

4    Q.  Is scaleability a way of saying the ability to handle

5    higher volumes of business?

6    A.  Sure.

7    Q.  And how did -- how did you present Blaze Advisor

8    software as meeting that key strategic initiative?

9    A.  Decision management software in general and specifically

10   Blaze Advisor, as an industry leader, is able to process

11   large volumes of transactions, requests for decisions, rules

12   basis or -- can be greater than 25 to 50,000 rules making

13   decisions, and it can all be done in machine time.  So they

14   are able to meet deadlines, take on new business and -- and

15   become a much more agile organization as they can very

16   easily do what I call what-if transactions where they can

17   run the book of business at certain rules and then modify

18   the rules and run the same book of business and see the

19   positive effect on their balance sheet and profit and loss

20   statements.

21   Q.  You mentioned the what-if analysis earlier, and I

22   appreciate the description.  How does that benefit -- how

23   does that benefit Chubb & Son?

24   A.  They can make informed business decisions and they're no

25   longer trial and error.  They're able to determine what

1    level of investment and what marketplace to spend in, for

2    which gets the biggest bang for the buck.

3    Q.  Does it have any impact on speed?

4    A.  It's all about speed, not only speed of processing, but

5    there's the speed of examining the marketplace and being

6    able to change things quickly and interactively based upon a

7    sensing of what's going on in the marketplace.

8    Q.  With that ability, can you get products to market

9    faster?

10   A.  It's all about time to value, yes.

11   Q.  And by "time to value," what do you mean by that?

12   A.  Once there is a perceived need for modification of the

13   software, being able to set about to invoke a standard

14   development life cycle and get a product -- a change or a

15   new rules base or a new decision into production very

16   quickly.

17   Q.  And how does that relate to or impact the ability of

18   Chubb & Son to have a new insurance product to market?  You

19   can you answer my question, please.

20   A.  Sure.  You're able to modify the book of business on the

21   fly by business people rather than technologists.  You don't

22   have to suffer the standard queue online waiting for the IT

23   folk to make changes, because the business people are able

24   to make their changes with the software in English language

25   without having to do coding.  That enables them to change

LAWRENCE WASLCIN - DEPOSITION

1    things, to run AB analysis examining different groups,

2    changing the rules, and they can -- seeing the results of

3    those rules.  It positively affects the business.

4    Q.  If you turn to page 6 of the RFI, and you see it lists

5    out the current CSI business goals and then it has four

6    bullet points.  Can you tell us more from -- did you learn

7    more from Chubb & Son with respect to those business goals?

8    A.  As a result of our discovery effort, are you saying?

9    Q.  Yes, as a result of your working with Chubb & Son.

10   A.  I believe that they well stated their business goals,

11   they understood their business well.

12   Q.  Okay.  Good.  Then on page 7 of the RFI, they describe

13   their current state of renewal processing.  If you would

14   review that for a moment.

15          And my question is going to be to you on your

16   discussions and -- from your discussions with Chubb & Son,

17   what changes to their current state were they seeking to

18   achieve through the technology of Blaze Advisor?

19   A.  Well, there were a number of different changes.  For one

20   thing, they ran their policy -- the policy is up for renewal

21   on a monthly basis in -- in the current state of the world.

22   They were looking to do that with much more -- the cycle

23   time could be reduced greatly, they could run them daily,

24   or, more importantly, they could be run by the business unit

25   rather than waiting for a technologist to run those cycles

1    so that they can make adjustments to the extent that you can

2    change a policy rating more interactively, you can derive a

3    greater profitability because of the period of time that you

4    are now able to -- a variation in price rather than go with

5    the standard pricing, so you created a value in your actual

6    premium revenues.

7            The ability to -- they talk about Section 1 rules

8    within their specialty renewal business.  They can vary the

9    attributes of the claims, of the -- I'm sorry -- of the

10   limits and the deductibles and the term length in various

11   ways and be able to penetrate and make changes that create a

12   better reward-risk ratio and thus greater revenue

13   profitability.

14   Q.  And if we go to page 11 of the RFI, there is a heading

15   at the bottom of the page, "Renewal processing:  Future

16   state."

17   A.  Yes.

18   Q.  And they -- Chubb & Son in the RFI says, "The goal of

19   this project is to create an application and architecture to

20   allow for a streamlined rules" --

21           COURT REPORTER:  To what?

22   BY MR. HINDERAKER:

23   Q.  -- 'to allow for a streamlined rules-based renewal

24   processing engine."

25           It goes on to say, "An additional goal is to build

LAWRENCE WILKINS — DEPOSITION

1    the foundation for a future state architecture for

2    rules-based processing that can be applied to new projects

3    as we seek to improve the efficiency of our

4    business-processing environment."

5    A.   A key architectural element of a rules-based product

6    like Blaze Advisor is that the rules are separated from the

7    likes and stored in a nonredundant central mass database;

8    therefore, as new products get created, you can now utilize

9    the rules that are sitting in this database for your

10   application without having to continually rewrite those

11   rules and then also to conform that a single rules change,

12   like an interest rate, for example, or risk factor in

13   changing it in one place, in one rule, can then affect all

14   of the applications that are drawing on that one rule

15   change.  So your ability to come to market with new products

16   in a new architecture is greatly enhanced.

17   Q.   Is that an element -- is that a matter of speed again?

18   A.   Certainly speed is a key consideration.

19   Q.   What other considerations go into that?

20   A.   Uniformity, auditability, the ability for a business to

21   consistently apply rules for the ability of people to

22   understand the rules that are firing and the decisions that

23   are being made.  And that's key in customer service.  It's

24   key in business to be able to accept or reject business.

25   Q.   Would you -- thank you.  Would you look and find

1    Exhibit 105, please.  Well, rather than search around, here

2    is another copy of it.

3              You were asked about Exhibit 105 earlier today,

4    and this is an another copy of Exhibit 105.  And I guess my

5    question to you about this, about this Exhibit 105 -- I

6    guess first we should establish that you are the author of

7    the content?

8    A.  I am.

9    Q.  And with respect to FICO's response to Chubb & Son's

10   RFI, is Exhibit 105 a fair summary of the response?

11   A.  Of whose response?

12   Q.  Of FICO's response to the RFI.

13   A.  In broadly general terms, yes.

14   Q.  So as we saw, the RFI is dated early February 2006.

15   Your e-mail, Exhibit 105, is February 22, 2006.  In those

16   discussions that you had with Chubb & Son, either weekly or

17   every ten days that you mentioned, what was the subject

18   matter of those discussions as you moved the process forward

19   before the license agreement was signed?

20   A.  Typically, those conversations had to do with the

21   creation of a proof of concept that would enable us to

22   remove any doubt that we had the superior product.  While

23   there were other rules management systems on the market, it

24   was incumbent on FICO at the time to be able to show that

25   rules could be created faster, that they could be executed

1    faster, that they could be managed easier and by business

2    people.

3           And each one of those attributes of the product

4    needed to be proved to the client, and so we would create

5    code, show examples of what we did, and define the scope --

6    understand their rationale and how they create their rules

7    and how they would create them in the new existence and new

8    product.  And then it was a question of refining their scope

9    so that we can give accurate pricing --

10   Q.  Okay.

11   A.  -- for both the product as well as the professional

12   services engagement.

13   Q.  All right.  So let me move the process forward a little

14   bit to after the license agreement is signed in June of

15   2006.  Is there a next phase that might be called client

16   acceptance or client testing?  What was the next phase?

17   A.  Well, as the license agreement is executed and then the

18   master services agreement was executed, it was necessary for

19   us to craft the actual product and the way it worked within

20   their environment.  That required our technical people to

21   begin to code, to begin to draft a bespoke version of the

22   software that made sense to the application it was being

23   written for.  Like any other application development

24   project, you have to follow a certain structured development

25   life cycle.

LAWRENCE WILLIAMS - DEPOSITION

1          Once the units -- and I call them units.  I call

2     them building blocks.  Once those building blocks are

3     created, you unit test each of those building blocks, and

4     then you start to glue those building blocks together to

5     perform a more fully functional product, which then can be,

6     again, tested by the users in the form of acceptance testing

7     or full quality control to make sure that if I run this

8     business in the as-is state and then I run it again in the

9     future state, I'm going to get the same results or that I am

10    going to accept the changes because that was designed that

11    way.

12          So what I'm saying is, you have to quality control

13    your product acceptance, and that was conditional, and

14    anybody that is buying a professional services engagement

15    has to be able to finally accept the work product

16    deliverable.  And those are steps -- were key steps in the

17    process.

18    Q.  And were you involved in that process with Chubb & Son?

19    A.  Yes, I attended the status meeting.

20    Q.  Okay.  And were you in meetings where either the

21    business people or the IT people of Chubb commented upon the

22    performance of the software in that context of the

23    acceptance testing?

24    A.  One of those folks -- and this is told to me by, I

25    believe, Sully -- was so impressed, he said that I just did

1    in one afternoon myself, utilizing the Blaze Advisor

2    software, something that would have taken months and

3    hundreds of thousands of dollars of budget for that same

4    process to be done by IT.  This product implementation has

5    basically paid for itself on the first time we ran it.

6    Q.  And that was from Sully?

7    A.  Yes.

8    Q.  Okay.  And then did any of the business -- did any of

9    the business people of Chubb & Son comment on how the use of

10   the product, that is, Blaze Advisor, would be able to assist

11   them in growing their revenue, moving into the mid-market?

12   A.  Only that within the first full year they did succeed in

13   accepting considerably more business than they had in the

14   previous year for no increase in staff.

15   Q.  This was identified in an earlier deposition as

16   Exhibit 330, dated November 3, 2006.  Placing a time, it's

17   after the June license agreement.  It's after the divisional

18   and it's before the second amendment.

19           Do you know who prepared Exhibit 330?

20   A.  I did.

21   Q.  And what was the purposes of Exhibit 330?

22   A.  Sales training within FICO.

23   Q.  So internal, internal to FICO?

24   A.  Yes.

25   Q.  Okay.  And I think maybe the title tells us what we need

1    to know, but would you just give us a general description of

2    what this document was intended to say and teach?

3    A.  It was a full, if you will, client journey document here

4    which described the business need, the intended solution,

5    how we built the solution, and the results of the

6    implementation.

7    Q.  Okay.  And is this fair to say that this summarizes your

8    firsthand experience in that process of selling to Chubb?

9    A.  Certainly.

10   Q.  Maybe just a couple more questions about this.  If you

11   go to the page that is 5877 where it says, "Chubb specialty

12   insurance business" and has the bullet points.

13   A.  Yes.

14   Q.  What, what was the source of this information that's on

15   this letter?

16   A.  Interestingly, the bullet that talks about 3.5 billion

17   comes from the RFI from Chubb.

18   Q.  Mm-hmm (Yes).

19   A.  1,000 employees comes from the RFI.  100,000 policies

20   written comes from RFI.  And the enterprise-wide premium

21   revenue comes from the earlier intent -- or I should say a

22   summary intent to talk about what would have come from the

23   annual report.

24   Q.  Okay.  And then on the next page, which is 5878, same

25   question:  What was the source of your understanding of the

```
1    Chubb current state?
2    A.  Initially, in that first response, it was the RFI, and
3    it was refined through subsequent weekly conversations with
4    the technology team headed by Sully.
5    Q.  And then on the next page, 5879, you lay out the vision
6    statement and then you lay out success criteria.  Do you
7    know if the success -- do you know if the success criteria
8    were met?
9    A.  I do know that they automated their renewals --
10   Q.  Mm-hmm.
11   A.  -- in short order.  I do know that from the testimony of
12   the business people that they did -- they were able to
13   access and modify the rules; and through the analysis tools
14   of the Blaze Advisor product, they would be able to know
15   which rules are the best rules and which rules are the worst
16   rules and, in effect, modify them accordingly.
17           THE COURT:  All right.  Members of the Jury, we're
18   going to take our break now.  And I have a matter that I and
19   the lawyers need to take up during the break, so why don't
20   you plan to be back in the courtroom at 1:35 on that clock.
21   Okay?
22           THE CLERK:  All rise for the jury.
23                       (Jury exits.)
24
25           (In open court without the Jury present.)
```

1          THE COURT:  All right.  Go ahead and be seated.

2          We're going to take about a ten-minute break here,

3    and then I will come back up and give you my ruling on the

4    various issues that have been briefed over the last couple

5    of days.  Okay?  Be back here about 12:00 or shortly

6    thereafter.

7                    **(Recess taken.)**

8

9          **(In open court without the Jury present.)**

10         THE COURT:  All right.  Let's go on the record.

11         All right.  We're here in the courtroom outside

12    the presence of the jury.  I'm going to give the Court's

13    ruling on the various cross motions for exclusion of

14    evidence of -- defendants' motion to exclude evidence of

15    settlement agreements that FICO has achieved with other

16    Blaze Advisor licensees, and those are basically Dockets

17    Numbers 1086, 1094 and 1103, and FICO's motion to exclude

18    evidence of perpetual licenses between FICO and other Blaze

19    Advisor licensees.  Those are Dockets 1097, 1098, 1101, and

20    I believe either 1103 or 1106 from this morning -- 1106 from

21    last night, rather.

22         In order to give context to my ruling and further

23    guidance, I will give the parties -- I'm going to start with

24    the legal rule as it relates to actual damages in this case.

25         Judge Wright has found and neither party

1     challenges that the measure of actual damages in this case

2     is both for the alleged infringement and the alleged breach

3     of contract, that that measure is the market value of the

4     license fee for the infringing use.  This is found by

5     applying an objective standard using the paradigm of a

6     hypothetical negotiation between a willing seller and a

7     willing buyer.

8              As described by the Second Circuit in the *On Davis*

9     case, which appears to be the seminal decision in this area,

10    and it is the one on which Judge Wright relied most heavily,

11    and here I'm going to fully quote the relevant language from

12    that case.

13             "The reasonable license fee on which a willing

14    buyer and a willing seller would have agreed for the use

15    taken by the infringer," and again I'm going to emphasize

16    that last seven words of that test, "for the use taken by

17    the infringer," which is quoted at 246 F.3d at 167.

18             It is clear to this Court from *On Davis* and the

19    cases following it, as well as the somewhat, somewhat

20    analogous patent infringement context, that improving this

21    reasonable license fee that results from the hypothetical

22    negotiation, the jury may hear evidence that includes -- and

23    here I'm quoting from *Safka*, "expert testimony, prior sales

24    history and evidence of sales of comparable assets," which

25    is to say other reasonably similar license agreements, and I

1    would cite the parties to *Safka Holdings* at 42 F.Supp.3d

2    488, pin cite 493.

3              I would also virtually cite all of the cases cited

4    by the parties in their various filings on this issue,

5    including *Gaylord,* M2M Solutions, *Audio MPEG* and *Utah*

6    *Medical.*  Simply stated, the admission of other license

7    agreements is as a general proposition well accepted.

8              In addition, each party, and/or their experts as

9    appropriate, may introduce evidence of the kinds of

10   considerations that would factor into such a hypothetical

11   negotiation based on their knowledge and experience.

12             Finally, it is equally clear that neither party

13   can put in evidence, nor have their lawyers argue:  This is

14   what I would have charged or what I would have paid for such

15   a license.  With those rules in mind, let me turn to the

16   specific issues before the Court.

17             As to the settlement agreements between FICO and

18   third parties, they are inadmissible.  Third-party licenses

19   are admissible to show the value of a license, but in the

20   context of a settlement agreement, Rule 408 makes it clear

21   that the agreement is inadmissible to prove the value of the

22   claim, that is in that circumstance the license, since the

23   offer may be motivated by a desire for peace, and those

24   settlement agreements are therefore inadmissible.  They're

25   irrelevant as well as prejudicial because they may

1    improperly suggest to the jury the value of a claim.

2         And courts have routinely excluded such agreements

3    to settle that involved licenses like these, and I would

4    cite the parties to, among other things, *LaserDynamics* and

5    *Uniloc*.  So based on that, the following exhibits are

6    excluded, and these are all plaintiff numbers.

7         So P424, 425, 430, 437, 439, 803, 810 and 812.  I

8    am reserving ruling on two exhibits that have been

9    identified, P427 and P767.  These agreements do not on their

10   face indicate that they are settlements, and if FICO can lay

11   proper foundation that they were the result of an arm's

12   length negotiation that occurred not under the threat of a

13   claim of breach or infringement, they are admissible.

14        Turning now to the admissibility of the

15   third-party perpetual licenses involving FICO, FICO argues

16   that because they are perpetual initial licenses, they are

17   not economically comparable to the hypothetical license at

18   issue here, and therefore they must also be excluded.

19        I agree with FICO that third-party licenses may

20   only be admitted after a threshold showing that they are

21   sufficiently comparable.  From the cases the parties have

22   cited, however, that level of comparability is not a high

23   bar.  It is not by any means the same as substantially

24   similar.

25        Many of the cases are cited from the patent

1  context, and in the patent context, which is different, it

2  requires sort of distilling those cases down.  They seem to

3  require that the licenses involve similar or same technology

4  and be generally economically comparable.

5          So in this case, I find that the third-party

6  licenses here meet the low threshold for admissibility and

7  concern over their dissimilarities go to the weight of the

8  evidence and are more than fair game for cross-examination.

9          Simply stated, they are licenses for Blaze Advisor

10  between FICO and another entity.  The fact that they are

11  perpetual, rather than for a fixed term, is a more than fair

12  field of inquiry by FICO, and FICO is more than free to

13  admit testimony and evidence why the considerations that go

14  into the hypothetical license negotiation are different from

15  those that are involved in initial perpetual licenses like

16  these.

17          I will also note that two of the licenses, as I

18  read them, D172 and D281, do not appear to be perpetual

19  licenses.  So some further guidance to the parties.  This

20  issue or fight over actual damages has focused the parties a

21  little bit more concretely, I think, on the standard for

22  actual damages.  I mentioned at the outset that the license

23  fee is premised on the infringer's use, that is the license

24  that is being negotiated for in the hypothetical

25  negotiation.

1          And in order to avoid some of the disputes that

2     have arisen, I am going to define now the scope or the

3     license that is the subject of the hypothetical negotiation,

4     and at the end of the case, this will be, or something,

5     very, very close to this, will be the instruction to the

6     jury.

7          The license that is the subject of the

8     hypothetical negotiation is a one-time, enterprise-wide

9     global license to use Blaze Advisor for internal business

10    purposes in 15 applications for a period of three years by

11    an insurance company with annual revenues of approximately

12    30 billion.  Let me just pause there so people can follow

13    that, and I want to emphasize something that I just said.

14    It's a one-time, three-year license.

15          So and that is the economic circumstance in which

16    the hypothetical negotiation is occurring.  So let me turn

17    to the last issue about whether those license agreements may

18    also be introduced as evidence of the meaning of the FICO

19    Federal license, and I find that they cannot be.

20          I've reviewed the cases by Federal.  They fall

21    into two categories, I would say.  Most of them involve

22    evidence that or contracts between the two parties involved

23    in the litigation.

24          The other case, which is the *Quadrant* case, really

25    involves a different circumstance where the Court was

1      construing the meaning of a provision in a contract that had

2      very discrete language and looked to how two other decisions

3      by a court had interpreted very similar language that just

4      omitted one word, and so this was not a circumstance where

5      the jury was considering how do I interpret an ambiguous

6      contract based on a whole variety of agreements, but rather

7      the Court was applying interpretations of other courts as a

8      matter of law to a very discrete set of or very discrete bit

9      of language in a contract before it.

10             So I find that Federal's cases are inapposite, and

11     FICO's cases generally establish the point that I think is

12     accurate that parol evidence is, if not exclusively, then

13     virtually exclusively, evidence of course of dealings

14     between the two parties at issue in the litigation, which is

15     not the case with the license agreements between FICO and

16     third parties, and I would exclude those licenses or limit

17     their admission to not prove the meaning of this contract.

18             And I would also say that that is based not only

19     on what I have just said, but also on Rule 403 and the

20     danger that this might confuse the jury or waste time or

21     unfairly prejudice FICO.  That said, obviously Federal is

22     free to ask a witness, couldn't you have used language like

23     such and such, not referencing the agreement, but you can

24     use, couldn't you have used language like this.

25             And in that circumstance if the witness says, no,

1    we could not have or we never have, then, you know, it's a

2    fair subject of impeachment, but the agreements may not be

3    put in for that purpose, and I will consider giving a

4    curative instruction or an instruction at the end of the

5    case on that topic.

6              All right.  That's the Court's ruling on those

7    issues.  Let me ask.

8              Mr. Hinderaker, any need for clarification?

9              MR. HINDERAKER:  I think I understand.  So from

10   point of view of clarification, no.  From the point of view

11   of our factual evidence, some of the, some of the years of

12   use of the application are more than three years, but so

13   there is a -- there is an issue around that, limiting it to

14   a three-year term.

15             THE COURT:  Understood.

16             MR. HINDERAKER:  Limiting it to a term I have no

17   quarrel with.  Limiting it to a certain -- the term limits

18   should be in line with the evidence.

19             THE COURT:  It should, and I will look to the

20   parties to tell me what the term is.  I think it should be

21   the maximum term of any of the uses, so if it's four years,

22   it's four years, if you're following what I'm saying.

23             And then I would say, I have described it as a 30

24   billion dollar enterprise.  Again, I'm looking to the

25   parties to make sure that I have that right number.  I think

1    you know what number I'm referring to.

2              Anything further on your side, Mr. Hinderaker?

3              MR. HINDERAKER:  No, Your Honor.  I understand the

4    construct.  I understand the Court's thinking, I think, and

5    then it will conform with the evidence as it finally comes

6    in in the trial.

7              THE COURT:  Very well.  And let me just before I

8    turn to Federal for a second, let me just say a couple of

9    things.

10             Ms. Kliebenstein's letter not last night but the

11   one immediately previous to that, I just want to say

12   contained a complete, accurate and fair summary and a clear

13   understanding of what I had said, so I appreciate that.  One

14   other thing you guys should know.  There is no way you would

15   know this.  We don't have access to Lexus.  We have Westlaw,

16   so if you cite Lexus cases, I can usually find them on

17   Westlaw, but not always.

18             So if you do cite Lexus, if you wouldn't mind

19   attaching a copy of the case, that would be helpful.  Okay.

20   Any questions or clarification by Federal?

21             MS. GODESKY:  So we noticed the same thing

22   Mr. Hinderaker raised about the term of the license.  So we

23   will think about that and come back to the Court.  Just so

24   it's clear, this hypothetical negotiation is in the context

25   of willing buyer, willing seller, not someone under the

1    threat of copyright infringement if they're continuing to

2    use the product.

3              THE COURT:  Correct.

4              MS. GODESKY:  Okay.

5              THE COURT:  It is an arm length negotiation

6    between a willing buyer and a willing seller, and so, yes.

7    That context cannot under the law include the fact of threat

8    of litigation or claim of breach, that one of the cases, and

9    I believe it was *On Davis*, maybe it was one of the other

10   ones, made it very clear that the infringer's use not

11   accounting for the claim of infringement.  Okay?

12             MS. GODESKY:  And then, Your Honor, on the last

13   issue you ruled on, this issue of introducing other license

14   agreements to resolve the ambiguity in Section 10.8, we

15   certainly --

16             THE COURT:  You disagree.  I understand.

17             MS. GODESKY:  We disagree, yes, but I also think

18   your ruling did not address another reason why these

19   contracts are plainly admissible which is, the door has been

20   opened.  Mr. Hinderaker opened this case by declaring this

21   is the standard FICO language, and then Ms. Boone came on

22   the stand and said this is the standard 10.8 language, and

23   this is its business purpose.

24             And so we have to be able to challenge that with

25   evidence that shows, this isn't standard language.  It's

1    different in, I mean, they produced hundreds of contracts.

2    I have no intention of producing or entering into evidence

3    hundreds of contracts, but we should be able to show there

4    is nothing to prove that this is the standard Section 10.8,

5    and the business purpose that they're describing is

6    reflected in numerous other contracts that they regularly

7    enter into and are completely distinct from the provision in

8    this contract.

9           The door is open, and we have to be able to

10   challenge this notion that this is standard and consistent

11   with our standard business purpose.

12          THE COURT:  I would, I would say this:  I think

13   you can challenge the notion that this is standard language.

14   Okay?  And to that extent, the agreements that come into

15   evidence can demonstrate that it's not or the jury can

16   decide whether it's standard language, but what it can't be

17   used for is to say if, in order to interpret 10.8 in this

18   contract, you need to consider the language of these 10

19   other license agreements.  That I think is beyond what the

20   law allows, and so it's a very thin distinction.

21          But the license agreements, you know, I've said

22   they come in for whatever use the jury decides to make of

23   them in the hypothetical negotiation.  I think you are free

24   to say that the claim that this is standard language is

25   belied by other evidence, but Mr. Hinderaker is more than

1    free -- I'll give you a second -- is more than free to say,

2    you know, there is no evidence that it's not standard.

3    There is just, we have a lot of agreements.

4           So I understand your point, but I don't think you

5    can get from there to, and therefore, this is how to

6    interpret 10.8 in light of the language of these other

7    agreements.

8           MS. GODESKY:  But they have their witnesses, Your

9    Honor.  We saw it with Ms. Boone, and I expect to see it

10   from other witnesses testifying that we, we have a standard

11   business purpose behind our assignment clauses, and the

12   standard purpose is that if there is a merger or acquisition

13   that results in more revenue, right, we have the ability to

14   get more money through a license fee.

15          And the fact that there are numerous license

16   agreements that actually say that, if there is a merger or

17   acquisition that results in more revenue we have a right to

18   get additional license fee, in contrast to the Chubb license

19   agreement, that is completely probative of resolving the

20   ambiguity in 10.8.  They know how to negotiate that language

21   in to serve the business purpose.

22          They didn't here, and the jury should be free to

23   consider that.

24          THE COURT:  Well, the problem with that I think

25   is, you are assuming that that is -- you said they are free

1    to negotiate it, but there is no evidence that that's what

2    was coming from FICO or that FICO thought that language

3    meant anything different from what was in your agreement.

4           MS. GODESKY:  Your Honor, that just goes to the

5    weight of the evidence.  That's fodder for

6    cross-examination.  If Mr. Hinderaker wants to elicit that

7    type of testimony if it's true, that's absolutely fair game,

8    but, you know, the jury is presented with this ambiguity.

9           Under New York law, extrinsic evidence that can

10   resolve the ambiguity is absolutely fair game.  There is,

11   there is -- we've heard very little from witnesses in terms

12   of, you know, the communications between the parties about

13   what this provision meant.  And so certainly if business

14   purpose is, you know, more money if more revenue, and that

15   language appears in certain contracts but not in ours,

16   that's relevant to resolving the ambiguity.

17          They can challenge it.  There is responses like

18   the one that you just, I don't know, suggested, but to not

19   let us probe this issue is, you know, completely carving out

20   all of -- very relevant bucket of extrinsic evidence.

21          THE COURT:  Go ahead, Mr. Hinderaker.  Is this

22   issue coming up with Mr. Carretta, do we think?

23          MR. HINDERAKER:  Yes.

24          MS. GODESKY:  Yes.

25          THE COURT:  Okay.

1           MR. HINDERAKER:  I think it starts to get off

2     track with the word "standard."  And as Ms. Boone said and

3     her e-mail said, here is our standard contract, our specimen

4     contract for Blaze Advisor.  As the Court has already noted,

5     New York law, the cases that we cite are clear that if

6     you're going into parol -- if you're going to go into the

7     interpretation of a contract, that has to be tethered to the

8     parties to the case.

9           When -- and then as Ms. Boone testified, every

10     contract -- and as counsel for defense has argued, every

11     contract is unique.  Every contract is the product of its

12     own unique negotiation.  Every client being motivated by

13     that client's motivations.  So to bring in other contracts

14     unique to themselves, unique to their own motivations

15     without any evidence of the, of that, those facts, one,

16     we're contrary to the law because it's not relevant to the

17     meaning of these two parties to this contract.

18           And secondly, it's a vehicle to create, without

19     any factual support, lawyer argument, lawyer argument that

20     in this contract this provision meant such and so without

21     having any idea of what the parties to that different

22     contract were trying to accomplish in their negotiations.

23           THE COURT:  Well, all right.  Understood.  Go

24     ahead and be seated, Mr. Hinderaker.

25           So, first of all, Mr. Carretta is not going to

1    testify to the meaning of 10.8, right?

2          MS. GODESKY:  I believe Mr. Carretta is going to

3    talk about the business purpose of 10.8, and he's going to

4    echo what we heard.  I have to say, Your Honor, the transfer

5    fees they opened on standard.  Ms. Boone's e-mail said

6    standard.  She testified about standard, you know.  They've

7    locked themselves into this position, and we have to be

8    entitled to challenge it.  I'm not talking about dozens of

9    agreements.

10          THE COURT:  I don't disagree with the notion.

11    You're talking about cross-examination, and if the witness,

12    yes, I agree that if the witness said this is standard

13    language, the business reason behind this says this, it is

14    fair cross-examination to say, you know, other language

15    might express this business purpose in a different way or a

16    clearer way, and in fact such language has been used in FICO

17    contracts.  That's fair.

18          What I'm -- that's all fair cross-examination in

19    response to what the testimony is.  What I'm saying is, you

20    don't get to introduce these agreements to say, when you

21    interpret 10.8 of this contract, you have to interpret it in

22    light of this language.  There is a difference there, and

23    there is a line I'm drawing.

24          MS. GODESKY:  I just think the one thing I will

25    say is, under New York law, right, the doctrine of when

1      you're interpreting an ambiguity, the absence of words that

2      are routinely used in other contracts is significant, and so

3      what we should be able to argue to the jury at the end of

4      the case is, look at these three or four agreements.  They

5      specifically said if revenue increases because of a merger

6      or acquisition, we're going to renegotiate the license fee.

7              So, ladies and gentlemen, the fact that that

8      language was not negotiated into the Chubb agreement, that

9      says something.  There is a significance to that.

10             THE COURT:  All right.  Well, I'm not sure any of

11     the cases that Federal has cited support that.  All of the

12     cases that you have cited are involving language and

13     differences in language between the same two parties, other

14     than this *Quadrant* case.  But the --

15             Go ahead.

16             MS. GODESKY:  I think the *Starter Corp* Second

17     Circuit case addresses one party's agreement with other

18     companies, and I think that FICO's cases are inapposite.  I

19     mean, these are discovery dispute type cases.  These are

20     cases where you didn't have a party contending that they had

21     a standard contract, right?

22             The Southern District of Ohio case was about a

23     contract provision that was unambiguous.  There is an

24     ambiguity here, and New York law is clear.  I mean, it's

25     like the core principle of New York law.  Once the Court

1    finds an ambiguity, extrinsic evidence has to come in.

2             THE COURT:  It does.

3             MS. GODESKY:  And this is absolutely probative

4    extrinsic evidence.

5             THE COURT:  And I think I've made it clear that

6    you can, you know, first of all it springs off their

7    testimony, and you have so far been allowed to cross-examine

8    in exactly the manner you have suggested, right?

9             MS. GODESKY:  Yes, and it wasn't objected to at

10   the time so a reference to a curative instruction, I mean I

11   would absolutely object to that because I walked through

12   Ms. Boone's cross-examination very slowly.  I didn't publish

13   anything to the jury.

14            You asked Mr. Hinderaker if there was an objection

15   to the one agreement we admitted.  There was no objection.

16   So there is definitely no basis for a curative instruction,

17   and if we hear Mr. Carretta talking about, this is the

18   business purpose behind the provision or this is our

19   standard general language when it comes to assignments and

20   mergers, I mean, I think I should be able to confront him

21   not only with this general question of, isn't it true that

22   in certain circumstances you used different language, but

23   also show the jury a couple examples of that language.

24            These are contracts that were negotiated

25   contemporaneously by folks in his legal department, and the

1    absence of this specificity in the Chubb agreement is

2    meaningful, and it's certainly probative of trying to

3    resolve the ambiguity.

4           I mean, the jury, like I said, you know, we

5    haven't heard much from witnesses about conversations about

6    this clause.  So this is, this is relevant and probative.

7           THE COURT:  I think what you and I are debating

8    right now is not what happens when Mr. Carretta is on the

9    stand so much as what happens in final argument.

10          MS. GODESKY:  I think that's mostly correct,

11   except I, I would like to be able to, if we hear what I'm

12   anticipating, to do what I did with Ms. Boone and show him a

13   couple agreements.

14          THE COURT:  And I -- that is proper.

15          MS. GODESKY:  Okay.

16          THE COURT:  Okay?

17          MS. GODESKY:  Thank you, Your Honor.

18          THE COURT:  But it's, but it's a question of what

19   he says, and it's also a question of how you frame your

20   questions.

21          MS. GODESKY:  Understood.

22          THE COURT:  Okay.

23          Mr. Hinderaker, you have been very patient.  Did

24   you want to come up and address further?

25          MR. HINDERAKER:  I would like to say this:  What

1    we know from Judge Wright's order is that the extent that

2    paragraph 10.8 has been found to be ambiguous is in the

3    phrase, "And client shall make no expanded use."

4           And counsel is using the word "ambiguity" when it

5    is specific to that element of 10.8 to try to make 10.8 into

6    something that it's not.

7           This 10.8 in this license agreement is as written.

8    There are various other license agreements where the parties

9    negotiated various other terms that would be implicated upon

10   a merger, upon an acquisition or upon some other event.

11   Some clients had different motivations for what they wanted

12   to be able to be free to do.  FICO had to consider whether

13   it was willing to agree to that.

14          Each of these negotiations is different, and none

15   of the, none of the examples that counsel is arguing about

16   are directed to that phrase, that element of 10.8 that has

17   been found to be ambiguous.  She wants the language of 10.8

18   to read other than it does.

19          So I think the Court's -- none of these agreements

20   should be in evidence, and just as Ms. Boone said, sure,

21   license agreements are negotiated.  Sure, the negotiations

22   result in different terms.  Not a surprise.  Not a big

23   revelation.

24          But then if you start to use other people's

25   negotiations to beat up the meaning of this one between

1     these parties, when as far as I know, all of the evidence of

2     the back and forth between these parties and 10.8 is already

3     in evidence, the red lining between Mr. Black and Ms. Boone.

4          THE COURT:  And wasn't, if I might just say, it

5     wasn't terribly illuminating, frankly.

6          MR. HINDERAKER:  Because there wasn't any real red

7     lining -- there wasn't any negotiations to 10.8 other than

8     adding "shall not be unreasonably withheld."

9          THE COURT:  I understand, but the

10    cross-examination we're describing is fair game depending on

11    what the witness says whether -- and showing those exhibits

12    as part of the impeachment is fine.  Whether what limits, if

13    any, will be placed on the final argument we'll address

14    further on down the road.

15         And I will look back at your cases again, but I

16    don't -- I did not read the Second Circuit case the way you

17    did.  So I will go read it again.

18         MS. GODESKY:  So will I.  Your Honor --

19         MR. HINDERAKER:  And the ruling stands that -- the

20    ruling stands today that those third-party agreements are

21    not admitted into evidence.

22         THE COURT:  Well, they're admitted into evidence

23    as to the hypothetical negotiation.  They're relevant to --

24         MR. HINDERAKER:  Yes.  As to the --

25         THE COURT:  And they can be used to, as

1    cross-examination of the witness, depending on what the

2    witness says.  For the moment, they're not going to be used

3    to argue that the meaning of this is what's in these

4    agreements.

5            MR. HINDERAKER:  As opposed to wasn't.

6            THE COURT:  What?  Go ahead.

7            MS. GODESKY:  I will make one last point in

8    response to Mr. Hinderaker.  So he pointed out this

9    ambiguity with the phrase "expanded use."  Everyone agrees

10   that is ambiguous.

11           THE COURT:  It precluded summary judgment.  Beyond

12   that --

13           MS. GODESKY:  The definition I used with Ms. Boone

14   had expanded use.  And we're going to lock it in the day

15   before the merger, and if you're increasing the number of

16   applications, that would be expanded use.  So that is

17   absolutely an example of how these other agreements resolve

18   ambiguities, because we're going to hear from FICO that the

19   measure of expanded use is the number of writing companies

20   running through these computer applications.

21           I should be able to argue the way that FICO

22   measures expanded use in its day-to-day business operations

23   as reflected in these other agreements is the number of

24   computer applications using Blaze.  That should be fair

25   game, and it should be admitted into evidence.

1           MR. HINDERAKER:  As Your Honor has already noted,

2      it's not parol evidence.  It's not admissible as parol

3      evidence.  It's not admissible as to the meaning of this

4      contract.  It's not between the parties.

5           MS. GODESKY:  We just fundamentally disagree with

6      that because there is an ambiguity, and as I've, you know,

7      as I've said over and over, the fact that FICO is defining

8      expanded use in a particular way with other parties buying

9      Blaze is absolutely relevant to how we're going to measure

10     expanded use.

11          THE COURT:  Understood.  For the moment, we're

12     just going to proceed in the manner I have suggested.  The

13     agreements can be used to cross-examine the witness, and you

14     can certainly make those points in your cross-examination.

15          MS. GODESKY:  Understood.  Thank you.

16          THE COURT:  All right.  We're in recess.

17                    **(Lunch recess taken.)**

18     **1:35 p.m.**

19                         **IN OPEN COURT**

20                      **(JURY NOT PRESENT)**

21          THE COURT:  Good afternoon.  Be seated.

22          All right.  Good everyone, everyone.

23          Before we bring the jury in, I did take the noon

24     hour to reread *Starter Corp* and *Borne*, the case underlying

25     it or the case that *Starter* cites to, and I just think

1     that -- I think I've got it right.

2          The extrinsic evidence to prove the plural

3     possessive parties' intent in those cases involved letters

4     and course of dealings and agreements between the parties.

5     And that makes sense to prove the parties' intent in a

6     particular agreement.

7          And the problem with using FICO's agreements with

8     others is, they don't necessarily or we don't have the same

9     context for saying this is the parties', plural possessive,

10    intent in this case.

11         So you're welcome, if you find cases in which

12    extrinsic evidence is of this nature, by all means, call

13    them to the Court's attention.

14         As I've indicated, you are, you are free to use

15    these in cross-examination, but I don't think that they are

16    extrinsic evidence of the parties' intent as to 10.8.

17         MS. GODESKY:  Thank you.

18         THE COURT:  Okay.  Before we bring the jury in,

19    anything else we need to deal with?

20         MR. HINDERAKER:  No, Your Honor.  I don't know how

21    long cross will be.  The direct will be an hour plus,

22    probably.  As a courtesy, Mr. Carretta is a San Diego

23    resident.  I think his flight time tonight is like -- I'm

24    not sure -- about 7-ish.

25         THE COURT:  Okay.

1        MR. HINDERAKER:  So I'm hopeful we can finish him.

2   I am hopeful we can get to the next witness, but in terms of

3   scheduling, I hope we can at least finish Mr. Carretta.

4        MS. GODESKY:  I would be surprised if we don't.

5        MR. HINDERAKER:  Very well.  Glad to hear.

6        THE COURT:  Very well.

7   1:38 p.m.

8                    **IN OPEN COURT**

9                    **(JURY PRESENT)**

10        THE COURT:  Be seated.

11        Mr. Hinderaker, call your next, if you would.

12        MR. HINDERAKER:  Your Honor, FICO calls Thomas

13   Carretta.

14        THE COURT:  Come on up, Mr. Carretta.  Well, if

15   you will just stop and raise your right hand.

16        THE WITNESS:  Yes, sir.

17                    <u>THOMAS CARRETTA</u>,

18   called on behalf of the plaintiff, was duly sworn, was

19   examined and testified as follows:

20        THE WITNESS:  I do, sir.

21        THE COURT:  Go ahead and be seated and state your

22   full name for the record.  Make sure you speak into the mic.

23        THE WITNESS:  Thomas Frank Carretta.

24        MR. HINDERAKER:  These are exhibits that we will

25   be using today, and you will see they are tabbed.

1

2                      DIRECT EXAMINATION

3    BY MR. HINDERAKER:

4    Q.  Good afternoon.  We know that you are retired from FICO.

5    When did you retire?

6    A.  December 16th of 2020.

7    Q.  Happily retired?

8    A.  Yes.

9    Q.  What was your job at FICO or your job title before

10   retirement?

11   A.  Vice president legal and deputy general counsel.

12   Q.  And how many years did you have that position?

13   A.  I was hired as vice president legal, we didn't have that

14   other title, back when I joined in June of 2005.

15   Q.  Okay.

16   A.  And then sometime later, I don't remember when.

17   Q.  Sometime later the responsibilities increased?

18   A.  A little bit, yes.

19   Q.  For how much of that time -- well let me ask this:

20   During your time and your duties at FICO, did you have

21   responsibility for the, for transactions, for contracting,

22   for license agreements?

23   A.  Yes.  I was responsible for team folks that we managed

24   the transactions.

25   Q.  Tom, the mic goes up and down.

1    A.  Okay.

2    Q.  And I hit it too much.  So if you would speak into it,

3    we can all hear better.

4    A.  Okay.

5    Q.  So you were saying you were what?

6    A.  I was responsible for a team of lawyers and myself, and

7    we managed the commercial transactions for the group.

8    Q.  And how many lawyers were in your team?

9    A.  I think at the time -- it ebbed and flowed, but it was

10   approximately 18 lawyers and 6 or 7 paralegals.

11   Q.  For how many years did you lead the transactional group

12   at FICO?

13   A.  My entire career at FICO.

14   Q.  Had you had experience with software licensing before

15   FICO?

16   A.  Yes, I have.

17   Q.  And could you summarize that for us please.

18   A.  Yes.  I practiced at a small group of computer

19   companies, hardware and software, for about ten years.  Then

20   went to a privately owned company in Mankato, CWC Computers

21   now known as Fire Pond or changed its name to Fire Pond,

22   went to be a public company through that process of an

23   initial IPO in 1999, 2000 period.

24           And then I moved to ReTech, which is located right

25   here in Minneapolis or was at the time.  I worked there

1    about five years before it was sold to Oracle, and then I

2    moved immediately over to Fair Isaac Corporation or known as

3    FICO.

4    Q.  And what was the business of ReTech?

5    A.  ReTech was an enterprise software company that supported

6    large retailers, so clients like Best Buy, Target, most of

7    the major big retail, retailers.

8    Q.  You were a lawyer at ReTech.

9    A.  Yes, I was general counsel at ReTech.

10   Q.  And in that role had responsibility for the licensing

11   transactions, the contracting transactions of ReTech?

12   A.  That is correct.

13   Q.  And prior to ReTech, Fire Pond, you were a lawyer at

14   Fire Pond as well?

15   A.  That's right.  I was general counsel at Fire Pond as

16   well.

17   Q.  And what were your responsibilities at Fire Pond with

18   respect to contract transactions, licensing transactions?

19   A.  I was responsible for that process.

20   Q.  And I forgot to ask you.  What was the business of Fire

21   Pond?

22   A.  Fire Pond manufactured something called a configurator.

23   It was an enterprise piece of software that was -- our

24   primary customers were people like John Deere, Peterbilt

25   Trucks, anything with big wheels on it, General Motors, to

1   enable them to identify the product the customer wanted to

2   buy, like a Peterbilt truck.

3           And they have 50,000 options, and they would sort

4   through all those options and eliminate things that you

5   couldn't buy and then add things that you should buy.  So if

6   you were buying a truck to go over the mountains, you have

7   bigger brakes, bigger radiator, that kind of thing.

8   Q.  Let's go a little further back in time before your

9   involvement in the software industry and licensing.  Tell us

10  your educational background, where you grew up, where you we

11  want to school.

12  A.  Sure.  Born in Los Angeles.  I went to Loyola Marymount,

13  a Jesuit school in Los Angeles.  My background was an

14  English literature major.  After I graduated there in 1980,

15  I moved to Minneapolis and lived here up until August of

16  last year.

17          Oh, sorry.  I should say, and I went to Hamline

18  University Law School.

19  Q.  I'm glad you graduated from law school.

20  A.  Yes, graduated in 1983.

21  Q.  In the binder is a document that's called J1.  Can you

22  find that please.

23  A.  Yes, I see it.

24  Q.  And do you recognize that as the license agreement

25  between FICO and Chubb & Son?

1    A.  I do.

2    Q.  All right.  Did you have any, did you have any direct

3    role in the drafting of this agreement?

4    A.  No, I did not.

5    Q.  When did you first become aware of this agreement?

6    A.  It would have been in the latter portion of 2015.

7    Q.  And why did you become aware of it?

8    A.  I worked -- in my role, I interface a lot with

9    salespeople, all the way from the executive vice president

10   who is responsible for global sales to the regional managers

11   and so on.  So I became familiar with gentleman named Russ

12   Schreiber and Mike Sawyer who came to me to ask some

13   questions about this agreement, like I said late.

14   Q.  What were the questions that they asked?

15   A.  They had become aware that there was a potential merger

16   that had been announced between the entire organization of

17   Chubb with a Swiss company called ACE.  Those aren't the

18   proper names, but Chubb Corporation.  And they wanted to ask

19   some questions about the agreement.

20   Q.  And in particular, do you recall in particular what the

21   questions were they had about the agreement?

22   A.  Yes.  It was primarily what happens because of the

23   merger, and so therefore I looked at this particular

24   agreement.

25   Q.  And is there a particular paragraph that was pertinent

1     to that question?

2     A.   There's one particular paragraph that's on point, which

3     was Section 10.8, but I read the entire agreement as well.

4     Q.   Okay.  And what did you, what did you tell Mr. Schreiber

5     and/or Mr. Sawyer about what they should do?

6              MS. GODESKY:  Objection.

7              THE COURT:  Let's approach, Counsel.

8                     (Sidebar discussion)

9              MR. HINDERAKER:  I think he's going to say I told

10    them to call the client.

11             THE COURT:  Okay.  And it's your, just want to be

12    clear, that's not legal advice as far as you are concerned.

13             MR. HINDERAKER:  I see what you are saying.  I

14    took it as just a fact of what he did.

15             THE COURT:  Okay.

16             MR. HINDERAKER:  But, yeah, but I suppose --

17             MS. GODESKY:  I mean I didn't know what he was

18    going to say.

19             MR. HINDERAKER:  No, I'm not quarreling why we're

20    having the conversation, but you know, it does lead up to

21    transparency.  It does lead up into, you know, the fact they

22    had been contact yet, and so I will ask Carretta his

23    understanding had they been contacted yet, and he will say

24    not to my knowledge.

25             THE COURT:  That's all fine.  Yeah.  Yeah.

1              MS. GODESKY:  I mean, I think that's okay, but

2      he's --

3              MR. HINDERAKER:  It's not for legal advice.

4              MS. GODESKY:  But it is.  This is information that

5      Sawyer and Schreiber apparently told him in the process of

6      asking for legal advice.  So if we're disclosing some of the

7      things that they're telling him, like we haven't yet been

8      contacted by Chubb, here's the situation, it starts to go

9      into the whole sword/shield issue because they're

10     withholding a lot of communications between Mr. Carretta and

11     Mr. Sawyer and Schreiber.

12             And so, you know, I think Mr. Sawyer and

13     Mr. Schreiber were asked about their communications with

14     Chubb at their depositions, and those facts are properly

15     established through --

16             THE COURT:  They're already in evidence.

17             MR. HINDERAKER:  And he'll tie it up win the

18     context of the thing he did, which was prompt them to do it.

19             THE COURT:  I don't think that's legal advice.  I

20     understand your concern, and it's, you know, again be very

21     careful.  And I know you want to be very careful.

22             MR. HINDERAKER:  One step at a time.

23             THE COURT:  Right.

24             MS. GODESKY:  Okay.

25                       (In open court)

1   BY MR. HINDERAKER:

2   Q.  I'm going to ask you this question first.  To your

3   knowledge, had Schreiber or Mr. Sawyer been contacted by

4   Chubb & Son regarding the announced merger?

5   A.  I don't know.  All right.  So I'll repeat I don't know.

6   Q.  All right.  And what did you tell them to do regarding

7   contacting the client?

8   A.  I told them I would read the announcement that they had

9   talked about and would read the agreement and get back to

10  them.

11  Q.  Get back to Sawyer and Schreiber?

12  A.  That's correct.

13  Q.  Okay.  I would like to go to, if I might go to in your

14  tab what is Exhibit 90.

15  A.  Okay.

16  Q.  And would you identify, identify Exhibit 90 for us

17  please.

18  A.  Exhibit 90 is a letter I wrote in January.  It's dated

19  January 27th of 2016, regarding a notice of breach of the

20  agreement that we just referred to, and it's written to the

21  general counsel of the Chubb Group, Mr. Joe Wayland, Joseph

22  Wayland.

23  Q.  All right.  I'd like to go through what you wrote in

24  this agreement.

25          So let's start with, if we might, let's start with

1    the third paragraph.

2           And you say to him, "I am writing now to again

3    confirm the agreement may not be transferred or assigned

4    without FICO's consent."  I'll continue on but let me stop

5    at that point.

6           Why do you say, "I am writing now to again

7    confirm"?

8    A.  Because prior to this point in speaking with Mike Sawyer

9    and Russ Schreiber, after I did some review, I asked them to

10   go back to the business, their contacts at Chubb, Chubb &

11   Sons, and tell them you should be aware this agreement is

12   out there, obviously, because they'd purchased and been

13   using the software, but that there's a particular clause

14   that is involved when there is a merger or acquisition such

15   as what was described.

16   Q.  So that explains the "again."

17          "Confirm that the agreement may not be transferred

18   and assigned without FICO's consent and that FICO has not

19   and does not consent to such transfer and agreement."

20          Is that a reference to paragraph -- well, what

21   were you referring with that sentence?

22   A.  I was referencing Section 10.8 of the agreement that is

23   J001.

24   Q.  Okay.

25   A.  That's the license agreement.  And pointing out that,

1    you know, we had not consented, just to be very clear, and

2    that we were not consenting to the transfer and an

3    assignment.

4    Q.  Are you referencing the first sentence in 10.8 in that

5    regard?

6    A.  I very much am.

7    Q.  And at this point did you have any information from

8    Chubb & Son with respect to the facts underlying the

9    acquisition or any facts relating to the acquisition?

10   A.  Well, when I saw the announcement, I read it, and I'm

11   experienced in mergers and acquisitions through the course

12   of my career, and so I understood the process.  So I read

13   the announcement.  I knew the announcement was simply that,

14   it was an announcement that they had signed the agreement,

15   but that these take time to close.  And actually the merger

16   be completed.

17          So I read that, and because it was such a large

18   merger and Chubb Corporation was an American public company,

19   so it files with the Securities Exchange Commission reports

20   and things, I was able to read some of the filings.

21          And between those activities and reading the

22   agreement, it became clear to me to tell Russ Schreiber and

23   Mike Sawyer they should go back to their business contacts

24   before the merger was completed.

25          You can never tell when these mergers are going to

1     complete and close.

2     Q.  Okay.  And then this letter January 27th is after the

3     merger was completed, correct?

4     A.  Yes, it is.

5     Q.  All right.  And so you're saying in that first sentence:

6     "FICO has not and does not consent."

7                    And then let me go to the second sentence of your

8     third paragraph.  "The agreement plainly states in

9     Section 10.8 that the agreement may not be assigned without

10    consent," and it goes on.

11                   "A change of control or merger and acquisition of

12    Chubb was also stated as being a deemed assignment requiring

13    consent."

14                   And what are you saying there when you say "was

15    also"?

16    A.  Well, there's -- the way Section 10.8 was structured --

17                   MS. GODESKY:  Objection.

18                   THE COURT:  Sustained.  Why don't you rephrase it

19    or --

20                   Mr. Carretta, you can answer the question that was

21    asked.  You cannot provide testimony about your

22    interpretation of the contract.  Okay?

23                   THE WITNESS:  Okay.

24    BY MR. HINDERAKER:

25    Q.  So my question is why did you say, why did you say what

1    you said, "A change of control or merger and acquisition of

2    Chubb was also stated"?

3    A.  Well, 10.8 is a commercial clause.  It sounds legal, but

4    it's a commercial clause.  And I simply looked at it, and in

5    a commercial perspective, it says, "No assignment unless you

6    obtain consent."

7    Q.  And so let's be careful and we'll just stay with your

8    understanding of the provision and why you wrote what you

9    wrote.

10            So let me focus you then on the second sentence of

11   10.8.

12   A.  That's a direct reference to the agreement.

13   Q.  That, that being, that being that the language in your

14   letter, "A change of control or merger and acquisition of

15   Chubb was also stated as being a deemed assignment requiring

16   consent"?

17   A.  That is correct.

18   Q.  Okay.  So that language in your letter is a reference to

19   the second sentence of paragraph 10.8?

20   A.  That's right.  I was simply mimicking what's in the

21   clause.

22   Q.  As you wrote this letter saying Notice of Breach, in

23   your understanding, when was the request for FICO's prior

24   written consent to have happened?

25            MS. GODESKY:  Objection.

```
 1                    THE COURT:  Sustained.
 2      BY MR. HINDERAKER:
 3      Q.  Why did you think that -- why did you think that Chubb &
 4      Son was in breach?
 5                    MS. GODESKY:  Objection.
 6                    THE COURT:  Rephrase the question.
 7      BY MR. HINDERAKER:
 8      Q.  Why did you write a letter that says Notice of Breach to
 9      Chubb & Son?
10                    MS. GODESKY:  Objection.
11                    THE COURT:  Overruled.
12                    THE WITNESS:  I wrote the letter because the
13      merger had closed, and therefore it became important to
14      provide information and notice to their counsel that they
15      had either overlooked this issue or they should be very
16      aware of it because it's important.
17      BY MR. HINDERAKER:
18      Q.  I think I understand that.  My question was a little bit
19      different.  Why did you write a letter that says Notice of
20      Breach?
21      A.  Well, because --
22                    MS. GODESKY:  Objection.
23                    THE COURT:  Let's approach again.
24                         (Sidebar discussion)
25                    THE COURT:  He wrote what he wrote.
```

1        MS. GODESKY:  Sure.  And he can read what he wrote

2  but why --

3        THE COURT:  No, he can say -- he can go beyond

4  that.  He can say because I thought they were in breach or I

5  was putting them on notice that our position was they were

6  in breach.  That doesn't --

7        MR. HINDERAKER:  We're defending against a claim

8  that he acted in bad faith, and he, in my judgment, should

9  be able to explain why he thought he wasn't, what he

10  understood that -- it doesn't.  He's not tell the jury what

11  the contract means, but what he understood and why he was

12  doing what he was doing, so we can defend the bad faith

13  claim.

14        MS. GODESKY:  He should be defending a bad faith

15  claim with evidence other than lawyer's interpretation of

16  the contract.

17        MR. HINDERAKER:  It's not that.

18        MS. GODESKY:  If we could have had lawyers as a

19  mouthpiece interpreting this contract, this case would be

20  very different.  We'd have lawyers from ACE and Chubb all

21  marching up and taking the stand and talking about their

22  interpretation of the clause at the time it was negotiated,

23  their interpretation of Mr. Carretta's breach letters, why

24  they disagreed with the breach.

25        That's not how you try cases.  This is work

1    product.  This is attorney-client communications, and

2    they're selectively waiving it as they so choose, but he was

3    instructed over and over at his deposition not to answer

4    questions about what does "expanded use" mean in

5    Section 10.8.

6            They don't want him to answer that question, but

7    he's allowed to say I believe that they were in breach when

8    he's been instructed not to answer questions about how he

9    interprets "expanded use"?

10           THE COURT:  Yeah.  How -- so if he is not entitled

11   to -- I mean, he's the person that gave the notice of the

12   breach.  How is FICO to defend the bad faith claim if not, I

13   wrote it, I meant it, this is, you know --

14           It's a very difficult line.  I will give you that,

15   but I'm not so sure that, you know, he's not asking him, you

16   know, what does this provision mean, et cetera, et cetera.

17           MS. GODESKY:  Well, they could defend the bad

18   faith claim by having -- everyone keeps telling us it's a

19   commercial clause, right?  They could have their business

20   people testify about how this was all done in good faith on

21   their end because their interpretation of Section 10.8 and

22   its business purpose is XYZ.

23           But if their defense to our bad faith claim is

24   going to be, our lawyer read the agreement and found a

25   breach, that's an advice-of-counsel defense, and we would

```
 1    have been entitled to all of Mr. Carretta's memos and emails

 2    with Mr. Sawyer and Schreiber.

 3              THE COURT:  Well, they're not going to get to

 4    argue that FICO relied on the advice of their counsel.

 5              MS. GODESKY:  Right.  But that's what's happening

 6    when you call the counsel here, and he's, you know, with the

 7    gravitas of a lawyer saying, well, I reviewed the contract

 8    and I thought it was in breach.

 9              MR. HINDERAKER:  Any time for me?

10              THE COURT:  Yeah, please.

11              MR. HINDERAKER:  Yeah.  Thank you.

12              One, we've been through this argument before in a

13    motion in limine.  You gave us instructions about what a

14    lawyer can say and not say.

15              THE COURT:  Right.

16              MR. HINDERAKER:  And Mr. Carretta is a fact

17    witness in the sense that he's the one that wrote the

18    letters.  He's the one that received the letters from the

19    counter counsel at Chubb, and we're going to go from this

20    letter to a couple other communications between he and

21    Mr. Hopp, who is the other lawyer.

22              We're going to jump past all of the 408 time, and

23    we're going to go to the notice of termination letter, which

24    he wrote as well.  So the notion that we should get a bunch

25    of lawyers in here and just argue what the contract means
```

1    that are unconnected to the dispute and are not witnesses is

2    wrong.

3            And so having, having been through this once

4    already with the motion in limine, personally I'd appreciate

5    just I'll walk a very fine line.  I'll ask him what's in his

6    mind, why he did it and try to get through this.

7            THE COURT:  And let me give what I think is a line

8    that is appropriate.  Why did you say this?  Because I

9    thought they were in breach.

10            MR. HINDERAKER:  And I say why did you think they

11   were in breach?

12            THE COURT:  That I think crosses the line or

13   what -- I think you can say -- I don't, I think he can say I

14   thought they were in breach.  I believe they breached this

15   section and that section.  But I don't think he can answer

16   the "why" question, why do you think they were in breach.

17            MR. HINDERAKER:  Okay.  I'll ask him, did you

18   believe they were in breach.  Not why did you believe that.

19   What made you think that.

20            THE COURT:  Right, or what do you think they

21   breached.

22            MR. HINDERAKER:  What do you think they breached.

23   I'll ask that.

24            MS. GODESKY:  What section do you think they

25   breached.

1        THE COURT:  What section, yeah, right, what

2    section.

3        MS. GODESKY:  Then he can identify the section,

4    and that's it.

5        THE COURT:  Right.  Not because they made expanded

6    use or because they did this.  Just I felt they were in

7    breach of Section 3.1, 10.8.

8        MR. HINDERAKER:  And I can say you felt that on

9    January 27th.

10        THE COURT:  Say that again?

11        MR. HINDERAKER:  And I can say and you felt that

12    on January 27th, 2016, the date of the letter.

13        THE COURT:  Yeah, of course.

14        MR. HINDERAKER:  Yeah, so let me -- I'm not sure I

15    think this is quite the fair line, but I'm going to try to,

16    what did you say, what caused you to say that.

17        THE COURT:  Right.

18        MS. GODESKY:  What caused you to say that, you

19    know that's so open ended.  I think the question is meant to

20    be almost more leading.  Did you say, was this because you

21    thought they were in breach, and he can answer yes.  But

22    why, you know, what caused you to say that, well you know

23    there had been an acquisition and --

24        THE COURT:  Right.  I do think the more you lead,

25    the better this will come in.

1          MR. HINDERAKER:  I'm happy to lead him through it.

2          THE COURT:  Okay.

3          MR. HINDERAKER:  I don't want to be up here every

4    moment with a leading objection.

5          THE COURT:  You won't be.

6                    (In open court)

7    BY MR. HINDERAKER:

8    Q.  Okay.  We can hear you, right?

9    A.  Yes.

10   Q.  All right.  Your letter is dated January 27, 2016.  Fair

11   to say you wrote the letter on that date because, to your

12   knowledge, FICO had not received a request for consent?

13   A.  That's correct.  And they hadn't responded to Russ

14   Schreiber and Mike Sawyer either.

15   Q.  And in this letter you were giving Mr. Joseph Wayland

16   notice of breach of paragraph 10.8, correct?

17   A.  That is correct.

18   Q.  Now, so we talked about the sentence where you say, "A

19   change of control or merger and acquisition of Chubb was

20   also stated as being a deemed assignment requiring consent."

21          That was a reference to the second sentence of

22   paragraph 10.8, correct?

23   A.  Yes.

24   Q.  And then in your letter to, in this letter, you also

25   reference other sections of 10.8, one of them being

1   paragraph 2.1.  Agreed?

2   A.  Yes.

3   Q.  And if you look at paragraph 2.1, that provision of the

4   license agreement says, "Subject to the terms, conditions

5   and limitations of this agreement, Fair Isaac hereby grants

6   to client a perpetual subject to the provisions of Article

7   9, nonexclusive, non-transferrable license."

8           Was that -- was that your reference to

9   Section 2.1?

10  A.  Yes.

11  Q.  And then if we go to Section 2.2, it also says, this one

12  is entitled License to Documentation.  "Subject to the

13  terms, conditions and limitations of this agreement,

14  Fair Isaac grants to client a perpetual nonexclusive,

15  non-transferrable limited license."

16          Was that your reference to paragraph or to

17  Section 2.2 in your letter?

18  A.  Yes.

19  Q.  And then you also reference paragraph 3.1.  And 3.1

20  sub-Roman v, small v, says, "Client represents and warrants

21  that and its employees shall not assign, sublicense, lease,

22  transfer or distribute."

23          Was that your reference in your letter to Section

24  3.1?

25  A.  Yes.

1  Q.  And then you conclude saying, "Further, the license was

2  personal to Chubb having been granted to Chubb & Son the

3  defined client under Sections 2.1 and 2.2."

4       And that was an explanation of the license

5  agreement that you also provided.

6  A.  That's right.  Correct.

7  Q.  On the top of the next page you say, "Chubb Limited is

8  making use after this notice by FICO of the requirement for

9  consent constitutes Chubb and Chubb Limited as intentional

10  infringers under applicable copyright and patent laws, in

11  addition to being a breach of the agreement."

12       Now, with respect to that sentence, you identify

13  both Chubb and Chubb Limited.  Why?

14  A.  Because the merger had already closed, and so because of

15  that event having happened, the prior clause 10.8 became

16  operative.

17            MS. GODESKY:  Objection.

18            THE COURT:  Sustained.

19            THE WITNESS:  Let me restate that, if I can.

20            The merger closed.  A new party owned the

21  business.

22  BY MR. HINDERAKER:

23  Q.  And so when you reference Chubb Limited, is that a

24  reference to the new entity?

25  A.  That's right.  Chubb Limited at that moment was the

1    combination of the two companies, with Chubb Limited being

2    the Swiss group primarily that owned the company.

3    Q.   Okay.  And when you, when you use the word "Chubb" in

4    the sentence, is that a reference to Chubb & Son, the

5    client?

6    A.   Yes, because at the beginning of the letter I had

7    defined Chubb & Son as Chubb.  It's a bit confusing.

8    Q.   Well, we're trying to sort it out.

9         In the next sentence -- well, let me back up.  The

10   notice that you're giving is the notice of breach, and as a

11   consequence of the notice of breach, you're telling your

12   counter party no further use of Blaze Advisor is

13   appropriate.

14   A.   That's right.

15   Q.   The next sentence says, "FICO lacks sufficient

16   information to understand the full implications of Chubb

17   Limited's plans."  Why did you add that to your letter?

18   A.   From a business perspective, we needed, we didn't

19   understand anything more than what I had already read from

20   the public filings, and we hadn't gotten any feedback from

21   Chubb & Sons before the closing of the merger.

22        And so we were asking for information, because

23   they were our client, they were a good client, we wanted to

24   be able to understand what they intended to do as this big,

25   big organization.  And so I was simply asking them, you

1    know, to provide that information to us so that we could

2    consider how our futures would work out together.

3    Q.  And if that information came, it would have gone to the

4    business people?

5    A.  Yes.

6    Q.  Anyway, you didn't get it?

7    A.  I didn't get it, no.

8    Q.  Okay.

9    A.  Maybe I misunderstood what you said, Al.

10   Q.  No.  No.  I meant you're asking for -- you're saying we

11   lack sufficient information.  You knew that.  And you're

12   asking for getting some information to be more transparent

13   to make an informed concept.

14   A.  That's right.

15   Q.  And if that -- the transmission of that kind of

16   information would have gone to the FICO business people

17   rather than to yourself in all likelihood?

18   A.  That's right.

19   Q.  And then in the paragraph Lacks Sufficient Information,

20   you go on to say, "FICO is unable to accommodate any request

21   now for consent.  We are aware, of course, of the much

22   larger entity as a result of the merger."

23          And is that a reference to what?  That's a

24   reference to Chubb Limited, the new larger entity?

25   A.  Yes.

1    Q.  And you go on to say, "And how allowing the license

2    transfer will expose FICO to adverse impact based on the

3    expanded risks of IP indemnity of a larger organization."

4              What was that about?  Why did you say that?

5    A.  IP indemnity literally means intellectual property

6    indemnity.  It means FICO represented earlier that we owned

7    the software and we had the right to license the software.

8    Software is covered by copyright law.  And one of the rights

9    under copyright law is, you control who you sell to and

10   other bundles of rights.

11             And we needed to understand, when an indemnity

12   means is if a third party decides to sue Chubb Limited or

13   Chubb & Sons, we would have to indemnify, provide defense

14   against those intellectual property claims, to prove in fact

15   we owned the software and to shelter or protect the Chubb

16   organization from those claims.

17             That's part of the bargain that we made with

18   Chubb.  It's absolutely typical in the software industry.

19   Q.  And so you are saying, given that the IP is now inside

20   of a larger organization, that meant what to you?

21   A.  Well, we knew that Chubb Corporation owned Federal and

22   it had a division called Chubb & Sons.  As a result of the

23   merger, Chubb Limited owned Federal and Chubb & Sons.  And

24   it was a completely different entity.

25   Q.  Okay.

1    A.  So we didn't want to be exposed to this very large

2    entity.  Again, we didn't know what they were planning to do

3    with the software.

4    Q.  Understood then.  And you go on in the same paragraph,

5    "Additionally the original enterprise license was based on

6    Chubb & Son only, not the much larger organization which has

7    breath well beyond Chubb & Son."

8    A.  That's correct.

9    Q.  Okay.  Now does that -- did you say that because of the

10   second sentence in paragraph 10.8?

11   A.  Yes.  And additionally, it's important to understand,

12   and you see it in the first part, Section 2.1, that Chubb &

13   Sons bought license number one.  Then they expanded the

14   license to number two, and then they bought it for number

15   three, which each time gave them more and more rights.

16           And that's just the nature of how software is

17   sold.  You can buy small or you can buy big.  So it was

18   important to reference it again from a commercial

19   perspective.

20   Q.  So then on the second full paragraph on page 2, "While

21   FICO will consider licensing its IP to Chubb Limited, please

22   understand that it is not acceptable or agreed that Chubb

23   Limited may use, make use of FICO's IP."

24           So that's -- you gave that notice in your breach

25   of, in your notice of breach letter?

1    A.  That is correct.

2    Q.  And then you go on, "Further, FICO retains the right to

3    terminate the agreement, and nothing contained herein is to

4    be construed as a waiver of damages or the right to

5    terminate the agreement."

6         Have I read that right?

7    A.  That's right.

8    Q.  So here you are giving notice of not acceptable to use,

9    no waiver of damages.  And then in the next sentence you

10   say, "We understand that this was a large transaction and

11   this may have been an oversight."

12        Why did you say that?

13   A.  Again, from my merger and acquisition experience,

14   there's a lot going on.  There are tons of lawyers.  There's

15   tax accountants.  There's all these people looking at a lot

16   of different things, and this was a very big merger.

17        So therefore, it would have been possible that

18   they simply missed it, made a mistake, or equally possible

19   that they saw it and just decided to do nothing.  Either

20   way, I wanted to point it out that it could have been a

21   mistake, let's talk about it.  If you want us to make a

22   decision as to what to do, just inform us so that we can

23   decide whether to consent or not.

24   Q.  Okay.  And then in the next sentence you say, "While

25   FICO does not waive its right to terminate the agreement

1    immediately under Section 9.2C or otherwise waive any

2    rights, FICO is mindful of the long business relationship."

3    I'll go that far.

4              So your letter on the one hand is saying, this

5    could have been an oversight, and on the other side is

6    saying the very same sentence, "We do not waive our rights

7    to terminate."

8              Can you explain that?

9    A.  The -- the event of the merger was a defining moment,

10   and at that point the business relationship changed in terms

11   of what we were supposed to do, what they were supposed to

12   do.

13             And we just wanted them to be clear that because

14   that event happened, it triggered other rights or other

15   actions that could flow out of that.  And that's what I was

16   pointing out to them in that last sentence of the third

17   paragraph.

18             MR. HINDERAKER:  I've been handed a note that

19   perhaps the jurors monitors are off?

20             Am I wrong?  Am I right?

21             THE COURT:  Are they on or are they off?

22             THE JURY:  Off.

23             THE COURT:  It's on on my -- did it come on now?

24             THE JURY:  No.

25             THE COURT:  All right.  Hang on.  Now have is as

1    good a time as any to stand up and stretch for a second.

2                        (Off the record)

3            THE COURT:  I don't know why they went off.  It

4    said that everything was off, but everything wasn't off.

5    Yours were off.

6            MR. HINDERAKER:  Swell.

7            Could I ask or the court may ask?  I've been

8    asking questions about this Exhibit 90 for a while.  Has

9    Exhibit 90 ever been on the screen?

10            THE JURY:  No.  It's been off since the first

11   sidebar.

12            THE COURT:  Say again?

13            THE JURY:  It's been off since the first sidebar.

14            THE COURT:  Okay.  Well --

15            MR. HINDERAKER:  Can I go through some of this

16   again then?

17            THE COURT:  You may.

18            MR. HINDERAKER:  Thank you.

19            THE COURT:  Let me just test something again.  It

20   shouldn't affect it, but go ahead.

21   BY MR. HINDERAKER:

22   Q.  If I might, I don't know that I can ask the same

23   questions again, and I don't know that you'd want to hear

24   them again, but I would like to have the opportunity to walk

25   through the letter so you see what it is.  And I'll try to

1    do that appropriately.  So let's try it again.

2              This January 27, 2016, letter is, Mr. Carretta,

3    your letter giving, as you say, notice of breach of Blaze

4    Advisor software license and maintenance agreement," right?

5    A.  That is correct.

6    Q.  Okay.  And when we look at the third paragraph of the

7    first page, I had asked you questions about, "I am writing

8    now to again confirm the agreement may not be transferred or

9    assigned without FICO's consent."

10             I asked you why did you say "again."  And correct

11   me if I am wrong, but you said again because you understood

12   that Mr. Sawyer or Mr. Schreiber had made contact with Chubb

13   about the -- look at the license agreement in light of the

14   fact of the announced merger.

15   A.  That's right.

16             THE COURT:  Mr. Hinderaker, if I might make a

17   brief suggestion.

18             MR. HINDERAKER:  Yes.

19             THE COURT:  I think that's exactly right.  The

20   more you can lead through what you've already done --

21             MR. HINDERAKER:  Thank you.

22             THE COURT:  -- the better.

23             MR. HINDERAKER:  Thank you.

24   BY MR. HINDERAKER:

25   Q.  And then you go on in the rest of that sentence and say,

1    "May not be transferred."  "The agreement may not be

2    transferred or assigned without FICO's consent."

3              And that FICO has not and does not consent to such

4    transfer or assignment.

5              And in the prior questioning, you said that's a

6    reference to the first sentence of paragraph 10.8.

7    A.  That is correct.

8    Q.  "The attempted assignment is void and a breach of the

9    agreement."  The agreement plainly states in Section 10.8

10   that the agreement may not be assigned without consent.

11             Then I asked you questions about the next

12   sentence, "A change of control or merger and acquisition of

13   Chubb was also stated as being a deemed assignment requiring

14   consent."

15             And I asked you questions about the phrase "was

16   also."  And you said, well, I talked about the first

17   sentence.  Now it was also.  I'm talking now about the

18   second sentence of paragraph 10.8, right?

19   A.  Yes.

20   Q.  And then you mentioned other sections of the license

21   agreement, 2.1, 2.2 and 3.1, stating that the license is

22   non-transferrable, in your letter.

23   A.  That is correct.

24   Q.  And then when we did not have the monitors up, we went

25   to Section 2.1 of the license agreement and saw that it had

1   language forbidding -- saying it was non-transferrable.  We

2   went to Section 2.2 saying the same thing.  And we went to

3   Section 3.1 saying essentially the same thing as well,

4   correct?

5   A.  That's right.

6   Q.  And then we turned to the second page.  And I asked you

7   about the last sentence on the top paragraph that comes over

8   from the second or from the first page.  And I went, Chubb

9   Limited is making use after this notice by FICO of the

10  requirement for consent, "Constitutes Chubb and Chubb

11  Limited as intentional infringers under applicable copyright

12  or patent laws in addition to being a breach of the

13  agreement."

14          And I asked you what you meant by "Chubb," and you

15  said that's the client Chubb & Son.  And I asked you what

16  you meant by "Chubb Limited," and you said that's the new

17  larger organization after the acquisition, correct?

18  A.  Yes.  Yes.

19  Q.  And then in the next sentence, the next paragraph, FICO

20  lacks sufficient information to understand the full impli --

21  I couldn't say the word then either -- implications of Chubb

22  Limited's plans and without some shared insight is unable to

23  accommodate any request now for a consent.

24  A.  That is correct.

25  Q.  Okay.  And you explained that at this point in time FICO

1   at least to your knowledge, FICO simply had not received any

2   information from Chubb & Son?

3   A.  No.

4   Q.  Correct?

5   A.  That is correct.

6   Q.  We are aware, of course, that a much larger entity --

7   and I asked you that's a reference to Chubb Limited?

8   A.  That is correct.

9   Q.  "As a result of the merger and how allowing the license

10  transfer will expose FICO to adverse impacts based upon the

11  expanded risk of IP indemnity of a larger organization."

12          And at that point you explained to the jury how

13  software companies typically indemnify their clients against

14  any IP claims directed against your software.

15  A.  That is correct.

16  Q.  And so how being in a larger organization created

17  greater risk to FICO to honor that indemnity.

18  A.  That is correct.

19  Q.  "Additionally the original enterprise license was based

20  on Chubb & Son only, not the much larger client

21  organization."

22          I asked you.  That's a reference to the second

23  sentence of paragraph 10.8?

24  A.  Yes.

25  Q.  Then we went to the -- then we went to the next

1  paragraph.  "While FICO will consider licensing its IP to

2  Chubb Limited, please understand that it is not acceptable

3  or agreed that Chubb Limited may make use of FICO's IP."

4      So that's repeating what you've said before about,

5  after this breach letter, no use.

6  A.  That is correct.

7  Q.  You retain the right to terminate.  Nothing should be

8  construed as a waiver.

9      And you go on to say, "We understand that this was

10  a large transaction and this may have been an oversight."

11      And you explain how in large transactions

12  sometimes things are missed or sometimes you just close over

13  the problem.  You didn't know which.

14  A.  That's right.  Correct.

15  Q.  But if there was an oversight, it didn't change the fact

16  of your notice of breach letter.

17  A.  No.  If it was a mistake or active, it doesn't matter.

18  The event happened, and it therefore is a breach.

19  Q.  And then you go on to say, "FICO does not waive its

20  right to terminate the agreement immediately under

21  Section 9.2c."

22  A.  Correct.

23  Q.  So looking at 9.2c -- I got to get to c.  If I look at

24  the first sentence of 9.2c, "Fair Isaac may immediately

25  terminate this agreement without a requirement for prior

1    notice or a cure period if client violates any terms of the

2    license granted in this agreement."

3              That's the first sentence.

4    A.  That is correct.

5    Q.  Is that the sentence that you were -- is that what you

6    were referencing to in your letter?

7    A.  That's right, because my letter was the notice of

8    breach, and I didn't want it confused that we didn't have

9    other rights to immediately terminate.  It says the word

10   "may."

11   Q.  The other rights being any violation of the license

12   grant for 9.2c.

13   A.  That's correct.

14   Q.  And then you go on and conclude, "FICO is mindful of the

15   long business relationship with Chubb and is willing to

16   entertain a business resolution for the matter within the

17   next 30 days.

18             "I'm happy to entertain a discussion and encourage

19   the authorized business representatives from both parties to

20   both firms to further discussions."

21   A.  That's right.

22   Q.  Okay.  Whether you wrote the letter, what did you

23   understand what happened in 30 days?

24   A.  If we weren't able to reach a business solution and

25   continue the relationship, then we would be terminating the

1   license agreement.

2   Q.  Then let's turn to Exhibit 91.  This is a letter dated

3   February 17, 2016.  It's from, if we go to the last page,

4   it's from Andrew D. Hopp, Esquire, deputy general counsel of

5   Chubb.  Agreed?

6   A.  Yes.

7   Q.  And it is to you.

8   A.  That is correct.

9   Q.  I'd like to -- I'd like to look at the first paragraph,

10  please.

11  A.  Yes.

12  Q.  Okay.  If we can get to that?  We will in a second.  The

13  first paragraph.

14          Mr. Hopp says to you, "Notwithstanding the

15  acquisition, Chubb & Son, the contracting party to the

16  agreement, remains a viable legal entity within the Chubb

17  Group of Insurance Companies corporate structure and the

18  contracting party to the agreement."

19          Did you agree with Mr. Hopp that Chubb & Son was

20  the contracting party to the agreement?

21  A.  Yes.

22  Q.  And did you agree that it remained the contracting party

23  to the agreement?  Let me just read the next sentence.

24          "In short Chubb & Son is still FICO's client and

25  as such term is defined in the agreement, and it is our

1    position that no transfer or assignment of the agreement has

2    occurred."

3             Did you have any disagreement with that?

4    A.  Yes.  That's just wrong.

5    Q.  How so?

6    A.  Well, the very first part of that sentence he says,

7    there was an acquisition, which was one of the items listed

8    in 10.8.  It's plain as day.  And Chubb & Son is a division

9    of Federal, which is a corporation owned by Chubb

10   Corporation; and as a result of the merger, it was now owned

11   by Chubb Limited.

12            Chubb Corporation disappeared.  And so there was a

13   whole new company in effect in charge, Chubb Limited.  And

14   while it would still say Chubb & Son, the corporate

15   structure actually changed.

16            That's the whole purpose of Section 10.8.  From a

17   commercial perspective, we want to understand who we are

18   going to do business with and why and how to price software.

19   All of these commercial issues are involved.

20   Q.  And so in your answer that you just gave me, are you

21   referencing the second sentence of paragraph 10.8?

22   A.  I am.  Correct.

23   Q.  And in the next, in the next paragraph, "However, we are

24   in the process of evaluating Chubb & Son's use of Blaze

25   Advisor software based enterprise license.  While we

1   continue to evaluate our use and needs, our initial findings

2   indicate that the applications that have been utilizing

3   Blaze Advisor software since 2006 are currently running in

4   the exact same fashion as prior to the merger transaction."

5           Let me stop there.

6   A.  It doesn't change anything.

7   Q.  Well, in your mind why doesn't it?

8   A.  Because that's not --

9           MS. GODESKY:  Objection.

10          THE COURT:  Sustained.

11  BY MR. HINDERAKER:

12  Q.  If Chubb & Son was using Blaze Advisor after the merger

13  in the exact same fashion, would that have changed your

14  notice of breach letter?

15  A.  No.

16          MS. GODESKY:  Objection.

17          THE COURT:  Overruled.

18  BY MR. HINDERAKER:

19  Q.  And is that because when you, as you said earlier, the

20  event that triggered the notice of breach letter was the

21  acquisition without FICO's prior consent for continued use?

22  A.  That is correct.

23  Q.  And is it also correct, because of the -- because of

24  your letter, the period of time in which for FICO and

25  Chubb & Son to agree and continue relationship or not agree

1    and terminate the license was that 30-day period?

2    A.  That is correct.

3    Q.  Then Mr. Hopp in the third paragraph mentions that the

4    FICO and his business people are discussing purchasing new

5    additional products and professional services.  And he

6    concludes, "I suggest that we allow the business

7    representatives to continue their commercial discussions

8    with one another without legal intrusion."

9         Did you have any disagreement with that?

10   A.  No, I didn't.  In fact I was perfectly aligned with

11   that.

12   Q.  And you had said so in your first letter.

13   A.  That is correct.

14   Q.  You conclude, "We are very mindful of the long-standing

15   business relationship between the organizations, and we are

16   committed to working in the spirit of good partnership with

17   FICO moving forward."

18        You had no quarrel with that either.

19   A.  No, I did not.

20   Q.  Let me turn to the next exhibit in your notebook or your

21   binder, Number 92.

22        And now you are writing back to Mr. Hopp, and your

23   letter is dated February 22, 2016.  Do you have that before

24   you?

25   A.  I do.

1    Q.  All right.  So in the first paragraph you say, "The

2    agreement sets out in plain language that either a change of

3    control or a merger requires FICO's consent prior to any

4    assignment or transfer and that attempted assignment or

5    transfer is void."

6            Is that a reference to the second sentence of

7    paragraph 10.8, as well as the third sentence of

8    paragraph 10.8?

9    A.  Yes.

10   Q.  And then in the third paragraph you say, "If Chubb

11   Corporation through its subsidiary Federal Insurance Company

12   division, Chubb & Son, was no longer in control or merged

13   and the event turned on simply Chubb & Son being an existent

14   division, it defeats the purpose of having Section 10.8

15   overall."

16   A.  That's correct.

17   Q.  And you believed that then and you believe it now?

18   A.  Absolutely.

19   Q.  You go on to say, "The restrictive language and concept

20   requirement would be superfluous as there would be no point

21   of having all the language since the occurrence of any one

22   of the enumerated events could by remaining the client

23   bypass the restriction on assignment."

24           And that also is a reference to the second

25   sentence of paragraph 10.8?

1    A.  That is correct.

2    Q.  Are you telling Mr. Hopp that under his interpretation

3    the second sentence of 10.8 is meaningless?

4    A.  I'm telling him his position is wrong.  He's just not

5    reading it.

6    Q.  Let me go to the second page then.  The first full

7    paragraph.  And you say, "Chubb & Son is making use after

8    notice by Fair Isaac of the requirement for a consent.

9    Breach and demand for a license makes Chubb & Son an

10   intentional infringer, in addition to having breached of the

11   agreement."

12          So you are repeating that notice to them again?

13   A.  That is correct.

14   Q.  Then on the -- it's really the, I guess it's the second

15   full paragraph.  I think sometimes the third paragraph.  "In

16   reviewing this matter, I reviewed Chubb Limited and Chubb

17   Corporation's public filings."  And you go on to say a

18   number of things about that.

19          Why did you do that?

20   A.  Because he was ignoring the fact that the acquisition

21   happened.  He admitted it in his other letter, but he was

22   ignoring it in all of his arguments or his letters.  So I

23   was pointing out, look, these are public facts.  They're

24   prepared by the Chubb lawyers.  They're filed with the

25   Securities Exchange Commissions.  They're representing these

1    as all being true.

2         And if you go through A through E, you see, okay,

3    Chubb Limited now owns the company, including Federal and

4    its subsidiary or, excuse me, its division, Chubb & Sons,

5    that all of the people that were managing Chubb Corporation

6    are all gone.

7         In fact, John Finnigan was getting paid his change

8    of control money, which is a pretty good indicator that the

9    event happened.  They changed the headquarters to

10   Switzerland.  That's a big change.

11        And except for the independent directors in

12   subparagraph e, who are just that, they don't work for

13   Chubb.  They are not Chubb employees.  They are just

14   independent directors like your supposed to have who are a

15   minority, all the rest are Chubb Limited people.

16        So it was indisputable in my mind that the event

17   occurred.  They said it occurred.  Andrew said it occurred

18   in his letter, and therefore we need to get by that.  They

19   should have asked for consent, and they didn't prior to the

20   merger closing.

21   Q.  And you are detailing for him different indicia of the

22   change of characteristics of the new Chubb Limited as

23   compared to what the prior Chubb Corporation had been?

24   A.  That's right.  They are just two different companies.

25   They are not the same people.

1    Q.  And then attached to your letter and in the exhibit is

2    the United States Securities and Exchange Commission 8-K

3    form, correct?

4    A.  That is correct.

5    Q.  And that's what you were referencing in your letter?

6    A.  Right.

7    Q.  And then on the last page of your letter of

8    February 22nd, you say, "As you note the respective business

9    representatives of FICO and Chubb Limited are in business

10   discussions to address this issue, as well as possible other

11   matters.  While I also encourage these discussions, please

12   understand that it is not acceptable or agreed that any

13   entity or division within Chubb Limited make use of the

14   software."

15        So on the one hand, you are encouraging business

16   negotiations, and on the other hand, you are clear about

17   stating FICO's rights.

18   A.  That is correct.

19   Q.  Well, then let's move to Exhibit 93.  This is Andrew

20   Hopp to you a few days later, February 25, 2016.

21   A.  That's correct.

22   Q.  Agreed?

23   A.  Yes, I agree.

24   Q.  And he says to you, "Mr. Carretta we continue to

25   disagree.  In an effort to preserve a working relationship

1    between our companies, our IT software compliance team is

2    forwarding a commercial proposal to your sales

3    representatives for consideration."

4    A.  That's correct.

5    Q.  Agree?

6    A.  I agree.

7    Q.  I presume you passed that information on to the sales

8    representatives.

9    A.  I passed that a proposal was forthcoming.  I didn't

10    actually receive the proposal.

11    Q.  Understood.  So there was other, other witnesses I am

12    sure will testify to the commercial proposal, but that went

13    to the business folks, not to you.

14    A.  That is correct.

15    Q.  And then if we go to the next Exhibit 95.  And it is the

16    next day you say to Mr. Hopp, "Thank you for the email.  The

17    proposal was not acceptable from our business and compliance

18    teams, and I confirm it is rejected."

19        That's what you told him on that day.

20    A.  That's what I told Andrew Hopp, correct.

21    Q.  "However, I respect the effort and encourage continued

22    aggressive business dealings.  Thank you for facilitating

23    the business discussions."

24        So that's your communication to him on the 26th of

25    February.

1    A.  I actually used the word "business dialogue" but --

2    Q.  I misread it.  Okay.

3          And then I think it's the same date.  Let's go to

4    Exhibit 96.  February 26, 2016.

5    A.  Yes.

6    Q.  And Mr. Hopp says to you, "Thank you for your response,

7    and I agree with the approach."

8    A.  That's correct.

9    Q.  Sort of ends the communications that I'll be chatting

10   with you about until we get to Exhibit 103.

11   A.  Okay.

12   Q.  And if you would turn to that, please.  This is dated

13   March 30, 2016?

14   A.  That's correct.

15   Q.  And in the first paragraph you reference Chubb Limited,

16   you reference your letter of January 27th.  You reference

17   the merger of Chubb Corporation and ACE Limited, resulting

18   in the Chubb Limited, which in this letter you call new

19   Chubb.

20          And you reference breach of Section 10.8 of the

21   license agreement, correct?

22   A.  That is correct.

23   Q.  And in the next paragraph, you say, "I notified you by

24   email on March 11th that FICO had become aware of a further

25   material breach due to the use of the software outside of

1    the United States and two applications utilized in the

2    United Kingdom.  Moreover, during the period of time in

3    which FICO and new Chubb attempted resolve the breach of

4    Section 10.8, we became aware of the further application in

5    Canada."  I'll stop there.

6              What was the source of your information to make

7    that statement?

8    A.  I can't recall it specifically, but I thought it was me

9    that asked the maintenance and support organization to look

10   at the maintenance logs.

11   Q.  Okay.

12   A.  So this is a process where they, a client is given a

13   key.  If they have bugs to report or need information, they

14   just log something into the system, and then it gets

15   captured.

16   Q.  That would be the same thing as a help desk log?

17   A.  The same thing.

18   Q.  So the information that you were stating in this letter

19   came to you from help desk log information?

20   A.  That's correct.

21   Q.  Then you go on to say, "And the disclosure of

22   confidential information to an unauthorized third-party

23   consultant."

24              And what was the source of your information to say

25   that in the letter?

1    A.  The same, same source.

2    Q.  Okay.  Thank you.  Then you finish, "This information

3    was conveyed to the new Chubb business counter part Tamra

4    Pawloski, VP of software compliance and optimization."

5           Now, when you say that disclosure of confidential

6    information to an unauthorized third party is a breach, is

7    that a reference to paragraph 3.1 of the license agreement?

8    A.  One moment.  Yes.

9    Q.  And when you said that Blaze Advisor software outside of

10   the United States and the United Kingdom and in Canada, what

11   was the basis of -- what in the license agreement led you to

12   believe that that was a breach?

13   A.  The reference to territory in paragraph 1 of the license

14   agreement.

15   Q.  Saying?

16   A.  That the software is to be installed and physically

17   located in the United States.

18   Q.  And then you conclude your letter, "Attempts to amicably

19   resolve the dispute have been unsuccessful.  This letter

20   serves as notice that the agreement is terminated effective

21   March 31st.  Please take further notice of the provisions of

22   Section 9.3 of the agreement.

23          "As noted in my January 27, 2016, letter, FICO

24   considers new Chubb's current use and any future use of the

25   software as a breach of the agreement and willful

1    infringement of all applicable intellectual property rights,

2    including but not limited FICO's underlying copyrights and

3    patents."

4          I'd like to then, I'd like to turn then, if we

5    could, to paragraph 9.3 of the license agreement J1, J001.

6    A.  Okay.

7    Q.  Let me get there myself.  And paragraph 9.3 is entitled

8    Effect of Termination.  Agreed?

9    A.  Yes.  That is correct.

10   Q.  And it says, "Upon expiration or termination of this

11   agreement for any reason, all licenses granted hereunder

12   shall terminate immediately.  All support and maintenance

13   obligations shall cease.  Client shall immediately cease

14   using all Fair Isaac products and related documentation

15   (including all intellectual property arising from or related

16   to the foregoing), shall remove all copies of the Fair Isaac

17   products and related documentation from client's computer

18   systems," and so on.

19         And that is the provision that you were

20   specifically referencing regarding the effect of termination

21   in your notice of breach letter?

22   A.  That is correct.

23   Q.  And shortly after that, this lawsuit was commenced.

24         Have you had any -- did you have any involvement,

25   other than being a witness, did you have any involvement in

1    the management or handling of this lawsuit?

2    A.  No.

3    Q.  Your participation or your role in this whole matter is,

4    is that of a witness?

5    A.  That is correct.

6              MR. HINDERAKER:  No further questions, Your Honor.

7              THE COURT:  Ms. Godesky.

8              MS. GODESKY:  Your Honor, may I approach?

9              THE COURT:  You may.

10                   (Sidebar discussion)

11             MS. GODESKY:  So given Mr. Carretta's reference

12   just now in this last line of questions to his view that the

13   license agreement has a territorial restriction, I would

14   like to either be able to ask Mr. Carretta, as you suggested

15   during the pretrial conference, whether he's aware that the

16   court has held that the license agreement unambiguously does

17   not include a territory restriction or that Your Honor

18   instruct the jury to that fact.

19             MR. HINDERAKER:  And I disagree for all the

20   reasons that we've argued before and all the reasons that

21   the court should not interfere with this issue of whether

22   FICO acted in good faith or not.

23             THE COURT:  I understand the question to

24   Mr. Carretta.  It's an appropriate question.  It asks him

25   for why he said it, what's your good faith basis.

```
 1              MR. HINDERAKER:  And I did not pursue it any

 2    farther.

 3              THE COURT:  You didn't.  I do think -- I will

 4    instruct the jury that the court has determined that there's

 5    no territorial restriction in the license and leave it at

 6    that.

 7              And so I'm not going to allow the "where"

 8    question.  Okay?

 9              MS. GODESKY:  Okay.  Yes.

10              THE COURT:  But I will give that instruction

11    later, not right now.

12              MR. HINDERAKER:  And I hope that you would even do

13    it in final instructions to say that the geographic

14    restriction is not an issue in the case, and it's limited to

15    the good faith claim, but that's a decision for another day.

16              THE COURT:  We'll work on that, but I will

17    certainly instruct that there's not a territorial

18    restriction in the license.

19              MR. HINDERAKER:  But not today.  Let's not get the

20    court involved today.

21              THE COURT:  Okay?  How long do you suspect your

22    cross will take?

23              MS. GODESKY:  45 to an hour.

24              THE COURT:  I'd like to start and then take our

25    break.  Okay.
```

```
 1                  MS. GODESKY:  Sure.
 2                  THE COURT:  And I'll try not to turn off the
 3       monitors.
 4                          (In open court)
 5                  MS. GODESKY:  Another binder.
 6                  THE WITNESS:  Thank you.
 7                          CROSS-EXAMINATION
 8       BY MS. GODESKY:
 9       Q.  Good afternoon, Mr. Carretta.
10       A.  Good afternoon.
11       Q.  My name is Leah Godesky, and I represent the defendants
12       in this case.
13                  So you testified on direct examination that when
14       you were at FICO you were the vice president of legal and a
15       deputy general counsel; is that right?
16       A.  That is correct.
17       Q.  And just so everyone understands, the general counsel at
18       a company is the lead lawyer in an organization, correct?
19       A.  That's right.
20       Q.  Okay.  And a deputy general counsel is sort of that lead
21       lawyer's direct report, as a second in command, kind of
22       position, right?
23       A.  Right.
24       Q.  And you were one of two deputy general counsels at FICO.
25       A.  Yes.
```

1    Q.  And so you were one of the most senior lawyers at the

2    company.

3    A.  That's a fair statement.

4    Q.  And you primarily supervised a group of lawyers who

5    worked on FICO's contracts.

6    A.  Right.

7    Q.  Including things like license agreements for Blaze

8    Advisor.

9    A.  Yes.

10   Q.  And you had the same job at FICO up until your

11   retirement beginning in June of 2005.  Do I have that right?

12   A.  No.  I started in June 2005 at Fair Isaac.

13   Q.  Okay.  And then --

14   A.  And I held it until I retired.

15   Q.  Okay.  And as you said during direct examination, 2015,

16   the year that the ACE/Chubb acquisition was announced was

17   the first time you became involved in FICO's relationship

18   with Chubb, correct?

19   A.  Yes.

20   Q.  You were not involved in negotiating the license

21   agreement?

22   A.  No, I was not.

23   Q.  You were not involved in drafting the license agreement?

24   A.  No, I was not.

25   Q.  And that means you cannot speak to any communications

1    between Chubb and FICO in the 2006 time period as to what

2    particular provisions meant.

3    A.  I was not a party to that discussion in 2006.  That's

4    correct.

5    Q.  And you became involved in FICO's relationship with

6    Chubb in 2015 because Mike Sawyer and Russ Schreiber, two

7    sales folks at FICO, had heard about the ACE acquisition,

8    right?

9    A.  Yes.

10   Q.  And the first time that you sat down and you read the

11   Blaze Advisor contract that Chubb signed was 2015 after they

12   came to you, correct?

13   A.  Yes.

14   Q.  Now, you made a point of emphasizing during your direct

15   examination that the client in the Blaze Advisor license

16   agreement is the Chubb & Son division of Federal, right?

17   A.  That's correct.

18   Q.  And you understand that one of the reasons we're all

19   here is that FICO is taking the position that FICO only

20   licensed Blaze to the Chubb & Son division within Federal,

21   right?

22   A.  That's right.

23   Q.  Now, the Chubb & Son division within Federal is not a

24   legal entity.  We all agree on that, right?

25   A.  Yes.

 1    Q.  And I want to take a look at that letter you sent in

 2    January 2016 where you claimed for the first time that the

 3    Chubb entity was in breach.  And that is now in evidence as

 4    P90.

 5    A.  It's not on my screen.

 6    Q.  Mine either.  I think we are working on it.

 7            Are we hooked up?

 8            THE COURT:  We are all hooked up.

 9            MS. GODESKY:  Just one moment.

10            THE WITNESS:  Sure.

11            MS. GODESKY:  There it is.  Thank you, Vanessa.

12    BY MS. GODESKY:

13    Q.  Okay.  So you talked about this letter with

14    Mr. Hinderaker, right?

15    A.  That's correct.

16    Q.  And you said you wrote this letter to Mr. Joseph F.

17    Wayland in the legal department at Chubb Group and at Chubb

18    Limited, right?

19    A.  That's correct.

20    Q.  And the subject line of your letter was, "Notice of

21    Breach of Blaze Advisor Software License and Maintenance

22    Agreement Dated June 30th, 2006, As Amended," correct?

23    A.  That's correct.

24    Q.  And this, of course, this is a letter you sent, just so

25    everyone is clear on the timeline, before the litigation,

1   right?

2   A.  That is correct.

3   Q.  And in the first sentence of your letter you wrote,

4   "FICO and the Chubb Corporation, through its Chubb & Son

5   division, are parties to the above-referenced agreement."

6   Correct?

7   A.  Yeah.  It was shorthand because Federal was a subsidiary

8   of Chubb.

9   Q.  But you used that phrase "the Chubb Corporation" and

10  FICO were parties to the agreement, and the Chubb

11  Corporation had entered the agreement through its Chubb &

12  Son division.

13           That was the phrase you used, correct?

14  A.  Yeah.  It's using shorthand there.  That's right.

15  Q.  You don't work on pricing of Blaze license agreements,

16  but you have a general understanding based on all of your

17  years at the company that FICO prices enterprise Blaze

18  licenses generally based on the revenue of the company

19  that's purchasing the license, right?

20  A.  I wouldn't phrase it that way.  We use value pricing,

21  meaning what does the client expect, what problem are they

22  trying to solve for what size of an organization, and then

23  the business people come up with the pricing.  So it's not

24  one single methodology, but that -- it is value priced, is

25  the way I would phrase it.

1    Q.  Do you have an understanding, Mr. Carretta, that when

2    the business people set enterprise license prices at FICO

3    they look at the revenue of the organization that wants to

4    use Blaze?

5    A.  It depends on how you define "enterprise."  So

6    "enterprise" is a very misused word in the industry, because

7    there might be the enterprise of a subsidiary, the

8    enterprise of a global entity or some segment.  And

9    "enterprise" can also mean how open it is, how many people

10   can use the software.

11          It might become unlimited.  Where it could be

12   located might become unlimited.  There's a lot of variables,

13   and that's why the agreement defined what "enterprise"

14   meant.

15   Q.  Do you know what Chubb entity the FICO business team

16   that priced Chubb's license was looking at when they set

17   that $1.3 million license fee for Chubb?  Do you know?

18   A.  No.

19   Q.  Do you know whether the Chubb & Son division of Federal,

20   that nonlegal entity, even reports its own separate revenue?

21   A.  No.

22   Q.  Now, we can all agree and you have a general familiarity

23   with the succession of Blaze license agreements that Chubb

24   entered, right?

25   A.  Chubb & Son.

1   Q.  Okay.  Chubb & Son.

2           We can all agree that the December 2006 amendment,

3   as amended in December 2006, the license cost more money

4   than it did in June, right?

5   A.  That's correct.

6   Q.  Okay.  I want to put up Defendants' Demonstrative 22,

7   just to help us walk through this.

8           So, Mr. Carretta, is it true that the first

9   license that Chubb purchased from FICO only allowed Chubb to

10  use Blaze in a single application and cost about $173,000?

11  Does that sound right?

12  A.  I mean, I need to look at the agreement to see exactly

13  what they bought, but they bought a limited license at

14  first.  That's correct.

15  Q.  Okay.  And if you'd look in the binder I just handed

16  you, there's a copy of the license agreement behind J1.

17  A.  Okay.

18  Q.  And you can look at page 11, if you go by the little

19  bottom numbers on that document.

20  A.  Okay.  I'm on that page.

21  Q.  Okay.  So looking at that, is it accurate that the first

22  license allowed Chubb to use Blaze in a single application,

23  and the cost was about $173,000?

24  A.  For five seats.  That's right.

25  Q.  Okay.  And then the second division-wide license, does

1    it sound right that it was $350,000?

2    A.  I think it was a little more than that, 355, something

3    like that.  I see it is 350 plus maintenance.

4    Q.  Okay.  And then the enterprise-wide amendment in

5    December 2006 increased the price to 1.3 million, correct?

6    A.  Right, with credit for the fees they had already paid.

7    Q.  Okay.  Now, I want to take a look at that December 2006

8    amendment that came with that price tag increase up to

9    $1.3 million.

10           So, Vanessa, if we could pull up J1.  It's already

11   in evidence.  And I want to look, if we could, at page 20.

12           And so, Mr. Carretta, just so you have your

13   bearings, and you can look at the hard copy, we're now in

14   the December 2006 amendment.  Okay?

15   A.  Correct.

16   Q.  And the top of the second page says, "For purposes of

17   this Amendment Two, the enterprise-wide license shall mean

18   that client and its affiliates may use the Fair Isaac

19   product."  Right?

20           And then it goes on to talk about internal

21   business purposes and no limitation on the number of seats

22   or CPUs, correct?

23   A.  Yes, it says what it -- I mean, what you have on your

24   screen.

25   Q.  Okay.  And that language was not in the two prior Blaze

1    license agreements, the ones from earlier in 2006, right?

2    This was new language.

3    A.  Right.  That's new language.

4    Q.  And you understand now that Federal Insurance Company

5    has global affiliates in Chubb Australia, Chubb Europe, and

6    Chubb Canada.  You've come to have that understanding,

7    right?

8    A.  Could you repeat that?

9    Q.  You've come to understand, Mr. Carretta, that Federal

10   Insurance Company has affiliates like Chubb Canada, Chubb

11   Australia, and Chubb Europe, correct?

12   A.  Federal does.  That's correct.

13   Q.  Okay.  And you anticipated my next question, because the

14   Chubb & Son division of Federal, the only entity that FICO

15   now says could use the Blaze program, they didn't have any

16   affiliates as of December 2006, correct?

17   A.  Chubb & Sons is not an affiliate.

18   Q.  Chubb & Son doesn't have affiliates because it's not a

19   legal entity, right?

20   A.  That is correct.

21   Q.  So in your view, since Chubb & Son is the only client,

22   the addition of all this language about how now client and

23   its affiliates can use Blaze did not actually expand Chubb's

24   ability to use Blaze at all, right?

25   A.  It was still captured within Chubb & Sons.  That's

1    right.

2    Q.  So there was no expansion with this new language and the

3    $1.3 million price tag.

4    A.  No.  That's what they apparently negotiated.  That's

5    right.

6    Q.  And your view is that Chubb paid all this extra money

7    for this new reference to affiliates because one day down

8    the road the Chubb & Son division of Federal might, one,

9    turn itself into a legal entity; and, two, acquire

10   affiliates that might need to use Blaze.

11   A.  I don't agree with that.  I don't know why Chubb would

12   want that language.

13   Q.  Okay.  Mr. Carretta, we have a binder in front of you

14   that has a copy of your October 9th, 2018, deposition.  Can

15   you find that tab, please.

16   A.  You said in October?

17   Q.  October 9th, yes.

18   A.  I have it.

19   Q.  And if I could direct your attention to page 122,

20   line 14.

21   A.  Okay.  Page 122.

22   Q.  Line 14.  Question, "You testified that Chubb & Son

23   could not have any affiliates, as far as you understand it?

24           "Answer:  At the point of time that this contract

25   was entered, Chubb & Son was not a legal entity in and of

1    itself.  Therefore, it could not have had affiliates within

2    the meaning of the definition, but things could change in

3    the future.  They could incorporate as a separate business,

4    in which case as an entity they could then have the

5    potential to have an affiliate, but at the time they did not

6    have that possibility.

7              "And I don't believe they've ever incorporated.

8    And if they incorporated, it would have implicated the

9    balance of the agreement as well so you would have to look

10   at it.  So it wasn't meaningless language, and it was

11   important to Chubb, I believe, to preserve their future."

12             Was that your testimony at your deposition?

13   A.  That is correct.

14   Q.  Okay.  And, of course, whether Chubb had any concerns

15   back in 2006 about preserving its future, you wouldn't be

16   able to speak to that because you were not involved in the

17   negotiations at the time, correct?

18   A.  That's correct.

19   Q.  This is just an explanation that you've come up with

20   after reviewing the contract for the first time in 2015,

21   correct?

22   A.  Yes.

23             THE COURT:  Ms. Godesky, are you at a convenient

24   breaking point?

25             MS. GODESKY:  I am.  Thank you.

1          THE COURT:  Okay.  Members of the jury, we'll take

2     our afternoon break.  Be back in the courtroom at 25 minutes

3     to 4:00 on that clock.

4               (Recess taken at 3:17 p.m.)

5     3:36 p.m.

6                           **IN OPEN COURT**

7                          **(JURY PRESENT)**

8          THE COURT:  Be seated.

9          Go ahead.

10          MS. GODESKY:  Thank you.

11    BY MS. GODESKY:

12    Q.  Mr. Carretta, I want to take a look at the letter you

13    sent Chubb purporting to terminate the Blaze license

14    agreement on March 30th, 2016.  It's in evidence as P103.

15    It's in your binder, and it's up on the screen too.

16    A.  Okay.

17    Q.  Now this is a letter from you to a Mr. Andrew Hopp, a

18    lawyer at Chubb, right?

19    A.  That's right.

20    Q.  And you're terminating the license agreement and giving

21    your reasons for doing so, correct?

22    A.  That's right.

23    Q.  Okay.  I want to look at the second paragraph on this

24    page where you wrote, "FICO had become aware of a further

25    material breach due to the use of the software outside the

```
 1    United States and in two applications utilized in the United

 2    Kingdom."

 3              Do you see that?

 4    A.  I do see that first sentence, yes.

 5    Q.  Now, again, you don't know whether the use of Blaze by

 6    Chubb Europe is something that was discussed back in

 7    December 2006 when the agreement was executed because you

 8    were not involved in those communications, correct?

 9    A.  I was not involved in those communications or

10    negotiations, no.

11    Q.  And before sending this letter asserting that FICO had

12    become aware of this improper use, you didn't do anything to

13    research what representations FICO made to Chubb during the

14    course of their business relationship about whether Blaze

15    could be used in Europe, correct?

16    A.  No, I don't understand what you mean by your premise

17    that FICO made representations or such.

18    Q.  Well let me ask it a different way.  Before sending this

19    letter, you didn't do anything to research the

20    representations that FICO employees had made to Chubb during

21    the course of their business relationship about whether

22    Blaze could be used at Chubb Europe, correct?

23              MR. HINDERAKER:  I'm sorry.  Objection.  Lack of

24    foundation.

25              THE COURT:  Overruled.
```

1            THE WITNESS:  Again, you're talking about

2      representations.  I'm a lawyer.  That has a different

3      meaning than perhaps for other people.

4      BY MS. GODESKY:

5      Q.  Mr. Carretta, before sending this letter, you didn't do

6      anything to investigate the statements that FICO employees

7      made to Chubb about whether Blaze could be used by Chubb

8      Europe, correct?

9      A.  I did not.  That is correct.

10      Q.  And as we heard during your direct examination, when you

11      made this reference to a material breach that you had just

12      learned about, you were going off of entries in a

13      maintenance log, right?

14      A.  I was informed by the maintenance organization.  I

15      didn't actually read the logs.

16      Q.  But you had asked them to go through the logs, right?

17      A.  I did.

18      Q.  Okay.  Now, you testified earlier that Mike Sawyer was

19      one of the business people at FICO who came to you after he

20      saw the announcement of the big ACE acquisition with

21      questions about the license agreement, right?

22      A.  Yes.

23      Q.  Before you sent this letter purporting to terminate the

24      license agreement based on alleged improper use in Europe,

25      you didn't check to see if Mr. Mike Sawyer himself had ever

1    confirmed that Chubb in fact could use Blaze in Europe, did

2    you?

3    A.  I don't recall that, no.

4    Q.  I want to show you a document that's in evidence.  It's

5    P47.

6            And, Mr. Carretta, there's a Bates stamp at the

7    bottom which says FICO, which means it was produced from

8    FICO's files, right?

9    A.  I see the FICO Bates stamp, yes.  So I assume that FICO

10   produced it, yes.

11   Q.  And I want to look at the email at the bottom of this

12   first page.  This is an email from Mr. Mike Sawyer to

13   Richard Hill and Russ Schreiber.  Do you see that?

14   A.  I do.

15   Q.  These are all FICO employees, correct?

16   A.  Yes.

17   Q.  And this email was sent on August 14th, 2012, a couple

18   years before the ACE acquisition was announced, right?

19   A.  Yes, three years before approximately.

20   Q.  And Mike Sawyer writes, "I am the CP for Chubb."  Do you

21   see that?

22   A.  Yes.

23   Q.  That means client partner, right, the person who is

24   going to interface with Chubb.

25   A.  That's right.  He's the sale person.  We call them

1 client partners.

2 Q. And Mr. Sawyer writes in the next sentence, "They,"

3 meaning Chubb, "do have a global ELA for Blaze and have an

4 automated UW," meaning underwriting, "application running in

5 the UK already."

6   Do you see that?

7 A. I see that line, yes.

8 Q. So this email shows that FICO through its Chubb client

9 partner, Mr. Mike Sawyer, was aware as of 2012 that Blaze

10 was up and running in Chubb Europe, correct?

11 A. I don't, I don't know if I would agree with that.

12 Q. But that's what it suggests, right, Mr. Carretta?

13 A. Well, it says what it says.

14 Q. And you're not aware of anyone at FICO ever suggesting

15 to Chubb or even suggesting internally that use of Blaze in

16 Chubb Europe was a material breach of the contract at any

17 time before 2016 when you sent this letter, correct?

18 A. I believe that's correct.

19 Q. I want to look at one more document that's also already

20 in evidence. P60. This is an April 1st, 2015, email from

21 Oliver Clark at FICO to Richard Lagerweij at FICO titled

22 "Decision Simulator Proposal."

23   Do you see that?

24 A. I do.

25 Q. And this is forwarding a message that a Mr. Moffat at

1    FICO had sent to Hamish Tonkin at Chubb earlier that day,

2    correct?

3    A.  I think I'd have to do the timing math because I think

4    Andrew was -- yeah, he is a London guy.  So I don't know if

5    that's correct or not.  You just have to sort out the

6    timing.  It looks like it.

7    Q.  Well, the email from Mr. Moffat is at the bottom of the

8    chain and then it gets forwarded, right, later in the day?

9    A.  That's what it looks like, yeah.

10   Q.  And Mr. Moffat, according to this document, is a senior

11   account executive at FICO, right?

12   A.  That's right.

13   Q.  And his address is listed as London.

14   A.  That's right.

15   Q.  And if you look at the email about towards the bottom of

16   the page, he says, "Hi, Hamish."

17            Do you see that?

18   A.  I do.

19   Q.  And he says, "Please see the attached proposal for the

20   licensing costs and associated training for decision

21   simulator.  The prices are heavily discounted in line with

22   the existing Blaze contract.  No additional Blaze licenses

23   are needed as it is covered within the overall global Blaze

24   ELA."

25            Do you see that?

THOMAS - CROSS

```
 1    A.  Yeah, what's that it says.
 2    Q.  And that's a statement, just so everyone is clear, from
 3    FICO, not Chubb, right?
 4    A.  That is from Andy Moffat, who is a senior account
 5    executive.  That's right.
 6    Q.  At FICO?
 7    A.  At FICO.
 8    Q.  And that was made in April 2015 about a year before you
 9    wrote that letter saying that there had been a material
10    breach you just learned about because there was improper use
11    of Blaze in Europe, correct?
12    A.  That's what they're referring to, yes.
13    Q.  And you didn't speak to Mr. Moffat or review any of his
14    communications with Chubb before you sent that letter,
15    right?
16    A.  No, I did not.
17    Q.  And in fact the first time you saw this communication,
18    blessing the use of Blaze in Europe, was at your deposition
19    in this case when you were showed it by one of the Chubb
20    lawyers, correct?
21    A.  The outside lawyers, yes.  That's correct.
22    Q.  Okay.  Thank you, Vanessa.  We can take that down.
23            You also spoke on direct examination about how
24    your termination letter refers to allegedly unauthorized use
25    of Blaze by outside consultants, correct?
```

1    A.  That's correct.

2    Q.  And was that a reference to these companies DWS and

3    AppCentrica?

4    A.  Yes.

5    Q.  Now as a general matter, Mr. Carretta, FICO does agree

6    in certain circumstances to let its customers share Blaze

7    with consultants, correct?

8    A.  Every deal is different, so it sort of depends.

9    Q.  But in your decade plus at the company, you have seen

10   circumstances where they agree to that, correct?

11   A.  Yes.

12   Q.  And there's no categorical rule at FICO, we never let

13   our customers share Blaze with their consultants?

14   A.  Like I said, every deal is negotiated.

15   Q.  But there's no categorical rule, correct?

16   A.  I wouldn't phrase it that way.  It's dependent on the

17   whole deal, and therefore it may or may not be.

18   Q.  Okay.  Now, again, you became aware of these issues

19   involving DWS and AppCentrica because after you heard about

20   the ACE acquisition, you asked folks to start reviewing

21   FICO's maintenance logs to see if they could see any

22   problems related to Chubb, right?

23   A.  Yes.

24   Q.  And you were doing this because you wanted to find a

25   problem, right?

THOMAS - CROSS

1    A.  We began to become curious about who was using the

2    software.

3    Q.  And in the regular course of business, Mr. Carretta, you

4    don't usually scan maintenance logs for potential problems

5    with your customers, right?

6    A.  I don't.

7    Q.  And you don't direct people to do that either, right?

8    A.  I don't direct people to do that.

9    Q.  And it would have been helpful for you in this time

10   period, after the ACE acquisition was announced, if you

11   could find more potential problems with Chubb's use of

12   Blaze, correct?

13   A.  Not necessarily, no.

14   Q.  But it might give you more potential leverage in any

15   breach letters that you might want to send or conversations

16   that you want to have with Chubb, correct?

17   A.  Not necessarily.

18   Q.  But you did end up citing the use of Blaze by these

19   consultants, just like you cited use of Blaze in Europe, in

20   your termination letter, correct?

21   A.  I reference it in my termination letter.  That's

22   correct.

23   Q.  You referred to them as material breaches.

24   A.  Yes.

25   Q.  And based on those material breaches, you said that the

1   next day the contract was over and Chubb couldn't use Blaze

2   anymore.

3   A.  Among the other breach, the obvious one we spent all day

4   talking about.

5   Q.  Did you do anything to investigate the full extent of

6   the use, like how many people at AppCentrica or DWS had laid

7   eyes on the Blaze software?

8   A.  I did not personally, no.

9   Q.  Any use of Blaze in connection with this potential

10  project in Australia would have been quite small in the

11  context of an enterprise-wide license like Chubb had,

12  correct?

13  A.  I don't know that.

14  Q.  Well, an enterprise-wide license means that you can use

15  the software in an unlimited number of applications, right?

16  A.  I thought it was limited to the number of applications.

17  I'd have to look at the agreement to see how they defined it

18  again.

19  Q.  So you can't -- you can't speak at all to the relative

20  impact of this issue with DWS and AppCentrica relative to

21  the size of Chubb's use of Blaze and the scope of its

22  license?

23  A.  Well, it's more of an absolute.  We don't guess that,

24  oh, this one is important.  It was just two guys that looked

25  at it, versus Accenture.

1   Q.  But my question is whether you did anything to

2   investigate the magnitude of this issue.

3   A.  No, because of what I just said.  It's an absolute, you

4   are not allowed to do this.

5   Q.  And did you ever identify any evidence that AppCentrica

6   or DWS accessed Blaze for any purpose other than assisting

7   Chubb in its work on one of its internal computer

8   applications?

9   A.  I don't know what they did.  I don't remember.

10  Q.  So you have not identified any evidence that AppCentrica

11  or DWS accessed Blaze for any purpose other than assisting

12  Chubb, correct?

13  A.  The only thing I know is that they showed up in the

14  maintenance logs.  I was told that.  But I don't remember

15  any of the details that you are asking about.

16  Q.  Okay.  So I'm going to ask my question one more time.

17  You have no evidence that AppCentrica or DWS accessed Blaze

18  for any purpose other than to assist Chubb in it's computer

19  application work, correct?

20  A.  I just told you I don't remember.  I don't believe I was

21  told that.

22  Q.  So that's a no.  You don't have any evidence?

23  A.  I don't personally have any evidence, no.

24  Q.  And are you aware of any evidence that anyone at

25  AppCentrica or DWS shared Blaze with any third party outside

1    Chubb?

2    A.  I don't know.  I just know that third parties accessed

3    the software.

4    Q.  So that's a no.

5    A.  They are there in the log.

6    Q.  So that's a no.

7    A.  No.  That's just what I said.

8    Q.  Mr. Carretta, I'm entitled to an answer to the question

9    I'm asking.  Are you aware of any evidence that anyone at

10   AppCentrica or DWS shared Blaze with any third party outside

11   Chubb?

12   A.  Not that I'm aware of, other than that they appear in

13   the logs.

14   Q.  Okay.  Let's talk about Section 10.8 and this whole

15   concept of assignment.

16   A.  Okay.

17   Q.  During your direct examination, when you were talking

18   about that letter you sent to Chubb on January 27th, 2016,

19   you made a point of saying in your questioning with

20   Mr. Hinderaker that Chubb had not responded to Sawyer and

21   Schreiber at that point in time.

22           Do you remember that?

23   A.  Yes.

24   Q.  I want to take a look at P131, which is already in

25   evidence.  And I want to go to page 3 of the PDF.

1    A.  I'm looking at the screen now, yes.

2    Q.  Okay.  Perfect.  So this starts with an email from Mike

3    Sawyer to someone at Chubb on January 8th, 2016.  Do you see

4    that?

5    A.  Yes.

6    Q.  And he says, "Hi, Elie.  Happy new year!  I am following

7    up on the voicemail I left you before the holiday."

8            Do you see that?

9    A.  I do.

10   Q.  And then he says, "Can you get back to me about the ACE

11   acquisition?"

12   A.  Yes.

13   Q.  And then if you go to the second page of the PDF,

14   there's another email from Mr. Sawyer to Mr. Merheb at Chubb

15   the same day, about three hours later.  Do you see that?

16   A.  Where in this cycle of all these emails are you?

17   Q.  Sure.  I'm on the email from Mike Sawyer --

18   A.  Yes.

19   Q.  -- to Chubb at January 8th at 3:25 p.m.

20   A.  I see that.

21   Q.  And Mr. Sawyer says, "Elie.  Thanks for the call this

22   afternoon.  As discussed attached are Chubb's Blaze Advisor

23   license agreements for your review."  Do you see that?

24   A.  I do.

25   Q.  So this looks like Mr. Merheb at Chubb called Mr. Sawyer

1    at FICO the afternoon that Mr. Sawyer emailed him, correct?

2    A.  Yes.

3    Q.  And this was January 8th, 2016, a couple weeks before

4    you sent that letter alleging breach, correct?

5    A.  That is correct.

6    Q.  Now if we could go to Joint Exhibit 1, which is the

7    license agreement, I'd like to take a look at the text of

8    Section 10.8, which is on page 8.

9             So, Mr. Carretta, there's a few sentences in

10   Section 10.8, correct?

11   A.  Yes.

12   Q.  And during your direct examination with Mr. Hinderaker,

13   you distinguished between the first and the second sentence

14   of Section 10.8 several times, correct?

15   A.  They're independent, yes.  That's correct.

16   Q.  And you walked us through how certain things in your

17   breach letter related to the first sentence and how certain

18   things in your breach letter related to the second sentence.

19   Do you remember that?

20   A.  Yes.

21   Q.  Now it's true that FICO will sometimes enter license

22   agreements that don't have the second sentence that we see

23   in the Chubb agreement, right?  Sometimes FICO enters

24   license agreements that have assignment clauses without

25   specific references to mergers and acquisitions, correct?

1    A.  Like I said, they're all negotiated, so I'm sure there

2    are some that don't have that, but I am sure there are some

3    that do.

4    Q.  So you are sure that there are some that do not have

5    this second sentence that specifically references mergers

6    and acquisitions?

7    A.  Well, this particular sentence has a, an edit added on

8    to the end that was unique to Chubb.  The other, the rest of

9    the sentence starting with "in the event" and ending with

10   "provide such consent" is standard template language.

11   Q.  Okay.  I want to, if we could show Mr. Carretta, and not

12   yet publish to the jury, Exhibit D304.

13            This is in your binder, but we will put it on the

14   screen too, Vanessa.  I think the judge has turned it off

15   for the jury.

16   A.  Okay.

17   Q.  This is a software license agreement between FICO and

18   ███████████████████████, correct?

19   A.  That's what's in the header, yes.  That is correct.

20   Q.  And if you turn to page 15 you can see signatures from

21   FICO and ███████████████ going off those --

22            THE JURY:  Your Honor, we don't have the --

23            THE COURT:  Did you just say that your monitors

24   are off?

25            THE JURY:  Yes.

```
 1              THE COURT:  That's actually on purpose at this
 2     time because the exhibit is not yet into evidence.
 3              THE JURY:  Oh, I'm sorry.
 4              THE COURT:  Quite all right.  I'm glad you asked.
 5              THE WITNESS:  It's back on my screen.
 6     BY MS. GODESKY:
 7     Q.  Okay.  Terrific.  So on page 15 you can see that this
 8     was signed by FICO and ███████████████, correct?
 9     A.  That is correct.
10              MS. GODESKY:  Okay.  Defendants offer Exhibit 304
11     into evidence D304.
12              MR. HINDERAKER:  We just maintain our earlier
13     position, Your Honor.
14              THE COURT:  Overruled.  The exhibit is admitted.
15     BY MS. GODESKY:
16     Q.  And so then if we could publish the document to the jury
17     and go to page 13, there's an assignment clause.
18              If you could make that bigger Vanessa.  Thank you.
19              So, Mr. Carretta, this section reads, ██████████
20     ████████████████████████████████████████████████████████
21     ██████████████████████████████████████████████
22              Your Honor, I think there's a --
23              THE COURT:  Oh, thank you.
24              MS. GODESKY:  Thank you.
25
```

1    BY MS. GODESKY:

2    Q.  So the assignment clause, Mr. Carretta, reads, ███████

3    ████████████████████████████████████████████████████████

4    █████████████████████████████████████  and then it

5    goes on to say,  ████████████████████████████████████████

6    ████████████████████████████████████████████

7    █████████

8            Do you see that?

9    A.  I do.

10   Q.  And there's no specific reference in this agreement to

11   what you've characterized as standard language referencing

12   mergers and acquisitions, correct?

13   A.  Right.  This is unusual language.

14   Q.  Okay.  Now you also talked about --

15           Vanessa, we can take that one down.  Thank you.

16           You also talked during direct examination about

17   what you called the commercial purpose of Section 10.8,

18   right?

19   A.  Right.

20   Q.  And you said, we need to understand who we're doing

21   business with.  That was one reason you gave.

22   A.  That is correct.

23   Q.  And then you brought up indemnity concerns, and you

24   talked about how you need to know if there's a new entity in

25   town because you may have indemnity obligations you need to

1   know about, right?

2   A.  Yeah, that was one concern.  That's right.

3   Q.  So you were explaining that was, that's the commercial

4   purpose of these assignment clauses in FICO's contracts,

5   right?

6   A.  Well, the commercial purpose is to balance risk with

7   reward.  And indemnity risk is just that, it's a risk.

8   Q.  Right.  So the commercial purpose has to do with those

9   two things I just described, right?  You want to know who

10  you're doing business with and this indemnity issue.

11  A.  Right, among other possibilities.  That's right.

12  Q.  Now FICO enters Blaze license agreements that don't

13  reflect any particular concerns about new entities using

14  Blaze through mergers and acquisitions unless revenue

15  exceeds a certain threshold, correct?

16  A.  I don't recall that being a rule within FICO.

17  Q.  Okay.  Let's look at -- and we're not going to publish

18  this to the jury just yet.  This is Exhibit D4.

19  A.  Okay.  I'm there, yeah.

20  Q.  And this is a September 30th, 2005, license agreement

21  between FICO and a company called ███████████████████████,

22  correct?

23  A.  That's correct.

24  Q.  And if you look at page 11, you can see that this was

25  signed by FICO and ████████████████████

1    A.  Yes.

2              MS. GODESKY:  Defendants offer Exhibit D4 into

3    evidence.

4              MR. HINDERAKER:  No objection.

5              THE COURT:  Subject to the same limitation, it's

6    received.

7    BY MS. GODESKY:

8    Q.  Okay.  Mr. Carretta, let's go to page 10 where there's

9    an assignment provision.

10   A.  I see it.  The numbering is a little blurred, but I do

11   see it.

12   Q.  I apologize.  It look like it might be 10.8, but I'm not

13   sure.  It says, ███████████████████████████

14   ████████████████████████████████████████████

15   ██████████████████████████████████████

16   ████████████████████████████████████

17   ███████████████████████████████████████

18   ████████████████████████████████████████████

19   ██████████

20              Do you see that?

21   A.  I do.

22   Q.  Okay.  So let's look at Section 3.2 on page 14.

23   A.  I'm on page 14.

24   Q.  Okay.  And do you see the header saying Mergers and

25   Acquisitions Involving Client?

1    A.  I do.

2    Q.  It says, 

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17              Do you see that?

18   A.  I do see that.

19   Q.  So this language, it does not appear in the Chubb

20   license agreement, correct?

21   A.  No.  This was different.  It was negotiated differently.

22   Q.  And this is an example of an agreement where FICO's

23   concerns about potentially negotiating more license fees and

24   changing the scope of the agreement are only triggered if

25   that merger or acquisition means that the new entity is a

1    particular threshold size, right?

2    A.   That's right.  They anticipated small things and didn't

3    want to bother with them.

4    Q.   We can take that one down.  Thank you, Vanessa.

5             And then the other commercial purpose that you

6    talked about on direct examination, Mr. Carretta, was the

7    need for information so that you can price the software,

8    correct?

9    A.   I'm not sure I understand the context you are talking

10   about.  Are you talking about a new deal or --

11   Q.   So I understood you to be saying during direct

12   examination that one of the reasons this Section 10.8 clause

13   exists, one of the commercial purposes, is so that you,

14   FICO, can get information to price the software after a

15   merger or acquisition.

16   A.   Well, no, that's not entirely correct.  It's a clause

17   that says you can't not assign, right, is the first

18   sentence, and I'm paraphrasing.  And you need to acquire

19   consent before you make one of the assignments or a transfer

20   as defined or undefined.

21   Q.   Mr. Carretta, I'm not asking you to interpret the

22   language.

23   A.   I'm not.  I'm just playing back what it says.

24   Q.   I just -- during direct examination you testified that

25   one of the commercial purposes of Section 10.8 is so that

1    FICO can get information to properly price the software

2    after a merger or acquisition.

3            Is that true in your mind?

4    A.  I don't think that's what I testified to.

5    Q.  But is that true in your mind?  Is that one of the

6    commercial reasons?

7    A.  The commercial reason is to understand what is going to

8    happen post the event, which may or may not involve price

9    chain or may or may not involve an amendment.  It could be a

10   number of things.

11   Q.  And one of the things that you had to understand after

12   the event that was the ACE acquisition, was this issue of

13   expanded use, right, that's referenced in the second

14   sentence of Section 10.8 of the Chubb license agreement?

15   A.  Right.  There's an additional bit of language there.

16   Q.  And you agree that the words on the page in Section 10.8

17   of the Chubb contract state that FICO will not unreasonably

18   withhold consent to even expanded use of Blaze, correct?

19   A.  Let me look at the agreement, please.

20   Q.  Sure.  We can pull it up on the screen too.

21   A.  That would be --

22   Q.  It's in J1 at page 8.

23   A.  -- helpful.

24   Q.  If we could blow up Section 10.8, Vanessa?  Thank you.

25   A.  So if you wouldn't mind asking your question again.

1    Q.  My question is whether you agree that the words on the

2    page state, "that FICO cannot unreasonably withhold a

3    consent to expanded use."

4    A.  It's a non sequitur.  The way its written it's comma and

5    client shall make no expanded use, which grammatically means

6    it's a covenant.  It's a separate, independent term of the

7    sentence.  And client shall make no expanded use as a result

8    of, unless and until, they receive such consent.  So I don't

9    agree with you.

10   Q.  Even under your understanding of this agreement, if

11   Chubb were to ask FICO for consent after a merger or

12   acquisition, this agreement says that FICO will not

13   unreasonably withhold that consent, correct?

14   A.  No, that's not correct.

15   Q.  Okay.  Well, let's go look at P90.  This is your first

16   letter to Chubb asserting breach concerns after the ACE

17   acquisition.

18   A.  Okay.

19   Q.  So in P90, I want to go to the second page and look at

20   the first full paragraph.

21          You wrote, and this is January 2016, right,

22   Mr. Carretta?

23   A.  January 27, 2016.

24   Q.  This is your first letter to Chubb, right?

25   A.  The very first one.  That is right.

1    Q.  And you wrote, "FICO lacks sufficient information to

2    understand the full implications of Chubb Limited's plans

3    and without some shared insight is unable to accommodate any

4    request now for consent."

5              Do you see that?

6    A.  I do.

7    Q.  And you said during direct examination, we didn't know

8    what they were planning to do with the software, right?

9    A.  Right, because they didn't ask before they closed.  They

10   closed, and then we only had the information that we, we

11   could gather, and that's why we're asking them.

12   Q.  Mr. Carretta, I'm going to, to keep moving this along,

13   I'm just going to ask you to answer my question.  Okay?

14   A.  Okay.

15   Q.  I want to show you Mr. Hopp's response to your letter,

16   which is in evidence as P91.

17   A.  Yes.

18   Q.  And this was sent on February 17th, 2016, correct?

19   A.  That's correct.

20   Q.  And if we look at the second paragraph -- and blow that

21   up Vanessa.  Thank you.

22              Mr. Hopp wrote, "While we continue to evaluate our

23   use and means, our initial findings indicate that the

24   applications that have been using Blaze Advisor software

25   since 2006 are currently running in the exact same fashion

1    as prior to the merger transaction.

2            "Please be advised that our IT software compliance

3    department has been fully engaged to oversee this evaluation

4    process carefully and is committed to working with FICO to

5    gather the necessary information to understand the full

6    implication of our plans moving forward and to determine

7    Chubb & Son's future licensing needs."

8            Do you see that?

9    A.  I do.

10   Q.  And this was a direct response to the concerns that you

11   had raised in your January letter wondering what Chubb

12   Limited's plans were going to be, correct?

13   A.  Yes, I think that's probably correct.

14   Q.  And this is a direct assurance from Chubb that Blaze use

15   has not expanded by virtue of the ACE acquisition, correct?

16   A.  No, because Andrew ignored the fact that the event

17   occurred, and therefore it was already a breach.

18   Q.  I'm not asking about whether there was already a breach

19   or when in your mind Chubb had to ask for consent.  I'm not

20   asking about that.

21           My question is whether it's true that as far as

22   questions of expanded use are concerned, this was a direct

23   assurance from Chubb in response to your inquiry that Blaze

24   use had not expanded by virtue of the ACE acquisition.

25   A.  I disagree.

THOMAS - CROSS

928

1    Q.  Now, FICO had agreed when it signed the 2006 agreement

2    to explore any questions of expanded use in good faith,

3    correct?

4    A.  I'm sorry.  Could you repeat that?

5    Q.  When FICO signed the license agreement in 2006, it

6    agreed that it was going to explore any questions of

7    expanded use in good faith, correct?

8    A.  I think it's an implied covenant of good faith and fair

9    dealing for both parties, so yes.

10   Q.  And as to Mr. Hopp's statement in response to your

11   letter where he says, "Applications that have been using the

12   Blaze Advisor software are running in the exact same

13   fashion," you had no evidence as of February 17th, when you

14   received this letter, suggesting that that statement was

15   false, correct?

16   A.  The problem is, it's innocuous.  I don't know what

17   "currently running" means.

18           THE COURT:  Mr. Carretta, you need to answer the

19   question that she asked you.

20           THE WITNESS:  Okay.  Go ahead.  Please ask again.

21   BY MS. GODESKY:

22   Q.  As far as Mr. Hopp's statement in his response to you

23   that the applications that had been using Blaze Advisor

24   software since 2006 are running in the exact same fashion,

25   you had no evidence as of February 17th when you received

1    this letter suggesting that was false, correct?

2    A.  We didn't have any information.

3    Q.  You had no evidence suggesting it was false, correct?

4    A.  Yes, that's what I'm saying.

5    Q.  And the information that Mr. Hopp provided you and told

6    you that his compliance department was fully engaged was,

7    applications are currently running in the exact same

8    fashion.  That is information, isn't it?

9    A.  That's what he's telling us.

10   Q.  You had no evidence as of February 17th, when you

11   received this letter, suggesting that the number of

12   applications using Blaze at Chubb had changed, correct?

13   A.  We didn't know.

14   Q.  You had no evidence, right, Mr. Carretta?

15   A.  Right.

16   Q.  And you had no evidence that Blaze had been inserted

17   into Legacy ACE computer applications, right?  You hadn't

18   seen anything suggesting that had happened.

19   A.  No.

20   Q.  Now, I want to look at another communication from Chubb

21   a few days later on February 25th, 2016.

22            This is already in evidence as P94.

23   A.  Okay.

24   Q.  And this is an email that Tamra Pawloski at Chubb sent

25   to Mr. Sawyer and Mr. Schreiber, and this is dated

1    February 25th, 2016.  So this would be a few days after

2    Mr. Hopp sent you his letter, right?

3    A.   Yes.

4    Q.   And if you look at Ms. Pawloski's email she says Mike

5    and Russ, I know my GC -- that's general counsel, right?

6    A.   That's correct.

7    Q.   Reached out to you -- sorry?

8    A.   I assume that's what he means.

9    Q.   Okay.  "I know my GC reached out to yours but got an out

10   of office due to illness.  I wanted to share with you that

11   his communication was for us to work through a commercial

12   proposal.  I have attached that for your review and comment.

13   I am pretty open tomorrow if you'd like to discuss."

14            Do you see that?

15   A.   I do.

16   Q.   And then if you turn to the second page of the document

17   it says, "FICO proposal of February 25th, 2016," correct?

18   A.   Yes.  There's a proposal attached that says that date.

19   Q.   Okay.  And so Ms. Pawloski's proposal says, "Although

20   Chubb strongly disagrees with FICO's stated position, in a

21   good faith effort to move the relationship forward, Chubb

22   proposes that the parties renegotiate Chubb's currently

23   perpetual application-based enterprise license to downgrade

24   and limit Blaze Advisor development and deployment to

25   reflect Chubb's actual usage of 15 named applications of

1    Blaze Advisor deployment and 100 seats of Blaze Advisor" --

2    sorry.  I misread something -- "actual usage of 15 named

3    applications of Blaze Advisor deployment, 100 seats of Blaze

4    Advisor development at no additional cost to Chubb."

5            Do you see that?

6    A.  Yes.

7    Q.  So this was an offer from Chubb to switch from a

8    perpetual license with no limit on the number of

9    applications to a license that would have limited Chubb to

10   using Blaze in 15 applications, correct?  That's what she's

11   suggesting.

12   A.  That's correct.  I'm not sure which Chubb, but, yes,

13   that's what she's suggesting.

14   Q.  And she's also agreeing to limit the number of seats,

15   right?  Chubb had paid for an enterprise-wide license with

16   no limit on the number of seats, but she's saying we'll

17   limit it to current use, 100 seats.  That's what she's

18   saying, right?

19   A.  That's what she's saying.

20   Q.  And if we go on to the next sentence, Mr. Carretta, it

21   says, "All usage now and going forward does not and will not

22   change from that permitted under the current license

23   agreement, And all usage remains with the same named

24   applications," correct?

25   A.  That's correct.

1    Q.   That sounds like a commitment not to expand use to new

2    applications or new people, correct?

3    A.   I'm not sure I agree with you on that.

4    Q.   It's a commitment by Ms. Pawloski in this commercial

5    proposal not to expand beyond the 15 applications that are

6    currently using currently using Blaze, correct?

7    A.   I'm sorry.  I wasn't part of this, so I'm just reading

8    it now.

9    Q.   But that's how it reads, right?

10   A.   It reads what it reads.

11   Q.   And it also reads that she's making a commitment not to

12   expand to more people, correct?

13   A.   That's what it says.

14   Q.   And then in the last sentence of this paragraph

15   Ms. Pawloski wrote, "Under this proposal, Chubb will

16   continue to pay for maintenance at the current cost of

17   $237,000 per year in accordance with the terms of the

18   parties' current agreement."  Do you see this?

19   A.   I do.

20   Q.   No one at FICO even showed you this proposal from

21   Ms. Pawloski before you sent your letter purporting to

22   terminate the license agreement, correct?

23   A.   That is correct.

24   Q.   It wasn't passed on to you by Mr. Sawyer or

25   Mr. Schreiber, who received it from Ms. Pawloski.

1  A.  No, it was not passed on to me.

2  Q.  They knew that you were going to purport to terminate

3  the license agreement effective March 2016, but they never

4  passed this on to you, correct?

5  A.  No, I don't know that.

6  Q.  The first time you saw this proposal from Ms. Pawloski

7  was during your deposition in this litigation, correct?

8  A.  That is correct.  I misspoke earlier.  You are correct.

9  Q.  Now, you sent that letter on March 30th, 2016, saying

10  I'm terminating the Blaze license agreement effective the

11  next day, March 31st, correct?

12  A.  Yes.

13  Q.  And that was based on the allegedly newly discovered use

14  of Blaze in Europe right?

15  A.  One of the reasons.

16  Q.  And then you also had the reason of the DWS and

17  AppCentrica issues you found on the maintenance logs,

18  correct?

19  A.  Yes.

20  Q.  And then of course this issue with Section 10.8, right?

21  A.  Yes.

22  Q.  Now, as of March 30th, 2016, when you said you were

23  terminating the license agreement, you had no evidence that

24  Chubb had increased the number of computer applications

25  running Blaze, correct?

```
1   A.  I think that's correct.

2   Q.  And you --

3   A.  I did not.

4   Q.  And you had no evidence that Blaze had been added to any

5   computer applications at ACE, correct?

6   A.  I did not.

7   Q.  And you had no evidence that the number of people using

8   the Blaze software at Chubb had increased, correct?

9   A.  I didn't.  Correct.  Sorry.

10  Q.  Thank you.

11          MS. GODESKY:  I have no further questions.  Thank

12  you.

13          THE COURT:  Thank you, Ms. Godesky.

14          MR. Hinderaker, redirect.

15          MR. HINDERAKER:  Please.  I think we have some

16  binders coming up.

17          Thank you.

18          THE WITNESS:  Thank you.

19          MR. HINDERAKER:  Yes.

20                  REDIRECT EXAMINATION

21  BY MR. HINDERAKER:

22  Q.  Well, let's find my notes, and we'll try to start at the

23  beginning here.

24          You were asked about this notion of whether

25  Chubb & Son is a legal entity or not.  And if you would turn
```

1    to the Exhibit P91, please.  And this is Mr. Hopp's letter

2    to you of February 17, 2016?  Agreed?

3    A.  Agreed.

4    Q.  And let's look at the first paragraph where we didn't

5    spend time with before.

6         Is Mr. Hopp telling you, "Notwithstanding the

7    acquisition, Chubb & Son, the contracting party to the

8    agreement, remains a viable legal entity within the Chubb

9    Group of Insurance Companies corporate structure and the

10   contracting party to this agreement"?

11   A.  That's what it says.

12   Q.  That's what he says.

13        Maybe I need this again.

14        Let's go to J1.  And I want to spend just a few

15   moments with this.

16        The original agreement, as you look at it, is

17   dated June 30, 2006.  And we go to the signature page on

18   page 9 of J001, page 9, and our signature block is client

19   Chubb & Son?

20   A.  That's correct.

21   Q.  Okay.  And now let's move forward.  So we get to

22   Exhibit A of the original agreement.  And under the column

23   Scope and Quantity, you see that it says Named Application?

24   A.  Yes.

25   Q.  And then under the table at subpart a, it names what the

```
 1    application is.
 2    A.  That's correct.
 3    Q.  Okay.  And in the terminology, it's fair to call this a
 4    named application license?
 5    A.  Yes.  That's correct.
 6    Q.  Then let's go to Amendment Number One.  And if we go to
 7    the signature page of that.
 8    A.  Okay.
 9    Q.  All right.  The client is Chubb & Son, and it signs on
10    July 21st, and Fair Isaac Corporation signs on August 1st,
11    right?
12    A.  Yes.  That is correct.
13    Q.  All right.  And let's go back a page to the Scope and
14    Quantity under Amendment Number One.
15            And for Deployment, "For use solely by the Chubb
16    specialty division, no other limitations, i.e., seat or
17    named applications limitations apply."
18    A.  Yes.
19    Q.  Okay.  Amendment One is an expansion of rights, an
20    expansion of FICO's permission to Chubb & Son regarding the
21    scope of use of Blaze Advisor.  Agreed?
22    A.  Agreed.
23    Q.  And then let's -- so we go from a named application, and
24    this Amendment One is called a divisional license in your
25    terminology.
```

1    A.  That's correct.

2    Q.  And the client still is Chubb & Son who has the rights

3    to use the software within that division?

4    A.  That's correct.

5    Q.  And then let's go to Amendment Two.  If we go to the

6    signature page, the client Chubb & Son, a division of

7    Federal Insurance?

8    A.  Correct.

9    Q.  It's signs December 27th, and FICO signs December 28th,

10   right?

11   A.  That is correct.

12   Q.  And then we go to the Scope and Quantity column on the

13   page before.

14   A.  I see that.

15   Q.  All right.  And you see that the scope and quantity is

16   now described as enterprise-wide.

17   A.  That's correct.

18   Q.  Okay.  Whose enterprise are we talking about?

19   A.  The enterprise-wide license optional.

20   Q.  Understood.  And the client is?

21   A.  Chubb & Son.

22   Q.  The division?

23   A.  A division of Federal Insurance.

24   Q.  And is -- so we've gone from an expansion of rights to a

25   named application to a division.  And is this another

1    expansion of rights to the client Chubb & Son from

2    divisional use to the enterprise of Chubb & Son?

3    A.  Yes.

4    Q.  Now in this Amendment Two, you were asked some questions

5    about the first full paragraph on the top of the second

6    page.  I'll get over there please.  There we go.

7            For the purposes of this amendment, the enterprise

8    license shall mean that client.  Client is Chubb & Son, the

9    division?

10   A.  That's correct.

11   Q.  And its affiliates may use the Fair Isaac product.  So

12   far with me?

13   A.  Yes.

14   Q.  And then, then it defines affiliates shall mean any

15   entity directly or indirectly controlled by client.  And

16   then further defines that as having more than 50 percent of

17   the aggregate stock of ownership.

18   A.  That's right.

19   Q.  In your examination or questioning by Ms. Godesky, she

20   says that Chubb & Son, the division, has no affiliates.

21   A.  Yes, I recall that.

22   Q.  Okay.  And is that the license agreement and the

23   definition of affiliates that Chubb & Son signed?

24   A.  Yes, right here.  The one that's on my screen.

25   Q.  That's right.  That's the agreement that the two parties

1    entered into?

2    A.  That's correct.

3    Q.  Let me not hit this mic again.

4         Let's go to -- you were asked some questions about

5    your termination letter, 103.  Plaintiff's Exhibit 0103.

6    And keep the license agreement nearby as well.  In fact --

7    A.  Okay.

8    Q.  -- on a reference, your termination letter, because in

9    the termination letter you speak of the two applications

10   outside the United States and then in Canada.  I guess

11   three?

12   A.  Yes.

13   Q.  Would you go to the license agreement J001?

14   A.  Okay.

15   Q.  And if we could go to the seventh page, please.

16   A.  Okay.

17   Q.  The license agreement does include a provision 10.5 that

18   says Entire Agreement?

19   A.  That is correct.

20   Q.  It says it supercedes all prior or contemporaneous

21   proposals, and all other oral or written understandings,

22   representations, conditions and other communications between

23   the parties.

24        Agreed?

25   A.  Agreed.

1    Q.  It goes on to say that, "Each party represents and

2    warrants to the other party that entering into this

3    agreement it does not rely on any representation, promises

4    or assurances from any other party or employee," and so

5    forth.

6              And then it ends with the sentence, "Any other

7    terms or conditions or amendments shall not be incorporated

8    herein or be binding upon any party, unless expressly agreed

9    to in a writing signed by authorized representatives of

10   client and Fair Isaac."

11             Agreed?

12   A.  Yes.

13   Q.  And then the license agreement also has a provision

14   called 10.4, No Waiver.

15   A.  Yes.

16   Q.  And that provision ends, "No waiver of any rights of a

17   party under this agreement will be effective unless set

18   forth in a writing signed by the parties."

19             Agreed?

20   A.  Agreed.

21   Q.  Now at Fair Isaac, as a matter of fact, does Fair Isaac

22   have a policy that identifies those persons who have the

23   ability to enter into an agreement on behalf of FICO?

24   A.  Yes.

25   Q.  Do salesmen like Mr. Sawyer or Mr. Schreiber have the

1  authority under that written policy to enter into agreements

2  on behalf of FICO?

3          MS. GODESKY:  Objection.

4          THE COURT:  Overruled.

5          THE WITNESS:  No, they do not.

6  BY MR. HINDERAKER:

7  Q.  You were asked some questions about consultants, third

8  party.  And you made the statement that the, the prohibition

9  is absolute.  The magnitude does not matter.

10          What did you mean by that?

11 A.  Essentially the slightest infraction is a breach.  That

12 it effectively defines materiality.  Lawyers sometimes call

13 it strict liability.

14 Q.  Okay.  Let's go to the license agreement again and

15 paragraph 3.6.

16 A.  Okay.

17 Q.  Why don't you review it briefly so that you can get some

18 context.

19 A.  Okay.

20 Q.  All right.  And here in paragraph 3.6, FICO and Chubb &

21 Son have agreed that one consultant, ACS Commercial

22 Solutions, has the right to use Blaze Advisor software.

23          Do you see that?

24 A.  That's correct.

25 Q.  And in fact paragraph 3.6 expressly says, does it not,

1    that ACS Commercial Solutions is the information technology

2    infrastructure operations outsourced to ACS Commercial

3    Solutions?

4    A.  That's correct.

5    Q.  That's to say, ACS Commercial Solutions is going to be

6    using Blaze Advisor for the benefit of Chubb & Son, the

7    division?

8    A.  That's correct.

9    Q.  But to get that permission, it was negotiations of

10    paragraph 3.6?

11    A.  Yes.

12    Q.  And 3.6 further says, "Provided that such use is

13    otherwise subject to the terms and conditions of this

14    agreement and does not exceed the limitations and use for

15    other restrictions set forth herein."  Correct?

16    A.  Yes.  That's correct.

17    Q.  And it further says, "Client shall responsible," client

18    Chubb & Son, "shall be responsible for assuring ACS's

19    compliance with the terms and conditions of this agreement."

20            Agreed?  That's what it says?"

21    A.  Yes.

22    Q.  "And client shall be liable to Fair Isaac for any breach

23    of the agreement by ACS."  It says that?

24    A.  Yes.

25    Q.  "The rights granted to ACS herein shall not be extended

1    to any other third party without the prior written consent

2    of Fair Isaac."

3    A.  That's correct.

4    Q.  And if we went to paragraph 3.1, this contains a variety

5    of client representations and warrants that its employees

6    shall not under the heading License Restrictions?

7    A.  Yes, I see that.

8    Q.  An unauthorized third party using Blaze Advisor is not

9    subject to any of these restrictions, is it?

10    A.  I'm not sure I understand your question.

11    Q.  If a third-party consultant is using Blaze Advisor

12    without FICO's permission, that third-party consultant isn't

13    subject to any other restrictions of the license agreement,

14    correct?

15    A.  That's correct.

16    Q.  You were shown, you were shown some emails from Sawyer

17    and Moffat, maybe, and they were dated January 8, 2016.

18              So let's be clear.  Those are before your notice

19    of breach letter of January 27th.

20    A.  That's correct.

21    Q.  And in the third paragraph you say, "I am writing now to

22    again confirm."  And that "again" reference, the fact that

23    Sawyer had finally had gotten in contact with the client by

24    January about 10.8, as you say, "I am writing now to again

25    confirm"?

1    A.  That's right.

2    Q.  When you were asked questions about 10.8, you said the

3    first sentence and the second sentence are your words were,

4    "Independent restrictions."

5    A.  That's correct.

6    Q.  Why did you say that?

7    A.  Because that's the way it was designed.

8    Q.  Okay.  But what -- can you --

9    A.  Why did I say that?

10   Q.  Can you help us with that?

11   A.  Sure.  Because the first sentence which we have seen in

12   a number of these agreements, notwithstanding they're

13   negotiated in a little different -- is neither party without

14   the prior written consent of the other party, neither party

15   shall without the written consent of the other party, assign

16   or transfer this agreement or any part thereof.

17          So that's the absolute rule, the first rule.

18          MS. GODESKY:  Objection, Your Honor.

19          THE COURT:  Overruled.

20          THE WITNESS:  Okay.

21   BY MR. HINDERAKER:

22   Q.  Okay.  That's one restriction.  What's the other

23   independent restriction?

24   A.  The second restriction was designed to address mergers

25   and acquisitions and what happens in those circumstances

1    where there's a laundry list of these various kinds of ways

2    to get mergers done and acquisitions done, where each such

3    event shall be deemed it to be an assignment subject to this

4    section, which is 10.8.  And then it goes on.

5    Q.  Understood.  You were shown a couple license agreements.

6    A.  Correct.

7    Q.  And I'm going to show you a couple more.  And if you

8    would go to -- let's find the exhibit that's D282.

9            This is a license agreement between FICO and █████

10   ████████, dated June 30, 2006; is that correct?

11   A.  Sorry.  I was in the wrong book.

12   Q.  Yeah.  Yeah.  It's the one called your name on it

13   redirect.

14   A.  Yes, I have it.  ██████████.

15           MR. HINDERAKER:  Your Honor, I move Exhibit D0282.

16           MS. GODESKY:  No objection.

17           THE COURT:  D0282 is accepted.

18   BY MR. HINDERAKER:

19   Q.  Would you turn to paragraph 8.3, which is called No

20   Assignment?

21   A.  Correct.

22   Q.  Can you tell us looking at paragraph 8.3 of this exhibit

23   how it compares to 10.8 of the license agreement with Chubb

24   & Son?

25   A.  I think it's identical, the first sentence certainly is,

```
 1    if I check it.  Sorry.
 2             They're not quite identical, because it has the
 3    words ███████████████████████████████████.
 4    Q.  All right.  So this one says such -- the Exhibit D0282,
 5    ██████████████, everything is the same except it says,
 6    ██████████████████████████████████████████████
 7    ██████████
 8    A.  That is correct.
 9    Q.  That's the difference?
10    A.  That's the difference.
11    Q.  With the exceptions of that difference, everything in,
12    everything else in 8.3 of the ██████████ agreement is the
13    same as 10.8 of the Chubb & Son's agreement.  Do you agree?
14    A.  Yes.
15    Q.  Okay.  Why don't you pull out the D0017 from that same
16    binder.
17    A.  Okay.
18    Q.  This one is with ██████████████
19    A.  That is correct.
20    Q.  This is dated May 23, 2006?
21    A.  That is correct.
22    Q.  I think the other was dated May -- no.  It was dated
23    June 30, 2006.
24    A.  Yes.
25    Q.  So on the ████████ agreement, why don't we look at
```

1   paragraph 12.8.

2            THE COURT:  Will you be offering D17?

3            MR. HINDERAKER:  I will, yes.  I should.  Thank

4   you.

5            Your Honor, I offer D17.

6            MS. GODESKY:  No objection.

7            THE COURT:  D17 is received.

8   BY MR. HINDERAKER:

9   Q.  And now we can turn to paragraph 12.8.

10  A.  Okay.

11  Q.  And this is also entitled, No Assignment?

12  A.  Correct.

13  Q.  And could you do the same comparison for me, whether

14  there's any difference in the ███ 12.8 to the Chubb & Son

15  10.8?

16  A.  Excuse me.  This doesn't have the language at the --

17  following the last comma which says "will not be

18  unreasonably withheld" that's in the Chubb & Son agreement.

19  Q.  So with the ███, the "shall not be unreasonably

20  withheld" element that's in the Chubb & Son agreement is not

21  present in the ███ agreement.

22  A.  No, it is not.

23  Q.  From your experience, can you -- are there indicia that

24  tell you whether a license agreement is, say, heavily

25  negotiated or lightly negotiated?  Can you discern the

THOMAS v. FAIR ISAAC CORP.

1    difference?

2    A.   Sure.  I mean, the ones that are based on our template,

3    you can do line-by-line comparisons using a tool like Word.

4    Others are on the customer's paper and are therefore

5    radically different.

6    Q.   By definition?

7    A.   By definition.

8    Q.   And the two agreements that I just showed you, those are

9    both on basic paper, as FICO paper?

10   A.   Yes.

11   Q.   And did you notice whether the license agreements that

12   Ms. Godesky showed you, were they basic paper, was the basic

13   paper on those FICO as well?

14   A.   Yeah.  They definitely started with FICO paper or

15   template.

16   Q.   And is it fair to say that in those other agreements

17   they were simply more heavily negotiated?

18   A.   Yes.  Each one is different.

19   Q.   You were, you were asked a question by Ms. Godesky about

20   the second sentence of paragraph 10.8 and the, and then the,

21   "And client shall make no expanded use."

22            And you used the phrase from her examination to

23   you, "Well, that's a non sequitur."

24            Do you recall that?

25   A.   Yes.

1    Q.  What did you mean by that?

2    A.  Each of them are different restrictions, and so they all

3    work together, but they're different, independent from each

4    other.

5    Q.  And so what was the non sequitur nature of the question

6    then?

7    A.  Well, if I remember correctly, there's an event, comma,

8    "Client shall make no expanded use as a result," that's

9    driving towards maintaining the status quo.  Don't do

10   anything different today from what you were doing before

11   while we're in this period that we provided to them.

12   Q.  That period being the 30-day period?

13   A.  Yes.

14   Q.  So nothing different during the 30-day period than what

15   you did before?

16   A.  That is right.

17   Q.  Okay.

18          MS. GODESKY:  Objection, Your Honor.

19          THE COURT:  Sustained.

20   BY MR. HINDERAKER:

21   Q.  That's why you said it was a non sequitur.

22   A.  Right.

23          MS. GODESKY:  Objection.

24          THE COURT:  Sustained.

25

1    BY MR. HINDERAKER:

2    Q.  You were asked whether FICO had an obligation to explore

3    whether Chubb & Son had expanded its use in that 30-day

4    period.  Do you recall that?

5    A.  Yes.

6    Q.  Did FICO have such an obligation?

7    A.  No.

8    Q.  You've told us, of course, that you were not included in

9    the communications of the commercial proposal of Exhibit 94.

10   Nevertheless, you were asked about it.  You were asked about

11   what you saw just from the reading of it.

12          As you read Exhibit 94, is there any limitation on

13   the -- is there any limitation on the future use of Blaze

14   Advisor with respect to running more volume through the

15   applications?

16   A.  There's no reference to that.

17   Q.  Does it also say that -- I'm sorry.  I think it's in the

18   next paragraph down.

19          And it also says, "Chubb shall have the right to

20   change the applications utilizing the Blaze Advisor software

21   at any time and in its sole discretion without FICO's

22   consent so long as the named applications do not exceed an

23   amount of 15."

24          Also says that?

25   A.  I see that.  I see that.

1    Q.  And so is it in your -- is it a non sequitur to consider

2    this proposal, this commercial proposal, as having any

3    change to your notice of breach letter?

4    A.  Yes.

5    Q.  What?

6    A.  Yes.

7    Q.  What is it?

8    A.  This is just a whole different way, this is a whole new

9    deal, and that looks like expanded use to me.  It looks like

10   they're changing the way that they want to go about doing

11   things.

12   Q.  And then if I can just bring your attention to

13   Exhibit 96.  This is before your notice of termination

14   letter of March 30th.  In fact, on February 26, 2016, you

15   did communicate to Mr. Hopp that -- I got the wrong Exhibit

16   Number 95.

17            On February 26, 2015, you did communicate to

18   Mr. Hopp, "The proposal was not acceptable from our business

19   and compliance teams, and I confirm it is rejected."

20   A.  That's correct.

21            MR. HINDERAKER:  I have no further questions, Your

22   Honor.

23            THE COURT:  Thank you, Mr. Hinderaker.

24            Ms. Godesky, any recross?

25            MS. GODESKY:  No.  Thank you.

1          THE COURT:  All right.  Thank you, Mr. Carretta.

2     You may be excused.

3          THE WITNESS:  Thank you.

4          THE COURT:  All right.  It's 10 to 5:00.  So we'll

5     take our break for the weekend.

6          It seems like it's only Monday today for some

7     reason.  I'm not sure why.

8          Remember.  No investigation, no research, no

9     talking to others about the case.  Okay?

10          All right.  Enjoy your second weekend of this

11     week.

12          THE CLERK:  All rise for the jury.

13                        **IN OPEN COURT**

14                      **(JURY NOT PRESENT)**

15          THE COURT:  Go ahead and be seated.  We don't have

16     to be on the record for this.

17               (Off the record discussion)

18          MS. GODESKY:  So your comment about an instruction

19     on attorney witnesses relates to a concern I have about

20     Mr. Carretta's testimony.  I mean, it's no secret it's on

21     the record.  Objections were lodged repeatedly.  And I think

22     this witness skirted the rules many times in terms of

23     talking about his interpretations of the agreements.

24          And what he did at the end of his testimony was

25     exactly what we had tried to prevent with our motion in

1    limine.  I mean, we moved in limine and highlighted the fact

2    that Mr. Carretta was instructed at his deposition not to

3    talk about his understanding of expanded use and what that

4    looks like and how he would interpret it.  The court granted

5    the motion, was my understanding, with regard to the

6    sword-shield issue.

7         And then at the end of his testimony Mr. Carretta

8    testifies he looks at Ms. Pawloski's proposal and he says,

9    This is a whole new deal and that looks like expanded use to

10   me.  It looks like they're changing the way they want to go

11   about doing things.  And that is exactly the testimony that

12   we tried to explore at deposition and they instructed him

13   not to answer and asserted privilege.  And that's in his

14   deposition transcripts at page 151 and again earlier at

15   page 150.

16        And so I think there absolutely needs to be a

17   curative instruction, but I think it needs to go beyond what

18   Your Honor was just suggesting and specifically comment on

19   the fact that Mr. Carretta cannot be opining on the content

20   of, you know, how you interpret expanded use.

21        THE COURT:  Understood.  Why don't you submit

22   those pages of the deposition.

23        I think the instruction that I have drafted and

24   intend to give will cure this and other issues without the

25   need of commenting specifically on specific items of

1   testimony, but submit the depo pages -- if you really need

2   to submit letters, you guys can -- and I'll consider it.

3   That question and answer were concerning to me as well.

4   However, it was given in the context of I think this is a

5   proposal for expanded use.  It wasn't tied -- I know the

6   language is the same, but it wasn't tied to, I think this is

7   expanded use under the contract or this is beyond what the

8   contract means.  So, I know, we're -- it's -- drawing this

9   line is treacherous, but I'll take a look at that issue.

10          Mr. Hinderaker, you are welcome to respond.

11          MR. HINDERAKER:  I get antsy.  And I was aware of

12   the court's guidance, of course, and these questions came up

13   on redirect, and they came up on redirect because of the

14   questions that were on cross rather than let the unfairness

15   of not answering.

16          So like Ms. Godesky's question was, quote, "My

17   question is whether you agree that the words on the page

18   that FICO cannot unreasonably withhold a consent to expand

19   use.

20          "Answer:  That's a non sequitur.  The way it's

21   written it's, comma, and client shall make no expanded use,

22   which grammatically means it's a covenant.  It's a separate

23   independent term of the sentence, and the client should make

24   no expanded use as a result of unless and until they receive

25   such consent.  So I don't agree with you.

1          "Question:  Even under your understanding of this

2     agreement if Chubb were to ask FICO for consent after a

3     merger or acquisition, this agreement says that FICO will

4     not unreasonably withhold that on consent, correct?

5          "No, that's not correct."

6          If those questions aren't directed to the

7     attorney's, lawyer's understanding of the license agreement,

8     then nothing is.

9          And my follow-up was simply, "To be clear, what

10    did you mean by the non sequitur?"  So I walked through a

11    door that was opened up, in my humble view.  Thank you.

12         THE COURT:  I understand.

13         And I think the, the testimony at the very end of

14    Mr. Carretta's redirect relating to the commercial proposal

15    as expanded use I think is separate from that.  I think the

16    answer that Mr. Carretta initially gave as to expanded use

17    was -- or as to non sequitur, was adequately explained as to

18    the grammatical usage that he was trying to indicate, but I

19    thought the questions beyond that went into interpretation

20    of the contract.  But go ahead and submit what you want me

21    to look at.  You do the same.

22         All right.  We have those.  So it's pages 50 and

23    51 or 150 and 151?

24         MS. GODESKY:  150 and 151.

25         THE COURT:  Okay.  Well, you can each on this one

1    file a two-page letter, if you need to.

2              My intention is to give, regardless of this

3    particular issue, I will be giving an instruction about

4    lawyer testimony.  And I do think that it will take care of

5    concerns about this topic in general, but we'll see.

6              MS. GODESKY:  Thank you.

7              THE COURT:  Anything further, Mr. Godesky?

8              MS. GODESKY:  No thank you.

9              THE COURT:  Anything further, Mr. Hinderaker?

10             MR. HINDERAKER:  No, Your Honor.

11             THE COURT:  Okay.  Thanks, everyone.  Enjoy your

12   weekends.

13             (Court adjourned at 5:00 p.m., 02-24-2023.)

14

15             We, Kristine Mousseau and Renee A. Rogge, certify

16   that the foregoing is a correct transcript from the record

17   of proceedings in the above-entitled matter.

18

19             Certified by:  /s/Kristine Mousseau
                              Kristine Mousseau, CRR-RPR
20                            /s/Renee A. Rogge
21                            Renee A. Rogge, RMR-CRR

22

23

24

25