# EXHIBIT E

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
        ------------------------------------------------------------
 3                                     )
        Fair Isaac Corporation,        )  File No. 16-cv-1054(DTS)
 4      a Delaware Corporation,        )
                                       )
 5              Plaintiff,             )
                                       )
 6      v.                             )
                                       )
 7      Federal Insurance Company,     )  Courtroom 14W
        an Indiana corporation,        )  Minneapolis, Minnesota
 8      and ACE American Insurance     )  Wednesday, March 1, 2023
        Company, a Pennsylvania        )  9:00 a.m.
 9      Corporation,                   )
                                       )
10              Defendants.            )
                                       )
11      ------------------------------------------------------------

12

13

14            BEFORE THE HONORABLE DAVID T. SCHULTZ
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
                (JURY TRIAL PROCEEDINGS - VOLUME VIII)
16

17

18

19

20

21
           Proceedings recorded by mechanical stenography;
22      transcript produced by computer.

23                            *   *   *

24

25
```

```
1    APPEARANCES:

2       For Plaintiff:          MERCHANT & GOULD P.C.
                                 BY:  ALLEN W. HINDERAKER
3                                     HEATHER J. KLIEBENSTEIN
                                      PAIGE S. STRADLEY
4                                     MICHAEL A. ERBELE
                                      JOSEPH W. DUBIS
5                                     GABRIELLE L. KIEFER
                                 150 South Fifth Street, #2200
6                                Minneapolis, Minnesota 55402

7       For Defendants:         FREDRIKSON & BYRON
                                 BY:  TERRENCE J. FLEMING
8                                     LEAH C. JANUS
                                      CHRISTOPHER D. PHAM
9                                     RYAN C. YOUNG
                                      PANHIA VANG
10                               200 South Sixth Street, #4000
                                 Minneapolis, Minnesota 55402
11
                                 O'MELVENY & MYERS LLP
12                               BY:  LEAH GODESKY
                                      ANTON METLITSKY
13                                    DARYN E. RUSH
                                      ROXANA GUIDERO
14                               Times Square Tower
                                 7 Times Square
15                               New York, New York 10036

16      Court Reporters:        RENEE A. ROGGE, RMR-CRR
                                 KRISTINE MOUSSEAU, CRR-RPR
17                               MARIA V. WEINBECK, RMR-FCRR
                                 PAULA RICHTER, RMR-CRR-CRC
18                               United States District Courthouse
                                 300 South Fourth Street, Box 1005
19                               Minneapolis, Minnesota 55415

20
                                      *   *   *
21

22

23

24

25
```

1440

1

# <u>I N D E X</u>

2                                                              PAGE

3   **RANDOLPH BICKLEY WHITENER**
        Direct Examination (Resumed) By Mr. Hinderaker    1442
4       Cross Examination By Ms. Godesky                    1532
        Redirect Examination By Mr. Hinderaker              1599
5
6   **N. WILLIAM PAUL WAID**
        Direct Examination By Mr. Hinderaker                1606

7

8
    <u>PLAINTIFF'S</u>                                          <u>REC'D</u>
9       1113                                                1675
        1116                                                1702
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        March 1, 2023                              9:00 A.M.

 2

 3              (In open court without the Jury present.)

 4              THE COURT:  Good morning.  Be seated.

 5              We'll take up the issue with respect to

 6    Mr. Waid's testimony over the lunch hour.  It is clear to

 7    me he is not getting on the stand before then.  All right?

 8              MS. GODESKY:  Yes.

 9              THE COURT:  Okay.

10              THE CLERK:  All rise for the jury.

11                        (Jury enters.)

12

13

14              (In open court with the Jury present.)

15              THE COURT:  Go ahead and be seated.

16              Okay.  Good morning.  Thanks, everyone, for

17    braving our slippery roads.

18              Mr. Hinderaker, are you ready to proceed?

19              MR. HINDERAKER:  I am, Your Honor.

20              THE COURT:  Go ahead and recall Mr. Whitener

21    back.

22              MR. HINDERAKER:  I would call Mr. Whitener.

23              THE COURT:  Whitener.  Come on up, Mr. Whitener.

24              THE WITNESS:  Thank you.

25              THE COURT:  Just remind you as you're walking up,
```

```
 1    you're still under oath.  I don't have to swear you again.

 2           Do slow down a bit.  Okay?  The court reporter

 3    has to take down what you say, and you will hear from her

 4    if you're too fast.

 5           THE WITNESS:  Always delighted to hear from her.

 6    I'm pouring water.  There is a blessing and a curse to be

 7    southern.  We talk fast.

 8               (Witness previously sworn.)

 9                 (RANDOLPH BICKLEY WHITENER)

10           DIRECT EXAMINATION (RESUMED)

11    BY MR. HINDERAKER:

12    Q.  Good morning.

13    A.  Good morning.

14    Q.  In a few minutes, a couple minutes, I'm going to start

15    off where we left off, but I want to do this beforehand.

16           Mr. Mayleben, would you bring up the RFI, please?

17           And in your binder, if it's going to be better

18    for you, this is the J002 document.

19    A.  I'm there.

20    Q.  Okay.  And on the screen is going to be -- there we go.

21    I would like to bring your attention to page 6.

22    A.  I'm there.

23    Q.  And then I would like to bring your attention to that

24    section which is titled "Current CSI IT Environment."

25    A.  Yes.
```

1    Q.  And go down to that, please.  And then first if we can
2    show the table, the graph.  That's good.
3              And so you see that in the RFI, Chubb & Son is
4    telling FICO that in the business tier, there already is,
5    in their environment, Duck Creek?
6    A.  Yes, I see.
7    Q.  Okay.  And then that's explained in the RFI, if we go
8    to the writing underneath that.  "From an architectural
9    perspective the CSI environment can be broken out into four
10   distinct silos:  Underwriting, rating, claims and
11   reporting."
12             In your analysis of all of the documents in this
13   case that you have reviewed, was Blaze Advisor -- which
14   silo was Blaze Advisor used in in the architecture of the
15   defendant?
16   A.  Blaze Advisor was used in the business tier.  I am not
17   completely certain what the underwriting worksheet is, so I
18   won't speak to that.  The only deployment of Blaze Advisor
19   from the claims perspective was not in the claims services.
20   It was in providing support to actuarial -- to the
21   actuarial sciences group.
22   Q.  Yes.
23   A.  And then the underwriting services, it was deployed
24   here because you see the words, "Renewal," and I take you
25   back to my definition of this selling the insurance

1    process.  It's a quote, it's a bind, it's a book, it's an

2    issue.  And I also point out that those words have been

3    used by other defendants.

4    Q.  Understood.  In this exhibit under the next paragraph

5    where it says "Additionally," it's describing that the

6    interface -- about midway in that paragraph on

7    "Additionally," the interface between CSI Express and the

8    rating application is based loosely on a repository design

9    style with the Infomix-based UWS database as a central

10   repository.  And it concludes, the rating application uses

11   the Duck Creek rating engine to provide screen definition

12   and black box rating calculation."

13            Do you see where I read?

14   A.  I do.

15   Q.  In reviewing all the documents, is it accurate that

16   Blaze Advisor was used in the underwriting silo, and then

17   it accessed a different silo called "Ratings," which

18   included, at least in some applications, the use of Duck

19   Creek?

20   A.  Yes.

21   Q.  Thank you.  And so now let's go and return to where we

22   were before.  We were looking at -- we started off with --

23   well, let's pick up where we left off, and let's go to

24   slide 28, if we could.

25            And just as a quick review, this is a document of

1    the defendants', internal communication to themselves,

2    different parts of it, the people, called Business Rules.

3    And on this page of that document, it's a reporting inside

4    the company, inside the division -- inside Chubb & Son, the

5    division, uses within the P&C industry.  Do you see?

6    A.  Yes.

7    Q.  Okay.  And in terms of companies, it's reporting on the

8    use of business rules within -- by different insurance

9    companies?

10   A.  Yes.

11   Q.  And just to be clear, in each of the -- like in the

12   results for AIG, it specifically references Blaze Advisor,

13   right?

14   A.  It does.

15   Q.  And then in the solution description for Kemper Auto,

16   it specifically addresses Blaze Advisor?

17   A.  It does.

18   Q.  And then for the Hartford Insurance Group, it

19   specifically addresses Blaze Advisor in the solution

20   descriptions column?

21   A.  I agree.

22   Q.  Okay.  And in your view -- in your review of all of the

23   materials, what was the significance of this to you?

24   A.  The significance of this document to me was the fact

25   that in internal communications within Chubb, they

 1   highlighted the fact that other companies had done some

 2   quantification of benefits, and they stated those.  So I

 3   viewed this as a marketing department -- I'm sorry, not a

 4   marketing department -- a marketing effort by presenter to

 5   say, hey, you know, look, other people are seeing some

 6   stuff from this.  Maybe -- maybe we've got to take

 7   advantage of it.

 8   Q.  This is inside the IT group at Chubb & Son?

 9   A.  Yes, the communication.

10   Q.  Right.  So that, for example, they are reporting to

11   themselves that AIG country-specific risk models, rating

12   criteria, Blaze Advisor can be developed in shorter time

13   periods, 5 to 14 days, versus several months.  They

14   reported predictive modeling for Kemper Auto and Home,

15   eight-point reduction combined ratio after first year.

16   A.  It does say that, yep.

17   Q.  And that's insurance ease, insurance language.  What

18   is -- what is a combined ratio?

19   A.  In the insurance industry, we tend to manage and

20   measure on a ratio basis, so a combined ratio is a ratio of

21   written premium and earned premium versus the percentage of

22   various expense components of the profit and loss

23   statement.

24           So if you have a combined ratio that is exactly

25   100.0, you have broken even on your underwriting process.

1    If you have a combined ratio greater than 100.0, you're

2    losing money on your underwriting process.  If the combined

3    ratio is less than 100.0, you are making money.  Your

4    underwriting process is profitable.  That's the value of

5    the combined ratio.

6    Q.  So an eight-point reduction in the combined ratio is

7    good; more money?

8    A.  It is good from the perspective of something minus

9    eight is a lower number.  If -- and I do not know these

10   numbers.  I mean, I know -- pardon me.  I know people at

11   Kemper Auto and Home, not many, but I am familiar with

12   them.  But if their combined ratio -- and I'm going to go

13   with a little bit of hyperbole here.  If their combined

14   ratio was 120 and they reduced it eight points, certainly

15   they would have an objective to reduce the combined ratio

16   because you're losing money on your underwriting process,

17   but what you would have done is -- if you received an

18   eight-point benefit, you would have gone from 120 to 112,

19   still more work to do.

20            Conversely, if that combined ratio had been 105

21   when they started the process of improving it and now

22   you're down to 98, you've entered into the arena of an

23   underwriting profit.

24   Q.  And similarly, if you start off at an underwriting

25   profit with a combined ratio of 90 and you reducing it by

1    eight points, now you have an underwriting profit of a

2    combine ratio of 82?

3    A.  I agree with that, and that is a correct statement.

4    Q.  So the reduction is a beneficial positive direction?

5    A.  Yes.

6    Q.  Okay.  And then the Hartford Insurance Group,

7    straight-through processing was the objective.  "The result

8    drastically reduced error collection cycles, lowered the

9    cost of writing policies."

10             Of course, that's what they reported internally.

11   And did you evidence of that happening with the use of

12   Blaze Advisor by Chubb & Son?

13   A.  I would say yes to that.  I saw use of Blaze Advisor to

14   create a straight-through processing process for them, and

15   I would expect those benefits.  Computers do something the

16   same way every time, and so humans don't; therefore, error

17   processes go down.

18             I would also like to point out that since I have

19   talked about my career at the Hartford, this happened after

20   I was no longer working with the Hartford.

21   Q.  Understood.  Thank you.

22             Let's go to the next slide.  This is a

23   continuation of the same presentation but different

24   insurance companies.  Agreed?

25   A.  Agreed.

1    Q.  And again, on the slide itself, it's being specific to

2    Blaze Advisor, Malaysia National Insurance Company

3    identifies Blaze in the solution column, republic Indemnity

4    identifies Blaze in the solution column, and Auto Club

5    Group identifies Blaze Advisor in the solution column?

6    A.  Yes.

7    Q.  And Malaysia National Insurance reports faster and more

8    consistent decisions, rapid updates as regulations and

9    corporate policies change.

10            And did you see that same kind of experience with

11   the defendants using Blaze Advisor?

12   A.  I did.

13   Q.  And Pacific Indemnity, improve data quality from all

14   channels and making it easier for all agents to do business

15   with the company.

16            Let me just focus on making it easy for the

17   agents to do business with the company, did you see

18   evidence of that with the defendants' use of Blaze Advisor?

19   A.  Let me correct.  It is actually Republic Indemnity, and

20   yes, I did see evidence of that.

21   Q.  My bad.

22   A.  My reading glasses are better than yours.

23   Q.  I guess.  And then Auto Club Group, talking about

24   increased straight-through profits and ease of doing

25   business, moved from manual review of 100 percent of all

1    applications to a review of 1 percent, as well as a 35

2    percent increase in number of applications processed.

3              In your review of the documents, did you see that

4    the defendants were able to improve on the percentage of

5    their renewal applications?

6    A.   I saw that defendants were able to improve the

7    percentage of their renewals that did not require human

8    touch.  Going back to the phrase "straight-through

9    processing."  That's not exactly how this says it, but

10   that's what I saw.

11   Q.   That's what you saw to the defendants.

12   A.   Yes, and that's what this means.

13   Q.   Okay.  I'm going to move to another document, if this

14   thing works.  There we go.  And this document is called --

15   the title of the overall document is "Business Rules CoE

16   Update, January 2009."

17             MS. GODESKY:  Your Honor, may I approach?

18             THE COURT:  You may.

19             MS. GODESKY:  Thank you.

20

21                    **(Side-bar discussion.)**

22             MS. GODESKY:  So these are all slides or

23   documents that are not in evidence, and I think it's

24   improper to keep publishing them page after page to the

25   jury.  That happened with the document we just walked

 1    through, and now there is another one.

 2              THE COURT:  Are the slides within the documents?

 3              MR. HINDERAKER:  Yes.

 4              THE COURT:  Okay.  So are these slides -- tell me

 5    your objection again.

 6              MS. GODESKY:  My objection is --

 7              THE COURT:  That that document is --

 8              MS. GODESKY:  -- this is taken from P603, slide

 9    28.

10              THE COURT:  Right.

11              MS. GODESKY:  And P603 is not in evidence.  And

12    that's going to happen with the next document, too, and

13    several of the others.  And while an expert can properly

14    testify about documents that aren't in the record --

15              THE COURT:  Right.

16              MS. GODESKY:  -- I don't think it's appropriate

17    to be publishing them.  He can elicit testimony that he

18    relied on certain documents, he reviewed documents that say

19    certain things, but if we're publishing them, it's almost

20    like they're in evidence, right?  The foundation hasn't

21    been laid through any FICO or Chubb witness, and so I think

22    we're just back-dooring publication to the jury at this

23    point.  It's fair game for testimony, but not publication.

24              MR. HINDERAKER:  I don't think we should be

25    changing the rules of the game at this stage.  These are

 1    demonstratives.  This is information that he relied upon in

 2    forming his opinions, and I think the jury needs to know

 3    what he relied upon.

 4              THE COURT:  Okay.  So with that understanding,

 5    you can do it on the record, if you want.  You can object.

 6    I will admit them for demonstrative purposes only, but the

 7    slides and the documents won't go back with the jury absent

 8    foundation for the documents.  Okay?  So you can publish

 9    them.

10              MR. HINDERAKER:  Of course.  I never thought that

11    the demonstrative would go to the jury.

12              MS. GODESKY:  Will the Court know -- you're

13    accepting them for demonstrative purposes even though they

14    have these stamps on them?  You know, I just -- stamps

15    suggest that they are in evidence.

16              THE COURT:  I understand.

17              MS. GODESKY:  Thank you.

18

19              **(In open court with the Jury present.)**

20              THE COURT:  Actually, I will just go ahead and

21    instruct the jury on this.

22              Members of the Jury, the last document,

23    Exhibit 603, and this next document, Exhibit 605, are not

24    in evidence.  They won't go back to the jury room with you.

25    The slides that are being displayed from those exhibits are

1    simply used to illustrate the witness's testimony.  They

2    are demonstrative exhibits only, despite the number, the

3    exhibit stamp on the documents.

4              Go ahead, Mr. Hinderaker.

5              MR. HINDERAKER:  Thank you.

6    BY MR. HINDERAKER:

7    Q.  Let us go now to this document that's on the screen

8    now, Business Rules CoE Update, January 2009.  This is a

9    document you reviewed in forming your opinions?

10   A.  Yes.  Mr. Hinderaker, would you afford me the privilege

11   of just finding the document in the binders?

12   Q.  Sure, of course.  0605 is the number.

13   A.  Yes.  It's easier on my neck.

14             I'm there.  Thank you.

15   Q.  Okay.  Good.  So as the slide shows, this is a Business

16   Rules CoE Update.  And CoE stands for?

17   A.  Center of Excellence.

18   Q.  So this is an update of that Center of Excellence work.

19             I would like you to turn to page 14 of the

20   document.

21   A.  I am there.

22   Q.  Okay.  And this is called "Business Rules in the

23   Insurance Value Chain as Classified Into Ten Categories."

24   Tell us what that means?

25   A.  If we will look at the top line underneath the heading,

1    you have large arrows going from left to right, starting

2    with marketing, sales management, product development,

3    underwriting.  There is another word there.  I can't tell

4    what it is, rating -- I'm sorry, underwriting/writing,

5    policy administration, customer management, claims.  Those

6    are all parts of activities or buckets that contain

7    activities that insurance companies do.

8    Q.  Okay.

9    A.  Pardon me.  Underneath that, you have a series of rows,

10   and those series of rows are talking about tasks that have

11   to be performed within those arrows at the top.  So there

12   is a relationship on the exhibit -- if the row of the task

13   that has to be accomplished is to the left, it's lining up

14   under the marketing and sales and the product development

15   function; whereas, if it's to the right, it's lining up

16   underneath the claim, the far right claims function or the

17   far right customer management function.

18          So as you go down, you can look at these as tasks

19   or tactics to be accomplished.  The first one is product

20   definition.

21   Q.  Yes.

22   A.  The second one is product configuration.

23   Q.  Okay.  Maybe we should go through each one

24   individually.  We can do it that way?

25   A.  Certainly.  Certainly.

1    Q.  All right.  So product definition, that means what?

2    A.  So if you go back to the corporate underwriting

3    function I talked about, one of their tasks is to define

4    the company's appetite for risk, and then within that task,

5    they're going to define the products to be sold and the

6    jurisdictions where those products are going to be sold.

7    Inside of that concept, there is product definition.

8             So I'm going to insure X.  Let's arbitrarily

9    decide on commercial fire.  Okay?  In commercial fire, what

10   coverages are we going to offer?

11   Q.  Okay.  And once -- once corporate makes that decision

12   in terms of product definition, then the next step in

13   getting the product ready to go to market is what?

14   A.  There are two steps that have to happen now.

15   Q.  Okay.

16   A.  The first step is you submit that to the statutory

17   authority.  So if it's Nebraska, it goes to the Department

18   of Insurance in Nebraska.  Simultaneously, that product

19   definition is now going to go to the technology department

20   because you want the technology to manage the "bind, book,

21   issue" for that set of product definitions.  And -- excuse

22   me.  My sinuses are acting up today.

23            That product configuration is going to be what

24   the technologists build into the technology to execute that

25   selling process, "bind, book, issue."

1    Q.   So that's the second step on that value chain?

2    A.   Yes.

3    Q.   Excuse me.  And then in your analysis of the case

4    documents, was Blaze Advisor used with respect to product

5    configuration?

6    A.   Yes.

7    Q.   Okay.  Let's go to the next one, product inventory

8    management.  If you could describe what that is, please.

9    A.   Again, this is a corporate underwriting function.

10   Q.   Mm-hmm (Yes).

11   A.   And I actually did this function -- well, I've done all

12   three of these functions in my corporate underwriting

13   experience.  Product inventory is just really keeping track

14   of what products and what aspects of products are deployed

15   in each individual jurisdiction.  So it's completely

16   possible that you would have a product that you were going

17   to introduce to all 51 jurisdictions.  You can't get all 51

18   done at the same time.  So you go in -- you go in phases or

19   waves or sprints.  There are a lot of different terms used

20   in the industry to describe this, but you pick X.

21            I'm going to arbitrarily pick five.  You pick

22   five states.  I've got to get that product into those five

23   states.  Statutory filing out, submission to the technology

24   folks for the development process, approval from the State,

25   process completed, product introduced in those five states.

1    That leaves you with 46 jurisdiction, including the

2    district that it's got to be done in.

3            This is what inventory -- product inventory

4    management is.

5    Q.  All right.  And with the defendants' use of Blaze

6    Advisor, was Premium -- the Premium Booking application an

7    instance of product inventory management?

8    A.  I would say that the Premium Booking fit in a different

9    box.  I think the example of the inventory management is --

10   is actually the rules repository.

11   Q.  Okay.  Of Blaze Advisor?

12   A.  Of Blaze Advisor, the RMA.  And I'm sure that they had

13   additional product tracking, but I can see it in Blaze.

14   Q.  And then with respect to Premium Booking that I asked

15   about, what -- what step -- or what category does that fall

16   in, then?

17   A.  That's going -- pardon me.  Premium Booking is going to

18   fall into the -- I'm going to say the underwriting of the

19   product pricing and the validation boxes.

20   Q.  So in each of those it fits.  Okay.

21           Let's go to underwriting.  We've had -- you know,

22   you've described what it is.  We've had some testimony

23   about it.  Applications that use Blaze Advisor with the

24   defendants that were in the underwriting value chain, box

25   four.  Which ones were those?

 1    A.  I'm sorry, Mr. Hinderaker.  Repeat the question.

 2    Q.  Sure.  I am just going to focus in on box number four,

 3    underwriting.  And there were applications using Blaze

 4    Advisor by the defendants that were, in fact, used for

 5    underwriting?

 6    A.  Yes.

 7    Q.  And those applications were which ones?

 8    A.  CSI Express and Evolution Canada, and then there was

 9    use internationally.  But in terms of North America, those

10    two products, and inside of those products, we have to

11    include DecisionPoint for specific products.

12    Q.  And inside of those products, would you also include

13    ARP-1 and ARP-2?

14    A.  Yes.

15    Q.  The fifth category here --

16    A.  And, Mr. Hinderaker, can I go back to this underwriting

17    box, just one more statement?

18    Q.  Yeah.

19    A.  This box, both corporate underwriting, but corporate

20    underwriting is really rows one, two, and three.  Row four

21    for me, from my perspective, is the front-line

22    underwriting.  And as I stated earlier, Blaze Advisor

23    participated in both those areas.

24    Q.  Thank you for the clarification.

25            The next pricing rating, if you could describe

 1    what that is for us, please.

 2    A.  The -- I'm going to take them separately.  The pricing

 3    process is that process where the actuarial sciences and

 4    the product management group of the company work together

 5    to establish what is that adequate, precise, accurate

 6    premium on a type of risk exposure.

 7             So I remind everyone that the goal is not to

 8    write policies that don't have losses.  The goal is to

 9    write the policies that have an acceptable predictability

10    of loss, versus the policies that have an unacceptable

11    predictability of loss.

12             So in this -- sorry.  So in this pricing process,

13    the actuaries and the product develop -- I'm sorry, the

14    product management people work together for a product, a

15    state.  So if it's a new product, they're defining the

16    pricing initially.  If it's an existing product, they have

17    a periodic review, and depending upon the type of product,

18    that review could be as frequently as every six months.  It

19    could be as infrequently as annually.

20    Q.  Okay.

21    A.  Now, change that over to rating.  From that pricing

22    process comes the rating methodology for a policy, which is

23    then filed to each of the jurisdictions, and once approved

24    for use, transitioned again into the configuration, the IT

25    development part of the process where they build the

1    technology.

2    Q.  Okay.  In terms of the applications that the defendants

3    used Blaze Advisor, was Profitability Indicator an example

4    of this?

5    A.  Yes, absolutely.

6    Q.  Let's skip to -- let's skip to nine.  You already

7    mentioned that Blaze Advisor was not used in building or

8    claims adjudication, front-end edits.

9           So let's go to nine.  And nine is routing and

10   orchestration, and if you would give us what that means in

11   the insurance -- in the insurance industry.

12   A.  A request for a new application is going to come into

13   the company from an independent agent and broker.  The

14   first step is making sure that application makes it to the

15   appropriate underwriting authority, or the authority if

16   it's going to be human underwritten.

17   Q.  Okay.

18   A.  And so you have to have some kind of work distribution

19   process.

20          An underwriter in a given day is usually going to

21   touch four types of transactions, and this all relates back

22   to the policy administration system.  You have new business

23   coming in.  By the way, that's the number one priority,

24   book your new business.  Okay?

25          You have renewals that have to be dealt with.

1    That's the number two priority, book your renewals.

2            And then each of those policies can have two

3    other types of transactions.  You can have modification

4    transactions.  In the insurance industry, we call those

5    endorsements.  And endorsements can have no impact on

6    premium; endorsements can change premium.  And we have

7    fancy words for that in the insurance industry, and I'm not

8    going to use them here today.

9    Q.  Okay.

10   A.  The last transaction stream, I call it terminations,

11   but the reality is applicants turn into policies and

12   something happens and they request to cancel the policy, a

13   cancelation.  It's just a type of termination.  Okay?

14           And sometimes the risk over the life of -- the

15   policy over the life of the policy, the risk exposure is

16   changed, and the company looks at it and says, oh, my

17   goodness, we have gone from acceptable probability of loss

18   to unacceptable probability of loss, and because it's an

19   unacceptable probability of loss, we're going to non-renew

20   the policy.  So the workflow gets it to the underwriter,

21   the underwriter part of the process -- I'm sorry.  The

22   workflow process is responsible for getting that policy to

23   the right underwriting point so that the underwriter can

24   then execute the transaction.

25   Q.  Okay.  And then with respect to --

1    A.  Mr. Hinderaker, the court record is important.  Can I

2    ask you to read the last two sentences back?  Okay.  Go

3    ahead, sir.

4    Q.  Don't worry about it.

5            With respect to the applications that defendants

6    had that use Blaze Advisor, one of them is CUW-IM?

7    A.  Yes.

8    Q.  IM being Inventory Management?

9    A.  Yes, Commercial Workstation Inventory Management.

10   Q.  Is that one of the -- is that an application that would

11   fall in the value chain of workflow routing and

12   orchestration?

13   A.  Yes.  Inventory management is, in fact, executing that

14   process I talk about, making sure the request gets to the

15   right party.

16   Q.  Okay.  And by "right party," are you saying the right

17   underwriter?

18   A.  Yes, if it is going to be human underwriting.

19   Q.  Yes.  Let's use human underwritten for a moment.

20   A.  So then the answer to the question is yes, and it's

21   going to get it to the right underwriting person.

22   Depending upon the complexity of the transaction, that

23   might be a special underwriting assistant.  It might be

24   a -- it might be an underwriter.  It's going to be somebody

25   in the underwriting department with the authority and

1    authorization to execute that transaction.

2    Q.  Was it also used to direct the workflow and the

3    application to the underwriter with the appropriate

4    expertise to address -- the issue being to address the

5    policy for underwriting?

6    A.  In the specific case of defendant, yes.

7    Q.  Okay.

8    A.  There are -- there are insurance companies out there

9    that don't really leverage that concept, but in this case,

10   that is accurate.

11   Q.  The defendants did?

12   A.  The defendants did.

13   Q.  Were they also able to, with this CUW-IM, I'll call it,

14   extend the day?

15   A.  Yes.  Yes.  Because if you have a submission of a

16   request for policy that arrives at four o'clock in, just

17   arbitrarily speaking, Boston, Eastern time, and the agent

18   has communicated, I really need input on this by the close

19   of business today, well, that's only one hour.  But if you

20   had that expertise on the West Coast, now you take 5:00

21   p.m. and you extend it out to 6:00, 7:00-  you extend it to

22   8:00 p.m.

23   Q.  Let's go now to number ten, predictive analytics of --

24   did -- well, if you would describe for us how the

25   defendants used Blaze Advisor applications with respect to

1    this element of value called predictive analytics.

2    A.  Certainly.  This takes place in two points.  One of

3    their predictive -- and I'm going to use the phrase

4    "predictive modeling."  That's probably a little more

5    familiar phrase with people.

6         The first point where predictive modeling use

7    Blaze Advisor was applied is a policy capability called

8    profitability model.

9    Q.  Profitability Indicator?

10   A.  I'm sorry.  Profitability Indicator.  I apologize.

11        Profitability Indicator is a computer model using

12   Blaze Advisor that created a prediction on profitability,

13   as the name says, based on a given price point.  And then

14   the underwriter could look at that and say, oh, well, by

15   golly, the price point needs to go up X, 5 percent.  Or the

16   Profitability Indicator could say, hey, by golly, you don't

17   need all this money, you can go down 5 percent.  Okay?  And

18   the 5 percent is just for examples.  Okay?

19   Q.  Sure.

20   A.  So Profitability Indicator is a predictive modeling

21   application.  It used Blaze Advisor, and it was deployed

22   into CSI Express.

23   Q.  All right.  And how about CIS Claims?  Is that involved

24   in the predictive analytics category for value?

25   A.  It does.  CIS Express was a predictive model used

1    primarily by the actuarial sciences folks --

2    Q.  We're talking about CIS Claims.

3    A.  I'm sorry.  I'm sorry.  CIS Claims is a predictive

4    model used in the actuarial sciences function.  And what

5    it's doing is it's taking a hindsight view of policies, and

6    it's recalculating the proposed premium for it.

7    Q.  All right.

8    A.  Okay?  And then that proposed premium, it could be spot

9    on, it could be exactly right, it can be too little, oh, my

10   goodness and we've got to adjust our pricing process, or it

11   could be too much and, again, we would have to adjust our

12   pricing process.

13   Q.  Okay.  Let's go to another slide that you reviewed,

14   another document.  This is Business Rules Situation

15   Overview, and we're going forward in time to May 2014.

16   This is a document that you reviewed as part of your

17   analysis in forming your opinions?

18   A.  Yes.

19   Q.  And -- oops.  And this document has the Donald Light

20   quote that we saw before.

21   A.  Yes, it does.

22   Q.  So Chubb & Son continues to reference that as it's

23   internally talking about Blaze Advisor.

24   A.  Agreed.

25   Q.  And then we've seen what drives the business value.

1    We've seen this slide before:  Precision, consistency,

2    agility, speed, cost?

3    A.  I agree.

4    Q.  And still relevant as Chubb & Son is speaking about the

5    use of Blaze Advisor a few years -- a few years forward.

6    A.  Yes.

7    Q.  Okay.  Let's go to this document and it's called

8    "Enterprise IT Strategies and Appendices."

9    A.  Yes.

10    Q.  Okay.  And this is another document that you reviewed?

11    A.  I did, in fact, review this document, yes.

12    Q.  All right.  This one is dated November 28, 2009.  And

13    I'm directing -- by the slide, I'm directing your attention

14    to -- these pages happen to be at 27 and 28, but it's

15    discussing what is called the small business platform.

16              And tell us how this -- tell us the relevance of

17    this document to your analysis of how Blaze Advisor was

18    used by the defendants and the value of that use.

19    A.  The date of this document becomes important in that

20    analysis.  So we have the licensing in 2006, and now three

21    years later, we have the presentation by defendant that

22    we're going to pursue this small business platform, okay?

23    And the sentence that you've highlighted points out the

24    components of this small business platform.  Okay?

25              So the components are an automated renewal

1    capability.  So far we have heard that referred to as ARP,

2    Automated Renewal Processing, driven by a rules engine

3    architecture, and that's Blaze Advisor.

4    Q.  Okay.

5    A.  A Profitability Indicator, which I just spoke to a

6    minute ago.  And a market-facing web quote -- I'm sorry --

7    market-facing web quoting capability.  That will be a

8    product named DecisionPoint.

9    Q.  Okay.

10   A.  So I read this document, and I see that Chubb continues

11   to focus on the small and mid-market specialty and

12   commercial lines, available market space, if you afford me

13   that term.

14   Q.  Sure.

15   A.  And they're going to focus their efforts in what

16   they're going to call the small business platform, and

17   they're going -- the foundation of that small business

18   platform is going to be these capabilities.

19   Q.  And as it says in the first sentence, "The small

20   business platform is the next level business operating

21   model, aided by technology, to defend and grow CSI's highly

22   profitable small to middle market book of business."

23            Stopping there, in your analysis, that aligns

24   back to the key strategic initiative of the RFI?

25   A.  It does.  I think there is an additional word that is

1    important in there, Mr. Hinderaker.  I think the word

2    "defend" is very important, because three years later,

3    after 2006, after we want to grow this book, now not only

4    do they want to grow it, but they want to defend it --

5    defend what they have accomplished.

6    Q.  There is a sentence that reads, "The new operating

7    model integrates sufficient underwriting, speed of

8    response, and greater ease of doing business for our

9    agents."

10   A.  Yes.

11   Q.  Can you speak to how Blaze Advisor contributed to those

12   values?

13   A.  Certainly.  If you look at more efficient underwriting,

14   there are two aspects to this.  The first one is, how fast

15   can we get it done?  The second one is, how good are we at

16   achieving that acceptable, precise price point?  Okay?

17   That's efficient underwriting.  And ARP -- Blaze Advisor

18   was deployed to ARP, Automated Renewal Processing 1 and 2,

19   to improve speed.  Okay?

20          The underwriting process, it was used in that to

21   both achieve that adequate, precise premium, as well as to

22   be more efficient so that if it didn't have to be touched

23   by an underwriter, you didn't have to incur that time.  And

24   ease of doing business is a combination of many of those

25   things, but it's meeting the relationship needs, be faster,

1    be more precise, don't surprise me, aspects of the

2    relationship between the independent agent and brokers and

3    the underwriters.

4    Q.  Okay.  And maybe you've touched on this in your last --

5    what you just said, but they talk about greater ease of

6    doing business for our agents.  Anything further to say on

7    that, or have you addressed it?

8    A.  As it relates to the case documents I reviewed, I've

9    addressed it.

10        Let me say this:  When I entered into the

11   industry and was a front-line underwriter, we were taught,

12   encouraged, to be and measured on relationship with agents

13   in terms of, don't have an agent call in the general

14   manager and disparaging your name as the underwriter.  Do

15   not do that.

16        And just as a funny aside, our first -- at the

17   Hartford Insurance Group, our first foray into improving

18   speed in an area where my underwriting tools on my desk

19   were a ruler, a pen, carbonized forms and a Monroe JD-30

20   calculator, and the rack.  I mentioned the rack.

21   Q.  Today we use technology?

22   A.  Today we use technology, but our attempt to improve

23   speed was when we stopped including requests for quotes in

24   the regular mail, and they were now delivered specially to

25   me in a special folder at a special time.  New business

1  submissions requests for quotes arrived at 10:00 a.m., and

2  my job was to stop whatever I was doing and underwrite what

3  was in that envelope, and then -- I'm sorry -- folder, and

4  then put the folder in a special place because later they

5  were going to come pick it up.

6  Q.  Now, was that --

7  A.  Our effort to increase speed and to be easier to do

8  business with basically required us to change the mail

9  process and the use of underwriting time process.

10  Q.  It might be fair to say speed of response and ease of

11  doing business has always been important in the insurance

12  industry, and technology has made it faster and better and

13  easier?

14  A.  As long as I been here, that is an accurate statement.

15  Q.  All right.  Let's go on.  I want to talk about a few of

16  the other concepts here.  It's talking about focused

17  retention.  What does that mean?

18  A.  An insurance company wants to hold on to their

19  renewals.  The reason for that is because the -- I'll use

20  the phrase "organic growth."  New companies forming and

21  pursuing insurance, that's just not that great.  It's not

22  that great in personal lines.  It's not that great in

23  commercial lines, property and casualty.  It's not that

24  great in specialty lines.  There is just not that much new

25  new.

 1           So one of the processes that every -- one of the
 2    sales processes, sales and marketing processes, or growth
 3    tactics if you will, is let's take policies from somebody
 4    else.  Chubb -- just as a wild example -- Chubb, as a wild
 5    example, is looking and saying, I wonder if I can get some
 6    AIG policies over here, and they do that through the
 7    relationship with the independent agents and brokers.
 8           So focused retention is, I've got -- and I'm
 9    going to use some numbers.  These are arbitrarily selected
10    numbers.  I have got 100 renewals.  If I can hold on to 100
11    renewals, that's great.  They won't succeed at that, but
12    they always try -- they always measure and they always try
13    to hold on to their renewals.  One of the annual reports
14    makes reference to this.  The U. S. renewal retention for
15    commercial lines, I believe was 87 percent.
16    Q.  Okay.  Let's go to the next one.  I mean, that's good.
17    Okay?
18           Let's go to the next one.  Targeted nonrenewal.
19    What is that?  What is the meaning of that?
20    A.  It means that we, we the company, recognize the fact
21    that risk exposures are going to change, and if a -- if a
22    policy's risk exposure moves out of the acceptable level of
23    probability of loss into the unacceptable, as that policy
24    comes up to renew, we are going to refuse to renew it.
25    Nonrenewal is the industry fancy phrase for, I have a

1    statutorily required process I have to execute.

2    Q.   Okay.  And then repatriation in this context.

3    A.   I'm going to change your pronunciation of that word.

4    It's repatriation.

5    Q.   Okay.

6    A.   Repatriation means, you know, by golly -- and, again,

7    I'll give you an example.  AIG managed to get this policy

8    away from us a year ago, two years ago, but I still know it

9    exists, and I'm going to -- as that policy renewal date

10   comes up, I'm going to make an attempt to bring it again --

11   bring it back to us, away from AIG back to Chubb.

12   Q.   And then right pricing, cross-selling, upselling?

13   A.   Right pricing is just use of predictive modeling to get

14   that accurate, precise premium for the policy.

15        Cross-selling just means, hey, we've got a policy

16   with this -- with this business.  We sure would like to

17   sell another policy to them.

18        Upsell means, wow, we've got this policy in this

19   product.  Let's see if we can move them to a more robust

20   product.  This is going from a Toyota to a Lexus, and I

21   don't even know if that's the correct auto company

22   relationship.

23   Q.   I understand.

24        And then new business risk attraction and new

25   business risk avoidance.  And could you just address those

1    two, briefly?

2    A.  New business attraction is the concept of having the

3    agents and brokers view Chubb as a preferred carrier and

4    the first carrier they're going to submit to.  So when I

5    talk about the front-line underwriter or the front -- or

6    that field office of underwriters, trying to build that

7    relationship and that loyalty with the -- with the

8    independent agents and brokers.

9         That's why they do this.  We want to believe that

10   when you see this application, this potential customer, and

11   you know it meets our risk appetite and our guidelines, we

12   want you to send it to us first.

13   Q.  Okay.

14   A.  That's new business attraction.

15        Risk avoidance is just simply the, oh, my

16   goodness, this application has an unacceptable probability

17   of loss.  We don't want to write it.  We will decline it.

18   Q.  And then as the document concludes or as it's

19   highlighted, the key components of this platform are

20   automated renewal capability driven by a rules engine

21   architecture, profit -- and Profitability Indicator for

22   real-time scoring of risks.

23        And in your review of the documents of the

24   defendants, was it at this point the automated renewal

25   capability, ARP-1 and ARP-2, as well as Profitability

```
 1    Indicator for the real-time scoring of risks that were
 2    used -- to use a computer word, used to leverage Blaze
 3    Advisor and their various applications?
 4    A.  Yes.  All these were points of emphasis for the
 5    deployment of Blaze Advisor.
 6    Q.  Through the applications?
 7    A.  Through the applications, correct.
 8    Q.  So what's the -- maybe you've covered some of this.  So
 9    what's the takeaway that you have from this part of your
10    analysis of the documentation?
11    A.  I had several takeaways from this document.  One of the
12    first was, well, this is my positive sign that the business
13    community, the underwriting -- that corporate underwriting
14    function, if you will, and the IT people are working hard
15    together to execute those corporate strategies and tactics.
16    Q.  Okay.
17    A.  I mentioned earlier the word "defend," defend and grow
18    that small to mid-size commercial, that was a point of
19    emphasis for me.
20    Q.  Good.
21    A.  There are other things on the slide.  Would you like
22    for me to speak to them?
23    Q.  I'm just wondering if we haven't already touched them
24    when we were talking about it from the document itself.
25    A.  My answer would be, I have covered that thoroughly.
```

1    Q.  Okay.  That's why I moved on.

2            And then this is another document, another one

3    that you reviewed called "SBP Profitability Indicator for

4    New Business, Business Requirements."  This is a document

5    you reviewed in forming your opinions?

6    A.  It is.

7    Q.  And going to -- this is August 2008.  I'm going to take

8    you to page 4, and we have it on the screen as well.  And

9    we have this header, "Project Background."

10   A.  Yes.

11   Q.  Then it is titled "The SBP Profitability Indicator," so

12   now we're more specific discussion of the small business

13   platform for Profitability Indicator?

14   A.  Yes.

15   Q.  All right.  And then in many ways this is a repeat of

16   the earlier documents, so we don't need to spend a lot of

17   time on it, but "In creating the next-level operating model

18   aided by technology, to defend and grow Chubb's specialty

19   highly profitable small to mid-market book of business.

20   The key to survival in this market is efficient

21   underwriting, speed of response and low-cost structure."

22   A.  The answer is yes.  Let me, for the Court, point out

23   that SBP is simply small business platform, the beginning

24   document that we just looked at.

25   Q.  All right.  And then we can go to the next slide where

1    Chubb is talking to itself and saying -- is talking to

2    itself and saying, "The Profitability Indicator integration

3    with renewals project, these objectives were identified in

4    the business case."

5         And we have spoken about targeted nonrenewal,

6    focused retention, repatriation, upsell, cross-sell, right

7    pricing.  From your review of the case documents, was the

8    defendant able to identify -- was the defendant able to

9    achieve each of those business objectives?

10   A.  I would say most.

11   Q.  Okay.

12   A.  I'm not willing to comment on repatriation.  I can show

13   you in the documents where it was an aspirational project

14   on the -- on the list for the future.

15        I also will say the same thing for upsell and

16   cross-sell.  Upsell and cross-sell is spoken to through the

17   use of Blaze Advisor, in their deployment of Blaze Advisor

18   for underwriting guidance.  I have seen instances where

19   the -- the underwriting rules, response to the underwriting

20   was, move to a better product.

21        I've seen rules, responses in the underwriting

22   guidance that said, hey, this is a specialty product;

23   cross-sell them to commercial insurance.  I saw those.  But

24   repatriation, aspirational.

25   Q.  Okay.  With that -- with the exception of repatriation

1    being aspirational, the other objectives were achieved?

2    A.  Yes.

3    Q.  Using Blaze Advisor?

4    A.  Yes.

5    Q.  Okay.  We have seen this document before.  It's in

6    evidence.  It's the 2018 Annual Report of Chubb Limited?

7    A.  Yes.

8    Q.  In your review of the documents, did Chubb Limited take

9    this statement to heart, "Technology is a competitive

10   weapon"?

11   A.  Yes.

12   Q.  Okay.

13   A.  Counselor, if I may add one point?  When I entered the

14   industry, there were no personal computers.  There was no

15   Duck Creek.  As time went on and technology capabilities

16   increased, insurance companies moved to begin to adopt and

17   deploy those technologies.

18          Some companies were rapid adopters.  Some

19   companies were slow adopters.  But by the early 2000s, I

20   sat in executive groups where the phrase "adequate

21   technology" is table stakes to be in the game came about.

22   We just got to a point where if you weren't

23   technology-capable, the independent agents and brokers

24   weren't going to send you business.

25   Q.  Got it.  Got it.  Let me -- I need to look for a

1    document.  I'm going to -- if you would go to -- well, let

2    me --

3              This is the first page of a document,

4    Mr. Whitener, that you prepared, correct?

5    A.  Correct.

6    Q.  And here you are summarizing, from your review of the

7    documents of the defendant, the business reasons for using

8    Blaze Advisor in connection with selling insurance.

9    Agreed?

10   A.  Agreed.

11   Q.  And then in this document, which we won't -- in this

12   document -- well, I say "document" because I have it

13   printed, but then there are additional documents that

14   follow, slides if you will.

15             For example, in discussing speed and in

16   discussing precision, and we will go through each one of

17   those, but with respect to your analysis of each of those

18   attributes, at the bottom of the slide, you identify the

19   documents that are being summarized in that -- in that

20   analysis.  Is that true?

21   A.  That is correct.

22   Q.  So you've identified all the source material that you

23   are looking to for a discussion of the meaning and the

24   application of these reasons for using Blaze Advisor from

25   the defendants.

 1    A.  Yes.

 2              MR. HINDERAKER:  Your Honor, this has been marked

 3    as Exhibit 1137A.  It is this slide and the following

 4    slides that speak to each of these elements, with the

 5    identification of all of the documents that are being

 6    referenced, and this notebook is all of the documents that

 7    are being referenced.

 8              And I offer as a Rule 1006 summary this

 9    Exhibit 1137A.  1137A.

10              MS. GODESKY:  Objection.

11              THE COURT:  Counsel, approach.

12

13                    **(Side-bar discussion.)**

14              THE COURT:  Well, my question at least is, have

15    all of those underlying documents already been admitted?

16              MR. HINDERAKER:  No.

17              THE COURT:  Then I think 1137A has to be a

18    demonstrative.

19              MR. HINDERAKER:  A demonstrative?

20              THE COURT:  Mm-hmm.

21              MR. HINDERAKER:  Fair enough.

22

23              **(In open court with the Jury present.)**

24              THE COURT:  Mr. Whitener, make sure your

25    microphone is back on.

1    BY MR. HINDERAKER:

2    Q.  So let's, if we may, go through this.

3    A.  My time is yours.  My wife disagrees, by the way.

4    Q.  Yeah, right.

5           All right.  Let's keep working here.  We're going

6    to go through each one of these.  We've spoken about each

7    one to some extent, and let us go through each one together

8    now.

9           So turning to speed, if you would discuss how

10   Blaze Advisor was used by the defendants with regard to the

11   attribute -- positive attribute, in selling insurance that

12   we are calling speed.

13   A.  Each of these points in the slide, again, come from a

14   defendant document that I reviewed, so let me start at

15   50,000 feet.  Speed is important.  The faster you respond

16   to an agent, the faster you bring product to market, the

17   faster you modify existing products for approval by the

18   regulatory, statutory powers, the better you are.  Okay?

19   Q.  Okay.

20   A.  So, was -- was speed a goal for defendant?  Yes.

21   Q.  And was that goal achieved?

22   A.  Was Blaze Advisor deployed to make things -- to make

23   things faster?  Yes.  That goal was achieved.

24   Q.  Okay.

25   A.  Okay.

1    Q.  Execute decisions faster even in real-time.

2    A.  Yes.  I mean, if I -- if I go to the discussion of my

3    early days in underwriting, and I take you back to some of

4    my opening comments, the personal insurance group of

5    products is more simple.  The commercial suite of -- main

6    street commercial suite of process increases in complexity.

7    The specialty insurance market base is more complex.  Each

8    of those groups would have an amount of time it would take

9    to underwrite a policy, to underwrite a renewal.

10              So if in that market segment you have deployed

11   Blaze Advisor through Automated Renewal Processing, Phase 1

12   and Phase 2, and you have successfully done it, each of

13   those renewal policies that is coming through is going to

14   be done much faster, and the renewal offer is going to make

15   it to the independent agent and the policyholder faster.

16              If you look at new business -- and I'll use

17   specifically DecisionPoint in this case.  If you have a

18   market-facing portal that will deliver back a real-time

19   quote and inside of that you embed other functions in terms

20   of the underwriting process, the rules, and you embed the

21   Profitability Indicator and you respond in real or near

22   real-time back to that request, that increases your

23   probability of converting the quote into a policy.

24              So yes, executing decisions faster was

25   accomplished.

1    Q.  Do you agree with their statements in their documents

2    that speed is a key to survival in this market for

3    efficient underwriting and response and low-cost structure?

4    A.  Yes.  Multiple documents of the defendant emphasized

5    the need for speed and the deployment of Blaze Advisor to

6    accomplish that.

7    Q.  Let's go to precision.  We spoke about this in the

8    context of predictive modeling.  And was the application

9    called Profitability Indicator one of the applications that

10   did predictive modeling?

11   A.  Yes.

12   Q.  And what else about precision did you see in the

13   defendants' documents that was significant relative to the

14   use of Blaze Advisor?

15   A.  I'll initially in this discussion link back to

16   DecisionPoint, where you get a quote in real or near

17   real-time.  With that precise premium, accurate premium,

18   you increase your precision of your pricing, which

19   theoretically now means that when you come back and you

20   look at that policy in the future through CIS Claims, the

21   actuarial analytical, the actuarial analytical comes back

22   and says, we did great.  That's perfect.  We got the price

23   right.

24   Q.  Were the defendants able to use Blaze Advisor to

25   elevate decisionmaking to the level of the organization's

1    top expert?

2    A.   The capability was there -- I would actually need to

3    know who wrote -- so let me delineate.  I've seen this

4    through testimony.

5             There are two aspects to the rules.  There is the

6    what should the rule be?  I'm going to use the word

7    "writing the rule," or the phrase, excuse me.  And then

8    there is the transfer of that rule into technology.  Okay?

9    And I'm going to use the phrase "authoring the rule."

10            So when it comes to writing the rules, until I

11   know who in the corporate underwriting function wrote those

12   rules, I can't -- and then the transfer of those rules and

13   the document transfers them, I can't say that.  I can't say

14   Blaze Advisor can make this happen if the deployment

15   chooses to.

16   Q.   If they want to.  Exactly so.

17            And the other bullet points that are on this

18   screen for precision, you saw those bullet points in all of

19   their documentation as well?

20   A.   All but one.  The reduced claim leakage.  Again, I have

21   found no indication that Blaze Advisor was deployed into

22   the claim system.  Much like cross-sell and upsell, this

23   was aspirational.

24   Q.   Got it.

25   A.   They hadn't gotten there yet.

1    Q.  All right.  And with that exception, they had gotten to

2    the rest of them?

3    A.  Yes.

4    Q.  Then let's go to consistency.  Why is consistency

5    important to selling insurance?

6    A.  Consistency has two aspects.  The first aspect is, the

7    agents and brokers do not like to be surprised.  They --

8    they want to know what's coming.  So if you consistently

9    execute a request for quote on a specific type of

10   policy/state combination, that accrues to your benefit; you

11   are being consistent.

12         The other place that consistency applies is in

13   the execution of the underwriting rules because a computer

14   is going to take a set of facts, ten -- ten fact points.

15   Okay?  And it's going to analyze it and come to the same

16   conclusion every time as long as all ten of those fact

17   checks are unchanged.

18         We humans, we're not particularly good at that.

19   There is a reason I've never bowled a 300 game, and it's

20   because I can't do the same thing over and over again well

21   all those times.

22   Q.  Okay.  Agility.  From your review of all of the

23   documentation, there is a number of bullet points of what

24   follows from being agile.  Could you discuss some of those?

25   A.  Certainly.  Being agile is the twin of being fast.

1    Being fast is just, get her done.  Agile is, change

2    quickly.  Okay?

3            And so there -- there were times where an

4    opportunity raised its head and pre- deployment of Blaze

5    Advisor -- pardon me -- that deployment didn't -- didn't

6    meet the needs of the business -- of achieving the business

7    opportunity, and after Blaze Advisor, it did.

8    Q.  What was that example?

9    A.  That is Chubb Custom Market.  It's a 25 million dollar

10   book of business that Chubb was looking to acquire from

11   another insurance company.

12   Q.  And using Blaze Advisor, they achieved that?

13   A.  Well, what they did -- to achieve that, they had to

14   modify their booking process, and they used Blaze Advisor

15   to accelerate the modifications that were needed to the

16   booking process so that they could get the business.

17   Q.  So they were -- they increased their speed and got the

18   opportunity.

19   A.  Yeah.

20   Q.  Okay.

21   A.  There are some -- there are some other points in here

22   that I will --

23   Q.  Well, I'm going to go back.

24   A.  Thank you.

25   Q.  Yeah.

1    A.   The legacy modelization observation I think is

2    important.   I have been involved in several processing

3    transitions for policy administration, for billing, for

4    claims, not nearly as much in claims.   It is -- it is

5    difficult for exceedingly large companies.

6          And just to arbitrarily pick on one, I'm insured

7    by State Farm.   They're still using many legacy systems

8    because the transition to more modern technology is

9    difficult.   So what they do is, they use modern technology

10   to supplement the core legacy system sitting in the

11   background.   Okay?

12         And that was -- that was one of the things that

13   they were doing with Premium Booking modernization.

14   Q.   One of the things the defendants were doing with

15   Premium Booking modernization?

16   A.   That is correct.

17   Q.   Okay.   Moving on to scale, from your review of the

18   documents, was this achieved with Blaze Advisor?

19   A.   Yes.   They processed -- they processed business with

20   the same amount of humans.

21   Q.   They processed more business --

22   A.   More business.   I'm sorry.   I left out "more."

23         The underwriting talent of an insurance company

24   is expensive to build, and it is a critical human resource

25   strategy to retain.   You know, you don't -- you don't want

1    to lose any percentage of your underwriting staff unless

2    they're just not good at it.  Okay?  And insurance

3    companies have lots of process and procedure to monitor

4    those things.

5             So if you can take -- and, again, I'm going to

6    use arbitrary numbers, if you can take a staff of 100 and

7    they're doing 200 policies, and now all of a sudden through

8    the deployment of technology you have a staff of 100, and

9    now they can do 400 policies, they want to do that.

10   That -- that's scale, and that is a point that Blaze

11   Advisor was used at because now all of a sudden that

12   eight-hour day, zero -- well, not zero.  Anytime -- well,

13   yeah.  Anytime a policy was coming up for renewal -- and I

14   remember in my underwriting days, I had to underwrite

15   renewals at my desk.  If a policy was coming up for renewal

16   and the automated renewal processing project allowed that

17   to go straight through and a human didn't have to touch it,

18   that is underwriting time that can be allocated to

19   something else.

20   Q.  And I want to move on to that.  You said the

21   underwriter is a critical human resource in the insurance

22   company.  Is there value in freeing the underwriter's

23   time -- letting Blaze Advisor do some of the work, is there

24   value in freeing the underwriter's time to do other things?

25   A.  Yes.

```
 1    Q.  And why is that valuable?

 2    A.  Well, there are two -- there are two things that the

 3    underwriter's time would be allocated to, and the most

 4    important is that relationship with the agent and broker.

 5    It frees them to spend more time with the agents and

 6    brokers, working on that loyalty aspect of the relationship

 7    that I talked about.

 8         The other thing it does, is it's completely

 9    possible now that you have underwriting capacity to pursue

10    or evaluate new opportunities, new projects, because if

11    you're -- if you're touching renewals with humans, those

12    humans' times is being lapsed, it's being used.

13         Now they have that time, and you can say things

14    like, wow, maybe we should have a combined auto and

15    homeowners policy, and I'll bet you Bick Whitener would

16    bill that for us.

17    Q.  Got it.  All right.  Yes.  And now let's go to

18    compliance.  I take it you don't sell insurance policies --

19    you have the stay-out-of-jail rule.  You don't sell

20    insurance policies without being in compliance with state

21    regulations and the company's requirements?

22    A.  Correct.

23    Q.  All right.

24    A.  The CEO's with whom I worked, if I had to walk into

25    their office and tell them that we had egregiously breached
```

1    the rules of a state, I would not be well-received.

2    Q.  And did -- understood.  And did -- did the defendants

3    use Blaze Advisor in any of the applications to -- to be in

4    compliance with the requirements of the State?

5    A.  They used Blaze Advisor to both be in compliance with

6    the State and company requirements.  And they used Blaze

7    Advisor to control ranges where underwriting flexibility on

8    a certain item, it had a ceiling, it had a floor, and you

9    just had to make sure you stayed within that ceiling/floor.

10   Q.  Okay.  And so we've heard testimony about Texas

11   Accident Prevention Program, TAPS, an application the

12   defendants used with Blaze Advisor.  Is that an example of

13   staying in compliance with state requirements?

14   A.  Yes.

15   Q.  And then you mentioned applications that were used --

16   you mentioned how through Blaze Advisor containing

17   applications, they stayed in compliance with their own

18   company requirements?

19   A.  Yes.  Individual rate modification application would be

20   a good example of this.  On certain types of policies in

21   the commercial insurance arena, you are allowed to file

22   your rates in such a way that there is a -- there is a --

23   you can't go over this, and you can't go below that, and

24   that provides the underwriter some flexibility in terms of

25   that pricing process as they're working on the quote.

1   Q.  And so that application that we now call IRMA was using

2   Blaze Advisor to inform the underwriters of the range

3   consistent with state regulation in which they could work

4   on the premium for the policy?

5   A.  I would say that a little differently.

6   Q.  How would you say it?

7   A.  But -- but the job of IRMA, Individual Rate

8   Modification Application, with Blaze Advisor was to just

9   simply not let the underwriter choose a point that was

10  outside of the range.

11  Q.  Okay.

12  A.  The nice thing about -- the nice thing about IRMA and

13  other rules is, you've got to obey them.

14  Q.  Got it.  All right.  I understand.  I think we're --

15  different ways of saying that.

16          And then let's go to ease of doing business.

17  We've spoken about this before.  This is the relationship

18  between the underwriter and the independent agent/broker.

19  A.  Yes.

20  Q.  And using Blaze Advisor, from your review, were the

21  defendants able to improve the ease of doing business

22  between themselves and the independent agents and brokers?

23  A.  Yes.  The independent agents and brokers got more

24  consistent answers.  The independent agents and brokers got

25  faster responses.  The independent agents and brokers got

 1    consistency.  This -- this was a tactical deployment aimed

 2    at benefitting ease of doing business in addition to some

 3    of the other value points we discussed.

 4    Q.  Okay.  Now, I want to turn the subject matter to the

 5    different kinds of systems that insurance companies use in

 6    terms of selling insurance.  And we'll review the different

 7    kinds of systems, give that an overview, and then we can

 8    identify the various applications and put them in their

 9    appropriate systems.  Okay?

10    A.  Fine.

11              THE COURT:  Mr. Hinderaker, it sounds to me like

12    this might be a convenient breaking point for the morning

13    break.

14              MR. HINDERAKER:  I fully agree with you.

15              THE COURT:  Okay.  Thank you.

16              Members of the Jury, we will take our morning

17    recess.  Be back in the courtroom at 15 minutes to 11:00.

18    Thank you.

19              THE CLERK:  All rise for the jury.

20                        **(Jury exits.)**

21

22

23        **(In open court without the Jury present.)**

24              THE COURT:  Go ahead and be seated.

25    Mr. Whitener, you can go ahead and step down.

1           Just a housekeeping from yesterday, we have

2     spoken with the jurors, and they are unwilling and/or

3     unable to go to 5:30, which we couldn't have done last

4     night because the building, by the way, was shutting off

5     all the water, which means many horrible consequences

6     result.

7           However, they're willing to shorten their lunch

8     break to 30 minutes.  And, Ms. Godesky, since you raised

9     the issue, do you want to have a 30-minute lunch break

10    today so that we can move things more quickly?

11          MS. GODESKY:  That's fine with defendants.

12          THE COURT:  Mr. Hinderaker, can you live with

13    that?

14          MR. HINDERAKER:  I'm going to try.

15          THE COURT:  Okay.  So plan accordingly,

16    obviously, get your food here.  We'll also take up the

17    issue then --

18          MS. KLIEBENSTEIN:  Can I jump in, Your Honor?

19          THE COURT:  You may.

20          MS. KLIEBENSTEIN:  Why -- let's just go through

21    this.  So Ms. Pawloski is coming tomorrow, and Mr. Waid is

22    going today.  So the concern about tomorrow is what again?

23          THE COURT:  It's both Mr. Harkin and

24    Ms. Pawloski, and I think we're just trying to ensure that

25    Ms. Pawloski can get on and off the stand tomorrow.

```
1          MS. GODESKY:  Yes, and we're communicating with
2     her to figure out what our plan is.  But I just think
3     generally we need to move things along because, you know,
4     we're still in the middle of direct of Mr. Whitener, and so
5     I don't even have confidence that we're going to be able to
6     start our case midday tomorrow at this point.
7          THE COURT:  We'll see, but --
8          MS. KLIEBENSTEIN:  Here's -- so late last night
9     at 11:30 we got new exhibits that deal with Mr. Harkin.
10    Here is my concern:  I do not want Mr. Harkin to start
11    today.  I don't think nobody is really concerned about
12    that.
13         MS. GODESKY:  No.
14         MS. KLIEBENSTEIN:  It's tomorrow?  Okay.  Then I
15    am going to sit down.
16         THE COURT:  We will take a half an hour at lunch.
17    Twenty minutes after we break, we will take up the issue of
18    Mr. Waid's testimony that was raised this morning.  Okay?
19    So you guys get effectively 20 minutes, as do I.
20         MS. GODESKY:  Your Honor, before we go off the
21    record, I do want to at this point renew our objection to
22    Mr. Whitener's qualifications under Rule 702, and we move
23    to strike his testimony and instruct the jury to disregard
24    it.
25         FICO conceded that he was not an expert in
```

 1    decision management software, let alone Blaze.  Defendants

 2    asked for a voir dire of his credentials.  We didn't have

 3    that opportunity.  He was essentially presented based on

 4    Mr. Hinderaker's representation that he would be talking

 5    about insurance principles, and we have now listened to

 6    four hours of freewheeling testimony about the value of

 7    Blaze to Chubb.  And we are defending a 21 billion dollar

 8    revenue disgorgement claim, and it is enormously

 9    prejudicial to have this presented to the jury when he is

10    not meeting the standards of Rule 702.

11             THE COURT:  The motion is denied.  On the

12    question of whether you were permitted to voir dire the

13    witness, what I said yesterday was that we would take this

14    up as appropriate during the testimony, so I didn't deny

15    you that opportunity.  I denied you that opportunity at the

16    outset of his testimony.

17             Regardless of that, I understand the defendants'

18    objection.  Having read and re-read Judge Wright's order, I

19    believe the objection falls within her prior ruling that

20    Mr. Whitener's methodology and his opinions are admissible

21    and that the issues you're raising, including his

22    qualifications, because that was really raised in the guise

23    of his methodology, in my view.  But regardless of that,

24    the concerns you are raising in my judgment go to the

25    weight and credibility of the witness's testimony.

```
1              So -- but your issue is preserved.
2              MS. GODESKY:  Thank you.
3              THE COURT:  Thank you.  We will be back.
4                       (Recess taken.)
5

6

7         (In open court without the Jury present.)
8              THE COURT:  Be seated.  Mr. Whitener, before the
9    jury comes in, I'm going to give you a couple of
10   instructions.
11             THE WITNESS:  Yes.
12             THE COURT:  Slow down, number one.
13             Number two, I know you wouldn't know this, but
14   you can't ask questions, okay, of your lawyer or of court
15   staff.  Allow that to happen properly, if it's going to
16   happen.  Okay?
17             THE WITNESS:  Yes, sir.
18             THE COURT:  All right.
19             We will -- we're going to chew up that lunch
20   hour, 30 minutes, on the early side, so we're going to go a
21   little bit later now, and then we will plan to break at
22   12:30.
23             THE CLERK:  All rise for the jury.
24                       (Jury enters.)
25
```

1

2                    **(In open court with the Jury present.)**

3                    THE COURT:  Be seated.

4                    Mr. Hinderaker, you may proceed.

5                    MR. HINDERAKER:  Thank you.

6      BY MR. HINDERAKER:

7      Q.  As we said just at the break, there are three different

8      kinds of functions related to selling insurance:  Policy

9      administration systems, compliance systems, and utility

10     systems.  Agreed?

11     A.  Agree.

12     Q.  I think we've spoken about the policy administration

13     systems, and we can do that more in the context of the

14     specific applications.

15                    We've spoken about the compliance systems, and we

16     can do that a bit more in the context of the specific

17     applications.

18                    And then let's talk about the utility systems as

19     well in the context of the specific applications.

20     A.  Agreed.

21     Q.  So the first set is the policy administration system

22     applications.  And in overview, is this correct that these

23     are the systems that execute the "bind, book and issue"

24     process that you have described for us?

25     A.  Yes.

1    Q.  And is it these systems that would be the ones to

2    modify existing policies, either to cancel or renew as

3    well?

4    A.  Yes.

5    Q.  And is it also the truth -- true that the defendants

6    with Blaze Advisor policy administration system

7    applications automated the business decisions in the steps

8    of selling insurance?

9    A.  Were deployed, yes.

10   Q.  Yes.  And these defendants chose to use Blaze Advisor

11   as one of the technologies in their policy administration

12   systems -- systems?

13   A.  Yes.

14   Q.  And is it possible to sell insurance without a policy

15   administration system?

16   A.  Not and be competitive.

17   Q.  All right.  So let's turn to the applications.  And do

18   you place each of these ten applications in the category

19   of -- of a policy administration system?

20   A.  I do.

21   Q.  All right.  So we have CSI Express, Automated Renewal

22   Processing 1 and 2, Profitability Indicator, DecisionPoint,

23   Evolution Canada, Evolution Australia, EZER for the

24   European United Kingdom zone, Adapt for Europe, Adapt for

25   Australia and Cornerstone.  Those are the ones?

1    A.  Yes.

2    Q.  All right.  Now let's look at what the Blaze Advisor

3    function was in these applications.

4              With respect to CSI Express, is that accurate

5    from your analysis?

6    A.  It is.

7    Q.  So predictive modeling, policy scoring and underwriting

8    guidance?

9    A.  Yes.

10   Q.  And then for Automated Renewal Processing 1 and 2, is

11   that accurate from your assessment of the evidence?

12   A.  It is.

13   Q.  So ARP-1 is the renewal categorization, whether it can

14   or cannot be automated -- whether it can or cannot be

15   straight-through process, and ARP-2 is the policy renewal

16   automation?

17   A.  Correct.

18   Q.  And did ARP-2 include endorsement generation?

19   A.  It did.

20   Q.  Profitability Indicator, we've spoken about that, I

21   think.  The predictive modeling, the scoring?

22   A.  Yes.

23   Q.  That was a Blaze Advisor application, correct?

24   A.  Correct.

25   Q.  And then DecisionPoint, rules tables and pricing

1   calculations, I don't think we spoke about that yet.  Could

2   you describe what that was using Blaze Advisor?

3   A.  Yes.  I'm sorry.  DecisionPoint is the market-facing

4   capability for the -- for an approach into four products.

5   Okay?  It -- it brought information in.  It priced it.  It

6   went through the process of taking it through the

7   underwriting guidelines for those specific products, and it

8   was capable of giving back a real-time quote based on

9   defendant documents.

10  Q.  And so the eligibility determination is, in the steps

11  of selling insurance that we looked at, that is the

12  yes-or-no box?

13  A.  Yes.  It's the yes-or-no box.  It is, does this meet

14  the underwriting criteria, yes or no.

15  Q.  And endorsement generation we spoke about.

16          And data normalization, would you tell us what

17  that was?

18  A.  Actually, this was referred to earlier.  Data

19  normalization is just -- it's going to outside databases

20  and saying, hey, the data that you have given me here

21  doesn't match.  As an example, I about every 45 days get a

22  notification from the U. S. Postal Service that my address

23  is wrong, and it's because of a period.

24  Q.  Okay.  Then Evolution Canada and Australia, the Blaze

25  Advisor function was underwriting guidance?

1    A.  Yes.

2    Q.  And the Adapt application in European and Australia --

3    in Europe and Australia was also underwriting guidance?

4    A.  Yes.

5    Q.  And then Cornerstone was -- would you describe -- we

6    haven't really touched on Cornerstone, bond and transaction

7    validation, workflow routing.  How was Blaze Advisor used

8    in Cornerstone?

9    A.  Cornerstone is the policy administration system for

10   surety bond type of products.  They're a little bit of a

11   different animal, but Blaze Advisor was used for these

12   steps for the workflow routing and for the validation.

13   Q.  Saying they're a different animal, is it accurate to

14   say that underwriting a surety bond transaction is a bit

15   more complex than commercial?

16   A.  Yes.

17   Q.  And is that because of the risk that is associated with

18   underwriting -- with surety bonds?

19   A.  Yes.

20              MS. GODESKY:  Objection.  Leading.

21              THE COURT:  Sustained.

22   BY MR. HINDERAKER:

23   Q.  Tell us why, please.

24   A.  Surety bonds are a little bit of a different animal

25   because the exposure risk is higher.

1    Q.   Uh-huh.

2    A.   But more importantly, the exposure risk is higher

3    because in all of the insurance I have been talking about

4    at this point, there are two parties.  There is the --

5    there is the applicant who is going to have the policy, and

6    there is the writing company providing the policy.  In

7    surety -- in surety bond there are now three players.

8    There's the -- because surety bond is functionally a

9    performance guarantee.  So when you see large construction

10   projects, every one of those contractors, the people that

11   gave them the contract, to get the contract, they demand a

12   surety bond.

13           The contractor has to get the surety bond, so you

14   have the -- the person receiving the service, you have the

15   person providing the service, and you have the insurance

16   company providing the financial protection in terms of the

17   guarantee.  A little more complicated, a little more

18   involved.

19   Q.   Okay.  So that's the overview of those policy

20   administration applications or systems and the applications

21   within them.  I want to go now -- have you review for us

22   your analysis of the defendants' documents with respect

23   to -- with respect to them.

24           Perhaps the most efficient way to do that is if I

25   could ask you to speak to the --

1          THE COURT:  Counsel, approach, please.

2

3          **(In open court with the Jury present.)**

4          THE COURT:  Please put that back up.  Thank you.

5

6          **(Side-bar discussion.)**

7          THE COURT:  Sorry, but the second to the last

8    bullet point on that slide refers to the cost of basically

9    replacing and getting the application new.  I want to make

10   it clear, you're talking about the CSI Express application.

11         MR. HINDERAKER:  I am.

12         THE COURT:  Okay.  I just wanted to make sure, as

13   opposed to --

14         MR. HINDERAKER:  Not the whole schmiel.

15   Application by application.  There will be a couple other

16   instances of that, but it's application by application.

17         THE COURT:  And the applications we're

18   referencing are the applications of Chubb.

19         MR. HINDERAKER:  Only, yes.

20         THE COURT:  Okay.  I just wanted to make sure.

21

22         **(In open court with the Jury present.)**

23   BY MR. HINDERAKER:

24   Q.  In my view, this is important information, and I'm also

25   trying to think about the most efficient way to convey the

 1    information.  So I'm suggesting, Mr. Whitener, if -- using

 2    this slide, if you could speak to the bullet points that

 3    you have put on the slide regarding the CSI Express

 4    application, and tell us in your view the significance at

 5    the defendants.

 6    A.  Certainly.  CSI Express is the policy administration

 7    system for the specialty products of defendant.  You will

 8    notice in the -- in the second bullet point that we note

 9    from defendant documentation that they have 113 of those

10    specialty products.  So CSI Express is doing the policy

11    processing, it's doing the new business, the quotes, the

12    renewals, the terminations.  It's executing -- or managing

13    the execution of the "bind, book, issue" process for these

14    products.

15            CSI Express is the named application, computer

16    system in the 2006 RFI, requesting the information about

17    solutions.  There is a lot of other information on here.

18    Let me highlight just one or two things, and I'm going to

19    look at the slide to do this, because I don't remember the

20    details.

21    Q.  Please look.

22    A.  Probably the most important point here is the fact that

23    it supports Automated Renewal Processing, so that's through

24    two projects, ARP-1 and ARP-2.  It has a simulation tool in

25    it, a what-if, so that the corporate underwriting process

 1    at Chubb and that product development function I -- product

 2    management function I spoke to can take a book of business

 3    or a product and it can take all of that -- all of those

 4    policies, and it can change rules and parameters and get a

 5    result back that says, hey, if you do this, this is what we

 6    expect to happen, which is very powerful.

 7         And the last point I will make -- the last two

 8    points I'll make is, this is one of the places where the

 9    predictive modeling capability turned into Profitability

10    Indicator is applied, and it used Blaze 7.1.

11    Q.  Okay.  Then let's do a similar approach with Automated

12    Renewal Processing.  We'll combine both ARP-1 and ARP-2.

13    From the documents and your review, if you would explain

14    for us the significance of the bullet points you put on

15    this slide.

16    A.  Certainly.  So with the goal for straight-through

17    processing and the goal to improve speed and the goal to be

18    easier -- I'm sorry.  I apologize.

19         The first goal being straight-through processing;

20    the second goal being improved speed; the third goal being,

21    it would be easier to do business with, using Blaze Advisor

22    7.1, defendant built two renewal processing projects.  They

23    deployed ARP-1, when ARP-1 was just simply a

24    categorization.  Here is a policy's risk characteristics.

25    It fits into high touch, the underwriter has to do this.

1    Low touch, maybe somebody else can do it, an underwriting

2    assistant.  And no touch.

3         But with ARP-1 even though it categorized it no

4    touch, the system still wouldn't issue the renewal.  I

5    mean, a -- a minor, minor amount of human interaction was

6    required.  When they flushed out and implemented and

7    deployed ARP-2 now in that no-touch category, that minor

8    amount of button-pushing was no longer required.

9         The goal that was stated in the documents was to

10   eventually get to 90 percent of the renewals going through

11   straight-through processing within three years.  It's a --

12   it's a learning process.  It's a step-by-step process.  So

13   you would go in, and if you had stuff that categorized at

14   high touch, you would look at it, and say, anything we can

15   do with the rules.

16        If it were low touch, you would now be looking

17   at, okay, what can we do that might turn more of those into

18   low touch.  So it is an iterative process, if you'll allow

19   me that phrase.

20   Q.  And then no touch would be characterized as

21   straight-through processing?

22   A.  Yes.  No touch and straight-through processing mean the

23   same thing.

24   Q.  And in your review of the defendants' documents, did

25   you see where they were able to change the renewal rules

1    within a couple days as compared to months using Blaze

2    Advisor?

3    A.   Yes.  Defendant documents have several statements that

4    say that the use of Blaze Advisor in this rule modification

5    process modified the time frame to change rules from three

6    to four months to -- and I'm going to use less than a week.

7    It was three or four days.

8    Q.   With Blaze Advisor, three or four days?

9    A.   Correct.

10   Q.   And then Blaze Advisor 7.1, was that the version being

11   used for ARP-1 and ARP-2?

12   A.   That also was correct.

13   Q.   Profitability Indicator, I know we've spoken some about

14   that, so we don't have to repeat what we have heard, but to

15   save time, from your review of the documentation and the

16   things that you put on the slide, could you speak to the

17   ones we haven't addressed?

18   A.   Profitability Indicator uses -- or used Blaze 7.1.

19   Profitability Indicator's job was to enable the

20   underwriting function to have a more accurate and precise

21   price in the quoting or in the renewal process.  It

22   accomplished that well.

23        There are several things in here that I mentioned

24   that I had seen as desires:  Cross-sell, upsell,

25   repatriation.  I see indication that none of those were

1   actually fully implemented but that they were in the

2   underwriting guidance.

3   Q.  They were in the underwriting guidance?

4   A.  Yeah, they're in the underwriting guidance.  Cross-sell

5   this, upsell that.  Repatriation, no indication that

6   anything was done.

7   Q.  So with cross-sell and upsell, if not fully

8   implemented, they had begun to do that?

9   A.  They had begun to help the underwriters with that, yes.

10  Q.  DecisionPoint, same process, if you will.  Trying not

11  to repeat what we said already, but speak to the

12  significance of what you saw Blaze Advisor doing for the

13  defendants with DecisionPoint.

14  A.  My review of the defendants' documents indicated that

15  DecisionPoint was -- was a market-facing capability,

16  meaning that you could get to it through the Internet.  I

17  believe the Internet address was at Chubb.  It had -- the

18  interface initially has a number of commercial and

19  specialty types of products with it, and this -- this was

20  used with four specific products.  It allowed the

21  underwriting process and profitability -- with

22  Profitability Indicator to be able to provide a quote and

23  through a technology process that would allow the agent and

24  the customer to accept it and the binding take place right

25  there.

1    Q.  Of course, you noticed on the bullet point that it was

2    available 24/7, given the nature of that.

3             And you said the four -- four kinds of products.

4    D&O means what, please?

5    A.  Directors and officers.

6    Q.  EPL means what?

7    A.  Employment practices liability.

8    Q.  Crime means?

9    A.  Crime.

10   Q.  And fiduciary means?

11   A.  Fiduciary is financial protection for financial

12   institutions against employee malpractice -- employee

13   misbehavior.

14   Q.  And what is the significance in closing a sale of an

15   insurance policy if you're able to issue the quote at the

16   point of sale, right at the point of sale?

17   A.  You accomplish two things.  The first one is that much

18   faster than it having to come into the office and being

19   touched by an underwriting process.  And as I've mentioned

20   before, the faster you respond to quotes, the higher the

21   probability that you convert the quote to a policy.  And in

22   all of my years of experience, quote conversion percentage

23   was an important -- it was a key performance metric, if you

24   will.

25             The second thing is, with this happening so fast,

1    you are being easy to do business with, and the combination

2    of speed and ease of doing business helps with the

3    relationship with the agent and broker.

4    Q.  And then the DecisionPoint application, you have here,

5    files all supporting documentation to commercial

6    underwriter's workstation.

7              DecisionPoint, why don't you describe the

8    relationship, then -- the interrelationship between

9    DecisionPoint and the information into underwriter's

10   workstation?

11   A.  Sure.  So DecisionPoint is going to gather a lot of

12   information, and what's it's going to do in the execution

13   of the "bind, book, issue" process, is it's going to make a

14   decision.  Its decision that it makes, its price that it

15   applies to the quote, all of that is going through a

16   communications interface to go back to the -- to the

17   commercial underwriter workstation, which is a -- it's an

18   application that is there for the underwriters to be able

19   to see information about the policies and any -- any

20   pertinent interactions between the underwriter or the

21   special underwriting assistant and the independent agent

22   and broker.

23   Q.  On your slide here, you have the statement that the

24   estimate of cost to purchase new or develop internally is

25   between 5 and 10 million dollars.  That's speaking

1   specifically to the DecisionPoint application?

2   A.  It speaks specifically to the DecisionPoint

3   application, and the document I take that from isn't

4   provided there.  I can't remember the name of the -- the

5   organization that provided that estimate.  Perhaps Duff &

6   Phelps.

7   Q.  And we've had testimony about that earlier, about Duff,

8   D-U-F-F, and Phelps evaluation?

9   A.  Yes.

10  Q.  And I should have asked, going back a couple slides, it

11  said, for CSI Express, the same Duff & Phelps evaluation,

12  it set the cost to purchase or develop CSI Express at

13  between 25 and 40 million?

14  A.  It does say that.

15  Q.  Let's go to Evolution Canada, another policy

16  administration system.  Using the same approach, tell us

17  the significance that you gleaned, discerned, from the

18  documents of the defendants regarding Evolution Canada.

19  A.  Evolution Canada is the policy administration system

20  executing the "bind, book, issue" process for the country

21  of Canada.  Evolution is a little bit unique in that it is

22  processing both personal lines, commercial lines and

23  specialty lines; whereas, CSI Express is processing no

24  personal lines.  Okay?

25              The primary thing I noted in Evolution is that

1    the Automated Renewal Processing is -- is up there in that

2    system, deployed into that system as well.  So it's going

3    through the process of, okay, here comes a renewal.  I

4    believe Mr. Pandey's definition of the renewal window was

5    90 days.  So 90 days in advance, look at the risk

6    characteristics.  Is it high touch?  Is it medium touch?

7    Is it low touch?

8    Q.  Okay.  And did you see from the documents of the

9    defendants that in Canada they were able to achieve an 82

10   percent of the renewals at no touch?

11   A.  I did -- I did see that stated in the documentation.

12   It was a Duff & Phelps document.

13   Q.  And in Canada for Evolution, it uses both .net and

14   dot -- I'm sorry -- .net and Java architecture.  That was

15   in the documentation as well?

16   A.  Yes.

17   Q.  And you have on a slide version 7.1 is the Blaze

18   Advisor being used?

19   A.  I do.

20   Q.  Okay.  Let's go to Evolution Australia.  What did you

21   see in the documentations of the -- documentation of the

22   defendants regarding Evolution Australia?

23   A.  The documents indicate that the intent was to take the

24   Evolution policy administration system from Canada and

25   transport it to Australia to be the policy administration

1    of use in the country of Australia.  And I saw that that

2    did not happen because as they started the deployment

3    process, Blaze Advisor in that was replaced by the IBM

4    product ODM.

5    Q.  Okay.  As originally received in Australia, the Blaze

6    Advisor software was in the Evolution application?

7    A.  The documents do indicate that.

8    Q.  Now let's go to EZER, European Zone Executive Risk,

9    another policy administration system --

10   A.  Yes.

11   Q.  -- correct?

12          And what did you find to be significant and

13   meaningful regarding the use of Blaze Advisor for this

14   application?

15   A.  So, again, EZER takes on a little bit different flavor.

16   This application is very similar to the functions performed

17   by CSI Express with the combination of Commercial

18   Underwriter Workstation.  Blaze Advisor is used in it for

19   transactional processing, but primarily in terms of giving

20   underwriting guidance.  It does have the automated renewal

21   capability to categorize into the -- into the three

22   categories.

23   Q.  Okay.

24   A.  And it does use Blaze 7.1.

25   Q.  And then the -- the underwriting element of it is -- is

1    the underwriting element of it supporting the quotation,

2    binding, renewal, endorsement, cancellation, reinstatement,

3    document generation, reporting, that's all -- I'm sorry.

4    When we speak of a policy administration system, we're

5    speaking of a system that supports quotation, binding,

6    renewal, endorsement, cancellation, reinstatement, document

7    generation and reporting, right?

8    A.  Correct.

9    Q.  We go to Adapt Europe and Australia, did you see that

10   Adapt was used in both of those geographical areas?

11   A.  I did.

12   Q.  And so we can -- we can -- but we can speak of the

13   application together.  The application did the same thing

14   in each of the geographical areas?

15   A.  Correct.

16   Q.  So from your review of the documents of the defendants,

17   what was significant about the use of Blaze Advisor in

18   Adapt?

19   A.  Let me start by saying, this is the first demonstration

20   outside of the property and casualty universe.  This is

21   actually -- Adapt is the policy administration for a life

22   health product called Accident Benefit Life.  In the

23   document you will see it referred to as ABL.  But in Adapt,

24   Adapt is managing the "bind, book, issue" process and the

25   transactional streams that you would expect a policy

 1    administration system to manage.

 2              And Adapt is using version 7.1.

 3    Q.  Okay.

 4    A.  I'm sorry.  I am wrong.  I think Adapt was a different

 5    version number.  No, I'm incorrect again.  7.1.

 6    Q.  All right.  And did Adapt support using Blaze Advisor

 7    straight-through, no-touch processing, real-time, bind and

 8    issue, back-end administration, automation, document

 9    generation and electronic filing?

10    A.  It did.

11    Q.  Going to Cornerstone, another policy administration

12    system.  You mentioned that Cornerstone supported the Chubb

13    surety line of business?

14    A.  Correct.

15    Q.  To be distinguished from the specialty line of

16    business?

17    A.  Correct.

18    Q.  And as a policy administration system, did Cornerstone

19    support the "bind, book, issue" process for those kinds of

20    products?

21    A.  It did.

22    Q.  Is there more -- you're telling us that it was using

23    version 7.1 of Blaze Advisor.  Is there any more

24    significance in your analysis regarding Cornerstone that we

25    haven't spoken to?

1    A.  The only other point I would make is, it was used to

2    optimize and manage workflow.

3    Q.  And could you explain that, please?

4    A.  Routing of work to the appropriate party, very similar

5    to the Inventory Management aspect of CUW.

6    Q.  Okay.  Understood.  Thank you.

7            Let's move to what are called the compliance

8    applications.

9    A.  Certainly.

10   Q.  And in your review, Blaze Advisor was used in three

11   compliance applications.

12   A.  That is correct.

13   Q.  And the slide here identifies them as Premium Booking,

14   we've spoken some about; Texas Accident Prevention Systems,

15   TAPS; and Individual Rate Modification, IRMA?

16   A.  Correct.

17   Q.  All of those have been identified -- we've mentioned

18   them each, so let's just go through each one individually.

19           Premium Booking modernization, the Blaze Advisor

20   function was -- was what?

21   A.  Validation of the rules for the Premium Activity

22   Reporting System.  You will see this Premium Activity

23   Reporting System referred to as PARS, P-A-R-S.

24   Q.  When we discuss that application in its individual way,

25   we will look at that in some more detail.

```
 1                 Texas Accident Prevention Systems?
 2      A.  This is a compliance use simply to meet a statutory
 3      requirement by the great state of Texas for specific types
 4      of workers' compensation policies.
 5      Q.  Okay.  And individual rate modification, pricing rules,
 6      would you describe that if you haven't -- well, you did
 7      some.
 8      A.  I did some.  My description now will not be radically
 9      different.  Individual rate modification used with certain
10      commercial and specialty types of products is a mechanism
11      to give pricing flexibility to the underwriter in the
12      pricing of the policy.
13                 And individual rate modification, if you will
14      allow me to use the term "guardrails," the top of the range
15      is a guardrail, the bottom of the range is a guardrail, and
16      the job of IRMA is to make sure that nothing -- nothing
17      crashes through the guardrails.
18      Q.  Stay within the guardrails?
19      A.  Stay within the guardrails.
20      Q.  So now we will -- we will turn to Premium Booking
21      modernization.  I want to go forward on a slide here
22      because you spoke, I think, of this element of the PARS
23      modernization and resulting in the Premium Booking
24      application.
25                 From the defendants' documents, could you
```

1    describe what that image is showing?

2    A.   This image is not technology-specific.  This is a

3    business view of what has to happen.  So when an insurance

4    company issues -- well, binds a policy, okay?  So the --

5    figuratively speaking, the bind button has been pushed, the

6    quote has been accepted, the renewal offer has been

7    accepted, there are a number of things that need to happen.

8    Because we are a highly regulated industry, 51

9    jurisdictions, information has to go to multiple places.

10   One of those places is going to be statistical reporting.

11          So we -- we watched a testimony deposition, and I

12   have already forgotten this gentleman's name, but in his

13   title he used statutory reporting.  Statutory reporting is

14   just simply the insurance company sending to the

15   appropriate regulatory bodies information about policies.

16   Okay?

17          In statutory reporting, a policy is just not one

18   set of data.  So if I go back to that commercial fire

19   policy that I talked about, a commercial fire policy has

20   fire coverage.  I'm sure that's a big surprise, right?  But

21   that fire -- that fire coverage, it has a coverage code,

22   and part of the total policy premium is attributed to that

23   code.  And then that information, through a booking

24   process, in this case PARS, improved upon by Blaze Advisor

25   through a project called Premium Booking Modernization is

1    now feeding that information.

2              Well, I can tell you there is a code there for

3    lightning, and a premium would be associated to lightning.

4    There is a code there for wind and hail, and it will be

5    associated to hail.  I won't bore you with all 17 or 18 of

6    those coverages, but that's what happens.

7    Q.  Okay.

8    A.  And it is important because it is statutorily required,

9    okay?

10             The nice thing about -- the nice thing about this

11   chart is it shows you how many places a premium has to go

12   after that booking has been executed.  And if you look at

13   this chart, it's got to go to one, so daily premium and

14   loss control.  It's got to go to billing.  It's got to go

15   to actuarial bureau reporting.  Those are -- actuarial

16   bureau reporting means data aggregators for the industry --

17   I'm sorry.  It's a statutory requirement.  There are

18   companies that aggregate data for the insurance industry,

19   and companies contribute to them.  The NAIC is a good

20   example of that.

21             So then -- we've got three places the data has

22   got to go now.  We are going to go to a fourth -- it's

23   going to send information to the policy -- I'm sorry, to

24   the CIS Claims -- speaking specifically to CIS, it's going

25   to send policy to claims because the claims department

1    might get a phone call that says, hey, I'm X; I've got a

2    claim.  The first thing they are going to do is they're

3    going to confirm that the policy exists.

4    Q.  Slow down.

5    A.  I'm sorry.  So CIS Claims is going to get a phone call

6    about a claim.  They need to confirm that the policy is

7    active, that data transfer to claims allows that to be

8    done.

9    Q.  Okay.

10   A.  Then you come down to -- then you come down to profit,

11   and you notice that there are three sub-boxes under that.

12   So data has got to go to those three boxes.  So if you add

13   all those boxes up, one, two, three, four, five, six, there

14   are seven places that data has got to be sent.  There has

15   to be something that manages that sending.  At the

16   defendant, that something is named Premium Activity

17   Recording System, and it is that system that was modernized

18   using Blaze Advisor 7.1.

19   Q.  And that then is the Premium Booking application?

20   A.  As defined by the defendants' documents, yes.

21   Q.  And by modernizing this process resulting in the

22   Premium Booking application, is this the instance where,

23   because all that back-end -- all that back-end reporting

24   was done using Blaze Advisor and much faster, they were

25   able to capture the market -- the 25 million dollar market

```
1    opportunity you spoke about?

2    A.  That is correct.  Think about it not in terms of that

3    specific opportunity, but if you have a new opportunity in

4    front of you -- it might be aviation insurance.  It might

5    be automobile manufacturers.  At the end of the day, to

6    bring that product to market, in addition to all of the

7    work I talked about in the product management function and

8    the information technology function, you've got to be able

9    to book and report to the statutory authorities about that

10   premium.  That's what this is.

11   Q.  Okay.  And now we turn to this slide.  It is about

12   Premium Booking modernization.  It may be that we have

13   spoken about it.  I think so.  This was another -- this

14   also used Blaze Advisor version 7.1?

15   A.  Correct.

16   Q.  All right.  Let's go to Texas Accident Prevention

17   Systems.  Oops.  And we have these bullet points of yours.

18   We've described it already as relating to workers' comp in

19   Texas.  This application used version 7.1 of Blaze Advisor?

20   A.  Correct.

21   Q.  Okay.  Unless you see something that we haven't spoken

22   about on Texas Accident Prevention Systems, I'm ready to

23   move on.

24   A.  I will only say one sentence additional, if allowed.

25   Q.  Yeah.
```

1    A.  This is a use of Blaze Advisor to fulfill a statutory

2    reporting requirement.  It's not participating at this

3    point with anything with the "bind, book, issue."  It's

4    just saying, hey, this is a policy.  Here are the state

5    requirements.  Read it.

6    Q.  And hence, we put it in the compliance category?

7    A.  Correct.  And I'm sure that any insurance company would

8    prefer not to be slapped on the wrist and fined for not

9    complying with the requirement.

10   Q.  Okay.  Then let's go to IRMA.  And have we spoken about

11   this in terms of the guardrails?

12   A.  Yes.

13   Q.  It used Blaze Advisor version 7.1, from your review?

14   A.  Yes.

15   Q.  I think maybe we've spoken about each of the bullet

16   points on this slide.  Do you agree?

17   A.  I agree.

18   Q.  Okay.  Then let's go to the utility applications, and

19   we didn't define that before.  So what do you mean by

20   utility application?

21   A.  They are applications that are deployed to make

22   people's lives easier but specifically as it relates to the

23   "bind, book, issue" process of selling insurance.

24   Q.  But it does -- does it --

25   A.  I'm sorry?

1    Q.  Do these utility applications -- although not being

2    policy administration systems, do they connect to the

3    selling of insurance?

4    A.  Absolutely.

5    Q.  So at the defendants' utility applications were

6    commercial -- are these the utility applications at the

7    defendants?

8    A.  Yes.

9    Q.  We have spoken about CUW-IM, Broker Site in Canada.  We

10   will speak more about Exari in Europe.  We haven't really

11   addressed that.  And we've talked about CIS Claims.

12            So the Blaze Advisor function at Commercial

13   Underwriter Workstation.  That is what it was?

14   A.  Yes.

15   Q.  And I think we're spoken about that.

16   A.  I agree.

17   Q.  Okay.  And then Brokersite, we haven't really spoken

18   about that, client information access portal for brokers.

19   How did Brokersite use the Blaze Advisor function?

20   A.  It is a tool made available to the independent agents

21   and brokers to discover information about their

22   policyholders.  So if -- using a very, very simple example,

23   if the business calls the independent agent and broker and

24   says, when is my next premium due?  In this deployment and

25   in this function, the independent agent would go to the

1    Brokersite, look up that policy and say, oh, look, you have

2    a thousand books due on August the 1st.

3    Q.  This is an ease of doing business benefit?

4    A.  Correct.

5    Q.  Exari, data capture and document generation.  What was

6    that?

7    A.  Exari never deployed into production but built using

8    Blaze Advisor, is a use of Blaze Advisor to create an

9    interview tool to walk someone through an interview

10   process, an agent and broker, or potentially a customer,

11   asking them questions, and then the application Exari is

12   going to fill out paperwork based on those answers.

13   Q.  For the purpose of selling the insurance policy?

14   A.  Agreed.

15   Q.  And then CIS Claims, claims categorization, I think I

16   could use a little better understanding of what that means.

17   A.  CIS Claims is the predictive modeling use that looks

18   back at information and says, did we get the price right?

19   So when you think about categorization, really, there are a

20   couple, right?  There is, I got it right, or I didn't get

21   it right, and if I didn't get it right, I missed by --

22   Q.  Okay.  Got it.  Understood.

23        Now let's go through each of them in a little

24   more detail.  Commercial Underwriting Workstation Inventory

25   Management, this -- in terms of these bullet points, from

1    your review of the documents, was it used by 6,000 users in

2    the United States and Canada?

3    A.  Based on the documents, yes.

4    Q.  You had the bullet point, If CUW Inventory Management

5    is down and work orders cannot be created or reviewed, what

6    did you see from the documents that was the consequence of

7    CUW-IM being down?

8    A.  I believe the direct words of the document, and I

9    believe it here is the -- there was little to no "bind" --

10   "bind, book, issue" taking place.  This is the deployment

11   to -- for inventory management, and so inventory management

12   makes sure that any individual participant in the

13   underwriting process, it makes sure that their in-box does

14   not -- in-box of "bind, book, issue," in-box of any other

15   type of underwriting work, be it underwriting endorsements

16   or underwriting renewals, it's making sure that's what's in

17   their in-box is within their defined capacity.  And if it

18   does not, taking that work and getting it into some other

19   similar skill set person whose in-box can absorb the work.

20   Q.  And if that can't be done, then the work doesn't get

21   done?

22   A.  If that can't be done, the work doesn't get done.

23   Q.  You have here that commercial -- Chubb Commercial

24   Insurance processes over 5 billion dollars worth of

25   business with CUW-IM?

1   A.  It does.

2   Q.  Is that on an annual basis or what time frame?

3   A.  No.  That is annually.

4   Q.  You also have on here that there were 1.22 million

5   transactions per month.  That was CUW-IM?

6   A.  Correct.

7   Q.  And some of these other bullet points we've spoken to,

8   it uses Blaze Advisor 7.1?

9   A.  It does.

10  Q.  And then you have the estimated cost to purchase or

11  redevelop CUW at between 5 and 10 million dollars?

12  A.  Yes.  That's from the same data source as before.

13  Q.  Same data source as before, this Duff & Phelps?

14  A.  Correct.

15  Q.  Let's go to Brokersite.  We've spoken about it a bit.

16  So the interface between Brokersite and Evolution was what,

17  as you saw from the documents?

18  A.  The Blaze Advisor is used in Brokersite.

19  Q.  Mm-hmm (Yes).

20  A.  And it participates in that -- in that interface.  And

21  as I mentioned before, Brokersite's job is to get

22  information back to the agent and the broker as it relates

23  a specific policy, suite of policies, customer.

24  Q.  And as you've already said, the Canadian application

25  called Evolution used Blaze Advisor?

1    A.  Yes.

2    Q.  Now let's go to Exari.  We haven't heard much about

3    that.  You identified it a moment ago as the

4    document-authoring.  What did you see from the -- it's a

5    document-authoring application.

6         Tell us what you learned from the defendants'

7    documents regarding Exari and its use of Blaze Advisor?

8    A.  It was designed to be used with EZER, which I will

9    refresh your memories.  That is the European executive risk

10   policy administration system.  It was the -- through most

11   of the software development life cycle and 30 days before

12   moving to its scheduled move to production date, it was

13   tabled and put on the shelf.

14   Q.  Okay.  You have on that slide that the development of

15   Exari began in 2013?

16   A.  I do.

17   Q.  And that's from the documents of the defendants?

18   A.  Yes.

19   Q.  And then the date on which it was put on the shelf, in

20   your words, was January 27, 2016?

21   A.  Yes, again from defendant documents.

22   Q.  You have Blaze Advisor version 7.1?

23   A.  Correct.

24   Q.  Okay.  CIS Claims.  We've spoken about it already as a

25   predictive analytic application.  Maybe you can describe

1   how actuaries used this information and its relationship to

2   CSI Express?

3   A.  CSI Express is a very large application.  It has a

4   policy administration component.  It has a claims

5   component.  Excuse me.  Both of those components have

6   information that the actuarial department needs, as I

7   pointed out in the Premium Booking business slide.

8   Q.  Yeah.

9   A.  So what is going to happen is, periodically, CIS Claims

10  is going to take that information, policy claims, and it's

11  going to go through a predictive modeling process that --

12  as I said before, it just basically determines, is this

13  price right, or is this price not right and provide -- when

14  the answer is "not right," provide insight for reasons as

15  to why they now consider it not right.

16  Q.  And that's the actuarial element of it?

17  A.  Yes, that is the actuarial element of pursuing the

18  adequate accurate predictable price.

19  Q.  And then the ultimate result of that analysis, that

20  actuarial analysis, how is that then used?

21  A.  It's going to go back to the corporate underwriting

22  product management function, who will then use that to take

23  it into their underwriting guidelines and standards

24  definitions and potentially pricing definitions.

25  Q.  I'm sorry.  And then if the underwriting guidelines are

1    written into Blaze Advisor, it gets written there?

2    A.  It comes back to the deployment of the rules.  In this

3    case, in Blaze Advisor.

4    Q.  And this used version 7.1?

5    A.  Correct.

6    Q.  So we've gone through the insurance industry, the

7    process of selling insurance, the applications that use

8    Blaze Advisor, all of your analysis of what they did and

9    why, and the defendants' documents.  Let's use this slide

10   to summarize your overall view.

11   A.  My overall view from a time frame of defendants' use of

12   Blaze Advisor begins in 2006 midyear with the -- with the

13   RFI that says, we've got a corporate growth strategy that

14   now involves a tactic of moving to small and mid-market

15   specialty, and we have -- we recognize that that results in

16   increased transactional volume, which as staffed today, we

17   can't handle.  In addition, our systems are not really

18   built for this segment of the market.  And, oh, by the way,

19   we have a corporate expense strategy that will not allow us

20   to increase staff, so we need to find a way to do this

21   within our existing staff.

22           We that with that RFI, there were a series of

23   events that took place.  Some of them referenced in other

24   testimonies that I have not seen those documents, but I

25   have seen the ultimate license agreement that comes out of

1    that.  Blaze Advisor was licensed to be a technical

2    capability applied to the execution of those tactics.

3    Right?

4            Blaze Advisor was deployed initially through

5    ARP-1 and 2.  That, according to the documents, was a

6    success, and so then they started to -- to do two things.

7    Number one is expand the use of Blaze Advisor.  I believe

8    predictive modeling now came onto the table pretty quickly.

9    But they also went through an internal marketing process to

10   improve the knowledge of concepts of business rules

11   management and decision management in other parts of the

12   organization.

13   Q.  Okay.  And then on this slide we show the applications

14   that were -- all of the applications that ultimately used

15   Blaze Advisor?

16   A.  These are all of the uses of Blaze Advisor.

17   Q.  That we have just gone through.

18           And then were you able -- in your judgment, what

19   was the extent of -- in your judgment, what was the value

20   that the defendants realized using Blaze Advisor in selling

21   insurance?

22   A.  So when I talk about the value, I go back to the quote,

23   "buying, book, issue process."  Can I make things faster?

24   Can I make them more consistent?  Can I be more agile as it

25   respects to the opportunity in the marketplace and to

1    responding to statutory and regulatory changes?  Can I stay

2    more in compliance with both those statutory and those

3    underwriting -- corporate underwriting requirements?  Can I

4    be easier to do business with?  Can I take on -- can I

5    scale?  Can I take on more business with my existing very,

6    very valuable staff?

7            And if I do that, take on more business with my

8    valuable staff, but I reduce the amount of use of human

9    capitol in the "buying, book process," I can now

10   concentrate on agents and brokers and spending time with

11   them in developing that relationship, my conclusion is that

12   Blaze Advisor deployed by agents in some places, not all,

13   added significant value to the defendants' business of

14   selling insurance.

15   Q.  Okay.  And in drawing this judgment about the

16   significant value of selling insurance, do I understand you

17   correctly that the attributes or the features that resulted

18   in the significant value were the ones you just described:

19   Speed, agility, precision and so forth?

20   A.  That is correct.

21   Q.  Did you have -- we saw in some of the slides of the

22   defendants where some other insurance companies had done

23   the work to quantify or measure the improvements that they

24   realized with Blaze Advisor.

25           Did you have that -- any kind of information like

1    that available to you?

2    A.  I did not.

3    Q.  Is it necessary for you to have that kind of

4    quantification of information to draw your judgment that

5    Blaze Advisor added significant value?

6    A.  There are two different questions there in the

7    underwriting world I live in.  The first is, did it?  The

8    second is, how much did it?  Okay?  I had more than enough

9    information, documentation, 10,000-plus pages, to determine

10   that it did it.

11          I don't need a tape measurer or a stopwatch to

12   know that computers executing transactions is faster than

13   humans because I was a human underwriter, and I've worked

14   with many companies to -- to deploy technology into those

15   processes.  I don't know -- I don't need to measure

16   variation in compliance because I know a computer system

17   with a set of facts is going to make the same decision with

18   those facts every time, and I know -- I have been out on

19   underwriting audits and audited underwriting functions --

20   that humans cannot do that.

21   Q.  So overall as a -- overall, Blaze Advisor added

22   significant value in the selling of insurance by the

23   defendants?

24   A.  My opinion is that Blaze Advisor added significant

25   value to the -- to the defendants' process of executing the

 1   "bind, book, issue" which is how I describe the process of

 2   selling insurance where deployed.

 3             MR. HINDERAKER:  Thank you for your time.

 4             THE WITNESS:  You're welcome.

 5             THE COURT:  Ms. Godesky.

 6             MS. GODESKY:  Thank you.

 7             THE WITNESS:  Thank you.  I'm overburdened here.

 8                        **CROSS EXAMINATION**

 9   BY MS. GODESKY:

10   Q.  Good morning, Mr. Whitener.

11   A.  Good morning, Ms. Godesky.

12   Q.  You understand I represent the defendants in this case,

13   right?

14   A.  I do, in fact.

15   Q.  This is your first time testifying as an expert in

16   court, right?

17   A.  That is correct.

18   Q.  So no court or arbitrator has ever qualified you as an

19   expert in rules-based software?

20   A.  This is correct.

21   Q.  Your advanced degree is a college degree from Virginia

22   Commonwealth University where you majored in education,

23   correct?

24   A.  I have a degree in education, a Bachelor of Science

25   from Virginia Commonwealth University.  I struggle with the

```
 1    word "advanced."

 2    Q.  It's a degree in education from Virginia Commonwealth,

 3    right?

 4    A.  That is correct.

 5    Q.  You've never worked for a software company, correct?

 6    A.  Correct.

 7    Q.  And you've never worked as a software developer,

 8    correct?

 9    A.  Mostly correct -- well, no.  I'm sorry.  Correct.

10    Q.  During direct examination beginning of yesterday, you

11    talked about the work you've done at various insurance

12    companies, right?

13    A.  Various insurance companies and various vendors who

14    sell goods and services to the insurance companies.

15    Q.  Okay.  So I want to walk through the chronology of your

16    employment that Mr. Hinderaker took you through and asked

17    you a few different questions.

18            So you were at the Hartford, which is an

19    insurance company, from the late 1970s to the early 1990s?

20    A.  Mid-1993.

21    Q.  Okay.  And you did not do any work with decision

22    management software at that job because the software did

23    not exist in that time period, correct?

24    A.  Correct.

25    Q.  And then you were at the Prudential, which is another
```

1    insurance company, right?

2    A.  Again, correct.

3    Q.  And that was in the mid-1990s?

4    A.  Yes.

5    Q.  And there was no use of decision management software

6    there, correct?

7    A.  As you would define decision management software, that

8    is correct.

9    Q.  The rules software programs we're all here to talk

10   about, right?

11   A.  Correct.

12   Q.  Then you moved on to a mid-sized personal auto

13   insurance company in the late 90's to the early 2000s,

14   right?

15   A.  Correct.

16   Q.  And there was no decision management software

17   experience there because that company had decided to write

18   all of its business rules in code by software engineers,

19   right?

20   A.  Initially, yes.

21   Q.  And you've never been a member of a technology

22   department at an insurance company, correct?

23   A.  Correct.

24   Q.  That means you've never worked as a software engineer

25   or computer developer who writes code for an insurance

1    company, right?

2    A.  Partially correct -- mostly correct.

3    Q.  And you have no experience sitting down and writing

4    rules into computer applications using high-level

5    programming language because to the extent that was

6    happening at the insurance companies you worked at, other

7    people were doing that, correct?

8    A.  Mostly correct.

9    Q.  And you've never been a technology architect for an

10   insurance company, correct?

11   A.  Correct.

12   Q.  Okay.  So then your next job was, you were a

13   business -- you were at a business process outsourcer in

14   Montana in the early 2000s, right?

15   A.  Absolutely correct.

16   Q.  And that company did not use rules-based software?

17   A.  Correct.

18   Q.  Then in the mid-2000s, you joined a midsize property

19   and casualty insurance company called American Reliable,

20   right?

21   A.  Again correct.

22   Q.  And you were there from '04 to '05?

23   A.  Yes.

24   Q.  No decision management software in use at the time you

25   joined, correct?

1    A.  Correct.

2    Q.  And while you were there -- you talked about this on

3    direct a little bit -- you had a role in selecting Duck

4    Creek as the policy administration software for American

5    Reliable, correct?

6    A.  Yes, but I became responsible for the implementation

7    using Duck Creek.

8    Q.  Okay.  And you -- you left, though, after about a year

9    at the company, correct?

10   A.  I believe it was a little closer -- something in that

11   vicinity.

12   Q.  Yeah.  You were only there from '04 to '05, right?

13   A.  Yes.

14   Q.  So you didn't see the implementation of Duck Creek

15   because you moved on?

16   A.  Correct.

17   Q.  And you didn't work with any rules-based software

18   programs while you were at American reliable, like ODM or

19   Blaze or Drools, right?

20   A.  Right.

21   Q.  Then you went to another insurance company, Unitrin

22   Specialty, from '05 to '09, right?

23   A.  Correct.

24   Q.  They sell insurance, but no experience with decision

25   management software at Unitrin, right?

```
1    A.  Correct.

2    Q.  Then you went to a small technology services company

3    called Discoverture Solutions?

4    A.  Correct.

5    Q.  And that position didn't have anything to do with

6    rules-based software?

7    A.  That also is correct.

8    Q.  And so as we've seen over the course of your career,

9    you've worked a few different insurances companies but

10   never at Chubb, right, or ACE?

11   A.  Correct.

12   Q.  And so at the time when you sat down to form your

13   expert opinions in this case -- and your first report,

14   right, Mr. Whitener, was in April of 2019?

15   A.  Correct.

16   Q.  You had never used any decision management software,

17   correct?

18   A.  Agreed.

19   Q.  And that necessarily includes Blaze?

20   A.  That necessarily includes Blaze.

21   Q.  So when you sat down to provide all those expert

22   opinions in this case about the value of Blaze to Chubb,

23   you had never used Blaze or any computer applications that

24   included Blaze, correct?

25   A.  That is correct.
```

1    Q.  You had never used IBM ODM?

2    A.  Correct.

3    Q.  You had never used Drools?

4    A.  Correct.

5    Q.  And you had never used Red Hat Decision Manager?

6    A.  Correct.

7    Q.  So that first report you submitted in this case in

8    April 2019, with all the appendices, it was more than 50

9    pages.  Sound right?

10   A.  I'm fairly certain I can say yes to that one.

11   Q.  And it was all about how Blaze contributes to revenue

12   at Chubb, right?  All the opinions you just offered with

13   Mr. Hinderaker about speed and ease of doing business and

14   agility, correct?

15   A.  Mostly.

16   Q.  But when you wrote those 50 pages of opinions, you

17   could not speak to what Blaze looks like to someone who is

18   going in and using it to implement rules, correct?

19   A.  Correct.

20   Q.  And you had never used a computer application that

21   incorporated Blaze?

22   A.  Correct.

23   Q.  Then about a month later, you did your second report in

24   this case, and that was due in May of 2019, right?

25   A.  Sounds right.

1    Q.  And that was another 25 pages.

2    A.  Okay.

3    Q.  Focused on the value of Blaze to Chubb?

4    A.  Approximately.

5    Q.  Focused on the value of Blaze to Chubb?

6    A.  Again, correct.

7    Q.  So then as of May 2019, you submitted 75 pages of

8    written material about the value of Blaze to Chubb, but you

9    still hadn't seen the process of implementing rules into

10   Blaze, correct?

11   A.  Would you restate the date, please?

12   Q.  As of May 2019, that second report, 75 pages of

13   opinions about the value of Blaze to Chubb, but you still

14   hadn't seen the process of implementing rules, correct?

15   A.  At some point in that time frame, I had been given a

16   demonstration of Blaze by FICO, but I can't date stamp that

17   quite as precisely as you're asking.

18   Q.  Well, you were scheduled to provide sworn deposition

19   testimony in this case on June 27th, 2019.  Does that sound

20   right?

21   A.  Yes.

22   Q.  Okay.  And that's the process the jury has heard about

23   where you have to come to a conference room and sit down,

24   provide sworn testimony about all the opinions you've

25   offered, right?

```
1    A.  Yes.

2    Q.  And you're questioned by Chubb's lawyers for the first

3    time, correct?

4    A.  Correct.

5    Q.  And one day before your deposition about those 75 pages

6    of opinions that you'd offered, FICO's lawyers had you sit

7    down and watch a Webex presentation about Blaze.  Sound

8    right?

9    A.  Mostly.

10   Q.  So that was the first demonstration ever of how Blaze

11   works, and it was done after all your opinions were in,

12   those 75 pages of opinions, right?

13   A.  Yes.

14   Q.  Now, you didn't actually use Blaze during this

15   demonstration.  You weren't coming up with the rules and

16   then putting them into the software yourself.  That was

17   someone at FICO, right?

18   A.  In the demonstration?

19   Q.  Correct.

20   A.  I created a rule.

21   Q.  You created a rule, but mostly it was someone at FICO

22   running the demo, right?

23   A.  Correct.

24   Q.  And the demo was about 90 minutes?

25   A.  I couldn't remember.
```

1    Q.  Why don't you look in the binder in front of you.

2    There is a copy of your deposition transcript from June

3    2019.

4    A.  I'm there.

5    Q.  And why don't we look at page 21 to see if that

6    refreshes your recollection?

7    A.  21 in the box, correct?

8    Q.  Yes, please.

9    A.  Correct.

10   Q.  A 90-minute demonstration?

11   A.  Correct.

12   Q.  Okay.  And that demo is not particular to any

13   particular company's use of Blaze, right?

14   A.  It was not.

15   Q.  And it wasn't specific to the insurance industry in any

16   way?

17   A.  No, it was not.

18   Q.  The demo had nothing to do with Chubb's use of Blaze?

19   A.  Correct.

20   Q.  And, in fact, the demo was actually a college

21   admissions scenario, correct?

22   A.  Yes.

23   Q.  So when you sat down to provide sworn testimony to

24   Chubb's lawyers about these 75 pages of opinions, that

25   90-minute demo on college admission scenarios from FICO was

1    the full extent of your firsthand experience of Blaze,

2    correct?

3    A.  Yes, but --

4    Q.  "Yes" is good enough for now.  Thank you, Mr. Whitener.

5              Do you have a general understanding that

6    peer-reviewed literature is a term that's used for

7    literature that has been read and vetted by people other

8    than those who wrote it?

9    A.  Yes.

10   Q.  And the idea behind peer-reviewed literature is you

11   have someone looking at the publication and vetting your

12   ideas and conclusions to make sure they're sound, right?

13   A.  Yes.

14   Q.  And you have never published any peer-reviewed

15   literature on decision management software or rules

16   software, right?

17   A.  Correct.

18   Q.  And you haven't conducted any studies about the nature

19   and impact of rules software on businesses, correct?

20   A.  I'm sorry.  Restate that, please.

21   Q.  You have not conducted any studies, scientific studies,

22   on the impact of rules software in business, correct?

23   A.  Correct.

24   Q.  And before you rendered your expert opinions in this

25   case about the value of Blaze, you did not read or consider

1    any peer-reviewed literature about the value of rules

2    software, correct?  It's not something you cited.

3    A.  Correct.

4    Q.  And before you rendered your expert opinions in this

5    case, you didn't read or consider any peer-reviewed

6    literature examining the use of using high-level

7    programming language to code rules in businesses, right?

8    A.  Correct.

9    Q.  And you aren't aware of, and you haven't identified,

10   any literature or studies that compare the efficiency of

11   using rules software to the efficiency of having software

12   engineers write code themselves, right?

13   A.  Correct.

14   Q.  Now, before you rendered your expert opinions about all

15   the value that Blaze brought to Chubb, you didn't speak to

16   anyone at Chubb who had actually worked with Blaze, right?

17   A.  Correct.

18   Q.  And you said during direct examination that you read

19   some deposition testimony from witnesses in this case,

20   right?

21   A.  I did.

22   Q.  Those transcripts were sent to you by FICO's lawyers?

23   A.  Yes.

24   Q.  You didn't read every deposition transcript in this

25   case, but you read the ones that they sent you, correct?

1    A.  Correct.

2    Q.  So let's talk about what you reviewed.  You reviewed

3    testimony from Benjamin Baer at FICO, right?

4    A.  Correct.

5    Q.  We've heard from him.  He was one of FICO's first

6    witnesses, and he works in FICO marketing, right?

7    A.  Yes.

8    Q.  You also read testimony from Chris Ivey, he was another

9    witness from FICO in this trial, right, and he talked about

10   all those statements of work with Chubb?

11   A.  Yes.

12   Q.  And then you read the testimony of Lawrence Wachs, a

13   FICO/Blaze salesperson, right?

14   A.  Again correct.

15   Q.  And then you reviewed the deposition testimony of one

16   witness from Chubb, right?  That's Henry Mirolyuz.

17   A.  No.  There were two depositions.

18   Q.  That was the only Chubb witness whose deposition

19   transcript FICO's lawyers sent you, correct?

20   A.  Correct.

21   Q.  And before you rendered all your opinions about the

22   value of Blaze to Chubb, you didn't review the testimony of

23   Mr. Claudio Ghislanzoni, correct?

24   A.  Correct.

25   Q.  Nor the testimony of Mr. Ramesh Pandey, correct?

1    A.  Correct.

2    Q.  And you also didn't review the testimony of any Chubb

3    underwriters, right, folks like Alissa Theberge or Mike

4    Schraer, right?

5    A.  Correct.

6    Q.  And you didn't read the testimony of anyone at Chubb

7    involved in the process of writing rules using Blaze, like

8    Ellen Garnes?

9    A.  Correct.

10   Q.  Before you rendered your opinions in 1029, you also

11   didn't speak to any other people in the insurance industry,

12   people at companies other than Chubb, about their

13   experiences with Blaze or decision management software?

14   A.  Correct.

15   Q.  You didn't do a formal survey, right?

16   A.  Correct.

17   Q.  And you didn't have any informal conversations either,

18   correct?

19   A.  Correct.

20   Q.  Now, we saw some anecdotes about how other insurance

21   companies use Blaze.  Mr. Hinderaker showed you that on the

22   screen, right?

23   A.  Yes.

24   Q.  We're going to come back to that, but before you

25   rendered your expert opinions, you didn't try to do a study

1    examination how the country's largest insurance companies

2    are using rules-based software as opposed to coding by

3    software engineers, right?

4    A.  Correct.

5    Q.  You also haven't conducted any survey of FICO's

6    customers regarding their experience with Blaze, right?

7    A.  Correct.

8    Q.  And you haven't spoken to other rules software vendors

9    about their software programs, correct?

10   A.  Mostly correct.

11   Q.  Now, Mr. Whitener, as a general baseline, based on your

12   direct testimony, I'm assuming we can agree that the

13   insurance business is complex, right?

14   A.  I have described it that way before.  There are aspects

15   that are very, very simple, but generally speaking, it is a

16   complex industry.

17   Q.  Okay.  And I want to talk about some of the factors

18   that drive an insurance company's ability to earn revenue,

19   okay?  So the relationship between a broker and an agent,

20   on one hand, and the insurance company on the other, that

21   can affect where customers want to buy their insurance,

22   right?

23   A.  Yes.

24   Q.  And Blaze doesn't have anything to do with the

25   interpersonal relationships that Chubb employees build with

 1    brokers and agents, right?

 2    A.  Mostly correct.

 3    Q.  Blaze isn't taking people out to the ball game or out

 4    to dinner or a networking lunch, right?

 5    A.  Correct.

 6    Q.  And the insurance products that a company sells are

 7    also part of what determines the success of an insurance

 8    company, right?

 9    A.  Yes.

10    Q.  Can be a meaningful contributor to what makes a company

11    successful, right?

12    A.  Without products, there is no revenue, correct.

13    Q.  And insurance products are developed based on the

14    expertise of the insurance company and the know-how of the

15    people who work there, correct?

16    A.  In combination with statutory requirements of the

17    states in which they decided to do business and the state

18    requirements for the products they decided.

19    Q.  Fair enough.  And you have not identified any

20    particular insurance product that was specifically

21    developed at Chubb because of Blaze, right?

22    A.  Correct.

23    Q.  An error-free billing process is also an important

24    factor in attracting customers to an insurance company,

25    right?

1    A.  I would say that different, but it is an important

2    factor.

3    Q.  And Blaze has no role in Chubb's billing process,

4    right?

5    A.  I saw no documentation that indicated that.

6    Q.  Meaning you haven't seen anything connecting Blaze to

7    billing?

8    A.  Correct.

9    Q.  It's also very important that an insurance company have

10   a strong process for handling claims once they come in,

11   right?

12   A.  Correct.

13   Q.  And that's because brokers and agents aren't going to

14   have any desire to sell policies on behalf of insurance

15   companies that's not efficiently handling claims, right?

16   A.  Correct.

17   Q.  And it's important that an insurance company pays the

18   right amount of money when a claim comes in, and they do so

19   pretty fast?

20   A.  I'm going to say it slightly differently.  It is

21   important that insurance companies pay the right amount,

22   and it's important that they get that right amount to the

23   policyholder quickly.

24   Q.  And Blaze, I think as you said during your direct

25   examination, was not used in the claims handling side of

1    Chubb at all, right?

2    A.  Correct.

3    Q.  Underwriting is another aspect of how insurance

4    companies make money.  You were an underwriter, right?

5    A.  I was, yes.

6    Q.  And from your experience as an underwriter, you know

7    that your personal human judgment is crucial to the

8    performance and execution of your duties as an underwriter,

9    right?

10   A.  I'm not sure I agree with it.

11   Q.  Okay.  Let's look at your deposition transcript at page

12   47.

13   A.  Certainly.

14   Q.  And if I could direct you to page 47, line 7.  Let me

15   know when you're there.

16   A.  Patience, counselor.

17          I'm there.

18   Q.  You were asked at your deposition "Question:  Your

19   personal judgment was crucial in the performance of your

20   underwriting duties, correct?"

21          "Answer:  Yes."

22          That was your testimony at your deposition,

23   right?

24   A.  Yes.

25   Q.  Your emotional quotient or your emotional intelligence

```
1    was also crucial to your work as an underwriter, right?

2    A.  Yes.

3    Q.  And Blaze doesn't improve underwriters' ability to

4    exercise emotional intelligence and connect with people,

5    right?

6    A.  Yes, but --

7    Q.  I'll take the "yes," thank you.

8           Let's focus on the technology aspects of running

9    an insurance company.  You understand that Chubb uses many,

10   many different technologies to sell insurance, right?

11   A.  Yes.

12   Q.  Now, Mr. Hinderaker made a point of opening your

13   testimony this morning by pointing out that Duck Creek

14   technology was located in the CSI Express application

15   before Chubb purchased its license to use Blaze.  Do you

16   remember that?

17   A.  I do.

18   Q.  But before you rendered your expert opinions in this

19   case about the so-called importance of Blaze, you didn't do

20   anything to investigate how many other technologies were

21   deployed at the same time as Blaze at Chubb, correct?

22   A.  Correct.

23   Q.  And, in fact, at the time you rendered your expert

24   report and gave all these opinions, you denied that Chubb

25   could possibly be using hundreds of other technologies in
```

1    addition to Blaze, right?

2    A.  Yes.

3    Q.  You said, wow, you know, I haven't seen that holy-cow

4    number, right, that there would be more than 100 different

5    technologies, right?

6    A.  Correct.

7    Q.  But now you've seen testimony from Mr. Pandey and

8    Mr. Ghislanzoni confirming that there were hundreds of

9    other technologies in use, right?

10   A.  I have.

11   Q.  And you didn't consider that at all before you wrote

12   those 75 pages of opinions about the value of Blaze to

13   Chubb, correct?

14   A.  Correct.

15   Q.  And you also have not done anything to measure the

16   relative contribution that Blaze made to all these things

17   like speed, ease of doing business, agility, as compared to

18   the benefits that Chubb got from other technologies, right?

19   You didn't look into that.

20   A.  Correct.

21   Q.  And certainly technologies other than Blaze are

22   contributing to Chubb's ability to acquire revenue, right?

23   A.  Yes.

24   Q.  But you haven't made any effort to determine how much

25   of a direct contribution those other technologies are

1    making to revenue, right?  You haven't looked at that.

2    A.  Correct.

3    Q.  Now, the jury heard Mr. Ramesh Pandey talk about how

4    Duck Creek is the brain of CSI Express.  And you heard

5    that, too, right?

6    A.  I did.

7    Q.  But you didn't do anything to figure out how much Blaze

8    is contributing to CSI Express relative to Duck Creek,

9    correct?

10   A.  Correct.

11   Q.  And that same would be true for the CUW-IM application,

12   right?  You didn't do anything to examine, well, how much

13   is Blaze doing in CUW-IM as compared to the other

14   dozen-plus technologies, right?  You didn't look at that?

15   A.  Correct.

16   Q.  You talked about the rules that were in place at Chubb,

17   right?

18   A.  Yes.

19   Q.  And you understand, though, that when Blaze was used at

20   Chubb, it did not process all of the rules that Chubb was

21   running in the course of selling insurance, right?

22   A.  Yes.

23   Q.  And I think you said yesterday that when you sat down

24   to review the actual rules that Chubb was running, you

25   wanted to make sure that your thoughts about them made

1    sense, so you spoke with a consultant, right, a Brian

2    Sacco?

3    A.   Brian Sacco.

4    Q.   Sacco.  And you characterized him as someone who is

5    highly knowledgeable about rule repositories, right?

6    A.   I did.

7    Q.   And you spoke to Mr. Sacco because you personally are

8    not someone who is highly knowledgeable about rule

9    repositories.  That's why you needed to talk to him, right?

10   A.   Yes.

11   Q.   And before you rendered all your expert opinions in

12   this case, you didn't do anything to investigate how many

13   other rules Chubb was running in its business, right?  You

14   said it would be pure, unadulterated speculation for you to

15   try to figure out how many non-Blaze rules Chubb was

16   running.

17   A.   I did.

18   Q.   So in offering all these opinions about the value of

19   Blaze to Chubb, you didn't do anything to examine the rate

20   at which the Blaze technology was adopted at Chubb, right?

21   You didn't look at how many rules were they deciding to run

22   with Blaze versus how many rules are they having software

23   engineers write.  You didn't run that comparison.

24   A.   That is correct.

25   Q.   Now, when Chubb uses Blaze in the selling of insurance,

1    the process of defining the rules is decided and

2    articulated by people at Chubb, not people at FICO, right?

3    A.  Yes.

4    Q.  And the process of defining rules, you know from your

5    years in the insurance industry, takes substantial

6    experience, right?

7    A.  Yes.

8    Q.  If the rules do not accurately reflect an insurance

9    company's risk appetite and its view of what's an adequate

10   premium to charge, the result is, you're going to lose

11   money, right?

12   A.  I would say that the result is negative things are

13   going to happen, which usually leads to that conclusion.

14   Q.  Without good rules, Mr. Whitener, an insurance company

15   cannot make money, right?

16   A.  Correct.

17   Q.  And to the extent rules are being used to speed things

18   up, speed is only good if you're speeding up decisions that

19   are good for the insurance company, right?

20   A.  I agree.

21   Q.  If you're making a lot of quick decisions to bind and

22   renew policies that are not profitable, that's not a good

23   thing.

24   A.  Agreed.

25   Q.  Now, you also spoke on direct about how Blaze can

 1    increase speed compared to having software engineers

 2    programming the code themselves, right?  So-called hard

 3    coding by some.

 4    A.  Or professional coding, as it was described.

 5    Q.  Or professional coding, right?

 6              Vanessa, can we pull up slide 23, please, from

 7    Mr. Whitener's presentation?  Thank you.

 8              This is one of the slides you showed the jury

 9    during your direct examination, right?

10    A.  It is.

11    Q.  And you wrote -- under hard-coding the rules, you

12    wrote, "Hard coding requires substantial IT resources to

13    write business rules and changes to business rules in

14    computer language into application software."  Do you see

15    that?

16    A.  I do.

17    Q.  But you don't have any evidence that when folks at

18    Chubb used Blaze, they were able to stop using IT sources,

19    right?

20    A.  Correct.

21    Q.  And, in fact, you heard Mr. Pandey and Mr. Ghislanzoni

22    explain from the perspective of Chubb architects that the

23    Chubb business folks weren't able to write rules into

24    Blaze, right?  You heard that.

25    A.  Yes, but --

```
1    Q.  You didn't consider that testimony from Mr. Pandey or

2    Mr. Ghislanzoni before you offered expert opinions in this

3    case, correct?  You didn't read their testimony?

4    A.  Correct.

5    Q.  And you, of course, don't have any personal knowledge

6    of the IT infrastructure at Chubb that would allow you to

7    say, oh, no, the business people are writing all the rules,

8    correct?

9    A.  Oh, absolutely correct.

10            MS. GODESKY:  Thank you, Vanessa.  We can take

11   that down.

12   BY MS. GODESKY:

13   Q.  Now, on this topic of your opinion that Chubb realized

14   benefits from Blaze by increasing speed, you don't know

15   whether Blaze actually increased the speed of responding to

16   requests for quotes, correct?

17   A.  I know that it increased speed.  I do not know

18   precisely how much it increased speed.

19   Q.  Let's look at your deposition transcript at page 135.

20   A.  In the box, correct?

21   Q.  Please.

22   A.  Bear with me.

23            I'm there.

24   Q.  So at page 135, line 14, the question was, "Do you know

25   whether Blaze increased the speed of response to quote
```

1    requests in Federal?

2            "Answer:  I performed no quantitative analysis in

3    this process, no.  I do not know."

4            That was your testimony, correct, Mr. Whitener?

5    A.  Correct.

6    Q.  And you also can't say whether Chubb was actually able

7    to increase its speed of making renewal offers to

8    customers, correct?

9    A.  Based on the same premise, I understand -- I understand

10   that the renewal does not have to go to a human, it gets

11   done faster.

12   Q.  Mr. Whitener, you do not know whether Chubb increased

13   the speed of making renewal offers because of Blaze,

14   correct?

15   A.  I do not know how much.

16   Q.  Let's look at your deposition transcript at page 135.

17   A.  I'm there.

18   Q.  Actually, let's look at 136, line 8.

19   A.  I'm there.

20   Q.  "Question:  So you just don't know whether Federal

21   increased the speed of making renewal offers because of its

22   use of Blaze, correct?

23            "Answer:  That is correct."

24            That was your testimony back in 2019, correct?

25   A.  Yes, but --

1    Q.  The "yes" is fine.  Thank you.

2    A.  You're welcome.

3    Q.  And you also don't know, Mr. Whitener, whether Blaze

4    actually allowed Chubb to increase its speed to market by

5    ensuring compliance with all those reporting requirements

6    you talked about, correct?

7    A.  Yes, but --

8    Q.  The answer is yes, right, Mr. Whitener?

9    A.  Yes.

10   Q.  Now, you talked on direct examination, and we saw on

11   the slide, your opinion that Blaze improved the ease of

12   doing business at Chubb, right?

13   A.  Yes.

14   Q.  But you did not try to quantify in this case whether

15   Blaze actually improved Chubb's ease of doing business,

16   correct?

17   A.  Yes.  Allow me to point out, I quantified.  I measured

18   none of these things.

19   Q.  You don't know whether Chubb increased the ease of use

20   for agents and brokers by using Blaze in certain

21   applications.  You don't know that, right?

22   A.  I don't know how much.

23   Q.  You don't know that they did, correct?

24   A.  Yes, but --

25   Q.  Mr. Whitener, let's look at your deposition testimony

1    from June at page 140.

2    A.  I'm there.

3    Q.  Page 40 [sic], line 25, you were asked --

4    A.  Counsel -- I'm sorry.  Go ahead.

5    Q.  "Is it correct to say that you do not know whether

6    Federal increased its ease of use for agents and brokers by

7    way of those three bullet points?"  And those were your

8    bullet points about the value of Blaze, right?

9             And you answered, "That is correct."  That was

10   your testimony, correct?

11   A.  Counselor, I'm at page 140.

12   Q.  Yes.

13   A.  Is that where you are?

14   Q.  Yes.  At line 25?

15   A.  I'm sorry.  I'm on the wrong line.

16   Q.  You were asked, "Is it correct to say that you do not

17   know whether Federal increased the ease of use for agents

18   and brokers by way of those three bullet points," and that

19   was a reference to all your opinions, right?

20   A.  You are correct.

21   Q.  And your answer was, "You are correct."  Right?

22   A.  You are correct.

23   Q.  You also testified on direct examination, and we saw

24   the slides about how Blaze allowed Chubb to precisely price

25   its policies, right?  That was another thing you talked

1    about with Mr. Hinderaker.

2    A.  Yes.

3    Q.  But you did not measure in this case whether Blaze

4    actually improved Chubb's ability to define accurate and

5    adequate pricing, right?

6    A.  Correct.

7    Q.  And you can't speak at all to whether Chubb actually

8    increased the precision and accuracy of its quotes to

9    customers?

10   A.  Correct.

11   Q.  You also don't know whether Chubb increased the

12   precision and adequacy of its renewal offers, do you?

13   A.  Correct, but --

14   Q.  It's correct, right?

15   A.  Correct.

16   Q.  There was also talk during your direct examination

17   about how the benefits of Blaze allowed Chubb to grow in

18   the Small Commercial and mid-market segments.  Do you

19   remember that?

20   A.  I do.

21   Q.  But you don't know whether it's, in fact, true that

22   Chubb grew in the Small Commercial and mid-market segments

23   because of Blaze, right?  You can't say that.

24   A.  Correct.

25   Q.  Vanessa, if we could put up slide 37, please.

1      This is another slide you showed the jury during

2   your direct examination, right?

3   A.  It is.

4   Q.  And there is this quote, "Technology is a competitive

5   weapon."  And you said, oh, yes, you know, from my

6   examination of the document, Chubb agrees with that, right?

7   A.  Yes.

8   Q.  This is a discussion about a particular segment of the

9   Chubb business where 80 percent or more of submissions were

10  not touched by humans as reported in this document, right?

11  A.  Yes.

12  Q.  You understand from sitting through this trial that

13  this comment has nothing to do with Blaze, right?  This is

14  a discussion about a different area at Chubb that used Duck

15  Creek technology, right?

16  A.  I wasn't, but yes.

17  Q.  You have no reason to believe this is a reference to

18  Blaze Advisor software, correct?

19  A.  No.  I believe it's a general statement by the CEO.

20         MS. GODESKY:  Your Honor, I'm about to switch

21  topics, if it's a good time to break.

22         THE COURT:  Let's keep going a few more minutes.

23  Got about eight minutes.

24         MS. GODESKY:  Okay.

25  BY MS. GODESKY:

```
 1    Q.  Mr. Whitener, during direct examination, you walked us

 2        through all the computer applications that you say use

 3        Blaze, right?

 4    A.  Yes.

 5    Q.  You have never used any of those computer applications?

 6    A.  Correct.

 7    Q.  Let's start with CSI Express.  CSI Express is a policy

 8        administration system, right?

 9    A.  It is.

10    Q.  And like pretty much every policy administration

11        system, it's complex, correct?

12    A.  Correct.

13    Q.  It involves many different technologies?

14    A.  It does.

15    Q.  But before you rendered all your opinions in this case

16        about the value of Blaze and CSI Express, you didn't do

17        anything to measure how significant a part of CSI Express

18        Blaze is, right?

19    A.  Yes.

20    Q.  You have not done any analysis of what amount of

21        improvement to speed, ease of doing business or adequacy of

22        pricing is attributable to Blaze in CSI Express as opposed

23        to the application as a whole, correct?

24    A.  Correct.

25    Q.  That was outside the scope of the responsibilities you
```

1    had in this case, right?

2    A.  Correct.

3    Q.  In fact, before rendering expert opinions in this case,

4    you spent less than one second reviewing the components of

5    CSI Express that had nothing to do with Blaze, correct?

6    A.  Correct.

7    Q.  And you spoke a lot on direct examination about how

8    Blaze must have brought speed to CSI Express, but you

9    haven't done any work to try to determine whether you're

10   talking about one day, two days or hours, right?

11   A.  You are correct.

12   Q.  You didn't look at that.

13   A.  Correct.

14   Q.  And also in the context of CSI Express, you do not know

15   whether CSI Express actually increased the speed of

16   response to requests for quotes at Chubb, right?

17   A.  Yes, but --

18   Q.  You do not know, right, Mr. Whitener?

19   A.  Yes.

20   Q.  You don't know.

21   A.  Yes.

22   Q.  And you do not know whether the speed of making renewal

23   offers through CSI Express was actually increased because

24   of Blaze.  You cannot say that, right?

25   A.  I cannot say how much.  I can say I believe it was.

1    Q.  Mr. Whitener, before rendering all your opinions in

2    this case, you gave zero thought to whether you could have

3    measured all this contribution to speed that you say is

4    attributable to Blaze, correct?

5    A.  Zero?

6    Q.  Zero.  Sound right?

7    A.  No.  I took zero action based on those thoughts.

8    Q.  Let's look at your deposition page 153.

9    A.  I'm there.

10   Q.  Line 19.  "Question:  In your mind, would it be even

11   possible to measure the contribution that Blaze has to the

12   speed that you've discussed CSI Express creating?

13           "Answer:  Having had the privilege of giving that

14   question zero thought, I can't answer it."

15           That's the testimony you gave, correct?

16   A.  It is.

17   Q.  Let's talk about Profitability Indicator.  That's

18   another application you talked about, correct?

19   A.  Correct.

20   Q.  And you said it increased speed relating to renewals in

21   response to requests for quotes, correct?

22   A.  I'm sorry.  Repeat that.

23   Q.  You talked about how it increases speed because of

24   Blaze, right?

25   A.  I did.

1    Q.  And Profitability Indicator is part of the CSI Express

2    application?

3    A.  It is.

4    Q.  Counted as a separate application on your direct

5    examination, but it's part of CSI Express, right?

6    A.  It is an additional application deployed inside of CSI

7    Express.

8    Q.  And you don't know whether Profitability Indicator,

9    including Blaze, actually contributed to increased

10   revenues, right?

11   A.  Excuse me.  I didn't -- yes, I did not measure

12   anything.

13   Q.  Let's move on to DecisionPoint.  You talked about all

14   of the value that Blaze brought to DecisionPoint during

15   your direct examination, right?

16   A.  Yes.

17   Q.  And DecisionPoint, just like Profitability Indicator,

18   is part of CSI Express, correct?

19   A.  Yes.

20   Q.  You're sort of counting it separately on your slides,

21   right?

22   A.  Yes.

23   Q.  You don't know whether DecisionPoint actually

24   contributed to revenue at Chubb, correct?

25   A.  Yes, but --

```
 1    Q.  It's correct, right, Mr. Whitener?

 2    A.  Yes.

 3    Q.  Next up was Evolution.  Based on your review of the

 4    record in this case, you agree that Evolution uses many

 5    different technologies in addition to Blaze, right?

 6    A.  Yes.

 7    Q.  And you do not know whether the speed of response to

 8    quotes or requests for renewal were actually increasing

 9    because of Blaze, right?

10    A.  Yes, but -- yes.

11    Q.  You don't know?

12    A.  Yes.

13    Q.  And you haven't done anything to determine whether the

14    use of Blaze in Evolution actually improved the

15    availability of underwriting, correct?

16    A.  Correct.

17    Q.  Then you talked about Adapt.  Adapt is a policy

18    administration system, right?

19    A.  It is.

20    Q.  It is complex, correct?

21    A.  Yes.

22    Q.  And you cannot say whether any of the benefits that you

23    talked about on direct examination with Mr. Hinderaker were

24    actually realized by Chubb, correct?

25    A.  Correct.
```

1    Q.  Cornerstone is another policy administration system for

2    all those surety bonds, right?

3    A.  Correct.

4    Q.  Also complex.

5    A.  Correct.

6    Q.  And you don't know whether any of the benefits that you

7    spoke about on direct examination were actually realized by

8    Chubb because of Blaze, correct?

9    A.  Yes.

10   Q.  Then we have these compliance systems.  Premium Booking

11   is one of them, right?

12   A.  Yes.

13   Q.  That's also in CSI Express, right?

14   A.  Yes.

15   Q.  And the process underlying the Premium Booking

16   application used at Chubb is complex.

17   A.  Yes.

18   Q.  But before rendering all your expert opinions about the

19   value of Blaze and Premium Booking, you didn't do anything

20   to investigate what systems and software other than Blaze

21   are used in Premium Booking, correct?

22   A.  Correct.

23   Q.  And you haven't conducted any analysis to determine

24   whether Premium Booking actually enabled Chubb to bring new

25   products to market faster, right?

1    A.  Correct.

2    Q.  And you haven't done any analysis to determine whether

3    Blaze's incorporation in Premium Booking meant that Chubb

4    could report data for their new products faster, right?

5    A.  Correct.

6    Q.  Next was TAPS, the Texas Accident Prevention System.

7    And you are aware that witnesses have testified in this

8    case that the function Blaze performed in TAPS could have

9    just as easily have been performed by an Excel spreadsheet,

10   right?

11   A.  Yes.

12   Q.  You can't speak to whether or not that's true.  You

13   don't know.

14   A.  I know that the documents say that.

15   Q.  But you agree, it's certainly possible that other

16   software could have been used in TAPS to perform exactly

17   the same function as Blaze, right?

18   A.  Yes.

19   Q.  And you don't know whether Blaze's inclusion in TAPS is

20   what actually ensured that each policy written in the

21   workers' compensation line of business at Chubb was in

22   compliance with Texas regulations, correct?

23   A.  May I ask you to restate?

24   Q.  You don't know whether Blaze's inclusion in TAPS is

25   what was actually ensuring that all of these workers' comp

1    insurance policies satisfied Texas regulations, correct?

2    A.  Correct.

3    Q.  Then you talked about IRMA.  You have not determined

4    whether IRMA actually contributes to revenue at Chubb by

5    ensuring that quoted and issued policies are compliant,

6    right?

7    A.  Correct.

8    Q.  Then there was CUW inventory management.  That was

9    another application you walked us through, correct?

10   A.  Yes.

11   Q.  It uses many different technologies, right,

12   Mr. Whitener?

13   A.  If you're referring to CUW, that is correct.

14   Q.  And you cannot say anything as to whether the inclusion

15   of Blaze in CUW-IM actually accelerated inventory

16   management at Chubb, correct?

17   A.  Correct.

18             THE COURT:  Ms. Godesky, are you still at a

19   convenient breaking point?

20             MS. GODESKY:  Sure.

21             THE COURT:  Or --

22             MS. GODESKY:  Yeah, it's fine.  Thank you.

23             THE COURT:  All right.  Members of the Jury,

24   we're take our lunchtime recess.  Be back in the courtroom

25   at one o'clock.

```
 1              THE CLERK:  All rise for the jury.

 2                       (Jury exits.)

 3

 4

 5          (In open court without the Jury present.)

 6              THE COURT:  See you at ten to 1:00.

 7              ( Lunch recess.)

 8     Wednesday Afternoon Session of Fair Isaac versus Federal

 9

10                       12:56 p.m.

11                      IN OPEN COURT

12                    (JURY NOT PRESENT)

13              THE COURT:  All right.  A housekeeping matter,

14     just so you know, we may -- well, we'll just get going.

15              I'm going to lay down some guidance for the

16     parties with respect to Mr. Waid's testimony and tell you

17     what I see in the demonstrative slides, and then there's a

18     group of slides I have a question about.

19              So just by way of general guidance -- and,

20     Mr. Waid, you need to be heads up on this too.

21              During your testimony you can't use the phrase

22     "hypothetical negotiation."  You can be asked and you can

23     respond to questions about negotiating a license that is

24     four years in duration.

25              I'm going to prohibit counsel from using the
```

```
 1          phrase "transitional or bridge license" because of the way

 2          that connects to the question of infringement and breach of

 3          contract.  That said, it is a fact and you can certainly

 4          discuss the fact that the license is terminated.  And the

 5          parties are now -- well, if they were to negotiate a

 6          license for four years.

 7                    MR. HINDERAKER:  Or whatever the right period is.

 8                    THE COURT:  Whatever the right period is.  I

 9          mean, it's from stem to stern, it's approximately four

10          years.  Different applications are different lengths.  So I

11          think the best approach is four years.

12                    MS. GODESKY:  Your Honor, may I just clarify

13          something on that?

14                    THE COURT:  Sure.

15                    MS. GODESKY:  So there's different elements to

16          this claim, and so they have the four-year scenario for,

17          you know, the enterprise ACE entity.

18                    THE COURT:  Right.

19                    MS. GODESKY:  But then there's also this question

20          of -- and I think the question that's presented to the jury

21          is, what would have been the fair market value of a license

22          that would have covered use by Chubb Canada, Chubb Europe

23          and Chubb Australia from 2006 to 2016, under the scenario

24          where they weren't included in the first place, right, and

25          so they are seeking ten years there.
```

1    THE COURT:  But how is -- given that the court

2    has found no territorial restriction in the license, and

3    they are not a third party, so what's the, why is that

4    ten-year period at issue?

5    MS. GODESKY:  I am under the impression that they

6    are -- you're asserting a breach of contract claim.

7    THE COURT:  Okay.

8    MS. GODESKY:  Based on --

9    THE COURT:  They're a third party based on the

10   client definition?

11   MS. GODESKY:  Yes.  And so Mr. Waid's slides

12   include ten-year periods that the, those international

13   affiliates, right, were using Blaze in their particular

14   applications.  And so, you know, this isn't just about

15   hypothetical negotiation in 2016 post-termination.

16   There's also a huge driver of the numbers here is

17   hypothetical negotiation sitting there in 2006, also

18   including these three Chubb affiliates that they say

19   weren't included in the original license.

20   THE COURT:  Based on the definition of "client."

21   MS. GODESKY:  Correct.

22   MR. HINDERAKER:  I think the plaintiff should

23   also get a chance to restate the plaintiff's claims.

24   The definition of client is one element of it,

25   which depends on whether those foreign insurance companies

```
 1    are subsidiaries or not.  Also a different element of it is
 2    paragraph 3.1 of the license agreement says, "Only
 3    employees of Chubb & Son may use Blaze Advisor."
 4            We learned yesterday from Mr. Taylor that no
 5    employees of Chubb & Son are outside of the United States
 6    of America.
 7            So the client, we have -- there's different
 8    routes to the same result.  It is part of FICO's claim that
 9    the use for those many years outside of the United States
10    was a violation of the license agreement.
11            THE COURT:  Okay.  Yep.
12            And so for that then you're going to have to be
13    clear about negotiating a license for that use for that
14    period.  Okay?  Again, we're not going to call it a
15    hypothetical -- you guys aren't calling it a hypothetical
16    negotiation.
17            And it will, of course, be made clear, it needs
18    to be clear, that the basis for that claim is not a
19    territorial restriction.
20            MR. HINDERAKER:  Exactly so.
21            THE COURT:  Understood?
22            MR. HINDERAKER:  Can I ask one other question,
23    Your Honor?
24            THE COURT:  You may.
25            MR. HINDERAKER:  I have used, you know, as you
```

 1    know from our letters on this issue, I have used the word

 2    "transition license," because it was a word that

 3    Mr. Schreiber used, kind of an industry term.  I'm happy to

 4    use -- and in my judgment a transition license is exactly

 5    the license that you have described, one license that's

 6    come to a conclusion, and it's now necessary to negotiate

 7    another license for a period of years.

 8              I'm happy to use whatever term the court finds

 9    appropriate.

10              THE COURT:  There is no way around the notion

11    that the jury is going to understand that that license

12    period occurs after the putative end of the first license.

13    And so that fact just is not capable of being kept from the

14    jury.

15              MR. HINDERAKER:  All right.

16              THE COURT:  I'm asking you to not use the phrase

17    "transitional" or "bridge," though frankly they may well

18    use that in their own heads.

19              MR. HINDERAKER:  Yeah.  I'm happy to use any

20    word.  Is there just not a shorthand phrase to use,

21    apparently, is what we're saying.

22              THE COURT:  Precisely.

23              MR. HINDERAKER:  I see.  Fine.  That's fine too.

24              I don't know if we should -- what I'm thinking

25    about is, I think some of the slides have -- I'd have to

```
 1         look at the slides.
 2              THE COURT:  Yeah, a few of them do, and they will
 3         have to take the word "transitional" off.
 4              MR. HINDERAKER:  Yeah, I'm happy with the --
 5              THE COURT:  Right.
 6              MR. HINDERAKER:  I'm just trying to be straight
 7         up.
 8              THE COURT:  Yep.  No.  I appreciate it.
 9              MS. GODESKY:  Your Honor, may I?
10              THE COURT:  Hang on.  No.  Let me finish.
11              MS. GODESKY:  Oh, sorry.
12              THE COURT:  When you're talking about the
13         negotiation or the things that would go into this
14         hypothetical license, the fact witnesses, Mr. Waid, is
15         allowed to discuss the factors that FICO would consider in
16         those negotiations.  He may discuss factors that he has
17         observed the other side of the table to consider, but you
18         have to have the foundation to say that.
19              Not what would I consider if I were them, but
20         what have I seen them consider.  That can all come in.
21              That said, let me turn to the pricing
22         methodology, and I'm going to jump to sort of the end of
23         it, and then I will hear what you have to say about whether
24         it was disclosed.
25              In my view, slides 28 through 40 cannot be used
```

```
 1   because you can't connect the pricing methodology through a

 2   witness to the Chubb use.  Mr. Waid can testify to that

 3   pricing methodology, how it works, how it's supplied, and

 4   you can testify to math.  Okay?  This plus this equals

 5   that.

 6           You just cannot connect it to Chubb, because then

 7   you are, in my judgment, presenting the damages analysis

 8   that was excluded that was included in Zoltowski's report.

 9           Having said that, so in my judgment slide 27 can

10   come in or can be shown.  And you can explain the various

11   components as they -- I'm trying to describe this

12   carefully.  So you can say that 15 or 10 of the Chubb

13   applications were large, two of them were very large.  You

14   can explain the facts about Chubb's usage.  The witness

15   can't connect those two dots.

16           And in final argument, you can only connect those

17   dots by arguing that that is what a willing buyer and

18   seller would have agreed upon.  It's argument.  The jury is

19   free to disagree with you.

20           So, Ms. Godesky, now what was your point or

21   question?

22           MS. GODESKY:  I apologize for interrupting.  I

23   okay.  Thought you were summoning the jury.

24           THE COURT:  No.  No.

25           MS. GODESKY:  My other issue, Your Honor, was
```

1    just with these slides that talk about transition license

2    negotiations, and one of the entries is, "Level of effort

3    to/impact of stopping use."  And then there's a sliding

4    scale as to whether the customer can turn Blaze off

5    immediately or if it's going to be time consuming and

6    significant.  And that is --

7              THE COURT:  Which slide is that?

8              MS. GODESKY:  There's an example of it on slide

9    41.

10             THE COURT:  I don't have that printed in front of

11   me, but go ahead.

12             MS. GODESKY:  My concern is just that that takes

13   us out of willing buyer, willing seller land into world

14   where the buyer is under threat of, if you don't buy this

15   license, you know, we're going to sue you for breach or sue

16   you for copyright infringement.  That is how I understand

17   this entry on that slide.

18             THE COURT:  I don't necessarily understand it

19   that way.

20             But, Mr. Hinderaker, go ahead.

21             MR. HINDERAKER:  Mr. Waid will -- Mr. Waid's

22   understanding of that element is nothing, is 180 degrees

23   from Ms. Godesky's understanding of that element.

24             There are some circumstances and some clients in

25   his experience where he's encountered that it is FICO, more

 1      FICO support to the client.  It is useful to the client to

 2      make this, to remove Blaze Advisor from, from their systems

 3      by the end of the term.

 4              And if there is more, if there is some extended

 5      support that's required, some level of effort in that, well

 6      then that affects the price.  If there's not, then it

 7      doesn't affect the price.  It has nothing to do with any

 8      putative or infringing nature of the circumstances.

 9              It's just one of the things that he's

10      experienced.  In his experience, he has clients that say I

11      want to move off of Blaze Advisor.  Let's figure out a term

12      for that and how to do it.  And sometimes FICO's services

13      are useful to the client to do that.  That's a fact.

14              THE COURT:  And I understand it that same way.  I

15      would contextualize it by saying, when you are entering

16      into negotiations for a license that has a known fixed

17      term, which is our hypothetical negotiation, one of the

18      factors that the parties might discuss is knowing that the

19      term is four years and what are you going to do to extract

20      the software.

21              Those are factors that I would think they would

22      negotiate over.

23              MR. HINDERAKER:  And in fact have.

24              THE COURT:  Yeah.  The only other issue with

25      respect to this -- well, I think that's sufficient.  Okay.

1          MR. HINDERAKER:  Yeah, and then I think there's

2     been -- there was a challenge to 43.  This is Mr. Waid's

3     experience that these various factors have different

4     influencing weight, you know, on his negotiations, have had

5     different influencing weight on his negotiations.

6          And so this isn't, this is just testifying to his

7     experience and how those factors have played out.

8          THE COURT:  Understood.

9          Ms. Godesky, on those slides.

10         MS. GODESKY:  It's because the same language I

11    just pointed Your Honor to was on that slide as well, so --

12         THE COURT:  Understood.

13         So take off the phrase "transition license

14    negotiations" and maybe insert "fixed term license

15    negotiations," if you can.

16         MR. HINDERAKER:  Well, we're certainly going to

17    do business -- are we on, which slide are you on, Your

18    Honor?

19         THE COURT:  Well, I was on 41.

20         MR. HINDERAKER:  Yeah, so we --

21         THE COURT:  I see.

22         MR. HINDERAKER:  Experience with fixed term

23    license negotiations.

24         THE COURT:  Yes.

25         MR. HINDERAKER:  That's good.

1          THE COURT:  Going back to 38, on the top of that,

2    in this context I'm not sure this is appropriate.  The

3    slide is labeled "Standard Blaze Advisor Annual ELA Pricing

4    For Post-Termination Global Use."

5          MR. HINDERAKER:  The -- we've talked a lot about

6    named application pricing, and many of the slides are doing

7    the standard FICO pricing for the named application.  The

8    defendants have made arguments about, well, let's do

9    enterprise pricing.  And ELA stands for enterprise license

10   agreement.

11         And so if we were going to follow the basic

12   guidelines, the standard guidelines of FICO for pricing on

13   an enterprise, from an enterprise point of view, then that

14   gets translated into an annual price as well.  And that's

15   what slide 38 does.  We start not from an application-based

16   construct, but we start from an enterprise-based construct.

17   That then gets translated into the annual fee for the fixed

18   term.

19         THE COURT:  And I think the issue, at least for

20   me, with respect to slide 38 is, again, not directly tieing

21   it to Chubb.  So the language here is clearly tying to

22   Chubb specifically as opposed to the pricing methodology.

23   If you are dealing with an entity, you know, we, our

24   standard pricing methodology is X dollars per billion of

25   revenue or whatever.

```
 1              So I assume they have some kind of guidelines
 2     like that where they're -- in other words, the point is, I
 3     don't think we can do a pricing in the evidence tied to
 4     Chubb, because that runs afoul of Judge Wright's order that
 5     it's not what FICO would charge.
 6              And so you could talk about what they normally do
 7     or what their standard pricing methodology is for a company
 8     of this to that.
 9              MR. HINDERAKER:  Well, I am confused at this
10     point.
11              THE COURT:  Okay.
12              MR. HINDERAKER:  Judge Wright clearly said that
13     FICO can introduce its evidence using its standard pricing
14     methodology and the use of Blaze Advisor by defendants.
15     This is a lawsuit against Chubb.  And the notion that FICO
16     would be introducing evidence untethered to the defendants
17     or untethered to the facts of the case, I'm just not
18     tracking.
19              THE COURT:  And what I'm trying to describe is,
20     you put in the standard pricing methodology.  You can put
21     in the facts of the case, okay, through this witness or you
22     can remind the jury through there witness.  In final
23     argument, you can connect those two dots in argument and
24     say why that reflects what a willing buyer and a willing
25     seller would agree to.
```

```
 1              But if presented through a witness, connecting
 2     the dots in my view runs afoul of that line about not what
 3     FICO wants to charge or Federal wants to pay.
 4              MR. HINDERAKER:  And he's never going to say this
 5     is what FICO wants to charge.  He's simply going to say
 6     this is where we start, and then we go into the
 7     negotiations with the various factors.  None of these
 8     slides are intended to say what FICO would charge.
 9              Perhaps I could get some guidance.
10              THE COURT:  If the starting point is, this is
11     what would normally be our standard and that's where we
12     would start our negotiations --
13              MR. HINDERAKER:  Yes, exactly so.
14              THE COURT:  That's fine.
15              MR. HINDERAKER:  This is what this is.
16              THE COURT:  Okay.
17              MR. HINDERAKER:  And so, for example, on slides
18     11 through, 11 through 26.
19              THE COURT:  Yep.
20              MR. HINDERAKER:  This is taking the FICO
21     documents of the pricing guidelines and matrix.  These are
22     the standard.  These are the things against which FICO
23     prices on a standard basis, not the full negotiations, but
24     the starting point that Judge Wright permits, and then it's
25     supplied to the information we have from the case regarding
```

```
 1    each of the applications.

 2           The process inside of FICO is to take this

 3    information, make a judgment, large, very large, medium,

 4    small; and then go to from that, then I then go to 27 that

 5    you permit, and say, well, then now we have all these

 6    smalls and mediums and how does that translate out.

 7           The slides that you are forbidding are the ones

 8    that just did that math.

 9           THE COURT:  And what would you present the slides

10    28 to 40 as showing, then?

11           MR. HINDERAKER:  As showing the math as you or we

12    can show the math.  We can add it up from your earlier

13    order, and those slides only, only do that.  They add it

14    up.

15           If titles have to change, but they simply add it

16    up.  It's not what we claim.  The jury has to decide that.

17    I think the court's instructions to the jury on

18    hypothetical negotiation are going to have more factors.  I

19    think the defendant is free to ask about more factors.

20           Mr. Waid is constrained by his own experience,

21    and these slides are constrained by his experience.  None

22    of this is intended to be, none of it is, according to the

23    guidance of this court and Judge Wright, what FICO desires

24    or is subjective sense of damages.

25           THE COURT:  If -- well, Ms. Godesky, I know
```

```
1    you're going to want to weigh in.  Go ahead.
2              MS. GODESKY:  For sake of the record, I think
3    Your Honor understands this, but because I said it to
4    Ms. Solomon off the record this morning, I will just say it
5    now.  I mean, we continue to object to this as an end run
6    around the Daubert ruling, because essentially, you know,
7    Mr. Zoltowski was not excluded on qualification grounds.
8              It was this is irrelevant under the law.  So we
9    have that objection.  With regard to the slides, if Your
10   Honor is considering letting those slides from 28 to 40 be
11   used, I think the titles absolutely need to change.  We
12   cannot have these references to pre-termination and
13   post-termination, because then the implied meaning, right,
14   is this is what we would charge Chubb.
15             The other point I just want to make, Your Honor,
16   and I don't know that this is necessarily critical to these
17   sides, but I keep hearing the court say, you know, the
18   hypothetical negotiation is this four-year license, a
19   four-year term license.
20             And from our perspective, FICO is free to argue
21   that, but we will be arguing that a willing buyer and a
22   willing seller sitting down in 2016 to negotiate a license
23   that would cover this use --
24             THE COURT:  Right.
25             MS. GODESKY:  -- could be perpetual, because
```

```
 1          there's no cancellation fee, right?  You can get a
 2          perpetual license to use Blaze without cancellation.  And
 3          so why in the world would a willing buyer ever pay on a
 4          four-year basis when they could get a perpetual license for
 5          much less money?
 6                  And that is exactly what we believe the evidence
 7          will show happens.  So I just, I want to put that on the
 8          court's radar, because I think both sides have different
 9          views, but I think as far as the argument goes, and
10          ultimately when we're discussing the charge to the jury,
11          our position will be, there shouldn't be an instruction
12          that it's a four-year duration.
13                  The instruction should be a hypothetical
14          negotiation that would cover this use.
15                  MR. HINDERAKER:  And we can cross that bridge
16          when we --
17                  THE COURT:  We can.
18                  MR. HINDERAKER:  Later.  This doesn't impact what
19          we are talking about here.
20                  THE COURT:  It doesn't.  I understand your point.
21          And it's a fair point.  The law is that it is a license
22          that covers the use.
23                  So one thing I want to make -- so we've
24          cannibalized the half hour we gained.
25                  MS. GODESKY:  We still saved time.
```

1           THE COURT:  Right.  Crystal clear.  These, even

2      the calculations that are included in these slides, it

3      needs to be very clear in my view that this is information

4      that FICO would consider in setting out on these

5      negotiations.  Okay?

6           In other words, not this is what we would charge.

7      This is what we would demand.  This is how we would come

8      into it, understanding our own pricing.

9           MR. HINDERAKER:  Exactly so.  And with that

10     guidance, and the testimony will be that way.  And I

11     believe your earlier order, Your Honor, has been exactly

12     that we have the right to add it up.  So with that right of

13     adding it up, I would appreciate clarity in the sense that

14     are these slides now in, if it is very clear that we're

15     just adding it up?

16          THE COURT:  Yes.  It's just got to be clear.

17          MS. GODESKY:  And the titles are changing.

18          THE COURT:  And the titles are changing.

19          MR. HINDERAKER:  And I'm happy to change them.

20     If we can have agreement on which ones should be changed, I

21     would be happy to do it right away.  Mr. Mayleben is here.

22          THE COURT:  Ms. Godesky, are you able to provide

23     that answer?

24          MS. GODESKY:  Yes.

25          THE COURT:  Or do you need me to do it?

1          MS. GODESKY:  Well, is there just a way just to

2     anonymize it in terms of, you know, the references to

3     Federal Insurance Company in these particular apps, and we

4     could just have, you know, no specific reference to Chubb

5     and ACE and termination and pre-termination.  And it's

6     just, you know, large application, small application,

7     medium application and the country.

8          MR. HINDERAKER:  Well, now the jury doesn't know

9     that it relates to the lawsuit at all.

10         THE COURT:  Well, I do think -- you see this is

11    where -- this is where we get back to where I think we

12    crossed the line.

13         When you do use the names of the applications, it

14    risks spilling into, this is the damages analysis as it

15    relates to Chubb.

16         MR. HINDERAKER:  You have to instruct the jury on

17    the hypothetical negotiation.  We have to be clear that

18    this is just the starting point.

19         THE COURT:  Right.

20         MR. HINDERAKER:  And these slides that are using

21    that pricing matrix against the applications, there's no

22    title on those slides.  That's just standard pricing

23    methodology of FICO relevant to this case.

24         MS. GODESKY:  Right.  So which slide is that,

25    Mr. Hinderaker?

```
 1              THE COURT:  Looking at 28, for example.
 2              MR. HINDERAKER:  11 through 26 are just that.
 3    There's no title on it.
 4              THE COURT:  11 through 26 are fine.  I think it's
 5    the 28 through 40 where the connection comes.
 6              MS. GODESKY:  Right.  And so we would just say --
 7              MR. HINDERAKER:  That's where we're adding up.
 8              MS. GODESKY:  -- take Federal off.  Take ACE off.
 9    Take post-termination pre-termination and just
10    application -- take off all the names of the applications.
11    And then it's just application of the pricing guide to an
12    anonymous purchaser whose usage happens to match Federal's,
13    right?
14              So you have the country.  You have the size, and
15    then Mr. Waid can testify about how that is applied under
16    the pricing guide and do his math but without pointing to
17    Adapt and EZER and Federal and ACE.
18              MR. HINDERAKER:  Well, that doesn't make any
19    sense because the pricing, the standard pricing, you have
20    to set an application based on what it is.  Some are small
21    for the reasons that they, because of what they are.  Some
22    are very large because of the reasons for what they are.
23              Slide 28 doesn't mention, you know, the names of
24    the parties.  It's just -- but we do have to have some
25    connection in reality to the actual lawsuit.
```

```
 1              MS. GODESKY:  I'm not objecting to saying that
 2      it's large or medium or small.
 3              MR. HINDERAKER:  But it's not in the air.  It's
 4      in this lawsuit.  And what is large and what is medium and
 5      what is small?  And I want the jury to understand that
 6      Mr. Waid isn't making this up.  It's based upon facts.
 7      It's based upon data.
 8              MS. GODESKY:  Your Honor, I just think that's not
 9      the damages question that the jury is being asked, right.
10      I mean the damages question they're going to be asked is
11      the fair market value that would cover these, this sized
12      application, right?
13              THE COURT:  Right.
14              MS. GODESKY:  The use.  But they're not going to
15      be asked to apply it to Chubb and ACE and Adapt and
16      Profitability Indicator.  That's not the damages question.
17      It's objective.
18              MR. HINDERAKER:  You don't get to the damages
19      question against the defendants until you apply
20      Judge Wright's guidance and let us talk about what -- how
21      Blaze Advisor was being used, what was the use of Blaze
22      Advisor.  We have to connect it up to the facts of the
23      case.  I'm happy to have any title that --
24              And we could say standard fees before
25      negotiation, standard fees pricing methodology, whatever
```

1    would take away the anxiety about this, because I'm not

2    fighting against your guidance or Judge Wright's.

3           MS. GODESKY:  Your Honor, I would just point out,

4    the slides that we're not arguing about do that.  Right?  I

5    mean, Mr. Waid is presumably going to spend a lot of time

6    walking through all the slides that detail Chubb's use, the

7    names of the application, the number of rules, whether he

8    would characterize it as small, medium or large.

9           That's all going to be out there.  But then when

10   we pivot to, you know, this objective willing seller,

11   willing buyer, it should be anonymized.

12          MR. HINDERAKER:  Well, the willing buyer, willing

13   seller is going to be again from his experience of what the

14   factors are that he faces.  I don't think he's going to be

15   able to speak to the particular circumstances of the

16   defendants.  That's up to them to put in the evidence.

17          But the jury's going to hear the court's

18   instructions on those.  Mr. Waid will identify from his

19   experience what licensees have raised, and the defendants

20   are able to raise whatever else they want.  The jury, as we

21   know, is going to make the determination of the amount.

22          But as Judge Wright said, we get to tell -- we

23   get to start from our standard pricing methodology because

24   that's what the real world is.  The real world starts with

25   that.  The real world then has negotiations within that.

1    And we're just following your guidance as well, Your Honor.

2             THE COURT:  Well, we're -- all right.  We need to

3    move on.

4             Here's where we are disagreeing:  I agree you can

5    put in the standard pricing methodology.  You can add it

6    up.  You can say -- and through the witness.

7             MR. HINDERAKER:  Yes.

8             THE COURT:  Okay.  You know, if you had a

9    circumstance or if you're negotiating a license with six

10   large, two very large, you can talk about that, what would

11   be the standard pricing methodology that FICO would use in

12   such a circumstance.

13            I do think having the names of the apps on the

14   slides then risks confusing the jury that this is a damages

15   model.

16            Now, in final argument, these slides are fine.

17   Okay?

18            MR. HINDERAKER:  Are slides 11 through --

19            THE COURT:  No.  Those are fine.

20            MR. HINDERAKER:  Those are fine.

21            THE COURT:  Right.  It's 28 through 40 where we

22   have the application names that we risk connecting the dots

23   in a way that says this is our damages claim.

24            MR. HINDERAKER:  I think I can live with this as

25   long as I have -- with 11 through 27, because I can't --

```
 1              THE COURT:  Right.  11 through 27 are fine.

 2              MR. HINDERAKER:  They are fine.

 3              MS. KLIEBENSTEIN:  I have a suggestion.

 4              THE COURT:  Yes.

 5              MS. KLIEBENSTEIN:  What are we on, 28?

 6              THE COURT:  Yeah.  It's 28 through 40 that we're

 7      talking about.

 8              MS. KLIEBENSTEIN:  What if we just take the

 9      application names out of the left-hand column.  Is that

10      okay with you?

11              MS. GODESKY:  That's what I suggested.

12              MR. HINDERAKER:  Okay.  All right.

13              THE COURT:  Yeah.  Let's just do that and then --

14              MR. HINDERAKER:  As long as those slides are

15      good -- all right.

16              THE COURT:  Right.

17              MR. HINDERAKER:  Then, then we'll take those off.

18              MS. GODESKY:  And changing the titles.

19              THE COURT:  And changing the title.

20              MS. GODESKY:  Thank you.

21              MR. HINDERAKER:  And then -- and change the title

22      to 41 and change the -- sure.  We can work that.  We can

23      work with that.

24              THE COURT:  Okay.

25              MS. GODESKY:  And, Your Honor, just before the
```

```
 1  jury comes in, since we have all these slides with numbers
 2  again, I hate to raise this, but there's been a series of
 3  gratuitous comments from FICO's counsel about my objections
 4  and how unfortunate it is that I'm not agreeing to put
 5  their demonstratives into evidence.
 6          And so I would just ask before we go down that
 7  road again in front of the jury that they not make those
 8  comments and suggest it's my fault that we need to belabor
 9  these numbers.
10          THE COURT:  I assumed they were suggesting it was
11  my fault.  But those comments won't be made.
12          MS. GODESKY:  Thank you.
13          THE COURT:  All right.  Let's bring them in.
14  1:33 p.m.
15                        IN OPEN COURT
16                       (JURY PRESENT)
17          THE COURT:  Go ahead and be seated.
18          Members of the jury, you ended up with an hour
19  lunch.  The lawyers and I ended up with 20 minutes.  So
20  rest assured, we're working hard.
21          Come on up, Mr. Whitener.
22          THE WITNESS:  Thank you.
23  BY MS. GODESKY:
24  Q.  Good afternoon Mr. Whitener.
25  A.  Good afternoon.
```

1    Q.  So before the lunch break, we were going through all

2    the different computer applications at Chubb that used

3    Blaze that you talked about with Mr. Hinderaker, right?

4    A.  Agreed.

5    Q.  And the next one I want to talk about is Brokersite.

6    That is another application that you talked about during

7    direct, correct?

8    A.  Correct.

9    Q.  And you were in court yesterday, and you've heard

10   Mr. Mirolyuz at Chubb testify that Brokersite does not use

11   Blaze Advisor, correct?

12   A.  Correct.

13   Q.  And you, of course, never worked at Chubb, so you don't

14   have a basis to dispute that with your personal knowledge,

15   right?

16   A.  Correct.

17   Q.  CIS Claims is another application that you talked about

18   with Mr. Hinderaker, right?

19   A.  Correct.

20   Q.  And even though it's called claims, it is not a claims

21   handling application, right?

22   A.  Correct.

23   Q.  And you cannot say whether the use of CIS Claims

24   contributed to Chubb's revenue, correct?

25   A.  I disagree.

1    Q.  Let's look at your deposition at page 211.

2    A.  Bear with me.

3    Q.  Sure.

4    A.  I did better this time.

5    Q.  Your deposition at page 211, line 7.  "Question:  Do

6    you know whether that use of CIS Claims in fact contributes

7    to Federal's revenue?

8            "Answer:  I have done no quantification research,

9    nor have I talked with anyone at Federal, Chubb, ACE

10   Limited."

11           That was your answer at your deposition, correct,

12   Mr. Whitener?

13   A.  Correct.

14   Q.  Now, Blaze is not the only decision management software

15   out there.  Alternatives do exist, correct?

16   A.  Correct.

17   Q.  And your report identifies ten of them, right?

18   A.  Approximately, yes.

19   Q.  And those alternative decision management software

20   products could have been used in the computer applications

21   at Chubb that we've all been discussing in this trial,

22   right?

23   A.  Yes.  I'm sorry.  Yes.

24   Q.  But in forming your opinions in this case, you did not

25   look at all at those other decision management softwares

1    and analyze how they compare to Blaze, correct?

2    A.  Correct.

3    Q.  Now, during your questioning with Mr. Hinderaker, you

4    talked a bit about other insurance companies making use of

5    rules software, right?

6    A.  I'm sorry.  Say that again.

7    Q.  During your direct examination, you talked a little bit

8    about other insurance companies using Blaze.

9    A.  Yes.

10   Q.  And if we could pull up, Vanessa, slide 28 from

11   Mr. Whitener's PowerPoint.

12           This is one of those slides, right, Mr. Whitener?

13   A.  It is.

14   Q.  And Mr. Hinderaker showed you this slide during your

15   direct and he said, you know, this is internal

16   communications at Chubb, right?

17   A.  Yes.

18   Q.  He made a point of saying, this was Chubb reporting to

19   themselves about use of Blaze at other companies, right?

20   A.  Yes.

21   Q.  And do you see at the bottom of this document, there's

22   a source listed?

23   A.  It is.

24   Q.  Who is the source?

25   A.  Fair Isaac.

1    Q.  And if you go to slide 28, Vanessa, the next slide or

2    29.

3              There's the continued discussion of how Blaze's

4    apparently being used in the P&C industry, right?

5    A.  Yes.

6    Q.  And what's the source on that slide?

7    A.  Fair Isaac.

8    Q.  And as we discussed earlier, before you rendered your

9    expert opinions in this case about the value of Blaze to

10   Chubb, you didn't conduct a study of how all these

11   insurance companies are using Blaze as compared to having

12   software engineers code.

13   A.  That's correct.

14   Q.  And you heard, sitting through this trial, that Chubb

15   used decision management software in just one percent of

16   its 1500 computer applications before the merger, right?

17   A.  As measured on a number of applications footprint

18   basis, yes.

19   Q.  And they were using software engineers to code the

20   rules in all the other applications, right?  That's the

21   testimony.

22   A.  I believe so.

23   Q.  And the decision -- that was a decision that Chubb made

24   before the merger, even though it had an enterprise-wide

25   license to use Blaze without any limit on the number of

1    applications, correct?

2    A.   That is my understanding.

3    Q.   That's a pretty low rate of adoption, right,

4    Mr. Whitener?  One percent?  It's pretty low.

5    A.   Yes.

6    Q.   And then you heard from Mr. Ghislanzoni that at ACE

7    before the merger, ACE had decided to put Blaze into one

8    computer application and then this ODM decision management

9    program in about three applications.  You heard him testify

10   about that, right?

11   A.   I heard the testimony.

12   Q.   So at ACE, another giant insurance company, they're

13   only using rules software in less than one percent of their

14   applications, right?

15   A.   Sounds right.

16   Q.   And you don't have any basis to disagree with

17   Mr. Ghislanzoni's testimony that ACE didn't see a benefit

18   to using rules software more widely, correct?

19   A.   No.

20   Q.   And then you also heard Mr. Ghislanzoni explain that at

21   the combined ACE/Chubb entity today, rules software is

22   still used in only one percent of all of their computer

23   applications, right?

24   A.   Yes.

25   Q.   And you have no basis to disagree with that, correct?

1    A.  None.

2    Q.  And unlike Mr. Ghislanzoni and Mr. Pandey, as part of

3    your day-to-day work, you've never spent time analyzing the

4    efficiencies and functionality of rules software versus

5    coding by software engineers, correct?

6    A.  In terms of the current technology, that is correct.

7    Q.  Now at the end of your examination, we all saw this

8    final summary slide, right, and the final summary slide was

9    Blaze brought value to Chubb.

10             That's the summary of your opinion, correct?

11   A.  I believe I added the word "significant" but yes.

12   Q.  Significant value.  That's the summary of your opinion,

13   right?

14   A.  Correct.

15   Q.  But you do not know whether Blaze actually contributed

16   to any increase in revenue or profit at Chubb, correct?

17   A.  I did -- correct.  I did not measure anything.

18   Q.  Thank you.

19             I have no further questions.

20   A.  Thank you.

21             THE COURT:  Mr. Hinderaker, redirect.

22             MR. HINDERAKER:  Thank you.

23                   REDIRECT EXAMINATION

24   BY MR. HINDERAKER:

25   Q.  Mr. Whitener, my purpose is to talk about the analysis

1    that -- the analysis that you did make as opposed to the

2    analysis that you did not make.  So let me focus on the

3    analysis that you did make.

4            There were at various times in your answers to

5    the last set of questions where you would say mostly

6    correct, partially correct, yes, but, correct, but.

7            What was the qualification that you were trying

8    to express?

9            MS. GODESKY:  Objection.

10           THE COURT:  Overruled.

11           THE WITNESS:  As I mentioned earlier, in my

12   underwriting thought process, there's a difference between

13   what something does and how much something does something.

14   So when you ask me does it make things faster?  Yes.  I've

15   been at this for a couple of decades.  Okay.  Maybe more

16   than a couple decades.

17           And the pursuit of responding to requests for new

18   business and improving that response timing and -- has been

19   a key strategy for 44 years.  In fact, I was reading

20   Property Casualty 360 about three weeks ago, and another

21   company whose name escapes me, property casualty insurance

22   company, licensed another software package and in their

23   reasoning they quoted speed.

24           So that's an important thing.  And when I go to

25   ease of doing business, I can say the same things.  These

1    are, these are value points that the property casualty

2    insurance company pursues and pursues intentionally.  How

3    much they get in terms of deployment of an application,

4    they don't measure it.  I haven't measured it.

5              And in all of the documentation I was provided,

6    there was nothing that could speak to any of that.

7    BY MR. HINDERAKER:

8    Q.  And, for example, well I'll go back to that, but I want

9    to, I guess, stay on this examination for a moment, this

10   line.

11             And let me bring you to -- you were asked about

12   some stuff on your deposition at page 135.  And if you can

13   find page 135, please.

14             MS. GODESKY:  Objection.

15             THE COURT:  Sustained.

16   BY MR. HINDERAKER:

17   Q.  I'd like to -- Ms. Godesky asked you to look at

18   page 135, line 22, to 136, line 6.  And she read -- I'd

19   like to read the rest of the testimony.

20             MS. GODESKY:  Objection.

21             THE COURT:  Sustained.  You can ask him the

22   questions.

23             MR. HINDERAKER:  Okay.

24   BY MR. HINDERAKER:

25   Q.  It's, as you just said, you performed no quantitative

```
 1    analysis, correct?
 2    A.  Correct.
 3              THE COURT:  Mr. -- excuse me a second.
 4              Mr. Whitener, you cannot be reading from your
 5    deposition right now.
 6              THE WITNESS:  I'm sorry.  I'm sorry.
 7    BY MR. HINDERAKER:
 8    Q.  You -- in your report and in your opinions, those are
 9    drawn from, as you started to describe, and in the process
10    of drawing your opinions, you did not have the information
11    available to quantify, measure, the extent of which Blaze
12    Advisor was contributing to the value of selling
13    software -- to the value of selling insurance at the
14    defendants.
15              MS. GODESKY:  Objection.  Leading.
16              THE COURT:  Overruled.
17              THE WITNESS:  That is correct.
18    BY MR. HINDERAKER:
19    Q.  You were forthright about that in your deposition as
20    well.
21    A.  To the best of my ability.
22    Q.  Now, your -- I'll just represent to you, and it's in
23    the book here if you want to check it out.  You have a
24    reply report in the defendants' binder.  And that reply
25    report is May 31, 2019.
```

1    A.  Yes.

2    Q.  I'll represent to you that -- do you recall doing a

3    supplemental report in approximately May 2020 that was

4    limited to your analysis of the rules repository?

5    A.  Yes.

6    Q.  Okay.  And then of course your original report was, was

7    dated April 19, 2019.

8         So the fact -- counsel asked you whether you

9    reviewed Mr. Ghislanzoni's deposition before you wrote

10   these reports.

11   A.  That is correct.  I was asked that.

12   Q.  You were.  And given that his deposition was taken

13   after all -- after these two reports were written, it would

14   have been impossible for you to do that, correct?

15   A.  It would have been an exceedingly large challenge

16   bordering on the impossible.

17   Q.  Yes.  Well, you can't go into the future.

18        The deposition of Mr. Schreiber, Ms. Theberge,

19   Ms. Garnes taken in April of 2020, you would not have had

20   the opportunity to review those either before your reports

21   were written in 2019.

22   A.  That is also correct.

23   Q.  You were asked some questions about hard coding.  I

24   don't need to go over that again, but in your analysis of

25   the defendants case specific facts with respect to their

1    use of Blaze Advisor, did they report that they were able

2    to change rules, get products to market faster, because

3    rather than spending months doing coding, they could modify

4    the rules and days?

5                MS. GODESKY:  Objection.  Leading.

6                THE COURT:  Sustained.

7    BY MR. HINDERAKER:

8    Q.  What did you see in terms of the speed of being able to

9    modify rules from the defendants' documents?

10   A.  There are several places in the defendant documents

11   where the defendant documents give a case study from an

12   implementation?  DecisionPoint is one.  Profitability

13   Indicator is another.  I believe Premium Booking is

14   another, but that's less of a concrete memory.

15                In those, there are -- pardon me -- there are

16   statements about the reduction in time to modify rules from

17   three to four months down to a few days, three to

18   four days.

19   Q.  You were asked a question about Brokersite.  Your

20   understanding that Brokersite used Blaze Advisor is based

21   on what?

22   A.  The documents I referenced in that slide at the bottom

23   as my sources from the defendant documents.

24   Q.  From the defendant documents.  Okay.

25                Finally, Mr. Whitener, understanding that you

1    are, understanding that you are not an IT professional but

2    instead an insurance expert, why are you so confident in

3    your opinion that Blaze Advisor added significant value to

4    the defendants and their selling of insurance?

5    A.  With my underwriting background, the fact that I have

6    been very heavily involved in the execution of the quote,

7    bind, book and issue process, the fact that I have been so

8    heavily involved at the corporate underwriting function,

9    including several instances where I managed the selection

10   of vendors for policy administration systems and billing

11   systems for companies, the fact that I've been heavily

12   involved in the primary setting for technologists and

13   making sure that technologists receive from the business

14   units for which I worked the requirements and documentation

15   that they needed to increase their probability of success,

16   I have seen the value of automating underwriting and

17   compliance and statutory rules through use of technology.

18   I'm very, very confident in that.

19   Q.  Thank you for your time.

20   A.  You are welcome.

21              THE COURT:  Ms. Godesky, any recross?

22              MS. GODESKY:  No further questions.  Thank you.

23              THE COURT:  All right.  Mr. Whitener, you may

24   step down.  Thank you.

25              (Witness excused.)

1          THE COURT:  Mr. Hinderaker, are you ready to call

2     your next witness.

3          MR. HINDERAKER:  I am, Your Honor.  William Waid.

4          THE COURT:  Mr. Waid, come on up here, please.

5     If you would raise your right hand.

6                    N. WILLIAM PAUL WAID,

7     called on behalf of the plaintiff, was du ly sworn, was

8     examined and testified as follows:

9          THE WITNESS:  I do.

10         THE COURT:  Go ahead and sit down and make sure

11    you are speaking into a turned-on microphone and state your

12    full name for the record.

13         THE WITNESS:  N. William Paul Waid.

14                    DIRECT EXAMINATION

15    BY MR. HINDERAKER:

16    Q.  I think I'm getting myself organized.  Okay.

17         Good afternoon.

18    A.  Good afternoon.

19    Q.  Mr. Waid, where do you, where do you reside?

20    A.  Spring City, Pennsylvania.

21    Q.  And before that, where have you lived?

22    A.  I grew up in Oley, Pennsylvania, on a 500-acre dairy

23    farm.  After college, I moved to Boston, Massachusetts, for

24    12 years, after which I moved back to Pennsylvania because

25    my parents were getting a little bit older, and I needed to

1    take care of them.

2    Q.  Is that for us, for our reference, is that in the

3    Philadelphia area?

4    A.  It's generally outside of Philadelphia.  Pretty far

5    out, about 45 minutes outside.

6    Q.  I'd like to understand your entrance into the field of

7    technology, and perhaps we can start that by letting the

8    jury understand your educational background and go from

9    there.

10   A.  Okay.

11   Q.  So you went to college where?

12   A.  Lehigh University for civil engineering.

13   Q.  And then how did you get into technology from civil

14   engineering?

15   A.  It was quite by accident.  I really couldn't afford to

16   go to Lehigh, so I had to take overloaded courses, meaning

17   I took extra course loads.  It afforded me the opportunity

18   as a freshman to take a CAD cam, GKS programming and an

19   analytics course.  It was a junior level course.

20           And the professor took note of this and actually

21   offered me a job that summer working on a project for the

22   National Science Foundation.

23   Q.  And what was that project?

24   A.  The project was actually called the Bridge Fatigue

25   Investigator.  It's actually the early use of artificial

1      intelligence, more specifically a technique called Expert

2      Systems.

3               And the project was to take the world renowned

4      leader in bridge fatigue investigation, put what they know

5      inside a computer so that anybody inspecting a bridge could

6      take the knowledge of that expert and apply it.  And that

7      was my first introduction to artificial intelligence.

8      Q.  Maybe we should have a laymen's understanding of what

9      artificial intelligence is.

10     A.  That's a bit of a buzz word today.

11               It actually started back in the 60s as a research

12     project.  In the late 80s, when I got involved in it, it

13     was just starting to come into the compute world.  Compute

14     was a little light back then.  The principal of artificial

15     intelligence is really to get the computer to act like a

16     human, to actually be able to have the computer take the

17     same knowledge or experience of a human or make the

18     decisions of a human.

19               Expert System is just one of many techniques that

20     can be used.  It's been around for a long time.  And it's

21     really predicated on sort of what's called an inference

22     engine.

23     Q.  All right.  So that's college introduction to AI and

24     Expert Systems.

25               After college how did you continue on?

1    A.  Yeah, so the project sort of give me an opportunity to

2    see, you know, a lot of value could come from applying just

3    technology.  Here we're actually talking about bridge

4    fatigue investigation and repairing bridges.  It was more

5    interesting to me than going down the path of building

6    high-rises or doing my own bridge design.

7         So I pursued through a connection from the same

8    professor an attorney at Stone & Webster, the division of

9    Stone -- they actually designed nuclear power plants, but

10   the division I worked for was called the Advanced Systems

11   Development Services Group.

12   Q.  And how did that, what did that do and how did that

13   bear on your continuing work and experience into this kind

14   of technology?

15   A.  They were a consulting firm.  We actually built

16   solutions for clients.  I worked on fire damage control in

17   nuclear submarines.  We did a simulation of coal switching

18   at Ontario Hydro, like $25 billion coal contracts, and they

19   had to decide what coal to actually run through the plant.

20        We simulated that.  We also did Barbie Doll

21   packaging, for F150 steering knuckle design, Cessna

22   aircraft leading spar design, all automated design

23   activities.

24   Q.  Using this AI and Expert Systems?

25   A.  A variety of techniques beyond Expert Systems, neural

1   nets, genetic log rhythms, more decisioning and reference

2   engine technology, a variety of technologies.

3   Q.  So then you left Stone & Webster, and where did you go

4   from there?

5   A.  I went to a company called Neuron Data in 1996.

6   Q.  I think Mr. Marce mentioned, identified Neuron Data.

7   A.  Yeah.  Jean-Luc was one of a handful of people at

8   Neuron Data when I joined.

9   Q.  And what was your work at Neuron Data?

10  A.  I was a systems engineer.  Essentially my job was to

11  work with our clients and map the technology to their very

12  specific problems, get them to -- and buy the software and

13  then help them figure out how to use it to drive business

14  value out of the software.

15  Q.  Was there a connection between this work at Neuron Data

16  and work with the clients that you just described and what

17  now has become known as Blaze Advisor?

18  A.  Yeah.  So one of the challenges with the technology in

19  my experience at Stone & Webster was that it was very

20  powerful, but it was very expensive and very difficult to

21  use.

22          And at the time, Neuron Data was, had two

23  products.  It had something called Expert, which was an

24  expert system tool, that older technology I referred to,

25  and it also had what was known as a cross-platform Gooey

1    and database tools.  Essentially you could build something

2    in this and deploy it to Unix, a PC, a Mac, any of 28

3    different environments.  This is before Java came in.

4         Java was coming, so Neuron Data needed to

5    redefine itself.  It needed a new product, or it was going

6    to go out of business.  The proposal was made that we could

7    actually take the baseline of Neuron Data Expert product

8    and create a new, more powerful business tool.  And this

9    was the genesis of Blaze Advisor.

10   Q.  And you, and that idea was -- so there's the idea.

11   What was done with the idea?

12   A.  So we had, we had a starting point and as a system

13   engineer it was my job to work with clients.  So we began

14   to do what in the software industry we call it sort of beta

15   testing.  We would take early versions of our Blaze Advisor

16   software to clients.  I would work with them, figure out

17   what their needs were in order to make Blaze more powerful

18   and more meaningful to them.

19        And that sort of went through a period up until

20   2000, and then in 2000, we actually launch the first

21   official go to market version for Blaze Advisor.

22   Q.  Okay.  Let me kind of catch up with you.  In your work

23   with the clients to see what business needs they had that

24   perhaps could be solved with the technology Blaze Advisor,

25   I'd like to know what your interaction then was between

1    your role and, say, Jean-Luc Marce or other people who were

2    writing code, and I'll call it creating the product.

3              What was that dynamic?

4    A.  Yeah.  We started sort of the pilot work in 1998.  And

5    so I would collect very specific use cases.  I would

6    actually feed back features of the product directly to

7    Carlos Serranos Morales who was the lead architect and

8    developer.  Jean-Luc worked for Carlos.

9              And those would then be iterated on and released

10   as a product, taken back to the client, got additional

11   feedback on how they used it, what features they thought

12   they would need going forward, and then that sort of

13   iterated and cycled.

14             And you continue to improve the product.  It's

15   what we actually in the software industry call product

16   management.

17   Q.  Okay.  So I think you said the inception was 1996.

18   A.  That's when we started work, yes.

19   Q.  And you said your first launch was 2000.

20   A.  Yeah, we took our beta in '98.

21   Q.  1998.

22   A.  The first commercial launch to widespread sales was in

23   2000.

24   Q.  Let's define for us all, what does beta mean in normal

25   language?

1    A.  Yeah.  It's sort of like, think of it like the Wright

2    Brothers building an airplane.  I don't think anybody

3    wanted to get on the first airplane they built.  Maybe they

4    did, but it is something like that.

5              And then when they perfected it, it got strong

6    enough, stable enough to actually become, you know,

7    repeatable in-flight airplane.

8    Q.  Okay.  And when you get to the, when you get to the

9    point of being repeatable, that's when you went to market

10   in 2000.

11   A.  Correct.

12   Q.  How many years -- maybe I'm going to get ahead of you a

13   little bit here, but for how many years have you been

14   involved in working with clients to understand how and

15   direct the enhancements of or the continued improvements of

16   Blaze Advisor?

17   A.  Since 1998.  That really stopped.  I have a broader

18   remit and responsibility, but it is still involved with

19   Blaze Advisor.

20   Q.  So Neuron Data, what happened to that company?

21   A.  So they rebranded themselves to Blaze Software.

22   Q.  Same company, different name.

23   A.  Just changed the name.

24   Q.  Okay.

25   A.  As I mentioned, their other products became less

1    useful.  And so the focus was entirely on Blaze Advisor,

2    and they named the company Blaze Software.

3    Q.  Then what happened to the company Blaze Software?

4    A.  Interestingly enough, it was owned by a bunch -- it was

5    a startup.  So it was owned by a bunch of early investors,

6    and anybody who invests in a company, they want to get

7    their money out.  So these investors have been around for a

8    long time, and they wanted their money out.

9          So they did something unusual.  The first part is

10   not unusual.  They we want into an initial public offering.

11   Like they put it on the NASDAQ listing.  Raised a bunch of

12   money.  Investors got their investment out.  Made a lot of

13   money off the back of it.

14         And then a company in Germany called Brokat

15   actually bought Blaze Software, and another company,

16   Gemstone, off the market in a reverse, a reverse cash deal.

17   They basically took it off the market.

18   Q.  Okay.  And your personal role in employment, you stayed

19   with Blaze Advisor through these various companies, did

20   you?

21   A.  I did.  I actually changed roles through a couple of

22   those transitions, but I stayed.

23   Q.  And then after Brokat, was there another owner after

24   that?

25   A.  Yeah.  So Brokat actually burned through a whole bunch

1    of cash from that acquisition and actually became

2    insolvent.  They pretty much ran out of money in the June

3    time frame of 2001.  And we did find a buyer for the Blaze

4    Advisor asset in a company called HNC Software, but they

5    couldn't close before the beginning of August.

6          So we actually went out to all of our Blaze

7    clients and said we need you to buy the software that you

8    were talking about buying so we can stay afloat long enough

9    to close this deal.  And they did.  We were very up front

10   and very clear with them of the situation we were in.

11         But to keep their investment in Blaze alive, we

12   needed the money in order to bridge, and they did.  So HNC

13   Software purchased the assets Blaze Advisor.

14   Q.  All right.  And then how did Blaze Advisor get to FICO?

15   A.  So a year later, literally one year later in August of

16   2002, FICO purchased HNC Software.  Their primary interest

17   in, at that time, in HNC Software was a product called

18   Falcon.  Falcon is a fraud prediction tool that uses AI

19   techniques.  It also uses Blaze Advisor.

20         And it essentially predicts potential fraud or on

21   credit cards or debit cards.  So every time you swipe your

22   card, it's back there checking to make sure it was you who

23   actually charged the card.

24   Q.  Okay.  So we've come forward to Blaze Advisor and

25   yourself at FICO in 2002.

1          Would you give us -- describe for us the size of

2     the Blaze Advisor team.  I'm not talking about, I guess I'm

3     not talking about the coders, but the size of the Blaze

4     Advisor team in the context of bringing Blaze Advisor to

5     market from, you know, 2002 forward, 2002 on.

6     A.  Yes.  HNC had this concept of connecting decisions, and

7     it was a combination of bringing artificial intelligence,

8     analytic and predictive modeling and decisioning together

9     into sort of a unified way of driving business for our

10    clients.  It's essentially what the business FICO and HNC

11    were in, just at the core, at the core technology level.

12         So when that came across, FICO wasn't really

13    interested in that.  They were more interested in the

14    larger revenues from the Falcon product.  So I actually had

15    expected to get laid off in the acquisition and not have a

16    job, but they decided to keep me, and they asked me to run

17    a go-to-market function, which is essentially taking those

18    products into the market.

19         So in 2002 I had -- it was three people and me.

20    That was the scope of our go-to-market effort.

21    Q.  And did that go-to-market effort include the product

22    Blaze Advisor?

23    A.  Yeah, Blaze Advisor was the hallmark product at that

24    time.  There actually wasn't really very many others in the

25    works in engineering.  They were building them, but they

1   weren't ready for go-to-market.

2   Q.  In these early years were additional -- in addition to

3   the in-house, I'll call it in-house enhancements and

4   capabilities and improvements, feeding back from the client

5   feedback, in these early FICO years, were other investments

6   made into the capabilities of Blaze Advisor?

7   A.  Yeah, a tremendous amount of them, actually.

8   Q.  Can you tell us what they were?

9   A.  It's a long list.

10          So we introduced what we call RMA, our rule

11  maintenance application.  We've actually purchased another

12  company called Rules Power.  That was a company by

13  Dr. Charles Forgy, who was the inventor of RETE, and he had

14  a patent for something called RETE 3.  He owned that.  It

15  was faster than RETE 2 and RETE 1, but it also included

16  conflict detection.  Checked for things like circular

17  logic, rules never reached, nested rules that actually

18  conflict with one another.

19          It was a way to sort of check the validity of the

20  rules.  And our business is entirely focussed on enabling

21  businesses to make better decisions, and business users

22  today, they're all business users of the product.  So we

23  needed these capabilities to make sure that when

24  businesses -- business people are authoring rules that

25  they're not doing something they shouldn't be doing and

1    sort of detecting them.

2              We added something called a cross reference

3    browser that sort of let you visualize.  We added something

4    called the impact analysis tool.  This allowed you to sort

5    of say, if I change a piece of data or change a rule, what

6    am I affecting, like what other rules or data am I

7    affecting?

8              We built a nice visual testing capability.  I

9    could keep going on.  There's a significant number of

10   investments.

11   Q.  You mentioned, I think you mentioned RETE 3 --

12   A.  Yes.

13   Q.  -- of Dr. Forgy.  Did FICO purchase that patent?

14   A.  Yes, that is ours.

15   Q.  And you also mentioned there's a RETE 1 and a RETE 2.

16   My question is, is that technology RETE 1 and RETE 2, in

17   the public domain?

18   A.  It is in the public domain.  In fact, all rules engines

19   that were in question in this trial, Drools, ODM which was

20   formerly J-Rules, from I Log, they are all RETE based.

21   Q.  But not RETE 3 based?

22   A.  No they're RETE 2.

23   Q.  Did your role change at FICO around the 2007 time

24   frame?

25   A.  Yes.  FICO was organized around products, and we want

1    to market as products, but we were a pretty sizeable

2    company by then.  And so the go-to-market model shifted to

3    covering accounts.  And our CE or at the time was

4    ex-Accenture, so he aligned our go-to-market model around

5    industries and industry sectors.

6           I was actually put in charge on a global basis

7    for what we call our merging markets, government, help co,

8    manufacturing, high tech, our core industries were around

9    insurance and financial services.  So basically I had

10   everything outside of that.

11   Q.  Okay.  Why were the core industries financial services

12   and insurance?

13   A.  Well, there's a couple of reasons why.  Most of our,

14   most of our clients are in the business of risk assessment

15   and risk decision management.  So, and there's a lot that

16   goes into that statement.  I won't get into the specifics

17   on that.

18          But essentially in banks and insurance, that is

19   the business.  That's how you make money, is the ability to

20   actually assess that risk and price and actually sell or

21   sign the right product, sell that product out to a consumer

22   base.

23          There's a lot of decisions that get made in and

24   around that that range across a broad set of things, but

25   the use of analytics, the use of today machine learning and

1    AI and decisioning is quite predominant in those

2    businesses.

3    Q.  So that was the core focus of Blaze Advisor then.  Is

4    it still the core focus of Blaze Advisor with respect to

5    the industries that are most interested in it?

6    A.  From a revenue perspective and a penetration

7    perspective, yes, both.  Yes.

8    Q.  You mentioned that in 2002 you had about three people

9    going to the market with Blaze Advisor.  In 2007 how had

10   that changed?

11   A.  I had 93 people globally.

12   Q.  And then after, after that responsibility for emerging

13   markets, global and emerging markets, did your

14   responsibilities change after that?

15   A.  They did.  I actually took responsibility for a region.

16   The region was the Americas, Canada, US, South America,

17   Central America and the Caribbean.

18   Q.  And then after that within FICO, of course.

19   A.  After that I actually became a general manager for the

20   FICO Platform.  At the time it was called the decision

21   management platform, but it's the FICO Platform.

22   Q.  And today there's, the title is called the FICO

23   Platform.  First, what is it, and second question will be,

24   how does it relate to Blaze Advisor.

25   A.  So the FICO Platform is actually, we actually started

1    in earnest development in 2013, but it was that early

2    vision that was at HNC.  It was the ability to bring

3    decisioning, which is the core thing that our clients do

4    from a business value perspective and a business return

5    perspective into a common integrated technology platform

6    that made it very easy for you to get data in, apply

7    analytic principles like profiling to that data, apply

8    analytic models and machine learning models and to that

9    data and take decisions, including, you know, feedback and

10   learning mechanisms and enabling the business to control

11   all of that.  That's the FICO platform.

12   Q.  And how does it relate to Blaze Advisor?

13   A.  Blaze Advisor in that it is the core decisioning

14   engine.  It actually is interchangeable.  You can go from

15   FICO platform to Blaze.  You can go from Blaze to FICO

16   platform.

17   Q.  And now you are, your title today is what?

18   A.  I am the chief product and technology officer at FICO.

19   Q.  And what does that mean?

20   A.  That means I am responsible for all products and all

21   technology from a building of those products, including the

22   go-to-market, the pricing, the packaging, profitability and

23   our strategic direction of where we go.

24   Q.  And with respect to, with respect to your technology

25   responsibilities, we've learned in the lawsuit that there

1    are job descriptions called architects, and there are job

2    descriptions called software engineers.

3              In terms of the categories of responsibilities

4    that report to you, how does that lay out in the technology

5    space?

6    A.  I have responsibility for architects, software

7    engineers, quality assurance engineers, developmental

8    operations or dev ops engineering, documentation, user

9    experience, product management, program management and

10   project management and operations.

11   Q.  And are you knowledgeable about software architecture?

12   A.  I am.

13   Q.  And that you can code as well.

14   A.  I've coded a fair bit, yes.

15   Q.  How many people today are on your team?

16   A.  Just about a thousand.

17   Q.  I want to change topics a bit.  We heard testimony, and

18   you were here in the courtroom, of course, and if you heard

19   it differently than I do, make sure you say so, but heard

20   testimony that business rules management systems software

21   is used less than one percent of all applications at Chubb

22   Limited.

23              From your experience, including your experience

24   with Chubb & Son, is that an accurate way of assessing the

25   significance of one technology?

1   A.  It depends on what your measurements are.  If you're

2   talking from a pure technology perspective, yeah.  I have

3   over a hundred million lines of code that I manage.  I can

4   give you amazing numbers of the number of technology

5   components that are in that code.

6        When you blow it down to the actual business

7   practices, they all aggregate up into a few set of things

8   that actually occur at both banks and insurance.  That does

9   not mean that there are not a lot of supporting subsystems

10  in those organizations.  There is tremendous number of

11  them.

12       There's a lot of data management that goes on.

13  There's a lot of data exchange utilities that go on.

14  There's a lot of protocols that's actually communicated

15  across all the channels of communicating with your clients

16  or each other.

17       If you measure it there, absolutely you are going

18  to have 1500 or 3,000 or whatever the number is being

19  thrown out.  But when you actually talk to a business

20  person about what their core systems are, the ones they

21  think about, it is a much smaller number.

22  Q.  So is it fair to say that the more pertinent question

23  is, what are the core technologies?

24  A.  It depends on what you start from.  If you start from

25  core technologies, well, I use GDK, Log4j.  I can go

1    through a whole list of components that are used.  They are

2    not the core components.

3    Q.  Okay.

4    A.  The core components center in and around things like

5    your contact management, right?  They center in and around

6    the way you perform your risk assessment, the way you do

7    your pricing, the way you actually manage your product

8    definitions or your product validation or new introduction.

9           These are the sort of core systems that the

10   business thinks in terms of.

11   Q.  There was some testimony, another shifting topic, there

12   was some testimony about using the word "latency" or -- do

13   you recall that?

14   A.  I do.

15   Q.  First, latency, what is latency.

16   A.  Yeah.  There's, there's a bunch of terms that actually

17   sort of come together around latency.  Performance is

18   actually related to it, but latency is, it's very simply if

19   any of you used old analog phones, sometimes there's a lag

20   if you are calling across very long distances, right?  You

21   talk, and then you got to wait before that actually gets

22   there or gets back.

23          In the computer software world, it essentially,

24   it's a measure of the time it takes to respond.  There's

25   many factors that come into latency, though.  Performance

1    is one of the factors that comes into latency.

2    Q.  Is latency a consequence of connecting -- you used the

3    phone analogy.  Is latency the consequence of connecting

4    different computers together and they have to communicate

5    across time or space?

6    A.  There's more than three, but I'll give you three sort

7    of levels of where latency comes in.

8            Today modern Cloud computing has a lot of compute

9    distributed.  So you could process in Ohio, and you can

10   process in Raleigh, North Carolina, and you have to go

11   across the internet.  Even if it's a direct connect or a

12   secure channel, you still got to go across IT, CPIP or the

13   internet to get to it.

14           Sometimes those communications take a little bit

15   longer.  Another form of latency that gets introduced is,

16   maybe you are not communicating across, but you actually

17   communicate in your own data center.  Or you might have

18   different machines that are connected, but they're

19   connected through direct wires, so it's much faster.

20           Or it could even be in the same machine, frankly,

21   and you're still communicating between components of the

22   software.  And there's varying degrees from there, all the

23   way down to the final one which is in line.  In line

24   essentially means that you actually execute your rules or

25   your code or anything else that you are programming

1    directly in the same unit.

2            And when you when you talked about any kind of

3    coding or programming, it's all in line, unless you're

4    architecture is designed to separate that.

5    Q.  Okay.  Does the concept of latency have anything to do

6    with the use of Blaze Advisor?

7    A.  It has more to do with the architecture.  Your

8    architecture of your design is a bigger issue here.  In

9    today's modern compute world, though, we have a ton of

10   customers processing huge volumes on the Cloud, and we

11   don't have latency problems.

12           If you are in your own data center, you shouldn't

13   have latency problems.  Performance does play into that,

14   though.

15   Q.  Meaning?

16   A.  Well, the time to communicate is also the time to

17   process.  So if you have performance problems with your

18   software and it takes a long time for it to execute, you

19   will have the appearance of a latency.  Where that actual

20   delay is coming from, dependent on your architecture,

21   depends on your coding practices.  In the business world

22   space, business rules space, it gets a little confusing

23   because there's two forms of performance.

24           There's the performance of the rules.  Did I have

25   good business outcome?  And then there's the performance of

1    executing them.

2    Q.  Understood.  I'm changing topics again.

3              I'd like you to find in your book the

4    Exhibit 956.

5    A.  I have that.

6    Q.  Okay.  And you see that -- if we could publish the

7    first page.  I think there's no objection to it.

8              956 is the 2014 Chubb Corporation annual report.

9    Great.

10             You may recall Mr. Pandey saying that he had

11   never heard of Chubb & Son, a division of Federal, before

12   this lawsuit?

13   A.  I do.

14   Q.  Would you turn to page 12 of this annual report,

15   please.

16   A.  I am there.

17   Q.  Okay.  And you see that begins a listing of the

18   officers of Chubb & Son, a division of Federal?

19   A.  I do.

20   Q.  Okay.  And would you turn to page 13?

21   A.  I am there.

22   Q.  All right.  And under "officers," what's the first name

23   of officer of Chubb & Son?

24   A.  Ramesh Pandey.

25   Q.  And then if we go down that page a bit, we see a

1    listing of the officers of Federal Insurance Company.

2    A.  Yes.

3    Q.  Thank you.

4         Let me change topics again.  I'd like to

5    understand -- I'd like to understand the business model in

6    the software industry.  I'd like to -- in a way I'm going

7    back to 1996, 2002, but I'd like to understand the model,

8    the business model in the software industry.  But let's,

9    let's make it specific to Blaze Advisor and the lawsuit.

10         So when Blaze Advisor was first introduced into

11   the market and sold to the early customers, was there any

12   profit made?

13   A.  No profit.

14   Q.  All right.  Is that a common element, common aspect of

15   the software business model?

16   A.  It is very common.

17   Q.  Can you explain that for us, please?

18   A.  Yeah, and you will see this in start-up companies.

19   They're looking for investment money.  It's capital.

20   There's a number of reasons for it.

21         First of all, it takes time for you to build the

22   core software and get it to a state where it begins to

23   bring business value.

24         Once you get to that state, then you actually

25   have to take it to market and sell it, and you have to

1    establish customers with some kind of reoccurring or

2    regular revenue stream so that you can offset those

3    expenses.  And the period of time that it takes, that

4    depends on the software.

5             But it's not uncommon for it to take many years

6    before a software product actually begins to make money.

7    The good part about it is is once it does, it starts making

8    lots of money.

9    Q.  In the early years of Blaze Advisor -- well let me ask

10   you this:  How many years did Blaze Advisor lose money

11   before it turned?

12   A.  Well, we, if you count when we actually went to market

13   full, it's around nine years.

14   Q.  Before it turned?

15   A.  Before it turned a profit, yeah.

16   Q.  So 2000 launch.  Nine years brings us to 2009.

17   A.  Yeah, around there.  Maybe the end of 2008.

18   Q.  Okay.  Changing topics again.

19            We've heard a lot of language, use of words in

20   the trial.  We've heard the words "rules."  We've heard the

21   words "business rules."  Is there a distinction between

22   those?

23   A.  There is.  The concept of a rule is actually a

24   programming construct.  It's where it came out of.  Most

25   people think of it as an if then else rule.  A business

1    rule by its very nature and by its label refers to rules

2    that the business actually control or own.

3           So they're the ones that come up with it.

4    They're the ones that have to actually get it into some

5    kind of operating function.  They're the ones that have to

6    ensure that it's separating the way they intend it to be.

7    They're the ones who have to make sure it's a compliant

8    rule.

9           And so there's this connectivity between the

10   business having a care and ownership of that versus not.

11   I'll give you an example.

12           You actually want to convert a date of birth to

13   an age.  That actually constitutes a rule, not something a

14   business person is generally interested in.

15   Q.  Then now let's talk about what a business rule is in

16   contrast to that.

17   A.  They can be quite varied.  But by their pure

18   definition, they are rules that the business actually cares

19   to use to operate their business.  Very frequently those

20   rules change.  They change from pressures from a variety of

21   reasons.

22           One is compliance.  Another one would be new

23   product introduction.  Some of it might be competitive

24   pressure that they have to adjust against.  There's a lot

25   of reasons why, but in the core systems of banks and

1    insurance, those core rules actually become the

2    representation of how they do business.

3    Q.  So if we were going to try to understand the

4    significance within a company, I take it that we should be

5    asking about the business rules as opposed to their rules.

6    A.  Yes.

7    Q.  Let me change topics again.  Well, let me -- yeah, let

8    me do this first.

9            If we could get J1, please, the license

10   agreement.  There we go.  Thank you.

11           So we have on the screen, and you have the book

12   there, Mr. Waid, J1, the software license and maintenance

13   agreement between Chubb & Son, a division, and FICO, right?

14           I'd like to know, at this stage what was your

15   personal role with respect to, with respect to this license

16   agreement?

17   A.  So 2006, this would have been when the team was growing

18   to become international.  So I had international remit for

19   Blaze and other related tools products.

20           So I would have actually been involved in any

21   sort of core decisions made around pricing or material

22   changes in our contract terms or things of that nature.

23   They would have had to come to me for approval.

24   Q.  So your involvement at the management level?

25   A.  Yes.

1    Q.  And in fact were you the person who gave final approval

2    for the pricing of this license agreement?

3    A.  I don't recall that, but it would have been me, yes.

4    Q.  Okay.  And would it have been you that approved the

5    pricing for each of the amendments, Amendment one and

6    Amendment two?

7    A.  It would have required my approval, yes.

8    Q.  In 2006, and going back to the discussion we just had

9    about the -- we can take this down now for a little bit.

10            Going back to the discussion that we had about

11   the business model and the software industry and the

12   investment before turning profit, in 2006, that time frame,

13   what were FICO's discounting practices regarding Blaze

14   Advisor?

15   A.  I would use the word "aggressive."

16   Q.  Okay.  Can you build on that for us?

17   A.  Look.  2002 we just get this thing off the ground.

18   2003, there's three of us kicking around into 2004.  We're

19   look to go secure enough business to get references in the

20   industry.

21            Once you get those references and clients see

22   what you are able to accomplish with other clients, that

23   builds on itself, and you start to build a base of more

24   sales, both with the same clients or with new clients.

25            So it's not uncommon early in software to be

1    quite aggressive by discounting very low sometimes in order

2    to secure those reference accounts and secure that initial

3    business.

4    Q.  For the prospect of future business?

5    A.  Always for the prospect of future business, yes.

6    Q.  And when we look at the license agreement, we see that

7    Amendment Two was signed at the end of December of 2006.

8    A.  Yes.

9    Q.  Did that, does that timing bear on FICO motivations

10   with this product for discounting?

11   A.  At this time it did.

12   Q.  Why?

13   A.  It was -- it was our general practice to incent

14   customers to move to larger deals as quickly as possible.

15   It was our common practice at the time, if they bought an

16   initial license, to communicate to them in some form,

17   either written or go back and try to convince them, hey, if

18   you upgrade your license or if you buy more, I will credit

19   back what you've already bought 100 percent, just so you

20   buy more.

21            Those practices were quite common at that time

22   frame, yes.

23   Q.  Okay.  Can you contrast that to 2016?

24   A.  Very different.

25   Q.  And how and why?

1    A.  Our pricing model -- well, pricing model always been

2    our pricing model, but our pricing practices around

3    discount around the 2010-11, time frame, we started

4    becoming more stringent in how and where we actually

5    offered discounts.  That's reflected in the business.

6             We also changed other practices too.  Like we

7    began moving away from perpetual licenses.  The market was

8    moving away.  We were moving away.  We were moving towards

9    term licenses, which establish a reoccurring revenue base

10   for the product.

11   Q.  You mentioned standard pricing guidelines did not

12   change from that time frame.

13   A.  The pricing and how we priced did not change, no.  It's

14   the same pricing model that we had all the way back in

15   2003.

16   Q.  But discounting has changed?

17   A.  Yes.

18   Q.  And in terms of market acceptance to FICO's pricing

19   without the aggressive discounting, can you describe that?

20   A.  Yeah.  We began in the 2000 -- I said 2010, 2011 time

21   frame of sort of pulling back on the level of discounts and

22   by 2015 into '16, you know, relatively strong flat sales.

23   Going into '17 we had even more sales, 20 percent by my

24   last look of that.

25             So it was, it was a strong business at that point

1    in time.

2    Q.  Without aggressive discount?

3    A.  Without aggressive discounting, yes.

4    Q.  If we could go back to the license agreement, please.

5            You see at the top of the, at the top of the

6    license agreement in the first paragraph, if we could open

7    that up.

8    A.  Yes.

9    Q.  The software license and maintenance agreement is

10   entered into as of June 30, 2006, between Fair Isaac

11   Corporation and Chubb & Son, a division of Federal, client.

12           From your role on the business of FICO, but

13   specifically in the licensing of Blaze Advisor, what's the

14   significance, what's the business significance of defining

15   who the client is?

16   A.  It defines who you are doing business with.  It defines

17   who you are licensing the software to.

18   Q.  Okay.  And does it also -- well, a license agreement

19   is, of course, a two-way agreement, licensor/licensee.

20   A.  Yes.

21   Q.  And FICO as the licensor is bound by the terms of the

22   agreement.

23   A.  Yes.

24   Q.  And then on the licensee side, it's the client that's

25   bound by the terms of the agreement.

1    A.  Yes, the client is bound to all of the terms of the

2    agreement.

3    Q.  And the -- we've seen already that in the definition

4    of -- in Amendment One and Amendment Two, the definition of

5    "client" did not change.

6         Were you part of any discussions during that time

7    frame of Chubb & Son wanting to sign -- of any discussion

8    about the client being anybody else but Chubb & Son?

9    A.  No.

10   Q.  Going back to the basic, to the base agreement, we look

11   at the license grant in paragraph 2.1.  And there we see,

12   just as you said, the licenses is a, "hereby grants to

13   client."

14        But I'm also interested in asking your, the

15   business reasons for the fact that the license agreement

16   says it's non-transferrable, nonexclusive and a limited

17   license.

18   A.  Yeah, so first of all, software licenses are a

19   construct whereby ownership stays with FICO.  It's our IPR

20   software.  The license just gives them a right to use, and

21   there's specific conditions under that right to use.

22        This begins to outline the fact that this

23   agreement is with the client, and they cannot transfer this

24   agreement to anybody else, and it is nonexclusive, meaning

25   it is not just for them, and that there are limits framed

1    within this agreement that they must adhere to.

2    Q.  And what's the business thinking behind the phrase "for

3    internal business purposes only"?

4    A.  Yeah.  So this is an additional protection that we want

5    to make sure that the use of the license, the right to use

6    the license, is for the individual that we're licensing to,

7    in this case the client, and that it is for their internal

8    business purposes, and they can't extend or reach that use

9    of the license outside of the use just for that client.

10   Q.  Let's turn to 3.1.  This is called License

11   Restrictions.  There's a number of them, but overall,

12   what's the commercial business reason for FICO to put

13   restrictions into the license?

14   A.  They're all there to make sure that the software is

15   used in accordance with very specific constraints or

16   limitations that we place on that license grant.  There's

17   various reasons for them from a business perspective, but

18   all of it is to protect a very valuable piece of IP.

19   Q.  Being Blaze Advisor?

20   A.  In this case Blaze Advisor.

21   Q.  If we go into 3.1, we see the small Roman iv.  So it.

22   Begins, "Client represents and warrants that it and its

23   employees shall not," and then Roman, small Roman iv,

24   "disclose the Fair Isaac products to or permit use or

25   access of the Fair Isaac products by any third party or any

1    individuals other than the employees of client."

2            So let me stop at that point with "any third

3    party."

4            Why does FICO care that the Blaze Advisor

5    software cannot be disclosed used or accessed by any third

6    party?

7    A.  There's a number of reasons, two primary business

8    reasons.  We like to know who is using our software at all

9    times.  That third party could be a competitor or that

10   third party could be leaking confidential information about

11   the use of our software to a competitor.  It has happened

12   in the past, so we want very tight controls on who actually

13   gets access to that software.

14           Another business reason is also, there is a bit

15   of an integrity issue in the business here.  Third parties

16   purport themselves to be Blaze experts all the time, and we

17   do not want third parties getting access to Blaze software

18   unless we've at least had a conversation with the client

19   about that third party and any representations that they've

20   made.

21   Q.  Well then let's go to, we'll come back to 3.1, but then

22   let's go to 3.6.  And here we have a provision, Use By

23   Third party.

24           Is this an instance of what you just described

25   where the client wishes to have a third party, here ACS

1    Commercial Solutions, have access and use of Blaze Advisor

2    on behalf of the client?

3    A.  Yes.  It looks like a negotiated term whereby

4    third-party use was granted in a very specific case of ACS.

5    That conversation must have occurred.  And furthermore,

6    I'll point out here that this section holds ACS to the

7    obligations of the license grant and also the client to

8    ACS's responsibility to the license grant, which is what I

9    didn't mention yet another thing we're concerned about.

10            If the third party is going to use it, we want to

11   make sure that they're aware and they're beholding to the

12   contract terms of the license grant.

13   Q.  And you also bound the client to be responsible should

14   ACS not abide by it.

15   A.  Absolutely, because it's arm's reach for us, so yes.

16   Q.  And then the last sentence is clear saying what?

17   A.  This is basically saying you have a, you have a right

18   to use it with ACS but nobody else unless you actually come

19   back and ask for our consent.

20   Q.  You mentioned just by looking at it that this was a

21   negotiated term.  How did you, how were you able to tell

22   that?

23   A.  Well, it's easy because we don't allow ACS to use our

24   software in every one of our contracts.

25   Q.  All right.  Okay.  Dumb question.

1           Let's go back to 3.1(iv,) small Roman four,

2    "Client represents and warrants that it and its employees

3    shall not," and we read about the disclosed.  And then it

4    goes on, "permit use or access by any third party or by any

5    individual other than the employees of client."

6           From the business point of view, why is that

7    further restriction limiting, further restriction saying

8    only employees of the client?

9    A.  Well, it's very similar to the third party.  Our

10   agreement is with the client, and they are responsible for

11   making sure that the terms are agreed to and that flows

12   down through the employees of the client.  If they end up

13   giving it to somebody who is not an employee, where is the

14   terms and conditions being enforced?

15   Q.  Your further understanding of the license agreement,

16   I'd like to go to what's called Exhibit A.

17   A.  Exhibit A.

18   Q.  Exhibit A of the base document.  It's J001-011 on the,

19   our copy.

20   A.  Exhibit A of the contract.

21   Q.  Yes.  Yes.

22   A.  I am there.

23   Q.  And this Exhibit A is called Pricing and Payment.

24          And I want to ask you to explain for us some of

25   the things that are on here, including and starting with

1    Blaze Advisor Development.  And what is that as a product?

2    A.  Yeah.  So Blaze Advisor is actually broken down into

3    multiple licensing components.  The two primary components

4    of the licensing are around what we call our development

5    and our deployment licenses.

6         A development license is in the Blaze world are

7    licenses that are granted and limited to the purposes of

8    writing rules, connecting your Blaze Advisor application to

9    your systems and data and actually generating the

10   deployment that gets eventually put into the servers of the

11   client.

12        It's predominantly a technical tool, but the

13   technical tool also generates what we call rule maintenance

14   application, which is where business users can use that.

15   So it's the, it's the primary licensing component for that,

16   that development, authoring, connectivity and integration

17   work.

18   Q.  And at the outset at the original agreement in June for

19   use up to five seats, and then it goes on, "to be used

20   solely in connection with the named application."  We'll

21   get to that named application component in a bit, but what

22   does it mean for up to five seats?

23   A.  Yeah.  The, the development license is actually

24   associated with a portion of the software that actually

25   installs on a personal computer or a workstation.

1    Developers or programmers that use Blaze Advisor would have

2    that installed on their development machine where they do

3    their programming and where they do their work.  And this

4    is saying, you know, five of them.

5    Q.  Okay.  And I'm going to skip over platform for a moment

6    because it's both in development and deployment.  Let's

7    distinguish development so that we can under what

8    deployment is.

9    A.  Yeah, so the deployment license is actually referring

10   to, when you have authored your rules and tested them that

11   they are what you want them to be, you have to take those.

12          Rules and push them out into a server or some

13   processing unit somewhere.  And there's actually various

14   ways you can do that, technical ways you can do that, not

15   really relevant here, but the license to do that is that

16   run time piece that allows it to eventually go to

17   production and execute or operate, run those rules.

18   Q.  Okay.  And then in terms of the scope and quantity,

19   scope and quantity for development was five seats.  Scope

20   and quantity for deployment is named application.

21   A.  Correct.

22   Q.  And that, of course, is defined below as the CSI

23   Express.

24          Now going back to product, there's the reference

25   here platform, Java and .NET.  Would you explain what those

W. WILLIAM PAUL WAID - DIRECT

1    are?

2    A.  Yeah, they're essentially programming languages.

3    They're technology that programmers would use.  If you

4    remember, I said you could deploy.  You could actually pull

5    in the data that the client has, and you can deploy to the

6    servers.  If that data is or that server is in the .NET

7    platform or technology, you would need that particular

8    license.  If it was based on the Java technology, you would

9    need that license.

10            So -- and they are separate licenses, and in this

11   case this order form has both.

12   Q.  Okay.  And in terms of the standard pricing of, you're

13   using a FICO pricing methodology that you've been using

14   over the years, decades now, does the number of platforms

15   that are licensed impact the price?

16   A.  It does.

17   Q.  We will catch up with that issue later on, but just to

18   make that note.

19            Then the limitation --

20            We'll go down, if you will, Mr. Mayleben,

21   Definition of Named Application.

22            And I think we've seen the definition before, but

23   in terms of the permission granted to use Blaze Advisor,

24   what is the limitation of scope in this agreement?

25   A.  It's described as the CSI Express application,

1    parenthetically, which is Chubb's specialty insurance

2    underwriting and automated policy renewal application.  And

3    it's supporting systems applications excluding claims.

4    Q.  And in a general nomenclature, is this called a named

5    application license?

6    A.  It is what we call a named application license, yes.

7    Q.  Well, let's go to Amendment Two -- or I'm sorry --

8    Amendment One.

9    A.  I'm there.

10   Q.  Okay.  Our product.  We have the Blaze Advisor

11   development product, Blaze Advisor deployment product.  The

12   platform is still both, Java and .NET.  And the scope

13   quantity is now, let's do development first.  For use on up

14   to ten seats to be used solely by the Chubb specialty lines

15   division.

16          And then for development, that product, scope

17   quantity, for use solely by the Chubb specialty lines

18   division.  No other limitations, i.e. seat, or named

19   application limits apply.

20          So from your business perspective point of view,

21   can you interpret that in -- just tell us what that means.

22   A.  I think you meant deployment.

23   Q.  I -- yes, I did.

24   A.  Yeah.  The fencing around our licensing in this

25   particular case is a very specific business function.  So

1    call it specialty, specialty lines or the division of

2    specialty lines.  What it's saying is that in that division

3    and in that scope of that business type, they can use Blaze

4    Advisor for any number of applications that they wish to

5    without measure CPUs or others or limitations.

6    Q.  If it's for that division.

7    A.  For that division, yes.

8    Q.  Now when you say "they," is that the client?

9    A.  Absolutely.

10   Q.  And in your terminology this is called a divisional

11   license?

12   A.  Divisional license, yes.

13   Q.  And now let's turn to Amendment Two.

14          THE COURT:  Mr. Hinderaker, are you at a

15   convenient breaking point?

16          MR. HINDERAKER:  I surely am.

17          THE COURT:  Okay.  Members of the jury, we'll

18   take our afternoon or at least one of our afternoons

19   breaks, but I think we'll try and shorten it up if you can

20   be back in at ten minutes after 3:00.  All rise for the

21   jury.

22                    (Recess taken)

23          THE COURT:  Be seated.

24   BY MR. HINDERAKER:

25   Q.  So at the break we were just going to start talking

1    about Amendment Two.

2              Perhaps we can pull that up.

3              We mentioned already that it was signed at the

4    end of December 2006.

5              Now let's go to the table on the front of it.

6    And we see that the development product and the deployment

7    product is there, and the two platforms are still there.

8              But now let's talk about the column Scope and

9    Quantity, and here it is called enterprise-wide.  So my

10   first question to you is, Understanding this license

11   agreement, who is enterprise?

12   A.  The client.

13   Q.  Chubb & Son?

14   A.  Chubb & Son.

15   Q.  And distinguish between the scope of a divisional

16   license that was Amendment One and the scope of an

17   enterprise license for the client Chubb & Son.

18   A.  So Chubb & Son could have, and actually does have,

19   multiple divisions.  There's a specialty line, commercial

20   line, personal line.  There's finance.  There's a whole

21   bunch of other sort of scopes within Chubb & Son.

22             It is possible to actually license Blaze Advisor

23   within an organization on a smaller segment of it.

24   Ironically we call both of them enterprise license

25   agreements.  It's just what's the scope.

1    Q.  And scope defined by the client?

2    A.  The scope defined by the license grant in this case,

3    which is tied to the client.

4    Q.  Understood.  All right.  And I think you mentioned, you

5    mentioned different kinds of insurance products.  I can't

6    remember exactly the word you said, but were you speaking

7    of the different business units and different kinds of

8    insurance products?

9    A.  Yes.  And you can construct them in various ways to

10   whatever the scope of the client in license agreements like

11   this, as you saw with specialty lines, a division.

12   Q.  Right.  And in terms of the development seats, now

13   being -- now there's no limitation on development seats.

14   A.  There's no count.

15   Q.  No count.

16   A.  Yeah.  No count.

17   Q.  What's the difference between no limitation and no

18   count?

19   A.  When there are limitations in the agreement, they all

20   have to be upheld as part of the license grant.  This

21   section refers to what we call scope, which is sort of --

22   if you are talking about a box, you know, a little box, a

23   big box or like whole room.  So it's --

24          Scope is a function of many different dimensions.

25   It could be defined as in this case for the entire,

1    entirety of the client Chubb & Son.  It can be restricted

2    as it was previously to a division.  You could add other

3    restrictions to it.  They are all negotiated.

4    Q.  All right.  Is there anything in your understanding of

5    Amendment Two that changes the license restriction that we

6    looked at earlier in paragraph 3.1 being that it is only

7    the employees of the client Chubb & Son who can use Blaze

8    Advisor?

9    A.  No.

10   Q.  Stayed the same.

11   A.  Stayed the same.

12   Q.  Now, you mentioned that early at the beginning of your

13   testimony that you were the person responsible for the

14   price set for this license agreement.  And we can look at

15   the first page of Amendment Two and see pricing.

16          There was testimony earlier, and in particular

17   with Mr. Wachs, where he was using the phrase that the fee

18   was, was a net fee or the fee was one with credit given.

19   Do you recall that?

20   A.  I do.

21   Q.  And so, if you would, tell us what that means and how

22   it works.

23   A.  Yeah.  So I mentioned earlier that we were providing

24   incentives for clients to buy more.  So we had a practice

25   that if the client bought more within a 12-month period, we

1    would credit back whatever they previously paid.

2              Net fees are the fees that are due after that

3    credit is applied.  And in this particular agreement, it

4    identified the net fees as 950,000, which is the

5    incremental fee on top of the 350 that was already paid.

6    That gets you to 1.3 million.

7    Q.  Okay.  So in this instance, if we went through the

8    three stages, the first named application was, we saw

9    173,750.  The divisional, if you go to that was 350,000.

10   But the net number to the client was 350,000 minus the

11   original fee, correct?

12   A.  Yes.

13   Q.  And then if we go to the Amendment Two, where it says

14   1,300,000, the net number to the client is that 950,000,

15   because you've given credit for the earlier 350,000.

16   A.  Yeah.  And the reason for the distinction is, they've

17   already paid us that 350,000.

18   Q.  Yes.  So over the original plus one, plus two, that

19   turns out to be the full amount.

20   A.  Correct.

21   Q.  We further phrased, and I've used it plenty of times,

22   of value based pricing.  And as applied at FICO in its

23   license agreements, I'd like you to describe what that

24   means.

25   A.  Yeah.  So we attempt to actually price Blaze Advisor

1    against the value that it offers.  There are several

2    metrics that we use for doing that.  When we get to the

3    scenario here, which is an enterprise-wide, there's other

4    factors that come into play, but the primary metric we use

5    is revenues.

6    Q.  Revenues of -- what's your first data point for

7    revenues then?

8    A.  It's the revenues of the entire entity that we're

9    actually contracting with.

10   Q.  Of which the client is a part?

11   A.  Of which the client is a part, yes.

12   Q.  Okay.  Because we've heard testimony of the revenue,

13   and Mr. Wachs testified in his video of the Chubb

14   Corporation having $12.3 billion in annual revenue.

15        So if you would describe for us how that data

16   point of the whole organization then factors into the

17   pricing analysis that you apply, like in the first

18   instance, to a named application license, then to a

19   divisional and then to the enterprise of Chubb & Son.

20   A.  Well, the application license is actually based on a

21   variety of factors.  There's nine of them.  When we get to

22   the divisional license here at the 350, the way that it

23   would have been priced was to take the entire entity, all

24   12.3 billion of it.

25        And if my memory is correct, I think in the RFI

1    they said that their revenues was 3.5 billion for

2    specialty.

3    Q.  Specialty lines.

4    A.  Specialty lines.  So essentially you don't take a

5    proportion of that and say, let's say the pricing for the

6    $12.3 billion organization came out to X, and the specialty

7    lines is ██████████ of X.  We don't charge ██████████ of

8    the X.  What we do is, we try to incent the client to move

9    to a larger purchase, just like we do with the credits.  So

10   we'll take the difference between that, which in this case

11   is the three and a half billion to the 12.3.

12              And it's more of an art than it is a science.  We

13   pick anywhere ████████████████████████████ of the way

14   between, and we say that's the right price point for this

15   division.

16   Q.  And, of course, it's a matter of then negotiation

17   because the licensee as to decide as well.

18   A.  Of course it is, yes.

19   Q.  And let's say it is a different client that's much

20   smaller.  Let's say it's a client with 5 million in

21   revenue, and that license licenses Blaze Advisor.  Is it

22   the same software that goes to the $5 million client as

23   goes to a huge client?

24   A.  We have one software.

25   Q.  And the fee for the $5 million client will be same or

1     less or more?

2     A.  It will be less.

3     Q.  Because of value?

4     A.  Yes.

5     Q.  Once the license agreement is signed, does -- does FICO

6     ever revisit the original, you know, ever go to the client

7     and revisit that price?

8     A.  That depends on the circumstances.

9     Q.  Okay.  All right.  Let's just say, let's just say the

10    client is wildly successful, the client is growing

11    organically, the client makes, over time is just a much

12    bigger client, but it's all organic.

13              Does FICO try to revisit that pricing?

14    A.  We do not.

15    Q.  Well, then let's turn to paragraph 10.8.

16              Of the license agreement with Chubb & Son, as we

17    see, it's entitled No Assignment.  From your decades of

18    experience, do all of the Blaze Advisor license agreements

19    have some form of a no assignment clause?

20    A.  Yes, they all have some form of it.

21    Q.  And what is the, why in some cases is it different from

22    others?

23    A.  It can be negotiated.  At times with clients, they

24    would come back and want to change the language.  If we in

25    the odd case actually used client's paper.  We sometimes

1    negotiate it in.  So it is a negotiable term, but it is

2    still there.

3    Q.  Is it fair to say that every negotiation with every

4    client is unique to that client?

5    A.  Yeah, they are all unique.  Sometimes it gets

6    interesting.

7    Q.  What in overview, can you give us -- well, let's take

8    it in pieces.

9         The first sentence, "Neither party shall without

10   the prior written consent of the other party assign or

11   transfer this agreement or any part thereof."  So that's of

12   course it's mutual, "neither party."

13        What's the business purpose of that first

14   sentence?

15   A.  It's very simple as that bidirectionally, either party

16   has the opportunity to consent to the assignment.

17   Q.  If the licensor/licensee relationship was going to

18   change by assignment, either party gets to consent?  Is

19   that what you said?

20   A.  Yes.  That's correct.

21   Q.  Now let's -- and now let's go to the second sentence.

22        What's the reason that that's in FICO license

23   agreements?

24   A.  These contracts are all negotiated, in particular for

25   enterprise agreements, in a unique set of circumstances.

 1    There are events, such as mergers and acquisitions or

 2    reorganizations or the bringing on of portfolios, that have

 3    an impact to the circumstances under which it was

 4    originally conceived.

 5            So this section is basically saying that these

 6    events are considered an assignment and it requires

 7    consent.

 8    Q.  Okay.  And why does FICO preserve that right to itself

 9    to consent when one of those events happens?

10    A.  Well, these particular type of events in specific

11    actually materially change the basis, could materially

12    change the basis on which the license was granted and the

13    price that was set for that license.

14    Q.  And you use the word "could."  So depending on the

15    case?

16    A.  Yeah.  I mean, it could be a very small acquisition and

17    it's not material or impacting.

18    Q.  In your view, regardless of size, if there is one of

19    these events, FICO's consent is required?

20    A.  Absolutely.  We want to know about it.  We need to

21    assess that, the opportunity to assess that, and we need to

22    consent to it.  That's what this is saying.

23    Q.  So now let's be clear.  Consent to what?

24    A.  Well, these events are deemed an assignment.  That

25    means that if any one of these things happens, it is an

1   assignment, and therefore we need to consent to it.

2   Q.  And what's the outcome -- let's say you do consent,

3   what's the outcome of that?

4   A.  If we do consent, typically there's a modification to

5   the agreement so that we know who the parties are.

6   Q.  Or what the use is?

7   A.  And we memorialize that, yes.

8   Q.  Now, in this second sentence, "In the event of a change

9   of control of client or if client is merged with, acquired

10  by or acquires another entity or undergoes a reorganization

11  or otherwise acquires the right to process the business of

12  another, each such event shall be deemed to be an

13  assignment subject to this section, and the client shall

14  make no expanded use as a result of any such event."

15          So is there any -- in your understanding, the

16  license agreement is still with the client?

17  A.  Yes.

18  Q.  Now, it goes on to say, "And client shall make no

19  expanded use of the Fair Isaac product as a result of any

20  such event unless and until Fair Isaac provides such

21  written consent."

22          What's the commercial reason for that element of

23  the second sentence?

24  A.  It's an additional constraint that until consent is

25  actually made, lock it down, don't do anything with that

 1    software, lock it down.

 2    Q.  And what's, you know, so trying to understand now the

 3    time period in which, assuming the event triggering the

 4    second sentence, as you understand it from the business

 5    point of view, what's the time period in which this

 6    lockdown of the use would be in effect?

 7    A.  Well, the time period -- well, first of all, should

 8    have been notified before the event occurred.

 9    Q.  Yeah.

10    A.  But the time period is actually probably specified in

11    the contract relative to the cure period.

12    Q.  Okay.

13    A.  Typically it's 30 days.

14    Q.  Let's assume that's true.  So is that saying, within

15    30 days under the license agreement, there will be consent

16    given and going forward maybe with amended terms or consent

17    not given and the license terminated?

18    A.  Yeah.  Consent could be given, and there's some

19    paperwork to follow up on what that actually means.

20    Consent could be not given, in which case, you know, we

21    need to talk about the termination of the agreement.  New

22    sets of terms and a new agreement could actually be

23    negotiated.

24          There's a whole series of things that could

25    happen.  The point of the, the language is to make sure

1    that, you know, in mergers and acquisition there's an

2    opportunity for synergies.  This is referring to the fact

3    that you have an opportunity to grow the business just by

4    your nature of that merger and acquisition.

5              That's why you merged or acquired in the first

6    place, to grow the business.

7    Q.  So being bigger gives you opportunities to grow

8    business?

9    A.  It does.  And the point here is, you shouldn't be

10   processing any incremental business as a result of that.

11   It's lockdown until the consent is actually given and the

12   terms under which that is given.

13   Q.  And that, of course, and I guess we just said, and if

14   consent is not given, well then the license terminates.

15   A.  Yes, which is an option.

16   Q.  Is it the preferred option to FICO?

17   A.  It is not, no.  Our intention is to have long-term

18   relationships with our clients.  There is a, an incremental

19   value we get from our clients and having them happy with

20   our products.  That is actually feeding into the, strongly

21   feeding into our business strategy.

22             So, no, we seek to actually find amenable

23   outcomes in these situations.

24   Q.  Okay.  Let me just see where I'm at.  Would you go

25   to -- I think it's Exhibit 125.

```
1              And as you see -- I'll wait till it's on the
2     screen.  This is from Russ Schreiber to Natasha Fowlin, and
3     you are one of the CC recipients?
4     A.  Yes.
5     Q.  And Russ says, "Can you put 30 minutes on the calendar
6     for this group to discuss ACE's acquisition of Chubb and
7     potential licensing expansion fees?"
8              And obviously you were part of that
9     communication.
10    A.  Yes.
11    Q.  Okay.  At this point in time, did you have any
12    information about the acquisition, other than what was
13    publicly announced?
14    A.  No.
15    Q.  Nothing came, no information from Chubb & Son to you?
16    A.  No.
17    Q.  What did you understand -- well, what was your reaction
18    to -- you don't have to say what Mr. Schreiber thought, but
19    what was your reaction to him saying, "Let's discuss ACE's
20    acquisition of Chubb and potential licensing fees
21    expansion"?
22    A.  Well, I have regular calls with Russ, because he's our
23    insurance global lead, and I'm at this point in time
24    running our platform line of business.  So we speak on a
25    regular basis, and so I had become aware of the merger
```

1    announcement in October.

2              And in my last conversation with him, I asked him

3    where do we sit in actually having a conversation with

4    Chubb about the impending merger.  And his answer was, we

5    don't have one.  We don't have any contact.  So I asked

6    him, I'm like let's get Mike Sawyer on the phone.  Let's

7    figure out who do we call.  We got to know somebody at

8    Chubb who can actually address this, right?

9              This is Russ's conclusion about the licensing

10   event.  It's not an unfair conclusion.  It typically

11   happens this way that there's a license event.  But the

12   purpose of this call was actually entirely about how do we

13   reach Chubb, who do we reach at Chubb, because we need some

14   information about what's coming.

15   Q.  And then did you get any information before the

16   acquisition closed?

17   A.  I did not.  I knew that Mike went back and tried a

18   bunch of his resources, but we did not have any information

19   all the way through into January.

20   Q.  All right.  So we've seen from Mr. -- let me turn your

21   attention to Exhibit 90.  And this is Mr. Carretta's

22   January 27, 2016, letter to Joseph Wayland at Chubb

23   Limited.

24             Were you aware that -- are you aware of this

25   notice of breach letter on or about its time?

1    A.  I was.

2    Q.  Other than, other than -- I take it you -- Mr. Carretta

3    had authority to send the letter.

4    A.  He did.

5    Q.  But were you involved at all in the crafting of the

6    language of the letter?

7    A.  Not the language, no.

8    Q.  So we'll leave that to Mr. Carretta's testimony about

9    that.

10              And then if you would turn to Exhibit Number 91.

11   And now it's Andrew Hopp, Deputy General Counsel,

12   responding to Mr. Carretta, February 17, 2016.  You were

13   aware of this response, were you?

14   A.  Yes.

15   Q.  And did you read this response from Mr. Hopp?

16   A.  Yes.

17   Q.  What was your reaction to what he's saying?

18   A.  There were a couple.  The first one was, he sort of

19   missed the point that there was an event that needed our

20   consent.

21   Q.  Okay.  Agreed.  And the second one was what?

22   A.  He, he made a reference to, that the client remained

23   the same and that that was sufficient, which confused me.

24   Q.  Okay.  And you say in the second paragraph, he says,

25   "Our initial findings indicate that the applications that

1      have been utilizing the Blaze Advisor software since 2006

2      are currently running in the exact same fashion as prior to

3      the merger transaction."

4              Did that have any significance to you?

5      A.  It reassured me that he was following the contract in

6      that he was, during this period, before consent was given,

7      he was locking it down.  I'm not sure how convinced I was,

8      but it was reassuring.

9      Q.  And he also references that his IT people are in the

10     process of gathering information.  Let's stay in or around

11     this time frame of February.  Were you the -- did you

12     receive any additional, any information -- let me back up.

13             Before the letter from Mr. Carretta went out, you

14     said you had no information from Chubb & Son regarding the

15     acquisition.

16     A.  That's correct.

17     Q.  And in a reasonable time frame after February 17th, did

18     you on the business side, receive any information regarding

19     any more information that wasn't in this letter from

20     Mr. Hopp?

21     A.  No.

22     Q.  And then Mr. Carretta responded on February 22nd, and

23     we've heard his testimony.

24             And were you on the business side with respect to

25     the working with -- the authority for Mr. Carretta to send

1    Exhibit 92 out?  Did you have any?

2    A.  I'm sorry.

3    Q.  I'm sorry.  I was waiting for an answer, but you were

4    waiting for a question.

5             You okayed Mr. Carretta to send this letter out?

6    A.  Yes, I agreed.

7    Q.  All right.  I was going to ask you something about

8    this.

9             And the Carretta, the two Carretta letters are,

10   at the conclusion, encouraging business discussions with

11   Chubb & Son.  Did you share that desire?

12   A.  Absolutely.  Ten years of wonderful relationship with

13   Chubb, and they're our first foray into commercial and

14   specialty lines insurance.  They were a great reference.

15   They spoke at FICO World.  They took reference calls for

16   clients on new sales all the time, and they were great

17   people too.  They were, they were good to work with.

18   Q.  So then let's move forward to Exhibit 94.  You were

19   aware of -- the communication of course is from Tamra

20   Pawloski to Mike Sawyer, carbon copy to Russ Schreiber; and

21   then the second page of the document has a proposal

22   February 25, 2016, sent to FICO.

23             Were you aware of this response from Chubb & Son

24   at the time?

25   A.  Yes, it was sent to me.

1    Q.  Okay.  And -- well, what was your reaction and reading

2    of it?

3    A.  It's what I would call a non-starter.  That basically

4    means it cannot be accepted on its face value.

5    Q.  Why do you say that?  And give us the details for that.

6    A.  There's a number of reasons why, but let me start with

7    the most egregious one of them, which is this statement

8    here that the applications listed below, "That currently

9    utilize Blaze Advisor software, these are the same

10   applications using the software both prior to and after the

11   merger.  Under the above proposal, Chubb shall have the

12   right to change the applications utilizing Blaze software

13   at any time at its sole discretion without FICO's concept

14   so long as the named applications do not exceed 15," the

15   amount of 15.

16         We grant licenses.  Our clients don't grant

17   themselves licenses.  That's a core tenet of our license

18   agreement.  Besides that, fundamentally there's no

19   governance on that statement.  They could call anything,

20   you know, an application and say that's going here from

21   there to here, right.

22         There's no definition of it.  There's no common

23   understanding of it.  That alone completely threw the

24   proposal out of question.

25   Q.  Okay.  Did you draw a judgment whether it was a good

1    faith or bad faith proposal?

2    A.  My impression was, this was a bad faith proposal.

3    Q.  For the reasons you said or for any additional ones?

4    A.  For the reasons I just said.

5    Q.  As a consequence of receiving this proposal, did you

6    have any -- was there any reason to doubt that Blaze

7    Advisor would be used in the new larger organization now

8    called Chubb Limited now, the 30 plus billion dollar

9    organization?

10   A.  No.  The letter itself is very clear.  They want the

11   right to use the 15 applications and change them however

12   they want, whenever they want.  So it's clear that they're

13   talking about the 15 to begin with, but they're talking

14   about open door policy for anything in the future.

15   Q.  In any single Blaze Advisor application, is it possible

16   to change the functionality within that application to

17   service more business?

18   A.  The intention of the license definition and grant is

19   no.

20   Q.  Under the proposal of February 25, 2016, what's your

21   interpretation?

22   A.  That's exactly what she's asking to do.

23   Q.  If you would go to Exhibit 227.  And we see this is a

24   Chubb Corporation annual report of 2005.

25   A.  Yes.

1    Q.  And on page 22, if we go to that, we saw a similar list

2    earlier.  Here we have the list of the officers of the

3    division Chubb & Son, right?

4    A.  I'm sorry.  22 or 24?

5    Q.  Yeah, I'm on page 20 -- well, the Bates number, the

6    Exhibit Number is 0227-024.

7    A.  I'm there now.

8    Q.  Okay.  So there we have the, well the whole page is

9    bigger than on the screen, and there we have the officers

10   of Chubb & Son at that point in time.

11          And then I want to go to, I want to go to page 4

12   and just use this as a reference where we see net written

13   premiums grew 2 percent to 12.3 billion, on page 4.  It

14   would be the second full paragraph.

15   A.  Can I ask you to clarify page 4 of what?  It's the

16   Bates page 4?

17   Q.  Yeah.  So page 2 of the actual document, and at the

18   bottom it says P-0227-004.

19   A.  Thank you.  Yes, I see it now.

20   Q.  Okay.  So, so that's a reference point for the 2006

21   license agreement?

22   A.  Yes.

23   Q.  And then I think we've mentioned that that was the data

24   point used in pricing of the original license agreement in

25   2006, correct?

1    A.  It was a data point used in several pricing exercises

2    in 2006, yes.

3    Q.  Right.  Right.  But as a data point.  And then let's go

4    to 958.

5            And the front page is the Chubb Limited annual

6    report for 2016.

7    A.  Yes.

8    Q.  And let's go to page 3 of the annual report, not -- or

9    5 on the exhibit number or 3 on the report.

10   A.  Page 3.

11   Q.  Yes.

12   A.  There.

13   Q.  All right.  And here it reports that, if we can go to

14   the left-hand column, "We completed to my fellow

15   shareholders," there we go.  Right at the top, "We

16   completed the largest merger in insurance company history

17   and integrated two complementary insurance organizations,

18   ACE Limited and the Chubb Corporation, transforming

19   ourselves into the highest quality and largest

20   publicly-traded property and casualty insurance company in

21   the world."

22           And if we go to -- trying to find the reference

23   to, the reference to the size of the new organization, and

24   honestly I'm not finding it fast enough.

25           So let me simply just ask, In terms of the

1   value-based pricing of FICO and in terms of the business

2   purposes around that second sentence in paragraph 10.8,

3   what from your business point of view is the consequence of

4   Chubb & Son going from $12 billion -- going from being a

5   part of a $12 billion organization to being a part of a 30

6   plus billion dollar organization?

7   A.  That is a very significant change in circumstances.

8   Q.  And then if we go to Exhibit 95.  And this is building

9   off of or in the same time, the next day after that

10  commercial proposal of February 25th.

11          Mr. Carretta says, "The proposal was not

12  acceptable from our business and compliance teams, and I

13  confirm it is rejected."

14  A.  Yes, that's what it says.

15  Q.  And you authorized that?

16  A.  Yes.

17  Q.  And then if we go to Exhibit 103, this is

18  Mr. Carretta's notice of termination letter, which we've

19  gone through with him, the termination being effective the

20  next day.  And you --

21          Did you authorize the sending of the termination

22  letter as well?

23  A.  Yes, I agreed.

24  Q.  I would like to now change topics, and I want to talk

25  about the, I want to talk about the, what you know about

1    the third-party consultant called DWS Group, and then after

2    that I want to ask you questions about what you know about

3    the third-party consultant called AppCentrica.  We will

4    take them one at a time.

5            So if you would go to Exhibit 147A, please.

6    A.  I am there.

7    Q.  All right.  And if we can put that on the screen.  I

8    see the cursor, but -- he's having a little glitch.  Hang

9    on a second.  There we go.

10           From the first page, you see this is Federal

11   Insurance Company's Second Supplemental Answer to

12   Interrogatories 2, 3 and 4.

13           And let's look at interrogatory 2 on the next

14   page.

15           MS. GODESKY:  Mr. Hinderaker.

16           MR. HINDERAKER:  Yes.

17           MS. GODESKY:  I just want to confirm you are

18   showing 147A because it says 147.

19           MR. HINDERAKER:  It's on the screen.

20           MS. GODESKY:  Okay.

21           MR. HINDERAKER:  No.  147A.  All the blackout.

22           MS. GODESKY:  Sorry.

23           MR. HINDERAKER:  We seem to be having a

24   transmission issue.

25           All right.

1          So interrogatory number 2, if we can get that a

2    little bigger, please.

3    BY MR. HINDERAKER:

4    Q.  "Identify every person, division or entity, other than

5    employees of the division Chubb & Son, to whom Federal has

6    disclosed the FICO Blaze Advisor software after June 30,

7    2006."  And then there are those subparts.

8          Now let's go down the page to the second

9    supplemental answer.  It would be page 2 of the document.

10   I think you are on page 3.

11         Well, let me read it.  You have it in your

12   binder.

13   A.  I do.  I do.

14   Q.  The second supplemental answer, "Disclosure of the

15   Blaze Advisor software was made to at least the following:

16   One, Chubb Insurance Company of Europe SE.  Two, Chubb

17   Insurance Company of Canada, including through its

18   relationship with AppCentrica and Chubb Insurance Company

19   of Australia Limited including through its relationship

20   with DWS Group."  Do you see that?

21   A.  I do.

22   Q.  And I'm going to first go, before more questions, we'll

23   go to the interrogatory number 3, if we could get there.

24         Great.  Interrogatory number 3, and you see it

25   says, "Identify every person, division or entity, other

1  than employees of the division Chubb & Son, of which

2  Federal is aware that has used the Blaze Advisor software

3  after June 30, 2006."

4          And in terms of the interrogatory 3, the second

5  supplemental answer reads, if we go down a little bit,

6  "Chubb Insurance Company of Europe SE, Chubb Insurance

7  Company of Canada including through its relationship with

8  AppCentrica, and Chubb Insurance Company of Australia

9  Limited including through its relationship with DWS Group."

10          And it goes on to say more information about the

11  dates of the first use, which are not pertinent to my

12  questions to you now.

13          When -- this obviously was produced, was a

14  product of the lawsuit, this interrogatory.

15          When did you, when did you first become aware

16  that DWS Group was using Blaze Advisor?

17  A.  I don't know the exact day, but it was in March of

18  2016.

19  Q.  Of 2016.  And when did you become aware that

20  AppCentrica in Canada was a disclosed use and accessed

21  Blaze Advisor?

22  A.  It was during the litigation.

23  Q.  Okay.  So let's then discuss, let's then discuss your

24  knowledge about DWS.

25  A.  Okay.

1    Q.  So if you would go to Exhibit 1114.

2    A.  I'm there.

3    Q.  You are faster than me.

4         This is a message, email, Paul Swyny, if I

5    pronounce that correctly, at FICO.com.  Who is he?

6    A.  He's a client partner in Australia.  A client partner

7    is a, it's kind of a salesperson except they own accounts.

8    So they're the relationship owner of the accounts.

9    Q.  Okay.  And was Chubb Insurance Company of Australia one

10   of his accounts, did you know?

11   A.  I believe it was, yes.

12   Q.  And Russ Schreiber is on the email.  Mike Sawyer is on

13   the email, but you as well are on the email.

14   A.  Yes.

15   Q.  And so, and then with the email there's more documents

16   attached the same date, March 24, 2016, and I guess I'd

17   like to know the context in which Exhibit 1114 came to you.

18   A.  We had actually taken the activity of sort of searching

19   our records for who in Chubb and DWS was actually reaching

20   out to FICO, because it had come to our attention that

21   there was some work being done there.  The reason that

22   surfaced is because in coordination and communication of

23   our ongoing discussions with Chubb and the notice of the

24   breach, these things filter through our systems.  So when

25   that happens, we start getting notification of sort of

1    inbound events that are related.

2    Q.   Notifications to where?

3    A.   They actually called me.

4    Q.   Okay.

5    A.   Right?  So it's not formal.  It's not like triggering

6    some system somewhere.  It's like, hey, we got a call from

7    somebody that said they're working with Chubb, thought you

8    should know.

9    Q.   Okay.  And then with respect to DWS Group, did you get

10   knowledge that they were working with, the DWS Group was

11   working on Blaze Advisor?

12   A.   Yes.

13   Q.   How did you get that knowledge?

14   A.   Well, the community that we run, which community is,

15   they were like a chat board, online chat board.  It's a

16   place for clients or prospects to go and ask questions

17   about Blaze or any of our other products.  There was a chat

18   that had kicked off on that community site.

19   Q.   Okay.

20   A.   And Jeremy Chen was, he's the monitor, the person who

21   typically answers the community site.  In there he clearly

22   identified that he was working with Chubb & Son and working

23   on an existing project.

24   Q.   Well, let's go to the page that has the Bates number

25   FICO0000488 as part of this exhibit.

1      And that you were in this chain of

2   communications.  And Paul Swyny says, "We were contacted

3   out of the blue by someone claiming to be from or represent

4   Chubb in Australia and demanding help with their Blaze

5   project.  We've been as accommodating as we can and will

6   continue to support, but the chap we are in contact with is

7   challenging, to say the least."

8      And this is about the time you also were aware of

9   this happening?

10  A.  Yeah.  Actually the individual on the community site

11  was referred to reach out to our local support, and Erwan

12  is our local expert on Blaze.

13  Q.  And on the next page you were getting the report from

14  Paul Swyny.  Am I pronouncing that right?

15  A.  Swyny.

16  Q.  Swyny.  You are getting the report.  I had a chat with

17  Imran at DWS today, and I think I am now getting to the

18  bottom of what is going on here.  Chubb and Australia want

19  to evaluate a solution built by Chubb Canada, which has

20  been developed on Blaze 7.1, and they have chosen a third

21  party based in Melbourne DWS to help us get the evaluation

22  up and running.

23      Now, these communications are after, just looking

24  at the time frame, we know they're after the license

25  agreement was terminated.

1    Is that the correct context?

2    A.  No.  This was actually March 21st.

3    Q.  Okay.  I'm sorry.  Yes.

4    A.  2016.

5    Q.  So just a week before the termination.

6    A.  If I do the math, yeah, a week.

7    Q.  Yeah.  Yeah.  Sorry.

8         And with respect to the paragraph 3.14 that we

9    looked at earlier from the license agreement, "No

10   disclosure, use or access by an unauthorized third party."

11        First, did FICO ever give DWS Group authority to

12   use, access, use or access Blaze Advisor?

13   A.  Not for the purpose that he's working on here, no.  We

14   did not give any authority to DWS to use the software.

15   Q.  And is it fair you -- regardless of the purpose.  Okay.

16   You are saying because he's using it for Blaze Advisor.

17   A.  Yeah.  And he's also specifically referencing that he's

18   working with Chubb Canada activities.

19   Q.  No authority from FICO for DWS Group to be using or

20   accessing Blaze Advisor?

21   A.  That is correct.  Yes.

22   Q.  Now let's go to 1113.

23        And we should wait a minute, Your Honor, before

24   we publish it?

25        And this is Paul Swyny, April 3rd, Imran Aziz or

1    to Imran Aziz, like I said April 3, 2016.  And now this is

2    after the termination of the license agreement.

3    A.  It is.

4    Q.  Were you aware of this document on or about its date?

5    A.  I eventually became aware of it shortly after, yes.

6    Q.  Yes.  And the reason, why was it brought to your

7    attention?

8    A.  It was informing me of the fact that he was

9    communicating to DWS that we're not going to support you.

10              MR. HINDERAKER:  Your Honor, I offer

11   Exhibit 1113.

12              MS. GODESKY:  No objection.

13              THE COURT:  1113 is received.

14   BY MR. HINDERAKER:

15   Q.  And so in this communication, "Hi, Imran."  That's the

16   DWS person.  "Regarding Blaze Advisor support, I have been

17   informed by our legal department that it has notified

18   Chubb & Son that it has breached our license agreement,

19   which includes the M&S schedule."  Is that maintenance and

20   support?

21   A.  Correct.

22   Q.  "This was followed up with a termination notice last

23   week.  I suggest you check with your management team if you

24   are not aware of this development."

25              So that was FICO's position with respect to the

1    use of Blaze Advisor by DWS Group?

2    A.  Yes.

3    Q.  Then if you would go to 1116.

4         And I think we should wait on publishing this as

5    well, Your Honor.

6         Would you identify what P1116 is?

7    A.  Yeah, this is a log of a chat stream from our community

8    site that I was mentioning earlier.

9    Q.  And did you review this on or about its time regarding

10   how Blaze Advisor was being used?

11   A.  Yeah, this was the first indication that I was given.

12   Jeremy Chen called me.

13   Q.  Okay.  And this is the -- Jeremy Chen, as you

14   mentioned, the person receiving calls at the help desk.

15   A.  No, it was not help desk.  It's a community site.

16   Q.  I'm sorry.

17   A.  He's the product manager, and he's monitoring the

18   community site, so he's answering questions there.

19   Q.  Okay.  My bad.  All right.

20        And then Jeremy Chen brought this to your

21   attention?

22   A.  Yeah.  People call me about things like this all the

23   time.

24   Q.  And the first page references the fact question asked

25   by Imran Aziz at DWS.com.netAU, May -- or March 1, 2016.

1      So this was the information that you had before

2   termination?

3   A.  That -- yes.

4   Q.  And then on page 3 of 3 in this community post he is

5   saying, "There are a couple of things I have tried on Blaze

6   which are strange to me, and for them I need the answers."

7   A.  Yes.

8   Q.  And then it was following this, as we saw in the

9   earlier exhibit, that he was notified that maintenance and

10   support is not being offered.

11   A.  Yeah, this is a series of back and forth about, he's

12   essentially trying to pull in a Blaze project, and he's

13   having trouble with it, was the gist of what's in this

14   community chat.

15   Q.  Okay.  Had you ever been, had you been contacted at all

16   by Chubb & Son or Chubb Insurance of Canada or anybody

17   about permission for DWS to use and access Blaze Advisor?

18   A.  I was not.

19   Q.  Are you aware of anybody at FICO who was?

20   A.  I am not.

21   Q.  And as you said, at this time -- in fact until the

22   lawsuit you were unaware, completely unaware, that

23   AppCentrica was consulting and using Blaze Advisor on

24   behalf of Chubb Insurance Company of Canada?

25   A.  That is correct.

1    Q.  Let's go to Exhibit 0655A.  And this is Defendants'

2    Response to Plaintiff's Second Set of Requests For

3    Admissions.  This is another litigation generated document.

4              I'd like to go to the fourth page, if we can, and

5    request number 20.

6              And so the request to Federal is, "Admit that

7    Federal has disclosed the Blaze Advisor software to Chubb

8    Insurance Company of Europe SE."

9              And the response is, "Federal admits that Chubb

10   Insurance Company of Europe Se made use of Blaze Advisor

11   software," period.  And then there's legal stuff after

12   that.

13             If we looked at Request For Admission Number 21,

14   "Admit that Federal has distributed Blaze Advisor software

15   to Chubb Insurance Company of Europe," and if we looked at

16   Request For Admission 22, "Admit that Federal permitted

17   Chubb Insurance Company of Europe to access the Blaze

18   Advisor software," we'd see that the answer is identical in

19   each instance.

20             Let's look at the request number 23.

21             "Admit that Federal has disclosed the Blaze

22   Advisor software to Chubb Insurance Company of Canada," and

23   the answer is, "Federal admits that Chubb Insurance Company

24   of Canada made use of Blaze Advisor software," period.

25             And if we looked at number 24, "Admit that

1    Federal has distributed Blaze Advisor software to Chubb

2    Insurance Company of Canada."  And if we looked at number

3    25, "Admit that Federal permitted Chubb Insurance Company

4    of Canada to access the Blaze Advisor software."  The

5    answer is the same in every instance.

6              And now let me just turn you to number 26.

7    "Admit that Federal has disclosed that Blaze Advisor

8    software to Chubb Insurance Company of Australia."

9              And the answer is, admission is, "Federal admits

10   that Chubb Insurance Company of Australia Limited made use

11   of Blaze Advisor software."  If we looked at the, at

12   Request For Admission 27, "Admit that Federal has

13   distributed the Blaze Advisor software to Chubb Insurance

14   Company of Australia Limited."

15             If we looked at number 28, "Admit that Federal

16   has permitted Chubb Insurance Company of Australia to

17   access the Blaze Advisor software."  Again, in each

18   instance the answer is, "Federal admits that Chubb

19   Insurance Company of Australia made use of Blaze Advisor

20   software."

21             When did you first become aware that Blaze

22   Advisor software was used outside of the United States by

23   any company within the Chubb group of insurance companies?

24   A.  I first became aware in January of 2016.

25   Q.  And what was the context in which you became aware of

1   that?

2   A.  It was leading up to the merger event and then

3   subsequently.

4   Q.  I'm sorry.  You have to speak a little louder to the

5   mic.

6   A.  It was leading up to the merger event and subsequently

7   our sending of the breach notice that Mike Sawyer and Russ

8   Schreiber made me aware of their knowledge of that.

9   Q.  Let's go back to the, let's go back to the license

10  agreement.  And on the first page, of course, we touched

11  this base, the client is Chubb & Son, a division of

12  Federal, and always has been.

13          So let's go to Amendment Number Two, and you see

14  on the second page of Amendment Number Two it says, "For

15  the purposes of this amendment."  Right above payment you

16  can highlight that paragraph.  There we go.

17          "For the purposes of this Amendment Two, the

18  enterprise-wide license shall mean that client and its

19  affiliates may use the Fair Isaac products for their

20  internal business purposes with no limitation on the number

21  of seats or CPUs, subject to and in accordance with all of

22  the provisions of the agreement."

23          Have I read that so far?

24  A.  Yes.

25  Q.  Okay.  And as your understanding of this license

```
 1    agreement, the client is whom?

 2    A.   Chubb & Son.

 3    Q.   The division?

 4    A.   The division of Federal.

 5    Q.   Okay.  And then this Amendment Two goes on to define

 6    affiliates, does it not?

 7    A.   It does.

 8    Q.   "Affiliates shall mean any other entity directly or

 9    indirectly controlled by client, where control means the

10    ownership of more than 50 percent of the aggregate of all

11    voting interests representing the right to vote for the

12    election of directors or other managing authority in an

13    entity."

14              Have I read that right?

15    A.   Yes.

16    Q.   Is that, we have heard the reference that this is a

17    downstream only definition for affiliates.

18    A.   From the ownership clause, yes.

19    Q.   Yes.  Now let me represent to you, and it's a

20    stipulated fact, that Chubb & Son does not have any

21    affiliates.  Chubb & Son the division does not have any

22    affiliates.

23              In your commercial reading of this definition, is

24    there any other way to read the definition that to be an

25    affiliate you must be owned 50 percent by the client?
```

1    A.   No.

2    Q.   From your point of view, was the commercial purpose of

3    the license agreement as signed, with the license agreement

4    as signed, if there is, if there are no affiliates of the

5    client, does that change anything in your view regarding

6    the license agreement?

7    A.   No.

8    Q.   Why not?

9    A.   Still with the client.

10   Q.   Now, we saw in Mr. Carretta's notice of termination

11   letter that it was effective, excuse me, effective the next

12   day.  And he referenced in that letter paragraph 9.3 of the

13   license agreement.  So let's just go to that for a moment.

14             Effective termination.  We all can read it.

15   Client shall immediately cease using all Fair Isaac's

16   products and so forth.

17   A.   Yeah.

18   Q.   Okay.  And we saw from Mr. Carretta's letter that he

19   specifically pointed out that provision and the

20   consequences of not stopping use.

21             Today, as of today -- well, at any time, did you

22   receive a communication from Chubb & Son that they had

23   stopped using Blaze Advisor?

24   A.   I have not.

25   Q.   Did you ever receive a return of the documentation or a

1    certification that the documentation had been destroyed?

2    A.  I have not.

3    Q.  Let's turn to the subject matter of ACE American.  We

4    saw in earlier testimony that there's a small license

5    agreement between FICO and ACE American.  Are you generally

6    familiar with that?

7    A.  I am.

8    Q.  Does that license agreement have any, any applicability

9    to the use of Blaze Advisor by Chubb & Son, the client in

10   this agreement?

11   A.  It does not.

12   Q.  When did you first learn that ACE American Insurance

13   was using Blaze Advisor in connection with selling

14   insurance, using Blaze Advisor in the applications that

15   previously had been the ones run by Chubb & Son?

16   A.  In this lawsuit.

17   Q.  Never before?

18   A.  No.

19   Q.  So then it's obvious to say that no one from ACE

20   American ever reached out to FICO to your knowledge to try

21   to license Blaze Advisor to use in connection with selling

22   insurance?

23   A.  No.

24   Q.  I want to now turn to, I want to now turn to

25   standard -- well, I want to now turn to the experience,

1   your personal experience in the negotiation of license

2   agreements.

3   A.  Okay.

4   Q.  And I guess let's begin with personally, speaking of

5   you personally, not me.  Speaking of you personally.

6           How many negotiations of -- for Blaze Advisor

7   license fees have you been a part of?

8   A.  That would be really hard to say, but it's definitely

9   hundreds and hundreds of them.

10  Q.  And is it fair to say that you've been negotiating

11  Blaze Advisor license agreements in one form or another

12  since maybe 2002 or 2000?

13  A.  Even before that.

14  Q.  And as we noted in 2006 time frame, then you were the

15  person with final authority on pricing.  Is that still, was

16  that true still in 2016?

17  A.  Yes.  In 2016, absolutely.

18  Q.  Have you experience in negotiating agreements with

19  clients where, where the license agreement that they have

20  has come to an end, and you're negotiating with them for a

21  new license agreement?

22  A.  Yes.

23  Q.  And you've had experience where you're negotiating a

24  license agreement with someone who has never been a client

25  as well?

1    A.  Yes.

2    Q.  And you mentioned before that, well, discounting

3    practices have changed.  The guidelines for pricing really

4    have not, since 2003?

5    A.  Yeah.  The core -- the core pricing model has not

6    changed, no.

7    Q.  So I would ask you to go to Exhibit 421, please.

8    A.  I'm sorry.  You said 421?

9    Q.  421.  418.  It used to be called 421.  Now it's called

10   418.  Let's go to 418.

11            This is, as you see, Business Science Enterprise

12   Decision Management Design and Deployment, Tools and

13   Infrastructure Software Global Price List, 10/10/03.

14            I would like to first start by just understanding

15   the pricing methodology that FICO applies for the Blaze

16   Advisor licenses.

17   A.  Okay.

18   Q.  And let's begin with, with this document, and if you

19   could educate us about how to read it and how to use it.

20   A.  Okay.

21   Q.  All right?  And by the by, it's been in place since

22   2003.  Over the decades, what's the reaction, what's the

23   reaction from the marketplace to this methodology that FICO

24   applies in pricing?

25   A.  Yeah.  Ultimately the named application licensing that

1    we do in this guide became the most popular form of it.

2    Enterprise license agreements were very popular up front.

3    Today we don't sell enterprise license agreements anymore.

4    Most clients aren't interested in it.

5              But those two initially out of the gate were the

6    most popular.

7    Q.  Okay.  And as we go through this then, we will try to

8    keep that in mind that there are two flavors, the named

9    application and the enterprise, and we'll treat them,

10   excuse me, as best we can as separate things so we're not

11   getting ourselves confused, or me confused.

12             So let's go, if you would walk us through -- so

13   at the time of the notice of breach letter in 2016, these

14   are in place.  Would you walk us through how these

15   guidelines work?  Maybe we start at 2.1.1 or 2.1.2.

16   A.  Yeah, they're both related.

17   Q.  Okay.

18   A.  So in software industry there's two types of license

19   grants, generally speaking, annual or subscription and

20   perpetual.

21             Back in this time frame and for a number of years

22   following, most software, or most clients actually

23   preferred to buy perpetual licenses.  The primary

24   distinction between the two of them is, perpetual means

25   that the license continues to go on as long as the license

1    agreement terms are being upheld.

2              In the annual licensing, it's for a period of

3    time called a term.  So clients can pick that, anywhere

4    between, you know, one-year and five-year.  We don't sell

5    longer than five-year terms at this point in time.

6              And essentially the client is signing up and

7    saying, for a period of time I'm going to license the

8    software.  And that's what this is speaking to here, is

9    those two types of licenses, perpetual and annual.

10   Sometimes we use the term and annual interchangeably.  So

11   forgive me if I do that.

12   Q.  These, of course, are licenses, not purchases.

13   A.  They are licenses.  Absolutely.

14   Q.  Permissions to use.

15   A.  Permissions to use under the contract.

16   Q.  Okay.  This -- is there anything more, I mean, there's

17   other things said here.  Is there anything more of interest

18   from your point of view in describing the FICO pricing

19   methodology that comes out of 2.1.2 or 2.1.2?

20   A.  It does speak to this concept of annual maintenance and

21   support.  So I'm sure this is going to come up, so you

22   might as well cover it.

23             So there's a license to use the software, and

24   then there's a service that FICO offers called maintenance

25   and support.  And it covers two categories, general

1    categories of things.

2         One, the product continues to evolve.  We invest

3    it in.  We add new features to it.  Hopefully we don't get

4    defects, but if there are, we fix them.

5         And then we also offer support lines you heard

6    Chris Ivey talk about.  That's what he does, so you can

7    call him and ask for help, ask questions, troubleshoot

8    problems.

9         So the maintenance and support is a service.  You

10   pay for that every year.  And what this section is

11   referring to is how that maintenance is calculated.

12        In perpetual it's ███████ is what is listed

13   here.  You will see later in the section, you can't go

14   below ███████.  It's a negotiated term.

15        And on the annual maintenance, you will see here

16   that at this time it was included in the fee.  Later on we

17   had to separate them out because of our revenue accounting

18   and the way our accounting systems -- our accounting for

19   revenue actually occurs.

20   Q.  Okay.  If we move forward to 2016, was there a standard

21   maintenance percentage at that point?

22   A.  Yeah, things changed throughout the years, but in

23   February of 2015, all maintenance was standardized across

24   all products at ███████, and it was required.  You

25   couldn't get out of it.  You had to buy maintenance.

1    Q.  And by -- so we've seen testimony of Blaze Advisor

2    having different versions.  We have the copyright

3    registrations, you know, that started, 3.0 I think, and go

4    forward by many, many verges.

5          If a client wants to be updated or upgraded to

6    the next version of Blaze Advisor, is that a right the

7    client has because it pays for maintenance?

8    A.  If they are paying for maintenance and support and they

9    are current on their payments then, yes, they get access to

10   the new software.

11   Q.  Let's go to then, if it's helpful, but you're the one.

12   I'm looking at 2.2.2, Standard Order Volume Discount

13   Schedules.  Do I have that right?

14   A.  Yeah.  We don't use that.  We -- it was put into this

15   price guide as sort of a way to get clients to buy over

16   time.  Essentially, it's you buy a little bit more now, and

17   little bit later, you buy some more and buy some more.  And

18   over time, we will give you bigger discounts because you

19   buy a lot from us.

20   Q.  Excuse me for a moment.  I think I misspoke to 2.2.2,

21   but it's really 2.2.1?

22   A.  Yeah, 2.2.1.  This is our standard discount schedule

23   for a particular transaction.  So if a client is going to

24   buy software from us, depending on the amount that they're

25   going to spend, there's an allowable discount.

1    There's no requirement to discount, but there is

2    an allowable discount.  This gives our salespeople the

3    latitude to request and think in the scope of how much can

4    they actually discount the software.

5    There is authority levels on these different

6    tiers.  So individual salespeople can discount ████████

7    ██████ without asking.  They have to ask their manager to

8    go to ████████, and so on up the line.  You can see here

9    that it's capped at ████████.

10    That doesn't mean we didn't discount more than

11    ████████.  It was just not publicized, and those deals

12    that were above that have to have senior executive

13    management approval.

14    Q.  And is that discounting, what's the practices today

15    with respect to 2.2.1 or in 2016?

16    A.  Yeah.  We don't use this discount schedule anymore.  We

17    haven't use it in a long period of time.  As I mentioned

18    earlier, our discounting practices have changed

19    dramatically over the years.

20    Q.  Is there any use -- I jumped us ahead to 2.2.2.  Is

21    there useful information there in terms of understanding

22    standard pricing methodology?

23    A.  Not really.  As I was saying, this is a, this is an

24    option for discounts over time, and they are lower amounts.

25    Clients didn't really prefer this.  They actually preferred

1    negotiating each deal.  So very infrequently did we use

2    this and only early on.

3    Q.  Okay.  Well then let's go to 2.2.3, Marketing Reference

4    Client Discount.

5    A.  Yeah.  We, particularly early on as we're trying to get

6    this business off the ground, we are interested in

7    marketing attribution.  We need clients to stand up and

8    say, hey, yeah, we like this software.  It works well.

9    Create case studies and tell us about what benefits they

10   got from it, press releases, speaking engagements, anything

11   that's marketing related to sort of drum up new business.

12          The easiest way and the best way for us to get

13   business is for our clients to talk to other clients or

14   prospects about how great the software was.  So we would

15   incent clients to say, hey, look, we'll give you ███████

16   ███████  additional discount if you actually become a

17   marketing reference.

18   Q.  Is that influence in pricing true as of 2016 to the

19   same extent?

20   A.  We don't really give marketing discounts anymore.

21   That's kind of frowned upon in the industry.  It's sort of

22   like a sort of bribery thing, so we've taken that off.  We

23   still ask for marketing attribution, but we don't give

24   discounts for it, no.

25   Q.  Okay.  Well, should we move to, move to Section 7,

1    Blaze Decision Management.

2              So tell us what we need to know from 7.1, the

3    introduction.

4    A.  So at this time there was two separate products, the

5    Blaze Advisor and the Blaze Decision System.  This is a

6    holdout because FICO when they bought HNC had their own

7    sort of rules engine capability called Decision System.

8              So we had clients who were using this, and we

9    cobranded them Blaze, but they were two separate products.

10   Shortly after this, we merged those products, and anybody

11   who was a Decision System customer became a Blaze customer,

12   and all that functionality that was in Decision System

13   became available in Blaze.

14             And what you see underneath that, though is a

15   listing of options.  You have seen some of these already.

16   Q.  Mr. Waid, before we go there, let's -- no.  Stay in

17   this section, but I just want to point out at the first

18   bullet point, Blaze Advisor, which has two components that

19   are sold separately.  And here we have the guidelines

20   talking about Blaze Advisor development, and then Blaze

21   Advisor deployment.

22   A.  That's correct.

23   Q.  Okay.  I just want to tie that back to the license

24   agreement.  All right.

25             So I interrupted you.  You were going to say?

1    A.  Yeah.  I was just going to say that you will see these

2    listing of add-on options.

3           The Java code generation high speed processing,

4    you will see it referenced in here as high performance

5    option, today it's called the compile sequential option.

6    It's the same thing, but we support COBOL, Java and C

7    languages.  These are all languages that our clients might

8    want to work with in this sort of compile mode, very

9    separate from the RETE engine that I talked about.  Those

10   are two totally separate things, somewhat of a unique

11   offering for Blaze.

12          You will see reference to XML manager insurance.

13   This is a way of getting application data into Blaze.

14          Most of these, the rest of these options, the

15   scorecard, the reporting module, the rule analyst

16   automation model, the reporting module became standard in

17   Blaze.  We just added them.

18   Q.  We saw in the license agreement with Chubb & Son the

19   platform .NET as well as the platform Java?

20   A.  Yes, those are options as well.

21   Q.  Okay.  So this portion of the pricing guideline ties

22   back to that element of the license agreement.

23   A.  Yes.

24   Q.  Should we go to Section 7.3, does that make sense at

25   this point, for deployment pricing?

1    A.  Yeah.  We can talk about it.  I mean, early on we

2    offered an option to license Blaze by the size of the

3    machine, the server machine it was installed on.  So

4    servers have different sizes, and the primary metric at

5    this time for servers, before Cloud and virtual servers

6    came into being or predominantly into being, was the number

7    of CPUs and how many core processing units are on it.

8           The more there are, the faster the machine runs.

9    Basically you can install Blaze on it and run whatever you

10   want on that machine.  That was this licensing model.

11          The only place that this actually took hold was

12   the U.S. Government.  They like to buy this way.  Most

13   clients prefer the named application license price.

14   Q.  Okay.  So then let's go to that named application

15   license 7.4.

16          Can you, as it says, "Business function pricing

17   scopes the use of the deployment license to a single named

18   project or business process within a specified business

19   unit."

20          You have project size, project license fee, and

21   then other categories as you see in this, on the left-hand

22   side.

23          I'd appreciate it if you would walk us through

24   the guiding information at the top of the table and then

25   the table itself.

1     A.  Yeah.  So the, the information at the top is

2     delineating the fact that the licenses for deployment, not

3     development, are all based on the scope or size of the

4     business project in question.

5               The latter part actually refers back to how that

6     sizing actually occurs, which there was a more

7     sophisticated way of introducing sizing after 2003, but the

8     last part of this is actually coming back to some of the

9     option pricing that was included on the previous page.

10              The table and the predominant element here is

11    that the table is repeated, but you can see, as I, said

12    Blaze Advisor and Decision System were separate products at

13    this time, and they merged later.

14              But ostensibly the way that the sizing worked was

15    this concept of, you size the application into small,

16    medium large or very large.  And if it was a small, you go

17    across, your sale price was ▮▮▮▮▮▮.  If it was a medium,

18    your sale price was ▮▮▮▮▮▮.

19    Q.  And then to be clear, this is before any negotiation.

20    A.  Correct.  This would be our standard pricing.  This is

21    before anybody sat down and tried to get a better deal.

22    Q.  Okay.  I interrupted you, but did you finish?

23    A.  Yeah.

24    Q.  Okay.  And then 7.4.1, Named Application, Business

25    Function Pricing For Blaze Advisor Options.

1    A.  Yeah, this is just referring to some of the options

2    that were add-ons.

3    Q.  That we looked at on the prior page?

4    A.  Correct.

5    Q.  So we have looked at 7.4 Named Application, Pricing For

6    Deployment.  And now I guess we should turn to 7.5,

7    Enterprise Business Unit Pricing Guidelines.

8         Would you describe that for us, please?

9    A.  Yeah.  So you've already heard about the fact that we

10   have these named application licenses as one way of buying.

11   Generally speaking, as clients buy more application

12   licenses from us and they spend for money, it becomes

13   easier for them to license an enterprise-wide license.

14        This like is outlined in the contract that you

15   saw, frees up the scope, so you don't have to count how

16   many applications that you have.  It says and is restricted

17   to a scope definition.  Specialty lines business or all of,

18   you know, Chubb & Son, division of Federal, but it's the

19   broad scope.

20        There is a number of factors that come into it

21   that are listed here up front.  We do take into account how

22   many applications you are going to end up buying.  So, you

23   know, if you're a bank, you're going to end up buying lots

24   of applications from Blaze Advisor because you are going to

25   find value for it in a number of places.

1    If you are a manufacturing company, you are

2    probably not going to buy a lot of application use from

3    Blaze Advisor.  So those factors are taken into account, as

4    well as a bunch of others, but the core sort of pricing

5    mechanism is in the table.  It's relatively simple and

6    straightforward.

7    If there was a $2 billion entity that wanted to

8    license Blaze Advisor, it would be ███████.  If it was a

9    $4 billion entity, it would be ████████, and so on down

10   the line.

11   Now, this is just the fee for the deployment, and

12   it is a perpetual fee.  And this is the pricing that was in

13   place in 2003.

14   Q.  And again, this is a starting place before negotiations

15   begin.

16   A.  Correct.

17   Q.  Now let's move to 7.6 to understand development seat

18   pricing.

19   A.  So as we discussed and saw in the contract, the license

20   is split into the development seats and the deployment

21   seats.  The development seats are the users that are sort

22   of integrating Blaze and writing rules or doing some kind

23   of technical deployment of Blaze.

24   Ostensibly, and you've seen it in the contract,

25   these are typically linked to the application, or they're

1    linked to the divisional license.  You saw that reflected

2    in both of those contracts, or they're linked to in the

3    case of the enterprise.  Right?

4             And you will see here that there are different

5    configurations: ███████████████████████████████████████

6    ███████████████████████████████.

7    Q.  Can you explain how these ████████████████████████████

8    ████████████████, how do they work, and what are they

9    referencing to be, what do you look to see if something is

10   a pack?

11   A.  It's a, it's like going to the store and you want some

12   gum.  You can buy a single pack of gum or you can buy a

13   ███████████████.   ███████ individual gum packs in a package, you

14   save some money.  That's what this is doing.  It's just

15   saying if you buy ████████ at one time, we will give you a

16   little break.  If you buy ████████ at one time, I will give you

17   more of a break.  That's it.

18   Q.  And these are, do these translate in the license

19   agreement as development seats?

20   A.  They do.  They only show up in the -- this is for

21   pricing purposes --

22   Q.  Understood.

23   A.  -- for making a proposal.  They would show up in a

24   contract with a very specific scope, ██████████████████████████.

25   Q.  And is this the 7.6 Development Seat Pricing, did that

1    carry forward into the standard methodology in 2016?

2    A.  It does.  We don't really sell single dev seats

3    anymore.  We only sell packs, but, yeah, it's essentially

4    the same.

5    Q.  All right.  And can we go to 9.2.4.1.

6    A.  I am there.

7    Q.  Okay.  And, yeah, the appendix, near the bottom, 9.2.4

8    and then 9.2.4.1.

9         Blaze Advisor Deployment, and then what is this

10   describing?

11   A.  Yeah.  So when you, when you buy the software, you can

12   buy the development seats separate from the deployment

13   seat.  And you can take the development seat and start to

14   construct a Blaze project that you are going to use.

15        If you do that, what this is saying is, you have

16   270 days to use that before you must buy the deployment

17   license.  I don't know very many occasions where clients

18   only bought the development seat.  They buy the development

19   and the deployment usually together.

20        But essentially it's saying that, you know, if

21   you're developing something, you can't just use a dev seat

22   for more than 270 days.

23   Q.  So it's an option.

24   A.  Yeah.

25   Q.  Okay.

1           MR. HINDERAKER:  Your Honor, I know it's five

2    minutes before something like that.  I'm going to turn to

3    go into some other material, and I think it would be useful

4    for me to make sure I have that correct.

5           THE COURT:  Sure.  But before we do that, can I

6    ask counsel to approach previously.

7           MR. HINDERAKER:  Sure.

8                    (Sidebar discussion)

9           THE COURT:  If we were to go until you were done

10   with this, how long do you think it will take you?

11          MR. HINDERAKER:  Well, the next stage is to

12   really have him go through those slides.

13          THE COURT:  Right.  That seems fairly lengthy.

14          MR. HINDERAKER:  It can be.  And also honestly I

15   want to look at the slides and see what the edits were and

16   get -- satisfy myself that what was done was in my judgment

17   was what was supposed to be done.

18          THE COURT:  Right.  Let me ask it this way:  You

19   know, I would be willing to keep them here till 5:30 if

20   that would get us through all of this tonight, but I'm

21   frankly --

22          MR. HINDERAKER:  No.

23          THE COURT:  -- doubtful.

24          MR. HINDERAKER:  I don't think it will, and again

25   it has this risk that I'm anxious about.

```
 1              THE COURT:  Understood.
 2              Ms. Godesky, what do you know about Ms. Pawloski
 3     at this point?
 4              MS. GODESKY:  I apologies.  I put a mint in my
 5     mouth.
 6              We were trying to get ahold of her and Mr. Harkin
 7     and figure out, as we continue to prune our witness list
 8     and juggle these travel constraints, what our situation is,
 9     but we'll react within the confines we have.
10              THE COURT:  Okay.  So one way or another she'll
11     get on the stand and will testify.
12              MS. GODESKY:  I think so, although, I mean, we're
13     considering not calling her because she has some issues,
14     and we're trying to figure out what we're going to do.
15              THE COURT:  Okay.  Well, let me just say if it
16     were absolutely necessary, we would take her out of order.
17              MS. GODESKY:  Okay.  I have appreciate that.
18              THE COURT:  Okay.
19              MS. GODESKY:  Thank you.
20              THE COURT:  As long as you are here --
21              You don't have to be taking this.
22                        (On the record)
23              THE COURT:  Okay.  Members of the jury, we are
24     going to take our break for the evening.
25              I was consulting with whether we could finish
```

1    with the witness before, say, 5:30, and we're not going to

2    be able to achieve that, so we'll release you to go home

3    tonight at the usual time.

4              But Mr. Hinderaker.

5              MR. HINDERAKER:  I move the admission of

6    Plaintiff's Exhibit 1116.

7              MS. GODESKY:  And I've stated our objection.

8              THE COURT:  Understood.

9              The objection is overruled.  1116 will be

10   received.

11             And with that, we are in recess.

12             THE CLERK:  All rise for the jury.

13                       **IN OPEN COURT**

14                     **(JURY NOT PRESENT)**

15             THE COURT:  Anything further?

16             MS. GODESKY:  I just wanted to ask the court's

17   preference in terms of a directed verdict motion.

18             Our suggestion would be, if it works for the

19   court, not to lose too much time between the hours of, you

20   know, 9 to 5.  And so at the close of plaintiff's case, if

21   we have a motion, may we present it to the court at sidebar

22   and then -- we would like to argue it, if the court is

23   willing to hear us, but maybe we could do that --

24             THE COURT:  At the end of the day or --

25             MS. GODESKY:  Yes, if that works.

1       THE COURT:  Understood.  I think that would be

2   wise.  That way we don't lose the --

3       MS. GODESKY:  Right.

4       THE COURT:  -- the jury time.  So we will plan to

5   do that and assume that we'll take it up at the end of the

6   day.

7       MS. GODESKY:  Okay.  Thank you.

8       THE COURT:  Okay?  All right.

9       Anything further?

10      MS. GODESKY:  Not from us.

11      MR. HINDERAKER:  No, Your Honor.

12      THE COURT:  All right.  Thanks, everyone.  Have a

13  good night.

14      (Court adjourned at 5:01 p.m., 03-01-2023.)

15

16      We, Kristine Mousseau and Renee A. Rogge, certify

17  that the foregoing is a correct transcript from the record

18  of proceedings in the above-entitled matter.

19

20              Certified by:  /s/Kristine Mousseau
                            Kristine Mousseau, CRR-RPR
21
                            /s/Renee A. Rogge
22                          Renee A. Rogge, RMR-CRR

23

24

25